MDL 875●

BEFORE THE JUDICIAL PANEL ON MULIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | ) | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | ) | |
| | ) | |
| | ) | |
| | ) | |

MAY - 9 2008

FILED
CLERK'S OFFICE

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

*Robert Oberstar, et. al. v. CBS Corp. et. al.*, C.D. Cal., C.A. No. 2:08-118
*Ted Munn, et. al. v. Cla-Val Co., et. al.*, C.D. Cal., C.A. No. 2:08-282
*David Keleman, et. al. v. Buffalo Pumps, Inc. et. al.*, C.D. Cal., C.A. No. 2:08-712
*Larry Lindquist, et. al. v. Alfa-Laval, Inc. et. al.*, C.D. Cal., C.A. no. 2:08-873
*Robert Reaser, et. al. v. Allis Chalmers, etc., et. al.*, C.D. Cal., C.A. No. 2:08-1296

---

### DEFENDANT VIAD CORP'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Defendant Viad Corp (hereafter VIAD) submits this memorandum of law in opposition to Plaintiffs' motion to vacate the conditional transfer order (CTO-303).

### I.   INTRODUCTION.

Plaintiffs' instant motion to vacate the conditional transfer order is premised on two grounds. Plaintiffs argue: (1) there is no federal subject matter jurisdiction over any of the above referenced cases and; (2) since plaintiffs are arguably entitled to seek expedited trial settings under the California *Code of Civil*

**OFFICIAL FILE COPY**

RECEIVED
CLERK'S OFFICE

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2008 MAY -8 P 3: 49

IMAGED MAY 9 2008

PLEADING NO. 5446

*Procedure* the above referenced cases cannot be transferred to the Eastern District of Pennsylvania. Plaintiffs' motion fails on both grounds.

## II.  **ARGUMENT.**

### A.  **Plaintiffs' Motion To Vacate The Conditional Transfer Order Is Moot Because The United States District Court Has Already Denied Plaintiffs' Motion To Remand In The Matters Of *Oberstar*, *Munn*, *Keleman* and *Lindquist*.**

Plaintiffs' motions to remand have been briefed, considered, heard and denied in the matters of *Oberstar*, *Munn*, *Keleman* and *Lindquist*. (See Written Rulings attached hereto as Exhibit "A."). Plaintiffs argue there is no underlying federal jurisdiction upon which to base a transfer of this case to the Eastern District of Pennsylvania.  On the contrary, the United States District Court for the Central District of California has already denied Plaintiffs' numerous motions to remand in *Oberstar*, *Munn*, *Keleman* and *Lindquist*, where plaintiffs unsuccessfully argued that VIAD Corp had no basis to remove this case pursuant to 28 U.S.C. § 1442(a)(1), governing federal officer removals.  The Multi-District Litigation Panel should not second-guess the United States District Court for the Central District of California's denial of plaintiffs' motions to remand.

The only matter in which plaintiffs' motion to remand has not been heard by the United States District Court and denied is *Robert Reaser, et. al. v. Allis Chalmers, etc., et. al.,* C.D. Cal., C.A. No. 2:08-1296. That motion to be remand is

2

scheduled for May 12, 2008 in Department 6 of the United States District Court for the Central District of California. Though plaintiffs' motion to remand in that matter was untimely pursuant to the order of the Court, VIAD filed a timely opposition that is attached hereto and incorporated herein by reference. (attached as Exhibit "B"). Each and every argument made by plaintiffs in the instant motion to vacate the conditional transfer order ("motion to vacate the CTO"), which is tantamount to an improperly filed "motion for reconsideration", has been specifically addressed and refuted by the above referenced courts in *Oberstar*, *Munn*, *Keleman* and *Lindquist* and is fully briefed in VIAD'S opposition to plaintiffs' motion to remand in *Reaser, et. al. v. Allis Chalmers, etc., et. al.*, C.D. Cal., C.A. No. 2:08-1296.

Specifically, plaintiffs' instant motion to vacate the CTO again strains to argue that VIAD has not established a "colorable" military contractor defense because it has not produced the contracts its alleged predecessor in interest, Griscom-Russell Company (hereafter "GRC") and the United States Navy entered into. No such burden is placed on VIAD in order for it to justify federal officer removal jurisdiction.

The law does not require VIAD to produce contracts between GRC and the Navy to be entitled to litigate the merits of its military contractor defense in federal court—VIAD

has an absolute right to litigate the merits of that defense in federal court where as here the evidence shows it acted under color of a federal officer and has alleged a colorable federal defense. *See, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) ("[W]hen federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal."); *see also Arizona v. Manypenny*, 451 U.S. 232, 242, 101 S. Ct. 1657, 1664 (1981) (federal officer removal jurisdiction should not be frustrated by a narrow, grudging interpretation of section 1442(a)(1)); *Willingham v. Morgan*, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816 (1969) ("the officer need not win his case before he can have it removed"). VIAD need only show it can assert a "colorable" federal defense to satisfy the requirements of the federal officer removal statute. *Durham*, 445 F.3d at 1251 (citing *Jefferson County v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069 (1999)).

VIAD has submitted sufficient evidence to establish a colorable military contractor defense. This evidence includes the declarations of Admiral Ben J. Lehman, U.S. Navy, Ret., and Charles R. Cushing that VIAD filed in support of removal and in opposition to Plaintiffs' remand motion in *Reaser*. Multiple courts throughout the United States have found the declarations of Admiral Lehman and Dr. Cushing sufficient to support a colorable military contractor defense.

VIAD'S evidence in support of removal satisfies the standards established by the United States Supreme Court and the Ninth Circuit for federal officer removals. As the

4

Supreme Court recognized in *Willingham*, "[o]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. The officer need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407-08. If removal is allowed only where the removing party has "a clearly sustainable defense," "[t]he suit would be removed only to be dismissed." *Id.*

The issue as to whether VIAD must produce contracts between GRC and the Navy to establish its right to remove this case to federal court was squarely faced and rejected by the court in *Ballenger v. AGCO Corporation*, No. C 06-2271 CW, 2007 WL 1813821 (N.D.Cal. June 22, 2007). In considering plaintiffs' motion to remand following Todd Shipyards' removal of the action to federal court, plaintiffs contended that Todd Shipyards could not show that it acted under the direction of federal officers because it had not produced any actual contractual documentation of the work it allegedly performed on behalf of the Navy. *Id.* at *3. In rejecting this argument, the court held:

> Defendant Todd Shipyards is not required to produce contracts from decades past in order to demonstrate that it worked under the direction of federal officers; to require such documentation would frustrate the purpose of section 1442(a)(1). See, *Durham*, 445 F.3d at 1252. Admiral Horne's declaration suffices.

*Id.* The court in *Ballenger* ruled defendants were acting under the direction of a federal officer and had a colorable federal defense under *Boyle* without requiring them to produce evidence the Navy "affirmatively prohibited any kind of warning." *Id.; see, O'Connell v.*

*Foster Wheeler Energy Corp.*, — F. Supp. 2d —, 2008 WL 1722079, n. 12 (D. Mass. April 7, 2008) ("While citations to regulations or contractual provisions barring warnings would certainly be sufficient to state a colorable claim, the weight of the cases suggest that there is no strict requirement that the government 'prohibit' warnings altogether or 'dictate' the contents of the actual warnings incorporated"). (citing *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992 at 1004, n.8 (1999)); *see also Harris v. Rapid American Corp.*, 532 F. Supp. 2d 1001 at 1004-1005 (N.D. Ill. 2007) (rejecting plaintiff's argument that VIAD had not shown that Griscom-Russell acted under the direction of the Navy because it had not produced any contract or directive sent by the Navy); *Ferguson v. Lorillard Tobacco Company, Inc.* 475 F. Supp. 2d 725 at 729 (N.D. Ohio 2007) ("Given the sixty year lapse in time, Viad, contrary to plaintiff's contention, is not required to produce documents identifying the exact Naval officer who gave orders to Griscom-Russell during World War II").

Similarly, in *Oberstar v. CBS Corp.*, No. CV08-118 PA (C.D. Cal. Feb. 11, 2008), Judge Percy Anderson of the United States District Court for the Central District of California, rejected the identical argument plaintiffs are making here--that defendants including VIAD could not meet their burden to establish a colorable federal defense because they lacked evidence the Navy prohibited them from placing warnings on their products. *See Oberstar v. CBS Corp.*, No. CV08-118 PA (C.D. Cal. Feb. 11, 2008).

According to Plaintiffs, absent evidence of specific facts that defendants were prevented from placing warnings on their products, defendants cannot meet their burden to establish the availability of the military contractor defense.   Contrary to Plaintiffs' assertions, however, defendants' burden at this stage of the proceedings is not so exacting. . . . Although the Lehman Declaration may not establish the absence of a triable issue of fact with respect to the first two prongs of the *Boyle* test, as modified by *Oliver*, for a failure to warn claim, defendants need not prove so much at this preliminary stage of the proceedings. . . . Again, **to establish the propriety of their removal, defendants must only show a 'colorable' federal defense, not a winning one.** *Oberstar*, at pp. 4-5 (emphasis added). (Ex. "A").

Plaintiffs' motion to vacate the CTO also argues that removal of these actions was improper in the first place as plaintiffs' disclaimed any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party defendant committed at the direction of an officer of the United States Government. That argument has been repeatedly rejected by the Ninth Circuit and numerous other courts.   *Ballenger*, at *2.   Subject matter jurisdiction pursuant to 1442(a)(1) is based on a federal defense, regardless of whether plaintiffs' claims rest solely upon state law. *Ibid; See, Machnik v. Buffalo Pumps Inc., et al.,* 506 F.Supp.2d 99, 103 n.1 (D.Conn. 2007).  VIAD'S military contractor defense is clearly at issue since plaintiffs concede they were allegedly exposed to GRC's asbestos-containing products while serving aboard various naval ships.

7

Plaintiffs' "disclaimer" argument has been specifically addressed by several courts who have found such an argument unavailing. *see, Oberstar v. CBS Corp.*, No. CV08-118 PA, at 3 (C.D. Cal. Feb. 11, 2008) (attached as Ex. "A") ("Because removals pursuant to the federal officer removal statute are premised on the existence of a federal defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs' disclaimer nor its characterization of their claims are determinative"). (*citing Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007). *see also, Marley v. Elliot Turbomachinery Co., Inc.*, --- F.Supp.2d ---, 2008 WL 1700326 at * 6 (the Court rejects "plaintiffs' argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand.

**B.** **Plaintiffs Have Provided No Authority To Support Their Proposition That California Code of Civil Procedure Section 36 Dictates That The Conditional Transfer Order Must Be Vacated By A Federal Court.**

Plaintiffs' have provided no support for the proposition that the Judicial Panel on Multi-District Litigation is bound by California's civil procedure section governing preference in trial setting. At the outset it should be noted that plaintiffs have raised this argument previously in *Oberstar, Munn, Keleman* and *Lindquist* in their various motions to remand, all of which have been denied.

Plaintiffs' motion concedes that "[c]lassifying a law as "substantive" or "procedural" is "sometimes a challenging endeavor." *Gasperini v. Center for*

*Humanities, Inc.* 518 U.S. 415, 426 (1996). Plaintiffs then reason by analogy that as California's laws regarding the right to recover damages involve substantive law, by implication the "right to an expedited trial is clearly substantive" as well. The only support for this proposition is plaintiffs' citation to California case law ruling that collateral source and state damage limits have been held to be "substantive," with no further explanation (Plaintiffs' Motion pp. 14).

This panel is not bound by *California Code of Civil Procedure* Section 36 (hereafter CCP 36), in its ruling on the instant conditional transfer order. Plaintiffs can provide no support for the proposition that the existence of California's preference statute is grounds for vacating the instant conditional transfer order. If plaintiffs are concerned about the health of their respective clients they can utilize the mechanism set forth in the Federal Rule of Civil Procedure or applicable district rules. However, the argument that a state court civil **procedure** section provides substantive grounds for vacating a conditional transfer order cannot be persuasive in matters that were removed from state court months before plaintiffs filed and served the instant motion.

//

//

//

9

## II.   **CONCLUSION.**

Plaintiffs' motion to vacate the conditional transfer order should be denied.

The district court has denied Plaintiffs' motion to remand, validating VIAD'S

removal of this case to federal court pursuant to 28 U.S.C. § 1442(a)(1).  This case

should be transferred to the Eastern District of Pennsylvania.

DATED:  May 7, 2008                    FOLEY & MANSFIELD, PLLP

                                       By:  _Keith M Ameele_____
                                       Peter B. Langbord (CA. SBN #144319)
                                       Keith M. Ameele (CA. SBN #221927)
                                       150 S. Los Robles Ave., Suite 400
                                       Pasadena, California 91101
                                       Telephone: (626) 744-9359
                                       Facsimile: (626) 744-9359
                                       **Attorneys for Defendant**
                                       **VIAD CORP**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY – 9 2008

FILED
CLERK'S OFFICE

# PROOF OF SERVICE
[CCP, 1013A(3) CRC Rule 2006(d) - Revised 3/1/92]

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:**

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 150 S. Los Robles Avenue, Suite 400, Pasadena, California 91101.

    On **May 8, 2008**, I served the foregoing document described as: **DEFENDANT VIAD CORP'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

### See Attached Service List

☒    **(BY MAIL)** I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Los Angeles, California.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐    **(BY PERSONAL DELIVERY)** I caused each such envelope to be delivered to a courier with whom we have a direct billing account, who personally delivered each such envelope to the office of the addressee on the date last written below.

☐    **(BY FACSIMILE TRANSMISSION)**  I caused such document to be transmitted to the addressee(s) facsimile number noted above.  The facsimile machine I used complied with Rule 2003(3) and the transmission was reported as complete and without error.  Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the facsimile transmission, a copy of which is attached to this declaration.

☐    **(BY OVERNIGHT DELIVERY)** I caused such envelope(s) to be deposited in a box or other facility regularly maintained by the Federal Express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service.

Executed on **May 8, 2008**, Pasadena, California.

☒    **[STATE]** I declare under penalty of perjury under the laws of the State of California that the above is true and correct and, that I am employed in the office of a member of the bar of this court at whose direction the service was made.

☒    **[FEDERAL]** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

*Leo Valente*
Leo Valente

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2008 MAY –8  P 3: 49

RECEIVED
CLERK'S OFFICE

PANEL SERVICE LIST (Excerpted from CTO 304)
Robert Oberstar, et al. v. CBS Corp., et al., C.D. California, C.A. No. 2:08-118
Munn vs. CLA-VAL Co., et al., D.D. California, C.A. No. 2:08-282
David Kelemen, et al. v. Buffalo Pumps, Inc., et al., C.D. California, C.A. No. 2:08-712
Larry Lindquist, et al. v. Alfa Laval, In.c, et al., C.D. California, C.A. 2:08-873
Robert Reaser, et al. v. Allis-Chalmers Corp. Product Liability Trust, et al., C.D. California, C.A. No. 2:08-1296
MDL No. 875

| | | |
|---|---|---|
| Ron C. Eddins, Esq.<br>Jennifer L. Bartlett, Esq.<br>Ethan A. Horn, Esq.<br>SIMON, EDDINS &<br>GREENSTONE, LLP<br>301 E. Ocean Blvd., Suite 1950<br>Long Beach, CA 90802 | Richard C. Binzley<br>THOMPSON HINE LLP<br>127 Public Square<br>3900 Key Center<br>Cleveland, OH 44114 | Edward R. Hugo<br>BRYDON HUGO &<br>PARKER<br>135 Main Street, 20th Floor<br>San Francisco, CA 94105 |
| Edward J. Cass<br>GALLAGHER SHARP<br>FULTON & NORMAN<br>Bulkley Building, 7th Floor<br>1501 Euclid Ave.<br>Cleveland, OH 44115 | John J. Repcheck<br>MARKS O'NEILL<br>O'BRIEN &<br>COURTNEY PC<br>Gulf Tower, Suite 2600<br>707 Grant Street<br>Pittsburg, PA 15219 | Charles H. Kanter<br>PALMIERI, TYLER,<br>WIENER, WILHELM &<br>WALDRON LLP<br>2603 Main Street, East<br>Tower-Suite 1300<br>Irvine, CA 92614-4281 |
| John D. Roven<br>ROVEN-KAPLAN LLP<br>2190 North Loop West<br>Suite 410<br>Houston, TX 77018 | Adam M Chud<br>GOODWIN PROCTER<br>LLP<br>901 New York Avenue,<br>N.W.<br>Washington, DC 20001 | Reginald S. Kramer<br>OLDHAM & Dowling<br>195 South Main Street, Suite<br>300<br>Akron, OH 44308-1314 |
| David A. Damico<br>BURNS WHITE &<br>HICKTON<br>Fourth Northshore Center<br>106 Isabella Street<br>Pittsburg, PA 15212 | Richard D. Schuster<br>VORYS SATER<br>SEYMOUR & PEASE,<br>LLP<br>52 East Gay Street<br>P.O. Box 1008<br>Columbus, OH 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 | David C. Landin<br>HUNTON & WILLIAMS<br>LLP<br>Riverfront Plaza, East<br>Tower<br>951 East Byrd Street<br>Richmond, VA 23219 |
| Neil Selman<br>SELMAN BREITMAN &<br>BURGESS<br>11766 Wilshire Blvd., Sixth<br>Floor<br>Los Angeles, CA 90025 | Raymond P. Forceno<br>FORCENO GOGGIN &<br>KELLER<br>1528 Walnut Street, Suite<br>900<br>Philadelphia, PA 19102 | Robert N. Spinelli<br>KELLY JASONS<br>MCGUIRE & SPINELLI<br>Centre Square West, 15th<br>Floor<br>Philadelphia, PA 19102 |
| Ellen B. Furman<br>GOLDFEIN & HOSMER<br>1600 Market Street, 33rd Floor<br>Philadelphia, PA 19103 | Robert E. Swinckle<br>JAQUES ADMIRALTY<br>LAW FIRM PC<br>1370 Penobscot Building<br>645 Griwsold Street<br>The Maritime Asbestosis<br>Legal Clinic<br>Detroit, MI 48226-4192 | Gene Locks<br>LOCKS LAW FIRM LLC<br>1500Walnut Street<br>Philadelphia, PA 19102 |

| | | |
|---|---|---|
| Katherine Paige Gardiner<br>SEDWICK DETERT<br>MORAN & ARNOLD<br>LLP<br>One Market Plaza, Steuart<br>Tower, 8th Flr.<br>San Francisco, CA 94105 | Ronald L. Motley<br>MONTLEY RICE LLC<br>P.O. Box 1792<br>28 Bridgeside Blvd.<br>Mt. Pleasant, SC 29464 | Julia A. Gowin<br>PALMIERI, TYLER,<br>WIENER, WILHELM &<br>WALDRON LLP<br>2603 Main Street, East<br>Tower-Suite 1300<br>Irvine, CA 92614-4281 |
| Andrew J. Trevelise<br>REED SMITH LLP<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA 19103 | John S. Murray<br>WALSWORTH<br>FRANKLIN BEVINS &<br>McCALL<br>One City Blulevard West,<br>5th Floor<br>Orange, CA 92868-3604 | James K. Weston II<br>TOM RILEY LAW FIRM<br>4040 First Ave, N.E.<br>P.O. Box 998<br>Cedar Rapids, IA 52406 |
| Susan M. Hansen<br>BROWNSON & BALLOU<br>225 South Sixth Street,<br>Suite 4800<br>Minneapolis, MN 55402 | Glen R. Powell<br>GORDON & REES LLP<br>Embarcadero Center West<br>275 Battery Street, 20th Floor<br>San Francisco, CA 94111 | |

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY - 9 2008

FILED
CLERK'S OFFICE

RECEIVED
CLERK'S OFFICE
2008 MAY -8 P 3: 49
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# EXHIBIT A

**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |

| | |
|---|---|
| Title | Robert Oberstar, et al. v. CBS Corp., et al. |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| C. Kevin Reddick | Not Reported | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

| | |
|---|---|
| **Proceedings:** | IN CHAMBERS - COURT ORDER |

Before the Court is a Motion to Remand filed by plaintiffs Robert and Linda Oberstar ("Plaintiffs") (Docket No. 7). Also before the Court is a Motion to Stay originally filed in case number 08-143 PA (JWJx) by defendant General Electric Co. (Docket No. 5).[1/] Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument. The hearing calendared for February 11, 2008, is vacated, and the matters taken off calendar.

Plaintiffs allege claims for negligence, strict liability, and loss of consortium arising out of Mr. Oberstar's exposure to asbestos-containing products manufactured, fabricated, installed, or otherwise distributed by defendants. Specifically, Plaintiffs' claims assert that defendants violated their obligations imposed under state law to warn Mr. Oberstar of the dangers associated with their asbestos-containing products. Among other places, Plaintiffs allege that Mr. Oberstar was exposed to the asbestos contained in defendants' products while he served aboard the aircraft carrier U.S.S. Midway from 1959 to 1963. Plaintiffs commenced the action in Los Angeles Superior Court on December 3, 2007 and served defendants Viad Corp. ("Viad") and General Electric Co. ("GE") on December 10, 2007. Viad removed the action to this Court on January 8, 2008 and GE filed a Notice of Removal on January 9, 2008. Both Viad and GE based their Notices of Removal on 28 U.S.C. § 1442(a)(1)'s federal officer removal statute. 28 U.S.C. § 1442(a) provides, in relevant part:

> A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the

---

[1/]      Because defendants General Electric Co. and Viad Corp. filed separate Notices of Removal, there were originally two case numbers assigned to this action. Because both case numbers referred to the same case originally filed by plaintiffs in Los Angeles Superior Court, the Court consolidated the two actions into CV 08-118 PA (JWJx), dismissed CV 08-143 PA (JWJx), and directed that all future filings should reference only CV 08-118 PA (JWJx). Plaintiff also filed a Motion to Remand in CV 08-143 PA (JWJx) (Docket No. 14). That Motion will be addressed in this Order.

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |

| | |
|---|---|
| Title | Robert Oberstar, et al. v. CBS Corp., et al. |

United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442(a).

Suits against federal officers are an exception to the general rule that a case is removable only if the federal question appears on the face of a properly pleaded complaint. See Jefferson County v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." Id. "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting Jefferson County, 527 U.S. at 431, 119 S. Ct. 2075, 144 L. Ed. 2d 408 and citing Mesa v. California, 489 U.S. 121, 124-25, 131-35, 109 S. Ct. 959, 962, 965-67, 103 L. Ed. 2d 99 (1989)).

In establishing the propriety of removal under the federal officer removal statute, the defendant need not prove a valid federal defense, only a colorable defense:

In construing the colorable federal defense requirement, we have rejected a "narrow, grudging interpretation" of the statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." We therefore do not require the officer virtually to "win his case before he can have it removed."

Jefferson County, 527 U.S. at 431, 119 S. Ct. at 2075, 144 L. Ed. 2d 408 (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969)). Indeed, unlike other removal statutes, which are to be interpreted strictly, "the Supreme Court has mandated a generous interpretation of the federal officer removal statute . . . ." Durham, 445 F.3d at 1252. As the Supreme Court has held, "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 1664, 68 L. Ed. 2d 58 (1981) (quoting Willingham, 395 U.S. at 407, 89 S. Ct. at 1816, 23 L. Ed. 2d 396); see also Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 08-118 PA (JWJx)                     Date   February 11, 2008

Title      Robert Oberstar, et al. v. CBS Corp., et al.

In removing the action pursuant to the federal officer removal statute, defendants claim that they are entitled to assert the "military contractor defense." The military contractor defense shields contractors from liability for state tort law for defects in military equipment supplied to the United States when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle v. United Technologies Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 2518, 101 L. Ed. 2d 442 (1988). Although originally developed in the design defect context, the military contractor defense also applies in cases where a plaintiff alleges that the government contractor breached a state law duty to warn of potential dangers. In actions alleging a failure to warn claim against a military contractor, the supplier cannot be liable when it can show: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003-04 (7th Cir. 1996); see also In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992).

As an initial matter, Plaintiffs argue in their Motions to Remand that they have disclaimed any claim that could allow this Court to exercise jurisdiction pursuant to the federal officer removal statute. Specifically, the Complaint alleges:

> Plaintiffs hereby disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy vessels. Plaintiffs disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party Defendant committed at the direction of an officer of the United States Government.

Complaint, ¶ 4. In support of their argument that their waiver of claims prevents defendants from removing this action pursuant to § 1442(a)(1), Plaintiffs principally rely on Westbrook v. Asbestos Defendants (BHC), No. C-01-1661 VRW, 2001 WL 902642 (N.D. Cal. July 31, 2001). In Westbrook, the district court relied upon the plaintiff's disclaimer of "any claims arising out of work done on United States Navy ships" to support its conclusion that federal officer removal was not proper. Unlike in Westbrook, Plaintiffs here have not disclaimed claims against defendants arising out of exposure occurring on Navy vessels. Indeed, despite their purported disclaimer, Plaintiffs specifically seek damages from defendants for exposure to asbestos Mr. Oberstar may have come in contact with while he served on the U.S.S. Midway. Because removals pursuant to the federal officer removal statute are premised on the existence of a federal defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs' disclaimer nor its characterization of their claims are determinative. See Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007) ("Machnik's argument that the suit must be remanded because his complaint disclaimed any federal claims is unavailing . . . . Subject matter jurisdiction under § 1442(a)(1) is based upon a federal defense, regardless of whether the

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 08-118 PA (JWJx)                    Date   February 11, 2008

Title   Robert Oberstar, et al. v. CBS Corp., et al.

plaintiff's cause of action rests on state law. . . . [O]nce GE meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction."); Ballenger v. Agco Corp., No. C 06-2271 CW, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (denying motion to remand despite complaint's disclaimer of "any claim arising from any act or omission of the United State, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States").

Plaintiffs additionally argue that defendants have not met their burden to establish the existence of a valid federal defense to Plaintiffs' claims. Specifically, while conceding that defendants are "persons" within the meaning of § 1442(a)(1), Plaintiffs contend that defendants have not demonstrated that they can assert either a "colorable federal defense" or a "causal nexus" between their actions taken at the direction of a federal officer and Plaintiffs' claims. Durham, 445 F.3d at 1251. According to Plaintiffs, defendants lack the evidence to establish that federal officers prevented defendants from providing necessary warnings. As a result, according to Plaintiffs, defendants cannot prove either the applicability of the military contractor defense or the requisite causal nexus.

In their Motions to Remand, Plaintiffs state that their "complaint contains causes of action limited to state-based failure to warn claims." Motion to Remand, p. 6, ll. 8-9. Similarly, in their Reply, Plaintiffs state that they "did not necessarily sue GE or Viad for using asbestos, but rather for failing to warn of the hazards associated with it. Both GE and Viad claim they were acting under federal direction when they designed and manufactured their equipment, but such a showing is immaterial for purposes of this lawsuit and motion for remand." Reply, p. 8, ll. 4-8. According to Plaintiffs, absent evidence of specific facts that defendants were prevented from placing warnings on their products, defendants cannot meet their burden to establish the availability of the military contractor defense. Contrary to Plaintiffs' assertions, however, defendants' burden at this stage of the proceedings is not so exacting.

To establish their military contractor defense, defendants rely in large part on the declarations of Ben Lehman and Lawrence Betts. Lehman is a retired Rear Admiral, who joined the Navy in 1942 and served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944 and as Ship Superintendent at the San Francisco Naval Shipyard from 1952 to 1954. Lehman also worked as an engineer at GE from 1946 to 1948. Betts, a physician, served in the Navy from 1972 until 2001 when he retired with the rank of Captain.

Lehman's declaration indicates that during the period when the U.S.S. Midway was built and continuing during Mr. Oberstar's service in the Navy, "the Navy had complete control over every aspect of each piece of equipment used on Navy ships." Lehman Decl., ¶ 6. According to Lehman:

> Military specifications governed every characteristic of this equipment,
> including instructions and warnings. Drawings for nameplates, texts of
> instruction manuals, and every other document relating to the

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |
|---|---|---|---|

| Title | Robert Oberstar, et al. v. CBS Corp., et al. |
|---|---|

> construction, maintenance, and operation of the vessel was approved by
> the Navy. This control included the decision of what warnings should or
> should not be included. Thus, the Navy controlled the decision making
> with respect to instructions and warnings on every piece of equipment.
>
> Furthermore, the Navy had specifications as to the nature and content of
> all written material that was delivered with each piece of equipment,
> including turbines and turbine manuals. The Navy was intimately
> involved with and had final approval of all technical and engineering
> drawings, operating manuals, safety or hazard information, and any other
> written information that accompanied a piece of equipment. The Navy
> determined the nature of hazards to be subject to any precautionary
> labeling and the content of any such labeling. . . . In short, the Navy
> dictated every aspect of the design, manufacture, installation, overhaul,
> written documentation, and warnings associated with its ships and did not
> permit deviation by any of its contractors.

Lehman Decl., ¶¶ 6 & 7. In reviewing a nearly identical declaration submitted by Lehman, the court in
Nesbiet v. General Elec. Co. concluded that Lehman's Declaration raised "the inference that GE did not
provide a warning concerning the dangers of asbestos because the Navy did not permit any such
warning." 399 F. Supp. 2d 205, 208 (S.D.N.Y. 2005). Although the Lehman Declaration may not
establish the absence of a triable issue of fact with respect to the first two prongs of the Boyle test, as
modified by Oliver for a failure to warn claim, defendants need not prove so much at this preliminary
stage of the proceedings. See Oliver, 96 F.3d at 1003 (applying military contractor defense when "(1)
the government exercised its discretion and approved certain warnings; (2) the contractor provided the
warnings required by the government . . . ."). Again, to establish the propriety of their removal,
defendants must only show a "colorable" federal interest, not a winning one.

The third prong of the military contractor defense requires the contractor to have "warned the
government about dangers in the equipment's use that were known to the contractor but not to the
government." Id. at 1004. Defendants rely on the Betts Declaration to meet this third factor of the
Boyle test. Through his training and experience, Betts became familiar with "the history and practice of
the Navy occupational health program from its early days before World War II until the present time."
Betts Decl., ¶ 2. According to Betts, the "Navy's knowledge regarding the applications of asbestos and
the health effects represented the state of the art. During the period from the early 1920s to the late
1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a
marine steam turbine on United States Navy ships known by a turbine manufacturer, like General
Electric Company, that was not known by the United States and the United States Navy." Id., ¶ 30.
Based upon the Betts Declaration, defendants have provided sufficient evidence that there were no
dangers known by them that were not known by the government. See Nesbiet, 399 F. Supp. 2d at 209
("[A]ccording to Betts's affidavit, GE could not have possessed any information regarding the dangers

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |
| Title | Robert Oberstar, et al. v. CBS Corp., et al. | | |

posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.").

      The Court therefore concludes that defendants have met their burden, at this stage of the proceedings, to establish a "colorable" military contractor defense for purposes of removal under § 1442(a)(1).[2/] The Court also finds that defendants have submitted sufficient evidence of a "causal nexus" between Plaintiffs' claims and the actions defendants took at the direction of a federal officer. As did the court in Nesbiet, this Court finds that defendants' evidence "is sufficient for purposes of section 1442(a) to demonstrate that the Navy's control over warnings directly interfered with GE's duty to warn under state law. Thus, GE [and Viad] ha[ve] satisfied the 'causal nexus' requirement." Id. at 213.

      For all of the foregoing reasons, the Court finds that defendants have raised a "colorable" federal defense to the claims alleged in Plaintiffs' Complaint. As a result, defendants' removals pursuant to § 1442(a)(1) were proper. Plaintiffs' Motions to Remand are therefore denied. With respect to the Motion to Stay, GE seeks to stay this action pending the anticipated transfer of this action to the Eastern District of Pennsylvania as a potential "tag-along action" to Multidistrict Litigation Number 875. According to GE, transfer to the MDL is "imminent." Assuming this is true, GE will suffer little if any prejudice between now and the time this case is eventually is transferred to the MDL should no stay be imposed. Accordingly, the Court finds that GE has failed to establish the necessity for a stay. The Court therefore declines to stay these proceedings.

      IT IS SO ORDERED.

---

    [2/]    The Court recognizes that when faced with arguably similar evidence, other courts have reached a different result. See, e.g., Hilbert v. McDonnell Douglas Corp., No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan. 3, 2008). The Court declines to follow Hilbert because, in the Court's view, Hilbert places too high a burden on a defendant to prove its military contractor defense at such an early stage in the litigation. Given the liberality with which removals under § 1442 are to be considered, Hilbert's more exacting standard appears to conflict with Ninth Circuit precedent. See Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

**CASE NO.: CV 08-282-R**                    **Date:** April 14, 2008

**TITLE: TED MUNN and DONNA MUNN V. CLA-VAL CO., et al.**

=======================================================================

**PRESENT:**

### HON. MANUEL L. REAL, JUDGE

**William Horrell**                              **Sheri Kleeger**
**Deputy Clerk**                                 **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**

Brian Barrow                                     Thomas Moses
                                                 John Lister
                                                 Peter langbord
                                                 Brian Davis

**PROCEEDINGS:**    Plaintiff's Motion for Remand to State Court


**The Court hears arguments of counsel.**

**The Court DENIES the motion.**


5 min

**MINUTES FORM 90**                          **Initials of Deputy Clerk __WH__**
**CIVIL -- GEN**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

**CASE NO.: CV 08-712-R**                                    Date: **April 14, 2008**

TITLE: DAVID KELEMAN et al V. BUFFALO PUMPS INC; CLA-VAL CO., et al.
===============================================================================
PRESENT:

## HON. MANUEL L. REAL, JUDGE

**William Horrell**                                    **Sheri Kleeger**
Deputy Clerk                                           Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

Brian Barrow                                    John Lister
                                                Peter langbord


PROCEEDINGS:    Plaintiff's Motion for Remand to State Court


The Court hears arguments of counsel.

The Court DENIES the motion.


                                                                5 min


**MINUTES FORM 90**                    **Initials of Deputy Clerk   WH**
**CIVIL -- GEN**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

**CASE NO.: CV 08-501-R**                          **Date:** **April 14, 2008**

**TITLE: LARRY LINDQUIST et al V. CLA-VAL CO., et al.**

==========================================================================

**PRESENT:**

### HON. MANUEL L. REAL, JUDGE

**William Horrell**                                        **Sheri Kleeger**
**Deputy Clerk**                                           **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**      **ATTORNEYS PRESENT FOR DEFENDANTS:**

    **Brian Barrow**                              **John Lister**
                                  **Peter langbord**


**PROCEEDINGS:**    Plaintiff's Motion for Remand to State Court


      **The Court hears arguments of counsel.**

      **The Court DENIES the motion.**


                                                                           **5 min**


**MINUTES FORM 90**                        **Initials of Deputy Clerk __WH__**
**CIVIL -- GEN**

# EXHIBIT B

1  Peter B. Langbord, Esq., SBN 144319
   Keith M. Ameele, Esq., SBN 221927
2  **Foley & Mansfield PLLP**
   150 South Los Robles Ave., Suite 400
3  Pasadena, California 91101
   Telephone: (626) 744-9359
4  Facsimile: (626) 744-1702

5

6  Attorneys for Defendant
   **VIAD CORP**

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11
   ROBERT REASER and CHRISTINE          ) Case No. CV-08-1296-SVW (SSx)
12 REASER                               ) (Related to Case No. CV08-1441)
              Plaintiffs,               )
13                                      )
        vs.                             )
14                                      )
   ALLIS CHALMERS CORPORATION           ) **DEFENDANT VIAD CORP'S**
15 PRODUCT LIABILITY TRUST (sued        ) **OPPOSITION TO MOTION TO**
   individually and as successor-in-interest ) **REMAND TO STATE COURT;**
16 to ALLIS-CHALMERS                    ) **MEMORANDUM OF POINTS AND**
   CORPORATION;                         ) **AUTHORITIES AND AFFIDAVITS**
17 CBS CORPORATION f/k/a VIACOM         ) **OF ADMIRAL BEN J. LEHMAN, U.S.**
   INC. (sued as successor-by-merger to ) **NAVY, RET., AND CHARLES R.**
18 CBS CORPORATION f/k/a                ) **CUSHING IN SUPPORT THEREOF**
   WESTINGHOUSE ELECTRIC                )
19 CORPORATION and also as successor-   )
   in-interest to BF STURTEVANT)        )
20 CLA-VAL CO.;                         )
   FOSTER WHEELER ENERGY                )
21 CORPORATION;                         )
   GENERAL ELECTRIC COMPANY;            )
22 VIAD CORPORATION f/k/a THE           )
   DIAL CORPORATION (sued               )
23 individually and as successor-in-interest )
   to GRISCOM-RUSSELL COMPANY);         )
24 and DOES 1-450 INCLUSIVE,            ) **Date:        May 12, 2008**
                                        ) **Time:        1:30 p.m.**
25          Defendants.                 ) **Courtroom:   6**
                                        )
26 _____

27 //

28 //

   _____
   DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
   POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
   CHARLES R. CUSHING IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION..................................................................................... 2

II.   PLAINTIFFS' MOTION IS UNTIMELY................................................. 3

III.  PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE VIAD CAN
      ESTABLISH ALL OF THE ELEMENTS REQUIRED FOR FEDERAL
      OFFICER REMOVAL......................................................................... 3

      A.    STANDARD OF REVIEW. ........................................................ 3

      B.    PLAINTIFFS' "DISCLAIMER" DOES NOT DEFEAT REMOVAL
            AS SUBJECT MATTER JURISDICTION IS BASED ON A
            FEDERAL DEFENSE. ................................................................ 4

      C.    VIAD QUALIFIES AS A PERSON............................................. 6

      D.    VIAD HAS A COLORABLE FEDERAL DEFENSE. ................ 6

      E.    GRC ACTED UNDER A FEDERAL OFFICER OR AGENCY. ... 8

      F.    VIAD HAS ESTABLISHED THE CAUSAL NEXUS. ............... 8

      G.    CONTRACTS BETWEEN THE UNITED STATES NAVY AND
            VIAD'S ALLEGED PREDECESSOR ARE NOT REQUIRED TO
            JUSTIFY FEDERAL OFFICER REMOVAL JURISDICTION. ... 8

      H.    TRANSFER OF THIS MATTER TO THE MDL HAS NO BEARING
            ON THE DISPOSITION OF PLAINTIFFS' MOTION. ........... 17

IV.   CONCLUSION. ................................................................................... 19

i

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

## TABLE OF AUTHORITIES

**Cases**

Page(s)

*Amchem Prods., Inc. v. Windsor*
    521 U.S. 591, 598 (1997)...................................................................... 18

*Arizona v. Manypenny*
    451 U.S. 232, 242, 101 S. Ct. 1657, 1664 (1981) ............................... 9

*Asbestos Products Liability Litigation (No. VI)*
    771 F. Supp. 415, 418 (Jud.Pan.Mult.Lit., 1991). ............................ 18

*Ballenger v. Agco Corporation*
    2007 WL 1813821, * 2 (N.D. Cal. 2007) ............................... passim

*Boyle v. United Technologies Corp.*
    487 U.S. 500, 512 (1988)........................................... 6, 7, 13, 14

*Contois v. Able Industries Inc.*
    523 F. Supp. 2d 155 at 164, n.1 (D. Conn 2007.) ........................... 17

*Durham v. Lockheed Martin Corporation*
    445 F.3d 1247, 1251 (9th Cir. 2006) ................................... passim

*Ferguson v. Lorillard Tobacco Company, Inc.*
    475 F.Supp.2d 725, 729 (N.D. Ohio 2007) ........................... passim

*Fung v. Abex Corp.*
    816 F.Supp. 569, 572 (N.D.Cal. 1992)................................. 6, 8

*Gaus v. Miles, Inc.*
    980 F.2d 564, 566 (9th Cir. 1992). ...................................... 3

*Grispo v. Eagle-Picher Indus., Inc.*
    897 F.2d 626, 629 (2d Cir. 1990). ........................................ 6

*Harris v. Rapid American Corp.*
    532 F.Supp.2d 1001 (N.D. Ill. 2007)................................... passim

*Hilbert v. McDonnell Douglas Corp.*
    No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan 3, 2008),.......................... 14

*Jefferson County v. Acker*
    527 U.S. 423, 431, 119 S. Ct. 2069 (1999) ............................... 9

*Keleman et al. v. Buffalo Pumps, Inc.*
    No. CV-08-712-R (C.D. Cal. April 14, 2008).................................. 11

*Lindquist et. al. v. Cla-Val Co., et .al.*
    No. CV-08-501-R (C.D. Cal. April 14, 2008)................................. 11

*In re: Maine Asbestos Cases*
    44 F. Supp.2d 368, 374 n.2 (D.Me. 1999)................................. 17

## TABLE OF AUTHORITIES (cont)

*Machnik v. Buffalo Pumps Inc., et al.*
    506 F.Supp.2d 99, 103 n.1 (D.Conn. 2007)............................................ passim

*Marley v. Elliot Turbomachinery Co., Inc.*
    --- F.Supp.2d ---, 2008 WL 1700326 at * 6........................................ 5, 10, 15

*Mesa v. California*
    489 U.S. 121, 128 (1989) ........................................................... 15, 16

*Munn et. al. v. Cla-Val Co., et. al.*
    No. CV-08-282-R (C.D. Cal. April 14, 2008) ..................................... 11

*Nesbiet v. General Elec. Co.*
    399 F.Supp.2d 205, 210-11 (S.D.N.Y. 2005)............................... 10, 15, 16

*O'Connell v. Foster Wheeler Energy Corp.*
    --- F. Supp. 2d ---, 2008 WL 1722079, n. 12................................... 5, 13

*Oliver v. Oshkosh Truck Corp.*
    96 F.3d  992 at 1004, n.8 (1999) ................................................ 13, 14

*Oberstar v. CBS Corp.*
    No. CV08-118 PA, at 5 (C.D. Cal. Feb. 11, 2008).................. 5, 10, 13, 14, 16

*Westbrook v. Asbestos Defendants*
    2001 WL 902642 (N.D.Cal. 2001) ................................................ 5

*Willingham v. Morgan*
    395 U.S. 402, 407, 89 S. Ct. 1813, 1816 (1969)............................... 9, 12

*Wright v. A.W. Chesterton Company, Inc.*
    No. C07-05403, 2008 WL 512728 (N.D. Cal. Feb. 25, 2008), ..................... 14, 16


**Statutes**

28 U.S.C. § 1442(a)(1). ...................................................... 3, 4, 9, 18

28 U.S.C. § 1407(a). ......................................................... 18


**Other Authorities**

Selective Training and Service Act of 1940
    Pub. L. No. 783, § 9, 54 Stat. 885, 892-93 (1940) ............................. 12

Report of the Judicial Conference Ad Hoc Committee on Asbestos Litig.
    at pp. 2-3 (Mar. 1991)).......................................................... 18

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION.

On January 25, 2008 Plaintiffs' filed suit in the Los Angeles County Superior Court against several defendants, including Viad Corp ("VIAD"). Plaintiffs' allege that on or about December 13, 2007 Robert Reaser, who served as a fireman and pipefitter on the U.S.S. Shea ("Shea") from 1951-1956, was diagnosed with mesothelioma allegedly caused by his exposure to asbestos while working with or around equipment allegedly manufactured by VIAD'S alleged predecessor-in-interest, Griscom-Russell Company ("GRC").   (Motion, 1:2-9). Though not stated in plaintiffs' motion to remand, Plaintiffs' complaint also alleges exposure while working on the *U.S.S. Boston*, *U.S.S. Providence* and *U.S.S. Wilkinson* in the capacity of damage control, third and second classes, from 1951 to 1964.

On February 8, 2008 VIAD filed an answer to plaintiffs' complaint, generally denying all of plaintiffs' allegations and asserting several affirmative defenses, including immunity from suit based upon the military contractor defense. (See, Viad's Notice of Removal, Ex. "A", 1:22-2:2;4:5-11.)

On February 26, 2008 VIAD removed the case to this Court.  Plaintiffs have subsequently filed a motion with this Court seeking an order remanding the action back to state court.

Plaintiffs' motion should be denied as it is untimely. On March 11, 2008 this Court issued its "Order Re: Status Conference" setting a status conference date of April 14, 2008. This Court provided that if a motion for remand was being sought it must be filed no later then fourteen (14) days before the date set for the status conference in the instant matter. (Order Re: Status Conf. pp.3 ll.17-23). Accordingly, plaintiffs had until April 1, 2008 to file a motion for remand. Plaintiffs' motion was not filed until April 14, 2008, nearly two ("2") weeks after

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

1   the date so ordered by this Court. Accordingly, this Court should deny the instant

2   motion for non-compliance with clearly established Court orders.

3        Putting aside the untimeliness of the instant motion, plaintiffs' motion

4   should be denied because VIAD can comprehensively show, through the

5   declarations of Admiral Lehman and Dr. Cushing, that subject matter jurisdiction

6   is proper pursuant to federal officer removal.

7   **II.   PLAINTIFFS' MOTION IS UNTIMELY.**

8        This Court's "Order Re: Status Conference" clearly states that, "[i]f this case

9   was removed from state court and if plaintiff wants to seek a remand, plaintiff's

10   counsel should file an Ex Parte Application for Remand not later than fourteen (14)

11   days prior to the conference." (Order Re: Status Conf. pp.3 ll.17-23). Based on the

12   April 14, 2008 status conference date set by this Court, plaintiffs' motion had to be

13   filed by way of ex-parte application no later then April 1, 2008.

14        Here, no motion was forthcoming until April 14, 2008, nearly two ("2")

15   weeks after the date so ordered by this Court. This Court should deny Plaintiffs'

16   motion for non-conformance with Court orders.

17   **III.   PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE VIAD**

18   **CAN ESTABLISH ALL OF THE ELEMENTS REQUIRED FOR**

19   **FEDERAL OFFICER REMOVAL.**

20   **A.   STANDARD OF REVIEW.**

21        Plaintiffs' motion for remand effectively forces VIAD, as the party who

22   invoked this Court's removal jurisdiction, to prove by a preponderance of the

23   evidence whatever is necessary to support removal. *Gaus v. Miles, Inc.*, 980 F.2d

24   564, 566 (9th Cir. 1992).

25        On February 26, 2008 VIAD removed this case to this Court pursuant to the

26   federal officer removal statute, 28 U.S.C. section 1442 (a)(1), which allows

27   removal of the case from state to federal court if the defendant is the United States

28   or any agency thereof or any officer (or any person acting under that officer) of the

3

1   United States or of any agency thereof, sued in an official or individual capacity

2   for any act under color of such office. *Ballenger v. Agco Corporation*, 2007 WL

3   1813821, * 2 (N.D. Cal. 2007) (attached hereto as Ex. "B"); *Durham v. Lockheed*

4   *Martin Corporation*, 445 F.3d 1247, 1251 (9th Cir. 2006); *Ferguson v. Lorillard*

5   *Tobacco Company, Inc.*, 475 F.Supp.2d 725, 729 (N.D. Ohio 2007).

6        To remove plaintiffs' state court action pursuant to section 1442 (a)(1),

7   VIAD must establish that (1) it is a "person" within the meaning of the statute; (2)

8   it has a colorable federal defense; (3) GRC acted under the direction of a federal

9   agency or officer; and (4) there is a causal nexus between the claims asserted by

10  plaintiffs and GRC's conduct performed under the color of federal office.

11  *Durham*, 445 F.3d at 1251.

12       Contrary to plaintiffs' characterization of VIAD'S burden (Motion, 2:19-27)

13  and unlike removal under 28 U.S.C. section 1441, <u>both Congress and the United</u>

14  <u>States Supreme Court have mandated that this Court interpret section 1442(a)(1)</u>

15  <u>broadly in favor of removal.</u>  *Durham*, 445 F.3d at 1252-1253; *Ballenger* at *2

16  (emphasis added).   Plaintiffs' contention that VIAD bears "a special burden,"

17  citing Tenth Circuit authority (Motion, 2:19-27), is not followed by the Ninth

18  Circuit. As now Chief Ninth Circuit Judge Kozinski stated in *Durham*, "<u>removal is</u>

19  <u>absolute for conduct performed under color of federal office....</u>" *Durham*, 445

20  F.3d at 1252 (emphasis added).

21       **B.   PLAINTIFFS' "DISCLAIMER" DOES NOT DEFEAT REMOVAL**
22              **AS SUBJECT MATTER JURISDICTION IS BASED ON A**
23              **FEDERAL DEFENSE.**

24       Plaintiffs' contention that removal is improper because they disclaim any

25  "cause of action or recovery for injuries arising out of 'any cause of action of

26  recovery for any injuries resulting from exposure to asbestos dust caused by any

27  acts or omissions of a party defendant committed at the direction of an officer of

28  the United States Government'" (Motion, 3:14-21) has been rejected by the Ninth

4

1   Circuit.  *Ballenger*, at *2.  Subject matter jurisdiction pursuant to 1442(a)(1) is

2   based on a federal defense, regardless of whether plaintiffs' claims rest solely upon

3   state law.  *Ibid; See, Machnik v. Buffalo Pumps Inc., et al.*, 506 F.Supp.2d 99, 103

4   n.1 (D.Conn. 2007).  VIAD'S military contractor defense is clearly at issue since

5   plaintiffs admit Mr. Reaser's was allegedly exposed to GRC's asbestos-containing

6   products while serving aboard the *Shea* from 1951-1956. (Motion, 1:2-9).

7       Plaintiffs' "disclaimer" argument has been specifically addressed by several

8   courts who have found such an argument unavailing. *see, Oberstar v. CBS Corp.*, No.

9   CV08-118 PA, at 3 (C.D. Cal. Feb. 11, 2008) (attached as Ex. "C") ("Because removals

10   pursuant to the federal officer removal statute are premised on the existence of a federal

11   defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs'

12   disclaimer nor its characterization of their claims are determinative"). (*citing Machnik v.*

13   *Buffalo Pumps Inc.*, 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007). *see also, Marley v.*

14   *Elliot Turbomachinery Co., Inc.*, --- F.Supp.2d ---, 2008 WL 1700326 at * 6

15   (attached as Ex. "D") (the Court rejects "plaintiffs' argument that the disclaimer of

16   any claim arising from an act or omission compelled by the Navy warrants

17   remand"); *O'Connell v. Foster Wheeler Energy Corp.*, --- F. Supp. 2d ---, 2008 WL

18   1722079, n. 12 (D. Mass. April 7, 2008) (attached as Ex. "E") ("O'Connell has expressly

19   waived any claim based on defective design and 'any cause of action or recovery for any

20   injuries resulting from exposure to asbestos dust caused by acts or omissions of a party

21   committed at the direction of an officer of the United States Government'. In O'Connell's

22   view, this disclaimer eliminates federal subject matter jurisdiction, including any that

23   would attach under FORS. <u>This is not the law. The removal statute creates an exception to</u>

24   <u>the well pleaded complaint rule</u>"). (emphasis added).

25       Lastly, plaintiffs' citation to *Westbrook v. Asbestos Defendants,* 2001 WL

26   902642 (N.D.Cal. 2001) is inapposite since plaintiffs in *Westbrook* disclaimed any

27   cause of action for damages for any exposure on naval vessels. *Id.* at * 2.

28

### C.   VIAD QUALIFIES AS A PERSON.

As a corporation, VIAD meets the preliminary requirement that the removing party is a person within the meaning of the statute. *Fung v. Abex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992).

### D.   VIAD HAS A COLORABLE FEDERAL DEFENSE.

VIAD, as the alleged successor-in-interest to GRC, has a federal defense to plaintiffs' action, namely government contractor immunity from liability for injuries arising from any exposure to asbestos from equipment GRC manufactured pursuant to contracts with the United States Navy.  See, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988).  The elements of this defense include (1) the United States approved reasonable precise specifications; (2) the equipment conformed to those specifications for the military equipment supplied by GRC; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States. *Id.* at * 512.

At this preliminary stage of the litigation, VIAD need not prove that its military contractor defense will ultimately be meritorious, instead it need only show that it be "colorable" to justify removal. *Ballenger*, at *4.

In a failure to warn case, VIAD must establish that whatever warnings accompanied a product resulted from a determination from a government official and thus the government itself dictated the content of the warning meant to accompany the product.  *Grispo v. Eagle-Picher Indus., Inc.*, 897 F.2d 626, 629 (2d Cir. 1990).

To establish reasonably precise specifications, VIAD must show that the United States Navy actively participated in creating the specifications for the products and warning labels GRC allegedly supplied, and that the government imposed those specifications on GRC.  *Machnik*, 506 F.Supp.2d at, 103.  VIAD clearly satisfies this burden through the declarations of Admiral Lehman and Dr.

6

1   Cushing, both of whom testify that the United States Navy exercised complete
2   control over every aspect of all equipment supplied by contractors including
3   warnings, and that any materials or equipment supplied that was inconsistent with
4   the Navy specifications would have been rejected. (Lehman Dec., 3:20- 4:19;
5   Cushing Dec., Para. 10.)

6        As to the second element of the military contractor defense, VIAD must
7   show that the products GRC supplied to the Unites States conformed to Navy
8   specifications.  In other words, VIAD must demonstrate that the Navy received
9   exactly what it sought.  Based upon the declarations of Admiral Lehman and Dr.
10  Cushing, any materials supplied by a contractor that were not entirely consistent
11  with the Navy's extensive specifications would have been rejected.  Thus, if Mr.
12  Reaser was allegedly exposed to asbestos fibers while working with or around
13  GRC's distilling plants and oil heaters while aboard the *Shea*, that equipment had
14  to fully comply with the Navy's detailed specifications concerning both design and
15  warnings since, according to both Admiral Lehman and Dr. Cushing, the Navy
16  dictated every aspect of the design, manufacture, installation, overhaul, written
17  documentation and warnings associated with its ships and did not permit any
18  deviation by any of its contractors. (Lehman Dec., 3:20-4:19; Cushing Dec., para.
19  10-11.)

20       As to the third prong of the military contractor defense, VIAD must show
21  that at the time of Mr. Reaser's alleged exposure to asbestos fibers, GRC did not
22  fail to warn the United States Navy of any dangers associated with asbestos that
23  were known to GRC but not to the Navy.  *Boyle*, 487 U.S. at 512.  Based upon the
24  declaration of Admiral Lehman (8:14-18), the Navy was fully aware of the health
25  hazards associated with the use of asbestos and the Navy, as opposed to military
26  contractors such as GRC, was in the best position to know of those health hazards.
27  //
28  //

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

1       **E.    GRC ACTED UNDER A FEDERAL OFFICER OR AGENCY.**

2       To meet this requirement VIAD must show that the United States Navy

3 controlled the warnings GRC could provide for its products and that this control

4 prevented GRC from fulfilling its alleged state law duty to warn of the hazards

5 related to exposure to asbestos fibers. *Fung*, 816 F.Supp. 572; *Ballenger*, at * 3.

6 As shown above, Admiral Lehman and Dr. Cushing's declarations make clear that

7 the Navy's specifications precluded GRC from including warnings with the

8 equipment it supplied. (Lehman Dec., 9:14-18; Cushing Dec., paras.10-14.)  Thus,

9 GRC could not provide warnings about asbestos because it was acting under the

10 direction of the United States Navy.

11       **F.    VIAD HAS ESTABLISHED THE CAUSAL NEXUS.**

12       This final prong requires VIAD to demonstrate a causal nexus between the

13 claims plaintiffs assert and the acts GRC allegedly performed under color of

14 federal office. *Ballenger*, at * 4.  In other words, VIAD must show that the United

15 States Navy controlled which warnings GRC was allowed to provide. *Machnik*,

16 506 F.Supp.2d at * 104.  As discussed above, Admiral Lehman and Dr. Cushing's

17 declarations state that contractors supplying equipment to the Unites States Navy

18 were required to fully comply with all of the detailed specifications set by the

19 United States Navy, including warnings.  Thus, the inference is clear that GRC

20 could not include any warnings on its equipment.

21       **G.    CONTRACTS BETWEEN THE UNITED STATES NAVY AND**
22                 **VIAD'S ALLEGED PREDECESSOR ARE NOT REQUIRED TO**
                  **JUSTIFY FEDERAL OFFICER REMOVAL JURISDICTION.**
23

24       Plaintiffs' motion strains to argue that VIAD has not established a

25 "colorable" military contractor defense because it has not produced the contracts

26 its alleged predecessor in interest, GRC and the United States Navy entered in to.

27 No such burden is placed on VIAD in order for it to justify federal officer removal

28 jurisdiction.

8

1    The law does not require VIAD to produce contracts between GRC and the Navy to

2    be entitled to litigate the merits of its military contractor defense in federal court—VIAD has

3    an absolute right to litigate the merits of that defense in federal court where as here the

4    evidence shows it acted under color of a federal officer and has alleged a colorable federal

5    defense. *See, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006)

6    ("[W]hen federal officers and their agents are seeking a federal forum, we are to interpret

7    section 1442 broadly in favor of removal."); *see also Arizona v. Manypenny,* 451 U.S. 232,

8    242, 101 S. Ct. 1657, 1664 (1981) (federal officer removal jurisdiction should not be

9    frustrated by a narrow, grudging interpretation of section 1442(a)(1)); *Willingham v.*

10   *Morgan*, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816 (1969) ("the officer need not win his case

11   before he can have it removed"). VIAD need only show it can assert a "colorable" federal

12   defense to satisfy the requirements of the federal officer removal statute. *Durham*, 445 F.3d

13   at 1251 (citing *Jefferson County v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069 (1999)).

14   Plaintiffs' motion to remand must be denied, as VIAD has met its burden of showing it is

15   entitled to remove this case under 28 U.S.C. § 1442(a)(1).

16   VIAD has submitted sufficient evidence to establish a colorable military contractor

17   defense. This evidence includes the declarations of Admiral Ben J. Lehman, U.S. Navy,

18   Ret., and Charles R. Cushing that VIAD filed in support of removal and in opposition to

19   Plaintiffs' remand motion.

20   Admiral Lehman is a retired Rear Admiral of the United States Navy, serving on

21   active duty, in part, as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy

22   Yard between 1942 and 1944, and as a Ship Superintendent at the San Francisco Naval

23   Shipyard from 1950 to 1952, where he personally supervised and oversaw ship alterations

24   and equipment overhauls, among other experience set out in detail in his Declaration and

25   attached Curriculum Vitae. (Lehman Decl., ¶¶ 1, 4). Through his experience, professional

26   training, and education, Admiral Lehman is familiar with the plans, designs and

27   specifications used in the construction and repair of Navy ships. He also has personal

28   knowledge regarding Navy equipment manuals and regulations governing the warnings

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

1  permitted by the Navy. (Lehman Decl., ¶ 2). Admiral Lehman states in his Declaration that

2  "equipment suppliers were prohibited from providing any warnings to be placed on or to

3  accompany equipment supplied to the Navy without the consent and approval of the Navy."

4  (Lehman Decl., ¶ 10). He explains that certain warnings, including potential warnings and

5  recommendations regarding asbestos would not have been approved by the Navy "due to the

6  inability to effectively and comprehensively observe, implement, and comply with such

7  recommendations under the multitude of varying conditions likely to be encountered by

8  Navy ships at sea, and especially at war." *Id.*

9         Courts in California, Connecticut, Florida, Illinois, New York and Ohio have found

10  Admiral Lehman's testimony to be credible and admissible evidence that entitled the

11  removing defendants in those cases to litigate their military contractor defenses in federal

12  court. *See, e.g., Oberstar v. CBS Corp.*, No. CV08-118 PA, at 5 (C.D. Cal. Feb. 11,

13  2008) (attached as Ex. "C") (finding Lehman declaration sufficient to establish the first

14  two prongs of the military contractor defense—i.e., that Navy approved reasonably

15  precise specifications regarding asbestos warnings and that GRC's equipment conformed

16  to those specifications); *Machnik v. Buffalo Pumps Inc.*, ---F.Supp.2d---, No. 3:07cv357,

17  2007 WL 2705757 (D. Conn. Sept. 17, 2007) (finding defendant sufficiently established

18  a colorable military contractor defense based on the affidavit of Admiral Lehman);

19  *Marley v. Elliot Turbomachinery Co.*, No. 07-23042-CIV-JORDAN (S.D. Fla. Mar. 21,

20  2008) (attached as Ex. "D") (denying remand motion where affidavits of Admiral

21  Lehman and Admiral Horne were sufficient to advance a colorable government

22  contractor defense); *Harris v. Rapid American Corp.*, 532 F.Supp.2d 1001 (N.D. Ill.

23  2007) (denying remand motion where affidavits of Admiral Lehman and Dr. Charles

24  Cushing were sufficient to establish grounds for federal officer removal); *Nesbiet v.

25  General Elec. Co.*, 399 F.Supp.2d 205, 210-11 (S.D.N.Y. 2005) (finding Admiral

26  Lehman's affidavit raised an "inference that [defendant] did not provide a warning

27  concerning the dangers of asbestos because the Navy did not permit any such warning");

28  *Ferguson v. Lorillard Tobacco Co.*, 475 F.Supp.2d 725, 728 (N.D. Ohio 2007) (finding

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

1   Admiral Lehman's general background and experience sufficient to support his
2   affidavit and relying on that affidavit, in part, to overrule plaintiff's remand motion).;
3   *see also Lindquist et. al. v. Cla-Val Co., et .al.*, No CV-08-501-R (C.D. Cal. April 14,
4   2008) (attached hereto as Ex. "F"); *Keleman et al. v. Buffalo Pumps, Inc.*, No. CV-08-
5   712-R (C.D. Cal. April 14, 2008) (attached hereto as Exhibit "G"); *Munn et. al. v.
6   Cla-Val Co., et. al.*, No. CV-08-282-R (C.D. Cal. April 14, 2008) (attached hereto as
7   Exhibit "H") (In *Lindquist*, *Keleman* and *Munn* the Court denied plaintiffs' motions to
8   remand after plaintiffs' made identical arguments regarding the sufficiency of
9   Admiral Lehman's affidavit).
10         VIAD has also submitted the Declaration of Dr. Charles R. Cushing in opposition
11   to Plaintiffs' remand motion.  Dr. Cushing has reviewed the design and plan of the *U.S.S.*
12   *Shea*, *U.S.S. Boston*, *U.S.S. Providence* and *U.S.S. Wilkinson* all at issue at this case.
13   (Cushing Decl., ¶¶ 4-7). The *U.S.S. Shea*, *U.S.S. Boston* and *U.S.S. Providence* were all
14   built during World War II. (Cushing Decl., ¶¶ 4-6).  Based on his review of that design
15   and plan, and his knowledge, experience, and familiarity with the contracting practices
16   and requirements of the Navy in constructing vessels, Dr. Cushing concludes that any
17   GRC equipment on Navy vessels "was designed and built to meet precise and exacting
18   specifications of the U.S. Navy."  (Cushing Decl., ¶ 12).   According to those
19   specifications, the equipment "would have been manufactured without any insulation and
20   shipped to the shipyards without insulation.  The equipment would have been totally
21   insulated at the shipyard, or after installation on the vessels, by others using insulation
22   purchased from others." (Cushing Decl., ¶ 14). According to Navy specifications, GRC
23   would not have been able to affix any warnings or cautionary statements on its products.
24   (Cushing Decl., ¶ 12).   "Whether certain equipment used aboard U.S. Naval vessels
25   should have warnings, and the content and format of any such warnings, was determined
26   solely by the U.S. Navy.  Griscom-Russell would have had no discretion whatsoever to
27   affix any warnings of its own to products it delivered for installation on Navy ships."
28   (Cushing Decl., ¶ 12).  Dr. Cushing likewise concurs with Admiral Lehman's opinion

11

1   regarding information manuals–equipment manufacturers such as Griscom-Russell had

2   no discretion to deviate from the Navy's precise specifications for those manuals.

3   (Cushing Decl., ¶ 13).

4       Military contractors such as VIAD'S alleged predecessor could not deviate from

5   military specifications in any way by law.  *See* Selective Training and Service Act of

6   1940, Pub. L. No. 783, § 9, 54 Stat. 885, 892-93 (1940) (attached as Ex. "I").

7       [A]ny . . . company . . . who shall refuse to manufacture the kind,

8   quantity, or quality of arms or ammunition, or the parts thereof, or any

necessary supplies or equipment, as ordered by the Secretary of War

9   or the Secretary of the Navy . . . then . . . the President . . . is hereby

10   authorized to take immediate possession of any such plant or plants . .

. to manufacture therein such product . . . and any . . . company . . .

11   failing to comply with the provisions of this section shall be deemed

12   guilty of a felony, and upon conviction shall be punished by

imprisonment . . . .

13

14   *Id.*

15       VIAD'S evidence in support of removal satisfies the standards established by the

16   United States Supreme Court and the Ninth Circuit for federal officer removals.  As the

17   Supreme Court recognized in *Willingham*, "[o]ne of the most important reasons for

18   removal is to have the validity of the defense of official immunity tried in a federal court.

19   The officer need not win his case before he can have it removed." *Willingham*, 395 U.S.

20   at 407-08.   If removal is allowed only where the removing party has "a clearly

21   sustainable defense," "[t]he suit would be removed only to be dismissed." *Id.*

22       The issue as to whether VIAD must produce contracts between GRC and the

23   Navy to establish its right to remove this case to federal court was squarely faced and

24   rejected by the court in *Ballenger v. AGCO Corporation,* No. C 06-2271 CW, 2007 WL

25   1813821 (N.D.Cal. June 22, 2007).   In considering plaintiffs' motion to remand

26   following Todd Shipyards' removal of the action to federal court, plaintiffs contended

27   that Todd Shipyards could not show that it acted under the direction of federal officers

28

12

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

1  because it had not produced any actual contractual documentation of the work it allegedly

2  performed on behalf of the Navy. *Id.* at *3. In rejecting this argument, the court held:

> 3  Defendant Todd Shipyards is not required to produce contracts from
> 4  decades past in order to demonstrate that it worked under the direction of
>    federal officers; to require such documentation would frustrate the
> 5  purpose of section 1442(a)(1). See, *Durham*, 445 F.3d at 1252. Admiral
> 6  Horne's declaration suffices.

7  *Id.* The court in *Ballenger* ruled defendants were acting under the direction of a federal

8  officer and had a colorable federal defense under *Boyle* without requiring them to

9  produce evidence the Navy "affirmatively prohibited any kind of warning." *Id.; see,*

10  *O'Connell v. Foster Wheeler Energy Corp.,* --- F. Supp. 2d ---, 2008 WL 1722079, n. 12

11  (D. Mass. April 7, 2008) ("While citations to regulations or contractual provisions barring

12  warnings would certainly be sufficient to state a colorable claim, the weight of the cases

13  suggest that there is no strict requirement that the government 'prohibit' warnings

14  altogether or 'dictate' the contents of the actual warnings incorporated"). (citing *Oliver v.*

15  *Oshkosh Truck Corp.,* 96 F.3d 992 at 1004, n.8 (1999)); *see also Harris v. Rapid*

16  *American Corp.*, 532 F. Supp. 2d 1001 at 1004-1005 (N.D. Ill. 2007) (rejecting plaintiff's

17  argument that VIAD had not shown that Griscom-Russell acted under the direction of the

18  Navy because it had not produced any contract or directive sent by the Navy); *Ferguson*

19  *v. Lorillard Tobacco Company, Inc.* 475 F. Supp. 2d 725 at 729 (N.D. Ohio 2007)

20  ("Given the sixty year lapse in time, Viad, contrary to plaintiff's contention, is not

21  required to produce documents identifying the exact Naval officer who gave orders to

22  Griscom-Russell during World War II").

23      Similarly, in *Oberstar v. CBS Corp.*, No. CV08-118 PA (C.D. Cal. Feb. 11, 2008),

24  Judge Percy Anderson of this Court, rejected the identical argument plaintiffs are making

25  here--that defendants including VIAD could not meet their burden to establish a

26  colorable federal defense because they lacked evidence the Navy prohibited them from

27  placing warnings on their products. *See Oberstar v. CBS Corp.*, No. CV08-118 PA (C.D.

28  Cal. Feb. 11, 2008).

13

> According to Plaintiffs, absent evidence of specific facts that defendants were prevented from placing warnings on their products, defendants cannot establish their burden to establish the availability of the military contractor defense.      Contrary to Plaintiffs' assertions, however, defendants' burden at this stage of the proceedings is not so exacting. . . . Although the Lehman Declaration may not establish the absence of a triable issue of fact with respect to the first two prongs of the *Boyle* test, as modified by *Oliver*, for a failure to warn claim, defendants need not prove so much at this preliminary stage of the proceedings. . . . Again, **to establish the propriety of their removal, defendants must only show a 'colorable' federal defense, not a winning one.**

*Oberstar*, at pp. 4-5 (emphasis added).   Contrary to Plaintiffs' claim here, Admiral Lehman's Declaration submitted by VIAD in support of removal is based in part on his personal knowledge of Navy shipbuilding practices during World War II, when the *U.S.S. Shea, U.S.S. Boston* and *U.S.S. Providence* were built. (Cushing Decl., ¶¶ 4-6). In finding defendants' evidence sufficient to support removal, the court in *Oberstar* specifically recognized the personal experience of Admiral Lehman while serving in the Navy in the 1940s and 1950s at the Brooklyn Navy Yard and at the San Francisco Naval Shipyard.  *Id.*   The court also distinguished *Hilbert v. McDonnell Douglas Corp.*, No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan 3, 2008), relied on here by Plaintiffs, because *Hilbert* "placed too high a burden on a defendant to prove its military contractor defense" at the removal stage in the litigation, contrary to Ninth Circuit precedent. *Id.* at p. 6 (citing *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006)).

Again, in *Wright v. A.W. Chesterton Company, Inc.*, No. C07-05403, 2008 WL 512728 (N.D. Cal. Feb. 25, 2008) (attached as Ex. "J"), another case where the plaintiff alleged he was injured by exposure to asbestos from equipment on Navy vessels, the court concluded there was "sufficient evidence in the record to raise a colorable government contractor defense," based on evidence that included a declaration of Admiral Lehman stating the Navy would not permit the defendant to put any type of warning on equipment installed on a Navy vessel beyond warnings required by the Navy. *Id.* at *5-6 (denying

14

1   plaintiff's motion to remand based on the declarations of Admiral Lehman and others in
2   light of the "clear language" in *Durham* requiring the court to interpret the federal officer
3   removal statute in favor of removal). "The Court is mindful that Defendants need only
4   present a colorable federal defense to Plaintiff's claims and need not prove that the defense
5   will be meritorious." *Id.* at *6 (citing *Mesa v. California*, 489 U.S. 121, 128 (1989)).

6          Other courts across United States have likewise denied remand motions in failure
7   to warn cases where evidence similar to the evidence produced by Defendants here in
8   opposition to Plaintiffs' remand motion showed the Navy did prohibit asbestos warnings.
9   *See Machnik, Marley, Harris, Nesbiet,* and *Ferguson, supra.*

10         In *Harris v. Rapid American Corp.*, 532 F.Supp.2d 1001 (N.D. Ill. 2007), the court
11  denied plaintiff's motion to remand after VIAD removed the case (alleging injury from
12  asbestos exposure from GRC equipment on a Navy vessel) under the federal officer
13  removal statute, without requiring VIAD to produce contracts. Because the events at
14  issue (i.e., equipment provided to the Navy for vessels built in the 1940s) "took place so
15  long ago, the defendants support removal with affidavits concerning past policies and
16  practices of the U.S. Navy. Often times these affidavits come from the same limited pool
17  of experts." *Id.* To support its removal in *Harris*, VIAD relied on affidavits of Admiral
18  Lehman and Dr. Cushing similar to their Declarations submitted in this case. Plaintiff
19  claimed VIAD had not shown that "Griscom-Russell acted under the direction of the
20  Navy because it has not produced any contract or directive sent to it by the Navy,"
21  arguing the Lehman and Cushing affidavits were "not specific enough to demonstrate
22  that Griscom-Russell acted under the direction of the Navy." The court disagreed,
23  finding that the general background and knowledge of Admiral Lehman and Dr. Cushing
24  "at this preliminary stage" were sufficient to show:

25         (1) the Navy had complete control over the manufacture and design of
26         every piece of equipment on its ships, as well as the nature of warnings
           issued, and (2) contractors, such as Griscom-Russell, were not allowed
27         to deviate from these specifications. This is sufficient to show that
28         Griscom-Russell was 'acting under' a federal agency when they supplied

15

products to the Navy, and also to show the requisite causal nexus between the defendants' conduct under the direction of a federal officer and the plaintiff's claim that the defendants failed to warn Harris of the hazards associated with asbestos.

*Id.* at 1005. "The federal defense need only be colorable, not guaranteed to prevail." *Id.* at 1004 (citing *Mesa supra*). The court recognized that requiring VIAD to "win its case before it can have the case removed . . . would defeat the purpose of the federal officer removal." *Id.* at 1005-06.

In *Ferguson*, the court concluded the affidavit of Admiral Lehman supported VIAD'S claim that product warnings were dictated by the Navy and "no deviation from the warnings or lack thereof was permitted . . . ." *Ferguson*, 475 F. Supp.2d at 731. When coupled with evidence VIAD submitted of the Navy's knowledge of asbestos hazards, the court concluded VIAD had invoked a colorable federal contractor defense. *Id.*

In *Nesbiet*, the court determined defendant General Electric presented a colorable military contractor defense because Admiral Lehman's affidavit in that case "establishes for the purposes of this motion that the Navy's specifications controlled all aspects of the design and manufacture of marine steam turbines, including the nature of warnings to be affixed to or included with these turbines." *See, Nesbiet*, 399 F.Supp.2d at 211-212. Further noting Admiral Lehman's assertion that any deviation from those specifications would result in rejection, the court concluded "[t]his proffer is sufficient" to establish the "colorable defense" test for federal officer removal. *Id.* (recognizing a removing defendant need only show that the federal defense is plausible, not without foundation and made in good faith).

Based upon *Durham*, *Ballenger*, *Wright* and *Oberstar*, the Ninth Circuit does not require VIAD to produce contracts between GRC and the United States Navy to justify its removal of this case to federal court. To require such contracts for events that occurred over 60 years ago would clearly frustrate the mandate of both Congress and the

16

1  Supreme Court that agents of the federal government who are sued in state court are

2  entitled to try their federal military contractor defense in a federal court.

3      **H.      TRANSFER OF THIS MATTER TO THE MDL HAS · NO**

4      **BEARING ON THE DISPOSITION OF PLAINTIFFS' MOTION.**

5      Plaintiffs contend that removal by VIAD is a litigation tactic designed to delay

6  trial and force the matter to be transferred to the MDL. As clearly established above,

7  VIAD removed this case because it has a federal defense to plaintiffs' claims, which

8  VIAD is entitled to litigate and ultimately prove in federal court. Moreover, as

9  recognized by several courts, a defendant's subjective motives are irrelevant in

10  making a remand decision. see *In re Maine Asbestos Cases*, 44 F. Supp.2d 368, 374

11  n.2 (D.Me. 1999) ("[T]he Supreme Court has declared subjective motives irrelevant

12  on the remand decision, and it is not for this court to fashion a different rule tailored

13  specifically to the demands of mass tort litigation").  Similarly, in *Harris v. Rapid*

14  *American Corporation*, 532 F. Supp. 2d 1001, 1006 n.10 (N.D.Ill. 2007) Court

15  rejected such an argument and in denying plaintiff's motion to remand stated:

16          "[A] defendant's motives for removal are not part of the

17          analysis under § 1442(a)(1).  Therefore, we decline to

18          address this argument."

19      *See also Contois v. Able Industries Inc.*, 523 F. Supp. 2d 155 at 164, n.1 (D.

20  Conn 2007.) ("The plaintiff also argues that the court should be wary of permitting

21  removal of the case because of inefficiencies present in the asbestos litigation before the

22  Multi-district Litigation Panel. This argument is irrelevant to the merits of the instant

23  motion").

24      This Court cannot be influenced as to how or when it will rule on the remand

25  motion based on plaintiffs' theory regarding perceived delays caused by the MDL. The

26  existence of the MDL and what happens to the lawsuit after removal has no bearing on this

27  determination and should not be a factor considered in ruling on plaintiffs' motion.

28

DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF

1    The Court here should likewise disregard plaintiffs' similar argument since

2  it is irrelevant to the analysis as to whether or not plaintiffs' motion to remand

3  should be granted. The fate of plaintiffs' case if plaintiffs' motion to remand is

4  denied should not be considered any more than the Court should be swayed by the

5  fact that VIAD will face hostile and retaliatory measures if this action is remanded.

6    Plaintiffs' oppose transfer to the MDL out of fear that it is an unjust or

7  inefficient forum and that VIAD seeks to avail itself of what has been colloquially

8  referred to as the "black hole" of the federal asbestos MDL. To the contrary, the

9  MDL is the appropriate and an adequate venue for this litigation.

10    Before the creation of the MDL, both federal and state court faced "an

11  asbestos litigation crisis." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598

12  (1997). The courts were overwhelmed with asbestos lawsuits. "The most

13  objectionable aspects of asbestos litigation can be briefly summarized: dockets in

14  both federal and state courts continue to grow; long delays are routine, trials are

15  too long; the same issues are litigated over and over; transaction costs exceed the

16  victims' recovery by nearly two to one; exhaustion of such assets threatens and

17  distorts the process; and future claimants may lose altogether." *Id.* (*citing* the

18  *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litig.* at pp. 2-3

19  (Mar. 1991)).

20    In creating federal asbestos MDL 875, the court was persuaded that asbestos

21  litigation had reached a magnitude that threatened the administration of justice and

22  that required a new, streamlined approach. *In re Asbestos Products Liability

23  Litigation (No. VI)*, 771 F. Supp. 415, 418 (Jud.Pan.Mult.Lit., 1991). The

24  centralization of all federal asbestos personal injury/wrongful death actions, in the

25  words of 28 U.S.C. § 1407(a), "will be for the convenience of parties and

26  witnesses and will promote the just and efficient conduct of such actions." *Id.*

27  Additionally, while the focus of the MDL is on stream-lining pre-trial matters and

28  encouraging settlements, the MDL can and does remand cases to the transferor

18

**DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF
POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., AND
CHARLES R. CUSHING IN SUPPORT THEREOF**

1   courts for trial when appropriate. Given these factors, plaintiffs' right to a trial by

2   jury would be alive and well within MDL 875, if transfer is ordered. It is clear that

3   plaintiffs' fears in the instant matter have been met and addressed by the MDL.

4

5   **IV.   CONCLUSION.**

6         Plaintiffs' motion is clearly untimely and should be denied accordingly.

7   Regardless of the timeliness of plaintiffs' motion, VIAD has established by a

8   preponderance of the evidence all of the elements required for federal officer

9   removal and thus the motion should be denied.

10

11  DATED:  April 28, 2008                      FOLEY & MANSFIELD, PLLP

12

13                                    BY:

14                                          Peter B. Langbord
                                            Keith M. Ameele
15                                          Attorneys for Defendant
                                            **VIAD CORP**

16

17

18

19

20

21

22

23

24

25

26

27

28

19

# EXHIBIT A

FILED

Peter B. Langbord, Esq., SBN 144319
**Foley & Mansfield PLLP**
150 South Los Robles Ave., Suite 400
Pasadena, California 91101
Telephone: (626) 744-9359
Facsimile: (626) 744-1702

2008 FEB 26  PM 2:04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

Attorneys for Defendant
**VIAD CORP**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT REASER and CHRISTINE REASER | Case No. **CV08-01296 SVW (SSx)** |
| Plaintiffs | |
| vs. | **NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. SECTIONS 1442(a)(1) and 1446(a)** |
| ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST (sued individually and as successor-in-interest to ALLIS-CHALMERS CORPORATION); CBS CORPORATION f/k/a VIACOM INC. (sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION and also as successor-in-interest to BF STURTEVANT) CLA-VAL CO.; FOSTER WHEELER ENERGY CORPORATION; GENERAL ELECTRIC COMPANY; VIAD CORPORATION f/k/a THE DIAL CORPORATION (sued individually and as successor-in-interest to GRISCOM-RUSSELL COMPANY); and DOES 1-450 INCLUSIVE, | |
| Defendants. | |

1

NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. SECTIONS 1442(a)(1) and 1446(a)

**TO THE CLERK OF THE ABOVE-REFERENCED COURT:**

**PLEASE TAKE NOTICE** that Defendant, Viad Corp, hereby removes to this Court the state court action described below, pursuant to 28 U.S.C. sections 1442(a)(1) and 1446(a).

**PRELIMINARY MATTERS**

1.      On January 25, 2008, Plaintiffs ROBERT REASER and CHRISTINE REASER filed this lawsuit (the "Complaint") in the Superior Court of the State of California, County of Los Angeles, Case No. BC 384385 and entitled ROBERT REASER and CHRISTINE REASER v. ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST (sued individually and as successor-in-interest to ALLIS-CHALMERS CORPORATION); CBS CORPORATION f/k/a VIACOM INC. (sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION and also as successor-in-interest to BF STURTEVANT) CLA-VAL CO.; FOSTER WHEELER ENERGY CORPORATION; GENERAL ELECTRIC COMPANY; VIAD CORPORATION f/k/a THE DIAL CORPORATION (sued individually and as successor-in-interest to GRISCOM-RUSSELL COMPANY)and DOES 1-450 INCLUSIVE, A true and correct copy of the Complaint is attached hereto as Exhibit "A."

2.      Defendant VIAD CORP ("VIAD") was served with the Complaint on January 31, 2008.  This was the first date upon which VIAD received a copy of the Complaint.   True and correct copies of the summons and service of process transmittal from the CT Corporation System are attached hereto as Exhibits "B" and "C."

3.      This Notice of Removal is timely in that it is filed within 30 days of service of the Complaint by which VIAD received its first notice of the facts indicating that the case was removable within the meaning of 28 U.S.C. §1446(b).

4.      On February 8, 2008 VIAD answered the Complaint.  A true and correct copy of the Answer is attached hereto as Exhibit D.

## NATURE OF THE CASE

5.    This case is based upon Plaintiffs' allegations that ROBERT REASER and CHRISTINE REASER contracted an asbestos-related disease, specifically mesothelioma, allegedly caused by his exposure to asbestos dust and/or fibers.

6.    Plaintiffs assert strict liability and negligence claims against VIAD and other Defendants.

## GROUNDS FOR REMOVAL

7.    Exhibit "A" to the Complaint discloses that Plaintiffs claim ROBERT REASER  was exposed to asbestos and asbestos-containing products while serving in the United States Navy from 1951-1956 aboard the USS Shea as a welder, pipefitter, fireman and seaman apprentice, from 1951-1956 aboard the USS Boston as damage control, third class, from 1959-1960 aboard the USS Providence as damage control, second class, from 1960-1964 aboard the USS Wilkinson as damage control, second class and from 1964-1967 from NAS Cecil Field as damage control, first class.

8.    Plaintiffs allege that VIAD is the successor-in-interest to the Griscom-Russell Company ("GRISCOM-RUSSELL"). VIAD disputes it is the successor-in-interest to GRISCOM-RUSSELL. Plaintiffs further allege GRISCOM-RUSSELL manufactured and sold equipment (distilling plants) to the United States Navy which caused or contributed to his death.  Any equipment GRISCOM-RUSSELL manufactured and sold to the United States Navy was pursuant to procurement contracts entered into and in accordance with precise specifications required by the United States Navy.

9.    VIAD may remove this entire action because in manufacturing and selling equipment to the United States Navy, its alleged predecessor GRISCOM-RUSSELL was acting under an officer or agency of the United States of America within the meaning of 28 U.S.C. §1442(a)(1).

3

NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. SECTIONS 1442(a)(1) and 1446(a)

1    10.    Should Plaintiffs file a motion to remand this case, VIAD respectfully
2  requests an opportunity to respond more fully in writing, but offer the following
3  authorities at this time regarding removal.

4    11.    Removal pursuant to 28 U.S.C. §1442(a)(1) is appropriate where the
5  moving party can (1) demonstrate that it acted under the direction of a federal
6  officer; (2) raise a colorable federal defense to plaintiffs' claims and (3)
7  demonstrate a causal nexus between plaintiffs' claims and acts it performed under
8  color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25 (1989). All three
9  elements have been satisfied and thus VIAD is entitled to federal officer removal.

10    12.    Any equipment manufactured for the United States Navy by
11  GRISCOM-RUSSELL, as alleged, was manufactured under the direction of a
12  federal officer. GRISCOM-RUSSELL designed and manufactured any equipment
13  sold to the United States Navy according to the precise, detailed specifications of
14  the United States Navy. The United States Navy enforced compliance with those
15  design specifications. No aspect of the design of that equipment escaped the close
16  control of the United States Navy and its officers. Moreover, the United States
17  Navy specified what was to be written, posted, printed and published on any
18  nameplate or signage for any machine GRISCOM-RUSSELL manufactured for the
19  United States Navy.

20    13.    As recognized by United States Supreme Court in *Boyle v. United*
21  *Technologies Corp.* 487 U.S. 500, 512 (1988), VIAD, as the alleged successor-in-
22  interest to GRISCOM-RUSSELL, have a federal defense to the action, namely the
23  government contractor immunity from liability for injuries arising from any
24  exposure to asbestos from equipment GRISCOM-RUSSELL manufactured
25  pursuant to contracts with and specifications required by the United States Navy.

26    14.    Plaintiffs' claims are based on decedent's alleged exposure to asbestos
27  from material and equipment installed on Naval vessels. GRISCOM-RUSSELL
28

4

NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. SECTIONS 1442(a)(1) and 1446(a)

1   can demonstrate a causal nexus because any GRISCOM-RUSSELL equipment

2   decedent came into contact with was designed and manufactured in strict

3   accordance with the specifications required by the United States Navy.

4       15.    VIAD has raised a colorable federal defense to Plaintiffs' claims.

5   Pursuant to the government contractor defense, VIAD cannot be liable under state

6   law for any injuries caused by equipment it sold to the United States Navy.  VIAD,

7   as alleged the successor-in-interest to GRISCOM-RUSSELL, has more than a

8   colorable claim that it is entitled to immunity from state tort law under the federal

9   government contractor defense.

10      16.    VIAD is not required to notify and obtain the consent of any other

11  Defendant in this action in order to remove this matter, pursuant to 28 U.S.C.

12  §1442(a).  *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310,

13  1314-15 (9th Cir. 1981).

14      17.    As required by 28 U.S.C. §1446(b) and the local rules of this Court,

15  true and correct copies of the pleadings served upon VIAD are being filed with this

16  Notice of Removal.

17                          **CONCLUSION**

18      18.    Removal of this action is proper under 28 U.S.C. §1442, because it is

19  a civil action brought in a state court, and the federal district courts have original

20  jurisdiction over the subject matter pursuant to 28 U.S.C. §1442(a)(l) because

21  VIAD, as the alleged successor-in-interest to GRISCOM-RUSSELL, was acting

22  under an officer or agency of the United States government, namely the United

23  States Navy.

24

25  //

26  //

27  //

28  //

1    19.    THEREFORE, VIAD, pursuant to these statutes and in conformance

2 with the requirements set forth in 28 U.S.C. §1446, remove this action for trial

3 from the Superior Court of the State of California for the County of Los Angeles.

4

5 DATED: February 22, 2008         FOLEY & MANSFIELD, P.L.L.P.

6

7                     BY:

8                        Peter B. Langbord
Attorneys for Defendant

9                        VIAD CORP

# EXHIBIT A

page  26

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 25 2008

John A. Clarke, Executive Officer/Clerk

BY MARY GARCIA, Deputy

1  RON C. EDDINS, CA Bar No. 243581
   JENNIFER L. BARTLETT, CA Bar No. 183154
2  ETHAN A. HORN, CA Bar No. 190296
   SIMON, EDDINS & GREENSTONE, LLP
3  301 E. Ocean Blvd., Ste. 1950
   Long Beach, California 90802
4  Telephone (562) 590-3400
   Facsimile (562) 590-3412
5

6  Attorneys for Plaintiffs

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10                                    B C 3 8 4 3 8 5

11  ROBERT REASER and CHRISTINE      )  Case No.
    REASER                           )
12                                   )
                                     )  THIS ACTION CONSTITUTES COMPLEX
13              Plaintiffs,          )  ASBESTOS LITIGATION – SUBJECT TO THE
                                     )  GENERAL ORDERS CONTAINED IN FILE NO.
14         vs.                       )  C 700000 – DEPT. 59
                                     )
15  ALLIS CHALMERS CORPORATION       )  COMPLAINT FOR PERSONAL INJURY –
    PRODUCT LIABILITY TRUST (sued    )  ASBESTOS (NEGLIGENCE; STRICT
16  individually and as successor-in-interest to )  LIABILITY; LOSS OF CONSORTIUM)
    ALLIS-CHALMERS CORPORATION);     )
17  CBS CORPORATION f/k/a VIACOM,    )
    INC. (sued as successor-by-merger to CBS )
18  CORPORATION f/k/a WESTINGHOUSE   )
    ELECTRIC CORPORATION and also as )
19  successor-in-interest to BF      )
    STURTEVANT);                     )
20  CLA-VAL CO. ;                    )
    FOSTER WHEELER ENERGY            )
21  CORPORATION;                     )
    GENERAL ELECTRIC COMPANY;        )
22  VIAD CORPORATION f/k/a THE       )
    DIAL CORPORATION (sued           )
23  individually and as successor-in-interest to )
    GRISCOM-RUSSELL COMPANY);        )
24  and DOES 1-450 INCLUSIVE,        )
                                     )
25                                   )
              Defendants.            )
26                                   )

27

28

COMPLAINT FOR PERSONAL INJURY – ASBESTOS                                1

<u>GENERAL ALLEGATIONS</u>

COME NOW Plaintiffs **ROBERT REASER** and **CHRISTINE REASER** (hereinafter "Plaintiffs") and complain and allege as follows:

1.      The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 450, inclusive, are unknown to Plaintiffs at this time, who therefore sues said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly.  Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

2.      At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venture of his co-defendants, and each of them, and at all said times each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture.  Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned, defendants **ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST** (sued individually and as successor-in-interest to ALLIS-CHALMERS CORPORATION); **CBS CORPORATION** f/k/a VIACOM, INC. (sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION and also as successor-in-interest to BF STURTEVANT); **CLA-VAL CO.**; **FOSTER WHEELER ENERGY CORPORATION**; **GENERAL ELECTRIC COMPANY**; and **VIAD CORPORATION** f/k/a **THE DIAL CORPORATION** (sued individually and as successor-in-interest to GRISCOM-RUSSELL COMPANY) and DOES 1-450 inclusive, were individuals, corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**

-2-

1   California, and that said defendants have regularly conducted business in the County of Los Angeles,

2   State of California.

3       3.   Plaintiffs allege herein that Plaintiff ROBERT REASER developed malignant

4   mesothelioma as a result of exposure to asbestos from defendants' asbestos, asbestos-containing

5   products and/or products designed to be used in association with asbestos products ("Defendants'

6   Products"), including: ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST

7   (sued individually and as successor-in-interest to ALLIS-CHALMERS CORPORATION) (for Allis

8   Chalmers pumps); CBS CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to

9   CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION and also as successor-

10  in-interest to BF STURTEVANT) (for BF Sturtevant blowers and high pressure air compressor

11  turbines, and Westinghouse turbines and blowers); CLA-VAL CO. (for Cla-Val valves); FOSTER

12  WHEELER ENERGY CORPORATION (for Foster Wheeler boilers); GENERAL ELECTRIC

13  COMPANY (for General Electric generators and turbines); VIAD CORPORATION f/k/a THE

14  DIAL CORPORATION (sued individually and as successor-in-interest to GRISCOM-RUSSELL

15  COMPANY) (for Griscom-Russell distilling plants and fuel oil heaters).

16      4.   Plaintiffs hereby disclaim any cause of action or recovery for any injuries caused by any

17  exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy

18  vessels. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from exposure

19  to asbestos dust caused by any acts or omissions of a party Defendant committed at the direction of an

20  officer of the United States Government.

### FIRST CAUSE OF ACTION

(Negligence)

PLAINTIFFS COMPLAIN OF DEFENDANTS AND DOES 1-450, THEIR "ALTERNATE
ENTITIES", AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE
ALLEGE AS FOLLOWS:

    5.   Plaintiffs incorporate herein by reference, as though fully set forth therein, the general
allegations set forth above.

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

6.      At all times herein mentioned, each of the named defendants and DOES 1 through 450 was the successor, successor in business, successor in product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising asbestos, and products containing asbestos, including but not limited to, those products identified in paragraph 3 above.  Said entities shall hereinafter collectively be called "alternate entities."  Each of the herein named defendants is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, repaired, marketing, warranted, re-branded, manufactured for others and advertised asbestos, products containing asbestos. The following defendants, and each of them, are liable for the acts of each and every "alternate entity", and each of them, in that there has been a virtual destruction of Plaintiffs' remedy against each such "alternate entity"; defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; defendants, and each of them, have caused the destruction of Plaintiffs' remedy against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity".

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST | ALLIS-CHALMERS CORPORATION THE BUDA COMPANY |
| CBS CORPORATION | VIACOM INC. WESTINGHOUSE ELECTRIC CORPORATION BF STURTEVANT VIACOM INTERNATIONAL, INC. VIACOM PLUS |

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

| FOSTER WHEELER ENERGY CORPORATION | FOSTER WHEELER BOILER CORPORATION |
|---|---|
| | FOSTER WHEELER CONTRACTORS, INC. |
| | FOSTER WHEELER CORPORATION |
| | FOSTER WHEELER DEVELOPMENT CORP. |
| | FOSTER WHEELER ENERGY RESOURCES INC. |
| | FOSTER WHEELER ENERGY SERVICES, INC. |
| | FOSTER WHEELER ENVIRESPONSE, INC. |
| | FOSTER WHEELER ENVIRONMENTAL CORPORATION |
| | FOSTER WHEELER POWER GROUP, INC. |
| | FOSTER WHEELER POWER SYSTEMS, INC. |
| | FOSTER WHEELER PYROPOWER, INC. |
| | FOSTER WHEELER REALTY SERVICES, INC. |
| | FOSTER WHEELER USA CORPORATION |
| | C.H. WHEELER |
| GENERAL ELECTRIC COMPANY | GENERAL ELECTRIC BROADCASTING COMPANY, INC. |
| | GENERAL ELECTRIC CAPITAL ASSURANCE COMPANY |
| | GENERAL ELECTRIC PROFESSIONAL SERVICES COMPANY |
| | GENERAL ELECTRIC TRADING COMPANY |
| VLAD CORPORATION | THE DIAL CORPORATION |
| | GRISCOM-RUSSELL COMPANY |

7.     At all times herein mentioned, defendants, their "alternate entities", and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, renting, marketing, warranting, re-branding, manufacturing for others, packaging, and advertising asbestos, and/or asbestos products (hereinafter Defendants' Products).

8.     At all times herein mentioned, defendants, their "alternate entities", and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, specified, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, rented offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded,

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

Page 11

1   manufactured for others, packaged, and advertised Defendants' Products, including but not limited to
2   those products identified in paragraph 3 above, in that the Defendants' Products were unreasonably
3   dangerous because they released respirable asbestos fibers which resulted in personal injuries to users,
4   consumers, workers, bystanders, and others, including Plaintiff ROBERT REASER herein (hereinafter
5   collectively called "exposed person").   Said products were used at all times in a manner that was
6   reasonably foreseeable to defendants, their "alternate entities," and each of them, thereby rendering said
7   products unsafe and dangerous for use by "exposed person".   Plaintiffs herein allege that ROBERT
8   REASER was exposed to asbestos as a result of exposures to Defendants' Products, including but not
9   limited to those products identified in paragraph 3 above (hereinafter referred to as "defendants'
10  products" or "defendants' asbestos and asbestos-containing products"), were a substantial contributing
11  factor in the development of his malignant mesothelioma, and therefore proximately caused Plaintiff
12  ROBERT REASER 's injuries.

13       9.      Defendants, their "alternate entities," and each of them, had a duty to exercise reasonable
14  care while engaging in the activities mentioned above and each defendants breached said duty of
15  reasonable care in that defendants, and each of them, failed to safely and adequately design, manufacture
16  and/or sell defendants' products; failed to test said products; failed to investigate the hazards of said
17  products; failed to warn "exposed person", including Plaintiff ROBERT REASER, of the health hazards
18  of using defendants' products; failed to disclose the known or knowable dangers of using defendants'
19  products; failed to obtain suitable alternative materials to asbestos when such alternatives were
20  available; and as otherwise stated herein.

21       10.     The defendants' products were and are hazardous to the health and safety of Plaintiff, and
22  others in Plaintiff's position working with and in close proximity to such products, and since on or
23  before 1930, the hazards and dangerous propensities of the defendants' products were both known and
24  knowable to the defendants, their "alternate entities", and each of them, through the use of medical
25  and/or scientific data and other knowledge available to defendants, their "alternate entities", and each of
26  them at the time of defendants' manufacture, distribution, sale, research, study, fabrication, design,
27  modification, labeling, assembly, leasing, buying, offering for sale, supply, inspection, service,
28  installation, contracting for installation, repair, marketing, warranting, re-branding, re-manufacturing for

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

Page 12

1   others, packaging and advertising, of those products, which clearly indicated the hazards and dangerous

2   propensities of asbestos presented a substantial danger to users, including Plaintiff, ROBERT REASER,

3   of Defendants' Products through the intended and reasonably foreseeable use of those products.

4        11.   Defendants, their "alternate entities", and each of them, knew, or reasonably should have

5   known, that Defendants' Products were dangerous and were likely to be dangerous when used in their

6   intended and reasonably foreseeable manner.

7        12.   Defendants, their "alternate entities", and each of them, knew, or reasonably should have

8   known, that Defendants' Products would be installed, repaired, maintained, overhauled, removed,

9   sawed, chipped, hammered, mixed, scraped, sanded, swept, broken, "ripped out," or otherwise disturbed

10  in their ordinary, intended and foreseeable use, resulting in the release of airborne hazardous and

11  dangerous asbestos fibers, and that through such activity, "exposed person," including Plaintiff

12  ROBERT REASER  herein, would be exposed to said hazardous and dangerous asbestos fibers.

13  Defendants, their "alternate entities", and each of them, knew or reasonably should have known that

14  users, such as Plaintiff ROBERT REASER and others in his position, working with and in close

15  proximity to Defendants' Products would not realize or know the danger.  Defendants, their "alternate

16  entities," and each of them negligently failed to adequately warn or instruct of the dangers of the

17  products. A reasonable designer, manufacturer, distributor, seller, installer, buyer or supplier, under the

18  same or similar circumstances, would have warned of the dangers to avoid exposing others to a

19  foreseeable risk of harm. The negligent failure of defendants, their "alternate entities," and each of them

20  to warn was a substantial factor in causing harm to Plaintiff ROBERT REASER.

21       13.   Plaintiff ROBERT REASER  used, handled, or was otherwise exposed to asbestos from

22  Defendants' Products referred to herein in a manner that was reasonably foreseeable to defendants and

23  each of them.  Plaintiff's exposure to Defendants' Products occurred at various locations set forth in

24  Exhibit "A", which is attached hereto and incorporated by reference herein.

25       14.   As a direct and proximate result of the conduct of the defendants, their "alternate

26  entities", and each of them, as aforesaid, Plaintiff ROBERT REASER's exposure to asbestos from use

27  of Defendants' Products caused severe and permanent injury to the Plaintiff, the nature of which, along

28  with the date of Plaintiff's diagnosis and the date he learned such injuries were attributable to exposure

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1   to Defendants' Products, are set forth in Exhibit "B", which is attached hereto and incorporated by

2   reference herein.  Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

3   cancer and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma

4   and that said disease results from exposure to Defendants' Products over a period of time.

5         15.   Plaintiff ROBERT REASER suffers from malignant pleural mesothelioma, caused by

6   exposure to asbestos from Defendants' Products and/or from the use of Defendants' Products containing

7   asbestos including those products identified in paragraph 3 above.  Plaintiff ROBERT REASER was not

8   aware at the time of exposure that Defendants' Products presented any risk of injury and/or disease.

9         16.   As a direct and proximate result of the aforesaid conduct of defendants, their "alternate

10   entities," and each of them, Plaintiff ROBERT REASER  has suffered and will continue to suffer

11   permanent injuries and future injuries to his person, body and health, including, but not limited to, pain,

12   discomfort, loss of weight, loss of appetite, fatigue, somnolence, lethargy, dyspnea, dysphagia, and other

13   physical symptoms, and the mental and emotional distress attendant thereto, as Plaintiff's malignant

14   mesothelioma progresses, all to his general damage in a sum in excess of the jurisdictional limit of a

15   limited civil case.

16         17.   As a direct and proximate result of the aforesaid conduct of the defendants, their

17   "alternate entities", and each of them, Plaintiff ROBERT REASER has incurred, is presently incurring,

18   and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices,

19   X-rays and other medical treatment, the true and exact amount thereof being presently unknown to

20   Plaintiffs, subject to proof at trial.

21         18.   As a further direct and proximate result of the said conduct of the defendants, their

22   "alternate entities", and each of them, Plaintiffs have incurred, and will incur, loss of income, wages,

23   profits and commissions, a diminishment of earning potential, and other pecuniary losses, the true and

24   exact amount thereof being presently unknown to Plaintiffs, subject to proof at trial.

25         19.   Plaintiffs further allege that defendants, their "alternate entities", and each of them, also

26   engaged in the following wrongful acts:

27        (a)   Defendants, their "alternate entities", and each of them, suppressed from all consumers,

28   including Plaintiff ROBERT REASER, medical and scientific information concerning the health hazards

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**

Page 14

page  34

1   associated with inhalation of asbestos, including the substantial risk of injury or death therefrom.

2   Although defendants, and each of them, knew of the substantial risks associated with exposure to

3   asbestos, they willfully and knowingly concealed such information from the users of their asbestos

4   and/or asbestos-containing products in conscious disregard of the rights, safety and welfare of "exposed

5   person", including Plaintiff ROBERT REASER.

6        (b)      Defendants, their "alternate entities", and each of them, belonged to, participated in, and

7   financially supported industry organizations, including but not limited to the Gypsum Association,

8   Asbestos Information Association, Industrial Hygiene Foundation and others, which, for and on behalf

9   of defendants, their "alternate entities", and each of them, actively promoted the suppression of

10  information about the dangers of asbestos to users of the aforementioned products and materials, thereby

11  misleading Plaintiff ROBERT REASER as to the safety of their products.  Through their participation

12  and association with such industry organizations, defendants and each of them knowingly and

13  deliberately concealed and suppressed the true information regarding asbestos and its dangers, and

14  propagated misinformation intended to instill in users of Defendants' Products a false security about the

15  safety of their products.  The Dust Control Committee, which changed its name to the Air Hygiene

16  Committee, of the Asbestos Textile Institute, was specifically enlisted to study the subject of dust

17  control.  Discussions in this committee were held many times regarding the dangers inherent in asbestos

18  and the dangers, which arise from the lack of control of dust, and such information was suppressed from

19  public dissemination from 1946 to a date unknown to Plaintiff ROBERT REASER at this time;

20       (c)      Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford

21  Mines in Quebec, Canada, and the study of the workers at Raybestos-Manhattan plants in Manheim and

22  Charleston, South Carolina, defendants, their "alternate entities", and each of them, knew and possessed

23  medical and scientific information of the connection between the inhalation of asbestos fibers and

24  asbestosis, which information was disseminated through the Asbestos Textile Institute and other

25  industry organizations to all other defendants, their "alternate entities", and each of them, herein.

26  Between 1942 and 1950, the defendants, their "alternate entities", and each of them, failed to provide

27  this information to consumers;

28       (d)      Defendants, their "alternate entities", and each of them, failed to warn Plaintiff ROBERT

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1  REASER  and others of the nature of said materials which were dangerous when breathed and which

2  could cause pathological effects without noticeable trauma, despite the fact that defendants, their

3  "alternate entities", and each of them, possessed knowledge and were under a duty to disclose that said

4  materials were dangerous and a threat to the health of persons coming into contact therewith;

5  (e)  Defendants, their "alternate entities", and each of them, failed to provide Plaintiff

6  ROBERT REASER  with information concerning adequate protective masks and other equipment

7  devised to be used when applying, mixing, installing and sanding the products of the defendants, their

8  "alternate entities", and each of them, despite knowing that such protective measures were necessary,

9  and that they were under a duty to disclose that such materials were dangerous and would result in injury

10  to Plaintiff ROBERT REASER  and others applying and installing such material;

11  (f)  Defendants, their "alternate entities", and each of them, knew and failed to disclose that

12  Plaintiff ROBERT REASER  and anyone similarly situated, upon inhalation of asbestos would, in time,

13  have a substantial risk of developing irreversible conditions of pneumoconiosis, asbestosis,

14  mesothelioma and/or cancer;

15  (g)  Defendants, their "alternate entities", and each of them, failed to provide information of

16  the true nature of the hazards of asbestos materials and that exposure to these material would cause

17  pathological effects without noticeable trauma to the public, including buyers, users, and physicians

18  employed by Plaintiff ROBERT REASER  so that said physicians could not examine, diagnose, and

19  treat Plaintiff and others who were exposed to asbestos, despite the fact that defendants, their "alternate

20  entities", and each of them, were under a duty to so inform and said failure was misleading.

21  20.  Defendants, their "alternate entities", and each of them, and their officers, directors, and

22  managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of,

23  or should have known of, each of the acts set forth herein. Defendants, their "alternate entities", and

24  each of them, are liable for the oppressive and malicious acts of their "alternate entities", and each of

25  them, and each defendant's officers, directors, and managing agents participated in, authorized,

26  expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of

27  their "alternate entities" as set forth herein.

28  21.  The herein-described conduct of said defendants, their "alternate entities", and each of

1  them, was and is willful, malicious, oppressive, outrageous, and in conscious disregard and indifference

2  to the safety and health of "exposed person," including Plaintiff ROBERT REASER, in that defendants,

3  and each of them, continued to manufacture, market and/or sell dangerous products known to cause

4  severe, permanent injuries and death, despite possessing knowledge of the substantial hazards posed by

5  use of their products, in order to continue to profit financially therefrom.  Defendants, their "alternate

6  entities", and each of them, engaged in such conduct so despicable, contemptible, base, vile, miserable,

7  wretched and loathsome as to be looked down upon and despised by ordinary people and justifies an

8  award of punitive and exemplary damages pursuant to Civil Code section 3294.  Plaintiffs, for the sake

9  of example and by way of punishing said defendants, seek punitive damages according to proof.

10      22.    Defendants and each of them engaged in conduct which was intended by defendants and

11  each of them to cause injury to the plaintiffs, and despicable conduct which was carried on by the

12  defendant with a willful and conscious disregard of the rights or safety of others, including Plaintiff

13  ROBERT REASER.

14      23.    Defendants, and each of them, engaged in the despicable conduct described herein that

15  subjected persons, including Plaintiff ROBERT REASER , to cruel and unjust hardship in the form of

16  sever, debilitating and fatal diseases like asbestosis, lung cancer and mesothelioma, in conscious

17  disregard of those persons' rights.

18      24.    As a direct and proximate result of such intentional conduct by defendants, their

19  "alternate entities" and each of them, Plaintiff ROBERT REASER sustained the injuries and damages

20  alleged herein.

21      WHEREFORE, Plaintiffs pray for judgment against defendants, their "alternate entities", and

22  each of them, as hereinafter set forth.

23              **SECOND CAUSE OF ACTION**

24              (Strict Liability)

25      AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION
    FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-450, THEIR
26  "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

27      25.    Plaintiffs incorporate herein by reference, as though fully set forth therein, each and

28  every one of the general allegations and the allegations contained in the First Cause of Action herein.

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

26.     Defendants, their "alternate entities", and each of them, sold the aforementioned Defendants' Products and failed to adequately warn or instruct of the known and knowable dangers and risks of the ordinary, intended, and foreseeable use of their products, which dangers and risks would not have been, and were not, recognized by ordinary consumers of the products, including Plaintiff, ROBERT REASER , and the lack of sufficient instructions and/or warnings was a substantial factor in causing harm to Plaintiff ROBERT REASER  and others in Plaintiff's position working with and in close proximity to such products.

27.     Defendants' Products were defective and unsafe for their intended purpose and foreseeable use in that, when used, handled, installed, repaired, maintained, overhauled, removed, sawed, chipped, hammered, mixed, scraped, sanded, swept, broken, "ripped out," or otherwise disturbed, said products would result in the release, and therefore inhalation of, hazardous and dangerous asbestos fibers by exposed person, including Plaintiff ROBERT REASER . The defect existed in all of said products when they left the possession of the defendants, their "alternate entities," and each of them. At the time Defendants' Products were used by Plaintiff, and others in Plaintiff's position working with and in close proximity to such products, the products were substantially the same as when they left the possession of the defendants, their "alternate entities," and each of them and/or any changes made to the products after they left the possession of defendants, their "alternate entities", and each of them were reasonably foreseeable to defendants, their "alternate entities", and each of them. Defendants' asbestos and asbestos products were used by Plaintiff ROBERT REASER, and others in Plaintiff's position working with and in close proximity to such products, in a way that was reasonably foreseeable to defendants, and each of them. The defect in said products was a substantial factor in causing harm and personal injuries to Plaintiff ROBERT REASER, including malignant mesothelioma, while being used in a reasonably foreseeable manner, thereby rendering said products defective, unsafe, and unreasonably dangerous for their ordinary and intended use.

28.     As a direct and proximate result of the actions and conduct outlined herein, Defendants' Products failed to perform as safely as an ordinary consumer would have expected in that defendants' products, and each of them, during their ordinary and intended use, and such hazardous exposures lacked any perceptible qualities to the human body, yet they cause severe and fatal diseases, including

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**

1    asbestosis, lung cancer, mesothelioma and other cancers in humans.  Plaintiffs further allege that

2    "exposed person", including Plaintiff ROBERT REASER, were unaware of the harmful effects of

3    asbestos and further unaware of the harmful exposures to Defendants' Products when such exposures

4    occurred, and thus the failure of defendants' products to perform as safely as Plaintiff ROBERT

5    REASER had reason to expect was a substantial factor in causing his injuries.

6          29.    As a direct and proximate result of the actions and conduct outlined herein, Plaintiff

7    ROBERT REASER has suffered the injuries and damages alleged herein.

8          30.    Plaintiffs further allege that defendants, their "alternate entities", and each of them, also

9    engaged in the following wrongful acts:

10         (a)    Defendants, their "alternate entities", and each of them, suppressed from all consumers,

11   including Plaintiff ROBERT REASER, medical and scientific information concerning the health hazards

12   associated with inhalation of asbestos, including the substantial risk of injury or death therefrom.

13   Although defendants, and each of them, knew of the substantial risks associated with exposure to

14   asbestos, they willfully and knowingly concealed such information from the users of their asbestos

15   and/or asbestos-containing products in conscious disregard of the rights, safety and welfare of "exposed

16   person", including Plaintiff ROBERT REASER.

17         (b)    Defendants, their "alternate entities", and each of them, belonged to, participated in, and

18   financially supported industry organizations, including but not limited to the Gypsum Association,

19   Asbestos Information Association, Industrial Hygiene Foundation and others, which, for and on behalf

20   of defendants, their "alternate entities", and each of them, actively promoted the suppression of

21   information about the dangers of asbestos to users of the aforementioned products and materials, thereby

22   misleading Plaintiff ROBERT REASER as to the safety of their products.  Through their participation

23   and association with such industry organizations, defendants and each of them knowingly and

24   deliberately concealed and suppressed the true information regarding asbestos and its dangers, and

25   propagated misinformation intended to instill in users of Defendants' Products a false security about the

26   safety of their products.  The Dust Control Committee, which changed its name to the Air Hygiene

27   Committee, of the Asbestos Textile Institute, was specifically enlisted to study the subject of dust

28   control. Discussions in this committee were held many times regarding the dangers inherent in asbestos

1  and the dangers, which arise from the lack of control of dust, and such information was suppressed from

2  public dissemination from 1946 to a date unknown to Plaintiff ROBERT REASER at this time;

3      (c)    Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford

4  Mines in Quebec, Canada, and the study of the workers at Raybestos-Manhattan plants in Manheim and

5  Charleston, South Carolina, defendants, their "alternate entities", and each of them, knew and possessed

6  medical and scientific information of the connection between the inhalation of asbestos fibers and

7  asbestosis, which information was disseminated through the Asbestos Textile Institute and other

8  industry organizations to all other defendants, their "alternate entities", and each of them, herein.

9  Between 1942 and 1950, the defendants, their "alternate entities", and each of them, failed to provide

10  this information to consumers;

11      (d)    Defendants, their "alternate entities", and each of them, failed to warn Plaintiff ROBERT

12  REASER and others of the nature of said materials which were dangerous when breathed and which

13  could cause pathological effects without noticeable trauma, despite the fact that defendants, their

14  "alternate entities", and each of them, possessed knowledge and were under a duty to disclose that said

15  materials were dangerous and a threat to the health of persons coming into contact therewith;

16      (e)    Defendants, their "alternate entities", and each of them, failed to provide Plaintiff

17  ROBERT REASER with information concerning adequate protective masks and other equipment

18  devised to be used when applying, mixing, installing and sanding the products of the defendants, their

19  "alternate entities", and each of them, despite knowing that such protective measures were necessary,

20  and that they were under a duty to disclose that such materials were dangerous and would result in injury

21  to Plaintiff ROBERT REASER and others applying and installing such material;

22      (f)    Defendants, their "alternate entities", and each of them, knew and failed to disclose that

23  Plaintiff ROBERT REASER and anyone similarly situated, upon inhalation of asbestos would, in time,

24  have a substantial risk of developing irreversible conditions of pneumoconiosis, asbestosis,

25  mesothelioma and/or cancer;

26      (g)    Defendants, their "alternate entities", and each of them, failed to provide information of

27  the true nature of the hazards of asbestos materials and that exposure to these material would cause

28  pathological effects without noticeable trauma to the public, including buyers, users, and physicians

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**

Page 20                                                    page 40

1   employed by Plaintiff ROBERT REASER  so that said physicians could not examine, diagnose, and

2   treat Plaintiff and others who were exposed to asbestos, despite the fact that defendants, their "alternate

3   entities", and each of them, were under a duty to so inform and said failure was misleading; and

4       31.    Defendants, their "alternate entities", and each of them, and their officers, directors, and

5   managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of,

6   or should have known of, each of the acts set forth herein. Defendants, their "alternate entities", and

7   each of them, are liable for the oppressive and malicious acts of their "alternate entities", and each of

8   them, and each defendant's officers, directors, and managing agents participated in, authorized,

9   expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of

10  their "alternate entities" as set forth herein.

11      32.    The herein-described conduct of said defendants, their "alternate entities", and each of

12  them, was and is willful, malicious, oppressive, outrageous, and in conscious disregard and indifference

13  to the safety and health of "exposed person," including Plaintiff ROBERT REASER , in that defendants,

14  and each of them, continued to manufacture, market and/or sell dangerous products known to cause

15  severe, permanent injuries and death, despite possessing knowledge of the substantial hazards posed by

16  use of their products, in order to continue to profit financially therefrom.  Defendants, their "alternate

17  entities", and each of them, engaged in such conduct so despicable, contemptible, base, vile, miserable,

18  wretched and loathsome as to be looked down upon and despised by ordinary people and justifies an

19  award of punitive and exemplary damages pursuant to Civil Code section 3294.  Plaintiffs, for the sake

20  of example and by way of punishing said defendants, seek punitive damages according to proof.

21      33.    Defendants and each of them engaged in conduct which was intended by defendants and

22  each of them to cause injury to the plaintiffs, and despicable conduct which was carried on by the

23  defendant with a willful and conscious disregard of the rights or safety of others, including Plaintiff

24  ROBERT REASER.

25      34.    Defendants, and each of them, engaged in the despicable conduct described herein that

26  subjected persons, including Plaintiff ROBERT REASER , to cruel and unjust hardship in the form of

27  sever, debilitating and fatal diseases like asbestosis, lung cancer and mesothelioma, in conscious

28  disregard of those persons' rights.

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**



Page 21

1    35.    As a direct and proximate result of such intentional conduct by defendants, their

2  "alternate entities" and each of them, Plaintiff ROBERT REASER sustained the injuries and damages

3  alleged herein.

4    WHEREFORE, Plaintiffs pray for judgment against defendants, and their "alternate entities",

5  and each of them, as hereinafter set forth.

6

7                        **THIRD CAUSE OF ACTION**

8                            (Loss of Consortium)

9    AS AND FOR A FURTHER THIRD SEPARATE, AND DISTINCT CAUSE OF ACTION
   FOR LOSS OF CONSORTIUM, PLAINTIFF CHRISTINE REASER   COMPLAINS OF
10 DEFENDANTS, DOES 1-450, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND
   ALLEGES AS FOLLOWS:

11    40.    Plaintiff CHRISTINE REASER incorporates by reference, each and every allegation

12 contained in the general allegations and in the First, and Second Causes of Action herein.

13    41.    Plaintiffs ROBERT REASER and CHRISTINE REASER were married on November 10,

14 1956, and at all times relevant to this action were, and are now, husband and wife.

15    42.    Prior to Plaintiff ROBERT REASER's injuries as alleged, he was able and did perform

16 duties as a spouse.  Subsequent to the injuries and as a proximate result thereof, plaintiff ROBERT

17 REASER has been unable to perform the necessary duties as a spouse and the work and services usually

18 performed in the care, maintenance, and management of the family home, and he will be unable to

19 perform such work, service and duties in the future.  As a proximate result thereof, CHRISTINE

20 REASER has been permanently deprived and will be deprived of the consortium of her spouse,

21 including the performance of duties, all to her damages, in an amount presently unknown but which will

22 be proved at the time of trial.

23    43.    Plaintiff CHRISTINE REASER's discovery of this cause of her loss of consortium, as

24 herein alleged, first occurred within one year of the date this Complaint was filed.

25    44.    As a direct and proximate result of the acts of defendants, their "alternate entities", and

26 each of them, and the severe injuries caused thereby to plaintiff ROBERT REASER  as set forth in this

27 complaint, plaintiff CHRISTINE REASER has suffered, and for a long period of time will continue to

28 suffer, loss of consortium, including, but not limited, loss of services, marital relations, society, comfort,

1  companionship, love and affection of said spouse, and has suffered severe mental and emotional distress

2  and general nervousness as a result thereof.

3      44.   WHEREFORE, plaintiffs pray for judgment against defendants, their "alternate entities",

4  and each of them, in an amount to be proved at trial in each individual case, as follows:

5      Plaintiff ROBERT REASER :

6      1.    For plaintiff's general damages according to proof;

7      2.    For plaintiff's loss of income, wages, and earning potential according to proof;

8      3.    For plaintiff's medical and related expenses according to proof;

9      Plaintiff CHRISTINE REASER:

10      4.    For plaintiff's damages for loss of consortium and/or society according to proof;

11      Plaintiffs ROBERT REASER  and CHRISTINE REASER:

12      5.    For plaintiffs' cost of suit herein;

13      6.    For exemplary or punitive damages according to proof;

14      7.    For such other and further relief as the Court may deem just and proper, including

15  costs and prejudgment interest as provided in C.C.P. section 998, C.C.P. section 1032, and related

16  provisions of law.

17  DATED: January 24, 2008          SIMON, EDDINS & GREENSTONE, LLP

18

19             By

20             JENNIFER BARTLETT
            ETHAN A. HORN
21             Attorneys for Plaintiffs

22

23

24

25

26

27

28

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**

1

2                              DEMAND FOR JURY TRIAL

3                 Plaintiffs hereby demand trial by jury as to all issues so triable.

4

5     DATED: January 24, 2008                  SIMON, EDDINS & GREENSTONE, LLP

6

7                                              By:

8                                              ETHAN A. HORN
                                               Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

Page 24                                                                   page  44

## EXHIBIT "A"

Plaintiff ROBERT REASER's exposure to asbestos and asbestos-containing products occurred at various locations within the States of California, South Carolina, Massachusetts, Florida and Rhode Island including, but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Date(s) |
|---|---|---|---|
| United States Navy | USS Shea (DM-30)<br>San Diego, CA<br>Charleston, SC | Welder; Pipefitter;<br>Fireman; Seaman<br>Apprentice | 1951-1956 |
| United States Navy | USS Boston (CA-69/CAG-1)<br>Boston Naval Shipyard<br>Boston, MA | Damage Control, Third<br>Class | 1951-1956 |
| United States Navy | USS Providence (CLG-6/CL-82)<br>Providence, RI | Damage Control, Second<br>Class | 1959-1960 |
| United States Navy | USS Wilkinson (DL-5)<br>Long Beach, CA | Damage Control, Second<br>Class | 1960-1964 |
| United States Navy | NAS Cecil Field<br>Jacksonville, FL | Damage Control, First<br>Class | 1964-1967 |
| F. C. James<br>Construction | Florida | Framer | 1971-1997 |
| Self | Florida | Brake replacement | 1960s and 1970s |

1

## EXHIBIT "B"

2

3        Plaintiff ROBERT REASER's exposure to Defendants' Products caused severe and

4    permanent injury to Plaintiff ROBERT REASER including, but not limited to, mesothelioma.

5    Plaintiff was diagnosed with mesothelioma on or about December 13, 2007.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

**Page 26**

# EXHIBIT B

1/31 1:00

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST
(sued individually and as successor-in-interest to
ALLIS-CHALMERS CORPORATION)

[SEE ATTACHED DEFENDANTS]

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JAN 25 2008

John A. Clarke, Executive Officer/Clerk

BY MARY GARCIA, Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*
ROBERT REASER and CHRISTINE REASER

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
(El nombre y dirección de la corte es):
LOS ANGELES SUPERIOR COURT
111 N. Hill Street
111 N. Hill Street
Los Angeles, CA 90012
CENTRAL DISTRICT

CASE NUMBER:
(Número del Caso): BC384385

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Jennifer L. Bartlett, #183154                    562.590.3400
SIMON, EDDINS & GREENSTONE, LLP
301 East Ocean Blvd., Suite 1950
Long Beach, California 90802

DATE: JAN 25 2008              JOHN A. CLARKE, CLERK         Clerk, by M. GARCIA                    , Deputy
(Fecha)                                                                                                (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):
3. [X] on behalf of (specify): Viad Corporation F/K/A The Dial Corporation
   under: [ ] CCP 416.10 (corporation)           [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)    [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other (specify):
4. [ ] by personal delivery on (date):

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

## SUMMONS

Legal
Solutions
& Plus

Code of Civil Procedure §§ 412.20, 465

SUM-200(A)

| SHORT TITLE:  ROBERT REASER vs. ALLIS CHALMERS CORPORATION PRODUCT LIABILITY TRUST, et al. | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

➜   This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜   If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[ ] Plaintiff   [X] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

CBS CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to CBS
CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION and also as successor-in-
interest to BF STURTEVANT);
CLA-VAL CO. ;
FOSTER WHEELER ENERGY CORPORATION;
GENERAL ELECTRIC COMPANY;
VIAD CORPORATION f/k/a THE DIAL CORPORATION (sued individually and as successor-
in-interest to GRISCOM-RUSSELL COMPANY);
and DOES 1-450 INCLUSIVE

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Legal
Solutions
Plus

# EXHIBIT C

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
01/31/2008
CT Log Number 513039114

TO:   General Counsel
      Viad Corp
      1850 N. Central Avenue, Suite 800
      Phoenix, AZ 85004-4545

VIAD = Law

FEB 0 4 2008

RE:   **Process Served in California**

(G-R)

FOR:  Viad Corp (Domestic State: DE)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| TITLE OF ACTION: | Robert Reaser and Christine Reaser, Pltfs. vs. Allis Chalmers Corporation Product Liability Trust, etc., et al. including Viad Corporation, etc., Dfts. *Name discrepancy noted.* |
| DOCUMENT(S) SERVED: | Summons, Attachment(s), Complaint, Demand for Jury Trial, Exhibit(s), Notice, Cover Sheet, First Amended Order, Cover Sheet Addendum, Stipulation Form |
| COURT/AGENCY: | Los Angeles County, Los Angeles, Superior Court, CA Case # BC384385 |
| NATURE OF ACTION: | Asbestos Litigation - Personal Injury |
| ON WHOM PROCESS WAS SERVED: | C T Corporation System, Los Angeles, CA |
| DATE AND HOUR OF SERVICE: | By Process Server on 01/31/2008 at 13:00 |
| APPEARANCE OR ANSWER DUE: | Within 30 days after service |
| ATTORNEY(S) / SENDER(S): | Jennifer L. Bartlett Simon, Eddins & Greenstone, LLP 301 East Ocean Blvd. Suite 1950 Long Beach, CA 90802 562-590-3400 |
| ACTION ITEMS: | SOP Papers with Transmittal, via Fed Ex 2 Day , 798364980536 Email Notification, General Counsel DSHAY@VIAD.COM |
| SIGNED: PER: ADDRESS: | C T Corporation System Nancy Flores 818 West Seventh Street Los Angeles, CA 90017 |
| TELEPHONE: | 213-337-4615 |

Page 1 of 1 / NF

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# EXHIBIT D

1   Peter B. Langbord, Esq., SBN 144319
    Foley & Mansfield PLLP
2   150 South Los Robles Ave., Suite 400
    Pasadena, California 91101
3   Telephone: (626) 744-9359
    Facsimile:  (626) 744-1702

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 08 2008

John A. Clarke, Executive Officer/Clerk

BY RUGENA LOPEZ, Deputy

4

5   Attorneys for Defendant
    VIAD CORP

6

7

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             COUNTY OF LOS ANGELES

10

11  ROBERT REASER and CHRISTINE   )  Case No.  BC 384385
    REASER                  )  *[Assigned to Hon. Elizabeth A. Grimes, Dept.30]*
12                    )
          Plaintiffs      )
13                    )  **ANSWER OF VIAD CORP TO**
        vs.           )  **COMPLAINT FOR PERSONAL INJURY**
14                    )  **– ASBESTOS (NEGLIGENCE; STRICT**
    ALLIS CHALMERS CORPORATION  )  **LIABILITY; LOSS OF CONSORTIUM)**
15  PRODUCT LIABILITY TRUST (sued  )
    individually and as successor-in-interest to  )
16  ALLIS-CHALMERS CORPORATION);  )
    CBS CORPORATION f/k/a VIACOM INC.  )
17  (sued as successor-by-merger to CBS  )
    CORPORATION f/k/a WESTINGHOUSE  )
18  ELECTRIC CORPORATION and also as  )
    successor-in-interest to BF STURTEVANT)  )
19  CLA-VAL CO.;  )
    FOSTER WHEELER ENERGY  )
20  CORPORATION;  )
    GENERAL ELECTRIC COMPANY;  )
21  VIAD CORPORATION f/k/a THE DIAL  )
    CORPORATION (sued individually and as  )
22  successor-in-interest to GRISCOM-RUSSELL )
    COMPANY);  )
23  and DOES 1-450 INCLUSIVE,  )
                    )
24                    )
          Defendants.     )  *Complaint Filed: January 25, 2008*
25

26      COMES NOW DEFENDANT VIAD CORP ("Defendant") and answers the unverified

27  Complaint herein on its own behalf and on behalf of no other defendant or entity as follows:

28  Pursuant to California Code of Civil Procedure §431.30(d), Defendant denies generally and

---

ANSWER OF VIAD CORP TO COMPLAINT FOR PERSONAL INJURY – ASBESTOS
(NEGLIGENCE; STRICT LIABILITY; LOSS OF CONSORTIUM)

1  specifically each and every allegation of the unverified Complaint, and specifically denies that

2  plaintiff was, is or will be injured or damaged as alleged, or in any amount, or at all. If multiple

3  plaintiffs are involved in the action, the word "plaintiff" used herein shall include each and every

4  plaintiff.  If the action is for or includes a claim for wrongful death, the word "plaintiffs"

5  includes each and every plaintiff and plaintiff's decedent.

6  ### FIRST AFFIRMATIVE DEFENSE

7  Neither the Complaint nor any purported cause of action alleged therein states facts sufficient

8  to constitute a cause of action against answering Defendant, or states facts sufficient to state a claim

9  upon which relief may be granted.

10  ### SECOND AFFIRMATIVE DEFENSE

11  To the extent the Complaint asserts Defendant's alleged "market share" liability, or

12  "enterprise" liability, the Complaint fails to state facts sufficient to constitute a cause of action against

13  Defendant.

14  ### THIRD AFFIRMATIVE DEFENSE

15  Neither the Complaint nor any purported cause of action alleged therein states facts sufficient

16  to entitle plaintiff to an award of punitive damages against Defendant.

17  ### FOURTH AFFIRMATIVE DEFENSE

18  The imposition of any punitive damages in this matter would deprive Defendant of its

19  property without due process of law under the California Constitution and the United States

20  Constitution.

21  ### FIFTH AFFIRMATIVE DEFENSE

22  The imposition of any punitive damages in this matter would violate the United States'

23  Constitution prohibition against laws impairing the obligation of contracts.

24  ### SIXTH AFFIRMATIVE DEFENSE

25  The imposition of any punitive damages in this matter would constitute a criminal fine or

26  penalty and should, therefore, be remitted on the ground that the award violates the United States

27  Constitution.

28  //

ANSWER OF VIAD CORP TO COMPLAINT FOR PERSONAL INJURY – ASBESTOS
(NEGLIGENCE; STRICT LIABILITY; LOSS OF CONSORTIUM)

Page 31

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's action, and each alleged cause of action thereof, is barred by the applicable statute of limitations, including but not limited to California Code of Civil Procedure, §§335, 335.1, 337, 337.1, 337.15, 338(a), 338(d), 338(h), 338.1, 339, 340.2, 340.8, 343 and 361, and California Commercial Code, §2725.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff unreasonably delayed in bringing this action, without good cause therefore, and thereby has prejudiced Defendant as a direct and proximate result of such delay; accordingly, plaintiff's action is barred by latches and by §§583, 583.110, 583.210, 583.250, 583.310, 583.320, 583.360, 583.410 and 583.420 et. seq. of the Code of Civil Procedure.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff was negligent or otherwise legally liable in and about the matters alleged in the Complaint and in each alleged cause of action, and this negligence and/or other legal liability legally and proximately caused, in whole or in part, the damages alleged in the Complaint, if any there were. In the event plaintiff is entitled to any damages, the amount of these damages should be reduced by the comparative fault of plaintiff and any person whose negligent acts or omissions or other legal liability are imputed to plaintiffs.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff knowingly, voluntarily and unreasonably undertook to encounter each of the risks and hazards, if any, referred to in the Complaint and each alleged cause of action, and this undertaking proximately and legally caused and contributed to any loss, injury or damages incurred by plaintiff.

### ELEVENTH AFFIRMATIVE DEFENSE

Any loss, injury or damage incurred by plaintiff was proximately and legally caused by the negligent or willful acts or omissions or other legal liability of parties whom Defendant neither controlled nor had the right to control, and was not proximately caused by any acts, omissions or other conduct of Defendant.

//

*TWELFTH AFFIRMATIVE DEFENSE*

The products referred to in the Complaint were misused, abused or altered by plaintiff or by others; the misuse, abuse or alteration was not reasonably foreseeable to Defendant, and proximately and legally caused any loss, injury or damages incurred by plaintiff.

*THIRTEENTH AFFIRMATIVE DEFENSE*

Defendant alleges that its products were manufactured, produced, supplied, sold and distributed in mandatory conformity with specifications promulgated by the United States Government under its war powers, as set forth in the United States Constitution, and that any recovery by plaintiff on the Complaint on file herein is barred in consequence of the exercise of those sovereign powers.

*FOURTEENTH AFFIRMATIVE DEFENSE*

Plaintiff failed to exercise due diligence to mitigate plaintiff's loss, injury or damages; accordingly, the amount of damages to which plaintiff is entitled, if any, should be reduced by the amount of damages which would have otherwise been mitigated.

*FIFTEENTH AFFIRMATIVE DEFENSE*

The Court lacks subject matter jurisdiction over the matters alleged in the Complaint because the Complaint and each alleged cause of action against Defendant is barred by the provisions of California Labor Code, §3600, et seq.

*SIXTEENTH AFFIRMATIVE DEFENSE*

Defendant alleges that at the time of the injuries alleged in the Complaint, plaintiff was employed and was entitled to receive Workers' Compensation benefits from his employer's workers' compensation insurance carrier; that each of plaintiff's employers, other than Defendant, was negligent and/or legally liable in and about the matters referred to in said Complaint, and that such negligence on the part of said employers proximately and concurrently contributed to the occurrence of the accident and to the loss or damage complained of by plaintiff, if any there was; and that by reason thereof Defendant is entitled to set off and/or reduce any such workers' compensation benefits received or to be received by or on behalf of plaintiff against any judgment which may be rendered in favor of plaintiff. (*Witt v. Jackson,* 57 Cal.2d 57, 366 P.2d 641)

1
*SEVENTEENTH AFFIRMATIVE DEFENSE*

2      Defendant alleges that at the time of the injuries alleged in the Complaint, each of plaintiff's

3   employers was negligent and/or otherwise legally liable in and about the matters referred to in said

4   Complaint, and that such negligence and/or legal liability on the part of each employer proximately

5   and concurrently contributed to any loss or damage, including non-economic damages, complained of

6   by plaintiff, if any there were; and that Defendant is not liable for each said employers' proportionate

7   share of non-economic damages.

8
*EIGHTEENTH AFFIRMATIVE DEFENSE*

9      Defendant alleges that at the time of the injuries alleged in the Complaint, parties other than

10  this Defendant were negligent and/or otherwise legally liable in and about the matters referred to in

11  said Complaint, and that such negligence and/or other legal liability on the part of said parties

12  proximately, legally and concurrently contributed to any loss or damage, including non-economic

13  damages, complained of by plaintiff, if any there were; and that Defendant herein shall not be liable

14  for said parties' proportionate share of non-economic damages.

15
*NINETEENTH AFFIRMATIVE DEFENSE*

16     Defendant alleges that at all times relative to matters alleged in the Complaint, each of

17  plaintiff's employers, other than Defendant, was a sophisticated user of asbestos-containing products

18  and each of said employer's negligence or other legal liability in providing the product to its

19  employees in a negligent, careless and reckless manner was a superseding cause of plaintiff's injuries,

20  if any.

21
*TWENTIETH AFFIRMATIVE DEFENSE*

22     If plaintiff has received, or in the future may receive Worker's Compensation benefits from

23  Defendant under the Labor Code of the State of California as a consequence of the alleged industrial

24  injury referred to in the Complaint, and in the event Defendant is held liable to plaintiff, any award

25  against Defendant must be reduced in the amount of all such benefits received by plaintiff.

26
*TWENTY-FIRST AFFIRMATIVE DEFENSE*

27     If plaintiff has received, or in the future may receive, Worker's Compensation benefits from

28  Defendant under the Labor Code of the State of California as a consequence of the alleged industrial

---

ANSWER OF VIAD CORP TO COMPLAINT FOR PERSONAL INJURY – ASBESTOS
(NEGLIGENCE; STRICT LIABILITY; LOSS OF CONSORTIUM)

1  injury referred to in the Complaint, and in the event plaintiff is awarded damages against Defendant,

2  Defendant claims a credit against this award to the extent that Defendant is barred from enforcing his

3  rights to reimbursement for Worker's Compensation benefits that plaintiff has received or may in the

4  future receive.

5  ### TWENTY-SECOND AFFIRMATIVE DEFENSE

6  If plaintiff has received, or in the future may receive Worker's Compensation benefits from

7  Defendant under the Labor Code of the State of California as a consequence of the alleged industrial

8  injury referred to in the Complaint, Defendant demands repayment of any such Worker's

9  Compensation benefits in the event that plaintiff recovers tort damages as a result of the industrial

10  injury allegedly involved here.  Although Defendant denies the validity of plaintiff's claims, in the

11  event those claims are held valid and not barred by the statute of limitations or otherwise, Defendant

12  asserts that cross-demands for money have existed between plaintiff and Defendant and that demands

13  must be compensated, so far as they equal each other, pursuant to California Code of Civil Procedure

14  § 431.70.

15  ### TWENTY-THIRD AFFIRMATIVE DEFENSE

16  At all times and places in the matters alleged in the Complaint, plaintiff was not in privity of

17  contract with Defendant and said lack of privity bars plaintiff's recovery herein upon any theory of

18  warranty.

19  ### TWENTY-FOURTH AFFIRMATIVE DEFENSE

20  Plaintiff was barred from recovery in that all products produced by Defendant were in

21  conformity with the existing state-of-the-art, and as a result, these products were not defective in any

22  manner.

23  ### TWENTY-FIFTH AFFIRMATIVE DEFENSE

24  The Defendant did not and does not have a substantial percentage of the market for the

25  asbestos-containing products which allegedly caused plaintiff's injuries.  Therefore, Defendant may

26  not be held liable to plaintiff based on this Defendant's alleged percentage share of the applicable

27  market.

28  //

**Page 35**

*TWENTY-SIXTH AFFIRMATIVE DEFENSE*

Defendant denies any and all liability to the extent that plaintiff asserts Defendant's alleged liability as a successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, alter ego, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, labeling, assembling, distributing, leasing, buying, offering for sale, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain substance, the generic name of which is asbestos.

*TWENTY-SEVENTH AFFIRMATIVE DEFENSE*

Defendant alleges that California is an inconvenient forum in which to try this matter, that there is a suitable alternative forum, and that the balance of public and private interests weigh in favor of trying this matter in the aforesaid suitable alternative forum.

*TWENTY-EIGHTH AFFIRMATIVE DEFENSE*

The Complaint fails to state facts sufficient to constitute a cause of action to invoke the maritime/admiralty laws of the United States.

*TWENTY-NINTH AFFIRMATIVE DEFENSE*

Plaintiff herein has failed to join indispensable parties (California Code of Civil Procedure, §389) and the Complaint is thereby defective, and plaintiff is thereby precluded from any recovery whatsoever as prayed for herein.

*THIRTIETH AFFIRMATIVE DEFENSE*

Plaintiff has no standing or right to sue for fraud and conspiracy, breach of warranty, deceit, or any cause of action under California Civil Code, §§1709-1710, and therefore the Complaint and each cause of action thereof fail to state facts sufficient to constitute a cause of action against this answering Defendant.

*THIRTY-FIRST AFFIRMATIVE DEFENSE*

Plaintiff herein lacks legal capacity to sue and is not a real party in interest and is thereby precluded from any recovery whatsoever as prayed for herein.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

Fraud and conspiracy do not constitute a separate and distinct form of damages from general damages, and therefore, the prayer for fraud and conspiracy in addition to general damages does not sufficiently support or constitute a separate claim for damages against this answering Defendant, but is simply cumulative and included in general damages.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

Defendant alleges that, on information and belief, plaintiff named Defendant in this litigation without reasonable product identification and without a reasonable investigation; accordingly, Defendant, pursuant to Code of Civil Procedure §§128.5, 128.6 and 128.7 requests reasonable expenses, including attorney's fees, incurred by this Defendant as a result of the maintenance by plaintiff and plaintiff's attorneys of this bad faith action.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

The product(s) described in the Complaint which allegedly injured plaintiff were, without this answering defendant's knowledge, approval or consent, and contrary to instructions and/or the custom and practice in the industry, altered, redesigned, modified, or subjected to other treatment which substantially changed the character of each, such that they were not being used, functioning and/or performing in a manner intended by their manufacturer, and/or were not in substantially the same or similar condition as when they left the manufacturer's possession. If there was a defect in said product(s), which supposition is specifically denied, such defect resulted solely from such alteration, re-design, modification, treatment, or other change therein, and not from any act or omission by this answering defendant, thereby barring plaintiff from recovery herein as against this answering defendant.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

The imposition of punitive/ exemplary damages against this corporate defendant for acts of a former and/or predecessor corporate entity would be a violation of due process of law, and against public policy, under the laws and Constitution of the State of California and United States.

### THIRTY-SIXTH AFFIRMATIVE DEFENSE

The Complaint, as amended now or in the future, and each cause of action therein, is pre-empted by the Locomotive Boiler Inspection Act, 49 U.S.C.S. §§20701, et seq., The Federal Safety Appliances Act, 49 U.S.C. Sects. 20301, et seq., and all other applicable federal statutes, laws and regulations.

### THIRTY-SEVENTH AFFIRMATIVE DEFENSE

Some or all of the claimed causes of action and/or damages are barred by a prior settlement and release.

### THIRTY-EIGHTH AFFIRMATIVE DEFENSE

Defendant alleges that as a result of the acts, conduct, and omissions of plaintiff and plaintiff's agents, each cause of action presented in the Complaint has been waived, and plaintiff is estopped from asserting or recovering upon such claims.

### THIRTY-NINTH AFFIRMATIVE DEFENSE

Defendant alleges that plaintiff's tobacco use is an assumption of a known risk, and that said conduct of plaintiff proximately caused and contributed to the claimed injuries and damages, if any, and therefore the recovery of plaintiff, if any, is barred or proportionately reduced.

### FORTIETH AFFIRMATIVE DEFENSE

Defendant alleges that consumption of tobacco products is negligence per se because it is "inherently unsafe and consumed with the ordinary community knowledge of its danger," as expressed in *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, California Civil Code §1714.45(a)(1). Thus, the said negligence of plaintiff proximately caused and contributed to plaintiff's injuries and damages, if any, and therefore, the recovery of plaintiff, if any, is barred or proportionately reduced.

//
//
//
//
//

WHEREFORE, Defendant prays:

1.    That plaintiff take nothing by this Complaint;

2.    That Judgment be entered in favor of Defendant;

3.    For recovery of Defendant's costs of suit;

4.    For appropriate credits and set-offs arising out of any payment of Worker's
      Compensation benefits as alleged above; and

5.    For such other and further relief as the Court deems just and proper.

DATED:  February 6, 2008

FOLEY & MANSFIELD, PLLP

BY:  _____
     Peter B. Langhord
     Attorneys for Defendant
     VIAD CORP

## PROOF OF SERVICE
[CCP, 1013A(3) CRC Rule 2006(d) - Revised 3/1/92]

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 150 S. Los Robles Avenue, Suite 400, Pasadena, California 91101.

On **February 7, 2008**, I served the foregoing document described as: **ANSWER OF VIAD CORP TO COMPLAINT FOR PERSONAL INJURY - ASBESTOS (NEGLIGENCE; STRICT LIABILITY; LOSS OF CONSORTIUM)** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

Ron C. Eddins, Esq.
Jennifer L. Bartlett, Esq.
Ethan A. Horn, Esq.
SIMON, EDDINS & GREENSTONE, LLP
301 E. Ocean Blvd., Suite 1950
Long Beach, CA 90802
*Attorney for Plaintiffs*

☒　**(BY MAIL)**  I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Los Angeles, California.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐　**(BY PERSONAL DELIVERY)**  I delivered such envelope by hand to the office of the addressee(s) noted above.

☐　**(BY FACSIMILE TRANSMISSION)**  I caused such document to be transmitted to the addressee(s) facsimile number noted above.  The facsimile machine I used complied with Rule 2003(3) and the transmission was reported as complete and without error.  Pursuant to Rule 2005(i), I caused the machine to print a transmission record of the facsimile transmission, a copy of which is attached to this declaration.

☐　**(BY OVERNIGHT DELIVERY)**  I caused such envelope(s) to be deposited in a box or other facility regularly maintained by the Federal Express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service.

Executed on February 7, 2008, Pasadena, California.

☒　**[STATE]** I declare under penalty of perjury under the laws of the State of California that the above is true and correct and, that I am employed in the office of a member of the bar of this court at whose direction the service was made.

☐　**[FEDERAL]** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Leo Valente

Page 40

page  63

# EXHIBIT B

Slip Copy, 2007 WL 1813821 (N.D.Cal.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Mara J. BALLENGER, et al., Plaintiffs,
v.
AGCO CORPORATION, et al., Defendants.
No. C 06-2271 CW.
June 22, 2007.

Jeffrey A. Kaiser, William A. Levin, Levin Simes Kaiser & Gornick LLP, San Francisco, CA, for Plaintiffs.

James J. Braze, Gordon & Rees, LLP, Alex Paul Catalona, Schiff Hardin LLP, D. David Steele, George D. Yaron, Keith E. Patterson, Yaron & Associates, Evan Craig Nelson, Carroll, Burdick & McDonough LLP, San Francisco, CA, Bradley S. Thomas, Mason Thomas, Sacramento, CA, for Defendants.

ORDER DENYING PLAINTIFFS' MOTION TO REMAND CASE AND FOR PAYMENT OF FEES AND COSTS

CLAUDIA WILKEN, United States District Judge.

*1 Plaintiffs Mara J. Ballenger, individually and on behalf of the Estate of John M. Ballenger, James M. Ballenger and Charles J. Ballenger move to remand this action to state court. Defendant Todd Shipyards Corporation opposes this motion and requests that, if the Court is inclined to grant Plaintiffs' motion, the Court certify its order for interlocutory appeal. The motion was heard on June 21, 2007. Having considered all of the papers filed by the parties and oral argument, the Court denies Plaintiffs' motion to remand.

BACKGROUND

John M. Ballenger died of mesothelioma in 2005. Before his death, he and his wife filed suit for asbestos personal injury and loss of consortium in San Francisco County Superior Court. Todd Shipyards was named as a defendant in that action. After it threatened to remove the action, however, Mr. and Mrs. Ballenger dismissed without prejudice the claims against Todd Shipyards. Plaintiffs explain that Mr. Ballenger's health was rapidly declining and they could not risk the delay that would have been caused by removal; Mr. Ballenger died shortly thereafter.

After his death, Plaintiffs filed an amended complaint, seeking damages for asbestos-caused wrongful death and loss of consortium and reviving the claims against Defendant Todd Shipyards. Plaintiffs bring negligence and strict liability causes of action against "Asbestos Defendants," which includes Defendant Todd Shipyards. The complaint alleges that Mr. Ballenger's terminal mesothelioma stemmed, in part, from his occupational exposure to asbestos-containing products while working on premises owned or operated by Defendant Todd Shipyards.[FN1]

FN1. Although the complaint does not identify any particular vessel on which Mr. Ballenger worked, Plaintiffs state that, during a major overhaul at Todd Shipyards in San Pedro, California, Mr. Ballenger was exposed to asbestos while serving as a Naval officer on the USS Tappahannock.

According to the complaint, Defendant Todd Shipyards' employees and contractors negligently exposed Mr. Ballenger to airborne asbestos fibers by working with asbestos-containing materials in

page 65

his presence and then failed to warn him of the hazardous condition. The complaint states that Defendant Todd Shipyards' duty to warn Mr. Ballenger was independent of any potential role the U.S. Navy might have played in specifying the use of asbestos-containing materials on Navy ships and cites *Westbrook v. Asbestos Defendants,* 2001 U . S. Dist. LEXIS 11575 (N.D.Cal.).<u>FN2</u>

> FN2. In *Westbrook,* the court remanded an action that was improperly removed to federal court under the federal officer removal statute and awarded the plaintiffs the amount they incurred in attorneys' fees bringing the motion to remand. There, unlike here, the plaintiffs disclaimed, in writing, any claims arising out of work done on U.S. Navy vessels.

The complaint further states:

The Federal Courts lack jurisdiction over this action and removal is therefore improper. There is incomplete diversity of citizenship due to the presence of a California ASBESTOS DEFENDANT. Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed. This includes any claim arising from an act on a Federal Enclave as defined by Article I, section 8, clause 17 of the United States Constitution. This also includes any claim arising from any act or omission of the United States, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States. No claim of admiralty or maritime law is raised. Plaintiffs sue no foreign state or agency.

**\*2** First Amended Complaint, ¶ 8.

On March 30, 2006, Defendant Todd Shipyard filed its notice of removal, contending that removal is proper pursuant to 28 U.S.C. section 1442(a)(1). Plaintiffs filed a motion to remand. Before the Court ruled on Plaintiffs' motion, the Judicial Panel on Multidistrict Litigation (MDL Panel) ordered this case transferred to the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings. The Eastern District of Pennsylvania court severed all claims for punitive damages and advised the MDL Panel that coordinated or consolidated pretrial proceedings with respect to the remaining claims had been completed. After the MDL panel conditionally remanded all claims in this case, except for the severed punitive damages claims, to this Court, Plaintiffs re-noticed their motion to remand.

DISCUSSION

I. Remand

Defendant Todd Shipyards argues that it properly removed this action under the federal officer removal statute, which provides that an action may be removed by "any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1). <sup>FN3</sup>

> FN3. Specifically, § 1442(a)(1) provides: A civil or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

Generally, removal statutes are to be strictly construed; any doubt as to the right to remove should resolved in favor of remanding to state court. *See, e.g., Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992). But that is not the case concerning the federal officer removal statute. *See Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1252 (9th Cir.2006) (noting that, because it is important to the federal government to protect federal officers, removal rights under section 1442 are much

**page 66**

broader than those under section 1441). The Ninth Circuit instructs that there is a "clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* (noting that the Supreme Court has "insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)' " (quoting *Arizona v. Manypenny*, 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981))).

As the Supreme Court explained in *Jefferson County v. Acker*, 527 U.S. 423, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999),

It is the general rule that an action may be removed from state court to federal court only if a federal district court would have original jurisdiction over the claim in suit. To remove a case as one falling within federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded complaint; an anticipated or actual federal defense generally does not qualify a case for removal. Suits against federal officers are exceptional in this regard. Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint.

527 U.S. at 430-31 (citations omitted).

Thus, the fact that Plaintiffs' complaint expressly disavows any federal claims is not determinative. Rather, removal is proper under the federal officer removal statute if the moving party: (1) demonstrates that it acted under the direction of a federal officer; (2) raises a colorable federal defense to the plaintiff's claims; and (3) demonstrates a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 134-35, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989); *Fung v. Abex Corp.*, 816 F.Supp. 569, 571-72 (N.D.Cal.1992).[FN4]

> FN4. In addition, the removing party must qualify as a "person" for purposes of 28 U.S.C. section 1441(a). As a corporation, Defendant Todd Shipyards meets this preliminary requirement. *See Fung*, 816 F.Supp. at 572.

A. Acts under the direction of a federal officer

*\*3* To show that it was acting under the direction of a federal officer, Defendant Todd Shipyards must show that a federal officer had "direct and detailed control" over it. *Fung*, 816 F.Supp. at 572. If it "establishes 'only that the relevant acts occurred under the general auspices of a federal officer,' such as being a participant in a regulated industry," it is not entitled to remove under section 1442(a)(1). *Id.* (quoting *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947 (E.D.N.Y.1992)).

Defendant Todd Shipyards contends that it acted under the direction of U.S. Navy officers and provides declarations supporting this contention. According to a retired U.S. Navy Admiral, at the time that Mr. Ballenger was on the USS Tappahannock, all private contractors, such as Defendant Todd Shipyards, performed their work pursuant to precise requirements imposed by the Navy and under the Navy's detailed supervision: "the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships, including the USS Tappahannock" and did not permit deviations from its contractors. Horne Dec., ¶ 15. Among the requirements the Navy imposed on private contractors was that they use asbestos-containing materials in the maintenance and repair of Naval vessels. Admiral Roger B. Horne states that, in his opinion, "no private contractor could have affixed a written warning anywhere aboard an active duty Naval warship, advising the risk of asbestos exposure, following the completion of Navy-mandated repairs, except by permission of the United States Navy." *Id.*

Defendant Todd Shipyards notes that its acts here are similar to the defendant's acts in *Fung*. There, the court concluded that the "acting under" requirement was satisfied where the defendant established that the U.S. Navy monitored its "performance at all times and required the defendant to construct and repair the vessels in accordance with applicable and approved specifications

page 67

incorporated in the contracts. In addition, all contract supplies were subject to inspection, test, and approval by the government." *Fung*, 816 F.Supp. at 572-73.

Plaintiffs argue that, because Defendant Todd Shipyards has not produced any actual contractual documentation of the work it allegedly performed on behalf of U.S. Navy officers, it has not shown that it acted under the direction of federal officers. This argument is not persuasive. Defendant Todd Shipyards is not required to produce contracts from decades past in order to demonstrate that it worked under the direction of federal officers; to require such documentation would frustrate the purpose of section 1442(a)(1). *See Durham*, 445 F.3d at 1252. Admiral Horne's declaration suffices.

Plaintiffs further argue that, even accepting Admiral Horne's declaration as true, his declaration only proves that the government required Defendant Todd Shipyards to use asbestos products, not that Defendant Todd Shipyards was under the direct control of the Navy with respect to failure to warn and negligent use of asbestos. Plaintiffs, however, concede that Admiral Horne concluded that the Navy directed every aspect of installation and warnings associated with its ships. They contend that neither Admiral Horne's declaration, nor any other declaration Defendant Todd Shipyards submitted, establishes that the Navy directed the exact manner in which Defendant Todd Shipyards' workers and its subcontractors performed their work with asbestos products, nor that the government affirmatively prohibited contractors, including Defendant Todd Shipyards, from providing warning. This contention is not persuasive. Just as Defendant Todd Shipyards is not required to produce contracts from decades past, it is not required to produce such detailed declarations concerning whether the Navy directed the exact manner of installation and affirmatively prohibited any kind of warning in order to demonstrate that it worked under the direction of federal officers; such requirement would frustrate the purpose of section 1442(a)(1). *See Durham*, 445 F.3d at 1252. Horne's declaration is sufficient to establish that a federal officer had "direct and detailed control" over Defendant Todd Shipyards.

B. Colorable Federal Defense
    **4** To meet the second prong of the *Mesa* test, Defendant Todd Shipyards must show that it has a colorable federal defense; it need not prove that its defense will be meritorious. *Mesa*, 489 U.S. at 128; *Fung*, 816 F.Supp. at 573. As the Supreme Court explained in *Willingham v. Morgan*, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), "The officer need not win his case before he can have it removed."

Under *Boyle v. United Technologies, Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), liability for design defects in military equipments cannot be imposed on contracts, "pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." 487 U.S. at 512. In their motion, Plaintiffs argue that Defendant Todd Shipyards fails to produce any evidence necessary to show that it is entitled to the government contractor defense. In their reply, however, Plaintiffs do not argue that Defendant Todd Shipyards does not have a colorable government contractor defense; rather, they argue that the Court need not address this issue because Defendant Todd Shipyards fails to satisfy the first and third prongs of the *Mesa* test. The Court, however, finds that Defendant Todd Shipyards satisfies the first prong, as discussed above, and the third prong, as discussed below. Further, the Court finds that Defendant Todd Shipyards has a colorable federal defense.

C. Causal Nexus
    The final prong requires that a defendant demonstrate a causal nexus between the claims against it and the acts it performed under color of federal office. *See Overly v. Raybestos-Manhattan*, 1996 WL 532150, *4 (N.D.Cal.) (noting that the final requirement under the *Mesa* test is that there be a causal connection "between the rules imposed by the United States on the defendant contractor by the federal government and the liability asserted by plaintiff"). Defendant Todd Shipyards argues that this prong is satisfied because, as discussed above, it has produced evidence attesting to the regulations imposed by the U.S. Navy on the repair of its vessels, including the USS Tappahannock.

page  68

2007 WL 1813821

Page 5 of 5

These regulations required that Defendant Todd Shipyards use asbestos products. The Navy directed, inspected and supervised work on its vessels to ensure that contractors, such as Defendant Todd Shipyards, adhered to its requirements.

Plaintiff responds that there is no causal nexus, arguing that Defendant Todd Shipyards only establishes that federal officers directed it to use asbestos and that its claims are not limited to mere use of asbestos: the same argument the Court rejected above. The Court finds that Defendant Todd Shipyards also satisfies the causal nexus requirement.

CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' motion to remand this case and their request for attorneys' fees and costs incurred in bringing their motion to remand. Removal was proper under the federal officer removal statute. Defendant Todd Shipyards' request to certify this motion for interlocutory appeal is denied as moot.[FN5]

> FN5. Both parties submitted objections to other parties' evidence. To the extent that the Court relied upon evidence to which there is an objection, the parties' objections are overruled. To the extent that the Court did not rely on such evidence, the parties' objections are overruled as moot. The Court has not relied on any inadmissible evidence in deciding this motion.

**\*5** IT IS SO ORDERED.

N.D.Cal.,2007.
Ballenger v. Agco Corp.
Slip Copy, 2007 WL 1813821 (N.D.Cal.)

Motions, Pleadings and Filings (Back to top)

• 2006 WL 2186681 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Defendant Todd Shipyard Corporation's Opposition to Plaintiff's Motion to Remand Case to California Superior Court; Plaintiffs' Evidentiary Objections to the Declarations of Roger B. Horne, Jr., Ron Burger, Shelby Hagberg, LeRoy Balzer Submitted by Defendant Todd Shipyard Corporation in Support of its Opposition to Plaintiffs' Motion for Remand; Declaration of Roger E. Gold; (Jun. 20, 2006) ⚙ Original Image of this Document (PDF)
• 2006 WL 2186680 (Trial Motion, Memorandum and Affidavit) Defendant Todd Shipyards Corporation's Opposition to Plaintiffs' Motion to Remand (Jun. 2, 2006)
• 3:06cv02271 (Docket) (Mar. 30, 2006)
• 4:06cv02271 (Docket) (Mar. 30, 2006)
END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT C

**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | |
|---|---|---|
| Case No. | CV 08-118 PA (JWJx) | Date   February 11, 2008 |
| Title | Robert Oberstar, et al. v. CBS Corp., et al. | |

| | |
|---|---|
| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE |

| C. Kevin Reddick | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**        IN CHAMBERS - COURT ORDER

Before the Court is a Motion to Remand filed by plaintiffs Robert and Linda Oberstar ("Plaintiffs") (Docket No. 7). Also before the Court is a Motion to Stay originally filed in case number 08-143 PA (JWJx) by defendant General Electric Co. (Docket No. 5).[1/] Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument. The hearing calendared for February 11, 2008, is vacated, and the matters taken off calendar.

Plaintiffs allege claims for negligence, strict liability, and loss of consortium arising out of Mr. Oberstar's exposure to asbestos-containing products manufactured, fabricated, installed, or otherwise distributed by defendants. Specifically, Plaintiffs' claims assert that defendants violated their obligations imposed under state law to warn Mr. Oberstar of the dangers associated with their asbestos-containing products. Among other places, Plaintiffs allege that Mr. Oberstar was exposed to the asbestos contained in defendants' products while he served aboard the aircraft carrier U.S.S. Midway from 1959 to 1963. Plaintiffs commenced the action in Los Angeles Superior Court on December 3, 2007 and served defendants Viad Corp. ("Viad") and General Electric Co. ("GE") on December 10, 2007. Viad removed the action to this Court on January 8, 2008 and GE filed a Notice of Removal on January 9, 2008. Both Viad and GE based their Notices of Removal on 28 U.S.C. § 1442(a)(1)'s federal officer removal statute. 28 U.S.C. § 1442(a) provides, in relevant part:

> A civil action or criminal prosecution commenced in a State court against
> any of the following may be removed by them to the district court of the

---

[1/]        Because defendants General Electric Co. and Viad Corp. filed separate Notices of Removal, there were originally two case numbers assigned to this action. Because both case numbers referred to the same case originally filed by plaintiffs in Los Angeles Superior Court, the Court consolidated the two actions into CV 08-118 PA (JWJx), dismissed CV 08-143 PA (JWJx), and directed that all future filings should reference only CV 08-118 PA (JWJx). Plaintiff also filed a Motion to Remand in CV 08-143 PA (JWJx) (Docket No. 14). That Motion will be addressed in this Order.

SEND

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | |
|---|---|---|
| Case No. | CV 08-118 PA (JWJx) | Date    February 11, 2008 |
| Title | Robert Oberstar, et al. v. CBS Corp., et al. | |

United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442(a).

Suits against federal officers are an exception to the general rule that a case is removable only if the federal question appears on the face of a properly pleaded complaint. See Jefferson County v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." Id. "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting Jefferson County, 527 U.S. at 431, 119 S. Ct. 2075, 144 L. Ed. 2d 408 and citing Mesa v. California, 489 U.S. 121, 124-25, 131-35, 109 S. Ct. 959, 962, 965-67, 103 L. Ed. 2d 99 (1989)).

In establishing the propriety of removal under the federal officer removal statute, the defendant need not prove a valid federal defense, only a colorable defense:

> In construing the colorable federal defense requirement, we have rejected a "narrow, grudging interpretation" of the statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." We therefore do not require the officer virtually to "win his case before he can have it removed."

Jefferson County, 527 U.S. at 431, 119 S. Ct. at 2075, 144 L. Ed. 2d 408 (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969)). Indeed, unlike other removal statutes, which are to be interpreted strictly, "the Supreme Court has mandated a generous interpretation of the federal officer removal statute . . . ." Durham, 445 F.3d at 1252. As the Supreme Court has held, "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 1664, 68 L. Ed. 2d 58 (1981) (quoting Willingham, 395 U.S. at 407, 89 S. Ct. at 1816, 23 L. Ed. 2d 396); see also Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

**SEND**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |
|---|---|---|---|

| Title | Robert Oberstar, et al. v. CBS Corp., et al. |
|---|---|

In removing the action pursuant to the federal officer removal statute, defendants claim that they are entitled to assert the "military contractor defense." The military contractor defense shields contractors from liability for state tort law for defects in military equipment supplied to the United States when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle v. United Technologies Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 2518, 101 L. Ed. 2d 442 (1988). Although originally developed in the design defect context, the military contractor defense also applies in cases where a plaintiff alleges that the government contractor breached a state law duty to warn of potential dangers. In actions alleging a failure to warn claim against a military contractor, the supplier cannot be liable when it can show: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003-04 (7th Cir. 1996); see also In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992).

As an initial matter, Plaintiffs argue in their Motions to Remand that they have disclaimed any claim that could allow this Court to exercise jurisdiction pursuant to the federal officer removal statute. Specifically, the Complaint alleges:

> Plaintiffs hereby disclaim any cause of action or recovery for any injuries
> caused by any exposure to asbestos dust that occurred in a federal enclave,
> which expressly excludes U.S. Navy vessels. Plaintiffs disclaim any cause
> of action or recovery for any injuries resulting from exposure to asbestos
> dust caused by any acts or omissions of a party Defendant committed at
> the direction of an officer of the United States Government.

Complaint, ¶ 4. In support of their argument that their waiver of claims prevents defendants from removing this action pursuant to § 1442(a)(1), Plaintiffs principally rely on Westbrook v. Asbestos Defendants (BHC), No. C-01-1661 VRW, 2001 WL 902642 (N.D. Cal. July 31, 2001). In Westbrook, the district court relied upon the plaintiff's disclaimer of "any claims arising out of work done on United States Navy ships" to support its conclusion that federal officer removal was not proper. Unlike in Westbrook, Plaintiffs here have not disclaimed claims against defendants arising out of exposure occurring on Navy vessels. Indeed, despite their purported disclaimer, Plaintiffs specifically seek damages from defendants for exposure to asbestos Mr. Oberstar may have come in contact with while he served on the U.S.S. Midway. Because removals pursuant to the federal officer removal statute are premised on the existence of a federal defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs' disclaimer nor its characterization of their claims are determinative. See Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007) ("Machnik's argument that the suit must be remanded because his complaint disclaimed any federal claims is unavailing . . . . Subject matter jurisdiction under § 1442(a)(1) is based upon a federal defense, regardless of whether the



**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |
|---|---|---|---|

| Title | Robert Oberstar, et al. v. CBS Corp., et al. |
|---|---|

plaintiff's cause of action rests on state law. . . . [O]nce GE meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction."); Ballenger v. Agco Corp., No. C 06-2271 CW, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (denying motion to remand despite complaint's disclaimer of "any claim arising from any act or omission of the United State, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States").

Plaintiffs additionally argue that defendants have not met their burden to establish the existence of a valid federal defense to Plaintiffs' claims. Specifically, while conceding that defendants are "persons" within the meaning of § 1442(a)(1), Plaintiffs contend that defendants have not demonstrated that they can assert either a "colorable federal defense" or a "causal nexus" between their actions taken at the direction of a federal officer and Plaintiffs' claims. Durham, 445 F.3d at 1251. According to Plaintiffs, defendants lack the evidence to establish that federal officers prevented defendants from providing necessary warnings. As a result, according to Plaintiffs, defendants cannot prove either the applicability of the military contractor defense or the requisite causal nexus.

In their Motions to Remand, Plaintiffs state that their "complaint contains causes of action limited to state-based failure to warn claims." Motion to Remand, p. 6, ll. 8-9. Similarly, in their Reply, Plaintiffs state that they "did not necessarily sue GE or Viad for using asbestos, but rather for failing to warn of the hazards associated with it. Both GE and Viad claim they were acting under federal direction when they designed and manufactured their equipment, but such a showing is immaterial for purposes of this lawsuit and motion for remand." Reply, p. 8, ll. 4-8. According to Plaintiffs, absent evidence of specific facts that defendants were prevented from placing warnings on their products, defendants cannot meet their burden to establish the availability of the military contractor defense. Contrary to Plaintiffs' assertions, however, defendants' burden at this stage of the proceedings is not so exacting.

To establish their military contractor defense, defendants rely in large part on the declarations of Ben Lehman and Lawrence Betts. Lehman is a retired Rear Admiral, who joined the Navy in 1942 and served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944 and as Ship Superintendent at the San Francisco Naval Shipyard from 1952 to 1954. Lehman also worked as an engineer at GE from 1946 to 1948. Betts, a physician, served in the Navy from 1972 until 2001 when he retired with the rank of Captain.

Lehman's declaration indicates that during the period when the U.S.S. Midway was built and continuing during Mr. Oberstar's service in the Navy, "the Navy had complete control over every aspect of each piece of equipment used on Navy ships." Lehman Decl., ¶ 6. According to Lehman:

> Military specifications governed every characteristic of this equipment,
> including instructions and warnings. Drawings for nameplates, texts of
> instruction manuals, and every other document relating to the

**Page 74**

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 08-118 PA (JWJx)                                    Date   February 11, 2008

Title   Robert Oberstar, et al. v. CBS Corp., et al.

construction, maintenance, and operation of the vessel was approved by
the Navy. This control included the decision of what warnings should or
should not be included. Thus, the Navy controlled the decision making
with respect to instructions and warnings on every piece of equipment.

Furthermore, the Navy had specifications as to the nature and content of
all written material that was delivered with each piece of equipment,
including turbines and turbine manuals. The Navy was intimately
involved with and had final approval of all technical and engineering
drawings, operating manuals, safety or hazard information, and any other
written information that accompanied a piece of equipment. The Navy
determined the nature of hazards to be subject to any precautionary
labeling and the content of any such labeling. . . . In short, the Navy
dictated every aspect of the design, manufacture, installation, overhaul,
written documentation, and warnings associated with its ships and did not
permit deviation by any of its contractors.

Lehman Decl., ¶¶ 6 & 7. In reviewing a nearly identical declaration submitted by Lehman, the court in
Nesbiet v. General Elec. Co. concluded that Lehman's Declaration raised "the inference that GE did not
provide a warning concerning the dangers of asbestos because the Navy did not permit any such
warning." 399 F. Supp. 2d 205, 208 (S.D.N.Y. 2005). Although the Lehman Declaration may not
establish the absence of a triable issue of fact with respect to the first two prongs of the Boyle test, as
modified by Oliver for a failure to warn claim, defendants need not prove so much at this preliminary
stage of the proceedings. See Oliver, 96 F.3d at 1003 (applying military contractor defense when "(1)
the government exercised its discretion and approved certain warnings; (2) the contractor provided the
warnings required by the government . . . ."). Again, to establish the propriety of their removal,
defendants must only show a "colorable" federal defense, not a winning one.

The third prong of the military contractor defense requires the contractor to have "warned the
government about dangers in the equipment's use that were known to the contractor but not to the
government." Id. at 1004. Defendants rely on the Betts Declaration to meet this third factor of the
Boyle test. Through his training and experience, Betts became familiar with "the history and practice of
the Navy occupational health program from its early days before World War II until the present time."
Betts Decl., ¶ 2. According to Betts, the "Navy's knowledge regarding the applications of asbestos and
the health effects represented the state of the art. During the period from the early 1920s to the late
1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a
marine steam turbine on United States Navy ships known by a turbine manufacturer, like General
Electric Company, that was not known by the United States and the United States Navy." Id., ¶ 30.
Based upon the Betts Declaration, defendants have provided sufficient evidence that there were no
dangers known by them that were not known by the government. See Nesbiet, 399 F. Supp. 2d at 209
("[A]ccording to Betts's affidavit, GE could not have possessed any information regarding the dangers

SEND

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |
|---|---|---|---|

| Title | Robert Oberstar, et al. v. CBS Corp., et al. |
|---|---|

posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.").

The Court therefore concludes that defendants have met their burden, at this stage of the proceedings, to establish a "colorable" military contractor defense for purposes of removal under § 1442(a)(1).[2]/ The Court also finds that defendants have submitted sufficient evidence of a "causal nexus" between Plaintiffs' claims and the actions defendants took at the direction of a federal officer. As did the court in Nesbiet, this Court finds that defendants' evidence "is sufficient for purposes of section 1442(a) to demonstrate that the Navy's control over warnings directly interfered with GE's duty to warn under state law. Thus, GE [and Viad] ha[ve] satisfied the 'causal nexus' requirement." Id. at 213.

For all of the foregoing reasons, the Court finds that defendants have raised a "colorable" federal defense to the claims alleged in Plaintiffs' Complaint. As a result, defendants' removals pursuant to § 1442(a)(1) were proper. Plaintiffs' Motions to Remand are therefore denied. With respect to the Motion to Stay, GE seeks to stay this action pending the anticipated transfer of this action to the Eastern District of Pennsylvania as a potential "tag-along action" to Multidistrict Litigation Number 875. According to GE, transfer to the MDL is "imminent." Assuming this is true, GE will suffer little if any prejudice between now and the time this case is eventually is transferred to the MDL should no stay be imposed. Accordingly, the Court finds that GE has failed to establish the necessity for a stay. The Court therefore declines to stay these proceedings.

IT IS SO ORDERED.

---

[2]/     The Court recognizes that when faced with arguably similar evidence, other courts have reached a different result. See, e.g., Hilbert v. McDonnell Douglas Corp., No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan. 3, 2008). The Court declines to follow Hilbert because, in the Court's view, Hilbert places too high a burden on a defendant to prove its military contractor defense at such an early stage in the litigation. Given the liberality with which removals under § 1442 are to be considered, Hilbert's more exacting standard appears to conflict with Ninth Circuit precedent. See Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

page 76

# EXHIBIT D

--- F.Supp.2d ----, 2008 WL 1700326 (S.D.Fla.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, S.D. Florida,
Miami Division.
David A. MARLEY, et al., Plaintiffs,
v.
ELLIOT TURBOMACHINERY CO., INC., et al., Defendants.
No. 07-23042-CIV-JORDAN.
March 13, 2008.

Case A. Dam, David Aaron Jagolinzer, Ferraro Law Firm, Miami, FL, for Plaintiffs.

Edward Joy Briscoe, Helaine S. Goodner, Fowler White Burnett, Rebecca Carrie Kibbe, Kirkpatrick & Lockhart Preston Gates Ellis LLP, M. Stephen Smith, III, Rumberger Kirk & Caldwell, Frank Joseph Sioli, Jr., Brown Sims, P.C., Lori Anne M. Rovner, Virginia Easley Johnson, Foley & Mansfield, P.L.L.P., Sergio Edward Pagliery, Shook Hardy & Bacon, Miami, FL, Abigail Morrison Cohen, Conroy Simberg Ganon Krevans & Abel, Hollywood, FL, Timothy Clark, Timothy Clark, Plantation, FL, Kathleen Margaret Labarge, Bice Cole Law Firm, Steven A. Edelstein, The Biltmore Hotel, Coral Gables, FL, Evelyn Fletcher, Frances Spinthourakis, Hawkins & Parnell, Atlanta, GA, David M. Hawthorne, Hugh J. Turner, Jr., Akerman Senterfitt & Eidson, Fort Lauderdale, FL, Henry Salas, Cole, Scott, & Kissane P.A ., South Miami, FL, for Defendants.

## AMENDED ORDER DENYING MOTION TO REMAND

ADALBERTO JORDAN, District Judge.

   **\*1** Elliott Turbomachinery and Viad removed this action to federal court pursuant to 28 U.S.C. § 1442(a)(1). Pending is the plaintiffs' motion to remand, arguing that the defendants had not sufficiently shown a federal colorable defense and a nexus between this action and their official duties. For the reasons stated below, the motion to remand [D.E. 2] is DENIED.

## I. FACTUAL BACKGROUND

   This action is in essence a dispute about the defendants' ability, under their contract with the Navy, to warn Mr. Marley that unprotected asbestos exposure could cause mesothelioma and other ailments. The defendants were retained by the Navy in the 1940s to manufacture numerous ship parts and devices for the *U.S.S. Lake Champlain*. The manufactured products contained asbestos but did not have any type of warning about the dangers of unprotected asbestos exposure.

   Mr. Marley was a Navy sailor assigned to the *Lake Champlain* from 1959-1983. During his assignment, he was allegedly exposed to the asbestos contained in the defendants' products. As a result of this exposure, he allegedly developed mesothelioma. This suit is brought by Mr. Marley and his wife.

   Elliot and Viad removed this action under § 1442(a)(1), invoking federal officer jurisdiction. In support of removal, Elliot filed the affidavits of retired Admiral Ben J. Lehman and retired Admiral Roger B. Horne.[FN1]

   FN1. Viad joined Elliot's removal filings.

page  78

### A. ADMIRAL LEHMAN

Admiral Lehman joined the United States Navy in 1942 and remained on active duty until 1946. He served as ship superintendent and dry docking officer at the Brooklyn Navy Yard between 1942 and 1944. In 1950, he was assigned as a ship superintendent at the San Francisco Naval Shipyard. During his Naval service, he was personally responsible for the creation of Navy specifications for the procurement of materials and machinery used on Navy vessels. He is familiar with Navy specifications, equipment manuals, and qualified product lists, which are used in the construction and repair of Navy and commercial ships. *See* Lehman Aff. at ¶¶ 1-2.

Admiral Lehman states that in the 1940s and1950s, "the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings ... Thus the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment." *See id.* at ¶ 7. Admiral Lehman further states that the "Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment ... The Navy determined the nature of hazards to be subject to any precautionary handling and the content of any such labeling." *See id.* at ¶ 8.

Admiral Lehman's conclusion is (1) that manufacturers and suppliers were prohibited from providing any warning without the consent of the Navy, and (2) that "certain types of warnings would not have been approved by the Navy given the necessary performance needs and capabilities of the shipboard equipment, the ships, and Navy personnel. This would have included, but not been limited to, any potential warnings associated with asbestos including, but not limited to, recommendations regarding respiratory protection and repair and maintenance practices." *See id.* at ¶ 10. According to Admiral Lehman, prior to the mid 1960s, the Nevy relied on its own occupational health program to provide training and prevent the hazards of asbestos to shipyard workers. *See id.* at ¶¶ 11, 13(c).

### B. ADMIRAL HORNE

*\*2* Admiral Horne is a retired rear admiral of the United States Navy. He began his career in 1956. Throughout his Navy career, he concentrated in the areas of ship design, engineering, construction, overhaul, and inspection. He achieved the rank of chief engineer and deputy commander at the Naval Sea Systems Command for Ship Design and Engineering. *See* Horne Aff. at ¶ 2.

According to Admiral Horne, it was common for the Navy to send inspectors to the plants of manufacturers to assure conformance with the Navy specifications and requirements. *See id.* at ¶ 7. He also states that the Navy specifications covered the nature of any communication affixed to products supplied to the Navy by third parties. "Vendors such as Defendants would not have been permitted (either under the specifications or, as a matter of Navy practice) to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos, without prior discussion, approval and acceptance by the Navy." *Id.* at ¶ 12.

Admiral Horne concludes that any warning affixed by a vendor "would have been rejected as contrary to the Navy protocols for instruction and training relating to use of asbestos materials." *See id.* "The Navy determined to address the potential hazards of asbestos on Navy ships through training and not through warnings." *See id.* at ¶ 14.

### II. ANALYSIS

I conclude that removal of this action was appropriate under the federal officer removal statute.

A state-court action against any person acting under the direction of an officer of the United States or its agencies can be removed to federal court pursuant to § 1442(a)(1). The purpose of § 1442(a) (1) is to permit the removal of "those actions commenced in state court that expose a federal official

page 79

to potential civil liability or criminal penalty for an act performed ... under color of office." *See Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1427 (11th Cir.1996)*(internal citations omitted). The statute reflects Congress' intent "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties." *See id.* As such, § 1442(a)(1) is an exception to the well-pleaded complaint rule, which generally precludes removal where a federal question is not apparent within the four corners of the complaint. *See Mesa v. California, 489 U.S. 121, 136-37 (1989)*.

Removal under § 1442(a)(1) generally depends on the satisfaction of two separate requirements. First, the defendant must " *advance a 'colorable defense arising out of [his] duty to enforce federal law.'* " *See Magnin, 91 F.3d at 1427* (internal citations omitted, emphasis added). Second, the defendant must establish that the suit is for acts performed "under the color of office." This requirement is satisfied by showing " 'a causal connection' between what the officer has done under asserted official authority and the action against the defendants." *See id. See also Jefferson Co. v. Acker, 527 U.S. 423, 431 (1999)*(internal citations omitted). I find that the defendants have made a sufficient showing on both requirements.

### A. A COLORABLE DEFENSE

*\*3* The defendants have advanced a colorable federal defense to the plaintiffs' claims. A colorable defense is a defense that is "plausible." *See Magnin, 91 F.3d at 1427* ( *citing Mesa, 489 U.S. at 129*). In construing the colorable federal defense requirement, the Supreme Court has rejected "a narrow grudging interpretation" of the term, "recognizing that 'one of the most important reasons for removal is to have the validity' of the defense of official immunity tried in a federal court." *See Jefferson, 527 U.S. at 432* (internal citations omitted). *See also Willingham v. Morgan, 395 U.S. 402, 407 (1969)* ("We ... do not require the officer virtually to "win his case before he can have it removed.") Thus, a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage. All a removing defendant needs to do is to make a showing that his federal defense "is not without foundation and made in good faith." *See Nesbiet v. Gen. Electric, 399 F.Supp.2d 205, 211 n. 44 (S.D.N.Y.2005)* (internal citations omitted).

With this standard in mind, I turn to the federal defense advanced in this case. The defendants have raised a federal contractor defense to the plaintiffs' failure to warn claims. *See Not. of Removal [D.E. 1] at ¶ 9.* The defendants contend that their "alleged failure to warn of the hazards of asbestos resulted from the Navy's prohibition of such warnings." *See id.* at 10.

The Supreme Court recognized the federal contractor defense in *Boyle v. United Tech., Corp., 487 U.S. 500 (1988). Boyle* involved the crash of a United States Marine helicopter in a training exercise off the Virginia coast. The pilot survived the accident impact, but he could not open the helicopter's outward escape hatch and drowned. The pilot's estate sued the manufacturer of the helicopter, alleging that the escape hatch should have been designed to open inward to facilitate escape. The manufacturer's defense was that it had designed the helicopter pursuant to government specifications requiring an escape hatch that swung outward. On these facts, the Court held that liability for design defects in military equipment could not be imposed under state law when (1) the government approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about dangers known to the supplier but not known to the United States. *See 487 U.S. at 512.*

The Eleventh Circuit extended the holding of *Boyle* to failure to warn claims in *Dorse v. Eagle-Picher Indus., Inc., 898 F.2d 1487, 1489 (11th Cir.1990).*[FN2] Like this case, *Dorse* involved a claim that a manufacturer had failed to warn about the hazards of asbestos. The court noted that the federal contractor defense bars liability when (1) the case concerns an area of uniquely federal interest and (2) there is "a significant conflict" between an identifiable federal policy or requirement and a state law duty. The defense fails as a matter of law, however, if the contractor can "comply with both its contractual obligations and the state-prescribed duty of care." *See id.* at 1489 (internal citation omitted).[FN3]

page 80

FN2. The *Dorse* panel adopted the reasoning of the district court's order granting summary judgment in favor of the plaintiff on the defendant's government contractor defense.

FN3. The Eleventh Circuit ultimately concluded that the defendant had failed to produce sufficient evidence indicating that his contractual obligations prevented compliance with the state law duty to warn and entered summary judgment in favor of the plaintiff. *See* 898 F.2d at 1489. The summary judgment standard is obviously significantly higher than the colorable defense standard.

**\*4** The parties do not dispute that the procurement of Navy vessels (and parts for those vessels) is an area of uniquely federal interest. *See Boyle,* 487 U.S. 504-505 (civil liability arising from performance of procurement contracts with government is an area of "uniquely federal interest"); *Dorse,* 898 F.2d at 1489 ("procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest"). The dispute in this case is whether the defendants have shown a "good faith foundation" to argue that there was a conflict between their contractual obligations with the Navy and the state law duty to warn.

To satisfy their burden, the defendants have filed the affidavits of Admiral Lehman and Admiral Horne. According to Admiral Lehman, in the 1940s and the 1950s the Navy dictated every aspect of the warnings associated with its ships and did not permit deviation by any of its contractors. He concludes that the Navy would have rejected any asbestos warning suggested by the defendants as contrary to their policy to deal with the asbestos problem through training and not through warning. *See* Lehman Aff. at ¶ 10. Admiral Horne concurs with Admiral Lehman and states that "any request to include a warning regarding asbestos in an equipment manual would have been rejected as contrary to Navy protocols for instruction and training relating to use of asbestos materials." *See* Horne Aff. at ¶ 15.

The affidavits of Admiral Lehman and Admiral Horne are not unique to this case. Almost identical affidavits have been filed by the defendants in lawsuits all over the country. District courts, however, are split on whether these are sufficient to "advance" a colorable government contractor defense.

In *Nesbiet,* for example, the court concluded that the affidavits were sufficient to satisfy the removing defendant's burden. The court emphasized that at this stage of the proceedings the defendant had to "demonstrate merely that its claim to the military contractor defense is 'colorable.' " *See* 399 F.Supp.2d at 212. Similarly, in *Harris v. Rapid American Corp.,* the court recently held that the affidavits, albeit general in nature, were sufficient to support removal. *See* Case No. 07 C 6055 (N.D.Ill.Dec. 18, 2007). *See also Contois v. Able Indus., Inc.,* 523 F.Supp.2d 155, 160 (D.Conn.2007); *Ballenger v. Agco Corp.,* 2007 WL 1813821 (N.D.Call. June 22, 2007).

On the other hand, several courts have held that these type of affidavits are too general and vague to satisfy the removal burden of proof. *See e.g., Hilbert v. Mcdonnell Douglas Corp.,* Case No. 07cv11900 (D.Mass. Jan. 3, 2008); *Westmiller v. IMO Indus., Inc.,* 2005 WL 2850334, \*2 (W.D.Wash. Oct. 20, 2005); *Schilz v. A .P. Green Indus., Inc.,* 2002 WL 102608, \*1 (N.D.Cal. Jan. 15, 2002).

After reviewing these cases, I conclude that the affidavits of Admirals Lehman and Horne are sufficient to "advance" a colorable federal contractor defense. Without a doubt, the affidavits are lacking on specificity and leave a lot of room for speculation. But at this stage, they do provide a good faith foundation to show (1) that the Navy controlled the warnings to be affixed on parts manufactured by independent contractors, and(2) that the Navy was likely to reject any asbestos warning given its policy to deal with the asbestos problem exclusively through training.

**\*5** I agree that the Admirals' depositions in other cases suggest that they do not know of any instance when the Navy prohibited a warning proposed by a manufacturer or supplier. I also understand that there is a dispute as to whether the Navy manuals encouraged or prohibited the use

page  81

of warnings. These arguments undermine the credibility of the Admirals, and raise a number of questions that the defendants will have to answer to ultimately prevail on their defense. But that is a merits question for another day. I do not need to determine credibility or likelihood of success at the removal stage. Factual disputes about the Admirals' testimony should be resolved in federal court as long as the defendants have a good faith foundation for their contractor defense. *See Magnin, 91 F.3d at 1427-28.* Because I find that the defendants have satisfied this low standard, removal was proper.

## B. CASUAL NEXUS AND "ACTING UNDER" REQUIREMENTS

Although some courts treat the casual nexus and "acting under" requirements separately, both issues tend to "collapse into a single requirement: that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct order or to comprehensive detailed regulations." *See In re Methly Tertiary Butyl Ether Prod., 488 F.3d 112, 125 (2d Cir.2007). See also Magnin, 91 F.3d at 1429* (analyzing both requirements together). In other words, the defendants need to show that "his relationship to the plaintiff 'derived solely from his official duties.' " *See Magnin, 91 F.3d at 1427-28* ( citing Willingham, 395 U.S. at 406).

It is undisputed at this stage that the defendants manufactured and supplied the asbestos-containing products in the course of their contractual relationship with the Navy. Admiral Lehman's affidavit sufficiently establishes that the defendants were acting under federal authority when they supplied the asbestos-containing parts without warnings. Admiral Lehman generally states that the Navy has control over "what warnings should or should not be included." *See Lehman Aff. at ¶ 7.* He further states that "the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment." *See id.* Therefore, there is no question that the defendants' relationship with the plaintiff derived solely from the defendants' official duties. This is sufficient to establish a casual nexus under *Magnin. See 91 F.3d at 1429*

The plaintiffs suggest that the defendants need to show that the Navy actually prohibited asbestos warnings to establish a "casual nexus" at the removal stage. I disagree. "Just as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County, 527 U.S. at 432-33.* All a defendant needs to do to show a casual nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract with the Navy. *See Magnin, 91 F.3d at 1427-28.* This the defendants have done.[FN4]

FN4. The recent Supreme Court decision in *Watson v. Phillip Morris Co., 127 S.Ct. 2301 (2007)* is not helpful to the plaintiffs' position. *Watson* stands for the proposition that "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *See 127 S.Ct. at 2308.* As the Court explained the term "acting under" requires "an effort to assist, or to help carry out the duties or tasks of the federal superior." *See id.* at 2307. Here, plaintiffs' own complaint indicate that the defendants were hired by the Navy to manufacture the ship parts and devices that the Navy ultimately installed in the *Lake Champlain. See Compl.* Exposure Sheets. This is sufficient to show that the defendants helped carry out the Navy's duties or tasks.

## C. DISCLAIMER

***6** Finally, I reject the plaintiffs' argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand. In their complaint, the plaintiffs allege that:

Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office.)

page  82

Compl. at ¶ 5.

This disclaimer is circular. Its applicability depends on a determination of the core question in this case: whether the defendants's purported omission-the failure to warn-was required or caused by their contractual relationship with the Navy. If the failure to warn was required by the Navy, the disclaimer applies and the plaintiffs' claims fail as a matter of law. If the failure to warn was not required by the Navy, then the disclaimer does not apply. The problem with this argument is that the defendants have the right to have this question decided in federal court. *See Jefferson, 527 U.S. at 432* (defendants have a right to have "the validity' of the defense of official immunity tried in a federal court").

I understand that a number of courts have found that federal liability disclaimers defeat removal under § 1442(a)(1). *See e.g., Westbrook v. Asbestos Defendants, 2001 WL 902642, *3 (N.D.Cal. July 31, 2001).* The disclaimers in those cases, however, waived any liability arising out of work done on federal premises, irrespective of whether the work was done under the requirements of a federal agency or not. In contrast, the disclaimer here is more limited and is contingent on the Navy's contractual limitations and specifications. I am reluctant to find that the plaintiffs can defeat a government contractor's right to remove by disclaiming any claim arising from any act or omission compelled by a government agency. Such a circular disclaimer would defeat the purpose § 1442(a)(1) as it would force federal contractors to prove in state court that they were acting under the direction of the government.

### III. CONCLUSION

In sum, while Admiral Lehman's and Admiral Horne's affidavits fall far short from establishing that the defendants were not able to warn Mr. Marley about the danger of unprotected asbestos exposure, they are sufficient to "advance" a colorable government contractor defense and establish a nexus between this action and the defendants' official duties. Removal was appropriate. Accordingly, the plaintiffs' motion to remand is denied.

Unless this case is transferred to the Multi-District Litigation Panel before then, the parties shall file the joint scheduling report required by Local Rule 16.1(B)(2) by March 21, 2008.

DONE and ORDERED.

S.D.Fla.,2008.
Marley v. Elliot Turbomachinery Co., Inc.
--- F.Supp.2d ----, 2008 WL 1700326 (S.D.Fla.)

Motions, Pleadings and Filings (Back to top)

• 2008 WL 955358 (Trial Motion, Memorandum and Affidavit) Kentile Floors, Inc.'s Motion to Dismiss Plaintiffs' Complaint and Incorporated Memorandum of Law (Feb. 7, 2008)  Original Image of this Document (PDF)
• 2008 WL 955357 (Verdict, Agreement and Settlement) Joint Stipulation of Dismissal without Prejudice (Jan. 29, 2008)  Original Image of this Document (PDF)
• 2008 WL 955355 (Trial Motion, Memorandum and Affidavit) Sur-Reply of Defendant Elliot Company and Defendant Viad Corp in Opposition to Plaintiffs' Emergency Motion to Remand (Jan. 23, 2008)  Original Image of this Document (PDF)
• 2008 WL 955354 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendant's, Viad Corporation, Motion to Strike Plaintiffs' Notice of Supplementary Exhibit ""P" (Jan. 15, 2008)  Original Image of this Document (PDF)
• 2008 WL 977171 (Trial Motion, Memorandum and Affidavit) Defendant, Viad Corporation and Elliott Turbomachinery Co. Inc.,'s Motion to Strike Plaintiffs' Notice of Supplementary Exhibits ""Q", ""R",

page 83

""S'', ""T'' and ""U'' (Jan. 14, 2008) 🖼 Original Image of this Document (PDF)

• 2008 WL 977172 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Notice of Supplementary Exhibits (Jan. 14, 2008) 🖼 Original Image of this Document (PDF)

• 2007 WL 5075449 (Trial Motion, Memorandum and Affidavit) Defendant Elliot Company's Memorandum of Law in Opposition to Plaintiffs' Emergency Motion to Remand (Dec. 14, 2007) 🖼 Original Image of this Document with Appendix (PDF)

• 2007 WL 5075448 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Emergency Motion to Remand and Supporting Memorandum of Law (Dec. 7, 2007) 🖼 Original Image of this Document (PDF)

• 1:07cv23042 (Docket) (Nov. 21, 2007)

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT E

--- F.Supp.2d ----, 2008 WL 1722079 (D.Mass.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
William A. O'CONNELL
v.
FOSTER WHEELER ENERGY CORPORATION, A.W. Chesterton Company, and Buffalo Pumps, Inc.
Civil Action No. 08-10078-RGS.
April 7, 2008.

**Background:** Shipyard worker who allegedly contracted malignant mesothelioma from exposure to asbestos at shipyard brought action in state court against manufacturer of pumps for United States Navy ships, alleging that manufacturer was negligent and breached a duty under state law by failing to warn him of health hazards associated with asbestos. Following removal, worker moved to remand.

**Holding:** The District Court, Stearns, J., held that removal was warranted under the federal officer removal statute.

Motion denied.

[1] KeyCite Notes 

⟸334 Removal of Cases
    Under the federal officer removal statute, an action filed in state court may be removed, despite the non-federal cast of the complaint, if: (1) the defendant can demonstrate it was acting under the direction of a federal officer or agency; (2) the defendant has a colorable defense under federal law; and (3) a causal connection exists between the defendant's acts or omissions and the claims asserted by the plaintiff. 28 U.S.C.A. § 1442(a)(1).

[2] KeyCite Notes

⟸334 Removal of Cases
    The defendant bears the burden of establishing the elements for removal under the federal officer removal statute. 28 U.S.C.A. § 1442(a)(1).

[3] KeyCite Notes

⟸334 Removal of Cases
    Although removal statutes are typically construed narrowly, the purpose of the federal officer removal statute is to ensure a federal forum for defenses of official immunity; accordingly, the policy favoring removal should not be frustrated by a narrow, grudging interpretation of the federal officer removal statute. 28 U.S.C.A. § 1442(a)(1).

[4] KeyCite Notes

page 86

⇐⇒334 Removal of Cases
    The federal officer removal statute creates an exception to the well-pleaded complaint rule; regardless of whether the plaintiff's cause of action rests on state law, once defendant meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction. 28 U.S.C.A. § 1442(a)(1).



[5] KeyCite Notes

⇐⇒334 Removal of Cases
    Manufacturer of pumps for United States Navy ships had a colorable federal defense, namely, military contractor defense, to shipyard worker's state law failure to warn claim, as required for removal of worker's action pursuant to the federal officer removal statute, where communication of safety and health information about asbestos to shipyard workers was a matter exclusively within Navy's control, and Navy's knowledge of dangers of asbestos on board its ships was far more advanced than anything that would have been known to manufacturer. 28 U.S.C.A. § 1442(a)(1).



[6] KeyCite Notes

⇐⇒313A Products Liability
    The purpose of the military contractor defense is to shield government contractors from state tort liability for defects in military equipment when there is a significant conflict between state law and the uniquely federal interest in immunizing the trade-off between greater safety and greater combat effectiveness.



[7] KeyCite Notes

⇐⇒313A Products Liability
    To demonstrate a colorable military contractor defense in a failure to warn context, the contractor must produce sufficient evidence suggesting a genuine conflict between its federal obligations and a state law imposing liability for the failure to warn.



[8] KeyCite Notes

⇐⇒313A Products Liability
    When state law would otherwise impose liability on government contractor for a failure to warn, state law will be displaced if the contractor can show that: (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government.

[9] KeyCite Notes

⇐⇒334 Removal of Cases
    A defendant's showing of a colorable federal defense, for purposes of the federal officer removal statute, need only be plausible, not necessarily conclusive of the issue. 28 U.S.C.A. § 1442(a)(1).

[10] KeyCite Notes

⇐⇒334 Removal of Cases

page  87

United States Navy exercised substantial degree of control over provision of warnings by manufacturer of pumps for Navy ships, and Navy's control over warnings impeded manufacturer's ability to independently fulfill its state law obligation to warn of the dangers of asbestos, as required for removal of shipyard worker's action pursuant to the federal officer removal statute, alleging that manufacturer was negligent and breached a duty under state law by failing to warn him of health hazards associated with asbestos. 28 U.S.C.A. § 1442(a)(1).

Victoria M. Almeida, Mark O. Denehy, Adler Pollock and Sheehan PC, Providence, RI, Marianne E. Brown, David M. Governo, Bryna Rosen Misiura, Michael D. Simons, Governo Law Firm LLC, Tracy A.R. Jolly, John B. Manning, Jonathan F. Tabasky, Cooley Manion Jones LLP, Boston, MA, for Defendant.

Edward P. Coady, David W. Fanikos, Coady & Associates, Boston, MA, for Plaintiff.

*MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR REMAND*

STEARNS, District Judge.
  **\*1** Plaintiff William A. O'Connell was diagnosed with malignant mesothelioma in July of 2007. O'Connell alleges an exposure to asbestos while working at the Fore River Shipyard (Fore River) in Quincy, Massachusetts, from approximately 1960 to 1961. O'Connell claims that defendants, including Buffalo Pumps, Inc., (Buffalo Pumps),[FN1] were negligent and breached a duty under state law by failing to warn him of the health hazards associated with asbestos.

  O'Connell filed this action in Middlesex Superior Court on November 9, 2007. On January 18, 2008, Buffalo Pumps filed a notice of removal pursuant to 28 U.S.C. § 1442(a)(1), the Federal Officer Removal Statute (FORS).[FN2] On February 6, 2008, O'Connell filed a motion to remand.[FN3] Buffalo Pumps filed its opposition on March 11, 2008.[FN4]

*DISCUSSION*

  [1] [2] [3] [4]     Under FORS, an action filed in state court may be removed, despite the non-federal cast of the complaint, if: (1) the defendant can demonstrate it was acting under the direction of a federal officer or agency; (2) the defendant has a colorable defense under federal law; and (3) a causal connection exists between the defendant's acts or omissions and the claims asserted by the plaintiff.[FN5] *See Mesa v. California,* 489 U.S. 121, 132-134, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989); *Hilbert v. McDonnell Douglas Corp.,* 529 F.Supp.2d 187, 196 (D.Mass.2008); *Nesbiet v. Gen. Elec. Co.,* 399 F.Supp.2d 205, 210 (S.D.N.Y.2005). The defendant bears the burden on all three elements. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers,* 132 F.3d 824, 831 (1st Cir.1997). At issue here is whether Buffalo Pumps can assert a colorable federal defense to O'Connell's failure to warn claim.[FN6]

*Colorable Federal Defense*

  [5] [6] [7] [8] [9]     Buffalo Pumps asserts that it is immune from state tort liability on grounds that it was acting as a military contractor at the time of O'Connell's alleged asbestos exposure. *See Boyle v. United Techs., Corp.,* 487 U.S. 500, 506, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (analyzing a design defect defense under FORS). The purpose of the defense is to shield government contractors from state tort liability for defects in military equipment where there is a "significant conflict" between state law and the "uniquely federal interest" in immunizing the trade-off between greater safety and greater combat effectiveness. *Id.* at 511-512. To demonstrate a colorable military contractor defense in a failure to warn context,[FN7] the contractor must produce

page  88

sufficient evidence suggesting a genuine conflict between its federal obligations and a state law imposing liability for the failure to warn. State law will be displaced if the contractor can show that: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 1003-1004 (7th Cir.1996) (applying the military contractor defense announced in *Boyle, supra,* to failure-to-warn claims). For removal purposes, the defendant's showing need only be plausible; not necessarily conclusive of the issue. *See Jefferson County,* 527 U.S. at 431.

**\*2** Buffalo Pumps argues that the communication of safety and health information about asbestos to Fore River workers was a matter exclusively within the Navy's control. Buffalo Pumps offers the affidavits of the following four persons in support of its position: (1) Roger Horne (Horne Affidavit), a retired Rear Admiral of the United States Navy; (2) Dr. Samuel Forman (Forman Affidavit), the proprietor of an occupational health clinic monitoring asbestos exposure and a student of the Navy's historical awareness of asbestos hazards; (3) David Sargent Jr. (Sargent Affidavit), also a Navy Rear Admiral; and (4) Martin Kraft (Kraft Affidavit), the current production manager for Buffalo Pumps. The affidavits and attached exhibits clearly establish a plausible federal contractor defense. The analysis required by the first and second elements of the *Boyle* defense are closely tied. Under the first prong, the defendant must establish that the United States approved "reasonably precise specifications" for the equipment supplied by the contractor, including the appropriate wording of any warnings regarding a potential hazard. *See Hilbert,* 529 F.Supp.2d at 198. Although the contractor need not show that the government prohibited it from supplementing the warnings with warnings of its own, it must produce evidence that it was acting within the parameters of reasonably precise specifications imposed by the United States. *Cf. Oliver,* 96 F.3d at 1004 (there must be an element of constraint; while a *dictat* is not required, government oversight must extend beyond the mere "rubber stamping" of a contractor's unilateral conduct). A defendant will meet its burden under the second element of the test if it can demonstrate that "any deviation from [the government's] specifications would likely have resulted in rejection of the equipment." *Nesbiet,* 399 F.Supp.2d at 212. *See also Hilbert,* 529 F.Supp.2d at 198 n. 11.

Buffalo Pumps satisfies the first two elements by virtue of the Horne and Sargent Affidavits. Admiral Horne attests to his work as a naval ship engineer and his personal knowledge of naval ship specifications, including centrifugal pumps and related equipment, during the time of O'Connell's employment at Fore River. The Sargent Affidavit is relevant to establishing the historical pervasiveness of Navy control over all aspects of shipbuilding contracts.[FN8] Considered together, the affidavits reasonably establish that the specifications for the pump component supplied to the Navy by Buffalo Pumps were detailed, precise, and under the Navy's pervasive control. They also demonstrate that the Navy insisted on a meticulous review and approval process for written materials accompanying components supplied to its ships. As Admiral Sargent explains:

[t]he Navy also had precise specifications as to the nature of the written materials to be delivered with equipment supplied to the Navy, which included engineering reference materials to assist the naval operators and maintenance personnel in servicing and maintaining such equipment and to assist the Navy training establishment to develop instructional materials and courses. These written materials are and were generically known as "instruction books" or "technical manuals." Through specifications, the Navy required that certain equipment be supplied with a defined number of copies of one or more instruction books or technical manuals.

**\*3** Navy personnel participated intimately in the preparation and review of these instruction books and technical manuals in a standardized format used by the Navy. These manuals included safety information to the extent-and only to the extent-directed by the Navy. Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy. The Navy dictated, reviewed and approved the contents of all technical manuals, including any cautionary language or emphasis. The Navy ... often created lengthy memoranda detailing word-by-word line edits to the

page  89

content of technical manuals submitted for approval, including the wording of instructional material and warnings.

Sargent Affidavit, at ¶¶ 47-48.[FN9] Admiral Horne gives a similar explanation of the Navy's control over the content of any cautionary materials supplied by its contractors, as well as the reasons for that control:

[i]n addition to specifications regarding design and manufacturing of the equipment itself, the Navy also had detailed specifications that governed the form and content of written materials to be delivered with equipment, including pumps, supplied to the Navy. These written materials typically consisted of technical or instruction manuals that were designed to assist the Navy engineering staff in servicing and maintaining the equipment. Navy personnel participated in and approved the preparation of this kind of information. The Navy specifications for these manuals contained detailed direction as to the kinds of information to be included....

The Navy relied on its training and procedures regarding general shipboard safety hazards, such as asbestos. The Navy believed that excessive warnings for common shipboard hazards led to apathy and resulting disregard of hazard. Thus, the Navy would not have permitted (either under the specifications or, as a matter of Navy practice) a vendor such as Buffalo Pumps to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos.

Horne Affidavit, at ¶¶ 11, 16. Admiral Sargent further emphasizes that the communication of safety and health information in written materials relating to pumps or other components had to be consistent with the Navy's overall practices and priorities, and the realities of its workplaces:

[t]he reasons for the Navy's detailed control over and review and approval of all written communication regarding equipment it procured was to ensure consistency of that information with the overall goals and priorities of the Navy in its operations. The Navy employed millions of uniformed and civilian personnel aboard thousands of vessels and at hundreds of land-based facilities around the world. The information provided with regard to equipment had to be consistent with the Navy's overall evaluation of the appropriate types and level of information its personnel required to efficiently perform their job responsibilities under a variety of circumstances. In addition, written communications regarding work practices, including safety precautions and equipment, had to be coordinated with the training of Navy personnel, the physical circumstances in which they performed their work, and the tools, protective devices and equipment and other materials available aboard Navy vessels and at Navy installations.

*4 Sargent Affidavit, at ¶ 49.

The third element of the test requires the contractor to have warned the government about hazards of which it had knowledge, but were unknown to the government. See Nesbiet, 399 F.Supp.2d at 212. The Horne Affidavit satisfies this element. According to Horne, the Navy's knowledge of the dangers of asbestos on board its ships was far more advanced than anything that would have been known to a contractor like Buffalo Pumps.[FN10] Therefore, the third element is met and Buffalo Pumps has a colorable defense.[FN11]

O'Connell argues that the affidavits submitted by Buffalo Pumps closely track those that were rejected by the district court in Hilbert,[FN12] and urges this court to follow suit. Hilbert, however, is not persuasive in the disposition of this case because of two essential differences in the showings by defendant. First, although the plaintiff in Hilbert claimed exposure to asbestos while serving in the Navy, the Hilbert defendants failed to produce an affiant with personal knowledge of the Navy's shipbuilding program. See Hilbert, 529 F.Supp.2d at 200 (finding that the "most important" affiant was deficient because his knowledge was limited to Air Force practices, while the plaintiff was exposed while serving in the Navy). Here, Buffalo Pumps has submitted the affidavits of Admirals Horne and Sargent; both of whom have personal knowledge of the detailed specifications imposed on contractors by the Navy during the period of O'Connell's alleged exposure. Accordingly, the affiants do

page 90



not resort to the level of "speculation" that the *Hilbert* court found objectionable.[FN13] Second, the *Hilbert* defendants failed to provide any evidence that the Navy regulated the content, and not just the form, of the relevant written materials. *See id.* at 201. Buffalo Pumps, however, has submitted examples of detailed, word-by-word, revisions provided by the Navy upon review of written manuals and instructions. Accordingly, the court does not find the *Hilbert* decision to be applicable.

*Acting Under and Causal Connection*

[10] As a practical matter, this remaining element is closely bound to the determination that Buffalo Pumps has a colorable military contractor defense. Since the Navy issued reasonably precise specifications as to the warnings, the court concludes, for purposes of this motion, that: (1) the Navy exercised a substantial degree of control over Buffalo Pumps's provision of warnings; and (2) the Navy's control over these warnings impeded Buffalo Pumps's ability to independently fulfill its state law obligation to warn of the dangers of asbestos (if indeed it knew of these dangers). *See Nesbiet,* 399 F.Supp.2d at 212; *Contois v. Able Indus., Inc.,* 523 F.Supp.2d 155, 161 (D.Conn.2007). Buffalo Pumps has therefore satisfied all three elements of the statute and the case was properly removed.[FN14]

*ORDER*

For the foregoing reasons, plaintiff's motion to remand this action to state court is *DENIED.* The parties' motions for a hearing are also *DENIED.*

*\*5* SO ORDERED.

FN1. Buffalo Pumps manufactured and supplied pumps for United States Navy ships.

FN2. Specifically, section 1442(a)(1) provides: "A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." 28 U.S.C. § 1442(a)(1).

FN3. O'Connell also requests costs and fees incurred as a result of the removal pursuant to 28 U.S.C. § 1447(c).

FN4. No other defendant filed a brief in opposition to the motion to remand.

FN5. Although removal statutes are typically construed narrowly, the purpose of FORS is to ensure a federal forum for defenses of official immunity. *See Willingham v. Morgan,* 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). Accordingly, the policy favoring removal "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Id.*

FN6. O'Connell has expressly waived any claim based on defective design and "any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government." Complaint, at ¶ 4. In O'Connell's view, this disclaimer eliminates federal subject matter jurisdiction, including any that would attach under FORS. This is not the law. The removal statute creates an exception to the well-pleaded complaint rule. *See Jefferson County v. Acker,* 527 U.S. 423, 430-431, 119 S.Ct. 2069, 144 L.Ed.2d 408

page 91

(1999); *Mesa v. California*, 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). "[R]egardless of whether the plaintiff's cause of action rests on state law ... once [defendant] meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction." *Machnik v. Buffalo Pumps Inc.*, 506 F.Supp.2d 99, 103 n. 1 (D.Conn.2007). *See also Ballenger v. Agco Corp.*, No. 06-2271-CW, 2007 WL 1813821, at *2 (N.D.Cal. June 22, 2007) (denying motion to remand despite the disclaimer of "[e]very claim arising under the Constitution, treaties, or laws of the United States ... includ[ing] any claim arising from an act on a Federal Enclave as defined by Article I, section 8, clause 17 of the United States Constitution ... any claim arising from any act or omission of the United States, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States.").

FN7. Although the First Circuit has yet to address the federal contractor defense in the failure to warn context, the court will follow persuasive opinions in other circuits which have held that the defense should apply. *See Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 350 (4th Cir.1998) (citing to cases from the Second, Fifth, Sixth, Seventh, and Ninth Circuits).

FN8. Although Sargent's duty post-dates O'Connell's employment, he is competent to testify because in his service he was responsible for all "matters relating to both the technical and programmatic details of design, construction, delivery and support of both new and in-service aircraft carriers, expeditionary warfare and auxiliary ships of the Navy." Such "in-service" ships included those that were built as far back as the 1950's. The exhibits to Sargent's affidavit include revisions to a 1959 technical manual for a submarine pump, which contains specific cautionary (non-asbestos) language demonstrating the depth of the Navy's control over the details of the written materials contractors were required to distribute.

FN9. Admiral Sargent attaches to his affidavit a 1959 example of the detailed editing undertaken by the Navy of a draft manual submitted by a contractor for review and approval. Attached to the Kraft Affidavit is an additional example, in this case to a draft equipment manual Buffalo Pumps submitted to the Navy in 1966.

FN10. According to the Horne Affidavit:[t]he Navy had state of the art knowledge regarding the potential risks associated with exposure to asbestos and asbestos-containing products. Acting with this knowledge about asbestos-related hazards, the Navy affirmatively addressed the issue of asbestos-related safety precautions. The Navy established its MilSpecs to accounts for the safety precautions it deemed appropriate. In dealing with asbestos, the Navy conducted its own training, adopted its own precautionary measures and procedures and provided its own warnings where such warnings were deemed appropriate.Horne Affidavit, at ¶ 12.

FN11. Horne's testimony is further corroborated by Forman's affidavit, who, pursuant to Navy orders, reviewed the Navy's historical knowledge and practices in industrial hygiene in relation to asbestos. Forman cites to several Navy studies verifying that as early as 1922, the Navy recognized and attempted to mitigate the harm of exposure by seamen to asbestos. Foreman Affidavit, ¶ 14. Forman cites to a study appearing in a 1947 issue of the Navy's Safety Review, which noted the potential health hazards resulting from asbestos exposure. Foreman Affidavit, ¶ 32. Further, Forman cites to a 1958 safety handbook for pipefitters which warned of the dangers of asbestos and the need to wear dust respirators. Foreman Affidavit, ¶ 37.

FN12. O'Connell cites *Hilbert* for the proposition that in order to avail itself of the federal contractor defense a defendant must provide either: (1) non-testimonial evidence that the military affirmatively prohibited warnings (e.g., contracts or regulations); or (2)

page 92

evidence that the contractor tried to give an asbestos warning, but was stopped by the Navy. The court disagrees with that characterization of the opinion. While citations to regulations or contractual provisions barring warnings would certainly be sufficient to state a colorable claim, the weight of the cases suggest that there is no "strict requirement that the government 'prohibit' warnings altogether or 'dictate' the contents of the warnings actually incorporated." *Oliver,* 96 F.3d at 1004 n. 8. *See also Quiles v. Sikorsky Aircraft,* 84 F.Supp.2d 154, 171 n. 5 (D.Mass.1999). Indeed, what concerned the *Hilbert* court was the complete lack of testimony from individuals with personal knowledge of the matters at hand. *See Hilbert,* 529 F.Supp.2d at 202-203 ("[The defendants'] argument thus boils down to a bald, unsupported assertion that if they had attempted to warn about the hazards of asbestos, the government would have exercised its discretion to bar the warning. At least on this record, that sort of speculation is not remotely adequate. It does not come close to demonstrating-even colorably-that the government exercised its discretion to issue 'reasonably precise specification' as to health and safety warnings.").

FN13. To the extent that O'Connell takes issue with statements in the affidavits regarding general Navy practices, the court notes that his Complaint is not limited to any one ship or employer. O'Connell's allegations are directed towards exposure "during the course of his employment at the Fore River Shipyard" while working on the *USS Long Beach* and "other ships."

FN14. The court is aware that removal of this case will require transfer to the asbestos multidistrict litigation in the Eastern District of Pennsylvania over plaintiff's objection.

D.Mass.,2008.
O'Connell v. Foster Wheeler Energy Corp.
--- F.Supp.2d ----, 2008 WL 1722079 (D.Mass.)

Motions, Pleadings and Filings (Back to top)

- 2008 WL 686036 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for Remand (Feb. 6, 2008) [image] Original Image of this Document (PDF)
- 2008 WL 686037 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiff's Motion for Remand (Feb. 6, 2008) [image] Original Image of this Document (PDF)
- 2008 WL 686034 (Trial Pleading) Complaint (Jan. 18, 2008) [image] Original Image of this Document (PDF)
- 2008 WL 686035 (Trial Pleading) Defendant Buffalo Pumps, Inc.'s Notice of Removal of Action Under 28 U.S.C. | 1442 (Jan. 18, 2008) [image] Original Image of this Document (PDF)
- 1:08cv10078 (Docket) (Jan. 18, 2008)
END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT F

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

**CASE NO.: CV 08-501-R**                            Date: **April 14, 2008**

**TITLE: LARRY LINDQUIST et al V. CLA-VAL CO., et al.**
==============================================================================
**PRESENT:**

### HON. MANUEL L. REAL, JUDGE

    **William Horrell**                                    **Sheri Kleeger**
    **Deputy Clerk**                                        **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**          **ATTORNEYS PRESENT FOR DEFENDANTS:**

    **Brian Barrow**                                        **John Lister**
                                                        **Peter langbord**


**PROCEEDINGS:**    Plaintiff's Motion for Remand to State Court


        **The Court hears arguments of counsel.**

        **The Court DENIES the motion.**


                                                     **5 min**


**MINUTES FORM 90**                            **Initials of Deputy Clerk   WH**
**CIVIL -- GEN**

# EXHIBIT G

Case MDL No. 875   Document 5446   Filed 05/09/08   Page 125 of 362

Case 2:08-cv-01296-SVW-SS     Document 25-5     Filed 04/28/2008     Page 4 of 28
Case 2:08-cv-00712-R-JTL     Document 43     Filed 04/14/2008     Page 1 of 1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

**CASE NO.: CV 08-712-R**                    **Date: April 14, 2008**

**TITLE: DAVID KELEMAN et al V. BUFFALO PUMPS INC; CLA-VAL CO., et al.**
========================================================================
**PRESENT:**

### HON. MANUEL L. REAL, JUDGE

**William Horrell**                                   **Sheri Kleeger**
Deputy Clerk                                          Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**

   Brian Barrow                                  John Lister
                                                 Peter langbord


**PROCEEDINGS:**   Plaintiff's Motion for Remand to State Court


            The Court hears arguments of counsel.

            The Court DENIES the motion.




                                                    5 min


**MINUTES FORM 90**                    **Initials of Deputy Clerk   WH**
**CIVIL -- GEN**


                                                    page  97

# EXHIBIT H

page  98

Case MDL No. 875   Document 5446   Filed 05/09/08   Page 127 of 362

Case 2:08-cv-01296-SVW-SS      Document 25-5      Filed 04/28/2008      Page 6 of 28
Case 2:08-cv-00282-R-JTL      Document 39      Filed 04/14/2008      Page 1 of 1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

**CASE NO.: CV 08-282-R**                                           Date: **April 14, 2008**

**TITLE: TED MUNN and DONNA MUNN V. CLA-VAL CO., et al.**
===============================================================================

**PRESENT:**

### HON. MANUEL L. REAL, JUDGE

**William Horrell**                                           **Sheri Kleeger**
**Deputy Clerk**                                              **Court Reporter**

ATTORNEYS PRESENT FOR PLAINTIFFS:            ATTORNEYS PRESENT FOR DEFENDANTS:

        Brian Barrow                                    Thomas Moses
                                                        John Lister
                                                        Peter langbord
                                                        Brian Davis

PROCEEDINGS:    Plaintiff's Motion for Remand to State Court


        The Court hears arguments of counsel.

        The Court DENIES the motion.


                                                        5 min

**MINUTES FORM 90**                        Initials of Deputy Clerk __WH__
**CIVIL -- GEN**

# EXHIBIT I

page 100

**54 Stat.]** 76th CONG., 3d SESS.—CHS. 719, 720—SEPT. 13, 16, 1940

**885**

[CHAPTER 719]

### JOINT RESOLUTION

September 13, 1940
[H. J. Res. 575]
[Pub. Res., No. 94]

To authorize Jesse H. Jones, Federal Loan Administrator, to be appointed to, and to perform the duties of, the Office of Secretary of Commerce.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That notwithstanding any provision of law to the contrary, Jesse H. Jones, Federal Loan Administrator, may continue in such office and be appointed to, in the manner now provided by law, and may exercise the duties of the Office of Secretary of Commerce: *Provided,* That the total compensation to be paid him as Secretary of Commerce and as Federal Loan Administrator shall be that provided by law for the Secretary of Commerce.

Appointment of Jesse H. Jones, Federal Loan Administrator, to Office of Secretary of Commerce.

*Proviso.*
Total compensation.

Approved, September 13, 1940, 1 p.m., E. S. T.

[CHAPTER 720]

### AN ACT

September 16, 1940
[S. 4164]
[Public, No. 783]

To provide for the common defense by increasing the personnel of the armed forces of the United States and providing for its training.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) the Congress hereby declares that it is imperative to increase and train the personnel of the armed forces of the United States.

Selective Training and Service Act of 1940.
Declarations of Congress.

(b) The Congress further declares that in a free society the obligations and privileges of military training and service should be shared generally in accordance with a fair and just system of selective compulsory military training and service.

(c) The Congress further declares, in accordance with our traditional military policy as expressed in the National Defense Act of 1916, as amended, that it is essential that the strength and organization of the National Guard, as an integral part of the first-line defenses of this Nation, be at all times maintained and assured. To this end, it is the intent of the Congress that whenever the Congress shall determine that troops are needed for the national security in excess of those of the Regular Army and those in active training and service under section 3 (b), the National Guard of the United States, or such part thereof as may be necessary, shall be ordered to active Federal service and continued therein so long as such necessity exists.

39 Stat. 166.

**SEC. 2.** Except as otherwise provided in this Act, it shall be the duty of every male citizen of the United States, and of every male alien residing in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of twenty-one and thirty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner and in such age group or groups, as shall be determined by rules and regulations prescribed hereunder.

Registration.
Age limits.

**SEC. 3.** (a) Except as otherwise provided in this Act, every male citizen of the United States, and every male alien residing in the United States who has declared his intention to become such a citizen, between the ages of twenty-one and thirty-six at the time fixed for his registration, shall be liable for training and service in the land or naval forces of the United States. The President is authorized from time to time, whether or not a state of war exists, to select and induct into the land and naval forces of the United States for training and service, in the manner provided in this Act, such number of men as in his judgment is required for such forces in the national interest: *Provided,* That within the limits of the quota determined under section 4 (b) for the subdivision in which he resides, any person, regardless of race or color, between the ages of eighteen and thirty-six, shall be afforded an oppor-

Liability for training and service.

Number of men to be selected and inducted.

*Proviso.*
Volunteering for induction.

tunity to volunteer for induction into the land or naval forces of the United States for the training and service prescribed in subsection (b), but no person who so volunteers shall be inducted for such training and service so long as he is deferred after classification: *Provided further*, That no man shall be inducted for training and service under this Act unless and until he is acceptable to the land or naval forces for such training and service and his physical and mental fitness for such training and service has been satisfactorily determined: *Provided further*, That no man shall be inducted for such shelter, sanitary facilities, water supplies, heating and lighting arrangements, medical care, and hospital accommodations, for such men, as may be determined by the Secretary of War or the Secretary of the Navy, as the case may be, to be essential to public and personal health: *Provided further*, That except in time of war there shall not be in active training or service in the land forces of the United States at any one time under subsection (b) more than nine hundred thousand men inducted under the provisions of this Act. The men inducted into the land or naval forces for training and service under this Act shall be assigned to camps or units of such forces.

(b)   Each man inducted under the provisions of subsection (a) shall serve for a training and service period of twelve consecutive months, unless sooner discharged, except that whenever the Congress has declared that the national interest is imperiled, such twelve-month period may be extended by the President to such time as may be necessary in the interest of national defense.

(c)   Each such man, after the completion of his period of training and service under subsection (b), shall be transferred to a reserve component of the land or naval forces of the United States; and until he attains the age of forty-five, or until the expiration of a period of ten years after such transfer, or until he is discharged from such reserve component, whichever occurs first, he shall be deemed to be a member of such reserve component and shall be subject to such additional training and service as may now or hereafter be prescribed by law: *Provided*, That any man who completes at least twelve months' training and service in the land forces under subsection (b), and who thereafter serves satisfactorily in the Regular Army or in the active National Guard for a period of at least two years, shall, in time of peace, be relieved from any liability to serve in any reserve component of the land or Naval forces of the United States and from further liability for the training and service under subsection (b), but nothing in this subsection shall be construed to prevent any such men, while in a reserve component of such forces, from being ordered or called to active duty in such forces.

(d)   With respect to the men inducted for training and service under this Act there shall be paid, allowed, and extended the same pay, allowances, pensions, disability and death compensation, and other benefits as are provided by law in the case of other enlisted men of like grades and length of service of that component of the land or naval forces to which they are assigned, and after transfer to a reserve component of the land or naval forces as provided in subsection (c) there shall be paid, allowed, and extended with respect to them the same benefits as are provided by law in like cases with respect to other members of such reserve component. Men in such training and service and men who have been so transferred to reserve components shall have an opportunity to qualify for promotion.

(e)   Persons inducted into the land forces of the United States under this Act shall not be employed beyond the limits of the Western Hemisphere except in the Territories and possessions of the United States, including the Philippine Islands.

*[margin notes]*
Fitness required.
Adequate shelter, etc., for men inducted.
Peacetime land force, maximum.
Camp, etc., assignments.
Period of service.
Transfer to reserve component.
Period of membership.
Proviso. Relief of certain persons from liability to serve in time of peace.
Call to active duty.
Pay, allowances, pensions, etc.
Benefits extended.
Promotions.
Use of land forces beyond Western Hemisphere, restriction.

887

[54 STAT.]   76TH CONG., 3D SESS.—CH. 720—SEPT. 16, 1940

(f) Nothing contained in this or any other Act shall be construed as forbidding the payment of compensation by any person, firm, or corporation to persons inducted into the land or naval forces of the United States for training and service under this Act, or to members of the reserve components of such forces now or hereafter on any type of active duty, who, prior to their induction or commencement of active duty, were receiving compensation from such person, firm, or corporation.

*Compensation from private parties.*

Sec. 4. (a)  The selection of men for training and service under section 3 (other than those who are voluntarily inducted pursuant to this Act) shall be made in an impartial manner, under such rules and regulations as the President may prescribe, from the men who are liable for such training and service and who at the time of selection are registered and classified but not deferred or exempted: *Provided*, That in the selection and training of men under this Act, and in the interpretation and execution of the provisions of this Act, there shall be no discrimination against any person on account of race or color.

*Impartiality of selection.*

*Proviso. No race discrimination.*

(b) Quotas of men to be inducted for training and service under this Act shall be determined for each State, Territory, and the District of Columbia, and for subdivisions thereof, on the basis of the actual number of men in the several States, Territories, and the District of Columbia, and the subdivisions thereof, who are liable for such training and service but who are not deferred after classification, except that credits shall be given in fixing such quotas for residents of such subdivisions who are in the land and naval forces of the United States on the date fixed for determining such quotas. After such quotas are fixed, credits shall be given in fixing such quotas for residents of such subdivisions who subsequently become members of such forces. Until the actual numbers necessary for determining the quotas are known, the quotas may be based on estimates, and subsequent adjustments therein shall be made when such actual numbers are known. All computations under this subsection shall be made in accordance with such rules and regulations as the President may prescribe.

*Basis for determining quotas.*

*Credits.*

*Computations.*

Sec. 5. (a)  Commissioned officers, warrant officers, pay clerks, and enlisted men of the Regular Army, the Navy, the Marine Corps, the Coast Guard, the Coast and Geodetic Survey, the Public Health Service, the federally recognized active National Guard, the Officers' Reserve Corps, the Regular Army Reserve, the Enlisted Reserve Corps, the Naval Reserve, and the Marine Corps Reserve; cadets, United States Military Academy; midshipmen, United States Naval Academy; cadets, United States Coast Guard Academy; men who have been accepted for admittance (commencing with the academic year next succeeding such acceptance) to the United States Military Academy as cadets, to the United States Naval Academy as midshipmen, or to the United States Coast Guard Academy as cadets, but only during the continuance of such acceptance; cadets of the advanced course, senior division, Reserve Officers' Training Corps or Naval Reserve Officers' Training Corps; and diplomatic representatives, technical attachés of foreign embassies and legations, consuls general, consuls, vice consuls, and consular agents of foreign countries, residing in the United States, who are not citizens of the United States, and who have not declared their intention to become citizens of the United States, shall not be required to be registered under section 2 and shall be relieved from liability for training and service under section 3 (b).

*Persons exempt from registration.*

(b) In time of peace, the following persons shall be relieved from liability to serve in any reserve component of the land or naval forces of the United States and from liability for training and service under section 3 (b)—

*Persons exempt from liability to serve in time of peace.*

(1) Any man who shall have satisfactorily served for at least three consecutive years in the Regular Army before or after, or

*Service in Regular Army.*

888                    PUBLIC LAWS—CH. 720—SEPT. 16, 1940    [54 Stat.

partially before and partially after the time fixed for registration under section 2.

Service in active National Guard and Regular Army.

(2) Any man who as a member of the active National Guard shall have satisfactorily served for at least one year in active Federal service in the Army of the United States, and subsequent thereto for at least two consecutive years in the Regular Army or in the active National Guard, before or after or partially before and partially after the time fixed for registration under section 2.

Service in active National Guard.

(3) Any man who is in the active National Guard at the time fixed for registration under section 2, and who shall have satisfactorily served therein for at least six consecutive years, before or after or partially before and partially after the time fixed for such registration.

Service in Officers' Reserve Corps.

(4) Any man who is in the Officers' Reserve Corps on the eligible list at the time fixed for registration under section 2, and who shall have satisfactorily served therein on the eligible list for at least six consecutive years, before or after or partially before and partially after the time fixed for such registration: *Provided,* That nothing in this subsection shall be construed to prevent the persons enumerated in this subsection, while in reserve components of the land or naval forces of the United States, from being ordered or called to active duty in such forces.

Proviso.
Call to active duty.

Deferment of designated public officers.

(c) (1) The Vice President of the United States, the Governors of the several States and Territories, members of the legislative bodies of the United States and of the several States and Territories, judges of the courts of record of the United States and of the several States and Territories and the District of Columbia, shall, while holding such offices, be deferred from training and service under this Act in the land and naval forces of the United States.

Officers necessary to public health, safety, or interest.

(2) The President is authorized, under such rules and regulations as he may prescribe, to provide for the deferment from training and service under this Act in the land and naval forces of the United States, of any person holding an office (other than an office described in paragraph (1) of this subsection) under the United States or any State, Territory, or the District of Columbia, whose continued service in such office is found in accordance with section 10 (a) (3) to be necessary to the maintenance of the public health, safety, or interest.

Deferment of ministers of religion, etc.

(d) Regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act.

Deferment of personnel employed in essential industry, etc.

(e) The President is authorized, under such rules and regulations as he may prescribe, to provide for the deferment from training and service under this Act in the land and naval forces of the United States of those men whose employment in industry, agriculture, or other occupations or employment, or whose activity in other endeavors, is found in accordance with section 10 (a) (3) to be necessary to the maintenance of the national health, safety, or interest. The President is also authorized, under such rules and regulations as he may prescribe, to provide for the deferment from training and service under this Act in the land and naval forces of the United States (1) of those men in a status with respect to persons dependent upon them for support which renders their deferment advisable, and (2) of those men found to be physically, mentally, or morally deficient or defective. No deferment from such training and service shall be made in the case of any individual except upon the basis of the status of such individual, and no such deferment shall be made of individuals by occupational groups or of groups of individuals in any plant or institution.

Persons with dependents.

Deficient or defective persons.

(f) Any person who, during the year 1940, entered upon attendance for the academic year 1940–1941—

(1) at any college or university which grants a degree in arts or science, to pursue a course of instruction satisfactory completion of which is prescribed by such college or university as a prerequisite to either of such degrees; or

(2) at any university described in paragraph (1), to pursue a course of instruction to the pursuit of which a degree in arts or science is prescribed by such university as a prerequisite; and who, while pursuing such course of instruction at such college or university, is selected for training and service under this Act prior to the end of such academic year, or prior to July 1, 1941, whichever occurs first, shall, upon his request, be deferred from induction into the land or naval forces for such training and service until the end of such academic year, but in no event later than July 1, 1941.

(g) Nothing contained in this Act shall be construed to require any person to be subject to combatant training and service in the land or naval forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Any such person claiming such exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the land or naval forces under this Act, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be assigned to work of national importance under civilian direction. Any such person claiming such exemption from combatant training and service because of such conscientious objections shall, if such claim is not sustained by the local board, be entitled to an appeal to the appropriate appeal board provided for in section 10 (a) (2). Upon the filing of such appeal with the appeal board, the appeal board shall forthwith refer the matter to the Department of Justice for inquiry and hearing by the Department or the proper agency thereof. After appropriate inquiry by such agency, a hearing shall be held by the Department of Justice with respect to the character and good faith of the objections of the person concerned, and such person shall be notified of the time and place of such hearing. The Department shall, after such hearing, if the objections are found to be sustained, recommend to the appeal board (1) that if the objector is inducted into the land or naval forces under this Act, he shall be assigned to noncombatant service as defined by the President, or (2) that if the objector is found to be conscientiously opposed to participation in such noncombatant service, he shall in lieu of such induction be assigned to work of national importance under civilian direction. If after such hearing the Department finds that his objections are not sustained, it shall recommend to the appeal board that such objections be not sustained. The appeal board shall give consideration to but shall not be bound to follow the recommendation of the Department of Justice together with the record on appeal from the local board in making its decision. Each person whose claim for exemption from combatant training and service because of conscientious objections is sustained shall be listed by the local board on a register of conscientious objectors.

(h) No exception from registration, or exemption or deferment from training and service, under this Act, shall continue after the cause therefor ceases to exist.

SEC. 6. The President shall have authority to induct into the land and naval forces of the United States under this Act no greater number

*Marginal notes:*
Deferment of certain college or university students.

Conscientious objectors.

Assignment.

Appeal.

Hearing.

Recommendation. If objections sustained.

If not sustained.

Register of conscientious objectors.

No exemption, etc., after cause therefor ceases.

Number inducted restricted to appropriation therefor.

890        PUBLIC LAWS—CH. 720—SEPT. 16, 1940       [54 STAT.

of men than the Congress shall hereafter make specific appropriation for from time to time.

*Bounty and substitute prohibition. Proviso. Allowance not regarded as bounties.*

SEC. 7. No bounty shall be paid to induce any person to enlist in or be inducted into the land or naval forces of the United States: *Provided,* That the clothing or enlistment allowances authorized by law shall not be regarded as bounties within the meaning of this section. No person liable for service in such forces shall be permitted or allowed to furnish a substitute for such service; no substitute as such shall be received, enlisted, enrolled, or inducted into the land or naval forces of the United States; and no person liable for training and service in such forces under section 3 shall be permitted to escape such training and service or be discharged therefrom prior to the expiration of his period of such training and service by the payment of money or any other valuable thing whatsoever as consideration for his release from such training and service or liability therefor.

*Certificate upon completion of training, etc.*

SEC. 8. (a) Any person inducted into the land or naval forces under this Act for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training and service under section 3 (b) shall be entitled to a certificate to that effect upon the completion of such period of training and service, which shall include a record of any special proficiency or merit attained.

*Physical examinations.*

In addition, each such person who is inducted into the land or naval forces under this Act for training and service shall be given a physical examination at the beginning of such training and service and a medical statement showing any physical defects noted upon such examination; and upon the completion of his period of training and service under section 3 (b), each such person shall be given another physical examination and shall be given a medical statement showing any injuries, illnesses or disabilities suffered by him during such period of training and service.

*Restoration to positions.*

(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within forty days after he is relieved from such training and service—

*Government or D. C. employees.*

(A) if such position was in the employ of the United States Government, its Territories or possessions, or the District of Columbia, such person shall be restored to such position or to a position of like seniority, status, and pay;

*Private employees.*

(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so;

*State, etc., employees.*

(C) if such position was in the employ of any State or political subdivision thereof, it is hereby declared to be the sense of the Congress that such person should be restored to such position or to a position of like seniority, status, and pay.

*Status upon restoration.*

(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration.

891

[54 STAT.]   76TH CONG., 3D SESS.—CH. 720—SEPT. 16, 1940

(d) Section 8 (c) of the joint resolution entitled "Joint Resolution to strengthen the common defense and to authorize the President to order members and units of reserve components and retired personnel of the Regular Army into active military service", approved August 27, 1940, is amended to read as follows:

*Ante, p. 885.*

"(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of active military service, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was ordered into such service, and shall not be discharged from such position without cause within one year after such restoration."

*Restoration without loss of seniority, etc.*

(e) In case any private employer fails or refuses to comply with the provisions of subsection (b) or subsection (c), the district court of the United States for the district in which such private employer maintains a place of business shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, to specifically require such employer to comply with such provisions, and, as an incident thereto, to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. The court shall order a speedy hearing in any such case and shall advance it on the calendar. Upon application to the United States district attorney or comparable official for the district in which such private employer maintains a place of business, by any person claiming to be entitled to the benefits of such provisions, such United States district attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing of any motion, petition, or other appropriate pleading and the prosecution thereof to specifically require such employer to comply with such provisions: *Provided,* That no fees or court costs shall be taxed against the person so applying for such benefits.

*Remedial action upon failure to comply.*

*Representation by U.S. district attorney.*

*Proviso. Court fees, etc.*

*Ante, p. 890.*

(f) Section 3 (d) of the joint resolution entitled "Joint Resolution to strengthen the common defense and to authorize the President to order members and units of reserve components and retired personnel of the Regular Army into active military service", approved August 27, 1940, is amended by inserting before the period at the end of the first sentence the following: ", and, as an incident thereto, to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action".

*Recovery of wages or benefits.*

(g) The Director of Selective Service herein provided for shall establish a Personnel Division with adequate facilities to render aid in the replacement in their former positions of, or in securing positions for, members of the reserve components of the land and naval forces of the United States who have satisfactorily completed any period of active duty, and persons who have satisfactorily completed any period of their training and service under this Act.

*Personnel Division. Establishment, functions, etc.*

(h) Any person inducted into the land or naval forces for training and service under this Act shall, during the period of such training and service, be permitted to vote in person or by absentee ballot in any general, special, or primary election occurring in the State of which he is a resident, whether he is within or outside of such State at the time of such election, if under the laws of such State he is entitled so to vote in such election; but nothing in this subsection shall be construed to require granting to any such person a leave of absence for longer than one day in order to permit him to vote in person in any such election.

*Right to vote, etc.*

page 107

892                    PUBLIC LAWS—CH. 720—SEPT. 16, 1940                    [54 Stat.

Employment of members of Communist Party, etc.

(1) It is the expressed policy of the Congress that whenever a vacancy is caused in the employment rolls of any business or industry by reason of induction into the service of the United States of an employee pursuant to the provisions of this Act such vacancy shall not be filled by any person who is a member of the Communist Party or the German-American Bund.

Placing of orders for material, etc.

[text obscured] and which is of the nature and kind usually produced or capable of being produced by such individual, firm, company, association, corporation, or organized manufacturing industry.

Compliance obligatory.

Precedence over all other orders.

[text obscured] and shall take precedence over all other orders and contracts theretofore placed with such individual, firm, company, association, corporation, or organized manufacturing industry, [text obscured] individual, firm, association, company, corporation, or organized manufacturing industry or the responsible head or heads thereof owning or operating any plant equipped for the manufacture of arms or ammunition or parts of ammunition, or any necessary supplies or equipment for the Army or Navy, and any individual, firm, association, company, corporation, or organized manufacturing industry or the responsible head or heads thereof owning or operating any

Taking possession of certain manufacturing plants.

manufacturing plant, which, in the opinion of the Secretary of War or the Secretary of the Navy shall be capable of being readily transformed into a plant for the manufacture of arms or ammunition, or parts thereof, or other necessary supplies or equipment, [text obscured] of the United States [text obscured]

[text obscured] of the Navy who shall refuse to furnish such arms, ammunition, or parts of ammunition, or other supplies or equipment, at a reasonable price as determined by the Secretary of War or the Secretary of the Navy, as the case may be [text obscured]

Authorization.

Failure to comply.

Penalty.

[text obscured] or other individual, firm, company, association, or corporation, or organized manufacturing industry, or the responsible head or heads thereof, failing to comply with the provisions of this section shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment for not more than three years and a fine not exceeding $50,000.

Compensation for use of plants, etc.

The compensation to be paid to any individual, firm, company, association, corporation, or organized manufacturing industry for its products and material, or as rental for use of any manufacturing plant while used by the United States, shall be fair and just:

Proviso. Employment standards.

Provided, That nothing herein shall be deemed to render inapplicable [text obscured] State or Federal laws concerning the health, safety, security, and employment standards of the employees in such plant.

893

54 STAT.]   76TH CONG., 3D SESS.—CH. 720—SEPT. 16, 1940

The first and second provisos in section 8 (b) of the Act entitled *Previcus repealed.*
"An Act to expedite national defense, and for other purposes", *Ante, p. 689.*
approved June 28, 1940 (Public Act Numbered 671, Seventy-sixth
Congress), are hereby repealed.

SEC. 10.  (a)  The President is authorized—

(1)  to prescribe the necessary rules and regulations to carry *Rules, etc.*
out the provisions of this Act;

(2)  to create and establish a Selective Service System, and *Selective Service System.*
shall provide for the classification of registrants and of persons *Classification of registrants.*
who volunteer for induction under this Act on the basis of avail- *Civilian local boards.*
ability for training and service, and shall establish within the
Selective Service System civilian local boards and such other
civilian agencies, including appeal boards and agencies of appeal,
as may be necessary to carry out the provisions of this Act. There
shall be created one or more local boards in each county or politi-
cal subdivision corresponding thereto of each State, Territory,
and the District of Columbia. Each local board shall consist of *Membership.*
three or more members to be appointed by the President, from
recommendations made by the respective Governors or comparable
executive officials.  No member of any such local board shall be *Requirements.*
a member of the land or naval forces of the United States, but
each member of any such local board shall be a civilian who is
a citizen of the United States residing in the county or political
subdivision corresponding thereto in which such local board has
jurisdiction under rules and regulations prescribed by the Presi-
dent.  Such local boards, under rules and regulations prescribed *Powers.*
by the President, shall have power within their respective juris-
dictions to hear and determine, subject to the right of appeal to
the appeal boards herein authorized, all questions or claims with
respect to inclusion for, or exemption or deferment from, training
and service under this Act of all individuals within the jurisdic-
tion of such local boards.  The decisions of such local boards shall *Finality of board's decisions; exception.*
be final except where an appeal is authorized in accordance with
such rules and regulations as the President may prescribe.
Appeal boards and agencies of appeal within the Selective Service *Appeal boards, etc.*
System shall be composed of civilians who are citizens of the
United States.  No person who is an officer, member, agent, or *Selective Service System personnel not exempt by reason of such status.*
employee of the Selective Service System, or of any such local
or appeal board or other agency, shall be exempted from registra-
tion, or deferred from training and service, as provided for in
this Act, by reason of his status as such officer, member, agent, or
employee;

(3)  to appoint by and with the advice and consent of the Senate, *Director of Selective Service. Appointment; salary.*
and fix the compensation at a rate not in excess of $10,000 per
annum, of a Director of Selective Service who shall be directly
responsible to him and to appoint and fix the compensation of such *Other officers, etc.*
other officers, agents, and employees as he may deem necessary to
carry out the provisions of this Act; *Provided*, That any officer on *Proviso. Assignments not to prejudice status, etc.*
the active or retired list of the Army, Navy, Marine Corps, or
Coast Guard, or of any reserve component thereof or any officer or
employee of any department or agency of the United States who
may be assigned or detailed to any office or position to carry out the
provisions of this Act (except to offices or positions on local boards,
appeal boards, or agencies of appeal established or created pursuant
to section 10 (a) (3)) may serve in and perform the functions of
such office or position without loss of or prejudice to his status as
such officer in the Army, Navy, Marine Corps, or Coast Guard or
reserve component thereof, or as such officer or employee in any

894                    PUBLIC LAWS—CH. 720—SEPT. 16, 1940                    [54 Stat.

*Senate approval of designated appointments.*

department or agency of the United States: *Provided further,* That any person so appointed, assigned or detailed to a position the compensation in respect of which is at a rate in excess of $5,000 per annum shall be appointed, assigned or detailed by and with the advice and consent of the Senate: *Provided further,* That the President may appoint necessary clerical and stenographic employees for local boards and fix their compensation without regard to the Classification Act of 1923, as amended, and without regard to the provisions of civil-service laws.

*Other employees.*

*42 Stat. 1488.*
*5 U. S. C. §§ 656-674; Supp. V, §§ 661, 674.*

*Utilization of Government, etc., agencies.*

(4)  to utilize the services of any or all departments and any and all officers or agents of the United States and to accept the services of all officers and agents of the several States, Territories, and the District of Columbia and subdivisions thereof in the execution of this Act; and

*Printing, binding, etc.*

(5)  to purchase such printing, binding, and blankbook work from public, commercial, or private printing establishments or binderies upon orders placed by the Public Printer or upon waivers issued in accordance with section 12 of the Printing Act approved January 12, 1895, as amended by the Act of July 8, 1935 (49 Stat. 475), and to obtain by purchase, loan, or gift such equipment and supplies for the Selective Service System as he may deem necessary to carry out the provisions of this Act, with or without advertising or formal contract; and

*44 U. S. C., Supp. V, § 14.*

*Parole.*

(6)  to prescribe eligibility, rules, and regulations governing the parole for service in the land or naval forces, or for any other special service established pursuant to this Act, of any person convicted of a violation of any of the provisions of this Act.

*Delegation of authority.*

(b)  The President is further authorized, under such rules and regulations as he may prescribe, to delegate and provide for the delegation of any authority vested in him under this Act to such officers, agents, or persons as he may designate or appoint for such purpose or as may be designated or appointed for such purpose pursuant to such rules and regulations as he may prescribe.

*Voluntary service. Penalty envelopes.*

(c)  In the administration of this Act voluntary service may be accepted. Correspondence necessary in the execution of this Act may be carried in official penalty envelopes.

*Fiscal, disbursing, and accounting agent.*

(d)  The Chief of Finance, United States Army, is hereby designated, empowered, and directed to act as the fiscal, disbursing, and accounting agent of the Director of Selective Service in carrying out the provisions of this Act.

*Penal provisions.*

Sec. 11.  Any person charged as herein provided with the duty of carrying out any of the provisions of this Act, or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, and any person charged with such duty, or having and exercising any authority under said Act, rules, regulations, or directions who shall knowingly make, or be a party to the making, of any false, improper, or incorrect registration, classification, physical or mental examination, deferment, induction, enrollment, or muster, and any person who shall knowingly make, or be a party to the making of, any false statement or certificate as to the fitness or unfitness or liability or nonliability of himself or any other person for service under the provisions of this Act, or rules, regulations, or directions made pursuant thereto, or who otherwise evades registration or service in the land or naval forces or any of the requirements of this Act, or who knowingly counsels, aids, or abets another to evade registration or service in the land or naval forces or any of the requirements of this Act, or of said rules, regulations, or directions, or who in any manner shall knowingly fail or neglect to perform any duty required

**54 Stat.]   76th CONG., 3d SESS.—CH. 720—SEPT. 16, 1940**

of him under or in the execution of this Act, or rules or regulations made pursuant to this Act, or any person or persons who shall knowingly hinder or interfere in any way by force or violence with the administration of this Act or the rules or regulations made pursuant thereto, or conspire to do so, shall, upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, or if subject to military or naval law may be tried by court martial, and, on conviction, shall suffer such punishment as a court martial may direct.  No person shall be tried by any military or naval court martial in any case arising under this Act unless such person has been actually inducted for the training and service prescribed under this Act or unless he is subject to trial by court martial under laws in force prior to the enactment of this Act. Precedence shall be given by courts to the trial of cases arising under this Act.

SEC. 12. (a) The monthly base pay of enlisted men of the Army and the Marine Corps shall be as follows: Enlisted men of the first grade, $126; enlisted men of the second grade, $84; enlisted men of the third grade, $72; enlisted men of the fourth grade, $80; enlisted men of the fifth grade, $54; enlisted men of the sixth grade, $36; enlisted men of the seventh grade, $30; except that the monthly base pay of enlisted men with less than four months' service during their first enlistment period and of enlisted men of the seventh grade whose inefficiency or other unfitness has been determined under regulations prescribed by the Secretary of War, and the Secretary of the Navy, respectively, shall be $21.  The pay for specialists' ratings, which shall be in addition to monthly base pay, shall be as follows: First class, $30; second class, $25; third class, $20; fourth class, $15; fifth class, $6; sixth class, $3.  Enlisted men of the Army and the Marine Corps shall receive, as a permanent addition to their pay, an increase of 10 per centum of their base pay and pay for specialists' ratings upon completion of the first four years of service, and an additional increase of 5 per centum of such base pay and pay for specialists' ratings for each four years of service thereafter, but the total of such increases shall not exceed 25 per centum.  Enlisted men of the Navy shall be entitled to receive at least the same pay and allowances as are provided for enlisted men in similar grades in the Army and Marine Corps.

(b) The pay for specialists' rating received by an enlisted man of the Army or the Marine Corps at the time of his retirement shall be included in the computation of his retired pay.

(c) The pay of enlisted men of the sixth grade of the National Guard for each armory drill period, and for each day of participation in exercises under sections 94, 97, and 99 of the National Defense Act, shall be $1.50.

(d) No back pay or allowances shall accrue by reason of this Act for any period prior to October 1, 1940.

(e) Nothing in this Act shall operate to reduce the pay now being received by any retired enlisted man.

(f) The provisions of this section shall be effective on and after October 1, 1940.  Thereafter all laws and parts of laws insofar as the same are inconsistent herewith or in conflict with the provisions hereof are hereby repealed.

SEC. 13. (a) The benefits of the Soldiers and Sailors Civil Relief Act, approved March 8, 1918, are hereby extended to all persons inducted into the land or naval forces under this Act, and to all members of any reserve component of such forces now or hereafter on active duty for a period of more than one month; and, except as

Enlisted men of Army and Marine Corps. Monthly base pay.

Specialists' ratings.

Increase upon completing certain periods of service.

Navy, enlisted men.

Specialists' rating on retirement.

National Guard. 39 Stat. 200, 207; 41 U. S. C. §§ 55-64, 346-348.

Back pay, etc.

Pay of retired enlisted man.

Effective date. Repeal.

Soldiers and Sailors Civil Relief Act, 1918. Benefits extended. 40 Stat. 440; Post, p. 1181.

896                        PUBLIC LAWS—CH. 720—SEPT. 16, 1940                [54 Stat.

hereinafter provided, the provisions of such Act of March 8, 1918, shall be effective for such purpose.

(b) For the purposes of this section—

Inoperative provisions.
52 Stat. 440, 441, 442-445, 447.

(1) the following provisions of such Act of March 8, 1918, shall be inoperative: Section 100; paragraphs (1), (2), and (5) of section 101; article 4; article 5; paragraph (5) of section 601; and section 603;

Terms defined. "Persons in military service."

(2) the term "persons in military service", when used in such Act of March 8, 1918, shall be deemed to mean persons inducted into the land or naval forces under this Act and all members of any reserve component of such forces now or hereafter on active duty for a period of more than one month;

"Period of military service."

(3) the term "period of military service", when used in such Act of March 8, 1918, when applicable with respect to any such person, shall be deemed to mean the period beginning with the date of enactment of this Act or the date on which such person is inducted into such forces under this Act for any period of training and service or is ordered to such active duty, whichever is the later, and ending sixty days after the date on which such period of training and service or active duty terminates;

"Date of approval of this Act."
54 Stat. 443.

(4) the term "date of approval of this Act", when used in such Act of March 8, 1918, shall be deemed to mean the date of enactment of the Selective Training and Service Act of 1940.

(c) Article III of such Act of March 8, 1918, is amended by adding at the end thereof the following new section:

Installment contracts. Termination agreements, etc.

"Sec. 303. Nothing contained in section 301 shall prevent the termination or cancellation of a contract referred to in such section, nor the repossession or retention of property purchased or received under such contract, pursuant to a mutual agreement of the parties thereto, or their assignees, if such agreement is executed in writing subsequent to the making of such contract and during the period of military service of the person concerned."

Notice of requirements.

Sec. 14. (a) Every person shall be deemed to have notice of the requirements of this Act upon publication by the President of a proclamation or other public notice fixing a time for any registration under section 2.

Separability of provisions.

(b) If any provision of this Act or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Voluntary enlistment or reenlistment.

(c) Nothing contained in this Act shall be construed to repeal, amend, or suspend the laws now in force authorizing voluntary enlistment or reenlistment in the land and naval forces of the United States, including the reserve components thereof.

Terms defined. "Between the ages of twenty-one and thirty-six."

Sec. 15. When used in this Act—

(a) The term "between the ages of twenty-one and thirty-six" shall refer to men who have attained the twenty-first anniversary of the day of their birth and who have not attained the thirty-sixth anniversary of the day of their birth; and other terms designating different age groups shall be construed in a similar manner.

"United States."

(b) The term "United States", when used in a geographical sense, shall be deemed to mean the several States, the District of Columbia, Alaska, Hawaii, and Puerto Rico.

"Dependent."

(c) The term "dependent" when used with respect to a person registered under the provisions of this Act includes only an individual (1) who is dependent in fact on such person for support in a reasonable manner, and (2) whose support in such a manner depends on income earned by such person in a business, occupation, or employment.

"Land or naval forces" and "land and naval forces."

(d) The terms "land or naval forces" and "land and naval forces" shall be deemed to include aviation units of such forces.

897

(e) The term "district court of the United States" shall be deemed to include the courts of the United States for the Territories and the possessions of the United States. <span>"District court of the United States."</span>

SEC. 16. (a) Except as provided in this Act, all laws and parts of laws in conflict with the provisions of this Act are hereby suspended to the extent of such conflicts for the period in which this Act shall be in force. <span>Suspension of conflicting laws.</span>

(b) All the provisions of this Act, except the provisions of sections 3 (c), 3 (d), 3 (r), and 12, shall become inoperative and cease to apply on and after May 15, 1945, except as to offenses committed prior to such date, unless this Act is continued in effect by the Congress. <span>Period of operation, etc.</span>

(c) There are hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such sums as may be necessary to carry out the provisions of this Act. <span>Appropriation authorized. Post, p. 978</span>

SEC. 17. This Act shall take effect immediately. <span>When effective.</span>

SEC. 18. This Act may be cited as the "Selective Training and Service Act of 1940". <span>Short title.</span>

Approved, September 16, 1940, 3:08 p. m., E. S. T.

---

[CHAPTER 721]

AN ACT

<span>September 16, 1940 [S. 4025] [Public, No. 784]</span>

To authorize the Reconstruction Finance Corporation to make loans for the development of deposits of strategic and critical minerals which in the opinion of the Corporation would be of value to the United States in time of war, and to authorize the Reconstruction Finance Corporation to make more adequate loans for mineral developmental purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 14 of the Act entitled "An Act relating to direct loans for industrial purposes by Federal Reserve banks, and for other purposes," approved June 19, 1934, as amended, is amended to read as follows: <span>Reconstruction Finance Corporation. 48 Stat. 120; 15 U. S. C. § 606b; Supp. V, § 606b.</span>

"SEC. 14. The Reconstruction Finance Corporation is authorized and empowered to make loans upon sufficient security to recognized and established corporations, individuals, and partnerships engaged in the business of mining, milling, or smelting ores. The Reconstruction Finance Corporation is authorized and empowered also to make loans to corporations, individuals, and partnerships engaged in the development of a quartz ledge, or vein, or other ore body, or placer deposits, containing gold, silver, or tin, or gold and silver, or any strategic or critical mineral which in the opinion of the Reconstruction Finance Corporation would be of value to the United States in time of war, when, in the opinion of the Reconstruction Finance Corporation, there is sufficient reason to believe that, through the use of such loan in the development of a lode, ledge, or vein, or mineral deposit, or placer gravel deposit, there will be developed a sufficient quantity of ore, or placer deposits of a sufficient value to pay a profit upon mining operations: *Provided,* That not to exceed $20,000 shall be loaned to any corporation, individual, or partnership for such development purposes; except that not in excess of $40,000 in the aggregate may be loaned to any corporation, individual, or partnership for such purposes, if such corporation, individual, or partnership has expended funds previously obtained from the Reconstruction Finance Corporation for such purposes in such manner as to justify an additional loan for such purposes: *Provided further,* That there shall not be allocated or made available for such development loans a sum in excess of $10,000,000." <span>Loans for mineral development purposes.</span> <span>Strategic or critical minerals.</span> <span>Proviso. Maximum loans.</span> <span>Aggregate amount.</span>

Approved, September 16, 1940.

# EXHIBIT J

Slip Copy, 2008 WL 512728 (N.D.Cal.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Albert WRIGHT Jr., Plaintiff,
v.
A.W. CHESTERTON COMPANY INC., Defendant.
No. C07-05403 MJJ.
Feb. 25, 2008.

Daniel Lee Keller, John Bruce Jackson, Stephen Michael Fishback, Keller, Fishback & Jackson LLP, Agoura Hills, CA, for Plaintiff.

## ORDER DENYING MOTION TO REMAND

MARTIN J. JENKINS, District Judge.

### INTRODUCTION

*1 Before the Court is Plaintiffs Albert Wright, Jr. ("Mr.Wright") and Marva Wright's (collectively, "Plaintiffs") Motion to Remand. (Docket No. 23.) Defendants Foster Wheeler ("Foster Wheeler") and Leslie Controls ("Leslie Controls") (collectively, "Defendants") oppose the Motion.[FN1] For the following reasons, the Court **DENIES** the Motion.

> FN1. Plaintiff objects to Leslie Controls' Joinder in Foster Wheeler's Notice of Removal and Leslie Controls' Joinder in Foster Wheeler's Opposition to this Motion. Whether or not Leslie Controls may join the Notice of Removal is not, however, dispositive of this Motion because any defendant can unilaterally remove a case under § 1442. See Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (explaining that a federal officer or agency defendant can unilaterally remove a case under § 1442). Therefore, for purposes of this Motion, the Court need not determine whether Leslie Controls' may join in Foster Wheeler's Notice of Removal. However, once the case is removed by Foster Wheeler, the Court perceives no reason why Leslie Controls may not Join in Foster Wheeler's Opposition to Plaintiff's Motion to Remand. In addition, Leslie Controls filed its joinder in the opposition not less than 21 days before the hearing date with both the Court and Plaintiffs. ( See Plf.'s Objection, Docket No. 44 at 2.) The Court therefore perceives no prejudice from Leslie Control's failure to efile. See Civ. L.R. 7-3(a).

### FACTUAL BACKGROUND

This is a personal injury action arising out of injuries allegedly sustained by Mr. Wright due to exposure to Defendants' asbestos and asbestos-containing products. ( See Keller Decl., Exh. A ("Complaint") ¶¶ 10-15.) Plaintiffs allege that Mr. Wright contracted lung cancer as a result of his exposure to these products during his employment as a machinist and flange turner, among other places, for the Navy. ( Id. ¶¶ 11, 36-37, Exh. A .) Mr. Wright worked aboard twenty-six or more Navy ships and vessels in his career.[FN2] ( See id. at Exh. A.)

> FN2. Mr. Wright worked aboard various Navy vessels including, but not limited to, the

USS Midway, USS Enterprise, USS Kitty Hawk, USS Coral Sea, USS Oriskany, USS Constellation, USS Mount Hood, USS John F Kennedy, USS Hancock, USS Ticonderoga, USS Providence, USS Mount Baker, USS Mauna Kea, USS Pigeon, USS Pyro, USS Guitarro, USS Drum, USS Pintado USS Hawkbill, USS Permit, USS Swordfish, USS Halibut, USS Grayback, USS Brinkley Bass, USS Trigger, and USS Wahoo.

Plaintiffs filed this asbestos action on September 13, 2007 in San Francisco County Superior Court against Defendant Foster Wheeler, Leslie Controls and dozens of other defendants. ( *See* Keller Decl., Exh. A ("Complaint").) Plaintiffs brought claims of negligence, strict liability, false representation, intentional tort, premises owner/contractor liability and loss of consortium. ( *See* Complaint at 1.) Plaintiffs argue, in this Motion, that Plaintiffs' claims against Foster Wheeler are based only on its failure to warn about the dangers of asbestos that Foster Wheeler incorporated into the design and manufacture of its boilers. (Plfs.' Mem. of P. & A. at 14.) Indeed, in the Complaint, Plaintiffs "disclaim any cause of action or recovery for any injuries and damages resulting from exposure to asbestos caused by the acts or omissions of defendants committed at the specific direction of an officer of the United States Government acting within his official capacity." ( *See* Complaint ¶ 9a.) Foster Wheeler filed a Notice of Removal on October 23, 2007. ( *See* Notice of Removal, Docket No. 1.) Plaintiffs now seek an order remanding this case to state court.

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 1441(a), a defendant in a civil action may remove a case from state court to federal district court if the district court has subject matter jurisdiction over the case. The Court strictly construes the removal statute against removal and Defendants have the burden of establishing that removal jurisdiction is proper. See *Gaus v. Miles, Inc.,* 980 F.2d 564, 566-67 (9th Cir.1992).

Removal pursuant to 28 U.S.C. § 1442, however, is different. Pursuant to 28 U.S.C. § 1442(a)(1), a civil action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1). To satisfy this provision a party must "(1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v. Abex Corp.,* 816 F.Supp. 569, 517 (N.D.Cal.1992) (citing *Mesa v. California,* 489 U.S. 121, 124-125, 134-135, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)).[FN3]

> FN3. The removing party must also qualify as a federal officer or person acting under the same. As a corporation, Foster Wheeler meets this requirement. See *Fung,* 816 F.Supp. at 572. Additionally, the parties do not contend otherwise.

**\*2** Unlike removal under § 1441(a), the presumption under § 1442 is in favor of removal. See *Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1252-53 (9th Cir.2006). In *Durham,* after a review of the relevant case law, the Ninth Circuit stated that "when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* at 1252. The Court further explained that "[b]ecause it's so important to the federal government to protect federal officers, removal rights under section 1442 are much broader than those under section 1441." *Id.* at 1253 (noting that the breadth of the removal rights are exemplified by, inter alia, the fact that under § 1442 a federal officer can remove a case even if the plaintiff could not have filed the case in federal court to begin with, that removal under § 1442 is not subject to the well-pleaded complaint rule and that a federal officer or agency can unilaterally remove a case under section 1442).[FN4]

> FN4. Plaintiffs correctly argue that the Ninth Circuit, in *Durham,* was confronted with the question of whether the removal petition was timely, so the court did not reach the merits of the defendant's removal petition. Plaintiff understates, however, the breadth of the holding in *Durham.* While *Durham* needed only to determine the timeliness question, the Court analyzed the history of § 1442. In so doing, the Circuit's determination that

page 116

there should be a presumption in *favor* of removal was not limited to the mere question of timeliness. In addition, the Circuit makes the presumption determination in order to come to its final holding. Thus, the language regarding the breadth and presumption in favor of removal was not dicta, but essential to the holding and thus binding. A recent decision from this court interpreted it as such and accordingly denied a motion to remand. *See Ballenger v. AGCO,* No. C 06-2271, 2007 WL 1813821 (N.D.Cal. June 22, 2007).

## ANALYSIS

Plaintiffs argue that Defendants fail to establish that Foster Wheeler acted under the direction of a federal officer, raised a colorable federal defense, or established a causal nexus between its alleged action under the control of a federal officer and Plaintiffs' claims. Plaintiffs also raise evidentiary objections to Defendants' evidence.

Defendants, on the other hand, argue that they have submitted sufficient evidence on each of the required elements for removal under § 1442 in both their Notice of Removal and the exhibits attached to their Opposition to this Motion. The Court turns first to the evidentiary challenges, then to the merits.

## I. Evidentiary Issues

In the instant case, Defendants submit four declarations. Plaintiff raises evidentiary objections to all four. The general contours of these objections are outlined in this section. Below, in the discussion on the merits, if the outcome relies on evidence that is specifically challenged, it shall be so noted and the objection resolved.

The first two declarations, attached to Defendant's Notice of Removal, are the declarations of J. Thomas Schroppe, a retired Foster Wheeler executive, and Ben J. Lehman, a retired Rear Admiral of the United States Navy. These declarations are offered for the purpose of demonstrating that Foster Wheeler was subject to government specifications and oversight in all aspects of the design of its boilers, including the relevant warnings attached thereto. ( *See* Affidavit of J. Thomas Schroppe, Notice of Removal, Exhibit B and Affidavit of Ben J. Lehman, Notice of Removal, Exhibit C). Plaintiffs object to the admissibility of these affidavits for four reasons. ( *See* Plfs.' Evid. Obj.) First, Plaintiffs argue that under Federal Rule of Evidence ("FRE") 402, the challenged evidence is not relevant. Next, under FRE 602, Plaintiffs contend that the witnesses do not have personal knowledge of the matters asserted. Third, some of the evidence is purportedly inadmissible hearsay under FRE 802. Finally, Plaintiffs argue that these declarations violate the best evidence rule, under FRE 1002-1004.[FN5]

> FN5. While Plaintiffs refer to the "secondary evidence rule" and cite FRE 1003, the Court presumes, given the description of the objection, that the objection is based on FRE 1002.

**\*3** As a general matter, none of these objections are meritorious. First, the declarations are relevant to this Motion because they are related to the Navy's level of control over Foster Wheeler's production activities. ( *See* Notice of Removal, Exhs. B, C.) Mr. Wright alleges that his injuries were caused by his work on at least twenty-six Navy ships, not just one or even a small handful. While Defendants only cite one ship by name in their Notice of Removal, they note that the allegations are related to "exposure while working on, among other ships, the USS Constellation." ( *See* Notice of Removal at 2.) Thus, evidence regarding general navy practices, as it relates to the Navy's contracts with Foster Wheeler, is both relevant and appropriate. Insofar as Plaintiff argues that the testimony is not relevant because these declarations are dated prior to the inception of this action in state court, this argument is unavailing. The fact that the declaration pre-dates the inception of the suit does not undermine the relevance of the practices testified to, all of which occurred prior to the date the declaration was signed.

page 117

Next, both Schroppe and Lehman testify to their personal knowledge of the facts contained in the declaration. Schroppe states that he is personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary equipment because he was personally involved in such contracts at all the various stages of contracting. ( *See id.,* Exh. B at 2.) Lehman testifies that his years of experience with the Navy have caused him to be thoroughly familiar with U.S. Navy specifications and the means by which the U.S. Navy controlled its contracts and inspection procedures. ( *See id.,* Exh. C at 9.) Thus, Schroppe and Lehman's testimony regarding the Navy's contracting and specifications related to Foster Wheeler boilers is based on personal knowledge. Third, insofar as specific statements are inadmissible hearsay, this will be taken up as is relevant, below. However, as a general matter, the majority of the challenged statements are based on personal knowledge, not an out of court statement, and are not inadmissible hearsay. Finally, these declarations do not violate the Best Evidence Rule. Under FRE 1002, "to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." Here, Schroppe and Lehman, in their declarations, do not attempt to prove the content of a writing, recording or photograph. While the declarations cite various specifications that are also written, such as the Military Specifications ("Mil Specs"), they rely on their independent knowledge of the contents and therefore need not submit the document/s themselves.

The third declaration, by Thomas J. Moses, counsel for Foster Wheeler, includes a copy of Plaintiffs' Preliminary Asbestos Litigation Statement, a copy of a Government Purchase Order, and a copy of a District Court case. (Moses Decl., Exhs. A-C.) Plaintiff objects to the Purchase Order, arguing that it never references the USS Constellation and Defendant's attorney never establishes a foundation for its authenticity or how he is qualified to submit or interpret it. (Plfs.' Reply at 9.) The Court agrees that the Government Purchase Order lacks some foundation and specificity. However, the Court need not determine the admissibility of this document as the Court need not rely on it to resolve this Motion.

*4 Finally, the fourth declaration, by Lawrence Stilwell Betts ("Betts"), includes forty-five exhibits. Plaintiffs generally object to the entire declaration on the same grounds that they object to the Schroppe and Lehman declarations. As above, as a general matter, these objections are not meritorious. However, insofar as the Court's decision relies on specific portions of the Betts declarations, the objections thereto are considered below.

Plaintiffs also argue that the Court should not consider the Betts declaration because it was untimely. The Court, however, finds this argument unavailing. First, Plaintiffs contend that a removal notice cannot be amended or supplemented after the time for removal has expired. ( *See* Plfs.' Reply at 5.) While this may be the case, Defendants do not seek to amend their removal notice. In addition, the issues raised in the Betts declaration, and attached exhibits, were generally raised in Defendants' Notice of Removal. ( *See* Notice of Removal, Exh. C at 14-15.) Thus, the untimeliness argument is unavailing. In addition, the Betts declaration was filed with the Court on December 17, 2007, more than the requisite time in advance of the January 29, 2008 hearing in this matter. While Defendants failed to efile the exhibits, the Court received copies on December 17, 2007 and Plaintiffs received copies on December 18, 2007, also more than 21 days before the hearing in this matter. Thus, while Defendants may have committed a procedural error in filing this declaration, the Court perceives no prejudice from the Court's consideration of the Betts declaration in resolving this matter.

## II. The Merits

### a. The First and Third *Mesa* Prongs: Foster Wheeler acted under the direction of a federal officer and Foster Wheeler demonstrated a causal nexus.

Under *Mesa,* Defendants must establish that Foster Wheeler acted under the direction of a federal officer. 489 U.S. at 121, 134-45. In addition, Defendants must establish that there is a causal nexus between Plaintiff's claims and Foster Wheeler's actions under the control of a federal officer. *See id.* Defendants contend that they have established both of these prongs. The Court agrees.

To show that Defendants acted under the direction of a federal officer, Foster Wheeler cannot simply show that the "relevant acts occurred under the general auspices of a federal officer, such as



page 118

being a participant in a regulated industry." *Fung, 816 F.Supp. at 572* (quotations omitted). Instead, "[a] majority of courts have held that the federal official must have 'direct and detailed control' over the defendant." *Id.* (quoting *Ryan v. Dow Chemical Co., 781 F.Supp. 934, 947* (E.D.N.Y.1992).

Relying on *Good v. Armstrong World Industries, 914 F.Supp. 1125 (E.D.Pa.1996)*, Plaintiffs contend that Foster Wheeler must also cite a specific federal officer who designed, manufactured or even directed the design and manufacture of the boilers present in the Navy vessels and installations identified in Plaintiffs' Complaint. (Plfs.' Mem. of P. & A. at 8-9.) Plaintiffs, however, provide no authority establishing that this is a requirement in the Ninth Circuit. In fact, such a finding would be in potential conflict with the removal standard enunciated in *Durham*. Thus, Plaintiffs have not shown that Defendants, in this circuit, are required to cite a specific federal officer, as long as they show that they acted under the requisite direct and detailed control of a federal official. *See Fung, 816 F.Supp. at 572*.

**\*5** Here, Defendants have provided sufficient evidence supporting a finding that the Navy had direct and detailed control over their ability to place asbestos warnings on their boilers provided to the Navy. Under contracts between Foster Wheeler and the Navy for boilers and auxiliary equipment, the Navy was responsible for all design aspects and approved the equipment at multiple steps along the way. ( *See* Notice of Removal, Exh. B. ("Schroppe Decl") ¶¶ 2, 5, 8, 9, 12, 14, 19.) In addition, the Navy exercised significant direction and control over the contents of all written documentation to be delivered with the naval boilers. ( *Id.* ¶ 21.) Under the Navy's precise specifications, Foster Wheeler was not permitted to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy. ( *Id.* ¶ 22.)[FN6]

> FN6. The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Schroppe declaration are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

Plaintiffs offer no contradictory evidence. Instead, Plaintiffs argue that there is no evidence that the asbestos-containing components were anything other than standard stock equipment. (Plfs .' Mem. of P. & A. at 10.) However, the evidence presented by Defendants establishes that the boilers that Foster Wheeler designed and manufactured for the Navy were subject to specific design requirements and control that resulted in equipment that was specific to the needs of the Navy and not standard stock equipment. In addition, Plaintiffs argue that Defendants' evidence is insufficient and contradictory. However, perceiving no real contradictions in the evidence, and given the presumption in favor of removal under *Durham*, this evidence is sufficient to establish the Navy's direct and detailed control over Defendants' design of the boilers and the warnings attached thereto.

Next, Plaintiffs argue that there is no causal nexus because there is no proof that a specific federal officer directed Foster Wheeler about warnings specifically. However, as discussed above, there is no requirement that Defendants cite a specific federal officer by name, as long as the requisite direction, control and causal nexus is established. In addition, Defendants offer evidence that the Navy would not permit Foster Wheeler to affix any type of warning or caution statement to a piece of equipment intended for installation onto a navy vessel, beyond those required by the Navy. ( *See* Schroppe Decl. ¶ 22; Lehman Decl. ¶ 14.) As Lehman testified, "[t]o do so would have interfered with the U.S. Navy's mission and control of its ships and personnel." (Lehman Decl. ¶ 14.) Thus, Defendants have established a causal nexus between Plaintiff's claims and Foster Wheeler's actions under the control of a federal officer.[FN7]

> FN7. The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Schroppe and Lehman declarations are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

page  119

**b. Second *Mesa* Prong: Foster Wheeler raises a colorable federal defense to Plaintiffs' claims.**

Foster Wheeler urges the Court to determine its right to remove under 28 U.S.C. 1442(a)(1) in light of the government contractor's defense set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). As discussed more fully below, the Court finds that there is sufficient evidence in the record to raise a colorable government contractor defense.

*\*6 In *Boyle*, the Supreme Court found that liability arising from state law, here the duty to warn, may not be imposed in instances where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. As noted above, Plaintiffs waive all claims against Foster Wheeler save for those arising from a failure to warn. ( *See* Complaint ¶ 9a.) The Ninth Circuit clarified the contractor defense as it applies to failure to warn claims in *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir.1996). The court in *Butler* found the contractor defense to be "inapplicable to a failure to warn claim in the absence of evidence that in making its decision whether to provide a warning ... [defendant] was acting in compliance with reasonably precise specifications imposed on [it] by the United States." *Id* . at 586 (quotations omitted).

In the instant case, as discussed above, Defendants provide sufficient evidence, by way of the Schroppe and Lehman declarations, that satisfies the first and second prongs of the *Boyle* test; the United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's equipment conformed to these specifications. The outstanding question, therefore, is whether Defendants submit sufficient evidence to establish the third prong; whether Foster Wheeler warned the United States about the dangers in the use of the equipment that were known to Foster Wheeler but not to the United States.

Defendants submit two declarations to support their contention that Foster Wheeler did not have any knowledge about the dangers of the use of asbestos that were not known to the United States Navy. First, Lehman testified that the U.S. Navy was well aware of the dangers of asbestos and conducted extensive research concerning the hazard of exposure to asbestos, thus staying abreast of the latest information, including the results of research. (Lehman Decl. ¶ 13.) The Navy made deliberate decisions on the allocation of its resources in light of this knowledge. ( *Id.*) Next, Defendants submit the declaration of Lawrence Stilwell Betts, a retired Navy captain and medical professional who is familiar with the industrial products used by the Navy, the Navy work environments and the Navy occupational health program. Betts testified that the Navy controlled asbestos exposure consistent with the then current state of accepted scientific and medical knowledge balanced by needs for national defense. (Betts Decl. ¶ 31.) Betts further testified that

[t]he Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art. During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos containing products used on or in boilers and auxiliary equipment on United States Navy ships known by a boiler manufacturer, like Foster Wheeler, that was not known by the United States government and the United States Navy.

*\*7 (Betts Decl. ¶ 32.) FN8

FN8. The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Lehman and Betts declarations are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

Plaintiff, in response, argues that, inter alia, Defendants have failed to establish that the Navy had knowledge about the dangers of using Foster Wheeler's asbestos-containing equipment or boilers specifically. However, the testimony above regarding the Navy's superior knowledge is only part of the record before the Court. Betts testifies that the Navy had the most current knowledge regarding the dangers of asbestos. Schroppe and Lehman's testimony further establishes that the Navy knew

page 120

of, and in fact required, the specific design parameters for the boilers made by Foster Wheeler. Thus, if the boilers contained asbestos, then it was by design, known by the Navy, and was approved and/or required by the Navy. The warnings regarding such asbestos were also according to, and limited by, the specifications set forth by the Navy. Thus, Plaintiff's argument that the Navy did not have knowledge about the asbestos contained in Foster Wheeler's boilers is unavailing. Plaintiffs also present other related arguments challenging the Betts declaration. Each argument, like their primary argument, discussed above, is similarly unavailing given the totality of the evidence in the record.

The Court is mindful that Defendants need only present a colorable federal defense to Plaintiff's claims and need not prove that the defense will be meritorious. *See Mesa,* 489 U.S. at 128; *Ballenger,* 2007 WL 1813821 at *4. Here, on this record, the Court finds that Defendants have established that they have a colorable federal defense.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** the Motion to Remand. Pursuant to the clear language in *Durham,* the Court must interpret § 1442 broadly in favor of removal. Given the evidence in the record, Defendants have established the requisite basis for removal.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
Wright v. A.W. Chesterton Co. Inc.
Slip Copy, 2008 WL 512728 (N.D.Cal.)

Motions, Pleadings and Filings (Back to top)

- 2007 WL 4937316 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of Motion to Remand Case to California Superior Court (Dec. 26, 2007) Original Image of this Document (PDF)
- 2007 WL 4937317 (Trial Motion, Memorandum and Affidavit) Declaration of Daniel Keller Submitted in Support of Plaintiffs' Reply Brief in Support of Motion to Remand Case to California Superior Court (Dec. 26, 2007) Original Image of this Document with Appendix (PDF)
- 2007 WL 4937318 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Evidentiary Objections to the Declaration of Thomas Moses, Esq. Submitted in Support of Defendant Foster Wheeler LLC's Notice of Removal (Dec. 26, 2007) Original Image of this Document (PDF)
- 2007 WL 4937319 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Evidentiary Objections to the Declaration of Lawrence Betts Submitted in Support of Defendant Foster Wheeler LLC's Notice of Removal (Dec. 26, 2007) Original Image of this Document (PDF)
- 2007 WL 4937315 (Trial Motion, Memorandum and Affidavit) Defendant Foster Wheeler USA Corporation's Opposition to Plaintiffs' Motion to Remand (Dec. 14, 2007) Original Image of this Document (PDF)
- 3:07cv05403 (Docket) (Oct. 23, 2007)
END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1    Peter B. Langbord, Esq., SBN 144319
     **Foley & Mansfield PLLP**
2    150 South Los Robles Ave., Suite 400
     Pasadena, California 91101
3    Telephone: (626) 744-9359
     Facsimile: (626) 744-1702
4

5    Attorneys for Defendant
     **VIAD CORP**

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   ROBERT REASER and CHRISTINE       )   Case No. CV08-1296 SVW (SSx)
     REASER,                           )   *(Related to Case No. CV08-1441)*
12                                      )
                                        )   Judge Stephen V. Wilson
13                Plaintiffs,           )
                                        )   **DECLARATION OF ADMIRAL BEN**
14        vs.                           )   **J. LEHMAN, U.S. NAVY RET., IN**
                                        )   **SUPPORT OF OPPOSITION TO**
15   ALLIS CHALMERS CORPORATION        )   **MOTION FOR REMAND TO STATE**
     PRODUCT LIABILITY TRUST, et al.,  )   **COURT**
16                                      )
                                        )
17                Defendants.           )
                                        )   DATE:          May 12, 2008
18                                      )   TIME:          1:30 p.m.
                                        )   COURTROOM:     6
19                                      )
                                        )
20                                      )
                                        )
21                                      )

22

23        Rear Admiral (USN, Retired) Ben J. Lehman, under penalty of perjury,

24   deposes and states as follows:

25        1.   I am a retired Rear Admiral of the United States Navy. Before joining

26   the Navy in 1942, I received a Bachelor of Mechanical Engineering degree from

27   the College of the City of New York. After joining the Navy, I was ordered to

28

                                          1
     DECLARATION OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION TO REMAND

study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design at the Naval Academy in Annapolis. The curriculum was primarily in electrical and mechanical engineering. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University.

I joined the United States Navy in 1942 and remained on active duty until 1946. While on active duty in the United States Navy, I served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944.

In 1946, I left active duty and joined the Naval Reserve. In 1950, I returned to active duty and was assigned as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952. I was then transferred to the Assistant Industrial Manager Office in San Francisco from 1952 to 1954 as a Planning Officer.

In 1954, I returned to the Naval Reserve where I was a member and then Commanding Officer of Naval Reserve Engineering Companies.

I was promoted to Rear Admiral in 1977 in the Naval Reserve.

I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods, I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975 providing engineering consultation services to various industries including the shipbuilding industry. During my Naval service, I have personally been responsible for the creation of Navy specifications for the procurement of materials

1    and machinery for use on Navy ships. A true, complete and accurate copy of my

2    Curriculum Vitae is attached as Exhibit A. I am an adult and have personal

3    knowledge of the facts contained herein.

4         2.     Based on my experience, professional training and education, I am

5    familiar with the plans, designs and specifications used in the construction and

6    repair of commercial and Navy ships. In addition, I am familiar with Navy

7    specifications, equipment manuals and qualified products lists which are used in

8    the construction and repair of Navy and commercial ships. I am also familiar with

9    the Navy regulations regarding the use of, placement of, and repairs or

10   maintenance of asbestos products generally during the periods in which they were

11   used and the Navy regulations regarding such maintenance, technical manuals and

12   warnings permitted by the Navy.

13        3.     I submit this Declaration to attest to the level of supervision and

14   control by the United States Navy and its officers over every aspect of the design,

15   manufacture and use of equipment intended for installation on Navy vessels.

16        4.     During my service in the Navy as a Ship Superintendent, I was

17   personally involved with the supervision or oversight of ship alterations and

18   equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn

19   Navy Yard) and at the San Francisco Naval Shipyard (Hunter's Point).

20        5.     During the 1940s and 1950s, the Navy generally utilized a system of

21   ship design and construction that established and set the designs of ships, which

22   designs were known to the Navy to meet particular performance capabilities. The

23   Navy then restricted any deviations from such designs by any suppliers and/or

24   contractors. When a change in the design and/or construction of a ship was

25   required, the Navy would oversee, control and approve all aspects of the change.

26   Design drawings were prepared by the design agent for the Navy or by the Navy

27   itself. The Navy reviewed and approved the drawings and then submitted them to

28   the individual suppliers and contractors to use in the manufacturing, supply and/or

installation of the equipment and the construction of the ship. These pertained to the original designs, as well as changes initiated and controlled by the Navy.

6.    Any deviation from military specifications of equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other item of equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew in maintaining the ship during its service using materials carried on board when shipyard help was not available.

7.    In the 1940s, 1950s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel were approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

8.    The Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation by any of its contractors.

4

DECLARATION OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION TO REMAND

9.    The Navy specified the use and placement of insulation, including asbestos insulation, on Navy ships during World War II and the 1950s. Mechanical equipment for use aboard Navy ships was delivered without insulation. This was to prevent damage to the insulation during shipment and installation, and to allow the equipment to be effectively connected to other equipment and systems on board, which connections as well as the equipment could then be effectively insulated. If mechanical equipment such as evaporators and heaters were to be insulated, it was not insulated by the manufacturers, but rather by shipyard personnel.

Shipyards and shipyard personnel were solely responsible for installing and insulating the equipment. Insulation was installed in accordance with plans, specifications, and schedules developed for and controlled by the Navy. Based upon my experience, professional training, education and research, it is my opinion that the United States Navy was aware of the dangers of asbestos by the 1940s. Despite such knowledge, the Navy did not provide any warnings. The research by LCdr S. A. Forman, MC, US Navy [Par. 13 h, below] supports my opinion.

10.    Based upon my experience, professional training, education and research, it is my opinion that equipment suppliers were prohibited from providing any warnings to be placed on or to accompany equipment supplied to the Navy without the consent and approval of the Navy. Moreover, certain types of warnings would not have been approved by the Navy given the necessary performance needs and capabilities of the shipboard equipment, the ships and Navy personnel. This would have included, but not been limited to, any potential warnings associated with asbestos including, but not limited to, recommendations regarding respiratory protection, and repair and maintenance practices. This was due to the inability to effectively and comprehensively observe, implement, and comply with such recommendations under the multitude of varying conditions likely to be encountered by Navy ships at sea, and especially at war.

DECLARATION OF ADMIRAL BEN J. LEHMAN. U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION TO REMAND

11.   All equipment and procedures had to be standardized to assure that personnel were familiar with the procedures for operating, repairing and maintaining the equipment, and that the tools and equipment aboard ship or at ports world-wide were available to perform such procedures. Thus, a contractor or supplier could not provide warnings or recommendations without the consent and authorization of the Navy.

12.   During the 1940s and early 1950s, the Navy did not have the tools, equipment and/or personnel capabilities to meet or comply with any potential warnings or recommendations pertaining to the health hazards of asbestos aboard ship, especially under the exigencies of war. Further, the Navy limited the areas of interest of each manufacturer to the equipment supplied by that manufacturer. Because equipment was required by the Navy to be supplied without insulation, it would have been improper and unauthorized for the manufacturer or supplier of such equipment to supply warnings or other recommendations with respect to insulation, which would not have been within its particular area of interest. As the manufacturer and/or supplier would not have been responsible for the insulation, it likely would not have been aware of any hazard associated with such insulation or required to determine whether any existed, and thus it had no ability or obligation to supply warnings about insulation. As the Navy would have been the entity which required the insulation, designated the type and placement of the insulation, and directed a different entity to supply, install it, or both e.g., the shipyard, the Navy's knowledge of any potential hazards associated with the insulation would have been equal or superior to that of the equipment manufacturers and suppliers that provided the uninsulated equipment, such as evaporators.

13.   Based upon my review of many Navy documents, my career experience in the Navy, and personal knowledge of the Navy's hazard communication program and naval practices generally, I can state as follows:

//

6

a.     Uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy could simply not operate if various personnel were trained differently and received additional inconsistent information from different manufacturers.

b.     Asbestos insulation products began containing hazard warning labels from the insulation manufacturers in the mid-1960s. Prior to that time, beginning more than two decades earlier, the Navy's own occupational health program provided training, engineering and administrative controls, personal protective equipment, and medical surveillance to prevent the hazards of asbestos to shipyard workers.

c.     Any additional warning about the hazards of asbestos by an equipment manufacturer would be only partial in scope as well as inherently redundant, eventually obsolete, and almost certainly inconsistent with the Navy's own training. The Navy could not permit unauthorized hazard labels which might interfere with the abilities of sailors to perform their duties in the heat of battle.

d.     At most, it is possible that manufacturers of equipment delivered to the Navy without insulation, such as evaporators, could merely have told personnel to follow the Navy's own mandates for handling asbestos. This redundant information is not informative, diverts attention from hazards inherent in the equipment, and would certainly become obsolete.  Equipment such as evaporators last many years and the Navy's asbestos hazard communication program evolved over the years to keep pace with scientific developments and changes in materials.

e.     If each equipment manufacturer (and conceivably even the pipe and structural steel manufacturers) provided its own warning about asbestos insulation that might be used on or around its product, inconsistent warnings

DECLARATION OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION TO REMAND

would certainly have resulted. Many other hazardous substances (for example boiler feed water chemicals, fuels, solvents, heavy metals) are used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances.

f.      Some types of insulation used by the Navy on equipment were non-asbestos (e.g., fiberglass blankets) and any general warning about asbestos on such equipment would simply be wrong. In fact, asbestos was designated as a "critical material" by the Army and Navy Munitions Board on or about January 30, 1940. See Exhibit B. The Navy directed that substitutes for asbestos, including fiberglass, cotton duck lagging and hair felt, should be used where possible, including on low temperature pieces of equipment such as evaporators, in order to conserve available asbestos. See Exhibit C.

g.      Based on my experience, the United States Navy, as the biggest user of asbestos in World War II, and thereafter in shipbuilding, was more knowledgeable about any hazard of asbestos than any of the vendors who supplied it and upon whom plaintiff seeks to impose a duty not consistent with or imposed by the above naval specification. In Par. 9, I mentioned the extent of the Navy's knowledge with regard to asbestos. As an aid to the Court, I submit herewith as Exhibit D an affidavit of Samuel A. Forman, M.D., with attached exhibits, with which I am thoroughly familiar from various other litigations involving the U.S. Navy. Dr. Forman compiled the documents attached to his affidavit while detailed by the Navy and under Navy orders to perform an investigation into the state of Naval hygiene and asbestos. I agree with the conclusion of Dr. Forman that the state of knowledge of the United States Navy regarding hazards of asbestos was

quite complete when compared to available knowledge at the time of World War II, and that by 1940 the United States Navy was a leader in the field of occupational medicine relating to, among other things, asbestos exposure. I myself, was exposed to asbestos in inspecting the work of insulating shops under my supervision during my tenure at the Brooklyn Navy Yard and also in San Francisco. Accordingly, my interest in the Navy's knowledge in this field was both personal and professional, and continuing to this day.

I have reviewed all of the exhibits attached to the affidavit of Dr. Forman including the article attached as Exhibit C thereto, as well as the documents listed in Paragraph 9, sub-paragraph (a) through (f), as either official United States Navy Documents or articles reproduced from recognized and reputable magazines and reviews of the kind relied upon by experts.

14.   Based on my experience, the United States Navy is bound by its own regulations and would not permit any vendor gratuitously to do anything not provided for in its own regulations. The Navy would not allow any warnings to be placed on any product without specific authority by way of an order or a regulation.

Therefore, I conclude:

The information possessed by the Navy with respect to the specification and use of asbestos, and the health hazards associated with its use aboard Navy vessels, represented the state-of-the-art and far exceeded any information that possibly could have been provided by manufacturers of equipment such as evaporators. Based upon the knowledge at a given period in time, the Navy was fully aware of the recognized health hazards of asbestos and had a robust program to control exposure of personnel and monitor their health.

There was no information concerning any asbestos hazard or danger posed by any asbestos-containing product applied to any equipment on a United States

DECLARATION OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION TO REMAND

1   Navy ship known to a manufacturer of equipment such as evaporators that was not

2   previously known to the United States and the United States Navy.

3        It would be unreasonable to assume that the Navy would have accepted

4   gratuitous comments from equipment manufacturers about hazards associated with

5   a product they neither made nor sold and about which the Navy was already aware.

6

7        I declare under penalty of perjury that the foregoing is true and accurate.

8   Executed this 21st day of April, 2008.

9

10                                          Ben J. Lehman

11                                          Rear Admiral

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION TO REMAND

# EXHIBIT A

Page 11

08/16/2006  10:07   7755885877           MECHELEXTEX              PAGE  02

# Ben J. Lehman
## Rear Admiral U.S. Navy (Engineering) Retired
Professional Engineer,  Safety Professional   President - Mech Elex Tex, Inc.

**Education:**

| | |
|---|---|
| College of the City of New York [CCNY],  B.S. in Mechanical Engineering | (1942) |
| Massachusetts Institute of Tech. [M.I.T.], Naval Architecture {4 months} | (1942) |
| U.S. Navy Post-Graduate School, Electrical and Mechanical Engineering | (1945) |
| Harvard University,  M.S. in Mechanical Engineering | (1949) |
| Stanford University, Design Philosophy and Advanced Stress Analysis | (1957-59) |

**Forensic Experience:**

Testified in court over 50 times regarding ;

Ship Design, Construction and Repair,

Safety Engineering including Warnings and Training,
Product Defects
Construction Practices and Equipment; Electrical Equipment;

**Professional Recognition:**

Registered Professional Engineer: New York (1949), California (1953), [Emeritus:Alabama (1976),  Louisiana (1976)]   Florida (1976:lapsed)
Certified Safety Professional  (1979-2004:discontinued in 2004)

**Career Experience:**

| | |
|---|---|
| Ship superintendent and planning officer, [U.S. Navy- Ensign to LCdr] (1942-46 + 1950-54) | |
| (Promotions in the Naval Reserve: Cdr-1957, Captain-1962, Rear Admiral-1977; retired 1982) | |
| Engineer, General Electric Co. (1946-48) & Bethlehem Steel Shipbuilding Div. | (1949-50) |
| Engineer, Bechtel Corp. (1954-55)  &  Sylvania Electric Microwave Laboratory | (1955) |
| Project Engineer, Kaiser Aircraft and Electronics (1956-57) & Beckman Instruments | (1957-59) |
| Engineering Manager,  Lockheed Missiles and Space Co. | (1959-69) |
| Director of Engineering, Lockheed Shipbuilding and Construction Co. | (1969-72) |
| Vice-President Engineering, Litton Industries & Ingalls Shipbuilding | (1972-75) |
| Independent Consultant | (1975 –present) |

**Affiliations:**

| | |
|---|---|
| Systems Safety Society | American Society of Naval Engineers |
| American Society of Safety Engineers | Society of Naval Architects & Marine Engineers |
| Institute of Electrical & Electronic Engineers  (IEEE) | Risk Analysis Society |
| Society of Automotive Engineers | |

P.O. Box 3480, 169 Juniper Drive,  Lake Tahoe-Stateline, NV 89449
Phone 775.588.7765   E-mail: mechelex@post.harvard.edu   FAX 775.588.5877

# EXHIBIT B



U.S. ARMY AND NAVY MUNITIONS BOARD

THE STRATEGIC AND CRITICAL MATERIALS

(Published by the Board as a reference and as a
matter of general information to those interested
in these materials and the particular phase of
industrial preparedness to which they pertain)



INTRODUCTION

This pamphlet is intended as a primer on the subject of the strategic and critical materials and to serve as a reference and guide to those who are interested in this particular phase of industrial preparedness. It can hardly serve more than to give a general picture of the scheme of things and perhaps remove some of the common misunderstandings that obtain in relation to the sources, production, quality, and uses of these materials, both from a military and industrial point of view. For details the initiated and technical reader should refer to special texts, references and the established and authoritative agencies dealing with the various items or groups of materials herein involved. A few of the many available references are included in a list of references attached hereto.

Previous issues of this pamphlet were under dates and titles as follows:

Sept. 1, 1938 - "Strategic and Critical Materials
                 Their Relation to National Security".

Nov. 15, 1938 - "Strategic and Critical Materials
                 Their Relation to National Security".

Mar. 29, 1939 - "Commodities Considered Problematical".

Nov. 6, 1939 - "Commodities Considered Problematical"

- 1 -



THE NEED FOR INDUSTRIAL PREPAREDNESS
SUPPLIES OF STRATEGIC AND CRITICAL MATERIALS

Since the inception of industrial preparedness, planning for the materials essential to national defense, the procurement of which might often be difficulties, has been given continuous study. Planning with respect to these materials continues today on a sounder basis and with more active public interest and support than has obtained in the past.

Modern nations are now, as they never were before, economically interrelated. However, should a nation desire to isolate it must meet the conditions regularly imposed. As from those basic materials which are its sustained and those from which implements of war are fabricated is the isolated nation must supply its own or suffer in proportion to its inability to meet its needs.

Modern life makes great demands upon industry. Such demands have built our present and complicated industry of today. Modern war will make even greater demands on this industry. The supply of raw materials which feeds it must continue undiminished and in some cases at a greatly increased rate. These raw materials we produce in abundance domestically are no problem. What of those we do not produce? What of those we produce but not in quantity adequate for our defense needs in a major part.

It is with these materials we are here concerned. Richly endowed with resources as we are, there are a number of materials the supply of which we must look to nearby foreign lands or oceans. Some of those we may obtain from our own Western Hemisphere. However, there are other materials essential to national defense which must be supplied from other areas and which may be denied to us.

There are four practical approaches to the solution or partial solution of the problem of an emergency supply of strategic and critical materials to meet our needs during such a period. Probably all four will be necessary in the degree in which it may be possible to apply them. They are by:

1. Development of domestic production of those materials on a scale adequate or partially adequate to requirements;

2. Development of substitutes;

3. Maintaining friendly relations with the nations who control the sources and distribution of these materials and by keeping trade routes open to the principal sources;

4. Acquiring adequate stock piles of those materials in time of peace as a war reserve, particularly those which offer the most difficulty of solution by the foregoing methods.

Control measures are increasingly applicable to varying degrees under each measure. Only the last can have a fully secure assurance unless and until the others are fully and completely developed and executed.

Page 15



## CURRENT LIST OF THE STRATEGIC AND CRITICAL MATERIALS:

On January 30, 1940, the Army and Navy Munitions Board approved the following definitions and lists of strategic and critical materials:

### DEFINITIONS

STRATEGIC MATERIALS. Strategic materials are those essential to national defense, for the supply of which in war dependence must be placed in whole or in substantial part upon sources outside the continental limits of the United States, and for which strict conservation and distribution control measures will be necessary.

CRITICAL MATERIALS. Critical materials are those essential to national defense, the procurement problems of which in war would be less difficult than those of strategic materials either because they have a lesser degree of essentiality or are obtainable in more adequate quantities from domestic sources, and for which some degree of conservation and distribution control will be necessary.

### STRATEGIC MATERIALS (14)

| | | |
|---|---|---|
| Antimony | Mercury | Rubber |
| Chromium | Mica | Silk |
| Coconut Shell Char | Nickel | Tin |
| Manganese, ferrograde | Quartz Crystal | Tungsten |
| Manila Fiber | Quinine | |

### CRITICAL MATERIALS (15)

| | | |
|---|---|---|
| Aluminum | Iodine | Platinum |
| Asbestos | Kapok | Tanning Materials |
| Cork | Opium | Toluol |
| Graphite | Optical Glass | Vanadium |
| Hides | Phenol | Wool |

The Army and Navy Munitions Board will, from time to time, and keeps under surveillance, certain additional materials which might become strategic or critical.





## STRATEGIC MATERIALS

### ANTIMONY

One of the principal uses of antimony is in the manufacture of plates for storage batteries. Other uses are for type metal, cable covering, babbitt and other bearing metals, ornamental and high-grade pure antimony, metal, but little is used in these ways in small amounts of pure antimony. Metal by itself is used very little. Antimony is used in alloys with other non-ferrous metals. Other than lead, antimony when are as a more important in primary mixtures, is contained in alloys.

Antimony is marketed in several different forms: antimony oxide, liquated antimony, antimony sulphide, antimony sulphate, etc. The pure metallic product and regulus or an intermediate product obtained during the smelting of ores. Antimony is available not only in the foregoing forms, but also as a secondary or recovered antimony large quantities of which are regularly returned to use. The supply is mainly dependent upon the rate of general industrial activity. The metal is relatively cheap, and there is little incentive to use it. The average price over the past 10 years has been approximately... cents per pound.

Formerly the United States obtained a very large portion of its antimony from China, but in recent years South and Central America have been chief sources of bismuth. The only primary antimony smelter in the United States is located in Laredo, Texas, and operates almost wholly on Mexican ores.

#### U. S. IMPORTS FOR CONSUMPTION (short tons) FOR 1938

| Country | Ore, Antimony Content | Metal Antimony | Total Antimony |
|---|---|---|---|
| Argentina | | | 718 |
| Bolivia | 7138 | | 4155 |
| Chile | 2494 | | 496 |
| China | 345 | 864 | 404 |
| Mexico | 5630 | 410 | 6304 |
| All others | 408 | | 455 |
| Total | 5987 | 861 | 5743 |

#### WORLD PRODUCTION 1938 (metric tons)

| | |
|---|---|
| Africa | 2,043 |
| Bolivia | 9,566 |
| China | 17,797 |
| Europe | 5,400 |
| Mexico | 7,591 |
| United States | |
| All others | 3,616 (estimated) |
| Total | 89,600 or 32,084 short tons |

-5-



## COCONUT SHELL CHAR



Charcoal made from coconut shells, by firing the shells in a confined space with little or no oxygen, has long been considered the best absorbent filling for gas mask canisters. The basic material, coconut shells, is produced in most tropical countries and islands. However, a large portion is burned as fuel in the drying of the meat to produce copra. Coconut growth is confined to tropical sea areas because both saline water and tropical climate are necessary for productive trees.

Since the civilian population must be considered equally with the military for gas mask protection in a major emergency of the future, the production of gas masks during such a period will not be limited to military equipment. Hence, an unusually large number may be necessary, thus increasing component raw material requirements proportionately.

Great progress has been made in the development of satisfactory substitutes for coconut shell char from domestic materials which are abundantly available. It is believed that within the next year large scale production of an entirely satisfactory non-coconut charcoal for gas mask canisters will be available and thus eliminate this now strategic material from this list.

## MANGANESE (ferrograde)

Manganese ore available for the iron and steel industry has attracted a great deal of attention as a strategic commodity. The type of ore required by this industry must be of metallurgical grade containing a minimum of 35% manganese to be suitable for the manufacture of 78 to 80% ferromanganese. The alloy which is essential in modern manufacture of steel. While the above amounts are used in other industries and for other purposes, manganese of this quality is indispensable in the production of steel making where it serves two purposes: first, as a deoxidizer and purifying agent in all steel manufacture; and second, as an alloying element where the addition of manganese produces properties desired for special purpose steels. Our steel industry alone uses approximately 17 pounds of manganese in the form of ferromanganese for every ton of steel produced. There are no satisfactory substitutes for manganese in steel manufacture.

Normally more than 90 per cent of the world's manganese ore comes from the U.S.S.R., British India, Gold Coast, Union of South Africa and Brazil. Russia alone accounts for more than half. Brazil and Cuba are the principal producers in the Western Hemisphere, but with present installed equipment the combined output of those two countries could supply only a part of our needs.

Proven domestic resources of metallurgical grade ore are extremely limited. High tariff protection to domestic producers over more than a decade failed to develop any substantial production from low grade deposits. A need of stock manganese ore as a first line of defense is apparent. It seems equally important that our known and limited domestic resources of high grade ore be used as a second line of defense for an emergency rather than to currently deplete our limited deposits of such ores.

The Bureau of Mines states that the indicated consumption of manganese ore, of 35% or more Mn content, 1936 to 1938 inclusive was respectively 848,491; 994,505; and 509,932 long tons. Steel ingot production for these three years was 60.4, 72.5 and 39.6%, respectively of capacity. Therefore, a year of approximately full capacity steel production, as would certainly be necessary during a corresponding period of a major war effort, would require about 1 million long tons of metallurgical grade ore for the steel industry alone.

### U.S. MANGANESE ORE IMPORTS FOR CONSUMPTION, LONG TONS (35% or more Mn)

| Country | 1938 | 1939 |
|---|---|---|
| U.S.S.R. | 166,043 | 185,243 |
| Gold Coast | 125,359 | 242,923 |
| Brazil | 29,698 | 42,715 |
| British India | 25,480 | 105,935 |
| Cuba | 131,425 | 89,544 |
| Others | 7,085 | 10,771 |
| Total | 485,598 | 657,125 |

These imported ores averaged approximately 48% manganese content. In addition considerable ferromanganese was imported. The manganese content of imported ferromanganese was 81,118 long tons in 1938 and 53,456 in 1939.

-9-





### MERCURY

The problem of supply presented by mercury (quicksilver) from a national defense point of view is apparent. The civilian uses of mercury are indispensable to a large degree and it is industrially important in many respects, ones with extremely high prices. Since supply is essential and vital over an extended emergency period, its military uses are principally in the manufacture of fulminate for detonating high explosives, chromate mercury compounds used in paint for ship bottoms and for many industrial activities ranging from the production of gold to the disinfection of seeds. In addition to the foregoing, its civilian uses include the generation of power from mercury boilers, mercury vapor lamps and the manufacture of felt. The average annual consumption of mercury in the United States for the last ten years has been about 28,000 flasks (76,194 each). During the period 1917 and 1918 our average consumption was 40% above that for the preceding ten-year period. The inference may be made that the possible increase in consumption to be expected in war would be approximately one quarter than that of the preceding normally high year. While many substitutes have been developed, particularly lead azide as a substitute for mercury fulminate, mercury remains undisplaced for many important industrial and military uses.

Under normal conditions, two-thirds of the world's output of mercury comes from Spain, and the United States ranks third. The only other present source of mercury in quantity in the Western Hemisphere is Mexico, producing about half as much as the U.S. The United States ranks as the largest consuming country of mercury, normally using approximately 30,000 flasks of which roughly half is imported. Self-sufficiency in mercury could be made possible only at prices greatly above those prevailing at present and the period of self-sufficiency would probably be very limited at any price.

Mercury prices have advanced materially within the past year chiefly due to the Spanish Revolution when the production of that country was limited and the European situation which has since developed. It is reported that the entire Spanish mercury production for 1940 has been obligated at a value of approximately $200 per flask. World price is presently around $180 per flask whereas for years it has been under $100.

While mercury is an important strategic material, it is not anticipated that as difficult a problem of emergency supply will be encountered as that of some of the other higher priority strategic materials such as tin, rubber, manganese and chromium, largely due to our partial self-sufficiency and stocks normally maintained by industry.

-19-

Page 22











QUININE

Many years of mally seasons
And Malaria's countless agonies
Are among the many reasons
Why whole gangs is with a...     Panama Patchwork.

Quinine is the best known, most general and least and most
specific for prevention and treatment of malaria. Those who are
dosed with it before, during and after exposure to malarial
conditions. Two synthetic compounds, atabrine and plasmochin
have made great strides in the treatment of malaria but quinine
has completely displaced quinine.

Cinchona bark from which quinine is derived is graded into
two classes, namely, factory bark and pharmaceutical bark.
The quinine is extracted from the bark by various processes and
after purification is produced in the form of sulfate of quinine.

The world's production of cultivated cinchona bark and the
manufacture of quinine extracted therefrom are controlled by
a combination of a group of planters (Kina Bureau Cola) and by
a very small group of manufacturers in Holland. Ninety to 95 per-
cent of the cultivated cinchona bark is grown in the Netherland India
the control exercised by the combination is a very effective monopoly.
Numerous attempts have been made and are still being made to break
its power by growing cinchona bark elsewhere but up to the present
such efforts have been without any degree of success. This
organization operates as the Kina-Bureau and although it is not
recognized in the United States because of this country's anti-trust
laws, it does exercise control over our imports.

Some other countries which produce cinchona bark on a small
scale but which make little or no dent on the world supply of quinine
are: Japan, British India, Bolivia, Peru, and the Philippine
Islands. These, in general, are not half-sufficient for their
own needs.





If a shortage of crude rubber occurs, this country will necessarily use much greater quantities of reclaimed rubber. At present, the consumption of reclaimed rubber amounts to about 170,000 tons a year. Our remaining plants operating at full capacity could produce considerably more. It is estimated that reclaiming plants operating at full expanded capacity could produce about 240 to 250 of our overall rubber requirements, i.e., providing scrap rubber continues available.

The synthetic rubbers and rubbers obtained from native sources might in some cases be substituted for imported crude rubber. At present, the domestic production of synthetic rubber is small, and there is very little production of native rubber in this country. In the event of a shortage and higher prices of imported crude rubber, the production of these substitutes could be expanded, but a considerable period of supply would be required before the industries would be able to meet national supply even minimum domestic needs. So far, no all-purpose synthetic rubber has been developed. Certain of the synthetics are in some cases for certain purposes better than crude rubber — particularly in the oil resistant fields; costs, however, at present far exceed that of the natural product.

Rubber is indispensable in the manufacture of motor vehicles, airplanes, submarines, balloons, gas masks, electric motors, ships, railroad trains, street cars, electric wire, telephones, typewriters, printers rolls, wireless apparatus, radio, electrical goods, industrial tires and garden hose, orchard spray tubing, milking machines, druggists goods and several types of shoes. In addition, rubber is used for not indispensable in the manufacture of many other commodities.

Stocks of crude rubber on hand in the U.S. vary from time to time. Rarely in the past several years have stocks exceeded 6 months supply; generally they have been half that much. This in large part may be accounted for by the effects of the International Rubber Regulation Agreement which regulates production and export quotas of the signatory countries under British, Dutch, French and Siamese control. Over 98% of world rubber production is thus under regulatory control. Manufacturers of rubber goods in the United States are divided in their opinion concerning the restrictive agreement. Many are glad to have it in strict because it has enabled them to purchase crude rubber at a less variable cost and has removed somewhat the speculation in investment. In the past, domestic manufacturers effectively have speculated and sometimes as several million dollars in one month buying and selling rubber. On the other hand, some dislike and see the advantage to the artificial device.

A national stock pile of rubber is being obtained as a result of an agreement of June 23, 1939 with the United Kingdom whereby approximately 600,000 bales of American cotton is to be exchanged for about 80,000 long tons of crude rubber. Delivery is being made, storage, and has been made a part of our defense program. The situation as to storage of U.S.O. is made a Government facilities in the most important Eastern ports generally, in some of the ports of the United States receipts of this commodity in these localities. About two-thirds of U.S. rubber imports are entered on the Atlantic Coast.

Further pertinent information is shown on a chart which follows.

-18-











TIN

The outstanding characteristics of this metal which make it essential to the arts and industries are its:

Ability to form thin, ductile, non-corrosive and closely adhering films or coatings on steel and other metals.

Anti-friction properties.

Ability to act as a flux in binding one metal to another.

Tin presents one of our serious strategic mineral problems because the metal is indispensable for so many uses and there is literally no domestic production even in exorbitant prices. It has become indispensable in the preservation of food, since it furnishes a protective coating on the steel from which our so-called tin cans are made. It is used in the manufacture of automobiles, for the making of bearings, solders, bronze and gun metals. Tin can be rolled into foil and has many uses as a chemical. These uses could be reduced only to a limited extent by substitution. Only a minor part of our requirements in tin during an emergency period could be met by recovering tin from old scrap metals which have a tin content.

Under normal conditions the consumption of tin in the United States is 75,000 long tons annually or approximately 45 percent of world output. An analysis of U.S. tin consumption shows that percentages of use are as follows: tinplate 41, solder 22, babbitt 8, bronze 7, collapsible tubes 4, galvanizing, type metal, foil, tinning, terneplate and chemicals each approximately 2.

The world's principal producers of tin ore are the Malaya States, Netherland Indies, Bolivia, Siam and China. During the past five years 81% of foreign purchases was obtained from Asia, 18% from Europe and 1% elsewhere. Bolivian ore is sent to Europe for refining because there are no smelting facilities in the Western Hemisphere except one of small capacity in Argentina, and also because these ores have considerable impurities. At European refineries they are "sweetened" by mixing with other ores of purer content.

Tin, among other important and high priority strategic materials is now being acquired for a national stock pile reserve. Domestic resources of virgin tin offer no hope whatever for emergency exploitation. Domestic production of tin during the period 1901-1938 has been less than 0.1% of our national consumption.

-15-

## TUNGSTEN

Tungsten is the heaviest of the base metals, its density being the same as that of gold. It has the highest melting point and highest modulus of elasticity of all the metals. Tungsten is an element required to give alloy steels high tension characteristics. In industry it is widely used for high speed tool steel, lamp filaments, non-ferrous alloys, electric contacts and electrodes, and also in the chemical industry for various uses. In the form of tungsten carbide it has still further uses. A strictly direct military use is as an alloy in armor piercing bullet cores.

Tungsten moves into consumption in this country principally in the form of ore or concentrates. It is marketed on the basis of a short ton unit of contained $WO_3$. A short ton unit is one percent of a short ton or 20 pounds.

Fortunately, tungsten does not offer as great a problem as some of the other strategic minerals mainly because we produce some of our needs, moreover molybdenum serves as a substitute in some uses including high speed tool steel. Normal annual consumption is estimated to be between 4,500 and 5,000 short tons of concentrates (60% $WO_3$). In the last 14 years the United States imported 80% more tungsten concentrates than it produced.

In 1938 the United States was apparently the second largest world producer, domestic output being the highest in record. The domestic tungsten industry is protected by a tariff of 50 cents per pound tungsten content on imported ores and concentrates. China and Burma normally produce most of the world's tungsten ore. Other important foreign producers are Bolivia, Portugal, Malay States and Australia.

Page 35





## ASBESTOS

Asbestos is a mineral fiber. It is a general term applicable to any of several minerals which exist in fibrous form but which differ in chemical composition and in some physical characteristics. Asbestos is non-inflammable and is only slightly acted upon by acids. Its fibrous structure permits it to be spun into yarn or thread, woven into cloth, or felted into sheets or packings in the same way that a vegetable fiber may be treated, but unlike vegetable fiber it consists of inert, incombustible mineral matter and is, therefore, fireproof, weatherproof, and highly resistant to chemical action. Asbestos ore is generally quarried, the high grade ore being sorted out by hand.

Asbestos may be termed indispensable to modern life. As the chief constituent of brake-band linings and clutch facing it is essential to automotive transport; in the form of gaskets and packings it is a necessary part of steam-driven machinery; as a heat insulator it plays an important role in both household and factory construction and equipment; and combined with cement it is employed in the manufacture of vast quantities of roofing and other building materials.

The United States is the largest asbestos-consuming country in the world but produces only a small fraction of its requirements of raw materials. In 1936 sales from domestic production amounted to 5 percent of the quantity and 4 percent of the value of domestic requirements.

The volume of asbestos consumed in the U. S. depends primarily on two great industries -- automobile manufacture and the building trades. The plotted consumption curve of asbestos has a definite relationship to those of automobile production and building construction.

Two of possible methods to be considered in meeting emergency needs were we denied imports are: (1) stimulation of domestic production, which bears little promise; and (2) substitution of other materials for the major uses of asbestos which probably would be the main method utilized, thus freeing all available stocks for absolutely essential uses where in substitutes are unsatisfactory. The building trade would particularly feel the main of the substitute burden, by the use of stucco, tar and felt roof and shingle, felt siding should the necessity be brought about.

In an emergency we would, if necessary, wholly or partially cease exports of manufactured asbestos products. Exports of such products for 1936 were valued at approximately 3,500,000 compared with imports of unmanufactured asbestos valued roughly at 8,000,000.

Canada is by far the world's greatest producer and supplies most of our imports. The United States, Southern Africa and Cyprus are major producers. Some 18 other countries produce asbestos in varying amounts.

## CORK

Cork, in all its forms, comes from the bark of an oak tree of which there are two species (Quercus Suber and Quercus Occidentalis). For reasons which nature alone controls, this oak tree grows in commercial stands only in areas bordering the Mediterranean Sea, and all attempts to establish cork forests in this country and elsewhere have thus far been unsuccessful. Much of the land on which the cork tree grows is used for raising hogs, the principal crops being cork and pigs. The pigs do not eat the cork bark and are particularly fond of the cork oak acorns. In distinction to cork trees, the cork oak is an evergreen, the leaves resembling small holly leaves minus the sharp points.

Virtually all of the physical properties of cork are based either directly or indirectly upon its unique cellular construction, and it is these physical properties which account for its many various uses. The most important of the physical properties are buoyancy, compressibility, resilience, resistance to moisture and liquid penetration, frictional quality, low thermal conductivity, ability to absorb vibration, stability.

The world's supply of cork comes from a total area approximately the size of the State of New Jersey, stretching in a narrow belt for more than 1,000 miles along the northern coast of Africa and more than 1,800 miles along the coasts of Portugal, Spain and France. Annual world production is about 250,000 tons of raw cork of which the major producers normally are: Portugal 50%, Spain 30%, Algeria 15%. Owing to its great disproportion of bulk to weight, raw cork is generally shipped in mixed cargo vessels from the Mediterranean Area. A shipload of cork only would necessitate water ballast.

The cork industry in the U.S. with few exceptions is located on the Atlantic seaboard from Maryland to New York and involves chiefly five major production classes. These classes with approximate production value for 1937 are: cork stoppers and natural cork specialties, $3,500,000; cork insulation products, $6,770,000; cork composition and composition products, $5,100,000; cork tile $115,000; and cork marine products, $130,000.

Cork is often broken into as many as 100 to 150 grades before it starts moving through a manufacturing plant from which it may emerge in almost endless varieties of products for use in connection with other products from automobiles to watches.

U.S. imports for 1938 were approximately 80,000 tons, representing about 40% of the world production. Owing to its many industrial and commercial uses a shortage of cork in a major emergency would entail serious difficulties. Even though substitutes are available and practical in a number of cases there are others whereby substitution might temporarily disrupt mass production practices; or there may be a shortage of a particular substitution such as rubber, itself a strategic material. Conservation, substitution and at least some degree of control of cork stocks would be necessary in an emergency were we denied imports.

-38-

GRAPHITE

Sometimes called plumbago or black lead, this mineral consists of crystallized carbon. Chemically it is identical with the diamond but the widest of differences exist in physical characteristics between the two — one is the softest of minerals, the other the hardest.

Natural graphite may be either crystalline or amorphous. Crystalline or flake graphite is commonly understood to mean graphite in crystals of sufficient size to be visible to the naked eye; much of the so-called amorphous graphite shows a crystalline structure under the microscope; but its particles are small and its appearance is relatively dull. Crystalline graphite occurs either in veins, as in the Ceylon deposits, or as flakes disseminated in schists or other kinds of rock as in many of the deposits in the United States. Most deposits of amorphous graphite are the result of the alteration of coal beds by the intrusion of igneous rocks; amorphous graphite is also made artificially by means of the electric furnace. Some amorphous graphite marketed is contaminated with coal, coke, or other amorphous carbonaceous matter.

Graphite is used principally in the foundry and steel industry for linings, facing, and for core washes, and crucibles, for paints and pigments, pencils, crayons, commutator brushes, stove polish, in lubricants and for the manufacture of electrodes. Among the many uses to which high purity graphite, either of natural or artificial type, is especially well adapted may be mentioned brushes for electrical machines, special furnace blocks, carbon raiser (for raising the carbon content of steel), battery (dry-cell) graphite, electrotyping graphite and other grades used in brake linings, clutch facings, oilless bearings, graphite greases, rubber compounds and molds, powder glazing, boiler graphite and radio resistors. Military uses for graphite are principally for foundry and crucible work, paints and pigments, electrical machine brushes, electrodes and dry batteries.

Domestic supplies of graphite are drawn principally from Ceylon, Madagascar, Mexico, and Chosen. Canada normally supplies all our imports (usually less than 1,000 tons a year) of artificial graphite together with as much as 500 tons of flake and somewhat larger quantities of amorphous or micaceous. Although flake graphite, the world's largest sources of graphite are in Central Europe and Russia, these are considered too low-grade for export overseas. Actually graphite was produced in almost every country in the world; from Greenland (6 tons in 1936) to South Africa (65 tons in 1936) yet Ceylon has, in later years, been ...... have been the only countries that have been able to get their ....... prices for their own graphite to permit it to be shipped to the industrial nations all over the world. Even Korean (Chosen) graphite is of rather limited market and serious graphite, notwithstanding its purity, is not adapted to the United States. ... of a total world output of 200,000 metric tons, the U.S.S.R. recently has been credited with furnishing over 40 percent, Germany and Austria another ...... Chosen, another 20 percent; and Mexico, 11 percent. Although a very .... name ..... in Ceylon and Madagascar, ...... exceeds 10 percent of the world's total, the value of their output is probably at least half of the world's total.

-39-



## IODINE

Iodine is a non-metallic element widely distributed in nature. It occurs in bluish-black rhombic plates, of metallic lustre, peculiar odor, acrid taste and neutral reaction; sparingly soluble in water, readily so in ether, and in alcohol, also in an aqueous solution of potassium iodide or sodium chloride. It volatilizes slowly at ordinary temperatures, and produces a dark-blue color with gelatinized starch in cold solution.

Iodine is largely used in medicine both externally and internally. Externally, it is used as an antiseptic in the form of tincture or in solution. It is also used as a germicide and counter-irritant. It is also used in many powders, and ointments. The tincture of iodine, by far the most popular, whether of alcoholic or aqueous solution, is cheap, easily prepared, convenient to use and above all highly effective. This combination makes iodine particularly well adapted as a general antiseptic. The salts of iodine, ammonium, potassium and strontium do not possess the germicidal qualities of the element itself, but are used internally as alteratives.

The commercial uses of iodine and the iodides are various and extensive. Small amounts of iodine are used as a chemical reagent in laboratory work and similar small amounts in various organic compounds and dyes, but the chief demand in the chemical field is in the production of the sensitizing solutions used in the manufacture of photographic films, plates and papers. Within the past few years considerable amounts of iodine have been added to cattle feed and to fertilizer for soils low in iodine.

Formerly sixty percent of the world's annual production of iodine was produced in Chile and twenty percent in Scotland. Relatively small amounts were produced in Japan, France and Java. World production and trade of iodine have undergone significant changes in recent years with the United States, formerly dependent upon a foreign monopoly for its supplies, emerging as the world's second largest producer, and capable of obtaining its entire requirements from domestic sources. The old method of obtaining this important item was from kelp. It is now produced in this country from salt brines obtained from abandoned oil wells. In 1930, prior to the utilization of domestic resources, the price of iodine was approximately $5.00 per pound. Since that time the price has gradually declined to around $1.60 per pound. This item, however, is being maintained on the critical list because it is a foreign item essentially and because the industry is young and it is felt that some difficulty may be encountered in maintaining domestic production to the degree necessary for emergency needs. There is no satisfactory substitute for this item for field use as an antiseptic for the armed forces.

### KAPOK

Kapok is a vegetable down obtained from the seed pods of a widely distributed tropical tree which is indigenous to Southern Asia and the East Indies. Java is the leading center of commercial production. During recent years some kapok has been harvested and exported from the Philippine Islands, where formerly the wild crop was allowed to go to waste.

Commercial Kapok is a soft, lustrous, inelastic fiber having a low specific gravity. It is too brittle for spinning however, the cellular structure and shape of the fiber together with its low specific gravity renders it especially adaptable for use as a stuffing material for life saving equipment, pillows, mattresses and upholstered furniture. As a filler for lifesaving equipment it possesses marked advantages over other commercial fillers. Certain other tropical fibers, that is, pachote, and simal and baled possess qualities which render them approximately as efficient as kapok for use in life preservers. However, these are neither produced in the United States, nor elsewhere in sufficient quantity or importance.

The estimated average annual world production for the year 1938 was 20,922 tons, of which the Dutch East Indies was the major producer. The United States imported 6,254 tons of kapok in 1938 and 9,579 tons in 1939.

The principal substitutes which can be used in lifesaving appliances are British Indian "Kapok" (an inferior product, not genuine kapok) and reindeer hair.

### OPIUM

Opium is the coagulated milky exudate, obtained by incising the unripe capsule of the white poppy (Papaver Somniferum) an annual herb indigenous to Asia, but cultivated elsewhere.

Crude opium is prepared in irregular lumps or cakes of dark brown color. There are some twenty alkaloids of opium of which morphine and codeine are the most important. Morphine has been classed as the most important drug in medicine for relieving pain. The drug is permanent and does not deteriorate, but finished preparations become unusable. However, the content of alkaloidal salts can be recovered with only the losses incident to processing.

The principal world sources are British India, Turkey, Asia and Yugoslavia. Importation is controlled by the Narcotics Division of the Treasury Department by allotting specified quotas to recognized importers. Shipping routes are via the Mediterranean and Atlantic sea lanes. Two-thirds of the imports are made in United States bottoms. In 1925 authority was granted the Surgeon General of the Army to accept and store in reserve, stocks of opium or preparations thereof, suitable for medicinal use, which have been seized and confiscated by the authorities. At the present time the amounts received in this manner are considered sufficient for all military uses in a national emergency.

-26-



## OPTICAL GLASS

This is another of the formerly strategic materials recently lowered to the critical list mainly owing to improved conditions and facilities for domestic production and to the accumulation of stockpile reserves.

Practically no optical glass and comparatively few optical instruments were manufactured in the United States prior to the World War. All our needs in military optical glass and instruments were of necessity supplied by importation because Europe, and particularly Germany, had a monopoly on the industry.

Optical instruments are essential equipment for the armed forces for no army or navy is properly equipped unless it is provided with an adequate supply of field glasses, cameras, fire control and range finding instruments, microscopes and lenses.

As the result of the intensive development and experimentation conducted between April 1917 and June 1918, we were at the end of that time manufacturing optical glass in sufficient quantity and quality to effectually meet essential requirements of the Army and Navy. At the end of August in 1918 there were five plants producing optical glass in sufficient output to meet military and naval needs.

Since the World War American manufacturers have had difficulty in successfully competing with foreign producers having sources of cheap skilled labor at their command.

With the advantage now obtained, namely, a 50 percent tariff on blanks and a correspondingly higher import duty on finished products, our domestic industries are furnishing approximately 50 percent or better of present peace time needs. However, conditions have been such in the industry that domestic production is not developed to a point where imports can be excluded.

While the situation of the United States is infinitely better at the present time than at the beginning of 1917, the acquisition of war reserves was considered necessary and the supply problem in any future emergency is thus minimized to the extent present stocks on hand will meet requirements until production facilities can be expanded.



## PHENOL

Phenol ($C_6H_5OH$), sometimes called crystal carbolic acid or hydroxybenzene is a colorless, poisonous solid of characteristic odor. It is a natural coal tar product and is also produced synthetically. Its chief use is in the manufacture of synthetic resins and plastics. Other uses are for preservatives, antiseptics, solvents, dies and pharmaceuticals. An important military use is in the manufacture of certain types of explosives used in quantity by the armed forces.

The increasing development of the plastics industry will require increasing production of phenol. From 1929 to 1933 the annual production of phenol increased from 24 million pounds to 33 million pounds, and in 1937 had doubled to reach an actual production of 55 million pounds. In 1938, the last year for which a full production return has been compiled, the output of phenol decreased to about 44 million pounds, in accordance with general business conditions. The 1939 production was probably close to the 1937 output. Tendency in the industry is to favor the increasing development of facilities for manufacturing synthetic phenol, as against natural phenol. In contrast to conditions at the time of the World War, natural phenol is now considered as a reserve or additional source to supplement the production of synthetic phenol.

For civilian use, phenol is an important base for many phenolic resins, one of the oldest and most widely used of all the synthetic resin or plastic groups. For military purposes practically all of the required phenol is for the manufacture of ammonium picrate, although primarily for the manufacture of picric acid. Phenol may be regarded as an intermediate product in the manufacture of picric acid, starting with the essential raw materials of benzene, sulfuric acid, nitric acid, caustic soda (and chlorine for the chlorobenzol process). Whether the picric acid is considered to be made by the phenol process or by the chlorobenzol method would determine whether there actually would be a substantial military requirement for phenol as such. The raw materials which would be required to make picric acid directly by the chlorobenzol process, would include those materials required to make phenol, although phenol itself would not be produced by that method. In this respect, there is actually no military substitute available for picric acid.

In 1939, from a total production of 44,500,000 pounds of phenol, about 35,000,000 pounds of phenolic (phenol-formaldehyde) resins were produced. This group constituted 34% of all coal tar resins and 20% of all synthetic resins produced in 1939.

-28-

## PLATINUM

Platinum is one of the rare and precious metals which has many uses in industry. It is necessary in the making of sulfuric and nitric acids and is used in many laboratory instruments, electrical contacts and in the dental and jewelry industries. In recent years Alaskan platinum production has shown phenomenal increases. Output (chiefly placer platinum) has advanced progressively from 11,658 ounces in 1935 to 42,390 ounces in 1936. Chief world producers are Canada, about one-half; U.S.S.R., South Africa, U. S. and Colombia in the order named. In the event of a shortage of platinum during an emergency, it is believed that a substantial amount could be obtained in the form of jewelry from the large domestic supply available in this form. A limited amount of platinum is still held in reserve from the supply acquired by the War Department in 1917-18.

## TANNING MATERIALS

A tanning material is a substance possessing properties which will convert raw hide into a permanent, non-putrescible material, leather. The principal materials used in tanning are obtained from certain barks, woods, fruits, nuts, etc., which contain tannic acid. Certain metallic salts, such as chromium salts, are sometimes utilized in tanning; however, these are usually used in conjunction with vegetable materials.

The most important natural sources of tanning materials are: Roots — conaigre; Woods — chestnut and quebracho; Barks — oak, hemlock, wattle, mangrove, and larch; Leaves — sumac. Of these materials chestnut, oak, hemlock, larch, sumac and conaigre are indigenous to the United States.

In general, tanning extracts are prepared by leaching tannic acid bearing vegetable materials with hot water. The resulting liquor, containing tannin, is condensed, usually in vacuum evaporators, until it contains twenty-five percent tannin. In this condition it is marketed as tannin extract. Some producers continue the evaporation until the extract is reduced to a solid or powder and market it in this form.

Domestic consumption is estimated to be in the neighborhood of 500,000,000 pounds annually of which approximately fifty percent is imported. Imports are due to the preference of tanners for foreign materials, either from quality or price considerations, or a combination of the two. The bulk of imports is derived from South America, mainly from Argentina and Paraguay. These imports are either in the form of commercial extracts or as raw materials to be extracted in this country.

Tannic acid made chemically and other synthetic materials have been placed in the market and tried by the tanning industry; however, none of these has proven as satisfactory as the material obtained from vegetable sources. Continuous research is being conducted toward the development of a satisfactory substitute for the natural product.

-85-

## TOLUOL

Toluol ($CH_3C_6H_5$) is a clear transparent liquid with a characteristic aromatic benzol-like odor and a peculiar disagreeable taste. That required for military purposes is almost entirely for manufacturing TNT (trinitrotoluene) which is made by nitrating toluol. TNT is the most important shell-filling high explosive used by the armed forces. Toluol has many chemical and other industrial uses such as the manufacture of intermediate chemicals, benzoic acid, pharmaceutical compounds, dye stuffs, rubber cements, stains and enamels, solvent for rubber, lacquers, varnishes, etc. The United States production of toluol was 16 million gallons in 1938.

Toluol may be obtained from bituminous coal and from petroleum. Methods of obtaining nitration-grade toluol from petroleum in commercial quantity have not yet been perfected, although a number of laboratory methods have been successful. Considerable progress may be expected in this respect from our progressive refining industry, particularly when demand warrants.

The peace-time supply of toluol is obtained entirely from by-product coke ovens, toluol production following closely the trend in production of pig-iron since most of those ovens are used to produce the coke for making pig iron, and toluol with other coal derivatives are by-products.

While there appears to be a gradual increase in the use of toluol in the chemical industry the peace-time production probably will never be on a scale sufficient for war-time needs and for such needs there must necessarily be an expansion of production capacity. The quantity of toluol used as a raw material in the manufacture of chemicals is of the order of magnitude of 5 million gallons per year in times of good industrial activity. Approximately 15 million gallons per year are used as a solvent, largely in the manufacture of nitrocellulose coatings. This quantity to a large degree could be replaced, if necessary, by high aromatic material obtained from petroleum.

- 30 -

## VANADIUM

This element is a metal widely distributed. It is found in commercial quantities in a limited number of operations, principally in four countries of which Peru normally is the most important. In 1938 the United States became the largest world producer. Greatly increased output in the Paradox Valley region in Colorado swelled the domestic total. The ores of vanadium most frequently found are carnotite, patronite, roscolite and vanadinite. United States production of vanadium contained in all types of ores from which it was recovered totaled 1,613,155 pounds in 1938 compared with 1,086,125 pounds in 1937. Despite the large increase in domestic production imports for consumption in this country increased. Imports were 1,384,320 pounds in 1938.

Ferrovanadium is used in the manufacture of steel alloys. The metal is also alloyed with copper. Salts of vanadium are used to color pottery and glass, and also are used as mordants in dyeing. "Red Coke" or crystalline vanadium oxide is used as a catalyst in the preparation of vanadium compounds.

## WOOL

Wool is the most important animal fiber, and the health and well-being of both the civilian population and the armed forces depends to a considerable extent upon the supply of this material. In normal times we import a considerable supply from the countries of Europe and from Argentina, Uruguay, Australia, South Africa and Canada. In time of war, both our Army and Navy are clothed in wool. Without imports there would be serious shortages of this material. The principal military uses of wool are in the manufacture of clothing, blankets, felt, horse equipment, bunting and flannel.

During 1939 we imported 99,193,000 pounds of apparel wool while producing 441,897,000 pounds during the same period. One of the main military uses for wool is in the supply of uniforms. These should be available as fast as personnel for the armed forces is mobilized. Woolen cloth must be available before manufacture can start. At least 90 days will be required to convert the necessary raw wool into cloth unless a sufficient supply of uniform cloth is available at the beginning of any emergency. It is very doubtful that such will be the case for a major emergency mobilization. Ways and means are being considered for the purpose of providing a reserve of suitable woolen cloth. Such a reserve could be rotated by current military use from this reserve replacement being made at the time with new cloth purchased from annual appropriations provided for uniform cloth for the regular establishment.

-51-



## OTHER MATERIALS

Those materials which were formerly known as "Materials Neither Strategic nor Critical" or as times loosely called "Essential Materials" together with those which have been dropped from the higher priority lists, are now maintained under observation and surveillance by the Board. Studies, statistics and other data are kept up on these materials. Trends in production and uses are watched and the Board is kept advised and in touch with new conditions and developments in respect to these and such new materials that may come into industrial use.

Two additional metals have been added to this list. They are beryllium and cobalt, neither of which is produced in quantity in the United States. Some of the more important of the materials maintained under continued surveillance are: abrasives, acetone, ethyl alcohol, molybdenum, magnesium nitrogen compounds, refractories, uranium and zirconium.

* * * * * * * * * * *

An outline world map showing some of the sources of the strategic materials is attached as a supplement to this pamphlet. The given figures showing percent of world production are approximate and are intended to indicate an average for the past several years. Local or world conditions may change percentages materially from year to year under varied circumstances, but as a whole they are considered typical under average conditions. United States mica production as shown includes all mica except scrap and waste.





REFERENCES

American Industry in the War.  Report of the U.S. War Industries Board.
    Baruch U. S. Printing Office.

An Analysis of the Strategic Mineral Problem of the U. S.  Finch and
    Furness. Bureau of Mines. December, 1936.

Commodity Files.  Office Assistant Secretary of War.

Crude Rubber.  U. S. Tariff Commission.  November, 1939.

Final Report of the Chairman of the U.S. War Industries Board to the
    President of the United States.  February, 1919.

Foreign Commerce and Navigation of the U. S. - U.S. Dept. of Commerce.

Hearings before the Committee on Military Affairs, House of Representatives,
    76th Congress, on Stockpile Reserve Legislation.

Industrial Chemistry.  Riegel.

Information Circular 7097.  Bureau of Mines, December, 1939.

Metal Statistics 1940.  American Metal Market, 111 John Street, N.Y.

Minerals Yearbook 1939 (Review of 1938).  Bureau of Mines, Dept. of Interior.

Mineral Trade Notes – monthly.  Bureau of Mines.

Raw Materials Bibliography.  U. S. Tariff Commission. December, 1939.

Raw Materials in Peace and War.  Staley.

Report Upon Certain Deficient Strategic Minerals.  Staff of Geological
    Survey and Bureau of Mines.  February 28, 1939.

Standard Statistics.

Strategic Mineral Supplies.  G. A. Roush.  McGraw-Hill.

Technical Trends and National Policy.  National Resources Committee, 1937.

The European War and U.S. Imports.  U.S. Imports.  U.S. Tariff Commission.
    November, 1939.

The Mineral Reserves of the U. S. and its Capacity for Production.
    Leith and Liddell.  National Resources Committee.

The Strategy of Raw Materials.  Brooks Emeny.

Tin Investigation 1934-35.  House of Representatives Committee on
    Foreign Affairs.

World Minerals and World Politics.  Leith.

# EXHIBIT C

 

Authority NND903849
By DT NAR-Date 6/1/04



TITLE 32 - NATIONAL DEFENSE

CHAPTER IX - OFFICE OF PRODUCTION MANAGEMENT

Subchapter B - PRIORITIES DIVISION

Part 1064 - ASBESTOS

CONSERVATION ORDER NO. M-79 CURTAILING THE USE OF CERTAIN
TYPES OF ASBESTOS

WHEREAS, National defense requirements have created shortage
of certain types of asbestos for the combined needs of defense,
private account, and export; and the supply now is and will be in-
sufficient for defense and essential civilian requirements unless
their use in certain products manufactured for civilian use is cur-
tailed; and it is necessary in the public interest, to promote the
defense of the United States, to conserve the supply and direct the
distribution thereof;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1064.1 (a)   Restrictions on the Use of Certain Types of Asbestos

   (1)   Unless otherwise specifically authorized by the Director
of Priorities, after February 1, 1942, no person shall
fabricate, spin, or process in any other way asbestos
fibre imported from South Africa except where such fab-
rication, spinning or processing is necessary to fill
Defense Orders as defined in Priorities Regulation
No. 1, as amended from time to time.

   (2)   In addition to the above limitation, unless otherwise
specifically authorized by the Director of Priorities,
after February 1, 1942, no person shall fabricate, spin,
or process in any other way:

      (i)   Chrysotile asbestos fibre (Rhodesian Grade C and
G-1 and 2 except where such fabricating, spinning
or processing is necessary to fill Defense Orders
for:

         (a)   Core rovings to meet Navy specification
Number 17-1-20 (INT) (Insulation, electrical,
asbestos fibre, treated and untreated, dated
October 1, 1941, or as same may be amended.)

         (b)   tapes and cloth which are required by spec-
ification to be of non-ferrous nature.

         (c)   non-ferrous lapps.

Page 52

DECLASSIFIED

Authority NND903549

By DT NARA Date 6/14/04 

(11)   Amosite asbestos fibre (Grade B-1 or amosite asbestos having a fibre length equivalent to that of Grade B-1) except where such fabricating, spinning or processing is necessary to fill Defense Orders for Amosite woven felt blankets and mattresses for turbine insulation for use on naval and maritime ships.

(iii)  Amosite asbestos fibre (Grade B-3 or D-3 or amosite asbestos having a fibre length equivalent to that of Grade B-3 or D-3) except where such fabricating, spinning or processing is necessary to fill Defense Orders for:

(a)   Woven felt blankets and mattresses and fittings for turbine insulation for use on naval and maritime ships;

(b)   Fire proof board;

(c)   Sprayed Amosite;

(d)   Eighty-five per cent magnesia pipe covering and blocks;

(e)   Molded Amosite pipe covering and blocks

(f)   Flexible amosite pipe insulation

(g)   Dry pack insulation.

(3) In addition to the above limitations unless otherwise specifically authorized by the Director of Priorities, after February 1, 1942, no person shall install eighty-five per cent magnesia or other high temperature pipe covering except in installations where temperatures of 200° Fahrenheit or over occur.

(b)   Reports

(1) Any person who manufactures or processes asbestos fibre shall, on or before the 10th day of February, 1942, and on or before the 10th day of each calendar month thereafter, file with the Office of Production Management, Ref: M-79, all of the information required by Forms PD-251 and PD-252, whichever is applicable.

(2) In addition, any person who manufactures or processes asbestos fibre shall, when requested, file with the Office of Production Management, Ref: M-79, all the information required by Form PD-253.




Authority NND903549
By PT NARA Date 6/1/14



limiting or curtailing to a greater extent than herein provided, the use of asbestos fibre in the production of any article, the limitations of such other Order shall be observed.

(4)   Correspondence and Communication.   All reports to be filed hereunder and all communications concerning this Order, shall, unless otherwise directed, be addressed to:

"Office of Production Management
Washington, D. C. Ref:   M-79"

(5)   Violations.   Any person who wilfully violates any provision of this order, or who by any Act or omission falsifies records to be kept or information to be furnished pursuant to this Order, may be prohibited from receiving further deliveries of any Material subject to allocation, and such further action may be taken as is deemed appropriate, including a recommendation for prosecution under Section 35 A of the Criminal Code (18 U.S.C. 80).

(6)   Effective Date.   This Order shall take effect immediately and shall continue in effect until revoked.

(P.D. Reg. 1, Amended, Dec. 23, 1941, 6F.R.6680; O.P.M. Reg. 3 Amended, Sept. 2, 1941, 6F.R. 4865; EO. 8629, Jan. 7, 1941, 6 F. R. 191; E.O. 8875, Aug. 28, 1941, 6 F. R. 4483; sec. 2 (a), Public No. 671, 76th Congress, Third Session, as amended by Public No. 89, 77th Congress, First Session).

Issued this 20th day of January, 1942.

(Signed)   J. S. Knowlson

J. S. Knowlson
Acting Director of Priorities



Authority *NND903549*
By *PI* NARA, ~Date~ *6/4/04*

## OFFICE OF PRODUCTION MANAGEMENT

### Division of Priorities

For immediate release
January 23, 1942

PM 2262

South African asbestos has been placed under strict control
by the Director of Priorities, who issued Conservation Order M-79
curtailing the uses of certain types of asbestos. It takes
effect immediately.

The order prohibits the use of South African asbestos after
February 1, except to fill defense orders, and permits its use to
fill defense orders for specified purposes only.

Unless specifically authorized by the Director of Priorities,
after February 1, no one shall process any chrysotile asbestos
fiber unless necessary to fill defense orders for core roving or
non-ferrous tapes, cloth and lapps.

Prohibitions are also placed by the order on processing
Grade B-1 amosite asbestos fiber except to fill defense orders
for woven felt blankets and mattresses for marine turbine insu-
lation. Nor shall anyone process Grade B-3 or D-3 amosite
asbestos fiber unless to fill defense orders for turbine insu-
lation blankets, fire-proof board, sprayed amosite, welded
amosite pipe covering and blocks, 85 per cent magnesia pipe
covering, flexible amosite pipe insulation or dry pack insula-
tion. The order prohibits installing without specific authority
any high temperature pipe covering unless used where temperatures
of over 200 degrees fahrenheit occur.

The order states that anyone processing asbestos fiber should
file all information required on form PD-251 or PD-252 and return
it to OPM by February 10, 1942, and by the tenth of every calen-
dar month thereafter. When OPM requests it, any asbestos pro-
cessor must fill out and return form PD-253

Authority NND943542
By DT NARA Date 6/14/06

514

SUPERVISOR OF SHIPBUILDING, U. S, N.
ORANGE, TEXAS

File NOd-1512/S39(3228)                    21 February 1942

To:          Bureau of Ships

Subject:     DD569-580; Insulation; Substitution of
             Fiberglas for Amosite Blankets; Proposal
             for.

Reference:

     (a)     CSC ltr. file DD569-580/S39(200) dated
             14 February 1942.
     (b)     CSC ltr. file DD569-580/S39(200) dated
             12 February 1942.

Enclosure:   (Herewith)

     (A)     Copy of reference (a), with its enclosures.
     (B)     Copy of reference (b).

     1.      References (a) and (b) propose substitution
of fiberglas for amosite in portable blankets for valves
and fittings on high pressure auxiliary steam lines, low
pressure auxiliary steam lines, auxiliary exhaust, mis-
cellaneous low pressure, low temperature pipe lines and
on the main steam lines, quoting as authority certain
O.P.M. news releases, conservation orders and letters,
copies of which are attached to enclosure (A).

     2.      This office has received no instructions
prohibiting the use of amosite other than those supplied
by the contractor.

     3.      The contractor also proposes to substitute
hair felt for hot fresh water systems, in lieu of woven
asbestos fibre, as set forth in reference (b).

     4.      The Bureau is requested to advise as to
what substitutions are now necessary and to advise of
the approved substitutes.

                                        E. B. Perry.

Copy to:
     CSC
     Design Division, Development
          Section.

DDR 833 — INSUL



EXHIBIT
Cushing 29
7/7/04    ES

Authority NND903519
By M N&R a Date 6/14/08

PTB:EF
3/10/43

DD4(551asa/S38-1(514)

## VIA AIR MAIL

MAR 10 1943

From :   The Chief of the Bureau of Ships.
To   :   The Supervisor of Shipbuilding, USN , Orange, Texas.

SUBJECT:   Destroyers - DD875-650 - Lagging of Deaerating Feed
Tanks and Evaporators.

1.   Confirming information furnished Commander H.G.
Chalkley, USNR, during his visit to the Bureau of Ships on
March 10, 1943, the use of cotton duck lagging in lieu of
asbestos cloth for deaerating feed tanks and evaporators is
hereby authorized.

2.   The cotton duck should be in accordance with Type B
Bureau of Ships Specification 24DH(INT). After installation,
a two-coat fire retardant treatment shall be applied by brushing
or spraying, using one of the following mixtures:

(a)   Boric Acid ($H_3BO_3$) - - - - - - - - - - - - 50 percent
Sodium alginate - - - - - - - - - - - - - - 1 percent
Water - - - - - - - - - - - - - - - - - 49 percent
followed when thoroughly dried by one finish coat of fire
retardant paint, Bureau of Ships Specification 52P22(INT) as
amended, to prevent moisture from leaching out the fire re-
tardant mixture.

(b)   Sodium Silicate Solution - - - - - - - - - 31.0 percent
(sp.gr. 1.41 to 1.42, silica soda ratio 3.2 to 3.4)
Kaolin - - - - - - - - - - - - - - - - - 41.4 percent
Water - - - - - - - - - - - - - - - - - 27.6 percent
No fire retardant paint is necessary.

Copy to:
Cdr. H.G. Chalkley
648                          3111014
646
356



AN

ADMINISTRATIVE HISTORY

OF

THE BUREAU OF SHIPS

DURING WORLD WAR II

VOLUME IV

FIRST DRAFT NARRATIVE
PREPARED BY THE HISTORICAL SECTION
BUREAU OF SHIPS

linoleum, marine plywood for emergency repairs and for a large number of applications where fire and water are destructive elements.

Shark Repellent Kit    A material for the protection of personnel from attack by sharks has been developed.  A water soluble material and a chemical have been combined and enclosed in a unit designed to attach to the individual users life jacket.  The unit has a quick opening device for immediate use.

Salt Water Soap and Laundry Methods    Conservation of fresh water aboard all ships is of major importance.  As a large amount of water is required for use by the ship's laundry, a salt water soap and instructions for its use in laundry practice has been developed which saves from 5,000 to 7,000 gallons of fresh water per day on a cruiser class ship.

Mess gear of High Impact Strength    Glass and china tableware suffer considerable damage from shock due to gun firing.  Tableware made of glass and of plastic material has been developed which reduces this breakage to a minimum under battle conditions of today.

Asbestos-Glass Insulation Lagging Cloth    A shortage of asbestos fiber and facilities for weaving cloth necessitated development of an alternate.  By twisting an asbestos yarn around a glass yarn, a glass-asbestos yarn was produced which actually produced a better and more workable cloth of about 1/2 the weight and which used about 1/2 the asbestos used in the Standard asbestos cloth.

Resin-Bonded Bearing Strips.    Lignum Vitae has been the standard bearing material for stern tubes for years.  A natural rubber bearing strip was found to be more satisfactory than wood, but the shortage of natural rubber necessitated an alternate for rubber bearing strips or going back to wood. The resin bonded materials were developed and have given satisfaction.

-157-

# EXHIBIT D

## AFFIDAVIT OF SAMUEL A. FORMAN, M.D.

COMMONWEALTH OF MASSACHUSETTS  )
                                            )     ss.

COUNTY OF MIDDELSEX                  )

     I, Samuel A. Forman, M.D., being under penalty of perjury, declare and say:

     1.  I am a medical doctor specializing in preventive medicine and occupational medicine.  I received a B.A. degree from the University of Pennsylvania majoring in history and biology, graduating *magna cum laude* in 1973.  I attended Cornell Medical School, graduating with an M.D. degree in 1977.  I also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, I became board certified in occupational medicine after attending a residency at the Harvard School of Public Health.

     2.  In 1977, I went on active duty in the United States Navy, and I performed my internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978.  I remained on active duty in the Navy until 1983.  Thereafter, I continued to work for the Navy as a civilian employee until 1986.  My qualifications and credentials are more fully described in my curriculum vitae, a copy of which is attached as Exhibit A.

     3.  While on active duty in the Navy, I ran an occupational health clinic at the Naval Weapons Station at Seal Beach, California, and assisted in the medical programs at the Long Beach Naval Shipyard.  Among other responsibilities, I assisted in the asbestos medical surveillance program for over 2,000 employees.  At any one time, I was following 200 cases of asbestos disease.

4.  In 1982, I was assigned to the Naval Environmental Health Center at Norfolk, Virginia.  While stationed there, I designed occupational medicine programs with regard to Navy-specific occupational diseases, performed health hazard evaluations, inspected the occupational health programs of government facilities as part of the NAVOSH program, carried out epidemiologic studies, and trained Navy doctors and nurses in occupational medicine.

5.  In 1983, a Navy JAG officer for the Naval Medical Command requested that I become part of a team to locate, digest and organize government documents for production in asbestos litigation.  Over the next year and a half, I investigated the Navy's historical handling and knowledge of various industrial hygiene issues, including asbestos disease.

6.  In 1985, pursuant to Navy orders, a copy of which is attached as Exhibit B, I completed my review of Navy knowledge and practice in industrial hygiene, including its awareness of and response to health hazards of asbestos, as a formal assignment.  My search for documents took me to the National Archives, other warehouses and storage facilities for record of the Navy's Bureau of Medicine and Surgery.  I was given full security clearances for and access to these facilities.  I also conducted research at private facilities such as Harvard University's Countway Library of Rare Books.

7.  Following my research, I published an article entitled "U.S. Navy Shipyard Occupational Medicine Through World War II" in the *Journal of Occupational Medicine*, Vol. 30, No. 1 (Jan. 1988).  A copy of that article is attached as Exhibit C.

8. On the basis of my research for and regarding the Navy, I concluded that the Navy's occupational health programs have paralleled, and at times led, the development of occupational medicine and industrial hygiene with respect to asbestos-related disease. From my review of countless Navy documents and my studies while employed by the Navy, I acquired extensive knowledge as to the state of Navy knowledge and awareness regarding the hazards of asbestos. Based upon that review, I conclude that the Navy's knowledge in these areas was quite complete when compared to available knowledge at the time, and that by 1940 the Navy was a leader in the field of occupational medicine relating to, among other things, asbestos exposure.

9. Based upon my review, I am aware that the Navy knew by 1922 that asbestos exposure was a potential health hazard, and that its knowledge and awareness continued to develop throughout the following decades. This development is evidenced by, among numerous other documents, the following:

a. Louis I. Dublin, Ph.D., et al., "Instructions to Medical Officers," U.S. Naval Med. Bull. 17:883, 885-86, 897-899 (1922) (listing "Asbestos workers" among "Hazardous Occupations"). The document, a copy of which is attached as Exhibit D, originated from the Division of Preventive Medicine of the United States Navy Medical Corps.

b. Handbook of the U.S. Navy Hospital Corps (1939) (workplace inspection checklist includes: "What precautions are exercised to prevent damage from pipe covering compounds? What asbestos hazards exist?"). A copy of this document is attached as Exhibit E.

c. Annual Report of the Surgeon General of the United States Navy (1939) (describing asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods" and noting risk "continued exposure to present occupational conditions"). A copy of this document is attached as Exhibit F.

d. Ernest W. Brown, M.D., "Industrial Hygiene and the Navy in National Defense," *War Medicine*, vol. 1, 3, 11-12 (1941) (listing asbestosis among "chief occupational health hazards in navy [ship]yards" to "workers engaged in the manufacture of asbestos insulating covers" and describing appropriate measures for control of asbestos exposure). The author of the document, a copy of which is attached as Exhibit G, was a Captain in the Navy Medical Corps.

e. U.S. Navy Department, U.S. Maritime Commission, "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" (Jan. 20, 1943) (describing sources of asbestos exposure and listing appropriate precautions). The document, a copy of which is attached as Exhibit H, was approved by the Navy, and an introduction was co-signed by Secretary of the Navy Frank Knox.

f. U.S. Navy *Safety Review*, Vol. 4, No. 1 (Jan. 1947) ("[e]xposure to asbestos dust is a health hazard which cannot be overlooked in maintaining an effective industrial hygiene program"). A copy of this document is attached as Exhibit I.

10.  All of my opinions set forth herein are held to a reasonable degree of
scientific certainty.

Samuel A. Forman, M.D.

Sworn to and subscribed
before me this 23rd day
of June, 2005.

NOTARY PUBLIC

DEMETRIO S. FRANCISCO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 2, 2011

# EXHIBIT A

# SAMUEL A. FORMAN, M.D.

One Research Drive
Suite 301B
Westboro, MA 01581

(508)-948-6010          (508)-948-6095 fax          (617)-945-9645 home
sforman@statusone.com  email

## EMPLOYMENT

**2005 – present**

**Consultant**, Cambridge, MA
Expertise in population-based case management, disease management, predictive modeling, proposal writing, professional publications, toxicology, and general management of health-related enterprises.

**1997 - 2004**

**StatusOne**, Westboro, MA
Senior VP, Chief Medical Officer and Co-founder
Services, consulting, software and Internet services helping risk-bearing health organizations care for their frailest members. Develop predictive models, organize and execute medical management services, formulate client relationships, contribute professional papers and monographs, evaluate competitive offerings, and represent StatusOne to medical audiences. A Principal Investigator of the CMS Medicare Coordinated Care Demonstration with Washington University Physician Network. Led proposal writing for American Healthways CMS contracts.
StatusOne is an American Healthways Company since September 2003.

**1995 - 1997**

**Blue Cross and Blue Shield of Massachusetts**, Boston, MA
Medical Director, Clinical Improvement
General management responsibilities for pharmacy, home care, and several health care joint ventures. Lead clinical improvement projects involving all specialties in a 100,000 member integrated delivery system. Provide general internal medicine care.

**1986 - 1993**

**Procter & Gamble Company**, Cincinnati, Ohio
Consultant, later Associate Director, Occupational Health
Manage U.S. self-insured health programs for 30,000 employees comprising the detergent, paper, pharmaceutical and food divisions. Build epidemiologic function, design, contract for, and execute studies. Model programs reapplied worldwide. Manage 5 physicians, 3 nurses plus support staff. Deliver clinical services to technical center staff and senior management. Direct 70 site clinics and 60 part-time physicians.

**1984 - 1986**

**Coastal Emergency Services, Inc.**, Virginia
Clinical services in emergency and general internal medicine.

## MILITARY SERVICE

**1982 - 1986**

**Navy Environmental Health Center**
Norfolk, Virginia
Lieutenant Commander, later GS-14 Consultant in the occupational medicine division
Set standards, review complicated disability claims, apply statistical methods to health care delivery, inspect clinics for QA and UR, lecture on professional topics, perform epidemiologic studies and health hazard evaluations, manage development and implementation of clinical information management system.

Samuel A. Forman, MD                                    Curriculum vitae

| | |
|---|---|
| 1980 - 1982 | **Naval Regional Medical Center**<br>Long Beach, California<br>Occupational Medicine Service; Head, Seal Beach Naval Weapons Station clinic.  General and occupational clinical and preventive programs for personnel at conventional, nuclear capable, and special weapons industrial base.  Manage asbestos medical surveillance program at Long Beach Naval Shipyard. |
| 1978 - 1979 | **USS St. Louis (LKA-116) and USS Duluth (LPD-6)**<br>Based at San Diego, California<br>Ship's physician<br>Western Pacific operations, general office and emergency practice.<br>Vietnamese refugee assistance. |

# EDUCATION

| | |
|---|---|
| 1993 - 1995 | **Yale** University School of Management,<br>New Haven, Connecticut<br>**Master of Business Administration**<br>Concentration in Organizational Behavior and Operations.  Total quality management, health administration, finance, marketing, accounting and statistics. Coordinator of Yale/Columbia Graduate School of Business Negotiation Colloquium. |
| 1979 - 1980 | **Harvard** University School of Public Health,<br>Boston, Massachusetts<br>**Master of Science**<br>Residency in Occupational Medicine |
| 1977 - 1978 | **National Naval Medical Center,**<br>Bethesda, Maryland<br>Internal medicine rotating internship<br>Assistant senior intern. |
| 1976 - 1977 | **Harvard** University School of Public Health,<br>Boston, Massachusetts<br>**Master of Public Health** |
| 1973 - 1977 | **Cornell** University Medical College,<br>New York, New York<br>**Doctor of Medicine**<br>MD-MPH program. |
| 1970 - 1973 | **University of Pennsylvania,**<br>Philadelphia, Pennsylvania<br>**Bachelor of Arts** magna cum laude<br>Majors in biology and history. |

Samuel A. Forman, MD                                    Curriculum vitae

## PUBLICATIONS

Forman, S: "Targeting the Highest-Risk Population to Complement Disease Management" Health Management Technology 49-50, Jul 2004.

Forman SA, Lynch JP: "High Risk Geriatric Population Medical Management" (abstract) J Am Geriatric Assoc S111, May 2001.

Forman SA: "Internet-Deployed Population Based Case Management" Inside Case Management 7(2), May 2000.

Lynch J, Forman SA, Graff S, Gunby M: "High Risk Population Health Management: Achieving Improved Patient Outcomes and Near-Term Financial Results" Am J Managed Care 6(7):781-791, 2000.

Forman S. "Medicare Risk Plans and Disease Management Vendors" Disease Management and Health Outcomes 7(1):1-4, 2000.

(Book) Forman SA, Kelliher M: *Status One: Breakthroughs in High Risk Population Health Management*, Medical Management Series, Jossey Bass Publishers, San Francisco 1999.

Borron SW, Forman SA, Lockey JE, Lemasters GK, Yee LM: "Dust and Mirrors or Corruption is in the Eye of the Beholder," American Journal of Industrial Medicine 34:409-410, 1998.

Forman SA, Kelliher M, Wood G: "Clinical Improvement with Bottom Line Impact - Custom Care Planning for the Acutely, Chronically Ill in a Managed Care Setting," J Managed Care 3(7): 1039-1048, July 1997.

Borron SW, Forman, SA, Lockey JE, Lemasters GK, Yee LM: "An Unpublished 1932 Study of Asbestosis Among Manufacturing Workers: Reconstruction of the Cohort and Original Findings," American Journal of Industrial Medicine 31: 324-334, 1997.

Ducatman AM, Forman SA, Teichman R, Gleason RE: "Occupational Physician Staffing in Large U.S. Corporations," Journal of Occupational Medicine 33(5): 613-618, 1991.

Forman SA: "A Review of Propylene Glycol Dinitarate Toxicology and Epidemiology," Toxicology Letters 43: 51-65, 1988.

Ducatman AM, Yang WM, Forman SA: "B-Readers and Asbestos Medical Surveillance," Journal of Occupational Medicine 30(8): 644-647, 1988.

Forman SA: "Sublethal Exposure to Microwave Radiation (letter)," Journal of the American Medical Association 259(1): 3129, 1988.

Forman SA: "U.S. Navy Occupational Medicine Through World War Two," Journal of Occupational Medicine 31(1): 28-32, 1988.

Forman SA, Potter HG, Helmkamp JC: "Retrieval Methodology for Inpatient Records," Military Medicine 152: 190-193, 1987.

Samuel A. Forman, MD                                           Curriculum vitae

Forman SA, Helmkamp JC, Bone CM: "Cardiac Morbidity Associated With Occupational Exposure to 1,2 Propylene Glycol Dinitrate," Journal of Occupational Medicine 25(5): 445-450, 1987.

Forman SA: "Radiation-Induced Breast Cancer (letter)," Archives of Internal Medicine 145: 574-575, 1985.

Helmkamp JC, Forman SA, McNally MS, Bone CM: "Morbidity and Mortality Associated With Exposure to Otto Fuel II in the U.S. Navy 1966-1979," Naval Health Research Center Report 84-35, 1984.

Forman SA: "Industrial Hygiene Records – Will They Be Useful and IBM's Experience With ECHOES," American Conference of Governmental Industrial Hygienists Journal 6: 41,75, 1983.

Forman SA, Holmes CK, McManamon TV, Wedding C: "Psychological Symptoms and Intermittent Hypertension Following Acute Microwave Exposure," Journal of Occupational Medicine 24(11): 932-934, 1982.

Forman SA, Castell DO: "Food Intolerance and Peptic Ulcer Disease," Gastroenterology 75(1): 162, 1978.

## ACADEMIC AFFILIATIONS

Organizer of Healthcare 2005, Yale School of Management, Feb 2005.

University of Cincinnati, adjunct associate professor of medicine, 1989 to 2003.

University of Cincinnati, chairman of the post-graduate Medicine Advisory Committee, 1988-1990.

Eastern Virginia Medical College, adjunct assistant professor of family practice and community medicine, 1983-1985.

## LICENSES and CERTIFICATIONS

Licensed to practice medicine in Massachusetts, Virginia, California and Ohio.
Board certified in Occupational Medicine.

## MEMBERSHIPS

Member, American College of Physician Executives, American Medical Association, and Massachusetts Medical Society
Fellow, American College of Occupational and Environmental Medicine.

## INTERESTS

General management within health related businesses.  Innovations, strategy and leadership in the cost effective delivery of medical care and the maintenance of high patient functional status.
Enjoy travel, rowing, writing fiction, numismatics, history, and antiques.
Company surgeon of the Lexington Minutemen historical reenactors.

# EXHIBIT B

UNCLASSIFIED

151825Z  AUG  85  RR     UUUU                    2271825

ADMIN

NAVENVIRHLTHCEN NORFOLK VA

COMNAVMEDCOM WASHINGTON DC

UNCLAS //N06260//

SUBJ: USE OF NAVAL MEDICAL COMMAND ARCHIVAL MATERIALS

1.  PASS TO MEDCOM-00D4 (MR. HERMAN).

2.  I HAVE ASSIGNED DR. SAMUEL A. FORMAN THE TASK OF REDISCOVERING

HISTORY OF OCCUPATIONAL HEALTH WITHIN NAVY MEDICINE.  EFFORT HAS

IMPLICATIONS FOR CURRENT CONTINGENCY ROLES AND MORALE OF THE TWIN

OCCUPATIONAL MEDICINE AND INDUSTRIAL HYGIENE OFFICER COMMUNITIES.

WILL USE OLD BUMED RECORDS AT THE NATIONAL ARCHIVES AND NAVMEDCOM

ARCHIVES FROM 20-23 AUG 85.

2.  PLEASE ALLOW ACCESS TO APPROPRIATE MATERIALS.  AS NATIONAL

ARCHIVES MILITARY RECORDS OPEN ONLY DAYTIME HOURS, PLEASE ACCOMODATE

WORK AT MEDCOM FROM 1630-2100, IF POSSIBLE.

DR. S. A. FORMAN, OCC MED CONSUL          326:SAF:HFC
COORDINATOR, 4-4657                       15 AUG 85

      CDR J.P. WILKINSON, MSC, USN, 4-4657          MINIMIZE CONSIDERED

UNCLASSIFIED      151825 AUG 85

*1. Submittal w/ltr*

| REQUEST AND AUTHORIZATION FOR TDY TRAVEL OF DOD PERSONNEL | 1. DATE OF REQUEST |
|---|---|
| (Reference: Joint Travel Regulations)<br>Travel Authorized as indicated in items 2 through 21. | 16 SEP 1985 |

**REQUEST FOR OFFICIAL TRAVEL**

| 2. NAME (Last, First, Middle Initial) | 3. POSITION TITLE AND GRADE OR RATING |
|---|---|
| FORMAN, SAMUEL A.        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 | OCCUPATIONAL MEDICINE CONSULTATION COORD<br>CS-14 |

| 4. OFFICIAL STATION | 5. ORGANIZATIONAL ELEMENT | 6. PHONE NO. |
|---|---|---|
| NAVY ENVIRONMENTAL HEALTH CENTER<br>NAVAL STATION, NORFOLK, VA 23511 | OCCUPATIONAL HEALTH DEPT | 444-4657 |

| 7. TYPE OF ORDERS | 8. SECURITY CLEARANCE | 9. PURPOSE OF TDY |
|---|---|---|
| SINGLE | SECRET PENC BASED ON<br>BAC COMP 01AUG73 BY<br>DODNACC-DIS | HISTORY OF NAVY OCCUPATIONAL HEALTH/<br>RESEARCH FOR WORKSHOP PRESENTATION<br>(OTHER) |

| 10a. APPROX NO. OF DAYS OF TDY (Including travel time) | b. PROCEED O/A (Date) |
|---|---|
| 3 | 18 SEPTEMBER 1985 |

**11. ITINERARY    [X] VARIATION AUTHORIZED**

NATIONAL ARCHIVES BRANCH, SUITLAND, MD AND IN AND AROUND SUITLAND, MD; NATIONAL
ARCHIVES, NAVAL HISTORY MUSEUM, WASHINGTON NAVY YARD, NAVMEDCOM, WASHINGTON, DC AND IN
AND AROUND WASHINGTON, DC AND RETURN NORFOLK, VA

**12.    MODE OF TRANSPORTATION**

| COMMERCIAL | | | | GOVERNMENT | | | PRIVATELY OWNED CONVEYANCE (Check one) |
|---|---|---|---|---|---|---|---|
| RAIL | AIR | BUS | SHIP | AIR | VEHICLE | SHIP | RATE PER MILE: |
| | | | | | | | [ ] MORE ADVANTAGEOUS TO GOVERNMENT |
| [ ] | | | | | | | [ ] MILEAGE REIMBURSEMENT AND PEN DIEM LIMITED TO CON-<br>STRUCTIVE COST OF COMMON CARRIER TRANSPORTATION & RELATED PER DIEM AS DETERMINED IN JTR. TRAVEL TIME LIMITED AS INDICATED IN JTR. |
| | | AS DETERMINED BY APPROPRIATE TRANSPORTATION OFFICER (Overseas Travel only) | | | | | |

**13.    [X] PER DIEM AUTHORIZED IN ACCORDANCE WITH JTR.**
[ ] OTHER RATE OF PER DIEM (Specify)

| 14.<br>PER DIEM | TRAVEL | OTHER | ESTIMATED COST<br>TOTAL | 15. ADVANCE AUTHORIZED |
|---|---|---|---|---|
| $ 225.00 | $ --- | $ 140.00 | $ 365.00 | $ 283.00 |

**16. REMARKS** (Use this space for special requirements, leave, superior or 1st-class accommodations, excess baggage, registration fees, etc.)

UTILIZATION OF GOVERNMENT FACILITIES NOT REQUIRED AS IT IS CONSIDERED SUCH UTILIZATION
WOULD ADVERSELY AFFECT PERFORMANCE OF ASSIGNED TEMPORARY DUTY.  LODGING RECEIPTS
REQUIRED.  RECEIPTS REQUIRED FOR ALL EXPENSES INCURRED OVER $25.00.  RENTAL CAR AUTH-
ORIZED.  AUTHORIZED BTSC NEGOTIATED COMPACT CAR (A) APPROXIMATELY 600 MILES FOR 3 DAYS.
PHONE CALLS FOR OFFICIAL BUSINESS ARE APPROVED FOR PAYMENT.

| 17. REQUESTING OFFICIAL (Title and signature) | 18. APPROVING OFFICIAL (Title and signature) |
|---|---|
| | CAPT J. J. BELLASCA, MC, USN, COMMANDING<br>OFFICER |

**AUTHORIZATION**

| ACCOUNTING CITATION | APPROPRIATION AND SUBHEAD | OBJECT CLASS | BUREAU CONTROL NUMBER | SUB-AUTH | AUTHORIZATION ACCOUNTING ACTIVITY | TYPE | TRAVEL ORDER (Tango) NO. | COST CODE |
|---|---|---|---|---|---|---|---|---|
| | AA1751804.1800 | 000 | 68546 | 0 | 66818 | 2E | 508713 | 713403383113 (E) |

| 20. ORDER AUTHORIZING OFFICIAL (Title and signature) OR AUTHENTICATION | 21. DATE ISSUED |
|---|---|
| CAPT J. J. BELLASCA, MC, USN, COMMANDING OFFICER | 16 SEPTEMBER 1985 |
| | 22. TRAVEL ORDER NUMBER |
| | N6854685508713 |

**DD FORM 1610** JUN 67    s/n 0102-LF-016-7702    NAVY OVERPRINT - JAN. 1971

| REQUEST AND AUTHORIZATION FOR TDY TRAVEL OF DOD PERSONNEL | | 1. DATE OF REQUEST |
|---|---|---|
| *(Reference: Joint Travel Regulations)* Travel Authorized as Indicated in Items 2 through 21. | | 13 AUG 85 |

| REQUEST FOR OFFICIAL TRAVEL | | |
|---|---|---|

| 2. NAME *(Last, First, Middle Initial)* FORBAR, SAMUEL A.   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 | 3. POSITION TITLE AND GRADE OR RATING OCCUPATIONAL MEDICINE CONSULTATION COOR.  GS-14 | |
|---|---|---|

| 4. OFFICIAL STATION NAVAL ENVIRONMENTAL HEALTH CENTER, NAVAL STATION, NORFOLK, VIRGINIA 23511 | 5. ORGANIZATIONAL ELEMENT OCCUPATIONAL HEALTH DEPARTMENT | 6. PHONE NO. 444-4657 |
|---|---|---|

| 7. TYPE OF ORDERS SINGLE | 8. SECURITY CLEARANCE SECRET CLNC BASED ON BAC COMP 01 AUG 73 BY DODNACC-DIS | 9. PURPOSE OF TDY MISSION |
|---|---|---|

| 10a. APPROX NO. OF DAYS OF TDY *(Including travel time)* 4 | b. PROCEED O/A *(Date)* 20 AUGUST 1985 | |
|---|---|---|

11. ITINERARY   [X] VARIATION AUTHORIZED

NATIONAL ARCHIVES, MEDCOM, NAVY HISTORICAL MUSEUM, WASHINGTON, DC, AND IN AND AROUND WASHINGTON, DC AND RETURN NORFOLK.

| 12. | MODE OF TRANSPORTATION | | | | | | |
|---|---|---|---|---|---|---|---|
| | COMMERCIAL | | | GOVERNMENT | | | PRIVATELY OWNED CONVEYANCE *(Check one)* |
| RAIL | AIR | BUS | SHIP | AIR | VEHICLE | SHIP | RATE PER MILE: |
| | | | | | | | [ ] MORE ADVANTAGEOUS TO GOVERNMENT |
| | [ ] AS DETERMINED BY APPROPRIATE TRANSPORTATION OFFICER *(Overseas Travel only)* | | | | | | [X] MILEAGE REIMBURSEMENT AND PER DIEM LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER TRANSPORTATION & RELATED PER DIEM AS DETERMINED IN JTR. TRAVEL TIME LIMITED AS INDICATED IN JTR. |

13. [X] PER DIEM AUTHORIZED IN ACCORDANCE WITH JTR.
[ ] OTHER RATE OF PER DIEM *(Specify)*

| 14. | ESTIMATED COST | | | 15. ADVANCE AUTHORIZED |
|---|---|---|---|---|
| PER DIEM $90.00 | TRAVEL $78.00 | OTHER $25.00 | TOTAL $493.00 | $322.00 |

16. REMARKS *(Use this space for special requirements, leave, superior or 1st-class accommodations, excess baggage, registration fees, etc.)*
UTILIZATION OF GOVERNMENT FACILITIES NOT REQUIRED AS IT IS CONSIDERED SUCH UTILIZATION WOULD ADVERSELY AFFECT PERFORMANCE OF ASSIGNED TEMPORARY DUTY. LODGING RECEIPTS REQUIRED. RECEIPTS REQUIRED FOR ALL EXPENSES INCURRED OVER $25.00. POC IS AUTHORIZED FOR USE IN AND AROUND TDY STATION ON OFFICIAL BUSINESS. AUTHORIZED TO DEPART FROM AND RETURN TO RESIDENCE IN VIRGINIA BEACH, VA. OWNERS AND OPERATORS STATEMENT:  I certify that I am the owner and operator of the private conveyance utilized and primarily responsible for the operating expenses thereof:  LICENSE:  PA 093A3Y

| 17. REQUESTING OFFICIAL *(Title and signature)* | 18. APPROVING OFFICIAL *(Title and signature)* CAPT J. J. BELLANCA, MC, USN, COMMANDING OFFICER |
|---|---|

| AUTHORIZATION | | | | | | | |
|---|---|---|---|---|---|---|---|
| LINE | APPROPRIATION AND SUBHEAD | OBJECT CLASS | BUREAU CONTROL NUMBER | SUB-AUTH | AUTHORIZATION ACCOUNTING ACTIVITY | TYPE | TRAVEL ORDER *(Tango)* NO. | COST CODE |
| ACCG | AA17518U4.1880 | 000 | 68546 | 0 | 66815 | 2D | 50X675 | 67537771N3113(2) |

| 20. ORDER AUTHORIZING OFFICIAL *(Title and signature)* OR AUTHENTICATION CAPT J. J. BELLANCA, MC, USN, COMMANDING OFFICER | 21. DATE ISSUED 15 AUGUST 1985 |
|---|---|
| | 22. TRAVEL ORDER NUMBER X6254655050675 |

DD FORM 1610 s/n 0102-LF-016-7703
1 JUN 87

NAVY OVERPRINT · JAN. 1971

| REQUEST AND AUTHORIZATION FOR TDY TRAVEL OF DOD PERSONNEL | | 1. DATE OF REQUEST |
|---|---|---|
| *(Reference: Joint Travel Regulations)* Travel Authorized as Indicated in Items 2 through 21. | | 30 JULY 1985 |

**REQUEST FOR OFFICIAL TRAVEL**

| 2. NAME *(Last, First, Middle Initial)* | 3. POSITION TITLE AND GRADE OR RATING |
|---|---|
| FORMAN, SAMUEL A.  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 | GS-14 OCCUPATIONAL MEDICINE CONSULTATION COOR. |

| 4. OFFICIAL STATION NAVY ENVIRONMENTAL HEALTH CENTER NAVAL STATION, NORFOLK, VIRGINIA  23511 | 5. ORGANIZATIONAL ELEMENT OCCUPATIONAL HEALTH DEPT. | 6. PHONE NO. 444-4657 |
|---|---|---|

| 7. TYPE OF ORDERS SINGLE | 8. SECURITY CLEARANCE SECRET CLRC BASED ON BAC COMP 01 AUG 73 BY DONNACC-DIS | 9. PURPOSE OF TDY MISSION (SPECIAL MISSION) |
|---|---|---|

| 10a. APPROX NO. OF DAYS OF TDY *(Including travel time)* 5 | b. PROCEED O/A *(Date)* 5 AUGUST 1985 | |
|---|---|---|

| 11. ITINERARY     ☒ VARIATION AUTHORIZED |
|---|
| HARVARD MEDICAL SCHOOL AND SCHOOL OF PUBLIC HEALTH LIBRARIES, BOSTON, MA AND IN AND AROUND BOSTON, MA AND RETURN NORFOLK, VA |

**12.                                    MODE OF TRANSPORTATION**

| COMMERCIAL | | | | GOVERNMENT | | | PRIVATELY OWNED CONVEYANCE *(Check one)* |
|---|---|---|---|---|---|---|---|
| RAIL | AIR | BUS | SHIP | AIR | VEHICLE | SHIP | RATE PER MILE: |
| | X | | | | | | ☐ MORE ADVANTAGEOUS TO GOVERNMENT |
| ☐ AS DETERMINED BY APPROPRIATE TRANSPORTATION OFFICER *(Overseas Travel only)* | | | | | | | ☐ MILEAGE REIMBURSEMENT AND PER DIEM LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER TRANSPORTATION & RELATED PER DIEM AS DETERMINED IN JTR. TRAVEL TIME LIMITED AS INDICATED IN JTR. |

| 13.  ☒ PER DIEM AUTHORIZED IN ACCORDANCE WITH JTR. ☐ OTHER RATE OF PER DIEM *(Specify)* |
|---|

| 14. | | ESTIMATED COST | | | 15. ADVANCE AUTHORIZED |
|---|---|---|---|---|---|
| PER DIEM | TRAVEL | OTHER | | TOTAL | |
| $375.00 | $120.00 | $50.00 | | $545.00 | $120.00 |

| 16. REMARKS *(Use this space for special requirements, leave, superior or 1st-class accommodations, excess baggage, registration fees, etc.)* |
|---|
| UTILIZATION OF GOVERNMENT FACILITIES NOT REQUIRED AS IT IS CONSIDERED SUCH UTILIZATION WOULD ADVERSELY AFFECT PERFORMANCE OF ASSIGNED TEMPORARY DUTY.  LODGING RECEIPTS REQUIRED.  RECEIPTS REQUIRED FOR ALL EXPENSES INCURRED OVER $25.00.  COMMERCIAL AIR IS AUTHORIZED.  AUTHORITY TO USE TAXI/LIMO SERVICE.  LIBRARY USER AND COPIER FEE AUTHORIZED. PHONE CALLS FOR OFFICIAL BUSINESS ARE APPROVED FOR PAYMENT. |

| 17. REQUESTING OFFICIAL *(Title and signature)* | 18. APPROVING OFFICIAL *(Title and signature)* CAPT J. J. BELLANCA, MSN, USN, COMMANDING OFFICER |
|---|---|

**AUTHORIZATION**

| J 00 | APPROPRIATION AND SUBHEAD | OBJECT CLASS | BUREAU CONTROL NUMBER | SUB-AUTH | AUTHORIZATION ACCOUNTING ACTIVITY | TYPE | TRAVEL ORDER *(Torgo)* NO. | COST CODE |
|---|---|---|---|---|---|---|---|---|
| | AA1751804.1880 | 000 | 68546 | 0 | 66818 | 20 | 68N503 | 6033656N3113(E) |

| 20. ORDER AUTHORIZING OFFICIAL *(Title and signature)* OR AUTHENTICATION | 21. DATE ISSUED 30 JULY 1985 |
|---|---|
| CAPT J. J. BELLANCA, MC, USN, COMMANDING OFFICER | 22. TRAVEL ORDER NUMBER 6N56N63N68N0603 |

DD FORM 1610  S/N 0102-LF-016-1702                                    NAVY OVERPRINT - JAN. 1971

# EXHIBIT C

This material may be protected by
copyright law (Title 17 U.S. Code).

# US Navy Shipyard Occupational Medicine through World War II

## Samuel A. Forman, MD, MPH

*For more than 60 years the US Navy has maintained occupational health programs for its civil service workers in shipyards, arsenals, and aircraft repair facilities. The early history of the organization, people, and professional activities dedicated to the health of this large federal industrial workforce is examined.*

*Early efforts were stimulated by increasingly complex naval technology and worker compensation law. During World War II training, clinical, and preventive programs were pursued vigorously. Navy occupational health paralleled and at times led the development of occupational medicine and industrial hygiene in America.*

The history of United States Navy occupational medicine encompasses health aspects of one of the largest federal industries during peace and war. It is a history paralleling, and at times leading, the development of occupation health in this country. This paper utilizes mostly primary sources to trace the origins of Navy occupational medicine through 1945, ending with the Second World War demobilization. The latter period marked a pause in professional progress and later activities are both within living memory and have been discussed elsewhere.[1]

In the late 19th century new seagoing technologies multiplied naval health hazards. Introduction of iron warships made naval construction and repair a diverse, heavy industry (Fig. 1). An array of occupational activities that were essentially unknown in the days of wooden ships and sail propulsion characterized work supporting the new fleets. In addition to the age-old injury problems of falls from scaffolding and rigging, there were hazards incident to riveting, welding, painting with rust-inhibiting lead paints, chipping, sandblasting, metal casting, ordnance loading, and electric wiring.

Several occupational health problems were recognized by 1900, but little preventive action was taken. For example, deafness among boilermakers and gunners mates was an accepted fact of life.[2] Toxic conditions gained attention only if they afflicted many people and compromised a ship crew's readiness for duty.[3] Greater preventive medical interest was shown in the prevalent and pressing problems of sailors such as infectious diseases and minimally adequate shipboard ventilation.[4,5]

The health of civil service workmen in many shipyards and arsenals received little attention. Injuries might be treated in the station military dispensary,[6] at the discretion of the commanding officer. There was no provision for disability benefits if a prolonged health problem occurred.

Worker compensation laws enacted in the first 2 decades of the 20th century placed financial responsibility for occupational injuries on the employer. The first comprehensive compensation plan for federal employees became law in 1916. Unlike state plans, which were most often administered by insurance companies, benefits for Navy civil service workers were administered directly by the government through its Employees' Compensation Commission. The aggregate bill for benefits was served to the Secretary of the Navy each year. Financial losses resulting from civil service employee worker compensation were deducted from the Navy budget. As dollar losses became a highly visible and painful reminder of occupational health issues, occupational health, previously an obscure topic, gained a measure of recognition.

The First World War witnessed a large increase of industrial activities in shipyards and supporting shore stations. More Navy physicians recognized that occu-

[right partial column, cut off]
Fig.
sveted t
DC)

pation
care a
keep th
tions d
interes

Poor
dollars
whose
Navy s
toxic ir
priority
ards.[10]
belt dri
safely .
ments.

As W
program
effort t
Althoug
and the
end of t
ernman
time isv

One l
advance
medicin
sation (
poor oc
grams t
safety a
assigned
officers
occupat
Medicin
bilities .
From th

Journal

From the Occupational Medicine Division, Navy Environmental Health Center, Norfolk, VA 23511. Present address: Health and Safety Division, The Procter and Gamble Company, Ivorydale Technical Center, Cincinnati, OH 45217.

The views presented are those of the author and do not represent the official position of the Department of the Navy or the Naval Medical Command.

0096-1736/92/3(00)-00####.00/0
Copyright © by American Occupational Medical Association



Fig. 1. Introduction of iron warships made naval construction and repair a diverse, heavy industry. The crew of USS Monitor observes its riveted iron turret and rifled steel cannon following the battle with CSS Virginia in 1862. (Courtesy of US Navy Imaging Command, Washington, DC)

pational health services, then consisting mostly of injury care and employment physical examinations, helped keep the work force on the job.[7,8] Although a few locations developed rudimentary occupational clinics, such interest remained the exception.

Poor compensation experience, as measured by both dollars and lost-time injuries, attracted critical comment from the Federal worker compensation program, whose administrator requested inspections of several Navy shipyards in 1917.[8] Detection and correction of toxic industrial hazards initially received a secondary priority to control of numerous and evident safety hazards.[10] Even so, Navy workers were maimed by exposed belt drives long after these dangerous mechanisms were safely enclosed in most private industrial establishments.

As WW I progressed, ineffective occupational health programs came to be recognized as impairing the war effort through needless waste of industrial manpower. Although plans for better services within both the Navy and the private sector took shape in mid-1918,[11,12] the end of the war halted their implementation. Navy government industries were rapidly demobilized to peacetime levels.

One legacy of the war years remained to sustain and advance the nucleus of a full-time Navy occupational medicine function. Criticism by the Employee Compensation Commission and the Secretary of the Navy for poor compensation cost experience led to ongoing programs in both safety and industrial hygiene. In 1917, a safety engineer was appointed and others were later assigned to each shipyard. In 1929, full-time medical officers were assigned to assist each safety officer in occupational health matters.[13] At the Navy Bureau of Medicine and Surgery, occupational medicine responsibilities were added to its preventive medicine division. From the beginning, organized occupational health was focused on the civil servants laboring in Navy shipyards.

An early initiative came from Dr Robert Jones at the Navy Bureau of Medicine and Surgery, who recommended periodic physical examinations for a variety of occupations based on their potential toxic exposures. Of interest, screening of asbestos workers for pulmonary diseases was recommended along with examinations for more widely recognized conditions such as silicosis and lead poisoning.[14] Unfortunately, resources to provide such services were most often not obtainable from each base's commanding officer.

Nevertheless, a new vigor and purpose came to occupational health programs. Some performed excellent services for the Navy and workers at their locations. Boston Naval Shipyard Clinic sent one of its doctors in 1923 to complete postgraduate occupational medicine studies at the Harvard School of Public Health.[15] In 1925, Dr Ernest Brown completed a survey of lead poisoning in Philadelphia Naval Shipyard welders. He exhibited a disciplined and wide-ranging approach including clinical assessment, evaluation of work practices, and environmental sampling. Not content with passively describing the workplace, he devised hazard control strategies including altered work practices and adaptations of respiratory protection equipment.[16]

Other bases lagged in their occupational health and safety efforts. In some instances the occupational physician might retreat into the clinic to be exclusively occupied with acute injury treatment. Military base safety officers were often untrained and ineffective.[17]

There was a growing appreciation for the importance of job-specific pre-employment physical examinations.[18] Unlike active duty sailors who had to pass an induction "pre-employment" examination before donning the uniform, civilian employees were examined only when required by the base commanding officer and under general guidelines of the Civil Service Commission. Pre-

Page 78

employment examinations comprised a significant enterprise for the 1920s work force numbering almost 60,000

Uniformed Navy personnel continued to receive variable occupational medical services. Almost from their introduction into the service, hazards inherent in aircraft and submarine environments gained the attention of dedicated medical professionals. When other occupational conditions were addressed at all, it was often in the context of a health problem severe enough to immediately impair health and fitness for duty. Examples include sailors' noise-induced hearing loss,[19,20] lead encephalopathy,[21] nitroglycerin poisoning,[22] and painting solvent intoxication.[23] These endeavors remained distinct from organized Navy occupational medicine, which remained oriented toward civil service worker health.

By the end of the 1930s, a small, full-time group of occupational health physicians had been in place for a number of years.[24] A few physicians, like Dr Ernest Brown, achieved superior competence in the practice of occupational medicine. Although all programs had not been uniformly successful, and adequate resources were hard to come by, the organization was poised to meet requirements arising from an anticipated industrial mobilization.[25]

As war clouds gathered, Rear Admiral Charles Stephenson (Fig. 2), in charge of preventive medicine at the Navy Bureau of Medicine and Surgery, faced the challenge of building upon the modest Navy occupational health program of the previous decades. The general approach to maritime industries was already being discussed. Navy yards, arsenals, and air stations would gear up to produce and maintain specific, often complex ships and weapons, yet remain flexible enough to accommodate anticipated battle repairs. Using an organizational model revived from WW I, the US Maritime Commission would give contracts to private companies to mass-produce vessels such as "Liberty" transport ships and landing assault craft.

Immediate challenges included defining the scope of Navy occupational health, obtaining the backing of the military hierarchy, and staffing the effort with trained individuals. A coherent blueprint for the content of military occupational health was provided by Dr Ernest Brown. He envisioned services to include clinical care for injuries, job placement medical certifications, surveillance examinations for noxious work exposures, and workplace hazard inspections and controls.[26,27]

The next challenge was providing skilled manpower at a time when large industries monopolized the few qualified people.[28] The most viable answer was a timely proposal from Philip Drinker at the Harvard School of Public Health for training military officers in short courses of instruction.[29] Professor Drinker was already a well-known authority who had invented the "iron lung" mechanical respirator in 1929,[30] devised means to quantify and control industrial dust exposures,[31] and pioneered concepts in permissible exposure limits. Stephenson sent two bright Navy physicians, Drs Otto Burton and Howard Karl Sessions, to complete the occupational medicine master's degree program at Harvard during 1941.

Concurrently, Stephenson worked to empower the organization to tackle expanded responsibilities without external interference. An unsolicited attempt by the Public Health Service to perform occupational health inspections of naval facilities was promptly declined,[32,33] reportedly with the support of President Roosevelt.[34] For industrial activities all occupational health services would be provided from within the Navy.

The new Navy program was adopted and announced with some fanfare[35] (Fig. 3). It included pre-employment examinations,[36] injury care, medical surveillance for known occupational health hazards, and industrial hygiene field surveys. Shipyards developed well-staffed occupational health services manned by professionals in uniform and comprising both clinical and industrial hygiene divisions. These were located at the largest industrial facility in each of the 12 naval districts and lent occupational health support to smaller naval facilities in their areas.[37]

Key manpower was to be provided by training uniformed officers in short courses as proposed by Philip Drinker. By the war's close some 111 naval officers had completed the courses, most classes having convened at Harvard[38] and a few at Columbia.[39] Schools of Public Health. Of interest, 39 officers, unlike their classmates, were non-physicians, a group comprising one of the first formal training programs in modern industrial hygiene. Both physicians and hygienists shared formal lectures but separated during laboratory periods. Doctors attended industrial clinics and hygienists learned sampling strategies, laboratory assays, and hazard-control techniques. An additional 16 hygienists were taken on active duty, having already gained experience in industrial settings.

The role of occupational health within the US Mari-



Fig. 2. Rear Admiral Charles S. Stephenson (1887-1965) was instrumental in designing and implementing the Navy occupational medicine program during WW II. (Courtesy of the Naval Medical Command, Washington, DC)

30

  

Fig. 3. As illustrated by contemporary poster art, injury care, physical examination, and protective measures were aspects of the Navy wartime occupational medicine program. (Courtesy of the National Archives, Washington, DC)

time Commission evolved in 1942. Philip Drinker was also active here.[40] As chief medical consultant he was instrumental in the adoption of joint Navy - Maritime Commission health and safety standards for contract shipyards.[41] The health guidelines were based largely on the experience of a traveling health team's findings in the course of inspections of representative shipyards. In August 1942, the team was professionally staffed with loaned Navy physicians and industrial hygienists.

Contract shipyards that the Maritime Commission supervised provided their own injury treatment measures, whereas industrial hygiene inspection services were provided by government personnel. Qualified people were unavailable to institute the inspection services, so arrangements were made with the Navy to provide uniformed men. They were assigned to four regional offices: one physician and two industrial hygienists each to Philadelphia and Oakland and one industrial hygienist each to the offices in New Orleans and Chicago.[42]

In contrast to the program of the Maritime Commission, the Navy occupational health program had no traveling consultants or inspectors. When occupational health issues of general importance to naval industries arose or when special expertise beyond that in each naval district was required, Drinker's team was consulted. Health questions related to welding[43,44] and asbestos insulation work were the subjects of health hazard evaluations by the Maritime Commission during the war.

Asbestos workplace field investigations have had long-term significance. There had been anecdotal case reports implicating asbestos in lung disease from naval shipyard clinics.[45-47] A Maritime Commission field survey at a civilian contract shipyard revealed two laggers with x-ray evidence of asbestosis among a small number of tradesmen.[48] Navy occupational health officers were concerned enough about such findings that they cooperated with Philip Drinker in his proposal to do a large-scale pulmonary survey of asbestos insulation workers and obtained permission to extend the survey to two naval shipyards.[49]

Only three asbestosis cases were identified among more than 1,000 asbestos insulation workers who participated in the chest x-ray screenings at four shipyards.[50,51] Disease prevalence appeared low, an artifact caused by the inadvertent dilution of the at-risk population with briefly exposed persons. Low asbestosis prevalence in shipyard workers was interpreted in the professional community to mean that asbestos lagging operations were relatively free of pneumoconiosis risk. Although these early studies concerning asbestos hazards did not stand the test of time,[52-54] they represented superior occupational health methods of their era.

Industrial health activities were rapidly demobilized by 1946. The Maritime Commission health consultation office was disbanded. Although few physicians and industrial hygienists remained in active Navy service, those who gained experience during the war, like Drs. Otto Burton and Howard Karl Sessions and industrial hygienists Sidney Goren and George Johnson, led Navy programs through the 1950s.

Navy occupational health had played an important role in wartime industries. Its organization included superior practitioners. It broke new ground for industrial hygiene as a distinct health-related profession. It confidently tackled known health issues and actively pursued newer ones. Members of this team, veterans of occupational medicine and industrial hygiene services in Navy shipyards, arsenals, air stations, and the Maritime Commission, shared a common experience. Taking their know-how with them into private industry, government, and academia, Navy programs left a distinctive mark on American occupational health for many years.

## References

1. Lawton GM, Snyder PJ: Occupational health programs in US naval shipyards *Environ Res* 1976;11:168-185.

2. Gaston WB: Report relative to a series of experiments conducted on board the USS Ohio during target practice, with plasticine for the protection of ear drums during heavy gunfire *US Naval Med Bull* 1900;3:148-148.

3. Woods GW: An Account of thirty-seven cases of pityliym occurring on board of the USS Wachusett: *Annual Report of the Surgeon General of the Navy*, US Government Printing Office, 1873. pp 485-490.

4. Kershner E: Hygiene and medical reports of medical officers of the US Navy-USS Wachusett: *Annual Reports of the Surgeon General of the Navy*, US Government Printing Office, 1876.

5. Gihon AL: *Practical Suggestions in Naval Hygiene*, ed 3, US Government Printing Office, 1878.

6. Clehorn CJ: Report of US Naval Station, Kittery, Maine *Annual Report of the Surgeon General of the Navy*, US Government Printing Office, 1876.

7. Blackwood NJ: Industrial notes from the Boston yard *US Naval Med Bull* 1919;9:549-544.

8. Bloedorn WA: Studies of industrial accidents which occurred in the Navy yard at Washington, DC *US Naval Med Bull* 1916;10:586-685.

9. *Safety Record at US Navy Yards*, *US Naval Med Bull* 1925;22:187-191.

10. Saaka A: Measures to Prevent Poisoning by Trinitrotoul: *US Naval Med Bull* 1919;13:585-591.

11. Selby CD: Medical service in the conservation of industrial man power, *JAMA* 1918;71:383-534.

12. Mook HE: Industrial medicine and surgery: A resume of its development and scope *J Indust Hyg Toxicol* 1919;1:1-8.

13. Jones RP: Industrial hygiene at Navy yards: *US Naval Med Bull* 1928;18:575-587.

14. Dublin LI: Occupational hazards and diagnostic signs: A guide to impairments to be looked for in hazardous occupations: *US Naval Med Bull* 1928;17:883-916.

15. Abstracts from the Annual Sanitary Report of the Navy Yard, Boston, Mass., for the Year 1938 *US Naval Med Bull* 1938;18:685.

16. Brown KW: Report of lead poisoning among oxyacetylene welders in the scrapping of naval vessels *US Naval Med Bull* 1925;23:187-817.

17. Secretary of the Navy letter "Safety Engineering" dated October 11, 1926, National Archives, Record Group 28, Washington DC.

18. Desweiter JW: Eye examination as a factor in the reduction of industrial accidents *US Naval Med Bull* 1925;28:60-71.

19. Trible GB, Watkins SB: Ear protection *US Naval Med Bull* 1919;13:48-60.

20. Hidest GB: Gunfire deafness in the navy *US Naval Med Bull* 1920;28:729-739.

21. Stitt ER: Lead poisoning from red lead dust: The possible frequency of lead encephalopathy in such cases *US Naval Med Bull* 1912;6:151-152.

22. Fortescue TA: Report of poisoning by trinitrotoluene among enlisted men engaged in transferring TNT from storage to USS Nitro *US Naval Med Bull* 1917;36:491-495.

23. Young QA, Gelette AC: Drop poisoning as a potential hazard in spray coating airplane wings *US Naval Med Bull* 1938;81:83-86.

24. Shinn EL: Industrial Medicine *US Naval Med Bull* 1936;33:94-98, 960-980.

25. Navy Bureau of Medicine and Surgery restricted letter "Estimates of Medical Supplies for Navy Yard Dispensaries" dated December 30, 1934. Declassified 1961, National Archives, Record Group 58, Washington DC.

26. Brown KW: Industrial hygiene and the Navy in the national defense *US Navy Med Bull* 1941;39:391-396.

27. Brown, KW: Industrial hygiene and the Navy in the national defense War Med 1941;1:3-14.

28. Joint meeting of Subcommittee on Industrial Hygiene and Health of the Federal Security Agency and Council on Industrial Hygiene of the American Medical Association, unpublished minutes, January, 28, 1941, National Archives, Record Group 28, Washington DC.

29. Harvard School of Public Health letter, Philip Drinker to James P. Conant dated November 30, 1940.

30. Drinker P, Shaw LA: An apparatus for the prolonged administration of artificial respiration: A design for adults and children *J Clin Invest* 1929;7:229-947.

31. Drinker P, Hatch T: *Industrial Dust*, New York, McGraw-Hill Book Co. 1936.

32. Navy Department memorandum "Conference with Representatives of the Division of Industrial Hygiene Concerning Problems of Occupational Illness in the Navy Industrial Establishment" dated February 24, 1941, National Archives, Record Group 52, Washington DC.

33. Navy Department memorandum "Cooperation of Public Health Service" dated February 25, 1941, National Archives, Record Group 52, Washington DC.

34. Navy Bureau of Medicine and Surgery memorandum. "Notes for consideration when you (Surgeon General McIntire) call on Assistant Secretary Bard" dated March 11, 1941, National Archives, Record Group 52, Washington DC.

35. Navy Department press release "Navy to Expand Safety and Industrial Health Program" dated March 8, 1941.

36. Navy Department memorandum "Physical Examinations for Employees Engaged in Work Hazardous to Themselves and Others" dated October 23, 1941, National Archives, Record Group 52, Washington DC.

37. Stephenson CS, Burton CL: Industrial Hygiene Program of the US Navy *Am J Public Health* 1943;33:319-328.

38. Harvard School of Public Health syllabus "Tentative Schedule of Three Months Course for Medical Officers Who Will Specialize in Industrial Hygiene for the Army and Navy" dated January 27-April 28, 1941.

39. Columbia University syllabus "Course for Navy Officers" dated April, 1941.

40. "Plans for Safety and Health Program" C. W. Fischer, U.S. Navy Department and D. S. Ring, U.S. Maritime Commission, joint memorandum for the Assistant Secretary of the Navy and Commissioner U.S. Maritime Commission, dated November 5, 1942, National Archives, Record Group 52, Washington DC.

41. Minimum Requirements for Safety and Industrial Health by Contract Shipyard, US Navy Department and US Maritime Commission, US Government Printing Office, 1943.

42. Anonymous: History of Industrial Health Program of the US Navy During and After World War II, unpublished Bureau of Medicine and Surgery manuscript, undated, probably 1923, National Archives, Record Group 52, Washington DC.

43. Drinker P, Nelson KW: Welding fumes in steel fabrication *Indust Med* 1944;13:675-676.

44. Drinker P, Nelson KW: Shipyard Health Problems *J Indust Hyg Toxicol* 1944;26:96-99.

45. Chief, Navy Bureau of Ships letter "Insulation—water repellant asemite for cold water piping" dated August 12, 1942, National Archives, Record Group 52, Washington DC.

46. Puget Sound Navy Shipyard, Bremerton, WA, letter "Asemite (magnesium oxide and asbestos) lagging, toxic effects of inhalation and ingestion of, by workmen" dated January 5, 1944, National Archives, Record Group 52, Washington DC.

47. Navy Bureau of Medicine and Surgery letter "Asemite lagging toxic effects of" dated January 19, 1944, National Archives, Record Group 52, Washington DC.

48. Dreesen WC, Fleischer WE. "Report an investigation of asbestosis from asemite pipe covering at Bath iron works, Bath, Maine, unpublished manuscript dated December 19, 1944, National Archives, Record Group 52, Washington DC.

49. Navy Bureau of Ships letter "Industrial health—Survey of respiratory diseases" dated March 24, 1944, National Archives, Record Group 52, Washington DC.

50. Fleischer WE, Viles PJ, Gade RL, et al: A health survey of pipe covering operations in constructing naval vessels *J Indust Hyg Toxicol* 1946;28:9-16.

51. Drinker P: Health and safety in contract shipyards during the war *Occup Med* 1947;3:335-343.

52. Abstracts from current literature—Environmental Control *Occup Med* 1948;1:511.

53. Marr WT: Asbestos exposure during naval vessel overhaul *Am Indus Hyg Assoc J* 1964;26:264-268.

54. Selikoff IJ, Churg J: The occurrence of asbestos among installation workers in the United States *Ann NY Acad Sci* 1965;132:139-155.

# EXHIBIT D



DEFENDENT'S
EXHIBIT
Buffalo Pumps

3

# THE DIVISION OF PREVENTIVE MEDICINE.

Lieut. Commander R. F. Jones, Medical Corps, United States Navy, in charge.

Notes on Preventive Medicine for Medical Officers, United States Navy.

## INSTRUCTIONS TO MEDICAL OFFICERS.

### OCCUPATION HAZARDS AND DIAGNOSTIC SIGNS: A GUIDE TO IMPAIRMENTS TO BE LOOKED FOR IN HAZARDOUS OCCUPATIONS.

By Louis I. Dublin, Ph. D., Statistician Metropolitan Life Insurance Co., and Philip Libbott.

#### INTRODUCTION.

Many occupations have injurious effects on the physical condition of those engaged in them. The health of those who work with the poisons, such as lead, arsenic, mercury, picric acid, etc., or those who are exposed for long periods to dust, heat, humidity, or to the infectious materials, etc., may be impaired seriously as the result of their work. The occupation is now recognized as of the very first importance as a factor in the causation of disability and even of death. Doctor Edsall has shown that in his clinic at the Massachusetts General Hospital many of the conditions for which treatment is sought by men of working ages are the effects of occupations.[1] Other industrial clinics are reporting similar results. With their attention directed to occupation as a possible factor, industrial physicians are able to diagnose a great many obscure cases which previously had puzzled even the most competent clinicians. In this way they discover a great many more cases of disease of occupational origin than had before been thought possible. Thus, in 1917 about 150 cases of lead poisoning were discovered at the Massachusetts General Hospital, which are more than were recorded by this clinic during the five-year period prior to the adoption of the more intensive methods of study. It is generally recognized that patients come to physicians with pains and complaints of an indefinite char-

[1] See Monthly Labor Review of the U. S. Bureau of Labor Statistics, December, 1917, p. 160–166.

8554—22——10

883

884          DIVISION OF PREVENTIVE MEDICINE.          Vol. XVII.

acter, and it is only when consideration is given to the occupation
and its possible effects that many of these cases are cleared up.

The medical examiner should, therefore, be very careful to see if
any of the usual diagnostic signs of poisoning, dust, heat, or other
hazards which are known to be inherent in occupations are in evi-
dence among their patients where no other explanation of the case
is readily available. In the case of those exposed to lead, such as
employees of storage-battery plants, white-lead workers, paint mix-
ers, painters, etc., the blue line on the gum, the pale, sallow ap-
pearance, and the trembling fingers are significant as indications of
chronic lead poisoning, and the physician should look for these
signs. Physical symptoms and conditions which ordinarily might
be passed by in this way become very important if they point to
the possible effect of the occupation.

This article has been prepared to aid physicians in general prac-
tice, industrial hygienists, safety engineers, and others who come
into close professional contact with those who are engaged in indus-
trial processes. Nine major hazards of employment are listed,
namely, abnormalities of temperature; compressed air; dampness;
dust; extreme light; infectious; poor illumination; repeated motion,
pressure, or shock; and the poisons. A separate section is devoted
to a discussion of skin irritants. Long exposure to any of these will
usually leave definite physical signs which the medical examiner can
discover if he will look for them. To aid him in detecting the
hazards and their effects on the worker, two lists are presented. The
first consists of the more common hazardous occupations, arranged
alphabetically; the second consists of hazards, together with their
effects or symptoms, as well as the occupations affected. After
each occupation in the first list is a reference in code to the par-
ticular hazard in the second list. The capital letters after each
occupation, "A," "B," "C," etc., refer to the general hazard. The
Arabic numerals signify the particular hazard, as "D1," inorganic
dust; "D2," organic dust.

The following example will show how this guide may be of value
to the general practitioner: A man, who works in a garage, suffering
from continuous headaches, visits his physician. The latter can
find no cause for the patient's illness. The patient shows no signs
of disease other than the subjective symptoms which he describes.
Perhaps the physician will recommend an examination of the sub-
ject's eyes, ears, and sinuses, which will prove negative. A puzzling
diagnosis such as this becomes very simple when the occupation is
ascertained and this guide is utilized. Alongside of "Garage work-
ers" in the "Alphabetical list of hazardous occupations," the physi-
cian finds the symbols J 16, 25. "J" represents the hazard poisons
and "16, 25" the particular poisons—carbon monoxide and gasoline,

respectively. Upon looking up the symptoms of these poisons in the second list he finds that both produce headache when inhaled in small quantities. In such a case the effective remedy lies in the removal of the etiological factor—the two poisons.

The following procedure is therefore recommended: The medical examiner or physician should ascertain the occupation of the applicant. He should then look for it in the "Alphabetical list of hazardous occupations." If found there, it is possible that the person has been exposed to and is possibly suffering from the effects of some hazard of the occupation. The numerals will indicate the particular hazards of the occupation. The physician should then make special effort to discover the symptoms or signs referred to in the second list. By this means he can readily determine whether the person examined is in fact suffering from the effect of his occupation. His examination is in this way made more illuminating. Physicians, not specialists in occupational hygiene, can thus learn to detect the effects of industry and, conversely, can eliminate the occupation as the cause when certain symptoms are observed which do not fit the usually observed effects of the occupation.

Medical examiners should remember that it is often necessary to keep in mind not only the present occupation but the former one as well. Persons suffering from certain ailments may no longer be engaged in the industry which was originally responsible for their condition. But careful inquiry into their occupational history will sometimes result in the recording of an occupation the effects of which are clearly those from which the patient is suffering. The medical profession must give occupational findings greater weight in forming their judgments regarding physical conditions and in diagnosing and treating disease.

### ALPHABETICAL LIST OF HAZARDOUS OCCUPATIONS.

Acetylene makers, D 1, J 4, 36, 43.
Acid dippers, C, J 10, 22, 26, 37, 42.
Acid finishers (glass), J 26, 28, 42.
Acid makers. See particular acid.
Acid mixers, J 26, 27, 42.
Acid recoverers, J 22, 37, 42.
Acid transporters, J 26, 37, 42.
Airplane-wing varnishers, J 50. See also Varnishers.
Alcohol distillery workers, J 5, 6.
Aldehyde pumpmen, J 1, 50.
Alkali salt makers, C, J 14, 18, 26, 46, 47.
Amber workers, J 28.
Ammonium salts makers, A 1, J 4, 15, 22, 26, 42.

Ammonium sulphate makers, J 42.
Aniline dye makers. See Dye makers.
Aniline makers, J 7, 10, 12, 26, 34, 37.
Animal hair dressers. See Hair workers.
Animal handlers, F 1, 5.
Annealers, A 1.
Antimony extractors (refiners), A 1, J 3.
Antimony fluoride extractors, J 27.
Antipyrin makers, J 31, 40.
Arsenic roasters, A 1, J 3.
Art-glass workers, J 5, 11, 27, 22, 30, 52.
Artificial flower makers, H, J 9, 21, 23, 29, 30.



886　　　　　DIVISION OF PREVENTIVE MEDICINE.　　　Vol. XVII.

Artificial ice makers, A 2, G, J 4.
Artificial leather makers, J 7, 9, 12, 37, 48.
Artificial manure makers. See Fertilizer makers.
Artificial silk makers, G, J 4, 5, 16, 30, 47, 50.
Asbestos workers, D 1.
Asphalt testers, J 15.
Auto painters, G. See also Painters.

Babbitters, J 28.
Bakelite makers, J 30.
Bakers, A 2, D 2, J 16.
Balloon (toy) fillers, J 10.
Barbers, H.
Bar-mill workers (iron and steel), A L.
Basic slag (artificial manure) workers, D 1.
Batch makers (glass works). See Glass mixers.
Batch makers (rubber works). See Compounders (rubber).
Battery (tannery), G, F 1.
Battery (dry) makers, B 1, J 5, 10, 22, 21, 26, 28, 29, 46.
Battery (storage) makers. See Storage battery makers.
Beamers (textile), D 2.
Beamhouse workers (tannery), G, F 1.
Beatermen (paper and pulp), G, J 18.
Bed rubbers (marble and stone), D 1.
Bench molders (foundry), D 1, J 18, 28.
Benzol stillmen, A 1, J 12.
Bessemer-converter workers (iron and steel), A 1.
Beta-still operators (beta naphthol), A 1, J 48.
Bevelers, D 1.
Bicyclists, H.
Billet mill workers (iron and steel), A 1.
Bisque-kiln workers, A 1, D 1, J 16.
Blacksmiths, A 1, H, II, J 14, 16, 22, 26.
Blast-furnace workers, A 1, J 22, 46, 47.
Bleachers, A 2, G, J 7, 15, 21, 27, 37, 48.
Bleachers (cloth), A 2, G.
Bleachery dryers, A 2, G.
Bleachers (felt hat), G, J 16.
Bleachers (tannery), J 28.

Blooming-mill workers (iron and steel), A 1.
Blowers (felt hat), D 2, J 20.
Blowers (glass manufacturing). See Glass blowers.
Blowers-out (zinc smelting), A 1, J 13.
Bluers (revolvers), A 1.
Boiler-room workers, A 1, J 14, 16.
Boiler washers, G.
Bone-black makers, J 4, 42.
Bone renderers, J 8.
Bone workers, D 1.
Bookbinders, J 9, 28, 30.
Bottle-cap makers, J 29.
Brass founders, A 1, J 8, 9, 13, 14, 16, 26, 42, 46.
Brass polishers, J 28.
Braziers, A 1, J 13, 28.
Brewers, A 2, G, J 14.
Brick burners, A 1, J 14, 28.
Brickmakers, A 1, G, D 1, F 2, J 28, 46.
Briquet makers, J 40.
Bronzers, D 1, J 4, 6, 9, 10, 11, 12, 13, 25, 28, 29, 30, 47.
Broom makers D 2, J 19, 46.
Browners (gun barrels), J 22, 23, 29, 30.
Brushers (felt hat), D 2, J 20.
Brush makers, D 2, F 1, J 23, 30, 40.
Buffers, D 1, 2, G.
Buffers (rubber), J 5, 11, 28.
Burlers (casemline), A 1, J 28.
Burnishers (iron and steel), G, J 8, 43.
Burnishers (rifle barrels), J 8.
Burrers (needles), D 1.
Bury filers, D 1.
Butchers, A 2, F 1, 3.
Button makers, D 1, 2.

Cable makers, J 28.
Cable splicers, G, J 16, 28, 47, 62.
Caisson workers, A 2, B, G, G, J 14.
Calenderers (rubber), A 2, D 1.
Calico printers, A 2, G, J 7, 8, 9, 16, 18, 21, 22, 26, 28, 50, 59, 48, 62.
Camphor makers, J 26, 62.
Cambric (colored) makers, J 9 31.
Candy makers A 2 G.
Canners, A 2, G, F 3, J 28.
Cap loaders, J 29.
Cappers (window glass), A 1.
Carbide makers, A 1, D 1, J 16.
Carbolic acid makers, J 12, 29, 40, 48.

No. 8.
Carbon brus...
Carbon dis...
Carbon elec...
Carbonizers...
Carborundu...
Carders (t...
Card grind...
Carpenters...
Carpet mak...
Carroters (...
Cartridge...
Cartridge...
Cartridge...
Cartridge...
A 2, G.
Case harde...
Casters (b...
founders...
Casters (ir...
Casting cle...
stone Art...
Cast scrub...
12.
Catchers (...
Cattle sale...
Celluloid m...
28, 30, 3...
Celluloid p...
Celluloid w...
Cementers...
16, 30, 5...
Cement mix...
Cement wo...
Chambermn...
43.
Charcoal bu...
Charcoal w...
2, G, D...
Chargers (t...
Chargers (t...
J 8, 13, 1...
Chasers (st...
Chauffeurs...
Chimney sw...
Chippers, J...
Chloride of...
Chlorine ma...
29.
Chloroform...
Chromium s...
Cigar makers...

Carbon brush makers, D 1.
Carbon dioxide makers, J 14.
Carbon disulphide makers, J 15.
Carbonizers (shoddy), D 2, J 10, 20, 48.
Carborundum workers, A 1, D 1.
Cankers (textile), D 2.
Card grinders (textile), D 1, 2.
Carpenters, IL
Carpet makers, D 2, F 1, J 0.
Carroters (felt hats), J 9, 29, 37.
Cartridge cup washers, C.
Cartridge dippers, J 20, 37, 48.
Cartridge felt and wad makers, C.
Cartridge makers, J 28, 29.
Cartridge shot shell paraffin dippers,
   A 2, C.
Case hardeners, A 1, J 23.
Casters (brass foundry).  See Brass
   founders.
Casters (iron and steel), A 1.
Casting cleaners (foundry), D 1.  See
   also Acid dippers.
Cast scrubbers (electroplaters), J 11,
   12.
Catchers (iron and steel), A 1.
Cattle salesmen, F 1.
Celluloid makers, J 1, 5, 11, 15, 16, 22,
   23, 30, 37, 47, 48.
Celluloid polishers, D 2.
Celluloid workers, D 2.
Cementers (rubber shoes), J 11, 12,
   15, 30; 02.
Cement-mixers (rubber), J 11, 15, 15.
Cement workers, A 1, D 1.
Chambermen (sulphuric acid), J 46,
   48.
Charcoal burners, J 14, 10.
Charcoal workers (sugar refining), A
   2, C, D 1.
Chargers (smelting), A 1, D 1.
Chargers (zinc smelting), A 1, D 1,
   J 9, 13, 16, 22, 46.
Chasers (steel) D 1.
Chauffeurs, IL, J 23.
Chimney sweepers, D 1, J 16, 40.
Chippers, D 1.
Chloride of lime makers, J 17, 18.
Chlorine makers (electrolytic), J 18,
   20.
Chloroform makers, J 17.
Chromium workers, J 21.
Cigar makers, D 2, IL

Clay and bisque makers (pottery),
   A 2, C, D 1.
Clay-plug makers (pottery), C, D 1.
Clay-products workers.  See Pottery
   workers.
Clerks, IL
Cloth preparers, C.  See also Bleach-
   ers.
Coal miners.  See Miners.
Coal-tar workers, J 7, 12, 16, 30.
Cobblers, D 2, F 1, IL
Coke-oven workers, A 1, J 4, 12, 16, 40.
Cold-storage-plant workers, A 2.
Color makers, A 1, D 1, J 8, 9, 12, 21,
   20, 23.
Colored-paper workers, J 9.
Colorers (white) of shoes, J 28.
Comb makers (celluloid), D 2.
Compositors, D 1, IL, J 7, 8, 31, 28.
Compounders (rubber), D 1, J 7, 8, 9,
   11, 12, 27.
Concentrating-mill workers (lead and
   zinc), C, D 1, J 28.
Coners (felt hats), D 2, J 20.
Confectioners.  See Candy makers.
Construction camp workers, F 2.
Cooks, A 2.
Copper founders, J 9.
Copper miners.  See Miners.
Copper smelters, A 1, J 9, 10, 46.
Cord makers, D 2, J 40.
Corn makers, A 1, D 1, J 13, 16.
Cork workers, D 2.
Cotton-mill workers, C, D 2.
Cotton twisters, D 2, IL
Cranemen (zinc industry), A 2.
Cranemen (iron and steel), A 1.
Creosoting plant workers, C.
Crucible mixers, D 1.
Crucible-steel department employees,
   A 1.
Crushermen (clay and stone), D 1.
Cupola men (foundries), A 1.
Curers, vapor (rubber).  See Vulcan-
   izers.
Curriers (tannery), D 2, F 1, J 9, 11.
Cut-glass workers, D 1, J 9, 28.
Cutlery workers, D 1, J 9, 28.
Cyanamid makers, A 1, D 1.

Dancers, IL
Decorators (pottery), J 9, 11, 12, 28,
   02.

888      DIVISION OF PREVENTIVE MEDICINE.      Vol. XVII.

Degreasers (fertilizer, leather), J 11, 12, 28.
Dentists, J 20.
Detonator cleaners, J 28.
Detonator fillers, J 28.
Detonator packers, J 28.
Devil operators (felt hats), D 2, J 28.
Diamond cutters, D 1, 1L
Diamond polishers, J 28.
Digester-house workers (paper and pulp), A 2, C.
Dimethyl-sulphate makers, J 16, 28, 80, 87, 48.
Dippers (granuolsa), J 37.
Dippers (rubber), J 11.
Dippers. See also Acid dippers.
Disinfectant makers, J 17, 18.
Divers, B.
Doffers (textile), C, D 2
Drawers (glass), A 1.
Dressy tenders (textile), A 2, C.
Drivers, A 2, C.
Drop forgers, A 1.
Dry battery workers. See Battery (dry) makers.
Dry cleaners, A 2, J 11, 12, 16, 80, 62.
Dryers (felt hats), A 2, J 80.
Dryers (rubber), J 12, 18.
Drying-room workers (miscellaneous), A 2, J 14, 16.
Dye makers, A 2, C, J 1, 3, 4, 6, 7, 8, 0, 10, 12, 17, 18, 21, 22, 23, 28, 28, 29, 30, 31, 34, 30, 40, 44, 46, 46, 47, 48, 52.
Dyers, A 2, C, J 4, 21, 28, 28, 27, 28, 30, 44. See also preparatory processes.

Edison storage battery workers, J 28.
Electric'ans, R.
Electric linemen, R.
Electroplaters, C, J 8, 11, 12, 22, 28.
Electrotypers, A 2, D 1, J 28. See also Electrophalers.
Elevator runners, R.
Embroidery workers, C, J 28.
Emery wheel makers D 1, J 28.
Enamelers. See Enamel makers.
Enamel makers, A 1, C, 1L, J 8, 8, 9, 10, 11, 16, 16, 21, 26, 28, 87, 62.
Engravers, D 1, 1L. See also fitted engravers.
Etchers, J 27, 37, 30.

Explosive workers, C, J 1, 6, 7, 12, 29, 30, 34, 36, 37, 44, 48, 61. See also particular occupation.
Extractor operators (soap), A 2, C.

Farmers, F 1, 2.
Fat renderers, A 2, J 3.
Feather curers, D 2, J 9.
Feather workers, D 2, F 3, J 7, 8, 11, 12, 30, 38, 62.
Felt extractors, C.
Felt-hat makers, A 2, C, D 2, J 9, 16, 28, 30, 37, 48. See also particular occupation.
Ferro-alloys workers, J 9, 10, 43.
Fertilizer makers, C, D 1, F 3, J 10, 12, 14, 26, 27, 37, 42, 46, 47, 48. See also Phosphate mill employees.
Fiber workers, D 2.
Filament makers (incandescent lamps), J 36, 30.
File cutters, D 1, J 28.
Filers, D 1, J 8, 28.
Film makers. See Celluloid makers.
Filter press workers, C.
Finishers (incandescent lamps), J 16.
Finishers (leather), D 2.
Finishers (shoe). See Shoe finishers.
Fireworks makers J 8, 20, 42. See also Explosives.
Fishermen, A 2, C.
Fitters (shoe), J 30.
Flangers (felt hats), A 2, J 16.
Flatteners (glass), A 1.
Flatteners (glass), A 1.
Flax-spinners, C, D 2.
Flint workers, D 1.
Floor molders (foundry), A 1, D 1, J 28, 28.
Flour workers, D 2.
Flue cleaners, D 1, J 10, 46, 40.
Flask tenders (Jahenhaus), C.
Foremen, A 1.
Formers (felt hats), D 2.
Foundry workers, A 1, D 1, J 16. See also particular metal.
Fruit-preserve makers, J 3.
Fruit preservers, J 48.
Fulminate makers, J 22, 29.
Fumigators, J 22, 46.
Fur carders, D 2.
Fur clippers, D 2, F 1.
Fur cutters, D 2, F 1.

Fur handlers, D 2, F
Furnace workers, A 1
Furniture polishers, J 62.
Fur preparers, D 2, F
Fur pullers, D 2, F 1.

Galvanizers, C, J 3, 4, 27, 40, 46.
Garage workers, J 16.
Garbage workers, F 3
Gardeners, J 9.
Gas (Illuminating) wi 12, 16, 22, 30, 47, 49.
Gas purifiers, J 4, 22.
Gatherers (glass), A
Gilders, J 6, 12, 12, 2
Glass blowers, A 1, D
Glass cutters, C, D 1.
Glass finishers, C, D 1
Glass-furnace workers
Glass mixers, D 1, J 6
Glass polishers, J 28.
Glaze dippers (pottery 28.

Glaze mixers (pottery 28.
Glost-kiln workers, A
Glove makers (leathe D 2. See also Tann
Glue workers, J 2, C, 12, 16, 28, 37, 40, 43
Gold beaters, D 1, 1L.
Gold refiners, D 1, J 9
Grain elevator worker
Granite workers. See
Graphite workers, A 1
Grinders (cobra). Se
Grinders (metals), C,
Grinders (rubber), D
Guncotton dippers, J 1
Guncotton pickers, D
Guncotton washers, J
Guncotton wringers, I
Gypsum workers, D 1.

Hair workers, C, D 2,
Hammermen, 1L.
Hardeners (felt hats)
Hardeners (metals), J
Harness makers, D 2.
Hat makers, felt. Se ers.



**Vol. XVII.**

*n.* C, J 1, 5, 7, 12, 29,
44, 48, 51.  *See also*
pation.

*r.*   ap), A 2, C.

2, J 3.
2, J 9.
D 2, F 3, J 7, 9, 11.

A 2, C, D 2, J 9, 16.
*See also* particular

*crs.* J 9, 10, 42.
C, D 1, F 1, 3, J 10,
42, 46, 47, 48. *See*
mill employees.
2.
(Incandescent

J 23.

: Celluloid makers.
*rs,* C.
*scent lamps*), J 16,
), D 2.
*See* Shoe finishers.
J 8, 29, 42.  *See*

*n.*
n), A 2, J 16.
A 1,
*rs,* J 47.
D 2.

*t.*
J 16, 40, 46.
minum), C.

*n,* D 2.
1, D 1, J 16. *See*
*erial.*
*n,* J 6,
46.
J 22, 29.
cl.
*n* 1.
*n* 1,
1.

**Fur handlers,** D 2, F 1, J 9, 29.
**Furnace workers,** A 1, B, J 14, 16.
**Furniture polishers,** J 5, 11, 25, 36, 53, 83.
**Fur preparers,** D 2, F 1, J 9, 29, 57.
**Fur pullers,** D 2, F 1.

**Galvanizers,** C, J 3, 4, 9, 10, 13, 23, 33, 37, 46, 48.
**Garage workers,** J 16, 25.
**Garbage workers,** F 3.
**Gardeners,** J 9.
**Gas (illuminating) workers,** A 2, J 4, 13, 16, 22, 39, 47, 49.
**Gas purifiers,** J 4, 22, 30, 47.
**Gatherers (glass),** A 1.
**Gilders,** J 5, 11, 12, 25, 30.
**Glass blowers,** A 1, D 1, E.
**Glass cutters,** C, D 1.
**Glass finishers,** C, D 1, J 25, 27, 28, 48.
**Glass-furnace workers,** A 3, E.
**Glass makers,** D 1, J 3, 9, 21, 25, 23.
**Glass polishers,** J 25.
**Glass dippers (pottery),** C, J 5, 9, 21, 25.
**Glaze mixers (pottery),** D 1, J 5, 9, 21, 25.
**Glost-kiln workers,** A 2, J 16, 25.
**Glove makers (leather preparers),** C, D 2.  *See also* Tannery workers.
**Glue workers,** A 2, C, D 2, F 3, J 4, 11, 12, 16, 29, 37, 46, 47.
**Gold beaters,** D 1, E.
**Gold refiners,** D 1, J 9, 22, 29, 30.
**Grain elevator workers,** D 2.
**Granite workers,** *See* Stonecutters.
**Graphite workers,** A 1, D 1.
**Grinders (colors),** *See* Color makers.
**Grinders (metals),** C, D 1, J 5, 28.
**Grinders (rubber),** J 2, J 5, 28.
**Guncotton dippers,** J 37, 48.
**Guncotton pickers,** D 2.
**Guncotton washers,** C.
**Guncotton wringers,** J 37.
**Gypsum workers,** D 1.

**Hair workers,** C, D 2, F 1, 3.
**Hammermen,** E.
**Hardeners (felt hats),** J 20, 30.
**Hardeners (metals),** A 1.
**Harness makers,** D 2.
**Hat makers,** *&c.*  *See* Felt-hat makers.

**Heater boys (riveters),** J 23.
**Heel makers (shoe),** D 2.
**Hemp workers,** D 2.
**Horn workers,** D 1.
**Hothouse workers,** A 2.
**Hot-rod rollers (iron and steel),** A 1.
**Hydrochloric-acid makers,** J 20, 48.

**Ice (artificial) makers.**  *See* Artificial-ice makers.
**Ice-cream makers,** A 2, C.
**Imitation-pearl makers,** J 23, 37.
**Incandescent-lamp makers,** J 5, 16, 23, 29, 30, 37.  *See also* particular occupation.
**Incandescent-mantle hardeners,** E.
**Ink makers,** J 21, 30.
**Insecticide makers,** J 9, 18, 28, 42.
**Insulators,** J 46.
**Iron and steel workers (all departments),** A 1.  *See also* particular occupation.
**Ironers,** A 2.

**Japan makers,** A 2, J 9, 11, 23, 36, 52.
**Japanners,** *See* Japan makers.
**Jewelers,** D 1, G, H, J 5, 9, 20, 23, 30, 37, 48.
**Junk metal refiners,** A 1, D, J 18, 23.
**Jute workers,** D 2.

**Kiln tenders,** A 1, J 16.
**Knitters,** E.
**Knitting-mill workers,** D 2.

**Labelers (paint cans),** J 23.
**Lace makers,** D 2.
**Lacquerers.**  *See* Lacquer makers.
**Lacquer makers,** J 5, 11, 12, 23, 30, 52.
**Lampblack makers,** J 35, 52.
**Lapidaries,** D 1.
**Lard makers,** J 3.
**Lasters (shoes),** A 2, C, D 2, J 30.
**Lathe turners,** E.
**Laundry workers,** A 2, C, J 16, 17, 18.
**Layer patters (glass),** A 1.
**Lead burners,** J 10, 23.
**Leadleaf makers,** A 1, J 23.
**Lead miners,** J 23.  *See also* Miners.
**Lead pipe makers,** J 23.
**Lead salts makers,** J 23.
**Lead smelters,** A 1, D 1, J 3, 9, 10, 23, 46.

Leather workers, D 2, F 1. See also Tannery workers.
Lore tenders (glass), A 1.
Letter sorters, H.
Levermen (iron and steel), A 1.
Lifters-over (glass), A 1.
Lime burners, D 1, J 10, 14, 16.
Limekiln charmers, D 1, J 14, 16.
Lime pullers (tannery), C, F 1.
Lime workers, D 1.
Linen workers, D 2.
Linoleum colorers, J 9, 21.
Linoleum makers, A 2, C, D 1, J 3, 5, 21, 23, 30, 48, 52.
Linotypers, J 3, 23.
Linseed-oil boilers, J 8, 23.
Lithographers, D 1, H, J 7, 9, 11, 12, 21, 23, 37, 52.
Litho-transfer workers, J 23.
Locksmiths, H.
Longshoremen, F 1.
Lumbermen, A 2, F 2.
Luters (zinc smelting), A 1, J 12.

Machinists, H.
Marble cutters, D 1.
Marblers (glass), A 1.
Masons, C, D 1, H.
Match-factory workers, C, D 1, 2, J 15, 21, 23, 42, 47.
Mattress makers, D 2.
Meat inspectors, F 1.
Melters (foundry; glass), A 1.
Mergerizers, J 4, 48.
Mercurial-vapor-lamp makers, J 20.
Mercury bronzers, J 20.
Mercury miners, J 20. See also Miners.
Mercury salts workers, J 20.
Mercury smelters, A 1, J 16, 20, 46.
Mercury-solder makers, J 20.
Mercury-still cleaners, J 20.
Metal polishers, G.
Metal-polish makers, J 25.
Metal turners, D 3.
Metal workers. See particular occupation.
Mica strippers or splitters, D 1.
Mica workers, D 1.
Microscopist, H.
Milkers, H.
Millinery workers, J 7, 11, 12, 30, 33, 52.

Miners, A 2, C, D 1, F 2, G, H, J 14, 16, 37, 47.
Mirror silverers, A 2, C, J 1, 23, 29.
Mixers (felt hats), D 2, J 20.
Mixers (rubber), A 2, D 1, J 7, 9, 10, 11, 12, 21, 23.
Mixing-room workers (miscellaneous), D 1, 2.
Mold breakers (foundry), D 1.
Molders. See Bench molders, Floor molders.
Mounttypers, J 3, 23.
Merchanters, J 6, 8, 9, 11, 12, 21, 37.
Motion-picture-film makers. See Celluloid makers.
Motormen, A 2.
Mottlers (leather), J 5, 30.
Moving-picture-machine operators, H.
Muffle tenders, A 1.
Muriatic-acid makers. See Hydrochloric-acid makers.
Muriatic-acid mixers. See Acid mixers.
Musical-instrument makers, J 23.
Musicians, H.

Nickel platers, C. See also Electroplaters.
Nitraters, J 37, 48.
Nitric-acid workers, J 23, 37, 48.
Nitroglycerin makers, J 10, 23, 35, 37, 48.

Oilcloth makers. See Linoleum makers.
Oil extractors, J 15.
Oil-flotation-plant workers, J 33, 46, 47, 48.
Oil refiners. See Petroleum refiners.
Oil-well workers, J 32.
Open-hearth-department workers (iron and steel), A 1.
Oxy-acetylene cutters, H.

Packing-house employees, A 2, C.
Painters, H, J 7, 11, 12, 23, 28, 30, H2.
Paint makers, C, J 7, 11, 12, 16, 23, 29, 30, 42, 52.
Paint removers, D 1, J 28.
Pair-heaters (tin-plate), A 1.
Paper-box makers, J1.
Paper glazers, J 1.
Paperhangers, D 1, J 9, 21, 23.

Paper makers, particular occupation.
Paraffin workers
Patent-leather 30, 42, 52.
Pavers, A 1, I
Pencil (colored
Perfume make
Petroleum refi 23, 35, 42, 4
Pewter makers makers.
Phosgene mak
Phosphate-mill J 42. See al
Phosphor-bron
Phosphorus-com
Phosphorus-ext ators, A 2, C
Phosphorus ex
Phosphorus (m
Photo-engraver
Photographers,
Photographic r 22, 29.
Photograph ret
Picklers, C, J
Pierie-acid ma
Pigment maker
Pipe fitters, J piped.
Pitch workers.
Pit molders (fo
Planer men (n
Plasterers, C, I
Plaster of Pari
Platers. See E
Plumbers, J 25 manufactured
Pneumatic-tool
Polishers, J 1,.
Polishers (furn polishers.
Porcelain make
Porters, H.
Pot fillers (glas
Pot lifters (iron
Pot pullers (fu
Pot-room worke carbide plant
Pot setters, A 1.
Pottery workers 16, 23, 28, 46 occupation.

Vol. XVII.

DIVISION OF PREVENTIVE MEDICINE.    891

L, F 2, G, H, J 14.

2. C, J 1, 23, 29.
3    29.
4, J 1, J 7, 8, 9.

(miscellaneous).

dry), D 1.
makers, Floor

S.
9, 11, 12, 21, 37.
makers. See Cel-

J 6, 39.
line operators, E.

rs. See Hydro-

See Acid mix-

makers, J 23.

See also Electro-

J 23, 37, 48.
J 10, 24, 35, 37.

Linoleum mak-

orkers, J 33, 46.

leum refiners.

nt workers (Iron

E.

res, A 2, C.
12, 23, 29, 30, 32.
7, 11, 12, 18, 23.

J 23,
te), A 1.

9, 21, 29.

Paper makers, A 2, C.  See also particular occupation.
Paraffin workers, J 15, 35, 46.
Patent-leather makers, A 2, J 5, 10, 23, 30, 46, 52.
Pavers, A 1, H, J 49.
Pencil (colored) makers, J 7, 9, 31.
Perfume makers, J 23, 39, 31.
Petroleum refiners, A 1, C, J 25, 26, 29, 38, 46, 47, 48, 49.
Phenol makers.  See Carbolic-acid makers.
Phosgene makers, J 16, 18, 41.
Phosphate-mill workers, A 2, C, D 1, J 42.  See also Fertilizer makers.
Phosphor-bronze workers, J 42.
Phosphorus-compounds makers, J 42.
Phosphorus-evaporating-machine operators, A 2, C, J 43.
Phosphorus extractors, J 42, 43.
Phosphorus (red) makers, J 43.
Photo-engravers, J 12, 21, 39, 37.
Photographers, K, 41, J 30, 44.
Photographic makers, J 7, 12, 16, 21, 22, 29.
Photograph retouchers, J 29.
Picklers, C, J 10, 22, 30, 37, 48.
Piecticated makers, J 37, 39, 44, 48.
Pigment makers.  See Color makers.
Pipe fitters, J 25.  See also Liquid piped.
Pitch workers, J 9.
Pit molders (foundry), A 1, D 1.
Planer men (stone, metal), D 1.
Plasterers, C, D 1.
Plaster of Paris workers, D 1.
Platers.  See Electroplaters.
Plumbers, J 23.  See also substance manufactured.
Pneumatic-tool workers, D 1, H.
Polishers, D 1, J 8, 26, 33, 30.
Polishers (furniture).  See Furniture polishers.
Porcelain makers.  See Pottery.
Porters, H.
Pot-fillers (glass), A 1.
Pot lifters (iron and steel), A 1.
Pot pullers (foundry), A 1.
Pot-room workers (aluminum foundry; carbide plant), A 1.
Pot setters, A 1.
Pottery makers, A 1, C, D 1, J 9, 14, 16, 26, 29, 46.  See also particular occupation.

Pouncers (felt hats), D 1, 2.
Pourers (brass foundry), A 1, J 15.
Preparers (tannery), C, F 1, 9.
Pressers, H, J 16.
Pressmen (oil refining), C.
Pressmen (printers), D 1.
Preventors workers (rubber), A 2, J 7, 9, 11, 12, 21.
Primers (explosives), J 22.
Printers, D 1, J 7, 8, 9, 11, 28, 52.
Puddlers (iron and steel), A 1, M.
Pullers-out (felt hats), C.
Pulp-mill employees, C.  See also particular occupation.
Putty makers, D 1, J 11, 18, 23.
Putty polishers (glass), D 1, J 22.
Pyrites burners, A 1, D 1, J 9, 46, 47.
Pyroxylin makers.  See Guncotton.

Quarrymen, D 1, F 2.

Rag workers, D 2, F 2.
Reclaimers (rubber), J 7, 12, 15, 20, 23, 42.
Red-lead workers, J 23.
Refiners (metals), A 1, J 9, 10, 16, 23, 29, 37, 46.  See also particular metal.
Refiners (sugar).  See Sugar refiners.
Refrigerating-plant workers, A 2, C, J 4.
Riveters, H, J 23.
Roller coverers (cotton mills), C, D 2.
Rollers (metals), A 1.
Roll setters (iron and steel), A 1.
Roll wrenchers (iron and steel), A 1.
Roofers, A 2, J 23, 49.
Roofing-paper workers, J 49.
Rope makers, D 2.
Roughers (iron and steel), A 1.
Rubber-store makers, J 21.
Rubber-substitute makers, J 46.
Rubber-tire builders, J 9, 11, 12, 21.
Rubber washers, J 9, 11, 12, 21.
Rubber workers, A 2, J 7, 9, 9, 11, 12, 21, 25, 26, 29, 30, 46, 52.  See also particular occupation.

Sugar makers, C, D 1, J 29.
Salters, A 2, H.
Salt extractors (Coke-oven by-products, J 4, 48.
Salt preparers, A 2, C, D 1.
Sand blasters, D 1.
Sand cutters, D 1.

892     DIVISION OF PREVENTIVE MEDICINE.     Vol. XVII.

Sanders, D 1.
Sanding-machine operators, D 1.
Sandpaperers (enameling and painting auto bodies, etc.), D 1, J 27.
Saw filers, D 1.
Saw-mill workers, D 2, F 2.
Sawyers, II.
Scissors sharpeners, II.
Scourers, wool lock (shoes), D 2.
Scrapers (foundry), D 1.
Screen tenders (pulp mill), C.
Screen workers (lead and zinc smelting), D 1, J 28.
Sealers (incandescent lamps), J 16.
Sealing-wax makers, J 9, 52.
Seamstresses, II.
Sears workers, C, J 4, 34, 47.
Sewing-machine operators, II.
Shale-oil workers. See Petroleum refiners.
Shavers (felt hats, fur, tannery), C, D 2, F 1, 3.
Shaving-brush makers, D 2, F 1.
Sheep-dip makers, J 9.
Sheet-metal workers, J 29.
Shellackers. See Shellac makers.
Shellac makers, J 4, 5, 11, 12, 28, 30, 52.
Shell fillers, J 30, 44, 51.
Shepherds, F 1.
Shoddy workers, F 2, F 3, J 10, 26, 48.
Shoe-factory operatives, D 2, J 8, 12, 30. See also particular occupation.
Shoe finishers, A 2, J 4, 5, 6, 11, 12, 28, 30.
Shoemakers. See Cobblers.
Shot makers, J 5, 6, 28.
Shove-in boys (glass), A 1.
Sifters, D 1, 2.
Silicate extractors, J 27.
Silk workers, D 2, F 2.
Silo workers, J 14.
Silverers (mirrors). See Mirror silverers.
Silver melters, A 2, J 16.
Silver refiners, J 22.
Singers (cloth), J 16.
Sintering-plant workers, D 1.
Sizers (felt hats), C, J 26.
Skimmers (glass), A 1.
Slag-machine tenders (iron and steel), A 1.
Slate workers, D 1.
Slip makers (pottery), C, D 1, J 28.

Slushers (porcelain enameling), J 28.
Smelters. See particular metal.
Smokeless-powder makers, J 5, 12, 18, 34, 39, 44.
Smoothers (glass), C, D 1.
Soap makers, A 2, C, F 3, J 3, 36, 34.
Soda makers, C, J 4, 14, 18, 37, 47.
Sodium-hydroxide makers, C.
Sodium-sulphide makers, J 47.
Softeners (tannery), D 2.
Solderers, J 26, 28.
Sole stitchers (flake machine), J 28.
Spinners (asbestos), D 1.
Spinners (textiles), D 2, II.
Spongers, C.
Sprayers, C.
Sprayers (trees), J 9, 28.
Spreaders (rubber works), A 2.
Stablemen, F 1.
Stainers (shoes), J 28.
Stamp-mill workers, C, D 1.
Starch workers, D 2, J 14, 47.
Starters (felt hats), C, J 28.
Stationary workers, II.
Steam fitters. See pipe fitters.
Stearic-acid makers, A 2, J 8.
Steel engravers, C, J 28, 20, 37. See also Engravers.
Stereotypers, A 2, J 8, 28.
Stiffeners (felt hats), J 28, 30.
Still (coal-tar) cleaners, A 1, J 12, 49.
Stillmen (carbolic acid), A 1, J 30.
Stillmen, operating, A 1.
Stitchers (shoes), J 30.
Stokers, A 1, B, J 16.
Stonecutters (dry), D 1, II.
Stonecutters (wet process), C, D 1, II.
Storage-battery makers, J 28, 20, 40, 48.
Straw-hat makers, A 2, D 2.
Submarine (storage-battery) workers, J 16.
Sugar refiners, A 2, C, D 1, J 4, 14, 46, 47.
Sulphite cooks (pulp mill), A 2, C, J 46.
Sulphur burners, A 1, D 1, J 46, 49.
Sulphur-chloride makers, J 18, 29.
Sulphurers (hops and malt), J 46.
Sulphur extractors, J 16.
Sulphuric-acid workers, J 9, 19, 29, 37, 46, 49.
Sumackers (tannery), C, F 1.
Surgical-dressing makers, J 30.

Table hands (tannery
Table operators (iron
Table turners (enamel J 28.
Tailors, II.
Takers-down (glass).
Tallow refiners, F 3, J
Tank men, C.
Tannery workers, C, J 17, 21, 22, 28, 46, 47
Tapers (airplanes), J
Tappers (smelting), ·
Tar workers, J 40.
Taxidermists, D 2, F
Teasers (glass), A 1,
Telegraphers, II.
Telephone linesmen (t
Temperers, A 1, C, J 1
Textile-comb makers, ·
Textile printers. See
Textile workers, A 2, C particular occupation
Thermometer makers.
Thread glazers, A 2, C
Tile makers, A 2, C, D
Tin-foil makers, A 1, J
Tinners, A 1, C, J 2, 4,
Tin-plate mill workers steel workers.
Tire builders. See Rub
Tobacco moisteners, C.
Tobacco rollers, D 2.
Tobacco workers, D 2.
Toepieces (iron and st
Toolmakers, D 1.
Top fillers (foundry).
Towermen (sulphuric : 46, 48.
Toy makers, J 5, 6, 28
Transfer workers (pot
Transporters of hides
Treaders (rubber), J
Tree sprayers. See Sp
Trench diggers, F 2.
Tube makers (glass), J
Tabulators (incandesc
16.
Tumbling barrel work
Tunnel workers, B, F 2
Turners-out (glass), A
Turpentine extractors.
Type cleaners, J 11, 28
Type founders, J 28.



Table hands (tannery), G, F 1.
Table operators (iron and steel), A 1.
Table turners (enameling), A 2, D 1,
 J 28.
Tailors, H.
Takers-down (glass), A 1.
Tallow refiners, F 3, J 8, 18, 48.
Tank men, C.
Tannery workers, C, F 1, 3, J 7, 9, 11,
 17, 21, 22, 26, 46, 47, 48.
Tappers (smelting), A 1.
Tar workers, J 40.
Taxidermists, D 2, F 1, J 9, 28.
Teasers (glass), A 1, J 16.
Telegraphers, H.
Telephone linemen (trench work), C.
Temperers, A 1, C, J 16, 22, 28, 38, 48.
Textile-comb makers, D 1.
Textile printers. See Calico printers.
Textile workers, A 2, C, D 2. See also
 particular occupation.
Thermometer makers, J 29.
Thread glazers, A 2, C.
Tile makers, A 2, C, D 1, J 28.
Tin-foil makers, A 1, J 28.
Tinners, A 1, C, J 8, 4, 9, 10, 28, 28.
Tin-plate mill workers. See Iron and
 steel workers.
Tire builders. See Rubber-tire makers.
Tobacco moisteners, C.
Tobacco rollers, D 2.
Tobacco workers, D 2.
Tongsmen (iron and steel), A 1.
Toolmakers, D 1.
Top filters (foundry), A 1, D 1.
Towermen (sulphuric acid), J 19, 37,
 44, 48.
Toy makers, J 5, 9, 28.
Transfer workers (pottery), J 28, 52.
Transporters of hides and wool, F 1.
Treaders (rubber), J 12.
Tree sprayers. See Sprayers (trees).
Trench diggers, F 2.
Tube makers (glass), A 1.
Tubulators (incandescent lamps), J
 18.
Tumbling barrel workers, D 1.
Tunnel workers, B, F 2, C.
Turners-out (glass), A 1.
Turpentine extractors, C, J 52.
Type cleaners, J 11, 50.
Type founders, J 28.

Typewriters, J 28.
Typists, H.

Upholsterers, D 2, J 30.

Vapor curers. See Vulcanizers.
Varnish boilers, J 2.
Varnish makers, A 2, J 1, 3, 4, 11, 12,
 30, 52.
Vatmen, C.
Velvet makers, C, J 8.
Veterinarians, F 1, 3.
Vignetters, J 28.
Vinegar workers, J 1.
Vintners, J 14.
Vulcanizers, A 2, C, J 7, 5, 11, 12, 15,
 21, 30, 48.
Vulcanizers (steam), A 2, C.

Wall-paper printers, A 2, C, J 9, 21, 28.
Warming-house employees (guncot-
 ton), A 2.
Washers, C.
Washers (rubber), C.
Washwomen, C, H.
Watchmakers, C, H.
Water gilders, J 8.
Waterproof-cloth makers, J 28.
Weavers, D 2, H.
Weighers, D 2.
Welders, A 1, B, J 13, 28.
White-lead workers, J 14, 28.
Wire drawers, J 8, 48.
Wirers (incandescent lamps), J 8.
Wood-alcohol distillers, J 30.
Wood-last scourers (shoes), D 2.
Wood preservers, J 9, 30, 48.
Wood stainers, J 21, 28.
Woodworkers, D 2, J 28, 30.
Wool carders, D 2, F 1.
Wool scourers, A 2, C.
Wool spinners, D 2, F 1.
Wool workers, D 2, F 1. See also par-
 ticular occupation.
Wringers (guncotton), J 37.

X-ray workers, R.

Yeast makers, J 14.

Zinc-chloride makers, J 10, 18, 28.
Zinc-electrode makers, J 29.
Zinc miners, J 9. See also Miners.
Zinc smelters, A 1, J 12, 18, 28, 48.



894                    DIVISION OF PREVENTIVE MEDICINE.                    Vol. XVII.

LIST OF HAZARDS, SYMPTOMS, OCCUPATIONS EXPOSED, AND
PREVENTION.

A. ABNORMALITIES OF TEMPERATURE.

The primary physiological effect of abnormal temperatures is the disturbance of the heat-regulating system of the body. Heat dilates the blood vessels on the surface of the body, increasing the supply of blood in this region. Cold, on the other hand, constricts the blood vessels, causing a diminished blood supply on the body surface. Continuous abrupt changes from one extreme of temperature to another may cause serious congestion of the internal organs, the heat-regulating system of the body not being capable of adapting itself to sudden variations. It is in this way that a cold draft, which causes a sudden variation of the temperature, may produce neuralgia, paralysis, and respiratory diseases. Extremes of temperature may produce pathological changes by direct action. Thus, extreme dry heat will cause conjunctivitis, cataract, and the familiar sunburn. Extreme cold may cause frostbite and eczema. With the above data in mind, abnormalities of temperature have been classified under only two headings, namely, "Sudden variations of temperature" and "Extreme dry heat." Extreme cold has not been listed as a distinct hazard, because a temperature so low as to cause the direct effects mentioned above is rarely met in industry. It is evident that the occupations listed in the division "Extreme dry heat" are exposed not only to the danger of the direct action of the high temperatures but also to the hazard "Sudden variations of temperature."

The prevention of disease due to exposure to extremes of temperature consists, obviously, in the avoidance of sudden variations of temperature. Drafts are particularly hazardous, and may be practically eliminated by the use of vestibule and storm doors. Workers in cold processes should keep active and avoid chill. The hot-process worker should allow his body to cool off gradually after completion of the day's work. He should carefully regulate his diet, drinking plenty of water and avoiding meats. As direct preventive measures for the effects of extreme heat, it is advisable to make use of shields, helmets, goggles, water-cooled furnace doors, exhaust systems, cold air, fans, etc.



DIVISION OF PREVENTIVE MEDICINE.   895

A. Abnormalities of Temperatures.

B. COMPRESSED AIR.

In building tunnels, laying deep foundations for large buildings, etc., it is necessary for the work to be carried on under increased air pressure in order to prevent the entrance of water into the excavations. The laborer is lowered gradually and at short intervals the



896                    DIVISION OF PREVENTIVE MEDICINE.                    Vol. XVII.

pressure of the air in the compartment is increased.  The first sensation of compression is felt on the eardrums, which may be relieved by the act of swallowing.  If the air is too quickly compressed hemorrhage may occur.  The greater part of the danger of working in compressed air lies in hasty decompression.  While under compression the blood and tissue juices dissolve an increased amount of air, the gases of which are released when the pressure is suddenly decreased.  The bubbles thus formed cut off the blood supply from various parts of the body by blocking up the capillaries.  The symptoms of compressed air illness, the so-called "bends," are the result.

Workers in compressed air must follow strictly the rules governing gradual compression and decompression, especially the latter.  It is not advisable for boys and for men over 40 years of age to work under high pressure.

### B. Compressed air.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Compressed air. | Workmen, vertigo paralysis in the back and legs, paralysis of legs and arms, painful constriction of the chest, cerebral hemorrhage and aphasia, coma, subcutaneous hemorrhage, impairment of hearing. | Caisson workers, diving tunnel workers. |

### C. DAMPNESS.

The moisture content of the air is very important for the proper adjustment of the physiologic processes of the body.  Damp air will prevent the evaporation of moisture from the body and will therefore affect the body temperature.  High humidity tends to increase the effects of high temperature.  Moist cold air has the effect of undermining the general vitality of the organism, weakening its resistance to diseases of the respiratory passages, and to neuralgic and rheumatic affections.  The same effects are noticed among workers around open tanks and vats, who are continuously working in wet clothes.  Excessive dampness suggests dry air as a hazard.  The latter causes chapped skin and catarrhal conditions.  It has not been listed among the hazards because it is not characteristic of any one occupation but is prevalent generally, especially during the winter months.

When dampness is a feature of an industrial process the following precautions should be taken to avoid ill effects:

(1)  Provision of exhaust systems wherever steam is generated.

(2)  Provision of floors with drain channels to prevent the accumulation of water.

(3)  Provision of adequate waterproof clothing, such as rubber boots, rubberized aprons, etc.

Wherever there is dampness special measures should be taken to keep the humidity at its proper percentage. In this connection the wet-bulb thermometer is invaluable in determining the degree of moisture in the air. By circulating the air the effects of high humidity may be mitigated.

### C. Dampness.

| Health hazard. | Symptoms, conditions, or disease in back list. | Occupations which offer such exposure. |
|---|---|---|
| Dampness. | Diseases of the respiratory passages, headache and rheumatic affections. | [text illegible] |

### D. Dust.

Dusts have here been divided into two kinds, according to their chemical composition, namely, organic and inorganic. The difference in symptoms listed under each is based on the findings of recent investigators that organic dusts do not cause pulmonary lesions. Dr. H. R. M. Landis[a] has found that wherever fibrosis was present in the lungs of men exposed to organic dust, the latter was always mixed with some form of mineral or metallic dust. Tobacco workers exposed to organic dust for years showed no pulmonary changes other than those found in people living in the city. Mineral and metallic dusts, however, produce fibrosis of the lung tissue, the

[a] See article on "The Pathological and Clinical Manifestations Following the Inhalation of Dust," in The Journal of Industrial Hygiene, July, 1919, pp. 117–132.

898                DIVISION OF PREVENTIVE MEDICINE.                Vol. XVII.

extent of which depends on the time of exposure and the particular dust inhaled. Of the inorganic dusts, silica is the most harmful, producing serious pulmonary damage in a comparatively short period of time, while the least harmful are those which produce slight changes and then only after long exposure, for example, lime, coal, etc. The relationship between occupational dust and tuberculosis is rather a doubtful one. Authorities disagree as to the effect of fibrosis on the resisting power to the tubercle bacillus. Dust, by acting as a carrier of the bacilli, may increase their number in the lungs. In this way, men exposed to dust may be in greater danger of contracting turberculosis than others. Dr. H. R. M. Landis claims, however, that in the trades exposed to inorganic dust, mistaken diagnosis of pneumoconiosis swells the mortality statistics for tuberculosis. As a means of avoiding incorrect diagnosis of pneumoconiosis, Roentgen ray examinations of the lungs and sputum analyses are invaluable.

There are four effective methods that may be used to prevent the inhalation of dust generated during industrial processes. No one of these can apply to all conditions, but the particular method to be used must be adapted to the peculiarities of the process.

(1) The use of water to dampen the dust and thus prevent it from rising and filling the atmosphere.

(2) The use of exhaust systems which remove the dust at the point of origin.

(3) The use of inclosing chambers in which the dust-producing processes are confined, being regulated from the outside.

(4) The use of respirators and helmets.

In many cases it may be necessary to combine several of these measures effectively to prevent the inhalation of dust by the worker.

*D. Dust.*





No. 8.                    DIVISION OF PREVENTIVE MEDICINE.                    899

D. *Dust*—Continued.

| Health hazard. | Symptoms, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 1. Inorganic dust—Continued. | Cough, dyspnea, pleuritic pains, etc.—Continued. | |
| 2. Organic dust | Dryness of nose, throat, and mouth, cough, emphysema, asthma, bronchitis, emphysema, tuberculosis. | |

E. EXTREME LIGHT.

Intense light is usually a product of a process associated with heat. Among the different kinds of light included under this heading are the arc light, furnace glare, glowing metal or glass, and X ray. Poor illumination as a hazard is treated under "G. Poor illumination." Continuous exposure to strong light is not only irritating to the conjunctiva, but may also cause a degeneration of the retina and decomposition of the visual purple. Repeated electric flashes of brilliant light have caused severe ophthalmia, retinitis, and even blindness. Glass blowers and steel puddlers, who have to look at a glowing molten mass, are apt to develop cataracts. It seems that the invisible ultra-violet rays and infra-red rays are responsible. The introduction of X rays into the medical field has brought to light the highly

8054—22——11



dangerous character of the radiographer's work. Severe dermatitis and cancer may ensue after exposure to X rays.

The following protective devices prove effective in preventing the injurious action of extreme light:

(1) Shields.

(2) Helmets.

(3) Goggles which eliminate the ultra-violet and infra-red rays.

(4) Clothing which covers the skin completely.

(5) X-ray apparatus should be inclosed as completely as possible with lead plates.

*E. Extreme light.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupation which offer such exposure. |
|---|---|---|
| Extreme light. | Cataracts, retinitis, conjunctivitis, dermatitis, ulceration and reddening of the skin, dermal epithelioma, cancer. | Blacksmiths; steelsmiths; electric linemen; furnace workers; glass blowers; glass-furnace workers; incandescent-mantle hardeners; moving-picture machine operators; oxyacetylene cutters; photographers; puddlers (iron and steel); smokers; welding X-ray workers. |

## F. INFECTIONS.

There are many infectious diseases, such as tetanus, trachoma, and syphilis, which are often of occupational origin. They are not, however, specifically occupational; that is, they do not arise from a condition caused by an industrial process. The conditions which cause these diseases in industry are identical with those which cause them out of industry. The above-mentioned diseases have not therefore been included in this list of occupational infections. Those diseases which have been included arise primarily in occupational exposure. There are a number of other diseases which occur in occupations, but these are of such little numerical importance that they also have not been included.

Besides the general rules of sanitation, the following measures are recommended:

(1) *Anthrax.*—All hides and animal hair must be thoroughly sterilized. Foreign skins or hair should not be carried on the unprotected shoulder. The hands should be frequently washed with bichloride of mercury. Hair sorters should wear respirators.

(2) *Hookworm.*—Workers in mines and others who are exposed to infected soil should make special effort to keep the skin clean. Shoes must always be worn and gloves are also of value in preventing the entrance of the hookworm through the skin. Infected soil should be disinfected and kept dry. The stools of infected individuals must be disinfected immediately.

(3) *Septic infections.*—Workers should avoid puncturing the skin. Cuts, scratches, or abrasions should be treated at once to avoid in-



No. 6.                    DIVISION OF PREVENTIVE MEDICINE.                    901

fection. Men having open wounds should not be allowed to work with putrid material.

**F. Infections.**

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 1. Anthrax: External | | |
| Internal | | |
| 2. Hookworm (ankylostomiasis) | | |
| 3. Septic infections. | | |

### G. Poor Illumination.

The effects of poor illumination are not easily apparent. The hazard may be present in any plant, but is especially prevalent in a limited number of occupations because of the peculiar conditions that makes it difficult properly to illuminate the workroom. Miner's nystagmus is the outstanding example of the effects of this hazard. Poor illumination is not only the cause of the conditions listed below but is also an important factor in the causation of accidents.



902          DIVISION OF PREVENTIVE MEDICINE.          Vol. XVII.

Artificial light is least harmful to the worker when it comes from overhead, reflected from the ceiling by inverted bowl-shaped reflectors. Light-colored walls and ceilings aid materially in properly illuminating a room. Special precaution must be taken to avoid glare. All lights should be shaded so that only diffused light reaches the eye.

### G. Poor Illumination.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Poor illumination.... | Nystagmus, eyestrain, deficient vision due to malignation or hyperopia, headache, giddiness. Nystagmus contributes to neurasthenia. | Bottom harvesters (long and sterile) miners workers, coal miners(?) embroidery workers jewelers(?) metal polishers(?) miners photographers steel engravers, barrel workers, watchmakers, any hosiery worker. |

### H. Repeated Motion, Pressure, Shock, Etc.

Under this heading are included those muscle-strain conditions which are caused by the continuous repetition of movements, pressure, or blows. This section is not concerned with the neurasthenic phenomena which are sometimes called occupational neurosis. Everyone is familiar with the muscular strain experienced in performing for the first time some exercise, such as rowing, long walking, etc. Men newly introduced into a process requiring such repeated action are affected similarly but often much more severely, so as to disable them temporarily for the particular job. The injury does not stop with muscular strain but may even cause inflammation of the surrounding sheaths or paralysis of the parts concerned.

Many types of occupational neurosis may be avoided by working at a comfortable pace, avoiding fatigue. Where continuous pressure or shock is the cause, pads or cushions are often beneficial. Workers who have to grasp tools tightly would do well frequently to change their method of holding the instrument, if this is possible. Occasional rest periods will do much toward the prevention of muscular pains and cramps.

### H. Repeated motion, pressure, shock, etc.

| Health hazard. | Symptom, condition, or disease to look for. | Occupation which offer such exposure. |
|---|---|---|
| Repeated motion, shock, etc. | Pain of muscle used, set up by a spasmodic, irregular, irregular, or other local changes of a chronic inflammatory nature. Irritability, gradual emaciation and partial paralysis of parts, occupational neurosis. | Artificial-flower makers, barbers, blacksmiths(?) buffers(?) bricklayers(?) carpenters, chisellers(?) dentists, riveters, sawyers, engravers, drillers(?) brick layers telegraph typists, washerwomen, woodworkers weavers(?) |

PREVENTIVE MEDICINE.　Vol. XVII.

No. 5.　DIVISION OF PREVENTIVE MEDICINE.　903

...ful to the worker when it comes from
ceiling by inverted bowl-shaped re-
...ceilings aid materially in properly
...precaution must be taken to avoid
...led so that only diffused light reaches

r. Illumination.

| | Occupations which offer such exposure. |
|---|---|
| ...pose | ...work-... |

ly, Pressure, Shock, Etc.

luded those muscle-strain conditions
...nuous repetition of movements, pres-
...not concerned with the neurasthenic
...times called occupational neurosis.
...muscular strain experienced in per-
...exercise, such as rowing, long walk-
...ed into a process requiring such re-
...ilarly but often much more severely,
...ly for the particular job. The injury
...strain but may even cause inflamma-
...s or paralysis of the parts concerned.
...neurosis may be avoided by working
...fatigue. Where continuous pressure
...ushions are often beneficial. Workers
...would do well frequently to change
...nstrument, if this is possible. Occa-
...h toward the prevention of muscular

...ion, pressure, shock, etc.

| | Occupations which offer such exposure. |
|---|---|

## J. Poisons.

The continued introduction of new processes making use of new
poisonous substances in industry makes this section of more and
more importance. The enormous increase in the production of dye-
stuffs and other chemicals will no doubt show its effects on the
workmen in the form of industrial poisoning. During the war the
increased production of trinitrotoluol and tetrachlorethane for air-
plane dope resulted in a large number of cases of poisoning from
these substances. For the data presented under this heading, the
revised "List of industrial poisons," compiled by Sommerfeld and
Fischer for the International Association for Labor Legislation, has
been drawn upon largely. The arrangement is similar.* The mate-
rial in that list has been revised and brought up to date. Several
poisons have been added and all the occupations exposed are given
for each poison. The symptoms are those given by recent investi-
gators. In order to avoid swelling the list of poisons to unwar-
ranted proportions, substances the effects of which are similar have
been grouped. Thus all nitro compounds of benzol and its homo-
logues have been included under one heading and the same pro-
cedure has been followed with amido compounds. An endeavor has
been made to limit this list to those substances the actions of which
are mainly constitutional. The next section (p. 912) is devoted to
the substances occurring in industry which act as skin irritants.
Because of the very large number of substances in the latter class,
it has not been possible to treat them as fully as the other poisons.

To prevent industrial poisoning the following precautions should
be taken: Personal cleanliness must be maintained. Workers must
be instructed as to the toxicity of the substances handled. Frequent
medical examinations of workers must be made to detect early symp-
toms of disease. Men should not be allowed to eat in workrooms
where poisonous substances are handled. Work clothes should be
removed at end of day's work. Proper lavatory facilities should be
provided. Work clothes should receive special attention. The use
of gloves and boots are often necessary. Mechanical devices for
confining the poisons are of prime importance. (See also preventive
measures, under "Dust.") Fumes and gases should be taken care
of by proper ventilation, the use of exhaust systems, fans, and
blowers. Men who work in an atmosphere polluted by poisonous
fumes and gases should always wear gas masks properly suited for
the obtaining conditions.

* See United States Bureau of Labor, Bulletin No. 100, May, 1912.

.904  DIVISION OF PREVENTIVE MEDICINE.  Vol. XVII.

J. Poisons.

| Health hazard. | Symptoms, conditions, of disease to look for. | Occupations which offer such exposure. |
|---|---|---|

No. 3.  DIVISION OF P

J.-Pois

| Health hazard. | Symptom, conditions, of disease to look for. |
|---|---|





DIVISION OF PREVENTIVE MEDICINE.                    Vol. XVII.

J. Poisons—Continued.

DIVISION OF PREVEN:

J. Poisons—Co



908
DIVISION OF PREVENTIVE MEDICINE.
Vol. XVII.

J. Poisons—Continued.

| Health hazard. | Symptoms, condition of disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 29. Mercury and its compounds. | | |
| 30. Methyl alcohol. | | |
| 31. Methyl bromide. | | |
| 32. Naphtha. | | |
| 33. Nitranilins. | | |
| 34. Nitrophenol and other nitro compounds of the benzol group. | | |

No. 3.
DIVISION OF PR

J. Poiso

| Health hazard. | Symptoms, condition of disease to look for. |
|---|---|
| 35. Nitroglycerin. | |
| 36. Nitronaphthalene. | See Nitrobenzol. |
| 37. Nitrous gases and nitric acid. | |
| 38. Petroleum. | |
| 39. Phenol. | |
| 40. Phenyl hydrazine. | |







912      DIVISION OF PREVENTIVE MEDICINE.     Vol. XVII.

### J. Poisons—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|

## SKIN IRRITANTS.

Because of the fact that dermatoses form such a large proportion of all occupational diseases and are often disabling, the more important occupations that are exposed to skin irritants have been listed separately. A complete enumeration of such occupations would be impossible. Almost any foreign substance can become a skin irritant if it is in continuous contact with the skin. Thus soap and water, which ordinarily do not irritate the skin, may cause severe dermatoses in washerwomen.

The data presented below are a compilation of the literature on the subject, taken largely from Dr. R. Prosser White's compilation of "Occupational Affections of the Skin."

Skin affections caused by different external irritants often show the same clinical picture. A number of occupational skin eruptions have no specific lesions or special pathology, which makes their differential diagnosis very difficult. Most superficial industrial skin diseases show simply a difference in degree of catarrhal inflammation, depending on the intensity of the irritant. For these reasons the symptoms for each irritating substance have not been listed as has been done for the other hazards.

Occupational dermatoses are characterized by their grouping, situation, mode of appearance, spread, and evolution. They crop up in series, retaining their initial type throughout, unless they are secondarily infected. They are most often local, except when they are a differentiating sign of the toxemia. The onset and development are usually sudden. The inflammation is sharply outlined. Exudation is excessive and there is deep-seated edema. The eruption usually predominates on the right side.

There are many cases of dermatitis which are caused by physical agents, such as heat, cold, friction, etc. In this bulletin these conditions are dealt with only as they are related to the hazards listed.

No. 5.      DIVISION OF PRE

Thus among the symptoms for " light" we find skin eruptions.

The following is the list of the to dermatoses with the irritating

| Occupation exposed. | Occupation exposed to |
|---|---|



91A

DIVISION OF PREVENTIVE MEDICINE.                    Vol. XVII.

*Occupation exposed to specified skin irritants—Continued.*

| Occupation exposed | Skin irritants |
| --- | --- |
| Lampblack makers | Soot. |
| Laundry workers | Caustic alkali, soap. |
| Lime burners | Lime. |
| Lime packers (laundry) | Lime. |
| Lime men on boat | Lye. |

| | |
| --- | --- |
| Machinists | |
| Marble | Cutting compounds, lubricants, oils. |
| Match-factory workers | Lime, dextrine, paste. |
| Metal workers | Alkali, caustic alkali. |
| Miners (rubber) | |
| Merchants | |

Nickel platers

Meat chloride, nickel sulphate.

Packing-house employees

Photographic plate cleaners

Photographers

Salt pressers

Tannery workers

Tanners

Typists

Varnishers

Weed preservers

Zinc-chloride makers                    Acids, zinc chloride.

**HEALTH CONDITIONS**

Health conditions of the Navy d
were excellent.  The annual admis
Navy, for the four-week period endi
per annum, as compared with 576 p
week period ending September 9.

There has been little change in t
nicable diseases; the annual admissi
ending October 7 was 49 per 1,000,
for the five-week period ending Septe

The following table gives the ann
certain communicable diseases for th
1920, in comparison with the mean
of September, for the four-year pe

| | |
| --- | --- |
| Cerebrospinal fever | |
| Diphtheria | |
| German measles | |
| Influenza | |
| Malaria | |
| Measles | |
| Mumps | |
| Pneumonia | |
| Scarlet fever | |
| Smallpox | |
| Tuberculosis | |
| Typhoid fever | |

There were 173 admissions with d
tember, 132 occurring in insular a
United States, and 17 among the for
for pneumonia is somewhat higher t
two or three months, the rate for th
tober 7 being 1.5 per 1,000 per annu
measles, mumps, or scarlet fever has
four weeks, either ashore or afloat.

There has been a decided increas
disease during the past two months,
eases, entire Navy, for the four-w
being 163 per 1,000 per annum.  T
neral diseases for the entire Navy
passed is now 118 per 1,000 per annu:

# EXHIBIT E



# HANDBOOK
### OF THE
# HOSPITAL CORPS
## UNITED STATES NAVY
## 1939

⚓

PUBLISHED BY
**THE BUREAU OF MEDICINE AND SURGERY**
UNDER THE AUTHORITY OF
**THE SECRETARY OF THE NAVY**

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1939

For sale by the Superintendent of Documents, Washington, D. C.  -  -.  -  - Price $1.75 (Buckram)

DEFENDANT'S
EXHIBIT
Buffalo Pumps

14



BUREAU OF MEDICINE AND SURGERY,
NAVY DEPARTMENT,
Washington, D. C., July 1, 1939.

The Handbook of the Hospital Corps, United States Navy, 1939, is a revised edition of the former Handbook of the Hospital Corps, United States Navy, 1930, and is compiled from articles prepared by members of the Medical, Dental, Hospital, and Nurse Corps, U. S. Navy, and reviewed and revised by Commander W. J. C. Agnew, Medical Corps, and Chief Pharmacist N. L. Saunders, U. S. Navy. It is published for the instruction and guidance of members of the Medical Department of the United States Navy and for use at the Hospital Corps Schools.

The use in this volume of certain portions of the text of the United States Pharmacopeia is by virtue of permission received from the Board of Trustees of the United States Pharmacopeial Convention. The said Board of Trustees is not responsible for any inaccuracy of quotation nor for any errors in the statement of quantities or percentage of strengths.

Permission to use for comment parts of the National Formulary, Sixth Edition, in this volume has been granted by the Committee on Publications by authority of the American Pharmaceutical Association.

Authority for use of New and Nonofficial Remedies, 1935 Edition, has been granted by the American Medical Association.

Ross T. McIntire,
Surgeon General, U. S. Navy.

II



MEDICINE AND SURGERY,
NAVY DEPARTMENT,
Washington, D. C., July 1, 1939.

ed States Navy, 1939, is a revised
spital Corps, United States Navy,
ed by members of the Medical,
ry, and reviewed and revised by
ps, and Chief Pharmacist N. L.
the instruction and guidance of
United States Navy and for use at

s of the text of the United States
eived from the Board of Trustees
ion. The said Board of Trustees
cation nor for any errors in the
aptha.

s National Formulary, Sixth Edi-
he Committee on Publications by
sociation.

Remedies, 1935 Edition, has been

ROSS T. MCINTIRE,
Surgeon General, U. S. Navy.

## TABLE OF CONTENTS

| | Page |
|---|---|
| FOREWORD | v |
| CHAPTER I. HISTORY OF THE HOSPITAL CORPS | 1 |
| II. ANATOMY AND PHYSIOLOGY | 5 |
| III. SECTION 1. MINOR SURGERY AND FIRST AID | 85 |
| SECTION 2. BANDAGES AND BANDAGING | 131 |
| SECTION 3. SPLINTS AND APPLIANCES | 145 |
| SECTION 4. EMERGENCY DENTAL TREATMENT | 165 |
| IV. SECTION 1. MATERIA MEDICA AND THERAPEUTICS | 177 |
| SECTION 2. TOXICOLOGY | 257 |
| V. SECTION 1. NURSING | 271 |
| SECTION 2. WARD MANAGEMENT | 344 |
| SECTION 3. OPERATING ROOM AND SURGICAL TECHNIQUE | 356 |
| VI. SECTION 1. HYGIENE AND SANITATION | 371 |
| SECTION 2. ALLERGY | 459 |
| SECTION 3. GENITO-URINARY AND VENEREAL DISEASES | 490 |
| SECTION 4. PREVENTION OF VENEREAL DISEASES | 511 |
| SECTION 5. INDUSTRIAL MEDICINE AND INDUSTRIAL HAZARDS | 514 |
| SECTION 6. FIELD SANITATION | 521 |
| SECTION 7. DUTY WITH MARINE CORPS EXPEDITIONARY FORCES | 564 |
| SECTION 8. LANDING FORCE | 570 |
| SECTION 9. SHORE PATROL | 574 |
| VII. DIETS AND MESSING FOR THE SICK | 579 |
| VIII. PHARMACY | 599 |
| IX. CHEMISTRY | 643 |
| X. ANESTHESIA | 735 |
| XI. SECTION 1. ADMINISTRATION AND GENERAL CLERICAL PRO- | |
| CEDURES | 749 |
| SECTION 2. HOSPITAL SUPPLIES AND PROPERTY ACCOUNT- | |
| ABILITY | 774 |
| SECTION 3. COMMISSARY SUPERVISION | 804 |
| SECTION 4. DEATHS AND MEDICO-LEGAL MATTERS | 823 |
| XII. HOSPITAL CORPS TECHNICAL SPECIALTIES | |
| SECTION 1. AVIATION MEDICINE | 847 |
| SECTION 2. BASAL METABOLISM | 849 |
| SECTION 3. BLOOD GROUPING AND MATCHING | 856 |
| SECTION 4. CHEMICAL WARFARE | 862 |
| SECTION 5. DIVING AND SUBMARINE DUTY | 872 |
| SECTION 6. ELECTROCARDIOGRAPHY | 879 |
| SECTION 7. EMBALMING | 882 |
| SECTION 8. INDEPENDENT DUTY | 887 |
| SECTION 9. LABORATORY PROCEDURES AND TECHNIQUE | 889 |
| SECTION 10. PHYSICAL THERAPY | 917 |
| SECTION 11. RECRUITING | 935 |
| SECTION 12. X-RAY | 940 |
| INDEX | 959 |
| | III |

## FOREWORD

In this 1939 edition of the Handbook of the Hospital Corps, U. S. Navy, the subject matter has been revised, enlarged, and brought up-to-date, as nearly as possible, with the sciences which are briefly discussed in the various chapters and sections.

The handbook is intended to serve as a general guide and reference book for the hospital corpsmen of the Navy, especially those performing duty independent of medical officers, and as a textbook for their instruction in the Hospital Corps Schools and elsewhere. It contains information and instructions concerning the duties of the Hospital Corps of the Navy, but hospital corpsmen, particularly those in the upper ratings, are urged to make frequent reference to the U. S. Navy Regulations, the Manual of the Medical Department, U. S. Navy, the manuals of other Navy Department bureaus, circular letters, etc., for additional information and instructions.

The principal subjects have been arranged in the order in which they occur in examinations for advancement in rating. As these subjects necessarily are presented in epitomized form, readers of the handbook should realize that the information contained in it must be supplemented by reference to the standard textbooks and professional journals usually available in the medical libraries of hospitals, ships, and stations.

The Bureau of Medicine and Surgery herewith expresses appreciation to the following-named members of the Medical Department, U. S. Navy for the time and effort spent in preparing, reviewing, and revising the material for this book:

| | |
|---|---|
| Captain J. Harper, (MC), U. S. Navy.<br>Commander G. B. McArthur, (MC), U. S. Navy | Anatomy and Physiology. |
| Commander M. D. Willcutts, (MC), U. S. Navy | Minor Surgery and First Aid.<br>Bandages and Bandaging. |
| Captain H. B. Harvey, (DC), U. S. Navy.<br>Captain W. L. Darnall, (DC), U. S. Navy.<br>Commander R. S. Davis, (DC), U. S. Navy. | Emergency Dental Treatment. |
| Chief Pharmacist M. G. Swann, U. S. Navy. | Materia Medica and Therapeutics.<br>Pharmacy. |
| Chief Pharmacist A. T. Schwartz, U. S. Navy.<br>Pharmacist P. S. Gault, U. S. Navy. | Toxicology. |
| Chief Nurse J. Ferris, U. S. Navy. | Nursing. |
| Chief Nurse P. W. Hoyle, U. S. Navy. | Ward Management. |
| Commander G. A. Eckert, (MC), U. S. Navy. | Operating Room and Surgical Technique. |
| Lieutenant O. L. Burton, (MC), U. S. Navy. | Hygiene and Sanitation.<br>Prevention of Venereal Diseases. |
| Lieut. Commander F. M. Rohow, (MC), U. S. Navy. | Allergy. |
| Commander M. S. Mathis, (MC), U. S. Navy. | Genito-urinary and Venereal Diseases. |



## FOREWORD

Commander H. L. Shinn, (MC), U. S. Navy — Industrial Medicine and Industrial Hazards.

Captain W. L. Mann, (MC), U. S. Navy — Field Sanitation.

Commander W. T. Brown, (MC), U. S. Navy — Duty with Marine Corps Expeditionary Forces.

Commander L. D. Arbuckle, (MC), U. S. Navy — { Landing Force. / Shore Patrol. }

Nurse R. Dunbar, U. S. Navy — Diets and Messing for the Sick.

Lieut. Commander G. L. Bosarth, (MC), U. S. Navy — { Chemistry. }

Pharmacist's mate second class, J. F. Reid, U. S. Navy —

Captain F. L. Conklin, (MC), U. S. Navy — Anaesthesia.

Chief Pharmacist N. L. Saunders, U. S. Navy — Administration and General Clerical Procedures.

Division of Finance, Bureau of Medicine and Surgery. — Hospital Supplies and Property Accountability.

Chief Pharmacist J. H. Bell, U. S. Navy — Commissary Supervision.

Captain C. W. O. Bunker, (MC), U. S. Navy — { Deaths and Medico-Legal Matters. }

Chief Pharmacist R. Altman, U. S. Navy —

Commander J. C. Adams, (MC), U. S. Navy — Aviation Medicine.

Commander J. M. McChnts, (MC), U. S. Navy — Basal Metabolism.

Commander H. B. Ragle, (MC), U. S. Navy — Blood Grouping and Matching.

Commander B. H. Adams, (MC), U. S. Navy — Chemical Warfare.

Commander F. S. Johnson, (MC), U. S. Navy — Diving and Submarine Duty.

Captain C. R. Baker, (MC), U. S. Navy — Electrocardiography.

Embalming. (Based on the Manual of the Medical Department, U. S. Navy.)

Chief Pharmacist C. P. Dean, U. S. Navy — Independent Duty.

Commander O. Wildman, (MC), U. S. Navy — Laboratory Procedures and Technique.

Lieutenant G. G. Welch, (MC), U. S. Navy — Physical Therapy.

Captain G. R. Thomas, (MC), U. S. Navy — Recruiting.

Commander W. A. Fort, (MC), U. S. Navy — X-ray.

Commander F. W. Muller, (MC), U. S. Navy —

Appreciation and thanks are herewith expressed for the courtesy of the American Red Cross, the General Electric X-ray Corporation, and the following publishers in permitting the reproduction and use of certain illustrations appearing in this book: William Wood & Co., for figures 8, 9, 12, 15, 17, 18, 24, 27, 30, 32, 33, 57, 41, 47, and 62; Lea and Febiger for figures 10, 11, 16, 29, 40, 44, 56, 64, 67, 68, 70, 71, 77, 78, 81, and 123; W. B. Saunders & Co. for figures 49, 50, 57, 65, and 167; P. Blakiston's Son & Co., for figures 13, 14, 20, 23, 48, 124, 127, 135, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, and 178; J. B. Lippincott & Co., for figures 72, 166, and 146; and The Macmillan Co., for figure 152.

The courtesy of the Medical Department, U. S. Army in permitting use of the text of and the reproduction and use of the illustrations in the Manual of Splints and Appliances of the U. S. Army, is acknowledged.

The assistance of Pharmacist's mate first class C. E. Otwell, Jr., U. S. Navy, in preparing the index and typewriting much of the manuscript and of Chief Pharmacist's mate, J. A. McColley, U. S. Navy, and Pharmacist's mate third class M. J. Hadden, U. S. Navy, in preparing a number of the sketches and illustrations is acknowledged.



514     HANDBOOK OF THE HOSPITAL CORPS, U. S. NAVY

It should always be remembered that disease that have attacked more than half the men of the country during youth, diseases that bring misery to thousands of children and suffering to hundreds of thousands of women innocently infected, and that are incurred almost exclusively through promiscuous sexual intercourse, are diseases to be avoided. It should also be remembered that the man who practices promiscuous cohabitation almost invariably contracts one of the venereal diseases, sooner or later, in spite of every precaution. And if sufficient moral stamina to resist sexual temptation is not possessed, then it must be remembered to take prophylactic treatment as soon as possible after exposure.

REFERENCES

Syphilology.—Stokes.
Practice of Urology.—Young.
Hospital Corps Handbook, U. S. Navy, 1943

## Section 5.—INDUSTRIAL MEDICINE AND INDUSTRIAL HAZARDS

Industrial Medicine is that branch of medicine which deals with the prevention of disease and injuries among industrial workers. Strictly speaking, industrial medicine has become of such importance in late years, that it is not now limited to workers, but endeavors to promote good health and increase the life span of the entire people.

Its purpose or aims are to insure good health, the prevention of avoidable accidents, to alleviate unnecessary suffering and thereby provide contentment and promote more efficient work. It further deals with the rehabilitation of diseased and injured persons and reclassifies them to work in such positions as their disabilities will permit, thereby obviating the necessity for their becoming public charges and insuring them a livelihood.

Industrial Medicine is akin to Hygiene and Sanitation and Preventive Medicine, but spreads out to embrace accident prevention as well. Its aims are accomplished by endeavoring to reduce the health and accident hazards to a minimum by education, safety devices and precautions, periodic physical examinations, cooperation of employees, and by the passage of laws for the protection of the workers.

The need for the development of this branch of Medicine is apparent to all, when it is known that in the sixteenth century the average life expectancy of the working man was 21 years, as compared to 44 years for those of the upper classes. The working men were really slaves. They worked from 12 to 20 hours daily, 7 days a week. They were subjected to forms of health hazards about which little or nothing was known. The death of the men was considered a natural course of events.

The value of Industrial Medicine to the workers has been clearly manifest. Today, the average working man in industry may well expect to live to the age of 50 with still a better outlook for the future when the hazards to health and accident are better understood and safety measures are developed and perfected to protect against such hazards.

In this country today, every employee is protected by laws which require that certain standards of protection be maintained against health and accident hazards. Compensation laws are in force to require the payment of disability benefits to those incapacitated by accident or disease which were connected with their employment.



U. S. NAVY

INDUSTRIAL MEDICINE                                                515

A National Safety Council was established in 1913 and its slogan of "Safety First" has become a by-word in all homes.  In 1914 a health section composed largely of Industrial Surgeons, was incorporated as part of the association. Thus the need of medical advice in industry was established.  It is a well-recognized fact that the "human machine" constitutes a very definite hazard to health and accident.  The medical man therefore must form a definite part of any industrial organization.  Today, the National Safety Council in America is one of the greatest organizations of its kind and by its help has put the working conditions in this country on a very high plane and the industrial worker has reaped the benefits.

Today, every industry in this country, no matter how large or how small, has its medical staff, or its equivalent.  Many large industries have their own hospitals and medical staffs; others have contract surgeons but all are required in one form or other to give medical attention to the employees under them. The Government having passed such laws must therefore lead the way in protecting its own employees.  The United States Navy is one of the largest of the industries maintained by this Government.  An organization has been set up in the Navy to protect its personnel, both civilian and naval.  A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy.  He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like.  He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities.  A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented.  Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of the medical personnel for such purposes.  Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea.  In each of these places a variety of health hazards exist.  It is therefore necessary that this personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

An occupational hazard is any condition, existing in the trades, which will lead directly or indirectly to disease or injury.  No method can be devised for classifying hazards for they are too numerous.  However, they may be grouped under the following headings:

1. Those hazards present in the working force by reason of physical defect.
2. Those hazards found in the working places, including hygienic and sanitary defects, mechanical defects of machinery, lack of safety education and the like.
3. Those hazards presented by carelessness of employees.  A large majority of accidents are due to this cause alone.
4. Those hazards due to unforeseen influences such as lightning, earthquake, tornado, and the like.

Industrial accidents may be prevented by an understanding of the hazards presented in the foregoing groups, by:

1. Thorough physical examination of all new employees, prior to their actual employment, to discover potential physical defects which would render the em-



516    HANDBOOK OF THE HOSPITAL CORPS, U. S. NAVY

ploye a hazard to himself or others. An example of this would be a person with manifestly defective vision being employed as a machinist. Physical examination of all regular employees periodically, to determine their ability to continue working at their trade and to reclassify them to less hazardous work or to retire them, as found necessary in individual cases. Repeated examination of all employees engaged in hazardous trades such as sandblasting, painting, chrome plating, T. N. T. handling, and others, to determine any possible systemic effects present as a result of their trade.

2. A constant and thorough inspection of all shops and working places by the safety engineer, the medical officer, and their assistants to determine the causes of accidents, the hazards to health and the immediate correction of these faults. Education of the employees by means of lectures, motion pictures, posters, and such, will further accomplish much in the line of prevention.

3. The prevention of carelessness by indoctrination of all employees with the spirit of prevention and building up a spirit of cooperation and high morale among them. If necessary, disciplinary measures should be taken when workers are habitually careless.

4. Providing, in so far as is possible, means of protection and escape in cases of disaster.

An exact classification of occupational diseases is difficult, in view of the great number and types of diseases presented by the industry. There is such a great variety and number of skin diseases in the trades that they are generally grouped under the heading of Occupational or Trade Dermatoses. It is sufficient to state here that practically all diseases and injuries may be associated with industry.

To successfully carry out the objects of Industrial Medicine the medical personnel of the Navy must know:

1. The organization of a safety unit of an industry and the duties of each of the personnel.

2. The hazards to health and accident presented by the particular industry to which they are attached.

3. The methods and means of protection to be established against the encountered hazards.

4. The treatment of industrial diseases and injuries.

5. The laws relating to compensation and treatment of sick and injured personnel, including a knowledge of the necessary reports and returns to be submitted in such cases.

For the purpose for which this book is intended, it seems sufficient to give the hospital corpsmen a general idea of the organization, hazards, protection, treatment and laws as related to the Navy, rather than to try to discuss Industrial Medicine as a whole. This may well be done by discussing the safety organization and its associated duties at a navy yard, for those in force at navy yards are applicable to a greater or lesser degree throughout the Navy. These will be considered in the order given.

**Organization.**

At all navy yards, the Commandant is the head of the organization. He is responsible to the Navy Department for the protection of the employees, as well as the naval personnel, under his command. He is familiar with the nature of the work being performed by the employees at his station and the health and accident hazards presented. Accordingly, he appoints, as the working head of the organization, a safety officer or a safety engineer, as he is better known. The safety engineer must be of sufficient rank and service to have



U. S. NAVY

INDUSTRIAL MEDICINE                                                517

become familiar with the various trades in a navy yard, a knowledge of machinery, a man of cooperative ability and well liked, and having sufficient knowledge of safety devices and appliances to intelligently make inspections and recommend proper protective measures. His duties are primarily, to prevent accidents and promote healthy working conditions. It is his duty to inspect all working places, make a general survey of all mechanical conditions and to recommend the addition of all necessary safety appliances for the protection of the workers. He must make daily inspections of the shops to see that these safeguards are in working order and are being used. He must investigate all major accidents in order to determine the cause and recommend methods to prevent a similar accident. There should be full cooperation between him and the medical officer. All improvements come under his supervision.

The Commandant further assigns a medical officer to act as advisor to the safety engineer. The medical officer must be of the same qualifications as the safety engineer, with the addition that he must be thoroughly versed in the diseases connected with industry. He need not have a thorough knowledge of machinery but must understand sufficient of the operation of the various machines to intelligently advise the safety engineer in matters relating to the development of safety devices. The duties of the medical officer are as follows, and in this connection it is well for members of the Hospital Corps to understand the nature of these duties in order that they may be of assistance to him in the performance of these duties:

The medical officer is the safety engineer of the human body. He acts as consultant to the safety engineer in all matters pertaining to the general welfare and health of the employees. Hygiene and sanitation are his important duties. He must interest himself in the employees and instruct them in the every day principles of personal hygiene and self preservation. He must instruct the employees in safety measures and encourage them to cooperate in protective measures. They must be made "safety conscious" or "safety minded". The morale must be kept up. A high morale leads to fewer accidents and better workmanship. The medical officer must inspect all working places in order to have a better understanding as to the actual conditions under which the men work. He must make appropriate recommendations to improve deficiencies noted and must then see that these recommendations are carried out. He must personally make all physical examinations of prospective employees or see that the physical standards for employment are adhered to. He must make physical examinations of all employees believed to be physically unfit for further work to prevent them from injuring themselves or others. He must further treat and view the scene of all accidents to be able to determine their cause and to assist the safety engineer in formulating plans to prevent recurrences. He must so organize the personnel under him that prevention will be effectively handled.

The safety engineer is assisted in his work by the foremen of the shops and in some instances by safety committees in each shop elected by the employees. These men or committees are generally chosen from among the older employees and from men who have considerable experience in their trade. It has been repeatedly recommended, but not as yet accomplished, that the safety organization be enlarged by the creation of two new civil service ratings. These are, a civilian safety engineer and a civilian assistant safety engineer. These men would be appointed by competitive examination and should be men who have had considerable experience in the trades with a liberal understanding of all. They would act as assistants to the naval safety officer and would be of great value to the organization, inasmuch as their duties would be permanent. A

**518**   HANDBOOK OF THE HOSPITAL CORPS, U. S. NAVY

naval officer is subject to change of duty and cannot act as permanent safety officer. In changing the safety officers at intervals a weakness is left in the organization which the civilian assistants could well fill, until such time as the new officer became familiar enough with his new duties to take hold.

The organization of the medical adviser is composed of junior medical officers, dental officers, to some extent, members of the Hospital Corps, and of nurses. The duties of the hospital corpsmen are to assist the medical officer in his inspections, assist in the treatment of the injured and to prepare the necessary reports and returns in cases of accident, occupational disease, and the physical examination of employees. This, then, is briefly the organization of a safety unit in a navy yard. This unit will function as well aboard a battleship or in other places. The commanding officer of a ship is the head of the organization. He is assisted by the First Lieutenant acting as safety engineer. Division Officers act as assistants to the First Lieutenant and safety committees are elected in each division from among the crew. The medical officer is the advisor to the safety engineer and he in turn is assisted by the dental officer and hospital corpsmen. All then that is necessary for the unit to function is that a study be made of the hazards presented aboard ship and to proceed as explained later.

### Hazards to health and accidents.

The organization completed, a study must be made to determine the hazards ....ing in the particular organization to which the unit is attached. There ... major hazards and minor hazards. A major hazard is represented by unguarded machinery or improperly or faulty insulated electrical wiring. A minor hazard is a greasy shop floor, loose articles lying around on the deck or an open, unguarded hatchway aboard ship. It must be remembered that no two industries present the same hazards. There are hazards peculiar to each trade or profession. Efforts must therefore be made by the safety organisation to locate these hazards and afford protection accordingly. To indicate just what types of hazards may be encountered while working with a safety unit of a navy yard and in an effort to make the subject of hazards a little clearer to the readers the following questionnaire, prepared by the Inspector of the Medical Department Activities of the West Coast is quoted in part. This questionnaire represents a very thorough picture of the major hazards with which a safety unit of a navy yard must cope, aside from the many minor ones always present in any organization. Answers to these questions must be made not only to the inspecting officer but they must in some form or other be answered daily if the organization is to be successful. By this is meant that problems of this nature are a daily occurrence and the safety unit must be prepared to meet them at once and not wait to formulate answers at inspection intervals.

"Q. 1. What industrial processes employ lead at some stage of the work? This includes tetraethyl lead. How many workers are exposed to lead? What precautions are taken to prevent damage to workers using lead? How frequently are workers using lead checked to determine possible absorption of this element?

"Q. 2. What industrial processes employ chromium at some stage of the work? What precautions are employed to safeguard workers from chromium poisoning?

"Q. 3. What processes create a possible dust hazard? What precautions are observed to prevent damage to workers exposed to dust? Are routine examinations made of the chests of workers exposed to dust? Are X-rays made to de-

MDPS, U. S. NAVY

INDUSTRIAL MEDICINE

519

cannot act as permanent safety
vals a weakness is left in the
well till, until such time as the
duties to take hold,

composed of junior medical
of the Hospital Corps, and of
re to assist the medical officer
be injured and to prepare the
tient, occupational disease, and
hen, is briefly the organisation
will function as well aboard a
f officer of a ship is the head
at Lieutenant acting as safety
he First Lieutenant and safety
among the crew. The medical
l he in turn is assisted by the
that is necessary for the unit;
ords presented aboard ship and

made to determine the hazards
h the unit is attached. There
ajor hazard is represented by
insulated electrical wiring. A
cies lying around on the deck
. It must be remembered that
There are hazards peculiar to
store be made by the safety
rd protection accordingly. To
conteced while working with a
make the subject of hazards a
uestionnaire, prepared by the
r of the West Coast is quoted
thorough picture of the major
urd must cope, aside from the
ganisation. Answers to these
cting officer but they must in
organisation is to be successful.
sire a daily occurrence and the
 race and not wait to formulate

ß at some stage of the work?
are are exposed to lead? What
workers using lead? How de-
termine possible absorption of

romium at some stage of the
geard workers from chromium

hazard? What precautions are
to dust? Are routine examina-
dust? Are X-rays made to de-

termine the presence of silicats in workers exposed to dust? Have cases of
silicosis developed?

"Q. 4. What industrial processes produce fumes which may be a health
hazard? How are these fumes controlled?

"Q. 5. What industrial processes produce carbon monoxide in possible danger-
ous concentrations? What industrial processes produce carbon dioxide in
possible dangerous concentrations? Have any cases of poisoning from these
sources occurred?

"Q. 6. What processes employ volatile solvents during some stage of the
work? Are aniline compounds used? Has damage occurred from their use?

"Q. 7. Are organic wax compounds used? Has damage occurred?

"Q. 8. What precautions are exercised to prevent damage from pipe covering
compounds? What asbestos hazards exist?

"Q. 9. What precautions are taken to prevent damage from glass wool?

"Q. 10. What radio-active compounds are used on the station and what
precautions are used to prevent damage from this and luminous paints?"

These are but a few of the questions asked but they serve the purpose for
which they were intended, i. e., to indicate just what is meant by a health
hazard and ones which must be studied in Industrial Medicine.

Protection.

Having made a survey to determine the hazards presented in the organisation
to which one is attached, means of protection must be sought. This is done
first by protecting against physical hazards by employing physically fit men.
In the Government, the physical standards are set according to the employment
and the hazards to be met with in each type of work. The U. S. Civil Service
standards are as follows:

1. For employment in arduous duties. Must be physically sound and in
good health, active and able bodied. Rating "A". For some positions e. g.
divers, requirements are specially rigid. Rating "A plus".

2. For less arduous employment. Requiring sound general health but less
physical strength, though for some employment special requirements exist,
i. e. perfect color preception for brakeman and chauffeurs. Rating "B".

3. For lighter and usually sedentary employments. General good health
but minor anatomical defects not interfering with efficient performance of
work may be passed, i. e. a typist may be lame.

Next, having employed a healthy working force it is necessary to protect
their health. Proper working places must be provided and maintained.
Hygienic and sanitary conditions must be kept on a high plane. All moving
parts of machinery must be guarded; goggles provided for workers required
to use them; helmets and masks for sand blasters; proper ventilation for
the chrome workers; masks for asbestos workers; protection for workers in
X-ray and radium; protective gloves, shoes, and other garments for foundry
workers, and other means of protection too numerous to mention here must
be available and used.

Special physical examinations must be made of all sand blasters, asbestos
handlers, those exposed to radium and its compounds, lead workers, those
engaged in dusty or smoky trades, handlers of T. N. T. and other explosives,
etc., to prevent the occurrence of the diseases associated with those trades from
injuring the men.

As mentioned before, all workers who are sick for any length of time and
whose efficiency has fallen off because of physical reasons must be examined
and either retired or reclassified.



520.    HANDBOOK OF THE HOSPITAL CORPS, U. S. NAVY

Treatment.

The treatment of industrial diseases and injuries is essentially that for any others. All accidents are treated according to the severity and locality. Men are not allowed to treat themselves for even minor accidents by reason of the dangers of infection and later incapacity. The treatment of diseases of occupation is a specialty in itself and need not be considered here.

Laws governing workers and accidents occurring during work.

The laws governing occupational diseases and injuries are quite numerous. It is therefore essential that a hospital corpsman be familiar with only those pertaining to Government employees. These, in general, are as follows:

All men injured or taken sick during the course of their employment are required to report to the dispensary for treatment. It makes no difference how trivial the accident or how minor the illness, he must still report. No first-aid boxes are allowed in any of the shops or offices. When a man reports, his injury or illness is investigated, treated, or otherwise disposed of. At the U. S. Navy Yard, Puget Sound, Wash., a form report of the case is prepared in quintuplicate, two copies of which are forwarded to the safety engineer, one copy is sent to the foreman of the shop or the supervisor of the office, one is given to the employee, and one placed in his file jacket. A separate file jacket is maintained for each employee who reports to the dispensary for treatment or for any other reason and is a permanent record which is kept during the entire time of employment. The information furnished on this report is as follows: Date; whether report is of injury or return to work; name; rating; pay number; shop; diagnosis; date and hour of injury; date and hour reported to dispensary; whether or not injury is due to employment; disposition (treated and returned to work, given time off, or transferred to naval hospital); name of medical officer treating case; and patient's statement regarding injury.

In addition to this form, a card-index form, U. S. Employees' Compensation Commission Form CA-16, is made out in each case. This form is started when the man reports and when final disposition of the case is made it is likewise filed in the man's jacket.

When an injured employee returns to his shop or office, or when the foreman or supervisor receives his copy of the form report, the foreman or supervisor immediately fills out U. S. E. C. C. Form CA-2, and forwards it to the injury officer, who, in turn, submits it to the dispensary for completion by the medical officer treating the case. The medical officer gets the data for this report from the forms previously described.

U. S. E. C. C. Form CA-3 is forwarded at the termination of total or partial disability of an employee, or upon his death.

U. S. E. C. C. Form CA-4 is a claim for disability allowance or compensation for injuries received which must be submitted by the employee within 60 days after the injury. This form must also be completed by the medical officer attending the case and once again the form report and U. S. E. C. C. Form CA-29 are of value.

U. S. E. C. C. Form CA-8 is similar to Form CA-4 but must be submitted on the first and sixteenth of each month by the employee, during the period of his disability.

When it becomes necessary for an injured employee to have hospital or other treatment not provided by a dispensary or local physician, U. S. E. C. C. Form CA-16 is made out and forwarded with the patient to the hospital or place where he is to receive such additional care.

ORPS, U. S. NAVY

FIELD SANITATION

521

injuries is essentially that for
ng to the severity and locality.
even minor accidents by reason
ty. The treatment of diseases
not be considered here.

g during work.

al injuries are quite numerous.
an be familiar with only those
general, are as follows:
course of their employment are
iment. It makes no difference
ness, he must still report. No
or offices. When a man reports,
or otherwise disposed of. At
a form report of the case, is
h are forwarded to the safety
to shop or the supervisor of the
ed in his file jacket. A separate
to reports to the dispensary for
ermanent record which is kept
information furnished on this
t of injury or return to work;
date and hour of injury; date
ot injury is due to employment;
rom time off, or transferred to;
iting case; and patient's state-

U. S. Employees' Compensation
ch case. This form is started
ition of the case is made it is

hop, or office, or when the fore-
s CIA-2; and forwards it to the
s dispensary for completion by
edical officer gets the data for
t,
s termination of total or partial

ility allowance or compensation
by the employee within 60 days
pleted by the medical officer at-
port and U. S. E. C. C. Form

CIA-4 but must be submitted on
ployee, during the period of his

ployee to have hospital or other
physician, U. S. E. C. C. Form
atient to the hospital or place

These arise when there is doubt as to the origin of the disability, i. e.,
whether or not the disability is occupational. In such cases U. S. E. C. C. Form
CA-17 is substituted for Form CA-16. Whenever U. S. E. C. C. Forms CA-16
and CA-17 are made out they must be accompanied by U. S. E. C. C. Form
CA-20.

U. S. E. C. C. Form CA-21, Discharge Report of Injury Case, is forwarded
when an employee is discharged from treatment after having been incapacitated
by reason of occupational injury or disease.

U. S. E. C. C. Form CA-82 is a report of hernia and must be submitted in
all cases in which claim is made that a hernia was caused by employment.

Numerous other forms, such as public bills for payment for treatment, are
used in handling these cases, but as they are accomplished by the injury officer
they are not listed here.

Forms showing reports of all physical examinations of employees, including
the special examinations previously mentioned, are also kept. These are
routine however, and are easily learned when actually engaged in this work.
Special forms for W. P. A., M. R. N., and P. W. A. workers are also provided.

In conclusion, it is well to state the qualifications expected of a hospital corps-
man engaged in Industrial Medicine.

1. He should realize that his first duty is to the workman who is injured.

2. His personality should inspire confidence.

3. He should have a knowledge of first aid.

4. He should have a knowledge of an efficient medical record system and
of statistical methods.

5. He should have a knowledge of sanitation, of working conditions, of
occupational hazards and preventive measures.

6. He should possess a general knowledge of industrial relations, including
employment, its methods and problems.

7. He should have a working knowledge of the workmen's compensation laws.

8. It would be well for all hospital corpsmen to obtain and read the publication
Medical Service in Industry and Workmen's Compensation Laws, 1932, published
by the American College of Surgeons as prepared by M. N. Newquist, A. B.,
B. Sc., M. D., to enhance their knowledge of this subject and thereby be of
more value to the medical organization of the Navy for industrial medicine.
This publication contains concise, complete statements of the problems of the
industrial organization and is of value to all industries.

REFERENCES

Industrial Medicine and Surgery.—Meek, 1931.
Industrial Health.—Kober and Hayhurst.
U. S. Naval Medical Bulletin, January and April, 1935.
Medical Service in Industry and Workmen's Compensation Laws, 1932.
Inspection Questionnaire, West Coast Medical Activities, U. S. Navy.

## Section 6.—FIELD SANITATION

*Health is necessary in war, and cannot be replaced by anything else.—Napoleon*

Introduction.

The activities of a medicomilitary organization tend to concentrate toward
one primary objective, "The conservation of physical efficiency for combat."
The hospital corpsmen of the Navy serve ashore, as well as afloat, and in



# EXHIBIT F



UNITED STATES NAVY DEPARTMENT
BUREAU OF MEDICINE AND SURGERY

ANNUAL REPORT OF THE
SURGEON GENERAL, U.S. NAVY
CHIEF OF THE BUREAU OF MEDICINE AND SURGERY
TO THE SECRETARY OF THE NAVY,
CONCERNING
STATISTICS OF DISEASES AND INJURIES
IN THE UNITED STATES NAVY

FOR THE CALENDAR YEAR
1889

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1941

DEFENDANT'S
EXHIBIT
Buffalo Pumps
15

20

Health Of The Navy

iona action of the light.

INDUSTRIAL MEDICINE

Navy Yard, Charleston, S. C.—In order that claims for industrial injury may be confined to those receiving such injury and that they may not result in the navy yard, all applicants for trades labor potentially in the hazardous occupations, including a thorough examination of chest, where necessary, prior to the assignment to the hazardous occupation. In addition to the placement examination of the worker prior to the assignment to his occupation, in such work, this involves a plan whereby continuous survey and involves considerable additional cost to the Yard and may be filed against the Government, but it is believed that the examination will prevent unjust industrial injury to the man occupied in hazardous industrial trades and prevent unjust compensation to be filed against the Government. As a means of protection to initiated employees and to prevent unjust claims for compensation for injured have been or claimed to have been received it is recommended that as a condition of employment all civil service applicants who show a positive serological reaction but to that are non-infectious by the Yard medical officer. It is also in pronouncing that where infection occurs this is the result of employment. Medical treatment should be performed at the Yard dispensary in order that non-infectious or more serological tests are advised and medical treatment non-infectious by the Yard medical officer. It is also in pronouncement. A complete individual record of employment, keeps private industrial corporations require serological tests and so employes with active periodic intervals thereafter. If it is found that employees reaction syphilitic disease, medical treatment to be government when they are pronounced non-infectious to be company physicians. Media treatment for Civil Service employees could be obtained from private physician or public clinics, and such treatment could be evidenced by certificates signed by physicians, but where this is not practicable nations should be performed at the Yard dispensary in order that serological tests may be followed.

Puget Sound Navy Yard, Bremerton, Wash.—The average employment of this Navy Yard is safety-minded, and a spirit of cooperation with regard to accident prevention, continues. The safety program has been... that is required to have continued good results during the past year, emphasis being placed on education by a great many methods of employee supervision. Analysis of representative periods have been obtained which have been installed in factory than the old; (a) salt tablet dispensers, 90 new double lenses for helmets have been obtained which require ventilation, good arrangement of shops in which hot work is carried on is carelessness of 20 percent of all accidents are directly attributable to 5,985 employees as compared with an average of 21 lost-time accidents among 3,032 employees in 1938 is considered very satisfactory. With been undertaken during the year the following additional safety measures have buffing and polishing work which (a) a face shield has been used; (b) new double lenses for helmets have been obtained which require ventilation; of ships and offices has been materially improved, and it is (e) an inspection has been made of all mask that have been on machine tool beds become available for projected, and to corrective spectacles have only slightly increased the number of such particle eye injuries as compared to men wearing number of safe-...

21

Hygienic And Sanitary Conditions Afloat And Ashore

nary cup goggles are unsuitable for most types of machine tool work as to restricted vision. It has been proposed to the Navy Department that a suitable type of spectacle goggle without side guards be approved for use on these types of machine tool work. At present, Navy specification welding glove has been found to be satisfactory for overhead electric welding. A number of men have been burned or injured type of glove in this glove, and to reduce the number of eye injuries among the regular Yard employees was due to the double or sometimes triple type of goggle is not acceptable. The increased number of eye injuries has been poor fitting goggles... but the eye injuries have increased out of proportion. Cause of failure to use of goggles has been by the medical department, injury officer, and shop superintendent. This problem to note that there were no lost-time eye injuries among the regular Yard...

Statistics show a definite increase in all types of industrial injuries among asses of employees except the Emergency Relief, Navy. This increase is out of proportion to the due to the fact that the shop superintendents insist that... employees requiring injuries or spots or insignificant may seem in extent or severity, report to the dispensary for... This opinion is supported by the reduction in the actual number of injuries resulting in loss of time from 22 during 1938...

Navy Yard, New York, N. Y.—Welding: There are approximately 200 electric welders and 175 gas welders carried on the rolls, and it is recommended to the Director of the Division of Industrial Hygiene, New York State Department of Labor, that, by study of the 220 electric, gas, and tack welders, be conducted by the Dispensary for damage to the eyes from, almost the cooking of certain welding rods, the funds and bulk of x-ray examinations, and x-ray pictures, physical examinations, and x-ray New York State Division of Industrial Hygiene.

It was recommended to the Commandant in December, 1939, at the inadequate measures welding fumes and protective measures or unusual causes of corrosion of the Yard. The proposed research contemplated with study of welders was required to spit in defining certain... making it was believed that such a study would yield results of great benefit... to the attention of the Medical Department during the year.

Page 133

workers would probably not receive a damaging exposure, the question of such a possibility demands careful consideration. The absolute necessity for further protection can be definitely determined by actual measurements of scattered radiation by means of the portable ionization chamber. It is recommended that the advisability of such tests be considered.

**Precautions Relative to Pickling of Metals.** (a) Building Ways, No. ... use for this plant... The acid employed is dilute area. One for first section at least is whether at any stage of operation personnel are subjected to contact with nascent gas or arsenic dust originating in the acid... the possibility of rising accumulation of arsenical compounds which comes up in the bath. Such a possibility extremely remote in view of the fact that the operations are conducted in the open air... the possible evidence of arsenic absorption instead of the unduly examination at intervals.

(b) Coppersmith Shop—Both sulphuric and muriatic acids are used in the vats of the unclosed space connected with the coppersmith shop... the possibility of arsenical exposure discussed above also obtain for this space. Provided minimum arsenical ventilation is provided and appears advisable. A semi-annual medical examination of operating personnel is advisable.

**Occupational Dust Hazards.** (a) The Steel and Brass Foundries.— The chief hazard to be considered is silicosis... the extent of the hazard being dependent upon the content of free silica... percentage of free silica, and the duration of exposure. Whether or not... silicosis may exist in these foundries can only be determined by actual counts of dust in the... air under the various working conditions and the estimation of the average dust... It has recently been reported by the New York State Department of Labor that silicosis can exist when the average plant dust concentration does not exceed 15 million parts per...

(b) Grinding Cleaning Shop.—The conditions in this shop appear to be particularly undesirable. The iron and brass foundry grindings are equipped with forced exhaust ventilation although its efficiency in controlling dust concentrations is undetermined. The casting cleaning shop, however, is not provided with any special ventilation, evidence being placed mainly on roof cowls, which, it is believed, are inadequate.

Certain of the grinding and chipping operations should be conducted under hoods with localized suction ventilation. Two high-speed grinding wheels and two carborundum grinding wheels are not equipped with systematic engineering survey of both grinding and cleaning shop to include dust counts and the measures necessary to reduce...

It is suggested that such a shop where the worst conditions prevail... is should be given an X-ray examination of the lungs in order to serve... out cases in...

---

...der consideration. Metallic lead is handled in the molten state in a ... component of Babbitt metal in the Inside Machine Shop No. 311. This metal contains lead, antimony, and copper. The lead volatilizes at a relatively low temperature. The melting ladles are equipped with a hood connected to an air exhaust system with suitable suction to prevent metal. In addition, a respirator is provided for protection against the inhalation of fumes.

...made under the ceiling with spray technique is conducted with lacquers and some slow drying, which may lead to toxic symptoms if inhaled beyond threshold concentration.

...are equipped with sanitary...

the Ordnance Machine and Sheet Metal Shops are situated... also provided for more effective removal of fumes. The spray result... exhaust results in a much slower rate of removal of localized fumes. No cases of volatile solvent poisoning were reported during the calendar year.

It is recommended that all spray painters be given an annual examination for evidence of toxic effects of volatile solvents.

**Industrial Protection Against X-ray and Radium.** (a) X-ray section.—The Portsmouth... X-ray... installation of X-ray machines of 200 kilovolts and 25 milliamperes capacity which is used approximately two years ago. This is employed chiefly for the detection of flaws... The maximum number of exposures... made per day. (b) Engineering Control. The X-ray tube is encased in a lead-glass enclosure. The radiation is contained in an enclosure 20 feet by 20 feet bounded by a shield 6-1/2 feet high, 20 feet from the tube in all directions and lined with sheet lead 2 mm. thickness...

...radium.—Individual floor men are assigned as operators of the X-ray and radium... a destructive action on the white and red cells of the blood... and an examination for possible blood examination of operating personnel is...

(b) Radium Protection.—The use of radium was limited 4 to 5 years ago for the detection of flaws in castings constructed from high... containing 276 mgms. of radium, which is the source of radiation. A capsule tests being conducted in the Inside Machine Shop. This is not a... that high radiation exposure may result... for one-hour exposure. It is... The chief metallurgist report... are not subject to harmful radiation at that distance. Protective...

It is explained that a thorough physical examination of a radium or X-ray worker shall be made before he is employed and that should the blood count shows suggestive changes the worker complains of an obscure condition... the question arises whether the foreman measures of protection against X-ray radiation should be... The situation was recently discussed with the Chairman of the Bureau of Standards... sated that personnel within the distance of 40 feet external of...

Case MDL No. 875   Document 5446   Filed 05/09/08   Page 290 of 362

Case 2:08-cv-01296-SVW-SS   Document 32-12   Filed 04/28/2008   Page 3 of 36

lasting are of various types. A special study is being attempted with regard to types of masks, helmets, and respirators with the idea of recommending standard items of as near one type as possible, for use employed by the Navy. What recently been carried out by this department. Representative of the manufacturers carried out in this department, and numerous reports of clinical and laboratory investigal effects on the material has representatives claim that no harmever a period of 6 years, and the only precaution to their employees exposed to asbestos dust... The evidence submitted is not conclusive, and the period of the... tion since the introduction of the product is too short to warrant any definite conclusion at present. Until further information is available be following precautions are to be observed: A suitable respirator, cap, and gloves at all times; the clothing must be loose and cover the arms and body; program must be worn... circulation in the compartment; and showers are required before ...at close of the day.

At present the Norfolk Navy Yard has no instruments for making dust counts. The acquisition of at least one of these instruments would be a great advancement in the field of industrial medicine at this station.

The hazards to civil employees consequent to industrial activity is a problem, and requires continued, intense, effort and research with regard to personnel exposure, machinery, and new processes. Safety devices and rules should be studied, developed, and mastered. this aspect should be studied, developed, and mastered. cooperation in the safety engineering and intensive study of industrial health problems.

Naval Torpedo Station, Newport, R.I.—The number of infectious, ...this is due no doubt to the low among civil employees at this station... no matter how trivial, to be dispensary where they are given report for daily observation... ...ness of colds, grippe, and bronchitis have been discharged. Many ...employees during the fall and winter months. By treating these ...old and capsules, and the prompt checking out of cases with elevated temperature, in appreciable decline in lost-time incidence has been ...that in 1935 there were 4,983 injuries... comparative classification we ...and in 1939 about 3,500 injuries among 3,862 employees.

An extensive study of all workers in explosive ma...building procedure has been carried out... ...ance monthly since October, 1938. An effort is being made... ...occupational poisonings, with particular reference to toxic and fulminates... routine physical and laboratory data have been completed, and ...x-rays are examined routinely... ...Sand-blasters are examined every three months, oftener if thought necessary.

may state of silicosis.

(c) Radiography.—The present practice of an annual X-ray examination of the... if so indicated, will be continued.

(d) Hazard of Buffing and Polishing.—The possible hazard incident to dust from artificial abrasives may... The dust from these materials does not contain free silica and therefore will not produce silicosis. does the buffing... similar to that of early silicosis... slightly as a general result of exposure increases. There is clinical evidence, however, that some may be more susceptible to disease... to keep the workroom in this field advise that these dust is approximately 50 percent... equipped with localized exhaust. This is recommended as a safety precaution.

The grinding wheels in the tool-room of the Shipfitter Shop are... provided with either individual or are kept constantly ventilated... reduces to a marked degree the... 

Hazard of Asbestosis. Asbestosis is an industrial disease of the lung... and is distinct from silicosis... ting Shop are exposure... material, valve bonnets, and high temperature... shop to remove asbestos dust at the source is a productive measure.

A medical survey of employees in this shop was conducted... ...17 years, 6 men are... ...not considered the concentration of the dust is... ...ment of asbestosis by continued findings precluded the future develop...

The following recommendations to present occupational disease... exhaust blower over the... Shop.

Norfolk Navy of Industrial... accomplished by... that... and the Navy Department Safety... regard to industrial medicine... cial attention is given to the working conditions... glass insulation, blasting, asbestos pipe-covering occupaquantity. Routine inspections have revealed that helmets used...

Respiratory System                                                                                                                    115

## RESPIRATORY SYSTEM

There were 318 original admissions and 20,719 sick days for diseases in this class during the year 1939, accounting for 0.85 percent of all admissions and 1.72 percent of total sick days.

In addition, there were 64 admissions for complications of other diseases, or conditions, 21 admissions reported as existing prior to enlistment, 74 readmissions, and 47 cases remaining from the previous year.

Four of the diagnoses in Class XVIII (chronic bronchitis, asthma, acute fibrinous pleurisy, and sero-fibrinous pleurisy) caused 74 percent of class admissions and 69 percent of class sick days.

The common acute infectious diseases, of the respiratory tract, colds, acute bronchitis, etc., as well as pneumonia, are classified as "Communicable diseases transmissible by oral and nasal discharges," and certain other diseases that might be thought of as diseases of the respiratory system, are accounted for in Class V. Class XVIII, therefore, does not account for a great number of admissions to the sick list.

Diseases in this class causing more than 10 admissions, together with a total for those diseases in the class causing less than 10 admissions, are listed in the following table:

### Diseases of Class XVIII, admissions and sick days, 1939

### Diseases of Class XVIII, with complications, 1939



116

### Diseases of Class XVII, classified (personal) admissions by age groups, 1939

### CIRCULATORY SYSTEM

Diseases in this class were responsible for 582 original admissions and 40,623 sick days, or 0.02 percent of all admissions and 3.37 percent of total sick days. The admission rate was 3776 per 100,000, as compared with 3361, the admission rate in 1938, and 3665, the median for the 9 preceding years.

Five of the diagnoses in the class (arterial hypertension; various veins; thrombosis; coronary artery; phlebitis; and chronic myocarditis) caused 61 percent of class admissions and 63 percent of class out days.

In addition to the 582 original admissions shown in the table below, there were 81 admissions covering cases reported as complications of other diseases and conditions, 116 readmissions, 85 for diseases reported as existing prior to enlistment, and 157 cases remaining from the previous year.

Thirty-five of the 105 persons invalided from the service on account of diseases in this class incurred the disability prior to entering the service.

Diseases for which 10 or more admissions were recorded during the year and a total for those diseases in the class causing less than 10 admissions are shown in the following table:

### Diseases of Class II, admissions and sick days, 1939



UNITED STATES NAVY DEPARTMENT
BUREAU OF MEDICINE AND SURGERY

ANNUAL REPORT OF THE
SURGEON GENERAL, U.S. NAVY
CHIEF OF THE BUREAU OF MEDICINE AND SURGERY

TO THE SECRETARY OF THE NAVY

CONCERNING

STATISTICS OF DISEASES AND INJURIES
IN THE UNITED STATES NAVY

FOR THE CALENDAR YEAR

1941

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON · 1944

## HEALTH OF THE NAVY

and reclaiming unit. This decline in the concentration of dust has been of primary importance from the standpoint. Other advantages are a decrease in operating cost from the ability to reclaim some 75 percent of the sand and water, decrease in time needed for cleaning castings, better quality of the finished job, and elimination of pickling process to get rid of last traces of sand.

*Navy Yard, New York, N. Y.*—Experience indicates that individuals have a type to apply for employment through the Labor Board have about 2 percent. In acute cases, the disease cannot be detected in the ordinary physical examination. Condensation is at present being given to the practicability of including a chest x-ray as part of the preemployment examination.

The urgent demand for personnel, particularly in some of the skilled trades, has led to a lowering of the physical standards set forth by the Civil Service Commission in a number of occupational classifications. Up to the present time, there has been no evidence that this lowering of physical requirements has been responsible for increased illness or accident rates.

In accordance with instructions contained in Secretary of the Navy letter dated 28 October 1941 periodic physical examinations have been given to employees who handle this material. In view of the increase, or others, in addition to these periodic examinations it has been considered advisable to perform periodic chest x-ray examinations. The use of the tool-grinders and on workmen handle chest x-ray emulating purposes, since little is known of the effects of fibre glass dust upon the lungs, it seems desirable to keep a close watch of those employees who handle this material. In view of the facilities, expanding this material. In view of the facilities for performing these examinations has been improved. The establishment of an industrial health office has been the first step to meet the increased requirements of the industrial program. It was felt that improved x-ray equipment suitable for the x-ray films would facilitate and expedite performances of the required periodic examinations. Purchase of such equipment has been approved.

In July 1941, a Reserve officer with a wide experience in industrial health work was assigned to duty at this yard. Shortly thereafter, a medical officer from the Regular Navy who had undergone a course of training in industrial hygiene, was ordered to duty at the yard. During the present period of indoctrination, these two officers were designated as Industrial Health Officer and Assistant Industrial Health Officer, respectively.

A comprehensive industrial health program has been put into operation. The following activities have already been accomplished:

(a) Survey of lighting in several shops with recommendations for improvement.

(b) Study of the efficiency of spray painting booths, with recommendations.

---

## HYGIENE AND SANITARY CONDITIONS AFLOAT AND ASHORE

(c) Study of ventilation in the temporary foundry, with recommendations.

(d) A study of illness (mercury poisoning) among painters working with anticipating plastic paint. As a result of this study an effective control measure has been put into effect.

(e) An investigation of nonstandard cleaning and degreasing agents used in the yard. As a result of the findings an order was issued prohibiting the use of unapproved cleaning agents in the yard.

(f) Compilation of a list of materials used in the yard which may offer potential health hazards. This list includes, all chemicals, such as benzol and carbon tetrachloride; all dust-producing materials, such as asbestos, sand, and fibre glass; and all toxic metals, such as lead and magnesium. Tabulations both metals, such as lead which shops are using each substance and analysis showing what materials are used in such shop. These tabulations are to be used as a basis for a comprehensive program of occupational disease prevention.

(g) A campaign of health education was instituted in an effort to reduce lost time due to minor illness among civilian employees. Posters illustrating illness of respiratory infection have been placed on the ground distributing educational material on the subject of colds, tuberculosis, and nutrition.

(h) Preemployment chest x-ray survey. During the latter part of 1941, plans were completed for taking chest x-ray films on a sample of 1,000 consecutive male applicants for employment, to ascertain whether any significant number of cases of active pulmonary tuberculosis will be found among men seeking employment at the yard.

Space on the ground floor of Building No. 200, at the present time occupied by the safety engineer, has been allocated for use as industrial health office and laboratory.

*Norfolk Navy Yard, Portsmouth, Va.*—Although some attention has been directed to industrial hygiene in the past for several years, not until the latter part of 1941 was a medical officer was assigned to this important phase of medical department activities. The safety officer and the industrial department have cooperated in an effort to detect hazards, and recommend measures to obviate them or make them less hazardous.

Preemployment physical examinations were conducted by the medical section of the Labor Board. An attempt is being made to conduct reduced examinations as recommended by the Navy Department, especially on those as recommended by the Navy hazardous exposures. Complete blood counts were obtained, van handlers, basophilic aggregation tests on welders, cutter,

## 28    HEALTH OF THE NAVY

burners, and painters, and x-ray examinations of the chest are made on sandblasters.

The silica hazard in the foundry was reduced somewhat by the substitution of steel grit for sand in two modern blasting units. Once old-type sandblasting unit using sand is still in operation. Plans to replace this unit have been made and it is anticipated that this will be accomplished as soon as practicable. To minimize the hazard presented by sandblasting operations, approved personal protection equipment is provided.

Painting has been some time lost from metal fume fever, particularly among those working around welding and burning operations on new construction and repair jobs. In many cases the men are exposed unnecessarily to fumes due to reluctance on the part of leading men to take the time to secure and set up blowers to remove those fumes. It very frequently happens in the compartments where they are needed. It very frequently happens that attacks of metal fume fever develop among others working develop among those working in a compartment when the bulkhead is being heated on the opposite side. This necessitates adequate ventilation in both compartments. An approved metal fume respirator that is so constructed that it can be worn under a welder's shield is being recommended for use by those exposed to metal fumes, and it is anticipated that the use of these respirators will reduce the time loss and increase production and efficiency.

There continues to occur an unnecessary number of cases of ophthalmia due to actinic rays from the welding arc. This is due to independence among many of the welders' helpers, carelessness on the part of those that are exposed due to improperly fitting goggles as well as goggles worn on the forehead instead of over the eyes, and many of them happen while the worker is walking about in the yard to and from job and to and from work. The campaign for the wearing of safety shoes has not been successful, and there continues to be an undue number of toe injuries, particularly among riggers.

Project Sound Navy Yard, Bremerton, Wash.—A medical officer reported 11 August 1941 as the industrial medical officer for this navy yard. He is doing excellent work, and has offered many suggestions that have been instituted in aiding the health and hygiene of the industrial yard.

The list of technical equipment to establish an industrial health laboratory has been approved.

The industrial health officer is working in close cooperation with the injury officer and the leading-men of the various shops and projects. Some very interesting and informative data ha[ ]

## HYGIENO AND SANITARY CONDITIONS ASHORE AND ASHORE   29

been accumulated regarding injuries to yard employees and non-occupational lost time.

The enlisted industrial health program was explained to the heads of the departments in the yard and to the masters of the various shops. The new program was received with enthusiasm and assured full cooperation. Many contacts with quartermen, leading-men and individual workers have been established by the industrial medical officer during his frequent visits to the shops.

A survey was made of all the shops and activities, and a chart prepared showing the location and nature of the possible health hazards.

Space for an industrial hygiene laboratory has been allotted in the chemical laboratory building and technical equipment has been requested. With the establishment of this laboratory, facilities will be available for investigation of industrial health hazards in this naval district.

A total of 2,276 eye injuries were treated at the dispensary during 1941 which indicates that the present eye protection is not satisfactory. The fact that eye injuries totaled 25.5 percent of all cases, but accounted for only 3.3 percent of the lost-time accidents indicates that there were few complications following the injuries.

The industrial medical officer has been working in cooperation with the safety engineer to determine the basic causes of the high frequency of certain types of injuries in the various trades. Members of the supervisory staff as a whole and many of the workers. At these meetings emphasis is placed on the responsibility of supervisors in guarding the safety and health of their men. Numerous problems and comments about procedures, policies, equipment and conditions were uncovered in the discussions following these meetings.

There were 10,401 sick leave applications during the year requesting a total of 46,451 sick days. Since a few employees do not have sufficient accumulated sick leave to cover their entire illness or injury, some take annual leave instead of sick leave, and some of the sick leave applications are not approved, 46,451 is not the total days absent from work due to nonoccupational illness. The following summary of a 3-year period is submitted for comparison:

|  | 1939 | 1940 | 1941 |
|---|---|---|---|
| Number of sick leave applications | 5,786 | 8,174 | 10,401 |
| Number of sick days requested and approved | 31,000 | 15,097 | 36,584 |
| Average sick leave application | 5.75 | 4.35 | 4.45 |
| Average number of applications each month per 1,000 employees | 44.1 | 54.6 | 62.1 |
| Average number of sick days requested each month per 1,000 employees | 232 | 318 | 277 |

The lower average days of illness per case in 1940 and 1941 is apparently due to a great increase in one and two-day absences.

Both the frequency of applications and the numb[ ] of sick days requested show an expected seasonal variation

# EXHIBIT G

## INDUSTRIAL HYGIENE AND THE NAVY IN NATIONAL DEFENSE

### ERNEST W. BROWN, M.D.
Captain, Medical Corps, United States Navy
NEW YORK

One of the most important concerns of the Medical Department of the United States Navy today is industrial hygiene, especially in navy yard practice. This is a situation of ever increasing moment in view of the present era of enormous expansion in naval construction, unparalleled in the history of the United States. This is bringing about a vast increase in the industrial force of the navy yards, and in all probability new problems in industrial hygiene will emerge incident to new materials and processes.

It should be remembered in this connection that the policy of the Navy Department is to allot new naval construction on an equal basis to government and commercial yards. It follows that the commercial establishments are also undergoing rapid development, with an enormous rise in industrial personnel. They will therefore be confronted with problems of industrial hygiene similar to many of those arising in navy yards.

Industrial hygiene is a field which is now undergoing rapid development. This appears to be due to certain significant trends, the most important of which has been the recent setting up of many industrial hygiene units in state or city departments of health through funds released by the passage of the Social Security Act. These trends, in fact, particularly that just mentioned, reflect a definite renaissance of industrial hygiene as a phase of public health in the United States.

This movement is receiving increasing recognition in naval industrial circles, and industrial hygiene is now listed as a specialty of the naval medical officer along with other specialties outside the purely clinical fields, such as aviation medicine, submarine medicine and chemical warfare medicine.

Those just mentioned, however, are concerned primarily with naval personnel. Industrial hygiene, on the other hand, is largely occupied with federal industrial personnel. It therefore follows that the status of the senior medical officer of a major navy yard in relation to the industrial

Presented at the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., Pittsburgh, Nov. 13, 1940.

3

War Medicine, v. 1: 3-14, 1941

DEFENDENT'S
EXHIBIT
Buffalo Pumps

19



4                          *WAR MEDICINE*

department is analogous in many respects to that of the medical director of a large commercial industrial plant. The object of this paper is to present an outline of the administration of industrial hygiene in navy yards, which are the chief industrial units of the Navy.

Mention should be made in this connection of the Subcommittee on Industrial Medicine of the Health and Medical Committee of the National Defense Council. The Surgeon General of the Navy is a member of the latter committee and is represented by two liaison naval medical officers in conjunction with the Subcommittee on Industrial Medicine. Important recommendations pertinent to the Navy and industrial health will result, and many of them undoubtedly will be put into effect.

The term industrial hygiene as applied in the present discussion is used in the specific sense of the prevention and control of occupational disease. The fact may be of interest that the first compensation law for occupational diseases in this country was one passed in 1908 by Congress for United States civil service employees. Compensation laws for industrial diseases have lagged far behind legislation covering accidents. Only sixteen states of the Union provided compensation for one or more occupational diseases up to the year 1937, although all but two provided legislation for accidental injuries.

### INDUSTRIAL ORGANIZATION OF NAVY YARDS

The mission of a navy yard is primarily the construction, maintenance and repair of naval vessels. The central administration of navy yards and, in fact, of all industrial shore stations of the Navy is vested in the Assistant Secretary of the Navy, in whose office is the Shore Establishments Division of the Navy Department.

There are eleven navy yards, located as follows: Portsmouth, N. H.; Boston; New York; Philadelphia; Washington, D. C.; Norfolk, Va.; Charleston, S. C.; Mare Island, Calif.; Puget Sound, Wash.; Territory of Pearl Harbor, Territory of Hawaii; and Cavite, Philippine Islands.

In addition, mention should be made of the following specialized industrial plants: the plants for the building of submarines at Portsmouth, N. H., and Mare Island, Calif.; the Naval Gun Factory at the Navy Yard, Washington, D. C., for the production of high caliber naval guns, torpedo tubes and accessories; the torpedo factories at Newport, R. I., and Alexandria, Va., for the manufacture of torpedoes; the powder plant at Indian Head, Md., for the production of Navy smokeless powder; the aircraft factory at Philadelphia for experimental air craft construction and repair; the naval armor plate plant at Charleston, W. Va., and the Naval Clothing Factory at Brooklyn.

*BROWN—INDUSTRIAL HYGIENE AND THE NAVY*          5

*Organization of the New York Navy Yard.*—The New York Navy Yard may be taken as typical of a major yard   Its organization falls under two departments, i. e., the industrial department, headed by a naval captain of the engineering branch, and an operations or military department, under the direction of a naval line captain.  As a conservative estimate it may be stated that 90 per cent of the activities of a navy yard are industrial.

Under the industrial manager there are at present twenty-three shops of different types, with a force per shop varying from 30 to 3,200 men. The total number of civil employees of this yard is now approximately 17,000.  This is rapidly rising and, it is estimated, will exceed 20,000 in 1941.

EXTENT OF THE CIVILIAN INDUSTRIAL FORCE OF THE NAVY

The combined industrial force of all navy yards is now approximately 130,000.  In view of the pending program of naval construction it is estimated that this number will reach 150,000 in 1941.  If made inclusive of all shore stations it will probably be close to 180,000.

In addition to the industrial force of navy yards, one must consider the employee volume in the commercial naval ship-building plants, such as the Newport News and Dry Dock Company, the New York Ship-building Corporation at Camden, N. J., and the Bethlehem concern at Quincy, Mass., which now employ from 12,000 to 15,000 men each.  It is a conservative estimate that the combined industrial personnel of all such plants on both the east and the west coast will reach a peak of over 100,000.

ORGANIZATION OF THE MEDICAL DEPARTMENT OF A NAVY YARD

The medical staff of the New York Yard consists of ten medical officers, five dental officers, one nurse, forty-five enlisted men and two civilian clerks.  The chief activities with reference to industrial personnel may be summarized as follows:

(a) *Preemployment physical examinations.*  All applicants for federal jobs are examined physically, although the standards for acceptance vary to some extent for different occupations.

(b) *Periodic physical examinations.*  These, of course, are conducted with the object of medical supervision of certain groups of employees exposed to definite potential health hazards, such as foundrymen and spray painters.

(c) *Physical examination of federal employees for retirement.*  This is for evaluation of the degree of disability and opinion as to disposition when total disability is alleged.

Page 144

12/18/2002  11:25   8655217441                    PAINE TARWATER                    PAGE  85

6                          WAR MEDICINE

(d) Diagnosis, treatment and disposition of industrial injuries and occupational diseases.

(e) Administration of compensation cases.   (f) Industrial hygiene and plant sanitation.

### THE INDUSTRIAL MEDICAL OFFICER

An officer of the medical staff of the navy yard is specifically detailed for industrial hygiene administration subject to the direction of the senior medical officer. Figure 1 outlines the scope of his activities.

(a) Advice to the safety engineer.  The adequate practice of industrial hygiene in navy yards, as in civil industry, is dependent on the close and efficient correlation of the work of the safety engineer and that of the industrial medical officer.  It is essential to obtain a grasp of the functions of both officers in order properly to visualize industrial hygiene administration.



Fig. 1.—Organization for administration of industrial hygiene in navy yards.

(b) Inspection.  The industrial medical officer is responsible for the general supervision of plant sanitation, i. e., ventilation, illumination, water supply, general cleanliness and adequacy and condition of sanitary facilities.  He also conducts shop inspections for occupational health hazards and measures for their control.  He cannot expect to evaluate working conditions and thereby detect occupational health hazards early unless he makes periodic inspections through the plant.  In this way he can observe the adequacy of existing measures against specific hazards and decide whether such methods are being properly utilized.  These inspections also have a psychologic value, in that they create greater respect for the medical service in the minds of the employees.

(c) Supervision of special physical examinations.  This includes handling of preemployment cases when the applicant reports previous exposure to potential industrial health hazards, such as lead fumes or foundry dust; periodic examinations of groups exposed to such potential occupational hazards, e. g., spray painters and sandblasters; examination

*BROWN—INDUSTRIAL HYGIENE AND THE NAVY* 7

of persons referred for transfer to other shops where there is a question of occupational disability, and clinical studies for a decision as to industrial origin of obscure disabilities. (*d*) Medical surveys of occupational groups.—This will be discussed later. (*e*) Administration of the medical aspects of claims for compensation for occupational disease pending before the United States Employees' Compensation Commission. (*f*) Supervision of preparation of accident and occupational disease reports for the Navy Department.

### THE SAFETY ENGINEER

A civilian safety engineer is stationed at the Navy Department as the adviser to the head of the Shore Establishments Division. A naval officer is assigned to each navy yard as the safety engineer.

*1. Accident and Unsafe Practice Control.*—Safety engineering is one of the divisions of the navy yard organizations. The safety engineer conducts an investigation of all lost time accidents with a view to fixing the cause and advising measures to prevent their recurrence. The basic features of approach to the safety problem in navy yards are provision of safety devices, such as mechanical guarding, and the safety education of workmen and their supervisors.

Another important aspect is the competitive approach, which has proved effective in stimulating interest in accident prevention. The Navy Department publishes the comparative safety scores of all navy yards monthly.

Figure 2 emphasizes the advance made by the Navy Department in accident reduction, beginning with an intensive safety campaign in navy yards in 1926. The period covered is from 1926 to 1937 inclusive. The accident rate was lowered from 20 to practically 10 per year in a twelve year period; the severity rate reduced from 2.2 per year to 0.5. On the other hand, it will be noted that the total man hours worked during the period increased to 115 million from 65 million per year, the average number of employees rising from approximately 30,000 to 66,000.

*2. Occupational Health Control.*—The control of occupational disease in navy yards naturally lies within the sphere of both the safety engineer and the industrial medical officer. Although the safety engineer is administratively charged with this task, the medical officer is actually coordinate with him in this phase.

As a matter of fact, the medical officer is the key man in the prevention of industrial disease in navy yards, in that he usually discovers its existence. The diagnosis having been made, the occupational history and the preemployment examination record are carefully reviewed in order to reach a decision, if possible, whether the hazard can be traced



**WAR MEDICINE**

to present or past employment.  If it is ascribed to or aggravated by environmental conditions, the medical officer confers with the safety engineer, and an industrial hygiene survey is usually recommended to the commandant.



Fig. 2.—Statistical data on accidents for the United States navy yards and naval stations.

**THE INDUSTRIAL HYGIENE SURVEY**

An industrial hygiene survey is of course a combined medical and engineering task.

*1. The Medical Survey.*—This consists of a complete clinical study, with detailed occupational histories of all exposed personnel as a case-finding procedure under the supervision of the industrial medical officer.

*BROWN—INDUSTRIAL HYGIENE AND THE NAVY*

Although not directly responsible beyond the medical survey, it is important that the medical officer have a reasonable grasp of the entire problem so that he will be in a position to utilize all data that have any bearing on the interpretation of his medical findings. In addition, he may act in an advisory capacity to the safety engineer with respect to certain technical phases in the planning and conduct of the engineering aspects of the survey.

*2. The Engineering Survey.*—The engineering phases of an industrial hygiene survey in a navy yard fall, naturally, under the direction of the safety engineer. As in a commercial industry, this embraces essentially a complete story of the occupational duties, the physical conditions of work, and the materials, processes and equipment of the individual shop; in other words, the environmental conditions.

Laboratory facilities: No facilities are provided for technical studies in the navy yard organization, and there is no central laboratory unit in Washington which could supply industrial hygienists for field studies. This is an urgent need, and recommendations have recently been made to the end of setting up such an agency.

The Navy Department has been most fortunate in the past in securing the services of the Division of Industrial Hygiene of the United States Public Health Service to conduct such technical studies, much in the same way that industries in the states utilize the facilities of state bureaus of industrial hygiene.

The safety engineer formulates the control program of the health hazard on the basis of the data obtained in the survey. After all, once the cause is disclosed, prevention of occupational disease is largely an engineering problem.

THE REPORTING OF INDUSTRIAL ACCIDENTS AND ILLNESS

An important advance in accident prevention by the Navy was initiated on July 1, 1940, when the Secretary directed that a report of each accident and illness, both "lost time" and "no lost time," occurring among civil personnel of navy shore establishments be made to the Bureau of Medicine and Surgery. The report of each accident is submitted on a form, known as form F-C (fig. 3). This presents the diagnosis of the injury and the essential details as to the cause. Punch cards are made up from these records for mechanical tabulating and indexing through a sorting machine. This provides facilities for the statistical analysis of these accidents and diseases, and the data obtained promise to be a far reaching contribution to the subject of accident control. Prior to use of this system a crude system of accident reporting to the department was in effect, but it was not adapted to statistical analysis.

12/10/2002  11:25   8655217441                    PAINE TARWATER                    PAGE  09



Fig. 3.—Form for report of industrial disability.

*BROWN—INDUSTRIAL HYGIENE AND THE NAVY*      11

OCCUPATIONAL HEALTH HAZARDS IN NAVY YARDS

The chief potential occupational health hazards in navy yards will now be considered as indicated in the accompanying table. The data are based chiefly on reports to the United States Employees' Compensation Commission over a series of years. It hardly requires emphasis that industrial medical officers must be constantly on the alert for new health hazards.

*Occupational Health Hazards in United States Navy Yards*

1. Dust Diseases
   (a) Silicosis: foundry workers and sandblasters
   (b) Asbestosis: makers of pipe insulating covers
2. Diseases Due to Lead and Lead Compounds
   (a) Spray lead painters
   (b) Brush lead painters
   (c) Lead putty workers
   (d) Oxyacetylene welders: cutting and scrapping of ships
   (e) Handlers of molten lead: preparation of Babbitt metal and lead coating of metals
   (f) Handlers of lead dross: used in powdered form as a detonator in naval ammunition
3. Diseases Due to Volatile Organic Solvents
   (a) Lacquer spray painters
   (b) Degreasing of machinery: benzene, toluene, xylene, trichlorethylene, higher ketones, etc.
4. Diseases Due to Roentgen Rays and Radium
5. Diseases Due to Welding
   (a) Hazour gases
   (b) Metallic oxides, of potentially toxic nature: manganese, lead, fluorides, silicon, zinc, etc.
   (c) Zinc fume fever
   (d) Eye hazards: actinic ophthalmia chiefly
6. Chromate Poisoning: abrasive dusters
7. Diseases Due to Ingestion of Radium: painters of luminous dials of instruments
8. Injuries from Minor Explosives: workers in high explosives, such as T. N. T. and tetryl (tetranitromethylaniline)
9. Diseases Due to Metallic Dust
   (a) Emerying pulmonary fibrosis: grinders, buffers and polishers; carborundum, alundum, etc.
10. Dermatoses: Hobbing operators from contact with cutting and soluble oils
11. Diseases Due to Excessive Heat: heat cramps, heat exhaustion and heat stroke
12. Caisson Diseases: diving operations
13. Functional Disturbances
    (a) Anosmia: from entering confined spaces
    (b) Phosgene poisoning: from carbon tetrachloride used to extinguish fires in confined spaces
    (c) Carbon monoxide poisoning: incident to all fires in confined spaces

1. *Dust Diseases.*—(a) Silicosis: Important units of all navy yards are iron, steel and brass foundries. The dust control problem is a major concern in these plants as in civil industry.

One of the difficulties met with in combating the foundry dust problem in navy yards is the fact that silica (silicon dioxide) dust is not particularly irritating or obnoxious in concentrations which may ultimately lead to pulmonary damage. As a result there is a tendency to an indifference on the part of the workers and even of the supervisors and executives which must be overcome in order to accomplish effective and permanent dust control. Another reason for this attitude is the long period necessary for silicosis to develop in foundry workers exposed to only moderate concentrations of dust, such as molders.

Page 150



12                                    WAR MEDICINE

A medical survey of the foundries of the Navy Yard, Washington, D. C., was conducted by me in 1939. Of 525 men subjected to roentgen examination, approximately 60 per cent had a record of ten years or over and 36 per cent a record of twenty years or over of total foundry employment. Silicosis was found in 12, or 2.4 per cent of the total—in all of them in stage 1 or 2; these data led to recommendations for improved methods of dust control.

Industrial hygiene surveys in foundries rather than the Washington Navy Yard have not as yet been carried out but would in all probability disclose a certain incidence of silicosis, even if not of the disabling type. The medical control of silicosis in the naval establishment consists of roentgen examination of the chest before employment and an annual roentgenogram of every man exposed to the higher silica dust concentrations, such as sandblasters and shake-out men.

(b) Asbestosis: This is a potential occupation disease hazard due to inhalation of asbestos dust among workers engaged in the manufacture of asbestos insulating covers for flanges, valves and high temperature steam turbines.

I recently conducted a medical survey of the workers of the pipe-insulating shop of the New York Navy Yard, inclusive of roentgen studies. The maximum working period of exposure was seventeen years. No cases of asbestosis were found. Similar findings have been reported from two other yards, but the study should be extended to all men in this trade.

Medical control consists of taking a roentgenogram of the lungs annually. The material is moistened, and localized exhaust ventilation is installed over the work area. A respirator is worn during the dustiest aspect of the process.

2. *Diseases Due to Lead and Lead Compounds.*—Lead poisoning has become comparatively infrequent in recent years both among industrial and among service naval personnel. This is apparently due partly to changes in materials and methods and partly to improved measures of control. Zinc and titanium paints have largely replaced leaded material for ship interiors. Red lead paint is still in use as the priming coat on hull exteriors, but the finishing coats contain either no lead or a greatly reduced proportion. All painters regularly handling lead-containing paint are examined semiannually for evidences of lead absorption.

3. *Diseases Due to Volatile Organic Solvents.*—Lacquer spray painting is done on an extensive scale in navy yards and therefore demands rigid medical supervision. Another important application is in degreasing measures. All spray lacquer personnel are subject to semiannual physical examination.

4. *Diseases Due to Roentgen and Radium Hazards.*—Radium and roentgen rays are continually utilized for the detection of flaws in castings

Page 151

BROWN—INDUSTRIAL HYGIENE AND THE NAVY    13

and pipe-welded joints for high pressure steam installations. Radium has an advantage in the small size of the equipment in that it is adapted to tests in the confined machinery spaces of ships.

The question of protection from irradiation of the operating and other personnel working in the vicinity of the apparatus has received thorough study, the practice of the Bureau of Standards being generally followed. Complete blood counts of all technicians are conducted quarterly, and special preemployment examinations are prescribed.

Another potential hazard of radium is that of ingestion incident to radium painting of luminous dials, especially for fire control instruments and aircraft. The control measures advised by the Public Health Service are generally in force plus certain local regulations.

5. *Diseases Due to Welding.*—The hygienic supervision of welders is another outstanding feature of medical responsibility. Approximately 2,500 welders were on the rolls of the combined shore establishments as of Jan. 1, 1940, including 653 at New York. This number has progressively increased and will continue to rise.

The immense volume of work in confined spaces is characteristic of naval welding. A battleship of 35,000 tons displacement under construction contains approximately 500 compartments in which electric welding is mandatory; certain of these spaces are extremely small and force the welder to work in very cramped positions. These conditions complicate the question of effective preventive control of the hazards.

The chief hazards which have to be considered at present are "nitrous fume" poisoning, zinc fume fever, as it is popularly termed, and actinic ophthalmia from ultraviolet irradiation of the welding arc. "Nitrous fume" poisoning, while comparatively rare, is a serious condition. No emphasis need be placed on the fact that these injuries would be still further reduced in number if the control measures provided were properly utilized.

It may be of interest to note that in 392 cases of actinic ophthalmia reported at the New York yard in the first ten months of 1940, only 30 per cent of the patients were welders, apprentice welders, helper welders and tack welders; the remaining 70 per cent were men exposed in spaces adjacent to the welding arc or assisting in welding operations but not utilizing available protective goggles.

Chronic poisoning among naval welders from manganese, fluorides or silicon, which might be ascribed to inhalation of these metallic or mineral oxides in the welding fumes originating in the rod coatings, has not been reported. The possibility of such poisoning, of course, cannot be denied.

Limitation of space prevents mention of additional occupational health hazards.



14                              WAR MEDICINE

ANNUAL EXAMINATIONS OF CRANE OPERATORS, ENGINE MEN
(HOISTING AND PORTABLE) AND LOCOMOTIVE ENGINEERS

These classes of workers are physically examined annually, with special emphasis on blood pressure, hearing and vision. In view of the nature of their duties, physical failure, such as sudden collapse, might involve critical injury to themselves and others and, in addition, damage to material. If corrective measures are impracticable the worker is retired or transferred to some suitable type of employment. A crane operator, for instance, presenting marked hypertension would be referred to his private physician and transferred to other duties.

LOSS OF TIME FROM INDUSTRIAL VERSUS
NONINDUSTRIAL DISABILITIES

In a limited study of 116 industrial companies in various parts of the United States conducted by the American College of Surgeons a few years ago, it was found that the loss of time from nonindustrial types of illness was approximately fifteen times that industrially connected. In my capacity as senior medical officer of the Washington Navy Yard I made the following observations for the calendar year 1938: total industrial force, 7,000; average number of days lost from industrial accidents 0.14, and average number of days lost from nonindustrial illness or accident, 5.20. The time lost from nonindustrial disability was therefore thirty-seven times that lost from industrial causes. A similar study made by me at the New York Navy Yard for 1939 revealed that the time lost from industrial causes was roughly four times that from nonindustrial causes. The possible factors in the difference between the two yards have not been analyzed.

Disparities of the same general order have been reported in recent statistical studies by certain large commercial industries and reflect an enormous economic loss. Much of this nonindustrial illness is preventable. It is believed that in the naval establishments this wastage due to preventable illness can be greatly reduced if the problem is attacked by an annual physical examination of all employees, men requiring corrective treatment being referred to their private physicians or to other agencies. This would require a heavy increase in medical staffs, but it would be a profitable investment by naval industry in the saving of man power for national defense. It is a question worthy of being explored.

# EXHIBIT H





U. S. Navy Department • U. S. Maritime Commission

573-1- 6

# Minimum Requirements

## FOR

# SAFETY AND INDUSTRIAL HEALTH

## IN

# CONTRACT SHIPYARDS

*1943*

Approved
U. S. Navy
Jan. 28, 1943

Approved
U. S. Maritime Commission
Feb. 9, 1943

United States Government Printing Office • Washington • 1943

DEFENDENT'S
EXHIBIT
Buffalo Pumps

34



U. S. NAVY DEPARTMENT
WASHINGTON, D. C.

U. S. MARITIME COMMISSION
WASHINGTON, D. C.

*To All Contractors Constructing Ships for United States Navy–United States Maritime Commission:*

As a result of the national conference on safety and health in shipyards holding contracts with the United States Navy and Maritime Commission, conducted under the auspices of these agencies in Chicago December 7 and 8, 1942, a unanimous agreement was reached upon the minimum standards which have now been approved by the Navy Department and United States Maritime Commission and which should be put into effect in shipyards holding contracts with the two agencies.

These standards represent a specialized study based upon a fact-finding survey on all coasts by experts in that field. They have received the unanimous concurrence of the representatives of the medical and safety departments and of labor-management committees from shipyards on all coasts.

The necessity for conserving manpower and promoting the physical welfare, health, and safety of what shortly will amount to one million workers in shipyards requires that careful observance of standards for the prevention of accidents and protection of health be accorded. Aside from the weight which must be given humanitarian considerations, it is simply good common sense that as much care and attention be given to protecting the human factors in the war production program as is given machines.

Under the administrative direction of the Maritime Commission, safety and industrial health consultants will be made available in all regions wherein shipyards holding contracts with the Navy and the Commission are located.

Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and the Maritime Commission, and each is requested to give full cooperation to the consultants on health and safety who will be charged with the coordination and supervision of the safety and health programs of the two agencies.

The cumulative restriction of manpower makes speedy attention and comprehensive action in respect to the subject matter hereof of vital importance.

FRANK KNOX, *Secretary of the Navy.*

E. S. LAND, *Chairman,*
*U. S. Maritime Commission.*

(I)

Page 156



UNITED STATES NAVY—MARITIME COMMISSION

MINIMUM REQUIREMENTS

FOR

SAFETY AND INDUSTRIAL HEALTH IN
CONTRACT SHIPYARDS

**S and H-1. Introduction.**

1.1  The standards for industrial health and safety as presented in this manual cover only minimum requirements. It is not to be assumed that compliance with these minimum standards is insurance of the development of good health and safety records.

1.2  It is recognized that in many shipyards, standards for health and safety are already in effect which go beyond the requirements of those listed here. The Maritime Commission and Navy urge that any standards of higher level be continued and that where substandard conditions of health and safety exist, they immediately be brought to the required standard or better.

1.3  In all cases the use of the words *shall* or *must* indicates that compliance with that section of the minimum requirements is mandatory. Where the words *should* or *may* are used the section may be considered desirable but not necessarily mandatory under certain circumstances which the contractor in his discretion may determine.

MINIMUM REQUIREMENTS FOR INDUSTRIAL HEALTH

**H-2. Medical Facilities.**

2.1  *Personnel.*—Yards employing up to 5,000 men should have two full-time physicians, and one additional physician for each additional 5,000 men. Yards with less than 2,000 to 3,000 men will not need full-time physicians.

2.2  Specialists in the various branches of the medical profession available in the area should be consulted as indicated.

2.3  Yards employing up to 5,000 men should have in the main dispensary six full-time nurses and three additional nurses for each additional 5,000. Additional nurses will be required for first aid stations.

2.4  There should be at least three clerks employed in the medical department for each 5,000 employees.

2.5  One ambulance driver should be available per ambulance per shift.

(1)

**E–3. Physical Facilities.**

3.1   The medical department should be provided with:

a. A waiting room with suitable registration facilities.

b. A general treatment room.

c. An eye treatment room.

d. A minor surgery room.

e. A ward with three beds for the first 5,000 employees, and one bed for each additional 10,000.

f. Doctors' offices and private examining rooms.

g. A nurses' office and dressing room.

h. X-ray room for yards employing 5,000 men and above.

i. A physiotherapy room.

j. Toilet facilities for doctors, nurses, and patients.

k. A storeroom for general medical stores.

l. X-ray files and viewing room.

3.2   First-aid treatment rooms, manned by nurses, should be provided wherever there is overcrowding at the main dispensary and loss of time due to distance from shipways and shops. These sub-stations may be located under building ways or near locations where the number of men working is large so that the distance a man need travel to a sub-station will not exceed approximately 400 yards.

**E–4. Equipment.**

4.1   The following equipment should be provided:

a. One ambulance for each 15,000 employees, or reasonable fraction thereof, with an ordinary passenger car always in reserve.

b. In some yards a station wagon is used satisfactorily inside the yard and an ambulance used only for trips outside.

c. An X-ray unit for yards employing about 5,000 men and above.

d. Medical and surgical stores required for minor surgery, eye injuries and physiotherapy.

**E–5. Records and Forms.**

5.1   The following records and forms are recommended:

Note.—*In an emergency no form need be filled out.*

a. A form authorizing the workman to report to the medical department for examination or treatment issued by a foreman or leading man or other supervisor. This shall show time of issue, arrival at dispensary, discharge from dispensary and return to work.

b. Appointment form for revisits and retreatments issued by the physicians and nurses.

c. A disposition form issued by physicians and nurses indicating return to work, hospitalization, to home, or other disposition.

d. A complete and accurate permanent filing system recording personal data, nature and cause of injury, diagnosis, treatment, disposition, and results.





3

*e.* The necessary state and insurance company forms.

*f.* Daily report to the safety department showing all new cases for the day, together with the nature and cause of injury, and the *diagnosis.*

*g.* The adoption of the standard nomenclature when made available by the Council on Industrial Health of the American Medical Association, Chicago, Illinois.

**H-6. Examinations.**

6.1  Physical examinations to insure proper placement of employees shall be given.

6.2  Periodic check examinations shall be given men working in occupations potentially hazardous to themselves or others, as for example to crane operators, locomotive and hoisting and portable engineers. Periodic check examinations should be given men in jobs in which there may be health hazard, as for example to sand blasters, radium and X-ray workers, and paint sprayers.

6.3  Special examinations such as X-ray, serologic and urinalyses shall be given in the individual case as indicated and in accordance with local needs.

**H-7. Air Raid Precautions.**

7.1  The medical department shall locate, equip, and maintain such emergency first aid dressing stations as may be deemed necessary to handle air raid casualties.

7.2  A certain number of yard employees shall be trained in first aid procedures to render assistance to the medical department in handling air raid victims.

7.3  Close cooperation should be maintained with the local civilian defense officials in order that evacuation and care of air raid victims may be carried out to the best advantage.

7.4  In keeping with local army and navy regulations, steps should be taken to provide protection of dispensaries by sandbags, or otherwise, from fragments and concussion of bombs.

**H-8. Responsibilities of the Medical Services.**

8.1  Frequent inspection of the yard by the medical staff shall be required in order that physicians may become familiar with shipyard jobs and thus help intelligently in preventing accidents and occupational disease.

8.2  Close collaboration shall be maintained with the safety department especially in regard to records of accidents and absenteeism.

8.3  It shall be the joint responsibility of the medical and safety departments through the supplies department to know the composition of paints, thinners, paint removers, and other chemicals used in the yard, and to see that the workers exposed are protected by the best safety practices.



8.4  As in the general practice of medicine the confidential relations of doctor and patient shall be maintained.

8.5  It is certain that in the near future women in large numbers are to be employed in the mechanical trades. It is necessary in shipyards to make special provisions for this class of patients. This will necessitate the establishment of separate waiting, treatment, and examining rooms. In yards where the number of employees is large, it may be logical to establish a separate dispensary for the handling of women patients.

**H-9. Sanitary Inspections.**

9.1  *Cafeterias and canteens.*—It shall be the duty of the medical department to adapt from Army and Navy standards, in reasonable conformity with the local health department rules, and inspection scheme to include preemployment examination of food handlers, quality and quantity of food, general cleanliness and comfort, screening, dishwashing, garbage and waste disposal. These inspections shall be made at unscheduled times and never less than once each week.

9.2  *Water supply, sewerage, and waste disposal.*—In cooperation with Maritime and Navy engineers the medical department shall inspect and report upon the above as often as seems advisable, but not less than twice yearly.

9.3  *Salt tablets.*—Salt tablets shall be made available to all employees and shall be kept in covered dispensers appropriately located.

**H-10. Respiratory Protective Equipment for Shipyards.**

The U. S. Bureau of Mines, 4800 Forbes Street, Pittsburgh, Penna., maintains a laboratory which tests and *approves* for use in industry respiratory protective equipment of all kinds. The Maritime Commission and Navy will require the use of *approved* equipment throughout all yards. The safety department shall be responsible for instructing men in the proper use of such equipment and for the maintenance of ample supplies.

10.1  Details of Bureau of Mines respirators with names of manufacturers, prices, and descriptions can be obtained from the Bureau or from the Maritime Commission.

10.2  The safety department shall be responsible to the management for cleaning and sterilizing all such equipment as often as may be agreed upon with the medical department.  (A method for such sterilization is included in these standards; see section H-12.0.)

10.3  *General requirements for respirators.*—

*a.* Adequate protection as defined by American Standard Safety Code for the Protection of Heads, Eyes, and Respiratory Organs. Handbook H-24, Nov. 1, 1938. Superintendent of Documents, Washington, D. C.; price 15¢.

*b.* Comfort (light weight and not obstructive to vision).



E-11. Jobs Requiring Respiratory Protective Equipment.

### 11.1 Dust.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Silica or Sand Dusts (as in sand blasting) | (1) Abrasive blasting helmets. |
| | (2) Dust respirator. |
| Lead Dust (as in mixing paint) | (1) Air line respirator. |
| | (2) Lead dust respirator. |
| Asbestos (as in covering pipes) | (1) Air line respirator. |
| | (2) Dust respirator. |

### 11.2 Metal fumes and smokes.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Lead and zinc oxide from welding and burning. | (1) Air line respirator. |
| | (2) Fume respirator for lead. |
| | (3) Dust respirator for zinc oxide. |

### 11.3 Solvent vapors.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Spray painting, both indoors and outdoors. | |
| Paint removing, usually indoors. | (1) Air line respirator. |
| Cementing, usually indoors. | (2) Chemical cartridge respirator. |
| Cleaning, usually indoors. | |
| Degreasing, usually indoors. | |

### 11.4 Acid gases and mists.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Pickling (indoors) | (1) Mist respirator. |
| Cleaning (indoors) | (2) Chemical cartridge respirator. |
| Degreasing (indoors) | |

### 11.5 Alkali mists.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Cleaning (indoors) | (1) Mist respirator. |
| Degreasing (indoors) | (2) Chemical cartridge respirator. |

### 11.6 Asphyxiating atmospheres.—

PROTECTIVE DEVICES
(1) Hose mask.
(2) Oxygen-breathing mask.
(3) All-service mask.

11.7 *Air supply for air-line masks of all kinds.*—Air at a comfortable temperature and free from odors and excessive moisture sometimes is difficult to furnish, especially for outdoor jobs in winter. Air quality and temperature shall be tested by the Safety Department and shall meet the suggestions of the American Standard Safety Code for air-supplied respirators (see. 10.3a).

E-12. Sterilization of Respirators.

12.1 Each worker who needs a respirator should be assigned his own respirator. Where this is not done, it is important that the respirator be sterilized in addition to being cleaned. Adequate sterilization may be accomplished by—



*a.* Washing the rubber and metal parts with soap, a brush and warm water, after which the respirator is sterilized by immersion for 10 minutes in a solution of formalin made by placing one part of 40 percent formaldehyde solution into nine parts of water.

*b.* Washing the rubber and metal parts with soap and warm water, after which the respirator is sterilized by dipping in a 5 percent solution of carbolic acid, a 2 percent solution of lysol, or a 70 percent solution of denatured alcohol.

*c.* Subjecting the respirator to sterilization by a moist atmosphere of antiseptic gas, preferably formaldehyde, for a period of ten minutes at room temperature.

*d.* After following any one of the outlined procedures, the respirator should be rinsed with water and hung up to dry. The respirator should not be used until it has been dried thoroughly.

*e.* The filters, felt screens, and elastic headbands should be removed, if detachable, before washing or sterilization of the respirator, unless it is evident that washing and sterilization will not harm these parts.

**12⅚** The National Safety Council has issued an Industrial Data Sheet No. D–Gen. 16, "Cleaning and Sterilizing Goggles and Respiratory Equipment."

**12–13. A Guide for Prevention of Industrial Disease in Shipyards.**

**12.1** Eight common types of disease and methods for their prevention are given in the following sections. Help in applying these methods will be given by the local Safety Department and by safety and medical consultants of the Navy Department and the Maritime Commission.

**12.2** *Flashburns and foreign bodies in the eye.*—

*a.* Effects on workers: "Flash" is a surface eye burn resulting from even momentary unprotected exposure to the welding arc. In this condition the eye is painful and sensitive, especially to light. An eye flash shall be treated only by the doctor or by methods he has prescribed.

*b.* Foreign bodies in the eye shall be removed only under the doctor's orders or by methods he has prescribed. Like flashburns, they are preventable.

*c.* For safe practice:

All workers:

   1. Whenever near welding areas wear antiflash goggles which
      have been approved by the Safety Department.

   2. Wear safety goggles when grinding, chipping, buffing,
      scratch-brushing, or forging.

7



Welders:

3. Wear approved antiflash goggles even when helmet is being worn.

4. Use portable screens to protect the eyes of fellow workers.

13.3 *Lead poisoning.—*

a. Sources: In general, any job in which dust, fume, or smoke from any substance containing lead is breathed daily.

b. For example:

| JOB: | WHEN MATERIAL IS: |
|---|---|
| Welding | Metal, coated with paint containing lead. |
| Cutting | |
| Burning | Lead. |
| Shrinking | Lead pigments. |
| Grinding | |
| Buffing | |
| Spray painting | |
| Mixing paint pigments | |

c. Job can be done safely with:

1. (a) Special ventilation: Use a local exhaust hood approximately 8 inches from the job and drawing at least 200 c. f. m. into the hood with filtration of the discharge, or discharge, to a place where the contaminated air will not be breathed, or

(b) Wearing of fume respirators, or

(c) Wearing of supplied air respirator.

2. Periodic medical examination which includes blood and urinalyses.

13.4 *Solvent vapors.—*

a. Sources: In general, any job in which solvent vapors are breathed. For example:

Spray painting.
Painting.
Using paint remover.
Applying cements.
Paint brush and spray gun cleaning.

b. Job can be safely done with:

1. Segregation of such work, and

2. (a) Special ventilation as may be required.

(b) Provision of spray booths with exhaust system.



Page 163

8

(c) Wearing of special respirators:
  (1) For spray painting: Supplied air respirators or air line hoods.
  (2) For other jobs: Chemical cartridge respirators.
  (See H-10 on respiratory protective equipment.)

**12.5   Zinc fume fever (zinc chills or shakes).—**

a. Sources: In general, any job in which the fumes from heated zinc are breathed.  For example:

| JOB: | WHEN MATERIAL IS: |
|---|---|
| Welding | Galvanized metal |
| Cutting | Zinc |
| Shrinking | Zinc alloy |
| Pouring zinc alloys | Brass |

b. Job can be safely done with:

  1. Special ventilation: Local exhaust hoses or hoods located close enough to operation at all times to remove smoke completely.
  2. Wearing of special respirators.

NOTE.—There are no known cumulative effects from zinc chills.

**12.6   Fiberglas.—**

a. Effects on workers: Men working with Fiberglas may develop a dermatitis or conjunctivitis which are skin and eye conditions. It is best to transfer to another job those who continue to be sensitive.

  1. Both experimental and practical evidence show conclusively that the inhalation of Fiberglas causes no lung damage.
  2. The cement used with Fiberglas may contain a toxic solvent such as carbon tetrachloride ($CCl_4$) which can cause severe illness or even death if the cement is used indoors with inadequate ventilation.

b. For safe practice:

  1. Clothing: Supply loose coveralls with collars and sleeves buttoned over cheesecloth.
  2. Goggles: Should be worn.
  3. Shower: Should be taken rather than bath, at end of shift. Respirators are usually not necessary, but if a cement containing a toxic solvent is used, proper protection either by ventilation or by a respirator must be supplied and used.



**13.7** *Asbestosis.—*

a. Sources: In general, any job in which asbestos dust is breathed. For example:

| JOB: | WHEN MATERIAL IS: |
|------|-------------------|
| Handling. | Asbestos |
| Sawing. | Asbestos mixtures. |
| Cutting. | |
| Molding. | |
| Welding rod salvage. | |

b. Job can be done safely with:

1. Segregation of dusty work and,
2. (a) Special ventilation: Hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or
   (b) Wearing of special respirators.
3. Periodic medical examination.

**13.8** Silicosis.—

a. Sources: In general, any job in which the dust of free silica (sand) is breathed daily.   For example:

        JOB
        Sand-blasting
        Sand packing of pipes
        Shot blasting of castings

b. Job can be done safely with:

1. Isolation of dusty process and, in addition,
2. Special ventilation: In the case of sand-blasting, the work should be done in the standard type of sand blast room, cabinet, or machine.
3. Special respirator for dust-containing free silica.
4. Periodic examination by doctor.

**13.9** Dermatitis.—

a. Sources: Excessive or improper use of cleaning agents such as gasoline. It is not at all uncommon to find dermatitis caused by excessive use of common soaps such as those used in laundering. Cutting oils, certain greases, certain insulating materials used on electric cables and conduits can cause dermatitis.

b. Job can be done safely with:

1. Precautions against excessive use of the causative agent.
2. Advice of the medical department in the use of protective salves and creams.

10

**E-14. Ventilation Standards.**

14.1  Ventilation is required to control temperature and to remove air impurities, as from welding and paint spraying.

14.2  The maintenance of proper working conditions shall be the responsibility of the safety department, whose staff shall work in close cooperation with the welding, paint, and electrical departments. Air analyses and tests shall be made by the safety and medical consultants of the Navy Department and the Maritime Commission as may be needed.

14.3  Personnel of Department.—

a. Number:

1. The size of the ventilation crew will vary with the type of ship, equipment available, etc. The head of the safety department will be responsible for the organization of the safety department or division.

2. There shall be a ventilation supervisor on each shift responsible to the head of the safety department. Under the supervisor there shall be a sufficient crew to inspect and maintain good working conditions.

3. An EC-2 ship shall have at least one ventilation man aboard. Larger ships, or ships like carriers with considerable galvanized welding, shall have at least two ventilation men.

4. The number of ventilation men on the night shifts shall be in proportion to the construction crews.

5. The ventilation crew must have available a maintenance and repair crew of sufficient size to keep equipment on the job and operating efficiently. Long waits during which equipment is idle must be avoided.

b. Training:

1. The ventilation supervisor (that is, the safety engineer) shall be trained to handle the entire ventilation program in the yard. Local educational institutions, State Industrial Hygiene Units, Maritime Commission engineers, and other sources are available to give this training.

2. The ventilation supervisor shall organize classes, demonstrations, and short talks on standard procedures for ventilating specific spaces on the ships.

14.4  *Type of equipment needed.*—In ship construction, two types of ventilation are used—local exhaust as for removal of welding fumes at the point of origin, and general ventilation to supply fresh air to confined working spaces.

Page 166



11

*c.* Local exhaust:

1. A common length for a local exhaust hose is forty feet. In ordering exhaust fans for use with local exhaust hoses, the following specifications should be met: Capable of drawing a minimum of 900 c. f. m. through each of 3-inch (or 4-inch) diameter flexible hose. Fans should have provisions for attaching three or more local exhaust hoses per unit.

2. In the interests of power economy, it is undesirable to move much more than 200 c. f. m. through each local exhaust hose.

*d.* General ventilation:

1. It is frequently desirable to introduce air into large working spaces such as deep tanks, fore- or after-peaks. This is done in many yards by using a flexible fabric duct, with metal elbows, and a fan of about 5,000 c. f. m. capacity.

2. It is desirable sometimes to supply a quantity of fresh air into the double bottom. Here a 2,000 c. f. m. unit may be used.

3. These two examples represent the two extremes of this type of work, and therefore are the two extremes in fan sizes. Fan static pressures in each case should exceed four inches of water.

4. For general ventilation of a ship engineroom during construction, a 10,000 c. f. m. blower is recommended. On the other hand, operations in confined quarters where heat is generated (plate shrinking, for example) may use a small portable fan to circulate the air. For this purpose, small blowers of from 800 to 1,500 c. f. m. shall be provided.

*e.* Ventilating procedures:

1. Local exhaust shall be used whenever a welding operation is being conducted in a confined space, or whenever galvanized metal is being welded. Local exhaust is always a suction process. Never blow a stream of air upon a welding arc.

2. Many welders think that it is enough to hold the end of the suction hose in the same compartment with the welding operation. This is not so. In order to capture the welding fumes, the end of the hose must be within six or eight inches of the arc, assuming a 200 c. f. m. volume per hose. Beyond this distance, the suction hose is ineffective.

3. The air supply to a general ventilation fan must be fresh outside air. Recirculation of air already contaminated shall not be permitted. A minimum of 400 c. f. m. per welder shall be supplied to a given working space such as a deep tank when general ventilation is used alone.

12



4. In warm weather, air movements or drafts are helpful, while in cold weather a minimum of air movement is desired and local exhaust will serve best. In temperate weather, it is most satisfactory to use a combination of local exhaust and general ventilation.

**14.5  Coordination of department with construction program.—**

a. The ventilation supervisor shall keep abreast of construction, and thus anticipate the ventilation needs.

b. The construction foreman shall inform the ventilation department of ventilation needs before the needs occur.

c. Blackboards, boxes, signal lights, or similar devices shall be installed on board and used to inform the ventilation department of immediate needs.

**14.6  Supplementary ventilating procedures.—**

a. Ventilating confined spaces, such as the fore- or after-peaks and deep tanks, is greatly simplified by the temporary removal or cutting through of certain plates.

b. For example, the fore-peak of a Liberty ship can best be ventilated by cutting a combination access and ventilation hole through the watertight bulkhead near the ship's bottom.

c. The tank top can be left off of the midship deep tanks until all welding has been completed in this space.

d. A side plate can be left or cut out of the engineroom at the bottom deck level.

## MINIMUM REQUIREMENTS FOR SAFETY

**9–1.  Management Part.**

9.1  It is absolutely essential, if a successful accident-prevention program is to be installed and operated, that top plant management take an active and interested part in the work.  The same supervision given any other important activity in the shipyard shall be given the safety program.

9.2  The responsibility of management insofar as industrial safety is concerned shall be considered to include—

9.21  The provision of a safe working environment.

9.22  Training of employees for safety.

9.23  Establishment of an accident record and reporting system which will definitely tie into nationally uniform reporting, record, and statistical requirements.

9.24  The appointment, where necessary, of a safety engineer (or a safety director) and staff to install, maintain, and properly supervise an accident-prevention program.

13



3.25  The issuance of instructions to all division or department heads, foremen, leaders, leadingmen and to any persons in supervisory capacity, that they are considered responsible for preventing accidents which involve employees working under their direction and requiring them to comply with all of the provisions of the accident prevention program in effect in the shipyard.

3.26  An active and interested participation in safety through—

(a) Review of, and executive action on, safety records.

(b) Regular attendance at safety meetings.

(c) Action upon good or bad departmental safety records through personal interviews with department heads.

(d) General letters, for bulletin board posting, addressed to employees and discussions of good or bad yard accident record.

(e) By setting a good example. (Goggles, safety shoes, hard hats and other necessary protective equipment shall be used by any executive who exposes himself to yard operations.)

**3-2. Safety Director and Staff.**

3.1  A full-time safety director (title may be safety engineer or safety inspector, etc.) and staff shall be appointed for all shipyards. (See Section 3.25 for duties and responsibilities.)  The safety director shall report to, and be responsible to, the highest ranking managerial executive or his designated representative.

3.2  The staff in the safety department in addition to the safety director, shall consist of:

3.21  An assistant safety director in yards having 3,000 employees or more except that there shall always be at least one safety engineer per shift.

3.22  One safety engineer (safety inspector) for each additional 1,500 employees.  Example: If a yard has 33,000 employees there would be required a safety director and an assistant plus 21 safety inspectors.

3.23  The staff of engineers shall be distributed over the three shifts in proportion to the number of employees on each shift.

3.24  One clerk and/or stenographer for the first 5,000 employees and one clerk for each additional 7,500 employees.  (It is not to be assumed that the time of safety inspectors or the safety director can be spent on clerical detail.  All office functions, while adequately supervised by the safety

14



director, should be carried on by clerks so the greatest possible amount of time of the safety director and his staff may be spent in the shipyard.)

8.23   The duties and responsibilities of the safety director shall include:

(a) Complete responsibility for formulating, administering and making necessary changes in the shipyard accident prevention programs within the limits of authority granted by the shipyard management. The safety director shall also be required to correlate the shipyard accident program with the minimum safety and health standards of the United States Navy Department and Maritime Commission.

(b) Submission of regular monthly, weekly or daily reports on the status of safety directly to the general manager or his designated representative.

(c) Acting in an advisory capacity on *all* matters pertaining to safety to the management, general manager, superintendents, foremen, quartermen, leadermen, purchasing department, engineering department, commissary department, or contractors.

(d) Maintenance of the accident record system, making all necessary reports, personal investigation of all fatal or serious accidents, investigation through his staff of all accidents, securing supervisor's accident reports, checking corrective action taken by supervisors to eliminate accident causes.

(e) Supervising, or closely cooperating with the training supervisor in the safety training of all employees. (See Section 6.24.)

(f) Correlating safety work with medical department to insure proper selection and placement of employees.

(g) Making personal inspections and supervising inspections by staff and by special employee committees, for the purpose of *discovering and correcting unsafe conditions or unsafe work practices BEFORE THEY CAUSE ACCIDENTS.*

(h) Exchanging information with other shipyards on best safety methods and consulting with United

Page 170

15



States Navy Department and Maritime Commission Regional Safety Consultants on safety problems which cannot be solved with methods or information at hand.

(i) Making certain that all federal, state or local laws, ordinances or orders bearing on industrial safety are complied with.

(j) Securing any necessary help or advice from the state labor departments on matters pertaining to safety and health.

(k) Initiating activities that will stimulate and maintain the interest of employees in safety.

(l) Acting as secretary of all safety committees and in such capacity he shall prepare an agenda for each such meeting covering the business to be discussed and, he shall prepare for the record, minutes of each such meeting.

(m) Directing the activities of his staff including the assistant safety director, so that the shipyard accident prevention program will be efficiently operated. It is expected that the safety director may delegate certain responsibilities to his staff engineers, such as that of acting as secretary of certain of the safety committees. Permission for such delegation of authority is expressly given in the interest of efficiency and for training the safety staff.

(n) Submission of the required reports on the status of safety in the shipyard to the interested government agencies at the time and intervals hereinafter requested.

**3-4. Accident Prevention Forms and Reports.**

4.1  The safety director shall cause to be designed and put into use at least the following forms and records:

4.11  *Supervisor's report of accident.—*

(a) Giving all vital data on case plus statements as to unsafe act and/or unsafe condition, reason unsafe act or condition was permitted to exist or occur, and the immediate corrective action taken or recommended. (See Form 1).

4.12  *Safety engineer's recommendation form.—*

(a) Form used by safety staff to record recommendations made during inspection. Used for follow-up. Made in triplicate; one to leader-



U. S. MARITIME COMMISSION — U. S. NAVY
PRIVATE SHIPYARDS

SUPERVISOR'S REPORT OF ACCIDENT OR OCCUPATIONAL DISEASE

17

SAFETY ENGINEERS RECOMMENDATION FORM

BLANK SHIPBUILDING COMPANY

To: _____     Location _____

Date: _____           Time: _____

An inspection of operations under your supervision revealed
the following unsafe practices and/or conditions

NOTE: (Unsafe acts or conditions to be described
here and numbered. Being members or names
of men involved may be listed.)

Above conditions or practices last observed (1)_____ (2)_____ (3)_____

Corrected at once? _____ If not, when will corrective action be taken? _____

                                     Signed _____
                                            Safety Department

Date checked _____      Signed _____
(Used only if condition is not                 Safety Department
corrected at once.)

                                            No. 609

NOTES:  (1) Size, approximately 3" x 5"

        (2) To be made out in triplicate (See 4.12)

        (3) Form need not be filled out if condition is
            corrected at once unless unsafe act or con-
            dition is a repetition or a flagrant violation
            of safety rules is involved.

        (4) If check above existence of same unsafe act or
            condition the matter should be referred in
            writing, to the proper executive for action.



13

man or quarterman on job, one to general manager, or other designated executive, one to safety department files after use to check performance.  (See Form 2.)

**4.13  United States Navy Department and Maritime Commission monthly injury summary.—**

    (a) To be submitted monthly to United States Navy-Maritime Commission.  (See Form 3 attached.) To include over-all breakdown of predominant accidents, types and causes, accident frequency, total number of fatal cases, total of lost-time cases and the time lost, etc.  *This form to be used also for report to management of shipyard.*  To be submitted in triplicate as required on form.  (See Form 3.)

    (b) The following formula shall be used in determining accident frequency rates for shipyards:

       1. Accident Frequency=

$$\frac{\text{Number Disabling Injuries} \times 1{,}000{,}000}{\text{Total Man-Hours Worked for Period Covered}}$$

       2. A disabling injury shall be considered to be any injury which results in a man being unable to report for work on the next regular day or shift after the accident, or one which calls for a standard time charge being made regardless of whether time is actually lost.  If time is lost due to the injury, subsequent to the initial return to work, then the injury shall be accounted as disabling.

**4.16  Minutes of safety committee meetings.—**

    (a) Minutes of meetings should show date and time of meeting, names of those present, action on unfinished business, brief description of new business discussed and action taken or ordered by the committee on each item.  The discussion should always include the predominating accident hazards of the yard and the means suggested to control them.

    (b) Various committee forms will be made available to shipyards on request.

**4.17**  These forms and any others pertaining to industrial safety or health shall be filed and made available to authorized

19

U. S. MARITIME COMMISSION — U. S. NAVY

PRIVATE SHIPYARDS

SURVEY SUMMARY FOR MONTH OF _____, 19__

INSTRUCTIONS

FORM 9—Front.   (See paragraph E. 4.13-a.)





21

representatives of the United States Navy-Maritime Commission upon request.

**8-8. Safety Committees.**

8.1  The safety director, in cooperation with the shipyard general manager, shall cause to be formed and put into effective operation at least the following safety committees.

8.11  *Central safety committees.—*

(a) Membership: management representative (chairman), safety director (secretary), all superintendents, foremen, medical department representative, quartermen or leadermen, and one employee.

(b) Membership of all but management representative, medical department representative and safety director may be rotated—terms of 9 months each but rotation to be arranged so only ½ of committee changes each month.

(c) Meetings: Shall be monthly or more often as necessary.

(d) Duties: This is the policy forming committee for safety work. They review the monthly report as submitted to the United States Navy-Maritime Commission and other records to determine the course of safety work for coming period. They decide such matters as type of safety equipment to be used and how it shall be made available to men, types of safety training to be used, whether accident prevention plan is being adhered to, interplant contest awards, etc. Such committees shall review the investigation on fatal or serious accidents and make recommendations. All Committee members are expected to make practical suggestions to improve shipyard safety. They also review reports of other committees to make certain suggestions and recommendations are properly followed through.

(e) Secretary: The safety director shall act as secretary, prepare an agenda, take minutes, prepare a report of committee meeting, and distribute copies of reports to members. He shall follow through with other committees, the suggestions and recommendations of the central safety committee.

22



**5.13  Supervisors' safety committee.—**

(a) Membership: Management representative, safety director, medical department representative, superintendents, foremen, quartermen, and leadermen. This is a rotating committee; rotation should be arranged so all of the supervisory staff serve in their respective periods, i. e., superintendents change each four months, foremen each two months, quartermen and leadermen each month. In no case should an entire group change at one time. Where a department or unit of a department has an unusually poor record then the responsible supervisory staff—superintendent, foremen, quartermen or leadermen should be retained on the committee until their record is at least equal to the shipyard average.

(b) Meetings: Shall be monthly or semimonthly or more frequently, as necessary.

(c) Duties: The primary purpose of this committee is the stimulation and maintenance of interest and the education of its members in accident prevention. The shipyard accident record shall be reviewed, the predominant types of accidents and the predominant causes of these accidents shall be discussed. Suggestions and recommendations to improve the records are solicited from each member. At least one timely subject must be discussed at each meeting; i. e., such as eye injuries and their prevention, electric shocks, hand tool accidents, etc. Methods of avoiding accidents due to these operations should be presented by the committee members.

(d) The committee shall review reports of all fatal and serious accidents and suggest preventive action. It shall review reports of inspection committees and check on the quality of the suggested corrective action for unsafe conditions or practices reported.

(e) The committee shall carry out the suggestions and recommendations of the central committee.

(f) Outside speakers such as safety engineers, insurance men, State Department of Labor men or men from other shipyards, may be used from



23

time to time to stimulate interest of committee members in accident-prevention work. Sound film strips, motion pictures or other similar media on safety subjects can and should be used if available and practicable.

(g) Secretary: Same as for central safety committee.

5.13  *Regular inspection committees.—*

(a) Number: One committee for each department and each hull.

(b) Inspection: Weekly or more often as necessary.

(c) Membership: At least two employees and a supervisory employee of each job being inspected. The safety director or staff safety engineer should accompany the committee.

(d) Duties: To inspect their department or hull for the purpose of discovering and having corrected unsafe acts and unsafe conditions likely to cause accidents. On each section of a job they should be accompanied by a responsible supervisory employee. They are observers only—the foremen, quartermen or leadermen shall do all corrective work. Where a condition is discovered on which there is disagreement the superintendent shall make the necessary decision. *Hazards immediately dangerous to health, life or limb shall be corrected by the accompanying supervisor at once.*

(e) The committee shall submit written reports to the safety director and indicate whether accident-producing conditions or practices have been corrected. These reports shall be referred to the supervisory safety committee by the safety director. If necessary because of dangerous conditions, he may refer them at once to the general manager.

5.14  *Special inspection committees.—*

(a) Staging inspectors, electrical inspectors, crane inspectors, boiler inspectors, and others.

(b) Membership: Specially qualified individuals or teams permanently assigned to work. (See paragraph 5.15c.)

(c) Duties:

1. Staging inspectors: Daily or continuous inspections of all stages shall be made on each

Page 179

24

hull—or other locations where stages are used. Report shall be made of all defects to the responsible supervisor for immediate correction. Copy of the daily report shall be submitted to the safety director.

2. Crane inspectors: Weekly inspections shall be made of all cranes and rigging. Reports shall be submitted to proper department heads for correction of unsafe conditions or practices. Copies of reports on defects shall be made to the safety director.

3. Other inspectors: As above and at indicated frequency.

5.15  *Safety committees—General.—*

(a) Committees in addition to those specified in these standards, may be formed and operated if desired.

(b) Representatives on all committees, when of a supervisory status, should be appointed by the shipyard general manager and held responsible by him for active and interested participation in the work of the committee. Employee representation may be secured in the same manner, or by appointment of employee committees, union shop stewards or by election of union members or by any other feasible means.

(c) The services of production employees having related duties may be taken advantage of on inspection committees. Stage erectors or repair men may serve as permanent and continuous staging inspectors, a man or men from the ventilation crew may be utilized for checking on ventilation practices. The reports of state or insurance inspectors will be considered adequate on boilers, air compressors and receivers or on other pressure vessels.

**5-6. Employee Safety Training.**

6.1  The time for the safety training of an employee to start is at the inception of his employment. After a physical examination, which should be made to make certain that the employee is physically capable of performing safely the work he is requesting, the man shall have explained to him the safety policy of the company by a representative of the safety department. This may be done individually, in general groups or in craft groups and the instruction may



25








be supplemented by printed instructions in the form of rule books or instruction cards.

6.3   Employees shall have in their possession, and be instructed in the proper use of, all necessary personal protective equipment before being started on any job.

6.5   General safety rule books, craft safety rule books or safety instruction cards should be supplied employees. Such books should be concise but complete enough to furnish written record of all important safety rules. *No rule shall be included which will not be strictly enforced.* The assistance of United States Navy-Maritime Commission safety engineers will be given in the preparation of such rule books if desired.

6.4   All employees shall be instructed in their specific duties by their immediate supervisor and they shall be made familiar with the hazards of the job and instructed carefully in how to avoid them. It shall further be the duty of the supervisor to constantly check all employees so unsafe working practices may be corrected before accidents occur.

6.5   Safety instruction shall be correlated with all apprentice and craft training schools. Safety instruction in such schools or training courses shall include an explanation and demonstration of the need for the safety equipment or safe practices specified and the strict enforcement of all safety requirements in the classes. The instructors shall, by their own example, impress upon the learners the importance of the safety requirements.

6.6   Safety bulletin boards shall be located at each hull and shop, and at such other locations where they may be desirable, on which safety posters, letters or bulletins from the shipyard management or safety department and other safety material may be posted.

6.61   The bulletin boards shall be located where the majority of the employees at a particular location will see them.

6.62   The bulletin boards shall be well constructed, have a locked glass cover and shall be lighted at night.

6.63   Safety posters and other material on bulletin boards shall be changed at least semimonthly or more often. (Posters will be made available by the United States Navy-Maritime Commission for the use of shipyards. However, posters may be selected by the shipyard safety department from any source.)

6.7   Where shipyard house organs (magazines or newspapers) are established, the safety director shall arrange to have a reasonable proportion of the space devoted to safety (articles, items and cartoon cuts relating to safety will be made available by United States Navy-Maritime Commission safety consultants.)



26

6.3  Sound-film strips and motion pictures on safety subjects should be used where practicable.  Public address systems, where installed, may be used for safety messages to shipyard employees especially during lunch hours or at shift changes.

**S-7. Safety Supply Store.**

7.1  A safety supply store shall be established in each shipyard where safety shoes, safety hats, protective impact goggles and filter-lens welding goggles shall be made available to shipyard workers.  Shoes may be sold at or near cost to employees, but safety hats and impact and filter-lens goggles shall be issued to each employee but shall remain the property of the company to be returned when the employee ends his employment.  Equipment such as work clothes, gloves, welders helmets, may also be stocked and sold to employees if desired.

7.11  Goggles may be stocked in the central tool room or first-aid department but should be fitted as described in paragraph 7.2 following.

7.2  The attendant of the safety store should be skilled in fitting safety shoes, and if goggles are also issued, he should be trained in proper fitting and servicing of goggles.

**S-8. Goggles.**

8.1  Impact-resisting goggles of a type suitable for the particular job and also of a type meeting the requirements of the United States Bureau of Standards, shall be worn by every employee exposed to the hazard of eye injuries.  Practically every employee in the shipyard, with the exception of those working inside offices at all times are either directly exposed to eye injury from the work they do, or indirectly through working near operations which are likely to produce flying objects.  (See paragraph H-10.3a, page 4.)

8.2  Except where *temporary lack of goggles* make it impossible, each employee shall have his own pair of goggles.  If it is necessary to reissue goggles to different employees, *the goggles must be sterilized after each use.*

8.3  Goggles supplied employees should be carefully fitted to their face to prevent irritation and to prevent the entrance of foreign objects around the edges.  (See paragraph 7.2.)

8.4  All employees working in proximity to arc-welding operations shall be required to wear anti "flash" goggles, of at least No. 2-5 shade (or equivalent), of a type meeting the requirements of the United States Bureau of Standards.  (See section 9.1 on welding for additional eye protection for welders.)

8.5  Welding screens constructed of wood, metal or other suitable material shall be used to protect the eyes of workers in proximity to electrical welding operations, whenever their use is practicable.





27

**3-4. Welding—Arc.**

9.1  All welders shall be made familiar with the hazards of their work and instructed in safe methods of performing the various types of jobs to which they are assigned.

9.2  Personal protection equipment used by welders shall include:

9.21  Welders' protective hood provided with the proper shade of filter type lens for protection against the harmful rays of the arc and a clear cover glass to protect the filter lens.

(a) The shades or their equivalent recommended are:

    Up to 30 amperes—No. 6-7 Shade.
    30 to 75 amperes—No. 8 Shade.
    75 to 200 amperes—No. 10 Shade.
    200 to 400 amperes—No. 12 Shade.
    Over 400 amperes—No. 14 Shade.

(b) Shades may also be selected from the following table:

| Rod diameter | Welding glass shade No. |
| --- | --- |
| 1/16 | 10 |
| 3/32 | 10 |
| 1/8 | 10 |
| 5/32 | 10 |
| 3/16 | 12 |
| 1/4 | 12 |
| 5/16 | 14 |
| 3/8 | 14 |

(c) The welder's hood should be inspected at least weekly to detect possible light leaks, cracked protective glass, or badly fouled or missing cover glasses. Any defects discovered shall be corrected at once.

9.22  Protective leather welders' jacket, long-sleeved wool shirt with buttoned collar and leather welders' gloves and safety hat.

(a) It has been found satisfactory in the hot summer months to substitute flameproofed cotton shirts. If this is done, the flameproofing, which must must be reapplied after each washing, should be done under the direction of the shipyard. This entails that laundering also be done by the company. Commercial laundries are rapidly undertaking this type of work.

9.23  Hardened and filter lens protective goggles with sideshields to be worn under the hood for protection against harm-

Page 183

28



ful rays where the hood is raised and for protection
against flying scale and chips. The goggles should be
of a type meeting the requirements of the United States
Bureau of Standards and of at least No. 3-4 shade or
equivalent.

9.24  Safety shoes or pull-on boots with cord or leather soles
and heels.

9.3  Welding screens (constructed of flameproofed fabric on wood
or metal frames, metal on metal frames, or plywood sheets joined by
rings) of a size sufficient to protect men working nearby from the
harmful effects of the electric arc rays shall be used on all electric
welding operations when practicable.

9.31  A type found very successful by one large company can be
economically constructed of ¼" to ⅜" plywood. Two
pieces about 18" x 30" are joined at two points along
one edge with 3" x ½" rings. The large size of the
rings allows the two pieces to lap sufficiently to make a
lightproof joint, while the light weight of the assembled
screen makes men more prone to use them.

9.4  Welding leads shall be inspected at least once each shift, and
those found defective shall be repaired or replaced.

9.5  All welding leads should be coiled back to centrally located
stations after the completion of each shift or job.

9.6  Welding rod tips should not be thrown on decks or stages but
should be retained by the welder and turned in at the end of the day
for salvage.

9.7  Each electric welder shall make an inspection of the area be-
low him, and of the opposite sides of bulkheads on which he is work-
ing, to make certain that there is no danger of falling or penetrating
sparks causing a fire. He and his helper must know the location of
fire extinguishing equipment and how to use it. It is recommended
that a fire extinguisher be available in the immediate area.

9.8  The safety of women welders presents several special problems
which should be carefully considered while women are being trained
and during their first several weeks on the job.

9.81  Women will at first be subject to excessive fatigue because
they are unaccustomed to shipyard work. In their en-
thusiasm they are likely to overdo and will, under such
conditions, be more prone to accidents and at the least,
absence may follow. They should, until they become
accustomed to the work, be carefully watched by super-
visors and if signs of fatigue are evident they should
temporarily be given lighter work.

Case MDL No. 875   Document 5446   Filed 05/09/08   Page 340 of 362

29





9.52   Work clothing for women is still in the development stage. In general, however, the following should be observed:

   (a) Safety shoes or pull-on boots with cord or leather soles and heels.

   (b) Long underwear, union suit type (wool for winter) khaki trousers and shirt, or overall type of overall with a drop seat and welders' leather uniform.

   (c) It is desirable that the outer clothing, unless of wool, be flameproofed.

   (d) Leather gloves.

9.53   Whenever possible, mechanical means of handling material should be utilized in preference to manual handling.

S–12. Burners.



10.1   Equipment for burners shall be the same as that for welders except that the leather clothing and welders' helmets need not be worn. Filter type lens protective glasses with side shields. "No. 3–6 shades or their equivalent should be worn. Flameproofed clothing is desirable.

10.2   All individual oxygen and acetylene and other gas lines shall be turned off at the manifold at lunch hour and at quitting time or if the burner must leave the immediate vicinity of his work during the regular shift.

10.3   All hose should be coiled up to the manifold when shifts are changed or when jobs are completed.



10.4   The practice of dusting the clothes by blowing oxygen on them or using oxygen for ventilating or cooling purposes has resulted in several fatalities and *shall be absolutely forbidden*. Oxygen shall be used only in connection with burning or welding operations.

10.5   Each burner shall make an inspection of the area below him, and of the opposite sides of bulkheads on which he is working, to make certain that there is no danger of falling sparks causing a fire. He and his helper should know the location of fire-extinguishing equipment and how to use it. It is recommended that a fire extinguisher be available in the immediate area.



10.6   Burners' uniforms (overalls) shall be laundered at least weekly except that if oil or grease is spilled on the clothing, it shall be changed at once. It is desirable that arrangements be made by the company to have uniforms (overalls) laundered and flameproofed.

10.7   Defective burning equipment such as torch, hose or cylinder pressure regulators (where cylinders are used), shall be repaired immediately.

10.8   All oxygen and acetylene (gas) lines shall be inspected at least once each shift and those found defective shall be repaired or replaced.

10.9   Standard color coding for oxygen and acetylene pipe lines shall be observed for oxygen and acetylene. (Since it may be impos-



Page 185

30




sible to secure colored hose during the war, identification may be made by any practicable means so long as every burner and burner's helper or any other person who has occasion to use oxygen-acetylene (gas) equipment is thoroughly familiar with it.)

**S-11. Cranes (Whirleys, Hammerheads, Bridge, etc.)**

11.1   The safe loads as specified for cranes on single lift shall not be exceeded.

a.  For the guidance of crane operators, weights of all sections over 5 tons shall be plainly marked on the section in figures at least 12 inches high.



11.2   On double lifts, cranes shall not be loaded to more than 75% of their combined rated capacities.

11.3   All crane operators shall be given a thorough physical examination upon employment and at at least yearly intervals thereafter. Particular attention should be given to the eye examination.

11.4   Crane inspectors.   (See section S. 5.14.)

11.5   All whirley and hammerhead cranes shall be provided with bumper guards of ¾″ wire rope or equivalent set from 32 to 36 inches from the ground, and fastened in the form of a half loop to all four wheel covers at the leading and trailing ends of the crane.



11.6   All traveling cranes regardless of the type shall be equipped with a clearly audible automatically operated signal which will indicate that the crane is in motion.   A siren or electric horn pitched to a tone above or below the general noise level of operations is preferable to a gong or bell.

11.7   The crane operator shall take signals only from the designated hook tenders or riggers and no others.   Hook tenders shall be identified by special hats or arm bands.



11.8   All loads shall be lifted or lowered under power.

11.9   Employees shall not be permitted to pass between the leading and trailing trucks of whirley cranes AT ANY TIME.

a.  Wheel covers shall be provided which will protect all wheels of whirley, gantry, hammerhead and bridge cranes to a distance of ¼ inch from the crane tracks.

11.10   Employees shall not remain under, or pass under crane loads.



11.11   Trolley lines for cranes shall be protected against accidental contact by men or material, by wood or other suitable sheathing, or if the trolley lines are elevated they shall have a vertical clearance of at least 12 feet above the ground.

a.  Bumper guards for trolley ends of bridge cranes should be provided to prevent the hoisting cables from swinging into the trolley wires.








31

11.13  The crane operator shall be required to immediately notify a designated department head of any defects he notices in the crane or its equipment.

11.13  No person other than the crane operator, a trainee, the supervisor in charge of cranes, the crane inspector, repairmen on crane repair jobs or safety department men shall be permitted in crane cabs. No more than three persons shall be in the cab at any time.

a.  Whenever possible, crane operators should be relieved on the ground and not in the crane cab.

11.14  Except under emergency conditions and then only with the approval of the safety department, men shall not ride loads. Men shall never be permitted to ride empty hooks or slings.

11.15  A clearance of at least 2 feet and preferably more shall be maintained between the crane and any stationary object or materials. Where existing structures make this clearance impossible, an exception to this rule may be granted by the United States Navy-Maritime Commission Safety Consultant after an inspection.

11.16  Strong-backs or spreaders should be used on all lifts where there is danger of the load buckling or where the spread is so wide slings or clamps may slip.  Steel strong-backs are preferable to wood.

11.17  The hook tenders shall familiarize themselves with the weights of the various plates, shapes and sections handled, so chain or cable slings of the proper size will be used on lifts.

11.18  All chain and cable slings and strongbacks should be clearly marked, by color coding, to indicate the maximum safe load for which they are to be used.

11.19  All electric cranes should be equipped with limit switches to prevent double blocking.

11.20  Storage racks shall be provided for all chain and cable slings at points convenient to the operations so they may be safely stored when not in use.  All chain and cable slings shall be inspected before each use by the hook tender and if found defective, shall be sent to the proper department for repair.  Such inspections shall be in addition to, not substitutes for, the regular inspections by the safety department.

S-12.  Plant Housekeeping.

12.1  Housekeeping shall be maintained at a high standard in all parts of the shipyard at all times.  The following rules shall (or should, as indicated) be put into effect:

a.  Wide, well-defined roads, aisles, and passages shall be laid out in the yard and shops and they shall be kept clear of obstructions and shall be kept clean and free from debris.  The width of aisles and passages in some of the older yards may be limited because of exist-







32

ing structures, but an effort should be made to maintain a width of twice that of the widest hand or power truck, plus two feet.

12.12  Aisles and passages should be defined by white or yellow lines painted on the floors. Materials or machines should not be permitted to encroach on these lines into the aisle.

12.13  All staging platforms, ramps, stairways, walkways, or other walkway surfaces on shipways shall be kept clean of all debris such as welding rod tips, bolts, nuts, and similar material. Welding leads, burner hose and air hose should be elevated over or placed under the walkway surfaces or protected by cross-over planks. They should be neatly arranged and not left in coils or loops where they may cause men to trip and fall.

12.14  All deck areas on hulls shall be kept free of debris and construction material shall be neatly piled so as not to present a hazard to employees.  (See par. S. 12.13 on hose, etc.)

12.15  All deck openings shall, as soon as practicable, be protected with guardrails at least 42 inches in height set 19″ back from the edge of the opening.  Manholes may be guarded by tacking three uprights to the deck and then tacking a ring of the proper diameter to the top of the uprights.  Hatches, without coamings, may be guarded by tacking uprights to the deck at intervals of not more than 10 feet and fastening 9″ x 6″ or 9″ x 3″ timber rails in place at 42″ from the deck.  Midrails set 21″ from the deck may be used also, and are especially recommended where women are employed.

    (a)  Where they are projecting stud bolts around the manholes or tank tops, they should be protected with either metal strips or wood covering to prevent slips and falls or snagging of clothing of workers.

12.16  All snow and ice shall be cleaned from stagings and platforms (by turning the planks), and from decks, before men on regular production are permitted to work on them.

12.17  Free access shall be maintained at all times to all exists and to all fire-alarm boxes or fire-extinguishing equipment.

12.18  All oils, paints, thinners, solvents, waste, rags, or other flammable substances shall be stored and used strictly

33

in accordance with the requirements of the National Fire Protection Association standards.

19.19  All staging lumber, or other lumber, when dismantled shall have all nails or spikes removed or bent over.

19.20  Plates and shapes shall be stored either in substantial metal or heavy timber racks or stored flat on a substantial timber or concrete foundation that will prevent shifting.

(a)  Plates and shapes shall be stored so there is at least an 8-foot clearance from the center line of railroad tracks.

19.21  Angle brackets and similar small pieces shall be stored in racks.

§ 21. Lighting.

21.1  A level of illumination should be maintained for the various type of jobs in all shops, at least as high as that recommended by the standards of the Illuminating Engineering Society.

Minimum Standards of illumination for certain industrial interiors as recommended by the Illuminating Engineering Society are as follows:



| Type of Work | Minimum approved foot-candles measured on the work |
|---|---|
| Assembly: | |
| Rough | |
| Medium | 10 |
| Construction—Indoor: | 30 |
| General | |
| Forge shops and welding | 15 |
| Foundries: | 30 |
| Charging floor, tumbling, cleaning, pouring and shaking out | 5 |
| Rough molding and core making | 10 |
| Fine molding and core making | 20 |
| Machine shops: | |
| Rough bench and machine work | 10 |
| Medium bench and machine work, ordinary automatic machines, rough grinding, medium buffing and polishing | 20 |
| Paint shops: | |
| Dipping, simple spraying, firing | 10 |
| Rubbing, ordinary hand painting and finishing; art, stencil and special spraying | 20 |
| Power plants, engine rooms, boilers: | |
| Boilers, coal and ash handling, storage battery rooms | 5 |
| Auxiliary equipment, oil switches and transformers | 10 |
| Engines, generators, blowers, compressors | 15 |
| Receiving and shipping | 20 |
| Sheet metal works: | |
| Miscellaneous machines, ordinary bench work | 15 |
| Punches, presses, shears, stamps, welders, spinning, medium bench work | 20 |



34

| Type of work | Minimum operating foot-candles measured on the work |
|---|---|
| Steel and iron manufacturing: | |
| Billet, blooming, sheet bar, skelp and slabbing mills | 5 |
| Boiler room, powerhouse, foundry and furnace rooms | 5 |
| Cold strip, pipe, rail, rod, tube, universal plate and wire drawing | 10 |
| Repair shops: | |
| Rough bench and machine work | 10 |
| Medium bench and machine work | 20 |
| Blacksmith shop | 10 |
| Carpenter and pattern shop | 10 |
| Storage | 2 |
| Store and stock rooms: | |
| Rough bulky material | 5 |
| Medium or fine material requiring care | 10 |
| Structural steel fabrication | 10 |
| Woodworking: | |
| Rough sawing and bench work | 10 |
| Sizing, planing, rough sanding, medium machine and bench work, gluing, veneering, cooperage | 20 |

13.2   All lights should be provided with reflectors suitable for the type of work being done and meeting the requirements of wartime dim-out regulations.   A regular schedule of cleaning and maintenance should be instituted that will keep the lighting units at their original efficiency.

**S-14. Hand Tools.**

14.1   All tool rooms issuing hand tools such as hammers, sledges, chisels, spud wrenches, center punches, portable air-driven tools, portable electric tools and other tools should be inspected daily by a safety engineer to make certain that only tools in good condition are being issued.   Tools in poor condition shall not be issued.

14.2   Workers' personal tool kits should be inspected at monthly intervals so defective tools may be discovered and repaired.

**S-15. Handling Material (Manual).**

15.1   All employees should be instructed in the proper method of lifting.   No limit can be set as to the maximum weight to be lifted by one man, but it should be made clear to all employees that they should secure help if the load is too heavy or too bulky for one man to handle easily.   Mechanical equipment should always be used when it is available and its use is practicable.

15.11   Posters illustrating the proper method of lifting should be displayed frequently and men observed lifting incorrectly should be reinstructed by their supervisor.

**S-16. Machine Guarding.**

16.1   All belts, pulleys, gears, chains, sprockets or other dangerous moving parts of machines shall be completely enclosed with guards

35

constructed of angle-iron brackets covered with heavy sheet metal or ¼-inch wire mesh.  Vertical or inclined belts shall be guarded to a height of 6 feet above the floor.  Horizontal belts over 8 feet above the floor may be guarded only on the under side.  Gears, chains and sprockets should be guarded no matter where located.

16.11   Since metal may not be available for guards at present, substantially constructed wood guards will be acceptable.

16.12   In all cases where state requirements are more stringent than those given above, the state rulings must be followed.

16.2   All machines shall be guarded at the point of operation so employees will not be injured while operating the machine.

16.21   The standards of guarding for the various machines as recommended by the Insurance Rating Bureau should be followed except where state requirements are more stringent when the latter will take precedence.

S-17.  Staging and Ladders.

17.1   United States Navy—Maritime Standards of Construction for shipyard staging is in the process of development and will replace the present recommended practice when published.

17.2   All staging, scaffolding, platforms and walkways shall be constructed in accordance with the requirements of the California State Industrial Commission except where existing state codes are more stringent in which case the latter shall take precedence.

17.3   All ladders should conform to the American Standard Safety Code on ladders.





U.S. Department
of Transportation
Maritime
Administration

# Certificate of True Copy

I HEREBY CERTIFY that the annexed ___is a true copy of a document entitled "Minimum

Requirements for Safety and Industrial Health in Contract Shipyards", consistic

of thirty-five pages, as it appears on file

in the Maritime Administration, U.S. Department of Transportation

IN WITNESS WHEREOF, I have hereunto set my hand, and cause

the seal of the Maritime Administration to be affixed, on th

day and year below written.

Secretary
Maritime Administration

Washington, D.C. _____ October 4 _____ 19_83_

Form MAR-93
(Rev. 8-82)

DHS EXHIBIT 3
DATE: 12-11-03
WITNESS: HUGH SUG
RENEE C. ROBERTS, R.P.

DEFENDANT'S
EXHIBIT
EXP/STC 53

Page 192

# EXHIBIT I

# SAFETY REVIEW



NAVEXOS P-52      Vol. 4, No. 1
Jan. 1947

J-H EXHIBIT 12(c)(1)



DEPOSITION
EXHIBIT
MUS 26

DEFENDENT'S
EXHIBIT
Buffalo Pumps
65

## FOUNDRY DUST

ONE of the elements in effective control of silicosis in foundry operations is the maintenance of the highest standards of housekeeping. One phase of the housekeeping program should include periodic removal, on a scheduled basis, of the dust which has settled on overhead obstructions, girders, conduits, catwalks, and other fixed objects where dust in the general atmosphere may settle and come to rest. Several of the shore establishments, realizing the importance of good housekeeping conditions in keeping down concentrations of dust in the general foundry atmosphere, make use of industrial vacuum-cleaning systems for the periodic removal of dust which has settled on overhead structural members and equipment.

The importance of developing and maintaining such a housekeeping program is emphasized in the following report submitted recently by the Boston Naval Shipyard:

"Personnel working in the foundry have complained of the material which is deposited overhead and elsewhere in the foundry and drops down when the building vibrates; a laboratory analysis of a sample of this deposit follows:

| | | |
|---|---|---|
| Tin | (as SnO2) | 9.66 |
| Lead | (as Pb ) | 2.09 |
| Copper | (as Cu ) | 2.06 |
| Silica | (as SiO2) | 2.64 |
| Sulphur | (as S ) | 4.90 |

Zinc Oxide ......The remainder, with the lead, copper and part of the zinc present as sulfides in the sample.

"In that the inhalation of heavy metal dusts is considered a contributing factor to metal-fume fever, the need for protective measures is obvious and again urged."

## ASBESTOS DUST

EXPOSURE to asbestos dust is a health hazard which must be overlooked in maintaining an effective occupational-hygiene program. Adequate localized ventilation to maintain dust concentrations below the safe threshold limits must be utilized wherever possible, and, if circumstances warrant these should be supplemented by general-room ventilation. Activities engaged in the handling of asbestos insulation and pipe covering should thoroughly investigate the environmental conditions under which these operations are performed, taking the necessary dust counts and checking existing ventilating facilities to insure that the hazard is being effectively and continuously controlled. In those instances where mechanical exhaust ventilation must be supplemented by the wearing of personal protective equipment, personnel exposed to such hazards should be furnished the navy half mask, conforming to BuShips Ad Int. Specification, Masks (for Protection of Respiratory Organs from Toxic Fumes and Dust), dated 16 September 1946, 37M3, Type C, Class 1, Filter-Pad Masks.

The following report from the Naval Shipyard, Portsmouth, New Hampshire, records the results of an investigation conducted at that activity:

"There were two investigations of occupational-health exposures during the month of October.

I (a) Conditions in the Asbestos Insulation and Pipe-Cover Section of Bldg. 174 were investigated and it was found that the dust count in this section was upward of 5 m./cu.ft.

(b) Recommendations were made as follows:

1. That the asbestos covering process be confined to as small a section of the shop as possible.
2. That proper ventilation be secured.
3. That appropriate respirators be worn by the workers.
4. That instruction be given workers in the use of respirators."

## FLAMEPROOFING OF TEXTILES

THE National Bureau of Standards recently announced "Circular C-455, Flameproofing of Textiles," which sets forth most recent results of research to develop treatments which reduce the flammability of textiles and make them reasonably resistant to effects of water. It also gives a new method for determining the relative flammability of untreated textiles. Requests for this publication should be sent to the Safety Branch, Office of Industrial Relations, Building K-1006, Navy Department, Washington 25, D. C.

13

1  Peter B. Langbord, Esq., SBN 144319
   **Foley & Mansfield PLLP**
2  150 South Los Robles Ave., Suite 400
   Pasadena, California 91101
3  Telephone: (626) 744-9359
   Facsimile:  (626) 744-1702
4

5  Attorneys for Defendant
   **VIAD CORP**
6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ROBERT REASER and CHRISTINE          )  Case No. CV08-1296 SVW (SSx)
    REASER,                              )  *(Related to Case No. CV08-1441)*
12                                       )
                                         )  Judge Stephen V. Wilson
13          Plaintiffs,                  )
                                         )
14      vs.                              )  **DECLARATION OF CHARLES R.**
                                         )  **CUSHING IN SUPPORT OF**
15  ALLIS CHALMERS CORPORATION           )  **OPPOSITION TO MOTION FOR**
    PRODUCT LIABILITY TRUST, et al.,     )  **REMAND TO STATE COURT**
16                                       )
                                         )
17          Defendants.                  )
                                         )  DATE:          May 12, 2008
18                                       )  TIME:          1:30 p.m.
                                         )  COURTROOM:  6
19                                       )
20                                       )
21  _____)
22

23      Charles R. Cushing, under penalty of perjury, deposes and states as follows:

24      1.      I am the president of C.R. Cushing & Co., Inc., Naval Architects,

25  Marine Engineers and Transportation Consultants.  Attached as Exhibit 1 is a true,

26  complete and correct copy of my curriculum vitae.  I respectfully submit this

27  Declaration in support of any assertion that Viad Corp has been sued in its capacity

28  as a person acting under an officer or agency of the United States within the

                                         1

1   meaning of 28 U.S.C. § 1442(a)(1).  This Declaration is based upon my
2   experience, education and training as a naval architect and marine engineer, which
3   includes my involvement in the design, construction, and/or conversion of more
4   than 250 ocean-going vessels.  It is also based upon my knowledge, experience,
5   research and familiarity of and with the history of the design, construction and
6   operation of United States Naval vessels during World War II.  Further, this
7   Declaration is based upon my knowledge and familiarity with the contracting
8   practices and requirements utilized by the U.S. Maritime Commission and the U.S.
9   Navy in constructing these vessels, and as applied to its suppliers and contractors.

10      2.      Plaintiffs allege in this case that Viad is the successor in interest to
11  Griscom-Russell Company ("Griscom-Russell").  Plaintiffs further allege that
12  Robert Reaser was exposed to asbestos while serving in the U.S. Navy from 1951
13  to 1967, and specifically from 1951 to 1964 while serving aboard the *USS Shea* as
14  a welder, pipefitter, fireman, and seaman apprentice, and aboard the *USS Boston*,
15  the *USS Providence*, and the *USS Wilkinson* in the capacity of damage control,
16  third and second classes.

17      3.      Griscom-Russell is a defunct company that manufactured evaporators
18  (distilling plants) and fuel oil heaters placed on some U.S. Navy vessels in the
19  1940s and 1950s.

20      4.      The *USS Shea* was originally an Allen M. Sumner-class destroyer in
21  the U.S. Navy.  The *Shea* was laid down on December 23, 1943 by the Bethlehem
22  Steel Company yard at Staten Island, New York as DD-750, launched on May 20,
23  1944, modified to be a Robert H. Smith-class destroyer minelayer and redesignated
24  DM-30 in late 1944, and commissioned at the New York Navy Yard on September
25  30, 1944.  The vessel was 376 feet 6 inches long, 40 feet beam, 18 feet 8 inches
26  maximum draft, and had a full load displacement of 2,200 tons.  During the period
27  when Reaser claims service on the *Shea*, she was engaged in normal Atlantic Fleet
28  operations from February 1, 1951, when she returned to Charleston, South

2

DECLARATION OF CHARLES R. CUSHING IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND TO STATE COURT

1  Carolina, until September 1953, when she reentered the Pacific, based at Long

2  Beach, California.

3       5.    The *USS Boston* was originally a Baltimore-class heavy cruiser in the

4  U.S. Navy.  The *Boston* was laid down on June 30, 1941 by the Bethlehem Steel

5  Company's Fore River Shipyard at Quincy, Massachusetts as CA-69, launched on

6  August 26, 1942, commissioned on June 30, 1943, reclassified CAG-1 on January

7  4, 1952 as the world's first guided missile cruiser, converted in Philadelphia by the

8  New York Shipbuilding Corporation, Camden, New Jersey, commencing February

9  1952, and recommissioned on November 1, 1955 as the lead ship of her class.  The

10  vessel was 673 feet 3 inches long, 71 feet 10 inches beam, 26 feet 10 inches

11  maximum draft, and had a full load displacement of 13,600 tons.  During the

12  period when Reaser claims service on the *Boston*, she was under conversion in

13  Philadelphia commencing February 1952 and operated along the East Coast and in

14  the Caribbean from her recommissioning in November 1955 until her departure for

15  the Mediterranean a year thereafter.

16       6.    The *USS Providence* was originally a Cleveland-class light cruiser in

17  the U.S. Navy.  The *Providence* was laid down on July 27, 1943 by the Bethlehem

18  Steel Company's Fore River Shipyard at Quincy, Massachusetts as CL-82,

19  launched on December 28, 1944, commissioned on May 15, 1945, reclassified

20  CLG-6 on May 23, 1957 as a Providence-class guided missile light cruiser,

21  converted at Boston commencing June 1957, and recommissioned on September

22  17, 1959.  The vessel was 610 feet 1 inch long, 6 feet 4 inches beam, 25 feet

23  maximum draft, and had a full load displacement of 10,000 tons.  During the

24  period when Reaser claims service on the *Providence*, she was under conversion at

25  Boston commencing June 1957 and,  following shakedown out of Guantanamo

26  Bay, arrived at her new home port of Long Beach, California on July 29, 1960.

27       7.    The *USS Wilkinson* was originally a Mitscher-class destroyer in the

28  U.S. Navy.  The *Wilkinson* was laid down on February 1, 1950 by the Bethlehem

3

DECLARATION OF CHARLES R. CUSHING IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND TO STATE COURT

1    Steel Company's Fore River Shipyard at Quincy, Massachusetts as EE-930,
2    reclassified DL-5 on February 9, 1951 as a destroyer leader, launched on April 23,
3    1952, and commissioned on August 3, 1954.  The vessel was 493 feet long, 50 feet
4    beam, 14 feet maximum draft, and had a full load displacement of 4,730 tons.
5    During the period when Reaser claims service on the *Wilkinson*, she was
6    overhauled at Long Beach, California commencing March 1960, thereafter
7    operated out of San Diego and locally, departed Long Beach for the Western
8    Pacific in January 1961, and returned to Long Beach Naval Shipyard in June 1961.

9       8.    The U.S. Navy Bureau of Ships and their design agents designed these
10   four vessels and prepared the construction design specifications.

11      9.    The U.S. Navy Bureau of Ships contracted for the construction of the
12   vessels, inspected and approved the construction, and accepted delivery.

13      10.    During World War II, asbestos was scarce and accordingly, was
14   regarded as "strategic material."  Its distribution and use was controlled by the
15   National Defense Office of Production Management and the U.S. Army and Navy
16   Munitions Board.  The government mandated that substitute materials be used,
17   wherever possible.

18      11.    The insulation on the evaporators and fuel oil heaters on these vessels
19   would have been installed by the shipyards, at the shipyards, after the machinery
20   was installed on the vessels.  The U.S. Navy required, in their specifications, that
21   the shipyard insulate all surfaces over 125 degrees Fahrenheit and below 600
22   degrees Fahrenheit with 85 percent magnesia, asbestos, rock wool or fibrous glass.

23      12.    The United States government was intimately involved in the
24   manufacture of any Griscom-Russell equipment used on U.S. war built vessels, as
25   the equipment manufactured for those vessels was designed and built to meet
26   precise and exacting specifications of the U.S. Navy.  Moreover, pursuant to the
27   U.S. Navy's specifications, Griscom-Russell would not have been able to affix to
28   its products any type of warning or cautionary statements concerning alleged

4

DECLARATION OF CHARLES R. CUSHING IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND TO STATE COURT

1  health hazards from the installation, use or maintenance of the products.  Whether
2  certain equipment used aboard U.S. Naval vessels should have warnings, and the
3  content and format of any such warnings, was determined solely by the U.S. Navy.
4  Griscom-Russell would have had no discretion whatsoever to affix any warnings of
5  its own to products it delivered to for installation on Navy ships.

6      13.    Moreover, the U.S. Navy had precise specifications for any
7  informational manuals delivered with Griscom-Russell equipment, and Griscom-
8  Russell would have had no discretion to deviate from such specifications.  The
9  U.S. Navy participated intimately in the preparation of this kind of information and
10  exercised specific direction and control over contents.

11     14.    The Griscom-Russell equipment manufactured for use on U.S. Navy
12  vessels would have been manufactured without any insulation and shipped to the
13  shipyards without insulation.  The equipment would have been totally insulated at
14  the shipyard, or after installation on the vessels, by others using insulation
15  purchased from others.  As noted above, the U.S. government specified and
16  approved the specifications governing how the shipyard should insulate the
17  equipment and the type of materials the shipyard should use to insulate the
18  equipment.

19

20     I declare under penalty of perjury that the foregoing is true and accurate.
21  Executed this **24** day of April, 2008.

22

23

24                               CHARLES R. CUSHING
25

26

27

28

DECLARATION OF CHARLES R. CUSHING IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND TO STATE COURT

# EXHIBIT 1

C. R. CUSHING & CO., INC.

## CHARLES R. CUSHING, Ph.D., P.E.

**Employer**:      C. R. Cushing & Co., Inc.
                   Naval Architects, Marine Engineers & Transportation Consultants
                   30 Vesey Street, 7th Floor
                   New York, New York 10007

**Position**:      President

**Education**:     U. S. Merchant Marine Academy, B.S. (Marine Transportation) 1956
                   Massachusetts Institute of Technology, B.S. (Naval Architecture and Marine
                        Engineering) 1960
                   State University of New York, M.S., (Ocean Transportation) 1972
                   University of Wales, Cardiff University, Ph.D. (Maritime Studies), 1997

**Experience:**

From its formation in 1968, Dr. Cushing has been President of C. R. Cushing & Co., Inc., a firm of naval architects, marine engineers and transportation consultants with offices in New York.  He has been responsible for the design, construction and/or conversion of over 250 ocean-going vessels in most major shipyards in the U.S., Europe and the Far East.  He has personally carried out and/or directed the concept, preliminary and contract design, strategic planning, plan approval and supervision of construction of tankers, tank barges, containerships, LNG ships, tugs, bulk carriers, roll-on/roll-off vessels, offshore pipe laying vessels, jacket delivery barges, passenger ships, and other types of vessels.  His work has included new construction, conversion, repair and refurbishment of vessels.  Dr. Cushing has been directly responsible for risk analyses, safety audits, energy audits and the preparation of the U.S.C.G. Tankerman's Manual, studies on corrosion, vessel maintenance, manning, safety, collision avoidance, pollution prevention, navigation, coatings, automation, pumping, noise, vibration, hydrodynamics, air quality, and similar, and has been responsible for port and terminal projects, economic analyses, material handling studies, marine operation and maintenance studies, automation studies, planned maintenance and repair systems, and numerous other projects in the marine field.  He has been responsible for the design of numerous types of intermodal shipping containers and purchase, inspection, and testing of containers, container refrigeration equipment, container chassis, and container handling equipment.

From 1961 to 1968, Dr. Cushing was the Chief Naval Architect at Sea-Land Service, Inc. and was responsible for the development of cranes, cargo handling systems, and the design and conversion of some 45 containerships.

Dr. Cushing holds a number of patents in maritime and intermodal technology.

Prior to his graduation from MIT, he sailed as a cadet and a licensed deck officer on a number of U.S.-flag general cargo and passenger vessels, and has been involved in cargo handling operations in the United States, South America, Southeast Asia, Australia, New Zealand, the Far East, Middle East, Africa, and Europe.

**C. R. CUSHING & CO., INC.**                                                     PAGE 2

## Professional Associations:

American Bureau of Shipping, Naval Architecture Committee, Past Member,
American Bureau of Shipping, Committee on Cargo Containers, Past Member
American National Standards Institute MH5 Committee, Member
American Society of Heating, Ventilation and Air Conditioning Engineers, Member, No. 3031973
American Society of Mechanical Engineers, Fellow, No. 261040
American Society of Naval Engineers, Naval Member, No. 00549
Charter Engineer, U.K., Engineering Council No. 152957
Chemical Transportation Advisory Board, Past Member
Chemical Trans. Advisory Board Subcommittee on Bulk Terminals/Tank Vessels, Past Member
EuroEngineer, European Union
Global Maritime and Transportation School (GMATS), Member, Board of Directors
Institute of Marine Engineering Science and Technology, Fellow
Instituto Pan Americano de Ingenieria Naval, Member IM-605
International Cargo Handling and Coordination Association, Member
International Standards Organization, TC-104, Past U.S. Delegate
Japan Society of Naval Architects and Ocean Engineers, Member
Korean Society of Naval Architects, Member
Professional Engineer, State of Mississippi, Reg. No. 03537
Lloyds Register of Shipping, U.S. Committee Past Chairman; Technical Committee, Past Chairman
Marine Board, Member, 2004 to date
Maritime Resource Center, Past Chairman
MIT Club of New York, Member
National Academy of Engineering – Elected 2004
National Academy of Sciences - NRC, Ship Structures Committee, Past Member
National Fire Protection Association, Member No. 105205
National Shipbuilding Research Program, Blue Ribbon Panel Member
National Safety Council, Member
New York City Port Council, Past Member
New York Yacht Club, Member
North East Coast Institution of Engineers and Shipbuilders, Past Member
Nautical Institute, Member No. 98 12550
Royal Institute of Naval Architects, Fellow
Royal Institute of Navigation, Member
Society of Maritime Arbitrators, Member
Society of Naval Architects and Marine Engineers, Life Member, Fellow, No. 1080010
SNAME Fellows Committee, past Chairman
SNAME Finance Committee, Member
SNAME Ship Technical Operating Committee, Member
Sperry Board of Awards, Chairman 1991/1992
State University of New York (Maritime College), Engineering Advisory Committee, Member
U.S.C.G., SOLAS Working Group on Container Safety - Member and past U.S. Delegate
U.S. Merchant Marine Academy, Trustee 2005 to date
U.S. Merchant Marine Academy Alumni Assn., President, 1986-1990
U.S. Merchant Marine Academy, Engineering Advisory Board, Member
U.S. Merchant Marine Academy Foundation, Chairman, 1982-1986
Webb Institute (Naval Architecture), Board Member; Fellow; Executive Committee; Finance Committee; Chairman; Audit Committee; Planning Committee

**C. R. CUSHING & CO., INC.**                                                                   PAGE 3

---

**Awards:**

The Admiral E.S. Land Medal for Excellence in Naval Architecture, USMMA, 1956
The Marine Man-of-the-Year, 1970, USMMA/SNAME
The Alumnus-of-the-Year, 1991, USMMA
The International Maritime Hall of Fame, 2000
The Admiral E.S. Land Medal for Outstanding Contributions in the Marine Field, SNAME, 2000
The Hall of Distinguished Graduates, USMMA, 2008

**Other Professional Activities:**

- Authored numerous publications for professional societies, trade publications and industry conferences.  Chapters in SNAME's Ship Design and 1993 Historical Transactions.

- Visiting Professor at World Maritime University in Malmo, Sweden and Dalian, China in The Ship Acquisition Process and Maritime Accident Investigation, 1987 to date.

- Lecturer at Massachusetts Institute of Technology, Webb Institute, University of Michigan, USMMA, Industrial College of the Armed Forces, MEBA, GMATS, and elsewhere.

- Serves as a director, officer or committee member of numerous educational, professional and industry organizations.

- Chairman, founder and principal shareholder in Oiltest, Inc.

- U.S. Naval Reserve, 30 years, retired 1982.

- Member National Academy of Engineering, elected 2004.

1   Peter B. Langbord, Esq., SBN 144319
    **Foley & Mansfield PLLP**
2   150 South Los Robles Ave., Suite 400
    Pasadena, California 91101
3   Telephone: (626) 744-9359
    Facsimile: (626) 744-1702
4

5   Attorneys for Defendant
    **VIAD CORP**
6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ROBERT REASER and CHRISTINE        )   Case No. CV-08-1296-SVW (SSx)
    REASER                             )   (Related to Case No. CV08-1441)
12                                     )
              Plaintiffs               )
13                                     )
         vs.                           )
14                                     )   **PROOF OF SERVICE RE:**
    ALLIS CHALMERS CORPORATION         )   **OPPOSITION TO MOTION FOR**
15  PRODUCT LIABILITY TRUST (sued      )   **REMAND TO STATE COURT**
    individually and as successor-in-interest )
16  to ALLIS-CHALMERS                  )
    CORPORATION);                      )
17  CBS CORPORATION f/k/a VIACOM       )
    INC. (sued as successor-by-merger to )
18  CBS CORPORATION f/k/a              )
    WESTINGHOUSE ELECTRIC              )
19  CORPORATION and also as successor- )
    in-interest to BF STURTEVANT)      )
20  CLA-VAL CO.;                       )
    FOSTER WHEELER ENERGY              )
21  CORPORATION;                       )
    GENERAL ELECTRIC COMPANY;          )
22  VIAD CORPORATION f/k/a THE         )
    DIAL CORPORATION (sued             )
23  individually and as successor-in-interest )
    to GRISCOM-RUSSELL COMPANY); )
24  and DOES 1-450 INCLUSIVE,          )
                                       )
25                                     )
              Defendants.              )
26  _____)

27

28

                                  1
**PROOF OF SERVICE RE: OPPOSITION TO MOTION FOR REMAND TO STATE COURT**

## PROOF OF SERVICE
[CCP, 1013A(3) CRC Rule 2006(d) - Revised 3/1/92]

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 150 S. Los Robles Ave.,  Suite 400, Pasadena, California 91101.

On **April 28, 2008**, I served the foregoing documents described as: **PLEASE SEE ATTACHED DOCUMENTS LIST** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

Ron C. Eddins, Esq.
Jennifer L. Bartlett, Esq.
Ethan A. Horn, Esq.
SIMON, EDDINS & GREENSTONE, LLP
301 E. Ocean Blvd., Suite 1950
Long Beach, CA 90802
Attorney for Plaintiffs

☒ *(BY MAIL)*  I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Los Angeles, California.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐ *(BY ELECTRONIC VERSION)* direct electronic filing, via the internet, of the .pdf document that has been scanned from a paper document.

☒ (BY COURT'S CM/ECF SYSTEM) Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF systems, which sent notification of that filing to the persona listed above.

☐ *(BY PERSONAL DELIVERY)*  I caused each such envelope to be delivered to a courier with whom we have a direct billing account, who personally delivered each such envelope to the office of the addressee on the date last written below.

☐ *(BY OVERNIGHT DELIVERY)* I caused such envelope(s) to be deposited in a box or other facility regularly maintained by the UPS service carrier.

Executed on **April 28, 2008**, Pasadena, California.

☒ [FEDERAL] I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Ruben Jauregui

1. DEFENDANT VIAD CORP'S OPPOSITION TO MOTION TO REMAND TO STATE COURT; MEMORANDUM OF POINTS AND AUTHORITIES AND AFFIDAVITS OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET., CHARLES R. CUSHING

2. AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET. IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND TO STATE COURT

3. AFFIDAVIT OF CHARLES R. CUSHING IN SUPPORT OF OPPOSITION TO MOTION FOR REMAND TO STATE COURT