MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 21 2008

FILED
CLERK'S OFFICE

PLEADING NO. 5553

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT
LITIGATION**

IN RE ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI),

This Document Relates to:

HENRY BARABIN and GERALDINE
BARABIN v. ALBANY
INTERNATIONAL CORP., et al.

*Western District of Washington,*
*Case No. CO7-1454 RSL*

MDL Docket No. 875

CTO - 291

**DEFENDANT ASTENJOHNSON, INC.'S MOTION AND BRIEF TO VACATE
CONDITIONAL REMAND ORDER**

Defendant AstenJohnson, Inc. ("Asten") hereby submit this motion to vacate the

Panel's conditional remand order, dated July 22, 2008.  Because pretrial proceedings in

this case have not concluded, this matter remains properly subject to multidistrict

litigation.  *See In re Asbestos Products Liability Litigation*, 771 F. Supp. 415, 424 (JPML

1991) (transferring all asbestos-related cases that were "not in trial").  Additionally,

Plaintiffs have yet to engage in any meaningful settlement negotiations with Asten,

refusing to budge on their long-standing demand for $1,000,000.  In light of the MDL's

purpose to facilitate settlement, the Panel should not allow a plaintiff to obtain a prompt

remand simply by refusing to engage in meaningful settlement negotiations.

ASTENJOHNSON'S MOTION & BRIEF TO
VACATE CONDITIONAL REMAND ORDER - 1

MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

OFFICIAL FILE COPY

IMAGED AUG 2 6 2008

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Furthermore, the MDL Court and JPML are well-suited to resolve the remaining pre-trial issues in this matter and facilitate settlement. Many of the remaining issues mirror those found in other cases in MDL-875, and the asbestos-related experience of the MDL Court and this Panel will promote the just and efficient resolution of these issues and help to avoid inconsistent rulings between district courts. Absent the completion of coordinated pretrial proceedings and settlement negotiations, the Panel should therefore vacate its conditional remand order.

## I.

## BACKGROUND

### A.    Procedural History

On December 16, 2006, Plaintiffs Henry and Geraldine Barabin ("Plaintiffs") filed suit in King County Superior Court against twenty-three named defendants. Plaintiffs allege that Mr. Barabin suffers from injuries caused by his exposure to various asbestos-containing products during his employment at the Texaco Refinery in Port Arthur, Texas and the Crown Zellerbach Paper Mill in Camas, WA (the "Camas Mill") and the Texaco Refinery in Port Arthur, Texas. (*See* Declaration of Kevin Rosenfield in Support of to AstenJohnson, Inc's Motion to Vacate ("Rosenfield Decl") ¶6, Ex. B.)

On September 10, 2007, in response to an email inquiry from the state court's bailiff, Plaintiffs' counsel disclosed that only three defendants still remained in the case: Crane Co.; Scapa Dryer Fabrics ("Scapa"); and Asten. (Rosenfield Decl. ¶2.) Because diversity jurisdiction now existed, the remaining defendants removed the case to federal court on September 18, 2007 in accordance with 28 U.S.C. § 1446. (*Id.*)

On October 1, 2007, Conditional Transfer Order ("CTO") No. 291 transferred the case to MDL-875 in the Eastern District of Pennsylvania. (*See* CTO-291.) Plaintiffs

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 2
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)
K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  subsequently filed a motion to vacate the transfer, which the Panel denied on February 8,

2  2008. (*See* Transfer Order.*)*

3  **B.     Settlement Conference**

4      On May 22, 2008, the remaining parties engaged in a court-mandated settlement

5  conference. (Rosenfield Decl. ¶14.)  During the conference, Plaintiffs reiterated their

6  settlement demand of $1,000,000 to Asten, which was the exact same demand they had

7  made one year prior. (*Id.* ¶15.)  Asten submitted a new, increased settlement offer of its

8  own, but Plaintiffs informed Asten and the MDL-875 clerk, Bruce Lassman, that it was

9  unwilling to move from the million dollar demand—despite having settled for

10  considerably less from multiple co-defendants (including the refinery owner, Texaco, a

11  defendant with significant exposure and the ability to pay). (*Id.*)  Indeed, Plaintiffs have

12  shown no interest in engaging in a meaningful settlement discussion with Asten. (*Id.*

13  ¶16.)

14      Asten requests that the Panel or MDL Court convene an additional settlement

15  conference, or refer the case to mediation, in order to engage the parties in meaningful

16  settlement discussions. (*Id.* ¶17.)

17  **C.     Facts Specific to Asten and Its Products**

18      Two of the three remaining defendants—Asten and Scapa—are manufacturers of

19  products known as dryer felts or dryer fabrics, which are designed, manufactured, and

20  sold for use in making and drying paper. (Rosenfield Decl. ¶3.)  For a period of time,

21  some of these dryer felts and fabrics were woven, in part, using chrysotile-containing

22  yarn, the only type of asbestos used by Asten and Scapa in the manufacture of their dryer

23  felts and fabrics. (*Id.*)  Various surveys and tests, however, demonstrate that the level of

24  chrysotile fibers released from these felts and fabrics during their use on paper machines,

25  if any, was at or below levels of asbestos found in the ambient air. (*Id.* ¶4.)

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 3
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Plaintiffs allege that Mr. Barabin was exposed to Asten dryer felts used on the paper machines at the Camas Mill.  Plaintiffs, however, have failed to establish any exposure of Mr. Barabin to any Asten dryer felt, much less any Asten asbestos-containing dryer felt.  Mr. Barabin never worked on the crew that removed and replaced dryer felts at the mill.  (Rosenfield Decl., Ex. A.)  Further, although Mr. Barabin identified several brands of dryer felts he saw at the Camas Mill—including Appleton and Albany felts—he did not identify Asten.  (*Id.*)

**D.**     **Texaco Refinery.**

Before working at the Camas Mill, Mr. Barabin performed maintenance and clean-up for an outside contractor at the Texaco Refinery from 1964 to 1968.  (Rosenfield Decl., Ex. B.)  Mr. Barabin cleaned up thermal insulation debris around insulated piping systems and boilers, and he worked around others who handled thermal insulation materials.  (*Id.*)  All medical experts in this case, including Plaintiffs' medical experts, have testified that Mr. Barabin's exposures to asbestos at Texaco were a substantial contributing cause of his mesothelioma.  (Rosenfield Decl. ¶18.)

Plaintiffs reached a settlement with Texaco in this case in the amount of $76,500.  (Rosenfield Decl., Ex. C.)

**E.**     **Remaining Pretrial Proceedings**

Pretrial proceedings in this case are presently at an advanced stage—but still remain materially incomplete.  To date, depositions of various fact and expert witnesses remain uncompleted.  (*Id.* ¶8.)  Asten and Scapa are also still in the process of obtaining records of asbestos-containing products at the Texaco Refinery, which has thus far proven difficult and may require the court's intervention.  (*Id.* ¶9.)  Additionally, we are trying to obtain Mr. Barabin's recent medical records, and there are numerous motions currently remain pending and are not yet fully briefed.  (*Id.* ¶¶10-111.)  Defendants are also still

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 4
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)
K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   waiting for Plaintiffs to provide deposition designations in compliance with a court order.

2   (*Id.* ¶12.)

3                                    **II.**

4                                **ARGUMENT**

5

6   **A.    Plaintiffs' Motion is Premature Because Pretrial Proceedings Are Not Yet
           Complete and this Action is "Not in Trial."**

7        On July 29, 1991, the Judicial Panel for Multidistrict Litigation issued an order

8   transferring over 25,000 asbestos-related personal injury lawsuits to the Eastern District of

9   Pennsylvania for pre-trial management.  So long as a case was still pending in federal

10  court, the lone criteria to determine the propriety of transfer was whether the case was

11  "not in trial."  *In re Asbestos Products Liability Litigation*, 771 F. Supp. 415, 424 (JPML

12  1991).  The scope of the Panel's order thus included those cases that were in the late

13  stages of discovery or even on the eve of trial.  *See id.*

14       In its decision, the Panel expressly recognized that the breadth of its order would

15  result in the transfer of cases that contained unique factual questions or were in the late

16  stages of pre-trial proceedings.  The Panel remarked that, in 1977, it had previously

17  rejected the transfer of various asbestos actions on the grounds that the cases had "factual

18  questions unique to each action" and that "many of these actions already are well

19  advanced."  *Id.* at 418 (*quoting In re Asbestos and Asbestos Insulation Material Products

20  Liability Litigation*, 431 F. Supp. 906, 910 (J.P.M.L 1977)).  Nevertheless, the Panel

21  determined that the explosion of asbestos-related lawsuits mandated "a new, streamlined

22  approach," thereby requiring "the centralization of all federal asbestos personal

23  injury/wrongful death actions."  *Id.* (emphasis added)

24       Notably, transfer to the MDL is only improper if the case's "pretrial proceedings"

25  have concluded.  *See* 28 U.S.C. § 1407(a).  By definition, "[p]re-trial, as an adjective,

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 5
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

means before trial . . . [and] all judicial proceedings before trial are pretrial proceedings." *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 494 (J.P.M.L. 1968).  This means that pretrial proceedings do not conclude until a final pretrial order is entered, and all prior proceedings are considered pretrial proceedings that may properly remain before the transferee court.  *See In re Patenaude*, 210 F.3d 135, 144-45 (3d Cir. 2000); *see also* JMPL Rule 7.6(d) (requiring motion to remand to include "a copy of the transferee district court's final pretrial order, where such order has been entered").[1]

Here, pretrial proceedings in the instant matter have not yet concluded.  Fact and expert witness depositions are currently incomplete.  (Rosenfield Decl. ¶8.)  Various motions remain pending and not fully briefed, and select medical records and work site records remain unproduced.  In fact, despite repeated discussions with refinery representatives and subpoenas to a number of entities, responsive documents have not yet been produced to defendants.  (*Id.* ¶¶9-12.)  The Panel should wait until coordinated pretrial proceedings and settlement negotiations are properly concluded and <u>then</u>, if the case remains unresolved, issue an order of remand.

**B.    The JPML Remains Well-Suited to Resolve Remaining Pre-Trial Issues in the Instant Case and Facilitate Settlement.**

Plaintiffs have provided no evidence that their case is atypical or should not be subject to multi-district litigation.  As a personal injury lawsuit based on alleged exposure to various asbestos-containing products, there is no question that Plaintiffs' case is very

---

[1] Although 28 U.S.C. § 1407 refers to "coordinated or consolidated pretrial proceedings," its distinction from case-specific pretrial proceedings is effectively meaningless so long as its "common core"—i.e., asbestos-related exposure—is similar to others in MDL 875.  *See, e.g., In re Wilson*, 451 F.3d 161, 170 (3d Cir. 2006) ("[T]he phrase '''coordinated or consolidated' is to be interpreted broadly... [A] proceeding that relates only to a single individual's case or claim can nonetheless be coordinated, as coordination can be found even if common issues are present only in relation to cases that have already been terminated."); *Patenaude*, 210 F.3d at 144 ("To be coordinated, it is not necessary that common issues are being contemporaneously addressed.").

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 6

MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

similar to other cases in MDL 875. These similarities—especially in conjunction with the asbestos-related experience of the JPML—support the inclusion of the instant case in multidistrict litigation. Such inclusion will promote the just and efficient conduct of the litigation and help avoid inconsistent rulings.

Plaintiffs cannot dispute that their lawsuit involves the same injuries, products, and claims that predominate in most of the cases within MDL 875. Because Asten intends to show that the alleged contact with their products did not cause Mr. Barabin's injuries, the entire universe of Mr. Barabin's asbestos exposure remains at issue. Asten will present evidence indicative of the numerous asbestos-containing products that were present at the paper mill and oil refinery where Mr. Barabin worked, and the amount of asbestos fibers released by such products. Most of these products are, undoubtedly, the same products and manufacturers currently involved in the various cases pending within MDL 875.

Indeed, many of the remaining pretrial issues in this matter are the same issues that face many of the cases in the MDL. Asten, for instance, filed pending motions to limit the testimony of several of Plaintiffs' experts, many of whom routinely testify in asbestos-related matters all across the nation. (*See* Rosenfield Decl. ¶11.) The methodologies utilized by these experts are likely the same as those previously (and currently) used by the experts in many of the other MDL cases. As such, the expertise and familiarity of MDL judges with these methodologies and issues will assist in the just and efficient resolution of the filed motions and help avoid inconsistent rulings from one district to another.

Similarly, Asten also filed a motion regarding the effect of low-dose exposure to asbestos and whether such exposure can cause mesothelioma. (*Id.*) Again, this issue predominates many, if not most, of the cases in the MDL. The dosage requirements of mesothelioma are a critical question that affects the majority of cases in the MDL. As

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 7
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)
K:\203887\0055420695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

such, the familiarity of MDL judges with this issue and the desire to avoid inconsistent rulings favor the inclusion of this case in MDL litigation.[2]

Finally, the JPML is experienced in facilitating settlements in asbestos-related cases and can potentially help the parties achieve resolution before trial, and Asten is amenable to engaging in settlement negotiations with the assistance of an MDL judge. (*Id.* ¶15.) The JPML has achieved substantial success in resolving those cases assigned to MDL 875, and this case may ultimately prove no different. *See Patenaude*, 210 F.3d at 140.

This matter is very similar to other asbestos-related cases in MDL-875, and— aided by the knowledge and experience of the JPML—the temporary inclusion of this case in multidistrict litigation will promote the just and efficient conduct of the litigation and help avoid inconsistent rulings.

**C.    The Panel Should Not Allow Plaintiffs to Obtain a Prompt Remand Without First Engaging in Meaningful Settlement Negotiations.**

Plaintiffs have yet to engage in any meaningful settlement negotiations with Asten, refusing to budge on their long-standing demand for $1,000,000.  (Rosenfield Decl. ¶15.) One of the essential intentions of multi-district litigation is to promote, facilitate, and encourage good faith settlement negotiations.  In light of such purpose, the Panel should not allow a plaintiff to obtain a prompt remand simply by refusing to engage in meaningful settlement negotiations.

The MDL court should schedule another settlement conference or refer the case to mediation in order to engage the parties in meaningful settlement discussions.  The Panel

---

[2] Moreover, the District Court for the Western District of Washington does not typically handle asbestos-related cases. (Rosenfield Decl. ¶13.)  In light of its substantial experience with asbestos-related matters, the Panel could therefore provide valuable assistance in efficiently evaluating and resolving remaining issues.

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 8

MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   should not effectively reward Plaintiffs for their refusal to negotiate in good faith a

2   potential settlement of this matter.

3                                        **III.**

4                                  **CONCLUSION**

5          The nature of Mr. Barabin's injuries does not, on its own, permit Plaintiffs to avert

6   multidistrict litigation.  Because pretrial proceedings and settlement negotiations in this

7   case have not yet concluded, Asten requests the Panel to vacate the conditional remand

8   order.

9

10

11         DATED this 19th day of August, 2008.

12
                                      K&L GATES LLP
13
                                      By _____
14                                       G. William Shaw, WSBA # 8573
                                         Kevin A. Rosenfield, WSBA # 34972
15                                       925 Fourth Avenue, Suite 2900
                                         Seattle WA 98104-1158
16                                       Telephone:  (206) 623-7580
                                         Facsimile:   (206) 370-6309
17                                    Attorneys for Defendant
                                      AstenJohnson, Inc.
18

19

20

21

22

23

24

25

ASTENJOHNSON'S MOTION TO VACATE
CONDITIONAL REMAND ORDER - 9

MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 1 2008

FILED
CLERK'S OFFICE

1

2

3

4

5

6

7 **BEFORE THE JUDICIAL PANEL ON  MULTIDISTRICT
LITIGATION**

8

9 IN RE ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI),

0

This Document Relates to:

1

2 HENRY BARABIN and GERALDINE
BARABIN v. ALBANY
INTERNATIONAL CORP., et al.

3

4 *Western District of Washington,
Case No. CO7-1454 RSL*

5

MDL Docket No. 875
CTO - 291

16 **DECLARATION OF KEVIN A. ROSENFIELD IN SUPPORT OF DEFENDANT
ASTENJOHNSON, INC.'S MOTION AND BRIEF TO VACATE
CONDITIONAL REMAND ORDER**

17

18 I, KEVIN A. ROSENFIELD, declare as follows:

19 1.       I am an attorney at K&L Gates LLP and one of the attorneys for defendant

20 AstenJohnson, Inc. ("Asten") in this action.  I have personal knowledge of the facts set

21 forth in this declaration, and I am competent to testify.

22 2.       On September 10, 2007, in response to an email inquiry from the state

23 court's bailiff, Plaintiffs' counsel disclosed that only three defendants still remained in the

24 case: Crane Co.; Scapa Dryer Fabrics, Inc. ("Scapa"); and Asten.  Because diversity

25

DECLARATION OF KEVIN A. ROSENFIELD  - 1
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)
K:\203887\00554\20695_KAR\20695P21K7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

jurisdiction now existed, the remaining defendants removed the case to federal court on September 18, 2007 in accordance with 28 U.S.C. § 1446.

3.      Two of the three remaining defendants—Asten and Scapa—are both manufacturers of products known as dryer felts or dryer fabrics, which are designed, manufactured, and sold for use making and drying paper.  For a period of time, some of these dryer felts and fabrics were woven, in part, using chrysotile-containing yarn, the only type of asbestos used by Asten and Scapa in the manufacture of their dryer felts and fabrics.

4.      Various surveys and tests demonstrate that the level of chrysotile fibers released from chrysotile-containing dryer felts used in the normal course of the paper-making process was far below applicable governmental standards, and, in most instances, was the functional equivalent of background levels of asbestos found in ambient air.  *See* Wendlick, J.D., *Asbestos Dust Testing - Machine Room #1*, Weyerhaeuser Co. (1973); Salazar, A., *Asbestos in Paper Machines* (1st Review), PALO ALTO MEDICAL CLINIC/ENVIRONMENTAL HEALTH SCIENCES (1977); and Salazar, A., *Asbestos in Paper Machines (2nd Review)*, PALO ALTO MEDICAL CLINIC/ENVIRONMENTAL HEALTH SCIENCES (1978); RJ LEE GROUP, *Blowdown Testing of Asten Dryer Felts and Fabrics*, (1998); *Testing Asbestos-Containing Dryer Felts for Asbestos Fiber Release* at the WESTERN MICHIGAN UNIVERSITY PILOT PLANT (2001).

5.      Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts from the perpetuation deposition of Henry Barabin, taken March 20, 2007.

6.      Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts from Plaintiffs' answers to Defendants' Style First Set of Interrogatories.

7.      Asten intends to argue at trial that, if Mr. Barabin suffers from an asbestos-related disease, his injuries are the result of his exposure to various other asbestos-

DECLARATION OF KEVIN A. ROSENFIELD  - 2

MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

containing products found at his previous work sites.  As such, the trier of fact will be asked to evaluate the broad spectrum of asbestos-product manufacturers that were present at these sites.

8.      Pretrial proceedings remain incomplete.  To date, the parties have yet to complete the depositions of various fact and expert witnesses.  Defendants still seek to depose Mr. Barabin's brother, Leroy, who was a co-worker of Mr. Barabin at the Texaco Refinery.  Additionally, Plaintiffs have indicated their intent to depose the following witnesses:  Dr. Samuel Hammar, who is the pathologist in this matter for both Scapa and Asten; Charles Blake, an industrial hygienist and witness for Crane Co.; and Dorsett Smith, MD, a pulmonologist and B-reader for Crane Co.

9.      Defendants Asten, Scapa, and Crane Co. are also still seeking to obtain records of asbestos-containing products at the Texaco Refinery, which is subject to a third-party subpoena.  Despite repeated discussions with refinery representatives and subpoenas to a number of entities, responsive documents have not been produced.

10.     Additionally, Asten and Scapa are still in engaged in the process of obtaining Mr. Barabin's recent medical records.  Plaintiffs have returned stipulations for the release of these records, and Asten and Scapa expect to receive these documents soon.

11.     All parties filed numerous motions in this action that are still unresolved and have not yet been fully briefed.  These include, but are not limited to, the following motions:

- Plaintiffs' motion to exclude evidence that all persons are exposed to ambient or background levels of asbestos.

- Asten's motion to exclude the opinion of Plaintiffs' experts that each and every inhalation of asbestos —no matter how slight— operated as an indivisible and cumulative cause of Mr. Barabin's injuries.  ("Motion to Exclude Testimony That Every Asbestos Fiber is Causative")

DECLARATION OF KEVIN A. ROSENFIELD  - 3
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)
K:\2038878\00554\20695_KAR\20695P21K7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

- Asten's motion to exclude the expert testimony of Kenneth Cohen on the grounds that he not qualified to testify as an expert and his methodology and findings regarding asbestos exposure are not generally accepted within the relevant scientific community.  ("Motion to Exclude Kenneth Cohen")

- Asten's motion to exclude testimony from Plaintiffs' expert, James Millette, regarding tests he performed in 1998 and 2003 on dryer felt materials. ("Motion to Exclude Certain Testimony of James Millette")

- Scapa's motion to exclude all evidence relating to the Asbestos Textile Institute.

- Asten's motion to exclude the expert testimony of Arnold Brody, Ph.D.

- Crane Co.'s motion to exclude the Southern Power and Light Advertisers Index and Articles.

- Crane Co.'s motion to exclude videos purporting to show release of asbestos fibers by use of Tyndall Lighting.

12.     Defendants are also still waiting for Plaintiffs to properly designate the depositions that they intend to use at trial.  On September 14, 2007, the court ordered Plaintiffs "to provide specific page and  line designations of the depositions they intend to present at trial."  Plaintiffs have not yet complied.

13.     The District Court for the Western District of Washington does not typically handle asbestos-related cases.

14.     The remaining parties engaged in a court-mandated settlement conference on May 22, 2008.  This conference took place in Philadelphia, Pennsylvania in front of Bruce Lassman, the clerk for Judge James Giles..

15.     During the conference, Plaintiffs reiterated their demand for $1,000,000 from Asten, which was the exact same demand they had made one year earlier.  Asten submitted a new, increased settlement offer of its own, but Plaintiffs informed Asten that they were unwilling to move from the million dollar demand, despite having settled for considerably less from multiple co-defendants.

DECLARATION OF KEVIN A. ROSENFIELD  - 4
MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)
K:\2038878\00554\20695_KAR\20695P21K7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   16.    Plaintiffs have shown no interest in engaging in a meaningful settlement

2   discussion.

3   17.    Asten believes that the Court should convene an additional settlement

4   conference or refer the case to mediation in order to attempt to engage the parties in

5   meaningful settlement discussions.

6   18.    All medical experts in this case, including Plaintiffs' medical experts, have

7   testified that Mr. Barabin's exposures to asbestos at Texaco were a substantial

8   contributing cause of his mesothelioma.

9   19.    Attached hereto as **Exhibit C** is a true and correct copy of Plaintiff's

10  disclosure of its settlement amounts in this matter.

11

12      I declare under penalty of perjury under the laws of the State of Washington that

13  the foregoing is true and correct.

14

15      EXECUTED this 19th day of August, 2008 at Seattle, Washington.

16

17      _____

18      Kevin A. Rosenfield
        K&L Gates LLP
19      925 Fourth Avenue, Suite 2900
        Seattle, WA 98104
20      Phone:  (206) 623-7580

21

22

23

24

25

DECLARATION OF KEVIN A. ROSENFIELD - 5

MDL Docket No. 875, CTO-291 (Western District of
Washington, Case No. C07-1454 RSL)

K:\2038878\00554\20695_KAR\20695P21K7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE (206) 623-7580
FACSIMILE (206) 623-7022

# Exhibit A

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

HENRY BARABIN and GERALDINE )
BARABIN, )
 )
          Plaintiffs, )
 )Cause No.
vs. )06-2-39452-6 SEA
 )
ALBANY INTERNATIONAL CORP., et )
al., )
 )
          Defendants. )
 )

PRESERVATION DEPOSITION OF HENRY BARABIN
Sun City West, Arizona
March 20, 2007
9:19 a.m.

(COPY)
Prepared by:
JoAnn Klemm, RPR
Certified Reporter #50022

KLEMM REPORTING SERVICES
23425 North 39th Drive, Suite 104-182
Glendale, Arizona  85310
(623) 581-8503

**Page 2**

1              I N D E X
2 WITNESS:       EXAMINATION        PAGE
3 HENRY BARABIN
4     By Mr. Judd           11
5
6
7          E X H I B I T S
8 Deposition
  Exhibits      Description        Page
9
    1  Notice of perpetuation deposition of    7
10     Plaintiff Henry Barabin
11  2  Social security records of Henry Barabin    7
12  3  Photograph of Royal and Alice Paul, Henry   29
       Barabin's uncle and aunt
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1       DEPOSITION OF HENRY BARABIN was taken on March
2 20, 2007, commencing at 9:19 a.m. at the Craig Collins
3 Law Office, L.L.C., 13912 West Stardust Boulevard, Suite
4 100, Sun City West, Arizona, before JoANN KLEMM,
5 Registered Professional Reporter, Certified Reporter,
6 Certificate Number 50022, in the State of Arizona.
7 COUNSEL APPEARING:
8 For the plaintiffs:
9     BRAYTON PURCELL, LLP
      By:  GARY V. JUDD, ESQ.
10     222 Rush Landing
      P.O. Box 6169
11     Novato, California  94948-6169
      (415) 898-1555
12     (415) 89801247 (fax)
      gjudd@braytonlaw.com
13
14 For the defendant Rogers Machinery Company, Inc.:
15     KELLER ROHRBACK L.L.P.
      By:  BENJAMIN J. LANTZ, ESQ.
16     1201 Third Avenue
      Suite 3200
17     Seattle, Washington  98101-3052
      (206) 623-1900
18     (206) 623-3384 (fax)
      blantz@kellerrohrback.com
19
20 For the defendant Scapa Dryer Fabrics, Inc.:
21     HAWKINS & PARNELL, LLP
      By:  NATHAN M. THOMPSON, ESQ.
22     4000 Suntrust Plaza
      303 Peachtree Street, N.E.
23     Atlanta, Georgia  30308-3243
      (404) 614-7400
24     (404) 614-7500 (fax)
      nthompson@hplegal.com
25

**Page 4**

1 COUNSEL APPEARING (continued):
2
  For the defendant Albany International:
3
  STEVEN V. RIZZO, P.C.
4  By:  CLAUDE F. BOSWORTH, ESQ.
  1620 S.W. Taylor Street
5  Suite 350
  Portland, Oregon  97205
6  (503) 229-1819
  (503) 229-0630 (fax)
7  cbosworth@rizzopc.com
8
  For the defendant Asten Johnson, Inc.:
9
  FORMAN PERRY WATKINS KRUTZ & TARDY LLP
10  By:  JOSHUA L. RUBENSTEIN, ESQ.
  1515 Poydras Street
11  Suite 1300
  New Orleans, Louisiana  70112
12  (504) 799-4383
  (504) 799-4384 (fax)
13  jrubenstein@fpwk.com
14
  For the defendant Crane Co.:
15
  MEAGHER & GEER
16  By:  NEIL SINGH, ESQ.
  8800 North Gainey Center Drive
17  Suite 261
  Scottsdale, Arizona  85258
18  (480) 624-8588
  (480) 222-6675 (fax)
19  nsingh@meagher.com
20
  For the defendant GE and CBS:
21
  WILLIAMS, KASTNER & GIBBS, PLLC
22  By:  GEORGE S. PITCHER, ESQ.
  888 SW Fifth Avenue
23  Suite 600
  Portland, Oregon  97204-2025
24  (503) 944-6961
  (503) 222-7261 (fax)
25  gpitcher@wkg.com

**Page 77**

1   sections to keep it close together and drag it on out to

2   the yard where they still had to throw it away.

3       Q.   During this time period, did you take any old

4   felt for your personal use?

5       A.   Yes.

6       Q.   All right.  What type -- how was that made

7   available to you, and what use did you make of it?

8       A.   Well, whenever they took a dryer felt off,

9   everybody wanted scraps of it if they could get it,

10  because they would use it in their gardens, especially

11  around your trees and around your hedges.  That's what I

12  used it for, around my hedges.  It let the water go

13  through, but it kept the grass from growing out.  So you

14  put the felt down.  Put a little dirt over the felt and

15  kept it looking nice.

16      Q.   When you handled the old dryer felts that came

17  off the machines, were they wet or dry?

18      A.   Dry.

19      Q.   In handling those dryer felts, did you see

20  visible dust?

21      A.   Oh, yes.

22      THE DEFENDANTS:  Object to form.

23      Q.   BY MR. JUDD:  Did you participate in the

24  reinstallation of the new felts?

25      A.   Yes.

**Page 78**

1       Q.   Did you see dust associated with the new felts?

2       THE DEFENDANTS:  Object to the form.

3       THE WITNESS:  You saw dust all the time.

4       THE DEFENDANTS:  Object to the nonresponsive

5   portion.  Move to strike.

6       Q.   BY MR. JUDD:  I'm going to reask that question

7   in a little different way.

8            Did you see anything in the air when you were

9   participating in the reinstallation of new dryer felts on

10  any of these machines?

11      THE DEFENDANTS:  Object to the form.

12      THE WITNESS:  Always saw dust.

13      Q.   BY MR. JUDD:  When you cut up old dryer felts

14  for use at home, did you see any visible dust in the

15  cutting?

16      A.   Oh, yes.

17      THE DEFENDANTS:  Object to the form.

18      Q.   BY MR. JUDD:  Did other employees also take

19  pieces of the old dryer felts for their own personal use?

20      A.   Yes.

21      Q.   Were you around when they were cutting, as

22  well?

23      A.   Yes.

24      Q.   Now, you've described in certain circumstances

25  the relative widths of the paper that would come off some

**Page 79**

1   of these machines, up to 150 inches, in some cases as

2   small as 18 inches for number 8, I believe?

3       A.   No, not 18 inches.

4       Q.   Maybe I misspoke.

5       A.   Number 8 machine was about -- about -- maybe

6   about eight feet wide where the paper came off, about

7   eight feet wide.

8       Q.   All right.  In this building where you worked

9   for these years between '73 and '84, machines 4, 5, 6, 7,

10  8, what was the widest of those machines in terms of the

11  size of the paper that would come off, and what was the

12  smallest, narrowest?

13      A.   The narrowest was number 8, which was about,

14  like I say, somewhere around eight feet.  And the widest

15  was number 6.  Number 6 was about 12, I think, somewhere.

16  They weren't big compared to my last job.

17      Q.   The dryer felts that were taken off, relative

18  to any of these machines, how wide were they relative to

19  the paper that came off them?

20      A.   Well, they was probably about six to eight

21  inches on each side of the paper, so the paper -- they

22  would -- always was wider than the paper.

23      Q.   The felts were always wider than the paper?

24      A.   Yes, yes.

25      Q.   How thick was your typical dryer felt on the

**Page 80**

1   machines used here?

2       THE DEFENDANTS:  Object to form.

3       THE WITNESS:  I would say about quarter inch, I

4   would say, somewhere in that neighborhood.

5       Q.   BY MR. JUDD:  Now, did you also participate in

6   the change out of wet felts?

7       A.   Yes.

8       Q.   The wet felt is at a different end of the

9   machine; is that correct?

10      A.   Yes.

11      Q.   Were they similar in dimension to the dryer

12  felts?

13      A.   They were about probably as wide as the dryer

14  felt, yes.

15      Q.   Were they shorter or longer?

16      A.   They were shorter, because they went through a

17  shorter section.

18      Q.   I see.  When you changed wet felts out, were

19  they damp or wet, or were they dry at that time?

20      A.   The one on the machine that we take off is wet.

21      Q.   Yes.

22      A.   The one we're putting on is dry.

23      Q.   And likewise, during this time period, do you

24  know the brand of any of the dryer felts you were

25  removing or installing?

**20 (Pages 77 to 80)**

**Page 81**

1    A.  During that time, I would remember we used a
2  lot of Albany felts.  We used a lot of those.  So that's
3  one of the few names I remember.  I remember that name,
4  but we used more than that, so I can't -- I wouldn't
5  remember all the names.
6    Q.  Do you associate Albany felt with the dry side
7  or wet side or both?
8    A.  I think Albany made both.
9    MR. JUDD:  Why don't we go off the record.
10  Take a little break.
11    THE VIDEOGRAPHER:  The time is 11:23 a.m.
12  We're now going off the record, ending Tape Number 2.
13    (Recess ensued from 11:21 a.m. until
14  11:35 a.m.)
15    THE VIDEOGRAPHER:  My name is Kim Naugle with
16  the firm of Legal Video Specialists, Phoenix, Arizona.
17  This begins Tape Number 3 of the videotaped deposition of
18  Henry Barabin taken at 13912 West Stardust Boulevard, Sun
19  City West, Arizona.  The time is 11:38 a.m.  We're now
20  back on the record.
21    Q.  BY MR. JUDD:  All right.  Mr. Barabin, are you
22  ready to resume?  We've taken a short break.
23    A.  Yes.
24    Q.  We were talking about your work in the building
25  that housed machines numbers 4, 5, 6, 7, 8.

**Page 82**

1    Was that building referred to by any particular
2  number or name?
3    A.  The wrap end.
4    Q.  Where?
5    A.  The wrap end.
6    Q.  The wrap end building.  Okay.  As opposed to
7  repeating those numbers all the time, we'll call it the
8  wrap end building.  Okay.
9    A.  Okay.
10    Q.  You were describing that your work as a fifth
11  hand was pretty much do anything you were told to do?
12    A.  Uh-huh.
13    THE COURT REPORTER:  Is that a yes?
14    THE WITNESS:  Yes.  I'm sorry.
15    Q.  BY MR. JUDD:  Mr. Barabin, it will be necessary
16  to say "yes" or "no."
17    A.  Okay.  She'll remind me.
18    Q.  I'm glad you're comfortable with the testimony,
19  but it will be -- when it reads out, it will need a "yes"
20  or a "no" --
21    A.  Okay.
22    Q.  -- or some word like that.
23    What other types of work did you do when a
24  machine was in operation as a fifth hand?
25    A.  Your biggest job was going and getting the

**Page 83**

1  supplies, like the stuff you needed to wrap each roll and
2  to wrap rolls.
3    Q.  How big were these rolls you were wrapping?
4    A.  It all depends.  Some of them was narrow rolls.
5  Some of them was wide rolls.  The diameter was different.
6  It all depends on the order --
7    Q.  Uh-huh.
8    A.  -- that the customer we were sending it to.
9  Some of them wanted small diameters.  Some wanted big
10  diameters.
11    Q.  When a paper came off the machine, how big were
12  those rolls?
13    A.  It was a full reel, several, 25, 20 tons,
14  whatever.  It all depends on the machine.  Like I said,
15  each machine was a different size.
16    Q.  Sure.
17    A.  So it was a reel about, oh, 30, 40 inches --
18  well, 50 inches in diameter.  Great big reel.
19    Q.  Yeah.
20    A.  You'd have to almost see a paper machine to
21  know what I'm talking about.
22    Q.  Would you be cutting paper off these larger
23  reels?
24    A.  Yes.  The winderman ran the paper off on the
25  smaller sizes that the customer would order.

**Page 84**

1    Q.  I see.
2    A.  And to what diameter the customer would ask
3  for.
4    Q.  Would this be done at the end of the --
5    A.  Paper machine.
6    Q.  -- paper machine?
7    A.  Yes.
8    Q.  Would orders be cut off and filled according to
9  customer orders as the paper was being made?
10    A.  Yes.
11    Q.  Was there also a stock area where paper came
12  off the machine in various rolls and lengths and then
13  would be cut at a different location?
14    A.  Well, yes, yes.
15    Q.  All right.  You described your participation in
16  helping to install and remove felts as a fifth hand.
17    Did you see other types of maintenance work as
18  you've described when you were working as a pulp and
19  paper tester?
20    A.  Well, it was pretty much the same type of
21  maintenance work:  Changing pumps, changing lines,
22  repairing flanges, whatever.  That's mostly what it is.
23    Q.  With regard to the pump work you saw, did you
24  help personnel who were working on pumps in the course of
25  their work?

**Page 65**

1  while you were working as a pulp and paper tester?
2  A.  Oh, yes, yes.
3  Q.  How often would you observe that?
4  A.  Oh, with the amount of machines we had, you'd
5  probably have a dryer felt going on probably a couple of
6  times a month, two months.  Dryer felts usually last
7  longer than wet felts.
8  Q.  Did you see dryer felts being changed out when
9  you were a pulp and paper tester?
10  A.  Yes.
11  Q.  How did they go about that?
12  A.  Well, they would bring a felt in a carton and
13  put it at the base of the machine in the basement, and
14  they would cut the old felt.  A lot of times they would
15  tie the two felts together and slowly run the old felt
16  off and the new felt on.
17      Then they would pick a dryer that was on the
18  inside where they could lay flat, where they had little
19  eyes on each end of the felts, and they would take a
20  spindle, a little piece of wire that they would run
21  through the eyes to keep the felt together.
22  Q.  I see.  What would happen to the old felt that
23  was taken off?
24  A.  Well, they'd take a forklift, gather it up and
25  bring it out to the yard.

**Page 66**

1  Q.  Did you observe visible dust when that change
2  out was occurring?
3      THE DEFENDANTS:  Object to the form.
4      THE WITNESS:  There was always dust.
5      THE DEFENDANTS:  Object to the nonresponsive
6  portion of the answer.
7  Q.  BY MR. JUDD:  Sir, let me ask you that again.
8      When you saw dryer felts being changed out,
9  what did you observe in the air, if anything?
10      THE DEFENDANTS:  Object to the form.
11  Q.  BY MR. JUDD:  Go ahead.  Go ahead.
12  A.  A lot of dust.
13  Q.  How was the old felt handled when it came off
14  the dryer?
15  A.  Well, it would drop down in the basement, and
16  then they usually take rope, tie it together and hook it
17  onto a forklift and drag it out to the yard.
18  Q.  Were you in the basement at any point in time
19  when you saw a felt being dragged out into the yard?
20      THE DEFENDANTS:  Object to the form.
21      THE WITNESS:  Of course.
22  Q.  BY MR. JUDD:  Go ahead, sir.
23  A.  Yes.
24  Q.  The new felts that you saw being loaded on, how
25  did they come packaged again?

**Page 67**

1  A.  Well, they came packaged in crates.
2  Q.  Were they in rolls or folded up or how --
3  A.  Most of them was rolled up.
4  Q.  And their size depended on the width of the --
5  A.  On which machine they was going to.
6  Q.  During the years you were working as a pulp and
7  paper tester, do you recall the names of any dryer felts
8  that you saw installed?
9  A.  No, not when I was a pulp and paper tester, no.
10  Q.  Sir, there's another building, 3 -- that housed
11  machines 3, 9, 10, 1, 2, 11 and 14.
12      Did you work taking samples in that building
13  when you also saw maintenance and repairs being
14  conducted?
15  A.  Yes.
16  Q.  Did you see paper machines being shut down in
17  that building, as well?
18  A.  Yes.
19  Q.  You described dryer felts being changed out in
20  the other building.
21      Did you see that type of work also taking place
22  in this building?
23  A.  Yes.
24  Q.  Did you observe pump repairs taking place in
25  this building?

**Page 68**

1  A.  Yes.
2  Q.  Was it about the same type of routine
3  maintenance or shutdown as you described in this other
4  building --
5  A.  Uh-huh.
6  Q.  -- where 4, 5, 6, 7, 8 were?
7  A.  Yes.
8  Q.  What's the difference, if any, between the
9  machines that were operating in the building with 4, 5,
10  6, 7, 8 and the other building where the other machines
11  were operating?
12  A.  4, 5, 6, 7, 8 made a different type of paper
13  than the other end of paper machines.  4, 5, 6, 7, 8 made
14  fine paper.  They made kraft bake.  They made specialty
15  papers, like on number 8.  On the other end, they made
16  food wrap, tissue paper, towelling.
17  Q.  Did your work take you across the street to the
18  building housing machines 15 and 16?
19  A.  Yes, we had to pick up samples there, also.
20  Q.  What type of paper was manufactured there?
21  A.  Fine paper.
22  Q.  What do you mean by "fine paper"?
23  A.  The kind of paper you guys got on the desk
24  here.
25  Q.  Writing paper, typing paper?

**17 (Pages 65 to 68)**

# Exhibit B

RECEIVED

FEB 28 2007

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

HENRY BARABIN and GERALDINE ) Cause No. 06-2-39452-6SEA
BARABIN, )
 ) DEFENDANTS' STYLE FIRST SET OF
             Plaintiffs, ) INTERROGATORIES PROPOUNDED
 ) TO PLAINTIFF AND ANSWERS
     v. ) THERETO
 )
ALBANY INTERNATIONAL CORP., et )
al., )
 )
           Defendants. )

TO:      HENRY BARABIN, Plaintiff

AND TO:   Zachary B. Herschensohn and Brayton Purcell, LLP, Attorneys for Plaintiff

     In accordance with CR 26 and CR 33 and the applicable style order governing asbestos

litigation, you will please answer the following interrogatories, separately and fully, under oath,

within sixty (60) days of the date of service of these interrogatories upon you or within the time

periods set by the appropriate style order.

     These interrogatories are to be treated as continuing.  If information is not available

within the time limits of the Civil Rules, you must answer each interrogatory as fully as possible

within the time limit and furnish additional information when it becomes available.  If additional

information is discovered between the time of making these answers and the time of trial, these

interrogatories are directed to that information.  If such information is not furnished, the

defendants will move at the time of trial to exclude from evidence any information requested and

1 -  DEFENDANTS' STYLE FIRST SET OF INTERROGATORIES PROPOUNDED TO PLAINTIFF AND
    ANSWERS THERETO
    J:\WA\106995\Pld\Style.wpd
                                  BRAYTON ❖ PURCELL, LLP
                                    American Bank Building
                            621 SW Morrison Street, Suite 950
                                   Portland, Oregon 97205
               Phone: (503) 295-4931; Fax: (503) 241-2573

1  amount smoked, whether or not you inhaled, type of tobacco product, brand names, etc.)

2  **ANSWER:**

3

4

5  Plaintiff smoked cigarettes from 1961 to 1984.  Plaintiff smoked approximately one pack

6  per day.  Plaintiff smoked Winston brand cigarettes.

7

8

9  **Employment**

10  **10.**    For each employer for whom you ever worked (including self-employment and part time

11  employment) please identify:

12          (a)    In chronological order, the beginning and ending dates of each period of

13  employment;

14

15          (b)    The place of each such employment;

16          (c)    The nature of the business for each such employment; and

17          (d)    Your particular title or job description or function for each such employment.

18

19  **ANSWER:** Plaintiff identifies the following employers:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| CA Turner | Texaco Refinery, Port Arthur, Texas | Laborer | 1961-1968 |

Job Duties: Plaintiff worked in every area at this refinery.  Plaintiff worked in the grease plant, where he dumped resin into hoppers and mixed the resin with petroleum to make motor oil. Plaintiff recalls the grease plant had insulated heaters used to heat resin. Plaintiff recalls insulators making repairs to the heaters and tearing insulation off of them. Plaintiff boxed up bottles of motor oil, and loaded the boxes onto freight cars.  Plaintiff worked in proximity to insulators and pipefitters tearing insulation off of vessels, tanks, cat towers, and boilers throughout the refinery.  Plaintiff swept up and gathered insulation debris after it was torn off of equipment and pipe lines.  Plaintiff worked in proximity to brick layers re-bricking boilers. Plaintiff picked up old brick, mortar, and insulation left behind by the brick layers.  Plaintiff recalls the insulation and brick being very dusty.  Plaintiff worked in proximity to welders. Plaintiff recalls welders were constantly welding in all areas of the refinery.  Plaintiff recalls the following co-worker: Leroy Barigan (cousin), Port Arthur, TX.  Plaintiff currently contends he

1   was exposed to asbestos during this employment.

2

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| Currently unknown | Willamette Iron & Steel, Portland, OR | Laborer | 1968 (one day) |

Job Duties: Plaintiff worked onboard a ship stripping paint inside a hull below deck. Plaintiff currently contends he was exposed to asbestos during this employment.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|----------------------|-----------|----------------|
| Crown Zellerbach Corporation | Crown-Zellerbach, Camas, WA | Paper Machine Operator | 1968-2001 |

Job Duties: Plaintiff started at this site as a paper packer. Plaintiff then worked as a pulp and paper tester. As a pulp and paper tester, plaintiff worked on all of the paper machines. Plaintiff recalls there were 16 paper machines. Plaintiff recalls most of the machines were manufactured by BELOIT. Plaintiff collected samples of pulp from each machine on a daily basis and took the samples to the pulp lab to be tested for consistency. Plaintiff walked through the chlorine plant to get to the pulp lab. Plaintiff recalled routinely walking past large insulated digesters. Plaintiff recalls the digesters would vibrate so much, dust and debris would be falling off of them. Plaintiff collected the samples by opening valves on the paper machine. Plaintiff recalls the lines and valves were insulated. Plaintiff then worked as a filter man. As a filter man, plaintiff routinely cleaned out pulp filters on all of the paper machines. Plaintiff recalls the filters were located at the top of the machines. Plaintiff recalls he typically cleaned out the filters while the machines were shut down. Plaintiff worked in proximity to millwrights performing routine maintenance, checking valves, taking covers off of pumps and repairing lines during paper machine shut downs. Both as a filter man, and as a pulp and paper tester, plaintiff's job duties took him to all areas of the mill. Plaintiff worked in proximity to brick layers and boilermakers, removing and replacing insulation and refractory materials on the boilers at the mill. Plaintiff worked in proximity to evaporators. Plaintiff recalls insulators and millwrights replacing components on the evaporators. Plaintiff frequently passed through the machine shop at this mill. Plaintiff worked in proximity to electricians and millwrights performing maintenance to GE and WESTINGHOUSE turbines in the turbine rooms. Plaintiff was next assigned to the #4, 5, 6, 7 and 8 paper machines. Plaintiff recalls these machines were used to make kraft paper and paper bags. Plaintiff worked on all areas of these machines from the wet end to the dry end. Plaintiff worked in several capacities on these machines including machine operator, back tender, and winder man. Plaintiff changed machine clothing, including the wet felts and the dryer felts. Plaintiff had to cut the felt off the pins and rollers. Plaintiff had to cut up the felt and take it out into the yard so laborers could dispose of it. Plaintiff recalls the replacement felts were stored in a warehouse at the mill. Plaintiff recalls frequently working in the warehouse. During machine shut downs, plaintiff used high pressure hoses to clean out insulated lines on the paper machine. Plaintiff recalls insulation flaking off of the lines. Plaintiff assisted millwrights with machine valve repairs. Plaintiff recalls the millwrights removing and installing new gaskets and packing

on the valves.  Plaintiff recalls some of the valves were manufactured by CRANE CO.  Plaintiff assisted millwrights with maintenance on pumps associated with the paper machines.  Plaintiff recalls millwrights opening up the pumps, and replacing gaskets.  Plaintiff recalls some of these pumps were VIKING PUMPS.  Plaintiff recalls working in the basement below the paper machines.  Plaintiff recalls the basement was filled with insulated steam lines and pipes.  Plaintiff recalls insulators and pipefitters removing and replacing the insulated lines in the basement below the paper machines.  In 1984, plaintiff was assigned to the No. 20 paper machine, a brand new paper machine at the time. Plaintiff was the lead paper machine operator, but performed all duties associated with the machine, including back tender, winder man, and machine assistant.  Plaintiff recalls the following manufacturers of dryer felts: ASTEN JOHNSON, INC., ALBANY INTERNATIONAL CORP., and APPLETON MILLS (VOITH FABRICS APPLETON, INC.).  Plaintiff recalls the following co-workers: Buford Sanders, 1109 NW Fourth Ave, Camas, WA 98607-2708, (360) 834-6506; Harry Mickes, 3201 G St, Washougal, WA 98671-2051, (360) 835-3129; Leard Henry, 9009 NE 54th St. E35; Vancouver, WA 98662; Dave Matson, address currently unknown; Harry Weeks, address currently unknown; Larry Mansfield, address currently unknown; Andy Nosko, 3223 I St, Washougal, WA 98671-1914 (360) 835-2509. Plaintiff currently contends he was exposed to asbestos during this employment.

**Asbestos Exposure/Job sites**

11.     Identify each <u>job site</u> or <u>ship</u> (referencing its specific location and the dates of your employment) at which you claim exposure to asbestos-containing products and your occupation or trade at each job site.

**ANSWER:**

Plaintiff refers to his response to Interrogatory No. 10, above.

12.     State separately for each job site or ship enumerated in your response to Interrogatory No. 11, the following:

(a)     The name and address of your employer;

(b)     The names of each contractor that brought, installed, or used the asbestos or asbestos-containing product on the job site, the date, and the contractor that is related to your exposure;

(c)     The nature of your exposure to asbestos-containing products (including job title, duties performed, and details as to whether exposure occurred during rip-out, repair, new

# Exhibit C

# Brayton❖Purcell LLP

RECEIVED S/S
AUG 2 3 2007
IRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

### TRIAL LAWYERS

The American Bank Building
621 S.W. Morrison Street, Suite 950
Portland, Oregon 97205
Telephone: (503) 295-4931
Facsimile: (503) 241-2573

Los Angeles: (415) 898-1555
San Francisco: (415) 898-1555
Salt Lake City: (801) 366-9100

Email: portland@braytonlaw.com
www.braytonlaw.com

ALAN R. BRAYTON•
GILBERT L. PURCELL•

DAVID R. DONADIO•
CHRISTOPHER E. ANDREAS•
LLOYD F. LEROY•

OF COUNSEL
JEFFREY D. EISENBERG•
RICHARD R. KUHN•
ROBERT M. LEVY•
DARRELL J. SALOMON•

• ADMITTED ONLY IN STATES
OTHER THAN OREGON




August 20, 2007

<u>**VIA FACSIMILE & US MAIL**</u>

ALL COUNSEL

     Re:     <u>Barabin v. Albany International Corp., et al.</u>
              King County Superior Court Cause No. 06-2-39452-6SEA

Dear Counsel:

     Pursuant to the Case Schedule, plaintiff discloses the following settlements:

| | |
|---|---|
| General Electric Company | $75,000.00 |
| Ingersoll-Rand Company | $25,000.00 |
| Texaco, Inc. | $76,500.00 |
| **Total** | **$176,500.00** |

Kindly Yours,

Zachary B. Herschensohn

ZBH:aja

J:\WA\106995\Ltr\All Counsel-18-sett discl.wpd

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 1 2008

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON  MULTIDISTRICT
LITIGATION**

IN RE ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI),

This Document Relates to:

HENRY BARABIN and GERALDINE
BARABIN v.ALBANY
INTERNATIONAL CORP., et al.

*Western District of Washington,
Case No. CO7-1454 RSL*

MDL Docket No. 875

CTO - 291

_____

**CERTIFICATE OF SERVICE**
**Re: Motion to Vacate the Conditional Remand Order**

I hereby certify that on August 19, 2008, I sent the following documents (including

this Certificate of Service):

1.    **DEFENDANT ASTENJOHNSON, INC'S MOTION TO VACATE
CONDITIONAL REMAND ORDER**

2.    **DECLARATION OF KEVIN A. ROSENFIELD IN SUPPORT OF
DEFENDANT ASTENJOHNSON, INC'S MOTION TO VACATE
CONDITIONAL REMAND ORDER**

via Fed Ex to the parties listed below:

Jeffrey N. Luthi, Clerk of the Panel
One Columbia Circle NE
Thurgood Marshall Federal Bldg. G 255 North Lobby
Washington DC 20002

CERTIFICATE OF SERVICE -1
MDL DOCKET NO. 875, CTO-291
(Western District of Washington Case
No. C07-1454 RSL)
K:\203887B\00554\20695_KAR\20695P21KX

**Original**

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    and

2        Delany Miller, Attorney for Plaintiff Henry Barabin, et al.
         Brayton Purcell LLP
3        111 SW Columbia Street Suite 250
         Portland, OR 97201
4

5    and the same documents via United States First Class Mail to the following:

6        **Please see attached Panel Service List.**

7

8        DATED this 19th day of August, 2008.

9                        K&L GATES LLP

10

11       Kathy Schwarz, Legal Secretary to
         Kevin A. Rosenfield, Attorneys for Defendant
12       AstenJohnson, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF SERVICE -2
MDL DOCKET NO. 875, CTO-291
(Western District of Washington Case
No. C07-1454 RSL)
K:\2038878\00554\20695_KAR\20695P21KX

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                      MDL No. 875

## PANEL SERVICE LIST (Excerpted from CRO)

Henry Barabin, et al. v. Albany International Corp., et al., E.D. Pennsylvania
(W.D. Washington 2:07-1454)

Peter G. Angelos
LAW OFFICES OF
PETER G ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana, One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607

Jan C. Kirkwood
WILLIAMS KASTNER
Two Union Square, Suite 4100
601 Union Street
Seattle, WA 98101

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER
& MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105

Barry N. Mesher
LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101

Delaney L. Miller
BRAYTON PURCELL LLP
Columbia Square Building
111 SW Columbia Street, Suite 250
Portland, OR 97201

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS
KRUTZ & TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608