**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2008

FILED
CLERK'S OFFICE

PLEADING NO. 5582

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON
## MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. IV) | * | MDL NO. 875 |
| | * | |

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ARMANDO A. SAMMARTINO, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | DIST. DIV. C.A. NUMBER:  DC 1 08-967- RJL |
| AC & R INSULATION CO., INC., *et al.*, | * | |
| Defendants. | * | |

### DEFENDANT KRAFFT-MURPHY COMPANY'S RESPONSE IN OPPOSITION TO MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Defendant Krafft-Murphy Company (hereinafter "Krafft-Murphy" or "Defendant"), by its undersigned counsel, hereby opposes Plaintiffs' Motion to Vacate Conditional Transfer Order (hereinafter "Motion to Vacate"), and in support of that opposition, states the following:

## I. BACKGROUND

**A.    PROCEDURAL BACKGROUND**

Plaintiffs filed their complaint in the Superior Court of the District of Columbia on or about May 1, 2008, alleging occupational exposure of Armando Sammartino to asbestos-

1

**OFFICIAL FILE COPY** IMAGED SEP 8  2008

containing products. *See* **Exhibit 1**.  On or about May 5, 2008, prior to service of the complaint

on Krafft-Murphy, Daniel Brown, Plaintiffs' Counsel, contacted the Defendants in this case and

informed them of the failing health of Armando Sammartino (hereinafter "Decedent" or "Mr.

Sammartino").  Plaintiffs' Counsel requested that a discovery deposition take place on May 7,

2008, only six days after filing Plaintiffs' Complaint.  Out of consideration for Mr. Sammartino's

declining health, Defendants agreed to take the discovery deposition of Mr. Sammartino without

requiring Plaintiffs to file Answers to Defendants' Interrogatories.  However, Defendants did

request that Plaintiffs furnish some sort of work history summary so that the places and dates of

employment could be established prior to Mr. Sammartino's deposition.  Thus, on May 6, 2008,

Defendant Krafft-Murphy and other defense counsel received an e-mail correspondence from

Plaintiffs' counsel relaying discovery materials which included a document titled "Armando

Sammartino - Work History" (hereinafter "Work History Chart"),  which contained the purported

work history of Mr. Sammartino in the above-captioned matter. **Exhibit 3**.   During the

deposition of Mr. Sammartino, Plaintiffs' counsel later confirmed that this Work History Chart is

a chart that is "part of Mr. Sammartino's responses to interrogatories," provided from Plaintiffs'

Counsel to Defendants. *See* **Exhibit 2**, Discovery Deposition of Armando Sammartino, May 30,

2008, at 153.  Defendant Krafft-Murphy was served with Plaintiffs' Complaint on May 23, 2008.

The Work History Chart listed job sites at issue where exposure to asbestos-containing

materials was alleged.  Among those job sites were the White House, Soldiers' Home,

Smithsonian Institution, Ronald Reagan Washington National Airport, U.S. Capitol Power Plant,

Washington, D.C. VA Medical Center  and Walter Reed Army Medical Center, all of which are

exclusive federal enclave job sites.  *See* **Exhibit 3**. *See also* **Exhibit 4**, Notice of Removal;

**Exhibit 5**, Opposition to Plaintiffs' Motion to Remand. Nowhere on this chart do Plaintiffs

indicate that they decline to allege Mr. Sammartino's exposure to asbestos-containing products at any particular job site. *See* **Exhibit 3**. This Work History Chart constitutes Krafft-Murphy's first notice that some of the alleged exposure to asbestos-containing materials potentially occurred on exclusive federal enclaves.

Thus, pursuant to 28 U.S.C. §1441 and §1446, Defendant Krafft-Murphy filed a Notice of Removal with the United States District Court for the District of Columbia (hereinafter "U.S. District Court") on the basis of a Federal Question under 28 U.S.C. §1331, namely that of federal enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. § 457. This removal was timely filed on June 5, 2008, and was accompanied by the written joinder and consent of all other proper Defendants. This removal was based upon information contained in purported discovery responses, later confirmed as attachments to what will be Plaintiffs' Answers to Interrogatories. Nonetheless, Plaintiffs filed a Motion for Remand on July 7, 2008.      On June 12, 2008, Defendant Krafft-Murphy Company filed a Notice of Tag-Along Action with the Clerk of the United States Judicial Panel on Multidistrict Litigation ("MDL Panel" or "Panel"). As a result, on July 21, 2008, the Clerk of this Panel issued Conditional Transfer Order 312 ("CTO-312") conditionally transferring the case to the Asbestos MDL Panel, MDL No. 875, assigned to the Honorable James T. Giles of the United States District Court for the Eastern District of Pennsylvania. On August 4, 2008, Plaintiff filed a Notice of Opposition to the Conditional Transfer Order with the MDL Panel. On August 21, 2008, Defendant Krafft-Murphy received a copy of Plaintiffs' Motion to Vacate Conditional Transfer Order, and supporting Memorandum, to which this Defendant presently responds.

**B.    LEGAL BACKGROUND**

Under 28 U.S.C. § 1407, the MDL Panel may transfer civil actions involving one or more common questions of fact, pending in different districts, to any district for coordinated or consolidated pretrial proceedings, upon the Panel's determination that transfers for such proceedings will be for the convenience of parties and witnesses, and will promote the just and efficient conduct of such actions.  Accordingly, the MDL Panel determined that asbestos litigation should be consolidated in order to serve the objectives set forth in the MDL statutory scheme; the Panel concluded that centralization of these actions under § 1407 would streamline the pretrial proceedings and avoid the most objectionable aspects of asbestos litigation – e.g. growing state and federal court dockets, delays, lengthy trials, repetition of litigation, higher costs than recoveries, etc. –  which result from the large number and complexity of cases alleging personal injury and/or wrongful death as a result of asbestos exposure. *In re Asbestos Products Liability Litigation*, 771 F.Supp. 415, 418 (1991); *see also Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation*, 1-3 (1991).

Therefore, pursuant to 28 U.S.C. § 1407, on July 29, 1991, the MDL Panel transferred 21,937 civil actions to the U.S. District Court for the Eastern District of Pennsylvania ["Asbestos MDL Panel"] for coordinated or consolidated pretrial proceedings. *See* 771 F.Supp. 415 (J.P.M.L. 1991) (*cited in Docket No. 875, Before the Judicial Panel on Multidistrict Litigation, In re Asbestos products Liability Litigation (No. VI), Conditional Transfer Order* (CTO-275)). Since that time, thousands of additional actions have been transferred to the Asbestos MDL Court, and all actions have been assigned to the Honorable James T. Giles. (CTO-275.)  These later cases, termed "tag-along actions," are transferred by the MDL Panel pursuant to Rule 7.4 of

4

the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ["R.P.J.P.M.L."], 199

F.R.D. 425, 435-36 (2001).  A "tag-along action" refers to a civil action pending in a district

court and involving common questions of fact with actions previously transferred under 28

U.S.C. § 1407.  Rule 1.1, R.P.J.P.M.L, 199 F.R.D. 425.

## II.        ARGUMENT[1]

       This case represents precisely the type of case that requires transfer to the Asbestos MDL

Panel.  Defendant Krafft-Murphy fully complied with all statutory  procedural requirements for

removal of this action, and submitted a Notice of Removal containing a colorable claim of

removability.  These matters were discussed at length in Defendant Krafft-Murphy Compnay's

Response in Opposition to Plaintiffs' Motion for Remand. **Exhibit 5**.  As Defendant Krafft-

Murphy has sufficiently demonstrated original federal court jurisdiction over the multiple,

exclusive federal enclaves discussed by Defendant Krafft-Murphy in its Notice of Removal and

in its Response in Opposition to Plaintiffs' Motion for Remand, any one of which would have

been sufficient to confer "removal jurisdiction" (or subject matter jurisdiction) on the U.S.

District Court, Plaintiffs' claims of procedural or jurisdictional deficiencies with this removal are

without merit.  Further, this case represents precisely the type of case that requires transfer to

MDL-875 under 28 U.S.C. §1407 to ensure proper and uniform handling of all federal asbestos-

related cases.  Such transfer does not impede Plaintiffs' right to Due Process under the Fifth

Amendment but instead allows for this case to be handled with other cases involving "common

---

[1]   Plaintiffs' Motion to Vacate did not contain numbered paragraphs as required by Rule 7.1(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.  Thus, in an attempt to comply with Rule 7.1(b) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Defendant Krafft-Murphy has organized its argument to correspond with Plaintiffs' arguments as set forth in Plaintiffs' Memorandum.

questions of fact" to ensure a just and efficient resolution to the case.  Accordingly, this case

should be transferred to the Asbestos MDL Panel.

**A.      THIS CASE WAS PROPERLY REMOVED AND TRANSFER TO THE
         ASBESTOS MDL PANEL IS NOW APPROPRIATE.**

As discussed in Defendant Krafft-Murphy Company's Opposition to Plaintiffs' Motion to

Remand, there are two separate bases for the U.S. District Court's original jurisdiction:  <u>federal</u>

<u>enclave jurisdiction</u>, a type of federal question jurisdiction arising under 28 U.S.C. § 1331 (*see*

*Akin v. Ashland Chemical*, 156 F.3d 1030, 1034 (10th Cir. 1998) ("[p]ersonal injury actions

which arise from incidents occurring in federal enclaves may be removed to federal district court

as a part of federal question jurisdiction"), *citing Mater v. Holley*, 200 F.2d 123, 124-25 (5th Cir.

1952)); and <u>16 U.S.C. § 457 jurisdiction</u>,[2]  pursuant to which federal courts are explicitly granted

jurisdictional authority over death and personal injury claims arising in federal enclaves (*Stokes*

*v. Adair*, 265 F.2d 662, 665-66 (4th Cir. 1959) (explaining that the laws of the state that are

assimilated under § 457 "lose their character as laws of the state and become laws of the Union,"

thereby providing an independent basis for federal jurisdiction independent of the "arising under

federal law" provision of 28 U.S.C. § 1331)).  Consequently, Defendant Krafft-Murphy had a

statutory right of removal under 28 U.S.C. § 1441, which it exercised.  Further, during the

---

[2]   16 U.S.C. § 457, *Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws*, states that, "[i]n the case of the death of any person by the neglect or wrongful act of another within a national part or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be." (Feb. 1, 1928, c. 15, 45 Stat. 54).

removal process, Krafft-Murphy adhered to all procedural requirements set forth by 28 U.S.C. § 1446.

The U.S. District Court obtained jurisdiction over this action at the time the case was removed from the Superior Court for the District of Columbia, and no further action would be required on the Motion for Remand *unless* the MDL Panel or U.S. District Court was to determine that the U.S. District Court did not have subject matter jurisdiction over this action. However, as discussed *supra,* the District Court clearly has subject matter jurisdiction over this matter based on Plaintiffs' claims arising on exclusive federal enclaves, and thus no action on Plaintiffs' Motion for Remand is required.

Furthermore, the district court may rule on a motion to remand between the time that a Notice of Tag-Along Action has been filed but before a transfer order has been issued. *Moore v. Wyeth-Ayerst Laboratories*, 236 F. Supp. 2d 509, 511 (D. Md. 2002)(citing *In re Asbestos Products Liability Litigation,* 170 F. Supp. 2d 1348, 1349 n. 1 (Jud. Pan. Mult. Lit. 2001)). However, the U.S. District Court has chosen not to do so in the instant case.  Plaintiffs filed a Motion to Expedite Consideration of Plaintiffs' Motion to Remand in the U.S. District Court. The Honorable Richard J. Leon reviewed and promptly denied Plaintiffs Motion to Expedite Consideration.  **Exhibit 6.** Accordingly, understanding that it had the ability to rule on Plaintiffs' Motion to Remand prior to the transfer of this case to the Asbestos MDL Panel, the U.S. District Court has declined to rule on the issue of remand at this time.  As such, it is proper for the case to be transferred to the Asbestos MDL Panel for further pretrial proceedings.

**B.      TRANSFERRING THIS CASE TO THE MDL PANEL ALLOWS THE CASE TO BE HANDLED BY A COURT WITH PRIOR EXPERIENCE HANDLING SIMILARLY SITUATED CASES.**

Plaintiffs' discussion pertaining to their contempt for the Asbestos MDL Panel is not a proper topic for consideration by this Panel, as it involves policy arguments that are not only unfounded (relying on unreported opinions from other jurisdictions), but also irrelevant. Congress and the federal judiciary have decided that the proper way to resolve the mass of asbestos litigation is to transfer cases to the Asbestos MDL Panel for consolidated pretrial proceedings. This action clearly fits into that category of case, and is thus properly an action for consideration by the Asbestos MDL Panel. Transferring this case to the Asbestos MDL Panel allows for judicial economy by assuring a just, efficient and uniform resolution of similarly situated cases by a judicial system that has the proper experience and background to adequately oversee pretrial issues in this matter.

Furthermore, despite Plaintiffs' arguments to the contrary, not only does the Asbestos MDL Panel have the authority to rule on motions to remand but it is better suited to rule on such a motion. Transfer under Section 1407 promotes judicial economy by eliminating duplicate discovery, preventing inconsistent or repetitive pretrial rulings thereby conserving the resources of the parties, their counsel and the judiciary. Indeed, allowing the Asbestos MDL Panel to handle all pre-trial matters in this case "provides for consistent treatment of similar issues and may reduce the burden on litigants and the judiciary." *Moore*, 236 F. Supp. 2d at 511.

**C.     THIS CASE EXEMPLIFIES PRECISELY THE TYPE OF CASE THAT SHOULD
BE TRANSFERRED TO THE ASBESTOS MDL PANEL UNDER 28 U.S.C. §
1407.**

The present matter involves questions of fact common to the actions previously

transferred to the Asbestos MDL Panel; as such, it is proper to transfer this case to the Asbestos

MDL Panel so that it can be handled along side other cases involving common questions of fact.

The Clerk of the MDL Panel indicated that, "[i]t appears that the actions on this conditional

transfer order involve questions of fact that are common to the actions previously transferred to

the Eastern district of Pennsylvania and assigned to Judge Giles." (CTO-275, para. 2.)  As such,

this matter satisfies the 28 U.S.C. § 1407 prerequisite of having "common questions of fact," and

can thus be transferred to the Asbestos MDL Court at the discretion of the MDL Panel (upon its

determination that transfer will be for the convenience of parties and witnesses, and will promote

the just and efficient conduct of the action).

The purpose of § 1407 is "for coordinated or consolidated pretrial proceedings" to allow

for greater judicial economy and a just and efficient resolution of claims.  Transfer under § 1407

promotes judicial economy by eliminating duplicate discovery, preventing inconsistent or

repetitive pretrial rulings thereby conserving the resources of the parties, their counsel and the

judiciary.  The present matter satisfies the statutory prerequisite of sharing common questions of

fact with other cases previously transferred to the Asbestos MDL Panel.  Accordingly, transfer of

this case to the Asbestos MDL Panel is appropriate.

**D.     PLAINTIFFS' RIGHT TO DUE PROCESS IS NOT VIOLATED BY TRANSFER TO THE MDL PANEL.**

Plaintiffs' right to due process is not violated by a transfer of this action to the Asbestos MDL Panel.  Transfer to the Asbestos MDL Panel will promote the even-handed administration of justice, as it will increase the efficiency of the pre-trial process, will result in consistent decisions on pre-trial procedural issues, and will help advance the litigation of Plaintiffs' cause of action.  There is nothing unjust about such a result and transfer of this case to the Asbestos MDL Panel does not violate Plaintiffs' right to Due Process under the Fifth Amendment.[3]  Indeed, the Asbestos MDL Panel may be the more appropriate "court of competent jurisdiction," (Plaintiffs' Memorandum, at 9) as it is handling numerous other cases involving common questions of fact.

Plaintiffs argue that the MDL Panel should stay the transfer in order to obtain a ruling on Plaintiffs' Motion to Remand in the U.S. District Court.  However, a ruling as to the issue of remand is not necessary prior to the case being transferred to the Asbestos MDL Panel.  The Asbestos MDL Panel is equally, if not more, capable of handling all pre-trial matters.  Additionally, as argued above, The Honorable Richard J. Leon of the U.S. District Court already reviewed and denied Plaintiffs Motion to Expedite Consideration of Plaintiffs' Motion to Remand.  **Exhibit 6**.  Accordingly, the U.S. District Court has already declined to rule on the issue of remand at this time due to the pending transfer of this case to the Asbestos MDL Panel.  As such, it is proper for the case to be transferred to the Asbestos MDL Panel for further pre-trial proceedings.

---

[3]  Plaintiffs' attempts to characterize Defendant Krafft-Murphy's removal of this action as "baseless" and "tactically-motivated" are unfounded – especially in light of the job sites in which Mr. Sammartino worked, some of which include the White House, Soldiers' Home, Smithsonian Institution, Ronald Reagan Washington National Airport, U.S. Capitol Power Plant, Washington, D.C. VA Medical Center  and Walter Reed Army Medical Center.

**CONCLUSION**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2008

FILED
CLERK'S OFFICE

Based on the foregoing, it is clear that this case involves questions of fact that are common to other cases previously transferred to the Asbestos MDL Court and that transfer will promote the just and efficient conduct of this case.

WHEREFORE, Defendant Krafft-Murphy Company respectfully requests that this Court deny Plaintiffs' Motion to Vacate Conditional Transfer Order.

Respectfully Submitted,

Neil J. MacDonald, Esquire
Bar No. 433699
HARTEL, KANE, DeSANTIS,
MacDONALD & HOWIE, LLP
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705
Phone: (301) 486-1200
Fax: (301) 486-0935
Attorneys for Defendant
KRAFFT-MURPHY COMPANY

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this _____5____ day of ___Sept___, 20_08_, I caused a true and correct copy of the foregoing Response in Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order to be sent, via postage pre-paid overnight delivery, to the Clerk of the Panel, and served, via postage pre-paid U.S. Mail, upon the counsel of record listed on the attached Panel Service List.

Neil J. Macdonald

11

# IN RE: ASBESTOS PRODUCTS LIABILITY
# LITIGATION (NO. VI)

MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-312)

Armando A. Sammartino, et al. v. AC& R Insulation Co., Inc., et al.,
D. District of Columbia, C.A. No. 1:08-967

Peter G. Angelos
LAW OFFICES OF
PETER G ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201

Thomas P. Bernier
SEGAL MCCAMBRIDGE SINGER
& MAHONEY LTD
One North Charles Street, Suite 2500
Baltimore, MD 21201

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Daniel A. Brown
BROWN & GOULD LLP
7700 Old Georgetown Road
Suite 500
Bethesda, MD 20814-6204

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219

Scott Patrick Burns
TYDINGS & ROSENBERG LLP
100 East Pratt Street, 26th Floor
Baltimore, MD 21202

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415

Katherine S. Duyer
GAVETT & DATT PC
15850 Crabbs Branch Way, Suite 180
Rockville, MD 20855

Richard L. Flax
LAW OFFICES OF
RICHARD L FLAX LLC
29 West Susquehanna Avenue
Suite 500
Baltimore, MD 21204

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

Steven Andrew Luxton
MORGAN LEWIS & BOCKIUS
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

Neil J. MacDonald
HARTEL KANE DESANTIS
MACDONALD & HOWIE LLP
Calverton Office Park
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705-3166

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER
& MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038

John A. McCauley
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202

Neil J. McDonald
HARTEL KANE DESANTIS
MACDONALD & HOWIE LLP
Calverton Office Park, Suite 500
11720 Beltsville Drive
Beltsville, MD 20705-3166

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105

**MDL No. 875 - Panel Service List (Excerpted from CTO-312(Continued)**

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Scott Hamilton Phillips
SEMMES BOWEN & SEMMES
25 South Charles Street
Suite 1400
Baltimore, MD 21201

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Robin Silver
MILES & STOCKBRIDGE
10 Light Street
Baltimore, MD 21202

Andrew J. Sloniewsky
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ & TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608

**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON**
**MULTIDISTRICT LITIGATION**

IN RE: ASBESTOS PRODUCTS          *          MDL NO. 875
LIABILITY LITIGATION  (NO. IV)
                                                      *

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ARMANDO A. SAMMARTINO, *et al.*,          *

     Plaintiffs,                                   *

         v.                                *     DIST. DIV. C.A. NUMBER:   DC 1 08-967-
RJL

AC & R INSULATION CO., INC., *et al.*,          *

     Defendants.                                *

---

**ORDER**

     **UPON CONSIDERATION OF** Plaintiffs' Motion to Vacate Conditional Transfer

Order, and Defendant Krafft-Murphy Company's Response in Opposition thereto, it is this ___

day of _____ 20___,

     **ORDERED** that Plaintiffs' Motion to Vacate Conditional Transfer Order is **DENIED**.

                                                _____
                                              Judge
                                              United States Judicial Panel on Multidistrict
                                              Litigation

Copies to:
All counsel of record

1

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2008

FILED
CLERK'S OFFICE

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

Civil Division

ARMANDO A. SAMMARTINO and THERESE          :
SAMMARTINO, his wife                        :
1604 Dennis Avenue,                         :
Silver Spring, MD 20902                     :
                                            :
            Plaintiffs,                      :
                                            :
v.                                          :
                                            :
AC & R INSULATION CO., INC.                 : Civil Action No. ___0003352-08___
Serve: Geoffrey S. Gavett, Esq.             :
        Gavett & Datt                       :
        15850 Crabbs Branch Way, #180       :
        Rockville, MD 20855                  :
                                            :
A.W. CHESTERTON, CO.                        :
Serve: President                            :
        Rte. 93, Middlesex Industrial Park  :
        Stoneham, MA  02180                  :
                                            :
BALTIMORE AIRCOIL COMPANY, INC.             :
Serve: The Corporation Trust, Inc.          :
        300 E. Lombard Street               :
        Baltimore, MD 21202                  :
                                            :
CERTAINTEED CORP. (Individually and as successor :
to Keasbey & Mattison Company's Asbestos Cement :
Pipe Division)                              :
Serve: President                            :
        P.O. Box 860                        :
        750 East Swedesford Road            :
        Valley Forge, PA  19482             :
                                            :
GARLOCK, INC.                               :
Serve: President                            :
        1666 Division Street                :
        Palmyra, NY  14522                  :
                                            :

RECEIVED
Civil Clerk's Office

MAY 0 1 2008

Superior Court of the
District of Columbia
Washington, D.C.



KRAFFT-MURPHY COMPANY                                :
(and as successor to National Asbestos Co.)          :
Serve: Neil MacDonald, Esq.                          :
     Hartel Kane Desantis & Howie, LLP          :
     Capital Office Park                         :
     6301 Ivy Lane , Suite 800                  :
     Greenbelt, MD 20770                        :
                                                     :
METROPOLITAN LIFE INSURANCE, CO.                     :
Serve: President/CEO                                 :
     1 Madison Ave.                             :
     New York, NY 10010                         :
                                                     :
NOLAND CO.                                           :
Serve: Arthur P. Henderson, Jr.                      :
     2700 Warwick Boulevard                     :
     Newport News, VA 23607                     :
                                                     :
OWENS ILLINOIS, INCORPORATED                         :
Serve: President/CEO                                 :
     One Seagate                                :
     Toledo, OH 43666                           :
                                                     :
RAPID AMERICAN CORP.                                 :
Successor in interest to the                         :
 Phillip Carey Corp.                                :
Serve: CSC                                           :
     2711 Centerville Road, Suite 400           :
     Wilmington, DE 19808                       :
                                                     :
THOS. SOMERVILLE CO.                                 :
Serve: President                                     :
     Thos. Somerville Co.                       :
     4900 6th Street, N.E.                      :
     Washington, D.C. 20017                     :
                                                     :
THE WALTER E. CAMPBELL COMPANY, INC.                 :
Serve: Michael C. Gibbons                            :
     361 Berkshire Drive                        :
     Riva, MD 21140                             :
                                                     :
       Defendants.                           :

## COMPLAINT AND DEMAND FOR JURY TRIAL

**(Negligence, Strict Liability, Breach of Warranty,
Punitive Damages, Aiding and Abetting
and Civil Conspiracy, and Loss of Consortium)**

1.        Jurisdiction of this Court is based on D.C. Code Ann. §11-921 (1981). Jurisdiction over the defendants rests on D.C. Code Ann. §13-423 (1981) based on their business activities in the District of Columbia and their acts or omissions causing injury to the male plaintiff within the District of Columbia.

2.        The male plaintiff, hereinafter referred to as "plaintiff", Armando A. Sammartino, was employed as a plumber from approximately 1948 to 1986, working primarily in and around the District of Columbia at jobsites where he was exposed to asbestos products. During this period of time, plaintiff frequently used and/or came into contact with asbestos and asbestos products designed, manufactured, specified, inspected, assembled, distributed, supplied and/or installed by the above-named defendants (hereinafter, individually and collectively "the defendants' asbestos products"). Because of this frequent contact with the defendants' asbestos products, plaintiff inhaled and ingested great quantities of asbestos fibers. As a result of this exposure, plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems.

### COUNT I
#### (Negligence)

3.        The plaintiff hereby adopts by reference the preceding paragraphs of the complaint as if fully set forth herein and further alleges that plaintiff's development of mesothelioma, asbestos-induced pleural disease and other related pulmonary problems was a direct and proximate result of the negligence of the defendants named herein in their design, manufacture, inspection, production, testing, distribution, specification, supply and/or installation and labeling of asbestos-containing materials and products, including, but not limited to, negligence in:

a.        failing to adequately warn the plaintiff of the hazards associated with the inhalation of asbestos fibers;

b.        failing to adequately warn the plaintiff that protective equipment should be used at all times when working with products containing asbestos;

    c.  failing to properly design and manufacture asbestos products for safe use under the conditions of use that were reasonably anticipated;

    d.  failing to properly test the asbestos products for hazards prior to placing these goods in the stream of commerce;

    e.  failing to provide adequate instructions for safe and proper use of asbestos products;

    f.  failing to remove asbestos products from the stream of commerce even after the defendants knew, or in the exercise of reasonable care, should have known, that these products were unsafe for use by consumers or workers under reasonably anticipated circumstances and/or any circumstances; and

    g.  failing to specify the use of non-asbestos containing substitute products.

  4.  As a direct and proximate result of the negligence of the defendants named herein, the plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems. Such potentially fatal injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish. Moreover, as a result of the debilitating injuries, the plaintiff has incurred and/or may incur substantial expenses for medical care and treatment.

  5.  As a further direct and proximate result of the negligence of the defendants herein, the plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

  WHEREFORE, the plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

## COUNT II
### (Strict Liability)

6.       Plaintiff adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further alleges that the illness, injury, and damages which he suffered were a direct and proximate result of the design, manufacture, specification, inspection, sale, supply and/or distribution of asbestos-containing products, by the defendants named herein, which were defective and/or unreasonably dangerous to the user and/or consumer.  The asbestos-containing products were defective and/or unreasonably dangerous in that they contained deleterious, toxic and carcinogenic asbestos fibers and because the products lacked any or adequate warnings about the hazards they posed.  The asbestos-containing products were further designed as defective and/or unreasonably dangerous in that their intended use and maintenance contemplated that the asbestos materials would be disturbed, releasing inhalable asbestos fibers, and the product manuals or specification data specified replacement, from time to time, of worn out or damaged asbestos materials.  The defendants named above are now or have been engaged in the business of designing, manufacturing, selling, inspecting, specifying in use and/or distributing asbestos-containing products.  The asbestos products that caused injury to plaintiff reached him without substantial change in the condition in which they were sold.  Plaintiff was unaware of the dangerous propensities of the asbestos products which rendered them unsafe and unfit for their intended use, and at the time he used these products, such use was anticipated by or should reasonably have been anticipated by the defendants.

7.       As a direct and proximate result of the strict liability of the defendants herein, the plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems.  Such injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish.  Moreover, as a result of the debilitating injuries, the plaintiff has incurred and/or may incur substantial expenses for medical care and treatment.

8.       As a further direct and proximate result of the strict liability of the defendants herein, the male plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

## COUNT III
### (Breach of Warranty)

9.     Plaintiff adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further alleges that the illness, injury, and damages from which he suffers are a direct and proximate result of the breach of express warranties made by the defendants herein, in that the asbestos products used by the plaintiff were expressly warranted as safe, and the plaintiff relied upon these express warranties of the defendants. However, the asbestos products as designed, manufactured, specified, inspected and distributed by the defendants herein were not safe for use by the plaintiff, but rather caused the disabling and potentially fatal injuries from which he now suffers.

10.     The illness, injury, and damages from which the plaintiff now suffers are a direct and proximate result of the breach of the implied warranty of fitness made by the defendants herein, in that the asbestos products used by the plaintiff were impliedly warranted by the defendants to be fit for their intended purposes and uses, and the plaintiff relied upon the defendants' skill and judgment and the implied warranties made by the defendants. However, the asbestos products as designed, manufactured, and distributed by the defendants herein were not fit for use of their intended purposes, but rather caused the disabling and potentially fatal injuries from which plaintiff now suffers.

11.     The illness, injury, and damages from which the plaintiff now suffers are a direct and proximate result of the breach of the implied warranty of merchantability made by the defendants named herein, in that the asbestos products used by the plaintiff were impliedly warranted by the defendants to be of merchantable quality, fit, safe, and in proper condition for the ordinary use for which asbestos products are designed and used, and the plaintiff relied upon the defendants' skill and judgment and the implied warranty of merchantability made by the defendants. However, the asbestos products as designed, manufactured, specified, inspected and distributed by the defendants named herein were unfit, unsafe, and unusable for the purposes for which they were intended, but rather caused the disabling and potentially fatal injuries suffered by the plaintiff.

12.     As a direct and proximate result of the breaches of warranty of the defendants named herein, the plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related

pulmonary problems. Such injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish. Moreover, as a result of the debilitating injuries, the plaintiff may incur substantial expenses for medical care and treatment.

13.     As a further direct and proximate result of the breach of warranty of the defendants herein, the plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, the plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

## COUNT IV
### (Punitive Damages)

14.     Plaintiff hereby adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further alleges that the illness, injury, and damages which he suffered were a direct and proximate result of the conduct of the defendants named herein, either by clear and convincing acts of commission or omission, which were intentional and/or so reckless, willful, and wanton in nature as to rise to the level of intentional action by the defendants, exhibiting reckless indifference to the health and well-being of the plaintiff and other similarly situated workers, and in reckless disregard for the consequences the defendants knew or should have known would result from their actions.

15.     The illness, injury, and damages suffered by the plaintiff were a direct result of the conduct on the part of the defendants that amounted to fraudulent representation concerning the safety of working in an environment containing asbestos fibers, such representation having been made despite defendants' knowledge that these products and this work environment were wholly unsafe, dangerous, and hazardous to the health of the plaintiff and/or similarly-situated workers.

WHEREFORE, plaintiff demands judgment for punitive damages against all defendants, jointly and severally, in the full and just amount of Thirty Million Dollars ($30,000,000.00), plus interest and costs.

## COUNT V
### (Aiding and Abetting and Civil Conspiracy
### as to Defendant Metropolitan Life Insurance Company)

16.     Plaintiff adopts and incorporates by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

17.     Metropolitan Life Insurance Company, by various means encouraged, aided and abetted, and knowingly provided substantial assistance to the tortfeasor manufacturers, sellers, distributors, suppliers (hereafter "the direct perpetrators") whose asbestos products were substantial contributing factors to the development of plaintiff's mesothelioma and/or other asbestos-related injuries, diseases and conditions.

18.     The defendants, each and all of them, by various means agreed between and among themselves to engage and participate in the tortious conduct described above in the preceding counts of this Complaint.

19.     Metropolitan Life Insurance Company encouraged, aided and abetted, and knowingly provided substantial assistance to the direct perpetrators of the tortious conduct described herein, with knowledge of their role in that tortious conduct, in the following and other ways:  in the concealment, alteration, manipulation and suppression of knowledge and information about the dangers and health hazards of asbestos; in the publication of misleading, fraudulent and incorrect statements about the lack of any connection between asbestos exposure and various diseases; in the publication, use and dissemination of fake, misleading, fraudulent and incorrect statements about asbestos-containing products being "non-toxic," safe, not dangerous, not hazardous, contributing to the well-being of workers; in the decisions made by various direct perpetrators of the injuries to plaintiff not to test, study, research or investigate the dangers and health hazards of their asbestos-containing products; in deciding not to publicize, disclose, make public or otherwise warn about the dangers and health hazards of asbestos-containing products; in efforts to prevent the United States government and its employees, agencies, departments and organizations from taking steps to do research and publish on the dangers of asbestos and to restrict, ban, reduce, eliminate or regulate the use of asbestos-containing products.

20.     Metropolitan Life Insurance Company agreed and conspired in furtherance of a common scheme in the following and other ways:  in the concealment, alteration, manipulation and

suppression of knowledge and information about the dangers and health hazards of asbestos; in the publication of misleading, fraudulent and incorrect statements about the lack of any connection between asbestos exposure and various diseases; in the publication, use and dissemination of fake, misleading, fraudulent and incorrect statements about asbestos-containing products being "non-toxic," safe, not dangerous, not hazardous, contributing to the well-being of workers; in the decisions made by various direct perpetrators of the injuries to plaintiff not to test, study, research or investigate the dangers and health hazards of their asbestos-containing products; in deciding not to publicize, disclose, make public or otherwise warn about the dangers and health hazards of asbestos-containing products; in efforts to prevent the United States government and its employees, agencies, departments and organizations from taking steps to do research and publish on the dangers of asbestos and to restrict, ban, reduce, eliminate or regulate the use of asbestos-containing products.

21.    As a direct and proximate result of the unlawful and tortious conduct engaged in by the direct perpetrators and Metropolitan Life Insurance Company, plaintiff has developed mesothelioma, asbestos-induced pleural disease and other related pulmonary problems. Such injuries have caused the plaintiff's permanent total and/or permanent partial disability, and plaintiff has suffered and will continue to suffer extreme physical pain and discomfort, as well as great mental anguish. Moreover, as a result of the debilitating injuries, the plaintiff has incurred and/or may incur substantial expenses for medical care and treatment.

22.    As a further direct and proximate result of the tortious conduct of the direct perpetrators and Metropolitan Life Insurance Company herein, the male plaintiff has suffered and will continue to suffer a loss of wages and/or wage-earning capacity and will continue to suffer great pecuniary loss in the future.

WHEREFORE, the plaintiff demands judgment against Metropolitan Life Insurance Company in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

### COUNT VI
#### (Loss of Consortium)

23.    The female plaintiff, Therese Sammartino, adopts by reference all relevant allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein, and further asserts that she is the wife of the male plaintiff.

24.    As a direct and proximate result of the negligence, strict liability, breaches of warranty of the defendants herein, the female plaintiff has incurred and/or may incur substantial expenses for the medical care and treatment of her husband, and has suffered and will continue to suffer the loss of consortium, society, and companionship of her husband.

WHEREFORE, the female plaintiff demands judgment against the defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

Respectfully submitted,

Daniel A. Brown (Bar No. 444772)

BROWN & GOULD, LLP
7700 Old Georgetown Road, Suite 500
Bethesda, Maryland 20814
(301) 718-4548
Attorney for Plaintiff

JURY TRIAL REQUESTED:

Daniel A. Brown

Armando Sammartino, Vol. III  5/30/08

VOLUME III

IN THE SUPERIOR COURT

OF THE DISTRICT OF COLUMBIA

----------------------------X

ARMANDO A. SAMMARTINO and     :

THERESE SAMMARTINO            :

       Plaintiffs        :    CIVIL ACTION NO.

v.                           :    2008-CA-003352-A

AC&R INSULATION CO., INC.,    :

et al.                       :

       Defendants        :

----------------------------X

VIDEOTAPE DEPOSITION OF ARMANDO SAMMARTINO

The Videotape Deposition of ARMANDO SAMMARTINO was taken in the above-captioned case on Friday, May 30, 2008, commencing at 9:40 a.m. at 1604 Dennis Avenue, Silver Spring, Maryland, 20902, reported by Linda Bahur, RPR.

EVANS REPORTING SERVICES
The Munsey Building, Suite 705
Seven North Calvert Street
Baltimore, Maryland  21202
410-727-7100   800-256-8410



Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

**Page 2**

APPEARANCES

1
2  DANIEL A. BROWN, ESQUIRE
      Brown & Gould, L.L.P.
3     On Behalf of the Plaintiffs
4
   HELYNA M. HAUSSLER, ESQUIRE
5     Hartel, Kane, DeSantis, MacDonald & Howie,
      L.L.P.
6     On Behalf of the Defendant, Krafft-Murphy
      Company and Baltimore Aircoil Co., Inc.
7
8  VINCENT PALMIOTTO, ESQUIRE
      Miles & Stockbridge, P.C.
9     On Behalf of the Defendant, CertainTeed
10
   GREGORY S. SAVAGE, ESQUIRE
11    Segal, McCambridge, Singer & Mahoney, Ltd.
      On Behalf of the Defendant, Garlock
12
13 KATHRYN KOZERO, ESQUIRE
      Gavett & Datt, P.C.
14    On Behalf of the Defendant, AC&R Insulation
      Company
15
16 RICHARD L. FLAX, ESQUIRE
      Law Offices of Richard L. Flax, L.L.C.
17    On Behalf of Walter E. Campbell Company, Inc.
18
   GERRY H. TOSTANOSKI, ESQUIRE
19    Tydings & Rosenberg
      On Behalf of Thomas Somerville Company
20
21

**Page 3**

1  SCOTT H. PHILLIPS, ESQUIRE
      Semmes, Bowen & Semmes, P.C.
2     On Behalf of Noland Company
3
   DAVID F. LUBY, ESQUIRE
4     Royston, Mueller, McLean & Reid, L.L.P.
      On Behalf of A.W. Chesterton
5
6  STEVEN A. LUXTON, ESQUIRE
      Morgan, Lewis & Bockius
7     On Behalf of Owens-Illinois
8
9
10
11
12
13
14
15
16
17
18
19
20
21

**Page 4**

STIPULATIONS

1
2      It is stipulated by and between Counsel
3  for the respective parties that the reading and
4  signing of this deposition by the Deponent is not
5  waived.
6      It is also stipulated and agreed by and
7  between Counsel for the respective parties that the
8  filing of this deposition with the Clerk of Court is
9  hereby waived.
10     - - - - - - - - - -
11     THE VIDEOGRAPHER:  This videotape
12 deposition is being taken in accordance with
13 Maryland Rules on May 30, 2008 at 9:40 a.m. --
14     MR. BROWN:  D.C. Rules.
15     THE VIDEOGRAPHER:  Okay.  This deposition
16 is being taken in accordance with D.C. rules on May
17 30, 2008 at 9:40 a.m. at 1604 Dennis Avenue in
18 Silver Spring, Maryland.  Our court reporter is
19 Linda Bahur with Evans Reporting.  My name is Lisa
20 Bauer with Bauer Video Productions.
21     The caption of the case is Armando

**Page 5**

1  Sammartino versus AC&R Insulation.  Our attorneys
2  have been identified on the written record.  Our
3  witness today is Armando Sammartino and will now be
4  sworn in.  This is the continuation of the discovery
5  deposition.  Anybody that has a Blackberry on, I
6  need it turned off, please.
7      MS. HAUSSLER:  Okay.  Sir, you were, you
8  were sworn in --
9      MR. LUXTON:  I think they've got to swear
10 him in again, right?
11     MS. HAUSSLER:  Okay.  Under D.C. law?
12     MR. LUXTON:  Okay.
13 Whereupon --
14     ARMANDO SAMMARTINO
15 a Witness called for examination, having been first
16 duly sworn, was examined and testified as follows:
17 first duly sworn, was examined and testified as
18 follows:
19     EXAMINATION
20 BY MS. HAUSSLER:
21 Q  Hi, sir.  Helyna Haussler again.  The

2  (Pages 2 to 5)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III  5/30/08

Page 150

1  U.S. Capitol Power Plant. I think we're done, sir.
2          THE WITNESS: Oh.
3          MS. HAUSSLER: We can go off the record.
4  Oh, actually --
5          MR. BROWN: Go off the record?
6          MS. HAUSSLER: No. Okay.
7          THE VIDEOGRAPHER: Off the record at
8  1:19.
9          (Break taken.)
10         THE WITNESS: Starting over with a clean
11  sheet?
12         THE VIDEOGRAPHER: Back on the record at
13  1:20.
14         BY MS. HAUSSLER:
15     Q  Sir, just a couple more questions. Do
16  you recall working for Vallmer Associates?
17     A  Vallmer. Yeah. He was one of Thornton's
18  supervisors.
19     Q  Do you recall what you did while you were
20  employed by Vallmer Associates?
21     A  He had an overview on all the jobs that

Page 151

1  all, that Thornton did whether he approved or
2  disapproved. That was his job.
3     Q  Okay. Do you have a recollection of
4  actually working directly for Vallmer Associates?
5     A  In conjunction with, not directly working
6  with.
7          (Phone ringing)
8     A  It's all right. Therese will get it
9  downstairs.
10    Q  And was that when you were working for
11  Thornton or is that on a separate occasion?
12    A  I think that was when I was with
13  Thornton.
14    Q  Okay.
15    A  I said amen too soon.
16    Q  Sir, I'm going to show you what's been
17  marked as Exhibit 5 and it says at the top, Armando
18  Sammartino Work History. Have you ever seen that
19  document before?
20    A  These are past employers, people I worked
21  for.

Page 152

1          MR. FLAX: Counsel, I'm going to object
2  to Exhibit 5 so I'm not interrupting you.
3          MS. HAUSSLER: That's fine.
4          MR. FLAX: Can I have a continuing
5  objection to any reference or utterance regarding
6  Exhibit 5?
7          MS. HAUSSLER: Sure. I fully expected
8  there would be.
9          MR. LUXTON: I'm going to join in that.
10         THE WITNESS: I may have worked with some
11  or all of those people a long time ago.
12         BY MS. HAUSSLER:
13    Q  Okay. Well, did you, do you recall
14  preparing that document or -- strike that.
15         Do you recall ever seeing that document
16  before, this exact document?
17    A  Looks good.
18    Q  Okay. Well, hold onto it for just a
19  moment. That was, that was given to us by, by your
20  attorney. And as you mentioned, it's got some of
21  the employers that you recall working on. And then

Page 153

1  are those some of the job sites that we talked about
2  today that you recall working at?
3     A  What about it?
4     Q  Those are -- are those some of the job
5  sites again that you recalled working at that we've
6  been discussing over the last couple of days?
7     A  Yeah.
8     Q  Okay. Now, sir, if you just look --
9     A  This?
10    Q  Yes. Just if you look at -- well, no.
11  Wait. Just if you can just read through it yourself
12  and just look through the sites and just look it
13  over as far as the products, see how, towards the
14  right?
15         MR. BROWN: I'm going to, I'm going to
16  make an objection to this line of inquiry. This
17  Exhibit 5 is a product of my office, which is part
18  of the responses to Mr. Sammartino's
19  interrogatories. There is information on the work
20  history, just as there is in the interrogatories
21  that comes from the benefit of Mr. Sammartino and

39 (Pages 150 to 153)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Armando Sammartino, Vol. III  5/30/08

Page 154

1  other information that comes from information that
2  my office has compiled.
3  　　　MR. LUXTON: I'll join in that, too.
4  　　　MS. HAUSSLER: So you wanted to make a
5  statement, right? Okay. That's fine.
6  　　　MR. FLAX: I think it's more an
7  objection. Counsel is once again joining.
8  　　　MS. HAUSSLER: That's fine.
9  　　　THE WITNESS: See, now, the question you
10  asked --
11  　　　MS. HAUSSLER: That's fine.
12  　　　MR. BROWN: I'm, I'm, yeah, I'm making an
13  objection to --
14  　　　MS. HAUSSLER: That's fine.
15  　　　MR. BROWN: -- to any inquiry into the --
16  if you're going to get into specific products,
17  that's not something --
18  　　　MS. HAUSSLER: I'm not going --
19  　　　MR. BROWN: Okay.
20  　　　MS. HAUSSLER: -- to mention the product
21  specifically listed on there.

Page 155

1  　　　MR. BROWN: Okay. Okay.
2  　　　MS. HAUSSLER: I have one question and
3  whoever wants to object to it, when they, when,
4  after I say it is free to. Sir --
5  　　　THE WITNESS: The question you asked me a
6  while ago about who supplied the cooling tower, here
7  it is, right here. Baltimore Aircoil.
8  　　　BY MS. HAUSSLER:
9  　　Q  Okay. Now, sir, I just want to mention
10  generally, all of the products that are listed on
11  that sheet, if you look at those products, are those
12  products that generally you believe you may have at
13  some point been exposed to throughout your career?
14  　　　MS. TOSTANOSKI: Objection to the
15  compound nature of the question --
16  　　　MR. LUXTON: Objection.
17  　　　MR. BROWN: Objection.
18  　　　MS. TOSTANOSKI: -- lack of foundation
19  and the document statement that Mr. Brown said --
20  　　　THE WITNESS: Those products exposed,
21  what?

Page 156

1  　　　MR. LUXTON: Calls for a response based
2  on hearsay.
3  　　　BY MS. HAUSSLER:
4  　　Q  If you look at the products that are
5  listed on this sheet --
6  　　A  Products over here?
7  　　Q  Yes, sir.
8  　　A  All right.
9  　　Q  Do you believe that those are products
10  that you may have been exposed to potentially
11  throughout your career or at some point in your
12  career --
13  　　　MS. TOSTANOSKI: Same objection.
14  　　Q  -- that may have contained asbestos?
15  　　　MR. LUXTON: Objection.
16  　　　MS. TOSTANOSKI: Objection.
17  　　A  I can't refer to any of these having
18  asbestos.
19  　　Q  Okay.
20  　　A  The VA Hospital, Academy of Science.
21  　　　MS. HAUSSLER: Okay. Thank you, sir.

Page 157

1  And just for the record, I'm going to get a clean
2  copy of Exhibit 5 to the court reporter. Dan, did
3  you want to --
4  　　　EXAMINATION
5  　　　BY MR. BROWN:
6  　　Q  Sam, do you recall working at the
7  Harrington Hotel?
8  　　A  Yeah. Yes.
9  　　Q  Do you know what you did at the
10  Harrington Hotel?
11  　　A  We installed another one of Baltimore
12  cooling towers.
13  　　Q  Another Baltimore Aircool cooling tower?
14  　　　MS. HAUSSLER: And to the extent these
15  are answers to interrogatory provided in answers to
16  interrogatories, I'm going to object to the extent
17  that it's not listed on this sheet that is,
18  according to counsel, part of plaintiff's answers to
19  interrogatories.
20  　　　MR. BROWN: Okay. This is, this is
21  supplementing it.

40 (Pages 154 to 157)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

## ARMANDO SAMMARTINO – WORK HISTORY

| Date | Employer | Occupation/Trade | Sites | Products | Coworkers |
|------|----------|------------------|-------|----------|-----------|
| 1941-1943 | Dunty Welding, Youngstown, OH | Certified welder | | | |
| 1943-1946 | U.S. Army/Military Service | | | | |
| 1946-1948 | Self-employed | Auto repairman, motor and body work | | | |
| 1948-1958 | Stewart Balnum Co., Washington, DC | Mechanical contractor: apprentice, journeyman, foreman | | | |
| 1958-1961 | R.M. Thornton, Inc., Washington, DC | Mechanical contractor: assistant project manager | | | |
| 1961-1964 | Maurice R. Colbert Co., Inc., Washington, DC | Mechanical contractor: superintendent | U.S. Capitol Power Plant | Baltimore Aircoil Cooling Tower - installed new cooling tower | |
| | | | German Embassy | Sprayed Limpet asbestos | |
| 1964-1969 | R.M. Thornton, Inc. Washington, DC | Mechanical contractor: project superintendent | VA Hospital, Washington, DC | | |
| | | | Nat'l Academy of Science | | |
| | | | American Pharmaceutical Co. | | |
| | | | Smithsonian | | |
| | | | Soldiers' Home (entire maintenance section, including a substation for electrical power) | | |
| 1958-1961 or 1964-1969 | R.M. Thornton, Inc. Washington, DC | Mechanical contractor: Assistant project mgr or project superintendent | 19th & T Holly House | | |
| | | | Children's Hospital | Canadian Asbestos<br>Eagle Picher 66<br>Eagle Picher One Coat<br>Owens-Corning Kaylo<br>Vermont Asbestos<br>Contractor: AC&R | Elmer Gibson |



| Date | Employer | Occupation/Trade | Sites | Products | Coworkers |
|---|---|---|---|---|---|
| | | | Columbia Women's Hospital | Eagle Picher Cement<br>JM Blue Mud<br>Owens-Coming Kaylo Block<br>Owens-Coming Kaylo Pricovering<br>Contractor: AC&R | Arthur Anderson |
| | | | Mayflower Hotel | Carey Mud<br>JM Blue Mud<br>Contractor: AC&R | John Kutens |
| | | | National Airport | Carey Mud<br>JM Blue Mud<br>Eagle Picher One Coat<br>Owens-Coming Kaylo<br>Rubecoid Calcilite<br>Contractor: AC&R | John Kutsos |
| | | | Prince George's County Hosp. | | |
| | | | Walter Reed | | |
| | | | White House | Carey Woolfelt<br>JM 352 Cement<br>JM Magnesia Pipecovering<br>Contractor: AC&R<br><br>Eagle Picher Mud<br>Owens-Coming Kaylo<br>Contractor: Walter E. Campbell | Lenoir Bradford<br><br><br><br><br>James Wallace |
| 9/1969- 10/1970 | Nash M. Love Associates Washington, DC | Mechanical contractor: Project manager | Riggs National Bank, M Street, Washington, DC (mechanical and electrical renovation) | | |
| | | | WMAL Radio & TV Studio | | |
| | | | National Gallery of Art | | |
| | | | Paul Mellon's private residence | | |
| | | | Int'l Monetary Fund | | |

| Date | Employer | Occupation/Trade | Sites | Products | Coworkers |
|------|----------|------------------|-------|----------|-----------|
| | | | Army Times | | |
| | | | Westchester Apartments | | |
| 10/1970-1971 | Vattner Associates Washington, DC | Mechanical estimator | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARMANDO A. SAMMARTINO and THERESE   :
SAMMARTINO, his wife   :
1604 Dennis Avenue   :
Silver Spring, MD 20902   :
  :
           Plaintiffs,   :
  :
  :
        v.   :  Civil Action No.
  :
AC & R INSULATION CO., INC.   :
Serve: Geoffrey S. Gavett, Esq.   :
      Gavett & Datt   :
      15850 Crabbs Branch Way, #180   :
      Rockville, MD 20855   :

A.W. CHESTERTON, CO.
Serve: President
      Rte. 93, Middlesex Industrial Park
      Stoneham, MA 02180

                           **Case: 1:08-cv-00967**
                           **Assigned To : Leon, Richard J.**
                           **Assign. Date : 6/5/2008**
                           **Description: General Civil**

BALTIMORE AIRCOIL COMPANY, INC.   :
Serve: The Corporation Trust, Inc.   :
      300 E. Lombard Street   :
      Baltimore, MD 21202   :
  :
CERTAINTEED CORP. (Individually and as   :
successor to Keasbey & Mattison   :
Company's Asbestos Cement Pipe Division)   :
Serve: President   :
      P. O. Box 860   :
      750 East Swedesford Road   :
      Valley Forge, PA 19482   :
  :
GARLOCK, INC.   :
Serve: President   :
      1666 Division Street   :
      Palmyra, NY 14522   :

1



KRAFFT-MURPHY COMPANY (and as successor :
to National Asbestos Co.)                    :
Serve:  Neil MacDonald, Esq.                 :
            Hartel, Kane, DeSantis,          :
                MacDonald & Howie, LLP       :
            Calverton Office Park            :
            11720 Beltsville Drive, Ste. 500 :
            Beltsville, MD  20705            :
                                             :
METROPOLITAN LIFE INSURANCE, CO.             :
Serve:  President/CEO                        :
            1 Madison Avenue                 :
            New York, NY  10010             :
                                             :
NOLAND CO.                                   :
Serve:  Arthur P. Henderson, Jr.             :
            2700 Warwick Boulevard           :
            Newport News, VA  23607          :
                                             :
OWENS ILLINOIS, INCORPORATED                 :
Serve:  President/CEO                        :
            One Seagate                      :
            Toledo, OH  43666               :
                                             :
RAPID AMERICAN CORP.                         :
Successor in interest to the                 :
Phillip Carey Corp.                          :
Serve:  CSC                                  :
            2711 Centerville Road, Suite 400 :
            Wilmington, DE  19808           :
                                             :
THOS. SOMERVILLE CO.                         :
Serve:  President                            :
            Thos. Somerville Co.             :
            4900 6th Street, N.E.            :
            Washington, D.C.  20017          :
                                             :
THE WALTER CAMPBELL COMPANY, INC.            :
Serve:  Michael C. Gibbons                   :
            361 Berkshire Drive              :
            Riva, MD  21140                 :
                                             :

2

## NOTICE OF REMOVAL OF CIVIL ACTION

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Defendant Krafft-Murphy Company (hereinafter "Krafft-Murphy"), joined and/or consented to by all Defendants properly sued and served in the civil action filed in the Superior Court for the District of Columbia, case no. 2008 CA 003352 A, pursuant to 28 U.S.C. §1441 and §1446, hereby note the removal of this action to the United States District Court for the District of Columbia.  Removal is based on Federal Question under 28 U.S.C. §1331, namely that of federal enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. §457. Removal of this matter based on federal question jurisdiction is proper because several of the job sites at issue in this matter – the White House, Soldiers' Home, The Smithsonian Institution, U.S. Capital Power Plant, Washington D.C. VA Medical Center, and Walter Reed Army Medical Center and Ronald Reagan Washington National Airport – are under federal enclave jurisdiction.

In support thereof, Defendant Krafft-Murphy states the following:

## I.  BACKGROUND

Plaintiffs filed their complaint in the Superior Court of the District of Columbia on or around May 1, 2008, alleging occupational exposure of Plaintiff Armando Sammartino to asbestos-containing materials. See Exhibit 1.  Prior to service of the complaint on Krafft-Murphy, on or about May 6, 2008, Krafft-Murphy received an e-mail correspondence from Daniel Brown, Plaintiffs' Counsel, relaying discovery materials which included a document titled "Armando Sammartino - Work History" (hereinafter "Work History Chart")  which contained the

purported work history of Plaintiff Armando Sammartino (hereinafter "Plaintiff" or "Mr.

Sammartino") in the above-captioned matter.  This Work History Chart listed job sites at issue

where exposure to asbestos-containing materials is alleged.  Among those job sites were the

White House, Soldiers' Home, Smithsonian Institution, Ronald Reagan Washington National

Airport, U.S. Capital Power Plant, Washington, D.C. VA Medical Center and Walter Reed

Army Medical Center, which are all exclusive federal enclave job sites.  See Exhibit 2.  This

Work History Chart constitutes Krafft-Murphy's first notice that some of the alleged exposure to

asbestos-containing materials potentially occurred on exclusive federal enclaves.  Subsequent to

Plaintiffs' correspondence attaching the Work History Chart, Krafft-Murphy was served with

Plaintiffs' Complaint on May 14, 2008.

Thus, pursuant to 28 U.S.C. §1441 and §1446, Defendant Krafft-Murphy files this Notice

of Removal on the basis of a Federal Question under 28 U.S.C. §1331, namely that of federal

enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. § 457.

## II.  JOB SITES

Numerous federal enclave sites are at issue in this case.  Among those sites are the White

House, Soldiers' Home, Smithsonian Institution, Ronald Reagan Washington National Airport,

U.S. Capital Power Plant, Washington, D.C. VA Medical Center and Walter Reed Army

Medical Center, which are all exclusive federal enclave job sites.  See Exhibit 2.

### A.    White House

"For two hundred years, the White House has stood as a symbol of the Presidency, the

United States government, and the American people."  www.whitehouse.gov (last visited June 2,

4

2008). In accordance with it's historical and governmental significance, the White House is an exclusive federal enclave. In December 1790, President George Washington signed an Act of Congress declaring that the federal government would reside in a district "not exceeding ten miles square...on the river Potomac." President Washington and city planner Pierre L'Enfant, chose the site for the "President's House." Construction of the White House began in 1792 but it was not completed until approximately 1800. President Theodore Roosevelt officially gave the White House its current name in 1901. Pursuant to 3 U.S.C. §102, the President is entitled to "the use of the furniture and other effects belonging to the United States and kept in the Executive Residence at the White House." 3 U.S.C. §102.

**B.     Soldiers' Home**

The Old Soldiers' Home, now known as the U.S. Soldiers' and Airmen's Home (hereinafter Soldiers' Home), is an exclusive federal enclave located in Washington, D.C. In 1851, the land which forms the core of Soldiers' Home was purchased by the U.S. Government to establish an "asylum for old and disabled veterans." www.defenselink.mil, (last visited June 2, 2008). Two of the buildings on this site, Quarters 1 and Anderson Cottage, served as the summer White House for several U.S. Presidents. During the Civil War, President Abraham Lincoln lived at Soldiers' Home in what is now called Anderson Cottage. It was here that President Lincoln wrote the last draft of the Emancipation Proclamation. Today, this 320 acre facility is home to nearly 1,300 veterans and is a perfect example of "The Military Taking Care of Its Own." Id.

C.    **Smithsonian Institution**

The Smithsonian Institution is an exclusive federal enclave. James Smithson established

the Smithsonian Institution, situated in Washington, D.C., as a result of a bequest in 1826.

Smithson, a British citizen and scientist, who died in 1829, named his nephew as beneficiary in

his last Will and testament. He stipulated that if the nephew would die without heirs (as he did in

1835), the estate should go to the United States of America for the following purpose:

> to found at Washington, under the
> name of the Smithsonian Institution,
> an establishment for the increase and
> diffusion of knowledge among men.

Six years after Smithson's death, President Andrew Jackson announced the bequest to

Congress. On July 1, 1836, Congress accepted the legacy bequeathed to the nation. In September,

1838, it was determined that Smithson's legacy, consisting of gold sovereign's re-coined at the

Philadelphia mint to U.S. currency, was worth over $500,000.

Eight years later, an Act of Congress, signed by President Polk on August 10, 1846,

established the Smithsonian Institution as a trust to be administered by a Board of Regents and a

Secretary of the Smithsonian. 20 U.S.C. §41. Ch.178, Sec.1, 9 Stat. 102. http://www.si.edu (last

visited May 28, 2008).   The General Service Administration lists the Old Smithsonian building

among those facilities on its building inventory. http://www.iolp.gsa.gov (last visited May 28,

2008).

Certain rules and regulations concerning the operation and security of the Smithsonian

Institution are codified at 40 U.S.C.A. §6301, et seq.  Unlawful activities on museum grounds, as

prescribed by statute, include the unauthorized sale of any article, the unauthorized displaying of

any sign, placard or other form of advertisement or the unlawful soliciting of alms, subscriptions

or contributions. 40 U.S.C.A. §6303.  Regarding building security, certain Smithsonian officials

may also designate certain employees as special police for their respective specified buildings

and grounds, who will wear uniforms and have certain powers. 40 U.S.C.A. §6306.


**D.      U.S. Capitol Power Plant**

The Capitol Power Plant is part of the exclusive federal enclave site known as the United

States Capitol Complex.  The United States Capitol Complex is comprised of various federal

government buildings including the "Capitol, the House and Senate Office Buildings, the U.S.

Botanic Garden, the Capitol Grounds, the Library of Congress buildings, the Supreme Court

Building, the Capitol Power Plant and various support facilities."  www.aoc.gov/cc/index.cfm

(last visited May 28, 2008).  In 1904, the construction of the Capitol Power Plant was authorized

by Congress.  Id.  See also 2 U.S.C. §2162.  Authorization of the construction of the Capitol

Power Plant and miscellaneous management and operational guidelines are set forth under 2

U.S.C. §2162.


**E.      National Airport**

In 1938, President Franklin D Roosevelt selected the site for the National Airport, now

known as Ronald Reagan Washington National Airport (hereinafter "National Airport"). For the

next several decades, including the time period in which Plaintiff claims exposure to asbestos-

containing products, the National Airport was owned and operated by the U.S. Government.  In

1986, a Bill was passed transferring the operation of National Airport to the Metropolitan

Washington Airports Authority.  However, the U.S. Government still owns the facility.

http://www.mwaa.com. (last visited May 28, 2008).  Furthermore, the General Service Administration lists the Ronald Reagan Washington National Airport among those facilities on its building inventory. http://www.iolp.gsa.gov (last visited June 2, 2008).

F.     **VA Hospital (Washington, D.C.)**

The VA Hospital in Washington, D.C., known as Washington, D.C. Veterans Affairs Medical Center (hereinafter VA Medical Center), is a federal enclave. The VA Medical Center is part of the Veterans Affairs Capitol Health Care Network and operates under the U.S. Department of Veterans Affairs.  http://www1.va.gov.   The Veterans Health Administration of the U.S. Department of Veterans Affairs provides medical care for veterans through various VA Medical Centers, including the VA Medical Center in Washington, D.C. 38 U.S.C. §7301 et seq..  Additionally, the procurement of medical facilities, such as the VA Medical Center, and operational guidelines for such facilities are set forth under 38 U.S.C. §8301 et seq.

G.     **Walter Reed Army Medical Center**

The Walter Reed Army Medical Center (hereinafter "Walter Reed") is a federal enclave facility.  Construction of Walter Reed, formerly known as Walter Reed General Hospital, was authorized through Congressional legislation and on May 1, 1909, the Hospital admitted its first patients. The hospital's capacity grew significantly during World War I and through World War II, Korea and Vietnam, the facility treated hundreds of thousands of soldiers.  Today, Walter Reed continues "to serve the military community from the Washington area and around the world."  www.wramc.army.mil. (last visited June 3, 2008).

## III. LEGAL ARGUMENT

Pursuant to 28 U.S.C. §1441 and §1446, Defendant Krafft-Murphy files this Notice of

Removal on the basis of a Federal Question under 28 U.S.C. 1331, namely that of federal enclave

jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. §457.

Under 28 U.S.C. §1331, the United States District Court has original jurisdiction in this

matter. Original jurisdiction is proper under 28 U.S.C. §1331, which grants "original jurisdiction

of all civil actions arising under the Constitution, laws, or treaties of the United States, to the

United States District Courts."

Federal enclave jurisdiction is a specific type of federal question jurisdiction arising under

28 U.S.C. §1331. Art. I, §8, cl. 17 of the U.S. Constitution grants to Congress the power:

> "To exercise exclusive Legislation in all Cases whatsoever .
> . . over all Places purchased by the Consent of the
> Legislature of the State in which the Same shall be, for the
> Erection of Forts, Magazines, Arsenals, Dock-Yards, and
> other needful Buildings;"

When Congress exercises this authority, federal enclaves are created "within which the United

States has exclusive jurisdiction." Akin v. Ashland Chemical, 156 F.3d 1030, 1034 (10th Cir.

1998), citing Mater v. Holley, 200 F.2d 123, 124-25 (5th Cir. 1952). As a result, "[p]ersonal

injury actions which arise from incidents occurring in federal enclaves may be removed to federal

district court on the basis of federal question jurisdiction. Akin, supra, 156 F.3d at 1034, citing

Mater, supra, 200 F.2d at 124-25.

In Akin. v. Big Three Industries, Inc., et al., 851 F. Supp. 819 (E.D. Tex. 1994), a case

similar to this matter, federal enclave jurisdiction was upheld as proper. In Akin, as employees of

9

Tinker Air Force Base ("Tinker") in Oklahoma City, Oklahoma. Plaintiffs alleged chemical exposure while working on jet engines manufactured for the United States Air Force and brought negligence and strict products liability claims against various manufacturers. In their discovery responses, Plaintiffs acknowledged that their alleged chemical exposure occurred "on base" – performing all of their work on those jet engines at Tinker. In denying Plaintiffs' Motion to Remand, the court held "in a toxic exposure case such as this, when the plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their employment duties, enclave jurisdiction is properly invoked."

Similarly, in connection with Plaintiff Sammartino's employment with several plumbing contractors, Mr. Sammartino claims that he was allegedly exposed to asbestos-containing materials while working at federal enclave job sites during the course of his employment with those plumbing contractors. According to Plaintiffs' "Work History" sheet, those federal enclave job sites include: U.S. Capitol Power Plant in Washington, D.C. while employed by Maurice R. Colbert Co., Inc.; National Airport in Virginia while employed by R.M. Thornton, Inc.; the VA Hospital, Smithsonian Institution, Walter Reed, Soldiers' Home, and White House in Washington, D.C. while employed by R.M. Thornton, Inc.. See Exhibit 2, supra.

It is notable that the majority of the federal enclave sites at issue are within the District of Columbia. In ITEL Corp. v. District of Columbia, 448 A. 2d 261 (D.C. App., 1982), the court affirmed the trial court's ruling which affirmed the Tax Division's Order denying a refund to ITEL where the sole issue was whether the District of Columbia personal property tax is applicable to a privately owned personalty located on federally – owned land in the District. In so doing, the court wrote the "District of Columbia is treated differently from federal enclaves

within state boundaries, such as various military bases. Within state boundaries, federal enclaves are owned by the federal government and purchased with the consent of the state legislature. States may withhold consent and thereby retain jurisdiction. In contrast, *all* parts of the District of Columbia are within exclusive Congressional jurisdiction, regardless of whether they are privately or federally-owned." Id.

Furthermore, the U.S. District Court also has "original jurisdiction" over action involving federal enclaves, including the instant case, on the basis of 16 U.S.C. § 457, which provides the following:

> *Action for death or personal injury within national park*
> *or other place under jurisdiction of the United States;*
> *application of State laws.* In case of the death of any person
> by the neglect or wrongful act of another within a national
> park or other place subject to the exclusive jurisdiction
> of the United States, within the exterior boundaries of any
> State, such right shall exist as though the place were under
> the jurisdiction of the State within whose exterior boundaries
> such place may be; in any such place the rights of the parties
> shall be governed by the laws of the State within the exterior
> boundaries of which it may be. (Feb. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in federal enclaves. Stokes v. Adair, 265 F. 2d. 662, 665-66 (4th Cir. 1959). The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1331. Id.

## IV.  CONCLUSION

Accordingly, removal of the above-caption matter to the United States District Court for the District of Columbia is proper on the basis of a Federal Question under 28 U.S.C. 1331, namely that of federal enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. §457.

All other Defendants properly sued and served in the District of Columbia action join and/or consent to this Notice of Removal.  Copies of the forms executed by all other Defendants properly sued and served in the State court action are attached. See Exhibit 3.

Defendant Krafft-Murphy reserves the right to amend this Notice of Removal. Defendant Krafft-Murphy also reserves all defenses including, without limitation, the defense of lack of personal jurisdiction.

As required by 28 U.S.C. §1446(a), true and correct copies "of all process, pleadings, and orders which have been served upon" Krafft-Murphy in the District of Columbia lawsuit that is being removed, as of June 4, 2008, will be filed within thirty (30) days of the filing of this Notice of Removal. Such process, pleadings, and orders that are not already attached as exhibits will be filed separately with the Certification of Filing of State Court Papers.

WHEREFORE, Defendant Krafft-Murphy Company, joined and/or consented to by all other Defendants properly sued and served in the District of Columbia action, pray this action be removed to this Court.

Respectfully Submitted,

HARTEL, KANE, DESANTIS,
MACDONALD, & HOWIE, LLP

*Neil J MacDonald*

Neil J. MacDonald, Esq.
Bar No. 433699
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705
Phone: (301)486-1200
Facsimile: (301) 486-0935
nmacdonald@hartelkane.com

Attorneys for Defendant
KRAFFT-MURPHY COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June, 2008, I caused a true and correct copy of the foregoing Notice of Removal to be served via first-class mail, postage prepaid, upon the following counsel of record:

Daniel A. Brown , Esquire
BROWN & GOULD, LLP
7700 Old Georgetown Rd., Suite 500
Bethesda, Maryland 20814
(301) 718-4548
*Attorney for Plaintiffs*

Katherine S. Duyer, Esquire
Gavett & Datt, P.C.
15850 Crabbs Branch Way,
Suite 180
Rockville, MD 20855
*Attorneys for Defendant*
*AC&R Insulation Co., Inc.*

Keith R. Truffer, Esquire
Royston, Mueller, McLean & Reid

13

The Royston Building, #600
102 W. Pennsylvania Avenue
Towson, MD 21204
*Attorneys for Defendant*
*A.W. Chesterton Company*

Neil J. MacDonald, Esquire
Hartel, Kane, DeSantis, MacDonald & Howie
11720 Beltsville Drive
Suite 500
Beltsville, MD 20705
*Attorneys for Defendant*
*Baltimore Aircoil Company, Inc.*

Vince J. Palmiotto, Esquire
Robin Silver, Esquire
Miles & Stockbridge, P.C.
10 Light Street
Baltimore, MD 21202
*Attorneys for CertainTeed Corporation*

Thomas P. Bernier, Esquire
Michelle Daugherty Siri, Esquire
Segal, McCambridge, Singer & Mahoney
One N. Charles Street
Suite 2500
Baltimore, MD 21201
*Attorneys for Defendant*
*Garlock Sealing Technologies, LLC*

Xan K. DeMarinis, Esquire
Steptoe & Johnson
1330 Connecticut Avenue, NW
Washington, DC 20036
*Attorneys for Defendant*
*Metropolitan Life Insurance Company*

Scott Phillips, Esquire
Semmes, Bowen & Semmes
250 West Pratt Street
Baltimore, MD 21201
*Attorneys for Defendant*
*Noland Company*

14

Steven A. Luxton, Esquire
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
*Attorneys for Defendant*
*Owens-Illinois, Inc.*

Ted Roberts, Esquire
Brian Zemil, Esquire
Venable LLP
210 Allegheny Avenue
Towson, MD 21285
*Attorneys for Defendant*
*Rapid American Corporation*

Jaime W. Luse, Esquire
Tydings & Rosenberg, LLP
100 E. Pratt Street
26th Floor
Baltimore, MD 21202
*Attorneys for Thos. Somerville Co.*

Richard Flax, Esquire
29 W. Susquehanna Avenue
Suite 500
Baltimore, MD 21204
*Attorneys for Defendant*
*Walter E. Campbell Co.*

Neil J. MacDonald

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ARMANDO A. SAMMARTINO, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action: 1:08-cv-00967-RJL |
| AC & R INSULATION CO., INC., *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DEFENDANT KRAFFT-MURPHY'S RESPONSE IN
### OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

Defendant Krafft-Murphy Company (hereinafter "Krafft-Murphy" or "Removing Defendant"), by its undersigned counsel, hereby opposes Plaintiffs' Motion for Remand, and in support of that opposition, states the following:

## I.    BACKGROUND

**A.   PROCEDURAL HISTORY**:

Plaintiffs filed their complaint in the Superior Court of the District of Columbia on or about May 1, 2008, alleging occupational exposure of Plaintiff Armando Sammartino to asbestos-containing materials. *See* **Exhibit 1**.  Prior to service of the complaint on Krafft-Murphy, on or about May 5, 2008, Daniel Brown, Plaintiffs' Counsel, contacted the Defendants in this case and informed them of the failing health of Armando Sammartino (hereinafter "Plaintiff Sammartino" or "Mr. Sammartino").  Plaintiffs' Counsel requested that a discovery deposition take place on May 7,



2008, only six days after filing Plaintiffs' Complaint.  Out of consideration for Mr. Sammartino's

declining health, Defendants agreed to take the discovery deposition of Mr. Sammartino without

requiring Plaintiffs to file Answers to Defendants' Interrogatories.  However, Defendants did

request that Plaintiffs furnish some sort of work history summary so that the places and dates of

employment could be established prior to Mr. Sammartino's deposition.  Thus, on May 6, 2008,

Krafft-Murphy and other defense counsel received an e-mail correspondence from Plaintiffs'

counsel relaying discovery materials which included a document titled "Armando Sammartino -

Work History" (hereinafter "Work History Chart")  which contained the purported work history of

Plaintiff Sammartino in the above-captioned matter.  During the deposition of Mr. Sammartino,

Plaintiffs' counsel later confirmed that this Work History Chart is a chart that is "part of Mr.

Sammartino's responses to interrogatories," provided from Plaintiffs' Counsel to Defendants.[1] *See*

**Exhibit 2**, Discovery Deposition of Armando Sammartino, May 30, 2008, at 153.  Mr. Sammartino

was deposed on May 7, 2008, May 14, 2008 and May 30, 2008. Subsequent to Plaintiffs'

correspondence attaching the Work History Chart, and the first day of Mr. Sammartino's discovery

deposition, Krafft-Murphy was served with Plaintiffs' Complaint on May 23, 2008.

The Work History Chart listed job sites at issue where exposure to asbestos-containing

materials was alleged.  Among those job sites were the White House, Soldiers' Home, Smithsonian

Institution, Ronald Reagan Washington National Airport, U.S. Capitol Power Plant, Washington,

D.C. VA Medical Center  and Walter Reed Army Medical Center, all of which are exclusive federal

enclave job sites.  *See* **Exhibit 3**. *See also* Notice of Removal, Exhibit 2.  On this chart, some of the

---

[1] To date, Plaintiffs have not provided to Defendants Plaintiffs' Answers to Interrogatories, or any other
discovery responses in this case.

allegations of asbestos exposure at certain job sites was based upon information gleaned from

discovery in prior litigation and was thus known to Plaintiffs' counsel.  (P's Memo at 13).

Nowhere on this chart do Plaintiffs indicate that they decline to allege Mr. Sammartino's exposure

to asbestos-containing products at any particular job site. *See* **Exhibit 3**.  This Work History Chart

constitutes Krafft-Murphy's first notice that some of the alleged exposure to asbestos-containing

materials potentially occurred on exclusive federal enclaves.

Thus, pursuant to 28 U.S.C. §1441 and §1446, Defendant Krafft-Murphy filed a Notice of

Removal with the United States District Court for the District of Columbia (hereinafter "U.S.

District Court") on the basis of a Federal Question under 28 U.S.C. §1331, namely that of federal

enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. § 457.  This removal

was timely filed on June 5, 2008, and was accompanied by the written joinder and consent of all

other proper Defendants. Further, this removal was based upon information contained in purported

discovery responses, later confirmed as attachments to what will be Plaintiffs' Answers to

Interrogatories.  Nonetheless, Plaintiffs filed a Motion for Remand on July 7, 2008.

## B.   LEGAL BACKGROUND REGARDING FEDERAL JURISDICTION

Removal is permitted by defendants in an action over which the U.S. district courts have

original jurisdiction. The defendants' right of removal in a civil action is provided in 28 U.S.C. §

1441(a), which states:

> (a) Except as otherwise expressly provided by Act of Congress, any civil
> action brought in a State court of which the district courts of the United
> States have original jurisdiction, may be removed by the defendant or the
> defendants, to the district court of the United States for the district and
> division embracing the place where such action is pending.

The procedures for removing an action are governed by 28 U.S.C. § 1446. This section

provides, in part, the following:

> (a) A defendant or defendants desiring to remove any civil action or criminal
> prosecution from a State court shall file in the district court of the United
> States for the district and division within which such actions pending a notice
> of removal signed pursuant to Rule I 1 of the Federal Rules of Civil
> Procedure and containing a short and plain statement of the grounds for
> removal, together with a copy of all process. pleadings, and orders served
> upon such defendant or defendants in such action.

> (b) The notice of removal of a civil action or proceeding shall be filed within
> thirty days after the receipt by the defendant, through service or otherwise, of
> a copy of the initial pleading setting for the claim for relief upon which such
> action or proceeding is based, or within thirty days after the service of
> summons upon the defendant if such initial pleading has then been fled in
> court and is not required to be served on the defendant, whichever period is
> shorter . . . .

28 U.S.C. § 1446.

Thus, pursuant to 28 U.S.C. §§ 1441 and 1446, defendants may remove an action to federal

court if the case is one over which the U.S. district courts have original jurisdiction, and if the

removing defendants adhere to the procedural requirements for removal. Federal courts have

"original jurisdiction" over cases involving diversity of citizenship between parties, because of

claims arising under federal law, or by virtue of some other explicit grant of jurisdiction. *Powers v.*

*South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust,*

719 F.2d 760, 763 (5th Cir. 1983). Claims "arising under" federal law are those based on federal

question jurisdiction under 28 U.S.C. §1331, which states, "[t]he district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Federal enclave jurisdiction is a specific type of federal question jurisdiction arising under 28

U.S.C. § 1331. The federal government acquires jurisdiction over lands by one of two methods: by

4

consent pursuant to Article I., section 8, clause 17 of the Constitution; or by a state's cessation of its

rights of sovereignty. *U.S. v. Holmes,* 414 F.Supp. 831, 837 (D.C.Md. 1976). Under the first

method, Clause 17 consent, the Constitution grants Congress the power, pursuant to art. I., § 8, cl.

17.,

> To exercise exclusive Legislation in all Cases whatsoever, over such District
> (not exceeding ten Miles square) as may, by Cessation of particular States,
> and Acceptance of Congress, become the Seat of the Government of the
> United States, and to exercise like Authority over all Places purchased by the
> Consent of the Legislature of the State in which the Same shall be, for the
> Erection of Forts, Magazines, Arsenals, Dockyards, and other needful
> Buildings,

Such consent may be in the form of a general consent statute or consent to a particular acquisition.

*United States v. State Tax Commission of Mississippi*, 412 U.S. 363, 372 n.15 (1973). Under the

second method, cessation, states enact legislation expressly ceding jurisdiction to the United States.

*See, e.g., Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 529 (1938); *Kleppe v. New Mexico,*

426 U.S. 529, 542 (1976).

Both methods are capable of creating federal enclaves "within which the United States has

exclusive jurisdiction." *Akin v. Ashland Chemical,* 156 F.3d 1030, 1034 (l0th Cir. 1998), *citing

Mater v. Holley,* 200 F.2d 123, 124-25 (5th Cir. 1952). Further, "[p]ersonal injury actions which

arise from incidents occurring in federal enclaves may be removed to federal district court on the

basis of federal question jurisdiction." *Akin, supra,* 156 F.3d at 1034; *Mater, supra,* 200 F.2d at

124-25.

There is an additional source of federal district court "original jurisdiction" over federal

enclaves, namely 16 U.S.C. § 457, which provides the following:

> *Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws.* In the case of the death of any person by the neglect or wrongful act of another within a national part or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. (Feb. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in exclusive federal enclaves. *Stokes v. Adair,* 265 F.2d 662, 665-66 (4th Cir. 1959). The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1331. *Id.*

Thus, there are two different bases for the U.S. district courts' original jurisdiction over personal injury actions arising on a federal enclave. First, federal courts have original jurisdiction over claims involving federal enclaves pursuant to the "arising under" provision of 28 U.S.C. §1331 [hereinafter "federal enclave jurisdiction"]. Additionally, death and personal injury claims arising in exclusive federal enclaves are governed by 16 U.S.C. § 457, which provides federal courts original jurisdiction over such actions through an explicit grant of jurisdictional authority [hereinafter "16 U.S.C. § 457 jurisdiction"].

**D.  REMOVAL IS STILL APPROPRIATE WHERE SOME EXPOSURE OCCURRED ON FEDERAL ENCLAVES AND OTHER EXPOSURE OCCURRED OFF OF FEDERAL ENCLAVE SITES.**

As outlined above, due to the medical causation issues central to litigation of an asbestos-related claim, demonstrating that Plaintiff Sammartino was potentially exposed to asbestos at even

one federal enclave job site is sufficient grounds for removal. In this case, it is evident that Plaintiff Sammartino worked on several federal enclave job sites where his potential asbestos exposure is at issue.

## II.   DISCUSSION

The numerous procedural and substantive arguments which Plaintiffs raise in the Motion to Remand are baseless,[2] and are refuted in the following sections:

## A.  DEFENDANTS MET THE PROCEDURAL REQUIREMENTS FOR REMOVAL

The Removing Defendant fully complied with the procedural requirements set forth in 28 U.S.C. §§ 1441 and 1446, including the "rule of unanimity,'" by obtaining the written joinder and consent of the other Defendants to this action, and filing the Notice of Removal within 30 days of service. Each proper Defendant joined in, and consented to, the Notice of Removal through an individual with the authority to bind each Defendant to its consent through letters transmitted to counsel for Krafft-Murphy. The letters were all signed by the parties or their counsel, and each fully indicates that particular Defendants joined in, and consented to, the removal of this action from the Superior Court of the District of Columbia to the U.S. District Court based on both federal enclave jurisdiction and 16 U.S.C. § 457 jurisdiction.

### 1.   Consent Letters Filed with This Court as an Exhibit to the Notice of Removal Meet the Requirements of the "Rule of Unanimity."

---

[2] Plaintiffs' arguments expressing their dislike for the MDL, as well as the unfortunate circumstances surrounding Mr. Sammartino's health, are wholly irrelevant to the issues of whether this action was properly removed. Thus, these statements will not be addressed in this Response.

These letters meet or exceed every procedural requirement pertaining to joinder and consent, were submitted by Removing Defendant in both hard copy and via CD-Rom to the Office of the Clerk at the time of removal, and leave absolutely no doubt that all Defendants fully agreed to the removal of this action.  Plaintiffs devoted considerable time and energy attempting to impugn the sufficiency and validity of these joinder and consent letters. However, Plaintiffs' arguments are factually and legally erroneous.

Where there are multiple defendants in a case, "removal generally requires unanimity among the defendants." *Williams v. Howard University,* 984 F. Supp. 27, 29 (D.D.C. 1997)(Green, J.)(quoting *Balazik v. County of Dauphin, 44* F.3d 209, 213 (3d Cir. 1995)). Each "defendant's consent to removal must be unambiguous and independent[;]" *Williams v. Howard University,* 984 F. Supp. 27, 29 (D.D.C. 1997)(Green, J.), however, "there is some variety in the timing and formality required for defendants to express their unanimous consent to removal[.]" *Id.*  "[W]hile § 1446 does not require that all defendants sign the same notice of removal, it does require that each defendant file a notice of removal, either independently or *by unambiguously joining in or consenting to another defendant's notice,* within the thirty-day period following service of process" (internal citations omitted, emphasis added). *Anne Arundel Co.,* 905 F.Supp. at 278 *(citing Creekmore v. Food Lion, Inc.,* 797 F.Supp. 505, 508 (E.D.Va. 1992)).  In the case at bar, every Defendant provided a written letter expressing the Defendants' unambiguous joinder in, and consent to, the removal and documentation of this consent was provided to this Court.

Plaintiffs incorrectly portrayed the case law of this Court, as well as that of other jurisdictions, as requiring every Defendant to personally sign the Notice of Removal or personally file their own written consent to removal directly to the court. Upon a review of the cases cited in Plaintiffs'

8

Motion, it is clear that the mere representation by counsel for one defendant to a district court that another defendant had joined in, consented to, or did not object to removal, with no documentation demonstrating that consent to the court in a timely manner, is insufficient to constitute a showing of consent by that other party. However, this is clearly inapposite to the case *sub judice,* in which every Defendant provided an independently written letter expressing that Defendant's unambiguous joinder in, and consent to, the removal. The Court was not left to rely on any representation by Krafft-Murphy, alone, as to the joinder and consent of all Defendants to removal. Instead, within the 30-day time period for removal, all Defendants provided correspondence to counsel for Krafft-Murphy joining in, and consenting to, the removal of this case to federal court, at which point Krafft-Murphy then provided this documentation evidencing joinder and consent to this Court as part of its Notice of Removal. *See* Notice of Removal, Exhibit 3.

The other authorities cited by Plaintiffs on the issue of unanimity involve circumstances in which courts determined that the unanimity requirement is not satisfied when one party represents to the court another party's verbal consent (or in some instances where the party argues that another party implicitly consented based on filing answers or motions in federal court, or by failing to object after removal). For example, Plaintiffs rely on two inapposite cases from the Fourth Circuit: *Creekmore v. Food Lion, Inc,,* 797 F.Supp. 505, 508 (E.D.Va. 1992) (holding that Food Lion's representations that two co-defendants had verbally consented to the removal were insufficient to demonstrate their affirmative and unambiguous desire to have the case removed); and *Martin Oil Co. v. Philadelphia Life Ins. Co.,* 827 F.Supp. 1236, 1237-38, 1239 (N.D.W.Va. 1993) (determining that joinder was insufficient when Philadelphia Life Insurance Company's notice of removal represented, without more, that counsel for a co-defendant had consented to the removal; the court

held that, "it is insufficient for a defendant who has not signed the removal petition to merely advise the removing defendant that it consents to removal and that the removing defendant may represent such consent to the Court on its behalf").[3] Such cases are thus inapposite to the present action, in which all proper defendants provided signed letters expressing their unambiguous joinder in the removal within the 30-day time period for removal and these letters were provided to the Court within the same prescribed 30-day time period.

The Plaintiffs' reliance on *Edelman v. Page*, 535 F. Supp. 2d 290 (D. Conn. 2008), as support for their proposition that letters filed with this Court are insufficient expressions of consent, is unfounded. In *Edelman*, the court remanding the case to state court because the multiple defendants, while unanimously consenting to removal, did not demonstrate their consent to the court. *Id.* at 292-293. In that case, the multiple defendants consented to removal of the case and gave their consent to the removing defendant via e-mail prior to the removing defendant filing the Notice of Removal in that case. However, those e-mails were never directed to the court to demonstrate consent of all defendants until after the 30 day time period for removal had expired. *Id.* Emphasizing that it is necessary for showing "some form of unambiguous written evidence of consent to the court *in a timely fashion*," *id.* (quoting *Russell Corp. v. Am. Home Assurance Co.,* 264 F.3d 1040, 1049 (11th Cir. 2001), the court remanded the case because the demonstration of consent of all defendants came after the 30-day period expired. *Id.* at 293.

Unlike the correspondence expressing consent in *Edelman*, the correspondence demonstrating

---

[3] Additionally, Plaintiffs' rely on *Amteco, Inc. v. BWAY Corp.,* 421 F.Supp.2d 1028, 1032 (E.D.Mo. 2003) (BWAY Corp.'s representation that St. Louis Paint Manufacturing Company had orally consented to removal was not sufficient under the removal statute); *Landman v. Borough of Bristol.* 896 F.Supp. 406 (E.D.Pa.1995) (finding that the Borough of Bristol had not provided its consent within 30 days based simply on Amtrak asserting in its removal petition that Bristol consented to the removal, with nothing more, or based on Bristol filing an answer in federal court).

consent in the instant case was provided to this Court in a timely fashion, prior to the expiration of

the 30-day time period for removal.  All Defendants provided a written letter expressing the

Defendants' unambiguous joinder in, and consent to, the removal that was then provided to this

Court in a timely fashion.  The Court was not left to rely on any representation by Krafft-Murphy,

alone, as to the joinder and consent of all Defendants to removal.  Instead, all Defendants provided

correspondence to Counsel for Krafft-Murphy showing that they unambiguously join in, and

consent to, the removal of this case to federal court and Krafft-Murphy then provided

documentation of this joinder and consent to this Court as part of its Notice of Removal. *See* Notice

of Removal, Exhibit 3.

Plaintiffs' reliance on *Codapro Corp. v. Wilson,* 997 F.Supp. 322 (E.D.N.Y. 1998), as support

for their proposition that letters filed with this Court are insufficient expressions of consent, is

similarly unfounded.  *Codapro Corp.* is distinguishable from the present action for numerous

reasons. The "consent letter" that was filed with the court in that case was written by an

untrustworthy *pro se* attorney seeking removal to an unknown third person, and as such the Court

found that this letter does not express the consent of the non-moving defendant. *Id.* at 326. In

*Codapro Corp.,* the case, which was centered on common law fraud claims, had been removed from

New York State Court to federal court by an attorney named Samuel Boyd, a *pro se* defendant

accused, *inter alia,* of using his attorney trust account as part of a fraudulent deal. *Codapro Corp.,*

997 F.Supp. at 324. As to the other "consent letters" rejected by the court in *Codapro Corp.,* the

court's rejection of these letters centered around the veracity of the those letters produced by Boyd,

because the court viewed Boyd's representations with justifiable skepticism as to whether the

Defendants did, indeed, consent in that specific case. *Id.* at 324. The language of the opinion makes

clear that the district court was highly skeptical of Boyd's representations. *Id.* Thus, for example, the Court did not accept Boyd's claim of joinder as to co-defendant Edward Canino, *id.* at 326 ("In the Court's view, a letter written *by Boyd* to an unknown third person cannot qualify as an unambiguous written manifestation of Canino's consent"), and it rejected Boyd's assertion that "he was authorized to act on behalf of all the other defendants when he filed the Notice of Removal because he is an attorney," noting that, "indeed, one of the defendant's, Edel, has filed an affidavit stating that he *objects* to removal" (emphasis in original), *id.* at 326-327.

The court's holding in *Codapro Corp.* must be viewed in the context of its unique facts, where an individual *defendant* allegedly mailed to an attorney, who was a *pro se co-defendant* and the removing party, a letter purporting to provide the consent to removal of himself (the sender) as well as six other corporate co-defendants, but with no indication that the sending defendant was an officer of these companies or that he had authority to act on their behalf. *Id.* at 324. Further, another defendant actually filed an affidavit *objecting* to the removal. *Id.* at 324. 326-27. In the instant case, all Defendants provided a written letter expressing the Defendants' unambiguous joinder in, and consent to, the removal that was then provided to this Court in a timely fashion. The Court was not left to rely on any representation by Krafft-Murphy, alone, as to the joinder and consent of all Defendants to removal. More importantly, the veracity of the authenticity of these letters is not disputed in this case. Plaintiffs do not purport, as they should not, that Krafft-Murphy is the party who prepared these letters. As such, unlike the letters in *Codapro*, the consent letters in this case demonstrate all Defendants' valid, unambiguous and independent consent to removal.

**2.   The "Consent Letters" do not Violate LCvR 5.1(e) and Consent for All Defendants was Valid Because Such Consent was Given by Individuals with the Ability to Bind Each Applicable Defendant to its Consent.**

Plaintiffs' arguments concerning alleged violations of LCvR 5.1(e) and the inability of counsel not barred in this Court to give consent for the purposes of removal are without merit.  First, LCvR 5.1(e) does not apply to consent letters drafted for the purposes of removal.  Second, irrespective of whether each attorney who signed the applicable consent letter for their client was barred in the U.S. District Court for the District of Columbia, their consent is valid for the purposes of removal because it binds their client to such consent.

a.   The "Consent Letters" do not violate LCvR 5.1(e).

For the purposes of consenting to removal of this case, defense counsel was neither required to be a member of the U.S. District Court for the District of Columbia nor place his or her bar number on the correspondence granting joinder and consent. Indeed, the individual granting consent need not even be an attorney to grant consent to removal. *See* Discussion II(2)(b), *infra*.  Plaintiffs' argument regarding this issue is merely a red herring to confuse the court from the proper removal of this case.

b.   Consent for the purposes of removal can be given by any individual that has the authority to bind the Defendant to such consent.

Consent for removal need not be given by an attorney barred in this Court.  Such consent can be given by any individual with the authority to bind the defendant to that consent. *Foley v. Allied Interstate Inc.,* 312 F.Supp.2d 1279, 1283 (C.D.Cal.2004)("[F]ederal courts have agreed that a corporation's consent to remove an action may be signed by someone other than a corporation's counsel of record, provided that such person has authority to bind the corporation.") Notably absent

in Plaintiffs' Motion to Remand is any supporting case law advancing Plaintiffs' argument that only

counsel of record, and a member of this Court's bar, can grant consent for removal.  Indeed,

"consent to removal by 'some timely filed written indication from each defendant, *or some person*

*or entity purporting to formally act on its behalf in this respect and to have authority to do so,* that

it has actually consented to such action.'" *Id.* (citing *Getty Oil Corp. v. Ins. Co. of N. Am.,* 841 F.2d

1254, 1262 n. 11 (5th Cir. 1988)(emphasis added).

     In *Foley,* plaintiffs argued that the corporation's consent to remove given by the corporation's

general counsel was invalid because it was made by someone other than the corporation's counsel

of record. *Id.* at 1283.  Rejecting this theory and denying the plaintiff's motion to remand in that

case, the *Foley* court found that a corporation's general counsel has the authority to bind that

corporation, and thus, for the purposes of removal, consent by someone other than the counsel of

record is sufficient for the purposes of removal.[4] *Id.*

     Like the defendant corporation's consent in *Foley,* consent for removal in this case was given

by counsel with the authority to bind each of their Defendant corporations.  While not all counsel

who gave formal consent to removal are members of the United States District Court for the District

of Columbia, they are all attorneys with the authority to consent for the purpose of removal[5].  Such

consent was laid out in formal, written documentation. Accordingly, unambiguous consent has been

given by all Defendants and such consent has been demonstrated in the documentation provided to

---

[4] Like the consenting defendant's general counsel in *Foley*, Steptoe & Johnson, LLP serves as National Counsel
for Defendant Metropolitan Life Insurance Co.  Accordingly, an attorney representing them has the authority to bind
them to their consent to removal in this case.

[5] While not required by any federal law regarding removal and the removal of unanimity, various defense
counsel have executed affidavits indicating their clients' understanding that defense counsel not barred in the United
States District Court for the District of Columbia had the authority to act on their client's behalf and consent to
removal in this cases.  **Exhibits 12-14.**

this Court.  *See* Notice of Removal, Exhibit 3.


   **3.      Any Pleadings or Other Documents Filed in the Superior Court for the District of
             Columbia After the Filing of the Notice of Removal Do Not Show Ambivalence
             Towards Removal or Otherwise Invalidate Consent to Removal.**

        The filing of a pleading, or other document, in state court after the filing of a notice of

removal has been filed does not demonstrate a defendant's ambivalence to removal or invalidate

that defendant's consent to removal. Thus, Plaintiffs' unfounded argument that the filing of an

Answer by Defendant A.W. Chesterton and the Entry of Appearance by Counsel for Metropolitan

Life Insurance Co. in the Superior Court for the District of Columbia has waived those Defendants'

consent to removal is without merit. Again, notably absent from Plaintiffs' argument is any case law

dealing directly with this issue.  In fact, as other courts have found, nothing short of an adjudication

on the merits can result in waiver of removal.  *See Foley v. Allied Interstate, Inc.*, *supra*, 312 F.

Supp.2d at 1284.  In *Foley*, Plaintiff asserted that Defendant Allied waived its right of removal by

filing an answer and serving various discovery.  *Id.*  In denying the plaintiff's motion to remand in

that case, the court found that actions [in state court] short of proceeding to an adjudication on the

merits will not result in waiver. *Id.* (citing *Resolution Trust Corp. v. Bayside Developers,* 43 F.3d

1230, 1240 (9th Cir. 1994)(quoting *Beighley v. Fed. Deposit Ins. Corp.*, 868 F.2d 776, 782 (5th Cir.

1989))).  Accordingly, neither Defendant A.W. Chesterton or Defendant Metropolitan Life

Insurance Co. have waived their consent to removal.

**B.   THE NOTICE OF REMOVAL SUFFICIENTLY DEMONSTRATES THAT PLAINTIFF SAMMARTINO WORKED ON NUMEROUS FEDERAL ENCLAVES WHERE EXPOSURE TO ASBESTOS-CONTAINING PRODUCTS IS AT ISSUE.**

Plaintiffs' Work History Chart, as supported through Plaintiffs' Deposition Testimony, indicates that potential asbestos exposure resulting in Plaintiff Sammartino's alleged injury is at issue in connection with numerous federal enclave sites, including: The Veterans' Affairs Medical Center, Walter Reed Army Medical Center, Ronald Reagan Washington National Airport, Capitol Power Plant, Smithsonian Institution, The White House and Soldier's Home (n/k/a Armed Forces Retirement Home). *See* **Exhibit 3.**   Whether federal enclave jurisdiction exists is a complex question, "resting on such factors as whether the federal government exercises exclusive, concurrent or proprietorial jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation." *Celli v. Shoell,* 995 F. Supp 1337, 1341 (D. Utah 1998).

The Notice of Removal clearly presents a colorable claim that this action is removable, describing its bases for removal and the enclave status of particular locations far beyond that which is minimally required.  Despite this showing, Plaintiffs still claim that the Notice of Removal failed to sufficiently demonstrate enclave status for particular locations.  This contention is unfounded. However, in response to Plaintiffs' assertion that the Notice of Removal does not prove sufficient information outlining the federal enclave status of particular sites, Defendant submit the following summaries further demonstrating that various sites at which Plaintiff Sammartino was allegedly exposed to asbestos were federal enclave sites.

1.      **Veterans' Affairs Medical Center  (VA Hospital)**

During the May 30, 2008 portion of his discovery deposition, Plaintiff Sammartino recalled

working at the VA Hospital, but he could not recall when he worked at that site.  *See* **Exhibit 2** at

61-62.[6]  However, Plaintiffs' Work History Chart states that Plaintiff Sammartino worked at the VA

Hospital sometime between 1964-1969. **Exhibit 3.**

The VA Hospital in Washington, D.C., known as Washington, D.C. Veterans Affairs

Medical Center (hereinafter VA Hospital), is a federal enclave.   The Veterans Health

Administration of the U.S. Department of Veterans Affairs provides medical care for veterans

through various VA Medical Centers, including the VA Medical Center in Washington, D.C.  38

U.S.C. §7301 et seq..  Under 38 U.S.C. § 8112, the federal government relinquished part of their

legislative jurisdiction for medical facilities and properties under the Veterans Affairs and created

concurrent jurisdiction on those medical facilities.  Specifically 38 U.S.C. § 8112 provides:

> The Secretary, on behalf of the United States, may relinquish to the State in which
> any lands or interests therein under the supervision or control of the Secretary are
> situated, such measure of legislative jurisdiction over such lands or interests as is
> necessary to establish concurrent jurisdiction between the Federal Government
> and the State concerned Such partial relinquishment of legislative jurisdiction
> shall be initiated by filing a notice thereof with the Governor of the State
> concerned, or in such other manner as may be prescribed by the laws of such
> State, and shall take effect upon acceptance by such State.

However, this relinquishment did not apply to facilities constructed prior to 1979. *Id.*  Accordingly,

---

[6] Like the majority of sites Mr. Sammartino discussed at his May 30, 2008 deposition, Plaintiff Sammartino
testified that he has know way of knowing whether he was exposed to asbestos-containing products at this job site.
*See* Exhibit 2 at 67. *See* discussion, *infra,* regarding Plaintiffs' use of coworker testimony in asbestos-related cases.

the federal government retains exclusive jurisdiction over facilities constructed prior to 1979,

including the VA Hospital facility at which Plaintiff Sammartino allegedly worked.


### 2.   Walter Reed Army Medical Center:

The Walter Reed Army Medical Center is an exclusive federal enclave. In a public report

entitled, *Inventory Report on Jurisdictional Status of Federal Areas Within the States As of June 30,*

*1962* (hereinafter "*Inventory Report*"), the General Services Administration ("GSA") compiled an

inventory of all federal lands located within the states.[7] The information contained in the Inventory

Report was authenticated in a 2001 affidavit signed by Carol S. Anadale, Program Expert in the

Office of Real Property of the GSA. **Exhibit 4.**  This *Inventory Report* demonstrates that several

sites at which Plaintiff Sammartino worked, and allegedly may have been exposed to asbestos,

which allegedly resulted in his disease, are federal enclaves.

An excerpt of the *Inventory Report,* attached hereto as **Exhibit 5,** indicates that Walter Reed

(listed as "Reed Walter") is a federal property. The Inventory Report further indicates that Walter

Reed is a federal property over which the Federal Government exercises exclusive legislative

jurisdiction, that the Federal Government acquired the property between 1942 and 1943, and

denotes the legislative authority granting the Federal Government exclusive legislative jurisdiction

over Walter Reed. Additionally, the Inventory Report indicates that the Federal Government

accepted jurisdiction over the land on April 22, 1943.

---

[7] Excerpts of relevant pages from the *Inventory Report* are provided as exhibits to the relevant job sites herein.

### 3.   Ronald Reagan Washington National Airport

The Ronald Reagan Washington National Airport ["National"] is a federal enclave. An

excerpt of the *Inventory Report,* attached hereto as **Exhibit 6,** indicates that National Airport  is a

federal property located in Arlington, Virginia. The *Inventory Report* further indicates that National

is a federal property over which the Federal Government exercises exclusive legislative jurisdiction,

that the Federal Government acquired the property between 1938 and 1953, and that the legislative

authority granting the Federal Government exclusive legislative jurisdiction over National is at

Federal Law Volume 59, page 53. However, because the land at National was acquired both before

and after the Federal Government adopted 40 U.S.C. § 255 in 1940, the Federal Government

acquired exclusive jurisdiction over those lands acquired between 1935 and 1940 as of the date

acquired, and exclusive jurisdiction over the remainder in 1953. *See, e.g.,* 63 Md. Op Att. Gen. 332,

1978 WL 33745 (Md.A.G.).


### 4.   Capitol Power Plant

The Capitol Power Plant is part of the federal enclave site known as the United States Capitol

Complex.  The United States Capitol Complex is comprised of various federal government

buildings including the "Capitol, the House and Senate Office Buildings, the U.S. Botanic Garden,

the Capitol Grounds, the Library of Congress buildings, the Supreme Court Building, the Capitol

Power Plant and various support facilities." *See* **Exhibit 7,** www.aoc.gov/cc/index.cfm  (last visited

May 28, 2008).  In 1904, the construction of the Capitol Power Plant was authorized by Congress.

Id.  See also 2 U.S.C. §2162.  Authorization of the construction of the Capitol Power Plant and

miscellaneous management and operational guidelines are set forth under 2 U.S.C. §2162.  As such,

19

the Capitol Power Plant is a federal enclave controlled by the U.S. Congress.

### 5.   Smithsonian Institution

The Smithsonian Institution is a federal enclave. James Smithson established the Smithsonian

Institution, situated in Washington, D.C., as a result of a bequest in 1826. Smithson, a British

citizen and scientist, who died in 1829, named his nephew as beneficiary in his last Will and

testament. He stipulated that if the nephew would die without heirs (as he did in 1835), the estate

should go to the United States of America for the following purpose:

> to found at Washington, under the
> name of the Smithsonian Institution,
> an establishment for the increase and
> diffusion of knowledge among men.

Six years after Smithson's death, President Andrew Jackson announced the bequest to

Congress. On July 1, 1836, Congress accepted the legacy bequeathed to the nation. In September,

1838, it was determined that Smithson's legacy, consisting of gold sovereign's re-coined at the

Philadelphia mint to U.S. currency, was worth over $500,000.

Eight years later, an Act of Congress, signed by President Polk on August 10, 1846,

established the Smithsonian Institution as a trust to be administered by a Board of Regents and a

Secretary of the Smithsonian. 20 U.S.C. §41. Ch.178, Sec.1, 9 Stat. 102. **Exhibit 8,**

http://www.si.edu (last visited May 28, 2008).   The General Service Administration lists the Old

Smithsonian building among those facilities on its building inventory. **Exhibit 9**,

http://www.iolp.gsa.gov (last visited May 28, 2008).

Certain rules and regulations concerning the operation and security of the Smithsonian

Institution are codified at 40 U.S.C.A. §6301, et seq.  Unlawful activities on museum grounds are

proscribed by statute, including the unauthorized sale of any article, the unauthorized displaying of

any sign, placard or other form of advertisement or the unlawful soliciting of alms, subscriptions or

contributions. 40 U.S.C.A. §6303.  Regarding building security, certain Smithsonian officials may

also designate certain employees as special police for their respective specified buildings and

grounds, who will wear uniforms and have certain powers. 40 U.S.C.A. §6306.


**6.      White House**

Undeniably, the White House is one of the most widely recognized federal enclaves.  "For

two hundred years, the White House has stood as a symbol of the Presidency, the United States

government, and the American people." **Exhibit 10**,  www.whitehouse.gov (last visited June 2,

2008).  In accordance with it's historical and governmental significance, the White House is an

exclusive federal enclave.  In December 1790, President George Washington signed an Act of

Congress declaring that the federal government would reside in a district "not exceeding ten miles

square...on the river Potomac."  President Washington and city planner Pierre L'Enfant, chose the

site for the "President's House." Construction of the White House began in 1792 but it was not

completed until approximately 1800.  President Theodore Roosevelt officially gave the White

House its current name in 1901.  Pursuant to 3 U.S.C. §102, the President is entitled to "the use of

the furniture and other effects belonging to the United States and kept in the Executive Residence at

the White House." 3 U.S.C. §102.

### 7.    Soldier's Home

Referred to on Plaintiffs' Work History Chart as "Soldier's Home," this federal enclave is now known as the Armed Forces Retirement Home (f/k/a Soldiers' and Airmen's Home). The Old Soldiers' Home, now known as the U.S. Soldiers' and Airmen's Home (hereinafter Soldiers' Home), is an exclusive federal enclave located in Washington, D.C.  In 1851, the land which forms the core of Soldiers' Home was purchased by the U.S. Government to establish an "asylum for old and disabled veterans." **Exhibit 11,** www.defenselink.mil. (last visited June 2, 2008). Two of the buildings on this site, Quarters 1 and Anderson Cottage, served as the summer White House for several U.S. Presidents.  During the Civil War, President Abraham Lincoln lived at Soldiers' Home in what is now called Anderson Cottage. It was here that President Lincoln  wrote the last draft of the Emancipation Proclamation.  Today, this 320 acre facility is home to nearly 1,300 veterans and is a perfect example of "The Military Taking Care of Its Own." Id.

### B.    THE WORK HISTORY DOCUMENT DOES NOT RUN AFOUL OF THE "WELL-PLEADED COMPLAINT" RULE AND SUFFICIENTLY  DEMONSTRATES THE NECESSITY OF REMOVAL.

Plaintiffs argue that application of the "well-pleaded" complaint rule precludes removal jurisdiction in this action based on their contention that the "four corners" of the complaint does not make a claim under federal law. (P.'s Memo 11-12). This argument is fundamentally incorrect, as it misstates the "well-pleaded complaint rule," and then misapplies it to the facts of this case.

### 1.    Legal Background Regarding the "Well-Pleaded Complaint" Rule and the "Artful Pleading" Doctrine.

22

In assessing whether federal courts have original jurisdiction over matters involving a federal question under 28 U.S.C. § 1331, the presence or absence of jurisdiction is normally governed by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *California v. United States, 215* F.3d 1005, 1014 (9th Cir. 2000).

However, the "artful pleading doctrine" is an established corollary to the well-pleaded complaint rule. This doctrine states that a plaintiff may not defeat removal by fraudulent means or by artfully failing to plead essential federal issues in a complaint. *See, e.g., Powers v. South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust,* 719 F.2d 760 (C.A.Tex. 1983). Thus, while a plaintiff who has both federal and state causes of action may choose to ignore federal claims and pursue only state claims in state court, a defendant is entitled to have the case removed if the plaintiff is attempting to avoid having an essential federal claim adjudicated in a federal forum by artfully drafting the complaint in terms of state law. *People of State of Ill. v. Kerr-McGee Chemical Corp.,* 677 F.2d 671 (7th Cir. 1982), *cert. denied* 103 S.Ct. 469. Consequently, a plaintiff's failure to make specific reference in a complaint to an applicable source of federal law will not prevent removal. *Larsen v. Waddell,* 516 F.Supp. 1353 (W.D.Pa.1981).

In assessing a complaint for "artful pleading," federal courts are permitted to look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded the cause of action so as to couch a federal claim in terms of state law. *See, e.g., Gateway 2000, Inc. v. Cyrix Corp.,* 942 F.Supp. 985 (D.N.J. 1996); *Emerson Power Transmission Corp. v. Roller Bearing Co. of America, Inc.,* 922 F.Supp 1306 (N.D.Ind. 1996). "Artful pleading doctrine" analysis requires removal courts to evaluate, *inter alia,* whether federal jurisdiction exists on the face of the complaint, whether

federal preemption exists, and whether a remedy is provided by federal law. *Stokes v. Bechtel North American Power Corp.,* 614 F.Supp. 732 (N.D.Cal. 1985). If a court answers affirmatively to any of these inquiries, the complaint was artfully pled to defeat federal adjudication of the case, and federal courts properly have jurisdiction. *Id.*

> **2.      Plaintiffs' Complaint was Artfully Pled, as evidenced by its omission of several essential issues, such as Plaintiffs' Alleged Exposure on Federal Enclave Job Sites.**

As noted, *supra,* in order for federal courts to apply the well-pleaded complaint rule, it is necessary that they examine a properly pleaded complaint. *California v. United States,* 215 F.3d. at 1014. In the present matter, the Complaint itself does not list any specific job sites where Plaintiff Sammartino was allegedly exposed to asbestos, nor does it provide any specific time frames of alleged exposures at any particular location.  Instead, specific sites and an initial showing of potential exposure to asbestos-containing products alleged at those sites were provided only in Plaintiffs' Work History Chart.  As such, to the extent that such issues as location(s) of alleged exposure and time frame(s) during which Plaintiff was allegedly exposed to asbestos-containing products were not contained within Plaintiffs' Complaint, Defendant was not fairly put on notice of such allegations. As such, Plaintiffs' Complaint would constitute an improperly pleaded complaint.

In the District of Columbia, to establish proximate causation in an asbestos-related personal injury case, such as in the case at bar, the plaintiff must "show that the defendant's product was the cause of his or her injuries," *Bragg v. Owens-Corning FIBERGLASS Corp.,* 734 A.2d 643, 650 (D.C. 1999)(citing *Claytor v. Owens-Corning Fiber Glass Corp.,* 662 A.2d 1374, 1332 (D.C. 1995)), by proving that, at a minimum, "[the plaintiff] and the defendants' products were in the

same *place* at the same *time*." *Claytor*, *supra*, 662 A.2d at 1384-85 (*emphasis added*). To satisfy

this substantial factor standard, a plaintiff must prove, not only that he regularly worked with, or in

proximity to, the asbestos-containing products of a particular defendant, but also that this exposure

was a substantial factor in contributing to his or her injury. *Weakley v. Burnham Corporation, et al.*,

871 A.2d 1167, 1175, 2005 D.C. App. LEXIS 157, 177 (2005).

Therefore, in order for the plaintiff in a District of Columbia asbestos-related personal injury

case to satisfy the burden of proof as to the critical element of causation, the plaintiff must establish

having worked with or in close proximity to a product manufactured, distributed or sold by a

particular defendant, at a particular place and time. The location or "place" of the alleged injuries is

necessary for establishing proximity, while the "time" of the injuries is determinative of the

frequency and regularity of exposure. Thus time and place are central to establishing causation, and

notice of Plaintiffs' allegations of these elements is essential for Defendant to prepare a full and fair

defense in this matter.

In the case at bar,  if Plaintiffs *had* served a "well-pleaded" complaint in this matter, that

Complaint necessarily should have included, at a minimum, specific representations made in the

Complaint itself addressing the specific work sites at which Mr. Sammartino was allegedly exposed

to asbestos, as well as the particular time frames of those exposures. Such a pleading would thus

have presented clear federal issues on its face - those of both federal enclave jurisdiction and 16

U.S.C. § 457 jurisdiction.


    3.    **The Work History Chart is Sufficient to Show That Alleged Exposure at Job
        Sites on Federal Enclaves is an Inextricable Issue in This Case.**

As Plaintiffs' Complaint was artfully pled, the Plaintiffs' Work History Chart serves as grounds for removal of this case, due to federal enclave jurisdiction and 15 U.S.C. § 457 jurisdiction. This document, as Plaintiffs indicate in their Memorandum, is a document that is typically furnished as part of Plaintiffs' Answers to Defendants Set Interrogatories. (P's Memo at 13). At the discovery deposition of Mr. Sammartino taken on May 30, 2008, Plaintiffs' Counsel confirmed that this document was part of Plaintiffs' Answers to Defendants' Set Interrogatories stating this document was furnished as "part of Mr. Sammartino's responses to interrogatories." *See* Exhibit 2 at 153. It is disingenuous, at best, for Plaintiffs to now argue that this document is not part of Plaintiffs' responses to Defendants' Set Interrogatories. Indeed, Plaintiffs admit that this document was prepared by Plaintiffs' Counsel as part of this litigation. As such, this Work History Chart is sufficient in demonstrating that alleged exposure to asbestos on federal enclave sites may be central to the issues involved in this case.

Each and every federal enclave site listed on the Work History Chart, and discussed during Plaintiff's deposition, in and of themselves, provide the basis for removal. Medical causation issues are an inextricable portion of litigation involving an asbestos-related claim. As Plaintiffs indicate in their Memorandum, "Plaintiffs in asbestos litigation generally argue that each and every exposure to asbestos substantially contributes to the development of the disease [while] Defendants in asbestos litigation generally...contest this argument." (P's Memo at 14-15). Accordingly, *any* potential asbestos exposure on any single federal enclave site is inextricable from this case because Plaintiffs, or Cross-Plaintiffs, may attempt to show that it was exposure at these sites that led to Plaintiff

Sammartino's injury.[8] As such even one federal enclave site where exposure to asbestos may be at issue serves as a basis for removal.

Such medical causation issues are important to remember in light of the fact that the job sites where alleged asbestos exposure may be at issue are not only those job sites on the Work History Chart in connection with which Plaintiffs specifically listed alleged asbestos-containing products or contractors, but *any* of the job sites listed on the Work History Chart. As Plaintiffs emphasized in their Memorandum,

> "[a]t some these jobsites, Plaintiff (sic) expressly alleges exposure to
> asbestos – at others, he does not. At certain of the jobsites (sic),
> Plaintiff's counsel may be aware from representation of clients in
> other cases or through pre-filing investigation, that asbestos was
> utilized at a particular jobsite during the same time period that
> Plaintiff worked at that job." (P's Memo at 13).

Thus, this document expresses potential alleged asbestos exposure known at the time it is drafted. Accordingly, just as notable as the listing of asbestos products at particular job sites is the lack of any indication that Plaintiffs' will <u>not</u> be alleging potential exposure to asbestos products at each site. Such an indication is typically made by writing "no exposure alleged," or similar, on the

---

[8] Plaintiffs argue that Defendants should be required to show medical causation evidence proving that potential exposure to asbestos-containing products at the federal enclave sites at issue caused Plaintiff Sammartino's disease. Not only does this argument run afoul of every legal principle surrounding the parties' burdens of proof but such a requirement is also premature. Accordingly, at best, this argument is unfounded and not supported by any established legal principles.

Work History Chart. Plaintiffs have left such potential identification of asbestos exposure open for

the same reason alluded to in Plaintiffs' Memorandum – specifically, it is "Plaintiff's burden to

prove up exposure to [asbestos-containing] products. This is typically accomplished through

deposition testimony where either Plaintiff (*or one of Plaintiff's coworkers*) identifies asbestos

products to which Plaintiff was exposed." (P's Memo at 13)(*emphasis added*). Accordingly,

Plaintiffs are leaving open the possibility that even if Plaintiff Sammartino could not identify

exposure to asbestos at one of the sites listed, a coworker witness may be able to do so.

Due to potential co-worker testimony in this case, the fact that Plaintiff, himself, may testify

that he does not know whether he was exposed to asbestos at a particular job site is of little import.

*See generally* **Exhibit 2.** It is common practice for Plaintiffs' counsel to use the Plaintiff's

testimony to place himself a particular job site, and then to use subsequent co-worker testimony in

attempts to demonstrate potential exposure to asbestos-containing products. As a result, despite

Plaintiffs' arcontrary, Plaintiff Sammartino's deposition testimony taken on May 30, 2008 in no

way undermines removal. In fact, Plaintiff Sammartino's testimony supports removal by leaving

open the potential for subsequent evidence of alleged asbestos exposure at these various federal

enclave job sites.

Accordingly, as demonstrated, Plaintiffs' Work History Chart, as supported by his

deposition testimony of May 30, 2008, provides grounds for removal in this case. The Work

History Chart was provided to Defendants by Plaintiffs' counsel as initial discovery, and was

affirmed later by Plaintiffs' counsel as being a document provided in response to Defendants' Set

Interrogatories in asbestos cases in the District of Columbia. This document thus serves as

documentation of the necessity and propriety of removal of this case to federal court on the basis of

federal enclave jurisdiction. This is especially true in light of the medical causation issues

inextricable to this case, wherein each and every site of potential exposure could be alleged by

Plaintiffs and Cross-Plaintiffs as a substantial contributing factor to Plaintiff Sammartino's disease.

Accordingly, removal is appropriate and Plaintiffs' Motion to Remand should be denied.


**D.      REMOVAL IS APPROPRIATE IN CASES OF INDIVISIBLE ALLEGED TOXIC
         EXPOSURE ON FEDERAL ENCLAVE AND NON-FEDERAL ENCLAVE SITES**

As outlined above, due to the medical causation issues essential to the litigation of an

asbestos-related claim, demonstrating that Plaintiff Sammartino was potentially exposed to asbestos

at even one federal enclave job site is sufficient grounds for removal. In this case, it is evident that

Plaintiff Sammartino worked on several federal enclave job sites where his potential asbestos-

exposure is at issue. The mere fact that there are other job sites at issue neither requires remand of

this case nor establishes the need to force Defendants to litigate these claims separately in this Court

as well as in the Superior Court for the District of Columbia.

Plaintiffs' analysis of other courts' holdings in cases involving a mixture of federal enclave

and non-federal enclave sites is wholly inaccurate. Plaintiffs' reliance on the court's granting of

plaintiff's motion to remand in *Anderson v. Crown Cork & Seal*, 93 F. Supp. 2d 697, 701 (E.D.Va

2000) is largely misplaced. In *Anderson*, the court's finding that plaintiff's exposure occurred both

on and off of the Norfolk Naval Shipyard was not the basis for the court's decision to remand the

case. Indeed, the court specifically distinguished the exposure of the plaintiffs in *Akin v. Big Three

Industries, Inc.*, 851 F. Supp 819 (E.D. Tex 1994)(denying a motion to remand based on the

plaintiff's exposure while working as an employee *on* Tinker Air Force Base, a federal enclave) and

*Reed v. Fina Oil & Chemical Company*, 995 F. Supp. 705 (E.D. Tex 1998)(denying a motion to remand due to plaintiff's indivisible injury from exposure to toxic substance *on* the Plains Butadiene Plant federal enclave site) from Anderson's exposure. *See Anderson,* 93 F. Supp 2d at 702.  The *Anderson* court then remanded the case because Plaintiff Anderson worked solely onboard a vessel, a non-federal enclave "site" while employed at Norfolk Naval Shipyard and was never exposed to asbestos *on* the Norfolk Naval Shipyard federal enclave site. *Id.* at 702.  The court noted that had Anderson's exposure occurred as a result of his employment at the shipyard, the result would have been to deny plaintiff's motion to remand. *Id.*

Like the plaintiffs in *Reed* and *Akin*, Plaintiff Sammartino worked *on* the federal enclave sites at issue.  As a result, the fact that his potentially indivisible exposure may have occurred partially on and partially off of federal enclave sites is irrelevant.  Due to the arguably indivisible nature of exposure in asbestos cases such as this, removal was appropriate and Plaintiffs' Motion to Remand should be denied.

### III. CONCLUSION

The U.S. District Court has original jurisdiction over this action under both federal enclave jurisdiction and 16 U.S.C. § 457 jurisdiction, and thus removal of this action is appropriate under 28 U.S.C. § 1441. Further, Defendants fully adhered to all removal procedural requirements set forth in 28 U.S.C. §§ 1441 and 1446. As such, the removal of this action was proper, and the Moving Defendant Krafft-Murphy Company respectfully requests this Court deny Plaintiffs' Motion for Remand.

WHEREFORE, Defendant Krafft-Murphy Company respectfully requests this Court for a hearing on this matter.

Respectfully Submitted,

_/s/ Neil J. MacDonald_____
Neil J. MacDonald, Esquire
Bar No. 433699
HARTEL, KANE, DeSANTIS,
MacDONALD & HOWIE, LLP
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705
Phone: (301) 486-1200
Fax: (301) 486-0935

Attorneys for Defendant
KRAFFT-MURPHY COMPANY

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of July, 2008, I caused a true and correct copy of the foregoing to be electronically filed and served upon the following counsel of record.

_/s/ Neil J. MacDonald_____
Neil J. Macdonald

**Full docket text:**
MINUTE ORDER denying [31] Motion to Expedite Consideration of Plaintiffs' Motion to Remand. It is
hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 08/06/08. (lcrjl3)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/03/2008 17:24:45 | | | |
| **PACER Login:** | hk0276 | **Client Code:** | 0200/1000 |
| **Description:** | History/Documents | **Search Criteria:** | 1:08-cv-00967-RJL |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

