MDL 875

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| In re Asbestos Products Liability | : | **MDL Docket No. 875** |
| Litigation (No. VI) | : | **CTO 312** |
| | : | |

**DEFENDANT NORTHROP GRUMMAN CORPORATION'S OPPOSITION TO
PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-312)**

Defendant Northrop Grumman Corporation (hereinafter "Northrop Grumman"), by and

through its attorneys, and as fully explained in its supporting brief, hereby responds to the

averments set forth in the motion filed by Plaintiffs in *Frederick Seitz and Mary Louise Seitz v.*

*Adel Wiggins Group, et al*, No. 08-CV-0353 (D. DE) to vacate CTO-312 as follows.

Mr. Seitz's illness is not sufficient reason to remand this case to state court or to vacate

the CTO.  While the Panel has vacated CTOs in the past, it has also transferred to the MDL cases

involving pending motions to remand.  Not only can a motion to remand be resolved by the

MDL court, but allowing the MDL to decide the issue will also ensure consistent results in

similarly situated cases and promote judicial efficiency.

Wherefore, Defendant Northrop Grumman Corporation respectfully requests that this

Panel deny Plaintiffs' Motion to Vacate CTO-312.

PLEADING NO. 5646

**OFFICIAL FILE COPY**

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2008 OCT -6  A 10: 48

RECEIVED
CLERK'S OFFICE

*[signature on following page]*

**IMAGED OCT 1 0 2008**

ELZUFON AUSTIN REARDON TARLOV &
MONDELL, P.A.

/s/ Penelope B. O'Connell

Penelope O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA Piper US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Dated: October 3, 2008

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT – 9 2008

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| In re Asbestos Products Liability | : | **MDL Docket No. 875** |
| Litigation (No. VI) | : | **CTO 312** |
| | : | |

**DEFENDANT NORTHROP GRUMMAN CORPORATION'S BRIEF IN SUPPORT OF
ITS OPPOSITION TO PLAINTIFFS' MOTION TO VACATE
CONDITIONAL TRANSFER ORDER (CTO-312)**

On July 21, 2008, this Panel entered CTO-312, which identified asbestos claims in 85

additional "tag-along actions" to be conditionally transferred to MDL-875 pursuant to 28 U.S.C.

§ 1407. *See* Order of July 21, 2008 (**Ex. A**). After receiving a one-month extension to file their

motion, Plaintiffs in *Frederick Seitz and Mary Louise Seitz v. Adel Wiggins Group, et al*, No. 08-

CV-0353 (D. DE) filed a motion to vacate CTO-312 on September 22, 2008.

Defendant Northrop Grumman Corporation (hereinafter "Northrop Grumman"), by and

through its attorneys, pursuant to 7.4(f) and 7.2(c) of the Rules of Procedure of the JPML,

submits this brief in opposition to the motion to vacate. This Panel has already determined that

centralization of all pending federal court actions not then in trial involving allegations of

personal injury or wrongful death caused by asbestos or asbestos containing products is

necessary for the convenience of parties and witnesses and will promote the just and efficient

conduct of such actions. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 771 F. Supp. 415 (J.P.M.L.

1991) (**Ex. B**). These considerations apply with equal force to the claims at issue here, which

share one or more common issues with the cases currently pending in MDL-875. Plaintiffs fail

to provide any valid reasons why their asbestos exposure claim should not be transferred to the

MDL, as explained below. Thus, this Panel should deny the motion to vacate CTO-312.

## STATEMENT OF THE CASE

Plaintiffs filed their Complaint on April 25, 2008.  In their Complaint, Plaintiffs alleged asbestos exposure from asbestos-containing products during Mr. Seitz's employment.  Particular to Northrop Grumman, the Complaint stated that Mr. Seitz served in the United States Marine Corps ("U.S. Marine Corps") as a mechanic and pilot from 1946 to 1967.  On June 4, 2008, Plaintiffs filed Answers to Standard Form Interrogatories and Standard Form Requests for Production, providing more detailed information as to the products from which they are claiming exposure and an alleged exposure history.  These responses indicated Mr. Seitz was claiming exposure to asbestos while working on and/or piloting United States Government aircraft, some of which were allegedly built for the Government by Northrop Grumman.  On June 10-11, 2008, Mr. Seitz was deposed, at which time he identified the specific military aircraft from which he claims asbestos exposure.  The only exposure Plaintiffs attribute to Northrop Grumman is from United States aircraft built for the United States Marine Corps.  Thereafter, Northrop Grumman removed this matter to federal court under § 1442 within 30 days of the first notice it received that acts it had taken under color of a federal officer were at issue.  *See* Notice of Removal (without voluminous exhibits) (**Ex. C**); 28 U.S.C. § 1442.  The case was assigned to Judge Gregory M. Sleet of the United States District Court for the District of Delaware.

Nearly seven weeks after Northrop Grumman properly filed its notice of removal, Plaintiffs filed the motion to remand cited in their motion to vacate before this Panel.  The remand issue has been fully briefed by the Plaintiffs and Northrop Grumman.  *See* Northrop Grumman's Opposition to Plaintiffs' Motion for Remand (without voluminous exhibits) (**Ex. D**).

# ARGUMENT

**A.**      **Frederick Seitz's Diagnosis Provides No Support to Vacate the MDL's Transfer Order.**

Plaintiff's illness is not reason enough to remand the case.  Mr. Seitz was diagnosed with mesothelioma in March 2008, at which point doctors informed him that he had approximately six months to live.  It has now been six months since Mr. Seitz was diagnosed with mesothelioma.  Remanding the case to state court at this point will not expedite matters sufficiently.  Indeed, when this case was still venued in state court, it was scheduled for a September 23, 2009 trial – one year from now.

Moreover, while Plaintiffs now rely on Mr. Seitz's illness as reason for remand, they have been less than efficient in the filing of their pleadings in this matter.  Northrop Grumman filed its notice of removal on June 12, 2008, and sought transfer of the case to the MDL at that time.  Plaintiffs waited seven weeks to file their Motion to Remand.  Thereafter, Plaintiffs requested a six-week extension of time from this Panel to file the motion to vacate.

Plaintiff's illness is also not reason enough to avoid transfer of this case to the MDL.  *See In re Asbestos Cases of Hatch, James & Dodge, G. Patterson Keahey*, No. 2:06-CV-741 TS, 2007 WL 582983, slip op. at 1-2 (D. Utah Feb. 20, 2007) (denying plaintiff's motion for relief, which asked the court to reconsider the issue of remand after the case had been transferred to the MDL based on the argument that plaintiff suffering from mesothelioma should have his "day in court" and remand would allow for an expedited proceeding, and stating that the court has to consider not only plaintiff's health but also policy implications of judicial efficiency, including waste of judicial resources and progression of litigation) (**Ex. E**).  Numerous cases currently in MDL-875 involve plaintiffs who suffer from mesothelioma and other fatal illnesses allegedly

resulting from asbestos exposure.  Consequently, it would make no sense to exclude each of these plaintiffs from the MDL, as this would surely defeat the purpose behind the MDL. Plaintiffs concede the futility of this argument in their failure to cite any supporting caselaw.

**B.**     **Pendency of a Motion to Remand is Not a Sufficient Reason To Deny Transfer Of Asbestos Exposure Claims To MDL-875**

It is beyond dispute that this Panel has the authority to transfer cases in which motions to remand are pending.  *See, e.g., In re Asbestos Prod. Liab. Litig. (No. VI), 170 F. Supp. 2d 1348, 1349 (J.P.J.L Oct. 18, 2001) (*finding there is no need to delay transfer in order permit resolution of pending motions to remand*)* **(Ex. F)***; In re Asbestos Prod. Liab. Litg. (No. VI), 1999 U.S. Dist. LEXIS 12131, at \*2 (J.P.J.L. August 2, 1999) (*declining to delay transfer to MDL pending resolution on various dispositive motions*)***(Ex. G)***; In re Asbestos Prod. Liab. Litig. (No. VI),* 1996 WL 143826, at \*1 (J.P.J.L. Feb. 16, 1996) (declining to delay transfer to MDL pending resolution of motions to remand) **(Ex. H)**; *In re Asbestos Prod. Liab. Litig. (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991) (rejecting the pendency of motions or other matters before the transferor court as grounds for carving out exceptions to transfer) (Ex. B).

Once transferred, such motions can be resolved by the MDL court.  *See, e.g., In re Bextra & Celebrez Mktg., Sales Prac. & Prods. Liab. Litig.,* No. 1699, slip op. at 2 (J.P.M.L. Apr. 13, 2006) (noting that "[p]ending motions to remand these actions to state court can . . . be presented to and decided by" the MDL court) **(Ex. I)**; *In re Bextra & Celebrez Mktg., Sales Prac. & Prods. Liab. Litig.,* No. 1699, slip op. at 2 (J.P.M.L. Feb. 15, 2006) ("The pendency of a motion to remand to state court is not a sufficient basis to avoid inclusion in Section 1407 proceedings.") **(Ex. J)**; *In re Rezulin Prods. Liab. Litig.,* 133 F. Supp. 2d 272, 288-92 (S.D.N.Y. 2001) (resolving motions to remand within MDL proceeding); *Falgoust v. Microsoft Corp.* 2000 WL

462919, at *2 (E.D. La. Apr. 19, 2000) (stating that "the JPML does have jurisdiction to transfer a case even where a jurisdictional objection is pending") (**Ex. K**); *In re Amino Acid Lysine Antitrust Litig.*, 910 F. Supp. 696, 700 (J.P.M.L. 1995) (noting that a pending motion to remand "can be presented to and decided by transferee judge"); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 368 F. Supp. 812, 813 (J.P.M.L. 1973) (stating that "the transferee judge certainly has the power to determine the question of remand").

Indeed, courts have recognized that motions to remand *should* be decided by the MDL court in order to avoid inconsistent results in similarly situated cases. In *Ivy v. Diamond Shamrock Chem. Co.*, 901 F.2d 7 (2d Cir. 1990) – a case addressing the propriety of MDL transfer while motions to remand were pending in various district courts – the Second Circuit acknowledged that "the jurisdictional issue in question is easily capable of arising in hundreds or even thousands of cases in district courts throughout the nation. . . . Once transferred, the jurisdictional objections can be heard and resolved by a single court . . . . *Consistency as well as economy is thus served.*" *Id.* at 9 (emphasis added);. This approach is consistent with that of the *Manual for Complex Litigation*, which notes that "the Pendency of motions raising questions common to related actions can itself be an additional justification for transfer." Manual for Complex Litigation, Fourth, § 20.131 at 221.

Plaintiffs have not identified *any* reason why the Eastern District of Pennsylvania is not capable of deciding the jurisdictional issues presented in the pending motion to remand. To the contrary, the MDL judge is certain to be very knowledgeable on issues relating to asbestos exposure and the range of jurisdictional issues raised by Plaintiffs. A judge with such experience and knowledge is actually in a better position to decide the often difficult legal and factual issues that are presented by motions to remand than numerous courts across the country. Recurrent

jurisdictional issues involving the applicability of the federal officer removal statute and government contractor defense have arisen in these cases as well as in numerous other cases in the MDL, and the MDL Court is well-positioned to address these matters in an efficient and consistent manner for the benefit of all parties and the judiciary.  *See In re Asbestos Cases of Hatch, James & Dodge, G. Patterson Keahey*, No. 2:06-CV-741 TS, slip op. at 2 ("The MDL is familiar with the subject matter and the reoccurring common issues, and will be able to resolve asbestos litigation case in an efficient and expeditious manner; it does by the thousands.")

In addition, to the extent any remand decision requires interpretation and application of state law, the MDL court is well-suited to decide such issues.  *See, e.g., In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d at 288-94 (involving an MDL court in Rezulin litigation resolving motions to remand to state court under Alabama, Mississippi, Louisiana, Texas and West Virginia law).

Furthermore, coordinated resolution of all motions to remand will serve another important purpose of 28 U.S.C. § 1407 – conservation of resources of the parties, their counsel, and the judiciary.  Absent coordinated treatment, substantially similar arguments for remand will be heard and decided in multiple district courts.  The benefits of avoiding such a substantial waste of time and expense outweighs any possible minor inconvenience to Plaintiffs.  Moreover, this Panel already has determined that "centralization of all federal court actions as one multidistrict docket (MDL-875) in the Eastern District of Pennsylvania will serve the convenience of the parties and witnesses and promote the just and efficient conduct of such actions."  *In re Asbestos Prod. Liab. Litig. (No VI)*, 771 F. Supp. 415 (J.P.M.L. 1991) (Ex. B).

Plaintiffs cite to *Vasura v. ACandS, Inc.*, 84 F. Supp. 2d 531 (S.D.N.Y. 2000) as an example where the Panel vacated its transfer order and allowed the transferor court to decide on

a pending motion to remand.  However, the facts of that case are very different from the present case.  In *Vasura*, the defendant removed the case based on diversity of jurisdiction under § 1441(a) and on the defendant's status as a "foreign state" under § 1441(d).  *Id.* at 532.  However, the removal was improper because the defendant was not a foreign state during the time relevant to the underlying claims and diversity was lacking at the time of removal.  *Id.* at 534.  Having discovered this after the case had been transferred to the MDL, the District Court judge intervened and sought the authority from Judge Weiner of the Eastern District of Pennsylvania to rule on the motion to remand.  Judge Weiner referred the question to the MDL Panel, which vacated its prior transfer order to allow the District Court to decide the motion to remand.  *Id.* at 533.  Because removal was improper, remand was appropriate.  *Id.* at 540.  Unlike *Vasura*, where removal was based on § 1441(a) and (d), and where the District Court intervened to rectify a question of diversity jurisdiction, in this case, Northrop Grumman properly removed this case to federal court under § 1442 because all claims Plaintiffs have asserted against it give rise to a colorable defense governed by federal law.

Both the Supreme Court of the United States and the Third Circuit have held that while §1441 requires a narrow interpretation, §1442 should be broadly construed.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (explaining that "Congress has decided that federal officers . . . require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of 28 U.S.C. § 1442(a)(1)"); *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987) (finding that the provisions of 28 U.S.C. § 1441 "are to be strictly construed against removal and all doubts should be resolved in favor of remand"); *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994) (finding that the

provisions of the federal officer removal statute are to be "broadly construed"). Thus, *Vasura* is clearly distinguishable from the present case.

Consequently, this Panel should reject Plaintiffs' arguments that their asbestos exposure claims should not be transferred to MDL-875 due to the pending motion to remand. Rather, transfer of these claims will effectuate the purposes of 28 U.S.C. § 1407 by ensuring consistency and conserving resources with respect to the motions to remand, as well as all other pretrial matters.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Panel deny Plaintiffs' Motion to Vacate CTO-312.

ELZUFON AUSTIN REARDON TARLOV & MONDELL, P.A.

/s/ Penelope B. O'Connell

Penelope O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA Piper US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Dated: October 3, 2008

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

2008 OCT -9 A 10: 48

RECEIVED CLERK'S OFFICE

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

OCT - 9 2008

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| **In re Asbestos Products Liability** | : | **MDL Docket No. 875** |
| **Litigation (No. VI)** | : | **CTO 312** |
| | : | |

## <u>CERTIFICATE OF SERVICE</u>

I, Penelope B. O'Connell, Esquire, hereby certify that on October 3, 2008, I

served on all counsel on the attached service list a copy of Northrop Grumman's

Opposition to Plaintiff's Motion to Vacate the Conditional Transfer Order (CTO-312) via

facsimile or U.S. Mail.

/s/ Penelope B. O'Connell

Penelope B. O'Connell

RECEIVED
CLERK'S OFFICE
2008 OCT -6  A 10: 49
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**SERVICE LIST**

OCT - 9 2008

**SEITZ v. ADEL WIGGINS GROUP, et al.**

FILED
CLERK'S OFFICE

| DEFENDANT | ADDRESS/TELEFAX |
|---|---|
| Counsel for Plaintiff | Allen D. Bowers, II, Esquire<br>Law Office of Joseph J. Rhoades,<br>1225 King Street, Suite 1200<br>PO Box 874<br>Wilmington, DE 19899<br>*Fax: 302-427-9509* |
| Counsel for Plaintiff | Sharon Zinns, Esquire<br>Levy, Phillips & Konigsberg, LLP<br>800 Third Avenue<br>New York, NY 10022<br>*Fax: 212-605-5290* |
| Delaware Defense Coordinating Counsel | Loreto P. Rufo, Esquire<br>Rufo Associates, P.A.<br>7217 Lancaster Pike, Suite 4<br>Hockessin, DE 19701<br>*Fax: 302-234-5905* |
| Adel Wiggins Group | Wade Mitchell<br>Baker & Hostetler, LLP<br>3200 National City Center<br>1900 East 9th Street<br>Cleveland, OH 44114-3485<br>*Fax: 216-696-0740* |
| Aerojet General Corporation | Neal C. Glenn, Esquire<br>Daniel Daly, Esquire<br>Kelley Jasons McGuire & Spinelli, LLP<br>The Webster Building, Ste. 209<br>3411 Silverside Road<br>Wilmington, DE 19810<br>*Fax: 302-478-7113* |
| **Air Cooled Motors** | **Air Cooled Motors**<br>**94 Hale Drive**<br>**Walterboro, SC 29488**<br>***Sent via U.S. Mail-First Class*** |
| Bell Helicopter Textron, Inc.<br>Cessna Aircraft Rhode Island, Inc.<br>Lycoming Engines<br>Textron, Inc. | Robert K. Beste, III, Esquire<br>Smith, Katzenstein & Furlow<br>PO Box 410<br>Wilmington, DE 19899<br>*Fax: 302-652-8405* |
| The Boeing Company<br>Teledyne Continental Motors | Christian J. Singewald, Esquire<br>White & Williams<br>824 Market Street, Suite 902<br>Wilmington, DE 19801-4938<br>*Fax: 302-654-0245* |

| | |
|---|---|
| CBS Corporation<br>Union Carbide Corporation | Beth Valocchi, Esquire<br>Swartz Campbell, LLC<br>300 Delaware Avenue, Suite 1130<br>Wilmington, DE 19801<br>*Fax: 302-656-1434* |
| **Curtiss-Wright Corporation** | **Curtiss-Wright Corporation<br>c/o The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801**<br>*Sent via U.S. Mail – First Class* |
| **Fletch Air, Inc.** | **Fletch Air, Inc.<br>118 FM 1621<br>Comfort, TX 78013-3425**<br>*Sent via U.S. Mail – First Class* |
| **Franklin Aircraft Engines, Inc.** | **Franklin Aircraft Engines, Inc.<br>136 Racquette Drive<br>Ft. Collis, CO 80524**<br>*Sent via U.S. Mail – First Class* |
| Garlock Sealing Technologies, LLC<br>Goodyear Tire & Rubber Company | Gary H. Kaplan, Esquire<br>Armand Della Porta, Esquire<br>Ana Marina McCann, Esquire<br>Marshall Dennehy Warner Coleman &<br>Goggin<br>1220 North Market Street, 5th Floor<br>PO Box 8888<br>Wilmington, DE 19899-8888<br>*Fax: 302-651-7905* |
| General Electric Company | Lynne M. Parker, Esquire<br>Hollstein, Keating, Cattell,<br>Johnson & Goldstein<br>One Commerce Center, Suite 730<br>1201 North Orange Street<br>Wilmington, DE 19801<br>*Fax: 302-573-2507* |
| Raytheon Company<br><br>Hawker Beechcraft, Inc.<br>Parker-Hannifin Corporation | Daniel Silver, Esquire<br><br>Noriss E. Cosgrove, Esquire<br>McCarter & English, LLP<br>405 North King Street, 8th Floor<br>PO Box 111<br>Wilmington, DE 19899<br>*Fax: 302-984-6399* |
| Honeywell | J. Michael Johnson, Esquire<br>Rawle & Henderson LLP<br>300 Delaware Avenue, Suite 1015<br>PO Box 588<br>Wilmington, DE 19899-0588<br>*Fax: 302-778-1400* |

| | |
|---|---|
| IMO Industries, Inc. | Jeffrey Marlin, Esquire<br>Megan Mantzavinos, Esquire<br>Marks O'Neill O'Brien & Courtney, P.C.<br>913 North Market Street, Suite 800<br>Wilmington, DE 19801<br>*Fax: 302-658-6537* |
| Pratt & Whitney<br>Rocketdyne, Inc.<br>Sikorsky Aircraft Corporation<br>United Technologies Corporation<br>Vought Aircraft Industries, Inc. | Paul A. Bradley, Esquire<br>Maron Marvel Bradley & Anderson, P.A.<br>1201 North Market Street, Suite 900<br>PO Box 288<br>Wilmington, DE 19899<br>*Fax: 302-425-0180* |
| Rolls-Royce North America Inc. | Rolls Royce North America, Inc.<br>c/o Corporation Service Co.<br>2711 Centerville Rd., Suite 400<br>Wilmington, DE 19808<br>*Fax: 302-636-5454* |
| Goodrich Corporation | Donald Reid, Esquire<br>Jason A. Cincilla, Esquire<br>Amaryah K. Bocchino, Esquire<br>Morris, Nichols, Arsht & TUnnell, LLP<br>1201 North Market Street<br>PO Box 1347<br>Wilmington, DE 19899<br>*Fax: 302-658-3989* |
| Judicial Panel on Multidistrict Litigation | Jeffrey M. Luthi<br>Clerk of the Panel<br>Judicial Panel on Multidistrict Litigation<br>One Columbus Circle, NE<br>Thurgood Marshall Fed. Judiciary Building<br>Room G-255, North Lobby<br>Washington, D.C. 20002<br>*Fax: (202) 502-2888* |

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| In re Asbestos Products Liability | : | **MDL Docket No. 875** |
| Litigation (No. VI) | : | **CTO 312** |
| | : | |

## CERTIFICATE OF SERVICE

I, Penelope B. O'Connell, Esquire, hereby certify that on October 7, 2008, I

served on all counsel on the attached service list a copy of Northrop Grumman's

Opposition to Plaintiff's Motion to Vacate the Conditional Transfer Order (CTO-312) via

facsimile or U.S. Mail.

/s/ Penelope B. O'Connell

Penelope B. O'Connell

RECEIVED
CLERK'S OFFICE
2008 OCT -7  A 11: 43
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

Page 1 of 2

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                        MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-312)

Frederick Seitz, et al. v. Adel Wiggins Group, et al., D. Delaware, C.A. No. 1:08-353

Peter G. Angelos
LAW OFFICES OF
 PETER G ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201

Robert Karl Beste III
SMITH KATZENSTEIN FURLOW
The Corporate Plaza
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Allen Dale Bowers II
LAW OFFICE OF JOSEPH
RHOADES
1225 King Street, Suite 1200
P.O. Box 874
Wilmington, DE 19899-0874

Paul A. Bradley
MARON MARVEL BRADLEY
& ANDERSON PA
1201 North Market Street, Suite 900
P.O. Box 288
Wilmington, DE 19801

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415

Noriss Ennis Cosgrove
MCCARTER & ENGLISH LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801

Neal C. Glenn
KELLEY JASONS MCGUIRE
& SPINELLI LLP
Centre Square West
1500 Market Street, Suite 1500
Philadelphia, PA 19102

J. Michael Johnson
RAWLE & HENDERSON LLP
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana, One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Gary H. Kaplan
MARSHALL DENNEHEY
WARNER COLEMAN & GOGGIN
1220 North Market Street, 5th Floor
Wilmington, DE 19801

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER
& MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038

Jeffrey S. Marlin
MARKS O'NEILL O'BRIEN
& COURTNEY PC
913 North Market Street, Suite 800
Wilmington, DE 19801

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105

## MDL No. 875 - Panel Service List (Excerpted from CTO-312(Continued)

Penelope B. O'Connell
ELZUFON AUSTIN REARDON TARLOV
& MONDELL PA
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

Lynne M. Parker
HOLLSTEIN KEATING CATTELL ET AL
12th & Orange Street, Suite 730
One Commerce Center
Wilmington, DE 19801

Armand J. Della Porta, Jr.
MARSHALL DENNEHEY WARNER COLEMAN
& GOGGIN
1220 Market Street, 5th Floor
Wilmington, DE 19801

Donald E. Reid
MORRIS NICHOLS ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Daniel M. Silver
MCCARTER & ENGLISH LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801

Christian J. Singewald
WHITE & WILLIAMS LLP
824 Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA 02110

Beth E. Valocchi
SWARTZ & CAMPBELL
300 Delaware Avenue, Suite 1130
Wilmington, DE 19801

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ
& TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608

Sharon J. Zinns
LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue
13th Floor
New York, NY 10022

# EXHIBITS
## to Northrop Grumman's Opposition to *SEITZ* Motion to Vacate CTO

EXHIBIT A

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

| CHAIRMAN: | MEMBERS: | | DIRECT REPLY TO: |
|---|---|---|---|

**CHAIRMAN:**
Judge John G. Heyburn II
United States District Court
Western District of Kentucky

**MEMBERS:**
Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Judge Anthony J. Scirica
United States Court of Appeals
Third Circuit

**DIRECT REPLY TO:**
Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax: [202] 502-2888
http://www.jpml.uscourts.gov

July 21, 2008

TO INVOLVED COUNSEL

Re: MDL No. 875 -- IN RE: Asbestos Products Liability Litigation (No. VI)

(See Attached CTO-312)

Dear Counsel:

Attached hereto is a copy of a conditional transfer order filed today by the Panel involving the above-captioned matter. This matter is transferred pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001). Copies of Rule 5.2, dealing with service, and Rules 7.4 and 7.5, regarding "tag-along" actions, are attached for your convenience.

Inasmuch as there is an unavoidable time lag between notification of the pendency of the tag-along action and the filing of a conditional transfer order, counsel are required by Rule 7.4(b) to notify this office **BY FACSIMILE**, at (202) 502-2888, of any official changes in the status of the tag-along action. These changes could involve dismissal of the action, remand to state court, transfer to another federal court, etc., as indicated by an order filed by the district court. Your cooperation would be appreciated.

**NOTICE OF OPPOSITION DUE ON OR BEFORE:** ___**August 5, 2008**___ (12 p.m. EST)
(Facsimile transmission is suggested.)

If you are considering opposing this conditional transfer order, please review Rules 7.4 and 7.5 of the Panel Rules before filing your Notice of Opposition.

A list of involved counsel is attached.

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

By_____
Jakeia Mells
Deputy Clerk

Attachments

JPML Form 39

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 1 2008

FILED
CLERK'S OFFICE

## UNITED STATES JUDICIAL PANEL
### on
### MULTIDISTRICT LITIGATION

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**

MDL No. 875

### (SEE ATTACHED SCHEDULE)

### CONDITIONAL TRANSFER ORDER (CTO-312)

On July 29, 1991, the Panel transferred 21,937 civil actions to the United States District Court for the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 771 F.Supp. 415 (J.P.M.L. 1991). Since that time, 83,141 additional actions have been transferred to the Eastern District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable James T. Giles.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Eastern District of Pennsylvania and assigned to Judge Giles.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation,</u> 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Eastern District of Pennsylvania for the reasons stated in the order of July 29, 1991, and, with the consent of that court, assigned to the Honorable James T. Giles.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

Page 1 of 3

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**

MDL No. 875

## SCHEDULE CTO-312 - TAG-ALONG ACTIONS

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|

**CALIFORNIA CENTRAL**
CAC 2  08-3995          Robert Thomas Schott, et al. v. CBS Corp., et al.

**CALIFORNIA NORTHERN**
CAN 3  08-2704          Lois Collins, et al. v. General Electric Co., et al.

**CONNECTICUT**
CT  3  08-938           William Barlow, et al. v. General Electric Co., et al.

**DISTRICT OF COLUMBIA**
DC  1  08-967           Armando A. Sammartino, et al. v. AC& R Insulation Co., Inc., et al.

**DELAWARE**
DE  1  08-353           Frederick Seitz, et al. v. Adel Wiggins Group, et al.

**ILLINOIS NORTHERN**
ILN  1  08-2975         Charlotte Kruse, etc. v. Anaconda Wire and Cable, et al.

**LOUISIANA MIDDLE**
LAM 3  08-74            Michael T. Hackler v. P&O Ports Louisiana, Inc., et al.
LAM 3  08-84            Leatha Kluka v. ANCO Industries, Inc., et al.
LAM 3  08-326           Keith A. Hornbeck, et al. v. Northrop Grumman Ship Systems, Inc., et al.

**MISSISSIPPI SOUTHERN**
MSS 1  07-1170          Helen G. Varnadore v. Crane Co., et al.

**NORTH CAROLINA MIDDLE**
NCM 1  08-382           Michael Leroy Leonard v. Anchor Packing Co., et al.
NCM 1  08-404           Virginia Earnhardt Ritchie v. Aqua-Chem, Inc., et al.
NCM 1  08-410           Everette L. Allman, Jr., et al. v. Aqua-Chem, Inc., et al.
NCM 1  08-426           Jean Freeman Edwards, etc. v. Aqua-Chem, Inc., et al.
NCM 1  08-427           Willard A. Brodie, Jr., et al. v. Aqua-Chem, Inc., et al.
NCM 1  08-428           Roy C. Talbott, et al. v. Aqua-Chem, Inc., et al.
NCM 1  08-429           John Franklin Garmon v. Aqua-Chem, Inc., et al.

**NORTH CAROLINA WESTERN**
NCW 1  08-238           James Wilson Earnhardt v. Aqua-Chem, Inc., et al.
NCW 1  08-239           James Robert Elders, Jr. v. Aqua-Chem, Inc., et al.
NCW 1  08-242           Gregory Alan Hamm, et al. v. Aqua-Chem, Inc., et al.
NCW 1  08-243           Benny T. Harkey, Jr., et al. v. Aqua-Chem, Inc., et al.
NCW 1  08-244           Barry Steven Hinson, et al. v. Aqua-Chem, Inc., et al.
NCW 1  08-245           Aloysius J. Krieger, Jr., et al. v. Aqua-Chem, Inc., et al.
NCW 1  08-246           George F. Leeper, et al. v. Aqua-Chem, Inc., et al.

## MDL No. 875 - Schedule CTO-312 Tag-Along Actions (Continued)

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|
| NCW 1 08-247 | Randall W. Michael, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-248 | Michael David Moore, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-249 | William Earl Moore, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-250 | Jerry Paul Piercy, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-251 | Randal Franklin Shelton v. Aqua-Chem, Inc., et al. |
| NCW 1 08-253 | James Ervin Stancil, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-254 | Gary Lynn Thomas, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-257 | Donna Norville, etc. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-258 | Jerry Cecil Brown, et al. v. Aqua-Chem, Inc., et a. |
| NCW 1 08-259 | Jerry Dean Dalton, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-260 | Larry R. Douthit, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-261 | Lawton Dayle Holland, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-263 | Thomas Jesse Holland, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-264 | Billy Eugene Lovelace, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-265 | James Junior Howard v. Aqua-Chem, Inc., et al. |
| NCW 1 08-266 | Donald Edward Sellers v. Aqua-Chem, Inc., et al. |
| NCW 1 08-267 | Gary Lee Smith, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-270 | Clyde Davidson, Jr., et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-271 | James Bright, Jr. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-272 | Dennis C. Harmon, Sr., et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-273 | Charles J. Holcomb, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-275 | John W. Carpenter, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-276 | Joseph Woodrow Koone v. Aqua-Chem, Inc., et al. |
| NCW 1 08-277 | Monty P. Welch, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-278 | Charles Y. Wilkinson, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-279 | Johnny Moore Black v. Aqua-Chem, Inc., et al. |
| NCW 1 08-280 | Winford Giles Clayton, Jr. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-281 | Jimmy Lee Colvin, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 08-282 | Ray Von Correll, et al. v. Aqua-Chem, Inc., et al. |

NEW YORK EASTERN

| | |
|---|---|
| NYE 1 08-2211 | Litha Haynes, etc. v. A.W. Chesterton Co., et al. |
| NYE 1 08-2307 | Leslie G. Speir, et al. v. A.W. Chesterton Co., et al. |
| NYE 1 08-2383 | Michael Trapani, et al. v. A.W. Chesteron Co., et al. |

NEW YORK NORTHERN

| | |
|---|---|
| NYN 1 08-545 | Richard Simpson v. AWC 1997 Corp., et al. |

NEW YORK SOUTHERN

| | |
|---|---|
| NYS 1 06-862 | Anthony J. Simini, et al. v. A.O. Smith Water Products Co., et al. |
| NYS 1 08-5491 | Ernesto Miranda, et al. v. Northrop Grumman Corp., et al. |

OHIO SOUTHERN

| | |
|---|---|
| OHS 1 06-722 | Gail W. Durham, etc. v. Rapid American Corp., et al. |

SOUTH CAROLINA

| | |
|---|---|
| SC 0 08-2104 | Randall C. Covington, et al. v. Aqua-Chem, Inc., et al. |
| SC 0 08-2105 | Joan McCoy, etc. v. Aqua-Chem, Inc., et al. |
| SC 0 08-2106 | Dennis R. Morgan, et al. v. Aqua-Chem, Inc., et al. |
| SC 0 08-2109 | John Clawson Ramsey v. Aqua-Chem, Inc., et al. |
| SC 0 08-2239 | James A. Rollins, Jr., et al. v. Aqua-Chem, Inc., et al. |

**MDL No. 875 - Schedule CTO-312 Tag-Along Actions (Continued)**

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|
| SC  0  08-2316 | Bobby Gene Allen, et al. v. Aqua-Chem, Inc., et al. |
| SC  0  08-2458 | James T. Johnson, et al. v. Aqua-Chem, Inc., et al. |
| SC  0  08-2460 | John Robert Odom, et al. v. Aqua-Chem, Inc., et al. |
| SC  0  08-2462 | Willie Hue Starr, et al. v. Aqua-Chem, Inc., et al. |
| SC  0  08-2470 | Steven F. Stewart, et al. v. Aqua-Chem, Inc, et al. |
| SC  3  08-2343 | John W. Vawter, et al. v. Buffalo Pumps, Inc., et al. |
| SC  3  08-2409 | Jerry T. Hickman, et al. v. Buffalo Pumps, Inc., et al. |
| SC  3  08-2426 | John W. Vawter, et al. v. Alfa Laval, Inc., et al. |
| SC  7  08-2108 | Lee Homer Parker, et al. v. Aqua-Chem, Inc., et al. |
| SC  7  08-2244 | Boyce Lamar Wilson, et al. v. Aqua-Chem, Inc., et al. |
| SC  8  08-2237 | Freddie Alton Ball, et al. v. Aqua-Chem, Inc., et al. |
| SC  8  08-2238 | Michael Charles Rogers, et al. v. Aqua-Chem, Inc., et al. |
| SC  8  08-2240 | Donnie Ray Shirley, et al. v. Aqua-Chem, Inc., et al. |
| SC  8  08-2305 | Lacy Gene Locklear, et al. v. Aqua-Chem, Inc. |
| SC  8  08-2307 | Carl Jackson Gibby, et al. v. Aqua-Chem, Inc., et al. |
| SC  8  08-2310 | Larry Carroll Marcengill v. Aqua-Chem, Inc., et al. |
| SC  8  08-2314 | Alton M. Murphy v. Aqua-Chem, Inc., et al. |
| SC  8  08-2315 | James Ray Wald, et al. v. Aqua-Chem, Inc., et al. |

TEXAS SOUTHERN
| TXS  4  08-1303 | Jose E. Apodaca v. BNSF Railway Co. |

VIRGINIA EASTERN
| VAE  3  08-374 | Sandra Brunson, etc. v. Alfa Laval, Inc., et al. |

(a)      Upon learning of the pendency of a potential "tag-along action," as defined in Rule 1.1 of these Rules, an order may be entered by the Clerk of the Panel transferring that action to the previously designated transferee district court on the basis of the prior hearing session(s) and for the reasons expressed in previous opinions and orders of the Panel in the litigation. The Clerk of the Panel shall serve this order on each party to the litigation but, in order to afford all parties the opportunity to oppose transfer, shall not send the order to the clerk of the transferee district court for fifteen days from the entry thereof.

(b)      Parties to an action subject to a conditional transfer order shall notify the Clerk of the Panel within the fifteen-day period if that action is no longer pending in its transferor district court.

(c)      Any party opposing the transfer shall file a notice of opposition with the Clerk of the Panel within the fifteen-day period. If a notice of opposition is received by the Clerk of the Panel within this fifteen-day period, the Clerk of the Panel shall not transmit said order to the clerk of the transferee district court until further order of the Panel. The Clerk of the Panel shall notify the parties of the briefing schedule.

(d)      Within fifteen days of the filing of its notice of opposition, the party opposing transfer shall file a motion to vacate the conditional transfer order and brief in support thereof. The Chairman of the Panel shall set the motion for the next appropriate hearing session of the Panel. Failure to file and serve a motion and brief shall be treated as withdrawal of the opposition and the Clerk of the Panel shall forthwith transmit the order to the clerk of the transferee district court.

(e)      Conditional transfer orders do not become effective unless and until they are filed with the clerk of the transferee district court.

(f)      Notices of opposition and motions to vacate such orders of the Panel and responses thereto shall be governed by Rules 5.12, 5.2, 7.1 and 7.2 of these Rules.

RULE 7.5:      MISCELLANEOUS PROVISIONS CONCERNING "TAG-ALONG ACTIONS"

(a)      Potential "tag-along actions" filed in the transferee district require no action on the part of the Panel and requests for assignment of such actions to the Section 1407 transferee judge should be made in accordance with local rules for the assignment of related actions.

(b)      Upon learning of the pendency of a potential "tag-along action" and having reasonable anticipation of opposition to transfer of that action, the Panel may direct the Clerk of the Panel to file a show cause order, in accordance with Rule 7.3 of these Rules, instead of a conditional transfer order.

(c)      Failure to serve one or more of the defendants in a potential "tag-along action" with the complaint and summons as required by Rule 4 of the Federal Rules of Civil Procedure does not preclude transfer of such action under Section 1407. Such failure, however, may be submitted by such a defendant as a basis for opposing the proposed transfer if prejudice can be shown. The inability of the Clerk of the Panel to serve a conditional transfer order on all plaintiffs or defendants or their counsel shall not render the transfer of the action void but can be submitted by such a party as a basis for moving to remand as to such party if prejudice can be shown.

(d)      A civil action apparently involving common questions of fact with actions under consideration by the Panel for transfer under Section 1407, which was either not included in a motion under Rule 7.2 of these Rules, or was included in such a motion that was filed too late to be included in the initial hearing session, will ordinarily be treated by the Panel as a potential "tag-along action."

(e)      Any party or counsel in actions previously transferred under Section 1407 or under consideration by the Panel for transfer under Section 1407 shall promptly notify the Clerk of the Panel of any potential "tag-along actions" in which that party is also named or in which that counsel appears.

RULE 5.2:     SERVICE OF PAPERS FILED

(a)     All papers filed with the Clerk of the Panel shall be accompanied by proof of previous or simultaneous service on all other parties in all actions involved in the litigation. Service and proof of service shall be made as provided in Rules 5 and 6 of the Federal Rules of Civil Procedure. The proof of service shall indicate the name and complete address of each person served and shall indicate the party represented by each. If a party is not represented by counsel, the proof of service shall indicate the name of the party and the party's last known address. The proof of service shall indicate why any person named as a party in a constituent complaint was not served with the Section 1407 pleading. The original proof of service shall be filed with the Clerk of the Panel and copies thereof shall be sent to each person included within the proof of service. After the "Panel Service List" described in subsection (d) of this Rule has been received from the Clerk of the Panel, the "Panel Service List" shall be utilized for service of responses to motions and all other filings. In such instances, the "Panel Service List" shall be attached to the proof of service and shall be supplemented in the proof of service in the event of the presence of additional parties or subsequent corrections relating to any party, counsel or address already on the "Panel Service List."

(b)     The proof of service pertaining to motions for transfer of actions pursuant to 28 U.S.C. §1407 shall certify that copies of the motions have been mailed or otherwise delivered for filing to the clerk of each district court in which an action is pending that will be affected by the motion. The proof of service pertaining to a motion for remand pursuant to 28 U.S.C. §1407 shall certify that a copy of the motion has been mailed or otherwise delivered for filing to the clerk of the Section 1407 transferee district court in which any action affected by the motion is pending.

(c)     Within eleven days of filing of a motion to transfer, an order to show cause or a conditional transfer order, each party or designated attorney shall notify the Clerk of the Panel, in writing, of the name and address of the attorney designated to receive service of all pleadings, notices, orders and other papers relating to practice before the Judicial Panel on Multidistrict Litigation. Only one attorney shall be designated for each party. Any party not represented by counsel shall be served by mailing such pleadings to the party's last known address. Requests for an extension of time to file the designation of attorney shall not be granted except in extraordinary circumstances.

(d)     In order to facilitate compliance with subsection (a) of this Rule, the Clerk of the Panel shall prepare and serve on all counsel and parties not represented by counsel, a "Panel Service List" containing the names and addresses of the designated attorneys and the party or parties they represent in the actions under consideration by the Panel and the names and addresses of the parties not represented by counsel in the actions under consideration by the Panel. After the "Panel Service List" has been received from the Clerk of the Panel, notice of subsequent corrections relating to any party, counsel or address on the "Panel Service List" shall be served on all other parties in all actions involved in the litigation.

(e)     If following transfer of any group of multidistrict litigation, the transferee district court appoints liaison counsel, this Rule shall be satisfied by serving each party in each affected action and all liaison counsel. Liaison counsel designated by the transferee district court shall receive copies of all Panel orders concerning their particular litigation and shall be responsible for distribution to the parties for whom he or she serves as liaison counsel.

**EXHIBIT B**

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)   **415**
Cite as 771 F.Supp. 415 (Jud.Pan.Mult.Lit. 1991)

from export subsidies, and are instead using only Korea."[29]

The other case cited in the Determination as evidence of a "general practice" does not use the "possibility" standard. *Porcelain-on-Steel Cooking Ware* first cites the established practice of excluding due to known subsidies,[30] and later states that "[i]n considering which countries' imports to use in calculating foreign market value, we generally disregard imports from countries that are also under investigation, non-market economy exporters and *countries believed to maintain export subsidies.*"[31] The *Porcelain-on-Steel Cooking Ware* determination originally uses the "known subsidies" standard, so the quoted language may be regarded as a reiteration of that standard. ITA cannot buttress the "mere possibility" standard by citing to the more pedestrian "known subsidies" standard case.

Commerce implies in the Determination that the "possibility of subsidies" standard is the equivalent of "countries believed to maintain export subsidies" used in the *Porcelain-on-Steel Cooking Ware* determination. There is a logical difference between a belief, which usually must have some basis in fact, and a possibility, which does not necessarily need any facts to back it up. Possibilities are not equivalent to beliefs, and it is not enough that a thing be possible for it to be believed. Therefore, two unjustified and unrelated prior statements do not a general practice make. ITA's statement that there is a "general practice" is unsupported.

## VII. Disqualification of Surrogates for Subsidies Found in Other Industries

ITA disqualified other countries because of subsidies applicable to areas other than shop towels, or even textiles. CNART argues that there is no reason to believe that a set of programs available to and utilized by one industry is *ipso facto* available to and being used by a totally different industry. Brief in Support, at 34. In light of

this Court's holding above, it is unnecessary to reach the merits of this argument. Comparable economies are qualified for surrogacy, and must be used in a redetermination of the dumping margin. Should the ITA disqualify Malaysia, the Philippines and Indonesia on other grounds, the Court may reach the merits of CNART's argument, but does not need to do so at this time.

## VIII. Conclusion

ITA's selection of Hong Kong as surrogate was unsupported by substantial evidence. ITA's exclusion of Indonesia, the Philippines and Malaysia was also unsupported by substantial evidence on the record as a whole. The evidence suggests that either Indonesia or the Philippines are more economically comparable to the PRC than Malaysia. All three are more comparable than Hong Kong. As a result, this case is remanded to the International Trade Administration for recalculation of the dumping margin using import unit values from Indonesia, the Philippines or Malaysia. In addition, the recalculation must correct the clerical errors described at pages 53 and 54 of CNART's Brief in Support.



In re ASBESTOS PRODUCTS
LIABILITY LITIGATION
(NO. VI).

MDL No. 875.

Judicial Panel on
Multidistrict Litigation.

July 29, 1991.

After issuing order to show cause why all pending federal district court actions

---

29. *Steel Wire Nails,* 51 Fed.Reg., at 10,248.

30. *Porcelain-on-Steel Cooking Ware,* 51 Fed. Reg., at 36,421.

31. *Id.* 51 Fed.Reg., at 36,423 (emphasis added).

**416**          **771 FEDERAL SUPPLEMENT**

not then in trial involving allegations of
personal injury or wrongful death caused
by asbestos should not be centralized in a
single forum, the Judicial Panel on Multi-
district Litigation, Nangle, J., held that
pursuant to statute governing transfer in
multidistrict cases, 26,639 actions involving
allegations of personal injury or wrongful
death caused by asbestos would be trans-
ferred to the Eastern District of Pennsylva-
nia for pretrial proceedings, considering
that actions involved common questions of
fact, and that centralization of actions
would best serve convenience of parties
and witnesses and promote the just and
efficient conduct of litigation.

So ordered.

**Federal Courts ⚖152**

Pursuant to statute governing transfer
in multidistrict cases, 26,639 actions involv-
ing allegations of personal injury or wrong-
ful death caused by asbestos would be
transferred to the Eastern District of Penn-
sylvania for pretrial proceedings, consider-
ing that actions involved common questions
of fact, and that centralization of actions
would best serve convenience of parties
and witnesses and promote the just and
efficient conduct of litigation. 28 U.S.C.A.
§ 1407.

———

Before JOHN F. NANGLE, Chairman, S.
HUGH DILLIN,* MILTON POLLACK,*
LOUIS H. POLLAK, HALBERT O.
WOODWARD, ROBERT R. MERHIGE,
Jr., and WILLIAM B. ENRIGHT, Judges
of the Panel.

* Judges Dillin and Pollack did not participate in
the decision of this matter.

1. It appears that the only districts with pending
asbestos actions that did not effect service of the
Panel's order are the Eastern District of Wiscon-
sin and the District of Rhode Island. In view of
the Panel's disposition of this docket, the actions
pending there will be treated as potential tag-
along actions in accordance with the Panel's
Rules. *See* Rules 12 and 13, R.P.J.P.M.L., 120
F.R.D. 251, 258–59 (1988).

**OPINION AND ORDER**

Judge NANGLE, Chairman, Delivered
the Opinion of the Panel, in Which Judges
POLLAK, WOODWARD, MERHIGE and
ENRIGHT joined.

On January 17, 1991, the Panel issued an
order to show cause why all pending feder-
al district court actions not then in trial
involving allegations of personal injury or
wrongful death caused by asbestos should
not be centralized in a single forum under
28 U.S.C. § 1407. Because of the difficulty
in serving this order on the enormous num-
ber of parties in this docket, the Panel
relied on the clerks of all district courts to
serve the parties to actions in their respec-
tive districts.[1]  As a result, the parties to
the 26,639 actions pending in 87 federal
districts and listed on the following Sched-
ule A are subject to the Panel's order.[2]
[Editor's Note: All but the Summary of
Schedule A has been omitted from publica-
tion by the Court.]  More than 180 plead-
ings have been filed in response to the
Panel's order, and a four hour hearing on
the question of transfer was held on May
30, 1991 in New York City, at which time
37 counsel presented oral argument.  In
many instances the attorneys filing these
pleadings or participating in oral argument
were representing the views of large
groups of parties.

Supporting transfer are plaintiffs in ap-
proximately 17,000 actions (including a core
group of more than 14,000 plaintiffs repre-
sented by over 50 law firms) and 30 defen-
dants (24 of which are named in more than
20,000 actions).  Opposing transfer are
plaintiffs in at least 5,200 actions and 454
defendants.  The positions of those parties
that have expressed a preference with re-

2. The Statistical Division of the Administrative
Office of the United States Courts reports that as
of March 31, 1991, nearly 31,000 actions were
pending in federal districts.  Based on Panel
communications with courts throughout the
country, the approximately 4,000 pending ac-
tions not embraced by the present order likely
include actions that, as of January 17, 1991,
were overlooked, in trial or already at least
partially tried but not yet statistically closed
because, *inter alia*, claims against one or more
defendants were stayed under the Bankruptcy
Code.

spect to transferee district are varied. Many parties suggest centralization in what amounts to their home forum. The Eastern District of Pennsylvania is the district either expressly favored or not objected to in the greatest number of pleadings. The Eastern District of Texas, which is the choice of the aforementioned core group of 14,000 plaintiffs, is also the district that has generated the most opposition from defendants. Other suggested districts that go beyond the home forum approach are the District of the District of Columbia, the Eastern District of Louisiana, the Northern District of Ohio, and the Eastern District of New York. Some parties' forum recommendations are expressed in the form of a suggested individual transferee judge or transferee judge structure.

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact relating to injuries or wrongful death allegedly caused by exposure to asbestos or asbestos containing products, and that centralization under § 1407 in the Eastern District of Pennsylvania will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.

## DISCUSSION

Any discussion of § 1407 transfer in this docket must begin with the recognition that the question does not arise in a vacuum. Indeed, the impetus for the Panel's order to show cause was a November 21, 1990 letter signed by eight federal district judges responsible for many asbestos actions in their respective districts.[3] These judges, citing the serious problem that asbestos personal injury litigation continues to be for the federal judiciary, requested

that the Panel act on its own initiative to address the question of § 1407 transfer. Furthermore, as the title of this docket suggests, this is the sixth time that the Panel has considered transfer of asbestos litigation. On the five previous occasions (1977, 1980, 1985, 1986 and 1987) that the Panel considered the question, it denied transfer in each instance.[4]

The Panel's constancy is not as dramatic as a mere recitation of the denials might suggest, however. The 1986 and 1987 dockets considered by the Panel involved only five and two actions, respectively. The 1985 Panel decision pertained not to personal injury/wrongful death asbestos actions but rather to property damage claims of school districts that incurred significant costs in removing asbestos products from school buildings. The denial in the 1980 Panel docket was based almost exclusively on the movants' failure to offer any distinctions that would warrant a disposition different from the Panel's first asbestos decision in 1977.

It is only in the 1977 decision, pertaining to 103 actions in nineteen districts, that the Panel offered any detailed analysis of its asbestos litigation reasoning with respect to asbestos personal injury/wrongful death actions. In that decision, the Panel first listed the primary arguments of the responding parties that unanimously opposed transfer: advanced stage of proceedings in many of the actions; use of voluntary coordinating arrangements in several districts; lack of commonality among defendants and plaintiffs; circumstances of exposure predominantly unique to each action; individual questions of causation in each action; predominantly individual questions of the liability of each defendant in each action;

---

**3.** The signatories to this letter are Judges Walter J. Gex, III (S.D.Miss.), Thomas D. Lambros (N.D.Ohio), Alan H. Nevas (D.Conn.), Richard A. Schell (E.D.Tx.), Charles Schwartz, Jr. (E.D.La.), Charles R. Weiner (E.D.Pa.), Charles R. Wolle (S.D.Iowa) and Rya W. Zobel (D.Mass.). Additionally, Judge Jack B. Weinstein (E.D.N.Y.) has contacted the Panel staff and requested that he also be considered a signatory to the letter.

**4.** *In re Asbestos and Asbestos Insulation Material Products Liability Litigation,* 431 F.Supp. 906 (J.P.M.L.1977); *In re Asbestos Products Liability Litigation (No. II),* MDL–416 (J.P.M.L. March 13, 1980) (unpublished order); *In re Asbestos School Products Liability Litigation,* 606 F.Supp. 713 (J.P.M.L.1985); *In re Ship Asbestos Products Liability Litigation,* MDL–676 (J.P.M.L. Feb. 4, 1986) (unpublished order); and *In re Leon Blair Asbestos Products Liability Litigation,* MDL–702 (J.P.M.L. Feb. 6, 1987) (unpublished order).

local issues predominating in the discovery process; absence of possibility of inconsistent or overlapping class certifications; and the readily discernible nature of the principal area common to all actions, the state of medical and scientific knowledge at a particular time regarding the health hazards posed by exposure to asbestos.

In denying transfer in the 1977 decision, the Panel recognized the existence of some common questions of fact among the actions. For in that docket, as in the matter currently before the Panel, all actions contained allegations of personal injury or death as a result of exposure to asbestos or asbestos containing products. The Panel nevertheless held that the other criteria for § 1407 transfer were not satisfied. In relevant part, the Panel stated:

> Many factual questions unique to each action or to a group of actions already pending in a single district clearly predominate, and therefore transfer is unwarranted.... Furthermore, many of these actions already are well advanced. Some of the actions have been pending for up to four years, and trial dates or discovery cutoff dates have been set in several actions. Under these circumstances, transfer would not further the purposes of Section 1407.

*In re Asbestos and Asbestos Insulation Material Products Liability Litigation,* 431 F.Supp. 906, 910 (J.P.M.L.1977).

Many of the parties presently opposing transfer in this docket rely on the facts and reasoning of the Panel's 1977 transfer decision. They insist that the situation that warranted denial then not only still prevails but has been magnified by the greatly increased number of actions and parties in federal asbestos personal injury/wrongful death litigation—more than 30,000 pending federal actions now, as opposed to the 103 actions subject to the Panel's 1977 decision. In our view, it is precisely this change that now leads us to conclude that centralization of all federal asbestos personal injury/wrongful death actions, in the words of 28 U.S.C. § 1407(a), "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of

such actions." In short, we are persuaded that this litigation has reached a magnitude, not contemplated in the record before us in 1977, that threatens the administration of justice and that requires a new, streamlined approach.

The Panel is not the first to reach such a conclusion. Just this past March 1991, the Judicial Conference Ad Hoc Committee on Asbestos Litigation, whose members were appointed by Chief Justice William H. Rehnquist, stated as follows:

> The committee has struggled with the problems confronting the courts of this nation arising from death and disease attributable to airborne asbestos industrial materials and products. The committee has concluded that the situation has reached critical dimensions and is getting worse. What has been a frustrating problem is becoming a disaster of major proportions to both the victims and the producers of asbestos products, which the courts are ill-equipped to meet effectively.

> After extensive study, the Institute for Civil Justice of the Rand Corporation in 1985 observed, with respect to how the civil justice system handles asbestos claims, that—

>> The picture is not a pretty one. Decisions concerning thousands of deaths, millions of injuries, and billions of dollars are entangled in a litigation system whose strengths have increasingly been overshadowed by its weaknesses.

> The ensuing five years have seen the picture worsen: increased filings, larger backlogs, higher costs, more bankruptcies and poorer prospects that judgments—if ever obtained—can be collected.

> It is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related dis-

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)   **419**
Cite as 771 F.Supp. 415 (Jud.Pan.Mult.Lit. 1991)

eases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.

The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.

*Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation,* 1–3 (1991) (footnote omitted) (hereinafter *Asbestos Committee Report*). The Committee pointed out that presently in the federal system nearly two new asbestos actions are being filed for every action terminated, and that at the current rate, there will be more than 48,000 actions pending in the federal courts at the end of three years. *Asbestos Committee Report, supra,* at 8.

The Committee also discussed the ongoing change in the demographics of asbestos litigation in the federal courts:

In 1984, when the Federal Judicial Center held its first asbestos conference, asbestos litigation in the federal courts was largely concentrated in only four district courts. Since that time, however, asbestos cases have infiltrated virtually every federal district. Asbestos litigation must therefore be viewed as a national problem rather than merely a local or regional one, especially with the number of Americans affected.

*Asbestos Committee Report, supra,* at 9 (footnote omitted).

Conclusions similar to those of the Judicial Conference Asbestos Committee have also been reached by judges actively involved in asbestos litigation. In perhaps the most recent comprehensive review of asbestos litigation, Judge Jack B. Weinstein (E.D.N.Y.) observed:

The large number of asbestos lawsuits pending throughout the country threatens to overwhelm the courts and deprive all litigants, in asbestos suits as well as other civil cases, of meaningful resolution of their claims.... Several commentators have recounted the inefficiencies and inequities of case-by-case adjudication in the context of mass tort disasters. *See, e.g.,* Rosenberg, *Class Actions for Mass Torts: Doing Individual Justice by Collective Means,* 62 Ind.L.J. 561 (1987); *Trends in Asbestos Litigation* (Federal Judicial Center 1987); Rubin, *Mass Torts and Litigation Disasters,* 20 Ga.L.Rev. 429 (1986); Note, *Class Certification in Mass Accident Cases Under Rule 23(b)(1),* 96 Harv.L.Rev. 1143 (1983); Comment, *Federal Mass Tort Class Actions: A Step Toward Equity and Efficiency,* 47 Alb.L.Rev. 1180 (1983).

The heyday of individual adjudication of asbestos mass tort lawsuits has long passed. *See [Asbestos Committee Report ], supra,* at 7 ("one point on which plaintiffs' counsel, defense counsel and the judiciary can agree is that the present way in which we have attempted to resolve asbestos cases has failed"). The reasons are obvious: the complexity of asbestos cases makes them expensive to litigate; costs are exacerbated when each individual has to prove his or her claim *de novo;* high transaction costs reduce the recovery available to successful plaintiffs; and the sheer number of asbestos cases pending nationwide threatens to deny justice and compensation to many deserving claimants if each claim is handled individually. The backlog is eroding a fundamental aspiration of our judicial system to provide equality of treatment for similarly situated persons. *Cf. [Asbestos in the Courts: The Challenge of Mass Toxic Torts* (RAND, Inst. of Social Justice 1985) ], *supra,* at 12 (recent wave of asbestos litigation marked by high concentration of claims, dominance of characteristics of individual asbestos cases, behavior of parties, lawyers and the attributes of judges "created a situation in which dispositions are

slow, costs are high, and outcomes are variable").

Overhanging this massive failure of the present system is the reality that there is not enough money available from traditional defendants to pay for current and future claims. Even the most conservative estimates of future claims, if realistically estimated on the books of many present defendants, would lead to a declaration of insolvency—as in the case of some dozen manufacturers already in bankruptcy.

*In re Johns-Manville Corporation, et al.,* No. 90–3973, slip op. at 61–63, 1991 WL 86304 (E.D.N.Y. May 16, 1991).

Given the dimensions of the perceived problem in federal asbestos litigation, it is not surprising that no ready solution has emerged. The Judicial Conference Asbestos Committee concluded that the only true solution lies in Congressional legislation. Nevertheless, it stressed that "[a]t the same time, or failing congressional action, the federal judiciary must itself act now to achieve the best performance possible from the system under current law." *Asbestos Committee Report, supra,* at 4. The Committee also noted that the Panel's order to show cause was pending at the time of the issuance of the Committee's report. The Committee observed that "this committee, by its recommendations, does not intend to affect or restrict in any way the actions of the Panel under 28 U.S.C. § 1407 or reduce the Panel's jurisdiction or authority." *Id.* at 22.[5]

It is against this backdrop that the Panel's decision and role in this litigation must be understood. First of all, our decision to order transfer is not unmindful of the fact that the impact of asbestos litigation varies from district to district, and that in some courts asbestos personal injury actions are being resolved in a fashion indistinguishable from other civil actions. It is not surprising, therefore, that parties and courts involved in such actions might urge that inclusion of their actions in multidis-

trict proceedings is inappropriate. The Panel, however, must weigh the interests of all the plaintiffs and all the defendants, and must consider multiple litigation as a whole in the light of the purposes of the law. *In re Multidistrict Private Civil Treble Damage Litigation Involving Library Editions of Children's Books,* 297 F.Supp. 385, 386 (J.P.M.L.1968). It is this perspective that leads us to conclude that centralization in a single district of all pending federal personal injury and wrongful death asbestos actions is necessary.

Much of the argument presented to the Panel in response to its order to show cause is devoted to parties' differing (and often inconsistent) visions of § 1407 proceedings: 1) some plaintiffs see centralized pretrial proceedings as a vehicle leading to a single national class action trial or other types of consolidated trials on product defect, state of the art and punitive damages, while many defendants staunchly oppose such a trial, favor a reverse bifurcation procedure where actual damages and individual causation are tried before liability, and hope to use § 1407 proceedings to effect the severance of claims for punitive damages through a transferee court order directing that, upon the return of any case to its transferor district, such claims not be tried until claims for compensatory damages have been resolved in all federal cases; 2) some parties hope to persuade the transferee court to establish case deferral programs for plaintiffs who are not critically ill, or who have been exposed to asbestos but do not presently show any signs of impairment (i.e., pleural registries), while many plaintiffs assert that such procedures are unfair or unconstitutional; 3) in response to the pressing concern about transaction costs in this litigation, some defendants consider § 1407 transfer necessary in order to provide a single federal forum in which limits on plaintiffs' contingent fees can be addressed, while some plaintiffs maintain that transfer is necessary to pre-

---

**5.** The Committee also observed that, in the interest of centralizing asbestos claims to the greatest extent possible, the Panel's authority "could be expanded to allow the Panel to trans-

fer actions for trial as well as for pretrial proceedings." *Asbestos Committee Report, supra,* at 31.

vent the depletion of defendants' limited insurance coverage by defense costs incurred in multiple districts; 4) some plaintiffs and defendants urge that transfer is necessary in order to develop through discovery proceedings nationwide product data bases on all asbestos products and corporate histories of all asbestos defendants, while other plaintiffs and defendants contend that such efforts would be of no utility and are simply designed to shift liability; 5) some plaintiffs are suggesting that defendants' finances are so fragile as to require limited fund class action determinations pursuant to Fed.R.Civ.P. 23(b)(1)(B), while other plaintiffs resist any attempt to restrict their right to pursue punitive damages; 6) some parties anticipate that a single transferee court would speed up case disposition and purge meritless claims, while others expect a system of spacing out claims so as not to overwhelm currently solvent defendants' cash flow and drive them into bankruptcy; and 7) some parties contend that a single transferee court is necessary for the purpose of exploring the opportunities for global settlements or alternative dispute resolution mechanisms, while other parties assert that such hopes are utopian at best as long as i)

more than twice as many asbestos cases remain pending in state courts as in federal courts, and ii) currently stayed claims against bankrupt defendants cannot be addressed by the transferee court.[6]

We enumerate these issues not for the purpose, as some parties seemingly misunderstand, of passing on their merits. The language of the first sentence of paragraph (b) of § 1407 is quite clear about the proper forum for resolution of such issues—"coordinated or consolidated pretrial proceedings shall be conducted by a judge or judges to whom such actions are assigned" by the Panel (emphasis added). The Panel has neither the power nor the disposition to direct the transferee court in the exercise of its powers and discretion in pretrial proceedings. *In re Plumbing Fixture Cases,* 298 F.Supp. 484, 489 (J.P.M.L.1968).

We cite these issues only as illustrations of 1) the types of pretrial matters that need to be addressed by a single transferee court in order to avoid duplication of effort (with concomitant unnecessary expenses) by the parties and witnesses, their counsel, and the judiciary, and in order to prevent inconsistent decisions;[7] and 2) why, at

---

**6.** There appears to be some confusion among the parties concerning the interaction of the provisions of the Bankruptcy Code and § 1407. Transfer under § 1407 of an action containing claims against a defendant in bankruptcy has no effect on the automatic stay provisions of the Bankruptcy Code (11 U.S.C. § 362). Claims that have been stayed in the transferor court remain stayed in the transferee court. The Panel, however, has never considered the pendency of such stayed claims in an action to be an impediment to transfer of the action. 28 U.S.C. § 1407(a) authorizes the Panel to transfer only "civil actions" and not claims. The complex multidistrict litigations before the Panel have often included actions brought against multiple defendants, the claims against one or more of which have been stayed as a result of bankruptcy. To have allowed the pendency of claims against a single bankrupt defendant to preclude the transfer of actions containing claims actively being litigated against common nonbankrupt defendants would have frustrated the essential purpose of § 1407.

Some parties have urged the Panel to treat the bankruptcy reorganizations themselves as "civil actions" appropriate for transfer under § 1407 to the transferee district. The reorganization

proceedings are not subject to our order to show cause, and this question is therefore not ripe for a Panel decision. We have not addressed this question before and would be reluctant to do so until: 1) the transferee court determines that other alternatives, such as coordination with the concerned bankruptcy courts, are insufficient to accomplish the goals of § 1407; and 2) other suggested means of transferring the bankruptcy reorganizations or relevant portions thereof have been fully explored by the transferee court and the concerned bankruptcy courts.

Finally, we note that to the extent that state court actions and bankruptcy proceedings are excluded from the ambit of the Panel's transfer decision, transfer will nonetheless have the salutary effect of creating one federal court with which such proceedings can be coordinated, to the extent deemed desirable by the concerned courts. Indeed, state court judges have communicated to the Panel that coordination among state courts and a single transferee court for the federal actions is an objective worthy of pursuit.

**7.** We note that to the extent any of these pretrial decisions are subject to appellate review pursuant to interlocutory appeal or writ of manda-

**422**                    **771 FEDERAL SUPPLEMENT**

least initially, all pending federal personal injury or wrongful death asbestos actions not yet in trial must be included in § 1407 proceedings. For example, if, as some courts, parties and commentators have suggested, there are insufficient funds to fairly compensate all deserving claimants, this should be determined before plaintiffs in lightly impacted districts go to trial and secure recoveries (often including punitive damages) at the possible expense of deserving plaintiffs litigating in districts where speedy trial dates have not been available. Similarly, if there are economies to be achieved with respect to remaining national discovery, pretrial rulings or efforts at settlement, these should be secured before claims against distinct types or groups of defendants are separated out of the litigation. Finally, because many of the arguments of parties seeking exclusion from transfer are intertwined with the merits of their claims or defenses and affect the overall management of this litigation, we are unwilling, on the basis of the record presently before us, to carve out exceptions to transfer. We prefer instead to give the transferee court the opportunity to conduct a substantive review of such contentions and how they affect the whole proceedings.

It may well be that on further refinement of the issues and close scrutiny by the transferee court, some claims or actions can be remanded in advance of the other actions in the transferee district. Should the transferee court deem remand of any claims or actions appropriate, the transferee court can communicate this to the Panel, and the Panel will accomplish remand with a minimum of delay. *See* Rule 14, R.P.J.P.M.L., 120 F.R.D. 251, 259–61 (1988).[8] We add that for those parties urging that resolution of this litigation lies primarily in the setting of firm, credible

trial dates, § 1407 transfer may serve as a mechanism enabling the transferee court to develop a nationwide roster of senior district and other judges available to follow actions remanded back to heavily impacted districts, for trials in advance of when such districts' overburdened judges may have otherwise been able to schedule them.

We remain sensitive to the concerns of some parties that § 1407 transfer will be burdensome or inconvenient. We note that since § 1407 transfer is primarily for pretrial, there is usually no need for the parties and witnesses to travel to the transferee district for depositions or otherwise. *See, e.g.,* Fed.R.Civ.P. 45(d)(2). Furthermore, the judicious use of liaison counsel, lead counsel and steering committees will eliminate the need for most counsel ever to travel to the transferee district. *See Manual for Complex Litigation, Second,* § 20.22 (1985).[9] And it is most logical to assume that prudent counsel will combine their forces and apportion their workload in order to streamline the efforts of the parties and witnesses, their counsel, and the judiciary, thereby effectuating an overall savings of cost and a reduction of inconvenience to all concerned. *See In re Nissan Motor Corporation Antitrust Litigation,* 385 F.Supp. 1253, 1255 (J.P.M.L.1974). Hopefully, combining such practices with a uniform case management approach will, in fact, lead to sizeable reductions in transaction costs (and especially in attorneys' fees).

In a docket of this size and scope, no district emerges as the clear nexus where centralized pretrial proceedings should be conducted. The Panel has decided to centralize this litigation in the Eastern District of Pennsylvania before Judge Charles R. Weiner. We note that: 1) more asbestos personal injury or wrongful death actions

---

mus, § 1407 transfer will also help to minimize the potential for inconsistent decisions from courts of appeals.

**8.** Those parties who may seek early remand of their actions or claims are reminded of i) Panel Rule 14(d)'s expression of the Panel's reluctance to order remand absent a suggestion of remand from the transferee judge, and ii) the special affidavit requirement of that Rule. 120 F.R.D.

at 260. *See also In re Holiday Magic Securities and Antitrust Litigation,* 433 F.Supp. 1125, 1126 (J.P.M.L.1977).

**9.** Liaison counsel would be called upon by the Panel to distribute future Panel orders regarding tag-along actions and any other matters to their liaison group as contemplated in Panel Rule 8(e). R.P.J.P.M.L., *supra,* 120 F.R.D. at 255.

are pending in that district than any other; 2) the court there has extensive experience in complex litigation in general and asbestos litigation in particular; and 3) the court has graciously expressed its willingness to assume the responsibility for this massive undertaking. Furthermore, in the person of Judge Weiner the Panel finds a judge thoroughly familiar with the issues in asbestos litigation, a track record of accomplishment and successful innovation,[10] and, on the basis of the pleadings before the Panel in which an opinion was expressed, a selection to which the majority of responding plaintiffs and defendants either expressly agree or are not opposed.

Many parties have suggested that the dynamics of this litigation make it impractical, if not impossible, for one single judge to discharge the responsibilities of transferee judge, while other parties have emphasized that more than a single transferee judge would dilute the judicial control needed to effectively manage the litigation. Varying suggestions have been made that the Panel appoint additional transferee judges to handle specific issues (e.g., class or limited fund determinations, discovery, settlement, claims administration, etc.), to deal with separate types of claims or defendants (e.g., maritime asbestos actions, railroad worker actions, friction materials actions, tire workers actions, etc.), or to divide the litigation along regional or circuit lines (helping to insure uniformity of decisions within each circuit pertaining, *inter alia,* to state law questions involved in the actions). Each of these suggestions has merit, as long as one judge has the opportunity to maintain overall control.

Section 1407(b) contemplates that multidistrict litigation may be conducted by "a judge or judges." It further expressly provides that "upon request of the panel, a circuit judge or a district judge may be designated and assigned temporarily for service in the transferee district by the Chief Justice of the United States or the chief judge of the circuit, as may be required, in accordance with the provisions of chapter 13 of this title." And the Panel has long expressed its willingness to appoint additional transferee judges in litigations whose size and complexity make it difficult for the original transferee judge to handle § 1407 proceedings alone. *See In re Multidistrict Civil Antitrust Actions Involving Antibiotic Drugs,* 320 F.Supp. 586, 588 (J.P.M.L.1970). We emphasize our intention to do everything within our power to provide such assistance in this docket.

---

**10.** The *Asbestos Committee Report, supra,* noted at 15:

> Judge Charles Weiner, the asbestos case manager in the Eastern District of Pennsylvania, is able to call upon over 20 active and senior judges in the district to handle asbestos cases on a priority basis. In addition to mandating standard, abbreviated pleadings, such as complaint, answer, and discovery requests, Judge Weiner meets regularly with counsel and handles on a regular basis all motions and discovery requests. Applying these sophisticated case management techniques, Judge Weiner and his colleagues have disposed of more than 2,000 cases through 1990. Another testament to Judge Weiner's techniques comes from the Panel pleading of certain plaintiffs already before him in the Pennsylvania district:

> > The Eastern District of Pennsylvania may be unique in another respect, and that again is due to the involvement of the Court. Perhaps no other jurisdiction has had the mutual cooperation of liaison counsel who have been instrumental, together with the Court in attempting to resolve the asbestos problem.

> > The adversary system remains, but the Court has eliminated the usual posturing of the litigants and has encouraged them to come up with programs and solutions. The classic example is the unique program established by counsel with the Court of binding arbitration through stipulated percentage of defendants' liability. The arbitrators are experts in asbestos litigation, and the medical issues are tried by submission on report. The average disposition rate is four cases in one day without judicial time.

> Pleading 87, Response of Greitzer and Locks at 15.

> Our reference to these passages is not meant to be an endorsement of any pretrial techniques to the exclusion of others, and in no way should be viewed as limiting Judge Weiner in his assessment of the appropriate tools to be used now that all federal personal injury/wrongful death asbestos actions will be before him for pretrial proceedings. We consider such passages to be helpful, however, in allaying the fears of parties not familiar with Judge Weiner that § 1407 transfer will result in their actions entering some black hole, never to be seen again.

Before making any specific appointments, however, we deem it advisable to allow the transferee judge to make his own assessment of the needs of this docket and communicate his preferences to us.

The Panel is under no illusion that centralization will, of itself, markedly relieve the critical asbestos situation. It offers no panacea. Only through the combined and determined efforts of the transferee judge and his judicial colleagues, of the many attorneys involved in asbestos matters, and of the parties, can true progress be made toward solving the "asbestos mess." This order does offer a great opportunity to all participants who sincerely wish to resolve these asbestos matters fairly and with as little unnecessary expense as possible.

Finally, in light of the Panel's disposition in this docket, it is necessary to remind parties and counsel of their continuing responsibility with respect to transfer of potential tag-along actions, including those either inadvertently overlooked at the time of the January 17, 1991 filing of the Panel's order to show cause or filed subsequent to the issuance of the Panel's order

to show cause. We note that Panel Rule 13(e) provides as follows:

> Any party or counsel in actions previously transferred under Section 1407 or under consideration by the Panel for transfer under Section 1407 shall notify the Clerk of the Panel of any potential "tag-along actions" in which that party is also named or in which that counsel appears.

R.P.J.M.L., *supra,* 120 F.R.D. at 259.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on the following Schedule A that are pending as of the date of this order, are not in trial, and are pending outside the Eastern District of Pennsylvania, be, and the same hereby are, transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Charles R. Weiner for coordinated or consolidated pretrial proceedings with the actions on Schedule A that remain pending in that district and are not in trial.[11]

IT IS FURTHER ORDERED that Panel Rule 19(a) be, and the same hereby is, suspended for this docket.[12]

---

11. The Panel's authority under § 1407 is to transfer for "pretrial" proceedings; actions on Schedule A that have been resolved or are presently in trial are not intended to be within the scope of the Panel's transfer decision. Given the tremendous number of actions pending in almost every federal district, however, it is not possible for the Panel to know at any one time the current status of all actions on Schedule A. When, pursuant to § 1407(c), the clerks of the transferor district courts receive a certified copy of the MDL–875 transfer order from the clerk of the transferee district court, we request the transferor district clerks to notify the Clerk of the Panel of any actions on Schedule A in their districts that have been resolved or are in trial, so as to permit the Panel to issue a correction order excluding such actions from transfer. We also remind counsel in such actions of the requirements of Panel Rule 10(f):

> With respect to any action that is the subject of Panel consideration, counsel shall notify the Clerk of the Panel of any development that would partially or completely moot the matter before the Panel.

*Id.* at 257.

12. Panel Rule 19(a), *id.* at 263, requires clerks of transferor district courts to forward to the clerk of the transferee district court the complete original file and docket sheet for each transferred action. Because of the voluminous files in this docket, we are suspending this rule. Instead, we will rely on the judgment of the transferee judge to request from the transferor district clerks or the parties whatever case files and docket sheets he needs.

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)   **425**
Cite as 771 F.Supp. 415 (Jud.Pan.Mult.Lit. 1991)

## SUMMARY OF SCHEDULE A
### DOCKET NO. 875
### IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

| DISTRICT | # OF CASES | DISTRICT | # OF CASES |
|---|---|---|---|
| AK. | 6 | MS., S. | 997 |
| AL., N. | 58 | MT. | 79 |
| AL., S. | 64 | NC., E. | 83 |
| AR., E. | 75 | NC., M. | 27 |
| AR., W. | 18 | NC., W. | 126 |
| AZ. | 112 | ND. | 12 |
| CA., C. | 31 | NE. | 93 |
| CA., E. | 1 | NH. | 61 |
| CA., N. | 3 | NJ. | 147 |
| CA., S. | 4 | NM. | 63 |
| CO. | 4 | NV. | 22 |
| CT. | 345 | NY., E. | 425 |
| DC. | 32 | NY., N. | 589 |
| DE. | 16 | NY., S. | 1441 |
| FL., M. | 220 | NY., W. | 420 |
| FL., N. | 1 | OH., N. | 4022 |
| FL., S. | 135 | OH., S. | 84 |
| GA., M. | 39 | OK., E. | 2 |
| GA., N. | 180 | OK., N. | 538 |
| GA., S. | 673 | OK., W. | 17 |
| HI. | 105 | OR. | 75 |
| IA., N. | 19 | PA., E. | 5703 |
| IA., S. | 65 | PA., M. | 244 |
| ID. | 30 | PA., W. | 264 |
| IL., C. | 166 | SC. | 266 |
| IL., N. | 459 | SD. | 2 |
| IL., S. | 37 | TN., E. | 78 |
| IN., N. | 1 | TN., M. | 65 |
| IN., S. | 169 | TN., W. | 29 |
| KS. | 26 | TX., E. | 1165 |
| KY., E. | 48 | TX., N. | 34 |
| KY., W. | 64 | TX., S. | 477 |
| LA., E. | 163 | TX., W. | 24 |
| LA., M. | 89 | UT. | 21 |
| LA., W. | 48 | VA., E. | 618 |
| MA. | 2630 | VA., W. | 275 |
| MD. | 597 | VI. | 61 |
| ME. | 39 | WA., E. | 14 |
| MI., E. | 242 | WA., W. | 193 |
| MI., W. | 9 | WI., W. | 22 |
| MN. | 12 | WV., N. | 23 |
| MO., E. | 69 | WV., S. | 586 |
| MO., W. | 42 | WY. | 1 |
| MS., N. | 5 | | |

**TOTAL DISTRICTS:  87**      **TOTAL TRANSFERS:  26,639**



EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:  ASBESTOS LITIGATION: | ) | |
| | ) | |
| FREDERICK SEITZ and MARY | ) | |
| LOUISE SEITZ, his wife | ) | |
| his wife, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. |
| | ) | |
| -vs.- | ) | |
| | ) | |
| ADEL WIGGINS GROUP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT NORTHROP GRUMMAN CORPORATION'S NOTICE OF REMOVAL
OF ACTION FROM DELAWARE SUPERIOR COURT**

TO THE JUDGE OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Northrop Grumman Corporation ("Northrop Grumman"), pursuant to 28 U.S.C. §§ 1331, 1332, 1442(a)(1), and 1446, hereby removes the above-styled action, which was initially filed in the Superior Court of the State of Delaware In And For New Castle County bearing Case No. 08C-04-247 ASB, to the United States District Court for the District of Delaware.  Removal to this Court is appropriate under the federal officer removal statute and on the ground that Plaintiffs' claims involve a federal question.  The grounds for removal are more particularly stated as follows:

1.  On April 25, 2008, Plaintiffs Frederick Seitz and his wife Mary Louise Seitz filed their Complaint in the Superior Court of Delaware, in and for New Castle County, naming Northrop Grumman as one of the defendants.  Northrop Grumman was served with the Complaint on May 13, 2008, a copy of which is attached hereto as Exhibit "A."

2.  Plaintiffs' Complaint alleges that Frederick Seitz was exposed to asbestos and asbestos-containing products that were mined, manufactured, distributed, sold, licensed, leased, installed, removed and/or used by the thirty (30) defendant corporations.  The Complaint contains vague and general allegations that Mr. Seitz was exposed to asbestos from a variety of aircraft mechanical asbestos containing products between 1944 to 1970 while employed as an electrician apprentice, mechanic, and pilot with various employers, including the United States Marine Corps ("USMC").

3.  The Complaint does not contain the name, type or class of product to which the Plaintiffs were allegedly exposed, or which Northrop Grumman allegedly manufactured, distributed or sold.  The Complaint fails to identify where and to which of Northrop Grumman's products Plaintiffs were allegedly exposed, and it fails to state a specific time period when the alleged exposure to a Northrop Grumman product occurred.

4.  Plaintiffs' Complaint was unclear as to the extent of Mr. Seitz's work history at the USMC air bases in Cherry Point and New River, North Carolina and responsibilities regarding same, noting only that Mr. Seitz was a "mechanic and pilot" in the USMC.

5.  Plaintiffs' Answers to Standard Form Interrogatories and Standard Form Request for Production, filed on June 4, 2008 provided more detailed information as to product identification and exposure history.  For instance, the attached work history forms of Mr. Seitz provide details as to the types of aircraft Mr. Seitz worked on while he was in the USMC.  A true and correct copy of Plaintiffs' Answers to Standard Form Interrogatory Responses and Referenced Employment and Work Histories are attached hereto as Exhibit "B."

6.  Mr. Seitz was deposed on June 10-11, 2008.  During his deposition, Mr. Seitz identified US military aircraft he maintained and flew, including those he maintains were manufactured by Northrop Grumman.  He also identified various US military aircraft carriers on

which he served.  (Because Mr. Seitz's deposition was just concluded less than 24 hours before this filing, a transcript is not yet available for attaching to this Notice.)

7.  Mr. Seitz testified all maintenance he performed on the military aircraft allegedly manufactured by Northrop Grumman, all flight time on military aircraft allegedly manufactured by Northrop Grumman and all time spent on United States aircraft carriers allegedly manufactured by Northrop Grumman resulted from specific orders of his superiors in the USMC. He also testified that, as a mechanic in the USMC, he followed Erection and Maintenance Instruction Manuals, among others, which provided him specific instructions as to how to maintain the aircraft and specified which replacement parts could be used.  These manuals were issued and distributed by the United States Government.  *See* Exhibits DF1, DF2 and DF3 from Mr. Seitz's Deposition, attached hereto as Exhibit "C."

8.  For more than a century, Northrop Grumman has designed, built, and repaired a wide variety of aircraft and aircraft carriers for the United States military.  These aircraft and aircraft carriers, and each of their parts, are designed and built in accordance with United States military specifications.

9.  As such, Plaintiffs' discovery responses served as notice that this is a civil action which may be removed pursuant to 28 U.S.C. § 1442(a)(1), the federal officer removal statute, and § 1441(b), claims involving a federal question.

10. Accordingly, this Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b), which provides that the notice of removal shall be filed within thirty (30) days after receipt by the Defendant, by service or otherwise, of a paper from which it may first be ascertained that the case is one which is or has become removable.

11. This action is one which may be removed to this Court by Northrop Grumman on the grounds of federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).

12. Northrop Grumman, if it is deemed to be a proper party, is entitled to rely on the federal officer removal statute because: (1) Northrop Grumman was acting under the direction of a federal officer or agency; (2) Northrop Grumman has colorable federal defenses arising out of its duties to the federal government; and (3) Northrop Grumman will demonstrate that there is a causal connection between the acts they performed under color of federal office and Plaintiffs' allegations in the case at bar. *See Mesa v. California*, 489 U.S. 121, 109 S. Ct. 953, 103 L. Ed.2d 99 (1989).

13. Plaintiffs base their claims against Northrop Grumman on alleged exposure to asbestos by Mr. Seitz while working on products manufactured, sold or distributed by Northrop Grumman.   On information and belief, to the extent that the design or manufacture of these products included asbestos-containing parts or components, such inclusion was explicitly and directly required by the United States Government in its detailed and precise specifications through and under the discretion of the Secretaries of the Departments of Defense and the United States Navy.   Any decision regarding asbestos in these products was under the full control and discretion of the United States Government.   *Green v. A.W. Chesterton Co.*, 366 F. Supp. 2d at 155-157 (citing *Freeberg v. Swinerton & Walberg Prop. Servs.*, 245 F. Supp. 2d 1144 (D. Colo. 2002)).

14. Northrop Grumman, if it is deemed to be a proper party, is entitled to rely on the government contractor defense (also referred to as the military contractor defense), which was developed from the principle of sovereign immunity.   This defense has also been described as derivative sovereign immunity.   This defense is uniquely federal in nature and thus displaces state law and is governed by federal common law.   *Boyle v. United Tech. Corp.*, 487 U.S. 500, 505 and 505 n.1, 108 S. Ct. 2510, 2514-15 and 2515 n.1 (1988) ("Another area that we have found to be of peculiarly federal concern, warranting the displacement of state law, is the civil liability of federal officials for actions taken in the course of their duty. We have held in many contexts that the scope of that liability is controlled by federal law. . . . [T]he liability of

independent contractors performing work for the Federal Government, like the liability of federal officials, is an area of uniquely federal interest."); *Yearsly v. Ross Constr. Co.*, 309 U.S. 18, 60 S. Ct. 413, 84 L. Ed. 554 (1940). *See also Zinck v. ITT Corp.*, 690 F. Supp. 1331, 1333 (S.D.N.Y. 1988) ("When a contractor acts under the authority and direction of the United States, it shares in the immunity enjoyed by the Government. . . . The application of this principle in a military context is even more sound because the government contractor defense serves not only the historic purpose, but it promotes and protects both the separation of powers and the military procurement process.").

15. The government contractor defense results in preemption of Plaintiffs' claims and shields Northrop Grumman from any liability for injuries arising from any exposure to asbestos while maintaining or piloting USMC aircrafts or serving on the aircraft carriers. *See Boyle*, 487 U.S. at 505-06, 108 S. Ct. at 2514-15; *Yearsly*, 309 U.S. at 20-21, 60 S. Ct. at 414 ("[I]t is clear that if [the] authority to carry out the project was validly conferred, that is, if what was done was within the Constitutional power of Congress, there is no liability on the part of the contractor for executing its will."); *City of Worcester v. HCA Mgmt Co.*, 753 F. Supp. 31, 37-38 (D. Mass. 1990) ("The Supreme Court has long held that, pursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government."). If it is deemed to be a proper party, Northrop Grumman can prove that it followed detailed instructions and specifications provided by the United States military, including the USMC and/or the United States Navy, and the services it performed conformed to those instructions and specifications.

16. The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow interpretation of § 1442(a)(1). *Willingham v. Morgan*, 395 U.S. 402, 405; 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1960).

17. Because Northrop Grumman satisfies the requirements for removal under 28 U.S.C. § 1442(a), it is entitled to remove this entire action.

18. Northrop Grumman is not required to notify and obtain consent of any other defendant in the action in order to remove Plaintiffs' action as a whole under 28 U.S.C. § 1442(a)(1) because the statute is jurisdictional in nature. *Ely Valley Mines Inc. v. Hartford Accident Indemnity Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981); *National Audubon Society v. Department of Water & Power of the City of Los Angeles*, 496 F. Supp. 499, 509 (E.D. Cal. 1980).

19. Northrop Grumman is also entitled to remove this case on the basis of federal question pursuant to § 1331 because Plaintiffs' claims arise under the laws of the United States, as explained in *Yearsly* and *Boyle*.

20. Whether Plaintiffs have stated a cause of action under which a military contractor can be liable or whether such claims are preempted is a uniquely federal issue that invokes this Court's jurisdiction pursuant to § 1331. *See Boyle*, 487 U.S. at 505, 108 S. Ct. at 2514-15.

21. Should Plaintiffs file a Motion to Remand this case, Northrop Grumman respectfully requests an opportunity to respond more fully in writing, including the submission of affidavits and authorities.

22. Northrop Grumman reserves the right to amend or supplement this Notice of Removal.

23. Northrop Grumman reserves all defenses, including, without limitation, the defense of lack of personal jurisdiction.

24. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on all parties and filed with the Prothonotary of the Superior Court of the State of Delaware, in and for New Castle County.

25.    A Notice of Tag-Along Action, identifying the coordinated pre-trial proceedings in the Eastern District of Pennsylvania (In Re Asbestos Products Liability Litigation, MDL Docket No. 875), to which this case may be transferred, will be filed with this Court.

WHEREFORE, PREMISES CONSIDERED, Defendant Northrop Grumman Corporation notes the removal of this action to this Court on the 12th day of June, 2008.

ELZUFON AUSTIN REARDON TARLOV & MONDELL, P.A.

/s/ *Penelope B. O'Connell*

Penelope B. O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181


Nancy Shane Rappaport (DE #3428)
DLA Piper US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Date:  June 12, 2008

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:  ASBESTOS LITIGATION:    )
    )
FREDERICK SEITZ and MARY    )
LOUISE SEITZ, his wife,    )
    )
    )
    Plaintiffs,    )    Case No. 1:08-cv-353 GMS
    )
    -vs.-    )
    )
ADEL WIGGINS GROUP, et al.,    )
    )
    Defendants.    )

---

## DEFENDANT NORTHROP GRUMMAN CORPORATION'S
## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

---

Penelope O'Connell (DE #4898)
ELZUFON AUSTIN REARDON TARLOV &
MONDELL, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA PIPER US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Date:  August 12, 2008

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDING......................................................... 1

II.    SUMMARY OF ARGUMENT ................................................................................. 2

III.   FACTUAL BACKGROUND .................................................................................. 3

     A.    The Complaint ............................................................................................ 3

     B.    Plaintiffs' Discovery Responses ................................................................. 4

     C.    Plaintiffs' Depositions ................................................................................ 4

     D.    U.S. Military Control Over Aircraft and Carriers Built by Northrop
            Grumman ..................................................................................................... 5

          1.    Chain of Command ......................................................................... 6

          2.    Government Contracts and Specifications................................... 7

          3.    Military Control Over Overhaul and Repair ................................ 8

IV.   ARGUMENT ........................................................................................................ 9

     A.    This Court Should Refrain From Ruling On Plaintiffs' Motion To Remand
            And Stay All Proceedings Pending Transfer To The MDL Court.......................... 9

     B.    Northrop Grumman's Right to Removal Cannot be Defeated by Plaintiffs'
            Purported "Waiver of Claims................................................................................ 9

          1.    The Federal Officer Removal is Based on Availability of a Federal
                Defense – a *Defense* That Plaintiffs Cannot Waive Despite Their
                Tactics ...................................................................................... 10

     C.    Court May Consider Supplemental Facts Contained in Subsequently Filed
            Affidavits .............................................................................................................. 12

     D.    Northrop Grumman's Properly Removed This Action Pursuant to the
            Federal Officer Removal Statute 28 U.S.C. § 1442 Et Seq. ................................ 13

          1.    Removal Under the Federal Officer Statute is to be Broadly
                Construed. .............................................................................. 13

          2.    Northrop Grumman Can Satisfy Each Required Element of the
                Federal Officer Removal Statute ............................................... 14

                a.    Northrop Grumman is a person within the meaning of the
                     statute ................................................................................. 15

                 b.    Northrop Grumman was acting under the direction of a
                     federal officer ..................................................................... 15

                     i.    The United States government issued detailed
                           specifications regarding the design and manufacture
                           of the Northrop Grumman aircraft at issue. ....................16

i

EAST\42058615.1

## TABLE OF CONTENTS

**Page**

    ii.    Northrop Grumman had no control over the thousands of component parts used, including engine......................16

    iii.    United States military officers were in charge of all work performed by Northrop Grumman and Mr. Seitz..........18

    iv.    Courts have consistently found that such circumstances warrant federal officer removal.............................…..20

  c.    Northrop Grumman can satisfy the requirement of a colorable federal defense ..............................................................23

    (i)    Northrop Grumman followed reasonably precise specifications from the military ........................................24

    (ii)    Equipment manufactured by Northrop Grumman conformed to military specifications ................................26

    (iii)    Military contractor defense applies to both design defect *and failure to warn claim* .....................................27

    (iv)    Northrop Grumman was only required to warn of dangers known to it, but not known to the government ....................................................................28

  d.    Northrop Grumman can also satisfy the causal nexus requirement of the federal officer removal statute.......................31

E.    This Case Should Remain, In Its Entirety, In Federal Court ...............................33

V.    CONCLUSION...................................................................................35

EAST\42058615.1

## TABLE OF AUTHORITIES

**Cases**

*Akin v. Big Three Industries, Inc.,*
  851 F. Supp. 819 (E.D. Tex. 1994) ...................................................................15

*Blackman v. Asbestos Defendants (BHC),*
  1997 U.S. Dist. Lexis 17821 (N.D. Cal. 1997) ........................................19, 20, 29

*Boyle v. United Techs. Corp.,*
  487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988) ...................................24, 27

*Butler v. Ingalls Shipbuilding, Inc.*
  89 F.3d 582 (9th Cir. 1996) ...................................................................32

*Carter v. Acands, Inc.,*
  2002 U.S. Dist. LEXIS 24057, 2002 WL 31682352 (E.D. Tex. 2002) ...................22, 32

*Cohn v. Petsmart, Inc.*
  281 F.3d 837 (9th Cir. 2002) ...................................................................13

*Collins v. Dartmouth Plan, Inc.*
  646 F.Supp 244 (D.Conn. 1986) ...........................................................9, 10

*Croker v. Borden, Inc.,*
  852 F.Supp 1322 (E.D. La. 1994) ...........................................................22

*Dewey v. Asbestos Defendants,*
  No. C-04-4645 (N.D. Cal. 2005) ...........................................................31

*Durham v. Lockheed Martin Corp.,*
  445 F.3d 1247 (9th Cir. 2008) ...........................................................14

*Faulk v. Owens-Corning Fiberglass Corp.*
  48 F.Supp.2d 653 (E.D. Tex. 1999) ...........................................................9

*Fiedt v. Owens Corning Fiberglass, Corp.,*
  153 F.3d 124 (3d Cir. 1998) ...........................................................14

*Fung v. Abex Corp.*
  816 F. Supp 569 (N.D. Cal. 1992) ........................................................17, 20, 31

*Good v. Armstrong World Industries,*
  914 F. Supp. 1125 (E.D. Pa. 1996) ........................................................15, 21, 22

*Hammond v. Terminal R.R. Ass'n of St. Louis,*
  848 F.2d 95 (7th Cir. 1988) .................................................................................................9

*Kolibash v. Committee On Legal Ethics of W.Va Bar,*
  872 F.2d 571 (4th Cir. 1989) ...............................................................................................14

*Lewis v. Babcock Indus., Inc.*
  No. 88 Civ. 1120 (JMC), 1992 WL 14271 (S.D.N.Y. June 8, 2992) .........................................26

*Machnik v. Buffalo Pumps, Inc.*
  506 F.Supp. 2d 99 (D.Conn. 2007)........................................................................................11

*Madden v. Able Supply Co.,*
  205 F. Supp. 2d 695 (S.D. Tex. 2002) ...................................................................................32

*Marley v. Elliot Turbomachinery Co.,*
  545 F.Supp. 2d 1266 (S.D. Fla..2008) ..................................................................................11

*McAboy v. IMO Industries,*
  C05-1241L, 2005 WL 2898047 (W.D. Wash. Oct. 27, 2005).....................................................33

*McFarlain v. Northrop Grumman Systems Corporation,*
  No. 05-1406-JJB-SCR, 2006 U.S. Dist., LEXIS 95421 (M.D.La.Feb.6, 2006)..........................10

*Mesa v. California,*
  489 U.S. 121, 103 L. Ed. 2d 99, 109 S.Ct. 959 (1989)...................................................14, 19, 31

*Miller v. Principal Life Ins. Co.*
  189 F.Supp. 2d 254 (E.D. Pa. 2002) ......................................................................................12

*Miller v. Diamond Shamrock Co.,*
  275 F.3d 414 (5th Cir. 2001) ...............................................................................................26

*Mitchell v. AC&S Inc.,*
  Civ. Act. No. 4:04cv2713, 2004 U.S. Dist. LEXIS 29504 (E.D. Va. Dec. 15, 2004).................22

*Nesbiet v. General Elec. Co.,*
  399 F.Supp. 2d 205 (S.D.N.Y. 2005)................................................................................30, 32

*Niemann v. McDonnell Douglas Corp.,*
  721 F.Supp. 1019 (S.D. Ill. 1989)................................................................26, 27, 28, 30

*Oberstar v. CBS,*
  CV 08-118 Pa, 2008 U.S. Dist. Lexis 14023 (C.D. Cal Feb. 11, 2008) .....................................10

*Oliver v. Oshkosh Truck Corp.,*
  96 F.3d 992 (7th Cir. 1996) ...........................................................................................................25

*Pack v. AC and S, Inc.,*
  838 F.Supp 1099 (D.Md. 1993)......................................................................................................22

*Quiles v. Sikorsky Aircraft,*
  84 F.Supp 2d 154 (D.Mass. 1999)..................................................................................................30

*Ramey v. Martin-Baker Aircraft Co.,*
  874 F.2d 946 (4th Cir. 1989) .........................................................................................................30

*Reed v. Fina Oil & Chem. Co.,*
  995 F.Supp. 705 (E.D. Tex. 1998)..................................................................................................30

*Steel Valley Auth. v. Union Switch & Signal Div.,*
  809 F.2d 1006 (3d Cir. 1987).........................................................................................................14

*Sun Buick, Inc. v. Saab Cars USA, Inc.,*
  26 F.3d 1259 (3d Cir. 1994)...........................................................................................................14

*Sundstrom v. McDonnell Douglas Corp.,*
  816 F. Supp 587 (N.D. Cal. 1993)..................................................................................................30

*Trevino v. General Dynamics Corp.,*
  865 F.2d 1474 (5th Cir. 1989) .......................................................................................................28

*USX Corp. v. Adriatic Ins. Co.,*
  345 F.3d 190 (3d Cir. 2003)...........................................................................................................12

*Venezia v. Robinson,*
  16 F.3d 209 (7th Cir. 1994) .....................................................................................................23, 24

*Williams v. GE,*
  418 F.Supp. 2d 610 (M.D.Pa. 2005)..............................................................................................23

*Williams-Ward v. Pitts,*
  908 F.Supp. 48 (D.Mass. 1995)......................................................................................................10

*Willingham v. Morgan,*
  395 U.S. 402 (1969).................................................................................................................12, 13

*Winters v. Diamond Shamrock Chemical Co.,*
  149 F.3d 387 (5th Cir. 1998) ................................................................15, 23

**Statutes**

28 U.S.C. § 1367(a) ........................................................................3, 33

28 U.S.C. § 1367(c) ...........................................................................34

28 U.S.C. § 1441(d) ...........................................................................12

28 U.S.C. § 1441 ...............................................................................14

28 U.S.C. § 1442 ...............................................................................17

28 U.S.C. § 1442(a) .................................................................21, 22, 32

28 U.S.C. § 1442 (a)(1)........................................................14, 15, 21, 22, 23

28 U.S.C. § 1442(a)(2)...........................................................................13

Defendant Northrop Grumman Corporation (hereinafter "Northrop Grumman") hereby opposes Plaintiffs' Motion to Remand this action to the Superior Court of the State of Delaware, in and for New Castle County, on the grounds that Northrop Grumman's removal of this action was proper.

## I.   NATURE AND STAGE OF THE PROCEEDING

On April 25, 2008, Plaintiffs Frederick and Mary Louise Seitz filed their Complaint in the Superior Court of the State of Delaware, in and for New Castle County, seeking to recover for personal injury allegedly resulting from exposure to asbestos containing products during occupational and non-occupational activities. *See* Complaint, attached hereto as **Exhibit A**. The Complaint, served on Northrop Grumman on May 13, 2008, asserted causes of action sounding in products liability and negligence. It further asserted that Mr. Seitz served in the United States Marine Corps ("U.S. Marine Corps") as a mechanic and pilot from 1946 to 1967. On June 4, 2008, Plaintiffs filed Answers to Standard Form Interrogatories and Standard Form Requests for Production, providing more detailed information as to the products from which they are claiming exposure and an alleged exposure history. These responses indicated Mr. Seitz was claiming exposure to asbestos while working on and/or piloting United States Government aircraft, some of which were allegedly built for the Government by Northrop Grumman. On June 10-11, 2008, Mr. Seitz was deposed, at which time he identified the specific military aircraft from which he claims asbestos exposure. The only exposure plaintiffs attribute to Northrop Grumman is from United States aircraft built for the United States Marine Corps.

Consequently, Northrop Grumman timely filed its Notice of Removal on June 12, 2008, and immediately thereafter filed a Motion to Stay these Proceedings pending transfer of this matter to MDL-875 for consolidated and coordinated pretrial proceedings, to which plaintiffs

filed a response in opposition. On July 21, 2008, the Judicial Panel on Multidistrict Litigation

filed a conditional transfer order for the transfer of this case to the Eastern District of

Pennsylvania. *See* Conditional Transfer Order, attached hereto as **Exhibit B**.

Plaintiffs filed a Motion to Remand this matter to state court on July 29, 2008. This is

Northrop Grumman's response in opposition to Plaintiffs' Motion to Remand.

## II.  SUMMARY OF ARGUMENT

Northrop Grumman properly removed this case to federal court because all claims

Plaintiffs have asserted against it give rise to a colorable defense governed by federal law.

Because subject matter jurisdiction unquestionably attaches to that defense, there is no basis for

remanding the case to state court. Doing so would strip Northrop Grumman of its right to argue

its primary defense in this action – a defense that cannot be waived by Plaintiffs without

dismissing all its claims against Northrop Grumman. For all the following reasons, Plaintiffs'

Motion should be denied.

First, this Court should refrain from ruling on Plaintiffs' Motion pending the transfer of

this case to MDL-875 for consolidated and coordinated pretrial proceedings.

Second, Northrop Grumman timely and properly removed this case on the basis of

Northrop Grumman's federal defense, namely the federal officer removal statute. Although

Plaintiffs have filed a "waiver" of certain claims (presumably for the sole purpose of fighting this

removal, having recognized that their claims do, indeed, subject the case to federal officer

removal), this attempt does not defeat removal and certainly is not sufficient basis for remand.

Third, Northrop Grumman is entitled to have the claims against it heard in federal court

because it has met the prerequisites for federal officer removal under 28 U.S.C. § 1442(a)(1).

The provisions of the federal officer removal statute are to be broadly construed. Specifically,

2

Northrop Grumman can show that (a) it is a person within the meaning of the statute; (b) the Plaintiffs' claims are based upon its alleged conduct acting under a federal officer; (c) it has a colorable federal defense to Plaintiffs' claims; and (d) there is a causal nexus between the claims and the conduct performed under color of federal office. As to the colorable federal defense, Northrop Grumman is entitled to the protections of the military contractor defense. Plaintiffs' produce liability claims against Northrop Grumman are barred because Northrop Grumman can prove that (1) the United States issued and approved reasonably precise specifications for the military aircraft that it was building; (2) the military aircraft conformed to those specifications; (3) the defense applies to design defect and failure to warn cases; and (4) the United States knew about the dangers of asbestos, such that Northrop Grumman was not required to warn the United States. Northrop Grumman is not required to prove that it is entitled to the military contractor defense at this stage; rather, it is only required to show a colorable defense.

Finally, after denying Plaintiffs' Motion to Remand, this Court should retain supplemental jurisdiction over this controversy in its entirety pursuant to 28 U.S.C. § 1367(a).

## III.   **FACTUAL BACKGROUND**

### A.   **The Complaint**

Plaintiffs' Complaint contains products liability based claims, sounding in negligence, willful and wanton conduct, and strict liability. *See generally* Exh. A. The Complaint contains vague and general allegations that Plaintiff Frederick Seitz was exposed to asbestos containing products manufactured, sold, distributed, or installed by the defendants. It includes allegations of exposure to Northrop Grumman products from 1946 to 1967 while Mr. Seitz served as an aircraft and helicopter mechanic and a pilot in the U.S. Marine Corps at various locations. *Id.* at ¶ 2.

### B.    Plaintiffs' Discovery Responses

Plaintiffs' Answers to Standard Form Interrogatories, filed on June 4, 2008, identify the specific models of Northrop Grumman aircraft that Mr. Seitz worked on and piloted, confirming that removal was proper.  The Answers reference "Plaintiff's Work History," which states that while serving in the U.S. Marine Corps as an aircraft mechanic, Mr. Seitz worked on various aircraft, including the F6, F7F-3, F9F, and F11F-1, which were manufactured by Northrop Grumman-owned entities.  In the course of his work on these aircraft, Mr. Seitz also claims to have "worked with a variety of asbestos-containing products including but not limited to engines and engine components, brakes, brake linings, and other brake parts, clamps, and gaskets." *See* Plaintiffs' Standard Form Interrogatory Responses and Referenced Employment and Work Histories, attached hereto as **Exhibit C**.  All Northrop Grumman products Mr. Seitz claims to have caused his asbestos exposure were aircraft that were designed and manufactured at the specific direction of the United States military, including each of its component parts.

### C.    Plaintiff's Deposition

On June 10 and 11, 2008, Plaintiff Frederick Seitz was deposed.  Through Mr. Seitz's testimony, defendants learned more information about the products involved.  Specifically, Mr. Seitz provided details as to the aircraft and aircraft carriers he worked on while he was in the U.S. Marine Corps.  Relevant to Northrop Grumman, he testified that while a mechanic in the U.S. Marine Corps, he worked on the F6F-5P and F7F-3P Tigercat.  *See* Frederick Seitz Video Dep. at 18, attached hereto as **Exhibit D**.  Plaintiff testified that he maintained and repaired the aircraft in strict accordance with manuals provided to him.  *Id.* at 17-19, 21.  Plaintiff also identified additional aircraft that he piloted during his service in the U.S. Marine Corps but testified that during his time as a pilot, he did not work on the maintenance of these aircraft and

only oversaw others doing so. *Id.* at 33-34. Furthermore, Mr. Seitz testified while he believed he was exposed to asbestos as a mechanic, he did not believe he was exposed to any asbestos from flying. *See* Seitz Dep. at 88-90, 96, 103, attached hereto as **Exhibit E**.

**D.      United States  Military Control Over Aircraft and Carriers Built by Northrop Grumman**

The primary business of Northrop Grumman as a contractor for the United States military is the construction of military equipment, including aircraft and carriers. *See* Affidavit of John F. DeBois (hereinafter "DeBois Aff.") at ¶ 13, attached hereto as **Exhibit F**. Northrop Grumman does not manufacture military aircraft and aircraft carriers for the U.S. Marine Corps and/or the U.S. Navy for any purpose other than to meet the defense needs of the United States government. *Id.* at 18. Moreover, the United States military asserted extensive control over the specifications for the design and manufacture of those aircraft and aircraft carriers. *See id.* at ¶¶ 4, 7, 17, 20.

**1.      Chain of Command**

All Navy and U.S. Marine Corps aircraft and aircraft carriers are manufactured according to plans and specifications defined exclusively by the United States government, specifically Naval Air Systems Command ("NAVAIR") and Naval Sea Systems Command ("NAVSEA").[1] *See* DeBois Aff. at ¶ 5 and fn. 1. (Exh. F). The chain of command within the U.S. Marine Corps concerning aircraft-building involves multiple tiers of authority. DeBois Aff. at ¶ 5. Foremost authority resides with the Secretary of the Navy for Navy personnel and operations, including the construction, outfitting, and repair of aircraft. *Id.* Immediately below and reporting to the Secretary is the Assistant Secretary of the Navy (Research, Development and Acquisition), whose responsibility includes the development and acquisition of U.S. Marine Corps aircraft and aircraft

---

[1] *See* 10 U.S.C. Sec. 5061 (2007) ("The Department of Navy is composed of the following: . . . c. the Headquarter, Marine Corps; d. the entire operating forces, including naval aviation, of the Navy and of the Marine Corps, and the

carriers through command of an organization that includes the Deputy Assistant Secretary of the

Navy (Air Programs). *Id.* The Deputy Assistant Secretary of the Navy (Air Programs) is the

principal advisor and coordinator for the Assistant Secretary on all matters pertaining to Marine

Corps aircraft, and monitors and advises the Assistant Secretary on programs managed by

NAVAIR. *Id.*

Under the command of NAVAIR, the Navy's aircraft building organization includes several

divisions responsible for aircraft design, manufacture, repair, and inspection. *Id.* at ¶ 6. Technical

and contractual control over shipboard equipment and material is directed by NAVAIR. *Id.*

NAVAIR has oversight responsibility concerning all aircraft built for the U.S. Navy. *Id.* This

oversight is performed by the local Defense Contract Management Agency ("DCMA"). *Id.*

DCMA directly monitors and manages compliance with the standards and specifications required

for aircraft built for the Marine Corps. *Id.*

The Navy, specifically NAVAIR, defines the U.S. Navy's requirements for aircraft

equipment and materials in detailed technical specifications that include state of the art

specifications known as "MilSpecs," and any changes or revisions to those specifications are

made exclusively by the Navy pursuant to formal procedures. *See* DeBois Aff. at ¶ 7 (Exh. F).

NAVAIR is responsible for defining the Navy's requirements in these specifications largely

because it has superior knowledge and expertise concerning the Navy's combat and combat-

ready missions and procuring particular aircraft needed to fulfill these missions. *Id.*

Pursuant to these defined procedures for the U.S. Navy's procurement of aircraft, the U.S.

Navy maintained an extensive level of supervision and control over the manufacture of aircraft for

the U.S. Navy by private contractors, including Northrop Grumman. *See* DeBois Aff. at ¶ 8 (Exh.

---

reserve components of those operating forces; e. all field activities, headquarters, forces, bases, installations, activities and functions under the control or supervision of the Secretary of the Navy . . . .").

F).  NAVAIR approved the initial conceptual design for all classes of aircraft, including the

weight, size, power output, speed, and other design parameters.  *Id.* at ¶ 9.  In the design phase, as

in all other phases, the U.S. Navy retained ultimate decisional authority over the design of aircraft.

*Id.*  If a design disagreement arose between the Navy and Northrop Grumman, the Navy controlled

the design adopted.  All final drawings and specifications required express U.S. Navy approval and

adoption.  *Id.*

### 2.        Government Contracts and Specifications

The contract documents for military aircraft and aircraft carriers construction and overhaul

are extensive and detailed.  The contracts often include multiple volumes of specifications and

detailed drawings.  *See* DeBois Aff. at ¶ 7 (Exh. F).  The specifications include or incorporate by

reference provisions from an extensive set of general specifications governing all aspects of

aircraft-building for the United States military, as well as Department of Defense or MilSpecs.  *Id.*

The MilSpecs incorporated several lower-level specifications, which together totaled several

thousands of pages, and included requirements for the materials to be used, including asbestos-

containing materials such as thermal insulation.  *Id.*

Mr. Seitz testified he worked on military aircraft and aircraft carriers.  Seitz Video Dep.

at 17, 34 (Exh. D).  Contracts entered into between Northrop Grumman and Bureau of

Aeronautics typically specified the exact components Northrop Grumman was required to use,

down to the part number.  *See* Selected specifications for the F6F3 and F7F3 attached hereto as

**Exhibit G1** at 23, 24, 31, 47, 50; **Exhibit G2** at 13, 19, 29, 39, 43; **Exhibit G-3** at 12, 13, 14,

21, 22, 23, 24, 25, 34, 36, 37, 38; DeBois Aff. at ¶¶ 7, 16-17 (Exh. F).  The component parts

were manufactured according to government specifications, approved by the government, and

supplied by outside contractors to Northrop Grumman for use in the aircraft.  *Id.* at ¶ 21.  Even

though the contracts do not always specify the materials used to make the components, Northrop Grumman was required to use the components it was provided, regardless of how they were made. *See id.* at ¶¶ 17, 20, 21. Thus, the contract entered into between Northrop Grumman and the Bureau of Aeronautics in 1945 for such aircraft may have required conformity with specifications requiring asbestos for a number of applications.

### 3.    Military Control Over Overhaul and Repair

With regard to the overhauling, and repair of aircraft, the processes and level of government control over Naval construction by Northrop Grumman was essentially the same as new aircraft construction. *See* DeBois Aff. at ¶ 22 (Exh. F). The specifications for material were just as detailed and were required by the Navy. *Id.* Indeed, in some instances, the level of control exercised by the Navy was greater during overhauls and refueling, which involves substantial rebuilding of major parts of the aircraft. *Id.*

All overhaul and repair of Navy aircraft by Northrop Grumman was done in accordance with binding Navy specifications and approved exclusively by the Navy and its designated officers. *Id.* In order for Northrop Grumman to comply with the United States specifications for its aircraft, Northrop Grumman would have had such specified materials on hand, possibly including asbestos-containing materials. *See id.* at ¶¶ 20, 22, 27.

Northrop Grumman incorporates by reference all facts stated in the affidavits, contracts and specifications attached as exhibits to this brief, as factual support of its Opposition to Remand.

IV.   **ARGUMENT**

A.   **This Court Should Refrain From Ruling On Plaintiffs' Motion To Remand And Stay All Proceedings Pending Transfer To The MDL Court.**

As a threshold matter, the Court should refrain from ruling on Plaintiffs' Motion pending the expected transfer of this case to MDL-875 for consolidated and coordinated pretrial proceedings. As set forth in Northrop Grumman's Motion to Stay (incorporated herein by reference), a stay or deferral of all proceedings – including consideration of Plaintiffs' Motion – pending transfer to the MDL Court is warranted to meet the goals of uniformity and efficiency that multi-district litigation is designed to serve. If this Court declines to stay proceedings, which it should not, Plaintiffs' Motion should be denied because this case was properly removed to this court pursuant to 28 U.S.C. § 1442, the "Federal Officer Removal" statute.

B.   **Northrop Grumman's Right to Removal Cannot be Defeated by Plaintiffs' Purported "Waiver of Claims."**

Effectively conceding their products liability claims subject them to removal in this case, plaintiffs attempt to "waive" all but their failure to warn claim solely for the purpose of defeating removal. Such tactics are ineffective, however, because the law is clear plaintiffs cannot waive Northrop Grumman's federal defense in this action.

Removal of a case is based upon the language in the complaint at the time of removal. *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 658 (E.D. Tex. 1999). When crafting a complaint for state court, a plaintiff who asserts both state and federal claims runs the risk of removal based on the federal claims. *Collins v. Dartmouth Plan, Inc.*, 646 F.Supp. 244, 246 (D.Conn. 1986). Therefore, once a defendant properly removes a case to federal court, a plaintiff may not defeat that removal by simply amending the complaint to eliminate federal claims. *Faulk*, 48 F.Supp.2d at 658; *see Hammond v. Terminal R.R. Ass'n of St. Louis*, 848 F.2d

95, 97 (7th Cir. 1988) (stating that the plaintiff cannot defeat removal by filing a new complaint or deleting the federal claim).  Federal jurisdiction survives any such attempts to amend the complaint.  *Collins*, 646 F.Supp. at 246.

In *Williams-Ward v. Pitts*, the court held that despite the plaintiff's attempts to waive the federal claims based on which the defendant properly removed the case, the federal court would retain jurisdiction as long as the case was properly removed.  908 F.Supp. 48, 52 (D.Mass. 1995).  In *McFarlain v. Northrop Grumman Systems Corporation*, the court held that despite the plaintiff's willingness to waive the design defect claims upon which the defendant had properly removed (as the Seitz' do here), *the court must still consider those claims because they were present at the time of removal.*  No. 05-1406-JJB-SCR, 2006 U.S. Dist. LEXIS 95421, at *16-17 (M.D. La. Feb. 6, 2006).

In this case, the Complaint originally contained counts for negligence, willful and wanton conduct, strict product liability, and loss of consortium.  The negligence and strict liability counts included claims for failure to warn, design defect, and manufacturing defect.  Northrop Grumman properly removed the case because it maintains a defense grounded in federal law to *all* these claims.  While Plaintiffs assert that they are waiving their original claims, in fact, they are attempting to informally amend their original complaint for the sole purpose of defeating removal.  Yet, Northrop Grumman's defense is not waivable by Plaintiffs so long as they are asserting any claims against Northrop Grumman under these circumstances.

### 1.     Federal Officer Removal is Based on Availability of a Federal Defense – a *Defense* That Plaintiffs Cannot Waive Despite Their Tactics.

Regardless of the legitimacy of Plaintiffs' "waiver of claims," Northrop Grumman's removal cannot be defeated because it is based on a federal *defense*.  The federal officer removal statute is premised on the existence of a federal defense, rather than a plaintiff's artfully

constructed complaint. *Oberstar v. CBS*, CV 08-118 PA, 2008 U.S. Dist. LEXIS 14023, at *8
(C.D. Cal. Feb. 11, 2008).

Where removal is based on the defendant's reliance on a federal defense rather than on
the construction of the plaintiffs' complaint, waiving federal claims does not lead to remand. *See
Oberstar*, 2008 U.S. Dist. LEXIS 14023, at *7 (holding that plaintiffs' motion to remand
disclaiming causes of action for injuries caused by exposure to asbestos dust that occurred in a
federal enclave did not defeat federal subject matter jurisdiction because the defendant removed
based on the federal defense, not based on the claims);[2] *Machnik v. Buffalo Pumps, Inc.*, 506
F.Supp. 2d 99, 103 n.1 (D.Conn. 2007) (stating that subject matter jurisdiction is based on a
federal defense regardless of whether the plaintiff's cause of action rests on state law); *Marley v.
Elliot Turbomachinery Co., Inc.*, 545 F.Supp.2d 1266, 1274 (S.D. Fla. 2008) (finding that in
order to determine whether plaintiffs' disclaimer of claims arising from an act or omission
compelled by the Navy applied, a federal court would have to determine whether the defendant's
omission was caused or required by the government contract). Defendants have the right to have
the validity of the military contractor defense tried in federal court. *Id.* A disclaimer removing
that right defeats the purpose of the federal officer removal statute.

Moreover, in order for Plaintiffs to defeat removal against Northrop Grumman, they
would need to dismiss *all* their claims against it because even a failure to warn claim gives rise to
federal officer removal. As set forth in detail later in this brief, Northrop Grumman has

---

[2] Cf. Westbrook v. Asbestos Defendants (BHC), No. C-01-1661 VRW, 2001 U.S. Dist. LEXIS 11575, at *6-7
(N.D. Cal. July 31, 2001). In Westbrook, the plaintiff disclaimed any claims arising out of work done on U.S. Navy
ships. The court decided plaintiff's disclaimer was effective and granted motion for remand. The court based its
decision on the absence of a colorable defense and the specific language of the disclaimer. In Oberstar, plaintiffs
did not disclaim claims against defendants arising out of exposure occurring on Navy vessels. Using this
difference in language, the District Court in Oberstar explained that the language that plaintiffs used in Oberstar did
not make remand appropriate.

sufficient basis for a defense that the United States government prevented it from warning mechanics like Mr. Seitz of the dangers of asbestos.

Northrop Grumman's removal was based on the federal officer removal statute and not on the face of the Complaint. U.S.C. §1442(a)(1). Thus, even if this Court permits Plaintiffs' waiver, it will not affect the availability of Northrop Grumman's federal defense and the case is still properly removed.

### C.    This Court May Consider Supplemental Facts Contained in Subsequently Filed Affidavits.

Northrop Grumman is entitled to present factual support for its removal after it has filed its Notice of Removal. First, and most simply, the federal courts require "notice" pleading. Section 1446(a) was amended to require defendants to conform to the "less onerous standard of notice pleading," and defendants are required to file only a Notice of Removal. *Miller v. Principal Life Ins. Co.*, 189 F. Supp. 2d 254, 257 n.2 (E.D. Pa. 2002).

Second, the United States Supreme Court in *Willingham v. Morgan*, 395 U.S. 402, 408 n.3 (1969), specifically allowed an affidavit to be filed in support of removal, even though it was not offered until a later proceeding. Similarly, in *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190 (3d Cir. 2003), the Third Circuit Court of Appeals permitted the consideration of facts contained in an affidavit which were relevant to the party's jurisdictional basis for removal under 28 U.S.C. § 1441(d) that were first submitted in response to a motion to remand an insurance policy coverage case to state court.

In doing so, the Third Circuit referenced *Willingham*, noting "the Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal." *Id.* at 206. The Court went on to note that "other courts more recently have allowed consideration of facts contained in later-filed

affidavits, treating those facts as an amendment of the notice of removal under § 1653," regarding amendments of pleadings to show jurisdiction. *See id.*, citing *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n.1 (9th Cir. 2002) (holding that the district court did not err in construing an affidavit setting forth the facts supporting the amount in controversy in a diversity case as an amendment under § 1653 to the notice of removal which stated summarily, without alleging any underlying facts, that the amount in controversy exceeded $ 75,000); *Miller,* 189 F. Supp. 2d at 257-58 (holding that, even assuming that the defendant's initial removal petition was defective in that it did not state that a codefendant was only a nominal defendant, *Willingham* permitted treatment of an amended notice of removal filed more than 30 days after the filing of the original removal notice and after service of a motion to remand as an amendment of the original notice under § 1653).

These cases illustrate that this Court is not precluded from considering facts contained in affidavits, or otherwise, that are filed concurrently with Northrop Grumman's Opposition to Plaintiffs' Motion to Remand.

**D.     Northrop Grumman Properly Removed This Action Pursuant to the Federal Officer Removal Statute 28 U.S.C. § 1442 Et Seq.**

**1.     Removal Under the Federal Officer Statute is to be Broadly Construed.**

The United States Supreme Court in *Willingham v. Morgan*, 395 U.S. 402 (1969), has held that 28 U.S.C. § 1442(a)(2) is not "narrow" or "limited." *Id.* at 406. The Court explained that "Congress has decided that federal officers . . . require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of 28 U.S.C. § 1442(a)(1)." *Id.* at 407. *Accord* 16 MOORE'S FEDERAL PRACTICE REMOVAL § 107.15[1][b] (3d ed. 2005) ("[A]t the same time Congress has gradually restricted the right of removal under the general removal statute, it has broadened the right of removal for federal . . . officers."). This

13

broad construction applies not only to federal officers, but with equal force to their agents as well. *See Durham vs. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2008) ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers, and their agents are seeking a federal forum, we are to interpret 28 U.S.C. § 1442 broadly in favor of removal.").

Similarly, the Third Circuit has drawn a distinction between the provisions of the federal officer removal statute, which are to be "broadly construed," and provisions of 28 U.S.C. § 1441, which "'are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" *Id.* (quoting *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987), and *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994); *see also Kolibash v. Committee On Legal Ethics of W. VA Bar*, 872 F.2d 571, 576 (4th Cir. 1989) (noting "the right of removal conferred by 28 U.S.C. § 1442(a)(1) is to be broadly construed").

In light of federal law favoring removal, and as explained in additional detail below, Northrop Grumman has satisfied 28 U.S.C. § 1442(a)(1) and, thus, Plaintiffs' motion should be defeated.

> ## 2.   Northrop Grumman Can Satisfy Each Required Element of the Federal Officer Removal Statute.

Within the Third Circuit, the prerequisites for Federal Officer Removal under §1442(a)(1) are met when a Defendant can show that "(1) it is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' a federal office; (3) it raises a colorable federal defense [to plaintiff's claims]; and (4) there is a causal nexus between the claims and the conduct performed under color of federal office." *Fiedt v. Owens Corning Fiberglass Corp.*, 153 F.3d 124, 127 (3d Cir. 1998); *Mesa v. California*, 489 U.S. 121, 124-25, 134-35, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989). Each element necessary to

establish federal officer removal jurisdiction in this case is satisfied as to Northrop Grumman, and removal is therefore proper.

### a.    Northrop Grumman is a "person" within the meaning of the statute.

Northrop Grumman is entitled to the protections of the statute, as corporations are "persons" within the meaning of 28 U.S.C. § 1442(a)(1).  *See Good v. Armstrong World Industries*, 914 F. Supp. 1125 (E.D. Pa. 1996) (recognizing Westinghouse, a corporation that designed and manufactured turbines, was a "person" within the meaning of the federal officer removal statute); *see also Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (holding that a corporate manufacturer of Agent Orange was a "person" within the meaning of the federal officer removal statute); *Akin*, 156 F.3d 1030 (holding that a corporate manufacturer of chemicals used by Air Force employees met all criteria for federal officer removal); *Blackman v. Asbestos Defendants (BHC)*, 1997 U.S. Dist. Lexis 17821, *5 (N.D. Cal. 1997) (concluding that a corporation is a person under the statute).  Plaintiffs have not disputed this fact.

### b.    Northrop Grumman was acting under the direction of a federal officer.

Northrop Grumman satisfies the second requirement of the statute for federal officer removal jurisdiction that it "acted under" the direction of a federal officer.  The "acting under" element of federal officer removal is satisfied where a government contractor manufactures products under the authority of a federal officer or agency that wields direct control over the products' manufacture.  *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993).  Here, the element is satisfied because Northrop Grumman was acting under the direction of a federal officer, namely the Secretary of the Navy, the Deputy Assistant Secretary of the Navy (Air Programs), the Deputy Assistant Secretary of the Navy for Ship Programs, and contracting

officers with NAVAIR and NAVSEA, when it manufactured the military aircraft and aircraft carriers that Plaintiff has identified.  *See* DeBois Aff. at ¶¶ 5, 24-25 (Exh. F).  Furthermore, to the extent that Plaintiffs seek to impose strict liability on Northrop Grumman for its alleged use of asbestos in these products, Northrop Grumman was also acting under the direction of a federal officer and was required to have available and install any material necessary to build the aircraft and aircraft carriers to the specifications of the military.

       **i.**      **The United States government issued detailed specifications regarding the design and manufacture of the Northrop Grumman aircraft at issue.**

The United States government provided detailed plans and specifications for these military aircraft and parts.  *See* DeBois Aff. at ¶¶ 5-7, 9 (Exh. F); Affidavit of Christopher Knott (hereinafter "Knott Aff.") at ¶¶ 5-6, attached hereto as **Exhibit O**; *see, e.g.,* Select Specifications for the F6F3 and F7F3 (Exhs. G1-G3), Erection and Maintenance Handbook for Navy Models F7F-1N, F7F-3, F7F-4N, F7F-2N, F7F-3N, F7F-3P Airplanes, Oct. 1, 1947 (attached hereto as **Exhibit H**); Illustrated Parts Catalog for F6F-3, F6F-3N, F6F-5, F6F-5N Airplanes, Apr. 15, 1944 (attached hereto as **Exhibit I**); Preliminary Handbook of Erection and Maintenance Instructions Navy Model F6F-3, F6F-3N, F6F-5, F6F-5N, British Models Hellcat I, Hellcat II Airplanes, June 1, 1945 (attached hereto as **Exhibit J**).  These specifications and guidelines routinely provided by the military mandated the use of specific parts that may have contained asbestos in aircraft produced for the military. *Id.*; *see* DeBois Aff. at ¶ 27 (Exh. F).

       **ii.**     **Northrop Grumman had no control over the thousands of component parts used, including engines**

Additionally, the parts used and specifications followed on Northrop Grumman aircraft were specified in manuals published by the Navy and any repairs or replacements to parts on Northrop Grumman aircraft were dictated by manuals published by the Navy.  Seitz Video Dep.

at 18-19, 21, 24 (Exh. D); Seitz Dep. at 47, 61, and Dep. Exhs. DF-1, DF-2 and DF-3 (Exh. E).

Some parts, including certain engines and brake and wheel systems, were Government Furnished

Equipment ("GFE") supplied by the government to Northrop Grumman. *See* DeBois Aff. at ¶ 21

(Exh. F); Knott Aff. at ¶ 6 (Exh. O). While contracts for each aircraft governed the relationships

between the manufacturer and the Navy, applicable general specifications also affected the

relationship.  For example, the general specifications applicable to the F7F-1 aircraft state, "All

specifications referred to in this contract and not otherwise identified are specifications of the

Bureau of Aeronautics, Navy Department." *See* Cost-Plus-Fixed-Fee Contract between the

United States of America and Grumman Aircraft Engineering Corp., Apr. 1, 1944 at 2 (attached

hereto as **Exhibit K**); *see also* Knott Aff. at ¶¶ 5-6 (Exh. O). Accordingly, any changes or

modifications to the manufacture of this aircraft by Northrop Grumman had to be documented in

writing and, after review and approval by the Government, incorporated into the contracts.  *See*

DeBois Aff. at ¶¶ 17, 25 (Exh. F); Knott Aff. at ¶ 5 (Exh. O).  Inspections of aircraft or aircraft

component parts were either supervised by or conducted by the government before acceptance.

*See, e.g.,* Navy Department, Bureau of Aeronautics, Contract NOa(s)-1679, Amendment No. 7,

at 7 ("Upon delivery of the first [F7F model] airplane . . . to the Government . . . such trials of

the airplane shall be conducted by the Navy Department (Board of Inspection and Survey) as

may be considered necessary by it for the purpose of determining whether or not the contract

guarantees have been fulfilled and the airplane is satisfactory for service use.") (Attached hereto

as **Exhibit L**); U.S. Naval Air Test Center, Report of Flight Test Division on Service Acceptance

Trials of the Model F7F-3 Airplane, Apr. 9, 1948 (Attached hereto as **Exhibit M**); DeBois Aff.

at ¶ 26 (Exh. F).  Accordingly, the Government exercised the "direct and detailed control" over

Northrop Grumman aircraft manufactured for the military required to support removal under §

1442. *See Fung v. Abex Corp.*, 816 F. Supp. 569, 573 (N.D. Cal. 1992) (finding direct and detailed control where the government inspected, tested and approved materials, but did not actually supply the materials).

Just as Mr. Seitz was required to use parts specified in manuals published by the Navy and obtained from Navy supply, Northrop Grumman was directed to use only the Government-specified parts and had no discretion in choosing the parts or the materials used in those parts. *See* DeBois Aff. at ¶¶ 17, 20, 21 (Exh. F); Knott Aff. at ¶ 6 (Exh. O). Through manuals and specifications, the United States government specified the very components Northrop Grumman was required to use, down to the part number. *See* Select Specifications for the F6F3 and F7F3 (Exhs. G1-G3). The component parts were manufactured according to government specifications, approved by the government, and supplied by outside contractors to Northrop Grumman for use in the aircraft. DeBois Aff. at ¶ 21 (Exh. F); Knott Aff. at ¶ 6 (Exh. O). Northrop Grumman was required to use the components it was provided, regardless of how they were made and what materials were made in their manufacture. DeBois Aff. at ¶ 21 (Exh. F). Regardless of whether or not the parts were "stock" equipment and were not specifically designed for the Navy, these parts were either provided to Northrop Grumman by the Navy or the Navy specified which products Northrop Grumman was to use—composed of whatever materials they were made of when selected by the Navy—and Northrop Grumman incorporated them into the aircraft by the methods the government specified to the extent required by its government contract.

iii.     **United States military officers were in charge of all work performed by Northrop Grumman and Mr. Seitz.**

Moreover, superior officers with binding authority were in charge of the work done by Mr. Seitz. *See* Seitz Dep. at 61 (Exh. E). These officers directly oversaw every step of

production of Northrop Grumman aircraft manufactured for the Navy. *See* DeBois Aff. at ¶ 24 (Exh. F). The contracting officers controlled the plans and specifications that governed Northrop Grumman's manufacture of aircraft for the Navy. *Id.* at ¶ 25. Thus, Northrop Grumman has met its burden under the "acting under" prong of the *Mesa* analysis and removal is proper.

Northrop Grumman acted under the direction of a federal officer when manufacturing the military aircraft and aircraft carriers upon which Plaintiff worked. *See* DeBois Aff. at ¶¶ 6, 24 (Exh. F); Seitz Dep. at 60-62, 66, 118 (Exh. E). During all phases of its construction of military aircraft and aircraft carriers for the U.S. Marine Corps, Northrop Grumman has performed its work under immediate supervision and control by NAVAIR and NAVSEA. *See also* Contract NOa(s)-1679 between Grumman Aircraft Engineering Corp. and the Bureau of Aeronautics, May 13, 1944, (Exh. L at section 19) (stating that Grumman Aircraft Engineering Corp. may not revise government contract specifications, drawings or design without prior written agreement with or approval from the contracting officer).

Plaintiff Frederick Seitz himself testified about the extent of control the U.S. Navy asserted over Northrop Grumman, the work he was doing and the military aircraft and aircraft carriers on which he worked. Seitz Dep. at 61-62 (Exh. E). The line chief would direct Mr. Seitz to the aircraft on which he had to work. *Id.* at 61. Mr. Seitz would follow the inspection requirements and would only use parts that met the requirements set in the U.S. Government-issued manuals. *Id.* Mr. Seitz testified that he did not have any choice but to use the parts specified in those manuals and identified by military issued parts numbers. *Id.* at 61. He strictly followed the orders he got from his superiors. *Id.* at 160.

Contracts between the military and Northrop Grumman typically required Northrop Grumman to comply with contract terms, contract plans, and specifications subject to review and

approval by the Government. *See* DeBois Aff. at ¶ 12 (Exh. F); *see also* Knott Aff. at ¶ 5 (Exh. O). The work Mr. Seitz performed on aircraft and aircraft carriers was pursuant to work plans, technical manuals and other design data produced by the military, which were required to be used without deviation, unless deviations are authorized by the Navy. *See* DeBois Aff. at ¶ 17.

Likewise, it is beyond dispute that Northrop Grumman constructed military aircraft, including those on which Mr. Seitz worked, according to precise, *detailed specifications promulgated by NAVAIR that may have required the use of asbestos-containing products. See* DeBois Aff. at ¶ 27 (Exh. F). Mr. Seitz testified that initial specifications and plans for military aircraft were issued by the Navy. Seitz Video Dep. at 18-19 (Exh. D); Seitz Dep. at 161 (Exh. E). These specifications, which totaled several thousands of pages, were based on the Navy's superior knowledge and expertise regarding the Navy's combat needs and could only be changed by Navy's officials. *See* DeBois Aff. at ¶ 7 (Exh. F). Any use of asbestos products, as with all other aspects of manufacturing the aircraft and carriers for the military, would have been pursuant to strict direction and control of officers of the United States military. Government specifications for Northrop Grumman aircraft were extraordinarily specific. *See id.* at ¶¶ 20, 25 (Exh. F); Select Specifications for F6F3 and F7F3 (Exhs. G1-G3).

> iv.    **Courts have consistently found that such circumstances warrant federal officer removal.**

Courts addressing similar factual situations have found that military contractors are entitled to federal officer removal and are "acting under" a federal officer for the purpose of the statute. In *Fung v. Abex Corp.*, the plaintiff alleged personal injuries arising out of his exposure to asbestos while serving in the U.S. Navy aboard a submarine. The manufacturer of the submarine was found to have satisfied the "acting under" prong of the statute because it was

"authorized to build submarines under a federal contract" and was under "the direct control of the Secretary of the Navy." 816 F. Supp. 569, 572 (N.D. Cal. 1992).

Also, in *Blackman v. Asbestos Defendants (BHC),* the plaintiff filed suit against a rocket manufacturer for personal injuries alleged to have resulted from his work assembling rocket parts. 1997 U.S. Dist. Lexis 17821 (N.D. Cal. 1997). The court found that the manufacturer was acting under a federal officer because the rockets and their parts were being manufactured pursuant to a contract with the United States Air Force, under which the U.S. Air Force exerted direct control. *Id.* at *6. Additionally, the court found that rocket motors manufactured by the defendant were made according to designs and specifications provided by the Air Force, designs which required the use of asbestos. *Id.* For these same reasons, Northrop Grumman has satisfied the "acting under" prong of the statute.

Plaintiffs' reliance on *Good v. Armstrong World Industries,* 914 F. Supp. 1125 (E.D. Pa. 1996) for the notion that "if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to removal" is inapposite. In *Good,* which involved removal of a case to federal court premised on 28 U.S.C. § 1442(a), the court found that the defendant did not establish that it acted under the direct and personal control of a single, specific federal officer, namely the Secretary of the Navy. The *Good* court found that Westinghouse had designed and manufactured the equipment at issue in accordance with the specifications and regulations mandated by the U.S. Navy, but it did not consider this to be sufficient to remove under § 1442(a)(1), because Westinghouse was not acting directly under control of the Secretary of the Navy, as it had suggested in its Notice of Removal. *See Good,* 914 F. Supp. at 1130. The court in *Good* read the statute literally, requiring that the contractor

21

act under the direct control of the Secretary of the Navy himself, or another officer of the United

States by stating:

> Removal must be predicated upon a showing that the acts forming
> the basis of the state suit were performed pursuant to an officer's
> direct orders or comprehensive and detailed regulations. (internal
> citations omitted) By contrast, if the corporation establishes only
> that the relevant acts occurred under the general auspices of federal
> direction then it is not entitled to § 1442(a)(1) removal.

*Id.* at 1128.

This strict literal approach has not been adopted, and indeed has been rejected, by the

majority of courts that have considered the federal officer removal statute. *See Mitchell v. AC&S*

*Inc.*, Civ. Act. No. 4:04cv2713, 2004 U.S. Dist. LEXIS 29504, at *9 (E.D. Va. Dec. 15, 2004

(agreeing with viewpoint of majority of jurisdictions rejecting strict literal approach taken by the

*Good* court); *Crocker v. Borden, Inc.*, 852 F. Supp. 1322, 1326 (E.D. La. 1994) (finding, in facts

nearly identical to *Good*, that the defendant acted under direction of U.S. Navy in constructing

marine turbines); *Herbert Pack, et al. v. AC and S, Inc.*, 838 F. Supp 1099, 1103 (Dist. Of MD

1993); *Carter v. AC&S, Inc.*, 2002 U.S. Dist. LEXIS 24057, 2002 WL 31682352 *4-5 (E.D. Tex.

2002) (finding that extensive control exercised by U.S. Navy over production and supply of

Westinghouse turbines met § 1442(a) requirements).

For prudent reasons and in keeping with the rationale of the federal officer removal

statute, the majority of courts have interpreted the language of § 1442(a) more liberally than the

*Good* court.  Section 1446 does not detail a definition of a federal officer.  As the *Mitchell* court

noted in rejecting the strict application of *Good*, "to refuse to accept the direction of a branch of

the armed services as the direction of a 'federal officer' is to 'deny that the government is

composed of entities as well as people.'" *Mitchell*, 2004 U.S. Dist. LEXIS 29504, at *9, citing

Kristina L. Garcia, Comment: *The Boyle Festers: How Lax Causal Nexus Requirements and the*

22

*"Federal Contractor Defense" Are Leading to a Disruption of Comity under the Federal Officer Removal Statute*, 46 EMORY L.J. 1629, 1645 (1997) (detailing problems with strict interpretation of "federal officer" in § 1442(a)(1)).

The affidavits of Messrs. DeBois and Knott, the hundreds of pages of manuals and specifications attached hereto, as well as the testimony of the Plaintiff Fredrick Seitz himself, make clear that Northrop Grumman was acting under the direction of a federal officer in the manufacture of the aircraft and carriers to which plaintiff claims to have been exposed.

### c. Northrop Grumman can satisfy the requirement of a colorable federal defense.

Removal is proper because Northrop Grumman can raise a colorable federal defense, specifically the military contractor defense (also referred to by courts as the government contractor defense). Courts are to construe a removing party's assertion of a colorable federal defense liberally. "We . . . do not require the officer virtually to 'win his case before he can have it removed.'" *Williams v. GE*, 418 F. Supp. 2d 610, 615 (M.D. Pa. 2005). In *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), the court found that because the government provided specifications for the "Agent Orange" manufactured by the defendant and because the product conformed to those specifications, the defendant was entitled to remove the action based on its assertion of the government contractor defense. Similarly, in *Akin v. Big Three Industries*, the court held the defendant raised a colorable claim to the government contractor defense and explained, "[a]lthough GE might or might not ultimately prevail on its government contractor defense . . . [a]ll that is required under § 1442(a)(1) . . . is that GE assert a colorable claim." 851 F. Supp. at 823.

In *Venezia v. Robinson*, 16 F.3d 209, 211 (7th Cir. 1994), the court acknowledged the necessity of a defendant's "*bona fide* federal defense" to the state law claim before federal

officer removal could be granted, but it stressed that the *merits* of a colorable defense are distinct

from this prerequisite.  The court stated, "Once the federal defendant has a *plausible* federal

defense, removal is appropriate so that the federal court may determine whether the defense

succeeds." *Id.* at 212 (emphasis added).

In *Boyle v. United Techs. Corp.*, 487 U.S.  500, 512, 101 L. Ed. 2d 442, 108 S. Ct. 2510

(1988), the Supreme Court set forth the three specific requirements of the government contractor

defense: "Liability for design defects in military equipment cannot be imposed, pursuant to state

law, when (1) the United States approved reasonably precise specifications; (2) the equipment

conformed to those specifications; and (3) the supplier warned the United States about the

dangers in the use of the equipment that were known to the supplier but not to the United States."

Northrop Grumman has made a colorable showing that it is entitled to this defense.

> (i)     **Northrop Grumman followed reasonably precise specifications from the military.**

The first element of the government contractor defense is satisfied where the defendant

demonstrates that the government "set or approved reasonably detailed specifications." *McKay v.*

*Rockwell Int'l. Corp.,* 704 F.2d 444, 453 (9th Cir. 1983).  As discussed above, in this case, the

government established detailed plans and specifications for aircraft, parts, and warnings to

which Northrop Grumman was required to adhere.

Applying this defense in cases specifically related to military aircraft, the United States

Supreme Court in the seminal case of *Boyle v. United Tech. Corp.* held that the selection of the

appropriate design for military aircraft

> often involves not merely engineering analysis but judgment as to
> the balancing of many technical, military, and even social
> considerations, including specifically the trade-off between greater
> safety and greater combat effectiveness.

24

487 U.S. at 511. The Court went on to hold that the character of the component part (the part specifically at issue in *Boyle* was a jet engine), "cannot be regulated by state tort law, no more in suits by civilians than in suits by members of the Armed Services." *Id.* Despite Plaintiffs' claims to the contrary, the selection and specification of component parts to be incorporated in military aircraft and control over any warnings to be affixed thereto are certainly an exercise of governmental discretion.

In *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th Cir. 1996), a products liability suit against the manufacturer of a Marine Corps MK-48 support vehicle that exploded upon collision with another vehicle, the court also found the military contractor defense barred the plaintiff's personal injury claims. The *Oshkosh* court found that the contractor satisfied the first prong, because the MK-48 vehicle design was developed collaboratively, the progress was meaningfully reviewed and approval by the Marine Corps was required. Further, the defendant adhered to "a detailed set of performance and dimension specifications" provided by the Marine Corps. Finally, the court held that the decision to make the design modifications that caused the injury were unavoidable given the Marine Corps precise specifications. *Id.* at 995.

The Navy's selection of parts and warnings to be used in Northrop Grumman planes is important. *See, e.g.,* Select Specifications for F7F3 and F6F3 (Exhs. G1-G3); Erection and Maintenance Handbook for Navy Models F7F-1N, F7F-3, F7F-4N, F7F-2N, F7F-3N, F7F-3P Airplanes, Oct. 1, 1947 (Exh. H); Illustrated Parts Catalog for F6F-3, F6F-3N, F6F-5, F6F-5N Airplanes, Apr. 15, 1944 (Exh. I); Preliminary Handbook of Erection and Maintenance Instructions Navy Model F6F-3, F6F-3N, F6F-5, F6F-5N, British Models Hellcat I, Hellcat II Airplanes, June 1, 1945 (Exh. J); Cost-Plus-Fixed-Fee Contract between the United States of America and Grumman Aircraft Engineering Corp., Apr. 1, 1944 at 2, (Exh. K). Such selection

serves as a reasonably precise specification directed by the government and supports federal

officer removal based on the government contractor defense. The protocol that Northrop

Grumman followed whenever it manufactured military aircraft pursuant to a contract with the

United States military and its Contracting Officers is sufficient to invoke the military contractor

defense in this case. *See* DeBois Aff at 24-25 (Exh. F).

**(ii)    Equipment manufactured by Northrop
Grumman conformed to military specifications.**

The second element of the government contractor defense is satisfied so long as the

product conformed to the military's specifications. *Niemann,* 721 F. Supp. at 1027 (holding that

where the requirements of the first prong had been met and the Air Force had accepted the

product as produced, and where nothing in the record indicated the contractor's failure to adhere

to Air Force specifications, this prong was also satisfied); *accord Oshkosh*, 96 F.3d at 1001

(finding that the contractor "did not deviate from" the Marine Corps' specifications, the court

determined that Oshkosh met the second prong of the *Boyle* test). Acceptance and use of a

product following its manufacture establishes that the item conformed to its specifications.

*Miller v. Diamond Shamrock Co.,* 275 F.3d 414, 420 (5th Cir. 2001); *Lewis v. Babcock Indus.,*

*Inc.,* No. 88 Civ. 1120 (JMC), 1992 WL 142751 at *7 (S.D.N.Y. June 8, 1992) ("Evidence that

the government inspected and accepted the products produced by the private contractors is

sufficient to establish conformity with reasonably precise specifications."), *aff'd,* 985 F.2d 83 (2d

Cir. 1993).

Here, the Navy approved and accepted the aircraft supplied by Northrop Grumman.

DeBois Aff. ¶ 26; (Exh. F). There are no allegations in this case that Mr. Seitz was injured

because any aircraft and aircraft carrier did not conform to military specifications. There is no

claim that these products did not meet detailed specifications provided by the military. This is

26

sufficient evidence to establish that Northrop Grumman's aircraft conformed to the

government's specifications.

> **(iii)   Military contractor defense applies to both a design defect *and a failure to warn claim.***

In addition to the well-accepted rule that the military or government contractor defense

applies to design defect claims, the Seventh Circuit has held unequivocally that *"the government*

*contractor defense ... may operate to defeat a state failure-to-warn claim." Oshkosh*, 96 F.3d

1003; *accord Niemann*, 721 F. Supp. at 1024 ("the policy behind the government contractor

defense ... supports the interpretation that the government contractor defense applies in failure to

warn cases.").

The Seventh Circuit provided a failure-to-warn version of the Boyle test:

> [W]hen state law would otherwise impose liability for a failure to
> warn, that law can be displaced when the contractor can show that:
> (1) the government exercised its discretion and approved certain
> warnings; (2) the contractor provided the warnings required by the
> government; and (3) the contractor warned the government about
> dangers in the equipment's use that were known to the contractor
> but not to the government.

*Oshkosh*, 96 F.3d at 1003-1004.  The court found that as with the design defect claims, these

requirements had been met and the failure-to-warn claims were similarly barred by the

government contractor's defense.  The *Oshkosh* court recognized that there is a "significant

conflict" between state law that would hold government contractors liable for "design defects in

military equipment and the 'uniquely federal interest' in immunizing 'the trade-off between

greater safety and greater combat effectiveness.'"  96 F. 3d at 997 (citing *Boyle*, 487 U.S. at 511-

12, 108 S. Ct. at 2518).

Northrop Grumman is not required at this stage to prove each of these elements of the

government contractor defense and that Plaintiffs' claims are barred.  It must only demonstrate a

colorable defense.  It is plausible that the government contractor defense may bar Plaintiffs'

claims.  Thus, Northrop Grumman has met its burden.

(iv)   **Northrop Grumman was only required to warn
of dangers known to it, but not known to the
government.**

The final prong of the *Boyle* test requires a government contractor to warn of dangers

known to the contractor, but not to the government. *Niemann,* 721 F. Supp. at 1027-28.  *Accord*

*Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1487 (5th Cir. 1989) ("After *Boyle*, a

government contractor only has the duty to warn the government of dangers of which it has

knowledge but the government does not.").  The *Niemann* court found strong evidence that the

last prong was satisfied.  Not only was there no indication on record that defendants were aware

of the danger of using asbestos, but there was uncontroverted evidence that the government was

aware of such danger and proceeded nevertheless. *Id.*  The court found that in the 1940's and

1950's, the time period in which the subject vessels were manufactured, the United States was

well aware of the risks of asbestos use, but "chose to continue use of asbestos in spite of this

knowledge." *Id.* at 1028.  The court deliberately avoided a "should have known" standard in

accordance with the language of *Boyle*. *Niemann,* 721 F. Supp. at 1027-28; *accord Oshkosh*, 96

F.3d at 1001.

In keeping with the reasoning in *Niemann,* Plaintiff worked on the various military

aircraft between 1946 and 1967, long after the United States was aware of the risks of asbestos.

By installing the components provided or specified by the government, Northrop Grumman acted

in compliance with precise specifications imposed by the government.  Northrop Grumman's

need to warn about hazards associated with these component parts is also driven by the same

specification.  Northrop Grumman did not control the decision whether to use the component

parts.  DeBois Aff. ¶ 17 (Exh. F).  In addition, the Navy had ultimate control over the written

28

materials accompanying the aircraft, to which aircraft mechanics like Mr. Seitz were required to refer and to adhere. *Cf.* DeBois Aff. at ¶ 28 (Exh. F).  Mr. Seitz recalled that the manuals discussed by him at his deposition were the only manuals that governed his work on the aircraft. Northrop Grumman had no control over these manuals or what materials were provided to the Naval aircraft mechanics performing work on the planes.  Seitz Video Dep. at 18-19 (Exh. D); Seitz Dep. at 161, Exhs. DF-1, DF-2, DF-3 (Exh. E).

Moreover, Mr. Seitz testified that he would retrieve all replacement parts from a military maintenance and supply shack or bin.  Seitz Dep. at 49 (Exh. E).  If the parts were not in inventory, he would go to air group supply and get it there or order it by phone by the government-issued part number.  *Id.*  Notably, by the time Mr. Seitz obtained any parts, they were already out of the box, because they would have already been subject to incoming inspection by the U.S. military.  *Id.* at 50.  Thus, any attempt to place warnings on packaging would have been obstructed by the military itself.

Northrop Grumman's "decision" whether or not to warn, or what warnings to include, was an act in compliance with reasonably precise specifications imposed by the government. Additionally, Mr. Seitz testified that at no point in his more than twenty-year career of working on U.S. Marine Corps aircraft did the U.S. Navy warn him of the hazards of asbestos.  *Id.* at 39-40, 53, 62. (Exh. E)

Northrop Grumman was not the manufacturer or distributor of asbestos products from which the Plaintiffs allege injury and did not have knowledge of dangers of asbestos generally that were not known to the government.  Plaintiffs do not, and cannot, contend otherwise.  *See, e.g., Blackman v. Asbestos Defendants (BHC)*, No. C-97-3066, 1997 WL 703773 at *3 (N.D. Cal. Nov. 3, 1997) (stating that a military contractor "is not an asbestos manufacturer; rather [the

29

defendant] manufactures solid rocket motors for military missiles. [The defendant] had no

greater opportunity to know of the dangers of asbestos in the 1970s than did the USAF, and

therefore, did not owe a duty to warn the USAF of the asbestos hazards."). *See also Nesbiet v.*

*Gen. Elec. Co.*, 399 F. Supp. 2d 205, 212 (S.D.N.Y. 2005) (finding government contractor

defense proper where the Navy's knowledge of the dangers of asbestos on board its ships was

state-of-the-art and, therefore, the Navy would have known of any dangers that were known to

the defendant).

　　The contractor's duty to warn only extends to dangers of which it has actual knowledge

and of which the government is not aware. *Quiles v. Sikorsky Aircraft*, 84 F. Supp. 2d. 154, 170

(D. Mass. 1999) (citing *Sundstrom v. McDonnell Douglas Corp.,* 816 F. Supp. 587, 590 (N.D.

Cal. 1993)). Since Northrop Grumman had no knowledge of any dangers that were not known to

the Navy, Northrop Grumman satisfies this prong. Likewise, the Navy had a much greater

opportunity to know of any dangers involved in the asbestos-containing parts at issue since

Northrop Grumman did not manufacture the parts, and the government independently contracted

for them. See *Reed v. Fina Oil & Chem. Co.,* 995 F. Supp. 705, 712 (E.D. Tex. 1998) ("Since the

government dictated the quality and content of the products and the testing of the products, then

for the limited purpose of determining whether a *colorable* federal defense has been claimed, the

court can presume that the government was informed of the attendant dangers of these

products."); *see also Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019, 1027-28 (S.D. Ill.

1989) (holding that McDonnell Douglas had no duty to warn the Government about the alleged

hazards of asbestos, since the Navy had superior knowledge about those hazards); *Ramey v.*

*Martin-Baker Aircraft Co.*, 874 F.2d 946, 950-51 (4th Cir. 1989) (holding that government's

superior knowledge about asbestos satisfies the third prong of *Boyle*).

Therefore, Northrop Grumman has established all the elements required to present a colorable government contractor defense to Plaintiffs' defective design claims.

> **d.    Northrop Grumman can also satisfy the causal nexus requirement of the federal officer removal statute.**

Northrop Grumman can also satisfy the final requirement of the federal officer removal statute, by demonstrating a causal nexus between its actions and Plaintiffs' claims.  To satisfy this requirement, the defendant must show that the state lawsuit "has arisen out of the acts done by [the defendant] under color of federal authority and in enforcement of federal law." *Mesa*, 489 U.S. at 131-32. *See Akin*, 851 F. Supp. at 823-4 ("[W]hen a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied."); *Pack*, 838 F. Supp. at 1103 (defendant satisfied the causal nexus requirement because "the government here contracted with [defendant] to build turbine generators under government specifications during the World War II period."); *Fung v. Abex Corp.*, 816 F. Supp. at 572 (causal nexus is satisfied upon showing of "strong government intervention and the threat that a defendant will be sued in state court based upon actions taken pursuant to federal direction.") (internal quotations omitted). The causal nexus has been found satisfied in asbestos cases when defendants' use of asbestos in products was compelled by the Government rather than being an independent choice of the defendant. *Dewey v. Asbestos Defendants*, No. C 04-4645 (N.D. Cal. 2005) slip op. at 6 (MIL specs requiring asbestos satisfied causal nexus) (attached hereto as **Exhibit N**).  The government's establishment of detailed and precise specifications and the Navy's acceptance and use of the aircraft manufactured by Northrop Grumman demonstrates that the products conformed to those specifications.  Plaintiffs' lawsuit is based on alleged exposure to parts incorporated in Northrop Grumman aircraft pursuant to those specifications.

In the context of a failure to warn claim, the defendant must establish that the government's control over warnings directly conflicted with the defendant's ability to fulfill a state law obligation to warn of safety hazards. *Nesbiet v. Gen. Elec. Co.*, 399 F. Supp. 2d 205, 211 (S.D.N.Y. 2005).  When a government contractor, in deciding whether to provide a warning, was acting in compliance with reasonably precise specifications imposed by the United States, the government contractor defense is applicable.  *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996)..  The case law demonstrates that where the government exercised a substantial degree of direct control over the provision of a warning and the control over the warnings interfered with defendant's ability to fulfill its state law obligation to warn about the dangers of asbestos, the defendant satisfies the "acting under" and "causal nexus" requirements of § 1442(a). *Nesbiet*, 399 F. Supp. 2d at 212 (citing *Carter v. Acands, Inc.*, No. 3:02-CV-00009, 2002 WL 31682352, at *4 (E.D. Tex. June 27, 2002) (holding in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that the "acting under" requirement of the federal officer removal statute was satisfied because the Navy had ultimate control over warnings affixed to equipment or included in the accompanying written materials); *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002) (stating in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that "any warnings promulgated (or not promulgated) with respect to the turbines were governed by Navy guidelines. Thus, the causal nexus is axiomatic.").

Here, the government had complete control over the allegedly asbestos-containing components on Northrop Grumman aircraft to which Mr. Seitz was allegedly exposed.  Not only was the manufacture of the aircraft governed by contracts with the government, any replacement parts were specified by and provided by the government, and the methods of repairing or

replacing the components, including any applicable warnings with respect to appropriate precautions to be taken by those doing the repairs and/or replacements, were dictated by the government. *See* Seitz Video Dep. at 18-19, 21, 24, 39-40 (Exh. D).  Here the causal connection is clear because it is the specific component parts that the government either required Northrop Grumman to use or supplied for use on the Northrop Grumman aircraft that gave rise to the alleged injury.

Plaintiffs' arguments that no causal nexus exists fail here for two reasons.  First, Northrop Grumman has shown that the warnings here were controlled by the federal government under its contracts to manufacture the aircraft pursuant to the Navy's specifications. Additionally, as demonstrated above, the more appropriate standard requires only a showing that government discretion was applied to warnings. *See McAboy v. IMO Industries*, No. C05-124IL, 2005 WL 2898047, at *5 (W.D. Wash. Oct. 27, 2005).  Therefore, Northrop Grumman has satisfied all elements necessary for federal officer removal jurisdiction and this case should not be remanded.

### E.     This Case Should Remain, in Its Entirety, in Federal Court.

After this Court has denied Plaintiffs' Motion to Remand, as it should, the Court should retain supplemental jurisdiction over this controversy in its entirety because no circumstances exist to justify the claims being severed.  28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under." Section (c) of the statute refines the supplemental jurisdiction doctrine by enumerating four circumstances in which District Courts have discretion to decline supplemental jurisdiction over state law claims: "(1) when the claims raise novel or complex issues of state law; (2) when the claims substantially

predominate over the claims within the district court's original jurisdiction; (3) when the district court dismisses the claims over which it has original jurisdiction; and (4) in exceptional circumstances, if there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

The claims raised in this case do not "raise novel or complex issues of state law." This is a personal injury matter brought under longstanding theories of liability, namely strict products liability and negligence. To the extent that any novel or complex issues of state law do exist, they are not questions of Delaware law, the state to which Plaintiffs' seek remand, but rather under choice of law principles, Plaintiffs' claims are more likely governed by the law of Colorado, where Plaintiffs reside. While Plaintiffs' claims against the remaining Defendants involve state law, such claims do not predominate over Plaintiffs' claims against Northrop Grumman. Mr. Seitz's work history establishes he spent the vast majority of his work, spanning from 1946 to 1967, while serving in the U.S. Marine Corps and working on military aircraft. Should this Court deny Plaintiffs' Motion to Remand, the third factor becomes irrelevant. Under the fourth factor, there are no exceptional circumstances which necessitate that this Court should decline jurisdiction over the remaining claims.

Plaintiffs filed this matter approximately four months ago. Thus far, very limited discovery has taken place and many defendants have just been served. Moreover, though plaintiffs claim a trial was scheduled for "just around the corner" in state court, providing plaintiff an opportunity to be heard before Mr. Seitz succumbs to his "advanced stage of incurable cancer," in fact the scheduling order attached to plaintiffs' Motion provides that trial was not scheduled in State Court until September 2009. There is an adequate and proper forum for the resolution of this case in its entirety, namely the MDL Court in the Eastern District of

Pennsylvania where all pretrial matters can be resolved.   Therefore, this case should remain in this Court until a full transfer to the MDL is authorized.

## V.    **CONCLUSION**

In sum, as laid out above and in the hundreds of pages of exhibits attached hereto, the United States military asserted intense control and scrutiny over Northrop Grumman and over the manufacture and design of the very aircraft identified by Plaintiffs in this action. Specifications for aircraft laid out over the course of hundreds, if not thousands, of pages specified the precise materials to be used, including asbestos. For all of the forgoing reasons, Northrop Grumman respectfully requests that this Court deny Plaintiffs' Motion to Remand.

ELZUFON AUSTIN REARDON TARLOV &
MONDELL, P.A.

/s/ Penelope B. O'Connell

Penelope O'Connell (DE #4898)
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, Delaware 19899
(302) 428-3181

Nancy Shane Rappaport (DE #3428)
DLA Piper US LLP
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3357

Attorneys for Defendant
Northrop Grumman Corporation

Date:  August 12, 2008

**EXHIBIT E**

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2007 WL 582983 (D.Utah)

c

In re Asbestos Cases of Hatch, James & Dodge, G.
Patterson Keahey
D.Utah,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Utah,Central Division.
In re ASBESTOS CASES OF HATCH, JAMES &
DODGE and G. PATTERSON KEAHEY.
Joseph Alexander Anderson, Jr. and Arva Anderson, Plaintiffs,
v.
Asbestos Defendants, et al., Defendants.
No. 2:06-CV-741 TS.

Feb. 20, 2007.

G. Patterson Keahey, Law Offices of G. Patterson
Keahey, Birmingham, AL, Mark F. James. Hatch
James & Dodge. Salt Lake City, UT, for Plaintiffs.
Dan R. Larsen, Karthik Nadesan, Tracy H. Fowler,
Scott A. Dubois, Kamie F. Brown, Snell & Wilmer,
Ross I. Romero, Mark J. Williams, Jones Waldo
Holbrook & McDonough, Melinda A. Morgan,
Richards Brandt Miller & Nelson, Patricia W.
Christensen, Parr Waddoups Brown Gee & Loveless, J. Kevin Murphy, Kipp & Christian, Katherine
E. Venti, John P. Ball, Jr., Parsons Behle &
Latimer, Jonathan L. Hawkins, Morgan Minnock
Rice & James, Barbara K. Berrett, Mark D. Taylor,
Berrett & Associates, Casey K. McGarvey, E. Scott
Savage, Berman & Savage PC, Rebecca L. Hill,
Scot A. Boyd, Christensen & Jensen PC, Peter W.
Billings, Christian D. Austin, Fabian & Clendenin,
Gregory S. Roberts, Ray Quinney & Nebeker, Kenneth Leigh Reich, Snow Christensen & Martineau,
Dennis C. Ferguson, Mark R. Anderson, Williams
& Hunt, Steven T. Densley, Strong & Hanni, Salt
Lake City, UT, Dennis H. Markusson, Markusson
Green & Jarvis, Mary Price Birk, Ronald L. Hellbusch, Baker & Hostetler, Denver, CO, Joseph J.
Joyce, Ryan J. Schriever, J. Joyce & Associates,
South Jordan, UT, for Defendants.

MEMORANDUM DECISION AND ORDER
DENYING PLAINTIFFS' MOTION FOR RELIEF

TED STEWART, United States District Judge.
*1 This matter is before the Court on Plaintiffs'
Motion for Relief, [FN1] wherein Plaintiffs ask the
Court to reconsider its prior determination not to
rule on Plaintiffs' Motion to Remand[FN2] this case
to state court. Defendants argue that judicial efficiency demands that this Court deny Plaintiff's Motion and continue in its declination to rule on the
Motion to Remand. The Court, having considered
the pleadings, the case law, and being otherwise
fully informed, will deny Plaintiff's Motion for Relief, as set forth more fully below.

FN1.Docket No. 150.

FN2.Docket No. 80.

I. BACKGROUND

This matter was initially filed in state court, but
was removed to this Court on September 1,
2006.FN3This Court scheduled a hearing on
Plaintiffs' Motion to Remand to the state court for
January 25, 2007. Prior to the hearing, the United
States of America Judicial Panel on Multidistrict
Litigation        ("MDL")        issued
Conditional    Transfer    Order    269    ("CTO
269"),FN4 which transferred Plaintiffs' case to the
United States District Court for the Eastern District
of Pennsylvania. The case will become one of many
under In re Asbestos Products Liability Litigation
(No. VI).

FN3.Docket No. 1.

FN4.SeeDocket No. 143.

In response to CTO 269, the Court struck the hearing on Plaintiffs' Motion to Remand.[FN5]Plaintiffs
now move for relief, requesting this Court to reconsider its determination not to rule on the Motion to
Remand the case, and urging the Court, in its dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cretion, to grant Mr. Anderson, who suffers from asbestos-caused **Mesothelioma**, his "day in court." Defendants oppose the Motion.

> FN5. Docket, November 30, 2006.

## II. *DISCUSSION*

Plaintiffs base their Motion for Relief on Mr. Anderson's poor health due to the **Mesothelioma** and the discretionary nature of the **conditional transfer order**. In opposition, Defendants claim that denial of the Motion will promote judicial efficiency.

A **conditional transfer order** issued by the MDL does not divest this Court of jurisdiction of pending pre-trial motions.[FN6] The Court's decision is therefore discretionary, resting largely on facts and underlying policy implications.

> FN6. Rules of Procedure of the Judicial Panel on Multidistrict Litigation R. 1.5.

### A. *Mr. Anderson's Health.*

Plaintiffs emphasize the rapid, terminal nature of the cancer known as **Mesothelioma** which plagues Mr. Anderson's body. The only known cause of **Mesothelioma** is asbestos. Based on the average two-year life expectancy following diagnosis, and Mr. Anderson's diagnosis with the disease on October 10, 2005, time is a major consideration. Plaintiffs assert that failure to remand the case to state court will deprive Mr. Anderson of his "day in court." But if remand is granted, Plaintiffs assert that they may be able to take advantage of the state's expedited proceeding, including an earlier trial setting.

If Mr. Anderson's health were the only factor before the Court, the decision would be easier. Unfortunately, it is not. While the Court extends its sympathy to Mr. and Mrs. Anderson, it must also consider the policy implications of judicial efficiency.

### B. *Judicial Efficiency.*

**\*2** Defendants assert that denial of Plaintiffs' Motion for Relief will further the goal of judicial efficiency. Following the finalization of CTO 269 and this Court's resolution or deferral of pending pre-trial delays, the case will be in the hands of the MDL. The MDL is familiar with the subject matter and the reoccurring common issues, and will be able to resolve asbestos litigation cases in an efficient and expeditious manner; it does so by the thousands.

These thousands of other cases concern Plaintiffs. Fearing that the case will "languish" in the MDL's extensive docket of products liability cases, Plaintiffs contend that the better use of judicial resources is to simply grant the Motion for Relief and address the issue of whether the removal was proper and, if federal subject matter jurisdiction is determined not to exist under the federal enclave clause because of the Master Complaint's disclaimer, then the time and resources of only one court have been expended.

Clearly, judicial efficiency depends on the issue of subject matter jurisdiction. This Court does not and will not address this issue. Whether a plaintiff under a state law tort may disclaim federal enclave jurisdiction by a master complaint without specific disclaimer in his own complaint, yet relate underlying facts of cumulative asbestos exposure during employment, which includes several federal enclaves among the many private, is not well settled by law. For this Court to decide that issue when the MDL is more than capable of making that determination would waste judicial resources and the progression of this litigation. Moreover, if the MDL decides that it has subject matter jurisdiction based on Mr. Anderson's federal enclave employment, all claims against all Defendants will be fully resolved.

The Court believes that the MDL is able to expeditiously and thoroughly resolve the issue of removal and all of Plaintiffs' claims. This judicial efficiency leads the Court to conclude that denial of Plaintiffs'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Motion** for Relief and continued deference on the **Motion** to **Remand** is proper under this situation. Despite Mr. Anderson's unfortunate and bleak health situation, policy implications of judicial efficiency persuade the Court to deny Plaintiffs' Motion for Relief.

III. *CONCLUSION*

Based upon the above, Plaintiffs Motion for Relief (Docket No. 150) is DENIED. The Court will continue to defer on Plaintiffs' **Motion** to **Remand** the case to the state court in order for the MDL to finalize the **conditional transfer order** and resolve the case.

SO ORDERED.

D.Utah,2007.
In re Asbestos Cases of Hatch, James & Dodge, G. Patterson Keahey
Slip Copy, 2007 WL 582983 (D.Utah)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT F**

**1348**        **170 FEDERAL SUPPLEMENT, 2d SERIES**

MDL–1061 can continue without any unnecessary interruption or delay.

Finally, if subsequent to transfer plaintiff continues to believe that the uniqueness of his particular situation or the type of his claims renders inclusion of *Uresti* in MDL–1061 unnecessary or inadvisable, we point out that whenever the transferee judge deems remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. at 436–38.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, *Joe W. Uresti v. Prudential Insurance Co. of America, et al.,* W.D. Texas, C.A. No. 5:01–104, is transferred to the District of New Jersey and, with the consent of that court, assigned to the Honorable Alfred M. Wolin for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.



In re ASBESTOS PRODUCTS
LIABILITY LITIGATION
(No. VI).

Justin Shane Wooley

v.

International Paper Co., et al.

Sylvia Ann Baden, et al.

v.

BPU Reynolds, Inc., et al.

No. 875.

Nos. C.A. 1:01–237, C.A. 2:01–288.

Judicial Panel on Multidistrict Litigation.

Oct. 18, 2001.

Plaintiffs who made claims for punitive damages in their asbestos litigation sought to vacate the Panel's orders conditionally transferring their actions for inclusion in centralized pretrial proceedings. The Judicial Panel on Multidistrict Litigation, William Terell Hodges, J., held that transfer was warranted.

Motion granted.

**1. Federal Courts ⟞157**

Delaying transfer of multidistrict litigation back to district court for inclusion in centralized pretrial proceedings was not warranted, in asbestos products liability litigation; although plaintiffs asserted that transfer should be denied or deferred in order to permit resolution of pending motions to remand to state court, that process would take three to four months to complete and if district court wished to address such motions it had adequate time in which to do so. 28 U.S.C.A. §1407.

**2. Federal Courts ⟞157**

Transfer by Judicial Panel on Multidistrict Litigation of lawsuits that contained claims for punitive damages, for inclusion in centralized pretrial proceedings, was warranted; although plaintiffs asserted that they were being denied their constitutional right to a jury trial because transferee court differentiated between claims for compensatory damages and claims for punitive damages choosing to retain jurisdiction over punitive damage claims for continuing pretrial effort, such administration was warranted as responsible public policy because it gave priority to compensatory claims over exemplary punitive damage windfalls. U.S.C.A. Const. Amend. 7; 28 U.S.C.A. § 1407.

BEFORE: WM. TERRELL HODGES, Chairman, JOHN F. KEENAN, MOREY L. SEAR, BRUCE M. SELYA, JULIA SMITH GIBBONS, D. LOWELL JENSEN and J. FREDERICK MOTZ, JUDGES of the Panel.

*TRANSFER ORDER*

WILLIAM TERELL HODGES,
Chairman.

Before the Panel are motions brought, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435–36 (2001), by plaintiffs in two Southern District of Mississippi and Southern District of Texas actions to vacate the Panel's orders conditionally transferring the actions to the Eastern District of Pennsylvania for inclusion in the centralized pretrial proceedings occurring there in this docket before Judge Charles R. Weiner.

[1, 2]  On the basis of the papers filed and hearing session held, the Panel finds that these two actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania, and that transfer of the actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.  We find that transfer of the actions is appropriate for reasons expressed by the Panel in its original decision in this docket directing centralization of all pending federal court actions not then in trial involving allegations of personal injury or wrongful death caused by asbestos or asbestos containing products.  *See In re Asbestos Products Liability Litigation (No. VI),* 771 F.Supp. 415 (Jud.Pan. Mult.Lit.1991).  In particular, we note that in the Panel's original decision distinctions based on such matters as the pendency of motions or other matters before the transferor court,[1] the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the stage of pretrial proceedings, the presence of unique claims or additional claims not relating to asbestos injury or death, and/or the unanimity of opposition to transfer by the parties to an action, were considered and rejected by the Panel as grounds for carving out exceptions to transfer in this extraordinary docket.

We are not persuaded to depart from this approach in dealing with the question of transfer of the actions now before the Panel.  Plaintiffs in the Southern District of Texas action have suggested that transfer should be denied because the way in which MDL–875 is being administered effectively denies them their constitutional right to a jury trial.  We reject this argument.  Although the number of Section 1407 remands in this docket is proportionately small, this is only because under Judge Weiner's stewardship the vast majority of transferred actions have been able to be concluded in the transferee district

---

1.  Plaintiffs in these actions have argued in essence that transfer should be denied or deferred in order to permit the resolution of pending motions to remand the actions to state court.  There is no need to delay transfer in order to accommodate such an interest.  We note that: 1) as a practical matter, there is a lag time of at least three or four months from the filing of an action, its identification as a potential tag-along action, issuance of a conditional transfer order, stay of transfer when a party timely objects to the conditional transfer, briefing on the question of transfer, the Panel hearing session, and the issuance of the Panel's subsequent order; 2) Panel Rule

1.5, R.P.J.P.M.L., 199 F.R.D. at 427, expressly provides that the pendency of a conditional transfer order does not in any way i) suspend orders and pretrial proceedings in the district court in which the action that is the subject of the conditional transfer order is pending, or ii) limit the pretrial jurisdiction of that court; and 3) accordingly, those courts wishing to address such motions have adequate time in which to do so, those courts concluding that such issues should be addressed by the transferee judge need not rule on them, and the process of 1407 transfer in MDL–875 can continue without any unnecessary interruption or delay.

during the course of pretrial proceedings (as of October 9, 2001, nearly 70,000 such actions have been closed in the transferee district). The fact remains that whenever the transferee judge has deemed remand of any claims or actions appropriate, procedures have been utilized to accomplish Section 1407 remand for trial with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. at 436–38. Accordingly, as of October 9, 2001, over 1,100 actions or claims therein have been returned to their originating transferor districts. The transferee court, when suggesting remand of claims, has differentiated between claims for compensatory damages and claims for punitive damages, choosing to retain jurisdiction over punitive damage claims for continuing pretrial effort. The Panel has deferred to this suggested approach, recognizing that recommendations of the transferee judge regarding the timing of remand should be given great weight, because that judge, after all, is the one who supervises day-to-day pretrial proceedings. When challenged by MDL–875 parties, the appellate court with authority over Panel transfers and remands in this docket has endorsed the Panel's treatment of remand of punitive damage claims:

> The resources available to persons injured by asbestos are steadily being depleted. The continuing filings of bankruptcy by asbestos defendants disclose that the process is accelerating. It is responsible public policy to give priority to compensatory claims over exemplary punitive damage windfalls; this prudent conservation more than vindicates the Panel's decision to withhold punitive damage claims on remand. It is discouraging that while the Panel and transferee court follow this enlightened practice, some state courts allow punitive damages in asbestos cases. The continued hemorrhaging of available

funds deprives current and future victims of rightful compensation.

*In re Collins,* 233 F.3d 809, 812 (3rd Cir. 2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 2216, 150 L.Ed.2d 209 (2001). Finally, with respect to any parties that believe the uniqueness of their particular situation renders inclusion of their action in MDL–875 unnecessary or inadvisable, we are confident that Judge Weiner will continue to promptly review arguments for returning transferred actions or claims to their transferor courts and will take all appropriate steps to assure their speedy return whenever he is convinced that retention in the MDL–875 proceedings is no longer needed.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these two actions are transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Charles R. Weiner for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.



# In re BRAND–NAME PRESCRIPTION DRUGS ANTITRUST LITIGATION

## No. MDL–997.

Judicial Panel on Multidistrict Litigation.

Oct. 19, 2001.

Antitrust treble damage action was brought by purchasers of brand name prescription drugs against manufacturers and wholesalers alleging illegal price fixing conspiracy. On defendants' motion to re-

EXHIBIT G

LEXSEE 1999 US DIST LEXIS 12131

**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI); Janice Chisholm v. United States of America, et al., N.D. California, C.A. No. 3:99-224SC; Charles I. Harley v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-38; John L. Renfro, Sr. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-71; Amiel P. Amin, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-79; Lawrence D. Graves, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-80; Clarence F. Metsker, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-81; Charles R. Ernst, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-82; Louis E. Atzinger, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-87; Harold R. Allen, Sr., et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-109; Alpha Knight, etc. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-110; Jack B. Boston, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-143; Ronald C. Foree, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-179; Raymond Hall, et al. v. Owens-Corning Fiberglas Corp., et al., W.D. Kentucky, C.A. No. 3:99-229**

**DOCKET NO. 875, C.A. No. 3:99-224SC, C.A. No. 3:99-38, C.A. No. 3:99-71, C.A. No. 3:99-79, C.A. No. 3:99-80, C.A. No. 3:99-81, C.A. No. 3:99-82, C.A. No. 3:99-87, C.A. No. 3:99-109, C.A. No. 3:99-110, C.A. No. 3:99-143, C.A. No. 3:99-179, C.A. No. 3:99-229**

**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

*1999 U.S. Dist. LEXIS 12131*

**July 27, 1999, Filed; August 2, 1999, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Motions were brought, pursuant to J. P. M. L. R. P. 7.4, 181 F. R. D. 1, 10 (1998), by certain plaintiffs and/or defendants in 12 Western District of Kentucky actions, and plaintiff in a remaining Northern District of California action, involving asbestos products liability.

**OVERVIEW:** Before the panel were motions brought, pursuant to J. P. M. L. R. P. 7.4, 181 F. R. D. 1, 10 (1998), by certain plaintiffs and/or defendants in 12 Western District of Kentucky actions, involving asbestos products liability, and plaintiff in a remaining Northern District of California action. All movants requested that the panel vacate the portions of its orders conditionally transferring their respective action(s) to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring there in the docket. The panel found that the actions involved common questions of fact with actions in the litigation previously transferred to the Eastern District of Pennsylvania and that transfer of the actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings in that district would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the asbestos litigation.

**OUTCOME:** It was ordered that the 13 actions be transferred to the Eastern District of Pennsylvania because this promoted the just and efficient conduct of the litigation.

Case MDL No. 875   Document 5646   Filed 10/09/08   Page 100 of 120

Page 2
1999 U.S. Dist. LEXIS 12131, *

**COUNSEL:** [*1] For JANICE CHISHOLM, Plaintiff (99-CV-224): James Geagan, Clayton Kent, Brayton Purcell Curtis & Geagan, Novato, CA.

For JANICE CHISHOLM, Plaintiff (99-CV-224): Patricia J. Kenney, U.S. Attorney's Office, San Francisco, CA.

For JANICE CHISHOLM, Plaintiff (99-CV-224): Ina L. Strichartz, U.S. Department of Justice, Washington, DC.

For UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF AGRICULTURE, US FOREST SERVICE, defendants (99-CV-224): Patricia J. Kenney, U.S. Attorney's Office, San Francisco, CA.

For UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF AGRICULTURE, US FOREST SERVICE, defendants (99-CV-224): Ina L. Strichartz, U.S. Department of Justice, Washington, DC.

**JUDGES:** BEFORE JOHN F. NANGLE, CHAIRMAN, WILLIAM B. ENRIGHT, CLARENCE A. BRIMMER, JOHN F. GRADY, BAREFOOT SANDERS, * LOUIS C. BECHTLE AND JOHN F. KEENAN, JUDGES OF THE PANEL.

    *   Judge Sanders took no part in the decision of this matter.

**OPINION**

*TRANSFER ORDER*

    Before the Panel are motions brought, pursuant to *Rule 7.4, R.P.J.P.M.L.*, 181 F.R.D. 1, 10 (1998), [*2] by i) certain plaintiffs and/or defendant Cardinal Industrial Insulation, Inc., in the twelve above-captioned Western District of Kentucky actions, and ii) plaintiff in the remaining above-captioned Northern District of California action. All movants request that the Panel vacate the portions of its orders conditionally transferring their respective action(s) to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket before Judge Charles R. Weiner.

    On the basis of the papers filed, [1] the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania, and that transfer of the

actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. We find that transfer of these actions is appropriate for reasons expressed by the Panel in its original decision in this docket directing centralization of all pending federal court actions [*3] not then in trial involving allegations of personal injury or wrongful death caused by asbestos or asbestos containing products. *See In re Asbestos Products Liability Litigation (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991)*. In particular, we note that in the Panel's original decision distinctions based on such matters as the pendency of motions or other matters before the transferor court, [2] the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the stage of pretrial proceedings, the presence of unique claims or additional claims not relating to injury or death, and/or the unanimity of opposition to transfer by the parties to an action, were considered and rejected by the Panel as grounds for carving out exceptions to transfer in this extraordinary docket.

    1   The parties to these actions waived oral argument and, accordingly, the question of *Section 1407* transfer of the actions was submitted on the briefs. *Rule 16.2, R.P.J.P.M.L.*, 181 F.R.D. 1, 14 (1998).

    We are not persuaded to depart from this approach in dealing with the question of transfer of these actions now before the panel. We note that under Judge Weiner's stewardship, as of July 27, 1999, i) nearly 60,000 actions have been closed in the transferee district, and ii) nearly 1,000 actions or claims therein have been returned to their originating transferor districts. To parties that believe the uniqueness of their particular situation renders inclusion of their action in MDL-875 unnecessary or inadvisable, we note that whenever the transferee judge deems remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See Rule 7.6 R.P.J.M.L., supra*, 181 F.R.D. at 11-13. We are confident that Judge Weiner will continue to promptly review arguments for returning transferred actions or claims to their transferor courts and will take all appropriate steps to assure their speedy return whenever he is convinced that tetention in the MDL-875 proceedings is no longer

needed.

2    Parties in certain of the actions before the Panel have argued that transfer should be denied or deferred in order to permit the judges assigned the actions to rule on various potentially dispositive pending motions. There is no need to delay transfer in order to accommodate such an interest. We note that: 1) as a practical matter, there is a lag time of at least three or four months from the filing of an action, its identification as a potential tag-along action, issuance of a conditional transfer order, stay of transfer when a party timely objects to the conditional transfer, briefing on the question of transfer, the Panel hearing, and the issuance of the Panel's subsequent order; 2) Panel *Rule 1.5, R.P.J.P.M.L., supra,* 181 F.R.D. at 3, expressly provides that the pendency of a conditional transfer order does not in any way i) suspend orders and pretrial proceedings in the district court in which the action that is the subject of the conditional transfer order is pending, or ii) limit the pretrial jurisdiction of that court; and 3) accordingly, those courts wishing to address such motions have adequate time in which to do so, those courts concluding that such issues should be addressed by the transferee judge need not rule on them, and process of 1407 transfer in MDL-875 can continue without any unnecessary interruption or delay

IT IS THEREFORE ORDERED that, pursuant to *28 U.S.C. § 1407,* the thirteen above-captioned actions be, and the same hereby are, transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Charles R. Weiner for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL

/s/Signature

John F. Nangle

Chairman

ATTACHMENT

**INVOLVED COUNSEL LIST**

**DOCKET NO. 875**

**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

Craig R. Banford

Huddleston, Bolen, Beatty, Porter & Copen

P.O. Box 2185

Huntington, WV 25722

Robert F. Barron

Kahn, Dees, Donovan & Kahn

305 Union Federal Building

P.O. Box 3646

Evansville, IN 47735

Richard C. Binzley

Thompson, Hine & Flory

127 Public Square

3900 Key Center

Cleveland, OH 44114

Sheila L. Birnbaum

Skadden, Arps, Slate, Meagher & Flom

919 Third Avenue

New York, NY 10022

Stephen M. Bowers

Hawkins & Parnell

4000 SunTrust Plaza

303 Peachtree Street, N.E.

Atlanta, GA 30308

Edward J. Cass

Gallagher, Sharp, Fulton & Norman

1999 U.S. Dist. LEXIS 12131, *3

Bulkley Building, 7th Floor

1501 Euclid Avenue

Cleveland, OH 44115

James [*4]  E. Cleveland

Huddleston, Bolen, Beatty, Porter & Copen

1442 Winchester Avenue

P.O. Box 770

Ashland, KY 41105

Kathy K. Condo

Reed, Smith, Shaw & McClay

Mellon Square

435 Sixth Avenue

Pittsburgh, PA 15219

David A. Damico

Burns, White & Hickton

2400 Fifth Avenue Place

120 Fifth Avenue

Pittsburgh, PA 15222

Scott T. Dickens

Tachau, Maddox, Hovious & Dickens

200 South 5th Street

Suite 200 N.

Louisville, KY 40202

John L. Dotson

O'Bryan, Brown & Toner

1500 Starks Building

Louisville, KY 40202

Robert C. Ewald

Wyatt, Tarrant & Combs

500 West Jefferson Street

2600 Citizens Plaza

Louisville, KY 40202

Raymond P. Forceno

Forceno & Hannon

Philadelphia Bourse Building

Suite 1000

Independence Mall East

Philadelphia, PA 19106

Ellen B. Furman

Goldfein & Joseph

Packard Building, 17th Floor

15th & Chestnut Streets

Philadelphia, PA 19102

James M. Gary

Weber & Rose, P.S.C.

2700 Aegon Center

400 West Market Street

Louisville, KY 40202

John K. Gordinier

Pedley, Zielke, Gordinier, Olt & Pence

Starks Building, Suite 1150

455 South Fourth Avenue

Louisville, KY 40202

- UNDELIVERABLE - Gregory S. Gowen

City Law Department

601 W. Jefferson Street

[*5]  Room 200, City Hall

Louisville, KY 40202

Albert F. Grasch

Grasch, Walters & Cowen

302 West High Street

Lexington, KY 40507

Susan M. Hanson

Stich, Angell, Kreidler & Muth, P.A.

The Crossings, Suite 120

250 2nd Avenue South

Minneapolis, MN 55401

Max S. Hartz

McCarroll, Nunley & Hartz

111 East Third Street

P.O. Box 925

Owensboro, KY 12302

Harry K. Herren

Woodward, Hobson & Fulton, LLP

2500 First National Tower

Louisville, KY 40202

Frank P. Hilliard

Starks Building, Suite 380

455 S. Fourth Avenue

Louisville, KY 40202

Joseph P. Hummel

Lynch, Cox, Gioman & Mahan

500 Meidinger Tower

Louisville, KY 40202

Clayton W. Kent

Brayton, Purcell, Curtis & Geagan

222 Rush Landing Road

Novato, CA 94948

David C. Landin

Hunton & Williams

Riverfront Plaza

East Tower

951 East Byrd Street

Richmond, VA 23219

Christopher D. Lee

Kahn, Dees, Donovan & Kahn

305 Union Federal Building

P.O. Box 3646

Evansville, IN 47735

Gene Locks

Greitzer & Locks

1500 Walnut Street

Philadelphia, PA 19102

Armer H. Mahan

Lynch, Cox, Gioman & Mahan

500 Meidinger Tower

Louisville, KY 40202

Gregory L. Monge

Vanantwerp, Hughes, Monge, Jones & Edwards LLP

P.  [*6]  O. Box 1111

Ashland, KY 41105

John B. Moore

1999 U.S. Dist. LEXIS 12131, *6

Boehl, Stopher & Graves

2300 Aegon Center

400 West Market Street

Louisville, KY 40202

M. D. Moretz

Woolf, McClane, Bright, Allen

900 Riverview Tower

900 South Gay Street

P.O. Box 900

Knoxville, TN 37902

R. K. Morton

Huddleston, Bolen, Beatty, Porter & Copen

P.O. Box 2185

Huntington, WV 25722

Ronald L. Motley

Ness, Motley, Loadholt, Richardson & Poole

P.O. Box 1137

Charleston, SC 29402

Donald A. Powell

Buckingham, Doolittle & Burroughs

50 South Main Street

P.O. Box 1500

Akron, OH 44309

John J. Repcheck

Sharlock, Repcheck & Mahler

3280 USX Tower

600 Grant Building

Pittsburgh, PA 15219

John D. Roven

9575 Katy Freeway

# 400

Houston, TX 77024

Kenneth L. Sales

Segal, Sales, Stewart, Cutler & Tillman

325 W. Main Street

2100 Waterfront Plaza

Louisville, KY 40202

Joseph D. Satterley

Segal, Sales, Stewart, Cutler & Tillman

2100 Waterfront Plaza

325 West Main Street

Louisville, KY 40202

Richard D. Schuster

Vorys, Sater, Seymour & Pease

52 East Gay Street

P.O. Box 1008

Columbus, OH 43216

Stephen F. Schuster

Ogden, Newell & Welch

 [*7] 500 West Jefferson Street

1700 Citizens Plaza

Louisville, KY 40202

Neil Selman

Selman, Breitman & Burgess

11766 Wilshire Boulevard

Sixth Floor

Los Angeles, CA 90025

Thomas C. Smith

Ziegler & Schneider, PSC

541 Buttermilk Place

P.O. Box 175710

Covington, KY 41017

Thomas W. Speckman

Speckman & Hoback

2330 Citizens Plaza

Louisville, KY 40202

Robert N. Spinelli

Kelley, Jasons, McGuire & Spinelli,

One Penn Center

Suite 1400

1617 JFK Boulevard

Philadelphia, PA 19103

Ina L. Strichartz

U.S. Department Of Justice

Environmental Dept.

P.O. Box 340

Ben Franklin Station

Washington, DC 20044

Robert E. Swickle

Jaques Admiralty Law Firm, P.C.

1370 Penobscot Building

Detroit, MI 48226

Andrew J. Trevelise

Reed, Smith, Shaw & McClay

2500 One Liberty Place

Philadelphia, PA 19103

Henry A. Triplett

Bennett, Bowman, Triplett & Vittitow

200 South 5th Street

Suite 400

Louisville, KY 40202

James K. Weston

Tom Riley Law Firm

4040 First Avenue, N.E.

P.O. Box 998

Cedar Rapids, IA 52406

**EXHIBIT H**

Westlaw.

Not Reported in F.Supp.                                                                     Page 1
Not Reported in F.Supp., 1996 WL 143826 (Jud.Pan.Mult.Lit.)

**H**

In re Asbestos Products Liability Litigation (No. VI)

Jud.Pan.Mult.Lit.,1996.

Only the Westlaw citation is currently available.

Judicial Panel on Multidistrict Litigation.

In re ASBESTOS PRODUCTS LIABILITY LITIG-ATION (NO. VI).

**No. 875.**

Feb. 16, 1996.

*1 *Edgardo P. Gonzales v. Owens-Corning Fiber-glas Corp., et al.,* N.D. California, C.A. No. 3:95-3705

*Nicandor San Juan v. Owens-Corning Fiberglas Corp., et al.,* N.D. California, C.A. No. 3:95-3709

*Catherine H. Simoneaux, et al. v. Exxon Corp., et al.,* M.D. Louisiana, C.A. No. 3:95-652

*Faye Carlson, etc. v. Anchor Packing Co., et al.,* D. Oregon, C.A. No. 3:95-1337

*Joseph R. Headley v. Anchor Packing Co., et al.,* D. Oregon, C.A. No. 3:95-1543

Before JOHN F. NANGLE, Chairman, ROBERT R. MERHIGE, Jr., WILLIAM B. ENRIGHT, CLAR-ENCE A. BRIMMER, JOHN F. GRADY, BARE-FOOT SANDERS [FN*] and LOUIS C. BECHTLE, Judges of the Panel.

TRANSFER ORDER

JOHN F. NANGLE, Chairman.

Presently before the Panel are motions, pursuant to Rule 12, R.P.J.P.M.L., 147 F.R.D. 589, 596 (1993), by plaintiffs in the five above-captioned N.D. Cali-fornia, M.D. Louisiana and D. Oregon actions re-questing that the Panel vacate the portions of its or-ders conditionally transferring their respective ac-tion to the Eastern District of Pennsylvania for in-clusion in the coordinated or consolidated pretrial proceedings occurring there in this docket before

Judge Charles R. Weiner.

On the basis of the papers filed,[FN1] the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania, and that transfer of the actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings in that district will serve the convenience of the parties and wit-nesses and promote the just and efficient conduct of the litigation. We find that transfer of these actions is appropriate for reasons expressed by the Panel in its original decision in this docket directing central-ization of all pending federal court actions not then in trial involving allegations of personal injury or wrongful death caused by asbestos or asbestos con-taining products. *See In re Asbestos Products Liab-ility Litigation (No. VI),* 771 F. Supp. 415 (J.P.M.L. 1991). In particular, we note that in the Panel's ori-ginal decision distinctions based on such matters as the pendency of motions or other matters before the transferor court,[FN2] the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the presence of unique or additional claims not relating to injury or death, and/or the unanimity of opposition to trans-fer by the parties to an action, were considered and rejected by the Panel as grounds for carving out ex-ceptions to transfer in this extraordinary docket. We find no reason to depart from this approach in deal-ing with the question of transfer of the actions now before the Panel.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the five above-captioned actions be, and the same hereby are, transferred to the East-ern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Charles R. Weiner for inclusion in the coordinated or consolid-ated pretrial proceedings occurring there in this docket.

FN* Judge Sanders took no part in the de-

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 143826 (Jud.Pan.Mult.Lit.)

cision of this matter.

FN1. The parties to the five actions waived oral argument and, accordingly, the question of Section 1407 transfer with respect to the actions was submitted on the briefs. Rule 17, R.P.J.P.M.L., 147 F.R.D. 589, 600-01 (1993).

FN2. The plaintiffs in the California and Oregon actions have argued that transfer should be denied or deferred in order to permit the judges assigned the actions to rule on motions to remand to state court. There is no need to delay transfer in order to accommodate such interests. We note that: 1) as a practical matter, there is a lag time of at least three or four months from the filing of an action, its identification as a potential tag-along action issuance of a conditional transfer order, stay of transfer when a party timely objects to the conditional transfer briefing on the question of transfer, the Panel hearing, and the issuance of the Panel's subsequent order 2) Panel Rule 18, R.P.J.P.M.L., *supra,* 147 F.R.D. at 601, expressly provides that the pendency of a conditional transfer order does not in any way i) suspend orders and pretrial proceedings in the district court in which the action that is the subject of the conditional transfer order is pending, or ii) limit the pretrial jurisdiction of that court; and 3) accordingly, those courts wishing to address such motions have adequate time in which to do so those courts concluding that such issues should be addressed by the transferee judge need not rule on them and the process of 1407 transfer in MDL-875 can continue without any unnecessary interruption or delay

Jud.Pan.Mult.Lit.,1996.
In re Asbestos Products Liability Litigation (No. VI)
Not Reported in F.Supp., 1996 WL 143826

(Jud.Pan.Mult.Lit.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT I

**MDL 1699**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 1 3 2006

FILED
CLERK'S OFFICE

*DOCKET NOS. 1657 & 1699*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS
LIABILITY LITIGATION*
*IN RE BEXTRA AND CELEBREX MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION*

*BEFORE WM. TERRELL HODGES,* CHAIRMAN, JOHN F. KEENAN, D.
LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR.,
KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL*

*ORDER OF TRANSFER WITH SIMULTANEOUS
SEPARATION, REMAND AND TRANSFER*

Presently before the Panel are motions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in 41 actions listed on Schedule A to vacate the Panel's orders conditionally i) transferring these actions involving the prescription medication Vioxx (manufactured by Merck & Co., Inc. (Merck)) to the Eastern District of Louisiana for inclusion in the Section 1407 proceedings occurring there in MDL-1657; ii) simultaneously separating and remanding claims in these actions relating to prescription medications Bextra and Celebrex (manufactured by Pfizer Inc. (Pfizer)) to their respective transferor districts; and iii) transferring the resulting Bextra/Celebrex actions to the Northern District of California for inclusion in MDL-1699 pretrial proceedings. Defendants Pfizer, Pharmacia Corp., G.D. Searle LLC and Merck oppose these motions and urge effectuation of the Panel's orders.

On the basis of the papers filed and hearing session held, the Panel finds that these actions involve common questions of fact with i) actions in MDL-1657 previously transferred to the Eastern District of Louisiana, and ii) actions in MDL-1699 similarly centralized in the Northern District of California. The Panel further finds that transfer for inclusion in the coordinated or consolidated pretrial proceedings in those two districts will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Transfer is also appropriate for reasons expressed by the Panel in its original orders directing centralization in these two dockets. In MDL-1657, the Panel held that the Eastern District of Louisiana was a proper Section 1407 forum for actions relating to Vioxx. *See In re Vioxx Products Liability Litigation*, 360 F.Supp.2d 1352 (J.P.M.L. 2005). Likewise, the Panel held that the Northern District of California was a proper Section 1407 forum for actions relating to Bextra and/or Celebrex. *See In re Bextra and Celebrex Marketing, Sales Practices and Products*

---

* Judges Hodges and Motz took no part in the decision **OFFICIAL FILE COPY**

IMAGED APR 1 3 2006

- 2 -

*Liability Litigation*, 391 F.Supp.2d 1377 (J.P.M.L. 2005). Pending motions to remand these actions to state court can, in appropriate parts, be presented to and decided by each of the transferee courts. *See, e.g., In re Ivy*, 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001).

Some opposing plaintiffs argue that separation and transfer of these claims for inclusion in MDL-1657 and MDL-1699 will foster inefficiency and inconsistency and/or disrupt ongoing related state court proceedings. We are unpersuaded by these arguments. *See In re Vioxx Marketing, Sales Practices and Products Liability Litigation/In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation*, ___ F.Supp.2d ___, 2006 WL 461029 (J.P.M.L. Feb. 15, 2006).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Eldon E. Fallon for inclusion in the coordinated or consolidated pretrial proceedings occurring there in MDL-1657 – *In re Vioxx Marketing, Sales Practices and Products Liability Litigation*. The claims relating to Pfizer's Bextra and Celebrex prescription medications are separated and remanded, pursuant to 28 U.S.C. § 1407(a), to their respective transferor courts.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 1407, the resulting actions involving claims relating to Bextra and Celebrex are transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable Charles R. Breyer for inclusion in the coordinated or consolidated pretrial proceedings occurring there in MDL-1699 – *In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation*.

FOR THE PANEL:

*John F. Keenan*
John F. Keenan
Acting Chairman

## Schedule A

MDL-1657 -- In re Vioxx Marketing, Sales Practices and Products Liability Litigation
MDL-1699 -- In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation

### Eastern District of California

Barbara Hacker v. Merck & Co., Inc., et al., C.A. No. 2:05-2193
Christopher Leeton v. Merck & Co., Inc., et al., C.A. No. 2:05-2240

### Western District of Kentucky

Rhoda Overstreet v. Merck & Co., Inc., et al., C.A. No. 3:05-561
Randall R. Jackson, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-562
Bonnie Mullins, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-577
Ernest D. Weber, Jr., et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-623
Robert Manley, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-656
Harold Thomax, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-669
Joan O'Bryan, etc. v. Merck & Co., Inc., et al., C.A. No. 3:05-681
Doyle A. Coen, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-682
Johnnie Anderson, etc. v. Merck & Co., Inc., et al., C.A. No. 3:05-685
Galen Noe, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-700
Cathy Groce Stearns, etc. v. Merck & Co., Inc., et al., C.A. No. 3:05-710
Natella Kaye Cox v. Merck & Co., Inc., et al., C.A. No. 3:05-716
Robert Sampson v. Merck & Co., Inc., et al., C.A. No. 3:05-722
Douglas Adams, et al. v. Merck & Co., Inc., et al., C.A. No. 3:05-723

### Eastern District of Missouri

Lonnie Case v. Merck & Co., Inc., et al., C.A. No. 4:05-1562
Jessie Abbott v. Merck & Co., Inc., et al., C.A. No. 4:05-1563
Bertha Armstead v. Merck & Co., Inc., et al., C.A. No. 4:05-1564
Berlin Jenkerson v. Merck & Co., Inc., et al., C.A. No. 4:05-1565
David Wagner v. Merck & Co., Inc., et al., C.A. No. 4:05-1590
John Kaczmarczyk v. Merck & Co., Inc., et al., C.A. No. 4:05-1592
Jerry M. Dance v. Merck & Co., Inc., et al., C.A. No. 4:05-1666
Doris Crenshaw v. Merck & Co., Inc., et al., C.A. No. 4:05-1669
Jeanette Lasky v. Merck & Co., Inc., et al., C.A. No. 4:05-1741
Francesco A. Sainieri v. Merck & Co., Inc., et al., C.A. No. 4:05-1744
Vincent Calania v. Merck & Co., Inc., et al., C.A. No. 4:05-1746
Thomas Kasper v. Merck & Co., Inc., et al., C.A. No. 4:05-1747
Bernadean Aareman v. Merck & Co., Inc., et al., C.A. No. 4:05-1748
Josephine Tourville v. Merck & Co., Inc., et al., C.A. No. 4:05-1750
Jacqueline M. Lawrence v. Merck & Co., Inc., et al., C.A. No. 4:05-1751
Adele Anthon v. Merck & Co., Inc., et al., C.A. No. 4:05-1752
James B. Elgin, Jr. v. Merck & Co., Inc., et al., C.A. No. 4:05-1753

- A2 -

### Eastern District of Missouri (Continued)

*Richard Manzel v. Merck & Co., Inc., et al.*, C.A. No. 4:05-1755
*Marcy A. West v. Merck & Co., Inc., et al.*, C.A. No. 4:05-1756
*Hilda L. Tucker v. Merck & Co., Inc., et al.*, C.A. No. 4:05-1757
*Arzie Stephens v. Merck & Co., Inc., et al.*, C.A. No. 4:05-1758
*Shirley Adams, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-1947
*Marie Nobles, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-2040
*Bernadette Dryer, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-2043
*Jean Davis, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-2076

EXHIBIT J

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATIOI

**MDL 1699**

FEB 15 2006

FILED
CLERK'S OFFICE

*RELEASED FOR PUBLICATION*

*DOCKET NOS. 1657 & 1699*

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

*IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS*
*LIABILITY LITIGATION*
*IN RE BEXTRA AND CELEBREX MARKETING, SALES PRACTICES AND*
*PRODUCTS LIABILITY LITIGATION*

*Juanell Y. McBrayer Wilkes, et al. v. Merck & Co., Inc., et al., N.D. Alabama, C.A. No. 2:05-1214*
*Jackie Collins v. Merck & Co., Inc., et al., S.D. Illinois, C.A. No. 3:05-451*
*Gracie Blount v. Merck & Co., Inc., et al., S.D. Illinois, C.A. No. 3:05-673*

**BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D.
LOWELL JENSEN, J. FREDERICK MOTZ,\* ROBERT L. MILLER, JR.,
KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL**

*ORDER OF TRANSFER WITH SIMULTANEOUS*
*SEPARATION, REMAND AND TRANSFER*

Presently before the Panel are motions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in the two Illinois actions and the health care provider defendants in the Alabama action seeking to vacate the Panel's order conditionally i) transferring these actions involving the prescription medication Vioxx (manufactured by Merck & Co., Inc. (Merck)) to the Eastern District of Louisiana for inclusion in the Section 1407 proceedings occurring there in MDL-1657; ii) simultaneously separating and remanding claims in these actions relating to prescription medications Bextra and Celebrex (manufactured by Pfizer Inc. (Pfizer)) to their respective transferor districts; and iii) transferring the resulting Bextra/Celebrex actions to the Northern District of California for inclusion in MDL-1699 pretrial proceedings. Defendants Pfizer, Pharmacia Corp., G.D. Searle LLC and Merck oppose these motions and urge effectuation of the Panel's order.

On the basis of the papers filed and hearing session held, the Panel finds that these actions involve common questions of fact with i) actions in MDL-1657 previously transferred to the Eastern District of Louisiana, and ii) actions in MDL-1699 similarly centralized in the Northern District of California. The Panel further finds that transfer for inclusion in the coordinated or consolidated pretrial proceedings in those two districts will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Transfer is also appropriate for reasons expressed by the Panel in its

---

\* Judge Motz took no part in the decision of this matter.

-2-

original orders directing centralization in these two dockets. In MDL-1657, the Panel held that the Eastern District of Louisiana was a proper Section 1407 forum for actions relating to Vioxx. *See In re Vioxx Products Liability Litigation,* 360 F.Supp.2d 1352 (J.P.M.L. 2005). Likewise, the Panel held that the Northern District of California was a proper Section 1407 forum for actions relating to Bextra and/or Celebrex. *See In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation,* 391 F.Supp.2d 1377 (J.P.M.L. 2005). Pending motions to remand these actions to state court can, in appropriate parts, be presented to and decided by each of the transferee courts. *See, e.g., In re Ivy,* 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation,* 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Eldon E. Fallon for inclusion in the coordinated or consolidated pretrial proceedings occurring there in MDL-1657 – *In re Vioxx Marketing, Sales Practices and Products Liability Litigation.* The claims relating to Pfizer's Bextra and Celebrex prescription medications are separated and remanded, pursuant to 28 U.S.C. § 1407(a), to their respective transferor courts.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 1407, the resulting actions involving claims relating to Bextra and Celebrex are transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable Charles R. Breyer for inclusion in the coordinated or consolidated pretrial proceedings occurring there in MDL-1699 – *In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation.*

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

EXHIBIT   K

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2000 WL 462919 (E.D.La.), 2000-1 Trade Cases P 72,885

▷
Falgoust v. Microsoft Corp.
E.D.La.,2000.

United States District Court, E.D. Louisiana.
Clair FALGOUST, et al.
v.
MICROSOFT CORPORATION
No. CIV.A.00-0779.

April 19, 2000.

MCNAMARA, Chief J.

**\*1** Before the court are the following motions:

(1) "Motion to Remand" filed by Plaintiffs and op-
posed by Defendant Microsoft; and

(2) "Motion to Stay All Proceedings Until the MDL
Panel Rules on Motions to Transfer this and Other
Actions Pursuant to 28 U.S.C. § 1407" filed by De-
fendant and opposed by Plaintiffs.

The motions, set for hearing on April 19, 2000, are
before the court on briefs without oral argument.
Having considered the memoranda of counsel and
the applicable law, the court now rules.

## BACKGROUND

The instant action is one of many cases filed
against Microsoft after findings of fact were issued
in *United States v. Microsoft* on November 5, 1999.
Currently, there are motions by several parties in
these cases pending before the Judicial Panel on
Multidistrict Litigation ("JPML") for consolidation
of all cases against Microsoft.

The Defendant requests that this court exercise its
discretion and stay pretrial proceedings, including
determinations of jurisdictional issues, pending a
determination by the JPML. Plaintiffs oppose the
motion, and urge this court to deny the stay, de-
termine that jurisdiction is lacking and remand the

case to state court.

## ANALYSIS

The JPML is established under 28 U.S.C. § 1407.
The purpose of this statute is to permit the central-
ization in one district of all pretrial proceedings in
civil actions involving one or more common ques-
tions of fact pending in different districts.[FN1] Fur-
ther, the statute seeks to eliminate potential con-
flicting rulings by coordinate district and appellate
judges.[FN2]

> FN1.*Matter of New York City Mun. Secur-
> ities Litigation,* 572 F.2d 49, 51-52 (2nd
> Cir.1978).

> FN2.*In re Air Crash Disaster off Long Is-
> land, N.Y. on July 17, 1996,* 965 F.Supp. 5,
> 7 (S.D.N.Y.1997).

A pending motion before the JPML does not affect
the jurisdiction of the transferor
court.[FN3] However, courts have inherent power to
"control the disposition of the causes on its docket
with economy of time and effort for itself, for coun-
sel, and for litigants."[FN4]

> FN3.*In re Air Crash Disaster at Paris,
> France on March 3, 1974,* 376 F.Supp.
> 887, 888 (J.P.M.L.1974).

> FN4.*Landis v. North American Co.,* 57
> S.Ct. 163, 166 (1936).

Plaintiffs assert that this court lacks subject matter
jurisdiction and that jurisdictional issues should be
resolved prior to any other action. While generally
true, cases such as this require special considera-
tion.

As stated previously, the purpose of the JPML is to
promote judicial economy and to prevent inconsist-
ent rulings. This case presents questions of fact

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 462919 (E.D.La.), 2000-1 Trade Cases P 72,885

similar to the other actions pending before the JPML. Additionally, the same jurisdictional question raised in this case has been raised before this court in another case against Microsoft, and will likely be raised in many of the other cases pending against Microsoft in other districts.

In support of their opposition, Plaintiffs have included a letter from the JPML to Judge Fallon regarding *Tramonte v. Chrysler Corp.*[FN5] where a motion to transfer was pending before the JPML and a motion to remand was pending before Judge Fallon. Plaintiffs quote a sentence from the letter which states "In the Panel's experience, such motions to remand to state court often involve questions unique to an action that are well suited for decisions prior to the 1407 transfer."While in *Tramonte* there were unique questions to be considered regarding jurisdiction, this is not the case here. As previously stated, this exact issue was presented to this court in another action against Microsoft, and will surely be an issue in many of the other cases pending against Microsoft in other districts.

> FN5. Civil Action No. 95-2109 (E.D. La. June 28, 1999).

**\*2** Plaintiffs also cite *Panama v. American Tobacco Co.,*[FN6] in support of their position, and assert that "the facts of this case closely mirror those in *Panama.*" Plaintiffs' reliance on *Panama* is misplaced. Procedurally, the two cases are similar in that defendants in both cases filed motions to stay pending a decision by the JPML, and plaintiffs in both cases filed motions to remand. However, the court in *Panama* noted that not all defendants joined in the motion to transfer and consolidate with the JPML and that there was the likelihood that the JPML "may not accept this case."[FN7]

> FN6.1999 WL 350030 (E.D.La.1999).

> FN7.*Id.* at n2.

Plaintiffs assert that the JPML "does not have the power to consider the propriety of coordinated or consolidated pretrial proceedings in state court actions."[FN8] However, once removed, federal courts have jurisdiction to determine jurisdiction, the JPML has the power to transfer cases with motions to remand pending, and the district courts have discretion to stay actions pending decisions of the JPML even where jurisdictional questions exist.

> FN8. See Plaintiffs' Memorandum in Opposition at p. 5.

The Second Circuit determined that the JPML does have jurisdiction to transfer a case even where a jurisdictional objection is pending.[FN9] In *Weinke v. Microsoft,* this same issue was presented to the district court. In that case, the court exercised its jurisdiction and stayed the action pending a decision by the JPML.[FN10]

> FN9. See *In re Ivy,* 901 F.2d 7, 9 (2d Cir.1990).

> FN10.2000 WL 220496 (E.D.Wis.1999).

In *Boudreaux v. Metropolitan Life Ins. Co.,* the court stated that "[t]he transferee judge 'certainly has the power to determine the question of remand,' and if remand issues are common to many of [these cases], decisions by the transferee judge would avoid 'duplicative discovery and conflicting pretrial rulings.' "[FN11] Other cases have come to this same conclusion.[FN12]

> FN11.1995 WL 83788 at \*2, (E.D.La.1995)(quoting *In re Air Crash Disaster at Florida,* 368 F.Supp. 812, 813 (J.P.M.L.1973)).

> FN12.*In re Professional Hockey Antitrust Litigation,* 369 F.Supp. 1117, 1118 (J.P.M.L.1974); *In re Air Crash Disaster at Juneau Alaska,* 360 F.Supp. 1406 (J.P.M.L.1973).

In all of these cases the courts determined that consistency and economy would be served by resolution of these issues by a single court after transfer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 462919 (E.D.La.), 2000-1 Trade Cases P 72,885

by the JPML. The same is true in this case. In the event that the Panel determines that consolidation of these cases is not warranted, Plaintiff may re-urge the motion.

Courts consider the following factors in deciding whether a stay of the proceedings is appropriate: 1) hardship and inequity on the moving party without a stay; 2) prejudice the non-moving party will suffer if a stay is granted; and 3) judicial economy.FN13

> FN13. See *Rivers v. Walt Disney Co.,* 980 F.Supp. 1358, 1360 (C.D.Cal.1997); See generally *Arthur-Magna, Inc. v. Del-Val Financial Corp.,* 1991 WL 13725 (D.N.J.1991); *Boudreaux v. Metropolitan Life Ins. Co.,* 1995 WL 83788 (E.D.La.1995).

First, Microsoft would suffer a considerable hardship and inequity if forced to simultaneously litigate multiple suits in multiple courts. Further, they could potentially suffer conflicting rulings by different judges in these multiple suits. Second, Plaintiffs have failed to show any significant prejudice they would suffer, beyond the slight delay pending the JPML decision. Finally, the interests of judicial economy would best be served by granting a stay.

Accordingly;

IT IS ORDERED that further proceedings in this case are STAYED pending the decision on consolidation and transfer by the JPML.

*3 IT IS FURTHER ORDERED that Plaintiffs' Motion to Remand is DENIED at this time and may be re-urged if necessary after the decision of the JPML.

E.D.La.,2000.
Falgoust v. Microsoft Corp.
Not Reported in F.Supp.2d, 2000 WL 462919 (E.D.La.), 2000-1 Trade Cases P 72,885

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.