MDL 875

BEFORE THE UNITED STATES OF AMERICA JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

JUDICIAL PANEL FOR MULTIDISTRICT LITIGATION JAN - 9 2009

|  |  |  |
|---|---|---|
| JAMES W. GIBBENS, *et al.*, | * | FILED |
| Plaintiffs, | * | CLERK'S OFFICE |
| VERSUS | * |  |
|  | * | MDL DOCKET NO. 875 |
| AQUA-CHEM, INC., *et al.*, | * | (CTO-317) |
| Defendants. | * |  |
|  | * |  |
| United States District Court | * |  |
| Middle District of Louisana | * |  |
| Civil Action No. 08-572-JVP-DLD | * |  |

* * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Northrop Grumman Ship Systems, Inc. f/k/a Avondale Industries, Inc. ("Avondale") submits this Memorandum in Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order and respectfully shows as follows:

Plaintiffs have set forth two separate arguments as alleged bases for their Motion to Vacate Conditional Transfer Order. The two arguments are separately set out in Section IIA and Section IIB of plaintiffs' memorandum. Avondale takes no position with respect to plaintiffs' argument set out in Section IIA of plaintiffs' memorandum, and Avondale does not oppose Plaintiffs' Motion to Vacate, but *only* to the extent that an Order by this Honorable Court to vacate the Conditional Transfer Order would be based exclusively on plaintiffs' argument set forth in Section IIA of plaintiffs' memorandum.

However, Avondale strongly opposes the position and arguments set forth by plaintiffs in Section IIB of their memorandum, in which plaintiffs argue that Avondale never established federal subject matter jurisdiction in this case and did not properly remove this case under the Federal Officer Removal Statute (28 U.S.C. §1442). Accordingly, Avondale strongly opposes

PLEADING NO. 5713

IMAGED JAN 1 2 2009            OFFICIAL FILE COPY

the issuance of any Order vacating the Conditional Transfer Order on the bases of plaintiffs' arguments in Section IIB of their memorandum.

The question of whether this case was properly removed under the Federal Officer Removal Statute (28 U.S.C. § 1442) is hotly contested as demonstrated in the attached Memorandum in Opposition to Motion to Remand.  Avondale presented to the transferee court prior to the entry of the Conditional Transfer Order the history of similar removals effected in Louisiana in recent months.  Most importantly, Avondale cited to two recent cases they removed under the Federal Officer Removal Statute that withstood identical Motions to Remand in the Middle District of Louisiana.

As explained in Avondale's attached memorandum, there appears to be an irreconcilable split between the Eastern District of Louisiana and the Middle District of Louisiana concerning the propriety of federal officer removals.  Avondale contends that the test applied in the Middle District (in cases removed by them), and the same test applied in the Eastern District (in cases removed by others[1]), is the proper test.  Moreover, Avondale contends that even if the test urged by the plaintiffs in this case is applied, the nature of the allegations made in plaintiffs' original petition lead to the conclusion that even the plaintiffs more onerous test is satisfied.

At any rate, this Honorable Court should not vacate the Conditional Transfer Order based on plaintiffs' arguments set forth in Section IIB of their memorandum until it has first made a determination on the pending motion to remand, where a full-fledged analysis of the Federal Officer Removal Statute in the context of this case can be made.  Avondale stands by the reasoning in its attached memorandum, and urges the Court to deny Plaintiffs' Motion to Vacate

---

[1] *See Delancey, et al. v. General Electric, et al.,* U.S.D.C., E.D. La. No. 04-431, 48 F. Supp. 2d 653 664 (E.D. Tex. 1999); *Fink v. Todd Shipyards, et al.,* E.D. No. 04-430.

Conditional Transfer Order as premature.

Respectfully Submitted:

**Kristopher T. Wilson, La. Bar No. 23978**
**F. Lewis Parks. Jr., La. Bar No. 29646**
**Halima N. Smith, La. Bar No. 28233**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:      (504) 568-1990
Facsimile:      (504) 310-9195
e-mail:      kilson@lawla.com
            lparks@lawla.com
            hsmith@lawla.com
**Attorneys for Northrop Grumman Systems**
**Corp.**

**BEFORE THE UNITED STATES OF AMERICA**

**JUDICIAL PANEL FOR MULTIDISTRICT LITIGATION**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN - 9 2009

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| JAMES W. GIBBENS, *et al.*, | * | |
| Plaintiffs, | * | |
| VERSUS | * | |
| | * | **MDL DOCKET NO. 875** |
| AQUA-CHEM, INC., *et al.*, | * | **(CTO-317)** |
| Defendants. | * | |
| | * | |
| United States District Court | * | |
| Middle District of Louisana | * | |
| Civil Action No. 08-572-JVP-DLD | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PROOF OF SERVICE

I hereby certify that on <u>8 January 2009</u> a copy of the foregoing MEMORANDUM IN

OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER

ORDER was filed with the Clerk of the Judicial Panel for Multidistrict Litigation.  Notice of this

filing will be sent to counsel as set forth in the attached Panel Service List (Excerpted from

CTO-317).

Respectfully Submitted:

Kristopher T. Wilson, La. Bar No. 23978
F. Lewis Parks. Jr., La. Bar No. 29646
Halima N. Smith, La. Bar No. 28233
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:     (504) 568-1990
Facsimile:      (504) 310-9195
e-mail:           kilson@lawla.com
                      lparks@lawla.com
                      hsmith@lawla.com
**Attorneys for Northrop Grumman Systems Corp.**

371535_1

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**

MDL No. 875

## INVOLVED COUNSEL LIST (CTO-317)

AAA Cooper Transporation
c/o Registered Agent
Registered Agent Solutions, Inc.
1040 Rock-N-Creek Road
Leesville, SC 29070

Stephen Adams
TAYLOR DUANE BARTON
& GILMAN LLP
10 Dorrance Street
Suite 700
Providence, RI 02903

F. Saunders Aldridge III
HUNTER MACLEAN EXLEY
& DUNN
P.O. Box 9848
Savannah, GA 31412

Peter G. Angelos
LAW OFFICES OF
PETER G ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201

Edward C. Bacon
BACON THORNTON & PALMER
Capital Office Park
6411 Ivy Lane, Suite 706
Greenbelt, MD 20770-1411

Nickolas C. Berry
HINSHAW & CULBERTSON LLP
Barnett Bank Building
1 East Broward Blvd.
Suite 1010
Fort Lauderdale, FL 33301

V. Brian Bevon
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Roy B. Blackwell
KAUFMAN & CANOLES PC
4801 Courthouse Street
Suite 300
P.O. Box 6000
Williamsburg, VA 23188-6000

Elizabeth E. Bowyer
TROUTMAN SANDERS LLP
1111 E Main St
Po Box 1122
Richmond, VA 23218-1122

Jon W. Brassel
BRASSEL BALDWIN KAGAN
& MAY PA
112 West Street
Annapolis, MD 21401

Dennis P. Brescoll
BRESCOLL & BRESCOLL
222 Merrill Street
Birmingham, MI 48009

Edward J. Briscoe
FOWLER WHITE BURNETT PA
Espirito Santo Plaza
14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

Paul H. Burmeister
HUSCH & EPPENBERGER LLC
401 South Main Street
Suite 1400
Peoria, IL 61602-1241

Dabney J. Carr, IV
TROUTMAN SANDERS LLP
1001 Haxall Point
P.O. Box 1122
Richmond, VA 23208

Pamela W. Carter
BAKER DONELSON BEARMAN
CALDWELL & BERKOWTIZ
201 St. Charles Avenue
Suite 3600
New Orleans, LA 70170

Michael P. Cascino
CASCINO VAUGHAN LAW
OFFICES LTD
220 S. Ashland Avenue
Chicago, IL 60607-5308

Daniel A. Casey
K&L GATES LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 200
Miami, FL 33131-2399

William Thomas Causby
NELSON MULLINS RILEY
& SCARBOROUGH LLP
1330 Lady Street
Keenan Bldg., 3rd Floor
P.O. Box 11070
Columbia, SC 29211-1070

Certainteed Corp.
750 East Swedesford Road
P.O. Box 860
Valley Forge, PA 19482-0101

**MDL No. 875 - Involved Counsel List (CTO-317) (Continued)**

Demetra A. Christos
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610-4714

Stuart L. Cohen
BENNETT AIELLO COHEN
& FRIED
The Ingraham Building
25 Southeast Second Avenue
Suite 808
Miami, FL 33131

William David Conner
HAYNSWORTH SINKLER BOYD
P.O. Box 2048
Greenville, SC 29602-2048

Eric David Cook
WILLCOX & SAVAGE PC
1800 Bank of America Center
One Commercial Place
Norfolk, VA 23510

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street
Suite 3000
Chicago, IL 60602-2415

Thomas C. Crumplar
JACOBS & CRUMPLAR PA
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899

Hugh W. Cuthbertson
ZANGARI HERSHMAN PC
59 Elm Street
Suite 400
New Haven, CT 06510

Case A. Dam
FERRARO LAW FIRM
4000 Ponce de Leon Boulevard
Suite 700
Miami, FL 33146

William Pearce Davis
BAKER RAVENEL & BENDER
P.O. Box 8057
Columbia, SC 29202

Richard M. Dighello, Jr.
UPDIKE KELLY & SPELLACY PC
One State Street
Suite 2400
P.O. Box 231277
Hartford, CT 06123-1277

Timothy J. Dodd
215 Broadway
Providence, RI 02903

Michael W. Drumke
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60606-6473

S. Lawrence Dumville
4356 Bonney Road
Suite 2-102
Virginia Beach, VA 23452

Steven A. Edelstein
The Biltmore Hotel
1200 Anastasia Avenue
Suite 410
Coral Gables, FL 33134

C. Michael Evert, Jr.
EVERT WEATHERSBY & HOUFF
3405 Piedmont Road, N.E.
Suite 225
Atlanta, GA 30305-1764

Matthew J. Fischer
SCHIFF HARDIN LLP
6600 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606-6473

John P. Fishwick, Jr.
LICHTENSTEIN & FISHWICK
101 S Jefferson St
Suite 400
Roanoke, VA 24004-0601

Evelyn M. Fletcher
HAWKINS & PARNELL LLP
4000 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA 30308-3243

James D. Gandy, III
PIERCE HERNS SLOAN
& MCLEOD
P.O. Box 22437
Charleston, SC 29413

John A. Gardner, III
HEDRICK GARDNER KINCHELOE
& GAROFALO LLP
6000 Fairview Road
Suite 1000
P.O. Box 30397
Charlotte, NC 28230

Lawrence G. Gettys
BRENT COON & ASSOCIATES
17405 Perkins Road
Baton Rouge, LA 70810

Richard S. Glasser
GLASSER & GLASSER PLC
Crown Center Building
580 East Main Street
Suite 600
Norfolk, VA 23510

Erin L. Golembiewski
MORRISON MAHONEY
One Constitution Plaza
10th Floor
Hartford, CT 06103-1810

David M. Governo
GOVERNO LAW FIRM LLC
260 Franklin Street
15th Floor
Boston, MA 02110

Marc C. Greco
GLASSER & GLASSER PLC
Crown Center Building
Suite 600
580 East Main Street
Norfolk, VA 23510

## MDL No. 875 - Involved Counsel List (CTO-317) (Continued)

Anthony C. Hayes
NELSON MULLINS RILEY
& SCARBOROUGH LLP
P.O. Box 11070
Columbia, SC 29211-1070

Josephine H. Hicks
PARKER POE ADAMS
& BERNSTEIN LLP
Three Wachovia Center
401 South Tryon Street
Suite 3000
Charlotte, NC 28202

Glen A. Huff
HUFF POOLE & MAHONEY
4705 Columbus Street
The Huff, Poole & Mahoney Building,
Suite 100
Virginia Beach, VA 23462

Virginia E. Johnson
FOLEY & MANSFIELD PLLP
4770 Biscayne Boulevard
Suite 1000
Miami, FL 33137

Zandra Lynn Johnson
SMITH MOORE LEATHERWOOD
P.O. Box 87
Greenville, SC 29602

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Thomas C. Junker
JUNKER TADDEO & STURM
3 West Cary Street
Richmond, VA 23220

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN McCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607

Leland I. Kellner
LAVIN COLEMAN FINARELLI
& GRAY
Penn Mutual Tower, 10th Floor
510 Walnut Street
Philadelphia, PA 19106

James G. Kennedy
PIERCE HERNS SLOAN
& McLEOD
P.O. Box 22437
Charleston, SC 29413

Edward P. Kenney
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603

Jennifer Marie Kinkus
YOUNG CONAWAY STARGATT
& TAYLOR
P.O. Box 391
Wilmington, DE 19899-0391

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

Donald A. Krispin
JAQUES ADMIRALTY LAW FIRM
1370 Penobscot Building
645 Griswold St.
Detroit, MI 48226-4192

Kathleen M. LaBarge
BICE COLE LAW FIRM
999 Ponce de Leon Boulevard
Suite 710
Coral Gables, FL 33134

David C. Landin
Hunton & Williams
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

Thomas W. Lyons, III
STRAUSS FACTOR LAING
& LYONS
222 Richmond Street
Suite 208
Providence, RI 02903-2914

William F. Mahoney
SEGAL McCAMBRIDGE SINGER
& MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038

Thomas F. Maxwell, Jr.
PULLMAN & COMLEY LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006

Kenneth Reed Mayo
REED MAYO LAW FIRM PC
484 Viking Drive
Suite 130
Virginia Beach, VA 23452

Kevin C. McCaffrey
CULLEN & DYKMAN
177 Montague Street
Brooklyn, NY 11201

Keith C. McDole
JONES DAY
2727 North Harwood Street
Dallas, TX 75201

Moffatt Grier McDonald
HAYNSWORTH SINKLER BOYD
P.O. Box 2048
Greenville, SC 29602

John P. McShea
McSHEA TECCE PC
Mellon Bank Center
1717 Arch Street
28th Floor
Philadelphia, PA 19103

**MDL No. 875 - Involved Counsel List (CTO-317) (Continued)**

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

Natalia Medina
MORGAN LEWIS & BOCKIUS
200 S. Biscayne Boulevard
Suite 5300 Wachovia Financial Center
Miami, FL 33131-2339

Robert L. Norton
JONES GRANGER TRAMUTO
CHRISTY & HALSTEAD
10000 Memorial Drive
Suite 888
P.O. Box 4340
Houston, TX 77210-4340

Robert L. O'Donnell
VANDEVENTER BLACK LLP
500 World Trade Ctr
101 W. Main Street
Norfolk, VA 23510

Melissa M. Olson
EMBRY & NEUSNER
118 Poquonnock Road
P.O. Box 1409
Groton, CT 06340

Richard H. Ottinger
VANDEVENTER BLACK LLP
500 World Trade Ctr
Norfolk, VA 23510

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Edward Lee Pauley
WALLACE & GRAHAM
525 North Main Street
Salisbury, NC 28744

Timothy Peck
SMITH MOORE LEATHERWOOD
P.O. Box 21927
Greensboro, NC 27420

Michael G. Phelan
BUTLER WILLIAMS & SKILLING
100 Shockoe Slip
4th Floor
Richmond, VA 23219

Carl E. Pierce, II
PIERCE HERNS SLOAN
& MCLEOD
P.O. Box 22437
Charleston, SC 29413

Richard T. Pledger
WALLACEPLEDGER LLC
7100 Forest Avenue
Suite 302
Richmond, VA 23226

Albert H. Poole
HUFF POOLE & MAHONEY PC
Huff, Poole & Mahoney Building
Suite 100
4705 Columbus Street
Virginia Beach, VA 23462

Jeffrey Scott Poretz
MILES & STOCKBRIDGE PC
1751 Pinnacle Drive
Suite 500
McLean, VA 22102-3833

Damon R. Pourciau
BRENT COON & ASSOCIATES
1515 Poydras Street
Suite 800
New Orleans, LA 70112

Steven J. Pugh
RICHARSON PLOWDEN
& ROBINSON PA
1900 Barnwell Street
P.O. Drawer 7788
Columbia, SC 29202

Joseph A. Rhodes, Jr.
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
P.O. Box 2757
Greenville, SC 29602

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

William V. Riggenbach
DUANE & SHANNON PC
10 East Franklin Street
Richmond, VA 23219

Lola M. Rodriguez
DUANE HAUCK & GNAPP
10 E Franklin St
Richmond, VA 23219-2106

Henry Salas
COLE SCOTT & KISSANE PA
Dadeland Centre II
9150 South Dadeland Blvd.
14th Floor
Miami, FL 33156

Carl R. Schwertz
DUANE HAUCK & GNAPP
10 East Franklin Street
Richmond, VA 23219-2106

Linda R. Self
BRASHER LAW FIRM
One Metropolitan Square
211 North Broadway
Suite 2300
St. Louis, MO 63102

Patricia M. Shepard
ADLER & ROSENTHAL LLC
290 Roberts Street
Suite 101
East Hartford, CT 06108

Frank J. Sioli, Jr.
BROWN SIMS PC
9100 South Dadeland Boulevard
Suite 908
Miami, FL 33156

Halima Narcisse Smith
LUGENBUHL WHEATON PECK
RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, LA 70130

Steven Wentzel Smith
LAW OFFICE OF
PETER G ANGELOS
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

**MDL No. 875 - Involved Counsel List (CTO-317) (Continued)**

Charles Monroe Sprinkle, III
HAYNSWORTH SINKLER BOYD
P.O. Box 2048
Greenville, SC 29602-2048

Kevin A. Sullivan
SAUTER SULLIVAN ET AL
3415 Hampton Avenue
St. Louis, MO 63139

Robert J. Sweeney
EARLY LUDWICK & SWEENEY
One Century Tower
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT 06508-1866

Jonathan F. Tabasky
COOLEY MANION & JONES LLP
21 Custom House Street
6th Floor
Boston, MA 02110

Jennifer M. Techman
EVERT WEATHERSBY & HOUFF
3405 Piedmont Road, NE
Suite 200
Atlanta, GA 30305

Mark S. Thomas
WILLIAMS MULLEN
3200 Beechleaf Court
Suite 500
Raleigh, NC 27619

Jeffrey M. Thomen
MCCARTER & ENGLISH LLP
185 Asylum Street
City Place I
Hartford, CT 06103-3495

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Tracy E. Tomlin
NELSON MULLINS RILEY
& SCARBOROUGH LLP
100 North Tryon Street
42nd Floor
Charlotte, NC 28202-4007

Archibald Wallace, III
WALLACEPLEDGER LLC
7100 Forest Avenue
Suite 302
Richmond, VA 23226

Mona Lisa Wallace
WALLACE & GRAHAM PA
525 North Main Street
Salisbury, NC 28144

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS
KRUTZ & TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608

Jennifer A. Whelan
MCGIVNEY & KLUGER PC
1 State Street
Boston, MA 02109

Stephen B. Williamson
MCGUIREWOODS LLP
100 North Tryon Street
Suite 2900
Charlotte, NC 28202

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JAMES W. GIBBENS, *ET AL*, | * | |
| PLAINTIFFS, | * | |
| VERSUS | * | |
| | * | CIVIL ACTION NO. 08-572-JVP-DLD |
| AQUA-CHEM, INC., *ET AL*., | * | |
| DEFENDANTS. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM IN OPPOSITION TO MOTION TO REMAND

NOW INTO COURT, through undersigned counsel, comes Northrop Grumman Ship Systems, Inc., successor by merger to Avondale Industries, Inc. and Northrop Grumman Ship Systems Corporation f/k/a Northrop Grumman Corporation, successor by merger to Avondale Industries, Inc. ("Avondale"), who respectfully submits this Memorandum in Opposition to plaintiff's Motion to Remand as follows.

FACTS

Plaintiffs filed suit in the 19th Judicial District Court for the Parish of East Baton Rouge seeking damages for themselves as well as their spouses for their alleged exposure to asbestos at numerous facilities.[1] In particular, plaintiff, James Gill ("Gill") claims that he worked at Avondale from 1963 – 1965, and he specifically alleged that Avondale was liable for failing to warn about the hazards of asbestos and in strict liability, among a host of other allegations.

---

[1]  *See,* Exhibit A, Plaintiff's Petition for Damages and First Supplemental and Amending Petition.

Avondale removed this matter, alleging that this action involved persons acting under the authority of a federal officer and that it had a colorable federal defense under the government contractor defense. Plaintiffs filed this Motion to Remand because they alleged that removal based on the federal officer statute is improper. This court should deny plaintiffs' Motion to Remand because plaintiffs' allegations against Avondale sound in negligence for alleged failure to warn and in strict liability. This Court, in *Daniel Melford v. Peter Territo, et al.*, denied plaintiff's Motion to Remand and determined that a causal connection existed between the plaintiff's claims and Territo's alleged action and that the government contractor defense asserted by Territo was indeed a "colorable" defense.[2] This case is nearly identical.

## INTRODUCTION

During the time that James Gill worked at Avondale, there were under construction vessels commissioned by the United States Navy and the U.S. Maritime Commission.[3] In particular, the Gulf & South American and Lykes vessels were constructed at Avondale under contracts with the United States government, specifically the Secretary of Commerce through the Maritime Subsidy Board.[4] Under the terms of those contracts, the United States Department of Commerce directed all facets of ship construction including design and materials. Some of the materials required by the Secretary of Commerce were asbestos-containing ones which were used in the construction of these vessels.[5] Also under construction during James Gill's stint at Avondale were Destroyer Escorts commissioned by the United States Navy. Just as with the Maritime Commission vessels, the Navy exercised pervasive control over the construction of the

---

[2] *See,* Exhibit B, Ruling on Motion to Remand in *Melford.*
[3] *See,* Exhibit C, Affidavit of Thomas McCaffery executed on November 17, 2008.
[4] *See*, Exhibit D, Affidavit of Thomas McCaffery executed on January 23, 2006 and Exhibit E, Affidavit of Thomas McCaffery executed on June 29, 2005.
[5] *See,* Exhibits C, D and E.

2

Destroyer Escorts and mandated that asbestos be installed therein.  One hundred percent of the ocean-going vessels under construction from 1963 to 1965 at Avondale were under the control of the United States Navy or the U.S. Maritime Commission.[6]

This memorandum will demonstrate that the United States Government exercised pervasive control over the construction of the Gulf & South American vessels, Lykes vessels, and Destroyer Escorts, and specified that certain materials were to be used.  The remainder of the memorandum will consist of an examination of the test applied by United States District Court for the Middle District of Louisiana in removals based on the Federal Officer Removal statute. As the Court is aware, the Middle District has rejected the test historically applied by the Eastern District on which the entirety of plaintiff's Motion to Remand is based.[7]

## LAW AND ARGUMENT

### A.      The Three-Prong Test

The United States Supreme Court has set forth criteria which must be met in order for a defendant to remove a case under 28 U.S.C. §1442(a)(1).  In *Mesa v. California*, the Court set forth a three-prong test, which requires the "person"[8] acting "under a federal officer" to:

   (1)      Demonstrate that he acted under the direction of a federal officer;

   (2)      Raise a federal defense to the plaintiff's claim; and

   (3)      Demonstrate a causal nexus between plaintiff's claims and acts he performed

---

[6]  *See*, Exhibit C.

[7]  *See, Lalonde, et al. v. Delta Field Erection, et al.*, C.A. No. 96-3244-B-M3, United States District Court, Middle District of Louisiana, August 5, 1998, cited with approbation in *Catania, et al. v. ACandS, Inc., et al.*, C.A. No. 02-368-D, United States District Court, Middle District of Louisiana, July 18, 2002 and plaintiff's Motion to Remand.

[8]  In the Fifth Circuit, Avondale Shipyards, a federal contractor, qualifies as a "person" for the purposes of the Federal Officer Removal Statute.  *Peterson v. BlueCross/BlueShield*, 508 F.2d 55 (5th Cir. 1975).

3

under color of federal office.[9]

## B.     Federal Control

As the attached affidavits demonstrate, Avondale and its personnel were subject to rigorous safety and construction standards that were monitored on a regular basis by federal inspectors. In short, the attached affidavits demonstrate that the federal government, acting under the direction of the United States Coast Guard, United States Maritime Administration, United States Secretary of Commerce and numerous other federal officers, exercised direct and detailed control over the design and construction of the Gulf & South American and Lykes vessels. Every aspect of the construction process required federal approval up to an including final delivery of the vessels. In addition, the Gulf & South American and Lykes vessels were built at a cost of over $10,000, a factor that triggered the application of the Walsh-Healy Act and all of its extensive regulations.[10]

## C.     Certain Materials Must Be Used

Some of the most significant sources of asbestos to which Gill could have been exposed while working on the Gulf & South American and Lykes vessels during the construction process were the insulation materials applied to piping and other machinery associated with the steam-driven engines built to power the vessels, as well as the fire-proofing materials utilized in the crew areas, e.g., cabins, galleys, mess halls, etc.

The affidavits of Thomas McCaffery as well as the affidavit of Edward Blanchard conclusively demonstrate the pervasive federal control exercised by the federal government from design through delivery.[11] Through Mr. McCaffery's and Mr. Blanchard's testimony, Avondale

---

[9]  *Mesa v. California*, 489 U.S. 121, 124-125, 134-135 (1989).
[10]  *See*, Exhibits C, D, and E and 41 C.F.R 50-204 (1966).
[11]  *See*, Exhibits C, D, and E and Exhibit F, Affidavit of Edward Blanchard

4

presents below some non-exclusive examples of federal control that enjoy special significance here.

> **1.   The Federal Government Required the Installation of Asbestos Containing Products on the Gulf & South American Vessels**

The Gulf & South American commercial cargo vessels were built by Avondale and delivered to the Gulf & South American Steamship Company, Inc.[12]  Although Gulf & South American ultimately operated the vessels, all three ships were purchased by the United States for the nation's Ready Reserve Force.[13]

This group of merchant ships was specifically chosen for its usefulness in war time or national emergency.[14]  They were maintained by the U.S. Maritime Administration to quickly provide shipping in response to such exigencies.[15]

Over one-half of the cost of building the Gulf & South American vessels at Avondale was paid by the U.S. Maritime Administration through the Maritime Subsidy Board.[16]  The authority to make these payments was Title V "Construction Differential Subsidy" (hereinafter "CDS"), of the Merchant Marine Act, 1936 (hereinafter referred to as "the Act").[17]  To qualify for this subsidy, ships had to be new, be operated in scheduled or "liner" cargo service to foreign countries, and be suitable for naval or military use.

Sections 502 and 504 of the Act required that the CDS payments be made directly to Avondale, rather than to Gulf & South American.[18]  Further, the Act required that the vessels built with CDS be constructed under a contract or contracts which

---

[12] *See,* Exhibit G, Maritime Subsidy Board, Maritime Administration Documents at ¶5.
[13] *See,* Exhibit G, ¶5.
[14] *See,* Exhibit G, ¶5.
[15] *See,* Exhibit G, ¶5.
[16] *See,* Exhibit G, ¶6.
[17] *See,* Exhibit G, ¶6.
[18] *See,* Exhibit G, ¶7.

5

. . . contain such provisions as are provided in this title to protect
the interests of the United States.[19]

As part of the CDS contract negotiations for the Gulf & South American vessels, the ship

plans and specifications developed by Gibbs & Cox, Inc. for Gulf & South American were

reviewed by both the U.S. Maritime Administration and the U.S. Navy.[20]  The Navy required

Gulf & South American to modify the original plans and specifications to include specific

"National Defense Features."[21]  At least five other modifications were made to the original plans

and specifications during contract negotiations before final approval by the Maritime Subsidy

Board.[22]

The Ship Construction Contract signed by the Maritime Administration/Maritime

Subsidy Board, Gulf & South American and Avondale contains the following provisions:

a.  The contract consisted of Special Provisions, General Provisions and the
approved Plans and Specifications.

b.  The Gulf & South American vessels were to be built by Avondale in strict
accordance with the approved Plans and Specifications.

c.  Changes in the Plans and Specifications could not be made without the specific
approval of the Maritime Subsidy Board.

d.  The Maritime Subsidy Board would pay Avondale 55% of the purchase price of
the Gulf & South American vessels, plus 100% of the cost of the National
Defense Features.

e.  The ships and the shipyard were required to be available at all times for inspection
by representatives of either the Maritime Subsidy Board or Gulf & South
American.[23]

A notable example of the Gulf & South American vessel construction specifications

---

[19]  *See*, Exhibit G, ¶7.
[20]  *See*, Exhibit G, ¶8.
[21]  *See*, Exhibit G, ¶8.
[22]  *See*, Exhibit G, ¶8.
[23]  *See*, Exhibit G, ¶9.

6

requiring Avondale to install asbestos containing materials can be found in Section 25, entitled "Joiner Work and Interior Decoration."[24]  This section required Avondale to use Johns-Manville Marinite 36 core wallboard for joiner bulkheads and liners in constructing the Gulf & South American vessels.[25]  Ceilings were required to be Johns-Manville, or equal, Marine Veneer panels.[26]  U.S. Coast Guard Publication CG-190, "Equipment Lists", dated August 3, 1964 identifies Johns-Manville Marinite 36 as "asbestos incombustible binder board."  The same document identifies Johns-Manville Marine Veneer as "asbestos cement board."[27]

<ol start="2">
<li>**Federal Regulations Governing the Construction of the Gulf & South American and Lykes Vessels Required the Installation of Asbestos-Containing Materials**</li>
</ol>

Under federal regulations, construction of the Gulf & South American and Lykes vessels was subject to the Marine Inspection and Navigation Laws of the United States.[28]  These laws are codified in Title 46 "Shipping" of the Code of Federal Regulations.[29]  These regulations are enforced by the U.S. Coast Guard.[30]  The specific regulations applicable to the cargo ships to be built by Avondale are contained in Title 46, Code of Federal Regulations, Subchapters F "Machinery" (parts 50 -62), I "Cargo and Miscellaneous Vessels" (parts 90 - 105), J "Electrical" (parts 110 - 113) and Q "Materials" (part 164).[31]

U.S. Coast Guard regulations provided that the Gulf & South American and Lykes vessels could not be constructed unless the vessel construction plans and specifications had been reviewed and approved by the U.S. Coast Guard to ensure compliance with these U.S. Coast

---

[24] *See*, Exhibit G, ¶10.
[25] *See*, Exhibit G, ¶10.
[26] *See*, Exhibit G, ¶10.
[27] *See*, Exhibit G, ¶10.
[28] *See*, Exhibit G, ¶11.
[29] *See*, Exhibit G, ¶12.
[30] *See*, Exhibit G, ¶12.
[31] *See*, Exhibit G, ¶12.

Guard Regulations.[32]  After the plans for the vessel are approved, the U.S. Coast Guard would continue to inspect the ship's structure, machinery and material to ensure that the ship is built in accordance with the approved plans and applicable U.S. Coast Guard Regulations.[33]

Part 92 of Title 46, entitled "Construction and Arrangement," provides one example of the Coast Guard's control over vessel construction plans and its enforcement powers.[34]  This section establishes the minimum acceptable standards for construction and arrangement of the accommodation and service areas aboard an inspected ship.[35]  Section 92.07, entitled "Structural Fire Protection," and identifies the specific materials to be used in the construction of decks, bulkheads and other structures.[36]  Paragraph 92-07-10(d)(7) provides that "Ceilings, linings, and insulation, including pipe and duct laggings, shall be of approved incombustible materials."[37]

In order for Avondale to determine the types of approved "incombustible materials" which were required to be installed on the Gulf & South American and Lykes vessels, it is necessary to review the section of the Coast Guard Publication CG 190 entitled "Equipment Lists."[38]  These contained lists of "Items approved or accepted under Marine Inspection and Navigation Laws."[39]  In that section, Avondale is bound by the requirements of section 164.009: "Incombustible Materials."[40]  The version of that standard effective at the time of plaintiff's alleged Avondale employment sets forth a list of Coast Guard approved pipe covering and

---

[32]  *See*, Exhibit G, ¶13.
[33]  *See*, Exhibit G, ¶ 14.
[34]  *See*, Exhibit G, ¶ 15.
[35]  *See*, Exhibit G, ¶ 15.
[36]  *See*, Exhibit G, ¶ 15.
[37]  *See*, Exhibit G, ¶16.
[38]  *See*, Exhibit G, ¶17.
[39]  *See*, Exhibit G, ¶17.
[40]  *See*, Exhibit G, ¶17.

8

lagging materials.[41]  Those "qualified products" and their manufacturers are:

> Baldwin-Ehret-Hill, Thermasil
> Baldwin-Ehret-Hill, 85% Magnesia
> Fiberboard Products Company, PABCO Precision Molded Caltemp
> Fiberboard Products Company, PABCO Precision Molded Super Caltemp
> Johns-Manville, 85% Magnesia
> Johns-Manville Thermobestos
> Owens-Corning Fiberglass, KAYLO Block Insulation
> Owens-Corning Fiberglass, KAYLO 20 Block Insulation
> The Rubberoid Company, Calsilite
> United States Plywood Company, UNIBESTOS[42]

There is no dispute that each and every one of the products listed above was an asbestos-containing product.[43]  There is also no dispute that these types of products were among the largest contributors to asbestos in the work environment.

    **D.**    ***Lalonde* and *Catania***

       In *Lalonde*, *supra*, and *Catania*, *supra*, this Court was presented with a "causal nexus" argument based on the same line of cases on which plaintiffs base their Motion to Remand. These cases stand for the proposition that if the federal government does not proscribe the issuance of warnings, and the only allegations against the removing party are failure to warn claims, then the causal nexus is not met.  Struck by the absence of any real precedent considered in that line of cases, the *Lalonde* court undertook to determine how the United States Fifth Circuit and the United States Supreme Court viewed the federal officer removal statute.  In particular, the *Lalonde* court studied the origin of the "causal nexus" test to determine whether the plaintiff's line of cases carried any legitimacy.

       In *Lalonde*, the Court held that the federal government contractor, DSM, "was 'acting under an officer of the United States or of any agency thereof' for purposes of removal under

---

[41] *See*, Exhibit G, ¶17.
[42] *See*, Exhibit G, ¶17.
[43] *See*, Exhibit G, ¶18.

§1442(a)(1)" because DSM operated a federal government-owned facility for the first part of plaintiff's exposure and subsequently at its own facility under the oversight of officers of the federal government. In a detailed analysis, the *Lalonde* court concluded:

> Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend require the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer. That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM not to warn Lalonde of the hazards of silica dust or not to provide him with adequate protective equipment. The Court specifically rejects and declines to follow these lower court cases to the extent plaintiff urges their applicability to the context presented here.[44]

After specifically rejecting *Overly* and its oft-cited progeny, the court went on to state:

> The Court instead looks to Supreme Court precedent regarding application of §1442(a)(1) which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under § 1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation," the test for removal under § 1442(a)(1) "should be broader, not narrower, than the test for official immunity."[45] Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specified details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the contractor to be "acting under" a federal officer is an "unduly grudging" requirement.
>
> *       *       *
>
> Every act taken in running the plant was taken under delegated federal authority. DSM *did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the ambit of its duties without a specific express federal directive as to the particulars, for DSM acted exclusively for and under the*

---

[44] *Lalonde* at p.7.
[45] *Id.* at p. 8.

**federal government in its operation of this facility.**[46]

The purpose of the federal officer removal statute is to:

> …[protect] against possible state interference with federal functions –regardless of whether the plant is being run directly by the United States **or by a contractor** retained and controlled by the federal government.  Whether a federal officer directly mandated the specific alleged act of omission in questions has little, if anything, to do with the core policy questions of whether federal interests potentially are impacted by the state court suit.[47]

In *Lalonde*, the Court correctly noted that:

> The "causal connection" required in civil cases under Supreme Court precedent is of a different nature from that required in cases such as *Overly*.  In particular, the governing precedents from the Supreme Court do not require a showing in a civil case that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law.  Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties.[48]

Accordingly, the "causal connection" inquiry is not whether the federal agent's alleged wrong was federally directed, but rather whether the alleged wrong occurred within the course of the agent's performance of the agent's federal duties.[49]

**E.     Avondale Can Assert Colorable Federal Defenses**

The third prong of the test for removal requires that a removing party demonstrate that it can assert a **colorable** federal defense to the claims made against it.  As explained in detail in *Mesa*:

> For purposes of removal, we only require [the removing party] to allege a colorable federal defense under federal law; "[t]he validity of the defense authorized to be made is a distinct subject.  It involves wholly different inquiries…It has no connection whatever

---

[46] *Lalonde*, at p. 8 (emphasis added).
[47] *Id.* at p. 9.
[48] *Id.* at p. 10.
[49] *Id.* at p. 11.

11

with the question of jurisdiction."[50]

Or, as stated by this Court in *Lalonde*: "The federal defense need only be a colorable one, not

necessarily one that will ultimately prove meritorious.[51]

### 1.   Avondale Is Immune Under the Longshore and Harbor Workers' Compensation Act (LHWCA).

Gill claims that he was exposed to asbestos while employed at Avondale.  Avondale is

and has always been in the business of constructing marine vessels.  The LHWCA, codified in 33

U.S.C. §933(i), specifically provides:

> The right to compensation or benefits under this Act shall be the
> exclusive remedy to an employee when he is injured, or to his
> eligible survivors or legal representatives if he is killed, by the
> negligence or wrong of any other person or persons in the same
> employ:  Provided, that this provision shall not affect the liability
> of a person other than an officer or employee of the employer.

Jurisdiction under Longshore and Harbor Workers' Compensation Act is established by the

satisfaction of the "status" and "situs" tests.  Injuries are compensable under the LHWCA for

"employees" including:

> . . . any person engaged in maritime employment including any
> longshoreman or other person engaged in longshoring operations
> and any harborworker including a ship repairman, ship-builder. .
> .[52]

Such a person must also sustain an injury

> . . . upon the navigable waters of the United States (including any
> adjoining pier, wharf, dry dock, terminal, building way, marine
> railway, or other adjoining area customarily used by an employer
> in loading, unloading, repairing, or building a vessel).[53]

Gill cannot dispute that he satisfies the "status" and "situs" test and is thus subject to the

---

[50] *Mesa, supra* at 964, quoting *The Mayor v. Cooper*, 6 Wall 247, 254, 18 L.ED 851 (1858).
[51] *Lalonde* at p. 13.
[52] 33 U.S.C. §902(3).
[53] 33 U.S.C. §903(a).

12

jurisdiction of the LHWCA, *a federal act*.  During the relevant time, Gill was an employee of

Avondale, and, as stated above, Avondale is and has always been in the business of constructing

marine vessels. Therefore, Avondale and Gill both qualify for treatment under the LHWCA.

Furthermore, since Avondale and Gill qualify for treatment under the LHWCA, their

rights should be settled in accordance with the LHWCA.  Congress explained the importance of

resolving disputes in the "employee family" within the framework of the LHWCA in the

following Senate Report:

> The other major provision of the bill relates to the immunization of
> fellow employees against damage suits.   The rationale of this
> change in the law is that when an employee goes to work in a
> hazardous industry he encounters two risks.   First, the risks
> inherent in the hazardous work and second, the risk that he might
> negligently hurt someone else and thereby incur a large common-
> law damage liability.  While it is true that this provision limits an
> employee's rights, it would at the same time expand them by
> immunizing him against suits where he negligently injures a fellow
> worker. *It simply means that rights and liabilities arising within
> the "employee family" will be settled within the framework of the
> Longshoremen's and Harbor Workers' Compensation Act.*
> (emphasis added).[54]

Thus, since Avondale's and Gill's substantive rights and liabilities derive from federal law, this

case should remain in federal court, and plaintiffs' Motion to Remand should be denied.

> **2.     Avondale Is Immune Under the Federal Contractor Defense.**

In addition to the defenses available under the LHWCA, Avondale also asserts federal

contractor immunity as a defense.  The standard for that defense was set out by the United States

Supreme Court in *Boyle v. United Tech. Corp.*[55]  In that case, the Court held that the federal

contractor defense is derived from the government's own immunity when performing

---

[54] *U.S. Code and Congressional and Administrative News*, 86th Cong., First Session 1959, Vol.
2, pages 2134-2136.
[55] 487 U.S. 500, 512 (1988).

discretionary functions, such as design selection for military equipment.[56]  To prevail under the federal contractor defense, Avondale only needs to establish that:    (1) reasonably precise specifications were approved by the United States; (2) the vessel(s) on which plaintiff worked conformed with those specifications; and (3) Avondale warned the United States of all dangers then known in using the asbestos-containing components the Unite States required be installed on those vessels that were unknown to the United States itself.[57]

      Due to the similarity of the requirements between the test for federal officer removal and the first and second prongs of the test for the federal contractor defense and for the same reasons set out above that establish that Avondale satisfies the jurisdictional analysis, they also satisfy the first prong of the federal contractor defense.    Avondale always conformed to the exceptionally precise specifications for the construction of the vessels as required and approved by officials of the United States.  Further, the vessels constructed at Avondale were ultimately accepted for delivery by those same officials following extensive inspections during construction and dock and sea trials thereafter.[58]  Thus, the vessels constructed at Avondale conformed with the specifications drafted and enforced by the federal government.  As to the third prong of the federal contractor defense, given the extensive presence and control of the construction of Gulf & South American and Lykes vessels by the federal government, the applicability of the Walsh-Healey Act and safety regulations promulgated by the LHWCA, it is also clear that Avondale had no knowledge of any dangers associated with the use of asbestos about which the United States government was not aware.

      While there is *no* evidence that Avondale knew of any dangers in using asbestos about

---

[56] *Id.* at 511.
[57] *Id.* at 512; *Winters v. Diamond Shamrock Chemical Co.,* 148 F.3d 7, 400 (5th Cir. 1998).
[58] *See,* exhibit F.

which the United States was not already aware, Avondale need not prevail in its federal

contractor defense—it need only establish its "colorability." This Court should not delve into

"the validity of the defense," which is a "distinct subject" and "involves wholly different inquires

apart from jurisdictional determination."[59]

Finally, the *Lalonde* court conducted an extensive examination of the "colorability" of

the Federal Contractor Defense when urged by a person or entity under strict government

supervision:

> The Court notes these many questions and uncertainties in the
> application of a government contractor defense to the facts of this
> case simply to illustrate that it cannot be stated categorically at this
> time that the Federal Contractor Defense is unavailable to DSM.[60]

Thus, the defense is available as to Avondale.

**F.      This Court has, in a factually similar case, denied a Motion to Remand
because the plaintiff alleged strict liability claims in addition to failure to
warn claims.**

In *Daniel Melford v. Peter Territo, et al.*, the plaintiff originally filed suit in the 19th

Judicial District Court for the Parish of East Baton Rouge, claiming that he was exposed to

asbestos while working at various facilities.[61]  He specifically alleged that Avondale was liable

for failure to warn about asbestos and was strictly liable for *garde* of the asbestos.[62]  The case

was removed to the United States District Court for the Middle District of Louisiana on the basis

of federal officer immunity and allotted to this very Court.  The plaintiff subsequently filed a

Motion to Remand, arguing that "the government did not exercise control over the warnings

provided to the Defendants' employees," that the "Defendant has no colorable defense that

---

[59] *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.2d 653, 664 (E.D. Tex. 1999).
[60] *Lalonde* at p. 19.
[61] *See*, Exhibit H, Petition in *Melford*.
[62] *Id.*

supports removal of Plaintiff's claims" and that the Defendants "do not qualify as a government contractor because he can establish no conflict between the mandates of the federal officer and his duty under state law to provide adequate warnings to his employees."[63]  As a result, plaintiff claimed that the defendants could not show a causal nexus "between the federal government's specifications and defendants' failure to warn his employees of the hazards of asbestos exposure."[64]  Avondale, in its Memorandum in Opposition to Motion to Remand, argued that the federal government exercised pervasive control over the construction of the vessels plaintiff worked on and specified that certain materials were to be used and that Avondale was immune under the Longshore and Harbor Workers' Compensation Act and the federal contractor defense.[65]

This Court, in ruling on the Motion to Remand, denied the motion and determined that "the facts of this case are sufficient to demonstrate that Territo acted pursuant to federal direction and that a causal connection exists between Territo's alleged actions and Melford's claims."[66] This Court also found that "Territo's assertion of the government contractor defense is sufficiently colorable for removal under Section 1442."[67]  Most importantly, however, this Court disagreed with the *Mouton v. Flexitallic, Inc.*[68] and *Overly v. Raybestos-Manhattan*[69] line of cases and saw "no basis in the language of Section 1442 or in controlling authority for the requirement that a defendant in a civil case show that the alleged wrongful act or omission was specifically directed or compelled by federal duty or law.  To the contrary, controlling cases

---

[63]  *See*, Exhibit I, Motion to Remand in *Melford*.
[64]  *Id.*
[65]  *See*, Exhibit J, Avondale's Memorandum in Opposition to Motion to Remand in *Melford*.
[66]  *See*, Exhibit B.
[67]  *Id.*
[68]  1999 WL 225438 (E.D. La.).
[69]  1996 WL 532150 (N.D. Cal.).

interpreting the statute have recognized that it is "neither 'limited' nor 'narrow' but should be afforded a broad reading so as not to frustrate the statute's underlying rationale."[70]

In the case at bar, plaintiff also raised allegations of failure to warn and strict liability against Avondale. Plaintiffs even raised virtually the same arguments in their Motion to Remand that the plaintiff in *Melford* asserted in his Motion to Remand—that there is no proof that the government exerted any influence in giving warnings, that there was no causal nexus between plaintiff's claims and any acts taken at the direction of a federal officer and that Avondale did not have a colorable defense under government contractor immunity.[71] This Court should deny this Motion to Remand because plaintiffs entire argument revolves around whether Avondale has a colorable defense only as to her failure to warn claims. Plaintiffs never applied the same analysis to their strict liability claims. In *Melford*, this Court found that there was a causal nexus and that Avondale presented a colorable defense under the government contractor defense as to plaintiff's strict liability claims and ultimately denied the Motion to Remand. This Court should apply the holding in the Motion to Remand in *Melford* to this case, deny plaintiffs' Motion to Remand and determine that jurisdiction is proper.

---

[70] *See,* Exhibit B.
[71] *See,* Exhibit D.

17

Respectfully Submitted:

_s/Gordon P. Wilson_____
**Gordon P. Wilson, La. Bar No. 20426**
**Halima N. Smith, La. Bar No. 28233**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    (504) 568-1990
Facsimile:    (504) 310-9195
e-mail:    gwilson@lawla.com
            hsmith@lawla.com
**Attorneys for Northrop Grumman Systems**
**Corp.**

## CERTIFICATE OF SERVICE

     I hereby certify that on <u>1 December 2008</u>, a copy of the foregoing MEMORANDUM IN OPPOSITION TO MOTION TO REMAND was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to:

| | | |
|---|---|---|
| Nicholas Dale Doucet | Lawrence G. Gettys | Julie A. Jacobs |
| Douglas R. Kraus | Dwight C. Paulsen, III | David E. Redmann, Jr. |
| Halima Narcisse Smith | Richard P. Voorhies, III | Gordon Peter Wilson |

by operation of the court's electronic filing system.  I also certify that I have mailed by United States Postal Service, this filing to the following non-CM/ECF participants:

Damon R. Pourciau
Brent Coon and Associates
1515 Poydras Street, Suite 2200
New Orleans, LA 70112

_s/Gordon P. Wilson_____
**Gordon P. Wilson, La. Bar No. 20426**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    (504) 568-1990
Facsimile:    (504) 310-9195
e-mail:    gwilson@lawla.com
**Attorneys for Northrop Grumman Systems**
**Corp.**

18

| | |
|---|---|
| JAMES H. GIBBENS, JACQUELYN GIBBENS, HOMER H. GILL, SR., JAMES L. GILL, GRANT HAWKINS, MARGIE HAWKINS, HARRISON J. HOLLOWAY, JOE LUCKY, JOAN LUCKY, WARREN V. MARCEL, WILMA MARCEL, JOSEPH MOBLEY, G.W. OSBORNE, LOURENA OSBORNE, ROBERT PYLE, DOROTHY PYLE | 19TH JUDICIAL DISTRICT COURT |
| VS. NO. 493,232 | PARISH OF EAST BATON ROUGE |
| AQUA-CHEM, INC., (d/b/a CLEAVER-BROOKS DIVISION), AVENTIS CROPSCIENCE USA, INC. (f/k/a RHONE POULENC AG COMPANY INC.), AW CHESTERTON CO.,WCandS, INC., AMCO INSULATIONS, INC., ASARCO, INC. (f/k/a AMERICA SMELTING & REFINING COMPANY), ASTEN GROUP, INC.,ASTENJOHNSON, INC. (f/k/a ASTEN, INC.), CBS CORPORATION (SUCCESSOR IN INTEREST TO WESTINGHOUSE ELECTRIC CORPORATION) CERTAINTEED CORPORATION, COLTEC INDUSTRIES, INC. (INDIVIDUALLY AND AS A SUCCESSOR TO ANCHOR PACKING COMPANY,INC.), COMBUSTION ENGINEERING, INC.,(INDIVIDUALLY AND SUCCESSOR-IN-INTEREST TO M.H. DETRICK COMPANY, WALSH REFRACTORY CORPORATION AND REFRACTORY AND INSULATION CORPORATION), CROWN CORK & SEAL COMPANY, INC., (SUCCESSOR TO MUNDET CORK COMPANY), DANA CORPORATION, EAGLE, INC. (f/k/a EAGLE ASBESTOS & PACKING COMPANY, INC.), EXXON MOBIL OIL CORPORATION (f/k/a MOBIL OIL CORPORATION) THE FLINTKOTE COMPANY, FOSTER WHEELER CONSTRUCTORS, INC., FOSTER WHEELER ENERGY CORPORATION, GARLOCK,INC., GENERAL ELECTRIC COMPANY, GENERAL REFRACTORIES COMPANY, GEORGIA PACIFIC CORPORATION (INDIVIDUALLY AND AS SUCCESSOR TO BESTWALL GYPSUM COMPANY), GREFCO, INC., HALIBURTON ENERGY SERVICE, INC. HBO INDUSTRIES, INC., IBEX CORPORATION, INGERSOLL-RAND COMPANY, J.T. THORPE COMPANY, KELLY MOORE PAINT COMPANY,INC., THE MCCARTY CORPORATION, METROPOLITAN LIFE INSURANCE COMPANY, MINNESOTA MINING & MANUFACTURING CORPORATION | |



DEFENDANT'S EXHIBIT
A

(3M CORPORATION),NORTH BROS.          §
INC.,OGLEBAY-NORTON COMPANY,          §
OWENS-ILLINOIS, INC.,                 §
PFIZER, INC. (AS SUCCESSOR-IN         §
-INTEREST TO QUIGLEY COMPANY,         §
INC.),PROKO INDUSTRIES, INC.,         §
RILEY STOKER, INC.(d/b/a DB           §
RILEY, INC.),TAYLOR-SEIDENBACH,       §
INC.,UNIROYAL, INC.,(f/k/a            §
UNITED STATES RUBBER COMPANY,         §
INC.),,VIACOM, INC., ZURN             §
INDUSTRIES, INC.                      §    STATE OF LOUISIANA
                                      §
FILED:_____        §    _____
                                      §    DEPUTY CLERK OF COURT

### PLAINTIFFS' ORIGINAL PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come Plaintiffs,
JAMES W. GIBBENS, JACQUELYN GIBBENS, HOMER W. GILL, SR., JAMES L.
GILL, GRANT HAWKINS, MARGIE HAWKINS, HARRISON J. HOLLOWAY, JOE
LUCKY, JOAN LUCKY, ARCEN P. MARCEL, HILMA MARCEL, JOSEPH MOSLEY, J.
W. OSBORNE, LOURENA OSBORNE, ROBERT PYLE, AND DOROTHY PYLE,
residents, of the full age of majority, of the State of Louisiana,
who respectfully represent that:

1.

The defendants, identified in Exhibit "B" (attached hereto and
incorporated by reference), are all either foreign corporations
licensed to do and/or doing business in the State of Louisiana or
domestic corporations licensed to do business and doing business in
the State of Louisiana.   The defendants are liable to the
Plaintiffs for the claims asserted herein and are solidary
obligors.

2.

The damages sought by Plaintiffs, exclusive of interest and
costs, exceed the minimum jurisdictional limits of the Court.

2

3.

Jurisdiction and venue of this matter are proper with this Court pursuant to Louisiana Code of Civil Procedure Articles 42, 73 and 74.

4.

Plaintiffs are properly joined in this action pursuant to Louisiana Code of Civil Procedure Articles 461 and 463.

5.

During the years and at the locations indicated in Exhibit "A", (attached hereto and incorporated herein by reference), Plaintiffs worked at various shipyards, steel mills, refineries, papermills, chemical plants and/or other industrial facilities in the state of Louisiana and elsewhere in the United States. While working at said facilities, Plaintiffs were occupationally exposed to substantial quantities of asbestos containing products mined, designed, manufactured, installed, marketed, advertised, sold, and/or distributed by defendants.

6.

As a direct result of the Plaintiffs' exposure to the defendants' defective products, the Plaintiffs have been diagnosed as suffering from severe and incapacitating injuries as specifically set forth in Exhibit "A", including, but not limited to shortness of breath, inability to breath, decreased exercise tolerance, asbestos related pleural disease, asbestosis, lung cancer, mesothelioma and other related cancer.

7.

Plaintiffs have sought the services of physicians in an effort to cure and/or arrest the conditions from which they are suffering to no avail.

3

8.

During the course of the Plaintiffs' work history, they were each exposed to asbestos containing products designed, manufactured, installed, advertised, marketed, distributed and/or sold by the defendants herein. These products were defective and caused the Plaintiffs to contract asbestos related diseases. These products were not accompanied by adequate warnings in that they did not warn the user that exposure to asbestos dust causes the occupational diseases of asbestosis, asbestos related pleural disease, asbestos related cancer, irreversible and progressive lung damage, as well as other asbestos related diseases, including pleural effusion, lung cancer, mesothelioma, gastrointestinal cancer, and other forms of cancer. Further, the defendants did not warn that their asbestos containing products brought about their pathological effects without noticeable trauma. These asbestos containing products were not accompanied by adequate instructions or warning for their safe and appropriate use, if, in fact, the products could safely be used in any circumstance. Alternate and safer products were available but not used. The designers and manufacturers of these products were negligent in their failure to determine the environment in which their products were used prior to introducing them into the stream of commerce and were negligent in the manner in which they marketed their products. Finally, these products were unreasonably dangerous per se.

COUNT ONE

9.

Defendants' asbestos containing products were unreasonably dangerous due to their design for the following reasons:

4

A.  As the manufacturers of potentially dangerous products, defendants are held to the knowledge of experts. They are required by the law to keep abreast of scientific knowledge, discoveries and advances and are presumed to know what is imparted thereby. Defendants also have the duty to test and inspect their products. The extent of any research and experiments must be commensurate with the dangers involved, all of which they deliberately failed to do;

B.  Even if a reasonable person would conclude that the dangers-in-fact of defendants' asbestos containing products did not outweigh the utility of those products, there were feasible ways to design defendants' products with less harmful consequences of which defendants held to the standard and skill of experts, should have been aware and feasibly could have utilized, yet failed to do so; and

C.  Even if a reasonable person would conclude that the danger-in-fact of defendants' products did not outweigh the utility of those products, the defendants held to the standard and skill of experts, should have reasonably known of the dangers inherent to the use of their asbestos containing products and could have feasibly utilized alternative products with less harmful consequence, which they failed to do.

10.

Specifically with respect to MINNESOTA MINING & MANUFACTURING CORPORATION (3M CORPORATION), the Plaintiffs' use of certain mask products which purported to provide respiratory

5

protection have contributed to cause the Plaintiffs' asbestos related disease. The failure of these products to provide adequate protection to the Plaintiffs is both a proximate and producing cause of Plaintiffs' injuries. The products were not accompanied by adequate instructions for safe and appropriate use, and/or instructions concerning maintenance and storage. Therefore, these respiratory protective devices were defective by reason of their design.

### COUNT TWO

11.

The defendants failed to adequately warn the Plaintiffs, ordinary users of asbestos containing products, concerning the dangers related to the way said products were designed. Specifically, defendants failed to provide the Plaintiffs and/or others similarly situated with adequate warnings of all dangers inherent in the normal use of their asbestos containing products which were not within the knowledge of or obvious to the ordinary user of those products. These dangers include the fact that the defendants' products were highly dangerous to the health of the person exposed to them in that they caused or contributed to numerous pulmonary diseases and a wide variety of cancers. Additionally, defendants failed to provide the Plaintiffs with knowledge as to reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth, there were any, to protect them from being poisoned and disabled as a result of the Plaintiffs exposure to or use of defendants' products. Further, defendants failed to instruct the Plaintiffs as to the proper and safe use of their products, if such products could ever safely be used.

6

12.

Subsequent to the time that the defendants caused their asbestos products to be sold and placed on the job site(s) where the Plaintiffs were employed, the defendants continued to acquire additional knowledge of the dangers caused by their products. This additional knowledge included, but was not limited to, the knowledge that exposure to even small amounts of asbestos and/or asbestos containing dust can cause serious and permanent injury. Nevertheless, the defendants negligently and recklessly failed and refused to warn and advise the Plaintiffs or others similarly situated of the dangers caused by their exposure to defendants' defective products, which the defendants had reason to know were in place at Plaintiffs' job site(s). Despite the defendants' knowledge that their asbestos containing products had contaminated job sites where the Plaintiffs were required to work, even to the present time, and possessed with the information uniquely available to the defendants relating to the dangerous effects of continued asbestos exposure, the defendants refused or neglected to warn and advise of the damages caused by their asbestos containing products to the Plaintiffs or the public at large. Defendants deliberately, intentionally and purposefully withheld such information from the Plaintiffs, thus denying Plaintiffs the knowledge with which to take necessary safety precautions such as periodic x-rays and medical examinations or avoiding further dust exposure or cigarette smoking, the carcinogenic effect of which defendants have long since learned is multiplied by exposure to their asbestos containing products. Specifically, even as of the present time, the defendants have failed to warn persons such as the Plaintiffs, who defendants knew were likely exposed to their

7

asbestos containing products, of the need for continued and
regular health monitoring due to prior asbestos exposure;
defendants have never issued recall type letters or notices to
prior users of their products.  Defendants intentionally delayed
the use of warnings on asbestos-containing products and failed to
advise the Plaintiffs and others exposed to their products in the
past, of medical findings known to defendants concerning the
dangers of asbestos exposure; defendants have suppressed the
decimation of information to Plaintiffs and the public at large
and falsely represented facts to Plaintiffs and the public at
large concerning the dangers of present and past asbestos
exposure.  The defendants' failure to warn and intentional
misrepresentation took place before, during and after Plaintiffs
were exposed to the asbestos containing products which the
defendants manufactured.  The defendants' breach of their post-
sale duty to warn Plaintiffs of the dangers posed by exposure to
the defendants asbestos containing products was a substantial
contributing cause of the Plaintiffs' damages.

### COUNT THREE

### 13.

Defendants' products were unreasonably dangerous due to
their defective design and the defendants' failure to warn. Even
if the risk of the hazard related to the use of the defendants'
products was not discoverable under existing technology at the
time they were designed and marketed, defendants' products were
unreasonably dangerous per se because of the intrinsically
dangerous characteristics of those products, including their
construction, composition and design.  Whether or not the
defendants actually perceived or could have perceived the dangers
of their products at the time they were designed and marketed, a

8

reasonable person would conclude that the danger-in-fact of those products, whether foreseeable or not, actually outweighed the benefit which flowed from the asbestos containing products.

### COUNT FOUR

14.

With conscience disregard and indifference for the safety of the Plaintiffs and other users of the asbestos-containing products which the defendants manufactured, advertised, marketed, and sold, defendants, acting through their servants, employees, representatives and agents placed their asbestos containing products in the market to be purchased and used by the public. Defendants knew that exposure to and use of their products could and would cause severe personal injury to the Plaintiffs and other persons exposed to said products.

15.

Defendants knew that their products and the component parts and accessories thereof, were defective before, during and after Plaintiffs were exposed to the defendants' asbestos containing products. Defendants intentionally, wrongfully and knowingly placed asbestos containing products on the market when they knew that said products would be handled by or used in the vicinity of persons such as the Plaintiffs who had no knowledge of the dangers involved.

16.

Defendants, by implication, in placing their asbestos containing products on the market, represented that said products could safely be used for the purposes for which they were manufactured and could safely be used and handled by Plaintiffs

9

and others similarly situated in various industries and job
sites.

17.

Defendants' intentional misconduct was motivated by their
financial interest and gain and the continued uninterrupted
distribution and marketing of their products.  In pursuit of this
financial motive, defendants consciously disregarded the safety
of the Plaintiffs and were, in fact, consciously willing to
permit their products to cause injuries to persons, such as the
Plaintiffs, whom the defendants knew were exposed to their
asbestos containing products without knowledge of the risk
involved.

COUNT FIVE

18.

Prior to placing their defective products on the market,
defendants knew and possessed medical and scientific data and
other knowledge that clearly indicated that asbestos and asbestos
containing materials and products were hazardous to the health
and safety of individuals such as the Plaintiffs, working in
close proximity to such products. Defendants had specific
knowledge that there was a high risk of injury or death resulting
from exposure to asbestos and asbestos containing products,
including, but not limited to asbestos related pleural disease,
asbestosis, lung cancer, mesothelioma, and other forms of cancer
and asbestos related diseases.  This knowledge was obtained, in
part, from scientific studies and medical data to which the
defendants had access, as well as scientific studies performed
by, at the request of, or at the insistence of defendants.  With
the intent to deceive the Plaintiffs and with the intent that the
Plaintiffs should be, and remain, ignorant of such medical and

19

scientific data and with the further intent to induce Plaintiffs
to alter their position to their injury and/or risk, and in order
to gain an advantage, defendants committed the following acts of
deceptive concealment:

A.  Defendants deliberately caused to be suggested as a
    fact to Plaintiffs, by not placing warning labels on
    their products, that it was safe for the Plaintiffs to
    work in close proximity with such materials;

B.  Defendants deliberately concealed the hazardous nature
    of their products from Plaintiff by concealing the fact
    that asbestos fibers released into the air as a result
    of the use of the defendants' asbestos containing
    products can, if inhaled, bring about pathological
    effects without noticeable trauma, when defendants were
    possessed with knowledge that such material was
    dangerous and a threat to the health of persons coming
    into contact therewith and had a duty to disclose such
    facts to Plaintiffs;

C.  Defendants deliberately failed to provide Plaintiffs
    with adequate respiratory protective devices although
    the Plaintiffs were required to work in areas where
    they would be exposed to defendants' products, even
    though defendants knew such protective measures were
    necessary, and had a duty to advise Plaintiffs that, if
    such protective devices were not used, it would result
    in injury to the Plaintiffs.

D.  Defendants deliberately concealed from Plaintiffs the
    true nature of their industrial exposure to their
    asbestos containing products, in that defendants knew
    that the Plaintiffs, upon inhalation of asbestos fibers

11

would, in time, develop irreversible lung damage, and would be in danger of ill health. Further, the defendants concealed the fact that Plaintiffs had, in fact, been exposed to harmful materials contained in their products and concealed the fact that the materials to which Plaintiffs were exposed would cause pathological effects without noticeable trauma;

S. Defendants deliberately failed to provide medical and scientific information to the public at large as to the true nature of the hazards of asbestos and actively concealed known medical and scientific facts from the public and the Plaintiffs;

19.

The aforementioned deliberate concealments by defendants of the true nature of the hazards resulting from inhalation of asbestos was a cause in fact of Plaintiffs' injuries.

COUNT SIX

20.

Plaintiffs repeat and allege all allegations contained in all paragraphs above as if fully set forth herein and further allege with regard to Owens-Illinois, Inc. and Metropolitan Life Insurance Company, (hereinafter referred to as the "conspiracy defendants") as follows:

21.

The conspiracy defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs. Further, the conspiracy defendants contributed, contrived, combined, confederated and conspired to deprive

12

Plaintiffs of the opportunity of informed free choice as to whether to use their asbestos-containing products and/or to expose themselves to said dangers.  In this connection, Plaintiffs have sued the Metropolitan Life Insurance Company in its capacity as a conspirator.  These conspiracy defendants committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to defendants' asbestos-containing products.

22.

In furtherance of said conspiracies, the conspiracy defendants performed the following overt acts:

A.  For many decades, defendants, individually, jointly and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which clearly indicated that the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of defendants' asbestos-containing products were unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

B.  Despite the medical and scientific data, literature, and test reports possessed by and available to defendants, defendants individually, jointly and in conspiracy with each other, willfully and maliciously:

1.  Withheld, concealed and suppressed said medical and scientific data, literature and test reports regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from the plaintiffs, and others similarly situated, who

13

were using and being exposed to defendants'
asbestos-containing products;

2.   Caused to be released, published and disseminated
     medical and scientific data, literature and test
     reports containing information and statements
     regarding the risks of asbestosis, cancer,
     mesothelioma and other illnesses and diseases,
     which defendants knew were incorrect, incomplete,
     outdated and misleading;

3.   Distorted the results of medical examinations
     conducted upon plaintiffs and/or workers such as
     Plaintiffs who were using the defendants'
     asbestos-containing products and being exposed to
     the inhalation of asbestos dust and fibers by
     falsely stating and/or concealing the nature and
     extent of the harm to which Plaintiffs and workers
     such as Plaintiffs have suffered.

23.

By the false representations, omissions and concealments set
forth above, the conspiracy defendants, individually, jointly,
and in conspiracy with each other, intended to induce the
Plaintiffs to rely upon said false representations, omissions and
concealments, to continue to expose themselves to the dangers
inherent in the use of and exposure to defendants asbestos-
containing products.

24.

Beginning in the early 1930's, Defendant Metropolitan Life
Insurance Company entered into a conspiracy with Raybestos-
Manhattan Corporation (predecessor to Raytech Corporation) and
Johns-Manville Corporation (predecessor to the Manville

14

Corporation and the Manville Corp. Asbestos Disease Compensation Fund) to affirmatively misrepresent material facts about the dangers of asbestos exposure and the seriousness of the health hazard posed by asbestos.  Other conspirators participating in the conspiracy(or in on-going or subsequent conspiracies) included Raytech Corporation, GAF Corporation, United States Gypsum Company, T&N PLC., Keasbey and Mattison, Pneumo Abex Corporation, American Brakeblok Corporation, and Owens-Illnois, and/or these companies' predecessors and/or successors-in-interest as set forth herein, (hereinafter called the "conspirators"), some or all of whom were members of the Quebec Asbestos Mining Association and/or the Asbestos Textile Institute and/or the Industrial Hygiene Foundation.  Acting in concert, the conspirators fraudulently misrepresented to the public and to public officials, _inter alia_, that asbestos did not cause cancer and that the disease asbestosis had no association with pleural and pulmonary cancer and affirmatively suppressed information concerning the carcinogenic and other adverse effects of asbestos exposure on the human respiratory and digestive systems.

25.

Additionally, Plaintiffs adopt all previous allegations as to the Conspiracy Defendants and additionally states with respect to any and all defendants named in this petition(or hereinafter to be added) who were members of the Air Hygiene Foundation (predecessor to the Industrial Hygiene Foundation), the Industrial Hygiene Foundation, the Quebec Asbestos Mining Association, the American Textile Institute, and/or other trade associations whose members conspired to conceal the hazards of asbestos.  These Defendants joined together to combat publicity and dissemination of data on the hazards of asbestos and acted to

15

conceal medical studies from the general public, including asbestos-exposed workers such as Plaintiffs. The above-described actions constituted intentional deception and fraud in actively misleading the public regarding the extent of the hazards of asbestos and substantially contributed to retarding the development of knowledge about such hazards, thereby substantially contributing to Plaintiffs' injuries and/or death.

26.

The Conspiracy Defendants were active conspirators and engaged in the suppression, alteration and destruction of relevant scientific studies involving the hazards of asbestos. Further, the Conspiracy Defendants and their co-conspirators, individually, as members of a conspiracy, and as agents of other co-conspirators, have been and are in a position of superior knowledge regarding the health hazards of asbestos, and therefore, the Plaintiffs had the right to rely upon the published reports commissioned by the Conspiracy Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

27.

The Conspiracy Defendants were active conspirators and engaged in the intentional suppression, alteration and destruction of relevant scientific studies involving the hazards of asbestos. Defendants conspired with Johns-Manville and participated in numerous unlawful acts in furtherance of the conspiracy.

28.

Further, Conspiracy Defendants intentionally and/or fraudulently manufactured and/or sold and/or distributed and

16

marketed and/or used defective products without adequate warning
of the hazards of asbestos that could and did result in personal
injury and/or death to those exposed to its products, including
Plaintiffs.

29.

Plaintiffs reasonably and in good faith relied upon the
false intentional and fraudulent representations, omissions and
concealments made by the conspiracy defendants regarding the
nature of their asbestos-containing products.

30.

As a direct and proximate result of Plaintiffs' reliance on
the conspiracy defendants' false and fraudulent representations,
omissions and concealments, Plaintiffs sustained damages
including injuries, illnesses and disabilities, and were deprived
of the opportunity of informed free choice in connection with the
use of and exposure to defendants' asbestos-containing products.

31.

The actions and inactions of the conspiracy defendants and
their predecessors-in-interest, as specifically alleged herein
above, whether taken separately or together, were of such a
character as to constitute a pattern or practice of intentional
wrongful conduct and/or malice resulting in damage and injury to
plaintiffs.  More specifically, the conspiracy defendants and
their predecessors-in-interest, consciously and/or deliberately
engaged in willful, wanton and/or malicious conduct with regard
to the Plaintiffs.

COUNT SEVEN

32.

Defendant Metropolitan Life Insurance Company through its

17

Policyholders Service Bureau undertook duties owed by the asbestos-producing Defendants to the Plaintiffs by the testing of asbestos workers and the conduct of scientific studies. These duties included without limitation:

> (a) to test fully and adequately for health risks concomitant to the normal and intended use of their products; and .
>
> (b) to instruct fully and adequately in the uses of their products so as to eliminate or reduce the health hazards concomitant with their normal or intended use.

In undertaking these duties, Metropolitan Life knew or should have known that it was providing testing services for the ultimate protection of third persons, including Plaintiffs.

33.

In both conducting said tests and in publishing their alleged results, Metropolitan Life failed to exercise reasonable care to conduct or publish complete, adequate and accurate tests of the health effects of asbestos. Metropolitan Life also caused to be published intentionally false, misleading, inaccurate and deceptive information about the health effects of asbestos exposure.

34.

The Plaintiffs unwittingly but justifiably relied upon the thoroughness of Metropolitan Life's tests and information dissemination, the results of which Metropolitan Life published in leading medical journals.

35.

As a direct and proximate contributing result of

18

Metropolitan Life's failures to conduct or accurately publish adequate tests or disseminate accurate and truthful information, after undertaking to do so; (i) the risk of harm to the Plaintiffs from asbestos exposure was increased, and (ii) the Plaintiffs suffered the injuries described below.

36.

In failing to test fully and adequately for the adverse health effects from exposure to asbestos; in delaying the publication of such results; and in falsely editing such results as were obtained; in suppressing relevant medical inquiry and knowledge about those hazards to promote the sale and distribution of asbestos as a harmless product; and in collaborating with the asbestos producing Defendants materially to understate the hazards of asbestos exposure, all for its own profit and gain, Metropolitan Life acted recklessly, wantonly, and in calculated disregard for the welfare of the general public, including the Plaintiffs' decedent.

DAMAGES SUSTAINED BY PLAINTIFFS

37.

The conduct of defendants, as alleged herein, was a direct, proximate and producing cause of the damages resulting from asbestos-related diseases as set forth in Exhibit "A". Plaintiffs have been damaged in the following non-exclusive particulars:

A.   Plaintiffs have suffered past, present and future physical and mental anguish;

B.   Plaintiffs have incurred hospital and/or medical and/or pharmaceutical and/or other expenses and will continue to incur such expenses in the future due to the

19

progressively disabling character of asbestos-related
diseases from which they now suffer and will continue
to suffer in the future;

C. Plaintiffs suffer physical impairments and permanent
disabilities at this time and will continue to suffer
this impairment in the future due to the disabling
character of asbestos-related diseases;

D. Plaintiffs are subject to an extraordinarily increased
likelihood of developing (or the progression and/or
recurrence of) cancer of the lungs, mesothelioma and
other cancers, all due to said exposure to asbestos-
containing products manufactured, installed,
maintained, sold, distributed and/or marketed by the
defendants;

E. Plaintiffs will require medical monitoring throughout
their lifetime to survey the progression of their
asbestos-related lung disease and to aid in the early
detection and treatment of any or all of the cancers
described above and will be required to pay for such
medical monitoring;

F. Plaintiffs have suffered a progressive loss of earning
capacity and will continue to suffer a loss of earning
capacity and wages throughout their lifetime;

G. Plaintiffs require or will require domestic help and
nursing care due to their disabilities and have been or
will be required to pay for such domestic help and
nursing services; and

H. Plaintiffs have been and will be prevented from
engaging in activities which were normal to them prior

20

to developing symptoms from their asbestos-related diseases.  Plaintiffs have been and will otherwise be prevented from participating in and enjoying the benefits of a full and complete life.

LOSS OF CONSORTIUM CLAIMS

38.

By reason of the defendants' fault, as described above, and because of the injuries and ill health effects suffered by the Plaintiffs as a result of their occupationally induced asbestos related diseases, Plaintiffs' spouses have suffered loss of consortium and have suffered mental anguish and are entitled to damages as are reasonable in the premises.

39.

Plaintiffs request a trial by jury for each and every defendant named herein.

WHEREFORE, premises considered, Plaintiffs pray that plaintiffs' Original Petition for Damages be served upon the named defendants, and that after due proceedings are had, there be judgment rendered in favor of Plaintiffs and against the defendants herein, jointly, severally, and in solido, for all damages reasonable in the premises, together with legal interest thereon from the date of judicial demand until paid, plus all cost of these proceedings, and all equitable and just relief.

Respectfully submitted,

LUNDY & DAVIS, L.L.P.

BY: _____
HUNTER W. LUNDY 8938
JACKEY W. SOUTH, 21125
Post Office Box 3010
Lake Charles, LA 70602
(337) 439-0707



CERTIFIED TRUE COPY

AUG 0 8 2008

BY _____
DEPUTY CLERK

EXHIBIT A

## JAMES W GIBBENS                  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
4201 GIBBENS-PAYNE DRIVE
BAKER, LA    70714

Principal Jobsite(s) include, but not limited to, the following:

| DATE: | JOBSITE | TRADE |
|---|---|---|
| 1957-1967 | K. F. GIBBENS BUILDERS GONZALES, LA BATON ROUGE, LA | SUPERVISOR, CARPENTER, ELECTRICIAN, INSULATOR |
| 1967-1986 | EXXON COMPANY USA OFFSHORE | RADIO ELECTRICIAN OFFICER, MERCHANT MARINE, ELECTRICIAN |

DISEASE:    ASBESTOSIS

DIAGNOSIS DATE:03/15/2001

EXHIBIT A

**HOMER W GILL**          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
13046 VITRANO LANE
INDEPENDENCE, LA    70443

Principal Jobsite(s) include, but not limited to, the following:

| DATE: | JOBSITE | TRADE |
|-------|---------|-------|
| 1951-1959 | DELTA LINE | BOILERMAKER, MAINTENANCE |
| | NEW ORLEANS, LA | MECHANIC, MERCHANT MARINE |

DISEASE:    ASBESTOSIS

DIAGNOSIS DATE: 03/15/2001

EXHIBIT A

**JAMES L GILL**          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
13184 VITRANO ROAD
INDEPENDENCE, LA     70443

Principal Jobsite(s) include, but not limited to, the following:

| DATE: | JOBSITE | TRADE |
|---|---|---|
| 1956 | KAISER ALUMINUM CHARLMETTE, LA | BOILERMAKER, WELDER |
| 1957 | UNION TANK CAR CO. : BAKER, LA | WELDER |
| 1960-1962 | BOLAND MARINE & MFG. CO. NEW ORLEANS, LA | BOILERMAKER, WELDER |
| 1960-1963 | TODD JOHNSON DRY DOCKS ALGERIS, LA | BOILERMAKER, WELDER |
| 1963-1965 | AVONDALE SHIPYARD NEW ORLEANS, LA | WELDER |
| 1963-1965 | KAISER ALUMINUM GRAMERCER, LA | WELDER |
| 1966-1969 | UNION CARBIDE TAFT, LA | WELDER |
| 1972 | MURPHY OIL REFINERY CHALMETTE, LA | WELDER |
| 1972-1974 | ATLAS ERECTION CO., INC. HARVEY CANAL HARVEY, LA | WELDER |
| 1972-1974 | HOOKER CHEMICAL TAFT, LA | WELDER |
| 1974-1996 | SHELL OIL COMPANY NEW ORLEANS, LA | WELDER |
| 1974-1975 | KAISER ALUMINUM CHALMETTE, LA | WELDER |

DISEASE:     ASBESTOSIS

DIAGNOSIS DATE:03/15/2001

EXHIBIT A

**GRANT HAWKINS**          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
1985 70TH AVENUE
BATON ROUGE, LA    70807

Principal Jobsite(s) include, but not limited to, the following:

| DATE: | JOBSITE | TRADE |
|---|---|---|
| 1950-1980 | BASF GEISMER, LA | MECHANIC |
| 1950-1980 | EXXON BATON ROUGE, LA | MECHANIC |
| 1950-1980 | UNIROYAL GEISMER, LA | MECHANIC |
| 1956-1986 | DOW CHEMICAL PLAQUEMINE, LA | MECHANIC |

DISEASE:    ASBESTOSIS

DIAGNOSIS DATE: 03/15/2001

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO. 493-232                                              DIVISION "D"

JAMES W. GIBBENS, ET AL

VERSUS

AQUA-CHEM, INC., (D/B/A CLEAVER-BROOKS DIVISION), ET AL

FILED: _____          _____
                                                              DEPUTY CLERK

## PLAINTIFFS' FIRST SUPPLEMENT AND AMENDMENT TO THE ORIGINAL PETITION FOR DAMAGES

NOW INTO COURT, by and through undersigned counsel, come Plaintiffs who file this, their First Supplement and Amendment to the Original Petition for Damages and respectfully show the Court the following:

I.

Please add the following Defendants:

1.  BASF Corporation

2.  Boland Machine & Manufacturing Company, Inc.

3.  Sank, Inc. f/k/a Buck Kreihs Company, Inc.

4.  Citgo Petroleum Corporation f/k/a Cities Service RMT Corporation as Successor by Merger to Cit-Con Oil Corporation

5.  Crowley Marine Services, Inc. As Successor by Merger to Delta Steamship Lines, Inc. f/k/a Delta Line, Inc.

6.  ConocoPhillips Company, Inc. As Successor-in-Interest to Conoco, Inc.

7.  Dixie Machine, Welding, & Metal Works, Inc.

8.  The Dow Chemical Company

9.  Entergy Louisiana, L.L.C. (f/k/a Entergy Louisiana, Inc. f/k/a Louisiana Power & Light Company)

10.  Entergy New Orleans, Inc. (f/k/a New Orleans Public Services, Inc.)

11.  Georgia-Pacific Consumer Products LP f/k/a Fort James Operating Company, sometimes erroneously referred to as Fort James Company or Fort James Company as successor to Crown-Zellerbach Corp.

12.  Hercules, Incorporated

13.  International Paper Company

14.     Marathon Oil Company

15.     Murphy Exploration & Production company – USA as Successor in Interest by Merger to Murphy Oil U.S.A., Inc. f/k/a Murphy Oil Corporation

16.     Northrop Grumman Ship Systems, Inc. As Successor-in-Interest to Avondale Industries, Inc.

17.     Occidental Chemical Corporation f/k/a Hooker Chemicals & Plastics Corp. f/k/a Hooker Chemical Corporation

18.     Ormet Primary Aluminum Corporation f/k/a Ormet Corporation

19.     Pittsburgh Plate Glass Company f/k/a PPG Industries, Inc.

20.     Reynolds Metals Company

21.     Shell Oil Company

22.     Texaco Inc.

23.     Union Carbide Corporation

24.     Union Pacific Railroad Company f/k/a Southern Pacific Transportation Company as Successor in Interest by Merger to Missouri Pacific Railroad Company

25.     Union Tank Car Company

26.     Reilly-Benton Co., Inc.

27.     Honeywell International Inc. As Successor in Interest by Merger to Allied-Signal Inc. f/k/a Bendix Corporation

## II.

Please amend Exhibit "A" to include additional work history.

## III.

Please amend Exhibit "B" to include Defendants Reilly-Benton Co., Inc.; Union Carbide Corporation; and Honeywell International Inc.

## IV.

Please add Exhibit "C" to identify and set forth premise Defendants as to petitioning Plaintiffs.

## V.

Please add the following language:

### "FACTS

*The following paragraphs only apply to Decedent, J.W. Osborne*

36A.     Union Pacific Railroad Company is a Delaware corporation with its principal place of business in the state of Louisiana (hereinafter "Railroad Defendant"). It has employees and substantial business operations and presence within the State of Louisiana, and this venue.

Additionally, Decedent was exposed to asbestos and asbestos-containing products while on the premises of the Railroad Defendant. The Railroad Defendant is subject to service of process through its registered agent.

36B.    During his employment with the Railroad Defendant, Decedent's duties included but were not limited to serving as head brakeman.  Decedent was engaged in the performance of his duties as an employee of the Railroad Defendant at the time he was injured as hereinafter alleged.

36C.    During the course of Decedent's employment, the Railroad Defendant was engaged in interstate commerce as a common carrier by rail, and all or part of the duties of the Decedent were in furtherance of and did closely, directly and substantially affect interstate commerce; therefore, the rights and liabilities of the parties are governed by the Federal Employer's Liability Act, ("FELA") 45 U.S.C., Section 1, et seq., which grants this Court jurisdiction over this action.

36E.    During the course and scope of his employment by the Railroad Defendant, Decedent was required to work with, and in the vicinity of, toxic substances, including asbestos and asbestos-containing products.

<u>CAUSE OF ACTION UNDER FELA</u>

36F.    The Railroad Defendant is guilty of one or more of the following negligent acts or omissions in violation of the FELA:

    1.    failing to provide Decedent with a safe work place;

    2.    failing to test and determine the ultra-hazardous nature of products prior to requiring employees to work with same;

    3.    failing to formulate and use a method of handling asbestos and asbestos-containing products, thus exposing Decedent to high concentrations of toxic dust;

    4.    failing to exercise reasonable care in publishing and enforcing a safety plan and method of handling and installing said materials and products;

    5.    failing to inquire of the suppliers and manufacturers of these products of their hazardous nature;

    6.    failing to provide Decedent with safe and suitable tools and equipment, including adequate protective masks and/or protective inhalation devices;

3

7. failing to provide Decedent with any instructions or adequate instructions regarding the use, handling or removal of these products;

8. recklessly and negligently failing to disclose, warn or reveal critical medical and safety information to Decedent regarding the hazards in general and those specific hazards at Decedent's work sites;

9. failing to properly supervise or monitor the work areas for compliance with safety regulations;

10. failing to provide a safe and suitable means of eliminating the amount of toxic dust in the air;

11. failing to periodically inspect their warehouse cars, locomotives, boilers, and their appurtenances in order to ascertain any contamination by toxic dusts and fibers; and

12. any other acts or omissions as may be revealed in discovery or at trial.

36G. As a direct and proximate result, in whole or in part, of one or more of the foregoing negligent acts or omissions on the part of the Railroad Defendant, Decedent suffered exposure to toxic substances, including asbestos and asbestos-containing products which resulted in one or more of the injuries complained of in this petition including the Original Petition for Damages and any and all supplements and amendments."

VI.

Please add the following language:

"STRICT LIABILITY AND NEGLIGENCE ACTION AGAINST BASF CORPORATION; BOLAND MACHINE & MANUFACTURING COMPANY, INC.; SANK, INC. F/K/A BUCK KREIHS COMPANY, INC.; CITGO PETROLEUM CORPORATION F/K/A CITIES SERVICE RMT CORPORATION AS SUCCESSOR BY MERGER TO CIT-CON OIL CORPORATION; CONOCOPHILLIPS COMPANY, INC. AS SUCCESSOR-IN-INTEREST TO CONOCO, INC.; DIXIE MACHINE, WELDING, & METAL WORKS, INC.; THE DOW CHEMICAL COMPANY; ENTERGY LOUISIANA, L.L.C. (F/K/A ENTERGY LOUISIANA, INC. F/K/A LOUISIANA POWER & LIGHT COMPANY); ENTERGY NEW ORLEANS, INC. (F/K/A NEW ORLEANS PUBLIC SERVICES, INC.); EXXON MOBIL CORPORATION F/K/A EXXON CORPORATION AS SUCCESSOR TO STANDARD OIL COMPANY; FORT JAMES OPERATING COMPANY, A/K/A JAMES RIVER PAPER COMPANY, INC., A/K/A JAMES RIVER OPERATING COMPANY, F/K/A JAMES RIVER CORPORATION OF VIRGINIA, F/K/A JAMES RIVER CORPORATION OF NEVADA, F/K/A CROWN ZELLERBACH CORPORATION; GEORGIA-PACIFIC LLC A/K/A GEORGIA PACIFIC CORPORATION; HERCULES, INCORPORATED; INTERNATIONAL PAPER COMPANY; MARATHON OIL COMPANY; MURPHY EXPLORATION & PRODUCTION COMPANY – USA AS SUCCESSOR IN INTEREST BY MERGER TO MURPHY OIL U.S.A., INC. F/K/A MURPHY OIL CORPORATION; NORTHROP GRUMMAN SHIP SYSTEMS, INC. AS SUCCESSOR-IN-INTEREST TO AVONDALE INDUSTRIES, INC.; OCCIDENTAL CHEMICAL CORPORATION

4

F/K/A HOOKER CHEMICALS & PLASTICS CORP. F/K/A HOOKER CHEMICAL
CORPORATION; ORMET PRIMARY ALUMINUM CORPORATION F/K/A
ORMET CORPORATION; PITTSBURGH PLATE GLASS COMPANY F/K/A PPG
INDUSTRIES, INC.; REYNOLDS METALS COMPANY; SHELL OIL COMPANY ;
TEXACO INC.; UNION CARBIDE CORPORATION ; UNION TANK CAR
COMPANY; AND UNIROYAL, INC. F/K/A UNITED STATES RUBBER
COMPANY, INC.

THE FOLLOWING PARAGRAPHS APPLY TO THE PLAINTIFFS LISTED ON
EXHIBIT "C" ATTACHED HERETO:

36H.   Plaintiffs allege premise liability against the Defendants listed on Exhibit "C"
(hereinafter the "premise Defendants"), in failing to provide a safe place in which to work free
from the dangers of asbestos.

36I.   The premises on which Plaintiffs were injured were owned by, and were in the
custody of the premise Defendants and were unreasonably dangerous due to the presence of
asbestos-containing products, which resulted in the exposure of Plaintiffs to airborne asbestos
fibers with no precautions taken to minimize the risk of danger or warn Plaintiffs of such danger.
The unreasonably dangerous condition of the premises and the negligence of the premise
Defendants were causes of the Plaintiffs' injuries.

36J.   The premise Defendants negligently, recklessly, willfully and/or because of gross
and wanton negligence, fault, or strict liability, failed to properly discharge its duties to Plaintiffs
in the following:

    a.   Defendants failed to provide Plaintiffs with a safe work place;

    b.   Defendants failed to provide Plaintiffs with safety equipment;

    c.   Defendants failed to provide Plaintiffs with correct, adequate, or proper
safety equipment;

    d.   Defendants recklessly and negligently failed to disclose, warn or reveal
critical medical and safety information to Plaintiffs regarding asbestos
hazards in general and with regard to those specific hazards at Plaintiffs'
work sites;

    e.   Defendants recklessly concealed and negligently omitted to reveal critical
medical and safety information from Plaintiffs regarding the safety and
health risks associated with the asbestos and asbestos-containing products
at their work sites;

    f.   Defendants failed to timely remove asbestos hazards from the work place;

    g.   Defendants failed to properly supervise or monitor the work areas for

5

compliance with safety regulations; and

h.      Defendants failed to provide a safe and suitable means of eliminating the amount of asbestos dust in the air.

36K.    The premise Defendants are strictly liable for hazardous things in its guarde, care, custody or right of control; and/or any other acts or omissions as may be revealed in discovery or at trial.

36L.    The above-described negligence, fault, strict liability and willful misconduct of these Defendants were proximate causes of the Plaintiffs' injuries.

## VII.

Please add the following language:

### "STRICT LIABILITY AND NEGLIGENCE ACTION AGAINST INDUSTRIAL AND MARINE EQUIPMENT CO. INC. AS SUCCESSOR IN INTEREST BY MERGER TO SINTES SALES, INC.; CROWLEY MARINE SERVICES, INC. AS SUCCESSOR BY MERGER TO DELTA STEAMSHIP LINES, INC. F/K/A DELTA LINE, INC.

36M.    Plaintiffs for Harrison Holloway and Plaintiff, Homer Gill, hereby allege negligent, grossly negligent, wanton, willful and intentional misconduct on behalf of Decedent's, Harrison Holloway, employer, Industrial and Marine Equipment Co. Inc. as Successor in Interest by Merger to Sintes Sales, Inc. and Plaintiff's, Homer Gill, employer, Crowley Marine Services, Inc. as successor by Merger to Delta Steamship Lines, Inc., d/k/a Delta Line, Inc., (hereinafter "employer Defendants") in failing to provide and/or ensure a safe place in which to work free of hazardous concentrations of asbestos and asbestos-containing dust, as well as sending Decedent and Plaintiff to work in said environments, at the facilities located on Exhibit "A".

36N.    At various times, the Decedent and Plaintiff were exposed to asbestos and asbestos-containing dust without the provision of appropriate safeguards by their employer Defendant.

36O.    The employer Defendants and/or their predecessors-in-interest, subsidiaries, or successors-in-interest, undertook and assumed the duties and responsibilities owed individually and/or delegated to them for providing Decedent and Plaintiff with a safe place to work and employer Defendants wantonly and/or negligently and/or willfully and/or intentionally failed to provide Decedent and Plaintiff a safe place to work.

36P.    The premises on which employer Defendants sent Decedent and Plaintiff to work were unreasonably dangerous due to the presence of asbestos-containing products, which

resulted in the exposure of the Decedent and Plaintiff to airborne asbestos fibers.  Other employees of said employer Defendants created airborne asbestos fibers by and through their work around Decedent and Plaintiff.  No or inadequate precautions were taken to minimize the risk of danger or warn Decedent and Plaintiff of such danger.  These premises and/or the asbestos-containing products contained thereon were defective, and the employer Defendants knew or should have known of said condition, knew or should have known of the presence of asbestos at said premises, and knew or should have known that the work of their employees around Decedent and Plaintiff would create airborne asbestos fibers.  The unreasonably dangerous condition of the premises, as well as the negligence of all employer Defendants, was a cause of the Decedent's and Plaintiff's injuries.  Therefore the Employer Defendants are liable for Decedent's and Plaintiff's damages pursuant to La. C.C. arts. 2315.

36Q.  Decedent and Plaintiff were exposed to asbestos-containing products during the course and scope of their employment at the jobsites listed on Exhibit "A".  Decedent's and Plaintiff's exposure to asbestos products occurred without fault on their part.  Decedent and Plaintiff hereby allege that the employer Defendants are liable for their injuries, and, in failing to provide a safe place in which to work free from the dangers of respirable asbestos-containing dust and for sending Plaintiffs to work in said environments.

36R.  Other employees of said employer Defendants, among others, created this asbestos-containing dust Plaintiffs have inhaled or otherwise ingested and as a result, have suffered the injuries both physically and mentally, including, without limitation, (i) asbestosis (ii) pulmonary or bronchogenic cancer; cancer of various sites and organs; (iii) mesothelioma; (iv) impaired pulmonary capacity; (v) reduced lung volume; (vi) pleural plaques and/or pleural thickening; (vii) interstitial lung fibrosis as well as any and all lung damage;  (viii) increased susceptibility to one of the foregoing diseases and other illnesses; and (ix) mental anguish associated with the preceding conditions, and with the fear of developing the preceding conditions.

36S.  The Employer Defendants identified in Paragraph "36M" above negligently, recklessly, willfully and/or because of gross and wanton negligence, or other fault, or strict liability, failed to properly discharge its duties to Decedent and Plaintiff in the following:

    1.    The Employer Defendants failed to provide Decedent and Plaintiff with a safe work place;

2. The Employer Defendants failed to provide Decedent and Plaintiff with safety equipment;

3. The Employer Defendants failed to provide Decedent and Plaintiff with correct, adequate, or proper safety equipment;

4. The Employer Defendants failed to protect Decedent and Plaintiff from any asbestos exposure;

5. The Employer Defendants failed to provide Decedent and Plaintiff with sufficient personal protective equipment safety devices and work procedures intended to prevent or substantially eliminate the effects of asbestos exposure;

6. The Employer Defendants failed to supervise or insure compliance with safety guidelines concerning exposure to asbestos-containing products;

7. The Employer Defendants failed to use or misused equipment and instrumentalities within their control which were intended to minimize Decedent's and Plaintiff's exposure to asbestos dust;

8. The Employer Defendants recklessly and negligently failed to disclose, warn or reveal critical medical and safety information to Decedent and Plaintiff regarding asbestos hazards in general and with regard to those specific hazards at Decedent's and Plaintiff's work sites;

9. The Employer Defendants recklessly concealed and negligently omitted to reveal critical medical and safety information from Decedent and Plaintiff regarding the safety and health risks associated with the asbestos and asbestos-containing products at their work sites;

10. The Employer Defendants failed to timely remove asbestos hazards from the work place;

11. The Employer Defendants failed to properly supervise or monitor the work areas for compliance with safety regulations;

12. The Employer Defendants failed to provide a safe and suitable means of eliminating the amount of asbestos dust in the air;

13. The Employer Defendants failed to properly perform engineering services, consulting and direction of work involving the installation, removal,

maintenance and/or disturbance of asbestos at Decedent's and Plaintiff's

work sites;

14.    The Employer Defendants failed to comply with applicable State and

Federal regulations regarding workplace exposure to asbestos; and

15.    The Employer Defendants failed to properly perform or direct the removal

and abatement of asbestos in place at Decedent's and Plaintiff's work

sites."

VIII.

Please add Exhibit "D" to identify and set forth the statutory survivors and/or wrong

death petitioners for the deceased Plaintiffs.

IX.

Please assert survival actions for the following deceased Plaintiffs, J W Osborne, Joel S.

Ricky, and Harrison J. Holloway.  The petitioners listed on Exhibit "D" are the statutory

survivors of the referenced Decedents and hereby substitute themselves in Decedents' stead and

hereby assert this survival action pursuant to La.C.C.Art. 2315.1.

X.

The Plaintiffs reiterate all other matters contained in the Original and Amended Petition

for Damages including the prayer of the Original and Amended Petitions as though set forth at

length herein.

WHEREFORE, the petitioners pray that their Original Petition be supplemented and

amended in the above particulars and that, after due proceedings had, there be judgment herein in

favor of Plaintiffs and against the Defendants as originally prayed for herein.

Respectfully submitted,

BRENT COON & ASSOCIATES

LAWRENCE G. GETTYS (LSB #23753)
DOUGLAS R. KRAUS (LSB #26668)
JULIE A. JACOBS (LSB #23796)
DAMON R. POURCIAU (LSB #31529)
17405 Perkins Road
Baton Rouge, LA 70810
Tel: (225) 751-7277
Fax: (225) 753-4503

CERTIFIED
TRUE COPY

AUG  8 2008

BY _____
DEPUTY CLERK

9

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Supplement and Amendment to the Original Petition for Damages was this day served by United States Mail, postage pre-paid and/or by facsimile and properly addressed upon all parties as indicated on the service list attached hereto.

Baton Rouge, Louisiana this _16th_ day of _AUGUST_, 2008.

_____

CERTIFIED TRUE COPY

001098

DEPUTY CLERK OF COURT

19th JUDICIAL DISTRICT,
EAST BATON ROUGE PARISH, LA.
FILED

2008 AUG -6 PM 1: 23

BY_____
DEPUTY CLERK & RECORDER FOR
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

CERTIFIED
TRUE COPY

AUG 6 2008

BY_____
DEPUTY CLERK

10

19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

DOCKET NO. 493-232                                        DIVISION "D"

JAMES W. GIBBENS, ET AL

VERSUS

AQUA-CHEM, INC., (D/B/A CLEAVER-BROOKS DIVISION), ET AL

FILED: _____     _____
                                                      DEPUTY CLERK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ORDER

Let the above and foregoing First Supplement and Amendment to the Original Petition for Damages be filed as prayed for.

SO ORDERED this the 8 day of _Aug_____, 2008.

_____
JUDGE, 19TH JUDICIAL DISTRICT COURT

## CERTIFICATE OF SERVICE

I hereby certify that a signed copy of this Order to Plaintiffs' First Supplement and Amendment to the Original Petition for Damages and Order was this day served by facsimile upon all parties as indicated on the service list attached hereto.

Baton Rouge, Louisiana this _____ day of _____, 2008.

_____

CERTIFIED TRUE COPY
0011099

DEPUTY CLERK OF COURT

19TH JUDICIAL DISTRICT
EAST BATON ROUGE PARISH LA
FILED
2008 AUG -6  PM 1:23
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH
DEPUTY CLERK & RECORDER FOR

CERTIFIED TRUE COPY
AUG  8 2008
BY _____
DEPUTY CLERK

11

EXHIBIT "A"

## Work History Summary

Gibbens, James W

Social Security #: 493-24-XXXX          Date of Birth: 12/8/1926

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE, IL | MANAGER | 1947 | 1951 |
| HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE, IL | MANAGER | 1955 | 1957 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA<br>BATON ROUGE, LA | SUPERVISOR | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA<br>BATON ROUGE, LA | INSULATOR | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J. F. GIBBENS BUILDERS | BAKER, LA<br>BATON ROUGE, LA | ELECTRICIAN | 1957<br>1957 | 1967<br>1967 |
| J. F. GIBBENS BUILDERS | J. F. GIBBENS BUILDERS | BAKER, LA<br>BATON ROUGE, LA | CARPENTER | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J. F. GIBBENS BUILDERS | BAKER, LA | ELECTRICIAN | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J. F. GIBBENS BUILDERS | BATON ROUGE, LA | INSULATOR | 1957 | 1967 |
| SELF EMPLOYED | SELF EMPLOYED | GONZALES, LA<br>BATON ROUGE, LA<br>BAKER, LA | SUPERVISOR | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA | CARPENTER | 1957 | 1967 |
| EXXON COMPANY U S A | EXXON MARINE DIVISION | OFFSHORE, LA<br>OFFSHORE, TX | MERCHANT MARINE<br>ELECTRICIAN<br>RADIO ELECTRICIAN<br>OFFICER | 1967 | 1986 |

EXHIBIT "A"

Work History Summary

Gill, Homer W

Social Security #: 434-48-XXXX          Date of Birth:          4/14/1934

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| DELTA LINE | DELTA LINE | NEW ORLEANS, LA | ENGINEER<br>BOILERMAKER<br>MERCHANT MARINE<br>MAINTENANCE<br>MECHANIC | 1951 | 1987 |

## EXHIBIT "A"
## Work History Summary

Gill, James L.

Social Security #: 438-44-XXXX          Date of Birth:     1/13/1931

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| DELTA TANK | DELTA TANK | BATON ROUGE, LA | BOILERMAKER | 1953 | 1954 |
| BOYCE HARVEY | BOYCE HARVEY | BATON ROUGE, LA | LABORER | 1954 | 1954 |
| IDEAL CEMENT COMPANY | IDEAL CEMENT COMPANY | BATON ROUGE, LA | LABORER | 1954 | 1954 |
| BOYCE HARVEY | SHARP STATION | BATON ROUGE, LA | LABORER | 1954 | 1956 |
| WELDING MFG. COMPANY | KAISER ALUMINUM | CHALMETTE, LA | BOILERMAKER WELDER | 1956 | 1956 |
| WELDING MANUFACTURING CO | WELDING MANUFACTURING | CHALMETTE, LA | WELDER BOILERMAKER | 1956 | 1956 |
| NICHOLS CONSTRUCTION CO | UNION TANK CAR CO. | BAKER, LA | WELDER | 1957 | 1957 |
| F. H. MCGRAW CO. | ORMET PLANT | BURNSIDE, LA | WELDER | 1957 | 1957 |
| BOLAND MARINE AND MFG. CO. | BOLAND MARINE | NEW ORLEANS, LA | BOILERMAKER WELDER | 1960 | 1962 |
| DIXIE MACHINE WELDING AND METAL WORKS | DIXIE MACHINE | NEW ORLEANS, LA | BOILERMAKER WELDER | 1960 | 1960 |
| TODD JOHNSON DRY DOCKS | TODD SHIPYARD | ALGIERS, LA | WELDER BOILERMAKER | 1960 | 1963 |
| BOH BROS. CONSTRUCTION | FRANCE ROAD YARD | NEW ORLEANS, LA | WELDER | 1953 | 1965 |
| BOH BROS. CONSTRUCTION | KAISER ALUMINUM | GRAMERCY, LA | WELDER | 1963 | 1965 |
| BOH BROS. CONSTRUCTION | AVONDALE SHIPYARD | AVONDALE, LA | WELDER | 1963 | 1965 |
| PETER KIEWIT CONSTRUCTION | UNION CARBIDE | TAFT, LA | WELDER | 1966 | 1967 |

EXHIBIT "A"

## Work History Summary

Gibbens, James W

Social Security #: 493-24-XXXX        Date of Birth: 12/8/1926

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE, IL | MANAGER | 1947 | 1951 |
| HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE FROZEN FOOD AND LOCKER CO. | HILLSIDE, IL | MANAGER | 1955 | 1957 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA BATON ROUGE, LA | SUPERVISOR | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA BATON ROUGE, LA | INSULATOR | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J. F. GIBBENS BUILDERS | BAKER, LA BATON ROUGE, LA | ELECTRICIAN | 1957 1957 | 1967 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA BATON ROUGE, LA | CARPENTER | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA | ELECTRICIAN | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BATON ROUGE, LA | INSULATOR | 1957 | 1967 |
| SELF EMPLOYED | SELF EMPLOYED | GONZALES, LA BATON ROUGE, LA BAKER, LA | SUPERVISOR | 1957 | 1967 |
| J. F. GIBBENS BUILDERS | J.F. GIBBENS BUILDERS | BAKER, LA | CARPENTER | 1957 | 1967 |
| EXXON COMPANY U S A | EXXON MARINE DIVISION | OFFSHORE, LA OFFSHORE, TX | MERCHANT MARINE ELECTRICIAN RADIO ELECTRICIAN OFFICER | 1967 | 1986 |

EXHIBIT "A"

## Work History Summary

Gill, Homer W

Social Security #: 434-48-XXXX          Date of Birth:          4/14/1934

| Employer | Job Site | City, State | Occupation | From | To |
|----------|----------|-------------|------------|------|-----|
| DELTA LINE | DELTA LINE | NEW ORLEANS, LA | ENGINEER BOILERMAKER MERCHANT MARINE MAINTENANCE MECHANIC | 1951 | 1987 |

EXHIBIT "A"

## Work History Summary

Gill, James L

Social Security #: 438-44-XXXX       Date of Birth:   1/13/1931

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| DELTA TANK | DELTA TANK | BATON ROUGE, LA | BOILERMAKER | 1953 | 1954 |
| BOYCE HARVEY | BOYCE HARVEY | BATON ROUGE, LA | LABORER | 1954 | 1954 |
| IDEAL CEMENT COMPANY | IDEAL CEMENT COMPANY | BATON ROUGE, LA | LABORER | 1954 | 1954 |
| BOYCE HARVEY | SHARP STATION | BATON ROUGE, LA | LABORER | 1954 | 1954 |
| WELDING MFG. COMPANY | KAISER ALUMINUM | CHALMETTE, LA | BOILERMAKER WELDER | 1956 | 1956 |
| WELDING MANUFACTURING CO | WELDING MANUFACTURING | CHALMETTE, LA | WELDER BOILERMAKER | 1956 | 1956 |
| NICHOLS CONSTRUCTION CO | UNION TANK CAR CO. | BAKER, LA | WELDER | 1957 | 1957 |
| F. H. MCGRAW CO. | ORMET PLANT | BURNSIDE, LA | WELDER | 1957 | 1957 |
| BOLAND MARINE AND MFG. CO. | BOLAND MARINE | NEW ORLEANS, LA | BOILERMAKER WELDER | 1960 | 1962 |
| DIXIE MACHINE WELDING AND METAL WORKS | DIXIE MACHINE | NEW ORLEANS, LA | BOILERMAKER WELDER | 1960 | 1960 |
| TODD JOHNSON DRY DOCKS | TODD SHIPYARD | ALGIERS, LA | WELDER BOILERMAKER | 1960 | 1963 |
| BOH BROS. CONSTRUCTION | FRANCE ROAD YARD | NEW ORLEANS, LA | WELDER | 1963 | 1965 |
| BOH BROS. CONSTRUCTION | KAISER ALUMINUM | GRAMERCY, LA | WELDER | 1963 | 1965 |
| BOH BROS. CONSTRUCTION | AVONDALE SHIPYARD | AVONDALE, LA | WELDER | 1963 | 1965 |
| PETER KIEWIT CONSTRUCTION | UNION CARBIDE | TAFT, LA | WELDER | 1966 | 1967 |

*James Gill Cont.*

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| WESTINGHOUSE ELECTRIC CORP. | UNION CARBIDE | TAFT, LA | WELDER | 1967 | 1969 |
| COMBUSTION ENGINEERING | GULF STATES PARISH ROAD | NEW ORLEANS | WELDER | 1971 | 1989 |
| COMBUSTION ENGINEERING | COMBUSTION ENGINEERING | NEW ORLEANS | WELDER | 1971 | 1989 |
| COMBUSTION ENGINEERING | NINE MILE POINT | WESTWEGO, LA | WELDER | 1971 | 1989 |
| ATLAS ERECTION CO., INC. | HARVEY CANAL | TAFT, LA | WELDER | 1972 | 1974 |
| LANE AND CO., INC. | LANE YARD | NEW ORLEANS, LA | WELDER | 1972 | 1972 |
| LITWIN CORP. | MURPHY OIL REFINERY | CHALMETTE, LA | WELDER | 1972 | 1972 |
| ATLAS ERECTION CO., INC. | HOOKER CHEMICAL | TAFT, LA | WELDER | 1972 | 1974 |
| D. B. RILEY | D. B. RILEY | TAFT, LA | WELDER | 1973 | 1974 |
| WILLIAMS AND MCWILLIAMS | FRANCE ROAD YARD | NEW ORLEANS, LA | WELDER | 1974 | 1974 |
| GULF ENGINEERING CO., INC. | NINE MILE POINT | WESTWEGO, LA | WELDER | 1974 | 1980 |
| BLOUNT BROS. | SHELL OIL COMPANY | NORCO, LA | WELDER | 1974 | 1974 |
| TRAIL MOBILE LEASING CORP. | KAISER ALUMINUM | CHALMETTE, LA | WELDER | 1974 | 1975 |
| TELLEPSEN CONSTRUCTION | GRAIN ELEVATOR | NEW ORLEANS, LA | WELDER | 1974 | 1974 |
| GULF ENGINEERING CO., INC. | LITTLE GYPSY | NEW ORLEANS, LA | WELDER | 1974 | 1974 |
| S. K. WHITTY AND CO., INC. | SUPERDOME STADIUM | NEW ORLEANS, LA | WELDER | 1974 | 1974 |
| J. A. JONES, INC. | NUCLEAR POWER PLANT | TAFT, LA | WELDER | 1976 | 1976 |
| BURDEN CONSTRUCTION CORP. | MOBIL OIL COMPANY | CHALMETTE, LA | WELDER | 1976 | 1976 |
| NATIONAL MAINTENANCE CORP. | MARATHON OIL REFINERY | GARVILLE, LA | WELDER | 1976 | 1981 |
| DELTA MAINTENANCE INC. | SHELL OIL REFINERY | NORCO, LA | WELDER | 1976 | 1979 |
| PARSON CONSTRUCTION CO | SHELL OIL REFINERY | NORCO, LA | WELDER | 1976 | 1976 |
| BUCK KREIHS CO., INC. | BUCK KREIHS | NEW ORLEANS, LA | BOILERMAKER WELDER | 1976 | 1976 |

*James Gill Cont.*

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| FOSTER WHEELER ENERGY CORP | GULF STATES PARISH ROAD | NEW ORLEANS, LA | WELDER | 1980 | 1980 |
| LAFAYETTE STEEL ERECTORS | KAISER ALUMINUM | LAPLACE, LA | WELDER | 1980 | 1980 |
| LOU-CON, INC. | NINE MILE POINT | WESTWEGO, LA | WELDER | 1980 | 1980 |
| FOSTER WHEELER ENERGY CORP | NINE MILE POINT | WESTWEGO, LA | WELDER | 1981 | 1981 |
| GULF ENGINEERING CO., INC. | GULF STATES PARISH ROAD | NEW ORLEANS, LA | WELDER | 1981 | 1981 |
| DELTA MAINTENANCE INC. | MURPHY OIL REFINERY | CHALMETTE, LA | WELDER | 1981 | 1981 |
| ALDEL MAINT. CONTRACTOR | GOOD HOPE OIL REFINERY | NORCO, LA | WELDER | 1982 | 1982 |
| NUCLEAR INST. SERVICE CO. | NUCLEAR POWER PLANT | TAFT, LA | WELDER | 1982 | 1982 |
| DELTA MAINTENANCE INC. | MOBIL OIL REFINERY | CHALMETTE, LA | WELDER | 1982 | 1985 |
| DELTA MAINTENANCE INC. | MURPHY OIL REFINERY | CHALMETTE, LA | WELDER | 1983 | 1991 |
| WESTINGHOUSE ELECTRIC CORP | NUCLEAR POWER PLANT | TAFT, LA | WELDER | 1983 | 1983 |
| AMEC PLANT SERVICES, INC. | GOOD HOPE OIL REFINERY | NORCO, LA | WELDER | 1984 | 1985 |
| GULF ENGINEERING CO., INC. | WATERFORD 1 AND 2 | TAFT, LA | WELDER | 1985 | 1985 |
| RAM INC. | BOGALUSA PAPER MILL | BOGALUSA, LA | WELDER | 1986 | 1986 |
| FOSTER WHEELER ENERGY CORP | NINE MILE POINT | WESTWEGO, LA | WELDER | 1986 | 1986 |
| GULF ENGINEERING CO., INC. | GULF ENGINEERING CO., INC. | NEW ORLEANS, LA | WELDER | 1986 | 1991 |
| BABCOCK AND WILCOX | PAPERMILL | NEW ORLEANS, LA | WELDER | 1987 | 1989 |
| JOY TECHNOLOGIES, INC. | JOY TECHNOLOGIES, INC. | ROSENBURG, TX | WELDER | 1987 | 1987 |
| IND. CONT. SERVICES, INC. | IND. CONT. SERVICES, INC. | HAMMOND, IN | WELDER | 1988 | 1988 |
| GREAT LAKES IND CONTRACTORS | CONOCO OIL REFINERY | HAMMOND, IN | WELDER | 1988 | 1988 |
| RN PYLE MECH. CONT., INC. | RN PYLE MECH. CONT.., INC. | PENSACOLA, FL | WELDER | 1988 | 1988 |
| MORRISON CONT. CO., INC. | MORRISON CONT. CO., INC. | HAMMOND, IN | WELDER | 1988 | 1988 |
| MURPHY CO. MECHANICAL CONTR | CONOCO OIL REFINERY | LIMA, OH | WELDER | 1989 | 1989 |

*James Gill Cont.*

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| BABCOCK AND WILCOX | GULF STATES PARISH ROAD | NEW ORLEANS, LA | WELDER | 1989 | 1989 |
| MID WEST IND. CONT., INC. | MURPHY OIL REFINERY | CHALMETTE, LA | WELDER | 1990 | 1991 |
| TENNESSEE VALLEY AUTHORITY | TENNESSEE VALLEY | CENTRAL CITY, KY | WELDER | 1990 | 1990 |
| ABB C-E SERVICES, INC. | NINE MILE POINT | WESTWEGO, LA | WELDER | 1981 | 1992 |

EXHIBIT "A"

Work History Summary

Hawkins, Grant

Social Security #:  437-48-XXXX        Date of Birth:   10/17/1934

| Employer | Job Site | City, State | Occupation | From | To |
|----------|----------|-------------|------------|------|-----|
| U.S. REYNOLDS | U.S. REYNOLDS | BATON ROUGE, LA | MECHANIC | 1948 | 1949 |
| BAROUCO, INC. | BAROUCO, INC | BATON ROUGE, LA | MECHANIC | 1950 | 1980 |
| BANUHO, INC. | EXXON | BATON ROUGE, LA | MECHANIC | 1950 | 1980 |
| BAROUCO, INC. | DOW CHEMICAL | PLAQUEMINE, LA | MECHANIC | 1950 | 1980 |
| BAROUCO, INC. | UNIROYAL | GEISMAR, LA | MECHANIC | 1950 | 1980 |
| BAROUCO, INC. | BASF | GEISMAR, LA | MECHANIC | 1950 | 1980 |
| DOW CHEMICAL | DOW CHEMICAL | PLAQUEMINE, LA | MECHANIC | 1956 | 1986 |
| QUALITY EQUIPMENT | QUALITY EQUIPMENT | BATON ROUGE, LA | MECHANIC | 1990 | 1995 |

EXHIBIT "A"

## Work History Summary

Holloway, Harrison J, deceased

Social Security #: 434-32-XXXX     Date of Birth:     1/22/1928

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| STANDARD DREDGING COMPANY | STANDARD DREDGING | NEW ORLEANS, LA | MATE | 1944 | 1945 |
| ARMY TRANSPORTATION CORP. | ARMY TRANSPORTATION | NEW ORLEANS, LA | CHIEF BOATSWAIN MATE | 1945 | 1950 |
| STANDARD DREDGING COMPANY | STANDARD DREDGING | NEW ORLEANS, LA | MATE | 1950 | 1959 |
| U.S. ARMY | U.S. ARMY | FORT EUSTIS, VA | SPECIALIST 3 | 1955 | 1957 |
| SINTES ENGINEERING | SINTES ENGINEERING | NEW ORLEANS, LA | MAINTENANCE | 1960 | 1963 |
| T. L. JAMES | T. L. JAMES | NEW ORLEANS, LA | DECK CAPTAIN | 1963 | 1968 |
| T. L. JAMES | T. L. JAMES | NEW ORLEANS, LA | MATE | 1963 | 1968 |
| T. L. JAMES | T. L. JAMES | NEW ORLEANS, LA | LEVERMAN | 1963 | 1968 |
| RMK DREDGING | RMK DREDGING | NEW ORLEANS, LA | BOSNMATE | 1968 | 1971 |
| RMK DREDGING | RMK DREDGING | NEW ORLEANS, LA | DREDGE OPERATOR | 1968 | 1971 |
| MIKE HOOKS DREDGING INC. | MIKE HOOKS DREDGING INC. | NEW ORLEANS, LA | CAPTAIN | 1968 | 1968 |
| MIKE HOOKS DREDGING INC. | MIKE HOOKS DREDGING INC. | NEW ORLEANS, LA | CAPTAIN | 1970 | 1975 |
| J. RAY MCDERMOTT | MCDERMOTT SHIPYARD | AMELIA, LA | CAPTAIN | 1972 | 1985 |

EXHIBIT "A"

## Work History Summary

Lucky, Joe, deceased

Social Security #: 430-38-XXXX        Date of Birth:   7/14/1928

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| MONSANTO CHEMICAL | MONSANTO CHEMICAL | LULING, LA | OPERATOR, BOILER OPERATOR | 1954 | 1985 |

EXHIBIT "A"

## Work History Summary

Marcel, Arcen P

Social Security #:  433-20-XXXX          Date of Birth:     9/6/1921

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| MCDERMOTT | MCDERMOTT SHIPYARD | AMELIA, LA | LABORER FOREMAN | 1956 | 1982 |

EXHIBIT "A"
## Work History Summary

Mobley, Joseph

Social Security #: 437-38-XXXX          Date of Birth:     4/13/1930

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| JOHNS MANVILLE | JOHNS MANVILLE | MARRERO, LA | LABORER | 1948 | 1950 |
| CELOTEX | CELOTEX | MARRERO, LA | LABORER | 1950 | 1953 |
| MCDERMOTT | MCDERMOTT SHIPYARD | HARVEY, LA | FOREMAN LABORER | 1961 | 1961 |

EXHIBIT "A"

## Work History Summary

Osborne, J W, deceased

Social Security #: 428-18-XXXX   Date of Birth: 7/17/1921

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| WESTERN UNION | WESTERN UNION | JACKSON, MS | TELEGRAPH OPERATOR/TIMEKEEPER | 1939 | 1941 |
| MISSOURI PACIFIC RAILROAD | MISSOURI PACIFIC RR | DUPO, IL | BRAKEMAN | 1941 | 1944 |
| METHYN PAINT CO | METHYN PAINT CO | ST. LOUIS, IL | LABORER | 1941 | 1941 |
| STANDARD OIL CO | STANDARD OIL CO | BATON ROUGE, LA | PIPEFITTER | 1943 | 1944 |
| US NAVY | US NAVY | MAYPORT, FL | ENGINEER | 1944 | 1946 |
| KENNISON TRUCK LINE | KENNISON TRUCK LINE | BATON ROUGE, LA | TRUCK DRIVER | 1946 | 1947 |
| KAISER ALUMINUM | KAISER ALUMINUM | BATON ROUGE, LA | WAREHOUSEMAN | 1947 | 1948 |
| CONTINENTAL CHEMICAL | CONTINENTAL CHEMICAL | LAKE CHARLES, LA | PIPEFITTER | 1949 | 1949 |
| KIRBY VACUUM | KIRBY VACUUM | BATON ROUGE, LA | SALEMAN | 1949 | 1951 |
| CONSOLIDATED ROOFING | STANDARD OIL | BATON ROUGE, LA | SUPERINTENDENT ROOFER | 1951 | 1960 |
| CONSOLIDATED ROOFING | ETHYL CHEMICAL | BATON ROUGE, LA | SUPERINTENDENT ROOFER | 1951 | 1960 |
| ALLIED ROOFING AND SHEET METAL CO INC | ALLIED ROOFING | BATON ROUGE, LA | ROOFER | 1955 | 1959 |
| MICHIGAN STATIONS GULF OIL | MICHIGAN STATIONS GULF OIL | LANSING, MI | GAS STATION | 1959 | 1992 |

EXHIBIT "A"

Work History Summary

Pyle, Robert, deceased

Social Security #: 431-24-XXXX          Date of Birth:     6/12/1925

| Employer | Job Site | City, State | Occupation | From | To |
|---|---|---|---|---|---|
| ROHN AND HAAS | ROHN AND HAAS | CITY, PA | OPERATOR | 1946 | 1950 |
| LION OIL COMPANY | LION OIL | ELDORADO, AR | OPERATOR | 1946 | 1949 |
| PENNSYLVANIA RAIL ROAD | PENNSYLVANIA RAILROAD | CITY, DE | OPERATOR | 1946 | 1950 |
| E. I. DUPONT | E. I. DUPONT | CITY, NJ | OPERATOR | 1950 | 1950 |
| LUNAS CONSTRUCTION | LION CHEMICAL | LULING, LA | BOILERMAKER HELPER | 1951 | 1952 |
| LION CHEMICAL | STEAM PLANT | LULING, LA | OPERATOR | 1953 | 1982 |

EXHIBIT "B"
MINER/MANUFACTURER/SELLER/SUPPLIER/DISTRIBUTOR DEFENDANTS:

1. AstenJohnson, Inc.
   State of Incorporation: Delaware
   Registered Office/Principal Business Establishment: Baton Rouge, LA

2. CBS Corporation, f/k/a Viacom, Inc. as successor to the liabilities of Westinghouse
   Electric Corporation
   State of Incorporation: Pennsylvania
   Registered Office/Principal Business Establishment: Baton Rouge, LA

3. Coltec Industries, Inc. (Individually and as Successor to Anchor Packing Company,
   Inc.)

4. Eagle, Inc. (Formerly Eagle Asbestos & Packing Co., Inc.)
   State of Incorporation: Louisiana
   Registered Office/Principal Business Establishment: New Orleans, LA

5. Garlock, Inc.

6. General Electric Company
   State of Incorporation: New York
   Registered Office/Principal Business Establishment: Harahan, LA

7. IMO Industries Inc. f/ka IMO Delaval Inc. f/k/a Transamerica Delaval Inc. f/k/a
   Delaval Turbine inc. f/k/a De Laval Turbine Inc.
   State of Incorporation: Illinois
   Registered Office/Principal Business Establishment: Richmond, VA

8. Ingersoll-Rand Company
   State of Incorporation: New Jersey
   Registered Office/Principal Business Establishment: Baton Rouge, LA

9. Owens-Illinois, Inc.
   Via the Louisiana Long-Arm Statute:

10. The McCarty Corporation
    State of Incorporation: Louisiana
    Registered Office/Principal Business Establishment: Baton Rouge, LA

11. Riley Power Inc. f/k/a Babcock Borsig Power, Inc.
    f/k/a DB Riley, Inc., f/k/a Riley Stoker Corporation
    State of Incorporation: Massachusetts
    Registered Office/Principal Business Establishment: Baton Rouge, LA

12. Taylor-Seidenbach, Inc.
    State of Incorporation: Louisiana
    Registered Office/Principal Business Establishment: New Orleans, LA

13. Union Carbide Corporation
    State of Incorporation: New York
    Registered Office/Principal Business Establishment: Baton Rouge, LA

14. Reilly-Benton Co., Inc.
    State of Incorporation: Louisiana
    Registered Office/Principal Business Establishment: Jefferson, LA

15. Honeywell International Inc. As Successor in Interest by Merger to Allied-Signal
    Inc. f/k/a Bendix Corporation
    State of Incorporation: Delaware
    Registered Office/Principal Business Establishment: Baton Rouge, LA

<u>EXHIBIT "C"</u>
<u>PREMISE DEFENDANTS LISTED WITH APPROPRIATE PLAINTIFFS:</u>

1. BASF Corporation
   State of Incorporation: Delaware
   Registered Office/Principal Business Establishment: Geismar, LA
   Plaintiff: **Grant Hawkins**

2. Boland Machine & Manufacturing Company, Inc.
   State of Incorporation: Louisiana
   Registered Office/Principal Business Establishment: New Orleans, LA
   Plaintiff: **James Gill**

3. Sank, Inc. f/k/a Buck Kreihs Company, Inc.
   State of Incorporation: Louisiana
   Registered Office/Principal Business Establishment: New Orleans, LA
   Plaintiff: **James Gill**

4. Citgo Petroleum Corporation f/k/a Cities Service RMT Corporation as
   Successor by Merger to Cit-Con Oil Corporation
   State of Incorporation: Delaware
   Registered Office/Principal Business Establishment: Lake Charles, LA
   Plaintiff: **Grant Hawkins**

5. ConocoPhillips Company, Inc. As Successor-in-Interest to Conoco, Inc.
   State of Incorporation: Delaware
   Registered Office/Principal Business Establishment: New Orleans, LA
   Plaintiff: **Grant Hawkins**

6. Dixie Machine, Welding, & Metal Works, Inc.
   State of Incorporation: Louisiana
   Registered Office/Principal Business Establishment: Harahan, LA
   Plaintiff: **James Gill**

7. The Dow Chemical Company
   State of Incorporation: Delaware
   Registered Office/Principal Business Establishment: Plaquemine, LA
   Plaintiff: **Grant Hawkins**

8. Entergy Louisiana, L.L.C. (f/k/a Entergy Louisiana, Inc. f/k/a Louisiana Power
   & Light Company)
   State of Incorporation: Texas
   Registered Office/Principal Business Establishment: Jefferson, LA
   Plaintiff: **James Gill**
   Plaintiff: **Grant Hawkins**

9. Entergy New Orleans, Inc. (f/k/a New Orleans Public Services, Inc.)
   State of Incorporation: Louisiana
   Registered Office/Principal Business Establishment: New Orleans, LA
   Plaintiff: **James Gill**

10. Exxon Mobil Corporation f/k/a Exxon Corporation as Successor to Standard Oil
    Company
    State of Incorporation: New Jersey
    Registered Office/Principal Business Establishment: Baton Rouge, LA
    Plaintiff: **James Gill**
    Plaintiff: **Grant Hawkins**
    Plaintiff: **J.W. Osborne**

11.  Georgia-Pacific Consumer Products LP f/k/a Fort James Operating Company,
     sometimes erroneously referred to as Fort James Company or Fort James
     Company as successor to Crown-Zellerbach Corp.
     State of Incorporation: Virginia
     Registered Office/Principal Business Establishment: New Orleans, LA
     Plaintiff: James Gill

12.  Hercules, Incorporated
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: Baton Rouge, LA
     Plaintiff: Grant Hawkins

13.  International Paper Company
     State of Incorporation: New York
     Registered Office/Principal Business Establishment: Bastrop, LA
     Plaintiff: Grant Hawkins

14.  Marathon Oil Company
     State of Incorporation: Ohio
     Registered Office/Principal Business Establishment: Lafayette, LA
     Plaintiff: James Gill

15.  Murphy Exploration & Production company – USA as Successor in Interest by
     Merger to Murphy Oil U.S.A., Inc. f/k/a Murphy Oil Corporation
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: New Orleans, LA
     Plaintiff: James Gill

16.  Northrop Grumman Ship Systems, Inc. As Successor-in-Interest to Avondale
     Industries, Inc.
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: Avondale, LA
     Plaintiff: James Gill
     Plaintiff: Grant Hawkins

17.  Occidental Chemical Corporation f/k/a Hooker Chemicals & Plastics Corp. f/k/a
     Hooker Chemical Corporation
     State of Incorporation: New York
     Registered Office/Principal Business Establishment: Taft, LA
     Plaintiff: James Gill
     Plaintiff: Grant Hawkins

18.  Ormet Primary Aluminum Corporation f/k/a Ormet Corporation
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: Burnside, LA
     Plaintiff: James Gill

19.  Pittsburgh Plate Glass Company f/k/a PPG Industries, Inc.
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: New Orleans, LA
     Plaintiff: Grant Hawkins

20.  Reynolds Metals Company
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: Baton Rouge, LA
     Plaintiff: Grant Hawkins

21.  Shell Oil Company
     State of Incorporation: Delaware
     Registered Office/Principal Business Establishment: Baton Rouge, LA
     Plaintiff: James Gill

22. Texaco Inc.
State of Incorporation: Delaware
Registered Office/Principal Business Establishment: New Orleans, LA
Plaintiff: Grant Hawkins

23. Union Carbide Corporation
State of Incorporation: New York
Registered Office/Principal Business Establishment: Baton Rouge, LA
Plaintiff: James Gill

24. Union Pacific Railroad Company f/k/a Southern Pacific Transportation
Company as Successor in Interest by Merger to Missouri Pacific Railroad
Company
State of Incorporation: Delaware
Registered Office/Principal Business Establishment: Baton Rouge, LA
Plaintiff: J.W. Osborne

25. Union Tank Car Company
State of Incorporation: Delaware
Registered Office/Principal Business Establishment: Ville Platte, LA
Plaintiff: James Gill

26. Uniroyal, Inc. F/k/a United States Rubber Company, Inc.
State of Incorporation: New Jersey
Registered Office/Principal Business Establishment: Jersey City, NJ
Plaintiff: Grant Hawkins

EXHIBIT "D"
WRONGFUL DEATHS/SURVIVAL ACTIONS

1.  OSBORNE, J W, DECEDENT
    Date of Death:        August 28, 2007

    Survivors/Petitioner(s):

    Sylvia Lorena Osborne        Deceased Spouse
    Date of Death:  10/6/2003

    Jackie Osborne              Major Son
    Date of Birth: January 27, 1942
    2083 Shawn Drive
    Baton Rouge, Louisiana 70806

    Toni Bezdek                 Major Daughter
    Date of Birth: December 2, 1946
    12097 Old Hammond Highway
    Baton Rouge, Louisiana 70816

    Rebecca Mae Biggar          Major Daughter
    Date of Birth: September 8, 1953
    1712 Soniat Street
    New Orleans, Louisiana 70115

2.  HOLLOWAY, HARRISON JAMES, DECEDENT
    Date of Death:        January 9, 2007

    Survivors/Petitioner(s):

    Joycelyyn Marie Brewer      Major Daughter
    Date of Birth: 1/23/1949
    206 Deerfield Club Drive
    Canton, MS  39046

3.  LUCKY, JOEL S., DECEDENT
    Date of Death:        August 28, 2004

    Survivors/Petitioner(s):

    Joan Lucky                  Surviving Spouse
    Date of Birth: 2/1/1935
    207 River Oaks Drive
    Luling, LA  70070

    Stafford Lucky              Major Son
    Date of Birth: 3/17/1967
    558 Cypress
    Luling, LA  70070

    Joel Lucky                  Major Son
    Date of Birth: 1/3/1965
    207 Barkley Drive
    Hickory Creek, TX  75065

# STATE OF LOUISIANA

THIS RECORD IS VALID FOR DEATH ONLY

STATE OF LOUISIANA
CERTIFICATE OF DEATH

1019805

FILE No. 157 2004 27 892



JUL 1 5 2005

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF A CERTIFICATE OR DOCUMENT REGISTERED WITH THE VITAL RECORDS REGISTRY OF THE STATE OF LOUISIANA, PURSUANT TO LSA — R.S.40:32, ET SEQ.

ACTING STATE REGISTRAR

# STATE OF LOUISIANA

IMPORTANT: 1162 THIS RECORD IS VALID FOR DEATH ONLY

FILE NO. 117

5207833

| Holloway | Harrison | James | January 9, 2007 |

White | Widowed | Male | New Orleans, Louisiana

January 22, 1928 | 78

Sea Going Captain | Oil Industry | No

Yes | 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 | 10

29480 Willow Glenn St.

Denham Springs | Livingston

29480 Willow Glenn St. | Livingston | Louisiana | No

Denham Springs | 70726 | LA

Holloway | Fred | St. Martin | LA

Harrison | Herr | Patterson | LA

Joyce Brewer | 708 Beverfield Club Dr., Concord, Miss. 39046 | 01/10/2007

Resthaven Cemetery | Denham Springs, Louisiana 70726

Seale Funeral Service, Inc. | Stacy Seale | 895
1720 South Range Ave.
Denham Springs, Louisiana 70726 | 1/17/07

Livingston | 01-09-07

JAN 2 9 2007

Copper Case

Rea Cox M.D. Coroner | 20 Veterans Square Suite Denham Springs LA 70726

OFFICE OF PUBLIC HEALTH - VITAL RECORDS REGISTRY
IN ACCORDANCE WITH LSA-R.S. 40:50(C) I
CERTIFY THAT THE ABOVE IS A TRUE AND CORRECT
COPY OF A DEATH CERTIFICATE IN MY CUSTODY

JENNIFER PAGAN
LOCAL REGISTRAR

I CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF A CERTIFICATE OR
DOCUMENT REGISTERED WITH THE
VITAL RECORDS REGISTRY OF THE
STATE OF LOUISIANA, PURSUANT TO
LSA — R.S. 40:32, ET SEQ.

ACTING STATE REGISTRAR

CERTIFICATION OF VITAL RECORD

## STATE OF ILLINOIS

### DEPARTMENT OF PUBLIC HEALTH · DIVISION OF VITAL RECORDS

FILL IN THIS FORM (except signature)
WITH TYPEWRITER OR LEGIBLE PRINTING

4900

STATE OF ILLINOIS
DWIGHT H. GREEN, Governor
Department of Public Health—Division of Vital Statistics

ORIGINAL

## CERTIFICATE OF BIRTH

1. PLACE OF BIRTH

County of St. Clair   Dist. No. 216

East St. Louis   Primary   Dist. No. 3647

Registered No. 196

Name of Hospital or Institution: St. Marys

3. FULL NAME OF CHILD: Jackie Wynne Osborne

5. Sex of Child: Male

FATHER: J. W. Osborne

10. Color or race: White   Age at time of this birth: 21

12. Birthplace: Kentucky

14. Trade, profession, or particular kind of work: Brakeman   Missouri Pacific Ry

MOTHER: Lorena Tate

18. Color or race: White   Age at time of this birth: 19

20. Birthplace: Denham Springs Louisiana

22. Mother's mailing address: 524 So. Maine St. Dupo, Illinois

14. I hereby certify that I attended the birth of this child who was BORN ALIVE at 11 (6:00 P.M.) on the date stated above.

Date signed: 1-27-42   Address: 418 3/4 Collinsville Ave E St L Ill

15. Date Filed: FEB 3 - 1942   Registrar: R. C. Fassle   East St Louis Ill

074458   This is to certify that this is a true and correct copy of the official record filed with the Illinois Department of Public Health.

DATE ISSUED: August 12, 1997

Steven L. Perry
STEVEN L. PERRY
DEPUTY STATE REGISTRAR

STATE OF LOUISIANA

THIS RECORD IS VALID FOR DEATH ONLY

5383592

STATE OF LOUISIANA
CERTIFICATE OF DEATH

FILE No. 117

Aug. 28, 2007

Pneumonia

Chronic Obstructive Pulmonary Disease

Coroner's Case

C. Shannon Cooper, MD, Coroner          4000 TB Bearndon Ave., Baton Rouge, LA 70807

OFFICE OF PUBLIC HEALTH - VITAL RECORDS REGISTRY

IN ACCORDANCE WITH LA R.S. 40:36
(D), I CERTIFY THAT THE ABOVE IS A
TRUE AND CORRECT COPY OF A DEATH
CERTIFICATE IN MY CUSTODY.

LOCAL REGISTRAR

I CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF A CERTIFICATE OR
DOCUMENT REGISTERED WITH THE
VITAL RECORDS REGISTRY OF THE
STATE OF LOUISIANA, PURSUANT TO
LSA -- R.S.40:32, ET SEQ.

Darlene W. Smith
STATE REGISTRAR

STATE OF LOUISIANA

THIS RECORD IS VALID FOR DEATH ONLY

STATE OF LOUISIANA
CERTIFICATE OF DEATH

FILE No. 117

CARCINOMATOSIS

OFFICE OF PUBLIC HEALTH - VITAL RECORDS REGISTRY

I CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF A CERTIFICATE OR
DOCUMENT REGISTERED WITH THE
VITAL RECORDS REGISTRY OF THE
STATE OF LOUISIANA, PURSUANT TO
LSA — R.S.40:32, ET SEQ.

STATE REGISTRAR

PLEASE SERVE THE FOLLOWING DEFFENDANTS #1 - #27 WITH ORIGINAL
PETITION & 1ST SUPPLEMENT:

1.  BASF Corporation
    Registered Agent:
    C. T. Corporation Systems
    5615 Corporate Blvd., Ste. 400B
    Baton Rouge, LA  70808

2.  Boland Machine & Manufacturing Company, Inc.
    Registered Agent:
    William F. Finegan
    1402 Whitney Building
    New Orleans, LA  70130

3.  Sank, Inc. f/k/a Buck Kreihs Company, Inc.
    Registered Agent:
    Michael Tonguis
    2225 Tchoupitoulas Street
    New Orleans, LA  70130

4.  Citgo Petroleum Corporation f/k/a Cities Service RMT Corporation as
    Successor by Merger to Cit-Con Oil Corporation
    Registered Agent:
    C. T. Corporation Systems
    5615 Corporate Blvd., Ste. 400B
    Baton Rouge, LA  70808

5.  Crowley Marine Services, Inc.
    As Successor by Merger to Delta Steamship Lines, Inc.
    F/k/a Mississippi Shipping Company, Inc.
    Registered Agent:
    CT Corporation System
    8550 United Plaza Boulevard
    Baton Rouge, LA  70809;

6.  ConocoPhillips Company, Inc. As Successor-in-Interest to Conoco, Inc.
    Registered Agent:
    United States Corporation Company
    320 Somerulos Street
    Baton Rouge, LA  70802-6129

7.  Dixie Machine, Welding, & Metal Works, Inc.
    Registered Agent:
    Vicki H. Kihnemann
    5801 Citrus Blvd.
    Harahan, LA 70123

8.  The Dow Chemical Company
    Registered Agent:
    C. T. Corporation Systems
    5615 Corporate Blvd., Ste. 400B
    Baton Rouge, LA  70808

9.  Entergy Louisiana, L.L.C. (f/k/a Entergy Louisiana, Inc. f/k/a Louisiana Power
    & Light Company)
    Registered Agent:
    T. Michael Twomey
    4809 Jefferson Hwy.
    Jefferson, LA 70121

10.    Entergy New Orleans, Inc. (f/k/a New Orleans Public Services, Inc.)
Registered Agent:
Marcus V. Brown
639 Loyola Avenue
New Orleans, LA  70119

11.    Georgia-Pacific Consumer Products LP f/k/a Fort James Operating Company,
sometimes erroneously referred to as Fort James Company or Fort James
Company as successor to Crown-Zellerbach Corp.
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

12.    Hercules, Incorporated
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

13.    International Paper Company
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

14.    Marathon Oil Company
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

15.    Murphy Exploration & Production company – USA as Successor in Interest by
Merger to Murphy Oil U.S.A., Inc. f/k/a Murphy Oil Corporation
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

16.    Northrop Grumman Ship Systems, Inc. As Successor-in-Interest to Avondale
Industries, Inc.
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

17.    Occidental Chemical Corporation f/k/a Hooker Chemicals & Plastics Corp. f/k/a
Hooker Chemical Corporation
Registered Agent:
C. T. Corporation Systems
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA  70808

18.    Ormet Primary Aluminum Corporation f/k/a Ormet Corporation
Registered Agent:
The Prentice-Hall Corporation System, Inc.
320 Somerulos Street
Baton rouge, LA  70802-6129

19.   Pittsburgh Plate Glass Company f/k/a PPG Industries, Inc.
      Registered Agent:
      The Prentice-Hall Corporation System, Inc.
      701 South Peters Street, Second Floor
      New Orleans, La 70130

20.   Reynolds Metals Company
      Registered Agent:
      C. T. Corporation Systems
      5615 Corporate Blvd., Ste. 400B
      Baton Rouge, LA  70808

21.   Shell Oil Company
      Registered Agent:
      Corporation Service Company
      320 Somerulos Street
      Baton Rouge, Louisiana 70802-6129

22.   Texaco Inc.
      Who may be served pursuant the Louisiana Long Arm Statute
      6001 Bollinger Canyon Rd.
      San Ramon, CA 94583

23.   Union Carbide Corporation
      Registered Agent:
      C. T. Corporation Systems
      5615 Corporate Blvd., Ste. 400B
      Baton Rouge, LA  70808

24.   Union Pacific Railroad Company f/k/a Southern Pacific Transportation
      Company as Successor in Interest by Merger to Missouri Pacific Railroad
      Company
      Registered Agent:
      C. T. Corporation Systems
      5615 Corporate Blvd., Ste. 400B
      Baton Rouge, LA  70808

25.   Union Tank Car Company
      Registered Agent:
      Corporation Service Company
      320 Somerulos Street
      Baton Rouge, Louisiana 70802-6129

26.   Reilly-Benton Co., Inc.
      Registered Agent:
      Thomas L. Cougill
      C/O Beason- Willingham, LLP,
      8550 United Plaza Blvd., Ste. 702,
      Baton Rouge, LA  70809

27.   Honeywell International Inc. As Successor in Interest by Merger to Allied-Signal
      Inc. f/k/a Bendix Corporation
      Registered Agent:
      Corporation Service Company
      320 Somerulos Street
      Baton Rouge, LA  70802-6129

PLEASE SERVE THE FOLLOWING DEFENDANTS #28 - #41 WITH FIRST
SUPPLEMENT ONLY:

28.  AstenJohnson, Inc.
     Registered Agent:
     Corporation Service Company
     320 Somerulos Street
     Baton Rouge, LA 70802-6129.

29.  CBS Corporation, f/k/a Viacom, Inc. as successor to the liabilities of
     Westinghouse Electric Corporation
     Registered Agent:
     C. T. Corporation Systems
     5615 Corporate Blvd., Ste. 400B
     Baton Rouge, LA  70808

30.  Eagle, Inc. (Formerly Eagle Asbestos & Packing Co., Inc.)
     Registered Agent:
     Susan B. Kohn
     1100 Poydras Street, 30th Floor
     New Orleans, LA 70136

31.  Exxon Mobil Corporation f/k/a Exxon Corporation as Successor to Standard Oil
     Company
     Registered Agent:
     Corporation Service Company
     320 Somerulos Street
     Baton Rouge, LA   70802

32.  General Electric Company
     Registered Agent:
     C. T. Corporation Systems
     5615 Corporate Blvd., Ste. 400B
     Baton Rouge, LA  70808

33.  IMO Industries Inc. f/k/a IMO Delaval Inc. f/k/a Transamerica Delaval Inc. f/k/a
     Delaval Turbine inc. f/k/a De Laval Turbine Inc.
     Registered Agent:
     Corporation Service Company
     320 Somerulos St.
     Baton Rouge, LA 70802-6129

34.  Ingersoll-Rand Company
     Registered Agent:
     C. T. Corporation Systems
     5615 Corporate Blvd., Ste. 400B
     Baton Rouge, LA  70808

35.  Owens-Illinois, Inc.
     Via the Louisiana Long-Arm Statute:
     O-I Plaza 3
     One Michael Owens Way
     Perrysburg, Ohio 43551

36.  The McCarty Corporation
     Registered Agent:
     Paul H. Spaht
     445 N. Blvd., Suite 300
     Baton Rouge, LA 70802

37.  Riley Power Inc. f/k/a Babcock Borsig Power, Inc.
     f/k/a DB Riley, Inc., f/k/a Riley Stoker Corporation
     Registered Agent:
     Corporation Service Company
     320 Somerulos, St.
     Baton Rouge, LA 70802-6129

38.  Taylor-Seidenbach, Inc.
     Registered Agent:
     Ralph I. Shepard
     731 So. Scott St.
     New Orleans, LA 70150

39.  Uniroyal, Inc. F/k/a United States Rubber Company, Inc.
     Who may be served pursuant the Louisiana Long Arm Statute:
     c/o Uniroyal Holding, Inc.
     70 Great Hill Rd.
     Naugatuck, CT 06770

<u>DO NOT SERVE THE FOLLOWING DEFENDANTS:</u>
The following defendants were mailed a courtesy copy of this pleading and will be served by this
office pursuant to LA C.C.P. Article 1313 by facsimile after we have received a conformed copy
from the court:

**Aqua-Chem, Inc.**
O'Bryon & Schnabel
Kevin O'Bryon
Fax:  504-799-4211

**Anco Insulations, Inc.**
Deutsch Kerrigan & Stiles LLP
Janice M. Culotta
Fax: 504-566-1201

**Certainteed Corporation**
Deutsch Kerrigan & Stiles LLP
Janice M. Culotta
Fax: 504-566-1201

**Dana Corp.**
Deutsch Kerrigan & Stiles LLP
Peggy Joffe
Fax: 504-566-1201

**Coltec Industries, Inc. (Ind. and as Successor
to Anchor Packing Company, Inc.)
Garlock, Inc.**
Aultman, Tyner & Ruffin
Glenn L.M. Swetman
Christopher Massenburg
Fax: 601 583-2677
Fax:  504 528-9640

**Kelly-Moore Paint Company, Inc.**
Sulzer & Williams
Fax: 985-898-0871

**Zurn Industries, Inc.**
Deutsch, Kerrigan & Stiles, LLP
Theodore L. White
Fax: 504-566-1201

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DANIEL W. MELFORD, SR.

VERSUS                                                CIVIL ACTION

PETER TERRITO, ET AL                                  NO. 05-1405

FILED
U.S. DIST. COURT
LA
2006 JAN 31  P 4: 06

## RULING ON MOTION TO REMAND

This matter is before the court on a motion to remand (doc. 3) by the plaintiff, Daniel W. Melford, Sr.  Defendant Peter Territo opposes the motion (doc. 27).[1] Jurisdiction is at issue.  Plaintiff has moved for expedited hearing (doc. 5) on the motion to remand which is granted.  There is no need for oral argument.

### FACTS AND PROCEDURAL HISTORY

Melford filed this action on November 9, 2005, in the Nineteenth Judicial District Court, Parish of East Baton Rouge, State of Louisiana, seeking to recover from a number of defendants for injuries allegedly caused by exposure to asbestos—Melford alleges that he is dying from malignant mesothelioma.  Plaintiff alleges that Territo was an officer in charge of health and safety at Avondale Industries, Inc.,[2] when Melford worked there as a mechanic from 1968 to 1970.

---

[1] While Territo did not initially respond to Melford's motion to remand within the time limits provided in LR 7.5M, the court granted a motion by Territo to extend his deadline (doc. 25) to allow Territo to respond to an affidavit (doc. 23, Exhibit A) filed by Melford after the motion to remand.

[2] Avondale is now known as Northrop Grumman Ship Systems, Inc.

1

DEFENDANT'S
EXHIBIT
B

Although he alleges that he never worked on any vessels, Melford claims he was exposed to asbestos while working around vessels undergoing construction and repair at Avondale's shipyard (doc. 1, Exhibit A, ¶ 41). Melford's petition contains the following allegations regarding Territo:

42.

[Territo] was aware or should have been aware of the dangerous condition presented by exposure to asbestos and that Petitioner Daniel W. Melford, Sr. would suffer from an injury as a result of this exposure, but he failed to provide to Mr. Melford knowledge of the dangers to his health from exposure to asbestos fiber.

43.

[Territo] had the responsibility of providing Mr. Melford with a safe place to work, and safety equipment with which to conduct his work. However, he negligently failed to carry out these duties, and failed to protect Mr. Melford from the dangers of asbestos dust exposure.

44.

In addition to the foregoing acts of negligence, Territo made the following acts and/or omissions:

a)   Failing to reveal and knowingly concealing critical medical information to Daniel W. Melford, Sr.;

b)   Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;

c)   Failing to provide necessary protection to Mr. Melford;

2

    d)      Failing to provide clean, respirable air and proper ventilation;

    e)      Failing to provide necessary showers and special clothing;

    f)      Failing to warn employees and their family members of the risks associated with direct and bystander exposure to asbestos.

(doc. 1, Exhibit A, ¶¶ 42-44).

Territo removed the action to this court on December 15, 2006. He alleges jurisdiction under 28 U.S.C. § 1442, the federal officer removal statute.

## LAW AND DISCUSSION

"[T]he burden of establishing jurisdiction rests upon the party seeking to invoke it . . . ." *Gaitor v. Peninsular & Occidental S. S. Co.*, 287 F.2d 252, 253 (5th Cir. 1961).

Section 1442 provides in part:

(a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

3

28 U.S.C.A. § 1442 (a)(1).  This provision was enacted to protect the exercise of federal authority against interference by states through their courts.[3]  Wright, Miller, & Cooper, Federal Practice and Procedure:  Jurisdiction 3d § 3727 at 136.  It has been invoked by a wide variety of federal officers and persons acting at the direction of federal officers in many different types of cases, both civil and criminal.  Id. at 125.

The Supreme Court has held that to remove a case under Section 1442, the defendant must (1) show that he acted at the direction of a federal officer; (2) establish a causal connection between the charged conduct and the asserted authority; and (3) raise a colorable federal defense.[4]  Willingham, 395 U.S. 406-09; Mesa v. California, 489 U.S. 121,129-38 (1989); Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397-401 (5th Cir. 1998); Miller v. Diamond Shamrock Co., 275 F.3d 414, 418 (5th Cir. 2001).

Territo alleges that during the time that Melford worked at Avondale, the company primarily constructed destroyer escorts for the U.S. Navy and lighter-aboard-ship ("LASH") commercial cargo vessels for the U.S. Department of Commerce, Maritime Administration.[5]  Melford contends that he never worked on or

---

[3]For a discussion of the history of the statute, see Willingham v. Morgan, 395 U.S. 402, 405 (1969).

[4]The defendant must also show, as a preliminary matter, that it is a "person" within the meaning of the statute.  Winters, 149 F.3d at 398.  This requirement is not at issue here.

[5]The construction of the LASH vessels was subsidized by the government through the U.S. Maritime Administration's Maritime Subsidy Board.  The government controlled the design and construction of the vessels to ensure that they were suitable for national defense or military purposes in time of war or national emergency (doc. 27, Exhibit C).

4

around any military vessels or equipment (doc. 23, Exhibit A), so Territo contends that Melford's alleged exposure must have come from working around the LASH vessels (doc. 27, Exhibit B).  This allegation is supported by the affidavit of Danny Joyce, an environmental, health, and safety management consultant (doc. 27, Exhibit B).

According to Territo, the asbestos used in constructing the LASH vessels was required by plans and specifications controlled by the United States through the Secretary of Commerce Maritime Subsidy Board (doc. 27 at pp. 6-9, Exhibit C), and Avondale was obligated to use the asbestos-containing materials by its contract with the United States.  Territo provides the affidavit of Thomas McCaffery (doc. 27, Exhibit C), a research consultant in the area of government ship design, development, construction, maintenance, and repair records.  McCaffery avers that the specifications for the LASH vessels required the use of asbestos-containing products in the joiner work and pipe insulation (doc. 27, Exhibit C).

Territo alleges that "Avondale and its personnel were subject to rigorous safety and construction standards that were monitored on a regular basis by federal inspectors." (doc. 27 at p. 5).  Territo provides the affidavit of Edward Blanchard, a former Avondale supervisor who claims to have worked closely with various agencies, including the Maritime Commission, in constructing vessels for the U.S. government (doc. 27, Exhibit E).  Blanchard avers that all aspects of the work on the federal vessels were performed

5

> under close, constant, and detailed surveillance by the
> United States Navy, United States Coast Guard, and the
> Maritime Commission and other federal agencies . . . .
> This surveillance was exercised by written specifications
> and personal oversight and inspection of all Avondale
> work by Federal Inspectors. Virtually no aspect of the
> construction of Federal Vessels escaped this close
> monitoring.

(doc. 27, Exhibit E at ¶ 3). According to Blanchard, "[t]he Federal Inspectors

monitored every aspect of the construction of the vessels at Avondale from the

moment the materials to be used in the construction first arrived at Avondale until the

ship was fully outfitted and delivered." (doc. 27, Exhibit E at ¶ 10). Blanchard avers

that during construction, federal inspectors continuously inspected the vessels to

ensure that the work met the government's regulatory and contractual specifications

(doc. 27, Exhibit E at ¶ 5). Blanchard recalled that the head of Avondale's safety

department "frequently met with the Federal Inspectors to discuss safety issues

regarding the construction of Federal Vessels." (doc. 27, Exhibit E at ¶ 15).

Blanchard avers that safety inspectors from the Maritime Commission had the

authority to terminate a project if they believed the work was not being performed

safely (doc. 27, Exhibit E at ¶ 16).

   Territo also submits his own affidavit in which he avers that during the

construction of the LASH vessels, daily inspections were conducted by inspectors

from the Maritime Administration and Coast Guard (doc. 27, Exhibit F). Territo

declares that safety inspectors from the Labor Management Standards

6

Administration routinely carried out inspections at Avondale to ensure compliance with federal safety standards, including standards set out in the Walsh-Healy Public Contracts Act (doc. 27, Exhibit F).

Finally, Territo asserts that the federal contractor defense and the Longshore and Harbor Workers' Compensation Act ("LHWCA") shield him from Melford's claims (doc. 1 at ¶ 5).

Under these facts and in light of his defenses, Territo contends that he is entitled to removal under Section 1442.

Melford contends that Territo is not entitled to removal under Section 1442 because he cannot show that the federal government limited his ability to provide safety warnings to Avondale employees concerning the dangers of asbestos. This argument is based on a line of federal district court cases involving similar facts that were remanded to state court because the removing defendant could not prove that the federal government restricted the defendant's ability to warn the plaintiffs of the dangers of asbestos. *See Savoie v. Northrop Grumman*, No. 05-2086 (E.D. La. 2005); *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La.); *Guidroz v. Anchor Packing*, No. 98-3709 (E.D. La. 1999); *Gauthe v. Asbestos Corp.*, 1997 WL 3255 (E.D. La.); *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal.); *Porche v. Flexitallic, Inc.*, 1996 WL 603919 (E.D. La.).

The *Mouton* case is representative of this line of cases. In *Mouton*, the plaintiff sued Avondale and its executive officers for failing to warn him about the

7

dangers of asbestos and failing to provide a safe place to work. The defendants removed under Section 1442, claiming that they had acted under the authority of various branches of the government (the Navy, the Federal Maritime Commission) in building ships during the relevant time frame. The defendants asserted government contractor immunity and a defense under the LHWCA. The court granted a motion to remand by the plaintiff.

The court determined that the defendants had failed to establish a causal connection between the plaintiff's claims and the government's direction. While the defendants had presented evidence that the government controlled the specifications of the ships and performed safety inspections, the court found that the government had provided no direction concerning warnings and had not prevented Avondale from taking its own safety precautions. *Mouton*, 1999 WL 225438 at *2-*3. In reaching this conclusion, the court noted that the claims at issue were premises liability and negligence claims based on a failure to warn, not product liability or defective design claims. While the defendants' design contracts might have been evidence of a causal connection if products liability or defective design claims had been at issue, the court concluded that there was no causal connection between the government design contracts and the defendants' alleged negligence in failing to warn the plaintiff of the dangers of asbestos. *Id.* at *3.

This court finds that line of reasoning unpersuasive. We see no basis in the language of Section 1442 or in controlling authority for the requirement that a

8

defendant in a civil case show that the alleged wrongful act or omission was specifically directed or compelled by federal duty or law. To the contrary, controlling cases interpreting the statute have recognized that it is "neither 'limited' nor 'narrow,' but should be afforded a broad reading so as not to frustrate the statute's underlying rationale." *Winters*, 149 F.3d at 398 (quoting *Murray v. Murray*, 621 F.2d 103, 107 (5th Cir. 1980)); *see also State of Texas v. National Bank of Commerce of San Antonio*, 290 F.2d 229, 231, *cert. denied Falkner v. National Bank of Commerce of San Antonio, Texas*, 368 U.S. 832 (1961) (requiring only a "colorable claim that the appellees were acting under an officer of the United States and that the appellees were acting under color of law, as agents of the United States within the meaning of § 1442(a)(1)"). The requirement that the government has controlled the specific act at issue may have a place in determining the merits of the question of immunity, but the "test for removal should be broader, not narrower, than the test for official immunity." *Willingham*, 395 U.S. at 405. Therefore, this factor should not applied to limit removal under Section 1442, at least not without specific guidance from the Supreme Court or the Fifth Circuit.

This case involves the same federal interest that was at stake in *Winters*, namely, the ability of the federal government to order and obtain military equipment at a reasonable cost. *Winters*, 149 F.3d at 399-400. Melford's claims against Territo are based on exposure to asbestos at Avondale's shipyard. Territo alleges that the asbestos was present because it was required in construction contracts controlled

9

by the government. Territo also alleges that the government was heavily involved in all aspects of the construction of federal vessels, including safety. If the government representatives believed that work on a project at Avondale was being done in an unsafe manner, it had the authority to shut down the project. The court finds that the facts of this case are sufficient to demonstrate that Territo acted pursuant to federal direction and that a causal connection exists between Territo's alleged actions and Melford's claims.

The final requirement for removal under Section 1442 is the assertion of a colorable federal defense. As noted, Territo asserts the government contractor defense under *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), and a defense under the LHWCA. Melford argues that neither defense has merit. However, it is not necessary for Territo to prove that his federal defense is meritorious, he need only "articulate its 'colorable' applicability to the plaintiff's claims." *Winters*, 149 F.3d at 400. "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court." *Willingham*, 395 U.S. at 407. Under *Boyle*, a defendant is required to show the following:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Winters*, 149 F.3d at 400 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). In light of the facts discussed above, the court finds that Territo's assertion

10

of the government contractor defense is sufficiently colorable for removal under Section 1442. The court need not address Territo's arguments under the LHWCA.

Accordingly, Territo has met the requirements established by controlling authority for removal under 28 U.S.C. § 1442(a)(1).

## CONCLUSION

For the foregoing reasons, the motion to remand (doc. 3) filed by the plaintiff, Daniel W. Melford, Sr., is hereby **DENIED**.

Baton Rouge, Louisiana, January 31, 2006.

JOHN V. PARKER
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

11

# AFFIDAVIT OF THOMAS McCAFFERY

COMMONWEALTH OF VIRGINIA
ALEXANDRIA CITY

BEFORE ME, the undersigned authority, personally came and appeared:

## THOMAS F. McCAFFERY

who, after being duly sworn, did dispose and state as follows:

1.  He is a technical consultant, researcher and the head of McCaffery &
    Associates, Inc., a company whose focus is on the location and analysis of
    United States Navy and merchant ship design, development, construction,
    maintenance and repair records.  He also specializes in research of personnel
    records, military specifications, qualified product lists and related records.

2.  He is an officer in the United States Naval Reserve and has been since 1976.
    His current rank is Commander,  He has been assigned on active duty to a
    variety of cruiser and destroyer type ships assigned to the U.S. Atlantic and
    Pacific Fleets.

3.  He is a Merchant Marine Officer licensed by the United States Coast Guard as
    Chief Mate of Steam or Motor Vessels of Any Gross Tons Upon Oceans.

4.  Between 1963 and 1965 20 of 20 or 100% of all ocean going ships delivered by
    Avondale Shipbuilding, Inc., previously known as Avondale Marine Ways, Inc.
    were constructed for the U.S. Navy and U.S. Maritime Administration.  The
    following table summarizes these ship construction projects:

| U.S. Government Agency | Class / Ship Type | Dates | Number |
|---|---|---|---|
| U.S. Navy | DDG 2 / Destroyer | 1963 | 1 |
| U.S. Navy | DE 1037 / Ocean Escort | 1963 | 2 |
| U.S. Maritime Administration | C3-S-37c / Cargo | 1963 - 64 | 4 |
| U.S. Maritime Administration | C3-S-37d / Cargo | 1964 - 65 | 5 |
| U.S. Navy | DE 1040 / Ocean Escort | 1965 | 3 |
| U.S. Maritime Administration | C4-S-66a / Cargo | 1965 | 5 |

DEFENDANT'S
EXHIBIT
C

5.  Cargo vessels built for the U.S. Maritime Administration were constructed under the provisions of Title V "Construction Differential Subsidy" (hereinafter "CDS"), of the Merchant Marine Act, 1936 (hereinafter referred to as "the Act"). The CDS program permitted the U.S. Maritime Administration to pay for over one-half of the cost of new merchant ships in order to defray the cost to ship owners of building ships in U.S. commercial shipyards. Eighteen of the ships listed above were built through this program under contracts between the U.S. Maritime Administration, Avondale and the following commercial shipping companies:

| Company | Ship Class |
|---|---|
| Lykes Brothers Steamship Company | C3-S-37c |
| Gulf & South America Line | C3-S-37d |
| Lykes Brothers Steamship Company | C4-S-66a |

6.  Sections 502 and 504 of the Act required that the CDS payments be made directly to Avondale, rather than to the prospective ship owner. Further, the Act required that the vessels built with CDS be constructed under a contract or contracts which ". . . contain such provisions as are provided in this title to protect the interests of the United States . . . "

7.  Ship plans and specifications for ships to be constructed with CDS were reviewed by both the U.S. Maritime Administration and the U.S. Navy. The Navy required all ships receiving CDS to include specific "National Defense Features." These features were intended to ensure that the ships could be used as Naval Auxiliaries in time of war.

8.  Ship Construction Contracts for ships built with CDS contained the following provisions:

    a.  The contract consisted of Special Provisions, General Provisions and the approved Plans and Specifications.
    b.  The vessels were to be built by Avondale in strict accordance with the approved Plans and Specifications.
    c.  Changes in the Plans and Specifications could not be made without the specific approval of the Maritime Administration.
    d.  The Maritime Administration would pay Avondale a percentage of the vessel's purchase price equal to the cost differential between U.S. and foreign construction, plus 100% of the cost of the National Defense Features.
    f.  The ships and the shipyard were subject at all times for inspection by representatives of the Maritime Administration.
    g.  The contracts were subject to the provisions to the Walsh-Healy Public Contracts Act.

9.   Ship construction specifications for the ships listed above, approved by the Maritime Administration and incorporated into the Ship Construction contracts, all required the use of at least some asbestos containing materials.  Some specifications required the use of several asbestos containing materials.

10.  The prospective ship owners were also parties to Operating Differential Subsidy Contracts with the Maritime Administration.  These contracts required all vessels receiving Operating Differential Subsidy to be documented under the Marine Inspection and Navigation Laws of the United States.

11.  The Marine Inspection and Navigation laws are codified in Title 46 "Shipping" of the Code of Federal Regulations and enforced by the U.S. Coast Guard.  The specific construction requirements applicable to all general cargo-type vessels built by Avondale are contained in Title 46, Code of Federal Regulations, Subchapters F "Machinery" (parts 50 -62), I "Cargo and Miscellaneous Vessels" (parts 90 - 105), J "Electrical" (parts 110 - 113) and Q "Materials" (part 164).

12.  Part 91 of these regulations is titled "Inspection and Certification".  Pursuant to this regulation, vessels built by Avondale are subject to U.S. Coast Guard Inspection and Certification.  When a ship is inspected by the U.S. Coast Guard and found to be in compliance with the with all of the Marine Inspection and Navigation Laws, a Certificate of Inspection is issued to the ship.  In the absence of a valid Certificate of Inspection any Cargo Vessel built by Avondale could not be operated by either Avondale or the ship's owner.

13.  The prerequisite for issuance of an original Certificate of Inspection by the U.S. Coast Guard is the mandatory Initial Inspection.

   A.   The first phase of the Initial Inspection is for the ship owner or builder to submit a complete set of plans for the ship to the U.S. Coast Guard for review and approval (46CFR91.20-10).  A ship that is subject to U.S. Coast Guard regulation may not be constructed unless its plans and specifications have been reviewed and approved by the U.S. Coast Guard (46CFR91.55).  Only after the plans for the vessel are approved, may the builder begin to construct the ship.

   B.   Throughout the construction period the U.S. Coast Guard, along with other Governmental agencies and the American Bureau of Shipping, inspect the ship's structure, machinery, material and workmanship (46CFR91.20-15).  The Coast Guard inspections are intended to ensure that the ship is built in accordance with the approved plans and applicable U.S. Coast Guard Regulations (46CFR91.20).  Any deviation from, or revision to, the previously approved plans by the builder must be approved, in writing, by the Commandant of the U.S. Coast Guard (46CFR90.15).

14.     Part 92 of Title 46 is titled "Construction and Arrangement." This section
        establishes the minimum acceptable standards for construction and arrangement
        of the accommodation and service areas aboard an inspected ship.  Section
        92.07 is titled "Structural Fire Protection" and identifies the specific materials to
        be used in the construction of decks, bulkheads and other structures (92.07-5(f)).

15.     For example, the portion of this section dealing with the ship's accommodation
        and service areas (92-07-10(d) (7)) states,

            "Ceilings, linings, and insulation, including pipe and duct
            laggings, shall be of approved incombustible materials."

16.     Starting in 1948, the U.S. Coast Guard published, bi-annually, Coast Guard
        Publication CG 190, "Equipment Lists".  These contained lists of, "Items
        approved or accepted under Marine Inspection and Navigation Laws".  Of
        specific interest is section 164.009, "Incombustible Materials".  This section
        identifies several types of asbestos containing products for insulation and lagging
        purposes.  These products include corrugated asbestos sheathing, asbestos
        cement board, asbestos paper, asbestos cement, block insulation and pipe
        covering (lagging).  The 1962, 1964 and 1966 editions of this publication listed
        approved pipe covering products.  Non-asbestos containing pipe covering
        products did not appear in this publication until the 1968 edition.  The following
        products  were the only pipe covering products approved by the U.S. Coast
        Guard through 1968:

            Baldwin-Ehret-Hill, Thermasil
            Baldwin-Ehret-Hill, Thermalite 85% Magnesia
            Fiberboard Products Company, PABCO Precision Molded Caltemp
            Fiberboard Products Company, PABCO Precision Molded Super Caltemp
            Johns-Manville, 85% Magnesia
            Johns-Manville Thermobestos
            Owens-Corning Fiberglass, KAYLO Block Insulation
            Owens-Corning Fiberglass, KAYLO 20 Block Insulation
            Pittsburgh-Corning Corp., UNIBESTOS
            The Rubberoid Company, Calsilite

17.     All of the pipe covering products identified above contained amosite asbestos.

18.     Accordingly, the only products that were approved by the U.S. Coast Guard for
        use as pipe coverings (laggings) in the service and accommodation areas of the
        general cargo-type ships constructed by Avondale through 1968 contained
        asbestos.

19.     The basis for the contracts between Avondale and the U.S. Navy to build the
        Navy warships listed above were the construction specifications prepared by the
        U.S. Navy.  Section 9390 / S39 of these specifications deals with the thermal
        insulation requirements of each class of ships.  This section incorporates by

reference either Section 9390 / S39 of the "General Specifications for Ships of the U.S. Navy" (hereinafter "General Specifications"), or Military Standard 769, "Thermal Insulation Requirements for Machinery and Piping". These documents specify the materials and minimum acceptable thicknesses for all thermal insulation products that may be used in the construction of ships for the U.S. Navy.

20.   Table 1 of both Military Standard 769 and Section 9390 / S39 of the General Specifications identify the product specifications which may be used on piping, valves, fittings, flange joints and machinery at indicated temperature ranges. Only two products were approved for use on piping whose temperature exceeded 370° F. These are Mil-I-2781, "Insulation, Pipe, Thermal" and Mil-T-15349, "Insulation Tape, Thermal". The latter product was only approved for temperatures up to 750° F on piping up to 3/4" in diameter. However, both products contained amosite asbestos.

22.   Specification Mil-I-2781 provides for three different grades of product, identified by temperature range. The maximum temperatures are, by Grade, 600°, 750° and 1200° F, respectively. Grades II and III each had two classes of product identified as "Fibrous" and "Compounded". All three grades could have been used in the construction of the warships listed above. The specification was amended on March 1, 1971 to delete the "Fibrous" classes of Grade II (class c) and Grade III (class f). On January 9, 1973 this specification was further amended to require that the products manufactured under this specification be asbestos and silica free.

22.   Paragraph 3 of Specification Mil-I-2781 requires that any product furnished under this specification must be one of those which has been tested, approved for use by the U.S. Navy and listed on the Qualified Products List for this specification. Qualified Products Lists for this specification, and its predecessor specification, Navy Department Specification 32-P-8 are available since 1946. All of the products contained on these lists contained amosite asbestos. The first non-asbestos containing product approved under this specification was not available until May 27, 1969. Another non-asbestos containing product became available under this specification on August 1, 1972.  The first Qualified Product List with no asbestos containing products was issued on May 3, 1973. Accordingly, the only products that Avondale could have used to insulate pipes whose normal operating temperature exceeded 370° F on ships it built for the U.S. Navy through mid-1969 contained asbestos.

23.   All contracts between the U.S. Navy, Coast Guard or Army and Avondale incorporated by reference, among others, the provisions of the Walsh-Healy Public Contracts Act.

24.    From the above he concludes that:

    a.    From 1963 through 1965 Avondale delivered 20 ocean going ships which were constructed in accordance with the terms of at least six contracts with various U.S. Government entities.

    b.    Ocean going vessels built for the U.S. Government represent 100% of the ocean going vessels delivered by Avondale between 1963 and 1965.

    c.    The contracts  to build these ships incorporated, by reference, ship construction specifications, plans, Military Standards, Military Specifications, Federal Regulations and the provisions of the Walsh-Healy Public Contracts Act.  These documents also included  lists of specific products approved by the U.S. Government for use in building ocean going vessels.

    d.    All of the contracts to build ships for the U.S. Government required that Avondale build the ships in strict accordance with the construction specifications, plans and other documents incorporated into the ship construction contracts.

    e.    On ships built for the U.S. Government, Avondale could only install those products which were approved for use by the U.S. Government.

    f.    Non-asbestos containing thermal insulation products were not approved for use on U.S. Navy or U.S. Coast Guard ships until May 27, 1969.

    g.    All of the asbestos containing thermal insulation used at Avondale from 1963 - 1965 was purchased by Avondale as a result of U.S. Government requirements.

26.    He has read the foregoing and all of the information contained therein is true and accurate to the best of his personal knowledge.

        Executed this 17th day of November, 2008 at Alexandria City, Virginia.

                        Thomas McCaffery

Sworn and subscribed before me
on this 17th day of November, 2008

Notary Public

CATHERINE VIERNES
Notary Public
Commonwealth of Virginia
My Commission Expires August 31, 2011
Commission ID# 280978

## AFFIDAVIT OF THOMAS McCAFFERY

STATE OF VIRGINIA
ALEXANDRIA CITY

BEFORE ME, the undersigned authority, personally came and appeared:

### THOMAS F. McCAFFERY

who, after being duly sworn, did dispose and state as follows:

1.   He is a technical consultant, researcher and the head of a company whose focus is on the location and analysis of United States Navy and merchant ship design, development, construction, maintenance and repair records.  He also specializes in research of personnel records, military specifications, qualified product lists and related records.

2.   He is an officer in the United States Naval Reserve and has been since 1976. His current rank is Commander.  He has been assigned on active duty to a variety of cruiser and destroyer type ships assigned to the U.S. Atlantic and Pacific Fleets.

3.   He is a Merchant Marine Officer licensed by the United States Coast Guard as Chief Mate of Steam or Motor Vessels of Any Gross Tons Upon Oceans.

4.   He has examined the specifications, design and construction of the second group of U.S. Maritime Administration design C3-S-37d vessels -- SS Gulf Trader, SS Gulf Shipper and SS Gulf Merchant (hereinafter "C3-S-37d vessels").

5.   The C3-S-37d vessels were built by Avondale Shipyards, Inc. (hereinafter "Avondale") and delivered to the Gulf & South American Steamship Company, Inc. (hereinafter "Gulf & South American").  Gulf & South American took delivery of the ships in 1964 and 1965 and operated them until July 31, 1984.  All three ships were purchased by the United States on that date for the nation's Ready Reserve Force.  This is a group of merchant ships specifically chosen for their usefulness in war time or national emergency.  These ships are maintained by the U.S. Maritime Administration to quickly provide shipping in response to a national emergency.

6.   According to the attached U.S. Maritime Subsidy Board documents, over one-half of the cost of building the C3-S-37d vessels at Avondale was paid by the U.S. Maritime Administration through the Maritime Subsidy Board.  The authority to make these payments was Title V "Construction Differential Subsidy" (hereinafter "CDS"), of the Merchant Marine Act, 1936 (hereinafter referred to as "the Act").



7.  Sections 502 and 504 of the Act required that the CDS payments be made directly to Avondale, rather than to Gulf & South American. Further, the Act required that the vessels built with CDS be constructed under a contract or contracts which ". . . contain such provisions as are provided in this title to protect the interests of the United States . . . "

8.  As shown in the attached Maritime Subsidy Board documents, the ship plans and specifications developed by Gibbs & Cox, Inc. for the C3-S-37d vessels were reviewed by both the U.S. Maritime Administration and the U.S. Navy. The Navy required Gulf & South American to modify the original plans and specifications to include specific "National Defense Features." At least five other modifications were made to the original plans and specifications during contract negotiations before final approval by the Maritime Subsidy Board.

9.  The Ship Construction Contract signed by the Maritime Administration / Maritime Subsidy Board, Gulf & South American and Avondale contains the following provisions:

   a.   The contract consisted of Special Provisions, General Provisions and the approved Plans and Specifications.
   b.   The C3-S-37d vessels were to be built by Avondale in strict accordance with the approved Plans and Specifications.
   c.   Changes in the Plans and Specifications could not be made without the specific approval of the Maritime Subsidy Board.
   d.   The Maritime Subsidy Board would pay Avondale 53.9% of the purchase price of the C3-S-37d vessels, plus 100% of the cost of the National Defense Features.
   f.   The ships and the shipyard were required to be available at all times for inspection by representatives of either the Maritime Subsidy Board or Gulf & South American.

10. Section 25, of the approved construction specification for the C3-S-37d vessels, "Specification for Construction of Single Screw Combination Bulk and General Cargo Liner Type Ship for Gulf & South American Steamship Co., Design C3-L-M8 (Second Group)" (attached) is entitled, "Joiner Work and Interior Decoration". This section required Avondale to use of Johns-Manville Marinite 36 core for joiner bulkheads (also known as "wallboard") and liners in constructing the C3-S-37d vessels. Ceilings were required to be Johns-Manville, or equal, Marine Veneer panels. U.S. Coast Guard Publication CG-190, "Equipment Lists", dated August 3,1964 identifies Johns-Manville Marinite 36 as "asbestos incombustible binder board." The same document identifies Johns-Manville Marine Veneer as "asbestos cement board."

11.     Gulf & South American, and its owners, Lykes Lines, Inc. (hereinafter "Lykes"),
        were parties to Operating Differential Subsidy Contracts with the Maritime
        Subsidy Board / U.S. Maritime Commission.  These contracts required all
        vessels receiving Operating Differential Subsidy to be documented under the
        Marine Inspection and Navigation Laws of the United States.  This specifically
        includes the C3-S-37d vessels discussed above and any other vessels built by
        Avondale for either Gulf & South American or Lykes.

12.     The Marine Inspection and Navigation laws are codified in Title 46 "Shipping" of
        the Code of Federal Regulations and enforced by the U.S. Coast Guard.  The
        specific construction requirements applicable to all general cargo-type vessels
        built by Avondale are contained in Title 46, Code of Federal Regulations,
        Subchapters F "Machinery" (parts 50 -62), I "Cargo and Miscellaneous Vessels"
        (parts 90 - 105), J "Electrical" (parts 110 - 113) and Q "Materials" (part 164).
        References to portions of these subchapters are from the versions of those
        subchapters that were in effect between 1962 and 1969.

13.     Part 91 of these regulations is titled "Inspection and Certification".  Pursuant to
        this regulation, vessels built by Avondale are subject to U.S. Coast Guard
        Inspection and Certification.  When a ship is inspected by the U.S. Coast Guard
        and found to be in compliance with the with all of the Marine Inspection and
        Navigation Laws, a Certificate of Inspection is issued to the ship.  In the absence
        of a valid Certificate of Inspection any Cargo Vessel built by Avondale could not
        be operated by either Avondale or the ship's owner.

14.     The prerequisite for issuance of an original Certificate of Inspection by the U.S.
        Coast Guard is the mandatory Initial Inspection.

        A.      The first phase of the Initial Inspection is for the ship owner or builder to
                submit a complete set of plans for the ship to the U.S. Coast Guard for
                review and approval (46CFR91.20-10).  A ship that is subject to U.S.
                Coast Guard regulation may not be constructed unless its plans and
                specifications have been reviewed and approved by the U.S. Coast Guard
                (46CFR91.55).  Only after the plans for the vessel are approved, may the
                builder begin to construct the ship.

        B.      Throughout the construction period the U.S. Coast Guard, along with
                other Governmental agencies and the American Bureau of Shipping,
                inspect the ship's structure, machinery, material and workmanship
                (46CFR91.20-15).  The Coast Guard inspections are intended to ensure
                that the ship is built in accordance with the approved plans and applicable
                U.S. Coast Guard Regulations (46CFR91.20).  Any deviation from, or
                revision to, the previously approved plans by the builder must be
                approved, in writing, by the Commandant of the U.S. Coast Guard
                (46CFR90.15).

15.   Part 92 of Title 46 is titled "Construction and Arrangement." This section establishes the minimum acceptable standards for construction and arrangement of the accommodation and service areas aboard an inspected ship. Section 92.07 is titled "Structural Fire Protection" and identifies the specific materials to be used in the construction of decks, bulkheads and other structures (92.07-5(f)).

16.   For example, the portion of this section dealing with the ship's accommodation and service areas (92-07-10(d) (7)) states,

> "Ceilings, linings, and insulation, including pipe and duct laggings, shall be of approved incombustible materials."

17.   In 1962, 1964 and 1966, among other years, the U.S. Coast Guard published Coast Guard Publication CG 190, "Equipment Lists". These contained lists of, "Items approved or accepted under Marine Inspection and Navigation Laws". Of specific interest is section 164.009, "Incombustible Materials" (attached). This section identifies several types of asbestos containing products for insulation and lagging purposes. These products include corrugated asbestos sheathing, sprayed asbestos insulation, asbestos cement board, asbestos paper, asbestos cement, block insulation and pipe covering (lagging).

A.   In the 1962 edition of CG 190, the approved pipe covering or lagging materials were:

Baldwin-Ehret-Hill, Thermasil
Baldwin-Ehret-Hill, Thermalite 85% Magnesia
Johns-Manville, 85% Magnesia
Johns-Manville Thermobestos
Owens-Corning Fiberglass, KAYLO Block Insulation
Owens-Corning Fiberglass, KAYLO 20 Block Insulation

B.   In the 1964 edition of CG 190, the approved pipe covering or lagging materials were:

Baldwin-Ehret-Hill, Thermasil
Baldwin-Ehret-Hill, Thermalite 85% Magnesia
Fiberboard Products Company, PABCO Precision Molded Caltemp
Fiberboard Products Company, PABCO Precision Molded Super Caltemp
Johns-Manville, 85% Magnesia
Johns-Manville Thermobestos
Owens-Corning Fiberglass, KAYLO Block Insulation
Owens-Corning Fiberglass, KAYLO 20 Block Insulation
Pittsburgh-Corning Corp., UNIBESTOS

C.    In the 1966 edition of CG 190, the approved pipe covering or lagging materials were:

    Baldwin-Ehret-Hill, Thermasil
    Baldwin-Ehret-Hill, 85% Magnesia
    Fiberboard Products Company, PABCO Precision Molded Caltemp
    Fiberboard Products Company, PABCO Precision Molded Super Caltemp
    Johns-Manville, 85% Magnesia
    Johns-Manville Thermobestos
    Owens-Corning Fiberglass, KAYLO Block Insulation
    Owens-Corning Fiberglass, KAYLO 20 Block Insulation
    The Rubberoid Company, Calsilite
    United States Plywood Company, UNIBESTOS

18.    All of the pipe covering products identified above contained asbestos.

19.    Accordingly, the only products that were approved by the U.S. Coast Guard for use as pipe coverings (laggings) in the service and accommodation areas of the general cargo-type ships constructed by Avondale for Gulf & South American and Lykes were the asbestos containing products listed above.

20.    From the above he concludes that:

a.    Gulf & South American sought, and received, financial assistance from the United States to defray over one-half of the cost of purchasing the C3-S-37d Cargo Vessels from Avondale.

b.    The United States, under provisions of the Merchant Marine Act, 1936, paid this financial assistance directly to Avondale.

c.    A contract defined the relationships, and respective responsibilities, between the United States, Gulf & South American and Avondale.

d.    During the contractual negotiations, the plans and specifications for the C3-S-37d Cargo Vessels were modified at the direction of the United States to meet, among other things, national defense requirements.

e.    When finally approved by the United States, the modified plans and specifications became part of the contract.

f.    The contract required Avondale to build the C3-S-37d Cargo Vessels in strict accordance with the approved plans and specifications.

g.    The plans and specifications approved by the United States required the use of specific asbestos containing materials in the joiner work of the C3-S-37d Cargo Vessels.

h.    Avondale was contractually obligated, by its contract with the United States, to use asbestos containing materials in the construction of the C3-S-37d Cargo Vessels.

i.    Avondale was required by Federal Regulation, enforced by the U.S. Coast Guard, to install use asbestos containing pipe insulation in the service and accommodation areas of Cargo Vessels built for Gulf & South American and Lykes Lines.

20. He has read the foregoing and all of the information contained therein is true and accurate to the best of his personal knowledge.

Executed this 23rd day of January, 2006 at Alexandria City, Virginia.

Thomas McCaffery

Sworn and subscribed before me
on this 23rd day of January, 2006

Notary Public

RALPH HAMMOCK
Notary Public
Commonwealth of Virginia
My Commission Expires April 30, 2008

## AFFIDAVIT OF THOMAS McCAFFERY

STATE OF VIRGINIA
ALEXANDRIA CITY

BEFORE ME, the undersigned authority, personally came and appeared:

### THOMAS McCAFFERY

who, after being duly sworn, did dispose and state as follows:

1.  He is a technical consultant, researcher and the head of a company whose focus is on the location and analysis of United States Navy and merchant ship design, development, construction, maintenance and repair records. He also specializes in research of personnel records, military specifications, qualified product lists and related records.

2.  He is an officer in the United States Naval Reserve and has been since 1976. His current rank is Commander. He has been assigned on active duty to a variety of cruiser and destroyer type ships assigned to the U.S. Atlantic and Pacific Fleets.

3.  He is a Merchant Marine Officer licensed by the United States Coast Guard as Chief Mate of Steam or Motor Vessels of Any Gross Tons Upon Oceans.

4.  At the request of Mr. Peter Territo and his attorneys, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, he researched the regulations and industry standards regarding thermal insulation of merchant ships built in the United States. This research specifically included those regulations and standards that applied to the design and construction the C4-S-66a design vessels built by Avondale Shipyards, Inc. for Lykes Brothers Steamship Company, Inc.

5.  Contracts for construction of the second group of four ships to be built to this design were signed on November 21, 1963 by representatives of U.S. Government, Department of Commerce, Lykes Brothers Steamship Company ("Lykes"), Inc. and Avondale Shipyards, Inc ("Avondale"). Under this agreement, the U.S. Government agreed to pay 55% of the construction cost of the four vessels. The U.S. Government also agreed to pay 100% of the identified cost of the National Defense Features incorporated into the vessels at the request of the U.S. Navy.

6.  The ships described above, and all other Lykes cargo ships, were required to be constructed according to the Marine Inspection and Navigation Laws of the United States. These laws are codified in Title 46 "Shipping" of the Code of Federal Regulations. These construction requirements are enforced by the U.S. Coast Guard. The specific construction requirements applicable to the Lykes

**DEFENDANT'S EXHIBIT**
E

cargo ships built by Avondale are contained in Title 46, Code of Federal Regulations, Subchapters F "Machinery" (parts 50 -62), I "Cargo and Miscellaneous Vessels" (parts 90 - 105), J "Electrical" (parts 110 - 113) and Q "Materials" (part 164). References to portions of these subchapters are from the versions of those subchapters that were in effect between 1962 and 1969.

7.    Part 91 of these regulations is titled "Inspection and Certification". Pursuant to this regulation Lykes cargo vessels were subject to U.S. Coast Guard Inspection and Certification. When a ship is inspected by the U.S. Coast Guard and found to be in compliance with the with all of the Marine Inspection and Navigation Laws, a Certificate of Inspection is issued to the ship. In the absence of a valid Certificate of Inspection the Lykes cargo vessels could not be operated.

8.    The prerequisite for issuance of an original Certificate of Inspection by the U.S. Coast Guard is the mandatory Initial Inspection.

   A.    The first phase of the Initial Inspection is for the ship owner or builder to submit a complete set of plans for the ship to the U.S. Coast Guard for review and approval (46CFR91.20-10). A ship that is subject to U.S. Coast Guard regulation may not be constructed unless its plans and specifications have been reviewed and approved by the U.S. Coast Guard (46CFR91.55). Only after the plans for the vessel are approved, may the builder begin to construct the ship.

   B.    Throughout the construction period the U.S. Coast Guard, along with other Governmental agencies and the American Bureau of Shipping, inspect the ship's structure, machinery, material and workmanship (46CFR91.20-15). The Coast Guard inspections are intended to ensure that the ship is built in accordance with the approved plans and applicable U.S. Coast Guard Regulations (46CFR91.20). Any deviation from, or revision to, the previously approved plans by the builder must be approved, in writing, by the Commandant of the U.S. Coast Guard (46CFR90.15).

9.    Part 92 of Title 46 is titled "Construction and Arrangement." This section establishes the minimum acceptable standards for construction and arrangement of the accommodation and service areas aboard an inspected ship. Section 92.07 is titled "Structural Fire Protection" and identifies the specific materials to be used in the construction of decks, bulkheads and other structures (92.07-5(f)).

10.   For example, the portion of this section dealing with the ship's accommodation and service areas (92-07-10(d) (7)) states,

         "Ceilings, linings, and insulation, including pipe and duct laggings, shall be of approved incombustible materials."

11. In 1958, 1962, 1964 and 1966, among other years, the U.S. Coast Guard published Coast Guard Publication CG 190, "Equipment Lists". These contained lists of, "Items approved or accepted under Marine Inspection and Navigation Laws". Of specific interest is section 164.009, "Incombustible Materials". This section identifies several types of asbestos containing products for insulation and lagging purposes. These products include corrugated asbestos sheathing, sprayed asbestos insulation, asbestos cement board, asbestos paper, asbestos cement, block insulation and pipe covering (lagging).

A. In the 1958 edition of CG 190, the approved pipe covering or lagging materials were:

Johns-Manville, 85% Magnesia
Johns-Manville Thermobestos

B In the 1962 edition of CG 190, the approved pipe covering or lagging materials were:

Baldwin-Ehret-Hill, Thermasil
Baldwin-Ehret-Hill, Thermalite 85% Magnesia
Johns-Manville, 85% Magnesia
Johns-Manville Thermobestos
Owens-Corning Fiberglass, KAYLO Block Insulation
Owens-Corning Fiberglass, KAYLO 20 Block Insulation

C. In the 1964 edition of CG 190, the approved pipe covering or lagging materials were:

Baldwin-Ehret-Hill, Thermasil
Baldwin-Ehret-Hill, Thermalite 85% Magnesia
Fiberboard Products Company, PABCO Precision Molded Caltemp
Fiberboard Products Company, PABCO Precision Molded Super Caltemp
Johns-Manville, 85% Magnesia
Johns-Manville Thermobestos
Owens-Corning Fiberglass, KAYLO Block Insulation
Owens-Corning Fiberglass, KAYLO 20 Block Insulation
Pittsburgh-Corning Corp., UNIBESTOS

D.   In the 1966 edition of CG 190, the approved pipe covering or lagging
     materials were:

     Baldwin-Ehret-Hill, Thermasil
     Baldwin-Ehret-Hill, 85% Magnesia
     Fiberboard Products Company, PABCO Precision Molded Caltemp
     Fiberboard Products Company, PABCO Precision Molded Super Caltemp
     Johns-Manville, 85% Magnesia
     Johns-Manville Thermobestos
     Owens-Corning Fiberglass, KAYLO Block Insulation
     Owens-Corning Fiberglass, KAYLO 20 Block Insulation
     The Rubberoid Company, Calsilite
     United States Plywood Company, UNIBESTOS

12.   All of the pipe covering products identified above contained asbestos.

13.   Accordingly, the only products that were approved by the U.S. Coast Guard for
      use as pipe coverings (laggings) in the service and accommodation areas of the
      Lykes cargo ships constructed by Avondale were the asbestos containing
      products listed above.

14.   He has read the foregoing and all of the information contained therein is true and
      accurate to the best of his personal knowledge.

      Executed this 29th day of June, 2005 at Alexandria City, Virginia.

                                        Thomas McCaffery

      Sworn and subscribed before me
      on this 29th day of June, 2005

      Notary Public

      Catherine Viernes
      NOTARY PUBLIC
      Commonwealth of Virginia
      My Commission Expires
      August 31, 2007

## AFFIDAVIT OF EDWARD BLANCHARD

STATE OF LOUISIANA

PARISH OF JEFFERSON

BEFORE ME, the undersigned authority, personally came and appeared:

### EDWARD BLANCHARD

who, after being duly sworn, did dispose and state as follows:

1. With the exception of approximately two years of service in the United States Navy between 1944 and 1946, he was employed at Avondale Shipyards and Avondale Industries, Inc. from 1942 until 1988, when he retired. From 1950, on he was a supervisor and, later, General Superintendent of Outfitting, Assistant Vice-President of Production Operations, Vice-President of Production Operations, and Group Vice-President of Production Operations at Avondale. At Avondale he oversaw the construction of all vessels.

2. Since 1950, he and the Avondale Production Department have worked intimately with personnel and inspectors from the United States Navy, the United States Coast Guard, and the United States Maritime Administration in the construction of military vessels built pursuant to contracts with the United States



Navy, the United States Coast Guard and the Maritime Commission (hereinafter sometimes referred to as "Federal Vessels").

3.    During all aspects of work on the Federal Vessels, *e.g.* landside construction, launching, outfitting, testing and sea trials, Avondale performed its work under close, constant, and detailed surveillance by the United States Navy, United States Coast Guard and the Maritime Commission and other federal agencies (hereinafter sometimes referred to as "Federal Inspectors"). This surveillance was exercised by written specifications and personal oversight and inspection of all Avondale work by Federal Inspectors. Virtually no aspect of the construction of Federal Vessels escaped this close monitoring.

4.    During all aspects of the construction of Federal Vessels, Federal Inspectors retained the ultimate decision making authority over all construction. If a disagreement regarding any issue arose, the Federal Inspectors' decision controlled.

5.    During the construction of the Federal Vessels, the Federal Inspectors would continuously inspect the vessel to ensure that the work on the vessel met the federal government's regulatory and contractual criteria. These inspections would take place daily, and he interacted with the Federal Inspectors daily to ensure that

2

production was proceeding on schedule and meeting all government specifications.

6.     In the 1950's, the Navy established a quality control system where all work performed on Navy vessels was approved by a Navy inspector. Later, the Navy established a Quality Assurance Office at Avondale. The Navy Quality Assurance group operated out of a two-story building constructed at Avondale pursuant to the Navy contracts which housed over sixty (60) Navy inspectors. Since he first became involved with navy inspectors at Avondale, the Navy inspectors had the authority to stop production on a project if any aspect of the work was being performed improperly or in an unsafe manner. Any problems noted by a Navy inspector had to be corrected before work on a project could proceed.

7.     The Federal Inspectors and their representatives had unlimited access to all areas of the Avondale shipyard. Federal Inspectors were allowed to go anywhere in the shipyard at any time and were not required to be escorted by Avondale personnel.

8.     There were different types of Federal Inspectors at Avondale, including boiler inspectors, hull inspectors, and safety inspectors. Further, the United States Navy and the United States Coast Guard had safety and occupational health

3

inspectors at Avondale that conducted frequent "walk-throughs" throughout the shipyard facility. The Navy also had inspectors who conducted similar "walk-throughs" during the construction of the Destroyer Escort Vessels and all other Navy vessels built at Avondale.

9.    The Federal Inspectors maintained a constant presence at Avondale and oversaw every aspect of the shipbuilding process. Further, the Navy inspectors were provided offices at Avondale pursuant to the Navy contracts and were present at Avondale at all times.

10.    The Federal Inspectors monitored every aspect of the construction of the vessels at Avondale from the moment the materials to be used in the construction first arrived at Avondale until the ship was fully outfitted and delivered.

11.    As soon as products to be used in the construction of a Navy vessel arrived at Avondale, they became the property of the United States Navy. The Navy inspectors oversaw the unloading, handling and storage of all construction materials, from steel plates to insulation products, and monitored the care and "housekeeping" of those products at Avondale until they were installed on the vessels.

12.    He recalls that the Navy required compliance with the smallest details

4

and, for example, would even check the temperature and humidity at which welding rods were stored.

13.     Similarly, the Navy monitored the handling and storage of insulation materials to be installed on vessels. The inspectors would reject materials which were broken or which had been stored improperly and were, for instance, too damp, and oversaw the installation of the products and tested the products once the installation was complete.

14.     Since the 1950's, the Navy had also worked closely with the safety directors at Avondale to ensure that Avondale maintained a safe working environment for its employees during he construction of Navy vessels.

15.     He recalls that Jim O'Donnell, the first head of the Avondale Safety Department frequently met with the Federal Inspectors to discuss safety issues regarding the construction of Federal Vessels.

16.     Navy inspectors had ultimate control over safety issues on Navy projects at Avondale and could shut down work on a project if they felt that the work was not being performed safely. Maritime Commission and Coast Guard inspectors had this same authority on Maritime Commission subsidized vessels and Coast Guard vessels.

5

17.     The Federal Vessels constructed at Avondale were built in stages, and every stage of the ship construction was inspected and approved by Federal Inspectors.   Work on a Federal Vessel could not progress until the work was inspected and approved by the Federal Inspectors and work that did not meet their specifications had to be corrected.

18.     He had to prepare 30-day production reports regarding the progress on the construction of every vessel built for the Navy, the Coast Guard, or the Maritime Commission at Avondale.   In those reports, he would have to certify that Avondale had complied with the contract requirements for a particular vessel before the installment payments would be released.

19.     He specifically recalls the Navy inspectors requiring adequate ventilation in vessels while insulation was being installed and specifically recalls discussing ventilation to be provided on the Destroyer Escorts with the Navy inspectors supervising that project and working with the Navy personnel to ensure that adequate ventilation was provided to the employees working on those vessels.

20.     He was personally involved in pre-bid inspections at Avondale where Navy personnel would review the working and safety conditions at the shipyard prior

6

to the awarding of a Navy contract.

21.    As soon as any ship built for the Navy, the Coast Guard or the Maritime Commission was launched and outfitted, various trials followed. A "Dock-Side" trial would first be conducted to assure a successful "Builder's Trial." Federal Inspectors would be present to monitor those tests.

22.    The first sea trial was called the "Builder's Trial" and was conducted by the shipyard using its personnel and senior Navy and government personnel on board for inspections, observation and approval. During the Builder's Trial, Navy and government inspectors would inspect the ship and would issue deficiency reports if they found any problems on the ship. The ship would then return to the shipyard facility, and shipyard workers would correct any deficiencies found by the inspectors. He has personally participated in these sea trials on Navy vessels, including the Destroyer Escorts. Similar, if not identical, procedures governed the Builder's Trials of Coast Guard and Maritime Commission vessels.

23.    Following the completion of the Builder's Trial and after Avondale made the necessary corrections to the ship, a second sea trial called an "Acceptance Trial" was conducted. Acceptance Trials were fully staffed by United States Navy officers,

7

civilian employees and crew, with shipyard and manufacturers' representatives along to observe. As before, any deficiencies discovered by any inspectors during the Acceptance Trial were Avondale's responsibility to correct. Similar, if not identical, procedures governed the Coast Guard and Maritime Commission vessels.

24.    He recalls that the Navy had lists of qualified products which could be used in the construction of their vessels and that every single component installed on a vessel constructed at Avondale had to be on the Navy's qualified list. Any substitutions or changes in items to be installed on a vessel had to be approved by the Navy. Similar, if not identical, procedures governed the Coast Guard and Maritime Commission vessels.

25.    During the construction of steam-powered commercial cargo vessels in the 1906's and 1970's, the same regular and detailed inspections of the work on those vessels were conducted by inspectors working under the authority of the U.S. Coast Guard and the Maritime Commission. For example, for Lykes Lines vessels constructed at Avondale, he recalls that there were ten inspectors monitoring the construction.

26.    He has read the foregoing and all of the information contained herein is true and accurate to the best of his knowledge, information and belief.

8

Executed this 30th day of June, 2005 at *Avondale*

Louisiana.

*Edward Blanchard*

EDWARD BLANCHARD

Sworn to and subscribed before me
this 30th day of June, 2005.

NOTARY PUBLIC

KRISTOPHER T. WILSON
NOTARY PUBLIC
LA BAR No. 23978
Parish of Orleans, State of Louisiana
My Commission is Issued for Life

P:\RSH\0525\Blanchard Affidavit.wpd                    9



Maritime Subsidy Board
Maritime Administration

June 25, 1963.
Regular Meeting.



Proceedings of the Maritime Subsidy Board.                     June 25, 1963.
                                                               Regular Meeting.

Present:    Chairman Alexander, Member Gulick
            and Member Ables.

Also Present:   G. L. Andrews, Deputy General
                Counsel; John M. O'Connell, Assistant
                Secretary and James S. Dawson, Jr.,
                Secretary.

The Board convened at 10:26 A.M. and adjourned
        at 12:16 P.M.

                        - - - - -

Gulf & South              The Board again considered the matter with respect to
American SB        the application dated June 26, 1962, from Gulf & South
Co., Inc. --       American Steamship Company, Inc., for construction-differ-
Application for    ential subsidy to aid in the construction of three new
CDS - 3 cargo      cargo vessels (Second Replacement Group), MA Design C3-S-37d
vessels - MA       (Award of construction-differential subsidy contract), trans-
Design C3-S-37d    mitted by the Chief, Office of Government Aid under date of
(2nd Replace-      June 12, 1963, which had been laid over from the Board
ment Group).       meeting of June 18, 1963.
                          In the course of the discussion, the Board directed
the Secretary to obtain from the Comptroller up-to-date information in the form
of a memorandum from the Comptroller to the Secretary, Maritime Subsidy Board,
as to the current financial qualifications of Gulf and South American Steamship
Company, Inc., to proceed with the construction of the three vessels in the
Second Replacement Group.
        In this connection, the Board noted statements in the memorandum, on
Pages 7 and 8 thereof, indicating that the Board determined on December 12, 1962,
that Gulf and South American Steamship Co., Inc., was financially qualified to
proceed with the subject construction and that it was understood that since
such date there had been no material change in the operator's financial condition.
        The requested memorandum from the Comptroller was desired by the Board to
document this understanding.
        Upon the unan' vote of Chairman Alexander, Member Gulick and Member Ables,
the Maritime Subsidy Board:
        (Order Recommendations 1, 2 and 3, Page 14).
        Memorandum from the Comptroller on the subject, dated July 12, 1963, is in
the files of the Secretary along with memorandum dated June 12, 1963, from the
Chief, Office of Government Aid.

                        - - - - -

June 25, 1963.
(Con.-4)

Grace Line Inc.
- Final Subsidy
Rates for Wages
& Subsistence
of Officers &
Crews of Cargo
Vessels - Trade
Routes Nos. 2,
4 & 25 - Calen-
dar Year 1960.

The Board considered the adoption of operating-differ-
ential subsidy rates computed for the calendar year 1960 and
applicable to the Wages and Subsistence categories of expense
for Grace Line Inc., cargo vessels on Trade Routes Nos.
2, 4, and 25, transmitted by the Chief, Office of Government
Aid under date of June 12, 1963.

After discussion, upon the "yea" vote of Chairman
Alexander, Member Gulick and Member Ables, the Maritime
Subsidy Board:

(Quote Recommendations 1, 2 and 3, Pages 3 thru 5).

Memorandum dated June 12, 1963, from the Chief, Office
of Government Aid, relative to the above matter is in the files of the Secretary.

- - - - -

A true record.

_James S. Dawson_
Secretary



MARITIME SUBSIDY BOARD
MARITIME ADMINISTRATION

The following is a summary of the actions taken by the Maritime Subsidy Board at a regular meeting held on June 25, 1963.

800.   Approved recommendations in memorandum dated June 12, 1963, from the Chief, Office of Government Aid, re Gulf & South American Steamship Co., Inc. - Application dated June 26, 1962, for construction-differential subsidy to aid in the construction of three new cargo vessels (Second Replacement Group) - MA Design C3-S-37d (Award of construction-differential subsidy contract).

801.   Approved recommendations in memorandum dated June 11, 1963, from the Chief, Office of Government Aid, re Moore-McCormack Lines, Inc. - Foreign Repair and Maintenance Work during Calendar Year 1961.

802.   Approved recommendations in memorandum dated June 13, 1963, from the Chief, Office of Government Aid, re American Export Lines, Inc. - Participation in Freight Revenue Pooling Agreements by member lines of the Mediterranean Canada Westbound Freight Conference (MEDCAN).

803.   Approved recommendations in memorandum dated June 3, 1963, from the Chief, Office of Government Aid, re American Export Lines, Inc. - Final Subsidy Rates for Wages and Subsistence of Officers and Crews of Combination Vessels - Trade Route No. 10 - Calendar Year 1960.

804.   Approved recommendations in memorandum dated June 13, 1963, from the Chief, Office of Government Aid, re Prudential Lines, Inc. - Final Composite Subsidy Rate for Protection and Indemnity Insurance Premium Costs and Crew Deductible Average Costs of Cargo Vessels - Trade Route No. 10 - Calendar Years 1960 and 1961.

805.   Approved recommendations in memorandum dated June 12, 1963, from the Chief, Office of Government Aid, re Grace Line Inc. - Final Subsidy Rates for Wages and Subsistence of Officers and Crews of Combination Vessels - Trade Routes Nos. 2 and 4 - Calendar Year 1960.

806.   Approved recommendations in memorandum dated June 12, 1963, from the Chief, Office of Government Aid, re Grace Line Inc. - Final Subsidy Rates for Wages and Subsistence of Officers and Crews of Cargo Vessels - Trade Routes Nos. 2, 4 and 25 - Calendar Year 1960.

James S. Dawson, Jr.
Secretary



MARITIME SUBSIDY BOARD - Regular Meeting - June 25, 1963

The Board convened at 10:26 and adjourned at 12:16 A.M.

Present: Chairman Alexander, Member Gulick, Member Ables

Also present: Deputy Gen. Counsel Andrews, Assistant Secretary, O'Donnell,
Secretary Dawson

1. GULF & SOUTH AMERICAN, etc.

In the course of the discussion, the Board directed the Secretary to obtain
from the Comptroller up-to-date information in the form of a memorandum from
the Comptroller to the Secretary, Maritime Subsidy Board, as to the current
financial qualifications of Gulf and South American Steamship Company, Inc.,
to proceed with the construction of the three vessels in the Second Replace-
ment Group. In this connection, the Board noted/statements in the staff
memorandum, on Pages 7 and 8 thereof, indicating that the Board determined
on December 12, 1962, that Gulf and South American Steamship Co., Inc.,
was financially qualified to proceed with the subject construction and
that it was understood that since such date there had been no material change
in the operator's financial condition. The requested memorandum from the
Comptroller was *desired by the Board* to document this understanding. *Memorandum from the*
*Comptroller on the subject, dated July 12, 1963, is in the files of the*
Thereupon, staff recommendation was approved unanimously.

2. MOORE-McCORMACK - Foreign Repairs, etc.

Recommendations I and II approved unanimously. The Maritime Administrator
announced that he was approving Recommendation III.

At this point, the Board took occasion to discuss the provisions of
Section 606(7) of the 1936 Act, as amended, and Article II-4 of the Operating-
Differential Subsidy Agreement respecting the use of U. S. goods and the
extent of the Board's authority to institute penalties appropriately designed

*dated June 13, 1963, from Chief, Office of Economics, MLD*
*Lily, along with memorandum*

to insure compliance therewith, as distinguished from the extreme penalty of default under contract and cancellation thereof.  The Secretary was directed to prepare a memorandum from the Board to the staff (Chief, Office of Government Aid and General Counsel), requesting the Office of Government Aid, to identify the problem areas in respect to this subject and the General Counsel to comment upon the provisions of the 1936 Act in the solution of such problems, as well as the need, if any, for new legislation to implement the Board's authority to resolve such problems and impose unreasonable penalties, as necessary.

3.  AMERICAN EXPORT LINES, INC. - Pooling Agreement, etc.

Approved unanimously.

4.  5.  6.  7.  Final Subsidy Rates

Approved unanimously.

Secretary



MARITIME SUBSIDY BOARD

AGENDA

June 25, 1963 – 10:00 A.M.

BOOK #1
    APPROVED
1. / GULF & SOUTH AMERICAN STEAMSHIP CO., INC. – Application dated June 26, 1962,
    for construction-differential subsidy to aid in the construction of three
    new cargo vessels (Second Replacement Group) – MA Design C3-S-37d (Award
    of construction-differential subsidy contract) – Aptaker 6/12/63 (Laid over
    from meeting of 6/18/63)


    APPROVED
2. / MOORE-McCORMACK LINES, INC. – Foreign Repair and Maintenance Work during
    Calendar Year 1961 – Aptaker 6/11/63


    APPROVED
3. / AMERICAN EXPORT LINES, INC. – Participation in Freight Revenue Pooling
    Agreements by member lines of the Mediterranean Canada Westbound Freight
    Conference (MEDCAN) – Aptaker 6/13/63


BOOK #2    APPROVED
4. / AMERICAN EXPORT LINES, INC. – Final Subsidy Rates for Wages and Subsistence
    of Officers and Crews of Combination Vessels – Trade Route No. 10 –
    Calendar Year 1960 – Aptaker 6/3/63


    APPROVED
5. / PRUDENTIAL LINES, INC. – Final Composite Subsidy Rate for Protection and
    Indemnity Insurance Premium Costs and Crew Deductible Average Costs of
    Cargo Vessels – Trade Route No. 10 – Calendar Years 1960 and 1961 – Aptaker 6/13/63


    APPROVED
6. / GRACE LINE INC. – Final Subsidy Rates for Wages and Subsistence of Officers
    and Crews of Combination Vessels – Trade Routes Nos. 2 and 4 – Calendar Year 1960
    Aptaker 6/12/63


    APPROVED
7. / GRACE LINE INC. – Final Subsidy Rates for Wages and Subsistence of Officers
    and Crews of Cargo Vessels – Trade Routes Nos. 2, 4 and 25 – Calendar
    Year 1960 – Aptaker 6/12/63

*Tail Over 6/18/63*

FORM MA-71
(12-62)

U.S. DEPARTMENT OF COMMERCE
MARITIME ADMINISTRATION

## CONCURRENCE RECORD

INSTRUCTIONS - Use this form in accordance with Administrator's Order 167 (Amended) and the Correspondence Manual.

| ORIGINATING OFFICE CODE | SUBJECT AND FILE NUMBER OF DOCUMENT QM97/L25-24: 640 |
|---|---|
| 640 | GULF & SOUTH AMERICAN STEAMSHIP CO., INC. - Application dated 6-26-62 for CDS to aid in the construction of 3 new cargo vessels (2nd Replacement Group) MA Design C3-S-37d (Award of Construction-differential subsidy contract) |

| ROUT-ING | CODE NO. | ORGANIZATIONAL UNIT | INITIALS | | |
|---|---|---|---|---|---|
| | | | WITHIN OFFICE | OFFICE HEAD | DATE |
| | 100 | MARITIME ADMINISTRATOR | | | |
| | 101 | DEPUTY MARITIME ADMINISTRATOR | | | |
| | 105 | CHIEF INVESTIGATOR AND SECURITY OFFICER | | | |
| | 106 | PUBLIC INFORMATION OFFICER | | | |
| | 112 | CHIEF HEARING EXAMINER | | | |
| 4 | 115 | SECRETARY, M.A. AND M.S.B. | | *JRD* | *4/14/63* |
| | 120 | OFFICE OF PROGRAM PLANNING | | | |
| 3 | 200 | OFFICE OF THE GENERAL COUNSEL | *#14* | *Grea* | *4/4/63* |
| | 300 | OFFICE OF SHIP OPERATIONS | | | |
| | 400 | OFFICE OF THE COMPTROLLER | | | |
| | 510 | OFFICE OF BUDGET AND MANAGEMENT | | | |
| | 520 | OFFICE OF PROPERTY AND SUPPLY | | | |
| | 550 | OFFICE OF PERSONNEL MANAGEMENT | | | |
| | 560 | OFFICE OF STATISTICS | | | |
| 1 | 600 | OFFICE OF GOVERNMENT AID | | | *6/12/63* |
| 2 | 800 | OFFICE OF SHIP CONSTRUCTION | | | *6/12/63* |
| | 900 | OFFICE OF RESEARCH AND DEVELOPMENT | | | |
| 5 | 640 | Mac Daniel | | | |
| 6 | | Dawson | | *6/20/63* | |

USCOMM-DC 31599-P 62

FORM MA-7.1 (12-62)



MARITIME ADMINISTRATION, WASHINGTON, D.C.

TO:     Secretary, Maritime Subsidy Board          DATE: June 12, 1963

                                                   QM97/L25-24:640
FROM:   Chief, Office of Government Aid

SUBJECT:   GULF & SOUTH AMERICAN STEAMSHIP CO., INC. - Application dated
           June 26, 1962, for construction-differential subsidy to aid in
           the construction of three new cargo vessels (Second Replacement
           Group) - MA Design C3-S-37d (Award of construction-differential
           subsidy contract)

The attached memorandum recommends that the Maritime Subsidy Board approve

and authorize the execution of Construction-Differential Subsidy Contract

No. MA/MSB-26 covering the above three ships.

                                         *Edward Aptaker*
                                         Edward Aptaker

Attachment

cc:   101   539
      200   600
      240   602
      250   620
      253   630
      300   640
      340   650
      400   660
      430   800
      515   810
            820
            10003

USCOMM-MA-DC

MARITIME ADMINISTRATION, WASHINGTON, D.C.

TO:  Maritime Subsidy Board

FROM:  Chief, Office of Government Aid

DATE:  June 12, 1963

QM97/L25-24:640

SUBJECT:  GULF & SOUTH AMERICAN STEAMSHIP CO., INC. - Application dated June 26, 1962, for construction-differential subsidy to aid in the construction of three new cargo vessels (Second Replacement Group) - MA Design C3-S-37d (Award of construction-differential subsidy contract)

## Purpose

To recommend that Construction-Differential Subsidy Contract No. MA/MSB-26 covering the construction of the three new cargo ships, be approved for execution in the form attached.

## Discussion

### Ship Construction Requirement

Article I-9(a)(2), as amended, of Operating-Differential Subsidy Agreement, Contract No. FMB-75, with Gulf & South American Steamship Co., Inc., requires that the construction contract for these three (3) ships comprising the second replacement group for Trade Route No. 31, be awarded by July 1, 1963.

### Previous Actions

Previous actions taken by the Maritime Subsidy Board pursuant to Administrator's Order No. 179 (amended) are summarized hereunder:

Section 4.  Determinations under Title V:

4.01 - Approval in Principle of Commercial Characteristics:

On October 12, 1962, the Maritime Subsidy Board, in acting on recommendation included in staff memorandum of September 20, 1962, approved in principle the

2

commercial characteristics and suitability for service on Trade Route No. 31
of three new cargo ships of MA Design C3-S-37d, the basic design approved for
the two ships of the operator's first replacement group.

4.02 - Determination of Commercial Characteristics:

On December 11, 1962, the Maritime Subsidy Board approved recommendations
included in staff memorandum of November 27, 1962, and, among other things
(a) made the necessary findings and determinations under Sections 501(a)(1),
(2) and (3), and 601(a) of the 1936 Act; (b) approved the basic commercial
characteristics of the MA Design C3-S-37d; (c) made a favorable determination
of economic feasibility; (d) approved the plans and specifications for sub-
mission to the Department of the Navy in accordance with Section 501(b) of
the Act; and (e) authorized the operator, after bidding plans and specifica-
tions had been approved by the Office of Ship Construction, and agreement
reached and approved by the Maritime Subsidy Board as to treatment of
national defense allowances, if any, to prepare Invitation for Bids under
Section 504 of the 1936 Act, and upon approval by such Office or by the
Board, if necessary, to issue Invitation for Bids.

4.03 - Determination of National Defense Features:

On February 12, 1963, the Board, acting on staff memorandum of January 30,
1963, took the following actions with respect to the three (3) ships to be
constructed for account of Gulf & South American Steamship Co., Inc. (second
replacement group):



3

(a)  Pursuant to action of December 11, 1962, in approving staff
memorandum of November 27, 1962, determined that the following changes,
as suggested in the Navy's letter of January 12, 1963, are in excess
of commercial requirements, and that the cost thereof shall be for
the sole account of the United States, provided that said items are
formally certified as national defense features by the Secretary of
the Navy:

    (1)  Increase in the shaft horsepower from 11,000 maximum
        commercial rating to national defense power of 13,600
        SHP using Naval design criteria.

    (2)  Upgrading ten 5-ton booms to ten 10-ton booms, with 5-ton
        rigging for commercial use.

(b)  Authorized and directed that the construction-differential sub-
sidy contract to be executed with Gulf & South American Steamship Co.,
Inc., applicable to the proposed three new cargo ships for the com-
pany's second replacement group, shall include, in substance, the
national defense recapture clauses identified as Recommendation "II"
in staff memorandum dated January 30, 1963; and

(c)  Directed the Office of Ship Construction, after approval by that
Office, to submit the contract bidding plans and specifications for
the three ships covering the changes requested by the Department of
the Navy for certification of the Secretary of the Navy, as required
by Section 501(b) of the Act.

4

The Assistant Secretary of the Navy, by letter of March 14, 1963, advised
the Maritime Administrator that the two features determined by the Board
to be in excess of commercial requirements "are of sufficient value and
importance for the operation of the proposed ships in time of war or
national emergency as to be certified as national defense features,
and are so certified."

4.04 - Determination of Cost Apportionment

### Issuance of Invitation to Bid

On February 8, 1963, Invitation for Bids for construction of these three
vessels were issued with the approval of the Office of Ship Construction,
pursuant to authority delegated to that Office under date of December 11,
1962.  The bid opening date was scheduled as April 16, 1963, and bids were
opened on that date.

### Determination of Lowest Responsive Domestic Bidder

On May 7, 1963, the Board, in acting on recommendations contained in memoran-
dum of April 25, 1963, from the Chief, Office of Ship Construction, determined,
among other things, that the bid of Avondale Shipyards, Inc., of $8,613,013,
for the national defense ship on a fixed price basis for each of three ships,
is fair and reasonable and the lowest responsive domestic bid.

### Foreign Shipbuilding Center, Estimated Foreign Cost, Construction-Differential Subsidy and Construction-Differential Subsidy Rate, etc.

On June 4, 1963, the Board, in approving recommendations included in memoran-
dum of May 27, 1963, from the Chief, Office of Ship Construction, with respect
to the construction of these three ships (a) approved Japan as the

5

representative low cost shipbuilding center on which to base the foreign
construction cost and construction-differential subsidy rate; (b) established
$3,944,000 per ship as the estimated cost of constructing in Japan, the
three ships; (c) established $4,616,013 per ship as the applicable construc-
tion-differential subsidy, which amount equals the difference between
the bid price for the commercial ship of Avondale Shipyards, Inc., of
$8,560,013 and the estimated foreign cost of $3,944,000; (d) established,
since the construction-differential subsidy is 53.9% of the bid price, the
amount of government aid for Gulf & South American Steamship Co., Inc.,
applicable to all authorized changes under the construction contract, and
to all approved Owner's expense associated with this contract, such as
design changes and inspection costs, be 53.9% of the domestic cost; and
(e) established that the foreign cost of the national defense features
added to the ships be 46.1% of the Avondale Shipyards, Inc., bid price.

## Award of Construction Contract

On   June  4 , 1963, the Board, in acting on recommendations included in
memorandum of May 23, 1963, from the Chief, Office of Ship Construction,
approved (a) the award of a contract to Avondale Shipyards, Inc., for the
construction of the three vessels, including national defense features
($53,000 for each ship) Bid 1(A), MA Design C3-S-37d, for a total amount
of $25,839,039 for three vessels on a fixed price basis, with delivery
of the first, second and third vessels within 600, 660 and 720 days,
respectively, from the date of contract award; and (b) a stipulation that
there be included in the contract award, Separate Price Item - Extended
Guarantee for Certain Items, Bid 1(D) at no cost.

6

## Section 502(f) Finding

On June 4, 1963, the Board, in acting on a recommendation included in memorandum of June 3, 1963, from the Chief, Office of Ship Construction, determined that an allocation under Section 502(f) of the Act is not warranted in connection with the construction of the three vessels for Gulf and South American Steamship Co., Inc.

## Subsidizable budget limitation for all engineering and architectural changes, fees concerned with design, plan approval, inspection, etc.

The Board on June 6, 1963, in acting on recommendation included in memorandum of May 28, 1963, from the Chief, Office of Ship Construction, with respect to the construction of these three ships, determined that the Board's payment of construction-differential subsidy on account of the Owner's cost of design, approving plans, conducting inspection (including all architectural, engineering and interior decorating services, together with related travel, communications and reproduction expenses), as incurred by Gulf & South American Steamship Co., Inc., in the construction of these three ships, MA Design C3-S-37d (second group), when approved by the Board, shall not apply to an amount in excess of the total sum of $340,000.

## Owner's Outfit

Since the cost of the Owner's outfit is included in the price bid for each of these ships, no recommendation is required concerning the Board's participation in such cost.

## Allocation of Domestic Cost

On the basis of the actions taken by the Board on June 4, 1963 establishing 53.9% as the construction-differential subsidy rate, and

7

in approving the award to Avondale Shipyards, Inc., of the contract for construction of these three MA Design C3-S-37d ships, allocations of their domestic cost between the Government and Gulf & South American Steamship Co., Inc., are shown in summary by the following tabulation:

|  |  | One Ship | Three Ships |
|---|---|---|---|
| Gulf & South American Steamship Co., Inc.'s share | 46.1% | $3,944,000 | $11,832,000 |
| Maritime Subsidy Board's share: |  |  |  |
| Construction-differential subsidy | 53.9% | $4,616,013 | $13,848,039 |
| National defense features | 100% | 53,000 | 159,000 |
|  |  | $4,669,013 | $14,007,039 |
| Contract total |  | $8,613,013 | $25,839,039 |

| Possible use of national defense features by Gulf & South American Steamship Co., Inc. - one ship: | Domestic Cost | Estimated Foreign Cost |
|---|---|---|
| Increased shaft horsepower | $45,000 x 46.1% | $20,745 |
| Increase in cargo boom capacity | 8,000 x 46.1% | 3,688 |
| Total | $53,000 | $24,433 |

The above percentage (53.9%) will also apply to the actual cost of engineering, inspection and pre-contract costs not to exceed $340,000, and to all authorized changes under the contract, as approved by the Board on June 6, 1963.

### Financial Qualifications

The Board, on December 11, 1962, in acting on staff memorandum of November 27, 1962, determined, pursuant to Section 501(a)(2) of the Act, that Gulf & South

8

American Steamship Co., Inc., was financially qualified to proceed with the
construction of these three vessels (second replacement group). It is under-
stood that since such date, there have been no material changes in the
operator's financial condition.

## Title XI Financing

By letter of February 27, 1963, the Maritime Administrator approved in
principle the company's application, as amended, for Title XI loan and
mortgage insurance on the subject three vessels.

Construction of two of these vessels, and possibly the third, will be
financed in part by Loan Agreements which will be insured under Title XI
of the Act. The usual provisions in this type of financing require the
owner to assign to the Trustee for the bondholders all of its right,
title and interest in the construction contract as security under the
Trust Indenture, but with the owner remaining liable for the performance
of its obligations under such contract. It is now in order, in this
instance, to approve assignment of the owner's interest in the construc-
tion contract to permit the proposed financing to be consummated. The
permission to assign should be conditioned upon the Maritime Administrator's
approval of the execution of documents required for the insurance of loan
or mortgage.

Additionally, it is required that the owner assign its interest in perform-
ance and payment bonds under the construction contract to the Trustee in

9

this type of financing. Surety companies at times require the issuance of riders to their bonds to add the Trustee as an additional obligee and to spell out the Trustee's rights thereunder. It may be necessary that the Board, the owner and the Trustee accept such riders.

A recommendation, which involves the Board's approval under terms of the construction contract, is being made to meet the above Title XI financing requirements. Recommendations regarding the construction contract are usually made by the Office of Ship Construction. However, based on discussions by the staffs of this Office and the Office of Ship Construction, it was decided that the matter could be handled more expeditiously by including the recommendation in this memorandum, in which the Office of Ship Construction will concur.

### Statutory Findings and Determinations

It is believed that the Maritime Subsidy Board and/or Maritime Administrator, by the above-cited actions, have made all the findings and determinations prerequisite to the execution of a construction-differential subsidy contract covering the construction of these three ships for Gulf & South American Steamship Co., Inc.

### Availability of Funds for Government's Share of Construction Cost

A representative of the Budget Office has advised orally that funds to cover the Government's share of the construction cost of these three new ships for Gulf & South American Steamship Co., Inc., have been included in the appropriation request for the fiscal year 1964, now being considered by the Congress. Therefore, execution of the construction differential subsidy contract is being recommended subject to the availability of appropriated funds.

10

## Citizenship

The latest confirmation of the citizenship of the operator is contained in a memorandum dated January 7, 1963, from the Deputy General Counsel, showing that the United States citizenship of the company was deemed to be satisfactorily established as of December 21, 1962, within the meaning of Section 2, Shipping Act, 1916, as amended.

## Trade-In of Ships

Gulf & South American Steamship Co., Inc., has on file an application dated July 25, 1962, for trade-in of two C2-S-AJ1 cargo ships and one C2-S-B1 cargo vessel against the three new cargo ships to be constructed as its second group of replacements. The operator advised by letter of April 9, 1963, that it does not intend to trade-in the ships being replaced at this time, but reserves its right under Public Law 87-401 to request that these three vessels be acquired by the United States at the time that the new ships are delivered to the company.

## Construction-Differential Subsidy Contract Provisions
## for Inclusion in Proposed Contract No. MA/MSB-26

The contract provisions contained in the attached proposed Construction-Differential Subsidy Contract No. MA/MSB-26, applicable to the above ships, which are being recommended for Board approval for execution, are similar to those contract provisions included in Grace Line Inc.'s recent construction-differential subsidy Contract No. MA/MSB-22, approved by the Board on May 23, 1963, and scheduled for execution on June 14, 1963.

11

Construction-Differential Subsidy Contract No. MA/MSB-26 includes the follow-ing items:

A.  The customary "Whereas" clauses.

B.  Article 1.  "Grant of Construction-Differential Subsidy" which shall be
    inclusive of such allowances as were approved by the Board on
    1963, in acting on memorandums of May 28, 1963, and May 27, 1963, with respect to engineer-
    ing, design costs, etc., and relative to estimated foreign costs, con-
    struction-differential subsidy rate, respectively.'

C.  Article 2.  "Board's Payment of Construction-Differential Subsidy and the
    Cost of National Defense Features" which will provide for the payment to
    the shipyard or the owner, as the case may be, of the Board's share of
    all items which are approved by the Board for inclusion in Article 1
    above.

D.  The latest articles (as per Contract MA/MSB-22) including provisions which
    have become standard for inclusion in construction-differential subsidy
    contracts covering new vessels, numbered and entitled as follows:

    Article 3.  "Insurance".

    Article 4.  "Documentation and Operation of the Vessels".

E.  Article 5.  "National Defense Features".  The following amounts are in-
    cluded as national defense allowances for each vessel:

12

| | Domestic Cost | Est. Foreign Cost |
|---|---|---|
| Increased shaft horsepower | $45,000 | $20,745 |
| Upgrading ten 5-ton booms to ten 10-ton booms | 8,000 | 3,688 |

with the proviso that in the event the costs thereof shall be increased or decreased by reason of changes under the construction contract, the amounts included in the foreign cost column above also will be correspondingly increased or decreased, as the case may be. This article contains the latest recapture provisions relating to the above two items as authorized by the Board on February 12, 1963, in approving Recommendation "II" contained in staff memorandum of January 30, 1963.

F. The latest articles (as per contract MA/MSB-22) including provisions which have become standard for inclusion in construction-differential subsidy contracts, applicable to new construction, numbered and entitled as follows:

Article 6.   "Requisition".

Article 7.   "Sale or transfer of the vessel by the Owner".

Article 8.   "Withdrawal from Reserve Funds".

Article 9.   "Board's Interest".

Article 10.   "Optional Termination of Construction Contract by Board".

Article 11.   "Officials not to Benefit or be Employed".

13

The construction-differential subsidy contract is being attached to this memorandum in accordance with the procedure adopted by the Board on November 13, 1962.

In view of the foregoing it is recommended that the recommendations contained on the following page of this memorandum be approved.

There is attached Appendix "A" on which are listed all documents relevant to this memorandum.

Edward Aptaker

Attachments

No Legal Objection:

General Counsel

Concurrence:

Chief, Office of Ship Construction

cc: 101  200  240  250  253  300  340
    400  430  515  539  600  602  620
    630  640  650  660  800  810  820
    10003

USCOMM-MA-DC

14

## Recommendation

It is recommended that the Maritime Subsidy Board take the following actions:

1. Approve and authorize (subject to the availability of the necessary appropriation) the execution of Construction-Differential Subsidy Contract No. MA/MSB-26, with Gulf & South American Steamship Co., Inc. ~~, a copy of which are in accordance with the comments contained in the foregoing memorandum.~~

2. (a) Grant prior approval, pursuant to terms of Construction Contract No. MA/MSB-25, to the assignment by the owner to the Trustee for bondholders of the owner's interest in such contract in connection with the financing of its payment obligations under Title XI insurance program, provided the Maritime Administrator authorizes issuance of such insurance, and (b) authorize the Secretary to notify the owner of such approval.

3. Authorize the Secretary to execute, on behalf of the Board, the acceptance of riders to the performance and payment bonds furnished under the construction contract, that may be required in connection with issuance of Title XI insurance, subject to the approval of the Office of the General Counsel.

Approved by the
Maritime Subsidy Board
Maritime Administration

Date JUN 25 1963

_James S Dawson_
Secretary



& SOUTH AMERICAN STEAMSHIP CO., INC.                          APPENDIX "A"

List of attachments and related documents referred to in memorandum to
Maritime Subsidy Board from Chief, Office of Government Aid, under the
Subject: GULF & SOUTH AMERICAN STEAMSHIP CO., INC. - Application dated
June 26, 1962, for construction-differential subsidy to aid in the con-
struction of three new cargo vessels (Second Replacement Group) - MA
Design C3-S-37d (Award of construction-differential subsidy contract)

| Item | | Date |
|------|----------------------------------------------------------------------|------|
| | **Attached to Original Only** | |
| | (Copies are also on file in the General Files and/or | |
| | Administrative Files of the Office of Government Aid) | |
| 1. | Copy of proposed Construction-Differential Subsidy Contract No. MA/MSB-26 | |

**Attached to All Copies**

| | | |
|------|----------------------------------------------------------------------|---------|
| 1. | Letter to Maritime Administrator from Assistant Secretary of the Navy, re certification of two national defense features | 3-14-63 |
| 2. | Memo. from Chief, Division of Estimates to Chief, Division of Subsidy Contracts, re tentative breakdown of costs | 5-27-63 |

**Incorporated by Reference**

| | | |
|------|----------------------------------------------------------------------|----------|
| 1. | Memorandum to Maritime Subsidy Board from Chief, Office of Government Aid, re Approval in principle of new ships proposed for construction (approved October 12, 1962) | 9-20-62 |
| 2. | Memorandum to Board from Chief, Office of Government Aid, re commercial characteristics of three ships proposed for construction (approved December 11, 1962) | 11-27-62 |
| 3. | Memorandum from Deputy General Counsel to Chief, Office of Government Aid, re Citizenship of Applicant | 1-7-63 |
| 4. | Memorandum to Board from Chief, Office of Government Aid, re National defense features for above three ships (approved February 12, 1963) | 1-30-63 |

 & SOUTH AMERICAN STEAMSHIP CO., INC.                                   APPENDIX "A"
                                                                          Page 2

                            Incorporated by Reference                              Date

5.    Letter from Gulf & South American to Chief, Office of Government
      Aid advising that company did not wish to trade-in old ships at this
      time
                                                                              4-9-63

6.    Memorandum to Board from Chief, Office of Ship Construction, re
      lowest responsive domestic bid (approved May 7, 1963)
                                                                              4-25-63

7.    Memorandum to Board from Chief, Office of Ship Construction re
      Award of contract to Avondale Shipyards, Inc., for construction
      of three ships for Gulf & South American Steamship Co., Inc.
      (approved 6-4-63)
                                                                              5-23-63

8.    Memorandum to Board from Chief, Office of Ship Construction,
      re Foreign shipbuilding center, estimated foreign cost,
      construction-differential subsidy and CDS rate on the three
      ships to be built for Gulf & South American (approved 6-4-63)
                                                                              5-27-63

9.    Memorandum to Board from Chief, Office of Ship Construction
      re Limitation on subsidy participation for owner's costs of
      engineering services relating to the three ships proposed for
      construction (approved 6/6/63)
                                                                              5-28-63

10.   Memorandum to Board from Chief, Office of Ship Construction re
      consideration of Section 502(f) of 1936 Act (Approved 6-4-63)
                                                                              6-3-63

DEPARTMENT OF THE NAVY
OFFICE OF THE SECRETARY
WASHINGTON 25, D. C.

1 4 MAR 1963

My dear Mr. Alexander:

Maritime Administration letter of 20 February 1963 forwarded the final
contract plans and specifications for the second replacement group of
three new 18-knot cargo ships of MA Design C3-S-37d proposed to be
built for Gulf and South American Steamship Company, Inc.  In addition,
the Department was requested to certify as national defense features
two design changes previously suggested in Navy letter of 12 January
1963, and described in Specification Supplement No. 1.

The following two design changes, determined by the Maritime Subsidy
Board to be in excess of commercial requirements, are of sufficient
value and importance for the operation of the proposed ships in time
of war or national emergency as to be certified as national defense
features, and are so certified:

    a.  Increase in shaft horsepower from 11,000 maximum commercial
rating to 13,600 Navy rating.

    b.  Increase in cargo boom capacity from 5 to 10 tons for ten
booms, except for 5-ton running rigging which is required for
commercial service.

With regard to the Department's letter of approval and certification
of 12 January 1963 on the question of speed, it is assumed that the
proposed ships designed for a sustained speed of 20 knots are not
economically feasible for the intended commercial service.  Navy
approvals for the ships as proposed are made within this context.

With kindest regards,

                                        Sincerely yours,

                                        Kenneth E. BeLieu
                                        Assistant Secretary of the Navy
                                        (Installations and Logistics)

The Honorable Donald W. Alexander
Administrator
Maritime Administration
U. S. Department of Commerce
Washington 25, D. C.

FORM CD-121 (5-22-59)
(PRES. BY A.O. 206-10)

UNITED STATES GOVERNMENT

# *Memorandum*

U.S. DEPARTMENT OF COMMERCE
MARITIME ADMINISTRATION

TO    :  Chief, Division of Subsidy Contracts
        Office of Government Aid

DATE:  MAY 2 7 1963

FROM  :  Chief, Division of Estimates

SUBJECT:  MA Design C3-S-37d Cargo Vessels for
          Gulf & South American Steamship Co., Inc.
          Avondale Shipyards, Inc., Contractor.
          TENTATIVE BREAKDOWN OF COSTS

| | |
|---|---|
| Fixed Price Bid for Each of Three Vessels (Commercial) | $8,560,013 |
| Fixed Price Foreign Cost | 3,944,000 |
| Government Subsidy (CBS Ratio 53.9%) | $4,616,013 |

### Contract

| | One | Three |
|---|---|---|
| Commercial Vessel (Fixed Price) | $8,560,013 | $25,680,039 |
| National Defense Features | 53,000 | 159,000 |
| Total | $8,613,013 | $25,839,039 |

### Gulf & South American Steamship Co. Share

| | One | Three |
|---|---|---|
| Base Commercial Vessel | $3,944,000 | $11,832,000 |

### Maritime Subsidy Board Share

| | | One | Three |
|---|---|---|---|
| Base Commercial Vessel | $8,560,013 | | |
| Less Foreign Cost | 3,944,000 | | |
| (53.9%) | $4,616,013 | $4,616,013 | $13,848,039 |
| National Defense Features: | | | |
| Increased Power | $ 45,000 | | |
| Increase in Cargo Boom Capacity | 8,000 | | |
| | $ 53,000 | 53,000 | 159,000 |
| Total | | $4,669,013 | $14,007,039 |

### Summary

| | | One | Three |
|---|---|---|---|
| Gulf & South American Share | | $3,944,000 | $11,832,000 |
| Maritime Subsidy Board Share: | | | |
| Subsidized Costs | $4,616,013 | | |
| NBF | 53,000 | | |
| | $4,669,013 | 4,669,013 | 14,007,039 |
| Total (One Ship) | | $8,613,013 | |
| Total Contract (Three Ships) | | | $25,839,039 |

2

The percentages applicable to the following items are:

(Owner     46.1%)
(MSB      53.9%)

1.  Engineering, Inspection, and Pre-Contract Cost (Ceiling $340,000)
2.  Changes under Contract

<u>Possible Use of NDF by Owner - One Vessel</u>

| | | |
|---|---|---|
| Increased Power | $45,000 x 46.1% | $20,745 |
| Increase in Cargo Boom Capacity | $ 8,000 x 46.1% | $ 3,688 |

NOTE:  Foreign Cost and Engineering Ceiling have not yet been
        approved by the Board.

Donald E. Frye

SPECIAL PROVISIONS

Contract No. MA/MSB-25

CONTRACT
FOR THE CONSTRUCTION OF
SINGLE SCREW CARGO VESSELS
MA DESIGN C3-S-37d
FOR

GULF & SOUTH AMERICAN STEAMSHIP CO., INC.

THIS CONTRACT, entered into as of the                  day of                  , 1963, by
and between the UNITED STATES OF AMERICA, (herein called the "Government"), repre-
sented by the Secretary of Commerce, acting by and through the MARITIME SUBSIDY
BOARD (said Secretary of Commerce, acting by and through the MARITIME SUBSIDY BOARD,
being herein called the "Board"), GULF & SOUTH AMERICAN STEAMSHIP CO., INC., a
corporation organized under the laws of the State of Louisiana (herein called the
"Owner"), and AVONDALE SHIPYARDS, INC., a corporation organized under the laws of
the State of Louisiana (herein called the "Contractor")

W I T N E S S E T H:

WHEREAS :

1. Pursuant to Sections 501(a) and 504 of the Merchant Marine Act, 1936, as
amended (herein referred to as the "Act"), all of the applicable requirements of
Title V of the Act, and other applicable provisions of law, the Owner, a citizen
of the United States, has made application to the Board for a construction-differential
subsidy to aid in the construction of three (3) cargo vessels, MA Design C3-S-37d
(herein called the "Vessels"), to be used in the foreign commerce of the United States;
and

2. The Owner has represented and the Board has determined that (a) the Plans
and Specifications call for the construction of Vessels which will meet the require-
ments of the foreign commerce of the United States, will aid in the promotion and
development of such commerce, and be suitable for use by the United States for
national defense or military purposes in time of war or national emergency; (b)
the Owner possesses the ability, experience, financial resources, and other quali-
cations necessary to enable it to operate and maintain the Vessels; and (c) the
granting of the aid applied for is reasonably calculated to replace worn-out or
obsolete tonnage with new and modern ships, or otherwise to carry out effectively the
purpose and policy of the Act; and

3. The Board has approved the Plans and Specifications for the construction of
the Vessels as submitted by the Owner; and

4. The Board has submitted the Plans and Specifications for the construction
of the Vessels to the Department of the Navy and has received the required approval
thereof; and

5. The Owner, in accordance with Section 504 of the Act, desires to finance
its portion of the cost of the construction of the Vessels; in accordance with the
Owner's application, the Board has permitted the Owner to obtain and submit to the
Board the competitive bids from domestic shipyards for such work; the Contractor
has submitted a bid; the Owner desires to have the Vessels built in the Contractor's
shipyard; the Board considers the bid of the shipyard to be fair and reasonable and
has approved it; and the Board desires to become a party to the contract for the
construction of the Vessels and has, by contract issued simultaneously herewith,
agreed to pay a construction-differential subsidy in an amount determined by the
Board in accordance with Section 502 of the Act.

NOW, THEREFORE, in consideration of the premises and of the mutual promises hereinafter set forth, the parties hereto agree as follows:

## SPECIAL PROVISIONS

ARTICLE I.  General Statement of Work.  (a)  The Contractor shall furnish all labor and material and shall perform all work necessary to construct, build, complete and deliver, at its own risk and expense, three (3) single screw vessels, MA Design C3-S-37d, in strict accordance with the Plans and Specifications referred to in Article II hereof, including National Defense Features, and will do everything required of the Contractor by this Contract (these Special Provisions, and the General Provisions approved by the Board on May 25, 1961, referred to at 26 Federal Register 5039 and made a part hereof, and the Plans and Specifications are all hereafter called the "Contract"), including the installation of any outfitting and equipment which the Plans and Specifications provide shall be furnished by the Owner and including the development of working plans, all for the consideration of Twenty-Five Millions Eight Hundred Thirty-Nine Thousand and Thirty-Nine Dollars ($25,839,039) (herein called the "Contract Price"), together with such additions and subject to such deductions as are herein provided.

(b)  The Vessels shall be identified as Maritime Administration Hull Nos. 168, 169, and 170 and Contractor's Hull Nos. 1037, 1038, and 1039 and shall be constructed at the Contractor's plant or shipyard (herein called the "Shipyard"), located at Avondale in the State of Louisiana.  Upon completion of the work, as required by the Contract, and after passing the tests provided in the Contract, each Vessel as completed shall be delivered to the Owner after five (5) days' notice to the Owner, alongside a safe and accessible pier at the shipyard, where there must be sufficient water for each Vessel always to be afloat, custom to the contrary notwithstanding; free and clear of all liens and claims of every nature except those arising out of the acts or omissions of the Owner or the Board, such delivery and acceptance by the Owner to be subject, however, to any guarantees provided in this Contract.  Upon each such delivery, the Owner shall give the Contractor a receipt for the Vessel and shall, within five (5) days thereafter, remove or cause the Vessel to be removed from the Shipyard.

(c)  The work to be performed hereunder shall be commenced immediately, shall be prosecuted with due diligence, and shall be completed, and delivery of each Vessel (in all respects complying with the terms of the Contract) shall be made on or before the delivery dates in the following schedule:

| Administration Hull Numbers | Contractor's Hull Numbers | Contract Delivery Date |
|---|---|---|
| 168 | 1037 | |
| 169 | 1038 | |
| 170 | 1039 | |

ARTICLE II.  Plans and Specifications.  The drawings or Plans and Specifications designated -

"Specification for Construction of Single Screw Combination Bulk and General Cargo Liner Type Ship for Gulf & South American Steamship Co., Inc. - Design C2-L-M9 - (Second Group) - Maritime Administration Design C3-S-37d" dated February 8, 1963, as modified by -

Modification No. 4 dated March 25, 1963
Modification No. 5 dated April 0, 1963

and

Administration Design C3-S-37d, covering Modifications to Meet Naval Requirements for National Defense" dated February 8, 1963.

(all of which documents are collectively called the "Plans and Specifications") for the construction of the Vessels, have, at or before the execution of this contract, been identified by the signatures of the parties hereto and are hereby made a part hereof with the same force and effect as though herein set out in full.

ARTICLE III.   Owner's Work.   Changes in the Plans and Specifications directed by the Owner shall not be performed by the Contractor unless approved by the Board and if performed by the Contractor without such approval, shall not constitute the basis for a change in the Contract Price or other claim against the Owner or the Board.

ARTICLE IV.   Payment of Contract Price.   (a) Progress payments on account of the Contract Price, adjusted as herein provided, shall be made to the Contractor by the Owner and the Board as the Contract work progresses. The amounts of such payments shall be determined substantially in accordance with the usual Board practice of dividing the Contract Price into points representing the estimated cost of the labor and material of the various components of the Contract Price, and measuring said progress by the percent of completion of said portions of the Contract Price as attested by representatives of the Board, the Owner and Contractor.   Such progress payments shall be made at monthly intervals or at such other intervals as the parties agree and as follows:

   (i)   The Board shall pay the Contractor fifty-three and nine-tenths per cent (53.9%) and the Owner shall pay the Contractor forty-six and one-tenth per cent (46.1%) of that portion of each progress payment on account of the Contract Price set out in Article I(a) hereof (excluding, however, the sum of One Hundred Fifty-Nine Thousand Dollars ($159,000) of the Contract Price for the National Defense Features incorporated in the Vessels).

   (ii)  The Board shall pay the Contractor fifty-three and nine-tenths per cent (53.9%) and the Owner shall pay the Contractor forty-six and one-tenth per cent (46.1%) of that portion of each progress payment on account of the net increase in Contract Price, pursuant to Article 4 of the General Provisions, for changes in the contract work approved by the Board as eligible for construction-differential subsidy; provided, however, in the event there is a net decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Owner and the Board pursuant to this Article IV shall be reduced by the respective percentages of such net decrease.

   (iii) The Board shall pay the Contractor one hundred per cent (100%) of that portion of each progress payment on account of One Hundred Fifty-Nine Thousand Dollars ($159,000) of the Contract Price set out in Article I(a) hereof for the National Defense Features incorporated in the Vessels.

   (iv)  The Board shall pay the Contractor one hundred per cent (100%) of that portion of each progress payment on account of the net increase in the Contract Price, pursuant to Article 4 of the General Provisions, for changes in the Plans and Specifications of the National Defense Features; provided, however, in the event there is a net decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Board pursuant to this Article IV shall be reduced by the amount of said net decrease.

provided, however, in the event there is a decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Owner shall be reduced by the amount of such decrease.

(b) The aggregate of the progress payments provided in (a) above shall not be in excess of:

(i) Ninety-five per cent (95%) of the value (as represented by the Contract Price set out in Article I(a) hereof) of the work performed and materials delivered to the Shipyard for the construction of the Vessels (subject, however, to the provisions of Paragraph (c) of this Article); plus

(ii) Ninety-five per cent (95%) of any cumulative net increase in Contract Price pursuant to Article 4 of the General Provisions, as of the date of said partial payment; or minus

(iii) Ninety-five per cent (95%) of any cumulative net decrease in Contract Price determined pursuant to Article 4 of the General Provisions, as of the date of said partial payment.

(c) The Board and the Owner may, on such terms and conditions as the Board may prescribe, include, as part of the value of the work performed on the Vessels, work performed by any subcontractor on materials, machinery or equipment to be installed in the Vessels, although not yet delivered, if the title to such materials, machinery or equipment included as part of the value of the work done on the Vessels shall have vested in the Contractor, subject, however, to the subcontractor agreeing to bear the risk of loss of such materials, machinery or equipment until delivered to the Shipyard, and provided, however, that all amounts included in respect of any such subcontractors' work shall be paid to the subcontractors within thirty (30) days.

(d) The amounts withheld under the provisions of Paragraph (b) of this Article IV, plus any other amounts payable to the Contractor under the terms of this Contract, shall be paid as follows:

(i) One-half of the amount so withheld as to each Vessel, except the last Vessel, shall be payable promptly after the delivery of such Vessel.

(ii) The remaining one-half of the amount withheld as to each Vessel, except the last Vessel, shall be paid promptly upon completion of the final guarantee survey held pursuant to Article 14(c) of the General Provisions of this Contract, less, however, an amount determined by the Board to be adequate to protect the Owner and the Board from all remaining contractual obligations, including the cost of remedying any remaining delivery or guarantee deficiencies and any disbursements by the Owner pursuant to Article 14 of the General Provisions, and neither the Contractor nor anyone claiming through the Contractor shall have any claim against such withheld amounts unless and until such obligations and guarantee deficiencies are remedied. The Owner and the Board may apply such withheld amounts towards the payment of or reimbursement for the expense of fulfilling such contractual obligations and remedying such deficiencies and the Contract Price and progress payments shall be adjusted and satisfied accordingly. Any amounts remaining of such deductions after fulfilling and remedying such obligations and deficiencies shall, however, be thereafter payable progressively promptly as such obligations and deficiencies are settled, except with respect to the last Vessel.

(iii) All other amounts payable

after (a) the Owner has notified the Board that all delivery and guarantee obligations have been satisfied, and (b) the Board has determined that all disputes and all claims under this Contract have been settled or finally adjudicated, and has also determined the final contract price.

(e) No payments shall be made except on bills, vouchers, or invoices submitted in such number or form and executed and attested in such manner as shall be prescribed by the Owner with the approval of the Board.

(f) The books, files and all other records of the Contractor and of any holding, subsidiary, affiliated or associated company shall at all times be subject to inspection and audit by representatives of the Board.

(g) The Vessels and the Shipyard of the Contractor shall at all times be subject to inspection by the Board and the Owner.

ARTICLE V.  Liquidated Damages.  The liquidated damages provided for in Article 6 of the General Provisions of the Contract are Two Thousand Two Hundred Dollars ($2,200.00) for each Vessel for each day of delay, of which Two Thousand Dollars ($2,000.00) shall be paid to the Owner and Two Hundred Dollars ($200.00) shall be paid to the Board.

ARTICLE VI.  Performance and Payment Bonds.  (a)  The dollar sum of the performance bond provided for in Article 22 of the General Provisions of this Contract is Ten Million Dollars ($10,000,000.00).

(b)  The dollar sum of the payment bond provided for in Article 22 of the General Provisions of this Contract is Two Million Five Hundred Thousand Dollars ($2,500,000.00), regardless of the number of Vessels covered by this Contract.

ARTICLE VII.  Insurance on the Vessels and Material.  From the time the first material destined for inclusion as a part of each Vessel becomes at risk at the Shipyard and until the Vessel has been physically delivered to and accepted by the Owner, each Vessel and all materials, outfit, equipment and appliances to be installed on or in the Vessel, including all materials, outfit, equipment and appliances provided by the Owner for and used, or to be used in the construction thereof, shall at the expense of the Contractor, be kept fully insured under full form (including pre-keel) Marine Builder's Risk Policies, including loss or damage caused by strikers, locked-out workmen, or persons taking part in labor disturbances, or riot or civil commotion, and protection and indemnity policies or clauses, including loss of life and personal injury coverage.  Such insurance shall include the value, as determined from time to time by the Owner, of all materials, outfit, equipment and appliances furnished by the Owner.  The amount of insurance, the terms of the policies, and the insurance companies, underwriters, or underwriting funds shall at all times be satisfactory to the Board and to the Owner.  All policies of insurance shall be taken out in the name of the Contractor and the Owner and the United States of America, and all losses under such policies shall be made payable to the Board for distribution by it to itself, the Owner and the Contractor as their respective interests may appear.  All cover notes and policies, with evidence of prepayment of all premiums or other charges, shall be delivered to the Board for its approval and custody.  Policies if not in conformance herewith, shall be surrendered and cancelled upon direction of the Board or of the Owner and new policies in conformance herewith shall be procured and delivered to the Board.

ARTICLE VIII.  Assignment by Owner.  With the prior approval of the Board, the Owner may assign its interest in the Contract in connection with the financing of its payment obligations hereunder.

ARTICLE IX.  Renegotiation.  (a)  To the extent required by law, this Contract is subject to the Renegotiation Act of 1951 (P.L. 9, 82d Congress, 65 Stat. 7) as amended (P.L. 764, 83rd Congress, 68 Stat. 1116; P.L. 216, 84th Congress, 69 Stat. 447; P.L. 85-930, 85th Congress 72 Stat. 1789; P.L. 87-520, 87th Congress, 76 Stat. 134) and to any subsequent Act of Congress providing for the renegotiation of contracts.  Nothing contained in this clause shall impose any renegotiation obligation with respect to this Contract or any subcontract hereunder which is not imposed by an Act of Congress heretofore or hereafter enacted.  Subject to the foregoing, this Contract shall be deemed to contain all the provisions required by Section 104 of the Renegotiation Act of 1951, and by any such other Act, without subsequent Contract amendment specifically incorporating such provisions.

(b)  The Contractor agrees to insert the provisions of this clause, including this Paragraph (b) in all subcontracts, as that term is defined in Section 103(g) of the Renegotiation Act of 1951 or in any subsequent Act of Congress providing for the renegotiation of contracts.

ARTICLE X.  Utilization of Small Business Concerns.  (a)  It is the policy of the Government as declared by the Congress that a fair portion of the purchases and contracts for supplies and services for the Government be placed with small business concerns.

(b)  The Contractor agrees to accomplish the maximum amount of subcontracting to small business concerns that the Contractor finds to be consistent with the efficient performance of this Contract.

ARTICLE XI.  Utilization of Concerns in Labor Surplus Areas.  It is the policy of the Government to place contracts with concerns which will perform such contracts substantially in areas of persistent or substantial labor surplus where this can be done, consistent with the efficient performance of the contract, at prices no higher than are obtainable elsewhere.  The Contractor agrees to use his best efforts to place his subcontracts in accordance with this policy.  In complying with the foregoing and with Paragraph (b) of Article X hereof, the Contractor in placing his subcontracts shall observe the following order of preference: (1) persistent labor surplus area concerns which are also small business concerns; (2) other persistent labor surplus area concerns; (3) substantial labor surplus area concerns which are also small business concerns; (4) other substantial labor surplus area concerns; and (5) small business concerns which are not labor surplus area concerns.

ARTICLE XII.  Value Engineering.  (a) The Contractor may submit to the Owner and the Board a proposal, designated as a value engineering proposal, for a modification in the Plans and Specifications for a change in the work or material upon the basis that the changed work or material produces substantially as satisfactory a ship as the work or material called for in the Plans and Specifications, together with the reduction in Contract Price resulting therefrom.

(b)  The Owner and the Board shall make every reasonable effort to expedite its analysis of any value engineering proposal submitted by the Contractor, provided, however, the Owner and the Board shall have no liability to the Contractor under this Contract or otherwise for any delay in taking action upon a value engineering proposal submitted by the Contractor or for any failure to take action upon any such study or recommendation.

(c)  The Owner, with the approval of the Board, may direct a change in the Plans and Specifications under Article 4 of the General Provisions of this Contract, incorporating the Contractor's value engineering proposal or any part of the proposal.

(d)  The submitting of a value engineering proposal to the Owner and the Board by the Contractor shall in no way affect or modify the contract obligations of the Contractor under this Contract to perform the contract work in accordance with the Plans and Specifications and to effect all deliveries in accordance with the terms of the Contract, except to the extent that a value engineering proposal is included in a change in the Plans and Specifications, pursuant to the provisions of Article 4 of the General Provisions of this Contract.

(e)  The Owner and the Board shall have no obligation to direct a change incorporating a value engineering proposal of the Contractor.

(f)  In the event a value engineering proposal or part thereof is embodied in a direction for a change in the Plans and Specifications, pursuant to Article 4 of the General Provisions of this Contract, the Board shall determine what part of the estimated reduction in contract costs is allocable to such value engineering proposal and as to that portion of the reduction in contract costs the Contract Price shall be reduced by an amount equal to 50 per cent thereof; provided, however, that with respect to any value engineering proposal which, prior to proposal by the Contractor, has been proposed or sponsored by any other shipyard, the Owner or its design agent or the Maritime Administration, the reduction in contract cost shall be 100% of the amount allocable to such value engineering proposal.

(g)  Notwithstanding the provisions of Article 4 of the General Provisions of this Contract, the reduction in contract cost allocable to the Value Engineering Proposal will be determined at the time the Value Engineering Proposal is incorporated in the Plans and Specifications.

(h)  The Owner or the Government may apply any of the Contractor's value engineering proposals or parts thereof in the construction of other ships without any obligation to make payment to the Contractor for such use.

ARTICLE XIII.  Modifications to General Provisions.  The General Provisions referred to in Article I hereof are modified as follows:

(a)  Add the following at the end of Article 14(b):

"Within 30 days after such determination has been communicated to the Contractor, the Contractor, if it disputes the determination, shall submit the determination to the Chief, Office of Ship Construction, of the Maritime Administration, as a dispute for decision by such Chief, Office of Ship Construction, with the right of appeal to the Board, all as provided in Article 36 hereof."

(b)  Add the following new subparagraph (e) at the end of Article 14:

"(e) The following items are hereby designated as 'extended guarantee period items':

Main Propulsion Unit - Including Turbines,
 Gears and Main Throttle Valve.
Propeller.
Boilers - Excluding brickwork unless damaged as
 a result of failure of other parts of boiler.
Anchor Windlass
Ship's Service Turbine Generator Sets.
Salt Water Pumps.
Hatch Covers.

Cargo Winch Controls
Steering Gear - Including Steering Transmission
System.

"Notwithstanding any provision of this Contract to the contrary, the term 'guarantee period' as used in the Contract shall mean, with respect to the extended guarantee period items, a period of one year after delivery of each Vessel and the Contractor (1) shall secure from subcontractors or (2) shall give, if any of such items are manufactured or produced by the Contractor, an extended guarantee period for each of the above designated items. The Contractor's liability under the guarantee provisions of this Contract with respect to the extended guarantee period items shall be limited at the conclusion of the guarantee period otherwise provided by this Article to transferring to the Owner in the manner set forth in subparagraph (d) hereof the guarantee rights against the suppliers of each of the extended guarantee period items for the remainder of the one-year period from the date of delivery of each of the vessels provided, however, that with respect to the extended guarantee period items produced or manufactured by the Contractor, the Contractor's liability shall extend for the one-year period. The final guarantee survey provided in subparagraph (c) of this Article 14 shall be performed with respect to the extended guarantee period items after the expiration of such one-year guarantee period; provided, however, that the term 'final guarantee survey' as used in Article IV(d)(ii) of the Special Provisions of this Contract shall refer to the final guarantee survey performed upon the expiration of six months from the date of delivery of the vessel and amounts withheld on the contract price shall be paid to the Contractor as provided in said Article IV(d)(ii)."

(c)  Subparagraph (a)(1) of Article 22.  Performance and Payment Bonds is deleted in its entirety and the following is substituted therefor:

"(1)  Performance Bond in the sum set out in the Special Provisions of this Contract conditioned upon the well and true performance and fulfillment of all undertakings, covenants, terms and conditions and agreements of this Contract during its original term and any extensions thereof that may be granted by the Owner and the Board, with or without notice to the surety, including all guarantees under this Contract, and conditioned upon the well and true performance and fulfillment of all undertakings, covenants, terms, conditions and agreements of any and all duly authorized modifications of this Contract that may hereafter be made, notice of which modifications to the surety being waived, excepting, however, the covenant to make prompt payment to all persons supplying labor and material in the prosecution of the work to be performed hereunder as covered by the Payment Bond described in subparagraph (2) of paragraph (a) of this Article 22 and the covenants or agreements set out in Article 15 of these General Provisions on the part of the Contractor to pay to the Board excess profits as therein provided."

(d)  The Index Page heading is amended by changing the words "Federal Maritime Board" to "Maritime Subsidy Board."

(e)  Paragraph (a) of Article 2 is amended to change the words "Federal Maritime Board" to "Maritime Subsidy Board."

(f)  Article 36.  Disputes is amended as follows:

Page 44, Line 6 - Between "Administration," and "who" insert "or by his duly authorized representative."

Page 44, Line 6 - Between "who" and "shall" insert ", as the case may be,".

Page 45, Line 3 — Between "Construction," and "a" insert "or his duly authorized representative, as the case may be,".

Page 45, Line 16— Between "Construction." and "The" insert ", or his duly authorized representative, as the case may be."

(g)  Article 24.  Work Hours Act of 1962---Overtime Compensation (a)  No Contractor or subcontractor contracting for any part of the contract work shall require or permit any laborer or mechanic to be employed on such work in excess of eight hours in any calendar day or in excess of forty hours in any workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times his basic rate of pay for all hours worked in excess of eight hours in any calendar day or in excess of forty hours in such workweek, whichever is the greater number of overtime hours.

(b)  In the event of any violation of the provisions of paragraph (a), the contractor and any subcontractor responsible for such violation shall be liable to any affected employee for his unpaid wages.  In addition, such contractor or subcontractor shall be liable to the United States for liquidated damages.  Such liquidated damages shall be computed, with respect to each individual laborer or mechanic employed in violation of the provisions of paragraph (a), in the sum of $10 for each calendar day on which such employee was required or permitted to work in excess of eight hours or in excess of forty hours in a workweek without payment of the required overtime wages.

(c)  The Board may withhold, or cause to be withheld, from moneys payable on account of work performed by the contractor or subcontractor, the full amount of wages required by this Contract and such sums as may administratively be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for liquidated damages as provided in paragraph (b).

IN WITNESS WHEREOF, THE UNITED STATES OF AMERICA, represented as aforesaid, has caused this Contract to be executed on its behalf in three counterparts the day of            ; GULF & SOUTH AMERICAN STEAMSHIP CO., INC. has caused this Contract to be executed on its behalf in three counterparts the            day of            , and AVONDALE SHIPYARDS, INC. has caused this Contract to be executed on its behalf in three counterparts the            day of            , with the intent that each counterpart shall have full force and effect, independently of the others, but full performance of one shall be full performance of all.

                              UNITED STATES OF AMERICA
                              BY: SECRETARY OF COMMERCE
                              MARITIME SUBSIDY BOARD
ATTEST:
                              BY:
_____   _____

ATTEST:                       GULF & SOUTH AMERICAN STEAMSHIP CO., INC.

                              BY:
_____   _____

ATTEST:                       AVONDALE SHIPYARDS, INC.

                              BY:
_____   _____

## CERTIFICATE AS TO EXECUTION BY OWNER

I, _____, certify that I am the _____ of the corporation named as Owner in the within contract; that _____ who signed the said contract on behalf of the Owner was then _____ of the said corporation; that I know his signature, and his signature thereto is genuine; and that said contract was duly signed, sealed and attested for and in behalf of said corporation by authority of its governing body.

_____

## CERTIFICATE AS TO EXECUTION BY CONTRACTOR

I, _____, certify that I am the _____ of the corporation named as Contractor in the within contract; that _____ who signed the said contract on behalf of the Contractor, was then _____ of the said corporation; that I know his signature, and his signature thereto is genuine; and that said contract was duly signed, sealed and attested for and in behalf of said corporation by authority of its governing body.

_____

FORM CD-121 (9-22-59)
(PRES. BY A.O. 208-10)

UNITED STATES GOVERNMENT

*Memorandum*

U.S. DEPARTMENT OF COMMERCE
MARITIME ADMINISTRATION
Washington 25, D.C.

TO     :   Secretary, Maritime Subsidy Board

DATE:  JUL 1 2 1963
QM97/L25-23:433

FROM   :   Comptroller

SUBJECT:   Gulf & South American Steamship Co., Inc. - Application dated
June 26, 1962, for CDS to aid in the construction of three
new cargo vessels (2d Replacement Group) - MA Design C3-S-37d
(Award of construction-differential subsidy contract)

Reference is made to your memorandum dated June 26, 1963, bringing to our
attention pages 7 and 8 of the staff recommendation dated June 12, 1963,
concerning the financial qualifications of Gulf & South American Steamship
Co., Inc., relative to the subject application.

In this regard, based on the Applicant's General Order 12 Statement as of
March 31, 1963, and after deducting all known costs, there was a balance
of $3,575,356 (excluding trade-in, if any) available for construction of
the Operator's second replacement group, as will be noted from the enclosed
statement.  This is approximately $1,000,000 more than the $2,593,759
referred to in the Board's finding dated December 11, 1962.

Based on the foregoing, the Applicant has sufficient funds to finance 100
per cent of its share of the cost of the two ships (First Group) now under
construction contract, and also has approximately $3,600,000 plus allow-
ances on trade-in of five old ships to apply against the Owner's share of
the cost of the three new ships proposed by the subject application.  Sub-
sequent to March 31, 1963, the Applicant has obtained a commitment for
Title XI financing covering four of the five ships to be constructed.  As
of March 31, 1963, there was no mortgage indebtedness on the Applicant's
fleet.

Since the Applicant has obtained a commitment for Title XI financing cover-
ing four of the five ships to be constructed, it is the opinion of this
office that Gulf & South American Steamship Co., Inc., has adequate finan-
cial resources for the proposed construction of three 18-knot cargo ships
of MA Design C3-S-37d (Second Group).

Joseph R. Hock

Enclosure

cc:
115   400   430   433   600-640

### Projection of Estimated Funds Available
### For Proposed Construction (2d Group)

**Funds Available**

| | |
|---|---:|
| Capital Reserve Fund balance 3/31/63 | $4,189,367.71 |
| Depreciation, year 1963, to be deposited (estimated) | 409,375.56 |
| | |
| Special Reserve Fund balance 3/31/63 less recapture liability and 5% retention (-0-) | |
| Excess earnings to be deposited | 2,373,317.28 |
| | -0- |
| Excess working capital pursuant to voluntary deposit policy adopted May 27, 1958 | 2,966,056.46 |
| | 9,938,117.01 |

**Funds Required**

| | |
|---|---:|
| Construction under contract | 6,362,760.54 |
| | |
| Estimated excess of funds available before considering any cost of Second Replacement Group and any allowance on trade-ins. | $3,575,356.47 |

### Funds Required for Ships under Construction
### as of March 31, 1963

| | |
|---|---:|
| Owner's share of base contract price | $8,402,000.00 |
| Owner's share of changes | -0- |
| Trade-in credits paid by Maritime | -0- |
| | |
| Balance to be paid by Owner | 8,402,000.00 |
| Payments made by Owner through 3/31/63 | 2,174,812.25 |
| Unpaid balance as of 3/31/63 | 6,227,187.75 |
| | |
| Owner's share of design and inspection, based on ceiling limitation, less subsidy | 219,300.00 |
| Payments by Owner through 3/31/63 | 83,727.21 |
| | |
| Unpaid balance as of 3/31/63 | 135,572.79 |
| | |
| Unpaid balance of Owner's share of total cost as of 3/31/63 | $6,362,760.54 |

Maritime Subsidy Board.
Maritime Administration.


October 25, 1963.
Regular Meeting.

Proceedings of the Maritime Subsidy Board.

October 25, 1963.
Regular Meeting.

Present:   Chairman Alexander, Member Gulick
           and Member Ables.

Also Present:  Robert E. Giles, General Counsel,
               Department of Commerce; G. L. Andrews,
               Deputy General Counsel; L. C. Hoffmann,
               Chief, Office of Ship Construction,
               (entered the meeting at 10:15 A.M. and
               withdrew at 10:45 A.M.) and John M.
               O'Connell, Assistant Secretary.

The Board convened at 10:10 A.M. and adjourned
        at 11:12 A.M.

- - - - -

Gulf & South
American SS
Co., Inc. -
Design C3-S-37d
(2nd Group) -
Proposed Change
under Contract
MA/MSB-25 -
Shipboard
Mechanization.

The Board again considered the matter with respect to
the authorization of Change under Contract No. MA/MSB-25
covering shipboard mechanization on Gulf & South American
Steamship Co., Inc.'s second group of ships, Design C3-S-37d,
under construction at Avondale Shipyards, Inc., transmitted
by the Chief, Office of Ship Construction under date of
October 16, 1963, which had been laid over from the meeting
of October 22, 1963.

After discussion, upon the "yea" vote of Chairman
Alexander, Member Gulick and Member Ables, the Maritime
Subsidy Board took the following actions:

1.  Consistent with policy of fostering ship mechanization, granted approval
to Gulf & South American Steamship Company to authorize an increased cost change
in Construction Contract No. MA/MSB-25 within the scope of the Construction-
Differential Subsidy Agreement No. MA/MSB-26, to Avondale Shipyards, Inc. for the
provision of shipboard mechanization on the basis that the final price will be
subject to adjudication, and the amount eligible for subsidy will not be in
excess of $250,000 per ship.

2.  Determined that the limitation of the authority of the Chief, Office of
Ship Construction to approve changes under contract and change settlements remain
at 2% of the single vessel contract price as previously established by Adminis-
trator's Order No. 55, exclusive of the change authorized pursuant to this
action.

Memorandum dated October 16, 1963, from the Chief, Office of Ship Construc-
tion, relative to the above matter is in the files of the Secretary.

- - - - -

October 25, 1963.
(Con.-3)

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board:
(Quote Recommendations 1, 2 and 3, Page 5).
Memorandum dated October 14, 1963, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

- - - - -

Domestic Coast-
wise & Inter-
coastal Shipping
- I.C.C. - Con-
tinued Partici-
pation by
Administrator/
Board.

The Board considered memorandum dated October 16, 1963, from Assistant General Counsel, Division of Operating Subsidy Contracts (Louis Zimmet), requesting approval by the Maritime Administrator and Maritime Subsidy Board of continued partici- pation and new interventions under certain specified conditions in cited Interstate Commerce Commission proceedings reopened, or to be reopened, involving water carrier rates in the coastwise and intercoastal trades.

After discussion, by the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board found and determined that the subject recommendation was not a matter for decision by the Maritime Subsidy Board, but rather a matter for decision by the Maritime Administrator, and accordingly, directed the Assistant Secretary to return said recommendation for resubmission to the Maritime Administrator for his consideration.

- - - - -

Upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the meeting adjourned at 11:12 A.M.

- - - - -

A true record.

Assistant Secretary

MARITIME SUBSIDY BOARD – Regular Meeting – October 25, 1963

Present:  Chairman Alexander, Member Gulick, Member Ables

Also present:   Robert E. Giles, General Counsel, Dept. of Commerce;
                Board Counsel Andrews and Assistant Secretary O'Connell
                Mr. Hoffmann entered at 10:15 and withdrew at 10:45 A.M.

The Board convened at 10:10 and adjourned at 11:12 A.M.

1.  GULF & SOUTH AMERICAN, etc.

Approved unanimously.

2.  AMERICAN EXPORT LINES, INC., etc.

Approved unanimously.

3.  AMERICAN PRESIDENT LINES, LTD.– Design C4-S-1qa Cargo Ships, etc.

The Board proceeded to consider staff memorandum from the Chief, Office of

Ship Construction, dated October 22, 1963, recommending that the Board

approve as a change under Contract MA/MSB-23, preliminary planning and

estimating for the provision of centralized control of engine room and

bridge control of main engine on three American President Lines ships

(Design C4-S-1qa cargo ships) now building at National Steel and Shipbuilding

Company at San Deigo, California, as set forth in letters of requests for

approval from American President Lines, Ltd., dated October 15 and 16, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick,

and Member Ables, the Board disapproved the recommendation set forth in the

memorandum from the Chief, Office of Ship Construction, under date of

October 22, 1963, and directed the Assistant Secretary to dispatch the

following telegram to Mr. Noah M. Brinson, Vice President, American Presi-

dent Lines, Ltd.:  /̲ Quote telegram _̲/

4.  AMERICAN PRESIDENT LINES, LTD., – Letter requests of August 30, etc.

Approved unanimously.

2.

5.  Domestic Coastwise and Intercoastal Shipping, etc.

The Board proceeded to consider memorandum dated October 16, 1963, from

Assistant General Counsel, Division of Operating Subsidy Contracts (Louis

Zimmet), requesting approval by the Maritime Administrator and Maritime

Subsidy Board of continued participation and new interventions under cer-

tain specified conditions and in cited Interstate Commerce Commission pro-

ceedings reopened, or to be reopened, involving water carrier rates in the

coastwise and intercoastal trades.  After discussion, by the "yea" vote of

Chairman Alexander, Member Gulick and Member Ables, the Board found and

determined that the subject recommendation was not a matter for decision

by the Maritime Subsidy Board, but rather a matter for decision by the

Maritime Administrator, and accordingly, directed the Assistant Secretary

to return said recommendation for resubmission to the Maritime Administrator

for his consideration.

John M. O'Connell

James S. Dawson, Jr.

MARITIME SUBSIDY BOARD

AGENDA

October 25, 1963 - 10:00 A.M.

APPROVED
1. / GULF & SOUTH AMERICAN STEAMSHIP CO., INC. - Design C3-S-37d (2nd Group),
MA Hulls 168-170 - Avondale Hulls 1037-1039 - Proposed Change under Contract -
MA/MSB-25 Covering Shipboard Mechanization -- Hoffmann 10/16/63 (Laid over
from meeting of 10/22/63)

APPROVED
2. / AMERICAN EXPORT LINES, INC. - Application for approval of cruises under
Public Law 87-45 with the SS ATLANTIC and SS INDEPENDENCE for 1963 and 1964 --
Aptaker 10/8/63

DISAPPROVED
3. / AMERICAN PRESIDENT LINES, LTD. - Design C4-S-1qa Cargo Ships - MA Hulls
164-166, NASSCO Hulls 338-340 - Proposed Change under Contract MA/MSB-23 -
Centralized Control for Engine Room and Bridge Control of Main Engine --
Hoffmann 10/22/63

APPROVED
4. / AMERICAN PRESIDENT LINES, LTD. - Letter requests of August 30 and Septem-
ber 27, 1963, for deferment of construction contract award date with respect
to four cargo ships to be built for Atlantic/Straits Service, Trade Route
No. 17 (Third Replacement Group) -- Aptaker 10/14/63

RETURNED
5. / Domestic Coastwise and Intercoastal Shipping - Interstate Commerce Commission
Proceedings, I.C.C. Dockets I & S 32816, et al - Continued Participation by
Administrator/Board -- Zimmet 10/16/63

6. NOTE: This space being held open for the addition of anticipated recom-
mendation from Office of Government Aid with recommendation and explanation
of contract covering Lykes ships to be built at Avondale. Item will be
distributed to each Board Member for inclusion in the docket books
immediately upon receipt.



FORM MA-71
(5-62)

U.S. DEPARTMENT OF COMMERCE
MARITIME ADMINISTRATION

## CONCURRENCE RECORD

INSTRUCTIONS - Use this form in accordance with Administrator's Order 167 (Amended) and the Correspondence Manual.

| ORIGINATING OFFICE CODE | | SUBJECT AND FILE NUMBER OF DOCUMENT | | | |
|---|---|---|---|---|---|
| 830 | | Gulf & South American Steamship Co., Inc. Design C3-S-37d (2nd Group), MA Hulls 168-170 Avondale Hulls 1038-1039 Proposed Change Under Contract MA-MSB-25 Covering Shipboard Mechanization | | | |

| ROUT-ING | CODE NO. | ORGANIZATIONAL UNIT | INITIALS | | |
|---|---|---|---|---|---|
| | | | WITHIN OFFICE | OFFICE HEAD | DATE |
| | 100 | MARITIME ADMINISTRATOR | | | |
| | 101 | DEPUTY MARITIME ADMINISTRATOR | | | |
| | 105 | CHIEF INVESTIGATOR AND SECURITY OFFICER | | | |
| | 106 | PUBLIC INFORMATION OFFICER | | | |
| | 107 | CADET TRAINING OFFICER | | | |
| 2 | 115 | SECRETARY, M.A. AND M.S.B. | Jre 10/25/63 | | |
| | 120 | OFFICE OF PLANNING AND SPECIAL STUDIES | | | |
| | 200 | OFFICE OF THE GENERAL COUNSEL | | | |
| | 300 | OFFICE OF SHIP OPERATIONS | | | |
| | 400 | OFFICE OF THE COMPTROLLER | | | |
| | 510 | OFFICE OF BUDGET AND MANAGEMENT | | | |
| | 520 | OFFICE OF PROPERTY AND SUPPLY | | | |
| | 550 | OFFICE OF PERSONNEL MANAGEMENT | | | |
| | 560 | OFFICE OF STATISTICS | | | |
| | 600 | OFFICE OF GOVERNMENT AID | | | |
| 1 | 800 | OFFICE OF SHIP CONSTRUCTION | | | 10/14/63 |
| | 900 | OFFICE OF RESEARCH AND DEVELOPMENT | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

USCOMM-DC-24028-P62

FORM MA-71
(5-62)

U.S. DEPARTMENT OF COMMERCE
MARITIME ADMINISTRATION

CONCURRENCE RECORD

INSTRUCTIONS - Use this form in accordance with Administrator's Order 167 (Amended) and the Correspondence Manual.

ORIGINATING OFFICE CODE

830

SUBJECT AND FILE NUMBER OF DOCUMENT

Gulf & South American Steamship Co., Inc.
Design C3-S-37d (2nd Group), MA Hulls 168-170
Avondale Hulls 1637-1639
Proposed Change Under Contract
MA/MSB- 25 DOVERING SHIPBOARD MECHANIZATION

| ROUT-ING | CODE NO. | ORGANIZATIONAL UNIT | INITIALS | | |
|---|---|---|---|---|---|
| | | | WITHIN OFFICE | OFFICE HEAD | DATE |
| | 100 | MARITIME ADMINISTRATOR | | | |
| 1B | 101 | DEPUTY MARITIME ADMINISTRATOR | | GRH | 10/17/63 |
| | 105 | CHIEF INVESTIGATOR AND SECURITY OFFICER | | | |
| | 106 | PUBLIC INFORMATION OFFICER | | | |
| | 107 | CADET TRAINING OFFICER | | | |
| 2 | 115 | SECRETARY, M.A. AND M.S.B. | | Hed | 10/17/63 |
| | 120 | OFFICE OF PLANNING AND SPECIAL STUDIES | | | |
| | 200 | OFFICE OF THE GENERAL COUNSEL | | | |
| | 300 | OFFICE OF SHIP OPERATIONS | | | |
| | 400 | OFFICE OF THE COMPTROLLER | | | |
| 1A | 510 | OFFICE OF BUDGET AND MANAGEMENT | | | 10/26/63 * |
| | 520 | OFFICE OF PROPERTY AND SUPPLY | | | |
| | 550 | OFFICE OF PERSONNEL MANAGEMENT | | | |
| | 560 | OFFICE OF STATISTICS | | | |
| | 600 | OFFICE OF GOVERNMENT AID | | | |
| 1 | 800 | OFFICE OF SHIP CONSTRUCTION | | | 10/15/63 |
| | 900 | OFFICE OF RESEARCH AND DEVELOPMENT | | | |
| 3 | 830 | Ship Cons | | | |

* This is a program which we endorse. While funds cannot now be stated as available in total to support a 1964 program of 17 replacement ships plus such mechanization, approval is recommended as in the best interests of the Maritime program. The Board may have to decide between fewer replacement ships and the mechanization program as the fiscal year proceeds, but this is not considered a compelling reason for disapproval of this recommendation.

Return
To Code
115
JEDavis

R 10/17

USCOMM-DC 24073-P62

U. S. DEPARTMEN. F COMMERCE
MARITIME ADMINISTRATION

October 16, 1963

TO:   Maritime Subsidy Board

FROM:   Chief, Office of Ship Construction

**ORIGINAL**

SUBJECT:   Gulf & South American Steamship Co., Inc.
Design C3-S-37d (2nd Group), MA Hulls 168-170
Avondale Hulls 1037-1039
Proposed Change Under Contract
MA/MSB-25 Covering Shipboard Mechanization

The attached memorandum recommends that the Board approve as a Change

under Contract MA/MSB-25, the provision of shipboard mechanization on

Gulf & South American's second group of ships under construction at

Avondale Shipyards, Inc.

L. C. Hoffmann

Attachment

**ORIGINAL**

U. S. DEPARTMENT OF COMMERCE
MARITIME ADMINISTRATION

October 16, 1963

TO:   Maritime Subsidy Board

FROM:   Chief, Office of Ship Construction

SUBJECT:   Gulf & South American Steamship Co., Inc.,
Design C3-S-37d (2nd Group)
Avondale Hulls 1037-1039
MA Hulls 168-170
Proposed Change Under Contract MA/MSB-25
Covering Shipboard Mechanization

PURPOSE:

The purpose of this memorandum is to obtain approval for the authorization
of a Change under Contract subject to construction differential subsidy
participation covering shipboard mechanization, which proposed change is in
excess of the authorized limitation of $50,000 delegated to the Office of
Ship Construction.

DISCUSSION:

On August 2, 1963, the Maritime Subsidy Board and Gulf & South American
Steamship Co. entered into the subject contract with the Avondale Shipyards,
Inc. for the construction of three single screw cargo ships, Design
C3-S-37d.

By letter dated October 9, 1963, Gulf & South American indicated that
they had been actively studying the installation of certain mechanisms
in the machinery plants of their five ships under construction, and
also some upgrading of the painting of the exterior hulls, for the
ultimate purpose of reducing shipboard manpower and maintenance, as
well as some supplementary applications of mechanization in the deck and
steward departments of the ships.

2

The Owner indicated that the first group of two ships was too far advanced in construction and anticipated delivery to obtain most of these features by expected delivery dates without incurring considerable delays and/or expensive cost changes at this time.  The Owner's request for authorization of an addendum to the subsidy contract, to facilitate shipyard changes and retrofit mechanization of these first two ships in an amount not exceeding $300,000 a ship, will be the subject of a separate memorandum to the Board.

Regarding the second group of three ships under discussion, after having obtained an extension to October 15, 1963 of the Contractor's deadline date for authorization, the Owner secured written concurrence from all unions except one regarding reduced manning scales resulting from the proposed shipboard mechanization.  These union concurrences contemplate a total crew complement of 36, including the master but not including cadets. The union acceptance was based on providing single room occupancy for all personnel.

The Owner has obtained preliminary estimates for thirteen items of work from the shipyard amounting to approximately $170,000 per ship.  In addition, the Owner has provided his own estimate for two items amounting to $35,000 per ship, for a total of $205,000 per ship for all fifteen items of work. A summary covering the scope of this work, based on the general descriptions furnished by the Owner, is attached hereto.

Allowing for a shipyard margin, the Owner is asking Board approval for an amount not exceeding $250,000 per ship.  The details of these fifteen items of work are to be submitted by the Owner as they are developed and will be subject to approval.

3

Under the delegation of authority to this Office to approve changes as set out in Administrator's Order No. 55 (amended) effective October 16, 1962, the Chief, Office of Ship Construction is authorized to approve changes not in excess of $50,000 each or in excess of a total of 2% of the contract price. It has been the practice of this Office to consider the Board approved changes (changes over $50,000) as included in the 2% limit. Since this large change would restrict the authority of this Office as to approval of additional changes to be expected in the completion of these ships, it will be desirable that in this instance, the Board consider the exclusion of this change from the 2% limit.

In view of the foregoing, it is recommended that the recommendations contained on the attached page of this memorandum be approved.

L. C. Hoffmann

cc:  101    800
     200    810
     240    820
     600    830
     640    830.1
            801

USCOMM-MA-DC

Attachment:  (A)  Shipboard Mechanization - Summary - C3-S-37d (2nd Group)

RECOMMENDATION:

It is recommended that the Maritime Subsidy Board take the following
actions:

1. Consistent with policy of fostering ship mechanization, grant*ed*
   approval to Gulf & South American Steamship Company to authorize
   an increased cost change in Construction Contract No. MA/MSB-25
   within the scope of the Construction-Differential Subsidy
   Agreement No. MA/MSB-26, to Avondale Shipyards, Inc. for the
   provision of shipboard mechanization on the basis that the
   final price will be subject to adjudication, and the amount
   eligible for subsidy will not be in excess of $250,000 per
   ship.

2. ~~Provided the Board approves recommendation~~ *Determined that* 1, the limitation of
   the authority of the Chief, Office of Ship Construction to
   approve changes under contract and change settlements remain
   at 2% of the single vessel contract price as previously
   established by Administrator's Order No. 55, exclusive of the
   change authorized pursuant to this action.


Approved by the
Maritime Subsidy Board
Maritime Administration

Date OCT 2 5 1963

Assistant Secretary

<u>ATTACHMENT "A"</u>

Shipboard Mechanization – C3-S-37d (2nd Group)

<u>Summary of Changes to Original Specifications</u>

Reference:  Gulf & South American letter to MA, dated October 9, 1963

|  |  | Preliminary Estimate |
|---|---|---|
| 1. | Install a performance data logging system to scan and record selected measurements pertinent to propulsion and auxiliary plant performance.  Also install a bell and alarm logging system arranged to record engine order and reply, and turbine response in terms of shaft RPM, and also arranged to record out-of-range alarm and selected individual point values of the performance data logging system. | $ 166,047 |
| 2. | Provide a pressure regulator and a control and a recirculating line which will automatically start the turbine-driven fuel oil service pump in case of failure of the motor driven fuel oil service pump. | 1,600 |
| 3. | Provide for a bypass, fitted with a three-way thermostatically operated valve between the inlet and outlet headers of the main lubricating oil coolers, to provide lubricating oil temperature control. | 3,300 |
| 4. | Provide for two complete and independent feed water regulators for each boiler. | 6,000 |
| 5. | This group of ships has wide range, steam atomizing burners.  This item provides additionally for flame detectors on each of the boiler burners. | 7,000 |
| 6. | Provide motor operated, locally controlled main and overboard sea valves. | 16,000 |
| 7. | Install an overflow oil purifier alarm system to provide for automatically stopping the oil purifier upon excess discharge from water outlet of the purifier. | 300 |
| 8. | Provide electronic fog signals, designed to operate through amplifier and control of the specified Public Address System equipment, to automatically sound simulated single stroke gong signal at stern of ship and bell signal at bow of ship at intervals required by regulatory bodies. | 450 |
| 9. | Provide boiler water high and low level alarm system. | 2,000 |
| 10. | Provide a fuel oil service discharge strainer differential pressure alarm. | 500 |

- 2 -

11. Provide a personnel call system.                                    $   4,000

12. Rearrange quarters on Upper and Main Decks.  (This item        10,000
    cannot be accurately estimated until revised quarters
    arrangement plans are completed by the Owner's design
    agent)

13. General upgrading of all outside exposed weather areas          12,750
    with a base inorganic zinc coating extends inorganic
    zinc to all hull exterior surfaces.

                                                   Sub-Total        169,947

14. Provide a means for throttle control from the navigating        30,000
    bridge.                                                        (Owners
                                                                   Estimate)

15. Install a remote operated valve and startup to the motor         5,000
    driven feed pump to provide for emergency feed water to       (Owners
    the boilers in case of main feed pump failure.                 Estimate)

                                                       Total     $205,000
                                                                    appx.

545

October 12, 1962.
(Con.-5)

| | |
|---|---|
| LBP | 470'-0" |
| Beam | 69'-0" |
| Depth | 41'-7" |
| Draft | 29'-8" |
| Displacement | 16,860 |
| Total DWT | 10,857 |
| Cargo DWT | 8,550 |
| Cruising radius | 13,100 |
| ☆ Speed | 18.4 knots |
| ☆ SHP (ABS) | 11,000 |
| Total dry cargo, cu. ft. | 543,550 |
| Reefer cargo, cu. ft. | 16,430 |
| Liquid cargo, tons | 812 |
| Gross tons (estimated) | 9,530 |
| Net tons (estimated) | 5,380 |
| Light ship | 6,093 |
| Passengers | 12 |

☆A speed of 18.0 knots will be obtained with 10,000 SHP (ABS) based on the latest Marad Speed-Power definitions. If the owner elects to accept this reduced SHP, subject to Board approval, a slight reduction in the cost estimates given herein may be possible.

subject to the following provisions:

A.  The Office of Ship Construction shall have the right to review and request changes as it deems necessary, as a result of any modifications in the design which may be submitted by the operator for incorporation in the bidding plans and specifications.

B.  The above approval shall be subject to all other required determinations and findings under the Merchant Marine Act, 1936, as amended, and to applicable contracts and regulations.

Memorandum dated September 28, 1962, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

Lykes Bros.
Steamship Co.,
Inc. - Construction-
Differential
Subsidy to Aid
in Construction
Four (4) Cargo
Vessels -
(Seventh Group)
- Approval in
Principle.

The Board considered the commercial characteristics and suitability for service on Trade Route No. 22, of Lykes Bros. Steamship Co., Inc.'s seventh replacement group consisting of four new cargo vessels of MA Basic Design C4-S-66a, transmitted by the Chief, Office of Government Aid under date of September 28, 1962.

After discussion, in the "yea" vote of Chairman Alexander and Member Gelling, the Maritime Subsidy Board in accordance with Section 204b of Administrator's Order No. 173, as amended, approved in principle the commercial characteristics and suitability for service on Trade Route No. 22, the plans and specifications dated March 21, 1962, MA Basic Design C4-S-66a, with approximate principal characteristics as follows:

544

October 12, 1962.
(Con.-4)

American Export
Lines, Inc. -
Freight Service
- Trade Route
No. 10 (Line B)
- Foreign Flag
Competition -
Substantiality
and Extent -
Calendar Year
1961.

The Board considered the matter of determination of substantiality of foreign flag competition and the percentage weight to be accorded each principal competitive foreign flag for use in calculating operating-differential subsidy rates for the American Export Lines, Inc. Freight Service on Trade Route No. 10 for calendar year 1961, transmitted by the Chief, Office of Government Aid under date of October 4, 1962.

After discussion, by the "yes" vote of Chairman Alexander and Member Gulick, the Maritime Subsidy Board:

1. Found that the freight ships of American Export Lines, Inc., in subsidized service on Trade Route No. 10 (Line B) encountered substantial foreign flag competition during calendar year 1961.

2. Approved the following percentage weights of foreign flag competition applicable to the operation of freight ships of American Export Lines, Inc., on Trade Route No. 10 (Line B) during calendar year 1961:

| Flag | Percentage Weight |
|------|-------------------|
| Italy | 45.7 |
| Norway | 23.7 |
| Yugoslavia | 30.6 |
| Total Percent | 100.0 |

Memorandum dated October 4, 1962, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

Gulf & South
American Steam-
ship Co., Inc. -
Construction -
Differential Sub-
sidy - Ready to aid
of Construction
Fund (6% Cargo
Vessels (Second
annual appro-
priation being
1962) - M Design

The Maritime Subsidy Board considered the geographical characteristics and suitability for service on Trade Route No. 31, of Gulf & South American Steamship Co., Inc., and the proposed replacement construction of three new cargo vessels of M design to be eligible for subsidy, as transmitted by the Chief, Office of Government Aid under date of September 28, 1962.

After discussion, by the "yes" vote of Chairman Alexander and Member Gulick, the Maritime Subsidy Board, pursuant to Section 501(a) of the Merchant Marine Act, 1936, as amended, with respect to Gulf and South American Steamship Co., Inc.'s application for construction-differential subsidy aid in the replacement construction of three new cargo vessels of M design, found and determined that such vessels of M design, together with the operating characteristics of Vessels:

624

December 11, 1962.
(Con.-4)

Memorandum dated November 28, 1962, from the Chief, Office of Government
Aid, relative to the above matter is in the files of the Secretary.

- - - - -

Gulf & South
American Steam-
ship Co., Inc.
- Application
for CDS to Aid
in Construction
3 Cargo Vessels
(Second Group)
- Commercial
Characteristics
and Economic
Feasibility.

The Board considered the matter with respect to the
commercial ship characteristics and other matters pre-
requisite to the award of construction-differential sub-
sidy and the operation of the three new cargo ships on
Gulf and South American Steamship Co., Inc.'s sub-
sidized service, transmitted by the Chief, Office of
Government Aid under date of November 27, 1962.

    After discussion, by the "yea" vote of Chairman
Alexander, Member Jones and Member Hook, the Board took
the following actions:

1. Determined under Section 501(a) of the 1936
Act, that (a) the plans and specifications dated November
15, 1962, of Gulf & South American Steamship Co.'s De-
sign C3-S-37d, will call for new ships which will meet the requirements of
the foreign commerce of the United States, and will aid in the promotion and
development of such commerce; (b) the applicant possesses the ability, ex-
perience, financial resources and other qualifications necessary to enable
it to operate and maintain the proposed new ships; and (c) the granting of
the aid applied for is reasonably calculated to replace obsolete tonnage
with new and modern ships, or otherwise to carry out effectively the purposes
and policy of the Act.

2. Found under Section 601(a) that (a) the operation of such vessels
on Gulf & South American Steamship Co.'s subsidized service is required to
meet foreign flag competition and to promote the foreign commerce of the
United States; (b) that the vessels which the operator proposes to build
will be of the size, type, speed and number, and with proper equipment to
enable him to operate and maintain his subsidized services in a manner as
may be necessary to meet competitive conditions, and to promote foreign
commerce; (c) the applicant possesses the ability, experience, financial
resources and other qualifications necessary to enable him to conduct the
proposed operation of the vessels as to competitive conditions and promote
foreign commerce; and (d) the granting of the aid applied for is necessary
to place proposed operations of the vessels on a parity with those of foreign
competitors, and is reasonably calculated to carry out effectively the pur-
poses and policy of the Act.

3. Approved the plans and specifications (subject to final approval by
the Office of Ship Construction) as satisfying the commercial requirements
of the applicant's subsidized services and approved the following basic
characteristics of the three proposed new ships:



708

*February 12, 1963.*
*(Con.-4)*

*American Presi-*
*dent Lines,*
*Ltd. - Reduction*
*in Sailings -*
*Line A-1 - Trade*
*Route No. 29 -*
*Calendar Year*
*1963 only.*

The Board considered the modification of Operating
Differential Subsidy Agreement, Contract No. FMB-50,
with American President Lines, Ltd. to reduce the mini-
mum sailing requirement applicable to its Line A-1-
Trans-Pacific Passenger-Freight Service (Trade Route
No. 29) from 31 to 29 sailings for calendar year 1963
only, transmitted by the Chief, Office of Government
Aid under date of January 30, 1963.

After discussion, by the "yea" vote of Chairman
Alexander, Member Gulick and Member Jones, the Maritime Subsidy Board:

1. Found and determined that for calendar year 1963 only a minimum of
29 sailings will constitute adequate service and meet foreign flag competi-
tion on American President Lines' Line A-1-Trans-Pacific Passenger-Freight
Service (Trade Route No. 29).

2. Authorized amendment of Operating-Differential Subsidy Agreement,
Contract No. FMB-50 with American President Lines, Ltd., so as to reduce
the minimum sailings on its Line A-1-Trans-Pacific Passenger-Freight Service
(Trade Route No. 29) from a minimum of 31 subsidized sailings per annum to
29 sailings per annum for calendar year 1963 only; and

3. Directed the Office of General Counsel to prepare an appropriate
addendum to American President Lines' Operating-Differential Subsidy Agree-
ment, Contract No. FMB-50, to effectuate the foregoing.

Memorandum dated January 30, 1963, from the Chief, Office of Government
Aid relative to the above matter is in the files of the Secretary

- - - - -

*Gulf & South*
*American Steam-*
*ship Co., Inc.*
*- National*
*Defense Features*
*Applicable to*
*Three New Cargo*
*Vessels (Second*
*Group) MA Design*
*C3-S-37d.*

The Board considered the matter of the National
Defense features applicable to the three new MA Design
C3-S-37d cargo vessels (second group) of Gulf & South
American Steamship Company, Inc., transmitted by the
Chief, Office of Government Aid under date of January 30,
1963.

After discussion, by the "yea" vote of Chairman
Alexander, Member Gulick and Member Jones, the Maritime
Subsidy Board took the following actions with respect to
the three MA Design C3-S-37d ships to be constructed for
the account of Gulf & South American Steamship Co., Inc.,
pursuant to Board action taken on December 11, 1962:

1. Determined that the following changes as suggested in the Department
of the Navy letter of January 12, 1963, are in excess of commercial require-
ments and the cost thereof shall be for the sole account of the United
States provided that these items are formally certified as national defense
features by the Secretary of the Navy:

    a. Increase in commercial shaft horsepower from 11,000 maximum
        American Bureau of Shipping rating to national defense power
        of 13,600 Naval design criteria.

    b. Upgrading of ten 5 ton booms to ten 10 ton booms, with 5 ton
        rigging for commercial use.



February , 1963.
(Con.-5)

2.  Authorized and directed that the construction-differential subsidy
contract to be executed with Gulf & South American Steamship Co., Inc.,
applicable to the three proposed new cargo ships of the company's second
replacement groups shall include, in substance, among other things, the
following provisions:

      a.  The owner agrees that, the owner will not at any time during
          the twenty-five year economic life of the ships, alter down-
          ward the increased shaft horsepower and in the event there
          should be a revision in the American Bureau of Shipping cer-
          tificate at some future date, which would change the maximum
          shaft horsepower rating for maximum continuous operation to
          make all or part of the increased shaft horsepower available
          for commercial operation, and/or the owner operates any vessel
          at a shaft horsepower which includes any part of the increased
          SHP, unless such operation shall be by direction of the
          United States or any agency or instrumentality thereof, or
          unless the Maritime Administrator determines that such in-
          creased SHP is or was used for the protection of life or proper-
          ty from loss at sea, the owner shall pay to the Board that
          portion of the estimated foreign cost of the increased SHP,
          incorporated in such vessel as determined by the Board, depre-
          ciated on the basis of a 25 year life, as determined by the Board
          to be applicable to the increased shaft horsepower made avail-
          able for use by reason of the revision in the American Bureau
          of Shipping certificate, in a lump sum or, at the owner's
          option, in equal annual installments over the remaining 25 years
          life of the vessel. The owner's liability under this paragraph
          as to each vessel will exist only during the first 25 years
          after delivery of the vessel by the shipbuilder.

      b.  The owner agrees that, the owner will not at any time during
          the 25 year economic life, alter downward the increased hull
          capacity and should the owner at any time during the 25 year
          economic life of the vessels, utilize any of the increased hull
          capacity, on any of the three vessels, as determined by the
          Board or should the American Bureau of Shipping and/or the
          United States Coast Guard during the same period amend their
          rules so as to require the incorporation in any of these
          vessels of the said item, then the owner will reimburse the
          Government in an amount equal to the foreign cost thereof,
          depreciated on the basis of a 25 year life, all as determined
          by the Board with respect to the three ships at the time such
          rules are so amended, or if such rules are not amended, with
          respect to the particular ship at the time the owner first makes
          any use of such additional capacity, now allowed for 5 years, for life in
          excess of 5 years, such payment to be in a lump sum, or at
          the owner's option, in equal annual installments over the re-
          maining 25 year life of the vessel. The owner's liability
          hereunder as to each vessel shall exist only during the first
          25 years after delivery of such vessel by the shipbuilder.

710

February 12, 1963.
(Con.-6)

c. The owner agrees to advise the Board immediately if any of
the national defense features referred to above are altered
in any way or are utilized and/or if applicable Coast Guard
or ABS rules or certificates are changed and the features be-
come subject to adjustment as provided herein, and to furnish
annually a certi icate as to whether such national defense
features were altered or used and as to whether the applicable
Coast Guard or ABS rules and/or certificates are changed.

3. Directed the Office of Ship Construction to submit, after approval
by that Office, the contract bidding plans and specifications for the
three ships covering the changes requested by the Department of the Navy
required by Section 501(b) of the Act.

Memorandum dated January 30, 1963, from the Chief, Office of Government
Aid, relative to the above matter is in the files of the Secretary.

- - - - -

*Grace Line Inc.*
*- Construction*
*Four C-4*
*Freighters -*
*Balance 2nd*
*Group - Exten-*
*sion of Con-*
*tract Award.*

The Board considered the amendment of Article
I-9(a)(2) of Operating-Differential Subsidy Agreement,
Contract No. FMB-49 with Grace Line Inc. to extend the
construction contract award date from May 15, 1963 to
June 5, 1963, for four C-4 freighters for Trade Route
No. 2 (balance of second group), transmitted by the
Chief, Office of Government Aid under date of January 24,
1963.

After discussion, by the "yea" vote of Chairman
Alexander, Member Gulick and Member Jones, the Maritime Subsidy Board took
the following actions:

1. Authorized the modifications of its action of June 13, 1962 (as
modified on August 7 and December 18, 1962) approving certain modifications
to Article I-9(a)(2) of Operating-Differential Subsidy Agreement, Contract
No. FMB-49, with Grace Line Inc., so as to authorize the further modifica-
tion of Article I-9 to extend the construction contract award date from
May 15, 1963, to June 5, 1963, for four C-4 freighters for Trade Route No. 2
(balance of second group).

2. Authorized and directed the Office of the General Counsel to pre-
pare an appropriate addendum to Contract No. FMB-49, to effectuate such
action.

Memorandum dated January 24, 1963, from the Chief, Office of Government
Aid, relative to the above matter is in the files of the Secretary.

Upon the "yea" vote of Chairman Alexander, Member Gulick and Member
Jones, the meeting adjourned at 10:55 A.M.

A true record.

Secretary



NAME

807

April 30, 1963.
(Con.-5)

*Gulf & South American Steam-ship Co., Inc. - Construction of Three Single Screw Cargo Vessels - MA Design C3-S-37d - Resume of Bids Opened April 16, 1963.*

The Board considered the matter with respect to determining that the bid of Avondale Shipyards, Inc., is the lowest responsive bid for the construction of three single screw cargo vessels, MA Design C3-S-37d, for Gulf & South American Steamship Company, Inc., transmitted by the Chief, Office of Ship Construction under date of April 25, 1963.

At the request of Member Ables and upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the matter was laid over for consideration at a future meeting.

- - - - -

*United States Lines Company - Use of SS AMERI-CAN SURVEYOR by American Red Cross.*

The Board considered the matter with respect to the use of United States Lines Company's ship, the SS AMERICAN SURVEYOR for making a second voyage to carry medical and relief supplies to Cuba for the American Red Cross, transmitted by the Chief, Office of Government Aid, Chief Office of Ship Operations under date of April 25, 1963.

After discussion, by the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board approved the amendment of Operating-Differential Subsidy Agreement, Contract No. FMB-19, with United States Lines Company, and authorized the execution of Addendum No. 113.

The Maritime Administrator advised that he had approved the amendment of the Use Agreement, Contract No. MA-2191, with United States Lines Company, and authorized the execution of Addendum No. 3 on behalf of the Maritime Adminis-tration.

Memorandum dated April 25, 1963, from the Chief, Office of Government Aid and Office of Ship Operations, relative to the above matter is in the files of the Secretary.

- - - - -

Upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the meeting adjourned at 4:13 P.M.

- - - - -

A true record.

*[signature]*

Secretary



NAME

841

May 29, 1963.
[Con.-3]

Memorandum dated May 23, 1963, from the Chief, Office of Ship Construction relative to the above matter is in the files of the Secretary.

- - - - -

*American President Lines, Ltd. - Recommendation of Award for Construction of 3 Cargo Vessels, MA Design C4-S-1qa.*

The Board considered the matter of recommending award of contract to National Steel and Shipbuilding Company for the construction of three MA Design C4-S-1qa cargo vessels for American President Lines, Ltd., transmitted by the Chief, Office of Ship Construction under date of May 23, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Board directed the Secretary to lay over the staff recommendation and request the Chief, Office of Ship Construction to supplement same with a further recommendation in keeping with the provisions of Section 502(f) of the 1936 Act as to the most recent information available in regard to existing privately-owned shipyards capable of merchant ship construction, as said information might pertain to the proposed award.

It was further noted that the requested supplemental report should indicate findings based on a review of available data on such shipyards, if deemed adequate, to determine whether their capabilities for merchant ship construction, including facilities and skilled personnel, provide an adequate mobilization base at strategic points for purposes of national defense and national emergency. In this connection, the report should indicate whether or not any basis exists for a finding that the award of the proposed construction should be allocated, with the approval of The President, to a specifically selected yard, including but not limited to the American Ship Building Company of Cleveland, Ohio, in such manner as may be determined to be fair, just and reasonable to all sections of the country, on the basis of a determination that such an award of the proposed construction is necessary to remedy an existing inadequacy in such mobilization base as to the capabilities and capacities of a specific yard at a strategic point, after taking into consideration the benefits accruing from standarized construction, the conditions of unemployment and the needs and reasonable requirements of all shipyards. If there be no basis for such a finding, then the Board will be in a position to award the contract to the lowest responsive bidder.

Memorandum dated May 23, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

*Gulf & South American Steamship Co., Inc. - Construction of 3 Single Screw Cargo Vessels - MA Design C3-S-37d.*

The Board considered the matter of recommending award of a contract to Avondale Shipyards, Inc. for the construction of three single-screw cargo vessels, MA Design C3-S-37d, for Gulf & South American Steamship Company, Inc., and further, that no allocation of the subject construction be made under the provisions of Section 502(f) of the 1936 Act, transmitted by the Chief, Office of Ship Construction under date of May 23, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Board directed the Secretary to lay over subject recommendation and obtain a supplemental report from the



NAME

855

June 4, 1963.
(Con.-7)

3. That the costs of Owner's Engineering and Owner Furnished Items shall be subject to audit by the Board and shall not include salaries or expenses of officers and employees of American President Lines, which would be paid out of the Owner's administrative overhead, independent of the subject construction and shall not include costs incurred by assignment of ship's officers and crew as inspectors of construction, unless approved by the Board.

Memorandum dated May 24, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

*Gulf & South American Steamship Co., Inc. - Construction of 3 Vessels - Design C3-S-37d - in consideration of Section 502(f) of the 1936 Act.*

The Board considered the memorandum of June 3, 1963, and Appendix A attached thereto, from the Chief, Office of Ship Construction, respecting Section 502(f) of the Merchant Marine Act of 1936, as amended, in order to determine whether or not there exists a need to allocate, in consideration of an award to Avondale Shipyards, Inc., for the construction of three vessels, Design C3-S-37d, for Gulf & South American Steamship Company, Inc.

After considerable discussion and careful analysis of the recommendation of June 3, 1963, including Appendix A, the Board, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, found and determined that:

1. The compilation of data necessary to the determinations prescribed by Section 502(f) of the Merchant Marine Act of 1936 (which requires a survey at least once each year of the existing privately owned shipyards, or a review of available data on such shipyards if deemed adequate, to determine whether their capabilities for merchant ship construction, including facilities and skilled personnel, provide an adequate mobilization base at strategic points for purposes of national defense and national emergency) has been accomplished.

2. There is no existing or impending inadequacy in our mobilization base as to the capabilities and capacities of a shipyard or shipyards at a strategic point, and

3. as a result an allocation under Section 502(f) is not warranted.

Memorandum dated June 3, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

*Gulf & South American Steamship Co., Inc. - Construction of 3 Single Screw Cargo Vessels - MA Design C3-S-37d.*

The Board again considered the matter of recommending award of a contract to Avondale Shipyards, Inc., for the construction of three single-screw cargo vessels, MA Design C3-S-37d, for Gulf & South American Steamship Company, Inc., transmitted by the Chief, Office of Ship Construction under date of May 23, 1963, which had been laid over from the Board meeting of May 29, 1963.

After discussion, and by unanimous consent of Chairman Alexander, Member Gulick and Member Ables, Recommendation No. 2, "No allocation of the subject construction be made under the provisions of Section 502(f) of the Merchant Marine Act, 1936, Amended", was deleted in view of the fact that the Board had made this determination in acting on the previous action, as contained in the memorandum from the Chief, Office of Ship Construction, dated June 3, 1963.

Thereupon, by the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board:



856

June 4, 1963.
(Con. - 8)

1.   Awarded a contract to Avondale Shipyards, Inc., for the construction of three single screw cargo vessels including National Defense Features ($53,000 for each vessel) Bid 1(A), Maritime Administration Design C3-S-37d, for a total amount of $25,839,039 for three vessels on a fixed-price basis with delivery of the first, second, and third vessels with 600, 660 and 720 days, respectively, from the date of contract award.

2.   Included in the contract award, Separate Price Item - Extended Guarantee for Certain Items, Bid 1(D) at no cost.

Memorandum dated May 23, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

*Gulf & South American Steamship Co., Inc. - CDS for Construction of 3 Cargo Ships, MA Design C3-S-37d.*      The Board considered the matter of recommending construction-differential subsidy for the construction of 3 cargo ships, MA Design C3-S-37d, including Attachment A, in the form of an administratively restricted document entitled, "Calculation of Foreign Cost and Construction Differential Subsidy for Three Cargo Ships, MA Design C3-S-37d, GULF AND SOUTH AMERICAN STEAMSHIP CO., INC.", transmitted by the Chief, Office of Ship Construction under date of May 27, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board found and determined that:

1.   Japan be approved as the representative low cost shipbuilding center on which to base the foreign construction cost and construction differential subsidy rate for three cargo ships, of MA Design C3-S-37d, proposed to be constructed for Gulf and South American Steamship Co., Inc.;

2.   the estimated cost of constructing in Japan three cargo ships, of MA Design C3-S-37d, be established at $3,944,000 per ship;

3.   the construction differential subsidy be established at $4,616,013. per ship, equal to the difference between the bid price for the commercial ship of the Avondale Shipyards, Inc., of $8,560,013 and the estimated foreign cost of $3,944,000;

4.   since the construction differential subsidy is 53.9 per cent of the bid price, the amount of government aid for Gulf and South American Steamship Co., Inc., applicable to all authorized changes under contract and to all approved Owner's expense associated with this contract, such as design charges and inspection costs, be established at 53.9 per cent of the domestic cost;

5.   the foreign cost of the National Defense Features added to the ships be established at 46.1 per cent of the Avondale Shipyards, Inc., bid price.

Memorandum dated May 27, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

*Prudential Lines, Inc. - ODSA, Contract No. FMB-113 - Extension of Contract award date for construction of 2 C4 freighters on Trade Route No. 10 (First Group).*      The Board considered the amendment of Operating-Differential Subsidy Agreement, Contract No. FMB-112, so as to extend the construction contract award date for two C4 freighters for operation on Trade Route No. 10 (First Group) for Prudential Lines, Inc., from November 1, 1963 to February 17, 1964, transmitted by the Chief, Office of Government Aid under date of May 20, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the matter was laid over for consideration at a future date.

- - - - -





857

June 4, 1963.
(Con.-9)

States Steam-
ship Co. -
Application for
reduction of
deposits in
statutory re-
serve funds.

The Board considered the letter application of Novem-
ber 27, 1962 (as supplemented by letter of April 5, 1963),
for reduction of required annual deposits in statutory
reserve funds, and letter application of April 11, 1963
for voluntary deposit of "free earnings" applicable to
calendar year 1962, transmitted by the Chief, Office of
Government Aid under date of May 15, 1963.

After discussion, upon the "yes" vote of Chairman
Alexander, Member Gulick and Member Ables, the matter was laid over for considera-
tion at a future meeting.

- - - - -

Actions taken
under Redele-
gation of
Authority -
Month of
April 1963.

The Board laid over for consideration at a future
meeting the memorandum dated May 22, 1963, from the Chief,
Office of Ship Construction re actions taken under redele-
gation of authority contained in Manual of Orders, Adminis-
trator's Order No. 55, dated October 19, 1962 - Changes in
contract plans and specifications during the month of
April 1963.

Upon the "yes" vote of Chairman Alexander, Member Gulick and Member Ables,
the meeting adjourned at 11:55 A.M.

- - - - -

A true record.

Secretary



Proceedings of the Maritime Subsidy Board.

June 6, 1963.
Regular Meeting.

Present:  Chairman Alexander, Member Gulick
          and Member Ables.

Also Present:  G. L. Andrews, Deputy General
               Counsel and James S. Dawson, Jr.,
               Secretary.

The Board convened at 10:05 A.M. and adjourned
        at 10:32 A.M.

- - - - -

*American Presi-*
*dent Lines, Ltd.*
*- Application*
*for CDS to aid*
*in construction*
*of 3 cargo ships,*
*MA Design*
*C4-S-1qa - Trade*
*Route No. 29.*

The Board considered the application dated June 27, 1962, as amended October 10, 1962, for construction-differential subsidy to aid in the construction of three new cargo ships for American President Lines, Ltd., MA Design C4-S-1qa, for operation on Trade Route No. 29 (Second Replacement Group) and the execution of Construction Differential Subsidy Contract No. MA/MSB-24, transmitted by the Chief, Office of Government Aid under date of June 4, 1963.

After discussion, upon the "yes" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board took the following actions:

1.  Approved a temporary construction-differential subsidy rate of 33 1/3% with the understanding that this rate later will be replaced with such rate as the Board determines to be proper under provisions of Section 502 of the Merchant Marine Act, 1936, as amended, and

2.  Approved and authorized the execution of Construction-Differential Subsidy, Contract No. MA/MSB-24 with American President Lines, Ltd.

Memorandum dated June 4, 1963, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

*American Presi-*
*dent Lines, Ltd.*
*- Settlement of*
*MA Change No 21*
*under Contract*
*FMB-135.*

The Board considered the matter with respect to the settlement of MA Change No. 21 under Contract FMB-136 covering modification of the steam and condensate piping system for the conversion of the SS PRESIDENT ROOSEVELT for American President Lines, Ltd., transmitted by the Chief, Office of Ship Construction under date of May 29, 1963.

After discussion, upon the "yes" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board approved the Contractor's estimate of $65,000 net increase in cost resulting from MA Change No. 21 in accordance with Article 7 of Contract FMB-136.

Memorandum dated May 29, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.



859

June 6, 1963.
(Con.-2)

*Gulf & South American Steamship Co., Inc. - Construction 3 Cargo Ships - C3-S-37d (2nd Group) - Limitations for Engineering & Architectural Fees, etc.*

The Board considered the establishment of a ceiling amount for those costs found eligible for construction-differential subsidy for all engineering services incurred by Gulf & South American Steamship Company, Inc., for the design, plan approval, and inspection identified with the construction of three cargo vessels, MA Design C3-S-37d (2nd Group), to be built by Avondale Shipyards, Inc., transmitted by the Chief, Office of Ship Construction under date of May 28, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board found and determined:

1. That the Maritime Subsidy Board's payment of construction subsidy on account of the Owner's cost of design, approving plans, conducting inspection (including all Architectural, Engineering, and Interior Decorating Services, together with related travel, communications, and reproduction expenses), as incurred by Gulf & South American Steamship Company, Inc., as required by the construction of these three ships, MA Design C3-S-37d (Second Group), when approved by the Board shall not apply to an amount in excess of the total sum of $340,000.

2. That these costs shall be subject to audit by the Board and shall not include salaries or expenses of officers and employees of Gulf & South American Steamship Company, Inc., which would be paid out of the Owner's administrative overhead, independent of the subject construction and shall not include costs incurred by assignment of ship's officers and crew as inspectors of construction, unless approved by the Board.

Memorandum dated May 29, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

*Actions taken under Redelegation of Authority - Month of April 1963.*

The Board, in noting actions taken under redelegation of authority contained in Manual of Orders, Administrator's Order No. 55, dated October 16, 1962, in a report from the Chief, Office of Ship Construction, dated May 22, 1963, respecting actions taken during the month of April, directed the Secretary to obtain a supplemental memorandum from the Chief, Office of Ship Construction, respecting Change No. 42, as reported on Page 8, Section 2 (u), in regard to Canadian cargo gear requirements.

Memoranda dated May 22, 1963 and July 12, 1963, from the Chief, Office of Ship Construction, relative to the above matter are in the files of the Secretary.

- - - - -

*States Steamship Co. - Application for reduction in deposits in statutory reserve funds.*

The Board again considered the letter application of November 27, 1962 (as supplemented by letter of April 5, 1963), for reduction of required annual deposits in statutory reserve funds, and letter application of April 11, 1963 for voluntary deposit of "free earnings" applicable to calendar year 1962, transmitted by the Chief, Office of Government Aid under date of May 15, 1963, which had been laid over from the Board meeting of June 4, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board took the following actions:



871

June 18, 1963.
(Con.-2)

"Unlike the former Federal Maritime Board in which two of the three members did not participate in daily Maritime subsidy administration, the Maritime Subsidy Board is composed of three officials who are personally involved on a daily basis in all facets of Maritime Administration activities, including applications, etc., for Government subsidy. In other words, the appointment of three of Maritime Administration's top officials to the Maritime Subsidy Board certainly could not have been premised upon an intention to isolate those officials in their Board activities from participation to any degree in their primary official capacities. On the contrary, it seems clear that the appointment of Maritime Administration officials to the Maritime Subsidy Board is supplemental to but not in derogation of their responsibilities and authority in their primary positions. Accordingly, the fact that activity in Staff considerations involves a matter which ultimately will be presented for a vote by the Board does not restrict the activities of Board members in their primary official capacities."

Memorandum dated June 11, 1963, from the Deputy General Counsel/Board Counsel, relative to the above matter is in the files of the Secretary.

- - - - -

*Gulf & South American SS Co., Inc. - Application for CDS - 3 cargo vessels - MA Design C3-S-37d (2nd Replacement Group).*    The Board considered the matter with respect to the application dated June 26, 1962, from Gulf & South American Steamship Company, Inc., for construction-differential subsidy to aid in the construction of three new cargo vessels (Second Replacement Group), MA Design C3-S-37d (Award of construction-differential subsidy contract), transmitted by the Chief, Office of Government Aid under date of June 12, 1963.

After discussion, upon the "yes" vote of Chairman Alexander, Member Gulick and Member Ables, the matter was laid over for consideration at a future meeting.

- - - - -

*American President Lines, Ltd. - CDS for construction of 3 cargo ships, MA Design C4-S-1qa.*    The Board considered the matter with respect to the foreign shipbuilding center, the estimated foreign construction cost, the construction-differential subsidy, and the construction-differential subsidy rate for the three cargo ships, MA Design C4-S-1qa, to be constructed for American President Lines, Ltd., transmitted by the Chief, Office of Ship Construction under date of June 13, 1963.

After discussion, upon the "yes" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board found and determined that:

1. Japan be approved as the representative low cost shipbuilding center on which to base the foreign construction cost and construction differential subsidy rate for three cargo ships, of MA Design C4-S-1qa, proposed to be constructed for American President Lines, Ltd.;

2. the estimated cost of constructing in Japan three cargo ships, of MA Design C4-S-1qa, be established at $5,628,000 per ship;



878

Proceedings of the Maritime Subsidy Board.

June 25, 1963.
Regular Meeting.

Present:  Chairman Alexander, Member Gulick
and Member Ables.

Also Present:  G. L. Andrews, Deputy General
Counsel; John M. O'Connell, Assistant
Secretary and James S. Dawson, Jr.,
Secretary.

The Board convened at 10:26 A.M. and adjourned
at 12:16 P.M.

- - - - -

*Gulf & South
American SS
Co., Inc. -
Application for
CDS - 3 cargo
vessels - MA
Design C3-S-37d
(2nd Replace-
ment Group).*

The Board again considered the matter with respect
to the application dated June 26, 1962, from Gulf & South
American Steamship Company, Inc., for construction-dif-
ferential subsidy to aid in the construction of three
new cargo vessels (Second Replacement Group), MA Design
C3-S-37d (Award of construction-differential subsidy con-
tract), transmitted by the Chief, Office of Government
Aid under date of June 12, 1963, which had been laid over
from the Board meeting of June 18, 1963.

In the course of the discussion, the Board directed
the Secretary to obtain from the Comptroller up-to-date information in the form
of a memorandum from the Comptroller to the Secretary, Maritime Subsidy Board,
as to the current financial qualifications of Gulf and South American Steamship
Company, Inc., to proceed with the construction of the three vessels in the
Second Replacement Group.

In this connection, the Board noted statements in the memorandum, on
Pages 7 and 8 thereof, indicating that the Board determined on December 12,
1962, that Gulf and South American Steamship Co., Inc., was financially quali-
fied to proceed with the subject construction and that it was understood that
since such date there had been no material change in the operator's financial
condition.

The requested memorandum from the Comptroller was desired by the Board to
document this understanding.

Upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables,
the Maritime Subsidy Board:

1.  Approved and authorized (subject to the availability of the necessary
appropriation) the execution of Construction-Differential Subsidy Contract
No. MA/MSB-26, with Gulf & South American Steamship Co., Inc.

2.  (a) Granted prior approval, pursuant to terms of Construction Con-
tract No. MA/MSB-23, to the assignment by the owner to the Trustee for bond-
holders of the owner's interest in such contract in connection with the financing
of its payment obligations under Title XI insurance program, provided the Mari-
time Administrator authorizes issuance of such insurance, and (b) authorized
the Secretary to notify the owner of such approval.

879

June 25, 1963.
(Con.-2)

3. Authorized the Secretary to execute, on behalf of the Board, the acceptance of riders to the performance and payment bonds furnished under the construction contract, that may be required in connection with issuance of Title XI insurance, subject to the approval of the Office of the General Counsel.

Memorandum from the Comptroller on the subject, dated July 12, 1963, is in the files of the Secretary along with memorandum dated June 12, 1963, from the Chief, Office of Government Aid.

- - - - -

*Moore-McCormack Lines, Inc. - Foreign repair & maintenance work during Calendar Year 1961.*

The Board considered the matter with respect to the disallowance of expenditures on foreign repair and maintenance work during calendar year 1961 by Moore-McCormack Lines, Inc., incurred in violation of the "Buy American" provisions of Section 606(7) of the Merchant Marine Act, 1936, as Amended, and Article II-4 of the Operating-Differential Subsidy Agreement, transmitted by the Chief, Office of Government Aid under date of June 11, 1963.

Upon the "yea" vote of Chairman Alexander, Member Gulick and Member Ables, the Maritime Subsidy Board:

1. Found and determined that the employment of foreign labor to perform certain non-emergency work on the subsidized ships of Moore-McCormack Lines, Inc., during calendar year 1961 constitutes a violation of Section 606 (7) of the Merchant Marine Act, 1936, as Amended, and Article II-4 of its Operating-Differential Subsidy Agreement, Contract No. FMB-48 (Rev.) and an event of default under Article II-30 of said Agreement.

2. Directed the Secretary to notify Moore-McCormack Lines, Inc., that no action will be taken by the Maritime Subsidy Board with respect to the violation incurred during calendar year 1961 of Section 606 (7) of the Merchant Marine Act, 1936, as Amended, and Article II-4 of its Operating-Differential Subsidy Agreement, Contract No. FMB-48 (Rev.), which constitutes an event of default under Article II-30 of said contract; it is to be understood, however, that the Board will no longer condone non-emergency foreign repairs and maintenance of the subsidized ships, and that if Moore-McCormack Lines, Inc., persists in such practices, then the Board will be constrained to consider taking positive action in connection therewith. It is to be further understood that the present determination by the Maritime Subsidy Board to take no action on the present violation for the year 1961 is without prejudice to the right of the Maritime Administrator to take such action described in 3 below.

Thereupon, Chairman Alexander announced that, in his capacity as Maritime Administrator, he was approving the following:

3. Approved pursuant to Article II-22 of Moore-McCormack Lines' Operating-Differential Subsidy Agreement, Contract No. FMB-48 (Rev.), and General Order No. 31 (2nd Revision), the exclusion from subsidized accounting for determining net profits for reserve fund and recapture purposes, of expenditures in the total amount of $16,638.22, plus applicable United States Customs duties, subject to audit by the Comptroller.

At this point, the Board took occasion to discuss the provisions of Section 606(7) of the 1936 Act, as amended, and Article II-4 of the Operating-Differential Subsidy Agreement respecting the use of U. S. goods and the extent of the Board's authority to institute penalties appropriately designed





CONSTRUCTION OF VESSELS:  (Continued)
   Grace Line, cargo ships, C4-S-65a, war risk ins., Apr. 11-17, 1963...787
   Grace Line, cargo ships, C4-S-65a, war risk ins., May 16, 1963...821
   Grace Line, cargo ships, C4-S-65a, construction award, May 23, 1963...837
   Grace Line, comb.ships, 3d group, award date ext., Jan. 11, 1963...660
   Grace Line, dispute with Ship Const.Office re riveted seams, C4-S-65a,
      Mar. 8, 1963...739
   Grace Line, dispute with Ship Const.Office re riveted seams, C4-S-65a,
      Apr. 11-17, 1963...787
   Grace Line, freighters, bal. of 2d group, Feb. 12, 1963...710
   Grace Line, freighters, bal. of 2d group, May 9, 1963...816
   Grace Line, contract deviation, liquidated damages, Mar. 8, 1963...740
   Grace Line, contract deviation, insurance, Mar. 5, 1963...740
   Gulf & So. American, cargo ships, 2d group, Nat. defense features,
      Feb. 12, 1963...706
   Gulf & So. American, cargo ships, 2d group, low bidder, Apr. 30, 1963...807
   Gulf & So. American, cargo ships, 2d group, low bidder, May 7, 1963...808
   Gulf & So. American, cargo ships, 2d group, award recommendation,
      May 29, 1963...841
   Gulf & So. American, cargo ships, 2d group, construction award,
      June 4, 1963...855
   Gulf & So. American, cargo ships, 2d group, Sec.502(f) allocation,
      June 4, 1963...855
   Gulf & So. American, cargo ships, 2d group, foreign costs, June 4, 1963...856
   Gulf & So. American, cargo ships, 2d group, eng. & arch.fees, June 6, 1963...859
   Gulf & So. American, cargo ships, 2d group, award date, June 18, 1963...874
   Lykes Bros., FMB-83, delivery date ext., Apr. 16, 1963...796
   Lykes Bros., bids, deviation from stand.financial resp. & guarantee
      provisions, May 31, 1963...844
   Lykes Bros., cargo ships, 6th group, award date ext., Jan. 22, 1963...683
   Lykes Bros., cargo ships, 6th group, low bidder, Feb. 1, 1963...700
   Lykes Bros., cargo ships, 6th group, foreign cost, Feb. 28, 1963...726
   Lykes Bros., cargo ships, 6th group, construction award, Feb. 28, 1963...727
   Lykes Bros., cargo ships, 6th group, eng.&arch.fees, Feb. 28, 1963...727
   Lykes Bros., cargo ships, 6th group, trade-ins, Mar. 13, 1963...747
   Lykes Bros., cargo ships, 6th group, trade-ins, Mar. 28, 1963...768
   Lykes Bros., cargo ships, 6th group, side agreement with Avondale,
      Mar. 19, 1963...739
   Lykes Bros., cargo ships, 6th group, award date, Mar. 22, 1963...761
   Lykes Bros., cargo ships, 7d group, delivery date ext., June 18, 1963...873
   Lykes Bros., cargo ships, 7th group, award date ext., Apr. 11, 1963...792
   Lykes Bros., cargo ships, 8th, 9th groups, award date, May 9, 1963...816
   Lykes Bros., cargo ships, 8th, 9th groups, award date, May 16, 1963...824
   Moore-McCormack, Argentina-Brasil, conversion, Feb. 1, 1963...698
   Moore-McCormack, Argentina-Brasil, conversion, foreign cost and subsidy,
      Mar. 28, 1963...763
   Plans and specifications, changes during November, Jan. 22, 1963...681
   Plans and specifications, changes during December, Feb. 12, 1963...706
   Plans and specifications, changes during January, Mar. 13, 1963...743

(Continued on next page)

GRACE LINE, INC.:
   Affiliates - increased agency fees, Jan. 11, 1963...661
   Affiliates - increased agency fees, Apr. 5, 1963...781
   Affiliates - increased agency fees, Apr. 9, 1963...784
   Calls at Martinique & Guadeloupe, Mar. 19, 1963...757
   Combination ships, 3d group, award date ext., Jan. 11, 1963...660
   Cargo ships, C4-S-65a, amend. invitation for bids, Mar. 8, 1963...740
   Cargo ships, C4-S-65a, war risk ins., Mar. 8, 1963...741
   Cargo ships, C4-S-65a, war risk ins., Mar.15, 1963...754
   Cargo ships, C4-S-65a, reefer capacity, Apr.5,1963...779
   Cargo ships, C4-S-65a, low bidder, Apr.5,1963...777
   Cargo ships, C4-S-65a, war risk ins., Apr. 11-17, 1963...787
   Cargo ships, C4-S-65a, war risk ins., May 16, 1963...821
   Cargo ships, C4-S-65a, foreign cost data, May16,1963...822
   Cargo ships, C4-S-65a, eng. & arch. fees, May 17, 1963...828
   Cargo ships, C4-S-65a, foreign cost-EDS, May 17, 1963...828
   Cargo ships, C4-S-65a, construction award, May 23, 1963...837
   CDS contract award, MA/MSB-22, May 23, 1963...837
   CDS-ODS appl. reconstruction ISM vessel, Rtes 2, 4, 25, Apr. 9, 1963...783
   CDS-ODS appl. reconstruction ISM vessel, Rtes 2, 4, 25, May 7, 1963...813
   Dispute with Ship Const. Office re riveted seams, C4-S-65a, Mar. 8, 1963...739
   Dispute re riveted seams, C4-S-65a, informal hearing, Apr. 11-17, 1963...787
   Freighters, bal. of 2d group, award date ext., Feb. 12, 1963...710
   Freighters, bal. of 2d group, award date ext., May 9, 1963...816
   Increased sailings, Rte. 2, Line A (1963, 1964), Mar. 19, 1963...756
   Privilege calls at Atlantic coast Panama ports, Jan. 3, 1963...649
   Pro Forma contract deviation - liquidated damages, Mar. 8, 1963...740
   Pro Forma contract deviation - insurance, Mar. 8, 1963...741
   Puerto Rico/U.S. Atl. service, temp. authority, Mar. 28, 1963...769
   Puerto Rico/U.S. Atl. service, temp. authority, Apr. 5, 1963...776
   Santa Magdalena, subsidy, Rte 2, Line A, Apr. 9, 1963...782
   Santa Monica, sale & withdrawal from subsidy, June 4, 1963...849
   Santa Sofia, sale & withdrawal from subsidy, June 3, 1963...848
   Section 803 violation & exemption, contract violation, Jan. 11, 1963...661
   Subsidy rates, H.& M., hull & mach., Rtes. 2, 4, 25 (1960), Jan. 15, 1963...674
   Subsidy rates, H.& M., hull & mach., Rtes. 2,4,25 (1961), Mar.5,1963...732
   Subsidy rates, wages&subsistence, compensation, Rtes 2,4 (1960), June 25,1963...882
   Subsidy rates, wages&subsistence, Rtes 2,4, 25 (1960), June 25, 1963...883
GULF & SOUTH AMERICAN S.S. CO., INC.:
   Cargo ships, 2d group, Natl. defense features, Feb. 12, 1963...708
   Cargo ships, 2d group, low bidder, Apr. 30, 1963...807
   Cargo ships, 2d group, low bidder, May 7, 1963...808
   Cargo ships, 2d group, award recommendation, May 29, 1963...841
   Cargo ships, 2d group, award recommendation, June 4, 1963...855
   Cargo ships, 2d group, Sec.502(b) allocation, June 4, 1963...855
   Cargo ships, 2d group, foreign costs, June 4, 1963...856
   Cargo ships, 2d group, eng. & arch. fees, June 4, 1963...859
   Cargo ships, 2d group, CDS appl., June 18, 1963...874
   Cargo ships, 2d group, award date, June 18, 1963...874



(Continued on next page)

GULF & SOUTH AMERICAN S.S. CO., INC.: (Continued)
Cargo ships, 2d group, CDS award, June 25, 1963...878
Cargo ships, M/MSB-5, perf. & payment bonds, Apr. 16, 1963...798
Privilege calls at Atlantic coast Panama, Jan. 3, 1963...650
Pursers' wages & overtime rates, Jan. 22, 1963...685
Service to East Coast Mexico ports, Feb. 14, 1963...712
Subsidy rates, M.& R., hull & mach., Rte. 31 (1961), Feb. 26, 1963...721
Subsidy rates, P.& I. ins., crew deductible average costs, Rte. 31 (1960, 1961), Mar. 15, 1963...750
Subsidy rates (tentative), comb. ships, Rte. 2, May 7, 1963...809
LYKES BROS. S.S. CO., INC.:
Bids, deviation from stand. financial resp. & guarantee provisions, May 31, 1963...844
Bids, deviation from stand. financial resp. & guarantee provisions, June 10, 1963...862
Cargo ships, FMB-83, delivery date ext., Apr. 16, 1963...796
Cargo ships, 6th group, award date ext., Jan. 22, 1963...683
Cargo ships, 6th group, low bidder, Feb. 1, 1963...700
Cargo ships, 6th group, foreign cost, Feb. 28, 1963...726
Cargo ships, 6th group, constr. award, Feb. 28, 1963...727
Cargo ships, 6th group, eng. & arch. fees, Feb. 28, 1963...727
Cargo ships, 6th group, CDS award, MA-MSB-20, Mar. 8, 1963...741
Cargo ships, 6th group, trade-ins, Mar. 13, 1963...747
Cargo ships, 6th group, trade-ins, Mar. 28, 1963...768
Cargo ships, 6th group, side agreement with Avondale, Mar. 19, 1963...759
Cargo ships, 6th group, award date, Mar. 22, 1963...761
Cargo ships, 6th group, delivery date ext., June 18, 1963...873
Cargo ships, 7th group, award date ext., April 11, 1963...792
Cargo ships, 8th, 9th groups, award date, May 9, 1963...816
Cargo ships, 8th, 9th groups, award date, May 16, 1963...824
Manning scales of new vessels, subsidy eligibility, Feb. 5, 1963...702
OCSA, FMB-59, amdt. Art. I-3(a), vessels, Mar. 28, 1963...765
Reduced sailings, Rte. 19, Line 4, Apr. 30, 1963...805
Subsidy rates, M.& R., hull & mach., Rtes.1,6,15-A,24(1961), Mar.5,1963...733
Subsidy rates, M.& R., hull & mach., Rtes.13,15-B,19,21-B1,21-B2, 22(1960), Jan. 15, 1963...675
Subsidy rates, P.& I. ins., crew deductible average costs, Rtes.13,15-B, 19, 21 (B-1, B-2), 22(1960, 1961), June 18, 1963...873
Subsidy rates, wages & subsistence, Rtes.13,15-B, 19, 21-B1, 21-B2, 22 (1960), Jan. 24, 1963...689
Virginia, withdrawal from subsidy, Jan. 22, 1963...682
MARITIME SUBSIDY BOARD:
Operations flexibility - D.O. 317, Feb. 5, 1963...703
Memo. Act. Int. Officer as duties, on appln., submitted, May 31, 1963...841
Participation in preparation of staff reports, June 18, 1963...870
Report to Chairman-Administrator (Aug. 12, 1961 - Jan. 31, 1963), Feb. 12, 1963...705
Report: World Shipbuilding 4th quarter 1962, Mar. 28, 1963...763
Report: World Shipbuilding 1st quarter 1963, June 18, 1963...870
Review, conduct - redelegations to staff, Mar. 16, 1963...757



1028

October 22, 1963.
(Con.-7)

*States Steamship*
*Co. - Foreign*
*Flag Competition*
*- Freight Service*
*B-2 - Trade Route*
*No. 29 - Calendar*
*Year 1962.*

The Board considered the determination of substantiality of foreign flag competition and the percentage weight to be accorded each principal competitive foreign flag for use in calculating operating-differential subsidy rates for States Steamship Company, freight service B-2 on Trade Route No. 29 for calendar year 1962, transmitted by the Chief, Office of Government Aid under date of October 10, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the matter was laid over for consideration at a future meeting.

- - - - -

*Gulf & South*
*American SS*
*Co., Inc. -*
*Design C3-S-37d*
*(2nd Group) -*
*Proposed Change*
*under Contract*
*MA/MSB-25 -*
*Shipboard*
*Mechanization.*

The Board considered the matter with respect to the authorization of Change under Contract No. MA/MSB-25 covering shipboard mechanization on Gulf & South American Steamship Co., Inc.'s second group of ships, Design C3-S-37d, under construction at Avondale Shipyards, Inc., transmitted by the Chief, Office of Ship Construction under date of October 16, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the matter was laid over for consideration at a future meeting.

- - - - -

Chairman Alexander, with the concurrence of Member Gulick and Alternate Member Hock, noted that the agenda items pertaining to the construction of four cargo ships, MA Design C4-S-58a, for Lykes Bros. Steamship Company, Inc., had been developed and prepared by the Office of Ship Construction, with an unusual degree of accuracy, alacrity and thoroughness in keeping with the high standards which had been established for important recommendations of this kind; and, accordingly, directed the Secretary to convey to Mr. Hoffmann, Chief, Office of Ship Construction, and the other members of his staff who had participated in these assignments, a memorandum of commendation on behalf of the Maritime Subsidy Board.

At this point, the Secretary mentioned that the laid-over recommendation respecting Gulf & South American Steamship Co., Inc., in regard to proposed change under Contract MA/MSB-25 covering shipboard mechanization, was an urgent item because of the date factors involved, as well as a new recommendation just received respecting proposed change under Contract MA/MSB-23, centralized control for engine room and bridge control of main engine, in regard to cargo ships being built for American President Lines, Ltd., by NASSCO.

The Chairman directed that these recommendations be included on the agenda for the next scheduled meeting of the Board at 10:00 A.M. on October 25, 1963.

Upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the meeting adjourned at 4:29 P.M.

- - - - -

A true record.

*[signature]*
Secretary



1029

Proceedings of the Maritime B...                    *October 25, 1963.*
                                                    *Regular Meeting.*

Present:  Chairman Alexander, Member Gulick
          and Member Ables.

Also Present:  Robert E. Giles, General Counsel,
               Department of Commerce; G. L. Andrews,
               Deputy General Counsel; L. C. Hoffmann,
               Chief, Office of Ship Construction,
               (entered the meeting at 10:15 A.M. and
               withdrew at 10:45 A.M.) and John M.
               O'Connell, Assistant Secretary.

The Board convened at 10:10 A.M. and adjourned
          at 11:12 A.M.

- - - - -

*Gulf & South*          The Board again considered the matter with respect
*American SS*      to the authorization of Change under Contract No. MA/MSB-25
*Co., Inc. –*      covering shipboard mechanization on Gulf & South American
*Design C3-S-37d*  Steamship Co., Inc.'s second group of ships, Design C3-S-
*(2nd Group) –*    37d, under construction at Avondale Shipyards, Inc., trans-
*Proposed Change –* mitted by the Chief, Office of Ship Construction under date
*under Contract*   of October 18, 1963, which had been laid over from the
*MA/MSB-25 –*      meeting of October 22, 1963.
*Shipboard*             After discussion, upon the "yes" vote of Chairman
*Mechanization.*   Alexander, Member Gulick and Member Ables, the Maritime
                   Subsidy Board took the following actions:

    1.  Consistent with policy of fostering ship mechanization, granted approval
to Gulf & South American Steamship Company to authorize an increased cost
change in Construction Contract No. MA/MSB-25 within the scope of the Construc-
tion-Differential Subsidy Agreement No. MA/MSB-26, to Avondale Shipyards, Inc.
for the provision of shipboard mechanization on the basis that the final price
will be subject to adjudication, and the amount eligible for subsidy will not
be in excess of $250,000 per ship.

    2.  Determined that the limitation of the authority of the Chief, Office
of Ship Construction to approve changes under contract and change settlements
remain at 2% of the single vessel contract price as previously established by
Administrator's Order No. 55, exclusive of the change authorized pursuant to
this action.

    Memorandum dated October 18, 1963, from the Chief, Office of Ship Con-
struction, relative to the above matter is in the files of the Secretary.



1260

Proceedings of the Maritime Subsidy Board.                    April 30, 1964.
                                                             Regular Meeting.

Present:  Chairman Johnson, Member Gulick and
         Alternate Member Hook.

Also Present:  G. L. Andrews, Deputy General
               Counsel and James S. Dawson, Jr.,
               Secretary.

The Board convened at 8:30 A.M. and adjourned
         at 9:35 A.M.

- - - - -

*Lykes Bros. SS*                The Board discussed report of Maritime Subsidy Board
*Co., Inc. v.*          Representative, Graydon L. Andrews in the matter of appeals
*Avondale Ship-*       by Lykes Bros. Steamship Co., Inc. and Gulf & South Ameri-
*yards, Inc. -*        can Steamship Co., Inc., the Owners, from decisions of the
*Gulf & South*         Chief, Office of Ship Construction, Maritime Administration,
*American SS Co.,*     under Article 36 of the General Provisions of Contract Nos.
*Inc. v. Avondale*     FMB-3 and FMB-5, respectively, holding that under the re-
*Shipyards, Inc.*      spective contracts Avondale Shipyards, Inc. may bill for
*- Consolidated*       100 per cent progress on subcontractors' material delivered
*Shipbuilding*         to the shipyard regardless of when Avondale actually makes
*Contract*             payment to the subcontractors, less the contractual holdback
*Appeals.*             of 5 per cent applicable to the total work performed.
                       It was noted by the Board that the subject report had
been published and served on April 22, 1964, following which the report and all
pertinent documents relating thereto had been carefully reviewed by the Chair-
man and Members.

Thereafter, upon the "yes" vote of Chairman Johnson, Member Gulick and
Alternate Member Hook, the Maritime Subsidy Board took the following action:

1.  Agreed to adopt as its own the report of Maritime Subsidy Board
Representative Graydon L. Andrews by concurring in the issues and conclusions
as set forth in the report.

2.  Observed that there appeared to be no dispute as to the contract
language and as a result, the instant case could have been resolved by a
careful reading of the contract language by a layman, thus avoiding loss of
time and expense for the fear of controversy for all parties of record,
including the Government.

3.  Noted that the appeals of Lykes and Gulf & South American were
fraught with the development of extraneous issues as to what they believe
the provisions of Contracts Nos. FMB-3 and FMB-5 should be, rather than what
the provisions of said contracts actually are.

4.  Instructed the Secretary to be responsible for the development of
an appropriate draft opinion of the Board in keeping with the foregoing deter-
minations for further review and consideration by the Members prior to
issuance thereof.

Copy of the report of Maritime Subsidy Board Representative Graydon L.
Andrews, relative to the above matter is in the files of the Secretary.

JAN-23-2006 15:43   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.2



Calculation of Foreign Cost and
Construction Differential Subsidy
for Three Cargo Ships, MA Design C3-S-37d
GULF AND SOUTH AMERICAN STEAMSHIP CO.,INC.

**ADMINISTRATIVELY RESTRICTED**

JAN-23-2006 15:43   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.3

CALCULATION OF FOREIGN COST

AND

CONSTRUCTION DIFFERENTIAL SUBSIDY

FOR

THREE CARGO SHIPS

MA DESIGN C3-S-37d

FOR

GULF AND SOUTH AMERICAN STEAMSHIP CO., INC.

PREPARED BY
OFFICE OF SHIP CONSTRUCTION
MAY, 1963

U. S. DEPARTMENT OF COMMERCE
MARITIME SUBSIDY BOARD - MARITIME ADMINISTRATION

USCOMM-MA-DC

ADMINISTRATIVELY RESTRICTED

## TABLE OF CONTENTS

|                                           | Page |
|-------------------------------------------|------|
| Recommendation                            | 1    |
| General Description                       | 2    |
| Principal Characteristics                 | 4    |
| Resume of Bids                            | 5    |
| Foreign Shipbuilding Center               | 6    |
| Staff Japanese Cost Estimate              | 7    |
| Comparison with Previous Determinations   | 8    |
| Data Submitted by Owner                   | 9    |

ADMINISTRATIVELY RESTRICTED

RECOMMENDATION

1.   THAT JAPAN BE APPROVED AS THE REPRESENTATIVE LOW COST SHIPBUILD-
ING CENTER ON WHICH TO BASE THE FOREIGN CONSTRUCTION COST AND CONSTRUCTION
DIFFERENTIAL SUBSIDY RATE FOR THREE CARGO SHIPS, OF MA DESIGN C3-S-37d, PRO-
POSED TO BE CONSTRUCTED FOR GULF AND SOUTH AMERICAN STEAMSHIP CO., INC.;

2.   THAT THE ESTIMATED COST OF CONSTRUCTING IN JAPAN THREE CARGO
SHIPS, OF MA DESIGN C3-S-37d, BE ESTABLISHED AT $3,944,000 PER SHIP;

3.   THAT THE CONSTRUCTION DIFFERENTIAL SUBSIDY BE ESTABLISHED AT
$4,616,013 PER SHIP, EQUAL TO THE DIFFERENCE BETWEEN THE BID PRICE FOR THE
COMMERCIAL SHIP OF THE AVONDALE SHIPYARDS, INC., OF $8,560,013 AND THE
ESTIMATED FOREIGN COST OF $3,944,000;

4.   THAT, SINCE THE CONSTRUCTION DIFFERENTIAL SUBSIDY IS 53.9 PER
CENT OF THE BID PRICE, THE AMOUNT OF GOVERNMENT AID FOR GULF AND SOUTH
AMERICAN STEAMSHIP CO., INC., APPLICABLE TO ALL AUTHORIZED CHANGES UNDER
CONTRACT AND TO ALL APPROVED OWNER'S EXPENSE ASSOCIATED WITH THIS CONTRACT,
SUCH AS DESIGN CHARGES AND INSPECTION COSTS, BE ESTABLISHED AT 53.9 PER
CENT OF THE DOMESTIC COST;

5.   THAT THE FOREIGN COST OF THE NATIONAL DEFENSE FEATURES ADDED TO
THE SHIPS BE ESTABLISHED AT 46.1 PER CENT OF THE AVONDALE SHIPYARDS, INC.,
BID PRICE.

- 1 -

ADMINISTRATIVELY RESTRICTED

## GENERAL DESCRIPTION

This project involves the construction of three single screw combination bulk and general cargo ships similar to the first group of Gulf and South American ships now under construction at Avondale Shipyards, Inc.

These ships will be of full scantling design, about 495 foot length overall, 69 foot beam, and 10,857 tons total deadweight at a full load draft of 29'-6". There will be five cargo holds, four forward and one aft of the machinery space. Fuel oil and salt water deep tanks will be provided in Holds #1 and #5. The aft bulkhead in Hold #4 will be oil tight, forming the forward boundary of four cargo oil or salt water ballast tanks located between this hold and the machinery space.

Accommodations will be provided in the midship deckhouse for 12 passengers and a total complement of 51, including officers, crew, and 3 spares. All living spaces will be air conditioned.

The cargo handling gear will consist of ten 5-ton, two 10-ton, and four 15-ton booms. One 60-ton heavy lift boom will also be provided at the forward end of hatch #3. All gear will be mounted on free-standing high tensile steel kingposts of rectangular section. The 16 main hoist winches are motor-driven with AC-DC motor generator control.

There will be 16 electric topping, 16 vang, and 8 schooner guy winches to provide complete power positioning at winch operators' stations for all booms except the heavy lift boom.

- 2 -

ADMINISTRATIVELY RESTRICTED

All weatherdeck hatch covers will be quick-acting, hydraulically-operated, watertight.  'Tween deck covers will be non-tight, operated by the cargo whips.

The main propulsion unit will consist of 10,000 SHP at normal operation, using steam at 585 psig and 840°F.  This unit will be capable of continuous maximum operation at 11,000 SHP.

- 3 -

ADMINISTRATIVELY RESTRICTED

JAN-23-2006 15:45   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.8

## PRINCIPAL CHARACTERISTICS

| | |
|---|---|
| Length, overall | 494'-8-3/8" |
| Length between perpendiculars | 470'-0" |
| Beam, molded | 69'-0" |
| Depth to main deck at side | 41'-7" |
| Design draft, molded | 29'-6" |
| Total deadweight | 10,857 |
| Gross tonnage | 9,800 |
| Net tonnage | 5,650 |
| Shaft horsepower, optimum @ 93 rpm | 10,000 |
| Shaft horsepower, maximum @ 96 rpm | 11,000 |
| Steam pressure at throttle @ 10,000 shp | 585 psig |
| Steam temperature @ throttle @ 10,000 shp | 840°F |
| Sustained sea speed | 18 knots |

Accommodations

| | | |
|---|---|---|
| Officers and crew | 48 | |
| Passengers | 12 | |
| Others | 3 | |
| Total | | 63 |

| | |
|---|---|
| Dry cargo capacity, bale, including deep tanks | 543,650 cu.ft. |
| Refrigerated cargo | 16,430 cu.ft. |
| Cargo oil capacity of deep tanks | 812 L.T. |
| Auxiliary generators, 450 volts, A.C. | 2 @ 600 KW |
| Emergency generator, 450 volts, A.C. | 1 @ 100 KW |

- 4 -

ADMINISTRATIVELY RESTRICTED

Resume of Fixed Price Bids Opened April 16, 1963 for the
Construction of Three Single Screw Cargo Vessels,
MA Design C3-S-37d (Second Group),
for Gulf & South American Steamship Co., Inc.

| | Avondale | Amer.Ship Lorain, Ohio | Beth. Sp.Pt. | Ingalls |
|---|---|---|---|---|
| **1A. National Defense Ship** | | | | |
| 1st Ship | $9,013,000 | $9,481,673 | $10,517,000 | NO BID |
| Each of 2 | 8,821,600 | 9,028,991 | 9,778,000 | NO BID |
| Each of 3 | 8,613,013 | 8,791,364 | 9,225,000 | $9,312,960 |
| | | | | |
| **1B. Commercial Ship** | | | | |
| 1st Ship | $8,956,000 | $9,436,673 | $10,450,000 | NO BID |
| Each of 2 | 8,766,600 | 8,983,991 | 9,711,000 | NO BID |
| Each of 3 | 8,560,013 | 8,746,364 | 9,158,000 | $9,269,930 |
| | | | | |
| **1E. Guarantee Extended from 6 to 12 Months** | | | | |
| Each Ship | No Cost | No Cost | $50,000 | No Cost |

DELIVERY CALENDAR DAYS

| | | | | |
|---|---|---|---|---|
| First Ship | 600 | 650 | 650 | 650 |
| Second Ship | 660 | 710 | 710 | 710 |
| Third Ship | 720 | 770 | 770 | 770 |

- 5 -

ADMINISTRATIVELY RESTRICTED

## FOREIGN SHIPBUILDING CENTER

In accordance with the Merchant Marine Act of 1936, as amended, subsidy determinations are based upon the difference in the cost of constructing a ship in the U. S. and in a foreign shipbuilding center.  In establishing the shipbuilding center upon which such determinations are made, only stable countries building ships similar to those designed by American subsidized operators are considered.  These factors limit consideration to the major shipbuilding nations competing for contracts in the world market.

During the past three years (prior to the Grace Line determination of May 17, 1963), this agency has used West Germany as the representative foreign shipbuilding center because West German yards are very modern and efficient and have been successful in competing in the world market; also, the ship owners have indicated a preference for West Germany as the shipbuilding center.  However, Germany has not been the foremost shipbuilding nation in the world, being outproduced by both Japan and the United Kingdom. Japan has outproduced every other shipbuilding nation since 1956.

In the case of this Gulf and South American project, as for the Grace Line proposed ships, the staff and the owners each priced the ships as if constructed in Japan or in Germany; in all cases, the Japanese price was lower than the German price.

In view of the foregoing, the staff considers Japan to be the proper selection for the shipbuilding center upon which to base subsidy cost for the Gulf and South American ships.

ADMINISTRATIVELY RESTRICTED

### STAFF JAPANESE COST ESTIMATE

The Maritime Administration obtained an estimate of the construction cost of the Grace Line cargo ships from A. L. Burbank & Co., Ltd., New York. The staff reviewed this estimate and concluded that the estimate was carefully prepared. The Maritime Subsidy Board, on May 17, 1963, determined that the proper foreign cost of the Grace Line ships was $6,034,000 per ship.

In preparing the Japanese cost estimate for the Gulf and South American ships, the staff used principally the basic data of the Grace Line estimate. In areas where the material or equipment was not equivalent, the Burbank values were supplemented by information from other sources.

After the review of the data supplied with the bids of the domestic yards and data submitted by the ship owner, the staff concluded that the proper foreign construction cost (excluding National Defense Features) is $3,944,000 for each of three ships. A summary of the staff's estimate follows:

| | | |
|---|---|---|
| Material | | $3,118,700 |
| Vendor Discount ($1,600,000 @ 5%) | - | 80,000 |
| Net Material Cost | | $3,038,700 |
| Labor & Overhead   (571,420 Hrs) | | 778,200 |
| Miscellaneous Direct Expense | | 102,900 |
| | | $3,919,800 |
| General & Admin. Expense | | 117,600 |
| Total Price – One Ship | | $4,037,400 |
| Multiple Ship Reduction | - | 94,200 |
| Total Price – Each of Three | | $3,943,200 |
| | Say | $3,944,000 |
| | | |
| C.D.S. Rate | | 53.9% |

– 7 –

ADMINISTRATIVELY RESTRICTED

## COMPARISON WITH PREVIOUS DETERMINATIONS

The following tabulation shows a comparison of the recommended estimated foreign cost with the determinations made for recent new construction projects:

### Low Cost Shipbuilding Center - Japan

Recommended:

| Owner | Design | U.S. Cost | Foreign Cost | C.D.S. Rate | Bid Date |
|---|---|---|---|---|---|
| Gulf & S.A. | C3-S-37d | $8,560,013 | $3,944,000 | 53.9% | 4-16-63 |

Approved:

| | | | | | |
|---|---|---|---|---|---|
| Grace | C4-S-65a | 13,145,000 | 6,034,000 | 54.0 | 3-21-63 |

### Low Cost Shipbuilding Center - Germany

Approved:

| | | | | | |
|---|---|---|---|---|---|
| Lykes | C4-S-66a | $10,039,073 | $5,037,000 | 49.8% | 1-10-63 |
| Amer. Mail | C4-S-1sa | 11,278,000 | 5,344,000 | 52.6 | 9-17-62 |
| U.S. Line | C4-S-64a | 10,571,900 | 5,430,000 | 48.6 | 7-16-62 |
| M.M. | C4-S-60a | 10,362,438 | 5,266,000 | 49.1 | 4-3-62 |
| Grace | C4-S-49a | 17,907,000 | 8,896,000 | 50.3 | 11-14-61 |
| Gulf & S.A. | C3-S-37d | 8,145,000 | 4,201,000 | 48.4 | 8-24-61 |
| Lykes | C3-S-37c | 8,018,000 | 4,049,000 | 49.5 | 8-24-61 |

- 8 -

ADMINISTRATIVELY RESTRICTED

## DATA SUBMITTED BY OWNER

Gulf and South American Steamship Co., prior to the bid opening on April 16, 1963, advised that its estimate of cost for this project was $3,966,916 for each of three ships if constructed in Germany and $3,787,197 for each of three ships if constructed in Japan.  Subsequently, on May 17, 1963, Gulf and South American Steamship Co., furnished the details of the estimates.  The construction cost, if built in Germany, was increased to $3,987,048.

During a conference held with the Owner's representatives on May 17, 1963, it was agreed that the construction of these ships could be performed more cheaply in Japan than in Germany and there was almost no discussion of the German cost estimate.  The staff considers that the Owner's Japanese cost estimate is not proper.  It is not cast in the usual form of an estimate from a Japanese shipyard and the price is considered to be too low.

Gulf and South American Steamship Co. has offered no data which shows that its price is consistent with known Japanese prices and, also, has failed to establish that its estimating pattern is such that it results in a price consistent with the actual Japanese market.

On May 21, 1963, Gulf and South American Steamship Co. was advised by telephone that the staff considered $3,944,000 for each of three ships to be a proper foreign cost for this project.  Gulf and South American Steamship Co. advised by telegram on May 23, 1963 as follows:

DON E. FRYE  RE OUR TELEPHONE CONVERSATIONS ON 2ND GROUP NEW CONSTRUCTION YOUR PROPOSED FOREIGN COST $3,944,000 AND CDS RATE 53.9 PCT ACCEPTABLE ALSO DESIGN AND INSPECTION BUDGET $340,000 ACCEPTABLE IF CONTRACT IS AWARDED TO AVONDALE

STRICKLAND

- 9 -

ADMINISTRATIVELY RESTRICTED

JAN-23-2006 15:47   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.14

Maritime Subsidy Board
Maritime Administration


July 31, 1963.
Regular Meeting.

IV                         FOREWORD

This booklet is published as an aid for persons desiring to install or to p
equipment of a type required to be approved by the Commandant of the Coast
The items listed in this publication are most of the items approved by the Comm
of the Coast Guard or approved by the Coast Guard's predecessor organiz
The failure of certain items of equipment on board existing vessels to be listed
publication does not necessarily mean that such equipment must be replace
equipment listed in this publication.  In connection with certain items, appro
been required by the regulations after certain dates as set forth in the regu
The equipment installed and in use on those dates were permitted to be reta
service so long as they remained in good and serviceable condition, and when no
serviceable would have to be replaced with equipment as listed in this public

This booklet replaces the publication entitled "Equipment Lists," dated M
1956, since the supply of that edition is exhausted.  This booklet includes the
or notices published in the Federal Register or the Coast Guard's "Proceeding
Merchant Marine Council" prior to April 1, 1958.

The approval of the items listed applies only to those specific items and d
extend to other devices or products which may be produced by the same manufa
The products listed under the various headings herein are not necessarily equ
for a specific service, and such listing indicates only that the minimum requir
of the statutes and regulations in effect at the date of the listing were met.

In cases where any question or doubt exists that an item of equipment is in c
ance with Coast Guard requirements, reference may be made to the nearest
Guard Marine Inspection Office to ascertain whether or not such item is in com
with the current requirements before such item is acquired for shipboard insta
or use.  If any of the items listed herein are found in the markets for sale and
lieved not to be in compliance with the requirements of the statutes or regulation
information, together with details regarding the deficiencies or defects believed t
should be brought to the attention of the Coast Guard District Commander.

In order to keep outstanding approvals current, most approvals are limite
definite period of time.  Most approvals in the section entitled "Approved
ments, Machines, and Equipment" are limited to 5-year periods.  The manufa
will be notified, however, prior to the termination of such period as it app
specific approvals.  If there have been no changes in the Coast Guard requir
and the manufacturer is still producing the item without modification, he
requests and will receive an extension for an additional 5-year period.  To
identify approvals in this group, those items of equipment which comply with
Guard specifications and regulations are assigned individual approval numbers.

Certificates are issued to manufacturers of permitted articles (of a dangerous n
for ships' stores and supplies which comply with the requirements in Part 147
regulations in Subchapter N (Explosives or Other Dangerous Articles or Subs
and Combustible Liquids on Board Vessels) in Title 46 (Shipping) of the C
Federal Regulations.  The certificate is valid for 1 year and must be renewed an
by the manufacturer.

General authority over and responsibility for the administration and enforcer
the navigation and vessel inspection laws and regulations applicable to instru
machines, and equipment used on vessels in the several Coast Guard distri
vested in and imposed upon the Coast Guard District Commanders in charge o
districts.

Shipowners, operators, builders, and other persons affected by the navigati
vessel inspection laws and regulations should familiarize themselves with the r
ments for instruments, machines, and equipment for use on vessels subject to th

FOREWORD

diction of the Coast Guard.   To this end, Coast Guard personnel concerned with administration and enforcement of these requirements will extend every possible assistance.

A. C. RICHMOND,
Vice Admiral, U. S. Coast Guard,
*Commandant*

Dist. (SDL No. 66)
A: None
B: e (35); c (9); d (2); b (1); p (1)
C: m o (1)
D: i (1)
E: m (1)
List 112
List 160

46       EQ MENT LISTS

## 164.009 INCOMBUSTIBLE MATERIALS

Any material listed as an approved Structural Insulation (164.007), or appr Bulkhead Panel (164.008) may be used as an Incombustible Material. In addi the following materials are considered as automatically meeting the requirements Incombustible Material for which no tests are required and for which no specifi provals will be granted:

1. Sheet or block glass.
2. All metals except magnesium or magnesium alloys.
3. Portland cement, gypsum, or magnesite concretes with aggregates of sand, gravel, asbestos fibers, expanded vermiculite, expanded or vesicular slag diatomaceous silica.
4. Asbestos millboard meeting the requirements of Federal Specification M-351a.
5. Woven asbestos cloth meeting the requirements of ASTM standard specifica D877–50, Grades AAA and AAAA.

Baldwin-Hill Co., 500 Breunig Ave., Trenton 2, N. J.
  164.009/28/0, BALDWIN-HILL SPUN FELT, mineral wool insulation type.
Carey Manufacturing Co., The Philip, Lockland, Cincinnati 15, Ohio.
  164.009/1/0, FIREFOIL SHEATHING, corrugated asbestos board type, ⅜" thick with steel veneer one side.
  164.009/2/0, CAREYSTONE ASBESTOS-CEMENT WALLBOARD, asbestos cement board type, ¾₂" minimum.
  164.009/3/0,   C A R E Y S T O N E SHEATHING ASBESTOS, cement board type, ¾₂" minimum.
Foster Co., Benjamin, 4535–37 W. Girard Ave., Philadelphia 31, Pa.
  164.009/37/0, "Fiberseal", composition type.
Gustin-Bacon Manufacturing Co., Kansas City 5, Mo.
  164.009/16/1, NO. 100 ULTRALITE MC INSULATION, glass wool insulation type, ⅜ #/cu. ft. density.
  164.009/23/0, NO. 75 ULTRALITE MC INSULATION, glass wool insulation type, ¾ #/cu. ft. density.
  164.009/24/0, NO. 150 ULTRALITE MC INSULATION, glass wool insulation type, 1.48 #/cu. ft. density.
Johns-Manville Sales Corp., 22 East 40th 't., New York 16, N. Y.
  164.009/13/0, TRANSITE, asbestos cement board type.
  164.009/14/0, BX-SPINTEX, mineral wool insulation type, 3 through 8 #/cu. ft. density.
  164.009/18/0, JM 85% MAGNESIA, magnesia block type.
  164.009/25/0, JM SIX-POUND REINFORCED ASBESTOS PAPER, asbestos paper type.
  164.009/26/0, JM 32-POUND COMMERCIAL GRADE ASBESTOS PAPER, asbestos paper type.
  164.009/31/0, LW MARINE ACOUSTICAL UNIT, incombustible material.

  164.009/32/0, THERMOFLEX F RF 400, mineral wool insul type.
164.009/36/0, "J-M 302 CEMEI composed solely of asbestos fibe
164.009/40/0, "Cellamite", asb paper type.
164.009/42/0, "Thermobestos", a tos-hydrous calcium silicate type
Keasbey & Mattison Co., Ambler, I
  164.009/4/0, APAC, asbestos ce board type.
  164.009/5/0, C-4 MARINE BOA asbestos cement board type.
  164.009/6/0, C-5 MARINE BOA asbestos cement board type.
  164.009/33/0, LINABESTOS, asb cement board type.
Knipp & Co., Inc., 3401 South Har St., Baltimore 25, Md.
  164.009/17/0, KNIPPLITE, pl type.
Kompolite Co., Inc., 11–25 44th F Long Island City 1, N. Y.
  164.009/12/0, THERMOFLEX, pl type.
L. O. F. Glass Fibers Co., 1810 Ma Ave., Toledo 1, Ohio.
  164.009/35/0, "Microlite B-305", fiber insulation type.
  164.009/38/0, "Super-Fine 050B", fiber insulation type.
  164.009/41/0, "MICROTEX-32-i glass fiber insulation type.
National Gypsum Co., Buffalo 2, N
  164.009/7/0, GOLD BOND BOARD, asbestos cement t type.
Ocean-Lite Flooring Corp., 454 Balti Brooklyn 17, N. Y.
  164.009/11/0, OCEAN-LITE, pl type.
Owens-Corning Fiberglas Corp., Tole Ohio.
  164.009/10/2, FIBERGLAS INSU TION TYPE TW-MC, glass insulation type 2 to 3½ #/cu density.



MATERIALS

Owens-Corning Fibergias Corp.—Con.
164.009/21/1, FIBERGLAS INSULA-
TION TYPE PF-334, glass wool
insulation type, ½ #/cu. ft. density.
164.009/22/1, FIBERGLAS INSULA-
TION TYPE PF-335, glass wool
insulation type, 1 #/cu. ft. density.
164.009/44/0, FIBERGLAS INSULA-
TION AF-310—AF-320 inclusive,
glass wool insulation type.

United States Gypsum Co., 300
Adams St., Chicago 6 Ill.
164.009/9/0, U. S. G. MAR
BOARD, gypsum board mets
neer type, ⅜″ with steel or a
num veneer one side.



4 – MAR   1
Copy _____ 1963

# Equipment Lists

Items approved or accepted under Marine
Inspection and Navigation Laws



APRIL 2, 1962

CG-190

U. S. Coast Guard

Treasury Department

# Equipment Lists

Items approved or accepted under Marine

Inspection and Navigation Laws

---

All the listings contained in this pamphlet have been issued prior to April 2, 1962.   All such actions are published in the Federal Register or the Proceedings of the Merchant Marine Council. Subsequent listings will be published in the Federal Register or the Proceedings of the Merchant Marine Council and consist of: Approved Instruments, Machines, and Equipment; Acceptable covered steel arc welding electrodes; Manufacturers having submitted affidavits covering Pipe, Tubing, Valves, Fittings, Flanges, Castings, Forgings, and Bolting; Acceptable hydraulic cast iron valves; Permitted Articles (of a dangerous nature) for Ships' Stores and Supplies; Formerly Approved Instruments, Machines, and Equipment; and Manufacturers whose affidavits covering pipe, tubing, valves, fittings, flanges, castings, forgings, and bolting are no longer in effect.

---

CG 190  •  APRIL 2, 1962

UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON : 1962

# TREASURY DEPARTMENT
## UNITED STATES COAST GUARD

CMC
April 2, 1

ADDRESS REPLY TO:
C O M M A N D A N T
U. S. COAST GUARD
HEADQUARTERS
WASHINGTON 25, D. C.



### FOREWORD

· Various items of lifesaving, firefighting, and miscellaneous equipment u
aboard vessels are required by certain navigation and vessel inspection laws :
regulations to be of types which are approved by the Commandant of the Cc
Guard. The regulations also specify that certain items may be accepted for use
board vessels upon submission of an affidavit that the applicable requirements ·
be met. In other cases, drawings and specifications for equipment are examined
order to advise manufacturers and prospective purchasers whether such it∈
when manufactured or installed will be acceptable for marine use.

This booklet contains seven separate and distinct lists, viz.:

    (a) Approved instruments, machines, and equipment;

    (b) Acceptable covered steel arc welding electrodes;

    (c) Manufacturers having submitted affidavits covering pipe, tubing, val\
fittings, flanges, castings, forgings, and bolting;

    (d) Acceptable hydraulic cast iron valves;

    (e) Permitted articles (of a dangerous nature) for ships' stores and suppli
and

    (f) Formerly approved instruments, machines, and equipment, which at ·
time have been approved for use on vessels, but are no longer approved for r
installations.

    . (g) Manufacturers whose affidavits covering pipe, tubing, valves, fittin
flanges, castings, forgings, and bolting are no longer in effect.

The need to have on board a particular type of vessel approved equipment
indicated in this publication is dependent upon the requirements of the navigat
and vessel inspection laws and the rules and regulations promulgated thereun
which are applicable to that vessel.

. The requirements for approved equipment for passenger, tank, cargo, mis∈
laneous, small passenger, and uninspected vessels, and artificial islands are
forth in the following publications:

    CG–115  Marine Engineering Regulations and Material Specifications

    CG–123  Rules and Regulations for Tank Vessels

    CG–176  Load Line Regulations

    CG–256  Rules and Regulations for Passenger Vessels

    CG–257  Rules and Regulations for Cargo and Miscellaneous Vessels

    CG–258  Rules and Regulations for Uninspected Vessels

III



IV                                    FO.   /ORD

CG–259  Electrical Engineering Regulations
CG–269  Rules and Regulations for Nautical Schools
CG–320  Rules and Regulations for Artificial Islands and Fixed Structures on the Outer Continental Shelf
CG–323  Rules and Regulations for Small Passenger Vessels (not more than 65 feet in length)

This booklet is published as an aid for persons desiring to install or to purchase equipment of a type required to be approved by the Commandant of the Coast Guard. The items listed in this publication are most of the items approved by the Commandant of the Coast Guard or approved by the Coast Guard's predecessor organizations. The failure of certain items of equipment on board existing vessels to be listed in this publication does not necessarily mean that such equipment must be replaced with equipment listed in this publication. In connection with certain items approval has been required by the regulations after certain dates as set forth in the regulations. The equipments installed and in use on those dates were permitted to be retained in service so long as they remained in good and serviceable condition and when no longer serviceable would have to be replaced with equipment as listed in this publication.

This booklet replaces the publication entitled "Equipment Lists," dated April 1 1960. This booklet includes the approvals granted or terminated as well as information published in the Coast Guard's "Proceedings of the Merchant Marine Council," prior to April 2, 1962.

The approval of the items listed applies only to those specific items and does not extend to other devices or products which may be produced by the same manufacturer. The products listed under the various headings herein are not necessarily equivalent for a specific service and such listing indicates only that the minimum requirements of the statutes and regulations in effect at the date of the listing were met.

In cases where any question or doubt exists that an item of equipment is in compliance with Coast Guard requirements, reference may be made to the nearest Coast Guard Marine Inspection Office to ascertain whether or not such item is in compliance with the current requirements before such item is acquired for ship board installation or use. If any of the items listed herein are found in the market for sale and are believed not to be in compliance with the requirements of the statutes or regulations, such information, together with details regarding the deficiencies or defects believed to exist, should be brought to the attention of the Coast Guard District Commander.

In order to keep outstanding approvals current most approvals are limited to a definite period of time. Most approvals in the section entitled "Approved Instruments, Machines, and Equipment" are limited to five year periods. If there have been no changes in the Coast Guard requirements and the manufacturer is still producing the item without modification, he simply requests and will receive an extension for an additional five year period. To further identify approvals in this group, those items of equipment which comply with Coast Guard specifications and regulations are assigned individual approval numbers.

Certificates are issued to manufacturers of permitted articles (of a dangerous nature) for ships' stores and supplies which comply with the requirements in Part 147 of the regulations in Subchapter N (Explosives or Other Dangerous Articles or Substances and Combustible Liquids on Board Vessels) in Title 46 (Shipping) of the Code of Federal Regulations. The certificate is valid for one year and must be renewed annually by the manufacturer.



FOREWORD

General authority over and responsibility for the administration and enf
ment of the navigation and vessel inspection laws and regulations applicab
instruments, machines, and equipment used on vessels in the several Coast G
districts are vested in and imposed upon the Coast Guard District Comman
in charge of such districts.

Shipowners, operators, builders, and other persons affected by the naviga
and vessel inspection laws and regulations should familiarize themselves with
requirements for instruments, machines, and equipment for use on vessels sul
to the jurisdiction of the Coast Guard. To this end, Coast Guard personnel
cerned with the administration and enforcement of these requirements will ex
every possible assistance.

E. J. ROLAND,
*Vice Admiral, U.S. Coast Guard,*
*Acting Commandan*

Dist. (SDL No. 74)
A:  None
B:  n(35); c(9); e(5); d(2); b p(1)
C:  m o(1)
D:  f i(1)
E:  m(1)
List 112
List 160



52          EQUIPMENT LISTS

## 164.009  INCOMBUSTIBLE MATERIALS

Any material listed as an approved Structural Insulation (164.007), or approved Bulkhead Panel (164.008) may be used as an Incombustible Material. In addition, the following materials are considered as automatically meeting the requirements of an Incombustible Material for which no tests are required and for which no specific approvals will be granted:

1. Sheet or block glass.
2. All metals except magnesium or magnesium alloys.
3. Portland cement, gypsum, or magnesite concretes with aggregates of sand, gravel, asbestos fibers, expanded vermiculite, expanded or vesicular slags, or diatomaceous silica.
4. Asbestos millboard meeting the requirements of Federal Specification HH–M–351a.
5. Woven asbestos cloth meeting the requirements of ASTM standard specification D677–50, Grades AAA and AAAA.

Baldwin-Ehret-Hill Co., 500 Breunig Ave., Trenton 2, N.J.
164.009/28/1, B-E-H SPUN FELT, mineral wool insulation type, 2½ to 4 #/cu. ft. density.
164.009/49/0, THERMASIL, asbestos-hydrous calcium silicate type pipe and block insulation.
164.009/50/0, THERMALITE, 85% magnesia type pipe and block insulation.

Carey Manufacturing Co., The Philip, Lockland, Cincinnati 15, Ohio.
164.009/1/0, FIREFOIL SHEATHING, corrugated asbestos board type, ¾" thick with steel veneer one side.
164.009/2/0, CAREYSTONE ASBESTOS-CEMENT WALLBOARD, asbestos cement board type, ¾₁₆" minimum.
164.009/8/0, CAREYSTONE SHEATHING ASBESTOS, cement board type, ¾₁₆" minimum.

Columbia Acoustics and Fireproofing Co., Stanhope, N.J.
164.009/61/0, "Cafco Heat-Shield", sprayed asbestos fiber type.
164.009/62/0, "Cafco Sound-Shield", sprayed asbestos fiber type.

Danak Eternit-Fabrik A/S, Aalborg, Denmark.
164.009/58/0, HARDTOP, asbestos cement board type.

Foster Co., Benjamin, 4635–37 W. Girard Ave., Philadelphia 11, Pa.
164.009/87/0, "Fiberseal", composition type.

Gossler Glasgespinst-Fabric G.M.B.H., Oscar, Hamburg-Bergedorf, West Germany.
164.009/71/0, "Bergla-Tal Fiber Glass Boards PA", fibrous glass insulation, 1 #/cu. ft.

Gustin-Bacon Manufacturing Co., 210 West Tenth St., Kansas City 5, Mo.

164.009/16/1, No. 100 ULTRALITE MC INSULATION, glass wool insulation type, 1 #/cu. ft. density.
164.009/23/0, No. 75 ULTRALITE MC INSULATION, glass wool insulation type, ¾ #/cu. ft. density.
164.009/24/0, No. 150 ULTRALITE MC INSULATION, glass wool insulation type, 1.48 #/cu. ft. density.

Isoflex Sales Co., 1554 Rollins Road, Burlingame, Calif.
164.009/55/0, ISOFLEX-k20, fibrous glass type, 0.75 #/cu. ft. density.

Johns-Manville Sales Corp., 22 E. 40th St., New York 16, N.Y.
164.009/13/0, TRANSITE, asbestos cement board type.
164.009/14/0, BX-SPINTEX, mineral wool insulation type, 3 through 8 #/cu. ft. density.
164.009/18/0, JM 85% MAGNESIA, magnesia block type.
164.009/25/0, JM 6-POUND REINFORCED ASBESTOS PAPER, asbestos paper type.
164.009/26/0, J-M 32-POUND COMMERCIAL GRADE ASBESTOS PAPER, asbestos paper type.
164.009/31/0, LW MARINE ACOUSTICAL UNIT, incombustible material.
164.009/32/0, THERMOFLEX FRP 400, mineral wool insulation type.
164.009/35/0, MICROLITE 0.6 density, glass fiber insulation type.
164.009/36/0, "J-M 302 CEMENT composed solely of asbestos fibers, diatomaceous silicas and clay.
164.009/38/0, SUPERFINE 0 glass fiber insulation type.
164.009/40/0, "Cellamite", asbestos paper type.
164.009/41/0, MICROTEX-32 glass fiber insulation type.



MATERIALS

Johns-Manville Sales Corp.—Cont.
164.009/43/0, "Thermobestos", asbestos-hydrous calcium silicate type.
164.009-60/0, ASBESTOCITE A and ASBESTOCITE B, asbestos cement board type, 105 #/cu. ft. density.
Keasbey & Mattison Co., Ambler, Pa.
164.009/4/0, APAC, asbestos cement board type.
164.009/83/0, LINABESTOS, asbestos cement board type.
Kempolite Co., Inc., 11-25 44th Road, Long Island City 1, N.Y.
164.009/12/0, THERMOFLEX, plaster type.
National Gypsum Co., Buffalo 2, N.Y.
164.009/7/0, GOLD BOND A-C BOARD, asbestos cement board type.
Ocean-Lite Flooring Corp., 143 Pioneer St., Brooklyn 31, N.Y.
164.009/11/0, OCEAN-LITE, plaster type.
Owens-Corning Fiberglas Corp., Toledo 1, Ohio.
164.009/10/2, FIBERGLAS INSULATION TYPE TW-MC, glass wool insulation type, 2 to 3½ #/cu. ft. density.
164.009/21/2, FIBERGLAS INSULATION TYPES PF-354 thru PF-336, glass wool insulation type, ¼ # to 1 #/cu. ft. density.
164.0099/44/0, FIBERGLAS INSULATION AF-310—AF-320 inclusive, glass wool insulation type.
164.009/58/0, FIBERGLAS AT-410, AT-415, and AT-420, fibrous insulation type, in ¼, ¾, and 1 pound densities respectively.
164.009/55/0, FIBERGLAS PF-452, fibrous insulation type, 1.75 #/cu. ft. density.

164.009/57/1, FIBERGLAS RINE DUCT INSULAT TYPE CPI, TW-MC incombustible material veneered one side aluminum foil-glass cloth lami 3 #/cu. ft. density.
164.009/59/0, FIBERGLAS and TWL, fibrous insulation 2 to 6 lbs. cu. ft. density.
164.009/64/0, KAYLO BLOCK SULATION, asbestos-hydrous cium silicate type, 12.8 #/cu density.
164.009/65/0, KAYLO 20 BL INSULATION, asbestos-hy calcium silicate type, 12.5 #/cu density.
Pittsburgh Plate Glass Co., One G way Center, Pittsburgh 22, Pa.
164.009/47/0, SUPERFINE FIBER GLASS, glass wool ½ to 1½ #/cu. ft. density.
Turners Asbestos Cement Co., Trafford Park, Manchester England.
164.009/73/0, "Turnall asbestos board", asbestos cement board 45 #/cu. ft. density.
Union Asbestos & Rubber Comp 1111 West Perry St., Blooming Ill.
164.009/63/1, UNARCOBOARD, bestos cement board type, #/cu. ft. average density.
United States Gypsum Co., 300 Adams St., Chicago 6, Ill.
164.009/9/0, U.S.G. M A R I BOARD, gypsum board metal neer type, ⅝" with steel or alu num veneer one side.
164.009/54/0, T H E R M A F I B GLASS FIBER, fibrous insula type, 3 #/cu. ft. density.
United States Plywood Corp., 55 44th St., New York 36, N.Y.
164.009/51/0, GLASAL, cement bestos board type.



# Equipment Lists



ems approved or accepted under Marine
Inspection and Navigation Laws



AUGUST 3, 1964

CG 190

U. S. Coast Guard

Treasury Department



# Equipment Lists

Items approved or accepted under Marine

Inspection and Navigation Laws

All the listings contained in this pamphlet have been issued prior to August 3, 1964. All such actions are published in the Federal Register or the Proceedings of the Merchant Marine Council. Subsequent listings will be published in the Federal Register and the Proceedings of the Merchant Marine Council and consist of Approved Instruments, Machines, and Equipment; Acceptable covered steel arc welding electrodes; Manufacturers having submitted affidavits covering Pipe, Tubing, Valves, Fittings, Flanges, Castings, Forgings, and Bolting; Acceptable hydraulic cast iron valves; Permitted Articles (of a dangerous nature) for Ships' Stores and Supplies; Formerly Approved Instruments, Machines, and Equipment; and Manufacturers whose affidavits covering pipe, tubing, valves, fittings, flanges, castings, forgings, and bolting are no longer in effect.

CG 190  •  AUGUST 3, 1964

UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON  :  1965

# TREASURY DEPARTMENT
## UNITED STATES COAST GUARD

CMC
August

*Address reply to:*
**COMMANDANT**
U.S. COAST GUARD
WASHINGTON, D.C. 20226



## FOREWORD

Various items of lifesaving, firefighting, and miscellaneous equipment aboard vessels are required by certain navigation and vessel inspection law regulations to be of types which are approved by the Commandant of the Guard. The regulations also specify that certain items may be accepted f on board vessels upon submission of an affidavit that the applicable require will be met. In other cases, drawings and specifications for equipment are ined in order to advise manufacturers and prospective purchasers whether items when manufactured or installed will be acceptable for marine use.

This booklet contains seven separate and distinct lists, viz:

(a) Approved instruments, machines, and equipment;

(b) Acceptable covered steel arc welding electrodes;

(c) Manufacturers having submitted affidavits covering pipe, tubing, fittings, flanges, castings, forgings, and bolting;

(d) Acceptable hydraulic cast iron valves;

(e) Permitted articles (of a dangerous nature) for ships' stores and su

(f) Formerly approved instruments, machines, and equipment, which time have been approved for use on vessels, but are no longer approved f installations.

(g) Manufacturers whose affidavits covering pipe, tubing, valves, fi flanges, castings, forgings, and bolting are no longer in effect.

The need to have on board a particular type of vessel approved equipm indicated in this publication is dependent upon the requirements of the nav and vessel inspection laws and the rules and regulations promulgated there which are applicable to that vessel.

The requirements for approved equipment for passenger, tank, cargo, laneous, small passenger, and uninspected vessels, and artificial islands forth in the following publications:

CG–115 Marine Engineering Regulations and Material Specifications
CG–123 Rules and Regulations for Tank Vessels
CG–176 Load Line Regulations

III



IV                               FOREWORD

CG-256 Rules and Regulations for Passenger Vessels
CG-257 Rules and Regulations for Cargo and Miscellaneous Vessels
CG-258 Rules and Regulations for Uninspected Vessels
CG-259 Electrical Engineering Regulations
CG-269 Rules and Regulations for Nautical Schools
CG-320 Rules and Regulations for Artificial Islands and Fixed Str
       on the Outer Continental Shelf
CG-323 Rules and Regulations for Small Passenger Vessels (Unc
       Gross Tons)

This booklet is published as an aid for persons desiring to install
purchase equipment of a type required to be approved by the Comman
the Coast Guard. The items listed in this publication are most of th
approved by the Commandant of the Coast Guard or approved by th
Guard's predecessor organizations. The absence of listings in this pub
of certain items of equipment on board existing vessels does not necessari
that such equipment must be replaced with that listed herein. In con
with certain items approval has been required by the regulations after
dates as set forth in the regulations. The equipments installed and in
those dates were permitted to be retained in service so long as they rem
good and serviceable condition and when no longer serviceable would hav
replaced with equipment as listed in this publication.

This booklet replaces the publication entitled "Equipment Lists," date
2, 1962. This booklet includes the approvals granted or terminated as
information published in the Coast Guard's "Proceedings of the Merchant
Council," prior to August 3, 1964.

The approval of the items listed applies only to those specific items a
not extend to other devices or products which may be produced by the sam
facturer. The products listed under the various headings herein are no
sarily equivalent for a specific service and such listing indicates only t
minimum requirements of the statutes and regulations in effect at the dat
listing were met.

In cases where any question or doubt exists that an item of equipme
compliance with Coast Guard requirements, reference may be made to the
Coast Guard Marine Inspection Office to ascertain whether or not such it
compliance with the current requirements before such item is acquired f
board installation or use. If any of the items listed herein are foun
markets for sale and are believed not to be in compliance with the requirem
the statutes or regulations, such information, together with details regar
deficiencies or defects believed to exist, should be brought to the attentio
Coast Guard District Commander.

In order to keep outstanding approvals current most approvals are lim
definite period of time. Most approvals in the section entitled "Approved
ments, Machines, and Equipment" are limited to 5 year periods. If th
been no changes in the Coast Guard requirements and the manufacturer
producing the item without modification, he simply requests and will re
extension for an additional 5 year period. To further identify approval
group, those items of equipment which comply with Coast Guard specificat
regulations are assigned individual approval numbers.

Certificates are issued to manufacturers of permitted articles (of a d
nature) for ships' stores and supplies which comply with the requirement
147 of the regulations in Subchapter N (Explosives or Other Dangerous



## FOREWORD

or Substances and Combustible Liquids on Board Vessels) in Title 46 (Shi
of the Code of Federal Regulations. The certificate is valid for 1 year an
be renewed annually by the manufacturer.

General authority over and responsibility for the administration and e
ment of the navigation and vessel inspection laws and regulations applic
instruments, machines, and equipment used on vessels in the several Coast
districts are vested in and imposed upon the Coast Guard District Comman
charge of such districts.

Shipowners, operators, builders, and other persons affected by the nav
and vessel inspection laws and regulations should familiarize themselves w
requirements for instruments, machines, and equipment for use on vessels
to the jurisdiction of the Coast Guard. To this end, Coast Guard personn
cerned with the administration and enforcement of these requirements will
every possible assistance.

E. J. ROLAND
*Admiral, U.S. Coast Gua*
*Comma:*

Dist. (SDL No. 79)
A: a, i, j, l, ll, n (1)
B: n (100); c (9); e (6); d (2); bpq (1)
C: i m o (1)
D: d (New London Only) (12); irv (1)
E: m s (1)
F: p (1)
List 112
List 160



56      ...JIPMENT LISTS

## 164.009  INCOMBUSTIBLE MATERIALS

Any material listed as an approved Structural Insulation (164.007), proved Bulkhead Panel (164.008) may be used as an Incombustible Mater addition, the following materials are considered as automatically meeting quirements of an Incombustible Material for which no tests are required which no specific approvals will be granted:

1. Sheet or block glass.
2. All metals except magnesium or magnesium alloys.
3. Portland cement, gypsum, or magnesite concretes with aggregates sand, gravel, asbestos fibers, expanded vermiculite, expanded or vesicular s diatomaceous silica.
4. Asbestos millboard meeting the requirements of Federal Specificati M–361a.
5. Woven asbestos cloth meeting the requirements of ASTM standar fication D677–50, Grades AAA and AAAA.

Baldwin-Ehret-Hill Co., 500 Breunig
   Ave., Trenton 2, N.J.
164.009/28/1, B-E-H SPUN FELT,
   mineral wool insulation type, 2½
   to 4 #/cu. ft. density.
164.009/49/0, THERMASIL, asbes-
   tos-hydrous calcium silicate type
   pipe and block insulation.
164.009/50/0, THERMALITE, 85%
   magnesia type pipe and block insu-
   lation.
Carey Manufacturing Co., The Philip,
   Lockland, Cincinnati 15, Ohio.
164.009/1/0, FIREFOIL SHEATH-
   ING, corrugated asbestos board
   type, ¼″ thick with steel veneer
   one side.
164.009/2/0, CAREYSTONE AS-
   BESTOS-CEMENT WALL-
   BOARD, asbestos cement board
   type, ³⁄₁₆″ minimum.
164.009/3/0, CAREYSTONE
   SHEATHING ASBESTOS, cement
   board type, ³⁄₁₆″ minimum.
Columbia Acoustics and Fireproofing
   Co., Stanhope, N.J.
164.009/61/0, "Cafco Heat-Shield",
   sprayed asbestos fiber type.
164.009/62/0, "Cafco Sound-Shield",
   sprayed asbestos fiber type.
Fibreboard Paper Products Corp., P.O.
   Box 4831, Oakland 23, Calif.
164.009/76/0, "PABCO Precision
   Molded' Caltemp" asbestos-hydrous
   calcium silicate type.
164.009/77/0, "PABCO 'Precision
   Molded' Super Caltemp" asbestos-
   hydrous calcium silicate.
Foster Co., Benjamin, 4685–37 W.
   Girard Ave., Philadelphia 31, Pa.
164.009/37/0, "Foster Insulfas Seal-
   er 31–28", composition type.
164.009/78/0, "Foster Insulfas Adhe-
   sive 31–15", composition type.
164.009/80/0, "Foster Insulfas Coat-
   ing 31–30", composition type.

Gustin-Bacon Manufacturing
   West Tenth St., Kansas Cit
164.009/16/1, No. 100 ULTR
   MC INSULATION, glass
   sulation type, 1 #/cu. ft. de
164.009/23/0, No. 75 ULTR
   MC INSULATION, glass
   sulation type, ¾ #/cu. ft.
164.009/24/0, No. 150 ULTR
   MC INSULATION, glass
   sulation type, 1.48 #/cu. ft.
Isoflex Sales Co., 1564 Rollin
   Burlingame, Calif.
164.009/56/0, ISOFLEX-k20
   glass type, 0.76 #/cu. ft. d
Johns-Manville Sales Corp.,
   40th St., New York 16, N.
164.009/13/0, TRANSITE,
   cement board type.
164.009/14/0, BX-SPINTEX,
   wool insulation type, 3 th
   #/cu. ft. density.
164.009/18/0, JM 85% MAG
   magnesia block type.
164.009/25/0, JM 6-POUND
   FORCED ASBESTOS PA
   bestos paper type.
164.009/30/0, J-M 32-POUN
   MERCIAL GRADE AS
   PAPER, asbestos paper t
164.009/31/0, LW MARINE
   TICAL UNIT, incombust
   terial.
164.009/32/0, THERMOFLE
   EF 400, mineral wool i
   type.
164.009/35/0, MICROLITE
   density, glass fiber insulat
164.009/36/0, "J-M 302 CE
   composed solely of asbest
   diatomaceous silica and c
164.009/38/0, SUPERFIN
   glass fiber insulation type
164.009/40/0, "Callamite",
   paper type.



## MATERIALS

Johns-Manville Sales Corp.—Con.
164.009/41/0, MICROTEX-32-308, glass fiber insulation type.
164.009/43/0, "Thermobeads", asbestos-hydrous calcium silicate type.
164.009/60/0, ASBESTOCITE A and ASBESTOCITE B, asbestos cement board type, 105 # /cu. ft. density.
164.009/72/0, MICROLITE, fibrous glass insulation type.

Kasbey & Mattison Co., Ambler, Pa.
164.009/4/0, APAC, asbestos cement board type.
164.009/28/0, LINABESTOS, asbestos cement board type.

Lumolite Co., Inc., 55 Webster Avenue, New Rochelle, N.Y.
164.009/12/0, THERMOFLEX, plaster type.

National Gypsum Co., Buffalo 2, N.Y.
164.009/7/0, COLD BOND A-C BOARD, asbestos cement board type.

Ocean-Lite Flooring Corp., 143 Pioneer St., Brooklyn 31, N.Y.
164.009/11/0, OCEAN-LITE, plaster type.

Owens-Corning Fiberglas Corp., Toledo 1, Ohio.
164.009/10/2, FIBERGLAS, INSULATION TYPE TW-MC, glass wool insulation type, 2 to 3½ #/cu. ft. density.
164.009/22/2, FIBERGLAS INSULATION TYPES PF-334 thru PF-336, glass wool insulation type, ½ # to 1 #/cu. ft. density.
164.009/44/0, FIBERGLAS INSULATION AF-810—AF-320 inclusive, glass wool insulation type.
164.009/53/0, FIBERGLAS AT-410, AT-415, and AT-420, fibrous insulation type, in ¼, ¾, and 1 pound densities respectively.
164.009/57/1, FIBERGLAS MARINE DUCT INSULATION,

TYPE CFI, TW-MC incombustible material veneered one side with aluminum foil-glass cloth laminate, 3 #/cu. ft. density.
164.009/59/0, FIBERGLAS TWF and TWL, fibrous insulation type, 2 to 6 lbs. cu. ft. density.
164.009/64/0, KAYLO BLOCK INSULATION, asbestos-hydrous calcium silicate type, 12.5 #/cu. ft. density.
164.009/65/0, KAYLO 20 PIPE INSULATION, asbestos-hydrous calcium silicate type, 12.5 #/cu. ft. density.

Pittsburgh Corning Corp., One Gateway Center, Pittsburgh, Pa.
164.009/79/0, UNIBESTOS, fibrous solid-type asbestos, 14# to 17#/cu. ft. density.

Pittsburgh Plate Glass Co., One Gateway Center, Pittsburgh 22, Pa.
164.009/47/0, SUPERFINE FIBER GLASS, glass wool type, ½ to 1½ #/cu. ft. density.
164.009/75/0, PPC TEXTRA, fibrous glass insulation-type, 3 #/cu. ft. density.

Union Asbestos & Rubber Co., 1111 West Perry St., Bloomington, Ill.
164.009/63/1, UNARCOBOARD, asbestos cement board type, 14 #/cu. ft. average density.

United States Gypsum Co., 300 West Adams St., Chicago 6, Ill.
164.009/0/0, U.S.G. MINERAL BOARD, gypsum board mineral veneer type, ⅝" with steel or aluminum veneer one side.
164.009/54/0, THERMAFIBER GLASS FIBER, fibrous insulation type, 3 #/cu. ft. density.

United States Plywood Corp., 55 West 44th St., New York 36, N.Y.
164.009/51/0, "GLASWELD", solid asbestos board type.



# Equipment Lists

### Items approved or accepted under Marine Inspection and Navigation Laws



AUGUST 1, 1966

CG–190

U. S. Coast Guard

Treasury Department



# Equipment Lists

### Items approved or accepted under Marine

### Inspection and Navigation Laws

All the listings contained in this pamphlet have been issued prior to August 1, 1966. All such actions are published in the Federal Register or the Proceedings of the Merchant Marine Council. Subsequent listings will be published in the Federal Register or the Proceedings of the Merchant Marine Council and consist of: Approved Instruments, Machines, and Equipment; Acceptable covered steel arc welding electrodes; Manufacturers having submitted affidavits covering Valves, Fittings, and Flanges; Acceptable hydraulic components; Permitted Articles (of a dangerous nature) for Ships' Stores and Supplies; Formerly Approved Instruments, Machines, and Equipment; and Manufacturers whose affidavits covering valves, fittings, and flanges are no longer in effect.

CG 190  •  AUGUST 1, 1966

UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON : 1966





## TREASURY DEPARTMENT
## UNITED STATES COAST GUARD

*Address reply to:*
COMMANDANT (CM
U.S. COAST GUARD
WASHINGTON, D.C. 202

August 1, 1966

### FOREWORD

Various items of lifesaving, firefighting, and miscellaneous equipment used abo
vessels are required by certain navigation and vessel inspection laws and regulati
to be of types which are approved by the Commandant of the Coast Guard.
regulations also specify that certain items may be accepted for use on board ves
upon submission of an affidavit that the applicable requirements will be met.
other cases, drawings and specifications for equipment are examined in order
advise manufacturers and prospective purchasers whether such items when ma
factured or installed will be acceptable for marine use.

This booklet contains seven separate and distinct lists, viz:

(a) Approved instruments, machines, and equipment;
(b) Acceptable covered steel arc welding electrodes;
(c) Manufacturers having submitted affidavits covering valves, fittings,
flanges;
(d) Acceptable hydraulic components;
(e) Permitted articles (of a dangerous nature) for ships' stores and suppl
(f) Formerly approved instruments, machines, and equipment, which at
time have been approved for use on vessels, but are no longer approved for
installations.
(g) Manufacturers whose affidavits covering valves, fittings, and flanges
no longer in effect.

The need to have on board a particular type of vessel approved equipment
indicated in this publication is dependent upon the requirements of the naviga
and vessel inspection laws and the rules and regulations promulgated thereun
which are applicable to that vessel.

The requirements for approved equipment for passenger, tank, cargo, miscellane
small passenger, and uninspected vessels, and artificial islands are set forth in
following publications:

CG–115 Marine Engineering Regulations and Material Specifications
CG–123 Rules and Regulations for Tank Vessels
CG–176 Load Line Regulations
CG–256 Rules and Regulations for Passenger Vessels
CG–257 Rules and Regulations for Cargo and Miscellaneous Vessels
CG–258 Rules and Regulations for Uninspected Vessels
CG–259 Electrical Engineering Regulations

III



CG-320 Rules and Regulations for Artificial Islands and Fixed Structures
Outer Continental Shelf

CG-323 Rules and Regulations for Small Passenger Vessels (Under 100
Tons)

This booklet is published as an aid for persons desiring to install or to pu
equipment of a type required to be approved by the Commandant of the Coast
The items listed in this publication are most of the items approved by th
mandant of the Coast Guard.  The absence of listings in this publication of
items of equipment on board existing vessels does not necessarily mean the
equipment must be replaced with that listed herein.  In connection with certain
approval has been required by the regulations after certain dates as set forth
regulations.  The equipments installed and in use on those dates were permi
be retained in service so long as they remained in good and serviceable conditi
when no longer serviceable would have to be replaced with equipment as listed
publication.

This booklet replaces the publication entitled "Equipment Lists," dated Au
1964.  This booklet includes the approvals granted or terminated as well as in
tion published in the Coast Guard's "Proceedings of the Merchant Marine Co
from July 31, 1947 to August 1, 1966.

The approval of the items listed applies only to those specific items made a
located in the United States and does not extend to other devices or product
may be produced by the same manufacturer.  The products listed under the
headings herein are not necessarily equivalent for a specific service and such
indicates only that the minimum requirements of the statutes and regulat
effect at the date of the listing were met.

In cases where any question or doubt exists that an item of equipment is
pliance with Coast Guard requirements, reference may be made to the neares
Guard Marine Inspection Office to ascertain whether or not such item is in com
with the current requirements before such item is acquired for shipboard inst
or use.  If any of the items listed herein are found in the markets for sale
believed not to be in compliance with the requirements of the statutes or regu
such information, together with details regarding the deficiencies or defects
to exist, should be brought to the attention of the Coast Guard District Com

In order to keep outstanding approvals current most approvals are limit
definite period of time.  Most approvals in the section entitled "Approved
ments, Machines, and Equipment" are limited to 5-year periods.  If there ha
no changes in the Coast Guard requirements and the manufacturer is still pr
the item without modification, he simply requests and will receive an exten
an additional 5-year period.  To further identify approvals in this group
items of equipment which comply with Coast Guard specifications and reg
are assigned individual approval numbers.

Certificates are issued to manufacturers of permitted articles (of a da
nature) for ships' stores and supplies which comply with the requirements
147 of the regulations in Subchapter N (Dangerous Cargoes) in Title 46 (S)
of the Code of Federal Regulations.  The certificate is valid for 1 year and
renewed annually by the manufacturer.

General authority over and responsibility for the administration and enfo
of the navigation and vessel inspection laws and regulations applicable to
ments, machines, and equipment used on vessels are vested in and imposed
Commander of each Coast Guard District.

Shipowners, operators, builders, and other persons affected by the naviga
vessel inspection laws and regulations should familiarize themselves with the

FL WORD

ments for the instruments, machines, and equipment for use on vessels subject to th
jurisdiction of the Coast Guard. To this end, Coast Guard personnel concerne
with the administration and enforcement of these requirements will extend ever,
possible assistance.

*W. J. Smith*

W. J. SMITH,
*Admiral, U.S. Coast Guard,*
*Commandant.*

Dist. (SDL No. 83)
A: None
B: en(5); c(4); d(2); pq(1)
C: m(2); o(1)
D: lrv(1)
E: m(1)
F: p(1)
List 112
List 160



*Keep Freedom In*



48

EQU

Bird-Archer Co., The, 4337 North American St., Philadelphia, Pa. 19140.
164.007/11/0, BACITE COLD SET CEMENT, plaster type, 2'' at 30 #/cu. ft.
California Zonolite Co., 5440 San Fernando Rd., West Los Angeles, Calif. 90039.
164.007/24/0, MONO-KOTE, sprayed vermiculite, 2'' at 18 to 22 #/cu. ft.
Carey Manufacturing Co., The Philip, Lockland, Cincinnati, Ohio 45215.
164.007/10/0, ROCKWOOL, mineral wool type bats or blankets,
3'' at 8 #/cu. ft., or
4'' at 6 #/cu. ft.
Forty-Eight Insulations, Inc., Aurora, Ill. 60504.
164.007/1/0, "48" C.G. FELT, mineral wool type bats or blankets,
3'' at 8 #/cu. ft. or
4'' at 6 #/cu. ft.
164.007/23/1, WEBER'S SUPER "48" INSULATING CEMENT, plaster type, 2½'' at approx. 25 #/cu. ft.

Johns-Manville Sales Corp., 22 East 4 St., New York, N.Y. 10016.
164.007/6/1, BX SPINTEX, mine wool type bats or blankets,
3'' at 8 #/cu. ft., or
4'' at 6 #/cu. ft.
164.007/7/1, #450 CEMENT, mine wool cement type, 2½'' at 30 #. ft.
164.007/9/1, BANROC 202AA, min wool type blankets, 3'' at 16 #/c
Pittsburgh Corning Corp., 1 Gate Center, Pittsburgh, Pa. 15222.
164.007/25/0, PO FOAMGLAS, c lated glass type, 4'' at 10 #/cu
United States Mineral Products Stanhope, N.J. 07874.
164.007/31/0, "Cafco Blaze-Shie sprayed asbestos fiber type, 2'' a #/cu. ft.
Vermiculite-Northwest, Inc., 2107 N Thirty-fourth St., Seattle, W 98103.
164.007/35/0, MONO-KOTE, spr vermiculite, 2'' at 18 to 22 #/c
Zonolite Co., 135 South LaSalle Chicago, Ill. 60603.
164.007/32/0, MONOCOTE, spr vermiculite type, 2'' at 18 to 2 cu. ft.

## 164.008  BULKHEAD PANELS

Note.—The constructions listed are approved as meeting class B-15 requirements and be used as components in class A-60, A-30, and A-15 construction unless otherwise

Arnot-Jamestown Division, Aetna Steel Products Corp., 780 5th Ave., New York, N.Y. 10019.
164.008/2/0, AETNA TYPE FSI—Class B, 2'' hollow steel panel filled with two 1'' blankets of Fiberglas Type TW-MG at 2½ #/cu. ft.
164.008/3/0, AETNA TYPE FAI—Class B, 2'' hollow aluminum panel filled with two 1'' blankets of BX-Spintex at 4 #/cu. ft. May be used as a component in A-30 or A-15 construction only.
Johns-Manville Sales Corp., 22 East 40th St., New York, N.Y. 10016.
164.008/12/1, MARINITE-36, ¼'' asbestos incombustible binder board.
164.008/13/1, MARINITE-30, ¼'' Asbestos incombustible binder board.

164.008/14/1, MARINITE-65, ¼' bestos incombustible binder bo
164.008/15/1, MARINE VENEER asbestos cement board.
164.008/29/1, MARINITE-23, 7 organic composition board aluminum or equivalent vene both sides.
UNARCO Industries, Inc., 1111 Perry St., Bloomington, Ill. 61
164.008/46/0, "UNARCOBOARD ¾ inch thickness, 33 pound cubic foot density.
United States Plywood Corp., 55 W St., New York, N.Y. 10019.
164.008/24/1, KAYLO, ½'' inc composition board, thickness sive of combustible veneer, inc of aluminum or equivalent v

## 164.009  INCOMBUSTIBLE MATERIALS

Any material listed as an approved Structural Insulation (164.007), or ap Bulkhead Panel (164.008) may be used as an Incombustible Material. In ad the following materials are considered as automatically meeting the requir of an Incombustible Material for which no tests are required and for which no approvals will be granted:
1. Sheet or block glass, clay, ceramics, or uncoated glass fibers.
2. All metals except magnesium or magnesium alloys.
3. Portland cement, gypsum, or magnesite concretes with aggregates sand, gravel, asbestos fibers, expanded vermiculite, expanded or vesicular sl diatomaceous silica, perlite, or pumice.



4. Asbestos millboard meeting the requirements of Federal Specification HH-M-851a.

5. Woven asbestos cloth meeting the requirements of ASTM standard specification D 1571, Grades AAA and AAAA.

6. Woven or knitted glass fabric containing not more than 2.5 percent lubrican

American Asbestos Textile Corp., 1082 Stanbridge St., Norristown, Pa., 19404.

164.009/88/1, "American Bestogins", (2.5% lubricant or less), approved in weights of ½ through 2½ pounds/square yard.

Baldwin-Ehret-Hill Co., 500 Brennig Ave., Trenton, N.J. 08838.

164.009/28/1, B-E-H SPUN FELT, mineral wool insulation type, 2½ to 4 #/cu. ft. density.

164.009/49/0, THERMASIL, asbestos-hydrous calcium silicate type pipe and block insulation.

164.009/50/0, THERMALITE, 85% magnesia type pipe and block insulation.

Carey Manufacturing Co., The Philip, Lockland, Cincinnati, Ohio 45201.

164.009/1/0, FIREFOIL SHEATHING, corrugated asbestos board type, ½" thick with steel veneer one side.

164.009/2/0, CAREYSTONE ASBESTOS-CEMENT WALLBOARD, asbestos cement board type, ⅜" minimum.

164.009/3/0, CAREYSTONE SHEATHING ASBESTOS, cement board type, ⅜" minimum.

Fibreboard Paper Products Corp., P.O. Box 4331, Oakland, Calif. 94604.

164.009/76/0, "PABCO 'Precision Molded' Caltemp" asbestos-hydrous calcium silicate type.

164.009/77/0, "PABCO 'Precision Molded' Super Caltemp" asbestos-hydrous calcium silicate.

Foster Co., Benjamin, 4635-37 W. Girard Ave., Philadelphia, Pa. 19131.

164.009/37/0, "Foster Insulfas Sealer 81-29", composition type.

164.009/78/0, "Foster Insulfas Adhesive 81-16", composition type.

164.009/80/0, "Foster Insulfas Coating 81-80", composition type.

164.009/85/0, Foster "Insulfas Glass Cloth No. 80", woven glass fabric type.

Gustin-Bacon Manufacturing Co., Kansas City, Mo. 64199.

164.009/16/1, No. 100 ULTRALITE MC INSULATION glass wool insulation type, 1 #/cu. ft. density.

164.009/23/0, No. 75 ULTRALITE MC INSULATION, glass wool insulation type, ¾ #/cu. ft. density.

164.009/24/0, No. 150 ULTRALITE MC INSULATION, glass wool insulation type, 1.48 #/cu. ft. density.

164.009/82/1, "Ultrafine OG # through CG #7", ½ through #/cu. ft. density.

Insul-Coustic Div., Birma Production Corp., Jersee Mill Rd., Sayreville N.J. 08872.

164.009/90/0, Insul-Coustic SeeGee Adhesive I-C 292 composition type.

164.009/91/0, Insul-Coustic SeeGee Coating I-C 598 composition type.

Isoflex Sales Co., 1564 Rollins Road, Burlingame, Calif. 94010.

164.009/56/0, ISOFLEX-k20, fibrous glass type, 0.75 #/cu. ft. density.

Johns-Manville Sales Corp., 22 East 40th St., New York, N.Y. 10016.

164.009/18/0, TRANSITE, asbestos cement board type.

164.009/14/0, EX-SPINTEX, mineral wool insulation type, 3 through #/cu. ft. density.

164.009/18/0, JM 85% MAGNESIA magnesia block type.

164.009/25/0, JM 6-POUND REINFORCED ASBESTOS PAPER, asbestos paper type.

164.009/28/0, J-M 32-POUND COMMERCIAL GRADE ASBESTOS PAPER, asbestos paper type.

164.009/31/0, LW MARINE ACOUSTICAL UNIT, incombustible material.

164.009/32/0, THERMOFLEX FELT RF 400, mineral wool insulation type.

164.009/36/0, "J-M 302 CEMENT" composed solely of asbestos fibers, diatomaceous silicas and clay.

164.009/38/0, SUPERFINE 050B, glass fiber insulation type.

164.009/40/0, "Cellamite", asbestos paper type.

164.009/41/0, MICTROX—32—308, glass fiber insulation type.

164.009/43/0, "Thermobestos", asbestos-hydrous calcium silicate type.

164.009/60/0, ASBESTOCITE A and ASBESTOCITE B, asbestos cement board type, 105 #/cu. ft. density.

164.009/72/1, MICROLITE, fibrous glass insulation type.

164.009/92/0, "Incombustible Hulliboard SG" fibrous glass incombustible type.

164.009/95/0, "J-M 801 CEMENT."

Kompolite Co., Inc., 55 Webster Avenue, New Rochelle, N.Y. 10801.

164.009/12/0, THERMOFLEX plaster type.

235-848 O—66——5



National Gypsum Co., Buffalo, N.Y. ...04.

164.009/7/0, GOLD BOND A-C BOARD, asbestos cement board type.

Owens-Corning Fiberglas Corp., Toledo, Ohio 43601.

164.009/10/2, FIBERGLAS, INSULATION TYPE TW-MO, glass wool insulation type, 2 to 8½ #/cu. ft. density.

164.009/21/2, FIBERGLAS, INSULATION TYPE PF-334, glass wool insulation type, ½ to 1 #/cu. ft. density.

164.009/44/0, FIBERGLAS INSULATION AF-310—AF-320 inclusive, glass wool insulation type.

164.009/53/0, FIBERGLAS AT-410, AT-415, and AT-420, fibrous insulation type, in ½, ¾, and 1 pound densities respectively.

164.009/57/1, FIBERGLAS MARINE DUCT INSULATION, TYPE CFI, TW–MO incombustible material veneered one side with aluminum foil-glass cloth laminate, 3 #/cu. ft. density.

164.009/59/0, FIBERGLAS TWF and TWL, fibrous insulation type, 2 to 6 lbs. cu. ft. density.

164.009/64/1, KAYLO BLOCK INSULATION, asbestos-hydrous calcium silicate type, 12.8 #/cu. ft. density.

164.009/65/1, KAYLO 20 BLOCK INSULATION, asbestos-hydrous calcium silicate type, 12.6 #/cu. ft. density.

164.009/81/1, "Aeroflex", fibrous glass type, 1¼ through 2 #/cn. ft. density.

164.009/87/0, "Fiberglas Marine Insulating Board (Semi-Rigid)", fibrous glass type.

164.009/89/0, FIBERGLAS INSULATION PF-CG, glass wool type, 6 #/cu. ft.

Pittsburgh Corning Corp., One Gateway Center, Pittsburgh, Pa. 15222.

Pittsburgh Plate Glass Co., One Gat... Center, Pittsburgh, Pa. 15230.

164.009/47/0, SUPERFINE FIBER GLASS, glass wool ty... to 1¼ #/cu. ft. density.

164.009/75/0, PPG TEXTRA... fibrous glass insulation-type, ... cu. ft. density.

Porter Co., Inc., H. K., 1250 Porter ... ing, Pittsburgh, Pa. 15210.

164.009/86/0, Porter Style ( (2.5% lubricant or less) inco... tible material type, ½ throug... pounds per square yard.

Raybestos-Manhattan, Inc., Man... Pa. 17545.

164.009/84/0, "Glassbestos", wov... bestos-glass cloth type, 1.10 an... pounds per square yard.

Ruberoid Co., The, 733 Third Ave., ... York, N.Y. 10017.

164.009/93/0, "Calalite" as... hydrous calcium silicate type, ... out factory applied covering.

United States Gypsum Co., 300 ... Adams St., Chicago, Ill. 60606.

164.009/5/0, U.S.G. MARINE B... gypsum board metal veneer... ¾" with steel or aluminum ... one side.

164.009/54/0, THERMAFIBER ( FIBER, fibrous insulation t... #/cu. ft. density.

United States Mineral Product... Stanhope, N.J. 07874.

164.009/61/0, "Cafco Heat-S... sprayed asbestos fiber type.

164.009/62/0, "Cafco Sound-B... sprayed asbestos fiber type.

United States Plywood Corp., 5... 44th St., New York, N.Y. 1001...

164.009/51/0, "GLASWELD" c... asbestos board type.

164.009/79/0, UNIBESTOS, ... solid-type asbestos, 14# to 1... ft. density.

JAN-23-2006 15:47  FROM:MCCAFFERY&ASSOCIATES 7053548614G          TO:15043109195          P.15

REPRODUCED AT THE NATIONAL ARCHIVES

Proceedings of the Maritime Subsidy Board.

July 31, 1963.
Regular Meeting.

Present:  Chairman Alexander, Member Gulick
          and Alternate Member Hock.

Also Present:  G. L. Andrews, Deputy General
               Counsel; L. C. Hoffmann, Chief,
               Office of Ship Construction (entered
               the meeting at 11:40 A.M. and with-
               drew at 11:55 A.M.) and James S.
               Dawson, Jr., Secretary.

The Board convened at 10:10 A.M. and adjourned
          at 12:05 P.M.

- - - - -

United States
Lines Co. -
Application for
CDS to aid in
Reconstruction
of SS UNITED
STATES (First
Conversion).

The Board again considered the matter respecting the
application of United States Lines Company filed November 30,
1962, for construction-differential subsidy providing for
the installation of showers and toilets in all tourist
class staterooms on the Upper, Main, A and B decks of the
SS UNITED STATES, based on the Company's estimate that the
domestic cost of this reconstruction, on a fixed-price basis,
exclusive of national defense features, if any, will be
$1,270,000, transmitted by the Chief, Office of Government
Aid under date of July 11, 1963, which had been laid over from the Board meeting
of July 25, 1963, as well as additional data respecting the history and legis-
lative intent covering the original construction of the ship, supplied by the
Chief, Office of Ship Construction under date of July 29, 1963.

After discussion, and upon the "yea" vote of Chairman Alexander, Member
Gulick and Alternate Member Hock, the recommendation was disapproved.

Thereupon, the Maritime Subsidy Board instructed the Secretary to prepare
letter of notification explaining reasons for disapproval and clear same with
Board prior to notification of the interested parties.

- - - - -

Lay-Up Status
Subsidized
Ships - Quarter
ending June 30,
1963.

The Board noted a report with respect to the lay-up
status of subsidized ships for the quarter ending June 30,
1963, transmitted by the Chief, Office of Government Aid
under date of July 19, 1963.

- - - - -

Actions taken
under Redele-
gation of
Authority -
Month of June
1963.

The Board noted actions taken under redelegation of
authority contained in Manual of Orders, Administrator's
Order No. 55, dated October 16, 1962 - Changes in contract
plans and specifications for the month of June 1963, trans-
mitted by the Chief, Office of Ship Construction under
date of July 24, 1963.

REPRODUCED AT THE NATIONAL ARCHIVES

JAN-23-2006 15:47  FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.16

July 31, 1963.
(Con.-2)

The Board called in Mr. Hoffmann, Chief, Office of Ship Construction, and requested that he supply for the record, with copies of same to all Board Members, an explanation on Item 4(a), Change 37, in the form of a memorandum respecting the upgrading of passengers' and officers' quarters and public spaces, Contract No. FMB-124, for the construction of six cargo ships for Farrell Lines, Inc.

Further, the Board obtained from Mr. Hoffmann information to the effect that Item 7(b), Change 12, on the installation of a sliding water-type power-operated crew's mess serving window in the conversion of one combination passenger-cargo ship for American President Lines, Ltd., was necessitated by Coast Guard safety requirements.

Memorandum dated July 24, 1963, from the Chief, Office of Ship Construction, relative to the above matter is in the files of the Secretary.

- - - - -

American Export Lines, Inc. - Permanent withdrawal of SSs EXPLORER, EXHIBITOR & EXCHANGE as subsidized vessels from ODSA, Contract No. FMB-87.

The Board considered the amendment of Operating-Differential Subsidy Agreement, Contract No. FMB-87, with American Export Lines, Inc., to reflect the permanent withdrawal of the SSs EXPLORER, EXHIBITOR and EXCHANGE as subsidized vessels upon termination of their period of use and completion of redelivery obligations under Use Agreement No. MA-2480, transmitted by the Chief, Office of Government Aid under date of July 19, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the Maritime Subsidy Board:

(Quote Recommendations 1, 2 and 3, Pages 4 and 5).

The Maritime Administrator advised that he had approved on July 31, 1963, that portion of the staff recommendation as an action of the Maritime Administrator as distinguished from those matters coming under the jurisdiction of the Board, in respect to the above matter.

Memorandum dated July 19, 1963, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

- - - - -

Delta Steamship Lines, Inc. - Foreign Flag Competition - Combination Passenger-Freighter Service & Freight Service - Trade Route No. 20 - Calendar Year 1962.

The Board considered the determination of substantiality of foreign flag competition and the percentage weight to be accorded each principal competitive foreign flag for use in calculating operating-differential subsidy rates for Delta Steamship Lines, Inc., combination passenger-freighter service and freight service on Trade Route No. 20 for calendar year 1962, transmitted by the Chief, Office of Government Aid under date of July 22, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the Maritime Subsidy Board:

1. Found that the freight ships and combination ships of Delta Steamship Lines, Inc., in subsidized service on Trade Route No. 20 encountered substantial foreign flag competition during calendar year 1962.

2. Approved the following percentage weights of foreign flag competition applicable to the operation of freight ships and combination ships of Delta Steamship Lines, Inc., on Trade Route No. 20 during calendar year 1962:

JAN-23-2006 15:48   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.17

REPRODUCED AT THE NATIONAL ARCHIVES

July 31, 1963.
(Con.-3)

| Flag | Percentage Weight |
|------|-------------------|
| Argentina | 18.4 |
| Brazil | 29.1 |
| Norway | 52.5 |
| Total Percent | 100.0 |

Memorandum dated July 22, 1963, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

- - - - -

**Gulf & South American SS Co., Inc. - Increase in Pursers' Base Wages.**

The Board considered the matter respecting the increase in base wages granted to Gulf & South American Steamship Co., Inc.'s non-union Pursers, effective June 16, 1963, transmitted by the Chief, Office of Government Aid under date of July 17, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the Maritime Subsidy Board found and determined that the increase in base wages granted to Pursers on Gulf & South American Steamship Co., Inc., subsidized ships, resulting in monthly base wages of $590, effective June 16, 1963, as set forth in the Company's letter of July 2, 1963, is fair and reasonable and eligible for operating-differential subsidy rate-making purposes commencing with calendar year 1964 rates and operating-differential subsidy accrual purposes commencing with calendar year 1963 payments.

Memorandum dated July 17, 1963, from the Chief, Office of Government Aid, relative to the above matter is in the files of the Secretary.

- - - - -

**Gulf & South American SS Co., Inc. - 2nd Replacement Group - Financial Qualification Agreement.**

The Board considered the matter respecting the execution of the form of agreement providing assurance of continued adequate financial resources and capacity of Gulf and South American Steamship Company, Inc., transmitted by the Secretary under date of July 30, 1963.

After discussion, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the Maritime Subsidy Board approved and authorized the execution of the agreement between Avondale Shipyards, Inc. and the Maritime Subsidy Board providing assurance of continued adequate financial resources and capacity.

Memorandum dated July 30, 1963, from the Secretary, relative to the above matter is in the files of the Secretary.

- - - - -

**American President Lines, Ltd. - Request for Permission to carry Passengers & Baggage between Pt. Everglades, Fla. & ports in Calif. & Hawaii (Docket S-149).**

The Board noted the recommended decision of Chief Hearing Examiner Paul N. Pfeiffer, respecting American President Lines, Ltd.'s request for written permission under Section 805(a) to carry passengers and their baggage between Port Everglades, Florida, and ports in California and Hawaii, as contained on Pages 27 through 29 of the official transcript in Docket No. S-149.

Thereupon, Member J. W. Gulick, acting in his capacity as Deputy Maritime Administrator with delegated authority from the Maritime Administrator to pass on such matters, announced that upon the record he had found and concluded

JAN-23-2006 15:49  FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.18

July 31, 1963.
(Con.-4)

that the carriage of passengers and their baggage aboard American President Lines' combination vessels SS PRESIDENT POLK and SS PRESIDENT MONROE between Port Everglades, Florida, and ports in California and Honolulu, Hawaii, in either direction, will not constitute unfair competition to any person, firm or corporation operating exclusively in the coastwise or intercoastal trade, and will not be prejudicial to the objects and policy of the Merchant Marine Act of 1936, as amended, within the meaning of Section 805(a) thereof.

Thereupon, the Maritime Subsidy Board, upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, took the following actions:

1.  Authorized the modification of American President Lines' Operating-Differential Subsidy Agreement, Contract No. FMB-50, as amended, to reflect the Section 805(a) permission as set forth in the recommended decision of the Chief Hearing Examiner and the final decision of the Deputy Maritime Administrator, and

2.  Directed the Office of General Counsel to prepare an appropriate addendum to Operating-Differential Subsidy Agreement, Contract No. FMB-50, to effectuate the foregoing.

Memorandum to General Counsel/Chief, Office of Government Aid from Secretary, Maritime Subsidy Board and copy of Docket No. S-149, dated July 31, 1963, relative to the above matter are in the files of the Secretary.

- - - - -

Upon the "yea" vote of Chairman Alexander, Member Gulick and Alternate Member Hock, the meeting adjourned at 12:05 P.M.

- - - - -

A true record.

James S. Dawson
Secretary

REPRODUCED AT THE NATIONAL ARCHIVES

MARITIME SUBSIDY BOARD
MARITIME ADMINISTRATION

The following is a summary of the actions taken by the Maritime Subsidy Board at a regular meeting held on July 31, 1963.

835.    Disapproved recommendations in memorandum dated July 11, 1963, from the Chief, Office of Government Aid, re United States Lines Company - Application dated November 30, 1962, for construction-differential subsidy to aid in the reconstruction of the SS UNITED STATES under Section 501(c) of the Merchant Marine Act, 1936, as amended (First Conversion).

836.    Noted memorandum dated July 19, 1963, from the Chief, Office of Government Aid, re Lay-Up Status of Subsidized Ships - Quarter ending June 30, 1963.

837.    Noted memorandum dated July 24, 1963, from the Chief, Office of Ship Construction, re Actions Taken under Redelegation of Authority Contained in Manual of Orders, Administrator's Order No. 55, dated October 16, 1962 - Month of June, 1963.

838.    Approved recommendations in memorandum dated July 19, 1963, from the Chief, Office of Government Aid, re American Export Lines, Inc. - Permanent withdrawal of the SSs EXPLORER, EXHIBITOR and EXCHANGE as subsidized vessels from Operating-Differential Subsidy Agreement, Contract No. FMB-87 (Applicable to the Third Replacement Group).

839.    Approved recommendations in memorandum dated July 22, 1963, from the Chief, Office of Government Aid, re Delta Steamship Lines, Inc. - Foreign Flag Competition Applicable to Combination Passenger-Freighter Service and Freight Service on Trade Route No. 20 - Calendar Year 1962.

840.    Approved recommendations in memorandum dated July 17, 1963, from the Chief, Office of Government Aid, re Gulf & South American Steamship Co., Inc. - Increase in Pursers' Base Wages.

841.    Approved recommendation in memorandum dated July 30, 1963, from the Secretary, re Gulf and South American Steamship Co., Inc. - Second Replacement Group - Execution of Construction and Construction-Differential Subsidy Contracts - Financial Qualification Agreement.

842.    Noted permission granted to American President Lines, Ltd. by Deputy Maritime Administrator for written permission under Section 805(a) to carry passengers and baggage between Port Everglades, Florida, and ports in California and Hawaii (Docket No. S-149) and authorized General Counsel to amend operating-differential subsidy agreement accordingly.

James S. Dawson, Jr.
Secretary

JAN-23-2006 15:50  FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195       P.20

REPRODUCED AT THE NATIONAL ARCHIVES

(A)

FORM MA-71
(8-62)

**U.S. DEPARTMENT OF COMMERCE**
**MARITIME ADMINISTRATION.**

**CONCURRENCE RECORD**

*Original*

**INSTRUCTIONS** - Use this form in accordance with Administrator's Order 167 (Amended) and the Correspondence Manual.

ORIGINATING OFFICE CODE ➡

115

SUBJECT AND FILE NUMBER OF DOCUMENT

Gulf & South American Steamship Company, Inc.
Second Replacement Group - Execution of Construc-
tion-Differential Subsidy Contracts - Financial
Qualification Agreement

| ROUT-ING | CODE NO. | ORGANIZATIONAL UNIT | INITIALS | | DATE |
|---|---|---|---|---|---|
| | | | WITHIN OFFICE | OFFICE HEAD | |
| | 100 | MARITIME ADMINISTRATOR | | | |
| | 101 | DEPUTY MARITIME ADMINISTRATOR | | | |
| | 105 | CHIEF INVESTIGATOR AND SECURITY OFFICER | | | |
| | 106 | PUBLIC INFORMATION OFFICER | | | |
| | 107 | CADET TRAINING OFFICER | | | |
| 1 | 115 | SECRETARY, M.A. AND M.S.B. | | *[signature]* | 7/31/63 |
| | 120 | OFFICE OF PLANNING AND SPECIAL STUDIES | | | |
| 3 | 200 | OFFICE OF THE GENERAL COUNSEL | *John Kennell* | *J. Andrus* | 7/31/63 |
| | 300 | OFFICE OF SHIP OPERATIONS | | | |
| 2 | 400 | OFFICE OF THE COMPTROLLER | *Hedbarry* | | 7/31/63 |
| | 510 | OFFICE OF BUDGET AND MANAGEMENT | | | |
| | 520 | OFFICE OF PROPERTY AND SUPPLY | | | |
| | 550 | OFFICE OF PERSONNEL MANAGEMENT | | | |
| | 560 | OFFICE OF STATISTICS | | | |
| | 600 | OFFICE OF GOVERNMENT AID | | | |
| | 800 | OFFICE OF SHIP CONSTRUCTION | | | |
| | 900 | OFFICE OF RESEARCH AND DEVELOPMENT | | | |
| 4 | 115 | Secretary | | *[signature]* | 7/31/63 |
| | | | | | |
| | | | | | |
| | | | | | |

*Handwritten notes in right margin:*
in a -
nu. g -
+ nu H.
at meeting
10:10-1:05
7/31/63

by JLD
by JLD

*Handwritten notes in left margin:*
approved
at
Board
Meeting
7/31/63
JLD

R
7/3?

USCOMM-DC 24079-P62

REPRODUCED AT THE NATIONAL ARCHIVES

# ORIGINAL

MARITIME ADMINISTRATION, WASHINGTON, D. C.

DATE: July 30, 1963

TO:       Maritime Subsidy Board

FROM:     Secretary

SUBJECT:  Gulf and South American Steamship Company, Inc.
          Second Replacement Group - Execution of Construction and Construction-
          Differential Subsidy Contracts - Financial Qualification Agreement


The attached memorandum recommends that the Maritime Subsidy Board approve and
authorize the execution of the form of agreement providing assurance of continued
adequate financial resources and capacity attached to said memorandum.

James S Dawson
Secretary

Attachment

ORIGINAL

JAN-23-2006 15:50  FROM:MCCAFFERY&ASSOCIATES 70535486146           TO:15043109195        P.22

REPRODUCED AT THE NATIONAL ARCHIVES

MARITIME ADMINISTRATION, WASHINGTON, D. C.

DATE:  July 30, 1963

Maritime Subsidy Board

FROM:      Secretary

SUBJECT:   Gulf and South American Steamship Company, Inc.
           Second Replacement Group - Execution of Construction and Construction-
           Differential Subsidy Contracts - Financial Qualification Agreement

<u>PURPOSE</u>

To recommend that the Maritime Subsidy Board approve and authorize the execution

of the form of agreement providing assurance of continued adequate financial

resources and capacity attached hereto.

<u>DISCUSSION</u>

The Invitation for Bids for the construction of the Second Group Replacement

Vessels of Gulf and South American  Steamship Company, Inc. provides (Article 7

(a)):

    "A bidder to be eligible for award shall at any time prior to the

    award of the contract covered by this Invitation, if required by

    the Board or the Owner, execute an agreement with the Board, in

    form satisfactory to the Board and the Owner, providing assurance of

    continuing adequate financial resources and capacity during the period

    covered by the contract."

Gulf and South American Steamship Company, Inc. advised by letter of June 4, 1963,

that it had determined to exercise its option to require the above type of agree-

ment and enclosed a copy of the agreement to be executed by the Board and the

successful bidder, Avondale Shipyards, Inc.  This agreement is in the same form

as was executed under Contract No. MA/MSB-5 to which Avondale Shipyards, Inc.,

REPRODUCED AT THE NATIONAL ARCHIVES

ilf and South American Steamship Company, Inc. and the Maritime Subsidy Board were
irties and covered the construction of the First Group Replacement Vessels of Gulf
and South American Steamship Company, Inc.  It will be noted that under this agree-
ment the agreement is between the Shipyard and the Board and the administration of
the agreement is solely within the control of the Board.  The execution of this
agreement will be required in connection with the execution of the construction
contract—Contract No. MA/MSB-25 and the construction-differential subsidy
contract—Contract No. MA/MSB-26, covering the construction of the subject replace-
ment vessels.

In view of the foregoing, it is recommended that the recommendation contained on
the following page of this memorandum be approved.

                                                _James S. Dawson Jr._
                                                          Secretary

Attachments


No Legal Objection:
_Graydon L. Andrews_
Deputy General Counsel


Concurrence:
_A L Hedbawny_
By, Comptroller


cc: 101
    200
    240
    201
    600
    115
    204
    800
USCOMM-MA-DC

REPRODUCED AT THE NATIONAL ARCHIVES

## OMMENDATION

It is recommended that the Maritime Subsidy Board take the following action:

Approve and authorize the execution of the agreement between Avondale Shipyards, Inc. and the Maritime Subsidy Board providing assurance of continued adequate financial resources and capacity. as per copy attached.


Approved by the
Maritime Subsidy Board
Maritime Administration
Date   JUL 3 1 1963

Secretary

JAN-23-2006 15:51   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.25

REPRODUCED AT THE NATIONAL ARCHIVES

AGREEMENT dated this          day of          , 1963, by and between
AVONDALE SHIPYARDS, INC., a Louisiana corporation (herein called "Avondale")
and the UNITED STATES OF AMERICA, represented by the SECRETARY OF COMMERCE,
acting by and through the MARITIME SUBSIDY BOARD (herein called the "Board").

W I T N E S S E T H :

WHEREAS, Avondale proposes to enter into a Contract (No. MA/MSB-25 )
for the construction of three ships for Gulf & South American Steamship Co.,
Inc.;

WHEREAS, Avondale proposes to assure the Board that it will remain
qualified during the period of said contract to perform its obligations
thereunder in order that the Board may determine that Avondale is financially
and otherwise qualified for contract award.

NOW, THEREFORE, in consideration of the award of the work and the
subsequent execution and delivery of the aforesaid contract by the Board and
the other party thereto, and in consideration of other good and valuable
consideration, the receipt of which is acknowledged, it is agreed by and
between the parties as follows:

1.  During the period covered by said Contract No. MA/MSB-25 ,
Avondale will not without the prior written approval of the Board and without
having given prior written notification to Gulf & South American Steamship
Co., Inc.;

(a) sell, assign, transfer, or dispose of, either directly or
indirectly, all or any substantial part of its assets to, or consolidate with,
merge into, or be merged with, or, except in the ordinary course of business,
otherwise acquire property or assets of any other person or corporation;

REPRODUCED AT THE NATIONAL ARCHIVES

(b) sell, assign, transfer, or dispose of, either directly or indirectly, or through any merger, consolidation, or reorganization, any interest in Contract No. MA/MSB-25 ;

(c) create, incur, guarantee, assume or be liable for any additional funded debt, current debt, or other obligations, unless for money borrowed for working capital of Avondale, in addition to (i) the present 6% notes now outstanding in the amount of $          (ii) funded indebtedness in excess of $3,500,000 (iii) funded or current debt incurred in the financing of leased vessels in excess of an outstanding total of $3,000,000, (iv) obligations incurred in the sale, transfer or assignment, with recourse or obligation to repurchase, of notes, accounts receivable, or rights under leases of vessels owned by Avondale; (v) other current debt incurred in connection with ship-building contracts;

(d) retire, redeem, prepay or purchase, directly or indirectly, any of the aforesaid 6% notes, except as they may become due and payable under the provisions of the Purchase Agreement dated March 30, 1959, between Avondale Shipyards, Inc. (formerly Bayou Shipyards, Inc.) and the Sellers of Avondale Marine Ways, Inc., as amended by the Supplemental Agreement, dated June 30, 1960, between Avondale Shipyards, Inc. (formerly Bayou Shipyards, Inc.) and the holders of the Sellers' Notes (herein called the "Purchase Agreement"), a copy of which said Purchase Agreement is attached hereto;

(e) create or incur or suffer to be created or incurred or to exist, or permit or suffer any of its subsidiaries to create or incur or suffer to be created or incurred or to exist any mortgage, lien, charge or encumbrance of any kind on or pledge of, any property of assets, real or personal, tangible or intangible, of Avondale or any of its subsidiaries, except that this provision

-2-

REPRODUCED AT THE NATIONAL ARCHIVES

ull not apply to those items specifically listed in Section (10)(b)(2) of the
Purchase Agreement and except for any of the purposes permitted in Paragraph
1(c) hereof;

(f)  carry on and conduct or permit any subsidiary to carry on and
conduct business in any other field than those in which Avondale and its sub-
sidiaries are now engaged, or make loans or advances to or make investments in
the shares of stock or securities of any person except (i) direct obligations of
the United States or obligations wholly guaranteed by the United States, (ii)
notes or other securities acquired in the bona fide settlement of debts owing to
Avondale or any subsidiary, (iii) loans or advances to its officers and employees
or stockholders in an aggregate amount which shall not exceed $10,000 at any time
outstanding, (iv) municipal bonds not in excess of the total principal amount
required by the Department of Labor, Bureau of Employees Compensation, and (v)
loans by or to Avondale to or by a subsidiary of Avondale as permitted in this
Agreement;

(g)  purchase, redeem or retire any shares of any class of its capital
stock except in accordance with the sinking fund requirements set forth in the
existing Articles of Incorporation and the provisions of the Purchase Agreement,
or convert existing common stock into preferred shares;

(h)  declare or pay any dividend on capital stock of the company if
the aggregate of all dividends declared or paid subsequent to December 31, 1960,
exceeds 75 per cent of the net income, after taxes, of Avondale from December 31,
1960 or if after giving effect thereto the net working capital of Avondale would
be less than $5,000,000, provided that nothing herein is intended to prohibit
dividend payments on preferred stock specifically provided for in the Purchase
Agreement.  The term net working capital as referred to herein shall mean the

-3-

JAN-23-2006 15:53   FROM:MCCAFFERY&ASSOCIATES 70535486146           TO:15043109195           P.28

sss of current assets over current liabilities, all as determined in accord-

ance with generally accepted accounting principles;

(i) make advances to or investments in parent, affiliated, or sub-

sidiary companies aggregating more than $1,000,000 outstanding at any particular

time;

(j) employ any other person or corporation as a managing or operating

agent or employ any senior executive officer unless qualified to direct the

operations of a first class shipyard capable of carrying out the obligations of

Avondale under the aforesaid contract.

2.   Notice and full disclosure of any proposed action described in

Paragraph 1 above shall be given by Avondale to the Board by registered airmail

postmarked ten full business days prior to the day any such action is proposed

to be taken.  Written notice to G&SA shall be given by Avondale coincidentally

with giving notice to the Board.  The written consent of the Board shall be

deemed to have been given unless notice of disapproval similarly delivered is

received by Avondale prior to the date such action is proposed to be taken.

3.   The Board shall not withhold its consent to any action hereunder

proposed to be taken by Avondale unless in its judgment, reasonably exercised,

the taking of such action would materially impair the ability of Avondale to

perform said contract.

4.   Avondale will furnish quarterly financial statements to the Board,

including income and surplus statements.

-4-

REPRODUCED AT THE NATIONAL ARCHIVES

5.  The contract period herein shall be deemed to be the period during which the aforesaid construction contract is being performed by Avondale.

IN WITNESS WHEREOF, the undersigned has executed this agreement this day of        , 1963.

AVONDALE SHIPYARDS, INC.

By_____
        President

IN WITNESS WHEREOF, the undersigned has executed this agreement this day of        , 1963.

MARITIME SUBSIDY BOARD

By_____
        Chairman

-5-

JAN-23-2006 15:53   FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.30

LAW OFFICES

# KOMINERS & FORT

TOWER BUILDING, 1401 K STREET, N. W.

WASHINGTON 5, D. C.

ELL KOMINERS
RANKLIN FORT
IN CUNNINGHAM
IERT S. HOPE
IK P. SCHLEFER
J. ALTON BOYER
HARRISON D. HUTSON
T. S. L. PERLMAN
J. LOVERING TRUSCOTT

TELEPHONE STERLING 3-7555
CABLE ADDRESS "MARLAW"

June 4, 1963

James S. Dawson, Jr., Esquire
Secretary
Maritime Administration
Washington 25, D. C.

              Re:  Gulf & South American Steamship Co., Inc.
                  Second Group Replacement Vessels

Dear Mr. Dawson:

    This will refer to the Invitation for Bids dated February 8, 1963, issued by Gulf & South American Steamship Co., Inc., covering the construction of the second group of three replacement vessels.  Article 7(a) of the Invitation provides in part as follows:

> "A bidder to be eligible for award shall at any time prior to the award of the contract covered by this Invitation, if required by the Board or the Owner, execute an agreement with the Board, in form satisfactory to the Board and the Owner, providing assurance of continuing adequate financial resources and capacity during the period covered by the contract."

    The purpose of this letter is to advise you that Gulf & South American has determined to exercise its option to require the above type of agreement.  Therefore, on the assumption that Avondale Shipyards, Inc., as low bidder, will finally be awarded the contract, the Company has discussed this question with  Avondale.  There are enclosed copies of the exchange of correspondence between Avondale and the Company, together with a copy of the proposed agreement, which is in the same form as was executed under Contract MA/MSB-5.  You will note that Avondale has agreed that if it is awarded the contract it will execute the agreement at the time of execution of the construction contract.

    In addition, because the question of the financial covenants will be the subject of a hearing (which we understand will be on June 11, 1963) before the Board in connection with the next group of replacement vessels of Lykes Bros. Steamship Co., Inc., we have

REPRODUCED AT THE NATIONAL ARCHIVES

James S. Dawson, Jr., Esquire
June 4, 1963
Page Two


been authorized by Gulf & South American to transmit five additional
copies of the correspondence and agreement for inclusion in the file
to be presented to the Board at that hearing.

Very truly yours,

Robert S. Hope

Enclosures

cc: Messrs. J. R. Hock      (w/o enc.)
           L. C. Hoffmann      "

May 28, 1962

Mr. H. E. Carter, President
Avondale Shipyards, Inc.
P. O. Box 50280
New Orleans 50, Louisiana

RE:   NEW CONSTRUCTION--SECOND GROUP

During a telephone conversation with you several days
ago you indicated a willingness to sign a "Financial
Covenant" agreement in connection with our second group
of ships similar to that which you signed in connection
with Contract No. HA/HSB-5.

Inasmuch as our financing plans contemplate two of these
three vessels being mortgaged under the provisions of
Title XI of the Merchant Marine Act, it is extremely
important to us that we have such an agreement from you.

Assuming that you have no objections to signing this form,
there are attached ten copies, five of which we would
appreciate you signing and returning to us at your
convenience.

You will note that the form is still incomplete as to
the construction contract number and also the amount of
mortgage which you have outstanding at the present time.
In this regard you will please insert in paragraph 1 (c).
Previously this information can be inserted in the proper
place at a later date.

Lloyd Strickland, Vice President-Finance

LAS/jts

attachments

JAN-23-2006 15:55  FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195          P.33

MAY 31 1963



# AVONDALE SHIPYARDS, INC.

P. O. BOX 50280, NEW ORLEANS 50, LA. • 866-4661 • AREA CODE 504

CABLE: AVONWAYS

May 30, 1963

Mr. Lloyd Strickland
Vice President-Finance
Gulf & South American Steamship Co., Inc.
821 Gravier Street
New Orleans 12, Louisiana

          Subject:  Second Group, C-3 Vessels

Dear Mr. Strickland:

Receipt of your letter of May 28, 1963 regarding con-
struction of subject vessels is acknowledged herewith.

Pursuant thereto, we are pleased to advise that we are
agreeable to execute a "Financial Covenant" agreement
similar to that which we executed in connection with
contract MA/MSB-5.  It is our understanding that this
letter will suffice until the date of execution of the
new contract at which time we will execute the "Covenant"
to become a part of the contract document.

          Yours very truly,

          AVONDALE SHIPYARDS, INC.

          Henry Z. Carter
          President

HZC:YP

JAN-23-2006 15:55  FROM:MCCAFFERY&ASSOCIATES 70535486146          TO:15043109195       P.34

May 28, 1963

Mr. H. L. Carter, President
Avondale Shipyards, Inc.
P. O. Box 50280
New Orleans 50, Louisiana

RE: THE CONSTRUCTION—SECOND GROUP

[text illegible due to poor image quality]

Lloyd Strickland, Vice President-Finance

LAS/jkt.

JAN-23-2006 15:57   FROM:MCCAFFEEY&ASSOCIATES 70535486146        TO:15043109195        P.35

REPRODUCED AT THE NATIONAL ARCHIVES

AGREEMENT dated this        day of            , 1963
by and between AVONDALE SHIPYARDS, INC., a Louisiana
corporation (herein called "Avondale") and the UNITED
STATES OF AMERICA, represented by the SECRETARY OF
COMMERCE, acting by and through the MARITIME SUBSIDY
BOARD (herein called the "Board").

W I T N E S S E T H:

WHEREAS, Avondale proposes to enter into a
Contract (No.          ) for the construction of three
ships for Gulf & South American Steamship Co., Inc.;

WHEREAS, Avondale proposes to assure the Board
that it will remain qualified during the period of said
contract to perform its obligations thereunder in order
that the Board may determine that Avondale is financially
and otherwise qualified for contract award.

NOW, THEREFORE, in consideration of the award
of the work and the subsequent execution and delivery of
the aforesaid contract by the Board and the other party
thereto, and in consideration of other good and valuable
consideration, the receipt of which is acknowledged, it
is agreed by and between the parties as follows:

1. During the period covered by said Contract
No.        , Avondale will not without the prior

REPRODUCED AT THE NATIONAL ARCHIVES

written approval of the Board and without having given
prior written notification to Gulf & South American
Steamship Co., Inc.;

    (a) sell, assign, transfer, or dispose of,
either directly or indirectly, all or any substantial
part of its assets to, or consolidate with, merge into,
or be merged with, or, except in the ordinary course
of business, otherwise acquire property or assets of
any other person or corporation;

    (b) sell, assign, transfer, or dispose of, either
directly or indirectly, or through any merger, consoli-
dation, or reorganization, any interest in Contract No.
    ;

    (c) create, incur, guarantee, assume or be liable
for any additional funded debt, current debt, or other
obligations, unless for money borrowed for working
capital of Avondale, in addition to (i) the present
6% notes now outstanding in the amount of $
(ii) funded indebtedness in excess of $3,500,000 (iii)
funded or current debt incurred in the financing of
leased vessels in excess of an outstanding total of
$3,000,000, (iv) obligations incurred in the sale,
transfer or assignment, with recourse or obligation to

[2]

REPRODUCED AT THE NATIONAL ARCHIVES

repurchase, of notes, accounts receivable, or rights under leases of vessels owned by Avondale; (v) other current debt incurred in connection with shipbuilding contracts;

(d) retire, redeem, prepay or purchase, directly or indirectly, any of the aforesaid 6% notes, except as they may become due and payable under the provisions of the Purchase Agreement dated March 30, 1959, between Avondale Shipyards, Inc. (formerly Bayou Shipyards, Inc.) and the Sellers of Avondale Marine Ways, Inc., as amended by the Supplemental Agreement, dated June 30, 1960, between Avondale Shipyards, Inc. (formerly Bayou Shipyards, Inc.) and the holders of the Sellers' Notes (herein called the "Purchase Agreement"), a copy of which said Purchase Agreement is attached hereto;

(e) create or incur or suffer to be created or incurred or to exist, or permit or suffer any of its subsidiaries to create or incur or suffer to be created or incurred or to exist any mortgage, lien, charge or encumbrance of any kind on or pledge of, any property of assets, real or personal, tangible or intangible, of Avondale or any of its subsidiaries, except that this provision shall not apply to those items specifically

[3]

JAN-23-2006 15:58   FROM:MCCAFFERY&ASSOCIATES 70535486146         TO:15043109195         P.38

REPRODUCED AT THE NATIONAL ARCHIVES

listed in Section (10)(b)(2) of the Purchase Agreement,
and except for any of the purposes permitted in Paragraph
1(c) hereof;

   (f) carry on and conduct or permit any subsidiary
to carry on and conduct business in any other field than
those in which Avondale and its subsidiaries are now
engaged, or make loans or advances to or make investments
in the shares of stock or securities of any person except
(i) direct obligations of the United States or obligations
wholly guaranteed by the United States, (ii) notes or
other securities acquired in the bona fide settlement of
debts owing to Avondale or any subsidiary, (iii) loans
or advances to its officers and employees or stockholders
in an aggregate amount which shall not exceed $10,000 at
any time outstanding, (iv) municipal bonds not in excess
of the total principal amount required by the Department
of Labor, Bureau of Employees Compensation, and (v) loans
by or to Avondale to or by a subsidiary of Avondale as
permitted in this Agreement;

   (g) purchase, redeem or retire any shares of any
class of its capital stock except in accordance with the
sinking fund requirements set forth in the existing
Articles of Incorporation and the provisions of the

[4]

JAN-23-2006 15:58   FROM:MCCAFFERY&ASSOCIATES 70535486146        TO:15043109195        P.39

REPRODUCED AT THE NATIONAL ARCHIVES

Purchase Agreement, or convert existing common stock into preferred shares;

(h) declare or pay any dividend on capital stock of the company if the aggregate of all dividends declared or paid subsequent to December 31, 1960, exceeds 75 per cent of the net income, after taxes, of Avondale from December 31, 1960 or if after giving effect thereto the net working capital of Avondale would be less than $5,000,000, provided that nothing herein is intended to prohibit dividend payments on preferred stock specifically provided for in the Purchase Agreement. The term net working capital as referred to herein shall mean the excess of current assets over current liabilities, all as determined in accordance with generally accepted accounting principles;

(i) make advances to or investments in parent, affiliated, or subsidiary companies aggregating more than $1,000,000 outstanding at any particular time;

(j) employ any other person or corporation as a managing or operating agent or employ any senior executive officer unless qualified to direct the operations of a first class shipyard capable of carrying out the obligations of Avondale under the aforesaid contract.

[5]

JAN-23-2006 15:59  FROM:MCCAFFERY&ASSOCIATES 70535486146         TO:15043109195          P.40

2.   Notice and full disclosure of any proposed action described in Paragraph 1 above shall be given by Avondale to the Board by registered airmail postmarked ten full business days prior to the day any such action is proposed to be taken.  Written notice to G&SA shall be given by Avondale : coincidentally with giving notice to the Board.  The written consent of the Board shall be deemed to have been given unless notice of disapproval similarly delivered is received by Avondale prior to the date such action is proposed to be taken.

3.   The Board shall not withhold its consent to any action hereunder proposed to be taken by Avondale unless in its judgment, reasonably exercised, the taking of such action would materially impair the ability of Avondale to perform said contract.

4.   Avondale will furnish quarterly financial statements to the Board, including income and surplus statements.

5.   The contract period herein shall be deemed to be the period during which the aforesaid construction contract is being performed by Avondale.

[6]

JAN-23-2006 15:59  FROM:MCCAFFERY&ASSOCIATES 70535486146        ~.TO:15043109195        P.41

REPRODUCED AT THE NATIONAL ARCHIVES

IN WITNESS WHEREOF, the undersigned has executed
this agreement this        day of              , 1963.

AVONDALE SHIPYARDS, INC.

By_____
        President

IN WITNESS WHEREOF, the undersigned has executed
this agreement this        day of              , 1963.

MARITIME SUBSIDY BOARD

By_____
        Chairman

[7]



AS, Inc. TECHNICAL FILE
FILE No. 1019-1701

GSA

SERIAL NO.
Asi Job
C3-600
(1963)

Hulls
1037-1039

SPECIFICATION FOR CONSTRUCTION

OF

SINGLE SCREW

COMBINATION BULK AND GENERAL CARGO

LINER TYPE SHIP

FOR

GULF & SOUTH AMERICAN STEAMSHIP CO.

DESIGN C3-L-M8

(SECOND GROUP)

MARITIME ADMINISTRATION

DESIGN C3-S-37d

DATED FEBRUARY 8, 1963

INCLUDING

MODIFICATION NO. 4 DATED MARCH 25, 1963
MODIFICATION NO. 5 DATED APRIL 10, 1963

AND

MODIFICATIONS TO MEET NAVAL
REQUIREMENTS FOR NATIONAL DEFENSE

SPECIFICATIONS FOR ASI JOB C3-600
(4-16-1963) – HULLS 1037-1039

GULF & SOUTH AMERICAN STEAMSHIP
CARGO VESSELS

RETURN TO VICE PRESIDENT – ENGINEERING

SPECIFICATION FOR CONSTRUCTION

OF

SINGLE SCREW

COMBINATION BULK AND GENERAL CARGO

LINER TYPE SHIP

FOR

GULF & SOUTH AMERICAN STEAMSHIP CO., INC.

DESIGN C2-L-M8

(SECOND GROUP)

---

MARITIME ADMINISTRATION

DESIGN C3-S-37d

---

DATED FEBRUARY 8, 1963

INCLUDING

MODIFICATION NO. 4 DATED MARCH 25, 1963
MODIFICATION NO. 5 DATED APRIL 10, 1963

AND

MODIFICATIONS TO MEET NAVAL
REQUIREMENTS FOR NATIONAL DEFENSE

GIBBS & COX, INC.
NEW YORK, N. Y.

14861

## TABLE OF CONTENTS

| SECTION | TITLE | |
|---|---|---|
| 1 | GENERAL PROVISIONS | 5 |
| 2 | STRUCTURAL HULL | |
| 3 | DECKHOUSES AND INTERIOR BULKHEADS | |
| 4 | DOORS, HATCHES AND MANHOLES | 10 |
| 5 | HULL FITTINGS | |
| 6 | DECK COVERINGS | 15 |
| 7 | INSULATION AND SHEATHING | |
| 8 | TOPMASTS, KING POSTS, VANG CONNECTIONS AND BOOMS | |
| 9 | RIGGING AND LINES | 20 |
| 10 | GROUND TACKLE | |
| 11 | DRAINAGE, SOUNDINGS, VENTS AND OVERFLOWS | 25 |
| 12 | AIR CONDITIONING, HEATING AND VENTILATION | |
| 13 | FIRE DETECTION AND EXTINCTION | |
| 14 | PAINTING AND CEMENTING | 30 |
| 15 | NAVIGATING EQUIPMENT | |
| 16 | LIFESAVING EQUIPMENT | 35 |
| 17 | COMMISSARY SPACES | |
| 18 | HOSPITAL, UTILITY SPACES, OFFICES AND WORKSHOPS | |
| 19 | FURNITURE AND FURNISHINGS | 40 |
| 20 | PLUMBING FIXTURES AND ACCESSORIES | |

I

14861

## TABLE OF CONTENTS (Cont'd)

| SECTION | TITLE | |
|---|---|---|
| 21 | HARDWARE | 5 |
| 22 | WEATHER CLOTHS AND COVERS | |
| 23 | STOWAGE SPACES AND MISCELLANEOUS EQUIPMENT | |
| 24 | NAME PLATES, NOTICE FRAMES AND MARKINGS | 10 |
| 25 | JOINER WORK AND INTERIOR DECORATION | |
| 26 | DRY DOCKING | 15 |
| 50 | MAIN AND AUXILIARY MACHINERY | |
| 51 | MAIN TURBINES | |
| 52 | REDUCTION GEARS - MAIN PROPULSION | 20 |
| 53 | MAIN SHAFTING, BEARINGS AND PROPELLER | |
| 54 | VACUUM EQUIPMENT | 25 |
| 55 | EVAPORATOR PLANTS | |
| 56 | FUEL OIL AND OILY BALLAST SYSTEMS | |
| 57 | LUBRICATING OIL SYSTEM | 30 |
| 58 | SALT WATER SYSTEMS | |
| 59 | POTABLE WATER SYSTEMS | 35 |
| 60 | FEED AND CONDENSATE SYSTEMS | |
| 61 | STEAM GENERATING PLANT | |
| 62 | FORCED DRAFT SYSTEM | 40 |
| 63 | STEAM AND EXHAUST SYSTEMS | |

II

14861

## TABLE OF CONTENTS   (Cont'd)

| SECTION | TITLE | |
|---------|-------|---|
| 64 | MACHINERY SPACE VENTILATION | |
| 65 | AIR CONDITIONING PLANT | 5 |
| 66 | SHIP SERVICE REFRIGERATION | |
| 67 | CARGO REFRIGERATION | 10 |
| 68 | CARGO OIL SYSTEM | |
| 71 | TANK LEVEL INDICATORS | 15 |
| 72 | COMPRESSED AIR SYSTEMS | |
| 73 | PUMPS | |
| 74 | PIPING | 20 |
| 75 | INSULATION AND LAGGING FOR PIPING AND MACHINERY | |
| 76 | EMERGENCY DIESEL GENERATOR ENGINE | 25 |
| 77 | AUXILIARY TURBINES | |
| 78 | TANKS - MISCELLANEOUS | |
| 79 | FLOOR PLATES, LADDERS AND GRATINGS - MACHINERY SPACE | 30 |
| 80 | ENGINEERS' AND ELECTRICIANS' WORKSHOPS, STORES AND REPAIR EQUIPMENT | |
| 81 | DECK MACHINERY | 35 |
| 85 | INSTRUMENTS AND CONTROL BOARDS - MECHANICAL | |
| 86 | SPARE PARTS | 40 |
| 87 | ELECTRICAL SYSTEMS - GENERAL | |

G2

1

III

15301

TABLE OF CONTENTS   (Cont'd)

| SECTION | TITLE | |
|---------|-------|---|
| | | 1 |
| 88 | GENERATORS, MOTOR GENERATORS AND RECTIFIERS | 5 |
| 89 | SWITCHBOARDS | |
| 90 | ELECTRICAL DISTRIBUTION | |
| 91 | MOTORS AND CONTROLS | 10 |
| 92 | LIGHTING | |
| 93 | RADIO, RADIOTELEPHONE, RADAR, LORAN AND TELEVISION EQUIPMENT | 15 |
| 94 | NAVIGATIONAL EQUIPMENT – ELECTRICAL | |
| 95 | INTERIOR COMMUNICATIONS | 20 |
| 96 | STORAGE BATTERIES AND BATTERY CHARGING | |
| 97 | ELECTRICAL INSTRUMENTS, SPECIAL TOOLS AND SPARE PARTS | |
| 100 | PLANS AND INSTRUCTION BOOKS | 25 |
| 101 | TESTS AND TRIALS | |
| 102 | DECK, ENGINE AND STEWARDS' EQUIPMENT AND TOOLS | 30 |

Revised April 27, 1961                IV

15211
15161

## SECTION 75

### INSULATION AND LAGGING FOR PIPING AND MACHINERY

1. General

2. Insulating Materials

3. Lagging Materials

4. Insulating Cements

5. Low Temperature Insulation and Lagging
   (-30 F to 125 F)

6. Medium Temperature Insulation and Lagging
   (126 F to 599 F)

7. High Temperature Insulation and Lagging
   (600 F to 999 F)

8. Flange, Valve and Fitting Insulation
   and Lagging

9. Machinery and Equipment Insulation
   and Lagging

10. Protection of Insulation

15211

## SECTION 75.  INSULATION AND LAGGING FOR PIPING AND MACHINERY

### 1.  GENERAL

All piping, machinery and equipment shall be insulated and lagged as specified.  Equipment and piping designed to disseminate heat are excluded from these requirements.

For piping with design internal temperatures of 300 F and over the pipe shall be insulated from the hangers or the hangers insulated from the steel structures to which they are attached where the heat transmitted may be objectionable on the other side of the structure.

Piping exposed to the weather shall be effectively insulated against freezing, except that this requirement applies only to systems in which a fluid is normally flowing, and does not apply to systems where the exposed portion may be secured and drained.  See Section 74 for drain requirements.

Concealed and exposed piping outside machinery space having internal temperatures over 125 F, or less than 55 F, shall have continuous insulation in way of all penetrations and supports except that insulated stuffing boxes shall be used in way of watertight structure.

Thickness of insulation as specified may be modified subject to approval but in no case shall the thickness be reduced such that the surface temperature of the insulation will be in excess of 145 F.

Diesel engine exhaust piping exposed to the weather shall be painted (see Section 14) and properly guarded to protect personnel from contact with the hot pipe.  Diesel exhaust piping and surfaces not exposed to weather shall be insulated and lagged as herein specified, in accordance with internal temperature requirements.

No thermal insulation will be required on dead-end hot water piping 3/8 inch IPS and smaller.  No thermal insulation will be required on any hot piping of sizes less than 3/8 inch IPS except that two layers of asbestos cloth shall be applied.

Exposed steam piping which presents a hazardous condition in accommodation spaces shall be fitted with flat expanded metal protection shields.

75-1

15211
15161

## SECTION 75.  INSULATION AND LAGGING FOR PIPING AND MACHINERY  (Cont'd)

1.  **GENERAL**  (Cont'd)

For painting of surfaces before application of insulation and after application of lagging, see Section 14.

2.  **INSULATING MATERIALS**

The following insulating materials shall be used in the manner hereinafter described for the various systems:

Low Temperature
-30 F to 125 F

| | |
|---|---|
| Cellular Glass | - Federal Specification HH-I-551 |
| Cellular Glass Vapor Sealer | - Approved Type |
| Anti-Sweat Asbestos Felt | - Military Specification MIL-I-15091, Type "B" (See Note) |

Note:  Foamed plastic pipe insulation, Armstrong Cork Co. "Armaflex" or equal may be used as an alternate.

Medium Temperature
126 F to 599 F

| | |
|---|---|
| Magnesia (85%) | - Federal Specification HH-I-554 |
| Calcium Silicate, Amosite Asbestos or Fibrous | - Military Specification MIL-I-2781 |

High Temperature
600 F to 999 F

| | |
|---|---|
| Diatomaceous Silica or Fibrous | - Military Specification MIL-I-2781 |
| Fibrous Glass - Sheet | - Military Specification MIL-I-16411 |
| Calcium Silicate | - Military Specification MIL-I-2781 |

75-2

15211
15161

SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY   (Cont'd)

3.   LAGGING MATERIALS

Lagging materials shall be in accordance with the following
Specifications:

Asbestos cloth and tape      - Federal Specification SS-C-466
                                   (See Note)

Fibrous glass cloth and tape- Military Specification
                                   MIL-C-20079

Adhesive lagging cement      - Military Specification
                                   MIL-C-3316

Note:  Lightweight asbestos pipe lagging cloth, United States
Rubber Co. or equal, may be used as an alternate for
Type 1, Grade A, Class 2 asbestos cloth.

Hardware cloth shall be No. 20 BWG steel wire 1/2 inch mesh, hot
dipped galvanized.

4.   INSULATING CEMENTS

Weatherproof insulating cement shall be made of materials suitable
to form a tough, fire-resistant, weather-resisting coating when troweled
on molded insulation.

Asbestos insulating cement shall be composed predominantly of
Grade 7D, or better, asbestos shorts.

High temperature insulating cement shall be composed predominantly
of mineral wool (rock, slag, or glass wool or mixtures thereof) satis-
factory for use on surfaces at a temperature up to 1500 F.  When
molded and dried, it shall weigh not more than 27 pounds per cubic foot.

5.   LOW TEMPERATURE INSULATION AND LAGGING (-30 F to 125 F)

Thickness

Low temperature surfaces (-30 F to 55 F) shall be insulated
with cellular glass to the minimum thicknesses listed in the following
tables:

75-3

15211
15161

<u>SECTION 75.  INSULATION AND LAGGING FOR PIPING AND MACHINERY</u>  (Cont'd)

5.  <u>LOW TEMPERATURE INSULATION AND LAGGING (-30 F to 125 F)</u>  (Cont'd)

<u>TABLE A</u>

THICKNESS OF PIPING
INSULATION, INCHES

Design Internal Operating Temp. F

| Pipe Sizes (Inches) | Column 1 Below -20 | Column 2 -20 thru 35 | Column 3 over 35 |
|---|---|---|---|
| 1/4 to 8 | 3 | 2-1/2 | - |
| 1/4 to 4-1/2 | - | - | 1-1/2 |
| 5 and over | - | - | 2 |

<u>TABLE A-1</u>

THICKNESS OF INSULATION
FOR COOLERS, TANKS, ETC., INCHES

Design Internal Operating Temp. F

| Size of Unit Dia. (Inches) | Column 1 Below -20 | Column 2 -20 thru 35 | Column 3 over 35 |
|---|---|---|---|
| 24 and below | 3-1/2 | 3 | 2 |
| 25 thru 36 | 4 | 3-1/2 | 2 |
| 37 thru 48 | 4-1/2 | 4 | 2 |

The following low temperature (-30 F to 55 F) systems shall be insulated and lagged in the manner hereinafter specified:

15381

## SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY  (Cont'd)

5.   LOW TEMPERATURE INSULATION AND LAGGING (-30 F to 125 F)   (Cont'd)

All refrigerant supply piping between expansion valve and
evaporator coil.  Refrigerant supply piping ahead of ex-
pansion valve need not be insulated where ambient temperature
is less than 120 F, except where dripping may cause damage
or discomfort.  Piping leading to and from refrigerated
spaces shall be suitably insulated for reasonable distance
from the spaces to prevent heat transfer from without.

All refrigerant return piping between evaporator coil and
compressor.

Air conditioning chilled water piping insulation shall be
in accordance with Table A.  For insulation in way of the
machinery spaces, thicknesses in accordance with Column 2
shall be used, and for insulation outside the machinery
spaces, thicknesses in accordance with Column 3 shall be
used.

Low temperature surfaces (56 F to 125 F) including all cold water
piping and equipment, such as fire, sanitary and fresh water systems,
and soil pipes, shall be insulated and lagged where damage or dis-
comfort may result from condensation dripping.

### Application of Insulation

Straight pipes shall be insulated with molded forms.  Bore, butt
ends and longitudinal joint surfaces shall be coated with vapor barrier
coating.  The outer insulation surface shall not be coated.  Only
sufficient coating to fill all surface cells shall be used.  Coating
shall be not more than 1/16 inch thick.  Insulation shall be installed
with staggered end joints; one half section extending beyond the
opposite end joint.  Longitudinal joints on horizontal piping shall be
on top and bottom of the pipe.  Insulation shall be secured tightly to
pipe with 1/2 inch wide No. 22 USSG galvanized steel bands spaced on
nine inch centers starting approximately 4-1/2 inches from insulation
butt joint.

15211
15161

SECTION 75.  INSULATION AND LAGGING FOR PIPING AND MACHINERY  (Cont'd)    1

5.   LOW TEMPERATURE INSULATION AND LAGGING (-30 F to 125 F)  (Cont'd)

Bent pipe, fittings, flanges, and valve covers shall be shop    5
assembled from sections of cellular glass molded pipe covering or
block with thin joints fitted tightly and cemented together with
adhesive cement.  All insulation surfaces including the outer surface
shall be coated with vapor barrier coating at time of installation.
Voids between insulation and fittings shall be filled with tightly    10
packed mineral wool.  Adjacent pipe insulation shall be fitted tightly
to the butt ends of the fitting cover using vapor barrier coating in
the joints.  The insulation shall be secured in a manner similar to
that specified for straight pipe.  Where steel bands are inconvenient
to install, No. 18 BWG galvanized iron wire applied over 1 inch wide    15
asbestos tape may be used.

Machinery, tanks and heat exchangers may be insulated with curved
or shaped segments of flat blocks of cellular glass.  When metal
surface temperatures are less than O F, a double layer construction    20
shall be used.  Insulation shall be installed with all joints staggered
for both single and double layer construction.  All inside surfaces
and butt edges shall be thoroughly coated with a thin layer of vapor
barrier coating.  An angle iron support for the base course of insulation
block on vertical equipment shall be provided.  The horizontal leg of    25
the angle iron shall be approximately 1/2 inch less in length than the
insulation thickness.

Vapor barrier coating shall be of an approved type.

Application of Lagging    30

After installation of the insulation and while the vapor sealer,
applied above, is still quite soft, it shall be covered with asbestos
or fibrous glass cloth or tape, or the cloth may be applied after
drying of the vapor sealer and secured by sewing.  Tape, where used    35
shall be wound spirally with not less than 3/8 inch overlap.  The
ends of each roll shall be stapled or cemented to the insulation.

15211
15161

SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY   (Cont'd)   1

5.   LOW TEMPERATURE INSULATION AND LAGGING (-30 F to 125 F)  (Cont'd)

Application of Antisweat Insulation and Lagging   5

Antisweat asbestos felt shall be applied to a minimum thickness
of 1/2 inch and secured with heavy twine.  Where piping passes through
the Galley and other humid spaces the insulation shall be 1 inch double
layer, waterproofed outside of each layer.  The outer layer shall be   10
installed so that all joints are staggered.

Antisweat insulation shall be covered with asbestos cloth or
fibrous glass cloth or tape and secured with adhesive lagging cement
to form a moistureproof finish.  Tape shall be wound spirally with
not less than 3/8 inch overlap.   15

6.   MEDIUM TEMPERATURE INSULATION AND LAGGING (126 F to 599 F)

Thickness   20

All piping having a normal design internal temperature between
126 F and 599 F shall be insulated with 85 per cent magnesia, in
accordance with the following Table:

TABLE B   25

THICKNESS OF PIPING INSULATION

| Nominal Pipe Size-Inches | Design Internal Temperature Range | | | | |
|---|---|---|---|---|---|
| | 126 F to 199 F | 200 F to 299 F | 300 F to 399 F | 400 F to 499 F | 500 F to 599 F |
| | Nominal Thickness of Insulation, Inches | | | | |
| 1-1/2 & under | 1 | 1 | 1 | 1-1/2 | 1-1/2 |
| 2 | 1 | 1 | 1-1/2 | 1-1/2 | 2 |
| 2-1/2 to 3 | 1 | 1 | 1-1/2 | 2 | 2 |
| 3-1/2 | 1 | 1-1/2 | 1-1/2 | 2 | 2 |
| 4 | 1 | 1-1/2 | 1-1/2 | 2 | 2-1/2 |
| 5 | 1 | 1-1/2 | 2 | 2 | 2-1/2 |

75-7

15381

SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY   (Cont'd)

6.   MEDIUM TEMPERATURE INSULATION AND LAGGING (126 F to 599 F)   (Cont'd)

TABLE B   (Cont'd)

THICKNESS OF PIPING INSULATION

| Nominal Pipe Size-Inches | Design Internal Temperature Range | | | | |
|---|---|---|---|---|---|
| | 126 F to 199 F | 200 F to 299 F | 300 F to 399 F | 400 F to 499 F | 500 F to 599 F |
| | Nominal Thickness of Insulation, Inches | | | | |
| 6 | 1 | 1-1/2 | 2 | 2 | 2-1/2 |
| 8 | 1-1/2 | 1-1/2 | 2 | 2-1/2 | 3 |
| 10 | 1-1/2 | 2 | 2-1/2 | 2-1/2 | 3 |
| 12 | 1-1/2 | 2 | 2-1/2 | 3 | 3 |
| 14 and over | 1-1/2 | 2 | 2-1/2 | 3 | 3-1/2 |

Note:   All thicknesses of insulation are nominal.  Actual thickness to conform to the Magnesia Insulation Manufacturers Association Table of New Simplified Thicknesses for 85 per cent Magnesia and Diatomaceous Silica Insulation.

Calcium silicate, amosite asbestos or fibrous glass insulation in accordance with Military Specification MIL-I-2781 may be used in which case the thickness shall be as approved.

Single layer molded insulation may be used where thermal conductivity and surface temperature requirements are met and provision for thermal expansion is included.

Lagging materials shall be in accordance with Article 3.

Application of Insulation

Single layer insulation on straight pipe shall be secured at 3 points for each 3-foot length with No. 18 BWG annealed iron wire or by metal bands.  After securing the wire or bands, the protruding ends shall be bent flat, leaving no projections.

75-8

15211
15161

SECTION 75.  INSULATION AND LAGGING FOR PIPING AND MACHINERY  (Cont'd)

6.  MEDIUM TEMPERATURE INSULATION AND LAGGING (126 F to 599 F)  (Cont'd)

All double standard thickness insulation and pipe insulation with a total thickness of 3 inches and over shall be applied in two layers with all joints broken.  The first layer with all joints tightly butted shall be securely wired to the pipe with No. 18 BWG annealed iron wire, using not less than 3 loops per sectional length or one loop per foot length on pipes up to and including 6 inch diameter and not less than 4 loops per sectional length on larger pipes.  The second layer shall be applied over the first layer so that both circumferential and horizontal joints are staggered, and shall be held in place on pipes up to and including 6 inches with not less than 3 loops of No. 18 BWG black annealed iron wire and 4 loops on larger pipes.  The ends of the wire shall be tightly twisted, bent over, and hammered into the insulation so as to leave no projections.  Metal bands, properly secured, may be used in lieu of wire.  Modifications to the above will be permitted as approved.

On bent pipe, where the radius of the bend permits, segments of molded insulation shall be used and unavoidable openings closed with insulating cement.  Where this procedure is not feasible, built-up insulation made of layers of insulating cement may be used.  In this case, the insulation shall be covered with a jacket of hard surface insulating cement, reinforced with hardware cloth where outside diameter over the insulation is 12 inches or greater.

Application of Lagging

Where piping goes through compartments, and where not exposed to weather, the insulation shall be covered with tape or cloth, neatly sewed with No. 19 B&S copper wire for asbestos and glass tying cord for fibrous glass, using not less than 3 stitches to the inch.  Tape, where used, shall be wound spirally with not less than 3/8 inch overlap.  The ends of each roll shall be stapled or cemented to the insulation.  Cloth and tape may also be applied with adhesive lagging cement.

7.  HIGH TEMPERATURE INSULATION AND LAGGING (600 F to 999 F)

Material and Thickness

All piping having normal internal design temperatures of 600 F and over shall be insulated with high temperature insulation or with a combination of high temperature and medium temperature insulation to the minimum thickness indicated in the following Table:

75-9

15211
15161

G2

## SECTION 75. INSULATION AND LAGGING FOR PIPING AND MACHINERY (Cont'd)

7. HIGH TEMPERATURE INSULATION AND LAGGING (600 F to 999 F) (Cont'd)

### TABLE C

THICKNESS FOR AN INNER LAYER OF HIGH TEMPERATURE INSULATION AND AN OUTER LAYER OF 85 PER CENT MAGNESIA, INCHES

| Design Int. Temp | 600 F to 699 F | | | 700 F to 799 F | | | 800 F to 899 F | | | 900 F to 999 F | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nom. Pipe Size-Inches | High Temp. Inner | Med. Temp. Outer | Total | High Temp. Inner | Med. Temp. Outer | Total | High Temp. Inner | Med. Temp. Outer | Total | High Temp. Inner | Med. Temp. Outer | Total |
| 1-1/2" & less | 2 | None | 2 | 2 | None | 2 | 2-1/2 | None | 2-1/2 | 2-1/2 | None | 2-1/2 |
| 2 | 1 | 1-1/2 | 2-1/2 | 1 | 1-1/2 | 2-1/2 | 1 | 1-1/2 | 2-1/2 | 1-1/2 | 1 | 2-1/2 |
| 2-1/2 | 1 | 1-1/2 | 2-1/2 | 1 | 1-1/2 | 2-1/2 | 1-1/2 | 1-1/2 | 3 | 1-1/2 | 1-1/2 | 3 |
| 3 | 1 | 1-1/2 | 2-1/2 | 1 | 2 | 3 | 1-1/2 | 1-1/2 | 3 | 1-1/2 | 1-1/2 | 3 |
| 3-1/2 | 1 | 1-1/2 | 2-1/2 | 1 | 2 | 3 | 1-1/2 | 1-1/2 | 3 | 2 | 1-1/2 | 3-1/2 |
| 4 | 1 | 1-1/2 | 2-1/2 | 1 | 2 | 3 | 1-1/2 | 1-1/2 | 3 | 2 | 1-1/2 | 3-1/2 |
| 5 | 1 | 2 | 3 | 1 | 2 | 3 | 1-1/2 | 1-1/2 | 3 | 2 | 1-1/2 | 3-1/2 |
| 6 | 1 | 2 | 3 | 2 | 2 | 3-1/2 | 1-1/2 | 2 | 3-1/2 | 2 | 2 | 4 |
| 8 | 1-1/2 | 2 | 3-1/2 | 1-1/2 | 2 | 4 | 2 | 2 | 3-1/2 | 2 | 2 | 4 |
| 10 | 1-1/2 | 2 | 3-1/2 | 1-1/2 | 2-1/2 | 4 | 2 | 2 | 4 | 2 | 2 | 4-1/2 |
| 12 | 1-1/2 | 2 | 3-1/2 | 1-1/2 | 2-1/2 | 4 | 2-1/2 | 2 | 4-1/2 | 2-1/2 | 2 | 4-1/2 |
| 14 | 1-1/2 | 2 | 3-1/2 | 1-1/2 | 2-1/2 | 4 | 2-1/2 | 2 | 4-1/2 | 2-1/2 | 2 | 4-1/2 |

NOTE: The thickness of the two materials may be varied somewhat, but the total thickness shall be at least equal to the sum of the 2 thicknesses shown, with the thickness of the high temperature insulation at least as shown in the above table.

75-10

15381

SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY   (Cont'd)

7.   HIGH TEMPERATURE INSULATION AND LAGGING (600 F to 999 F)   (Cont'd)

Single layer molded insulation may be used where thermal conductivity and surface temperature requirements are met and provision for thermal expansion is included.

Application of Insulation

On pipes smaller than 2 inches the entire insulation shall consist of one layer of high temperature insulation.  On pipes 2 inches and larger, the insulation shall consist of an inner layer of high temperature insulation and an outer layer of medium temperature insulation to make up the total minimum thickness specified.  Flanges, valves and fittings for steam piping, 2 inches and above, shall be provided with easily removable and replaceable tailored pads.

The insulation shall be applied and secured in the manner specified for the medium temperature insulation, except that modifications will be permitted as approved.  Insulating cement for the high temperature insulation shall be of the high temperature type specified under Article 4.

Application of Lagging

High temperature insulation shall be lagged as described for medium temperature lagging.

8.   FLANGE, VALVE AND FITTING INSULATION AND LAGGING

All flanges, valves and fittings shall be completely insulated and lagged equal to that specified for the attached piping.

Flanges, valves, and fittings not exposed to weather or undue moisture shall be insulated as follows:

Services subject to frequent maintenance, such as reducing and regulating valves, shall be provided with easily removable and replaceable tailored pads made of asbestos cloth or fibrous glass cloth of quality specified under Article 3, filled with felted amosite asbestos or quilted fibre glass.

For services not included above, insulating cement may be troweled on to total pipe insulation thickness and then coated with 1/2 inch hard surface insulating cement reinforced where necessary with hardware cloth.

75-11

15211
15161

SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY   (Cont'd)

8.   FLANGE, VALVE AND FITTING INSULATION AND LAGGING   (Cont'd)

Where removable tailored pads are used, the pipe insulation shall be tapered to permit the removal of nuts and bolts.  The flange insulation shall overlap the outer beveled edge of the pipe insulation approximately 2 inches.

9.   MACHINERY AND EQUIPMENT INSULATION AND LAGGING

Insulation

Surfaces of large extent, such as boiler drums and superheater headers, uptakes, turbines, pumps, heaters, evaporators, atmospheric condensers, etc., shall be insulated to the minimum thickness indicated by the following Table:

TABLE D

| Design Internal Temperature | THICKNESSES (INCHES) | | | |
| --- | --- | --- | --- | --- |
| | High Temp. Insulation | Med. Temp. Insulation | Insul. Cement | Total |
| 126 F to 199 F | - | 1 | 1/2 | 1-1/2 |
| 200 F to 299 F | | 1-1/2 | 1/2 | 2 |
| 300 F to 399 F | - | 2 | 1/2 | 2-1/2 |
| 400 F to 499 F | - | 2-1/2 | 1/2 | 3 |
| 500 F to 599 F | - | 3 | 1/2 | 3-1/2 |
| 600 F to 699 F | 1 | 2 | 1/2 | 3-1/2 |
| 700 F to 799 F | 1-1/2 | 2 | 1/2 | 4 |
| 800 F to 899 F | 2-1/2 | 1-1/2 | 1/2 | 4-1/2 |
| 900 F to 999 F | 3 | 1 | 1/2 | 4-1/2 |

75-12

15211
15161

## SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY   (Cont'd)

### 9.   MACHINERY AND EQUIPMENT INSULATION AND LAGGING   (Cont'd)

The insulation shall be of molded forms within limitation of commercial standards.  All insulation shall be tightly wired or banded to prevent settling, and all joints pointed up with insulating cement.

In lieu of molded forms for surfaces of large extent, fibrous glass sheet insulation as specified under Article 2 may be used.

In lieu of molded insulation, manholes, handholes, etc., may be insulated and lagged with removable tailored pads made of asbestos or fibrous glass cloth as specified under Article 3, filled with felted amosite asbestos or quilted fibre glass.  Large cumbersome pads or blankets, or a multiplicity of pads, shall not be used to cover large surfaces.

#### Lagging

Insulation on turbine casings, boiler drums, reciprocating pump steam ends and similar surfaces shall be lagged as follows:

Apply a 1/2 inch coat of mixture of 4 parts of asbestos insulating cement and one part of Portland cement, reinforced with hardware cloth.  After drying 24 hours, apply two coats of hard finish insulating cement, allowing one hour for each to dry.  The whole shall then be covered with asbestos or fibrous glass cloth to which has been applied adhesive lagging cement.

Evaporators, tanks, boiler uptakes, and similar surfaces shall have the insulation lagged with a 1/2 inch thick hard finish insulating cement reinforced with hardware cloth.

### 10.   PROTECTION OF INSULATION

Prior to application of lagging, insulation located in positions exposed to the weather or undue moisture shall be protected with 1/4

75-13

15211
15161

SECTION 75.   INSULATION AND LAGGING FOR PIPING AND MACHINERY  (Cont'd)

10.   PROTECTION OF INSULATION  (Cont'd)

inch thick weather-resistant insulation, reinforced with hardware cloth
and secured with No. 16 B&S copper wire.  Particular care shall be
taken to avoid cracks or openings in the continuity of the completed
insulation and lagging, especially in the vicinity of valves, flanges,
and fittings, in order to prevent entrance of water.

In locations where the completed insulation and lagging is liable
to abuse, protective galvanized sheet metal lagging of No. 20 USSG
shall be installed.

All insulation and lagging alongside of hatches subject to
mechanical injury shall be protected by 1/4 inch checkered plates
and heavy angles.

Insulation which is subject to crushing by supporting hangers
on the outside of same shall have adequate protection against
crushing.

- o -

75-14

SEC 25

SECTION 25    JOINER WORK AND INTERIOR DECORATION

1.    GENERAL

Accommodations for passengers, officers and crew shall be provided as indicated on the Contract Plans

as modified by Gibbs & Cox Drawing
Nos. 13303-6151-1, Rev. A; and 6151-2, Rev. A.                    NA CH2 1, PART 2

Ceiling heights in passenger, officer and crew staterooms shall be not less than 7 feet 6 inches in the room proper and 7 feet 0 inch in toilet and shower spaces.  Ceiling heights in passageways shall not be less than 7 feet 0 inch.

Panels and sections of linings or ceilings in way of pipes, valves, hangers, wiring and ducts, etc., requiring inspection, adjustment and possible repair, shall be arranged for easy removal by means of portable or hinged sections as required.  (See also Section 12.)

The erection of joiner work, as a rule, should not be commenced until the principal piping, electric cables, vent ducts, etc. are in place and consequent possible interferences between them and the joiner work ascertained.

For deck covering and cove bases see Section 6.

For painting materials and preparation of surfaces see Section 11.

For name plates and notice frames see Section 24.

For lighting see Section 32.

2.    CONSTRUCTION AND FINISH

Materials - General

The construction of the joiner work shall be of such design as to conceal electric cables, wiring boxes for switches, and receptacles, vent ducts, piping, etc.

Furring, hangers, moldings, H-posts, etc., used in the erection of bulkheads, linings and ceilings shall be galvanized steel or steel bonderized. H-posts and moldings shall have factory baked enamel finish in color to harmonize with marine veneer or melamine laminate indicated in Finish     DEV. Schedule.  Colors shall be selected by Interior Designer and approved      13 by the Owners.

Revised October 14, 1964                    25-1

15381

SECTION 25.   JOINER WORK AND INTERIOR DECORATION  (Cont'd)

2.    CONSTRUCTION AND FINISH  (Cont'd)

The attachment of fittings to the material shall be carefully studied and arrangements made for supporting the heavier items, such as lavatories, beds, etc., by through bolting and further support, independent of the bulkhead, as necessary.

All ceiling framing angles shall be through bolted to the joiner bulkheads in way of the H-posts.

Approved type insulating tape shall be used between all faying surfaces of dissimilar metals.

All fastenings shall be galvanized when of iron or steel and screws generally shall be of the self-tapping type, cadmium plated, "Shakeproof-Sems", or equal.

All mechanical fastenings in bulkheads, ceilings and linings shall be concealed.

Air conditioning units and convectors shall not be supported by the joiner work, except on specific approval.

All material used for bulkheading, ceiling and lining shall be thoroughly painted or otherwise treated to prevent absorption of moisture and to resist corrosion.

Materials for built-in wardrobes or lockers shall be of the same type as the room in which they are located. Wardrobes shall be equipped with shelf, hanger rod and clothes hooks.  Wardrobes shall be 24 inches deep inside.

Joiner Bulkheads and Linings

Joiner bulkheads and linings in passenger deck, Master's and Chief        DEV. 13
Engineer's accommodations, First Assistant Engineer's stateroom, Recreation
Room and Ship's Office shall be Johns-Manville Marinite 36 core with melamine
laminates, asbestos-backed, factory sealed on exposed sides, and balanced
laminate with protective coating on unexposed sides giving a total thickness
of 7/8 inch.  Pattern and color of melamine to be as indicated in Finish      DEV.
Schedule.                                                                      13

Joiner bulkheads and linings in other areas shall be Johns-Manville
Marinite 36 core, with integrally colored marine veneer, factory sealed on
exposed sides, and balanced laminate with protective coating on unexposed
sides, giving a total thickness of 7/8 inch; standard colors as indicated     DEV.
in Finish Schedule.                                                           13

Passageways, toilets and shower spaces, except in way of Lounge on Boat
Deck, shall be in color as indicated in Finish Schedule.                      DEV. 13

Revised October 14, 1964                  25-2

15381

SECTION 25-   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

2.   CONSTRUCTION AND FINISH   (Cont'd)

Joiner bulkheads in passageways may extend to the deckhead; if not, fire stops must be provided.

Accordian folding partition as manufactured by W. A. Park Co. Type No. 8 or equal shall be provided in the Dining Room where indicated, complete with track and all hardware necessary for installation. The partition shall be supported overhead by recessed track in the ceiling, without deck guide.

DEV. 13

Color and material for partition fabric shall be as indicated on Finish Schedule.

Ceilings

DEV. 9

Except as otherwise specified, all accommodations throughout, including all toilet and shower spaces .............. shall have ceilings of Johns-Manville or equal 3/16 inch thick integrally colored marine veneer, factory sealed .............. panels.

DEV. 9

Dining Room and Lounge, including passages on Boat Deck shall have marine type acoustical ceiling. T-jointed Johns-Manville Type A units, 3/16 inch integrally colored marine veneer in Lounge and Passages on Boat Deck and 3/16 inch marine veneer Decoran finish in Dining Room - Boat Deck. All ceilings shall have snap-on type cornice members with concealed fasteners.

DEV. 13

Doors

Interior joiner doors shall be as specified in Section 1.

The door frames shall be constructed with side jambs fitted to adjacent H-posts or fitted with integral H-posts above door frame. The H-posts shall extend from deck to top of joiner bulkhead with support to deckhead and shall be secured top and bottom.

DEV. 13

―――― Denotes Deletion Made

Revised October 14, 1964                    25-3

15381

SECTION 25.   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

2.   CONSTRUCTION AND FINISH   (Cont'd)

Mirrors

Mirrors shall be 1/4 inch thick, high grade polished plate glass, with electrolytic copper backing covered with a heavy coat of waterproof structural paint. All edges and slightly rounded edge corners shall be ground and polished. Frames shall be as specified on the Contract Plans. All mirrors must be guaranteed for a period of five years against silver oxidation and have the manufacturer's label on face and identification stamp of guarantee on the back. All necessary and required cutting or drilling of mirrors must be done by the mirror manufacturer. All contact edges of mirrors shall be lined with black felt strips.

The glass for the mirror on the aft bulkhead of the Passenger Lounge shall be of the laminated safety type.

3.   INTERIOR ARCHITECTURE AND DECORATION

Decorative Items

The Contractor shall make a total allowance of $2700.00 to cover the cost of the decorative items.                                      DEV. 13

This sum shall cover the execution of the work, cost of packaging for shipment, insurance during shipment and transportation to ship's side, supervision of installation on board the ship, and minor repairs.

The cost of installation shall be borne by the Contractor.
                                                                        DEV. 13
Final choice of these items shall be selected by Interior Designer subject to Owner's approval.

Decorative Screens (Allow $700.00)

Two decorative screens shall be constructed in accordance with     DEV.
Design Sketch.                                                       13

Revised October 14, 1964                    25-4

15381

SECTION 25   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

3.   INTERIOR ARCHITECTURE AND DECORATION   (Cont'd)

Decorations (Allow $1,000.00)                                    DEV. 13

This decoration allowance shall be for selection of appropriate decorative items by the Interior Designer.

4.   DRAPERIES, BEDSPREADS, RUGS AND CABLE CURTAINS

General

The Contractor shall provide the following:

Draperies complete with hardware in locations as indicated on the Contract Plans.

Bedspreads for the floor beds in passenger staterooms B-1, B-2, B-3, B-4, B-5 and B-6.

Rugs for the Captain's and passengers' staterooms.

Selection of material for draperies, bedspreads and rugs shall be as indicated on Finish Schedule.                          DEV. 13

Lines 28 through 35 deleted.                               DEV. 13

Revised October 14, 1964                    25-5

15381

SECTION 25.   JOINER WORK AND INTERIOR DECORATION  (Cont'd)

4.   DRAPERIES, BEDSPREADS, RUGS AND CABLE CURTAINS  (Cont'd)

Lines 5 through 27
deleted.

REV.
13

Workmanship - Draperies

All draperies shall be lined with aluminum-coated sateen.

All patterned fabric shall be carefully centered and matched at seams.

No machine stitching shall show on the front of the drapery.

Pleats shall be the proper depth for the length of the drapery and shall be pinched by hand, not machine sewed; full double turn in headings material.

Where bottom of draperies fit to furniture or joiner work, hems shall not be sewn until after hanging.

Revised October 14, 1964                    25-6

15381

SECTION 25.  JOINER WORK AND INTERIOR DECORATION  (Cont'd)

4.  DRAPERIES, BEDSPREADS, RUGS AND CABLE CURTAINS  (Cont'd)

Workmanship - Draperies  (Cont'd)

The headings of all draperies hung on I-beam tracks shall have
3/4 inch rustproof curtain rings securely sewn for attachment to hook
carriers, and a ring sewn on outside corner of heading and at bottom
for a fixed attachment.  No. 24 linen finish thread having a tensile
strength of not less than 4 pounds shall be employed.

All draperies hung on I-beam tracks shall be properly weighted
with tape weights or covered cut lead weights.  All weights to be
concealed.

Where 100 per cent fullness is specified, finished draperies,
before pleating, shall measure twice the distance they are to cover.

Pleats shall be spaced to the correct proportion of the area to
be covered, with waterproof stiffening material in the heading.

Where more than one width of material is used, seams resulting
from the joining of width must be free of puckering or drawing of
fabric.

All draperies shall have linen tags with location marked in
indelible ink sewed securely on back.

Bottom hems for Dining Room draperies shall be 6 inches deep
finished.  Side hems shall be as follows:

On panels, both edges shall have a 6 inch facing turn back
of the material.

On pairs of draperies, front edges shall have a 6 inch
facing turn back of the material with 2 inch back hems,
except as otherwise specified.

Headings for Dining Room draperies shall be French pleats with
3/4 inch rings securely sewed at each pleat and at both edges of the
drapery.

Traverse draperies in Dining Room shall be made to overlap not
less than 6 inches and shall hang in built-in ceiling and bulkhead
recesses.  Draperies for Dining Room shall be full length have 100 per
cent fullness and shall traverse, with continuous pull cords, the entire
length of the forward bulkhead.

25-6A

14861

SECTION 25.   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

4.   DRAPERIES, BEDSPREADS, RUGS AND CABLE CURTAINS   (Cont'd)

Workmanship - Draperies   (Cont'd)

Bottom hems on draperies for passenger staterooms, officers' and crew Recreation Rooms, Captain's, Chief Engineer's, First Assistant Engineer's and Chief Officer's quarters shall be 4-1/2 inches deep finished.  Side hems shall have a 2 inch facing turnback of the material with 1 inch back hems.  Headings shall be made with inverted pleats stitched 2-1/2 inches down from top of drapery.  All draperies shall traverse with continuous pull cords and shall hang in built-in recesses or metal valance boxes.  All draperies shall be sill length, shall have 100 per cent fullness and shall draw to center of windows with an overlap of 2 inches.

Draperies for all other officers' staterooms, offices, crew state-rooms, Hospital and Crew Mess shall be 100 per cent full, draw by hand, shall be portable and shall extend 4 inches each on top and bottom, and 6 inches on each side of window casing.

Top and bottom hems shall be divided in two pockets each for hanger rods, to allow for adjustment of drapery in case of shrinkage.

Hardware for Draperies

The hardware shall be of anodized aluminum except where steel is necessary for strength and wear or except as otherwise specified.  All parts of steel shall be bonderized.

Anchor hooks shall be installed to receive return rings on all draperies hung on I-beam tracks.

Dining Room, Passenger Staterooms,
Captain's, Chief Engineer's, First
Assistant Engineer's and Chief Officers'
Quarters, Officers' and Crew Recreation Rooms

All draperies shall be hung on heavy duty I-beam track with hook type carriers to take 3/4 inch rings which shall be sewn on curtain headings.

Draw cords for traverse draperies shall be continuous running through pulleys.  Pulleys shall be installed on the bulkhead or sill.

25-6B

15391

SECTION 25.   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

4.   DRAPERIES, BEDSPREADS, RUGS AND CABLE CURTAINS   (Cont'd):

All Other Officer Staterooms, Offices,
Crew Staterooms, Hospital and Crew Mess

Hardware shall be solid brass chromium plated, to match hardware specified in Section 23; 3/8 inch rods, Gould No. 8 with projection brackets, Gould No. 68, Catalog No. 14, shall be fastened to bulkhead at top and bottom of window casing.

Bedspreads:

Bedspreads shall be unlined and made up in the following manner:

Unfitted throw spreads with one width of 50 inch material at center and a partial width at each side joined with blind seams suitable for passenger bed shown on Design Sketch.                    DEV. 13

No machine stitching shall show on the fronts of bedspreads.

Hems shall be 1-1/4 inch wide on all four sides.

The bedspread size shall be 72 inches x 122 inches.

Rugs:

Rugs shall be installed as follows:                                             DEV. 13

Captain's Stateroom - 7 feet 0 inch x 4 feet 6 inches rectangular.

Passenger stateroom B-1 and B-2 - 6 feet 0 inch x
9 feet 0 inches rectangular.

Passenger stateroom B-3 and B-4 - 7 feet 0 inch x      DEV.
6 feet 0 inch rectangular.                                       13

Passenger stateroom B-5 and B-6 - 9 feet 0 inch x
5 feet 0 inch rectangular.

Cable Curtains:

Cable curtains, Adams and Westlake Company No. 120, or equal, complete with brackets, roller mechanism, guides and automatic stops shall be provided for all windows on Navigating Bridge Deck, including Chartroom, Boat Deck and Upper Deck except in Wheelhouse; on Main Deck they shall be provided only for windows in forward bulkhead, Frame 113.   The fabric portion of these curtains shall be light excluding.   Fabric shall be as indicated in Finish Schedule.      DEV.
                                                                                                    13

Revised October 14, 1964.                    25-6C                    Modification No. 1

15381

SECTION 25   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

5.   INTERIOR DESIGN AND FINISH                                        DEV. 13

The joiner work and interior decoration of the accommodations shall
be of design, materials and finishes indicated on the Design Sketches and
Finish Schedule listed below, which form a part of this Specification:

| | |
|---|---|
| Dwg. AM-101 | Finish Schedule (12 pages) |
| Dwg. AM-201 | Passenger Accommodations - Boat Dk. - Layout |
| Dwg. AM-301 | Lounge Screen |
| Dwg. AM-401 | Passenger Furniture; Bed Headboard, Coffee Table, |
| | and Lounge Chair; and Dining Room Clock |
| Dwg. AM-501 | Officer & Crew Recreation Rooms - Layout |

Furniture
Sketch No.

| | |
|---|---|
| 518 | Bed Headboard |
| 519-A | Coffee/End Table |
| 521 | Table Lamp |
| 523 | Ceiling Fixture |
| 525 | Easy Chair |
| 526 | End Table |
| 527 | Sofa |
| 528 | Stowage Cabinet |
| 529 | Bookcase |
| 535 | Table Lamp |
| 536 | Table Lamp |
| 537 | Table Lamp |
| 538 | Stool |
| 539 | Dining Room Chairs |
| 540 | Dining Room Servers |
| 541 | Dining Room Table |
| 542 | Lounge Sofa |
| 543 | Lounge Chairs |
| 545 | Cabinet in Lounge |
| 546 | Framed Mirror in Lounge |
| 547 | Card Table in Lounge |
| 548 | Coffee Table in Lounge |
| 549 | Lounge End Tables |
| 550 | Coffee Table |
| 551 | Stateroom Arm Chair |
| 552 | Chest-Luggage Stowage |
| 553 | Vanity Chest-Case |
| 554 | Vanity Chest-Chest |
| 555 | Vanity Chest |
| 556 | End Cabinets in Staterooms |
| 582 | Dining Room Tables |

This Page Added by
Development 13 on

October 14, 1964

25381

SECTION 25.   JOINER WORK AND INTERIOR DECORATION   (Cont'd)

5.   INTERIOR DESIGN AND FINISH   (Cont'd)

Furniture
Sketch No.                                                                DEV. 13

    2365A          Pass. Bed (L.P. and Card Table Racks Under)
    4461-A         Condiment Holder

    Where applicable, furniture indicated on above sketches supersede
furniture requirements indicated on Contract Furniture Schedule Dwg.
#8001-555.

This page Added by                          - o -
Development 13 on
October 14, 1964                            25-8

# Equipment

# Lists

### Items approved or accepted under Marine
### Inspection and Navigation Laws



APRIL 1, 1958

CG 190

U. S. Coast Guard

Treasury Department

# Equipment Lists

## Items approved or accepted under Marine Inspection and Navigation Laws

All the listings contained in this pamphlet have been previously published in the Federal Register or the Proceedings of the Merchant Marine Council. Listings subsequent to April 1, 1958 will be published in the Federal Register or the Proceedings of the Merchant Marine Council and consist of: Approved Instruments, Machines, and Equipment; Acceptable covered steel arc welding electrodes; Manufacturers having submitted affidavits covering Pipe, Tubing, Valves, Fittings, Flanges, Castings, Forgings, and Bolting; Acceptable hydraulic cast iron valves; Permitted Articles (of a dangerous nature) for Ships' Stores and Supplies; and Formerly Approved Instruments, Machines, and Equipment.

### CG 190 • APRIL 1, 1958

UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON : 1958

# UNITED STATES COAST GUARD

ADDRESS REPLY TO:
C O M M A N D A N T
U. S. COAST GUARD
HEADQUARTERS
WASHINGTON 25, D. C.



CMC
April 1,

## FOREWORD

Various items of lifesaving, firefighting, and miscellaneous equipment used ab
vessels are required by certain navigation and vessel inspection laws and regula
to be of types which are approved by the Commandant of the Coast Guard.
regulations also specify that certain items may be accepted for use on board ve
upon submission of an affidavit that the applicable requirements will be met.
other cases, drawings and specifications for equipment are examined in order to
vise manufacturers and prospective purchasers whether such items when manu
tured or installed will be acceptable for marine use.

This booklet contains six separate and distinct lists, viz:

    (a) Approved instruments, machines, and equipment;

    (b) Acceptable covered steel arc welding electrodes;

    (c) Manufacturers having submitted affidavits covering pipe, tubing, va
fittings, flanges, castings, forgings, and bolting;

    (d) Acceptable hydraulic cast iron valves;

    (e) Permitted articles (of a dangerous nature) for ships' stores and supp
and

    (f) Formerly approved instruments, machines, and equipment, which at
time have been approved for use on vessels, but are no longer approved for
installations.

The need to have on board a particular type of vessel approved equipmer
indicated in this publication is dependent upon the requirements of the navig
and vessel inspection laws and the rules and regulations promulgated thereu
which are applicable to that vessel.

The requirements for approved equipment for passenger, tank, cargo, and mi
laneous vessels are set forth in publications entitled "Marine Engineering Regula
and Material Specifications," CG–115; "Rules and Regulations for Tank Vess
CG–123; "Load Line Regulations," CG–176; "Rules and Regulations for Passe
Vessels," CG–256; "Rules and Regulations for Cargo and Miscellaneous Vess
CG–257; "Electrical Engineering Regulations," CG–259; and "Rules and Regula
for Nautical Schools," CG–269.

The requirements for approved equipment for small passenger vessels carrying
than six passengers are set forth in "Rules and Regulations for Small Passe
Vessels (not more than 65 feet in length)," CG–323.

The requirements for approved equipment for uninspected motorboats are set :
in a separate publication entitled "Rules and Regulations for Uninspected Vess
CG–258.

III

