ORIGINAL

MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 22 2009

FILED
CLERK'S OFFICE

1  Richard A. Brody, Esq. (SBN 100379)
   BRENT COON & ASSOCIATES
2  44 Montgomery Street, Suite 800
   San Francisco, CA  94104
3  Telephone:  415.489.7420
   Facsimile:  415.489.7426
4
5  Attorneys for Plaintiffs
6
7
8                    **DOCKET NO. 875**
9  **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**
10  **IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION**
11
12  This document relates to:          ***William H. Dawson, et al. v. CBS Corporation, et al.***
                                      **Civil Action No. 3 09-903 WHA**
13                                      **In the United States District Court, Northern District of**
                                      **California;**
14
15                                      **and**
16
                                      ***Johnie D. Pelfrey, Jr., et al. v. Foster Wheeler, LLC, et al.***
17                                      **Civil Action No. 3 09-902 MHP**
                                      **In the United States District Court, Northern District of**
18                                      **California;**
19
20                                      **and**
21                                      ***Michael E. Jenkins v. Allied Packing & Supply, Inc., et al.***
                                      **Civil Action No. 3 09-101 DMS (LSP)**
22                                      **In the United States District Court, Southern District of**
                                      **California.**
23
24
25
26
27
28

PLEADING NO. 5815

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

**OFFICIAL FILE COPY**

IMAGED APR 2 4 2009

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ................................................................................ 3

    A.    William H. Dawson and Rita M. Dawson. ................................. 3

    B.    Johnie D. Pelfrey, Jr. and Jan D. Pelfrey. ................................. 3

    C.    Michael E. Jenkins. ..................................................................... 3

    D.    Defendant General Electric Company. ...................................... 4

II.   VACATING CONDITIONAL TRANSFER ORDER 320 AS TO PLAINTIFFS
    DAWSON, PELFREY AND JENKINS IS IN THE INTERESTS OF JUSTICE ......... 4

III.  IN THE ABSENCE OF FEDERAL SUBJECT MATTER JURISDICTION, THE
    JUDICIAL PANEL CANNOT TRANSFER THESE CASES .......................................... 5

IV.  DEFENDANTS CANNOT MEET THEIR BURDEN TO PREVENT REMAND
    WITHOUT EVIDENCE ..................................................................................... 5

    A.    The Defendants Must Demonstrate Each Of The Following Five Elements. ...... 5

    B.    To Establish A Colorable Military Contractor's Federal Defense, Defendants
        Must Demonstrate The Existence Of Reasonably Precise Specifications,
        Conformity Thereto, And That The Supplier Warned The United States About
        Dangers Of Which It Had Greater Knowledge. ...................................................... 7

    C.    Defendants Cannot Establish A Colorable Federal Defense Without Evidence. 8

    D.    Defendants Cannot Demonstrate That They Were Prevented From Issuing
        Warnings As To The Hazards Of Asbestos, A Necessary Element Of Their
        Defense. ...................................................................................................................... 8

    E.    Defendants Were Never Prevented From Issuing Warnings About Asbestos. . 12

V.   PLAINTIFFS' DISCLAIMER PREVENTS DEFENDANTS FROM MEETING THE
    CAUSAL NEXUS REQUIREMENT ............................................................................ 13

    A.    Defendants Cannot Demonstrate A Causal Nexus Between Any Actions They
        Took Under The Direction Of A Federal Officer And Harm To The Plaintiff
        For Which Plaintiff Seeks Relief, Because Of Plaintiff's Express Disclaimer. . 13

    B.    Even If The Court Will Not Give Force To Plaintiffs' Disclaimer, Their Actions
        Will Likely Be Remanded. ...................................................................................... 14

    C.    Failing To Remand Plaintiffs' Cases Would Promote Inefficiency. .................. 15

VI.  CONCLUSION ............................................................................................... 16

ii

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

# TABLE OF AUTHORITIES

## Cases

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988)...........................................................7, 9, 11, 12

*Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582 (9th Cir. 1996) ..................................................9

*Carlough v. Amchem*, No. 93-215, at 8 (E.D. Pa. Apr. 15, 1993) (Mem. Op.) ...............................15

*Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006).................................................7

*Entrekin v. Fisher Scientific Inc.*, 146 F.Supp.2d 594 (3d Cir. 2001) ............................................6

*Faulk v. Owens-Corning*, 48 F.Supp.2d 653 (E.D. Tex. 1999) ......................................................9

*Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp.2d 1144 (D.Colo. 2002).....8

*Gaus v. Miles, Inc.*, 980 F.2d 564 (9th. Cir. 1992) ........................................................................6

*Hinchman v. Ametek, Inc., et al.* No. 24544-BH03, District Court for Brazoria County, Texas......12

*In re Air Disaster at Ramstein Air Base*, 81 F.3d 570 (5th Cir. 1996) ...........................................10

*In re Patenaude*, 210 F.3d 135 (3rd Cir. 2000)............................................................................15

*Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000)............................................10, 11

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994)..............................................................6

*Merrell Dow Pharmaceuticals, Inc. v Thompson*, 478 U.S. 804 (1986) ........................................14

*Mesa v. California*, 489 U.S. 121 (1989).....................................................................................5, 6

*New Jersey Department of Environmental Protection v. Exxon Mobil Corp.*,
     381 F.Supp.2d 381 (D.N.J. 2005) .........................................................................................6

*Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th. Cir. 1996) .....................................................9, 11

*Shilz v. A.P. Green Industries, Inc.*, 2002 WL 102608 (N.D. Cal. 2002).......................................14

*Sweeney v. Saberhagen Holdings, Inc., et al.*, No. C05-1637Z, U.S. District
     Court for the Western District of Washington .....................................................................12

*Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir. 1995)............................................................10

*Texas First Nat. Bank v. Wu*, 347 F.Supp.2d 389 (S.D. Tex. 2004)................................................7

*Vasquez v. Alto Bonito Gravel Plant Corp.*, 56 F.3d 689 (5th Cir. 1995) ........................................7

*Watson v. Philip Morris Companies*, 551 U.S. 142 (2007) ............................................................6

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

*Williams v. General Electric Co.*, 418 F.Supp.2d 610 (M.D. Penn. 2005)...................................5, 7

*Willingham v. Morgan*, 395 U.S. 402 (1969)................................................................5, 8

**Statutes**

28 U.S.C. section 1331...............................................................................................1

28 U.S.C. section 1442(a)(1) ...............................................................................1, 2, 5

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

**PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-320) AND CONSOLIDATED SUPPORTING BRIEF**

Plaintiffs William H. Dawson and Rita M. Dawson; plaintiffs Johnie D. Pelfrey, Jr. and Jan D. Pelfrey; and plaintiff Michael E. Jenkins move to vacate the Conditional Transfer Order of the Judicial Panel on Multidistrict Litigation (CTO-320) and offer this supporting brief:

1.    William Dawson and Johnie Pelfrey suffer from malignant mesothelioma, an incurable rapidly moving cancer of the pleura (the two thin membranes surrounding the lung), which is caused solely by past exposure to asbestos-containing products. Both Mr. Dawson and Mr. Pelfrey likely have less than 4 to 6 months to live. Michael Jenkins suffers from lung cancer that has spread to his brain, causing partial blindness and rendering him virtually incapacitated. Mr. Jenkins likely only has another 4 to 6 months to live.

2.    Jurisdiction and venue of the William Dawson, et al., matter are proper in the United States District Court for the Northern District of California.

3.    Jurisdiction and venue of the Johnie D. Pelfrey, Jr., et al., matter are proper in the United States District Court for the Northern District of California.

4.    Jurisdiction and venue of the Michael E. Jenkins matter are proper in the United States District Court for the Southern District of California.

5.    The defendant's grounds for removal of all three cases, namely, that the court has subject matter jurisdiction under 28 U.S.C. section 1331 because the action arises under the constitution, laws or treaties of the United States within the meaning of that statute by virtue of plaintiffs' attempt to adjudicate claims with respect to persons acting under an officer of the United States pursuant to 28 U.S.C. section 1442(a)(1) is incorrect. All of the relief sought in all three cases by the plaintiffs in their complaints is founded upon state law.

6.    Plaintiffs in the Dawson and Pelfrey cases have filed motions to remand (with supporting briefs), which are presently pending before the United States District Court for the Northern District of California.

/ / /

/ / /

7.      The motion to remand in the Michael E. Jenkins case was denied on March 25, 2009, by the Honorable Dana M. Sabraw, judge of the United States District Court for the Southern District of California.

8.      Numerous federal courts have ordered remand in other virtually identical cases where the defendants took the same approach in removing state law claims by invoking federal officer jurisdiction under 28 U.S.C. section 1442(a)(1).

9.      Transfer is inappropriate and impermissible because subject matter jurisdiction does not exist.

10.     Transfer is not appropriate because this case involves only California state law claims.  All plaintiffs have expressly disclaimed all claims arising under Federal law.

11.     Transfer is not appropriate because common issues do not predominate over individual issues of fact.

12.     Transfer of these cases will not further the convenience of the parties and the witnesses.

13.     Transfer will not advance the just and efficient conduct of these cases.  It will be more efficient for the dispositive issues of California state law to be handled by a federal district court judge in California.

14.     Transfer is inappropriate because these cases are not sufficiently complex and time consuming.

15.     Any benefits of coordination of pre-trial proceedings can be realized by less drastic means than transfer of this action and consolidation with a conglomeration of actions under various federal statutes and the laws of many states.  This Court (Docket No. 875) has approximately 85,000 asbestos-related cases pending before it.  Each of the plaintiffs who are the subject of this motion is dying from either malignant mesothelioma (Dawson and Pelfrey) or advanced lung cancer (Jenkins).  It is in the interest of justice to allow these dying men the opportunity to have their claims litigated during their lifetime.

/ / /

/ / /

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

# I.        PROCEDURAL HISTORY

### A.        William H. Dawson and Rita M. Dawson.

Plaintiffs filed their complaint for asbestos-related personal injuries (mesothelioma) on January 22, 2009, in the Alameda County Superior Court.

On March 2, 2009, defendant General Electric Company removed that action to the United States District Court for the Northern District of California. The case was initially assigned to a Magistrate Judge for all purposes. On March 25, 2009, defendant General Electric Company filed its Declination to Proceed Before a Magistrate Judge and Request For Reassignment to a United States District Judge. The case was then assigned to the Honorable William Alsup. Plaintiffs have timely filed their motion to remand this case to state court. The motion is set for hearing before Judge Alsup on May 7, 2009, at 8:00 a.m. in Courtroom 9 of the United States District Court for the Northern District of California.

### B.        Johnie D. Pelfrey, Jr. and Jan D. Pelfrey.

Plaintiffs filed their complaint for asbestos-related personal injuries (mesothelioma) on January 16, 2009, in the Alameda County Superior Court.

On March 2, 2009, defendant General Electric Company removed that action to the United States District Court for the Northern District of California. The case was initially assigned to a Magistrate Judge for all purposes. On March 8, 2009, defendant General Electric Company filed its Declination to Proceed Before a Magistrate Judge and Request For Reassignment to a United States District Judge. The case was then assigned to the Honorable Marilyn Hall Patel. Plaintiffs have timely filed their motion to remand this case to state court. The motion is set for hearing before Judge Patel on May 11, 2009, at 2:00 p.m. in Courtroom 15 of the United States District Court for the Northern District of California.

### C.        Michael E. Jenkins.

Plaintiff filed his complaint for asbestos-related personal injuries (lung cancer) on July 21, 2008, in the San Diego County Superior Court.

Plaintiff's motion to remand this case to state court was heard by Judge Dana M. Sabraw on March 9, 2009, and was denied.

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

### D.     Defendant General Electric Company.

Defendant General Electric Company first began business operations in New York in the 1890s. General Electric Company manufactured, sold and distributed numerous products that contained asbestos over the years. Those products include but are not limited to land-based steam turbines, marine steam turbines, gas turbines, electric motors, transit cars and transit car equipment, overhead crane drive systems, phenolic resin molding compounds, phenolic laminated compounds, and heat treatment ovens and industrial furnaces.

## II.     VACATING CONDITIONAL TRANSFER ORDER 320 AS TO PLAINTIFFS DAWSON, PELFREY AND JENKINS IS IN THE INTERESTS OF JUSTICE

William Dawson and Johnie Pelfrey suffer from malignant mesothelioma, a rapidly moving, incurable cancer caused solely by asbestos exposure. Michael Jenkins suffers from metastatic lung cancer that has spread to his brain. If CTO-320 is not vacated as to these three plaintiffs, they will likely die before their cases can be adjudicated by this transferee Court.

Although the stated goals of this Court are noble, i.e. to consolidate and attempt to resolve all pending asbestos cases in the Federal courts, it has simply proven to be an impracticable and impossible task to manage. The MDL-875 court has many tens of thousands of pending cases before it. There are simply not enough courtrooms available to allow the claims of Mr. Dawson, Mr. Pelfrey and Mr. Jenkins to be adjudicated before their likely imminent deaths. Defendants are well aware of the enormous case load facing the MDL-875 court. They will not negotiate any type of resolution of these cases knowing that the plaintiffs are likely to die before they are ever able to see a courtroom. These cases, therefore, are best left with the Federal courts to which they have been removed, and from which remand has been sought.

Further, motions to remand are pending in the Dawson and Pelfrey cases and are scheduled for hearings within weeks. The failure to vacate CTO-320 as to these plaintiffs will mean that they will not have the most immediate opportunity to remand their cases back to state court. For all these reasons, the interests of justice dictate that CTO-320 be vacated as to all three cases.

/ / /

/ / /

4

**III.  IN THE ABSENCE OF FEDERAL SUBJECT MATTER JURISDICTION, THE JUDICIAL PANEL CANNOT TRANSFER THESE CASES**

Neither the judicial panel, the proposed transferring courts, nor the United States District Courts for the Northern Districts or Southern Districts of California have jurisdiction over these cases. The defendants have not met their burden of establishing that the defendants were federal officers within the meaning of the Federal Officer Removal Statute, 28 U.S.C. section 1442(a)(1).

Further, all plaintiffs in their state court complaints have expressly disclaimed all claims arising from the actions or inactions of a federal officer. A defense that does not apply to plaintiffs' complaints cannot serve as the basis for removal. *Westbrook v. Asbestos Defendants*, 2001 WL 902643 (MD Cal. 2001), where a similar disclaimer was held to prevent federal subject matter jurisdiction.

Finally, plaintiffs have sought leave to amend their complaint to eliminate any basis for federal subject matter jurisdiction so that each plaintiff's case can be immediately remanded to the state court from which it was removed.

**IV.  DEFENDANTS CANNOT MEET THEIR BURDEN TO PREVENT REMAND WITHOUT EVIDENCE**

**A.  The Defendants Must Demonstrate Each Of The Following Five Elements.**

To prevail on a motion to remand, removing Defendants have the burden to demonstrate each of the following five elements:

(1)  it is a person;

(2)  it has a colorable federal defense;

(3)  it was acting pursuant to a federal officer's directions;

(4)  a causal nexus exists between the defendant's actions under the color of federal office and the plaintiff's claims; and

(5)  its activities were of such an official federal nature that warrants removal.

*See Mesa v. California*, 489 U.S. 121, 129 (1989); *Willingham v. Morgan*, 395 U.S. 402, 409 (1969) (regarding elements 1-4); *and see Williams v. General Electric Co.*, 418 F.Supp.2d 610 (M.D. Penn. 2005) (regarding element 5).

5

1    Plaintiffs do not dispute that each of the Defendants is a "person" for the purposes of

2    1442(a)(1).  However, Defendants have not offered even a scintilla of evidence that they are

3    capable of meeting any of the other prongs.

4    In *Watson v. Philip Morris*, the court held that a private firm's compliance with federal

5    laws, rules, and regulations <u>does not by itself</u> fall within the scope of the statutory phrase "acting

6    under" a federal "official," even if the regulation is highly detailed and even if the private firm's

7    activities are highly supervised and monitored. *See Watson v. Philip Morris Companies*, 551 U.S.

8    142 (2007).  Contrary to Defendants' claims, merely complying with federal rules and regulation is

9    not enough to invoke removal on federal officer grounds.  In *Hilbert v. McDonnell Douglas Corp.*,

10   the court explained that the federal officer removal statute was never intended to make it easy for

11   military contractors to gain access to federal courts and thus get cases in Multi-District Litigation

12   ("MDL").  The court opined that "[a]n overly generous interpretation of the *Mesa* [*v. California*,

13   489 U.S. 121 (1989)] criteria would do just that by permitting private, non-diverse defendants to

14   remove to federal court merely because of their status as government contractors." *See Hilbert v.*

15   *McDonnell Douglas Corp.*, 529 F.Supp.2d 187 (D.Mass. 2008).

16   This reasoning is consistent with the long held truism that federal courts are courts of

17   <u>limited</u> jurisdiction.  As the United States Supreme Court noted, "[f]ederal courts are courts of

18   limited jurisdiction.  They possess only that power authorized by Constitution and statute . . . which

19   is not to be expanded by judicial decree . . . .  It is to be presumed that a cause lies outside this

20   limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting

21   jurisdiction" (*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) [citations omitted]).

22   The presumption of a cause lying outside the limit of the jurisdiction of the federal courts is the

23   basis for the widely held policy of finding for remand. *See New Jersey Department of*

24   *Environmental Protection v. Exxon Mobil Corp.*, 381 F.Supp.2d 381, 402-403 (D.N.J. 2005);

25   *Entrekin v. Fisher Scientific Inc.*, 146 F.Supp.2d 594, 604 (3d Cir. 2001) [The federal court is

26   obligated to "strictly construe any removal statutes against removal and in favor of remand"]; *Gaus*

27   *v. Miles, Inc.*, 980 F.2d. 564, 566-67 (9th. Cir. 1992) [Courts ruling on motions for remand must

28   resolve any doubt in favor of remand]; *Vasquez v. Alto Bonito Gravel Plant Corp.*, 56 F.3d 689,

6

1 694 (5th Cir. 1995); *Texas First Nat. Bank v. Wu*, 347 F.Supp.2d 389, 394 (S.D. Tex. 2004); *but*

2 *see Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) [federal officers'

3 removal statute is to be construed broadly and doubts are to be resolved in favor of the removing

4 party].

5       Finally, Defendants cannot show that their activities are of such an official federal nature

6 that warrants removal to ensure the protection of federal interests and immunities from suit

7 afforded by this Court. *See Williams v. General Electric Co.*, 418 F.Supp.2d 610 (M.D. Penn.

8 2005).

9     **B.**     **To Establish A Colorable Military Contractor's Federal Defense, Defendants**
    **Must Demonstrate The Existence Of Reasonably Precise Specifications,**

10     **Conformity Thereto, And That The Supplier Warned The United States About**
    **Dangers Of Which It Had Greater Knowledge.**

11

12       Military contractors are immunized from liability under state tort law if: (1) the United

13 States approved reasonably precise specifications; (2) the equipment conformed to those

14 specifications; and (3) the supplier warned the United States about the dangers in the use of the

15 equipment that were known to the supplier but not to the United States. *Boyle v. United Techs.*

16 *Corp.*, 487 U.S. 500, 512 (1988). The Ninth Circuit noted that in actions involving asbestos used

17 in the construction of naval ships, a defendant must show that "in making [its] decisions regarding

18 warnings [it was] acting in compliance with 'reasonably precise specifications' imposed on [it] by

19 the United States." *In re Hawaii*, 960 F.2d at 813. The test was clarified in *Overly v.*

20 *Raybestos-Manhattan* that in order to "meet the *Boyle* test in a failure to warn case, the defendant

21 must show that the government affirmatively instructed it regarding the provisions of warnings."

22 1996 WL W532150 at *4.

23       Thus the federal officer defense trumps state law <u>only</u> "when the Government, making a

24 discretionary, safety-related military procurement decision contrary to the requirements of state

25 law, incorporates this decision into a military contractor's contractual obligations, thereby limiting

26 the contractor's ability to accommodate safety in a different fashion." *In re Hawaii*, 960 F.2d at

27 813.

28 / / /

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

Defendants need not prove their defense on the merits in order to prevent remand. That would require them to win their case at this early stage in order to prevent remand. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). But that does not mean that the merits of their defense are irrelevant to the question of remand. If federal courts could use an objectively baseless defense to claim subject matter jurisdiction over an action, then federal courts could claim subject matter jurisdiction over <u>any</u> state court action.

### C.   Defendants Cannot Establish A Colorable Federal Defense Without Evidence.

General Electric has provided not even a scintilla of evidence in its notice of removal. General Electric offers only its lawyer's hearsay. No person with personal knowledge is even named, let alone quoted, in support of General Electric's notice of removal.

Defendants have had <u>decades</u> to marshal evidence in support of their military contractor's defense to asbestos actions (because the same factual basis underlies their defense in all asbestos personal injury actions brought by former U.S. Navy sailors). They have had <u>decades</u> to get their evidence in order. And yet they offer <u>no</u> evidence here in support of removal. They offer only to provide evidence in opposition to this motion. Notice of Removal at ¶8, 3:23-25.

### D.   Defendants Cannot Demonstrate That They Were Prevented From Issuing Warnings As To The Hazards Of Asbestos, A Necessary Element Of Their Defense.

Defendants must demonstrate that they were <u>prevented</u> from providing warnings by some federal officer:

> Defendants fail to apprehend the essence of the "under color" causal connection requirement. They are being sued for unnecessarily and negligently causing their employees and other workers to be exposed to asbestos dust on the job and for failing to warn these employees and workers of the associated dangers. **What they must establish for purpose of § 1442(a)(1) is that the government authority under which they worked required them to act as they did. For purposes of Plaintiffs' failure to warn claims, for example, they must establish the DOE's [Department of Energy's] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards.**

*Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp.2d 1144, 1155, (D.Colo. 2002) (emphasis added).

/ / /

/ / /

1   Defendants are unable to provide a single witness, having personal knowledge, who will

2   say that the U.S. Navy prevented them from providing warnings about asbestos hazards.

3   Defendants are unable to provide a single witness, having personal knowledge, who will say that

4   they were <u>prevented</u> from issuing warnings, in compliance with their state law duties, by federal

5   officers.  Defendants are unable to provide a single witness, having personal knowledge, who will

6   say that Defendants ever <u>tried</u> to put an asbestos-related warning on a machine or in a manual.

7   The military contractor defense "is inapplicable to a failure to warn claim in the absence of

8   evidence that in making the decision whether to provide a warning . . . [defendant] was acting in

9   compliance with reasonably precise specifications imposed on it by the United States." *Butler v.*

10  *Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996).  The court went on to assert that "[i]n a

11  failure to warn action, where no conflict exists between any requirements imposed under a federal

12  contract and a state law duty to warn, regardless of any conflict which may exist between the

13  contract and state law design requirements, *Boyle* commands that we defer to the operation of state

14  law." *Id.*

15  In a failure to warn case there must be a showing of specific requirements with respect to

16  warnings.  A defendant is not immune from a failure to warn claim simply by showing the elements

17  of the defense with respect to a design defect claim because "design defect and failure to warn

18  claims differ practically as well as theoretically" *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003

19  (7th Cir. 1996).  Defendants must but have not made a showing that they received "reasonably

20  precise specifications" with respect to warnings from the U.S. Navy. *Butler*, 89 F.3d at 586).

21  In *Faulk v. Owens-Corning*, the United States District Court for the Eastern District of

22  Texas addressed this exact issue. *Faulk v. Owens-Corning*, 48 F.Supp.2d 653 (E.D. Tex. 1999).  In

23  *Faulk*, the Court stated that "the federal government had provided no direction or control on

24  warnings when using asbestos; moreover, the government did not prevent Defendants from taking

25  their own safety precautions heeding state law standards above the minimum standards

26  incorporated in their federal contracts. *Id.* at 663.  There was evidence of detailed government

27  specifications relating to the production of certain products, but nothing about warnings related to

28  the hazards of asbestos. *Id.* at 664.

9

1    Other circuit courts that have addressed the application of the *Boyle* factors in failure-to-

2  warn cases has concluded that the government contractor defense is only available when the

3  contractor's warning conforms to one that the government at least approved, if not dictated. *E.g.,*

4  *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431 (5th Cir. 2000).

5    In *Kerstetter*, the Fifth Circuit held that state law is only displaced in a failure-to-warn

6  claim if: (1) the government exercised its discretion and approved the particular warnings, if any;

7  (2) the contractor provided warnings that conformed to the approved warnings; and (3) the

8  contractor warned the government of the dangers in the equipment's use about which the contractor

9  knew, but the government did not. *Id.* at 438.

10    The Court's conclusion in *Kerstetter* was in accord with an earlier opinion in *In re Air*

11 *Disaster at Ramstein Air Base,* 81 F.3d 570 (5th Cir. 1996). In that case, the Fifth Circuit held that

12 a contractor is entitled to the defense in a failure-to-warn case only if it establishes "an identifiable

13 federal interest or policy in the existence or methods of warning and a significant conflict between

14 the federal interest or policy and the operation of state law." *Id.* at 576. The Court concluded that,

15 based on the evidence presented, it could not determine whether the government exercised

16 sufficient discretion with respect to a warning to bring the plaintiffs' claim within the scope of

17 *Boyle* because (like General Electric) the defendants had not presented any evidence to establish

18 whether they and the government were involved in any discussions about warnings. *Id.* The Fifth

19 Circuit clearly requires a contractor to prove that the government exercised some discretion over a

20 warning before a contractor can seek the solace of the military contractor defense in a failure-to-

21 warn case.

22    This is precisely the case here. General Electric has presented absolutely *zero evidence* that

23 it ever had any discussions with the Navy about asbestos warnings.

24    The Sixth and Seventh Circuits also require defendants to present evidence that the

25 government exercised discretion over a warning before the government contractor defense will bar

26 a failure-to-warn claim, even if the defendant would be immune from a design defect claim. In

27 *Tate v. Boeing Helicopters,* 55 F.3d 1150, 1156-1157 (6th Cir. 1995), the Sixth Circuit explained:

28

10

1   "Simply because the government exercises discretion in approving a design does not mean that the

2   government considered the appropriate warnings, if any, that should accompany the product."

3        Likewise, the Seventh Circuit, as noted earlier, confirmed that a defendant may not defeat a

4   state failure-to-warn claim simply by showing the elements of the government contractor defense

5   with respect to a design defect claim because "design defect and failure to warn claims differ

6   practically as well as theoretically." *Oliver*, 96 F.3d at 1003. Accordingly, both Courts of Appeals

7   applied the same modified *Boyle* factors used by the Fifth Circuit in *Kerstetter*.

8        Applying these factors in cases involving asbestos, other Courts of Appeals have been in

9   accord. The Ninth Circuit held that a defendant-contractor was not entitled to protection under

10   *Boyle* because it produced no evidence that the government required it to do anything with respect

11   to warnings on its products. *See In re Hawaii*, 960 F.2d at 806-813. Likewise, the Second Circuit

12   has held in asbestos cases that state law cannot be displaced where there is no evidence that the

13   government contractor could not comply with both its contractual obligations to manufacture

14   asbestos-containing products and its state-prescribed duty to warn of the hazards of asbestos dust.

15   *In re Joint Eastern and Southern Dist. N.Y. Asbestos Litigation*, 897 F.2d 626, 626-32 (2nd Cir.

16   1990).

17        The fundamental tenet underlying the *Boyle* doctrine is that state law should not be

18   preempted when the state law duty sought to be imposed on a contractor is not contrary to a duty

19   assumed under a government contract. *See Boyle*, 487 U.S. at 508-509. Borrowing the *Boyle*

20   Court's example, if the government contracted to purchase an air conditioner, specifying the

21   cooling capacity but not its precise construction, a state law imposing a duty upon the manufacturer

22   to include certain safety features (e.g., a warning) would not be contrary to the contractor's duty

23   under the contract. *Id.* at 509. "The contractor could comply with both its contractual obligations

24   and the state-prescribed duty of care." *Id.*

25   / / /

26   / / /

27   / / /

28   / / /

11

---

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

1    Because Defendants cannot offer any evidence whatsoever in support of the false claim that

2    they were prevented, by the U.S. Navy, from giving warnings about the health hazards of

3    asbestos—which the U.S. Navy was not even aware, at the time—their defense to any of plaintiff's

4    causes of action based on a failure to warn is objectively baseless and therefore cannot serve as the

5    basis for federal jurisdiction.

6    Where state law standards are not in conflict with the directions of federal officers, no

7    military contractor's defense exists.  *Boyle*, 487 U.S. at 507.  Defendants have no evidence that

8    state law duties to warn conflicted with their responsibilities to the federal government.  In fact,

9    their state law duties to warn ran parallel with Defendants' obligations to the U.S. Navy.

10    **E.**    **Defendants Were Never Prevented From Issuing Warnings About Asbestos.**

11    Rear Adm. Roger B. Horne, Jr., U.S. Navy, ret. testified that the U.S. Navy did not prohibit

12    any specific warnings.  Brody Decl., Exh. A[1] at 123:14-124:4.  Rear Adm. Ben Lehman, U.S.

13    Navy, ret. testified that he knew of no specific instance where a manufacturer's request to warn

14    about the hazards of asbestos was denied.  Brody Decl., Exh. B[2] at 22:22-24:10 and 27:16-23.

15    None of the Defendants has provided any evidence whatsoever of a military specification

16    that prohibited them from placing warnings in any of their technical manuals or on their equipment

17    that exposed Mr. Dawson to asbestos.  No such specification exists.  Defendants have provided no

18    evidence whatsoever that they ever attempted to provide such a warning but were rebuffed by a

19    federal officer.

20    Adm. Horne further testified to the existence of a Navy specification that actually requires

21    warning in technical manuals of procedures that cause serious injury or death and he has admitted

22    that such specification refers not only to operating procedures, but also to installation, maintenance

23    and repair.  Exh. A at 110:15-112:23.  Navy personnel were made aware of how to maintain and

---

24

25    [1] Exhibit A to the Declaration of Richard A. Brody in Support of Plaintiffs' Consolidated Motion to Vacate CTO-320
26    ("Brody Decl.") is the testimony of Rear Adm. Roger B. Horne, U.S. Navy, ret., taken July 8, 2004 in the case of
      *Hinchman v. Ametek, Inc., et al.* No. 24544-BH03, District Court for Brazoria County, Texas.  Adm. Horne served in
      the U.S. Navy from 1956 to 1991.
27    [2] Exhibit B to the Brody Decl. consists of excerpts from the testimony of Rear Adm. Ben Lehman, U.S. Navy, ret.,
      taken December 23, 2005 in the case of *Sweeney v. Saberhagen Holdings, Inc., et al.*, No. C05-1637Z, U.S. District
28    Court for the Western District of Washington.

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

1    repair Defendants' products by reference to these technical manuals. Exh. A at 128:4-129:15;

2    146:19-149:2. Had warnings been provided in these manuals, the sailors would have had an

3    opportunity to learn how to protect themselves when working around the products' asbestos

4    insulation. Adm. Horne testified that manufacturers should provide warnings about "subtle"

5    dangers that would not be known to the sailors. Exh. A at 118:24-119:4; 119:21-120:13. Thus,

6    Defendants' state law duties to warn about asbestos ran parallel to the U.S. Navy's instructions and

7    were never in conflict.

8         Adm. Horne has testified that when the Navy finally learned about the hazards of asbestos

9    in approximately 1968 or 1969, it immediately took corrective action. Exh. A, 20:2-24:21; 120:16-

10   121:8. The Navy would not have been taken by surprise if Defendants had timely provided

11   warnings on their equipment, in their manuals, or directly to the Navy.

12        One person extremely knowledgeable about this subject—Admiral Zumwalt[3]—is unable to

13   testify in this action because General Electric killed him. Admiral Zumwalt succumbed to

14   mesothelioma on January 2, 2000. If the U.S. Navy had known earlier about the hazards of

15   asbestos, Admiral Zumwalt would have known, and he might still be alive today. Not even the

16   highest-ranking officer in the U.S. Navy was safe.

17        Defendants' defense has no merit whatsoever, and Defendants cannot get the evidence they

18   need to support their defense. Their defense is objectively baseless. An objectively baseless

19   defense is not a "colorable" defense. An objectively baseless defense cannot serve as the basis for

20   federal jurisdiction, or federal courts could exercise jurisdiction over literally any case.

21   **V.    PLAINTIFFS' DISCLAIMER PREVENTS DEFENDANTS FROM MEETING THE
            CAUSAL NEXUS REQUIREMENT**

22

23        **A.    Defendants Cannot Demonstrate A Causal Nexus Between Any Actions They
                  Took Under The Direction Of A Federal Officer And Harm To The Plaintiff
24                For Which Plaintiff Seeks Relief, Because Of Plaintiff's Express Disclaimer.**

25        Plaintiffs' express disclaimer is as follows:

26   _____

27   [3] Admiral Elmo Russell Zumwalt, Jr. was from 1970 to 1974 the highest-ranking officer in the U.S. Navy ("Chief of
     Naval Operations") and in that capacity was a member of the Joint Chiefs of Staff. *See also* Brody Decl., Exh. A at
28   18:2-13.

13

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

Every claim arising under the constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission of a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).

Plaintiffs' Complaint at ¶3, 2:18-21.

Various courts have given effect to similar disclaimers as a basis for finding that federal subject matter jurisdiction did not exist. *See Westbrook v. Asbestos Defendants*, 2001 WL 902643 (N.D. Cal. 2001) [allowing plaintiff to disclaim all claims based on acts committed by defendant at the direction of a federal officer or agency.]; *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992) *Shilz v. A.P. Green Industries, Inc.*, 2002 WL 102608 (N.D. Cal. 2002), and *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996) [allowing plaintiff to limit claims to failure to warn]. Moreover, the U.S. Supreme Court determined that "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced. *See Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 809 (1986). Plaintiff here does not put forward any claims based on any act or omission by Defendant at the direction of any federal officer or agency.

General Electric's removal is based solely on a defense that does not apply to any of plaintiffs' claims, because every claim to which the defense would be applicable has been disclaimed.

**B.     Even If The Court Will Not Give Force To Plaintiffs' Disclaimer, Their Actions Will Likely Be Remanded.**

For the reasons stated above, the Court should give effect to plaintiffs' disclaimer. But if it will not, then <u>plaintiffs should be provided leave of court to immediately amend their Complaint</u> to remove any theory of liability, in whole or in part, to the extent that it gives rise to federal subject matter jurisdiction (including a colorable federal defense). As established above, Defendants cannot show any evidence that they were ever prevented by federal officers from complying with state law duties to warn. Defendants have no colorable defense whatsoever to causes of action based on their failure to warn. Plaintiffs should be allowed to proceed on those theories.

/ / /

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

1  *In re Patenaude*, 210 F.3d 135, 139-140 (3rd Cir. 2000) (footnote omitted) (emphasis added).  This

2  well-intentioned policy, designed to promote settlement, unfortunately has the opposite effect in a

3  mesothelioma or lung cancer case, such as those presented here.

4      In practice it gives Defendants an incentive to negotiate in bad faith to create the appearance

5  of an "avenue of settlement" long enough to beat the death clock.  This pits defense counsel, who

6  have unlimited time, against men dying of mesothelioma and lung cancer, for whom time is

7  running out.

8      The clock is ticking.  Even if their cases would be remanded by MDL 875 during their

9  lifetimes, the delay would diminish plaintiffs' chances of living to see their trials.  Plaintiffs are

10  entitled to their day in court in their lifetimes.  If these cases are sent to MDL 875, that is not likely

11  to happen.

12  **VI.    CONCLUSION**

13      Vacating CTO-320 as to plaintiffs William Dawson, Johnie Pelfrey and Michael Jenkins is

14  in the interest of justice.  Tragically, all three gentlemen are dying of asbestos-related cancers.  If

15  CTO-320 is not vacated as to these three plaintiffs, they will die before their cases can be

16  adjudicated.  In the cases of Mr. Dawson and Mr. Pelfrey, their spouses will be left without

17  adequate financial support.

18      Defendants have not presented a colorable federal defense to plaintiffs' non-disclaimed

19  claims, nor will they be able to do so in their opposition papers.  Defendants lack evidence that they

20  were ever prevented, by a federal officer, from complying with their state law duty to provide

21  warnings.  A defense unsupported by even a scintilla of evidence is not a "colorable" defense.

22  Because no colorable defense exists, no federal jurisdiction exists.

23      The military contractor's defense is inapplicable to plaintiffs' Complaint because plaintiffs

24  expressly disclaimed all causes of action based on the actions or inaction of a federal officer.  A

25  defense that is inapplicable on the face of the Complaint is not a "colorable" defense.

26  If federal subject matter jurisdiction is found to exist, the four factors identified by the Supreme

27  Court in *Carnegie-Mellon* each militate in favor of allowing plaintiffs to quickly amend their

28  complaint as necessary to destroy any federal subject matter jurisdiction so that this Court can

16

1  remand the case to Alameda County Superior Court.  To send plaintiffs' cases to MDL 875 would

2  waste judicial resources, weaken California's ability to enforce its laws against corporate

3  defendants responsible for the deaths of thousands of California residents, unfairly take away

4  plaintiffs' ability to recover for their ongoing pain and suffering, and unfairly take away plaintiffs'

5  ability to see, in their lifetimes, that some justice has been done.

6

7  DATED:  April 17, 2009                              Respectfully submitted,

8                                                      BRENT COON & ASSOCIATES

9

10                                                     By:

11                                                        RICHARD A. BRODY
                                                          Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO AND SUPPORTING BRIEF

**ORIGINAL**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 2 2009

FILED
CLERK'S OFFICE

Richard A. Brody, Esq. (SBN 100379)
BRENT COON & ASSOCIATES
44 Montgomery Street, Suite 800
San Francisco, CA 94104
Telephone: 415.489.7420
Facsimile: 415.489.7426

Attorneys for Plaintiffs

**DOCKET NO. 875**

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION**

| | |
|---|---|
| This document relates to: | *William H. Dawson, et al. v. CBS Corporation, et al.*<br>**Civil Action No. 3 09-903 WHA**<br>**In the United States District Court, Northern District of California;** |
| | **and** |
| | *Johnie D. Pelfrey, Jr., et al. v. Foster Wheeler, LLC, et al.*<br>**Civil Action No. 3 09-902 MHP**<br>**In the United States District Court, Northern District of California;** |
| | **and** |
| | *Michael E. Jenkins v. Allied Packing & Supply, Inc., et al.*<br>**Civil Action No. 3 09-101 DMS (LSP)**<br>**In the United States District Court, Southern District of California.** |

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2009 APR 21   A 10: 41

RECEIVED
CLERK'S OFFICE

1

DECLARATION OF RICHARD A. BRODY IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION TO
VACATE CTO

**DECLARATION OF RICHARD A. BRODY IN SUPPORT OF PLAINTIFFS'
CONSOLIDATED MOTION TO VACATE CONDITIONAL TRANSFER ORDER
(CTO-320)**

I, Richard A. Brody, do declare and state:

1.      I am an attorney at law duly licensed to practice before all the courts in the state of California, and I am admitted to practice before the Ninth Circuit Court of Appeal and the United States District Courts for the Northern District of California, Central District of California, and Southern District of California and am associated with the law firm of Brent Coon & Associates, counsel of record for plaintiffs William H. Dawson and Rita M. Dawson; Johnie D. Pelfrey, Jr. and Jan D. Pelfrey; and Michael E Jenkins herein. I make this declaration in support of Plaintiffs' Consolidated Motion To Vacate Conditional Transfer Order (CTO-320) And Consolidated Supporting Brief. Unless otherwise stated, I have personal knowledge of the following matters and could, if called to do so, testify competently thereto.

2.      Plaintiffs William H. Dawson and Rita M. Dawson filed their complaint for asbestos-related personal injuries on January 22, 2009, in the Alameda County Superior Court in Northern California. Mr. Dawson suffers from malignant mesothelioma, an incurable, rapidly moving cancer of the two thin membranes surrounding the lung (the pleura). Malignant mesothelioma is caused primarily by past exposure to asbestos fibers. Individuals suffering from malignant mesothelioma typically live no longer than 6 to 8 months after their initial diagnosis.

On March 2, 2009, defendant General Electric Company removed the Dawsons' state court action to the United States District Court for the Northern District of California. The removed case has been assigned to the Honorable William Alsup. Plaintiffs have timely filed a motion to remand their case to state court, which is set for hearing on May 7, 2009, at 8:00 a.m. in Courtroom 9 of the United States District Court for the Northern District of California before Judge Alsup.

3.      Plaintiffs Johnie D. Pelfrey, Jr. and Jan D. Pelfrey filed their complaint for asbestos-related personal injuries on January 16, 2009, in the Alameda County Superior Court in Northern California. Mr. Pelfrey also suffers from malignant mesothelioma.

/ / /

/ / /

DECLARATION OF RICHARD A. BRODY IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO

On March 2, 2009, defendant General Electric Company removed the Dawsons' state court action to the United States District Court for the Northern District of California. The removed case has been assigned to the Honorable Marilyn Hall Patel. Plaintiffs have timely filed a motion to remand their case to state court, which is set for hearing on May 11, 2009, at 8:00 a.m. in Courtroom 9 of the United States District Court for the Northern District of California before Judge Patel.

4.       Michael E. Jenkins filed his complaint for asbestos-related personal injuries on July 21, 2008 in the San Diego County Superior Court. Mr. Jenkins suffers from lung cancer that has spread to his brain. Mr. Jenkins has suffered a partial stroke that has left him virtually blind. Mr. Jenkins' overall medical prognosis is very poor.

Defendant General Electric Company removed the state court case to federal court. Plaintiff's motion to remand this case to state court was heard but denied by the Honorable Dana M. Sabraw on March 9, 2009. Should the conditional transfer order be vacated as to Mr. Jenkins, plaintiff's counsel intends to file a motion to amend the complaint to eliminate any potential federal officer issues, thus making the case available for remand to state court.

5.       Attached hereto as Exhibit A is a true and accurate copy of pertinent portions of the testimony of Rear Admiral Roger B. Horne, United States Navy, retired, taken on July 8, 2004 in the case *Hinchman v. Ametek, Inc., et al.*, Case No. 24544-BH03, District Court for Brazoria County, Texas. Admiral Horne served in the United States Navy from 1956 to 1991.

6.       Attached hereto as Exhibit B is a true and accurate copy of pertinent portions of the testimony of Rear Admiral Ben Lehman, United States Navy, retired, taken on December 23, 2005, in the case of *Sweeney v. Saberhagen Holdings, Inc., et al.*, Case No. C05-1637Z, United States District Court for the Western District of Washington.

/ / /

/ / /

/ / /

/ / /

/ / /

3

DECLARATION OF RICHARD A. BRODY IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CTO

1      I declare under penalty of perjury under the laws of the state of California that the foregoing

2 is true and correct, except as to any matters stated on information and belief, and as to those

3 matters, I believe them to be true.

4      Executed this 17th day of April, 2009, at San Francisco, California.

5

6

7 RICHARD A. BRODY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RICHARD A. BRODY IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION TO
VACATE CTO

**ORIGINAL**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 2 2009

FILED
CLERK'S OFFICE

1 | Richard A. Brody, Esq. (SBN 100379)
BRENT COON & ASSOCIATES
2 | 44 Montgomery Street, Suite 800
San Francisco, CA 94104
3 | Telephone: 415.489.7420
Facsimile: 415.489.7426
4

Attorneys for Plaintiffs
5

6

7

8 | **DOCKET NO. 875**

9 | **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

10 | **IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION**

11

12 | This document relates to:      *William H. Dawson, et al. v. CBS Corporation, et al.*
**Civil Action No. 3 09-903 WHA**
13 | **In the United States District Court, Northern District of**
**California;**
14

15 | **and**

16 | *Johnie D. Pelfrey, Jr., et al. v. Foster Wheeler, LLC, et al.*
**Civil Action No. 3 09-902 MHP**
17 | **In the United States District Court, Northern District of**
**California;**
18

19 | **and**

20

21 | *Michael E. Jenkins v. Allied Packing & Supply, Inc., et al.*
**Civil Action No. 3 09-101 DMS (LSP)**
22 | **In the United States District Court, Southern District of**
**California.**
23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

***William H. Dawson, et al. v. CBS Corporation, et al.***
**Civil Action No. 3 09-903 WHA**

***Johnie D. Pelfrey, Jr., et al. v. Foster Wheeler, LLC, et al.***
**Civil Action No. 3 09-902 MHP**

***Michael E. Jenkins v. Allied Packing & Supply, Inc., et al.***
**Civil Action No. 3 09-101 DMS (LSP)**

## CERTIFICATE OF SERVICE

I, the undersigned, declare:

I am over the age of eighteen years and not a party to the within cause.  I am employed in the County of San Francisco, California; my business address is 44 Montgomery Street, Suite 800, San Francisco, CA 94104.  On the date below, I served one true copy of:

**PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-320) AND CONSOLIDATED SUPPORTING BRIEF**

**DECLARATION OF RICHARD A. BRODY IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-320)**

[XX ]   **BY MAIL:** I placed a true copy, enclosed in a sealed envelope with postage paid, for collection and mailing on the date below at San Francisco, California, following ordinary business practices, to the addressee(s) noted below or on the attachment herein.  I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day in the ordinary course of business.

## SEE ATTACHED INVOLVED COUNSEL LIST

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Dated:  April 20, 2009

_____
Michelle Dantzman

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**

MDL No. 875

## SCHEDULE OF ACTIONS/INVOLVED COUNSEL LIST (EXCERPTED FROM CTO-320)

Northern District of California

Johnie D. Pelfrey, Jr., et al. v. Foster Wheeler, LLC, et al., C.A. No. 3:09-902  (Judge Marilyn Hall Patel)
William H. Dawson, et al. v. CBS Corp., et al., C.A. No. 3:09-903  (Judge Elizabeth D. Laporte)

Southern District of California

Michael E. Jenkins v. Allied Packing & Supply, Inc., et al., C.A. No. 3:09-101  (Judge Dana M. Sabraw)

Peter G. Angelos
LAW OFFICES OF PETER G ANGELOS PC
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

Julie R. Beaton
KUTAK ROCK
18201 Von Karman Avenue
Suite 1100
Irvine, CA 92612-1077

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Richard A. Brody
BRENT COON & ASSOCIATES
44 Montgomery Street
Suite 800
San Francisco, CA 94104

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415

Guillermo Escobedo
GORDON & REES LLP
101 West Broadway
Suite 2000
San Diego, CA 92101-3541

Katherine Paige Gardiner
SEDGWICK DETERT MORAN & ARNOLD LLP
One Market Plaza
8th Floor
San Francisco, CA 94105

Stephanie A. Hingle
KUTAK ROCK LLP
515 South Figueroa Street
Suite 1240
Los Angeles, CA 90071-3329

Steven K. Hwang
PERKINS & COIE
1620 26th Street
6th Floor
Santa Monica, CA 90404

**MDL No. 875 - Schedule of Actions/Involved Counsel List (Excerpted from CTO-320) (Continued)**

Kevin D. Jamison
POND NORTH LLP
350 South Grand Avenue
Suite 2850
Los Angeles, CA 90071

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607

Maureen L. King
BARG COFFIN LEWIS & TRAPP LLP
350 California Street
22nd Floor
San Francisco, CA 94104-1435

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

Peter B. Langbord
FOLEY & MANSFIELD PLLP
150 South Los Robles Avenue
Suite 400
Pasedena, CA 91101

Carrie Lin
COOLEY MANION JONES HAKE ET AL
201 Spear Street
Suite 1800
San Francisco, CA 94105

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER &
MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street
28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105

**MDL No. 875 - Schedule of Actions/Involved Counsel List (Excerpted from CTO-320) (Continued)**

Thomas Jeffrey Moses
BRYDON HUGO & PARKER
135 Main Street
20th Floor
San Francisco, CA 94105

Stephen Robert Onstot
WALSWORTH FRANKLIN BEVINS &
MCCALL
633 West Fifth Street
28th Floor
Los Angeles, CA 90071

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Francis D. Pond
POND NORTH LLP
350 South Grand Avenue
Suite 2850
Los Angeles, CA 90071

Glen R. Powell
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
20th Floor
San Francisco, CA 94111

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Dee Dee Stephens
BRENT COON & ASSOCIATES
44 Montgomery Street
Suite 800
San Francisco, CA 94104

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ & TARDY
PLLC
P.O. Box 22608
Jackson, MS 39225-2608

Yakov Paul Wiegmann
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

Don Willenburg
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
20th Floor
San Francisco, CA 94111

Dennis M. Young
FOLEY & MANSFIELD PLLP
1111 Broadway
10th Floor
Oakland, CA 94607

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 2 2009

FILED
CLERK'S OFFICE

# EXHIBIT A

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2009 APR 21  A 10: 41

RECEIVED
CLERK'S OFFICE

Exhibit A to the Declaration of Richard A. Brody In Support Of Plaintiffs' Consolidated
Motion To Vacate Conditional Transfer Order (CTO-320)

ADMIRAL ROGER B. HORNE

GARY DIMUZIO FOR PLAINTIFFS

CAUSE NO. 24544-BH03

WILLIAM HINCHMAN and wife )    IN THE DISTRICT COURT
BETTY HINCHMAN, et al., )
                    )
     Plaintiffs, )    BRAZORIA COUNTY, TEXAS
                    )
     v. )
                    )    23rd JUDICIAL DISTRICT
AMETEK, INC., et al., )
                    )
     Defendants. )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

ADMIRAL ROGER B. HORNE

JULY 8, 2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of ADMIRAL ROGER B. HORNE, produced as a witness at the instance of Defendant Buffalo Pumps, and duly sworn, was taken in the above-styled and numbered cause on the 8th day of July 2004, from 10:00 a.m. to 3:02 p.m., before Paul J. Frederickson, Certified Court Reporter and Notary Public in and for the State of Washington, reported by machine shorthand, with computer-aided transcription, at 1420 Fifth Avenue, Suite 4100, Seattle, Washington, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record.

1

---

1     PRESTON GATES ELLIS, LLP
2     925 Fourth Avenue, Suite 2900
3     Seattle, Washington  98104-1158
4     billshaw@prestongates.com
5  FOR DEFENDANT GUARD-LINE INC.:
6  (Appearing via telephone)
7     Kevin Melchi
8     DOGAN, WILKINSON, KINARD, SMITH & EDWARDS
9     P.O. Box 118
10    Pascagoula, MS 39568
11    228.762.2272
12 FOR DEFENDANT ALFA LAVAL, INC.:
13 (Appearing via telephone)
14    Randall W. Reavis
15    NEXSEN PRUET ADAMS KLEEMEIER
16    701 Green Valley Road, Suite 100
17    P.O. Box 3463 (27402)
18    Greensboro, NC 27408
19    336.373.1600 ext. 5104
20 FOR DEFENDANT WARREN PUMPS, INC.:
21 (Appearing via telephone)
22    Drew M. Schilling
23    HAWKINS, PARNELL & THACKSTON, LLP
24    4514 Cole Avenue, Suite 550
25    Dallas, Texas 75205

3

---

1          A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3  (Appearing via telephone)
4     Gary M. DiMuzio
5     CLARK, DEPEW & TRACEY, LTD, LLP
6     440 Louisiana, 16th Floor
7     Houston, Texas  77002
8     713.757.1400
9     diumzio@clarkdepew.com
10 FOR DEFENDANT BUFFALO PUMPS and CRANE CO.:
11    Michael J. Ramirez
12    GODWIN GRUBER
13    Renaissance Tower
14    1201 Elm Street, Suite 1700
15    Dallas, Texas  75270
16    214.939.8603
17    mramirez@godwingruber.com
18 FOR DEFENDANT BUFFALO PUMPS:
19    Brady L. Green
20    MORGAN, LEWIS & BOCKIUS, LLP
21    1701 Market Street
22    Philadelphia, PA  19103-2921
23    215.963.5000
24 FOR DEFENDANT GARLOCK:
25    G. William Shaw

2

---

1     214.780.5117
2  FOR DEFENDANT FMC CORPORATION:
3  (Appearing via telephone)
4     Jillian J. van Rensburg
5     DEHAY & ELLISTON, LLP
6     901 Main Street, Suite 3500
7     Dallas, Texas 75204
8     214.210.2422
9     jvanrensburg@dehay.com
10 FOR DEFENDANT IMO INDUSTRIES:
11 (Appearing via telephone)
12    Latosha Lewis
13    GARDERE WYNNE SEWELL, LLP
14    1000 Louisiana, Suite 3400
15    Houston, Texas  77002-5007
16    713.276.5500
17    LLewis@gardere.com

4

1 (Pages 1 to 4)

EXHIBIT A

ADMIRAL ROGER B. HORNE

<table>
<tr><td>

1        I N D E X

2

3    ADMIRAL ROGER B. HORNE

4       By Mr. DiMuzio: 8

5       By Mr. Ramirez: 173

6       By Mr. Shaw: 186

7       By Ms. Lewis: 191

8

9       INDEX TO EXHIBITS

10

11   1    Notice of Deposition        6

</td></tr>
</table>

INDEX

ADMIRAL ROGER B. HORNE
By Mr. DiMuzio: 8
By Mr. Ramirez: 173
By Mr. Shaw: 186
By Ms. Lewis: 191

INDEX TO EXHIBITS

1   Notice of Deposition   6

**Page 5**

MR. DIMUZIO: Okay. Are you there just for Buffalo or --

MR. RAMIREZ: Yes, I'm going to defend Admiral Horne on behalf of -- he is our expert.

MR. DIMUZIO: Okay. Are you Buffalo or Buffalo and Crane?

MR. RAMIREZ: Buffalo.

MR. DIMUZIO: Just Buffalo. Okay. Anybody from Crane out there?

MR. RAMIREZ: Actually, I will not defend him on behalf of Crane, but I will make an appearance for Crane.

MR. DIMUZIO: Oh, I got you. Okay.

MR. GREEN: Brady Green from Morgan, Lewis in Philadelphia, also for Buffalo Pumps.

MR. SHAW: Bill Shaw here in Seattle on behalf of Garlock.

MR. DIMUZIO: Okay. Anybody else?

MR. SHAW: That's it here.

MR. RAMIREZ: Do you want to stipulate an objection someone present, a defendant, is good for all defendants participating?

MR. DIMUZIO: Yes. Let's go ahead and get on the written record and just take care of all that

**Page 7**

JULY 8, 2004

[10:03 A.M.]

[Deposition Exhibit-1 marked.]

MR. DIMUZIO: This is Gary DiMuzio. I'm attorney with the plaintiffs. Let's see if we a have all the major players here, and if so, we'll go ahead get started.

Drew, introduce yourself.

MR. SCHILLING: I'm sort of a minor player though.

[Laughter.]

But, yes, Drew Schilling with Hawkins, Parnell & Thackston, for Warren Pumps Inc.

MR. REAVIS: This is Randy Reavis for Alfa Laval Inc.

MR. MELCHI: This is Kevin Melchi with Dogan & Wilkinson for Guard-Line Inc.

MS. VAN RENSBURG: Jillian van Rensburg for FMC Corporation with DeHay & Elliston.

[Discussion off the record.]

MR. RAMIREZ: Anybody else on the line?

MR. DIMUZIO: Anybody else? Who all do we have there?

MR. RAMIREZ: We've got Michael Ramirez from Godwin Gruber.

**Page 6**

housekeeping stuff right now.

This is Gary DiMuzio, attorney for plaintiffs. We're going to take this deposition pursuant to the Texas rules. For now I will allow an objection by one party present in person or on the phone be good for all parties present in person or on the phone, unless I feel there is just a lot of frivolous objections, in which case I may withdraw that agreement.

I believe, other than that, that's it. Is there anything else, Mike, or --

MR. DIMUZIO: No.

MR. DIMUZIO: Okay. I guess, court reporter, you can go ahead and swear the witness.

ROGER BIGELOW HORNE JR.,    being duly sworn on oath, was examined and testified, as follows:

[10:07 a.m.]

EXAMINATION

BY MR. DIMUZIO:

Q. Good morning, sir.

A. Good morning.

Q. Could you state full name for the record?

A. Roger Bigelow Horne Jr.

Q. And, Admiral Horne -- I guess I gave it away with the way I just referred to you, but I understand that

**Page 8**

ADMIRAL ROGER B. HORNE

| | |
|---|---|
| 1 you're a retired Admiral. Is that correct? | 1   Q.   Okay. And does that change regarding -- |
| 2      A.   That's correct. | 2 regardless of whether you're in deposition or trial or |
| 3      Q.   Okay. And who have you been hired by in this | 3 research? |
| 4 particular case, Mr. Hinchman's case? | 4      A.   No, everything. Whatever I do, if it's travel |
| 5      A.   I believe it's really working with Godwin | 5 time or whatever, is 200 dollars an hour. |
| 6 Gruber. | 6      Q.   Okay. And when did you retire from the Navy? |
| 7      Q.   Okay. And that's the law firm; correct? | 7      A.   In '91. |
| 8      A.   That's correct. | 8      Q.   Okay. And at that time did you go immediately |
| 9      Q.   Okay. And do you know what defendant in | 9 into doing consulting for litigation purposes? |
| 10 particular that you are here on behalf of? | 10      A.   No. I went to work for an engineering firm in |
| 11      A.   Buffalo. | 11 California called Exponent Failure Analysis Associates. I |
| 12      Q.   Buffalo Pump. Okay. Any other defendant that | 12 did do some legal work there but I did other work also. |
| 13 you are here on behalf of at this point? | 13      Q.   Okay. They do do some legal consulting; is |
| 14      A.   No. | 14 that correct? |
| 15      Q.   Have you ever worked on behalf of Buffalo Pump | 15      A.   I guess you would call it consulting, yes. |
| 16 previously before? | 16      Q.   Okay. Did you ever actually do any testifying |
| 17      A.   Not to my recollection, no. | 17 while you were with Exponent? |
| 18      Q.   Okay. What about any other asbestos | 18      A.   Yes, I did. |
| 19 defendants? Have you been hired in the past by any other | 19      Q.   Okay. And did those cases involve ships and |
| 20 asbestos defendants? | 20 that sort of thing? |
| 21      A.   Yes, I have. | 21      A.   Yes, mostly maritime. There was some other |
| 22      Q.   Okay. And could you tell us who you can | 22 accident type cases that I worked on but most of it was |
| 23 recall, as you sit here today, who are the other defendants | 23 maritime. |
| 24 that you may have been hired by in the past? | 24      Q.   Okay. Did you do any asbestos work during that |
| 25      A.   I've been hired by Todd Shipyard. | 25 time frame? |
| 9 | 11 |

| | |
|---|---|
| 1      Q.   Okay. | 1      A.   I think there was one case that I did with |
| 2      A.   Kaiser. | 2 Phelps Dodge, but I -- I'm not -- I'm pretty sure it was |
| 3      Q.   What Kaiser is that, sir? | 3 while I was at Exponent. |
| 4      A.   They were the shipbuilders during the World | 4      Q.   Okay. And what was your -- your role in that |
| 5 War II. | 5 litigation? |
| 6      Q.   I understand. Okay. Todd Shipyards, Kaiser. | 6      A.   I was helping Phelps Dodge or working in their |
| 7 Anyone else? | 7 behalf. |
| 8      A.   Yeah, I worked for Ingersoll-Rand. | 8      Q.   Okay. Now, was Phelps Dodge -- had they made |
| 9      Q.   Okay. | 9 some sort of equipment that had used asbestos or were they |
| 10      A.   I worked for, I believe, Garlock at one time. | 10 a premises or -- do you understand? |
| 11      Q.   Okay. | 11      A.   It was electrical cable. |
| 12      A.   I don't recall all of them. There's quite a | 12      Q.   Electrical cable, that was their product? |
| 13 few. | 13      A.   Yeah. |
| 14      Q.   Okay. Does your did you ever work on behalf of | 14      Q.   Okay. |
| 15 Westinghouse? | 15      A.   That's the product that I was working with. |
| 16      A.   Yes, I have. | 16      Q.   Okay. About how many depositions have you |
| 17      Q.   Okay. What about General Electric? | 17 given that would be related to asbestos type litigation? |
| 18      A.   No, I haven't. | 18      A.   Oh, I would have to give you an estimate. |
| 19      Q.   Okay. Any other pump companies that you can | 19      Q.   Sure. |
| 20 think of as we sit here today? | 20      A.   But probably 15, 20, somewhere in that range. |
| 21      A.   No. That's -- I think those are the only pump | 21 Maybe more, maybe a little less. |
| 22 companies. | 22      Q.   Okay. And have you testified in any trials |
| 23      Q.   Okay. And how much do you charge for your time | 23 yet? |
| 24 for doing this sort of work sir? | 24      A.   Yes. |
| 25      A.   200 dollars an hour. | 25      Q.   Okay. How many trials have you testified in? |
| 10 | 12 |

3 (Pages 9 to 12)

ADMIRAL ROGER B. HORNE

1   Mr. Hinchman and his work in the Navy. But did you receive
2   anything else that might be more general in nature, any
3   kind of statutes or specifications or diagrams or anything
4   like that?
5       A. Not for this case specifically, no.
6       Q. Okay. And did you do any research yourself
7   into Mr. Hinchman's case particularly?
8       A. No, I just applied my knowledge and experience.
9       Q. Okay. Now, as we've discussed before, you've
10  had your deposition taken before. I just want to make sure
11  of a few things here.
12      If you don't understand my question, any of my
13  questions today, which is quite likely, frankly, will you
14  please let me know so I can restate it and try to ask it in
15  a way that makes sense to you?
16      A. Will do.
17      Q. Okay. And also you understand that I represent
18  Mr. Hinchman in this case; correct?
19      A. That's correct.
20      Q. Okay. And it's your understanding that Mr.
21  Hinchman has mesothelioma, I take it?
22      A. That's correct.
23      Q. Okay. And essentially you and I are on
24  opposite sides of the litigation. You understand that;
25  correct?

                                                    17

1           MR. RAMIREZ: Objection, form.
2       A. No, I'm not aware of it.
3       Q. Okay. And I'll represent to you that he sued
4   many of the same defendants that Mr. Hinchman is suing in
5   his case. And I take it you are not aware of that either;
6   is that correct?
7       A. That is correct.
8       Q. Okay. Admiral, in your opinion does the Navy
9   do a good job to try and protect its sailors?
10      A. I think they do a very good job.
11      Q. Okay. Very important for the Navy to keep
12  their men out of harm's way; is that right?
13      A. That's correct.
14      Q. Okay. And I guess that's always been very
15  obvious in terms of combat operations. Obviously, the
16  Navy's always tried to preserve both their ships and their
17  men; correct?
18      A. That's correct.
19      Q. Okay. And going a little bit more subtle, even
20  when it comes down to things like electrical shocks and
21  burns and that sort of thing, do you think the Navy has
22  done a good job with the knowledge that they had in
23  preventing those sorts of injuries?
24      A. I -- yes, I think so, overall. They handle
25  those kind of things by a lot of training, and that's --

                                                    19

1       A. That's correct.
2       Q. Okay. Okay.  Sir, do you know who Admiral
3   Zumwalt is?
4       A. Yes.
5       Q. Who is Admiral Zumwalt?
6       A. He used to be chief of Naval operations quite a
7   few years ago.
8       Q. And basically he was sort of the boss of bosses
9   in the Navy, more or less, at one point in time; is that
10  correct?
11      A. Well, the boss of the Navy is the Secretary of
12  the Navy. But he was the -- he was the boss of the bosses
13  of the folks in the Navy, yes.
14      Q. Okay. Are you aware what Admiral Zumwalt died
15  from?
16      A. No. I think he had a boy that was in Vietnam.
17  I think he was claiming Agent Orange.
18      Q. Right.  So you -- you're not aware, as we sit
19  here today, that Admiral Zumwalt died of mesothelioma?
20      A. No, I'm not aware of that.
21      Q. Okay. And I just want to check your awareness.
22  I think it's clear from that answer, are you aware that
23  Admiral Zumwalt, and then subsequently his family after he
24  died, prosecuted an asbestos lawsuit? Are you aware of
25  that?

                                                    18

1   it's usually pretty extensive, yes.
2       Q. I see.  And along those lines, I believe you
3   testified previously that in your opinion it was sometime
4   around 1968 or 1969 when it started really becoming sort of
5   general knowledge throughout the Navy that asbestos could
6   be a very serious hazard; is that correct?
7       A. Yes.  In my experience, it was about -- about
8   -- well, I was at Puget Sound Naval Shipyard when the
9   Mangold report was written, and he was the health physicist
10  there at the shipyard.
11      And then when I went from that shipyard -- that was
12  about '68 or '69, is my recollection.  And that went, of
13  course, to the technical part of the Navy.  And it was
14  shortly after that, in my experience, that the Navy started
15  doing a lot of things to gain control of asbestos.
16      Q. I see.  Now, you mentioned something about a
17  Mangold report.  What are you talking about there exactly?
18      A. It was a report, a study that he made at Puget
19  Sound Naval Shipyard, a fellow by the name of Mangold.  And
20  what it did is it looked at a lot of different trades,
21  insulators and sheet metal workers and electricians and
22  machinists, and what have you, and he found that there was
23  statistically an indication that the insulators and the
24  pipe fitters were having more lung problems than others.
25  And he produced a report to that effect, which was signed

                                                    20

                                    5 (Pages 17 to 20)

ADMIRAL ROGER B. HORNE

1  out by Admiral Petrovic, the then shipyard commander at
2  Puget Sound.
3      And that went back to Washington to -- I think it
4  went directly to the -- at that time I think it was still
5  the Bureau of Ships. Hadn't become the Naval Sea Systems
6  Command.  But anyway it went back there.
7      And then it was shortly after that that we started
8  getting a lot of controls and direction coming out of
9  Washington on getting control of it.
10     Q.  Okay.  And I guess, based on what you said, it
11 would be fair to say that some sort of report came out that
12 indicated people were getting sick from being around
13 asbestos while it was being used.  This was provided to
14 the Navy, and the Navy fairly rapidly began to take steps
15 to protect the seamen; is that correct?
16     A.  That was my recollection.  The -- I don't know
17 that it was that they were getting sick, but I think they
18 were finding abnormalities in x-rays or something.  I
19 don't know.  I don't recall that exactly.
20     Q.  Okay.
21     A.  But it was soon after that that in my
22 experience, because I left that shipyard and went to Mare
23 Island Naval shipyard, and shortly after I was there, we
24 were doing a lot of different things in the overhaul of
25 ships as a result of the asbestos problem.

21

1  have had -- that may be in supply that had asbestos in it.
2      We started -- actually one of the first steps was we
3  were going to remove all of the asbestos, and then we found
4  out that we were creating more problems than not.  So we
5  backed away from that.
6      I had -- we only would do asbestos work with -- we
7  wouldn't let anybody else in the area when we started.
8  These are the initial controls.  When we took asbestos off
9  and put a nonasbestos -- we had to develop the products
10 first, things that -- something to use instead of asbestos
11 in the case of insulation.  And that took a little bit of
12 time.
13     But we started, as I said, to remove it, and then we
14 found out that that was creating a problem.  So what we
15 did was we put new material, nonasbestos material on for
16 insulation.  We painted it a different color, and then
17 painted over that with white, so that people could identify
18 what was asbestos and not.  We did a lot of training on
19 how to remove asbestos.
20     I actually had to schedule additional time in the
21 overhauls of ships in order to -- because we couldn't have
22 anybody doing ripout and work at the same time as asbestos
23 was being removed, and in particular in high density
24 spaces.
25     And then after that, the whole thing, OSHA began to

23

1      Q.  Okay.  And once this study came to the
2  attention of the Navy, I think you testified before that
3  this became a pretty widely discussed topic in Navy
4  circles; is that correct?
5      A.  Yes, at that time that was.  Now, there may
6  have been -- the Navy is a big organization.  This
7  particular report went to the technical part of the Navy,
8  and it was a technical part of the Navy that was starting
9  to take action.
10     Q.  I see.  Now, you say they were starting to
11 take action.  First of all, would you agree with me they
12 began to take action because they, the Navy, really
13 perceived asbestos as being a serious health threat at that
14 time; is that correct?
15     A.  Yes, I -- well, I can only give you my
16 experience.  I was a more junior officer at that
17 particular time, and it was shortly after that that we
18 started getting a lot of control.  So I -- you know, you
19 can draw your own conclusion from that, I guess.
20     Q.  Okay.  Now, you mentioned that things were
21 done, you mentioned things about controls, et cetera.
22 What was done?
23     A.  Well, the controls really evolved over a period
24 of time.  There were letters and things that were sent out
25 to identify all of the different types of material that may

22

1  clamp down on the amount of exposure that could be
2  received, and that evolved over time, and it took quite a
3  while for it all to develop to where we are now.
4      Q.  Okay.  Let me go back and touch on a few points
5  that you brought up.  You mentioned, first of all, that
6  initially it was going to be, "Let's just get rid of all
7  this.  Let's just get rid of the problem."  Is that
8  correct?
9      A.  Yeah.  Well, from my vantage point, that
10 appears what the decision was made.
11     Q.  Pardon?
12     A.  But then we backed away from that.
13     Q.  Okay.  And you mentioned they backed away from
14 that because you said there were some problems involved in
15 that.  Would it be fair to say that the problem involved in
16 that is that there would be increased risk of exposure to
17 asbestos to Navy personnel?
18     A.  I think that may have been part of it, I'm
19 sure.  And part of it was becoming more aware of what the
20 danger was or wasn't, whether it was encapsulated and so
21 forth.
22     Q.  Okay.  Now, you mentioned several things.  Let
23 me ask you about some particular techniques.  Did you
24 start training the men about wetting techniques, actually
25 wetting the equipment down before they did the work?

24

6 (Pages 21 to 24)

ADMIRAL ROGER B. HORNE

1 walking around, as we were discussing, to try to find some
2 leaks, and perhaps finding a leak on a flange connection to
3 a pump.
4      Q.  Okay.  All right.  I want to talk about a
5 little different subject here.  I want to talk about
6 warnings.  Did the Navy in any of their written materials
7 absolutely prohibit these companies from putting warnings
8 on the products that they sold to the Navy?
9          MR. SHAW:  Objection, form.
10     A.  It was the Navy's intent that the manufacturer
11 of this equipment provide any characteristics unique to
12 that equipment that -- that the Navy might need to know for
13 safe operation of the equipment or for maintenance of the
14 equipment.  The Navy was not looking for wholesale
15 warnings about anything else that might exist in the plant.
16     Q.  And what document are you referencing in
17 support of that opinion?
18     A.  Well, I'm -- I'm telling you what my own
19 experience is.  But there are documents associated with
20 instruction manuals and what have you.  I haven't looked
21 at those recently.  But they do say specifically in there
22 what is expected.
23     Q.  Okay.  Is there anything that expressly says,
24 "Do not warn about the dangers of asbestos" in any of those
25 specifications or regulations or materials that you're

109

1 referencing?
2          MR. SHAW:  Object to form.
3     A.  Of course not.
4     Q.  Okay.  Are there anything -- is there anything
5 in any of those specifications that indicates that there
6 should be warnings provided?
7     A.  Just --
8          MR. SHAW:  Objection to form.
9     A.  Specifically for what the intent was.  You can
10 read into these wordings anything you want to.  But what
11 the intent was, that the manufacturer of the equipment
12 provide the Navy with any information the Navy needed to
13 know about, uniquely about that equipment, in order to
14 operate and maintain it correctly.
15     Q.  Okay.  Well, for example, I think there is in
16 one of the specs there's actually a section entitled
17 Warnings and Cautions; isn't that correct?
18     A.  I believe there is.
19          MR. RAMIREZ:  Objection to form.
20     A.  There may be, yes, as I recall.
21     Q.  Okay.  And I think you've read through this
22 material before.  Let me just quote that.  This is 3.3.3.1:
23 "Warning and caution statements shall be included
24 for emphasis in all applicable installation, operating,
25 maintenance and repair procedures and data in accordance

110

1 with MIL-M-38784 and as follows."
2      Do you recall seeing language to that effect
3 regarding warnings in any of the military specifications?
4          MR. RAMIREZ:  Objection, form.
5      Gary, can you identify the document and the date of
6 that document?
7          MR. DIMUZIO:  That is a quote that has been
8 done over a period of many, many years.  I believe it's
9 Mil Spec 15071.
10         MR. RAMIREZ:  Okay.  Do you have the agency
11 that authored the document and the date of the document?
12         MR. DIMUZIO:  Not with me, no, I don't.
13         MR. RAMIREZ:  Objection.
14         MR. DIMUZIO:  The Admiral has seen this before
15 and discussed some of this in his prior testimony.
16         MR. RAMIREZ:  Okay.  I'm going to object to
17 form.
18         MR. DIMUZIO:  Okay.
19     Q.  Go ahead.  Do you recall seeing language like
20 that in military specifications before, Admiral?
21     A.  Language like that, I do.  And I can't say,
22 you know, that specific language, but yes.
23     Q.  Okay.  All right.  And you consider that to
24 be sound policy; right?
25         MR. RAMIREZ:  Objection to form.

111

1     A.  Yes, within the scope of what I said
2 previously.
3     Q.  Okay.  Further, there is a subsection listed as
4 A there, and the language there is:
5 "A warning statement shall be used to call
6 particular attention to a step of a procedure which if not
7 strictly followed could result in serious injury or death
8 of personnel."
9      Is it correct that the military actually had
10 language in their regulations regarding warnings to that
11 effect?
12         MR. RAMIREZ:  Objection, form.
13     A.  That's correct and it's very similar to what
14 you -- what was expected.  It was very similar to what you
15 saw on instructions for the KIDD on the DVD.
16     Q.  Regarding what?
17     A.  Regarding the safe operation.  I think it was
18 turbogenerators but it may have been main turbines.
19     Q.  Having to do with electrical shocks?
20     A.  No, I think it was having to do with proper --
21     Q.  Heat, getting burned?
22     A.  No, proper procedure for lighting that
23 equipment off, so that you didn't have a serious casualty.
24     Q.  I see.  Now, you would agree that -- well
25 first of all, you understand what mesothelioma is; right?

112

28  (Pages 109 to 112)

ADMIRAL ROGER B. HORNE

1 what, Gary?
2 　　MR. DIMUZIO: An expert on their equipment and
3 all the components that go into it.
4 　　MR. RAMIREZ: Objection, form.
5 　　DEFENSE COUNSEL: Objection, form.
6 　　MR. DIMUZIO: You can answer, sir.
7 　　A. I would -- again, I would -- I would not expect
8 that. It's not what the Navy intended when they -- in the
9 instructions which you previously read. And the Navy would
10 have a hard time dealing with that information, coming from
11 one vendor talking about another vendor's products. It's
12 not something that they could just go out and act on.
13 　　And certainly if there were any label plates or
14 anything like that that were cautionary notes or anything
15 like that that were put in there, it would not be in
16 accordance with the Navy's intent of its instructions.
17 They would expect it to -- those kind of things to come
18 from the -- the Navy's own understanding and testing, plus
19 the Bureau of Medicine, plus the manufacturers of that
20 particular equipment, in this case insulation. It's just
21 not a reasonable hypothetical.
22 　　MR. DIMUZIO: Okay. Objection, nonresponsive.
23 　　Q. I'm really not interested in what your opinion
24 is as what the Navy was expecting out of a given pump
25 manufacturer.
117

1 　　What I'm asking you is, if that pump manufacturer
2 was indeed an expert and they did have that knowledge about
3 the component parts, and they had information available to
4 them that the typical use and maintenance of that equipment
5 might present a danger, in your opinion, should that
6 company at least communicate to the Navy that potential
7 risk?
8 　　MR. RAMIREZ: Objection, form. Again, that's
9 just an unreasonable hypothetical.
10 　　A. The --
11 　　MR. DIMUZIO: To which I'm entitled to an
12 answer.
13 　　A. The -- the -- well, a couple of things here.
14 One, the pumps are not supplied with -- if we're talking
15 about external insulation on the pumps, they're not
16 supplied with insulation. That's put on later in the --
17 by the Navy to Navy specifications.
18 　　So I guess it's kind of like -- like a hypothetical,
19 saying, if you grow potatoes, then potato grower having to
20 warn the public not to fry them in oil because they're
21 liable to give you some kind of heart failure or something.
22 It's -- it's the second order thing here. And I don't --
23 I just can't get over that hypothetical.
24 　　The Navy, if it's something that has to do with the
25 pump itself, the operation of the pump or the maintenance
118

1 of the pump, and there is something there subtle that a
2 normal trained person wouldn't know, then I would expect
3 the contractor or the vendor to supply that information,
4 yes.
5 　　Q. Okay.
6 　　A. But within the framework of what we -- you
7 know, what I've said, they would supply it. But
8 insulation is not within that framework.
9 　　MR. DIMUZIO: Objection to the nonresponsive
10 portion of the answer.
11 　　Q. Now, you mentioned the word subtle.
12 Obviously, the walking in front of a gun designed to shoot
13 at airplanes, that would not be a subtle danger; correct?
14 That would be an open and obvious danger; right?
15 　　A. That's correct.
16 　　Q. Okay. And I guess electrocution can kind of go
17 both ways. Sometimes that can be a fairly subtle problem.
18 You might not know that an area would be hot, and therefore
19 a warning would be appropriate; is that correct?
20 　　A. That's correct.
21 　　Q. Okay. Do you think it was something obvious
22 about exposure to asbestos dust that should have alerted
23 Mr. Hinchman in 1950 to '52 that he was going to be dying
24 of mesothelioma 50 years later?
25 　　A. No.
119

1 　　Q. Okay. That was subtle; right?
2 　　MR. RAMIREZ: Objection, form.
3 　　A. It would have been subtle to me, yes.
4 　　Q. Right.
5 　　A. But I --
6 　　Q. There's nothing about the smell of asbestos
7 that would lead one to believe that they were going to die
8 of cancer; correct?
9 　　MR. RAMIREZ: Objection, form.
10 　　MR. SHAW: Objection.
11 　　A. No. He states that he was aware that breathing
12 too much dust was not good for you but he didn't understand
13 the full danger of it.
14 　　MR. DIMUZIO: Objection to the nonresponsive
15 portion.
16 　　Q. Now, you mentioned again in one of your answers
17 to this recent line of questions about, you know, what the
18 Navy did is they didn't put labels on stuff. You know,
19 they trained their people and they put procedures in play
20 place. Correct?
21 　　A. That's correct.
22 　　Q. Okay. They did that based on the knowledge
23 that asbestos was dangerous; right?
24 　　MR. RAMIREZ: Objection, form, calls for
25 speculation.
120

30 (Pages 117 to 120)

ADMIRAL ROGER B. HORNE

**Page 121**

1  A.  Yes, when they -- when the Navy -- I can only
2  speak from my personal experience.  But when the Navy
3  become aware of the significance of the hazard, they, I
4  think, took very responsible action.
5  Q.  Correct.  And essentially they warned their
6  seamen to follow appropriate procedures; correct?
7  MR. RAMIREZ:  Objection, form.
8  A.  That's correct.
9  Q.  Okay.  And you talked about this painting of
10  the lines.  What color were the asbestos containing
11  materials painted?
12  A.  Well, they were -- they were just a plain
13  white.
14  Q.  Plain white.  Now, if I walked on a ship and
15  saw plain white materials, I wouldn't make heads or tails
16  of it.  I would assume that was the color it was made.
17  But to those Navy seamen, based on the information given to
18  them by the Navy, that's a warning to them that that has
19  asbestos; right?
20  MR. RAMIREZ:  Objection, form.
21  A.  No, no, not the white.  The -- it's mostly
22  oriented to people who are going to do maintenance work.
23  But, yes, the Navy -- I don't know.  First let me make sure
24  you understand I don't know what the Navy is doing right
25  now.

**Page 122**

1  Q.  Right.
2  A.  I can only tell you what we started to do when
3  I was there.
4  Q.  Exactly.
5  A.  But what we did was we -- the idea come out,
6  "Well, we'll paint it."  It was kind of a magenta color.
7  It was a pink color.  But then you would paint over that
8  with a normal color.  And then, if you were going to work
9  on asbestos, or on insulation, I should say, you would
10  scrape a little of the outer paint off and you would see
11  the other color, and that would tell you this is
12  nonasbestos, it's okay to work on it without putting in all
13  the controls.
14  Q.  Okay.
15  A.  But if you didn't see that, then you said,
16  "Uh-oh, I've got a problem here," and you would go do
17  something quite a bit different.
18  Q.  Right.  So based on the color that was on that
19  pipe and the training and information given to the Navy
20  men, they knew that that had asbestos and they had to
21  behave differently than they did with nonasbestos
22  insulation; is that correct?
23  MR. RAMIREZ:  Objection, form.
24  A.  The color was underneath the painting.  As far
25  as with -- as a layman, if you were to walk through the

**Page 123**

1  space, it always looked the same as it did before.  But to
2  somebody who scraped a little bit of the paint off at that
3  time -- you know, what they're doing now, I don't know --
4  they would notice that.  We did not --
5  Q.  So the people who would be a danger of being
6  exposed to this, working on it, they knew what to do;
7  right?
8  MR. RAMIREZ:  Objection, form.
9  Q.  Is that correct?
10  A.  That's correct.  We did not go around and put
11  label plates on everything, or label all of the piping in
12  the engineering plant, or label plates and what have you
13  with, "This is asbestos.  Beware!"
14  Q.  Okay.  Now, is there any Navy regulation that
15  forbid these manufacturers from putting warnings directly
16  on the equipment regarding the dangers of asbestos?
17  MR. RAMIREZ:  Objection, form.
18  A.  There was -- there were directions as to what
19  kind of information they wanted to have, and I think you
20  just read some of it.  And they were not looking for -- I
21  think in that same document you'll probably find something
22  that says they didn't want to have a bunch of labels, you
23  know, on the thing, were not -- you know, all over the
24  plant, was what was inferred.  Those kind of things are
25  handled by training and procedures.

**Page 124**

1  There's a lot of dangerous things associated with a
2  ship, and particularly a warship.  And everything that --
3  a lot of it is handled by training and by procedures as to
4  follow.
5  Q.  And you would agree that the training and
6  procedures that the Navy implements includes recognizing
7  what a danger is and how to avoid that danger; is that
8  correct?
9  MR. RAMIREZ:  Objection, form.
10  A.  That's correct.
11  Q.  What was the answer, sir?
12  A.  That's correct.
13  Q.  Okay.  Now, do you think that there would have
14  been any significant economic disincentive to put a warning
15  on these, on this equipment?  In other words, how much do
16  you think it would have cost for them to add to the
17  nameplate, "Do not breathe dust.  Can cause serious bodily
18  injury"?  Would that have cost an enormous amount of money?
19  MR. RAMIREZ:  Objection, form.
20  A.  Well, it wouldn't have followed the
21  specifications that the Navy required.
22  Q.  But it wouldn't have cost much money, though;
23  right?  It would have been an inexpensive thing for them to
24  do; right?
25  MR. RAMIREZ:  Objection.

31 (Pages 121 to 124)

ADMIRAL ROGER B. HORNE

1    A.  Yeah, the Navy would just have to take it off
2    and get it done in accordance with specifications.
3    Q.  Well, that's not my question.  My question is,
4    that would not be an expensive thing to do that would
5    interfere with them being able to sell to the Navy;
6    correct?
7         MR. RAMIREZ:  Objection, form.  He just
8    answered the question.
9         MR. DIMUZIO:  No, he didn't.
10   Q.  Sir, would that be such an expense that it
11   would make it difficult for that company to sell that
12   product to the Navy?
13   A.  How much would it --
14        MR. RAMIREZ:  Objection, form.
15        MR. DIMUZIO:  I'm sorry, you can answer, sir.
16   A.  How much would it cost to put a label plate on
17   that would later be taken off and not allowed by the Navy?
18   Probably not very much.  I don't know what a label plate
19   would cost.
20   Q.  Okay.  Now, you say it's not allowed by the
21   Navy in the specs.  But just like any other technical
22   suggestion, couldn't these companies -- was there anything
23   forbidding these companies from suggesting to the Navy that
24   they put these warnings on there?
25        MR. SHAW:  Objection, form.
                                                        125

1         MR. RAMIREZ:  Objection, form speculation.
2    A.  Any company, anybody, can write a letter to the
3    Navy and suggest whatever they want to suggest.
4    Q.  So they could have done that?
5    A.  Anybody can.  I mean, you can write a letter
6    today and suggest that a certain kind of lube oil may have
7    a cars- -- what do you call it?
8         MR. RAMIREZ:  Carcinogenic?
9    A.  Carcinogenic.  And, you know, somebody can
10   write that.  And the Navy, they forward it over to a lab,
11   and they do something with it.  I don't know, you know.
12   But you can't just go out and all of a sudden put
13   requirements on whatever that product is because some
14   vendor thinks there may be a problem.
15   Q.  But, again, you say there is nothing to
16   prohibit them in the Navy regulations or any orders that
17   you've ever heard of that prevents them from giving the
18   Navy that information; right?
19        MR. RAMIREZ:  Objection, form.
20   A.  There is no regulation, there is -- obviously,
21   there is no regulation preventing anybody from writing a
22   letter to anybody they want and saying that there's
23   something wrong with somebody's product.
24   Q.  Exactly.  Exactly.  And, for example, there
25   are a variety of guns on Navy vessels; correct?
                                                        126

1    A.  Yes.
2         MR. RAMIREZ:  Objection, form.
3    Q.  Okay.  Let's say one of those guns had a
4    tendency to misfire when it was bumped into.  It would be
5    against the spec, I would suppose, for someone to just put
6    a warning on there saying, you know, "Don't bump into the
7    gun in this way because it may misfire."  They would not be
8    allowed to do that, given the spec for the gun; correct?
9         MR. RAMIREZ:  Objection, form.
10   A.  First of all, I wouldn't have a gun that could
11   be bumped into that would have a misfire.  They would have
12   a lot of testing going on before that.
13        But let's take your hypothetical.  If it's a
14   characteristic unique to that equipment, in the operation
15   of that equipment, that the vendor -- some characteristic
16   that the vendor put into the equipment, unique to that
17   equipment, then I would expect the warning that -- and for
18   it to be subtle, as we discussed before, not something that
19   would be common knowledge to any reasonably trained
20   operator.  That he would -- that they would warn about it,
21   yes.
22   Q.  Right.  And they would do that not by putting
23   a label on the gun but by sending a letter and picking up
24   the phone and calling somebody at the Navy and saying,
25   "Hey, we have discovered that this gun misfires when it
                                                        127

1    gets bumped into." Correct?
2    A.  No.
3         MR. RAMIREZ:  Objection, form.
4    A.  No, they would need to put that in the manual
5    for the operation of the gun so the Navy could train to
6    that requirement.
7    Q.  Okay.  That's a good point.  And I take it
8    you're right about what you just inferred there.  These
9    manufacturers, they typically write these technical manuals
10   themselves; correct?
11        MR. RAMIREZ:  Objection, form.
12   A.  They write them themselves.  My recollection is
13   most of them are written themselves.  I don't know that
14   all of them are done that way.  I guess --
15   Q.  They would provide those to the Navy, and the
16   Navy either approves or disapproves the way the manual is
17   written; correct?
18        MR. RAMIREZ:  Gary, you cut him off again.  I
19   know --
20        MR. DIMUZIO:  Oh, I'm sorry.  I'm sorry.
21        MR. RAMIREZ:  That's okay.
22        MR. DIMUZIO:  Sir, I mean no disrespect.  I
23   apologize for being on the telephone here.  If I could get
24   your facial cues, I probably would be a little better about
25   that.  I'm sorry.
                                                        128

32 (Pages 125 to 128)

ADMIRAL ROGER B. HORNE

1          THE WITNESS: No problem.
2     A.  The Navy -- the technical manuals are prepared
3  in accordance with a military specification.  The
4  specifications are rather specific as to, you know, the
5  kind of things that need to be in it.
6     Q.  And as you mentioned, that would be one of the
7  places where, if someone felt there was some danger
8  peculiar to their product, they could put that warning in
9  the technical manual and see if it was approved by the
10 Navy; correct?
11         MR. RAMIREZ:  Objection, form.
12    A.  That's correct.  And if it was a subtle -- you
13 know, if it wasn't something that's obvious to a reasonably
14 trained individual, then you would expect it to be in
15 there.
16    Q.  Okay.  I noticed some little like instructions
17 or checklists on various pieces of equipment around the USS
18 KIDD.  Are you familiar with what I'm talking about there?
19         MR. RAMIREZ:  Objection, form.
20    A.  Yes.
21    Q.  Okay.  Do those -- do they often say, "See
22 manufacturer's instructions for more details," or words to
23 that effect?
24         MR. RAMIREZ:  Objection, form.
25    A.  You may find that, but I don't -- I don't

                                                    129

1  recall that specifically.
2     Q.  You don't recall that, as we speak here now?
3     A.  No, I don't.
4     Q.  But it would be standard for these technical
5  manuals, which originally were prepared by the
6  manufacturers and then approved by the Navy, those would be
7  available for the men who were doing the detailed work on
8  that equipment; is that right?
9          MR. RAMIREZ:  Objection, form.
10    A.  Yes.  The manuals -- the manuals would be
11 referred to if they were having to work on something that
12 was, you know, a little bit beyond where their training is
13 associated with, that's correct.  Every time you work,
14 pack a pump, or whatever, you don't get a manual to do it.
15    Q.  But you do when you're trained initially;
16 right?
17         MR. RAMIREZ:  Objection to form.
18    A.  They may.  Depends on -- no, I think,
19 generally, not for packing.  But if there's something
20 peculiar to that equipment, you may get special training,
21 yes.
22    Q.  For example, overhauling that equipment and
23 adjusting that equipment; correct?
24         MR. SHAW:  Objection.
25         MR. RAMIREZ:  Objection, form.

                                                    130

1     A.  Certainly overhauling.  And if there's anything
2  unusual about the operation of it, there might be
3  something.
4     Q.  You know, you mentioned something earlier that
5  reminded me of something I read sometime ago.  You
6  mentioned something about mercury; I think it had to do
7  with probably thermometers or that sort of thing.  But
8  wasn't there some sort of a problem in the Navy with
9  mercury contamination of some equipment at one time?
10    A.  You must be referring to one of my previous
11 depos.  We haven't talked about mercury today; I don't
12 believe, anyway.  I don't recall.
13    But, yes, there's a problem with -- there's a
14 problem with mercury, and we had to purge mercury out of
15 the -- out of the system, my recollection is of that, yeah.
16    Q.  And when did that become an issue for the Navy?
17    A.  That's been around for quite a while.  I don't
18 remember exactly.
19    Q.  That's a problem that the Navy became aware of
20 generally prior to World War II; is that correct?
21         MR. RAMIREZ:  Objection, form.
22    A.  I don't think so.  I think it -- I think it
23 was after World War II.  We -- I think we still had -- we
24 still had mercury around after -- after World War II.  But,
25 again, I'm not -- I don't recollect when we -- when that

                                                    131

1  really come out.
2     Q.  Right.  But at that time when the Navy became
3  aware of the health problems with the mercury, they took
4  steps to educate their seamen and implement procedures and
5  try to eliminate or minimize the risks of mercury, didn't
6  they?
7     A.  Yes, that's correct.
8     Q.  Okay.
9     A.  I'm not --
10    Q.  In fact, they even had signs up --
11    A.  I'm not --
12    Q.  -- in some ships, is my understanding, talking
13 about this mercury hazard; is that correct?
14         MR. RAMIREZ:  Gary, you accidentally cut him
15 off again.
16         MR. DIMUZIO:  Oh, I'm sorry.
17    A.  You may be correct or incorrect.  I don't
18 recall ever seeing any of those signs.  So I don't -- I
19 know that mercury was a -- is a problem, but I'm not even
20 sure that I know that through the Navy.  And I don't
21 recall seeing any of those --
22    Q.  Okay.
23    A.  -- those signs.
24    Q.  And I think we've covered some of this before
25 but I just want to make sure at this point.

                                                    132

                              33 (Pages 129 to 132)

ADMIRAL ROGER B. HORNE

1   with steam plants, if the engineers happen to be familiar
2   with steam plants, then they might come to that conclusion.
3   If they're not, you know, if they're just -- if they're
4   just pump designers that are working on pressures and
5   strength of materials and what have you, I don't know that
6   they would necessarily know it. But --
7       Q. And I think you mentioned in another deposition
8   something to the effect that really there were a lot of
9   similarities between a steam power plant, whether it was on
10  a boat or on the land for that matter; correct?
11      MR. RAMIREZ: Objection, form.
12      DEFENSE COUNSEL: Objection, form.
13      A. Yes the steam cycle is the same. The pressures
14  and temperatures and what have you might be quite a bit
15  different, but the --
16      Q. Right. And the basic steam cycle between, say,
17  military vessels and commercial vessels of similar size are
18  also very, very similar as well, aren't they?
19      MR. RAMIREZ: Objection, form.
20      A. The cycle is the same. The equipment and what
21  have you requirements may be different.
22      Q. Okay. If somebody is selling equipment like
23  pumps and valves to the Navy, wouldn't you agree that that
24  manufacturer, he's going to know that Navy personnel are
25  going to work on that equipment?
                                                    145

1       MR. RAMIREZ: Objection, form.
2       A. If he's selling it to the Navy, I would think
3   he would know that, yes.
4       Q. Okay. And if that equipment requires gaskets
5   or packing, that manufacturer is going to know that those
6   gaskets and packing are going to have to be periodically
7   repaired or replaced. Wouldn't you agree with that?
8       MR. RAMIREZ: Objection, form.
9       A. The packing material, he would. He would know
10  that. The gasket material, you know, pump may run for a
11  long, long time before you have to use that. But that
12  material would be in there. Because it's a consumable, it
13  would be placed in there in accordance with Navy
14  specifications, so that the supply system could -- as it's
15  needed, because it is a consumable, could be replaced.
16      Q. Right. And the word consumable of course
17  infers that it will indeed be replaced; correct?
18      A. Yes.
19      Q. And certainly it's foreseeable to any
20  manufacturer selling equipment to the Navy that
21  periodically that equipment will need to be worked on and
22  opened up and this type of work done; right?
23      MR. RAMIREZ: Objection, form.
24      DEFENSE COUNSEL: Objection, form.
25      A. There are specific reliability specifications
                                                    146

1   in that regard, usually in the pump specifications, that
2   say, you know, it needs to be run for a certain number of
3   hours and be tested before it's accepted by the Navy,
4   before the design is accepted. And then there will be
5   general statements in there that before it needs to operate
6   for umpty-ump years without major overhauls, and packing
7   would be replaced every so many months, or something of
8   that nature.
9       Q. Okay. And you said that that would be included
10  in the manufacturer's instructions that be provided?
11      A. Yes.
12      MR. RAMIREZ: Objection, form.
13      A. It's included in the military specifications
14  for the pump.
15      Q. Okay. And would some of that information also
16  be in the military -- I mean in the manufacturer's
17  materials? It would be included with that?
18      MR. RAMIREZ: Objection, form.
19      A. I'm not sure if I understand what you mean.
20      Q. Okay. Would there be information regarding
21  this periodic maintenance and repair that you just
22  discussed? Would that be included in the manufacturer's
23  materials?
24      A. Objection, form.
25      DEFENSE COUNSEL: Objection, form.
                                                    147

1       A. Well, the materials that -- materials would
2   have to be in accordance with the military specs and the
3   purchase specifications. The consumables that we talked
4   about would have to be in accordance with those
5   specifications.
6       And, again, that's because the -- once the thing is
7   placed in service, and after it runs for umpty-ump months
8   or umpty-ump years, and it gets reserviced, then the Navy
9   is going to draw out of its supply system that material to
10  work it. And the Navy, in the case of pumps, the Navy may
11  also order a certain number of rotors or something of that
12  nature that they would want to have in case of a major
13  catastrophe.
14      Q. And my question, is that information regarding
15  that maintenance and repair of the equipment,  information
16  regarding those steps and procedures and how often to
17  follow them, that would be included in the detailed
18  manufacturer's materials; correct?
19      DEFENSE COUNSEL: Objection, form.
20      MR. RAMIREZ: Objection, form.
21      A. Are you -- do you mean the materials
22  instruction book?
23      Q. The instruction books for the equipment that
24  the men are working on, right.
25      A. Yeah, the maintenance and the how to go about
                                                    148

37 (Pages 145 to 148)

ADMIRAL ROGER B. HORNE

1  working on or operating the equipment would be in the
2  instruction manual, yes.
3      Q.  Okay.  And I think we talked about that before.
4  Those are generally written by the manufacturer and then
5  approved by the Navy; correct?
6          MR. RAMIREZ:  Objection, form.
7      A.  They're prepared to a set of Navy
8  specifications and then approved by the Navy, yes.
9      Q.  Okay.  All right.  And they would be initially
10  prepared in accordance with those specs by the
11  manufacturer; right?
12          MR. RAMIREZ:  Objection, form.
13      A.  That's correct.
14      Q.  Okay.  Have you ever been to the San Diego
15  destroyer yard, by the way?
16      A.  Yes, I was stationed there at one time.
17      Q.  Oh, is that right?  When was that?
18      A.  That's when I was on the OSBORNE.  We used to
19  pull in there.
20      Q.  Oh, I see.  And what time frame are we talking
21  about again?  Excuse me for not --
22      A.  1956 or 1959.
23      Q.  Okay.  All right.  You've mentioned -- I've
24  seen references in some of your other depositions to
25  qualified product list.  Can you just briefly explain what
                                                    149

1  a qualified product list is?
2      A.  Yeah.  Once a vendor has shown by -- that his
3  product meets the specifications, and usually that's done
4  by tests.  In the time frame that we are talking about
5  now, a lot of that testing was done at Annapolis, the
6  experimental lab at Annapolis.  And the product would be
7  tested to see that it met the requirements.  And then --
8  and this is for a specific vendor.  And if it did, then
9  that vendor's name would be put on a qualified products
10  list so that the Navy supply system, when it purchased
11  items such as consumables, then it would be -- they had to
12  be purchased from those particular vendors.
13      Q.  Okay.  And this would be something the vendors
14  themselves would initiate; correct?  They would do the
15  initial testing and provide this information to the
16  government?
17          MR. RAMIREZ:  Objection, form.
18      A.  They may do their own testing but the Navy
19  would do its own, do its own testing also.
20      Q.  Okay.  When we talk about testing here, we're
21  talking about the basic performance characteristics of that
22  piece of equipment; right?
23          MR. RAMIREZ:  Objection, form.
24      A.  Yes.
25      Q.  Okay.  We're not talking about some subtle
                                                    150

1  latent danger from asbestos dust.  The Navy never did that;
2  correct?
3          MR. SHAW:  Objection, form.
4      A.  I don't understand your question.
5      Q.  Okay.
6      A.  They never did what?
7      Q.  Whenever the Navy would test these products
8  they weren't testing them for potential dangers from
9  asbestos, were they?
10          MR. RAMIREZ:  Objection, form.
11      A.  Not to my knowledge.
12      Q.  Okay.
13      A.  Unless --
14      Q.  What were they testing them for?
15          MR. SHAW:  Hold on, counsel.  You cut him off
16  there.  Sorry.
17      A.  Generally they were testing to see if they
18  satisfied the specifications.  And I don't know that there
19  were any specifications regarding a hazard of asbestos back
20  in those days.
21      Q.  Okay.  Now, you mentioned -- I think I read
22  some inference -- to be honest with you, I've read so many
23  depos, I'm not sure if it's even yours anymore.  But
24  someone had mentioned that you could possibly go back and
25  actually identify what brands of packing and gaskets would
                                                    151

1  have been put in certain pieces of equipment.  Is that your
2  understanding the way the QPLs work?
3          MR. RAMIREZ:  Objection, form.
4          MR. SHAW:  Objection, form.
5      A.  On some gaskets and packing and some
6  consumables, if you go to the QPL, you'll find more than
7  one manufacturer.  And you'll find, you know, that it
8  could be three or four manufacturers that are on that QPL.
9  I don't know that -- certainly I couldn't, but, you know,
10  whether some person could pull out a piece of packing and,
11  without it having some identification on it, say, "Well,
12  this comes from vendor A and not vendor B."  Those things
13  don't have -- I don't think they have peculiar things.
14  Now, there may be some sheet gasket material or something
15  like that that you happen to find a manufacturer's stamp on
16  it.  But I -- I don't -- consumables might be a little bit
17  difficult to establish which vendor on the QPL a particular
18  item come from.
19      Q.  Okay.  Did Buffalo Pumps, did any of their
20  pumps or equipment -- was any of that on the QPL?
21          MR. RAMIREZ:  Objection, form.
22      A.  I don't know.  I haven't looked into that.
23  They had to be built to a Navy specification.  I don't
24  know that there was a QPL for that or not.
25      Q.  I believe -- and again, you know, I apologize.
                                                    152

                                      38  (Pages 149 to 152)

ADMIRAL ROGER B. HORNE

1    be done and checks that need to be made.
2         And that system is generally developed using the
3    instruction books to some degree, and then just good
4    engineering practice added to that.   But that's a separate
5    system than the instruction books, but a lot of the steps
6    and what have you might come out of the instruction books.
7         Q.   The preventative maintenance procedures that
8    come out of the systems devised by the Navy, the procedures
9    tell the Navy then when to do certain maintenance on
10   equipment found on a Navy ship; isn't that correct?
11        A.   That's -- that's correct, in general, yes.   It
12   might say -- for instance, there will be a step, if a pump
13   is not being used for a period of time, to -- or turbines
14   -- to rotate them, you know, once every so many days or
15   weeks or what have you.
16        Q.   And it may also -- these procedures may also --
17   necessarily will include maintenance policies and
18   procedures that may not necessarily be included in the
19   technical manuals supplied by the equipment manufacturer?
20        MR. DIMUZIO:  Objection, form.
21        A.   There may be some steps in there that are not
22   there, yes.   There will be general maintenance
23   requirements that good engineering practice demands for a
24   power plant.
25        MS. LEWIS:  Thank you, Admiral.  Those are all

                                                          201

1    of my questions.  I appreciate your time.
2         MR. RAMIREZ:  Okay.
3    Anybody else got questions?
4    Going once, going twice.
5    All right.  We're done.
6    Admiral Horne will read and then sign.
7    You all have a good day.
8         MR. SHAW:  Thank you very much.
9    [Deposition concluded at 3:02 p.m.]
10   [Signature reserved.]
11   [Deposition Exhibit-1 attached.]

                                                          202

1                    CAUSE NO. 24544-BH03
2    WILLIAM HINCHMAN and wife )  IN THE DISTRICT COURT
     BETTY HINCHMAN, et al.,   )
3                              )
         Plaintiffs,           )  BRAZORIA COUNTY, TEXAS
4                              )
         v.                    )
5                              )  23rd JUDICIAL DISTRICT
     AMETEK, INC., et al.,     )
6                              )
         Defendants.           )
7    *******************************************
8
          REPORTER'S CERTIFICATION
9
          DEPOSITION OF ADMIRAL ROGER B. HORNE
10
              JULY 8, 2004
11
     *******************************************
12
13        I, Paul J. Frederickson, Certified Court Reporter
14   and Notary Public in and for the State of Washington,
15   hereby certify to the following:
16        That the witness, Admiral Roger B. Horne, was duly
17   sworn and that the transcript of the oral deposition is a
18   true record of the testimony given by the witness;
19        That examination and signature of the witness to the
20   deposition transcript was waived;
21        That the original deposition was delivered to Mr.
22   DiMuzio;
23        That the number of minutes used by each party at the
24   deposition is as follows:
25        Mr. DiMuzio:      215

                                                          203

1         Mr. Ramirez:         19
2         Mr. Shaw:            6
3         Ms. Lewis:           15
4         That $   is the deposition officer's charges to
5    the Plaintiff for preparing the original deposition
6    transcript.
7         That pursuant to information given to the deposition
8    officer at the time said testimony was taken, the following
9    includes all parties or record:
10   FOR THE PLAINTIFFS:
11   (Appearing via telephone)
12       Gary M. DiMuzio
13       CLARK, DEPEW & TRACEY, LTD, LLP
14       440 Louisiana, 16th Floor
15       Houston, Texas  77002
16       713.757.1400
17       diumzio@clarkdepew.com
18   FOR DEFENDANT BUFFALO PUMPS and CRANE CO.:
19       Michael J. Ramirez
20       GODWIN GRUBER
21       Renaissance Tower
22       1201 Elm Street, Suite 1700
23       Dallas, Texas  75270
24       214.939.8603
25       mramirez@godwingruber.com

                                                          204

                            51 (Pages 201 to 204)

ADMIRAL ROGER B. HORNE

| | |
|---|---|
| 1 | FOR DEFENDANT BUFFALO PUMPS: |
| 2 | Brady L. Green |
| 3 | MORGAN, LEWIS & BOCKIUS, LLP |
| 4 | 1701 Market Street |
| 5 | Philadelphia, PA 19103-2921 |
| 6 | 215.963.5000 |
| 7 | FOR DEFENDANT GARLOCK: |
| 8 | G. William Shaw |
| 9 | PRESTON GATES ELLIS, LLP |
| 10 | 925 Fourth Avenue, Suite 2900 |
| 11 | Seattle, Washington 98104-1158 |
| 12 | billshaw@prestongates.com |
| 13 | FOR DEFENDANT GUARD-LINE INC.: |
| 14 | (Appearing via telephone) |
| 15 | Kevin Melchi |
| 16 | DOGAN, WILKINSON, KINARD, SMITH & EDWARDS |
| 17 | P.O. Box 118 |
| 18 | Pascagoula, MS 39568 |
| 19 | 228.762.2272 |
| 20 | FOR DEFENDANT ALFA LAVAL, INC.: |
| 21 | (Appearing via telephone) |
| 22 | Randall W. Reavis |
| 23 | NEXSEN PRUET ADAMS KLEEMEIER |
| 24 | 701 Green Valley Road, Suite 100 |
| 25 | P.O. Box 3463 (27402) |

205

| | |
|---|---|
| 1 | Greensboro, NC 27408 |
| 2 | 336.373.1600 ext. 5104 |
| 3 | FOR DEFENDANT WARREN PUMPS, INC.: |
| 4 | (Appearing via telephone) |
| 5 | Drew M. Schilling |
| 6 | HAWKINS, PARNELL & THACKSTON, LLP |
| 7 | 4514 Cole Avenue, Suite 550 |
| 8 | Dallas, Texas 75205 |
| 9 | 214.780.5117 |
| 10 | FOR DEFENDANT FMC CORPORATION: |
| 11 | (Appearing via telephone) |
| 12 | Jillian J. Van Rensburg |
| 13 | DEHAY & ELLISTON, LLP |
| 14 | 901 Main Street, Suite 3500 |
| 15 | Dallas, Texas 75204 |
| 16 | 214.210.2422 |
| 17 | jvanrensburg@dehay.com |
| 18 | FOR DEFENDANT IMO INDUSTRIES: |
| 19 | (Appearing via telephone) |
| 20 | Latosha Lewis |
| 21 | GARDERE WYNNE SEWELL, LLP |
| 22 | 1000 Louisiana, Suite 3400 |
| 23 | Houston, Texas 77002-5007 |
| 24 | 713.276.5500 |
| 25 | LLewis@gardere.com |

206

| | |
|---|---|
| 1 | That a copy of this certificate was served on all |
| 2 | parties shown herein on     and filed with the Clerk |
| 3 | pursuant to Rule 203.3. |
| 4 | I further certify that I am neither counsel for, |
| 5 | related to, nor employed by any of the parties or attorneys |
| 6 | in the action in which this proceeding was taken, and |
| 7 | further that I am not financially or otherwise interested |
| 8 | in the outcome of the action. |
| 9 | |
| 10 | |
| 11 | |
| 12 | Certified to by me this 12th day of July 2004. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | PAUL J. FREDERICKSON |
| | Washington CCR # 2419 |
| | Expiration Date: 01-23-05 |
| 20 | 31217 Pacific Hwy S #332 |
| 21 | Federal Way, Washington 98003-5401 |
| | pfRealtime@aol.com |
| 22 | fax 253.549.7442 |
| | 206.389.9314 |
| 23 | |
| 24 | |
| 25 | |

207

52  (Pages 205 to 207)

# EXHIBIT B

Exhibit B to the Declaration of Richard A. Brody In Support Of Plaintiffs' Consolidated
Motion To Vacate Conditional Transfer Order (CTO-320)

1

1              IN THE UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4                        --oOo--

5

6      LEO HICKMAN SWEENEY,

7                    Plaintiff,

8            vs.                        No. C05-1637Z

9      SABERHAGEN HOLDINGS,

       INC., et al.,

10

                       Defendants.

11      _____/

12

13

14                     DEPOSITION OF

15                     BEN LEHMAN

16      --------------------------------

17            Friday, December 23, 2005

18

19

20

       REPORTED BY:   DIANE K. LUSICH, Nevada CSR NO. 181

21                            Calif. CSR NO. 5218

       Job No. L05-198

22

23

24

25

EXHIBIT B

```
 1    Nevada.

 2              (Witness sworn.)

 3              VIDEOGRAPHER MOORE:  Please begin.

 4                        EXAMINATION

 5    BY MR. METCALF:

 6       Q.    Sir, my name is Conard Metcalf, and I represent

 7    the plaintiff in this case, and I will be asking you some

 8    questions today.  If --

 9              You are located where now today, in what city?

10       A.    Right now we are located in Reno, Nevada.

11       Q.    Reno, Nevada, okay.

12       A.    Yes.

13       Q.    And I am located at the moment in Colorado.

14    And so I will try to speak loudly so you can hear me.

15              If there is some glitch, though, and you can't

16    hear me for some reason, just tell me, and we will try to

17    get it fixed.

18       A.    Where in Colorado are you located?

19       Q.    Right now I am in Boulder.

20       A.    Okay.

21       Q.    What is your current address?

22       A.    My current mailing address is Post Office Box

23    3480, Stateline, Nevada 89449.  My actual street address

24    is 169 Juniper Drive, same locality, same zip code.

25       Q.    And could you tell us, just so we have it here
```

1    on the record, your full name?

2        A.    Ben J. Lehman, L-e-h-m-a-n.

3        Q.    How long have you resided at your current

4    address?

5        A.    About eighteen years.

6        Q.    Do you have a business that you operate out of

7    that address?

8        A.    Yes.

9        Q.    What is the nature of that business?

10       A.    The nature of that business is engineering

11   consulting, and it has largely been consulting with

12   regard to litigation over the years.

13       Q.    How long have you had that business, sir?

14       A.    Well, the business was incorporated shortly

15   after I moved to Nevada.  Before that I had the business

16   as an unincorporated activity.

17       Q.    So including the time you have had the

18   consulting business that you have just described as an

19   activity whether incorporated or unincorporated, can you

20   tell me approximately when that business began?

21       A.    1977.

22       Q.    Can you tell me the years that you were in

23   active duty in the Navy?

24       A.    I was in active duty from '42 to the end of

25   World War II.  I think I was released from active duty

1    I am not sure of any specific date.

2    BY MR. METCALF:

3        Q.    Do you remember the source of any such document

4    that you read?

5              MS. HABECK:   Same objection.

6              THE WITNESS:   You mean the source that said it

7    to me or the original source?

8    BY MR. METCALF:

9        Q.    The source that provided it to you, sir, I'm

10   sorry.

11       A.    The source that provided it to me was a legal

12   firm.

13       Q.    Do you remember which legal firm?

14       A.    Probably it was the Tarwarner firm in

15   Knoxville, Tennessee.   But it might have been the firm

16   which employs Mr. Turnicut Shandy in Chicago.

17       Q.    Do you know Carl Mangold?

18       A.    How do you spell the name?

19       Q.    The first name is C-a-r-l and the last name is

20   M-a-n-g-o-l-d.

21       A.    No.

22       Q.    Now, to your knowledge, sir, are there any

23   military, federal government, specifications that

24   expressly prohibit the putting of a label on equipment to

25   be used aboard ship which contains language about

1     asbestos being potentially harmful to the health and

2     precautionary measures to be taken to eliminate or

3     minimize the risk of exposure to asbestos?

4               MS. HABECK:  Objection to form, overbroad,

5     vague as to time.

6               Go ahead.

7               THE WITNESS:  The question is, do I know of any

8     specific prohibition about doing something?

9     BY MR. METCALF:

10        Q.    Correct.

11        A.    No.  There are many things that could be

12    prohibited, certainly, that could be prohibited, but it's

13    not and never has been.

14        Q.    Now, do you know of any specific instance when

15    a manufacturer of equipment to be used aboard a Navy

16    vessel went to the Navy and asked for permission to put

17    an asbestos warning label on a piece of equipment and the

18    Navy refused that permission?

19              MS. HABECK:  Objection to the form, vague,

20    overbroad.

21              Go ahead.

22              THE WITNESS:  I cannot think of any such

23    instance being recorded in any document that I have ever

24    read.

25    BY MR. METCALF:

1      Q.     Do you know the name of anybody in the United

2    States Navy who refused an equipment manufacturer's

3    request to place a warning label concerning asbestos on

4    equipment that was to be installed in a Navy ship?

5             MS. HABECK:  Objection to the form, overbroad,

6    vague.

7             THE WITNESS:  No, I do not know that.  I have

8    never, never had occasion to query Naval officers who

9    were on active duty during the periods I think are in

10   question, whether anybody had ever made such request.

11            MR. METCALF.  I'd ask the reporter to hand the

12   witness Exhibit 1, which is the Nesbiet deposition that

13   you gave, and Exhibit 2, which is the Westmiller

14   deposition which we have already referenced.

15   BY MR. METCALF:

16      Q.     Sir, do you have the deposition you gave in the

17   Westmiller case there in front of you, Exhibit 2?

18      A.     First I have Nesbiet.

19             Yes, now I have Westmiller.

20      Q.     Okay.  And what I would like to do, frankly,

21   sir, is to incorporate the questions and the answers from

22   the Westmiller deposition into this deposition, so I

23   don't have to go over the same stuff.  And to do that

24   what I need to do is ask you if there are any answers

25   that you know of that you gave in that deposition that

1      A.      Excuse me, sir?

2      Q.      Do you need a break here, or anything, to

3    consult with counsel?

4      A.      Oh, no.  I can have a cup of coffee.

5              MS. HABECK:  I was just making sure he didn't

6    want a break, and he's fine.

7              MR. METCALF:  Sure.  That's fine.

8              MS. HABECK:  Thank you.

9              MR METCALF:  If you need a break, just holler.

10   But I am going to be pretty short here, I think.

11             THE WITNESS:  Well, we have incorporated a

12   couple of depositions.  That should cut down on the time

13   involved.

14             MR. METCALF:  Yeah, I think so.  I think so.

15   BY MR. METCALF:

16     Q.      The -- do you know of any instance where Navy

17   personnel saw a warning label on a piece of equipment or

18   a product that was going on board a ship and directed

19   that the warning label be removed?

20             MS. HABECK:  Object to the form, vague as to

21   time, overbroad.

22             THE WITNESS:  I don't know of any specific

23   instance.

24             MR. METCALF:  Okay.

25   BY MR. METCALF:

37

```
 1              CERTIFICATE OF WITNESS
 2
                   I have read the foregoing deposition and
 3
      declare under penalty of perjury that the foregoing
 4
      testimony is true and correct.
 5
                   Executed at _____,
 6
      California, this _____ day of
 7
      _____,
 8    20____.
 9
                   ----------------------
10                     Ben Lehman
11
      Subscribed and sworn to before me
12
      this _____ day of _____, 20____.
13
14
15
                   _____
16
          Notary Public
17
18
19    ____ The deponent failed to appear or to send notice in
          order to approve or sign his deposition.
20
          ____ The deponent refused to approve or sign his
21        deposition for the following reasons:
22
23    ____ The deponent approved his deposition by means of
          the document attached.
24
          ____ The deponent waived reading, correcting, and
25        signing ___ on the record or ___ by means of the
```

1          I, DIANE K. LUSICH, hereby certify that

2     the witness in the foregoing deposition was, by me, duly

3     sworn to tell the truth, the whole truth and nothing but

4     the truth in the within-entitled cause;

5          That said deposition testimony of the

6     witness was taken down in shorthand by me, a certified

7     shorthand reporter and a disinterested person, at the

8     time and place therein stated, and that the testimony of

9     said witness, including certified copies, constitutes a

10    full, true and correct transcription of my shorthand

11    notes, and was thereafter reduced to typewriting by

12    computer under my direction and supervision, to the best

13    of my ability.

14          I further certify that I am not of counsel

15    or attorney for either or any of the parties to the

16    said deposition, nor in any way interested in the event

17    of this cause, and that I am not related to any of the

18    parties thereto.

19          Dated this 17th day of January, 2006.

20

21

22                    _____

23                    Certified Shorthand Reporter

                      License No. 5218

24                    State of California

25