**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 4 2009

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL

# ON MULTIDISTRICT LITIGATION

PLEADING NO. 5821

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | ) | |
| | ) | |
| LIABILITY LITIGATION (No.VI) | ) | MDL Docket No. 875 |
| | ) | |
| | ) | |
| This Document Relates to: | ) | |
| | ) | |
| CTO-319 | ) | |
| | ) | |
| FRANK J. WILLIAMS, JR., | ) | Case No. 09-00065 |
| | ) | In the United States District Court |
| Plaintiff, | ) | For the Eastern District of |
| | ) | Louisiana |
| v. | ) | |
| | ) | |
| LOCKHEED MARTIN CORP., et al. | ) | |
| | ) | |
| Defendants. | | |

## DEFENDANT LOCKHEED MARTIN CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER 319

Plaintiff Frank Williams, Jr.'s two-page Motion To Vacate Conditional Transfer Order 319 ("CTO-319") does not, and cannot, dispute CTO-319's determination that his asbestos personal injury lawsuit falls squarely within the purview of MDL 875 – *In Re: Asbestos Products Liability Litigation (No. VI)*. Rather, Plaintiff's *only* argument for vacating CTO-319 is that the transferor court has not ruled on his motion to remand the lawsuit to state court. [*See* Plaintiff's Motion, p. 2.] This Panel, however, routinely holds that pending motions to remand are *not*

**OFFICIAL FILE COPY**   IMAGED APR 2 4 2009

grounds for delaying transfer to MDL 875 and, indeed, are *irrelevant* to the MDL transfer

analysis.   It should do so here as well.

## I.   FACTUAL BACKGROUND

Plaintiff has sued more than a dozen separate defendants for his alleged asbestos-related

injuries.  He claims exposure to asbestos over a period of approximately 35 years from different

products manufactured and distributed by many different companies.  Specifically, Plaintiff

alleges that his injuries were "caused by . . . his substantial occupational exposure to asbestos

during his employment . . . starting in 1974 and continuing until today." [*See* Plaintiff's Petition,

Par. 9 attached hereto as Exhibit 1.]  Lockheed Martin removed this lawsuit to Federal Court

upon learning that Plaintiff's allegations against Lockheed Martin were subject to federal officer

jurisdiction.  Plaintiff thereafter filed a motion to remand this action to state court.  To date, the

transferor court has not ruled on Plaintiff's motion.

On March 4, 2009, this Panel conditionally transferred this action to MDL 875, *In Re:*

*Asbestos Products Liability Litigation (No. VI)* on the grounds that Plaintiff's lawsuit "appears

[to] involve questions of fact that are common to the actions previously transferred to the Eastern

District of Pennsylvania and assigned to Judge Robreno." [*See* CTO-319, attached hereto as

Exhibit  2.]  On April 3, 2009, Plaintiff filed his Motion To Vacate CTO-319 solely on the

grounds that the transferor court has not ruled on the remand motion.

## II.   LEGAL ARGUMENT

This Panel and appellate courts reviewing this Panel's decisions consistently affirm that

tag-along cases appropriately are transferred to MDL proceedings notwithstanding pending

jurisdictional motions.  As the Second Circuit explained, "the sole issue [before the Judicial

Panel on Multidistrict Litigation] is the merits of the transfer viewed against the purposes of the multidistrict statutory scheme, *whether or not there is a pending jurisdictional objection*." *In Re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990)(emphasis added).  "The fact that there [are] pending jurisdictional objections [does] not deprive the MDL panel of the ability to transfer the case." *Grispino v. New England Mutual Life Insurance Co.*, 358 F.3d 16, 19 n.3 (1st Cir. 2004).

Given this Panel's specific and limited focus, every published JPML decision addressing the propriety of transfer to MDL 875 despite pending remand motions has, not surprisingly, ordered the transfer of such lawsuits.  For example, in *In Re Asbestos Products Liability Litigation (No. VI)*, 170 F.Supp.2d 1348 (J.P.M.L. 2001), this Panel summarily rejected plaintiffs' argument that a lawsuit otherwise suitable for MDL 875 should remain in the transferor district due to a pending motion to remand. *Id.* at 1349.  The Panel reasoned that "distinctions [between asbestos personal injury lawsuits] based on such matters as the pendency of motions or other matters before the transferor court . . . were considered and rejected by us as grounds for carving out exceptions to transfer in this extraordinary docket." *Id.*  Indeed, in specific response to plaintiffs' argument that pending remand motions should preclude transfer, this Panel explained:

> Certain plaintiffs argue that transfer of their actions should be denied or deferred in order permit the resolution of motions to remand the actions to state court. *There is no need to delay transfer in order to accommodate such an interest* . . . . [T]hose courts wishing to address such motions have adequate time in which to do so, while those courts concluding that such issues should be addressed by the transferee judge need not rule on them, and the process of Section 1407 transfer in MDL No. 875 can continue without any unnecessary interruption or delay.

*Id.* at 1349 n.1 (*see also In re Asbestos Products Liability Litigation (No. VI)*, 1996 WL 143826, p. 2 n.2 (J.P.M.L 1996)(emphasis added).   Just last year, this Panel, using language *identical* to

its 2001 and 1996 decisions, issued yet another published decision affirming that motions to remand cannot delay transfer to MDL proceedings.  *See In re Asbestos Products Liability Litigation (No. VI)*, 560 F.Supp.2d 1367, 1368 n.2 (J.P.M.L. 2008).

Here, Plaintiff's motion is based on the same tired argument repeatedly rejected by this Panel; i.e., that transfer should be "denied or deferred" to permit resolution of his motion to remand.  [Plaintiff's Motion, p. 2.]  Given this Panel's precedent that there is no "motion to remand exception" to MDL 875 transfers, and the undisputed fact that Plaintiff's asbestos lawsuit involves "common questions of fact . . . with actions previously transferred to the Eastern District of Pennsylvania," Plaintiff's motion must be denied.  (*See In re Asbestos Products Liability Litigation (No. VI)*, 560 F.Supp.2d 1367, 1368 *citing In re Asbestos Products Liability Litigation (No. VI)*, 771 F.Supp. 415 (J.P.M.L. 1991).

### III.   CONCLUSION

For the foregoing reasons, Lockheed Martin respectfully requests that Plaintiff's Motion To Vacate CTO-319 be denied in its entirety.

Respectfully submitted,

_____
**ROBERT E. KERRIGAN, JR. (#7350)**
**A. WENDEL STOUT, III (#12511)**
**DAVID K. GROOME, JR. (##22788)**
Deutsch, Kerrigan & Stiles, L.L.P.
755 Magazine St.
New Orleans, LA 70130
Phone: (504) 581-5141 Fax:(504) 566-1201
*Attorneys for Lockheed Martin Corporation*

**C E R T I F I C A T E  OF SERVICE**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 24 2009

FILED
CLERK'S OFFICE

State of Louisiana

Parish of Orleans

David K. Groome, Jr., being duly sworn deposes and states that he is an employee of

Deutsch, Kerrigan & Stiles, L.L.P., the attorney for defendant, Lockheed Martin Corporation,

herein, that he is over 18 years of age and is not a party to the within action, and that on the **23rd**

**day of April, 2009,** he caused a copy of defendant's, Lockheed Martin Corporation, Opposition

to Plaintiff's Motion to Vacate Conditional Transfer Order 319 to be sent via regular mail to all

counsel of record indicated on the attached service list by depositing a true copy of same

securely enclosed in a post-paid envelope in a Post Office regularly maintained by the U.S.P.S.

in New Orleans, Louisiana.

_____
David K. Groome, Jr.


Sworn to and Subscribed before Me,
this ___23___ day of April, 2009.

_____
Notary Public ( Bar No 01947 )
for life


1086936

LITIGATION (NO. VI)                                                    MDL No. 875

# INVOLVED COUNSEL LIST (EXCERPTED FROM CTO-319)

Frank J. Williams, Jr. v. Lockheed Martin Corp., et al., E.D. Louisiana, C.A. No. 2:09-65
(Judge Ivan L. Lemelle)

Peter G. Angelos
LAW OFFICES OF PETER G ANGELOS PC
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Lloyd J. Bourgeois
DIDRIKSEN LAW FIRM
3114 Canal Street
New Orleans, LA 70119

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

R. Dean Church, Jr.
FORMAN PERRY WATKINS KRUTZ &
TARDY LLP
1515 Poydras Street
Suite 1300
New Orleans, LA 70112

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street
Suite 3000
Chicago, IL 60602-2415

Thomas L. Cougill
WILLINGHAM FULTZ & COUQILL LLP
808 Travis
Suite 1608
Houston, TX 77002

Leon Gary, Jr.
JONES WALKER
Four United Plaza
8555 United Plaza Boulevard
Baton Rouge, LA 70809

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS FERNANDEZ
ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607

Robert E. Kerrigan, Jr.
DEUTSCH KERRIGAN & STILES LLP
755 Magazine Street
New Orleans, LA 70130

Susan B. Kohn
SIMON PERAGINE SMITH & REDFEARN
LLP
Energy Centre
1100 Poydras Street
30th Floor
New Orleans, LA 70163-3000

MDL No. 875 - Involved Counsel List (Excerpted From CTO-319) (Continued)

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

David C. Landin
Hunton & Williams
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

Christopher K. Lightfoot
HAILEY MCNAMARA HALL LARMANN &
PAPALE
One Galleria Boulevard
P.O. Box 8288
Suite 1400
Metairie, LA 70011-8288

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER &
MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street
28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Olivia Smith Regard
JONES WALKER
500 Dover Boulevard
Lafayette, LA 70503

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Edward A. Rodrigue, Jr.
BOGGS LOEHN & RODRIGUE
3616 South I-10 Service Road West
Suite 109
Metairie, LA 70001

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ &
TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608

Jennifer D. Zajac
4512 Laudun Street
Metairie, LA 70006

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FILED

2009 NOV 12  A 9:30

CIVIL DIST COURT

APR 24 2009

FILED
CLERK'S OFFICE

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

NO.: 08-11685                                    SECTION: J-13

FRANK J. WILLIAMS, JR.

versus

LOCKHEED MARTIN CO. individually and as successor-in-interest to **MARTIN MARIETTA, INC., OWENS-ILLINOIS, INC., VIACOM, INC.**, as successor-in-interest to **WESTINGHOUSE ELECTRIC CORPORATION, FOSTER WHEELER CORPORATION, GENERAL ELECTRIC COMPANY, UNIROYAL, INC., THE McCARTY CORPORATION, EAGLE, INC.,** formerly known as **EAGLE ASBESTOS & PACKING, CO., TAYLOR-SEIDENBACH, INC., REILLY-BENTON COMPANY, INC., CSR, LTD, ADVOCATE MINES, LTD,** and **NORCA CORPORATION**

FILED: _____        _____
                                                            **DEPUTY CLERK**

### PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Petitioner, Frank J. Williams,

Jr., who files this petition with respect, and represents as follows:

1.

Petitioner is a person of the full age of majority, and resident of the Parish of Orleans,

State of Louisiana.

2.

Venue is proper in this parish under Articles 42 and 74 of the Louisiana Code of Civil

Procedure, as at least one of the defendants has a registered office in this parish, and in as much

as at least some of the wrongful conduct Petitioner complains of occurred in this parish.

3.

Made defendants herein are:

**LOCKHEED MARTIN CO.,** individually and as successor in interest to **MARTIN MARIETTA, INC.,** a foreign corporation, authorized to do and doing business in the State of Louisiana, with its principal place of business in Louisiana located at 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809 and their agent for service of process in Louisiana located at Corporation Service Company, 320 Somerlous Street, Baton Rouge, Louisiana 70802.

**OWENS-ILLINOIS, INC.,** a foreign corporation, with their principal place of business located at One Seagate, Toledo, OH 43666 and who may be served through the Louisiana long-arm statute at One Seagate, Toledo, OH 43666.

1



**VIACOM, INC.,** as successor-in-interest to **WESTINGHOUSE ELECTRIC CORPORATION,** a Delaware corporation, with their principal place of business in Louisiana located at 320 Somerlous Street, Baton Rouge, Louisiana 70802 and their agent for service of process in Louisiana located Corporation Service Company, 320 Somerlous Street, Baton Rouge, Louisiana 70802.

**FOSTER WHEELER CORPORATION,** , a foreign corporation, with their principal place of business at Perryville Corporate Park in Clinton, NJ 08809-4000, and who may be served through the Louisiana long-arm statute at Perryville Corporate Park in Clinton, NJ 08809-4000.

**GENERAL ELECTRIC COMPANY,** , a New York Corporation, with their principal place of business in Louisiana located 800 Commerce Road East, Harahan, Louisiana 70123 and their agent for service of process in Louisiana located at CT Corporation Systems, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808.

**UNIROYAL, INC.,** a foreign corporation, with their principal place of business located at 70 Great Hill Road, Naugatuck, Connecticut, 06770 and who may be served through the Louisiana long-arm statute at 70 Great Hill Road, Naugatuck, Connecticut, 06770.

**THE McCARTY CORPORATION,** , a Louisiana corporation, with their principal place of business 445 North Boulevard, Suite 300, Baton Rouge, Louisiana 70802, and their agent for service of process being Paul Spaht, 445 North Boulevard, Suite 300, Baton Rouge, Louisiana 70802.

**EAGLE, INC.,** formerly known as **EAGLE ASBESTOS & PACKING, CO.,** a Louisiana corporation with its principal place of business located at 2431 Clio Street, New Orleans, Louisiana 70113, and its agent for service of process being Susan B. Kohn, 1100 Poydras Street 30th Floor, New Orleans, Louisiana 70163.

**TAYLOR-SEIDENBACH, INC.,** a Louisiana corporation with its principal place of business located at 731 South Scott Street, New Orleans, Louisiana 70119, and its agent for service of process being Robert I. Shepard or Ralph I. Shepard, 731 South Scott Street, New Orleans, Louisiana 70119.

**REILLY-BENTON COMPANY, INC.,** a Louisiana corporation, with their principal place of business 8550 United Plaza Boulevard, Suite 702, Baton Rouge, Louisiana 70809 and their agent for service of process being Thomas L. Cougill c/o Beason-Willinham, LLP, 8550 United Plaza Boulevard, Suite 702, Baton Rouge, Louisiana 70809.

**CSR, LTD,** a foreign corporation, with their principal place of business in Chatswood, NSW, Australia, and who may be served through the Louisiana long-arm statute at 9 Help Street, Chatswood, NSW 2067, Australia.

**ADVOCATE MINES, LTD,** a foreign corporation, with its principal place of business in Canada, and who may be served through the Louisiana long-arm statute through Winn Oughtred at Border, Ladner & Gervais, LLP, 40 King Street West, Suite 4100, Toronto, Canada M5H 3Y4.

And

**NORCA CORPORATION,** a foreign corporation, with their principal place of business in Great Neck, New York, and who may be served

through the Louisiana long-arm statute at 185 Great Neck Road, Great Neck, New York 11022.

4.

Petitioner was employed as a mechanical engineer by Lockheed Martin Co., as successor-in-interest to Martin Marrietta Co., beginning prior to 1974, working at the Michoud Assembly Facility during his employment.  Petitioner was also employed in the telecommunications industry for a number of years.

5.

Defendants, Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.), and Taylor-Seidenbach, Inc., are domestic corporations with their registered offices in the Parish of Orleans, State of Louisiana.

6.

Defendants, Foster-Wheeler Corporation, Owens-Illinois, Inc., Reilly-Benton Company, Inc., Viacom, Inc. (as successor-in-interest to Westinghouse Electric Corporation), Foster Wheeler Corporation, General Electric Company, Uniroyal, Inc., and The McCarty Corporation, are all corporations incorporated under the laws of the various states of the United States.  These asbestos defendants all have their principal place of business in various states of the United States, as well as some foreign countries.  All of them may be served through their Louisiana agent for service of process or under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Louisiana Secretary of State.

7.

Prior to Mr. Williams's diagnosis in August 2008, he was exposed to asbestos on a daily basis and he contracted mesothelioma.  The injury to Mr. Williams occurred prior to August 2008, although the disease did not manifest itself until that time.

8.

Frank Williams was employed by Martin Marrietta, Inc., now known as Lockheed Martin Co.  At all relevant times herein during his employment with Lockheed and its predecessors, he

3

was exposed to dangerously high levels of asbestos, in the normal routine course of his work. His initial exposures occurred beginning in or around 1974.

9.

Mr. Williams's mesothelioma was caused by injuries and damages to his person that he received from his substantial occupational exposure to asbestos during his employment. The internal injuries Mr. Williams received from his exposure to asbestos dust caused injuries and damages to his person starting in 1974 and continuing until today. Mr. Williams's mesothelioma was caused by injurious exposure to asbestos dust and damages he received from that exposure. Mr. Williams's diagnosis of mesothelioma is directly attributable to his exposure to asbestos fibers from 1974 to 2008, and those initial injuries and damages caused by that exposure from 1974 to 2008. Medical studies suggest that Mr. Williams began to sustain tissue damage shortly after his inhalation of asbestos fibers, and that he sustained distinct bodily injury in each year of his occupational exposure to asbestos dust.

10.

As a result of exposure to asbestos, and as a result of the tortuous conduct of all defendants, Mr. Williams contracted mesothelioma and other related ill health effects, with which he was first diagnosed on approximately August 25, 2008.

11.

Eagle, Inc., Reilly-Benton Company, Taylor-Seidenbach, Inc., and The McCarty Corporation, manufactured, distributed, and/or installed asbestos-containing pipe covering, blankets, special fittings, gaskets blocks, valves, cements, mastics, and jackets. They sold, distributed and/or installed these products at the Michoud Assembly Facility, at various times throughout the time of Mr. Williams's exposure. In addition, Eagle, Inc., Reilly-Benton Company, Taylor-Seidenbach, Inc. and The McCarty Corporation, distributed asbestos containing products manufactured, distributed, and sold by other asbestos material manufacturers. Foster-Wheeler Corporation (block and boiler insulation), Viacom, Inc. and its predecessor corporations (block and boiler insulation, electrical component insulation), General Electric (block and boiler insulation, electrical component insulation), Uniroyal, Inc. (asbestos blankets, mats, and other asbestos containing material) manufactured, distributed, and/or placed

4

into commerce various asbestos containing materials.  These defendants are referred to as "asbestos defendants."

12.

During various periods of time, Eagle, Inc., Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. would package the above-described products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus making them liable as the manufacturer under Louisiana law.  Eagle, Inc., Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. also did contracting work at locations at which Frank Williams was working thereby exposing Mr. Williams to asbestos-containing products, which caused and/or contributed to his mesothelioma.  Frank Williams was exposed to asbestos-containing products manufactured, distributed and sold by all "asbestos defendants" named in this petition.

13.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by all "asbestos defendants," Mr. Williams inhaled asbestos fibers and other harmful substances emitted during the normal use of said products, proximately causing the mesothelioma and other related ill health effects from which he now suffers.  Petitioner further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions.  Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

14.

As a result of the aforementioned acts of negligence, intentional tort, fraud, strict liability, and absolute liability of all of the defendants named, Mr. Williams contracted mesothelioma and other related ill health effects from which he now suffers.

15.

The asbestos-containing products manufactured, distributed and/or sold by all "asbestos-defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, all defendants failed and refused to warn Mr. Williams and/or his employers of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, asbestosis, pleural plaques, pleural thickening, and cancer.

16.

Prior to the time Mr. Williams was exposed to asbestos, all defendants were aware of the health hazards associated with exposure to asbestos, including but not limited to asbestos related mesothelioma, pulmonary disease, pleural plaques, pleural thickening, fibroses, asbestosis, and cancer. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims.

17.

All defendants made the misrepresentation cited in the foregoing paragraph despite their knowledge of the falsity, and fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intention to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

18.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said product, Mr. Williams was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted asbestos-related mesothelioma and other related ill-health effects.

19.

The misrepresentation and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Williams and other employees and their family members who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their exposure to asbestos. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees and their family members so that they would not associate any lung disease with occupational exposure from their job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees who contracted disease. These actions constitute fraud under Louisiana law.

20.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of the 1930's, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Mr. Williams.

21.

By the time Mr. Williams began working with and around asbestos products, virtually every state in the United States recognized asbestos as a compensable claim under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company with federal government contracts were bound to comply with health and safety requirements of the Walsh Healy Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required

isolation of dusty work, ventilation, use of respirators, and medical examination by doctors. Despite this, Mr. Williams and other similarly situated workers were never warned of any hazard associated with asbestos, were never protected by use of adequate ventilation, were required to work with asbestos and around others using asbestos products and were required to pick up asbestos containing debris. They never saw a warning on any asbestos product nor were they warned by any defendant about any hazard associated with exposure to asbestos products. Despite the fact that all defendants were aware of the hazards of asbestos to which Mr. Williams was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law. Even after OSHA became law in 1971, Mr. Williams was not warned of the health hazards associated with exposure to asbestos.

22.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment, which proximately caused the injuries to Mr. Williams in the following manner:

1)  The materials published or caused to be published were false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products;

2)  The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

   a)  To maintain a favorable atmosphere for the continued sale, distribution, and use of asbestos-related products;
   b)  To assist in the continued pecuniary gain of the defendants through he sale of asbestos products to an ignorant public;
   c)  To influence in the defendant's favor, legislation to regulate asbestos exposure and to limit medical and disability claims for compensation;
   d)  To provide a defense against lawsuits brought for injury resulting from asbestos disease;
   e)  To prevent relevant medical inquiry about asbestos disease;
   f)  To mislead the general public and Mr. Williams about the hazards associated with asbestos products; and
   g)  To induce Mr. Williams, his employers, and his clients to use asbestos products;

3)  Defendants were in a position of superior knowledge regarding the health hazards of asbestos and therefore Mr. Williams and others deciding to use

the said asbestos containing products to which Mr. Williams was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos related products.

23.

Insurance premiums were set based on the risks posed by the insured.  Insurance companies discussed the hazards of asbestos with insureds that manufactured, used, or distributed asbestos products.  Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly.  This was true prior to the time that Mr. Williams was first exposed to asbestos and continued throughout his employment.  The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting.  When the Supreme Court of North Carolina (McNeely v. Carolina Asbestos Co., May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates"; he wrote that even though rates for those in the asbestos business were high, "their adequacy... is generally doubted."  To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance – "sort of a right pocket to left pocket ... in other words there wasn't any way (insurance companies) could lose money on it." (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85-05657, Div. "D", Civil District Court for the Parish of Orleans.)

24.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) has been shown by numerous documents and testimony in asbestos-related cases throughout the United States.  In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically

9

impossible" for Petitioners to pursue their claims. The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insureds were working together to discourage Petitioners from pursuing valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for our other pending asbestosis cases and (sic) in this jurisdiction we will soon have to formulate a 'game plan' for the continued defense of these asbestos cases with the other defendants." In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economically (sic) impossible for the Petitioners to purse the other cases." These attempts to prevent and stifle valid claims by Petitioners such as Mr. Williams show that the defendants, to this day, are committing fraud.

25.

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines,

10

mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice-President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November 1933, through January, 1934, reflected that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators that should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust cause pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 59, No. 1, January 4, 1935.

26.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute.

Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time.  A report of these works was prepared by Dr. Gardner on April 18, 1938.  The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comment.

27.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Patterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure.  Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment, which did not involve any exposure to asbestos dust.  Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease.  Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned.  Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather then inform them of health consequences which would undoubtedly lead to costly lawsuits against the company.  As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown ... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they drop dead?'  He said, 'Yes.  We save a lot of money that way.'"  (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of America, U.S. Claim Court Civ. No. 465-83C.)

28.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburg).  The organizations' name was changed to "Industrial Hygiene Foundation" ("IHF") and, in 1968, it was again changed to the "Industrial Health Foundation."  J-M joined in 1936.  Other IHF members included, among others, Flintkote, Garlock, and Westinghouse Electric Corporation or their predecessors in interest.  All of these companies are defendants in this case.  The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place.  One of the functions of the IHF was to gather and disseminate information regarding

occupational health to its members.  Since its inception, it has published special bulletins on

items of general interest under the headings of legal bulletins, medical bulletins, management

bulletins and engineering bulletins.  Since 1937, member companies have been kept informed on

occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent

to all members in return for their annual membership fee.  The Digest is a compilation of

abstracts, grouped by topic, of the published domestic and foreign scientific and medical

literature pertaining to industrial health and hygiene.  In addition to scientific abstracts, the

Digest includes a section on legal developments, and also provides notice of any proposed

changes in threshold limit values for various substances.  Correspondence between members and

the IHF established that members either participated in or knew of a number of studies and

surveys dating as far back as the 1930s which linked asbestos with various lung diseases.  As

part of its consultative services for its members, the IHF undertook a number of studies involving

evaluations of asbestos dust conditions and asbestos-related disease.   In June 1947, the fruits of

the industry survey conducted by the IHF for the ATI and its members were published in a

"Report of Preliminary Dust Survey for Asbestos Textile Institute."  The object of the

investigation was stated as:  "defining the specific nature and the magnitude of the (asbestosis)

problem in all its phases … An original objective of most immediate importance was to facilitate

the exchange of information between the member companies on successful methods of dust

control and otherwise to promote a general improvement in that field."  The preliminary survey

was divided into three parts designated as "Engineering, Medical and Physical Testing" and was

based on visits made to member companies' plants over a three month period.  While the actual

report does not reveal the identity of the plants which were visited, deposition testimony of Dr.

Braum indicates that other companies evaluated in the report included, among others, Garlock, a

defendant in this case.  Minutes of Air Hygiene Committee meetings throughout the 1940's and

1950's reflect frequent discussions and presentations pertaining to appropriate medical practices

and industrial hygiene approaches to the problem of asbestos dust in the work place.  It was

continually stressed that both pre-employment and periodic follow-up medical examinations

were essential to monitor the health of employees, the necessity of x-rays and lung function

studies, and the proper requisites for a diagnosis of asbestos-related disease.  Some annual

meetings apparently were held by the IHF.  The minutes for the Fifth Annual Meeting of the Air

Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed

asbestos to be one of its two main topics of interest.  An Interim Report of the Preventive

Engineering Committee, written by Philip Drinker, discussed *inter alia* dust particle size and

dust control.  A second report by Foundation Research at the Saranac Laboratory entitled

"Individually Susceptiblity to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with

the problems of silica dust.  Also discussed were court decisions on Workers' Compensation

cases.  A case involving the death of a North Carolina man was discussed, the minutes indicated

that the claimant sought compensation on grounds that the Petitioner's pneumonia was due to

asbestosis.  The Supreme Court of North Carolina upheld the award finding that asbestosis was a

contributing cause of death.  The Air Hygiene Foundation also recommended that pre-

employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the

Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that

various procedures be implemented to reduce the dust in manufacturing facilities.  In December

of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of

the American Textile Institute (discussed *infra*) to respond to inquiries regarding IHF's proposed

Industrial Hygiene Survey of the member companies.  It was agreed at the February 5, 1947

meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its

proposed survey.  A June 18, 1947 report by W.C.L. Hemeon, Head Engineer for IHF, stated that

the medical review reflected an incidence of asbestosis ranging between 3% and 20%.  In one

presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value

was criticized as being unsafe for persons exposed to asbestos fiber.  Defendants thus had direct

and actual knowledge that the suggested threshold limit value for asbestos was not safe.  In

addition, this criticism was published in the scientific literature and all defendants were put on

notice of the hazards of the suggested threshold limit value.

29.

   In addition to the IHF, there were other trade associations which were formed to aid and

service companies in the asbestos industry.  Members of the ATI, founded on November 16,

1944, included companies which produced asbestos containing cloth.  Members included, among

14

others, Uniroyal, Inc., and Garlock, Inc., who are defendants in this action. At the June 13, 1946 meeting of the ATI, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the ATI recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

30.

Sumner Simpson, the first Raybestos-Manhattan, Inc. President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan, Inc., was going to have to deal with that reality.

15

31.

Defendant Owens-Illinois (O-I) began the manufacture and sale of the asbestos containing product "Kaylo" in the 1940s. Defendant's knowledge of the hazards posed by the inhalation of asbestos fiber released from Kaylo can be documented as far back as the early 1940s. Much of the evidence arises out of testing done of Kaylo at the Saranac Laboratory at Saranac Lake, New York. The following is a brief description of some of the evidence pertaining to O-I's knowledge of the health hazards posed by inhalation of asbestos dust released from its Kaylo product. On February 12, 1943, O-I's director of research, U.E. Bows, sent a letter to L.U. Gardner of the Saranac Laboratory stating: "(The health hazard) should be considered from the standpoint of employees working in the plant where the material is made or where it may be sawed to the desired dimensions and also considered from the standpoint of applicators or erectors at the point of use." On November 16, 1948, A.J. Vorwald of the Saranac Laboratory sent a letter to U.E. Bows regarding the effects of inhalation of Kaylo dust in animal studies. This letter provides in pertinent part:

> "In all animals sacrificed after more than 30 months of exposure to Kaylo dust, unmistakable evidence of asbestosis has developed, showing that Kaylo on inhalation is capable of producing asbestos and must be regarded as a potentially hazardous material.

> * * *

> I realize that our findings regarding Kaylo are less favorable than anticipated. However, since Kaylo is capable of producing asbestosis, it is better to discover it now in animals rather then later in industrial workers. Thus, the company, being forewarned, would be in a better position to institute adequate control measures for safeguarding exposed employees and protecting its own interest."

Along with the November 16 letter of Vorwald was an interim report to the Owens-Illinois Glass Company regarding the ability of dust generated by Kaylo to cause lung disease. Pertinent portions of that report provide:

> "Kaylo is capable, on prolong inhalation of producing asbestosis in the lungs of guinea pigs and it should be handled industrially as a hazardous dust.

\*\*\*

The animals were exposed to atmospheric
suspensions of Kaylo dust for 8 hours daily, 5 and
½ days a week throughout the experiment. The dust
concentration which varied somewhat from time to
time has averaged 116 particles per cubic foot of air
over the entire course of the experiment to date.

\*\*\*

All nine animals sacrificed subsequent to 30 months
in the present experiment…have developed true
fibrosis of a type characteristic of the response of
guinea pigs to asbestos.

While the lesions up to 30 months showed no
fibrosis, certain aspects of them were compatible
with a preliminary stage in the development of
asbestosis. These aspects were masked by the inert
type of reaction to the materials other than asbestos
in the dust.

\*\*\*

Kaylo, because of its content of an appreciable
amount of fibrous chrysotile, is capable of
producing asbestosis and should be handled as a
hazardous industrial dust."

The Saranac Laboratory report clearly informed O-I that the asbestos content in the air in

certain parts of its plant were potentially hazardous to human health. The report further

recommended respirators be used by workers loading Kaylo material into box cars. In the same

report O-I was also warned against reliance on compliance with government and industry

standards in order to completely protect against the possibility of occupational disease. On

February 7, 1952, Vorwald sent a letter to W.G. Hazard enclosing the final report on "The

Capacity of Inhaled Kaylo Dust to Injure the Lung." A copy of the report was sent to O-I

corporate medical director, Shook. The report states in pertinent part:

"Kaylo dust is capable of producing peribronchiolar
fibrosis typical of asbestosis. The dust also has a
slightly unfavorable influence upon a tuberculosis
infection. Although extrapolation from animal to
human experience is difficult, nevertheless, the
results of the study indicate that every precaution
should be taken to protect workers against inhaling
the dust."

17

Despite the information made known to O-I concerning the ability of dust generated from its Kaylo product to cause asbestosis and other ailments, O-I actually drafted a pamphlet stating that Kaylo could be used without the danger of developing asbestosis.  See, December 12, 1950 letter from Willis G. Hazard to A.G. Vorwald; December 9, 1952 correspondence from C.W. Howard to George White.  O-I continued to promote Kaylo as safe and "non-toxic."  See advertisement in Petroleum Engineer, C-55 to C-62, April 1952, Hydros Calcium Silicate Heat Insulation.  Other evidence of knowledge includes the fact that in May 1952, Willis Hazard of O-I attended the Seventh Saranac Symposium where considerable discussion of asbestosis and cancer took place.

On October 5, 1955, Hazard of O-I wrote concerning a report of Saranac Lake contained in Arch. Indust. Health, 12:348-360 (1955), entitled "Effect of Inhaled Commercial Hydrous Calcium Silicate Dust on Animal Tissues."  The report was published by Dr. Scheepers of the Saranac Laboratory and contained some of the Saranac Laboratory's findings pertaining to Kaylo.  The report was not shown to O-I officials prior to publication.  In his October 5, 1955 correspondence, Hazard stated:

> "We had felt (publication of the research) would be the proper procedure for the long run, even though the experiments did not show Kaylo to be lily-white.  They showed to be specific, the Kaylo dust could cause asbestosis, an incurable lung condition; and they showed the dust could reactivate tuberculosis..."

The name "Kaylo" and "O-I" appear no where in the article.  It is completely anonymous.

The above aptly demonstrates that O-I possessed the requisite knowledge of the hazards posed by inhalation of asbestos fiber as far back as the 1940s.  Despite that knowledge, defendant chose not to warn the Petitioner or others similarly situated of the hazards posed to their health by working with or near defendant's products.  Further, defendant's suppression of known health hazards associated with exposure to their products constitutes fraud under Louisiana law.

Owens-Corning Fiberglass Corporation's (OCF) knowledge of the hazards associated with inhalation of asbestos can also be dated back to the early 1930s.  The following is a brief outline of some of the documentation clearly demonstrating that at all times relevant hereto, OCF

18

knew of the dangers to health posed by the inhalation of asbestos fiber released from its

products. OCF began operations as the manufacturer of fiberglass insulation, which at the time

was a major competitor of asbestos-containing insulation materials. On January 20, 1931, the

Legal and Patent Department of OCF writes to Gardner of Saranac Laboratories:

> "It is indeed good news to hear that you do
> but feel you will encounter any evidence of an
> asbestos-like reaction since none of the (fiberglass)
> fiber reaches the interior of the lungs."

As a manufacturer of fiberglass insulation, OCF expended substantial effort and resources to

espouse the benefits of using fiberglass instead of asbestos. One of the primary benefits OCF

focused on was that fiberglass insulation did not pose dangers to health, unlike asbestos

insulation products. In the 1950s, OCF became a major purchaser of "Kaylo," the asbestos-

containing insulation manufactured by O-I. In 1958, OCF purchased the Kaylo business from O-

I and also became active in the insulation contracting business. In purchasing the Kaylo business

from O-I, OCF received copies of the aforementioned Saranac studies pertaining to Kaylo

insulation products. As a manufacturer and contractor involved in the insulation industry, OCF

became fully aware of the health hazards associated with inhalation of asbestos fiber.

A May 23, 1941 memorandum to Harold Boeschenstein documents a meeting of OCF

employees with union attorneys and consultant Bartley. Bartley had apparently expressed

concern to OCF over the health effects of fiberglass, particularly respiratory dangers. The

memorandum further describes a meeting with union representatives in which low workers

compensation rates for fiberglass manufacturers are discussed and contrasted with rates for

asbestos manufacturers. Also discussed are meetings at the American Industrial Hygiene

Association. On June 16, 1941, E.C. Ames sent a memorandum to H. Borstein entitled

"Investigation of Health Aspects of Fiberglass" authored by Dr. W.J. Siebert, discussing the

research of Dr. Seibert, a pathologist working for the Asbestos Workers' Union. In his paper,

Dr. Siebert questioned the inference raised in other reports that there was no health hazards

posed by glass fibers because they were too large to get into the human beings lungs. In 1941,

OCF also circulated a brochure which mentioned a letter from a representative of Aetna

Insurance Company, J. Hill, stating that workers' compensation insurance for fiberglass was less

costly than coverage for asbestos.  On September 8, 1941, OCF's legal departments ordered

reprints of the asbestos industrial hygiene reports of Page, Bloomfield & Lanza.  On January 7,

1942, Edward Ames of OCF sent memoranda to Boeschenstein and E.J. Marshall setting forth a

plan to "take the offensive" in 1942, by going to the Asbestos Workers' Union with

documentation on asbestosis.  On December 27, 194[?], Mr. Ames of OCF sent a memorandum

to C.E. Gregory stating: "In formulating our policy on admixtures with asbestos, we should keep

on the alert because otherwise we will run the risk of smearing fiberglass with the hazards of

exposure to asbestos."  On September 21, 1970, Kern sent a memorandum to Dr. Jon Konzen

concerning "asbestos-labeling" aptly depicting OCF's attitude in affixing labels to its asbestos

containing products:

> "Reference is made to your memo of September 15,
> regarding the warning label that should appear on
> Kaylo.  Are you saying we have this now?
> Naturally I would like to delay this requirement as
> long as possible.  Please advise."

In addition to the foregoing, OCF was apprised of the dangers posed by asbestos as a

result of workers' compensation claims and third party actions brought by insulation workers

against OCF and its subsidiary contracting divisions.  The above clearly demonstrated that OCF

was fully apprised of the dangers associated with the use of its products and took no precaution

to warn Carl Williams, or other similarly situated, of those dangers or how to safely use its

products.

32.

Defendants, Eagle, Inc., Reilly-Benton, Inc., and Taylor-Seidenbach, Inc. (T-S), did

contracting work as early as the 1940s.  U.S. Navy vessels were being constructed at all of these

times.  Accordingly, Eagle, Reilly-Benton, and T-S were aware of the health and safety

requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as

regulations of the U.S. Navy and U.S. Maritime Commission in 1943.  These mandatory

regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to

asbestos.  Moreover, these defendants, being asbestos insulation contractors, had to pay higher

insurance premiums as a consequence thereof.  Mr. Williams was exposed to asbestos as a result

of the products manufactured, distributed, and sold by these defendants, yet at no time was he protected from or warned of these hazards.

Even after OSHA became the law in 1971, Mr. Williams was not advised of the hazards associated with exposure to asbestos. These defendants were aware of the hazards of asbestos but failed and/or refused to warn Mr. Williams of the dangers. These defendants also concealed and/or suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law. *See*, Deposition of Fred J. Schuber, Jr., May 31, 1990, pages 149-155, 176-179, and exhibits attached to the May 9, 1990 deposition of Mr. Schuber; Deposition of Thomas R. Dimm, February 3, 1986, pages 65-66; Eagle's response, dated March 27, 1990, to Petitioner's interrogatory number 4 in the case of *Atzenhoffer, et al v. National Gypsum, Co., et al*, C.A. #89-894; and Act No. 532 (1952), amendments to the Louisiana Workers' Compensation Act.

33.

Since the early 1940s, defendants, Foster-Wheeler Corporation (F-W), CBS Corporation, and General Electric, were major manufacturers of boilers used in the construction of U.S. Navy vessels. Their position was derived through government contacts at a national level, and since that time throughout the time when Mr. Williams was last exposed, they supplied boilers to virtually every shipyard constructing and repairing U.S. Navy vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.

Despite this knowledge, at no time was Mr. Williams advised of these hazards, as defendants failed and refused to warn Mr. Williams of the dangers and, furthermore, concealed and suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law.

34.

Defendants CBS Corporation and General Electric also manufactured , sold, distributed, or otherwise placed into commerce electrical components containing asbestos which Mr. Williams was exposed throughout his career.

35.

Defendants CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation supplied raw asbestos fibers to various manufacturers, especially Johns-Manville, for use as a component and/or ingredient in the manufacture of asbestos-containing materials and insulation at relevant times herein.

36.

The many tons of asbestos fibers sold by CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation and delivered to the New Orleans metropolitan area more than adequately fulfill the minimum requirements to trigger jurisdiction of the Louisiana and United States judicial system over these entities.

37.

Plaintiffs allege that it was CSR, Ltd's, Advocate Mines, Ltd's, and Norca Corporation's negligence that resulted in Frank Williams, Jr. working with and inhaling dangerous asbestos fibers, especially including crocidolite fibers, produced by the products manufactured, supplied, and/or sold by other parties and/or non-parties named herein. CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation owed a duty to Frank Williams not to place a defective and unreasonably dangerous product into the stream of commerce. These entities breached their duty and the injuries Frank Williams, Jr. suffers from were a direct and proximate result of the breach of that duty.

38.

As a result of CSR, Ltd.'s, Advocate Mines, Ltd's, and Norca Corporation's failure to warn that exposure to asbestos fibers was dangerous and/or fatal despite having knowledge of the same, Frank Williams, Jr. was unaware of any danger of exposure to CSR, Ltd.'s, Advocate Mines, Ltd's, and Norca Corporation's products and such failures on the part of these three entities caused, in part, the injuries of Frank Williams, Jr.

39.

CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation owed Frank Williams, Jr. a duty to warn of known dangers associated with its products or of dangers reasonably foreseeable at the time the products were placed into the stream of commerce. These three entities breached

their duty in this regard, which breach ultimately resulted in Frank Williams, Jr.'s injuries and will ultimately lead to his untimely death. These entities were also negligent in failing to keep abreast of literature in the field as to the dangerous propensities of asbestos fibers and the products these fibers were incorporated into, especially crocidolite fibers. They failed to take reasonable means to discover the dangerous nature and propensities of these fibers, which acts and/or omissions were negligent and a proximate cause of the injuries of Frank Williams, Jr.

40.

The exposures experienced by Frank Williams, Jr. were clearly foreseeable, at the time CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation sold its asbestos fibers to asbestos-product manufacturers. CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation knew or should have known of the dangers of asbestos exposure to those such as Frank Williams, Jr. but they failed to prevent or minimize the exposures and totally failed and neglected to give any type of warning or alarm regarding the consequences of exposures to asbestos fibers.

41.

The asbestos fibers CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation sold to asbestos-containing product manufacturers and placed into the stream of commerce was defective and unreasonably dangerous at the time the fibers left their hands. CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation placed into the stream of commerce a product that was inherently and unreasonably dangerous, which rendered the product and any product manufactured by their customers unreasonably dangerous and defective for failing to contain adequate warnings concerning reasonably foreseeable uses.

42.

CSR, Ltd., Advocate Mines, Ltd., Norca Corporation and/or their predecessor or successor entities sold, supplied, furnished, shipped, or otherwise transported and/or caused the transport of asbestos fibers into and/or through the state of Louisiana for use in products manufactured in Louisiana. By and through this action, CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation availed themselves of the protections of Louisiana law and did business in this state. CSR, Ltd., Advocate Mines, Ltd., and Norca Corporation entered into, completed,

23

and/or performed contracts in the state of Louisiana and purposefully availed itself of the laws of Louisiana.

43.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

44.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, non-toxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Williams was exposed to products manufactured, distributed, and sold by the defendants, and he contracted asbestos related mesothelioma and other related ill health effects.

45.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Williams (and other similarly situated employees) who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

46.

All asbestos defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Williams, and for which these defendants are strictly liable under Louisiana law.

47.

All asbestos defendants were the owners of asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Williams and for which these defendants are strictly liable under Louisiana law.

48.

All asbestos defendants were involved in an ultra-hazardous activity in the handling of asbestos, which asbestos resulted in the injury to Mr. Williams, and for which defendants are absolutely liable under Louisiana law.

49.

Some of the defendants were hired to and did remediate asbestos from some portions of the NASA- Michod facility while workers, including Mr. Williams, were present and working, no breathing or other protection was provided to Mr. Williams or his co-workers even though the remediation personnel wore protective suits and respirators.

50.

As a result of the aforementioned acts of negligence, intentional tort, fraud, strict liability, and absolute liability of all of the hereinabove named defendants, Mr. Williams contracted asbestos-related mesothelioma and other related ill health effects, for which all defendants are jointly, severally, and in solido liable.

51.

Defendant, Lockheed Martin Corporation, as successor in interest to Martin Marrietta, Inc., are strictly liable as the owners and/or lessees of the Michoud Assembly Facility where Mr. Williams received significant exposures to asbestos fibers throughout his working career as they had garde of the asbestos containing materials at all relevant times herein.

52.

Alternatively, Lockheed Martin Corporation, as successor in interest to Martin Marrietta, Inc., knew or should have known of the propensity of asbestos fibers to cause and/or contribute to the mesothelioma now suffered by Frank Williams, yet they failed to adequately warn and/or protect Mr. Williams from inhaling these dangerous fibers throughout his career.

53.

All of the hereinabove named defendants are jointly, severally, and in solido liable to Mr. Williams for the damages sustained as a result of his contraction of mesothelioma and other related ill health effects. Mr. Williams is entitled to damages for the following:

a.     Past, present, and future physical pain and suffering;

b.     Past, present, and future mental pain and anguish;

c.     Past, present, and future loss of income;

d.     Past, present, and future medical expenses;

e.     Loss of the enjoyment of life; and

f.     Any and all other damages which may be proven at trial of this matter.

54.

All of the hereinabove named defendants are jointly, severally, and in solido liable for all damages suffered as a result of Frank Williams's contraction of mesothelioma and other related ill health effects associated therewith.

55.

A trial by jury is requested on all issues.

WHEREFORE, Petitioner, Frank Williams, Jr. prays that all defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of Petitioner and against all defendants for all damages suffered by Petitioner, together with legal interest and all costs associated with the prosecution of this claim. Petitioner further prays for all general and equitable relief as is just.

Respectfully submitted,

DIDRIKSEN LAW FIRM


CALEB H. DIDRIKSEN, Bar No. 1334
RICHARD J. GARVEY, JR., Bar No. 20822
LOYD J. BOURGEOIS, JR., Bar No. 29771
AMANDA K. WINGFIELD, Bar No. 30800
3114 Canal Street
New Orleans, Louisiana 70119
Telephone: (504) 586-1600
Facsimile: (504) 822-3119

A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

26

Please serve the petition for damages, the notice of perpetuation deposition, and the motion for expedited trial, on the following:

**LOCKHEED MARTIN, CO.,** individually and as successor-in-interest to **MARTIN MARIETTA, INC.**
Through its agent for service of process:
Corporation Service Company
320 Somerulos Street
Baton Rouge, Louisiana 70802

**VIACOM, INC.,** as successor-in-interest to **WESTINGHOUSE ELECTRIC CORPORATION**
Through its agent for service of process:
C T Corporation System
8550 United Plaza Blvd.
Baton Rouge, Louisiana 70809

**GENERAL ELECTRIC COMPANY,**
Through its agent for service of process:
C T Corporation System
8550 United Plaza Blvd.
Baton Rouge, Louisiana 70809

**THE McCARTY CORPORATION**
Through its agent for service of process:
Paul H. Spaht
445 North Blvd., Suite 300
Baton Rouge, Louisiana 70802

**EAGLE, INC.,** formerly known as **EAGLE ASBESTOS & PACKING, CO**
Through its agent for service of process:
Susan Kohn
1100 Poydras Street
30th Floor
New Orleans, Louisiana 70163

**TAYLOR-SEIDENBACH, INC.**
Through its agent(s) for service of process:
Robert I Shepard
Ralph I Shepard
731 South Scott Street
New Orleans, Louisiana 70119

**REILLY-BENTON COMPANY, INC.**
Through its agent for service of process:
Thomas Cougill
Beason-Willingham LLP
8550 United Plaza Blvd., Suite 702
Baton Rouge, Louisiana 70809

**OWENS-ILLINOIS, INC.**
**Via Long-Arm Statute**
Through its agent for service of process:
Owens-Illinois, Inc.
One Seagate

Toledo, OH 43666

**FOSTER WHEELER CORPORATION,**
**Via Long-Arm Statute**
Through its agent for service of process:
C T Corporation System
111 Eighth Avenue
New York, New York 10011

**UNIROYAL, INC.,**
**Via Long-Arm Statute**
Through its agent for service of process:
Uniroyal, Inc.
70 Great Hill Road
Naugatuck, Connecticut, 06770

**CSR, Ltd.**
**Via Long-Arm Statute:**
9 Help Street
Chatswood, NSW 2067
Australia

**Advocate Mines, Ltd.**
**Via Long-Arm Statute:**
Winn Oughtred
Border, Ladner & Gervais, LLP
40 King Street West, Suite 4100
Toronto, Canada M5H 3Y4.

And

**NORCA CORPORATION**
**Via Long-Arm Statute:**
185 Great Neck Road
Great Neck, New York 11022.

# MDL-875

**UNITED STATES JUDICIAL PANEL**
on
**MULTIDISTRICT LITIGATION**

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**Mar 04, 2009**

FILED
CLERK'S OFFICE

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

MDL No. 875

(SEE ATTACHED SCHEDULE)

## CONDITIONAL TRANSFER ORDER (CTO-319)

On July 29, 1991, the Panel transferred 21,937 civil actions to the United States District Court for the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 771 F.Supp. 415 (J.P.M.L. 1991). Since that time, 84,244 additional actions have been transferred to the Eastern District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable Eduardo C. Robreno.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Eastern District of Pennsylvania and assigned to Judge Robreno.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Eastern District of Pennsylvania for the reasons stated in the order of July 29, 1991, and, with the consent of that court, assigned to the Honorable Eduardo C. Robreno.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

**OFFICIAL FILE COPY**

IMAGED Mar 04 2009

Pleading No. 5771

2

**IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

Page 1 of 5

MDL No. 875

## SCHEDULE CTO-319 - TAG-ALONG ACTIONS

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|

**CALIFORNIA CENTRAL**
CAC  2  08-501      Larry Lindquist, et al. v. CLA-VAL Co., et al.

**CALIFORNIA NORTHERN**
CAN  3  08-5439     Pauline Smithson, et al. v. General Electric Co., et al.
CAN  3  08-5440     Shirley Ruby Holliday, et al. v. General Electric Co., et al.

**LOUISIANA EASTERN**
LAE  2  09-65       Frank J. Williams, Jr. v. Lockheed Martin Corp., et al.

**MASSACHUSETTS**
MA  1  08-10078     William A. O'Connell v. Foster Wheeler Energy Corp., et al.

**MAINE**
ME  1  09-32        Joseph N. Vigue, et al. v. Metropolitan Life Insurance Co., et al.
ME  2  09-7         Susan Leet, etc. v. Aurora Pump Co., et al.

**MINNESOTA**
MN  0  08-6408      Leo J. Selz v. Soo Line Railroad Co.
MN  0  08-6473      Edward Taticek v. Soo Line Railroad Co.
MN  0  09-97        Robert E. Mannelin v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-98        Lawrence Maul v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-99        Douglas A. Nystedt v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-101       Brenda Bischoff, etc. v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-102       Kenneth L. Olson v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-103       John Plevell v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-104       James E. Butler, Jr. v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-105       Clarence A. Cripps v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-106       Robert W. Pulkinen v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-107       James J. Dauer v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-108       Daniel F. Gangl v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-109       Gerald D. Saw v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-111       Marlyn Grunwald v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-112       Mark D. Jackson v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-113       John B. Thomatz v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-114       Louis R. Karakash v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-115       Karl R. Kuth v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-116       Carlo V. Toivari v. Garlock Sealing Technologies, LLC, et al.
MN  0  09-117       Leslie R. Wiedenhoft v. Garlock Sealing Technologies, LLC, et al.

**MDL No. 875 - Schedule CTO-319 Tag-Along Actions (Continued)**

| | | |
|---|---|---|
| MN  0  09-118 | Donald W. Zimmer v. Garlock Sealing Technologies, LLC, et al. |
| MN  0  09-126 | Joseph M. Baudek v. Garlock Sealing Technologies, LLC, et al. |
| MN  0  09-128 | Robert L. Gouldin v. Garlock Sealing Technologies, LLC, et al. |
| MN  0  09-188 | Robert H. Mingo v. Garlock Sealing Technologies, LLC, et al. |
| MN  0  09-189 | Michael L. Paun v. Garlock Sealing Technologies, LLC, et al. |

**NORTH CAROLINA MIDDLE**

| | | |
|---|---|---|
| NCM  1  08-935 | Dale Litaker, etc. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-13 | Jimmy A. Miller, et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-14 | Tyre L. Nicholson, et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-16 | Elmer Leslie Sisk, Jr., et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-35 | Dwight Allen Barnhardt, et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-36 | Paul Pritchett, Jr., et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-47 | Jim Allen Woodell, et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-48 | Terry Russell Tilley v. Aqua-Chem, Inc., et al. |
| NCM  1  09-49 | Robert Kenneth Whitlock, Sr. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-55 | Michael Cleve Bray, Sr., et al. v. Aqua-Chem, Inc., et al. |
| NCM  1  09-56 | Larry Joe Almond, et al. v. Aqua-Chem, Inc., et al. |

**NORTH CAROLINA WESTERN**

| | | |
|---|---|---|
| NCW  1  08-372 | Troy J. McAuley, Jr., et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  08-374 | David Lee Pope, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  08-448 | Gary C. Whitworth, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-4 | Robert Lee Nichols, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-5 | Grover M. Ensley, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-6 | Jim M. Vance, Jr., et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-8 | Franklin Clinton Cloninger v. Aqua-Chem, Inc., et al. |
| NCW  1  09-9 | Eldridge Elmer Clark, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-11 | Johnny Miller Lytton, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-12 | James Lee Plummer, Sr. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-13 | George Wagoner Ferguson, III, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-14 | Verline Borders Petty, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-15 | Larry Eugene Mauldin v. Aqua-Chem, Inc., et al. |
| NCW  1  09-16 | Stanley Earl Fox, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-17 | Gary Marvin Tench, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-19 | Gregory Lewis Gabriel, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-20 | Darrell Edward Garrison, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-21 | Richard Volan Rumfelt v. Aqua-Chem, Inc., et al. |
| NCW  1  09-24 | James Phillip Rhodes, et al. v. Aqua-Chem, Inc., et al. |
| NCW  1  09-25 | Clarence Barlow v. Aqua-Chem, Inc., et al. |
| NCW  1  09-26 | James Edgar Cooper, III, et al. v. Aqua-Chem, Inc., et al. |

**MDL No. 875 – Schedule CTO-319 Tag-Along Actions (Continued)**

| | | |
|---|---|---|
| NCW 1 | 09-27 | Ernest Wade Currie, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-28 | Gary Eugene Davis, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-32 | Dennis Ray Drum, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-33 | Ronnie Lewis Finger, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-34 | David Sloan Edwards, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-35 | Donna Teague Garver, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-36 | Joseph Dail Drum, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-37 | Scotty Paul Garver, et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-38 | Brenda Diane Greene v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-39 | Marvin Leroy Gee, Jr., et al. v. Aqua-Chem, Inc., et al. |
| NCW 1 | 09-73 | Billy Burklin Baber, et al. v. Aqua-Chem, Inc., et al. |

**NEW JERSEY**

| | | |
|---|---|---|
| NJ 2 | 09-193 | Joseph A. Matuska, et al. v. ABB, Inc., et al. |
| NJ 2 | 09-257 | Gerald L. Hoffeditz, et al. v. AM General, LLC, et al. |

**NEW YORK SOUTHERN**

| | | |
|---|---|---|
| NYS 1 | 08-11010 | Francis Bruce Travis v. 3M Co., et al. |
| NYS 1 | 08-11011 | Dwight O. Johnson, Jr. v. Anchor Packing, et al. |

**OHIO NORTHERN**

| | | |
|---|---|---|
| OHN 1 | 09-10000 | Willard E. Bartel, et al. v. A-C Product Liability Trust, et al. |
| OHN 1 | 09-10001 | Willard E. Bartel, et al. v. A-C Product Liability Trust, et al. |

**SOUTH CAROLINA**

| | | |
|---|---|---|
| SC 0 | 09-100 | Joyce C. Moses, et al. v. Aqua-Chem, Inc., et al. |
| SC 0 | 09-124 | Mendel Wayne Godfrey, et al. v. Aqua-Chem, Inc., et al. |
| SC 0 | 09-222 | Dean Lynn Dover, et al. v. Aqua-Chem, Inc., et al. |
| SC 0 | 09-224 | Jimmie Keith Chapman v. Aqua-Chem, Inc., et al. |
| SC 0 | 09-225 | Eugene Alfred Blackwell, et al. v. Aqua-Chem, Inc., et al. |
| SC 6 | 09-122 | Randall Jewell Booker, et al. v. Aqua-Chem, Inc., et al. |
| SC 6 | 09-162 | Larry Wayne Garmon, etc. v. Aqua-Chem, Inc., et al. |
| SC 7 | 09-179 | Leslie Steven Hall, et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-99 | Donnie Ray Richardson v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-101 | Eugene Mack Edney, et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-125 | Michael Leonard Merck, et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-127 | Richard L. Wentzky, et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-163 | George Wesley Fincher, Jr., et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-166 | Don Richard Cox, Sr. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-176 | Billy F. Owens, et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-177 | Weldon Cleo Masters, et al. v. Aqua-Chem, Inc., et al. |
| SC 8 | 09-180 | Tony Oral Getsinger, et al. v. Aqua-Chem, Inc., et al. |

**MDL No. 875 - Schedule CTO-319 Tag-Along Actions (Continued)**

TEXAS WESTERN
TXW 6  08-365          Edward Wilhite, et al. v. Able Supply Co., et al.

VIRGINIA EASTERN
VAE 2  06-8895         Robert E. Harrelson v. American Standard, Inc., et al.
VAE 2  06-8896         Kenneth E. Leslie v. American Standard, Inc., et al.
VAE 2  06-8898         Carl H. Wilson, Sr. v. American Standard, Inc., et al.
VAE 2  08-9436         Larry A. Ayers v. American Standard, Inc., et al.
VAE 2  08-9437         Thomas Babbs v. American Standard, Inc., et al.
VAE 2  08-9438         Julius Bahn v. American Standard, Inc., et al.
VAE 2  08-9439         Gordon E. Breimon v. American Standard, Inc., et al.
VAE 2  08-9440         Leo M. Bresnahan v. American Standard, Inc., et al.
VAE 2  08-9441         Kenneth K. Carter v. American Standard, Inc., et al.
VAE 2  08-9442         Richard C. Clark v. American Standard, Inc., et al.
VAE 2  08-9443         Charles B. Correll v. American Standard, Inc., et al.
VAE 2  08-9444         Tommy L. Davis v. American Standard, Inc., et al.
VAE 2  08-9445         Everett C. Eivins v. American Standard, Inc., et al.
VAE 2  08-9446         Paul L. Green v. American Standard, Inc., et al.
VAE 2  08-9447         Frank D. Hartman v. American Standard, Inc., et al.
VAE 2  08-9448         John T. Huffman v. American Standard, Inc., et al.
VAE 2  08-9449         Robert F. Novack v. American Standard, Inc., et al.
VAE 2  08-9450         Paul A. Fowler, Sr. v. American Standard, Inc., et al.
VAE 2  08-9451         Don F. Gulbronson v. American Standard, Inc., et al.
VAE 2  09-9471         Louis Coy v. American Standard, Inc., et al.
VAE 2  09-9472         Edward J. Meeker v. American Standard, Inc., et al.
VAE 2  09-9473         Glen Nelson v. American Standard, Inc., et al.
VAE 2  09-9474         Lester A. Newton v. American Standard, Inc., et al.
VAE 2  09-9475         Bennie R. Pope v. American Standard, Inc., et al.
VAE 2  09-9476         Richard H. Ramsey v. American Standard, Inc., et al.
VAE 2  09-9477         Harold D. Roberts v. American Standard, Inc., et al.
VAE 2  09-9478         Max L. Scheper v. American Standard, Inc., et al.
VAE 2  09-9479         Jim D. Shell v. American Standard, Inc., et al.
VAE 2  09-9480         Stanley E. Smith v. American Standard, Inc., et al.
VAE 2  09-9481         Forest D. Stufflebean v. American Standard, Inc., et al.
VAE 2  09-9482         Jack Timmins v. American Standard, Inc., et al.
VAE 2  09-9483         Joe L. Michael v. American Standard, Inc., et al.
VAE 2  09-9484         Eugene N. Petersen, Jr. v. American Standard, Inc., et al.
VAE 2  09-9485         Paul J. Powers v. American Standard, Inc., et al.
VAE 4  08-3259         Paul H. Schulte v. Amchem Products, Inc., et al.
VAE 4  08-3260         Herbert N. Powell v. American Air Liquide Corp., et al.
VAE 4  08-3261         Robert L. Corley, Jr. v. Amchem Products, Inc., et al.
VAE 4  08-3262         Clark M. White v. Amchem Products, Inc., et al.
VAE 4  08-3263         Stephen Carl Mapp, Sr. v. Amchem Products, Inc., et al.
VAE 4  08-3264         Hardy McClease Gallop, Jr. v. Amchem Products, Inc., et al.

**MDL No. 875 – Schedule CTO-319 Tag-Along Actions (Continued)**

VAE 4  08-3265  James Edward Daniels, Jr. v. Amchem Products, Inc., et al.
VAE 4  08-3266  Timothy Swain v. Amchem Products, Inc., et al.
VAE 4  08-3267  Kenneth M. Watson v. Amchem Products, Inc., et al.

WISCONSIN EASTERN
WIE 2  08-1006  Nancy Brix, etc. v. Albany International Corp., et al.