JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MDL 875**

AUG 24 2009

FILED
CLERK'S OFFICE

**BEFORE THE UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                               **MDL No. 875**

**Daniel Holmes, Personal Representative of the Estate of Gerald Holmes**
**v.**
**A.W. Chesterton Company, et al.**
**US District Court for the District of Oregon Case No. CV-09-678-JO**

## MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Pursuant to Rule 7.4(c)-(d) of the Rules of Procedure of the judicial Panel on Multidistrict Litigation, Plaintiff moves the Panel to vacate the August 6, 2009, order conditionally transferring the above-referenced cases to the United States District Court for the Eastern District of Pennsylvania.

This Motion is based on the attached Brief in Support of Motion to Vacate Conditional Transfer order, the Declaration of Jeffrey S. Mutnick in Support of the Motion to Vacate and such other materials as may be presented to the panel in the event a hearing on the motion is required.

///

Page 1 -     **MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503.595.1033, 503.224.9430 (facsimile)

**OFFICIAL FILE COPY**

IMAGED AUG 24 2009

PLEADING NO. 5708

Plaintiff requests that, before transferring these cases, the Panel give the transferor court the opportunity to rule on Plaintiff's pending motion to remand this case to state court because, in Plaintiff's view, the federal courts have no subject-matter jurisdiction over this lawsuit.

DATED:  August _21_, 2009

Jeffrey S. Mutnick, OSB #721784
JEFFREY S. MUTNICK, PC
737 SW Vista Avenue
Portland, OR 97205
Telephone: (503) 595-1033
Facsimile: (503) 224-9430
Attorneys for Plaintiff

**Page 2 -     MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 4 2009

FILED
CLERK'S OFFICE

## BEFORE THE UNITED STATES JUDICIAL PANEL
### on
### MULTIDISTRICT LITIGATION

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**

**MDL No. 875**

### OBJECTION TO CONDITIONAL TRANSFER ORDER AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER

An Order transferring the matter set forth below in Paragraph 1 to the MDL Docket No.

875 was filed on August 6, 2009. Plaintiff did not receive notice of the Order and therefore did

not have an opportunity to file objections to the transfer to MDL No. 875. Plaintiff files herewith

a Motion to Vacate Conditional Transfer Order, or, in the alternative, Objection to the

Conditional Transfer Order, Plaintiff's Brief in Support of Objection to and Motion to Vacate

Conditional Transfer Order, and Declaration of Jeffrey S. Mutnick in this tag-along case. The

tag-along case is:

**Daniel Holmes, Personal Representative of the Estate of Gerald Holmes**
**v.**
**A.W. Chesterton Company, et al.**
**USDC for the District of Oregon Case No. CV-09-678 JO**

Removing Defendant Leslie Controls ("Leslie") filed its Petition for Removal of this

lawsuit from the Multnomah County Circuit Court, State of Oregon, where it was pending as

Page 1 - **OBJECTIONS TO CONDITIONAL TRANSFER ORDER AND MOTION TO VACATE
CONDITIONAL TRANSFER ORDER**

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

case No. 0810-15439 on June 17, 2009. Plaintiff on July 14, 2009, filed a Motion to Remand the case to the Multnomah County Circuit Court, State of Oregon, based upon (1) Leslie's procedural failure to remove this matter within the statutory time allowed; and (2) the lack of any basis for the assertion of federal jurisdiction under the theory alleged in Leslie's Removal Petition.

Before the Court had an opportunity to hear the Motion to Remand to the State Court, the case was transferred to MDL No. 875 on August 4, 2009. Plaintiff's counsel did not have notice of the Court's intention to transfer prior to the hearing of the Motion to Remand, and therefore did not file objections. Plaintiff requests that this Motion to Vacate also be considered Plaintiff's objections to the conditional transfer to MDL No. 875. (*See* Plaintiff's facsimile to Jakeia in the MDL Panel Office, dated August 6, 2009.)

DATED: August 21, 2009

Jeffrey S. Mutnick, OSB #721784
JEFFREY S. MUTNICK, PC
737 SW Vista Avenue
Portland, OR 97205
Telephone: (503) 595-1033
Facsimile: (503) 224-9430
Attorneys for Plaintiff

Page 2 -     **OBJECTIONS TO CONDITIONAL TRANSFER ORDER AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 4 2009

FILED
CLERK'S OFFICE

# BEFORE THE UNITED STATES JUDICIAL PANEL
on
## MULTIDISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                          **MDL No. 875**

**Daniel Holmes, Personal Representative of the Estate of Gerald Holmes**
v.
**A.W. Chesterton Company, et al.**
**US District Court for the District of Oregon Case No. CV-09-678-JO**

## BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER

**I.**      **Introduction**

Pursuant to Rule 7(c)-(d) of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation, Plaintiff files this memorandum in support of his Motion to Vacate the Panel's

August 6, 2009, Conditional Transfer Order, which conditionally transfers the above-referenced

action to the Eastern District of Pennsylvania for pretrial proceedings under 28 U.S.C. section

1407.

This action alleges liability against the removing Defendant for injuries resulting from

defendant's failure to warn of or mitigate a hazard to Plaintiff's health. The complaint (Exhibit

A) alleges that Defendant Leslie Controls ("Leslie"), among others, failed to warn Plaintiff of the

hazards associated with the inhalation of asbestos fiber. Plaintiff was employed as a shipfitter in

**Page 1 -**      **BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL
TRANSFER ORDER**

the ship yards in Portland, Oregon, during World War II. While so employed, Plaintiff worked in a capacity that caused him to be exposed to airborne asbestos fibers. (Exhibit A)  Leslie improperly removed this case on the basis of alleged "federal enclave" or "federal officer" jurisdiction, without (1) removing the matter within the statutorily prescribed period of time, and (2) removing the case without factual or legal basis for its contention that Leslie falls within the narrowly defined class of defendants for whom "federal enclave" or "federal officer" jurisdiction is available.

Plaintiffs had a motion to remand pending before the District Court for the District of Oregon to remand this lawsuit to the Multnomah County Circuit Court of Oregon at the time the Conditional Transfer Order was issued.  (Exhibit B)  Plaintiff was unable to file objections prior to the removal of this action. For this, Plaintiff seeks that the Court vacate its Order of Conditional Transfer based on the objections to that transfer set forth herein.

It is Plaintiff's position that the Condition Transfer Order was prematurely issued and, in the interest of judicial economy, Plaintiff respectfully requests the Panel either defer any further action on the conditional transfer or vacate the conditional transfer until the transferor court rules on Plaintiff's remand motion.

## II.  __Summary of Facts__

Plaintiff is the personal representative of the Estate of Gerald Holmes. Gerald Holmes was a shipyard worker employed between 1943 and 1945 at the Oregon shipyard in Portland, Oregon. The Oregon shipyard was located on the Columbia River and was commonly referred to as the "Kaiser yard." The yard was a private yard at which primarily Liberty and Victory ships were constructed.

While employed as a shipfitter and helper, Plaintiff was exposed to airborne asbestos fibers while working in and around individuals cutting and fabricating asbestos-containing

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@JMUTNICKLAW.COM

materials. Plaintiff experienced significant occupational exposure to asbestos while so employed, and, as a result, Plaintiff was diagnosed with mesothelioma on or about February 26, 2008. (Exhibit C)

On December 4, 2008, Plaintiff was deposed. (Exhibit D). During the course of his deposition, Plaintiff described the nature of his exposure. At no time during the course of the deposition was any question asked about any military personnel at Plaintiff's place of work. There was no evidence in the record before the Multnomah County Circuit Court or before the District Court regarding the presence of any military personnel with control over Plaintiff or Defendants at the private ship yard at which Plaintiff was employed.

Plaintiff brought an action against a number of defendants. (Exhibit A) That action included Leslie. As to all defendants except Metropolitan Life, Plaintiff alleged Defendants were negligent in failing to warn Plaintiff about the hazards of asbestos products and sought recovery setting forth similar allegations in a claim for relief based on products liability. While the complaint does claim liability for defects in products manufactured or sold by Leslie, those allegations are based upon failure to warn Plaintiff of the hazards associated with the inhalation of asbestos fibers. As is noted in Exhibit A, a number of other defendants were named and served in the lawsuit at the time Leslie filed the removal notice. Subsequent to the filing of the complaint, Plaintiff died and, pursuant to statute, the personal representative of the Estate was substituted as the plaintiff.

The complaint named the removing defendant in this case. While Leslie was also designated as a predecessor to Circor International, Inc., Leslie appeared at Plaintiff's deposition (Exhibit D) as Leslie Controls. A letter dated November 14, 2008, from Leslie's defense counsel stated:

> **This will serve to advise you that we will be representing the defendant Leslie Controls, Inc., in the above-referenced case** (identified in the

**Page 3 -**   **BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

> complaint as "Circor International, inc., a Delaware corporation, individually
> and as successor-in-interest to Leslie Controls, Inc.") and intend to file an
> appearance on its behalf.

(Emphasis added). (Exhibit E) Counsel's appearance on behalf of Leslie Controls was more than

two weeks prior to Mr. Holmes' December 4, 2008, deposition.. (Exhibit D).

Counsel did not indicate she was "specially appearing" or otherwise contend she was

appearing for any entity other than Leslie Controls. By letter of December 9, 2008 (Exhibit F),

counsel for Leslie Controls stated as follows:

> By letter of November 14, 2008, we advised we would be representing the
> defendant Leslie Controls, Inc. ... Please note, we will be representing only
> CIRCOR International, Inc., in this matter and intend to file an appearance on
> its behalf.

As noted in the affidavit of Plaintiff's counsel (Exhibit G), a discussion was had between

counsel in which counsel for Leslie Controls (Circor) indicated that, for purposes of service,

Leslie Controls wished to be served independently of Circor. The parties agreed that additional

service would be made upon Leslie Controls. Copies of the service documents as to Circor and

Leslie Controls are attached as Exhibit H.

## III.   <u>Discussion</u>

Rather than reassert grounds which Plaintiff set forth in the Motion to Remand (Exhibit

B), which was pending before the United States District Court of Oregon at the time of the

transfer, Plaintiff attaches as Exhibit G the entirety of its Motion to Remand and sets forth below

the grounds upon which Plaintiff relies in requesting that this Court vacate its Order of

Conditional Transfer and return this matter to the District Court of Oregon for ruling on

Plaintiff's motion to remand.

Plaintiff submits to this Court that the conditional transfer should be vacated and the

motion for remand be returned to the District Court of Oregon for the following reasons:

**Page 4 -   BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL
TRANSFER ORDER**

1.     **The conditional transfer was accomplished prior to Plaintiff having the opportunity to set forth objections to said transfer.**

Plaintiff filed his motion to remand on July 14, 2009. Notice of the conditional transfer was entered by this Panel on August 4, 2009, but Plaintiff did not receive a copy of that notice. Upon receiving a copy of the notice, Plaintiff contacted the Clerk of the Panel by facsimile correspondence (Exhibit I) that Plaintiff objected to the conditional transfer and that Plaintiff was not aware of the conditional transfer with sufficient time to submit objections. This Panel graciously granted Plaintiff an opportunity to state those objections, staying the conditional transfer. (Exhibit J) Plaintiff submits the conditional transfer should be stayed at least until the transferring court has an opportunity to rule on Plaintiff's motion to remand.

The local federal court has a vested interest in addressing the issues raised by Plaintiff's motion to remand. First, the local federal court has a vested interest in construing the applicability of 28 USC §1442(a)(1). The 30-day time period for removal begins running from the defendant's receipt of the initial pleading when that pleading affirmative reveals on its face the facts necessary for federal court jurisdiction. *Harris v. Bankers Life& Casualty Co.,* 425 F3d 689, 690-91 (9th Cir. 2005). Plaintiff has alleged Leslie was aware of Plaintiff's complaint by at least November 14, 2008. Leslie's removal was not filed until June 17, 2009.

In a case presenting almost identical facts as those in the present case, *Cantrell v. Great Republic Insurance Co.*, 873 F2d 1249 (9th Cir 1989), the plaintiff named GRIC as a defendant in her complaint. The complaint, similar to the present case, was answered by another entity, Great Republic Life Insurance Co. (GRLIC). GRLIC also cross-complained against the plaintiff. Several months elapsed and GRIC and GRLIC jointly removed the state action to federal court. Despite the fact the action was removable under ERISA, the court held that the "original complaint" was removable, noting

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

the petition for removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, **through service or otherwise**, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant, if such initial pleading has then been filed in the court, and is not required to be served on the defendant, whichever period is shorter.

872 F2d at 1254 (emphasis added).

In the present case, Defendant Circor was named as the successor in interest to Leslie Controls. Leslie made an appearance through its counsel and attended the deposition of Plaintiff. Later Circor contended that service should have been made upon Leslie Controls. It is the distinction of service upon which Leslie contends that its removal was timely.

As the court noted in *Cantrell, supra,*

…[n]either the addition of Cantrell as plaintiff in her representative capacity nor the addition of GRLIC as a defendant makes the amended complaint and "amended pleading"… from which it first may be ascertained that the case is one which is or has become removable. 28 USC §1446(b).… There is nothing about the addition of a party plaintiff or defendant in the context of this action that either creates federal jurisdiction or makes the fact of federal jurisdiction newly ascertainable.

872 F2d at 1255.

Just as in *Cantrell*, Defendant Leslie Controls seeks to justify its removal upon the deletion of Circor as the successor in interest, despite the fact that Leslie has been identified in each complaint and that Leslie acknowledged its participation through its counsel (Ex. E).

The transferor court has an interest in addressing the timeliness of Leslie's removal applying the law of the circuit in which the case was filed. For this reason, the conditional transfer should be vacated and the motion to remand be heard by the transferor court.

**Page 6 -** **BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

2.    **There is no colorable federal contractor defense to this failure-to-warn claim.**

Plaintiff has attached as Exhibit B his motion to remand which was pending before the transferor court. Without reiterating in detail the arguments set forth in regards to the federal contractor claim upon which Leslie relies in its removal, Plaintiff incorporates Exhibit B and summarizes his position below.

Several factors are significant in evaluating whether Leslie has any colorable federal contractor defense to this failure-to-warn claim. First, Plaintiff was employed in a private shipyard, which while building vessels for the federal government during World War II, was privately owned and privately controlled by the Kaiser Shipbuilding Corporation.

Second, Leslie has no evidence that the equipment it supplied to the shipyard was in any way different than the equipment it sold to the general public.

Third, in its interrogatory response, included in Plaintiff's motion to remand (Exhibit B) and separately set forth as Exhibit K to this motion, Leslie states unequivocally that it did not believe its products were dangerous, took no action to warn prior to World War II, during World War II, or at any time subsequent to World War II. Leslie's disingenuous claim that it was somehow inhibited from addressing the hazards of asbestos-containing materials within its pumps, or that it was inhibited in some manner from warning the shipyard, Plaintiff or his co-workers, is contradicted by Leslie's assertion in its interrogatory responses.  (Exhibit K)

Fourth, the Ninth Circuit in *In Re Hawaii Federal Asbestos Cases*, 960 F2d 806 (9th Cir. 1992), affirmed the federal district court's rejection of the "military equipment" defense as applied to asbestos insulation based upon the allegations by plaintiff of a breach of state law duty to warn of dangerous conditions.

Page 7 -   **BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Fifth, there is no evidence in the present case that Leslie will be able to meet its burden that it did in fact act under direction of a federal officer. The generic allegation by Leslie that the Secretary of the Navy required that products meet specifications is an insufficient claim upon which to base the defense of "military specification." *Good v. Armstrong World Industries*, 914 FSupp 1125 (ED Penn 1996). As the court noted in *Good*, the policy reasons for having federal officer removal jurisdiction are not present in asbestos cases where the government contract defense is asserted. *Good*, 914 FSupp at 1131.

As noted above, the transferor court has a vested interest in addressing this issue, applying the law of the Ninth Circuit as it was articulated by Judge Belloni of the Oregon District Court, who rejected the position taken by Leslie in *In Re Hawaii Federal Asbestos Cases, supra.*

Plaintiff submits these objections to the conditional transfer of this matter to MDL 875. The transferor court had pending before it at the time of the transfer a motion to remand. The transferor court has a significant interest in addressing the various issues set forth above and in Plaintiff's motion to remand, incorporated herein. Judicial economy will be served by having the transferor court address these issues, which can be accomplished promptly and without the unnecessary use of the resources of this Panel.

## IV.  <u>Conclusion</u>

As noted above, the complaint on its face discloses Plaintiff's causes of action are entirely creatures of state law. Defendant formally joined in the removal filing. The filing was untimely. The basis for the removal, federal officer jurisdiction, is not a basis upon which

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

removal can be justified in the Ninth Circuit. Transfer of this case should be stayed until the

transferor court has had the opportunity to rule on Plaintiff's motion to remand.

DATED:  August 21, 2009

Jeffrey S. Mutnick, OSB #721784
JEFFREY S. MUTNICK, PC
737 SW Vista Avenue
Portland, OR 97205
Telephone: (503) 595-1033
Facsimile: (503) 224-9430
Attorneys for Plaintiff

**Page 9 -    BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 4 2009

FILED
CLERK'S OFFICE

# BEFORE THE UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                                    **MDL No. 875**

**Daniel Holmes, Personal Representative of the Estate of Gerald Holmes**
**v.**
**A.W. Chesterton Company, et al.**
**US District Court for the District of Oregon Case No. CV-09-678-JO**

## SCHEDULE

DANIEL HOLMES, Personal Representative for the Estate of GERALD HOLMES,
                              Plaintiff,

    vs.

A.W. CHESTERTON CO., a Massachusetts corporation; BUFFALO PUMPS, INC., a
Delaware corporation; CLEAVER-BROOKS, a division of AQUA-CHEM, INC., a
Wisconsin corporation; FLOWSERVE CORPORATION, individually and as successor-in-
interest to DURAMETALLIC CORP.; FOSTER WHEELER, LLC, a New York corporation;
GENERAL ELECTRIC CO., a Connecticut corporation; GOULDS PUMPS, INC., a
Delaware corporation, individually and as successor-in-interest to GOULDS PUMPS (IPG);
MAR-DUSTRIAL SALES, INC., an Oregon Corporation; LESLIE CONTROLS, INC., a
foreign corporation, successor-in-interest to LESLIE CO., LESLIE, LESLIE EVENTEMP,
LESLIE TYFON, LESLIE CONSTANTEMP, and LUBRASOFT; METROPOLITAN LIFE
INSURANCE COMPANY, a New York corporation; OWENS-ILLINOIS, INC., a Delaware
corporation; RAPID-AMERICAN CORPORATION, a Delaware corporation; VIACOM,
INCORPORATED, a Delaware corporation, AS SUCCESSOR-BY-MERGER TO CBS
CORPORATION FKA WESTINGHOUSE ELECTRIC CORPORATION,

                              Defendants.

United States District Court, District of Oregon
Civil Case No. 09-678-JO
Honorable Owen M. Panner

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 4 2009

FILED
CLERK'S OFFICE

## BEFORE THE UNITED STATES JUDICIAL PANEL
### on
### MULTIDISTRICT LITIGATION

**IN RE:  ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                                    **MDL. No. 875**

**Daniel Holmes, Personal Representative of the Estate of Gerald Holmes**
**v.**
**A.W. Chesterton Company, et al.**
**US District Court for the District of Oregon Case No. CV-09-678-JO**

### AFFIDAVIT OF JEFFREY S. MUTNICK

I, JSM, having been duly sworn, do hereby depose and say as follows:

1.      I am the attorney for Daniel Holmes, as personal representative of the Estate of

Gerald Holmes.

2.      I make this Affidavit in support of Plaintiff's Objection to Conditional Transfer

Order and Motion to Vacate Conditional Transfer Order. All facts and statements contained in

this declaration are within my personal knowledge.

3.      Attached hereto as Exhibit A is a true and correct copy of Plaintiff's original

Complaint dated October 27, 2008.

4.      Attached hereto as Exhibit B is a true and correct copy of Plaintiff's Motion for

Remand, Memorandum of Law is support of same, and all attached exhibits, dated July 14, 2009.

**Page 1 -     AFFIDAVIT OF JEFFREY S. MUTNICK**

5.      Attached hereto as Exhibit C is the Pathology Report of Plaintiff's diagnosis dated February 26, 2008.

6.      Attached hereto as Exhibit D is a true and correct copy of the Deposition Transcript of Russell Greer, December 4, 2008.

7.      Attached hereto as Exhibit E is a true and correct copy of a letter received from Defendant Leslie Controls' counsel dated November 14, 2008.

8.      Attached hereto as Exhibit F is a true and correct copy of a letter received from Defendant Leslie Controls' counsel dated December 9, 2008.

9.      Attached hereto as Exhibit G is a true and correct copy of the Affidavit of Jeffrey S. Mutnick in Support of Plaintiff's Motion for Remand dated July 14, 2009.

10.     Attached hereto as Exhibit H are true and correct copies of the service documents on Circor (January 5, 2009) and Leslie Controls (June 4, 2009).

11.     Attached hereto as Exhibit I is a true and correct copy of the facsimile sent by Plaintiff to the Clerk of the Panel on August 6, 2009.

12.     Attached hereto as Exhibit J is a true and correct copy of the Order Reinstating Stay of Conditional Transfer Order.

13.     Attached hereto as Exhibit K is a true and correct copy of pages 1, 2, 3, 4, 32, 35, and 36 of Defendant Leslie Control, Inc.'s, Responses to Plaintiffs' Standard Interrogatories To All Defendants *In Re: Complex Asbestos Litigation*, Case No. 828684, Superior Court of California, City and County of San Francisco, dated May 15, 2008.

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY OF PERJURY.

DATED:  August *21*, 2009



JEFFREY S. MUTNICK

STATE OF OREGON          )
County of Multnomah      ) ss.

Subscribed and sworn to before me this *21* day of August 2009.

Notary Public of Oregon
My Commission Expires: *8-02-13*

```
OFFICIAL SEAL
J ALISON HILBER
NOTARY PUBLIC-OREGON
COMMISSION NO. 439501
MY COMMISSION EXPIRES AUGUST 2, 2013
```

Page 3 -    AFFIDAVIT OF JEFFREY S. MUTNICK

LAW OFFICE OF JEFFREY S. MUTNICK
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 4 2009

**Daniel Holmes, etc. v. AW Chesterton, Co., et al., D. Oregon, CA #1:09-678 (J. Panner)**

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served **PLAINTIFF'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER, SCHEDULE, OBJECTION TO CONDITIONAL TRANSFER ORDER ANDMOTION TO VACATE CONDITIONAL TRANSFER ORDER,  BRIEF IN SUPPORT OF MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER, AFFIDAVIT OF JEFFREY S. MUTNICK, and all attached EXHIBITS** on the following named person(s) on the date and in the manner indicated below:

**VIA ELECTRONIC FILING:**

US District Court of Oregon

Monica Wells/Jeannie Loftis
BULLIVANT HOUSER BAILEY PC
888 SW Fifth Avenue
300 Pioneer Tower
Portland, OR 97204
*Of Attorneys for Leslie Controls*

Eric L. Dahlin
DAVIS WRIGHT TREMAINE LLP
1300 SW 5th Avenue, Suite 2300
Portland, OR 97201-5630
*Of Attorneys for Foster Wheeler*

Jason H. Daywitt
RIZZO MATTINGLY BOSWORTH PC
411 SW Second Avenue, Suite 200
Portland, OR 97204
*Of Attorneys for Cleaver-Brooks*

Christine E. Dinsdale
SOHA & LANG
701 Fifth Avenue, Suite 2400
Seattle, WA 98104
*Of Attorneys for Flowserve Corporation*

Page 1 -    **CERTIFICATE OF SERVICE**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Mark J. Fucile
FUCILE & REISING LLP
115 NW First Avenue, Suite 410
Portland, OR 97209-4024
*Of Attorneys for Owens-Illinois, Inc.*

Christopher E. Hawk
GORDON & REES LLP
601 SW 2nd Avenue, Suite 2300
Portland, OR 97204
*Of Attorneys for Goulds Pumps, Inc.*

Thomas A Packer
GORDON & REES LLP
501 SW 2nd Ave., Suite 2300
Portland, OR 97204
*Of Attorneys for 3M Company*

George S. Pitcher
WILLIAMS KASTNER
888 SW Fifth Avenue, Suite 600
Portland, OR 97204
*Of Attorneys for CBS/Viacom, General Electric*

John M. Silk
WILSON SMITH COCHRAN & DICKERSON
1215 Fourth Avenue, Suite 1700
Seattle, WA 98161-1007
*Of Attorneys for Metropolitan Life*

Brian R. Talcott
DUNN CARNEY ALLEN HIGGINS & TONGUE
851 SW 6th Avenue, Suite 1500
Portland, OR 97204
*Of Attorneys for AW Chesterton Co.*

## VIA US MAIL, FIRST CLASS POSTAGE PREPAID

Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, NE., Room G-255, North Lobby
Washington, DC 20002-8004
(Original and four paper copies; one disc with pdf copy)

**Page 2 -    CERTIFICATE OF SERVICE**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Peter G. Angelos
LAW OFFICES OF PETER G. ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415
Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania venue, NW
Washington, DC 2004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204

**Page 3 -     CERTIFICATE OF SERVICE**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 32520

William F. Mahoney
SEGL MCCAMBRIDGE SINGER & MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA 02110

**Page 4 -    CERTIFICATE OF SERVICE**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ & TARDY PLLC
PO Box 22608
Jackson, MS 39225

DATED: August 21, 2009

Jeffrey S. Mutnick, OSB #727184
Of Attorneys for Plaintiff

**Page 5 -     CERTIFICATE OF SERVICE**

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

OCT 2 7 2008
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 4 2009

FILED
CLERK'S OFFICE

1

2

3

4

IN THE CIRCUIT COURT OF THE STATE OF OREGON

5

FOR THE COUNTY OF MULTNOMAH

6

7   GERALD HOLMES,

8            Plaintiff,

9        vs.

Case No.   **0810-15439**

10  ALLIS-CHALMERS CORPORATION
    PRODUCT LIABILITY TRUST; ALFA
11  LAVAL, a foreign corporation; ASBESTOS
    CORPORATION LTD., a foreign corporation;
12  A.W. CHESTERTON CO., a Massachusetts
    corporation; BUFFALO PUMPS, INC., a
13  Delaware corporation; CIRCOR
    INTERNATIONAL, INC, a Delaware
14  corporation, individually and as successor-in-
    interest to LESLIE CONTROLS, INC.;
15  CLEAVER-BROOKS, a division of AQUA-
    CHEM, INC., a Wisconsin corporation; COLFAX
16  CORPORATION, a Delaware corporation,
    individually and as successor-in-interest to IMO
17  INDUSTRIES, INC; CRANE COMPANY, a
    Connecticut corporation; CROWN CORK &
18  SEAL CO., a New York corporation, individually
    and as successor-in-interest to MUNDET CORK
19  CORP.; FLOWSERVE CORPORATION,
    individually and as successor-in-interest to
20  DURAMETALLIC CORP.; FOSTER
    WHEELER, LLC, a New York corporation;
21  GARLOCK SEALING TECHNOLOGIES LLC,
    a New York corporation, individually, and as
22  successor-in-interest to GARLOCK PACKING
    CO.; GENERAL ELECTRIC CO., a Connecticut
23  corporation; GOULDS PUMPS, INC., a Delaware
    corporation, individually and as successor-in-
24  interest to GOULDS PUMPS (IPG);
    METROPOLITAN LIFE INSURANCE
25  COMPANY, a New York corporation; OWENS-
    ILLINOIS, INC., a Delaware corporation;
26  RAPID-AMERICAN CORPORATION, a

PLAINTIFF'S COMPLAINT-
PERSONAL INJURY BASED ON
STRICT LIABILITY AND
NEGLIGENCE

AND DEMAND FOR JURY TRIAL

CASE NOT SUBJECT TO
MANDATORY ARBITRATION

Page 1 -   **COMPLAINT**

EX.A
(157P)

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

GERALD HOLMES,

        Plaintiff,

   vs.

ALLIS-CHALMERS CORPORATION
PRODUCT LIABILITY TRUST; ALFA
LAVAL, a foreign corporation; ASBESTOS
CORPORATION LTD., a foreign corporation;
A.W. CHESTERTON CO., a Massachusetts
corporation; BUFFALO PUMPS, INC., a
Delaware corporation; CIRCOR
INTERNATIONAL, INC, a Delaware
corporation, individually and as successor-in-
interest to LESLIE CONTROLS, INC.;
CLEAVER-BROOKS, a division of AQUA-
CHEM, INC., a Wisconsin corporation; COLFAX
CORPORATION, a Delaware corporation,
individually and as successor-in-interest to IMO
INDUSTRIES, INC; CRANE COMPANY, a
Connecticut corporation; CROWN CORK &
SEAL CO., a New York corporation, individually
and as successor-in-interest to MUNDET CORK
CORP.; FLOWSERVE CORPORATION,
individually and as successor-in-interest to
DURAMETALLIC CORP.; FOSTER
WHEELER, LLC, a New York corporation;
GARLOCK SEALING TECHNOLOGIES LLC,
a New York corporation,  individually, and as
successor-in-interest to GARLOCK PACKING
CO.; GENERAL ELECTRIC CO., a Connecticut
corporation; GOULDS PUMPS, INC., a Delaware
corporation, individually and as successor-in-
interest to GOULDS PUMPS (IPG);
METROPOLITAN LIFE INSURANCE
COMPANY, a New York corporation; OWENS-
ILLINOIS, INC., a Delaware corporation;
RAPID-AMERICAN CORPORATION, a

Case No.

PLAINTIFF'S COMPLAINT-
PERSONAL INJURY BASED ON
STRICT LIABILITY AND
NEGLIGENCE

AND DEMAND FOR JURY TRIAL

CASE NOT SUBJECT TO
MANDATORY ARBITRATION

Page 1 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

1  Delaware corporation; VIACOM,
   INCORPORATED, a Delaware corporation, AS
2  SUCCESSOR-BY-MERGER TO CBS
   CORPORATION FKA WESTINGHOUSE
3  ELECTRIC CORPORATION; 3M COMPANY
   AKA MINNESOTA MINING AND
4  MANUFACTURING COMPANY, a foreign
   corporation;

5          Defendants.

6

7          Plaintiff alleges:

8                  COUNT I - STRICT LIABILITY

9                              1.

10         Gerald Holmes (hereinafter "Plaintiff") is a resident of the State of Oregon.

11                             2.

12         Plaintiff was employed at the approximate times and locations listed in Exhibit "A,"

13  which is attached to this complaint and incorporated herein by reference.  During his career as a

14  shipyard worker, Plaintiff was exposed to airborne asbestos fibers, by both directly working with

15  asbestos and asbestos-containing materials himself and by working in the vicinity of other

16  workers handling such products.

17                             3.

18         At all material times:

19         a) Allis Chalmers Corporation Product Liability  Trust is a trust for a corporation, which

20            at all relevant times was doing business in the state of Oregon, engaged in the

21            manufacture, sale, and/or distribution of asbestos-containing products including, but

22            not limited to, pumps, gaskets, and packing;

23         b) Alfa Laval was and is a foreign corporation, which at all relevant times was doing

24            business in the state of Oregon, engaged in the manufacture, distribution, and/or sale

25            of asbestos-containing products including, but not limited to, valves, packing, and

26

Page 2 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

1  discs;

2 c) Asbestos Corporation Ltd. was and is a foreign corporation, which at all relevant

3   times was doing business in the state of Oregon, engaged in the sale of asbestos fibers

4   to manufacturers of asbestos-containing products;

5 d) A.W. Chesterton Co. was and is a Massachusetts corporation, which at all relevant

6   times was doing business in the state of Oregon, engaged in the manufacture,

7   distribution, and/or sale of asbestos-containing products, including gaskets, packaging

8   and sealing devices;

9 e) Buffalo Pumps, Inc., was and is a Delaware corporation, which at all relevant times

10   was doing business in the state of Oregon, engaged in the manufacture, distribution,

11   and/or sale of asbestos-containing products, including but not limited to pumps,

12   gaskets, and packing;

13 f) Circor International, Inc, a Delaware corporation, individually and as successor-in-

14   interest to Leslie Controls, Inc., which at all relevant times was doing business in the

15   state of Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-

16   containing products, including but not limited to valves;

17 g) Cleaver-Brooks, a division of Aqua-Chem, Inc. was and is a Wisconsin corporation,

18   which at all relevant times was doing business in the state of Oregon, engaged in the

19   manufacture, distribution, and/or sale of asbestos-containing products, including but

20   not limited to, boilers;

21 h) Colfax Corporation, a Delaware corporation, individually and as successor-in-interest

22   to Imo Industries, Inc., which at all relevant times was doing business in the state of

23   Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-containing

24   products, including but not limited to, pumps;

25 i) Crane Company was and is a Connecticut corporation, which at all relevant times was

26   doing business in the state of Oregon, engaged in the manufacture, distribution,

Page 3 - **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

1    and/or sale of asbestos-containing products, including but not limited to valves,

2    packing, gaskets, and discs;;

3    j)  Crown Cork & Seal Co. individually and as successor-in-interest to Mundet Cork

4        Corp., was and is a New York corporation, which at all relevant times was doing

5        business in the state of Oregon, engaged in the manufacture, sale and/or distribution

6        of asbestos-containing products including but not limited to fireproofing materials;

7    k)  Flowserve Corporation, individually and as successor-in-interest to Durametallic

8        Corp., was and is a Delaware corporation , which at all relevant times was doing

9        business in the state of Oregon, engaged in the manufacture, sale and/or distribution

10       of asbestos-containing products, including, but not limited to, packing and seals;

11    l)  Foster Wheeler LLC was and is a New York LLC , which at all relevant times was

12        doing business in the state of Oregon, engaged in the manufacture, distribution,

13        and/or sale of asbestos-containing products, including, but not limited to, insulation,

14        engines, gaskets, packing, turbines, and related component materials;

15    m) Garlock Sealing Technologies LLC, individually and as successor-in-interest to

16        Garlock, Inc., was and is a New York LLC, which at all relevant times was doing

17        business in the state of Oregon, engaged in the manufacture, sale, and/or distribution

18        of asbestos-containing products including, but not limited to, insulation, gaskets,

19        packing, and fluid sealing devices marketed under various brand names;

20    n)  General Electric Co., was and is a Connecticut corporation , which at all relevant

21        times was doing business in the state of Oregon, engaged in the manufacture, sale,

22        and/or distribution of asbestos-containing products including, but not limited to,

23        generators and turbines;

24    o)  Goulds Pumps (IPG), Inc. was and is a Delaware corporation , which at all relevant

25        times was doing business in the state of Oregon, engaged in the manufacture, sale,

26

Page 4 -   **COMPLAINT**

1   and/or distribution of asbestos containing-products including, but not limited to,

2   pumps, gaskets, and packing;

3   p) Metropolitan Life Insurance Company was a New York corporation, which at all

4   relevant times was doing business in the state of Oregon, engaged in the business of

5   providing a variety of insurance products, including life insurance, casualty and

6   liability insurance, and workers' compensation insurance to a variety of customers,

7   including corporations engaged in the manufacture, distribution, and sale of asbestos

8   and asbestos-containing products;

9   q) Owens-Illinois, Inc. was and is a Delaware corporation, which at all relevant times

10   was doing business in the state of Oregon, engaged in the manufacture, sale, and

11   distribution of asbestos-containing materials;

12   r) Rapid American Corporation was and is a Delaware corporation, which at all relevant

13   times was doing business in the state of Oregon, engaged in the manufacture, sale,

14   and distribution of asbestos-containing materials, but not limited to boiler insulation

15   and pipe insulation;

16   s) Viacom, Incorporated, as successor by merger to CBS Corporation fka Westinghouse

17   Electric Corporation, was and is a Delaware corporation , which at all relevant times

18   was doing business in the state of Oregon, which engaged in the manufacture, sale,

19   and/or distribution of asbestos-containing products including, but not limited to

20   insulation, gaskets, packing, wire, engines, motors, turbines and related component

21   parts;

22   t) 3M Company was and is a foreign corporation, which at all relevant times was doing

23   business in the state of Oregon, engaged in the manufacturing, distribution, and sale

24   of safety equipment including, but not limited to, defective dust masks.

25   / / /

26   / / /

Page 5 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

4.

At all material times, some or all of the Defendants, with the exception off Metropolitan Life Insurance Company and 3M, was regularly engaged in the business of manufacturing, designing, processing, marketing, distributing, applying, re-branding and/or selling products containing asbestos fiber for use in fire proofing, insulation, and other materials in the construction and maintenance of buildings and/or automobiles.   One or more of the same Defendants has engaged in the mining and sale of asbestos fiber.  These products were used at locations where Plaintiff was employed as set forth above.

5.

Beginning in approximately 1929 and continuing thereafter, Metropolitan Life Insurance Company, at the request of, and as part of its business service to, one or more of its insurance customers, conducted or commissioned studies and medical research, medical investigations, medical studies, and collection of medical and epidemiological data, concerning the disease producing capabilities of asbestos and asbestos-containing materials.  In the 1930s and 1940s, Metropolitan Life directly transmitted and indirectly disseminated the results of such investigation and studies to a variety of individuals and industrial companies involved in asbestos-related industries, including one or more of the defendants named herein.   These medical investigation studies and information included substantial evidence of the disease-producing capability of asbestos and asbestos-containing products.  Metropolitan Life Insurance Company thereafter engaged in a continuous and consistent course of conduct suppressing, minimizing, understating and denying the evidence of disease causing properties of asbestos and asbestos-related material.

6.

At all times relevant to this action, Defendants conducted regular, sustained and not isolated business activity in the state of Oregon.

/////

Page 6 -   **COMPLAINT**

7.

This complaint was filed within the applicable statute of limitations.

8.

In the use of asbestos-containing products of Defendants, respirable asbestos fibers were released which are capable of causing pulmonary disease and/or cancer if inhaled by individuals, including Plaintiff, who were exposed to the fibers in their work environments.

9.

Defendants were aware of the risks of asbestos inhalation by the following means:

a.   Medical and scientific literature describing the dangers and toxicity of asbestos fibers dates back to before the turn of the twentieth century.  By 1930, it was conclusively established and made known to the medical and industrial communities that asbestos causes asbestosis.  As early as 1934, the members of the asbestos industry became aware that even persons not working directly with asbestos and asbestos-containing products suffered harm due to exposure to asbestos.  By 1963 there were over 300 articles in English regarding asbestos related illness available.

b.   The Oregon Industrial Accident Commission Safety Code for the Prevention and Control of Occupational Disease (adopted December 15, 1945, revised September 1, 1949) lists asbestos as an atmospheric contaminant against exposure to which precautions should be taken.

10.

Defendants' asbestos-containing products were unreasonably dangerous and defective as:

a.   Defendants did not provide sufficient warnings and/or instructions of the harm caused by exposure to Defendants' asbestos-containing products;

Page 7 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

b.   The asbestos-containing products of Defendants were capable of causing pulmonary disease and/or cancer if inhaled by individuals, including Plaintiff, in their work places, including those set forth above.

c.   Individual workers, including Plaintiff, were not advised to utilize proper respiratory protection and were exposed to airborne asbestos fibers within their working environment at work sites, including, but not limited to, the work sites identified above.

11.

As a result of Plaintiff's exposure to the unreasonably dangerous and defective asbestos-containing products manufactured, distributed, sold, installed, applied or containing the Defendants' asbestos fiber, Plaintiff contracted mesothelioma, from which he has suffered pain, discomfort, fear, and interference with his daily activities and enjoyment of life, and has endured mental and emotional pain and suffering, all of which is permanent, all to Plaintiff's non-economic damage in the amount of $1,750,000.

12.

As a result of Plaintiff's exposure to the unreasonably dangerous and defective asbestos-containing products manufactured, distributed, sold, installed, applied or containing the Defendants' asbestos fiber, Plaintiff contracted mesothelioma, and has incurred doctor, hospital, custodial and medical expenses and will incur like medical expenses in the future and has past and future impairment of wage-earning capacity resulting in economic damages in the amount of $450,000.

COUNT II -- NEGLIGENCE

13.

Plaintiff re-alleges paragraphs 1 through 12.

/////

/////

Page 8 -   **COMPLAINT**

14.

Defendants were negligent generally, and in one or more of the following particulars:

a.    Defendants did not provide sufficient or adequate warnings and/or instructions of the harm caused by exposure to defendants' asbestos-containing products when they knew or should have known of that harm;

b.    Defendants failed to withdraw asbestos-containing products from the market prior to plaintiff's exposure, when they knew or should have known of its dangerous propensities;

c.    Defendants failed to determine the level of airborne asbestos fibers emitted by the products when the products were being used by the end user;

d.    Defendants failed to conduct tests to determine the amount of asbestos to which Plaintiff, or similarly situated workers, would be exposed, when using the product.

e.    Defendants failed to warn individual workers, including Plaintiff, regarding the hazards associated with the use of the product.

15.

As a result of Defendants' negligence, Plaintiff was exposed to airborne asbestos fibers, which caused him to contract mesothelioma, from which Plaintiff has suffered pain, discomfort, fear, and interference with his daily activities and enjoyment of life, and has endured mental and emotional pain and suffering, all of which is permanent, all to Plaintiff's non-economic damage in the amount of $1,750,000.

16.

As a result of Defendants' negligence, Plaintiff was exposed to asbestos-containing products manufactured, distributed, sold, applied or installed by defendant or containing the fiber mined and distributed by Defendants, which caused him to contract mesothelioma, and has incurred doctor, hospital, custodial and medical expenses and will incur similar medical expenses

Page 9 -   **COMPLAINT**

1  in the future and has lost earning in the past and future, all to Plaintiff's economic damages in the

2  amount of $450,000.

3       **WHEREFORE**, Plaintiff prays for judgment as follows:

4          **Count One (Strict Liability):**

5           1. Non-economic damages in the amount of $1,750,000.

6           2. Economic damages in the amount of $450,000.

7           3. Plaintiff's costs and disbursements incurred herein.

8           4. Any other costs this court deems equitable.

9          **Count Two (Negligence):**

10           1. Non-economic damages in the amount of $1,750,000.

11           2. Economic damages in the amount of $450,000.

12           3. Plaintiff's costs and disbursements incurred herein.

13           4. Any other costs this court deems equitable.

14      DATED this 27th day of October, 2008.

15

16               LAW OFFICE OF JEFFREY S. MUTNICK

17

18               Jeffrey S. Mutnick, OSB No. 721784

19               Of Attorneys for Plaintiffs

20

21  Plaintiff Demands a Jury Trial.

22               Jeffrey S. Mutnick, OSB No. 721784

               Of Attorneys for Plaintiffs

23

24

25

26

Page 10 - **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|---|---|---|---|---|
| 1943-1945 | Oregon Shipyard (Kaiser)<br><br>Portland, OR | Various activities, including ship fitting, cleanup, helper, insulation, and riveting. | Allis Chalmers Corporation Product Liability Trust | Turbines, engines, condensers, pumps, motors, industrial equipment, machinery, and assorted components. |
| | | | Alfa Laval | Valves, packing, and discs. |
| | | | Asbestos Corporation Ltd. | Asbestos Fiber |
| | | | A.W. Chesterton Co. | Gaskets, packaging and sealing devices |
| | | | Buffalo Pumps, Inc. | Pumps, gaskets, and packing |
| | | | Circor International, Inc | Valves |
| | | | Aqua-Chem, Inc. | Boilers |
| | | | Colfax Corporation | Pumps |
| | | | Crane Company | Valves, packing, gaskets, and discs |
| | | | Crown Cork & Seal Co. | Fireproofing materials |
| | | | Flowserve US, Inc. | Packing and seals |
| | | | Foster Wheeler | insulation, engines, gaskets, packing, turbines, and related component materials |

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|---|---|---|---|---|
| | | | Garlock Sealing Technologies | Insulation, gaskets, packing, and fluid sealing devices |
| | | | General Electric Co. | Generators and turbines |
| | | | Goulds Pumps (IPG), Inc. | Pumps, gaskets, and packing |
| | | | Owens-Illinois, Inc. | Block and pipe covering |
| | | | Rapid American Corporation | Boiler insulation and pipe insulation |
| | | | Viacom, Inc. | Insulation, gaskets, packing, wire, engines, motors, turbines and related component parts |
| | | | 3M Company | Dust masks |
| 1943-1945 | Swan Island Shipyards Portland, OR | Various activities, including ship fitting, cleanup, helper, insulation, and riveting. | Allis Chalmers Corporation Product Liability Trust | Turbines, engines, condensers, pumps, motors, industrial equipment, machinery, and assorted components. |
| | | | Alfa Laval | Valves, packing, and discs. |
| | | | Asbestos Corporation Ltd. | Asbestos Fiber |
| | | | A.W. Chesterton Co. | Gaskets, packaging and sealing devices |
| | | | Buffalo Pumps, Inc. | Pumps, gaskets, and packing |

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|---|---|---|---|---|
| | | | Circor International, Inc | Valves |
| | | | Aqua-Chem, Inc. | Boilers |
| | | | Colfax Corporation | Pumps |
| | | | Crane Company | Valves, packing, gaskets, and discs |
| | | | Crown Cork & Seal Co. | Fireproofing materials |
| | | | Flowserve US, Inc. | Packing and seals |
| | | | Foster Wheeler | insulation, engines, gaskets, packing, turbines, and related component materials |
| | | | Garlock Sealing Technologies | Insulation, gaskets, packing, and fluid sealing devices |
| | | | General Electric Co. | Generators and turbines |
| | | | Goulds Pumps (IPG), Inc. | Pumps, gaskets, and packing |
| | | | Owens-Illinois, Inc. | Block and pipe covering |
| | | | Rapid American Corporation | Boiler insulation and pipe insulation |

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|------|-------------------|---------------|------------|------------------------------|
|      |                   |               | Viacom, Inc. | Insulation, gaskets, packing, wire, engines, motors, turbines and related component parts |
|      |                   |               | 3M Company | Dust masks |



COPY

JEFFREY S. MUTNICK, OSB #721784
jmutnick@mutnicklaw.com
Jeffrey S. Mutnick Law Office
737 SW Vista Avenue
Portland, Oregon 97205
503-595-1033
503-224-9430 (Facsimile)

*Of Attorneys for Plaintiff Daniel Holmes, Personal Representative for the Estate of Gerald Holmes*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DANIEL HOLMES, Personal Representative for the Estate of GERALD HOLMES,<br><br>          Plaintiff,<br><br>     v.<br><br>A.W. CHESTERTON CO., et al.,<br><br>          Defendants. | Case No. CV-09-678-JO<br><br>**PLAINTIFF'S MOTION FOR REMAND**<br>**Pursuant to 28 U.S.C. § 1447(c)**<br><br>**ORAL ARGUMENT REQUESTED** |

Pursuant to 28 USC §1447(c), Plaintiff respectfully moves the Court for an order remanding the above-captioned case to the Circuit Court for the State of Oregon, County of Multnomah on the following grounds: (1) Defendant Leslie Controls ("Defendant") failed to remove this matter within the time period required by 28 USC §1446(b); and (2) there is no subject matter jurisdiction in the U.S. District Court as required by 28 USC §1442(a)(1).

/ / /

Page 1 -    PLAINTIFF'S MOTION FOR REMAND

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM



EX. B
(1.51P)

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(a)

Pursuant to L.R. 7.1(a), Plaintiff certifies that it made a good faith effort to confer with the attorney for Leslie Controls. Plaintiff requested that Defendant withdraw their Notice of Removal or Plaintiff would be forced to file a motion for remand and seek sanctions. Defendant denied Plaintiff's request.

This Motion is supported by the accompanying Memorandum of Law in Support of Plaintiff's Motion for Remand.

DATED this 14th day of July 2009.

LAW OFFICE OF JEFFREY S. MUTNICK

Jeffrey S. Mutnick, OSB #721784
Of Attorneys for Plaintiff

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

## CERTIFICATE OF SERVICE

I hereby certify that I served **PLAINTIFF'S MOTION TO REMAND, MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND, and all attached EXHIBITS** on the following named person(s) on the date indicated below via:

☒ NOTICE OF ELECTRONIC FILING USING THE Cm/ECF SYSTEM

MAILING WITH THE U.S. POSTAL SERVICE BY FIRST CLASS MAIL, POSTAGE PREPAID

Ms. Monica Wells
Bullivant Houser Bailey PC
300 Pioneer Tower
888 SW Fifth Ave.
Portland, OR 97205
*Attorneys for Defendant Leslie Controls*

And any other attorneys of record.

DATED: July 14, 2009

Jeffrey S. Mutnick, OSB #727184
Of Attorneys for Plaintiff

Page 1 - **CERTIFICATE OF SERVICE**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

JEFFREY S. MUTNICK, OSB #721784
jmutnick@mutnicklaw.com
Jeffrey S. Mutnick Law Office
737 SW Vista Avenue
Portland, Oregon 97205
503-595-1033
503-224-9430 (Facsimile)

*Of Attorneys for Plaintiff Daniel Holmes, Personal Representative for the Estate of Gerald Holmes*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DANIEL HOLMES, Personal Representative for the Estate of GERALD HOLMES,<br><br>_Plaintiff,_<br><br>v.<br><br>A.W. CHESTERTON CO., et al.,<br><br>_Defendants._ | Case No. CV-09-678-JO<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR REMAND Pursuant to 28 U.S.C. § 1447(c)**<br><br>**ORAL ARGUMENT REQUESTED** |

### I. INTRODUCTION

This is an asbestos-related personal injury case which must be remanded to the

Multnomah County Circuit Court because it was both untimely and improperly removed.

Plaintiff's counsel would not customarily request attorney fees and costs, but Counsel does in

this instance based upon the facts set forth below. The untimeliness of the Motion, as well as the

fact that Defendant's memorandum fails to address significant authority contrary to Leslie

Control's (hereinafter "Leslie" or "Defendant") position, suggest the removal was solely for the

**Page 1 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503-595-1033; 503-224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

purpose of delaying resolution of the case through transfer to MDL 875. Since significant facts were ignored, Plaintiff has been forced to devote a substantial amount of time responding to this Motion, and therefore seeks attorney fees and costs as allowed by 28 USC 1447.

## II.  STATEMENT OF FACTS

Contrary to the allegations in Defendant's petition and pleadings upon which it relies, the complaint in the present case was filed on October 27, 2008. A copy of the Complaint is attached as Exhibit A. At the time the complaint was filed, Plaintiff was recently diagnosed with mesothelioma, and while in failing health, remained capable of having his testimony perpetuated.

Exhibit A named the removing Defendant in this case. While Defendant was also designated as a predecessor to Circor International, Inc., Defendant appeared at Plaintiff's deposition (see Exhibit B) as Leslie Controls. A letter dated November 14, 2008, from defense counsel stated:

> **This will serve to advise you that we will be representing the defendant Leslie Controls, Inc., in the above-referenced case** (identified in the complaint as "Circor International, inc., a Delaware corporation, individually and as successor-in-interest to Leslie Controls, Inc.") and intend to file an appearance on its behalf.

(Emphasis added). (*See* Exhibit C). Counsel's appearance on behalf of Leslie Controls was more than two weeks prior to Mr. Holmes' December 4, 2008, deposition (*see* Exhibit B).

Counsel did not indicate he was "specially appearing" or otherwise contend he was appearing for any entity other than Leslie Controls. By letter of December 9, 2008 (Exhibit D), counsel for Leslie Controls stated as follows:

> By letter of November 14, 2008, we advised we would be representing the defendant Leslie Controls, Inc. ... Please note, we will be representing only CIRCOR International, Inc., in this matter and intend to file an appearance on its behalf.

**Page 2 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

As noted in the affidavit of Plaintiff's counsel (Exhibit H), a discussion was had between counsel in which counsel for Leslie Controls (Circor) indicated that, for purposes of service, Leslie Controls wished to be served independently of Circor. The parties agreed that additional service would be made upon Leslie Controls. Copies of the service documents as to Circor and Leslie Controls are attached as Exhibit E.

### III. ARGUMENT

### A.  DEFENDANT LESLIE CONTROLS, INC.'S REMOVAL IS UNTIMELY

Leslie has removed this case based on 28 USC § 1442(a)(1).  Leslie's removal is clearly untimely:[1]

> The notice of removal of a civil action or proceeding **shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based,** or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, **whichever period is shorter**.

28 USC § 1446(b) (emphasis added).

The thirty day time period for removal starts to run from a defendant's receipt of the initial pleading when that pleading affirmatively reveals on its face the facts necessary for federal court jurisdiction. *Harris v. Bankers Life & Casualty Co.*, 425 F3d 689, 690-91 (9th Cir 2005). Defendant was aware of Plaintiff's complaint by at least November 14, 2008. The complaint stated on its face the location of Plaintiff's exposure, in and around U.S. Navy ships in the Kaiser ship yards during World War II.  Defendant's reliance on *Durham v. Lockheed Martin Corp.*, 445 F3d 1247 (9th Cir 2006), is misplaced. In *Durham*, the removing defendant only learned of

---

[1] Leslie's removal is also improper, as explained *infra*.

**Page 3 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKSLAW.COM

the basis for federal officer removal at some point after it was served with summons and complaint. A State of California pleading was a "notice" pleading. Lockheed received responses to interrogatories, which made more definite and certain the allegation of exposure, providing a basis for federal officer removal.  In *Durham*, the Court held that removal was timely based upon the circumstances.  In the present case, Defendant has been served with three complaints. Only after the last amendment, which was partially to substitute the personal representative after Mr. Holmes' death from mesothelioma, did Defendant initiate removal proceedings. Unlike *Durham*, the removal in the present case is untimely. Defendant was aware of the facts of the case on November 14, 2008, when it appeared in behalf of Leslie Controls. It is disingenuous for the same counsel to now say it should not have removed the case within 30 days of October 28, 2007.

It is Plaintiff's position that Leslie had knowledge of this suit and its allegations by October 27, 2008. A notice of deposition of Mr. Holmes was also served on counsel for Leslie on November 29, 2008. Counsel for Leslie attended the deposition on December 4, 2008, during which Mr. Holmes identified his exposure to pumps and described his the work which exposed him to asbestos in the shipyards. None of Plaintiff's allegations regarding exposure on or around Navy ships in the Kaiser shipyards have changed. The same facts of which Leslie's counsel was aware when served with the complaint and when responding with the letter of November 14, 2008, are the present facts.

While various U.S. District Courts have not interpreted the question of when a defendant had notice and whether some formality need be associated with that notice, that is not an issue in the present case. The only issues in the present case are whether Defendant's removal is timely

Page 4 – **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

and whether that removal is otherwise proper. Given Defendant's correspondence, service upon Defendant, appearance at deposition, and Defendant's knowledge of Plaintiff's exposure as testified to by Plaintiff in his deposition, it is clear Defendant had notice.

The only colorable argument that could be made by Defendant under these circumstances is that the amended complaint substituting Daniel Holmes as the personal representative of Gerald Holmes constituted a "new claim," which began the 30-day removal period anew. This argument is without merit. ORCP 34A states as follows: "No action shall abate by the death or disability of a party or by the transfer of any interest therein if the claim survives or continues."

ORCP 34B states, in pertinent part: "In the case of the death of a party, the court shall, on motion, allow the action to be continued: ... (b)(1) by such party's personal representative or successor of interest at any time within one year after the party's death..." *See also* ORCP 34D (Death of a Party; Surviving Parties). The substitution of the personal representative did not require additional service on Defendant, but only a motion continuing the action already pending in the Multnomah County Circuit Court. The dates upon which Defendant seizes in attempting to rationalize this removal proceeding appear to be the 30-days subsequent to the amendment of the complaint to substitute the personal representative and the removal of Circor from the complaint.

## B.  THERE IS NO SUBJECT MATTER JURISDICTION IN THE US DISTRICT COURT

If the court finds the Defendant's removal was timely, the court should nevertheless remand this case to state court because Defendant's basis for removal – federal officer jurisdiction – has not been established by the removing party.

Leslie appears to claim it has a colorable federal defense to Plaintiffs' action with its inclusion of some military specifications and the affidavit of Admiral Horne. It contends the

**Page 5 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

"government contractor immunity" defense as stated in *Boyle v. United Technologies, Inc.*, 487 U.S. 500, 101 LE2d 442, 108 S. Ct. 2510 (1988) and its progeny, is its colorable defense. Leslie has failed to apprise this Court of controlling Ninth Circuit case law which states there is no federal "government contractor" immunity defense under *Boyle* in asbestos litigation where the theory of liability is a failure to warn or failure to meet consumer expectations. *In Re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 ((9th Cir. 1992).

Federal district courts throughout the country have determined that (1) if the plaintiff is only asserting a failure to warn claim in asbestos litigation, (2) then there is no federal defense available to the purported federal officer under *Boyle*, and (3) federal officer removal jurisdiction is inappropriate. *Overly v. Raebestos-Manhattan*, 1996 W.L. 532150 (N.D. Cal. 1996), attached hereto and marked as Exhibit A; *Ruffin v. Armco Steel Corp.*, 959 F. Supp. 770 (S.D. Texas 1997); *Good v. Armstrong World Industries*, 914 F. Supp. 1125 (E.D. Penn. 1996); *Feidt v. Owens-Corning Fiberglass*, 153 F. 3d 126 (3d Cir. 1998); *Arness v. Boeing North American*, 997 F. Supp. 1268 (C.D. Cal. 1998); *Megill v. Worthington Pump, Inc.*, 1999 W.L. 191565 (D. Del. 1999) (Exhibit B hereto); *McCormick v. C.E. Thurston*, 977 F. Supp. 400, 403 (E.D. Vir. 1997). *See also, Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 951 (E.D.N.Y. 1992) (Weinstein, J.) (Agent Orange case granting motion to remand.) ("The defendants . . . are being sued entirely for past acts in allegedly providing a tainted product to the government. . . . The military contractor defense raises straightforward common law tort issues that the State Courts are as adept at handling as the federal judiciary.").

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
757 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

## C. THE NINTH CIRCUIT HAS A STRONG PRESUMPTION AGAINST REMOVAL JURISDICTION

When a case is removed to Federal Court, there is a "strong presumption" against federal court removal jurisdiction. *Gaus v. Miles, Inc.*, 980 F. 2d 564, 566 (9th Cir. 1992) [citing *Nishimoto v. Federman-Bachrach & Associates*, 903 F. 2d 709, 712 n. 3 (9th Cir. 1990)]. The defendant, who was the removing party, bears the burden of proving the propriety of removal, including jurisdiction. *Id.* at 566-67. *Nishimoto*, 903 F. 2d at 712 n. 3. The Ninth Circuit "strictly construes the removal statute against removal jurisdiction." *Gaus*, 980 F. 2d at 566; *Duncan v. Stuetzle*, 76 F. 3d 1480, 1485 (9th Cir. 1996). Federal jurisdiction "must be rejected if there is any doubt as to the right of removal in the first instance." *Duncan*, 76 F. 3d at 1485 (emphasis added). In determining whether to remand a removed civil action due to lack of subject matter jurisdiction, "any doubt should be resolved in favor of remand." *St. Francis Hospital And Medical Center v. Blue Cross & Blue Shield Of Connecticut, Inc.*, 776 F. Supp. 659, 661 (D. Conn. 1991); 28 U.S.C. §§ 1441(a), 1447(c). There is no "federal officer" removal jurisdiction here.

## D. THERE IS NO COLORABLE FEDERAL CONTRACTOR DEFENSE TO THIS FAILURE-TO-WARN CLAIM.

Leslie's memorandum is relatively spartan as to the specific concepts upon which Defendant relies. They appear to rely on the *Boyle* "government contractor" defense to support federal officer removal jurisdiction herein. However, the Ninth Circuit and other U. S. Circuit Courts throughout the country have struck the *Boyle* government contractor defense as a matter of law in asbestos cases at least for failure to warn claims and in the Ninth Circuit consumer expectation defect claims. *In Re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir.

**Page 7 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

1992).  As the Ninth Circuit explained:

> The appellants' failure to alert those individuals who work most closely with their insulation products . . . to the dangers of asbestos exposure was patently clear from the evidence.  That the inadequacy of the defendants' warnings was a legal cause of the plaintiffs' injuries cannot be denied.  The plaintiffs could have taken precautionary measures or left their jobs had they been warned of the dangers.  A reasonable jury, in reaching its verdict of liability, necessarily would have found from the evidence that the defendants breached their State law duty to warn both before and after the introduction of warning labels in 1966.  Thus, even were the asbestos insulation "military equipment", we would affirm the district court's decision to preclude the military contractor defense.

*In Re Hawaii Federal Asbestos Cases*, 960 F.2d at 814.  *See also*, *In Re Joint Eastern And Southern District New York Asbestos Litigation*, 897 F.2d 626, 632 (2d Cir. 1990) ("Stripped to its essentials, the military contractor's defense under *Boyle* is to claim 'the government made me do it.' ").

Plaintiffs' claim is based upon a failure to warn.  *See* Exhibit A.

Relying upon the Ninth Circuit *In Re Hawaii Federal Asbestos Cases* precedent, district courts within the Ninth Circuit, Fifth Circuit, Third Circuit, and Second Circuit, have already remanded asbestos cases when federal officer removal jurisdiction is invoked by an asbestos defendant under the *Boyle* "government contractor" defense.  One of the most lucid explanations of the rational is *Good v. Armstrong World Industries*, 914 F. Supp. 1125 (E.D. Penn. 1996).  In *Good*, a case was removed to Federal Court when the plaintiff stated he worked with asbestos that was used on turbine generators manufactured by Westinghouse.  As the Court explained:

> Westinghouse contends that it designed and manufactured the turbine generators in accordance with specifications and regulations mandated by the Navy and is thereby entitled to remove the case to federal court pursuant to the federal officer removal statute."

914 F. Supp. at 1126.

**Page 8 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9450 (facsimile)
JMUTNICK@MUTNICKLAW.COM

As the *Good* Court explained:

> The facts relied on by Westinghouse as set forth in the notice and affidavit applied to the foundations of the government contractor defense, rather than the federal officer removal statute. By showing that the United States Navy was involved in the design and manufacture of the turbines, **the detailed affidavit of Gate** lends support for a colorable claim of the government contractor defense, but I find that these facts do **not** show that Westinghouse acted under the immediate supervision of the Secretary of the Navy or any other officer, as required by the statute. [¶] . . . In order to remove to federal court, Westinghouse must set forth evidence showing that it did, in fact, act under a federal officer, a burden that Westinghouse has not satisfied. [¶] . . . **Acting under the direction of the Navy, however, is not the same as acting under the direct and detailed control of the federal officer. . . .** [¶] Westinghouse's poor showing of the causal connection between the allegations of plaintiffs and the conduct taken under direction of a federal officer is also evidence by **its failure to set forth the substance of the regulations and specifications.** The Complaint alleges personal injury based upon exposure to asbestos. Neither the notice nor the affidavit establishes that the Secretary of the Navy specified the use of asbestos in the design and manufacture of the turbine generators.

*Good*, 914 F. Supp. at 1129-1130 (emphasis added).

The *Good* Court further explained that the policy reasons for having federal officer removal jurisdiction are not present in asbestos cases where the *Boyle* government contract defense is asserted. As the *Good* Court explained:

> The Supreme Court fashioned the government contract defense to displace State law because there exists a unique federal interest in civil liability arising out of the performance of federal procurement contracts. [citation omitted] **I question whether that federal interest exists in this case. The impact of this personal injury action on the federal interest in protecting future defense procurement -- the fundamental point of the government contract defense -- is speculative.** It is common knowledge that asbestos is no longer used in the design and manufacture of equipment, so that this lawsuit cannot interfere with a federal program involving products that contain asbestos. Therefore, **the adjudication of this personal injury action in State Court does not threaten the enforcement of a federal policy sufficient to warrant removal.**

**Page 9 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Even assuming that the federal interest underlying <u>the government contractor defense</u> is present, simply noting the presence of a federal interest does not provide a sufficient or necessary basis to allow removal. . . . When enacting the federal officer removal statute, Congress sought to distinguish lawsuits on the basis of their susceptibility to State Court manipulation. **The government contractor defense is not subject to such manipulation.** Unlike a federal officer's defense of immunity, the government contract defense by a corporation raises straightforward common law issues that State Courts are as adept at handling as the federal judiciary.

*Good*, 914 F. Supp. at 1131 (emphasis added).

Here, the *Boyle* defense is not subject to State Court manipulation and this is emphatically true because the Ninth Circuit itself has struck the *Boyle* defense in both failure to warn and consumer expectation claims based on common law product liability. An excellent discussion of the asbestos cases and federal officer removal jurisdiction not being provided by the *Boyle* defense is found in *Arness v. Boeing North America*, 997 F. Supp. 1268 (C.D. Cal. 1998). In *Arness*, Boeing sought to remove the case against federal officer removal concerning its disposal of toxic chemicals at the Rocketdyne facilities. Boeing had manufactured and tested rocket engines at these facilities pursuant to contracts with the U. S. government. Plaintiffs claimed personal injury from its disposal. The *Arness* Court summarized the holdings of two asbestos cases when favorably using them as precedents to grant a motion to remand as follows:

In both cases, the defendant government contractors were sued by plaintiffs for their alleged exposure to asbestos **based on failure to warn theories.** The court in *Overly* found that because of the control exercise by the United States over the defendant, **in the guise of detailed specifications regarding the manufacture and design of ships built by the defendant,** did **not** restrict the defendant's "ability to notify individuals of the presence of asbestos in the work environment," the defendant failed to establish a causal connection between that control and "the legal theory under which plaintiffs" sought to hold the defendant liable. [citation omitted]    Likewise in *Ruffin*, the court held that to establish the required causal connection, the defendant must not only show that the mill where plaintiffs were exposed to asbestos was built pursuant to government specifications, "but also that (the

**Page 10 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

> government) restricted or prohibited (the defendant) from
> providing adequate precautions against or otherwise notifying its
> employees of the hazards of asbestos exposure."

*Arness*, 997 F. Supp. at 1275 (emphasis added).

One of the cases favorably relied upon by the *Arness* Court was *Overly v. Raybestos-Manhattan*, 1996 W.L. 532150 (N.D. Cal. 1996).  In *Overly*, defendant Avondale Industries removed an asbestos case to Federal Court based on federal officer jurisdiction.  The *Overly* Court explained that "plaintiffs have proceeded against Avondale on the 'failure to warn theory' of product liability."  *Overly* at p. 1.  Also, the Court noted that "plaintiffs are not pursuing a design defect claim of products liability and have offered in writing to waive all potential claims related to design defects."  *Overly* at p. 3.  The *Overly* Court citing *In Re Hawaii Federal Asbestos Cases*, explained as follows:

> The Ninth Circuit has ruled that in failure to warn product
> liability cases involving asbestos allegedly used in the construction
> of naval ships, a defendant must specifically show that "in making
> (its) decisions with regard to warnings (it was) acting in
> compliance with "reasonably precise specifications" imposed on
> (it) by the United States."  *In Re Hawaii Federal Asbestos Cases*,
> 960 F.2d 806, 813 (9th Cir. 1992).  Thus, in order to meet the
> *Boyle* test in a failure to warn case, the defendant must show that
> the government affirmatively instructed it regarding the provision
> of warnings.  Defendant's only showing on this motion relates to
> the government's manufacturing and engineering specifications.
> Defendant has not demonstrated that the government provided
> "reasonably precise specifications" affecting Avondale's provision
> of warnings.  [citation omitted]  Absent a showing by defendant
> that the federal government gave specific instructions to Avondale
> not to warn employees of the existence of asbestos, Avondale is
> offered no protection by government contractor immunity.
> [citation omitted]   Therefore defendant fails to meet the second
> prong of the *Mesa* [*v. California*, 489 U.S. 121 (1989)] standard
> because Avondale has no colorable federal defense to the charges
> in this case.

*Overly* at pp. 3-4.

In *Ruffin v. Armco Steel Corp.*, 959 F. Supp. 770 (S.D. Tex. 1997), the Court held there

**Page 11 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

was no federal officer removal jurisdiction in a case that involved even more control by the federal government over the defendant than the allegations by Leslie in supplying valves. In *Ruffin*, the plaintiff worked at Armco's steel mill where he was exposed to asbestos. Armco claimed that "its Houston steel plant was constructed under the control of federal officers, which presumptively provides it with sufficient basis for removal under §1442(a)(1)." *Ruffin* at 959 F. Supp. at 772. As the defendant contended:

> Armco claims that at all times relevant to the suit, it acted under the supervision of the Secretary of Commerce and other officials from the Defense Plan Corporation ("DPC"), one of many federal corporations created to assist in the war program. Armco claims that the nexus requirement under *Mesa* is satisfied with proof that the plant it constructed was built pursuant to DPC plans and the State action against it arose from injuries allegedly caused from Armco's compliance with those plans [presumably insulating parts of the plant with asbestos]. Because the plaintiff's State action is predicated on a failure to warn theory, **however, Armco must not only show that the mill was built pursuant to DPC specifications (and asbestos** was a government approved or mandated material) **but also that DPC restricted or prohibited Armco from providing adequate precautions against or otherwise notifying its employees of the hazards of asbestos exposure.**

*Ruffin*, 959 F. Supp. at 744 (emphasis added).

The Court went on to further explain that it is not enough merely to show government involvement in the procurement contract, but detailed control and indeed **federally mandated conflicts with State law duties.** As the Court explained:

> The court finds that although Armco has proven that DPC supervised and extensively monitored the construction of the mill, Armco has failed to demonstrate that DPC exercised the same degree of control with respect to safety precautions that allegedly should have been taken to warn employees of the hazards associated with asbestos exposure. There was no evidence to show that DPC prevented Armco from issuing adequate safety warnings or that the government enacted or even considered enacting its own programs or guidelines to cover workplace safety. Nor does the evidence show that DPC controlled personnel matters or at all

**Page 12 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

> interfered with the duty of care Armco owed under State law to its employees. **The mere fact that the government possessed the power to control or regulate employee safety neither establishes that that power was ever used nor that operational mandates of this type were ever issued. Without such proof, Armco cannot satisfy the statutory requirements for removal under §1442(a)(1).**

*Ruffin*, 959 F. Supp. at 776 (emphasis added).

The *Ruffin* Court further explained that giving blanket immunity under *Boyle* and expanding federal jurisdiction is not warranted by any federal policy. As the Court explained:

> The court also believes that blanket absolution of liability for all acts of neglect, whether or not committed under specific and direct order, would encourage laxity at the expense of human lives without any corresponding benefit. [¶] Finally, the court can find no threat to the enforcement of federal laws if the instant case is adjudicated in State Court. . . . Furthermore, the basic intent of §1442(a)(1) removal is for protection of federal officials, as well as those acting under their direction, against State Court hostility or interference with the effectuation of federal policy. **In this case, there is arguably no potential federal policy violation, aside from a general government interest in cost control, requiring a federal form for adjudication.**

*Ruffin*, 959 F. Supp. at 776-777 (emphasis added).

Even in the Third Circuit which broadly interprets the scope of federal officer removal jurisdiction, district courts remand asbestos cases back to State Court in highly analogous situations. *Megill v. Worthington Pump*, 1999 W.L. 191565 (D. Del. 1999). In *Megill*, the defendant claimed that it "supplied various pumps to the U. S. Navy for use on navy vessels" and "[a]ccording to the military specifications included in the record, asbestos was specifically mentioned". *Megill*, at pp. 1-2. The *Megill* Court cited the Ninth Circuit's striking of the *Boyle* defense in asbestos cases and went on to remand the case back to State Court holding as follows:

> In the case at bar, plaintiffs assert liability based on the following conduct: 1) failure to substitute other materials for asbestos; 2) failure to warn; 3) failure to adequately research the dangers of asbestos; 4) failure to adequately package, distribute

**Page 13 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

and use asbestos; and 5) failure to remedy the above failures. Worthington has not established that the U. S. Navy prohibited it from substituting materials or otherwise changing the specifications, so long as protocol was followed. **Likewise, there is no evidence of record that the U. S. Navy prohibited defendant from, or otherwise directed defendant in, issuing warnings or researching and effectuating product safety.** Under these circumstances, the court concludes that **there is no causal connection between plaintiffs' claims and the conduct performed under color of a federal office; thus, there is no colorable federal defense.**

*Megill* at pp. 3-4 (emphasis added).

The Ninth Circuit has routinely struck the *Boyle* government contractor defense as a matter of law in other failure-to-warn cases involving military equipment such as marine helicopters and naval vessels. *Snell v. Bell Helicopter*, 107 F.3d (9th Cir. 1997); *Butler v. Ingalls Shipbuilding*, 89 F.3d 582 (9th Cir. 1996). *See also, Tate v. Boeing Helicopters*, 55 F.3d 1160 (6th Cir. 1995).

As noted above, the Ninth Circuit has repeatedly held that in a failure to warn claim, the government must have affirmatively precluded warnings in order for the contractor to be shielded of *Boyle* immunity. *Nielson v. George Diamond Vogel Paint Co.*, 892 F.2d 1450 (9th Cir. 1989). The Ninth Circuit's interpretation of *Boyle* does apply to military aircraft and vessels. *Snell v. Bell Helicopter*, 107 F.3d 744, 749 (9th Cir. 1997). As has been explained above, the requirement that the government affirmatively bar warnings is not just Ninth Circuit law. *See, Boyle, supra. Boyle* required the government must actually make a decision regarding the act or omission upon which state tort liability is grounded.

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Office*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Defendant may try to avoid the holding of *In re Hawaii Federal Asbestos Cases* by speculating that the Navy would not have permitted it to warn about asbestos. However, it never asked permission to warn about asbestos. Moreover, any attempt to manufacture a conflict is foreclosed by the United States Supreme Court's recent landmark preemption decision in *Wyeth v. Levine*, which held that the FDA's approval of a particular drug warning label did <u>not</u> preempt the plaintiff's Vermont state law claims against the manufacturer for failure to warn. *Wyeth v. Levine*, 555 U.S. __, No. 06-1249, slip op. (2009). On the contrary, the Court made it clear that "absent clear evidence that the FDA would not have approved a change to [the] label, we will **not** conclude that it was impossible for Wyeth to comply with both state and federal requirements." *Id.*, slip op. at 15 (2009) *Wyeth* makes it clear that in the duty to warn context, state law is not preempted unless there is <u>clear evidence</u> that the federal agency actually considered the warning that the state law requires and would have prohibited such a warning. This is consistent with *Boyle*, which held the federal officer has to consider the actual design defect at issue. *Boyle*, 108 S. Ct. at 2518 ("they assure the design feature in question was considered by a government officer").

The *Wyeth* defendant had argued that it could not have complied with its state-law duty to strengthen its warning label, because the FDA would not have approved a stronger warning label. The Supreme Court rejected that argument. *Wyeth* held that while the FDA retained authority to approve or reject any labeling changes, the Court "cannot credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning." *Id.*, slip op. at 16. The Court noted that the defendant had offered no evidence "that it attempted to give the kind of warning required by the Vermont jury but was prohibited from doing so by the FDA," nor that

**Page 15 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

"the FDA intended to prohibit it from strengthening the warning . . . because the agency deemed such a warning inappropriate in reviewing [its] drug applications." *Id.*, slip op. at 16-17. Indeed, the Court noted that there was no evidence that the FDA made any affirmative decision regarding the warnings required by Vermont law, or even "gave more than passing attention to the issue." *Id.*, slip op. at 17. The Court further made it clear that "the mere fact that the FDA approved [the] label does not establish that it would have prohibited such a change." *Id.* Thus, the Court held that the defendant had "failed to demonstrate that it was impossible for it to comply with both federal and state requirements," and affirmed the plaintiff's verdict under Vermont tort law. *Id.*

Defendant here cannot show that asbestos warnings were barred by military contract. As in *Wyeth*, Defendant has no evidence it attempted to warn end users about the hazards of asbestos, but was prohibited from doing so by the Navy. Nor can it provide any evidence that the Navy ever considered whether Defendant would be permitted to give the asbestos warnings had they wished to do so. As the Ninth Circuit correctly stated in *In re Hawaii Federal Asbestos Cases, supra.*, there was no conflict between the conditions imposed by Defendant's Navy contracts and its state law duty to warn, and there can be no basis to hold that state law is preempted.

Most significantly in the present case, Defendant implies that it was prohibited from placing warnings on the products because of the level of government supervision. Defendant relies on Admiral Horne's affidavit, and contends that it was required to comply with the government's specifications. Leslie cannot prove that the existence of the military specifications altered its publically available products in any respect. To the contrary, Leslie's interrogatory

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

responses (Exhibit F) establish that Leslie did not have warnings on its products at the time it sought certification by the military and that it did not put warnings on the products subsequent to World War II or at any time during the manufacture of the products in question.

Leslie contends in its responses to the plaintiff's standard interrogatories in the State of California at page 32, Response to Interrogatory No. 37, as follows:

**INTERROGATORY NO. 37:**
As to RAW ASBESTOS and to each such ASBESTOS-CONTAINING PRODUCT listed in YOUR responses to Interrogatories No. 29 and 31 did DEFENDANT warn of the health hazards of asbestos? If so, state for each such warning:
A.      The content, size, color, and location; whether the warning appeared on the material and/or on the container, and/or was placed on a tag; whether the warning was included in contracts; whether the warning was included in advertising or other promotional materials;
B.      State whether you have any photographs thereof;
C.      The inclusive dates on which you used each such warning;
D.      State all changes you made in such warnings and the dates of such changes; and
E.      Identify the person most knowledgeable about your warnings and warning policy.

**RESPONSE TO INTERROGATORY NO. 37:**
Defendant states that it is not aware of any health or safety hazards associated with normal use of its products; therefore, issued no such warnings.

Defendant Leslie Control, Inc.'s Responses to Plaintiffs' Standard Interrogatories to All Defendants (Asbestos General Order 129) (Exhibit F).

Its assertion that warnings were not required at any time, a defense which renders moot its claim that it was in some way intimidated, directed, prohibited, or mandated by the government in its failure to warn of the hazards associated with its products. To the contrary, Leslie states clearly it would not and did not put a warning on a product regardless of the

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-5430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

existence of the military specification. Significantly, Leslie has asserted this same position in its defense to Plaintiff's claims. *See* Answer of Leslie Controls (Exhibit G).

In response to Interrogatory No. 44 at page 36 of Exhibit F, Leslie stated as follows:

**INTERROGATORY NO. 44:**
> When do YOU contend that THIS DEFENDANT first became aware that there is an association between asbestos exposure and disease in human beings?

**RESPONSE TO INTERROGATORY NO. 44:**
> ....
> Leslie responds that the exact time of when Leslie first obtained any knowledge concerning the potential health hazards of asbestos is unknown. Matthew Wrobel – Director of Quality Assurance, first became aware of the potential health hazards of asbestos sometime in the late 1980's through oral conversation. ... Accordingly, Leslie Controls is able to state that, as a company, it took its safety obligation seriously and was well aware of any and all hazards involved in the manufacture of valves.
> .... Based upon information and belief, it is the position of the manufacturers of the gaskets and packing that the manufacturers encapsulated the fiber in lubricants, binders, metals and adhesives, which prevents the release of asbestos fibers upon normal use and installation. ....

(Exhibit F).

It would appear Leslie's own statements are the most appropriate basis for granting Plaintiff's motion to remand. Defendant's contention that its products were not dangerous, required no warnings, and no warnings were placed on the products at any point in time prohibits this defendant from relying upon the federal contractor defense, since Defendant's position is it would not have put warnings on the products regardless of the position of the federal government.

It is difficult to understand how Leslie can contend it was prohibited from placing warnings on its products when it has taken the position that the products did not require warnings and has pled as its defense to Plaintiff's mesothelioma claim that its products did not cause

**Page 18 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9450 (facsimile)
JMUTNICK@MUTNICKLAW.COM

asbestos fibers to enter the air and were not at any point in time during the period of manufacture unreasonably dangerous to the extent that Leslie should have provided a warning (Exhibit G). Leslie's contentions are incongruous, inconsistent, and without either factual or legal merit.

## IV.  CONCLUSION

Plaintiff's motion to remand this matter to the state court should be granted because Defendant failed to timely remove the case. Even if the court find Defendant did remove the case in a timely manner, Defendant fails to meet the requirements of federal officer jurisdiction. This case should be remanded to the state court.

DATED this __14th__ day of July 2009.

LAW OFFICE OF JEFFREY S. MUTNICK

Jeffrey S. Mutnick, OSB #721784
Of Attorneys for Plaintiff

Page 19 – PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMAND

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                          FOR THE COUNTY OF MULTNOMAH

6

7    GERALD HOLMES,

8                Plaintiff,

9         vs.                                    Case No.

10   ALLIS-CHALMERS CORPORATION
     PRODUCT LIABILITY TRUST; ALFA            PLAINTIFF'S COMPLAINT-
11   LAVAL, a foreign corporation; ASBESTOS    PERSONAL INJURY BASED ON
     CORPORATION LTD., a foreign corporation;  STRICT LIABILITY AND
12   A.W. CHESTERTON CO., a Massachusetts       NEGLIGENCE
     corporation; BUFFALO PUMPS, INC., a
13   Delaware corporation; CIRCOR              AND DEMAND FOR JURY TRIAL
     INTERNATIONAL, INC, a Delaware
14   corporation, individually and as successor-in-  CASE NOT SUBJECT TO
     interest to LESLIE CONTROLS, INC.;        MANDATORY ARBITRATION
15   CLEAVER-BROOKS, a division of AQUA-
     CHEM, INC., a Wisconsin corporation; COLFAX
16   CORPORATION, a Delaware corporation,
     individually and as successor-in-interest to IMO
17   INDUSTRIES, INC; CRANE COMPANY, a
     Connecticut corporation; CROWN CORK &
18   SEAL CO., a New York corporation, individually
     and as successor-in-interest to MUNDET CORK
19   CORP.; FLOWSERVE CORPORATION,
     individually and as successor-in-interest to
20   DURAMETALLIC CORP.; FOSTER
     WHEELER, LLC, a New York corporation;
21   GARLOCK SEALING TECHNOLOGIES LLC,
     a New York corporation,  individually, and as
22   successor-in-interest to GARLOCK PACKING
     CO.; GENERAL ELECTRIC CO., a Connecticut
23   corporation; GOULDS PUMPS, INC., a Delaware
     corporation, individually and as successor-in-
24   interest to GOULDS PUMPS (IPG);
     METROPOLITAN LIFE INSURANCE
25   COMPANY, a New York corporation; OWENS-
     ILLINOIS, INC., a Delaware corporation;
26   RAPID-AMERICAN CORPORATION, a

     Page  1 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

Mot. to Remand
EXHIBIT A   1 of 14

1  Delaware corporation; VIACOM,
   INCORPORATED, a Delaware corporation, AS
2  SUCCESSOR-BY-MERGER TO CBS
   CORPORATION FKA WESTINGHOUSE
3  ELECTRIC CORPORATION; 3M COMPANY
   AKA MINNESOTA MINING AND
4  MANUFACTURING COMPANY, a foreign
   corporation;
5
            Defendants.
6

7      Plaintiff alleges:

8                    COUNT I - STRICT LIABILITY

9                              1.

10     Gerald Holmes (hereinafter "Plaintiff") is a resident of the State of Oregon.

11                             2.

12     Plaintiff was employed at the approximate times and locations listed in Exhibit "A,"

13  which is attached to this complaint and incorporated herein by reference.  During his career as a

14  shipyard worker, Plaintiff was exposed to airborne asbestos fibers, by both directly working with

15  asbestos and asbestos-containing materials himself and by working in the vicinity of other

16  workers handling such products.

17                             3.

18     At all material times:

19     a)  Allis Chalmers Corporation Product Liability  Trust is a trust for a corporation, which

20         at all relevant times was doing business in the state of Oregon, engaged in the

21         manufacture, sale, and/or distribution of asbestos-containing products including, but

22         not limited to, pumps, gaskets, and packing;

23     b)  Alfa Laval was and is a foreign corporation, which at all relevant times was doing

24         business in the state of Oregon, engaged in the manufacture, distribution, and/or sale

25         of asbestos-containing products including, but not limited to, valves, packing, and

26

Page 2 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com


Motion to Remand
EXHIBIT A 2 of 14

discs;

c)  Asbestos Corporation Ltd. was and is a foreign corporation, which at all relevant times was doing business in the state of Oregon, engaged in the sale of asbestos fibers to manufacturers of asbestos-containing products;

d)  A.W. Chesterton Co. was and is a Massachusetts corporation, which at all relevant times was doing business in the state of Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-containing products, including gaskets, packaging and sealing devices;

e)  Buffalo Pumps, Inc., was and is a Delaware corporation, which at all relevant times was doing business in the state of Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-containing products, including but not limited to pumps, gaskets, and packing;

f)  Circor International, Inc, a Delaware corporation, individually and as successor-in-interest to Leslie Controls, Inc., which at all relevant times was doing business in the state of Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-containing products, including but not limited to valves;

g)  Cleaver-Brooks, a division of Aqua-Chem, Inc. was and is a Wisconsin corporation, which at all relevant times was doing business in the state of Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-containing products, including but not limited to, boilers;

h)  Colfax Corporation, a Delaware corporation, individually and as successor-in-interest to Imo Industries, Inc., which at all relevant times was doing business in the state of Oregon, engaged in the manufacture, distribution, and/or sale of asbestos-containing products, including but not limited to, pumps;

i)  Crane Company was and is a Connecticut corporation, which at all relevant times was doing business in the state of Oregon, engaged in the manufacture, distribution,

Page 3 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com


Motion to Remand
EXHIBIT A 3 of 14

1  and/or sale of asbestos-containing products, including but not limited to valves,

2  packing, gaskets, and discs;;

3  j)  Crown Cork & Seal Co. individually and as successor-in-interest to Mundet Cork

4  Corp., was and is a New York corporation, which at all relevant times was doing

5  business in the state of Oregon, engaged in the manufacture, sale and/or distribution

6  of asbestos-containing products including but not limited to fireproofing materials;

7  k)  Flowserve Corporation, individually and as successor-in-interest to Durametallic

8  Corp., was and is a Delaware corporation , which at all relevant times was doing

9  business in the state of Oregon, engaged in the manufacture, sale and/or distribution

10  of asbestos-containing products, including, but not limited to, packing and seals;

11  l)  Foster Wheeler LLC was and is a New York LLC , which at all relevant times was

12  doing business in the state of Oregon, engaged in the manufacture, distribution,

13  and/or sale of asbestos-containing products, including, but not limited to, insulation,

14  engines, gaskets, packing, turbines, and related component materials;

15  m)  Garlock Sealing Technologies LLC, individually and as successor-in-interest to

16  Garlock, Inc., was and is a New York LLC, which at all relevant times was doing

17  business in the state of Oregon, engaged in the manufacture, sale, and/or distribution

18  of asbestos-containing products including, but not limited to, insulation, gaskets,

19  packing, and fluid sealing devices marketed under various brand names;

20  n)  General Electric Co., was and is a Connecticut corporation , which at all relevant

21  times was doing business in the state of Oregon, engaged in the manufacture, sale,

22  and/or distribution of asbestos-containing products including, but not limited to,

23  generators and turbines;

24  o)  Goulds Pumps (IPG), Inc. was and is a Delaware corporation , which at all relevant

25  times was doing business in the state of Oregon, engaged in the manufacture, sale,

26

Page 4 -   **COMPLAINT**


Motion to Remand
EXHIBIT A 4 of 14

1       and/or distribution of asbestos containing-products including, but not limited to,

2       pumps, gaskets, and packing;

3   p)  Metropolitan Life Insurance Company was a New York corporation, which at all

4       relevant times was doing business in the state of Oregon, engaged in the business of

5       providing a variety of insurance products, including life insurance, casualty and

6       liability insurance, and workers' compensation insurance to a variety of customers,

7       including corporations engaged in the manufacture, distribution, and sale of asbestos

8       and asbestos-containing products;

9   q)  Owens-Illinois, Inc. was and is a Delaware corporation, which at all relevant times

10       was doing business in the state of Oregon, engaged in the manufacture, sale, and

11       distribution of asbestos-containing materials;

12   r)  Rapid American Corporation was and is a Delaware corporation, which at all relevant

13       times was doing business in the state of Oregon, engaged in the manufacture, sale,

14       and distribution of asbestos-containing materials, but not limited to boiler insulation

15       and pipe insulation;

16   s)  Viacom, Incorporated, as successor by merger to CBS Corporation fka Westinghouse

17       Electric Corporation, was and is a Delaware corporation , which at all relevant times

18       was doing business in the state of Oregon, which engaged in the manufacture, sale,

19       and/or distribution of asbestos-containing products including, but not limited to

20       insulation, gaskets, packing, wire, engines, motors, turbines and related component

21       parts;

22   t)  3M Company was and is a foreign corporation, which at all relevant times was doing

23       business in the state of Oregon, engaged in the manufacturing, distribution, and sale

24       of safety equipment including, but not limited to, defective dust masks.

25  ///

26  ///

Page 5 -  **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com



Motion to Remand
EXHIBIT A 5 7 14

4.

At all material times, some or all of the Defendants, with the exception off Metropolitan Life Insurance Company and 3M, was regularly engaged in the business of manufacturing, designing, processing, marketing, distributing, applying, re-branding and/or selling products containing asbestos fiber for use in fire proofing, insulation, and other materials in the construction and maintenance of buildings and/or automobiles. One or more of the same Defendants has engaged in the mining and sale of asbestos fiber. These products were used at locations where Plaintiff was employed as set forth above.

5.

Beginning in approximately 1929 and continuing thereafter, Metropolitan Life Insurance Company, at the request of, and as part of its business service to, one or more of its insurance customers, conducted or commissioned studies and medical research, medical investigations, medical studies, and collection of medical and epidemiological data, concerning the disease producing capabilities of asbestos and asbestos-containing materials. In the 1930s and 1940s, Metropolitan Life directly transmitted and indirectly disseminated the results of such investigation and studies to a variety of individuals and industrial companies involved in asbestos-related industries, including one or more of the defendants named herein. These medical investigation studies and information included substantial evidence of the disease-producing capability of asbestos and asbestos-containing products. Metropolitan Life Insurance Company thereafter engaged in a continuous and consistent course of conduct suppressing, minimizing, understating and denying the evidence of disease causing properties of asbestos and asbestos-related material.

6.

At all times relevant to this action, Defendants conducted regular, sustained and not isolated business activity in the state of Oregon.

/////

Page 6 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com

Motion to Remand
EXHIBIT A 6 % 14

7.

This complaint was filed within the applicable statute of limitations.

8.

In the use of asbestos-containing products of Defendants, respirable asbestos fibers were released which are capable of causing pulmonary disease and/or cancer if inhaled by individuals, including Plaintiff, who were exposed to the fibers in their work environments.

9.

Defendants were aware of the risks of asbestos inhalation by the following means:

a.    Medical and scientific literature describing the dangers and toxicity of asbestos fibers dates back to before the turn of the twentieth century.  By 1930, it was conclusively established and made known to the medical and industrial communities that asbestos causes asbestosis.  As early as 1934, the members of the asbestos industry became aware that even persons not working directly with asbestos and asbestos-containing products suffered harm due to exposure to asbestos.  By 1963 there were over 300 articles in English regarding asbestos related illness available.

b.    The Oregon Industrial Accident Commission Safety Code for the Prevention and Control of Occupational Disease (adopted December 15, 1945, revised September 1, 1949) lists asbestos as an atmospheric contaminant against exposure to which precautions should be taken.

10.

Defendants' asbestos-containing products were unreasonably dangerous and defective as:

a.    Defendants did not provide sufficient warnings and/or instructions of the harm caused by exposure to Defendants' asbestos-containing products;

Page 7 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com


Motion to Remand
EXHIBIT A 7 of 14

b.    The asbestos-containing products of Defendants were capable of causing pulmonary disease and/or cancer if inhaled by individuals, including Plaintiff, in their work places, including those set forth above.

c.    Individual workers, including Plaintiff, were not advised to utilize proper respiratory protection and were exposed to airborne asbestos fibers within their working environment at work sites, including, but not limited to, the work sites identified above.

11.

As a result of Plaintiff's exposure to the unreasonably dangerous and defective asbestos-containing products manufactured, distributed, sold, installed, applied or containing the Defendants' asbestos fiber, Plaintiff contracted mesothelioma, from which he has suffered pain, discomfort, fear, and interference with his daily activities and enjoyment of life, and has endured mental and emotional pain and suffering, all of which is permanent, all to Plaintiff's non-economic damage in the amount of $1,750,000.

12.

As a result of Plaintiff's exposure to the unreasonably dangerous and defective asbestos-containing products manufactured, distributed, sold, installed, applied or containing the Defendants' asbestos fiber, Plaintiff contracted mesothelioma, and has incurred doctor, hospital, custodial and medical expenses and will incur like medical expenses in the future and has past and future impairment of wage-earning capacity resulting in economic damages in the amount of $450,000.

COUNT II – NEGLIGENCE

13.

Plaintiff re-alleges paragraphs 1 through 12.

///// 

/////

Page 8 -   **COMPLAINT**

Law Office of Jeffrey S. Mutnick
737 SW Vista Avenue
Portland, Oregon 97205
(503) 595-1033 / (503) 224-9430 Facsimile
jmutnick@mutnicklaw.com


Motion to Remand
EXHIBIT A 8 of 14

14.

Defendants were negligent generally, and in one or more of the following particulars:

a.   Defendants did not provide sufficient or adequate warnings and/or instructions of the harm caused by exposure to defendants' asbestos-containing products when they knew or should have known of that harm;

b.   Defendants failed to withdraw asbestos-containing products from the market prior to plaintiff's exposure, when they knew or should have known of its dangerous propensities;

c.   Defendants failed to determine the level of airborne asbestos fibers emitted by the products when the products were being used by the end user;

d.   Defendants failed to conduct tests to determine the amount of asbestos to which Plaintiff, or similarly situated workers, would be exposed, when using the product.

e.   Defendants failed to warn individual workers, including Plaintiff, regarding the hazards associated with the use of the product.

15.

As a result of Defendants' negligence, Plaintiff was exposed to airborne asbestos fibers, which caused him to contract mesothelioma, from which Plaintiff has suffered pain, discomfort, fear, and interference with his daily activities and enjoyment of life, and has endured mental and emotional pain and suffering, all of which is permanent, all to Plaintiff's non-economic damage in the amount of $1,750,000.

16.

As a result of Defendants' negligence, Plaintiff was exposed to asbestos-containing products manufactured, distributed, sold, applied or installed by defendant or containing the fiber mined and distributed by Defendants, which caused him to contract mesothelioma, and has incurred doctor, hospital, custodial and medical expenses and will incur similar medical expenses

Page 9 -   **COMPLAINT**

Motion to Remand
EXHIBIT A 9 8 14

1  in the future and has lost earning in the past and future, all to Plaintiff's economic damages in the

2  amount of $450,000.

3         **WHEREFORE,** Plaintiff prays for judgment as follows:

4            **Count One (Strict Liability):**

5            1. Non-economic damages in the amount of $1,750,000.

6            2. Economic damages in the amount of $450,000.

7            3. Plaintiff's costs and disbursements incurred herein.

8            4. Any other costs this court deems equitable.

9            **Count Two (Negligence):**

10            1. Non-economic damages in the amount of $1,750,000.

11            2. Economic damages in the amount of $450,000.

12            3. Plaintiff's costs and disbursements incurred herein.

13            4. Any other costs this court deems equitable.

14         DATED this 27th day of October, 2008.

15

16                      LAW OFFICE OF JEFFREY S. MUTNICK

17

18

19                      Jeffrey S. Mutnick, OSB No. 721784
                       Of Attorneys for Plaintiffs

20

21  Plaintiff Demands a Jury Trial.

22                      Jeffrey S. Mutnick, OSB No. 721784
                       Of Attorneys for Plaintiffs

23

24

25

26

Page  10 -  **COMPLAINT**


Motion to Remand
EXHIBIT A  10 of 14

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|---|---|---|---|---|
| 1943-1945 | **Oregon Shipyard (Kaiser)** <br><br> **Portland, OR** | *Various activities, including ship fitting, cleanup, helper, insulation, and riveting.* | Allis Chalmers Corporation Product Liability Trust | Turbines, engines, condensers, pumps, motors, industrial equipment, machinery, and assorted components. |
| | | | Alfa Laval | Valves, packing, and discs. |
| | | | Asbestos Corporation Ltd. | Asbestos Fiber |
| | | | A.W. Chesterton Co. | Gaskets, packaging and sealing devices |
| | | | Buffalo Pumps, Inc. | Pumps, gaskets, and packing |
| | | | Circor International, Inc | Valves |
| | | | Aqua-Chem, Inc. | Boilers |
| | | | Colfax Corporation | Pumps |
| | | | Crane Company | Valves, packing, gaskets, and discs |
| | | | Crown Cork & Seal Co. | Fireproofing materials |
| | | | Flowserve US, Inc. | Packing and seals |
| | | | Foster Wheeler | insulation, engines, gaskets, packing, turbines, and related component materials |

EXHIBIT A  11 of 14

Motion to Remand

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|---|---|---|---|---|
| | | | Garlock Sealing Technologies | Insulation, gaskets, packing, and fluid sealing devices |
| | | | General Electric Co. | Generators and turbines |
| | | | Goulds Pumps (IPG), Inc. | Pumps, gaskets, and packing |
| | | | Owens-Illinois, Inc. | Block and pipe covering |
| | | | Rapid American Corporation | Boiler insulation and pipe insulation |
| | | | Viacom, Inc. | Insulation, gaskets, packing, wire, engines, motors, turbines and related component parts |
| | | | 3M Company | Dust masks |
| 1943-1945 | Swan Island Shipyards Portland, OR | Various activities, including ship fitting, cleanup, helper, insulation, and riveting. | Allis Chalmers Corporation Product Liability Trust | Turbines, engines, condensers, pumps, motors, industrial equipment, machinery, and assorted components. |
| | | | Alfa Laval | Valves, packing, and discs. |
| | | | Asbestos Corporation Ltd. | Asbestos Fiber |
| | | | A.W. Chesterton Co. | Gaskets, packaging and sealing devices |
| | | | Buffalo Pumps, Inc. | Pumps, gaskets, and packing |

EXHIBIT A   Motion to Remand
12 8 14

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|------|-------------------|---------------|------------|------------------------------|
| | | | Circor International, Inc | Valves |
| | | | Aqua-Chem, Inc. | Boilers |
| | | | Colfax Corporation | Pumps |
| | | | Crane Company | Valves, packing, gaskets, and discs |
| | | | Crown Cork & Seal Co. | Fireproofing materials |
| | | | Flowserve US, Inc. | Packing and seals |
| | | | Foster Wheeler | insulation, engines, gaskets, packing, turbines, and related component materials |
| | | | Garlock Sealing Technologies | Insulation, gaskets, packing, and fluid sealing devices |
| | | | General Electric Co. | Generators and turbines |
| | | | Goulds Pumps (IPG), Inc. | Pumps, gaskets, and packing |
| | | | Owens-Illinois, Inc. | Block and pipe covering |
| | | | Rapid American Corporation | Boiler insulation and pipe insulation |

Page 3 – Exhibit A

EXHIBIT A 13 of 14
Motion to Remand

GERALD HOLMES
EXHIBIT A

| Year | Location/Employer | Work Activity | Defendants | Asbestos Containing Products |
|------|-------------------|---------------|------------|------------------------------|
| | | | Viacom, Inc. | Insulation, gaskets, packing, wire, engines, motors, turbines and related component parts |
| | | | 3M Company | Dust masks |

Motion to Remand
EXHIBIT A  14 of 14

IN THE CIRCUIT COURT OF THE STATE OF OREGON

IN AND FOR THE COUNTY OF MULTNOMAH

GERALD HOLMES,                              )
                                            )
                    Plaintiff,              )       ORIGINAL
                                            )
         v.                                 )
                                            )   No. 0810-15439
ALLIS-CHALMERS CORPORATION                  )
PRODUCT LIABILITY TRUST; ALFA               )   Video Deposition of
LAVAL, a foreign corp.; ASBESTOS            )   Gerald Holmes
CORPORATION LTD., a foreign                 )
corp.; A.W. CHESTERTON CO., a               )   December 4, 2008
Massachusetts corp.; BUFFALO                )
PUMPS, INC., a Delaware corp.;              )
CIRCOR INTERNATIONAL, INC., a               )
Delaware corp., individually and            )
as successor-in-interest to                 )   RECEIVED
LESLIE CONTROLS, INC.;                      )
CLEAVER-BROOKS, a division of               )     DEC 11 2008
AQUA-CHEM, INC., a Wisconsin                )
corp.; COLFAX CORPORATION, a                )
Delaware corp., individually and            )
as successor-in-interest to IMO             )
INDUSTRIES, INC.; CRANE COMPANY,            )
a Connecticut corp.; CROWN CORK &           )
SEAL CO., a New York corp.,                 )
individually and as                         )
successor-in-interest to MUNDET             )
CORK CORP.; FLOWSERVE                        )
CORPORATION, individually and as            )
successor-in-interest to                    )
DURAMETTALIC CORP.; FOSTER                   )
WHEELER, LLC, a New York corp.;             )
GARLOCK SEALING TECHNOLOGIES LLC,           )
a New York corp., individually              )
and as successor-in-interest to             )
GARLOCK PACKING CO.; GENERAL                )
ELECTRIC CO., a Connecticut                 )
corp.; GOULDS PUMPS, INC., a                )
Delaware corp., individually and            )
as successor-in-interest to                 )
GOULDS PUMPS (IPG); MAR-DUSTRIAL            )
SALES, INC., an Oregon c                    )
METROPOLITAN LIFE INSURA                     )
COMPANY, a New York corp                    )
OWENS-ILLINOIS, INC., a Delaware            )

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
COURT REPORTERS
www.slreporting.com

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slipc@qwestoffice.net

Motion to Remand

EXHIBIT 1 pg 5

corp.; RAPID-AMERICAN                    )
CORPORATION, a Delaware corp.;           )
VIACOM, INCORPORATED, a Delaware         )
corp., AS SUCCESSOR-BY-MERGER TO         )
CBS CORPORATION F/K/A                     )
WESTINGHOUSE ELECTRIC                     )
CORPORATION; 3M COMPANY A/K/A            )
MINNESOTA MINING AND                      )
MANUFACTURING COMPANY, a foreign         )
corporation,                              )
                                          )
                    Defendants.           )

---

DEPOSITION OF

GERALD HOLMES

Taken in behalf of Plaintiff

*   *   *

December 4, 2008

737 SW Vista Avenue

Portland, Oregon

Kellie M. Humiston, RMR, CRR, CSR

Court Reporter



Schmitt & Lehmann, Inc.
C O U R T   R E P O R T E R S
www.slreporting.com

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

(360) 695-5554 ** (503) 223-4040

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwestoffice.net

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

3

| 1 | | APPEARANCES |
|---|---|---|
| 2 | For the Plaintiff: | MR. JEFFREY MUTNICK<br>Attorney at Law |
| 3 | | 737 SW Vista Ave.<br>Portland, OR 97205 |
| 4 | | |
| 5 | For the Defendant<br>Allis-Chalmers and | MR. JASON H. DAYWITT<br>Attorney at Law |
| 6 | Cleave-Brooks: | Suite 200<br>411 SW 2nd Ave.<br>Portland, OR 97204 |
| 7 | | |
| 8 | For the Defendant Alfa<br>Laval: | MR. GARY L. BEAVER<br>Attorney at Law<br>Suite 100 |
| 9 | | 701 Green Valley Road<br>Greensboro, NC 27408 |
| 10 | | |
| 11 | For the Defendant A.W.<br>Chesterton: | MS. ANNE D. FOSTER<br>Attorney at Law<br>Suite 1500 |
| 12 | | 851 SW Sixth Ave.<br>Portland, OR 97204 |
| 13 | | |
| 14 | For the Defendants<br>Buffalo Pumps; | MR. JEFFREY M. ODOM<br>Attorney at Law |
| 15 | specially appearing for<br>Crown Cork & Seal, and<br>Crane Co. | Suite 4100<br>1420 Fifth Ave.<br>Seattle, WA 98101 |
| 16 | | |
| 17 | For the Defendant<br>Circor International: | MR. STEPHEN F. DEATHERAGE<br>Attorney at Law<br>Suite 300 |
| 18 | | 888 SW Fifth Ave.<br>Portland, OR 97204 |
| 19 | | |
| 20 | For the Defendant<br>Colfax, IMO Industries: | MS. ANNALIE M. FADDIS<br>Attorney at Law<br>Suite 2650 |
| 21 | | 111 SW Fifth Ave.<br>Portland, OR 97204 |
| 22 | | |
| 23 | For the Defendant<br>Flowserve: | MS. CHRISTINE E. DINSDALE<br>Attorney at Law<br>Suite 2400 |
| 24 | | 701 Fifth Ave.<br>Seattle, WA 98104 |
| 25 | | |

Motion to Remand
EXHIBIT B   3 of 5

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

4

```
 1   For the Defendant         MR. CHRISTOPHER E. HAWK
     Goulds Pumps:             Attorney at Law
 2                             Suite 2300
                               601 SW Second Ave.
 3                             Portland, OR 97204

 4   For the Defendants        MR. GEORGE S. PITCHER
     General Electric,         Attorney at Law
 5   Rapid-American and        Suite 600
     Viacom:                   888 SW Fifth Ave.
 6                             Portland, OR 97204

 7   Also present:            Daniel Holmes; Erin Marquiss;
                              Videographer, Brad Rohman
 8

 9
                                   INDEX
10   EXAMINATION BY:                              PAGE NO.

11   By Mr. Mutnick                               5 - 55

12

13                               EXHIBITS

14   (None)

15

16

17

18

19

20

21

22

23

24

25
```

Schmitt & Lehmann, Inc.
(360) 695-5554 ** (503) 223-4040   Motion to Remand
EXHIBIT B 4 of 5

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

56

```
 1    STATE OF OREGON        )
                             )  ss.
 2    County of Yamhill      )

 3

 4         I, Kellie M. Humiston, RMR, CRR and Certified

 5    Shorthand Reporter, do hereby certify that GERALD HOLMES

 6    personally appeared before me at the time and place mentioned

 7    in the caption herein; that the witness was by me first duly

 8    sworn under oath and examined upon oral interrogatories

 9    propounded by counsel; that said examination, together with

10    the testimony of said witness, was taken down by me in

11    stenotype and thereafter reduced to typewriting; and, that the

12    foregoing transcript, pages 1 to 55, both inclusive,

13    constitutes a full, true and accurate record of said

14    examination of and testimony by said witness, and of all other

15    oral proceedings had during the taking of said deposition, and

16    of the whole thereof.

17         Witness my hand at Newberg, Oregon, this 9th day of

18    December 2008.

19

20

21                        Kellie M. Humiston

22                        Kellie M. Humiston, RMR, CRR
                          Oregon CSR No. 90-0150
                          Washington CCR No. 2942
23

24

25
```

Motion to Remand
EXHIBIT B 5 of 5

**⊞⊞ Bullivant|Houser|Bailey** PC

Attorneys at Law

JEANNE F. LOFTIS
Admitted in Oregon and Washington
Direct Dial: (503) 499-4601
E-mail: jeanne.loftis@bullivant.com

November 14, 2008

RECEIVED

NOV 14 2008

*Via Facsimile*

Jeffrey S. Mutnick
Law Offices of Jeffrey S. Mutnick
737 SW Vista Ave.
Portland, OR 97205

Re:    *Gerald Holmes v. Allis-Chalmers Corporation Product Liability Trust, et al.*
Multnomah County Circuit Court Case No. 0810-15439

Dear Jeff:

This will serve to advise you that we will be representing the defendant Leslie Controls, Inc. in the above-referenced case (identified in the complaint as "Circor International, Inc., a Delaware corporation, individually and as successor-in-interest to Leslie Controls, Inc.") and intend to file an appearance on its behalf.

Pursuant to ORCP 69, we ask that you provide us ten (10) days' written notice prior to taking any action, including the seeking of an order of default against our client. Nothing in this letter is intended to waive any of the requirements for adequate service of the summons and complaint.

Thank you for your courtesy and cooperation.

Very truly yours,

Jeanne F. Loftis

JFL:sw

Motion to Remand
EXHIBIT C

**⧉B Bullivant|Houser|Bailey** PC

Attorneys at Law

JEANNE F. LOFTIS
Admitted in Oregon and Washington
Direct Dial: (503) 499-4601
E-mail: jeanne.loftis@bullivant.com

December 9, 2008

*Via Facsimile*

Jeffrey S. Mutnick
Law Offices of Jeffrey S. Mutnick
737 SW Vista Ave.
Portland, OR 97205

        Re:    *Gerald Holmes v. Allis-Chalmers Corporation Product Liability Trust,
            et al.*
            Multnomah County Circuit Court Case No. 0810-15439

Dear Jeff:

       By letter of November 14, 2008, we advised we would be representing the defendant
Leslie Controls, Inc. in the above-referenced case (identified in the complaint as "CIRCOR
International, Inc., a Delaware corporation, individually and as successor-in-interest to Leslie
Controls, Inc.").

       Please note, we will be representing only CIRCOR International, Inc., in this matter
and intend to file an appearance on its behalf.

       Pursuant to ORCP 69, we ask that you provide us ten (10) days' written notice prior
to taking any action, including the seeking of an order of default against our client. Nothing
in this letter is intended to waive any of the requirements for adequate service of the
summons and complaint.

       Thank you for your courtesy and cooperation.

                 Very truly yours,

                 *Stephanie K Willher for*

                 Jeanne F. Loftis

JFL:sw

*Motion to Remand*

EXHIBIT D

# CIRCUIT COURT OF THE STATE OF OREGON

## FOR MULTNOMAH COUNTY

GERALD HOLMES,

        Plaintiff,

   vs.

ALLIS–CHALMERS CORPORATION
PRODUCT LIABILITY TRUST, et al.,

       Defendant.

_____/

Case No. **0810–15439**

CERTIFICATE OF SERVICE

STATE OF DELAWARE
County of New Castle      ss.

I, Daniel Newcomb, hereby certify that I am a competent person 18 years of age or older, a resident of the State of Delaware and that I am not a party to nor an attorney for any party in the within named action; that I made service of a true copy of:

*Summons and Complaint; Exhibit A*

CORPORATE SERVICE – Pursuant to ORCP7D(3)(b)(i):

Upon **CIRCOR INTERNATIONAL, INC.**, by personal service upon Scott LaScala, the clerk on duty in the office of the registered agent, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801 on November 13, 2008 at 2:00 PM.

I declare under the penalty of perjury that the above statement is true and correct.

Dated this ___5th___ day of ___January___ ,20__09__.

        X _____
        Daniel Newcomb
        Nationwide Process Service, Inc.
        1201 S.W. 12th Avenue, Suite 420
        Portland, OR 97205
        503–241–0636

183732

EXHIBIT E 1 of 2   Motion to Remand

## Alison Hilber

**From:** Royal Hebert [RoyalHebert@nationwideprocess.com]
**Sent:** Wednesday, June 10, 2009 11:48 AM
**To:** Jennifer Gabler
**Subject:** Confirmation of Service re: Holmes v. AW Chesterton, et al.

Jenny,

I apologize for the delay in getting this confirmation to you, we just got this information from our server this morning.

**Re:** Holmes v. AW Chesterton, et al.
**NPS #:** 197956
**Service Upon:** Leslie Controls, Inc.
**By Leaving With:** Katie White, clerk on duty in the office of CT Corporation, Registered Agent
**Date/Time:** 6/04/09  2:30 pm
**Address:** 4701 Cox Road, Suite 301, Glen Allen, VA 23060
**Mailing Made:** N/A

Royal Hebert
NATIONWIDE PROCESS SERVICE, INC.
1201 SW 12th Avenue, Suite 420
Portland, OR 97205
(503) 241-0636 voice
(503) 241-1604 fax
royal.hebert@nationwideprocess.com

This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately call (800) 670-8231 and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.

_____ Information from ESET NOD32 Antivirus, version of virus signature database 4145 (20090610) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

EXHIBIT E   Motion to Remand 2 of 2

99998.001



May 15 2008
2:12PM

1   MICHAEL J. PIETRYKOWSKI (SBN: 118677)
    JAMES G. SCADDEN (SBN: 090127)
2   CHRISTOPHER D. STRUNK (SBN: 214110)
    GORDON & REES LLP
3   Embarcadero Center West                    POS _____5-15-08_____
    275 Battery Street, Twentieth Floor
4   San Francisco, CA 94111                     VERIF ____YES_____
    Telephone: (415) 986-5900
5   Facsimile: (415) 986-8054                   LDF ____11/11/08_____

6   Attorneys for Defendant
    LESLIE CONTROLS, INC.                       TD/TSC _____

7
         LESCON
8                        SUPERIOR COURT OF CALIFORNIA

9                     CITY AND COUNTY OF SAN FRANCISCO

10

11  IN RE:                            )    CASE NO. 828684
                                      )
12                                    )    DEFENDANT LESLIE CONTROL,
    COMPLEX ASBESTOS LITIGATION       )    INC.'S RESPONSES TO PLAINTIFFS'
13                                    )    STANDARD INTERROGATORIES TO
                                      )    ALL DEFENDANTS (Asbestos General
14                                    )    Order 129)
                                      )
15                                    )
                                      )
16                                    )

                              PREFACE
17
           These Interrogatories are to be answered pursuant to San Francisco Superior Court
18
    General Order No. 129.
19
           Unless otherwise specifically set forth, the time frame for response to these
20
    Interrogatories is from 1930 until 1985; except where otherwise specifically set forth, each
21
    Interrogatory and each Response are intended and should be construed as including and being
22
    limited to such time frame.  Where expressly stated with reference to the date and circumstances
23
    justifying use of such date, the responding party may limit any such response to dates subsequent
24
    to 1930, but which in no event an later than the inception of the responding party, including the
25
    inception of any predecessor in interest.
26
           Unless otherwise specifically set forth, the geographic scope for response to these
27
    Interrogatories by domestic corporations is the United States.  Hospital and other health care
28

                                         -1-        EXHIBIT F [illegible handwriting]
    _____
    DEFENDANT LESLIE CONTROL, INC.'S RESPONSES TO PLAINTIFFS' STANDARD
                  INTERROGATORIES TO ALL DEFENDANTS

entity defendants shall provide responses related only to that defendant's physical facilities and shall not be required to disclose any information related to the furnishing of services to patients.

### DEFINITIONS

1.    "ASBESTOS-CONTAINING PRODUCT(S)" shall mean a product(s) which THIS DEFENDANT knows or believes to have contained any amount of the mineral asbestos at any time.

2.    "COMPANY" means any private enterprise including corporations, partnerships, joint ventures, and sole proprietorships. For purposes of Interrogatory No. 19, the term "COMPANY" includes organizations, associations or groups of manufacturers, miners, distributors, importers, labelers, suppliers and/or sellers of asbestos-containing products, of which the responding defendant was a member.

3.    A "CONTRACT UNIT" shall mean a branch, division, subsidiary or other affiliated entity of a DEFENDANT which has been or is now engaged in installation, disturbing or handling and/or removal of RAW ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS.

4.    "DOCUMENT(S)" or "WRITING(S)" shall include all writings as defined by Section 250 of the California Evidence Code.

5.    "GEOGRAPHIC AREA" means the 46 counties of Northern California (Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kern, Kings, Lake, Lassen, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo, Yuba) and military facilities/installations in the State of California, or the following shipyards: Bethlehem Shipbuilding, San Pedro; California Shipbuilding, Terminal Island; Consolidated Steel Shipyard, Wilmington; Los Angeles Shipbuilding and Dry Dock aka L.A. Ship, San Pedro; National Steel and Shipbuilding Corporation, San Diego; Todd Shipyards Corporation, San Pedro; Triple "A" Machine, San Diego; Western Pipe and Steel Company, Los Angeles and San Pedro Divisions;

-2-

EXHIBIT F 277

Motion to Remand

DEFENDANT LESLIE CONTROL, INC.'S RESPONSES TO PLAINTIFFS' STANDARD
INTERROGATORIES TO ALL DEFENDANTS

1    Naval Air Station, North Island; Thirty-second Street Naval Repair Facility, San Diego; Long

2    Beach Naval Shipyard; and San Diego Destroyer Base.

3        6.    A request to "IDENTIFY" a "WRITING" or "DOCUMENT" or study shall mean

4    a request to either attach such an exhibit to your answers to these Interrogatories, or to describe

5    such with sufficient particularity that it may be made the subject of a request for production of

6    documents. YOUR description should include an indication of: (a) the author; (b) addressee(s);

7    (c) date of origin; (d) the nature of the writing or document (e.g., letter, telephone memorandum,

8    audio tape recording, photograph, etc.); and (e) its present location, name and present address of

9    custodian thereof.

10       7.    A request to "IDENTIFY" an oral communication shall mean a request to

11   describe the communication with particularity, and shall include the following information; (a)

12   the identity of all parties to the communication; (b) the identity of the person whom you contend

13   initiated the communication; (c) the identity of all persons present at the time of the

14   communication; and (d) the time, date and place of the communication.

15       8.    A request to "IDENTIFY" or to state the "IDENTITY" of a person or individual

16   means to state his or her name, the place of employment, job title, present business or present or

17   last known home address, years of employment and last known telephone number if not

18   employed by DEFENDANT.

19       9.    A request to "IDENTIFY" the product shall mean a request to describe the

20   product, the material or compound by the following means: (1) by nickname or slang name used

21   in your industry and/or occupation; (2) by the name under which it is sold in the marketplace

22   (trade name); (3) by its generic name; and (4) by manufacturer.

23       10.    "MARKETING" or "MARKETED" shall mean the mining, supply, sale, labeling,

24   distribution, importing, processing or manufacture of RAW ASBESTOS and/or ASBESTOS-

25   CONTAINING PRODUCT(S).

26       11.    A request to describe the "NATURE" of a product means to describe the: (a)

27   color; (b) texture; (c) form (i.e., powder, liquid, paste, solid, board, cloth, blanket, wire

28   insulation, etc.); (d) physical dimensions, if solid (length, width and height); (e) the type of

-3-    EXHIBIT F 3 ) 7

shipping package and shipping package dimensions if not solid; (f) type of asbestos fiber used in the composition of the product (e.g., chrysotile, amosite, crocidolite); (g) the intended use or function of such product as recommended by this DEFENDANT as the miner, producer, supplier, contractor, manufacturer, distributor, owner or seller; and (h) the type of worksite in which it was intended to be used (e.g., shipyard, refinery, commercial building construction, manufacturing plant, home, power generating plant, etc.).

12.   "PREMISES" includes, but is not limited to, buildings, structures in a refinery, boilers, generators, tract housing, commercial buildings and other such structures.

13.   "RAW ASBESTOS" means asbestos fiber mined or milled, either packaged or in bulk, not compounded with other substances and essentially pure with the exception of naturally occurring trace amounts of other substances.

14.   "THIS DEFENDANT" or "DEFENDANT" shall mean the named defendant herein, all of its divisions and subsidiaries in which it holds a controlling interest, and all "alternate entities" as defined and identified by name in any complaint pending against YOU as of the date of your answers.

15.   "YOU" and "YOUR" refer to the DEFENDANT who is named above as responding party.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

IDENTIFY the person verifying these answers on YOUR behalf.

**RESPONSE TO INTERROGATORY NO. 1:**

Matthew S. Wrobel, Director of Quality Assurance, Leslie Controls, Inc., 12501 Telecom Drive, Tampa, FL.

**INTERROGATORY NO. 2:**

State the date of first employment with YOU, and the dates and titles of each job position the person verifying these interrogatories has held while employed by YOU.

**RESPONSE TO INTERROGATORY NO. 2:**

Mr. Wrobel began working for Leslie Controls in 1966.  He has held various positions

-4-

EXHIBIT F 4 7

1   by each such agreement.

2   **RESPONSE TO INTERROGATORY NO. 36:**

3      N/A

4   **INTERROGATORY NO. 37:**

5      As to RAW ASBESTOS and to each such ASBESTOS-CONTAINING PRODUCT

6   listed in YOUR responses to Interrogatories No. 29 and 31 did DEFENDANT warn of the health

7   hazards of asbestos? If so, state for each such warning:

8      A.    The content, size, color, and location; whether the warning appeared on the

9   material and/or on the container, and/or was placed on a tag; whether the warning was included

10   in contracts; whether the warning was included in advertising or other promotional materials.

11      B.    State whether you have any photographs thereof;

12      C.    The inclusive dates on which you used each such warning;

13      D.    State all changes you made in such warnings and the dates of such changes; and

14      E.    Identify the person most knowledgeable about your warnings and warning policy.

15   **RESPONSE TO INTERROGATORY NO. 37:**

16      Defendant states that it is not aware of any health or safety hazards associated with

17   normal use of its products; therefore, issued no such warnings:

18   **INTERROGATORY NO. 38:**

19      With respect to each of YOUR ASBESTOS-CONTAINING PRODUCTS, state whether

20   THIS DEFENDANT's name, a trademark, logos, color coding, or other identifying markings

21   ever appeared on the actual product itself. If so, IDENTIFY each such product, state when the

22   practice to place such identifying markings upon the product was begun and when it ended, if

23   applicable, and describe in detail the pertinent marking(s) and the purpose, if any, of such

24   markings.

25   **RESPONSE TO INTERROGATORY NO. 38:**

26      See answer to 31(E).

27   **INTERROGATORY NO. 39:**

28      Between the years 1930 to 1985, did THIS DEFENDANT purchase or otherwise acquire

-32-

EXHIBIT F 5 of 7

Motion to Remand

1  CONTRACT UNITS.

2  **RESPONSE TO INTERROGATORY NO. 42:**

3      No.

4  **INTERROGATORY NO. 43:**

5      State whether or not any of YOUR CONTRACT UNITS installed and/or removed RAW

6  ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS in the GEOGRAPHIC AREA at

7  any time between 1930 and 1985.  If so:

8      A.    State the business addresses and name of the CONTRACT UNIT;

9      B.    State the inclusive periods of time the CONTRACT UNITS were working in the

10  GEOGRAPHIC AREA;

11      C.    State the name and address of each job site within the GEOGRAPHIC AREA and

12  the dates the CONTRACT UNIT worked at those job sites, and, IDENTIFY the RAW

13  ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS installed or removed on each

14  occasion;

15      D.    Either (1) attach all DOCUMENTS evidencing the information sought in this

16  Interrogatory and its subparts to your answers to these Interrogatories, or (2) attach disks

17  containing such data, or (3) describe such DOCUMENTS with sufficient particularity that they

18  may be made the subject of a request for production of documents.

19  **RESPONSE TO INTERROGATORY NO. 43:**

20      N/A.

21  **INTERROGATORY NO. 44:**

22      When do YOU contend that THIS DEFENDANT first became aware that there is an

23  association between asbestos exposure and disease in human beings?

24  **RESPONSE TO INTERROGATORY NO. 44:**

25      Defendant assumes that this Interrogatory is limited to the knowledge of defendant

26  LESLIE CONTROLS, INC., as contrasted to the knowledge of its employees, and is further

27  limited to knowledge associated with the hazards of encapsulated, covered, and/or housed

28  asbestos-containing gaskets and/or packing materials that may have been incorporated into its

-35-   EXHIBIT F 6 of 7

1   equipment.

2         Leslie responds that the exact time of when Leslie first obtained any knowledge

3   concerning the potential health hazards of asbestos is unknown.   Matthew Wrobel - Director of

4   Quality Assurance, first became aware of the potential health hazards of asbestos sometime in

5   the late 1980's through oral conversation.  However, Leslie Controls is not aware of any studies

6   that indicate the handling of asbestos-containing gaskets or packing is a potential health hazard.

7   At all times throughout its history, Leslie Controls complied with all applicable state and Federal

8   statutes, including OSHA.  Indeed, inspectors for OSHA were present at the Leslie

9   manufacturing facility(ies) at various times throughout its history, and at no time did OSHA

10   warn Leslie Controls about the so-called "hazards of asbestos" or stop Leslie from performing

11   any work involving gaskets and/or packing materials, much less stop such work because such

12   work created a "hazard."  Accordingly, Leslie Controls is able to state that, as a company, it took

13   its safety obligations seriously and was well aware of any and all hazards involved in the

14   manufacture of valves.

15         With respect to Leslie Controls' employees, it is impossible for Leslie Controls to state

16   when each and every one of its employees may have heard of some vague "hazard" from the

17   exposure to asbestos-containing materials, such as insulation, that it never manufactured.

18   Matthew Wrobel, Director of Quality Assurance, first became aware of the potential health

19   hazards of asbestos some time in the late-1980s through oral conversation.  Further, defendant is

20   not aware of any potential health hazards associated with the use of asbestos-containing gaskets

21   or packing.  Based upon information and belief, it is the position of the manufacturers of the

22   gaskets and packing that the manufacturers encapsulated the fiber in lubricants, binders, metals

23   and adhesives, which prevents the release of asbestos fibers upon normal use and installation.

24   Additionally, the gaskets and packing were completely encased within the body of the valves,

25   making access to the gaskets or packing impossible without removal and/or disassembly in the

26   valve.

27   **INTERROGATORY NO. 45:**

28         How do YOU contend that THIS DEFENDANT first became aware that there is an

-36-   EXHIBIT F 717

**Jeanne F. Loftis**, OSB #913612
E-Mail: jeanne.loftis@bullivant.com
**Monica Wells**, OSB #034918
E-Mail: monica.wells@bullivant.com
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon  97204-2089
Telephone: 503.228.6351
Facsimile: 503.295.0915
Attorneys for Defendant Leslie Controls, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DANIEL HOLMES, Personal Representative for the Estate of GERALD HOLMES,<br><br>Plaintiff,<br><br>v.<br><br>A.W. CHESTERTON CO., et al.,<br><br>Defendants. | Civil No.: 3:09-CV-00678-PA<br><br>**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

Defendant Leslie Controls, Inc. ("Leslie Controls"), by and through its attorneys,

answers plaintiff's Second Amended Complaint as follows:

      1.     In answer to paragraph 1, Leslie Controls lacks knowledge or information

sufficient to form a belief about the truth of the allegations and therefore denies them.

      2.     In answer to paragraph 2, Leslie Controls lacks knowledge or information

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon  97204-2089
Telephone: 503.228.6351

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**
**Page 1**

EXHIBIT 6 : of Motion to Remand

sufficient to form a belief about the truth of the allegations and therefore denies them. Leslie Controls specifically denies that decedent Gerald Holmes was exposed to asbestos from any Leslie Controls product. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

3.     In answer to paragraph 3(a) to 3(h) and 3(j) to 3(n), these allegations refer to other defendants and do not require a response by Leslie Controls. In answer to paragraph 3(i), Leslie Controls admits that it is a New Jersey corporation. Leslie Controls lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 3(i) and therefore denies the same.

4.     In answer to paragraph 4, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

5.     The allegations in paragraph 5 refer to Metropolitan Life Insurance Company and not to Leslie Controls, and as such, they do not require any answer by Leslie Controls.

6.     In answer to paragraph 6, Leslie Controls lacks knowledge or information sufficient to form a belief about the truth of the allegations and therefore denies them.

7.     In answer to paragraph 7, Leslie Controls lacks knowledge or information sufficient to form a belief about the truth of the allegations and therefore denies them.

8.     In answer to paragraph 8, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

9.     In answer to paragraph 9, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

10.    In answer to paragraph 10, Leslie Controls denies the allegations that are

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Page 2

EXHIBIT 4   2 Motion to Remand

directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

11.    In answer to paragraph 11, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

12.    In answer to paragraph 12, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

13.    In answer to paragraph 13, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

14.    In answer to paragraph 14, Leslie Controls incorporates by reference its answers to paragraphs 1 through 12 as set forth above.

15.    In answer to paragraph 15, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

16.    In answer to paragraph 16, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

17.    In answer to paragraph 17, Leslie Controls denies the allegations that are directed against it. To the extent the allegations refer to other defendants, no response is required by Leslie Controls.

18.    In answer to the allegations contained in the WHEREFORE paragraph following paragraph 17, Leslie Controls specifically denies that plaintiff is entitled to any damages or relief. To the extent the allegations refer to other defendants, no response is

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**
**Page 3**

EXHIBIT 4   Motion to Remand

required by Leslie Controls.

## AFFIRMATIVE DEFENSES

19.     Leslie Controls, through its counsel, reserves the right to rely upon the following affirmative defenses to the allegations and claims asserted in plaintiff's Second Amended Complaint to the extent supported by evidence later developed or facts later learned, without now assuming the burden of proof on any such defense that would otherwise rest on plaintiff and with the reservation of Leslie Controls' right to amend or supplement its responses to plaintiff's Second Amended Complaint, as well as Leslie Controls' affirmative defenses, as information is gathered through discovery:

### FIRST AFFIRMATIVE DEFENSE

20.     Leslie Controls alleges that plaintiff's claims are barred by the applicable statutes of limitation, statutes of ultimate repose, and/or doctrine of laches.

### SECOND AFFIRMATIVE DEFENSE

21.     Leslie Controls alleges that plaintiff's Second Amended Complaint, and each alleged cause of action thereof, fails to state a claim against Leslie Controls upon which relief can be granted.

### THIRD AFFIRMATIVE DEFENSE

22.     Leslie Controls alleges that plaintiff's damages, if any, were solely and proximately caused by decedent Gerald Holmes's own fault and negligence in failing to exercise reasonable care for his own safety.

### FOURTH AFFIRMATIVE DEFENSE

23.     Leslie Controls alleges that plaintiff's injuries and damages, if any, were solely and proximately caused by decedent Gerald Holmes's intentional assumption of a known risk.

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**
Page 4

*Motion to Remand*

*EXHIBIT G  4 of 11*

## FIFTH AFFIRMATIVE DEFENSE

24.     Leslie Controls alleges that plaintiff's injuries and damages, if any, were caused or contributed to by alteration and/or unintended use and/or misuse of the product.

## SIXTH AFFIRMATIVE DEFENSE

25.     Leslie Control alleges that plaintiff's damages, if any, were either wholly or in part the fault of others, whether that fault be the proximate result of negligence, strict liability, or any other type of fault caused by persons, firms, corporations, or entities other than Leslie Controls, including but not limited to other defendants, third-party defendants to be named and persons with whom plaintiff has settled.  Leslie Controls further alleges that said negligence or fault comparatively reduces the percentage of fault or negligence, if any, by Leslie Controls.

## SEVENTH AFFIRMATIVE DEFENSE

26.     Leslie Controls alleges that the injuries, damages, losses, and/or detriment of which plaintiff complains and for which plaintiff seeks recovery, if any, were the result of causes independent of the purported acts or omissions of Leslie Controls, and these causes operated as intervening and superseding causes, thereby cutting off any liability on the part of Leslie Controls.

## EIGHTH AFFIRMATIVE DEFENSE

27.     Leslie Controls alleges that at all times pertinent to plaintiff's Second Amended Complaint, the medical and scientific information reasonably available to Leslie Controls was such that Leslie Controls neither knew, nor reasonably could have known, that any allegedly used products might present a foreseeable risk of long term or latent harm with the normal and expected use of those products.

## NINTH AFFIRMATIVE DEFENSE

28.     Leslie Controls alleges that the purchasers of its products were knowledgeable

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND
AMENDED COMPLAINT
Page 5**

EXHIBIT 4

and sophisticated users and were in a better position to warn decedent Gerald Holmes of the risks associated with using such products. To the extent decedent Gerald Holmes was not warned of these risks, it was the failure of these knowledgeable and sophisticated purchasers to pass along the warnings Leslie Controls provided and their failure was the proximate and superseding cause of plaintiff's damages, if any.

## TENTH AFFIRMATIVE DEFENSE

29.    Leslie Controls alleges that the asbestos products, if any, for which it had any legal responsibility were installed or applied in accordance with regulations promulgated by federal and state agencies.

## ELEVENTH AFFIRMATIVE DEFENSE

30.    Leslie Controls alleges that any injury, condition or loss suffered by plaintiff were caused or permitted by the negligent failure of decedent Gerald Holmes's employer(s) to provide adequate instructions to them concerning the safe use of asbestos products, and by said employers' failure to provide decedent Gerald Holmes with a safe place of work, and/or adequate equipment to protect him from harmful exposure.

## TWELFTH AFFIRMATIVE DEFENSE

31.    Leslie Controls alleges that decedent Gerald Holmes exposure to any products allegedly manufactured by Leslie Controls, which exposure is expressly denied, was so minimal as to be insufficient to establish a reasonable degree of probability that Leslie Controls products caused the claimed injury.

## THIRTEENTH AFFIRMATIVE DEFENSE

32.    Leslie Controls alleges that if it is proved at trial that Leslie Controls is liable for damages to plaintiff, which liability is expressly denied, said liability is not sole but rather proportionate or alternatively, joint and several between or among Leslie Controls, plaintiff, one or more of the other defendants, or other persons or entities not presently a

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**
Page 6

EXHIBIT 4   Motion to Remand
6 of 11

party hereto and, consequently, Leslie Controls is entitled to have its liability limited to is proportionate share or alternatively, is or may be entitled to contribution from such other defendants, persons, or entities.

## FOURTEENTH AFFIRMATIVE DEFENSE

33.     Leslie Controls alleges that all claims filed against it in this matter are barred by military contractor defense, also known as the government contractor defense.

## FIFTEENTH AFFIRMATIVE DEFENSE

34.     Plaintiff's allegations against Leslie Controls are improperly based on the theory of successor liability where no such liability exists.

## SIXTEENTH AFFIRMATIVE DEFENSE

35.     Plaintiff has waived and/or is estopped from asserting claims against Leslie Controls.

## SEVENTEENTH AFFIRMATIVE DEFENSE

36.     If plaintiff has incurred any injury or damages, which Leslie Controls denies, Leslie Controls alleges that the risk of such injury or damage to plaintiff was not foreseeable.

## EIGHTEENTH AFFIRMATIVE DEFENSE

37.     Plaintiff has failed to join and/or serve an indispensable party or parties to this litigation.

## NINETEENTH AFFIRMATIVE DEFENSE

38.     Plaintiff has failed to properly commence this lawsuit against Leslie Controls.

## TWENTIETH AFFIRMATIVE DEFENSE

39.     Plaintiff has failed to properly serve Leslie Controls with the summons and complaint.  This court lacks personal jurisdiction over Leslie Controls.

## <u>ANSWER AND AFFIRMATIVE DEFENSE TO CROSS-CLAIMS</u>

40.     Leslie Controls denies all allegations against it contained in cross-claims

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND
AMENDED COMPLAINT**
Page 7

EXHIBIT ___ Motion to Remand 7 8 11

asserted or to be asserted against Leslie Controls in this matter.

## AFFIRMATIVE DEFENSES

41.     The cross-claims of defendants other than Leslie Controls fail to state a claim upon which relief can be granted.

42.     Leslie Controls re-alleges and incorporates by reference its affirmative defenses to plaintiff's Second Amended Complaint as set forth herein above.

## DEMAND FOR JURY TRIAL

43.     Leslie Controls requests a trial by jury.

## RELIEF

44.     WHEREFORE, having fully answered plaintiff's Second Amended Complaint, Leslie Controls prays for the following:

a. That plaintiff's claims against Leslie Controls be dismissed with prejudice;

b. That plaintiff recovers nothing from Leslie Controls on plaintiff's claims herein;

c. That Leslie Controls be awarded all costs and disbursements incurred herein; and

d. That Leslie Controls be granted such other and further relief as the Court may deem just and equitable.


DATED:  June 24, 2009

                BULLIVANT HOUSER BAILEY PC


By  */s/ Monica Wells*
      Jeanne F. Loftis, OSB #913612
      Monica Wells, OSB #034918
      Telephone: 503.228.6351
      Attorneys for Defendant Leslie Controls, Inc.

**DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND
AMENDED COMPLAINT**

EXHIBIT 4 Motion to Remand 8 of 11

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2009, I electronically filed the foregoing **DEFENDANT LESLIE CONTROLS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF System, and I hereby certify that I have the documents to the following non-CM/ECF participants by the method indicated:

*Via E-mail*

Christopher Hawk
Thomas Packer
GORDON & REES LLP (OR)
601 SW 2nd Ave.
Ste. 2300
Portland, OR  97204
chawk@gordonrees.com; tpacker@gordonrees.com;
eramirez@gordonrees.com;
503-222-1075 (Telephone)
503-907-6636 (Facsimile)

**Attorneys for Defendant 3M Company, Alfa Laval, Inc., Goulds Pumps**

Jason H. Daywitt
Claude Bosworth
Andrew Grade
RIZZO MATTINGLY BOSWORTH PC
411 SW 2nd Ave.
Ste. 200
Portland, OR  97204
recordsmanagement@rizzopc.com
503-229-1819 (Telephone)
503-229-0630 (Facsimile)

**Attorneys for Defendant Allis-Chalmers Corporation Prodcut Liability Trust, Cleaver Brooks**

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon  97204-2089
Telephone: 503.228.6351

**CERTIFICATE OF SERVICE**
**Page 1**

EXHIBIT 4 Motion to Remand

Brian R. Talcott
DUNN, CARNEY, ALLEN, HIGGINS & TONGUE
851 SW 6th Avenue, Suite 1500
Portland, OR  97204
brt@dunn-carney.com
503-224-6440 (Telephone)
503-224-7324 (Facsimile)

**Attorneys for Defendant AW Chesterton Co.**

Christine Dinsdale
Soha & Lang
701 Fifth Avenue, Suite 2400
Seattle, WA  98104
asbestos@sohalang.com
206-624-1800 (Telephone)
206-624-3585 (Facsimile)

**Attorneys for Defendant Flowserve Corporation**

Eric Dahlin
DAVIS, WRIGHT & TREMAINE
1300 SW Fifth Avenue, Suite 2300
Portland, OR  97201
ericdahlin@dwt.com
503-778-5218 (Telephone)
503-778-5299 (Facsimile)

**Attorneys for Defendant Foster Wheeler LLC**

Marc M. Carlton
George S Pitcher
WILLIAMS, KASTNER & GIBBS
888 SW 5th Ave., Ste. 600
Portland, OR  97204-2025
asbestos@williamskastner.com
503-228-7967 (Telephone)
503-222-7261 (Facsimile)

**Attorneys for Defendant General Electric Company, Viacom Inc.**

**CERTIFICATE OF SERVICE**
**Page 2**

EXHIBIT Q   Motion to Remand   10 of 11

John M Silk
WILSON, SMITH, COCHRAN & DICKERSON
1215 Fourth Avenue, Suite 1700
Seattle, WA  98161-1007
silk@wscd.com
206-623-4100 (Telephone)
206-623-9273 (Facsimile)

**Attorneys for Defendant Metropolitan Life Insurance Company**

DATED:  June 24, 2009

BULLIVANT HOUSER BAILEY PC


By  */s/ Monica Wells*
    **Jeanne F. Loftis**, OSB #913612
    **Monica Wells**, OSB #034918
    Telephone: 503.228.6351
    Attorneys for Defendant Leslie Controls, Inc

11690872.1

Bullivant|Houser|Bailey PC

300 Pioneer Tower
888 SW Fifth Avenue
Portland, Oregon 97204-2089
Telephone: 503.228.6351

CERTIFICATE OF SERVICE
Page 3

EXHIBIT G   Motion to Remand   8   11

JEFFREY S. MUTNICK, OSB #721784
jmutnick@mutnicklaw.com
Jeffrey S. Mutnick Law Office
737 SW Vista Avenue
Portland, Oregon 97205
503-595-1033
503-224-9430 (Facsimile)
  *Of Attorneys for Plaintiff Daniel Holmes, Personal Representative for the Estate of Gerald Holmes*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DANIEL HOLMES, Personal Representative for the Estate of GERALD HOLMES,<br><br>                              Plaintiff,<br><br>                    v.<br><br>A.W. CHESTERTON CO., et al.,<br><br>                              Defendants. | Case No. CV-09-678-JO<br><br>**AFFIDAVIT OF JEFFREY S. MUTNICK IN SUPPORT OF PLAINTIFF'S MOTION FOR REMAND Pursuant to 28 U.S.C. §1447(c)** |

STATE OF OREGON          )
County of Multnomah      ) ss.

I, Jeffrey S. Mutnick, having been duly sworn, do hereby depose and say as follows:

1.      I am the attorney for Plaintiff, Daniel Holmes. I have reviewed the documents attached to Plaintiff's Motion for Remand and marked as Exhibits A-G, and that those exhibits are true and accurate copies of the original documents.

2.      I filed this lawsuit in Multnomah County Circuit Court, as their was no complete diversity of parties. I confirmed with other counsel in California the identity and appropriate information regarding Defendant Leslie Controls, a defendant with whom I have not previously been involved in litigation.

Page 1 -    **AFFIDAVIT OF JEFFREY S. MUTNICK IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
*Jeffrey S. Mutnick Law Office*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (Facsimile)
JMUTNICK@MUTNICKLAW.COM

Motion to Remand
EXHIBIT H  1 of 2

3.      An appearance was made by Leslie Controls through correspondence and then later through attendance by a representative of the same law firm, Bullivant Houser Bailey, at Mr. Holmes' deposition. Brief discussions were had with counsel from Bullivant Houser Bailey regarding the issues of service. Counsel contended that service should be made on Leslie Controls at the Circor location. Rather than create an unnecessary issue regarding service, I proceeded to serve Leslie Controls in addition to the earlier service made on Circor.

4.      Since Leslie Controls indicated it would appear without necessarily referencing its relationship to Circor, I named Leslie Controls as directed by the same counsel who had initially written me on November 14, 2008 (Exhibit C).

5.      My staff also directed copies of the proposed Amended Complaint after Mr. Holmes' death to all of the previous counsel by e-mail prior to my appearance at ex parte.

6.      Throughout the pendency of the litigation, from the date of filing until the present, Defendant Leslie Controls has been represented by Bullivant Houser Bailey.

DATED this 14th day of July 2009.

Jeffrey S. Mutnick, OSB #721784
Of Attorneys for Plaintiff

Subscribed and sworn to before me this 14th day of July 2009.

Notary Public for Oregon
My commission expires: 08-02-09

OFFICIAL SEAL
J ALISON HILBER
NOTARY PUBLIC-OREGON
COMMISSION NO. 395579
MY COMMISSION EXPIRES AUG. 2, 2009

Page 2 -    **AFFIDAVIT OF JEFFREY S. MUTNICK IN SUPPORT OF MOTION FOR REMAND**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503.595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

EXHIBIT H   Motion to Remand
2 of 2

*006334*

---

### Central Oregon Pathology Consultants, PC

1348 NE Cushing Dr., Suite 200, Bend Oregon 97701
PH: (541) 382-7696, FAX (541) 389-5723
CLIA# 38D0628303

| | |
|---|---|
| Brad B. Bryan, MD | Brian K. Stewart, MD |
| Joseph A. Hughes, MD | Virginia L. Vader, MD |
| James L. Judd, MD | Laurel B. Yocom, MD |
| Brigitte K. Nixon, MD | Cheryl L. Younger, MD |

## SURGICAL PATHOLOGY REPORT

Patient Name:   **GREER, RUSSELL**          Accession #:   **S-07-18011**

Medical Record #:   105886  8479926          Location:        SCMC - Bend
Date of Birth:   8/31/1922   Age:   85          Service Date:   9/18/2007
Gender:   M                                          Received:        9/18/2007
Physician(s):   Edward  Boyle, JR, MD
                       Derek B. Hamblin, MD

**Tissue:** A) Pleura. B) Pleura #2. C) Pleura #3.
**Clinical Data:** Pleural effusion.

---

**Diagnosis:**
A, B, C.  Pleura biopsies for frozen and permanent sections:
     Malignancy mesothelioma.

**Comment:**
Slides were reviewed with Dr. Brad Bryan, who concurs.

---

**Gross Description:**
A.  Received labeled "Greer" and right pleura for an intraoperative consultation by frozen section are irregular fragments of soft red tissue measuring 1 x 1 x 0.3 cm in aggregate. A representative section was submitted for frozen section. **FROZEN SECTION DIAGNOSIS: RIGHT PLEURA: SUSPICIOUS FOR MESOTHELIOMA. DEFER TO PERMANENTS** (LBY/SCMC-B). Sections:  AFS) Remainder of frozen section tissue, A2) Remainder of tissue.
B.  Received labeled "Greer" and right pleura #2 are multiple irregular fragments of rubbery, gray, fibromembranous tissue measuring 1.8 x 1.4 x 0.2 cm. Sections:  B) Entirely submitted.
C.  Received labeled "Greer" and right pleura #3 are biopsies of multiple irregular fragments of gray, fibromembranous tissue measuring 0.6 x 0.4 x 0.1 cm in aggregate. Sections:  C) Entirely submitted.
TV/LBY:jmm

**Microscopic Description:**
A.  Part A on permanent section has sheets and clusters of malignant cells invading the fibrous pleura.  These have relatively uniform nuclei and appear to represent mesothelial cells.
B.  Additional pleural tissue on slide B has similar infiltrate.
C.  Slide C has a similar pattern.

**Immunohistochemical Results:**
The following immunohistochemical studies were performed on formalin-fixed, paraffin-embedded tissue sections.  Block B was used.  Control slides reacted appropriately.

| Antibody | Result |
|---|---|
| Calretinin | Strongly positive |
| WT-1 | Positive, nuclear stain |
| CEA | Negative |
| CK5/6 | Positive |

Note:  This immunohistochemical test was developed and its performance characteristics determined by Central Oregon Regional Pathology Services, LLC, Bend, OR, CLIA# 38D0656805.  It has not been cleared or approved by the U.S. Food and Drug Administration.  The FDA has determined that such clearance or approval is not necessary.
CLY:slt

---



*006334*

| **Central Oregon Pathology Consultants, PC** | | |
|---|---|---|
| Brad B. Bryan, MD | 1348 NE Cushing Dr., Suite 200, Bend Oregon 97701 | Brian K. Stewart, MD |
| Joseph A. Hughes, MD | PH: (541) 382-7696,  FAX  (541) 389-5723 | Virginia L. Vader, MD |
| James L. Judd, MD | CLIA# 38D0628303 | Laurel B. Yocom, MD |
| Brigitte K. Nixon, MD | | Cheryl L. Younger, MD |

## SURGICAL PATHOLOGY REPORT

Patient Name:   **GREER, RUSSELL**              Accession #:     **S-07-18011**

Final Diagnosis performed by **Laurel B. Yocom, M.D.**  Electronically signed 09/20/2007

IN THE CIRCUIT COURT OF THE STATE OF OREGON

IN AND FOR THE COUNTY OF MULTNOMAH

GERALD HOLMES,

                Plaintiff,

      v.

ALLIS-CHALMERS CORPORATION
PRODUCT LIABILITY TRUST; ALFA
LAVAL, a foreign corp.; ASBESTOS
CORPORATION LTD., a foreign
corp.; A.W. CHESTERTON CO., a
Massachusetts corp.; BUFFALO
PUMPS, INC., a Delaware corp.;
CIRCOR INTERNATIONAL, INC., a
Delaware corp., individually and
as successor-in-interest to
LESLIE CONTROLS, INC.;
CLEAVER-BROOKS, a division of
AQUA-CHEM, INC., a Wisconsin
corp.; COLFAX CORPORATION, a
Delaware corp., individually and
as successor-in-interest to IMO
INDUSTRIES, INC.; CRANE COMPANY,
a Connecticut corp.; CROWN CORK &
SEAL CO., a New York corp.,
individually and as
successor-in-interest to MUNDET
CORK CORP.; FLOWSERVE
CORPORATION, individually and as
successor-in-interest to
DURAMETTALIC CORP.; FOSTER
WHEELER, LLC, a New York corp.;
GARLOCK SEALING TECHNOLOGIES LLC,
a New York corp., individually
and as successor-in-interest to
GARLOCK PACKING CO.; GENERAL
ELECTRIC CO., a Connecticut
corp.; GOULDS PUMPS, INC., a
Delaware corp., individually and
as successor-in-interest to
GOULDS PUMPS (IPG); MAR-DUSTRIAL
SALES, INC., an Oregon corp.;
METROPOLITAN LIFE INSURANCE
COMPANY, a New York corp.;
OWENS-ILLINOIS, INC., a Delaware

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORIGINAL

No. 0810-15439

Video Deposition of
Gerald Holmes

December 4, 2008

RECEIVED

DEC 11 2008

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
C O U R T   R E P O R T E R S
www.slreporting.com

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwestoffice.net

EX. D
(56 pp)

corp.; RAPID-AMERICAN                    )
CORPORATION, a Delaware corp.;           )
VIACOM, INCORPORATED, a Delaware         )
corp., AS SUCCESSOR-BY-MERGER TO         )
CBS CORPORATION F/K/A                     )
WESTINGHOUSE ELECTRIC                     )
CORPORATION; 3M COMPANY A/K/A             )
MINNESOTA MINING AND                      )
MANUFACTURING COMPANY, a foreign          )
corporation,                              )
                                          )

                    Defendants.

---

DEPOSITION OF

GERALD HOLMES

Taken in behalf of Plaintiff

\*   \*   \*

December 4, 2008

737 SW Vista Avenue

Portland, Oregon

Kellie M. Humiston, RMR, CRR, CSR

Court Reporter

Schmitt & Lehmann, Inc.
(360) 695-5554 ** (503) 223-4040
C O U R T   R E P O R T E R S
www.slreporting.com

400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwestoffice.net

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

3

```
 1                              APPEARANCES
 2    For the Plaintiff:        MR. JEFFREY MUTNICK
                                Attorney at Law
 3                              737 SW Vista Ave.
                                Portland, OR 97205
 4
      For the Defendant         MR. JASON H. DAYWITT
 5    Allis-Chalmers and        Attorney at Law
      Cleave-Brooks:            Suite 200
 6                              411 SW 2nd Ave.
                                Portland, OR 97204
 7
      For the Defendant Alfa    MR. GARY L. BEAVER
 8    Laval:                    Attorney at Law
                                Suite 100
 9                              701 Green Valley Road
                                Greensboro, NC 27408
10
      For the Defendant A.W.    MS. ANNE D. FOSTER
11    Chesterton:              Attorney at Law
                                Suite 1500
12                              851 SW Sixth Ave.
                                Portland, OR 97204
13
      For the Defendants        MR. JEFFREY M. ODOM
14    Buffalo Pumps;            Attorney at Law
      specially appearing for   Suite 4100
15    Crown Cork & Seal, and    1420 Fifth Ave.
      Crane Co.                 Seattle, WA 98101
16
      For the Defendant         MR. STEPHEN F. DEATHERAGE
17    Circor International:      Attorney at Law
                                Suite 300
18                              888 SW Fifth Ave.
                                Portland, OR 97204
19
      For the Defendant         MS. ANNALIE M. FADDIS
20    Colfax, IMO Industries:   Attorney at Law
                                Suite 2650
21                              111 SW Fifth Ave.
                                Portland, OR 97204
22
      For the Defendant         MS. CHRISTINE E. DINSDALE
23    Flowserve:                Attorney at Law
                                Suite 2400
24                              701 Fifth Ave.
                                Seattle, WA 98104
25
```

Gerald Holmes, 12/4/2008                 Holmes v. Allis-Chalmers Corp.

4

 1   For the Defendant          MR. CHRISTOPHER E. HAWK
     Goulds Pumps:              Attorney at Law
 2                              Suite 2300
                                601 SW Second Ave.
 3                              Portland, OR 97204

 4   For the Defendants         MR. GEORGE S. PITCHER
     General Electric,          Attorney at Law
 5   Rapid-American and         Suite 600
     Viacom:                    888 SW Fifth Ave.
 6                              Portland, OR 97204

 7   Also present:             Daniel Holmes; Erin Marquiss;
                               Videographer, Brad Rohman
 8

 9
                                   INDEX
10   EXAMINATION BY:                          PAGE NO.

11   By Mr. Mutnick                            5 - 55

12

13                             EXHIBITS

14   (None)

15
─────────────────────────────────────────────────────
16

17

18

19

20

21

22

23

24

25

                    Schmitt & Lehmann, Inc.
            (360) 695-5554 ** (503) 223-4040

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

5

1            PORTLAND, OREGON; THURSDAY, DECEMBER 4, 2008

2                         1:12 p.m.

3                    *      *      *

4            MR. MUTNICK:  This is a perpetuation deposition.

5    There are notices that we'll attach as Exhibits 1 and 2 and

6    the documents that were submitted to Judge Maurer and the

7    order that she signed allowing it to be expedited in the case

8    of Mr. Holmes versus a number of asbestos companies.

9            I've indicated off the record prior to our starting

10   the video that I will stipulate to the preservation of all

11   objections, including objections to the form of the question

12   and the sufficiency of the answer, in order to have the matter

13   go smoothly.

14           And some of the defendants indicated that they

15   wanted to make some statements for the record regarding their

16   appearances before we get to that particular thing.

17           The record will reflect, though, that yesterday in

18   our continuing efforts to provide information, we finally

19   received the records that we had actually sought from

20   Dr. Harris, but include virtually all the hospital records of

21   any significance, and they were distributed electronically

22   yesterday when we received them.  And at this point I think

23   the only thing that remains that we have sought is our records

24   from Social Security, which we requested, and I believe that

25   the request was appended to the materials provided to Judge

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

6

1  Maurer.

2           Go ahead.

3           MR. ODOM:  This is Jeff Odom with Lane Powell,

4  appearing specially on behalf of Crown Cork & Seal and Crane

5  Company, and just wanted to state that my presence here does

6  not waive any objection we may have as to service,

7  jurisdiction, venue.  And our records indicate that we have

8  yet to be served in this matter.

9           MS. FADDIS:  This is Annalie Faddis from the Abbott

10 law firm specially appearing today for IMO Industries,

11 incorrectly named as Colfax Corporation, and appearing today

12 without waiver of objections to service and other objections.

13 Thank you.

14          MS. FOSTER:  This is Anne Foster from Dunn Carney

15 appearing on behalf of A.W. Chesterton; again, specially

16 appearing without waiving service, any objections regarding

17 service or other objections.

18          MR. MUTNICK:  To the extent that you have been

19 served and have objections to those, I'll stipulate that none

20 of those objections are waived.  To the extent that you

21 haven't been served and are making what you want to

22 characterize as a special appearance, then if there's anybody

23 left that is in that category, otherwise we'll start the

24 video.

25          THE VIDEOGRAPHER:  This is the videotaped

Schmitt & Lehmann, Inc.
(360) 695-5554 ** (503) 223-4040

1  deposition of Gerald Holmes.  We're on the record at 1:18.

2  Would the court reporter administer the oath.

3                          GERALD HOLMES

4        called as a witness on behalf of the Plaintiff,

5         after having been first duly sworn under oath,

6               was examined and testified as follows:

7                          EXAMINATION

8  BY MR. MUTNICK:

9        Q.    State your full name for us and -- will you -- will

10  you do that for us, Mr. Holmes?

11       A.    Sure.  What was the question?

12       Q.    Your full name.

13       A.    Oh.  Gerald A. Holmes.

14       Q.    You tell me if you have any difficulty hearing me.

15  You just ask me to repeat the question.

16       A.    Okay.

17       Q.    You and I spoke last night?

18       A.    Yes.

19       Q.    And this is a little more intimidating than you had

20  anticipated?

21       A.    Ah, no.  Maybe (pause) --

22       Q.    It's okay?

23       A.    Yeah.

24       Q.    Okay.  What we're going to talk about today,

25  Mr. Holmes, is a little bit of your background, some work that

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

8

1    you did over the course of your life, a little bit about your

2    family.  Okay?

3         A.   Yeah.

4         Q.   Fair enough?

5         A.   Yeah.

6         Q.   So first tell us, what year were you born?

7         A.   1926.

8         Q.   1926?

9         A.   Yeah.

10        Q.   And where were you born?

11        A.   In Aberdeen, South Dakota.

12        Q.   How did you happen to end up here in Oregon?

13        A.   I guess there wasn't no work back there.

14        Q.   Your whole family come out here?

15        A.   Yes, yes.

16        Q.   And do you know roughly how old you were when you

17   moved out here?

18        A.   I think seven.

19        Q.   And when you moved out here, did you move out here

20   with sisters and brothers?

21        A.   Yeah.  It was two brothers and my mother.

22        Q.   Your dad, too, or not?

23        A.   No.  He was out here first.

24        Q.   He came first?

25        A.   Yeah.

1        Q.   So you were about seven.  Did you go to grade

2   school and some school beyond that here in Portland?

3        A.   Went out in Liberal.  That's a little burg out of

4   Molalla.

5        Q.   Towards Molalla?

6        A.   Yeah.  Then we went to Molalla for seventh and

7   eighth grade, I guess.

8        Q.   And then at some point did you leave school to

9   go -- to enlist in the military?

10       A.   No.

11       Q.   What did you do?

12       A.   Um (pause) --

13       Q.   Did you get a job in the shipyards?

14       A.   Yeah.

15       Q.   Do you recall how old you were about when that

16   happened?

17       A.   I think you had to be 16.

18       Q.   Do you know -- was that 1943, 1944?  Do you -- or

19   do you recall?

20       A.   I think it was '43 or (pause) --

21       Q.   About -- about 1943?

22       A.   Or '44.

23       Q.   To the best of your recollection --

24       A.   Yeah.

25       Q.   -- do you recall what time of -- time of year it

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

                                                                    10

1  was?

2          A.    No.

3          Q.    Spring, fall, summer; rainy, sunny?

4          A.    I don't remember.

5          Q.    Do you remember what -- did you have to join a

6  union down there?

7          A.    Not right away, but after six weeks or something, I

8  did, yeah.

9          Q.    And which section or which craft did you get placed

10 in?

11         A.    The painter's union, I guess.

12         Q.    What was your -- so your -- what shipyard did you

13 go apply for work and get work in?

14         A.    The Oregon shipyard.

15         Q.    And where is -- where is that -- where was that

16 located?

17         A.    Out in the northwest corner of Portland.

18         Q.    Do you know where the St. John's Bridge is?

19         A.    Yeah.

20         Q.    Was it right by the St. John's Bridge?

21         A.    A couple miles from there.

22         Q.    Up in that area?

23         A.    Yeah.

24         Q.    In Oregon, though?

25         A.    Yes.

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

1        Q.    And was it called Oregon Ship Building?

2        A.    I believe so.

3        Q.    You went -- did you apply directly there at the

4   yard itself, go down there and put in an application or

5   something?

6        A.    I -- I believe they had an office someplace, but I

7   don't recall where.

8        Q.    When you first got work at the shipyards -- do you

9   know what a Liberty ship is?

10       A.    Yeah.

11       Q.    And did you see Liberty ships there when you went

12  to work there?

13       A.    Yes.

14       Q.    Did they -- do you know what the weighs are?

15       A.    Yeah.

16       Q.    And what -- tell us what those are.

17       A.    That's big skids or something that the ship was

18  started on and built from there on up.

19       Q.    Have you -- have you ever heard the term

20  "outfitting dock"?

21       A.    Yeah.

22       Q.    Okay.  So you know what that is, too?

23       A.    Yes.

24       Q.    So let's talk a little bit about what happened when

25  you first went down to the shipyards.  You were assigned --

Gerald Holmes, 12/4/2008                Holmes v. Allis-Chalmers Corp.

12

1    even -- even though you may not have had to have joined a

2    union right away, were you assigned to work onboard a ship?

3         A.    Yes.

4         Q.    And do you recall what your first work was in the

5    shipyards?

6         A.    Painter's helper and down in the double bottom.

7         Q.    And so when you went down in the double bottoms --

8    do you know what a scaler is?

9         A.    Yes.

10        Q.    Did you do that kind of work?

11        A.    Yes.

12        Q.    Where -- when you first went to work in the

13   shipyards, is that what you were doing, scaling?

14        A.    Yes.

15        Q.    What did you have to do to be a scaler?

16        A.    Not much.  That was about the last -- lowest thing

17   on the list.

18        Q.    And by the "lowest," does that also mean you were

19   in the lowest part of the ship, too?

20        A.    Well, I don't know about -- no.  It just means that

21   was the -- you started out there.

22        Q.    What -- what kind of equipment do you use to -- to

23   do scaling work?

24        A.    Just a mask and goggles and drop cord.

25        Q.    Did -- how do you scale?  Do you use something to

Gerald Holmes, 12/4/2008                Holmes v. Allis-Chalmers Corp.

13

1  do that?

2          A.    It's a big, wide putty knife.

3          Q.    And what's the object of that?

4          A.    Get the rust and scale off so they can repaint

5  them.

6          Q.    So you -- were you down in the bottoms of the ship

7  to do that scaling work?

8          A.    Yes.

9          Q.    And you may -- used a term, "double bottom."  What

10 does that mean?

11         A.    Well, pretty much what it sounds.  It was about so

12 much, two and a half feet or two feet of space to crawl around

13 in down there.

14         Q.    Pretty dark down there?

15         A.    Yeah.  That's why you had the drop cord.

16         Q.    So you would -- would you have to go through the

17 entire ship to get down to the bottom?

18         A.    No.  They had one -- one hole that you -- ladder

19 that you went down and -- and just one -- one hole after you

20 got down to the bottom where you could go either way.

21         Q.    So -- but you would come onboard the ship while it

22 was in the process of being built, right?

23         A.    Right.

24         Q.    And were there other crafts around on the other

25 decks?

1      A.   Yes, but on the way down, none of them got in our

2  way or we didn't get in their way.

3      Q.   I understand that you didn't mingle with them.

4      A.   No.

5      Q.   But were there lots of folks on the -- on the ship

6  doing all kinds of other work?

7      A.   Different crafts, yeah.

8      Q.   Did you see carpenters?

9      A.   Well, I don't know now.

10      Q.   How about electricians?

11      A.   Yeah.  They was all around.

12      Q.   And do you know what a pipe fitter is?

13      A.   Yes.

14      Q.   Did the ships have -- these were Liberty ships?

15      A.   Yes.

16      Q.   Now, I'm talking about the scaling work first here,

17  right?

18      A.   Right.

19      Q.   Let's focus on that.  And then do you know what a

20  pipe fitter is?

21      A.   Yes.

22      Q.   And were there lots of pipes on the ship?

23      A.   Yes.

24      Q.   Do you -- it wasn't part of your job to know where

25  they went or what they were for, right?

Gerald Holmes, 12/4/2008               Holmes v. Allis-Chalmers Corp.

15

1       A.    No.

2       Q.    Did you get an idea of what those pipes were for

3   and what they did?

4       A.    Not at that time, no.

5       Q.    Did you -- so roughly do you know how long you

6   spent scaling on the first ship you were on?

7       A.    I don't think -- two or three days, maybe --

8       Q.    And then --

9       A.    -- at the most.

10      Q.    Then from there did you go to another -- another

11  boat?

12      A.    Yeah.  I got upgraded to the super structure of the

13  boat, ship.

14      Q.    How many ships did you just do the scaling work on

15  before you got upgraded?  Do you -- one, two, three?

16      A.    Three -- three days or four.

17      Q.    Same ship or different ships?

18      A.    You progressed it, elevated or whatever you call

19  it.

20      Q.    So did you go from one to another to scale?

21      A.    Yeah.

22      Q.    And then after you had scaled for a few days, you

23  got promoted?

24      A.    Yeah.

25      Q.    To -- what was that title, if they had one?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

16

1      A.   Painter's helper, I guess.

2      Q.   And during the time that you were in the

3   shipyards -- let's first establish this:  When you worked in

4   the shipyards, was that regular work the whole time you were

5   there?  Were you a regular employee?

6      A.   Yes.

7      Q.   You weren't part-time --

8      A.   No.

9      Q.   -- is what I'm getting at?

10     A.   No.

11     Q.   You were a full-time employee?

12     A.   Right.

13     Q.   And do you recall whether you worked five or six

14  days?

15     A.   I think it was six days all the time.  And

16  sometimes, say I had a rush job, you worked seven days.

17     Q.   Do you recall there being some production pressure

18  in the shipyards?  Were they in a hurry to get the boats out?

19     A.   Oh, yeah, but I don't think you'd say any pressure,

20  either.

21     Q.   No.  I understand nobody was screaming at you --

22     A.   No.

23     Q.   -- to go faster, but -- but there was -- they

24  wanted to get those ships finished --

25     A.   Sure.

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

1      Q.    -- as fast as they could?

2      A.    Sure.   There was a record deal.

3      Q.    Did -- so after you got promoted to a painter's

4  helper, now, what -- what does that job involve?

5      A.    Working in the cabins, there's a super structure,

6  after they was -- all the rough work was done.

7      Q.    And would some of that work as a painter's helper

8  then -- well, what -- would that involve actually painting

9  things?

10      A.    Yeah.

11      Q.    And --

12      A.    Just trim around the windows and baseboards, and

13  that was about it.

14      Q.    What was the difference between a painter and a

15  painter's helper?

16      A.    The painter got more money, naturally, and he did

17  run the spray guns and whatever.

18      Q.    So you -- you would do more -- did you actually use

19  paint brushes?

20      A.    Yes.

21      Q.    Rollers?

22      A.    Yeah.

23      Q.    And you would -- you would do that kind of work

24  while the guy that was getting a little more money, in that

25  they called a regular painter, might be spraying things?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

18

1     A.   Yeah.

2     Q.   Would you work in crews or groups?

3     A.   Just two or so in a room.

4     Q.   How would you get your assignments every day, know

5  where to go from -- from --

6     A.   I don't remember that.

7     Q.   Did you have a lead man or a foreman?

8     A.   Yeah, yeah, but I don't --

9     Q.   Somehow or another somebody would tell you what to

10  do every day --

11    A.   Oh, yeah.

12    Q.   -- and you would -- but is it fair to say that the

13  whole -- after the scaling that we talked about, the rest of

14  the time that you were in the shipyard, you were a painter's

15  helper?

16    A.   No.  I think I advanced to a carpenter.

17    Q.   Later on?

18    A.   Yeah.

19    Q.   Is it fair to say that the entire time that you

20  worked in the shipyards, you worked in the construction of the

21  ships?

22    A.   Yes.

23    Q.   Some aspect of the ship building process?

24    A.   Yes.

25    Q.   During the time that you were in the shipyards, did

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

19

1    you go from ship to ship?

2        A.   Yes.

3        Q.   Did -- if there -- they had a certain number of

4    ships in -- in various stages of completion?

5        A.   Right.

6        Q.   Would you go from one to the next to the next?

7        A.   Yeah.  It was -- they was just like a deck of cards

8    or something.  You moved up.

9        Q.   So if -- if -- let's just say during the time that

10   you were in the shipyards, if they built ten -- if there were

11   ten ships being built, would you have worked on all ten?

12       A.   I think so.

13       Q.   The way you were moved around from --

14       A.   Yeah.

15       Q.   So --

16       A.   I think so.

17       Q.   When you went on these ships, which -- however many

18   there were during the time, and we'll find out how long you

19   were there and what period when we get some Social Security

20   records, but when you worked on the ships and moved from ship

21   to ship, was the work basically the same?

22       A.   Pretty much, yeah.

23       Q.   Did you ever notice any change in the conditions,

24   like all of a sudden it got cleaner or -- or the work was

25   different, more people cleaning up, anything like that?

1      A.   No.   They pretty well all worked the same.   They

2   graduated.

3      Q.   And as you went from ship to ship, would you

4   move -- would you work in different parts of the different

5   ships?

6      A.   Yeah, but they basically tried to keep you in the

7   same job that you was on.

8      Q.   You learned how to do a certain thing and they

9   wanted you to keep --

10     A.   Yeah.

11     Q.   -- doing it one to the next?   Is that the idea?

12     A.   Right.

13     Q.   What was the thing you learned how to do?   You said

14  painting, you said brushes basically, but would you work below

15  deck, in the cabins, above deck, move around?   How did that

16  work?

17     A.   Oh, gosh, I don't know.   As they went on, we just

18  graduated.

19     Q.   What did you do when it was raining outside?

20     A.   Oh, they had work for us and -- and put tarps up

21  and (pause) --

22     Q.   Did you work on these ships, did you go down and

23  work in the cabins, too?

24     A.   Yeah.

25     Q.   What -- when you would go down to work in the

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

21

1   cabins -- well, let me back up a little bit here.

2                   When you were working on the ships, were the same

3   types of other workers on all of the ships, electricians,

4   carpenters, whatever they may be?

5        A.   Pretty much, yeah.

6        Q.   And do you recall there being machinery on the

7   ships being installed?

8        A.   No.

9        Q.   You just don't recall it?

10        A.   No.

11        Q.   When you got on the ships, were the -- was the

12   machinery already on the ship?

13        A.   Well, as they went on, yeah, up the hill.

14        Q.   They'd put it on?

15        A.   Yeah.

16        Q.   How about the engine rooms?  Were those being

17   worked on when you were on the ships?

18        A.   Yeah.  They installed them before they did a lot of

19   the cabin work and stuff upstairs, the big parts, the

20   propeller and -- or the shaft, not the propeller.

21        Q.   How about things like pumps and (pause) --

22        A.   I don't know how many there was on there, but a lot

23   of them.

24        Q.   A lot of them.  And -- and those were getting

25   installed and -- and put on while you were on the ships?

1        A.    Yeah.

2        Q.    Do you have any idea approximately how long you

3    might have stayed on, you know, one ship?  Was the -- was the

4    time pretty much the same from ship to ship or would you be on

5    one ship longer than another, or do you know?  Do you recall?

6        A.    I don't -- I don't recall.  They just moved us

7    along from -- from one, whichever one was getting ready to --

8    they usually graduated them.

9        Q.    So you would just kind of move up the line --

10       A.    Right.

11       Q.    Is that what you would do?

12       A.    Yeah.

13       Q.    So you'd be on the weighs and then -- is that where

14   you were, working on the weighs?

15       A.    The weighs is where the ship is started, the keel

16   they called it.

17       Q.    Lay the keel?

18       A.    Yeah.  And just graduated piece after piece as --

19   after that.

20       Q.    Do you recall whether most of the work that you did

21   was on the weighs or did you ever do any work on the

22   outfitting dock, or both?

23       A.    The majority of it was on the weighs.

24       Q.    As the ships were just working up the weighs?

25       A.    Yeah.

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

23

1      Q.   You know what a -- what a sea trial is or a --

2      A.   Yes.

3      Q.   -- trial run?  Were you around at times -- I'm not

4   asking whether you were working on those ships, but do you

5   remember there being certain ships that went out for -- do you

6   remember there being certain ships that went out for trials?

7      A.   Yes.

8      Q.   Did you actually go on any of those?

9      A.   No.

10     Q.   Painters weren't the kind of people --

11     A.   No.

12     Q.   -- that went on those?

13     A.   No.

14     Q.   But you could -- do you remember being in the

15   shipyards when they would have these little ceremonies and

16   launch the ships?  Do you remember being there for that?

17     A.   Oh, no, not really.  I don't know if they did that

18   on a different shift or -- or what now.

19     Q.   Now, that reminds me.  I forgot to ask you about --

20   about the shifts, the various shifts.  There would be more

21   than one shift in the shipyards, right?

22     A.   Yeah.

23     Q.   And did you work on the same shift from ship to

24   ship or month to month?

25     A.   I think they kind of rotated.

1      Q.    So you think that over the course of the time that

2   you were in the shipyards, you at some point in time or

3   another worked on all the different shifts?

4      A.    Shifts, yeah.

5      Q.    And at this point obviously 50 plus years later,

6   you're not going to be able to tell us which shift when or

7   anything like that.  I mean, nobody would expect you to do

8   that --

9      A.    No.

10     Q.    -- right?

11     A.    No.

12     Q.    In -- so when -- how long do you think you were in

13   the shipyards?

14     A.    Just about two years.

15     Q.    And was that all in the same place, Oregon Ship

16   Building?

17     A.    Yes.

18     Q.    During that time, was there any kind of work that

19   went on in the ships that you think you -- well, let me back

20   this up and put it a little bit clearer.

21          During the time that you were in the shipyards, do

22   you think you saw all the -- saw all the kinds of work that

23   got done to build a ship?

24     A.    No.

25     Q.    Did you see -- I think we talked about you saw pipe

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

25

1  fitters?

2      A.   Yeah.

3      Q.   You saw electricians?

4      A.   (Nodding head).  Yeah.

5      Q.   You did?

6      A.   (No audible response).

7      Q.   How about machinists?

8      A.   Oh, I don't know.  I -- I can't really remember.

9      Q.   Was the work that you did as a painter's helper any

10  different, from your understanding, than anybody else that was

11  working as a painter's helper?

12     A.   No.

13     Q.   And as a scaler, was the kind of work you did the

14  same as other scalers?

15     A.   Yes.

16     Q.   So if we talked to other scalers, you don't think

17  that you did anything different than they did?

18     A.   No.

19     Q.   And the same thing with painter's helper, right?

20     A.   Right.

21     Q.   And you said earlier that you thought you might

22  have at one point gone over to the carpenters.  Do (pause) --

23     A.   Yeah, I did.

24     Q.   Do -- towards the end of your time in the yards, or

25  did they just loan you over there?

Gerald Holmes, 12/4/2008                 Holmes v. Allis-Chalmers Corp.

26

1      A.   I can't remember.  I think I was -- I don't know

2  which way it was now, with the carpenters or the painters.

3      Q.   But during the time that you were in the shipyards,

4  was the job that you did the most frequent, painting?

5      A.   It was the easiest work.

6      Q.   Do you recall doing any other kinds of work?

7      A.   No.

8      Q.   Do you think that that's most of what you did,

9  painting?

10     A.   That and build -- carpentry work, build scaffolds

11 for the riveters.

12     Q.   And -- and let's talk a little bit about the

13 building scaffolds.  What -- when you build scaffolds for

14 other people to work off of, right?

15     A.   Yes.  Mainly it's for the riveters.

16     Q.   And where would they be working, the riveters?

17 What part of the ship would that be on?

18     A.   On the inside, they'd be pushing their hot rivets

19 out, and the outside, they was bending them over and

20 flattening them out.

21     Q.   So would you build the scaffolds inside the ship?

22     A.   They -- they had them built inside.  I worked

23 outside.

24     Q.   Now, when you were doing scaffold -- scaffold

25 building, scaffold construction, erection, one of those words

1   would probably work, right?

2       A.   Yes.

3       Q.   And so you and -- it took more than just you to do

4   that, right?

5       A.   Yes.

6       Q.   You worked --

7       A.   Two -- two of us usually.

8       Q.   And would you build it and move it as well?

9       A.   Well, they had them set up in such a way that they

10  were shaped like a ship but stayed back four feet or something

11  like that, so -- and then they had big boards that slid out

12  from the scaffolding to the ship.

13      Q.   Now, is this steel scaffolding?

14      A.   No.  Wood.

15      Q.   All wood?

16      A.   Yeah.

17      Q.   So they -- you'd build the scaffold and then

18  there'd be boards across it?

19      A.   The scaffolds were already there, but they were on

20  a sliding.  They adjusted to the ship, how it was being built,

21  upward.  As it went upward, the scaffolding come out, come

22  closer to the ship.

23      Q.   And do you recall whether you did that in -- after

24  you were a painter, in the middle of the time you went back to

25  being a painter, or towards the end of your time in the

Gerald Holmes, 12/4/2008            Holmes v. Allis-Chalmers Corp.

28

1   shipyards?

2         A.    I think towards the end of the time.

3         Q.    Do you have an idea whether that was months or --

4         A.    No.

5         Q.    What -- of the jobs, three jobs we've talked about,

6   carpenter, painter and (pause) --

7         A.    Scaler.

8         Q.    Scaler.  Right.  Thanks.

9         A.    Well, I guess that's --

10        Q.    Of those three jobs, which one do you think you did

11  the most?

12        A.    I think the scaffolding, probably --

13        Q.    Okay.

14        A.    -- carpenter.

15        Q.    And was that the -- with the scaffolding, was it

16  the same thing, you'd go from ship to ship?

17        A.    (Nodding head).

18        Q.    Same idea as with the painting?

19        A.    Yeah.

20        Q.    And when you were doing the scaffolding, at that

21  point there must have been all kinds of workers around you,

22  huh?

23        A.    Yeah, but most of them was out of our way, and

24  they -- everything was just kind of like an erector set, I

25  guess.  The scaffolding come along and then they'd put a big

1    sheet of steel in there for part of the bottom and then they

2    built some more scaffold above that.  It was kind of like an

3    erector set, I guess.

4         Q.   And it would kind of go up and you would kind of go

5    up with it?

6         A.   Right.

7         Q.   And -- and then people would fill other -- the

8    parts that were done and start doing other things?

9         A.   Right.

10        Q.   So it became kind of like -- some -- some crafts

11   they call following crafts.  Painters, for example, they come

12   in after people have done their work and then they paint.

13             When you're building scaffolds, you're kind of at

14   the front end of things?

15        A.   A lot of it, yes.

16        Q.   And then after you might come -- did -- after you

17   did your scaffold work or while you were doing it, would there

18   be electricians and -- and other carpenters and other crafts

19   that would come in into the spaces that had been finished?

20        A.   They -- yes.  Some of them used the same

21   scaffolding.

22        Q.   Yeah.  They -- yeah, the scaffolding was there for

23   the benefit of not just the riveters, right?

24        A.   No, no.  It was permanent.

25        Q.   And then would you go up another level and build

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

30

1    more scaffold?

2         A.   Every -- I think it was every four feet or

3    something like that.

4         Q.   And as you continued to build the scaffold, did

5    other parts of the ship continue to get finished?

6         A.   Yeah.  Not so much on the outside.

7         Q.   Right.  'Cause it was already done at the bottom.

8              But when you were inside the ships, were they

9    dusty?

10        A.   Yeah.

11        Q.   And was there debris in the ship, I mean, stuff

12   left over from the construction process that needed to be

13   cleaned up?

14        A.   Yes.

15        Q.   Do you ever remember anything called a sucker or a

16   blower?

17        A.   I think they had them in there.

18        Q.   That -- that ring a bell to you?

19        A.   Yeah.  There's a temporary.  They'd move them.

20        Q.   And how about the laborers, do you ever recall the

21   laborers coming in and sweeping up, people they called

22   sweepers?

23        A.   Yeah.  In the later stage, yes.

24        Q.   The further on the ship was in construction, the

25   more there was to clean up?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

31

1        A.    Right.

2        Q.    And then you would -- did you ever see the sweepers

3   and the laborers in there cleaning up?

4        A.    Yeah.

5        Q.    Would they do their work sometimes be -- at the

6   same time you were working or after?

7        A.    Oh, mostly on the other shifts.

8        Q.    So you might see them coming and going?

9        A.    Yeah.

10       Q.    During the time that you worked in the shipyards,

11   is it fair to say that the kinds of conditions you were

12   exposed to were the same as all the other workers down there?

13       A.    I guess, unless it was outside.

14       Q.    Let me kind of ask it to you this way.  There was

15   nothing special or unique or different about you as a worker

16   than all the other workers?

17       A.    No.

18       Q.    You did the same kind of work that every other

19   person in your particular craft or trade, whether it was a

20   carpenter or scaler or painter, did on those ships, right?

21       A.    Right.

22       Q.    And you did -- did you do that work in the same

23   conditions that those other people did it in?

24       A.    Yes.

25       Q.    Now, I understand from our having had a chance to

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

1   talk before we started today that, you know, this period of

2   time that you were in the shipyards, you recall it, but you

3   don't recall it very distinctly?

4          A.   Clear, no.

5          Q.   And it's been a long time, right?

6          A.   (Nodding head).

7          Q.   But in terms of the type of work that you did and

8   the fact that you worked there steadily, you recall that

9   specifically?

10         A.   Yeah.

11         Q.   At this point in time, do you recall just, you

12  know, whether you do or you don't, just tell me, seeing pipes

13  and -- going throughout the vessels?

14         A.   Yes.

15         Q.   And do you ever recall seeing people applying

16  materials to those pipes?

17         A.   Yes.

18         Q.   So you were onboard the vessels that -- some of the

19  vessels at least at points in time when the -- the insulation

20  went on?

21         A.   Right.

22         Q.   And you were onboard some of the vessels at times

23  when the machinery was being installed?

24         A.   Mostly, but all the light materials and stuff they

25  put on later, but heavy equipment, pumps and stuff, they put

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

33

1  down below and they put them on first.

2       Q.   So when you -- were you on sometimes when that was

3  occurring?

4       A.   Yes.

5       Q.   And (pause) --

6       A.   Mostly that was done before I got to the finishing

7  paint.

8       Q.   And you --

9       A.   And there were several of us on the ship painting,

10  too.

11       Q.   When you were painting, the machinery was probably

12  already on?

13       A.   Yes.  And it was all painted.

14       Q.   When you were scaffolding, they were probably

15  putting it on?

16       A.   Yeah.

17       Q.   And when you were -- depending upon what part of

18  the ship that you worked in, you would have to get to that

19  part of the -- the ship, right?  So if you worked down in the

20  bottom, you had to go through -- like you said, you went down

21  a ladder to get there?

22       A.   Yeah.

23       Q.   Right?  And you made mention earlier when you were

24  talking about the scaling about a mask.  When you did the

25  scaling work way down in the double bottoms, you wore some

Gerald Holmes, 12/4/2008            Holmes v. Allis-Chalmers Corp.

34

1   kind of a mask?

2       A.   Yeah.  Just one that covers your nose and mouth.

3       Q.   When you did the other kind of work painting and

4   scaffolding, did you wear a mask?

5       A.   No.

6       Q.   And --

7       A.   Unless there was spraying or something around it.

8       Q.   Unless they were spraying?

9       A.   Yeah.  If they were in the same room as you were.

10  Usually they kept us separate -- separated.

11      Q.   So at this point in time, is there

12  anything (pause) -- well, let me just back up.

13           When you were working in the shipyards, we've

14  talked about how there were other kinds of crafts.  Did you

15  get to know any of those folks on the other crafts?

16      A.   Oh, yeah.

17      Q.   I think I asked you this yesterday, and obviously

18  now we're here, does the name E.J. Bartells mean anything to

19  you?

20      A.   I seen their trucks and signs around.

21      Q.   And do you recall the names of any of the pumps or

22  heating equipment that were onboard those ships?

23      A.   Not right offhand, but I -- I'd recognize some of

24  them if I heard them.

25      Q.   And do you -- you know from your just general

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

35

1  experience that -- you know what a gasket is?

2      A.   Yes.

3      Q.   And do you recall at any time seeing gaskets being

4  used onboard the -- the boats?

5      A.   Yeah.

6      Q.   And what kinds of things would you see those used

7  for?

8      A.   Oh, on the big water pumps and -- and heat.  I

9  don't know.  Maybe heat.  I don't know.

10     Q.   Besides gaskets, do you know what packing is?

11     A.   I never heard it.

12     Q.   Okay.  Do you -- and we talked about the fact you

13  know what insulation is?

14     A.   Yeah.

15     Q.   And you saw insulation?

16     A.   (Nodding head).

17     Q.   Did you see people putting things around the pipes

18  as well?

19     A.   Yeah.

20     Q.   What -- what did you see there?

21     A.   Well, just like they still have, I guess, around

22  the hot water tanks and the hot water pipes and stuff.

23     Q.   Did you ever hear the expression "wrapping" the

24  pipes?

25     A.   Yeah.

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

36

1     Q.   And did you -- did you see people wrap pipes down

2  in the --

3     A.   They come in different lengths and cut in half, and

4  they put them around the pipe and fold them together and tape

5  it.

6     Q.   So you'd be in places at least walking through or

7  being around places where you could see people doing that kind

8  of work?

9     A.   Yes.

10    Q.   And -- and the other types of work that we talked

11 about, gasket work and other types of work, you -- after two

12 years in the shipyards, did you think you can fairly say that

13 you saw everything that was done to build a ship at least on

14 some occasion?

15    A.   I don't think so.

16    Q.   What do you think you missed?

17    A.   I -- I don't know.  By not knowing, I don't know.

18    Q.   Did you ever get into the -- that's a good point,

19 and a terrible question.  Did you -- did you ever get on one

20 of these boats or get a chance to be on one when they were --

21 right before they were ready to go out to be -- for the trial?

22    A.   No.  I -- I was in the draft at the time.  I got to

23 ride on one of them to Hawaii, but (pause) --

24    Q.   You think it was one that got built where you were

25 or --

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

37

1        A.   I don't know.   I -- I couldn't have cared less

2   then.

3        Q.   The -- the -- yeah.   The point in time when you

4   were -- would go to the next ship, though, was never a point

5   where it was ready to go right out to the sea trial?   You --

6   you were leaving before that?

7        A.   Yes.

8        Q.   At some point you left the shipyards to go into the

9   military?

10        A.   Right.

11        Q.   Had you enlisted, were you drafted, what?

12        A.   Drafted.

13        Q.   Where did you -- about -- was that in 1945?

14        A.   Yes.

15        Q.   And where did you go initially when you were taken

16   into the military?

17        A.   Went over to Hawaii for a week and from Hawaii went

18   to New Caledonia.

19        Q.   Where was your basic training?   Do you recall that?

20        A.   Camp Roberts, California.

21        Q.   And by the time that you went over to Hawaii, had

22   the war ended?

23        A.   No.

24        Q.   How soon after you got -- left to Hawaii and went

25   to New Caledonia had the war ended?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

38

1        A.    I think it was about -- after my basic training

2   in -- in Camp Roberts.  I don't know whether that was 16 weeks

3   or what it was.

4        Q.    We're talking about 1945?

5        A.    Yeah.  We was -- we was on our way home from Camp

6   Roberts when they declared it over with.

7        Q.    So when you went over to Hawaii and then, as you

8   mentioned earlier, to New Caledonia, the war was over?

9        A.    Yes.

10       Q.    What was your assignment -- now, the way I

11  understood what you told us was that Hawaii was just a place

12  you stopped on your way to New Caledonia?

13       A.    Yeah.

14       Q.    And you don't recall now at this point in time what

15  ship you went over on?

16       A.    No.

17       Q.    But you were -- went over on a troop transport?

18       A.    Yes.

19       Q.    First to Hawaii and then on to New Caledonia?

20       A.    Right.

21       Q.    Was it the same boat?

22       A.    No.

23       Q.    So you took one vessel from here to Hawaii, and

24  then were in Hawaii briefly and then got on another boat and

25  went to New Caledonia?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

39

1        A.    Right.

2        Q.    And when you were on those boats, you were a

3   passenger, basically?

4        A.    Yes.

5        Q.    When you got to New Caledonia, what was your job

6   there?

7        A.    They didn't have none left.  I (pause) --

8        Q.    What did they find for you to do over there?

9        A.    Just odd jobs.  I tended bar for a while and -- in

10  the officers club, and drove truck for a year or so.  And I

11  enlisted for another year, but they was letting them out on

12  points, and at that time -- and they would have both come out

13  about the same time, come up about the same time.

14       Q.    So you ended up being in New Caledonia for over a

15  year?

16       A.    Yeah.

17       Q.    And during that time, did -- what did -- what did

18  you do for the longest?  Where were you assigned to for the

19  longest period?

20       A.    Driving truck around.

21       Q.    And was that part of the motor pool?

22       A.    Yes.

23       Q.    Did you have anything to do with taking care of or

24  repairing the -- the vehicles in the motor pool?

25       A.    No.

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

40

1     Q.   You just drove them?

2     A.   Right.

3     Q.   And when you were tending bar, do you know how long

4  you did that for, roughly?

5     A.   Probably six months.

6     Q.   And would that be the most of what you did while

7  you were in New Caledonia, those two things, tending bar and

8  working in the -- driving people around?

9     A.   Driving -- driving truck, yeah.

10    Q.   Then when you were discharged from the service,

11  where did you go after that?

12    A.   Back to Portland.

13    Q.   Came back here?

14    A.   Yeah.

15    Q.   And what did you -- what kind of work did you take

16  up at that point?

17    A.   I guess I -- that was in about '48 or getting to be

18  close to it.

19    Q.   Right.

20    A.   And my brother had a truck and he worked on the

21  flood and stuff there.

22    Q.   At Vanport?

23    A.   Yeah.

24    Q.   Always an event worth noting.

25    A.   Yeah.

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

41

1    Q.    So did you work with your brother with the truck?

2    A.    No, just by my -- myself with his truck.

3    Q.    Okay.  And was it a -- what kind of truck was that?

4    A.    Oh, I think it was an old Rio.

5    Q.    Dump truck?

6    A.    Yeah.

7    Q.    So your brother would -- by the time you got back

8    to Portland from New Caledonia -- your brother, was he older

9    than you?

10   A.    Yes.

11   Q.    And what was his name?

12   A.    Everett.

13   Q.    He had already gone into the dump truck business?

14   A.    No.  He was just kind of looking for something for

15   me to do, I think --

16   Q.    Okay.

17   A.    -- when I got out.

18   Q.    And helped you out that way?

19   A.    Yes.

20   Q.    So you got into the dump truck business a little

21   bit?

22   A.    Yeah.

23   Q.    And how did that go from then on?  Just give us an

24   idea of how the dump truck business evolved.

25   A.    Oh, it's like -- like a lot of things, it

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

42

1    progressed as time went on.

2         Q.    Did you own your own truck right away or --

3         A.    No.  Not for -- till 1963.

4         Q.    '53.

5         A.    Fifty -- '53, yeah.

6         Q.    What year did -- eventually you got married, right?

7         A.    Yeah.

8         Q.    And was that before or after you got your first

9    truck?  Or (pause) --

10        A.    Oh, I don't know.  It was right about that time.

11        Q.    About the same time?

12        A.    Yeah.

13        Q.    And so I think you just told us that you got the

14   truck maybe in around '53 --

15        A.    Yeah.

16        Q.    -- '54, somewhere around there.  And -- and did you

17   and your wife -- what was her name?

18        A.    Alma.

19        Q.    With an A, A-L-M-A?

20        A.    (Nodding head).

21        Q.    Did she -- you two have any children together?

22        A.    No, not (pause) --

23        Q.    You have a son?

24        A.    Later on, yeah.

25        Q.    Yeah.  That's what I meant, later on.

Gerald Holmes, 12/4/2008          Holmes v. Allis-Chalmers Corp.

43

1    A.    Yeah.

2    Q.    Usually it comes later.

3    A.    Yeah.

4    Q.    Just kidding you.

5    A.    Not always, I guess.

6    Q.    No, not -- especially not now, but -- but then it

7  probably did.

8    A.    Yeah.

9    Q.    So you two got married in what, around 1954 or so?

10   A.    Yes.

11   Q.    And do you know how long after that, within a year

12 or so, did you have your first child?

13   A.    Yes.

14   Q.    What -- was that a boy?

15   A.    Yes.

16   Q.    What -- what was his name?

17   A.    Bill.

18   Q.    Had your wife been married before?

19   A.    Yes.

20   Q.    And did she have children?

21   A.    Yes.

22   Q.    What did -- what were her -- girls, boys, what?

23   A.    Two girls.

24   Q.    So when you married Alma, your wife, you had kind

25 of an instant family there, right, the two --

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

44

1      A.   Yeah.

2      Q.   -- two girls?  They lived with you?

3      A.   Yes.

4      Q.   And then not long after that, you two together had

5  another child, a boy?  So --

6      A.   Yeah.  I guess it's (pause) --

7      Q.   You had a son?

8      A.   Yeah.

9      Q.   So then there are three kids in the house, right?

10     A.   Right.

11     Q.   Two girls and a boy, right?

12     A.   Right.

13     Q.   Did you raise all three of those kids, you and your

14  wife, Alma?

15     A.   Pretty much so.

16     Q.   And then during the time that you were raising

17  them, what kind of work did you do?

18     A.   I guess I had -- I drove for my brother for a while

19  and then I got my own.

20     Q.   Your own dump truck?

21     A.   Yeah.

22     Q.   And generally what is -- what do you do when you

23  own a dump truck?

24     A.   Oh, at that time we'd -- digging basements around

25  Portland here to -- where the Hilton Hotel and Standard

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

45

1    Insurance Building.  We'd dig down 20 feet from the street

2    level and haul the dirt away.

3         Q.   Did you do -- did you operate equipment for the

4    dirt digging yourself, too?

5         A.   No.

6         Q.   So your part of the operation was to haul off the

7    dirt?

8         A.   Right.

9         Q.   And is that most of what you did with the dump

10   truck over the years that you operated it, haul things off

11   like dirt and gravel?

12        A.   That or anything anybody else needed hauled away.

13        Q.   Okay.  We talked about -- during that time, though,

14   do you recall ever hauling away any debris that you thought

15   might have insulation or insulation products in it?  Was that

16   the kind of thing that you hauled away?

17        A.   I may have, but several operators, they didn't

18   separate everything at that time.  When you go into an old

19   building and the furnace and whatever was there, it went out

20   with the dirt.

21        Q.   Would you just kind of drive up to a place, have

22   somebody dump something in your truck, take it somewhere, dump

23   it, come back and get another load?

24        A.   Yeah.

25        Q.   Was that basically what you did?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

46

1      A.    Yeah.  And there was other -- other trucks there,

2   too.

3      Q.    So you would pretty much just stay in the cab?

4      A.    Yes.

5      Q.    Did you -- and then just operate whatever you had

6   to do to dump it and then make another run?

7      A.    Right.

8      Q.    Just what we all kind of think about --

9      A.    Round and around.

10     Q.    Round and around.  And you did that -- did you do

11   that -- how long did you do that, do you know?  I mean, from

12   the middle of 1950 or so till when?  Till you retired?

13     A.    Yeah.

14     Q.    Did you ever have any other work that you did

15   besides driving a dump truck after you came back from the war?

16     A.    No.

17     Q.    Okay.  Your wife passed away at some point in time?

18     A.    Yeah.  I think it was 1953, wasn't it?

19           MS. MARQUISS:  '93.

20     Q.    I think your granddaughter's going to help you

21   there and tell you it was '93.  Does that sound about right?

22     A.    Yeah.

23     Q.    And so that's, say, 15 years or so ago?

24     A.    Yeah.

25     Q.    During that 15 years, have you remarried?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

47

1       A.    No.

2       Q.    And have you lived on your own?

3       A.    Yes.

4       Q.    To your right, who is that sitting to your right,

5  that guy right there?

6       A.    Dan Holmes, but (pause) --

7       Q.    And who is he in your life?

8       A.    He's a big part of it.

9       Q.    How's he related to you?  You've got the same last

10  name, so --

11      A.    Yeah.

12      Q.    -- tell us how -- how that works.

13      A.    I don't know.  What is he?  A nephew?

14      Q.    Your brother's son?

15      A.    Yeah.

16      Q.    And your brother -- now, you told us that you ran a

17  dump truck all those years.  Did your brother also have a dump

18  truck?

19      A.    Yes.

20      Q.    And ultimately your son, what happen -- did your

21  son run your dump truck?

22      A.    After I retired.

23      Q.    And is your son alive now?

24      A.    No.

25      Q.    When did he pass away?

Gerald Holmes, 12/4/2008                Holmes v. Allis-Chalmers Corp.

48

1       A.    In '93, I guess it was.

2       Q.    Like '03?  How -- does that sound about right to --

3  about five years ago?

4       A.    Yeah.  I think so.

5       Q.    What did he pass away from?

6       A.    Heart attack.

7       Q.    And how -- was he -- he would have been pretty

8  young at that point, right?

9       A.    45 or so, I think.

10      Q.    Okay.  And in terms of the last five or ten years,

11  who -- who have you spent most of your time with in terms of

12  family and people that you -- you love?

13      A.    This is two of them right here.

14      Q.    Okay.  You've got your granddaughter's to your

15  left.

16      A.    Yeah.

17      Q.    And your nephew to your right?

18      A.    Right.

19      Q.    And right now, are you living on your own?

20      A.    Yes.

21      Q.    Tell me, did you have an internist, a regular

22  doctor that you went to or that you go to?  By "regular" I

23  mean pretty much --

24      A.    Well, no.  One recommended the other and the other

25  recommended another one.

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

49

1     Q.   So a bunch of doctors?

2     A.   Yeah.

3     Q.   At some point did you get to feeling something in

4 your chest that caused your family to have some concern about

5 you?

6     A.   Yeah.  I guess Dan thought I should go have a

7 checkup.

8     Q.   Did you have an operation?

9     A.   Yes.

10    Q.   And after you had the operation, did somebody tell

11 you what you had?

12    A.   Yes.

13    Q.   And did they -- do you have cancer?

14    A.   I did -- they said I did have, and then they said I

15 didn't and then they come back with I did.

16    Q.   Do you -- do you know the name of the doctor that

17 told you that?

18    A.   I can't remember.

19    Q.   Just one of a bunch of them that --

20    A.   Yeah.

21    Q.   Now, when you had this operation, was it under your

22 arm?

23    A.   Yeah, pretty much so.

24    Q.   Did they go in and take -- do something to your

25 lungs?

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

50

1      A.   Yeah.  Drained the fluid.

2      Q.   And did they take a biopsy at that time, some

3  material, to find out whether you had cancer?

4      A.   I guess they must have.

5      Q.   You're asleep.

6      A.   Yeah.

7      Q.   You were asleep, but how long do you remember being

8  in the hospital for for that?

9      A.   Oh, I think it was seven or eight days.

10      Q.   Quite awhile?

11      A.   Yeah.

12      Q.   And then they told you that you had cancer.  And

13  since that time -- that would have been, what, in the early

14  part of this year?

15      A.   Yeah.

16      Q.   Since that time, have you had any treatment for

17  that cancer?

18      A.   No.  Just pills and one doctor to another.

19      Q.   At some point did somebody say something to you

20  about having some chemotherapy?

21      A.   Yes.

22      Q.   And what -- what did you think about that?

23      A.   No.

24      Q.   And why not?

25      A.   I just -- my wife went through that and my son did.

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

51

1   They didn't like it.

2        Q.   So you -- you declined that?

3        A.   Right.

4        Q.   And that's really -- you've got some pills.  Do you

5   have pain right now from -- from in your chest?

6        A.   No.  Just from falling the other day.  And my ribs

7   kind of hurt once in a while, but (pause) --

8        Q.   Let's -- let's talk a little bit about that.  You

9   recently had a fall?

10       A.   Yes.

11       Q.   And how long ago was that?

12       A.   About a week ago.

13       Q.   And you're doing -- recovering from that fall?

14       A.   Yeah.

15       Q.   At -- right now in terms of your medical care, you

16  said you get some pills and you turned down the chemotherapy.

17  You're not -- are -- you're not really getting any specific

18  care for your cancer, are you?

19       A.   No.

20       Q.   Is there something that they -- that anybody said

21  they could do for it besides the chemotherapy?

22       A.   I don't remember.  I don't think so.

23       Q.   Okay.  What do you do?  Like, do you still drive?

24       A.   Not -- yeah.  Not as much, though.  I got a rig

25  here we've got 4800 miles on it, and I bought it and -- a

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

52

1  little over a year ago.

2      Q.   You're not -- you told us you're living on your

3  own?

4      A.   Yes.

5      Q.   People -- are there people that come in and help

6  you?

7      A.   Sure.  Well, yeah.  There's a lot of people

8  stopping by quite often.

9      Q.   Do you take care of your own meals, though, for the

10 most part?

11     A.   That place up the street does.

12     Q.   You go out to -- out to restaurants you like?

13     A.   Yeah.

14     Q.   You've been doing that for a long time, though?

15     A.   Yeah.

16     Q.   That's just kind of a thing you -- you've been

17 doing.  Have you been doing that since your wife passed away

18 pretty much?

19     A.   Pretty much so.

20     Q.   So you go up the street to the restaurant?

21     A.   Dan likes it pretty well.

22     Q.   At least he tells you he does.

23          How about yard work this last summer?  Were you

24 able to do some of that?

25     A.   I got a son-in-law that takes care of that, and he

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

53

1   just comes and goes and does it when he feels like it and when

2   it needs it.  He keeps it looking pretty good.

3        Q.   How about your other household things?  You're able

4   to clean up after yourself, take care of yourself for the most

5   part?

6        A.   For the most part.

7        Q.   And since your wife passed away, have you had --

8   you know, over these years that you've been on your own, have

9   you had any hobbies or any other things that you like to do

10  beside -- besides going up to the restaurant?

11       A.   No.  I got a lady that comes in once or twice a

12  week and cleans.

13       Q.   Do you ever do any traveling, family reunions,

14  those kinds of things?

15       A.   No.

16       Q.   Spend time with your granddaughters and your --

17  your nephew, obviously.

18       A.   Not as much as I should, but they -- they got

19  things to do, too, and places to go, and my little

20  great-great-granddaughter takes up a little bit of time; not

21  really much of mine, but keeps Erin pretty (pause) --

22       Q.   What would you like to do if you could do whatever

23  you wanted in the next couple of months?

24       A.   I haven't given that much thought.

25       Q.   I know.  Most people don't.  What do you -- what

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

54

1   do -- what do you think, though?

2        A.   I don't know.  Probably go to Hawaii or something

3   where it's warmer.

4        Q.   Yeah.  Probably the answer you'd get for most of

5   the people at this table.

6             Just to kind of summarize here, at this point you

7   have no specific doctor that's taking care of your cancer; is

8   that right?

9        A.   No.

10       Q.   You do have a medical doctor that you can see if

11  you need to?

12       A.   Yeah.

13       Q.   And you -- other than the time that you spent in

14  the shipyards, can you think of any other place that you might

15  have been exposed to asbestos?

16       A.   Gosh, I don't -- I can't -- I don't know.

17       Q.   Is that about the only place you can think of that

18  you probably got exposed to asbestos?

19       A.   Yeah.  I've been to a lot of the shops and garages

20  where they work on the trucks, but I never worked on them

21  myself or -- just breathed in some of the fumes.

22       Q.   In fact, we didn't really cover that, but when it

23  came to your truck, you sent it out for service for the most

24  part, right?

25       A.   Right.

Gerald Holmes, 12/4/2008                     Holmes v. Allis-Chalmers Corp.

55

1        Q.   You didn't do the brake jobs --

2        A.   No.

3        Q.   -- or the clutch jobs or any of that stuff

4    yourself?

5        A.   No.

6        Q.   So other than the shipyards where they were doing

7    all the things that people do to build ships, can you recall

8    any other place you were around where people were working on

9    gaskets, machinery, insulation, anything like that?

10       A.   No.

11            MR. MUTNICK:  Okay.  That's all I have to ask you

12   today.  And I don't think these people are going to ask any

13   questions today, but they may.  So we'll take a break and then

14   we'll see if they have any questions, and then we'll decide

15   what to do next.

16            THE VIDEOGRAPHER:  We're off the record at 2:12.

17            (Recess:  2:10 p.m. - 2:14 p.m.).

18            MR. MUTNICK:  For the purposes of the written

19   record, the defendants have advised that without waiving any

20   opportunity to ask questions or -- or proceed in any way,

21   they're not going to do that at this point in time, and I

22   won't contend that anything has been waived or make any

23   objection to any reasonable proceeding to accomplish whatever

24   needs to be accomplished.

25            (The Deposition was concluded at 2:15 p.m.).

Gerald Holmes, 12/4/2008                    Holmes v. Allis-Chalmers Corp.

56

1   STATE OF OREGON        )
                           )  ss.
2   County of Yamhill      )

3

4          I, Kellie M. Humiston, RMR, CRR and Certified

5   Shorthand Reporter, do hereby certify that GERALD HOLMES

6   personally appeared before me at the time and place mentioned

7   in the caption herein; that the witness was by me first duly

8   sworn under oath and examined upon oral interrogatories

9   propounded by counsel; that said examination, together with

10  the testimony of said witness, was taken down by me in

11  stenotype and thereafter reduced to typewriting; and, that the

12  foregoing transcript, pages 1 to 55, both inclusive,

13  constitutes a full, true and accurate record of said

14  examination of and testimony by said witness, and of all other

15  oral proceedings had during the taking of said deposition, and

16  of the whole thereof.

17         Witness my hand at Newberg, Oregon, this 9th day of

18  December 2008.

19

20

21                        _Kellie M. Humiston_____
                          Kellie M. Humiston, RMR, CRR
22                        Oregon CSR No. 90-0150
                          Washington CCR No. 2942
23

24

25

Schmitt & Lehmann, Inc.
(360) 695-5554 ** (503) 223-4040

**⧗⧗ Bullivant | Houser | Bailey** PC

Attorneys at Law

JEANNE F. LOFTIS
Admitted in Oregon and Washington
Direct Dial: (503) 499-4601
E-mail: jeanne.loftis@bullivant.com

November 14, 2008

RECEIVED

NOV 14 2008

*Via Facsimile*

Jeffrey S. Mutnick
Law Offices of Jeffrey S. Mutnick
737 SW Vista Ave.
Portland, OR 97205

Re:    *Gerald Holmes v. Allis-Chalmers Corporation Product Liability Trust, et al.*
Multnomah County Circuit Court Case No. 0810-15439

Dear Jeff:

This will serve to advise you that we will be representing the defendant Leslie Controls, Inc. in the above-referenced case (identified in the complaint as "Circor International, Inc., a Delaware corporation, individually and as successor-in-interest to Leslie Controls, Inc.") and intend to file an appearance on its behalf.

Pursuant to ORCP 69, we ask that you provide us ten (10) days' written notice prior to taking any action, including the seeking of an order of default against our client. Nothing in this letter is intended to waive any of the requirements for adequate service of the summons and complaint.

Thank you for your courtesy and cooperation.

Very truly yours,

Jeanne F. Loftis

JFL:sw

300 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204-2089 • 503.228.6351 Fax 503.295.0915

www.bullivant.com | Seattle  Vancouver  Portland  Sacramento  San Francisco  Las Vegas

EX. E
(1P)

12/09/2008 17:26 FAX                   BULLIVANT HOUSER BAILEY                      ☑002


**Bullivant | Houser | Bailey** PC
Attorneys at Law

JEANNE F. LOFTIS
Admitted in Oregon and Washington
Direct Dial: (503) 499-4601
E-mail: jeanne.loftis@bullivant.com

December 9, 2008

*Via Facsimile*

Jeffrey S. Mutnick
Law Offices of Jeffrey S. Mutnick
737 SW Vista Ave.
Portland, OR  97205

      Re:   *Gerald Holmes v. Allis-Chalmers Corporation Product Liability Trust,
           et al.*
           Multnomah County Circuit Court Case No. 0810-15439

Dear Jeff:

    By letter of November 14, 2008, we advised we would be representing the defendant Leslie Controls, Inc. in the above-referenced case (identified in the complaint as "CIRCOR International, Inc., a Delaware corporation, individually and as successor-in-interest to Leslie Controls, Inc.").

    Please note, we will be representing only CIRCOR International, Inc., in this matter and intend to file an appearance on its behalf.

    Pursuant to ORCP 69, we ask that you provide us ten (10) days' written notice prior to taking any action, including the seeking of an order of default against our client. Nothing in this letter is intended to waive any of the requirements for adequate service of the summons and complaint.

    Thank you for your courtesy and cooperation.

               Very truly yours,

               Jeanne F. Loftis

JFL:sw

EX. F
(1 P)

JEFFREY S. MUTNICK, OSB #721784
jmutnick@mutnicklaw.com
Jeffrey S. Mutnick Law Office
737 SW Vista Avenue
Portland, Oregon 97205
503-595-1033
503-224-9430 (Facsimile)
     *Of Attorneys for Plaintiff Daniel Holmes, Personal Representative for the Estate of*
*Gerald Holmes*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DANIEL HOLMES, Personal Representative for the Estate of GERALD HOLMES,<br><br>               Plaintiff,<br><br>     v.<br><br>A.W. CHESTERTON CO., et al.,<br><br>               Defendants. | Case No. CV-09-678-JO<br><br>**AFFIDAVIT OF JEFFREY S. MUTNICK IN SUPPORT OF PLAINTIFF'S MOTION FOR REMAND Pursuant to 28 U.S.C. §1447(c)** |

STATE OF OREGON     )
County of Multnomah  ) ss.

     I, Jeffrey S. Mutnick, having been duly sworn, do hereby depose and say as follows:

     1.     I am the attorney for Plaintiff, Daniel Holmes. I have reviewed the documents attached to Plaintiff's Motion for Remand and marked as Exhibits A-G, and that those exhibits are true and accurate copies of the original documents.

     2.     I filed this lawsuit in Multnomah County Circuit Court, as their was no complete diversity of parties. I confirmed with other counsel in California the identity and appropriate information regarding Defendant Leslie Controls, a defendant with whom I have not previously been involved in litigation.

Page 1 -    **AFFIDAVIT OF JEFFREY S. MUTNICK IN SUPPORT OF MOTION FOR REMAND**

**JEFFREY S. MUTNICK**
*Jeffrey S. Mutnick Law Offices*
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

Ex. G
(2 pp)

3.    An appearance was made by Leslie Controls through correspondence and then later through attendance by a representative of the same law firm, Bullivant Houser Bailey, at Mr. Holmes' deposition. Brief discussions were had with counsel from Bullivant Houser Bailey regarding the issues of service. Counsel contended that service should be made on Leslie Controls at the Circor location. Rather than create an unnecessary issue regarding service, I proceeded to serve Leslie Controls in addition to the earlier service made on Circor.

4.    Since Leslie Controls indicated it would appear without necessarily referencing its relationship to Circor, I named Leslie Controls as directed by the same counsel who had initially written me on November 14, 2008 (Exhibit C).

5.    My staff also directed copies of the proposed Amended Complaint after Mr. Holmes' death to all of the previous counsel by e-mail prior to my appearance at ex parte.

6.    Throughout the pendency of the litigation, from the date of filing until the present, Defendant Leslie Controls has been represented by Bullivant Houser Bailey.

DATED this 14th day of July 2009.

Jeffrey S. Mutnick, OSB #721784
Of Attorneys for Plaintiff

Subscribed and sworn to before me this 14th day of July 2009.

Notary Public for Oregon
My commission expires: 08-02-09

OFFICIAL SEAL
J ALISON HILBER
NOTARY PUBLIC-OREGON
COMMISSION NO. 395579
MY COMMISSION EXPIRES AUG. 2, 2009

Page 2 -    **AFFIDAVIT OF JEFFREY S. MUTNICK IN SUPPORT OF MOTION FOR REMAND**

JEFFREY S. MUTNICK
Jeffrey S. Mutnick Law Offices
737 SW Vista Avenue
Portland, OR 97205
503 595-1033; 503 224-9430 (facsimile)
JMUTNICK@MUTNICKLAW.COM

CIRCUIT COURT OF THE STATE OF OREGON

FOR MULTNOMAH COUNTY

GERALD HOLMES,

       Plaintiff,

  vs.

ALLIS–CHALMERS CORPORATION
PRODUCT LIABILITY TRUST, et al.,

       Defendant.

_____/

Case No. **0810–15439**

CERTIFICATE OF SERVICE

STATE OF DELAWARE
County of New Castle       ss.

I, Daniel Newcomb, hereby certify that I am a competent person 18 years of age or older, a resident of the State of Delaware and that I am not a party to nor an attorney for any party in the within named action; that I made service of a true copy of:

*Summons and Complaint; Exhibit A*

CORPORATE SERVICE – Pursuant to ORCP7D(3)(b)(i):

Upon **CIRCOR INTERNATIONAL, INC.**, by personal service upon Scott LaScala, the clerk on duty in the office of the registered agent, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801 on November 13, 2008 at 2:00 PM.

I declare under the penalty of perjury that the above statement is true and correct.

Dated this ___5th___ day of ___January___ ,20_09_.

                  X _____
                  Daniel Newcomb
                  Nationwide Process Service, Inc.
                  1201 S.W. 12th Avenue, Suite 420
                  Portland, OR 97205
                  503–241–0636

183732

Ex. H
(ZPP)

## Alison Hilber

**From:**     Royal Hebert [RoyalHebert@nationwideprocess.com]
**Sent:**     Wednesday, June 10, 2009 11:48 AM
**To:**       Jennifer Gabler
**Subject:** Confirmation of Service re: Holmes v. AW Chesterton, et al.

Jenny,

I apologize for the delay in getting this confirmation to you, we just got this information from our server this morning.

**Re:**  Holmes v. AW Chesterton, et al.
**NPS #:**  197956
**Service Upon:**  Leslie Controls, Inc.
**By Leaving With:**  Katie White, clerk on duty in the office of CT Corporation, Registered Agent
**Date/Time:**  6/04/09  2:30 pm
**Address:**  4701 Cox Road, Suite 301, Glen Allen, VA 23060
**Mailing Made:**  N/A


Royal Hebert
NATIONWIDE PROCESS SERVICE, INC.
1201 SW 12th Avenue, Suite 420
Portland, OR 97205
(503) 241-0636 voice
(503) 241-1604 fax
royal.hebert@nationwideprocess.com

This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately call (800) 670-8231 and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.


_____ Information from ESET NOD32 Antivirus, version of virus signature database 4145 (20090610) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

### Law Office of Jeffrey S. Mutnick

737 SW Vista Avenue
Portland, Oregon 97205
Tel. (503) 595-1033
Fax (503) 224-9430
jmutnick@mutnicklaw.com

## FACSIMILE COVER SHEET

| | |
|---|---|
| **DATE:** August 6, 2009<br><br>Sent again 8/10/09 | **RE:** USDC, District of Oregon Case<br>No. 09-678<br>**MDL 875**<br>**CTO 324** |
| **TO:** Jeffery N. Luthi<br><br>Attn: JaKeia | **FROM:** Jeffrey S. Mutnick (Plaintiff's counsel) |
| **FAX:** 1-202-502-~~2800~~<br>2-888 | **NO. PAGES:** ~~2~~ 35 |

**MESSAGE:** In response to receiving the Conditional Transfer Order (CTO) from Judge Panner's Medford, Oregon office this morning, our office called and spoke with someone at the Panel's Office. This morning was the first time that we received the Conditional Transfer Order and this was e-mailed from Judge Panner's Medford, Oregon clerk. After speaking with the clerk in the Panel's office we explained that this morning was the first time our office had received the CTO, and therefore, never had a chance to object to this Order and continue the stay . The Panel's Office advised that we should fax over the Motion for Remand that Plaintiff filed on July 14, 2009 and had pending in front of Judge Panner in the United States District Court, District of Oregon. Defendant Leslie Controls filed a response to Plaintiff's Motion for Remand on July 28, 2009 and requested oral argument. So our office and Judge Panner's Portland Office had no notice of a CTO pending. We would like time to object to the CTO as we never received a copy and plaintiff had a request pending before the court.

EX I.
(10)

**UNITED STATES JUDICIAL PANEL**
on
**MULTIDISTRICT LITIGATION**

**IN RE: ASBESTOS PRODUCTS**
**LIABILITY LITIGATION (NO. VI)**

Daniel Holmes, etc. v. A.W. Chesterton, Co., et al.,  )
  D. Oregon, C.A. No. 1:09-678      )     MDL No. 875

**ORDER REINSTATING STAY OF CONDITIONAL TRANSFER ORDER**

  A conditional transfer order was filed in this action (*Holmes*) on July 17, 2009.  In the absence of any known opposition to the proposed transfer of *Holmes*, the stay of transmittal with regard to *Holmes* was lifted on August, 4, 2009, and the action was transferred to the Eastern District of Pennsylvania.   Subsequently, on August 10, 2009, the Panel received a belated notice of opposition to the transfer of *Holmes* submitted by plaintiff in *Holmes*.  In his opposition, plaintiff, through counsel, asserts that he never received a copy of the Panel's July 17, 2009, order, and that this was the cause of his failure to submit a timely notice of opposition. Recourse to available sources reveals that the address for plaintiff Holmes' counsel is correctly recorded in the Panel's records and that a copy of the July 17, 2009, order was mailed to that address on July 17, 2009. Nevertheless, based upon his assertion of non-receipt, the Panel is persuaded that these circumstances justify reinstatement of the conditional transfer order in *Holmes* in order to permit plaintiff to pursue his opposition to transfer.

  IT IS THEREFORE ORDERED that the stay of the Panel's conditional transfer order designated as "CTO-324" filed on July 17, 2009, is REINSTATED insofar as it relates to this action. Plaintiff's notice of opposition is deemed filed as of August 10, 2009.  In accordance with Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), plaintiff shall file the required motion and supporting brief to vacate the conditional transfer order on or before August 26, 2009.  No extensions of time will be granted.

           FOR THE PANEL:

           Jeffery N. Lüthi
           Clerk of the Panel

Ex. J
(IP)

99998.001



19854611

May 15 2008
2:12PM

1  MICHAEL J. PIETRYKOWSKI (SBN: 118677)
   JAMES G. SCADDEN (SBN: 090127)
2  CHRISTOPHER D. STRUNK (SBN: 214110)
   GORDON & REES LLP
3  Embarcadero Center West                POS ___ 5-15-08
   275 Battery Street, Twentieth Floor
4  San Francisco, CA 94111                VERIF ___ YES
   Telephone: (415) 986-5900
5  Facsimile: (415) 986-8054              LDF ___ 11/11/08

6  Attorneys for Defendant                TD/TSC _____
   LESLIE CONTROLS, INC.
7
        LESCON
8               SUPERIOR COURT OF CALIFORNIA

9              CITY AND COUNTY OF SAN FRANCISCO

10

11  IN RE:                          )  CASE NO. 828684
                                    )
12  COMPLEX ASBESTOS LITIGATION     )  DEFENDANT LESLIE CONTROL,
                                    )  INC.'S RESPONSES TO PLAINTIFFS'
13                                  )  STANDARD INTERROGATORIES TO
                                    )  ALL DEFENDANTS (Asbestos General
14                                  )  Order 129)
                                    )
15                                  )
                                    )
16                                  )

17                           **PREFACE**

18        These Interrogatories are to be answered pursuant to San Francisco Superior Court

19  General Order No. 129.

20        Unless otherwise specifically set forth, the time frame for response to these

21  Interrogatories is from 1930 until 1985; except where otherwise specifically set forth, each

22  Interrogatory and each Response are intended and should be construed as including and being

23  limited to such time frame.  Where expressly stated with reference to the date and circumstances

24  justifying use of such date, the responding party may limit any such response to dates subsequent

25  to 1930, but which in no event an later than the inception of the responding party, including the

26  inception of any predecessor in interest.

27        Unless otherwise specifically set forth, the geographic scope for response to these

28  Interrogatories by domestic corporations is the United States.  Hospital and other health care

                                    -1-
                                                                            Ex. K
   DEFENDANT LESLIE CONTROL, INC.'S RESPONSES TO PLAINTIFFS' STANDARD             (APP)

entity defendants shall provide responses related only to that defendant's physical facilities and shall not be required to disclose any information related to the furnishing of services to patients.

### DEFINITIONS

1.    "ASBESTOS-CONTAINING PRODUCT(S)" shall mean a product(s) which THIS DEFENDANT knows or believes to have contained any amount of the mineral asbestos at any time.

2.    "COMPANY" means any private enterprise including corporations, partnerships, joint ventures, and sole proprietorships. For purposes of Interrogatory No. 19, the term "COMPANY" includes organizations, associations or groups of manufacturers, miners, distributors, importers, labelers, suppliers and/or sellers of asbestos-containing products, of which the responding defendant was a member.

3.    A "CONTRACT UNIT" shall mean a branch, division, subsidiary or other affiliated entity of a DEFENDANT which has been or is now engaged in installation, disturbing or handling and/or removal of RAW ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS.

4.    "DOCUMENT(S)" or "WRITING(S)" shall include all writings as defined by Section 250 of the California Evidence Code.

5.    "GEOGRAPHIC AREA" means the 46 counties of Northern California (Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kern, Kings, Lake, Lassen, Marin, Mariposa, Mendocino, Merced, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo, Yuba) and military facilities/installations in the State of California, or the following shipyards: Bethlehem Shipbuilding, San Pedro; California Shipbuilding, Terminal Island; Consolidated Steel Shipyard, Wilmington; Los Angeles Shipbuilding and Dry Dock aka L.A. Ship, San Pedro; National Steel and Shipbuilding Corporation, San Diego; Todd Shipyards Corporation, San Pedro; Triple "A" Machine, San Diego; Western Pipe and Steel Company, Los Angeles and San Pedro Divisions;

-2-

1    Naval Air Station, North Island; Thirty-second Street Naval Repair Facility, San Diego; Long

2    Beach Naval Shipyard; and San Diego Destroyer Base.

3         6.      A request to "IDENTIFY" a "WRITING" or "DOCUMENT" or study shall mean

4    a request to either attach such an exhibit to your answers to these Interrogatories, or to describe

5    such with sufficient particularity that it may be made the subject of a request for production of

6    documents. YOUR description should include an indication of: (a) the author; (b) addressee(s);

7    (c) date of origin; (d) the nature of the writing or document (e.g., letter, telephone memorandum,

8    audio tape recording, photograph, etc.); and (e) its present location, name and present address of

9    custodian thereof.

10        7.      A request to "IDENTIFY" an oral communication shall mean a request to

11    describe the communication with particularity, and shall include the following information; (a)

12    the identity of all parties to the communication; (b) the identity of the person whom you contend

13    initiated the communication; (c) the identity of all persons present at the time of the

14    communication; and (d) the time, date and place of the communication.

15        8.      A request to "IDENTIFY" or to state the "IDENTITY" of a person or individual

16    means to state his or her name, the place of employment, job title, present business or present or

17    last known home address, years of employment and last known telephone number if not

18    employed by DEFENDANT.

19        9.      A request to "IDENTIFY" the product shall mean a request to describe the

20    product, the material or compound by the following means: (1) by nickname or slang name used

21    in your industry and/or occupation; (2) by the name under which it is sold in the marketplace

22    (trade name); (3) by its generic name; and (4) by manufacturer.

23        10.     "MARKETING" or "MARKETED" shall mean the mining, supply, sale, labeling,

24    distribution, importing, processing or manufacture of RAW ASBESTOS and/or ASBESTOS-

25    CONTAINING PRODUCT(S).

26        11.     A request to describe the "NATURE" of a product means to describe the: (a)

27    color; (b) texture; (c) form (i.e., powder, liquid, paste, solid, board, cloth, blanket, wire

28    insulation, etc.); (d) physical dimensions, if solid (length, width and height); (e) the type of

shipping package and shipping package dimensions if not solid; (f) type of asbestos fiber used in the composition of the product (e.g., chrysotile, amosite, crocidolite); (g) the intended use or function of such product as recommended by this DEFENDANT as the miner, producer, supplier, contractor, manufacturer, distributor, owner or seller; and (h) the type of worksite in which it was intended to be used (e.g., shipyard, refinery, commercial building construction, manufacturing plant, home, power generating plant, etc.).

12.    "PREMISES" includes, but is not limited to, buildings, structures in a refinery, boilers, generators, tract housing, commercial buildings and other such structures.

13.    "RAW ASBESTOS" means asbestos fiber mined or milled, either packaged or in bulk, not compounded with other substances and essentially pure with the exception of naturally occurring trace amounts of other substances.

14.    "THIS DEFENDANT" or "DEFENDANT" shall mean the named defendant herein, all of its divisions and subsidiaries in which it holds a controlling interest, and all "alternate entities" as defined and identified by name in any complaint pending against YOU as of the date of your answers.

15.    "YOU" and "YOUR" refer to the DEFENDANT who is named above as responding party.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

IDENTIFY the person verifying these answers on YOUR behalf.

**RESPONSE TO INTERROGATORY NO. 1:**

Matthew S. Wrobel, Director of Quality Assurance, Leslie Controls, Inc., 12501 Telecom Drive, Tampa, FL.

**INTERROGATORY NO. 2:**

State the date of first employment with YOU, and the dates and titles of each job position the person verifying these interrogatories has held while employed by YOU.

**RESPONSE TO INTERROGATORY NO. 2:**

Mr. Wrobel began working for Leslie Controls in 1966.  He has held various positions

-4-

1  by each such agreement.

2  **RESPONSE TO INTERROGATORY NO. 36:**

3      N/A

4  **INTERROGATORY NO. 37:**

5      As to RAW ASBESTOS and to each such ASBESTOS-CONTAINING PRODUCT

6  listed in YOUR responses to Interrogatories No. 29 and 31 did DEFENDANT warn of the health

7  hazards of asbestos? If so, state for each such warning:

8      A.    The content, size, color, and location; whether the warning appeared on the

9  material and/or on the container, and/or was placed on a tag; whether the warning was included

10  in contracts; whether the warning was included in advertising or other promotional materials.

11      B.    State whether you have any photographs thereof;

12      C.    The inclusive dates on which you used each such warning;

13      D.    State all changes you made in such warnings and the dates of such changes; and

14      E.    Identify the person most knowledgeable about your warnings and warning policy.

15  **RESPONSE TO INTERROGATORY NO. 37:**

16      Defendant states that it is not aware of any health or safety hazards associated with

17  normal use of its products; therefore, issued no such warnings.

18  **INTERROGATORY NO. 38:**

19      With respect to each of YOUR ASBESTOS-CONTAINING PRODUCTS, state whether

20  THIS DEFENDANT's name, a trademark, logos, color coding, or other identifying markings

21  ever appeared on the actual product itself. If so, IDENTIFY each such product, state when the

22  practice to place such identifying markings upon the product was begun and when it ended, if

23  applicable, and describe in detail the pertinent marking(s) and the purpose, if any, of such

24  markings.

25  **RESPONSE TO INTERROGATORY NO. 38:**

26      See answer to 31(E).

27  **INTERROGATORY NO. 39:**

28      Between the years 1930 to 1985, did THIS DEFENDANT purchase or otherwise acquire

-32-

DEFENDANT LESLIE CONTROL, INC.'S RESPONSES TO PLAINTIFFS' STANDARD

1  CONTRACT UNITS.

2  **RESPONSE TO INTERROGATORY NO. 42:**

3      No.

4  **INTERROGATORY NO. 43:**

5      State whether or not any of YOUR CONTRACT UNITS installed and/or removed RAW

6  ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS in the GEOGRAPHIC AREA at

7  any time between 1930 and 1985.  If so:

8      A.      State the business addresses and name of the CONTRACT UNIT;

9      B.      State the inclusive periods of time the CONTRACT UNITS were working in the

10  GEOGRAPHIC AREA;

11      C.      State the name and address of each job site within the GEOGRAPHIC AREA and

12  the dates the CONTRACT UNIT worked at those job sites, and, IDENTIFY the RAW

13  ASBESTOS and/or ASBESTOS-CONTAINING PRODUCTS installed or removed on each

14  occasion;

15      D.      Either (1) attach all DOCUMENTS evidencing the information sought in this

16  Interrogatory and its subparts to your answers to these Interrogatories, or (2) attach disks

17  containing such data, or (3) describe such DOCUMENTS with sufficient particularity that they

18  may be made the subject of a request for production of documents.

19  **RESPONSE TO INTERROGATORY NO. 43:**

20      N/A.

21  **INTERROGATORY NO. 44:**

22      When do YOU contend that THIS DEFENDANT first became aware that there is an

23  association between asbestos exposure and disease in human beings?

24  **RESPONSE TO INTERROGATORY NO. 44:**

25      Defendant assumes that this Interrogatory is limited to the knowledge of defendant

26  LESLIE CONTROLS, INC., as contrasted to the knowledge of its employees, and is further

27  limited to knowledge associated with the hazards of encapsulated, covered, and/or housed

28  asbestos-containing gaskets and/or packing materials that may have been incorporated into its

1   equipment.

2       Leslie responds that the exact time of when Leslie first obtained any knowledge

3   concerning the potential health hazards of asbestos is unknown.   Matthew Wrobel - Director of

4   Quality Assurance, first became aware of the potential health hazards of asbestos sometime in

5   the late 1980's through oral conversation.  However, Leslie Controls is not aware of any studies

6   that indicate the handling of asbestos-containing gaskets or packing is a potential health hazard.

7   At all times throughout its history, Leslie Controls complied with all applicable state and Federal

8   statutes, including OSHA.  Indeed, inspectors for OSHA were present at the Leslie

9   manufacturing facility(ies) at various times throughout its history, and at no time did OSHA

10  warn Leslie Controls about the so-called "hazards of asbestos" or stop Leslie from performing

11  any work involving gaskets and/or packing materials, much less stop such work because such

12  work created a "hazard."  Accordingly, Leslie Controls is able to state that, as a company, it took

13  its safety obligations seriously and was well aware of any and all hazards involved in the

14  manufacture of valves.

15      With respect to Leslie Controls' employees, it is impossible for Leslie Controls to state

16  when each and every one of its employees may have heard of some vague "hazard" from the

17  exposure to asbestos-containing materials, such as insulation, that it never manufactured.

18  Matthew Wrobel, Director of Quality Assurance, first became aware of the potential health

19  hazards of asbestos some time in the late-1980s through oral conversation.  Further, defendant is

20  not aware of any potential health hazards associated with the use of asbestos-containing gaskets

21  or packing.  Based upon information and belief, it is the position of the manufacturers of the

22  gaskets and packing that the manufacturers encapsulated the fiber in lubricants, binders, metals

23  and adhesives, which prevents the release of asbestos fibers upon normal use and installation.

24  Additionally, the gaskets and packing were completely encased within the body of the valves,

25  making access to the gaskets or packing impossible without removal and/or disassembly in the

26  valve.

27  **INTERROGATORY NO. 45:**

28      How do YOU contend that THIS DEFENDANT first became aware that there is an

DEFENDANT LESLIE CONTROL, INC.'S RESPONSES TO PLAINTIFFS' STANDARD
INTERROGATORIES TO ALL DEFENDANTS