MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2009

FILED
CLERK'S OFFICE

PLEADING NO. 5914

1  JENNIFER JUDIN (State Bar No. 256973)
   jjudin@dehay.com
2  PAUL C. WHITE II (SBN 213900)
   pwhite@dehay.com
3  DEHAY & ELLISTON, L.L.P.
   800 West 6th Street, Suite 788
4  Los Angeles, CA  90017
   Telephone:  (213) 271-2727
5  Facsimile:  (213) 271-2730
6
   Attorneys for Defendant
7  LESLIE CONTROLS, INC.

8  **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

9   IN RE: ASBESTOS PRODUCTS          )   MDL DOCKET NO. 875
    LIABILITY LITIGATION (No. VI)     )
10                                    )
                                      )   **DEFENDANT LESLIE**
11  ELLIS MICHAEL STATON AND          )   **CONTROLS, INC.'S RESPONSE**
    SUSAN MARY STATON,                )   **TO PLAINTIFFS' MOTION TO**
12                                    )   **VACATE CONDITIONAL**
        v.                            )   **TRANSFER ORDER (CTO-324)**
13                                    )
    AMERICAN STANDARD, INC.,          )   **(Filed concurrently with the**
14  individually and as successor-in-interest )  **Declaration of Paul C. White and**
    to THE TRANE COMPANY; et al.      )   **Leslie Controls Inc.'s Certification**
15                                    )   **of Interested Parties)**
16                                    )
17
               **UNITED STATES DISTRICT COURT**
18
               **CENTRAL DISTRICT OF CALIFORNIA**
19
20  ELLIS MICHAEL STATON AND          Case No. CV09-03724 R (VBKx)
21  SUSAN MARY STATON,
                                      Case No. BC412018 (Los Angeles
22          Plaintiffs,               County Superior Court)
23      v.                            **DEFENDANT LESLIE CONTROLS,**
24  AMERICAN STANDARD, INC.,          **INC.'S RESPONSE TO**
    individually and as successor-in-interest  **PLAINTIFFS' MOTION TO**
25  to THE TRANE COMPANY; et al.,     **VACATE CONDITIONAL**
                                      **TRANSFER ORDER (CTO-324)**
26          Defendants.
27          **OFFICIAL FILE COPY**
28
                                      **IMAGED** SEP   8 2009

LESLIE/Staton

DEFENDANT LESLIE CONTROLS, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER (CTO-324)

# I.     INTRODUCTION

Plaintiffs have offered no valid arguments supporting a decision to vacate the Conditional Transfer Order ("CTO").  This Panel has the jurisdiction and the congressional mandate to transfer this case to the MDL No. 875 in the Eastern District of Pennsylvania ("MDL").  Accordingly, this Panel should deny Plaintiffs' Motion to Vacate the CTO ("Motion") and should transfer this case to the MDL.

Plaintiffs have offered no evidence to show that the Panel is jurisdictionally or procedurally precluded from transferring this case to the MDL.  Rather, Plaintiffs endeavor to convince this Panel that their Motion for Remand, filed in District Court, is somehow unresolved, and that this Panel should allow sufficient time for a "final" decision on remand to be handed down.  The reality, of course, is that Plaintiffs' Motion for Remand was *fully vetted, in both written and oral arguments*, before the Hon. Manuel L. Real (C.D. CA), who issued a written order *denying* their remand motion.  Moreover, it is not the charge of this Panel to make a determination as to the propriety of Judge Real's denial of remand.

Plaintiffs now come before this Panel and rehash the same failed arguments they made during their Remand hearing, with an added emotional appeal that Plaintiff Ellis Michael Staton will somehow be denied his day in court if his case is transferred to the MDL.  However, this Panel routinely transfers to the MDL cases similar to the instant action, wherein plaintiffs are ill.  Plaintiffs have offered no serious argument as to why their action should be treated any differently than other cases transferred by this Panel.

Plaintiffs' recycled arguments, now improperly brought before this Panel, have been heard, argued, and denied in the District Court.  This Panel should likewise deny Plaintiffs' Motion and transfer this case to the MDL, "for the convenience of the parties and witnesses and [to] promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a) (2009).

## II.    PROCEDURAL HISTORY

### A.    Plaintiffs' Motion for Remand Was Denied After Full Hearing

Plaintiffs filed their personal injury Complaint alleging asbestos-related injuries on April 16, 2009 in the Los Angeles County Superior Court. After Defendant Leslie Controls, Inc. ("Leslie") received the Summons and Complaint, it timely filed a Notice of Removal to the United States District Court for the Central District of California on May 26, 2009.[1]  Leslie argued that such removal was proper under 28 U.S.C. § 1442(a)(1) because (1) any products Leslie sold to the U.S. Navy were manufactured in strict compliance with detailed government specifications, including markings and labeling specifications; and (2) the Navy had superior knowledge about potential health hazards, including asbestos-related hazards. Plaintiffs filed a Motion to Remand on June 2, 2009. Leslie's Opposition to said motion and Plaintiffs' Reply were timely filed.

On June 29, 2009, the Hon. Manuel L. Real heard extensive oral argument and issued an oral decision denying Plaintiffs' remand motion. On July 14, 2009, Judge Real issued his written order. His ruling denied Plaintiffs' request for remand, based on Leslie meeting its burden of establishing that removal was proper under 28 U.S.C. § 1442(a)(1).[2]  Plaintiffs filed a Petition for Writ of Mandamus ("Writ") before the Ninth Circuit on July 16, 2009, requesting that the Appeals Court overturn Judge Real's ruling. Notably, neither the Ninth Circuit nor the District Court issued a stay of proceedings as a result of Plaintiffs' Writ.

### B.    Conditional Transfer Order (CTO-324)

On July 17, 2009, this Panel filed its Conditional Transfer Order (CTO-324) identifying Plaintiffs' action as tag-along action, pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation. Under the Conditional Transfer Order, Plaintiffs' action will be transferred to the MDL before the

---

[1]  Leslie's Notice of Removal, attached as Exhibit A to the Declaration of Paul C. White ("White Decl.").

[2]  Judge Real's Order of July 14, 2009, attached as Exhibit B to the White Decl.

LESLIE/Staton

1   Honorable Eduardo C. Robreno for coordinated or consolidated pretrial proceedings,

2   pursuant to 28 U.S.C. § 1407.  Plaintiffs filed a Notice of Opposition on August 3,

3   2009, followed by Plaintiffs' Motion to Vacate Conditional Transfer Order (CTO-

4   324) filed on August 18, 2009.

5   **III.   ARGUMENT**

6       **A.   The Panel Has Proper Jurisdiction to Transfer this Action.**

7       Plaintiffs have offered no argument that the Panel is procedurally or

8   jurisdictionally precluded from transferring this action to the MDL.  Their Motion is

9   silent as to these considerations because, indeed, the Panel is *not* prevented from

10  transferring this action.  Plaintiffs instead attempt to argue that the Panel should

11  vacate its CTO because the Panel has, on at least one occasion[3], vacated a CTO to

12  allow a district court to issue a ruling on a *remand* motion.

13      First, unlike the single and only case cited by Plaintiffs, the issue of remand

14  here has already been *decided*.  After written and oral argument, Judge Real denied

15  Plaintiffs' remand motion.  While Plaintiffs seek to have the Ninth Circuit overrule

16  Judge Real's ruling, their Writ includes *no* new issues of fact or law in support of

17  remand.  Further, after receipt of Plaintiffs' Writ, neither the Ninth Circuit nor the

18  District Court issued a stay of proceedings.  Plaintiffs' Writ is an attempt to frustrate

19  the Panel's congressional mandate to transfer federal actions involving asbestos-

20  related personal injury allegations to the MDL.

21      Second, even if there were outstanding jurisdictional issues (which there are

22  not); such issues are *insufficient reason* to prohibit transfer.  Outstanding

23  jurisdictional questions do not defeat transfer by this Panel.  *See In re Asbestos*

24  *Prods. Liab. Litig (No. VI.)*, 170 F. Supp.2d 1348 (J.P.M.L. 2001); *accord In re*

25  *Gypsum Wallboard*, 302 F.Supp. 794 (J.P.M.L 1969); *In re Ivy*, 901 F.2d 7, 9 (2nd

26  Cir. 1990) ("The MDL Panel has jurisdiction to transfer a case in which a

27  jurisdictional objection is pending.")

28  [3] *Vasura v. AC&S*, 84 F. Supp. 2d 531 (S.D.N.Y. 2000)

LESLIE/Staton

1    Thus, Plaintiffs' argument that this Panel should vacate its CTO because the

2 Ninth Circuit *may* overturn the District Court's final order denying remand is

3 inapposite and, at this point, pure speculation.  The Ninth Circuit has yet to indicate

4 that it will even consider Plaintiffs' Writ.  But even if it should so decide, and even if

5 Plaintiffs should prevail before the Ninth Circuit, Plaintiffs' action easily could be

6 sent back to state court from the MDL itself.

7

8    **B.    Plaintiffs' Arguments in Their Motion to Vacate CTO Have Already Been Argued Before and Denied by the District Court.**

9    Plaintiffs claim that during his service aboard a Navy vessel, Mr. Staton was

10 exposed to asbestos from Leslie's equipment.  As Leslie's Removal papers and

11 Opposition to Remand explained in great detail, Leslie closely complied with

12 government specifications in the products it supplied to the U.S. Navy.  Leslie is thus

13 able to avail itself of the federal officer/government contractor defense.  As Judge

14 Real ruled, Leslie properly removed Plaintiffs' action to Federal court.

15    The U.S. Navy exercised direction and control over the design, manufacture,

16 inspection and testing of all equipment supplied by Leslie to the Navy pursuant to

17 government contract.  Moreover, even *if* certain products supplied by Leslie to the

18 Navy did contain asbestos (which Plaintiffs *have not* shown), the Navy possessed

19 virtually unparalleled knowledge of the dangers of asbestos, and so Leslie had no

20 duty to warn.  *See, e.g., Durham v. Lockheed Martin Corporation,* 445 F. 3d 1247,

21 1252 (9th Cir. 2006).  The District Court denied Plaintiffs' request for remand, ruling

22 that Leslie had timely removed Plaintiffs action and had met its burden of showing a

23 colorable federal officer defense to support its removal.

24    Plaintiffs want to convince this Panel that their Writ contains new arguments

25 and analysis that will compel the Ninth Circuit to overturn the District Court's denial

26 of remand.  In support of this effort, Plaintiffs sprinkle their instant Motion with

27 statements such as Leslie "wrongly removed this case to federal court,"[4] and "there is

28

---

[4] Plaintiffs' Motion to Vacate CTO, p. 4.

DEFENDANT LESLIE CONTROLS, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE
CONDITIONAL TRANSFER ORDER (CTO-324)

LESLIE/Staton

1   absolutely no federal subject matter jurisdiction over Plaintiffs' causes of action."[5]

2   However, as Judge Real noted during oral argument, the reality is that

3   Plaintiffs simply misunderstand the law regarding removal based on the federal

4   officer statute.  As Judge Real's Order stated, Leslie "timely *and properly*" removed

5   Plaintiffs' case to Federal court, "consistent with the requirements of the federal

6   officer removal statute, 28 U.S.C. § 1442(a)(1), and 28 U.S.C. § 1446." (emphasis

7   added).  Moreover, Plaintiffs have offered *no new arguments* in their Writ for the

8   Ninth Circuit to consider.  Their Writ is a recitation of the exact same arguments that

9   Judge Real considered and rejected during the remand hearing.

10  Plaintiffs thus improperly request that this Panel reach substantive conclusions

11  regarding the merits of the Writ and further, that the Panel predict that the Ninth

12  Circuit will not only consider Plaintiffs' Writ, but also will grant it.  They ask this,

13  despite the fact that neither the Ninth Circuit nor the District Court saw fit to stay

14  proceedings so that the Writ could be considered.  Underpinning all their efforts is

15  the bold and unqualified assertion that justice cannot be served in the MDL.

16  **C.     Plaintiffs' Arguments do not Justify Vacating CTO-324.**

17  Plaintiffs argue that vacating this Panel's Conditional Transfer Order is

18  required because Mr. Staton may die before complete adjudication of Plaintiffs'

19  claims in the MDL.  Citing no cases, Plaintiffs contend the MDL lacks the ability to

20  resolve Plaintiffs' claims expeditiously.  Plaintiffs fail to consider that the MDL has

21  broad discretion to accommodate case-specific exigencies, such as an advanced

22  disease, by prioritizing and otherwise organizing pretrial proceedings accordingly.

23  *In re Joann Patenaude*, 210 F.3d 135, 139-40 (3rd Cir. 2000); *see also In re Asbestos*

24  *Prods. Liab. Litig. (No. VI)*, 1996 WL 539589 (E.D. Pa. Sept. 16, 1996) ("The Court

25  has prioritized malignancies and other serious disease cases").  Should the need

26  present itself; Plaintiffs can request this relief from the MDL.

27

28  _____
[5] *Id.*

5

LESLIE/Staton

1  *In re Joann Patenaude*, 210 F.3d 135, 139-40 (3rd Cir. 2000); *see also In re Asbestos*
2  *Prods. Liab. Litig. (No. VI)*, 1996 WL 539589 (E.D. Pa. Sept. 16, 1996) ("The Court
3  has prioritized malignancies and other serious disease cases").  Should the need
4  present itself; Plaintiffs can request this relief from the MDL.

5  **IV.    CONCLUSION**

6
7      This Panel should transfer the instant action under its Conditional Transfer
8  Order (CTO-324) and there is no reason why it should depart from its initial order.
9  Transfer is appropriate because this case is similar to those before MDL No. 875,
10  and moreover, Plaintiffs failed to demonstrate any viable reason why they are
11  dissimilar or otherwise should receive preferential treatment.  Further, Plaintiffs
12  removal arguments are irrelevant to the issues before this Panel.

13  DATED: September 3, 2009                    **DEHAY & ELLISTON, L.L.P.**

14

15

16  By: _____
     Jennifer Judin
17   Paul C. White II
     800 West 6th Street, Suite 788
18   Los Angeles, CA    90017
     Telephone:  (213) 271-2727
19   Facsimile:  (213) 271-2730

20

21

22

23

24

25

26

27

28

6

LESLIE/Staton

1  JENNIFER JUDIN (State Bar No. 256973)
   jjudin@dehay.com
2  PAUL C. WHITE II (SBN 213900)
   pwhite@dehay.com
3  DEHAY & ELLISTON, L.L.P.
   800 West 6th Street, Suite 788
4  Los Angeles, CA   90017
   Telephone:  (213) 271-2727
5  Facsimile:   (213) 271-2730

6  Attorneys for Defendant
   LESLIE CONTROLS, INC.
7

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2009

FILED
CLERK'S OFFICE

8      **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

9   IN RE: ASBESTOS PRODUCTS          )   MDL DOCKET NO. 875
    LIABILITY LITIGATION (No. VI)     )
10                                    )
                                      )   **DECLARATION OF PAUL C.**
11  ELLIS MICHAEL STATON AND          )   **WHITE IN SUPPORT OF LESLIE**
    SUSAN MARY STATON,                )   **CONTROLS, INC.'S**
12                                    )   **OPPOSITION TO PLAINTIFFS'**
              v.                      )   **MOTION TO VACATE**
13                                    )   **CONDITIONAL TRANSFER**
    AMERICAN STANDARD, INC.,          )   **ORDER (CTO-324)**
14  individually and as successor-in-interest )
    to THE TRANE COMPANY; et al.      )
15                                    )
                                      )
16                                    )
                                      )
17

18              **UNITED STATES DISTRICT COURT**

19              **CENTRAL DISTRICT OF CALIFORNIA**

20
    ELLIS MICHAEL STATON AND          |   Case No. CV09-03724 R (VBKx)
21  SUSAN MARY STATON,                |
                                      |   Case No. BC412018 (Los Angeles
22              Plaintiffs,           |   County Superior Court)
                                      |
23            v.                      |
                                      |   **DEFENDANT LESLIE CONTROLS,**
24  AMERICAN STANDARD, INC.,          |   **INC.'S RESPONSE TO**
    individually and as successor-in-interest |   **PLAINTIFFS' MOTION TO**
25  to THE TRANE COMPANY; et al.,     |   **VACATE CONDITIONAL**
                                      |   **TRANSFER ORDER (CTO-324)**
26              Defendants.           |

27

28

LESLIE/Staton

# DECLARATION OF PAUL C. WHITE

I, Paul C. White, declare:

1.     I am an attorney at law, duly licensed to practice law in the State of California and am associated with the law offices of DeHay & Elliston LLP, attorneys of record for defendant, Leslie Controls. Inc. (hereinafter "Leslie"), in the above-referenced matter.  I have reviewed the file and am familiar with its contents.  Based upon my review and my personal knowledge, I declare that if called upon and sworn, I could and would competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of Leslie's Notice of Removal to the United States District Court for the Central District of California, filed on May 26, 2009.

3.     Attached hereto as Exhibit B is a true and correct copy of the District Court's Order of July 14, 2008, denying Plaintiffs' Motion for Remand.

4.     Attached hereto as Exhibit C is a true and correct copy of Leslie's Certification of Interested Parties, concurrently filed with its Notice of Removal on May 26, 2009.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 3rd day of September, 2009, at Los Angeles, in the County of Los Angeles, California.

_____
PAUL C. WHITE

1

DECLARATION OF PAUL C. WHITE IN SUPPORT OF DEFENDANT LESLIE CONTROLS, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-324)

LESLIE/Staton

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2009

A

FILED
CLERK'S OFFICE

1    JENNIFER JUDIN (State Bar No. 256973)
     jjudin@dehay.com
2    PAUL C. WHITE II (SBN 213900)
     pwhite@dehay.com
3    DEHAY & ELLISTON, L.L.P.
     800 West 6th Street, Suite 788
4    Los Angeles, CA   90017
     Telephone:   (213) 271-2727
5    Facsimile:   (213) 271-2730

6    Attorneys for Defendant
     LESLIE CONTROLS, INC.

7

8

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

MAY 2 0 2009

John A. Clarke, Executive Officer/Clerk

By_____, Deput
CYNTHIA M. JACOBS

9          **SUPERIOR COURT OF CALIFORNIA**

10         **FOR THE COUNTY OF LOS ANGELES**

11

12    ELLIS MICHAEL STATON AND
     SUSAN MARY STATON,
13

14           Plaintiffs,

15        v.

16    AMERICAN STANDARD, INC.,
     individually and as successor-in-interest
17    to THE TRANE COMPANY;
     AURORA PUMP COMPANY;
18    ARMSTRONG INTERNATIONAL,
     INC.; BUFFALO PUMPS, INC.;
19    CARRIER CORPORATION,
     individually and as successor-in-interest
20    to Elliott Company, successor-in-interest
     to Crocker-Wheeler Company;
21    CLEAVER-BROOKS, INC.,
     individually and f/k/a Aqua-Chem, Inc.;
22    CRANE CO., individually and as
     successor in interest to Chapman Valves;
23    DOWMAN PRODUCTS, INC.; FMC
     CORPORATION, individually, on
24    behalf of FRASER'S BOILER
     SERVICE, INC.; GARLOCK
25    SEALING TECHNOLOGIES, L.L.C.
     individually and as successor-in-interest
26    to Garlock, Inc.; GEORGIA-PACIFIC,
     LLC, f/k/a Georgia-pacific Corporation,
27    individually and as successor-in-interest
     to Bestwall Gypsum Company;
28    GOULDS PUMPS INCORPORATED;
     GRINNELL, L.L.C. (f/k/a Hamilton

LACSC Case No. BC412018

**DEFENDANT LESLIE CONTROLS,
INC.'S NOTICE OF FILING OF
NOTICE OF REMOVAL OF
ACTION UNDER 28 U.S.C. §§ 1442
AND 1446**

State Action Filed:    April 16, 2009
Trial Date:           None Set

LESLIE/Staton

| | |
|---|---|
| 1 | Distributing, Inc.); IMO INDUSTRIES, INC. (individually and as successor-in-interest to De Laval Turbine, Inc.); |
| 2 | |
| 3 | INGERSOLL-RAND COMPANY individually and as successor-in-interest to The Aldrich Company; ITT |
| 4 | CORPORATION, f/k/a ITT INDUSTRIES, INC., individually, and |
| 5 | as successor-in-interest to "BELL & GOSSETT" branded product and |
| 6 | Grinnell Corporation; JOHN K. BICE CO., INC; JOHNSON CONTROLS, |
| 7 | INC., KAISER GYPSUM COMPANY, INC.; KELLY-MOORE PAINT |
| 8 | COMPANY, INC.; LESLIE CONTROLS, INC.; MECHANICAL |
| 9 | DRIVES & BELTING (f/k/a L.A. Rubber Company); METALCLAD |
| 10 | INSULATION CORPORATION; PENTAIR, INC., individually and as |
| 11 | successor-in-interest to Aurora Pump Company; RED-WHITE VALVE |
| 12 | CORPORATION; SPENCE ENGINEERING COMPANY, INC.; |
| 13 | SPIRAX SARCO, INC.; SPX CORPORATION, individually and as |
| 14 | successor-in-interest to General Signal Corporation (successor-in-interest to |
| 15 | Aurora Pump Company); THOMAS DEE ENGINEERING CO.; TRIPLE A |
| 16 | MACHINE SHOP, INC. (a/k/a Triple A Shipyard); UNION CARBIDE |
| 17 | CORPORATION; THE WILLIAM POWELL COMPANY; YARWAY |
| 18 | CORPORATION; YORK INTERANTIONAL CORPORATION, |
| 19 | individually and as successor-in-interest to Central Environmental Systems, Inc., |
| 20 | f/k/a Borg-Warner Central Environmental Systems, Inc.; York- |
| 21 | Luxaire, Inc.; Luxaire Inc.; and The C.A. Olsen Manufacturing Company and |
| 22 | d/b/a "Moncrief Furnaces" d/b/a York Hearing & Air Conditioning; ZURN |
| 23 | INDUSTRIES, LLC., f/k/a Zurn Industries, Inc., a/k/a and successor-by- |
| 24 | merger to Erie City Iron Works and d/b/a "Keystone" branded products; and |
| 25 | DOES 1-300 inclusive, |
| 26 |                           Defendants. |
| 27 | |
| 28 | |

LESLIE/Suton

DEFENDANT LESLIE CONTROLS, INC.'S NOTICE OF FILING OF NOTICE OF REMOVAL

1  TO THE CLERK OF THE SUPERIOR COURT OF THE STATE OF

2  CALIFORNIA COUNTY OF LOS ANGELES:

3    PLEASE TAKE NOTICE THAT on May 26, 2009, Defendant Leslie

4  Controls, Inc. ("Leslie Controls") filed in the United States District Court for the

5  Central District of California a Notice of Removal, to effect the removal of the

6  above-captioned case from the Superior Court for the State of California for the

7  County of Los Angeles.  A true and correct copy of the Notice of Removal is

8  attached hereto as Exhibit 1.

9    The Los Angeles County Superior Court hereby is advised that, pursuant to

10  28 U.S.C. § 1446, the filing of the Notice of Removal in the United States District

11  Court, together with the service and filing of a copy of that Notice with this Court,

12  effects the removal of the above-entitled action, which can proceed no further in

13  this Court unless and until the case is remanded.

14

15  DATED:  May 26, 2009      **DEHAY & ELLISTON, L.L.P.**

16                 Jennifer Judin
                  Paul C. White II

17

18

19          By: _____

20              Paul C. White II

21              Attorneys for Defendant
               LESLIE CONTROLS, INC.

22

23

24

25

26

27

28

LESLIE/Sutton

DEFENDANT LESLIE CONTROLS, INC.'S NOTICE OF FILING OF NOTICE OF REMOVAL

**PROOF OF SERVICE**
(Code Civ. Proc., §§ 1013A, 2015.5, 1011
Cal. Rules of Court, Rule 2008(e))
State of California, County of Los Angeles
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
**Los Angeles Superior Court Case No. BC 412 018**

I, the undersigned, declare:

I am a citizen of the United States and am employed in the County of Los Angeles, California. I am over the age of eighteen (18) years, not a party to the above-entitled action, and my business address is located at 800 West 6th Street, Suite 788, Los Angeles, California 90017.

On the date executed below, I served the document(s) described as:

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTIONS 1442 and 1446**

on the interested parties in this action as follows:

[ ] **BY PERSONAL DELIVERY:** I caused to be personally delivered a true copy in a sealed envelope addressed as indicated below.

[ ] **BY OVERNIGHT DELIVERY:** I placed a true copy in a sealed, fully prepaid, UPS Next Day Air envelope addressed as indicated below. It is picked up by UPS on that same day in the ordinary course of business.

[ X ] **BY FACSIMILE:** I personally sent a true copy to the person(s), counsel or interested party, authorized to accept service as set forth below at fax number **[SEE SERVICE LIST]** from fax number **(213) 271-2730.** The facsimile machine I used complied with CRC Rule 2003(3) and the transmission was reported as complete and without error. Pursuant to CRC Rule 2008(e) a transmission verification report was properly issued by the transmitting facsimile machine, stating the time and date of such transmission. **(All Defense Counsel)**

[ X ] **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated below. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit. **(Plaintiffs Only)**

| **BARON & BUDD, P.C.** | **BARON & BUDD, P.C.** |
|---|---|
| 3102 Oak Lawn Avenue, Suite 1100 | 9465 Wilshire Blvd., Suite 460 |
| Dallas, TX 75219 | Beverly Hills, CA 90212 |
| Tel: (214) 521-3605 | Tel: (214) 860-0476 |
| Fax: (214) 520-1181 | Fax: (214) 860 0480 |
| **Attorneys for Plaintiffs** | **Attorneys for Plaintiffs** |

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2009, at Los Angeles, California.

Lucia M. Oyos

**1**

**PROOF OF SERVICE**

1

**SERVICE LIST**
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*

2

**Los Angeles Superior Court Case No. BC 412 018**

| | |
|---|---|
| BECHERER, KANNETT & SCHWEITZER<br>2200 Powell Street, Suite 805<br>Emeryville, CA 94608<br>Tel: (510) 658-3600<br>Fax: (510) 658-1151 | **JOHN K. BICE CO., INC.** |
| LAW OFFICES OF GLASPY & GLASPY<br>100 Pringle Avenue, Suite 750<br>Walnut Creek, CA 94596<br>Tel: (925) 947-1300<br>Fax: (925) 947-1594 | **FRASER'S BOILER SERVICE, INC.;<br>GARLOCK SEALING TECHNOLOGIES,<br>LLC** |
| GORDON & REES, LLP<br>275 Battery Street, Suite 2000<br>San Francisco, CA 94111<br>Tel: (415) 986-5900<br>Fax: (415) 986-8054 | **GOULDS PUMPS INCORPORATED;<br>INGERSOLL-RAND COMPANY** |
| GRACE GENSON, COSGROVE & SCHIRM<br>444 South Flower Street, Suite 1100<br>Los Angeles, CA 90071-2912<br>Tel: (213) 533-5400<br>Fax: (213) 533-5444 | **KELLY-MOORE PAINT COMPANY** |
| HOWARD, ROME MARTIN & RIDLEY<br>1775 Woodside Road, Suite 200<br>Redwood City, CA 94061-3436<br>Tel: (650) 365-7715<br>Fax: (650) 364-5297 | **IMO INDUSTRIES, INC.** |
| JACKSON & WALLACE, LLP<br>14724 Ventura Blvd., Suite 410<br>Sherman Oaks, CA 91403<br>Tel: (818) 379-4700<br>Fax: (818) 379-4702 | **ZURN INDUSTRIES, INC.** |
| JACKSON & WALLACE, LLP<br>55 San Francisco Street, 6th Street<br>San Francisco, CA 94133<br>Tel: (415) 982-6300<br>Fax: (415) 982-6700 | **BUFFALO PUMPS, INC.** |

2

| | |
|---|---|
| K & L GATES LLP<br>10100 Santa Monica Blvd., 7th Floor<br>Los Angeles, CA 90067<br>Tel: (310) 552-5000<br>Fax (310) 552-5001 | **CRANE CO.** |
| LOMBARDI, LOPER & CONANT, LLP<br>1999 Harrison Street, Suite 2600<br>Oakland, CA 94612<br>Tel:  (510) 433-2600<br>Fax:  (510) 433-2699 | **MECHANICAL DRIVES & BELTING** |
| LOW, BALL & LYNCH<br>505 Montgomery Street, 7th Floor<br>San Francisco, CA 94111<br>Tel:  (415) 981-6630<br>Fax: (415) 982-1634 | **ARMSTRONG INTERNATIONAL, INC.** |
| MCKENNA LONG & ALDRIDGE, LLP<br>444 South Flower Street, 8th Floor<br>Los Angeles, CA 90071-2901<br>Tel:  (213) 688-1000<br>Fax: (213) 243-6330 | **METALCLAD INSULATION CORPORATION ; UNION CARBIDE CORPORATION** |
| MORGAN LEWIS & BOCKIUS, LLP<br>300 South Grand Avenue, 22nd Floor<br>Los Angeles, CA 90071-3132<br>Tel: (213) 612-2500<br>Fax: (213) 612-2501 | **YARWAY CORPORATION; GRINNELL, LLC** |
| POND NORTH LLP<br>350 S. Grand Avenue, Suite 2850<br>Los Angeles, CA 900781<br>Tel: (213) 617-6170<br>Fax: (213) 623-3594 | **FMC CORPORATION** |
| PRINDLE, DECKER & AMARO LLP<br>310 Golden Shore, 4th Floor<br>Long Beach, CA 90802<br>Tel: (562) 436-3946<br>Fax: (562) 495-0564 | **AMERICAN STANDARD, INC.; TRIPLE A MACHINE SHOP, INC.** |

3

| | |
|---|---|
| SCHIFF HARDIN, LLP<br>One Market Plaza<br>Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>Tel: (415) 901-8700<br>Fax: (415) 901-8701 | **GEORGIA-PACIFIC, LLC** |
| SELMAN BREITMAN, LLP<br>11766 Wilshire Blvd., Sixth Floor<br>Los Angeles, CA 90025-6538<br>Tel: (310) 445-0800<br>Fax: (310) 473-2525 | **CLEAVER-BROOKS, INC.** |
| TUCKER ELLIS & WEST LLP<br>515 South Flower Street, 42nd Floor<br>Los Angeles, CA 90071<br>Tel: (213) 430-3400<br>Fax: (213) 430-3409 | **CARRIER CORPORATION** |
| WALSWORTH, FRANKLIN, BEVINS<br>One City Blvd. West, Fifth Floor<br>Orange, CA 92868<br>Tel: (714) 634-2522<br>Fax: (714) 634-0686 | **BONDEX INTERNATION, INC.;<br>DOWMAN PRODUCTS, INC.'<br>HAMILTON MATERIALS, INC.;<br>THOMAS DEE ENGINEERING CO.** |

4

**SERVICE LIST**

EXHIBIT "1"

1  JENNIFER JUDIN (State Bar No. 256973)
   jjudin@dehay.com
2  PAUL C. WHITE II (SBN 213900)
   pwhite@dehay.com
3  DEHAY & ELLISTON, L.L.P.
   800 West 6th Street, Suite 788
4  Los Angeles, CA   90017
   Telephone:  (213) 271-2727
5  Facsimile:   (213) 271-2730

6  Attorneys for Defendant
   LESLIE CONTROLS, INC.

7

8                    UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT

10                                     CV09-03724  JSL (MANx)

11

12 ELLIS MICHAEL STATON AND          Case No. _____
   SUSAN MARY STATON,
13                                    Case No. BC412018 (Los Angeles
                   Plaintiffs,        County Superior Court)
14
          v.
15                                    DEFENDANT LESLIE CONTROLS,
   AMERICAN STANDARD, INC.,           INC.'S NOTICE OF REMOVAL OF
16 individually and as successor-in-interest   ACTION UNDER 28 U.S.C.
   to THE TRANE COMPANY;             SECTIONS 1442 AND 1446
17 AURORA PUMP COMPANY;
   ARMSTRONG INTERNATIONAL,
18 INC.; BUFFALO PUMPS, INC.;
   CARRIER CORPORATION,
19 individually and as successor-in-interest
   to Elliott Company, successor-in-interest
20 to Crocker-Wheeler Company;
   CLEAVER-BROOKS, INC.,
21 individually and f/k/a Aqua-Chem, Inc.;
   CRANE CO., individually and as
22 successor in interest to Chapman Valves;
   DOWMAN PRODUCTS, INC.; FMC
23 CORPORATION, individually, on
   behalf of FRASER'S BOILER
24 SERVICE, INC.; GARLOCK
   SEALING TECHNOLOGIES, L.L.C.
25 individually and as successor-in-interest
   to Garlock, Inc.; GEORGIA-PACIFIC,
26 LLC, f/k/a Georgia-pacific Corporation,
   individually and as successor-in-interest
27 to Bestwall Gypsum Company;
   GOULDS PUMPS INCORPORATED;
28 GRINNELL, L.L.C. (f/k/a Hamilton
   Distributing, Inc.); IMO INDUSTRIES,

*(stamp:)* 2009 MAY 26  PM 3:47   CLERK U.S. DISTRICT COURT  CENTRAL DIST. OF CALIF.  LOS ANGELES   FILED

INC. (individually and as successor-in-interest to De Laval Turbine, Inc.); INGERSOLL-RAND COMPANY individually and as successor-in-interest to The Aldrich Company; ITT CORPORATION, f/k/a ITT INDUSTRIES, INC., individually, and as successor-in-interest to "BELL & GOSSETT" branded product and Grinnell Corporation; JOHN K. BICE CO., INC; JOHNSON CONTROLS, INC., KAISER GYPSUM COMPANY, INC.; KELLY-MOORE PAINT COMPANY, INC.; LESLIE CONTROLS, INC.; MECHANICAL DRIVES & BELTING (f/k/a L.A. Rubber Company); METALCLAD INSULATION CORPORATION; PENTAIR, INC., individually and as successor-in-interest to Aurora Pump Company; RED-WHITE VALVE CORPORATION; SPENCE ENGINEERING COMPANY, INC.; SPIRAX SARCO, INC.; SPX CORPORATION, individually and as successor-in-interest to General Signal Corporation (successor-in-interest to Aurora Pump Company); THOMAS DEE ENGINEERING CO.; TRIPLE A MACHINE SHOP, INC. (a/k/a Triple A Shipyard); UNION CARBIDE CORPORATION; THE WILLIAM POWELL COMPANY; YARWAY CORPORATION; YORK INTERANTIONAL CORPORATION, individually and as successor-in-interest to Central Environmental Systems, Inc., f/k/a Borg-Warner Central Environmental Systems, Inc.; York-Luxaire, Inc.; Luxaire Inc.; and The C.A. Olsen Manufacturing Company and d/b/a "Moncrief Furnaces" d/b/a York Hearing & Air Conditioning; ZURN INDUSTRIES, LLC., f/k/a Zurn Industries, Inc., a/k/a and successor-by-merger to Erie City Iron Works and d/b/a "Keystone" branded products; and DOES 1-300 inclusive,

Defendants.

DEFENDANT LESLIE CONTROLS, INC.'S NOTICE OF REMOVAL

TO THE CLERK AND THE HONORABLE JUDGE OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE, that, pursuant to 28 U.S.C. sections 1442 and 1446, Defendant LESLIE CONTROLS, INC. ("Leslie Controls") hereby gives notice of the removal of this action, originally filed in the Los Angeles County Superior Court, to the United States District Court for the Central District of California based on the following grounds:

1.   **Jurisdiction**.  This Court has subject matter jurisdiction over this case because the claims involve a person, Leslie Controls, acting under the authority of an office or agency of the United States.  28 U.S.C. § 1442; *Freiberg v. Swinerton & Walberg Property Services, Inc.* 245 F.Supp.2d 1144, 1150 (2002).

2.   **Intradistrict Assignment**.  The claims are pending within the District and the Division of this Court.  Therefore, the claims should be assigned to this Division.

3.   **Timeliness**.  This Notice of Removal is timely because it was filed within thirty (30) days of formal service of the Summons and Complaint upon Leslie Controls, consistent with the requirements 28 U.S.C. Section 1446(b) and Rule 6 of the Federal Rules of Civil Procedure.

4.   **Background**.  On or about April 16, 2009, Plaintiffs ELLIS MICHAEL STATON and SUSAN MARY STATON ("Plaintiffs") filed their Complaint against Leslie Controls and numerous other defendants in the Superior Court of the State of California, County of Los Angeles.  The Complaint was served on Leslie Controls on April 25, 2009.

5.   In the Complaint, Plaintiff ELLIS MICHAEL STATON alleges exposure to asbestos-containing products while serving from 1968 to 1972 as boiler tender aboard the USS Edson, at locations including the Long Beach Naval Shipyard in Long Beach, California.  (A true and correct copy of the Summons and Complaint is attached as Exhibit 1 to this Notice of Removal.)

1

LESLIE/Staton

6.   Any equipment manufactured for the U.S. Navy by Leslie Controls to be used aboard U.S. Naval vessels was manufactured under the direction and control of a federal officer. (*See, generally*, Declaration of Ret. Adm. Roger Horne ("Horne Decl."), attached hereto as Exhibit 2.) Leslie Controls manufactured and designed equipment sold to the Navy according to the precise, detailed specifications of the U.S. Navy (*See, generally*, Declaration of Matthew Wrobel ("Wrobel Decl."), attached hereto as Exhibit 3.) The United States Navy enforced compliance with those design specifications and no aspect of the design of that equipment escaped the close control of the United States Navy and its officers, including all aspects of warnings associated with the equipment. (*See, generally,* Horne Decl.; Wrobel Decl.) Accordingly, Leslie Controls was acting under an officer or agent of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.   **Legal Authorities**.  Should Plaintiffs file a motion to remand this case, Leslie Controls will respond more fully in its written opposition to that motion, but, for now, offers the following authorities:

8.   Removal is appropriate where, as here, the removing party (1) acted under the direction of a federal officer; (2) raises a colorable federal defense to plaintiff's claims and (3) can demonstrate a causal nexus between plaintiff's claims and the acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25 (1989).

9.   In 2006, the Ninth Circuit unequivocally stated that "the Supreme Court has mandated a generous interpretation of the federal officer removal statute ... [and] has held that the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Durham v. Lockheed Martin Corporation*, 445 F.3d 1247, 1252 (9th Cir. 2006) (citations omitted). Applying the court's ruling in *Durham*, at least five California federal district courts have recently held that they are required to interpret section 1442

2

LESLIE/Staton

1  broadly in favor of removal where a manufacturer of equipment demonstrates that it
2  acted under the direction of a federal officer, raises a colorable federal defense to
3  plaintiff's claims and establishes a causal connection between its alleged action
4  under the control of a federal officer and plaintiff's claims. *See Ballenger v. Agco*
5  *Corporation*, 2007 WL 1813821 (N.D. Cal. June 22, 2007) (a copy of Judge
6  Wilken's Order is attached hereto as Exhibit 4); *Nelson v. Alfa Laval, Inc., et al*, CV
7  07-8338 VBF(RCx) (a copy of Judge Fairbank's Order is attached hereto as Exhibit
8  5); *Wright vs. A.W. Chesterton, Inc.*, CV 07-05403MJJ (a copy of Judge Jenkins's
9  Order is attached hereto as Exhibit 6); *Oberstar v. CBS Corp.*; CV 08-118 PA(JWJx)
10  (a copy of this Order is attached hereto as Exhibit 7); *Jenkins v. Allied Packing &*
11  *Supply*, CV 09-0101 DMS(LSP) (a copy of Judge Sabraw's Order is attached hereto
12  as Exhibit 8).

13      10.   As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500
14  (1988), Leslie Controls has a federal defense to this action: government contractor
15  immunity from liability for injuries arising from any exposure to asbestos-containing
16  equipment on board United States Navy vessels, insofar as they were manufactured
17  or repaired by Leslie Controls. *See also Carley v. Wheeled Coach*, 991 F.2d 1117,
18  1123 (3d Cir. 1993); *Kleeman v. McDonnel Douglas Corp.*, 890 F.2d 698, 700 (4th
19  Cir. 1989); *Garner v. Santoro*, 865 F.2d 629, 634 (5th Cir. 1991).

20      11.   Removal based on government contractor/supplier immunity is also
21  allowed in failure to warn cases. In *Kerstetter v. Pacific Scientific Co.*, 210 F.3d
22  431, 438 (5th Cir.) *cert denied* 519 U.S. 919 (2000), the court held that the
23  government contractor defense is available in "failure to warn" actions where the
24  evidence shows that the lack of a warning reflects governmental direction and
25  control rather than the unfettered discretion of the product's manufacturer.

26      12.   As noted in *Kerstetter*, "[t]he government need not prepare the
27  specifications to be considered to have approved them." (*Id.* at 435.) The only
28  material issue is whether the manufacturer's designs and specifications were

LESLIE/Simon

1  subjected to "substantial review" rather than a mere "rubber stamp" approval. (*Id.*)

2  Substantial review is established where there is evidence of a "continuous back and

3  forth" between the contractor and the government." (*Id.*)  In this regard, "[t]he

4  specifications need not address the specific defect alleged; the government need only

5  evaluate the design feature in question." (*Id.*)

6      13.  Further, according to Ret. Admiral Roger Horne: "The Navy would not,

7  and could not permit an equipment manufacturer or supplier to interfere with the

8  Navy's mission by placing warnings on any equipment (or in any instructions or

9  manuals which accompanied the equipment) on any Navy ships or in any shipyards

10  in which U.S. Navy ships were being built or repaired that might cause sailors or

11  workers to deviate from their mission or require the U.S. Navy to devote scarce

12  resources to programs it deemed non-essential, in its unilateral view." (Horne Decl.,

13  page 5, ¶ 14.)

14      14.  The U.S. Navy exercised complete supervision, direction and control

15  over the design, manufacture, inspection and testing of Leslie Controls equipment.

16  (*Id.*, at ¶ 15.)

17      15.  Leslie Controls is not required to notify and obtain the consent of any

18  other defendant in this action in order to remove Plaintiffs' action as a whole under

19  28 U.S.C. § 1442(a)(1). *Ely Valley Mines, Inc. v. Hartford Accident Indemnity Co.*,

20  644 F.2d 1310, 1315 (9th Cir. 1981); *Akin v. Ashland Chemical Co.*, 156 F.3d 1030,

21  1034-35 (1998).

22      16.  A properly removed case cannot be remanded for discretionary or

23  policy reasons, such as allegations of related state cases or contentions that judicial

24  economy compels remand. *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S.

25  336, 343-344 (1976); *Elrad v. United Life & Accident Insurance Co.*, 624 F. Supp.

26  742, 743 (N.D. Ill. 1985).

27      17.  Leslie Controls has attached those documents required by 28 U.S.C.

28  section 1446(a) and (b) and the local rules of the United States District Court,

4

DEFENDANT LESLIE CONTROLS, INC.'S NOTICE OF REMOVAL

LESLIE/Sutton

1   Central District of California, including a copy of the Summons and Complaint filed

2   upon it by Plaintiffs.

3     WHERERFORE, Defendant Leslie Controls respectfully requests that the

4   above action now pending against it in the Superior Court of California, County of

5   Los Angeles, be removed to this Court.

6

7   DATED: May 26, 2009.       **DEHAY & ELLISTON, L.L.P.**
                  Jennifer Judin

8                     Paul C. White II

9

10

11           By: _____

12                Paul C. White II
              Attorneys for Defendant

13                LESLIE CONTROLS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT LESLIE CONTROLS, INC.'S NOTICE OF REMOVAL

LESLIE/Staton

EXHIBIT "1"

SUM-100

**SUMMONS**
(CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 1 6 2009

John A. Clarke, Executive Officer/Clerk

BY MARY GARCIA, Deputy

NOTICE TO DEFENDANTS:
(AVISO AL DEMANDADO):
AMERICAN STANDARD, INC., individually and as successor-in-interest to The TRANE COMPANY (see additional parties attachment)

YOU ARE BEING SUED BY PLAINTIFFS:
(LO ESTÁ DEMANDANDO EL DEMANDANTE):
ELLIS MICHAEL STATON AND SUSAN MAY STATON

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia. Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

CASE NUMBER:
(Número del Caso):
BC 412018

The name and address of the court is:
(El nombre y dirección de la corte es):
Los Angeles Superior Court - Central District
111 North Hill Street
Los Angeles, California 90012

The name, address and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
John Langdoc, Esq. (SBN 235509)
Eric Brown, Esq. (SBN229622)
Jed Borghei, Esq. (SBN257049)
BARON & BUDD, P.C.
9465 Wilshire Blvd., Suite 460, Beverly Hills, CA 90212
Telephone: (310) 860-9476
Facsimile: (310) 860-0480

DATE: APR 16 2009          JOHN A. CLARKE, CLERK          M. GARCIA          Deputy
(Fecha)                                                                        (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☐ on behalf of (specify):
   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

LESLIE CONTROLS, INC.
12501 TELECOM DR.
TAMPA, FL 33637

| SHORT TITLE: ELLIS MICHAEL STATON and SUSAN MARY STATON vs. AMERICAN STANDARD, INC., individually and as successor-in-interest to The TRANE COMPANY; | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

➡ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➡ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party):

☐ Plaintiff  ☒ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

AURORA PUMP COMPANY;
ARMSTRONG INTERNATIONAL, INC.;
BONDEX INTERNATIONAL, INC.;
BUFFALO PUMPS, INC.;
CARRIER CORPORATION, individually and as successor-in-interest to Elliott Company, successor-in-interest to Crocker-Wheeler Company;
CLEAVER-BROOKS, INC., individually and f/k/a Aqua-Chem, Inc.;
CRANE CO., individually and as successor in interest to Chapman Valves;
DOWMAN PRODUCTS, INC.;
FMC CORPORATION, individually, on behalf of and as successor-in-interest to Peerless Pump Co.;
FRASER'S BOILER SERVICE, INC.
GARLOCK SEALING TECHNOLOGIES, L.L.C. individually and as successor-in-interest to Garlock, Inc.;
GEORGIA-PACIFIC, LLC, f/k/a Georgia-Pacific Corporation, individually and as successor-in-interest to Bestwall Gypsum Company;
GOULDS PUMPS INCORPORATED;
GRINNELL, L.L.C. (f/k/a Grinnell Corporation);
HAMILTON MATERIALS, INC. (f/k/a Hamilton Distributing, Inc.);
IMO INDUSTRIES, INC. (individually and as successor-in-interest to De Laval Turbine, Inc.);
INGERSOLL-RAND COMPANY individually and as successor-in-interest to The Aldrich Company;
ITT CORPORATION, f/k/a ITT INDUSTRIES, INC., individually, and as successor-in-interest to "BELL & GOSSETT" branded products and Grinnell Corporation;
JOHN K. BICE CO., INC.;
JOHNSON CONTROLS, INC.;
KAISER GYPSUM COMPANY, INC.;
KELLY-MOORE PAINT COMPANY, INC.;
MECHANICAL DRIVES & BELTING (f/k/a L.A. Rubber Company);
METALCLAD INSULATION CORPORATION;
PENTAIR, INC., individually and as successor-in-interest to Aurora Pump Company;
RED - WHITE VALVE CORPORATION;
SPENCE ENGINEERING COMPANY, INC.;
SPIRAX SARCO, INC.;

Page __1__ of __2__

SPX Corporation, individually and as successor-in-interest to General Signal Corporation (successor-in-interest to Aurora Pump Company);
THOMAS DEE ENGINEERING CO.;
TRIPLE A MACHINE SHOP, INC. (a/k/a Triple A Shipyard);
UNION CARBIDE CORPORATION;
THE WILLIAM POWELL COMPANY;
YARWAY CORPORATION;
YORK INTERNATIONAL CORPORATION, individually and as successor-in-interest to Central Environmental Systems, Inc., f/k/a Borg-Warner Central Environmental Systems, Inc.; York-Luxaire, Inc.; Luxaire, Inc., and The C.A. Olsen Manufacturing Company and d/b/a "Moncrief Furnaces" d/b/a York Heating & Air Conditioning;
ZURN INDUSTRIES, LLC., f/k/a Zurn Industries, Inc., a/k/a and successor-by-merger to Erie City Iron Works and d/b/a "Keystone" branded products,
and DOES 1-300

Form Adopted by Rule 982a(9)(A)
Judicial Council of California
982(a)(9)(A) [New January 1, 1983]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  Deuyae Clancy, Esq. (SBN 255276)
   John Langdoe, Esq. (SBN 235509)
2  BARON & BUDD, P.C.
   3102 Oak Lawn Avenue, Suite 1100
3  Dallas, Texas  75219
   Telephone: 214/521-3605
4  Facsimile: 214/520-1181

5  Jennifer K. Berg, Esq. (SBN 147427)
   Eric Brown, Esq. (SBN 229622)
6  Jed Borghei, Esq. (SBN 147427)
   BARON & BUDD, P.C.
7  9465 Wilshire Blvd., Suite 460
   Beverly Hills, CA 90212
8  Telephone: 310/860-0476
   Facsimile: 310/860-0480

9

10 Attorneys for Plaintiffs

11        SUPERIOR COURT OF THE STATE OF CALIFORNIA

12           COUNTY OF LOS ANGELES-CENTRAL DISTRICT

13 ELLIS MICHAEL STATON AND SUSAN MARY          CASE NO.
   STATON
14                                              COMPLAINT FOR
              Plaintiffs,                       PERSONAL INJURIES
15
                                                [COMPLEX ASBESTOS
16 vs.                                          LITIGATION-SUBJECT
                                                TO THE GENERAL
17 AMERICAN STANDARD, INC., individually and    ORDERS CONTAINED
   as successor-in-interest to The TRANE        IN FILE NO. C700000].
18 COMPANY;
   AURORA PUMP COMPANY;
19 ARMSTRONG INTERNATIONAL, INC.;
   BONDEX INTERNATIONAL, INC.;
20 BUFFALO PUMPS, INC.;
   CARRIER CORPORATION, individually and as
21 successor-in-interest to Elliott Company;
   successor-in-interest to Crocker-Wheeler Company;
22 CLEAVER-BROOKS, INC., individually and f/k/a
   Aqua-Chem, Inc.;
23 CRANE CO., individually and as successor in
   interest to Chapman Valves;
24 DOWMAN PRODUCTS, INC.;
   FMC CORPORATION, individually, on behalf of
25 and as successor-in-interest to Peerless Pump Co.;
   FRASER'S BOILER SERVICE, INC.;
26 GARLOCK SEALING TECHNOLOGIES, L.L.C.,
   individually and as successor-in-interest to Garlock,
27 Inc.;
   GEORGIA-PACIFIC, LLC, f/k/a Georgia-Pacific
28 Corporation, individually and as

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 1 6 2009

John A. Clarke, Executive Officer/Clerk

BY MARY GARCIA, Deputy

BC 412018

BY FAX

PLAINTIFF'S ORIGINAL ASBESTOS COMPLAINT
C:\Documents and Settings\cardrch\Local Settings\Temporary Internet Files\OLK37\Staton.EM.CX.LA. Original Complaint2.wpd (cra ) (4.13.09 )

successor-in-interest to Bestwall Gypsum Company;
GOULDS PUMPS INCORPORATED;
GRINNELL , L.L.C. (f/k/a Grinnell Corporation);
HAMILTON MATERIALS, INC. (f/k/a Hamilton
Distributing, Inc.);
IMO INDUSTRIES, INC. (individually and as
successor-in-interest to De Laval Turbine, Inc.);
INGERSOLL-RAND COMPANY individually and
as successor-in-interest to The Aldrich Company;
ITT CORPORATION, f/k/a ITT INDUSTRIES,
INC., individually, and as successor-in-interest to
"BELL & GOSSETT" branded products and
Grinnell Corporation;
JOHN K. BICE CO., INC.;
JOHNSON CONTROLS, INC.;
KAISER GYPSUM COMPANY, INC.;
KELLY-MOORE PAINT COMPANY, INC.;
LESLIE CONTROLS, INC.;
MECHANICAL DRIVES & BELTING (f/k/a L.A.
Rubber Company);
METALCLAD INSULATION CORPORATION;
PENTAIR, INC., individually and as successor-in-
interest to Aurora Pump Company;
RED - WHITE VALVE CORPORATION;
SPENCE ENGINEERING COMPANY, INC.;
SPIRAX SARCO, INC.;
SPX Corporation, individually and as successor-in-
interest to General Signal Corporation (successor-in-
interest to Aurora Pump Company);
THOMAS DEE ENGINEERING CO.;
TRIPLE A MACHINE SHOP, INC. (a/k/a Triple A
Shipyard);
UNION CARBIDE CORPORATION;
THE WILLIAM POWELL COMPANY;
YARWAY CORPORATION;
YORK INTERNATIONAL CORPORATION,
individually and as successor-in-interest to Central
Environmental Systems, Inc., f/k/a Borg-Warner
Central Environmental Systems, Inc.; York-Luxaire,
Inc.; Luxaire, Inc., and The C.A. Olsen
Manufacturing Company and d/b/a "Moncrief
Furnaces" d/b/a York Heating & Air Conditioning;
ZURN INDUSTRIES, LLC., f/k/a Zurn Industries,
Inc., a/k/a and successor-by-merger to Erie City Iron
Works and d/b/a "Keystone" branded products, and
DOES 1-300

   Defendants.

PLAINTIFF'S ORIGINAL ASBESTOS COMPLAINT

N:\_CLIENTS\S\STATON. EM.CA\Complaint.Answer.Service\Staton.EM.CA LA Original Complaint.wpd (cra ) (4.13.09 )

COME NOW, Plaintiff ELLIS MICHAEL STATON AND MARY SUSAN STATON and for causes of action against Defendants, and each of them, complain and allege as follows:

### STATEMENT OF COMPLEX LITIGATION

This case is being brought by ELLIS MICHAEL STATON AND SUSAN MARY STATON as a result of ELLIS MICHAEL STATON being diagnosed with mesothelioma, an incurable and terminal lung disease caused by exposure to asbestos.

Asbestos litigation has long been designated complex in Los Angeles County for several historical reasons, including the number of parties, the length, duration and complexity of anticipated deposition testimony of fact, lay and expert witnesses, the wide-ranging medical issues that may or may not be involved, the complexity of industrial hygiene and governmental regulations that may or may not be involved, and the anticipated proportionate amount of economic, non-economic and punitive damages sought for plaintiffs' anticipated death and the loss of consortium for their spouses and dependants.

The average life expectancy of a patient diagnosed with mesothelioma is extremely short. Some patients diagnosed with mesothelioma only live weeks or months following their diagnosis. Further, as their diseases progress, their prognosis slowly worsens such that their ability to participate in trial may diminish drastically. Often, plaintiffs in mesothelioma cases must present videotaped deposition testimony taken at the outset of their cases, as their medical condition has worsened so severely that even traveling a few miles to the courthouse is impossible. Plaintiffs in such cases routinely bring motions for trial preference and often stipulate to expedited and/or shortened time periods for responsive pleadings in order to permit the granting of trial dates in less than 120 days.

In this matter, ELLIS MICHAEL STATON was diagnosed with mesothelioma on or about March 10, 2009. Because of ELLIS MICHAEL STATON's varied work history and the numerous asbestos products to which he is alleged to have been exposed, Plaintiffs

PLAINTIFF'S ORIGINAL ASBESTOS COMPLAINT
N:\_CLIENTS\S\STATON. EM.CA\Complaint.Answer.Service\Staton.EM.CA LA Original Complaint.wpd (cra ) (4 13.09 )

Page 3

have named numerous manufacturers of asbestos products, contractors and suppliers of asbestos products and fibers as defendants.

## GENERAL ALLEGATIONS

1.    The true names and/or capacities, whether individual, corporate, associate, governmental, or otherwise, of Defendants, DOES 1 through 300, inclusive, are unknown to Plaintiffs at this time; who, therefore, sue said Defendants by such fictitious names; and when the true names and capacities of said Defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereon allege that each Defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to Plaintiffs, as hereinafter alleged, either through said Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, lease or sale of the instrumentality causing the injury, or in some other manner.

2.    Plaintiffs are informed and believe, and thereon allege that at all times mentioned herein, Defendants and each of them, were the agents, servants, employees and/or joint venturers of their co-Defendants and were, as such, acting within the scope, course, and authority of said agency, employment and/or joint venture, in that each and every Defendant, as aforesaid, when acting as a principal, was negligent in the selection and hiring or each and every other Defendant as the agent, servant, employee and/or joint venturer.

3.    Plaintiff, ELLIS MICHAEL STATON, was a California resident during a substantial period of his asbestos exposure upon which Plaintiffs' claims are based.

4.    Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendants, AMERICAN STANDARD, INC., individually and as successor-in-interest to The TRANE COMPANY; AURORA PUMP COMPANY; ARMSTRONG INTERNATIONAL, INC.; BONDEX INTERNATIONAL, INC.; BUFFALO PUMPS, INC.; CARRIER CORPORATION, individually and as

successor-in-interest to Elliott Company, successor-in-interest to Crocker-Wheeler
Company; CLEAVER-BROOKS, INC., individually and f/k/a Aqua-Chem, Inc.; CRANE
CO., individually and as successor in interest to Chapman Valves; DOWMAN
PRODUCTS, INC.; FMC CORPORATION, individually, on behalf of and as
successor-in-interest to Peerless Pump Co.; FRASER'S BOILER SERVICE, INC.;
GARLOCK SEALING TECHNOLOGIES, L.L.C. individually and as
successor-in-interest to Garlock, Inc.; GEORGIA-PACIFIC, LLC, f/k/a Georgia-Pacific
Corporation, individually and as successor-in-interest to Bestwall Gypsum Company;
GOULDS PUMPS INCORPORATED; GRINNELL , L.L.C. (f/k/a Grinnell Corporation);
HAMILTON MATERIALS, INC. (f/k/a Hamilton Distributing, Inc.); IMO INDUSTRIES,
INC. (individually and as successor-in-interest to De Laval Turbine, Inc.);
INGERSOLL-RAND COMPANY individually and as successor-in-interest to The
Aldrich Company; ITT CORPORATION, f/k/a ITT INDUSTRIES, INC., individually,
and as successor-in-interest to "BELL & GOSSETT" branded products and Grinnell
Corporation; JOHN K. BICE CO., INC.; JOHNSON CONTROLS, INC.;KAISER
GYPSUM COMPANY, INC.; KELLY-MOORE PAINT COMPANY, INC.; LESLIE
CONTROLS, INC.; MECHANICAL DRIVES & BELTING (f/k/a L.A. Rubber
Company); METALCLAD INSULATION CORPORATION; PENTAIR, INC.,
individually and as successor-in-interest to Aurora Pump Company; RED -WHITE
VALVE CORPORATION; SPENCE ENGINEERING COMPANY, INC.; SPIRAX
SARCO, INC.;  SPX Corporation, individually and as successor-in-interest to General
Signal Corporation (successor-in-interest to Aurora Pump Company); THOMAS DEE
ENGINEERING CO.; TRIPLE A MACHINE SHOP, INC. (a/k/a Triple A Shipyard);
UNION CARBIDE CORPORATION; THE WILLIAM POWELL COMPANY;
YARWAY CORPORATION; YORK INTERNATIONAL CORPORATION, individually
and as successor-in-interest to Central Environmental Systems, Inc., f/k/a Borg-Warner
Central Environmental Systems, Inc.; York-Luxaire, Inc.; Luxaire, Inc., and The C.A.
Olsen Manufacturing Company and d/b/a "Moncrief Furnaces" d/b/a York Hearing & Air

Conditioning; ZURN INDUSTRIES, LLC., f/k/a Zurn Industries, Inc., a/k/a and

successor-by-merger to Erie City Iron Works and d/b/a "Keystone" branded products, and

DOES 1-300, inclusive, are corporations organized and existing under and by virtue of the

laws of the State of California, or the laws of some other state of the United States of

America, or some foreign jurisdiction, and that said Defendants were authorized to do and

are doing business in the State of California, and that said Defendants have regularly

conducted business in the State of California.

5.     At all times mentioned above, Defendants, and each of them, were engaged

in the business of manufacturing, fabricating, designing, assembling, distributing, leasing,

buying, selling, inspecting, servicing, installing, repairing, marketing, warranting, and

advertising a certain substance, *the generic name of which is asbestos, and other products*

containing said substance.

6.     Plaintiff, ELLIS MICHAEL STATON, was exposed to Defendants' asbestos

and asbestos containing products contributing to and causing the development of

mesothelioma.  A listing of Defendants' asbestos and asbestos-containing products alleged

at this time to have caused Plaintiff's injuries.   As a result of exposure to Defendants'

asbestos and asbestos containing products, asbestos fibers entered his body.  Plaintiff

suffers from mesothelioma and each of Defendants asbestos and asbestos containing

products that entered his body was a substantial factor in bringing about, prolonging, or

aggravating Plaintiff's mesothelioma.  The asbestos and asbestos containing products

Plaintiff was exposed to were manufactured or supplied by a named defendant.

## FIRST CAUSE OF ACTION

### (Negligence)

### (Against all Defendants)

7.     Plaintiffs hereby incorporate by reference, as though fully set forth herein,

each and every allegation contained in the General Allegations above.

8.     At all times herein mentioned, each of the named Defendants and DOES 1

through 300 was the successor, successor in business, successor in product line or a

1   portion thereof, assign, predecessor, predecessor in business, predecessor in product line

2   or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or

3   partial owner of or member in an entity researching, studying, manufacturing, fabricating,

4   designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

5   supplying, selling, inspecting, servicing, installing, contracting for installation, repairing,

6   marketing, warranting, re-branding, manufacturing for others, packaging and advertising

7   as certain product, namely asbestos, and other products containing asbestos.  Said entities

8   shall hereinafter collectively be called "Alternate Entities."  Each of the herein named

9   Defendants is liable for the tortious conduct of each successor, successor in business,

10   successor in product line or a portion thereof, assign, predecessor in product line or a

11   portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned

12   entity, or entity that it was a member of, or funded, that researched, studied, manufactured,

13   fabricated, designed, modified, labeled, assembled, distributed, leased, bought, offered for

14   sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

15   marketed, warranted, re-branded, manufactured for others and advertised a certain

16   product, namely asbestos, and other products containing asbestos.  The following

17   Defendants, and each of them, are liable for the acts of each and every "Alternate Entity,"

18   and each of them, in that there has been a virtual destruction of Plaintiff's remedy against

19   each such "Alternate Entity;" Defendants, and each of them, have acquired the assets,

20   product line, or a portion thereof, of each such "Alternate Entity;" such "Alternate Entity;"

21   Defendants, and each of them, caused the destruction of Plaintiff's remedy against each

22   such "Alternate Entity;" each such Defendant has the ability to assume the risk-spreading

23   role of each such "Alternate Entity;" and that each such Defendant enjoys the goodwill

24   originally attached to each such "Alternate Entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| AMERICAN STANDARD, INC. | individually and as successor-in-interest to The TRANE COMPANY |
| CARRIER CORPORATION | individually and as successor-in-interest to Elliott Company, successor-in-interest to Crocker-Wheeler Company |

| | |
|---|---|
| CLEAVER-BROOKS, INC. | individually and f/k/a Aqua-Chem, Inc. |
| CRANE CO. | individually and as successor in interest to Chapman Valves |
| FMC CORPORATION, | individually, on behalf of and as successor-in-interest to Peerless Pump Co. |
| GARLOCK SEALING TECHNOLOGIES, L.L.C. | individually and as successor-in-interest to Garlock, Inc. |
| GEORGIA-PACIFIC, LLC | f/k/a Georgia-Pacific Corporation, individually and as successor-in-interest to Bestwall Gypsum Company |
| GRINNELL , L.L.C. | (f/k/a Grinnell Corporation) |
| HAMILTON MATERIALS, INC. | (f/k/a Hamilton Distributing, Inc.) |
| IMO INDUSTRIES, INC. | (individually and as successor-in-interest to De Laval Turbine, Inc.) |
| INGERSOLL-RAND COMPANY | individually and as successor-in-interest to The Aldrich Company |
| ITT CORPORATION, f/k/a ITT INDUSTRIES, INC. | individually, and as successor-in-interest to "BELL & GOSSETT" branded products and Grinnell Corporation |
| MECHANICAL DRIVES & BELTING | (f/k/a L.A. Rubber Company) |
| PENTAIR, INC. | individually and as successor-in-interest to Aurora Pump Company2 |
| SPX Corporation | individually and as successor-in-interest to General Signal Corporation (successor-in-interest to Aurora Pump Company) |
| TRIPLE A MACHINE SHOP, INC. | (a/k/a Triple A Shipyard) |
| YORK INTERNATIONAL CORPORATION | individually and as successor-in-interest to Central Environmental Systems, Inc., f/k/a Borg-Warner Central Environmental Systems, Inc.; York-Luxaire, Inc.; Luxaire, Inc.; and The C.A. Olsen Manufacturing Company and d/b/a "Moncrief Furnaces" d/b/a York Hearing & Air Conditioning |
| ZURN INDUSTRIES, LLC. | f/k/a Zurn Industries, Inc., a/k/a and successor-by-merger to Erie City Iron Works and d/b/a "Keystone" branded products |

9.     Defendants had a duty to use reasonable care in manufacturing their products and to warn the customer, user, or bystander that their products were dangerous and unsafe. At all times mentioned herein, Defendants, and each of them, negligently and carelessly researched, tested, manufactured, designed, developed, distributed, labeled, advertised, marketed, warranted, inspected, repaired, fabricated, modified, serviced, and sold a certain substance, the generic name of which is asbestos, and other products

1  containing said substance, in that said substance was capable of causing and did, in fact,

2  proximately cause personal injuries to users and consumers thereof while being used in

3  manner reasonably foreseeable, thereby rendering said substance unsafe and dangerous for

4  use by the consumer, users, or bystanders thereof, and others to whom Defendants owe a

5  duty, including Plaintiff ELLIS MICHAEL STATON.

6   10. Plaintiff, ELLIS MICHAEL STATON, is a worker who, for a substantial

7  length of time, has used, handled, and been otherwise exposed to the asbestos and asbestos

8  products referred to in Paragraph 6 above, in a manner that was reasonably foreseeable,

9  through his occupational exposure to asbestos while serving in the United States Navy

10  from 1968 through 1972 as a boiler tender aboard the U.S.S. Edson at locations including,

11  but not limited to, the Long Beach Naval Shipyard, Long Beach, California; while

12  working for Broadway Hospital in Los Angeles, California in the early 1970's; and while

13  working for St. Francis Hospital in Lynwood, California and Tulsa, Oklahoma the through

14  the 1970's. As a result of exposure to Defendants' asbestos and asbestos containing

15  products, asbestos fibers entered his body. Plaintiff suffers from mesothelioma and each of

16  Defendants' asbestos and asbestos containing products that entered his body was a

17  substantial factor in bringing about, prolonging, or aggravating Plaintiff's mesothelioma.

18  The asbestos and asbestos containing products Plaintiff was exposed to were

19  manufactured or supplied by a named Defendant.

20   11.   As a direct and proximate result of the above-referenced conduct of the

21  Defendants, and each of them, as aforesaid, said exposure to said asbestos caused severe

22  and permanent injury to Plaintiff's lungs and body, including, but not limited to the disease

23  mesothelioma.

24   12.   On or about March 10, 2009, Plaintiff, ELLIS MICHAEL STATON, was

25  advised that he has the asbestos-related disease, mesothelioma. Prior to that date, Plaintiff

26  did not know, nor did he have reason to know, that he had contracted this disease related

27  to his exposure to asbestos. Prior to said date, Plaintiff was not aware that exposure to

28  asbestos presented any risk of injury and/or disease to him, and had not been advised or

informed by anyone that he could contract, nor indeed did contract, any disease, sickness or injury as a result of working in the vicinity of asbestos.

13.     Plaintiff is informed and believes, and thereupon alleges, that mesothelioma is a vicious, painful and invariably fatal malignancy of the lining of the lung, stomach, or heart and that said disease results from exposure to asbestos and asbestos products over a period of time.  There is no known cure for any form of malignant mesothelioma.

14.     As a direct and proximate result of the aforesaid conduct of the Defendants, and each of them, Plaintiff has suffered, and continues to suffer, severe and permanent injuries to his person, body and health, including, but not limited to, the disease mesothelioma, all to his general damage in a sum within the jurisdictional limits of this court.

15.     As a direct and proximate result of the aforesaid conduct of the Defendants, and each of them, Plaintiff was compelled to and did employ the services of hospitals, surgeons, physicians, nurses, and the like, to care for and treat him, and did incur medical, hospital and professional incidental expenses, and Plaintiff is informed and believes and thereupon alleges that by reason of said Plaintiff's injuries, he will necessarily incur additional like expenses for an indefinite period of time in the future, and when said amounts are ascertained, he will allege said amounts.

16.     The above-referenced conduct of said Defendant was and is willful, malicious, outrageous and/or in conscious disregard and indifference to the safety of users of said asbestos and asbestos products, including Plaintiff.  Defendant is guilty of oppression, fraud, or malice and engaged in conduct which was intended by the defendant to cause injury to the plaintiff or conduct which was carried on by the defendant with a conscious disregard of the rights or safety of others.  Defendant subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights and engaged in intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving Plaintiff of property or legal

1   rights or otherwise causing injury.  Plaintiff therefore, for the sake of example and by way

2   of punishing Defendant, seeks punitive damages, according to proof.

3       17.    Plaintiffs further allege all of the foregoing portions of this cause of action

4   specifically against those Defendants who supplied asbestos fibers (as pled against those

5   Defendants who manufactured asbestos products), and any other asbestos fiber supplier or

6   distributor to manufacturers of the asbestos-containing products to which Plaintiff was

7   exposed, as well as any DOE Defendants who may be determined at a later date.

## SECOND CAUSE OF ACTION

(Strict Liability)

(Against all Defendants)

11       18.    Plaintiffs hereby incorporate by reference, as though fully set forth herein,

12   each and every allegation contained in the First Cause of Action.

13       19.    At all times mentioned herein, Defendants, and each of them, researched,

14   manufactured, tested, designed, labeled, distributed, advertised, marketed, warranted,

15   inspected, repaired, offered for sale, and sold a certain substance, the generic name of

16   which is asbestos, and other products containing said substance which Defendants knew

17   were to be used without inspection for defects and which substance contained design and

18   manufacturing defects, in that same was capable of causing and did, in fact, cause personal

19   injuries to the users, consumers, and bystanders while being used in a reasonably

20   foreseeable manner, thereby rendering same unsafe and dangerous for use by the

21   consumers, users, and bystanders.

22       20.    As a direct and proximate result of the above described conduct by

23   Defendants and each of them, Plaintiff ,ELLIS MICHAEL STATON, suffered severe and

24   permanent injuries to his person, as alleged hereinabove.

25       21.    At all times mentioned herein, the asbestos and products containing said

26   substance discussed above failed to perform as safely as an ordinary consumer would

27   expect when used in an intended or reasonably foreseeable manner, and the risk of danger

28

inherent in this substance and products outweighs the benefits of said substance and products.

22.   At all times mentioned herein, the foreseeable use of the asbestos and products containing said substance discussed above involved a substantial danger not readily recognizable to an ordinary user, consumer, or bystander, but which danger was known or knowable to Defendants, and Defendants failed to adequately warn of the substantial danger.

23.   As a direct and proximate result of the above described conduct by Defendants and each of them, Plaintiff suffered severe and permanent injuries to his person, as alleged hereinabove.

24.   The above-referenced conduct of said Defendant was and is willful, malicious, outrageous and/or in conscious disregard and indifference to the safety of users of said asbestos and asbestos products, including Plaintiff.  Defendant is guilty of oppression, fraud, or malice and engaged in conduct which was intended by the defendant to cause injury to the plaintiff or conduct which was carried on by the defendant with a conscious disregard of the rights or safety of others.  Defendant subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights and engaged in intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving Plaintiff of property or legal rights or otherwise causing injury.  Plaintiff therefore, for the sake of example and by way of punishing Defendant, seeks punitive damages, according to proof.

25.   Plaintiffs further allege all of the foregoing portions of this cause of action specifically against those Defendants who supplied asbestos fibers (as pled against those Defendants who manufactured asbestos products), and any other asbestos fiber supplier or distributor to manufacturers of the asbestos-containing products to which Plaintiff was exposed, as well as any DOE Defendants who may be determined at a later date.

### THIRD CAUSE OF ACTION

(False Representation Under Restatement of Torts Section 402-B)

(Against All Defendants)

26.    Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation contained in the First through Second Causes of Action.

27.    At the aforementioned time when Defendants, their "Alternate Entities," and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised the said asbestos and asbestos-containing products, as herein above set forth, the Defendants, their "Alternate Entities," and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other "exposed persons," including the Plaintiff herein and his employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

28.    The purchasers and users of said asbestos and asbestos-containing products, and other "exposed persons," including the Plaintiff and his employers, relied upon said representations of Defendants, their "Alternate Entities,"and each of them, in the selection, purchase and use of asbestos and asbestos-containing products.

29.    Said representations by Defendants, their "Alternate Entities," and each of them, were false and untrue, and Defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products were not safe for their intended use, nor were they of merchantable quality as represented by Defendants, their "Alternate Entities," and each of them, in that asbestos and asbestos-containing products have very dangerous properties and defects whereby said products cause asbestosis, other lung damages and cancer, and have other defects that cause injury and damage to the users of said products

1  and other "exposed persons," thereby threatening the health and life of said persons

2  including Plaintiff herein.

3       30.    As a direct and proximate result of said false representations by Defendants,

4  their "Alternate Entities," and each of them, the Plaintiffs sustained the injuries and

5  damages herein above set forth.

6       31.    The above-referenced conduct of said Defendant was and is willful,

7  malicious, outrageous and/or in conscious disregard and indifference to the safety of users

8  of said asbestos and asbestos products, including Plaintiff.  Defendant is guilty of

9  oppression, fraud, or malice and engaged in conduct which was intended by the defendant

10  to cause injury to the plaintiff or conduct which was carried on by the defendant with a

11  conscious disregard of the rights or safety of others.  Defendant subjected Plaintiff to cruel

12  and unjust hardship in conscious disregard of his rights and engaged in intentional

13  misrepresentation, deceit, or concealment of a material fact known to the defendant with

14  the intention on the part of the defendant of thereby depriving Plaintiff of property or legal

15  rights or otherwise causing injury.  Plaintiff therefore, for the sake of example and by way

16  of punishing Defendant, seeks punitive damages, according to proof.

17       32.    Plaintiffs further allege all of the foregoing portions of this cause of action

18  specifically against those Defendants who supplied asbestos fibers (as pled against those

19  Defendants who manufactured asbestos products), and any other asbestos fiber supplier or

20  distributor to manufacturers of the asbestos-containing products to which Plaintiff was

21  exposed, as well as any DOE Defendants who may be determined at a later date.

22                          **FOURTH CAUSE OF ACTION**

23                              (Intentional Tort)

24                            (Against All Defendants)

25       33.    Plaintiffs, hereby incorporate by reference, as though fully set forth herein,

26  each and every allegation contained in the First through Third Causes of Action.

27       34.    At all times pertinent hereto, the Defendants, their "Alternate Entities," and

28  each of them, owed Plaintiff a duty, as provided for in Section 1708, 1709 and 1710 of the

1  Civil Code of the State of California, to abstain from injuring the person, property or

2  rights of the Plaintiff. When a duty to act was imposed, as set forth herein, the

3  Defendants, their "Alternate Entities," and each of them, did do the acts and omissions in

4  violation of that duty, thereby causing injury to the Plaintiff as is more fully set forth

5  herein. Such acts and omissions consisted of acts falling within Section 1709 (Deceit) and

6  Section 1710 (Fraud) and more specifically, included suggestions of fact which were not

7  true and which Defendants, their "Alternate Entities," and each of them, did not believe to

8  be true; assertions of fact which were not true and which Defendants, their "Alternate

9  Entities," and each of them, had no reasonable ground for believing to be true, and the

10  suppression of fact when a duty existed to disclose it, all as are more fully set forth herein;

11  the violation of any one such duty gave rise to a cause of action for violation of the rights

12  of the Plaintiff as provided for in the aforementioned Civil Code sections.

13      35.      Since on or before 1930, the Defendants, their "Alternate Entities," and each

14  of them, have known and have possessed the true facts of medical and scientific data and

15  other knowledge which clearly indicated that the asbestos and asbestos-containing

16  products referred to in Plaintiff's First Cause of Action were and are hazardous to the

17  health and safety of Plaintiff, and others in Plaintiff's position working in close proximity

18  with such materials. The Defendants, their "Alternate Entities," and each of them, have

19  known of the dangerous propensities of other of the aforementioned materials and

20  products since before that time. With intent to deceive Plaintiff, and others in Plaintiff's

21  position, and with intent that he and such others should be and remain ignorant of such

22  facts with intent to induce Plaintiff and such others to alter his and their positions to his

23  and their injury and/or risk and in order to gain advantages, the following acts occurred:

24      (a)      Defendants, their "Alternate Entities," and each of them, did not label any of

25  the aforementioned asbestos-containing materials and products regarding the hazards of

26  such materials and products to the health and safety of Plaintiff and others in Plaintiff's

27  position working in close proximity with such materials until 1964 when certain of such

28  materials were labeled by some, but not all, of Defendants, their "Alternate Entities," and

1  each of them, herein when the knowledge of such hazards was existing and known to

2  Defendants, their "Alternate Entities," and each of them, since on or before 1930.  By not

3  labeling such materials as to their said hazards, Defendants, their "Alternate Entities," and

4  each of them, caused to be suggested as a fact to Plaintiff that it was safe for Plaintiff to

5  work in close proximity to such materials when in fact it was not true and Defendants,

6  their "Alternate Entities," and each of them, did not believe it to be true.

7      (b)   Defendants, their "Alternate Entities," and each of them, suppressed

8  information relating the danger of use of the aforementioned materials by requesting the

9  suppression of information to the Plaintiff and the general public concerning the

10  dangerous nature of the aforementioned materials to workers, by not allowing such

11  information to be disseminated in a manner which would have given general notice to the

12  public and knowledge of the hazardous nature thereof when Defendants, their "Alternate

13  Entities," and each of them, were bound to disclose such information;

14      (c)   Defendants, their "Alternate Entities," and each of them, sold the

15  aforementioned products and materials to Plaintiff's employer and others without advising

16  Plaintiff and others of the dangers of use of such materials to persons working in close

17  proximity thereto when Defendants, their "Alternate Entities," and each of them, knew of

18  such dangers, and had a duty to disclose such dangers all as set forth herein.  By said

19  conduct, Defendants, their "Alternate Entities," and each of them, caused to be positively

20  asserted to Plaintiff that which was not true and that which Defendants, their "Alternate

21  Entities," and each of them, had not reasonable ground for believing to be true, to wit, that

22  it was safe for Plaintiff to work in close proximity to such materials;

23      (d)   Defendants, their "Alternate Entities," and each of them, suppressed from

24  Plaintiff medical and scientific data and knowledge of the contents of the Lanza report.

25  Although bound to disclose it, Defendants, their "Alternate Entities," and each of them

26  influenced A.J. Lanza to change his report, the altered version of which was published in

27  Public Health Reports, Volume 50 at page 1 in 1935, thereby causing Plaintiff and others

28  to be and remain ignorant thereof.  Defendants, there "Alternate Entities," and each of

1   them, caused Asbestos Magazine, a widely disseminated trade journal, to omit mention of

2   danger, thereby lessening the probability of notice of danger to users thereof;

3       (e)    Defendants, their "Alternate Entities," and each of them, belonged to,

4   participated in, and financially supported the Asbestos Textile Institute and other industry

5   organizations which, for and on behalf of Defendants, their "Alternate Entities," and each

6   of them, actively promoted the suppression of information of danger to users of the

7   aforementioned products and materials, thereby misleading Plaintiff by the suggestions

8   and deceptions set forth above in this cause of action.  The Dust Control Committee,

9   which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute

10  was specifically enlisted to study the subject of dust control.  Discussions in this

11  committee were held many times regarding the dangers inherent in asbestos and the

12  dangers which arise from the lack of control of dust, and such information was suppressed

13  from public dissemination from 1946 to a date unknown to Plaintiff at this time;

14      (f)    Commencing in 1930 with the study of mine and mill workers at Asbestos

15  and Thetford mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan

16  plants in Manheim and Charleston, South Carolina, Defendants, their "Alternate Entities,"

17  and each of them, knew and possessed medical and scientific information of the

18  connection between inhalation of asbestos fibers and asbestosis, which information was

19  disseminated through the Asbestos Textile Institute and other industry organizations to all

20  other Defendants, their "Alternate Entities," and each of them, herein.  Between 1942 and

21  1950, the Defendants, their "Alternate Entities," and each of them suggested to the public

22  as a fact that which is not true and disseminated other facts likely to mislead Plaintiff.

23  Such facts did mislead Plaintiff and others by withholding the afore-described medical and

24  scientific data and other knowledge and by not giving Plaintiff the true facts concerning

25  such knowledge of danger, which Defendants, their "Alternate Entities," and each of them,

26  were bound to disclose;

27      (g)    Defendants, their "Alternate Entities," and each of them, failed to warn

28  Plaintiff and others of the nature of said materials which were dangerous when breathed

1  and which could cause pathological effects without noticeable trauma, despite the fact that

2  Defendants, their "Alternate Entities," and each of them, possessed knowledge and were

3  under a duty to disclose that said materials were dangerous and a threat to the health of

4  persons coming into contact therewith;

5       (h)   Defendants, their "Alternate Entities," and each of them, failed to provide

6  Plaintiff with information concerning adequate protective masks and other equipment

7  devised to be used when applying and installing the products of the Defendants, and each

8  of them, despite knowing that such protective measures were necessary, and that they were

9  under a duty to disclose that such materials were dangerous and would result in injury to

10  the Plaintiff and others applying and installing such material;

11      (i)   Defendants, their "Alternate Entities," and each of them, when under a duty

12  to so disclose, concealed from Plaintiff the true nature of the industrial exposure of

13  Plaintiff and knew that Plaintiff and anyone similarly situated, upon inhalation of asbestos

14  would, in time, develop irreversible conditions of pneumoconiosis, asbestosis and/or

15  cancer.  Defendants, their "Alternate Entities," and each of them, also concealed from

16  Plaintiff and others that harmful materials to which they were exposed would cause

17  pathological effects without noticeable trauma;

18      (j)   Defendants, their "Alternate Entities," and each of them, failed to provide

19  information of the true nature of the hazards of asbestos materials and that exposure to

20  these materials would cause pathological effects without noticeable trauma to the public,

21  including buyers, users, and physicians employed by Plaintiff and Plaintiff's employers so

22  that said physicians could examine, diagnose and treat Plaintiff and others who were

23  exposed to asbestos, despite the fact that Defendants, their "Alternate Entities," and each

24  of them, were under a duty to so inform and said failure was misleading; and

25      (k)   Defendants, their "Alternate Entities," and each of them, failed to provide

26  adequate information to physicians and surgeons retained by Plaintiff's employers and

27  their predecessor companies, for purposes of making physical examinations of Plaintiff

28

1   and other employees as to the true nature of the risk of such materials and exposure thereto

2   when they in fact possessed such information and had a duty to disclose it.

3       36.     Defendants, their "Alternate Entities," and each of them, willfully failed and

4   omitted to complete and file First Report of Occupational Injury of Illness regarding

5   Plaintiff's injuries, as required by law, and did willfully fail and omit to file report of

6   injury and occupational disease with the State of California.  Plaintiff was in the class of

7   persons with respect to whom a duty was owed to file such reports and who would have

8   been protected thereby if the fact of danger from products complained of had become

9   known.

10      37.     Defendants, their "Alternate Entities," and each of them, having such

11  aforementioned knowledge, and the duty to inform Plaintiff about the true facts, and

12  knowing the Plaintiff did not possess such knowledge and would breathe such material

13  innocently, acted falsely and fraudulently and with full intent to cause Plaintiff to remain

14  unaware of the true facts and to induce Plaintiff to work in a dangerous environment, all in

15  violation of sections 1708, 1709 and 1710 of the Civil Code of the State of California.

16      38.     The above-referenced conduct of said Defendant was and is willful,

17  malicious, outrageous and/or in conscious disregard and indifference to the safety of users

18  of said asbestos and asbestos products, including Plaintiff.  Defendant is guilty of

19  oppression, fraud, or malice and engaged in conduct which was intended by the defendant

20  to cause injury to the plaintiff or conduct which was carried on by the defendant with a

21  conscious disregard of the rights or safety of others.  Defendant subjected Plaintiff to cruel

22  and unjust hardship in conscious disregard of his rights and engaged in intentional

23  misrepresentation, deceit, or concealment of a material fact known to the defendant with

24  the intention on the part of the defendant of thereby depriving Plaintiff of property or legal

25  rights or otherwise causing injury.  Plaintiff therefore, for the sake of example and by way

26  of punishing Defendant, seeks punitive damages, according to proof.

27      39.     Plaintiffs further allege all of the foregoing portions of this cause of action

28  specifically against those Defendants who supplied asbestos fibers (as pled against those

1   Defendants who manufactured asbestos products), and any other asbestos fiber supplier or

2   distributor to manufacturers of the asbestos-containing products to which Plaintiff was

3   exposed, as well as any DOE Defendants who may be determined at a later date.

4   **FIFTH CAUSE OF ACTION**

5   (Breach of Warranty)

6   (Against all Defendants)

7       40.    Plaintiffs hereby incorporate by reference, as though fully set forth herein,

8   each and every allegation contained in the First through Fourth Causes of Action.

9       41.    Defendants, and each of them, expressly and implicitly, warranted that said

10  substance was reasonably fit for its intended use without endangering human life, and that

11  such substance was of interchangeable quality.

12      42.    Defendants and each of them breached the above described expressed and

13  implied warranties in that said substance was defective, which defects permitted and/or

14  caused said substance to seriously and permanently cause injury to Plaintiff, ELLIS

15  MICHAEL STATON, including, but not limited to, the disease mesothelioma and other

16  lung damage, while said substance was used in a manner that was reasonably foreseeable.

17      43.    As a direct and proximate result of the above described breaches of

18  warranties by Defendants, and each of them, Plaintiff suffered severe and permanent

19  injuries to his person, as alleged hereinabove in this complaint.

20      44.    The above-referenced conduct of said Defendant was and is willful,

21  malicious, outrageous and/or in conscious disregard and indifference to the safety of users

22  of said asbestos and asbestos products, including Plaintiff.  Defendant is guilty of

23  oppression, fraud, or malice and engaged in conduct which was intended by the defendant

24  to cause injury to the plaintiff or conduct which was carried on by the defendant with a

25  conscious disregard of the rights or safety of others.  Defendant subjected Plaintiff to cruel

26  and unjust hardship in conscious disregard of his rights and engaged in intentional

27  misrepresentation, deceit, or concealment of a material fact known to the defendant with

28  the intention on the part of the defendant of thereby depriving Plaintiff of property or legal

1  rights or otherwise causing injury.  Plaintiff therefore, for the sake of example and by way

2  of punishing Defendant, seeks punitive damages, according to proof.

3      45.  Plaintiffs further allege all of the foregoing portions of this cause of action

4  specifically against those Defendants who supplied asbestos fibers (as pled against those

5  Defendants who manufactured asbestos products), and any other asbestos fiber supplier or

6  distributor to manufacturers of the asbestos-containing products to which Plaintiff was

7  exposed, as well as any DOE Defendants who may be determined at a later date.

8

9  **SIXTH CAUSE OF ACTION**

10  (Premises Owner/Contractor Liability)

11      46.  Plaintiffs, by this reference, incorporate the allegations contained in the First

12  through Fifth Causes of Action.

13      47.  At all times mentioned herein, the Premises Owner/Contractor Liability

14  Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or

15  controlled the premises  where Plaintiff was present.  The information provided is

16  preliminary, based on recall over events covering many years and further investigation and

17  discovery may produce more reliable information.  Additionally, Plaintiff might have been

18  present at these or other Premises Owner/Contractor Liability Defendants' premises at

19  other locations and on other occasions.

20      48.  Prior to and at said times and places, said Premises Owner/Contractor

21  Liability Defendants, and each of them, respectively, caused certain asbestos-containing

22  insulation, other building materials, products and toxic substances to be constructed,

23  installed, maintained, used, supplied, replaced, repaired and/or removed on each of the

24  aforesaid respective premises, by their own workers and/or by various contractors, and

25  caused the release of dangerous quantities of toxic asbestos fibers and other toxic

26  substances into the ambient air and thereby created a hazardous and unsafe condition to

27  Plaintiff and other persons exposed to said asbestos fibers and toxic substances while

28  present at said premises.

49.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition and unreasonable risk of harm and personal injury to Plaintiff and other workers or persons so exposed present on each of the aforesaid respective premises.

50.   At all times relevant herein, Plaintiff entered said premises and used or occupied each of said respective premises as intended and for each of the respective Premises Owner/Contractor Liability Defendants' request and invitation.  In so doing, Plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor Liability Defendants, and each of them.

51.   Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

52.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, remained in control of the premises where Plaintiff was performing his work.

53.   At all times mentioned herein, the Premises Owner/Contractor Liability Defendants, owed to Plaintiffs and others similarly situated a duty to exercise ordinary care in the management of such premises in order to avoid exposing workers such as Plaintiff to an unreasonable risk of harm and to avoid causing injury to said person.

54.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn Plaintiff of, the existence of the aforesaid dangerous conditions and hazards on said premises.

55.     Prior to and at the times and places aforesaid, said Premises Owner/Contractor Liability Defendants, and each of them, respectively, caused certain asbestos-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured Plaintiff.

56.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm Plaintiff and others unless special precautions were taken.

57.     In part, Plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take necessary precautions.

58.     The work of contractors on premises controlled by the Premises Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances including but not limited to asbestos.

59.     The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Premises Owner/Contractor Defendants. Said negligent conduct includes but is not limited to:

a.     Failure to warn of asbestos and other toxic dusts;

b.     Failure to suppress the asbestos-containing or toxic dusts;

c.     Failure to remove the asbestos-containing and toxic dusts through the use of ventilation or appropriate means;

d.     Failure to provide adequate breathing protection, i.e., approved respirators or masks;

e.     Failure to inspect and/or test the air;

f.     Failure to provide medical monitoring.

60. The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code §1708, and Labor Code §6400, et seq., or Health & Safety Code §40200, et seq., and regulations promulgated thereunder. Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

61. Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code §6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§4105, 4106, 4107 and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health & Safety Code §40200, et seq., which empowers the California Air Quality Management Districts to promulgate regulations covering emission standards for hazardous air pollutants. Such state and federal standards required said Premises Owner/Contractor Liability Defendants to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions. Defendants' violations of said codes include but are not limited to:

    (a)    Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

    (b)    Failing to segregate work involving the release of asbestos or other toxic dusts;

(c)   Failing to suppress dust using prescribed ventilation techniques;

(d)   Failing to suppress dust using prescribed "wet down" techniques;

(e)   Failing to warn or educate Plaintiff or others regarding asbestos or other toxic substances on the premises;

(f)   Failing to provide approved respiratory protection devices;

(g)   Failing to ensure "approved" respiratory protection devices were used properly;

(h)   Failing to provide for an on-going health and screening program for those exposed to asbestos on the premises;

(i)   Failing to provide adequate housekeeping and clean-up of the work place;

(j)   Failing to properly warn of the hazards associated with asbestos as required by statute;

(k)   Failing to properly report renovation and disturbance of asbestos-containing materials;

(l)   Failing to have an asbestos removal supervisor as required by regulation;

(m)   Failing to get approval for renovation as required by statutes; and

(n)   Failing to maintain records as required by statute.

62.   Premises Owner/Contractor Liability Defendants, and each of them, were the "statutory employer" of Plaintiff as defined by the California Labor Code and California case law.

63.   Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by Defendants' violation of said regulations, ordinances or statutes.

64.   At all times mentioned herein, Plaintiff was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

65.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without

1  knowledge of, or inspection for, defects or dangerous conditions, that the persons present

2  and using said premises would not be aware of the aforesaid hazardous conditions to

3  which they were exposed on the premises, and that such persons were unaware of the

4  aforesaid violations of codes, regulations and statutes.

5    66.    As a legal consequence of the foregoing, Plaintiff developed an asbestos-

6  related illness - mesothelioma, which has caused great injury and disability as previously

7  set forth, and Plaintiff has suffered damages as herein alleged.

8    67.    The above-referenced conduct of said Defendant was and is willful,

9  malicious, outrageous and/or in conscious disregard and indifference to the safety of users

10  of said asbestos and asbestos products, including Plaintiff.  Defendant is guilty of

11  oppression, fraud, or malice and engaged in conduct which was intended by the defendant

12  to cause injury to the plaintiff or conduct which was carried on by the defendant with a

13  conscious disregard of the rights or safety of others.  Defendant subjected Plaintiff to cruel

14  and unjust hardship in conscious disregard of his rights and engaged in intentional

15  misrepresentation, deceit, or concealment of a material fact known to the defendant with

16  the intention on the part of the defendant of thereby depriving Plaintiff of property or legal

17  rights or otherwise causing injury.  Plaintiff therefore, for the sake of example and by way

18  of punishing Defendant, seeks punitive damages, according to proof.

19  ## SEVENTH CAUSE OF ACTION

20  (Loss of Consortium)

21  (Against All Defendants)

22

23    68.    Plaintiff's spouse incorporates by reference each and every paragraph of the

24  First through Sixth Causes of Action herein.

25    69.    Plaintiffs were married at all times relevant to this action were, and are now,

26  husband and wife.

27    70.    Prior to Plaintiff, ELLIS MICHAEL STATON's, injuries as alleged, Plaintiff,

28  ELLIS MICHAEL STATON was able and did perform duties as a spouse.  Subsequent to

PLAINTIFF'S ORIGINAL ASBESTOS COMPLAINT
N:\_CLIENTS\S\STATON. EM.CA\Complaint.Answer.Service\Staton.EM.CA  LA  Original Complaint.wpd (crs ) (4.13.09 )

Page 26

the injuries and as a proximate result thereof, Plaintiff has been unable to perform the necessary duties as a spouse and the work and service usually performed in the care, maintenance and management of the family home, and Plaintiff will be unable to perform such work, service and duties in the future.  As a proximate result thereof, Plaintiff's spouse SUSAN MARY STATON has been permanently deprived and will be deprived of the consortium of her spouse, including the performance of duties, all to her damages, in an amount presently unknown to Plaintiffs but which will be proved at the time of trial.

71.     Further, as a direct and proximate result of the acts of Defendants, and each of them, and the severe injuries caused thereby to Plaintiff as set forth in this complaint, Plaintiff's spouse ,SUSAN MARY STATON has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress as general nervousness as a result thereof.

72.     Discovery of the cause of Plaintiff's spouse SUSAN MARY STATON's loss of consortium, as herein alleged , first occurred within one year of the date this complaint was filed.

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them in and amount to be proved at trial in each individual case, as follows:

1.     General damages according to proof;

2.     Damages for medical and related expenses, according to proof;

3.     Damages for loss of earning capacity, according to proof;

4.     Damages for loss of earnings, according to proof;

5.     Damages for Plaintiff's other economic losses, according to proof;

6.     Exemplary or punitive damages according to proof;

7.     Plaintiff's spouse's damages for loss of consortium according to proof;

8.     Prejudgment interest, according to proof;

9.     Costs of suit incurred herein; and

10.     Such other and further relief as this Court may deem just and proper,

including costs and prejudgment interest as provided in C.C.P. §998, C.C.P.

§1032 and related provisions of law.

DATED: April 16 , 2009                    BARON & BUDD, P.C

By: _____
        ERIC BROWN, ESQ.
        JED BORGHEI, ESQ.
        Attorneys for Plaintiffs: ELLIS MICHAEL
        STATON AND MARY SUE STATON

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Eric Brown, Esq. (SBN236922)<br>Joel Boghai, Esq (SBN235043)<br>John Langdon, Esq. (SBN235509)<br>BARON & BUDD, P.C.<br>9465 Wilshire Blvd. Suite 492, Beverly Hills, CA 90212<br>TELEPHONE NO.: (310) 850-0476    FAX NO.: (310) 550-0430<br>ATTORNEY FOR (Name):    Plaintiffs | CONFORMED COPY<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>APR 16 2009<br><br>John A. Clarke, Executive Officer/Clerk<br>BY MARY GARCIA, Deputy |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | |
|---|---|
| STREET ADDRESS:    111 North Hill Street | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE:    Los Angeles, California 90012 | |
| BRANCH NAME:    Central | |

**CASE NAME:** ELLIS MICHAEL STATON and SUSAN MARY STATON

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: BC 412018 |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | | JUDGE:<br><br>DEPT: |

BY FAX

*Items 1-5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☒ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800-1812)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. ☒ monetary    b. ☐ nonmonetary; declaratory or injunctive relief    c. ☒ punitive

4. Number of causes of action (specify): seven

5. This case ☐ is ☒ is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: APRIL 16, 2009

Eric Brown, Esq.
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first filed action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California | CIVIL CASE COVER SHEET | Cal. Rules of Court, rule 201.8, 1800-1812;<br>Standards of Judicial Administration, § 19 |
|---|---|---|

Page 1 of 2

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers**
If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 5 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 201.8(c) and 227 of the California Rules of Court.

**To Parties in Complex Cases**
In complex cases, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 1800 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property Damage/Wrongful Death
  Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–Physicians & Surgeons
    Other Professional Health Care Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business Practice (07)
  Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel) (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
  Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 1800–1812)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims *(Arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgement**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late Claim
    Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Ellis Michael Staton,et al v. AMERICAN STANDARD INC,et al. | BC 41 2018 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 30   ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check <u>one</u> Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked.
For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

**BY FAX**

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|
| 1. Class Actions must be filed in the County Courthouse, Central District.  6. Location of property or permanently garaged vehicle. |
| 2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).  7. Location where petitioner resides. |
| 3. Location where cause of action arose.  8. Location wherein defendant/respondent functions wholly. |
| 4. Location where bodily injury, death or damage occurred.  9. Location where one or more of the parties reside. |
| 5. Location where performance required or defendant resides.  10. Location of Labor Commissioner Office. |

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☑ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4

| SHORT TITLE: | | CASE NUMBER |
|---|---|---|
| Ellis Michael Staton,et al v. AMERICAN STANDARD INC,et al | | |

| | A<br>Civil Case Cover<br>Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 3., 5. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation    Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 2 of 4

| SHORT TITLE | CASE NUMBER |
|---|---|
| Ellis Michael Staton,et al v. AMERICAN STANDARD INC,et al | |

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review<br>(39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance(21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

| SHORT TITLE: Ellis Michael Staton,et al v. AMERICAN STANDARD INC,et al | CASE NUMBER |
|---|---|

**Item III. Statement of Location:** Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE. <br><br> ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS: 818 W. 7TH STREET |
|---|---|
| CITY: LOS ANGELES | STATE: CA | ZIP CODE: 90017 | |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the  STANLEY MOSK  courthouse in the CENTRAL  District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d))

Dated: APRIL 16 2009

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

---

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev. 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

---

EXHIBIT "2"

1  JENNIFER JUDIN (State Bar No. 256973)
   jjudin@dehay.com
2  JOANNA L. MACQUEEN (State Bar No. 161281)
   jmacqueen@dehay.com
3  PAUL C. WHITE II (SBN 213900)
   pwhite@dehay.com
4  DEHAY & ELLISTON, L.L.P.
   800 West 6th Street, Suite 788
5  Los Angeles, CA   90017
   Telephone:   (213) 271-2727
6  Facsimile:   (213) 271-2730

7  Attorneys for Defendant
   LESLIE CONTROLS, INC.

8

9                UNITED STATES DISTRICT COURT

10                    CENTRAL DISTRICT

11

12  ELLIS MICHAEL STATON AND          Case No. _____
13  SUSAN MARY STATON,
                                       Case No. BC412018 (Los Angeles
14              Plaintiffs,            County Superior Court)

15       v.                           **DECLARATION OF RET. REAR**
                                       **ADMIRAL ROGER B. HORNE IN**
16  AMERICAN STANDARD, INC.,           **SUPPORT OF DEFENDANT**
    individually and as successor-in-interest   **LESLIE CONTROLS, INC.'S**
17  to THE TRANE COMPANY; et al.,
                                       **NOTICE OF REMOVAL**
18              Defendants.

19

20

21

22

23

24

25

26

27

28

LESLIE/Staton

DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

I, Roger B. Horne, Jr., being under penalty of perjury, declare and say:

1. I am a retired Rear Admiral of the United States Navy, in which I served between 1956 and 1991.

2. I began my Navy career in 1956, immediately after receiving a Bachelor of Science degree in Naval Engineering from the United States Naval Academy at Annapolis, Maryland. I have also received extensive post-graduate education in naval engineering, including a Master of Science Degree in Mechanical Engineering from the U.S. Naval Postgraduate School, and have taught Naval Engineering as a Visiting Professor at the University of Michigan. Throughout my Navy career, I concentrated in areas of ship design, engineering, construction, overhaul and inspection. Ultimately, I achieved the rank of Chief Engineer and Deputy Commander, Naval Sea Systems Command ("NAVSEA") for Ship Design and Engineering. Prior to that, I served as Deputy Commander, NAVSEA for Facilities and Industrial Management; Commander, Puget Sound Naval Shipyard; Commander, Engineering Duty Officer School; Production and Repair Officer, Mare Island Naval Shipyard; Nuclear Engineering Manager, Puget Sound Naval Shipyard; Nuclear Submarine Inspection Officer, Supervisor of Shipbuilding Office, Ingalls Shipyard and Chief Engineer in the USS Ozbourn (DD 846).

3. In addition to my training and experience in Navy ship construction, as outlined above, I have been recognized for achievements in the field of marine machinery and engineering, and have received three Navy Legion of Merit Awards and three Meritorious Service Awards for Engineering and Industrial Achievement and an award from the Marine Machinery Association.

4. I submit this Affidavit in support of defendant Leslie Controls, Inc.'s ("Leslie") Notice of Removal to attest to the level of supervision, direction and control exercised by the U.S. Navy over the design and manufacture of equipment, including valves, intended for installation on Navy vessels. In addition, I have personal knowledge of the comprehensive plans, specifications and requirements which governed suppliers like Leslie of equipment for use aboard Navy ships. More particularly, I can attest that any and all work performed on valves

-2-
**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

1   built and supplied for these ships by vendors such as Leslie was performed to the requirements

2   specified by the Navy, and that the work was reviewed and inspected by Navy personnel in the

3   vendor's plant.  In many instances during my career I personally inspected equipment, including

4   valves, to verify conformance with the requirements specified, although more immediate

5   supervision typically was exercised by officers and other Navy personnel under my command or

6   the command of NAVSEA or its predecessor, the Bureau of Ships ("BUSHIPS").

7        5.     Valves built for Navy vessels, including Leslie valves, were manufactured

8   according to detailed specifications prepared, written, approved and issued exclusively by the

9   Navy, specifically NAVSEA or BUSHIPS.  In my role as Chief Engineer and Deputy

10   Commander for NAVSEA's Ship Design and Engineering Division, I was personally responsible

11   to the Commander of NAVSEA for developing ship designs and providing overall technical

12   support to the operating fleet, including technical support for the maintenance of Navy ships, and

13   Navy ships under construction.  I was also responsible for maintaining naval ship military

14   specifications and for monitoring compliance with the specifications by all vendors and

15   contractors of naval equipment.  I am fully aware that only valves especially designed and built

16   for U.S Navy combat vessels, including Leslie valves could be installed.

17        6.     The Navy chain of command concerning ship construction involves several layers

18   of authority related to technical and contractual control over Navy shipbuilding.  The Secretary

19   of the Navy [subject to the President and Congress] has ultimate authority over the Navy and

20   Navy shipbuilding; immediately below the Secretary, as has been the case since the creation of

21   NAVSEA, is the Chief of Naval Operations ("CNO"), to whom NAVSEA reports.  Prior to the

22   establishment of NAVSEA, BUSHIPS controlled all combat ship design and construction and

23   reported to the CNO as well as a civilian Assistant Secretary.  Since the creation of NAVSEA,

24   NAVSEA reports to the CNO for all military ship design and construction.  (See Exhibit A & B.)

25        7.     Under the command of NAVSEA, as was the case with BUSHIPS, the Navy's

26   shipbuilding structure was comprised of several divisions and levels of authority concerning ship

27   design, construction, repair and inspection.  Technical and contractual control over shipboard

28   equipment and material was directed by the Commander of Naval Sea Systems and the

-3-
DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

1  Commander of Naval Supply.  Each of these two organizations had oversight responsibility

2  concerning, among other things, valves built for Navy vessels.  Compliance with the standards

3  and specifications required for valves built for Navy use was directly monitored by Naval

4  Machinery Inspectors under both of these divisions:  the Machinery Inspectors under Naval

5  Supply worked on-site at the vendor's (in this case Leslie Controls, Inc. s') manufacturing

6  facility, and the Machinery Inspectors under Naval Sea Systems Commands carried out their

7  responsibilities at the shipbuilding yards.  Moreover, it was common in my experience for

8  Directors of the Machinery and Propulsion Equipment Groups, who worked for me at times

9  during my career, to inspect the manufacturing process at vendors' plants.

10       8.     In my experience, it was the Machinery Inspectors who exercised primary,

11  frontline control over the work performed for the Navy and government shipyards and

12  governments contract shipyards by vendors such as Leslie in the production of valves and other

13  equipment.  The Naval Machinery Inspectors were responsible for assuring that contractors such

14  as Leslie followed the required contract specifications as they relate to naval machinery.  Further,

15  the Naval Machinery Inspectors would report to their superiors any violations or failures to

16  comply with specifications.

17       9.     The Navy retained the "final say" over the design of any piece of equipment, and

18  made the ultimate decision regarding how to resolve an engineering disagreement between the

19  Navy and an outside supplier.

20       10.    Equipment sold by Leslie during the 1940's, 1950's and 1960's to the United

21  States Navy for use on U.S. Navy ships was always required to comply with the detailed

22  specifications issued by the government.  For example, attached as Exhibit C is a copy of the

23  1968 Military Specification (MilSpec MIL –G -21032, "Gaskets, Metallic Asbestos, Spiral

24  Wound".  These specifications dictated the materials that Leslie was required to use in

25  component parts in the equipment.  These specifications were made part of the contract, and

26  strict compliance therewith was mandatory.

27       11.    In addition, I can attest that the military specifications for valves and other

28  equipment intended for use aboard Navy vessels were drafted, approved and maintained by the

-4-

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

Navy, specifically NAVSEA, to address all aspects of shipboard equipment and materials requirements, including the materials to be used, and any changes to these specifications were made by the Navy. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels. NAVSEA or BUSHIPS also prepared contract specifications which incorporated the MilSpecs. These specifications reflected the state of the art and the special needs of combat vessels destined for combat with our sailors.

12.  The Navy had unique specifications for valves. The specifications were communicated to valve vendors such as Leslie when the Navy (directly or through its contractors) issued its Request for Proposal for certain equipment.

13.  The Navy specifications also covered the nature of any communication affixed to valves or other equipment supplied to the Navy. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

14.  The Navy would not, and could not permit an equipment manufacturer of supplier to interfere with the Navy's mission by placing warnings on any equipment (or in any instructions or manuals which accompanied the equipment) on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed non-essential, in its unilateral view.

15.  The Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not

-5-
DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

1    be included. Thus, the Navy controlled the decision making with respect to instructions and

2    warnings on every piece of equipment.

3       16.     In addition to specifications regarding design and manufacturing of the equipment

4    itself, the Navy also had detailed specifications that governed the form and content of written

5    materials to be delivered with equipment, including valves, supplied to the Navy. The Navy was

6    intimately involved with and had final approval of all technical and engineering drawings,

7    operating manuals, safety or hazard information and any other written information that

8    accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to

9    any precautionary labeling and the content of any such labeling. In short, the Navy dictated

10    every aspect of the design, manufacture, installation, overhaul, written documentation and

11    warnings associated with its ships and did not permit deviation from any of its contractors.

12       17.     In conclusion, in each and every instance where Leslie contracted with the U.S.

13    Navy for the provision of equipment, the U.S. Navy exercised direction and control over the

14    design, manufacture, inspection and testing of all such equipment. Pursuant to the terms of all

15    contracts with Leslie entered with the U.S. Navy, the Navy retained authority to direct and

16    control the performance under the terms of the contract.

17       I declare under penalty of perjury under laws of the State of ___WA___ that the

18    foregoing is true and correct, and that if called as a witness, I could competently testify to the

19    foregoing facts, all of which are within my own personal knowledge.

20

21    Executed this _19_ day of March 2008, at _Seabeck  WA_. \

22                            _Roger B Horne_
                                     ROGER B. HORNE, JR.

23

24

25

26

27

28

-6-

**DECLARATION OF RET. REAR ADMIRAL ROGER E. HORNE**

# EXHIBIT A



# Technical and Contractual Control

## Recent Organization

# EXHIBIT B

### Definition of Key Position Responsibilities

Chief of Naval Operations (CNO):  Overall responsibility for accomplishment of the mission of the Navy in the defense of the United States.  This includes recommendations for the Naval ship building programs and the readiness of the Operating forces to meet the threat at hand.

Commander of the Naval Sea Systems Command (COMNAVSEA): Responsible to the CNO for technical support of Naval ships, ship designs, and ship construction. Responsible for management of the Naval Shipyards and contract administration of ships under construction in private yards.

Deputy Commander for Ship Design and Ship Systems Engineering:  Responsible to COMNAVSEA and specific project officers for developing ship designs and for overall technical support to the operating fleet, maintenance of ships, and ships under construction. Responsible for the maintenance of Naval ship military specifications.  Monitors contractor performance to requirements in the development of new naval machinery being built to specifications developed by his design personnel.

Director of the Machinery Group: Responsible to the Deputy Commander for Ship Design and Ship Systems Engineering for technical support of projects involving ship machinery. This includes the development of new designs as well as support of on going ship construction and ships in maintenance and at sea. Responsible for the maintenance of military specifications related to naval machinery.  Naval machinery involves auxiliary machinery, as well as, propulsion machinery.

Director of the Propulsion Branch: Responsible to the Director of the Machinery Group for propulsion machinery. Is responsible for the technical effort associated with the development and integration of new propulsion systems into ship designs and related support to the operating fleet. Propulsion systems involve steam, diesel and gas turbine. Has cognizance of specifications related to propulsion systems.

Head Steam Turbine Branch:  Responsible to the Director of the Propulsion Branch for the development on naval turbines and maintenance of life cycle technical support of turbines used in ship designs.  Responsible for the maintenance of and designation of specifications to be used in turbine designs being developed by contractors.

Deputy Commander for Facilities and Industrial Management:  Responsible to COMNAVSEA for oversight of the Naval Shipyards and the Supervisor of Shipbuilding offices located in the private shipyards where naval ships are under construction.

EXHIBIT

Hecht 3

Supervisor of Shipbuilding(SUPSHIP):  Responsible to COMNAVSEA via the Deputy
    Commander for Facilities and Industrial Management for the administration of the
    ship building contracts in the shipyard(s) he is responsible for.  Assures ships are
    built to required specifications.  Approves changes to specifications as authorized
    by the appropriate cognizant NAVSEA technical code and Project Officer.

Head Inspection Department:  Responsible to the Supervisor of Shipbuilding for the
    inspection of Naval ships under construction in the shipyard.  Assures by on scene
    inspections and audits that the navy specifications for the ship are followed.
    Comments on contractor requests for changes in the contract specifications as
    requested by other  SUPSHIPS departments.  Is not authorized to change
    specifications.

Naval Machinery Inspector:  Specialized inspectors qualified in Naval machinery  that
    are responsible to the Head of the Inspection Department for assuring the,
    contractor follows the required contract specifications as they relate to Naval
    machinery.  Inspects ship installations and received material from subcontractors
    including government furnished material such as propulsion equipment.  Reports
    violations to specifications.

Head Contracts/Supply Dept. Progresses government furnished material and manages
    contract changes.  Is authorized after appropriate technical and project
    management  approval to sign contract change documents.

Commander Naval Supply System (COMNAVSUP):  Is responsible to the Chief of
    operations for supply support of the operating fleet and supply functions related to
    the shipbuilding programs.  This includes the maintenance and distribution of
    repair parts for ships at sea.

Resident Contract Administration Offices:  Located in the manufacturing plants of
    contractors under contract with the US Navy to supply equipment.  In some cases
    equipment is under development.  Offices are responsible to COMNAVSUP for
    assurance that equipment is built to the contract technical specifications.  In the
    case of naval machinery these are specified by NAVSEA.  Takes part in visits by
    the Deputy Commander for Ship Design and Ship Systems Engineering to assure
    contractor performance.   Does not have the authority to allow contractor change
    to technical specifications without approval from NAVSEA and proper contract
    modification.

Machinery Inspectors:  Depending on the size and complexity of contracts administered
    the resident Office may have a staff of inspectors some of which specialize in
    certain areas such as propulsion machinery.  These inspectors follow the
    contractor's effort and formally report violations to specifications.

### Ship Design and Naval Machinery Military Specifications

Certain military specifications relate to ship and ship equipment. These are maintained by the Naval Sea Systems Command (NAVSEA) formerly the Bureau of Ships. NAVSEA has in its command engineers highly qualified in specialty areas such as steam turbines, gas turbines, reductions gears etc. These engineers have control over the military specifications that concern their area of expertise. In addition, NAVSEA has had an Engineering Standards Sub Group and a Combatant Ship Specifications and General Specifications Division to help manage the large number of specifications (thousands) and contract plans that exist. Changes to specifications are continually under review as new technology and construction techniques evolve.

Changes to specifications must be coordinated with the cognizant technical engineer. Once a contract which references certain specifications is signed with a contractor the cognizant engineer will resolve any questions of interpretations. There must be clear assignment of responsibility for resolving questions. If this does not occur, different interpretations are liable to occur. Once a specification is invoked in a contract no technical changes can be made that violates that specification without the cognizant engineers review.

The reasons for such control is that specifications are frequently very subtle and what is perceived as a minor change can have a disastrous impact. The safety and effectiveness of combatant ships depends to a large extent on adherence to specifications that have evolved by a process of experience and technology advancement. Since ships are very complex, and subject to various opinions as to what are proper requirements, special care is taken to assure proper technical reviews are made before any waivers to the specifications are approved. Such changes are formal, that is in writing.

### The Ship Design/Construction Process

Once a ship is to be designed there are four design phases that take place: feasibility design, preliminary design, contract design and detailed design. A Ship Design and Engineering Director is assigned along with support from cognizant technical codes.

During the feasibility design phase the outlines of several ship configurations will be considered. For the machinery plant, different types of propulsion plants will be considered, and an outline of the space and weight required for each plant determined. There are now four basic plants and several combinations plants that can be put together.

Once a ship concept has been selected as a result of the feasibility study the preliminary design phase will be started. This design phase is done by NAVSEA and results in an engineering description of the ship and its major subsystems. Performance characteristics

EXHIBIT

Hoans 4

and system diagrammatics are developed during this phase. During this phase, for the machinery plant, each cognizant engineer will do tradeoff studies to determine the best combination of machinery that can be used.

Following the preliminary design phase is the contract design phase. During this phase the designers develop a technical package of drawings and specifications that the various shipbuilders can bid on. This process is done in great detail and the cognizant engineers use the appropriate specifications and contract plans at their disposal to convey to the prospective builders how the ship will be built. By using the contract specifications incorporated during the contract design phase NAVSEA solicits for bids to perform the detail design and ship construction. In some cases detail design or part of it may not be done by the final ship builder selected.

During the detail design phase NAVSEA does not relinquish control. NAVSEA is involved in the development and purchasing of government furnished equipment such as the that used in the propulsion plant. They will review and approve change proposals to specifications and monitor progress and performance to requirements in detail through design reviews, by visits to the design agency, and by approving plans and calculations that have been developed.

Once construction of the ship has been started or new machinery development started by a contractor NAVSEA (the Engineering Directorate) will continue to monitor performance by on site visits and reviews to assure work is proceeding in a proper manner, as specified, and to resolve any technical problems that might come up. Any technical changes to the specifications are reviewed for approval by NAVSEA.

# EXHIBIT C

QUALIFIED PRODUCTS LIST

OF

PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-I-2781

INSULATION, PIPE, THERMAL

This list has been prepared for use for the Government in the procurement of products covered by the subject specification and some forms of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product to meet/due to the latest effective issue of the applicable specification. This list is subject to change without notice, revision of any instance of this list will be issued if necessary. The issuing of a product from one release the supplier from compliance with the specification requirements. Use of the information shown, herein for advertising or publicity purposes is specially forbidden.

The activity responsible for this Qualified Products List is   Naval Ship Engineering Center

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade I | | | |
| Class a | New CareyTemp 1500 Cylindrical & Segmented Pipe Insulation | Philip Carey Test Rpt. NCEL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: John Ashtown |
| Class b | Pabco | CH 5-38 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94120 Plant: Emeryville, Calif. |
| Class b | Caltemp | THM V10678 | do. |
| Class b | Colotites | EIS 910332 | CAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class b | | | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Waukegan, Ill. |
| | JM (H17 Asbestos) Thermobestos | HIF C-8281 HIF C10247 | Waukegan, Ill. |
| Class b | Thermobestos | Rpt. No. 2421-7-595 of 12 July 1981 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Class b | Thermo-11 | IDE 610245 | Keene Corp. Industrial Insulation Div. 200 Tremain Ave. Trenton, N. J. 08650 Plant: Valley Forge, Pa. |
| Class b | Kaylo-rb-1700 | H23 A10234 | Minmet Industries, Inc. Winslow Avenue Fairlawn Park, New Jersey Plant: Ashton, Pa. |
| Class b | Kaylo | KE5994233 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |

1 of 9

QPL-2781-31
27 May 1939
SUPERSEDING
QPL-2781-29
25 September 1961
ASC 5540

MIL-2701

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | MIL OR QUALIFICATION DOCUMENT | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Grade II** | | | |
| Class a | Unibestos #900 | RDT 8105709; J.L.P. Research, Inc. Rpt. of 10/21/64 and Pittsburgh Corning Corp. Rpt. No. PC-U-1 of 13/9/64 | Pittsburgh Corning Corp. One Gateway Center Pittsburgh 22, Pa. Plants: Tyler, Texas Port Allegany, Pa. |
| Class d | New Carrytemp 1300 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. SCML-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class d | Caltemp | RDS 010079 | Pittsburgh Corp. Fibre Industrial Products Div. 470 Brannan St. San Francisco, Calif. 94111 Plant: Emeryville, Calif. |
| Class d | Chilkilito | RDS 010072 | CDG Corp. 140 East 52 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class d | Thermobestos | RDS 010147 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plants: Waukegan, Ill.; & Jr |
| Class d | Thermobestos | Rpt. No. SCD-7-496 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Class d | Thermwall | RDS 010047 | Keene Corn. Mechanical Insulation Div. 200 Seventh Ave. Eronton, S. C. Endrt Plant: Valley Forge, Pad |
| Class d | Kaylount-1700 | RDS 010104 | Mineral Industries, Inc. Mineral Avenue Pittston Falls, New Jersey Plant: Ashley, Pa. |
| Class d | Kaylo | RDS 010022 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| **Grade III** | | | |
| Class a. Type I | New Carrytemp 1300 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. SCML-4 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Type II | New Carrytemp 1300 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. SCML-5 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |

2 of 3

000106

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade III Class 4 Type I | Caltemp | MIL 010070 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif; 94119 Plant: Emeryville, Calif. |
| Type II | Caltemp | MIL 010251 | do. |
| Type IV | Pypane | MIL D-6006 | do. |
| Type I | Calsilite | MIL 010272 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Type I | Thermobestos | MIL 010247 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N. J. |
| Type II | Thermobestos | MIL 010247 | do. |
| Type I | Thermobestos | Rpt. No. BCR-T-096 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Type II | Thermobestos | Rpt. No. BCR-T-096 of 12 July 1961 | do. |
| Type II | Superex | MIL 010202 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Type I | Thermasil | MIL 010240 | Keene Corp. Industrial Insulation Div. 200 Dewevuly Ave. Keasbey, N. J. 08832 Plant: Valley Forge, Pa. |
| Type II | Thermasil | MIL 010240 | Keene Corp. Industrial Insulation Div. 200 Dewevuly Ave. Keasbey, N. J. 08832 Plant: Valley Forge, Pa. |
| Type I | Hytherm-1700 | MIL 010106 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pa. |
| Type II | Hy-Temp | MIL D-6021 | do. |
| Type I | Kaylo | MIL 010222 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43602 Plant: Berlin, Calif. |
| Type II | Kaylo | MIL 010222 | do. |
| Grade III Class 4 | Unibestos 81300 | MIL 010080, Pittsburgh Corning Corp. Rpt. No. PC-C-1 of 13/9/64 | Pittsburgh Corning Corp. One Gateway Center Pittsburgh 22, Pa. Plant: Tyler, Texas Port Allegany, Pa. |

☆ U.S. GOVERNMENT PRINTING OFFICE: 1968-0-253/3-16



# Technical and Contractual Control

## Navy Department 1946

- Secretary of the Navy
  - Chief of Naval Operations
  - Assistant Secretary Material
    - Chief Bureau of Ships
      - Director Contract Division
        - Hull and Machinery Purchasing
      - Assistant Chief Ship Design
        - Ship Specifications
        - Director Ships Technical
          - Hood Turbine and Gear Section
    - Chief Bureau of Naval Supply
      - Resident Contract Administration Offices
        - Inspectors

EXHIBIT "3"

1  JENNIFER JUDIN (State Bar No. 256973)
   ijudin@dehay.com
2  JOANNA L. MACQUEEN (State Bar No. 161281)
   jmacqueen@dehay.com
3  PAUL C. WHITE II (SBN 213900)
   pwhite@dehay.com
4  DEHAY & ELLISTON, L.L.P.
   800 West 6th Street, Suite 788
5  Los Angeles, CA   90017
   Telephone:   (213) 271-2727
6  Facsimile:   (213) 271-2730

7  Attorneys for Defendant
   LESLIE CONTROLS, INC.

8

9                 UNITED STATES DISTRICT COURT

10                      CENTRAL DISTRICT

11

12  ELLIS MICHAEL STATON AND          | Case No. _____
13  SUSAN MARY STATON,                |
                                      | Case No. BC412018 (Los Angeles
14                Plaintiffs,         | County Superior Court)
15        v.                          |
16  AMERICAN STANDARD, INC.,          | **DECLARATION OF MATTHEW
    individually and as successor-in-interest | WROBEL IN SUPPORT OF
17  to THE TRANE COMPANY; et al.,     | DEFENDANT LESLIE CONTROLS,
                                      | INC.'S NOTICE OF REMOVAL**
18                Defendants.

19

20

21

22

23

24

25

26

27

28

LESLIE/Staton

DECLARATION OF MATTHEW WROBEL

I, Matt Wrobel, declare:

1.     I am employed by Leslie Controls, Inc. ("Leslie") as the Group Director of Quality Assurance, and have been employed by Leslie in various capacities for forty-one years.

2.     Leslie has been in business since around 1905 and I am personally familiar with the products that Leslie has manufactured throughout its corporate history.

3.     I am also personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Leslie for valves and related equipment because I was personally involved in such contracts at the various stages of development, including production, testing, and acceptance.

4.     I submit this affidavit to attest to the degree of involvement, supervision, direction and control exercised by the U.S. Navy and/or its authorized agents and officers in connection with procurement contracts with Leslie for equipment to be installed aboard U.S. Naval vessels. The following paragraphs describe the contract process from the perspective of Leslie as the vendor, as well as the levels of interaction between Leslie and the Navy agents and personnel through the various stages of a given contract.

5.     Leslie furnished and fabricated valves and related equipment for U.S. Navy vessels under contract between Leslie and the United States Navy Department and/or its authorized government agencies, officers and personnel.

6.     Leslie was obligated to comply with Military Specifications ("Mil Specs") which cover all specific components of the valves and any related equipment, including accessories, subcomponents, and other materials required to fabricate the Leslie equipment.

7.     Equipment sold by Leslie to the U.S. Navy for use on Navy ships always had to be provided pursuant to detailed specifications issued by the government. For example, attached hereto as Exhibit A is a copy of Valves, Pressure Reducing, Steam Service, MIL -V- 17848B, 1968) . This specification in turns incorporates by reference numerous additional specifications such as "Gaskets, Metallic- Asbestos, Spiral Wound", MIL -G- 21032). These specifications

-2-
DECLARATION OF MATTHEW WROBEL

1   dictated the materials that Leslie was to use in component parts in the equipment.   These

2   specifications were made part of the contract, and strict compliance therewith was mandatory.

3       8.  The U.S. Navy and/or its authorized government agencies had a consistent and

4   thorough program of inspecting equipment sold by Leslie to ensure that such equipment

5   complied with all U.S. Navy/ government contract requirements.  This program of inspection

6   included ongoing site inspections during the manufacturing process at the Leslie plants.  I have,

7   for the past forty years interfaced with many if not all of the Government / Navy Quality

8   Assurance Inspectors assigned to LESLIE from the 1960's to present.  The names of some of

9   these inspectors were Mr. Frank Mishnekoff (1960's), Mr. Jules Raymond (1970's), Mr. Charles

10   Crossan (1980's), Mr. Allen Eubanks (1980's), Mr. Daniel Nusekabel (1990's) and Mr. Bruce

11   Smith (1990's).  I personally interacted with these individuals in different capacities on a regular

12   basis. They all had the authority, and exercised the authority, to closely inspect our work, accept

13   or reject product and to halt production on any occasion that they felt Leslie was not in

14   compliance with U.S. Navy / government contract specifications. Government, Navy and

15   shipyard quality personnel would also inspect Leslie supplied equipment at the receipt activities.

16   Government, Navy and shipyard quality personnel would perform inspections of welds and

17   materials which sometimes included x-ray film to ensure compliance with specifications.

18       9.    Attached hereto and made a part hereof and marked as Exhibit B is a true and

19   correct copy of a document that has been obtained at my direction from records kept in the

20   ordinary course of business by Leslie.  This document is an example of an "Inspection and Test

21   Report – Certificate of Compliance" issued by Leslie and accepted and signed by government

22   inspectors upon completion of thorough testing of Leslie equipment.  This particular Certificate

23   describes the numerous tests and inspections that were accomplished upon Leslie equipment

24   destined to the Newport News Shipbuilding and Drydock Co. for installation upon U.S. Navy

25   ships in the 1971 time frame.  The government had detailed specifications describing the

26   inspections and testing to be accomplished, for example attached hereto and marked as Exhibit C

27   is a true and correct copy of MIL – I – 45208A that has been obtained at my direction from the

28   records kept in the ordinary course of business by Leslie.  This is an example of one of the many

DECLARATION OF MATTHEW WROBEL

1   specifications that would be made part of the contract between Leslie and the U.S. Navy.

2        10.    U.S. Navy inspection and testing continued at the shipyards where Leslie

3   equipment was installed on board U.S. Navy ships. Inspectors at the shipyard had the authority,

4   and exercised the authority, to inspect and accept equipment based upon its compliance with

5   Navy specifications. Over the past forty yeas I personally interfaced with many Government and

6   shipyard quality personnel concerning equipment supplied and it's compliance to required

7   specifications. It was understood that should these personnel deem the equipment to not be in

8   compliance with requirements, the equipment in question would be rejected and returned for

9   modification or replacement.

10       11.    U.S. Navy inspection and testing continued in "Sea Trials" wherein the Navy

11  rigorously tested all equipment at sea under diverse conditions. Only if the equipment performed

12  to the satisfaction of the Navy would that equipment be accepted. It was understood that the U.S.

13  Navy directed and controlled these testing procedures, and that U.S. Navy directed and

14  controlled whether any equipment would be found unsatisfactory so as to require modification or

15  replacement.

16       12.    The U.S Navy also conducted further testing of exemplar equipment. For

17  example, periodically Leslie was obliged to send exemplars to facilities such as the Naval

18  Engineering Station, or the Naval Boiler and Turbine Laboratory where the exemplars were

19  subjected to extensive inspection and testing under diverse conditions. Should the Navy find any

20  deficiencies in the manufacture or function of the equipment, the Navy directed and controlled

21  Leslie in formulating a response to correct any such deficiencies.  Attached hereto and made a

22  part hereof and marked as Exhibit D is a true and correct copy of a document that has been

23  obtained at my direction from records kept in the ordinary course of business by Leslie.  This

24  document describes a Leslie Governor that was sent at the direction of Frank Mishnekoff from

25  Leslie to the United States Navy Marine Engineering Laboratory in Annapolis, MD for

26  "performance tests." Results of such testing were to be directed to Mr. Mishnekoff at his address

27  at the Leslie production facility.

28       13.    In addition to the above design, manufacture and testing there remained an

-4-

DECLARATION OF MATTHEW WROBEL

1  obligation by Leslie to provide technical manuals for the valves and related equipment furnished

2  pursuant to a U.S. Navy / government contract.  The U.S. Navy exercised direction and control

3  over all written documentation to be delivered with its naval valves such as engineering

4  drawings, test reports, technical manuals and other technical data that could be used as needed by

5  the shipboard engineering officer during the life of the equipment.  Leslie created the technical

6  manuals in accordance with the Mil Specs and then submitted them for revisions, modifications

7  and the ultimate approval of the U.S Navy and/or its authorized government agencies.  Navy

8  personnel participated in the preparation of this kind of information and exercised specific

9  direction and control over its contents.  These manuals included safety information related to the

10  operation of naval valves and related equipment only to the extent directed by the Navy.

11      14.    Furthermore, the U.S. Navy had precise specifications, practices and procedures

12  that governed the content of any communication affixed to machinery supplied by Leslie to the

13  Navy as shown on approved Navy drawings.  At no time did the U.S. Navy instruct Leslie

14  Controls to affix warnings or caution statements regarding asbestos hazards to a piece of

15  equipment intended for installation onto a U.S. Navy vessel.

16      15.    In conclusion, in each and all instances wherein Leslie contracted with the U.S.

17  Navy for the provision of equipment, the U.S. Navy exercised direction and control over the

18  design, manufacture, inspection and testing of all such equipment.  Pursuant to the terms of all

19  contracts which Leslie entered with the U.S. Navy, the U.S. Navy retained such authority to

20  direct and control the performance under the terms of the contract.

21

22  Executed under penalty of perjury this  26  of March 2008 at  TAMPA , Florida.

23

24                                          Matthew Wrobel

25

26

27

28

LECO/1049920/3527000v.1

# EXHIBIT A

MIL-V-17848B(SHIPS)
12 November 1968
SUPERSEDING
MIL-V-17848A(SHIPS)
19 November 1958
(See 6.5)

# MILITARY SPECIFICATION

## VALVES, PRESSURE REDUCING, STEAM SERVICE

1. SCOPE

1.1 Scope. This specification covers self-contained pressure reducing valves for steam service.

1.2 Classification. Pressure reducing valves shall be of the following classes, and compositions as specified (see 6.2): (See Amendment 4)

    Class A - Internal pilot operated
    Class B - Inverted, gas loaded, liquid sealed
    Class C - Spring loaded
    Composition A - 2-1/4 percent chromium 1 percent molybdenum
    Composition B - 1-1/4 percent chromium 1/2 percent molybdenum
    Composition D - Carbon steel
    Composition E - Bronze

2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein.

SPECIFICATIONS

    MILITARY
        MIL-S-901 - Shock Tests, H.I. (High-Impact); Shipboard Machinery,
             Equipment and Systems, Requirements for.

Amend 4 &rarr;      MIL-D-1000 - Drawings, Engineering and Associated Lists.
        MIL-R-2765 - Rubber Sheet, Strip, Extruded, and Molded Shapes,
             Synthetic, Oil Resistant.

Amend 4 &rarr;      MIL-Q-9858 - Quality Program Requirements.
        MIL-R-17131 - Rods, Welding, Surfacing.
        MIL-F-20042 - Flanges, Pipe, Bronze (Silver Brazing).
        MIL-G-21032 - Gaskets, Metallic-Asbestos, Spiral Wound (For ASA
             Commercial Flanged Joints in Piping Systems).

STANDARDS

    MILITARY
        MIL-STD-167 - Mechanical Vibrations of Shipboard Equipment.
        MIL-STD-758 - Nondestructive Testing, Welding, Quality Control,
             Material Control and Identification and Hi-Shock Test
             Requirements for Piping System Components for Naval
             Shipboard Use.
        MS16142 - Boss, Gasket Seal Straight Thread Tube Fitting, Standard
             Dimensions for.

Amend 4 &rarr; MIL-STD-278

PUBLICATIONS

    NAVSHIPS
        NAVSHIPS 0948-045-7010 - Material Identification and Control (MIC for
             Piping Systems).

(Copies of specifications, standards, drawings and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

FSC 4820

EXHIBIT
70.500

0658

28124

MIL-V-17048B(SHIPS)

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
  A105 - Forged or Rolled Steel Pipe Flanges, Forged Fittings, and Valves
         and Parts for High-Temperature Service.
  A182 - Forged or Rolled Steel Pipe Flanges, Forged Fittings, and Valves
         - and Parts for High-Temperature Service.
  A193 - Alloy Steel Bolting Materials for High Temperature Service.
  A194 - Carbon and Alloy Steel Nuts for Bolts for High-Pressure and High-
         Temperature Service.
  A216 - Carbon Steel Castings Suitable for Fusion Welding for High-
         Temperature Service.
  A217 - Alloy Steel Castings for Pressure-Containing Parts Suitable for
         High-Temperature Service.
  A305 - Carbon Steel Bars Subject to Mechanical Property Requirements.
  B61  - Steam or Valve Bronze Castings.

(Application for copies should be addressed to the American Society for Testing and
Materials, 1916 Race Street, Philadelphia, Pa. 19103.)

UNITED STATES OF AMERICA STANDARDS INSTITUTE (USAS)
  B1.12 - Class 5 Interference-Fit Thread.
  B16.5 - Steel Pipe Flanges and Flanged Fittings.

(Application for copies should be addressed to the United States of America Standards
Institute, 10 East 40th Street, New York, N. Y. 10016.)

NATIONAL BUREAU OF STANDARDS
  Handbook H28 - Screw Thread Standards for Federal Services.

(Application for copies should be addressed to the Superintendent of Documents, Government
Printing Office, Washington, D. C. 20402.)

UNIFORM CLASSIFICATION COMMITTEE
  Uniform Freight Classification Rules.

(Application for copies should be addressed to the Uniform Classification Committee,
20 'nion Station, 516 West Jackson Boulevard, Chicago, Illinois 60606.)

(Technical society and technical association specifications and standards are generally
available for reference from libraries. They are also distributed among technical groups
and using Federal agencies.)

3.  REQUIREMENTS
  3.1  Qualification.  The valves furnished under this specification shall be products
which are qualified for listing on the applicable qualified products list at time set for
opening of bids (see 4.2 and 6.3).

  3.2  Definitions.  The definitions specified in 3.2.1 through 3.2.7 are applicable
to this specification.

  3.2.1  Set pressure.  The downstream pressure which the valve is set to maintain under
a given set of operating conditions (i.e. inlet pressure and flow).  Normally the valve
is set with a flow of approximately 10 percent of rated capacity.

  3.2.2  Accuracy of regulation.  The maximum permissible band over which the downstream
pressure may vary when the valve is set at any pressure within the required range of adjust-
ment and is subjected to any combination of inlet pressure, flow demand, and ambient
temperature variations, within the specified limits.

  3.2.3  Set pressure limits.  The range of set pressures over which the valve can be
adjusted while meeting the performance requirements specified.

  3.2.4  Lock-up pressure.  The outlet pressure delivered by a reducing valve under
shut off conditions (i.e. when the flow is reduced to a point where it is equal to or less
than the allowable leakage).

  3.2.5  Nominal pressure.  The approximate maximum pressure which the valve will be
subjected to in service under normal conditions.

  3.2.6  Design pressure and temperature.  The maximum pressure and temperature upon which
valve should be subjected to under any condition.  The pressure and temperature upon which
r- -strength of the pressure containing envelope is based.

2

3.2.7 Proof pressure. The maximum test pressure that the valve is required to with-stand without permanent damage. Valve operation is not required during application of the proof pressure, but after the pressure has been removed, the valve shall be capable of meeting all performance requirements.

3.3 Materials. Materials shall be as specified in table 1. Materials for parts other than those listed in table 1 shall be suitable for the intended pressures and tem-peratures and shall be selected to prevent galling, seizing, or excessive wear on operating parts. Clearances shall be such as to prevent interferences due to thermal expansion.

Table I - List of materials

| Name of parts | Composition A | Composition B | Composition D | Composition E |
|---|---|---|---|---|
| Body, bonnet, and bottom cover | ASTM A182 grade F22 ASTM A217 grade WC9 | ASTM A182 grade F11 ASTM A217 grade WC6 | ASTM A105 grade 11 ASTM A216 grade WCB ASTM A396 grade 60 | ASTM B61 |
| Internal trim | See 3.3.1 | | | |
| Cylinder liner and piston (class A) | 400 series corrosion-resistant steel – Parts shall have surface hardness of 500 Brinell minimum. | | | 400 series cor-rosion-resistant steel ASTM B61 Nickel-copper alloy |
| Gaskets | Spiral wound. Materials and construction in accordance with MIL-G-21032. Load character-istics as required by valve design and ap-plication. | | | No approved In Accordance with MRS STD. Practice (amend 5) |
| Diaphragm (metallic) | Nickel-copper alloy 300 series corrosion-resistant steel Nickel-chrome alloy | | | |
| Diaphragm (nonmetallic) | MIL-R-2765 (amend. 4) | | | |
| Springs | See 3.3.2 | | | |
| Bolting 1/ | ASTM A193 grade B16 ASTM A194 grade 4 | ASTM A193 grade B16 ASTM A194 grade 2H | ASTM A193 grade B7 ASTM A194 grade 2H | ASTM A193 grade B7 ASTM A194 grade 2H Nickel-copper alloy corrosion-resistant steel |

1/ If desired by the manufacturer, the higher grade bolting materials may be used in lower temperature categories (i.e. ASTM A194, grade 4 may be used for composition B, etc.)

3.3.1 Trim materials. Unless otherwise specified (see 6.2) the valve manufacturer shall select, from the categories listed in 3.3.1.1 and 3.3.1.2 (where applicable), the trim materials best suited to meet the requirements of the application.

3.3.1.1 Main valve trim materials. Main valve trim (defined as consisting of the seat or seat ring, and plug and the guide posts and bushings) materials shall be selected from the following:

Stellite - All trim to be stellite (see note). TABLE AND 3.3.2, ........

Hardened corrosion-resistant steel - Hardened corrosion resistant steel plus 400 series or 17-4 PH) and stellite (see note) seat or seat ring. Guiding surfaces to be hardened corrosion-resistant steel or stellite (see note). For composition E valves, bronze guide bushings may be used.

0660

MIL-V-17948B(SHIPS)

Non-galling grades of materials shall be chosen to prevent galling between rubbing surfaces. A difference in hardness of at least 100 points brinell shall be maintained between the rubbing surfaces of the guide bushings and posts. This requirement does not apply if both the guide bushings and posts are stellited or if the hardness of either exceeds 450 brinell.

3.3.1.2 **Pilot valve trim materials (class A).** Pilot valve trim (defined as consisting of the seat, valve, and guiding surfaces) shall be made from one or a combination of the following materials:

    400 series or 17-4 PH corrosion resistant steel - hardened
    Stellite (see note)

NOTE: Where stellite is specified, it may consist of either wrought stellite 6B, cast stellite 6, or an inlay of stellite (not less than 3/32 inch thickness for main seat and disc surfaces). Where inlays are used, welding rods shall be in accordance with type MIL-RCoCr-A or MIL-R-17131.

3.3.2 **Spring materials.** On applications where the working temperature of the spring will exceed 600°F, either Inconel X-750 or A-286 alloy steel shall be used. Where the working temperature of the spring exceeds 450°F, but not 600°F, Inconel 600 or tungsten tool steel may also be used. For applications where the working temperature of the spring will not exceed 450°F, 300 series corrosion-resistant steel may be used.

3.4 **Valve descriptions.** The following is a brief description of the classes A, B, and C:

—Loaded (inner t)

    (a) **Class A (internal pilot operated).** The downstream pressure feedback is sensed by a spring load diaphragm to position a small pilot valve which in turn utilizes line steam pressure to position the main throttling valve via an operating piston.

    (b) **Class B (inverted, gas loaded, liquid sealed).** The downstream pressure is controlled by an air (or other inert gas) loaded diaphragm assembly located below the main valve body. The reduced pressure feedback is conducted to the top of the diaphragm, which is protected with a water seal, and compared with the air load to directly position the main throttling valve. The bottom surface of the diaphragm is protected with a glycerin seal.

    (c) **Class C (spring loaded).** The downstream pressure feedback is sensed by a spring loaded diaphragm which directly positions the main throttling valve.

3.5 **Design and construction.**

3.5.1 **Design concept.** Valves shall be operated, maintained, and repaired onboard Naval ships and therefore design emphasis shall be placed on simplicity, maintainability, ruggedness, and reliability.

3.5.2 **Accessibility.** The design and construction of the valves shall afford easy access for adjustment and repair when working from either side of the valve and without requiring removal from the line.

3.5.3 **Pressure-temperature ratings.**

3.5.3.1 **Pressure-temperature ratings (composition A, B, and D).** The design and pressure-temperature rating for composition A, B, and D valves shall be in accordance with USAS B16.5 except for maximum allowable temperature. Maximum temperature limitations shall be as follows:

    Composition A  -  1050°F.
    Composition B  -  1000°F.
    Composition D  -  775°F.

3.5.3.2 **Pressure-temperature ratings (composition E).** Composition E valves shall be designed for a working pressure of 100 pounds per square inch gage (psig) at 425°F.

3.5.4 **End preparation.** Valves shall be furnished with flanged ends in accordance with USAS B16.5 for composition A, B and D valves and MIL-F-20042 for composition E valves. Flanges shall be cast or forged integral with the valve body and the inlet and outlet flanges shall be of the same size and pressure rating.

0661

MIL-V-17048D(SHIPS)

3.5.5 Bonnet and bottom cover joints.

3.5.5.1 Bonnet and bottom cover joints - composition A, B, and D. The bonnet and bottom cover for composition A, B, and D valves shall be flanged for attachment to the body. These joints shall be secured by either of the following:

(a) Through bolts threaded the entire length and fitted with a nut on each end. Threads on both bolts and nuts shall be class 2 fit in accordance with Handbook H28.

(b) Tap-end studs with interference fit at the tap end and a class 2 fit at the nut end. Interference fit shall be in accordance with USAS B1.1).

The bonnet and bottom cover shall be located by body guiding (i.e. a close tolerance fit between machined diameters on the body, bonnet, and bottom cover) rather than depending on studs or bolts for location. Spiral wound gaskets shall be fully retained and the joints shall have metal-to-metal take-up to provide controlled compression of the gaskets. Joint design shall assure parallel alignment of the guide bushings. Sufficient bolting area shall be provided to maintain metal-to-metal make-up over at least a 3 year period. Bearing surfaces of nuts and their respective surfaces on the valve shall be finished machined.

3.5.5.2 Bonnet and bottom cover joints - composition E. Composition E valves in sizes 1-1/2 inches and below may utilize straight machine threaded and gasketed joints. All sizes of composition E valves may utilize joints in accordance with 3.5.5.1 or joints secured with cap screws. Joint design shall assure proper alignment of the guide bushings. The bearing surfaces of nuts and bolts and their respective surfaces on the valve shall be cast smooth and true without nut interference or shall be finished machined.

3.5.6 Internal trim. All internal trim (except welded or brazed in seat rings) shall be readily replaceable without requiring removal of the valve body from the line. The main plug or disc shall be simple seated and top and bottom guided. The guiding surfaces (bushings and posts) shall have the proper hardness, finish, concentricity, parallelism, clearances, length and rigidity to prevent binding or seizing and to insure proper seating under all design conditions. These alignment requirements shall be maintained with interchangeable parts and under any tolerance stack-up condition. Where quick change cage trim is specified (see 6.2), the seat ring shall be gasket sealed and retained by way of the bonnet or bottom cover bolting. Where cage trim is not specified, and where a separate seat ring is provided, it shall be seal welded or brazed circumferentially on valves used at 225 psig steam pressure and above.

3.5.7 Gaskets. Spiral wound gaskets shall retain sufficient residual load in service to maintain a leak-tight joint over at least a 3 year period.

3.5.8 Interchangeability. All parts having the same manufacturer's part number shall be directly interchangeable with each other with respect to installation and performance without requiring selection or fitting.

3.5.9 Spring design. Springs shall be designed so that they will not be compressed solid during any operation of the valve. Spring ends shall be squared and ground. When removed from the valve and compressed solid, the spring shall not exhibit a permanent set exceeding 0.010 inches per inch of spring length, measured ten minutes after release of the spring.

3.5.10 Threads. All threads shall conform to Handbook H28. Where necessary, provisions shall be incorporated to prevent the accidental loosening of threaded parts. Fine threads shall not be used. The design shall be such that standard wrenches can be used on all external bolting.

3.5.11 Body construction. Valves shall be of basic globe configuration with inline inlet and outlet ports. All steam pressure lines, except for the external downstream pressure sensing line (where used), shall be internally ported in the body and bonnet. Body passages shall be designed to produce gradual changes in flow direction so as to reduce any effects of concentrated impingement and 90 degree turns. In portions of the valve subject to velocity increases and flow direction changes, such as immediately down stream of the seat, the design shall eliminate direct impingement against the walls at close range.

3.5.12 Control connections. Where external downstream sensing is used, a 1/2 inch IPS flanged connection which is either cast or forged integral with the body or bonnet, welded (for composition A, E, and D valves) or brazed (for composition C) shall be provided.

5

MIL-V-17948b(SHIPS)

3.5.13  Set point adjustment. Means shall be provided for adjusting the set point through the specified range, with the valve under pressure. The adjusting or loading device shall be safeguarded against accidental change in set point. Unless otherwise specified (see 6.2), class A and C valves shall be adjustable over a range of at least 75 to 125 percent of the specified set pressure and class B valves shall be adjustable between 5 and 100 percent of the maximum set point.

3.5.14  Class A. The operating piston shall be separate from the main valve and shall be fitted with one or more piston rings. Means shall be provided for drainage of water from the top of the operating piston. The pilot valve and diaphragm chambers shall be self draining. The pilot valve shall be single seated, integral with the pilot valve stem, and cone shaped. The valve shall be controlled by a spring referenced metal diaphragm and shall open against the high pressure. A return spring shall be incorporated to keep pilot valve in contact with the diaphragm at all times. The construction of the pilot section shall be such that the diaphragm does not travel through center at any time during the required valve operation. All edges which contact the diaphragm during operation shall be rounded to prevent damage to the diaphragm. On valves used for steam temperature above 750°F., the main valve return spring shall be recessed in a condensate chamber out of the flow of live steam. The reduced pressure sensing line shall be internal or external as specified (see 6.2).

3.5.15  Class B. The diaphragm chamber shall be located below the valve body and a water seal shall be provided for the upper surface of the diaphragm and a glycerin seal for the lower surface of the diaphragm to prevent exposure to steam or air. The upper diaphragm chamber shall constitute a reservoir for the supply of water and the design shall not rely on condensation to form an initial protective seal. The construction shall be such that the temperature of the diaphragm does not exceed 180°F. with an ambient temperature of 110°F. A loading fitting which permits loading, bleeding, and isolation of the lower diaphragm chamber shall be provided. A pressure gage with a range from zero to approximately 150 percent of the maximum pressure to which the chamber will be charged to obtain the highest set pressure, shall be provided and attached to the loading fitting. A relief valve shall be provided on the loading fitting to prevent charging the diaphragm chamber beyond its design pressure. All air connections shall be straight thread and O-ring seal construction in accordance with MS16142. All pneumatic attachments shall be protected from external damage or mishandling with a sturdy guard. The entire diaphragm chamber shall be securely attached to the bottom of the valve to prevent any damage from shock or whip. Where specified (see 6.2) diaphragm chamber charging equipment, with the necessary tubing and fittings, and suitable for charging to the maximum set point of the regulator, shall be provided.

3.5.16  Class C. Valves shall incorporate a metal diaphragm which has sufficient strength and flexibility to meet the specified performance requirements and provide extended service (at least three years) under the operating conditions. Class C valves shall be limited to set pressures of 50 psig and below.

3.6  Performance requirements.

3.6.1  Accuracy of regulation. The valve shall have an accuracy of regulation, as defined in 3.2.3, as specified (see 6.2).

3.6.2  Capacity requirements. The actual steam flow capacity required, in pounds per hour, based on the minimum inlet pressure and highest reduced pressure setting under which the valve will be required to operate shall be as specified (see 6.2). The valve shall meet the specified capacity requirement, or any intermediate capacity requirement down to 10 percent of the specified capacity requirement, and shall operate without hunting, chattering, or excessive noise or vibration, or exceeding the accuracy of regulation specific in 3.6.1, under all specified operating conditions.

3.6.3  Range of adjustment. Valves shall be capable of meeting the performance requirements specified in 3.6.1 and 3.6.2 when set at any point within the required range of set pressure adjustment.

3.6.4  Seat tightness. With a dead-end downstream volume not exceeding the volume represented by 100 diameters of downstream pipe, any steam leakage from the inlet to the outlet of the valve shall be limited below a value which will cause a discharge pressure buildup of more than 10 pounds per square inch (psi) in a 1 hour period.

3.6.5  External leakage. There shall be no external leakage which can be detected by use of a mirrored surface.

6

*See Amend 4*

MIL-V-17848B(SHIPS)

3.6.4 **Mechanical shock and vibration.** Valves shall be designed to meet the mechanical shock requirements defined by grade A, class I of MIL-S-901 and the environmental vibration requirements defined by type I of MIL-STD-167. Requirements for shock and vibration testing shall be as specified (see 6.3).

3.7 **Marking.**

3.7.1 **Body markings.** The manufacturer's name or trademark and the body material composition shall be cast or forged integral with the valve body. The size, rating, and a flow arrow or "inlet" and "outlet" shall be cast or forged integral with the valve body or stamped on the O.D. of the flanges.

3.7.2 **Identification plates.** Each valve shall have an identification plate permanently attached to an exposed position on the valve that will not be covered by insulation. The identification plate shall be made of corrosion-resistant material and shall contain the following information or a space therefor:

      (a)  Manufacturer's name
      (b)  MIL-V-17848 and class
      (c)  USAS rating
      (d)  Adjustable set pressure range
      (e)  Manufacturer's model and part number      — (Amend 4)
      ~~(f)~~
      (g)  Space for 9 digit CID number

3.8 **Drawings.**    *See Amend 4*

3.8.1 **Preliminary drawings.** Preliminary drawings which are sufficient to permit evaluation of the design and approval of materials, shall be submitted with bids to the procuring activity. These drawings shall show the following:

      (a)  Accurately scaled sectional assembly which clearly depicts the design and construction of the valve.
      (b)  Bill of material listing specification, grade, condition, and any other data required to fully identify the properties of the materials proposed.
      (c)  Details of the seat, disc, and stem assembly and all other replaceable internal trim.
      (d)  Outline dimensions, disassembly space, location and size of end connections and mounts and any other dimensions pertinent to installation.
      (e)  Estimated weight and any limitations on installation.
      (f)  Table of spring data (where applicable).
      (g)  Reference to any previous applicable shock and vibration approval for valve and test report numbers.
      (h)  Recommended assembly torques, or equivalent procedures, for making up all joints and threaded assemblies.
      ~~(i)~~  ~~Tabulation of required gasket characteristics including all dimensions (with tolerances) and load-versus-compression characteristics (with tolerances).~~
      (j)  Mark areas to be radiographic, magnetic particle, or dye penetrant inspected.

3.8.2 **Final drawings.** Final drawings and certification data sheets shall be submitted to the procuring activity for approval within 60 days after date of contract. These drawings shall be in accordance with types II and III of MIL-D-1000/2 except for extent of detail. Only the information required in 3.8.1 need be furnished for the type II drawings. The following data, in addition to that required in MIL-D-1000/2, shall be furnished for the type III drawings:

      (a)  Ship identification.
      (b)  Applicable assembly drawing number(s).
      (c)  Applicable manual number.
      (d)  CID (APL) number.
      (e)  Application description including (i) through (m) of 6.2.
      (f)  Valve description.
      (g)  The set pressure and adjustable range of valve.
      (h)  Required accuracy of regulation over specified range of operating conditions.
      (i)  Rated accuracy of regulation over specified range of operating conditions.
      (j)  Required maximum capacity under specified conditions.
      (k)  Rated maximum capacity under specified conditions.
      (l)  Fail-open capacity (for purposes of relief valve sizing).
      (m)  All deviations from assembly drawing.

7

MIL-V-17848B(SHIPS)

*See Amend 4*

3.8.3  Limited rights legend. When the Government has only limited rights in the data shown on the drawings, as determined by the contractual provisions regarding rights in technical data, the drawings furnished may be marked with the following restrictive legend:

"Furnished under United States Government Contract No. _____. Shall not be either released outside the Government, or used, duplicated, or disclosed in whole or in part for manufacture or procurement, without the written permission of _____, except for: (a) emergency repairs or overhaul work by or for the Government, where the item or process concerned is not otherwise reasonably available to enable timely performance of the work; or (b) release to a foreign government, as the interests of the United States may require; provided that in either case the release, use, duplication or disclosure hereof shall be subject to the foregoing limitations. This legend shall be marked on any reproduction hereof in whole or in part."

*See Amend*

3.9  Manuals. Manuals shall be furnished in accordance with type I of MIL-M-15071. The quantity and distribution of manuals shall be as specified (see 6.2). The following, in addition to that required for type I of MIL-M-15071, shall be included as part of the manual contents:

(a) The approved engineering drawings for the valve (including certification data sheet). These drawings shall be supplemented by additional illustrations where necessary to adequately illustrate operation and maintenance. These additional illustrations may consist of blowouts, partial or full sections, etc., and may eliminate extraneous lines and details to clarify the intersection of parts.

(b) Table listing wrench sizes and assembly torques for other equivalent procedures for making up all joints and threaded assemblies.

(c) Instructions to permit overhaul by shipyard or other repair facility. These should include procedures for checking all critical dimensions subject to wear or change, and the acceptable dimensional limits, surface finish condition, etc. Also, the appropriate procedure (that is, part replacement, correction of repair facility, or repair at manufacturer's facility) which should be followed to correct each case of damage or wear.

(d) Detailed disassembly and reassembly procedures. In addition to providing procedures for the complete disassembly and reassembly of the equipment, maintenance and troubleshooting sections shall contain, or refer to, only the limited disassembly and reassembly required to accomplish each particular operation. This is intended to reduce the possibility of unnecessary disassembly and unnecessary disturbance of adjustments when performing specific or limited maintenance or troubleshooting operations.

(e) Adjustment procedures.

3.10  Workmanship. Valves shall be free from defects affecting either operation or appearance. Workmanship shall be first class in every respect.

4.  QUALITY ASSURANCE PROVISIONS

4.1  Responsibility for inspection. Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

*See Amend 4*

4.1.1  Quality program requirements. Reducing valves furnished under this specification shall be manufactured under a quality program which has been accepted as meeting the requirements of MIL-Q-9858.

4.2  Qualification tests[1]. Qualification tests shall be conducted at a laboratory satisfactory to the Naval Ship Engineering Center (NAVSEC) and shall consist of the examination and tests specified in 4.2.2 through 4.2.10.

_____

[1] Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.4 and 6.4.1).

MIL-V-17048D(SHIPS)

*See Amend 4*

4.2.1 **Qualification test sample.** Each of the following classes and ratings shall require separate qualification testing. The size and composition of the test valve shall be as approved by NAVSEC (Auxiliary Equipment Branch).

      Class A -- 150, 600 and 1500 psig ratings
      Class B -- 150 and 600 psig ratings
      Class C -- 150 and 600 psig ratings

4.2.2 **Examination.** The valve shall be visually and dimensionally examined to determine conformance with the requirements of this specification and the approved engineering drawings. Particular emphasis shall be placed on the dimensions, finishes, and condition of the guiding and seating surfaces.

4.2.3 **Nondestructive tests.** Nondestructive tests (radiography, magnetic particle, and dye penetrant) shall be conducted in accordance with MIL-STD-278 Amd, STD-271 (Group 6)

4.2.4 **Hydrostatic test.** Composition A, B and D valves shall be tested in accordance with USAS B16.5. Composition C valves shall be tested to 100 psig. There shall be no external leakage, permanent distortion or structural failure.

4.2.5 **Dead-end test.** With an inlet pressure equal to the nominal rating, the outlet pressure in a dead-end volume representing not more than 100 diameters of the downstream pipe, shall not rise more than 10 psi in a 1 hour period.

4.2.6 **External leakage test.** All pressure containing parts, including the diaphragm chamber for class D valves, shall be tested with steam or air to the maximum working pressure to check for external leakage. There shall be no external leakage which can be detected by use of a mirrored surface (for steam) or bubble fluid (for air).

4.2.7 **Performance test.** The valve shall be subjected to the tests specified in 4.2.7.1 through 4.2.7.3. Unless otherwise approved, the delivered pressure shall at all times hold within the limits of plus or minus 5 percent or plus or minus 2 psi, whichever is greater. There shall be no evidence of hunting, chattering or any other unstable or unsatisfactory operation of the valve during any portion of these tests. The test specified in 4.2.7.1 and 4.2.7.2 shall be conducted with the valve set at the upper and lower limits of the set pressure range (see 3.5.13).

4.2.7.1 **Flow-droop test.** The flow shall be varied from lock-up to the maximum flow rating of the valve in not more than 15 seconds and from the maximum flow rating to lock-up in not more than 15 seconds. This test shall be conducted under the following sets of conditions:

          (a)  Maximum inlet pressure - lowest set pressure.
          (b)  Minimum inlet pressure - lowest set pressure.
          (c)  Minimum inlet pressure - highest set pressure.
          (d)  Maximum inlet pressure - highest set pressure.

Unless otherwise approved, the maximum inlet pressure for these tests shall be equal to the rating of the valve and the minimum inlet pressure for these tests shall be equal to 75 percent of the rating of the valve.

4.2.7.3 **Inlet pressure transient.** With a constant flow demand equal to 10, 50 and 100 percent of the maximum, the inlet pressure shall be varied from 75 percent to 100 percent of the inlet rating in not more than 5 seconds and from 100 percent to 75 percent of the inlet rating in not more than 5 seconds.

4.2.7.3 **Endurance test.** Following the tests of 4.2.7.1 and 4.2.7.2, the valve shall be subjected to a 20 hour operational test to check functioning and performance.

4.2.8 **High-impact shock test.** The valve shall be subjected to the high-impact shock requirements for grade A, class I of MIL-S-901.

4.2.9 **Vibration test.** The valve shall be vibration tested in accordance with type I of MIL-STD-167.

4.2.10 **Post test examination.** After completion of the tests specified in 4.2.3 through 4.2.9, the test valve shall be disassembled and visually and dimensionally examined. Any damage, excessive wear, or signs of galling or pitting shall be cause for rejection.

MIL-V-17464E(SHIPS)

(.) First unit examination and tests.  The first valve of the same class and rating and intended for the same basic shipboard application, furnished under a contract or order shall undergo the first unit examination and tests specified in 4.3.1 through 4.3.5.  First unit examination and tests will be waived on subsequent orders for the same equipment and basic application.  First unit tests may also be waived where the manufacturer has sufficient verifiable evidence based on test data or previous shipboard experience, or both with the same or similar application to satisfactorily demonstrate that the valve proposed will meet all contract requirements and is suitable for the intended shipboard application.  All subsequent valves of the same class and rating and intended for the same basic shipboard application furnished shall undergo quality conformance inspection specified in 4.4  4.5 (figure4)

4.3.1  Examination.  Valves shall be examined as specified in 4.2.2.

4.3.2  Hydrostatic test.  Valves shall be hydrostatic tested as specified in 4.2.4.

4.3.3  Dead-end test.  Valves shall be dead-end tested as specified in 4.2.5.

4.3.4  External leakage.  Valves shall be tested for external leakage as specified in 4.2.6.

4.3.5  Performance test.  The tests specified in 4.3.5.1 and 4.3.5.2 shall be conducted with the valve set at the upper and lower setting of the adjustable set pressure range required by the application (see 6.2).  The maximum inlet temperature, the range of operating inlet pressures, the maximum rate of change of the inlet pressure, the maximum flow capacity required, and the maximum rate of change of flow demand shall be as specified (see 6.2) to meet the application requirements.  The required accuracy of regulation shall be maintained and there shall be no evidence of hunting, chattering, or any other unstable or unsatisfactory operation of the valve over any portion of the required operational range of the valve.

4.3.5.1  Flow-droop test.  The flow shall be varied from lock-up to the maximum flow rating and back at the rate specified (see 6.2).  This test shall be conducted under the following sets of conditions:

(a)  Maximum inlet pressure - lowest set pressure.
(b)  Minimum inlet pressure - lowest set pressure.
(c)  Minimum inlet pressure - highest set pressure.
(d)  Maximum inlet pressure - highest set pressure.

4.3.5.2  Inlet pressure transient.  With a constant flow demand equal to 10, 50 and 100 percent of the maximum, the inlet pressure shall be varied over the specified range at the maximum rate specified (see 6.2).
See drawing 4   for   4.3.5.3  &  4.3.6.  (new)

4.4  Sampling for quality conformance inspection.

4.4.1  Lot.  All valves of the same class, rating, composition and size, offered for delivery at one time shall be considered a lot for the purpose of sampling.

4.4.2  Sampling for visual and dimensional examination.  A random sample of valves shall be selected from each lot in accordance with table II and shall be examined as specified in 4.5.1.1 and 4.5.1.2.  Failure of any valve in the sample to pass the examination specified in 4.5.1.1 and 4.5.1.1 shall be cause for rejection of the lot.

Table II - Sampling for visual
and dimensional examination

| Lot size | Sample quantity |
|---|---|
| 2 to 25 | 1 |
| 26 to 65 | 2 |
| 66 to 180 | 3 |
| Over 180 | 4 |

10

BEST COPY AVAILABLE

MIL-V-17?409(SHIPS)

4.4.3  Sampling for tests.  A random sample of valves shall be selected from each lot in accordance with table III and shall be tested as specified in 4.5.2.  If the number of rejected valves in any sample exceeds the acceptance number specified in table III the lot represented by the sample shall be subject to rejection.  If the sample size specified in table III equals or exceeds the lot size, the lot shall undergo 100 percent inspection.

Table III - Sampling for tests.

| Lot size | Sample size | Allowable number of rejects |
|----------|-------------|------------------------------|
| 2 to 8   | 5           | 0                            |
| 9 to 15  | 7           | 0                            |
| 16 to 25 | 10          | 0                            |
| 26 to 40 | 15          | 0                            |
| 41 to 65 | 25          | 0                            |
| 66 to 110 or over | 35 | 1                            |

4.5  Quality conformance inspection.

4.5.1  Examination.

4.5.1.1  Visual examination.  A visual examination shall be made of the sample valves selected in accordance with 4.4.2 to verify conformance to the requirements of this specification.

4.5.1.2  Dimensional examination.  A dimensional examination shall be made on the sample valves selected in accordance with 4.4.2 to verify conformance with the approved drawings.

4.5.2  Tests.

4.5.2.1  Nondestructive tests.  Nondestructive tests shall be conducted as specified in 4.2.3.

4.5.2.2  Hydrostatic test.  Each of the sample valves selected in accordance with 4.4.3 shall be hydrostatic tested as specified in 4.2.4.

4.5.2.3  Dead-end test.  Each of the sample valves selected in accordance with 4.4.3 shall be dead-end tested as specified in 4.2.5.

4.5.2.4  External leakage.  Each of the sample valves selected in accordance with 4.4.3 shall be tested for external leakage as specified in 4.2.6.

4.5.3  Material verification.  Where level I MIC requirements are invoked (see 6.21), material identification and control shall be in accordance with NAVSHIPS 0900-005-7010.

4.6  Inspection of preparation for delivery.  The packaging, packing and marking shall be inspected for compliance with section 5 of this document.

5.  PREPARATION FOR DELIVERY

(The preparation for delivery requirements specified herein apply only for direct Government procurements.)

5.1  Sub-contracted material and parts.  The preparation for delivery requirements of referenced documents listed in section 2 do not apply when material and parts are procured by the supplier for incorporation into the equipment and lose their separate identity when the equipment is shipped.

5.2  Domestic shipment and early equipment installation (see 5.4).

5.2.1  Valves.

5.2.1.1  Preservation and packaging.  Preservation and packaging which may be the supplier's commercial practice, shall be sufficient to afford adequate protection against corrosion, deterioration and physical damage during shipment from the supply source to the using activity and until early installation.

11

MIL-V-17048(SHIPS)

5.2.1.2 Packing. Packing shall be accomplished in a manner which will insure acceptance by common carrier at the lowest rate and will afford protection against physical or mechanical damage during direct shipment from the supply source to the using activity for early installation. The shipping containers or method of packing shall conform to the Uniform Freight Classification Rules or other carrier regulations as applicable to the mode of transportation and any conform to the supplier's commercial practice.

5.2.1.3 Marking. Shipment marking information shall be provided on interior packages and exterior shipping containers in accordance with the contractor's commercial practice. The information shall include nomenclature, Federal stock number, of manufacturer's part number, contract or order number, contractor's name and destination.

5.3 Domestic shipment and storage or overseas shipment requirements. The requirements and levels of preservation, packaging, packing and marking for shipment shall be specified by the procuring activity (see 5.4 and 6.2).

5.4 Use of polystyrene (loose-fill) material.

5.4.1 For domestic shipment and early equipment installation and level C packaging and packing. Unless otherwise approved by the procuring activity (see 6.2), use of polystyrene (loose-fill) material for domestic shipment and early equipment installation and level C packaging and packing applications such as cushioning, filler and dunnage is prohibited. When approved, unit packages and containers (interior and exterior) shall be marked and labelled as follows:

"CAUTION

Contents cushioned, etc. with polystyrene (loose-fill) material.
Not to be taken aboard ship.
Remove and discard loose-fill material before shipboard storage.
If required, recushion with cellulosic material bound fiber.
(fiberboard or transparent flexible cellular material."

5.4.2 For level A packaging and level A and B packing. Use of polystyrene (loose-fill) material is prohibited for level A packaging and level A and B packing applications such as cushioning, filler and dunnage.

6. NOTES

6.1 Intended use. Pressure reducing valves covered by this specification are intended for line steam pressure reducing service onboard ship.

6.2 Ordering data. Procurement documents should specify the following:

(a) Title, number and date of this specification.
(b) Class and composition required (see 1.2).
(c) Trim materials where specific requirement is known (see 3.3.11.
(d) Quick change cage trim, when required (see 3.5.6).
(e) Adjustable range of reduced pressure settings required, if other than specified in 3.5.13.
(f) Whether internal or external reduced pressure sensing line is required (see 3.5.14).
(g) Charming equipment to be supplied with class B valves (see 3.5.15).
(h) Accuracy of regulation required (see 3.6.11.
(i) Minimum and maximum inlet pressures (psig) (see 3.6.2 and 4.3.5).
(j) Maximum rate of inlet pressure variation (psi/second) where known (see 4.3.5).
(k) Maximum inlet steam temperature (°F) (see 4.3.5).
(l) Maximum and minimum capacity required (pounds/hour) (see 4.3.5).
(m) Maximum rate of flow demand variation (pounds/hour/second) where known (see 4.3.5 and 4.3.5.2).
(n) Shock and vibration testing requirements (see 3.6.6).
(o) Manuals (quantity and distribution) (see 3.9).
(p) Flow rate required (see 4.3.5.1).
(q) Whether level 1 MIC is required (see 4.5.3).
(r) Preservation, packaging, packing and marking requirements, if other than specified in 5.2 (see 5.3).
(s) When polystyrene "loose-fill" is approved (see 5.4).
(t) Brief description of application and any special performance   construction requirements.

12

MIL-V-17848B(SHIPS)

6.3  This specification covers only pressure reducing valves (formerly Type I of MIL-V-17848A(SHIPS)).  Type II valves of revision A have been ___ ___  Series (pressure and temperature ratings) have been replaced by USAS B16.5 ratings.  Other classification has been changed as follows:

| Revision A | Revision B |
|---|---|
| --- | Class A |
| Class B | Same |
| Class A | Class C |
| Class C | Deleted |

6.4  With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List 17848 whether or not such products have actually been so listed by that date.  The attention of the suppliers is called to this requirement, and manufacturers ___ ___ to arrange to have the products that they propose to offer to the Federal Government tested for qualification, in order that they may be eligible to be awarded contracts or orders for the products covered by this specification.  The activity responsible for the qualified products list is the Naval Ship Engineering Center, Department of the Navy, Washington, D.C. 20360, and information pertaining to qualification of products may be obtained from that activity.  Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.4.1).

6.4.1  Copies of "Provisions Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Publications and ___ ___ Center, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120.

6.5  CHANGES FROM PREVIOUS ISSUE.  THE OUTSIDE MARGINS OF THIS DOCUMENT HAVE BEEN MARKED "I" TO INDICATE WHERE CHANGES (DELETIONS, ADDITIONS, ETC.) FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS HAS BEEN DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT AS WRITTEN IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

Preparing activity:
Navy - SH
(Project 4820-X1931)

# EXHIBIT B

LESLIE ORDER NO.

DESCRIPTION 3" DDOMER 900# DCV.

MFG. AUTHORIZED BY   CUSTOMER

9/24/71   ITEM NO.   18.0   DWG. APPROVAL _____ YES ☒ NO ☐

THE REFERENCED PRODUCT UNITS HAVE PASSED QUALITY ASSURANCE INSPECTIONS AND TESTS, AS FOLLOWS:

VISUAL INSPECTION — CONFORMANCE TO WORKMANSHIP, APPEARANCE STANDARDS.

DIMENSIONAL INSPECTION — CONFORMANCE TO DWG.   22948W   C.D. NO.   22959W

☐ INSPECTION — MTL. IN ACCORDANCE WITH DWG. AND/OR SPECIFICATIONS.

☐ CHEMICAL COMPOSITION AND MECHANICAL PROPERTIES TEST.

☐ RADIOGRAPHIC EXAMINATION   CLASS 1 — ☒, CLASS 2 — ☐, — ☐

☐ MAGNETIC PARTICLE TEST

☒ LIQUID PENETRANT TEST   SEATS & WELDS

☒ PRESERVATION, MARKING, PACKAGING AND PACKING INSPECTION — CONFORMANCE TO SPEC. NO. _____

☒ PRESSURE TEST: HYDROSTATIC   3250   P.S.I.   AIR _____ P.S.I.

☒ SEAT TIGHTNESS TEST:  AIR _____ P.S.I.   BUILD-UP _____ P.S.I.

WATER   1090   P.S.I.   BUILD-UP _____ P.S.I.

STEAM _____ P.S.I.   BUILD-UP _____ P.S.I.

☒ PERFORMANCE TEST:  AIR _____ P.S.I.   SETTING _____ P.S.I.

WATER   1090   P.S.I.   SPAN _____ P.S.I.

DISCHARGE PRESSURE (PUMP GOVERN.) _____ P.S.I.

☒ OTHER TESTS:   POST SHOCK & VIBRATION INSPECTION & TEST

EXCEPTIONS AND VARIATIONS: _____

DCASD QAS
11/12/71

INSPECTED BY _____   TESTED BY _____
DATE   9/24/71   DATE   9/24/71

PRODUCT LISTED ABOVE HAS BEEN INSPECTED AND TESTED IN ACCORDANCE WITH SPECIFICATIONS CALLED FOR, AND HAS BEEN FOUND TO MEET ALL APPLICABLE CONTRACT REQUIREMENTS.

RECORDS ARE ON FILE, SUBJECT TO EXAMINATION AT OUR SOURCE.

CERTIFIED _____   DATE   9/24/71
QUALITY CONTROL MANAGER

# EXHIBIT C

MIL–I–45208A
16 DECEMBER 1963
SUPERSEDING

MIL-I-45208 (ARMY)
12 OCTOBER 1961
NPD (NAVEXOS P-1634)
APPENDIX A (In Part)
26 FEBRUARY 1960

## MILITARY SPECIFICATION

# INSPECTION SYSTEM REQUIREMENTS

*This specification has been approved by the Department of Defense and is mandatory for use by the Departments of the Army, the Navy, the Air Force and the Defense Supply Agency.*

## 1. SCOPE

1.1 Scope. This specification establishes requirements for contractors' inspection systems. These requirements pertain to the inspections and tests necessary to substantiate product conformance to drawings, specifications and contract requirements and to all inspections and tests required by the contract. These requirements are in addition to those inspections and tests set forth in applicable specifications and other contractual documents.

1.2 Applicability.

1.2.1 Applicability. This specification shall apply to all suppliers or services when referenced in the item specification, contract or order.

1.2.2 *Relation to Other Contract Requirements.* The inspection system requirements set forth in this specification shall be satisfied in addition to all detail requirements contained in the statement of work or in other parts of the contract. The contractor is responsible for compliance with all provisions of the contract and for furnishing specified articles which meet all requirements of the contract. To the extent of any inconsistency between the contract schedule or its general provisions and this specification the contract schedule and the general provisions shall control.

1.2.3 *Options.* This specification contains fewer requirements than specification MIL-Q-9858, Quality Program Requirements. The contractor may use, at his option, the requirements of MIL-Q-9858, in whole or in part, whenever this specification is specified, provided no increase in price or fee is involved. This option permits one uniform system in the event the contractor is already complying with MIL-Q-9858.

## 2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitations for bids form a part of this specification to the extent specified herein.

SPECIFICATIONS
  MILITARY

| | |
|---|---|
| MIL-Q-9858 | Quality Program Requirements |
| MIL-C-45662 | Calibration System Requirements |

2.2 Amendments and Revisions. Whenever this specification is amended or revised subsequent to its contractually effective date, the contractor may follow or authorize his subcontractors to follow the amended or revised document provided no increase in price or fee is required. The contractor shall not be required to follow the amended or revised document except as a change in contract. If the contractor elects to follow the amended or revised document, he shall notify the Contracting Officer in writing of this election. When the contractor elects to follow the provisions of an amendment or revision, he must follow them in full.

1

MIL-I-45208A

2.3 Ordering Government Documents. Copies of specifications, standards and drawings required by contractors in connection with specific procurements may be obtained from the procuring agency or as otherwise directed by the Contracting Officer.

## 3. REQUIREMENTS

3.1 Contractor Responsibilities. The contractor shall provide and maintain an inspection system which will assure that all supplies and services submitted to the Government for acceptance conform to contract requirements whether manufactured or processed by the contractor, or procured from subcontractors or vendors. The contractor shall perform or have performed the inspections and tests required to substantiate product conformance to drawing, specifications and contract requirements and shall also perform or have performed all inspections and tests otherwise required by the contract. The contractor's inspection system shall be documented and shall be available for review by the Government Representative prior to the initiation of production and throughout the life of the contract. The Government at its option may furnish written notice of the acceptability or non-acceptability of the inspection system. The contractor shall notify the Government Representative in writing of any change to his inspection system. The inspection system shall be subject to disapproval if changes thereto would result in nonconforming product.

3.2 Documentation, Records and Corrective Action.

3.2.1 Inspection and Testing Documentation. Inspection and testing shall be prescribed by clear, complete and current instructions. The instructions shall assure inspection and test of materials, work in process and completed articles as required by the item specification and the contract. In addition, criteria for approval and rejection of product shall be included.

3.2.2 Records. The contractor shall maintain adequate records of all inspections and tests. The records shall indicate the nature and number of observations made, the number and type of deficiencies found, the quantities approved and rejected and the nature of corrective action taken as appropriate.

3.2.3 Corrective Action. The contractor shall take prompt action to correct assignable conditions which have resulted or could result in the submission to the Government of supplies and services which do not conform to (1) the quality assurance provisions of the item specification, (2) inspections and tests required by the contract, and (3) other inspections and tests required to substantiate product conformance.

3.2.4 Drawings and Changes. The contractor's inspection system shall provide for procedures which will assure that the latest applicable drawings, specifications and instructions required by the contract, as well as authorized changes thereto, are used for fabrication, inspection and testing.

3.3 Measuring and Test Equipment. The contractor shall provide and maintain gages and other measuring and testing devices necessary to assure that supplies conform to the technical requirements. In order to assure continued accuracy, these devices shall be calibrated at established intervals against certified standards which have known valid relationships to national standards. If production tooling, such as jigs, fixtures, templates, and patterns is used as a media of inspection, such devices shall also be proved for accuracy at established intervals. Calibration of inspection equipment shall be in accordance with MIL-C-45662. When required, the contractor's measuring and testing equipment shall be made available for use by the Government Representative to determine conformance of product with contract requirements. In addition, if conditions warrant, contractor's personnel shall be made available for operation of such devices and for verification of their accuracy and condition.

3.4 Process Controls. Process control procedures shall be an integral part of the inspection system when such inspections are a part of the specification or the contract.

3.5 Indication of Inspection Status. The

2

MIL-I-15208A

contractor shall maintain a positive system for identifying the inspection status of supplies. Identification may be accomplished by means of stamps, tags, routing cards, move tickets, tote box cards or other control devices. Such controls shall be of a design distinctly different from Government inspection identification.

3.6 Government-furnished Material. When material is furnished by the Government, the contractor's procedures shall include as a minimum the following:

    (a) Examination upon receipt, consistent with practicability, to detect damage in transit;

    (b) Inspection for completeness and proper type;

    (c) Periodic inspection and precautions to assure adequate storage conditions and to guard against damage from handling and deterioration during storage;

    (d) Functional testing, either prior to or after installation, or both, as required by contract to determine satisfactory operation;

    (e) Identification and protection from improper use or disposition; and

    (f) Verification of quantity.

3.6.1 *Damaged Government-furnished Material.* The contractor shall report to the Government Representative any Government-furnished material found damaged, malfunctioning or otherwise unsuitable for use. In the event of damage or malfunction during or after installation, the contractor shall determine and record probable cause and necessity for withholding material from use.

3.7 Nonconforming Material. The contractor shall establish and maintain an effective and positive system for controlling nonconforming material, including procedures for the identification, segregation, presentation and disposition of reworked or repaired supplies. Repair of nonconforming supplies shall be in accordance with documented procedures acceptable to the Government. The acceptance of nonconforming supplies is the prerogative of and shall be as prescribed by the Government. All nonconforming supplies shall be positively identified to prevent use, shipment and intermingling with conforming supplies. Holding areas, mutually agreeable to the contractor and the Government Representative, shall be provided by the contractor.

3.8 Qualified Products. The inclusion of a product on the Qualified Products List only signifies that at one time the manufacturer made a product which met specification requirements. It does not relieve the contractor of his responsibility for furnishing supplies that meet all specification requirements or for performing specified inspections and tests for such material.

3.9 Sampling Inspection. Sampling inspection procedures used by the contractor to determine quality conformance of supplies shall be as stated in the contract or shall be subject to approval by the Government.

3.10 Inspection Provisions. Alternative inspection procedures and inspection equipment may be used by the contractor when such procedures and equipment provide, as a minimum, the quality assurance required in the contractual documents. Prior to applying such alternative inspection procedures and inspection equipment, the contractor shall describe them in a written proposal and shall demonstrate for the approval of the Government Representative that their effectiveness is equal to or better than the contractual quality assurance procedure. In cases of dispute as to whether certain procedures of the contractor's inspection system provide equal assurance, the procedures of this specification, the item specification and other contractual documents shall apply.

3.11 Government Inspection at Subcontractor or Vendor Facilities. The Government reserves the right to inspect at source supplies or services not manufactured or performed within the contractor's facility. Government inspection shall not constitute acceptance; nor shall it in any way replace contractor inspection or otherwise relieve the contractor of his responsibility to furnish an acceptable end item. When inspection at subcontractors'

3

MIL-I-45208A

plants is performed by the Government, such inspection shall not be used by contractors as evidence of effective inspection by such subcontractors. The purpose of this inspection is to assist the Government Representative at the contractor's facility to determine the conformance of supplies or services with contract requirements. Such inspection can only be requested by or under authorization of the Government Representative.

3.11.1 *Government Inspection Requirements*. When Government inspection is required, the contractor shall add to his purchasing document the following statement:

"Government inspection is required prior to shipment from your plant. Upon receipt of this order, promptly notify the Government Representative who normally services your plant so that appropriate planning for Government inspection can be accomplished."

3.11.2 *Purchasing Documents*. When, under authorization of the Government Representative, copies of the purchasing document are to be furnished directly by the subcontractor or vendor to the Government Representative at his facility rather than through Government channels, the contractor shall add to his purchasing document a statement substantially as follows:

"On receipt of this order, promptly furnish a copy to the Government Representative who normally services your plant or, if none, to the nearest Army, Navy, Air Force, or Defense Supply Agency inspection office. In the event the representative or office cannot be located, our purchasing agent should be notified immediately."

3.11.3 *Referenced Data*. All documents and referenced data for purchases applying to a

Government contract shall be available for review by the Government Representative to determine compliance with the requirements for the control of such purchases. Copies of purchasing documents required for Government inspection purposes shall be furnished in accordance with the instructions of the Government Representative.

3.12 Receiving Inspection. Subcontracted or purchased supplies shall be subjected to inspection after receipt, as necessary, to assure conformance to contract requirements. The contractor shall report to the Government Representative any nonconformance found on Government source-inspected supplies and shall require his supplier to coordinate with his Government Representative on corrective action.

3.13 Government Evaluation. The contractor's inspection system and supplies generated by the system shall be subject to evaluation and verification inspection by the Government Representative to determine its effectiveness in supporting the quality requirements established in the detail specification, drawings and contract and as prescribed herein.

**4. QUALITY ASSURANCE PROVISIONS**

This section is not applicable to this specification.

**5. PREPARATION FOR DELIVERY**

This section is not applicable to this specification.

**6. NOTES**

6.1 Intended Use. This specification will apply to the procurement of supplies and services specified by the military procurement agencies.

6.2 Order Data. Procurement documents should specify the title, number and date of this specification.

Custodians:
Army—Munitions Command
Navy—Office of Naval Material
Air Force—Hq USAF
DSA—Hq DSA

Preparing activity:
Army—Munitions Command

4

REQUEST FOR ~~~~~~~~~~~~~~~

**SECTION A - REQUEST FOR ~~~~~~**

| | |
|---|---|
| United States Navy<br>Marine Engineering Laboratory<br>Annapolis, Maryland - 21402 | 425 Valley Brook Ave.<br>Lyndhurst, N.J.<br>AREA CODE 201-438-8000 |
| **3. PRIME CONTRACTOR AND ADDRESS**<br><br>Warren Pumps, Inc.<br>Warren, Mass. - 01083<br>Contract Number - NOBS 4884 | **4. MANUFACTURING PLANT NAME AND ADDRESS**<br><br>Leslie Company<br>425 Valley Brook Ave.<br>Lyndhurst, N.J. - 07071<br>P.O. Number - R-77103 |

| 5. END ITEM AND/OR PROJECT | 6. SAMPLE NUMBER | 7. LOT NO. | 8. REASON FOR SUBMITTAL | 9. DATE SUBMITTED |
|---|---|---|---|---|
| GOVERNOR PUMP | 1 | 1 | Special requests<br>(see remarks) | 9/2-/66 |

| 10. MATERIAL TO BE TESTED | 10a. QUANTITY SUBMITTED | 11. QUANTITY REPRESENTED | 12. SPEC. & AMEND. AND/OR DRAWING NO. AND REV. FOR SAMPLE & DATE |
|---|---|---|---|
| GOVERNOR<br>1" PLNS-5 | 1 | 2 | MIL-G-18916 - AMEND. #2 |

| 13. PURCHASED FROM OR SOURCE | 14. SHIPMENT METHOD | 15. DATE SAMPLED AND SUBMITTED BY |
|---|---|---|
| | MTR FRT PPD | F. Mishnekoff  9/2-/66 |

**16. REMARKS AND/OR SPECIAL INSTRUCTIONS AND/OR WAIVERS**

Submitted for performance tests in accordance with Paragraph 413.
1" Leslie Class PLNS-5 Navy Type CPg Class 1, Series 600
Service - Standby Lube Oil Pump
(See page 2 for operating conditions)

**17. SEND REPORT OF TEST TO**   Mr. F. Mishnekoff - QAR  c/o Leslie Company
DCASD - Newark                                          425 Valley Brook Ave.
                                                                       Lyndhurst, N.J.

**SECTION B - RESULTS OF TEST**

| 1. DATE SAMPLE RECEIVED | 2. DATE RESULTS REPORTED | 3. LAB. REPORT NO. |
|---|---|---|
| | | |

| a. TEST PERFORMED | RESULTS OF TEST | SAMPLE RESULT | REQUIREMENTS |
|---|---|---|---|
| | | | |

*(Continuation sheets will be used if more space is required)*

| | TYPED NAME AND TITLE OF PERSON CONDUCTING TEST | SIGNATURE |
|---|---|---|
| | | |

EXHIBIT "4"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARA J. BALLENGER, et al., | No. C 06-2271 CW |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION TO REMAND CASE AND FOR PAYMENT OF FEES AND COSTS |
| v. | |
| AGCO CORPORATION, et al., | |
| Defendants. | |

Plaintiffs Mara J. Ballenger, individually and on behalf of the Estate of John M. Ballenger, James M. Ballenger and Charles J. Ballenger move to remand this action to state court.  Defendant Todd Shipyards Corporation opposes this motion and requests that, if the Court is inclined to grant Plaintiffs' motion, the Court certify its order for interlocutory appeal.  The motion was heard on June 21, 2007.  Having considered all of the papers filed by the

1  parties and oral argument, the Court denies Plaintiffs' motion to

2  remand.

3                              BACKGROUND

4      John M. Ballenger died of mesothelioma in 2005.  Before his

5  death, he and his wife filed suit for asbestos personal injury and

6  loss of consortium in San Francisco County Superior Court.  Todd

7  Shipyards was named as a defendant in that action.  After it

8  threatened to remove the action, however, Mr. and Mrs. Ballenger

9  dismissed without prejudice the claims against Todd Shipyards.

10 Plaintiffs explain that Mr. Ballenger's health was rapidly

11 declining and they could not risk the delay that would have been

12 caused by removal; Mr. Ballenger died shortly thereafter.

13     After his death, Plaintiffs filed an amended complaint,

14 seeking damages for asbestos-caused wrongful death and loss of

15 consortium and reviving the claims against Defendant Todd

16 Shipyards.  Plaintiffs bring negligence and strict liability causes

17 of action against "Asbestos Defendants," which includes Defendant

18 Todd Shipyards.  The complaint alleges that Mr. Ballenger's

19 terminal mesothelioma stemmed, in part, from his occupational

20 exposure to asbestos-containing products while working on premises

21 owned or operated by Defendant Todd Shipyards.[1]

22     According to the complaint, Defendant Todd Shipyards'

23 employees and contractors negligently exposed Mr. Ballenger to

24     _____

25     [1]Although the complaint does not identify any particular
   vessel on which Mr. Ballenger worked, Plaintiffs state that, during
26 a major overhaul at Todd Shipyards in San Pedro, California, Mr.
   Ballenger was exposed to asbestos while serving as a Naval officer
27 on the USS Tappahannock.

28                                2

United States District Court
For the Northern District of California

1   airborne asbestos fibers by working with asbestos-containing

2   materials in his presence and then failed to warn him of the

3   hazardous condition.  The complaint states that Defendant Todd

4   Shipyards' duty to warn Mr. Ballenger was independent of any

5   potential role the U.S. Navy might have played in specifying the

6   use of asbestos-containing materials on Navy ships and cites

7   Westbrook v. Asbestos Defendants, 2001 U.S. Dist. LEXIS 11575 (N.D.

8   Cal.).[2]

9        The complaint further states:

     The Federal Courts lack jurisdiction over this action and
     removal is therefore improper.  There is incomplete diversity
     of citizenship due to the presence of a California ASBESTOS
     DEFENDANT.  Every claim arising under the Constitution,
     treaties, or laws of the United States is expressly
     disclaimed.  This includes any claim arising from an act on a
     Federal Enclave as defined by Article I, section 8, clause 17
     of the United States Constitution.  This also includes any
     claim arising from any act or omission of the United States,
     any agency thereof; any officer of the United States, or a
     claim against any other person or entity that is based on an
     act that was performed under specific direction of the United
     States, any agency thereof or any Officer of the United
     States.  No claim of admiralty or maritime law is raised.
     Plaintiffs sue no foreign state or agency.

18   First Amended Complaint, ¶ 8.

19        On March 30, 2006, Defendant Todd Shipyard filed its notice of

20   removal, contending that removal is proper pursuant to 28 U.S.C.

21   section 1442(a)(1).  Plaintiffs filed a motion to remand.  Before

22   the Court ruled on Plaintiffs' motion, the Judicial Panel on

23   Multidistrict Litigation (MDL Panel) ordered this case transferred

24

25        [2]In Westbrook, the court remanded an action that was
     improperly removed to federal court under the federal officer
26   removal statute and awarded the plaintiffs the amount they incurred
     in attorneys' fees bringing the motion to remand.  There, unlike
27   here, the plaintiffs disclaimed, in writing, any claims arising out
     of work done on U.S. Navy vessels.

28                                  3

1   to the Eastern District of Pennsylvania for coordinated or

2   consolidated pretrial proceedings.  The Eastern District of

3   Pennsylvania court severed all claims for punitive damages and

4   advised the MDL Panel that coordinated or consolidated pretrial

5   proceedings with respect to the remaining claims had been

6   completed.  After the MDL panel conditionally remanded all claims

7   in this case, except for the severed punitive damages claims, to

8   this Court, Plaintiffs re-noticed their motion to remand.

9                          DISCUSSION

10  I.   Remand

11        Defendant Todd Shipyards argues that it properly removed this

12  action under the federal officer removal statute, which provides

13  that an action may be removed by "any officer of the United States

14  or any agency thereof, or person acting under him, for any act

15  under color of such office."  28 U.S.C. § 1442(a)(1).[3]

16        Generally, removal statutes are to be strictly construed; any

17  doubt as to the right to remove should resolved in favor of

18  remanding to state court.  See, e.g., Gaus v. Miles, Inc., 980 F.2d

19  564, 566 (9th Cir. 1992).  But that is not the case concerning the

20  federal officer removal statute.  See Durham v. Lockheed Martin

21  Corp., 445 F.3d 1247, 1252 (9th Cir. 2006) (noting that, because it

22  _____

23        [3]Specifically, § 1442(a)(1) provides:
      A civil or criminal prosecution commenced in a State court

24    against any of the following persons may be removed by them to
      the district court of the United States for the district and

25    division embracing the place wherein it is pending:
      (1) Any officer of the United States or any agency thereof, or

26    person acting under him, for any act under color of such
      office or on account of any right, title or authority claimed

27    under any Act of Congress for the apprehension or punishment
      of criminals or the collection of the revenue.

28

United States District Court
For the Northern District of California

1   is important to the federal government to protect federal officers,

2   removal rights under section 1442 are much broader than those under

3   section 1441). The Ninth Circuit instructs that there is a "clear

4   command from both Congress and the Supreme Court that when federal

5   officers and their agents are seeking a federal forum, we are to

6   interpret section 1442 broadly in favor of removal." Id. (noting

7   that the Supreme Court has "insisted that the policy favoring

8   removal 'should not be frustrated by a narrow, grudging

9   interpretation of § 1442(a)(1)'" (quoting Arizona v. Manypenny, 451

10  U.S. 232, 242 (1981))).

11      As the Supreme Court explained in Jefferson County v. Acker,

12  527 U.S. 423, (1999),

13      It is the general rule that an action may be removed from
        state court to federal court only if a federal district court
14      would have original jurisdiction over the claim in suit. To
        remove a case as one falling within federal-question
15      jurisdiction, the federal question ordinarily must appear on
        the face of a properly pleaded complaint; an anticipated or
16      actual federal defense generally does not qualify a case for
        removal. Suits against federal officers are exceptional in
17      this regard. Under the federal officer removal statute, suits
        against federal officers may be removed despite the nonfederal
18      cast of the complaint.

19  527 U.S. at 430-31 (citations omitted).

20      Thus, the fact that Plaintiffs' complaint expressly disavows

21  any federal claims is not determinative. Rather, removal is proper

22  under the federal officer removal statute if the moving party:

23  (1) demonstrates that it acted under the direction of a federal

24  officer; (2) raises a colorable federal defense to the plaintiff's

25  claims; and (3) demonstrates a causal nexus between the plaintiff's

26  claims and the defendant's acts performed under color of federal

27

28                              5

United States District Court
For the Northern District of California

1  office. Mesa v. California, 489 U.S. 121, 124-25, 134-35 (1989);

2  Fung v. Abex Corp., 816 F. Supp. 569, 571-72 (N.D. Cal. 1992).[*]

3      A.  Acts under the direction of a federal officer

4      To show that it was acting under the direction of a federal

5  officer, Defendant Todd Shipyards must show that a federal officer

6  had "direct and detailed control" over it. Fung, 816 F. Supp. at

7  572. If it "establishes 'only that the relevant acts occurred

8  under the general auspices of a federal officer,' such as being a

9  participant in a regulated industry," it is not entitled to remove

10  under section 1442(a)(1). Id. (quoting Ryan v. Dow Chemical Co.,

11  781 F. Supp. 934, 947 (E.D.N.Y. 1992)).

12      Defendant Todd Shipyards contends that it acted under the

13  direction of U.S. Navy officers and provides declarations

14  supporting this contention. According to a retired U.S. Navy

15  Admiral, at the time that Mr. Ballenger was on the USS

16  Tappahannock, all private contractors, such as Defendant Todd

17  Shipyards, performed their work pursuant to precise requirements

18  imposed by the Navy and under the Navy's detailed supervision; "the

19  Navy dictated every aspect of the design, manufacture,

20  installation, overhaul, written documentation and warnings

21  associated with its ships, including the USS Tappahannock" and did

22  not permit deviations from its contractors. Horne Dec., ¶ 15.

23  Among the requirements the Navy imposed on private contractors was

24  that they use asbestos-containing materials in the maintenance and

25  _____

26  [*]In addition, the removing party must qualify as a "person"
   for purposes of 28 U.S.C. section 1441(a). As a corporation,

27  Defendant Todd Shipyards meets this preliminary requirement. See
   Fung, 816 F. Supp. at 572.

28                              6

United States District Court
For the Northern District of California

1   repair of Naval vessels.  Admiral Roger B. Horne states that, in

2   his opinion, "no private contractor could have affixed a written

3   warning anywhere aboard an active duty Naval warship, advising the

4   risk of asbestos exposure, following the completion of Navy-

5   mandated repairs, except by permission of the United States Navy."

6   Id.

7       Defendant Todd Shipyards notes that its acts here are similar

8   to the defendant's acts in Pung.  There, the court concluded that

9   the "acting under" requirement was satisfied where the defendant

10  established that the U.S. Navy monitored its "performance at all

11  times and required the defendant to construct and repair the

12  vessels in accordance with applicable and approved specifications

13  incorporated in the contracts.  In addition, all contract supplies

14  were subject to inspection, test, and approval by the government."

15  Pung, 816 F. Supp. at 572-73.

16      Plaintiffs argue that, because Defendant Todd Shipyards has

17  not produced any actual contractual documentation of the work it

18  allegedly performed on behalf of U.S. Navy officers, it has not

19  shown that it acted under the direction of federal officers.  This

20  argument is not persuasive.  Defendant Todd Shipyards is not

21  required to produce contracts from decades past in order to

22  demonstrate that it worked under the direction of federal officers;

23  to require such documentation would frustrate the purpose of

24  section 1442(a)(1).  See Durham, 445 F.3d at 1252.  Admiral Horne's

25  declaration suffices.

26

27

28

7

1    Plaintiffs further argue that, even accepting Admiral Horne's

2  declaration as true, his declaration only proves that the

3  government required Defendant Todd Shipyards to use asbestos

4  products, not that Defendant Todd Shipyards was under the direct

5  control of the Navy with respect to failure to warn and negligent

6  use of asbestos.  Plaintiffs, however, concede that Admiral Horne

7  concluded that the Navy directed every aspect of installation and

8  warnings associated with its ships.  They contend that neither

9  Admiral Horne's declaration, nor any other declaration Defendant

10  Todd Shipyards submitted, establishes that the Navy directed the

11  exact manner in which Defendant Todd Shipyards' workers and its

12  subcontractors performed their work with asbestos products, nor

13  that the government affirmatively prohibited contractors, including

14  Defendant Todd Shipyards, from providing warning.  This contention

15  is not persuasive.  Just as Defendant Todd Shipyards is not

16  required to produce contracts from decades past, it is not required

17  to produce such detailed declarations concerning whether the Navy

18  directed the exact manner of installation and affirmatively

19  prohibited any kind of warning in order to demonstrate that it

20  worked under the direction of federal officers; such requirement

21  would frustrate the purpose of section 1442(a)(1).  See Durham, 445

22  F.3d at 1252.  Horne's declaration is sufficient to establish that

23  a federal officer had "direct and detailed control" over Defendant

24  Todd Shipyards.

25    B.  Colorable Federal Defense

26    To meet the second prong of the Mesa test, Defendant Todd

27  Shipyards must show that it has a colorable federal defense; it

28

United States District Court
For the Northern District of California

8

1  need not prove that its defense will be meritorious.  Mesa, 489

2  U.S. at 128; Fung, 816 F. Supp. at 573.  As the Supreme Court

3  explained in Willingham v. Morgan, 395 U.S. 402, 407 (1969), "The

4  officer need not win his case before he can have it removed."

5     Under Boyle v. United Technologies, Corp., 487 U.S. 500

6  (1988), liability for design defects in military equipments cannot

7  be imposed on contracts, "pursuant to state law, when (1) the

8  United States approved reasonably precise specifications; (2) the

9  equipment conformed to those specifications; and (3) the supplier

10  warned the United States about the dangers in the use of the

11  equipment that were known to the supplier but not to the United

12  States." 487 U.S. at 512.  In their motion, Plaintiffs argue that

13  Defendant Todd Shipyards fails to produce any evidence necessary to

14  show that it is entitled to the government contractor defense.  In

15  their reply, however, Plaintiffs do not argue that Defendant Todd

16  Shipyards does not have a colorable government contractor defense;

17  rather, they argue that the Court need not address this issue

18  because Defendant Todd Shipyards fails to satisfy the first and

19  third prongs of the Mesa test.  The Court, however, finds that

20  Defendant Todd Shipyards satisfies the first prong, as discussed

21  above, and the third prong, as discussed below.  Further, the Court

22  finds that Defendant Todd Shipyards has a colorable federal

23  defense.

24     C.  Causal Nexus

25     The final prong requires that a defendant demonstrate a causal

26  nexus between the claims against it and the acts it performed under

27

28

United States District Court
For the Northern District of California

1  color of federal office.  See Overly v. Raybestos-Manhattan, 1996

2  WL 532150, *4 (N.D. Cal.) (noting that the final requirement under

3  the Mega test is that there be a causal connection "between the

4  rules imposed by the United States on the defendant contractor by

5  the federal government and the liability asserted by plaintiff").

6  Defendant Todd Shipyards argues that this prong is satisfied

7  because, as discussed above, it has produced evidence attesting to

8  the regulations imposed by the U.S. Navy on the repair of its

9  vessels, including the USS Tappahannock.   These regulations

10  required that Defendant Todd Shipyards use asbestos products.  The

11  Navy directed, inspected and supervised work on its vessels to

12  ensure that contractors, such as Defendant Todd Shipyards, adhered

13  to its requirements.

14       Plaintiff responds that there is no causal nexus, arguing that

15  Defendant Todd Shipyards only establishes that federal officers

16  directed it to use asbestos and that its claims are not limited to

17  mere use of asbestos: the same argument the Court rejected above.

18  The Court finds that Defendant Todd Shipyards also satisfies the

19  causal nexus requirement.

20                              CONCLUSION

21       For the foregoing reasons, the Court DENIES Plaintiffs' motion

22  to remand this case and their request for attorneys' fees and costs

23  incurred in bringing their motion to remand.   Removal was proper

24  under the federal officer removal statute.  Defendant Todd

25  Shipyards' request to certify this motion for interlocutory appeal

26

27

28
                              10.

1    is denied as moot.[5]

2       IT IS SO ORDERED.

3         6/22/07

4    Dated: _____

                                       *Claudia Wilken*

5                                   CLAUDIA WILKEN

                                   United States District Judge

United States District Court
For the Northern District of California

       _____

[5]Both parties submitted objections to other parties' evidence. To the extent that the Court relied upon evidence to which there is an objection, the parties' objections are overruled. To the extent that the Court did not rely on such evidence, the parties' objections are overruled as moot. The Court has not relied on any inadmissible evidence in deciding this motion.

11

EXHIBIT "5"

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES -- GENERAL

Case No.   CV 07-8338VBF(RCx)                          Dated: February 8, 2008

Title:     Donald Nelson, et al. -v- Alfa Laval, Inc., et al.

---

PRESENT:   HONORABLE VALERIE BAKER FAIRBANK, U.S. DISTRICT JUDGE

Rita Sanchez                              None Present
Courtroom Deputy                          Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:         ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                                  None Present

PROCEEDINGS (IN CHAMBERS):      RULING RE: PLAINTIFF'S MOTION TO REMAND
                                [FLD 1/7/08]

        Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court
finds that this matter is appropriate for decision without oral argument. The hearing calendared
for February 11, 2008 at 1:30 p.m. is hereby vacated and the matter taken off calendar.

---

        After review of all papers filed, the Motion to Remand is DENIED. First, although most
removal statutes are narrowly construed, the Federal Officer Removal Statute is an outlier.
Plaintiff cannot plead around the "government contractor" defense. Second, Defendant
Foster Wheeler has presented sufficient evidence to set forth a colorable government
contractor defense. Although the evidence is not overwhelming, it is sufficient to meet the
low bar of a "colorable" defense at this stage.

MINUTES FORM 90                              Initials of Deputy Clerk ___rs___
CIVIL - GEN
                                 -1-

1.    <u>Background</u>

    a.    <u>Filing History</u>

      Plaintiff Donald Nelson and his wife, Hilaria Nelson, filed this action in California Superior Court in November, 2007 against several manufacturers of asbestos-containing products.   Plaintiffs allege that Donald Nelson contracted malignant pleural mesothelioma, a type of cancer, due to exposure to asbestos while serving as a fireman/boiler tender in the U.S. Navy aboard a destroyer from 1959 to 1963.  Defendant Foster Wheeler was served on November 28, 2007 and removed this action to federal court on December 27, 2007.

      Foster Wheeler asserts that Nelson's injuries stem from service on a Navy destroyer that was commissioned in 1946.  Foster Wheeler designed and built boilers and auxiliary equipment for the U.S. Navy.  It is possible that Foster Wheeler boilers and equipment were on the ship on which Mr. Nelson served.

      Plaintiffs filed this present Motion to Remand to State Court on January 7, 2008. Defendant Foster Wheeler filed an Opposition and supporting declaration on January 18, 2008.  Plaintiffs filed a Reply brief in support of their Motion to Remand on January 25, 2008.  Defendant Leslie Controls, Inc. filed a joinder to Foster Wheeler's Notice of Removal and Opposition to Motion to Remand on January 25, 2008.  Plaintiffs filed a Reply to Leslie Control's Joinder on January 29, 2008.

    b.    <u>Federal Officer Removal Statute and Federal Contractor Defense</u>

      The basis for Foster Wheeler's removal is 28 U.S.C. § 1442(a)(1), which authorizes removal in a civil case "commenced in a State court against ... [t]he United States or any agency thereof or any officer (or person acting under that officer) of the United States or of any agency thereof…"  Removal is proper under the Federal Officer Removal Statue where the moving party: (1) demonstrates that it acted under the direction of a federal officer; (2) demonstrates a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office; and (3) raises a colorable federal defense to the

MINUTES FORM 90                        Initials of Deputy Clerk   rs
CIVIL - GEN

plaintiff's claims.  Mesa v. California, 489 U.S. 121, 124-45, 134-35, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).

As to the first and second factors, Foster Wheeler argues that it was acting under the direction of the United States Navy and its officers.  Acting under this direction, Foster Wheeler submits that it was not allowed to vary from design specifications approved by the Navy nor affix warnings to its boilers.  To prove that it followed with the directions of the Navy in design and manufacture of its products, Defendant Foster Wheeler filed several declarations – J. Thomas Schroppe, Ben Lehman and Lawrence Stillwell Betts – with their Notice of Removal.

To meet the third prong of removal under the Federal Officer Removal Statute, Foster Wheeler must submit a "colorable" federal defense.  Foster Wheeler submits that it intends to offer a "government contractor" defense, under the case Boyle v. United Techs. Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).  Under Boyle, to establish a federal contractor defense, the defendant must prove (1) "The United States approved reasonably precise specifications" for the military equipment supplied by the contractor; (2) "the equipment conformed to those specifications;" and (3) "the [military contractor] warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States."

According to Foster Wheeler, the government contractor defense is available in a failure to warn case "where there is evidence that the government was involved in the decision to give, or not to give, a warning." Kerstetter v. Pacific Scientific Co., 210 F.3d 431, 438 (5th Cir.), cert. denied 531 U.S. 919 (2000).

2.    **Summary of Arguments**

Plaintiffs' Motion argues that the Complaint expressly disclaims all federal claims.  Instead, according to the Plaintiffs, they seek only to assert state-law duty to warn claims, and therefore, removal was not proper.  Plaintiffs also assert that the government contractor defense is untenable because Foster Wheeler has presented insufficient evidence

MINUTES FORM 90                              Initials of Deputy Clerk __rs__
CIVIL - GEN
                                    -3-

to support the contention that the Navy specifically directed the design and production of boilers and auxiliary equipment.

    **3.**    <u>Burden on Removal</u>

        **a.**    <u>The Well-Pleaded Complaint Rule and Plaintiff's Disclaimer</u>

Plaintiffs argue that removal was improper because they disclaimed all federal remedies.  Plaintiffs' Complaint, paragraph 4, states:

> "Plaintiffs hereby disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy vessels.  Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party Defendant committed at the direction of an officer of the United States Government."

Plaintiffs argue that such disclaimers are generally given effect as an extension of the well-pleaded complaint rule.  See, e.g., <u>Jefferson County v. Acker</u>, 527 U.S. 423, 430-31, 119 S.Ct. 2069 (1999).

Despite this rule, suits against federal officers "may be removed despite the nonfederal cast of the complaint."  <u>Jefferson County</u>, 527 U.S. at 430.  "The statute providing for removal of any civil action against the United States or any agency or officer thereof creates an exception to the well-pleaded complaint rule; even if a plaintiff's complaint does not, on its own, raise a federal question, federal jurisdiction is proper where a defendant establishes the statutory requirements."  <u>Machnik v. Buffalo Pumps, Inc.</u>, 506 F.Supp.2d 99 (D. Conn. 2007).

        **b.**    <u>Application of 28 U.S.C. § 1442(a)(1)</u>

Removal statutes are, as a general rule, narrowly interpreted.  See <u>Gaus v. Miles, Inc.</u>, 980 F.2d 564, 566 (9th Cir. 1992).  ("Removal statutes are to be strictly construed, and any doubts as to the right of removal be resolved in favor or remanding to state court.")  The

MINUTES FORM 90                        Initials of Deputy Clerk __rs__
CIVIL - GEN

Federal Officer Removal Statute, however, is subject to a more liberal interpretation than the general federal removal statue. The Supreme Court has "held that the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal should not be frustrated by a narrow or grudging interpretation of 28 U.S.C. § 1142(a)(1)." Arizona v. Manypenny, 451 U.S. 282, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981) (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969)).

The Ninth Circuit has stated: "[W]e do not interpret our jurisdiction under section 1442 so strictly…the Supreme Court has mandated a generous interpretation of the federal officer removal statute." Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1252 (9th Cir. 2006). The Ninth Circuit noted, after describing the history of the Federal Officer Removal Statute: "We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." Id. at 1252 (citing Bradford v. Harding, 284 F.2d 307, 310 (2d Cir. 1960)).

Plaintiff submits that, despite this authority, the removal statute should be narrowly construed, and that Foster Wheeler, as a private party, "bear[s] a special burden in establishing the official nature of their activities." See Reply, p.2, citing Williams v. Gen. Elec. Co., 418 F.Supp.2d 610 (M.D. Penn. 2005), quoting Freiberg v. Swinerton & Walberg Property Svcs., Inc., 245 F.Supp. 2d 1144, 1150 (D.Colo. 2002). Even accepting that Foster Wheeler bears a "special burden" as a private party asserting a government contractor defense, for purposes of removal, Foster Wheeler need only advance a "colorable" government contractor defense for removal to be appropriate.

### 4.    Requirements for Federal Jurisdiction under 28 U.S.C. § 1442(a)(1)

As noted above, removal under 28 U.S.C. § 1442(a)(1) is appropriate where a Defendant:  (1) demonstrates that it acted under the direction of a federal officer; (2) demonstrates a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office; and (3) raises a colorable federal defense to the plaintiff's claims.  Mesa v. California, 489 U.S. at 124-25, 134-35 (1989).

MINUTES FORM 90                                    Initials of Deputy Clerk __rs__
CIVIL - GEN

a.    Whether Foster Wheeler Acted Pursuant to a Federal Officer's Directions

Plaintiffs argue that "Foster Wheeler ... must provide evidence that the Navy – in its contract specifications – prohibited Foster Wheeler from issuing warning about the hazards of asbestos. Mot. at 7.

While the affidavits may be somewhat generic, they are sufficient to set forth a "colorable" claim of a government contractor defense.[1]  The declaration of J. Thomas Schroppe establishes that Foster Wheeler was required to follow the directions of the Navy. Mr. Schroppe was an employee and past president of Foster Wheeler.  His experience gives him sufficient personal knowledge to testify to the amount of control exercised by the Navy over its contractors.  He states that Foster Wheeler would not have been permitted to affix a warning label to a piece of equipment manufactured for the Navy.

The declaration of Admiral Ben J. Lehman also establishes that the level of control that the Navy exercised over its contractors.  Admiral Lehman acted in various capacities for the Navy from 1942 through 1954, including acting as a ship superintendent.  He also states that Foster Wheeler would not be permitted to affix a warning to equipment.

Further, Plaintiffs argue "Foster Wheeler offers no actual specification or contracts wherein the Navy ever precluded it from issuing warning about asbestos. Foster Wheeler attempts to rely on the generic and previously-prepared declaration of J. Thomas Schroppe and Admiral Ben J. Lehman." Mot. at 8.

---

[1] In addition to the Affidavits submitted by Foster Wheeler, Defendant Leslie Controls submits a declaration with its Joinder. This declaration is by Mr. Matt Wrobel, a corporate representative of Leslie Controls, is more general than that submitted by Foster Wheeler and covers a later time frame.  In addition, the Court notes that this Joinder was filed late, on January 25, 2008, after the time for Reply.  For this reason, the Court does not base its decision on the evidence and arguments submitted with the late-filed Joinder.

MINUTES FORM 90
CIVIL - GEN

Initials of Deputy Clerk __rs__

-6-

With their Opposition to the Motion to Remand, however, Foster Wheeler submits a purchase order dated October 18, 1942, for boilers. This purchase order contains a 36 page appendix detailing the specifications for each piece of equipment. This demonstrates that all of the products produced by Foster Wheeler for the Navy were subject to strict controls and design specifications.

      b.    Whether a Causal Nexus Exists Between the Defendant's Actions Under Color of Federal Office and Plaintiff's Claims

Similar issues regarding removal by federal contractors have arisen frequently. The more persuasive and analogous precedent support denying the motion to remand. In Ballenger v. Agco Corp., 2007 WL 1813821 (N.D. Cal. 2007), the plaintiff alleged that he was injured from exposure to asbestos while working on a shipyard that manufactured ships for the Navy.[2] The court determined, on evidence similar to that submitted here, that removal was proper. The court noted, in response to the plaintiff's evidentiary objections that defendants "[are] not required to produce contracts from decades past in order to demonstrate that it worked under the direction of federal officers; to require such documentation would frustrate the purpose of section 1442(a)(1)." Id. at *3 (citing Durham, 445 F.3d at 1252).

In Machnik v. Buffalo Pumps, Inc., 506 F.Supp.2d 99 (D. Conn. 2007), Defendant General Electric (GE) removed and the Plaintiff sought to remand. The court considered whether removal was proper, where GE claimed to provide goods and services to the U.S. Navy. The court stated the plaintiff's claims "against GE are based only upon his exposure to asbestos-containing products supplies by GE to the U.S. Navy. Because of this, once GE meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction." Id. at 104.

Plaintiff relies, in part, on In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813 (2d Cir. 1992). As Defendant Foster Wheeler submits, however, this case is distinguishable. In the Hawaii Federal Asbestos Cases, the Ninth Circuit found that the government contractor

---

[2] The case is misidentified in the Defendant's papers but attached as exhibit B to their declaration.

MINUTES FORM 90                          Initials of Deputy Clerk   rs
CIVIL - GEN

defense was unavailable because the asbestos-containing goods at issue were the same as those commercially available. That is, the goods at issue there were not specially produced for the government and according to government specifications. Here, however, the boilers were built specially for combat vessels and according to detailed government specifications.

    c.    Colorable Federal Defense

      To support removal, Foster Wheeler needs to set forth a "colorable" federal defense. Mesa v. California, 489 U.S. 121, 133-34 (1989). As noted above, Foster Wheeler seeks to assert a federal contractor defense, which requires proving three elements. (1) "The United States approved reasonably precise specifications" for the military equipment supplied by the contractor; (2) "the equipment conformed to those specifications;" and (3) "the [military contractor] warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States."

      First, as noted above, Defendant must show that it acted under the direction of a federal officer. "Whether a defendant is 'acting under' the direction of a federal officer depends on the detail and specificity of the federal direction of the defendant's activities and whether the government exercises control over the defendants." Watson v. Phillip Morris Cos., 420 F.3d 852, 856-67 (8th Cir. 2005). As noted above, it appears there was fairly specific direction and control over the equipment supplied.

      Second, the evidence of conformity with specifications is weak. Nevertheless, the evidence is sufficient to set forth a "colorable" defense.

      Third, as set forth in the declaration of Dr. Betts, it is unlikely that Foster Wheeler held superior knowledge regarding asbestos and failed to warn the Navy. The declaration of Dr. Betts details the level of knowledge the Navy had regarding the effects of exposure to asbestos. Dr. Betts states that the Navy has had state-of-the-art knowledge regarding asbestos since the 1920s and exercised control over all warnings on equipment, such as boilers. Mot. at 12.

MINUTES FORM 90               Initials of Deputy Clerk __rs__
CIVIL - GEN

EXHIBIT "6"

1
2
3
4
5
6
7
8               IN THE UNITED STATES DISTRICT COURT
9           FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   ALBERT WRIGHT JR.,                    No. C07-05403 MJJ

12              Plaintiff,                 **ORDER DENYING MOTION TO
                                           REMAND**
13        v.

14   A.W. CHESTERTON COMPANY INC,

15              Defendant.

16
17                        **INTRODUCTION**

18       Before the Court is Plaintiffs Albert Wright, Jr. ("Mr. Wright") and Marva Wright's

19   (collectively, "Plaintiffs") Motion to Remand.  (Docket No. 23.)  Defendants Foster Wheeler

20   ("Foster Wheeler") and Leslie Controls ("Leslie Controls") (collectively, "Defendants") oppose the

21   Motion.[1]  For the following reasons, the Court **DENIES** the Motion.

22                     **FACTUAL BACKGROUND**

23       This is a personal injury action arising out of injuries allegedly sustained by Mr. Wright due

24

25       _____

26       [1] Plaintiff objects to Leslie Controls' Joinder in Foster Wheeler's Notice of Removal and Leslie Controls' Joinder
     in Foster Wheeler's Opposition to this Motion.  Whether or not Leslie Controls may join the Notice of Removal is not,
     however, dispositive of this Motion because any defendant can unilaterally remove a case under § 1442.  *See Durham v.*
27   *Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (explaining that a federal officer or agency defendant can unilaterally remove
     a case under § 1442).  Therefore, for purposes of this Motion, the Court need not determine whether Leslie Controls' may
28   join in Foster Wheeler's Notice of Removal.   However, once the case is removed by Foster Wheeler, the Court perceives
     no reason why Leslie Controls may not join in Foster Wheeler's Opposition to Plaintiff's Motion to Remand.  In addition,
     Leslie Controls filed its joinder in the opposition not less than 21 days before the hearing date with both the Court and
     Plaintiffs.  (See Pls.'s Objection, Docket No. 44 at 2.)  The Court therefore perceives no prejudice from Leslie Control's
     failure to efile.  *See* Civ. L.R. 7-3(a).

United States District Court
For the Northern District of California

1   to exposure to Defendants' asbestos and asbestos-containing products. (*See* Keller Decl., Exh. A

2   ("Complaint") ¶¶ 10-15.) Plaintiffs allege that Mr. Wright contracted lung cancer as a result of his

3   exposure to these products during his employment as a machinist and flange turner, among other

4   places, for the Navy. (*Id.* ¶¶ 11, 36-37, Exh. A.) Mr. Wright worked aboard twenty-six or more

5   Navy ships and vessels in his career.[2] (*See id.* at Exh. A.)

6          Plaintiffs filed this asbestos action on September 13, 2007 in San Francisco County Superior

7   Court against Defendant Foster Wheeler, Leslie Controls and dozens of other defendants. (*See*

8   Keller Decl., Exh. A ("Complaint").) Plaintiffs brought claims of negligence, strict liability, false

9   representation, intentional tort, premises owner/contractor liability and loss of consortium. (*See*

10  Complaint at 1.) Plaintiffs argue, in this Motion, that Plaintiffs' claims against Foster Wheeler are

11  based only on its failure to warn about the dangers of asbestos that Foster Wheeler incorporated into

12  the design and manufacture of its boilers. (Plfs.' Mem. of P. & A. at 14.) Indeed, in the Complaint,

13  Plaintiffs "disclaim any cause of action or recovery for any injuries and damages resulting from

14  exposure to asbestos caused by the acts or omissions of defendants committed at the specific

15  direction of an officer of the United States Government acting within his official capacity." (*See*

16  Complaint ¶ 9a.) Foster Wheeler filed a Notice of Removal on October 23, 2007. (*See* Notice of

17  Removal, Docket No. 1.) Plaintiffs now seek an order remanding this case to state court.

                                          **LEGAL STANDARD**

19         Pursuant to 28 U.S.C. § 1441(a), a defendant in a civil action may remove a case from state

20  court to federal district court if the district court has subject matter jurisdiction over the case. The

21  Court strictly construes the removal statute against removal and Defendants have the burden of

22  establishing that removal jurisdiction is proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566-67 (9th

23  Cir. 1992).

24         Removal pursuant to 28 U.S.C. § 1442, however, is different. Pursuant to 28 U.S.C. §

25  1442(a)(1), a civil action may be removed by "[a]ny officer of the United States or any agency

26  _____

27       [2] Mr. Wright worked aboard various Navy vessels including, but not limited to, the USS Midway, USS Enterprise, USS Kitty Hawk, USS Coral Sea, USS Oriskany, USS Constellation, USS Mount Hood, USS John F Kennedy, USS

28  Hancock, USS Ticonderoga, USS Providence, USS Mount Baker, USS Mauna Kea, USS Pigeon, USS Pyro, USS Gulterro, USS Drum, USS Pintado USS Hawkbill, USS Permit, USS Swordfish, USS Halibut, USS Grayback, USS Brinkley Bass, USS Trigger, and USS Wahoo.

2

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1   thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1).

2   To satisfy this provision a party must "(1) demonstrate that it acted under the direction of a federal

3   officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus

4   between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v.*

5   *Abex Corp.*, 816 F.Supp. 569, 517 (N.D.Cal. 1992) (citing *Mesa v. California*, 489 U.S. 121, 124-

6   125, 134-135 (1989)).[3]

7        Unlike removal under § 1441(a), the presumption under § 1442 is in favor of removal. *See*

8   *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252-53 (9th Cir. 2006). In *Durham*, after a

9   review of the relevant case law, the Ninth Circuit stated that "when federal officers and their agents

10  are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* at

11  1252. The Court further explained that "[b]ecause it's so important to the federal government to

12  protect federal officers, removal rights under section 1442 are much broader than those under

13  section 1441." *Id.* at 1253 (noting that the breadth of the removal rights are exemplified by, inter

14  alia, the fact that under § 1442 a federal officer can remove a case even if the plaintiff could not have

15  filed the case in federal court to begin with, that removal under § 1442 is not subject to the well-

16  pleaded complaint rule and that a federal officer or agency can unilaterally remove a case under

17  section 1442).[4]

                            **ANALYSIS**

18

19       Plaintiffs argue that Defendants fail to establish that Foster Wheeler acted under the direction

20  of a federal officer, raised a colorable federal defense, or established a causal nexus between its

21  alleged action under the control of a federal officer and Plaintiffs' claims. Plaintiffs also raise

22  evidentiary objections to Defendants' evidence.

23

24      [3] The removing party must also qualify as a federal officer or person acting under the same. As a corporation, Foster Wheeler meets this requirement. *See Fung*, 816 F.Supp. at 572. Additionally, the parties do not contend otherwise.

25      [4] Plaintiffs correctly argue that the Ninth Circuit, in *Durham*, was confronted with the question of whether the

26  removal petition was timely, so the court did not reach the merits of the defendant's removal petition. Plaintiff understates, however, the breadth of the holding in *Durham*. While *Durham* needed only to determine the timeliness question, the Court

27  analyzed the history of § 1442. In so doing, the Circuit's determination that there should be a presumption in *favor* of removal was not limited to the mere question of timeliness. In addition, the Circuit makes the presumption determination

28  in order to come to its final holding. Thus, the language regarding the breadth and presumption in favor of removal was not dicta, but essential to the holding and thus binding. A recent decision from this court interpreted it as such and accordingly denied a motion to remand. *See Ballenger v. AGCO*, No. C 06-2271, 2007 WL 1813821 (N.D. Cal. June 22, 2007).

                                3

1   Defendants, on the other hand, argue that they have submitted sufficient evidence on each of

2   the required elements for removal under § 1442 in both their Notice of Removal and the exhibits

3   attached to their Opposition to this Motion.  The Court turns first to the evidentiary challenges, then

4   to the merits.

5   **I.   Evidentiary Issues**

6   In the instant case, Defendants submit four declarations.  Plaintiff raises evidentiary

7   objections to all four.  The general contours of these objections are outlined in this section.  Below,

8   in the discussion on the merits, if the outcome relies on evidence that is specifically challenged, it

9   shall be so noted and the objection resolved.

10   The first two declarations, attached to Defendant's Notice of Removal, are the declarations

11   of J. Thomas Schroppe, a retired Foster Wheeler executive, and Ben J. Lehman, a retired Rear

12   Admiral of the United States Navy.  These declarations are offered for the purpose of demonstrating

13   that Foster Wheeler was subject to government specifications and oversight in all aspects of the

14   design of its boilers, including the relevant warnings attached thereto.  (*See* Affidavit of J. Thomas

15   Schroppe, Notice of Removal, Exhibit B and Affidavit of Ben J. Lehman, Notice of Removal,

16   Exhibit C).  Plaintiffs object to the admissibility of these affidavits for four reasons.  (*See* Plfs.'

17   Evid. Obj.)  First, Plaintiffs argue that under Federal Rule of Evidence ("FRE") 402, the challenged

18   evidence is not relevant.  Next, under FRE 602, Plaintiffs contend that the witnesses do not have

19   personal knowledge of the matters asserted.  Third, some of the evidence is purportedly inadmissible

20   hearsay under FRE 802.  Finally, Plaintiffs argue that these declarations violate the best evidence

21   rule, under FRE 1002-1004.[5]

22   As a general matter, none of these objections are meritorious.  First, the declarations are

23   relevant to this Motion because they are related to the Navy's level of control over Foster Wheeler's

24   production activities.  (*See* Notice of Removal, Exhs. B, C.)  Mr. Wright alleges that his injuries

25   were caused by his work on at least twenty-six Navy ships, not just one or even a small handful.

26   While Defendants only cite one ship by name in their Notice of Removal, they note that the

27

28   _____

[5] While Plaintiffs refer to the "secondary evidence rule" and cite FRE 1003, the Court presumes, given the description of the objection, that the objection is based on FRE 1002.

4

United States District Court
For the Northern District of California

1  allegations are related to "exposure while working on, among other ships, the USS Constellation."

2  (*See* Notice of Removal at 2.) Thus, evidence regarding general navy practices, as it relates to the

3  Navy's contracts with Foster Wheeler, is both relevant and appropriate. Insofar as Plaintiff argues

4  that the testimony is not relevant because these declarations are dated prior to the inception of this

5  action in state court, this argument is unavailing. The fact that the declaration pre-dates the

6  inception of the suit does not undermine the relevance of the practices testified to, all of which

7  occurred prior to the date the declaration was signed.

8       Next, both Schroppe and Lehman testify to their personal knowledge of the facts contained in

9  the declaration. Schroppe states that he is personally familiar with the degree of supervision and

10  control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for

11  boilers and auxiliary equipment because he was personally involved in such contracts at all the

12  various stages of contracting. (*See id.*, Exh. B at 2.) Lehman testifies that his years of experience

13  with the Navy have caused him to be thoroughly familiar with U.S. Navy specifications and the

14  means by which the U.S. Navy controlled its contracts and inspection procedures. (*See id.*, Exh. C

15  at 9.) Thus, Schroppe and Lehman's testimony regarding the Navy's contracting and specifications

16  related to Foster Wheeler boilers is based on personal knowledge. Third, insofar as specific

17  statements are inadmissible hearsay, this will be taken up as is relevant, below. However, as a

18  general matter, the majority of the challenged statements are based on personal knowledge, not an

19  out of court statement, and are not inadmissible hearsay. Finally, these declarations do not violate

20  the Best Evidence Rule. Under FRE 1002, "to prove the content of a writing, recording, or

21  photograph, the original writing, recording, or photograph is required." Here, Schroppe and

22  Lehman, in their declarations, do not attempt to prove the content of a writing, recording or

23  photograph. While the declarations cite various specifications that are also written, such as the

24  Military Specifications ("Mil Specs"), they rely on their independent knowledge of the contents and

25  therefore need not submit the document/s themselves.

26       The third declaration, by Thomas J. Moses, counsel for Foster Wheeler, includes a copy of

27  Plaintiffs' Preliminary Asbestos Litigation Statement, a copy of a Government Purchase Order, and

28  a copy of a District Court case. (Moses Decl., Exhs. A-C.) Plaintiff objects to the Purchase Order,

United States District Court

For the Northern District of California

5

1  arguing that it never references the USS Constellation and Defendant's attorney never establishes a

2  foundation for its authenticity or how he is qualified to submit or interpret it.  (Plfs.' Reply at 9.)

3  The Court agrees that the Government Purchase Order lacks some foundation and specificity.

4  However, the Court need not determine the admissibility of this document as the Court need not rely

5  on it to resolve this Motion.

6       Finally, the fourth declaration, by Lawrence Stilwell Betts ("Betts"), includes forty-five

7  exhibits. Plaintiffs generally object to the entire declaration on the same grounds that they object to

8  the Schroppe and Lehman declarations.  As above, as a general matter, these objections are not

9  meritorious.  However, insofar as the Court's decision relies on specific portions of the Betts

10  declarations, the objections thereto are considered below.

11       Plaintiffs also argue that the Court should not consider the Betts declaration because it was

12  untimely.  The Court, however, finds this argument unavailing.  First, Plaintiffs contend that a

13  removal notice cannot be amended or supplemented after the time for removal has expired.  (See

14  Plfs.' Reply at 5.)  While this may be the case, Defendants do not seek to amend their removal

15  notice.  In addition, the issues raised in the Betts declaration, and attached exhibits, were generally

16  raised in Defendants' Notice of Removal.  (See Notice of Removal, Exh. C at 14-15.)  Thus, the

17  untimeliness argument is unavailing.  In addition, the Betts declaration was filed with the Court on

18  December 17, 2007, more than the requisite time in advance of the January 29, 2008 hearing in this

19  matter.  While Defendants failed to efile the exhibits, the Court received copies on December 17,

20  2007 and Plaintiffs received copies on December 18, 2007, also more than 21 days before the

21  hearing in this matter.  Thus, while Defendants may have committed a procedural error in filing this

22  declaration, the Court perceives no prejudice from the Court's consideration of the Betts declaration

23  in resolving this matter.

24  **II.    The Merits**

25       a.    **The First and Third *Mesa* Prongs: Foster Wheeler acted under the direction of a**

26            **federal officer and Foster Wheeler demonstrated a causal nexus.**

27       Under *Mesa*, Defendants must establish that Foster Wheeler acted under the direction of a

28  federal officer. 489 U.S. at 121, 134-45.  In addition, Defendants must establish that there is a

6

1   causal nexus between Plaintiff's claims and Foster Wheeler's actions under the control of a federal

2   officer. *See id.* Defendants contend that they have established both of these prongs. The Court

3   agrees.

4       To show that Defendants acted under the direction of a federal officer, Foster Wheeler cannot

5   simply show that the "relevant acts occurred under the general auspices of a federal officer, such as

6   being a participant in a regulated industry." *Fung*, 816 F. Supp. at 572 (quotations omitted).

7   Instead, "[a] majority of courts have held that the federal official must have 'direct and detailed

8   control' over the defendant." *Id.* (quoting *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947

9   (E.D.N.Y. 1992).

10      Relying on *Good v. Armstrong World Industries*, 914 F.Supp. 1125 (E.D.Pa. 1996), Plaintiffs

11  contend that Foster Wheeler must also cite a specific federal officer who designed, manufactured or

12  even directed the design and manufacture of the boilers present in the Navy vessels and installations

13  identified in Plaintiffs' Complaint. (Plfs.' Mem. of P. & A. at 8-9.) Plaintiffs, however, provide no

14  authority establishing that this is a requirement in the Ninth Circuit. In fact, such a finding would be

15  in potential conflict with the removal standard enunciated in *Durham*. Thus, Plaintiffs have not

16  shown that Defendants, in this circuit, are required to cite a specific federal officer, as long as they

17  show that they acted under the requisite direct and detailed control of a federal official. *See Fung*,

18  816 F. Supp. at 572.

19      Here, Defendants have provided sufficient evidence supporting a finding that the Navy had

20  direct and detailed control over their ability to place asbestos warnings on their boilers provided to

21  the Navy. Under contracts between Foster Wheeler and the Navy for boilers and auxiliary

22  equipment, the Navy was responsible for all design aspects and approved the equipment at multiple

23  steps along the way. (*See* Notice of Removal, Exh. B. ("Schroppe Decl") ¶¶ 2, 5, 8, 9, 12, 14, 19.)

24  In addition, the Navy exercised significant direction and control over the contents of all written

25  documentation to be delivered with the naval boilers. (*Id.* ¶ 21.) Under the Navy's precise

26  specifications, Foster Wheeler was not permitted to affix any type of warning or caution statement to

27  a piece of equipment intended for installation onto a Navy vessel, beyond those required by the

28

United States District Court
For the Northern District of California

7

United States District Court

For the Northern District of California

1  Navy. (*Id.* ¶ 22.)[6]

2       Plaintiffs offer no contradictory evidence.  Instead, Plaintiffs argue that there is no evidence

3  that the asbestos-containing components were anything other than standard stock equipment.  (Plfs.'

4  Mem. of P. & A. at 10.)  However, the evidence presented by Defendants establishes that the boilers

5  that Foster Wheeler designed and manufactured for the Navy were subject to specific design

6  requirements and control that resulted in equipment that was specific to the needs of the Navy and

7  not standard stock equipment.  In addition, Plaintiffs argue that Defendants' evidence is insufficient

8  and contradictory.  However, perceiving no real contradictions in the evidence, and given the

9  presumption in favor of removal under *Durham,* this evidence is sufficient to establish the Navy's

10  direct and detailed control over Defendants' design of the boilers and the warnings attached thereto.

11       Next, Plaintiffs argue that there is no causal nexus because there is no proof that a specific

12  federal officer directed Foster Wheeler about warnings specifically.  However, as discussed above,

13  there is no requirement that Defendants cite a specific federal officer by name, as long as the

14  requisite direction, control and causal nexus is established.  In addition, Defendants offer evidence

15  that the Navy would not permit Foster Wheeler to affix any type of warning or caution statement to a

16  piece of equipment intended for installation onto a navy vessel, beyond those required by the Navy.

17  (*See* Schroppe Decl. ¶ 22; Lehman Decl. ¶ 14.)  As Lehman testified, "[t]o do so would have

18  interfered with the U.S. Navy's mission and control of its ships and personnel."  (Lehman Decl. ¶

19  14.)  Thus, Defendants have established a causal nexus between Plaintiff's claims and Foster

20  Wheeler's actions under the control of a federal officer.[7]

21       b.    Second *Mesa* Prong: Foster Wheeler raises a colorable federal defense to

22             Plaintiffs' claims.

23       Foster Wheeler urges the Court to determine its right to remove under 28 U.S.C. 1442(a)(1)

24  in light of the government contractor's defense set forth in *Boyle v. United Technologies Corp.,* 487

25  ───────────

26  [6] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
    The objections to these sections of the Schroppe declaration are the same boilerplate objections discussed above and the
27  evidence is admissible for the same reasons already stated.

28  [7] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
    The objections to these sections of the Schroppe and Lehman declarations are the same boilerplate objections discussed above
    and the evidence is admissible for the same reasons already stated.

8

United States District Court
For the Northern District of California

1    U.S. 500 (1988).  As discussed more fully below, the Court finds that there is sufficient evidence in

2    the record to raise a colorable government contractor defense.

3          In *Boyle*, the Supreme Court found that liability arising from state law, here the duty to warn,

4    may not be imposed in instances where "(1) the United States approved reasonably precise

5    specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the

6    United States about the dangers in the use of the equipment that were known to the supplier but not

7    to the United States."  *Id.* at 512.  As noted above, Plaintiffs waive all claims against Foster Wheeler

8    save for those arising from a failure to warn. (*See* Complaint ¶ 9a.)  The Ninth Circuit clarified the

9    contractor defense as it applies to failure to warn claims in *Butler v. Ingalls Shipbuilding, Inc.*, 89

10   F.3d 582, 586 (9th Cir. 1996).  The court in *Butler* found the contractor defense to be "inapplicable

11   to a failure to warn claim in the absence of evidence that in making its decision whether to provide a

12   warning . . . [defendant] was acting in compliance with reasonably precise specifications imposed on

13   [it] by the United States." *Id.* at 586 (quotations omitted).

14         In the instant case, as discussed above, Defendants provide sufficient evidence, by way of the

15   Schroppe and Lehman declarations, that satisfies the first and second prongs of the *Boyle* test; the

16   United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's

17   equipment conformed to these specifications.  The outstanding question, therefore, is whether

18   Defendants submit sufficient evidence to establish the third prong; whether Foster Wheeler warned

19   the United States about the dangers in the use of the equipment that were known to Foster Wheeler

20   but not to the United States.

21         Defendants submit two declarations to support their contention that Foster Wheeler did not

22   have any knowledge about the dangers of the use of asbestos that were not known to the United

23   States Navy.  First, Lehman testified that the U.S. Navy was well aware of the dangers of asbestos

24   and conducted extensive research concerning the hazard of exposure to asbestos, thus staying abreast

25   of the latest information, including the results of research.  (Lehman Decl. ¶ 13.)  The Navy made

26   deliberate decisions on the allocation of its resources in light of this knowledge.  (*Id.*)  Next,

27   Defendants submit the declaration of Lawrence Stilwell Betts, a retired Navy captain and medical

28   professional who is familiar with the industrial products used by the Navy, the Navy work

9

1   environments and the Navy occupational health program.  Betts testified that the Navy controlled

2   asbestos exposure consistent with the then current state of accepted scientific and medical

3   knowledge balanced by needs for national defense.  (Betts Decl. ¶ 31.)  Betts further testified that

4       [t]he Navy's knowledge regarding the applications of asbestos and the health effects
        represented the state of the art.  During the period from the early 1920s to the late

5       1960s, there was nothing about the hazards associated with the use of asbestos
        containing products used on or in boilers and auxiliary equipment on United States

6       Navy ships known by a boiler manufacturer, like Foster Wheeler, that was not known
        by the United States government and the United States Navy.

7

8   (Betts Decl. ¶ 32.)[8]

9        Plaintiff, in response, argues that, inter alia, Defendants have failed to establish that the Navy

10  had knowledge about the dangers of using Foster Wheeler's asbestos-containing equipment or

11  boilers specifically.  However, the testimony above regarding the Navy's superior knowledge is only

12  part of the record before the Court.  Betts testifies that the Navy had the most current knowledge

13  regarding the dangers of asbestos.  Schroppe and Lehman's testimony further establishes that the

14  Navy knew of, and in fact required, the specific design parameters for the boilers made by Foster

15  Wheeler.  Thus, if the boilers contained asbestos, then it was by design, known by the Navy, and was

16  approved and/or required by the Navy.  The warnings regarding such asbestos were also according

17  to, and limited by, the specifications set forth by the Navy.  Thus, Plaintiff's argument that the Navy

18  did not have knowledge about the asbestos contained in Foster Wheeler's boilers is unavailing.

19  Plaintiffs also present other related arguments challenging the Betts declaration.  Each argument,

20  like their primary argument, discussed above, is similarly unavailing given the totality of the

21  evidence in the record.

22       The Court is mindful that Defendants need only present a colorable federal defense to

23  Plaintiff's claims and need not prove that the defense will be meritorious.  *See Mesa*, 489 U.S. at

24  128; *Ballenger*, 2007 WL 1813821 at *4.  Here, on this record, the Court finds that Defendants have

25  established that they have a colorable federal defense.

26  //

27

28  ────────────────────
        [8] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
    The objections to these sections of the Lehman and Betts declarations
    are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

United States District Court

For the Northern District of California

1

## CONCLUSION

2    For the foregoing reasons, the Court **DENIES** the Motion to Remand. Pursuant to the clear

3    language in *Durham*, the Court must interpret § 1442 broadly in favor of removal. Given the

4    evidence in the record, Defendants have established the requisite basis for removal.

5

6    **IT IS SO ORDERED.**

7

8

9    Dated: February 21, 2008

10                                                    MARTIN J. JERKINS
                                                     UNITED STATES DISTRICT JUDGE.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

EXHIBIT "7"

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | |
|---|---|---|
| Case No. | CV 08-118 PA (JWJx) | Date   February 11, 2008 |
| Title | Robert Oberstar, et al. v. CBS Corp., et al. | |

| Present: The Honorable: | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| C. Kevin Reddick | Not Reported | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

Proceedings:   IN CHAMBERS - COURT ORDER

Before the Court is a Motion to Remand filed by plaintiffs Robert and Linda Oberstar ("Plaintiffs") (Docket No. 7). Also before the Court is a Motion to Stay originally filed in case number 08-143 PA (JWJx) by defendant General Electric Co. (Docket No. 5).[1/] Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument. The hearing calendared for February 11, 2008, is vacated, and the matters taken off calendar.

Plaintiffs allege claims for negligence, strict liability, and loss of consortium arising out of Mr. Oberstar's exposure to asbestos-containing products manufactured, fabricated, installed, or otherwise distributed by defendants. Specifically, Plaintiffs' claims assert that defendants violated their obligations imposed under state law to warn Mr. Oberstar of the dangers associated with their asbestos-containing products. Among other places, Plaintiffs allege that Mr. Oberstar was exposed to the asbestos contained in defendants' products while he served aboard the aircraft carrier U.S.S. Midway from 1959 to 1963. Plaintiffs commenced the action in Los Angeles Superior Court on December 3, 2007 and served defendants Viad Corp. ("Viad") and General Electric Co. ("GE") on December 10, 2007. Viad removed the action to this Court on January 8, 2008 and GE filed a Notice of Removal on January 9, 2008. Both Viad and GE based their Notices of Removal on 28 U.S.C. § 1442(a)(1)'s federal officer removal statute. 28 U.S.C. § 1442(a) provides, in relevant part:

A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the

---

[1/]   Because defendants General Electric Co. and Viad Corp. filed separate Notices of Removal, there were originally two case numbers assigned to this action. Because both case numbers referred to the same case originally filed by plaintiffs in Los Angeles Superior Court, the Court consolidated the two actions into CV 08-118 PA (JWJx), dismissed CV 08-143 PA (JWJx), and directed that all future filings should reference only CV 08-118 PA (JWJx). Plaintiff also filed a Motion to Remand in CV 08-143 PA (JWJx) (Docket No. 14). That Motion will be addressed in this Order.

Case 2:08-cv-00873-ABC-PLA     Document 6-3     Filed 02/29/2008     Page 15 of 19

**SEND**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

 CV 08-118 PA (JWJx)           February 11, 2008

Title:  Robert Oberstar, et al. v. CBS Corp., et al.

> United States for the district and division embracing the place wherein it is
> pending: (1) The United States or any agency thereof or any officer (or
> any person acting under that officer) of the United States or of any agency
> thereof, sued in an official or individual capacity for any act under color of
> such office . . . .

28 U.S.C. § 1442(a).

Suits against federal officers are an exception to the general rule that a case is removable only if
the federal question appears on the face of a properly pleaded complaint. See Jefferson County v.
Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999). "Under the federal officer
removal statute, suits against federal officers may be removed despite the nonfederal cast of the
complaint; the federal-question element is met if the defense depends on federal law." Id. "A party
seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the
statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions,
and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham v. Lockheed Martin
Corp., 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting Jefferson County, 527 U.S. at 431, 119 S. Ct. 2075,
144 L. Ed. 2d 408 and citing Mesa v. California, 489 U.S. 121, 124-25, 131-35, 109 S. Ct. 959, 962,
965-67, 103 L. Ed. 2d 99 (1989)).

In establishing the propriety of removal under the federal officer removal statute, the defendant
need not prove a valid federal defense, only a colorable defense:

> In construing the colorable federal defense requirement, we have rejected
> a "narrow, grudging interpretation" of the statute, recognizing that "one of
> the most important reasons for removal is to have the validity of the
> defense of official immunity tried in a federal court." We therefore do not
> require the officer virtually to "win his case before he can have it
> removed."

Jefferson County, 527 U.S. at 431, 119 S. Ct. 2075, 144 L. Ed. 2d 408 (quoting Willingham v.
Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969)). Indeed, unlike other
removal statutes, which are to be interpreted strictly, "the Supreme Court has mandated a generous
interpretation of the federal officer removal statute . . . ." Durham, 445 F.3d at 1252. As the Supreme
Court has held, "the right of removal is absolute for conduct performed under color of federal office, and
has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging
interpretation of § 1442(a)(1).'" Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 1664, 68
L. Ed. 2d 58 (1981) (quoting Willingham, 395 U.S. at 407, 89 S. Ct. at 1816, 23 L. Ed. 2d 396); see also
Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the
Supreme Court that when federal officers and their agents are seeking a federal forum, we are to
interpret section 1442 broadly in favor of removal.").

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 08-118 PA (JWJx)                                    Date   February 11, 2008

Title        Robert Oberstar, et al. v. CBS Corp., et al.

In removing the action pursuant to the federal officer removal statute, defendants claim that they are entitled to assert the "military contractor defense." The military contractor defense shields contractors from liability for state tort law for defects in military equipment supplied to the United States when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle v. United Technologies Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 2518, 101 L. Ed. 2d 442 (1988). Although originally developed in the design defect context, the military contractor defense also applies in cases where a plaintiff alleges that the government contractor breached a state law duty to warn of potential dangers. In actions alleging a failure to warn claim against a military contractor, the supplier cannot be liable when it can show: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003-04 (7th Cir. 1996); see also In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992).

As an initial matter, Plaintiffs argue in their Motions to Remand that they have disclaimed any claim that could allow this Court to exercise jurisdiction pursuant to the federal officer removal statute. Specifically, the Complaint alleges:

> Plaintiffs hereby disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy vessels. Plaintiffs disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party Defendant committed at the direction of an officer of the United States Government.

Complaint, ¶ 4. In support of their argument that their waiver of claims prevents defendants from removing this action pursuant to § 1442(a)(1), Plaintiffs principally rely on Westbrook v. Asbestos Defendants (BHC), No. C-01-1661 VRW, 2001 WL 902642 (N.D. Cal. July 31, 2001). In Westbrook, the district court relied upon the plaintiff's disclaimer of "any claims arising out of work done on United States Navy ships" to support its conclusion that federal officer removal was not proper. Unlike in Westbrook, Plaintiffs here have not disclaimed claims against defendants arising out of exposure occurring on Navy vessels. Indeed, despite their purported disclaimer, Plaintiffs specifically seek damages from defendants for exposure to asbestos Mr. Oberstar may have come in contact with while he served on the U.S.S. Midway. Because removals pursuant to the federal officer removal statute are premised on the existence of a federal defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs' disclaimer nor its characterization of their claims are determinative. See Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007) ("Machnik's argument that the suit must be remanded because his complaint disclaimed any federal claims is unavailing . . . . Subject matter jurisdiction under § 1442(a)(1) is based upon a federal defense, regardless of whether the

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 08-118 PA (JWJx)                                     Date   February 11, 2008

Title   Robert Oberstar, et al. v. CBS Corp., et al.

plaintiff's cause of action rests on state law. . . . [O]nce GE meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction."); Ballenger v. Agco Corp., No. C 06-2271 CW, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (denying motion to remand despite complaint's disclaimer of "any claim arising from any act or omission of the United State, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States").

Plaintiffs additionally argue that defendants have not met their burden to establish the existence of a valid federal defense to Plaintiffs' claims. Specifically, while conceding that defendants are "persons" within the meaning of § 1442(a)(1), Plaintiffs contend that defendants have not demonstrated that they can assert either a "colorable federal defense" or a "causal nexus" between their actions taken at the direction of a federal officer and Plaintiffs' claims. Durham, 445 F.3d at 1251. According to Plaintiffs, defendants lack the evidence to establish that federal officers prevented defendants from providing necessary warnings. As a result, according to Plaintiffs, defendants cannot prove either the applicability of the military contractor defense or the requisite causal nexus.

In their Motions to Remand, Plaintiffs state that their "complaint contains causes of action limited to state-based failure to warn claims." Motion to Remand, p. 6, ll. 8-9. Similarly, in their Reply, Plaintiffs state that they "did not necessarily sue GE or Viad for using asbestos, but rather for failing to warn of the hazards associated with it. Both GE and Viad claim they were acting under federal direction when they designed and manufactured their equipment, but such a showing is immaterial for purposes of this lawsuit and motion for remand." Reply, p. 8, ll. 4-8. According to Plaintiffs, absent evidence of specific facts that defendants were prevented from placing warnings on their products, defendants cannot meet their burden to establish the availability of the military contractor defense. Contrary to Plaintiffs' assertions, however, defendants' burden at this stage of the proceedings is not so exacting.

To establish their military contractor defense, defendants rely in large part on the declarations of Ben Lehman and Lawrence Betts. Lehman is a retired Rear Admiral, who joined the Navy in 1942 and served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944 and as Ship Superintendent at the San Francisco Naval Shipyard from 1952 to 1954. Lehman also worked as an engineer at GE from 1946 to 1948. Betts, a physician, served in the Navy from 1972 until 2001 when he retired with the rank of Captain.

Lehman's declaration indicates that during the period when the U.S.S. Midway was built and continuing during Mr. Oberstar's service in the Navy, "the Navy had complete control over every aspect of each piece of equipment used on Navy ships." Lehman Decl., ¶ 6. According to Lehman:

Military specifications governed every characteristic of this equipment, including instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to the

CV-90 (06/04)                    CIVIL MINUTES - GENERAL                    Page 4 of 6

**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No: | CV 08-118 PA (JWJx) | Date: February 11, 2008 |
| Title: | Robert Oberstar, et al. v. CBS Corp., et al. | |

construction, maintenance, and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines and turbine manuals. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information, and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. . . . In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation, and warnings associated with its ships and did not permit deviation by any of its contractors.

Lehman Decl., ¶¶ 6 & 7. In reviewing a nearly identical declaration submitted by Lehman, the court in Nesbiet v. General Elec. Co. concluded that Lehman's Declaration raised "the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning." 399 F. Supp. 2d 205, 208 (S.D.N.Y. 2005). Although the Lehman Declaration may not establish the absence of a triable issue of fact with respect to the first two prongs of the Boyle test, as modified by Oliver for a failure to warn claim, defendants need not prove so much at this preliminary stage of the proceedings. See Oliver, 96 F.3d at 1003 (applying military contractor defense when "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government . . . ."). Again, to establish the propriety of their removal, defendants must only show a "colorable" federal defense, not a winning one.

The third prong of the military contractor defense requires the contractor to have "warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Id. at 1004. Defendants rely on the Betts Declaration to meet this third factor of the Boyle test. Through his training and experience, Betts became familiar with "the history and practice of the Navy occupational health program from its early days before World War II until the present time." Betts Decl., ¶ 2. According to Betts, the "Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art. During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a marine steam turbine on United States Navy ships known by a turbine manufacturer, like General Electric Company, that was not known by the United States and the United States Navy." Id. ¶ 30. Based upon the Betts Declaration, defendants have provided sufficient evidence that there were no dangers known by them that were not known by the government. See Nesbiet, 399 F. Supp. 2d at 209 ("[A]ccording to Betts's affidavit, GE could not have possessed any information regarding the dangers

SEND

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| CASE NO. | CV 08-118 PA (JWJx) | Date | February 11, 2008 |
| Title | Robert Oberstar, et al. v. CBS Corp., et al. | | |

posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.").

The Court therefore concludes that defendants have met their burden, at this stage of the proceedings, to establish a "colorable" military contractor defense for purposes of removal under § 1442(a)(1)." The Court also finds that defendants have submitted sufficient evidence of a "causal nexus" between Plaintiffs' claims and the actions defendants took at the direction of a federal officer. As did the court in Nesbiet, this Court finds that defendants' evidence "is sufficient for purposes of section 1442(a) to demonstrate that the Navy's control over warnings directly interfered with GE's duty to warn under state law. Thus, GE [and Vlad] ha[ve] satisfied the 'causal nexus' requirement." Id. at 213.

For all of the foregoing reasons, the Court finds that defendants have raised a "colorable" federal defense to the claims alleged in Plaintiffs' Complaint. As a result, defendants' removals pursuant to § 1442(a)(1) were proper. Plaintiffs' Motions to Remand are therefore denied. With respect to the Motion to Stay, GE seeks to stay this action pending the anticipated transfer of this action to the Eastern District of Pennsylvania as a potential "tag-along action" to Multidistrict Litigation Number 875. According to GE, transfer to the MDL is "imminent." Assuming this is true, GE will suffer little if any prejudice between now and the time this case is eventually is transferred to the MDL should no stay be imposed. Accordingly, the Court finds that GE has failed to establish the necessity for a stay. The Court therefore declines to stay these proceedings.

IT IS SO ORDERED.

---

⁷  The Court recognizes that when faced with arguably similar evidence, other courts have reached a different result. See, e.g., Hilbert v. McDonnell Douglas Corp., No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan. 3, 2008). The Court declines to follow Hilbert because, in the Court's view, Hilbert places too high a burden on a defendant to prove its military contractor defense at such an early stage in the litigation. Given the liberality with which removals under § 1442 are to be considered, Hilbert's more exacting standard appears to conflict with Ninth Circuit precedent. See Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

EXHIBIT "8"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL E. JENKINS,

                    Plaintiff,

    vs.

ALLIED PACKING & SUPPLY, INC., et al.,

                    Defendant.

CASE NO. 09-cv-0101 DMS (LSP)

**ORDER DENYING MOTION TO
REMAND**

    Plaintiff brought this state law tort action in San Diego Superior Court against Defendants, including Defendant Leslie Controls, Inc. ("Leslie Controls"), on July 21, 2008. Plaintiff alleges, *inter alia,* that Defendants violated their California state law duty to warn him of the dangers posed by asbestos in their products, and that he developed lung cancer as a result. Plaintiff alleges asbestos exposure from serving as a pipefitter aboard the U.S. Navy vessels U.S.S. Marshall, U.S.S. Collett, and U.S.S. Fletcher. Defendant Leslie Controls furnished and fabricated valves and related equipment for Navy vessels under contract during the 1940s to 1960s. It removed the case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), on January 9, 2009. Plaintiff now seeks to have the case remanded. (Doc. 18.) The matter is suitable for submission without oral argument, pursuant to Civil Rule 7.1. For the following reasons, the motion is denied.

A.    **Legal Standard for Removal under 28 U.S.C. § 1442**

    Pursuant to 28 U.S.C. § 1442(a)(1), a civil action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1). To satisfy § 1442, a government contractor must (1) demonstrate that

- 1 -

09-cv-0101

1   it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's

2   claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendant performed

3   under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-125, 134-135 (1989).[1]

4        Generally, removal statutes are to be strictly construed, and any doubt as to the right to remove

5   should be resolved in favor of remanding to state court. *See, e.g., Gaus v. Miles, Inc.*, 980 F.2d 564,

6   566 (9th Cir.1992). Unlike removal under § 1441(a), however, § 1442 strongly favors removal. *See*

7   *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252-53 (9th Cir. 2006) ("when federal officers

8   and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of

9   removal."). Indeed, under § 1442 a federal officer may remove a case even if the plaintiff could not

10  have filed the case in federal court; removal is not subject to the well-pleaded complaint rule, *i.e.*, a

11  federal officer's defense can provide subject matter jurisdiction; and, a federal officer or agency

12  unilaterally may remove a case, without the consent of any other defendant. *Id.* at 1253.

13  **B.    Discussion**

14       Plaintiff argues that Leslie Controls fails to establish removal was proper under § 1442(a).

15  Plaintiff further argues that, Leslie Controls' defense notwithstanding, removal is improper because

16  he specifically disclaimed any claims for relief arising under federal law. Plaintiff also raises

17  evidentiary objections to Leslie Controls' evidence. The Court turns first to the evidentiary challenges,

18  then to the merits.

19           1.    **Plaintiff's Evidentiary Objections to the Notice of Removal**

20       Leslie Controls submitted declarations from Matthew Wrobel and Rear Admiral Roger Horne

21  (ret.) in support of its notice of removal. Plaintiff objects to these declarations on various grounds.

22  First, as to Mr. Wrobel's declaration, Plaintiff argues: (1) the declaration is inadmissible hearsay; (2)

23  Mr. Wrobel fails to provide a basis for his expert opinion under Fed. R. of Evid. 702, and hence, it

24  lacks foundation; and (3) the declaration is irrelevant because Mr. Wrobel does not refer to any

25  specifications regarding asbestos warnings or testify as to whether the Navy prevented Leslie Controls

26  from fulfilling its state law duty to warn. (Doc. 18-3, at 1-2.) Similarly, Plaintiff objects to Rear Adm.

27  _____

28      [1] The removing party must also qualify as a federal officer or person acting under the same.
    As a corporation, Leslie Controls meets this requirement, *see Fung v. Abex Corp.*, 816 F.Supp. 569,
    572 (N.D. Cal. 1992), and the parties do not contend otherwise.

1  Horne's declaration because: (1) it is inadmissible hearsay; (2) Rear Adm. Horne does not state

2  whether he has personal knowledge of Leslie Control's products specifications, design, or

3  manufacture, or whether warnings were placed on them; and (3) Rear Adm. Horne offers an expert

4  opinion that lacks foundation under Fed. R. of Evid. 702. (*Id.* at 2.) Plaintiff asks the Court to strike

5  Rear Adm. Horne's declaration because it is contrary to deposition testimony given by him on June

6  12, 2006, in *Baxter v. Alfa Laval, Inc., et al.*, Middlesex (Mass.) Super Ct., No. 05-4314. (*Id.* at 2-3.)

7      As a general matter, these objections are not meritorious. Mr. Wrobel is Group Director of

8  Quality Assurance at Leslie Controls. His testimony is based on his personal knowledge following

9  forty-one years of employment with Defendant, where he was personally involved in Navy

10  procurement contracts at various stages of contracting. (Wrobel Decl. ¶1.) Rear Adm. Horne's Navy

11  career focused on ship design, engineering, construction, overhaul and inspection, ultimately achieving

12  the rank of Chief Engineer and Deputy Commander, Naval Sea Systems Command for Ship Design

13  and Engineering. (Horne Decl. ¶2.) He testifies that he has personal knowledge of the Navy's

14  comprehensive plans, specifications, and requirements which governed suppliers like Leslie. Because

15  Mr. Wrobel and Rear Adm. Horne testify as a percipient witnesses, neither offers opinion testimony

16  that is subject to Fed. R. of Evid. 702. Moreover, both declarations are relevant, because both Mr.

17  Wrobel and Rear Adm. Horne offer testimony concerning the Navy's supervision of Leslie Control's

18  product manufacturing and its control over the issuance of warnings. (Wrobel Decl. ¶¶6-14; Horne

19  Decl. ¶¶7-16.) Finally, assuming Rear Adm. Horne's declaration is inconsistent with his deposition

20  testimony in *Baxter*, such inconsistency "is not ordinarily a basis for striking the testimony." *United*

21  *States v. Powers*, 467 F.2d 1089, 1095-1096 (7th Cir. 1972).

22      **2.    Plaintiff's Disclaimers**

23      Plaintiff's Complaint recites the following:

24      The Federal Courts lack subject matter jurisdiction over this action as there is no
        federal question and incomplete diversity of citizenship exists due to the presence of
25      one or more California defendants. Removal is improper. Every claim arising under
        the constitution, treaties, or laws of the United States is expressly disclaimed (including
26      any claim arising from an act or omission of a federal enclave, or any officer of the
        U.S. or any agency acting under him occurring under color of such office). . . . Plaintiff
27      specifically disclaims any federal . . . claim that would give rise to federal jurisdiction.

28  (Compl. ¶3.) Moreover, Plaintiff recites that, to the extent any of Plaintiff's asbestos exposure took

1   place on a federal enclave, military vessel, or in the construction, repair or maintenance of a military

2   vessel or aircraft, Plaintiff's negligence claims are based solely on a theory of failure to warn. (*Id.*)

3       Plaintiff contends that irrespective of Leslie Control's arguments under the federal officer

4   removal statute, removal is improper because Plaintiff expressly disclaimed any claim arising under

5   federal law in his complaint. (Mot. at 17-18.) Citing *Westbrook v. Asbestos Defendants*, 2001 WL

6   902642 (N.D. Cal. 2001), *Shild v. A.P. Green Indus., Inc.*, 2002 WL 102608 (N.D. Cal. 2002), and

7   *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), Plaintiff argues the use of such

8   disclaimers operates to defeat removal in asbestos cases because as the Plaintiff he is free to elect what

9   law he will rely upon. (*Id.*, at 17-18; Reply at 18.)

10      Under § 1442(a), "suits against federal officers may be removed despite the nonfederal cast of

11  the complaint; the federal-question element is met if the *defense* depends on federal law." *Jefferson*

12  *County v. Acker*, 527 U.S. 423, 431 (1999) (emphasis added). Plaintiff maintains that he has waived

13  any claims raising a federal question, because "any act or omission by [Leslie Controls] at the direction

14  of [the Navy] is not the subject of this suit." (Mot. at 17.) Plaintiff's argument is flawed because it

15  presupposes that Leslie Controls is not entitled to a federal contractor defense. "One of the most

16  important reasons for [federal officer] removal is to have the validity of the defense . . . tried in a

17  federal court." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Thus, if Leslie Controls satisfies

18  *Mesa*, Plaintiff's disclaimers have no effect on the propriety of removal.

19      3.    ~~Removal Under § 1442(a)~~

20      Leslie Controls contends that removal is proper because it satisfies *Mesa*. Plaintiff contends

21  Leslie Controls does not satisfy *Mesa*, because it fails to offer credible evidence demonstrating that

22  it acted at the specific direction of the Navy to omit warnings about the dangers of asbestos exposure.

23      *a.*    *Acts Under the Direction of a Federal Officer*

24      A private party defendant satisfies *Mesa's* first prong – acts under the direction of a federal

25  officer – upon a showing it "assist[ed] or help[ed] to carry out the duties or tasks of a federal superior."

26  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 127 S.Ct. 2301, 2307 (2007). Such assistance

27  establishes a "special relationship" between the contractor and the federal government involving

28  "subjection, guidance, or control" that is sufficient to support removal. *Id.*, at 2307, 2310.

1   Defendants provide sufficient evidence that Leslie Controls acted under the direction of the

2   federal government.  Leslie Controls manufactured valves for Naval vessels, and Rear Adm. Horne

3   testifies that "in each and every instance where Leslie contracted with the [Navy] for the provision of

4   equipment, the [Navy] exercised discretion or control over the design, manufacture, inspection and

5   testing of all such equipment." (Horne Decl. ¶17.)  Pursuant to the terms of all contracts between

6   Leslie Controls and the Navy, "the Navy retained authority to direct and control the performance under

7   the terms of the contract." (*Id.*)  Moreover, "[t]he Navy had complete control over aspect of each piece

8   of equipment" through detailed specifications that governed the design and manufacturing of the

9   equipment itself, as well as written materials accompanying the equipment, such as operating manuals,

10  safety and hazard information and precautionary labeling. (*Id.* at ¶¶15-16.)  Similarly, Mr. Wrobel

11  testifies that the Navy exercised "direction and control" over the design, manufacture, inspection and

12  testing of all equipment.  (Wrobel Decl. ¶15.)  Navy personnel had the authority to inspect, accept or

13  reject equipment and to halt production if the equipment did not meet the Navy's specifications. (*Id.*

14  at ¶9.)  Finally, if the Navy did detect deficiencies in the procured equipment, it "directed and

15  controlled [Leslie Controls] in formulating a response to correct any such deficiencies." (*Id.* at ¶12.)

16  Indeed, these activities occurred in the context of Leslie Controls furnishing and fabricating

17  valves and related equipment for Navy vessels under contract from the 1940s to 1960s.  Those vessels

18  were used to perform the Navy's various war and peacetime missions.  If Leslie Controls (or any other

19  contractor) had not provided the equipment, the Navy would have had to produce those valves by

20  itself.  This "special relationship" is on all fours with the Supreme Court's example in *Watson*:

21      The assistance that private contractors provide federal officers goes beyond simple
        compliance with the law and helps officers fulfill other basic governmental tasks.  In

22      the context of [*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir.
        1998)], for example, Dow Chemical fulfilled the terms of a contractual agreement by

23      providing the Government with a product that it used to help conduct a war.  Moreover,
        at least arguably, Dow performed a job that, in the absence of a contract with a private

24      firm, the Government itself would have had to perform.

25  127 S. Ct. at 2308.  Accordingly, this prong is met.

26      b.      *Colorable Federal Defense*

27      To meet the second prong of the *Mesa* test, Leslie Controls must show that it has a colorable

28  federal defense.  489 U.S. at 128.   A defense may be colorable even if the court ultimately rejects it.

- 5 -

1   *Jefferson County*, 527 U.S. at 431; *see Willingham*, 395 U.S. at 407 (federal "officer need not win his

2   case before he can have it removed"). The government contract defense shields contractors from state

3   tort liability for defects in military equipment supplied to the United States when "(1) the United States

4   approved reasonably precise specifications; (2) the equipment conformed to those specifications; and

5   (3) the supplier warned the United States about the dangers in the use of the equipment that were

6   known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512

7   (1988). The Ninth Circuit clarified *Boyle's* application to failure to warn claims in *Butler v. Ingalls*

8   *Shipbuilding, Inc.*, where it held the defense "inapplicable . . . in the absence of evidence that . . .

9   [defendant] was acting in compliance with reasonably precise specifications imposed on [it] by the

10  United States." 89 F.3d 582, 586 (9th Cir.1996) (quotations omitted).

11          According to Plaintiff, Leslie Controls "must in fact show that as a result of following a

12  directive or order from the government it was prevented from fulfilling its state law duty to warn."

13  (Reply at 4.) Citing *Overly v. Raybestos-Manhattan*, Plaintiff argues that removal is only proper upon

14  a showing that "the government affirmatively instructed it regarding the provision of warnings." 1996

15  WL 532150, *4 (N.D. Cal. 1996). Plaintiff argues Leslie Controls' evidence is insufficient because

16  the declarants fail to identify precise specifications on asbestos warnings. At most, Plaintiff argues

17  Mr. Wrobel's declaration establishes that "at no time did the Navy instruct Leslie Controls *not to warn*

18  of the dangers of asbestos." (*Id.* at 8.)

19          Plaintiff's argument is unavailing. First, the Court notes that *Overly* was decided before

20  *Durham*, and thus, its reasoning is questionable. *Compare Overly*, 1996 WL 532150, *2 ("[federal

21  officer] removal statute is strictly construed against removal jurisdiction and doubt is resolved in favor

22  of remand") *with Durham*, 445 F.3d at 1253 ("when federal officers and their agents are seeking a

23  federal forum, we are to interpret section 1442 broadly in favor of removal"). Second, both *Butler*,

24  89 F.3d at 586 and *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992), state that

25  for the federal contractor defense to apply *on the merits*, a defendant must show that it "act[ed] in

26  compliance with reasonably precise specifications imposed on [it] by the United States." Here, Rear

27  Adm. Horne testifies that "the Navy controlled the decision making with respect to instructions and

28  warnings on every piece of equipment." (Horne Decl. ¶15.) The Navy "determined the nature of

1    hazards to be subject to any precautionary labeling and the content of any such labeling." (*Id.* at ¶16.)

2    Because the Navy "would not, and could not, permit" a contractor to place warnings on any equipment

3    that might interfere with the Navy's mission, and "the Navy dictated every aspect of . . . warnings

4    associated with its ships, it did not permit deviation from any of its contractors." (*Id.* at ¶14.)  This

5    testimony is corroborated by Mr. Wrobel, who testifies that the "Navy has precise specifications,

6    practices, and procedures that governed the content of any communication affixed to machinery

7    supplied by Leslie [Controls] to the Navy as shown on approved Navy drawings." (Wrobel Decl. ¶14.)

8    "At no time did the [Navy] instruct Leslie Controls to affix warnings or caution statements regarding

9    asbestos hazards to a piece of equipment intended for installations onto a [Navy] vessel."[2] (*Id.*)  The

10   inference to be drawn from this evidence is that Leslie Controls' alleged failure to warn resulted from

11   compliance with the Navy's specifications, which precluded any such warning.

12           Plaintiff attempts to rebut this inference by submitting the Navy's "Uniform Labeling Program

13   for Hazardous Industrial Chemicals and Materials," dated September 24, 1956.  ("Uniform Labeling

14   Program," Gardner Decl. Ex. D.)  According to Plaintiff, this instruction details labeling for hazardous

15   products supplied to the Navy, and the instruction specifically states that it does not govern the type

16   of labeling required by "State and Federal laws and regulations." (*Id.* at ¶2(a).)  Because this program

17   does not trump labels required by state law, Plaintiff argues the Navy did not intend for Leslie Controls

18   to omit all warnings on its products.  (Reply at. 7.)  However, this instruction does not apply to

19   products containing asbestos, as its stated purpose "is to standardize . . . labeling requirement for

20   hazardous *chemical* products." (Uniform Labeling Program, ¶1.)  Plaintiff fails to rebut the inference

21   to be drawn from Leslie Controls' evidence.

22           Leslie Controls also satisfies the last two *Boyle* prongs, *i.e.*, whether its product complied with

23   the Navy's specifications and whether Leslie Controls knew more about asbestos hazards than the

24   Navy.  Mr. Wrobel's testimony establishes that the Navy had the authority to reject any equipment that

25   was not up to its specifications.  (Wroboel Decl. ¶¶9, 12.)  From this, the inference can be drawn that,

26   if Plaintiff was exposed to asbestos from Leslie Controls' valves while on board a Navy vessel, the

27

28           [2]  Plaintiff objects to this portion of Mr. Wrobel's testimony under "the best evidence rule,"
     Fed. R. Evid. 1002.  However, Mr. Wrobel is not attempting to prove the content of a particular
     specification; rather his testimony is based on his personal knowledge.

1   valves necessarily met Navy specifications. *Machnik v. Buffalo Pumps Inc.*, 506 F.Supp.2d 99, 103

2   (D. Conn. 2007). Finally, Leslie Controls submits evidence that the Navy's knowledge of the asbestos

3   hazards on board its vessels and in its supply yards was "state-of-the-art" during relevant periods of

4   Plaintiff's alleged exposure. (*See* Declaration of Gerald Kerby, M.D. ¶¶23, 27 and Declaration of

5   Ernani D. Storlazzi ¶¶40-41.) The Navy, according to this evidence, would have known of any

6   dangers that were known to Leslie Controls. *See Nesbiet v. General Electric Co.*, 399 F.Supp.2d 205,

7   212 (S.D.N.Y. 2005). The Court concludes Leslie Controls has presented a colorable federal defense

8   sufficient for purposes of removal.

9              c.   *Causal Nexus*

10         Finally, to show the existence of a "causal nexus," Leslie Controls must show that Plaintiff's

11   claims "[arose] out of the acts done by [the defendant] under color of federal authority." *Mesa*, 489

12   U.S. at 131-32. Plaintiff's claims against Leslie Controls pertain to the warnings (or lack thereof)

13   affixed to valves produced pursuant to strict Naval specifications. Any warnings promulgated (or not

14   promulgated) with respect to the valves were governed by those specifications and "the Navy did not

15   permit contractors to deviate from any of its specifications." (Opp. at 13.) Nevertheless, Plaintiff

16   argues that the causal nexus is not met because Leslie Controls fails to show any conflict between the

17   Navy's specifications and state law, as required by *Boyle*. (Mot. at 16.) Assuming such a conflict is

18   necessary to this analysis, it is plain that "the Navy's control over warnings directly interfered with

19   [Leslie Controls'] ability to fulfill its state-law obligation to warn about the dangers of asbestos."

20   *Nesbiet*, 399 F.Supp.2d at 212. Accordingly, Leslie Controls has established a sufficient causal nexus

21   for purposes of this motion.

22   **C.**     **Conclusion**

23         The Court finds that Leslie Controls has met its burden to remove this action. Accordingly,

24   Plaintiff's motion to remand is DENIED.

25   **IT IS SO ORDERED.**

26   DATED: March 25, 2009

27

28                                   HON. DANA M. SABRAW
                                    United States District Judge

09-cv-0101

**PROOF OF SERVICE**
(Code Civ. Proc., §§ 1013A, 2015.5, 1011
Cal. Rules of Court, Rule 2008(e))
State of California, County of Los Angeles
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
Los Angeles Superior Court Case No. BC 412 018

I, the undersigned, declare:

I am a citizen of the United States and am employed in the County of Los Angeles, California. I am over the age of eighteen (18) years, not a party to the above-entitled action, and my business address is located at 800 West 6th Street, Suite 788, Los Angeles, California 90017.

On the date executed below, I served the document(s) described as:

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTIONS 1442 and 1446**

on the interested parties in this action as follows:

[  ]   **BY PERSONAL DELIVERY:** I caused to be personally delivered a true copy in a sealed envelope addressed as indicated below.

[  ]   **BY OVERNIGHT DELIVERY:** I placed a true copy in a sealed, fully prepaid, UPS Next Day Air envelope addressed as indicated below. It is picked up by UPS on that same day in the ordinary course of business.

[ X ]   **BY FACSIMILE:** I personally sent a true copy to the person(s), counsel or interested party, authorized to accept service as set forth below at fax number **[SEE SERVICE LIST]** from fax number **(213) 271-2730.** The facsimile machine I used complied with CRC Rule 2003(3) and the transmission was reported as complete and without error. Pursuant to CRC Rule 2008(e) a transmission verification report was properly issued by the transmitting facsimile machine, stating the time and date of such transmission. **(All Defense Counsel)**

[ X ]   **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated below. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit. **(Plaintiffs Only)**

| | |
|---|---|
| **BARON & BUDD, P.C.**<br>3102 Oak Lawn Avenue, Suite 1100<br>Dallas, TX 75219<br>Tel: (214) 521-3605<br>Fax: (214) 520-1181<br>**Attorneys for Plaintiffs** | **BARON & BUDD, P.C.**<br>9465 Wilshire Blvd., Suite 460<br>Beverly Hills, CA 90212<br>Tel: (214) 860-0476<br>Fax: (214) 860 0480<br>**Attorneys for Plaintiffs** |

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2009, at Los Angeles, California.

Lucia M. Oyos

1

**PROOF OF SERVICE**

1

**SERVICE LIST**

*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*

2

**Los Angeles Superior Court Case No. BC 412 018**

3

| | |
|---|---|
| BECHERER, KANNETT & SCHWEITZER<br>2200 Powell Street, Suite 805<br>Emeryville, CA 94608<br>Tel: (510) 658-3600<br>Fax: (510) 658-1151 | **JOHN K. BICE CO., INC.** |
| LAW OFFICES OF GLASPY & GLASPY<br>100 Pringle Avenue, Suite 750<br>Walnut Creek, CA 94596<br>Tel: (925) 947-1300<br>Fax: (925) 947-1594 | **FRASER'S BOILER SERVICE, INC.;<br>GARLOCK SEALING TECHNOLOGIES,<br>LLC** |
| GORDON & REES, LLP<br>275 Battery Street, Suite 2000<br>San Francisco, CA 94111<br>Tel: (415) 986-5900<br>Fax: (415) 986-8054 | **GOULDS PUMPS INCORPORATED;<br>INGERSOLL-RAND COMPANY** |
| GRACE GENSON, COSGROVE & SCHIRM<br>444 South Flower Street, Suite 1100<br>Los Angeles, CA 90071-2912<br>Tel: (213) 533-5400<br>Fax: (213) 533-5444 | **KELLY-MOORE PAINT COMPANY** |
| HOWARD, ROME MARTIN & RIDLEY<br>1775 Woodside Road, Suite 200<br>Redwood City, CA 94061-3436<br>Tel: (650) 365-7715<br>Fax: (650) 364-5297 | **IMO INDUSTRIES, INC.** |
| JACKSON & WALLACE, LLP<br>14724 Ventura Blvd., Suite 410<br>Sherman Oaks, CA 91403<br>Tel: (818) 379-4700<br>Fax: (818) 379-4702 | **ZURN INDUSTRIES, INC.** |
| JACKSON & WALLACE, LLP<br>55 San Francisco Street, 6th Street<br>San Francisco, CA 94133<br>Tel: (415) 982-6300<br>Fax: (415) 982-6700 | **BUFFALO PUMPS, INC.** |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

2

**SERVICE LIST**

| | |
|---|---|
| K& L GATES LLP<br>10100 Santa Monica Blvd., 7th Floor<br>Los Angeles, CA 90067<br>Tel: (310) 552-5000<br>Fax (310) 552-5001 | CRANE CO. |
| LOMBARDI, LOPER & CONANT, LLP<br>1999 Harrison Street, Suite 2600<br>Oakland, CA 94612<br>Tel:  (510) 433-2600<br>Fax:  (510) 433-2699 | MECHANICAL DRIVES & BELTING |
| LOW, BALL & LYNCH<br>505 Montgomery Street, 7th Floor<br>San Francisco, CA 94111<br>Tel:  (415) 981-6630<br>Fax: (415) 982-1634 | ARMSTRONG INTERNATIONAL, INC. |
| MCKENNA LONG & ALDRIDGE, LLP<br>444 South Flower Street, 8th Floor<br>Los Angeles, CA 90071-2901<br>Tel:  (213) 688-1000<br>Fax: (213) 243-6330 | METALCLAD INSULATION<br>CORPORATION ; UNION CARBIDE<br>CORPORATION |
| MORGAN LEWIS & BOCKIUS, LLP<br>300 South Grand Avenue, 22nd Floor<br>Los Angeles, CA 90071-3132<br>Tel:  (213) 612-2500<br>Fax: (213) 612-2501 | YARWAY CORPORATION; GRINNELL,<br>LLC |
| POND NORTH LLP<br>350 S. Grand Avenue, Suite 2850<br>Los Angeles, CA 900781<br>Tel:  (213) 617-6170<br>Fax: (213) 623-3594 | FMC CORPORATION |
| PRINDLE, DECKER & AMARO LLP<br>310 Golden Shore, 4th Floor<br>Long Beach, CA 90802<br>Tel:  (562) 436-3946<br>Fax: (562) 495-0564 | AMERICAN STANDARD, INC.; TRIPLE<br>A MACHINE SHOP, INC. |

3

SERVICE LIST

| | |
|---|---|
| SCHIFF HARDIN, LLP<br>One Market Plaza<br>Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>Tel: (415) 901-8700<br>Fax: (415) 901-8701 | **GEORGIA-PACIFIC, LLC** |
| SELMAN BREITMAN, LLP<br>11766 Wilshire Blvd., Sixth Floor<br>Los Angeles, CA 90025-6538<br>Tel: (310) 445-0800<br>Fax: (310) 473-2525 | **CLEAVER-BROOKS, INC.** |
| TUCKER ELLIS & WEST LLP<br>515 South Flower Street, 42nd Floor<br>Los Angeles, CA 90071<br>Tel: (213) 430-3400<br>Fax: (213) 430-3409 | **CARRIER CORPORATION** |
| WALSWORTH, FRANKLIN, BEVINS<br>One City Blvd. West, Fifth Floor<br>Orange, CA 92868<br>Tel: (714) 634-2522<br>Fax: (714) 634-0686 | **BONDEX INTERNATION, INC.;<br>DOWMAN PRODUCTS, INC.'<br>HAMILTON MATERIALS, INC.;<br>THOMAS DEE ENGINEERING CO.** |

4

**B**

1    JENNIFER JUDIN (State Bar No. 256973)
      jjudin@dehay.com
2    PAUL C. WHITE II (SBN 213900)
      pwhite@dehay.com
3    DEHAY & ELLISTON, L.L.P.
      800 West 6th Street, Suite 788
4    Los Angeles, CA  90017
      Telephone:  (213) 271-2727
5    Facsimile:  (213) 271-2730

6    Attorneys for Defendant
      LESLIE CONTROLS, INC.

7

8                 **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12    ELLIS MICHAEL STATON AND
      SUSAN MARY STATON,

13                Plaintiffs,

14       v.

15    AMERICAN STANDARD, INC.,
      individually and as successor-in-interest
16    to THE TRANE COMPANY, *et al.*,

17                Defendants.

      Case No. CV09-03724 R (VBKx)

      Case No. BC412018 (Los Angeles
      County Superior Court)

      ~~[PROPOSED]~~ **ORDER DENYING
      PLAINTIFFS' MOTION FOR
      REMAND AND MOTION TO
      STRIKE AND OBJECTIONS TO
      EVIDENCE**

      **Hearing Date: June 29, 2009
      Time:       10:00 a.m.
      Courtroom:  8 [Hon. Manuel L. Real]**

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 4 2009

CENTRAL DISTRICT OF CA...
BY

18

19

20

21

22

23

24

25

26

27

28

LESLIE/Staton

1   This Court has considered Plaintiffs': 1) Motion for Remand to the Superior

2   Court of California, County of Los Angeles; and 2) Motion to Strike and Objections

3   to Evidence, and declarations and documents filed both in support and in opposition

4   thereto.  Good cause appearing therefore, Plaintiffs' Motion is hereby DENIED.

5

6   The Court's ruling is based on the fact that Defendant Leslie Controls, Inc.

7   timely and properly removed this case from the Superior Court of California, County

8   of Los Angeles to this District Court, consistent with the requirements of the federal

9   officer removal statute, 28 U.S.C. § 1442(a)(1), and 28 U.S.C. § 1446.

10

11   IT IS HEREBY ORDERED that Plaintiffs' Motion for Remand and Motion to

12   Strike and Objections to Evidence are DENIED in their entirety.

13

14

15   DATED:  July 14, 2009                    _____

16                                                              Hon. Manuel L. Real

17                                                          United States District Court

18

19   Respectfully Submitted,

20   **DEHAY & ELLISTON, L.L.P.**
     Jennifer Judin
21   Paul C. White II

22

23

24   By:_____

25        Paul C. White II

26        Attorneys for Defendant

27        LESLIE CONTROLS, INC.

28

———————————————————————————
1
[PROPOSED] ORDER DENYING PLAINTIFFS' MOTION FOR REMAND AND MOTION TO STRIKE
AND OBJECTIONS TO EVIDENCE

LESLIE/Staton

C

1    JENNIFER JUDIN (State Bar No. 256973)
     jjudin@dehay.com
2    PAUL C. WHITE II (SBN 213900)
     pwhite@dehay.com
3    DEHAY & ELLISTON, L.L.P.
     800 West 6th Street, Suite 788
4    Los Angeles, CA   90017
     Telephone:  (213) 271-2727
5    Facsimile:   (213) 271-2730

6    Attorneys for Defendant
     LESLIE CONTROLS, INC.

7

8                  UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT

10

11                                        **CV09-03724 JSL (MANx)**
     ELLIS MICHAEL STATON AND            Case No. _____
12   SUSAN MARY STATON,

13                    Plaintiffs,         Case No. BC412018 (Los Angeles
                                          County Superior Court)
14            v.

15   AMERICAN STANDARD, INC.,             **DEFENDANT LESLIE CONTROLS
     individually and as successor-in-interest   INC.'S CERTIFICATION OF
16   to THE TRANE COMPANY;               INTERESTED PARTIES**
     AURORA PUMP COMPANY;                **[Pursuant to F.R.C.P. 7.1 and Local
17   ARMSTRONG INTERNATIONAL,            Rule 7.1]**
     INC.; BUFFALO PUMPS, INC.;
18   CARRIER CORPORATION;
     individually and as successor-in-interest
19   to Elliott Company, successor-in-interest
     to Crocker-Wheeler Company;
20   CLEAVER-BROOKS, INC.,
     individually and f/k/a Aqua-Chem, Inc.;
21   CRANE CO., individually and as
     successor in interest to Chapman Valves;
22   DOWMAN PRODUCTS, INC.; FMC
     CORPORATION, individually, on
23   behalf of FRASER'S BOILER
     SERVICE, INC.; GARLOCK
24   SEALING TECHNOLOGIES, L.L.C.
     individually and as successor-in-interest
25   to Garlock, Inc.; GEORGIA-PACIFIC,
     LLC, f/k/a Georgia-pacific Corporation,
26   individually and as successor-in-interest
     to Bestwall Gypsum Company;
27   GOULDS PUMPS INCORPORATED;
     GRINNELL, L.L.C. (f/k/a Hamilton
28   Distributing, Inc.); IMO INDUSTRIES,

FILED
2009 MAY 26  PM 3: 46
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___

LESLIE/Staton

INC. (individually and as successor-in-
interest to De Laval Turbine, Inc.);
INGERSOLL-RAND COMPANY
individually and as successor-in-interest
to The Aldrich Company; ITT
CORPORATION, f/k/a ITT
INDUSTRIES, INC., individually, and
as successor-in-interest to "BELL &
GOSSETT" branded product and
Grinnell Corporation; JOHN K. BICE
CO., INC; JOHNSON CONTROLS,
INC., KAISER GYPSUM COMPANY,
INC.; KELLY-MOORE PAINT
COMPANY, INC.; LESLIE
CONTROLS, INC.; MECHANICAL
DRIVES & BELTING (f/k/a L.A.
Rubber Company); METALCLAD
INSULATION CORPORATION;
PENTAIR, INC., individually and as
successor-in-interest to Aurora Pump
Company; RED-WHITE VALVE
CORPORATION; SPENCE
ENGINEERING COMPANY, INC.;
SPIRAX SARCO, INC.; SPX
CORPORATION, individually and as
successor-in-interest to General Signal
Corporation (successor-in-interest to
Aurora Pump Company); THOMAS
DEE ENGINEERING CO.; TRIPLE A
MACHINE SHOP, INC. (a/k/a Triple A
Shipyard); UNION CARBIDE
CORPORATION; THE WILLIAM
POWELL COMPANY; YARWAY
CORPORATION; YORK
INTERANTIONAL CORPORATION,
individually and as successor-in-interest
to Central Environmental Systems, Inc.,
f/k/a Borg-Warner Central
Environmental Systems, Inc.; York-
Luxaire, Inc.; Luxaire Inc.; and The C.A.
Olsen Manufacturing Company and
d/b/a "Moncrief Furnaces" d/b/a York
Hearing & Air Conditioning; ZURN
INDUSTRIES, LLC., f/k/a Zurn
Industries, Inc., a/k/a and successor-by-
merger to Erie City Iron Works and
d/b/a "Keystone" branded products; and
DOES 1-300 inclusive,

Defendants.

DEFENDANT LESLIE CONTROLS, INC.'S CERTIFICATION OF INTERESTED PARTIES

1       Pursuant to 7.1 of both the Federal Rules of Civil Procedure and the Local

2   Rules, the undersigned, counsel of record for Defendant Leslie Controls, Inc.,

3   certifies that the following are corporate parents, affiliates and/or subsidiaries of said

4   party, which are publicly held: Circor International.

5

6   DATED:  May 26, 2009                **DEHAY & ELLISTON, L.L.P.**

7                                    Jennifer Judin
                                 Paul C. White II

8

9

10                 By: _____

11                          Paul C. White II

12                          Attorneys for Defendant
                        LESLIE CONTROLS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LESLIE/Staton

1

DEFENDANT LESLIE CONTROLS, INC.'S CERTIFICATION OF INTERESTED PARTIES

**PROOF OF SERVICE**
**(Code Civ. Proc., §§ 1013A, 2015.5, 1011**
**Cal. Rules of Court, Rule 2008(e))**
**State of California, County of Los Angeles**
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
**Los Angeles Superior Court Case No. BC 412 018**

I, the undersigned, declare:

I am a citizen of the United States and am employed in the County of Los Angeles, California. I am over the age of eighteen (18) years, not a party to the above-entitled action, and my business address is located at 800 West 6th Street, Suite 788, Los Angeles, California 90017.

On the date executed below, I served the document(s) described as:

**CERTIFICATION OF INTERESTED PARTIES**

on the interested parties in this action as follows:

[ ]   **BY PERSONAL DELIVERY:** I caused to be personally delivered a true copy in a sealed envelope addressed as indicated below.

[ ]   **BY OVERNIGHT DELIVERY:** I placed a true copy in a sealed, fully prepaid, UPS Next Day Air envelope addressed as indicated below. It is picked up by UPS on that same day in the ordinary course of business.

[ X ]   **BY FACSIMILE:** I personally sent a true copy to the person(s), counsel or interested party, authorized to accept service as set forth below at fax number **[SEE SERVICE LIST]** from fax number **(213) 271-2730.** The facsimile machine I used complied with CRC Rule 2003(3) and the transmission was reported as complete and without error. Pursuant to CRC Rule 2008(e) a transmission verification report was properly issued by the transmitting facsimile machine, stating the time and date of such transmission. **(All Defense Counsel)**

[ X ]   **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated below. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit. **(Plaintiffs Only)**

| **BARON & BUDD, P.C.** | **BARON & BUDD, P.C.** |
|---|---|
| 3102 Oak Lawn Avenue, Suite 1100 | 9465 Wilshire Blvd., Suite 460 |
| Dallas, TX 75219 | Beverly Hills, CA 90212 |
| Tel: (214) 521-3605 | Tel: (214) 860-0476 |
| Fax: (214) 520-1181 | Fax: (214) 860 0480 |
| **Attorneys for Plaintiffs** | **Attorneys for Plaintiffs** |

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2009, at Los Angeles, California.

Lucia M. Oyos

1

**PROOF OF SERVICE**

**SERVICE LIST**
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
**Los Angeles Superior Court Case No. BC 412 018**

| | |
|---|---|
| BECHERER, KANNETT & SCHWEITZER<br>2200 Powell Street, Suite 805<br>Emeryville, CA 94608<br>Tel: (510) 658-3600<br>Fax: (510) 658-1151 | JOHN K. BICE CO., INC. |
| LAW OFFICES OF GLASPY & GLASPY<br>100 Pringle Avenue, Suite 750<br>Walnut Creek, CA 94596<br>Tel: (925) 947-1300<br>Fax: (925) 947-1594 | FRASER'S BOILER SERVICE, INC.;<br>GARLOCK SEALING TECHNOLOGIES,<br>LLC |
| GORDON & REES, LLP<br>275 Battery Street, Suite 2000<br>San Francisco, CA 94111<br>Tel: (415) 986-5900<br>Fax: (415) 986-8054 | GOULDS PUMPS INCORPORATED;<br>INGERSOLL-RAND COMPANY |
| GRACE GENSON, COSGROVE & SCHIRM<br>444 South Flower Street, Suite 1100<br>Los Angeles, CA 90071-2912<br>Tel: (213) 533-5400<br>Fax: (213) 533-5444 | KELLY-MOORE PAINT COMPANY |
| HOWARD, ROME MARTIN & RIDLEY<br>1775 Woodside Road, Suite 200<br>Redwood City, CA 94061-3436<br>Tel: (650) 365-7715<br>Fax: (650) 364-5297 | IMO INDUSTRIES, INC. |
| JACKSON & WALLACE, LLP<br>14724 Ventura Blvd., Suite 410<br>Sherman Oaks, CA 91403<br>Tel:  (818) 379-4700<br>Fax: (818) 379-4702 | ZURN INDUSTRIES, INC. |
| JACKSON & WALLACE, LLP<br>55 San Francisco Street, 6th Street<br>San Francisco, CA 94133<br>Tel: (415) 982-6300<br>Fax: (415) 982-6700 | BUFFALO PUMPS, INC. |

2

**SERVICE LIST**

| | |
|---|---|
| 1 · K& L GATES LLP<br>10100 Santa Monica Blvd., 7th Floor<br>Los Angeles, CA 90067<br>Tel: (310) 552-5000<br>Fax (310) 552-5001 | CRANE CO. |
| LOMBARDI, LOPER & CONANT, LLP<br>1999 Harrison Street, Suite 2600<br>Oakland, CA 94612<br>Tel:  (510) 433-2600<br>Fax:  (510) 433-2699 | MECHANICAL DRIVES & BELTING |
| LOW, BALL & LYNCH<br>505 Montgomery Street, 7th Floor<br>San Francisco, CA 94111<br>Tel: (415) 981-6630<br>Fax: (415) 982-1634 | ARMSTRONG INTERNATIONAL, INC. |
| MCKENNA LONG & ALDRIDGE, LLP<br>444 South Flower Street, 8th Floor<br>Los Angeles, CA 90071-2901<br>Tel:  (213) 688-1000<br>Fax: (213) 243-6330 | METALCLAD INSULATION<br>CORPORATION ; UNION CARBIDE<br>CORPORATION |
| MORGAN LEWIS & BOCKIUS, LLP<br>300 South Grand Avenue, 22nd Floor<br>Los Angeles, CA 90071-3132<br>Tel: (213) 612-2500<br>Fax: (213) 612-2501 | YARWAY CORPORATION; GRINNELL,<br>LLC |
| POND NORTH LLP<br>350 S. Grand Avenue, Suite 2850<br>Los Angeles, CA 900781<br>Tel: (213) 617-6170<br>Fax: (213) 623-3594 | FMC CORPORATION |
| PRINDLE, DECKER & AMARO LLP<br>310 Golden Shore, 4th Floor<br>Long Beach, CA 90802<br>Tel:  (562) 436-3946<br>Fax: (562) 495-0564 | AMERICAN STANDARD, INC.; TRIPLE<br>A MACHINE SHOP, INC. |

3

**SERVICE LIST**

| | |
|---|---|
| SCHIFF HARDIN, LLP<br>One Market Plaza<br>Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>Tel: (415) 901-8700<br>Fax: (415) 901-8701 | **GEORGIA-PACIFIC, LLC** |
| SELMAN BREITMAN, LLP<br>11766 Wilshire Blvd., Sixth Floor<br>Los Angeles, CA 90025-6538<br>Tel: (310) 445-0800<br>Fax: (310) 473-2525 | **CLEAVER-BROOKS, INC.** |
| TUCKER ELLIS & WEST LLP<br>515 South Flower Street, 42nd Floor<br>Los Angeles, CA 90071<br>Tel: (213) 430-3400<br>Fax: (213) 430-3409 | **CARRIER CORPORATION** |
| WALSWORTH, FRANKLIN, BEVINS<br>One City Blvd. West, Fifth Floor<br>Orange, CA 92868<br>Tel: (714) 634-2522<br>Fax: (714) 634-0686 | **BONDEX INTERNATION, INC.;<br>DOWMAN PRODUCTS, INC.'<br>HAMILTON MATERIALS, INC.;<br>THOMAS DEE ENGINEERING CO.** |

4

**SERVICE LIST**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2009

FILED
CLERK'S OFFICE

1    JENNIFER JUDIN (State Bar No. 256973)
     jjudin@dehay.com
2    PAUL C. WHITE II (SBN 213900)
     pwhite@dehay.com
3    DEHAY & ELLISTON, L.L.P.
     800 West 6th Street, Suite 788
4    Los Angeles, CA   90017
     Telephone:  (213) 271-2727
5    Facsimile:  (213) 271-2730

6    Attorneys for Defendant
     LESLIE CONTROLS, INC.

7

8                 UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT

10

11                                    **CV09-03724 JSL** (MANx)

     ELLIS MICHAEL STATON AND       Case No. _____
12   SUSAN MARY STATON,

13                Plaintiffs,         Case No. BC412018 (Los Angeles
                                      County Superior Court)
14        v.

15   AMERICAN STANDARD, INC.,        **DEFENDANT LESLIE CONTROLS**
     individually and as successor-in-interest   **INC.'S CERTIFICATION OF**
16   to THE TRANE COMPANY;           **INTERESTED PARTIES**
     AURORA PUMP COMPANY;            [Pursuant to F.R.C.P. 7.1 and Local
17   ARMSTRONG INTERNATIONAL,        Rule 7.1]
     INC.; BUFFALO PUMPS, INC.;
18   CARRIER CORPORATION,
     individually and as successor-in-interest
19   to Elliott Company, successor-in-interest
     to Crocker-Wheeler Company;
20   CLEAVER-BROOKS, INC.,
     individually and f/k/a Aqua-Chem, Inc.;
21   CRANE CO., individually and as
     successor in interest to Chapman Valves;
22   DOWMAN PRODUCTS, INC.; FMC
     CORPORATION, individually, on
23   behalf of FRASER'S BOILER
     SERVICE, INC.; GARLOCK
24   SEALING TECHNOLOGIES, L.L.C.
     individually and as successor-in-interest
25   to Garlock, Inc.; GEORGIA-PACIFIC,
     LLC, f/k/a Georgia-pacific Corporation,
26   individually and as successor-in-interest
     to Bestwall Gypsum Company;
27   GOULDS PUMPS INCORPORATED;
     GRINNELL, L.L.C. (f/k/a Hamilton
28   Distributing, Inc.); IMO INDUSTRIES,

LESLIE/Staton

INC. (individually and as successor-in-interest to De Laval Turbine, Inc.); INGERSOLL-RAND COMPANY individually and as successor-in-interest to The Aldrich Company; ITT CORPORATION, f/k/a ITT INDUSTRIES, INC., individually, and as successor-in-interest to "BELL & GOSSETT" branded product and Grinnell Corporation; JOHN K. BICE CO., INC; JOHNSON CONTROLS, INC.; KAISER GYPSUM COMPANY, INC.; KELLY-MOORE PAINT COMPANY, INC.; LESLIE CONTROLS, INC.; MECHANICAL DRIVES & BELTING (f/k/a L.A. Rubber Company); METALCLAD INSULATION CORPORATION; PENTAIR, INC., individually and as successor-in-interest to Aurora Pump Company; RED-WHITE VALVE CORPORATION; SPENCE ENGINEERING COMPANY, INC.; SPIRAX SARCO, INC.; SPX CORPORATION, individually and as successor-in-interest to General Signal Corporation (successor-in-interest to Aurora Pump Company); THOMAS DEE ENGINEERING CO.; TRIPLE A MACHINE SHOP, INC. (a/k/a Triple A Shipyard); UNION CARBIDE CORPORATION; THE WILLIAM POWELL COMPANY; YARWAY CORPORATION; YORK INTERANTIONAL CORPORATION, individually and as successor-in-interest to Central Environmental Systems, Inc., f/k/a Borg-Warner Central Environmental Systems, Inc.; York-Luxaire, Inc.; Luxaire Inc.; and The C.A. Olsen Manufacturing Company and d/b/a "Moncrief Furnaces" d/b/a York Heating & Air Conditioning; ZURN INDUSTRIES, LLC., f/k/a Zurn Industries, Inc., a/k/a and successor-by-merger to Erie City Iron Works and d/b/a "Keystone" branded products; and DOES 1-300 inclusive,

Defendants.

LESLIE/Sutton

DEFENDANT LESLIE CONTROLS, INC.'S CERTIFICATION OF INTERESTED PARTIES

1       Pursuant to 7.1 of both the Federal Rules of Civil Procedure and the Local

2   Rules, the undersigned, counsel of record for Defendant Leslie Controls, Inc.,

3   certifies that the following are corporate parents, affiliates and/or subsidiaries of said

4   party, which are publicly held: Circor International.

5

6   DATED:  May 26, 2009           **DEHAY & ELLISTON, L.L.P.**

7                                   Jennifer Judin
                                Paul C. White II

8

9

10                   By: _____

11                                 Paul C. White II

12                                 Attorneys for Defendant
                            LESLIE CONTROLS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DEFENDANT LESLIE CONTROLS, INC.'S CERTIFICATION OF INTERESTED PARTIES

**PROOF OF SERVICE**
(Code Civ. Proc., §§ 1013A, 2015.5, 1011
Cal. Rules of Court, Rule 2008(e))
State of California, County of Los Angeles
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
**Los Angeles Superior Court Case No. BC 412 018**

I, the undersigned, declare:

I am a citizen of the United States and am employed in the County of Los Angeles, California. I am over the age of eighteen (18) years, not a party to the above-entitled action, and my business address is located at 800 West 6th Street, Suite 788, Los Angeles, California 90017.

On the date executed below, I served the document(s) described as:

**CERTIFICATION OF INTERESTED PARTIES**

on the interested parties in this action as follows:

[ ]   **BY PERSONAL DELIVERY:** I caused to be personally delivered a true copy in a sealed envelope addressed as indicated below.

[ ]   **BY OVERNIGHT DELIVERY:** I placed a true copy in a sealed, fully prepaid, UPS Next Day Air envelope addressed as indicated below. It is picked up by UPS on that same day in the ordinary course of business.

[ X ]   **BY FACSIMILE:** I personally sent a true copy to the person(s), counsel or interested party, authorized to accept service as set forth below at fax number **[SEE SERVICE LIST]** from fax number **(213) 271-2730.** The facsimile machine I used complied with CRC Rule 2003(3) and the transmission was reported as complete and without error. Pursuant to CRC Rule 2008(e) a transmission verification report was properly issued by the transmitting facsimile machine, stating the time and date of such transmission. **(All Defense Counsel)**

[ X ]   **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated below. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit. **(Plaintiffs Only)**

| **BARON & BUDD, P.C.** | **BARON & BUDD, P.C.** |
|---|---|
| 3102 Oak Lawn Avenue, Suite 1100 | 9465 Wilshire Blvd., Suite 460 |
| Dallas, TX 75219 | Beverly Hills, CA 90212 |
| Tel:  (214) 521-3605 | Tel:  (214) 860-0476 |
| Fax:  (214) 520-1181 | Fax:  (214) 860 0480 |
| **Attorneys for Plaintiffs** | **Attorneys for Plaintiffs** |

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2009, at Los Angeles, California.

Lucia M. Oyos

1

PROOF OF SERVICE

**SERVICE LIST**
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
**Los Angeles Superior Court Case No. BC 412 018**

| | |
|---|---|
| BECHERER, KANNETT & SCHWEITZER<br>2200 Powell Street, Suite 805<br>Emeryville, CA 94608<br>Tel: (510) 658-3600<br>Fax: (510) 658-1151 | **JOHN K. BICE CO., INC.** |
| LAW OFFICES OF GLASPY & GLASPY<br>100 Pringle Avenue, Suite 750<br>Walnut Creek, CA 94596<br>Tel: (925) 947-1300<br>Fax: (925) 947-1594 | **FRASER'S BOILER SERVICE, INC.;**<br>**GARLOCK SEALING TECHNOLOGIES,**<br>**LLC** |
| GORDON & REES, LLP<br>275 Battery Street, Suite 2000<br>San Francisco, CA 94111<br>Tel: (415) 986-5900<br>Fax: (415) 986-8054 | **GOULDS PUMPS INCORPORATED;**<br>**INGERSOLL-RAND COMPANY** |
| GRACE GENSON, COSGROVE & SCHIRM<br>444 South Flower Street, Suite 1100<br>Los Angeles, CA 90071-2912<br>Tel: (213) 533-5400<br>Fax: (213) 533-5444 | **KELLY-MOORE PAINT COMPANY** |
| HOWARD, ROME MARTIN & RIDLEY<br>1775 Woodside Road, Suite 200<br>Redwood City, CA 94061-3436<br>Tel: (650) 365-7715<br>Fax: (650) 364-5297 | **IMO INDUSTRIES, INC.** |
| JACKSON & WALLACE, LLP<br>14724 Ventura Blvd., Suite 410<br>Sherman Oaks, CA 91403<br>Tel: (818) 379-4700<br>Fax: (818) 379-4702 | **ZURN INDUSTRIES, INC.** |
| JACKSON & WALLACE, LLP<br>55 San Francisco Street, 6th Street<br>San Francisco, CA 94133<br>Tel: (415) 982-6300<br>Fax: (415) 982-6700 | **BUFFALO PUMPS, INC.** |

2

**SERVICE LIST**

| | |
|---|---|
| K& L GATES LLP<br>10100 Santa Monica Blvd., 7th Floor<br>Los Angeles, CA 90067<br>Tel: (310) 552-5000<br>Fax (310) 552-5001 | **CRANE CO.** |
| LOMBARDI, LOPER & CONANT, LLP<br>1999 Harrison Street, Suite 2600<br>Oakland, CA 94612<br>Tel:  (510) 433-2600<br>Fax:  (510) 433-2699 | **MECHANICAL DRIVES & BELTING** |
| LOW, BALL & LYNCH<br>505 Montgomery Street, 7th Floor<br>San Francisco, CA 94111<br>Tel: (415) 981-6630<br>Fax: (415) 982-1634 | **ARMSTRONG INTERNATIONAL, INC.** |
| MCKENNA LONG & ALDRIDGE, LLP<br>444 South Flower Street, 8th Floor<br>Los Angeles, CA 90071-2901<br>Tel:  (213) 688-1000<br>Fax: (213) 243-6330 | **METALCLAD INSULATION CORPORATION ; UNION CARBIDE CORPORATION** |
| MORGAN LEWIS & BOCKIUS, LLP<br>300 South Grand Avenue, 22nd Floor<br>Los Angeles, CA 90071-3132<br>Tel:  (213) 612-2500<br>Fax: (213) 612-2501 | **YARWAY CORPORATION; GRINNELL, LLC** |
| POND NORTH LLP<br>350 S. Grand Avenue, Suite 2850<br>Los Angeles, CA 900781<br>Tel:  (213) 617-6170<br>Fax: (213) 623-3594 | **FMC CORPORATION** |
| PRINDLE, DECKER & AMARO LLP<br>310 Golden Shore, 4th Floor<br>Long Beach, CA 90802<br>Tel:  (562) 436-3946<br>Fax: (562) 495-0564 | **AMERICAN STANDARD, INC.; TRIPLE A MACHINE SHOP, INC.** |

3

**SERVICE LIST**

| SCHIFF HARDIN, LLP<br>One Market Plaza<br>Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>Tel:  (415) 901-8700<br>Fax: (415) 901-8701 | **GEORGIA-PACIFIC, LLC** |
|---|---|
| SELMAN BREITMAN, LLP<br>11766 Wilshire Blvd., Sixth Floor<br>Los Angeles, CA 90025-6538<br>Tel:  (310) 445-0800<br>Fax: (310) 473-2525 | **CLEAVER-BROOKS, INC.** |
| TUCKER ELLIS & WEST LLP<br>515 South Flower Street, 42nd Floor<br>Los Angeles, CA 90071<br>Tel:  (213) 430-3400<br>Fax: (213) 430-3409 | **CARRIER CORPORATION** |
| WALSWORTH, FRANKLIN, BEVINS<br>One City Blvd. West, Fifth Floor<br>Orange, CA 92868<br>Tel: (714) 634-2522<br>Fax: (714) 634-0686 | **BONDEX INTERNATION, INC.;<br>DOWMAN PRODUCTS, INC.'<br>HAMILTON MATERIALS, INC.;<br>THOMAS DEE ENGINEERING CO.** |

4

**SERVICE LIST**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP - 8 2009

FILED
CLERK'S OFFICE

1  JENNIFER JUDIN (State Bar No. 256973)
   jjudin@dehay.com
2  PAUL C. WHITE II (SBN 213900)
   pwhite@dehay.com
3  DEHAY & ELLISTON, L.L.P.
   800 West 6th Street, Suite 788
4  Los Angeles, CA   90017
   Telephone:   (213) 271-2727
5  Facsimile:   (213) 271-2730

6  Attorneys for Defendant
   LESLIE CONTROLS, INC.

7

8          **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

9  IN RE: ASBESTOS PRODUCTS          )   MDL DOCKET NO. 875
   LIABILITY LITIGATION (No. VI)      )
10                                     )
                                       )   **PROOF OF SERVICE**
11 ELLIS MICHAEL STATON AND           )
   SUSAN MARY STATON,                 )
12                                     )
                                       )
13        v.                           )
                                       )
14 AMERICAN STANDARD, INC.,           )
   individually and as successor-in-interest )
15 to THE TRANE COMPANY; et al.       )
                                       )
16                                     )
                                       )
17

18                 **UNITED STATES DISTRICT COURT**

                   **CENTRAL DISTRICT OF CALIFORNIA**
19

20 ELLIS MICHAEL STATON AND          Case No. CV09-03724 R (VBKx)
21 SUSAN MARY STATON,
                                     Case No. BC412018 (Los Angeles
22        Plaintiffs,               County Superior Court)

23        v.                        **DEFENDANT LESLIE CONTROLS,**
                                    **INC.'S RESPONSE TO**
24 AMERICAN STANDARD, INC.,         **PLAINTIFFS' MOTION TO**
   individually and as successor-in-interest **VACATE CONDITIONAL**
25 to THE TRANE COMPANY; et al.,    **TRANSFER ORDER (CTO-324)**

26        Defendants.

27

28

LESLIE/Staton

**PROOF OF SERVICE**
**(Code Civ. Proc., §§ 1013A, 2015.5, 1011**
**Cal. Rules of Court, Rule 2008(e))**
**State of California, County of Los Angeles**
*Ellis Michael Staton, et al. v. American Standard, Inc., et al.*
**District Court Case No. CV09-3724 JSL (MANx)**
**Los Angeles Superior Court Case No. BC 412 018**

I, the undersigned, declare:

I am a citizen of the United States and am employed in the County of Los Angeles, California. I am over the age of eighteen (18) years, not a party to the above-entitled action, and my business address is located at 800 West 6th Street, Suite 788, Los Angeles, California 90017.

On the date executed below, I served the document(s) described as:

1. **DEFENDANT LESLIE CONTROLS, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-324)**

2. **DECLARATION OF PAUL C. WHITE IN SUPPORT OF LESLIE CONTROLS, INC.'S OPPOSITION to PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-324)**

on the interested parties in this action as follows:

**[ ]   BY PERSONAL DELIVERY:** I caused to be personally delivered a true copy in a sealed envelope addressed as indicated below. **(Plaintiffs Only)**

**[ ]   BY OVERNIGHT DELIVERY:** I placed a true copy in a sealed, fully prepaid, UPS Next Day Air envelope addressed as indicated below. It is picked up by UPS on that same day in the ordinary course of business.

**[ X ]   BY FACSIMILE:** I personally sent a true copy to the person(s), counsel or interested party, authorized to accept service as set forth below at fax number **[SEE SERVICE LIST]** from fax number **(213) 271-2730.** The facsimile machine I used complied with CRC Rule 2003(3) and the transmission was reported as complete and without error. Pursuant to CRC Rule 2008(e) a transmission verification report was properly issued by the transmitting facsimile machine, stating the time and date of such transmission. **(All Defense Counsel)**

**[ ]   BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated below. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on ~~May~~ Sept. 3 , 2009, at Los Angeles, California.

_____
Lucia M. Oyos

LESLIE/Staton

<u>SERVICE LIST</u>

Hon. Manuel L. Real, Courtroom No. 8

c/o Civil Intake at United States District Court

312 N. Spring Street

Los Angeles, CA 90012


Office of the Clerk

James R. Browning

United States Court of Appeals for the Ninth Circuit

95 Seventh Street

San Francisco, CA 94103-1526


Jeffery N. Lüthi

Clerk of the Panel

One Columbus Circle, NE

Thurgood Marshall Federal

Judiciary Building

Room G-255, North Lobby

Washington, D.C. 20002

Dennis M. Young

Foley & Mansfield, P.L.L.P.

1111 Broadway, 10th Floor

Oakland, CA 94607

(510)590-9500 (Phone)

(510)590-9595 (Fax)

**Counsel for Defendant(s): GARDNER DENVER NASH, LLC, THE WILLIAM**

**POWELL COMPANY**

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

2:09-3724


Michael H. Bailey

Baker, Keener & Nahra

633 West Fifth Street, Suite 5400

Los Angeles, CA  90071

(213) 241-0900 (Phone)

(213) 241-0990 (Fax)

*Counsel for Defendant(s): JOHNSON CONTROLS, INC., YORK INTERNATIONAL*

*CORPORATION*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

2:09-3724

4

Thomas J. LoSAVIO

Low, Ball & Lynch

505 Montgomery Street, 7th Floor

San Francisco, CA  94111

(415) 981-6630 (Phone)

(415) 982-1634 (Fax)

*Counsel for Defendant(s): ARMSTRONG INTERNATIONAL, INC.*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

2:09-3724


Joseph Duffy

Morgan, Lewis & Bockius, L.L.P.

300 South Grand Avenue, 22nd FLOOR

Los Angeles, CA  90071

(123) 612-2500 (Phone)

(213) 612-2501 (Fax)

*Counsel for Defendant(s): YARWAY CORPORATION, GRINNELL, L.L.C. (FKA*

*GRINNELL CORPORATION)*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

2:09-3724

David M. Glaspy

Law Offices of Glaspy & Glaspy, Inc.

One Walnut Creek Center

100 Pringle Avenue, Suite 750

Walnut Creek, CA 94596

(925) 947-1300 (Phone)

(925) 947-1594 (Fax)

*Counsel for Defendant(s): GARLOCK SEALING TECHNOLOGIES, L.L.C.*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
> 2:09-3724


Andy J. Goetz

Kenneth Prindle

Prindle, Decker & Amaro, L.L.P.

310 Golden Shore, Fourth Floor

Long Beach, CA 90801-5511

(562) 436-3946 (Phone)

(562) 495-0564 (Fax)

*Counsel for Defendant(s): AMERICAN STANDARD, INC. (TRANE / KEWANEE), ITT*

*CORPORATION, TRIPLE A MACHINE SHOP, INC.*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
> 2:09-3724

A. Scott Goldberg

Selman Breitman, L.L.P.

11766 Wilshire Blvd., Sixth Floor

Los Angeles, CA  90025

(310) 445-0800 (Phone)

(310) 473-2525 (Fax)

*Counsel for Defendant(s): AURORA PUMP COMPANY, CLEAVER-BROOKS, INC., SPX*

*CORPORATION*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
>
> 2:09-3724

Robert M. Hamblett

Hassard & Bonnington

Two Embarcadero Center, Suite 1800

San Francisco, CA  94111

(415) 288-9800 (Phone)

(415) 288-9802 (Fax)

*Counsel for Defendant(s): KAISER GYPSUM COMPANY, INC.*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
>
> 2:09-3724

7

Jura A. Hartley

Grace, Genson, Cosgrove & Schrim

444 South Flower Street, Suite 1100

Los Angeles, CA  90071

(213) 533-5400 (Phone)

(213) 533-5444 (Fax)

**Counsel for Defendant(s): *KELLY-MOORE PAINT COMPANY***

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

C.J. Manoli

Jackson & Wallace, L.L.P.

55 Francisco Street, Sixth Floor

San Francisco, CA  94133

(415) 982-6300 (Phone)

(415) 982-6700 (Fax)

**Counsel for Defendant(s): *BUFFALO PUMPS, INC.***

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

8

Jennifer Judin

DeHay & Elliston, L.L.P.

800 West 6th Street, Suite 788

Los Angeles, CA  90017

(213) 271-2727 (Phone)

(213) 271-2730 (Fax)

*Counsel for Defendant(s): LESLIE CONTROLS, INC.*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724


Mark S. Kannett

Becherer, Kannett & Schweitzer

Water Tower

1255 Powell Street

Emeryville, CA  94608

(510) 658-3600 (Phone)

(510) 658-1151 (Fax)

*Counsel for Defendant(s): JOHN K. BICE CO., INC.*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

Peter B. Langbord

Foley & Mansfield, P.L.L.P.

150 South Los Robles Avenue, Suite 400

Pasadena, CA 91101

(626) 744-9359 (Phone)

(626) 744-1702 (Fax)

*Counsel for Defendant(s): RED-WHITE VALVE COMPANY*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724


Timothy J. McCaffery

Lombardi, Loper & Conant, L.L.P.

Lake Merritt Plaza

1999 Harrison Street, Suite 2600

Oakland, CA 94612-3541

(510) 433-2600 (Phone)

(510) 433-2699 (Fax)

*Counsel for Defendant(s): MECHANICAL DRIVES & BELTING*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

10

Michael T. McCall

Walsworth, Franklin, Bevins & McCall, L.L.P.

One City Boulevard West, Fifth Floor

Orange, CA  92868

(714) 634-2522 (Phone)

(714) 634-0686 (Fax)

*Counsel for Defendant(s): DOWMAN PRODUCTS, INC, SPIRAX-SARCO, INC.,*

*BONDEX INTERNATIONAL, INC., HAMILTON MATERIALS, INC., THOMAS DEE*

*ENGINEERING CO.*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
>
> 2:09-3724


Brien F. McMahon

Perkins Coie, LLP

1620 26th Street

Sixth Floor, South Tower

Santa Monica, CA  90404

(310) 788-9900 (Phone)

(310) 843-1284 (Fax)

*Counsel for Defendant(s): GEORGIA-PACIFIC, LLC.*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
>
> 2:09-3724

11

Nathan T. Newman

Tucker, Ellis & West, L.L.P.

Forty Second Floor

515 South Flower Street

Los Angeles, CA  90071

(213) 430-3400 (Phone)

(213) 430-3409 (Fax)

*Counsel for Defendant(s): CARRIER CORPORATION*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724


Dennis Young

Foley & Mansfield P.L.L.P.

1111 Broadway, 10th Floor

Oakland, CA 94607

*Counsel for Defendant(s): GARNDER DENVER NASH, LLC, (, individually as successor-in-interest to the NASH ENGINEERING CO.)*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724


Michael J. Pietrykowski

Gordon & Rees, L.L.P.

Embarcadero Center West

Twentieth Floor

275 Battery Street

San Francisco, CA  94111

(415) 986-5900 (Phone)

(415) 986-8054 (Fax)

*Counsel for Defendant(s): GOULDS PUMPS INCORPORATED, INGERSOLL-RAND*

*COMPANY*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
>
> 2:09-3724

Frank D. Pond

Pond North, L.L.P.

350 South Grand Avenue, Suite 2850

Los Angeles, CA  90071

(213) 617-6170 (Phone)

(213) 623-3594 (Fax)

*Counsel for Defendant(s): FMC CORPORATION, FRASER'S BOILER SERVICE, INC.*

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.
>
> 2:09-3724

Henry D. Rome

Howard, Rome, Martin & Ridley, L.L.P.

1775 Woodside Road, Suite 200

Redwood City, CA  94061-3436

(650) 365-7715 (Phone)

(650) 364-5297 (Fax)

*Counsel for Defendant(s): IMO INDUSTRIES, INC.*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

2:09-3724


William J. Sayers

McKenna, Long & Aldridge, L.L.P.

8th Floor

444 South Flower Street

Los Angeles, CA  90071-2901

(213) 688-1000 (Phone)

(213) 243-6330 (Fax)

*Counsel for Defendant(s):, UNION CARBIDE CORPORATION*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

2:09-3724


Grant D. Stiefel

K&L Gates LLP

10100 Santa Monica Boulevard, Seventh Floor

Los Angeles, CA  90067

(310) 552-5000 (Phone)

14

(310) 552-5001 (Fax)

*Counsel for Defendant(s): CRANE CO.*

 Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

 2:09-3724

John R. Wallace

Jackson & Wallace, L.L.P.

55 Francisco Street, Sixth Floor

San Francisco, CA  94133

(415) 982-6300 (Phone)

(415) 982-6700 (Fax)

*Counsel for Defendant(s): ZURN INDUSTRIES, INC.*

 Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No.

 2:09-3724

Atwood & Morrill Co., Inc.

c/o Weir Valves & Controls USA, Inc., individually and as successor-in-interest to Atwood &

Morrill, Inc.

29 OLD RIGHT ROAD

IPSWICH , MA 01938-1119

*Service Agent for Defendant(s): Atwood & Morrill Co., Inc.*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

CLEAVER-BROOKS, INC. individually and f/k/a AQUA-CHEM, INC., d/b/a CLEAVER-BROOKS DIVISION (successor-in-interest to DAVIS ENGINEERING COMPANY)

A. Scott Goldberg

SELMAN BREITMAN LLP

11766 Wilshire Boulevard, Sixth Floor

Los Angeles, CA 90025

*Service Agent for Defendant(s):  CLEAVER-BROOKS, INC. individually and f/k/a AQUA-CHEM, INC., d/b/a CLEAVER-BROOKS DIVISION (successor-in-interest to DAVIS ENGINEERING COMPANY)*

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

Dresser-Rand Company, individually and as successor-in-interest to Terry Steam Turbine Company and the Whiton Machine Company

1200 West Sam Houston Pkwy. N.,

Houston, TX 77043

*Service Agent for Defendant(s): Dresser-Rand Company, individually and as successor-in-interest to Terry Steam Turbine Company and the Whiton Machine Company*

16

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

Ingersoll-Rand Company, individually and as successor-in-interest to Terry Steam Turbine Company and the Whiton Machine Company

Michael J. Pietrykowksi

Gordon & Rees LLP

275 Battery Street, Twentieth Floor

San Francisco, CA 94111

*Service Agent for Defendant(s):* Ingersoll-Rand Company, individually and as successor-in-interest to Terry Steam Turbine Company and the Whiton Machine Company

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

Weil Pump Company, Inc.

W57 N14363 Doerr Way,

Cedarburg, WI 53012

*Service Agent for Defendant(s):* Weil Pump Company, Inc.

Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

17

**PENTAIR, INC./ PENTAIR PUMP GROUP, INC.**

55 Wayzata Blvd.

Suite 800

Minneapolis, MN 55416

*Service Agent for Defendant(s):* **PENTAIR, INC./ PENTAIR PUMP GROUP, INC.**

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2;09-3724

**SPENCE ENGINEERING CO., INC.**

Corporate Trust System

111 Eighth Avenue

New York, NY 10011

*Service Agent for Defendant(s):* **SPENCE ENGINEERING CO., INC.**

> Ellis Michael Staton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724

18

Page 1 of 2

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                    MDL No. 875

## INVOLVED COUNSEL LIST (Excerpted from CTO-324)

Ellis Michael Stanton, et al. v. American Standard, Inc., et al., C.D. California, C.A. No. 2:09-3724
(Judge Manuel L. Real)

Peter G. Angelos
LAW OFFICES OF PETER G
ANGELOS PC
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

Michael H. Bailey
BAKER KEENER & NAHRA
Library Tower
633 W. 5th Street
Suite 5400
Los Angeles, CA 90071

David T. Biderman
PERKINS COIE LLP
1620 26th Street
6th Floor, South Tower
Santa Monica, CA 90404-4013

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Jed Borghei
BARON & BUDD PC
9465 Wilshire Boulevard
Suite 460
Beverly Hills, CA 90212

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

Denyse Clancy
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street
Suite 3000
Chicago, IL 60602-2415

Joseph Duffy
MORGAN LEWIS &
BOCKIUS LLP
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Jennifer Judin
DEHAY & ELLISTON LLP
800 West 6th Strret
Suite 788
Los Angeles, CA 90017

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue,
N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607

Paul R. Kiesel
KIESEL BOUCHER &
LARSON LLP
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910

Bo Kim
PERKINS COIE LLP
South Tower
1620 26th Street
6th Floor, South Tower
Santa Monica, CA 90404-4013

Gregory Kim
HASSARD BONNINGTON
444 South Flower Street
Suite 1700
Los Angeles, CA 90071

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074

## MDL No. 875 – Involved Counsel List (Excerpted from CTO-324) (Continued)

Roger B. Lane
LANE & GOSSETT
1601 Reynolds Street
Brunswick, GA 31520

Peter B. Langbord
FOLEY & MANSFIELD PLLP
150 South Los Robles Avenue
Suite 400
Pasedena, CA 91101

Thomas J. LoSavio
LOW BALL & LYNCH
505 Montgomery Street
7th Floor
San Francisco, CA 94111-2584

Lillian C. Ma
TUCKER ELLIS & WEST LLP
135 Main Street
Suite 700
San Francisco, CA 94105

William F. Mahoney
SEGAL MCCAMBRIDGE
SINGER & MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606

Craig R. Maki
SELMAN BREITMAN LLP
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025-6538

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street
28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

Nathan T. Newman
TUCKER ELLIS & WEST LLP
515 South Flower Street
42nd Floor
Los Angeles, CA 90017-2223

Farrah S. Nicol
MCKENNA LONG &
ALDRIDGE LLP
444 South Flower Street
8th Floor
Los Angeles, CA 90071-2901

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Frank D. Pond
POND NORTH LLP
350 South Grand Avenue
Suite 2850
Los Angeles, CA 90071

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Tricia A. Takagi
MORGAN LEWIS & BOCKIUS
Five Park Plaza
Suite 1750
Irvine, CA 92614

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS
KRUTZ & TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608