UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DUANE PREWETT and EILEEN PREWETT, husband and wife, | CASE NO. C09-0838 RSM |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION TO REMAND |
| v. | |
| GOULDS PUMPS (IPG), *et al.*, | |
| Defendants. | |

## I. INTRODUCTION

This matter comes before the Court on "Plaintiffs' Motion for Summary Judgment and Remand." (Dkt. #23). Plaintiffs brought product liability claims in state court arising from their exposure to asbestos related to equipment produced by Defendants. They assert both a claim for design defects and for failure to warn. Defendant Foster Wheeler removed this case to federal court through the federal officer removal statute. 28 U.S.C. § 1442(a)(1). Plaintiff argues that this case should be remanded to state court because Foster Wheeler has failed to provide evidence that it meets the requirements of the statute.

For the reasons set forth below, the Court construes "Plaintiffs' Motion for Summary Judgment and Remand" as a motion to remand and grants the motion, remanding the case to King County Superior Court for further proceedings.

ORDER
PAGE - 1

OFFICIAL FILE COPY   IMAGED OCT 5 2009

## II. DISCUSSION

### A. Background

Plaintiff Duane Prewett worked as a boiler maker who installed, maintained, and repaired equipment at numerous work sites from 1964 to 1990. During that employment he was exposed to asbestos contained in a variety of products and equipment. More specifically, Plaintiff was exposed to asbestos contained in equipment manufactured by Defendant Foster Wheeler when he worked at Lockheed Shipyard in Seattle, Washington from 1964-1967 and Todd Shipyard in Seattle, Washington in 1967. In 2008, Plaintiff was diagnosed with lung cancer and pancreatic cancer allegedly caused by his exposure. He filed suit in King County Superior Court against multiple defendants including Foster Wheeler.

Plaintiff's exposure to asbestos in Foster Wheeler's equipment occurred at least in part while he worked as a boiler maker aboard the USS Coronado and the USS Nashville, Navy ships. Foster Wheeler admits that it manufactured the steam generators, including boilers and economizers, aboard those ships, but asserts that the design of that equipment was controlled by the Navy and subject to Navy specifications at all times. Because Foster Wheeler manufactured the equipment in question as a private contractor for the Navy, Foster Wheeler removed the case to federal court based on the federal officer removal statute, which allows for removal when a person acting under a federal officer or agency is sued in state court for actions taken pursuant to a federal duty. *See* 28 U.S.C. § 1442(a)(1); *Mesa v. California*, 489 U.S. 121 (1989).

The question before the court is whether removal under 1442(a)(1) was proper in this case.

### B. How to Construe "Plaintiffs' Motion for Summary Judgment and Remand"

Plaintiffs have moved simultaneously for summary judgment and to remand. They contend that the issues are intertwined because § 1442(a)(1), as interpreted by the Supreme Court, requires that the defendant have a colorable federal defense, *see Mesa*, 489 U.S. 121, in this case the government contractor defense. *See Boyle v. United Technologies Corp.*, 487 U.S.

ORDER
PAGE - 2

500 (1988). Plaintiffs' argument at base is that Foster Wheeler has provided no evidence supporting its government contractor defense, and therefore this court should grant summary judgment for Plaintiffs as to that affirmative defense and remand the case to state court because without the defense there is no basis for removal under § 1442(a)(1).

Summary judgment is inappropriate at this stage for two reasons. First, it is axiomatic that a federal court should determine whether it has subject matter jurisdiction before deciding the merits of a case. If this court lacks jurisdiction, it cannot rule on a motion for summary judgment. Secondly, if there is federal subject matter jurisdiction in this case, summary judgment would be improper at this stage because the United States Judicial Panel on Multidistrict Litigation is considering transferring the case to the Eastern District of Pennsylvania, where it will join thousands of other asbestos cases.

Thus, the proper procedure is to first decide whether federal subject matter jurisdiction exists. If it does not, the case should be remanded to state court. If it does, the case should be transferred to the Eastern District of Pennsylvania if the Panel so decides.

**C. § 1442 and the Standard for Removal**

§ 1442, known as the federal officer removal statute, states that a civil action commenced in state court is removable when "any officer (or any person acting under that officer) of the United States or of any agency thereof, [is] sued . . . for any act under color of such office." 28 U.S.C. § 1442(a)(1). To remove under this statute, the removing party must (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense, and (3) demonstrate a causal nexus between plaintiffs' claims and the acts it performed under color of federal office. *Mesa*, 489 U.S. 121, 133-34; *Fung v. Abex Corp.*, 816 F. Supp. 569, 571-72 (N.D. Cal. 1992).

The history of the federal officer removal statute goes back to 1815 when a customs statute included a removal provision in order to provide a federal forum for federal customs officers enforcing a trade embargo with England during the war of 1812. As the trade embargo was extremely unpopular with New England States, the federal officers needed protection from hostile state courts. *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). Similar enactments

ORDER
PAGE - 3

were made to protect federal officers in the 1830s when South Carolina threatened to nullify federal tariff laws by prosecuting the federal agents who collected the tariffs. *Id.* More removal statutes were passed around the time of the civil war and eventually the current provision was passed in 1948 extending the statute to cover all federal officers. *Id.*

The purpose of the federal officer removal statute is to "provide a federal forum for cases where federal officials must raise defenses arising out of their official duties" and "have the validity of the defense of official immunity tried in a federal court." *Id.* at 405, 407. Fundamentally, the statute is based on the notion that the federal government cannot function if its officers can be sued in a (potentially hostile) state court for actions taken pursuant to a federal duty and within the scope of federal authority. *Id.* at 406; *see Tennessee v. Davis*, 100 U.S. 257, 263 (1880) (noting that if a federal officer can be arrested and brought to trial in state court for actions taken within the scope of federal authority, "the general government may at any time be arrested at the will of one of its members").

In light of the statute's long history and crucial purpose, the Supreme Court has repeatedly echoed that "[t]he federal officer removal statute is not 'narrow' or 'limited.'" *Willingham*, 395 U.S. at 406. It has mandated that the statute be "liberally construed to give full effect to the purposes for which [it was] enacted." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). Thus the requirements for removal, including the requirement that the removing party raise a "colorable defense" must not be given a "narrow, grudging interpretation." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 407); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). The Ninth Circuit has reiterated these principles in the context of a private contractor asbestos case. *Durham*, 445 F.3d at 1252.

Nevertheless, removal is not automatic. At core, "[f]ederal jurisdiction rests on a federal interest in the matter." *Willingham*, 395 U.S. at 406 (internal quotations omitted). It is important to realize that in the cases in which the Supreme Court has encouraged a broad reading of the statute and cautioned against a "narrow, grudging interpretation," there was no question that an important federal interest was at stake since all those cases involved federal

ORDER
PAGE - 4

1 officers. *Acker*, 527 U.S. 423 (federal judges); *Mannypenny*, 451 U.S. 232 (federal
2 immigration officer); *Willingham*, 395 U.S.402 (warden of a federal prison); *Colorado v.*
3 *Symes*, 286 U.S. 510 (federal prohibition agent). The situation of a private contractor asserting
4 a government contractor defense is different because the federal interest is not as obvious. *See*
5 *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 140-41 (D. Mass. 2009). For there to be
6 a federal interest in a private contractor, product liability case, the government must have been
7 sufficiently involved in the design of the defective feature or defective warnings so it can be
8 said that the contractor is acting "under the color" of his duties as an agent of a federal officer.
9 This is not to say that the removal standard is any greater for private agents of federal officers
10 than it is for true federal officers – it is not. *See Durham*, 445 F.3d at 1253 ("If the federal
11 government can't guarantee its agents access to a federal forum if they are sued or prosecuted,
12 it may have difficulty finding anyone willing to act on its behalf)." But where a private
13 company violates state law at its own discretion rather than at the government's discretion and
14 in accordance with federal duties, it cannot be said that there is a sufficient federal interest to
15 justify a federal forum even using the broadest of interpretations.

    **D. Design Defect Claims**

        **1.Colorable Defense**

18 First the court turns to Plaintiffs' design defect claims. Foster Wheeler asserts the
19 government contractor defense as its "colorable defense." The government contractor defense,
20 articulated in *Boyle v. United Technologies Corp.*, immunizes government contractors from
21 liability for state torts where the contractor's contractual duties to the government conflict with
22 its ability to abide by state law. The contractor must show (1) the United States approved
23 reasonably precise specifications; (2) the equipment conformed to those specifications; and (3)
24 the supplier warned the United States about the dangers in the use of the equipment that were
25 known to the supplier but not to the United States. *Boyle*, 487 U.S. at 512.

26 The central policy behind the government contractor defense is one of preemption. *Id.*
27 at 504-08. State law is displaced where "a significant conflict exists between an identifiable
28 federal policy or interest and the operation of state law." *Id.* at 507 (internal quotations

ORDER
PAGE - 5

omitted). Where the United States chooses a design for military equipment, it exercises a discretionary function, balancing "many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511. When a conflict arises between a private contractor's duties under state law and its adherence to government specifications determined through the exercise of its discretionary function, it will not do to allow "second-guessing" through tort suits against the contractor. *Id.*

The first two *Boyle* requirements, that the government approve reasonably precise specifications and that the equipment conform to those specifications, are designed to assure that the defense is only available when the United States is exercising its discretionary function. As the Supreme Court put it, "they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* at 512. Only where the United States exercises a discretionary function can there be a conflict between a federal interest, the Navy's interest in having the design it wants, and state law. The Ninth Circuit cogently summarized the government contractor defense:

> [S]tripped to its essentials, the military contractor's defense under *Boyle* is to claim 'The Government made me do it.' *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion.

*In re Hawaii Fed. Asbestos Cases*, 960 F.3d 806, 813 (9th Cir. 1992) (quoting *In re Joint E. and S. Dist. N.Y. Asbestos Litigation*, 897 F.2d 626, 632 (2nd Cir. 1990)).

Here, Plaintiff first argues that the government contractor defense is inapplicable because Foster Wheeler sold asbestos-containing equipment for commercial vessels that was similar to the equipment it manufactured for the Navy. Where the government merely buys "stock" products, or products that are identical in both the military and non-military context, the government is not making a discretionary decision and thus the government contractor defense is inapplicable. *Boyle*, 487 U.S. at 509; *Hawaii*, 960 F.2d at 811. However, in this case at the remand stage, evidence that Foster Wheeler may have sold some boiler equipment

ORDER
PAGE - 6

commercially is not enough to show that the Navy was merely buying "stock" boilers and exercising no discretion. *Cf. Hawaii*, 960 F.2d at 812 (defendant could not use military contractor defense where it primarily manufactured asbestos insulation for private industry and sold "very, very, little" to the Navy who merely bought the identical product sold to private parties).

      Plaintiff next argues that to prove "the Government made me do it" in an asbestos case, a contractor must show that the government specifically required the contractor to use asbestos in its products. As authority, Plaintiff cites to *Hawaii* which states that "[i]f the defendants could demonstrate . . . that the Government's specifications required asbestos in their products, and not just a certain level of performance, the military contractor defense might be available." *Hawaii*, 960 F.3d at 813. Certainly one way to show "reasonably precise specifications" is to prove that the United States required the defect, in this case asbestos, but it is not the only way. The key is that the government must make a discretionary decision to incorporate a specific design that is in conflict with state law. *Id.* Therefore, proof that the government was involved in the decision to use asbestos or proof that the government and the contractor engaged in a "continuous back and forth" review process regarding the defective feature will also suffice. *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 998 (7th Cir. 1996); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1154 (6th Cir. 1995); *see also Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 438 (5th Cir. 2000) ("reasonably precise" standard is satisfied as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective). On the other hand, mere approval or "rubber stamping" of a defective design is not enough. *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 585 (9th Cir. 1996). "When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." *Id.* (quoting *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989). Additionally, mere performance standards, as opposed to design specifications, do not constitute "reasonably precise specifications." *Hawaii*, 960 F.2d at 813 (specifications must require more than "just a certain level of performance"). Compliance with performance standards is not necessarily

ORDER
PAGE - 7

incompatible with state law, thus there is no conflict between state products liability and a contractor's duties under its government contract and no displacement of state law.

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

*Boyle* 487 U.S. at 509.

In its attempt to prove that the government approved reasonably precise specifications, Foster Wheeler submits the affidavit of Mr. Schroppe, a former president of Foster Wheeler Boiler Corporation who holds a degree in Marine Engineering and worked for Foster Wheeler for 37 years. He states that Foster Wheeler prepared design drawings for its equipment conforming to specifications set forth in "Ship Specs" and "Mil Specs," and the Navy approved these designs. However, there is no indication in the affidavit, nor has Foster Wheeler provided any documents asserting that these specifications required the use of asbestos. Nor is there evidence that the Navy substantively considered the use of asbestos and made a discretionary decision to approve it, putting contractual requirements in conflict with state law. Instead, Mr. Schroppe's affidavit merely states that Foster Wheeler was required to design its boilers and components in accordance with rigid performance requirements and that the equipment was subject to rigorous testing to ensure it met those requirements. Because Foster Wheeler has provided no evidence that compliance with the Navy's performance standards would necessarily conflict with its duty to make safe products, *Boyle*'s requirements are not met. As with the air-conditioner referenced in *Boyle*, state law is not preempted.

Foster Wheeler also submits the affidavit of Admiral Lehman, who has an extensive engineering background and experience. He states that he served as a Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard from 1942 to 1944 and as Ship

ORDER
PAGE - 8

Superintendent at the San Francisco Naval Shipyard from 1950 to 1952. According to the Admiral, based on his service in the Navy and "close contact" with the Navy during his periods of private employment, he is familiar with U.S. Navy specifications. He states that "[t]he U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings." In addition, "The Navy retained the 'final say' over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual." These statements are too vague to amount to a showing of reasonably precise specifications. That the Navy had the "final say" over its equipment does not indicate anything beyond mere rubber stamping. In the absence of any documents showing that the Navy specified the *design* not merely the *performance* of the defective feature, or any specific testimony to that effect by people with specific knowledge, Foster Wheeler cannot say that the "government made me do it."

At the removal stage, the federal defense need only be "colorable." *Mesa*, 489 U.S. 121. The defendant is not required to "win his case before he can have it removed." *Acker*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 407). But a defendant must put forward some evidence that the government had reasonably precise specifications creating a conflict between state law duties and contractual obligations. Evidence showing performance requirements, design requirements as to features other than the asbestos insulation, or general Navy control is not helpful where there is no evidence demonstrating a difficulty complying with Navy specifications and state products liability law at the same time. "Reasonably precise" is not based on the "sheer number of specifications," but whether the specifications demonstrate a discretionary decision conflicting with state law. *Holdren*, 614 F. Supp. 2d at 142-43. Since no evidence demonstrating a conflict was put forth in this case, Foster Wheeler's government contractor defense is not "colorable."

**2. Causal Nexus**

For removal there must also be a causal nexus between the plaintiff's claims and the acts the defendant performed under color of office. *Fung*, 816 F. Supp. 569 at 571-72 (citing

ORDER
PAGE - 9

*Mesa*, 489 U.S. at 124-25). In a government contractor case, however, this requirement is essentially the same as the colorable defense requirement. The defendant must show that the Government made a discretionary decision regarding product design that conflicted with state law, therefore *causing* the defendant to violate state law. For the same reasons that there is no colorable federal defense, there is also no causal nexus in this case.

### E. Failure to Warn Claims

To assert the government contractor defense to a failure to warn claim, the defendant must show (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about the dangers in the equipment's use that were known to the contractor but not to the government. *Oshkosh*, 96 F.3d at 1003-1004. These elements are simply the *Boyle* elements made applicable to warnings. As with design defect claims, the underlying crux of the defense is that the government must make a discretionary decision as to product warnings that significantly interferes with the contractor's ability to abide by state law, thus creating a conflict between a federal interest and a state law duty. *See Boyle*, 487 U.S. at 511-12. To meet this standard, a contractor can show that the government prohibited warnings in general, that it prohibited warnings as to the specific feature in question, that it dictated specific warnings, that there was a "back and forth" discussion between the contractor and the government with respect to the warnings, or make some other showing that the government made a discretionary decision that preempted state law. *Oshkosh*, 96 F.3d at 1003-1004 (noting that the government need not dictate or prohibit warnings to satisfy *Boyle*, but the government's involvement must go beyond "rubber stamping"); *Tate*, 55 F.3d at 1157 ("Government discretion is required, not dictation or prohibition of warnings."); *See N.Y. Asbestos Litigation*, 897 F.2d at 630 ("The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official.").

Foster Wheeler has provided no evidence that it ever attempted to warn, or that the Navy prohibited warnings. Instead, the affidavits merely show that the Navy "would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any

ORDER
PAGE - 10

asbestos hazards on their equipment." (Lehman Affidavit P 14). Statements to this effect are merely hypothetical in the absence of evidence that Foster Wheeler attempted to warn. The question is not what the Navy *would have* done if a contractor suggested warnings, but whether the Navy actually exercised its discretion in approving proposed warnings that conflicted with state law. *Tate*, 55 F.3d at 1157; *Hawaii* 960 F.2d at 812. Because Foster Wheeler did not suggest warnings to the government, it is impossible that "the design feature in question," in this case the warnings, "was considered by a government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512. Thus, Foster Wheeler's government contractor defense is not "colorable." Similarly, there is no "causal nexus" because Foster Wheeler was not acting under color of any federal duty when it failed to provide warnings. In short, the government was not sufficiently involved in the decision not to warn to have a "federal interest in the matter" needed to justify a federal forum. *Willingham*, 395 U.S. at 406.

### III. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiff's Motion to Remand (Dkt. #23) is GRANTED.

(2) This case is remanded to King County Superior Court for further proceedings.

(3) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 9th day of September, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE