JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 8 2009

FILED
CLERK'S OFFICE

**MDL** 8 7 5

UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI), | MDL NO.875 |
| | PLAINTIFF JACOB FISCHER'S MOTION AND MEMORANDUM TO VACATE CONDITIONAL TRANSFER ORDER |

## I.    INTRODUCTION

Jacob Fischer, the plaintiff in the case captioned *Jacob Fischer v. Saberhagen Holdings, Inc., et. al.,* United States District Court, Western District of Washington, No. C09-5385, moves the Panel to vacate Conditional Transfer Order No. 326.  Plaintiff has pending a motion for summary judgment and remand before the transferor court.  The local Judge, Robert S. Bryan issued an order allowing limited early discovery to explore issues related solely to jurisdiction.  That discovery is now complete and the motion is before Judge Bryan in the Western District of Washington at Tacoma.  It is noted for hearing without oral argument on November 13, 2009.  In light of the fact that the motion is pending before the transferor district court and will be resolved most likely in the next 60 days with an order of remand, the Panel should vacate the conditional transfer order.  MDL 875 need not be burdened with claims over which the court has no jurisdiction.

PLAINTIFF JACOB FISCHER'S MOTION AND
MEMORANDUM TO VACATE CONDITIONAL TRANSFER
ORDER - 1
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\fischerj_judicial panel-
motion_vacate_cto326.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

OFFICIAL FILE COPY

IMAGED OCT 8 ᵔ 2009

## II.    RELIEF REQUESTED

Plaintiff Jacob Fischer respectfully requests that the Court vacate Conditional Transfer Order ("CTO") 326 so that the United States District Court for the Western District of Washington, Hon. Robert Bryan, can rule on a pending motion for summary judgment and remand.  The Panel should vacate the CTO because there is a high likelihood that federal courts lack subject matter jurisdiction in this case; therefore, it would be a waste of judicial resources and time to transfer this case to MDL 875, which is already burdened with thousands of pending asbestos cases.

## III.    EVIDENCE RELIED UPON

Plaintiff has filed his motion in the United States District Court for the Western District of Washington, seeking summary judgment dismissal of Lockheed's federal contractor defense (the sole basis of alleged federal jurisdiction).    That motion, and the related supporting Declaration of Brian F. Ladenburg, are attached hereto as Exhibits A and B, respectively. Plaintiff relies on both of these exhibits, and on the records on file herein with the MDL panel in support of its motion to vacate.

## IV.    ARGUMENT

In a previous case against Owens-Corning Fiberglass Corporation, one of the defendants to asbestos actions, a U.S. District Court held:

> The purpose of the MDL Panel's referring of asbestos cases to Judge Weiner was not to make one Judge rule on the various difficult issues that might come up on different factual contexts; rather, cases are supposed to be referred to Judge Weiner for determination of issues common to asbestos litigation.  To force difficult and fact-sensitive jurisdictional issues from all types of cases onto one Court would impossibly overburden that Court and not serve the goal of efficiency that underlies the MDL Program.  Thus this Court refuses to defer on this motion to remand and elects to address the merits.

PLAINTIFF JACOB FISCHER'S MOTION AND
MEMORANDUM TO VACATE CONDITIONAL TRANSFER
ORDER - 2
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\united states judicial panel--
motion_vacate_cto326.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT − 8 2009

FILED
CLERK'S OFFICE

# UNITED STATES JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI), | MDL NO.875 |
| | DECLARATION OF SERVICE |

I, Diana Linde, declare and state as follows:

1.   I am and at all times herein was a citizen of the United States, a resident of King County, Washington, and am over the age of 18 years.

2.   On October 7, 2009, I caused to be served true and correct copies, of:

(1)   Plaintiff Jacob Fischer's Motion and Memorandum to Vacate Conditional Transfer Order; and

(2)   Declaration of Service. On the following:

Attached hereto as Exhibit A is a true and correct copy of a letter dated September 23, 2009 from Jakeia Mells to Brian F. Ladenburg regarding proper filing requirements. This attachment documents service above mentioned documents on all parties via United States Priority Mail.

I declare under penalty of perjury pursuant to the laws of the State of Washington that the foregoing is true and correct.

Dated at Seattle, Washington this 7th day of October, 2009.

BERGMAN DRAPER & FROCKT, PLLC

Diana Linde

RECEIVED
CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
2009 OCT − 8  A 8: 26

EXHIBIT A

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**CHAIRMAN:**
John G. Heyburn II
United States District Court
Western District of Kentucky

**MEMBERS:**
Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Kathryn H. Vratil
United States District Court
District of Kansas

David R. Hansen
United States Court of Appeals
Eighth Circuit

W. Royal Furgeson, Jr.
United States District Court
Northern District of Texas

Frank C. Damrell, Jr.
United States District Court
Eastern District of California

**DIRECT REPLY TO:**
Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax: [202] 502-2888
http://www.jpml.uscourts.gov

September 23, 2009

Brian F. Ladenburg, Esq.
BERGMAN DRAPER & FROCKT PLLC
614 First Avenue
4th Floor
Seattle, WA 98104

*[stamp: RECEIVED SEP 2 8 2009 BERGMAN DRAPER & FROCKT]*

Re: MDL No. 875 -- IN RE: Asbestos Products Liability Litigation (No. VI)

> Jacob Edward Fischer v. Saberhagen Holdings, Inc., et al., W.D. Washington, C.A. No. 3:09-5385
> (Judge Robert J. Bryan)

Motion and Brief Due on or before: **October 8, 2009**

Dear Mr. Ladenburg:

We have received and filed your Notice of Opposition to the proposed transfer of the referenced matter for coordinated or consolidated pretrial proceedings. In accordance with Rule 7.4(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435 (2001), the conditional transfer order is stayed until further order of the Panel. You must adhere to the following filing requirements:

1) **Your Motion and Brief to Vacate the Conditional Transfer Order must be received in the Panel office by the due date listed above. An ORIGINAL and FOUR copies of all pleadings, as well as a COMPUTER GENERATED DISK of the pleading in Adobe Acrobat (PDF) format, are currently required for filing. Fax transmission of your motion and brief will not be accepted.** *See* Panel Rule 5.12(d). **Counsel filing oppositions in more than one action are encouraged to consider filing a single motion and brief with an attached schedule of actions.**

2) **Papers must be served on the enclosed Involved Counsel List. Please attach a copy of this list to your certificate of service.** (Counsel who have subsequently made appearances in your action should be added to your certificate of service).

3) **Rule 5.3 corporate disclosure statements are due within 11 days of the filing of the motion to vacate.**

4) **Failure to file and serve the required motion and brief within the allotted 15 days will be considered a withdrawal of the opposition and the stay of the conditional transfer order will be lifted.**

- 2 -

Any recent official change in the status of a referenced matter should be brought to the attention of the clerk's office as soon as possible by facsimile at (202) 502-2888.  Your cooperation would be appreciated.

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

By *Jakeia Mells*

Jakeia Mells
Deputy Clerk

Enclosure

cc:     Involved Counsel List
        Transferee Judge:  Judge Eduardo C. Robreno
        Transferor Judge:  Judge Robert J. Bryan

JPML Form 37

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                                    MDL No. 875

## INVOLVED COUNSEL LIST (Excerpted from CTO-326)

Jacob Edward Fischer v. Saberhagen Holdings, Inc., et al., W.D. Washington, C.A. No. 3:09-5385
(Judge Robert J. Bryan)

Peter G. Angelos
LAW OFFICES OF PETER G ANGELOS PC
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

Walter E. Barton
KARR TUTTLE & CAMPBELL
1201 3rd Avenue
Suite 2900
Seattle, WA 98101-3028

Kevin C. Baumgardner
CORR CRONIN MICHELSON
BAUMGARDNER & PREECE
1001 4th Avenue
Suite 3900
Seattle, WA 98154-1051

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street
Suite 3000
Chicago, IL 60602-2415

David S. Frockt
LAW OFFICES OF MATTHEW BERGMAN
17530 Vashon Highway SW
P.O. Box 2010
Vashon, WA 98070

Richard G. Gawlowski
WILSON SMITH COCHRAN & DICKERSON
1215 4th Avenue
Suite 1700
Seattle, WA 98161-1007

Elizabeth Anne K. Hiller
KNOTT & GLAZIER
601 S. Figueroa Street
Suite 4200
Los Angeles, CA 90017

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607

**MDL No. 875 - Involved Counsel List (Excerpted from CTO-326) (Continued)**

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

Brian F. Ladenburg
BERGMAN & FROCKT
614 First Avenue
4th Floor
Seattle, WA 98104

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
ROGER B LANE PC
1601 Reynolds Street
Brunswick, GA 31520

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER &
MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street
28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Kenneth E. Petty
WILLIAMS KASTNER PLLC
601 Union Street
Suite 4100
P.O. Box 21926
Seattle, WA 98111

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mount Pleasant, SC 29464

Aaron P. Riensche
OGDEN MURPHY & WALLACE
1601 5th Avenue
Suite 2100
Seattle, WA 98101

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Timothy Kost Thorson
CARNEY BADLEY SPELLMAN
701 Fifth Avenue
Suite 3600
Seattle, WA 98104-7010

**MDL No. 875 - Involved Counsel List (Excerpted from CTO-326) (Continued)**

Sarah E. Tilstra
CORR CRONIN MICHELSON BAUMGARDNER & PREECE
1001 4th Avenue
Ste. 3900
Seattle, WA 98154-1051

Mark B. Tuvim
GORDON & REES
701 Fifth Ave.
2130
Seattle, WA 98104

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ & TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608

Brian Weinstein
SCHROETER GOLDMARK & BENDER
Central Building
810 Third Avenue
Suite 500
Seattle, WA 98104

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 8 2009

FILED
CLERK'S OFFICE

# Exhibit A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

2009 OCT - 8  A 8: 26

RECEIVED
CLERK'S OFFICE

1   *Viala v. Owens-Corning Fiberglas Corp.*, 1994 U.S. Dist. LEXIS 4824, at 4-5 (N.D. Cal.

2   Apr. 13, 1994).

3          As the Panel is aware, unless the conditional transfer order is vacated, asbestos personal

4   injury actions in Federal Court are automatically transferred to the Eastern District of

5   Pennsylvania for proceedings under the Rules of the Judicial Panel on Multidistrict Litigation for

6   MDL Docket No. 875.  However, like the Court in *Viala*, the transferor Court in the Western

7   District of Washington is in the best position to rule on the factual context specific issue involved

8   in the already briefed remand motion of whether Lockheed has met its burden to justify federal

9   officer removal.   Accordingly this Panel should vacate the Conditional Transfer Order

10  transferring this case to the U.S. District Court for the Eastern District of Pennsylvania (MDL

11  Docket No. 875).  Should Lockheed prevail in its motion, Lockheed could notify the Clerk of the

12  Panel that this remains a tag-along action, and seek issuance of another CTO at that time.

13         Plaintiff contends that the U.S. District Court for the Western District of Washington is

14  best suited to decided the Motion for Remand and that this case should remain in the Western

15  District of Washington until such time as the Motion has been resolved.   The principle of

16  allowing the transferor court to decide potentially dispositive motions before transfer to an MDL

17  transferee court has been upheld in prior decisions of this Court.  *In Re L.E. Lay & Co. Antitrust*

18  *Litigations*, 391 F.Supp. 1054 1056 (Jud. Pan. Multi. Lit. 1975) ("on principles of comity, we are

19  reluctant to transfer any action that has an important motion under submission with a court"); *In*

20  *Re Resource Explorations, In. Securities Litigation,* 483 F.Supp. 817, 822 (Jud. Pan. Multi. Lit.

21  1980), and cases cited therein ("we are persuaded, on principles of comity, to defer our decision

22  concerning transfer of the Pennsylvania action because of the pendency of the defendants'

23  motion for summary judgment, which is fully submitted to the potential transferor judge.").

PLAINTIFF JACOB FISCHER'S MOTION AND
MEMORANDUM TO VACATE CONDITIONAL TRANSFER
ORDER - 3
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\united states judicial panel--
motion_vacate_cto326.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    For these reasons, Plaintiff Jacob Fischer respectfully asks that the Panel vacate CTO 326

2    with respect to his case pending in the Western District of Washington.

3    RESPECTFULLY SUBMITTED this 7th day of October 2009.

4                                            BERGMAN DRAPER & FROCKT, PLLC

5

6

7                                            BRIAN F. LADENBURG, WSBA #29531
                                             Counsel for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

PLAINTIFF JACOB FISCHER'S MOTION AND
MEMORANDUM TO VACATE CONDITIONAL TRANSFER
ORDER - 4
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\united states judicial panel--
motion_vacate_cto326.doc

HONORABLE ROBERT J. BRYAN
*Hearing Date: Friday, November 13, 2009*
*Without Oral Argument*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACOB EDWARD FISCHER,

            Plaintiff,

    v.

SABERHAGEN HOLDINGS, INC., et al.,

            Defendants.

NO. C09-5385

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REMAND**

NOTE ON MOTION CALENDAR:
FRIDAY, NOVEMBER 13, 2009

## I.    RELIEF REQUESTED

This asbestos case was removed from Pierce County Superior Court by Defendant Lockheed Shipbuilding Company, ("Lockheed") and the only stated basis for federal jurisdiction is the government contractor's defense. Shortly after removal, Plaintiff sought and was granted leave to take early discovery limited to the issue of this defense. (DKT# 9). That discovery— consisting of a deposition of Lockheed and a deposition of Admiral Horne, Lockheed's Navy asbestos case "removal" expert—reveals that Lockheed lacks facts to support essential elements of this defense.

This is a motion for summary judgment to strike the government contractor defense, an affirmative defense, as well as a motion for remand. Given the utter absence of facts to support

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 1
s:\clients\fischer, jacob\fischerj_pleading\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1   its affirmative defense, much less Lockheed's complete inability to meet its burden of proof, as

2   shown below, the defense – the sole basis for this case being removed to Federal court – should

3   be dismissed pursuant to Fed. R. Civ. P. 56 and this case should then be remanded to King

4   County Superior Court in Washington for resolution.

5                    **II.    STATEMENT OF FACTS**

6        This is a totally unremarkable and routine asbestos case arising out of asbestos exposure

7   at Puget Sound Naval Shipyard in Bremerton, as well as at two civilian shipyards in Seattle:

8   Todd Shipyard, and Lockheed Shipbuilding Company.  Plaintiff Jacob Fischer worked as a civil

9   service employee for the Navy, including work during the 1960s that required him to inspect

10  ships being built or overhauled for the Navy at Lockheed's Seattle shipyard.  As a result of

11  exposure to asbestos at Lockheed and other jobsites, Mr. Fischer developed malignant

12  mesothelioma, a cancer of the lining of the lung for which there is no cure and which is

13  invariably fatal.

14       Plaintiff filed this lawsuit in Pierce County Superior Court on January 9, 2009, naming

15  Lockheed and other defendants.  Plaintiff's claims against Lockheed are limited to negligence

16  claims arising out of Lockheed's workplace safety and industrial hygiene practices, and

17  Lockeed's premises liability for mishandling asbestos products during construction and overhaul

18  of ships in its shipyard; no product liability claims are asserted against Lockheed.

19       Lockheed removed this case on June 26, 2009.  The sole basis of Lockheed's removal is

20  the federal contractor defense as codified at 28 U.S.C. §1442(a)(1).  Lockheed asserted no other

21  basis for removal.

22       Plaintiffs sought leave of Court to conduct early discovery in this case, prior to

23  preparation of the FRCP 26 joint status report and discovery plan.  Plaintiffs requested leave to

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 2
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    conduct two depositions, both limited to issues addressing the federal contractor's defense that

2    Lockheed had asserted as the basis for federal jurisdiction.  The first deposition was of Admiral

3    Horne, who had filed an affidavit in support of Lockheed's removal concerning Naval

4    specifications.  The second deposition was a Fed. R. Civ. P. 30(b)(6) deposition of Lockheed

5    itself, to address a number of topics that go to the heart of the federal contractor's defense.

6          The Court granted Plaintiff's request by order dated July 24, 2009.  (Dkt. # 9).   Plaintiff

7    counsel deposed Admiral Horne in Seattle on August 5, 2009.   Plaintiff counsel deposed

8    Lockheed's Fed. R. Civ. P. 30(b)(6) corporate representative, Peter Balch, on August 11, 2009.

9          Admiral Horne's testified that he has been retained in approximately 200 asbestos cases

10   across the country in the past couple of years.  (Ladenburg Decl., Ex. A, at 10:6-21).   He has

11   never been retained by a Plaintiff in that litigation.  *Id.*, at 11:19-12:2.  The declaration he filed in

12   this case was "taken principally from previous declarations [he] has done," in other cases, and

13   edited.  *Id.*, at 19:13-16.  On August 5, when his deposition was taken, he could not recall the

14   process of editing the declaration he filed in this case:

15        Q      In this case did you have that sort of back and forth between yourself and
                the attorney for Lockheed where you took a draft, made some edits and
16              some changes, sent it back, had a back and forth like that?

17        A      I don't remember that.   It could have been.   I have done a lot of
                declarations and affidavits since this one, even in June, probably two or
18              three dozen, so I don't really recall the process in this particular one.

19   *Id.*, at 21: 6-15.

20         Whatever Admiral Horne did to edit the declaration, he did not edit it to account for facts

21   particular to this case.   Admiral Horne testified that he drafted and signed the declaration

22   submitted in support of Lockheed's removal of this case *before he was sent any materials by*

23   *Lockheed counsel specific to this case.*   Indeed, the nature of the "cookie cutter" removal

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 3
s:\clients\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1   declaration industry that Admiral Horne is engaged in is made apparent by Admiral Horne's

2   description of how the declaration was prepared in this case:

3       Q.   Okay.  In addition, there are other documents that you brought with you
             today that are not exhibits to your declaration, right?

4

5       A.   These are things that were sent to me by Mr. Andre just recently.

    Q.   Okay.  And I guess that was part of my next question was going to be
6           whether you can tell me, did the materials that Mr. Andre sent you that are
             specific to this case, the complaint filed by the plaintiff and the answers to
7           the interrogatories that are in your materials there, were those sent to you
             before or after you drafted this declaration?

8

9       A.   They were sent to me after, I believe.  I don't recall what went on before
             the declaration, but this pile was sent to me after.

10      Q.   Okay.  Let me ask you this:  Before you drafted your declaration, did you
             know what Jacob Fischer did in his career?

11

12      A.   I knew-- well, if you read the declaration, it's sort of generic to the Navy,
             involvement with specifications and what have you.  I did not have a full
13          understanding of what his job was, no.

14      Q.   Okay.  Did you have any understanding of what he did before you drafted
             the declaration?

15      A.   No.   The declaration was mostly what was the Navy's role in
             specifications and contracts.

16

17      Q.   Okay.  Did you have an understanding of the years that are involved with
             respect to Mr. Fischer and the claims he was making against Lockheed in
18          particular before you drafted this declaration?

19      A.   I think we did.  I think I had at the time because we were-- I think that
             was-- somewhere in there, I believe, that was discussed, either discussed
20          by phone or something, but I don't recall that right now.

21      Q.   Can you tell me, as you sit here today, what it was that you did understand
             about this case, you know, specific facts of this case, at the time you
22          drafted the declaration that you signed on June 26th?

23      A.   I understood it was an individual who worked at Lockheed in one manner
             or another, and that it involved Navy ships and Navy contracts and that
             that's what the declaration covered.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 4
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

Q.    Fair enough.  And did you have an understanding, at the time you drafted this declaration, for example, what Navy ships were involved?

A.    What ships were involved?  No.

Q.    Did you have an understanding whether or not this case involved an employee of Lockheed as opposed to a contractor or somebody working for the Navy?

A.    I didn't have-- I understood that the-- I think I thought at the time that it was an employee at Lockheed, but I wasn't sure.  I guess I assumed that. The concern was whether or not it involved—from my standpoint, what were the requirements for Navy ships as far as specifications, and what role did the Navy play as far as warnings were concerned, things of that nature. I've done a large number of these kinds of declarations, and it follows that path.

*Id.*, at 25:21-28:8.

Admiral Horne was not able to identify or point to any naval directive or contract provision from the Navy to Lockheed that dealt with industrial hygiene or workplace safety.  *Id.*, at 45:24-49:17.  Notwithstanding a filibuster and an attempt to dodge the question by changing the subject that lasted almost 8 pages of his deposition transcript, Admiral Horne was not able to identify any instance where Lockheed sought to engage in industrial hygiene preventative practices with respect to asbestos but the Navy turned them down.  *Id.*, at 45:18-53:25.  Finally, Admiral Horne was unable to identify anything Lockheed did in the areas of personal safety and industrial hygiene on its civilian ships that the Navy prevented Lockheed from doing on Navy ships in the area of asbestos safety.  *Id.,* at 62:12-64:17.

Lockheed's Fed. R. Civ. P. 30(b)(6) deposition took place in Philadelphia, Pennsylvania on August 11, 2009.   Lockheed produced Peter Balch, an in-house attorney who had formerly worked at Lockheed Shipbuilding Company in Seattle until Lockheed shut the shipyard down in the late 1980s.  He is presently the General Counsel for Lockheed Martin Maritime Systems &

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 5
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

Sensors, Inc.  He was the sole designee that Lockheed put forward to answer the questions contained in Plaintiff's Fed. R. Civ. P. 30(b)(6) notice.  Those topics included the following:

1.  The identity of any and all Naval vessels that Lockheed contends Mr. Jacob Fischer worked aboard during his employment with the United States Navy at Lockheed Shipyard between 1961-1971.

2.  Identification of any and all federal officers that Lockheed contends issued directives to Lockheed that form the basis of any "government contractor's" defense as articulated in Boyle v. United Technologies Corp., 487 U.S. 500 (1988) and its progeny, or otherwise under 28 U.S.C. §1442(a)(1).

3.  Identification of any and all written specifications, instructions, rules, directives, contracts, or other written material, if any, that Lockheed contends constitute or constitutes a government contractor defense to the claim or claims made in Plaintiff's complaint.

4.  Specific factual bases for any assertion by Lockheed of the Boyle government contractor's defense, to the extent that such factual bases are not already covered by topics 1-3 above.

5.  Identification of all conflicts, if any, Lockheed contends arise between its obligations pursuant to government contracts and/or the direction of federal officers and its duties under Washington tort law owed to Plaintiff Jacob Fischer in this case.

6.  Identification of any and all evidence in Lockheed's possession that Lockheed contends supports the proposition that Lockheed's work, or the work of any Lockheed subcontractors, conformed to reasonably precise government specifications.

7.  Identification of each and every warning Lockheed or its corporate predecessors issued to the United States federal government concerning the hazards associated with asbestos given by the date Mr. Jacob Fischer last worked on a vessel at Lockheed Shipyard (upon information and belief, believed to be approximately 1971).

8.  Identification of all correspondence or communication between Lockheed and the U.S. Navy that documents Lockheed's deviation from its standard practices with respect to workplace safety and industrial hygiene specifically to comply with Naval specifications, contracts, or directives at Lockheed Shipyard.

9.  Identification of all industrial hygiene and workplace safety practices that Lockheed Shipyard employed in its civilian shipbuilding, but that Lockheed was contemporaneously prevented from deploying while building Naval vessels because of directives, contracts, or specifications from the U.S. Navy.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 6
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

10. Identification of any communications documenting the U.S. Navy's stance with respect to whether Lockheed Shipbuilding could warn its employees, contractors, subcontractors, and business invitees with respect to the hazards associated with exposure to asbestos dusts on U.S. Naval vessels constructed, repaired, or overhauled at Lockheed.

11. Lockheed's workplace safety and industrial hygiene duties under the Walsh-Healy Act, and Lockheed's record in terms of compliance with that statute and its related regulations dealing with the management of hazardous dusts, including asbestos.

12. Identification of all state law tort duties owed with respect to asbestos that Lockheed claims it did not comply with because of directives of the United States Navy via contract, specification, work order, or other communication from the Navy.

Ladenburg Decl., Ex. G.

Mr. Balch testified that he had reviewed and produced approximately one banker's box of documents at his deposition that constituted material responsive to the above 12 topics. That banker's box of material included contracts with the navy to build ships, specifications about materials to be used, correspondence, and other records from the relevant time period. Nonetheless, Mr. Balch conceded that he was not aware of an instance in those documents where the Navy told Lockheed *how* to handle asbestos materials it may have been dealing with in the building of its ships: "Based on my review, I do not recall any specific instructions in those specifications as to how asbestos or materials containing asbestos are to be installed or used. I do recall seeing in those documents materials that are to be incorporated in the ship that contained asbestos." Ladenburg Dec., Ex. G., at 30:12-19; 32:8-24. He did not know and could not testify whether Naval inspectors did process inspections while workers were handling asbestos materials at Lockheed. *Id.*, at 33:15-36:14. Mr. Balch was asked point blank to identify any conflicts between Lockheed's duties under federal contracts and its duties under state tort law to protect workers and invitees from the hazards of asbestos. He could identify none. *Id.*,, at

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 7
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    36:17-39:5;  39:19-25.   He could identify no workplace safety directives from the Navy to

2    Lockheed.  *Id.,* at 46:24-47:17.  He could identify no industrial hygiene directives from the Navy

3    to Lockheed.  *Id.,* at 47:19-48:20.  Finally, Mr. Balch could not identify anything that Lockheed

4    did in the areas of workplace safety and industrial hygiene, specifically including asbestos use,

5    different for Navy vessels as opposed to civilian vessels.  *Id.,* at 49:9-51:12.

6         Mr. Balch gave other testimony on topics related to the defense.  He was unable, for

7    example, to cite any evidence that Lockheed warned the Navy of the hazards of asbestos

8    exposure prior to 1971.  *Id.,*  at 54:21-55:11.  Mr. Balch could point to no evidence, written or

9    otherwise, documenting an instance where Lockheed deviated from its standard workplace safety

10   and industrial hygiene protocols specifically to comply with Naval regulations or directives.  *Id.,*

11   56:17-57:6;  57:20-58:10.  Finally, he could identify no communications between the Navy and

12   Lockheed that purported to prohibit or prevent Lockheed from warning its invitees or employees

13   with respect to the hazards associated with asbestos exposure.  *Id.,* at 58:14-59:12.

14                          **III.    STATEMENT OF ISSUES**

15        1.      Should defendant Lockheed's "government contractor defense," an affirmative

16                defense, be dismissed pursuant to Fed. R. Civ. P. 56 when Lockheed cannot

17                produce evidence to satisfy the elements of the defense?

18        2.      Should this case be remanded to state court for lack of jurisdiction?

19                          **IV.    EVIDENCE RELIED UPON**

20   Plaintiff relies upon the Notice of Removal submitted by Lockheed (including the Declaration of

21   Admiral Horne in support thereof), as well as the Declaration of Brian F. Ladenburg submitted

22   herewith.

23   *///*

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 8
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

## V.   LEGAL ARGUMENT AND AUTHORITY

A.   <u>Legal Standard and Burden of Proof</u>.

In *Celotex v. Catrett Corp.*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the United States Supreme Court clarified the standard for summary judgment in a case where a party (like Lockheed here) has no evidence to support an essential element of a claim on which that party bears the burden of proof at trial. The Court explained: "Rule 56(c) mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-323. In such a situation there can be no "genuine issue of material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled" to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Id.*

In this case, Lockheed has removed on the sole basis of "federal officer removal." To justify removal, a defendant must (1) demonstrate that it acted under a federal officer; (2) raise a colorable federal defense to the plaintiff's claims; and (3) demonstrate a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office. *Fung v. Abex Corp.*, 816 F.Supp. 569, 571-72 (N.D.Cal.1992) (*citing Mesa v. California*, 489 U.S. 121, 134-135, 109 S.Ct. 959 (1989)). When the defendant is an actual federal officer, the federal officer removal statute, 28 U.S.C. 1442(a)(1), is construed more broadly than most removal statutes. *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 431, 119 S.Ct. 2069 (1999) (regarding suit against two federal judges). When, as here, the defendant is not itself a federal officer, but is

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 9
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1  merely claiming to be "acting under" a federal officer, the standard narrow interpretation of

2  removal statute applies. *Holdren v. Buffalo Pumps, et al.,* 2009 WL 1220639, 6 (D. Mass. May

3  4, 2009).

4      With respect to the second removal factor, Lockheed's claimed "colorable federal

5  defense" is the "government contractor" defense set forth by the Supreme Court in *Boyle v.*

6  *United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).   The

7  government contractor's defense is an affirmative defense and it is Lockheed's burden to

8  establish it. *Snell v. Gell Helicopter Textron, Inc.,* 107 F.3d. 744, 749 (9th Cir. 1997); *see also*

9  *McKay v. Rockwell Int'l Corp.,* 704 F.2d 444, 453 (9th Cir. 1983).  Should Lockheed be unable

10  to come forward with evidence to support the elements of its defense in response to this

11  summary judgment motion, the defense must be dismissed per *Celotex, supra.*  If the defense is

12  dismissed, Lockheed will then have no purported "colorable federal defense" upon which to base

13  its removal and remand will be proper.

14  B.   Lockheed has Failed to Meet its Burden to Establish the "Government Contractor"

15  Defense Regarding Plaintiffs' Design Defect Claims.

16      As a threshold matter, it is worth noting that federal officer defense, in the context of

17  asbestos cases, is traditionally a defense to a product liability claim brought against either

18  asbestos insulation or equipment manufacturers whose products were placed aboard Naval

19  vessels, thereby exposing sailors or shipyard workers who maintained the vessels during

20  overhauls.  Almost all published authorities dealing with this defense in asbestos cases are

21  product liability cases.

22      This case, however, is different:  Lockheed is (apparently) asserting that the Navy

23  directed Lockheed to breach statutory and regulatory state law tort duties, and common law

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 10
s:\clients\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    premises liability duties, owed to workers in the shipyard.  While there is nothing *per se* wrong

2    with Lockheed making such an assertion in the abstract, the link Lockheed seeks to make

3    between its conduct and directives from federal officers is more remote and attenuated than in

4    product liability cases.  Here, Lockheed's workplace safety and industrial hygiene practices are

5    at issue.  Plaintiff will present evidence that they were negligent practices; Lockheed will dispute

6    that.  But at the end of the day, for Lockheed to prevail on its government contractor's defense,

7    Lockheed will have to show how its practices (even if negligent under state tort law), were

8    engaged in at the behest of the Navy.  In other words, the specifications, directives, or other

9    commands from the Navy that Lockheed must establish to come forth with a colorable defense

10   must be specifications not for what Lockheed built (i.e., a product), but for *how Lockheed built*

11   *it*.  Lockheed's processes, practices, customs, and procedures are at issue; not the products

12   Lockheed produced under federal contracts.  And while the record in what is now very mature

13   asbestos litigation is replete with naval specifications that specify that asbestos be used in

14   conjunction with products placed on Naval vessels, Plaintiff suspects that Lockheed will have a

15   hard time indeed coming forward with evidence that the Navy specified how Lockheed was to

16   manage the industrial hygiene or workplace safety practices at its shipyard.  To be certain, no

17   such specifications have been identified so far in this case.

18          Perhaps because Lockheed's assertion of this defense as a "premises defendant" in

19   asbestos litigation is novel, the authorities Lockheed points to in its removal papers arise

20   exclusively out of product liability claims.  In *Boyle,* for example, the Supreme Court

21   enumerated a three-step analysis of when the government contractor defense displaces a

22   plaintiff's state tort law product liability claim:

> [S]tate law which imposes liability for design defects in military equipment is
> displaced where (1) the United States approved reasonably precise specifications; (2)

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 11
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    the equipment conformed to those specifications; and (3) the supplier warned the
2    United States about dangers in the use of the equipment known to the supplier but not
     to the United States." 487 U.S. at 512.

3    The Supreme Court made clear that while the procurement of equipment by the United States is

4    an area of uniquely federal interest, it does *not* end the inquiry.   "That merely establishes a

5    necessary, not a sufficient, condition for the displacement of state law.  Displacement will occur

6    only where... a 'significant conflict' exists between an identifiable 'federal policy or interest and

7    the [operation] of state law,' or the application of state law would 'frustrate specific objectives of

8    federal legislation.'"  *Id.* at 507 (citations omitted).  Stated another way, "If there is no conflict, if

9    both federal policy and state law can be satisfied at the same time, the contractor may not assert

10   the defense."  *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187, 198 (D. Mass. 2008).

11   The Supreme Court has held unequivocally that in order for a "significant conflict" to exist

12   between federal interest and state law, the government specifications must specifically require

13   the *design feature* that conflicted with state law and gave rise to the injury:

14       Here the state-imposed duty of care that is the asserted basis of the contractor's
         liability (specifically, the duty to equip helicopters with the sort of escape-hatch
15       mechanism petitioner claims was necessary) is precisely contrary to the duty imposed
         by the Government contract (the duty to manufacture and deliver helicopters with the
16       sort of escape-hatch mechanism shown by the specifications).  Even in this sort of
         situation, it would be unreasonable to say that there is always a "significant conflict"
17       between the state law and a federal policy or interest.  If, for example, a federal
         procurement officer orders, by model number, a quantity of stock helicopters that
18       happen to be equipped with escape hatches opening outward, it is impossible to say
         that the Government has a significant interest in that particular feature.  That would
19       be scarcely more reasonable than saying that a private individual who orders such a
         craft by model number cannot sue for the manufacturer's negligence because he got
20       precisely what he ordered.

21   *Boyle,* 487 U.S. at 2517.  Hence, in order to avail it-self of this defense, Lockheed must

22   establish that the Navy explicitly specified how Lockheed was to handle and use asbestos in

23   its shipyard, and that the use of asbestos in the manner Lockheed used it was considered and

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 12
s:\clients\f\fischer, jacob\fischer\_pleadings\fischer\_pld\_plaintiff motion for partial summary judgment &
remand\_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1   approved by a Government officer and not merely unilaterally implemented by the contractor

2   (Lockheed) itself.  The Ninth Circuit makes clear, at least in a product liability scenario, that

3   this is a defendant's obligation.  *See In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th

4   Cir. 1992), holding: " [I]f the defendants could demonstrate... that the Government's

5   specifications required asbestos in their products, and not just a certain level of performance,

6   the military contractor defense **might** be available."  *Id.* at 813 (emphasis added).  Lockheed

7   has not and cannot make this showing.  It has presented *no* evidence, either in the form of

8   specifications, contracts or any other document, to establish that the Navy required

9   Lockheed, for example, to expose its workers to unreasonable levels of asbestos dust during

10  the construction or overhaul of Naval vessels.  Lockheed has presented no evidence that the

11  Navy prohibited workers building Navy ships from using respirators.  Lockheed has no

12  evidence that the Navy prevented Lockheed from taking air samples.  Lockheed has no

13  evidence that the Navy prevented Lockheed from requiring visitors on its ships from wearing

14  protective clothing, or requiring that the protective clothing be removed after leaving the

15  vessel.  Indeed, Lockheed can only meets its legal burden by coming forward with bad

16  factual admissions.  The "Navy made me do it" defense requires, at a minimum, that

17  Lockheed come forward and admit that it "did it," and identify what the "it" is.  At this point,

18  Lockheed has not done that.

19      Moreover, Lockheed's industrial hygiene and workplace safety practices when building

20  Naval vessels did not differ from its practices when building civilian vessels.  Thus, Lockheed

21  cannot avail itself of "The Navy made me do it" defense because Lockheed did what it did

22  whether working on a Naval vessel or not.  The purpose behind the Supreme Court's creation of

23  the government contractor defense was to insulate the *government itself* from indirect liability.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 13
s:\clients\\fischer, jacob\\fischerj_pleadings\\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    "The imposition of liability on Government contractors will directly affect the terms of

2    Government contracts: either the contractor will decline to manufacture the *design specified* by

3    the Government, or it will raise its price. Either way the interests of the United States will be

4    directly affected." *Boyle,* 487 U.S. at 507 (emphasis added). Here Lockheed manufactured its

5    vessels for the Navy in the same way it manufactured its products for commercial purchasers.

6    As a result, it cannot be held liable for any "design specified by the Government" and the

7    concerns the Supreme Court expressed are not implicated. Accordingly, pursuant to *Boyle,*

8    Lockheed simply cannot avail itself to the military contractor defense.

9            In the product liability context, the Ninth Circuit does not allow use of the military

10   contractor defense when the contractor sells the same products to the military as it does to

11   commercial users. *See In re Hawaii Federal Asbestos Cases,* 960 F.2d at 811. There, the issue

12   addressed was whether the trial court erred in not allowing the manufacturers of asbestos

13   containing insulation supplied to both the military and private commercial customers to assert

14   the military contractor defense. Evidence was presented that the defendants' insulation, while

15   used on board Navy vessels, was also sold on the ordinary commercial market. In such an

16   instance, the Ninth Circuit stated that the military contractor defense does not apply: "[T]he fact

17   that a company supplies goods to the military does not, in and of itself, immunize it from liability

18   from the injuries caused by those goods. **Where the goods ordered by the military are those**

19   **readily available, *in substantial form,* to commercial users, the military contractor defense**

20   **does not apply.**" *Id*; *See also Neilsen v. George Diamond Vogel Paint Co.* 892 F.2d 1450 (9th

21   Cir.1990) (rejecting military contractor defense asserted by paint manufacturer who extensively

22   supplied paint to Army Corp. of Engineers).

23

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 14
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    The Ninth and Second Circuits are in agreement that the military contractor defense *only*

2    arises if the government made the procurement in direct conflict with the contractor's ability to

3    safely make its product:  "'[s]tripped to its essentials, the military contractor defense under *Boyle*

4    is to claim, 'The government made me do it.'"  *In re Hawaii Federal Asbestos Cases*, 960 F.2d at

5    813, *citing In re Joint Eastern and Southern District New York Asbestos Litigation,* 897 F.2d

6    626, 632 (2d Cir.1990).  "*Boyle* displaces state law only when the Government in making a

7    discretionary, safety-related military procurement decision contrary to the requirements of state

8    law, incorporates this decision into a military contractor's obligations which thereby *limits the*

9    *contractor's ability to accommodate safety in a different fashion.*"  *Id.* (emphasis added).  As

10   Lockheed manufactured ships for private companies in the exact same manner (by unreasonably

11   exposing workers to asbestos fibers) as the ships it made for the Navy, it cannot claim that the

12   Government made it act dangerously.

13   Simply put, to be shielded from state liability, Lockheed must establish that the

14   government made it poison its own workers.  There is no evidence whatsoever that the military

15   demanded that Lockheed expose its workers to asbestos.  Accordingly, Lockheed cannot meet its

16   burden to establish the government contractor's affirmative defense.

17   To the extent that Lockheed is attempting to claim that it could not have warned shipyard

18   workers on Naval vessels about the hazards of working with and around asbestos, Lockheed is

19   fighting an uphill battle because even if such evidence did exist factually, it would almost

20   certainly be insufficient.  Absent a letter from the Navy forbidding Lockheed from placing

21   warnings in the shipyard for some (unspecified) military reason, Lockheed cannot meet its

22   burden here.  Indeed, every circuit court to address the application of the *Boyle* factors in failure-

23   to-warn cases has concluded that the government contractor defense is *only* available when the

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 15
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1   contractor's warning conforms to one that the government approved, if not dictated. *See*

2   *Kerstetter,* 210 F.3d at 438, (*citing In re Air Disaster at Ramstein Air Base,* 81 F.3d 570 (5th Cir.

3   1996)); *Tate v. Boeing Helicopters,* 55 F.3d 1150, 1156-1157 (6th Cir. 1995), "[s]imply because

4   the government exercises discretion in approving a design does not mean that the government

5   considered the appropriate warnings, if any, that should accompany the product."); *Oliver v.*

6   *Oshkosh Truck Corp.,* 96 F.3d 992, 1003 (7th Cir. 1996); *In re Hawaii Federal Asbestos Cases,*

7   960 F.2d at 813; *In re Joint Eastern and Southern District New York Asbestos Litigation,* 897

8   F.2d at 632.

9        The consensus among circuit courts should come as no surprise, as the fundamental tenet

10   underlying *Boyle* is that state law should not be preempted when the state law duty sought to be

11   imposed on a contractor is not contrary to a duty assumed under a government contract. *Boyle,*

12   487 U.S. at 508-09. Moreover, in District Courts throughout the country, cases have been

13   consistently remanded to the state court based on the inability of removing defendants to make

14   this showing. Attached as Exhibit C, to the Ladenburg Declaration is the recent decision

15   *Holdren, et.al. v. Buffalo Pumps, Inc., et. al.* (D. Mass. May 4, 2009) which addressed this issue

16   on a motion substantially similar to the one at hand, including a declaration from Mr. Horne. *See*

17   *also,* Ladenburg Decl., Exs. D, E, and F (orders granting remand in other Western District of

18   Washington asbestos cases in 2009 by Judges Lasnik and Martinez, respectfully). There is no

19   evidence that Lockheed was complying with government specifications when it neglected to

20   place an asbestos warning in its shipyards or otherwise protect those on its premises from

21   asbestos dust. There was no conflict between Lockheed's federal and state responsibilities; it

22   could have easily complied with both its federal contractual duties to the Navy and its state law

23   duties to its works and those present in its shipyard to warn of the dangers inherent in the

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 16
s:\clients\f\fischer, jacob\f\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1  asbestos used with its products, to test and monitor asbestos levels in the air, to provide

2  respirators and other personal protective equipment, to segregate areas of the ship where asbestos

3  was being used from other areas by negative pressure enclosures, etc.. Consequently, there is no

4  basis for Lockheed's assertion that it is protected by the government contractor defense.

5      Finally, there is simply no evidence presented that an officer had direct and detailed

6  control over Lockheed.  Visibly absent are any excerpts from the contracts that it had with the

7  Navy to demonstrate that it was acting under the direction of a federal officer when it exposed

8  workers and visitors at its shipyards to toxic asbestos dust.  As such, proof of the necessary direct

9  and detailed official control over the acts for which Lockheed is now being sued, is lacking.

10  Again, the Navy may have told Lockheed what to build (and on this record, we don't even have

11  proof that the Navy required asbestos on any ship that Jacob Fischer worked aboard), but the

12  Navy did not tell Lockheed how to build it in a way that required exposure and prevented

13  reasonable precautions.

14      As Lockheed has not made the requisite showing, this Court should grant summary

15  judgment to Plaintiffs and dismiss Lockheed's affirmative defense:  the federal contractor

16  defense.  Once summary judgment is granted, Lockheed will have no "colorable federal defense"

17  and the Plaintiffs will have shown that removal was improper and that this Court should remand

18  this action to the King County Superior Court.

19  **VI.    LOCKHEED CANNOT REMOVE THIS ACTION FOR FEDERAL OFFICER
         JURISDICTION AS THE PLAINTIFFS HAVE EXPLICITLY WAIVED**

20  **ANY CLAIM THAT WOULD IMPLICATE FEDERAL OFFICER JURISDICTION**

21      Lockheed asserts federal officer jurisdiction under 28 U.S.C. §1442, subdivision (a), as

22  the exclusive basis for subject matter jurisdiction.  Lockheed generally contends (albeit without

23  supporting evidence) that the actions for which it is being sued were directed and compelled by

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 17
s:\clients\f\fischer, jacob\fischer\_pleadings\fischer\_pld\_plaintiff motion for partial summary judgment &
remand\_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    the United States Navy.   In their complaint, however, Plaintiffs expressly and specifically

2    disclaimed:

3              [A]ny and all claims for injury against any defendant whose conduct, whether by
               omission or commission, was engaged in at the behest of the United States or any
4              agency or person acting under him or under color of such office to the extent such
               a claim would implicated federal court jurisdiction under the federal officer
5              removal statute, 28 U.S.C §1442(a)(1), predicated on the government contractor's
               defense articulated in Boyle v. United Technologies Corp., 487 U.S. 500 (1988).
6              See Notice of Removal exhb. 1, Compl. 3:21-4:3.

7    In other words, Plaintiffs are specifically not suing Defendant, and waive any claim against

8    it, for anything that a federal officer or agency may have compelled Defendant to do.

9              Federal courts have frequently given effect to such disclaimers.  As the court explained in

10   Westbrook v. Asbestos Defendants (BHC), "[p]laintiff's claims against defendant Todd Shipyards

11   Corp., exclude plaintiff's asbestos exposure at military and federal government jobs sites . . . the

12   court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of

13   work done on federal job sites in vessels.  This waiver, therefore, justifies remand."  2001 WL

14   902642 (N.D. Cal. July 31, 2001) (emphasis added).  See also Overly v. Raybestos-Manhattan,

15   Inc., 1996 WL 532150, 3 (N.D. Cal. Sept. 9, 1996).  In Sheppard v. Northrop Grumman Systems

16   Corp., 2007 WL 1550992 (E.D. La., May 24, 2007) the Court explained that "its decision to

17   follow plaintiffs' disclaimer is further supported by the fact that, unlike the plaintiffs in Overly

18   and Westbrook who disclaimed causes of action post-removal, plaintiff here disclaimed these

19   causes of action in his original petition in state court."  Id. at 7.  Attached as Exhibit I to the

20   Pepple Declaration is a copy of a remand order from the Western District of Washington giving

21   effect to the Plaintiff's disclaimer of claims that implicate federal officer jurisdiction based on the

22   government contractor defense.  See also, Pepple Decl. ¶9, Ex. H.  Most recently, a California

23   District Court cited Westbrook in upholding a Plaintiff's disclaimer.  Debrocke v. Allis-Chalmers

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 18
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    *Corp. Product Liability Trust*, 2009 WL 1464153 (N.D.Cal. May 26, 2009) ("Plaintiffs have

2    expressly disclaimed and waived any claim arising out of or related to any asbestos exposure

3    aboard federal jobsites and navy vessels. The Court sees no reason not to hold Plaintiffs to this

4    waiver").

5          When presented with motions for remand, courts have repeatedly recognized that a

6    plaintiff may disclaim recovery for any exposures that raise potential federal question issues, and

7    thereby preserve state court jurisdiction. "The party who brings suit is master to decide what law

8    he will rely upon." *Willy v. Coastal Corp.*, 855 F.2d 1160, 1167 (5th Cir. 1988). Disclaimers to

9    preclude removal are specifically authorized because "the plaintiff has the prerogative of

10   determining the theory of his action and . . . may defeat removal to the federal courts by avoiding

11   allegations which provide a basis for the assertion of federal jurisdiction." *Jones v. General Tire*

12   *& Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976).  Indeed, "[t]he fact that a plaintiff could have

13   alleged viable federal claims is of no moment."  It is the plaintiff's choice to sue or not sue on

14   any particular cause of action and a person cannot be forced to bring suit.  Invalidating the

15   Plaintiffs' disclaimer in this case would be forcing the Plaintiffs' to bring suit.

16         It is true that under *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 119 S.Ct. 2069 (1999),

17   federal question jurisdiction depends upon the nature of the defense, not the nature of the claim.

18   However, by the terms of the disclaimer, Plaintiffs have "disclaimed all claims for injury against

19   any defendant whose conduct… would implicated federal court jurisdiction under the federal

20   officer removal statute".  Whether a defendant's conduct meets that criteria is a question of fact.

21   It makes no difference whether or not it is the nature of the Plaintiffs' claim or the Defendant's

22   defense that implicates that question of fact.  Either way, the Defendant's actions either factually

23   satisfy the elements of the government contractor's defense or they do not.  If so, the relevant

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 19
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1   claim does not exist.  Plaintiffs have affirmatively given up all right to recover for any harm done

2   to them by the Defendants when that harm was the result of actions that satisfy the requirements

3   of the government contractor's defense.  Yet Lockheed is trying to insert claims based upon

4   those actions into the Plaintiffs' complaint in order to remove.  Lockheed cannot remove based

5   on a defense to a claim that does not exist.

6         Furthermore, disclaimers of this type do not prejudice defendants in any way.  As stated

7   in *Caldwell v. Am. Home Prods. Corp.*, 210 F.Supp.2d 809, 812 (S.D. Miss. 2002), "By electing

8   to disclaim all federal claims, plaintiffs will be precluded from trying [them] in the state court…

9   but that does not prevent plaintiff from being entitled to remand."  If Lockheed believes that any

10  of the claims in the complaint inherently involve federal officer jurisdiction through the

11  government contractor's defense, then the proper procedural action for it to take would be to file

12  a motion to dismiss those claims in King County Superior Court.  The fact that Lockheed would

13  rather attempt to insert more claims into the Plaintiffs' complaint and remove the case to federal

14  court, than allow the matter to come to a resolution in state court demonstrates the true purpose

15  behind Lockheed's removal:   to succeed in transferring this matter to the MDL and thereby

16  indefinitely delay its resolution.

17                              **VII.   CONCLUSION**

18        The fatal flaw in Lockheed's attempt to remove this standard state court action is its

19  blatant lack of evidence to support any of the three elements of federal officer removal.  As a

20  combined summary judgment and remand motion, this brief has primarily pointed out how

21  completely Lockheed has failed to support its claim that the government contractor defense is a

22  colorable defense in this action.  That alone is sufficient to justify summary judgment on that

23  defense and remand to state court.  However, the same flaw that applies to the "colorable federal

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 20
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1  defense element" of federal officer removal also applies to the other two elements.  Lockheed

2  also has no evidence that it acted under a federal officer in the areas for which it has been sued

3  (industrial hygiene and workplace safety).  Lockheed has presented no evidence to demonstrate a

4  causal nexus between the Plaintiffs' claims and any acts Lockheed performed under the color of

5  office.  Lockheed must also provide some evidence to demonstrate those two elements if it

6  wishes to justify its removal.  In reality, however, this attempted removal is not based upon any

7  facts.

8       Lockheed knows full well that its lack of any evidence to support its claim that it is

9  protected by the government contractor's defense would prevent it from successfully utilizing

10  that defense at trial.  However, that is irrelevant to Lockheed because Lockheed is not attempting

11  to remove this case in order to try it in federal court.  Its goal is simply to delay the resolution of

12  this matter in order to place a higher burden on the plaintiffs who are bringing this case.  In

13  federal court, all asbestos cases are sent to the MDL in Eastern Pennsylvania that indefinitely

14  delays the resolution of the case.  "[I]n federal court [plaintiffs] will encounter significant delay

15  upon their transfer through the panel on multi district litigation to the Eastern District of

16  Pennsylvania where no asbestos trials or discovery takes place in deference to global settlement

17  efforts.  This delay is of economic benefit to the defendants and imposes costs on the plaintiffs."

18  *In re Maine Asbestos Cases*, 44 F.Supp.2d 368, 374 (D.Me 1999).  Lockheed's goal in removing

19  this case has nothing to do with any belief that the government contractor's defense will hold up,

20  it is simply out of a desire to delay the matter as long as possible.  Meanwhile, Mr. Fischer's

21  health continues to deteriorate and his death becomes more imminent by the day.

22       Plaintiffs respectfully request that this Court grant this motion for summary judgment

23  remand the case to state court pursuant to 28 U.S.C. § 1447(c).

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 21
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1

2    RESPECTFULLY SUBMITTED this 7th day of October 2009.

3                              BERGMAN DRAPER & FROCKT, PLLC

4

5                              _____
                               BRIAN F. LADENBURG, WSBA #29531
6                              Counsel for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND REMAND - 22
s:\clients\f\fischer, jacob\fischerj_pleadings\fischerj_pld_plaintiff motion for partial summary judgment &
remand_us district court.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

# Exhibit B

HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACOB EDWARD FISCHER,

          Plaintiff,

    v.

SABERHAGEN HOLDINGS, INC., et al.;

        Defendants.

NO.  C09-5385

DECLARATION OF BRIAN F. LADENBURG IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REMAND

I, BRIAN F. LADENBURG, declare and state as follows:

1.    I am one of the attorneys representing plaintiffs in the above-captioned case.  I make this statement based on personal knowledge.

2.    Attached as Exhibit A is a true and correct copy of the Deposition Transcript of Roger B. Horne taken August 5, 2009 in Seattle, Washington in the above-captioned case.

3.    Attached as Exhibit B is a true and correct copy of the Deposition Transcript of Peter D. Balch taken August 11, 2009 in Philadelphia, Pennsylvania in the above-captioned case.

DECLARATION OF VANESSA FIRNHABER-BAKER IN
SUPPORT OF PLAINTIFF'S MOTION TO SEEK LEAVE OF
COURT TO CONDUCT LIMITED DEPOSITIONS PRIOR TO
HOLDING A FRCP 26(F) CONFERENCE.- 1
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\fischerj_pld_plaintiff's motion for partial summary
judgment and remand_dec bfl.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

4. Attached as Exhibit C is a true and correct copy of Memorandum and Order Re: Motion to Remand in *Holdren v. Buffalo Pumps, Inc.; United States District Court, District of Massachusetts;* Civil Action No. 08cv10570-NG.

5. Attached as Exhibit D is a true and correct copy of Order of Remand in *Libsack v. Saberhagen Holdings, Inc., et al.; United States District Court; Western District of Washington at Seattle*; No. C09-0870RSL.

6. Attached as Exhibit E is a true and correct copy of Order of Remand in *Yost v. Saberhagen Holdings, Inc., et al.; United States District Court; Western District of Washington at Seattle*; No. C09-0759RSL.

7. Attached as Exhibit F is a true and correct copy of Order Granting Plaintiffs' Motion to Remand in *Prewett v. Saberhagen Holdings, Inc., et al.; United States District Court; Western District of Washington at Seattle*; No. C09-0838RSL.

8. Attached as Exhibit G is a true and correct copy of Notice of Videotaped 30(b)(6) Deposition of Lockheed Shipbuilding Company in the above captioned case.

9. Attached as Exhibit H is a true and correct copy of Notice of Videotaped Deposition and Subpoena Duces Tecum to Admiral Roger B. Horne in the above captioned case.

## I DECLARE UNDER PENALTY OF PERJURY THE TRUTH

## OF THE FOREGOING STATEMENT.

DECLARATION OF VANESSA FIRNHABER-BAKER IN
SUPPORT OF PLAINTIFF'S MOTION TO SEEK LEAVE OF
COURT TO CONDUCT LIMITED DEPOSITIONS PRIOR TO
HOLDING A FRCP 26(F) CONFERENCE.- 2
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\fischerj_pld_plaintiff's motion for partial summary
judgment and remand_dec bfl.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1    Dated at Seattle, Washington this ___ day of October, 2009.

2                        BERGMAN DRAPER & FROCKT, PLLC

3

4                        BRIAN F. LADENBURG

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF VANESSA FIRNHABER-BAKER IN
SUPPORT OF PLAINTIFF'S MOTION TO SEEK LEAVE OF
COURT TO CONDUCT LIMITED DEPOSITIONS PRIOR TO
HOLDING A FRCP 26(F) CONFERENCE.- 3
s:\clients\f\fischer, jacob\fischerj_pleadings_us district court\fischerj_pld_plaintiff's motion for partial summary
judgment and remand_dec bfl.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

# Exhibit A

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

JACOB EDWARD FISCHER,                    )
                                         )
                 Plaintiff,              )
                                         )
        vs.                              ) No. C09-5385
                                         )
SABERHAGEN HOLDINGS, INC., et al.,       )
                                         )
                 Defendants.             )
                                         )
                                         )

VIDEOTAPED DEPOSITION OF ROGER B. HORNE

August 5, 2009

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square      2208 North 30th Street, Suite 202
600 University St.    Tacoma, WA 98403
Suite 2300            (253) 627-6401
Seattle, WA 98101     (253) 383-4884 Fax
(206) 340-1316        scheduling@byersanderson.com
(800) 649-2034        www.byersanderson.com

Serving Washington's Legal Community Since 1980

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

## Page 2

```
1        APPEARANCES
2   For the Plaintiff:
3        Brian F. Ladenburg
         Bergman & Frockt
4        614 First Avenue
         Fourth Floor
5        Seattle, WA  98104-2233
         206.957.9510
6        206.957.9549 Fax
         Brian@bergmanlegal.com
7
8   For Defendant Lockheed:
9        Robert G. Andre
         Ogden Murphy Wallace
10       1601 Fifth Avenue
         Suite 2100
11       Seattle, WA  98101-1686
         206.447.7000
12       206.447.0215 Fax
         Randre@omwlaw.com
13
14  For Defendant Todd Shipyards:
15       Walter E. Barton
         Karr Tuttle Campbell
16       1201 Third Avenue
         Suite 2900
17       Seattle, WA  98101
         206.223.1313
18       206.682.7100 Fax
         Gbarton@karrtuttle.com
19
20  For Defendant Saberhagen Holdings:
21       Timothy K. Thorson
         Carney Badley Spellman
22       700 Fifth Avenue
         Suite 5800
23       Seattle, WA 98104-5017
         206.622.8020
24       206.467.8215 Fax
         thorson@carneylaw.com
25
```

## Page 3

```
1   APPEARANCES (CONTINUED)
2
3   For Defendant IR and ACL:
4        Kevin J. Craig
         Gordon & Rees
5        701 Fifth Avenue
         Suite 2130
6        Seattle, WA  98104
         206.695.5118
7        206.689.2822 Fax
         Kcraig@gordonrees.com
8
9
10
         Also present:  Lindsay Fulmer, videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1               EXAMINATION INDEX
2   EXAMINATION BY:                    PAGE NO.
3   MR. LADENBURG                          5
4   MR. BARTON                        92
5   MR. LADENBURG                     104
6
7                EXHIBIT INDEX
8   EXHIBIT NO.    DESCRIPTION          PAGE NO.
9
10  Exhibit No. 1   2-page notice of videotaped     14
                    deposition and subpoena duces
11                  tecum to Admiral Roger B.
                    Horne.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1            BE IT REMEMBERED that on Wednesday,
2   August 5, 2009, at 1601 Fifth Avenue, Suite 2100,
3   Seattle, Washington, at 11:12 a.m., before TERI LYNN
4   PRITCHARD, CCR, RPR, CRR, Notary Public in and for
5   the State of Washington, appeared ROGER B. HORNE, the
6   witness herein;
7            WHEREUPON, the following
8   proceedings were had, to wit:
9
10            <<<<<< >>>>>>
11
12            VIDEOGRAPHER:  We are on the
13  record.  This is the beginning of Tape No. 1 in the
14  deposition of Admiral Roger B. Horne.
15       The time is approximately 11:12.
16       Will the court reporter please swear in the
17  witness.
18
19  ROGER B. HORNE,        having been first duly sworn
20                by the Notary, deposed and
21                testified as follows:
22
23            EXAMINATION
24  BY MR. LADENBURG:
25  Q  Good morning, sir.  Would you please state your full
```

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 6

1    name for the record.
2  A  Roger B. Horne, Jr.
3  Q  I understand you are a retired admiral with the
4    United States Navy?
5  A  That's correct.
6  Q  In conjunction with some paperwork we had filed in
7    this case earlier, I was provided with what I think
8    is your curriculum vitae, and you had, before we
9    started today, given me basically a stack of
10    documents that I believe represents the global
11    universe of materials that you've reviewed in
12    conjunction with this case; is that correct?
13  A  That's correct.
14  Q  Okay.  And among the items in there is your current
15    curriculum vitae?
16  A  I believe it's in there, yeah.
17  Q  And is that up to date, sir?
18      What's the date of the last revision for that?
19  A  I'm pretty sure that's up to date, yes.
20  Q  And just by way of background, I wanted to get some
21    information with respect to your career since you
22    left the Navy, which wasn't totally clear to me.
23      First of all, what year did you leave the Navy?
24  A  1991.
25  Q  Okay.  So since 1991, what is it you've done?

Page 7

1      Have you been fully retired or do you engage in
2    other activities?
3  A  No.  I went to work for Exponent Failure Analysis
4    Associates.  They're an engineering firm down in
5    California, and I worked with them for about eight
6    years, I guess, eight or nine years.
7  Q  And what did you do for that firm?
8  A  I headed up their marine and aviation section.
9      Then I retired from there, and I've been doing
10    some consulting work since then, been on a couple
11    nonprofit-- nonpaying boards, and then I'm on one
12    board.  I do receive pay.
13  Q  Let's go one by one.
14      You are there for eight or nine years, so that
15    takes up to the year 2000, approximately?
16  A  Say that again.
17  Q  That takes us up to about the year 2000 when you left
18    Failure--
19  A  Analysis, yeah, I think that's about right.
20      It could have been, you know-- could have been
21    another year.
22      It's right-- real close.
23  Q  Somewhere around that time?
24  A  Somewhere around that time, yeah.
25  Q  Okay.  And when you were there, you said you headed

Page 8

1    up their marine and aviation section.
2      What type of work did you do?
3  A  Well, we had several accident-type investigations
4    that we did.
5      I went over to-- I spent a lot of time going over
6    to Russia, and at that time we were trying to figure
7    out how to change some of the military technology to
8    civilian uses, and Failure Analysis was interested in
9    being involved in that.
10      I did quite a bit in that area and structuring
11    some of the marine sections of the company.
12  Q  Let me ask you this:  Who were your customers at that
13    company or your clients?
14  A  A lot of it was legal, accident investigations type
15    stuff.
16      Some of it--
17  Q  Are we talking maritime accidents or aviation
18    accidents?
19  A  Maritime-- I think there was one aviation involved,
20    but most of it was maritime.
21      The work over in Russia was a little different.
22    That was kind of exploring for business opportunities
23    in Russia.
24  Q  Okay.  And at the time did you live in California?
25  A  No.  I lived up here, and I had an apartment down

Page 9

1    there.
2  Q  Okay.
3  A  And I'd go down there for two or three weeks and come
4    back up here for a week or so.
5  Q  Okay.  And the declaration you signed in this case
6    indicated it was signed at Seabeck.
7      Is that where you live?
8  A  Yes.
9  Q  How long have you lived there?
10  A  I bought the property in 1982, I believe.  I built a
11    home on it when I retired from the Navy in the 1991,
12    1992 time frame.
13  Q  Okay.  And then you mentioned you did some consulting
14    work ever since you left Failure Analysis Associates.
15      Is that the type of work you're doing here in
16    this case?
17  A  That's correct.
18  Q  Is that consulting work limited to asbestos
19    litigation or is it--
20  A  It's what I get asked to do, but for the last
21    three years or so it's been overwhelmingly asbestos.
22  Q  Other than asbestos cases, have you been asked to do
23    this type of work in-- let me strike that.
24      Let me ask it this way:  What, other than
25    asbestos cases-- what other cases have you worked on?

3  (Pages 6 to 9)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

---

Page 10

1   A  I worked on marine accident type things.  There's
2   been a few of them.
3   Q  And when you are retained in asbestos litigation, who
4   is it that has hired you?
5   A  Different law firms.
6   Q  Can you give me a ball park estimate, let's say, for
7   the last two years or so, how many different cases
8   you've worked on like this?
9           MR. ANDRE:  You mean asbestos
10   cases?
11   Q  (By Mr. Ladenburg)  Yes, asbestos cases you've worked
12   on.
13   A  On some of these cases I have several different
14   retentions on the same case.
15   Q  I understand.
16   A  I haven't tried to count it up, so what I give you is
17   more of a guess than an estimate, I guess, but I
18   would say it's probably a couple hundred or over a
19   hundred-- probably closer to 200.
20   Q  In the last couple of years?
21   A  Let's make it three, three to four years.
22   Q  Of those couple hundred--
23   A  I need to qualify that.
24   Q  Go ahead.
25   A  All of those-- I was retained on those cases, but

---

Page 11

1   many of them settled before I do anything.
2   Q  I understand.
3       So you don't always get to the point where you
4   review materials, draft a declaration, sit for a
5   deposition or maybe even testify at trial?
6   A  A lot of times they settle before I do anything, and
7   I don't get paid in that case because I have no
8   retainer's fee.
9   Q  I understand.
10   A  So they just go away, but what I told you is the
11   approximate number of retentions.
12   Q  Fair enough.
13       Can you give me an idea whether or not-- since
14   you've started doing this consulting work, whether
15   you've ever been retained by an attorney representing
16   the plaintiff in one of those cases?
17   A  Would you repeat that?
18       I don't know that I understood that.
19   Q  Have you ever been retained by a law firm or an
20   attorney representing a plaintiff in an asbestos
21   case--
22   A  I don't think I've ever been asked to.
23   Q  From that answer, can I-- just to follow up and get
24   this into the record for my follow-up purposes, can I
25   assume then that you haven't actually done work for a

---

Page 12

1   plaintiff in an asbestos case?
2   A  No, I-- no, I haven't.
3   Q  With respect to Lockheed in particular, my
4   understanding is you were contacted at some point in
5   this case by the attorneys here for Lockheed
6   Shipbuilding Company; is that right?
7   A  That's correct.
8   Q  And in this case, is this case also a case where
9   you've been retained by any other defendant or is it
10   just Lockheed at this point?
11   A  I believe it's just Lockheed.
12   Q  Okay.  And can you give me an idea-- I don't want a
13   particular date, if you don't have it, but how long
14   ago were you first contacted by Lockheed in this
15   case?
16   A  Gee, I don't remember.
17       It's probably been-- if I had to guess, probably
18   a couple of months.
19       I really don't remember that.
20   Q  Okay.
21   A  I have a lot of cases going by.  I can't pinpoint
22   that for you.
23   Q  Let me ask you this:  How were you first contacted?
24   Was it by letter, e-mail--
25   A  I think it was by e-mail.

---

Page 13

1       Normally it comes by e-mail.
2       It could have been initially-- if I get a phone
3   call, I ask them to send an e-mail because then I
4   have a record of it.
5   Q  Are you pretty good communicating by e-mail?
6   A  Pretty good.
7       I'm not a young fellow, so I'm not as good as the
8   high school graduates probably recent, but I can do
9   it.
10   Q  Fair enough.  Understood.
11       In terms of your preferred mode of corresponding
12   on these cases, is it e-mail?
13   A  Yes-- well, yes and no.
14       If it's somebody requesting a retention, I like
15   for them to send me an e-mail so I make sure I have
16   something in writing, documented so I can take that
17   e-mail and put it into my log.
18   Q  Okay.
19   A  I don't necessarily save those e-mails, but I have a
20   log then, and it says what the case is and who it was
21   that notified me and what the date is, and then if
22   they send me material, I put a date down for that.
23       That's the way I keep on it.
24   Q  What happened in this case?
25       Were you retained by snail mail, U.S. mail letter

---

4  (Pages 10 to 13)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 14

1  or by an e-mail or something else?
2  A  I don't remember.
3    If I had to guess, I would say it was by e-mail,
4  but I don't remember.
5  Q  How about the materials you brought with you in
6  response to the subpoena today?
7    Maybe this is a good time-- let's hand him
8  Exhibit No. 1, if you can, and we'll just go through
9  the dep notice quickly.
10         (Exhibit No. 1 marked for
11         identification.)
12
13  Q  (By Mr. Ladenburg)  Why don't you take a look at
14  Exhibit No. 1, if you could.
15    Is this a copy of the notice of deposition and
16  related subpoena that you were provided before your
17  deposition today?
18  A  Yes.
19  Q  Okay.
20  A  Excuse me, I believe this was also sent to me, yes.
21  Q  If you look at the second page where it asks
22  for copies of-- the last item there, "All
23  correspondence, e-mail or other written or electronic
24  communications between Admiral Horne and counsel for
25  Lockheed Shipbuilding," I looked through your

Page 15

1  materials there, and I didn't see any correspondence
2  one way or the other--
3  A  There's no correspondence between me and them.
4    I mean, I haven't gone back to-- if it was an
5  e-mail, I would have said, "Yes, I'll take the case,"
6  but I don't have an e-mail.
7    There's no letter-- I don't recall there
8  being-- I think there was one letter I just received.
9    I think it's in that pile there someplace.
10  Q  You have the only copy right now, that I know of, of
11  the pile of materials you brought with you.
12  A  I thought I brought it-- but I did have a-- I think
13  it was an e-mail that set up this meeting, the
14  deposition, and it also said what the time would be
15  and where it would be and set up a predeposition
16  meeting an hour before this meeting so we could
17  discuss the case.
18  Q  Sure.  Understood.
19  A  That's what I'm looking for.  I thought I brought it.
20    I don't see it here.
21  Q  Let me ask you this:  Before coming here today, did
22  you review your inbox for any e-mails in this case to
23  see if you had any?
24  A  I don't hear real well, so you have to--
25  Q  Before you came here today, after you had this

Page 16

1  subpoena, did you review your e-mail to see if you
2  had any e-mails from Mr. Andre or anyone else related
3  to this case that would have been responsive to that
4  item on the subpoena?
5  A  I don't think I did because I don't normally-- what I
6  was asked to do was-- I did have a phone call, I
7  think, and we talked, and what I was going to be
8  doing was testifying about my declaration, so I
9  didn't try to go into anything else.
10  Q  All right.  Well, it's fine.  It may be that we can
11  get those later.
12    I was hoping to use the e-mails as kind of a
13  guide for chronology, if nothing else.
14  A  If I have any e-mails, I'd be glad to provide them to
15  the court reporter.
16    I don't have any trouble--
17  Q  Fair enough.
18  A  What it's going to be is "Will you work on this
19  case," and there was one other letter, and it may
20  have been an e-mail, which set up this deposition and
21  the timing.
22  Q  Okay.  Here is what I would like to do, if you could,
23  after the deposition is adjourned, is if you could
24  look and consult with Mr. Andre, your counsel, and
25  try to ascertain if there's any e-mails that you

Page 17

1  haven't brought with you today, either from him or
2  back to him and also whether there's any letters,
3  whether they be simple transmittal letters or more
4  substantive letters sent from Mr. Andre to you, if
5  you could just provide copies--
6  A  I would be glad to.
7  Q  He may be able to do it since he's on the other end
8  of that, but in any event, I just would like to get a
9  copy of kind of the correspondence in the case to
10  know when you were retained and also transmittal
11  letters enclosing what you were provided in the case.
12    I see you've got a stack of documents there and a
13  lot of those I've seen before.
14    I assume that those were provided to you by
15  Mr. Andre; is that right?
16  A  That's correct.
17    These were sent over to me, and they had-- I
18  think they had-- must have had a letter that come
19  with it, but I don't--
20  Q  Okay.  If you could take a look for that, those
21  transmittal letters or transmittal e-mails and any
22  other correspondence you got to or from either
23  Mr. Andre or other Lockheed attorneys you may have
24  dealt with in the case.
25  A  Certainly.

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 18

1  Q  Now let's move on and talk about any discussion
2     you've had.
3        Who have you talked to about this case since you
4     were first brought in?
5  A  The meeting we just had, Mr. Andre and this gentleman
6     here were at the meeting.
7  Q  You said "this gentleman here," and just for the
8     record, is that Gene Barton--
9  A  That's correct.
10 Q  And did--
11               MR. ANDRE:  And another lawyer down
12     there too.
13               MR. LADENBURG:  From your firm?
14               MR. CRAIG:  Mr. Craig.
15               MR. LADENBURG:  The three of you,
16     fair enough.
17               MR. BARTON:  He was real quiet
18     though.
19               MR. CRAIG:  I said, "Hello."
20               MR. ANDRE:  That was the only
21     people in the room, the three lawyers and him.
22 Q  (By Mr. Ladenburg)  And before that, were there any
23     other discussions, telephone conversations about the
24     case?
25 A  I think-- I don't recall one.

Page 19

1        Somehow I got the idea that it was just going to
2     be about my declaration, and there may have been a
3     phone call, but I don't remember that.
4  Q  Okay.  Since you bring up your declaration, I guess
5     we'll move on to that and talk about that, if we can.
6        In conjunction with the notice of removal that
7     Lockheed filed in the case, it looks like you signed
8     a declaration that is about six pages long, dated
9     June 26th.
10       Do you have a copy of that declaration in your
11     materials there in front of you?
12 A  Yes, I do.
13 Q  Did you prepare this and type this up yourself?
14 A  It was taken principally from previous declarations
15     that I have done, and I reviewed it and gave
16     comments, I guess, and then signed it.
17 Q  And so in conjunction with your work in other
18     asbestos cases, you've done similar declarations to
19     this in the past?
20 A  I've done a lot of declarations that are very similar
21     to this.
22 Q  And you've done those declarations not just for
23     Lockheed, you've done them for other defendants in
24     asbestos litigation?
25 A  That's correct.

Page 20

1  Q  And did you provide a copy of that to Lockheed as
2     kind of a template to work on or--
3  A  I don't recall doing that.
4        Those declarations are kind of out there.
5        If I did, I don't remember.
6  Q  Okay.  So can you just describe for me kind of the
7     process for how this declaration was composed and
8     edited and kind of finalized?
9  A  Normally I'll get a phone call or an e-mail or
10     something that they want to have a declaration, and
11     they'll have example declarations that I've given in
12     the past, and there's a lot of boilerplate-- I call
13     it boilerplate-- a lot of words are the same, my
14     background and all of that.
15 Q  Sure.
16 A  So that's generally, you know, put together.
17       Then the firm that's retained me will put in some
18     suggested wording where they've taken it from
19     previous declarations, and that will come to me, and
20     I'll review it.
21       If I don't like it, send it back to them.
22 Q  Okay.
23 A  And we'll reach an agreement on a declaration.
24       Once that's done, I'll sign it, and if it's a
25     declaration, it doesn't have to be notarized, but a

Page 21

1     lot of them I have to do is affidavits.
2        The wording in the affidavits and declarations
3     are pretty similar.
4  Q  Okay.
5  A  There's not a whole lot of difference.
6  Q  In this case did you have that sort of back and forth
7     between yourself and the attorney for Lockheed where
8     you took a draft, made some edits and some changes,
9     sent it back, had a back and forth like that?
10 A  I don't remember that.
11       It could have been.
12       I have done a lot of declarations and affidavits
13     since this one, even in June, probably two or three
14     dozen, so I don't really recall the process in this
15     particular one.
16 Q  Okay.  What is your standard recordkeeping mode in a
17     case like this if you do have those drafts of
18     declarations?
19       Is it the drafts are sent by e-mail and you edit
20     the e-mail and send it back or do you use a fax
21     machine to send back edits or how do you do that?
22 A  Normally it's done by e-mail.
23 Q  Okay.  So is a declaration sent to you in like a
24     draft word form where you can edit it and e-mail it
25     back?

6  (Pages 18 to 21)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

# Byers & Anderson, Inc.
## Court Reporters & Video/Videoconferencing

---

Page 22

1  A  Well, sometimes I can edit it.  Sometimes the format
2     is such that when I edit it, we lose the format, so
3     it may have to go back and get redone in a format or
4     something like that.
5  Q  Okay.  Do you ever send edits by fax?
6  A  I'm sure I have, but I don't recall it.
7     I don't recall doing it by fax, but it may be,
8     but I don't think so.
9  Q  If I wanted to ascertain whether, in fact, this
10    declaration went through a series of edits or even
11    one version of edits, a back and forth between you
12    and the attorney, is that something that upon
13    returning to your office you could ascertain for me
14    by looking at e-mails and looking at your
15    correspondence--
16 A  I could look to see whether I have an e-mail like
17    that.
18 Q  Okay.
19 A  I don't usually-- what I do-- and I try to save a
20    copy, a hard copy of the one that I-- in this case
21    here, what I would have done is did the-- signed it,
22    and then I would have faxed it to him.
23 Q  Sure.
24 A  And then I would have kept a copy of what I faxed.
25 Q  The finished product?

---

Page 23

1  A  Finished product.
2  Q  All right.
3  A  So I would have a copy that looks just like the one
4     you have that would be in my file.
5  Q  Okay.
6  A  And that's what I retain.
7     I don't try to retain all of the e-mails and
8     everything else that goes back and forth because it's
9     been a lot of cases and a lot of things.
10    What I'm really interested in is having a copy of
11    the final agreement.
12 Q  Well, you say you don't try to retain e-mails.
13    Do you affirmatively delete e-mails?
14 A  Pardon?
15 Q  Do you actually affirmatively delete e-mails or
16    destroy them?
17 A  I delete them, a lot of them.
18    I haven't deleted all of them, but I've deleted
19    some.
20    I may have an e-mail in there with this in it.  I
21    may not.  I don't know.
22    It's not a value to me what we start out with.
23    What's a value to me is what we end up with.
24 Q  And what's a value to me is different than what's a
25    value to you.

---

Page 24

1  A  I understand.  I'm trying to help you.
2     What I end up with is a copy, a hard copy, of
3     what was the original that was signed.
4     If I go back in my files, I'll find the original
5     of this thing, and that's what's of interest to me.
6  Q  All right.  Well, what we'll do, in addition to my
7     request earlier, just to see if there's general
8     correspondence, is I want to make a specific request
9     to you and to Lockheed's attorney for copies of any
10    drafts of this declaration, whether they're going to
11    you or coming from you, between you and Lockheed
12    counsel.
13    If you can check your home e-mail system, see if
14    they're there, and I'll also ask Bob to do the same,
15    but for now, I'll assume that we're not going to be
16    able to go into that today until we get that
17    straightened out, if it does exist.  It may not.
18 A  If it exists, I'll be glad to get it to you.  I don't
19    know whether it's there or not.
20 Q  Fair enough.
21    In a minute I'll probably go through your stack
22    of materials and ask you to kind of identify what
23    you've reviewed in the case.
24    Before I do that, is it fair to say that the
25    materials that you brought with you today to this

---

Page 25

1     deposition constitute the entirety of the materials
2     that you've reviewed in conjunction with this Jacob
3     Fischer case?
4  A  Yes, I think that's-- I believe that's correct.
5     This was sent to me by Mr. Andre.
6     It has my declaration in it and has the exhibits
7     in it.
8  Q  Okay.
9  A  But the exhibits that are in here are used in several
10    other declarations.
11 Q  Understood.
12 A  They're not just this particular one, so I won't
13    necessarily, in my file over there, retain-- for each
14    one of the declarations, all of the exhibits, but
15    what I'll have is a signed copy of the declaration
16    itself, and it will refer to the exhibits, and I know
17    what the exhibits are because I developed them.
18 Q  The exhibits to your declaration, is that what you're
19    referring to?
20 A  Yes.
21 Q  Okay.  In addition, there are other documents that
22    you brought with you today that are not exhibits to
23    your declaration, right?
24 A  These are things that were sent to me by Mr. Andre
25    just recently.

---

7 (Pages 22 to 25)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 26

1  Q  Okay.  And I guess that was part of my next question
2     was going to be whether you can tell me, did the
3     materials that Mr. Andre sent you that are specific
4     to this case, the complaint filed by the plaintiff
5     and the answers to the interrogatories that are in
6     your materials there, were those sent to you before
7     or after you drafted this declaration?
8  A  They were sent to me after, I believe.
9     I don't recall what went on before the
10    declaration, but this pile was sent to me after.
11 Q  Okay.  Let me ask you this:  Before you drafted your
12    declaration, did you know what Jacob Fischer did in
13    his career?
14 A  I knew-- well, if you read the declaration, it's sort
15    of generic to the Navy, involvement with
16    specifications and what have you.
17    I did not have a full understanding of what his
18    job was, no.
19 Q  Okay.  Did you have any understanding of what he did
20    before you drafted the declaration?
21 A  No.  The declaration was mostly what was the Navy's
22    role in specifications and contracts.
23 Q  Okay.  Did you have an understanding of the years
24    that are involved with respect to Mr. Fischer and the
25    claims he was making against Lockheed in particular

Page 27

1     before you drafted this declaration?
2  A  I think we did.  I think I had at the time because we
3     were-- I think that was-- somewhere in there, I
4     believe, that was discussed, either discussed by
5     phone or something, but I don't recall that right
6     now.
7  Q  Can you tell me, as you sit here today, what it was
8     that you did understand about this case, you know,
9     specific facts of this case, at the time you drafted
10    the declaration that you signed on June 26th?
11 A  I understood it was an individual who worked at
12    Lockheed in one manner or another, and that it
13    involved Navy ships and Navy contracts and that
14    that's what the declaration covered.
15 Q  Fair enough.
16    And did you have an understanding, at the time
17    you drafted this declaration, for example, what Navy
18    ships were involved?
19 A  What ships were involved?  No.
20 Q  Did you have an understanding whether or not this
21    case involved an employee of Lockheed as opposed to a
22    contractor or somebody working for the Navy?
23 A  I didn't have-- I understood that the-- I think I
24    thought at the time that it was an employee at
25    Lockheed, but I wasn't sure.

Page 28

1     I guess I assumed that.
2     The concern was whether or not it involved-- from
3     my standpoint, what were the requirements for Navy
4     ships as far as specifications, and what role did the
5     Navy play as far as warnings were concerned, things
6     of that nature.
7     I've done a large number of these kinds of
8     declarations, and it follows that path.
9  Q  Okay.  You mentioned you've done a lot of these
10    declarations, and I actually think I've seen a couple
11    of other copies in different cases.
12    Tell me, if you can-- whether prior to this case,
13    whether you've been retained by other private
14    shipyards in a position similar to Lockheed's
15    position in this case, shipyards who built Navy ships
16    for the U.S. Navy but nothing like PSNS but a private
17    shipyard.
18    Any of the private shipyards retain you to draft
19    a declaration like this?
20 A  I may have done one for Todd, may have done one for
21    General Dynamics.
22    I say I may because I'm not sure.
23    I have done work for them.  I don't know if I did
24    a declaration or not.
25 Q  Okay.

Page 29

1  A  There's a good chance I did, but I don't remember.
2  Q  Is that something you could check, see if you have
3     any final drafts of declarations that you've done for
4     other private shipyards?
5  A  No.  I think-- I assume in this particular
6     declaration, that Mr. Andre had a copy of previous
7     declarations.  If not, when we discussed it, I sent
8     him one, and we went from there.
9  Q  My question is:  At your office, at your house-- I
10    think you mentioned earlier you kept for your file
11    purposes the final copy of what--
12 A  What I signed, yes.
13 Q  Could you check those copies to see if you've ever
14    signed a declaration in final form for either Todd,
15    General Dynamics or another private shipyard?
16 A  Sure.
17 Q  If you could, I would like to request a copy of that,
18    if possible.
19 A  Sure.
20 Q  If I understand you correctly, you're not sure that
21    you have done that.  You're just saying that you may
22    have done that?
23 A  Yes.  You have to realize I have done a large number
24    of these things, and I don't have a complete memory
25    of which ones are involved.

8  (Pages 26 to 29)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 30

1    I do a lot for valve manufacturers, pump
2  manufacturers, different turbine manufacturers, a lot
3  of-- and with each of those categories, several
4  different manufacturers of pumps or manufacturers of
5  valves, and sometimes they involve declarations and
6  sometimes they involve affidavits, and I don't have
7  a-- you know, I couldn't tell you which ones I did
8  this declaration for and which one I did this
9  declaration.
10    I don't remember that.
11 Q  Is it-- would it be accurate to state that you've
12  done more declarations for valve, turbine, pump, and
13  other equipment manufacturers than you have for
14  shipyards?
15 A  Yes, I would say that's accurate.
16 Q  Okay.  We'll come back to this in a minute.
17    I'm going to ask you a little bit about other
18  work you have done in addition to doing these
19  declarations.
20    Can you describe for me the level of work you've
21  done in terms of trial testimony in asbestos
22  litigation?
23 A  Yes, I've done some trial.
24 Q  You've testified at trial in a courtroom when a trial
25  is going on?

Page 31

1 A  Yes.
2 Q  And how many times have you done that, approximately?
3 A  Not very many.  Probably ten or-- I'm just guessing,
4  you know.  It may be less, maybe one or two more.  I
5  don't know.
6 Q  Were those trials all over the country or mostly in
7  the Seattle area or what?
8 A  A lot of them were in California actually.
9    Most of them end up in California.
10 Q  And when you testified at-- when you have testified
11  at trial, do you recall who it was you were
12  testifying for, which-- not which attorneys hired you
13  but which party it was that hired you in that case--
14  in those cases?
15 A  I don't think I've done that for a shipyard, but I
16  think-- you know, you might be able to pull one up
17  and tell me, "Well, you did," but I don't recall it.
18    I think most of it is for pumps and valves,
19  turbines, equipment like that.
20 Q  Okay.  And has this trial testimony just kind of been
21  interspersed throughout the eight or nine years
22  you've been doing this consulting work?
23 A  Would you repeat that?
24 Q  Has this trial testimony been interspersed pretty
25  regularly throughout the interval of time you've been

Page 32

1  doing the work or has it been mostly recent
2  testimony?
3 A  I think most of the trials have been in the last--
4  probably been in the last year or so.
5 Q  Okay.  Do you recall offhand the last trial you
6  testified in?
7 A  No.
8 Q  Okay.  I want to ask about-- specifically now about
9  Lockheed, if I can.
10    Have you reviewed any contracts between the Navy
11  and Lockheed Shipbuilding Company in this case?
12 A  I saw one this morning in the meeting that we had.  I
13  think it was between Lockheed and the Navy.  I'm not
14  sure that it was, but it was an example of a
15  contract.
16 Q  Okay.  How many pages was it, approximately?
17 A  It's just a wild guess, but I would say 80.
18 Q  80?
19 A  It's just a guess.  About so thick.  (Indicating.)
20 Q  Did you read all 80 pages?
21 A  No.  I just thumbed through it.
22 Q  Were you directed to a particular portion of it or
23  what did you do in review of this contract?
24 A  I don't think I was directed to anything specific,
25  but just what-- I think there was a question at the

Page 33

1  end of it regarding-- there was some documents, two
2  or three sheets that indicated the security
3  classification associated with some
4  government-furnished equipment, and the question was
5  what was that document, and I explained that.
6    MR. LADENBURG:  Okay.  Bob, can I
7  get a copy of that when we take a break?
8    MR. ANDRE:  Sure.  I mean, you're
9  going to get that as part of the contracts that
10  they're compiling for the expert next Tuesday.
11    MR. LADENBURG:  Let's go off the
12  record.  Since it's something he reviewed this
13  morning, I want to take a look at it and see what it
14  is.
15    VIDEOGRAPHER:  Going off the
16  record, the time is approximately 11:49.
17    (Recess 11:49 a.m. to 12:06 p.m.)
18
19    VIDEOGRAPHER:  Back on the record,
20  the time is approximately 12:06.
21 Q  (By Mr. Ladenburg)  Okay.  We took a break, and since
22  we took a break, Mr. Andre has given me a copy of a
23  contract that, Admiral Horne, you reviewed this
24  morning?
25 A  I looked at quickly, yes.

9  (Pages 30 to 33)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

| Page 34 | Page 36 |
|---|---|

**Page 34**

1  Q  It is approximately 80 pages or so, and it is a
2     contract between Lockheed's predecessor, which was
3     Puget Sound Bridge & Dry Dock Company, and the U.S.
4     Navy, and it's dated, I think, 1962 or 1963,
5     something like that.
6  A  Yeah.
7  Q  I was asking you earlier-- this came up because I was
8     asking you whether you reviewed any contracts between
9     Lockheed and the Navy.
10       Is that the only contract you reviewed between
11    Lockheed and the Navy in this case?
12  A  In this case, yes.
13       I don't know if I've reviewed any in the past or
14    not.  I don't remember doing that.
15  Q  When I refer to Lockheed, I guess I should be clear.
16       You are aware, I assume, that Lockheed purchased
17    its Seattle shipyard here, and I think that
18    transaction was about 1959 or something-- you are
19    aware-- in any event, it used to be known as Puget
20    Sound Bridge & Dredge or Puget Sound Bridge & Dry
21    Dock--
22  A  I have learned that, yes.
23  Q  Okay.  So when I refer to Lockheed in this case, I'm
24    also intending to include, within the scope of that
25    identification, its predecessor shipyard, even though

**Page 35**

1     it wasn't known as Lockheed at the time, okay?
2  A  Yep.
3  Q  All right.  So having reviewed that contract, I
4     guess, for the first time today, let me ask you this:
5     Did anything you reviewed this morning in any way
6     change any of your opinions or thoughts as reflected
7     in the declaration that you signed in June in this
8     case?
9  A  No.
10  Q  Okay.  I just want to ask you some questions about--
11    let me ask you about your personal experience first.
12       I'm aware of your declaration and kind of your
13    career in the Navy, and I think I have a pretty good
14    grasp on what you did, but what I'm not clear about
15    is whether you actually had any role yourself in the
16    contracting process with a civilian shipyard as
17    opposed to dealing with mil specs on particular
18    pieces of equipment.
19       I think that might just be a feature of the fact
20    that most of the work you've done deals with
21    equipment as opposed to shipyards, but obviously this
22    is a shipyard case and I want to get an understanding
23    as to whether you had any role in your career in the
24    Navy, at any time, in negotiating contracts with
25    civilian shipyards, corresponding with the shipyards

**Page 36**

1     about those contracts, you know, going through the
2     process to inspect the work they were doing to make
3     sure it complied with specifications, things of that
4     nature.
5  A  When I was working with the-- in the Supervisor of
6     Shipbuilding office in Ingalls Shipyard, Pascagoula,
7     Mississippi, and I was there for five years, I had
8     responsibility for inspecting the ships that were
9     under construction, and in doing that had to
10    ascertain at times how things were invoked on the
11    contractor.
12  Q  What do you mean by "invoked"?
13  A  In other words, if the contractor was required to use
14    a certain structural weld design, what documents said
15    the contractor had to do it that way.
16       If he had to do an ultrasonic inspection on
17    certain welds or pipe fittings, what were their
18    requirements?  How did they get invoked?
19       If the contractor wasn't following the
20    specifications, then it was my responsibility and the
21    inspectors that I had working for me, to reject that
22    material.
23       In that sense I had to know-- at times I had to
24    go back to detailed specifications, plans, and what
25    have you, to be sure, you know, that-- who was right,

**Page 37**

1     the contractor or the supervisor of the shipbuilding,
2     my inspectors?
3       So in that sense, yes, I spent five years doing
4     that kind of stuff.
5       In my last job as deputy commander for ship
6     design and ship systems engineering, I dealt with the
7     Supervisor of Shipbuilding offices.  We had 15 of
8     them at that time, don't have that many now.  I think
9     we're down to-- in eight Navy shipyards that were
10    under my overview, there were contract issues which
11    would come up.
12       I would-- the Naval Sea Systems Command had a
13    battery of lawyers.  We would use those lawyers in
14    some cases.
15       A lot of it had to do with change orders,
16    adjudicating change orders, things that the
17    contractor thought was outside the scope of the
18    contracts and the Navy was requiring them to do it,
19    and there would be debate over that.
20       I was involved in some of that-- quite a bit of
21    that.
22       Those are, I guess, examples of, in my personal
23    background, that I had direct oversight over that
24    sort of thing.
25  Q  Okay.  I appreciate the answer.  I'm not sure I quite

10  (Pages 34 to 37)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 38

1   understand what I was after, which was whether in the
2   course of, for example, negotiating and drafting and
3   ultimately signing a contract like the one you
4   reviewed this morning, is that something you
5   personally had a role in doing?
6   A   No, I did not draft the contracts.  That was-- most
7     of those contracts are-- the specifications that go
8     into the contracts, those things were done by people
9     that were under me in my last job.
10  Q   And are those what we typically refer to as mil specs
11    in this litigation?
12  A   Military specifications, but the detailed
13    specifications for a ship list in them the
14    specifications that are applicable.
15  Q   Okay.
16  A   And then there are contract plans which further list
17    specifications, and there's a hierarchy of
18    specifications.
19        You go to one specification and that will
20    reference two more specifications.  You go to those,
21    they'll reference two more, and all of those get
22    invoked in the contract by invoking one of them.
23        Sometimes we would get into some discussion as
24    to-- with somebody like Lockheed, as to whether or
25    not this is really a contract requirement or not, and

Page 39

1     that's how the change orders and things like that
2     went around, to clarify those things.
3   Q   Okay.  And in a general sense are the military
4     specifications, contract specifications that you've
5     referenced just now, are those specifications that
6     have to do with, for lack of a better way to say it,
7     exactly how the ship is to be put together so that
8     you get a final product that is fully compliant with
9     all these numerous mil specs on each piece of
10    equipment throughout the ship?
11  A   It's very complicated.  It goes quite a bit beyond on
12    that.
13        The Navy has a whole set of different documents
14    that get invoked in a contract, and when you go to
15    the contract, it should lead you to detail
16    specifications, it should lead you to contract plans,
17    it should lead you to maybe a set of specifications
18    that are applicable at that particular time, and it
19    won't necessarily list each and every one of them.
20        Because the specifications involve a lot of
21    things that are entirely different from one another,
22    some of it may involve a hull structure, and if it's
23    a hull structure, it might involve material, might
24    involve welding rods, it might involve joint designs
25    or what have you, if you wanted to talk ship fitter

Page 40

1     type things.
2         A pipe fitter has a whole other set of
3     requirements that goes to him.
4         The electricians go with another set, and the
5     electronics guys another set, the ordnance guys
6     another set.
7         There's literally hundreds if not thousands of
8     specifications, if you're talking about a major
9     combatant ship, that get invoked.
10  Q   Sure.
11  A   They stem from a contract.  It opens out.
12  Q   Okay.  Let me just ask a general question and see
13    if-- I hope you can understand what I'm getting at
14    here.
15        It seems to me that the mil specs and items that
16    are on the qualified products list, for example, that
17    all of that has to do with kind of the what of the
18    ship, what it is, what it's designed to be, what
19    you're trying to physically have.
20        Am I wrong or do those specs also deal with and
21    direct someone like Lockheed or any other shipyard
22    with the how, the means, and the manner of
23    constructing the ship?
24  A   No.  There would be a document-- let's just talk
25    about welding, for instance.

Page 41

1         There will be a document for welding, what you're
2     supposed to have, preheat temperature before you
3     strike an arc, what types of magnetic particle
4     inspections you make of the interpass weld, what--
5     the final x-raying of the weld.
6         There will be documents that get into that kind
7     of detail.
8         They will not-- you will not see them in a
9     contract obviously because as I was trying to explain
10    this thing, it's-- it gets very broad.
11        The ship is a very complicated thing.
12        They get invoked, and in this particular case,
13    one of the gentlemen was in the Supervisor of
14    Shipbuilding office, and part of his responsibility
15    was to see that those specifications were carried
16    out.
17  Q   I understand.
18        Again, that-- for example, let's take welding.
19        If you're talking about a shipyard doing the
20    welding to make sure that the welds comply with
21    whatever the Navy has in mind to make sure that
22    they're sound, I assume, and that there's no flaws or
23    any cracks-- I assume there's probably x-rays of
24    welds that went on and things like that.
25  A   Yeah, mm-hm, mm-hm.

11 (Pages 38 to 41)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 46

1    specifications out there, especially in the '50s and
2    '60s, that called for materials that at times
3    contained asbestos.  I think that's really not
4    debatable.
5        I want to kind of shift and focus now
6    specifically on what I mentioned earlier, which is
7    workplace safety of workers and industrial hygiene.
8        Let me ask you-- for example, you talked about
9    welding earlier.
10       My understanding is for a lot of welding, a
11   welder has to wear a hood to protect his eyes.
12  A  Mm-hm.
13  Q  Did the Navy ever tell private shipyards what type of
14   hoods the welders they hired as subcontractors could
15   or couldn't use?
16  A  I don't know the answer to that.  I don't know the
17   answer to that.
18       I know that we inspected for, you know, safety
19   from the standpoint of a ship and indirectly to crew.
20       Whether or not-- how that was invoked, I'm really
21   not sure when you go back--
22  Q  I'm talking about safety, by the way-- just so I'm
23   clear, I'm talking about safety during the time the
24   vessel is at the shipyard at Lockheed here and during
25   the time it's either being built, if it's initial

Page 47

1    construction of a ship or the time it's being
2    repaired, if it's a repair project.
3        In other words, it's not an interval of time when
4    the ship is at sea with sailors, even though I
5    understand sometimes there may have been some sailors
6    who assisted with those projects.
7        When a ship is at the shipyard, either being
8    built for the first time or being repaired, did the
9    Navy have specifications, directives, contract
10   provisions, any other sort of other written,
11   formalized industrial hygiene procedures and
12   practices that it required its private shipyards to
13   comply with that you can reference for me?
14  A  I think that-- I believe there were some that come
15   through the-- as I said, the inspections that were
16   made, that would go back to the 1930s,
17   recommendations were made as to when they made the
18   inspections of shipyards, "Well, you ought to do this
19   instead of that," those kinds of things were made,
20   specifically not just for things like fire or eye
21   protection or toe protection or head protection but
22   also for dust and not just asbestos but all kinds of
23   things.
24       The shipyard profession is a tough profession,
25   and there's a lot of care taken for the people in

Page 48

1    every shipyard I've been associated with.
2   Q  Okay.  What are they?  Can you identify any of them?
3   A  Any protection?  Yeah.  You have safety meetings.
4        You discuss all of these kinds of problems.
5   Q  Let me ask you this:  Was Lockheed required to have
6    safety meetings when it worked on naval vessels in
7    the 1950s, '60s, early '70s?
8   A  The Navy requirements--
9   Q  Required by the Navy, I should have said.
10  A  I don't know that.
11       Probably not, but--
12  Q  That's what I'm asking about.
13       I'm not asking what the general practices might
14   have been, based on your understanding.  I'm not
15   asking about what your experience was yourself and
16   your recollection.
17       I'm asking, as you sit here today, whether you're
18   aware of and can identify for me, either with a
19   document or something else you can point me to,
20   whether you're aware of any situations that
21   demonstrate the Navy dictating to Lockheed Shipyard
22   how Lockheed is to conduct itself with respect to
23   workplace safety and industrial hygiene during the
24   construction or maintenance of naval vessels at a
25   shipyard.

Page 49

1   A  You would have to look at the individual contracts to
2    see how that's worded.
3        I don't know that off the top of my head.
4   Q  Okay.  So you would defer to the written contracts?
5   A  You would probably have to figure out-- you know, go
6    back to those kinds of things in order to identify
7    just how it was written.
8        The Navy did have manuals associated with-- that
9    go way back, involving safety, and how those manuals
10   were invoked, I don't know.
11  Q  Were the manuals that the Navy had, were those
12   manuals that the Navy gave to its private shipyard
13   contractors?
14  A  I'm sure they probably did.
15       You know, I don't know that, but--
16  Q  You're assuming that to be the case?
17  A  It would be an assumption on my part.
18  Q  Okay.  Are you aware of any circumstance where, you
19   know, particular to this case, are you aware of any
20   circumstance that you can cite for me where Lockheed
21   expressed to the Navy a desire to engage in certain
22   industrial hygiene practices with respect to asbestos
23   exposure and the Navy said, "No.  You can't do what
24   you would like to do to protect your workers with
25   respect to asbestos exposure"?

13 (Pages 46 to 49)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 50

1       Are you aware of any situation you can cite for
2    me where that happened in this case?
3  A  You want a specific case?
4  Q  This case that you're here for today, Mr. Fischer's
5    case at Lockheed.
6  A  I would say that generically any kind of labelling
7    and warning and all of that, the Navy had its own
8    procedures for controlling those things, and the
9    contractor would be expected to follow those things.
10 Q  I'm not asking about warnings.
11      I'm asking about procedures to be followed and
12   protections to be engaged in at the shipyard, not a
13   warning that's on a plaque or something, but just,
14   you know, putting Visqueen up, using a respirator--
15   I could go on and on, but the type of things that we
16   know we should do now to safely handle asbestos.
17      My question is: Are you aware whether at any
18   time, relevant to this case, at Lockheed, during the
19   time Mr. Fischer was there, are you aware and can you
20   cite for me any example where Lockheed, either in
21   writing or through discussions on the telephone or
22   other communication, expressed a desire to do certain
23   things with respect to asbestos and workplace safety
24   with respect to asbestos at its shipyards on those
25   Navy ships, and the Navy said, "No, you can't do

Page 51

1    that" because of any number of reasons, whether it's
2    specs or contracts--
3  A  Well, I just tried to give you an example, and maybe
4    I don't understand exactly what you wanted, but if
5    the contractor wanted to alter the design or the-- or
6    certain things-- add warnings on all the pipe or
7    valves or all that kind of-- if that's what you're
8    referring to, yeah, the Navy had its own system for
9    that.
10      If you're talking about when you cut into a pipe
11   that had asbestos on it, then I would say that was
12   something within the shipyard up until 1971.
13 Q  Okay.
14 A  I don't want my answer to lead you one direction
15   beyond what I'm trying to say.
16 Q  I think I know what you're trying to say, and it's
17   clear from your affidavit, your declarations that you
18   filed that it's your opinion that the Navy had the
19   final say over both whether warnings would be affixed
20   to any sort of equipment and what they would say.
21      Is that a fair statement?
22 A  That's a fair statement.
23 Q  And without challenging you on that, I'm not going to
24   necessarily agree with you on that point, but I do
25   want to focus on something else.

Page 52

1    Set that aside for a moment.
2       What I'm asking you actually is different.
3       I'm not asking-- the last answer you gave was
4    kind of a hypothetical, you know, if somebody wanted
5    to do this, the Navy would have said, "No," and I'm
6    not here to talk right now about hypotheticals.
7       I'm talking about facts of this case that you're
8    relying on that you may know about.
9       I'm wondering whether you are aware of any
10   incidents, any actual concrete example you can give
11   me from Lockheed Shipyard during the time interval
12   relevant to this case when Mr. Fischer was down there
13   or had occasion to go down there, can you cite for me
14   any examples where Lockheed wanted to do something to
15   protect the workers and the Navy said, "No" with
16   respect to asbestos?
17        MR. ANDRE:  Before you answer that
18   question, how specific are you?
19      Is there a hypothetical on Mr. Fischer--
20        MR. LADENBURG:  No.  It's a
21   hypothetical.
22        MR. ANDRE:  Well, it's on this
23   case, Mr. Fischer.
24      He's a hull inspector and he worked for the Navy.
25 Q  (By Mr. Ladenburg)  I'm not asking a hypothetical.

Page 53

1       I'm asking you, in this case, are you aware of
2    whether that happened?
3  A  Sorry.  You'll have to repeat it.
4  Q  I'll back up and repeat it.
5       I'll try to break it down for you.
6       I'm not asking a hypothetical now and I don't
7    want you to give a hypothetical answer.
8  A  Right.
9  Q  I'm not asking you what your opinion was about how
10   likely something might have been the case or whether
11   something would have happened.
12      I'm asking whether in fact it did happen, to your
13   knowledge.  If it didn't, fine.
14      I'm asking you, in this case, whether you're
15   aware of Lockheed expressing a desire to engage in
16   certain industrial hygiene or workplace safety
17   practices with respect to asbestos and being told,
18   "No, you cannot do that" by the Navy during the
19   interval of time when Mr. Fischer would have been at
20   Lockheed Shipyard.
21 A  No, I don't know of any specific case.  I can only
22   tell you generically where the Navy's interest was,
23   but I have no direct knowledge if the Navy said, "No"
24   to something Lockheed wanted to do back in that time
25   frame.

14  (Pages 50 to 53)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 54

1  Q  Fair enough.
2      Then since you don't have knowledge of that
3  specific that I just asked you about, now let's go to
4  the general.
5      In a general sense, do you have knowledge of not
6  just Lockheed but any private shipyard during the
7  '60s, early 1970s?
8      Do you have any knowledge of any private shipyard
9  expressing a desire to do certain things to protect
10  workers from asbestos exposure at its shipyard when
11  working on naval vessels and the Navy again said,
12  "No, you cannot do that"?
13  A  I don't know of any case-- the Navy didn't tell you
14  what they didn't want you to do.  The Navy told you
15  what they wanted you to do.
16  Q  Understood.
17  A  There's a difference there.
18      You can say that the contractor would tell you
19  not to do this, but you can think of thousands of
20  things in that category.
21      What was important to the Navy is telling you
22  what they wanted in the requirements.  That's what
23  they wanted, not what they don't want but what they
24  want.
25  Q  What did the Navy want in the '60s and '70s?

Page 55

1  A  In what regard?
2  Q  What did the Navy want its private shipyards to do to
3  protect its workers from the hazards of asbestos
4  exposure from, let's say, 1960 to 1971?
5  A  The requirements that-- the inspections that were
6  available that had been made and the recommendations
7  that had been made by the Navy were published and
8  goes way back to the maritime commissions with regard
9  to asbestos.
10  Q  Let me ask you some specifics--
11  A  The recommendations were there.  "This is the way you
12  should do it."
13  Q  Is a recommendation binding or is that just a
14  recommendation?
15  A  Pardon?
16  Q  Was the recommendation binding or was it just a
17  recommendation?
18  A  I think-- I don't know that it was binding.  You'd
19  have to figure that out, but I think they wanted to
20  have contracts.  If they were-- totally didn't care
21  about their people, I think you might have a little
22  problem.
23      I don't know that it was made contractually as
24  something.  That's-- let's put it this way, you can
25  read the inspection reports, and it's pretty strong

Page 56

1      language in some of them if they felt it wasn't being
2  done right.
3  Q  Okay.  Let's take some examples.
4      For example-- if you know this, tell me.  If you
5  don't know it, say you don't know.
6      Did the Navy require Lockheed Shipyard between
7  1960 and 1971 to take dust counts to monitor levels
8  of asbestos fiber in the air on the Navy vessels
9  being worked on at the shipyard?
10  A  I don't know that.
11  Q  Do you know whether the Navy required-- again,
12  between 1960 and 1971, did the Navy require Lockheed
13  to have its workers and the workers of subcontractors
14  on the ships use respirators when working on the
15  vessels, the Navy vessels, that were either being
16  repaired or constructed during that time period?
17      MR. BARTON:  Object to the form of
18  the question.
19      THE WITNESS:  I don't have any way
20  of knowing that without seeing Lockheed's procedures,
21  and I don't know.
22      The recommended practice might be one thing and
23  they might do something else, but I don't know.
24      As far as a contract is concerned with the Navy,
25  I don't know of anything, you know, that specifically

Page 57

1      required it.
2  Q  (By Mr. Ladenburg)  Well you say their recommended
3  practice may be one thing and they might do something
4  else.
5      In that situation where what's recommended and
6  what's done may be different, is that situation
7  different from the situation with respect to
8  warnings?
9      Was Lockheed free to decide whether to put
10  warning plaques on equipment that had asbestos or
11  involved asbestos between 1960 and 1971?
12  A  Now what you're getting into is altering the ship.
13  That's something different.
14  Q  That's what I thought.
15  A  That's something different.
16      There, the Navy had specific requirements, and
17  they wanted labelling to be done a certain way.  As
18  far as the warnings and tech manuals and what have
19  you, the Navy decided, once it knew the seriousness
20  of it, that you could not control it with labels or
21  things in tech manuals.
22  Q  Now, I've reviewed some prior transcripts of yours.
23  I'm not sure if I've ever seen you be asked this
24  question, but have you ever been up to the Turner
25  Joy?

15  (Pages 54 to 57)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

## Page 58

1       It's now a museum up there in Bremerton--
2   A  I've been aboard it, but I haven't gone all through
3   it.
4       I used to be part of the Kitsap County Historic
5   Society, and we kind of mothered that ship a little
6   bit.
7   Q  When was the last time you were aboard the ship?
8   A  Oh, it was a long time ago.
9       It's been several years.
10  Q  Okay.  Are you aware whether or not on the Turner
11  Joy, as it is sitting right now, whether
12  there's warning plaques on any of the valves,
13  turbines, miscellaneous pieces of equipment that are
14  on that ship?
15  A  About what?  Warnings about what?
16  Q  Anything.  Anything with respect to the use of the
17  product itself, not just asbestos or any sort of
18  warning.
19      Could be for electrical hazards or anything else.
20  A  There's electrical hazard warnings, there's, you
21  know, "Don't open the throttle valve until you set
22  the overspeed trip" aboard.
23      Where there's immediate danger to a specific
24  piece of equipment, then, you know-- that a normally
25  trained sailor wouldn't know, then a warning might be

## Page 59

1   appropriate and accepted, but you can't-- there are
2   miles and miles of piping.  There are miles and miles
3   of electrical cable.  There are thousands of valves.
4   There are hundreds of probably pumps on large ships.
5       There's putting-- trying to put labels on all of
6   these things doesn't make much sense.
7       Sticking in an instruction book that people
8   may not ever see isn't going to help you, so the Navy
9   decided it was going to control these things by
10  procedure and training and discipline, and when the
11  knowledge of the-- the full knowledge of the danger
12  of asbestos is concerned, that's what the Navy did.
13      They did not go out and start labelling
14  everything.  They didn't go out and change all the
15  instruction books.
16      They invoked procedures to control it.
17  Q  You say "when the full knowledge of asbestos hazards
18  came to be," and when was that for the Navy, to the
19  best of your knowledge?
20          MR. CRAIG:  Object to form.
21          THE WITNESS:  I was here in the
22  shipyard in 1968--
23  Q  (By Mr. Ladenburg)  You are talking about PSNS?
24  A  Yes.
25  Q  Okay.

## Page 60

1   A  We had a fellow here by the name of Carl Mangold,
2   which you've probably heard of.
3   Q  I think I've heard his name now and again.
4   A  Carl, and I think it was around 1965, and my
5   recollection from reading and being involved in these
6   cases is when-- I think it was Germany come out--
7   anyway, there was some consensus in the medical field
8   that yeah, there's a link between lung cancer and the
9   other-- and asbestos.
10      Carl was one of the leaders in doing-- causing
11  the shipyard to-- people to do-- have medical exams,
12  x-rays and all, everybody, and also put out a lot of
13  written procedures for protecting the people.
14      It was in the '60s, after 1965, I think, and
15  before that, things were not that great, but after
16  that, he was very instrumental in shipyards.
17      They found that in his x-rays and all, a report
18  went back to NavSea, and they found that some trades,
19  like machinists and ship fitters and welders, it was
20  not a problem, but insulators, pipe fitters, they had
21  an abnormal number of lung abnormalities, and that
22  went out in around 1968, and 1971 is when the
23  instruction came out.
24  Q  Do you happen to know when in 1971, what month that
25  was?

## Page 61

1   A  February, I think it was.
2   Q  Was this some sort of a formal-- you say "the
3   instruction."
4       What is that?
5       Is that like a mil spec or some sort of a formal
6   procedure for the Navy?
7   A  It tells the people how they're supposed to handle--
8   tells the shipyards how they're supposed to handle
9   asbestos.
10  Q  Okay.  So what was the situation between 1968 and
11  1971-- when Mangold was first coming up with his
12  findings and 1971?  Was there some sort of process
13  where they formalized how to handle it?
14  A  I know that there was a lot of traffic going back and
15  forth as far as the Navy yards were concerned, and I
16  think Supervisor of Shipbuilding were also alerted to
17  it.
18  Q  As a result, in 1971, PSNS and the other Navy
19  shipyards adopted certain practices with respect to
20  asbestos?
21  A  Instruction also went to the Supervisor of
22  Shipbuilding offices.
23  Q  And was the instruction, in 1971 then, also shared
24  with private shipyards that the Navy contracted with?
25  A  How they chose to invoke that, you know, I don't

16  (Pages 58 to 61)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 62

1    know.
2        Whether they do that with a change order or, you
3    know, how they would administer that, I don't know
4    how that-- if it was going to cost the shipyard
5    money, the shipyard would come in and say, "Okay.
6    We'll do it, but this is what the change is," and
7    what it's going to cost, so there would have been--
8    there may have been-- or the shipyard just may have
9    adopted it as a good practice.
10       I can't answer that, you know, specifically for
11   you.
12  Q   Okay.  As you sit here today, are you aware of any
13   workplace safety practices or industrial hygiene
14   procedures that Lockheed deployed in its civilian
15   shipyard for nonNavy customers that it couldn't
16   employ with Navy ships because of some sort of a
17   directive, contract specification, recommendation,
18   whatever you want to call it, from the Navy; in other
19   words, something they had to do different from Navy
20   ships on industrial hygiene and safety on asbestos
21   than what they did for their private shipbuilding
22   customers?
23  A   For practical reasons, I doubt that you would find
24   two different procedures in a shipyard because that's
25   kind of confusing.

Page 63

1        "When I work on this kind of a ship, I'm going to
2    do it this way, and I don't have to worry about
3    safety, but if I work on this one, I have to worry
4    about safety, so I have to have a set of procedures
5    to cover this work over here, and they're not going
6    to be applicable to this work over there," I don't
7    think that's, you know, very logical that it would be
8    done that way.
9        I think you'll find that in all shipyards there's
10   going to be a safety group.  There would have been a
11   safety group-- I don't know this specifically, but I
12   would be greatly surprised if Lockheed didn't have a
13   safety division within the shipyard and that they
14   weren't conscious of the hazards that exist in
15   shipbuilding.
16       There's a lot of them.
17       You know, there's a lot of ways you can get hurt,
18   either electrically shocked or something falls on you
19   or you fall off a ladder or something falls on your
20   toes or you can get something in your eyes or breathe
21   the wrong kinds of fumes or dust or what have you, so
22   all of these shipyards were not callous to the fact
23   that their workers needed to be protected.
24       One of the problems that you have is you got the
25   requirements out there-- is making the people adhere

Page 64

1    to them.
2        It's sort of like some people don't stop at the
3    stop signs.  Sometimes I don't.  It's not good.
4    Q   I understand that.
5    A   But people will do things that don't follow the
6    rules.
7    Q   I think this deposition is more about what the rules
8    were than whether they were complied with, okay?
9        At least that's what I want to focus on here.
10       In light of your last answer, can I assume that
11   the answer to my question is "no," that you're not
12   aware of any differences between Lockheed's
13   industrial hygiene and safety practices on its
14   civilian ships as opposed to its practices on its
15   Navy ships?
16  A   I don't know.  I have no idea if they had a different
17   procedure or not.
18       I just gave you my answer.
19       I think it would be not too logical that they
20   would, but I don't know that.
21  Q   Well, there's certainly certain things they had to do
22   for Navy ships to comply with the Navy specifications
23   that would have differed from civilian ships, right?
24  A   Yeah, but that's different from personal safety.
25  Q   Okay.  That's what I suspected, but that's why I'm

Page 65

1    asking you the questions.
2        Have you, in the course of anything you've done
3    in this case, have you reviewed any correspondence at
4    all between Lockheed and the Navy with respect to any
5    of the ships that Mr. Fischer has identified having
6    worked on at Lockheed Shipyard?
7    A   No.
8    Q   We have this contract obviously.  Maybe that was part
9    of correspondence, but I'm thinking of change orders,
10   work-- the typical construction of a ship type of
11   back and forth you're going to see in documents,
12   whether it's change orders about costs or labor
13   strife or anything having to do with the construction
14   of these six or so vessels--
15  A   Not specific to this case.  I don't recall anything
16   specific to this case.
17       Like I-- in the last two years I've logged in
18   something like 1,400 retentions.
19  Q   That's a lot of cases.
20  A   Well, a lot of those are several people on the same
21   case.  Many of them, at least half of them, I don't
22   do anything on.
23       You know, somewhere along there they get mixed up
24   in my mind.
25  Q   Okay.  What I would like to do now, before we stop--

17  (Pages 62 to 65)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 66

1  we may take a break after this. I'm not sure if I'm
2  finished yet or not, but can we just have you, if you
3  could, identify the materials that you brought
4  pursuant to my subpoena, and I don't want to mark
5  them all or I'll just get a copy or something from
6  Bob later on rather than mark them all, but if you
7  could just go through your materials and just state
8  for the court reporter what it was-- you know, all
9  the items you reviewed, the different documents you
10  reviewed in conjunction with your work--
11  A  In this stack here?
12  Q  That stack there, and I think there was-- Bob gave me
13  a couple other documents he showed you this morning
14  that you didn't have that you didn't bring with you.
15  A  Right.
16      This doesn't have anything to do with this case.
17      This is the notice of videotaped deposition and
18  subpoena duces tecum of Admiral Roger Horne.
19  Q  And that was the deposition notice and subpoena we
20  talked about earlier?
21  A  Yeah.
22      There's my declaration and the exhibits that were
23  associated with my declaration.
24  Q  Okay.
25  A  There's a U.S. Civil Service Commission supplemental

Page 67

1  experience and qualification statement for an
2  application for a job that was submitted by
3  Mr. Fischer, dated 2/21/64.
4  Q  Okay.
5          MR. ANDRE:  That's exhibits to your
6  declaration (indicating.)
7      This is your CV (indicating.)
8          THE WITNESS:  My resume.
9      There's a declaration of Robert Andre in support
10  of Defendant Lockheed Shipbuilding Company's notice
11  of removal from state court, dated-- what is the
12  date?  Okay.
13  Q  (By Mr. Ladenburg)  That's good enough.  I've got a
14  copy of that.
15  A  These are all exhibits that go with it also.
16  Q  So the Andre declaration and all exhibits.
17  A  And there's Plaintiff's responses to style
18  interrogatories.
19  Q  Okay.  And the attached Exhibit A to that?
20          MR. ANDRE:  Right.
21          THE WITNESS:  And there's Exhibit A
22  to that.
23          MR. LADENBURG:  Okay.
24          THE WITNESS:  Then there's notice
25  of removal of action under 28USC.

Page 68

1          MR. LADENBURG:  Okay.
2          THE WITNESS:  There's Defendant
3  Lockheed Shipbuilding Company's notice of removal to
4  federal court.
5          MR. LADENBURG:  Okay.
6          THE WITNESS:  Then there's notice
7  of removal action under 28USC.
8  Q  (By Mr. Ladenburg)  And then I think now we're down
9  to your documents you got off the Internet on the
10  ships; is that right?
11  A  Yeah.  Then there's documents here for each of the
12  ships.
13      There's one of them missing.  I forget the name
14  of it right now, but the rest of them are there.
15  Q  Can you just-- these are danfis (phonetic) documents
16  or where did you get these documents?
17  A  I pulled these off the Internet.
18      It's Jane's fighting ships, and it's a good
19  source.  I've never found them wrong yet.  They're
20  pretty good.
21  Q  In any event, there's a website--
22  A  You go to the website, and it's listed down here at
23  the bottom.
24          MR. BARTON:  It's on my favorites
25  on my computer at the office.

Page 69

1          MR. LADENBURG:  I bet.
2  Q  (By Mr. Ladenburg)  You can just tell me the ship,
3  identify that.
4  A  There's the Plainview, the Denver, the Goldborough,
5  and the U.S. General W.P. Richardson which I think he
6  is referring to because it was later called the
7  President Roosevelt.
8  Q  Okay.
9  A  And the Turner Joy, and there was one other ship that
10  I didn't-- I failed to pull off.  I forget what the
11  name is right now.
12  Q  Let me ask you this:  For all of that information you
13  got off the Internet for those ships, is there
14  anything that you learned about those ships that you
15  thought was significant with respect to the work you
16  were asked to do in this case?
17  A  I think there was-- not really because I was asked to
18  provide a declaration originally.
19  Q  Sure.
20  A  And when I was going to testify, the names of the
21  ships were given to me somehow or other, and so I
22  thought I should go look at those to see what it said
23  about them, whether it made any sense or not.
24  Q  Okay.
25  A  A couple of them were kind of questionable whether it

18  (Pages 66 to 69)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

## Page 70

1 was ships that were really appropriate for this case
2 as far as Lockheed is concerned.
3 Q  What do you mean by that?  They're not appropriate
4 meaning they weren't built there, weren't overhauled
5 there during the time period?
6 A  Yeah.  Well, the General Richardson, it was built
7 back in 1944 and turned-- left the Navy and became
8 renamed to the Roosevelt, but I couldn't find in
9 here-- it wasn't built at Lockheed, and I couldn't
10 find in here whether or not the time frames we're
11 talking about there was involved in any way with
12 Lockheed.
13      It may have been, but I just didn't notice it.
14 Q  I see.  So you couldn't verify that it was Lockheed--
15 A  I couldn't verify it, no.
16      There was another one-- I thought there was
17 another one that there was some question concerning,
18 but I don't recall that right now.
19 Q  Okay.
20 A  I think I read that one off.
21      Then there's the e-mail we talked about.
22 Q  E-mail yesterday just setting up your appointment for
23 today?
24 A  Yeah, setting up.
25 Q  That was from Mr. Andre's office?

## Page 71

1 A  Yeah.
2 Q  Okay.
3 A  Then there's my ferry schedule.
4 Q  Okay.  I don't think I need a copy of that.  I think
5 I've got it memorized.
6      MR. LADENBURG:  Okay.  Bob, why
7 don't we take a quick break, and I'll try to figure
8 out if we have anything else that I want to ask and
9 then see if we're done.  Let's go off the record for
10 a minute.
11      VIDEOGRAPHER:  Going off the
12 record, the time is approximately 1:01.
13      (Recess 1:01 to 1:13 p.m.)
14
15      VIDEOGRAPHER:  Back on the record,
16 the time is approximately 1:13.
17 Q  (By Mr. Ladenburg)  Okay.  I'm going to follow up on
18 a few things we covered before the break.
19      We talked quite a bit about industrial hygiene,
20 workplace safety, and things like that before the
21 break, and I was asking you about what the Navy's
22 position was with respect to industrial hygiene,
23 workplace safety, particularly with respect to
24 asbestos, and I think we've covered that pretty well.
25      Just in a general sense though, and not limiting

## Page 72

1 it to asbestos, did the Navy have-- and I think you
2 may have touched on this earlier, but I want to get
3 your understanding.
4      Did the Navy have a policy or a specification,
5 some sort of formal written policy that it issued to
6 people like Lockheed, private contractors who are
7 building ships, that specified how and in which way
8 Lockheed was to control the means and the manner of
9 the work of subcontractors and the trades that were
10 doing the work on these ships?
11 A  How they were supposed to control it?
12 Q  Yeah, or whether they were to control it is the first
13 question, and if so, how.
14 A  I need to ask you a question in order to answer it.
15      What-- control of what, from a safety standpoint
16 or from a--
17 Q  Not necessarily even limited to safety, just any sort
18 of procedures about the how of building a ship-- you
19 talked earlier about certain welds had to be done a
20 certain way.
21      You would inspect for that, right?
22 A  Mm-hm.
23      All of those requirements stem out of the
24 contract and all of the invoked specifications.
25 Q  Okay.  And--

## Page 73

1 A  And, I should say, for certain types of material, and
2 I don't know-- well, for instance, in the work I was
3 involved in at Ingalls, there were documents that
4 specified, books that come along that were invoked
5 that tells you how to do certain kinds of welds, how
6 to braze certain kinds of joints.
7      There were documents that came out and gave you a
8 lot of specific requirements.
9 Q  Okay.
10 A  I'm sure you will find some of those kind of
11 documents probably invoked back at that time here,
12 but I don't know what they would be.
13 Q  Okay.  I don't want to pin you down to just the ships
14 in this case.
15      I'm talking about your general understanding of
16 the Navy and its contracting with private shipyards
17 in the '50s, '60s-- late '50s, I guess, '60s, maybe
18 even into the early '70s.
19 A  Mm-hm.
20 Q  I guess maybe I should ask a hypothetical--
21 A  We had-- same time frame you're talking about, I was
22 at Ingalls Shipbuilding, and we had documents
23 concerning brazing of pipe joints.  We had documents
24 concerning HY 80 welding.  We had-- you know, these
25 are books, documents that went along with how you had

19 (Pages 70 to 73)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 74

1    to perform the work.
2        It was in a lot more detail than just a
3    specification that may be three or four pages.
4    Q   Okay.
5    A   So there were documents like that.
6        When you get into Lockheed and these particular
7    ships, I don't know.
8    Q   I understand.
9        I understand you are just answering questions
10   generally and that means may not apply just to Lockheed.
11   Maybe it's your general understanding.
12       You were at Ingalls, and I understand that.
13       Let's take Mr. Fischer, for example.
14       Since you did your declaration, you've been
15   provided his answers to interrogatories and other
16   materials, so you have some understanding of what his
17   job was, right?
18   A   Yes.
19   Q   And one of the things he said he did was inspect
20   ships for the Navy; is that right?
21   A   That's correct.
22   Q   Are you aware of any circumstance where during naval
23   inspections it's not the finished product that's
24   inspected, the actual physical equipment or what have
25   you on the ship, but the Navy is actually there

Page 75

1    observing workers doing their work and making sure
2    that procedures and that means and manner of the work
3    and how it's done is done a certain way as opposed to
4    just inspecting the brazed joints or the welded
5    joints or what have you after they're finished to
6    make sure they comply with the specifications?
7    A   I can tell you what I did because I had these kind of
8    inspectors working for me.
9    Q   Okay.
10   A   And at the same time frame we're talking about here.
11       I required-- some things are more critical than
12   other things.
13       The contractor has 1,000, 2,000, 3,000, 4,000
14   people out there, may have several hundred or a
15   thousand people working on a particular ship or more.
16   Supervisor of Shipbuilding office has a relatively
17   small number of inspectors, and when you get to a
18   district like 13, it covers not just Lockheed but
19   they may be doing work up in Everett or wherever
20   there's Navy work going, so these people get spread
21   around.
22       In my case, I wanted to be sure that we looked at
23   certain things that were critical to safety of the
24   submarines, and so I prepared a manual for the
25   Supervisor of Shipbuildings' office that was given to

Page 76

1    the contractor, and it said the things that we wanted
2    to look at and be called to look at is in-process
3    inspection, not final inspection but in-process
4    inspection.
5    Q   Okay.
6    A   Makeup of critical joints, the radiographs--
7    reviewing certain radiographs before the root passes,
8    ultrasonic test procedures and qualifications,
9    packing and gasket materials and critical systems.
10       These are things that when they get ready to do
11   that step, the contractor is required to notify you,
12   and then you would send an inspector out and look at
13   that particular thing because you can't have a man
14   down there all the time running all over the ship
15   because there's so many things going on at one time,
16   you don't have that number of people, so what you
17   want to do is to focus on the critical things that
18   are going to affect the safety of the ship or the
19   quality of the ship in a real sense.
20   Q   And those are called process inspections on some
21   critical areas of the ship?
22   A   Yeah.
23   Q   Okay.
24   A   And that would be in-process.
25       They will call you, so you would maintain your--

Page 77

1    and I had at least one guy that would, on a daily
2    basis, just wander around and look at safety things.
3        I'm not talking about asbestos here, but running
4    of acetylene lines and things like that because the
5    government is self-insured, and so you--
6    Q   They're also immune.
7    A   It's a government ship, so one of our
8    responsibilities is to see that the contractor from a
9    ship safety standpoint is doing the right thing.
10   Q   Do you happen to still have a copy of that manual you
11   drafted?
12   A   Mm-hm.
13   Q   Is that something I could get from you?
14   A   I'll give it to you, but I want it back.
15       MR. LADENBURG:  Is it something I
16   can get a copy of or is it not-- I would like to
17   request a copy of it if I could, Bob.
18       MR. ANDRE:  Would you like to
19   request a copy as part of this deposition?
20       MR. LADENBURG:  Yeah.  I think
21   it's-- based on his testimony, I think it's relevant
22   to the scope of this deposition.
23       MR. ANDRE:  Because this has to do
24   with hull inspection work?
25       MR. LADENBURG:  Yeah, and even if

20  (Pages 74 to 77)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 78

1    it's not at Lockheed--
2              THE WITNESS:  It's written for
3    Ingalls Shipbuilding.
4              MR. ANDRE:  How big is--
5              MR. LADENBURG:  It's a private
6    shipyard--
7              THE WITNESS:  It's about so thick.
8    (Indicating.)
9              MR. ANDRE:  We'll provide you a
10   copy.
11       We'll make copies at our expense, okay?
12       Admiral Horne will send it to me, and we'll make
13   a copy.
14              MR. LADENBURG:  Fair enough.
15   Q   (By Mr. Ladenburg)  So these process inspections,
16       were they done at the same time you were doing what I
17       would call-- I guess I'd call a normal inspection, to
18       make sure they were in compliance with the spec or
19       were they separate events that you went out there
20       just to check the processes on these critical systems
21       you've identified?
22   A   Well, in the case we had here-- I think we had at one
23       time maybe four submarines or more, nuclear
24       submarines, being conducted, and I had maybe 20, 25
25       inspectors.

Page 79

1        Some of them were hulls, some of them were
2    electrical, some of them were machinery, some of them
3    were electronic, some of them were ordnance, so it
4    was a much bigger operation than I think we're
5    talking here, but I had these people all at the site.
6        In the case of Ships 13, they are spread out not
7    just at Lockheed, but they're spread out in other
8    locations.
9        It's hard to compare-- you know, you get apples
10   and oranges here is what it is.
11       I could not cover everything in the shipyard.  I
12   couldn't have a guy everywhere watching every
13   operation that was going on, so to me it was
14   important to pick the things that affected the safety
15   and quality of the ship the most.
16   Q   Did you rely on private shipyards like Lockheed,
17       Ingalls, et cetera, to do their own due diligence to
18       make sure that the processes were done appropriately
19       and that--
20   A   Yes, and then I audited their paperwork.
21   Q   Okay.  So--
22   A   So weld records, x-ray records of critical joints,
23       ultrasonic test records, some testing-- hydrostatic
24       testing, some of these things-- we try to be present
25       on the most critical ones, but there's obviously much

Page 80

1        more you can cover.
2    Q   So at least some of that responsibility is, on any
3        Navy ship at a private shipyard, is delegated to the
4        private shipyard to ensure compliance with
5        specifications; is that right?
6    A   Yes.  They'll have their own inspection group.
7        They'll have their own inspection group.
8    Q   And they're required to by contract, right?
9    A   Required to-- I'm pretty sure they were required to
10       at that time-- we were.  We had-- Ingalls was.
11   Q   Okay.
12   A   And we worked principally with them so that-- because
13       we could not tell the contractor what to do.  We
14       could just report him if he didn't do what he was
15       supposed to by the specifications.
16   Q   Okay.
17   A   Then they'd have to work back on that.
18   Q   What do you mean when you say you couldn't tell the
19       contractor what to do?  I'm not sure I follow you
20       there.
21   A   You can't go down on the ship and tell a welder,
22       "Don't weld it that way.  Weld it this way."
23       If he's welding it wrong, you reject it.  You go
24       through the contractor's management with your
25       rejection, and do it that way.

Page 81

1        You don't have any absolute control over the
2    individual that's actually doing the welding.  You
3    have to deal with the contractor's management.
4    Q   I see.
5        If I understand what you're saying, and correct
6    me if I'm wrong, but at the private shipyards working
7    on naval vessels in the late '50s, '60s, early '70s,
8    that time frame, it was the private shipyards who
9    retained the right to control the means and the
10   manner of the work, and you if saw something that was
11   wrong about that as an inspector for the Navy, you
12   couldn't correct it right away.  You'd have to go
13   through proper channels of the shipyard; is that
14   right?
15   A   Yeah, you have to follow the specifications.
16       The contract has to follow the requirements, and
17   if he's not following the requirements, then you can
18   put him on report.
19       You can't-- unless it's a real safety issue, like
20   he's going to blow up the ship or something--
21   Q   Well, sure.
22   A   --you don't stop the work.
23       What you do is you say, "Hey, this is not right.
24   It's going to get rejected," and then you go through
25   the process.

21 (Pages 78 to 81)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 82

1   The process is if the rejection-- the contractor
2   will come in and ask for a waiver or a deviation. If
3   it's a deviation that's a minor infraction that the
4   Supervisor of Shipbuilding may be able to-- doesn't
5   alter some basic specification, some procedural
6   thing, and a supervisor has the authority to say,
7   "Okay. I'll approve that"-- if it's a waiver, if
8   it's a change in the specification, the Supervisor of
9   Shipbuilding doesn't have the authority to do that.
10  It goes back to Washington and the Naval Sea Systems
11  Command or the Bureau of Ships, either okays it or
12  doesn't.
13      If it comes back-- because that's a basic waiver
14  of the specifications.
15      The local supervisor can't do that.
16  Q  Let me ask you a hypothetical.
17      Let's assume that you were on one of these
18  process inspections, all right?
19      You observe somebody, let's say a contractor not
20  an employee of the shipyard itself but typically I
21  think they hired subcontractors in different trades
22  to do different work, different jobs.
23      Let's say a subcontractor on one of your process
24  inspections is engaged in some activity that is
25  incorrect.

Page 83

1       If I understand what you're saying correctly, if
2   that happened, the Navy inspector would notify the
3   general-- not the general contractor but the shipyard
4   of the noncompliance and ask that it be corrected but
5   would not walk over to the worker and say, "Hey, stop
6   doing it this way. Do it another way"; is that
7   right?
8   A  That's generally correct, yes.
9       If it's a real immediate--
10  Q  An emergency?
11  A  --danger, somebody doing something that's going to
12  kill somebody immediately, then you might use some
13  common sense, but there has to be a formal
14  understanding as to who controls who, and the
15  supervisor's office has a responsibility to see that
16  the work is done, you know, properly, and the
17  supervisor's office is responsible for the safety of
18  their people, the supervisor's people.
19      At Pascagoula, we had safety meetings in the
20  supervisor's office. We had all of our inspectors
21  in, and we had lectures, and we had Ingalls
22  Shipbuilding come over and give some of those
23  lectures, just to be sure that our people understood
24  what the safety aspects were.
25  Q  Okay. I think I understand.

Page 84

1       In terms of directing work of subcontractors on a
2   ship, my understanding is that that would typically
3   be something that the private shipyard was in charge
4   of as opposed to the inspectors from the Navy; is
5   that right?
6   A  Yes. The inspectors of the Navy should not and
7   didn't have the authority, unless we're getting into,
8   like I said, a safety issue. They had to work
9   through the supervisors and the shipyard-- shipyard
10  supervisors and the shipyard management.
11      Sometimes an inspector would come to me and say,
12  "This doesn't look right to me," and, you know, I'd--
13  if I didn't know, I would get the book or I would get
14  somebody that did know, and we'd go back and look at
15  it, and I would say, "You're right. Reject it," so
16  they write a formal rejection to what's there.
17  Q  I think I've got you.
18      Was there ever a circumstance, outside of a
19  safety emergency or something where the ship is about
20  to blow up or something like that, was there ever a
21  circumstance where Navy inspectors gave direct
22  instructions or orders or directives to, you know,
23  workers engaged in the various trades who were
24  employed by subcontractors as opposed to being
25  employed by the shipyard itself?

Page 85

1   A  Some subcontractors-- you mean like a subcontractor
2   in this case to Todd?
3   Q  Or to Lockheed, I guess--
4   A  Lockheed rather-- Lockheed--
5   Q  Any subcontractor.
6   A  Say Westinghouse had a turbine in a ship and they
7   come in to-- a representative comes in to look at the
8   turbine and the turbine was in a Lockheed ship?
9   Q  Sure. I was thinking more along the lines of
10  subcontractors that are doing work, whether it's the
11  pipe fitters, insulators, the actual-- those-- I call
12  them subcontractors--
13  A  When a subcontractor comes in to do the work, the
14  subcontractor has a supervisor.
15      The workers for that subcontractor, the
16  supervisor is responsible-- his supervisor-- he takes
17  his order from his supervisor, and he is responsible
18  for the safety of his people.
19      The supervisor is responsible to the shipyard to
20  see to things now.
21      If somebody sees one of the contract workers--
22  say a shipyard worker sees one of the contractor
23  workers doing something wrong, then he has to work
24  through his management.
25      He can't go out there and just change it around.

22  (Pages 82 to 85)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 86

1    The contractor is responsible for his people.
2    If it's a ship that's in for overhaul or
3  something, then you have a crew and a captain in
4  there, and he's responsible for the safety of his
5  crew, and he's also responsible for the safety of his
6  ship, that they don't blow it up.
7    The shipyard is responsible for the shipyard
8  workers, their health and welfare, and the contractor
9  is responsible for his workers--
10 Q  So overlapping responsibility?
11 A  Yeah, and you can't have everybody telling everybody
12   else what to do.
13    Those lines of responsibility have to be, you
14   know, firm.
15 Q  Is there a hierarchy of responsibility for workplace
16   safety at the shipyard?
17 A  Yeah.
18 Q  Who is at the top of the pyramid?
19 A  Well, I was as commanding officer of Puget Sound
20   Naval Shipyard.
21 Q  At a private shipyard who is at the top of the
22   shipyard?
23 A  The president of the shipyard.
24 Q  If it's Lockheed, the president of Lockheed is the
25   top of the pyramid?

Page 87

1  A  Pardon?
2  Q  In Lockheed's case, it would be the president of
3    Lockheed?
4  A  It would be-- well, he's the guy that-- ultimately
5    it's his shipyard.
6  Q  Okay.
7  A  Now, he has to follow the requirements in the
8    contract.
9    The Navy is there to see that he does it that
10   way, but, you know, if somebody is going to give the
11   people, his shipyard workers, orders, it's going to
12   be him through his management.
13    If somebody is going to give the Navy inspectors
14   records, it's going to be the Navy through his
15   management.
16    If it's a contractor out there doing work in the
17   shipyard, then the contractor, that man down there is
18   taking orders from his boss, and they have to follow
19   whatever the overhaul requirements are.
20    You can't have everybody telling everybody else
21   what to do.  It doesn't work that way.
22 Q  Doesn't there have to be someone that's ultimately
23   responsible for the entire ship when it's being
24   worked on, in terms of safety?
25 A  Well, the Navy is not-- is self-insured, so when

Page 88

1  you're talking ship safety items, I would say that
2  the Navy can step in and say, "Hey, you've got to
3  stop something rather quick."
4    You are not going to go down and give an order on
5  the deck plate unless it's an immediate danger, but
6  the Navy can step in and say, "I don't like the way
7  you're doing this procedure, and it's affecting the
8  safety of the ship or the equipment or whatever," but
9  you deal with-- you don't deal on the deck plate
10  worker to worker on these kinds of items because then
11  you have chaos down there.
12    You work through the supervisors and on up the
13  line to resolve issues where you disagree, and all of
14  these things, there's formal rejections, formal
15  procedures within each of these offices as to how you
16  go about doing that.
17    They may not all be the same exactly, but the
18  same idea.
19 Q  Let me pose one last hypothetical, and then I think
20  I'll move on.
21    Let's assume, hypothetically, that you have a
22  ship that's being overhauled down at Lockheed
23  Shipyard for the Navy.  It's a Navy ship, done
24  pursuant to a contract, and there's several crews of
25  workers from different trades around the ship at the

Page 89

1  same time, and let's assume, for the sake of this
2  hypothetical, that the welders there doing their work
3  are engaged in some sort of work where-- maybe it's
4  pipe fitters.  I don't know.
5    There's some brazing going on, for example, and
6  there's some fumes being emitted into the atmosphere,
7  and that whole crew has respirators, whatever they
8  need to deal with it, but they're also working nearby
9  two or three other trades that don't have the right
10  protection for that.
11    The guy in charge of the brazers or welders
12  doesn't see that as a problem, but the other workers
13  in the other trades get upset about it, and they
14  have a dispute about whether that's the appropriate
15  workplace safety situation in that tight area of the
16  ship.
17    In a situation like that, who has the ultimate
18  authority or control to go to the supervisor of those
19  workers and say to that supervisor, "You know, you
20  need to knock it off or wait or you need to wait
21  until these guys clear out.  We need to get these
22  guys from this other union here who are doing this
23  other work to have respirators"-- do you understand
24  the hypothetical?
25    MR. BARTON:  I'll object to the

23 (Pages 86 to 89)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 90

1    form.
2  Q  (By Mr. Ladenburg)  Go ahead and answer, if you can.
3  A  If it's all within house, all of the people you're
4    talking about belong to the shipyard--
5  Q  That is not my hypothetical, but go ahead.
6  A  That's the way I interpreted it.
7  Q  Let's assume these guys all worked for different
8    subcontractors.
9  A  Different subcontractors?
10    Well, the shipyard has hired these people, okay,
11    and if-- what the people should-- at the project
12    level, there will be a project superintendent, there
13    will be a shipyard guy in charge of that project, and
14    he will report to somebody up the line, okay?
15    He's the guy in charge.
16    If one contractor's work is affecting another
17    contractor's work in one way or the other, he's the
18    guy that has to coordinate that and resolve that.
19  Q  Let me interrupt you because I think we are out of
20    videotape, and we'll finish this.
21    VIDEOGRAPHER:  This is the end of
22    Tape No. 1.  This deposition will continue on Tape
23    No. 2.  The time is approximately 1:40.  We are going
24    off the record.
25    (Pause in the proceedings.)

Page 91

1    VIDEOGRAPHER:  Back on the record,
2    this is the beginning of Tape No. 2 in the continuing
3    deposition of Admiral Roger B. Horne.  The time is
4    approximately 1:42.
5  Q  (By Mr. Ladenburg)  Okay.  We are back on the record,
6    and I unfortunately had to interrupt you because we
7    were running out of videotape.
8    I want to let you continue with your answer, and
9    if you can't remember where you left off, maybe we
10    can have the court reporter read back for us.
11  A  It's probably good if you read it back.
12    (Answer on Page 90, Line 9-
13    18 read by the reporter.)
14
15    THE WITNESS:  And so he settles
16    those kind of disputes at the deck plate.
17    In the Navy, we call them ship superintendents.
18    They can call them different things in private yards,
19    but he is a manager who has that project, and he's
20    responsible overall for the coordination of the work
21    and carrying out the schedule and resolving
22    interferences between one trade and another and so
23    forth.
24  Q  (By Mr. Ladenburg)  And in a private shipyard, he
25    would be an employee of the private shipyard, right?

Page 92

1  A  That's correct.
2    MR. LADENBURG:  I think that's all
3    the questions I have for you.  I don't know if any of
4    these other attorneys do.
5    They have a chance to ask you some questions now,
6    so I think at this point I'm going to turn it over to
7    them.
8    MR. BARTON:  I have a few questions
9    for you, Admiral Horne.  I think if somebody wants to
10    pass me a microphone--
11
12
13    EXAMINATION
14  BY MR. BARTON:
15  Q  I want to ask you just some follow-up questions about
16    the idea of in-process inspection that you were
17    discussing with Mr. Ladenburg.
18    In your experience at Ingalls Shipyard in the
19    Supervisor of Shipbuilding office, when inspectors
20    under your supervision would conduct in-process
21    inspections, would that include being there and
22    observing the work as it was being done or going and
23    taking a look at that work that was incomplete but had
24    been finished up to that point?
25  A  It would involve three different things.

Page 93

1    One, it could involve in-process work.  It's like
2    the fit-up of a joint, a critical joint before you
3    start welding it or brazing it or something of that
4    nature.  That could be a critical step that you won't
5    know whether it was done right or not because it gets
6    covered up as you proceed.
7    There's those kinds of situations where you may
8    say, "I want to see these kinds of things, see that
9    they're done right."
10    There's some things that you can do by looking at
11    the records, radiographs.
12    You don't have to be there when they radiograph
13    the joint.  You have to look at the film and see
14    whether it meets the standards as far as the quality
15    of the film is concerned and whatever it was x-rayed,
16    whether it meets the specifications, so you do those
17    kind of things perhaps separately because you can
18    always go back and reject that joint because it's got
19    a defect in it or something and make them grind it
20    out and start over.  You can do that.
21    There are some things that you can accept on the
22    basis of review of records in a statistical sense.
23    You've got 500 of these things, and so you can
24    pull out a statistical level of a sample level and
25    say, "Well, I get 93 percent assurance if I look at

24  (Pages 90 to 93)

Roger B. Horne
August 5, 2009

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 94

1    ten of these or 50 of these or 100 of these, I'll get
2    assurance, and it's not so critical if I make a
3    mistake, but it gives me an overall sense of the
4    quality," so you may go ahead with it from a
5    statistical standpoint.
6        There's some things you want to see directly and
7    there are other things that you monitor in a
8    different manner.
9  Q  So there would be-- at times there would be certain
10   tasks or jobs that you want an inspector on-hand to
11   watch being performed to make sure it is being done
12   correctly?
13 A  There are some cases, like the fit-up that I
14   mentioned, something that it's very critical--
15   there's not a whole lot of those kind of things, but
16   there are some, that you want to see that it was done
17   right in the process because you can't tell after
18   it's done whether or not the quality is really there.
19 Q  How much of an inspector's job would involve that
20   kind of in-process inspection?
21 A  There's not too much of that really.
22       It's more of a procedural thing.
23       The manual I give you, you guys can take a look
24   at, but you get a feel for the kind of things that
25   inspectors wanted to see and what they would-- could

Page 95

1    do on the basis of records.
2  Q  Now, from--
3  A  In my case, at the end of-- when the work was all
4    done, the ship was ready to go, then we did an audit
5    to see-- you know, an overall audit of all the
6    records, and that's strictly a paper thing, but to be
7    sure that all these inspections were really carried
8    out.
9  Q  Do you have an understanding in this case with
10   respect to Mr. Fischer and what his position was as
11   an inspector?
12 A  It varied.
13       Looking at the-- what he was doing, when he was
14   at-- he was a structural inspector, is the way I
15   interpreted it, for a while, and he would be, pretty
16   much as he put in his sheet there-- I thought that
17   was a fairly accurate description of what he would
18   do.
19       There's-- I thought there was another sheet or
20   something.
21       Anyway, as he moved up, he went from-- to my
22   understanding, he went-- he become a cost analyst,
23   and that's a different job.
24       As a cost analyst, what he's doing is getting
25   involved in the change orders, looking at things from

Page 96

1    the standpoint-- I think I mentioned some things-- a
2    contractor comes in and says, "This is outside the
3    contract" or the government comes in and says, "I
4    want you to do it-- I want to issue a change order.
5    I want you to add this to the contract."
6        The cost analyst would get out there and try to
7    determine what the costs should be, and the shipyard
8    will submit an estimate, and the cost analyst will
9    debate it, based on his background.
10       If he's going to be a cost analyst, you will have
11   to have a background in that particular area for him
12   to be able to do it.
13 Q  Now, there's a document in your file that includes a
14   job description that Mr. Fischer provided at some
15   point during his employment?
16 A  Yes.
17 Q  Is that in front of you there?
18       I think you are looking for something that looks
19   like this. (Indicating.)
20       I want you to find that in the records that you
21   brought with you.
22 A  Okay.
23 Q  All right.  I'm looking at something that across the
24   top it has a case number reference and says,
25   "Document 7, filed July 13th, 2009, Page 22 of 27."

Page 97

1        Is that what you're looking at?
2  A  Yes.
3  Q  So that's what you were-- this is the document that
4    you were talking about when you said that was what
5    you thought was a pretty good description of what
6    Mr. Fischer would do as a hull inspector; is that
7    right?
8  A  That's correct.
9  Q  You had hull inspectors working under you at Ingalls?
10 A  Yes.
11 Q  Now, you were working in the submarine division, but
12   does that pretty much dovetail with the type of work
13   that all inspectors under your supervision at Ingalls
14   performed?
15 A  Yes, very similar.
16 Q  So in your experience, with respect to hull
17   inspectors doing in-process inspections where they
18   would actually watch work being performed, can you
19   give us an idea of the types of in-process
20   inspections that a hull inspector would do?
21 A  He's going to be looking at a lot of welding in the
22   makeup of joints.
23       Different materials require different types of
24   welding rods, different types of fit-up, different
25   material-- he's responsible for going and seeing that

25 (Pages 94 to 97)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 98

1  the right materials, right welding rod is there,
2  they're using the right amount of preheat, that the
3  fit-up is there, that the in-process inspections are
4  being made of the joints, those sorts of things,
5  things that are structural in nature.
6      He's not responsible for machinery operation.
7  He's not responsible for pipe fitting work. He's not
8  responsible for electronics or electrical. He's not
9  responsible for ordnance, any of those things, but he
10 is responsible for structural items.
11     You'll find sometimes things like ventilation
12 ducting could come under his control, not the
13 operation of the ventilation system but to put up the
14 sheet metal or the bulkhead-- whether the bulkhead is
15 fair or not fair, these are all things that fall
16 under the category of a hull inspector.
17 Q  Now, you-- as you described in your testimony, you
18    had-- when you were at Ingalls in the Supervisor of
19    Shipbuildings' office, you pretty much had a detail
20    of the sorts of things that you wanted your people to
21    go and have a look at.
22        These were civilians under you; is that correct?
23 A  Say again?
24 Q  These were civilian inspectors?
25 A  Well, I had a couple of military, and then I had some

Page 99

1  civilians, yes.
2  Q  And you understand that Mr. Fischer, when he was
3     working as a hull inspector, was a civilian employee
4     of the Navy?
5  A  That's correct.
6  Q  And similar to inspectors that you had working under
7     you at Ingalls?
8  A  That's correct.
9  Q  And when you had a job for one of your inspectors to
10    do, say, "I need you to go and conduct the following
11    inspections on this ship," did they have the option
12    of saying, "No"?
13 A  They wouldn't be employed too long, no.
14     I tried to-- because of the number of ships and
15    the sparseness of our inspectors, that's why we made
16    the manual and we tried to make sure that we covered
17    certain critical things because we could not cover
18    everything that was going on.
19 Q  And did your inspectors have, for lack of a better
20    term, freedom to go throughout the yard as they
21    pleased?
22 A  Well, there wasn't any barbed wire around them or
23    anything, but they had to do their job.
24     I wouldn't expect to find them over on a civilian
25    contract someplace.

Page 100

1      They needed to be on the job that they were
2  involved with.
3  Q  But if you sent someone to inspect, let's say for
4     lack of a better ship's name, the U.S.S. Pascagoula
5     that was under construction there at Ingalls
6     Shipyard, as far as you know, he'd be able to just go
7     over, walk up on that ship, and go into whatever
8     section of the ship that he needed to go to; is that
9     right?
10 A  Yeah. He could go where he was required to be, but I
11    expected him to inspect.
12 Q  And among your inspectors who were working for you at
13    Ingalls Shipyard, did you ever have a situation where
14    one of your inspectors came back to you and reported
15    to you or you heard that they had reported to another
16    supervisor what they believed to be an unsafe working
17    condition?
18 A  I'm sure there were issues.
19     Most of the issues centered around fire,
20    electrical safety.
21     I can't remember, you know, specific ones.
22     Because we had a fire at Ingalls, I was very
23    sensitive to that, so I did have hull inspectors
24    always on the watch for-- not to go out specifically
25    to look for it, but to be on the watch for unsafe

Page 101

1  running of acetylene lines and things of that nature.
2  Q  There has been some discussion during your deposition
3     regarding knowledge of the health risks of asbestos,
4     and in the course of your work you've got to
5     understand that there are certain hazards associated
6     with exposure to asbestos, and you testified with
7     respect to some of that knowledge during your
8     deposition.
9        Now, having the experience of both being a naval
10    officer and working in a civilian shipyard in that
11    capacity, over the course of your experience do you
12    have any reason to think-- to believe, let's say
13    while you were at Ingalls Shipyard in the 1960s, that
14    the management of Ingalls Shipbuilding knew anything
15    more about the hazards of asbestos than the U.S. Navy
16    did?
17 A  No, I really-- the Bureau of Medicine I'm sure had--
18    that was their job, part of their job, and I'm sure,
19    you know, they had state of the art type of
20    knowledge.
21     I was just out there working.
22     I had a one-liner in a health book at the Naval
23    Academy that concerned asbestos, and it said that it
24    wasn't good for your lungs. That was about it.
25     I promptly forgot that.

26 (Pages 98 to 101)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

---

Page 42

1  Q  Did the Navy have similar specifications, directives
2     or other means of requiring a private shipyard, for
3     example, to do or not do things in the construction
4     of a vessel for the Navy with respect to--
5  A  I guess I wasn't clear.
6        Yes, the--
7  Q  Let me finish my question.
8        I'm particularly asking you with respect to
9     issues of workplace safety and industrial hygiene.
10 A  Industrial hygiene, as far as these asbestos cases
11    are concerned, after the instruction came out in
12    1971--
13 Q  What instruction are you referring to in 1971?
14 A  That was put out by the naval-- I think we'd gone
15    from the Bureau of Ships to the Naval Sea Systems
16    Command at that time.
17       The instruction said that when you're dealing
18    with asbestos, particularly in repair work and what
19    have you, there were certain controls that you had to
20    use, and that was sent to the Supervisor of
21    Shipbuilding offices, and it was also sent to all the
22    Navy shipyards and to the forces that flow.
23 Q  Was it sent to the private shipyards that contracted
24    with the Navy?
25 A  It was sent to the Supervisor of Shipbuilding offices

---

Page 43

1     who administered the contracts.
2        It was their responsibility to see that those
3     things were carried out.
4  Q  And carried out, again, at private shipyards as well?
5  A  Yes.
6  Q  Okay.  And what type-- is this something that's in a
7     document somewhere that we could locate and review or
8     what type of--
9  A  All I could provide you with is the 1971 instruction,
10    which goes out to all these people.
11       How they invoke it, how they-- this says what the
12    requirements are, and then they have to take that and
13    put it into action.
14       In the shipyards, Navy yards, where I was
15    involved after this document come out, it had a
16    significant impact on being able to overhaul ships
17    because in order to remove the insulation and that
18    type of material, you had to put these controls on
19    and you had to evacuate the space.  You couldn't work
20    it the same way as you worked it before.
21       It was different.
22 Q  It was a departure from the private practice?
23 A  That's correct.
24 Q  And prior to that 1971 change, I guess, was there
25    anything, to your knowledge, at all in place similar

---

Page 44

1     to that with respect to workplace exposure to
2     asbestos in the Navy?
3  A  Yes.  It goes back to the 1930s.  There was a-- it
4     was looked at as an industrial problem, and you can
5     find in the records inspections that were made and
6     recommendations that were made.
7        There was not a fiber count or anything like
8     there is, you know, developed, so the people were
9     cutting into asbestos or doing this, and there was
10    recommendations on how to go about doing that.
11       It was looked at as an industrial problem.
12 Q  When you say there was recommendations about how to
13    go about doing that, I want to be very clear.
14       I am limiting this to directives or
15    specifications or instructions from the Navy to
16    private shipyards with respect to industrial hygiene.
17       Are you aware of any of those that existed prior
18    to 1971?
19 A  I'm aware of inspections that go back to the maritime
20    commission in the 1930s made by the medical
21    department of the Navy, of yards, that made
22    recommendations from an industrial-- you know,
23    cutting in it like a shop or something, wet it down
24    or this or that-- asbestosis was recognized as a
25    problem.

---

Page 45

1        There was nothing that indicated how significant
2     the dust was in fiber counts per cubic centimeter or
3     anything.  That didn't exist.
4        It was a judgment sort of a call.
5  Q  When you say it didn't exist, are we talking about at
6     any time prior to 1971?
7  A  No.  I think prior-- there might have been a little
8     bit before 1971.
9        1965, in that range, is when the link-- to the
10    best of my knowledge, is when the link was made to
11    mesothelioma, lung cancer.
12       Before that, it was asbestosis, and it was-- you
13    go back to when OSHA come in, and that was-- I don't
14    know where that was, but it was right in the 1970s
15    there, I think, early 1970s, late 1960s, and then
16    there began to be a dust-- you know, fiber counts,
17    and things changed in that regard.
18       The requirements for the material and what was to
19    be used, it all come from military specifications.
20 Q  What material?  Are you talking about asbestos
21    materials or are you talking about material that
22    would be used to mitigate the problem?
23 A  Yes, the asbestos material was--
24 Q  Okay.  I will accept, you know, for the purposes of
25    the rest of this deposition, that there were military

12  (Pages 42 to 45)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 102

1  Q  I would like to essentially ask you the same
2     question.  Obviously you have the experience of
3     having been at Ingalls Shipyard.
4        Do you have any reason to believe that any other
5     private shipyard that did contract work for the Navy
6     during the 1960s, such as Lockheed or such as Todd
7     Shipyards, had any more knowledge regarding the risks
8     of asbestos exposure than the U.S. Navy did?
9  A  I doubt if anyone had more knowledge.
10       I don't know what the individual yards knew or
11    didn't know, but I do know, from reading, as a result
12    of these cases, of reading inspections that were
13    performed to go way back to the '30s, and I know what
14    was taking place in Puget Sound Naval Shipyard when
15    we started to find out what was going on.
16       I know that the Navy was very active, and I
17    believe very strongly that the Navy took-- was the
18    leader in taking the appropriate action once the
19    hazard was understood.
20  Q  Would you agree that it was more likely that the Navy
21    knew more about the risks of exposure to asbestos
22    than the shipyards did?
23          MR. LADENBURG:  I'm going to object
24    based on foundation.
25          THE WITNESS:  Again, you know, I

Page 103

1     can't-- don't have perfect knowledge of what the-- I
2     do know that the Navy had knowledge and was pretty
3     extensive, and I do know that the Navy had a Bureau
4     of Medicine that was addressing the issue for a long
5     time.
6        I don't know-- I would not expect any shipyard to
7     have that degree of knowledge without having those
8     kind of people working for them.
9  Q  (By Mr. Barton)  So you say you do know that the Navy
10    had knowledge and that it was extensive.
11       What do you base that testimony on?
12  A  Say that again.
13  Q  You said that you do know that the Navy had knowledge
14    about the risk of asbestos and that it was very
15    extensive.
16       What do you base that statement on?
17  A  I base that on looking at a lot of cases and reading
18    historical documents that have come up in these past
19    cases.
20       They indicate that the Navy had a knowledge that
21    progressed right along with the medical knowledge of
22    the dangers of asbestos at the time.
23       I don't know of any case that I've read where a
24    private shipyard or somebody had come up with the
25    idea that asbestos would create lung cancer that come

Page 104

1     out of a private shipyard.
2        I believe the Germans-- I may be wrong, but they
3     were the first ones that started making the link, and
4     then there was a meeting in New York, and the
5     physicians reached a consensus, and that was in the
6     '60s, 1965, I believe.
7        I would expect that Navy doctors, because that's
8     their profession, medical, and they had doctors that
9     specialized in industrial issues, that they would be
10    aware of that.
11       I don't know whether shipyards would be or not.
12          MR. BARTON:  Thank you, Mr. Horne.
13    That's all I have.
14
15
16          FURTHER EXAMINATION
17  BY MR. LADENBURG:
18  Q  I have a couple of follow-ups.
19       Can I get from you-- I don't think I got it from
20    your resume because the dates weren't on there.
21       When were you at PSNS, what years?
22  A  I was there twice.  I was there from 1968 to 1972, I
23    think it was, as a nuclear engineering officer.  Then
24    I come back in 1981 as the shipyard commander.
25  Q  How long did you stay?

Page 105

1  A  I was up there in 1983, I think, 1983, 1984-- early
2     1984, late 1983.
3  Q  Okay.
4  A  In-between there, I was down at Mare Island Naval
5     Shipyard.
6  Q  Are you aware of any policy of the Navy or contract
7     or specification, any sort of requirement from the
8     Navy issued to a private shipyard like Lockheed in
9     the '50s, '60s or '70s that forced or required
10    Lockheed to expose workers on those ships to
11    asbestos-- airborne friable asbestos fibers?
12          MR. BARTON:  Object to the form.
13          THE WITNESS:  Would you ask it
14    again, please, because I did lose-- my hearing is not
15    that great.
16  Q  (By Mr. Ladenburg)  All right.  I'll try it again.
17    Sorry.
18       Are you aware of any Navy policy or directive,
19    specification, anything from the Navy, I guess, in
20    the late '50s, '60s, early '70s, that required a
21    private shipyard like Lockheed, working on Navy
22    ships, to expose its workers to airborne friable
23    asbestos fibers?
24          MR. BARTON:  Object to the form of
25    the question.

27 (Pages 102 to 105)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 106

1          MR. THORSON: Join.
2          MR. ANDRE: Join.
3          THE WITNESS: I wouldn't expect it
4    to.
5       It was a requirement that they work with
6    asbestos.
7       Whether they are going to be exposed to
8    asbestos-- there wouldn't be a requirement that said,
9    "You have to go out and breathe so many fibers per
10   hour" or something, but there was a requirement that
11   they had to put insulation on ships to a certain
12   specification.
13 Q   (By Mr. Ladenburg) Understood.
14      Was it a requirement that they had to work with
15   asbestos in an unsafe manner?
16         MR. BARTON: Object to the form.
17         THE WITNESS: Of course not.
18         MR. LADENBURG: Okay. Fair enough.
19      That's all I have.
20      If we're done with the questions, I wanted to put
21   a couple of things on the record with respect to
22   what's happened here with the documents and stuff
23   that I want to get, if that's okay.
24      Is everyone else finished?
25         MR. CRAIG: Brian, I just want to

Page 107

1    make sure we understand that an objection by one
2    defense counsel is good for all--
3          MR. LADENBURG: That's fine. I
4    don't care about that.
5       A couple of things-- Bob, I just want to put on
6    here that we had some documents come up in the
7    deposition that he didn't bring with him. I just
8    want to get copies of those.
9       I don't think I'll need to ask you more questions
10   about them, but if I do, I want to reserve my right
11   to ask.
12         MR. ANDRE: You want copies of the
13   e-mails and letters from my office and any edits of
14   his declaration?
15         MR. LADENBURG: And a copy of his
16   manual.
17         MR. ANDRE: A copy of his manual
18   and any declarations that he's written that he's got
19   a copy of written on behalf of a private shipyard
20   client?
21         MR. LADENBURG: Correct. I think
22   that covers it.
23         THE WITNESS: What was the last
24   one?
25         MR. LADENBURG: Any other

Page 108

1    declarations you've done similar to this but not for
2    an equipment company but for a shipyard--
3          THE WITNESS: For shipyards, yeah.
4          MR. LADENBURG: Private shipyards,
5    not for Navy yards but for a private shipyard.
6          THE WITNESS: Right.
7          MR. LADENBURG: And then the other
8    thing I wanted to just point out, and it may be
9    obvious, but we noted this dep up in conjunction with
10   Lockheed's removal of this case to federal court
11   where I had a court order that-- in my
12   representations to the Court I indicated I would try
13   to keep this deposition limited in scope to issues
14   arising out of and related to the federal contractor
15   defense, and that's what we've done.
16      Whether this case stays in federal court or goes
17   to state court, I want to reserve my right to ask for
18   a deposition on the merits to the extent that this
19   witness will be offered at trial as a witness on any
20   other liability issues unrelated to the federal
21   contractor defense, which is the scope of this
22   deposition.
23      I don't know if that's what you're going to offer
24   him for. I haven't seen a disclosure yet--
25         MR. ANDRE: Let me ask you this:

Page 109

1    If the case is remanded back to state court, you want
2    to depose him again. If it's not remanded back to
3    state court and stays in federal court, you still
4    want to depose him again. Is that it?
5          MR. LADENBURG: I don't know
6    whether I want to depose him again at all because I
7    don't know the scope-- the scope of his testimony
8    hasn't been disclosed to me yet, other than I agreed
9    to keep this to federal contractor related stuff
10   because that's why I wanted the dep and that's why I
11   got an early deposition under the federal rules.
12      At some point, if we stay in federal court,
13   you'll do a Federal Rule 26 disclosure about what
14   this guy is going to say at trial.
15      If we've covered everything, fine.
16      I just want to make sure that by taking his
17   deposition early for purposes of dealing with the
18   remand, I'm not foreclosing myself from doing
19   merits-based discovery down the road, whether in
20   federal court or state court.
21      It may be that the scope of what you retained him
22   for and what he's going to offer testimony on is
23   limited even at trial to federal contractor defense
24   issues, and if that's the case, I think we're
25   finished.

28 (Pages 106 to 109)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

Byers & Anderson, Inc.
Court Reporters & Video/Videoconferencing

Page 110

1    If it goes beyond that, which it may well do,
2    considering his background and career, I just want to
3    be able to do merits-based discovery on whatever it
4    is that you might disclose him for if it exceeds the
5    scope of where we are today.
6        I hope that's clear.
7        I am not saying I want another dep for sure
8    today. I just want to be clear that I am not waiving
9    my right to ask questions--
10           MR. ANDRE: He's available--
11           THE WITNESS: I hope it's clear to
12   those guys. It don't mean a damn thing to me.
13           MR. ANDRE: I can't say yes or no
14   at this point in time, but he's available here and
15   he's not going any place.
16           MR. LADENBURG: Fair enough. I
17   think we can leave it at that.
18           VIDEOGRAPHER: This is the end of
19   Tape No. 2, and this adjourns the deposition. The
20   time is approximately 2:10.
21           (Deposition concluded at 2:10 p.m.)
22           (Signature waived.)
23
24
25

Page 111

1    STATE OF WASHINGTON )  I, Terilynn Pritchard, RPR, CRR,
                         ) ss CCR # 2047, a duly authorized
2    County of King     )  Notary Public in and for the State
                            of Washington, residing at
3                           Auburn, do hereby certify:
4
5        That the foregoing deposition of ROGER B. HORNE
     was taken before me and completed on August 5, 2009, and
6    thereafter was transcribed under my direction; that the
     deposition is a full, true and complete transcript of the
7    testimony of said witness, including all questions, answers,
     objections, motions and exceptions;
8
         That the witness, before examination, was by me
9    duly sworn to testify the truth, the whole truth, and
     nothing but the truth, and that the witness waived the right
10   of signature;
11       That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
12   of any such attorney or counsel and that I am not
     financially interested in the said action or the outcome
13   thereof;
14       That I am herewith securely sealing the said
     deposition and promptly delivering the same to
15   Attorney Brian F. Ladenburg.
16       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my official seal this 7th day of August, 2009.
17
18
19
20
         _____
21       Terilynn Pritchard, CCR, RPR, CRR
         Notary Public in and for the State
         of Washington, residing at
22       Auburn.
23
24
25

29 (Pages 110 to 111)

Roger B. Horne
August 5, 2009

62c4707e-c280-4fb3-8b7f-716872d18dff

# Exhibit B

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
                    AT TACOMA
                    - - -
JACOB EDWARD FISCHER,   : CIVIL ACTION
        Plaintiff       :
                        :
      vs.               :
                        :
SABERHAGEN HOLDINGS,    :
INC., et al            :
        Defendants      : NO. C09-5385
```

```
                    - - -
        Tuesday, August 11, 2009
                    - - -
```

Videotaped Deposition of PETER

D. BALCH, taken pursuant to notice, at the

offices of Veritext National Court Reporting,

1801 Market Street, Suite 1800, Philadelphia,

Pennsylvania, beginning at approximately 10:20

a.m., before Carol McAvey, Registered

Professional Reporter and Notary Public, there

being present.

* * *

```
    VERITEXT NATIONAL COURT REPORTING COMPANY
                  KNIPES-COHEN
            1801 Market Street - Suite 1800
            Philadelphia, Pennsylvania 19103
```

Page 2

1  APPEARANCES:
2
3  BERGMAN, DRAPER & FROCKT
   BY: BRIAN LADENBURG, ESQUIRE
   614 First Avenue
4  3rd Floor
   Seattle, Washington 98104
5  Phone: (206) 957-9510
   E-mail: Brian@bergmanlegal.com
6  Representing the Plaintiff
7
   KNOTT & GLAZIER, LLP
8  BY: ELIZABETH KLEIN HILLER, ESQUIRE
   601 South Figueroa Street
9  Suite 4200
   Los Angeles, California 90017
10 Phone: (213) 312-9200
   E-mail: Hiller@knottglazier.com
11 Representing the Defendant,
   LOCKHEED SHIPBUILDING COMPANY
12
13 OGDEN, MURPHY & WALLACE
   BY: ROBERT G. ANDRE, ESQUIRE
14 1601 Fifth Avenue
   Suite 2100
15 Seattle, Washington 98101
   Phone: (206) 447-7000
16 E-mail: Randre@omwlaw.com
   Representing the Defendant,
17 LOCKHEED SHIPBUILDING COMPANY
18
   CARNEY, BADLEY & SPELLMAN
19 BY: TIMOTHY K. THORSON, ESQUIRE
   701 Fifth Avenue
20 Suite 3600
   Seattle, Washington 98104
21 Phone: (206) 622-8020
   E-mail: Thorson@carneylaw.com
22 Representing the Defendant,
   SABERHAGEN HOLDINGS, INC.
23
24
25

Page 4

1        I N D E X
2         - - -
3  WITNESS                    PAGE
4  PETER D. BALCH
5     BY MR. LADENBURG              6
6
7        E X H I B I T S
8         - - -
9  NUMBER        DESCRIPTION      PAGE
10  1 Notice of Deposition          6
11  2 Mr. Balch's bio sheet        80
12  3 Lockheed documents           83
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  APPEARANCES CONTINUED:
2  (VIA TELEPHONE)
3
   KARR, TUTTLE, CAMPBELL
4  BY: WALTER E. BARTON, ESQUIRE
   1201 Third Avenue
5  Suite 2900
   Seattle, Washington 98101
6  Phone: (206) 223-1313
   E-mail: Gbarton@karrtuttle.com
7  Representing the Defendant,
   TODD PACIFIC SHIPYARD and
8  TODD SHIPYARD
9
   GORDON & REES, LLP
10 BY: KEVIN CRAIG, ESQUIRE
   701 Fifth Avenue
11 Suite 2130
   Seattle, Washington 98104
12 Phone: (206) 695-5100
   E-mail: Kcraig@gordonrees.com
13 Representing the Defendants,
   INGERSOLL-RAND and ASBESTOS CORP., LTD.
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1            PETER D. BALCH
2            VIDEOTAPE OPERATOR:  We're now
3  on the video record.  The time is 10:20.  My
4  name is Earle Strain of Veritext.  The date
5  today is August 11, 2009.  This deposition is
6  being held at 1801 Market Street, Philadelphia
7  PA.
8            The caption in this case is
9  Fischer versus Saberhagen Holdings, Inc., et
10 al.
11           The name of the witness is
12 Peter Balch.
13           Counsel will now introduce
14 themselves.
15           MR. LADENBURG:  Brian
16 Ladenburg, counsel for the plaintiff.
17           MR. THORSON:  Tim Thorson for
18 Saberhagen Holdings, Inc.
19           MR. ANDRE:  Robert Andre of
20 Ogden, Murphy, Wallace in Seattle for Lockheed
21 Shipbuilding Company.
22           MS. HILLER:  Elizabeth Hiller
23 for Lockheed Shipbuilding Company.
24           - - -
25           PETER D. BALCH, after having

2  (Pages 2 to 5)

Page 6

```
 1        PETER D. BALCH
 2  been first duly sworn, was examined and
 3  testified as follows:
 4              - - -
 5        EXAMINATION
 6              - - -
 7        (Whereupon, Exhibit 1 was
 8  marked for identification.)
 9              - - -
10  BY MR. LADENBURG:
11  Q.   Good morning, sir.
12  A.   Good morning.
13  Q.   Would you please state your full name?
14  A.   Peter D. Balch.
15  Q.   Mr. Balch, before we started this
16  morning, I was handed a short bio of you, I
17  believe.
18        You're the General Counsel for
19  Lockheed Martin Maritime Systems & Sensors; is
20  that right?
21  A.   That's correct.
22  Q.   Before we kind of get into the topics
23  we've designated here in the 30(b)(6) notice
24  today, I want to get a little bit more
25  background information about you, if I can.
```

Page 7

```
 1        PETER D. BALCH
 2        Correct me if I'm wrong, but
 3  just glancing over your bio this morning, it
 4  looks like you've more or less worked for
 5  Lockheed continuously since you got out of law
 6  school or am I missing part of your career?
 7  A.   Just a small part. I graduated law
 8  school in 1980 from New York University. I
 9  worked in private practice for about five
10  years before going to Lockheed Shipbuilding
11  Company in 1985.
12  Q.   And when you were in private practice,
13  where were you working, New York City or --
14  A.   No. Immediately after law school, I
15  moved to Wenatchee, Washington. I worked for
16  the firm of Jeffers, Jeffers, Danielson, Sonn
17  and Aylward. I worked there for about a year.
18        I moved to Seattle. I worked
19  for Betts, Patterson and Mines for about three
20  years. And I worked for one year as in-house
21  counsel for Marine Power and Equipment in
22  Seattle and then I moved to Lockheed
23  Shipbuilding Company.
24        MS. HILLER: Is everybody on
25  the phone muted?
```

Page 8

```
 1        PETER D. BALCH
 2        MR. LADENBURG: Can anyone on
 3  the phone hear us?
 4        MR. BARTON: You're cutting in
 5  and out.
 6        MR. LADENBURG: Okay. Well,
 7  we'll just try --
 8        MR. BARTON: I can barely hear
 9  you at all.
10        MR. LADENBURG: Okay. We'll
11  just try to do our best to speak up, I guess.
12  I'm not sure if we can get it any louder on
13  the phone, but we have to play the hand we're
14  dealt here anyway.
15        The question was if you guys
16  could make sure, if you're not speaking, to
17  mute your phones, because you're kind of
18  coming through on the phone and it's creating
19  a bit of noise on our end.
20        MR. BARTON: I'm muted.
21  BY MR. LADENBURG:
22  Q.   Okay, so, I'm sorry, just kind of going
23  back to the background information we were
24  getting.
25        The year in Wenatchee, a few
```

Page 9

```
 1        PETER D. BALCH
 2  years at Betts, Patterson in Seattle and then
 3  you said you went in house to Lockheed
 4  Shipbuilding; is that right?
 5  A.   My first in-house job was Marine Power
 6  and Equipment, also in Seattle.
 7  Q.   What type of business is that?
 8  A.   They're a boat builder. They were --
 9  when I was working for them, they were
10  involved in some litigation with the State of
11  Washington over the Issiquah class ferries,
12  the 100-car ferries in Seattle.
13  Q.   And you held that job for about a year?
14  A.   Correct.
15  Q.   Okay. What year approximately was this?
16  Are we talking like '85?
17  A.   In approximately the Fall of '84 until
18  the -- October of '85, when I went to Lockheed
19  Shipbuilding.
20  Q.   Okay. And then when you went to
21  Lockheed Shipbuilding, were you working at
22  first in Seattle?
23  A.   Yes.
24  Q.   Okay. How long did you stay with
25  Lockheed Shipbuilding as opposed to some other
```

Page 10

PETER D. BALCH

1    PETER D. BALCH
2  iteration of Lockheed and its various
3  subsidiaries?
4  A.   I was at Lockheed Shipbuilding Company
5  from October of 1985 until about September of
6  1988.
7  Q.   And then when you left -- well, let me
8  just -- before I move on from that, let me ask
9  you, what were your responsibilities when you
10 were with Lockheed Shipbuilding in Seattle?
11 A.   I was hired to assist the company
12 counsel whose name was Carol Warner at the
13 time.
14        There were various duties.  I
15 did manage some litigation for Lockheed
16 Shipbuilding at the time.  There were some
17 cases involving third party actions by
18 employees against outside companies.  And so
19 the defendants in those cases often wanted to
20 have some discovery and so forth.  I
21 coordinated that.
22        I reviewed contracts for
23 Lockheed Shipbuilding Company, various kinds
24 of government contracts.  There were lots of
25 different issues.  It's hard to name them all.

Page 11

PETER D. BALCH

1    PETER D. BALCH
2        One of the jobs that I had was
3  as an ethics ombudsman, after the company
4  instituted a more formalized ethics program.
5  And so I was the person who actually, you
6  know, listened to various employees who might
7  have had an ethics complaint or a perceived
8  ethics complaint.
9        That's about all I can think
10 of right now.
11 Q.   Okay.  And was October of 1985 the first
12 time you ever worked for Lockheed in any
13 capacity?
14 A.   Yes.
15 Q.   Okay.  And then have you been affiliated
16 with Lockheed more or less ever since 1988,
17 after you left Lockheed Shipyard?
18 A.   Yes.
19 Q.   Okay.  In terms of today's deposition,
20 can you tell me what you have done to prepare
21 for this deposition today?
22 A.   I have searched my personal records for
23 any data or articles that I maintained from
24 Lockheed Shipbuilding Company.  I have brought
25 those with me.

Page 12

PETER D. BALCH

1    PETER D. BALCH
2        I have reviewed documents,
3  including the Complaint, the Notice of
4  Deposition and some other documents provided
5  by Lockheed Shipbuilding Company's counsel.
6        I have very generally perused
7  a box of documents that you see on the chair
8  over there for contracts or specifications
9  that might be related to this case.
10 Q.   Okay.  When did you first learn that you
11 may be Lockheed's designee under Rule 30(b)(6)
12 today?
13 A.   Approximately one month ago, the middle
14 of July.
15 Q.   Okay.  And in terms of the documents
16 that you referenced, I believe I've been
17 provided a company probably of the same
18 documents that are in the box there.  I had a
19 box of documents produced from Knott & Glazier
20 in Los Angeles, and they followed that up and
21 gave me an additional Fed Ex box of some more
22 documents.
23        And I guess what I'm curious
24 is you also referenced your own personal
25 documents, and you said you brought those with

Page 13

PETER D. BALCH

1    PETER D. BALCH
2  you?
3  A.   Yes, sir.
4  Q.   I don't know whether you know, is that
5  something that I've been provided a copy of or
6  not?
7        MS. HILLER:  I don't believe
8  it has.  And you obviously can talk about
9  that.  I don't know that you'll find anything
10 that's pertinent to the case, but you
11 certainly are welcome to ask him about it.
12        MR. LADENBURG:  No, I'm just
13 trying to -- at this point, as we get started
14 here, I'm just trying to get an idea of what
15 our universe of documents is that we're
16 talking about, so...
17        Okay, I'll get to that.
18 BY MR. LADENBURG:
19 Q.   But you have a small file, it looks like
20 maybe an inch or two of documents you brought
21 with you that are your personal documents from
22 your work at Lockheed Shipbuilding; is that
23 right?
24 A.   Yeah, it's probably less than an inch.
25 It's the small folder on that chair, yes.

4  (Pages 10 to 13)

Page 14

PETER D. BALCH

1
2 Q.   Okay.  And those are just documents you
3 happened to have kept yourself back from your
4 time when you worked in Seattle?
5 A.   Yes.
6 Q.   Okay.  You understand that you are
7 Lockheed's designee under Federal Rule
8 30(b)(6) for purposes of this deposition; is
9 that right?
10 A.   Yes, sir.
11 Q.   Are you familiar with that rule of civil
12 procedure?
13 A.   Yes.
14 Q.   You understand that your answers today
15 bind the corporation?
16 A.   Yes.
17 Q.   Okay.  I think what I want to do is just
18 kind of start -- I may not go completely in
19 order, but start going through the topics.
20 And we've designated 12 different topics that
21 I wanted to cover.
22       I think we have an
23 understanding that today we're somewhat
24 limited in scope.  I'm not here to go into
25 everything about the liability case or other

Page 15

PETER D. BALCH

1
2 matters outside the scope of this
3 deposition, which my understanding is, is
4 limited to issues related to the federal
5 contractor defense that Lockheed has asserted
6 as a basis for Federal jurisdiction in the
7 case.
8       My goal in listing these 12
9 topics is to try to delve into the factual
10 bases for Lockheed's assertion of that
11 defense.
12       Are you familiar with the
13 materials Lockheed filed -- the removal
14 paperwork I guess I'll call it -- to get this
15 case into Federal court?
16 A.   Yes, I have read the Motion For Removal.
17 Q.   Okay.  And have you read the related
18 affidavit or declaration of Admiral Horn?
19 A.   If it was attached to the -- I don't
20 believe it was attached to the Notice of
21 Removal.
22 Q.   Okay.  You don't -- in any event, you
23 don't --
24 A.   I don't recall reviewing that affidavit.
25 Q.   Okay.  Have you reviewed -- Admiral Horn

Page 16

PETER D. BALCH

1
2 was deposed in this case last week.
3       Have you seen that transcript?
4 A.   No, sir.
5 Q.   Okay.  I think topic number one is moot.
6 I think we've identified for you, at least as
7 best we can, the vessels that Mr. Fischer
8 claims he worked aboard at Lockheed.
9       So I think for now, I'll skip
10 that one and just move to the second topic, if
11 we can, which is the identification of any and
12 all federal officers that Lockheed contends
13 issued directives to Lockheed that form the
14 basis of any government contractor's defense
15 as articulated in Boyle versus United
16 Technologies Corp., and its progeny or
17 otherwise under 28 USC, Section 1442 (a)(1).
18       I guess my first question is:
19 In preparing for this deposition, were you
20 able to identify federal officers that issued
21 directives to Lockheed that Lockheed contends
22 constitute a federal officer defense to the
23 claims that Mr. Fischer is making in this
24 case?
25       MS. HILLER:  Objection to

Page 17

PETER D. BALCH

1
2 form.
3       THE WITNESS:  I will answer it
4 in this way:  I reviewed the documents and saw
5 on a number of contracts, government contracts
6 between the United States Navy and Lockheed
7 Shipbuilding Company, that they, in fact,
8 signed by a contracting officer authorized by
9 the U.S. Navy.
10       The contracts refer to
11 specifications, both detailed specifications
12 and general specifications, that are then
13 subsequently modified under the contract.
14       All of that material together
15 constitutes the precise specifications that
16 Lockheed Shipbuilding built these ships in
17 accordance with.  And that is primarily the
18 basis for the government contractor defense.
19       In terms of federal officers
20 issues directives by name or personally
21 issuing directives, I don't recall seeing, you
22 know, specific signed memoranda or
23 communications from a federal officer.  But
24 the contracts were, in fact, signed by
25 contracting officers.

5 (Pages 14 to 17)

Page 18

PETER D. BALCH
1        PETER D. BALCH
2   BY MR. LADENBURG:
3   Q.   Okay.  So, we have contracts.  I think
4   we can agree -- you know, my goal today is not
5   to get bogged down in the documents.  I think,
6   to a large extent, they speak for themselves.
7   But I guess what I'll ask, just since you
8   reference in the contracts -- you said in a
9   again sense -- is in terms of your
10  understanding of the issues that we're here to
11  talk about today, my understanding is you have
12  personal knowledge from your work at Lockheed
13  from 1985 through '88.
14          You also have prepared
15  yourself today by reviewing I assume mostly
16  the same documents that were produced to me by
17  Lockheed's counsel, maybe some from your own
18  files.
19          Is there any else that informs
20  or anything else that forms the basis for your
21  testimony today other than that?
22  A.   Well, my experience in government
23  contracting throughout my career.
24          But specifically this case,
25  no, nothing else.

Page 19

PETER D. BALCH
1        PETER D. BALCH
2   Q.   In the course of preparing today, did
3   you speak with anyone else that worked at
4   Lockheed, for example, before you did?
5       MS. HILLER:  Just so we're
6   clear, when you say Lockheed, are you
7   referring to Lockheed Shipbuilding?
8       MR. LADENBURG:  Good point.
9   BY MR. LADENBURG:
10  Q.   For this question, yes, Lockheed
11  Shipbuilding.
12  A.   I spoke with a former colleague from
13  Lockheed Corporation who was in the Legal
14  Department in Calabasas, California a number
15  of years ago, and his name is Bob Gusman,
16  G-U-S-M-A-N.
17          And I called Mr. Gusman for
18  the purpose of determining whether he knew if
19  the former company counsel of Lockheed
20  Shipbuilding Company was still alive or where
21  he was living if he was alive.  And we did
22  have a conversation about -- about that.
23  That's basically all that we talked about.
24  Q.   Okay.  Did you speak with anyone else
25  from Lockheed Shipbuilding Company in the

Page 20

PETER D. BALCH
1        PETER D. BALCH
2   course of preparing for your testimony today?
3   A.   I have spoken generally with the current
4   company secretary, Ildi Songrady --
5       THE COURT REPORTER:  Same that
6   name again.
7       THE WITNESS:  Ildi, I-L-D-I,
8   Songrady, S-O-N-G-R-A-D-Y.
9          -- concerning the case, but
10  not specifically about this 30(b)(6)
11  deposition.
12  BY MR. LADENBURG:
13  Q.   Okay.  I think we've met before.  She --
14  you're aware she testified as a 30(b)(6)
15  witness in a different Lockheed case?
16  A.   Yes.
17  Q.   Okay.  So, I'm a bit unclear.  Did your
18  discussion with her -- was that at all
19  something you did to prepare for today or was
20  it just -- you said it didn't relate to
21  today's case.
22  A.   At the time I spoke with Mrs. Songrady,
23  I don't think I knew that I was going to be
24  deposed as a 30(b)(6) witness.  So I did not
25  discuss with her any of that.

Page 21

PETER D. BALCH
1        PETER D. BALCH
2   Q.   Okay, I've got you.
3          Did you discuss -- did you
4   have discussions with anybody who was employed
5   by Lockheed Shipbuilding Company at any time
6   prior -- at any time prior to 1971, and
7   including 1971, which I think is the last date
8   when Mr. Fischer worked at the shipyard, in
9   preparing for your deposition today?
10  A.   No.
11  Q.   Okay.  And kind of going back to topic
12  two, I was asking for identification of
13  federal officers.
14          And I understand generally
15  from your answer that the officers, to the
16  extent you're able to identify them, would be
17  the officers who -- or from the Navy who
18  signed the contracts with Lockheed
19  Shipbuilding Company or otherwise were
20  corresponding with them in a way that is
21  reflected in the documents that were produced
22  to me or produced to us before this deposition
23  today; is that right?
24  A.   Yes.  There are other naval officers
25  mentioned in the documents that I reviewed.

6  (Pages 18 to 21)

Page 22

PETER D. BALCH

1
2  Some of them may have been working for the
3  Bureau of Ships or the Supervisor of
4  Shipbuilding. So I don't recall any of them
5  by name. But I know that there are other
6  naval officers, federal officers, that are
7  mentioned in those documents.
8  Q.   Okay. And I don't want to get bogged
9  down with the names of each one of them and go
10 through one by one. I just want to ask the
11 question this way to be clear kind of what the
12 universe of federal officers are that we're
13 dealing with here:
14           Other than those that are
15 referenced or identified in the documents,
16 which I think I can identify as easily as you,
17 are there any others that you're aware of,
18 that Lockheed's aware of, that it claims to be
19 the federal officers, officer or officers,
20 that issued directives, specifications, et
21 cetera, that might form the federal contractor
22 defense in this case or is it limited to those
23 we can identify in the documents?
24           MS. HILLER:  Objection to
25 form.

Page 23

PETER D. BALCH

1
2           THE WITNESS:  Well, this set
3  of documents represents, I think as you know,
4  a very small subset of a large number of
5  files. I believe in the realm of 13,000 boxes
6  of files.
7           There are other documents
8  which Lockheed Shipbuilding Company is
9  continuing to search for, including in the
10 National Archives and other sources of
11 government documents. Because although we
12 have some of the detailed specifications and
13 general specifications for the ships in issue,
14 there are, one would believe, other documents,
15 other specifications that would inform this
16 case.
17           There may be, as we find those
18 documents, federal officers, naval officers
19 who have prepared specifications who have
20 prepared things like mill specs or mill
21 standards, which are also referenced in the
22 general specification and detailed
23 specifications. And those federal officers
24 are unknown to me right now, but I'm sure that
25 the documentation, as it develops, will show

Page 24

PETER D. BALCH

1
2  that certain specifications involved in these
3  ships were issued by federal officers.
4  BY MR. LADENBURG:
5  Q.   Okay. Let me just ask you this:  Are
6  the federal officers Lockheed is aware of
7  limited to officers of the Navy or some other
8  federal department or some other --
9  A.   Well, there may be officers -- I'm not
10 sure, but there may be officers at the
11 Department of Defense, the DOD, that may have
12 created some specifications that were broader
13 than just a Navy specification. There may
14 have been some general specifications that
15 would be DOD related.
16 Q.   But as you sit here today, are you aware
17 of whether that's the case or not?
18 A.   No, sir.
19 Q.   Okay. So as far as you are aware today,
20 and I guess as far as Lockheed Shipbuilding
21 Company is aware, as of the time we're taking
22 this deposition, the federal officers, the
23 known federal officers, I guess, are limited
24 to Navy officers; is that right?
25           When I say officers, I mean --

Page 25

PETER D. BALCH

1
2  strike that. I don't mean to say Navy
3  officers as opposed to enlisted personnel, but
4  they're limited -- the federal officers you're
5  aware of are limited to officers affiliated
6  with the Navy; is that right?
7           MS. HILLER:  Objection to
8  form.
9           THE WITNESS:  As far as I know
10 today, but discovery continues, so...
11 BY MR. LADENBURG:
12 Q.   Okay. Kind of a related topic is topic
13 three. I think I'll jump to that now. I
14 might come back to two in a moment.
15           But topic three just asks for
16 identification of any and all written
17 specifications, instructions, rules,
18 directives, contracts or other written
19 material, if any, that Lockheed contends
20 constitute or constitutes a government
21 contractor defense to the claim or claims made
22 in Plaintiff's complaint.
23           Earlier we already, you know,
24 referenced this approximately one banker's box
25 of documents that Lockheed has produced

7 (Pages 22 to 25)

Page 26

PETER D. BALCH

1
2 specifically in conjunction with today's
3 deposition notice. And you also referenced, I
4 take it, a small folder of your own personal
5 documents.
6         I'm assuming that the
7 documents that have been produced include
8 documents responsive to my topic number three
9 on the deposition notice?
10 A.   I believe so.
11 Q.   Okay. Have you gone through those
12 documents yourself?
13 A.   I have -- as I said earlier, I've
14 perused generally the documents in that box,
15 correct.
16 Q.   Okay. In conjunction with perusing
17 those documents or otherwise in conjunction
18 with your preparation today, are you able to
19 point me to any particular specifications or
20 instructions, rules, directives, et cetera,
21 that Lockheed contends -- for purposes of the
22 federal contractor defense that Lockheed
23 contends that -- strike that.
24         Let me ask it this way:
25 Within that box of documents that you

Page 27

PETER D. BALCH

1
2 reviewed, are there any -- can you point me to
3 any specific specifications, directives, et
4 cetera, that Lockheed, for purposes of this
5 case, relies on as being a specification,
6 written directive that forms the basis of the
7 federal contractor defense?
8 A.   I would have to take some time to
9 actually go pull various -- the various
10 documents.
11         In general, I can tell you
12 that the documents in that box represents, in
13 part, the basis for the government contractor
14 defense, in that they consist of contracts
15 which are maybe 15, 20 pages long, which then
16 reference specifications, both detailed
17 specifications, which are many hundreds of
18 pages long.
19         There are also reference to
20 general specifications which are not as long
21 as the detailed specifications. The detailed
22 specifications and/or the general
23 specifications reference other sub-tier
24 documents known as mill specs or mill
25 standards. And taken together, those

Page 28

PETER D. BALCH

1
2 documents are very precise and explain exactly
3 how the Navy contracted for these ships to be
4 built with virtually no room to -- for the
5 contractor, for Lockheed Shipbuilding, to come
6 up with its own design or own materials that
7 it chose to put into the ships.
8         So from that perspective, the
9 whole collection of documents is supportive of
10 that defense.
11 Q.   Okay. Let me see if I can follow up a
12 little bit on that.
13         You're aware that this is a
14 lawsuit, generally speaking, arising out of
15 alleged asbestos exposure at Lockheed
16 Shipbuilding Company in Seattle?
17 A.   Yes, sir.
18 Q.   Okay. And in conjunction with looking
19 through the documents, is it Lockheed's
20 contention or position in the case that
21 because of government contracts, related
22 specifications, mill specs, mill standards, et
23 cetera, that Lockheed, to comply with the
24 contracts, those specifications, et cetera, in
25 different portions of these Navy vessels that

Page 29

PETER D. BALCH

1
2 were being built, had to use
3 asbestos-containing material?
4 A.   I believe that asbestos is called for in
5 a number of the documents, correct.
6 Q.   Okay. Again, without going into looking
7 at each specific document, but I think there
8 is about six vessels we listed as being
9 vessels that, per Mr. Fischer's memory, were
10 vessels that he worked aboard, either at Todd
11 or Lockheed. I think some of them may have
12 been Todd Shipyard, which wouldn't be
13 relevant.
14         But was the -- in terms of the
15 specifications and anything that's responsive
16 to my topic number three, I guess,
17 specifications, written instructions, rules,
18 you know, I would include in that the mill
19 specs that you referenced, can you point me
20 to -- and we might have to stop and go look at
21 the documents eventually. But just as you sit
22 here, can you recall -- can you point me to
23 any specification, directive, et cetera, that
24 required -- that instructed Lockheed not only
25 that asbestos was to be used, but how the

8  (Pages 26 to 29)

ca1ffc97-1020-4a1f-af2f-6ac2ec1fe912

Page 30

PETER D. BALCH

1
2 asbestos is to be installed or how the workers
3 doing the work at Lockheed are to do their
4 work?
5        MS. HILLER: Objection to
6 form.
7 BY MR. LADENBURG:
8 Q.   Do you understand the distinction I'm
9 making?
10 A.   Yeah, I understand.
11 Q.   Okay.
12 A.   Based on my review, I don't recall any
13 specific instructions in those specifications
14 as to how asbestos or materials containing
15 asbestos are to be installed or used.
16        I do recall seeing in those
17 documents materials that are to be
18 incorporated on the ship that contained
19 asbestos.
20 Q.   Okay.  I think we can agree on that.  I
21 mean I think that certain mill specs -- I mean
22 I reviewed mill specs and there are mill specs
23 that are in those documents that are
24 referenced.  And I think -- I think we can all
25 agree that the Navy called for asbestos to be

Page 31

PETER D. BALCH

1
2 used on these Navy vessels in the 1960's.
3        The reason -- the question I'm
4 asking, which is a little bit different, is --
5 and I'll guess I'll just ask now generally,
6 setting aside the documents reviewed.
7        Does Lockheed have any
8 information to suggest that the Navy told
9 Lockheed how to install the
10 asbestos-containing components or materials on
11 the ship or how its contractors doing that
12 work, you know, subcontractors doing the work
13 for Lockheed, were to install the
14 asbestos-containing components or materials on
15 the ship, whether you have document --
16 documentary support or not?
17        MS. HILLER: Objection to
18 form.
19        THE WITNESS: The best way I
20 can answer that is that in either these
21 documents or other documents which I have not
22 seen yet, there would be detailed installation
23 procedures that the Navy would have approved.
24        Those detailed installation
25 procedures may have included procedures for

Page 32

PETER D. BALCH

1
2 installing asbestos-related materials, whether
3 they were tiles or gaskets or insulation.  But
4 I'm not aware of any specific documents
5 regarding how asbestos-containing materials
6 were to be installed today.
7 BY MR. LADENBURG:
8 Q.   Okay.  You say may have.  What I'm
9 wondering is -- I guess we're kind of limited
10 today to what you have reviewed or what you do
11 know of, what you can point me to.
12        I mean can you point me to any
13 document, as you sit here today, where the
14 Navy tells Lockheed Shipbuilding Company, with
15 respect to the installation or the
16 construction of this ship that calls for use
17 of asbestos, here's how we want your workers
18 to do that work?
19        Can you point me to any
20 document that meets that criteria?
21        MS. HILLER: Objection to
22 form, lacks foundation.
23        THE WITNESS: I don't -- I
24 don't believe I can.
25 BY MR. LADENBURG:

Page 33

PETER D. BALCH

1
2 Q.   Okay.  Are you aware of what Admiral
3 Horn last week called "process inspections" by
4 the Navy?
5        Does that -- do you know what
6 he was referring to when he referred to a Navy
7 process inspection versus, I guess, a standard
8 inspection?
9        MS. HILLER: Objection.  Lacks
10 foundation.
11        THE WITNESS: I don't recall
12 reviewing Admiral Horn's testimony, nor any
13 affidavits from Admiral Horn.
14 BY MR. LADENBURG:
15 Q.   Okay.  Well, Admiral Horn has testified
16 and his testimony is what it is.  I'm asking
17 just by way of background.
18        Admiral Horn referred to two
19 different types of inspections the Navy
20 conducted during his tenure when he would work
21 with shipbuilders, private shipbuilders,
22 including Ingalls Shipyard down on the Gulf
23 Coast and he also spent some time up in
24 the Puget Sound area.
25        But just by way of background,

9  (Pages 30 to 33)

Page 34

PETER D. BALCH

1        PETER D. BALCH
2 for your edification, his testimony was that
3 there were inspections once work was done to
4 make sure it complied with specifications.
5 But there also were certain critical events
6 that would happen during the construction of
7 any naval vessel, where it wasn't simply the
8 Navy showing up to inspect the work after it
9 was finished, but he called them process
10 inspections, which were -- whatever it was
11 that was being inspected had to be inspected
12 while the workers were actually doing the work
13 to make sure that the process complied with
14 the Navy's requirements more or less.
15        And I'm paraphrasing and, you
16 know, it may not be exactly word for word what
17 Admiral Horn's testimony was. But I give you
18 that background because I wanted to ask you
19 whether you're aware of the Navy doing any
20 sort of process inspections on the ships
21 involved in this case at Lockheed Shipbuilding
22 Company with respect to anything that had to
23 do with the use of asbestos?
24        MS. HILLER: Objection to
25 form.

Page 35

PETER D. BALCH

1        PETER D. BALCH
2        THE WITNESS: I'm not an
3 expert on inspection. And I will say that I
4 am generally aware, from my tenure at Lockheed
5 in general, not just my tenure at Lockheed
6 Shipbuilding Company, that the government does
7 inspect during construction of the -- of the
8 product.
9        I don't know whether on these
10 ships that the government had a specific
11 process inspection related to the installation
12 or the construction of the vessel as it
13 pertains to the asbestos-containing materials;
14 but that's highly likely that they did,
15 because the government does inspect constantly
16 during construction at various key events as
17 you mentioned.
18 BY MR. LADENBURG:
19 Q.   I understand that. And the key
20 distinction I was getting at -- and I'm not
21 sure you answered this part of my question --
22 was did the Navy inspect any of these naval
23 vessels not simply to insure that the
24 asbestos-containing components or materials
25 were actually used in compliance with

Page 36

PETER D. BALCH

1        PETER D. BALCH
2 specifications, but did the Navy actually, you
3 know, conduct any inspections while workers
4 were working with or using asbestos-containing
5 materials during the construction of the
6 vessels at issue in this case during the time
7 that that work was going on and during the
8 time workers were using asbestos-containing
9 materials during the construction of these
10 vessels, if you know?
11 A.   I do not --
12        MS. HILLER: Objection to
13 form.
14        THE WITNESS: I do not know.
15 BY MR. LADENBURG:
16 Q.   Okay, fair enough.
17        Okay. Moving on now to topic
18 five. Can you identify for me any conflicts
19 that Lockheed contends arise between its
20 obligation pursuant to the government
21 contracts at issue in this case and duties
22 that Lockheed has under Washington tort law
23 owed to a Plaintiff like Mr. Fischer?
24        MS. HILLER: Objection. Calls
25 for a legal conclusion, lacks foundation,

Page 37

PETER D. BALCH

1        PETER D. BALCH
2 calls for speculation.
3        THE WITNESS: Counsel, I
4 really would be speculating to answer the
5 question. It's worded quite broadly, "duties
6 under Washington tort law". And I'm not
7 exactly sure precisely where the topic is
8 headed.
9 BY MR. LADENBURG:
10 Q.   Well, in asbestos litigation, a lot of
11 the attorneys often refer to the federal
12 contractor defense as "the Navy made me do it
13 defense", a shorthand way of trying to
14 describe in a nutshell what the defense really
15 is.
16        And topic five is actually
17 taken from one of the elements that you have
18 to prove under the case law to actually
19 prevail on a federal contractor defense.
20        There are miscellaneous
21 federal cases that discuss this. But in any
22 event, the gist of it, I guess, is that I
23 could not do X, Y and Z to comply with state
24 tort law or to meet my duties under state tort
25 law because the federal government told me not

10  (Pages 34 to 37)

Page 38

1          PETER D. BALCH
2  to in a nutshell.  That's what I'm getting at
3  here.
4          So I don't know if that's
5  helpful or not.  But what I'm asking for is
6  for Lockheed -- can Lockheed identify
7  anything -- any sort of state-based tort duty
8  that it couldn't comply with or it couldn't
9  meet because the federal government, through
10  the Navy or other federal officers, told them
11  not to?
12          MS. HILLER:  Objection to
13  form.  Calls for speculation, calls for a
14  legal conclusion.
15          MR. THORSON:  Brian, can we
16  have a stipulation that an objection by one
17  shall be deemed as an objection by all
18  counsel?
19          MR. LADENBURG:  Sure.
20          MR. THORSON:  Thank you.
21          THE WITNESS:  I have not made
22  a specific search of Washington tort law at
23  the time at issue, first of all.
24          Having said that, I'm not
25  aware that anything that the U.S. Navy was

Page 39

1          PETER D. BALCH
2  asking Lockheed Shipbuilding to do or to
3  install in its ships conflicted with any --
4  with any existing Washington tort law at the
5  time.
6  BY MR. LADENBURG:
7  Q.   Okay.  So as you sit here today, you're
8  not aware of any conflict?
9          MS. HILLER:  Objection.
10  Misstates the testimony.
11          MR. LADENBURG:  I don't want
12  to misstate your testimony.  If it did, please
13  correct it.
14          MS. HILLER:  And objection to
15  form as well.
16          THE WITNESS:  I'm trying to be
17  accurate in accordance with your question and
18  in accordance with the topic listed.
19          I don't know that there was a
20  conflict between the government specifications
21  or the government contracts and Washington
22  tort law at the time.
23          Having said that, if there
24  were a conflict, I'm not aware of what that
25  conflict was at the time.

Page 40

1          PETER D. BALCH
2  BY MR. LADENBURG:
3  Q.   Okay.  Let me ask some specifics then I
4  guess.  For example, let's talk about
5  workplace safety.
6          Lockheed, in the 19 -- late
7  50's, 60's, et cetera -- and my understanding,
8  correct me if I'm wrong, but my understanding
9  is that you've reviewed some of these
10  contracts.  For example, like this is one for
11  the -- that was produced to me for the LPD-7
12  Class, LPD-9 and 10.  It's dated 1963.
13  A.   Yes, I believe so.  I believe I reviewed
14  that.
15  Q.   Okay.  And -- well, I'll get to that in
16  a minute.  Let me just ask this, though, with
17  respect to state law:  Are you aware of
18  Lockheed ever being told by any federal
19  officer to do certain things or to refrain
20  from doing certain things with respect to
21  workplace safety, industrial hygiene, things
22  of that nature?
23          MS. HILLER:  Objection to
24  form.
25  BY MR. LADENBURG:

Page 41

1          PETER D. BALCH
2  Q.   During the construction of the vessels
3  we're talking about in this case.  I'm
4  limiting this to the window of years when
5  Mr. Fischer would have been doing his work at
6  Lockheed Shipyard.
7          MS. HILLER:  Same objection.
8          THE WITNESS:  No, I'm not
9  aware of any direct communication from a
10  federal officer.
11          As I said before, I am aware
12  of federal officers in the form of contracting
13  officers or other Navy officials who were
14  supervising the construction of the vessels,
15  having issued contracts and specifications
16  that, by their nature, instructed Lockheed how
17  to do things, what materials to use and so
18  forth.
19          But I'm not aware of any other
20  communications, in answer to your question.
21  BY MR. LADENBURG:
22  Q.   And that would include communications on
23  issues with respect to industrial hygiene, for
24  example?
25  A.   I recall, in general, going through

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8488 ~ 888-777-6690

ca1ffc97-1020-4a1f-af2f-6ac2ec1fe912

Page 42

PETER D. BALCH

1
2 these documents that there were some that
3 referred to industrial workplace hygiene or
4 workplace -- I'm trying to think of the right
5 word -- housekeeping; making sure that the --
6 you know, that the shipyard was clean and fit.
7 And there are some documents that I could
8 find, if you wanted me to look for them, that
9 do refer to that.
10 Q.   Okay.  I think I recognize the document
11 in particular that you're referring to.  I
12 reviewed these documents before our deposition
13 and went through in trying to locate some of
14 these things.  But maybe at a break, we can
15 take a break and we can actually find the
16 document.
17         But the document I recall -- I
18 don't know, just maybe to make sure we're on
19 the same page, was a document from the Navy in
20 about 1966 or 1967 or so that discussed the
21 Navy's desire that Lockheed improve certain
22 shipyard housekeeping type things.  In a
23 nutshell, that's what the document that I
24 recall seeing seemed to refer to.
25         Is that the same document

Page 43

PETER D. BALCH

1
2 you're --
3 A.   It may be.  It was just a few pages
4 long.
5 Q.   Yeah, okay.  Well -- actually, why don't
6 we do that.  Why don't we take a break and
7 find that document and then we can actually --
8 I'll get on the same page and take a look.
9         MR. LADENBURG:  So Why don't
10 we go off the record.
11         VIDEOTAPE OPERATOR:  We're
12 going off the video.  The time is 11:07.
13             - - -
14         (Whereupon, a short break was
15 taken at this time.)
16             - - -
17         VIDEOTAPE OPERATOR:  We're
18 back on the video.  The time is 11:17.
19 BY MR. LADENBURG:
20 Q.   Okay, we took a break and I think we
21 found the document we were referring to before
22 we went off the record.
23         And just -- I don't think I'm
24 going to mark these documents.  We've done a
25 pretty good job -- Lockheed had done a great

Page 44

PETER D. BALCH

1
2 job in this case of Bates stamping everything.
3         So just for identification
4 purposes, the document I'm looking at is Bate
5 number LSCC02138583 is the first page and it
6 continues.  There's two pages after that.
7         Is that the -- is this the
8 document you were recalling before we went off
9 the record?
10 A.   Yes, sir.
11 Q.   Okay.  And just -- can you just
12 generally tell me what this document is and...
13 A.   It is in the form of a letter from
14 Lockheed Shipbuilding and Construction Company
15 to the Commander of Naval Ship Systems via the
16 Supervisor of Shipbuilding concerning
17 cleanliness during the construction apparently
18 of the USS BROOKE, which was a Destroyer
19 Escort Guided Missile Class 1.
20 Q.   Okay.  Was there anything particular in
21 this document -- I think this came up when I
22 asked you a question about whether you're
23 aware of the Navy giving any sort of
24 directives or instructions to Lockheed with
25 respect to issues on industrial hygiene.

Page 45

PETER D. BALCH

1
2 I think I asked you that question,
3 and then your response was, I think, to refer
4 to this document; is that right?
5 A.   That's correct.  And specifically my
6 response was aimed at a document that I have
7 not seen, but which is referred to in this
8 document which is called Reference A, which
9 was COMNAVSHIPSYSCOM Serial Number 6035-209,
10 which, in the document we're looking at, was
11 referred to as reporting some observations of
12 foreign objects or foreign matter on the USS
13 BROOKE due to some housekeeping issues.
14 Q.   Okay.  So basically this is a response
15 to Reference A, which we don't have the
16 benefit of right now; but a communication from
17 the Navy indicating that on the BROOKE, there
18 was some sort of -- it appears -- "foreign
19 matter within systems" is what it says, but
20 something that was a concern for the Navy with
21 respect to housekeeping.
22         And this is a Lockheed
23 document we're looking at in response, at
24 least in part, to that communication from the
25 Navy; is that right?

Page 46

```
1            PETER D. BALCH
2   A.   Correct.
3   Q.   Okay.  Is there anything else in this
4   document that -- specifically that you wanted
5   to point to in answer to my question on
6   industrial hygiene or does the document pretty
7   much speak for itself?
8   A.   I'm having trouble remembering the exact
9   question at this point.
10  Q.   Okay, well, I am too.  I guess let me
11  just ask you:  Did -- what I was getting at
12  and the reason I asked the question is I was
13  wondering whether the Navy actually told
14  Lockheed how to do its work in a nutshell with
15  respect to industrial hygiene, workplace
16  safety, those type of issues.
17           And I was wondering whether
18  the Navy, for example, would actually direct
19  or instruct Lockheed Shipbuilding Company with
20  respect to how Lockheed was to have the
21  Lockheed employees, the subcontractors, anyone
22  working on the vessel do their work in terms
23  of workplace safety and industrial hygiene.
24           So I guess my specific
25  question is -- and it may be related to this
```

Page 47

```
1            PETER D. BALCH
2   document, it may not.  But my specific
3   question is:  Did the Navy actually tell
4   Lockheed what to do with respect to I'll start
5   with issues of workplace safety?
6        MS. HILLER:  Objection to
7   form.
8        THE WITNESS:  I'm not aware of
9   any specific directive or communication where
10  the Navy told Lockheed how to accomplish
11  safety, other than the fact that
12  specifications and other references in the
13  contracts or the sub-tier documents referred
14  to in contracts called that out.  I'm not
15  aware of any particular communications from an
16  individual officer or a group of officers that
17  told Lockheed how to accomplish safety.
18  BY MR. LADENBURG:
19  Q.   Okay.  How about the same question, but
20  instead of workplace safety, just -- and it
21  may be the same thing, I'm not sure; but for
22  me they may be different.
23           Did the Navy issue any
24  instructions or directives to Lockheed with
25  respect to how Lockheed was to conduct itself
```

Page 48

```
1            PETER D. BALCH
2   in the area of industrial hygiene?
3        MS. HILLER:  Objection to
4   form.
5        THE WITNESS:  Again, I'm not
6   aware of any specific industrial hygiene
7   related directives or communications from a
8   Navy officer or a government official.
9           Having said that, if we had
10  the Reference A referred to in this document,
11  there may have been -- I'm guessing -- but
12  there may have been some identification in
13  that communication, that letter from
14  COMNAVSHIPSYSCOM with respect to certain
15  things that the Navy expected in terms of
16  industrial hygiene.
17  BY MR. LADENBURG:
18  Q.   Okay.  But that's -- that's your
19  speculation?
20  A.   That is my speculation, sir.
21  Q.   Okay.  It's not something we have the
22  benefit of because we don't have that
23  document.
24           And let me ask you this:
25  Did you -- I mean just to be clear, you
```

Page 49

```
1            PETER D. BALCH
2   haven't -- you have never seen Reference A,
3   right?
4   A.   That's correct.
5   Q.   Okay.  All right.  I guess kind of a
6   related question -- this is not limited to a
7   review of documents.  This is just a question
8   for you as Lockheed's witness on these topics.
9           Can you identify for me
10  anything in the areas of industrial hygiene or
11  workplace safety that Lockheed did differently
12  for its civilian customers as opposed to what
13  Lockheed did for Navy vessels it was working
14  on, to either construct or repair?
15       MS. HILLER:  Objection to
16  form.  Lacks foundation.
17       THE WITNESS:  Is this related
18  to my work during '85 to '88 at the shipyard?
19  BY MR. LADENBURG:
20  Q.   No, this is not limited to that period
21  of time.  This is a question just directed to
22  you in your capacity as Lockheed's 30(b)(6)
23  witness today.
24       MS. HILLER:  Same objections.
25       THE WITNESS:  I'm not aware
```

13 (Pages 46 to 49)

Page 50

PETER D. BALCH

2 that -- that Lockheed, either at the shipyard
3 or in my other positions, has ever made a
4 bright line distinction between industrial
5 hygiene or safety with respect to its
6 government customers versus its commercial
7 customers.
8         Having said that, there may be
9 specific requirements of contracts which --
10 government contracts which impacted safety or
11 hygiene that I'm not aware of.  But I don't --
12 as I sit here today, I can't say, you know,
13 that I observed, in my work at Lockheed, a
14 distinction -- for instance, a production line
15 that was a government production line versus a
16 commercial production line and they had
17 completely different safety or hygiene
18 procedures or rules.
19 BY MR. LADENBURG:
20 Q.   Okay.  Well, let me ask you -- since
21 this is an asbestos case, let me ask you
22 specifically about asbestos.
23        You know, was there anything
24 Lockheed did differently with respect to the
25 handling of asbestos when either repairing or

Page 51

PETER D. BALCH

2 building a ship for the Navy as opposed to
3 standard protocol for handling the same type
4 of materials dealing with asbestos components,
5 et cetera, for private customers?
6        MS. HILLER:  Objection to
7 form.  Lacks foundation.
8        THE WITNESS:  I'm not aware of
9 how Lockheed Shipbuilding Company handled
10 asbestos either for the Navy or for commercial
11 customers, other than to comply with the
12 procedures, if any, in government contracts.
13 BY MR. LADENBURG:
14 Q.   Well, certainly they're not going to
15 comply with procedures in government contracts
16 if it's a private customer, though, right?
17        MS. HILLER:  Objection to
18 form.  Calls for speculation, lacks
19 foundation.
20 BY MR. LADENBURG:
21 Q.   Let me back up for this foundation
22 stuff.  I mean you're aware Lockheed also
23 built vessels and did work for private
24 customers in --
25 A.   Yes.

Page 52

PETER D. BALCH

2 Q.   -- the State of Washington, for example.
3 Non Navy customers, let's put it that way.
4 A.   I am aware.
5 Q.   Private ship -- you know, shipping
6 companies purchased vessels; Lockheed built
7 them, right?
8 A.   Yes, sir.
9 Q.   Okay.  So, Lockheed also did a
10 significant amount of work for the Navy in the
11 50's, 60's, early 70's; is that right?
12 A.   That's my belief.
13 Q.   Okay.  And -- so in terms of the issue
14 on asbestos, the question I asked was whether
15 you're aware today, as you sit here as
16 Lockheed's designee on topics related to the
17 federal contractor defense -- what I'm getting
18 at is, are you aware of anything Lockheed did
19 differently that was unique to Lockheed's Navy
20 work in the area of asbestos components,
21 parts, et cetera and how those were installed,
22 are you aware of anything that Lockheed did
23 with respect to asbestos, how it was handled,
24 industrial hygiene with respect to asbestos,
25 et cetera, that Lockheed only did for the Navy

Page 53

PETER D. BALCH

2 and didn't do for its other customers, its
3 non-Navy customers with respect to handling
4 the same type of material?
5        MS. HILLER:  Objection to
6 form.  Lacks foundation, outside the scope of
7 this deposition.
8        THE WITNESS:  I'm going to try
9 to answer the question, if that's okay with
10 counsel.
11 BY MR. LADENBURG:
12 Q.   Please do.
13 A.   With respect to material handling, I
14 know that under government contracts, as
15 opposed to commercial contracts or, as you've
16 said, private customer, private entity
17 contracts, there would have been very specific
18 government property regulations or procedures.
19        So that materials which were
20 purchased and delivered to Lockheed
21 Shipbuilding under a government contract would
22 have been very tightly controlled in a
23 government property management system separate
24 and apart from a commercial property system.
25 They would have been segregated, they would

14  (Pages 50 to 53)

Page 54

PETER D. BALCH

1          PETER D. BALCH
2  have been inventoried in a different way.  And
3  that's all because of, again, regulations that
4  were flowed down into the government
5  contracts.
6          Having said that, with respect
7  to how the materials potentially containing
8  asbestos were installed or the industrial
9  hygiene aspects with respect to
10  asbestos-containing materials, I do not know
11  personally of any differences in how they were
12  handled or whether there were any industrial
13  hygiene differences between government work
14  and commercial work.
15  BY MR. LADENBURG:
16  Q.   Okay.  I want to skip ahead if we can on
17  the notice to topic seven.
18          In preparing today, did you
19  review topic seven?
20  A.   Yes, sir.
21  Q.   Were you able to identify any instance
22  where Lockheed warned the United States
23  government or the Navy about the hazards
24  associated with asbestos on or before 1971?
25          MS. HILLER:  Objection to

Page 55

PETER D. BALCH

1          PETER D. BALCH
2  form.  Lacks foundation.
3          THE WITNESS:  Based on the
4  materials that I've reviewed, which again I
5  believe it is incomplete giving the ongoing
6  nature of discovery, I do not believe that I
7  saw any Lockheed warnings to the United States
8  government on asbestos.
9  BY MR. LADENBURG:
10  Q.   Before '71?
11  A.   Correct.
12  Q.   Or I guess including '71 as well.  Okay.
13  Since you didn't identify any, I think we're
14  probably finished with that topic.
15          Why don't we move onto -- I
16  think topic eight I may have already somewhat
17  delved into.  But I want to cover it and make
18  sure I didn't leave anything out.
19          And for the record, just to be
20  clear, topic eight was identification of all
21  correspondence or communication between
22  Lockheed and the U.S. Navy that documents
23  Lockheed's deviation from its standard
24  practices with respect to workplace safety and
25  industrial hygiene specifically to comply with

Page 56

PETER D. BALCH

1          PETER D. BALCH
2  naval specifications, contracts or directives
3  at Lockheed Shipyard.
4          Like I said, I think we may
5  have already gone through that.  In the last
6  series of questions I kind of got into, I
7  might have got ahead of myself.  But I want to
8  make sure that's true and let you answer the
9  question.
10          I mean are you aware of
11  anything that you haven't already told me
12  about that would fit into the category number
13  eight there?
14          MS. HILLER:  Objection to
15  form.
16  BY MR. LADENBURG:
17  Q.   I guess to be more specific, are you
18  aware of any correspondence or communications
19  between Lockheed and the U.S. Navy that would
20  document Lockheed's deviation from its
21  standard practices with respect to workplace
22  safety and industrial hygiene specifically to
23  comply with naval specifications, contracts or
24  directives at Lockheed Shipyard?
25          MS. HILLER:  Objection to

Page 57

PETER D. BALCH

1          PETER D. BALCH
2  form.  Lacks foundation.
3          THE WITNESS:  I'm not aware of
4  any correspondence or communication that
5  documents any deviation of standard hygiene or
6  safety practices, no.
7  BY MR. LADENBURG:
8  Q.   Okay.  And I assume the same answer
9  would apply to topic nine then?
10          MS. HILLER:  Objection to
11  form.  I'm not -- Brian, maybe you need an
12  actual question there, because that one
13  doesn't ask about correspondence and you just
14  specifically asked about correspondence.
15  BY MR. LADENBURG:
16  Q.   Sure.  I mean I'm happy to --
17          MS. HILLER:  Yeah, I just
18  think maybe we need a more clear question.
19  BY MR. LADENBURG:
20  Q.   The question is:  Are you able to
21  identify any industrial hygiene or workplace
22  safety practices that Lockheed Shipyard
23  employed in its civilian shipbuilding, but
24  that Lockheed was contemporaneously prevented
25  from deploying when building naval vessels

                    15 (Pages 54 to 57)

Page 58

PETER D. BALCH

1
2    because of directives, contracts or
3    specifications of the U.S. Navy?
4            MS. HILLER:  Objection to
5    form.  Lacks foundations, calls for a legal
6    conclusion.
7            THE WITNESS:  I'm not aware of
8    any such civilian shipbuilding practices that
9    we were prevented from complying with because
10   of U.S. Navy directives, no.
11   BY MR. LADENBURG:
12   Q.   Okay.  I want to -- okay, I'm going to
13   move on then if you're not aware of any.
14           Let's go to topic ten, which
15   is the identification of any communications
16   documenting the U.S. Navy's stance with
17   respect to whether Lockheed Shipbuilding could
18   warn its employees, contractors,
19   subcontractors, business invitees with respect
20   to the hazards associated with exposure to
21   asbestos dust on U.S. naval vessels
22   constructed, repaired or overhauled at
23   Lockheed.
24           In preparation for your
25   deposition today, were you able to identify

Page 59

PETER D. BALCH

1
2    any such communications?
3            MS. HILLER:  Objection to
4    form.  Lacks foundation.
5            THE WITNESS:  Based on my
6    review of the documents that we've identified,
7    have been provided to me prior to this
8    deposition, I do not recall any U.S. Navy
9    documents or communications dealing with any
10   warnings of employees, contractors or
11   subcontractors or invitees concerning
12   asbestos, no.
13   BY MR. LADENBURG:
14   Q.   Okay.  And are you aware of any -- let
15   me just ask you this:  I mean you also -- you
16   didn't just review documents to prepare for
17   this deposition, right?
18           I mean the scope of your
19   testimony is based on more than just the
20   documents reviewed, I guess is what I'm
21   asking, isn't that right?  It's based on your
22   experience at Lockheed, your experience
23   contracting generally with the federal
24   government, and the other things you
25   identified earlier as we got started today?

Page 60

PETER D. BALCH

1
2    A.   Correct.
3    Q.   So, topic ten asks for identification of
4    any communications that document the Navy
5    stance.
6            Are you aware of anything else
7    that's not in the documents reviewed that
8    would shed light on the Navy's position on
9    whether Lockheed could warn its employees with
10   respect to hazards associated with asbestos
11   exposure?
12           MS. HILLER:  Objection to
13   form.  Lacks foundation.
14           THE WITNESS:  I can honestly
15   say that I'm not aware, either through my
16   review of documents or my experience generally
17   working for Lockheed, of any stance or any
18   communications setting forth the Navy stance
19   on warnings concerning asbestos on naval
20   vessels.
21   BY MR. LADENBURG:
22   Q.   Okay.  The next topic has to do with
23   Walsh-Healy.  Topic 11 is Lockheed's workplace
24   safety and industrial hygiene duties under the
25   Walsh-Healy Act and Lockheed's record in terms

Page 61

PETER D. BALCH

1
2    of compliance with that statute and its
3    related regulations dealing with the
4    management of hazardous dusts, including
5    asbestos.
6            Were you able to -- well, let
7    me back up.  Did you -- what did you do to
8    prepare to discuss topic 11 today?
9            MS. HILLER:  Objection to
10   form.
11           THE WITNESS:  I reviewed the
12   documents that were provided by counsel to me.
13   BY MR. LADENBURG:
14   Q.   Okay.
15   A.   And that's about it.  I did not research
16   the Walsh-Healy Act.
17   Q.   So you haven't pulled the statute and
18   read the statute?
19   A.   Not recently, no.
20   Q.   Okay.  Did you -- in reviewing the
21   documents, did you run across any references
22   to the Walsh-Healy Public Contracts Act?
23   A.   I did.  The Walsh-Healy Act is mentioned
24   either in the contract or in the general
25   specifications of the contract -- contracts

16 (Pages 58 to 61)

Page 62

1           PETER D. BALCH
2    for a number of these vessels.
3    Q.   Okay.
4    A.   And by that I mean -- when I say a
5    number of these vessels, the
6    particular vessels that Mr. Fischer claims
7    that he worked on, I think we were able to
8    find contracts for about three of them, and I
9    do recall references to compliance with
10   Walsh-Healy in those contracts.
11   Q.   Okay. I think I have one example here
12   that I'll just show you.
13          And this is a copy of the
14   contract between Puget Sound Bridge and Dry
15   Dock Company, Lockheed's predecessor, and the
16   U.S. Navy for the LPD-7 Class, LPD-9 and 10,
17   construction of two amphibious transports.
18   It's dated 23 May, 1963 and its reference to
19   Walsh-Healy is on Page 25 of the contract.
20          Let me just hand this to you
21   and see if that's what you recall.
22          MS. HILLER: Do you want to
23   just hand him the cover page, too, just so he
24   can --
25          MR. LADENBURG: I want to kind

Page 63

1           PETER D. BALCH
2    of keep it altogether, but yeah.
3           MS. HILLER: Okay.
4           THE WITNESS: I won't take it
5    apart.
6    BY MR. LADENBURG:
7    Q.   This is Bates stamped in a different
8    manner from the rest of our documents for some
9    reason, so it's a different Bates stamp
10   convention. I'm not sure why that happened,
11   but we can identify it for the record in a
12   minute for what actual pages these are.
13          MS. HILLER: I apologize for
14   that. That might have been a --
15          MR. LADENBURG: It's not a
16   problem.
17          MS. HILLER: I have to talk to
18   the people that did the Bates stamping.
19          MR. LADENBURG: As long as we
20   can identify it and make sure we're all on the
21   same page, that's all that matters really.
22          MS. HILLER: Just so you know,
23   I will take a look into that particular issue
24   and potentially send you a corrected version
25   of these, because I don't want it to be the

Page 64

1           PETER D. BALCH
2    same Bates number as potentially other
3    documents that have been produced in other
4    cases.
5           MR. LADENBURG: Fair enough.
6           MS. HILLER: So I'll look into
7    this issue.
8           MR. LADENBURG: Okay.
9           MS. HILLER: I think we're
10   fine for the record right now, but as far
11   as...
12          THE WITNESS: I recall
13   reviewing either this contract or a contract
14   very similar to this where the Walsh-Healy
15   Public Contracts Act was specifically called
16   out in the general provisions incorporated
17   into the contract, yes, sir.
18   BY MR. LADENBURG:
19   Q.   Okay. And this is a contract between --
20   well, between Puget Sound Bridge and Dredge,
21   but Lockheed's predecessor and the U.S. Navy
22   for construction of two vessels; is that
23   right?
24          MS. HILLER: I think it just
25   says -- I think it's actually bridge and dry

Page 65

1           PETER D. BALCH
2    dock.
3           MR. LADENBURG: I'm sorry,
4    bridge and dry dock. I always get confused as
5    to when the names changed from bridge and
6    dredge to bridge and dry dock.
7           MS. HILLER: It's hard to keep
8    track.
9           THE WITNESS: Correct, it is
10   for two vessels the LPD-9 and 10.
11   BY MR. LADENBURG:
12   Q.   Okay. And I think it's -- is it Clause
13   44 of the contract --
14   A.   It is Clause 44.
15   Q.   -- that references the Walsh-Healy Act?
16   A.   Yes, sir.
17   Q.   I guess my question, just for starters,
18   is pretty simple. And I hope you can answer
19   it. If you can't, that's -- I mean let me
20   know. But the question is: Did the
21   provisions of the Walsh-Healy Public Contracts
22   Act apply to the construction of those two
23   vessels at Lockheed's predecessor, Puget Sound
24   Bridge and Dry Dock?
25          MS. HILLER: Objection to

Page 66

PETER D. BALCH

1       PETER D. BALCH
2   form.  Lacks foundation, calls for a legal
3   conclusion.
4           THE WITNESS:  Well, it was
5   made applicable by incorporation into the
6   contract.  If the provisions of the Act were
7   at issue in our performance of the contract,
8   then, yes, we -- you know, we would have
9   complied with the Walsh-Healy Public Contracts
10  Act.
11  BY MR. LADENBURG:
12  Q.   Okay.  And is that -- that answer you
13  just gave, would that be true for -- not only
14  for this contract, but I think you've produced
15  two or three others in conjunction with this
16  deposition, you know, contracts similar to
17  this with the U.S. Navy that likewise
18  incorporate or reference the Walsh-Healy Act,
19  is the answer the same for those other
20  contracts or do we need to go through them one
21  by one?
22  A.   Well, I don't recall specifically
23  whether Walsh-Healy -- the Walsh-Healy Act is
24  referenced in all those other contracts, but
25  that may be the case.

Page 67

PETER D. BALCH

1       PETER D. BALCH
2   Q.   For those where it is referenced, I
3   guess if we just -- if it's not referenced,
4   that's fine; but for those other contracts
5   where it is referenced, similar to its
6   reference here, I guess my question is:  For
7   those contracts, is your answer the same?
8   A.   For those contracts that reference the
9   Walsh-Healy Act, my answer would be, yes, it
10  was applicable and we would have complied with
11  the Walsh-Healy Act.
12  Q.   Okay.  I guess those are two different
13  statements, so let me just take them one at a
14  time.
15          When you say it was
16  applicable, I'll take you at your word on
17  that.
18          In terms of compliance, can
19  you tell me what Lockheed did to comply with
20  the Walsh-Healy Act, specifically the
21  provisions of the Walsh-Healy Act dealing with
22  toxic dusts, including asbestos?
23          MS. HILLER:  Objection to
24  form; lacks foundation, calls for a legal
25  conclusion.

Page 68

PETER D. BALCH

1       PETER D. BALCH
2           THE WITNESS:  Again, I'm
3   not -- I have not reviewed the Walsh-Healy Act
4   in detail recently.  I'm not aware that the
5   Walsh-Healy Act or any regulations
6   specifically -- specifically regulate dust or
7   hazardous dust.
8   BY MR. LADENBURG:
9   Q.   Okay.  So you're not aware whether there
10  were regulations promulgated pursuant to the
11  Walsh-Healy Act that actually and specifically
12  identify levels of permissible exposures to a
13  whole host of workplace toxins and other
14  materials, but specifically with asbestos?
15  You're not aware of that?
16  A.   I'm not, sir.
17  Q.   Okay.  All right.  Fair enough.
18          So if you're not aware, I
19  think I can move on from this document.  I
20  think what I'll do at this point is simply
21  identify -- our copy here for the document we
22  just referenced has different Bates numbering.
23  But just for identification purposes, it looks
24  like it's JAC starting at 000049 through --
25  not all the pages are Bates stamped, but it

Page 69

PETER D. BALCH

1       PETER D. BALCH
2   looks like 70 or so is the last page that's
3   Bates stamped.
4           But in any event, it is the
5   May 23, 1963 contract between Puget Sound
6   bridge and Dry Dock Company and the government
7   for the construction of LPD-9 and LPD-10 and
8   some related attachments.
9           MR. LADENBURG:  And Elizabeth,
10  maybe what we can do is after the deposition
11  or sometime later, we'll see if we can get a
12  copy of this that complies with the other
13  conventional Lockheed Bates stamp system that
14  we've been going with for these cases.
15          MS. HILLER:  Yeah, I am a
16  little puzzled.  So, yeah, we'll look into it.
17          MR. LADENBURG:  Okay.  I just
18  want to make sure we know what document we're
19  referring to so it's clear and...
20          Okay.  We can move on from
21  there.
22  BY MR. LADENBURG:
23  Q.   Okay.  With respect to Walsh-Healy,
24  before I move on, I want to ask whether you're
25  aware at any time prior to 1972, I guess --

Page 70

PETER D. BALCH

1   I'm including 1971, that year. My
2   understanding is Mr. Fischer retired in
3   approximately May of 1971. I could be wrong.
4   But based on his personnel file that we have,
5   I think that's about the date of his
6   retirement.
7            And my question is: At any
8   time that he was still working and would have
9   been employed by the Navy doing these
10  inspections at the shipyards, including
11  Lockheed, are you aware of whether at any time
12  from May 1971 or so and prior, whether
13  Lockheed, in the construction of its naval
14  vessels or the repair of naval vessels,
15  employed any sort of dust monitoring systems
16  to take dust measurements to sample the air to
17  get dust levels, particularly asbestos dust
18  levels when those ships were being worked on?
19           MS. HILLER: Objection to
20  form. Lacks foundation.
21           THE WITNESS: I'm not aware of
22  any such dust monitoring systems in that time
23  frame, no.
24  BY MR. LADENBURG:

Page 71

PETER D. BALCH

1   Q.   Okay. So to be clear, you're not aware
2   whether or not those dust levels were taken --
3   whether Lockheed did that or not did that?
4   You're not aware one way or the other as you
5   sit here today?
6   A.   I don't have any idea one way or the
7   other, sir.
8   Q.   Okay.
9            VIDEOTAPE OPERATOR: I'm sorry
10  to interrupt. We have to go off the video.
11  The time is 11:50. This concludes Tape Number
12  One.
13                 - - -
14           (Whereupon, a short break was
15  taken from 11:50 a.m. to 12:03 p.m.)
16                 - - -
17           VIDEOTAPE OPERATOR: We're
18  back on the video. The time is 12:04,
19  beginning of Tape Two.
20           MR. LADENBURG: And then just
21  housekeeping before we get started --
22  Elizabeth, did you want to identify -- I think
23  you found the actual real Bates numbers for
24  our May 23, 1963 document, which actually has

Page 72

PETER D. BALCH

1   been produced according to your standard Bates
2   stamp convention, and I just had another
3   random copy. So for the record, why don't you
4   --
5            MS. HILLER: Yeah, the Bates
6   range that I show -- and I think this includes
7   the general provisions and the scheduling and
8   such that were attached to the contract are
9   LSCC02145510 through LSCC02145571. And that's
10  for the contract that was related to the LPD-7
11  class.
12           MR. LADENBURG: Okay.
13  BY MR. LADENBURG:
14  Q.   Okay. We were -- I was trying to wrap
15  up my discussion of the Walsh-Healy Act, which
16  is my topic number 11 before we left, and we
17  had gone through that contract and I was
18  asking you some questions about Lockheed's
19  understanding with respect to whether it took
20  dust samples.
21           I guess Mr. Fischer worked
22  until about 1971 and we've identified several
23  vessels in this case that we think he worked
24  aboard in conjunction with his work for the

Page 73

PETER D. BALCH

1   U.S. Navy.
2            On the issue of Walsh-Healy, I
3   want to make sure I understand your testimony.
4   For those contracts that we have that identify
5   Walsh-Healy, like the one we just reviewed --
6   and I think that there are at least one or two
7   others that have been produced in conjunction
8   with this deposition that also reference
9   Walsh-Healy like the reference here in Clause
10  44.
11           And I'm not clear -- and if
12  it's my fault, I apologize; but I want to get
13  for the record clear Lockheed's position with
14  respect to -- for those contracts that
15  identify Walsh-Healy, my understanding of your
16  testimony is that Walsh-Healy applied and that
17  Lockheed would have taken steps to comply with
18  the Walsh-Healy Act.
19           I guess my question is: Is
20  that -- is my understanding accurate?
21           MS. HILLER: Objection to
22  form.
23           THE WITNESS: Can I review the
24  contract again --

19 (Pages 70 to 73)

Page 74

PETER D. BALCH

1      PETER D. BALCH
2  BY MR. LADENBURG:
3  Q.   Yeah.
4  A.   -- where that was.
5          MS. HILLER:  I don't
6  remember --
7          MR. LADENBURG:  I have it.
8          MS. HILLER:  -- what page?  If
9  you have it open to that paragraph...
10         MR. LADENBURG:  Yeah, it's
11 actually Paragraph 44, I believe, in this copy
12 of the contract.  Some of the other ones, I
13 think it was actually --
14         MS. HILLER:  But it's not
15 Paragraph 44 of the contract.  I think it's
16 Paragraph 44 of the general provisions.
17         MR. LADENBURG:  Yeah, it's
18 actually the --
19         MS. HILLER:  Okay.
20         MR. LADENBURG:  It's on Page
21 25, yeah.
22         MS. HILLER:  I think if you
23 look at those Page numbers then it should be
24 there.  There you go.
25         Brian, just so we're clear on

Page 75

PETER D. BALCH

1      PETER D. BALCH
2  your questions, you're talking about contracts
3  between Lockheed Shipbuilding and one of its
4  -- or one of its predecessors and the Navy,
5  because obviously Mr. Fischer has given
6  interrogatory responses indicating other navy
7  ships that he encountered in his whole career.
8          MR. LADENBURG:  Sure.  No, I'm
9  talking -- I'm trying to --
10         MS. HILLER:  No, I understand
11 you're trying to limit -- I just want to make
12 sure that Mr. Balch doesn't testify to Navy
13 ships that have no connection to Lockheed
14 Shipbuilding.
15         MR. LADENBURG:  I understand
16 that.  And I think the difficulty I have is
17 that Mr. Fischer just simply identified ships
18 that he recalled being at either Lockheed or
19 Todd and he kind of associated them all as,
20 you know, the Harbor Island shipyards or
21 whatever.
22         MS. HILLER:  Right.
23         MR. LADENBURG:  So, yeah, with
24 that caveat, I mean those ships we've
25 identified at either Lockheed or Todd.  So

Page 76

PETER D. BALCH

1      PETER D. BALCH
2  that would include all the ones we know of
3  that he has identified as being ships he
4  recalls inspecting and being aboard down at
5  either Lockheed or Todd.
6          MS. HILLER:  And I guess I
7  just want to even make sure that without this
8  clarification -- because there have been Navy
9  ships identified even before his time as an
10 inspector that I -- from my understanding of
11 this case -- and I realize I may not know as
12 much as you and the other attorneys -- but
13 there are other Navy ships that were listed
14 that have nothing to do with Lockheed.
15         MR. LADENBURG:  That's
16 absolutely true, because the bulk of his
17 career was actually inspecting ships at Puget
18 Sound Naval Shipyard.
19         MS. HILLER:  Okay.  I just
20 wanted to make sure we were clear that your
21 question was narrowed to --
22         MR. LADENBURG:  Yeah, it is.
23 It's -- I'm trying to focus only on Navy ships
24 that are being built or repaired at Lockheed
25 Shipyard or its predecessor, Puget Sound

Page 77

PETER D. BALCH

1      PETER D. BALCH
2  Bridge and Dry Dock.
3  BY MR. LADENBURG:
4  Q.   So with those clarifications, I guess my
5  questions is:  Did the Walsh-Healy Act apply
6  to the construction of those vessels?
7  A.   Let me be real clear in my answer.  As I
8  think I stated earlier, the clause is
9  referenced in the general provisions which are
10 incorporated into the contract.
11         The actual clause in the
12 general provisions says that if the contract
13 is -- for supply is over $10,000, which this
14 contract is, and is otherwise subject to the
15 Walsh-Healy Public Contracts Act, then all of
16 the representations and stipulations required
17 by the Act and regulations are incorporated by
18 reference, okay.
19         So with that caveat, we have
20 the first part of that requirement that the
21 contract is over $10,000 met.  If the contract
22 is otherwise subject to the Walsh-Healy Act as
23 the second requirement, then yes, Lockheed
24 Shipbuilding or Puget Sound Bridge and Dry
25 Dock would have complied with the Walsh-Healy

20  (Pages 74 to 77)

Page 78

PETER D. BALCH

1    PETER D. BALCH
2    Act.
3    Q.   Okay.  And in terms of answering the
4    second requirement, is that something you can
5    do today?
6         Can you tell me whether it's
7    otherwise subject to the Walsh-Healy Act or
8    not?
9    A.   No, sir.  I do not know that for a fact
10   as I sit here.
11   Q.   Okay.  Okay, I think that's all I have
12   on Walsh-Healy for now.
13        And then I think I just have
14   one topic left, but I think we may have
15   covered it.  So I just want to kind of
16   identify it and make sure I haven't left
17   anything out.
18        Topic 12 is the identification
19   of all state law tort duties owed with respect
20   to asbestos that Lockheed claims it did not
21   comply with because of directives of the
22   United States Navy via contract,
23   specification, work order or other
24   communication from the Navy.
25        Again, I think we've talked

Page 79

PETER D. BALCH

1    PETER D. BALCH
2    about this, but just to kind of wrap things up
3    and be very clear on the record, I want to
4    make sure that I haven't left anything out.
5         Has Lockheed identified any
6    state law tort duties owed with respect to
7    asbestos that Lockheed claims it did not
8    comply with -- specifically, this is again
9    limited to Mr. Fischer and his vessels --
10   because of directives of the United States
11   Navy?
12        MS. HILLER:  Objection to
13   form.  Lacks foundation, calls for a legal
14   conclusion.
15        THE WITNESS:  I'm not here to
16   give an opinion on state tort law duties, but
17   I'm not aware and I have not found in my
18   preparation for this deposition any specific
19   asbestos-related tort duties in existence at
20   the time alleged in the complaint, 1961
21   through 1971, that we did not comply with
22   because of U.S. Navy direction, no.
23   BY MR. LADENBURG:
24   Q.   Okay, fair enough.
25        MR. LADENBURG:  I think that's

Page 80

PETER D. BALCH

1    PETER D. BALCH
2    probably all the questions I have.  I'm going
3    to have to review my notes on this.
4         One thing I think we should do
5    also, I'm going to attach your bio as
6    Exhibit 2.  That's one thing that we don't
7    have Bates stamped and it was helpful.  So I
8    think just if we could make that Exhibit 2 to
9    the deposition.
10        - - -
11        (Whereupon, Exhibit 2 was
12   marked for identification.)
13        - - -
14        MR. LADENBURG:  I'll look over
15   my notes really quickly.  If anyone else has a
16   question, if you can go ahead and go.  If
17   not --
18        MR. THORSON:  I don't have any
19   questions.
20        MR. LADENBURG:  -- just give
21   me a moment.
22        MS. HILLER:  Anybody on the
23   phone?
24        MR. LADENBURG:  Are you guys
25   on the phone even there?  Gene --

Page 81

PETER D. BALCH

1    PETER D. BALCH
2    MR. BARTON:  Yeah, we're here.
3    It's just that on mute, we can't hear you
4    guys.  I have no questions.
5         MR. THORSON:  That's not the
6    way mute is supposed to work.  It's supposed
7    to be muting you, not us.
8         MR. LADENBURG:  We're just
9    wondering if anyone on the phone has any
10   questions?
11        MR. BARTON:  No.
12        VIDEOTAPE OPERATOR:  Do you
13   want to go off the video?
14        MR. LADENBURG:  Yeah, why
15   don't we go off.
16        VIDEOTAPE OPERATOR:  We're
17   going off the video.  The time is 12:13.
18        - - -
19        (Whereupon, a short break was
20   taken from 12:14 p.m. to 12:26 p.m.)
21        - - -
22        MR. LADENBURG:  We have just
23   reviewed some documents you brought in your
24   personal file today.  And why don't we just
25   have you identify -- a few of these documents

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8488 ~ 888-777-6690

ca1ffc97-1020-4a1f-af2f-6ac2ec1fe912

Page 82

1          PETER D. BALCH
2   I want to make copies of and mark as
3   Exhibit 3. If you can just identify what
4   those are, we'll mark them for the record and
5   have copies made by the court reporter.
6          THE WITNESS: Yes, the first
7   document is a plastic encased card associated
8   with the launch of the LSD-43 FORT MCHENRY.
9   On the obverse side is a listing of the ship
10  numbers that were built from the period 1964
11  until approximately 1987.
12          The second document is a
13  one-page corporate history of Lockheed
14  Shipbuilding Company with the name, its date
15  of incorporation and the historical changes in
16  the name of the company up through -- well,
17  from 1904 up through 1985.
18          The third document is a
19  three-page set of maps of Harbor Island and
20  the specific location of Building 312. And it
21  also lists Yard 1 and Yard 2 that were on
22  Harbor Island. And this was for purposes of
23  showing people how to commute or get
24  directions to the shipyard.
25          The last document is -- it

Page 83

1          PETER D. BALCH
2   appears to be a fax of a document called the
3   Lockheed Shipbuilding Fleet, again, listing
4   ships built by Lockheed or predecessors in
5   name during the ownership of Puget Sound
6   Bridge and Dredge or Bridge and Dry Dock by
7   Lockheed Aircraft Corporation from
8   approximately 1959 until 1987.
9          MR. LADENBURG: Okay. Those
10  collectively we will have copied and marked as
11  Exhibit 3. And I think with that I'm
12  finished.
13          I don't believe anyone else
14  has any other questions. But if you do, speak
15  now.
16          - - -
17          (Whereupon, Exhibit 3 was
18  marked for identification.)
19          - - -
20          MR. ANDRE: Mr. Balch, you
21  have the right to review your transcript. Do
22  you want to review the transcript for
23  accuracy?
24          THE WITNESS: Sure.
25          - - -

Page 84

1          PETER D. BALCH
2          (Whereupon, the deposition was
3   concluded at 12:29 p.m.)
4          - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 85

1          PETER D. BALCH
2          C E R T I F I C A T E
3          - - -
4   COMMONWEALTH OF PENNSYLVANIA:
5                             : SS
6   COUNTY OF PHILADELPHIA      :
7
8          I, Carol A. McAvey,
9   Registered Professional Reporter and Notary
10  Public within and for the County of
11  Philadelphia, Commonwealth of Pennsylvania, do
12  hereby certify that the foregoing testimony of
13  PETER D. BALCH was taken before me at 1801
14  Market Street, Suite 1800, Philadelphia,
15  Pennsylvania on August 11, 2009; that the
16  foregoing testimony was taken in shorthand by
17  myself and reduced to typing under my
18  direction and control, and that the foregoing
19  pages contain a true and correct transcription
20  of all the testimony of said witness.
21
22          .......................
23          CAROL A. McAVEY
            Notary Public
24
25          My Commission expires
            September 18, 2012

22  (Pages 82 to 85)

ca1ffc97-1020-4a1f-af2f-6ac2ec1fe912

| Page 86 | Page 88 |
|---|---|

**Page 86**

1       INSTRUCTIONS TO WITNESSES
2     Read your deposition over carefully.  It
3 is your right to read your deposition and make
4 changes in form or substance.  You should
5 assign a reason in the appropriate column on
6 the errata sheet for any change made.
7     After making any change in form or
8 substance which has been noted on the
9 following errata sheet, along with the reason
10 for any change, sign your name on the errata
11 sheet and date it.
12     Then sign your deposition at the end of
13 your testimony in the space provided.  You are
14 signing it subject to the changes you have
15 made in the errata sheet, which will be
16 attached to the deposition before filing.  You
17 must sign it in front of a witness.  Have the
18 witness sign in the space provided.  The
19 witness need not be a notary public.  Any
20 competent adult may witness your signature.
21     Return the original errata sheet &
22 transcript to deposing attorney, (attorney
23 asking questions) promptly!  Court rules
24 require filing within 30 days after you
25 receive the deposition.  Thank you.

**Page 88**

1       PETER D. BALCH
2       ERRATA SHEET
3 PAGE  LINE #   CHANGE    REASON THEREFORE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 87**

1     PETER D. BALCH
2     I have read the foregoing
3 deposition and the answers given by me are
4 true and correct, to the best of my
5 knowledge and belief.
6
7
8
9
10
     ......................
11     PETER D. BALCH
12
13
14
15
16
Witness to signature
17
18 Address
19
20
    My Commission expires
21
    .....................
22
23
24
25

# Exhibit C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANKLIN D. HOLDREN, et al., )<br>    Plaintiffs, )<br>  )<br>    v. )<br>  )<br> BUFFALO PUMPS, INC., et al., )<br>    Defendants. ) | Civil Action No. 08cv10570-NG |

GERTNER, D.J.

### MEMORANDUM AND ORDER RE: MOTION TO REMAND
May 4, 2009

## I.      INTRODUCTION

The plaintiffs in this product-liability lawsuit have brought claims against a number of manufacturers for their failure to warn of the dangers of asbestos associated with their products. Defendants include both commercial manufacturers, who produced goods for the general market, and a smaller subset of companies who contracted with the United States Navy ("the Navy") to supply pumps, oil heaters, and other equipment. See, e.g., Notice of Removal ¶ 5 (document # 1). This Memorandum Re: Motion to Remand concerns the second set of defendants who produced machinery for Navy ships from 1957 to 1979. Although the failure-to-warn claims against both sets of defendants are all but identical, the latter group has sought the protections of a federal forum. If they failed to warn about asbestos hazards in violation of Massachusetts law, they claim it was because they were acting at the behest of the Navy. On this basis, these manufacturers argue that they are entitled to the "federal contractor defense" and, consequently, to removal under the federal officer removal statute. 28 U.S.C. § 1442(a)(1); see Notice of Removal.

In reply, the plaintiffs have filed a Motion to Remand the case to state court (document # 10). However the motion is resolved, this Court is merely a temporary way station for the

**Ex. 11:1**

underlying litigation: If remand is granted, this action will return to the Massachusetts courts to be heard expeditiously alongside the plaintiffs' claims against the other manufacturers.[1]  If denied, the case will join thousands of other asbestos cases waiting to be resolved by the Multidistrict Litigation Panel in Philadelphia.[2]

In a multitude of suits like this one, courts across the country have split on whether failure-to-warn cases against these private government contractors justify removal to federal court.  See Harris v. Rapid American Corp., 532 F. Supp.2d 1001, 1004 (N.D. Ill. 2007) (collecting cases on both sides).  Some courts have found similar evidentiary materials submitted by the same defendants sufficient; others have disagreed.[3]  Precisely because district courts have differed in their application of the removal statute, it is not enough to recite general standards followed by specific facts, as many decisions have done.  Rather, the Court must consider the underlying purposes of the federal officer removal statute, with its long history, and the context in which the defendants now seek removal.

Looking to these purposes, it is clear that private government contractors -- particularly those in failure-to-warn cases -- are several degrees distant from the paradigmatic federal officer protected by 28 U.S.C. § 1442(a)(1).  Federal customs officials and tariff collectors, beset by

---

[1] At present, the state court trial is set for May 6, 2009.  See Holdren v. Alfa Laval, Inc., Massachusetts Superior Court, Middlesex Co., Civil Action No. 08-0718; Letter from David Fanikos (document # 54).

[2] Recently, the MDL Panel stated that its docket included 59,000 pending cases encompassing some 3.5 million asbestos-related claims.  See In re: Asbestos Products Liability Litigation, MDL Docket No. 875, 254 F.R.D. 266 (E.D. Pa. Dec. 18, 2008).

[3] Compare O'Connell v. Foster Wheeler Energy Corp., 544 F. Supp. 2d 51 (D. Mass. 2008) (Stearns, J.); Machnik v. Buffalo Pumps, Inc., 506 F. Supp. 2d 99 (D. Conn. 2007); Niesbet v. General Electric Co., 2005 WL 697966 (S.D.N.Y. 2005); Harris v. Rapid American Corp., 532 F. Supp. 2d 1001, with Westmiller v. Imo Industries, Inc., 2005 WL 2850334 (W.D. Wash. 2005); Hilbert v. McDonnell Douglas Corp., 529 F. Supp. 2d 187 (D. Mass. 2008); Miranda v. Abex Corp., 2008 WL 4778886 (S.D.N.Y. 2008).

**Ex. 11:2**

state civil suits and criminal prosecutions in the early eighteenth century, were the original recipients of these protections. See Watson v. Philip Morris Cos., Inc., 127 S. Ct. 2301, 2304-07 (2007). Since then, this right to a federal forum has been afforded to federal prohibition agents, federal judges, and federal immigration officers, among others. See Colorado v. Symes, 286 U.S. 510 (1932); Jefferson County, Ala. v. Acker, 527 U.S. 423 (1999); Arizona v. Manypenny, 451 U.S. 232 (1981). Here, the removal statute has served to insulate national policy from state interference, to shield federal officers and their agents from the potential bias of state courts, and to promote consistent application of official immunity doctrines.

Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, but only under certain circumstances. See Ryan v. Dow Chemical Co., 781 F. Supp. 934, 939 (E.D.N.Y. 1992) (suggesting that private actors seeking to invoke the federal officer removal statute "bear a special burden"). After all, these contractors, sued by plaintiffs from the same state, hardly face the kind of state-court bias with which the federal officer removal statute was originally concerned. What they do face, however, is state tort liability stemming from the execution of federal duties -- much like the federal tariff officer who acted at the behest of the national government. See In re Eastern and Southern Dist. New York Asbestos Litigation, 897 F.2d 626, 630 (2d Cir. 1990). Thus, a contractor may assert the "federal contractor defense" only insofar as it has acted as the federal government's agent by complying with "reasonably precise" design specifications. See Boyle v. United Technologies Corp., 487 U.S. 500, 507-08 (1988). And, like the federal officer, it may remove the action only if the federal government was the source of the specific act for which the contractor now faces suit. See Mesa v. California, 489 U.S. 121, 131-32 (1989).

**Ex. 11:3**

By virtue of their limited federal role, the private contractors in this failure-to-warn case are different from the prototypical federal officer but, just as critically, they also stand apart from military contractors sued for design defects. When the military commissions a product, its design specifications reflect a trade-off between safety and performance that trumps conflicting state law. Warnings, by themselves, do not necessarily jeopardize that basic policy judgment. Rather, the decision not to warn about a particular hazard involves a separate discretionary judgment and requires separate proof. See Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1994). In order for a contractor to avoid liability, the decision not to warn must be the government's, not the contractor's, and it must reflect a federal interest incompatible with the important health and safety requirements of state law. While the Court recognizes the significant national interests on which the removal statute is premised, comity and federalism require a careful determination of whether there is a meaningful conflict between state law and federal policy. See Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th Cir. 1996). If there is not -- if both federal policy and state law can be satisfied at the same time -- removal may well be inappropriate.

The removing defendants have together submitted volumes of evidence seeking to show that the Navy would not have permitted them to warn about the dangers of asbestos, if they had tried. But the Court's decision rests ultimately on what is missing from the record. The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever attempted to warn about asbestos on products destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military

-4-

**Ex. 11:4**

equipment they produced during the same period, by contrast to the equipment they supplied to the Navy. Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.

All told, the manufacturers do not claim that the Navy ever offered them any guidance on asbestos warnings, nor that they themselves ever contemplated warning about the dangers of asbestos. Their defense, instead, rests entirely on an untested hypothetical: If they had made such a proposal, the Navy would have refused that recommendation. This account rings of post-hoc justification.

Under the circumstances, the Court finds that defendants have not shown the type of genuine and "significant conflict" between federal policy and state law that would support the federal contractor defense. See Boyle, 487 U.S. at 511-12. Nor have they shown any causal relationship between the Navy's directives and their failure to warn about asbestos. See Mesa v. California, 489 U.S. 121 (1989); Hilbert v. McDonnell Douglas Corp., 529 F. Supp. 2d 187 (D. Mass. 2008). Both are required to justify removal jurisdiction here. Given the purposes of the federal officer removal statute and the federal contractor defense, removal in this case is not warranted. The plaintiffs' Motion to Remand (document # 10) is **GRANTED**.

## II.    BACKGROUND

This is an asbestos personal injury action. Plaintiff Franklin Holdren ("Mr. Holdren") worked as a boiler technician onboard various Navy ships, and in Navy shipyards, from 1957 to 1979.[4] See Compl. ¶ 9, Ex. 1 to Notice of Removal (document # 1-2). Thereafter, he inspected and maintained residential and commercial boilers at power plants, paper mills, and other

--------

[4] Mr. Holdren worked onboard Navy ships including the USS Ault, USS Sierra, USS Norfolk, and USS Pawcatuck, as well as at the Fore River Shipyard in Quincy, Massachusetts. See Pl. Disclosures at 5.

**Ex. 11:5**

industrial sites. Pl. Disclosures at 4-5, Ex. 2 to Notice of Removal (document # 1-3). Mr. Holdren's exposure to asbestos during the course of his employment allegedly caused him to develop malignant mesothelioma. See Compl. ¶ 11.

The plaintiffs filed suit in Massachusetts state court, charging that the defendants were responsible for Mr. Holdren's asbestos-related disease. They seek relief on theories of negligence, breach of warranty, and gross negligence, as well as loss of consortium.[5] The plaintiffs claim that the removing defendants breached their duties to Mr. Holdren in failing to warn him about asbestos and its health hazards; they do not allege defective design against these defendants. Id. at ¶¶ 17, 26 (disclaiming defective-design theories against manufacturers of equipment installed on Navy vessels). All of the plaintiffs' claims are based on state law. See id.

Five defendants seek removal in this case: Buffalo Pumps, Inc.; Foster Wheeler Energy Corp.; Viad Corp.; General Electric Co. ("GE"); and Elliott Turbo Machinery Co. Each claims that it was a manufacturer and supplier of equipment used or procured by the United States Navy during the period of Mr. Holdren's employment aboard Navy ships. Each further argues that, as a government contractor, it had no authority to add asbestos warnings to the products or accompanying manuals that it supplied to the Navy. See, e.g., GE Opp. Mem. at 18-21 (document # 37); Foster Wheeler Opp. Mem. at 5, 11 (document # 25). As a result, the defendants seek to remove the claims against them to federal court under 28 U.S.C. § 1442(a)(1).

In support of removal, the defendants have submitted thousands of pages of materials. Importantly, no defendant attempts to show that it actually sought to warn about asbestos or that

---

[5] The plaintiffs also assert two counts exclusively against Metropolitan Life Insurance Company -- conspiracy and undertaking of a special duty. Because these counts are not related to the federal contractor defense or removal, the Court does not address them here.

**Ex. 11:6**

it even considered warning about asbestos. Rather, all claim that -- if they had tried -- the Navy would have rejected any such warning, whether it was affixed to the products themselves or included in the technical manuals that accompanied the equipment. Because of this common approach, the Court evaluates the evidence cumulatively, giving each manufacturer the benefit of the defendants' combined submissions.

These submissions include affidavits from individuals familiar with the defendants' manufacturing processes,[6] the Navy's procurement practices,[7] and the Navy's knowledge of asbestos risks during the relevant period.[8] They also include numerous military specifications ("MILSPECS") illustrating the requirements that the Navy imposed on parts and equipment it commissioned. See, e.g., MIL-P-17639 (document # 21-32); MIL-P-17840 (document # 21-33); MIL-T-17600A, Ex. C to Betts Aff. (document # 42); MIL-M-15071D (document # 24-9).

Significantly, the vast majority of these documents do not pertain to warnings at all. See Hilbert, 529 F. Supp. 2d at 199 n.14. To be sure, they demonstrate that the products themselves were meticulously designed and tested by the Navy as part of its ship-building program -- but not that the same attention or detail was ever applied to the possibility of including asbestos warnings. Against this backdrop, three things are clear: (1) The Navy held final authority over the design of these products and, where it chose to exercise that authority, any associated

---

[6] See Aff. of Martin Kraft, current production manager for Buffalo Pumps (document # 21-31); Aff. of J. Thomas Schroppe, retired President of Foster Wheeler Boiler Corp. (document # 25-6); Aff. of Thomas Keenan, product engineer for Elliott Turbo Machinery (document # 41-2); Aff. of David Hobson, GE manager of Navy customer service (document # 42).

[7] See Aff. of David Sergeant, retired Rear Admiral of the United States Navy (document # 21-4); Aff. of Roger Horne, retired Rear Admiral of the United States Navy (document # 21-35); Aff. of Ben Lehman, retired Rear Admiral of the United States Navy (document # 5-6, 41-3); Aff. of Charles Cushing, naval architect and marine engineer (document # 5-5).

[8] See Aff. of Samuel Forman, Navy doctor for occupational medicine beginning in 1977 (document # 21-38); Aff. of Lawrence Betts, Navy industrial hygiene officer beginning in 1972 (document # 42).

Ex. 11:7

warnings; (2) manufacturers themselves drafted the technical manuals and warnings that accompanied their products, subject to Navy review and revision; and (3) the Navy was aware of the risks of asbestos and, in other contexts, took some steps to issue precautions about handling the substance. What they do not show is whether anyone -- either the manufacturers or the Navy itself -- ever contemplated applying asbestos warnings to these products. Indeed, it is not clear that the Navy ever exercised its final authority in any fashion that either expressly barred or broadly preempted the inclusion of asbestos warnings with this equipment.

Given their importance, these materials are analyzed in greater detail below. The central question is whether they establish that the manufacturers were acting at the direction of the Navy when they failed to provide asbestos warnings, or colorably show that such warnings would have conflicted with "reasonably precise specifications" approved by the Navy. Boyle, 487 U.S. at 512.

## III.   ANALYSIS

### A.   Removal Standard

The law relating to the federal contractor defense and the federal officer removal statute, 28 U.S.C. § 1442(a)(1), is outlined in this Court's opinion in Hilbert v. McDonnell Douglas Corp., 529 F.Supp.2d 187, 191-92, 196-99 (D. Mass. 2008), another asbestos case which presented all but identical issues. The Court's view of those principles is little changed, however the applicable standards are reviewed here for clarity and easy reference.

The Supreme Court's decision in Mesa v. California, 489 U.S. 121 (1989), established three criteria for removal pursuant to 28 U.S.C. § 1442(a)(1).[9] First, the defendant seeking

---

[9] Section 1442 provides, in relevant part:

   (a) A civil action or criminal prosecution commenced in a State court against any of the

**Ex. 11:8**

removal must demonstrate a colorable federal defense. Second, the defendant must be a federal officer or "acting under" a federal officer. Third, the defendant must show that there is a "causal connection" between the acts taken under color of office and the conduct for which the plaintiff has sued. Mesa, 489 U.S. at 131-32 (quoting Maryland v. Soper (No. 1), 270 U.S. 9, 33 (1926)); see In re Methyl Tertiary Butyl Ether ("MBTE") Products Liability Litigation, 488 F.3d 112, 124 (2d Cir. 2007). The burden is on the removing defendants to satisfy each of these elements. See Rossello-Gonzalez v. Calderon-Serra, 398 F.3d 1, 11 (1st Cir. 2004).

By Mesa's terms, the asserted federal defense must only be "colorable" to justify removal. 489 U.S. at 132-34. Yet removal of a federal officer's case has never been automatic. As a constitutional matter, a defendant must aver something more than his status as a federal officer in order to bring his case into a federal forum. It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases. See Mesa, 489 U.S. at 136-38 (denying removal of state criminal cases against postal service employees because the charged officers had not asserted a colorable federal defense). Without this requirement, § 1442(a) would "expand[] the jurisdiction of the federal courts beyond the bounds established by the Constitution." Id. at 136 (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491 (1983)). Because it alone confers Article III jurisdiction, the "colorable" standard requires that a federal court carefully weigh the plausibility of the proffered defense. See Adams v. Reliance Standard Life Ins. Co., 225 F.3d 1179, 1182 (10th Cir. 2000) ("In light of the limited

---

following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such act . . . .

**Ex. 11:9**

subject matter jurisdiction granted to the federal courts by Congress, we have a duty to satisfy ourselves that jurisdiction is appropriate.").[10]

Nonetheless, it is typical in these cases to quote the Supreme Court's admonition that Section 1442(a) should not be subject to a "narrow, grudging interpretation." Arizona v. Manypenny, 451 U.S. 232, 242 (1981); Jefferson County, Ala. v. Acker, 527 U.S. 423, 431 (1999) (quoting Willingham v. Morgan, 395 U.S. 402, 407 (1969)). There is no doubt, as the Supreme Court reasoned, that federal officer removal protects "exercise[s] of legitimate federal authority" -- but this is hardly the end of the story in the case of private government contractors. Manypenny, 451 U.S. at 242. Indeed, a crucial jurisdictional question in such cases is whether the contractor's actions were undertaken at the direction of the federal government at all.[11] By their very nature, private actors face a kind of preliminary showing typically unknown to bona fide federal officers. See Ryan v. Dow Chemical Co., 781 F.Supp. 934, 939 (E.D.N.Y. 1992). Yet this showing, where a contractor must colorably establish that it acted at the federal government's behest, is essential to the Court's Article III jurisdiction.

In this respect, government contractors are degrees different from both the federal officers who originally inspired the removal statute and the cases in which the Supreme Court later coined its cautionary language. The earliest version of the federal officer removal statute

---

[10] See also Marathon Oil Co. v. Ruhrgas, A.G., 115 F.3d 315, 318 & n.7 (5th Cir. 1997) (noting "the overwhelming body of precedent commanding all federal courts to scrutinize assiduously subject matter jurisdiction at each stage of litigation, trial and appellate, and to dismiss cases not properly before us"), vacated on other grounds, 129 F.3d 746 (5th Cir. 1997). Cf. 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); Fed.R.Civ.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[11] As set out more fully below, where a manufacturer seeks removal based on the federal contractor defense, whether the federal government actually directed the act at issue is doubly important. It pertains to two separate prongs of the Mesa standard for removal: both the question of causation and the colorability of the asserted federal defense.

-10-

Ex. 11:10

was promulgated by Congress in response to a barrage of state-court suits by New England

ship-owners, who opposed federal customs officials' efforts to enforce a trade embargo with

England during the War of 1812. See Customs Act of 1815, ch. 31, § 8, 3 Stat. 198.  The

statute's scope was later expanded when South Carolina sought to nullify federal tariff laws in

the 1830s by authorizing the prosecution of the federal agents who collected those tariffs.  See

Force Act of March 2, 1833, ch. 57, 4 Stat. 632-33; Gay v. Ruff, 292 U.S. 25, 32 (1934)

(discussing history and origins of the federal officer removal statute); Watson v. Philip Morris

Cos., Inc., 127 S. Ct. 2301, 2304-07 (2007) (same).  In the years since, the statute has been

applied to protect a wide variety of federal officers, as well as those "acting under" them, from

suit in state court. See Colorado v. Symes, 286 U.S. 510, 517 (1932) (considering state

prosecution of federal prohibition agent); Willingham v. Morgan, 395 U.S. 402, 407 (1969)

(considering prisoner's suit against the warden and chief medical officer of a federal prison);

Arizona v. Manypenny, 451 U.S. 232, 242 (1981) (considering state prosecution of federal

immigration officer); Jefferson County, Ala. v. Acker, 527 U.S. 423 (1999) (considering effects

of local occupational tax on federal judges).

     It is these cases -- where the federal character of the disputed act is hardly in doubt -- that

have prompted the Supreme Court to caution against an unduly narrow view of federal officer

removal. See id. at 431.  Indeed, it is not up to a court, at a preliminary stage, to conclusively

determine the validity of a plausible but contested federal defense. See id. Yet the court must

still satisfy itself that the defense has enough substance to trigger the right to a federal forum.

Relaxing this standard too far, particularly in the context of a private contractor, could well err in

the opposite direction -- by providing a federal forum to a party whose acts were outside its

Ex. 11:11

federal directives. A colorable federal defense, as <u>Mesa</u> itself makes plain, is not a requirement

that may be reduced to the point of vanishing altogether. <u>See</u> 489 U.S. at 132-34.

 The removal standard's remaining two elements -- the defendant's status as a federal

officer or agent and the required causal nexus -- are arguably subject to a somewhat higher

showing. These factors are akin to jurisdictional facts set by Congress, as opposed to the

colorable federal legal defense that provides the constitutional basis for a federal court's removal

jurisdiction. <u>See</u> <u>Amoche v. Guarantee Trust Life Ins. Co.</u>, 556 F.3d 41, 50 (1st Cir. 2009)

(applying "reasonable probability" standard to jurisdictional facts, such as amount in

controversy, "where little or no evidence has yet been produced" at the pleadings stage); <u>United</u>

<u>Food & Comm. Workers Union, Local 919, AFL-CIO v. Centermark Prop. Meriden Sq., Inc.</u>, 30

F.3d 298, 305 (2d Cir. 1994) (holding that the party asserting jurisdiction must support

challenged jurisdictional facts "with competent proof and justify its allegations by a

preponderance of the evidence").

 Between these two requirements, the causation standard is likely to be the more difficult

threshold. In practical terms, the federal government must be the source of the specific act for

which the contractor now faces suit. A federal contractor must show that those acts or omissions

were dictated by the federal government -- i.e., that it acted <u>as</u> the federal government. <u>See</u> <u>In re</u>

<u>Eastern and Southern Dist. New York Asbestos Litigation</u>, 897 F.2d 626, 630 (2d Cir. 1990). If

the contractor acted of its own accord, while the government simply remained silent, removal

cannot be sustained.

 Obviously, the Court's decision assumes, in the absence of First Circuit authority to the

contrary, that government contractors are entitled to seek removal under the statute, as other

-12-

**Ex. 11:12**

courts have held.  See Hilbert, 529 F. Supp. 2d at 191-92 (collecting cases); Watson v. Philip

Morris Cos., Inc., 127 S. Ct. 2301, 2307 (2007) (suggesting, in dicta, that government

contractors may invoke federal officer removal).  Likewise, the Court assumes that the federal

contractor defense described in Boyle, 487 U.S. 500, supplies a substantive defense for purposes

of the removal statute.  This conclusion is not self-evident.  See Hilbert, 529 F. Supp. 2d at 192;

Ryan v. Dow Chemical Co., 781 F. Supp. 934, 944-45 (E.D.N.Y. 1992).  But as in Hilbert, the

Court need not resolve this question because it finds, in any case, that the defendants do not

satisfy the criteria for removal set out in Mesa, 489 U.S. 121.

    B.    **Assertion of a Colorable Federal Defense**

        1.    **Legal Standard**

      The removing defendants assert only one federal defense: the federal contractor defense

recognized by the Supreme Court in Boyle, 487 U.S. 500.  While Boyle involved allegations of

defective design -- in that case, related to a Marine helicopter's emergency escape system --

courts, including this one, have adapted its elements to failure-to-warn claims.  In particular,

when state law would otherwise impose liability for a failure to warn, that law can be displaced

when the contractor can show that: (1) the government issued reasonably precise specifications

governing warnings; (2) the contractor provided the warnings required by the government; and

(3) the contractor warned the government about dangers in the equipment's use that were known

to the contractor but not to the government.  See Hilbert, 529 F. Supp. 2d at 198 (citing Oliver v.

Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th Cir. 1996); Boyle, 487 U.S. at 512).

      This Court's previous decision also made clear, as did Boyle, that the crux of the federal

contractor defense is a "significant conflict" between a federal interest and the defendant's state-

**Ex. 11:13**

law duties. Id. at 511. This requirement was at the heart of the Supreme Court's extension of the Federal Tort Claims Act's (FTCA) discretionary function exception to cases in which the military's procurement needs cannot be reconciled with state law. See id.; 28 U.S.C. § 1346(b); 28 U.S.C. § 2680(a). Ultimately, the elements described above must demonstrate such a conflict. "If there is no conflict, if both federal policy and state law can be satisfied at the same time, the contractor may not assert the defense." Hilbert, 529 F. Supp. 2d at 198. The measure of "reasonably precise" is not simply the sheer number of specifications; it is whether those requirements plausibly imply such a conflict between the omitted warning and a deliberate federal policy-choice or judgment.

Importantly, compared to the design-defect claims in Boyle, the type of conflict required by the defense may be considerably more difficult to show in a failure-to-warn case. "[D]esign defect and failure to warn claims differ practically as well as theoretically." Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1994). In the design-defect case, the government is entitled to receive the product it commissioned. The design specifications themselves reflect a federal interest; where it is aware of potential risks in the design, the government has necessarily balanced safety and performance. See Boyle, 487 U.S. at 511 (discretionary function lies in "the balancing of many technical, military, and even social considerations"). In these cases, the manufacturer could not remedy the design defect without compromising those relative priorities -- that is, without giving the government a product different from what it expressly ordered.

Failure-to-warn claims do not raise the same type of obvious conflict. See Oliver, 96 F.3d at 1003-04; Tate, 55 F.3d at 1156.[12] Generally speaking, a manufacturer could give the

---

[12] Cf. Wyeth v. Levine, 555 U.S. ___, No. 06-1249, slip. op. at 15-16 (Mar. 4, 2009) (examining drug manufacturer's preemption defense to failure-to-warn claim). "[A]bsent clear evidence that the FDA would not have approved a change to [the drug's] label, we will not conclude that it was impossible for Wyeth to comply with both state and

-14-

government precisely the product it ordered while complying with its state-law duties to warn. Such a warning does not, by itself, require a departure from the government's design specifications and the judgments they reflect. For this reason, proof that would support the defense as to a defective-design claim is not sufficient to defeat liability for a failure to warn. Id. Merely because the government has issued reasonably precise design specifications does not mean that it also exercised the requisite discretion with respect to warnings. These are separate showings.

Thus, a manufacturer asserting the federal contractor defense must show that the federal government issued reasonably precise specifications covering warnings -- specifications that reflect a considered judgment about the warnings at issue. Short of this, the manufacturer must show either back-and-forth negotiations over the warning or "some extrinsic evidence that the government exercised independent judgment" in such a way as to preclude the warning.[13] Hilbert, 529 F. Supp. 2d at 199 (discussing "direct control," "negotiation," and "extrinsic evidence" theories).

Government silence about a particular warning does not easily fit into any of these categories and does little to substantiate the alleged exercise of government discretion. The keystone is proof that the government exercised its discretion in connection with the warnings in some meaningful way. See Lewis v. Babcock Indus., Inc., 985 F.2d 83, 87 (2d Cir. 1993) (rejecting the defense where the government merely "rubber stamped" the manufacturer's design); Trevino v. General Dynamics Corp., 865 F.2d 1474, 1481 (5th Cir. 1989) (stating that

federal regulations." Id. at 15.

[13] For instance, a broad policy statement or regulation expressing the decision not to warn about a particular hazard would be one such type of extrinsic evidence.

-15-

Ex. 11:15

"imprecise or general guidelines" would be insufficient). While the government need not dictate

the exact content of the warnings, it must have at least spoken broadly on the subject such that an

actual conflict is apparent. Only this showing adds up to the type of incompatibility

contemplated by the federal contractor defense. As the Supreme Court has stated, "a conflict

there must be." Boyle, 487 U.S. at 508.

At its root, the defense may protect government discretion, see Tate, 55 F.3d at 7, 14, but

it only does so where that discretion has actually been exercised. It does not shield defendants

where the government might have exercised its discretion and final authority but did not.

Indeed, the purpose of both the federal officer removal statute and the federal contractor defense

is to protect the execution of federal policies from state interference. If the government cannot

be said to have made a decision -- if it is simply silent -- there is no federal policy or interest to

protect. By default, any state-law duties thus remain intact.

### 2.      Application to the Evidence

The removing defendants submit a variety of materials to show that the Navy either

specifically prohibited them from warning about asbestos or had concluded, as a broad matter of

policy, that such precautions were unnecessary and undesirable. The Court has carefully

scrutinized the voluminous materials submitted by the parties. See Hilbert, 529 F.Supp.2d at 199

n.14. While the number of pages has multiplied, the evidence is ultimately no more persuasive.

#### a.      Evidence of Direct Control

Large portions of the evidence relate to the Navy's control over the design of the parts

and ships themselves, rather than the accompanying labels, manuals, and warnings. See, e.g.,

Buffalo Pumps Opp. Mem. (document # 21); Sergeant Aff. ¶¶ 48-54 (only four pages out of

**Ex. 11:16**

thirty addressing warnings, as opposed to ship design and Navy organization). Because the case

does not include design-defect claims, much of this evidence is beside the point; compliance

with the Navy's exacting design specifications would not have automatically foreclosed the

defendants' ability to warn about the hazards associated with the required components. "Simply

because the government exercises discretion in approving a design does not mean that the

government considered the appropriate warnings that ought to accompany the product." Tate, 55

F.3d at 1156.  The possibility that defendants could have satisfied both the federal design

specifications and their state-law duty to warn is precisely what makes these cases different from

Boyle, 487 U.S. 500.  As stated, the removing defendants must make out a genuine conflict

between Navy policy and the omitted warnings.

　　　None of the procurement contracts, military specifications, or technical manual revisions

addressed to these defendants discuss asbestos warnings whatsoever.  Nor is there evidence that

the Navy had a fixed set of approved warnings for these products, simply dictating for

manufacturers the content or subject-matter of the warnings that did appear.  See MIL-M-

15071D, effective June 6, 1961 (document # 24-9) (permitting manufacturers to utilize technical

manuals "prepared in accordance with [their] commercial practice," discussed infra).  Finally,

none of these materials reflect a single effort by manufacturers to warn about asbestos -- even at

the proposal or draft stage -- that was then rebuffed by the Navy.  Altogether, there is little

evidence that the Navy exercised "direct control" to prohibit asbestos warnings.

　　　Instead, the defendants take a more hypothetical approach to control.  They argue that if

they had tried to warn about asbestos, the Navy would have rejected this effort.  In support of

this broad proposition, they submit the affidavits of David Sergeant, Jr., Roger Horne, and Ben

**Ex. 11:17**

Lehman, all retired Rear Admirals of the United States Navy who served during the relevant period. Sergeant Aff. (document # 21-4); Horne Aff. (document # 21-35); Lehman Aff. (document # 5-6). Each describes the importance of asbestos to the Navy's ship-building program, the Navy's design of these vessels, the Navy's requisition and procurement processes, and the Navy's careful oversight of production itself to ensure compliance with its specifications. Based on this survey, each expressed the opinion that "the Navy would not have permitted Buffalo Pumps or other equipment suppliers to place asbestos-related warnings on packaging or containers for pumps or related parts or items supplied during the 1940s, 1950s, or 1960s." Sergeant Aff. ¶¶ 51, 54; see also Horne Aff. ¶¶ 15-16; Lehman Aff. ¶ 10.

But the documentary evidence on which the affiants rely does not bear out their conclusion. The military specifications they point to are vague about the content of manufacturer warnings: None of them specify which hazards manufacturers should warn about and which they should not. See, e.g., MIL-P-17639 (document # 21-32) (governing the design of pumps, without addressing warnings); MIL-P-17840 (document # 21-33) (same). For instance, the technical manuals that accompanied these products appear to have been governed primarily by one military specification -- MILSPEC 15071D and its successors. MIL-M-15071D, effective June 6, 1961 (document # 24-9); MIL-M-15071H, effective July 17, 1978 (document # 38-5). This MILSPEC set out the requirements for technical manuals across the board, rather than one or several specific products. It required that every manufacturer itself prepare and submit a technical manual governing the use and repair of its product to the Navy. MIL-M-15071D § 3.1.2. Although the removing defendants argue that the content of these manuals was dictated exclusively by the Navy, rather than the general marketplace, the very first

Ex. 11:18

section of MILSPEC 15071D states: "The intent is to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to the detail requirements included herein." Id. § 1.1; see also id. § 3.1.3 ("A class A or B manual may be the manufacturer's commercial manual, or one prepared in accordance with his commercial practice.").

With respect to warnings, the manual specifications are notably bare, providing only:

> Notes, cautions and warnings -- Notes, cautions and warnings should be used to emphasise important and critical instructions. The use should be as sparing as is consistent with real need.
>
> (a) "NOTE" -- An operating procedure, condition, etc., which it is essential to highlight.
> (b) "CAUTION" -- Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.
> (c) "WARNING" -- Operating procedures, practices, etc., which will result in personal injury or loss of life if not correctly followed.

Id. § 3.3.6; see also id. § 3.1.9 ("Operating instructions -- Information shall include routine and emergency procedures, safety precautions . . . ."). Beyond these provisions, the manual specifications offer little guidance on the subject of warnings. While the requirements express an overall interest in parsimony, they discourage only superfluous or trivial precautions. Certainly, they do not exclude asbestos warnings on their face.

### b.    Evidence of Negotiation

Instead, the specifications left the work of drafting technical manuals -- including any warnings therein -- to the manufacturers themselves, subject to Navy review and approval. Here, the Navy officers and other affiants place an enormous emphasis on the Navy's ultimate control over the products and any accompanying warnings. "The Navy retained the 'final say' over the design of

**Ex. 11:19**

any piece of equipment." Horne Aff. ¶ 15; see also Lehman Aff. ¶¶ 3, 5-8 ("The Navy was

intimately involved with and had final approval of all technical and engineering drawings,

operating manuals, safety or hazard information and any other written information that

accompanied a piece of equipment."); Hobson Aff. ¶¶ 4, 8;  Keenan Aff. ¶¶ 12-22 (document #

41-2).  They also point to the Navy's role in reviewing, editing, and approving the technical

manuals as evidence of this control.  See Sergeant Aff. ¶ 51 ("Navy personnel . . . participated

intimately in the preparation and review of these instruction books and technical manuals.").

But the fact that the Navy possessed final authority over the design and labeling of these

products does not, without more, demonstrate that it exercised that authority with respect to

asbestos warnings.  No evidence shows that the Navy even considered such a possibility; no

draft proposed such a warning.  Seeking to elide this gap, defendants characterize the Navy's

revision of the technical manuals as "exacting" and "lengthy," suggesting that the Navy all but

wrote these manuals itself.  Id.  That is not the case.  As noted, MILSPEC 15071D explicitly

encourages manufacturers to submit their commercial manuals -- which would have been subject

to state law -- where suitable.  See MIL-M-15071D §§ 1.1, 3.1.3.  Moreover, most of the naval

revisions offered as exhibits, while certainly detailed, are no more than one or two pages in

length and do not address warnings, asbestos or otherwise, at all.  See Technical Manual

Revisions, Ex. L to Sergeant Aff. (document # 21-30) and Ex. C to Kraft Aff. (document # 21-

34).

      Two revisions do illustrate the Navy's attention to safety issues generally, but these notes

reveal no discernible position on asbestos warnings -- the subject of the claims in this case.

Technical Manual Revision, June 8, 1959, Ex. L to Sergeant Aff. at 2 (requiring manufacturer to

**Ex. 11:20**

add caution about transporting pump units); Technical Manual Revision, July 28, 1966, Ex. C to

Kraft Aff. at 6 (requiring manufacturer to add the warning "Never use water on electrical fires.

Use CO2."). Such evidence does not amount to the type of "back-and-forth" discussion about

asbestos risks that would colorably support a negotiation version of the federal contractor

defense. See Hilbert, 529 F. Supp. 2d at 199. Simply because the Navy ultimately approved all

labels and manuals does not imply that it rejected a warning that the manufacturers never offered

for its consideration. Rather, the record is simply silent.

### c.   Extrinsic Evidence

In the absence of this evidence, the defendants appeal to the Navy's general knowledge of

asbestos risks and its safety efforts in other contexts. Samuel Forman, a Navy doctor in

occupational medicine, points to the Navy's extensive experience with asbestos beginning in the

1920s and its adoption of certain precautions over the following decades. Forman Aff.

(document # 21-38); see also Betts Aff. (document # 25-7) (offering similar history of

occupational safety); Lehman Aff. ¶¶ 9, 11. Documentary materials highlight the Navy's

knowledge of the dangers of asbestos and available methods of avoiding injury or illness due to

working with asbestos, including wetting the materials before cutting to reduce dust, instructing

workers to wear masks and providing proper ventilation at work sites. See, e.g., Bureau of Ships

Manual, Thermal Insulation (document # 21-7); Minimum Requirements for Safety and

Industrial Health, 1943 (document # 21-68); Letter re: Asbestos Hazards, Dec. 6, 1968

(document # 21-60); NAVSHIPS Instruction 5100.26, effective Feb. 9, 1971 (document # 21-

61). Based on these submissions, the Court has no doubt that the Navy knew a good deal about

asbestos; this is not a case where the defendants withheld information about the risks of their

products.

**Ex. 11:21**

Yet even at this range, no evidence shows that asbestos warnings, by their nature, would have conflicted with any documented Navy policy. In fact, the defendants may prove too much: They present evidence that the Navy, in other contexts, recognized the hazards of asbestos and offered occupational safety instructions to those who worked with it. See Buffalo Pumps Opp. Mem. at 14-15 (document # 21); Forman Aff. ¶¶ 32, 34-41. Under these circumstances, it is entirely plausible that the Navy would have accepted manufacturer warnings consistent with its own "robust safety and health program."[14] Id. at ¶ 44. As the defendants admit, it is simply not true that the Navy had no interest in the hazards of asbestos. Id. Nothing in the naval history of asbestos shows that the Navy was intent on limiting the asbestos precautions it had adopted exclusively to those places where these warnings appeared.

Likewise, Dr. Forman's conclusion that the Navy "reject[ed] the participation from manufacturers in the Navy's efforts to alert Navy personnel to potential asbestos" is unfounded. Forman Aff. ¶ 30 (document # 21-38). His review of naval materials showed no instance "in which the Navy, at any time during the 1930s through the 1960s, instructed or permitted a supplier of pumps to a vessel or facility to affix or provide any asbestos-related warning with its equipment." Id. at ¶ 29. But, equally, he points to no instance where the Navy had occasion to consider a manufacturer's proposed asbestos warning or where it preemptively forbade such a warning. To say, then, that the Navy conclusively "rejected" manufacturers' participation in its asbestos safety practices is a mischaracterization. Id. at ¶¶ 20-21, 27-28 (showing only that the Navy rejected outside federal inspections of its shipyards by the U.S. Labor Department's Bureau

---

[14] Contrary to Dr. Forman's suggestion, it would not be "unreasonable to assume" that the Navy might have accepted a warning that matched its own policies for the handling of asbestos-related equipment. Forman Aff. ¶ 44.

-22-

of Labor Standards in 1941, and that it later chose to continue using asbestos). Once again, the

defendants seek to transform the Navy's silence into a substantive policy judgment.

The manufacturers' theory is in many ways extraordinary. By its terms, they would be

shielded anytime the government knew as much about a hazard as they knew themselves.

Indeed, this theory takes government silence on a particular warning and turns it into an

affirmative expression of government policy and evidence of a specific discretionary judgment.

The implicit assumption is that if the government knows about a hazard, the precautions it has

adopted are an exact calibration of its estimation of the risks, permitting no more and no less.

This is too much to conclude from the scant guidance on asbestos that the Navy communicated

to these manufacturers. In most instances, silence on a subject indicates that an issue has not

been raised or decided. Cf. Kimbrough v. United States, 128 S. Ct. 558, 561 (2007) ("Drawing

meaning from silence is particularly inappropriate here, because Congress knows how to direct

sentencing practices in express terms."); James v. United States, 366 U.S. 213, 220 (1961)

(warning against reading too much into legislative silence). Yet here the removing defendants

ask the Court to draw exactly the opposite conclusion from the Navy's silence -- that it had

considered and then rejected asbestos warnings on these products. On the record presented, the

Court finds this theory insufficient to raise a colorable federal contractor defense. Silence is not

the stuff of "reasonably precise" specifications.

### d.      Evidence of Conflict

Finally, the defendants' efforts fail also when the Court steps back to consider the

keystone of the federal contractor defense: Some genuine conflict between federal interests and

the state-law duties at issue. Boyle v. United Technologies Corp., 487 U.S. 500, 512 (1988).

-23-

**Ex. 11:23**

Above all, they have not adequately shown what underlying Navy policy or priority would have prevented them from warning about asbestos altogether, as they claim. For the substantive source of this conflict, the defendants suggest that the Navy had an interest in enforcing "uniformity" across its safety protocols and also a concern that "apathy and resulting disregard of hazard[s]" would be the product of too many safety warnings. See Sergeant Aff. ¶ 53; Lehman Aff. ¶¶ 10, 12; Horne Aff. ¶ 16.

The manufacturers offer no documentary proof of these imperatives and this Court can find none. While a military concern for standardization and consistency is rational and compelling, defendants admit that the Navy had adopted safety practices for asbestos exposure and handling during the relevant period. See, e.g., Forman Aff. ¶¶ 37-38, 41. Thus, uniformity could not have been a bar to manufacturer warnings where, as defendants also admit, the Navy carefully reviewed all accompanying written materials. Lehman Aff. ¶¶ 3, 5-8. This interest implies only that manufacturer warnings could have been made consistent with the precautions the Navy issued elsewhere -- not that they would have been prohibited altogether. Id. at ¶ 12d. As for fear of apathy, the Court simply has no evidence that this was a controlling federal interest, apart from a single unsourced statement in Admiral Horne's affidavit. Horne Aff. ¶ 16.

The default rule, as Boyle made clear, is that state law duties persist when the federal government requisitions a product from a private contractor, absent instructions to the contrary. This principle does not change when it is the military that has procured the equipment. See Boyle, 487 U.S. at 507-08 (requiring reasonably precise specifications in order to displace state law, even where the United States Marine Corps was the procuring party). It is difficult for the Court to credit any overwhelming threat to military efficiency posed by holding manufacturers to

-24-

**Ex. 11:24**

their state-law duty to warn -- applicable in the broader marketplace -- until the government has expressed a policy against such warnings. See id. at 510 (declining to adopt increased procurement costs as rationale for insulating all government contracts from liability).

Absent an identifiable federal interest at stake, communicated in the form of reasonably precise specifications, the Court cannot conclude that defendants have met even the generous threshold offered by the federal officer removal statute.

C.      "Acting Under" a Federal Officer\

To be entitled to removal, a defendant must also show that it was a federal officer or "acting under" a federal officer. Watson v. Philip Morris Cos., Inc., 127 S. Ct. 2301, 2307 (2007). This requirement concerns the identity of those permitted to seek removal under Section 1442(a)(1); it broadly confines removal jurisdiction under this section to federal officers and their agents. For the purposes here, the Court finds that the manufacturers have satisfied this element. They have shown that they produced the equipment at issue pursuant to specific procurement requests from the Navy and under the close supervision of its employees. See, e.g., Keenan Aff. ¶¶ 12-22. These facts are sufficient to establish that the defendants were "acting under" a federal officer, as the statute requires. See Watson, 127 S. Ct. at 2308 (suggesting that "[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, or supervision"); Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 486 (1st Cir. 1989) (permitting removal by private telephone company that facilitated wire-tapping at the direction of federal agents).

D.      Causal Connection

**Ex. 11:25**

The final requirement for federal officer removal is related, but far more specific: A removing defendant must show that the specific acts or omissions complained of were committed pursuant to a federal duty. That is, it must show a causal connection between its federal mandate and the very actions it now seeks to defend in federal court. The defendant seeking removal "must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty."[15] Mesa v. California, 489 U.S. 121, 131-32 (1989) (quoting Maryland v. Soper (No. 1), 270 U.S. 9, 33 (1926)). In the case of a government contractor, this question is closely related to evidence supporting a colorable federal defense; in both instances, a defendant must show that it acted at the federal government's command. See Hilbert, 529 F. Supp. 2d at 203. But, as a jurisdictional fact, causation is judged by a somewhat stricter "reasonable probability" standard. Amoche v. Guarantee Trust Life Ins. Co., 556 F.3d 41, 50 (1st Cir. 2009). Moreover, a federal contractor who acts as a governmental agent in one limited capacity will arguably have less leeway in this analysis than a federal officer who executes federal policies generally.[16] Nonetheless, proof of reasonably precise specifications would generally establish the requisite causal connection.

Here, however, that causal nexus is lacking. As the Court noted at the outset, the removing defendants have offered no evidence that the Navy's position on asbestos warnings had any real bearing on their own. So far as the record shows, no Navy contractor ever sought to

---

[15] A federal contractor who acts as a governmental agent in one limited capacity will arguably have less leeway in this analysis than a federal officer who executes federal policies generally. See Ryan v. Dow Chemical Co., 781 F. Supp. 934, 939 (E.D.N.Y. 1992).

[16] A supplier of equipment may have still more difficulty compared to other types of private agents directly enlisted in government activities. Compare this case to Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 486 (1st Cir. 1989), in which a phone company was sued under state law for assisting federal agents conduct a wiretapping operation.

-26-

**Ex. 11:26**

warn about asbestos during the relevant period; nor do the defendants claim that they considered proposing an asbestos warning to the Navy.[17] Cf. Wyeth v. Levine, 555 U.S. ___, No. 06-1249, slip. op. at 15 (Mar. 4, 2009) (noting that the defendant did not argue "that it attempted to give the kind of warning required by [state law] but was prohibited from doing so by the FDA"). Likewise, as discussed above, the Court cannot identify any specific naval regulation or broad policy statement that would have preempted an effort to warn about asbestos. Finally, the defendants might show that they included asbestos warnings with products sold in the general marketplace, but omitted those warnings on equipment supplied to the Navy. This evidence would support the inference that the Navy was responsible for any failure to warn -- but there is none. See MIL-M-15071D §§ 1.1, 3.1.3 (permitting manufacturers to submit commercial manuals for Navy approval and review).

Instead, the proof the defendants offer is all but speculation: They tell the Court that if they had sought to warn, the Navy would have rejected such a proposal. This hypothetical, even if true, does not amount to causation.[18] If the manufacturers never contemplated warning about asbestos here and did not do so on their other products, it is difficult to see how the Navy "caused" them to omit such precautions. As a general matter, this element will not be hard to satisfy. It simply prevents removing defendants from imputing their own unrelated judgments to

---

[17] Mr. Lehman testified at his deposition that he could not recall any instance in which a vendor asked to put a warning on any piece of equipment. Nor could he specifically recall any contractors or vendors bringing possible asbestos health hazards to the Navy's attention. See Lehman Dep. at 62-63 (document # 11-4). Likewise, Mr. Schroppe conceded that he knew of no document in which the Navy forbade contractors from warning about asbestos. See Schroppe Dep. at 1337 (document # 11-2).

[18] Cf. Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 876 (1st Cir. 2008) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989)) (examining but-for causation by assuming that the alleged cause was present and asking whether "even if that factor had been absent, the event nevertheless would have transpired in the same way"). The Court cannot say that the manufacturers would have provided asbestos warnings even in the absence of the broad Navy prohibition they allege -- i.e., they have not shown that anything "would have been different." Id.

Ex. 11:27

the government after the fact. Here, however, that appears to be precisely the manufacturers' rationale. As a result, the Court finds that the defendants have also failed to show a sufficient causal connection to support removal.

### E.      Disclaimer

In addition to their substantive objections to removal, plaintiffs have sought to plead around the federal contractor defense by disclaiming any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy vessels. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States government. Compl. ¶ 4. Because the Court finds no basis for removal, as discussed above, it need not resolve whether such a disclaimer defeats the defendants' right to seek a federal forum under 28 U.S.C. § 1442(a)(1). The Court notes, however, that several other courts to consider the issue have found precisely such a disclaimer ineffective. See, e.g., O'Connell v. Foster Wheeler Energy Corp., 544 F. Supp. 2d 51, 54 n.6 (D. Mass. 2008); Machnik v. Buffalo Pumps, Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007).

## IV.      CONCLUSION

The defendants have shown that they were subject to many military specifications in relation to the products at issue, but quantity is no substitute for precision in the Boyle analysis. They have offered no Navy regulations or specifications that apply to asbestos warnings in particular and few, if any, that relate to their ability to include safety warnings more generally. In fact, the specifications governing the creation of technical manuals appear to open the door to

Ex. 11:28

warnings developed for products sold commercially.  This evidence does not meet the requirement of "reasonably precise specifications" in the failure-to-warn context -- specifications which must show a significant conflict between federal interests and state-law duties.  Nor does it demonstrate that the Navy itself "caused" the defendants to omit the disputed warnings, as the federal officer removal statute requires.

For the reasons stated, this Court lacks subject-matter jurisdiction over the pending action.  The plaintiffs' Motion to Remand (document # 10) is **GRANTED**.

**SO ORDERED.**

Date:  May 4, 2009            /s/Nancy Gertner
                              **NANCY GERTNER, U.S.D.C.**

-29-

**Ex. 11:29**

# Exhibit D

1

2

3

**09-CV-00870-FINAFF**

4

5

6           UNITED STATES DISTRICT COURT

7        WESTERN DISTRICT OF WASHINGTON
                AT SEATTLE

8

9 RALPH and YVONNA LIBSACK,     )     No. C09-0870RSL

10                 Plaintiffs,  )     ORDER OF REMAND
         v.                 )

11 SABERHAGEN HOLDINGS, INC.,    )

12  et al.,                     )

13                Defendants.  )

14

15        This matter comes before the Court on "Plaintiffs' Motion for Summary Judgment

16 and Remand." Dkt. # 14.[1] Because the Court cannot decide a substantive motion on the merits

17 unless it has subject matter jurisdiction over the dispute, plaintiffs' motion for remand must be

18 resolved at the outset. See Sarei v. Rio Tinto, PLC, 487 F.3d 1193, 1200 (9th Cir. 2007).

19 Defendant Leslie Controls, Inc., argues that it is a federal contractor entitled to a federal forum

20 under 28 U.S.C. § 1442(a)(1). Removal in this case is proper if (1) the removing defendant

21 acted under the direction of a federal officer; (2) there is a colorable federal defense to plaintiffs'

22 claims; and (3) a causal nexus exists between plaintiffs' claims and defendant's acts performed

23

24      [1] Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court

25 finds that this matter can be decided on the papers. The parties' requests for oral argument are therefore
DENIED. The Court has considered the declaration of Roger Horne in its entirety without ruling on

26 plaintiffs' evidentiary objections.

ORDER OF REMAND

1   under color of federal office. <u>Mesa v. California</u>, 489 U.S. 121, 131-32 (1989). Defendant, as

2   the party asserting federal jurisdiction, has the burden of establishing that this Court has the

3   power to hear this dispute. <u>In re Dynamic Random Access Memory Antitrust Litig.</u>, 546 F.3d

4   981, 984 (9th Cir. 2008).

5         The Court adopts the excellent historical and legal analysis set forth in <u>Holdren v.</u>

6   <u>Buffalo Pumps, Inc.</u>, 614 F. Supp.2d 129 (D. Mass. 2009). As was the case in <u>Holdren</u>,

7   plaintiffs have asserted only a failure-to-warn claim against Leslie Controls. Complaint at ¶ 4.2.

8   Although defendant has submitted declarations and exhibits that were not before the Honorable

9   Nancy Gertner, United States District Judge, when she issued her decision in <u>Holdren</u>, the

10   additional documents do not fill the evidentiary gaps identified by Judge Gertner. In particular,

11   there is still no evidence that asbestos warnings would have conflicted with any documented

12   Navy policy or specification or that Leslie Controls' failure to warn was in any way "caused" by

13   the Navy.[2] The ultimate conclusions remain the same: defendant has failed to raise a colorable

---

15       [2] Defendant argues that <u>Holdren</u> should not be followed because the District of Massachusetts

16   "was not subject to, and did not discuss, the Ninth Circuit's mandate in <u>Durham</u> [v. Lockheed Martin

17   <u>Corp.</u>, 445 F.3d 1247 (9th Cir. 2006)]" that removal rights for federal officers and their agents should be
broadly construed. Response at 5-6. In addition, defendants argue that <u>Holdren</u> draws too sharp a

18   distinction between federal officers and private entities performing work for the federal government.
Response at 6. Neither criticism is persuasive.

19      Broad construction of 28 U.S.C. § 1442(a)(1) is not a construct of the Ninth Circuit. The

20   Supreme Court has long commanded a generous interpretation of § 1442(a)(1) in order to protect the
ability of the federal government to act, through its agents, in the fifty states. <u>See</u>, <u>e.g.</u>, <u>Colorado v.</u>

21   <u>Symes</u>, 286 U.S. 510, 517 (1932); <u>Durham</u>, 445 F.3d at 1252-53. <u>Holdren</u> specifically acknowledges
that the federal removal statute should not be subject to a "narrow, grudging interpretation." <u>Holdren</u>,

22   614 F. Supp.2d at 140 (quoting <u>Arizona v. Manypenny</u>, 451 U.S. 232, 242 (1981)). Defendant's
<u>Durham</u>-based criticism is unfounded.

23      Leslie Controls does not attempt to identify the contours of the "sharp distinction" <u>Holdren</u>

24   purportedly draws between federal officers and private entities asserting a federal contractor defense.
Neither a federal officer nor a private contractor working for the government are entitled to a federal

25   forum simply because of their status – they must show that the federal government was the cause of the
specific act for which the individual now faces suit. Where a private entity is involved (as opposed to a

26   direct employee of the federal government), its profit-making interests, product development efforts, and

ORDER OF REMAND             -2-

1  federal defense to plaintiff's failure-to-warn claim and has failed to demonstrate a causal nexus

2  between plaintiffs' claim and defendant's acts performed under color of federal office. Thus, the

3  Court lacks subject matter jurisdiction over the pending action.

4

5      For all of the foregoing reasons, plaintiffs' motion for remand (Dkt. # 14) is

6  GRANTED. The Court has not considered or decided the cross-motions for summary judgment

7  filed by the parties. This matter is hereby remanded to the Superior Court of Washington in and

8  for the County of King.

9

10      DATED this _31st_ day of August, 2009.

11

12              _MM Slasnik_

13              Robert S. Lasnik
               United States District Judge

14

15

16

17

18

19

20

21

22

23

24  _____
    corporate structure may have "caused" the challenged act. Such considerations are generally not in play

25  when the federal officer, acting in the scope of his or her employment, carries out the employer's
    directives. The fact that it may be difficult for a private contractor to satisfy the Mesa conditions is a

26  function of their distinct attributes and does not invalidate or call into question the Holdren analysis.

ORDER OF REMAND                        -3-

# Exhibit E

**09-CV-00759-DECL**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRENDA YOST, ) | No. C09-0759RSL |
|                  Plaintiff, ) | |
|     v. ) | ORDER OF REMAND |
| SABERHAGEN HOLDINGS, INC., ) | |
|   et al., ) | |
|                 Defendants. ) | |

    This matter comes before the Court on "Plaintiffs' Motion for Summary Judgment and Remand." Dkt. # 26.[1] Because the Court cannot decide a substantive motion on the merits unless it has subject matter jurisdiction over the dispute, plaintiffs' motion for remand must be resolved at the outset.  See Sarei v. Rio Tinto, PLC, 487 F.3d 1193, 1200 (9th Cir. 2007). Defendant Leslie Controls, Inc., argues that it is a federal contractor entitled to a federal forum under 28 U.S.C. § 1442(a)(1).  Removal in this case is proper if (1) the removing defendant acted under the direction of a federal officer; (2) there is a colorable federal defense to plaintiffs' claims; and (3) a causal nexus exists between plaintiffs' claims and defendant's acts performed under color of federal office.  Mesa v. California, 489 U.S. 121, 131-32 (1989).  Defendant, as

---

    [1] Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court finds that this matter can be decided on the papers.  The parties' requests for oral argument are therefore DENIED.

ORDER OF REMAND

1   the party asserting federal jurisdiction, has the burden of establishing that this Court has the

2   power to hear this dispute. <u>In re Dynamic Random Access Memory Antitrust Litig.</u>, 546 F.3d

3   981, 984 (9th Cir. 2008).

4         The Court adopts the excellent historical and legal analysis set forth in <u>Holdren v.</u>

5   <u>Buffalo Pumps, Inc.</u>, 614 F. Supp.2d 129 (D. Mass. 2009). As was the case in <u>Holdren</u>,

6   plaintiffs have asserted only a failure-to-warn claim against Leslie Controls. Complaint at 3.

7   Although defendant has submitted declarations and exhibits that were not before the Honorable

8   Nancy Gertner, United States District Judge, when she issued her decision in <u>Holdren</u>, the

9   additional documents do not fill the evidentiary gaps identified by Judge Gertner. In particular,

10   there is still no evidence that asbestos warnings would have conflicted with any documented

11   Navy policy or specification or that Leslie Controls' failure to warn was in any way "caused" by

12   the Navy.[2] The ultimate conclusions remain the same: defendant has failed to raise a colorable

13

_____

14     [2] Defendant argues that <u>Holdren</u> should not be followed because the District of Massachusetts

15   "was not subject to, and did not discuss, the Ninth Circuit's mandate in <u>Durham [v. Lockheed Martin Corp.</u>, 445 F.3d 1247 (9th Cir. 2006)]" that removal rights for federal officers and their agents should be

16   broadly construed. Response at 5-6. In addition, defendants argue that <u>Holdren</u> draws too sharp a distinction between federal officers and private entities performing work for the federal government.

17   Response at 6. Neither criticism is persuasive.

18     Broad construction of 28 U.S.C. § 1442(a)(1) is not a construct of the Ninth Circuit. The Supreme Court has long commanded a generous interpretation of § 1442(a)(1) in order to protect the

19   ability of the federal government to act, through its agents, in the fifty states. <u>See, e.g.</u>, <u>Colorado v. Symes</u>, 286 U.S. 510, 517 (1932); <u>Durham</u>, 445 F.3d at 1252-53. <u>Holdren</u> specifically acknowledges

20   that the federal removal statute should not be subject to a "narrow, grudging interpretation." <u>Holdren</u>, 614 F. Supp.2d at 140 (quoting <u>Arizona v. Manypenny</u>, 451 U.S. 232, 242 (1981)). Defendant's

21   <u>Durham</u>-based criticism is unfounded.

22     Leslie Controls does not attempt to identify the contours of the "sharp distinction" <u>Holdren</u> purportedly draws between federal officers and private entities asserting a federal contractor defense.

23   Neither a federal officer nor a private contractor working for the government are entitled to a federal

24   forum simply because of their status – they must show that the federal government was the cause of the specific act for which the individual now faces suit. Where a private entity is involved (as opposed to a

25   direct employee of the federal government), its profit-making interests, product development efforts, and corporate structure may have "caused" the challenged act. Such considerations are generally not in play

26   when the federal officer, acting in the scope of his or her employment, carries out the employer's

ORDER OF REMAND                    -2-

1   federal defense to plaintiff's failure-to-warn claim and has failed to demonstrate a causal nexus

2   between plaintiffs' claim and defendant's acts performed under color of federal office.  Thus, the

3   Court lacks subject matter jurisdiction over the pending action.

4

5            For all of the foregoing reasons, plaintiffs' motion for remand (Dkt. # 26) is

6   GRANTED.  The Court has not considered or decided the cross-motions for summary judgment

7   filed by the parties.  This matter is hereby remanded to the Superior Court of Washington in and

8   for the County of King.

9

10           DATED this 31ˢᵗ day of August, 2009.

11

12                                        _____

13                                        Robert S. Lasnik
                                          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25   _____

26   directives.  The fact that it may be difficult for a private contractor to satisfy the Mesa conditions is a
     function of their distinct attributes and does not invalidate or call into question the Holdren analysis.

ORDER OF REMAND                              -3-

# Exhibit F

1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
9                                 AT SEATTLE
10
11                                          )
     DUANE PREWETT and EILEEN               )   CASE NO. C09-0838 RSM
12   PREWETT, husband and wife,             )
                                            )
13              Plaintiffs,                 )   ORDER GRANTING PLAINTIFFS'
                                            )   MOTION TO REMAND
14       v.                                 )
                                            )
15                                          )
     GOULDS PUMPS (IPG), *et al.*,          )
16                                          )
                                            )
17              Defendants.                 )
     _____    )

18                          **I. INTRODUCTION**

19          This matter comes before the Court on "Plaintiffs' Motion for Summary Judgment and

20   Remand." (Dkt. #23). Plaintiffs brought product liability claims in state court arising from

21   their exposure to asbestos related to equipment produced by Defendants. They assert both a

22   claim for design defects and for failure to warn. Defendant Foster Wheeler removed this case

23   to federal court through the federal officer removal statute. 28 U.S.C. § 1442(a)(1). Plaintiff

24   argues that this case should be remanded to state court because Foster Wheeler has failed to

25   provide evidence that it meets the requirements of the statute.

26          For the reasons set forth below, the Court construes "Plaintiffs' Motion for Summary

27   Judgment and Remand" as a motion to remand and grants the motion, remanding the case to

28   King County Superior Court for further proceedings.

ORDER
PAGE - 1

## II. DISCUSSION

### A. Background

Plaintiff Duane Prewett worked as a boiler maker who installed, maintained, and repaired equipment at numerous work sites from 1964 to 1990. During that employment he was exposed to asbestos contained in a variety of products and equipment. More specifically, Plaintiff was exposed to asbestos contained in equipment manufactured by Defendant Foster Wheeler when he worked at Lockheed Shipyard in Seattle, Washington from 1964-1967 and Todd Shipyard in Seattle, Washington in 1967. In 2008, Plaintiff was diagnosed with lung cancer and pancreatic cancer allegedly caused by his exposure. He filed suit in King County Superior Court against multiple defendants including Foster Wheeler.

Plaintiff's exposure to asbestos in Foster Wheeler's equipment occurred at least in part while he worked as a boiler maker aboard the USS Coronado and the USS Nashville, Navy ships. Foster Wheeler admits that it manufactured the steam generators, including boilers and economizers, aboard those ships, but asserts that the design of that equipment was controlled by the Navy and subject to Navy specifications at all times. Because Foster Wheeler manufactured the equipment in question as a private contractor for the Navy, Foster Wheeler removed the case to federal court based on the federal officer removal statute, which allows for removal when a person acting under a federal officer or agency is sued in state court for actions taken pursuant to a federal duty. *See* 28 U.S.C. § 1442(a)(1); *Mesa v. California*, 489 U.S. 121 (1989).

The question before the court is whether removal under 1442(a)(1) was proper in this case.

### B. How to Construe "Plaintiffs' Motion for Summary Judgment and Remand"

Plaintiffs have moved simultaneously for summary judgment and to remand. They contend that the issues are intertwined because § 1442(a)(1), as interpreted by the Supreme Court, requires that the defendant have a colorable federal defense, *see Mesa*, 489 U.S. 121, in this case the government contractor defense. *See Boyle v. United Technologies Corp.*, 487 U.S.

ORDER
PAGE - 2

500 (1988).  Plaintiffs' argument at base is that Foster Wheeler has provided no evidence supporting its government contractor defense, and therefore this court should grant summary judgment for Plaintiffs as to that affirmative defense and remand the case to state court because without the defense there is no basis for removal under § 1442(a)(1).

Summary judgment is inappropriate at this stage for two reasons.  First, it is axiomatic that a federal court should determine whether it has subject matter jurisdiction before deciding the merits of a case.  If this court lacks jurisdiction, it cannot rule on a motion for summary judgment.  Secondly, if there is federal subject matter jurisdiction in this case, summary judgment would be improper at this stage because the United States Judicial Panel on Multidistrict Litigation is considering transferring the case to the Eastern District of Pennsylvania, where it will join thousands of other asbestos cases.

Thus, the proper procedure is to first decide whether federal subject matter jurisdiction exists.  If it does not, the case should be remanded to state court.  If it does, the case should be transferred to the Eastern District of Pennsylvania if the Panel so decides.

**C.  § 1442 and the Standard for Removal**

§ 1442, known as the federal officer removal statute, states that a civil action commenced in state court is removable when "any officer (or any person acting under that officer) of the United States or of any agency thereof, [is] sued . . . for any act under color of such office." 28 U.S.C. § 1442(a)(1).  To remove under this statute, the removing party must (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense, and (3) demonstrate a causal nexus between plaintiffs' claims and the acts it performed under color of federal office. *Mesa*, 489 U.S. 121, 133-34; *Fung v. Abex Corp.*, 816 F. Supp. 569, 571-72 (N.D. Cal. 1992).

The history of the federal officer removal statute goes back to 1815 when a customs statute included a removal provision in order to provide a federal forum for federal customs officers enforcing a trade embargo with England during the war of 1812.  As the trade embargo was extremely unpopular with New England States, the federal officers needed protection from hostile state courts. *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).  Similar enactments

ORDER
PAGE - 3

were made to protect federal officers in the 1830s when South Carolina threatened to nullify federal tariff laws by prosecuting the federal agents who collected the tariffs. *Id.* More removal statutes were passed around the time of the civil war and eventually the current provision was passed in 1948 extending the statute to cover all federal officers. *Id.*

The purpose of the federal officer removal statute is to "provide a federal forum for cases where federal officials must raise defenses arising out of their official duties" and "have the validity of the defense of official immunity tried in a federal court." *Id.* at 405, 407. Fundamentally, the statute is based on the notion that the federal government cannot function if its officers can be sued in a (potentially hostile) state court for actions taken pursuant to a federal duty and within the scope of federal authority. *Id.* at 406; *see Tennessee v. Davis*, 100 U.S. 257, 263 (1880) (noting that if a federal officer can be arrested and brought to trial in state court for actions taken within the scope of federal authority, "the general government may at any time be arrested at the will of one of its members").

In light of the statute's long history and crucial purpose, the Supreme Court has repeatedly echoed that "[t]he federal officer removal statute is not 'narrow' or 'limited.'" *Willingham*, 395 U.S. at 406. It has mandated that the statute be "liberally construed to give full effect to the purposes for which [it was] enacted." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). Thus the requirements for removal, including the requirement that the removing party raise a "colorable defense" must not be given a "narrow, grudging interpretation." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 407); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). The Ninth Circuit has reiterated these principles in the context of a private contractor asbestos case. *Durham*, 445 F.3d at 1252.

Nevertheless, removal is not automatic. At core, "[f]ederal jurisdiction rests on a federal interest in the matter." *Willingham*, 395 U.S. at 406 (internal quotations omitted). It is important to realize that in the cases in which the Supreme Court has encouraged a broad reading of the statute and cautioned against a "narrow, grudging interpretation," there was no question that an important federal interest was at stake since all those cases involved federal

ORDER
PAGE - 4

officers. *Acker*, 527 U.S. 423 (federal judges); *Mannypenny*, 451 U.S. 232 (federal

immigration officer); *Willingham*, 395 U.S.402 (warden of a federal prison); *Colorado v.*

*Symes*, 286 U.S. 510 (federal prohibition agent). The situation of a private contractor asserting

a government contractor defense is different because the federal interest is not as obvious. *See*

*Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 140-41 (D. Mass. 2009). For there to be

a federal interest in a private contractor, product liability case, the government must have been

sufficiently involved in the design of the defective feature or defective warnings so it can be

said that the contractor is acting "under the color" of his duties as an agent of a federal officer.

This is not to say that the removal standard is any greater for private agents of federal officers

than it is for true federal officers – it is not. *See Durham*, 445 F.3d at 1253 ("If the federal

government can't guarantee its agents access to a federal forum if they are sued or prosecuted,

it may have difficulty finding anyone willing to act on its behalf)." But where a private

company violates state law at its own discretion rather than at the government's discretion and

in accordance with federal duties, it cannot be said that there is a sufficient federal interest to

justify a federal forum even using the broadest of interpretations.

### D. Design Defect Claims

#### 1. Colorable Defense

First the court turns to Plaintiffs' design defect claims. Foster Wheeler asserts the

government contractor defense as its "colorable defense." The government contractor defense,

articulated in *Boyle v. United Technologies Corp.*, immunizes government contractors from

liability for state torts where the contractor's contractual duties to the government conflict with

its ability to abide by state law. The contractor must show (1) the United States approved

reasonably precise specifications; (2) the equipment conformed to those specifications; and (3)

the supplier warned the United States about the dangers in the use of the equipment that were

known to the supplier but not to the United States. *Boyle*, 487 U.S. at 512.

The central policy behind the government contractor defense is one of preemption. *Id.*

at 504-08. State law is displaced where "a significant conflict exists between an identifiable

federal policy or interest and the operation of state law." *Id.* at 507 (internal quotations

ORDER
PAGE - 5

omitted).  Where the United States chooses a design for military equipment, it exercises a discretionary function, balancing "many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511.  When a conflict arises between a private contractor's duties under state law and its adherence to government specifications determined through the exercise of its discretionary function, it will not do to allow "second-guessing" through tort suits against the contractor.  *Id.*

The first two *Boyle* requirements, that the government approve reasonably precise specifications and that the equipment conform to those specifications, are designed to assure that the defense is only available when the United States is exercising its discretionary function. As the Supreme Court put it, "they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* at 512.  Only where the United States exercises a discretionary function can there be a conflict between a federal interest, the Navy's interest in having the design it wants, and state law.  The Ninth Circuit cogently summarized the government contractor defense:

> [S]tripped to its essentials, the military contractor's defense under *Boyle* is to claim 'The Government made me do it.'  *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion.

*In re Hawaii Fed. Asbestos Cases*, 960 F.3d 806, 813 (9th Cir. 1992) (quoting *In re Joint E. and S. Dist. N.Y. Asbestos Litigation*, 897 F.2d 626, 632 (2nd Cir. 1990)).

Here, Plaintiff first argues that the government contractor defense is inapplicable because Foster Wheeler sold asbestos-containing equipment for commercial vessels that was similar to the equipment it manufactured for the Navy.  Where the government merely buys "stock" products, or products that are identical in both the military and non-military context, the government is not making a discretionary decision and thus the government contractor defense is inapplicable.  *Boyle*, 487 U.S. at 509; *Hawaii*, 960 F.2d at 811.  However, in this case at the remand stage, evidence that Foster Wheeler may have sold some boiler equipment

ORDER
PAGE - 6

commercially is not enough to show that the Navy was merely buying "stock" boilers and exercising no discretion. *Cf. Hawaii*, 960 F.2d at 812 (defendant could not use military contractor defense where it primarily manufactured asbestos insulation for private industry and sold "very, very, little" to the Navy who merely bought the identical product sold to private parties).

Plaintiff next argues that to prove "the Government made me do it" in an asbestos case, a contractor must show that the government specifically required the contractor to use asbestos in its products. As authority, Plaintiff cites to *Hawaii* which states that "[i]f the defendants could demonstrate . . . that the Government's specifications required asbestos in their products, and not just a certain level of performance, the military contractor defense might be available." *Hawaii*, 960 F.3d at 813. Certainly one way to show "reasonably precise specifications" is to prove that the United States required the defect, in this case asbestos, but it is not the only way. The key is that the government must make a discretionary decision to incorporate a specific design that is in conflict with state law. *Id.* Therefore, proof that the government was involved in the decision to use asbestos or proof that the government and the contractor engaged in a "continuous back and forth" review process regarding the defective feature will also suffice. *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 998 (7th Cir. 1996); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1154 (6th Cir. 1995); *see also Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 438 (5th Cir. 2000) ("reasonably precise" standard is satisfied as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective). On the other hand, mere approval or "rubber stamping" of a defective design is not enough. *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 585 (9th Cir. 1996). "When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." *Id.* (quoting *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989). Additionally, mere performance standards, as opposed to design specifications, do not constitute "reasonably precise specifications." *Hawaii*, 960 F.2d at 813 (specifications must require more than "just a certain level of performance"). Compliance with performance standards is not necessarily

ORDER
PAGE - 7

incompatible with state law, thus there is no conflict between state products liability and a

contractor's duties under its government contract and no displacement of state law.

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

*Boyle* 487 U.S. at 509.

In its attempt to prove that the government approved reasonably precise specifications, Foster Wheeler submits the affidavit of Mr. Schroppe, a former president of Foster Wheeler Boiler Corporation who holds a degree in Marine Engineering and worked for Foster Wheeler for 37 years. He states that Foster Wheeler prepared design drawings for its equipment conforming to specifications set forth in "Ship Specs" and "Mil Specs," and the Navy approved these designs. However, there is no indication in the affidavit, nor has Foster Wheeler provided any documents asserting that these specifications required the use of asbestos. Nor is there evidence that the Navy substantively considered the use of asbestos and made a discretionary decision to approve it, putting contractual requirements in conflict with state law. Instead, Mr. Schroppe's affidavit merely states that Foster Wheeler was required to design its boilers and components in accordance with rigid performance requirements and that the equipment was subject to rigorous testing to ensure it met those requirements. Because Foster Wheeler has provided no evidence that compliance with the Navy's performance standards would necessarily conflict with its duty to make safe products, *Boyle*'s requirements are not met. As with the air-conditioner referenced in *Boyle*, state law is not preempted.

Foster Wheeler also submits the affidavit of Admiral Lehman, who has an extensive engineering background and experience. He states that he served as a Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard from 1942 to 1944 and as Ship

ORDER
PAGE - 8

1  Superintendent at the San Francisco Naval Shipyard from 1950 to 1952.  According to the
2  Admiral, based on his service in the Navy and "close contact" with the Navy during his periods
3  of private employment, he is familiar with U.S. Navy specifications.  He states that "[t]he U.S.
4  Navy had complete control over every aspect of every piece of equipment.  Military
5  specifications governed every significant characteristic of the equipment used on U.S. Navy
6  ships, including the instructions and warnings."  In addition, "The Navy retained the 'final say'
7  over the design of any piece of equipment, and made the ultimate decisions, whether
8  engineering or contractual."  These statements are too vague to amount to a showing of
9  reasonably precise specifications.  That the Navy had the "final say" over its equipment does
10  not indicate anything beyond mere rubber stamping.  In the absence of any documents showing
11  that the Navy specified the *design* not merely the *performance* of the defective feature, or any
12  specific testimony to that effect by people with specific knowledge, Foster Wheeler cannot say
13  that the "government made me do it."

14        At the removal stage, the federal defense need only be "colorable." *Mesa*, 489 U.S. 121.
15  The defendant is not required to "win his case before he can have it removed." *Acker*, 527 U.S.
16  at 431 (quoting *Willingham*, 395 U.S. at 407).  But a defendant must put forward some
17  evidence that the government had reasonably precise specifications creating a conflict between
18  state law duties and contractual obligations.  Evidence showing performance requirements,
19  design requirements as to features other than the asbestos insulation, or general Navy control is
20  not helpful where there is no evidence demonstrating a difficulty complying with Navy
21  specifications and state products liability law at the same time.  "Reasonably precise" is not
22  based on the "sheer number of specifications," but whether the specifications demonstrate a
23  discretionary decision conflicting with state law.  *Holdren*, 614 F. Supp. 2d at 142-43.  Since
24  no evidence demonstrating a conflict was put forth in this case, Foster Wheeler's government
25  contractor defense is not "colorable."

26        **2.  Causal Nexus**
27        For removal there must also be a causal nexus between the plaintiff's claims and the
28  acts the defendant performed under color of office.  *Fung*, 816 F. Supp. 569 at 571-72 (citing

ORDER
PAGE - 9

*Mesa*, 489 U.S. at 124-25).  In a government contractor case, however, this requirement is essentially the same as the colorable defense requirement. The defendant must show that the Government made a discretionary decision regarding product design that conflicted with state law, therefore *causing* the defendant to violate state law.  For the same reasons that there is no colorable federal defense, there is also no causal nexus in this case.

**E. Failure to Warn Claims**

To assert the government contractor defense to a failure to warn claim, the defendant must show (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; and (3) the contractor warned the government about the dangers in the equipment's use that were known to the contractor but not to the government.  *Oshkosh*, 96 F.3d at 1003-1004. These elements are simply the *Boyle* elements made applicable to warnings.  As with design defect claims, the underlying crux of the defense is that the government must make a discretionary decision as to product warnings that significantly interferes with the contractor's ability to abide by state law, thus creating a conflict between a federal interest and a state law duty.  *See Boyle*, 487 U.S. at 511-12.  To meet this standard, a contractor can show that the government prohibited warnings in general, that it prohibited warnings as to the specific feature in question, that it dictated specific warnings, that there was a "back and forth" discussion between the contractor and the government with respect to the warnings, or make some other showing that the government made a discretionary decision that preempted state law.  *Oshkosh*, 96 F.3d at 1003-1004 (noting that the government need not dictate or prohibit warnings to satisfy *Boyle*, but the government's involvement must go beyond "rubber stamping"); *Tate*, 55 F.3d at 1157 ("Government discretion is required, not dictation or prohibition of warnings.");  *See N.Y. Asbestos Litigation*, 897 F.2d at 630 ("The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official.").

Foster Wheeler has provided no evidence that it ever attempted to warn, or that the Navy prohibited warnings.  Instead, the affidavits merely show that the Navy "would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any

ORDER
PAGE - 10

asbestos hazards on their equipment." (Lehman Affidavit P 14).  Statements to this effect are merely hypothetical in the absence of evidence that Foster Wheeler attempted to warn.  The question is not what the Navy *would have* done if a contractor suggested warnings, but whether the Navy actually exercised its discretion in approving proposed warnings that conflicted with state law.  *Tate*, 55 F.3d at 1157; *Hawaii* 960 F.2d at 812. Because Foster Wheeler did not suggest warnings to the government, it is impossible that "the design feature in question," in this case the warnings, "was considered by a government officer, and not merely by the contractor itself."  *Boyle*, 487 U.S. at 512.  Thus, Foster Wheeler's government contractor defense is not "colorable."  Similarly, there is no "causal nexus" because Foster Wheeler was not acting under color of any federal duty when it failed to provide warnings.  In short, the government was not sufficiently involved in the decision not to warn to have a "federal interest in the matter" needed to justify a federal forum. *Willingham*, 395 U.S. at 406.

### III.  CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1)  Plaintiff's Motion to Remand (Dkt. #23) is GRANTED.

(2)  This case is remanded to King County Superior Court for further proceedings.

(3)  The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 9th day of September, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 11

# Exhibit G

HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JACOB EDWARD FISCHER,<br><br>         Plaintiff,<br><br>   v.<br><br>SABERHAGEN HOLDINGS, INC., et al.,<br><br>         Defendant. | NO.  C09-5385<br><br>**NOTICE OF VIDEOTAPED 30(b)(6) DEPOSITION OF LOCKHEED SHIPBUILDING COMPANY** |

**TO:**      **LOCKHEED SHIPBUILDING COMPANY**

**AND TO:**     **ROBERT G. ANDRÉ, of OGDEN MURPHY WALLACE, P.L.L.C., its counsel of record**

     YOU, AND EACH OF YOU, WILL PLEASE TAKE NOTICE that pursuant to

Fed.R.Civ.P. 30(b)(6), the testimony of the defendant **LOCKHEED SHIPBUILDING**

**COMPANY** will be taken on oral examination before trial at the instance and request of the

plaintiff in the above entitled action before a court reporter as follows:

| | |
|---|---|
| **DATE:** | **Tuesday, August 11, 2009** |
| **TIME:** | **10:00 a.m. (EDT)** |
| **AT&T CALL-IN NUMBER:** | **(636) 651-3182 Participant Code: 9377013** |

NOTICE OF VIDEOTAPED 30(B)(6) DEPOSITION
OF LOCKHEED SHIPBUILDING COMPANY - 1
s:\clients\fischer, jacob\fischerj_pleadings\fischerj_pld_notice of videotaped 30(b)(6) deposition_lockheed
shipbuilding.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

PLACE (WITNESS):    Veritext
1801 Market Street, 18th Floor
Philadelphia, PA 19103
(215) 241-1000

COURT
REPORTER and    Veritext
VIDEOGRAPHER:    1801 Market Street, 18th Floor
Philadelphia, PA 19103
(215) 241-1000
(215) 241-1539 - Fax

on that day; the said oral examination of said corporation at said time and place to be subject to

continuance or adjournment from time to time or place to place until completed.

      Pursuant to Fed.R.Civ.P. 30(b)(6), demand is made that **LOCKHEED SHIPBUILDING**

**COMPANY** duly designate one or more officers, directors or managing agents, or other persons

who consent to testify on behalf of **LOCKHEED SHIPBUILDING COMPANY** and are

familiar with the facts, opinions and other matters regarding:

1.    The identity of any and all Naval vessels that Lockheed contends Mr. Jacob Fischer worked aboard during his employment with the United States Navy at Lockheed Shipyard between 1961-1971.

2.    Identification of any and all federal officers that Lockheed contends issued directives to Lockheed that form the basis of any "government contractor's" defense as articulated in <u>Boyle v. United Technologies Corp.</u>, 487 U.S. 500 (1988) and its progeny, or otherwise under 28 U.S.C. §1442(a)(1).

3.    Identification of any and all written specifications, instructions, rules, directives, contracts, or other written material, if any, that Lockheed contends constitute or constitutes a government contractor defense to the claim or claims made in Plaintiff's complaint.

4.    Specific factual bases for any assertion by Lockheed of the <u>Boyle</u> government contractor's defense, to the extent that such factual bases are not already covered by topics 1-3 above.

5.    Identification of all conflicts, if any, Lockheed contends arise between its obligations pursuant to government contracts and/or the direction of federal officers and its duties under Washington tort law owed to Plaintiff Jacob Fischer in this case.

NOTICE OF VIDEOTAPED 30(B)(6) DEPOSITION
OF LOCKHEED SHIPBUILDING COMPANY - 2
S:\Clients\F\FISCHER, Jacob\Fischer J_Pleadings\Fischer J_PLD_Notice of Videotaped 30(b)(6) Deposition_Lockheed Shipbuilding.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

6.     Identification of any and all evidence in Lockheed's possession that Lockheed contends supports the proposition that Lockheed's work, or the work of any Lockheed subcontractors, conformed to reasonably precise government specifications.

7.     Identification of each and every warning Lockheed or its corporate predecessors issued to the United States federal government concerning the hazards associated with asbestos given by the date Mr. Jacob Fischer last worked on a vessel at Lockheed Shipyard (upon information and belief, believed to be approximately 1971).

8.     Identification of all correspondence or communication between Lockheed and the U.S. Navy that documents Lockheed's deviation from its standard practices with respect to workplace safety and industrial hygiene specifically to comply with Naval specifications, contracts, or directives at Lockheed Shipyard.

9.     Identification of all industrial hygiene and workplace safety practices that Lockheed Shipyard employed in its civilian shipbuilding, but that Lockheed was contemporaneously prevented from deploying while building Naval vessels because of directives, contracts, or specifications from the U.S. Navy.

10.     Identification of any communications documenting the U.S. Navy's stance with respect to whether Lockheed Shipbuilding could warn its employees, contractors, subcontractors, and business invitees with respect to the hazards associated with exposure to asbestos dusts on U.S. Naval vessels constructed, repaired, or overhauled at Lockheed.

11.     Lockheed's workplace safety and industrial hygiene duties under the Walsh-Healy Act, and Lockheed's record in terms of compliance with that statute and its related regulations dealing with the management of hazardous dusts, including asbestos.

12.     Identification of all state law tort duties owed with respect to asbestos that Lockheed claims it did not comply with because of directives of the United States Navy via contract, specification, work order, or other communication from the Navy.

This testimony upon oral examination will be taken on the ground and for all purposes set forth under the Federal Rules of Civil Procedure and pursuant to Fed.R.Civ.P. 30(b)(6) and the said witness will give evidence material to the establishment of the plaintiff's case. Plaintiff requests that person(s) so designated be prepared to testify as to all matters known or reasonably available to defendant **LOCKHEED SHIPBUILDING COMPANY** and its predecessors.

NOTICE OF VIDEOTAPED 30(B)(6) DEPOSITION
OF LOCKHEED SHIPBUILDING COMPANY - 3
S:\Chem\A\FISCHER, Jacob\Fischer1_Pleadings\Fischer1_PLD_Notice of Videotaped 30(b)(6) Deposition_Lockheed
Shipbuilding.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

1  Plaintiff intends to videotape and make a stenographic record of said deposition in accordance

2  with the Federal Rules of Civil Procedure.

3       DATED this 29th day of July, 2009.

4                                    BERGMAN DRAPER & FROCKT, PLLC

5

6                                    GLENN S. DRAPER, WSBA #24419
                                     BRIAN F. LADENBURG, WSBA #29531
7                                    Counsel for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# Exhibit H

HONORABLE ROBERT J. BRYAN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACOB EDWARD FISCHER,

        Plaintiff,

    v.

SABERHAGEN HOLDINGS, INC., et al.,

        Defendant.

NO.  C09-5385

**NOTICE OF VIDEOTAPED
DEPOSITION AND SUBPOENA
DUCES TECUM TO ADMIRAL
ROGER B. HORNE**

TO   :    ADMIRAL ROGER B. HORNE

TO   :    ALL COUNSEL OF RECORD

      NOTICE is hereby given that the deposition of the following-described person will be

taken pursuant to Fed.R.Civ.P. 30 on the following date, at the following time and place, subject

to continuance or adjournment from time to time.

| | |
|---|---|
| **WITNESS:** | **ADMIRAL ROGER B. HORNE** |
| **DATE:** | **Wednesday, August 5, 2009** |
| **TIME:** | **11:00 a.m. PDT** |
| **AT&T CALL-IN NUMBER:** | **(636) 651-3182** <br> **Participant Code: 9377013** |

NOTICE OF VIDEOTAPED DEPOSITION AND SUBPOENA
DUCES TECUM TO ADMIRAL ROGER B. HORNE - 1
S:\Clients\F\FISCHER, Jacob\Fischer\_Pleadings\Fischer\_PLD\_NicDep\_SDT\_Admiral Roger B  Horne.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, THIRD FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

PLACE:               Ogden Murphy Wallace, P.L.L.C.
                     1601 Fifth Avenue, Suite 2100
                     Seattle, WA  98101
                     (206) 447-7000

COURT REPORTER:      Byers & Anderson, Inc.
                     One Union Square
                     600 University Street, Suite 2300
                     Seattle, WA  98014
                     (206) 340-1316
                     (206) 903-1117 – Fax

A stenographic record of the deposition shall be made simultaneously with the videotape at the expense of the noting party.

## SUBPOENA DUCES TECUM

Admiral Horne is to bring with him the following materials:

- Current curriculum vitae;

- Any documents prepared by Admiral Horne specifically for this case, including any report, summary or notes;

- All documents provided to Admiral Horne relating to his opinions in this case;

- All documents consulted by Admiral Horne specifically relating to his opinions in this case;

- All correspondence, email or other written or electronic communications between Admiral Horne and counsel for Lockheed Shipbuilding in this case.

DATED this 29th day of July, 2009.

BERGMAN DRAPER & FROCKT, PLLC

GLENN S. DRAPER, WSBA #24419
BRIAN F. LADENBURG, WSBA #29531
Counsel for Plaintiff

NOTICE OF VIDEOTAPED DEPOSITION AND SUBPOENA
DUCES TECUM TO ADMIRAL ROGER B. HORNE - 2
s:\donnie\l\frocker, bach\frocker, pleadings\frocker, phf, notdep, sdt, admiral roger b. horne.doc

BERGMAN DRAPER & FROCKT, PLLC
614 First Avenue, Third Floor
Seattle, WA  98101
Telephone: 206.957.9510
Facsimile: 206.957.9549