JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MDL 875**

DEC - 3 2009

FILED
CLERK'S OFFICE

PLEADING NO. 5991

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE ASBESTOS PRODUCTS | * | |
| LIABILITY LITIGATION (No. VI) | * | **MDL DOCKET NO.: 875** |
| | * | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES CORLEY and | * | |
| MYRA CORLEY, | * | |
| | * | |
|     Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: 2:09-cv-1812 |
| | * | |
| LONG-LEWIS, INC., individually and as | * | |
| successor to Burrell Corp., f/k/a Long-Lewis | * | |
| Hardware Company, et al., | * | |
| | * | |
|     Defendants. | * | |
| | * | |

## DEFENDANT, GARLOCK SEALING TECHNOLOGIES, LLC'S RESPONSE TO
## PLAINTIFFS' MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER AND
## JOINDER IN THE RESPONSE FILED BY CBS CORPORATION

Comes now Defendant, Garlock Sealing Technologies, LLC ("Garlock"), and hereby

adopts by reference as if fully set forth herein the response of CBS Corporation to the Plaintiffs'

Motion to Vacate Conditional Transfer Order filed in this matter on November 25, 2009.

**OFFICIAL FILE COPY**          **IMAGED DEC - 3 2009**

However, Garlock shows that CBS based its removal on the federal officer removal statute, 28 U.S.C. § 1442 (a)(1), while Garlock removed based on the original jurisdiction of the United States District Court pursuant to federal enclave jurisdiction, which is a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331, as well as on the statutory authority set forth in 16 U.S.C. § 457.   Garlock's position in that regard is more specifically set out in Garlock's original "Notice of Removal" as well as in its "Response in Opposition to Plaintiffs' Motion to Remand," copies of which are attached hereto and incorporated by reference as if fully set forth herein and identified as Exhibits "A" and "B," respectively.[1]

To avoid redundancy, Garlock will not set forth all the arguments as to the purpose of and the principles underlining the creation of MDL-875, or the reasons as to why this Panel should not vacate the existing Conditional Transfer Order pending the resolution of the motion to remand.  Rather, Garlock attaches hereto and incorporates by reference as if fully set forth herein and identifies as Exhibit "C" the Transfer Order dated February 8, 2007 issued in *MDL-875 -- In re Asbestos Prods. Liability Litig. (No. VI)* transferring certain Mississippi actions to MDL-875 in circumstances similar to those presently before the Panel.

In short, Plaintiffs have fallen far short of showing the type of compelling and extraordinary circumstances which might justify this Panel's deviation from its determined policy of centralizing all asbestos-related claims pending in federal courts within MDL-875. Certainly, if such unique circumstances were to develop, the transferee court can be expected to act accordingly.  See, Wooley/Baden, 170 F. Supp. 2d at 1350.  Thus, Plaintiffs' prejudice-based argument in support of their motion to vacate is likewise without merit.

---

[1]   The exhibits referenced in Exhibits "A" and "B" have not been included as these are voluminous and specifically address the federal jurisdictional issues which are not directly before the Panel presently.  However, the full exhibits will be made readily available to the Panel upon request; and, of course, the Panel has ready access to these through PACER.

CONCLUSION

For the reasons set forth above, Plaintiffs have failed to show good cause in support of their motion to vacate. Thus, the transfer of this case for inclusion in MDL-875 should be affected without further delay.

RESPECTFULLY SUBMITTED, this 1st day of December, 2009.

EDWARD B. McDONOUGH, JR. (MCDOE0149)
Attorney for Defendant
Garlock Sealing Technologies, LLC

OF COUNSEL:

EDWARD B. McDONOUGH, JR., P.C.
Post Office Box 1943
Mobile, AL 36633
Telephone: (251) 432-3296
Facsimile: (251) 432-3300
Email: ebm@emcdonoughlaw.com

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 3 2009

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 1st day of December, 2009, served a copy of the above and foregoing pleadings upon the Clerk of the Panel and all parties and counsel of record to the said cause by placing a copy of the same in the U.S. Mail, postage prepaid and properly addressed as follows: (See Involved Counsel List, attached hereto).

EDWARD B. McDONOUGH, JR. (MCDOE0149)

**IN RE ASBESTOS PRODUCTS**
**LIABILITY LITIGATION (No. VI)**                    MDL DOCKET NO.: 875

### INVOLVED COUNSEL LIST (Excerpted from CTO-327)

Charles Corley, et al. v. Long-Lewis, Inc., et al., N.D. Alabama, C.A. No. 2:09-1812
(Judge Harwell G. Davis, III)

Peter G. Angelos, Esq.
LAW OFFICES OF PETER G ANGELOS
PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201

Janet W. Black, Esq.
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Brian M. Blythe, Esq.
BRADLEY ARANT BOULT CUMMINGS
LLP
One Federal Place
1819 Fifth Avenue North, 7th Floor
P.O. Box 830709
Birmingham, AL 35283-0709

Russell W. Budd, Esq.
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219

James Arthur Butts, Esq.
JOHN D SAXON PC
2119 3rd Avenue, North, Suite 100
Birmingham, AL 35203

C. Paul Cavender, Esq.
BURR & FORMAN LLP
3100 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203

John D. Cooney, Esq.
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415

Jenelle R. Evans, Esq.
BALCH & BIINGHAM LLP
1901 Sixth Avenue North, Suite 2700
P.O. Box 306
Birmingham, AL 35201-0306

Jeffrey E. Friedman, Esq.
FRIEDMAN LEAK DAZZIO ZULANAS
& BOWLING PC
3800 Colonnade Parkway, Suite 650
P.O. Box 43219
Birmingham, AL 35243

Anthony C. Harlow, Esq.
STARNES & ATCHISON LLP
100 Brookwood Place
Seventh Floor
P.O. Box 598512
Birmingham, AL 35259

James A. Harris, III, Esq.
HARRIS & HARRIS LLP
2501 20th Place South
Colonial Bank Building, Suite 450
Birmingham, AL  35223

Frederick G. Helmsing, Jr., Esq.
MCDOWELL KNIGHT ROEDDER &
SLEDGE LLC
63 South Royal Street, Suite 900
P.O. Box 350
Mobile, AL 36601

MDL No. 875 – Involved Counsel List (Excerpted from CTO-327) (Continued)

James G. House, III, Esq.
FORMAN PERRY WATKINS KRUTZ &
TARDY PLLC
200 S. Lamar Street
City Center Building, Suite 100
Jackson, MS 39201-4099

Kevin M. Jordan, Esq.
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish, Esq.
CR0WELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan, Esq.
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607

G. Patterson Keahey, Jr., Esq.
G PATTERSON KEAHEY PC
One Independence Plaza, Suite 612
Birmingham, AL 35209

Peter A. Kraus, Esq.
WATERS & KRAUS LLP
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204

David C. Landin, Esq.
HUNTON & WILLIAMS
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 232 19-4074

Roger B. Lane, Esq.
ROGER B LANE PC
1601 Reynolds Street
Brunswick, GA 31520

Frank E. Lankford, Jr., Esq.
HUIE FERNAMBUCQ & STEWART
2801 Highway 280 South
Three Protective Center, Suite 200
Birmingham, AL 35223-2484

William F. Mahoney, Esq.
SEGAL MCCAMBRIDGE SINGER &
MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606

Robert C. Malaby, Esq.
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038

John P. McShea, Esq.
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103

Philip McWeeny, Esq.
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

William T. Mills, II, Esq.
PORTERFIELD HARPER MILLS &
MOTLOW PA
22 Inverness Center Parkway, Suite 500
P.O. Box 530790
Birmingham, AL 35253-0790

Edwin B. Nichols, Esq.
MAYNARD COOPER & GALE PC
1901 Sixth Avenue North
2400 Amsouth/Harbert Plaza
Birmingham, AL 35203-2618

MDL No. 875 – Involved Counsel List (Excerpted from CTO-327) (Continued)

Thomas A. Packer, Esq.
GORDON & REES LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

W. Larkin Radney, IV, Esq.
LIGHTFOOT FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203

F. Grey Redditt, Jr., Esq.
VICKERS RIIS MURRAY & CURRAN
Eleventh Floor, Regions Bank Building
106 Saint Francis Street
Post Office Drawer 2568
Mobile, AL 36652-2568

Joseph F. Rice, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mount Pleasant, SC 29464

Anne L. Smith, Esq.
MCDOWELL KNIGHT ROEDDER &
SLEDGE LLC
P.O. Box 350
Mobile, AL 36601

Julian H. Smith, III, Esq.
BALCH & BINGHAM LLP
1710 Sixth Avenue North
P.O. Box 306
Birmingham, AL 3520 1-0306

Michael P. Thornton, Esq.
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA 02110

Michael A. Vercher, Esq.
CHRISTIAN & SMALL LLP
505 North 20th Street, Suite 1800
Birmingham, AL 35203-2696

Walter G. Watkins, Jr., Esq.
FORMAN PERRY WATKINS KRUTZ &
TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608

Allan R. Wheeler, Esq.
BURR & FORMAN LLP
Suite 3100
South Trust Tower
420 North 20th Street
Birmingham, AL 35203

James A. Wyatt, III, Esq.
PARSONS LEE & JULIANO
300 Protective Center
2801 Highway 280 South
P.O. Box 530630
Birmingham, AL 35223-0630

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FILED

DEC - 3 2009

FILED
CLERK'S OFFICE

2009 Sep-11 PM 02:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA - SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES CORLEY and MYRA CORLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CV-09-HGD-1812-S |
| | ) | |
| LONG-LEWIS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

COME NOW Defendants Garlock Sealing Technologies LLC and Owens-Illinois, Inc. ("Defendants"), pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, and give notice of removing this action from the Circuit Court of Jefferson County, Alabama, where the action is now pending, to the United States District Court for the Northern District of Alabama, Southern Division.  Removal of this action is based upon the following:

1.     On May 7, 2009, Plaintiffs filed an original Complaint in the Circuit Court of Jefferson County, Alabama captioned, *Charles Corley and Myra Corley v. Long-Lewis, Inc., et al.*, Case No. CV-2009-901544.00 ("State Case").  See true and correct copy of the Original Complaint attached hereto Collective Exhibit 1.[1]

2.     On or about July 7, 2009, plaintiffs filed a Second Amended Complaint naming defendants Garlock Sealing Technologies LLC and Owens-Illinois, Inc. as

---

[1] In accordance with 28 U.S.C. § 1446(a) Defendants have filed with this Notice of Removal true and correct copies of all process, pleadings, and orders that have been served upon defendants in the State Case as of this date.

1

644894.1



**EXHIBIT
A**

defendants.  See true and correct copy of the Second Amended Complaint attached hereto as Collective Exhibit 1.

3.      Plaintiffs served the Complaint upon Defendant Garlock Sealing Technologies LLC on August 11, 2009, and upon Defendant Owens-Illinois, Inc. on August 13, 2009, respectively.  See true and correct copies of Summonses attached hereto as Collective Exhibit 1.  These defendants are removing this action within thirty (30) days after service of Plaintiffs' Second Amended Complaint pursuant to 28 U.S.C. § 1446(b).

4.      All other Defendants named and served in the State Case have consented to this Notice of Removal, and each has expressly stated their consent in Consents for Removal attached as Collective Exhibit 2.  These Consents for Removal have also been filed separately with the Clerk, United States District Court for the Northern District of Alabama, Southern Division.  These Consents for Removal do not constitute a waiver of any defenses to which these Defendants are otherwise entitled, including without limitation, the defenses of lack of personal jurisdiction, insufficient process or service of process, and improper venue.

5.      The Second Amended Complaint seeks recovery of damages arising from the allegation that plaintiff Charles Corley has suffered an asbestos-related injury arising from exposure to products that were "produced, distributed, manufactured, installed, insured, owned, and/or maintained or controlled the premises, facilities, and work sites containing asbestos-containing products and/or materials" by defendants.  See Second Amended Complaint attached hereto as Collective Exhibit 1.  Plaintiffs' claims are based upon five (5) separate and distinct legal theories, including, strict liability, negligence,

2

breach of warranties, conspiracy, loss of consortium, and plaintiffs seek significant damages in this case.  See Second Amended Complaint attached hereto as <u>Collective Exhibit 1</u>.

6.      Defendants recently learned of the basis for removal to federal court because Plaintiff Charles Corley testified at his deposition taken on August 25-27, 31, 2009, that he was exposed to asbestos-containing products that caused his injury at a number of government-owned shipyards, including, Long Beach Naval Shipyard, Philadelphia Naval Shipyard, Norfolk Naval Shipyard, and Boston Naval Shipyard.  <u>See</u> Corley Deposition at pp. 101 (Long Beach Naval Shipyard), 177-79 (Philadelphia Naval Shipyard), 261-62 (Norfolk Naval Shipyard), 270 (Boston Naval Shipyard) attached hereto as <u>Exhibit 3</u>.  Therefore, the Plaintiffs have admitted that Plaintiff Charles Corley has exposure at federal enclaves.  In addition, these shipyards have been recognized as federal enclaves and/or government-owned shipyards which clearly qualify as federal enclaves.  <u>See</u> copy of reference materials relating to shipyards attached hereto as <u>Exhibit 4</u>.

7.      The defendants' right of removal in a civil action is provided in 28 U.S.C. § 1441(a), which states:

> (a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

Thus pursuant to 28 U.S.C. § 1441(a), defendants may remove an action to federal court if the case is one over which the U.S. district courts have original jurisdiction.  Further,

3

federal courts have "original jurisdiction" over cases involving diversity of citizenship between parties, because of claims arising under federal law, or by virtue of some other explicit grant of jurisdiction. *Powers v. South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust,* 719 F.2d 760, 763 (5th Cir. 1983). Claims "arising under" federal law are those based on federal question jurisdiction under 28 U.S.C. § 1331, which provides that, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

8.      In the instant matter, the U.S. District Court has original jurisdiction pursuant to federal enclave jurisdiction, which is a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331. The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dockyards, and other needful Buildings." U.S. Const. art. I., § 8, cl. 17. The federal courts have held that "[s]uch places are 'federal enclaves' within which the United States has exclusive jurisdiction." *Akin v. Ashland Chemical,* 156 F.3d 1030, 1034 (10th Cir. 1998), (*citing Mater v. Holley,* 200 F.2d 123, 124-125 (5th Cir. 1952)). As such, "[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction." *Akin,* 156 F.3d at 1034; *Mater,* 200 F.2d at 124-125.

9.      The U.S. District Court also has original jurisdiction over this matter on the basis of 16 U.S.C. § 457, which provide the following:

4

644894.1

> *Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws.* In the case of the death of any person by the neglect or wrongful act of another within a national part or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. (Fed. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in federal enclaves. *Stokes v. Adair,* 265 F.2d 662, 665-66 (4th Cir. 1959). The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1441, *Id.*

10.     Likewise, in the present matter, because Mr. Corley was allegedly injured on exclusive federal enclaves, the United States District Court clearly has basis for original jurisdiction:  **federal enclave jurisdiction** – a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331; and 16 U.S.C. § 457 jurisdiction, by virtue of the explicit grant of authority provided by statute.  Therefore, as this case involves the federal court's original jurisdiction, and as the Plaintiffs originally brought suit in Circuit Court for Jefferson County, Alabama, the Defendants may properly remove this case to the United States District Court for the Northern District of Alabama, Southern Division pursuant to 28 U.S.C. § 1441(a).  *See Akin v. Big Three Industries,* 851 F. Supp. 819, 821-22 (E.D. Tex 1994) (stating that "enclave jurisdiction is properly invoked" where

5

"plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their employment duties"); *Fung v. Abex Corp., et al.,* 816 F. Supp. 569, 571 (N.D. Cal. 1992) (indicating that as plaintiff's causes of action arose on an exclusive federal enclave, they were properly the subject of federal jurisdiction).

11.    Garlock and OI reserve the right to amend this Notice of Removal as may be necessary, and request a full and fair opportunity to brief, respond to, and argue against any motion to remand filed by plaintiffs.

12.    Garlock and OI reserve all defenses, including without limitation, the defenses of lack of personal jurisdiction, insufficient process or service of process, and improper venue.

13.    Accordingly, this action is removable to this Court pursuant to 28 U.S.C. § 1441(a).

WHEREFORE, Defendants Garlock Sealing Technologies LLC and Owens-Illinois, Inc., as consented to by all other Defendants named and served in the State Case, remove this action to the United States District Court for the Northern District of Alabama, Southern Division.

Respectfully Submitted this the 10th day of September, 2009,

STARNES & ATCHISON

By: _____
       Anthony C. Harlow

Seventh Floor, 100 Brookwood Place
P. O. Box 598512-8512
Birmingham, AL  35259-8512
(205) 868-6074

*Attorneys for Defendant Owens-Illinois, Inc.*

6

644894.1

EDWARD B. MCDONOUGH, JR.

By: _____ ,
      Edward B. McDonough, Jr.

Law Offices of Edward B.
McDonough, Jr., PC
P.O. Box 1943
Mobile, AL 36633
(251) 432-3296

*Attorneys for Defendant Garlock Sealing*
*Technologies LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing pleading has been served upon the following counsel for parties in interest herein by delivering same to the offices of said counsel, or by mailing same to the offices of said counsel by United States Mail with sufficient postage thereon to carry the same to its destination.

G. Patterson Keahey, Jr., Esquire
Law Offices of G. Patterson Keahey, P.C.
One Independence Plaza, Suite 612
Birmingham, Alabama 35209

Respectfully submitted this 10th day of September, 2009.

_____
Attorney

7

644894.1

FILED
2009 Oct-13  PM 04:0
U.S. DISTRICT COUR
N.D. OF ALABAM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| CHARLES CORLEY and MYRA CORLEY, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 2:09-cv-01812-HGD ) |
| LONG-LEWIS, INC., et al., | ) ) |
| Defendants. | ) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

COME NOW Defendants Garlock Sealing Technologies LLC and Owens-Illinois, Inc. ("Defendants"), by and through counsel, and respectfully request that this Court deny Plaintiffs' Motion to Remand.   In support of their Response, Defendants would show unto the Court as follows:

## I.   LAW AND ANALYSIS

### A.   Introduction

The defendants' right of removal in a civil action is provided in 28 U.S.C. § 1441(a), which states that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."   Thus



EXHIBIT
B

pursuant to 28 U.S.C. § 1441(a), defendants may remove an action to federal court if the case is one over which the U.S. district courts have original jurisdiction. Federal courts have "original jurisdiction" over cases involving diversity of citizenship between parties, because of claims arising under federal law, or by virtue of some other explicit grant of jurisdiction. *Powers v. South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust,* 719 F.2d 760, 763 (5th Cir. 1983). Claims "arising under" federal law are those based on federal question jurisdiction under 28 U.S.C. § 1331, which provides that, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

In the instant matter, the U.S. District Court has original jurisdiction pursuant to federal enclave jurisdiction, which is a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331. The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dockyards, and other needful Buildings." U.S. Const. art. I., § 8, cl. 17. The federal courts have held that "[s]uch places are 'federal enclaves' within which the United States has exclusive jurisdiction." *Akin v. Ashland Chemical,* 156 F.3d 1030, 1034 (10th Cir. 1998), (*citing Mater v. Holley,* 200 F.2d 123, 124-125 (5th Cir. 1952)). As such,

"[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction." *Akin*, 156 F.3d at 1034; *Mater*, 200 F.2d at 124-125.  The U.S. District Court also has original jurisdiction over this matter on the basis of 16 U.S.C. § 457, which provides as follows:

> *Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws.*  In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. (Fed. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in federal enclaves.  *Stokes v. Adair*, 265 F.2d 662, 665-66 (4th Cir. 1959).  The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1441. *Id.*

In the Second Amended Complaint, plaintiffs assert the following:

> 40.    Charles Corley has been diagnosed with malignant pleural mesothelioma due to exposure to asbestos and asbestos-containing products.  Charles Corley's asbestos-related malignant mesothelioma was due to his exposure to asbestos-containing products, and **each and every exposure to asbestos and asbestos-containing materials contributed to the cause of his asbestos-related mesothelioma**.

Second Amended Complaint at ¶ 40 (emphasis added).    Moreover, plaintiff Charles Corley has admitted that  his indivisible injury was a result of exposure to asbestos-containing products that he worked with and/or around at the Philadelphia Naval Shipyard, Long Beach Naval Shipyard, and Norfolk Naval Shipyard.  See Deposition of Charles Corley (August 25-27, 31, and September 1, 2009) at pp. 101 (Long Beach Naval Shipyard), 177-79 (Philadelphia Naval Shipyard), and 261-62 (Norfolk Naval Shipyard) attached hereto as Exhibit A.  Therefore, plaintiff Charles Corley admits that he was injured on exclusive federal enclaves, including the Philadelphia Naval Shipyard, Long Beach Naval Shipyard, and Norfolk Naval Shipyard, and the United States District Court clearly has basis for original jurisdiction:   federal enclave jurisdiction – a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331; and 16 U.S.C. § 457 jurisdiction, by virtue of the explicit grant of authority provided by statute.  Accordingly, as this case involves the federal court's original jurisdiction, and as the Plaintiffs originally brought suit in Circuit Court for Jefferson County, Alabama, the Defendants may properly remove this case to the United States District Court for

the Northern District of Alabama, Southern Division pursuant to 28 U.S.C. § 1441(a).

Plaintiffs have asserted a number of arguments seeking that this Court remand this case to state court. Plaintiffs' arguments that Defendants' removal of this case was motivated by an effort to delay this case, that the artfully plead complaint allows plaintiffs to avoid removal of the case, and that Defendants failed to timely file the Notice of Removal are without merit and should be rejected by this Court because these arguments are without legal and factual support. Rather, as demonstrated in the Notice of Removal and herein, Defendants have satisfied their burden of establishing a proper basis for federal question jurisdiction.

**B.     Plaintiff Charles Corley *Does* Allege Exposure to Asbestos-Containing Products in Federal Enclaves.**

Plaintiff Charles Corley has provided sworn testimony in his deposition that he was exposed to asbestos-containing products while working in federal enclaves which led to his personal injury. In the Plaintiffs' Motion to Remand (hereinafter "Plaintiffs' Motion") and supporting Memorandum (hereinafter "Plaintiffs' Memorandum"), plaintiffs boldly make a number of statements which are clearly inaccurate. Plaintiffs assert that:

> Mr. Corley's deposition testimony *does not* claim *exposure* to asbestos at any of the specific shipyards at issue. To the contrary, his testimony denies exposure at the Boston Naval Shipyard, does not even discuss exposure at Norfolk Naval Shipyard or Long Beach

Naval Shipyard and only references *seeing* an asbestos containing product at Philadelphia Shipyard.

Plaintiffs' Memorandum, p. 10.

Plaintiffs further represent in their filings:

Removing Defendants have misrepresented Mr. Corley's deposition testimony. Mr. Corley did not testify that he was exposed to asbestos at any of the naval shipyards as Removing Defendants state. Rather, Mr. Corley's deposition testimony simply describes (after craftily elicited by defense counsel) his experience on several naval shipyards during his military service. In fact, Mr. Corley testified that he saw Kaylo (an asbestos containing product) at Philadelphia Naval Shipyard. Mr. Corley *did not* testify that he used or worked with Kaylo, and in fact, made reference to others who did use and work with Kaylo. Mr. Corley *did not* claim asbestos exposure while at Philadelphia Naval Shipyard.

Plaintiffs' Memorandum, p. 9 (emphasis in original).

Although Defendants concede that while Mr. Corley's deposition testimony may not establish that he was exposed to asbestos during his work in a government shipyard known as the Boston Naval Shipyard, the remaining assertions by plaintiffs mischaracterize Mr. Corley's sworn testimony. Mr. Corley clearly alleges exposure to asbestos-containing products while working at the following government shipyards: Norfolk Naval Shipyard, the Long Beach Naval Shipyard and the Philadelphia Shipyard.

Philadelphia Naval Shipyard

Q.    ... Was there any overhaul done – overhauls done while you served on the USS Monterey?

A.    We went back to the shipyard in Philadelphia.   And I don't recall the dates, but it had to be in '53.

Q.    **Was there an overhaul done in the Philadelphia shipyard?**

A.    **Yes, it was.**

Q.    **Who owned the Philadelphia shipyard?**

A.    **It was a government yard.**

Q.    **Was it government owned and operated?**

A.    **Yeah.** It had to be because they didn't work.

Q.    **Did – did you have any involvement with the overhaul?**

A.    Only – **yes, yes.** We had to -- we had to direct them to which ones to take out, pumps and machinery.  And we directed them which of our lagging jobs weren't sufficient.  And we made out a list and submitted them at a shipyard overhaul list and all we did was to make sure they followed that list.  And we inspected the unit when they put it back.  And we tested it.  They didn't.  We tested it.  And the biggest thing, job was to get them to get it done and get it back on time.  They like to do – they liked to bring everything back on the last day so you don't have time to look at it.

      ...

Q.    **So while the shipyard workers were doing work, you and your crew were also doing work?**

A.    **Yes. Yes.**

...

Q.     The **Kaylo that was then installed when you were in
the shipyard in 1953** –

A.     **Yeah.**

Q.     -- by the shipyard workers, you didn't have
responsibilities for actually installing that yourself, did you?

A.     **Oh, no, no, no.  They did it.  We were in the space
with them doing it and they were cutting it and fitting it and all
that, and there was dust everywhere, because in a shipyard
there's a lot more dust than you can ever believe.**  You've got to
also understand that we weren't concerned with the dust, except
getting it cleaned up and getting it out of there.  We weren't worried
about breathing it.

*See* Deposition of Charles Corley (August 25-27, 31, 2009) at pp. 177-87 attached

hereto as *Exhibit A*.

In fact, it was plaintiffs' counsel that elicited the following testimony from

plaintiff Charles Corley:

Q:     We'll get to that in just a minute.  **To continue on the
Monterey, I think, did you all – do you recall on the Monterey
that you testified that you all went into overhaul in a Philadelphia
shipyard?**

A:     **Yes.**

Q:     **Do you recall that, there again, you testified about the
Kaylo product.**

DEFENSE COUNSEL:  Object to the form. Leading.

A:     **When we went in that shipyard, this was
approximately two years after we had left it, they went in and cut**

off all of the lagging that we had replaced.  And they redid the lagging work.  They used form-fitted asbestos pack lagging. . . .

. . .

A:    The way I came in contact with it on the Monterey is when they were putting it on in the shipyard, I watched them and inspected it, because it was a shipyard known for lousy work. . . . So the only way that I would have been exposed to Kaylo on the Monterey would have been in that shipyard, because I – we did not, to my knowledge, change any of it after we left.  We may have used some on other lines, but it wasn't me.

. . .

Q:    And when you saw them do this type of modification on the Kaylo product, did you see any kind of dust created?

DEFENSE COUNSEL:  Object to the form.

A:    Yes, there had to be dust from the saw.

Q:    How close were you to that dust?

MR. LITTLE:  Same objection.

A:    Well, sometimes I was right there with it. . . .

. . .

Q:    Where you were cleaning up and this dust was created where this Kaylo product was used, did you breathe the dust?

MR. LITTLE:  Object to the form.

A:    It was in the air, I had to breathe it.

*See* Deposition of Charles Corley (September 1, 2009) at pp. 97-101 (emphasis added).

Long Beach Naval Shipyard

Similarly, plaintiff Charles Corley not only testified that Long Beach Naval Shipyard was a government shipyard, but he also stated that he was exposed to asbestos-containing products while working at the Long Beach Naval Shipyard:

> Q.    And do you recall the brand names or manufacturer names of any of the insulation on these steam lines, sitting here today?
>
> A.    ... But later on, we had some that was extremely important to us, because it was premade, preformed. It came in pieces to fit pipes from, I believe two inches is the smallest I've ever seen, up to eight inches, and it was in a solid form, easy to put on. It was called Kaylo. We put it – you could put it on and just wrap it and seal it and leave it. It took – you could do in a day what took weeks to do the old way. **We seen that the first time in a shipyard at Long Beach.**
>
> Q.    What year was that, Mr. Corley, if you recall?
>
> A.    1950. 1949 or '50.
>
> Q:    **All right. And can you tell us – I know you were asked a lot of questions about that Kaylo product in the last four days, but can you tell the judge and judge what that was and how you saw it used around you?**
>
> MR. LITTLE: Object to the form.
>
> A:    **I seen it [Kaylo] at a shipyard, I was there, and I realized that it was just a labor-saving product that I went to the yard people and asked them to teach me how to put it on. They did. . . .**
>
> ...
>
> Q.    How often did you see this Kaylo pipe covering cut or sawed when you were on the Cavalier, can you say, approximately?

A.    Well, a lots from in the yard, and I got taught how to use it, but I don't remember how many times we used it on the ship, because when I left it, we still had some boxes left.  But we had used -- any time we had a damaged pipe, we used it. ...

*See* Deposition of Charles Corley (September 1, 2009), pp. 48-51, attached hereto as *Exhibit A* (emphasis added).

Q.    Can you tell me where you – what cruises or what you did other than the first month while you were at the Long Beach Naval Shipyard?   And let me ask you, **that Long Beach Naval Shipyard, was it owned and operated by the U.S. government or a private company?**

A.    I don't know.  I was seventeen years old.

Q.    **Since then, have you come to find out who it was owned by?**

A.    **It was operated by the Navy or government the next time I went in it.**

Q.    **So at least one time when you were there it was owned and operated by the government?**

A.    **Yes.**

...

Q.    And you talked about making new blankets.  Tell me about what products you used to do the lagging, or explain what you are talking about.

A.    Well, we had bags of asbestos.  We mixed them up with water and formed it. ... It was a four-stage project, taking the old stuff off and putting the new on and forming it.  We went back in that yard.

...

Q.    You said you were introduced into that or you learned about that when you were back at the yard?

A.    Yeah.

Q.    When in your career did you start seeing this preformed insulation?

A.    That was at that shipyard there in, you said it was whatever date it was, the second tour of the shipyard. I thought it was 1950. When did we go in it? When I go in the yard the second time?

Q.    Well, it says you were based out of Long Beach in 1949. But the only time that I have that there was any overhaul was back when you first went on the ship.

A.    No, we come back into the shipyard. You said San Pedro?

Q.    Yes, sir.

A.    That's then we went in the yard there, I'm sure, the Long Beach yard.

...

Q.    Okay. So you didn't personally ever handle the Kaylo or install it yourself?

A.    Yes, I did.  I handled it.

Q.    I thought you said you were just supervising it?

A.    How do you teach a man how to do something if you don't do it – show him how?

Q.    How did you learn to do it?

A.    Watching the shipyard.

*See* Deposition of Charles Corley (August 25-27, 31, 2009) at pp. 101-21 attached

hereto as *Exhibit A* (emphasis added).

<u>Norfolk Naval Shipyard</u>

During his deposition, Mr. Corley also provided testimony that he worked in

the Norfolk Naval Shipyard.  Mr. Corley expressly admitted that the Norfolk Naval

Shipyard was a government facility.  While working in the shipyard Mr. Corley

also alleges that he was exposed to asbestos-containing materials.  The following

testimony from Mr. Corley details his time spent at the Norfolk Naval Shipyard:

> Q.   On June 22, 1959, it appears that you then began serving
> on the USS Mississinewa; is that correct?
>
> A.   Yes.
>
> Q.   And do you recall how long you served on this ship for
> transferring out?
>
> A.   January of '62. Is that right?
>
> Q.   Does January 3, 1962 sound correct to you?
>
> A.   Yes.
>
> …
>
> A.   One year, and I can't tell you what year, we left in
> January to come back to the United States in Norfolk, Virginia, to
> Portsmouth Shipyard for overhaul of the Mississinewa.  And it had to
> be the year after I went on it, because after I went on it, I discovered
> the boilers had oxygen damage.  We had to go back to the states to
> have them retubed.
>
> …

Q.   1960. **When you returned to Portsmouth at the Norfolk shipyard in 1960, was that a private shipyard or government-owned shipyard?**

A.   **No, government shipyard.**

Q.   And how long did you and the other members of the crew of the Mississinewa remain at the Norfolk Shipyard in Portsmouth, Virginia, for this overhaul?

A.   As best I recall, about three months.

...

Q.   Do you know the name brand or manufacturer of any products, equipment, machinery, materials, that you believe may have contained asbestos that you worked with or around while you served on the Mississinewa?

A.   Well, like all the rest of the ships, we had asbestos insulated pipes all over the ship. ...

...

Q.   My question is: were there any other pieces of equipment or machinery, products or materials that you worked with or around on the Mississnewa that you believe may have or could have contained asbestos while you were serving?  You told us about the boilers and you told us about the steam lines. Anything else?

A.   No. I just – **there's asbestos everywhere, so I just – everything that was operating with steam had asbestos on it.**  So I don't want to stand by and name everything, the fire pumps, the heat exchangers and boiler evaporators and the water evaporators, et cetera, because they were already explained on each ship you have been on, so the same thing applies to any ship you can name.

...

Q.    When you went into port at the government-operated shipyard in Norfolk – Naval Shipyard in Portsmouth, Virginia, you told us you were there approximately three months in early 1960, correct?

A.    Yes.

Q.    How did your duties and responsibilities change while the ship was, I assume, in dry dock?

A.    They increased.

Q.    Okay.

A.    I had to stay there all the time to see that the boilers were being put together right.  They had to retube the entire boilers.

Q.    What did that involve?

A.    Removing a section of the tubes and installing a new section at a time so that the structure remained intact.  And they had to – they are sealed by rolling. They have to be rolled properly.  And after they would roll in a new batch, their inspector would go in and I would follow him.  I would go in and check them.  And, invariably, you would find some that had to be redone.

Q.    The men who were performing this work, were they –

A.    Civilians.

Q.    And they were working for the government there at the shipyard?

A.    Yes.

*See* Deposition of Charles Corley (August 25-27, 31, 2009) at pp. 224-62 attached hereto as *Exhibit A* (emphasis added)  Mr. Corley further testified in response to plaintiffs' counsel's questions:

> Q:    All right. And then you were asked about gasket material and I believe you stated that on the Monterey that you all had to renew most, if not all of the gasket material on that ship?  Does that refresh your memory?
>
> DEFENSE COUNSEL:  Object to the form.
>
> A:    Just about every flange on that ship started leaking so bad.  After we recommissioned it in Philadelphia and the Navy took it, it started leaking so bad, **we had to stop along the way in Norfolk, Virginia to repair a bunch of it.**
>
> **Q:    And did you personally – were your personally involved in the gasket renewal on the Monterey?**
>
> **A:    Absolutely, yes**
>
> **Q:    What   were   the   predominant   gasket manufacturers that you recall using on the Monterey?**
>
> **A:    Well, on the high pressure steam lines, which was the main concern we used what was called a Flexitallic.  On the auxiliary steam, we used Crane for steam flanges and we used Garlock for water flanges.  We used – we used tons of it.**

*See* Deposition of Charles Corley (September 1, 2009) at pp. 80-81 (emphasis added).

Therefore, contrary to plaintiffs' assertions that Mr. Corley never testified to being exposed to asbestos-containing products while working the shipyards, federal enclaves, Mr. Corley's deposition testimony speaks for itself.

### C.   Defendants Have Demonstrated A Sufficient Showing That Federal Question Jurisdiction Exists In This Case.

Defendants have sufficiently established that federal question jurisdiction exists in this case. Based upon the admissions made by plaintiff Charles Corley and the information provided by Defendants regarding the status of the above-listed shipyards as federal enclaves, Defendants have shown that federal question jurisdiction exists in this matter.

The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dockyards, and other needful Buildings." U.S. Const. art. I., § 8, cl. 17. The federal courts have held that "[s]uch places are 'federal enclaves' within which the United States has exclusive jurisdiction." *Akin v. Ashland Chemical,* 156 F.3d 1030, 1034 (10th Cir. 1998), (*citing Mater v. Holley,* 200 F.2d 123, 124-125 (5th Cir. 1952)). As such, "[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction." *Akin,* 156 F.3d at 1034; *Mater,* 200 F.2d at 124-125. The U.S. District Court also has original jurisdiction over this matter on the basis of 16 U.S.C. § 457, which provides as follows:

> *Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws.* In the case of the death of any

> person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. (Fed. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in federal enclaves. *Stokes v. Adair,* 265 F.2d 662, 665-66 (4th Cir. 1959). The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1441. *Id.*

1. Plaintiffs Have Admitted That Plaintiff Charles Corley was Exposed to Asbestos-Containing Products at Government Shipyards Which are Federal Enclaves.

Rule 801(d)(2) of the Federal Rules of Evidence provides an exception to the hearsay rule for an admission by a party-opponent. The Committee Notes to the Rule provide in part: "[a]dmissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." Fed. R. Evid. 801 advisory committee notes. Moreover, "[a] party's own statement

is the classic example of an admission." *Id. See e.g.*, *Clay v. Equifax, Inc.*, 762 F.2d 952, 955 (11th Cir. 1985); *Henson v. City of Dundee*, 682 F.2d 897, 908 (11th Cir. 1982).   As demonstrated hereinabove, plaintiff Charles Corley expressly admits in his deposition testimony that Norfolk Naval Shipyard, Long Beach Naval Shipyard and Philadelphia Naval Shipyard were federal government shipyards during the times that he worked in these facilities.   Essentially, plaintiffs are attempting to discredit the testimony of their own witness, Mr. Corley, despite his unequivocated concessions that these facilities were owned and operated by the federal government.

<u>Philadelphia Naval Shipyard</u>

Q.   ... Was there any overhaul done – overhauls done while you served on the USS Monterey?

A.   We went back to the shipyard in Philadelphia.   And I don't recall the dates, but it had to be in '53.

Q.   **Was there an overhaul done in the Philadelphia shipyard?**

A.   **Yes, it was.**

Q.   **Who owned the Philadelphia shipyard?**

A.   **It was a government yard.**

Q.   **Was it government owned and operated?**

A.   **Yeah.** It had to be because they didn't work.

Q.   Did – did you have any involvement with the overhaul?

A.   Only – yes, yes.

See Deposition of Charles Corley (August 25-27, 31, 2009) at pp. 177 – 79 attached hereto as *Exhibit A*.

<u>Long Beach Naval Shipyard</u>

Q.   Can you tell me where you – what cruises or what you did other than the first month while you were at the Long Beach Naval Shipyard?  And let me ask you, **that Long Beach Naval Shipyard, was it owned and operated by the U.S. government or a private company?**

A.   I don't know.  I was seventeen years old.

Q.   **Since then, have you come to find out who it was owned by?**

A.   **It was operated by the Navy or government the next time I went in it.**

Q.   **So at least one time when you were there it was owned and operated by the government?**

A.   **Yes.**

See Deposition of Charles Corley (August 25-27, 31, 2009) at pp. 101 attached hereto as *Exhibit A* (emphasis added).

<u>Norfolk Naval Shipyard</u>

A.   One year, and I can't tell you what year, we left in January to come back to the United States in Norfolk, Virginia, to Portsmouth Shipyard for overhaul of the Mississinewa.  And it had to be the year after I went on it, because after I went on it, I discovered

the boilers had oxygen damage.  We had to go back to the states to have them retubed.

...

Q.    1960.  **When you returned to Portsmouth at the Norfolk shipyard in 1960, was that a private shipyard or government-owned shipyard?**

A.    **No, government shipyard.**

...

Q.    Do you know the name brand or manufacturer of any products, equipment, machinery, materials, that you believe may have contained asbestos that you worked with or around while you served on the Mississinewa?

A.    Well, like all the rest of the ships, we had asbestos insulated pipes all over the ship. ...

...

Q.    **When you went into port at the government-operated shipyard in Norfolk – Naval Shipyard in Portsmouth, Virginia, you told us you were there approximately three months in early 1960, correct?**

A.    **Yes.**

Q.    **How did your duties and responsibilities change while the ship was, I assume, in dry dock?**

A.    **They increased.**

Q.    **Okay.**

A.    **I had to stay there all the time to see that the boilers were being put together right.  They had to retube the entire boilers.**

Q.   **What did that involve?**

A.   **Removing a section of the tubes and installing a new section at a time so that the structure remained intact. And they had to — they are sealed by rolling. They have to be rolled properly. And after they would roll in a new batch, their inspector would go in and I would follow him. I would go in and check them. And, invariably, you would find some that had to be redone.**

Q.   **The men who were performing this work, were they —**

A.   **Civilians.**

Q.   **And they were working for the government there at the shipyard?**

A.   **Yes.**

*See* Deposition of Charles Corley (August 25-27, 31, 2009) at pp. 224-62 attached hereto as *Exhibit A* (emphasis added). Accordingly, plaintiffs have admitted that plaintiff Charles Corley was exposure to asbestos-containing products at three (3) government shipyards and this court has original jurisdiction of this case.

2.   <u>As Demonstrated by Defendants' Notice of Removal, and Further Confirmed Herein, It is Clear That Philadelphia Naval Shipyard, Long Beach Naval Shipyard, and Norfolk Naval Shipyards are Federal Enclaves.</u>

In *Akin v. Ashland Chemical Co.*, the Tenth Circuit Court of Appeals stated:

The United States has power and exclusive authority "in all Cases whatsoever ... over all places purchased" by the government "for the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings," U.S. Const. art. I, § 8, cl. 17. Such places are "federal enclaves" within which the United States has exclusive

jurisdiction. FN1 Personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction. There is no dispute that Tinker Air force Base at Oklahoma City, Oklahoma is such a federal enclave.

FN1. The Constitutional language is that the Congress shall have power "[t]o exercise exclusive Legislation," see id., which has been construed to mean exclusive jurisdiction under 28 U.S.C. § 1331. See *Mater v. Holley*, 200 F.2d 123, 124-25 (5th Cir.1952). Noting that the United States has exclusive sovereignty in enclave areas, the Fifth Circuit said that it "would be incongruous to hold that ... (courts of the United States) are without power to adjudicate controversies arising" therein. Id. 124.

*Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).  In *Bachman v. Fred Meyer Stores, Inc.*, the district court evaluated the removing party's assertion of federal question jurisdiction based upon federal enclave and determined that the documents produced by the defendants, although not the actual deed of the property, "provided a preponderance of evidence that shows Hill Air Force Base" was a federal enclave.  *Bachman v. Fred Meyer Stores, Inc.*, 402 F. Supp.2d 1342, 1348 (D. Utah 2005).[1]

Similarly, the documentation relating to the shipyards attached as <u>Exhibit 4</u> to Defendants' Notice of Removal establishes that each of the shipyards at issue in this matter are federal enclaves.  In addition, the documentation attached hereto also serves to confirm that admissions made by the plaintiffs and the prior factual

---

[1] Plaintiff asserts that the removing party must establish that the federal government has accepted the transfer of sovereignty under 40 U.S.C. § 255; however, this statutory section is only applicable to lands acquired after February 1940. *Markham v. United States*, 215 F.2d 56, 58 (1954).

information provided to this Court establishes that the shipyards at issue were federally owned and operated and under the exclusive control of the federal government at the time Mr. Corley worked at these facilities.

For example, with regard to the Norfolk Naval Shipyard, U.S. Supreme Court in *Western Union Telegraph Co. v. Chiles* provides the history of the federal government's ownership of the shipyard and clearly supports the fact that the Norfolk Naval Shipyard is a federal enclave. *Western Union Telegraph Co. v. Chiles*, 214 U.S. 274, 29 S.Ct. 613, 53 L.Ed. 994 (1909), attached hereto as *Collective Exhibit B*. In addition, attached is a certified map of the Norfolk Naval Shipyard confirming the federal government jurisdiction. *Id. [Large scale certified map, which is a portion of Exhibit B, filed conventionally with Clerk's Office].* Also attached is historical information concerning the Norfolk Naval Shipyard which likewise serves to support these facts. *Id.*

Next, the attached statutes demonstrate that the Pennsylvania Naval Shipyard (formerly referred to as League Island) is a federal enclave. *See* 74 Pa. Stat. § 120.46-47 attached hereto as *Collective Exhibit C.* The federal government's exclusive jurisdiction is further supported by the Pennsylvania Supreme Court decision of *Kiker v. City of Philadelphia*, 31 A.2d 289 (Pa. 1943). *Id.*

Additionally, documentation from the California State Military Museum serves to confirm that the Long Beach Naval Shipyard was a federal enclave when Mr. Corley alleges to have been exposed to asbestos while working there:

> The Long Beach NSY, which closed in FY97, was located at Terminal Island between the cities of Long Beach and San Pedro and approximately 23 miles south of the Los Angeles International Airport.
>
> . . .
>
> The property was first leased to the Federal government in 1935, but most construction occurred during World War II. . . .
>
> . . .
>
> Immediately before World War II it became apparent that a major anchorage and operation area was needed in the Long Beach-Los Angeles-San Pedro area.  Public Law 667 (76th Congress) authorized the establishment of a fleet operating base there, as well as land acquisition, harbor breakwater, buildings and other accessories.  The Second Deficiency Bill of 1940 provided $19.8 million, and Terminal Island naval dry docks was established. . . .
>
> . . .
>
> On 9 February 1943, the Secretary of the Navy established the facilities as the US Naval Dry Docks, Roosevelt Base, California.  The name of this facility was changed to Terminal Island Naval Shipyard on 30 November 1945.   The name became Long Beach Naval Shipyard (NSY) in March 1948.

*See* Long Beach Naval Shipyard Materials attached hereto as *Collective Exhibit D*.

The ownership of the Long Beach Naval Shipyard is further confirmed by the Record of Decision for the Disposal and Reuse of Naval Station Long Beach and

Long Beach Naval Shipyard, Long Beach, California, and the documents attached to the Declaration of Kristin R. Parker. *Id.*

Plaintiffs seek to rely on *Akin v. Big Three Industries*, 156 F.3d 1030 (10th Cir. 1998) for the proposition that a case may only be removed to federal court if *all* of Mr. Corley's alleged exposures occurred at a federal enclave. Plaintiffs' Memorandum, pp. 11-12. Plaintiffs' discussion of the *Akin* case focuses on the court's holding that the right to removal must be clearly determinable by the defendants. *Id.* at 1035. Specifically, in *Akin*, the court held that only after defendants received plaintiff's written responses to interrogatories were they put on notice that the conduct sued upon took place wholly within a federal enclave, under federal direction. *Id.* The court further held that defendants properly removed the case to federal court. *Id.* Here, plaintiffs argue that removal is improper because Mr. Corley's alleged exposures did not wholly occur within federal enclaves. However, although all of the plaintiff's exposure was at a federal enclave, the court did not hold in *Akin* that removal is only proper where all alleged exposures occur within federal enclaves. *See id.*

Within Plaintiffs' Complaint, Plaintiffs have alleged that Mr. Corley has a single, indivisible injury that occurred from years of alleged exposure to asbestos-containing products throughout his career. Second Amended Complaint, ¶ 40. In other words, Mr. Corley does not have a separate injury for each alleged exposure

site. Defendants would show that Mr. Corley's injury arises in part under federal law, as a result of his work in the federal enclave shipyards, and in part under state law. Even if the state and federal claims are divisible, which they are not, this Court would have jurisdiction over both claims. *See* 28 U.S.C. §§1367(a), 1441(c). Therefore, upon establishing federal enclave jurisdiction, this Court's jurisdiction extends to all of Plaintiffs' claims.

**D.    Plaintiffs' Argument that Federal Law is not a Substantial Portion of this Case is not a Proper Basis for this Court to Remand this Case.**

In this case, plaintiff alleges a single wrong: alleged exposure to defendants' products and materials have caused plaintiff Charles Corley to contract an asbestos-related disease. Second Amended Complaint at ¶¶ 1-3. Additionally, plaintiffs specifically assert that "Charles Corley's asbestos-related malignant mesothelioma was due to his exposure to asbestos-containing products, and **each and every exposure to asbestos and asbestos-containing materials contributed to the cause of his asbestos-related mesothelioma.**" Second Amended Complaint at ¶ 40 (emphasis added). Therefore, accepting plaintiffs' assertion that each and every exposure to asbestos contributing to the plaintiff Corley's injury, then the exposure in the shipyards is just as important as any other exposures during Mr. Corley's work career. Second Amended Complaint at ¶ 40.

In addition, a careful review of plaintiff Charles Corley's deposition shows that the only exposure that plaintiff has to the Kaylo product that plaintiffs claim

was manufactured by defendant Owens-Illinois, Inc. was as a result of exposure on the USS Cavalier originating in the Long Beach Naval Shipyard and on the USS Monterey in the Philadelphia Shipyard. *See* Deposition of Charles Corley, *supra*. In fact, Mr. Corley admitted this fact when he stated at the conclusion of his deposition that he had testified as to all of the times he worked with or around Kaylo in responding to plaintiff counsel Keahey's and defense counsel's questions. Ex. A, Deposition of Charles Corley (September 1, 2009) at pp. 203-204. Therefore, application of federal law is a substantial portion of this case as to defendant Owens-Illinois, Inc.

Plaintiffs seem to place an emphasis on the fact that only four out of some seventeen exposure sites are federal enclaves. Plaintiff's Memorandum, p. 12. However, plaintiff Charles Corley's deposition establishes that he is not alleging asbestos exposure at all of these sites; therefore to argue that there are seventeen jobsites where Mr. Corley had asbestos exposure is inaccurate. Also, the number of sites of alleged exposure on federal enclaves compared to non-federal facilities does not equate in any way to duration or total amount of exposure on such enclaves. The number of alleged exposure sites does not shed light on the duration or amount of exposures at any of these particular sites. Consequently, plaintiffs' argument regarding the fact that only four of the seventeen plus exposure sites are federal enclaves is completely immaterial.

Additionally, plaintiffs' reliance on *Grable, Dixon,* and *McCarty* is misplaced. Plaintiffs argue that these cases stand for the proposition that a substantial federal interest in the litigation must be shown prior to removal of any action to federal court. While Defendants advocate that a substantial federal interest is involved in the case at bar, these cases are not applicable. As detailed by the United States Supreme Court in *Grable,* the language in these cases deals with a very specific type of federal "arising under" jurisdiction. Under 28 U.S.C. §1331, there is federal question jurisdiction for any civil action "arising under the Constitution, laws, or treaties of the United States," which is typically invoked by plaintiffs pleading a cause of action created by federal law. *Grable & Sons Metal Products, Inc. v. DaRue Eng'g & Manuf'g,* 545 U.S. 308, 312 (2005).

> There is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction, this Court having recognized for nearly 100 years that in certain federal-question jurisdiction will lie over state-law claims that implicate significant federal issues. The doctrine captures the common sense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantive questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues.

*Id.* (holding that defendant was entitled to remove quiet title action where claim to title was premised on IRS's failure to give adequate notice, as defined by federal law).

In the case at bar, Defendants submit that this Court has original jurisdiction over the claims asserted by Plaintiffs by virtue of federal enclave jurisdiction. *See* 28 U.S.C. § 1331; 16 U.S.C. § 457. In *Mater v. Holley*, 200 F.2d 123, 124-25 (5th Cir. 1952), the Fifth Circuit Court of Appeals examined federal enclave jurisdiction, noting that

> "[i]t has long been settled that, where lands for such a purpose are purchased by the United States with the consent of the state Legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provisions, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." It seems indubitable that any law existing in territory over which the United State has "exclusive" sovereignty must derive its authority and force from the United States and is for that reason federal law, even though having its origin in the law of the state within the exterior boundaries of which the federal area is situate. ... Existing federal jurisdiction is not affected by concurrent jurisdiction in state courts.

*Id.* at 124-25. Because the federal government has exclusive sovereignty over the federal enclaves at issue here, the shipyards, any law existing in that territory is deemed federal law. This Court can exercise original jurisdiction under federal enclave jurisdiction, which can be distinguished from *Grable* and its progeny.

Given the evidence showing the shipyards in question to be federal enclaves, Mr. Corley's confirming direct testimony that the shipyards were owned and operated by the federal government, and the case law referenced above,

Defendants have successfully established federal question jurisdiction in this matter.

E.   **Plaintiffs' Artfully Pleaded Complaint Does Not Avoid Removal.**

Plaintiffs' artfully pleaded complaint does not bar removal in this action. Plaintiffs argue that application of the "well-pleaded" complaint rule precludes removal jurisdiction in this action based on Plaintiffs' contention that the "four corners" of the complaint do not make a claim under federal law.   Plaintiff's Memorandum, pp. 7-8.   Plaintiffs also contend that their Complaint specifically discounts, denies and disavows any federal claims.  *Id.* at 8.[2]  These arguments are fundamentally incorrect and they misapply the "well-pleaded" complaint rule to the facts of this case.

The "well-pleaded" complaint rule provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392-93 (1987). However, "an 'independent corollary' to the well-pleaded complaint rule is the further principle that 'a plaintiff may not defeat removal by omitting to plead necessary federal questions. If a court concludes that a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal

---

[2] Paragraph 6 of Plaintiff's First Amended Complaint states that "[r]emoval of this action is improper for the following reasons: … (e) the plaintiffs expressly disclaim every claim arising under the Constitution, treaties or law of the United States (including any claim arising from an act or omission on a federal enclave, or by any officer of the United States or any agency or person acting under him/her under color of such office).  (Amended Complaint, ¶6).

question appears on the face of the plaintiff's complaint." *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998) (internal citation omitted). Where the complaint, on its face, brings causes of action created under state law, "original federal jurisdiction is unavailable unless it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims, or that one or the other claim is 'really' one of federal law." *Franchise Tax Bd. of the State of Cali. v. Constr. Laborers Vacation Trust for S. Cali.*, 463 U.S. 1, 13 (1983).

In this case, plaintiffs' claims against Defendants are really claims under federal law by virtue of federal enclave jurisdiction. Plaintiffs' failure to indicate the federal enclave status and location of Mr. Corley's exposure will not shield plaintiffs from the consequences of federal enclave status. It is evident from Mr. Corley's deposition testimony, as more fully set forth herein, that he was exposed to asbestos-containing products while working in several naval shipyards, which are classified as federal enclaves. The significance of plaintiff Corley's exposure at the shipyards is further supported by the focus of much of plaintiff's counsel's questioning during Mr. Corley's deposition. *See e.g.* Ex. A, Deposition of Charles Corley (September 1, 2009) at pp. 48-51, 80-81, 97-101. Accordingly, Plaintiffs' causes of action arise under the laws of the United States as provided in 28 U.S.C. §1331 and 16 U.S.C. § 457 and are properly the subject of federal jurisdiction. Plaintiffs' attempt to "disclaim" every claim arising under the Constitution, treaties

or law of the United States is contrary to the reasoning underlying 28 U.S.C. §1331

and 16 U.S.C. §457 and should not be determinative of this Court's subject matter

jurisdiction

### F.   Plaintiffs' Assertion that the Defendants Filing of the Notice of Removal is Motivated by Delay is Without Merit.

Courts have recognized that "[r]emoval is a statutory right" and "[a]s long as

defendant is within its rights to remove under the [relevant removal] statute,

defendant's motives for removal are irrelevant in determining whether removal is

proper" *Bryfogle v. Carvel Corp.*, 666 F. Supp. 730, 733 (E.D. Pa. 1987).

Defendants' filing of the Notice of Removal is based upon valid law, i.e., federal

question jurisdiction; therefore, the plaintiffs' attempt to influence the Court based

upon a baseless argument relating to an unsubstantiated claim that defendants wish

to delay this case should be rejected.

Plaintiffs have also argued that this Court should "expedite consideration of

this motion as Mr. Corley's condition is terminal and fast approaching life

expectancy . . . ." See Plaintiffs' Memorandum, p. 3.  However, as demonstrated

by prior filings, the parties have previously cooperated in completing Mr. Corley's

trial preservation deposition, and the parties have unfortunately learned that Mr.

Corley passed away on October 3, 2009.  Accordingly, any argument claiming that

Defendants are attempting to improperly delay this matter or that there is a need to

expedite this case due to Mr. Corley's health or for any other reason are without merit.

G.   **Defendants' Notice of Removal Was Filed Timely.**

Plaintiffs allege that Defendants' Notice of Removal was not timely filed.  It is not surprising that the plaintiffs fail to provide this Court with any case law in support of their position.  In fact, plaintiffs base this argument on the fact that they gave "advance notice" via email to Defendants' counsel that Plaintiffs intended to file an amended complaint adding Garlock and OI as defendants to the pending litigation.  While Defendants admit plaintiffs' counsel sent an advance notice of the pending litigation, plaintiffs' argument ignores the plain language of 28 U.S.C. §1446 governing removal and the basic principles of judicial process as applied by the courts.  *See Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).  Pursuant to 28 U.S.C. §1446(b), a defendant's notice of removal "shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based . . . ."28 U.S.C. §1446(b).  "If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable . . . ."  *Id.*

{B1069492}                                    34

Plaintiffs contend that a defendant's thirty days in which to file a notice of removal runs from the date of the "advance notice" from Plaintiff, regardless of whether the defendant has actually been served or joined in the action. This argument is contrary to the plain language of 28 U.S.C. §1446, the purpose of civil procedure and governing case law. *See Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999). Essentially, Plaintiffs' argument requires a "potential" defendant to interject itself into state litigation prior to being served with any initial pleading in the matter for purposes of preserving its right to seek removal where the Plaintiff has given the potential defendant "advance notice" that it would eventually be joined in the state litigation.

In discussing its adoption of the "last-served defendant" rule under the removal statute, 28 U.S.C. §1446, the Eleventh Circuit Court of Appeals reasoned that "individual defendants are not required to take action – whether seeking removal or otherwise responding to another defendant's notice of removal – *until they are properly served . . . ." Bailey v. Janssen Pharmaceutical, Inc.*, 536 F.3d 1202, 1208 (11th Cir. 2008) (emphasis added). Acknowledging the importance of formal service in the judicial process, the Court further elaborated that

> [t]he [Supreme] Court [in *Murphy Brothers*] held that
> formal process is required, noting the difference between
> mere notice to a defendant and official service of process:
> "An individual or entity named as a defendant is not
> obliged to engage in litigation unless notified of the
> action, and brought under a court's authority, by formal

process." Thus, a defendant is "required to take action" as a defendant – that is, bound by the thirty-day limit on removal – "only upon service of a summons or other authority – asserting measure stating the time within which the party served must appear and defend." The Court essentially acknowledged the significance of formal service to the judicial process, most notably the importance of service in the context of the time limits on removal . . . .

*Bailey*, 536 F.3d at 1208 (quoting *Marano Enters. of Kan. v. Z-Teca Rests., L.P.,* 254 F.3d 753, 756 (8th Cir. 2001)). Plaintiffs' baseless argument that notifying a defendant's counsel via email or via correspondence that it may be brought into pending litigation is enough to trigger the time provisions of the removal statute is not supported by law, at best. Plaintiffs' argument that Defendants' Notice of Removal was not filed timely is without merit and should be rejected.

## H.   Defendant CBS Corporation ("Westinghouse") Successfully Established Federal Jurisdiction Under 28 U.S.C. § 1442(a)(1)

Co-Defendant Westinghouse has successfully established federal jurisdiction under 28 U.S.C. § 1442(a)(1), the "federal officer" removal statute. Westinghouse has shown that (1) it acted under the detailed direction and control of the Navy and its officers in designing, manufacturing and supplying turbines and similar items of marine nature to the U.S. Navy; (2) a "causal nexus" exists given that Plaintiffs allege Mr. Corley was injured due, in part, to exposure to asbestos-containing components used in or on Westinghouse Navy equipment; and (3) Westinghouse has alleged a colorable federal defense to the action, i.e., government contractor

immunity from liability for injuries arising from any exposure to asbestos attributable to Westinghouse Navy equipment. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

Though a removing defendant has the burden of proving the existence of federal subject matter jurisdiction, 28 U.S.C. § 1442(a)(1) should be broadly construed and the "officer need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Under 28 U.S.C. § 1442(a)(1), "a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage." *Marley v. Elliot Turbomachinery Co.*, 545 F. Supp. 2d 1266, 1271 (S.D. Fla. 2008).

As more fully set forth in its Notice of Removal and Response to Plaintiffs' Motion to Remand, Westinghouse has successfully established the elements announced by the Court in *Mesa* to support removal under the "federal officer" removal statute.

## II.    <u>CONCLUSION</u>

WHEREFORE, Defendants Garlock Sealing Technologies LLC and Owens-Illinois, Inc., as consented to by all other Defendants named and served in the State Case, have properly removed this action to the United States District Court for the Northern District of Alabama, Southern Division and this Court should deny plaintiffs' Motion to Remand.

Respectfully submitted this the 13th day of October, 2009.

STARNES & ATCHISON

By: s/Anthony C. Harlow
Anthony C. Harlow
Seventh Floor, 100 Brookwood Place
P. O. Box 598512-8512
Birmingham, AL  35259-8512
(205) 868-6074
*Attorneys for Defendant Owens-Illinois, Inc.*


EDWARD B. MCDONOUGH, JR.

By:  s/Edward B. McDonough, Jr.
Edward B. McDonough, Jr.
Law  Offices of Edward B. McDonough, Jr.,
P.O. Box 1943
Mobile, AL 36633
(251) 432-3296

*Attorneys for Defendant Garlock Sealing
 Technologies LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2009, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

s/  Anthony C. Harlow

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB - 8 2007

FILED
CLERK'S OFFICE

*DOCKET NO. 875*

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

*Eswin Dean v. 3M Co., et al.,* N.D. Mississippi, C.A. No. 4:06-142
*Archie Lord, Sr. v. Phillips 66 Co., et al.,* S.D. Mississippi, C.A. No. 1:06-660
*Joseph Newsome v. Phillips 66 Co., et al.,* S.D. Mississippi, C.A. No. 1:06-661
*Cleophus Smith v. Phillips 66 Co., et al.,* S.D. Mississippi, C.A. No. 1:06-662
*Joseph Alexander Anderson, Jr., et al. v. Ford Motor Co., et al.,* D. Utah, C.A. No. 2:06-741

## BEFORE WM. TERRELL HODGES,[*] CHAIRMAN, D. LOWELL JENSEN,[*] J. FREDERICK MOTZ,[*] ROBERT L. MILLER, JR., KATHRYN H. VRATIL, DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL

### TRANSFER ORDER

Before the Panel are motions brought, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in two actions pending in the Northern District of Mississippi and the District of Utah, respectively, and three actions pending in the Southern District of Mississippi. Movants ask the Panel to vacate the respective portions of its orders conditionally transferring their actions to the Eastern District of Pennsylvania for inclusion in the centralized pretrial proceedings occurring there in this docket before Judge James T. Giles.

On the basis of the papers filed and hearing session held (without oral argument), the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania, and that transfer of the actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. We find that transfer of the actions is appropriate for reasons expressed by the Panel in its original decision in this docket directing centralization of all pending federal court actions not then in trial involving allegations of personal injury or wrongful death caused by asbestos or asbestos containing products. *See In re Asbestos Products Liability Litigation (No. VI),* 771 F.Supp. 415 (J.P.M.L. 1991). Particularly, in the Panel's original decision distinctions based on such matters as the pendency of motions or other matters before the transferor court,[1] the uniqueness of a party's status, the type of defendant, the

---

[*]   Judges Hodges, Jensen and Motz took no part in the disposition of this matter.

[1]   Plaintiffs have argued that transfer of their actions should be denied or deferred in order to permit the resolution of motions to remand the actions to state court. There is no need to delay transfer in order to accommodate such an interest. We make the following observations: 1) as a practical matter, there is a lag time of at least three or four months from the filing of an action, its identification as a potential tag-along action, issuance of a conditional transfer order, stay of transfer when a party timely objects to the conditional transfer, briefing on

(continued...)



**EXHIBIT**

C

- 2 -

docket condition of any specific federal district, the stage of pretrial proceedings, the presence of unique claims or additional claims not relating to asbestos injury or death, and/or the unanimity of opposition to transfer by the parties to an action, were considered and rejected by the Panel as grounds for carving out exceptions to transfer in this extraordinary docket. We are not persuaded to depart from this approach in dealing with the question of transfer of the actions now before the Panel.

Under the stewardship of the transferee court, as of January 1, 2007, i) over 74,460 actions have been closed in the transferee district, and ii) over 1,350 actions or claims therein have been returned to their originating transferor districts. To any parties that believe the uniqueness of their particular situation renders continued inclusion of their action in MDL-875 unnecessary or inadvisable, whenever the transferee court deems remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. at 436-38. We are confident that the transferee court will continue to promptly review arguments for returning transferred actions or claims to their transferor courts and will take all appropriate steps to assure their speedy return whenever it is convinced that retention in the MDL-875 proceedings is no longer needed.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these five actions are transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable James T. Giles for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Robert L. Miller, Jr.
Acting Chairman

---

[1](...continued)
the question of transfer, the Panel hearing session, and the issuance of the Panel's subsequent order; 2) Panel Rule 1.5, R.P.J.P.M.L., 199 F.R.D. at 427, expressly provides that the pendency of a conditional transfer order does not in any way i) suspend orders and pretrial proceedings in the district court in which the action that is the subject of the conditional transfer order is pending, or ii) limit the pretrial jurisdiction of that court; and 3) accordingly, those courts wishing to address such motions have adequate time in which to do so, those courts concluding that such issues should be addressed by the transferee judge need not rule on them, and the process of Section 1407 transfer 'n MDL-875 can continue without any unnecessary interruption or delay.