JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MDL 875**

DEC – 4 2009

FILED
CLERK'S OFFICE

1  Richard A. Brody, Esq. (SBN 100379)
Cecil B. Crain, Esq. (SBN 252780)
2  BRENT COON & ASSOCIATES
44 Montgomery Street, Suite 800
3  San Francisco, CA  94104
Telephone:  415.489.7420
4  Facsimile:  415.489.7426

5  Attorneys for Plaintiffs

6

7

8

9                        **DOCKET NO. 875**

10  **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11  **IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

12

13

14  This document relates to:        *Myrtes Faye Kollar, et al., v. Metalclad Insulation Corp., et al.*

15                                  N.D. California, C.A. No. 3:09-5106

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

**OFFICIAL FILE COPY**          **IMAGED** DEC – 4 2009

PLEADING NO. 5996

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTS SUPPORTING VACATUR AND REMAND ...................................... 3

    A.   Plaintiffs' decedent Albert Kollar. ............................................................ 3

    B.   Union Asbestos and Rubber Company designed Unibestos decades prior to the sales at issue, and for decades it was readily available on the commercial market. ........... 3

    C.   Pittsburgh Corning Corporation purchased from UNARCO the right to manufacture Unibestos. .............................................................................................. 4

    D.   Pittsburgh Corning Corporation never designed alternate versions of Unibestos. ...... 4

    E.   Removing Defendant Metalclad Insulation Corporation brokered a sale of commercially-available Unibestos Insulation to the U.S. Navy, of identical design, composition, and manufacture to that which was commercially available to private buyers. ...................................................................................................... 6

III.   ARGUMENT AND AUTHORITIES SUPPORTING VACATUR AND REMAND ..... 7

    A.   Metalclad has the burden to demonstrate five elements to avoid remand................... 7

    B.   The Federal Officers' Removal Statute defense does not apply to Metalclad because Unibestos is not "military equipment" of the type covered by that statute, and the federal government never instructed Metalclad not to warn it.................................... 8

        1.   The Federal Officers' Removal Statute protects the Federal Government by protecting its suppliers of military equipment.......................................................... 8

        2.   Unibestos was readily available to commercial purchasers during the time of Metalclad's brokered sale to the U.S. Navy; therefore, Unibestos was not "military equipment" protected by 1442(a)(1). ................................................................... 8

        3.   Metalclad has shown no evidence that it was ever prevented from warning the federal government about the hazards of asbestos, and cannot show that its duties to the federal government were substantially in conflict with state law, because the duties in fact ran parallel. ................................................................................ 10

    C.   Metalclad and Pittsburgh Corning Corporation were not acting under a federal official when the Unibestos was being manufactured or tested. ............................... 14

    D.   Defendant cannot demonstrate a causal nexus between any actions they took under the direction of a federal officer and harm to the plaintiff for which plaintiffs seek relief. ...................................................................................................... 15

    E.   The activities of Metalclad and Pittsburgh Corning Corporation were not of such an official nature that removal is warranted................................................................. 15

    F.   This case should not be transferred to MDL-875 until open questions as to subject matter jurisdiction have been resolved by the U.S. District Court............................ 17

IV.    CONCLUSION ................................................................................................ 17

i

1

**TABLE OF AUTHORITIES**

2

3 **Cases**

4 *Aikins v. Microsoft Corp.*, 2000 U.S. Dist. LEXIS 4371 (E.D.La. 2000) ..........................................17

5 *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988)..................................................................passim

6 *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582 (9th Cir. 1996) ........................................10

7 *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) ..........................9, 15

8 *Entrekin v. Fisher Scientific Inc.*, 146 F.Supp.2d 594 (3d Cir. 2001)........................................14

9 *Faulk v. Owens-Corning*, 48 F.Supp.2d 653 (E.D. Tex. 1999).................................................10, 11

10 *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp.2d 1144 (D.Colo. 2002) ...10

11 *Gaus v. Miles, Inc.*, 980 F.2d. 564 (9th. Cir. 1992)....................................................................15

12 *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187 (D.Mass. 2008) ........................14

13 *Howard v. Lemmons*, 547 F.2d 290 (5th Cir. 1977)..................................................................17

14 *In re Air Disaster at Ramstein Air Base*, 81 F.3d 570 (5th Cir. 1996).................................11

15 *In re Hawaii Federal Asbestos Cases* (1992) 960 F.2d 806 ..............................................passim

16 *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000) ..............................................11, 12

17 *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) ..................................................14

18 *Medical Soc'y v. Conn. Gen. Corp.*, 187 F. Supp. 2d 89 (S.D.N.Y. 2001) ........................17

19 *Mesa v. California*, 489 U.S. 121 (1989) ....................................................................................7, 14

20 *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044 (E.D.Wisc. 2001) ...........................................17

21 *New Jersey Department of Environmental Protection v. Exxon Mobil Corp.*, 381 F.Supp.2d 381

22    (D.N.J. 2005)..................................................................................................................14

23 *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992 (7th. Cir. 1996) ...........................................10, 12

24 *Opelika Nursing Home, Inc. v. Richardson*, 448 F.2d 658 (5th Cir. 1971) ........................17

25 *Page v. Wright*, 116 F.2d 449, 453 (7th Cir. 1940)..................................................................17

26 *Rice v. Rice Foundation*, 610 F.2d (7th Cir. 1979) ...............................................................17

27 *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir. 1995).......................................................12

28 *Texas First Nat. Bank v. Wu*, 347 F.Supp.2d 389 (S.D. Tex. 2004) ....................................15

ii

1

**TABLE OF AUTHORITIES, CONTINUED**

2

3      **Cases, continued**

4      *United States ex rel. Esola v. Groomes*, 520 F.2d 830 (3rd Cir. 1975)................................17

5      *Vasquez v. Alto Bonito Gravel Plant Corp.*, 56 F.3d 689 (5th Cir. 1995) ........................15

6      *Watson v. Philip Morris Companies*, 551 U.S. 142 (2007) ................................................14

7      *Williams v. General Electric Co.*, 418 F.Supp.2d 610 (M.D. Penn. 2005)....................7, 15

8      *Willingham v. Morgan*, 395 U.S. 402 (1969)......................................................................7

9

10     **Statutes**

11     28 U.S.C. § 1442(a)(1) ...............................................................................................8, 10, 16

12     28 U.S.C. section 1331 ..............................................................................................................1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

## PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-328) AND SUPPORTING BRIEF

Plaintiffs Myrtes Faye Kollar, Dianne L. Caron, and Linda A. Heath move to vacate the Conditional Transfer Order of the Judicial Panel on Multidistrict Litigation (CTO-328) and offer this supporting brief:

I.      **INTRODUCTION**

1.      Plaintiffs' decedent Albert Kollar died of malignant mesothelioma on August 14, 2007.  He is survived by his wife, Myrtes Faye Kollar, and by his daughters, Dianne L. Caron and Linda A. Heath.

2.      Venue of this matter is proper in the United States District Court for the Northern District of California.

3.      Plaintiffs' complaint, on its face, does not create subject matter jurisdiction under 28 U.S.C. section 1331 because the action does not arise under the constitution, laws or treatises of the United States within the meaning of that statute.  All of the relief sought by the Plaintiffs in their Complaint is founded upon state law.

4.      No colorable federal defense is implicated by Plaintiffs' complaint.  Defendant Metalclad Insulation Corporation's ("Metalclad") sole stated basis for removal is 28 U.S.C. 1442(a)(1), commonly known as the "Military Contractors' Defense" or the "Federal Officers' Removal Statute."  As shown below, this defense is not applicable, and not even "colorable."  Therefore, subject matter jurisdiction does not exist, which requires this case to be remanded.

5.      Plaintiffs filed a motion to remand (with supporting points and authorities, and evidence substantially similar to the evidence and authorities for this motion), before the United States District Court for the Northern District of California.  The motion was based on the lack of federal subject matter jurisdiction, because of the inapplicability of the military contractor's defense to commodity asbestos insulation, as set forth below.

/ /

/ /

/ /

6.      Plaintiffs' motion to remand was denied, without prejudice to re-file, on November 24, 2009. Exh. 10.[1] The order states that the motion is denied in light of Plaintiffs' opposition to CTO-328, and that Plaintiffs may re-file their motion to remand once this motion has been decided.

7.      Federal courts have an affirmative obligation to investigate whether federal subject matter jurisdiction exists, and cannot proceed with any case until open questions as to the existence of federal subject matter jurisdiction have been determined.

8.      The Judicial Panel on Multidistrict Litigation has an affirmative obligation to investigate whether federal subject matter jurisdiction exists, and cannot proceed with this case (including transferring this case to MDL 875) until open questions as to whether Metalclad has presented a colorable federal defense have been resolved.

9.      Until Plaintiffs' motion to remand is resolved, this case cannot be transferred to MDL 875, because there will be an open question as to subject matter jurisdiction. Therefore, CTO-328 must be vacated as to this case, so that Plaintiffs' motion to remand can be decided.

10.      Transfer is inappropriate and impermissible because subject matter jurisdiction does not exist, and open questions as to the existence of subject matter jurisdiction have not been resolved.

11.      Transfer is not appropriate because this case involves only California state law claims. Plaintiffs have expressly disclaimed all claims arising under Federal law.

12.      Transfer is not appropriate because common issues do not predominate over individual issues of fact.

13.      Transfer will not further the convenience of the parties and the witnesses.

14.      Transfer will not advance the just and efficient conduct of these cases. It will be more efficient for the dispositive issues of California state law to be handled by a federal district court judge in California.

15.      Transfer is inappropriate because this case is not sufficiently complex and time

---

[1] All references to "Exh." herein refer to Exhibits to the Declaration of Cecil B. Crain, Esq., in Support of Plaintiffs' Motion to Vacate CTO-328, filed herewith. Exhibit 10 is U.S. Magistrate Judge Joseph C. Spero's order of November 25, 2009, denying without prejudice Plaintiffs' motion to remand.

2

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

1  consuming.

2      16.      Any benefits of coordination of pre-trial proceedings can be realized by less drastic

3  means than transfer of this action and consolidation with a conglomeration of actions under various

4  federal statutes and the laws of many states.  This Court (Docket No. 875) has tens of thousands of

5  asbestos-related cases pending before it.  It is in the interests of justice to permit Plaintiffs to seek

6  their relief in the Northern District of California.

7  **II.      FACTS SUPPORTING VACATUR AND REMAND**

8      **A.      Plaintiffs' decedent Albert Kollar.**

9      17.      Albert Kollar worked as a draftsman in the Mare Island Naval Shipyard from

10 December of 1939 to December of 1941.  He served in the United States Navy as a Warrant Officer

11 from December 1941 to October 1945.  After leaving active duty, Mr. Kollar returned to work at

12 the Mare Island Naval Shipyard as a draftsman from October 1945 until approximately 1973.  He

13 also served in the United States Navy Reserves from April 1946 to June 1977.

14     18.      Plaintiff Myrtes Faye Kollar is Albert Kollar's surviving spouse, and his successor-

15 in-interest.  Plaintiffs Dianne L. Caron and Linda A. Heath are Albert Kollar's surviving daughters.

16 Mr. Kollar was taken from them before his time.

17     **B.      Union Asbestos and Rubber Company designed Unibestos decades prior to the**
   **sales at issue, and for decades it was readily available on the commercial**
18   **market.**

19     19.      Unibestos is an asbestos-containing insulation for pipes.  Exh. 5, response to

20 Interrog. no. 31-E, at 30:19-31:11.[2]

21     20.      It was designed, tested, and developed by the Union Asbestos and Rubber Company

22 ("UNARCO") in 1936 and 1937 in conjunction with the U.S. Navy.  Exh. 5, response to Interrog.

23 no. 31-B, at 29:1-21; Exh. 7, response to Interrog. no. 4 at p. 6.[3]

24     21.      UNARCO began selling Unibestos to private buyers from no later than 1954.  Exh.

25 5, response to Interrog. no. 31-B, at 29:1-21; and Exh. 7, response to Interrog. no. 4 at p. 6.

26 _____

27 [2] Exhibit 5 is Pittsburgh Corning Corporation's response to San Francisco Superior Court's General Order no. 129
   interrogatories, verified in 1997.
28 [3] Exhibit 7 is PCC's response to Master Interrogatories and Requests for Production, verified in 1994.

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

1

    **C.**    **Pittsburgh Corning Corporation purchased from UNARCO the right to manufacture Unibestos.**

2

3        22.    On June 30, 1962, the Pittsburgh Corning Corporation purchased from UNARCO

4  the right to manufacture Unibestos.  Exh. 5, response to Interrog. no. 31-B, at 29:1-21; Exh. 6,

5  response to Interrog. no. 8 at pp. 8-9; Exh. 7 at p. 3; and Exh. 8 at 22:16-24:23.[4]

6        23.    PCC manufactured and sold Unibestos to private commercial buyers during the

7  years 1962-72.  Exh. 5, response to Interrog. 30, 31-A, and 31-B, at 27:24-29:21; and Exh. 7,

8  response to Interrog. 5(a)-(c) at pp. 7-8.

9        24.    Pittsburgh Corning Corporation relabeled and sold certain types of asbestos-

10  containing mastics and accessory products, but the only asbestos-containing product it ever

11  manufactured was Unibestos.  *Id.*; Exh. 5, preliminary statement at 2:3-23; Exh. 6, response to

12  Interrog. no. 7 at p. 8; and Exh. 7, general objection at p. 1; Exh. 7, response to Interrog. no. 4 at

13  pp. 6-7.

14

15     **D.**    **Pittsburgh Corning Corporation never designed alternate versions of Unibestos.**

16        25.    At no time did Pittsburgh Corning Corporation ever modify the design, composition,

17  or manufacturing process of Unibestos.  The only aspects of Unibestos that were ever varied by

18  PCC were its dimensions, *i.e.*, the width of the pipe it was to cover, and the thickness of the

19  insulation, based on the following evidence:

20           a.   PCC never sold Unibestos on an experimental or test basis.

21              Exh. 5, response to Interrog. no. 31-B, at 29:1-18.

22           b.   PCC never designed a product containing asbestos.

23              Exh. 6, response to Interrog. no. 6, at pp. 7-8.

24  / /

25  / /

26

27  [4] Exhibit 6 is PCC's response to Requests for Admissions and Special Interrogatories, verified in 1982.  Exhibit 8 is an excerpt of the Deposition of Robert E. Buckley, taken February 7, 1980, in Pittsburgh, Pennsylvania, in connection with LASC case no. C 137 465.  Robert E. Buckley was a Vice President at PCC during the relevant times.  Exh. 8 at

28  21:1-22:5.

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

c. PCC was unaware the identity of any "individual who participated in the design and preparation of manufacturing specifications" of Unibestos.

Exh. 6, response to Interrog. no. 10, at p. 10.

d. PCC's Unibestos all had the same composition, except that composition might vary based on the thickness of the insulation requested by the customer.

Exh. 5, response to Interrog. no. 31-D, at 29:24-30:18.

Exh. 6, response to Interrog. no. 70, at pp. 36-37.

Exh. 7, response to Interrog. no. 6(e), at pp. 8-9.

e. PCC "made no alterations during 1962 - 1972" to the "chemical composition" of Unibestos.

Exh. 6, response to Interrog. no. 8, at pp. 8-9.

f. PCC did not know of any "written memoranda, specifications, blueprints, or other written materials of any kind or character relating to the design and preparation" of Unibestos.

Exh. 6, response to Interrog. no. 11, at p. 10.

Exh. 7, response to Interrog. no. 7, at pp. 11-12.

g. PCC identified its Unibestos by stock numbers.

Exh. 9, at lines 1-3. [5]

h. The Unibestos to be supplied to the U.S. Navy was identified by stock numbers.

Exh. 3, at pp. 3-5 and 9 (all pages labeled "CONTINUATION SHEET").

Based on the foregoing evidence, Pittsburgh Corning Corporation never modified Unibestos, and sold only one version of Unibestos during the years 1962-1972. All Unibestos sold during the years 1962-1972 was identical, except in terms of the dimensions of the pipes it was to cover, and in terms of the thickness of the insulation.

//

//

_____

[5] Exhibit 9 is an excerpt of the trial testimony of Wilfred Newton's trial testimony on April 29, 1998. Please note that the page numbers are not visible, but Plaintiffs only cite to a single page.

5

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

**E.     Removing Defendant Metalclad Insulation Corporation brokered a sale of commercially-available Unibestos Insulation to the U.S. Navy, of identical design, composition, and manufacture to that which was commercially available to private buyers.**

26.     "[I]n 1968, Metalclad brokered a shipment of Pittsburgh Corning Unibestos Insulation for use in the construction of four nuclear submarines being constructed at Mare Island Naval Shipyard . . . ." Exh. 2, ¶ 7 at 4:4-7; *see also* Exh. 3.[6]  To meet the requirements of this contract, the Unibestos would have to conform to the following three military specifications:

    a.   MIL-I-2781 / Grade II, Class C

    b.   MIL-I-2781 / Grade III, Class F

    c.   MIL-I-24244

*Id.* In order to verify that Pittsburgh Corning Corporation's standard Unibestos met those specifications, the U.S. Navy sent inspectors to the PCC manufacturing plant, to oversee the production and testing of the Unibestos.  *See* Exh. 2, ¶¶ 10-13; *see also* Exh. 4.[7]

27.     The inspectors performed tests, showing that this batch of Unibestos met the required military standards.  *Id.*  Metalclad has put forward no information that the U.S. Navy, or its inspectors, interfered with PCC's standard procedures for manufacturing Unibestos.  Metalclad has put forward no evidence that the Unibestos differed from other Unibestos sold by PCC under the same stock numbers.  The U.S. Navy inspectors would only observe the production, and perform tests on the final product.  Exh. 2, ¶ 9L, at 9:1-19; Exh. 9 at lines 18-26.

28.     The Unibestos sold to the U.S. Navy was identical in design, composition, and manufacture to Unibestos sold to private buyers during the years 1962-1972.  Metalclad has shown no evidence to the contrary, and as addressed above, Pittsburgh Corning Corporation never varied their design, composition, or manufacturing process.  There is no reason to believe that the Unibestos sold to private buyers would not have passed those same tests.  Metalclad has put no evidence forward to the contrary.  In fact, PCC claimed in its discovery responses that Unibestos

---

[6] Exhibit 2 is the Declaration of Dan H. Heflin, Jr., P.E., in support of Metalclad's Removal in this action.  Exhibit 3 is the Award/Contract N000445-69-C-0137, confirming the Award Notice dated August 3, 1968.
[7] Exhibit 4 is correspondence between Pittsburgh Corning Corporation and Mare Island Naval Shipyard regarding Unibestos, in which PCC provided the U.S. Navy with proof that their stock Unibestos passed the Navy's tests.

1 met those three military standards.  Exh. 5, response to Interrog. no. 31-G, at 31:19-32:1.

2       29.    Mr. Heflin declared for Metalclad that Pittsburgh Corning Corporation's standard,

3 stock Unibestos would not have served the U.S. Navy's needs.  Exh. 2 at 12:15-22.  But this is

4 wrong, because the U.S. Navy ultimately used standard, stock Unibestos on their submarines.

5 Performing new tests on standard Unibestos did not make it into a new, government-controlled

6 product.

7 **III.**    **ARGUMENT AND AUTHORITIES SUPPORTING VACATUR AND REMAND**

8     **A.**    **Metalclad has the burden to demonstrate five elements to avoid remand.**

9       To prevail on a motion to remand, removing defendant Metalclad has the burden to

10 demonstrate each of the following five elements:

11     (1)    it is a person;

12     (2)    it has a colorable federal defense;

13     (3)    it was acting pursuant to a federal officer's directions;

14     (4)    a causal nexus exists between the defendant's actions under the color of federal

15         office and the plaintiff's claims; and

16     (5)    its activities were of such an official federal nature that warrants removal.

17 *See Mesa v. California*, 489 U.S. 121, 129 (1989); *Willingham v. Morgan*, 395 U.S. 402, 409

18 (1969) (regarding elements 1-4); *and see Williams v. General Electric Co.*, 418 F.Supp.2d 610

19 (M.D. Penn. 2005) (regarding element 5).

20       Plaintiffs do not dispute that Metalclad is a "person" for the purposes of 28 U.S.C. §

21 1442(a)(1).  However, Metalclad is unable to demonstrate any of the other elements.  Because

22 Metalclad will not prevail on Plaintiffs' Motion for Remand, CTO-328 should be vacated as to this

23 action.

24 //

25 //

26 //

27 //

28 //

**B.** **The Federal Officers' Removal Statute defense does not apply to Metalclad because Unibestos is not "military equipment" of the type covered by that statute, and the federal government never instructed Metalclad not to warn it.**

The first element Metalclad has the burden to show is that it has a colorable federal defense. Metalclad's removal of this action was based solely on the Federal Officers' Removal Statute (28 U.S.C. § 1442(a)(1)).  *See* Exh. 1 at 1:23 and 2:3-12.[8]

**1.** **The Federal Officers' Removal Statute protects the Federal Government by protecting its suppliers of military equipment.**

The Federal Officers' Removal Statute, often called the "Military Contractors' Defense," was passed to protect the federal government's ability to acquire military equipment. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511 (1987).  Specifically, if military contractors were required to comply with state laws that were substantially in conflict with the federal requirements (including state laws imposing tort liability for compliance with federal specifications), the contractors would incur increased costs (including state law tort liability), and pass those increased costs on to the federal government. *Id.*  Thus the statute is intended to protect the federal government's ability to purchase special equipment, and would only incidentally provide protection to military contractors.

**2.** **Unibestos was readily available to commercial purchasers during the time of Metalclad's brokered sale to the U.S. Navy; therefore, Unibestos was not "military equipment" protected by 1442(a)(1).**

The applicable law with regard to the definition of "military equipment" is found in *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 811 (9th Cir. 1992).  That decision concerned commercially-available asbestos insulation supplied to the U.S. Navy, very much like the Unibestos at issue in this case. *Id.*

Defendant, on the other hand, relies only on California state court definitions of what constitutes "military equipment." Exh. 1 (Notice of Removal) at 5:5-12.

Asbestos insulation that is "readily available on the commercial market" is not entitled to the Federal Officers' Removal Statute defense. *In re Hawaii*, 960 F.2d at 811.  The federal

---

[8] Exhibit 1 is Metalclad's Notice of Removal, filed in this action on October 27, 2009.

8

1    government has no interest in extending protection to contractors who serve the broader needs and

2    desires of end-users in the private sector, because they "have factored the costs of ordinary tort

3    liability into the price of their goods." *Id.* They will not enjoy immunity from state tort liability

4    because that immunity is unlikely to affect the marketing or pricing of their goods. *Id.*

5          As shown above, except as to its dimensions (which varied based on the width of the pipes

6    to be covered, and the desired thickness of the insulation), the Unibestos supplied to Mare Island

7    Naval Shipyard was identical in every respect—design, composition, and manufacture—to

8    Unibestos that Pittsburgh Corning Corporation had sold to the general public since 1962. It was

9    probably identical to the Unibestos sold by UNARCO to the general public during the years 1954-

10    1962. In fact, Metalclad was part of the general public, and could just as easily have purchased that

11    Unibestos for use on a private project, by specifying the same stock numbers. Metalclad ordered

12    the Unibestos out of a catalog by stock numbers. This was not special "military equipment."

13          The federal officers watched as stock Unibestos was produced by Pittsburgh Corning

14    Corporation according to its usual process, and then watched or performed tests to determine if the

15    stock Unibestos met the military specifications required by the contract. That level of involvement

16    was not sufficient to turn the stock Unibestos into "military equipment."

17          It is true that Unibestos may have been developed in conjunction with testing by the U.S.

18    Navy, in response to the U.S. Navy's needs. But the development took place in 1936-37. At the

19    time the Unibestos was supplied to Mare Island Naval Shipyard <u>more than three decades</u> had

20    elapsed, and in that time, Unibestos was made readily available on the commercial market. A

21    product that, at one time, may have been developed for the U.S. Navy, had over the decades

22    evolved into a common, stock, readily-available commercial product.

23          It is true that the Federal Officers' Removal Statute is to be construed broadly and doubts

24    are to be resolved in favor of the removing party. *Durham v. Lockheed Martin Corp.*, 445 F.3d

25    1247, 1253 (9th Cir. 2006). However, in this case, there is no doubt. The facts are clear, from the

26    evidence presented above, that the Unibestos supplied to Mare Island Naval Shipyard was not

27    "military equipment" because it was readily available on the commercial market, and had been for

28    decades. If Metalclad contends any facts are in doubt, it should identify them with particularity.

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

3. **Metalclad has shown no evidence that it was ever prevented from warning the federal government about the hazards of asbestos, and cannot show that its duties to the federal government were substantially in conflict with state law, because the duties in fact ran parallel.**

For its defense to have merit, Metalclad must demonstrate that it was <u>prevented</u> from providing warnings by some federal officer:

> Defendants fail to apprehend the essence of the "under color" causal connection requirement. They are being sued for unnecessarily and negligently causing their employees and other workers to be exposed to asbestos dust on the job and for failing to warn these employees and workers of the associated dangers. **What they must establish for purpose of § 1442(a)(1) is that the government authority under which they worked required them to act as they did. For purposes of Plaintiffs' failure to warn claims, for example, they must establish the DOE's [Department of Energy's] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards.**

*Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp.2d 1144, 1155, (D.Colo. 2002) (emphasis added).

The military contractor defense "is inapplicable to a failure to warn claim in the absence of evidence that in making the decision whether to provide a warning . . . [defendant] was acting in compliance with reasonably precise specifications imposed on it by the United States." *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996). The court went on to assert that "[i]n a failure to warn action, where no conflict exists between any requirements imposed under a federal contract and a state law duty to warn, regardless of any conflict which may exist between the contract and state law design requirements, *Boyle* commands that we defer to the operation of state law." *Id.*

In a failure to warn case there must be a showing of specific requirements with respect to warnings. A defendant is not immune from a failure to warn claim simply by showing the elements of the defense with respect to a design defect claim because "design defect and failure to warn claims differ practically as well as theoretically" *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996). Metalclad must but has not made a showing that it received "reasonably precise specifications" with respect to warnings from the U.S. Navy. *Butler*, 89 F.3d at 586.

In *Faulk v. Owens-Corning*, the United States District Court for the Eastern District of Texas addressed this exact issue. *Faulk v. Owens-Corning*, 48 F.Supp.2d 653 (E.D. Tex. 1999). In

10

1    *Faulk*, the Court stated that "the federal government had provided no direction or control on

2    warnings when using asbestos; moreover, the government did not prevent Metalclad from taking its

3    own safety precautions heeding state law standards above the minimum standards incorporated in

4    their federal contracts. *Id.* at 663. There was evidence of detailed government specifications

5    relating to the production of certain products, but nothing about warnings related to the hazards of

6    asbestos. *Id.* at 664.

7         Other circuit courts that have addressed the application of the *Boyle* factors in failure-to-

8    warn cases has concluded that the government contractor defense is only available when the

9    contractor's warning conforms to one that the government at least approved, if not dictated. *E.g.*,

10   *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000).

11        In *Kerstetter*, the Fifth Circuit held that state law is only displaced in a failure-to-warn

12   claim if: (1) the government exercised its discretion and approved the particular warnings, if any;

13   (2) the contractor provided warnings that conformed to the approved warnings; and (3) the

14   contractor warned the government of the dangers in the equipment's use about which the contractor

15   knew, but the government did not. *Id.* at 438.

16        The Court's conclusion in *Kerstetter* was in accord with an earlier opinion in *In re Air

17   Disaster at Ramstein Air Base*, 81 F.3d 570 (5th Cir. 1996). In that case, the Fifth Circuit held that

18   a contractor is entitled to the defense in a failure-to-warn case only if it establishes "an identifiable

19   federal interest or policy in the existence or methods of warning and a significant conflict between

20   the federal interest or policy and the operation of state law." *Id.* at 576. The Court concluded that,

21   based on the evidence presented, it could not determine whether the government exercised

22   sufficient discretion with respect to a warning to bring the plaintiffs' claim within the scope of

23   *Boyle* because (like Metalclad) the defendants had not presented any evidence to establish whether

24   they and the government were involved in any discussions about warnings. *Id.* The Fifth Circuit

25   clearly requires a contractor to prove that the government exercised some discretion over a warning

26   before a contractor can seek the solace of the military contractor defense in a failure-to-warn case.

27        This is precisely the case here. Metalclad has presented absolutely *zero evidence* that it

28   ever had any discussions with the Navy about asbestos warnings.

---

11

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

1    The Sixth and Seventh Circuits also require defendants to present evidence that the

2   government exercised discretion over a warning before the government contractor defense will bar

3   a failure-to-warn claim, even if the defendant would be immune from a design defect claim.  In

4   *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156-1157 (6th Cir. 1995), the Sixth Circuit explained:

5   "Simply because the government exercises discretion in approving a design does not mean that the

6   government considered the appropriate warnings, if any, that should accompany the product."

7    Likewise, the Seventh Circuit, as noted earlier, confirmed that a defendant may not defeat a

8   state failure-to-warn claim simply by showing the elements of the government contractor defense

9   with respect to a design defect claim because "design defect and failure to warn claims differ

10   practically as well as theoretically."  *Oliver*, 96 F.3d at 1003.  Accordingly, both Courts of Appeals

11   applied the same modified *Boyle* factors used by the Fifth Circuit in *Kerstetter*).

12    Applying these factors in cases involving asbestos, other Courts of Appeals have been in

13   accord.  The Ninth Circuit held that a defendant-contractor was not entitled to protection under

14   *Boyle* because it produced no evidence that the government required it to do anything with respect

15   to warnings on its products.  *See In re Hawaii*, *960* F.2d at 806-813.  Likewise, the Second Circuit

16   has held in asbestos cases that state law cannot be displaced where there is no evidence that the

17   government contractor could not comply with both its contractual obligations to manufacture

18   asbestos-containing products and its state-prescribed duty to warn of the hazards of asbestos dust.

19   *In re Joint Eastern and Southern Dist. N.Y. Asbestos Litigation*, 897 F.2d 626, 626-32 (2nd Cir.

20   1990).

21    The fundamental tenet underlying the *Boyle* doctrine is that state law should not be

22   preempted when the state law duty sought to be imposed on a contractor is not contrary to a duty

23   assumed under a government contract.  *See Boyle*, 487 U.S. at 508-509.  Borrowing the *Boyle*

24   Court's example, if the government contracted to purchase an air conditioner, specifying the

25   cooling capacity but not its precise construction, a state law imposing a duty upon the manufacturer

26   to include certain safety features (e.g., a warning) would not be contrary to the contractor's duty

27   under the contract.  *Id.* at 509.  "The contractor could comply with both its contractual obligations

28   and the state-prescribed duty of care."  *Id.*

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

Metalclad is unable to identify a military specification relevant to the Unibestos preventing Metalclad (or PCC) from issuing warnings about asbestos hazards. Metalclad is unable to provide a single witness, having personal knowledge, who will say that the U.S. Navy prevented Metalclad from ever providing warnings about asbestos hazards. Metalclad cannot show evidence that it ever tried to warn the U.S. Navy, or even that any other supplier of asbestos-containing products to the U.S. Navy tried to provide warnings and was rebuffed. Metalclad cannot show evidence that it ever asked permission from the U.S. Navy to provide warnings, and was rebuffed.

Metalclad's only evidence that it could not have warned the U.S. Navy is Mr. Heflin's conclusory declaration that it is "highly unlikely" Metalclad (or PCC) would have been permitted to provide warnings that contradicted military specifications. Exh. 2, ¶ 9N. But those allegedly-contradictory military specifications are never identified. Metalclad has had decades to research the question of which military specifications allegedly prevented it from issuing warnings, but has nothing to show the Court.

Because Metalclad cannot offer any evidence, beyond Mr. Heflin's unsupported conjecture, in support of the false claim that it was prevented, by the U.S. Navy, from giving warnings about the health hazards of asbestos—of which the U.S. Navy was not even fully aware at the time—their defense to any of plaintiffs' causes of action based on a failure to warn is baseless and therefore cannot serve as the basis for federal jurisdiction.

In fact, Metalclad's duties to the federal government were not in conflict with its state law duties to warn. Metalclad's duty to the federal government was to provide warnings as to any subject in which Metalclad had superior knowledge, including the hazards of asbestos. Where state law standards are not in conflict with the directions of federal officers, no military contractor's defense exists. *Boyle*, 487 U.S. at 507. Metalclad has no evidence that state law duties to warn conflicted with their responsibilities to the federal government. Metalclad's state law duties to warn ran parallel with its obligations to the U.S. Navy—and it failed both of them.

/ /

/ /

/ /

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

**C.     Metalclad and Pittsburgh Corning Corporation were not acting under a federal official when the Unibestos was being manufactured or tested.**

The third element Metalclad has the burden to show is that it was acting under a federal official with regard to the events giving rise to the federal defense.  But it cannot demonstrate this element, because Metalclad and Pittsburgh Corning Corporation's actions never went beyond manufacturing a product while federal agents watched, and allowing their manufactured product to be tested by federal agents.  Those actions alone are insufficient to meet this element.

In *Watson v. Philip Morris*, the court held that a private firm's compliance with federal laws, rules, and regulations <u>does not by itself</u> fall within the scope of the statutory phrase "acting under" a federal "official," even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.  *See Watson v. Philip Morris Companies*, 551 U.S. 142 (2007).  In *Hilbert v. McDonnell Douglas Corp.*, the court explained that the federal officer removal statute was never intended to make it easy for military contractors to gain access to federal courts and thus get cases in Multi-District Litigation ("MDL").  The court opined that "[a]n overly generous interpretation of the *Mesa* [*v. California*, 489 U.S. 121 (1989)] criteria would do just that by permitting private, non-diverse defendants to remove to federal court merely because of their status as government contractors."  *See Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187 (D.Mass. 2008).

This reasoning is consistent with the long held truism that federal courts are courts of <u>limited</u> jurisdiction.  As the United States Supreme Court noted, "[f]ederal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree . . . .  It is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction" *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) [citations omitted].  The presumption of a cause lying outside the limit of the jurisdiction of the federal courts is the basis for the widely held policy of finding for remand.  *See New Jersey Department of Environmental Protection v. Exxon Mobil Corp.*, 381 F.Supp.2d 381, 402-403 (D.N.J. 2005); *Entrekin v. Fisher Scientific Inc.*, 146 F.Supp.2d 594, 604 (3d Cir. 2001) [The federal court is

14

1    obligated to "strictly construe any removal statutes against removal and in favor of remand"]; *Gaus*

2    *v. Miles, Inc.*, 980 F.2d. 564, 566-67 (9th. Cir. 1992) [Courts ruling on motions to remand must

3    resolve any doubt in favor of remand]; *Vasquez v. Alto Bonito Gravel Plant Corp.*, 56 F.3d 689,

4    694 (5th Cir. 1995); *Texas First Nat. Bank v. Wu*, 347 F.Supp.2d 389, 394 (S.D. Tex. 2004).

5         It is true that the Federal Officers' Removal Statute is to be construed broadly and doubts

6    are to be resolved in favor of the removing party. *Durham v. Lockheed Martin Corp.*, 445 F.3d

7    1247, 1253 (9th Cir. 2006). However, in this case, there is no doubt. The facts are clear, from the

8    evidence presented above, that the actions of Metalclad and PCC never went far enough to meet the

9    third element (action under a federal official). Therefore, vacatur is proper.

10       **D.    Defendant cannot demonstrate a causal nexus between any actions it took
11              under the direction of a federal officer and harm to the plaintiff for which
              plaintiffs seek relief.**

12       The Fourth Element that Metalclad must show to prevent remand is the existence of a

13   causal nexus between Metalclad's actions under color of federal office, and the Plaintiffs' injuries.

14   Metalclad cannot show this because, as established above, it was not acting under color of federal

15   office (the Third Element).

16

17       **E.    The activities of Metalclad and Pittsburgh Corning Corporation were not of
              such an official nature that removal is warranted.**

18       The fifth, and final, element that Metalclad must show to prevent remand is that its acts

19   were of such an official nature that removal would be warranted to ensure the protection of federal

20   interests and immunities from suit afforded by this Court. *See Williams v. General Electric Co.*,

21   418 F.Supp.2d 610 (M.D. Penn. 2005).

22       Military contractors are immunized from liability under state tort law if: (1) the United

23   States approved reasonably precise specifications; (2) the equipment conformed to those

24   specifications; and (3) the supplier warned the United States about the dangers in the use of the

25   equipment that were known to the supplier but not to the United States. *Boyle*, 487 U.S. at 512.

26   The Ninth Circuit noted that in actions involving asbestos used in the construction of naval ships, a

27   defendant must show that "in making [its] decisions regarding warnings [it was] acting in

28   compliance with 'reasonably precise specifications' imposed on [it] by the United States." *In re*

1   *Hawaii*, 960 F.2d at 813.   The test was clarified in *Overly v. Raybestos-Manhattan* that in order to

2   "meet the *Boyle* test in a failure to warn case, the defendant must show that the government

3   affirmatively instructed it regarding the provisions of warnings."   1996 WL W532150 at *4.

4   　　　Thus the federal officer defense trumps state law <u>only</u> "when the Government, making a

5   discretionary, safety-related military procurement decision contrary to the requirements of state

6   law, incorporates this decision into a military contractor's contractual obligations, thereby limiting

7   the contractor's ability to accommodate safety in a different fashion."   *In re Hawaii*, 960 F.2d at

8   813.

9   　　　In this case, Pittsburgh Corning Corporation's actions in manufacturing stock Unibestos,

10   identical to every other piece of Unibestos ever manufactured by PCC (except insofar as the

11   dimensions varied depending on the diameter of the pipe to be covered and the thickness of the

12   insulation), were not of such an official character as to warrant removal.   PCC's actions were the

13   exact same actions that it took when manufacturing Unibestos for private customers, based on the

14   same stock numbers, and were not of an official nature.   Therefore, federal subject matter

15   jurisdiction does not exist.

16   　　　In this case, Metalclad's actions in failing to provide warnings to the U.S. Navy of the

17   hazards of asbestos were not of such an official nature that removal is warranted.   Metalclad claims

18   that it was prevented from issuing warnings as to the hazards of asbestos by the U.S. Navy.   Exh. 1

19   at 10:27-11:4; Exh. 2, ¶ 9N, at 10:3-12.   However, Metalclad has provided no evidence whatsoever

20   to back up these claims.   Metalclad has not, and cannot, produce a single relevant military

21   specification which prevented it from providing warnings in conjunction with the Unibestos

22   supplied to Mare Island Naval Shipyard.   *See Id.*   Metalclad has not, and cannot, produce any

23   evidence that it ever asked the U.S. Navy for permission to include warning labels as to the hazards

24   of asbestos.   These are not official-type actions worthy of the protections in the Federal Officers'

25   Removal Statute (28 U.S.C. § 1442(a)(1) ).   Therefore, federal subject matter jurisdiction does not

26   exist.

27   //

28   //

---

16

PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

**F.** **This case should not be transferred to MDL-875 until open questions as to subject matter jurisdiction have been resolved by the U.S. District Court.**

Federal Courts have an affirmative obligation to determine whether subject matter jurisdiction exists in every case: "the duty devolves upon the court 'at any time' the jurisdictional question is presented to proceed no further until that question is determined." *Page v. Wright*, 116 F.2d 449, 453 (7th Cir. 1940), *cert dismissed* 312 U.S. 710 (1941). A Federal Court is always required to examine its own jurisdiction. *United States ex rel. Esola v. Groomes*, 520 F.2d 830 (3rd Cir. 1975); *Howard v. Lemmons*, 547 F.2d 290 (5th Cir. 1977); *Rice v. Rice Foundation*, 610 F.2d (7th Cir. 1979). When a party's allegation that subject matter jurisdiction exists is challenged, the Court is compelled to make further inquiry as to its jurisdiction in the matter. *Opelika Nursing Home, Inc. v. Richardson*, 448 F.2d 658 (5th Cir. 1971).

Because the District Court in this case has declined to hear Plaintiffs' Motion to Remand pending a decision by this Panel, it is for this Panel to decide whether Plaintiffs' Motion to Remand should be decided at the U.S. District Court level or in MDL-875. *Medical Soc'y v. Conn. Gen. Corp.*, 187 F. Supp. 2d 89, 91 (S.D.N.Y. 2001), citing *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044, 1046-47 (E.D.Wisc. 2001) and *Aikins v. Microsoft Corp.*, 2000 U.S. Dist. LEXIS 4371, *1 (E.D.La. 2000). Transfer, without resolving the question of subject matter jurisdiction, would force the MDL-875 to make that determination. *Id.*

It is proper for the JPML to ask an MDL to resolve questions of subject matter jurisdiction where to do so would require the resolution of questions of fact and law that are common to the cases of the MDL. *Id.* But the opposite is true if the questions related to the existence of subject matter jurisdiction are not common to other cases in the MDL. *See Id.* Requiring J. Robreno to stop conducting the general business of MDL-875 in order to resolve Plaintiffs' Motion to Remand would not be an efficient use of judicial resources. Therefore, CTO-328 should be vacated as to this action so that the determination can be made at the District Court level.

## IV. CONCLUSION

Metalclad's Removal of this action to federal court was improper, because Metalclad lacks a colorable federal defense. Because Metalclad is unable to meet its burden show all five elements

17

1  to prevent remand, CTO-328 should be vacated as to Plaintiffs' action.

2      Metalclad removed this case to federal court based on its brokerage of the sale of readily-

3  available, stock commercial merchandise. The Unibestos manufactured by Pittsburgh Corning

4  Corporation never varied in terms of design, composition, or manufacture, except with regard to

5  the dimensions of the pipe it was to cover and the desired thickness of the insulation. There was

6  nothing special about the Unibestos that exposed Mr. Kollar to asbestos fibers at the Mare Island

7  Naval Shipyard. Any private corporation could have made the same purchase, had it identified the

8  same stock numbers.

9      Metalclad cannot meet the second element to prevent remand (the existence of a colorable

10  federal defense) because there is no doubt that Unibestos was a readily-available commercial

11  product, and therefore, not military equipment. *In re Hawaii*, 960 F.2d at 811. With regard to its

12  failure to provide warnings, Metalclad cannot show a colorable federal defense, because it was

13  never prevented from issuing warnings. It has no evidence that it tried to issue warnings, or that it

14  discussed warnings with the federal government.

15      Metalclad cannot meet the third element to prevent remand, because it was not acting under

16  the direction of a federal official when it brokered the purchase from Pittsburgh Corning

17  Corporation of readily-available Unibestos. Metalclad probably picked PCC's stock numbers out

18  of a catalog. Nor was PCC acting under the direction of a federal official when it produced its

19  standard Unibestos, following standard procedures, while federal officials watched. PCC was not

20  acting under the direction of a federal official when the Unibestos was tested for compliance with

21  MIL-I-24244.

22      Metalclad cannot meet the fourth element to prevent remand, which is to show a causal

23  nexus between its actions under the direction of a federal officer and the harm for which plaintiffs

24  seek relief. Metalclad and PCC were not acting under the direction of a federal officer.

25      Metalclad cannot meet the fifth element to prevent remand, because its activities were not

26  of such an official nature that the federal government has an interest in protecting them. The

27  activities of Metalclad and PCC in brokering a sale, producing standard, readily-available

28  commercial products, and in failing to issue warnings, were not official-type activities. The federal

18

1    government has no interest in shielding Metalclad from liability in this instance.

2          Metalclad seeks the protections of the Federal Officers' Removal Statute for common

3    commercial activities.  Brokering the sale of stock commercial products, readily available to—and

4    commonly sold to—private buyers is not a special federal activity.  Common, commercially-

5    available stock asbestos insulation is not "military equipment."  *In re Hawaii*, 960 F.2d at 811.  The

6    Federal Officers' Removal Statute was never intended to protect those activities, and the federal

7    government has no interest in shielding Metalclad from liability for its tortious actions.  *Id.*

8    Therefore, the federal courts lack subject matter jurisdiction over this case.

9          The determination of whether subject matter jurisdiction exists should be made at the

10   District Court level.  To transfer this case to MDL-875 would disrupt the proceedings of the MDL

11   and would not promote judicial economy.  This Panel has the power to vacate CTO-328 as to this

12   action, so that the determination of whether subject matter jurisdiction exists will be made at the

13   District Court level.

14

15   DATED:  December ___, 2009                    Respectfully submitted,

16                                                 BRENT COON & ASSOCIATES

17

18                                    By:  _____

19                                         CECIL B. CRAIN
                                           Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

_____
                                    19
              PLAINTIFFS' MOTION TO VACATE CTO-328 AND SUPPORTING BRIEF

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 4 2009

FILED
CLERK'S OFFICE

1   Richard A. Brody, Esq. (SBN 100379)
    Cecil B. Crain, Esq. (SBN 252780)
2   BRENT COON & ASSOCIATES
    44 Montgomery Street, Suite 800
3   San Francisco, CA  94104
    Telephone:  415.489.7420
4   Facsimile:   415.489.7426

5   Attorneys for Plaintiffs

6

7

8

9                                **DOCKET NO. 875**

10     **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11       **IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

12

13

14   This document relates to:       *Myrtes Faye Kollar, et al., v. Metalclad Insulation Corp., et al.*

15                             N.D. California, C.A. No. 3:09-5106

16

17

18

19

20

21

22

23

24

25

26

27

28                                    1

DECLARATION OF CECIL B. CRAIN, ESQ. IN SUPPORT OF
PLAINTIFFS' MOTION TO VACATE CTO-328

## DECLARATION OF CECIL B. CRAIN IN SUPPORT OF
## PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-328)

I, Cecil B. Crain, do declare and state:

1.      I am an attorney at law duly licensed to practice before all the courts in the state of California as well as the United States District Court for the Northern District of California and the Ninth Circuit Court of Appeal and am associated with the law firm of Brent Coon & Associates, counsel of record for plaintiffs Myrtes Faye Kollar, Dianne L. Caron, and Linda A. Heath, herein. I make this declaration in support of Plaintiffs' Motion to Vacate CTO-328.  Unless otherwise stated, I have personal knowledge of the following matters and could, if called to do so, testify competently thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Metalclad Insulation Corporation's Notice of Removal to Federal Court Pursuant to 28 U.S.C. § 1442(a)(1) (Federal Officer), filed in this action on October 27, 2009.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the Declaration of Dan H. Heflin, Jr., P.E. in Support of Metalclad Insulation Corporation's Notice of Removal Pursuant to 28 U.S.C. § 1442(a)(1) (Federal Officer), filed in this action on October 27, 2009 (hereinafter, the "Heflin Decl.").  Relevant passages have been marked.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of Award/Contract N000445-69-C-0137, confirming Award Notice dated August 3, 1968.  Exhibit 3 was attached to the Heflin Decl. as Exhibit 1.  The pages labeled "Continuation Sheet" are marked.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of correspondence between Pittsburgh Corning Corporation and Mare Island Naval Shipyard regarding a shipment of Unibestos.  Exhibit 4 was attached to the Heflin Decl. as Exhibit 3.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the Response of Pittsburgh Corning Corporation to Plaintiff's Standard Interrogatories (revised General Order 129), verified by Richard C. McPherson on June 2, 1997.

/ /

DECLARATION OF CECIL B. CRAIN, ESQ. IN SUPPORT OF
PLAINTIFFS' MOTION TO VACATE CTO-328

7.      A full version (not just excerpts) of Exhibit 5 was attached to the Declaration of Felicia Y. Feng in Support of Notice of Removal Pursuant to 28 U.S.C. § 1442(a)(1) (Federal Officer), filed in this action on October 27, 2009 (hereinafter, the "Feng Decl."), as Exhibit J.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts of the Response of Pittsburgh Corning Corporation to Plaintiff(s) Master Set of Interrogatories and Requests for Admissions, verified by Robert E. Buckley on December 21, 1982.  A full version of Exhibit 6 was attached to the Feng Decl. as Exhibit K.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts of Response of Pittsburgh Corning Corporation to Plaintiffs' Master Interrogatories and Requests for Production, verified by Richard C. McPherson on May 23, 1994.  A full version of Exhibit 7 was attached to the Feng Decl. as Exhibit L.  Relevant passages have been marked.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of excerpts of the deposition of Robert Buckley, dated February 7, 1980 in the matter of *Dorothy St. Jacque, et al. v. Johns-Manville Products Corporation, et al.*, Los Angeles Superior Court case no. C 137 465.  Exhibit 8 is a subset of the excerpts that were attached to the Feng Decl. as Exhibit M.  Robert E. Buckley testified that he was a Vice President at Pittsburgh Corning Corporation.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of an excerpt of Wilfred Newton's trial testimony in *Alma Sanders, et al., v. Abex Corp., et al.*, San Francisco Superior Court case no. 966458, on April 29, 1998.  Exhibit 9 is a subset of the excerpts that were attached to the Feng Decl. as Exhibit P.  Please note that the page numbers are not visible.  However, Plaintiffs cite to only a single page.  Relevant passages have been marked.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION TO REMAND CASE TO STATE SUPERIOR COURT [Docket No. 15], entered November 24, 2009 in the U.S. District Court.

/ /

/ /

/ /

3

1       I declare under penalty of perjury under the laws of the state of California that the foregoing

2   is true and correct, except as to any matters stated on information and belief, and as to those

3   matters, I believe them to be true.

4       Executed this 30th day of November, 2009, at San Francisco, California.

5

6                        CECIL B. CRAIN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CECIL B. CRAIN, ESQ. IN SUPPORT OF
PLAINTIFFS' MOTION TO VACATE CTO-328

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 4 2009

FILED
CLERK'S OFFICE

# EXHIBIT 1

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 1

1   LISA L. OBERG (BAR NO. 120139)
    loberg@mckennalong.com
2   FELICIA Y. FENG (BAR NO. 184346)
    ffeng@mckennalong.com
3   MCKENNA LONG & ALDRIDGE LLP
    101 California Street
4   41st Floor
    San Francisco, CA  94111
5   Telephone:    (415) 267-4000
    Facsimile:    (415) 267-4198
6
    Attorneys for Defendant
7   METALCLAD INSULATION CORPORATION

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  MYRTES FAYE KOLLAR, individually;        CASE NO.
    and DIANNE L. CARON and LINDA A.
12  HEATH, individually and as Co-Trustees    **NOTICE OF REMOVAL TO FEDERAL**
    of the Kollar Family Trust Dated May 9,   **COURT PURSUANT TO 28 U.S.C. §**
13  2002,                                     **1442(a)(1) (FEDERAL OFFICER)**

14            Plaintiffs,

15       v.

16  ALLIED PACKING & SUPPLY, INC., et
    al.,
17
              Defendants.
18

19

20       Defendant METALCLAD INSULATION CORPORATION (hereinafter "Metalclad")

21  hereby gives notice of the removal of the above-entitled action from the Superior Court of the

22  State of California, County of San Francisco, to the United States District Court for the Northern

23  District of California, San Francisco Division, pursuant to 28 U.S.C. § 1442(a)(1).  In support of

24  its removal, Metalclad respectfully offers the following:

25

26

27

28

# I.
## JURISDICTIONAL GROUNDS FOR REMOVAL

1.      Removal of this case is proper pursuant to 28 U.S.C. §1442(a)(1) as this is a civil action commenced in a state court against the United States or agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office.

2.      Original federal jurisdiction is not required for removal pursuant to 28 U.S.C. § 1442(a)(1). *See Willingham v. Morgan*, 395 U.S. 402, 406 (1969) ("the right of removal under § 1442(a)(1) is made absolute whenever a suit in state court is for any act "under color" of federal officer, regardless of whether the suit could originally have been brought in federal court."); *Jefferson County v. Acker*, 527 U.S. 423 (1999) (under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint).

# II.
## INTRADISTRICT ASSIGNMENT AND VENUE

3.      On August 11, 2008, a civil action was commenced against Metalclad and other defendants with the filing of Plaintiffs' Complaint for Damages (Wrongful Death - Asbestos) ("Complaint") in *Myrtes Faye Kollar, et al. v. Allied Packing & Supply, Inc.*, Case No. CGC-08-274794 (Superior Court, San Francisco County, California).

4.      A substantial number of defendants named in the Complaint are alleged to have regularly conducted business in the County of San Francisco.

5.      Pursuant to Civil Local Rule 3-2(d), all civil actions arising in San Francisco County shall be assigned to the San Francisco Division or the Oakland Division of the Northern District of California.  Venue is proper in the San Francisco Division of the Northern District Court of California because the underlying state court action was filed in the Superior Court of California for the County of San Francisco and all parties are subject to personal jurisdiction in this District.

6.      On September 28, 2009, Plaintiffs served Metalclad with the Summons and Complaint.  In their Complaint, Plaintiffs seek damages for wrongful death (mesothelioma)

1   sustained by Albert Kollar due to his alleged exposure to asbestos while working as a draftsman

2   at Mare Island Naval Shipyard in Vallejo, California from 1939 to 1941 and 1945 to 1973 and as

3   a warrant office for the United States Navy (Active Duty and Reserves) from 1941 to 1977. *See*

4   Summons and Complaint attached Exhibit A to the Declaration of Felicia Y. Feng ("Feng Decl."),

5   which reflects a true and correct copy of all process, pleadings, and orders in the State Court

6   Action that have been served upon Metalclad, as required by 28 U.S.C. § 1446(a).

7       7.      Metalclad is filing this Notice of Removal within thirty (30) days of the service of

8   Plaintiffs' Complaint, and thus removal is timely under 28 U.S.C. § 1446(b).

9       8.      Whereas all defendants must consent to removal under 28 U.S.C. § 1441, a federal

10  officer or agency defendant can unilaterally remove a case under 28 U.S.C. § 1442. *See Ely*

11  *Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

12  Therefore, removal of this case under Federal Officer Removal is timely and appropriate.

13
                                    **III.**
                    **PURSUANT TO 28 U.S.C. § 1442(A)(1)**
14          **REMOVAL IS PROPER ON FEDERAL OFFICER GROUNDS**

15      9.      As stated above, this case is properly removed under 28 U.S.C. § 1442(a)(1), as

16  this is a civil action commenced in a State court against the United States or agency thereof or

17  any officer (or any person acting under that officer) of the United States or any agency thereof,

18  sued in an official or individual capacity for any act under color of such office. Metalclad has a

19  federal defense to this action, *i.e.*, government contractor immunity from liabilities for injuries

20  arising from any exposure to asbestos-containing thermal insulation from a shipment that it

21  brokered that was used by the United States Navy on board Navy vessels.

22      10.     Metalclad is a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *See Fung*

23  *v. Apex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992) (finding that a corporate defendant was a

24  "person").

25      11.     Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party

26  can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable

27  federal defense to plaintiff's claims, and (3) demonstrate a causal nexus between plaintiff's

28  claims and acts it performed under color of federal office. *See Mesa v. California*, 489 U.S. 121

1   (1989) (setting forth elements of federal officer removal); *Boyle v. United Technologies Corp.*,

2   487 U.S. 500 (1988) (discussing government contractor defense); *Ballenger v. Agco Corp.*, 2007

3   WL1813821 (N.D. Cal. 2007) (upholding removal where alleged asbestos exposure occurred on

4   Navy ship); *Fung v. Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1993) (upholding removal where

5   alleged asbestos exposure occurred in Navy shipyard and submarine); *Ferguson, et al., v.*

6   *Lorillard Tobacco Co., et al.*, 475 F.Supp.2d 725 (N.D. Ohio 2007) (upholding removal where

7   alleged asbestos exposure occurred aboard Navy ship); *Nesbiet v. General Electric Col, et al.*,

8   399 F.Supp.2d 205 (S.D.N.Y. 2005) (upholding removal where alleged asbestos exposure

9   occurred in Navy shipyard); *Pack v. AC and S, Inc., et al.*, 838 F.Supp. 1099 (D.Md. 1993)

10  (upholding removal where alleged asbestos exposure occurred in Navy Shipyard).

11        12.     Metalclad has satisfied all of the three requirements and is entitled to remove the

12  instant action.

13        13.     All of the actions attributed to Metalclad, as alleged in Plaintiffs' Complaint, were

14  performed by Metalclad under the direction of federal officer, specifically under the direction,

15  control, and supervision of an officer or agency of the United States Navy within the meaning of

16  28 U.S.C. § 1442(a)(1).  Plaintiffs' Complaint indicates that Mr. Kollar worked as a draftsman at

17  Mare Island Naval Shipyard in Vallejo, California from 1945 to 1973.  In December of 1968,

18  Metalclad brokered a shipment of Unibestos thermal insulation from Pittsburgh-Corning's Tyler,

19  Texas, facility to the nuclear division of Mare Island for use in the reactor compartment of the

20  USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado*.  *See* Exhibit ("Exh.") 1

21  to attached to Declaration of Dan H. Heflin, Jr. ("Heflin Decl."); Exh. B attached to Feng Decl.

22  The Navy independently solicited this procurement of Unibestos for a specified use aboard these

23  submarines and that procurement was governed by a Navy contract.  *See* Heflin Dec., ¶¶ 10-14;

24  Exh. 1 to Heflin Decl.  The award contract set forth specifications that mandated Naval oversight

25  during production, identified where the Unibestos would be used, and, set forth the testing and

26  verification requirements that were to be met prior to it being used in Naval Service.  *Id.*

27        14.     Metalclad has a colorable federal defense to Plaintiffs' claims pursuant to the

28  "government contractor defense."  Liability for design defects in military equipment is prohibited

1    under state law where:  (1) the United States reasonably approved precise specifications; (2) the

2    equipment conformed to those specifications; and (3) the supplier warned the United States about

3    the dangers in the use of the equipment that were known to the supplier, but were not known to

4    the United States.  *Oxford v. Foster-Wheeler*, 177 Cal.App.4th 700 (2009); *Boyle v. United*

5    *Technologies Corp.*, 487 U.S. 500, 512 (1988).  California courts have applied the "government

6    contractor defense" to government-purchased products that satisfy the three elements of the

7    defense, even if similar products are available commercially.  *See Oxford*, 177 Cal.App.4th at

8    709-711 (2009); *Jackson v. Deft, Inc.*, 223 Cal.App.3d 1305, 1319 (1990) ("if a product is

9    produced according to military specifications and used by the military because of particular

10   qualities which serve a military purpose, and is incidentally sold commercially as well, that

11   product may nonetheless still qualify as military equipment under the military contractor

12   defense").

13       15.    The officers of the United States Navy approved reasonably precise specifications

14   of the Metalclad-brokered shipment of Unibestos for use in the reactor compartment of the USS

15   *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado*.  In fact, as early as January,

16   1936, the Navy commissioned a 30-day study to determine Unibestos' suitability for use in the

17   Naval Service.  *See* Exh. 8 attached to Heflin Decl.; Heflin Decl., ¶¶ 12-13.  As a result of that

18   study, the Navy concluded that: (a) Unibestos had satisfactory heat insulating properties; (b) that

19   a desirable property of Unibestos for Naval Service use was its light weight; (c) that it was

20   questionable whether or not Unibestos possessed sufficient stability for use in the Naval Service;

21   and, (d) that a 6-month service study was necessary to determine the stability of Unibestos.  *Id.*

22   On July 7, 1936, the Navy authorized another study to determine the suitability of Unibestos for

23   use in the Naval Service at high temperatures.  *See* Exh. 9 attached to Heflin Decl.; Heflin Decl.,

24   ¶¶ 12-13.  The results of that study were issued on December 16, 1937, and found that Unibestos'

25   heat insulating properties and light weight were desirable for use in Naval Service.  *Id.*  The

26   December 15, 1936 appearance of Unibestos on restricted Navy specifications indicates the Navy

27   immediately put it into use for Naval Service.  *See* Exhs. C through I to Feng Decl.  The Navy

28   continued using Unibestos throughout the 1930s, the 1940s, and the 1950s and it remained on the

Navy's Qualified Products List ("QPL") for the Metalclad-brokered shipment at issue here. *Id.* Pittsburgh Corning did not begin manufacturing Unibestos until July 1, 1962 when it purchased selected assets from Union Asbestos & Rubber Co. – some 26 years after the Navy became involved with Unibestos and at least 26 years after Unibestos appeared on a Navy's QPL. *See* Exhs. J through M to Feng Decl.

16.     The Navy maintains a strict inspection program to assure that vendors comply with all government specifications. *See* Heflin Decl., ¶ 9E-H. To carefully control the products used and to ensure they meet the precise requirements necessary for their intended end use, the Navy maintains separate procurement and requirement departments. *See* Heflin Decl., ¶ 9I. All nuclear products and all non-nuclear products were procured through separate departments and access to nuclear products was prohibited by non-nuclear personnel. *Id.* The Navy also maintained separate specifications for thermal insulation and approved all such thermal insulation produced for the Navy. *See* Heflin Decl., ¶ 9H.

17.     Before a manufacturer like Pittsburgh Corning received authorization to manufacture materials such as thermal insulation for use by the Navy, all of the design documentation had to first be inspected by the Navy. *See* Heflin Decl., ¶ 9F. The Navy had superior knowledge of the demands and requirements of combat-ready vessels and this knowledge required Naval control of military specifications. *See* Heflin Decl., ¶ 9G. Military specifications address all aspects of shipboard equipment and materials requirements, including whether the product contained asbestos and reflect the state of the art and the special needs of the Navy's combat vessels. *Id.* Further, the Navy had unique specifications for thermal insulation used aboard nuclear grade submarines and these specifications were communicated to outside vendors, including Pittsburgh Corning, by the Navy in Requests for Proposals for certain equipment and materials. *See* Heflin Decl., ¶ 9H.

18.     A QPL pre-qualifies certain vendors to produce certain frequently used Navy-approved products, but a QPL provides a base specification only and does not guaranteed a product was suitable for use on every Navy application. *See* Heflin Decl., ¶ 9I-J. To accommodate the Navy's particular combat design interests for specific vessels or classes of

1  vessels, the Navy often requires products appearing on a QPL to meet even stricter performance

2  requirements than those specified by the range of performance parameters allotted for by the QPL

3  alone. *Id.* In that instance, the Navy creates additional, separate specifications to guarantee the

4  product meets the exact performance parameter required at all times throughout the entire life of

5  the vessel. *See* Heflin Decl., ¶ 9L. The award contract relating to the Metalclad-brokered

6  shipment of Unibestos required compliance with MIL-I-24244; thus, this production had to meet

7  stricter requirements than the Navy's QPL. *See* Exhs. 1 and 3 to Heflin Decl.; Exh. I to Feng

8  Decl.; Heflin Decl., ¶¶ 10-14. In short, stock Pittsburgh Corning Unibestos from the QPL would

9  not have qualified for use on the USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS

10  *Pintado* because it would not have met the Navy's corrosion and chemical specifications. *See*

11  Heflin Decl., ¶¶ 10-14; Exhs. 1, 3 and 5 to Heflin Decl.; Exh. I to Feng Decl.

12        19.     The Metalclad-brokered shipment of Unibestos was qualified for use on the

13  submarines only because it was subject to additional corrosion, mercury, chloride and fluoride

14  analyses in accordance with MIL-I-24244 (Ships), a specification above and beyond what was

15  required by the QPL. *See* Heflin Decl., ¶¶ 10-14; Exhs. 1, 3 and 5 to Heflin Decl.; Exh. I to Feng

16  Decl. MIL-I-24244 is a unique military specification entitled Insulation Material With Special

17  Corrosion, Chloride and Fluoride Requirements (ISSE Controlled Further Dissemination Only As

18  Directed By NAVSEA System C-9B2). *See* Exh. 5 to Heflin Decl.; Heflin Decl., ¶¶ 10-14.

19  MIL-I-24244 is a highly classified document, accessible only by persons in the Naval Sea

20  Systems Command or by the procuring agency, that specifies corrosion, chloride and fluoride

21  requirements above and beyond what is provided for by the QPL. *Id.* Attempts to obtain certified

22  copies of MIL-I-24244 from the National Archives (NARA) have not been successful. *See*

23  Exh. 5 to Heflin Decl.; Heflin Decl., ¶ 14. A search by a contracted archivist of unclassified files

24  at NARA did not locate that specification. *Id.* Since the specification was originally classified

25  but since declassified, it is likely that NARA records of it are still on file in one of the many

26  storage boxes containing classified materials. *Id.* Thus, because of the original classification of

27  MIL-I-24244, it cannot be reasonably obtained from NARA. *Id.* The fact that MIL-I-24244 was

28  restricted from public dissemination and likely remains with other classified material evidences

1   the Navy's highly sensitive design interests in these submarines. *See* Exh. 5 to Heflin Decl.;

2   Heflin Decl., ¶¶ 10-14. General stock Unibestos insulation supplied pursuant to the QPL only,

3   *i.e.*, not subject to the additional specifications of MIL-I-24244, would not have been appropriate

4   for use given the Navy's express additional requirements invoked for materials intended for use

5   in the nuclear areas of these submarines. *Id.*

6       20.     As a direct result of the loss of the USS *Thresher* due to the piping failure in its

7   nuclear reactor in 1963, the Navy created "The Submarine Safety Certification Program", known

8   as "SubSafe", a program ensuring that every part of a submarine complied with strict

9   specifications. *See* Exhs. N and O to Feng Dec; Exh. 7 to Heflin Decl.; Heflin Decl. ¶ 9D.

10  SubSafe was created to assure that every item affecting the submarine's pressure hull's watertight

11  boundary and/or the ability of the submerged ship to recover from flooding was given

12  significantly upgraded controls. *Id.* The propulsion system is critical to the vessel's recovery

13  capability, and the associated piping is a critical to the propulsion system. *Id.* The insulation

14  applied to that piping must be free of corrosion. *Id.* MIL-I-24244 provides additional

15  requirements assuring freedom from corrosive materials, and is an element of "SubSafe," a key

16  requirement of the specification. *Id.* As such, the Metalclad-brokered Unibestos was

17  manufactured in accordance with precise specifications that were supplied by the Navy.

18      21.     The Metalclad-brokered shipment of Unibestos conformed to military

19  specifications. This shipment of Unibestos was required to and did meet exact corrosion,

20  mercury, chloride and fluoride contamination requirements necessary for use in the submarines'

21  nuclear compartments. *See* Exhs. 1, 3 and 5 to Heflin Decl.; Exh. I to Feng Decl.; Heflin Decl.,

22  ¶¶ 10-14. Prior to production, the Navy required Pittsburgh Corning to conduct exacting

23  chemical analyses following explicit Navy protocol. *See* Exhs. 1, 3 and 5 to Heflin Decl.; Heflin

24  Decl., ¶¶ 10-14. Prior to shipment, the Navy required Pittsburgh Corning to follow step-by-step

25  Navy testing procedures to determine the corrosion cracking capability of that specific shipment

26  of Unibestos in order to meet specification MIL-I-24244. *See* Exhs. 1 and 3 to Heflin Decl.;

27  Heflin Decl., ¶¶ 10-14. The Navy's requirement that Pittsburgh Corning certify this particular

28

McKenna Long &
Aldridge LLP
Attorneys at Law
San Francisco

- 8 -

1   shipment of Unibestos in accordance with MIL-I-24244 demonstrates that the Navy was directly

2   involved with the production of this shipment of Unibestos. *See* Heflin Decl., ¶¶ 10-14.

3         22.   Additionally, the Navy required Defense Contractor Administration Service

4   representatives ("DCAS"), employed by the Navy, to be present at Pittsburgh Corning's

5   production facility during the specified testing and production. *See* Exh. 1 to Heflin Decl.; Heflin

6   Decl., ¶¶ 9M and 11.  DCAS's role was to ensure that Pittsburgh Corning complied with and met

7   the required government specifications during production. *See* Heflin Decl., ¶ 9M. DCAS

8   monitored the testing of the product to ensure that the vendor complied with each and every

9   requirement specified by the Navy's testing procedure. *Id.*  DCAS also independently reviewed,

10  inspected and tested the product prior to shipment.  DCAS served as the on-site "eyes and the

11  ears" of the government and had the final say as to whether the production complied with the

12  Navy's specification. *Id.*  DCAS had the final say as to whether the product cleared for shipment.

13  *Id.*  The Award Contract makes clear that the on-site DCAS at Pittsburgh Corning's facility

14  during this production of Unibestos was required to "witness the [corrosion] test [specified by

15  MIL-I-24244], verify that the procedure [was] followed, and also to personally examine the test

16  specimens . . . ." *See* Exh. 1 to Heflin Decl.; Heflin Decl., ¶ 11.  In addition, the on-site DCAS

17  was required to "verify that [Pittsburgh Corning's] laboratory [was] capable of performing the

18  chemical analysis test" and "to verify that the test results furnished . . . . [were] in fact the ones

19  taken from the lot" which Pittsburgh Corning supplied on the contract. *Id.*

20        23.   Prior to shipping, the Navy required both Pittsburgh Corning and an on-site

21  government inspector to independently certify that this lot of Unibestos met the Navy's exact

22  specifications. *See* Heflin Decl., ¶ 11; Exhs. 1 and 3 to Heflin Decl.  Moreover, once the

23  shipment arrived at Mare Island, it was subject to further inspection and testing by government

24  personnel. *See* Exh. 1 to Heflin Decl.; Exhs. B and P to Feng Decl.; Heflin Decl., ¶ 11.  It was

25  quarantined at MINS until March, 1969, to guarantee that it met the Navy's combat design

26  requirements for these nuclear grade submarines prior to ever being cleared for use. *Id.*  As

27  detailed above, the Navy clearly controlled the manufacture and supply of this lot of Unibestos.

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF REMOVAL TO FEDERAL COURT PURSUANT TO 28 U.S.C. § 1442(A)(1) (FEDERAL OFFICER)

24.     The Navy possessed as much as or more information regarding the dangers of asbestos than did Metalclad during the relevant time periods.  Specifically, the US Naval Medical Bulletin acknowledged that asbestos was a potential human health hazard in 1922, prescribed methods for dealing with dust, and recognized asbestos dust as causing specific physical symptoms.  *See* Exh. Q to Feng Decl.  By 1939, the Navy was conducting medical surveys of workers using asbestos-containing materials.  *See* Exh. R to Feng Decl.  In the early 1940s, the Navy and the United States Maritime Commission jointly sponsored a national conference to address the issues of safety and health requirements in government contract shipyards, resulting in the adoption of the Minimum Requirements for Health and Industrial Safety in Government Contract Shipyards, which specifically addressed the topic of dust suppression to avoid potential asbestos-related illnesses.  *See* Exh. S to Feng Decl.  The Navy further pursued safe work practices during the 1950s and 1960s to reduce the then-known risks associated with exposure to asbestos dust.  *See* Exhs. T, U and V to Feng Decl.

25.     Even as late as 1970, there were no other substitutes for thermal insulation required under MIL-I-24244 (*i.e.*, Unibestos), and the Navy maintained sole discretion for the materials it qualified.  As noted in its 1970 report by a committee appointed to study the feasibility of eliminating asbestos from use at shipyards, "The insulation materials used on stainless steel piping must meet the requirements of MIL-I-24244 regarding chloride content.  None of the recommended materials [in this study] are qualified to meet this specification..." *See* Exh. W to Feng Decl.

26.     Nonetheless, Pittsburgh Corning had already begun affixing warnings to Unibestos, prior to this December 1968 shipment.  *See* Exhs. J through M to Feng Decl.  As of November 1968, Pittsburgh Corning began affixing a 5-inch by 3-inch notice to be printed in red on all cartons containing Unibestos.  *Id.*  Those warnings, which again were implemented before this shipment of Unibestos, read:  "This product contains asbestos fibers.  If dust is created when this product is handled, avoid breathing the dust.  If adequate ventilation control is not possible, wear respirator approved by the U.S. Bureau of Mines." *Id.*  Further, Navy specifications addressed all communication placed on all materials supplied by outside contractors and the Navy

1   utilized its own warning and training protocols regarding the use of asbestos. *See* Heflin Decl.,

2   ¶ 9N. Therefore, it is highly unlikely that the Navy would have allowed either Metalclad or

3   Pittsburgh Corning to include additional warnings on this shipment regarding the potential risks

4   of asbestos. *Id.* Because the Navy was aware of the potential health hazards of asbestos, and

5   Pittsburgh Corning provided warnings on Unibestos, Metalclad had no duty to warn the Navy.

6   *See Boyle* at 512; *Ramey v. Martin-Barker Aircraft*, 874 F.2d 946, 951 at n.10 (4th Cir. 1989)

7   ["Because we conclude the Navy was already aware of the risk at issue, we need not consider

8   whether [the manufacturer] would otherwise have been required to warn the Navy directly of the

9   risk in order to assert successfully a military contractor defense."]; *Shuman v. United States*, 765

10  F.2d 283, 285-286 (1st Cir. 1989); *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587,

11  589-590, 595-596 (N.D. Cal. 1993).

12          27.     Based upon the submitted evidence, Metalclad has demonstrated a causal nexus

13  between Plaintiffs' claims and acts it performed under color of federal office.

14          28.     The U.S. Supreme Court and the Ninth Circuit have instructed courts to interpret

15  28 U.S.C. § 1442(a)(1) broadly in favor of removal. *See Arizona v. Manypenny*, 451 U.S. 232

16  (1981) (policy favoring removal should not be frustrated by narrow, grudging interpretations of

17  § 1442(a)(1)); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (noting

18  that, because it is important to the federal government to protect federal officers, removal rights

19  under section 1442 are much broader than those under 1441); *Ballenger v. Agco Corp.*, 2007

20  WL1813821 (N.D. Cal. 2007) (The Ninth Circuit instructs that there is a 'clear command from

21  both Congress and the Supreme Court that when federal officers and their agents are seeking a

22  federal forum, we are to interpret section 1442 broadly in favor of removal.').

23          29.     The existence of a single removable claim allows removal of the entire action. 28

24  U.S.C. § 1441(c); *see also National Audubon Society v. Dept. of Water*, 496 F.Supp. 499, 509

25  (E.D. Cal. 1980).

26          30.     Notice of removal has been filed with the state court and provided to all adverse

27  parties pursuant to 28 U.S.C. § 1446(d).

28

1    31.    This removal is based upon this Notice of Removal to the United States District

2    Court, the Certificate of Service of Notice to Adverse Party of Removal, the Notice to Adverse

3    Party of Removal filed in the state court action, the Declarations of Felicia Y. Feng and Dan H.

4    Heflin, Jr. and attached exhibits, all process, pleadings, and orders that have been served upon

5    Metalclad in the state court case, and any other matters that the Court deems applicable.

6        WHEREFORE, Defendant Metalclad Insulation Corporation hereby removes this action

7    to the United States District Court for the Northern District of California, San Francisco Division,

8    and seeks that the Superior Court of the State of California, County of San Francisco, proceed no

9    further with respect to this action.

11   Dated:    10/27/09                    MCKENNA LONG & ALDRIDGE LLP

13                                         By: _____

14                                             LISA L. OBERG
                                               FELICIA Y. FENG

15

16                                         Attorneys for Defendant
                                           METALCLAD INSULATION
                                           CORPORATION

17   SF:27391014.1

# EXHIBIT 2

# EXHIBIT 2

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 2

1    LISA L. OBERG (BAR NO. 120139)
     loberg@mckennalong.com
2    FELICIA Y. FENG (BAR NO. 184346)
     ffeng@mckennalong.com
3    MCKENNA LONG & ALDRIDGE LLP
     101 California Street
4    41st Floor
     San Francisco, CA 94111
5    *Telephone:*    (415) 267-4000
     *Facsimile:*    (415) 267-4198
6
     Attorneys for Defendant,
7    METALCLAD INSULATION CORPORATION

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                                   CV 09        5106

11   MYRTES FAYE KOLLAR, individually;        CASE NO.
     and DIANNE L. CARON and LINDA A.
12   HEATH, individually and as Co-Trustees   **DECLARATION OF DAN H. HEFLIN, JR.**
     of the Kollar Family Trust Dated May 9,  **P.E. IN SUPPORT OF METALCLAD**
13   2002,                                     **INSULATION CORPORATION'S NOTICE**
                                               **OF REMOVAL PURSUANT TO 28 U.S.C.**
14              Plaintiffs,                    **1442(a)(1) (FEDERAL OFFICER)**

15        v.

16   ALLIED PACKING & SUPPLY, INC., et
     al.,
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

SF:27392052.1

ORIGINAL
FILED

OCT 27 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JCS

1    I, Dan H. Heflin, Jr., P.E., declare:

2

3        1.      I am over the age of eighteen and am not a party to this action.  I have personal

4    knowledge of the matters set forth in this declaration.  If called as a witness, I could and would

5    competently testify to the following.

6        2.      I graduated from Virginia Polytechnic Institute with a Bachelor of Science Degree

7    in industrial engineering in 1956.  I am a registered Professional Engineer in Virginia since 1968.

8        3.      I am a retired Director of Engineering at Newport News Shipbuilding and Drydock

9    Co. ("NNSD")—the largest privately-owned shipbuilding company in the world.  I worked for

10   NNSD from 1956 through 1992.  During my 36-year career at NNSD, I worked in various

11   positions within the Shipbuilding Segment including, Designer, Design Section Manager, and

12   Director of Engineering Services.

13       •       As a Designer, I reviewed and processed boiler drawings for numerous

14               commercial and naval vessels.  That work involved reviewing and

15               recommending changes to vendor-furnished drawings to assure compliance

16               with applicable Navy and commercial specifications and standards.  I also

17               worked closely with the Navy's Supervisor of Shipbuilding and/or

18               NAVSHIPS Command regarding approvals for issue of drawings and

19               associated technical manuals.  I also designed numerous components (and

20               supporting systems) for the *USS America* (CVA-66) as a Designer.

21       •       As a Design Section Manager, I prepared SSN-688 Class contract drawings

22               and technical specifications for the Naval Seas System Command.  That

23               work involved technical oversight of all aspects of the non-nuclear portions

24               of an entirely new class of nuclear attack submarines.  Creating the

25               specifications for Naval Seas System Command involved intensive design

26               studies and an understanding of the Navy's goals and objectives for this

27               class of vessels, as well as constant communications with Naval Seas

28               System Command officials.

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 2 -
DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)
SF:27390956.1

- In approximately 1971, the U.S. Navy designated NNSD the "lead yard design agent" and "planning yard" for the life cycle support for all SSN-688- Class submarines, As Design Section Manager of the Submarine Design Office, I worked closely with the U.S. Navy Supervisor of Shipbuilding and Naval Sea Systems Command to resolve design issues and construction and maintenance issues associated with the lead ship and all follow-on 688-Class ships. I also worked with then-Commander Wesley C. Hewitt to resolve design, construction, maintenance, and overhaul matters concerning 688-CLASS ships at various naval shipyards.

- As a Director of Engineering Services, I was responsible for design and engineering activities for nuclear and non-nuclear vessels.

4.    After retiring from NNSD in 1992, I formed Heflin & Williams, an engineering consulting firm, which is located at 208 East Plume Street, Norfolk, Virginia 23510. Heflin & Williams provides engineering-related services to private industry and to government agencies. I have performed cost-engineering and production engineering analyses for various government subcontractors. My work has also included analysis of governmental specifications and material and facility requirements for conversion overhauls by commercial shipyards. I have also served as a consultant to Navy contractors regarding their qualification and compliance with government specifications.

5.    I submit this declaration in support of Defendant Metalclad Insulation Corporation's Notice of Removal to Federal Court to present my opinions relative to the procurement of Unibestos Thermal insulation pursuant to the 1968 Award Contract from Mare Island Naval Shipyard to Metalclad Insulation Corporation for a shipment of Pittsburgh Corning Unibestos Insulation.

6.    It is my understanding, based upon review of Plaintiffs' Complaint and Preliminary Fact Sheet that Plaintiffs claim that Albert Kollar suffered exposure to Metalclad supplied Unibestos thermal insulation while working as a draftsman at Mare Island Naval Shipyard between 1945 to 1973.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)
SF:27390956.1

7.　　It is also my understanding, based upon my review of the Award Contract ("Purchase Order"), the Material Cards for Unibestos shipped to Mare Island Naval Shipyard, the correspondence from Pittsburgh Corning Corporation to government personnel at Mare Island Naval Shipyard regarding the Unibestos shipment, and Wilfred Newton's trial testimony, that in 1968 Metalclad Insulation Corporation brokered a shipment of Pittsburgh Corning Unibestos Insulation for use in the construction of four nuclear submarines being constructed at Mare Island Naval Shipyard: the *USS Guitarro*, the *USS Drum*, the *USS Hawkbill*, and the *USS Pintado*.

8.　　Attached hereto are true and correct copies of the following Exhibits, which I reviewed in preparation of this Declaration and which are central to the allegations in this matter:

- Exhibit 1: Award/Contract N000445-69-C-0137, confirming Award Notice dated August 3, 1968.

- Exhibit 2: MIL-I-2781 and its associated QPL, and its predecessor Navy Specification P-8 and its associated QPLs and Approved Materials Lists which preceded the implementation of QPLs.

- Exhibit 3: Correspondence between Pittsburgh Corning and Mare Island Naval Shipyard regarding the shipment of Unibestos pursuant to the Metalclad Purchase Order.

- Exhibit 4: Mare Island Stock Cards associated with receipt and issue of the subject Unibestos.

- Exhibit 5: MIL-I-24244.

- Exhibit 6: Defense Standardization Program Office publication, SD-20. "The DOD Qualification Program", January 2002.

- Exhibit 7: Statement of Rear Admiral. Paul E. Sullivan, U.S. Navy, Deputy Commander for Ship Design, Integration and Engineering, Before the House Science Committee On The SubSafe Program, 29 October, 2003.

- Exhibit 8: U.S. Naval Engineering Experiment Station Report No. 7737, dated July 31, 1936, Preliminary Report on Unibestos Sectional Pipe Covering.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

- Exhibit 9: U.S. Naval Engineering Experiment Station Report No. 8321, dated December 16, 1937, Insulation, Pipe Covering, and Block Unibestos.
- Exhibit 10: Scanned copies of two local Newspaper articles regarding a recent and on-going revelation of welding inspection fraud by a company (Northrup Grumman) inspector, and the Navy's reactions thereto.

9. In order to establish the perspective from which to review the circumstances of this issue, one must have a full understanding of the Navy's material and process requirements and the depth to which its concern for ship's safety and reliability dictate those requirements. Following is a brief summary of the essence of those concerns and the policies adopted to ensure satisfactory compliance by all parties involved.

A. Through my education, training and work experience, I have developed expertise regarding United States Navy ship and submarine design, development, maintenance, construction and repair, including the mandatory compliance with military specifications and the level of control and supervision exercised by the United States Navy over all equipment installed aboard a United States Navy vessel.

B. The Navy operates under a regimented, formal, disciplined system of design and material control. Because of the criticality and inherent danger of many systems aboard ship, the Navy has established a rigid system to assure that only proper materials are available for and used in the construction and repair activities at any level. The extent of the Navy's concern is dramatically illustrated by the welding materials issue reported in Exhibit 10.

C. With the advent of Nuclear Power and its introduction into naval ships, the Navy established separate command control of all aspects of nuclear power applications. That command and control structure is NavSea Code 08 (formerly Nuclear Type Desk in BuShips and NavShips Code 08), and has absolute control over all matters involved in any way with nuclear power.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 5 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

1      In the exercise of such control, entirely new and independent requirements

2      were established and put into effect to provide the level of assurance

3      deemed necessary to NavSea Code 08.  Specifically, the navy established

4      new and more stringent requirements for a host of material applications,

5      among which was Mil-I-24244, Exhibit 5.

6  D.   The systems of assurance and control were further strengthened by the

7      Navy's response to the loss of *USS Thresher* in 1963.  The program created

8      to assure significantly upgraded controls was, and remains, "The

9      Submarine Safety Certification Program", popularly known as "SubSafe",

10      and is described in significant detail in RADM Paul E. Sullivan's

11      Statement to the (US Congress) House Science Committee on 28 October,

12      2003, Exhibit 7.  That program provides additional emphasis and

13      mandatory procedures to assure the adequacy of every item that in any way

14      affects the submarine pressure hull watertight boundary and/or the ability

15      of the submerged ship to recover from flooding.  The propulsion system is

16      a critical component of the recovery capability, and the associated piping is

17      a critical element of the propulsion system.  Thus, the insulation applied to

18      that piping must be free of corrosion.  The MIL-I-24244 requirements for

19      additional requirements for assurance of freedom from corrosive materials

20      is an element of "SubSafe".  That certification is the key requirement of the

21      specification.

22  E.   The Navy's design systems are clearly established and promulgated by a

23      series of specifications, directives, and instructions.  Moreover, the Navy

24      maintains an all-encompassing inspection program to assure that the

25      requirements of the specifications, directives, and instructions are complied

26      with and certifications of same are recorded.

27  F.   The Navy, through Naval Sea Systems Command or the Bureau of Ships,

28      exclusively prepared, drafted and issued specifications for thermal

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 6 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

insulation and approved all such thermal insulation produced for the Navy. Before a manufacturer like Pittsburgh Corning received authorization to manufacture selected equipment or materials such as thermal insulation for use by the Navy, all of the design documentation first had to be approved by the Navy. These inspections and approvals were the responsibility of the Bureau of Engineering and its successor organizations, the Bureau of Ships, Naval Ship Systems Command and Naval Sea Systems Command. The Navy frequently required changes in design, materials and documentation before approving the design and authorizing the manufacture of the equipment and materials for use aboard its vessels.

G.  Military specifications for thermal insulation and other equipment used aboard Navy vessels were drafted, approved and maintained by the Navy, specifically the Naval Sea Systems Command. The Naval Sea Systems Command controlled the military specifications in large part because it had superior knowledge of the demands and requirements of combat-ready vessels. Military specifications address all aspects of shipboard equipment and materials requirements, including whether these materials contained asbestos and reflect the state of the art and the special needs of the Navy's combat vessels.

H.  The Navy had unique specifications for thermal insulation used aboard nuclear powered submarines. These specifications were communicated to outside vendors, including Pittsburgh Corning, by the Navy in Requests for Proposals for certain equipment and materials.

I.  The Navy also has a complex supply system for the procurement of materials used aboard ships. Materials intended for nuclear applications are procured beyond the Navy's standard material ordering practices and under the purview of the Commands responsible for nuclear power; in the case of submarines, NavSea Code 08. Materials intended for nuclear

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 7 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

1   applications are segregated throughout the complete supply system, and

2   expressly restricted to nuclear use.  Evidence of that restriction in practice

3   is documented in the material stock cards, Exhibit 4, wherein the restriction

4   was lifted for surplus materials after completion of the intended ships, and

5   the materials released for non-nuclear use.  Part of the Navy's system

6   includes the QPL, which are comprehensive lists of selected Navy-

7   approved products (e.g., insulation, electrical switches, cements, lubricants,

8   valves, etc.) citing Navy-approved manufacturers/suppliers, specific to that

9   sole commodity.  Through the QPL program, and the predecessor Navy

10   Approved Materials List, vendors of materials with repeated or frequent

11   use by the military can pre-qualify their product(s) through a Navy testing

12   program which penults future acquisitions of that identical product to be

13   procured without further testing.  Such pre-qualified vendors are recorded

14   on a QPL generated for certain Military Specifications.  A QPL certifies

15   listed vendor's proven compliance with the base specification for a

16   product.  Exhibit 7 explains the origin and application of QPLs.

17   J.   Once a QPL is established, the Navy can select a pre-qualified vendor's

18   product that fits the Navy's needs for a particular application, as expressed

19   in the associated specification.  A manufacturer's/supplier's product that

20   appears on a QPL falls within a specific range of performance parameters

21   required by the Navy and articulated in the associated specification.

22   K.   Once a product listed on the QPL becomes subject to a special certification,

23   the QPL is no longer applicable for that specific procurement, i.e., the

24   product as identified on the QPL, which is the baseline specification only,

25   is not suitable for use on the particular vessel or class of vessels whose

26   precise design interest the Navy is contemplating because that particular

27   vessel or class of vessels requires a stricter requirement not guaranteed by

28   the products listed in the QPL.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

SF:27390956.1

- 8 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

L.   Where the Navy requires that production of a product or material such as the subject lot of Pittsburgh Corning Unibestos meet standards beyond those required by the specification and its associated QPL, the Navy may invoke additional oversight of the production of the product using on-site government inspectors.  These inspectors are called Defense Contractor Administration Service representatives ("DCAS"), and are employees of the U.S. Navy.  It is DCAS's responsibility to ensure that vendors such as Pittsburgh Corning follow the total required contract specifications during production.  DCAS is present during production and monitors the vendor's testing of the product to ensure that the vendor complies with each and every requirement specified in the Navy's testing procedures.  DCAS also independently reviews, inspects and tests the product prior to shipment. DCAS serves as the on-site "eyes and the ears" of the government and has the final say as to whether the production complies with the Navy's specification and whether it will ultimately be cleared to be sent to its contracted destination.  The documentation (Exhibits 1, 3 & 4), reflecting the production, testing and sale of the Pittsburgh Corning Unibestos that was brokered to Mare Island Naval Shipyard shows that a DCAS was present overseeing and approving the manufacture of the production lot.

M.   Navy specifications also addressed the nature and type of any marking and/or labeling placed on all equipment and materials supplied by outside contractors, including thermal insulation.  The Navy utilized its own warning and training protocols regarding the use of materials and processes it considered to be a hazard or threat to combat effectiveness.  Any attempt by a vendor such as Pittsburgh Corning or a supplier such as Metalclad to attach a warning or cautionary statement not specified and approved by the Navy would likely have been unwelcome.  The Navy had established its

1    own training and adopted its own precautionary measures regarding the use

2    of asbestos and asbestos containing products.

3    N.    The Navy also had specifications addressing the form and content of

4          written materials to be delivered with, products supplied to the Navy, and

5          these specifications contained explicit direction regarding the type of

6          information to be included.  This included any and all cautions and

7          warnings.  It is highly unlikely that Pittsburgh Corning or Metalclad would

8          have been allowed to include a warning not required and approved by the

9          Navy.  Any attempt to include a cautionary warning without prior Navy

10         approval would have been prohibited as a violation of Military

11         Specifications because the Navy addressed hazards such as asbestos though

12         training, not through warnings.

13         10.    I personally reviewed the Award Contract/Purchase Order and correspondence

14   from Pittsburgh Corning to Mare Island nuclear procurement personnel (Exhibits 1 & 3).  That

15   purchase order clearly invokes the requirements of MIL-I-24244 (Exhibit 5), Type 1 and

16   Amendment 1, plus the requirements of MIL-1-2871.  MIL- I-24244 is titled "Insulation Material

17   With Special Corrosion, Chloride and Fluoride Requirements (ISSE Controlled Further

18   Dissemination Only As Directed By NAVSEA System C-9B2)."  It is patent that MIL-I-24244

19   specifies special corrosion, chloride and fluoride requirements above and beyond what is

20   permitted under the specification and its associated QPL.  (Exhibit 5, Bates pages 61312-61315.)

21   MIL-I-24244 was highly classified until 2004.

22         11.    MIL-I-24244 section 3.31 requires that "the specific material supplied" must be

23   analyzed.  (Exhibit 5, Bates page 61312.)  MIL-I-24244 section 4.3.1 demonstrates that the Navy

24   imposed pre-production testing of this material by each supplier.  That section requires that the

25   "corrosion test shall be performed as a preproduction test by each supplier...It need not be

26   repeated for subsequent orders from any source unless required by the ordering data."  (Exhibit 5,

27   Bates page 61315.)  Thus, the Pittsburgh Corning Unibestos then listed on QPL 2781 (Exhibit 2)

28   could not qualify for sale to Mare Island under the procurement order cited.  That procurement

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 10 -
DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

1   was designated for specific end-use on specific submarines in the nuclear areas. Pittsburgh

2   Corning was required to subject its Unibestos to two additional chemical analysis tests in

3   accordance with MIL-1-24244 (Ships), and verified by the local government inspector (DCAS)

4   prior to shipping the Unibestos to Mare Island. The combined requirements of both specification

5   assured that the insulation met the Navy's requirements for use aboard the *USS Guitarro*, the *USS*

6   *Drum*, the *USS Hawkbill*, and/or the *USS Pintado*. Even though the material being procured, such

7   as this lot of thermal insulation, is compliant with both of the invoked specifications in every

8   respect, either by prior or compliant testing and certification, the navy may require additional

9   testing to ensure to its satisfaction the precise chemical makeup of that specific material lot. That

10  is exactly what occurred in this subject procurement. That additional testing was originally

11  performed by the manufacturer as witnessed by the DCAS inspectors, and confirmed by the

12  specific lot testing by the Laboratory's Receipt Inspection, Code M-136B on 3/9/69. Thus, it is

13  obvious that the navy controlled the procurement of this lot of insulation in every respect.

14       12.    The Navy's requirement that Pittsburgh Corning certify the shipment of Unibestos

15  in accordance with MIL-1-24244 indicates that, even before it left the Pittsburgh Corning factory,

16  the Navy effectively controlled the manufacture of this production lot. In fact, the Navy played a

17  key role in the original development of Unibestos in 1936 and 1937 as shown in Exhibits 8 and 9.

18       13.    Those Exhibits are the Navy's own test reports on samples of Unibestos insulation

19  products provided to the Navy's Engineering Experiment Station to gain Navy acceptance. In

20  Exhibit 8, the Navy Lab reported preliminary test results of Super Unibestos pipe covering and

21  block in response to tasking by the Navy's Bureau of Engineering. (See paragraphs 1 and 2, Page

22  3). Source of material and test protocols are defined in Exhibit 8 on Pages 4 and 5 in paragraphs

23  3 and 8. The remainder of the report cites the findings and conclusions. The final report,

24  Exhibit 9, provides official results of the tests, again citing authority for the conduct of the test,

25  and the conclusions. This evidence further demonstrates the Navy control over the development

26  and ultimate approval for use of the Unibestos materials. It is important to note that these tests do

27  not address the special requirements later invoked in Mil-I-24244, Exhibit 5.

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 11 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

14.    In the nuclear age, Navy engineering authorities deemed it necessity to require further testing for application of the Unibestos to nuclear piping. That recognized need exceeded the requirements of previous testing and certification under MIL-1-2781. Thus, the imposition of MIL-I 24244 makes clear that the Navy invoked the new requirement for their direct oversight of the production of the Metalclad-brokered shipment of Pittsburgh Corning Unibestos; and that this specific lot of Unibestos was a government controlled product. The fact that MIL-1-24244 was restricted from public dissemination further indicates that the Navy had highly sensitive design interests in the *USS Guitarro*, the *USS Drum*, the *USS Hawkbill*, and the *USS Pintado*.

The purchase order (Exhibit 1) for the Unibestos insulation subject to MIL-1-24244 was intended for use on stressed austenitic stainless steel (Page 29 of Exhibit 1), and was therefore required to meet precise corrosion, chloride and fluoride specifications. On submarines, those concerns apply uniquely to nuclear piping, and that application is noted (Nuclear Target) on Page 1 of the Purchase Order itself (Exhibit 1). That concern derives from the extremely adverse effect of chlorides on stainless steel in the form of chloride stress corrosion. Such corrosion severely degrades the strength of the piping, and introduces the probability of failure under stress. This is clearly above and beyond the requirements for stock Unibestos that could be purchased by the Navy pursuant to the QPL. The existence of MIL-1-24244 and it's application to the shipment of Unibestos made by Metalclad demonstrates that other shipments of Unibestos insulation supplied pursuant to the QPL only, i.e., not subject to the additional specifications of MIL-1-24244, would not have been appropriate for use given the Navy's expressed additional requirements invoked for materials intended for nuclear system application in the *USS Guitarro*, the *USS Drum*, the *USS Hawkbill*, and the *USS Pintado*. Additionally, the Shipyard's own Chemical Laboratory performed receipt testing of materials to validate the vendor's certificates; further attesting to the sensitivity of the materials and the concern of the Navy that the materials be proper and suitable for nuclear applications.

Attempts to obtain certified copies of MIL-I-24244 from the National Archives (NARA) have not been successful. A search by our contracted archivist of unclassified files at NARA did not locate that specification. Since the specification was originally classified but since

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 12 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

1   declassified, it is likely that NARA records of it are still on file in one of the many storage boxes

2   containing classified materials.  Thus, because of the original classification of MIL-I-24244, it

3   cannot be reasonably obtained from NARA.  The copy I have relied upon and attached hereto as

4   Exhibit 5 was obtained from Newport News Shipbuilding records provided by that company in an

5   unrelated matter.

6          I declare under penalty of perjury that the foregoing is true and correct and that this

7   declaration was executed on this 24th day of October, 2009 at Norfolk, Virginia.

8

9                                                    _____

10                                                        DAN H. HEFLIN, JR.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

SF:27390956.1

# EXHIBIT 3

# EXHIBIT 3

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 3



**PLAINTIFF'S**
**PLAINTIFF'S**
**EXHIBIT 27**

4 1 3 4 8 0

STANDARD FORM 26, JUN ...
FEDERAL SERVICES ADMINIST...
FED. PROC. REG. (41CFR) 1-...

**AWARD/CONTRACT**

| 1. CONTRACT (Proc. Inst. Ident.) NO. | 144/KB | 2. EFFECTIVE DATE | 3. REQUISITION/PURCHASE REQUEST/PROJECT NO. | 4. CERTIFIED FOR NATIONAL |
|---|---|---|---|---|

N00445-69-C-0137

SEE "SUPPLIES/SERVICES" BELOW

REG. 2 AND/OR DMS REG.
RATING)

5. ISSUED BY            CODE   CODE 530

SAN FRANCISCO BAY NAVAL SHIPYARD
VALLEJO, CALIFORNIA   94592

6. ADMINISTERED BY (If other than block 5)   CODE
COMMANDER
DEFENSE CONTRACT ADMINISTRATION SERVIC
REGION — LOS ANGELES
11099 SO LA CIENEGA BOULEVARD
LOS ANGELES, CALIFORNIA   90045

7. CONTRACTOR      CODE
NAME AND ADDRESS

FACILITY CODE

(Street, city,
county, State,
and ZIP code)

METALCLAD INSULATION CORP.
P O BOX 178
TORRANCE, CALIFORNIA   90507

9. DISCOUNT FOR PROMPT PA

5.00%.

11. SHIP TO/MARK FOR      CODE

RECEIVING OFFICER, BLDG. 483
SAN FRANCISCO BAY NAVAL SHIPYARD
VALLEJO, CALIFORNIA   94592

10. SUBMIT INVOICES (4 copi
copies) TO ADDRESS SHOW

12. PAYMENT WILL BE MADE BY   COMMANDER
DEFENSE CONTRACT ADMINISTRATION SERVICES
REGION — LOS ANGELES
11099 SO LA CIENEGA BOULEVARD
LOS ANGELES, CALIFORNIA   90045

CODE

13. THIS PROCUREMENT WAS [X] ADVERTISED. [ ] NEGOTIATED, PURSUANT TO:

[ ] 10 U.S.C. 2304 (a) (   )   [ ] 41 U.S.C. 252 (c) (   )

14. ACCOUNTING AND APPROPRIATION DATA
APPRO & SUBHEAD

| | OBJ CL | BUCH&SN | AAA | TYPE | PAA | COST CODE | TAG NO |
|---|---|---|---|---|---|---|---|
| 17X4512.2417 N1F | - | 77277/- | 445 | 2E | - | - | H925 |

| 15. ITEM NO. | 16. SUPPLIES/SERVICES | 17. QUANTITY | 18. UNIT | 19. UNIT PRICE |
|---|---|---|---|---|

THIS CONTRACT CONFIRMS PURCHASE AWARD NOTICE DATED 1968 AUGUST 13

1-0   SUPPLIES - SERVICES AND PRICES:
(NUMBERS IN PARENTHESIS FOR NAVY USE ONLY)

NUCLEAR TARGET

INSULATION MATERIAL, PIPE, THERMAL, TUBULAR,
MOLDED IN ACCORDANCE WITH MILITARY SPECIFI-
CATIONS MIL-I-24244(SHIPS) DTD 68 AUG 22, TYPE
I, AND AMENDMENT 1 DTD 68 FEB 15, AND MIL-I-
2781, IN THE FOLLOWING SIZES, LENGTHS & SUB-TYPES:

PLAINTIFF'S
EXHIBIT
159
944118

21.

22. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign
this document and return _____ copies to issuing office.) Contractor agrees
to furnish and deliver all items or perform all the services set forth or otherwise
identified above and on any continuation sheets for the consideration stated herein.
The rights and obligations of the parties to this contract shall be subject to and
used by the following documents: (a) this award/contract, (b) the solicitation, if any,
and (c) such provisions, representations, certifications, and specifications, as are
attached or incorporated by reference herein. (Attachments are listed herein.)

**CONTRACTING OFFICER WILL COMPLETE BLOCK 22 OR 26 AS APPLICABLE**

TOTAL AMOUNT OF CONTRACT  $10,905.6

26. [X] AWARD (Contractor is not required to sign this document.)   Your
on Solicitation Number  N00445-69-B-0258   including
additions or changes made by you which additions or changes are set forth in
above, is hereby accepted as to the items listed above and on any continuation sh
tile award consummates the contract which consists of the following documents
the Government's solicitation and your offer, and (b) this award/contract.
Further contractual document is necessary.

23. NAME OF CONTRACTOR

BY

27. UNITED STATES OF AMERICA

BY

24. NAME AND TITLE OF SIGNER (Type or print)

(Signature of person authorized to sign)

25. DATE SIGNED

28. NAME OF CONTRACTING OFFICER (Type or print)

O1MADALI

(Signature of Contracting Officer)

29. DATE SIG

CO  AUG

STANDARD FORM 36, JULY 1966
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR) 1-16.101

**CONTINUATION SHEET**

OF OFFEROR OR CONTRACTOR

REF. NO. OF DOC. BEING CONT'D.

METALCLAD INSULATION CORPORATION

N00445-69-C-0137

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | |
|---|---|---|---|---|---|
| 1 | DMN 5640 199 5646<br>1/2" IPS ID X 1/2" WALL THICKNESS,  3-FT LENGTH,<br>SUBTYPE 1F, FIBROUS-TEMPERATURE UP TO 1200°F: | 80 | EA | 1.849 | |
| | CMR 8171A016 JO 19 142 9001 SS665  20 EACH)<br>CMR 8171A001 JO 19 152 9001 SS666  20 EACH)<br>CMR 8171A031 JO 19 162 9001 SS672  20 EACH)<br>CMR 8171A046 JO 19 172 9001 SS677  20 EACH) | | | | |
| 2 | DMN 5640 199 5647<br>3/4" IPS ID X 1 1/2" WALL THICKNESS,  3-FT LENG<br>SUBTYPE 1B, FIBROUS-TEMPERATURES tIP TO 750°F. | 120 | EP | 1.632 | |
| | CMR 8171A017 JO 19 142 9001 SS665  30 EACH)<br>CMR 8171A002 JO 19 152 9001 SS666  30 EACH)<br>CMR 8171A032 JO 19 162 9001 SS672  30 EACH)<br>CMR 8171A047 JO 19 172 9001 SS677  30 EACH) | | | | |
| 3 | DMN 5640 I99 5648<br>1" IPS ID X 1" WALL THICKNESS, 3-FT LENGMS,<br>SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 300 | EP | .901 | |
| | CMR 8171A018 JO 19 142 9001 SS665  75 EACH)<br>CMR 8171A003 JO 19 152 9001 SS666  75 EACH)<br>CMR 8171A033 JO 19 162 9001 SS672  75 EACH)<br>CMR 8171A048 JO 19 172 9001 SS677  75 EACH) | | | | |
| 4 | DMN 5640 I99 5649<br>1 1/2" IPS-ID X 2" WALL THICKNESS,  3-FT LENGTHS,<br>SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 120 | EA | 3.15 | 37 |
| | CMR 8171A019 JO 19 142 9001 SS665  30 EACH)<br>CMR 8171A004 JO 19 152 9001 SS666  30 EACH)<br>CMR 8171A034 JO 19 162 9001 SS672  30 EACH)<br>CMR 8171A049 JO 19 172 9001 SS677  30 EACH) | | | | |
| 5 | DMN 5640 I99 5650<br>2" IPS ID X 2" WALL THICKNESS,  3-FT LENGTHS,<br>SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 80 | EC | 3.339 | 267 |
| | CMR 8171A020 JO 19 142 9001 SS665  20 EACH)<br>CMR 8171A005 JO 19 152 9001 SS666  20 EACH)<br>CMR 8171A035 JO 19 162 9001 SS672  20 EACH)<br>CMR 8171A050 JO 19 172 9001 SS677  20 EACH) | | | | |

STANDARD FORM 36. JULY 1966
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR) 1—16.101

NAME OF OFFEROR OR CONTRACTOR

**CONTINUATION SHEET**

REF. NO. OF DOC. BEING CONT'D.

METALCLAD INSULATION CORPORATION

N00445-69-C-0137

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | |
|---|---|---|---|---|---|
| 6 | DMN 5640 199 5651 <br> 3" IPS ID X 1/2" WALL THICKNESS, 3-FT LENGTHS, <br> SUBTYPE 1F, FIBROUS—TEMPERATURES UP TO 1200°F. <br><br> CMR 8171A021 JO 19 142 9001 SS665   50 EACH) <br> CMR 8171A006 JO 19 152 9001 SS666   50 EACH) <br> CMR 8171A036 JO 19 162 9001 SS672   50 EACH) <br> CMR 8171A051 JO 19 172 9001 SS677   50 EACH) | 200 | EA | 2.536 | |
| 7 | DMN 5640 199 5652 <br> 4" IPS ID X 1 1/2" WALL THICKNESS, 3-FT LENGTHS, <br> SUBTYPE 1B, FIBRWS—TEMPERATURES UP TO 750°F. <br><br> CMR 8171A022 JO 19 142 9001 SS665   40 EACH) <br> CMR 8171A007 JO 19 152 9001 SS666   40 EACH) <br> CMR 8171A037 JO 19 162 9001 SS672   40 EACH) <br> CMR 8171A052 JO 19 172 9001 SS677   40 EACH) | 160 | EA | 2.939 | |
| 8 | DMN 5640 199 5653 <br> 5" IPS ID X 2" WALL THICKNESS, 3-FT LENGTHS, <br> SUBTYPE 1B, FIBROUS—TEMPERATURES UP TO 750°F. <br><br> CMR 8171A023 JO 19 142 9001 SS665   15 EACH) <br> CMR 8171A008 JO 19 152 9001 SS666   15 EACH) <br> CMR 8171A038 JO 19 162 9001 SS672   15 EACH) <br> CMR 8171A053 JO 19 172 9001 SS677   15 EACH) | 60 | EA | 5.15 | |
| 9 | DMN 5640 199 5664 <br> 8" IPS ID X 3" WALL THICKNESS, 3-FT LENGTHS, <br> SUBTYPE 1B, FIBROUS—TEMPERATURES UP TO 750°F. <br><br> CMR 8171A024 JO 19 142 9001 SS665   40 EACH) <br> CMR 8171A009 JO 19 152 9001 SS666   40 EACH) <br> CMR 8171A039 JO 19 162 9001 SS672   40 EACH) <br> CMR 8171A054 JO 19 172 9001 SS677   40 EACH) | 160 | EA | 10.505 | 16 |
| 10 | DMN 5640 199 5655 <br> 1" IPS ID X 1 1/2" WALL THICKNESS, 3-FT LENGTHS <br> SUBTYPE 1B, FIBROUS—TEMPERATURES UP TO 750°F. <br><br> CMR 8171A025 JO 19 142 3001 SS665   350 EACH) <br> CMR 8171A010 JO 19 152 3001 SS666   350 EACH) <br> CMR 8171A040 JO 19 162 9001 SS672   350 EACH) <br> CMR 8171A055 JO 19 172 9001 SS677   350 EACH) | 1400 | EA | 1.717 | 240 |

36—608

STANDARD FORM 36, JULY 1966
GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR) 1-16.101

**CONTINUATION SHEET**

PAGE OF OFFEROR OR CONTRACTOR

PT. NO. OF DOC. BEING CONT'D.

METALCLAD INSULATION CORPORATION

N00445-69-C-0137

SUPPLIES/SERVICES

| ITEM NO. | | QUANTITY | UNIT | UNIT PRICE | |
|---|---|---|---|---|---|
| 11 | DMN 5640 199 5656<br>10" IPS ID X 3" WALL THICKNESS, 3-FT LENGTHS,<br>SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F.<br><br>(MR 8171A026 JO 19 142 9001 SS665  50 EACH)<br>(MR 8171A011 JO 19 152 9001 SS666  50 EACH)<br>(MR 8171A041 JO 19 162 9001 SS672  50 EACH)<br>(MR 8171A056 JO 19 172 9001 SS677  50 EACH) | 200 | EA | 12.159 | |
| 12 | DMN 5640 199 5657.<br>2" IPS ID X 1" WALL THICKNESS, 3-FT LENGTHS,<br>SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F.<br><br>(MR 8171A027 JO 19 142 9001 SS665  45 EACH)<br>(MR 8171A012 JO 19 152 9001 SS666  45 EACH)<br>(MR 8171A042 JO 19 162 9001 SS672  45 EACH)<br>(MR 8171A057 JO 19 172 9001 SS677  45 EACH) | 180 | EA | .885 | |
| 13 | DMN 5640 199 5658<br>2" IPS ID X 1/2" WALL THICKNESS, 3-FT LENGTHS,<br>SUBNPE 1F, FIBROUS-TEMPERATURES UP TO 1200°F.<br><br>(MR 8171A028 JO 19 142 9001 SS665  100 EACH)<br>(MR 8171A013 JO 19 152 9001 SS666  100 EACH)<br>(MR 8171A043 JO 19 162 9001 SS672  100 EACH)<br>(MR 8171A058 JO 19 172 9001 SS677  100 EACH) | 400 | EA | 2.139 | |
| 14 | DMN 5640 199 5659<br>2" IPS ID X 3" WALL THICKNESS, 3-FT LENGTHS,<br>SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F.<br><br>(MR 8171A029 JO 19 142 9001 SS665  15 EACH)<br>(MR 8171A014 JO 19 152 900.1 SS666  15 EACH)<br>(MR 8171A044 JO 19 162 9001 SS672  15 EACH)<br>(MR 8171A059 JO 19 172 9001 SS677  15 EACH) | 60 | EA | 5.481 | 3 |
| 15 | DMN 5640 199 5660<br>5" IPS ID X 3" WALL THICKNESS, 3-FT LENGTHS,<br>SUBTYPE %FIBROUS-TEMPERATURES  UP TO 750°F.<br><br>(MR 8171A030 JO 19 142 9001 SS665  15 EACH)<br>(MR 8171A015 JO 19 152 9001 SS666  15 EACH)<br>(MR 8171A045 JO 19 162 9001 SS672  15 EACH)<br>(MR 8171A060 JO 19 172 9001 SS677  15 EACH) | 60 | EA | 8.332 | 49 |

36-108

3.0   PACKING, PACKAGING AND MARKING

3.4   SHIPMENT TO BE MARKED AS FOLLOWS:

RECEIVING OFFICER, BLDG. 483
SAN FRANCISCO BAY NAVAL SHIPYARD
VALLEJO, CALIFORNIA 94592
CONTRACT N00445-69-C-0137
ITEMS WITH DMN'S AS DESIGNATED

4.0   DELIVERIES

4.1   TIME OF DELIVERY

THE SUPPLIES TO BE FURNISHED SHALL BE DELIVERED ON OR BEFORE
60 DAYS AFTER DATE OF CONTRACT.

5.0   INSPECTION AND ACCEPTANCE

5.2   INSPECTION OF THE SUPPLIES TO BE FURNISHED HEREUNDER SHALL BE MADE AT
SUB-CONTRACTOR'S PLANT LOCATED AT TYLER, TEXAS BY THE COGNIZANT GOVERN-
MENT INSPECTOR - COMMANDER, DEFENSE CONTRACT ADMINISTRATION SERVICES
REGION - DALLAS, MERCHANDISE MART BLDG. 500 SWTH ERVAY STREET, DALLAS,
TEXAS 75201.

ACCEPTANCE OF SUCH SUPPLIES AND SUCH ADDITIONAL INSPECTION AS MAY BE
DEEMED TO BE APPROPRIATE, SHALL BE MADE AT DESTINATION BY THE RECEIV-
ING ACTIVITY.

THE COGNIZANT INSPECTOR SHOULD BE NOTIFIED WEN MATERIAL IS READY FOR
INSPECTION.

THE RECEIVING ACTIVITY WILL FURNISH TO THE PAYING OFFICE NAMED HEREIN
SIX COPIES OF THE MATERIAL INSPECTION REPORT (DD FORM 250), ONE PRO-
PERLY CERTIFIED, PROMPTLY AFTER ACCEPTANCE OF SUPPLIES.

PRINCIPAL MANUFACTURER OF THE SUPPLIES:
PITTSBURG CORNING CORPORATION, TYLER, TEXAS

COMMANDER, DEFENSE CONTRACT ADMINISTRATION SERVICES REGION - LOS
ANGELES, 11099 SO LA CIENEGA BLVD, LOS ANGELES, CALIFORNIA 90045
IS HEREBY DESIGNATED AS THE PROGRESSING ACTIVITY.

GENERAL SERVICES ADMINISTRATION
FED. PROC. REG. (41 CFR 1-16.10

## SOLICITATION, OFFER, AND AWARD

| 1. CONTRACT (Proc. Inst. Ident.) NO. | 2. SOLICITATION NO. | | IDSA REG. | NATIONAL DEFENSE UNDER AND/OR DMS REG. |
|---|---|---|---|---|
| | N00445-69-R-0258 | [X] ADVERTISED (IFB) [ ] NEGOTIATED (RFP) | | |

| ISSUED BY | CODE | 5. DATE ISSUED | 6. REQUISITION/PURCHASE REQUEST NO. |
|---|---|---|---|
| SAN FRANCISCO BAY NAVAL SHIPYARD VALLEJO, CALIFORNIA  94592 | | 68 JUL 10 | *SEE BELOW *SUPPLIES/SERV |

7. ADDRESS OFFER TO (If other than block 3):

PURCHASE DIVISION: SUPPLY DEPARTMENT
SAN FRANCISCO BAY NAVAL SHIPYARD
P. O. BOX 2015
VALLEJO, CALIFORNIA  94592

## SOLICITATION

Sealed offers in original and __2__ copies for furnishing the supplies or services described in the Schedule will be received at the place spec...
Block 8. OR IF HAND-CARRIED, IN THE DEPOSITARY LOCATED IN PURCHASE DIVISION
BLDG.  71  BID BOX      until 10:00AM PDST 68...

Notice is an advertised solicitation, offers will be publicly opened at that time.
and Conditions.     All offers are subject to the following:
1. The attached Solicitation Instructions and Conditions, SF 33A.
2. The General Provisions, SF 32, __04 JUN__ edition, which is attached or incorporated herein by reference.

3. The Schedule included below and/or attached hereto.
4. Such other provisions, representations, certifications, and spec... are listed in the Schedule.)

9. INFORMATION CALL (Name and Telephone No.) (No collect calls.): MRS. M.MILLER   AC 707   646- ...

## SCHEDULE

NUCLEAR TARGET

### TABLE OF CONTENTS

SECTION 1.0 - SUPPLIES OR SERVICES & PRICES
SECTION 2.0 - DESCRIPTION OR SPECIFICATIONS
SECTION 3.0 - PACKING, PACKAGING & MARKING
SECTION 4.0 - DELIVERIES

SECTION 5.0 - INSPECTION & ACCEPTANCE
SECTION 6.0 - REFERENCED PROVISIONS
SECTION 7.0 - OTHER PROVISIONS

INSULATION MAT'L, PIPE, THERMAL, TUBULAR MOLDED,
FIBROUS
FSC 5640

FOR NAVY USE ONLY
GR 817IA00E-AG60-J0 19 142 9D011
CJO 19 152 0001, 19 162 9001 E
CJO 19 172 0001

## OFFER (NOTE: Reverse Must Also Be Fully Completed By Offeror)

...th the above, the undersigned offers and agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a differ... stated by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at t...
price each item, delivered at the designated point(s), within the time specified in the Schedule.

| 10. DISCOUNT FOR PROMPT PAYMENT | % 10 CALENDAR DAYS; | % 20 CALENDAR DAYS; | % 30 CALENDAR DAYS; | CALENDAR DAYS |
|---|---|---|---|---|
| NAME & ADDRESS | CODE | | FACILITY CODE | 18. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or Print) |

Area Code and Telephone No:

[ ] Check if Remittance Address is Different From Above—Enter Such Address in Schedule.

19. SIGNATURE

## AWARD (To Be Completed By Government)

| 21. ACCEPTED AS TO ITEMS NUMBERED | 22. AMOUNT | | | | | 20. OFFER DATE |
|---|---|---|---|---|---|---|
| 24. SUBMIT INVOICES (4 copies unless otherwise specified) TO ADDRESS SHOWN IN BLOCK | | 23. ACCOUNTING AND APPROPRIATION DATA | | | | |
| 25. ADMINISTERED BY (If other than block 3) | CODE | 17X4912.2417 | 77777I-445 | TYPE 2F | PAA | COST CODE TAC H 925 |
| | | 27. PAYMENT WILL BE MADE BY | | | | |

NAME OF CONTRACTING OFFICER (Type or Print)

26. PAYMENT    [ ] 41 U.S.C. 251(k)   [ ]
             [ ] 10 U.S.C. 2304(a)( )   [ ]

29. UNITED STATES OF AMERICA

(Signature of Contracting Officer)

30. AWARD DATE

FSN FORM 33 (Rev. 3-59)   ...ed will be made on this form, or on Standard Form 26, or by other official written notice.

STANDARD FORM 33A,
CENERAL SERVICES ...
FED PROC. REG. (41 CFR) 1-16.101

# SOLICITATION INSTRUCTIONS AND CONDITIONS

**1. DEFINITIONS.**
As used herein:

(a) "The term "solicitation" means Invitation for Bids (IFB) where the procurement is to be advertised, and Request for Proposal (RFP) where the procurement is to be negotiated.

(b) The term "offer" means bid where the procurement is advertised, and proposal where the procurement is negotiated.

(c) For purposes of this solicitation Form 33, the term "advertised" includes Block 2 of Standard Advertising and other types of restricted advertising.

**2. PREPARATION OF OFFERS.**

(a) Offerors are expected to examine the drawings, specifications, Schedule, and all instructions. Failure to do so will be at the offeror's risk.

(b) Each offeror shall furnish the information required by the solicitation. The offeror shall sign the solicitation and print or type his name on the Schedule and each Continuation Sheet thereof on which he makes an entry. Erasures or other changes must be initialed by the person signing the offer. Offers signed by an agent are to be accompanied by evidence of his authority unless such evidence has been previously furnished to the issuing office.

(c) Unit price for each unit offered shall be shown and such price shall include packing unless otherwise specified. A total shall be entered in the Amount column of the Schedule for each item offered. In case of discrepancy between a unit price and extended price, the unit price will be presumed to be correct, subject, however, to correction on the same extent and in the same manner as any other mistake.

(d) Offers for supplies or services other than those specified will not be considered unless authorized by the solicitation.

(e) Offeror must state a definite time for delivery of supplies or for performance of services unless otherwise specified in the solicitation.

(f) Time, if stated as a number of days, will include Saturdays, Sundays, and holidays ... unless ... as Government time only.

**3. EXPLANATION TO OFFERORS.** Any explanation desired by an offeror regarding the meaning or interpretation of the solicitation, drawings, specifications, etc., must be requested in writing and with sufficient time allowed for a reply to reach offerors before the submission of their offers. Oral explanations or instructions given before the award of the contract will not be binding. Any information given to a prospective offeror concerning a solicitation will be furnished to all prospective offerors as an amendment of the solicitation, if such information is necessary to offerors in submitting offers on the solicitation or if the lack of such information would be prejudicial to uninformed offerors.

**4. ACKNOWLEDGMENT OF AMENDMENTS TO SOLICITATIONS.** Receipt of an amendment to a solicitation by an offeror must be acknowledged (a) by signing and returning the amendment, (b) on the reverse of Standard Form 33, or (c) by letter or telegram. Such acknowledgment must be received prior to the hour and date specified for receipt of offers.

**5. SUBMISSION OF OFFERS.**

(a) Offers and modifications thereof shall be enclosed in sealed envelopes and addressed to the office specified in the solicitation. The offeror shall show the hour and date specified in the solicitation for receipt, the solicitation number, and the name and address of the offeror on the face of the envelope.

(b) Telegraphic offers will not be considered unless authorized by the solicitation; however, offers may be modified by telegraphic notice, provided such notice is received prior to the hour and date specified for the receipt. ... However, see [par. 8.]

(c) Samples of items, when required, must be submitted within the time specified, and unless otherwise specified, must be at no expense to the Government. If not destroyed in the Government ... supplies will be returned at offeror's request and expense unless otherwise specified by the solicitation.

**6. FAILURE TO SUBMIT OFFER.** If no offer is to be submitted ...

---

**7. MODIFICATION OR WITHDRAWAL OF OFFERS.**

(a) If this solicitation is advertised, offers may be modified or withdrawn by written or telegraphic notice received ... the exact hour and date specified for receipt of offers ... also may be withdrawn in person by an offeror or his representative, provided his identity is made known and a receipt for the offer, but only if the withdrawal is made prior to the exact hour and date set for receipt of offers, ...

(b) If this solicitation is negotiated, offers may (subject to par. 8, when applicable) be modified or withdrawn by written or telegraphic notice received at any time prior to award; or may be withdrawn in person by an offeror or his representative, provided his identity is made known and a receipt for the offer prior to award.

**8. LATE OFFERS AND MODIFICATIONS OR WITHDRAWALS.**

(a) This paragraph applies in all advertised solicitations. ... of offers by selected offerors (other than those solicitations with such offerors) shall not be withdrawn and ...

(b) Offers and modifications ... received at the office specified in the solicitation after the exact hour and date specified for receipt ... will not be considered unless: (1) they are received before award is made; and either (2) they are sent by registered mail for which an official dated postmark ... or by telegraph if authorized, and it is determined ...

(b) Offerors using certified mail are cautioned to obtain a Certified Mail receipt showing a legible, dated postmark ...

(c) The time of mailing of late offers submitted by registered or certified mail shall be deemed to be the last minute ...

**9. DISCOUNTS.** (a) Notwithstanding the fact that a blank is provided for a ten (10) day discount, prompt payment discount offered for payment within less than twenty (20) ... will not be considered in evaluating offers for award. ... otherwise specified in the solicitation. However, offered discounts of less than 20 days will be taken if payment is made within the discount period even though not considered in the evaluation of offers.

(SF 33A) is designated as Pages 1 and 4 of this solicitation.

NAME OF OFFEROR OR CONTRACTOR

N00445-69-B-0258

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE |
|---|---|---|---|---|
| | **1.0  SUPPLIES, SERVICES & PRICES** | | | |
| | INSULATION MATERIAL, PIPE, THERMAL, TUBULAR, MOLDED IN ACCORDANCE WITH MILITARY SPECIFICATIONS MIL-I-24244(SHIPS) DATED 22 AUG. 1966, TYPE I, AND AMENDMENT 1 DATED 15 FEB 1968, AND MIL-I-2781, IN THE FOLLOWING SIZES, LENGTHS AND SUB-TYPES: | | | |
| 1. | DMN 5640-199-5646 1/2" IPS ID X 1/2" WALL THICKNESS, 3 FT LENGTH, SUBTYPE IF, FIBROUS - TEMPERATURES UP TO 1200°F. | 80 | EA | |
| 2. | DMN 5640-199-5647 3/4" IPS ID X 1 1/2" WALL THICKNESS, 3 FT LENGTH, SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 120 | EA | |
| 3. | DMN 5640-199-5648 1" IPS ID X 1" WALL THICKNESS, 3 FT LENGTHS, SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 300 | EA | |
| 4. | DMN 5640-199-5649 1 1/2" IPS ID X 2" WALL THICKNESS, SUBTYPE 1B, 3 FT LENGTHS FIBROUS-TEMPERATURES UP TO 750°F. | 120 | EA | |
| 5. | DMN 5640-199-5650 2" IPS ID X 2" WALL THICKNESS, SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F, 3 FT LENGTHS: | 80 | EA | |
| 6. | DMN 5640-199-5651 3" IPS ID X 1/2" WALL THICKNESS, 3 FT LENGTHS SUBTYPE IF, FIBROUS-TEMPERATURES UP TO 1200°F. | 200 | EA | |
| 7. | DMN 5640-199-5652 4" IPS ID X 1 1/2" WALL THICKNESS, 3 FT LENGTHS SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 160 | EA | |
| 8. | DMN 5640-199-5653 5" IPS ID X 2" WALL THICKNESS, 3 FT LENGTHS, SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F.   SUB- | 60 | EA | |
| 9. | DMN 5640-199-5654 8" IPS ID X 3" WALL THICKNESS, 3 FT LENGTHS, SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 160 | EA | |
| 10. | DMN 5640-199-5655 1" IPS ID X 1 1/2" WALL THICKNESS, 3 FT LENGTHS, SUBTYPE 1B, FIBROUS-TEMPERATURES UP TO 750°F. | 1400 | EA | |

2.1. CONTINUED

N00445-69-C-0258    PG 7

CERTIFICATION REQUIREMENTS.

THE CONTRACTOR WILL SUPPLY, AT THE TIME OF SHIPMENT OF THIS TARGET MATERIAL, A CERTIFIED COPY OF THE CHEMICAL ANALYSIS OF THE MATERIAL. IF THE MATERIAL SPECIFICATIONS REFERENCED HEREIN LIST SPECIFIC CHEMICAL ELEMENTS QUANTITATIVE REQUIREMENTS AND A CERTIFIED COPY OF THE PHYSICAL PROPERTIES OF THE MATERIAL IF THE SPECIFICATIONS REFERENCED IN THE CONTRAC LIST SPECIFIC PHYSICAL PROPERTIES. UNLESS SPECIFICALLY EXCEPTED BY THIS CONTRACT. FOR COMPONENTS (I.E., ASSEMBLIES) SUCH CERTIFICATION IS REQUIRED FOR ALL MATERIALS UTILIZED TO FABRICATE THE PRESSURE CONTAINING PARTS OF THE ASSEMBLY. IN ADDITION TO THE ABOVE, THE CONTRACTOR SHALL ALSO INCLUDE A CERTIFICATE SPECIFICALLY LISTING EACH OF THE REQUIRED TESTS INCLUDED IN THE SPECIFICATION AND/OR THE CONTRACT AND SEPARATELY LISTING AND SEPARATELY CERTIFYING THAT EACH TEST HAS BEEN SATISFACTORILY COMPLETED AND THAT THE MATERIAL IS IN STRICT ACCORDANCE WITH THE CONTRACT AND SPECIFICATIONS. THE MATERIAL DESCRIPTION, AND HEAT HEAT CODE OR HEAT NUMBER, ETC., MUST BE INCLUDED ON THE COPIES OF CHEMICAL ANALYSIS, PHYSICAL PROPERTIES, AND CERTIFICATES. CERTIFICATIONS USING PHRASES SUCH AS "IS EQUAL TO", "IS SIMILAR TO", "IS TO THE ... MY KNOWLEDGE AND BELIEF", ETC., ARE NOT ACCEPTABLE OR PERMISSABLE. THE ABOVE SPECIFIC TEST DATA AND CERTIFICATIONS ARE ALSO REQUIRED.

INTENDED USE MAKES IT MANDATORY THAT MATERIAL FURNISHED SHALL BE FREE OF ALL MERCURY CONTAMINATION. DURING THE MANUFACTURING PROCESSES, TESTS, AND INSPECTIONS. THE PRODUCT, TO BE OFFERED FOR ACCEPTANCE SHALL NOT HAVE COME IN DIRECT CONTACT WITH MERCURY OR ANY OF ITS COMPOUNDS NOR WITH ANY MERCURY CONTAINING DEVICES EMPLOYING A SINGLE BOUNDARY OF CONTAINMENT. THE MANUFACTURER SHALL CERTIFY THAT THE PRODUCT, WHEN SHIPPED, IS FREE FROM MERCURY CONTAMINATION.

THE CONTRACTOR SHALL FORWARD ONE (1) COPY OF THE ABOVE CERTIFICATION PAPERS TO CODE 526 UNDER SEPARATE COVER, AND TWO (2) COPIES WITH THE MATERIAL. THE INITIAL COPY TO CODE 526 SHALL BE FORWARDED AS SOON AS IT IS AVAILABLE, PREFERABLY BEFORE THE MATERIAL IS SHIPPED. THE COGNIZANT DCASR INSPECTOR SHALL WITHHOLD SHIPMENT OF THE MATERIAL UNTIL ALL THREE COPIES OF ALL CERTIFICATES ARE FURNISHED. FAILURE TO FURNISH THESE CERTIFICATES SHALL BE CAUSE FOR REJECTION OF THE MATERIAL OR FOR TERMINATION OF THE CONTRACT."

N00415-69-B-0258    PG 9

5.   THE REQUIREMENTS OF MIL-I-24244 MAY BE INVOKED IN LIEU OF THE ABOVE REQUIREMENTS.

6.   VENDOR IS RESPONSIBLE FOR OBTAINING INDEPENDENT TESTING LABORATORY SERVICES. IF HE CANNOT DO THE TESTS HIMSELF, TO MEET THE ABOVE REQUIREMENTS.

III   C.   REQUIRE THAT COPIES OF THE CHEMICAL ANALYSIS TEST PROCEDURES BE SENT TO SFBNS BEFORE FINAL ACCEPTANCE OF THE MATERIAL, IF THE TESTS ARE OTHER THAN THAT OF ENCLOSURE (2).

III   D.   REQUIRE THAT THE LOCAL DCASR REPRESENTATIVE VERIFY THAT THE TEST PROCEDURE SPECIFIED IS, IN FACT, ACTUALLY USED ON THE CONTRACT. IS FURTHER REQUESTED THAT DCASR VERIFY:

   1.   THAT THE REQUIREMENTS SPECIFIED IN PARAGRAPH III.A ARE MET. THE VENDOR IS TO PERFORM THE "CORROSION TEST", A DCASR REPRESENTATIVE SHALL WITNESS THE TEST, VERIFY THAT THE PROCEDURE IS FOLLOWED, AND ALSO TO PERSONALLY EXAMINE THE TEST SPECIMEN FOR EVIDENCE OF CRACKING AT THE CONCLUSION OF THE TEST AS DEFINED IN ENCLOSURE (1).

   2.   THE REQUIREMENTS SPECIFIED IN PARAGRAPH III.B ARE MET.   A DCASR REPRESENTATIVE IS TO VERIFY THAT THE VENDOR'S OR INDEPENDENT LABORATORY IS CAPABLE OF PERFORMING THE CHEMICAL ANALYSIS TEST SPECIFIED IN ENCLOSURE (2).   THE DCASR REPRESENTATIVE IS TO VERIFY THAT THE TEST RESULTS FURNISHED TO SFBNS ARE IN FACT THE ONES TAKEN FROM THE LOT WHICH THE VENDOR IS SUPPLYING ON THE CONTRACT.

III   E.   REQUIRE THE VENDOR TO SUPPLY A WRITTEN QUANTITATIVE CERTIFICATION OF THE TESTS RESULTS, AS SPECIFIED IN PARAGRAPH III.A AND III.B.   THE CERTIFICATIONS UNDER PARAGRAPH III.B SHALL AS A MINIMUM, INCLUDE CHLORIDE, SILICATE, AND SODIUM CONTENT.

N00445-69-B-0258          PG 11

## 3.0  PACKING, PACKAGING AND MARKING

3.1  PACKAGING AND PACKING SHALL BE LEVEL-C IN ACCORDANCE WITH SECTION 5 OF THE APPLICABLE SPECIFICATION.

3.2  THE FOLLOWING MARKING INSTRUCTIONS APPLY:

MARKING:  ALL UNIT, INTERMEDIATE, AND SHIPPING CONTAINERS; ITEMS SHIPPED WITHOUT CONTAINERS, AND ITEMS PACKED LOOSE WITHOUT UNIT OR INTERMEDIATE CONTAINERS WILL BE MARKED IN ACCORDANCE WITH THE LATEST EDITION OF THE MILITARY STANDARD MARKING OF SHIPMENT, MIL-STD-129D DATED 22 DEC. 1964.

3.3  MARKING OF SHIPMENT.  IN ADDITION TO OTHER MARKINGS REQUIRED BY THE SPECIFICATION, ALL SHIPPING CONTAINERS, BOXES, LIFTS, ETC., SHALL BEAR IN 3" HIGH BLACK LETTERS THE WORDS "TARGET MATERIAL", WHEN THE PACKAGE IS LARGE ENOUGH FOR THIS SIZE LETTERS, AND FOR SMALL PACKAGES THE LARGEST PRACTICAL LETTERS SHALL BE USED.

4. 2  COMPUTING DELIVERY  TIME

ATTENTION IS DIRECTED TO PARAGRAPH 10(D) OF THE SOLICITATION INSTRUCTION AND CONDITIONS,    WHICH PROVIDES THAT A WRITTEN AWARD MAILED OR OTHERWISE FURNISHED TO THE SUCCESSFUL BIDDER RESULTS IN A BINDING CONTRACT.  ANY AWARD HEREUNDER OR A PRELIMINARY NOTICE THEREOF, WILL BE MAILED OR OTHERWISE FURNISHED TO THE BIDDER. THE DAY THE AWARD IS DATED, THEREFORE, IN COMPUTING THE TIME AVAILABLE FOR PERFORMANCE,  THE BIDDER SHOULD TAKE INTO CONSIDERATION THE TIME REQUIRED FOR THE NOTICE OF AWARD TO ARRIVE THROUGH THE ORDINARY MAILS.  HOWEVER, A BID OFFERING DELIVERY BASED ON DATE OF RECEIPT BY THE CONTRACTOR OF THE CONTRACT OR NOTICE OF AWARD (RATHER THAN THE CONTRACT DATE) WILL BE EVALUATED BY ADDING THE MAXIMUM NUMBER OF DAYS NORMALLY REQUIRED FOR DELIVERY OF THE AWARD THROUGH THE ORDINARY MAILS.   IF, AS SO COMPUTED, THE DELIVERY DATE OFFERED IS LATER THAN THE DELIVERY DATE REQUIRED IN THE INVITATION, THE BID WILL BE CONSIDERED NONRESPONSIVE AND REJECTED.   (AUG 1967)

4. 3  ACCELERATED DELIVERY

IF AWARDED A CONTRACT, THE BIDDER IS AUTHORIZED TO EXCEED THE DELIVERY RATE OR TO COMPLETE PERFORMANCE OF THE CONTRACT PRIOR TO THE TIME SET FORTH IN THE CONTRACT.   THE MAXIMUM ACCELERATION OF DELIVERY IS DESIRED.

4. 4  CONTRACTOR NOTICE REGARDING LATE DELIVERY

IN THE EVENT THE CONTRACTOR ENCOUNTERS DIFFICULTY IN MEETING PERFORMANCE RE-QUIREMENTS, OR WHEN HE ANTICIPATES DIFFICULTY N COMPLYING WITH THE CONTRACT DELIVERY SCHEDULE OR DATE, BE SHALL IMMEDIATELY NOTIFY THE CONTRACTING OFFICER VIA COGNIZANT INSPECTOR, IF ASSIGNED, IN WRITING, GIVING PERTINENT DETAILS; PROVIDED, HOWEVER, THAT HIS DATA SHALL BE INFORMATIONAL ONLY IN CHARACTER AND THAT THIS PROVISION SHALL NOT BE CONSTRUED AS A WAIVER BY THE GOVERNMENT OF ANY DELIVERY SCHEDULE OR DATE PO2 ANY RIGHTS OR REMEDIES PROVIDED BY LAW OR UNDER THIS CONTRACT.

4. 5  FOR DEPARTMENT OF DEFENSE ADMINISTRATIVE USE ONLY

NAVY PRIORITY 09  APPLIES

N00445-69-B-0258          PG   1

5.0   INSPECTION & ACCEPTANCE

5.I   (A)  THE BIDDER SHALL FURNISH THE FOLLOWING INFORMATION:

   (1)  ARE THE SUPPLIES TO BE FURNISHED FROM STOCK?

     (NOTE:  ONLY NEW AND UNUSED SUPPLIES ARE ACCEPTABLE UNLESS OTHERWISE SPECIFIED)

   (2)  STATE NAME AND ADDRESS OF PRINCIPAL MANUFACTURER, NOT DEALER OF SUPPLIES:

   (3)  STATE PLACE OF PRINCIPAL MANUFACTURER OF SUPPLIES OR PERFORMANCE OF SERVICES:

   (4)  WHERE MAY SUPPLIES BE INSPECTED? (SHOW ADDRESS OF CONTRACTOR'S OR SUBCONTRACTOR'S PLANT WHERE SUPPLIES WILL BE AVAILABLE FOR INSPECTION   IF PRESERVATION, PACKAGING, OR PACKING IS TO BE ACCOMPLISHED BY A SUBCONTRACTOR, INDICATE NAME AND ADDRESS OF SUBCONTRACTOR.)

   (NAME OF CONTRACTOR OR SUBCONTRACTOR)

   (STREET ADDRESS)

   (CITY, STATE, ZIP CODE)

(B)  THE NOTICE OF AWARD MAY SPECIFY THE PLACE AND MANNER OF INSPECTION AND ACCEPTANCE IN ACCORDANCE WITH THE GENERAL PROVISIONS AND OTHER TERMS OF M I'S INVITATION FOR BIDS.  GENERALLY, IF DELIVERY IS AT OR NEAR CONTRACTOR'S PLANT, INSPECTION AND ACCEPTANCE WILL BE AT THAT DESTINATION.  INSPECTION MAY BE SPECIFIED TO INSPECTION AT CONTRACTOR'S PLANT WITH ANY ADDITIONAL INSPECTION AS MAY BE PERFORMED AT DESTINATION.

WHEN THE AWARD SPECIFIED THAT INSPECTION IS TO BE PERFORMED AT THE CONTRACTOR'S PLANT, THE COGNIZANT GOVERNMENT INSPECTOR NAMED IN THE AWARD IS DESIGNATED AS THE AUTHORIZED REPRESENTATIVE OF THE CONTRACTING OFFICER FOR THE PURPOSES OF ADMINISTERING THIS CONTRACT IN ACCORDANCE WITH CURRENT DIRECTIVES RELATING TO ME MATERIAL INSPECTION SERVICE.

PART I

## 6.1 LIST OF ASPR & NPD REQUIRED CLAUSES FOR FIRM FIXED-PRICE SUPPLY CONTRACTS

JO445-69-B-0258 Pag

| Source | Prescribed by | Clause Title | Clause Da |
|---|---|---|---|
| 1-707.3(a) | 7-104.14 | Utilization of Small Business Concerns* | JAN 1958 |
| 1-805.3 | 7-104.20 | Utilization of Concerns in Labor Surplus Areas* | NOV 1967 |
| 6-104.5 | 7-104.3 | Buy American Act | MAY 1964 |
| 6-305 | 7-104.13 | Preference for Certain Domestic Commodities | SEP 1967 |
| 7-103.1 | 7-103.1 | Definitions* | FEB 1962 |
| 7-103.2 | 7-103.2 | Charges* | JAN 1958 |
| 7-103.3 | 7-103.3 | Extras* | JUL 1949 |
| 7-103.4 | 7-103.4 | Variation in Quantity* | JUL 1343 |
| 7-103.5(a) | 7-103.5(a) | Inspection* | MAY 1958 |
| 7-103.6 | 7-103.6 | Responsibility for Supplies* | JAN 1958 |
| 7-103.7 | 7-103.7 | Payments* | JAN 1958 |
| 7-103.8 | 7-103.8 | Assignment of Claims* | FEB 1962 |
| 7-103.9 | 7-103.9 | Additional Bond Security* | JUL 1949 |
| 7-103.12(a) | 7-103.12(a) | Disputes* | JAN 1958 |
| 7-103.13(a) | 7-103.13(a) | Renegotiation | OCT 1959 |
| 7-103.19 | 7-103.19 | Officials Not to Benefit* | JUL 1949 |
| 7-103.20 | 7-103.20 | Covenant Against Contingent Fees* | JAN 1958 |
| 7-103.24(i) | 7-103.24(i) | Suspension of Work | APR 1966 |
| 7-104.15 | 7-104.15 | Examination of Records* | FEB 1962 |
| 7-104.16 | 7-104.16 | Gratuities | MAR 1952 |

*The asterisk after a clause title is solely for the purpose of the Government identifying the clauses contained in Standard Form 32, General Provisions (Supply Contract), June 1964 edition.

PART II

0445-69-B-0258

| Source | | Prescribed by | Clause Title | Clause |
|---|---|---|---|---|
| ☐ | 1-322.5(a) | 7-104.47 | Limitation of Price and Contractor Obligations | |
| ☐ | 1-322.5(b) | 7-104.47 | Cancellation of Items | OCT 19 |
| ☐ | 1-327.2 | 7-104.59 | Required Source for Aluminum ingot | OCT 19 |
| ☐ | 1-707.3 (b) | 7-104.22 | Small Business Subcontracting Program | MAR 196 |
| ☐ | 1-805.3(b) | 7-104.38 | Labor Surplus Area Subcontracting Program | JUN 196 |
| ☒ | 1-1208(a) | 7-104.48 | New Material | NOV 1967 |
| ☐ | 1-1404(a) | 7-104.19 | Ocean Transport of Government Owned Supplies | JAN 1965 |
| ☐ | 1-1404(b)(1) | 7-104.19 | Employment of Ocean-Going Vessels | NOV 1963 |
| ☐ | 1-1404(b)(2) | 7-104.19 | Preference for United States-Flag Vessels | JAN 1958 |
| ☐ | 1-1410(b) | 7-104.46 | Non-Use of Foreign-Flag Vessels Engaged in Cuban and North Vietnam Trade | DEC 1955 |
| ☐ | 4-606 | 7-104.30 | Humane Method of Livestock Slaughter | APR 1966 |
| ☐ | 6-603.3(a) | 7-104.31 | Duty Free Entry for Certain Specified Items | JAN 1961 |
| ☐ | 6-603.3(b) | 7-104.31 | Notice of Imports - Possible Duty Free Entry | FEB 1968 |
| ☐ | 6-703.4 | 7-104.43 | U.S. Products (Military Assistance Program) | FEB 1968 |
| ☐ | 6-806.4 | 7-104.57 | U.S. Products and Services (Blanace of Payments Program) | DEC 1962 |
| ☐ | 6-807(a) | 7-104.58 | Identification of Expenditures in the U.S. | JUN 1965 |
| ☐ | 6-1110 | 7-104.66 | Acquisition and Use of Excess and Near-Excess Currency | OCT 1966 |
| ☐ | 7-104.4 | 7-104.4 | Notice of the Government of Labor Disputes | DEC 1967 |
| | | | | SEP 1958 |

N0004○-69-B-0258   Page   2

| Source | Prescribed by | Clause Title | Clause Da |
|---|---|---|---|
| 10-405 | 7-104.65 | Insurance | FEB 1968 |
| 13-702(a) | 7-104.24 | Government Property (Fixed Price) | APR 1968 |
| 13-704 | '7-104.25 | Special Tooling | OCT 1967 |
| 13-705 | 7-104.52 | Special Test Equipment | JUN 1365 |
| E-510.1 | 7-104.35 | Progress Payments | NOV 1964 |

6.2 Continued

PG 23

SUPPLIES, AS WELL AS FOR EXCESS COSTS INCURRED OR TO BE INCURRED.

ANY SUPPLIES OR PARTS THEREOF CORRECTED OR FURNISHED IN REPLACEMENT PURSUANT TO THIS CLAUSE SHALL ALSO BE SUBJECT TO ALL THE PROVISIONS OF THE CLAUSE TO THE SAME EXTENT AS SUPPLIES INITIALLY DELIVERED.

FAILURE TO AGREE UPON ANY DETERMINATION TO BE MADE UNDER THIS CLAUSE SHALL BE A DISPUTE CONCERNING A QUESTION OF FACT WITHIN THE MEANING OF THE "DISPUTES" CLAUSE OF THIS CONTRACT.

THE WORD "SUPPLIES" AS USED HEREIN INCLUDES RELATED SERVICES.

THE RIGHTS AND REMEDIES OF THE GOVERNMENT PROVIDED IN THIS CLAUSE ARE IN ADDITION TO AND DO NOT LIMIT ANY RIGHTS AFFORDED TO THE GOVERNMENT BY ANY OTHER CLAUSE OF THE CONTRACT.

7. 5  SPECIAL TAX CLAUSE FOR FIXED-PRICE CONTRACTS (WAV NAT INST. 5840.13)

N00445-69-B-0258    PG 25

THE FOLLOWING CLAUSE NILL APPLY IF THE CONTRACTOR IS LOCATED WITHIN THE
DICTION OF THE CITY OF LOS ANGELES, CALIFORNIA.

NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS CONTRACT:

(A)   THE CONTRACT PRICE INCLUDES ALLOCABLE LOS ANGELES CITY LICENSE TAXES
CLUDING THOSE TAXES (HEREINAFTER REFERRED TO AS "ADDITIONAL TAXES") RESUL
FROM THE APPLICATION OF PRINCIPLES EXPRESSED BY THE LOS ANGELES CITY ATTO
HIS OPINION DATED 2 MARCH 1960.   'IF, AFTER THE CONTRACT DATE, THE CONTRAC
NOT REQUIRED TO PAY OR BEAR THE BURDEN, OR OBTAINS A CREDIT OR REFUND OF A
A PORTION OF SAID TAXES FROM THE (CITY CF LOS ANGELES, THE CONTRACT PRICE S
DECREASED BY THE AMOUNT OF SUCH RELIEF OR REFUND ALLOCABLE TO THIS CONTRAC
THAT AMOUNT SHALL BE PAID TO THE GOVERNMENT, AS THE CONTRACTING OFFICER DI
THE CONTRACT PRICE SHALL BE SIMILARLY DECREASED IF THE CONTRACTOR, THROUGH
FAULT OR NEGLIGENCE OR FAILURE TO FOLLOW INSTRUCTIONS OF THE CONTRACTING O
AS PROVIDED IN (B) BELOW, IS REQUIRED TO PAY OR BEAR THE BURDEN OR DOES NO
TAIN A REFUND OF ANY SUCH TAXES.   INTEREST PAID OR CREDITED TO THE CONTRAC
INCIDENT TO A REFUND OF THOSE TAXES SHALL INSURE TO THE BENEFIT OF THE GOV
TO THE EXTENT THAT SUCH INTEREST WAS EARNED AFTER THE CONTRACTOR WAS PAID C
IMBURSED BY THE GOVERNMENT FOR THESE TAXES.

(B)   THE CONTRACTOR SHALL COMPLY WITH THE INSTRUCTIONS OF THE CONTRACTING O
IN ORDER TO OBTAIN A REDUCTION, CREDIT OR REFUND OF LOS ANGELES CITY LICENSI
AND THE CONTRACT PRICE SHALL BE EQUITABLY ADJUSTED TO COVER THE COSTS OF SU
PLIANCE, INCLUDING REASONABLE ATTORNEY'S FEES ARISING THEREFROM.

(C)   THE CONTRACTOR SHALL MAINTAIN ACCURATE RECORDS SHOWING THE AMOUNT OF
LOS ANGELES LICENSE TAXES, AND SPECIFICALLY THE AMOUNT OF ADDITIONAL TAXES,
CLUDED IN THE CONTRACT PRICE.

7. 6  WAIVER OF CLAIMS (JULY 1963) (NSCO CODE 08)

CONTRACTOR WAIVES ANY AND ALL CLAIMS FOR EXTRA WORK PERFORMED IN RESPONSE TO
FORMAL DIRECTIONS, SUGGESTIONS OR INSTRUCTIONS (WRITTEN OR ORAL) GIVEN BY REP
SENTATIVES OF THE CONTRACTING OFFICER, EXCEPT IN THOSE CASES WHERE THE CONTRA
DIRECTLY NOTIFIES THE CONTRACTING OFFICER (PURCHASE DIVISION, CODE 532,
SAN FRANCISCO BAY NAVAL SHIPYARD, VALLEJO, CALIFORNIA 94592) PRIOR TO COMMENC
SUCH EXTRA WORK, AND REQUESTS A FORMAL CHANGE ORDER COVERING SUCH WORK.

7. 7  DESIGNATION OF PROGRESSING ACTIVITY (NPD 30-101.3C(2)

IF THIS CONTRACT REQUIRES INSPECTION AT SOURCE PRIOR TO SHIPMENT, THE ADMINIST
TIVE CONTRACTING OFFICER OF THE DEFENSE CONTRACT ADMINISTRATION SERVICES ACTIV
IS HEREBY DESIGNATED AS THE PROGRESSING ACTIVITY PURSUANT TO NPD 30-101 AND CU
RENT DIRECTIVES RELATING TO DEFENSE CONTRACT ADMINISTRATION SERVICES REGION. I
INSPECTION AT SOURCE IS NOT REQUIRED, THE RECEIVING ACTIVITY WITHIN CONTINENTAL
UNITED STATES IS SO DESIGNATED AS THE PROGRESSING ACTIVITY.

7.9  GOVERNMENT SURPLUS (JA... 1965) (ASPR 1-1208 (d)                    N00445 69-B-0258        PG

(A)   IN THE EVENT THE BID OR PROPOSAL IS BASED ON FURNISHING ITEMS OR COM
ENTS WHICH ARE FORMER GOVERNMENT SURPLUS PROPERTY OR RESIDUAL INVENTORY RI
7 FROM TERMINATED GOVERNMENT CONTRACTS, A COMPLETE DESCRIPTION OF THE IT
COMPONENTS, QUANTITY TO BE USED, NAME OF GOVERNMENT AGENCY FROM WHICH ACQU
AND DATE OF ACQUISITION SHALL BE SET FORTH ON A SEPARATE SHEET TO BE ATTAC
TO BID OR PROPOSAL.  NOTWITHSTANDING ANY INFORMATION PROVIDED IN ACCORDANC
WITH THIS PROVISION, ITEMS FURNISHED BY THE CONTRACTOR MUST COMPLY IN ALL
RESPECTS WITH THE SPECIFICATIONS CONTAINED HEREIN.

(B)   EXCEPT AS DISCLOSED CY THE CONTRACTOR IN (A) ABOVE, NO PROPERTY OF TH
TYPE DESCRIBED HEREIN SHALL BE FURNISHED UNDER THIS CONTRACT UNLESS APPROVE
WRITING BY THE CONTRACTING OFFICER.

X00445 69-B-0258   PG 29

## THERMAL INSULATION CORROSION TEST PROCEDURE

### Scope

To provide a test to determine the corrosion cracking capability of wetted insulating material on stressed austenitic stainless steel.

### Method

The test procedure outlined below is a modification of the test described in ASTM Bulletin dated October 1957, TP 196-202. The essential differences lie in the method of heating the test specimen, the bath design and the specimen preparation. Either method is considered adequate to fulfill the scope requirements indicated above.

In the procedure described below a sample of the test insulation is wrapped around stressed U-bend specimens and maintained wetted by partial immersion in demineralized water. The U-bend specimens are in turn fastened to a low pressure steam pipe and heated to approximately 200-220F. The water drawn through the insulation by capillary action transfers leachable constituents to the heated surfaces. These leachable constituents concentrate on the specimen as the water volatizes and will cause the austenitic stainless steel U-bend specimens to crack, if the constituents are corrosive.

### Test Equipment Description

Figure 1 is a diagram of the test apparatus used in the test. Four Type 304 stainless steel U-bend specimens are fastened around a horizontal 1-inch, Schedule 40, Ni-Cu-Fe Alloy 600 pipe. The position of the apex of the U-bend is on the underside of the pipe. The U-bend specimens are wrapped with approximately one-inch thick insulating material which is supported around the pipe by 40 mesh Ni-Cr-Fe Alloy 600 screening. A one pint, stainless steel pan containing demineralized water is located below the insulation. The water level in the pan is maintained approximately 1 inch below the specimens, i.e., 1 inch of the insulation thickness is inserted in the water. The pan has three drilled openings approximately 1 inch above the nominal water level as an overflow path to protect against the dilution of the deposits on the U-bend specimens in the event of an excessive makeup water flow rate. An auxiliary backup container (not shown on the drawing) is provided below the one-pint pan to collect any overflow water.

Demineralized water used in the test must meet the following specifications:

Chloride Concentration = 0.1 ppm, maximum

Conductivity = 2.5 micro-mho/cm, maximum

pH = 6.0 - 8.0

A Corrosion Test For Thermal
Insulating Material

Next wrap a sample of the insulating material to be tested so that
all four U-bend specimens are covered with approximately 1" thick insula-
tion. Block or rigid pipe insulation can be cut in strips and applied
parallel to the steam piping. Felt lagging or soft insulation is applied
on a blanket covering the U-bend specimens. Liquid-type cements are
applied to quartz glass wool bags. The quartz glass wool is rinsed in
demineralized boiling water twice before applying to the cement. A mini-
mum of 50 grams of cement (dry basis) must be applied to the quartz glass.
Secure the insulating material against the U-bend specimens with the 40-
mesh Alloy 600 screening.

Next introduce 5-10 psig steam to the 3-inch Alloy 600 piping. Heat
the specimens and insulation for one hour and then shut off the steam
supply. Slowly add demineralized water into the pan and then carefully
apply the steam pressure again. Maintain the liquid level in the range
of 3/8" or 3/4" below the U-bend specimens, adding as required. Cover the
pan and insulated U-bend specimens with the protective splash guard.

Continue the test for a period of four weeks. In the event that the
makeup water overflows the one-pint pan, return the overflow water back
into the pan, as the opportunity presents itself. The makeup water flow-
rate must range from 200 - 600 ml per day in order to provide sufficient
leaching action. The rate can be estimated by noting the level decrease
in the pan during a time period when no makeup water is added or by cali-
brating a water supply container. If the rate is less than 200 ml per
day, increase the evaporative rate by raising the steam supply pressure
to 12 psig. If this action does not provide the necessary minimum flow
it is indicative that the insulation is not being wicked properly. Quartz
glass wool can be placed between the test insulation and the Alloy 600
screening in order to promote increased wicking action. A makeup rate
greater than 600 ml/day is acceptable and need not be corrected.

At the end of the test period, remove the four U-bend specimens. Wash
each specimen, scrubbing any adherent deposits with a stiff bristle brush.
Examine each specimen for evidence of cracking by 30X magnification.
Areas of attack are usually identified by reddish corrosion products
located around the cracks.

Evaluation of Test Results

Evidence of one or more cracks in the U-bend surface or edges below
the bolt holes (as viewed by 30X magnification) constitutes a specimen
failure. Pitting attack not accompanied by cracking does not constitute
a specimen failure.

Insulating material is considered satisfactory and acceptable if none
or only one out of the four U-bend specimens contain cracks. Insulating
material is considered corrosive and non-acceptable if two or more out
of the four U-bend specimens contain cracks.

N00445-6:  -0258     PG 33

## THERMAL INSULATION CHEMICAL ANALYSIS PROCEDURE

I.  Sample Preparation

The materials to be tested are of two general types:  (a) asbestos base, which can be pulverized (using Waring-type blender) and (b) cements, which can be either air dried or painted on stainless steel sheet prior to leaching.

The asbestos-type materials should be carefully sampled and pulverized before leaching is begun.

(a)  Asbestos-type materials.

Procedure:

1.  Weigh approximately 20. g of the pulverized sample into an 800 ml beaker.

2.  Cover the sample with distilled water, usually a volume of about 200 ml is sufficient.

3.  Cover the beaker with a large watch glass and heat for ½ hour at a temperature at or near boiling, ~95-100°C.

4.  Cool the sample to room temperature.  Filter the solution through a No. 41 Whatman filter paper in a Buchner-type funnel (aspirator-type suction can be used).  Wash the residue repeatedly with distilled water.  The efficiency of the leaching is dependent upon how well the soluble ions are washed away from the insoluble bulky residue.  In general, about 250 mls of distilled water can be used for the washings, since a final volume of 500 ml is a convenient volume for aliquoting for the chemical analysis to follow.

5.  Measure the pH of the leach solution.  The solution shall not exceed a pH of 11.2.

6.  Adjust the filtered solution to a volume of 500 ml.  Transfer the solution to a polyethylene container and reserve for chemical analysis.  The final solution should not stand in glass because contamination from silicate ion is excessive.  (Called sample solution A).

(b)  Cements.

The water leaching of cements may be done by two procedures:
(1) Painting of the cement on a strip of stainless steel is desirable if the cement will stick to the steel during the ½ hour leaching, or
(2) a portion of the cement (~20. g) can be air dried prior to the water leaching step.  The air drying aids in removing some volatile compounds which make filtration difficult.

N00445-09-B-0258          PG 35

(a) Sodium chloride (20 μg Cl/ml).  Dry ≈ 1 g sample of reagent grade sodium chloride at 110°C for several hours and store in a desiccator.  Transfer 0.0330 g of the dry sodium chloride to a liter flask and dilute to the mark with chloride-free distilled water.  The solution should remain usable indefinitely if stored in a polyethylene bottle.

(b) Ferric ammonium sulfate (6%).  Dissolve 99.7 g Fe$_2$(SO$_4$)$_3$NH$_4$SO$_4$ 24H$_2$O and dilute to the mark in a one liter flask with 8 N nitric acid.  Allow to stand at least 24 hours.  This solution is stable for several months if stored in a brown bottle.

(a) Mercuric thiocyanate (1.3%).  Dissolve 7.5 g Hg(SCN)$_2$ in 500 ml methyl alcohol.  Mix the reagent using a magnetic stirrer for at least one-half hour and filter.

(d) Nitric acid (8N).

6.  PROCEDURE

(a) Preparation of calibration curve.

(1) Pipette aliquots of standard sodium chloride solutions containing 20, 40, 60, 80 and 100 micrograms of Cl solution into 50 ml volumetric flasks.

(2) Add 2 ml of ferric ammonium sulfate and mercuric thiocyanate. (After each addition, wash down walls of flask with distilled water to insure thorough mixing).  Dilute to volume and mix.

(3) Allow the solutions to stand for fifteen minutes.  Read the optical density in a 5 cm cell at 470 μμ against a 5 cm reference cell containing water.

(b) Analysis of unknown samples

(1) Pipette an aliquot of sample solution A which contains approximately 20-60 μg chloride into a 50 ml volumetric flask.

(2) Add 2 ml of ferric ammonium sulfate and mercuric thiocyanate. (After each addition wash down walls of flask with distilled water to insure thorough mixing).  Dilute to volume and mix.

(3) Allow the solutions to stand for fifteen minutes.  Read the optical density in a 5 cm cell at 470 μμ against a 5 cm cell containing a sample blank prepared as follows:  Pipette an aliquot of sample solution A into a 50 ml volumetric flask and dilute to volume with distilled water.



Figure 1 — Chemical Analysis

PPM Cl

REJECTABLE AREA

ACCEPTABLE AREA

# EXHIBIT 4

# EXHIBIT 4

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 4

Pittsburgh Corning Corporation
One Gateway Center
Pittsburgh, Pennsylvania 15222

November 19, 1968

Receiving Officer   Code 526
Building 483
San Francisco Bay Naval Shipyard
Vallejo, California  94590

Subject:   Your Noo445-69-C-0137

Gentlemen:

Attached are three Certified Certificates attesting to Corrison, Mercury Contamination, QPL 2781 and two Chemical Analysis Test results in accordance with MIL-I-24244 (Ships) dated August 22, 1966.

Two complete sets have been forwarded to our shipper at Tyler, Texas, who in turn will have these approved by the local inspector, so that this material can be set up for immediate shipment.

Very truly yours,

PITTSBURGH CORNING CORPORATION

W. L. Gibanic
Assistant Manager
Scheduling-Traffic Department

WLG/km
Attachment

# PITTSBURGH CORNING CORPORATION
### ONE GATEWAY CENTER
### PITTSBURGH, PA. 15222

Metalclad Insulation Corporation P. O. #693
San Francisco Bay Naval Shipyard
Contract No. N00445-69-C-0137
Order consists of 15 items of UNIBESTOS Insulation
conforming to MIL-I-2781D, Grade II, Class C and
Grade III, Class F, and MIL-I-24244 (Ships)
Sub-type 1B and 1F
Lot #108 and Lot #214

May Concern:

This is to certify that UNIBESTOS insulation as manufactured
by Pittsburgh Corning Corporation conforms to Military Specification
for "Insulation Pipe, Thermal", MIL-I-2781D, as described under 1.2.
as Insulation Grade II, Class C; and Grade III, Class F; further, that
this insulation is covered by the Qualified Products List QPL-2781
and the Department of the Navy in Dallas has approved the Quality
Approval for UNIBESTOS Pipe Covering Production June 13, 1963.

Very truly yours,

John H. Price, Jr.
Vice President – Sales

Subscribed before me this

_____ day of   November , 1968

Evelyn A. Heil

Commission expires   April 14, 1969

EVELYN A. HEIL, Notary Public
PITTSBURGH, ALLEGHENY COUNTY, PA.
MY COMMISSION EXPIRES APRIL 14, 1969

# PITTSBURGH CORNING CORPORATION
## ONE GATEWAY CENTER
### PITTSBURGH, PA. 15222

JOHN H. PRICE, JR.
VICE PRESIDENT - SALES

Metalclad Insulation Corporation P. O. #693
San Francisco Bay Naval Shipyard
Contract No. N00445-69-C-0137
Order consists of 15 items of UNIBESTOS Insulation
Conforming to MIL-I-2781D, Grade II, Class C and
Grade III, Class F, and MIL-I-24244 (Ships)
Sub-type 1B and 1F
Lot #108 and Lot #214

To Whom It May Concern:

This is to certify that the UNIBESTOS insulation, as furnished
on the subject purchase order, has been successfully corrosion tested
on a preproduction basis as described in (BuShips) letter serial 1500-1-
1827 dated 30 December 1964, enclosure (1a) as per BuShips' letter
1500-1-610 dated February 9, 1965.

This is to further certify that UNIBESTOS is included in the
summary of test results enclosure (3a) of the aforementioned letter and,
as indicated by the letter, this listing constitutes preproduction
testing of the materials listed.

Very truly yours,

John H. Price, Jr.
Vice President - Sales

JHP:kj

Sworn and subscribed before me this

14th   day of   November, 1968

Notary Public

My commission expires   April 11, 1969

EVELYN A. HEIL, Notary Public
PITTSBURGH, ALLEGHENY CO.
[illegible]

h

Pittsburgh Corning Corporation
One Gateway Center
Pittsburgh, Pennsylvania 15222

Metalclad Insulation Corporation P.O.   #693
San Francisco Bay Naval Shipyard
Contract No. N00445-69-C-0137
Order consists of 15 items of UNIBESTOS Insulation
Grade 111, Class F, and MIL-I-24244 (Ships)
Sub-type 1B and 1F
Lot #214 (consists of Grade 11, Class C and
Sub-type 1B items)

To Whom It May Concern:

This is to certify that the subject order was tested for
chemical analysis in accordance with MIL-I-24244 (Ships) dated 22 August 1966
by the Pittsburgh Corning Corporation laboratory at Port Allegany, Pennsylvania
on   November 8, 1968   with test results as follows:

| Sample Number | 1 | 1a | 2 | 2a | 3 | 3a |
|---|---|---|---|---|---|---|
| Leachable Cl    (ppm) | 96 | 85 | 101 | 90 | 68 | 91 |
| Leachable Na+   (ppm) | 39,800 | 38,600 | 42,300 | 40,500 | 40,600 | 43,000 |
| Leachable SiO₃  (ppm) | 65,000 | 59,400 | 100,000 | 89,300 | 108,300 | 115,600 |
| pH of leachate solution | 10.6 | 10.6 | 10.8 | 10.8 | 10.7 | 10.8 |

Very truly yours,

John H. Price, Jr.
Vice President - Sales

JHP:kj

Sworn and subscribed before me this

14th   day of   November, 1968

Notary Public

My commission expires   April 11, 1969

EVELYN A. HEIL, Notary Public
PITTSBURGH, ALLEGHENY COUNTY, PA.
MY COMMISSION EXPIRES April 11, 1959

PITTSBURGH DC° CORNIN

Pittsburgh Corning Corporation
One Gateway Center
Pittsburgh, Pennsylvania 15222

Metalclad Insulation Corporation P. O. #693
San Francisco Bay Naval Shipyard
Contract No. N00445-69-C-0137
Order consists of 15 items of UNIBESTOS Insulation
Grade III, Class F, and MIL-I-24244 (Ships)
Sub-type 1B and 1F
Lot #108 (consists of Grade III, Class F and
Sub-type 1F items)

To Whom It May Concern:

This is to certify that the subject order was tested for
chemical analysis in accordance with MIL-I-24244 (Ships) dated 22 August 1966
by the Pittsburgh Corning Corporation laboratory at Port Allegany, Pennsylvani
on    November 8, 1968    with test results as follows:

| Sample Number | | 1 | 1a | 2 | 2a | 3 | 3a |
|---|---|---|---|---|---|---|---|
| Leachable Cl | (ppm) | 142 | 131 | 115 | 137 | 149 | |
| Leachable Na+ | (ppm) | 37,500 | 36,100 | 41,900 | 41,400 | 33,000 | 161 |
| Leachable $SiO_3$ | (ppm) | 43,700 | 32,500 | 60,000 | 72,500 | 27,500 | 32,500 |
| pH of leachate solution | | 10.6 | 10.5 | 10.5 | 10.6 | 10.4 | 20,600 |
| | | | | | | | 10.3 |

Very truly yours,

John H. Pr ce Jr.
Vice President — Sales

JHP:kj

Sworn and subscribed before me this

14th    day of    November, 1968

Notary Public

My commission expires    April 11, 1969

EVELYN A. HEIL, Notary Public
PITTSBURGH, ALLEGHENY C........T

I T T S B U R G H   DC ° C O R N I N C

# PITTSBURGH CORNING CORPORATION
### ONE GATEWAY CENTER
### PITTSBURGH, PA. 15222

JOHN H. PRICE, JR.
VICE PRESIDENT-SALES

Metalclad Insulation Corporation P. O. #693
San Francisco Bay Naval Shipyard
Contract No. N00445-69-C-0137
Order consists of 15 items of UNIBESTOS Insulation
conforming to MIL-I-2781D, Grade II, Class C and
Grade III, Class F, and MIL-I-2424 (Ships)
Sub-type 1B and 1F
Lot #108 and Lot #214

To Whom It May Concern:

This is to certify that UNIBESTOS insulation as manufactured
by Pittsburgh Corning Corporation conforms to Military Specification
"Insulation, Pipe, Thermal", MIL-I-2781D, as described under 1.2
Classification Grade II, Class c; and Grade III, Class f; further, that
UNIBESTOS insulation is covered by the Qualified Products List QPL-2781
and that the Department of the Navy in Dallas has approved the Quality
Control Manual for UNIBESTOS Pipe Covering Production June 13, 1963.

Very truly yours,

John H. Price, Jr.
Vice President - Sales

JHP:kj

Sworn and subscribed before me this

14th _____ day of November, 1968

_Evelyn A. Heil_
Notary Public

My commission expires _April 11, 1969_

EVELYN A. HEIL, Notary Public
PITTSBURGH, ALLEGHENY CO., PA.
MY COMMISSION EXPIRES APR. 11, 1969

# EXHIBIT 5

# EXHIBIT 5

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 5

1  GERALD A. DESIMONE, ESQ.
   BARNABY W. HORTON, ESQ.
2  MARISSA BANEZ, ESQ. (State Bar No.: 111188)
   DANAHER, TEDFORD, LAGNESE &
3  NEAL, P.C.
   Capitol Place
4  21 Oak Street – Suite 700
   Hartford, Connecticut 06106
5  Telephone: (860) 247-3666
   Facsimile: (860) 547-1321
6
7  SUSAN M. BUNSTOCK, ESQ. (State Bar No.: 98031)
   JOHN P. KATERNDAHL, ESQ. (State Bar No.:127646)
8  HASSARD BONNINGTON
   2 Embarcadero Center
9  Suite 1800
   San Francisco, California 94111-3993
10 Telephone (415) 288-9800

11 Attorneys for Defendant
   PITTSBURGH CORNING CORPORATION

12

13 Attorneys for Defendant PITTSBURGH CORNING CORPORATION

14

15              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

16             IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17 IN RE:                              :

18                                     :    NO. 828684
   COMPLEX ASBESTOS LITIGATION:
19                                     :    RESPONSE OF PITTSBURGH CORN-
                                       :    CORPORATION TO PLAINTIFF'S
20 _____ :    STANDARD INTERROGATORIES
                                       :    (Revised General Order 129)

21

22                        PRELIMINARY STATEMENT

23      This Defendant manufactured an asbestos thermal insulation
   product, UNIBESTOS, from July 1, 1962 to on or about February 1
24 1972.  Unless otherwise stated in response to specific
   interrogatories, the responses herein shall be limited to such
25 product and time period.  This Defendant objects to providing
   responses for any other period of time on the grounds that such
26
27
28 additional information sought is irrelevant, immaterial, not

furthermore, could be burdensome, expensive and harassing to comply with.

At various times, this Defendant also relabeled and sol certain types of mastic products as accessory products. Alt all the formulations of these relabeled mastic accessory proc are not now known, a few did include small amounts of asbesto fibers used as a binder, which fibers were encapsulated in a bituminous and/or resinous binder. These accessory products not manufactured by this Defendant, were not used on high temperature insulation products such as UNIBESTOS and were no insulating materials. Those few mastic products which contai: asbestos fibers as a binder have not been considered to be a source of asbestos fiber emissions. Consequently, such materi was specifically exempted from certain regulations in the fede Environmental Protection Agency's National Emissions Standard Asbestos, <u>see</u> 40 C.F.R. § 61.22 <u>et seq</u>., (now 40 C.F.R. § 61.1 and were exempt from the asbestos controls of the Consumer Products Safety Commission 16 C.F.R. § 1304.3(c). Similarly, asbestos regulations of the Occupational Safety and Health Act, which require caution labels on asbestos products, did not appl to any material where asbestos fibers were modified by a bindir agent, coating or binder. <u>See</u> 29 C.F.R. § 1910.1001(g)(2)(i) (now 29 C.F.R. § 1910.1001(j)(4)(i)).

The term asbestos is generically applied to several different minerals, may be found in various fiber types and may be found in a wide variety of product forms, including ceiling tiles, floor tiles, gaskets, gloves, mastics, protective aprons,

2

utility), governmental agency or entity, shipyard, distributor, refinery, contractor, supplier, PREMISE owner or occupant, ship owner, or other PREMISE or site in the GEOGRAPHIC AREA and whether any of THIS DEFENDANT's RAW ASBESTOS has at any time, been sold to any manufacturer, or manufacturing facility, of ASBESTOS-CONTAINING PRODUCTS. If so, state:

1. The names of each such COMPANY, governmental agency or entity, shipyard, distributor, supplier, manufacturer or refinery;

2. The inclusive dates of each such sale, and the amount (quantity) and the trade brand name of such RAW ASBESTOS sold;

3. The manner of shipment (e.g. boat, rail, etc.)

4. Whether you have any records indicating any such sale or shipment and, if so, the name, address and job classification of each person who currently has possession of such records.

5. Either (1) attach all DOCUMENTS evidencing the information sought in this Interrogatory and its subparts to your answers to these Interrogatories, or (2) attach disks containing such data, or (3) describe such DOCUMENTS with sufficient particularity that they may be made the subject of a request for production of documents.

**RESPONSE**: Not applicable.


INTERROGATORY NO. 30:

Between 1930 and 1985, did YOU ever engage in any of the activities listed below with regard to ASBESTOS-CONTAINING PRODUCTS? If so, state the inclusive dates of such activity:

27

1    A.    Supply;

2    B.    Importing;

3    C.    Distribution;

4    D.    Marketing;

5    E.    Sale;

6    F.    Labeling;

7    G.    Manufacturing;

8    H.    Brokering;

9 **RESPONSE:** This Defendant manufactured and sold UNIBESTOS for the

10 first time on July 1, 1962 on which date it purchased

11 selected assets and facilities from Union Asbestos and

12 Rubber Company (UNARCO) which it then utilized in the

13 manufacture of UNIBESTOS. Pittsburgh Corning's

14 production ceased on or about February 1, 1972. See

15 Preliminary Statement regarding accessory products.

16

17 INTERROGATORY NO. 31:

18    If your answer to any subpart of Interrogatory No. 30

19 regarding "ASBESTOS-CONTAINING PRODUCTS" is in the affirmative,

20 state:

21    A.    The trade, brand name, and/or generic name of each such

22 ASBESTOS-CONTAINING PRODUCT MARKETED in any form or quantity

23 between 1930 and 1985;

24 **RESPONSE:** Trade name: UNIBESTOS. See Preliminary Statement

25 regarding accessory products.

26

27

28

B.   The date(s) each such ASBESTOS-CONTAINING PRODUCT placed on the market, including the date(s) each such ASBESTOS-CONTAINING first MARKETED:

1. On an experimental basis;

2. On a test basis; or

3. For sale.

RESPONSE: This Defendant manufactured and sold UNIBESTOS for the first time on July 1, 1962 on which date it purchased selected assets and facilities from Union Asbestos and Rubber Company (UNARCO) which it then utilized in the manufacture of UNIBESTOS.  This Defendant does not have specific knowledge as to when UNIBESTOS was first sold, however, this Defendant believes the product was first commercially sold by UNARCO as early as 1954.  Other published studies and governmental reports suggest that UNARCO first manufactured UNIBESTOS for sale in 1937 or 1938 pursuant to the requirements and testing of the United States Navy.

C.   The date(s) each such ASBESTOS-CONTAINING PRODUCT

1. Ceased to be produced; or

2. Was recalled from the market, if ever.

RESPONSE: This Defendant ceased the production of UNIBESTOS on or about February 1, 1972.

D.   A detailed description of the chemical composition of each such ASBESTOS-CONTAINING PRODUCT, including the type and/or grade of asbestos and/or asbestos fiber contained in each such product and the quantitative percentage of asbestos or asbestos

29

1  fiber in such product, and all non-asbestos components of the
2  ASBESTOS-CONTAINING PRODUCT, and if the chemical composition
3  changed over time the inclusive dates of each formulation;
4  **RESPONSE**: Because authentic, reliable production records of the
5  precise percentages of components in UNIBESTOS cannot
6  be found in this Defendant's files, and because the
7  quantity of each component varied from one wall
8  thickness and inner diameter to another, the
9  information requested in this interrogatory concerning
10  quantities of components can only be based on the
11  following approximations:

12  <u>Average Percentages per Unit Volume</u>
13  Amosite fiber                    6%
14  Sodium Silicate and
15  Diatomaceous Earth        17%
16  <u>Average Percentages by Weight</u>
17  Amosite fiber                   65%
18  Sodium Silicate and
     Diatomaceous Earth        35%
19
20  E.    A description of the physical appearance and nature of
21  each ASBESTOS-CONTAINING PRODUCT, including any color coding,
22  distinctive logo, either on the product or on the packaging;
23  **RESPONSE**: Rigid, 3-foot long, half cylinders of thermal
24  insulation for piping.  As to UNIBESTOS during the
25  period this Defendant manufactured an asbestos thermal
26  insulation product, the product was shipped in
27  paperboard cartons measuring three (3) feet in length.
28  The other dimensions varied according to the diameters

of the contents.  Printed material on the carton
included, among other information, the following:
corporate identification; product name; size of
contents; generic description; corporate logo; warning
label, beginning in 1968, which read:  "This product
contains asbestos fibers.  If dust is created when the
product is handled, avoid breathing the dust.  If
adequate ventilation control is not possible, wear
respirator approved by U.S. Bureau of Mines."  See
attached copy of a UNIBESTOS carton photograph.  See
also this Defendant's response to Interrogatory No. 3

F.   A detailed description of the intended use of each such
ASBESTOS-CONTAINING PRODUCT, including any temperature limits for
each such use;

**RESPONSE:** UNIBESTOS was produced for use as thermal pipe covering
insulation.  On occasion, per customer request, the
UNIBESTOS was cut into blocks.  Up to 1500 degrees
Fahrenheit.

G.   Whether any such ASBESTOS-CONTAINING PRODUCT was on the
Government's "Qualified Products List," and if so, the inclusive
dates it was on such list;

**RESPONSE:** Yes.  This Defendant's asbestos thermal insulation
product complied with:

Military Specification MIL.I.24244

Military Specification MIL.I.2781 --

Grade II,  Class c

Grade III, Class f

31

Federal Specification HH-I-561

H.    The name and address of the supplier of the RAW ASBESTOS used in each such product and the time period of such supply;

RESPONSE: This Defendant purchased amosite asbestos fibers from the following suppliers:

(1)    Union Asbestos and Rubber Co. (UNARCO)
       332 South Michigan Avenue
       Chicago, Illinois   60604

(2)    EGNEP (Pty.) Limited (EGNEP)
       (owned by Cape Asbestos Company, Limited)
       Burlington House
       22 Rissik Street
       Johannesburg, South Africa

(3)    North American Asbestos Corporation
       (North American)
       200 South Michigan Avenue
       Chicago, Illinois   60604

(4)    General Services Administration (GSA)
       United States of America
       Stockpile Disposal Division
       Property Management and Disposal Services
       Washington, D.C.   20405

Cape Asbestos Company, Limited, with offices in London, England, together with its subsidiary, North American Asbestos Corporation, acted as liaison between Pittsburgh Corning and EGNEP, but were not involved in the actual buy-sell transaction between the parties.

With regard to asbestos sold by North American to Pittsburgh Corning Corporation, all of it was purchased by North American from GSA.

North American purchased such asbestos and, in turn, billed Pittsburgh Corning upon shipment.

32

**AFFIDAVIT**

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF ALLEGHENY
       )SS:

BEFORE ME, the undersigned authority in and for said Commonwealth and County, personally appeared Richard C. McPherson, who being duly sworn deposes and says that he is Senior Vice President of Human Resources with Pittsburgh Corning Corporation, that he is authorized to make this affidavit on its behalf and that the facts contained in the foregoing responses to interrogatories are based on previous responses to similar interrogatories compiled by Robert E. Buckley who was a former Vice President and Assistant to the President of Pittsburgh Corning Corporation and who has sworn that said responses were true and correct to the best of his knowledge or information and belief.

                   _R. C. McPherson_
                   R. C. McPherson

SWORN TO AND SUBSCRIBED BEFORE ME

this _2nd_ day of _June_ 1997.

_Julie A. Stephens_
Notary Public

Notarial Seal
Julie A. Stephens, Notary Public
Plum Boro, Allegheny County
My Commission Expires March 16, 2000

Member, Pennsylvania Association of Notaries

# EXHIBIT 6

# EXHIBIT 6

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 6



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

(ALL DIVISIONS)

RESPONSE OF PITTSBURG CORNING CORPORATION TO
PLAINTIFF(S) MASTER SET OF INTERROGATORIES
AND
REQUEST FOR ADMISSIONS

GENERAL OBJECTION

This defendant applied its product to certain of
the defined products during the period February 1963 to 1972.
Unless otherwise stated in answer to specific interrogatories,
the responses herein shall be limited to such product and time
period.  This defendant objects to providing answers for any
other period of time on the grounds that such additional
information is irrelevant, immaterial, not calculated to lead to
the discovery of admissible evidence, and furthermore, could be
burdensome, expensive and harassing to comply with.

The mineral asbestos may be found in a wide variety of
product forms, including ceiling tiles, floor tiles, gaskets,
gloves, mastics, protective aprons, protective matting, etc.
This defendant objects generally to the plaintiff's
interrogatories as vague, overly broad, irrelevant, immaterial
and not reasonably calculated to lead to the discovery of

business which manufactured, sold, processed, distributed or contracted to apply insulation products containing asbestos?

ANSWER:   No.   However, on July 1, 1962 this defendant purchased certain selected assets related to the asbestos thermal insulation product business from Union Asbestos and Rubber Company.

5.   If the answer to Interrogatory No. 4 is "Yes," then state the following concerning such predecessor:

(a)   Full and correct name;

(b)   The principal place of business;

(c)   State of incorporation;

(d)   Date of acquisition by defendant;

(e)   Was this business authorized to transact business in the State of Texas?

(f)   Attach copies of all papers pertaining to the acquisition.

ANSWER:   Not applicable.

6.   As to any product containing asbestos in any form, has this defendant, or any predecessor(s):

(a)   Ever designed such a product?

ANSWER:   No.

-7-

(b)   Manufactured such a product?

ANSWER:   Yes.

(c)   Processed such a product?

ANSWER:   See (b) above.

(d)   Sold such a product?

ANSWER:   Yes.

(e)   Distributed such a product?

ANSWER:   See (d) above.

(f)   Patented such a product?

ANSWER:   No.

(g)   Relabeled such a product which was manufactured, sold, or distributed by another company?

ANSWER:   No.

7.   If your answer to No. 6(b, 6(d) and 6 (e) is "Yes", then give the trade name of the product, the year the defendant or predecessor first sold or distributed such product, and the year the defendant last sold or distributed such product.

ANSWER:   UNIBESTOS; see response to Request No. 2 (a).

8.   Have any of the products listed above in Interrogatory

-8-

No. 6 been altered in chemical composition since first being marketed?

ANSWER: This defendant manufactured and sold UNIBESTOS for the first time on July 1, 1962 on which date it purchased said product and selected related assets and facilities from Union Asbestos and Rubber Company (UNARCO). This defendant does not have specific knowledge as to when UNIBESTOS was first commercially sold, however this defendant believes the product was first sold by UNARCO as early as 1954. Further, this defendant has no knowledge with respect to UNARCO's actions concerning the designing, developing, testing and packaging of the product during and after the product's introduction into the market. However, this defendant made no alternations during 1962 - 1972.

9. If so, please state:

(a) The trade name of each such product.

(b) The date each such product was altered.

(c) The nature of the alteration.

(d) The reason for the alteration.

ANSWER: See answer to Interrogatory No. 8.

-9-

10.  What is the name, address, and the job title of each individual who participated in the design and preparation of manufacturing specifications for each such product?

ANSWER:   Unknown.  See answer to Interrogatory No. 8.

11.  Do any written memoranda, specifications, blueprints or other written materials of any kind or character relating to the design and preparation of said products now exist?

ANSWER:   Unknown.  See answer to Interrogatory No. 8.

12.  If so, please state:

(a)   List each written material or document

(b)   Who presently has possession of each such document?

(c)   Where is it located?

ANSWER:   See answer to Interrogatory No. 11.

13.  In what year did the defendant first begin selling or distributing insulation products containing asbestos?

ANSWER:   See answer to Interrogatory No. 8.

(f)  If there are any documents, records or memorandums of any kind concerning such knowledge, list them and attach copies.

ANSWER:      Defendant is unable to state when it knew of any particular health hazard presently alleged to be associated with asbestos exposure.  However, beginning perhaps as early as 1965, this defendant, gradually became aware of news media reports being circulated which indicated large amounts of respirable asbestos fibers inhaled over a long period of time under certain conditions might be related to adverse health consequences. This defendant's awareness related mainly to manufacturing environments.


70.  As to every product of yours which you have identified in previous interrogatories state specific type or types of asbestos, (i.e., crocidolite, chrysotile, amosite or any others) which your products contained.  If you have any percentage figures available, then give the percentage as to each product.

ANSWER:      UNIBESTOS contained the following approximate percentages of its various components per unit volume of insulation:

-36-

a. Amosite Fiber          6.5% - 5.6%
b. Sodium Silicate        2.6% - 2.3%
c. Diatamaceous earth     18.2% - 10.5%

71. Does defendant contend that plaintiff improperly used its products?

ANSWER:   Defendant may contend that position, however discovery is ongoing.

72. Set forth a list of photographs, plats, sketches or other documents in the possession of the party that will potentially be used as an exhibit at the trial of this case by you.

ANSWER:   As the present time this defendant intends to use the 1968 warning label.

73. Were you or any of your agents, servants, employees aware of any of the articles described on Exhibit A prior to the year 1950?

ANSWER:   No. This defendant was not engaged in the asbestos thermal insulation product business prior to July 1, 1962.

-37-

# A F F I D A V I T

COMMONWEALTH OF PENNSYLVANIA )
                               )     SS.
COUNTY OF ALLEGENY           )
                               )

         BEFORE ME, the undersigned authority in and for said Commonwealth and County, personally appeared ROBERT E. BUCKLEY, who being duly sworn, deposes and says that he is the former Vice President and Assistant to the President of Pittsburgh Corning Corporation, that he is currently a Consultant to the Company, that he is authorized to make this affidavit on its behalf, and that the facts contained in the foregoing      Answers to Interrogatories are true and correct to the best of his knowledge or information and belief.



                              ROBERT E. BUCKLEY

SWORN TO and subscribed before me
this 21st day of December, 1982.

_____
            Notary Public

GENE H. RENZIEHAUSEN, Notary Public
Plum Borough, Allegheny County, PA.
Commission Expires August 3, 1985

# EXHIBIT 7

# EXHIBIT 7

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 7

IN RE:  ASBESTOS LITIGATION :    IN THE DISTRICT COURTS OF
                                :
                                :    TRAVIS COUNTY, TEXAS
                                :
                                :

RESPONSE OF PITTSBURGH CORNING CORPORATION TO
PLAINTIFFS' MASTER INTERROGATORIES AND
REQUESTS FOR PRODUCTION

GENERAL OBJECTION

This Defendant manufactured and/or sold an asbestos-containing thermal insulation product which contained asbestos from approximately 1962 until the end of approximately February 1, 1972.  Unless otherwise stated in response to specific interrogatories and requests, the responses herein shall be limited to such product and time period.  This Defendant objects to providing responses for any other period of time on the grounds that such additional information sought is irrelevant, immaterial, not calculated to lead to the discovery of admissible evidence and, furthermore, could be burdensome, expensive and harassing to comply with.

At various times, this Defendant also relabeled and sold certain types of mastic products as accessory products.  Although all the formulations of these relabeled mastic accessory products



tiles, floor tiles, gaskets, gloves, mastics, protective aprons, protective matting, etc.  This Defendant objects generally to these interrogatories and requests as vague, overly broad, irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence so far as they relate or refer to unidentified asbestos-containing products or materials and will limit its responses as stated above.

This Defendant states that there never existed a predecessor corporation with respect to this Defendant.  While this Defendant purchased on June 30, 1962 selected assets from Union Asbestos & Rubber Co., it did not purchase that company, that company continued to operate as a separate company for years and to sell other products including asbestos-containing products, it was not a predecessor corporation of this Defendant and on information and belief it or its successor continues to operate as an independent company to this date.  Further, Defendant states that its responses to any interrogatory or request herein relate only to this Defendant and are not to be construed to imply the existence of a predecessor corporation.

1.  State the name, address, job title, length of time employed by Defendant, and a year-by-year list of all other

-3-

**RESPONSE:** No.

4. Identify by name each product containing asbestos fiber that Defendant or any of its predecessor or subsidiary companies at any time manufactured or sold.

**RESPONSE:** This Defendant has no predecessor or subsidiary involved with asbestos-containing products. This Defendant manufactured and sold UNIBESTOS for the first time on July 1, 1962, on which date it purchased selected assets and facilities from Union Asbestos and Rubber Company (UNARCO) which it then utilized in the manufacture of UNIBESTOS. This Defendant does not have specific knowledge as to when UNIBESTOS was first sold, however, this Defendant believes the product was first commercially sold by UNARCO as early as 1934. Other published studies and governmental reports suggest that UNARCO first manufactured UNIBESTOS for sale in 1937 or 1938 pursuant to the requirements and testing of the United States Navy. Pittsburgh Corning's production ceased on or about February 1,

DFT/DPT/67299.1

-6-

1972.   See General Objection regarding accessory products.

5. Identify by name each product containing asbestos fibers that Defendant or any of its predecessor or subsidiary companies at any time marketed or sold.

**RESPONSE:**  See this Defendant's response to Interrogatory No. 4.

If the answer to one or more of the last three interrogatories is in the affirmative or lists any products, state as to each named product the following:

(a)   As to each product, state whether such product was mined, manufactured, marketed, and/or sold.

**RESPONSE:**  See this Defendant's response to Interrogatory No. 4.

(b)   the names of the companies mining, manufacturing, marketing, and/or selling each product mined, manufactured, marketed, and/or sold.

**RESPONSE:**  Pittsburgh Corning Corporation. This Defendant did not participate in relabelling agreements concerning asbestos thermal insulation products.  However, on July 1, 1962, this Defendant purchased selected assets

DFMORDEFDS.1

-7-

and facilities of Union Asbestos and Rubber Company, which assets included a small amount of UNIBESTOS manufactured by the original producer.   In addition: Defendant purchased a small amount of UNIBESTOS, specifically manufactured for this Defendant in accord with its specifications, from Holmes Foundry in Ontario, Canada in 1963 and/or 1964 and early 1972. See General Objection regarding accessory products.

(c)   The trade or brand name of each of those products mined, manufactured, marketed and/or sold.

**RESPONSE:** Trade name: UNIBESTOS.

(d)   The date each of the named products was placed on the market.

**RESPONSE:** See this Defendant's response to Interrogatory No. 4.

(e)   A description of the physical (chemical) composition of each of the named products, including the type of asbestos contained in the product and the percentage of asbestos put in each product.

**RESPONSE:** Because authentic, reliable production records of the precise percentages of components in UNIBESTOS cannot be found in this Defendant's files, and because the

DFIDFI97290.1

-8-

quantity of each component varied from one wall thickness and inner diameter to another, the information requested in this interrogatory concerning quantities of components can only be based on the following approximations:

Average Percentages per Unit Volume

Amosite fiber                                6%

Sodium Silicate and
Diatomaceous Earth          17%

Average Percentages by Weight

Amosite fiber                                65%

Sodium Silicate and
Diatomaceous Earth          35%

(f) The date each of the products was removed from the market and no longer sold or distributed and the reason or reasons therefor.

RESPONSE: This Defendant ceased the manufacture of its asbestos thermal insulation product on or about February 1, 1972, due to the recognition that it was not economically or practically possible to install equipment which would conform to proposed federal standards regarding the manufacturing process, an

-9-

increasing awareness of the suspicion that inhalation of asbestos fibers could conceivably create possible health hazards in circumstances not previously believed to be of concern, a lack of supply of the necessary raw material and a lack of profitability.

(g)  The date asbestos was removed from such products, if ever, and the reasons therefor.

**RESPONSE:**  Not applicable to this Defendant.

(h)  A description of the physical appearance of each of the named products.

**RESPONSE:**  Rigid, 3-foot long, half cylinders of thermal insulation for piping.  A specimen of this Defendant's asbestos thermal insulation product, UNIBESTOS, is available at this Defendant's corporate counsel's office in Pittsburgh, Pennsylvania per mutually convenient, scheduled appointment for plaintiff's non-destructive visual examination.

(i)  A detailed description of the intended uses of the named products.

DFTDPI019399.1

-10-

**RESPONSE:**  UNIBESTOS was produced for use as thermal pipe covering insulation.  On occasion, per customer request, the UNIBESTOS was cut into blocks.

(j)  Identify the last year that you sold each asbestos-containing product.

**RESPONSE:**  See this Defendant's response to Interrogatory No. 4.

7.  Do any documents, including but not limited to written memoranda, specifications, recommendations, blueprints, or other written materials of any kind or character, relating to the design, preparation, or introduction into the market of the products listed in Interrogatory No. 6 still exist?  If so, state:

(a)  A description of each such document.

(b)  The name, address, and job title of each person who currently has possession of each document, and where the documents are currently located.

**RESPONSE:**  Unknown, as UNIBESTOS was developed by UNARCO and the information sought is not contained in the files of this Defendant.  See this Defendant's response to Interrogatory No. 4.  However, to the best of

DFHWH78739.1

-11-

Pittsburgh Corning's knowledge, UNIBESTOS was not a patented product. However, Pittsburgh Corning did acquire a patent that related to the process by which pipecovering could be manufactured as part of its purchase agreement with Union Asbestos and Rubber Company, dated July 1, 1962. That patent #2,620,515 was issued September 9, 1952 and was for a "Method of and Apparatus for Forming Pipe Insulation". That patent was not found in any search of Pittsburgh Corning Corporation's corporate files but was obtained recently from the Carnegie Library. See attached copy.

8.   Before distributing, selling, or placing the products listed in your responses to Interrogatory Nos. 3-6 into the stream of commerce, were any tests conducted to determine potential health hazards involved in the use of, or exposure to, the materials such as asbestos, contained in those products?  If the answer is affirmative, state:

(a)   The names of the products tested and the date of each test.

DETROIT-947299.1

-12-

**AFFIDAVIT**

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF ALLEGHENY                } SS:

BEFORE ME, the undersigned authority in and for said Commonwealth and County, personally appeared Richard C. McPherson, who being duly sworn deposes and says that he is Vice President of Human Resources with Pittsburgh Corning Corporation, that he is authorized to make this affidavit on its behalf and that the facts contained in the foregoing __Interrogatories and Request for Production__ are based on previous responses to similar __Interrogatories and Request for Production__ _____ compiled by Robert E. Backley who was a former Vice President and Assistant to the President of Pittsburgh Corning Corporation and who has sworn that said responses were true and correct to the best of his knowledge or information and belief.

_R. C. McPherson_

R. C. McPherson

SWORN TO AND SUBSCRIBED BEFORE ME

this __23rd__ day of __May__                    1994.

_(signature)_

Notary Public

# EXHIBIT 8

# EXHIBIT 8

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 8

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DOROTHY ST. JACQUE, et )
al.,                   )
              Plaintiffs, )
                       )        No. C 137 465
        vs             )
                       )
JOHNS-MANVILLE PRODUCTS )
CORPORATION., etc., et )
al.,                   )
              Defendants. )
                       )
                       )
AND ALL RELATED CASES  )

DEPOSITION OF ROBERT BUCKLEY,

Taken on behalf of the

Plaintiffs, at Pittsburgh,

Pennsylvania, on February 7, 1980,

commencing at 9:30 A.M., pursuant

to Notice.

Reported By: Jerry Lefler, CSR
Certificate No: 3856

COMPUTERIZED SHORTHAND REPORTERS
1122 Wilshire Boulevard
Los Angeles, CA  90017



COMPUTERIZED SHORTHAND REPORTERS

8

1          THURSDAY, FEBRUARY 7, 1980, PITTSBURGH, PENNSYLVANIA

2                              9:30 P.M.

3                               -oOo-

4

5                           ROBERT BUCKLEY,

6          having been duly sworn by the Reporter,
           was examined and testified as follows:
7

8                            EXAMINATION

9

10   BY MR. SIMON:

11        Q.    Sir, would you state your full name for the

12   record.

13        A.    Robert E. Buckley.

14        Q.    What does the "E" stand for?

15        A.    Edmond.

16        Q.    What is your date of birth?

17        A.    November 18, 1915.

18        Q.    Have you ever had your deposition taken before

19   with regard to asbestos litigation?

20        A.    Yes.

21        Q.    On how many occasions, sir?

22        A.    Two that I think of.

23        Q.    I take it, then, sir, you are familiar with the

24   nature and purpose of a deposition.

25        A.    Yes.

26        Q.    Do I assume correctly that you have had an

27   opportunity to communicate with your counsel before the

28   commencement of this deposition?

1    Q.    Did your job title change in 1959?

2    A.    Yes.

3    Q.    In what respect?

4    A.    I was made Vice-president, sales.

5    Q.    As Vice-president of sales, how did your job

6    duties or responsibilities differ from those of national

7    general sales manager?

8    A.    Not in any significant degree or fashion.

9    Q.    It was basically a promotion with no

10    significant change in duties?

11    A.    That's right.

12    Q.    How long did you remain Vice-president of sales?

13    A.    Until 1968.

14    Q.    And this, again, was a national job?

15    A.    Yes.

16    Q.    Was your job title again changed in 1968?

17    A.    Yes.

18    Q.    By the way, sir, as Vice-president of sales

19    nationally, where was your office located?

20    A.    Pittsburgh, Pennsylvania.

21    Q.    As General Manager, same office?

22    A.    Yes.

23    Q.    In 1968, sir, your job title changed to what?

24    A.    Vice-president, international.

25    Q.    Vice-president of sales, international?

26    A.    Yes.

27    Q.    Did you have any response --

28    A.    Just Vice-president, international, but the

22

1    function of the job was primarily sales, yes.

2         Q.    Did you basically perform the same duties on an

3    international scale that you had previously performed on a

4    national scale?

5         A.    Yes.

6         Q.    Sir, at some point in time, Pittsburgh-Corning

7    opened a manufacturing plant in Port Allegheny,

8    Pennsylvania; is that correct?

9         A.    At some point in time, yes.

10        Q.    Do you recall whether that plant was built or

11   purchased?

12        A.    My recollection is that it was built.

13        Q.    Do you recall when it was built, or do you know

14   when it was built?

15        A.    During or about 1937, 1938.

16        Q.    In 1962 or thereabouts, sir, a plant was

17   purchased in Tyler, Texas?

18        A.    Yes.

19        Q.    Do you recall the exact date of the purchase?

20        A.    July 1, 1962.

21        Q.    Were these the only two plants owned by

22   Pittsburgh-Corning that ever manufactured

23   asbestos-containing products?

24        A.    With your permission, should I elaborate on

25   what plant was built in 1937, because it doesn't -- the

26   date doesn't relate to asbestos products.

27        Q.    I understand that, sir.  Let me clarify it.

28             In 1937, did the Port Allegheny plant

1    manufacture asbestos-containing products?

2         A.    No.

3         Q.    That didn't commence until sometime later?

4         A.    The manufacture of asbestos products at Port

5    Allegheny, Pennsylvania, took place sometime later, yes.

6         Q.    When was that, sir?

7         A.    1964.

8         Q.    As you stated previously, sir, the Tyler, Texas

9    plant was purchased on July 1, 1962?

10        A.    Yes.

11        Q.    Was the plant equipment purchased as well?

12        A.    Yes.

13        Q.    And the product which had been manufactured in

14   the Tyler, Texas plant, or products, do you know what they

15   were prior to July of 1962?

16        A.    Yes.

17        Q.    What were they, sir?

18        A.    Unibestos.

19        Q.    Any others?

20        A.    No.

21        MR. VAN DAM:   When you say "any others," do you mean

22   any others manufactured or purchased by Pittsburgh-Corning?

23        MR. SIMON:  No.

24        Q.    To the best of Mr. Buckley's knowledge, were

25   any products other than Unibestos manufactured in the Tyler,

26   Texas plant prior to July of 1962 when you purchased it?

27        A.    To my knowledge, no.

28        Q.    In addition to purchasing the plant and the

1    equipment in the Tyler, Texas plant, did you also purchase

2    the rights to manufacture asbestos -- strike that.  I mean

3    to say did Pittsburgh-Corning purchase the rights to

4    manufacture asbestos -- Unibestos?

5         A.   Yes.

6         Q.   At that time, did Pittsburgh-Corning purchase

7    the exclusive right to manufacture asbestos?

8         MR. VAN DAM:  Unibestos, you mean.

9         MR. SIMON:  Unibestos, I'm sorry.

10        MR. VAN DAM:  Nothing exclusive about

11   Pittsburgh-Corning's manufacture of asbestos-containing

12   products.

13        MR. SIMON:  I'm sorry.  It's still early for me, sir.

14   Do you want the question reread?

15        THE WITNESS:  Yes.

16        Q.   BY MR. SIMON:  You stated that you purchased

17   the Tyler plant in 1962 with the plant and equipment.  Did

18   you at that time, or did Pittsburgh-Corning at that time

19   also purchase the exclusive right to manufacture Unibestos?

20        A.   I don't think you can catagorize the purchase

21   as, or the rights as an exclusive right because that would

22   imply that the product was a patented product, and

23   Unibestos was not a patented product.

24        MR. VAN DAM:  Mr. Simon, the purchase agreement that

25   is under question will be produced today, and it will be

26   produced to you later, and it might answer most of your

27   questions.

28        MR. JUDY:  I would note that it has already been

SHORTHAND REPORTERS

# EXHIBIT 9

# EXHIBIT 9

## To the Declaration of
## Cecil B. Crain, Esq.

# EXHIBIT 9

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

BEFORE HON. DOUGLAS C. MUNSON, JUDGE  -  DEPARTMENT NO. 303

---oOo---

ALMA SANDERS, et al.,                )
                                     )   BRAYTON 131
              Plaintiffs,            )
                                     )   No. 966458
vs.                                  )
                                     )
ABEX CORPORATION, et al.,            )
                                     )
              Defendants.            )
                                     )
_____     )
                                     )
and cases consolidated for trial.    )
                                     )



REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

Wednesday, April 29, 1998

TESTIMONY OF WILFRED B. NEWTON

APPEARANCES OF COUNSEL:

    For Plaintiff:

        PHILIP A. HARLEY, Attorney at Law
        STEPHEN M. FISHBACK, Attorney at Law
        Brayton, Harley & Curtis
        222 Rush Landing Rd.
        Novato, CA 94945
        [415] 989-1555

    For Defendant:

        GREGORY S. ROSSE, Attorney at Law
        Misciagna & Colombatto
        27 Maiden Lane, 4th Floor
        San Francisco, CA 94108
        [415] 391-6182


Reported by R. Gary Hill, RMR, CSR 1152
            Official Reporter


HILL REPORTING SERVICE - SAN FRANCISCO

1   Particular package of pipe covering; is that correct?

2   A.   Packages, yes, each particular dimension or size has a

3   different stock number.

4   Q.   Okay.   Skipping over the next two, there is a date

5   received, what does that reflect?

6   A.   That reflects when the Inspection Department, that is,

7   department that does the actual receipt inspection, I'll call

8   it, actually received that, because this cover letter is

9   prepared only by the Inspection Department.

10  Q.   So this was received by the Inspection Department at Mare

11  Island on January 30, 1969?

12  A.   Yes.

13  Q.   And then the date, does that mean date completed?

14  A.   That means that the date that the material was what's

15  called made ready for issue; in other words, it had completed

16  all of its inspections, and the inspections entailed counting

17  the number of pieces, the number of cartons, and then it

18  included measurements, and then there was chemical analysis,

19  and review of paperwork, which was a integral step which was to

20  review all of the certifications from a vendor or a company.

21  Q.   And see if that product met all of the specifications

22  required of it?

23  A.   Right, they had to tell us it did first, before we

24  reviewed anything.

25  Q.   And then after they told you, you independently tested?

26  A.   Yes, that's correct.

27  Q.   And all of that process was completed on March 14th, 1969?

28  A.   Yes.

# EXHIBIT 10

# EXHIBIT 10

To the Declaration of
Cecil B. Crain, Esq.

# EXHIBIT 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MYRTES FAYE KOLLAR,

      Plaintiff(s),

v.

ALLIED PACKING AND SUPPLY INC.,

      Defendant(s).

_____/

Case No.  09-05106 JCS

**ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION TO REMAND CASE TO STATE SUPERIOR COURT [Docket No. 15]**

On November 6, 2009, this Court was advised by the MDL Panel in the Eastern District of Pennsylvania that a Conditional Transfer Order (CTO-328) was entered in this case (the "Transfer Order").

On November 15, 2009, Plaintiffs' filed a Motion to Remand Case to State Superior Court (the "Motion").

On November 19, 2009, Plaintiffs' filed a Notice of Filing Opposition to the Transfer Order.

IT IS HEREBY ORDERED that Plaintiffs' Motion is DENIED without prejudice to re-filing after the MDL panel has issued a decision on the Transfer Order.

IT IS SO ORDERED.

Dated:  November 24, 2009

JOSEPH C. SPERO
United States Magistrate Judge

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC ~ 4 2009

FILED
CLERK'S OFFICE

1  Richard A. Brody, Esq. (SBN 100379)
   Cecil B. Crain, Esq. (SBN 252780)
2  BRENT COON & ASSOCIATES
   44 Montgomery Street, Suite 800
3  San Francisco, CA 94104
   Telephone: 415.489.7420
4  Facsimile: 415.489.7426

5  Attorneys for Plaintiffs

6

7

8

9                          **DOCKET NO. 875**

10      **BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

11        **IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

12

13

14  This document relates to:        *Myrtes Faye Kollar, et al., v. Metalclad Insulation Corp., et al.*

15                                  N.D. California, C.A. No. 3:09-5106

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        1
   _____
                        PROOF OF SERVICE REGARDING
                  PLAINTIFFS' MOTION TO VACATE CTO-328

RECEIVED
CLERK'S OFFICE
2009 DEC -4  A 11: 19
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

1

**PROOF OF SERVICE REGARDING**
**PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-328)**

2

3

4        I, the undersigned, declare:

5        I am over the age of eighteen years and not a party to the within cause.  I am employed in

6  the County of San Francisco, California; my business address is 44 Montgomery Street, Suite 800,

7  San Francisco, CA 94104.

8        On the date below, I served one true copy of the following:

9        **PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER**
         **(CTO-328) AND SUPPORTING BRIEF**

10

11       **DECLARATION OF CECIL B. CRAIN IN SUPPORT OF**
         **PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER**
         **(CTO-328)**

12

13       **PROOF OF SERVICE REGARDING**
         **PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER**
         **(CTO-328) (this document)**

14

15                      SEE ATTACHED SERVICE LISTS

16  <u>XXX</u>   By U.S. Mail:  I placed a true copy, enclosed in a sealed envelope with postage paid, for
            collection and mailing on the date below at San Francisco, California, following ordinary
17          business practice, to the addressees noted on the two attachments herein.  I am readily
            familiar with the firm's practice for collection and processing of correspondence for mailing
18          with the United States Postal Service; such correspondence would be deposited with the
            United States Postal Service the same day in the ordinary course of business.
19

20

21       I declare under penalty of perjury under the laws of the state of California that the foregoing

22  is true and correct.

23

24  Dated: December 3, 2009

25                                              Michelle Dantzman

26

27

28
                                              2
                              PROOF OF SERVICE REGARDING
                          PLAINTIFFS' MOTION TO VACATE CTO-328

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

2009 DEC -4 A 11: 19

RECEIVED CLERK'S OFFICE

SERVICE LIST and Linda A. Heath, individually and as Co-Trustees of the Kollar Family Trust D CGC08274794          12/1/2009

J.T. THORPE & SON, INC
**BASSI, EDLIN, HUIE & BLUM LLP**
351 CALIFORNIA ST STE 200
SAN FRANCISCO, CA 94104
P: (415) 397-9006          F: (415) 397-1339

BERRY & BERRY
**BERRY AND BERRY**
2930 LAKESHORE AVENUE
OAKLAND, CA 94610
P: (510) 250-0200          F: (510) 835-5117

UNION CARBIDE CORPORATION
**BRYDON HUGO AND PARKER**
135 MAIN STREET STE 200
SAN FRANCISCO, CA 94105
P: (415) 808-0300          F: (415) 808-0333

WARREN PUMPS INC
**CARROLL BURDICK ET AL**
44 MONTGOMERY ST STE 400
SAN FRANCISCO, CA 94104
P: (415) 989-5900          F: (415) 989-0932

A.W. CHESTERTON COMPANY
AMERICAN BILTRITE, INC.
**COOLEY MANION JONES HAKE AND KUROWSKI**
201 Spear St Suite 1800
SAN FRANCISCO, CA 94105
P: (415) 512-4381          F: (415) 512-6791

GOULDS PUMPS , INC.
**CROSBY AND ROWELL**
299 THIRD ST, 2ND FLR EMBARCADERO CENTER WEST
OAKLAND, CA 94607
P: (510) 267-0300          F: (510) 839-6610

ALFA LAVAL SEPERATION , INC., AND DELEVAL SEPERATOR COMPANY
**DEHAY AND ELLISTON LLP**
800 West 6th Street Suite 788
LOS ANGELES, CA 90017
P: (213) 271-2727          F: (213) 271-2730

BW/IP, INC.
RILEY POWER, INC.
**FOLEY AND MANSFIELD PLLP**
1111 BROADWAY 10TH FLR
OAKLAND, CA 94607
P: (510) 590-9500          F: (510) 590-9595

COLTEC INDUSTRIES, INC., FAIRBANKS MORSE ENGINE DIVISION
GARLOCK SEALING TECHNOLOGIES LLC
**GLASPY AND GLASPY**
100 PRINGLE AVE SUITE 750
WALNUT CREEK, CA 94596
P: (925) 947-1300          F: (925) 947-1594

THE GOODYEAR TIRE AND RUBBER COMPANY
**GORDON AND REES**
275 BATTERY ST STE 2000
SAN FRANCISCO, CA 94111
P: (415) 986-5900          F: (415) 986-8054

ALLIED PACKING AND SUPPLY, INC.
**HERR AND ZAPALA**
152 N THIRD ST STE 500
SAN JOSE, CA 95112
P: (408) 287-7788          F: (408) 927-0408

IMO INDUSTRIES, INC., INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO DELAVAL STEAM TURBINE CO.
**HOWARD ROME MARTIN AND RIDLEY LLP**
1775 WOODSIDE RD STE 200
REDWOOD CITY, CA 94061
P: (650) 365-7715          F: (650) 364-5297

CERTAINTEED CORPORATION
METALCLAD INSULATION CORPORATION, INDIVIDUALLY AND AS SII NORTHER CALIFORNIA INSULATION
**MCKENNA LONG AND ALDRIDGE**
101 CALIFORNIA ST 41ST FLOOR
SAN FRANCISCO, CA 94111
P: (415) 267-4000          F: (415) 267-4198

SOCO WEST
**MURRIN AND ASSOCIATES LLC**
71 LafayetteCircle Suite B
LAFAYETTE, CA 94549
P: (925) 262-2105          F: (925) 262-2111

GEORGIA-PACIFIC LLC FORMERLY KNOWN AS GEORGIA-PACIFIC CORPORATION
**PERKINS COIE**
1888 Century Park East Suite 1700
LOS ANGELES, CA 90067
P: (310) 788-9900          F: (310) 843-1284

STERLING FLUID SYSTEMS (U.S.A), LLC, FORMERLY KNOWN AS PEERLESS PUMP COMPANY
**POND NORTH LLP**
350 S GRAND AVE STE 3300
LOS ANGELES, CA 90071
P: (213) 617-6170          F: (213) 623-3594

ITT INDUSTRIES , INC., INDIVIDUALLY AND AS SII TO BELL & GOSSETT TRANE U.S. INC.
**PRINDLE AMARO GOETZ HILLYARD BARNES AND REINHOLTZ LLP**
369 PINE STREET, SUITE 800
SAN FRANCISCO, CA 94104
P: (415) 788-8354          F: (415) 788-3625

SEPCO CORPORATION
**SELMAN BREITMAN LLP**
33 NEW MONTGOMERY  6TH FLOOR
SAN FRANCISCO, CA 94105
P: (415) 979-0400          F: (415) 979-2099

RAPID AMERICAN CORPORATION
**SONNENSCHEIN NATH AND ROSENTHAL LLP**
525 MARKET ST 26TH FLOOR
SAN FRANCISCO, CA 94105
P: (415) 882-5000          F: (415) 882-0300

RHEEM MANUFACTURING CO.
**VASQUEZ ESTRADA AND DUMONT LLP**
1000 4TH ST STE 700
SAN RAFAEL, CA 94901
P: (415) 453-0555          F: (415) 453-0549

AMETEK, INC.
THOMAS DEE ENGINEERING COMPANY
**WALSWORTH FRANKLIN BEVINS AND MCCALL LLP**
601 MONTGOMERY ST 9TH FLR
SAN FRANCISCO, CA 94111
P: (415) 781-7072          F: (415) 391-6258

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                                    MDL No. 875

### INVOLVED COUNSEL LIST (Excerpted from CTO-328)

Myrtes Faye Kollar, et al. v. Metalclad Insulation Corp., et al., N.D. California,
C.A. No. 3:09-5106  (Judge Joseph C. Spero)

Peter G. Angelos
LAW OFFICES OF PETER G
  ANGELOS PC
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307

Richard A. Brody
BRENT COON & ASSOCIATES
44 Montgomery Street
Suite 800
San Francisco, CA 94104

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street
Suite 3000
Chicago, IL 60602-2415

Felicia Y. Feng
MCKENNA LONG ALDRIDGE LLP
101 California Street
41st Floor
San Francisco, CA 94111

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Roger B. Lane
ROGER B LANE PC
1601 Reynolds Street
Brunswick, GA 31520

**MDL No. 875 - Involved Counsel List (Excerpted from CTO-328) (Continued)**

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER & MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street
28th Floor
Philadelphia, PA 19103

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street
Suite 2000
San Francisco, CA 94111

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mount Pleasant, SC 29464

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ & TARDY PLLC
P.O. Box 22608
Jackson, MS 39225-2608