UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Jun 29, 2010

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LIITGATION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | §<br>§ | Civil Action No. MDL-875<br>Eckerle |

This Document Relates to:

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **RONALD ECKERLE** | §<br>§ | |
| **VERSUS** | §<br>§ | Civil Action No. 2:10-cv-1460-MVL-KWR |
| **NORTHROP GRUMMAN SHIPBUILDING, INC.,** *ET AL.* | §<br>§ | |

**MEMORANDUM IN OPPOSITION TO MOTION TO
VACATE CONDITIONAL TRANSFER ORDER WITH INCORPORATED
MEMORANDUM, OR IN THE ALTERNATIVE, OPPOSITION AND
MOTION FOR CONTINUANCE OF TRANSFER UNTIL TRANSFEROR
JUDGE RULES ON MOTION TO REMAND**

Northrop Grumman Shipbuilding, Inc. (hereinafter referred to as "Northrop Grumman"),

submits this response to plaintiff's Motion to Vacate Conditional Transfer Order with

Incorporated Memorandum, or in the Alternative, Opposition and Motion for Continuance of

Transfer until Transferor Judge Rules on Motion to Remand and respectfully shows as follows:

This case is a putative class action that seeks medical monitoring for bodily injury caused

by asbestos or asbestos-containing products.  It is exactly the type of case that the M.D.L. No.

875 was designed to accommodate.  The case is, at present, in the very early stages of discovery

and will greatly benefit from consolidation in the Eastern District of Pennsylvania given the numerous, nationwide manufacturers and suppliers of asbestos-containing materials that are, or soon will be, parties to this suit. In fact, all of the concerns raised by the Panel in *In Re Asbestos Products Liability Litigation (No. VI)*, 771 F.Supp. 415 (J.P.M.L. 1981) are present here.

In this Motion to Vacate the Conditional Transfer Order, the plaintiff states that the case was wrongfully removed because the basis for the removal, the Class Action Fairness Act, 28 USC §1332(d), is not a "... basis for a federal jurisdiction." Northrop Grumman maintains that its basis for removal is valid and that the Motion to Remand, which is presently under consideration by the transferor of court, will be denied. For the court's convenience, Northrop Grumman has attached a copy if its Memorandum in Opposition to Motion to Remand and stands by the arguments made therein.

Accordingly, Northrop Grumman prays that plaintiff's Motion to Vacate the Conditional Transfer Order be denied.

<div style="margin-left: 40%;">

Respectfully Submitted:
**BLUE WILLIAMS, L.L.P.**

*/s/ Edwin A. Ellinghausen, III*
BRIAN C. BOSSIER (#16818)
EDWIN A. ELLINGHAUSEN, III (#1347)
CHRISTOPHER T. GRACE, III (#26901)
ERIN H. BOYD (#20121)
STACIE J. FITZPATRICK (#31789)
3421 N. Causeway Blvd., Suite 900
Metairie, LA 70002
Telephone: (504)831-4091
Facsimile: (504)849-3055
Attorneys for Northrop Grumman
Shipbuilding, Inc.

</div>

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the above and foregoing filing has been served on all participating counsel of record in this matter via CM/ECF electronic case filing this 24th day of June, 2010.

*/s/ Edwin A. Ellinghausen, III*

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                    MDL No. 875

**PANEL SERVICE LIST (Excerpted from CTO-336)**

Ronald Eckerle v. Northrop Grumman Shipbuildings, Inc., et al., E.D. Louisiana,
C.A. No. 2:10-1460  (Judge Mary Ann Vial Lemmon)

Peter G. Angelos
LAW OFFICES OF PETER G
ANGELOS PC
One Charles Center
100 North Charles Street
22nd Floor
Baltimore, MD 21201
**mjolley@lawpga.com**

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307
**jwblack@wardblacklaw.com**

Brian C. Bossier
BLUE WILLIAMS LLP
3421 N. Causeway Boulevard
Suite 900
Metairie, LA 70002
**bbossier@bluewilliams.com**

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue
Suite 1100
Dallas, TX 75219
**rbudd@baronbudd.com**

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street
Suite 3000
Chicago, IL 60602-2415
**jcooney@cooneyconway.com**

Philip C. Hoffman
LANDRY & SWARR LLC
1010 Common Street, Suite 2050
New Orleans, LA 70112
**phoffman@landryswarr.com**

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995
**kevin.jordan@bakerbotts.com**

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
**pkalish@crowell.com**

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street
Third Floor
Oakland, CA 94607
**skazan@kazanlaw.com**

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue
Suite 3000
Dallas, TX 75204
**kraus@waterskraus.com**

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219-4074
**DLandin@Hunton.com**

**MDL No. 875 - Panel Service List (Excerpted from-CTO-336) (Continued)**

Roger B. Lane
ROGER B LANE PC
1601 Reynolds Street
Brunswick, GA 31520
**attylane@bellsouth.net**
William F. Mahoney
SEGAL MCCAMBRIDGE SINGER &
MAHONEY LTD
233 South Wacker Drive
Suite 5500
Chicago, IL 60606
**wmahoney@smsm.com**

Robert C. Malaby
MALABY & BRADLEY
150 Broadway
Suite 600
New York, NY 10038
**rcmalaby@mblaw.net**

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103
**jmcshea@mcshea-tecce.com**

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza
32nd Floor
Spear Street Tower
San Francisco, CA 94105
**pmcweeny@schiffhardin.com**

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111
**tpacker@gordonrees.com**

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mount Pleasant, SC 29464
**jrice@motleyrice.com**

Samuel M. Rosamond, III
CRAWFORD LEWIS PLLC
400 Poydras Street
Suite 2100
New Orleans, LA 70130
**srosamond@crawford-lewis.com**

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street
30th Floor
Boston, MA 02110
**mthornton@tenlaw.com**

Walter G. Watkins Jr.
FORMAN PERRY WATKINS KRUTZ &
TARDY LLP
P.O. Box 22608
Jackson, MS 39225-2608
**wwatkins@fpwk.com**

Kristopher T. Wilson
LUGENBUHL WHEATON PECK
RANKIN & HUBBARD
601 Poydras Street
Suite 2775
New Orleans, LA 70130
**kwilson@lawla.com**

**ATTACHMENT TO OPPOSITION TO MOTION TO VACATE CONDITIONAL TRANSFER ORDER WITH INCORPORATED MEMO, OR IN THE ALTERNATIVE, OPPOSITION AND MOTION FOR CONTINUANCE OF TRANSFER UNTIL TRANSFEROR JUDGE RULES ON MOTION TO REMAND**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RONALD ECKERLE<br>Plaintiff | §<br>§<br>§ | CIVIL ACTION<br>NO.: 2:10-CV-1460 |
| VERSUS | §<br>§ | JUDGE: MARY ANN VIAL<br>LEMMON |
| NORTHROP GRUMMAN<br>SHIPBUILDING, INC., ET AL.<br>Defendants | §<br>§<br>§<br>§ | MAG. JUDGE: KAREN WELLS<br>ROBY |

## OPPOSITION OF NORTHROP GRUMMAN SHIPBUILDING, INC TO PLAINTIFF'S MOTION TO REMAND

This class action suit was filed in state district court in Orleans Parish on March 30, 2010. It was removed on May 12 by Northrop Grumman Shipbuilding, Inc. (f/k/a Northrop Grumman Ship Systems, Inc., and f/k/a Avondale Industries, Inc.) (Northrop Grumman) pursuant to the jurisdictional provisions of the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. §1332(d), and the removal provisions of 28 U.S.C. §§1441, 1146, and 1453.

The plaintiff now moves to remand, and Northrop Grumman opposes.

### THE APPLICABLE LAW

CAFA provides for federal diversity jurisdiction over class actions in which:  (1) the aggregate number of putative class members exceeds one hundred, 28 U.S.C §1332(d)(5); (2) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, *id.,*

§§1332(d)(2) and (6); and (3) there is diversity of citizenship between any member of a plaintiff class and any defendant, *id.*, §1332(d)(2)(A). Northrop Grumman is a Virginia corporation with its principal place of business in Virginia. Such actions may be removed to federal court without regard to whether any defendant is a citizen of the state in which the suit was filed, and without the unanimous consent of all defendants. *Id.*, §1453(b).

There are three statutory exceptions to CAFA's jurisdictional grant.

The "discretionary" exception, *id.*, §1332(d)(3), provides that the federal district court, "in the interests of justice looking at the totality of the circumstances," *may* decline to exercise jurisdiction over class actions in which more than one-third of the members of all plaintiff classes in the aggregate, *and* the primary defendants, are citizens of the state in which the action was brought. The statute sets forth six specific factors which must be considered by the court in exercising that discretion. *Id.*, §§1332(d)(3)(A)-(F).[1]

The "local controversy" exception, *id.*, §1332(d)(4)(A), provides that the court must decline jurisdiction when *all* of the following four criteria are met: (1) More than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the state in which the suit was filed, *id.*, §1332(d)(4)(A)(i)(I); (2) at least one defendant from whom significant relief is sought by the class, and whose conduct forms a significant basis for the class claims, is a citizen of the forum state, *id.*, §1332(d)(4)(A)(i)(II); (3) principal injuries from the conduct of

---

[1] Those considerations are: (1) whether the claims involve matters of national or interstate interest; (2) whether the claims will be governed by the law of the forum state; (3) whether the claims are pleaded in a manner that seeks to avoid federal jurisdiction; (4) whether the forum state has a distinct nexus with the plaintiff class members, the alleged harm, or the defendants; (5) whether the plaintiff class members are predominantly citizens of the forum state; and (6) whether prior class actions asserting similar claims against any defendant have been filed within the three-year period preceding the filing of the suit. 28 U.S.C. §§1332(d)(3)(A)-(F).

each defendant were incurred in the forum state, *id.*, §1332(d)(4)(A)(i)(III);  and (4) no other class actions asserting similar factual allegations have been filed against any defendant within the preceding three-year period, *id.*, §1332(d)(4)(A)(ii).

Finally, the "home state" exception, *id.*, §1332(d)(4)(B), provides that the court must decline jurisdiction of class actions in which two-thirds or more of the members of all plaintiff classes in the aggregate, *and* the primary defendants, are citizens of the forum state.

Because "Congress crafted CAFA to exclude only a narrow category of truly localized controversies," *Preston v. Tenet Healthsystem Memorial Medical Center, Inc.*, 435 F.3d 804, 812 (5th Cir. 2007); *DeHart v. BP America, Inc.*, 2010 WL 231744, slip op. at 4 (W.D. La. 2010), these exceptions are *stricti juris*, and must be construed narrowly and resolved in favor of federal jurisdiction. *Preston v. Tenet Healthsystem Memorial Medical Center, Inc., supra*, 435 F.3d at 810. The burden of proof is on the party seeking remand to establish each and every element of an exception by a preponderance of the evidence. *Id.* at 812-14; *Frazier v. Pioneer Americas, L.L.C.*, 455 F.3d 542, 546 (5th Cir. 2006); *Caruso v. Allstate Ins. Co.*, 469  F. Supp. 2d 364, 367 (E.D. La. 2007).

## ARGUMENT

There is no dispute that this case meets the threshold criteria for removal and the exercise of federal jurisdiction under CAFA.  It is a class action brought on behalf of more than one hundred putative class members; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and the required minimal diversity is present.  The plaintiff does not contend

otherwise. The plaintiff argues only that this Court must decline jurisdiction under the "local controversy" exception set forth in 28 U.S.C. §1332(d)(4)(A).

### A. The "Local Controversy" Exception

The plaintiff acknowledges that the burden of proof on this motion to remand is his, and that he must establish each and every element of the "local controversy" exception by a preponderance of the evidence. Document 7-1, p. 6.

### 1. The "significant local defendant" requirement.

The "significant local defendant" element of the "local controversy" exception, 28 U.S.C. §1332(d)(4)(A)(i)(II), requires the plaintiff to establish by a preponderance of the evidence that at least one defendant who is a citizen of Louisiana is a defendant from whom the class as a whole seeks significant relief. Whether a putative class seeks significant relief from an in-state defendant requires not only an assessment of how many members of the class were harmed by that defendant's conduct, but also a comparative assessment of the relief sought against that defendant, and that defendant's comparative ability to satisfy the potential judgment, relative to the relief sought against the other defendants sued, and their ability to pay. *Escoe v. State Farm Fire & Cas. Co.*, 2007 WL 1207231, slip op. at 2 (E.D. La. 2007) (unpublished opinion); *Robinson v. Cheetah Transportation*, 2006 WL 3322580, slip op. at 2 (W.D. La. 2006) (unpublished opinion), *aff'd*, 2007 WL 28257 (W.D. La. 2007) (*per* James, C.J.) (unpublished opinion); *Robinson v. Cheetah Transportation*, 2006 WL 468820, slip op. at 3-4 (W.D. La.)

<div align="center">4</div>

(unpublished opinion), *aff'd,* 2006 WL 1453036 (**W.D. La.** 2006) (*per* James, C.J.)(unpublished opinion).

The plaintiff asserts broadly that all of the Avondale "executive officers" are significant defendants within the meaning of the "local controversy" exception because they participated equally with Avondale in failing to provide a safe place to work, are equally liable, and are equally able to pay any potential judgment. Document 7-1, pp. 4-5. The plaintiff neither offers nor references any evidentiary support for those broad assertions.

The duty to provide the putative class members with a safe place to work is Avondale's. The only "significant conduct" on the part of the "executive officers" that is invoked by the plaintiff in this action is the alleged breach of *Avondale's* duty to provide the putative class members with a safe place to work. The Avondale "executive officers"—all of whom are retired, most of whom are deceased— have little or no ability, individually or as a group, to satisfy any judgment that may be rendered. Indeed, the plaintiff will not, as a practical matter, look to those "executive officers" for the satisfaction of any such judgment. He will look to Northrop Grumman, and to the insurance coverage purchased by Northrop Grumman and its corporate predecessors to protect the Avondale business enterprises over the years.

## 2. The "parallel class action" requirement.

The final required element of the "local controversy" exception is:

during the 3-year period preceding the filing of [the removed class action suit], no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.

5

28 U.S.C. §1332(d)(4)(A)(ii).

The plaintiff acknowledges that a parallel class action for medical monitoring is currently pending in state district court in Jefferson Parish. Document 7-1, pp. 5-6 & n.4. That case, *Bourgeois v. A.P. Green Indus., Inc.*, No. 488-642, Division Y (24th J.D.C., Jefferson Parish, La.), was filed by the same law firm that represents the plaintiff in this action, and seeks virtually identical class relief against virtually all of the defendants in this suit on the basis of virtually identical factual allegations. The plaintiff argues that this Court must decline jurisdiction of the instant suit, despite the pendency of the *Bourgeois* class action, because the *Bourgeois* suit was *initiated* more than three years before this suit was filed.

That argument misses the point. Although the *Bourgeois* class action was initiated in 1996, the trial court ultimately rejected the proposed plaintiff class and denied class certification. That ruling was affirmed on appeal, and certiorari was denied by the Louisiana Supreme Court. *Bourgeois v. A.P. Green Indus., Inc.*, 939 So.2d. 478 (La. App. 5th Cir.), *writ denied*, 943 So.2d. 1095 (La. 2006). Thereafter, in June 2007, the *Bourgeois* plaintiffs filed an amending petition, see Exhibit 1, proposing a new plaintiff class. That newly-defined class action was commenced within the three-year period preceding the filing of the instant action, and thus forecloses application of the "local controversy" exception.

Beyond that, the *Bourgeois* class action is still pending. The *Bourgeois* plaintiffs to this day actively seek certification of their new proposed class, and to this day vigorously pursue class relief against Northrop Grumman, its "executive officers," and its insurers that is virtually

identical to the class relief that is sought in this suit—and they do so on the basis of factual allegations that are essentially indistinguishable from those asserted in this action.

The "local controversy" exception must be narrowly construed in favor of the exercise of federal jurisdiction. *Preston v. Tenet Healthsystem Memorial Medical Center, Inc., supra,* 485 F.3d at 810. The purpose of the "parallel class action" element of that exception is to insure that federal jurisdiction will be extended to embrace suits, such as this one, in which "other class actions on the same subject have been (or are likely to be) filed elsewhere." *See* Senate Report No. 109-14, pp. 36-37 ("[T]he committee intends that this consideration should strongly favor the exercise of federal jurisdiction.... It is the Committee's intention that this factor be interpreted liberally and that plaintiffs not be able to plead around it with creative legal theories.")(discussing the "parallel class action" consideration of 28 U.S.C. §1332(d)(3)(F)).

As the Senate Report notes:

> [I]f a controversy results in the filing of multiple class actions, it is a strong signal that those cases may not be of the variety that [the "local controversy"] exception is intended to address. As such, it is a test for assessing whether a controversy is localized. The Committee wishes to stress that another purpose of this criterion is to insure that overlapping or competing class actions or class actions making similar factual allegations against the same defendant that would benefit from coordination are not excluded from federal court by the Local Controversy Exception and thus placed beyond the coordinating authority of the Judicial Panel on Multidistrict Litigation. The committee also wishes to stress that the inquiry under this criterion should not be whether identical (or nearly identical) class actions have been filed. The inquiry is whether similar factual allegations have been made against the defendant in multiple class actions, regardless of whether the same causes of action were asserted or whether the purported plaintiff classes were the same (or even overlapped in significant respects).

Senate Report, *supra* at 39.

The mechanical reading adopted by the plaintiff would apply the three-year provision of the "parallel class action" element of this exception as a kind of prescriptive period, or statute of limitations. In this view, the "local controversy" exception becomes quite expansive in its application. The *pendency* of parallel class actions becomes immaterial, and the "local controversy" exception reaches to foreclose the exercise of federal jurisdiction even in the face of a dozen pending and actively prosecuted parallel class actions—so long as those actions were *initiated* at least three years and one day in the past. It is indeed difficult to divine what purpose such a rule would serve. It certainly would not foster the legislative aims described in the Senate Report. And it manifestly does not comport with the Fifth Circuit's mandate that the "local controversy" exception be construed narrowly in favor of the exercise of federal jurisdiction.

Fairly read, the three-year provision of the "parallel class action" element is not a limitations period; it is a requirement of *currency*. The "local controversy" exception should apply only in the absence of *current* parallel class actions. Any parallel class action that is initiated within the three-year period is current within the meaning of the exception, whether it is presently pending or not. And any parallel class action that is presently pending is current within the meaning of the exception, whether it was *initiated* within the three-year period or not.

In short, the "local controversy" exception, construed narrowly and resolved in favor of the exercise of federal jurisdiction, cannot be applied to mandate federal abstention in this case, where a virtually identical parallel class action is currently pending, and is currently being vigorously prosecuted, against the defendants in this action.

8

## B. The "home state" and "discretionary" exceptions.

Both the "home state" exception and "discretionary" exception require that the primary defendants be citizens of the state in which the suit was filed. 28 U.S.C. §1332(d)(4)(B)("home state" exception); *id.*, §1332(d)(3)("discretionary" exception). The burden of proving this element by a preponderance of the evidence is on the party seeking remand, *Preston v. Tenet Healthsystem Memorial Medical Center, Inc., supra,* 485 F.3d at 812-14, and that burden must be satisfied before the Court can weigh the statutory factors enumerated to guide the exercise of its discretion under the "discretionary" exception, *id.,* at 812.

Moreover, it is well established that *all* primary defendants must be citizens of the forum state for either of these exceptions to apply. *Robinson v. Cheetah Transportation,* 2006 WL 3322580, slip op. at 3 (W.D. La. 2006) (unpublished opinion) (plain language of statute requiring that *the* primary defendants, rather than *a* primary defendant, be citizens of forum state, indicates that exceptions apply only when *all* primary defendants are citizens of forum state), *aff'd,* 2007 WL 28257 (W.D. La. 2007) (*per* James, C.J.)(unpublished opinion). *See Frazier v. Pioneer Americas, L.L.C.,* 455 F.3d 542, 546 (5th Cir. 2006) (plain text of §1332(d)(5)(A), excluding from CAFA jurisdiction class actions in which "the primary defendants" are states, requires that *all* primary defendants be states). *See also* Senate Report No. 109-14, p. 35("cases in which … one or more of the primary defendants are not citizens of the state in which the action was filed will be subject to federal jurisdiction," and will not fall within the "home state" or "discretionary" exceptions).

The term "primary defendants" is not defined in the statute, and there is little case law addressing that question. The Senate Report refers to primary defendants as defendants who are "real targets" of the class claims, and who would be expected to incur most of the loss in the event liability is found. Senate Report, *supra* at 41. Some courts have held that the primary defendants are those against whom direct liability is asserted, as opposed to vicarious liability, indemnification, or contribution. *See, e.g., Kearns v. Ford Motor Co.*, 2005 WL 3967998, slip op. at 8 (C.D. CAL. 2005) (unpublished opinion). In *Robinson v. Cheetah Transportation*, 2006 WL 3322580 (W. D. La. 2006), the Western District of Louisiana concluded that the term "primary defendant" should include any person who has substantial exposure to significant portions of the proposed class:

> [T]he plaintiffs have provided no evidence that Sprinter and Bengal would incur most of the loss if liability were found. The plaintiffs rely on their allegation that Bengal is the party that actually improperly loaded the cranes onto the truck. However, while the complaint asserts a claim against Bengal for its alleged negligence in doing so, an essentially identical claim is also asserted against out-of-state defendant Union Pacific Railroad. Given that the alleged negligent loading of the cranes onto the truck is a significant facet of the plaintiffs' claims, it is indisputable that Union Pacific would be expected to incur a significant portion of the loss if found liable; therefore, Union Pacific is a primary defendant in this case. Accordingly, because all of the primary defendants are not Louisiana residents, the "Home State" exception does not apply.

*Id.* at 3 (footnotes and citations omitted). *Accord, DeHart v. BP America, Inc.*, 2010 WL 231744, slip op. at 13-14 (W.D. La. 2010).

That Northrop Grumman is a primary defendant in this case can hardly be doubted. The claims against Northrop Grumman are largely identical to the claims against the "executive officers." The liability that is asserted against Northrop Grumman in the petition is clearly direct

10

liability, not vicarious or derivative. Indeed, the predominant tortious conduct that is alleged by the plaintiff in this action is the breach of *Avondale's* tort duty to provide the putative class members with a safe place to work. Moreover, the Avondale "executive officers," who are purported to be the local defendants in this action, have little or no demonstrable ability, either individually or as a group, to satisfy any potential judgment that might be rendered. And it is not to the "executive officers" that the plaintiff will look for satisfaction of such a judgment—it is to Northrop Grumman, and to the insurance coverage Northrop Grumman and its corporate predecessors have maintained.

Moreover, as has been noted, Congress enacted CAFA to encourage federal jurisdiction over class action suits that are interstate in character, or of national interest, and crafted the statutory exceptions so as to exclude only a narrow category of truly localized controversies. *Preston v. Tenet Healthsystem Memorial Medical Center, Inc., supra,* 485 F.3d at 812; *DeHart v. BP America, Inc., supra,* 2010 WL 231744, slip op. at 7, 9. The interstate character of this action is further evidenced by the fact that the asbestos exposure that is complained of in the plaintiff's petition originated exclusively from various asbestos-containing products that were manufactured by companies other than Northrop Grumman, and provided to Avondale by various suppliers and contractors. Those major manufacturers, such as Owen-Illinois, Inc., Uniroyal, Inc., Foster Wheeler, Westinghouse, Hopeman Brothers, Liberty Mutual for the liability of Wayne Manufacturing, Asbestos Corporation, Ltd., Rapid American Corporation, as successor to Phillip Carey Mfg. Corp., Bayer Cropscience, Inc. as successor to Benjamin Foster Company, are nonlocal. These manufacturers will be the subject of incidental actions to be filed

11

by Northrop Grumman designed to impose upon them the ultimate liability for any class relief that may be awarded in this action. A similar third-party demand was filed in the *Bourgeois* class action pending in state court. Exhibit 2, *Bourgeois* Third Party Demand. In this light, this suit is clearly interstate in character, and does not represent the kind of "truly localized controversy" that Congress intended to except from CAFA jurisdiction.

Nor, indeed, are those "executive officers" quite so local as the plaintiff assumes. Steven Kennedy was the former head of the Avondale Safety Department during the early OSHA years and was the individual charged by Avondale with responsibility for compliance with OSHA's asbestos-related safety regulations. Exhibit 3, Deposition of Steven Kennedy (Dec. 30, 1998), pp. 139-46. He was a citizen of Texas. *Id.* at 1, 10-14, 19-20, 161-64. If any of the so-called "executive officers" could be characterized as a primary defendant, Steven Kennedy would be such a defendant. The plaintiff also asserts the liability of J.T. Cole, a Plant Superintendent and Vice President at Avondale between the 1940s and 1972. He was a citizen of Alabama. Exhibit 4, Avondale Employment Card of J. T. Cole.

In sum, because *all* of the primary defendants are not citizens of Louisiana, neither the "home state" exception nor the "discretionary" exception can be applied.

## CONCLUSION

It is undisputed that this action meets the basic criteria for the exercise of federal diversity jurisdiction under the Class Action Fairness Act, and that it was properly removed to this Court. The statutory exceptions to federal jurisdiction under CAFA, which must be

construed narrowly in favor of the exercise of federal jurisdiction, cannot be applied under the circumstances presented in this case.

Accordingly, the plaintiff's motion to remand must be denied.

Respectfully Submitted:

**BLUE WILLIAMS, L.L.P.**

*/s/ Edwin A. Ellinghausen, III*

BRIAN C. BOSSIER (#16818)
EDWIN A. ELLINGHAUSEN, III (#1347)
CHRISTOPHER T. GRACE, III (#26901)
ERIN H. BOYD (#20121)
STACIE J. FITZPATRICK (#31789)
3421 N. Causeway Blvd., Suite 900
Metairie, LA 70002
Telephone: (504)831-4091
Facsimile: (504)849-3055
Attorneys for Northrop Grumman
Shipbuilding, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing filing has been served on all participating counsel of record in this matter via CM/ECF electronic case filing this 2^B day of June, 2010.

*/s/ Edwin A. Ellinghausen, III*

13

# EXHIBIT 1

## *BOURGEOIS v. A.P. GREEN INDUS., INC.*

## FOURTH SUPPLEMENTAL AND AMENDING PETITION

CASE:488642 P1 FIL FOUR~ SUPPLEMENTAL AND AMENDIN~

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 488-642

DIVISION

ROBERT BOURGEOIS, ET AL.

VERSUS

A. P. GREEN INDUSTRIES, INC., ET AL.

FILED: _____

_____
DEPUTY CLERK

## FOURTH SUPPLEMENTAL AND AMENDING PETITION FOR DAMAGES WITH INCORPORATED MOTION FOR LEAVE OF COURT

NOW INTO COURT, through undersigned counsel, come Plaintiffs who respectfully request leave of court to file this Fourth Supplement and Amendment to the Petitions for Damages filed in the captioned matter in the following respects:

1.      Paragraph 2 is hereby amended and supplemented to read as follows:

2.

Consistent with the opinion of the Fifth Circuit Court of Appeal No. 06-CA-87, attached hereto as Exhibit "1," and La. C. Civ. Proc. Art. 592, the class definition should be restricted or otherwise redefined as follows:

**All persons who were exposed to respirable asbestos fibers while working at Avondale Shipyards Main Yard between and including 1952 and 1976 such that periodic medical monitoring is medically advisable.**

2.      For the purpose of adding the following Paragraphs to the Petition and all subsequent amendments/supplements to read as follows:

86.

Plaintiffs respectfully suggest that this Honorable Court is empowered by La. C. Civ. Proc. Art. 591 et seq. and the Fifth Circuit's opinion to create subclasses such as those workers who worked predominantly of vessels and those workers who worked predominantly on land (not on vessels).

87.

Plaintiffs respectfully request a modified class definition that reasonably incorporates the guidelines/formula provided in the Fifth Circuit Court of Appeal's opinion.

CODED    IMAGED JN 25
CODED

CASE:488642 P1 FIL FOUR    SUPPLEMENTAL AND AMENDIN          Page 2 of 2

3.      Plaintiffs reiterate all other matters and allegations contained in the Original Petition for Damages and all amendments/supplements thereto including the prayer in their original petition as though set forth at length herein.

4.      To date, no defendant (Avondale Industries, Inc., Northrop Grumman Ship Systems, Peter Territo, J.D. Roberts, John Chantrey, Ollie Gatlin, Steven Kennedy, American Motorists Insurance Company, Commercial Union Insurance Company, Highlands Insurance Company and Travelers Insurance Company) has filed an Answer to the Original Petition, or the First, Second and Third Supplemental and Amending Petitions.

5.      Pursuant to La. C. Civ. Proc. Art. 1151, Plaintiffs "may amend [their] petition without leave of court at any time before the answer thereto is served." Plaintiffs have attached a copy of the JeffNet report indicating that none of the named defendants have filed an Answer (Exhibit 2).

        WHEREFORE, Plaintiffs pray that their Petition be supplemented and amended in the above particulars and that, after due proceedings had, there be judgment herein in favor of Plaintiffs and against the defendants as originally prayed for herein.


                        Respectfully submitted,

                        LANDRY & SWARR, L.L.C.


                        MICKEY P. LANDRY, Bar No. 22817
                        FRANK J. SWARR, Bar No. 23322
                        DAVID R. CANNELLA, Bar No. 26231
                        1010 Common Street, Suite 2050
                        New Orleans, Louisiana 70112
                        Telephone: (504) 299-1214
                        Facsimile: (504) 299-1215

                        COUNSEL FOR PLAINTIFFS


                        CERTIFICATE OF SERVICE

        I hereby certify that a copy of the above and foregoing has been served upon opposing counsel by facsimile and/or depositing same in the U. S. Mail, properly addressed and postage prepaid, this the ___ day of June, 2007.


                        DAVID R. CANNELLA


FILED JUN 25 08

                                                          2

                                                 488-642

# EXHIBIT 2

### *BOURGEOIS v. A.P. GREEN INDUS., INC.*

### EXCEPTIONS, CROSS-CLAIM AND THIRD-PARTY DEMAND

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 488-642                                            DIVISION "Y"

**ROBERT ANDREW BOURGEOIS, ET AL**

**VERSUS**

**A.P. GREEN INDUSTRIES, INC., ET AL**

FILED: _____

                                   DEPUTY CLERK

**EXCEPTIONS, CROSS-CLAIM AND THIRD-PARTY DEMAND**

NOW INTO COURT, through undersigned counsel, come Albert Bossier, Peter Territo, Steve Kennedy, and Ollie Gatlin who assert the following exceptions, cross-claim, and third party demand:

**EXCEPTIONS**

Albert Bossier, Peter Territo, Steve Kennedy, and Ollie Gatlin assert and adopt all of their previously filed exceptions, including, but not limited to, lis pendens, prematurity, vagueness, improper cumulation, improper class action, lack of subject matter jurisdiction, prescription, no cause of action, and no right of action as if copied herein *in extenso.*

**CROSS-CLAIM AND THIRD PARTY DEMAND**

AND NOW, while reserving all of their exceptions, Albert Bossier, Peter Territo, Steve Kennedy, and Ollie Gatlin (hereinafter collectively referred to as third party plaintiffs) respectfully aver as follows:

1.

Named as defendants in cross-claim and third party defendants (hereinafter collectively referred to as third party defendants) are:

    a)    Flexitallic, Inc., a foreign corporation authorized to do and doing business in the state of Louisiana;

    b)    Garlock, Inc., a foreign corporation authorized to do and doing business in the state of Louisiana;

    c)    Owens-Corning Fiberglas Corporation, a foreign corporation authorized to do and doing business in the state of Louisiana;

    d)    Owens-Illinois, a foreign corporation authorized to do and doing business in the state of Louisiana;

e)   Pittsburgh-Corning Corporation, a foreign corpor-
ation authorized to do and doing business in the
state of Louisiana;

f)   Uniroyal, Inc., a foreign corporation authorized to
do and doing business in the state of Louisiana;

g)   Westinghouse Electric Corporation , a foreign
corporation authorized to do and doing business in
the state of Louisiana, as the manufacturer of
asbestos   containing   wall   board   and   related
products;

h)   Hopeman Brothers, Inc., a foreign corporation
authorized to do and doing business in the state of
Louisiana;

i)   G.A.F.   Corporation,   a   foreign   corporation
authorized to do and doing business in the state of
Louisiana;

j)   Armstrong   World   Industries,   Inc.,   a   foreign
corporation authorized to do and doing business in
the State of Louisiana;

k)   Combustion Engineering, Inc., a foreign corporation
authorized to do and doing business in the State of
Louisiana;

l)   Liberty   Mutual   Insurance   Company,   a   foreign
corporation authorized to do and doing business in
the State of Louisiana, as the insurer of Wayne
Manufacturing, Inc.;

m)   Manville Trust Corporation, a foreign corporation
authorized to do and doing business in the State of
Louisiana;

n)   A. P. Green, Inc., a foreign corporation authorized
to do and doing business in the State of Louisiana;

o)   Babcock   and   Wilcox,   a   foreign   corporation
authorized to do and doing business in the State of
Louisiana;

p)   Foster Wheeler Corporation, a foreign corporation
authorized to do and doing business in the State of
Louisiana;

q)   McCarty   Corporation,   a   foreign   corporation
authorized to do and doing business in the State of
Louisiana;

r)   Asbestos   Claims   Management   Corporation   f/k/a/,
National   Gypsum   Company,   Inc.,   a   foreign
corporation authorized to do and doing business in
the State of Louisiana;

s)   Asbestos Corporation, Ltd., a foreign corporation
authorized to do and doing business in the State of
Louisiana;

t)   Fibreboard   Corporation,   a   foreign   corporation
authorized to do and doing business in the State of

Louisiana;

u)  Rapid American Corporation, a foreign corporation
authorized to do and doing business in the State of
Louisiana.

2.

Third party plaintiffs have been named as defendants by the
plaintiffs in this case.

3.

Third party plaintiffs have denied any and all liability in
this case.

4.

Alternatively, while denying any and all liability, the third
party plaintiffs are entitled to contribution and/or indemnity from
the third party defendants for any and all amounts for which the
third party plaintiffs may be cast.

5.

Third party defendants are all miners, manufacturers, sellers,
distributors and/or suppliers of asbestos products or were insurers
of miners, manufacturers, sellers, distributors and/or suppliers of
asbestos products and were engaged in or materially participated in
the business of manufacturing or facilitating the manufacturing of
asbestos products, or representing themselves as manufacturers of
asbestos products, or are professional vendors of asbestos or
asbestos containing products, which were expected to and did reach
each Plaintiff's worksite(s) where Plaintiffs were exposed to them.

6.

The products mined, manufactured, distributed, supplied, sold,
and/or used by these defendants were defective, unreasonably
dangerous, and unreasonably dangerous per se, to the plaintiffs who
were intended and foreseeable users and bystanders that were
exposed to these products.  These defects include, without
limitation, the following:

a.  the mining, manufacture, sale, supply, distribution
and use of products that are unreasonably dangerous
or unreasonably dangerous per se;

b.   the mining, manufacture, sale, supply, distribution and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting potential for causing serious injury and health problems to those who would be forseeably exposed to them;

c.   lack of warning or of sufficient warning of the hazards these products would present in the course of their normal foreseeable use or intended use;

d.   lack of safety instruction or of sufficient safety instruction for eliminating or reducing the health risks associated with the intended use of these products;

e.   failure to inspect these products to assure sufficiency and adequacy of warnings and safety cautions;

f.   failure to test or adequately test these products for defects or hazards that they could present to the intended or foreseeable users;

g.   failure to truthfully report or adequately report the results of product testing, and medical studies associated with foreseeable hazards of these products by intended or foreseeable users;

h.   failure to properly design these products where the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

i.   defects in the composition and construction of these products;

j.   failure to recall these products mined, manufactured, sold, supplied and distributed;

k.   failure to properly package these products so that they could be safely transported, handled, stored, or disposed of; and

l.   overwarranting the safety of these products that were manufactured, sold, or supplied by the third party defendants.

7.

The fault and defective products of the third party defendants are a proximate cause of Plaintiffs' alleged harm.

8.

Each and every one of the third party defendants were also negligent in engaging in the substandard conduct enumerated above and this negligence was also a proximate cause of Plaintiffs' alleged harm.

9.

Owens-Illinois, Inc. and Owens Corning Fiberglas Corporation (OCF) engaged in a joint venture to produce an asbestos-containing product (among others) known as Kaylo. This product was tested by the Saranac Laboratory in Saranac Lake, New York in 1943.

10.

That same year the laboratory reported to these manufacturers that the product was causing cancer in animal studies and should be treated as hazardous.

11.

In 1952, at the Seventh Saranac Symposium, in a meeting with the asbestos industry, this apparent cancer link was again discussed in the presence of these manufacturers' representatives, yet the company did not disclose this to the public or medical community and continued to market and represent Kaylo as a safe product. These discussions at the symposium were kept confidential by all present pursuant to a long standing confidentiality agreement between OCF, other asbestos companies and Saranac Labs. In exchange for research funding, the Saranac Lab would divulge no findings, particularly adverse findings, without the agreement by its funding members.

12.

In 1953, The Saranac Laboratories indicated directly to Owens-Corning Fiberglas that asbestos fibers were carcinogenic. Owens-Corning Fiberglas suppressed this information while continuing to sell asbestos products as safe and non-toxic.

13.

In 1958, Owens-Illinois, Inc. sold the Kaylo product line to Owens-Corning Fiberglas Corporation. At no point between 1943 until after Plaintiffs were exposed to this product did Owens-Corning Fiberglas Corporation or Owens-Illinois issue any warnings concerning this product's hazard. Owens-Corning Fiberglas Corporation and Owens Illinois continuously held this product out to the public as safe and non-toxic, when they knew the facts were

otherwise.

14.

Such conduct amounted to fraud, fault, gross negligence and
negligence and was a proximate cause of Plaintiffs' alleged harm.

15.

Harold Boeschenstein, Edward Ames, M.D. Birch, William A.
Lots, Louis Saxby, Dr. John Konzen, J.P. Kern, Richard F. Shannon,
F.W. Swank, John Thomas, E.J. Marshall, Dr. Jon Konzen, T.S.
Rogers, A.J. Pearson, and John Vyverberg are or were employees and
executive officers of OCF. OCF delegated to each of them, and to
other OCF employees to be identified, one or more duties with
respect to the health and the safety of users of Kaylo and other
OCF asbestos products, and the health and safety of bystanders, and
other non-users of said products, including plaintiffs herein, such
as the duty to warn users of asbestos products of their hazards and
the duty to make their asbestos products safe in ordinary use.
Each of them breached their delegated duty to all exposed to their
employer's asbestos products, including plaintiffs. Each of them
is individually liable for his own negligence, fraud, and acts in
conspiring to keep information about the hazards of his employer's
asbestos products from becoming known to the public, to the
purchasers of the products including Avondale, users of the
products, and bystanders. Each of them failed in their delegated
duty to take steps to find substitute products, to properly test
the products, to properly warn the purchasers, users, and
bystanders as well as those charged with establishing safe levels
of exposure to asbestos products, and those charged with work place
safety, of the health hazards associated with the products know to
these individuals, and/or failed in their delegated duty to see
that these things were done. The following persons are also liable
for the reasons set forth hereinafter.

16.

Louis Saxby was a Vice President of OCF. He knew that
asbestos workers, bystanders, and family members contracted lung

disease caused by exposure to asbestos dust from OCF's insulation products. Despite having this knowledge, he failed in his delegated duty to ensure that purchasers, including Avondale, end-users of OCF's products, and bystanders, including plaintiffs, were warned of the hazards of using those products and exposure to the asbestos in said products.

17.

Dr. John Konzen was a medical director of OCF. He knew that the use of asbestos could cause asbestos-related diseases. Despite his knowledge that OCF's products should be labeled to warn purchasers such as Avondale, users, and bystanders of serious health risks, he failed in his delegated duty by waiting many years before taking action to see that OCF's products contained warnings.

18.

J.P. Kern was an employee of OCF charged with the responsibility of labeling asbestos products. Despite having information that OCF's products were hazardous, he failed in his delegated duty to third persons, such as plaintiffs, by delaying as long as possible disseminating information of the hazards associated with OCF's products to government regulators, the public, purchasers, and bystanders. J.P. Kern also took part in conspiring with other employees of OCF to keep information relating to the hazards of asbestos products from government regulators, the public, purchasers, including Avondale, users, and bystanders.

19.

Harold Boeschenstein was the President of OCF. He knew since 1942 that there were serious health hazards associated with the inhalation of asbestos fibers and he embarked upon a strategy to use this information to benefit OCF and himself during negotiations with the labor union. Subsequently, when OCF began selling asbestos products, he breached his delegated duty to purchasers, including Avondale, users, and bystanders exposed to OCF's products, such as plaintiffs, by negligently or intentionally concealing such information to promote the sale of Kaylo.

20.

Edward Ames was the public relations director for OCF. He too learned that exposure to asbestos fibers over a period of time could cause asbestosis and other asbestos-related illnesses. Mr. Ames breached his delegated duty to purchasers, including Avondale, users, and bystanders, such as plaintiffs, by assisting Mr. Boeschenstein in concealing the hazards of asbestos disease.

21.

William A. Lots worked for OCF in the Newark Product Development Laboratory. He knew at least as early as 1963 that breathing asbestos dust could cause asbestos disease. Despite having this information, he breached his delegated duty to purchasers, including Avondale, users, and bystanders by negligently and/or intentionally failing to take any steps to ensure that the information was disseminated to the purchasers, including Avondale, users, and bystanders, such as plaintiffs.

22.

Richard Shannon and F.W. Swank also knew that the use of OCF products could cause asbestos disease. Despite having this knowledge, they participated in a decision to slow down the development of substitute products, because substitute products were not money makers for OCF. Instead of pressing forward to formulate a substitute product and replacing asbestos containing products, they breached their delegated duties to purchasers, including Avondale, users, and bystanders by deciding to continue selling asbestos products without warning of the hazards associated with the use of the products.

23.

John Thomas was a President of OCF. He knew since the 1940's that the use of OCF products, including Kaylo, could cause asbestos disease. Despite having this knowledge, he breached his delegated duty to purchasers, including Avondale, users, and bystanders exposed to OCF's products by negligently and/or intentionally failing to ensure that substitute products were developed and that

adequate health hazard warnings were given.  He also participated
in the decision to slow down the use of substitute products,
because they did not make money for OCF.

24.

The actions of these employees and executive officers of OCF
were conducted in the course and scope of employment for OCF and
were performed for the benefit of OCF.  Therefore, OCF is
vicariously liable for the individual fault and liability of its
employees and executive officers.

25.

Since 1935, the Industrial Hygiene Foundation ("IHF") by and
through the IHF members: A.P. Green Industries, Inc., Asbestos
Corporation Limited ("ACL"), Eagle-Picher Lead Co., GAF Corporation
(and all predecessors ("GAF"), Johns-Manville Corporation ("JM"),
Owens-Corning Fiberglas Corporation ("OCF") and Westinghouse
Electric Corporation ("WEC") (hereinafter referred to as "IHF
defendants") held itself out to the public as an independent
research organization whose purpose was the advancement of
healthful industrial work conditions.

26.

The IHF, through its agents, Daniel C. Braun and Paul Gross,
knowingly participated in an asbestos industry conspiracy, along
with A.P. Green Industries, Inc., ACL, Eagle-Picher Lead Co., GAF,
JM, OCF and WEC, among others, as hereinafter described.  The
purposes of the conspiracy was to suppress and misrepresent
information about the dangers of exposure to asbestos and asbestos-
containing products, thus creating the impression that there were
no dangers associated with the use of asbestos or asbestos-
containing products.

27.

The IHF Defendants, at all times material, were aware that the
Plaintiffs and others similarly situated were being regularly
exposed to asbestos and asbestos-containing products and that such
exposure was hazardous long before the public or these Plaintiffs

were aware of such dangers.

28.

The IHF, through its agent, Daniel C. Braun, at the behest of the IHF defendants, suppressed the publication of important scientific data regarding the hazards of asbestos by excluding from a report, prepared and published by the IHF, all references to the connection between asbestosis and lung cancer.

29.

Mr. Vandiver Brown, corporate counsel, of Johns-Manville Corp., was a member of both the IHF's Board of Trustees and the IHF's Legal Committee.

30.

The following defendants were members of the trade association known as the Quebec Asbestos Producers Association, (also known as the Quebec Asbestos Mining Association (QAMA)): JM, ACL, GAF, National Gypsum Co., Rapid-American Corporation (as the successor of Philip Carey), and others.  These defendants, hereinafter referred to as QAMA defendants, participated in a conspiracy to misrepresent the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951 through their agent, Ivan Sabourin.

31.

In the 1950's, Ivan Sabourin of the Quebec Mining Association, was a member of the QAMA Legal Committee, along with Vandiver Brown of JM and as liaison for the IHF entered into an agreement where the associations would carry on activities on behalf of the individual members of both associations.  These acts included agreements not to publish information that may call into question the health effects related to asbestos, to attempt to target and pressure independent scientists from publication of information derogatory of asbestos and its health effects and to promote the existing TLV levels as proper and safe for workers.

32.

The IHF defendants and QAMA defendants, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with asbestos manufacturers and distributors to withhold certain information from the purchasers and users of asbestos products who would continue to be exposed to asbestos and asbestos-containing products. The IHF defendants and QAMA defendants knew full well that such continued exposure would cause injury to those so exposed.

33.

In or around 1950, QAMA began to formulate a plan to influence public opinion regarding the relationship between asbestos and cancer by gaining control over the production of medical literature on this subject. The QAMA with the knowledge, consent and assistance of the IHF, used this control to edit the resulting literature so that damaging information abut asbestos would be excluded. These associations altered research and disseminated this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

34.

In 1950, QAMA began to implement this plan to gain control over the medical literature by contracting with the Saranac Laboratories to perform an evaluation of the relationship between asbestos exposure and cancer. After a preliminary report, authored by Arthur Vorwald in 1952, indicated that a cancer/asbestos relationship might exist in experimental animals, QAMA refused to further fund the study which was terminated and never publicly discussed.

35.

As a result of the termination of this study, QAMA fraudulently withheld information from the public and affirmatively

misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer. Said affirmative misrepresentations made by conspirators' agents, K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown, and Ivan Sabourin, were directed to _inter alia_, U.S. government officials; Canadian government officials; U.S. National Cancer Institute as well as other medical organizations; and the general public.

36.

Subsequently, the QAMA defendants and IHF defendants contracted with IHF and the Mellon Institute to have Dr. Daniel Braun study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Traun, reported to the QAMA that asbestosis did increase a workers' chances of developing lung cancer. This report was kept confidential and a revised report was published which deleted these risks.

37.

In December of 1957, Dr. Kenneth W. Smith of JM wrote to Ivan Sabourin of QAMA offering suggestions for changes in the Braun/Traun report which would make the exclusion of the cancer data more believable.

38.

In 1958, QAMA requested that the report of Drs. Braun and Traun, which contained findings regarding the increased incidence of cancer in person with asbestosis, be edited to exclude such findings. The IHF agreed and published a version of the study which contained a conclusion that asbestos exposure alone did not increase the incidence of lung cancer; a conclusion known by the IHF to be patently false.

39.

The IHF's publication of the edited version of the Braun/Traun Report constituted a material misrepresentation as well as a fraudulent concealment of the risks associated with exposure to asbestos. Such publication furthered the aims of the asbestos

industry conspiracy by creating the misleading impression that exposure to asbestos did not create an increased risk of cancer, thereby reinforcing the myth of safety already created by the asbestos industry and its co-conspirators.

40.

In 1958, the QAMA held a symposium at which the edited work of Drs. Braun and Traun were publicized in an effort to influence public opinion by providing "official knowledge," as characterized by Ivan Sabourin, that the inhalation of asbestos dust would not cause cancer.

41.

The QAMA sponsorship of the symposium was not widely publicized. To keep such sponsorship discreet, publicity was carefully orchestrated by a committee of QAMA.

42.

The publication of the Braun/Traun Report by the IHF and the symposium which showcased the edited report, lent greater credibility to the arguments put forth by the asbestos industry, that the current Threshold Limit Value ("TLV") for asbestos exposure was safe and thus, furthered the goals of the conspiracy. By this time both QAMA, IHF and the constituent members were fully aware that asbestos presented a significant cancer risk and that the TLV standards they sponsored (and had gained wide acceptance) would not protect those so exposed.

43.

In 1967, QAMA conspirators determined at their trade association meeting that they would intentionally mislead consumers regarding the extent of risks involved in the inhalation of asbestos products.

44.

In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Raybestos-Manhattan and QAMA members, by way of their agents, Cartier, Sabourin and LaChance.

45.

At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed as well as the carcinogenic properties of all fiber types of asbestos. In an affirmative attempt to mislead the public regarding the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and successfully did so. In addition, the conspirators induced Dr. Arthur Vorwald not to announce the results of his and Gardner's animal studies demonstrating excess cancers in animals and thereby fraudulently misrepresented existing secret data which could to be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

46.

The following defendants were members of the trade organization known as the Asbestos Textile Institute ("ATI"): ACL, Garlock, Inc., H.K. Porter, JM, National Gypsum Company, Uniroyal, Inc., and others. (Hereinafter referred to as ATI defendants)

47.

In 1947, the ATI defendants received a report from W.C.L. Hemeon, an engineer for the IHF, regarding asbestosis, which emphasized the inadequacy of the then existing TLV and suggested that the TLV be re-evaluated. The members of the ATI joined in the IHF conspiracy with the result that neither the ATI nor the IHF published this report. The concealment of these material facts, regarding asbestos exposure, from the public and the affirmative misrepresentation to the public and class of persons exposed to asbestos, that the existing TLV was acceptable, is fraud. Thereafter, the IHF and the other conspirators mentioned above, withheld this report and other additional information regarding the TLV dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing the view that the existing TLVs were safe.

48.

In 1965, Dr. Paul Gross, then the Director of the IHF's Research Laboratory, became a member of the ACGIH's Threshold Limit Committee and was able to perpetuate the view that the industry sponsored TLV was safe, correct and proper. This was done with the knowledge and approval of the QAMA, IHF, and ATI.

49.

Dr. Gross was given primary responsibility for setting TLVs for mineral dust, including asbestos. Dr. Gross failed to share with the Committee, the public, the IHF and other associations knowledge regarding the hazards of asbestos (Braun/Traun Report) and the questionable efficacy of the TLV set for asbestos (Hemeon Report).

50.

The ACGIH Threshold Limit Committee issued an annual list of TLVs for a variety of industrial gases, vapors, dusts, fumes and mists during the 1940s, 1950s, 1960s, and 1970s. TLVs were used to indicate the maximum allowable concentrations of, inter alia, certain dusts, including asbestos. The TLV for asbestos was set in 1946 as a 5 MPPCF (five million particles per cubic foot of air). The TLV remained at this dangerous level until rewritten by the U.S. Government in 1971.

51.

The TLVs promulgated by the ACGIH were often accepted by governmental agencies as well established, scientifically supported standards.

52.

While a member of the Threshold Limit Value Committee, Dr. Gross continued to perform asbestos-related research and consulting work for asbestos companies, including JM, the IHF and presumably with the knowledge and benefit to ATI and QAMA.

53.

The IHF itself, played a critical role in the development of the asbestos TLV and exerted tremendous effort to insure that its

credibility was maintained.   In 1967, the IHF sponsored workshops on TLVs.   The IHF obtained from the Threshold Limit Value Committee, the important position as a "transfer agent" of data to be submitted to that Committee.   The IHF also offered to collect and interpret data regarding the efficacy of the current TLV on behalf of trusting Industrial Hygiene Associations.

54.

The staff of the IHF was intimately involved in the Threshold Limit Value Committee's work there, providing, at least the appearance of, industry cooperation with the Threshold Limit Value Committee while in fact manipulating the date for the benefit of the IHF, QAMA, ATI and their respective members.

55.

In 1953, National Gypsum, through its agents, in response to an inquiry form the Indiana Divisions of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.   This was done despite knowledge from its respective associations that protection was needed, ventilation was necessary, that there was mounting evidence that asbestos did cause cancer, and that the TLV levels were insufficient to protect workers.

56.

In 1955, Johns-Manville Corporation, through its agent Kenneth Smith, caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers."   This published study materially altered the results of an earlier 1949 study concerning the same set of workers.   The purpose of the alteration was to present research which mis-stated the actual risks that asbestos presented.   This alteration of Dr.

Smith's study constituted a fraudulent and material misrepresentation regarding the extent of the risk associated with asbestos inhalation.

<div align="center">57.</div>

In 1955, the National Cancer Institute held a meeting at which JM, individually and as an agent for other co-conspirators, including QAMA, IHF and ATI and A. Vorwald, as an agent of their members, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer when, in fact, the defendants were in secret possession of several studies which demonstrated that positive evidence did exist.

<div align="center">58.</div>

In 1957, the defendant members of the QAMA, IHF and ATI rejected a proposed unrestricted research study on cancer and asbestos, thereby avoiding any possibility of publication of literature which would conflict with the IHF's edited version concealing from the public, material facts regarding asbestos exposure.   This rejection constituted an affirmative misrepresentation of the then-existing knowledge regarding asbestos exposure and lung cancer.

<div align="center">59.</div>

In 1964, the defendant members of the ATI, met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently publicized by Dr. Irving J. Selikoff.   Thereafter, these members of the ATI embarked upon an aggressive campaign to further suppress the association between asbestos exposure and lung cancer.

<div align="center">60.</div>

The IHF defendants and IHF acting through their agents, Dr. Daniel C. Braun and Dr. Paul Gross, approved and ratified the conspiratorial acts described above and furthered the conspiracy by active and knowing participation in activities which suppressed the hazards of asbestos exposure and pressured non-industry aligned

researchers from publication of their work.

61.

The acts of these Defendants as described above, which proximately caused the alleged injury to the Plaintiffs, constitute a fraudulent concealment and/or a fraudulent misrepresentation in the following manner:

    a.   The material published or caused to be published by the defendants was false and incomplete in that these Defendants; and the conspirators knowingly and deliberately deleted references to the health hazards of asbestos and asbestos-related products known to them.

    b.   These Defendants and the conspirators individually, as members of a conspiracy, and as agents of other conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

        1.   maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products by assuring the public that asbestos was safe;

        2.   assist in the continued pecuniary gain of the conspirators through the sale of their products;

        3.   influence in the proposed legislation to regulate asbestos exposure by assuring those charged with such responsibilities that asbestos was safe and that current regulations, e.g., the asbestos TLV, were sufficient to protect workers and consumers;

        4.   to provide a defense in lawsuits brought for injury resulting from asbestos disease, and;

5.     to     counter     arguments     by     independent
researchers   that   asbestos   exposure   was
hazardous.

62.

These Defendants individually, as members of the conspiracy,
and as the agents of other co-conspirators intended that the public
rely upon these false and misleading published reports regarding
the safety of asbestos and asbestos-related products.   In the
absence of publicly available medical and scientific data regarding
the hazards of asbestos and asbestos-related products, the public
continued to rely on these false and misleading reports which
resulted in their continued exposure to those products.

63.

These Defendants, individually as members of the conspiracy
and as agents of other conspirators, were in a position of superior
knowledge regarding the health hazards of asbestos and, therefore,
the public had a right to rely on the Defendants' report regarding
the safety of asbestos and the absence of publicly available
medical and scientific data regarding the hazards of asbestos and
asbestos-related products.

64.

The absence of information regarding the hazards of asbestos
and asbestos-related products was knowingly caused by the
Defendants and their co-conspirators.   The Defendants knew that
such reliance on the published reports regarding asbestos and its
health effects, would result in the exposure of the Plaintiffs and
persons similarly situated to asbestos and their subsequent
development of an asbestos-related disease.

65.

The failure of the Defendants to properly report and publish
the results of studies undertaken at the request of its members
unnecessarily increased the risk that workers would be exposed to
asbestos and subsequently develop asbestos-related diseases by
creating an impression that exposure to asbestos was safe.

66.

Asbestos Corporation Limited ("ACL"), a Canadian asbestos mining company, mined, milled, bagged, sold and transported asbestos fibers to various asbestos product manufacturers, including but not limited to: H.K. Porter, Southern Asbestos, Eagle-Picher Company, OCF, Raybestos-Manhattan, Ruberoid Corporation n/k/a GAF, Uniroyal and numerous other asbestos products manufacturers for all times relevant to this action.

67.

ACL has for all years relevant to this case (1920-1995) been a member of the QAMA, ATI, and IHF and participated in the conspiracy and fraud set out above.

68.

ACL participated in and promoted policies in both associations to suppress publication of literature regarding the hazards of asbestos. The ATI, despite expressly stating in 1973 that they were aware of thousands of reports wherein their members' products had been implicated in asbestos-related deaths, dedicated itself to a policy to continue to promote and exploit the misconceptions about the known hazards connected with asbestos.

69.

In the middle 1950s, the IHF's own research detailed a clear cancer link to asbestos. All references to cancer were deleted from these studies funded by the IHF members, including ACL. The result was a published study that actively misled academia, government bodies, unions, and other entities, concerning the true nature of the hazards connected with asbestos and asbestos products. The result was the perpetuation of erroneous beliefs concerning TLV standards as well as potential carcinogenic effects of asbestos. This silence has resulted in ignorance on the part of the lay public generally to the dangers of asbestos thereby needlessly resulting in thousands of exposures.

70.

Foster Wheeler Corporation, McCarty Corporation, Pittsburgh-Corning, and Westinghouse Electric Corporation were aware of the risk of harm presented by their asbestos products. Each of these defendants either through exchange of information and/or industry sponsored studies were notified, directly by their parent companies some of which were involved in the misconduct described above, that their products presented an unreasonable risk of harm. However, each company disregarded these notices, elected to conceal these hazards from the plaintiffs continued to use and hold out these products as safe and non-toxic.

71.

Each of these defendants mentioned above were informed that asbestos dust presented health risks by the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The U.S. Government issued advisories, through the U.S. Maritime Commission, to all government contractors regarding their findings of enumerated health risks in the workplace. During the 1950s, the Department of Defense adopted and distributed to all government contractors, safety standards that pertained to the use of these defendants' products in various work places. In the early 1950s, Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S. Government promulgated and published the Walsh-Healy Act which adopted safety standards and regulations regarding asbestos dust. Based on information and belief, each of the companies, their predecessors, and corporation officers were made aware of these findings at the time they were issued. Despite this knowledge these companies continued to manufacture, distribute, relabel, fabricate, sell, and install these products at the Plaintiffs' worksites. This was done without warning to Avondale and users, including, plaintiffs, and without the knowledge on the part of Avondale and its employees that plaintiffs were in danger. Additionally these defendants continued to market their products without disclosing the dangers and

simultaneously affirming that their products were safe and non-toxic.

72.

With the advent of these plaintiffs' claims and the claims of earlier plaintiffs, these defendants adopted so called "document retention policies" in which documents, indicating these defendants' knowledge, were purged from their corporate records. These purges were conducted under the pretext of destruction of stale business records; but, also included any and all documents that related to their knowledge of existing and potentially incriminating evidence related the dangers of asbestos.

73.

Additionally, with respect to Westinghouse Electric Corporation ("WEC"), WEC knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products without warning to downstream customers.

74.

WEC began manufacturing asbestos-containing wallboard systems in 1956 and continued to do so until the mid 1970s. Prior to 1972, WEC failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, WEC applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of WEC's asbestos-containing products.

75.

Hopeman Brothers is a company that performed joiner work at Avondale. In performing the joiner work, Hopeman Brothers installed asbestos containing wall board and other asbestos containing products in a manner which negligently and without warning exposed plaintiffs to asbestos dust, which was a proximate cause of the plaintiffs' alleged harm.

76.

Wayne Manufacturing Company manufactured the asbestos containing wall board used by Hopeman Brothers.    Wayne Manufacturing Company is strictly liable and liable for negligence for the reasons set forth in paragraphs 4, 5, 6, 7, 8, and other paragraphs generally referring to all manufacturers of products.

77.

Liberty Mutual Insurance Company insured Wayne Manufacturing Company at all material times herein and is therefore liable for any and all liability of Wayne Manufacturing Company.

**WHEREFORE,** Albert Bossier, Peter Territo, Steven Kennedy, and Ollie Gatlin pray that their cross-claim and third party demand be filed and that the third party defendants be duly served and cited and that, the alternative and in the event of a judgment against them, which liability is denied, that there be further judgment over and against all cross-claim defendants and third party defendants for indemnity and/or contribution for any and all amounts owed by them to plaintiffs, and for all costs of these proceedings, and for all other equitable and legal relief as the nature of the case may permit and as the law may allow.


RESPECTFULLY SUBMITTED:

BY:

~~GARY A. LEE, ESQ.~~
LA Bar No. 08265
LEE, FUTRELL, PERLES L.L.P.
201 St. Charles Avenue
Suite 2409
New Orleans, LA 70170

Attorneys for Albert Bossier, Peter Territo, Steven Kennedy, and Ollie Gatlin

**PLEASE SERVE:**

**Asbestos Corporation, Ltd.**
Through its attorney of record:
Thomas Milazzo
LeBlanc, Miranda & DeLaup
2121 Airline Drive
Suite 601
Metairie, LA 70001

**Combustion Engineering, Inc.**
Through its attorney of record:
J. Michael Johnson
Galloway, Johnson, Tompkins & Burr
One Shell Square, Suite 4040
New Orleans, LA 70139

**Foster Wheeler Corporation**
Through its attorney of record:
Rebecca Bush
Adams & Reese
One Shell Square, Suite 4500
New Orleans, LA 70139

**Garlock, Inc.**
Through its attorney of record:
Troy N. Bell
Aultman, Tyner, McNeese & Ruffin
400 Poydras Street
Suite 1810
New Orleans, LA 70130

**Liberty Mutual Insurance Company,** as the insurer of Wayne
Manufacturing Company and **Hopeman Brothers, Inc.**
Through its attorney of record:
Kaye N. Courington
Duncan & Courington
322 Lafayette Street
New Orleans, LA 70130

**The McCarty Corporation**
Through its agent for service of process:
Susan Kohn
Simon, Peragine, Smith & Redfearn
1100 Poydras Street
30th Floor
New Orleans, LA 70163

**Owens-Corning Fiberglas Corporation**
Through its attorney of record:
Michael T. Cali
Frilot, Partridge, Kohnke & Clements
1100 Poydras Street
Suite 3600
New Orleans, LA 70163

**Uniroyal, Inc.**
Through its attorney of record:
John D. Cosmich
Foreman, Perry, Watkins & Krutz
1200 One Jackson Place
188 E. Capitol Street
Jackson, MS 39225

**Owens-Illinois**
Through its attorney of record:
John D. Cosmich
Foreman, Perry, Watkins & Krutz
1200 One Jackson Place
188 E. Capitol Street
Jackson, MS 39225

**Westinghouse Electric Corporation**
Through its attorney of record:
Madeleine Fischer
Jones, Walker, Waechter, Poitevent, Carrere & Denegre
201 St. Charles Ave.
50th Floor
New Orleans, LA 70170

**Pittsburgh-Corning Corporation**
Through its attorney of record:
Glenn Adams
Porteous, Hainkel, Johnson & Sarpy
704 Carondelet Street
New Orleans, LA 70130

**Rapid American Corporation**
Through its attorney of record:
Jerald Album
Two Lakeway Center
3850 N. Causeway Blvd.
Suite 1130
Metairie, LA    70002

**A.P. Green, Inc., Armstrong World Industries, Inc.,**
**Asbestos Claims Management Corporation f/k/a, National Gypsum**
**Company, Inc., Flexitallic, Inc., and G.A.F. Corporation**
Through their attorney of record:
A. Wendel Stout
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130

**Manville Trust Corporation**
c/o David Austern
General Counsel for the Trust
1825 Eye St., N.W., Suite 300
Washington, D.C. 20006-1202

**Babcock and Wilcox**
c/o its Registered Agent
C.T. Corporation Systems
8550 United Plaza Blvd.
Baton Rouge, LA 70809

**Fibreboard Corporation**
c/o its Registered Agent
United States Corporation Company
1101 American Bank Bldg.
New Orleans, LA 70130

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel or record by placing a copy of same in the United States Mail, properly addressed and postage prepaid and/or via fax, this 12·30·98 day of December, 1998.

NEW SERVICE INSTRUCTIONS
AS OF JANUARY 27, 1999

Foster Wheeler Corporation
(via the Louisiana Long Arm Statute)
Perryville Corporate Park
Clinton, New Jersey 08009

2/11/99

NEW SERVICE INSTRUCTIONS (CROSS-CLAIM AND THIRD PARTY DEMAND)
AS OF FEBRUARY 1, 1999

Gasket Holding, Inc. (f/k/a Flexitallic, Inc.)
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

GAF Corporation
(via the Louisiana Long-Arm Statute)
1361 Alps Road
Wayne, NJ 07470

Armstrong World Industries, Inc.
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

A. P. Green Industries, Inc.
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

Asbestos Claims Management Corporation
(via the Louisiana Long Arm Statute)
2608 Eastland Avenue, Suite 202
Greenville, TX 75402

NEW SERVICE INSTRUCTIONS (CROSS-CLAIM AND THIRD PARTY DEMAND)
AS OF FEBRUARY 8, 1999

**Owens-Corning Fiberglas Corporation**
through its registered agent for service of process
C. T. Corporation Systems
8550 United Plaza Blvd.
Baton Rouge, Louisiana 70809

NEW SERVICE INSTRUCTIONS (CROSS-CLAIM AND THIRD PARTY DEMAND)
AS OF MAY 26, 1999

Garlock, Inc.
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

NEW SERVICE INSTRUCTIONS (CROSS-CLAIM AND THIRD PARTY DEMAND)
AS OF MAY 26, 1999

Garlock, Inc.
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

# EXHIBIT 3

# DEPOSITION OF STEVEN KENNEDY

PAGE 1 SHEET 1

1

```
 1    CIVIL DISTRICT COURT
 2        PARISH OF ORLEANS
 3        STATE OF LOUISIANA
 4
 5    NATHANIEL GAINES AND        NO. 95-01823
 6    FLORIDA MAE EIGANS GAINES
 7    VERSUS            DIV. "M"
 8    AVONDALE INDUSTRIES, INC., ET AL
 9        consolidated with
10    NUMBER: 91-18397      DIV. "F"
11            JUDGE AD HOC
12            LEWIS S. DOHERTY, III
13    IN RE: ASBESTOS PLAINTIFFS
14    VERSUS
15    BORDEN, INC., ET AL
16
17    Telephone Deposition of STEVEN KENNEDY, taken at
18    the Courtyard Marriott, San Antonio, Texas, on
19    December 30, 1998.
20
21
22
23    REPORTED BY:  LOUIS JANKOWSKI
24            CERTIFIED COURT REPORTER
25            STATE OF LOUISIANA
```

PAGE 2

2

```
 1        APPEARANCES
 2
 3    FOR THE PLAINTIFFS NATHANIEL GAINES AND FLORIDA
 4    MAE EIGANS GAINES:
 5
 6    ROUSSEL AND ROUSSEL
 7    1710 Cannes Drive
 8    LaPlace, Louisiana 70068
 9    BY:  GEROLYN P. ROUSSEL, ESQUIRE
10
11    FOR IN RE: PLAINTIFFS:
12
13    MURRAY LAW FIRM
14    909 Poydras Street
15    LL&E Tower, Suite 2550
16    New Orleans, Louisiana 70112
17    BY:  JOSEPH A. RACE, ESQUIRE
18
19    FOR MINE SAFETY APPLIANCES:
20
21    HOFFMAN, SIEGEL, SEYDEL, BIENVENU & CENTOLA
22    650 Poydras Street
23    2100 Poydras Center
24    New Orleans, Louisiana 70130-6121
25    BY:  LAWRENCE J. CENTOLA, JR. ESQUIRE
```

PAGE 9  SHEET 5

9

1  STEVEN KENNEDY, after having been first duly
2  sworn by the above-mentioned court reporter, was
3  examined and testified as follows:
4      MRS. ROUSSEL:
5          We're going to have reading and
6  signing?
7      MR. CARAWAY:
8          Yes.
9      MRS. ROUSSEL:
10          Sir, the court reporter is going to
11  be taking down everything you're going to say.
12  He's sworn you, similar to court testimony.  He
13  will put it in a booklet form and send it to
14  you.  You can't change your testimony, but if
15  there are misspellings or if something was
16  transcribed incorrectly, which has never
17  happened with this gentleman, just in case, he's
18  going to send it to you and give you an
19  opportunity to read it.
20  EXAMINATION BY MRS. ROUSSEL:
21      Q.  Mr. Kennedy, I'm Gerolyn Roussel, and
22  we're going to just do a test right now to see
23  whether or not they can hear; if you can turn
24  your mute button off and see if that, maybe,
25  helps.

PAGE 10

10

1      Mr. Kennedy, state your full name for the
2  record, please.
3      A.  Steven J. Kennedy.
4      Q.  And your home address, sir?
5      A.  2142 Border Mill, San Antonio  78230.
6      Q.  How long have you lived at that
7  address?
8      A.  About three years.
9      Q.  And what's your phone number at that
10  address?
11      A.  691-0713.
12      Q.  What's the area code?
13      A.  210.
14      Q.  And are you currently employed?
15      A.  Yes, part-time, doing engineering.
16  MR. TRACHTENBERG:
17          We lost you again.
18  MRS. ROUSSEL:
19          I don't know what to do.  Does
20  anybody have any suggestions?
21  MR. LEE:
22          The only thing I can suggest is that
23  we put the speaker as close as possible to Mr.
24  Kennedy.  You might not hear the questions, but,
25  hopefully, you'll hear the answer, but I don't

PAGE 11  SHEET 6

11

1   know what else to tell you.
2       MR. TRACHTENBERG:
3           Gerolyn, when we muted, it was fine,
4   and then we could hear Lou.
5       MRS. ROUSSEL:
6           Lou is sitting between me and the
7   witness.
8       MR. TRACHTENBERG:
9           I don't know if it's on our end or
10  your end; we're going to try.
11      MRS. ROUSSEL:
12          We moved the phone and put it by the
13  witness.
14  EXAMINATION BY MRS. ROUSSEL:
15      Q.   Sir, you said you're employed
16  part-time?
17      A.   Part-time.
18      Q.   What do you do part-time?
19      A.   Engineering work.
20      Q.   And the engineering work you do, is
21  that as a consultant?
22      A.   No.  I'm on the payroll.
23      Q.   Whose payroll are you on?
24      A.   Alamo Ironworks, Foundry Division.
25      Q.   That name is what?

PAGE 12

12

1       A.   Alamo.
2       Q.   I know from talking with you prior in
3   your other deposition, that I remember you're an
4   electrical engineer.
5       A.   Yes.
6       Q.   The type of consulting work that you
7   do with Alamo Ironworks, is that as an
8   electrical engineer?
9       A.   It specializes in the ISO 9,000.
10  It's a new program that I've been writing for
11  the company.
12      Q.   And what type --
13      A.   It takes in the whole ball of wax.
14  It's a quality program designed to have almost
15  zero defects.
16      Q.   What type of program is that?  Is
17  that a computer program?
18      A.   No.  We put it in the computer.  This
19  is a program that I've written.
20      Q.   Tell me a little bit about it.
21      A.   Well, there's three manuals, what you
22  call quality systems manuals, which is the
23  corporate manual.  The quality procedure manual
24  is the procedure or second manual, and then the
25  DOP, Department Operating Procedures, is the

PAGE 13  SHEET 7

13

1    third-grade manual. This tells you how to do
2    everything. That's how you do it, just like
3    making a cake.
4         Q.   Does that manual incorporate safety
5    procedures for the company?
6         A.   No. This is just procedural work of
7    how to mold a certain part.
8         Q.   How long have you been doing that?
9         A.   Oh, it's seven years with Alamo and
10   about 21 years with Gulf Star Foundries.
11        Q.   What type of work does Alamo
12   Ironworks do?
13        A.   Alamo Ironworks, Foundry Division, we
14   make parts. It's an engineering-type foundry.
15   It's like a job foundry. We take certain types
16   of special parts, like for the oil field or
17   manufacturing, we make those type parts for
18   them.
19        Q.   And Gulf Star Foundries, what type of
20   work?
21        A.   Same thing. They are no longer in
22   business.
23        Q.   Sir, give me your date of birth.
24        A.   August 12, 1919.
25        Q.   And your Social Security number?

PAGE 14

14

1         A.   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.
2    MR. TRACHTENBERG:
3         It's got to be your end, because it's
4    cutting off and on.
5    MRS. ROUSSEL:
6         Off the record.
7         (DISCUSSION OFF THE RECORD)
8    MS. TOLBERT:
9         I'd like to reserve our rights if we
10   can't hear what's going on.
11   MR. CARAWAY:
12        You're not reserving anything. This
13   deposition is going to be canceled immediately
14   if --
15   MRS. ROUSSEL:
16        Not at my cost, Bud.
17   MR. CARAWAY:
18        You're not reserving any rights, I'm
19   just telling you that right now. You can say
20   what you want to, but I can hear you very well.
21   I want you to hear everything I say very
22   clearly.
23   MS. TOLBERT:
24        All I'm trying to do is hear what's
25   going on.

PAGE 19  SHEET 10

19

1   judgeship that I held for 13 years, and I guess
2   I'm just continually studying.
3      Q.   You got your degree in Electrical
4   Engineering?
5      A.   Yes, ma'am.
6      Q.   And that was from what university?
7      A.   Texas.
8      Q.   What year was that?
9      A.   I can't remember.  About '48, after I
10   come out of the service.  I come out of the
11   service in '44, '43.  It's a long time ago.  I
12   can't remember.
13      Q.   So you came out of the Air Force in
14   1943 or '44, and then you went to Texas
15   University?
16      A.   Yes, ma'am.
17      Q.   And how many years were you in
18   college?
19      A.   Three and a half.  Went through
20   summer school.
21      Q.   So sometime in approximately 1947ish
22   you got your degree from Texas University?
23      A.   Somewhere around there.
24      Q.   And during that time, were you
25   required to take either the

PAGE 20

20

1   Engineering-In-Training course or exam or the
2   Professional Engineers exam?
3      A.   No, because I went right in, right to
4   work, and I didn't have any need for it at that
5   time.  And it just got away from me.  I never
6   did try for it.  Not an professional, no.
7      Q.   You're not a Licensed Professional
8   Engineer?
9      A.   No.
10      Q.   And the correspondence courses that
11   you took, what were those?
12      A.   Well, I took electronics courses, and
13   electronics for automation, this to use in my
14   engineering in the plants, and management
15   courses, anything that would better me.
16      Q.   I understand that after college you
17   also worked in a shipyard in New York?
18      A.   Yes.  New York Ship in Camden, New
19   Jersey.
20      Q.   And what were your job
21   responsibilities at New York Shipyards; is that
22   what it was?
23      A.   New York Ship.  Chief Test Engineer.
24      Q.   What did those responsibilities
25   include?

PAGE 139  SHEET 70

139

1  time period that you were at Avondale Shipyards,
2  no air monitoring studies were done?
3      A.   No.
4      Q.   No, none were done?
5      A.   No, not to my knowledge, no.
6  MRS. ROUSSEL:
7          That's all I have.  Thank you.
8  MR. CARAWAY:
9          I have a few questions.
10  MR. HAINKEL:
11          Before you start, so we don't all
12  pipe in and chime in during your examination, I
13  think for this, at least for me, you know, if
14  Gerolyn or Joseph objects to form, that will
15  cover for me, too, and we'll assume I'm joining
16  in, okay.
17  MR. LEE:
18          That's fine.
19  EXAMINATION BY MR. CARAWAY:
20      Q.   Mr. Kennedy, you've been asked some
21  questions about the time periods in which you
22  had any involvement in the Safety Department,
23  and I want to follow up on that area of inquiry.
24          According to your employment card from
25  Avondale, you were made Director of Safety.

PAGE 140

140

1  That's a title given to you, Director of Safety
2  on December 13, 1971.  Do you have any reason to
3  disagree with that date?  Does that sound right
4  to you?
5  MR. RACE:
6          I object to the form of the question.
7  MRS. ROUSSEL:
8          I object.
9  THE WITNESS:
10          I'm not very good at dates.  It
11  sounds right.
12  EXAMINATION BY MR. CARAWAY:
13      Q.   What I'm asking is, do you have any
14  reason to disagree with the accuracy of that
15  date that appears on your employment card?
16  MRS. ROUSSEL:
17          I object to the form of the question,
18  also object to asked and answered.
19  EXAMINATION BY MR. CARAWAY:
20      Q.   You can answer the question.
21      A.   No.  I take that as correct.
22      Q.   Before you were made Director of
23  Safety at Avondale, did you have any safety
24  responsibilities in the Safety Department at
25  Avondale?

WILLIAMS & JANKOWSKI, 3850 N. CAUSEWAY, SUITE 1465, MET., LA., 832-0937

— PAGE 141  SHEET 71 —

141

1    A.   No.
2    MRS. ROUSSEL:
3        Objection to form.  If he doesn't
4    recall the date that he acquired that title, how
5    do you expect him to know what functions he had?
6    MR. CARAWAY:
7        That's fine.  You made your
8    objection.
9    MR. LEE:
10        The answer was no.
11   EXAMINATION BY MR. CARAWAY:
12    Q.   If it is true that you did not have
13   safety responsibilities in the Safety Department
14   before you became Director of Safety at Avondale
15   in 1971, did you have any meetings or conduct
16   any meetings at which Mr. O'Donnell reported to
17   you concerning safety developments prior to,
18   before you became Director of Safety?
19    A.   No.
20    Q.   You were asked some questions early
21   on about a document that you were not, today,
22   able to read.  And my question to you is:  if
23   the information contained on the Avondale
24   timecard is correct, and that you did not become
25   Director of Safety at Avondale until 1971, did

— PAGE 142 —

142

1    you have any responsibility or input at all in
2    any safety manual or pamphlet produced --
3    A.   No.
4    Q.   -- at Avondale in 1964?
5    A.   No.  I didn't have any contact with
6    the Safety Department until I become the
7    Director.
8    Q.   The input that you seem to recall
9    about a safety manual, would that have been a
10   safety manual that was being considered for
11   production or being produced at Avondale during
12   the period of time that you were Safety Director
13   there?
14   MRS. ROUSSEL:
15       I object to form.
16   MR. CARAWAY:
17       Do you understand my question?
18   THE WITNESS:
19       No.
20   EXAMINATION BY MR. CARAWAY:
21    Q.   Well, you seem to have recollection
22   of some involvement in a safety manual that was
23   produced at Avondale; is that correct?
24    A.   Yes.
25   MR. RACE:

PAGE 143  SHEET 72

143

1      I object to the form.
2    EXAMINATION BY MR. CARAWAY:
3      Q.  Is that correct?
4      A.  Yes.
5      Q.  Based upon your prior testimony?
6      A.  We -- yes, but I can't come up with a
7    time and all this.
8      Q.  But what I'm asking you is:  With
9    that, do you recall whether that involvement
10   took place during the period of time that you
11   had safety responsibilities after 1971?
12     A.  Yes, when I had -- when I was
13   Director of Safety, yes.
14     Q.  There's vast confusion in this
15   deposition, I think, about the positions that
16   you held when you were head of the Safety
17   Department at Avondale.  When you were --
18     MR. RACE:
19       I object to that.
20     MRS. ROUSSEL:
21       I object as well.
22     MR. CARAWAY:
23       You can make your objections.
24     MR. RACE:
25       I am.

PAGE 144

144

1      MR. STOVALL:
2        I join in that objection.
3      MR. CARAWAY:
4        That's fine.
5    EXAMINATION BY MR. CARAWAY:
6      Q.  Let me direct you, in particular, to
7    some questions that were asked by Mr. Adams
8    right down here, the gentleman with the glasses,
9    that attempted to clarify this.  When you were
10   Director of Safety at Avondale, did you also
11   have responsibility for other departments at
12   Avondale?
13     A.  Yes.  Quality Control, Test
14   Engineering and Industrial Security.
15     Q.  So when you became Director of Safety
16   in 1991 --
17     MR. LEE:
18       1971.
19   EXAMINATION BY MR. CARAWAY:
20     Q.  In '71, you added that position to
21   those directorships that you already had at
22   Avondale --
23     A.  Yes.
24     Q.  -- is that right?
25     A.  That's correct.

PAGE 145  SHEET 73

145

1    Q.   During the period of time that you
2  were the Director of Safety or the head of the
3  safety operations at Avondale, your testimony is
4  that you also directed the activities of, I
5  believe, three other independent departments at
6  Avondale?
7    A.  Yes.
8    MRS. ROUSSEL:
9      I object to the form of the question.
10  EXAMINATION BY MR. CARAWAY:
11   Q.  Is that true?
12   A.  That's true.
13   Q.  You've also testified that after you
14  became Director of Safety, Mr. O'Donnell
15  remained at Avondale in some capacity in the
16  Safety Department?
17    MRS. ROUSSEL:
18      I object to the form of the question;
19  also object to leading.
20    MR. RACE:
21      I object to form.
22    MR. CARAWAY:
23      Let me rephrase the question to
24  correct the leading nature of it.
25    MR. RACE:

PAGE 146

146

1      The horse is out of the barn.
2  EXAMINATION BY MR. CARAWAY:
3    Q.  When you became Safety Director in
4  1971, was Mr. O'Donnell still performing any
5  work for the Safety Department at Avondale?
6    MRS. ROUSSEL:
7      I object to form, object to leading.
8    MR. CARAWAY:
9      You can answer; they are just making
10  objections, Mr. Kennedy.
11    MR. RACE:
12      Valid objections.
13    THE WITNESS:
14      That's true.  He had safety
15  responsibility.
16  EXAMINATION BY MR. CARAWAY:
17   Q.  Do you recall exactly when, during
18  the period of time that you were Safety Director
19  at Avondale, Mr. O'Donnell stopped working
20  completely at Avondale?
21   A.  I could not honestly answer that
22  that's the date.
23   Q.  Do you recall whether or not Mr.
24  O'Donnell was performing safety responsibilities
25  at Avondale during the majority of the period of

PAGE 161  SHEET 81

161

1    information to dispute Jim O'Donnell's timecard
2    either, would you?
3        A.   No, I don't have any.
4        Q.   Now, you indicated that you're not a
5    lawyer, are you?
6        A.   No.
7        Q.   And you indicated that you took some
8    law classes?
9        A.   Yes.  Sam Houston University.
10       Q.   What kind of law classes did you
11   take?
12       A.   Courtroom procedures, Burnham's
13   Annotated.
14       Q.   How many hours of classes did you
15   take?
16       A.   At the beginning, it was 18, and then
17   every year I went back for, I think -- let's
18   see, what did we go back to?  Twenty-four.  Each
19   year come up with the new laws and new
20   procedures.
21       Q.   Did you ever obtain some kind of
22   certificate for that?
23       A.   No.  I just was qualified.  Yes, I
24   guess you could say, because I get a certificate
25   every year allowing me to continue with it,

PAGE 162

162

1    showing that I did, in fact, take the seminars,
2    if you will,
3        Q.   So that was like a continuing
4    CLE-type program?
5        A.   Yes, continuing education.
6        Q.   And why did you take the 18 hours to
7    begin with?
8        A.   Initiation for the first -- going
9    into for the first time to know all the rules
10   and the laws.
11       MR. CARAWAY:
12           He's forgotten.  Tell her why you
13   needed to take them, for the first time doing
14   what?
15       THE WITNESS:
16           Qualify for the judgeship.
17   EXAMINATION BY MRS. ROUSSEL:
18       Q.   What kind of judgeship would allow
19   you to take a judgeship position without a law
20   degree?
21       A.   Texas law.
22       Q.   Is it an elected position or
23   appointed position?
24       A.   No, it was appointed because I
25   refused.  When I was asked to take the position,

PAGE 163  SHEET 82

163

1   I refused the elected position.
2       Q.   You refused to take the elected
3   position?
4       A.   No.  I refused to go as an elected
5   position.  I said I'd take it as an appointed
6   position.
7       Q.   So you had the position of being
8   elected or being appointed?
9       A.   That's right.
10      Q.   Who would have appointed you to a
11  judgeship position without any legal training?
12      A.   The Council.
13      Q.   What council?
14      A.   The City Council.
15      Q.   Is that some kind of small -- what
16  type of court were you operating?
17      A.   Municipal.
18      Q.   Like traffic violations, that type of
19  thing?
20      A.   That, and quite a number of other
21  cases that come in.
22      Q.   Did it have a limit on the kinds of
23  cases you could handle?
24      A.   Yes.
25      Q.   What kind?

PAGE 164

164

1       A.   I could handle anything that's Class
2   B.
3       Q.   What's classified as Class B?
4       A.   I think it's fines of $800.
5       Q.   So traffic violations are anything
6   with a fine $800 or less?
7       A.   Yeah.  I couldn't have anything over
8   that, and the Magistrate, the whole nine yards,
9   and across the line many times.
10      Q.   Crossed what line?
11      A.   Well, for another judge, JPO, someone
12  can't sit on the bench, or he has an interest or
13  something in the case, then I would be appointed
14  to court to hear the case.
15      Q.   Like a Justice of the Peace?
16      A.   Yes.
17      Q.   You never sat on a civil trial docket
18  such as a --
19      A.   No.
20      Q.   -- Judge we think of in a courtroom?
21      A.   No.
22      Q.   No, you never held that?
23      A.   No.
24  MRS. ROUSSEL:
25      That's all I have.  Thank you.



PAGE 181  SHEET 91

181
REPORTER'S CERTIFICATE

1

2.

3      I, Louis Jankowski, Certified Court

4   Reporter, in and for the State of Louisiana, do

5   hereby certify that the within witness, after

6   being first duly sworn to testify to the truth,

7   the whole truth, and nothing but the truth, did

8   testify as hereinbefore set forth, in the

9   foregoing pages;

10      That the testimony was reported by me

11   in shorthand and transcribed under my personal

12   direction and supervision, and is a true and

13   correct transcript, to the best of my ability

14   and understanding;

15      That I am not of counsel, not related

16   to counsel, and in no way interested in the

17   outcome of this event.

18

19

20

21

22      ——————————————

23      LOUIS JANKOWSKI, C.C.R.

24

25

PAGE 182

182
WITNESS' VERIFICATION

1

2

3

4

5      I do hereby verify that I have

6   read or have had read to me the above and

7   foregoing transcript, and that it is true and

8   correct, to the best of my ability and

9   understanding, subject to the attached

10   corrigendum, if any.

11

12

13

14

15

16

17

18

19      ——————————————

20      (WITNESS' SIGNATURE)

21

22

23

24

25

WILLIAMS & JANKOWSKI, 3850 N. CAUSEWAY, SUITE 1465, MET., LA., 832-0937

# EXHIBIT 4

## AVONDALE EMPLOYMENT CARD OF J. T. COLE

**NORTHROP GRUMMAN**

Northrop Grumman Corporation
Ship Systems

P.O. Box 50280
New Orleans, LA 70150-0280
504-654-2121

## Certificate of Records

I, Stephen M. Robinson, Custodian of Records of Northrop Grumman Ship Systems, Inc.,

Avondale Operations, certify that the attached payroll records of  Steven J. Kennedy

are true and correct copies of all records kept by this office and that such records were kept

in the course and scope of business of this office.

Custodian of Records

January 17, 2007
Date

SSF I7214 (04/29/03)

| 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 | Kennedy, Steven J. | | #S218 | 8-12-19 |
|---|---|---|---|---|
| SOCIAL SECURITY NUMBER | NAME – LAST, FIRST MIDDLE | | PHONE | BIRTH DATE |
| CREDIT   ADDRESS | | | | SPOUSE |
| 5/16/62   537 Kenmore DRIVE, Harahan, La. 70123 | | | | Helen |
| 9/1/69   Dir.QualityCont, | Brunner | | | |
| 12-13-71   DIRECTOR OF SAFETY   Kennedy | | | | |
| 5-1-72   ING. ING. | Chantrey | | | |
| 5-16-72   GEN RAISE | | | | |
| 5/1/73   Gen'l Raise | | | | |
| 5-28-73   QUIT- LDW 5-25-73 | | | | |

| DATE | OCCUPATION | RATE | SUPERVISOR+SHIFT | DATE | OCCUPATION | RATE | SUPERVISOR+SHIFT |
|---|---|---|---|---|---|---|---|

| DATE | TERMINATION INFORMATION | DATE | TERMINATION INFORMATION |
|---|---|---|---|

| CLOCK NUMBER   S 218 | NAME   Steven J. Kennedy | | PR 2 | PR 4 |
|---|---|---|---|---|

| TO | NAME OF COMPANY | CITY & STATE | SUPERVISOR & POSITION |
|---|---|---|---|
| | | | |

| TITLE & NATURE OF WORK | WAGE | REASON FOR LEAVING |
|---|---|---|
| | | |

REMARKS

CLOCK #   **7147**   NAME   Steven J, Kenneay
537 Kenmare Avenue   FILE   210-03-5?42
Harahan, Louisiana

NEW ADDRESS - PHONE
NEXT ADDRESS - PHONE

| DATE | OCCUPATION | HIRED RATE | FOREMAN | DATE TERMINATED | REASONS - COMMENTS |
|---|---|---|---|---|---|
| 3/??,?? | Inspector | 3.10 Wk | Sal. McQue | | |
| 0/4/?3 | Quality Cont. | 3.10 | J. McQue | | |
| ?/?,?? | Merit | 3.58 (170.00) | McQue | | |
| 1/10/?? | Merit | 3.?9 (180.03) | McQue | | |
| 9/23/?4 | Merit | 5.00 (185.25) | | | |
| 5-24-65 | Merit | 4.43 (210.43) | McQue | | |
| ?/25/66 | Merit | 4.74 (225.16) | | | |
| 11/??/66 | Gen'l Raise | 4.95 | | | |
| | Fr--/---, Inc. | Enter rate( | | | |
| 10-1-67 | Trans/MoSal | | | | |
| ?/??-?? | ADV.RATE | | | | |
| | DIRECTOR QUALITY CONTROL | | | | |
| 11/30/?? | Acct. Dept. Brad | | | | |
| 12/31/66 | Mech. Director of | | | | |
| | Quality Control | Harahan | | | |
| ?/??-5? | GEN RAISE | | | | |



RESUME

MARITAL STATUS
AGE:

CITIZENSHIP:          U.S.A.

SECURITY CLEARANCE:   Secret

EMPLOYMENT RECORD:    5-16-42 to Present - _____dale Shipyards, Inc. as follows:

                      5-____-__-30-66 - _____ Qr. Quality Control

                      __-___-__-1-65 - ____. _____ Quality Control & Safety

                      ___ to Present - _____ of Quality Control, Test _____ing and Safety Dept.

EDUCATION:            5 yrs Grammar School

                      4 yrs High School

                      4 yrs College - Major - Electrical Engineering

                      18 most Industrial Management (Executive)

                      2 yrs Basic Electronics RCA Institute

                      13 most. Electronics for Automation ECA Institute

                      6 mos. Quality Control Principles and Control Chart Analysis

                      Safety Seminar Safe Operation of Motor Vehicles, Drilling ____

                      Safe Use of and Handling and Storage of Explosives (Geographical Exploration Both Domestic and Foreign)

                      Competent Person U. S. D, ___

                      Continuous Study of U. S. IX V. _____ Rules and _____ion plus Safety Engineering



## APPLICATION AND EMPLOYMENT RECORD

FOR WORK AS __Inspector__       DATE __May 15, 1 od__

FULL NAME __Steven J Kennedy__    SOC. SEC. __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__ STATE

ADDRESS __. .. Kenmore Dr.__   CITY __Harahan__     STATE __LA__ PHONE

CLOSEST RELATIVE __Helen A Kennedy (Wife)__ ADDRESS __Same__      PHONE

DATE OF BIRTH __7/12/19__   HEIGHT __5' 10"__   WEIGHT __170__   COLOR EYES __Blue__ HAIR __Grey__

PLACE OF BIRTH __Philadelphia__

SINGLE ☒  DIVORCED ☐  OWN HOME☒☒ RENT ☐

MARRIED ☒  SEPARATED ☐  LIVE WITH PARENTS☐

WIDOWED ☐

NO. MINOR DEP

OTHER DEP. __Self & Wife__

RELATIVE EMPLOYED HERE __No__      RELATIONSHIP

EDUCATION – GRAMMAR ☒  HIGH SCHOOL ☒  COLLEGE ☒  BUSINESS SCHOOL ☐    SPECIAL ☐

NAME OF COLLEGE, BUSINESS OR SPECIAL SCHOOL AND DEGREES, IF ANY __Air Corps 2 years - Disc. 11/17/45 Injury Army Air Corps. Internal e arrange Rt. Knee -$33.00 per month from Government__

SPECIAL SKILLS, KNOWLEDGE OR ABILITIES:

PREVIOUS EXPERIENCE – BEGIN WITH YOUR LAST JOB

| DATE FROM | TO | NAME OF COMPANY | CITY - STATE | SUPERVISOR & POSITION |
|-----------|-----|-----------------|--------------|------------------------|
| 1 3/59 | 3/60 | Independent Exp. Co. | Houston, Texas | |
| 2 5/60 | Present | building Inc. New York Ship- | Camden, N.J. | P. Matthews |
| 3 | | | | |

| | TITLE & NATURE OF WORK | WAGE | REASON FOR LEAVING |
|---|------------------------|------|---------------------|
| 1 | Party Manager Oil Exp. | 000.00/mo | did not have to move To seek emp. where : |
| 2 | Sub Foreman Test Engineer | 150.00/wk | Presently employed. |
| 3 | | | |

CHARACTER REFERENCES: DO NOT REFER TO PREVIOUS EMPLOYERS OR RELATIVES

| NAME | OCCUPATION | ADDRESS |
|------|------------|---------|
| R. W. Bishop | Geophysical Cons. | 5531 S. Claiborne A |
| R. Nash | Geophysicist | 000 Stewert Ave. New |

IT IS UNDERSTOOD AND AGREED THAT ANY MISREPRESENTATION BY ME IN THIS APPLICATION WILL BE SUFFICIE
CAUSE FOR CANCELLATION OF THIS APPLICATION, AND/OR SEPARATION FROM THE COMPANY'S SERVICE IF I HA
BEEN EMPLOYED. IF EMPLOYED, I AGREE TO ABIDE BY ALL THE ...... AND SAFETY RULES OF THIS COMPAN.

Ref: Mr. Russ

AS1-135                                             1-136



J-218

**DUTIES AS DIRECTOR OF SAFETY:** Direct operations in order to provide employees
a safe place to work and ...

Write procedures and rules governing the safety
of our employees while performing their daily work ...

... safety a ...

... to ...

Continuous study ... grading as Safety Engineer.

Author of Paper Entitled: "Industry New Problem 90db" Paper presented in Cleveland,
Ohio 1971).

I have done considerable research in this field and have implemented a noise abatement
program here at Avondale Shipyards, Inc.



**Edwin A. Ellinghausen III**

**From:** Efile_Notice@laed.uscourts.gov
**Sent:** Wednesday, June 09, 2010 5:04 PM
**To:** Efile_Information@laed.uscourts.gov
**Subject:** Activity in Case 2:10-cv-01460-MVL-KWR Eckerle v. Northrop Grumman Shipbuilding, Inc. et al Response/Memorandum in Opposition to Motion

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U. S. District Court

## Eastern District of Louisiana

## Notice of Electronic Filing

The following transaction was entered by Ellinghausen, Edwin on 6/9/2010 at 5:03 PM CDT and filed on 6/9/2010

**Case Name:** Eckerle v. Northrop Grumman Shipbuilding, Inc. et al
**Case Number:** 2:10-cv-01460-MVL-KWR
**Filer:** Northrop Grumman Shipbuilding, Inc.
**Document Number:** 14

**Docket Text:**
**RESPONSE/MEMORANDUM in Opposition filed by Northrop Grumman Shipbuilding, Inc. re [7] MOTION to Remand to State Court** *Opp. of NGSB to PL. Motion to Remand.* **(Attachments: # (1) Exhibit 4th S&A Petition, # (2) Exhibit Exceptions, Cross-Claim & TPD, # (3) Exhibit Depo. of Steven Kennedy, # (4) Exhibit Avondale Emp. Card of J.T. Cole)(Ellinghausen, Edwin)**

## 2:10-cv-01460-MVL-KWR Notice has been electronically mailed to:

Adam Devlin deMahy    ademahy@crawford-lewis.com, adamdemahy@cox.net, cdaigre@crawford-lewis.com

Brian C. Bossier    bbossier@bluewilliams.com, rgraffia@bluewilliams.com

Christopher Thomas Grace , III    cgrace@bluewilliams.com, ljackson@bluewilliams.com

David Ryan Cannella    dcannella@landryswarr.com, manthony@landryswarr.com

Edwin A. Ellinghausen , III    eellinghausen@bluewilliams.com, ddrake@bluewilliams.com

Erin Helen Boyd   eboyd@bluewilliams.com

Frank J. Swarr   fswarr@landryswarr.com, lslaw@landryswarr.com, manthony@landryswarr.com

Kristopher T. Wilson   kwilson@lawla.com, dfogg@lawla.com, rwalker@lawla.com

Mickey P. Landry   mlandry@landryswarr.com, manthony@landryswarr.com

Philip C Hoffman   phoffman@landryswarr.com, manthony@landryswarr.com, vsanchez@landryswarr.com

Reed S. Minkin   rminkin@lawla.com, tkeller@lawla.com

Samuel Milton Rosamond , III   srosamond@crawford-lewis.com, smelancon@crawford-lewis.com, srosamond3@cox.net

**2:10-cv-01460-MVL-KWR Notice has been delivered by other means to:**

Stacie L. Jirovec
Blue Williams, LLP (Metairie)
3421 N. Causeway Blvd.
Suite 900
Metairie, LA 70002

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-0]
[bef5b2c041f7f57f70c8b837b46e3ca6459df6bb7cd25aa0450f441e820b36831a48
8c38849bbb7cc55545ba868402649c81cf23ee9d28713761ea53c2ae8c28]]
**Document description:**Exhibit 4th S&A Petition
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-1]
[25657ccf8f38257566bfeeac0a1143e185ee5304917083f1823e286cfa05f9888bcf
3dc2036830cbb2b162f7cb1ecd6ecf76fcacd0771e1c2a63f9adb9d344db]]
**Document description:**Exhibit Exceptions, Cross-Claim & TPD
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-2]
[467feaa73f1a8b62279fa34823f99316ae46c3fc0275e7c7c7967d07110744d22af8
750510a2ca4e3c0f02e75b802e974ccbce4f582305ab1b13f23e265b1dd2]]
**Document description:**Exhibit Depo. of Steven Kennedy
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-3]
[196ada09fbb564bb7a2cd7277dfdfd68bce07f39c615474bc2e78c81bbcdff3fd715
ce246c5f0af35d08508fa5358002d486e1352dc82eb46e6fa312a38dfe2e]]

6/9/2010



**Document description:**Exhibit Avondale Emp. Card of J.T. Cole
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-4]
[94ef9530ac598f7fed250d49ab75145c261502499c82ed474a53b2d4a5ba5cea0432
43c708c1ca8c268f0e484f71c6dc939800e6bd3dc0ae518eba3ce2263be6]]

6/9/2010

**Responses and Replies**  

2:10-cv-01460-MVL-KWR Eckerle v. Northrop Grumman Shipbuilding, Inc. et al
CLASS_REQUESTED

**E-FILED**

JUN 0 9 2010

### U. S. District Court

### Eastern District of Louisiana

## Notice of Electronic Filing

The following transaction was entered by Ellinghausen, Edwin on 6/9/2010 at 5:03 PM CDT and filed on
6/9/2010

**Case Name:** Eckerle v. Northrop Grumman Shipbuilding, Inc. et al
**Case Number:** 2:10-cv-01460-MVL-KWR
**Filer:** Northrop Grumman Shipbuilding, Inc.
**Document Number:** 14

**Docket Text:**
**RESPONSE/MEMORANDUM in Opposition filed by Northrop Grumman Shipbuilding, Inc. re [7]
MOTION to Remand to State Court** *Opp. of NGSB to PL. Motion to Remand.* **(Attachments: # (1)
Exhibit 4th S&A Petition, # (2) Exhibit Exceptions, Cross-Claim & TPD, # (3) Exhibit Depo. of
Steven Kennedy, # (4) Exhibit Avondale Emp. Card of J.T. Cole)(Ellinghausen, Edwin)**


**2:10-cv-01460-MVL-KWR Notice has been electronically mailed to:**

Adam Devlin deMahy     ademahy@crawford-lewis.com, adamdemahy@cox.net, cdaigre@crawford-lewis.com

Brian C. Bossier     bbossier@bluewilliams.com, rgraffia@bluewilliams.com

Christopher Thomas Grace , III     cgrace@bluewilliams.com, ljackson@bluewilliams.com

David Ryan Cannella     dcannella@landryswarr.com, manthony@landryswarr.com

Edwin A. Ellinghausen , III     eellinghausen@bluewilliams.com, ddrake@bluewilliams.com

Erin Helen Boyd     eboyd@bluewilliams.com

Frank J. Swarr     fswarr@landryswarr.com, lslaw@landryswarr.com, manthony@landryswarr.com

Kristopher T. Wilson     kwilson@lawla.com, dfogg@lawla.com, rwalker@lawla.com

Mickey P. Landry     mlandry@landryswarr.com, manthony@landryswarr.com

Philip C Hoffman     phoffman@landryswarr.com, manthony@landryswarr.com, vsanchez@landryswarr.com

Reed S. Minkin     rminkin@lawla.com, tkeller@lawla.com

Samuel Milton Rosamond , III     srosamond@crawford-lewis.com, smelancon@crawford-lewis.com,

srosamond3@cox.net

**2:10-cv-01460-MVL-KWR Notice has been delivered by other means to:**

Stacie L. Jirovec
Blue Williams, LLP (Metairie)
3421 N. Causeway Blvd.
Suite 900
Metairie, LA 70002

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-0]
[bef5b2c041f7f57f70c8b837b46e3ca6459df6bb7cd25aa0450f441e820b36831a48
8c38849bbb7cc55545ba868402649c81cf23ee9d28713761ea53c2ae8c28]]
**Document description:**Exhibit 4th S&A Petition
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-1]
[25657ccf8f38257566bfeeac0a1143e185ee5304917083f1823e286cfa05f9888bcf
3dc2036830cbb2b162f7cb1ecd6ecf76fcacd0771e1c2a63f9adb9d344db]]
**Document description:**Exhibit Exceptions, Cross-Claim & TPD
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-2]
[467feaa73f1a8b62279fa34823f99316ae46c3fc0275e7c7c7967d07110744d22af8
750510a2ca4e3c0f02e75b802e974ccbce4f582305ab1b13f23e265b1dd2]]
**Document description:**Exhibit Depo. of Steven Kennedy
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-3]
[196ada09fbb564bb7a2cd7277dfdfd68bce07f39c615474bc2e78c81bbcdff3fd715
ce246c5f0af35d08508fa5358002d486e1352dc82eb46e6fa312a38dfe2e]]
**Document description:**Exhibit Avondale Emp. Card of J.T. Cole
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091133085 [Date=6/9/2010] [FileNumber=4093548-4]
[94ef9530ac598f7fed250d49ab75145c261502499c82ed474a53b2d4a5ba5cea0432
43c708c1ca8c268f0e484f71c6dc939800e6bd3dc0ae518eba3ce2263be6]]