UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Sep 01, 2010

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**MDL 875 – IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)
CONDITIONAL TRANSFER ORDER 338**

| | | |
|---|---|---|
| GAIL GARNER AND THE ESTATE OF | ) | |
| ANGELO PALERMO, | ) | |
|     PLAINTIFFS, | ) | CIVIL ACTION 6:10-6345 |
| | ) | WESTERN DISTRICT OF NEW |
| V. | ) | YORK, ROCHESTER DIVISION |
| | ) | |
| DII INDUSTRIES, LLC ASBESTOS PI | ) | (JUDGE CHARLES SIRAGUSA) |
| TRUST, | ) | |
|     DEFENDANT | ) | |

**DEFENDANT'S MOTION TO POSTPONE TRANSFER**

The Judicial Panel on Multidistrict Litigation conditionally transferred this action to the United States District Court for the Eastern District of Pennsylvania as a tag-along action to asbestos litigation pending there.  For the reasons discussed in its Brief in Support of this Motion, Defendant DII Industries, LLC Asbestos PI Trust respectfully requests that the Panel briefly postpone such a transfer until the United States District Court for the Western District of New York, in which this action is pending, rules on the Trust's motion to dismiss it, which is scheduled for hearing on December 2, 2010.

Respectfully submitted,

_____/s/ Gregg McHugh_____
Gregg McHugh
DII Industries, LLC Asbestos PI Trust
7557 Rambler Road, Suite 285
Dallas, Texas 75231
(214) 271-0554
gmchugh@diiasbestostrust.org

 Counsel for Defendant DII Industries, LLC
Asbestos PI Trust

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Sep 01, 2010

FILED
CLERK'S OFFICE

## <u>CERTIFICATE OF SERVICE</u>

On August 31, 2010, I served a copy of the foregoing pleading upon counsel listed on the

attached Panel Service List by electronic mail.


_____/s/ Andrew Ostapko_____

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

MDL No. 875

## PANEL SERVICE LIST ( Excerpted from CTO-338)

Gail Garner, et al. v. DII Industries, LLC Asbestos PI, et al., W.D. New York, C.A. No. 6:10-6345
(Judge Charles J. Siragusa)

Christina A. Agola
2100 First Federal Plaza
28 East Main Street
Rochester, NY 14614
**cagola@wnycivilrights.com**

Peter G. Angelos
LAW OFFICES OF PETER G
ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201
**mjolley@lawpga.com**

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307
**jwblack@wardblacklaw.com**

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219
**rbudd@baronbudd.com**

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415
**jcooney@cooneyconway.com**

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995
**kevin.jordan@bakerbotts.com**

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
**pkalish@crowell.com**

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607
**skazan@kazanlaw.com**

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204
**kraus@waterskraus.com**

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
**DLandin@Hunton.com**

Roger B. Lane
ROGER B LANE PC
1601 Reynolds Street
Brunswick, GA 31520
**attylane@bellsouth.net**

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER
& MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606
**wmahoney@smsm.com**

Robert C. Malaby
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038
**rcmalaby@mblaw.net**

Gregg McHugh
DII Industries LLC Asbestos PI Trust
7557 Rambler Road, Suite 285
Dallas, TX 75231
**gmchugh@diiasbestostrust.org**

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103
**jmcshea@mcshea-tecce.com**

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105
**pmcweeny@schiffhardin.com**

Andrew Lee Morrison
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022-6030
**andrew.morrison@klgates.com**

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111
**tpacker@gordonrees.com**

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mount Pleasant, SC 29466
**OilSpillLitigationMDL@motleyrice.com**

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA 02110
**mthornton@tenlaw.com**

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ &
TARDY LLP
P.O. Box 22608
Jackson, MS 39225-2608
**wwatkins@fpwk.com**

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Sep 01, 2010

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**MDL 875 – IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**
**CONDITIONAL TRANSFER ORDER 338**

| | | |
|---|---|---|
| **GAIL GARNER AND THE ESTATE OF** | ) | |
| **ANGELO PALERMO,** | ) | |
| **PLAINTIFFS,** | ) | **CIVIL ACTION 6:10-6345** |
| | ) | **WESTERN DISTRICT OF NEW** |
| **V.** | ) | **YORK, ROCHESTER DIVISION** |
| | ) | |
| **DII INDUSTRIES, LLC ASBESTOS PI** | ) | **(JUDGE CHARLES SIRAGUSA)** |
| **TRUST,** | ) | |
| **DEFENDANT** | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO POSTPONE TRANSFER**

The Judicial Panel on Multidistrict Litigation (Panel) conditionally consolidated this action with other asbestos lawsuits before the United States District Court for the Eastern District of Pennsylvania (Transferee Court).  For the reasons discussed below, Defendant DII Industries, LLC Asbestos PI Trust (Trust) respectfully requests that the Panel briefly postpone such a transfer until the United States District Court for the Western District of New York (Transferor Court), which has conducted the parties' dispute for more than two years, rules on the Trust's pending Motion to Dismiss (Motion).

FACTUAL AND PROCEDURAL HISTORY

I.      Establishment and Operation of the Trust

To deal with asbestos-related personal injury lawsuits filed against them, Harbison-Walker Refractories Company (Harbison-Walker) and DII Industries, LLC, then a subsidiary of Halliburton Company (Halliburton), filed bankruptcy petitions pursuant to Chapter 11 of the Bankruptcy Code.  Pursuant to section 524(g) of Chapter 11, the Trust was created in those proceedings and assumed the debtors' asbestos-related liabilities.

The Trust discharges its liabilities in accordance with Trust Distribution Procedures promulgated as part of Harbison-Walker's and Halliburton's reorganizations. Pursuant to these Procedures, a person allegedly injured by his exposure to a Halliburton entity's asbestos products can submit a Halliburton Claim to the Trust; similarly, a person allegedly injured by his exposure to Harbison-Walker asbestos can submit a Harbison-Walker Claim. If a claimant submits a Halliburton or Harbison-Walker Claim and satisfies the applicable medical and exposure criteria, and statute of limitations, he generally will receive a settlement offer from the Trust. If a claim fails to satisfy the applicable medical and exposure criteria, is barred by the applicable statute of limitations, or is barred by workers' compensation laws, the Trust will deny it. The claimant can challenge this rejection before a mediator, pro bono evaluator, or arbitrator. If these alternative dispute resolution procedures do not resolve the claim, the claimant can pursue his claim in court.

II.    Evaluation and Denial of Garner's Claim

In April 2006, Plaintiff Gail Garner (Garner) filed a claim against the Trust, asserting that her father, Angelo Palermo, was exposed to asbestos while working for a Halliburton entity and consequently died in 1966 from mesothelioma.

Garner submitted only the following evidence to support her claim that her father suffered from mesothelioma: (1) his death certificate, which stated that her father's death was caused by metastatic stomach cancer; (2) the July 2002 conjecture of a physician, who never treated or examined her father, that it seems possible that he had mesothelioma; and (3) the conclusion of another asbestos trust that her father's stomach cancer was asbestos related. This incompetent evidence did not satisfy the Trust's medical criteria. Additionally, Garner's claim

did not satisfy the applicable statute of limitations.  Therefore, in October 2006, the Trust denied Garner's claim.

Garner asked that a pro bono evaluator and an arbitrator review the Trust's decision, and the reviewers separately affirmed it.  Garner then, in April 2008, filed her claim in the Transferor Court ("Garner I").

The Panel conditionally transferred Garner I to the Transferee Court as a tag-along action to asbestos litigation pending there.  Both the plaintiffs and defendants in Garner I opposed the transfer, and the Panel consequently vacated its conditional transfer order.[1]

Subsequently, the defendants moved to dismiss Garner I for several reasons, but primarily because it was barred by the applicable statute of limitations.  At the hearing of the defendants' motion, the Transferor Court considered the parties' arguments about the timeliness of the action, but it could not determine that issue because pleading defects in Garner's complaint required it to dismiss the action for lack of jurisdiction.

Garner then, in April 2010, re-filed her claim against the Trust, this time in the Supreme Court of Monroe County, New York ("Garner II").  The defendants removed Garner II back to the Transferor Court and again asked that it be dismissed.  The plaintiffs responded to the defendants' motion by amending their complaint.[2]  The Trust replied to the plaintiffs' amended complaint by again seeking its dismissal because it remains barred by the applicable statute of limitations and workers' compensation laws.[3]  The plaintiffs' response to the Trust's Motion is due September 10, 2010, and the Transferor Court will hear the Motion on December 2, 2010.[4]

---

[1]  Order Vacating Conditional Transfer Order, attached as Exhibit A.

[2]  First Amended Complaint [hereinafter Amended Complaint], attached as Exhibit B.

[3]  Motion to Dismiss Plaintiffs' First Amended Complaint [hereinafter Motion to Dismiss], attached as Exhibit C.

[4]  Motion Scheduling Order, attached as Exhibit D.

As it did with Garner I, the Panel conditionally transferred Garner II to the Eastern District of Pennsylvania in its Conditional Transfer Order 338. As discussed below, the Panel should postpone such a transfer until the Transferor Court rules on the Motion.

## DISCUSSION

The Panel can consolidate civil actions involving common questions of fact only if such transfers will serve the convenience of the parties and witnesses and will promote the just and efficient conduct of the actions.[5] The immediate transfer of this action will be both inconvenient and inefficient; therefore, the Panel should postpone such a transfer. As discussed above, the Trust has moved to dismiss this action because it is time barred[6] and barred by workers' compensation laws.[7] Having conducted the parties' dispute for more than two years, during

---

[5]  28 U.S.C. § 1407(a).

[6]  The plaintiffs' claim accrued when Angelo Palermo experienced the symptoms of his alleged disease and expired three years later. See, e.g., N.Y. C.P.L.R. § 214-c ("[T]he three year period within which an action to recover damages for personal injury…caused by the latent effects of exposure to any substance…must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier."); Styles v. Goord, 367 F. Supp. 2d 473, 475 (W.D.N.Y. 2005) ("[C]ourts have held that a cause of action accrues at the moment a plaintiff begins to experience symptoms that a reasonable person would link with the underlying illness.") (emphasis in original); Wetherill v. Eli Lilly & Co., 89 N.Y.2d 506, 514-15 (1997) ("[I]n enacting a new 'discovery' rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced."). The plaintiffs admit that Palermo experienced all of the symptoms of mesothelioma before his death in 1966. See, e.g., Claim, attached to the Motion to Dismiss as Exhibit C, page 22 ("Angelo Palermo experienced all the symptoms of peritoneal mesothelioma."). Therefore, the plaintiffs' claim expired no later than 1969 and should be dismissed.

[7]  The plaintiffs claim that Palermo was injured by a Halliburton entity in New York while he was employed by it. Amended Complaint, paragraphs 12, 13, 37, 63-65, and 67. The plaintiffs therefore cannot recover here for such injuries because a New York employee cannot sue his employer for injuries sustained at work. See N.Y. WORKERS' COMP. LAW § 10 ("Every employer [shall]…secure compensation to his employees and pay or provide compensation for their disability or death from injury arising out of and in the course of the employment…."); § 11 ("The liability of an employer prescribed by the last preceding section shall be exclusive and in place of any other liability whatsoever, to such employee, his or her personal representatives, spouse, parents, dependents, distributees, or any person otherwise entitled to recover damages, contribution or indemnity, at common law or otherwise, on account of such injury or death or liability arising therefrom…."); Acevedo v. Consol. Edison Co. of N.Y., 189 A.D.2d 497, 501-02 (N.Y. App. Div. 1st Dep't 1993) ("The courts of this State have long held that, if an injury or disease is covered in any way by workers' compensation, recovery at law for a particular type of damage resulting from that injury or disease…will also be barred. In the instant case, therefore, whether the harm suffered by plaintiff employees from their exposure to the toxic asbestos fibers is characterized as injury or disease, any damage resulting from such harm will clearly have arisen out of plaintiffs' employment and is governed exclusively by the Workers' Compensation Law, irrespective of the adequacy or inadequacy of that law's remedial provisions.").

4

which it heard a motion to dismiss almost identical to the Motion before it, the Transferor Court

is familiar with the parties, the facts of this case, and with the local law applicable to the Motion

and so is the best court to decide it.   Transfer to the Transferee Court unnecessarily would burden

the parties with educating that court about the unique status of the Trust, the events that brought

the parties here, and the requirements of another state's laws and waste the time and resources

the parties have spent to advance this litigation to this stage.   Therefore, the Panel should briefly

delay transferring this action to the Transferee Court until the Transferor Court hears the Motion

on December 2, 2010, and decides it.[8]

---

[8]   See, e.g., In re Accutane Products Liability Litigation, 569 F.Supp.2d 1370, 1370-71 (J.P.M.L. 2008) ("[Roche moves] to vacate our order conditionally transferring this action (Hyde)…. Shortly after removing Hyde to federal court in July 2004, Roche moved for summary judgment, arguing that plaintiff's claims were barred by a Texas statute of repose. … Given that Roche's motion involves an issue of Texas law unique to Hyde and that the motion is potentially dispositive of the entire action, we are persuaded that the motion to vacate should be granted."); In re Resource Exploration, Inc. Securities Litigation, 483 F. Supp. 817, 820-22 (J.P.M.L. 1980) ("Because these nine actions appeared to share common questions of fact, the Panel originally issued an order to show cause why the actions should not be transferred to a single district for coordinated or consolidated pretrial proceedings. … [N]umerous defendants involved in, inter alia, the Pennsylvania action request that that action be excluded from transfer pending the resolution of defendants' motion for summary judgment. … … We are persuaded, on principles of comity, to defer our decision concerning transfer of the Pennsylvania action because of the pendency of the defendants' motion for summary judgment, which is fully submitted to the potential transferor judge.") (citing In re Air Crash Disaster at Tenerife, Canary Islands, on March 27, 1977, 435 F.Supp. 927, 928 n.3 (J.P.M.L. 1977); In re Professional Hockey Antitrust Litigation, 352 F.Supp. 1405, 1406-07 (J.P.M.L. 1973); In re Kaehni Patent Litigation, 311 F.Supp. 1342, 1344 (J.P.M.L. 1970)); see also In re Asbestos Products Liability Litigation (No. VI), Calvin Stevens, et al. v. Cooper/T. Smith Stevedoring Company, E.D. La. C.A. No. 2:10-968, Order Deferring Decision on Transfer (J.P.M.L. August 9, 2010) ("Plaintiffs in an action pending in the Eastern District of Louisiana have moved to vacate the respective portion of our order conditionally transferring the action to the Eastern District of Pennsylvania for inclusion in MDL No. 875. … After considering all argument of counsel, we have decided, under the somewhat unusual circumstances presented here, to defer a decision on plaintiffs' motion for a period of 60 days in order to provide the Eastern District of Louisiana with a sufficient opportunity to rule upon plaintiffs' fully-briefed motion to remand to state court.").

For the reasons set forth above, the DII Industries, LLC Asbestos PI Trust respectfully requests that the Judicial Panel on Multidistrict Litigation postpone transferring this action, allowing the United States District Court for the Western District of New York to rule on its Motion to Dismiss.

Respectfully submitted,

/s/ Gregg McHugh
Gregg McHugh
DII Industries, LLC Asbestos PI Trust
7557 Rambler Road, Suite 285
Dallas, Texas 75231
(214) 271-0554
gmchugh@diiasbestostrust.org

Counsel for Defendant DII Industries, LLC
Asbestos PI Trust

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Sep 01, 2010

FILED
CLERK'S OFFICE

## **CERTIFICATE OF SERVICE**

On August 31, 2010, I served a copy of the foregoing pleading upon counsel identified on

the attached Panel Service List by electronic mail.

/s/ Andrew Ostapko

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

MDL No. 875

## PANEL SERVICE LIST ( Excerpted from CTO-338)

Gail Garner, et al. v. DII Industries, LLC Asbestos PI, et al., W.D. New York, C.A. No. 6:10-6345
(Judge Charles J. Siragusa)

Christina A. Agola
2100 First Federal Plaza
28 East Main Street
Rochester, NY 14614
**cagola@wnycivilrights.com**

Peter G. Angelos
LAW OFFICES OF PETER G
ANGELOS PC
One Charles Center
100 North Charles Street, 22nd Floor
Baltimore, MD 21201
**mjolley@lawpga.com**

Janet W. Black
WARD BLACK PA
208 West Wendover Avenue
Greensboro, NC 27401-1307
**jwblack@wardblacklaw.com**

Russell W. Budd
BARON & BUDD PC
3102 Oaklawn Avenue, Suite 1100
Dallas, TX 75219
**rbudd@baronbudd.com**

John D. Cooney
COONEY & CONWAY
120 North LaSalle Street, Suite 3000
Chicago, IL 60602-2415
**jcooney@cooneyconway.com**

Kevin M. Jordan
BAKER BOTTS LLP
910 Louisiana
One Shell Plaza
Houston, TX 77002-4995
**kevin.jordan@bakerbotts.com**

Paul Kalish
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
**pkalish@crowell.com**

Steven Kazan
KAZAN MCCLAIN ABRAMS
FERNANDEZ ET AL
171 Twelfth Street, Third Floor
Oakland, CA 94607
**skazan@kazanlaw.com**

Peter A. Kraus
WATERS & KRAUS LLP
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204
**kraus@waterskraus.com**

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
**DLandin@Hunton.com**

Roger B. Lane
ROGER B LANE PC
1601 Reynolds Street
Brunswick, GA 31520
**attylane@bellsouth.net**

William F. Mahoney
SEGAL MCCAMBRIDGE SINGER
& MAHONEY LTD
233 South Wacker Drive, Suite 5500
Chicago, IL 60606
**wmahoney@smsm.com**

Robert C. Malaby
MALABY & BRADLEY
150 Broadway, Suite 600
New York, NY 10038
**rcmalaby@mblaw.net**

Gregg McHugh
DII Industries LLC Asbestos PI Trust
7557 Rambler Road, Suite 285
Dallas, TX 75231
**gmchugh@diiasbestostrust.org**

John P. McShea
MCSHEA TECCE PC
Mellon Bank Center
1717 Arch Street, 28th Floor
Philadelphia, PA 19103
**jmcshea@mcshea-tecce.com**

Philip McWeeny
SCHIFF HARDIN LLP
One Market Plaza, 32nd Floor
Spear Street Tower
San Francisco, CA 94105
**pmcweeny@schiffhardin.com**

Andrew Lee Morrison
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022-6030
**andrew.morrison@klgates.com**

Thomas A. Packer
GORDON & REES LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111
**tpacker@gordonrees.com**

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mount Pleasant, SC 29466
**OilSpillLitigationMDL@motleyrice.com**

Michael P. Thornton
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA 02110
**mthornton@tenlaw.com**

Walter G. Watkins, Jr.
FORMAN PERRY WATKINS KRUTZ &
TARDY LLP
P.O. Box 22608
Jackson, MS 39225-2608
**wwatkins@fpwk.com**

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Sep 01, 2010

FILED
CLERK'S OFFICE

# EXHIBIT A

A CERTIFIED TRUE COPY

ATTEST

By April Layne on Oct 10, 2008

FOR THE UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

**Oct 10, 2008**

FILED
CLERK'S OFFICE

**IN RE: ASBESTOS PRODUCTS LIABILITY**
**LITIGATION (No. VI)**

| | | |
|---|---|---|
| Gail Garner, etc. v. DII Industries, LLC, et al., | ) | |
| W.D. New York,  C.A. No. 6:08-6191 | ) | MDL No. 875 |

**ORDER VACATING CONDITIONAL TRANSFER ORDER**

**Before the entire Panel**[*]:  Plaintiff in an action pending in the Western District of New York has moved, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), to vacate the respective portion of our order conditionally transferring the action (*Garner*) to the Eastern District of Pennsylvania for inclusion in MDL No. 875.  Responding defendants[1] support the motion to vacate.

After considering all argument of counsel, we find that transfer of *Garner* to the Eastern District of Pennsylvania would not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of this litigation at the present time.  In *Garner*, plaintiff is essentially challenging the manner in which her claim for compensation was handled by defendant DII Industries, LLC, Asbestos PI Trust and certain individuals employed by the trust. The issues appear largely case-specific, and we are therefore persuaded that the motion to vacate should be granted.

IT IS THEREFORE ORDERED that our conditional transfer order designated as "CTO-309" is vacated insofar as it relates to this action.

---

[*]    Judges Heyburn and Furgeson took no part in the disposition of this matter.

[1]    DII Industries, LLC, Asbestos PI Trust; Douglas C. Allen; Mark M. Gleason; and Marcellene Malouf.

- 2 -

PANEL ON MULTIDISTRICT LITIGATION

_____
                    J. Frederick Motz
                    Acting Chairman

John G. Heyburn II, Chairman[*]        Robert L. Miller, Jr.
Kathryn H. Vratil                      David R. Hansen
W. Royal Furgeson, Jr.[*]

# EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Gail Garner, The Estate of Angelo Palermo,

                    Plaintiffs,

v.

DII Industries Asbestos PI Trust, LLC,
                    Defendant (s).

**FIRST AMENDED COMPLAINT**[1]

Civ. No.: 10-cv-6345 CJS

JURY TRIAL DEMANDED

### PRELIMINARY INTRODUCTION

1.      This is an action brought to redress the death of Angelo Palermo due to his
exposure to asbestos-containing products of entities of Haliburton and Harbison-
Walker through the execution of the DII Asbestos Personal Injury Trust.

### JURISDICTION AND VENUE

2.      Jurisdiction of this Court exists pursuant to  28 U.S.C.  § 1332 because the
Plaintiff is a resident of a different state from the defendant and because the
value of the matter in controversy exceeds $75,000.00.  Further, the Plaintiff has
jurisdiction pursuant to Title 28 §157 (b)(5) & 11 U.S.C. § 524 (9) which
authorized Plaintiff to commence litigation pursuant to 7.6 of the TDP dated
December 16, 2004, and pursuant to Fourth Amended and Restated Joint
prepackaged plan of Reorganization § 13.4 for exclusive District Court
jurisdiction.

---

[1]     This First Amended Complaint is filed pursuant to Rule 15(a)(1)(B) of the
Federal Rules of Civil Procedure which states in relevant part that a party
may amend its pleading..."21 days after service of a motion under Rule
12(b), (e), or (f), whichever is earlier."  Defendant filed a Motion to Dismiss
pursuant to Fed. R. Civ. P. 12 (b)(6) on July 2nd, 2010; the instant First
Amended Complaint was filed on July 22nd, 2010, within "21 days after
service" of Defendant's motion.

3.    Venue is proper pursuant to 28 U.S.C. §1391.

## ADMINISTRATIVE EXHAUSTION

4.    By notice dated August 30, 2007, pursuant to the Defendant DII Industries, LLC
      Asbestos PI Trust Alternative Dispute Resolution (ADR), Procedures, it was
      determined that pursuant to a non-binding hearing in the matter of Angelo
      Palermo conducted on August 21, 2007 in Boston, Massachusetts that the
      Plaintiff Gail Garner was denied compensation with regard to her claims.

5.    Thereafter, by notice dated October 2nd, 2007, Plaintiff Gail Garner duly advised
      DII Industries, LLC of her intention to pursue the asbestos unsecured PI Trust
      claim.

6.    Pursuant to Sections 5.11 and 7.6 of the TDP, Plaintiff Gail Garner was entitled
      to commence litigation in this matter within 180 days after her receipt of notice
      from the Defendant DII Industries, LLC, dated October 29, 2007.

7.    Pursuant to the Defendant DII Industries, LLC Asbestos PI Trust Distribution
      Procedures, ("TDP") at Sections 5.3(b)(2) and 7.6, which permits the filing of
      asbestos claims in a court in the "Claimant's Jurisdiction" in which the Claimant
      resided or experienced exposure to an asbestos-containing product or to conduct
      for which any of the Halliburton Entities or the Harbison-Walker Entities has legal
      responsibility.

2

8.    Pursuant to New York Civil Practice Law and Rules ("CPLR") section 205(a);
      Plaintiff re-filed her Complaint in New York State Supreme Court, Monroe
      County.

### PARTIES

9.    Plaintiff Gail Garner ("Garner") is an individual woman who was at all times
      relevant herein a resident of the County of Monroe, State of New York, the
      daughter and representative of the Estate of Angelo Palermo, a deceased union
      insulation mason for 29 years, from 1937 through 1966, in the construction
      asbestos industry, survived by Marlene Fargo ("Daughter") and Gail Garner
      ("Daughter").

10.   Defendant DII Industries, LLC Asbestos PI Trust ("Trust") is a trust organized for
      which a Halliburton Entity or a Harbison-Walker Entity has legal responsibility, as
      provided in and required by the Debtors' Joint Prepackaged Plan of
      Reorganization Under Chapter 11 of the Bankruptcy Code, Section 524(g).

### FACTS

11.   Angelo Palermo ("Palermo") was a union mason for 29 years, from 1937 through
      1966 in the construction asbestos industry.

12.   Palermo "spray coated" and handled asbestos containing products while working
      directly for one or more of the Halliburton or Harbison-Walker Entities or their
      predecessors' valid work sites in New York State.

3

13. Specifically, Palermo worked from 1941-1945 for Symington Gould (later renamed Symington Wayne), a direct subsidiary of Halliburton and Harbison-Walker, where application of asbestos-containing products-especially insulation materials were a key element of the manufacturing process utilized or installed regularly and in large quantities at this location.

14. Symington-Gould received government contracts; a maker of ships, tanks, railroad parts, large and small armor (machine guns and shells) and produced iron and steel foundry products; cast armor plates, electric steel castings, airplane engine cylinder castings and static turbine castings.

15. Plaintiff wrote "A109" on the Claim Form from the DII "A" Entity List:  A109 = Symington-Wayne.

16. Palermo also worked for Johns-Manville (largest asbestos company in the world) and City of Albany, which were listed as specific sites recognized by the Trust where asbestos is known to have been present.

17. Plaintiff wrote "B2434, B2435, B2436, B2437 and B4247" on the Claim Form from the DII "B" Entity List, in addition to, an Affidavit within the claim package.

4

18.   Asbestos was used in products manufactured or sold by Harbison-Walker Refractories Company, which DII Industries, LLC acquired in 1967. In 1968, Dresser took over Harbison-Walker Refractories Company until transferred to another division of DII Industries, LLC. Harbison-Walker was spun-off by DII Industries, LLC in July 1992. In 1998, Halliburton purchased Dresser (Symington-Wayne is a subsidiary of Dresser). DII Industries continued to retain responsibility for all asbestos claims pending as of the date of the spin-off.

19.   Palermo died on April 23, 1966 at age 51.

20.   Palermo's death certificate states that the immediate cause was acute liver failure due to "metastasis cancer due to primary stomach" (place of origin).

21.   However, the state of medical or scientific knowledge was such that the causation of Palermo's injury could not have been identified at the time of his death.

22.   The doctor, who signed the death certificate, was an inexperienced resident (became a plastic surgeon) who received his license 2 ½ years after Angelo Palermo's death.

23.   Garner was advised that Angelo Palermo's co-worker/friend was diagnosed with Mesothelioma.

24.     Garner filed a claim for her father with the Manville Personal Injury Settlement
        Trust ("Manville Trust") in February 2000.

25.     Garner requested Dr. William Beckett, a local occupational doctor, specializing in
        pulmonary (lung) and toxic substance diseases to evaluate Angelo Palermo's
        medical, work history and pictures of his digital clubbing (indicative of impaired
        blood oxygenation resulting from advanced lung scarring).

26.     Dr. Beckett's expert opinion:  Peritoneal mesothelioma is a difficult diagnosis to
        distinguish from carcinoma metastatic to the abdominal cavity or primary to the
        stomach, and it seems quite possible that the patient's fatal malignancy could
        have been a diffuse malignant mesothelioma of the peritoneum rather than a
        primary from the stomach.....patients with malignant mesothelioma can develop
        digital clubbing.

27.     Manville trust did not accept Dr. Beckett's opinion as a diagnosis.

28.     On February 14, 2002, Harbison-Walker filed with the U.S. bankruptcy court, and
        a temporary restraining order was issued to Harbison-Walker, staying asbestos
        claims against Halliburton's Dresser Industries Inc and claims against all
        Halliburton units.

6

29.    On June 6, 2003, a tribunal of asbestos experts of the Extraordinary Claims

        Panel of the Manville Trust diagnosed Angelo Palermo posthumously, with

        mesothelioma.

30.    On October 27, 2003, David Austern, president of the Manville Trust, confirmed

        the tribunal's unanimous determination that Palermo's claim is a Mesothelioma

        Extraordinary claim and issued financial restitution.

31.    Four months after the Manville diagnosis, Garner filed other asbestos claims.

32.    Four Trusts, including Manville, Celotex, Eagle-Picher and H.K. Porter (Trustee

        Mark Gleason is also the Trustee of H.K. Porter Trust), confirmed Palermo's

        death an asbestos related "mesothelioma" using the same medical evidence and

        trust standards as the DII Trust. On December 16, 2003, Halliburton filed their

        petitions as a prepackaged bankruptcy plan for Dresser Industries and other

        subsidiaries.

33.    From the "stay" of February 14, 2002 (Harbison-Walker filing) until November 20,

        2005, the effective date of the DII Industries, LLC PI Trust, all new asbestos

        personal injury claims were prohibited from being filed.

34.    On April 4, 2006, Plaintiff filed a pro se asbestos personal injury liability claim

        with DII Industries, LLC PI Trust for the Estate of Angelo Palermo.

7

35.   Plaintiff filed under the Trust's Individual Review (IR) Process, TDP 5.3(b)(1), which states: "Subject to the provisions set forth below, an Asbestos PI Trust claimant may elect to have his or her Asbestos Unsecured PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in section 5.3(a)(3) above."

36.   Trust Alternative Dispute Resolution (ADR), page 2: "Showing Required:  As set forth in the TDP, in order to establish a valid asbestos unsecured PI Trust Claim, a claimant must make a demonstration of exposure to asbestos-containing products for which one or more of the Halliburton Entities and/or the Harbison-Walker Entities bears legal responsibility."

37.   The DII Trust Director of Claims, in accordance with the TDP, confirmed that the Plaintiffs provided "conclusive evidence" of Angelo Palermo's high asbestos exposure in his capacity as a Union insulation mason in the asbestos industry and specifically working for one or more of a Harbison-Walker/Halliburton Entities.

8

38. The Defendants denied the claim for compensation due to (1) insufficient medical diagnosis; (2) Statute of Limitation, 3 year requirement under New York's Statute for filing of a lawsuit upon diagnosis of an asbestos-related disease; (3) the requirements, and the claim will not be reviewed as an Extraordinary Claim.

39. The Trust TDP 5.7(a)(2) states: "Medical evidence (I) that is a kind shown to have been received in evidence by a state or federal judge at trial."

40. Plaintiff referenced Federal Rule of Evidence 702, Testimony by Experts to qualify for valid medical evidence, as the Manville Extraordinary Claims Panel members all testified before the United States Judiciary Committee on the Fairness in Asbestos Injury Resolution Act of 2003, as experts, and deemed Angelo Palermo's death an asbestos-related mesothelioma.

41. Per the Trust TDP, 5.1(a)(2) "Effect of Statutes of Limitations and Repose:  To be eligible for a place in the FIFO Processing Queue, a claim must meet either (i)…(ii) for claims not filed against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system prior to the DII Industries Petition Date, (December 16, 2003) the applicable statute of limitation that was in effect at the time of the filing with Asbestos PI Trust.  However, the running of the relevant statute of limitations shall be tolled as of the earliest of … (D) the filing of a proof of claim with requisite supporting documentation with the Asbestos PI Trust after the DII Industries Effective Date. (November 2005)

9

42.   If an Asbestos PI Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state, or foreign statute of limitations at the time of the tolling event, it will be treated as timely filed if it is actually filed with Asbestos PI Trust within three (3) years after the DII Industries Effective Date" or  November 2008.

43.   DII Trust (TDP, 6.1) provided supporting documentation over the Internet: www.diiasbestostrust.org, <u>Forms</u>, <u>SOL Definition,</u> "The Asbestos Trust has two different dates for the calculation of the statute of limitations.  For Halliburton or Non-Harbison-Walker claims the petition date is December 16, 2003.  For Harbison-Walker claims the petition date is <u>February 14, 2002</u>.  All Claims:  If the claim meets any of tolling provisions described below and the claim was not barred by the applicable federal, state, or foreign statute of limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed with the Trust on or before November 20, 2008.  The running of the relevant statute of limitation shall be tolled as of the earliest of … (D) the occurrence of the Harbison-Walker Petition Date (for Harbison-Walker Claims)" - February 14, 2002.

44.   Plaintiff's claim was timely pursuant to the Discovery Rule of CPLR 214-c and the three-year New York Statute of Limitations, applying the stay - February 14, 2002 –November 20, 2005).

10

45.   As calculated, the date of Plaintiff's first filing with the Manville Trust in February

2000 to February 2002, it would equal 2 years (not barred at time of stay); from

November 2005 (the termination of the Stay and the establishment of the DII

Trust) adding one more year, it would equal the 3-year deadline date of

November 2006. The Plaintiff filed in April 2006; within 3 years, and before the

November 2008 TDP expiration date.

46.   Per the Trust TDP 5.4(a)(1) "Extraordinary Claims means an Asbestos

Unsecured PI Trust Claim that otherwise satisfies the Medical Criteria for

Disease Levels ... and that is held by a claimant whose exposure to asbestos (i)

occurred primarily as a result of working in manufacturing facilities of one or more

facilities of one or more Halliburton Entities or Harbison-Walker Entities or their

predecessors during a period in which the Halliburton entities or the Harbison-

Walker entities were manufacturing asbestos-containing products at their facility,

and the claim is a tort claim that is not otherwise barred by a statutory worker's

compensation program, or (ii) was at least 75% the result of Company Exposure

as defined in section 5.7 ( c ) below, and there is little likelihood of a substantial

recovery elsewhere."

11

47.   TDP 5.4 states: "Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims panel established by the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative. All decisions of the Extraordinary Claims Panel were deemed final and "not subject to any further administrative or judicial review"."

48.   Not withstanding, the defendants rejected Plaintiff's numerous legitimate requests for a review of the DII Extraordinary Claims Panel.

49.   After the Pro Bono Evaluator confirmed the Trusts' denial, the Plaintiff requested non-binding arbitration; thereafter, the Plaintiff was denied recovery.

50.   Defendants did not abide by the Court approved procedures contained in the TDP/ADR in they failed to notify Plaintiff of any potential conflicts, (i.e. Trust Arbitrator and Trust Legal Representative are co-founders of Resolutions, LLC in Boston, Massachusetts, same Arbitrator and location of the non-binding arbitration); that they failed to allow Plaintiffs to go before the DII Extraordinary Claims Panel; engaged in ex-parte communications, (i.e. defendants went directly to the Panel without the consent of the Asbestos "TAC" and the Legal Representative; also, the Arbitrator, Executive Director Marcellene Malouf and the Trust's attorney spoke outside the arbitration room together without the Plaintiff) and failed to value Plaintiffs' claims.

12

51.    On October 29, 2007, Defendants issued a notice of authorization to commence litigation within 180 days.

52.    On April 25, 2008, Plaintiff filed a Complaint with the Federal Court as pro se, with causes of action of: (I) Asbestos Personal Injury Product Liability; (II) Violation of Bankruptcy Code 11 U.S.C. §524(g)(2)(b)(ii)(v); (III) Not following trust distribution procedures (TDP); (IV) Unfair Practices; (v) Breach of Fiduciary duties.

53.    Plaintiff was notified, by Order of the Court, that her case was being transferred to Pennsylvania. Plaintiff and Defendants sent a motion to vacate the order. The order was vacated to remain in New York State.

54.    Pro se Plaintiff was notified, by Order of the Court, to obtain an Attorney to litigate the Estate.

55.    Plaintiff filed with the Court an Amended Complaint with causes of action of: (I) Asbestos Personal Injury Product Liability; (ii) Breach of Fiduciary Duty by Defendants Gleason and Malouf; and (iii) Negligent Hiring & Supervision of Defendants Gleason and Malouf.

56.    On September 17, 2009, a Hearing took place with the appearance of the Plaintiff and Defendants' attorneys.

13

57.   On February 4, 2010, Judge Charles J. Siragusa issued a decision that the Court finds no factual basis alleged for Federal jurisdiction.  Defendants' motion to dismiss was granted.

58.   Plaintiff asserts State Court Jurisdiction pursuant to CPLR section 205(a), based on Tort and Personal Injury Law.

59.   Plaintiffs' claim arises from exposure to asbestos by Halliburton and Harbison-Walker at employment locations in New York State.

### FIRST CAUSE OF ACTION

### Asbestos Personal Injury Product Liability

60.   Plaintiffs repeat the allegations contained in the above stated paragraphs in the complaint as if fully set forth herein.

61.   Upon information and belief, Defendant DII Industries knew and/or should have known that Angelo Palermo was a union insulation mason for 29 years, from 1937 through 1966 in the construction asbestos industry.

62.   Upon information and belief, Defendant DII Industries knew or should have known that Angelo Palermo was subject to extreme and dangerous levels of asbestos during his tenure.

14

63.     Upon information and belief, Defendant DII Industries knew or should have
        known that Angelo Palermo "spray coated" and handled asbestos containing
        products while working directly for one or more of the Halliburton or Harbison-
        Walker Entities or their predecessors' valid work sites.

64.     Upon information and belief, Defendant DII Industries knew or should have
        known that Angelo Palermo worked from 1941-1945 for Symington-Gould (later
        renamed Symington Wayne), a direct subsidiary of Halliburton and Harbison-
        Walker.

65.     Upon information and belief, Defendant DII Industries knew or should have
        known that Angelo Palermo ingested and/or inhaled asbestos at the work site
        causing him to suffer mesothelioma.

66.     That upon information and belief, Angelo Palermo suffered continuous, injurious
        and harmful exposure to asbestos culminating in his untimely death at the age of
        51 from mesothelioma.

67.     That the foregoing injuries to Angelo Palermo occurred as a result of the
        negligence of the Defendants DII Industries, Harbison-Walker and Halliburton in
        that they permitted Angelo Palermo to work in and maintained a hazardous and
        dangerous condition for such an extended period of time and in failing to exercise
        a degree of care which would be reasonably prudent to maintain, manage and

15

inspect said work sites, in failing to comply with the statutes, rules, ordinances and regulations in the manner as provided by law and in being otherwise careless and negligent in maintaining Angelo Palermo's work sites.

68.   That said duty to abate said asbestos in a safe, effective and lawful manner was non-delegable by virtue of the fact that exposure to asbestos is inherently dangerous and that defendants knew or should have known, upon information and belief, that the tasks they asked Angelo Palermo to perform would expose him to asbestos.

69.   That by reason of the foregoing negligent acts of defendants DII Industries, Harbison-Walker and Halliburton; Angelo Palermo sustained severe, serious and fatal injuries culminating in his death.  The Defendant, DII Industries, LLC Asbestos Trust was organized for which Halliburton Entity or Harbison-Walker Entity has legal responsibility, as provided in and required by the Debtors' Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code, Section 524 (g) to liquidate valid unsecured claims.

**WHEREFORE**, Plaintiff seeks judgment in accord with  the above stated causes

of action.


Dated: July 22, 2010
Rochester, New York


By:

CHRISTINA A. AGOLA, PLLC


/s/ Christina A. Agola, Esq.

Christina A. Agola, Esq

ATTORNEYS FOR PLAINTIFF
28 East Main Street
2100 First Federal Plaza
Rochester, New York 14614
585.262.3320
585.262.3325 (fax)
caa@wnycivilrights.com

17

# EXHIBIT C

Andrew L. Morrison (AM 1071)
K&L GATES, LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900 (Tel)
(212) 536-3901 (Fax)

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **GAIL GARNER AND** | X | |
| **THE ESTATE OF ANGELO PALERMO,** | : | **10-CV-6345-CJS** |
| **Plaintiffs** | : | |
| | : | **DEFENDANT'S MOTION TO DISMISS** |
| **v.** | : | **PLAINTIFFS' FIRST AMENDED** |
| | : | **COMPLAINT FOR FAILURE TO STATE A** |
| **DII INDUSTRIES, LLC ASBESTOS PI** | : | **CLAIM UPON WHICH RELIEF CAN BE** |
| **TRUST,** | | **GRANTED** |
| | : | |
| **Defendant** | X | |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant DII Industries, LLC

Asbestos PI Trust ("Trust"), a trust established to discharge certain bankrupt entities' asbestos-

related liabilities, files this Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to

State a Claim Upon Which Relief Can Be Granted.

In their First Amended Complaint ("Complaint"), the plaintiffs claim that an entity whose

liabilities the Trust inherited negligently exposed Angelo Palermo ("Palermo") to asbestos,

causing his death from mesothelioma.  As discussed in Defendant's Memorandum of Law in

Support of this Motion, the plaintiffs' claim accrued when the symptoms of Palermo's alleged

illness became manifest sometime before his death in 1966, and therefore, the claim should be

dismissed because it is barred by the applicable three-year statute of limitations.  Furthermore,

the plaintiffs claim that Palermo's asbestos exposure occurred while he was employed by the

allegedly liable entity, and therefore, the claim should be dismissed because it is barred by workers' compensation laws.

For these reasons, the Trust respectfully requests that the Court dismiss the plaintiffs' Complaint with prejudice and award such further relief as it is entitled to in law or equity.

Pursuant to Local Rule 7.1(c), the Trust intends to reply to the plaintiffs' response to this Motion.  Therefore, the plaintiffs are required to file and serve their response at least eight business days before the Motion's return date.

Dated: August 4, 2010

Respectfully submitted,

**K&L GATES LLP**

By:  s/ Andrew L. Morrison                     
     Andrew L. Morrison (AM 1071)
     K&L GATES LLP
     599 Lexington Avenue
     New York, New York 10022
     (212) 536-3900 (Tel)
     (212) 536-3901 (Fax)

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 4, 2010 a true and correct copy of the foregoing

document was served upon counsel for Plaintiffs Gail Garner and the Estate of Angelo Palermo

at the following address by way of the Court's ECF SYSTEM and by FedEx:

Christina A. Agola, Esq.
Law Offices of Christina A. Agola, PLLC
2100 First Federal Plaza
Rochester, New York 14614


_____ s/ Andrew L. Morrison _____
Andrew L. Morrison

Andrew L. Morrison (AM 1071)
K&L GATES, LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900 (Tel)
(212) 536-3901 (Fax)

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **GAIL GARNER AND** | X | |
| **THE ESTATE OF ANGELO PALERMO,** | : | **10-CV-6345-CJS** |
| | | |
| **Plaintiffs** | : | **DEFENDANT'S MEMORANDUM OF** |
| | | **LAW IN SUPPORT OF ITS MOTION TO** |
| **v.** | : | **DISMISS PLAINTIFFS' FIRST** |
| | | **AMENDED COMPLAINT FOR** |
| **DII INDUSTRIES, LLC ASBESTOS PI** | : | **FAILURE TO STATE A CLAIM UPON** |
| **TRUST,** | | **WHICH RELIEF CAN BE GRANTED** |
| | : | |
| **Defendant** | X | |

## <u>TABLE OF CONTENTS</u>

I.     Factual and Procedural History ....................................................................1–4

     A.     Establishment and Operation of the Trust ........................................1–2

     B.     Evaluation and Denial of the Plaintiffs' Claim..................................2–4

II.     Analysis .......................................................................................................5–7

     A.     Standard of Review................................................................................5

     B.     The Plaintiffs' Claim Should Be Dismissed Because It Is Barred by the Applicable Statute of Limitations and by Workers' Compensation Laws..................................................................................5–7

          1.     The Plaintiffs' Claim Is Barred by the Applicable Statute of Limitations ..............................................................................5–6

          2.     The Plaintiffs' Claim Is Barred by Workers' Compensation Laws......................................................................................7

# **TABLE OF AUTHORITIES**

Acevedo v. Consol. Edison of New York,
   189 A.D.2d 497 (1st Dep't 1993).........................................................................7

Annunziato v. City of New York,
   647 N.Y.S.2d 850 (2d Dep't 1996) .......................................................................7

Barlow v. Sun Chem. Co.,
   838 N.Y.S.2d 387 (Sup. Ct., Westchester Co. 2007) ...........................................6, 7

Cortec Indus., Inc., v. Sum Holding, L.P.,
   949 F.2d 42 (2d Cir. 1991) ..................................................................................2

Greene-Wotton v. Fiduciary Trust Co. Int'l,
   324 F. Supp.2d 385 (S.D.N.Y. 2003) ...................................................................7

In re United States Lines, Inc.,
   No. 86 B 12238, 2007 WL 748291 (Bankr. S.D.N.Y. 2007) ..................................6–7

Jones v. Bock,
   549 U.S. 199 (2007)............................................................................................5

Krogman v. Glenn Falls City Sch. Dist.,
   231 A.D.2d 76 (3d Dep't 1997) ............................................................................6

Michael v. Ametelco, Inc.,
   569 N.Y.S.2d 1003 (Sup. Ct., Monroe Co. 1991) .................................................5

Roth v. Jennings,
   489 F.3d 499 (2d Cir. 2007) .............................................................................2, 5

Styles v. Goord,
   367 F. Supp.2d 473 (W.D.N.Y. 2005).................................................................5

Wetherill v. Eli Lilly & Co.,
   89 N.Y.2d 506 (1997)......................................................................................5–6

As discussed below and summarized in Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint, the plaintiffs' First Amended Complaint ("Complaint") should be dismissed because its single claim is barred by the applicable three-year statute of limitations and by workers' compensation laws.  More specifically, the plaintiffs assert a personal injury claim arising from Angelo Palermo's asbestos exposure and the fatal illness it allegedly caused.  That claim accrued when Palermo's illness became evident, which the plaintiffs admit occurred sometime before his death in 1966.  The claim therefore expired more than forty years ago.  Additionally, the plaintiffs allege that Palermo's asbestos exposure occurred while he was employed by the entity against which they assert their claim.  The claim therefore is barred by workers' compensation laws.

I.      Factual and Procedural History

       A.      Establishment and Operation of the Trust

To deal with hundreds of thousands of asbestos-related personal injury lawsuits filed against them, Harbison-Walker Refractories Company ("Harbison-Walker") and DII Industries, LLC ("Halliburton"[1]) filed petitions pursuant to Chapter 11 of the Bankruptcy Code.[2]  Pursuant to section 524(g) of Chapter 11, Defendant DII Industries, LLC Asbestos PI Trust ("Trust") emerged from those proceedings and assumed the debtors' asbestos-related liabilities.[3]

_____

[1] DII Industries, LLC was a subsidiary of Halliburton Company.

[2] See Complaint, attached as Exhibit A to the Affidavit of Nancy Freeman [hereinafter Freeman Affidavit], paragraphs 28 and 32 (pages 6 and 7).

[3] See id., paragraphs 10 and 69 (pages 3 and 16).

The Trust discharges its liabilities in accordance with Trust Distribution Procedures.[4] Pursuant to these Procedures, claimants must, among other things, satisfy the applicable medical criteria and statute of limitations to recover from the Trust.[5]   Additionally, a claimant cannot recover from the Trust if his claim is barred by applicable workers' compensation laws.[6]

        B.      Evaluation and Denial of the Plaintiffs' Claim

On April 4, 2006, Plaintiff Gail Garner submitted a claim to the Trust, asserting that her father, Angelo Palermo, was exposed to asbestos for which a Halliburton or Harbison-Walker entity was responsible and consequently contracted mesothelioma and died.[7]   Garner further asserted that her claim was an Extraordinary Claim, which, if true, would slightly increase her claim's potential value.[8]

Garner submitted only the following evidence to support her claim that her father suffered from mesothelioma: (1) her father's death certificate, which stated that his death in 1966

---

[4]   See DII Industries, LLC Asbestos PI Trust Fifth Amended Trust Distribution Procedures [hereinafter TDP], attached as Exhibit B to the Freeman Affidavit and referred to or relied upon by the plaintiffs in paragraphs 2, 6, 7, 35, 37, 39, 41–43, 46, 47, and 50 of the Complaint (pages 1, 2, and 8–12).

When considering a motion to dismiss for failure to state a claim, the Court may consider the complaint, documents referred to in the complaint, and documents upon which the complaint relies.  Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Cortec Indus., Inc., v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

[5]   See id., sections 2.2, 5.1(a)(2), 5.3(a)(1), 5.3(b)(1), 5.3(b)(2), and 8.3 (pages 2, 3, 10, 11, 13, 14, 18-20, and 36).

[6]   See id., section 5.4 (pages 22-23).

[7]   See Unliquidated Asbestos PI Trust Pro Se Claim [hereinafter Claim], parts 2, 3A.1, 3A.2, 3A.4, and 3A.5 (pages 2 and 3), attached as Exhibit C to the Freeman Affidavit and referred to or relied upon by the plaintiffs in paragraphs 15, 17, 34, 38, 40, and 44 of the Complaint (pages 4, 7, 9, and 10).

[8]   See id., part 12 (page 7); TDP, sections 5.3(b)(3), 5.3(b)(4), and 5.4(a)(1) (pages 21 and 22).

was caused by metastatic stomach cancer;[9] (2) the July 11, 2002, speculation of a physician, who never treated or examined her father, that Palermo's cancer might have been mesothelioma;[10] and (3) the conclusion of the Johns-Manville Asbestos Trust ("Manville") that her father's stomach cancer was asbestos related.[11]   This incompetent evidence did not satisfy the Trust's medical criteria.[12]   Additionally, as discussed below, Garner's claim did not satisfy the applicable statute of limitations.   Therefore, the Trust denied Garner's claim.[13]

Garner asked that a pro bono evaluator review the Trust's decision, and the evaluator affirmed it.[14]   Garner then appealed the evaluator's decision to an arbitrator, and the arbitrator too

---

[9]  See Claim, page 70.

[10]  See id., page 159.

[11]  See id., pages 59 and 153–156.

Garner misrepresents that Manville found that her father was afflicted with mesothelioma, Complaint, paragraphs 29, 30, and 32 (Page 7), but her correspondence with Manville belies this assertion.  Garner apparently submitted a claim to Manville in February 2000 alleging that its asbestos caused her father to contract mesothelioma.  Id., paragraph 24 (page 6).  Manville first determined that Garner's claim should not be categorized as a Category 7, Malignant Mesothelioma claim, but as a Category 4, Other Cancer claim.  March 5, 2003 and May 5, 2003 Letters from Manville to Garner [hereinafter Manville Letters], attached as Exhibit D to the Freeman Affidavit.  Manville then determined that Garner's claim was worthless because she failed to present evidence that her father's condition was caused by asbestos exposure.  Id.  Garner asked that an arbitrator review Manville's categorization of her claim, and the arbitrator confirmed the trust's decision.  Id.  Garner next asked that an arbitrator review Manville's valuation of her Other Cancer claim.  Id.  Because Garner sought more than the maximum value of such a claim, the dispute first had to go before an Extraordinary Claim Panel to determine if the arbitrator could award such an amount.  Id.  The three-lawyer Panel found that, despite Garner's lack of medical evidence, the arbitrator's award could exceed the Other Cancer claim's maximum value.  Claim, page 154.  Following this decision, Manville offered to settle Garner's Other Cancer claim.  Id., pages 155-56.

[12]  See TDP, sections 5.7(a)(1)(B) and  5.7(a)(2) (pages 26 and 27).

[13]  See Complaint, paragraph 38 (page 9).

[14]  See id., paragraph 49 (page 12).

3

agreed with the Trust.[15]  Garner then asserted her claim in this Court.[16]  The Court dismissed that first lawsuit for lack of subject matter jurisdiction.[17]  The plaintiffs then filed this second lawsuit in the Supreme Court of Monroe County, New York, parroting their first complaint.[18]  The defendants removed the plaintiffs' second lawsuit to this Court and moved to have it dismissed.[19] In response to the defendants' motion, the plaintiffs filed this Complaint.

In their Complaint, the plaintiffs again allege that a Halliburton or Harbison-Walker entity caused Palermo's fatal illness by negligently exposing him to asbestos.[20]  As discussed below, the plaintiffs' claim is barred by the applicable statute of limitations and workers' compensation laws and therefore should be dismissed.

---

[15]  See id., paragraphs 4 and 49 (pages 2 and 12).

[16]  See id., paragraph 55 (page 13).

[17]  See id., paragraph 57 (page 14).

[18]  See Notice of Removal, Docket No. 1.

[19]  See id.; Defendants' Motion to Dismiss Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted, Docket No. 3; Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted, Docket No. 4.

[20]  See Complaint, paragraphs 60-69 (pages 14-16).

II.      Analysis

A.      Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, a court is to accept as true the allegations in the compliant, documents referred to in the complaint, and documents upon which the complaint relies.[21]  If such allegations demonstrate that the plaintiffs are not entitled to relief, the court should grant the motion.[22]

B.      The Plaintiffs' Claim Should Be Dismissed Because It Is Barred by the Applicable Statute of Limitations and by Workers' Compensation Laws

1.      The Plaintiffs' Claim Is Barred by the Applicable Statute of Limitations

The plaintiffs' personal injury claim is governed by the three-year statute of limitations set forth in New York Civil Practice Laws and Rules section 214-c(2).[23]  Such a claim accrues, at the latest, when a plaintiff discovers his injury, that is, when the injury's symptoms manifest themselves.[24]  The plaintiffs concede that Palermo displayed all of the symptoms of

----

[21]  Roth v. Jennings, 489 F.3d 499, 509-10 (2d. Cir. 2007).

[22]  Jones v. Bock, 549 U.S. 199, 215 (2007).

[23]  Complaint, paragraph 44 (page 10).

Arguably, section 214(5), and not section 214-c(2), governs the plaintiffs' claim, pursuant to section 214-c(6).  If section 214(5) provides the applicable statute of limitation, the plaintiffs' personal injury claim expired long ago, three years after Palermo was last exposed to Halliburton or Harbison-Walker asbestos.  Michael v. Ametelco, Inc., 568 N.Y.S.2d 1003, 1005 (Sup. Ct. Monroe Co. 1991).

[24]  See Styles v. Goord, 367 F. Supp. 2d 473, 475 (W.D.N.Y. 2005) ("[A] plaintiff cannot choose the date on which he 'discovers' his injury by delaying medical tests, or by taking successive tests to 'confirm' the results of earlier tests. For that matter, test results are not necessarily even required to commence the limitations period.  Rather, courts have held that a cause of action accrues at the moment a plaintiff begins to experience symptoms that a reasonable person would link with the underlying illness.") (emphasis in original); Wetherill v. Eli Lilly & Co., 89 N.Y.2d 506, 514-15 (1997) ("[I]n enacting a new 'discovery' rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced. … In this case, it is undisputed that the primary

mesothelioma before his death in 1966.[25]  Therefore, the plaintiffs' personal injury claim accrued

no later than 1966, expired no later than 1969, and should be dismissed.[26]

---

conditions that form the basis of plaintiff's claim – her dysplasia, her miscarriages, her misshapen uterus, and her incompetent cervix – were all known to her by 1988.  Thus, her 1992 action was commenced more than three years after her 'discovery of the injury' and her complaint was properly dismissed without further inquiry into the reasonableness of plaintiff's late discovery of the connection between her symptoms and her mother's ingestion of DES. … [T]here is nothing in either the language of the statute or its history to suggest that the Legislature intended to make the running of the Statute of Limitations depend on claimants' subjective understanding of the etiology of their conditions.  Indeed,…the date for commencing an action under CPLR 214-c(2) [otherwise] would depend on such fortuitous circumstances as the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her chosen physician."); Krogmann v. Glenn Falls City Sch. Dist., 231 A.D.2d 76, 78 (3d Dep't 1997) ("The instant controversy centers on whether 'discovery' occurred when plaintiff began to suffer from the collection of physical symptoms upon which her complaint is premised or, as plaintiff suggests, only when those ailments were definitively linked to a particular diagnosis, in February 1994.  To resolve this dispute, it is necessary only to look to the Court of Appeals recent decision in Wetherill. … Plaintiff admits that she began to experience the entire array of symptoms that characterize her illness shortly after she matriculated at the middle school. Inasmuch as the physical indicia of plaintiff's injuries were fully developed and apparent to her and her treating physicians by April 1989, at the latest,…plaintiff's claim must be deemed to have accrued at or before that time.") (citations omitted); Barlow v. Sun Chem. Co., 838 N.Y.S.2d 387, 399 (Sup. Ct., Westchester Co. 2007) ("Initially, plaintiffs' position regarding the knowledge that the decedent must have had to be deemed to have discovered his injury for the purposes of CPLR 214-c(2) is simply wrong. … [I]t is not when decedent learned that his [illness] was caused by exposure to the defendants' products that is the controlling date, or even when the disease was diagnosed, but rather when he experienced the symptoms of that disease that is determinative for statute of limitations purposes.").

[25] See, e.g., Claim, pages 21, 73, and 77 (identifying a hernia, digital clubbing, abdominal pain and distention, a bloody cough, chest pain, nausea, vomiting, swollen feet, fever, constipation, and weight loss as mesothelioma symptoms); pages 18 and 21 (noting that Palermo was treated for a hernia, "[s]tarted coughing continuously with shortness of breath," "gushed up blood," "had severe pains in his chest and stomach," and displayed "digital clubbing" and an "enlarged stomach"); page 22 ("Per all the documentation, Angelo Palermo experienced all the symptoms of peritoneal mesothelioma….").

[26] See In re U.S. Lines, Inc., No. 86 B 12238, 2007 WL 748291 (Bankr. S.D.N.Y. Mar. 7, 2007), at *8 ("At the time of his admittance to the hospital in February, which was shortly before his death, [the claimant] stated that a large lung mass, that he had been aware [sic] for the past eight years, began to grow more significantly in the past six months.  The reports also indicate that [the claimant] had experienced increasing weakness and shortness of breath, and bleeding and ulceration of the lung mass, beginning in October 2003.  Although Dr. Frank states that no

### 2.   The Plaintiffs' Claim Is Barred by Workers' Compensation Laws

Not only is the plaintiffs' personal injury claim barred by the statute of limitations, but it is barred by workers' compensation laws. Sections 10 and 11 of the New York Workers' Compensation Laws prohibit an employee from suing his employer for injuries sustained while at work. The plaintiffs claim that Palermo was injured by Halliburton or Harbison-Walker entities while he was employed by them.[27] The plaintiffs therefore cannot recover here for such injuries.[28]

---

reasonable thought would have been given to the fact that a chest mass lasting at least eight years was mesothelioma, the Claimant does not need to be precisely aware of the exact illness if he is aware of the symptoms. Although it is not clear that the bleeding and ulceration of the lung mass are symptoms of mesothelioma, a growing lung mass and increased weakness and shortness of breath, which all manifested in October 2003, are symptoms of asbestos-related diseases. Given the above facts, it is clear that there had been a manifestation prior to February 18, 2004.").

If Garner is asserting a wrongful death claim, it accrued when Palermo died and expired two years later. Annunziato v. City of New York, 647 N.Y.S.2d 850, 854 (2d Dep't 1996); Barlow v. Sun Chem. Co., 838 N.Y.S.2d 387, 400-01 (Sup. Ct., Westchester Co. 2007).

[27]   Complaint, paragraphs 12, 13, 37, 63-65, and 67 (pages 3, 4, 8, and 15-16).

[28]   See Acevedo v. Consol. Edison Co. of N.Y., 189 A.D.2d 497, 501-02 (1st Dep't 1993) ("The courts of this State have long held that, if an injury or disease is covered in any way by workers' compensation, recovery at law for a particular type of damage resulting from that injury or disease…will also be barred. In the instant case, therefore, whether the harm suffered by plaintiff employees from their exposure to the toxic asbestos fibers is characterized as injury or disease, any damage resulting from such harm will clearly have arisen out of plaintiffs' employment and is governed exclusively by the Workers' Compensation Law, irrespective of the adequacy or inadequacy of that law's remedial provisions.").

Again, if Garner is pursuing a wrongful death claim, it too is barred by workers' compensation laws. Greene-Wotton v. Fiduciary Trust Co. Int'l, 324 F. Supp. 2d 385, 392 (S.D.N.Y. 2003).

For the reasons stated above, the Trust respectfully requests that the Court dismiss the plaintiffs' Complaint with prejudice and award such further relief as they are justly entitled to in law or in equity.

Dated: August 4, 2010

Respectfully submitted,

K&L GATES LLP

By:   s/ Andrew L. Morrison            
         Andrew L. Morrison (AM 1071)
         K&L GATES LLP
         599 Lexington Avenue
         New York, New York 10022
         (212) 536-3900 (Tel)
         (212) 536-3901 (Fax)

         ATTORNEYS FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 4, 2010 a true and correct copy of the foregoing

document was served upon counsel for Plaintiffs Gail Garner and the Estate of Angelo Palermo

at the following address by way of the Court's ECF SYSTEM and by FedEx:

Christina A. Agola, Esq.
Law Offices of Christina A. Agola, PLLC
2100 First Federal Plaza
Rochester, New York 14614

_____ s/ Andrew L. Morrison_____
Andrew L. Morrison

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GAIL GARNER AND | X |
| THE ESTATE OF ANGELO PALERMO, | : |
| | |
| **Plaintiffs** | :   **10-CV-6345-CJS** |
| | |
| **v.** | :   **AFFIDAVIT OF NANCY E. FREEMAN** |
| | |
| DII INDUSTRIES, LLC ASBESTOS PI | : |
| TRUST, | |
| | : |
| **Defendant** | X |

Before me, the undersigned authority, personally appeared Nancy Freeman who, being by me duly sworn, deposed as follows:

1.      My name is Nancy E. Freeman.   I am over 18 years of age, of sound mind, capable of making this Affidavit, and I have personal knowledge of the facts stated herein, which are true and correct.

2.      I am the Director of Operations and Custodian of records of the DII Industries, LLC Asbestos PI Trust ("Trust").

3.      Attached as Exhibit A is a true and correct copy of the First Amended Complaint filed in the above-captioned action.

4.      Attached as Exhibit B is a true and correct copy of the DII Industries, LLC Asbestos PI Trust Fifth Amended Trust Distribution Procedures, which are the effective Trust Distribution Procedures.

5.      Attached as Exhibit C is a true and correct copy of the DII Industries, LLC Asbestos PI Trust Unliquidated Asbestos PI Trust Pro Se Claim filed by Gail Garner on April 4, 2006.

6.     Attached as Exhibit D are true and correct copies of March 5, 2003 and May 5, 2003 letters from the Johns-Manville Asbestos Trust to Gail Garner, which Garner attached as exhibits to the complaint she filed in this Court on April 25, 2008 (Cause No. 08-cv-6191-CJS).

_____

NANCY E. FREEMAN

SWORN TO AND SUBSCRIBED before me on August 2, 2010.

_____

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My commission expires ____12/27/10____.

Susan J. Pellett
Notary Public, State of Texas
My Comm. Expires 12/27/10

2

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————————

Gail Garner, The Estate of Angelo Palermo,

                  Plaintiffs,

v.

DII Industries Asbestos PI Trust, LLC,
                  Defendant (s).

—————————————————————————

**FIRST AMENDED COMPLAINT**[1]

Civ. No.: 10-cv-6345 CJS

JURY TRIAL DEMANDED

## PRELIMINARY INTRODUCTION

1.     This is an action brought to redress the death of Angelo Palermo due to his

exposure to asbestos-containing products of entities of Haliburton and Harbison-

Walker through the execution of the DII Asbestos Personal Injury Trust.

## JURISDICTION AND VENUE

2.     Jurisdiction of this Court exists pursuant to  28 U.S.C.  § 1332 because the

Plaintiff is a resident of a different state from the defendant and because the

value of the matter in controversy exceeds $75,000.00.  Further, the Plaintiff has

jurisdiction pursuant to Title 28 §157 (b)(5) & 11 U.S.C. § 524 (9) which

authorized Plaintiff to commence litigation pursuant to 7.6 of the TDP dated

December 16, 2004, and pursuant to Fourth Amended and Restated Joint

prepackaged plan of Reorganization § 13.4 for exclusive District Court

jurisdiction.

—————————————————————————

[1]     This First Amended Complaint is filed pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure which states in relevant part that a party may amend its pleading..."21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Defendant filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12 (b)(6) on July 2nd, 2010; the instant First Amended Complaint was filed on July 22nd, 2010, within "21 days after service" of Defendant's motion.

1

3.    Venue is proper pursuant to 28 U.S.C. §1391.

## ADMINISTRATIVE EXHAUSTION

4.    By notice dated August 30, 2007, pursuant to the Defendant DII Industries, LLC Asbestos PI Trust Alternative Dispute Resolution (ADR), Procedures, it was determined that pursuant to a non-binding hearing in the matter of Angelo Palermo conducted on August 21, 2007 in Boston, Massachusetts that the Plaintiff Gail Garner was denied compensation with regard to her claims.

5.    Thereafter, by notice dated October 2nd, 2007, Plaintiff Gail Garner duly advised DII Industries, LLC of her intention to pursue the asbestos unsecured PI Trust claim.

6.    Pursuant to Sections 5.11 and 7.6 of the TDP, Plaintiff Gail Garner was entitled to commence litigation in this matter within 180 days after her receipt of notice from the Defendant DII Industries, LLC, dated October 29, 2007.

7.    Pursuant to the Defendant DII Industries, LLC Asbestos PI Trust Distribution Procedures, ("TDP") at Sections 5.3(b)(2) and 7.6, which permits the filing of asbestos claims in a court in the "Claimant's Jurisdiction" in which the Claimant resided or experienced exposure to an asbestos-containing product or to conduct for which any of the Halliburton Entities or the Harbison-Walker Entities has legal responsibility.

2

8.   Pursuant to New York Civil Practice Law and Rules ("CPLR") section 205(a);

Plaintiff re-filed her Complaint in New York State Supreme Court, Monroe

County.

## PARTIES

9.   Plaintiff Gail Garner ("Garner") is an individual woman who was at all times

relevant herein a resident of the County of Monroe, State of New York, the

daughter and representative of the Estate of Angelo Palermo, a deceased union

insulation mason for 29 years, from 1937 through 1966, in the construction

asbestos industry, survived by Marlene Fargo ("Daughter") and Gail Garner

("Daughter").

10.   Defendant DII Industries, LLC Asbestos PI Trust ("Trust") is a trust organized for

which a Halliburton Entity or a Harbison-Walker Entity has legal responsibility, as

provided in and required by the Debtors' Joint Prepackaged Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code, Section 524(g).

## FACTS

11.   Angelo Palermo ("Palermo") was a union mason for 29 years, from 1937 through

1966 in the construction asbestos industry.

12.   Palermo "spray coated" and handled asbestos containing products while working

directly for one or more of the Halliburton or Harbison-Walker Entities or their

predecessors' valid work sites in New York State.

3

13.     Specifically, Palermo worked from 1941-1945 for Symington Gould (later renamed Symington Wayne), a direct subsidiary of Halliburton and Harbison-Walker, where application of asbestos-containing products-especially insulation materials were a key element of the manufacturing process utilized or installed regularly and in large quantities at this location.

14.     Symington-Gould received government contracts; a maker of ships, tanks, railroad parts, large and small armor (machine guns and shells) and produced iron and steel foundry products; cast armor plates, electric steel castings, airplane engine cylinder castings and static turbine castings.

15.     Plaintiff wrote "A109" on the Claim Form from the DII "A" Entity List:  A109 = Symington-Wayne.

16.     Palermo also worked for Johns-Manville (largest asbestos company in the world) and City of Albany, which were listed as specific sites recognized by the Trust where asbestos is known to have been present.

17.     Plaintiff wrote "B2434, B2435, B2436, B2437 and B4247" on the Claim Form from the DII "B" Entity List, in addition to, an Affidavit within the claim package.

4

18. Asbestos was used in products manufactured or sold by Harbison-Walker
Refractories Company, which DII Industries, LLC acquired in 1967. In 1968,
Dresser took over Harbison-Walker Refractories Company until transferred to
another division of DII Industries, LLC. Harbison-Walker was spun-off by DII
Industries, LLC in July 1992. In 1998, Halliburton purchased Dresser
(Symington-Wayne is a subsidary of Dresser). DII Industries continued to retain
responsibility for all asbestos claims pending as of the date of the spin-off.

19. Palermo died on April 23, 1966 at age 51.

20. Palermo's death certificate states that the immediate cause was acute liver
failure due to "metastasis cancer due to primary stomach" (place of origin).

21. However, the state of medical or scientific knowledge was such that the
causation of Palermo's injury could not have been identified at the time of his
death.

22. The doctor, who signed the death certificate, was an inexperienced resident
(became a plastic surgeon) who received his license 2 ½ years after Angelo
Palermo's death.

23. Garner was advised that Angelo Palermo's co-worker/friend was diagnosed with
Mesothelioma.

24.  Garner filed a claim for her father with the Manville Personal Injury Settlement Trust ("Manville Trust") in February 2000.

25.  Garner requested Dr. William Beckett, a local occupational doctor, specializing in pulmonary (lung) and toxic substance diseases to evaluate Angelo Palermo's medical, work history and pictures of his digital clubbing (indicative of impaired blood oxygenation resulting from advanced lung scarring).

26.  Dr. Beckett's expert opinion:  Peritoneal mesothelioma is a difficult diagnosis to distinguish from carcinoma metastatic to the abdominal cavity or primary to the stomach, and it seems quite possible that the patient's fatal malignancy could have been a diffuse malignant mesothelioma of the peritoneum rather than a primary from the stomach.....patients with malignant mesothelioma can develop digital clubbing.

27.  Manville trust did not accept Dr. Beckett's opinion as a diagnosis.

28.  On February 14, 2002, Harbison-Walker filed with the U.S. bankruptcy court, and a temporary restraining order was issued to Harbison-Walker, staying asbestos claims against Halliburton's Dresser Industries Inc and claims against all Halliburton units.

29.   On June 6, 2003, a tribunal of asbestos experts of the Extraordinary Claims

Panel of the Manville Trust diagnosed Angelo Palermo posthumously, with

mesothelioma.

30.   On October 27, 2003, David Austern, president of the Manville Trust, confirmed

the tribunal's unanimous determination that Palermo's claim is a Mesothelioma

Extraordinary claim and issued financial restitution.

31.   Four months after the Manville diagnosis, Garner filed other asbestos claims.

32.   Four Trusts, including Manville, Celotex, Eagle-Picher and H.K. Porter (Trustee

Mark Gleason is also the Trustee of H.K. Porter Trust), confirmed Palermo's

death an asbestos related "mesothelioma" using the same medical evidence and

trust standards as the DII Trust. On December 16, 2003, Halliburton filed their

petitions as a prepackaged bankruptcy plan for Dresser Industries and other

subsidiaries.

33.   From the "stay" of February 14, 2002 (Harbison-Walker filing) until November 20,

2005, the effective date of the DII Industries, LLC PI Trust, all new asbestos

personal injury claims were prohibited from being filed.

34.   On April 4, 2006, Plaintiff filed a pro se asbestos personal injury liability claim

with DII Industries, LLC PI Trust for the Estate of Angelo Palermo.

7

35.   Plaintiff filed under the Trust's Individual Review (IR) Process, TDP 5.3(b)(1), which states: "Subject to the provisions set forth below, an Asbestos PI Trust claimant may elect to have his or her Asbestos Unsecured PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in section 5.3(a)(3) above."

36.   Trust Alternative Dispute Resolution (ADR), page 2:  "Showing Required:  As set forth in the TDP, in order to establish a valid asbestos unsecured PI Trust Claim, a claimant must make a demonstration of exposure to asbestos-containing products for which one or more of the Halliburton Entities and/or the Harbison-Walker Entities bears legal responsibility."

37.   The DII Trust Director of Claims, in accordance with the TDP, confirmed that the Plaintiffs provided "conclusive evidence" of Angelo Palermo's high asbestos exposure in his capacity as a Union insulation mason in the asbestos industry and specifically working for one or more of a Harbison-Walker/Halliburton Entities.

38.   The Defendants denied the claim for compensation due to (1) insufficient medical diagnosis; (2) Statute of Limitation, 3 year requirement under New York's Statute for filing of a lawsuit upon diagnosis of an asbestos-related disease; (3) the requirements, and the claim will not be reviewed as an Extraordinary Claim.

39.   The Trust TDP 5.7(a)(2) states: "Medical evidence (I) that is a kind shown to have been received in evidence by a state or federal judge at trial."

40.   Plaintiff referenced Federal Rule of Evidence 702, Testimony by Experts to qualify for valid medical evidence, as the Manville Extraordinary Claims Panel members all testified before the United States Judiciary Committee on the Fairness in Asbestos Injury Resolution Act of 2003, as experts, and deemed Angelo Palermo's death an asbestos-related mesothelioma.

41.   Per the Trust TDP, 5.1(a)(2) "Effect of Statutes of Limitations and Repose:  To be eligible for a place in the FIFO Processing Queue, a claim must meet either (i)…(ii) for claims not filed against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system prior to the DII Industries Petition Date, (December 16, 2003) the applicable statute of limitation that was in effect at the time of the filing with Asbestos PI Trust.  However, the running of the relevant statute of limitations shall be tolled as of the earliest of … (D) the filing of a proof of claim with requisite supporting documentation with the Asbestos PI Trust after the DII Industries Effective Date. (November 2005)

9

42.   If an Asbestos PI Trust Claim meets any of the tolling provisions described in the

preceding sentence and the claim was not barred by the applicable federal, state,

or foreign statute of limitations at the time of the tolling event, it will be treated as

timely filed if it is actually filed with Asbestos PI Trust within three (3) years after

the DII Industries Effective Date" or  November 2008.


43.   DII Trust (TDP, 6.1) provided supporting documentation over the Internet:

www.diiasbestostrust.org, Forms, SOL Definition, "The Asbestos Trust has two

different dates for the calculation of the statute of limitations.  For Halliburton or

Non-Harbison-Walker claims the petition date is December 16, 2003.  For

Harbison-Walker claims the petition date is February 14, 2002.  All Claims:  If the

claim meets any of tolling provisions described below and the claim was not

barred by the applicable federal, state, or foreign statute of limitation at the time

of the tolling event, it will be treated as timely filed if it is actually filed with the

Trust on or before November 20, 2008.  The running of the relevant statute of

limitation shall be tolled as of the earliest of … (D) the occurrence of the

Harbison-Walker Petition Date (for Harbison-Walker Claims)" - February 14,

2002.


44.   Plaintiff's claim was timely pursuant to the Discovery Rule of CPLR 214-c and the

three-year New York Statute of Limitations, applying the stay - February 14, 2002

–November 20, 2005).

10

45.   As calculated, the date of Plaintiff"s first filing with the Manville Trust in February

2000 to February 2002, it would equal 2 years (not barred at time of stay); from

November 2005 (the termination of the Stay and the establishment of the DII

Trust) adding one more year, it would equal the 3-year deadline date of

November 2006. The Plaintiff filed in April 2006; within 3 years, and before the

November 2008 TDP expiration date.


46.   Per the Trust TDP 5.4(a)(1) "Extraordinary Claims means an Asbestos

Unsecured PI Trust Claim that otherwise satisfies the Medical Criteria for

Disease Levels … and that is held by a claimant whose exposure to asbestos (i)

occurred primarily as a result of working in manufacturing facilities of one or more

facilities of one or more Halliburton Entities or Harbison-Walker Entities or their

predecessors during a period in which the Halliburton entities or the Harbison-

Walker entities were manufacturing asbestos-containing products at their facility,

and the claim is a tort claim that is not otherwise barred by a statutory worker's

compensation program, or (ii) was at least 75% the result of Company Exposure

as defined in section 5.7 ( c ) below, and there is little likelihood of a substantial

recovery elsewhere."

11

47.   TDP 5.4 states: "Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims panel established by the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative.  All decisions of the Extraordinary Claims Panel were deemed final and "not subject to any further administrative or judicial review"."

48.   Not withstanding, the defendants rejected Plaintiff's numerous legitimate requests for a review of the DII Extraordinary Claims Panel.

49.   After the Pro Bono Evaluator confirmed the Trusts' denial, the Plaintiff requested non-binding arbitration; thereafter, the Plaintiff was denied recovery.

50.   Defendants did not abide by the Court approved procedures contained in the TDP/ADR in they failed to notify Plaintiff of any potential conflicts, (i.e. Trust Arbitrator and Trust Legal Representative are co-founders of Resolutions, LLC in Boston, Massachusetts, same Arbitrator and location of the non-binding arbitration); that they failed to allow Plaintiffs to go before the DII Extraordinary Claims Panel; engaged in ex-parte communications, (i.e. defendants went directly to the Panel without the consent of the Asbestos "TAC" and the Legal Representative; also, the Arbitrator, Executive Director Marcellene Malouf and the Trust's attorney spoke outside the arbitration room together without the Plaintiff) and failed to value Plaintiffs' claims.

51.   On October 29, 2007, Defendants issued a notice of authorization to commence litigation within 180 days.

52.   On April 25, 2008, Plaintiff filed a Complaint with the Federal Court as pro se, with causes of action of: (I) Asbestos Personal Injury Product Liability; (II) Violation of Bankruptcy Code 11 U.S.C. §524(g)(2)(b)(ii)(v); (III) Not following trust distribution procedures (TDP); (IV) Unfair Practices; (v) Breach of Fiduciary duties.

53.   Plaintiff was notified, by Order of the Court, that her case was being transferred to Pennsylvania.  Plaintiff and Defendants sent a motion to vacate the order. The order was vacated to remain in New York State.

54.   Pro se Plaintiff was notified, by Order of the Court, to obtain an Attorney to litigate the Estate.

55.   Plaintiff filed with the Court an Amended Complaint with causes of action of: (I) Asbestos Personal Injury Product Liability; (ii) Breach of Fiduciary Duty by Defendants Gleason and Malouf; and (iii) Negligent Hiring & Supervision of Defendants Gleason and Malouf.

56.   On September 17, 2009, a Hearing took place with the appearance of the Plaintiff and Defendants' attorneys.

13

57.  On February 4, 2010, Judge Charles J. Siragusa issued a decision that the Court finds no factual basis alleged for Federal jurisdiction. Defendants' motion to dismiss was granted.

58.  Plaintiff asserts State Court Jurisdiction pursuant to CPLR section 205(a), based on Tort and Personal Injury Law.

59.  Plaintiffs' claim arises from exposure to asbestos by Halliburton and Harbison-Walker at employment locations in New York State.

## FIRST CAUSE OF ACTION

### Asbestos Personal Injury Product Liability

60.  Plaintiffs repeat the allegations contained in the above stated paragraphs in the complaint as if fully set forth herein.

61.  Upon information and belief, Defendant DII Industries knew and/or should have known that Angelo Palermo was a union insulation mason for 29 years, from 1937 through 1966 in the construction asbestos industry.

62.  Upon information and belief, Defendant DII Industries knew or should have known that Angelo Palermo was subject to extreme and dangerous levels of asbestos during his tenure.

14

63.     Upon information and belief, Defendant DII Industries knew or should have

known that Angelo Palermo "spray coated" and handled asbestos containing

products while working directly for one or more of the Halliburton or Harbison-

Walker Entities or their predecessors' valid work sites.

64.     Upon information and belief, Defendant DII Industries knew or should have

known that Angelo Palermo worked from 1941-1945 for Symington-Gould (later

renamed Symington Wayne), a direct subsidiary of Halliburton and Harbison-

Walker.

65.     Upon information and belief, Defendant DII Industries knew or should have

known that Angelo Palermo ingested and/or inhaled asbestos at the work site

causing him to suffer mesothelioma.

66.     That upon information and belief, Angelo Palermo suffered continuous, injurious

and harmful exposure to asbestos culminating in his untimely death at the age of

51 from mesothelioma.

67.     That the foregoing injuries to Angelo Palermo occurred as a result of the

negligence of the Defendants DII Industries, Harbison-Walker and Halliburton in

that they permitted Angelo Palermo to work in and maintained a hazardous and

dangerous condition for such an extended period of time and in failing to exercise

a degree of care which would be reasonably prudent to maintain, manage and

15

inspect said work sites, in failing to comply with the statutes, rules, ordinances and regulations in the manner as provided by law and in being otherwise careless and negligent in maintaining Angelo Palermo's work sites.

68. That said duty to abate said asbestos in a safe, effective and lawful manner was non-delegable by virtue of the fact that exposure to asbestos is inherently dangerous and that defendants knew or should have known, upon information and belief, that the tasks they asked Angelo Palermo to perform would expose him to asbestos.

69. That by reason of the foregoing negligent acts of defendants DII Industries, Harbison-Walker and Halliburton; Angelo Palermo sustained severe, serious and fatal injuries culminating in his death.  The Defendant, DII Industries, LLC Asbestos Trust was organized for which Halliburton Entity or Harbison-Walker Entity has legal responsibility, as provided in and required by the Debtors' Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code, Section 524 (g) to liquidate valid unsecured claims.

**WHEREFORE**, Plaintiff seeks judgment in accord with  the above stated causes

of action.


Dated: July 22, 2010
Rochester, New York


                              By:

                                   *CHRISTINA A. AGOLA, PLLC*


                                   /s/ Christina A. Agola, Esq.

                                   Christina A. Agola, Esq

                                   *ATTORNEYS FOR PLAINTIFF*
                                   28 East Main Street
                                   2100 First Federal Plaza
                                   Rochester, New York 14614
                                   585.262.3320
                                   585.262.3325 (fax)
                                   caa@wnycivilrights.com

# EXHIBIT B

**DII INDUSTRIES, LLC ASBESTOS PI TRUST**

**FIFTH AMENDED TRUST DISTRIBUTION PROCEDURES**

**(December 17, 2009)**

# DII INDUSTRIES, LLC ASBESTOS PI TRUST

# FIFTH AMENDED TRUST DISTRIBUTION PROCEDURES

# TABLE OF CONTENTS

SECTION 1  Introduction ................................................................................................................ 1

    1.1    Purpose .......................................................................................................... 1

    1.2    Interpretation .................................................................................................. 1

SECTION 2  Overview ................................................................................................................... 1

    2.1    Asbestos PI Trust Goals ................................................................................ 1

    2.2    Asbestos PI Trust Claim Liquidation Procedures ........................................ 2

    2.3    Asbestos PI Trust Application of the Payment Percentage .......................... 4

    2.4    Asbestos PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment ....................................................................... 4

    2.5    Asbestos Unsecured PI Trust Claims Payment Ratio and Reduced Payment Option .................... 5

    2.6    Asbestos PI Trust Indemnity and Contribution Claims ................................ 6

SECTION 3  TDP Administration .................................................................................................. 6

    3.1    Asbestos TAC and Legal Representative ...................................................... 6

    3.2    Consultation and Consent Procedures ........................................................... 7

SECTION 4  Payment Percentage; Periodic Estimates .................................................................. 7

    4.1    Uncertainty of the Halliburton Entities' and the Harbison-Walker Entities' Asbestos Personal Injury Liabilities .............................................. 7

    4.2    Payment Percentage ...................................................................................... 7

    4.3    Applicability of the Payment Percentage ..................................................... 8

SECTION 5  Resolution of Asbestos Unsecured PI Trust Claims ................................................ 9

    5.1    Ordering, Processing, and Payment of Claims ............................................. 9

        5.1(a)    Ordering of Claims ....................................................................... 9

        5.1(b)    Payment of Claims ..................................................................... 11

        5.1(c)    Adjusting Payments Option ........................................................ 11

5.2  Resolution of Liquidated Asbestos Unsecured PI Trust Claims. ........................................... 12

   5.2(a)  Qualifying Settled Asbestos PI Trust Claims. ........................................... 12

   5.2(b)  Asbestos Final Judgment Claims ........................................... 12

5.3  Resolution of Unliquidated Asbestos PI Trust Claims ........................................... 13

   5.3(a)  Expedited Review Process ........................................... 13

   5.3(b)  Individual Review Process ........................................... 18

   5.3(c)  Review and Adjustment of Scheduled Values, Average Values and Maximum Values 21

5.4  Categorizing Claims as Extraordinary and/or Exigent Hardship ........................................... 22

5.5  Secondary Exposure Claims ........................................... 23

5.6  Indirect Asbestos PI Trust Claims ........................................... 23

   5.6(a)  In General ........................................... 23

   5.6(b)  Certain Indemnification Claims. ........................................... 25

5.7  Evidentiary Requirements ........................................... 25

   5.7(a)  Medical Evidence ........................................... 25

   5.7(b)  Exposure Evidence ........................................... 27

   5.7(c)  Company Exposure ........................................... 28

5.8  Claims Audit Program ........................................... 29

5.9  Second Disease (Malignancy) Claims ........................................... 29

5.10  Arbitration ........................................... 30

   5.10(a) Establishment of Alternative Dispute Resolution Procedures ........................................... 30

   5.10(b) Claims Eligible for Arbitration ........................................... 30

   5.10(c) Limitations on and Payment of Arbitration Awards ........................................... 31

5.11  Litigation ........................................... 31

SECTION 6  Claims Materials ........................................... 31

6.1  Claims Materials ........................................... 31

6.2  Content of Claims Materials ........................................... 31

6.3  Withdrawal or Deferral of Claims ........................................... 32

6.4  Filing Requirements and Fees ........................................... 32

SECTION 7  General Guidelines for Liquidating and Paying Claims ..................................................... 32

    7.1    Showing Required........................................................................................ 32

    7.2    Costs Considered .......................................................................................... 32

    7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity ............ 33

    7.4    Punitive Damages ......................................................................................... 33

    7.5    Sequencing Adjustments ............................................................................... 33

        7.5(a)    In General ................................................................................... 33

        7.5(b)    Unliquidated Asbestos Trust Claims .............................................. 34

    7.6    Suits in a Judicial Forum .............................................................................. 34

    7.7    Payment of Judgments for Money Damages................................................... 35

    7.8    Releases ....................................................................................................... 35

    7.9    Third-Party Services .................................................................................... 35

SECTION 8  Miscellaneous ............................................................................................................. 36

    8.1    Amendments ................................................................................................ 36

    8.2    Severability ................................................................................................. 36

    8.3    Governing Law ............................................................................................. 36

    8.4    Confidentiality of Claimant Submissions ....................................................... 36

## DII INDUSTRIES, LLC ASBESTOS PI TRUST
## FIFTH AMENDED TRUST DISTRIBUTION PROCEDURES

The DII Industries, LLC Asbestos PI Trust Fifth Amended Trust Distribution Procedures ("TDP") contained herein provide for resolving all Asbestos Unsecured PI Trust Claims (including so-called "premises liability" claims) for which a Halliburton Entity or a Harbison-Walker Entity has legal responsibility, as provided in and required by the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("Plan") and the DII Industries, LLC Asbestos PI Trust Agreement (the "Asbestos PI Trust Agreement"). The Plan and Asbestos PI Trust Agreement establish the DII Industries, LLC Asbestos PI Trust (the "Asbestos PI Trust"). The Trustees shall implement and administer this TDP in accordance with the Asbestos PI Trust Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Definitive Uniform Glossary of Defined Terms for Plan Documents filed of record with the Bankruptcy Court on November 22, 2004 [Docket # 2086].

## SECTION 1
## Introduction

### 1.1    Purpose

This TDP has been adopted pursuant to the Asbestos PI Trust Agreement. It is designed to provide fair, equitable, and substantially similar treatment for all Asbestos Unsecured PI Trust Claims that may presently exist or may arise in the future.

### 1.2    Interpretation

Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant.

## SECTION 2
## Overview

### 2.1    Asbestos PI Trust Goals

The goal of the Asbestos PI Trust is to treat all claimants equitably and in accordance with the requirements of section 524(g) of the Bankruptcy Code. This TDP furthers that goal by setting forth procedures for processing and paying claims generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[1] To this end, this TDP establishes a single schedule of eight asbestos-related

---

[1]  As used in this TDP, the phrase "in the tort system" shall include only claims asserted by way of litigation and not claims asserted against a trust established pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or any other applicable law.

1

diseases ("Disease Levels"), seven of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria") and specific liquidated values ("Scheduled Values"), and five of which have both anticipated average values ("Average Values") and caps on their liquidated values ("Maximum Values").   The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values. and Maximum Values, set forth in sections 5.3 and 5.4 below, have been selected and derived with the intention of achieving a fair allocation of the Asbestos PI Trust funds as among claimants suffering from different disease processes in light of the best available information considering the settlement history of the Halliburton Entities and the Harbison-Walker Entities and the rights claimants would have in the tort system absent the Reorganization Cases.

A claimant may assert separate Asbestos Unsecured PI Trust Claims against the Asbestos PI Trust based on exposure to asbestos or asbestos-containing products manufactured or distributed by more than one of the Halliburton Entities or the Harbison-Walker Entities (the "Multiple Exposure Claims").  To the extent that the Asbestos PI Trust has separate liabilities to a single claimant based on Multiple Exposure Claims. the Asbestos PI Trust shall pay the claimant its several share of the liquidated value of each of the separate claim or claims for which it is liable. subject to the applicable Payment Percentage and Maximum Annual Payment, and Claims Payment Ratio limitations. if any, set forth below.   Under no circumstances, however, shall any claimant receive more than the full liquidated value of each of one Harbison-Walker Asbestos PI Trust Claim and one Non-Harbison-Walker Asbestos PI Trust Claim (as defined in section 5.3(a)(3) below) as such value(s) is (are) determined under this TDP.

## 2.2    Asbestos PI Trust Claim Liquidation Procedures

Asbestos Unsecured PI Trust Claims shall be processed based on their place in the FIFO Processing Queues to be established pursuant to section 5.1(a) and section 5.2 below.   The Asbestos PI Trust shall take all reasonable steps to resolve Asbestos Unsecured PI Trust Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include conducting settlement discussions with claimants' representatives of more than one claim at a time; provided, however, that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in section 5.3(b)(2) below.   The Asbestos PI Trust also shall make every effort to resolve each year at least that number of Asbestos Unsecured PI Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment, as those terms are defined below.

The Asbestos PI Trust shall process and liquidate all Asbestos Unsecured PI Trust Claims, other than Qualifying Settled Asbestos Unsecured PI Trust Claims and Asbestos Final Judgment Claims, pursuant to the relevant provisions of this TDP.  Qualifying Settled Asbestos Unsecured PI Trust Claims shall be processed and paid solely pursuant to the Plan. the Asbestos PI Trust Funding Agreement, and section 5.2(a) below.  Asbestos Final Judgment Claims shall be processed and paid pursuant to section 5.2(b) below.

Asbestos Unsecured PI Trust Claims, other than Foreign Claims, that meet the presumptive Medical/Exposure Criteria of Disease Levels I-V, VII, and VIII shall be processed and paid under the Expedited Review process described in section 5.3(a) herein.   Asbestos

Unsecured PI Trust Claims involving Disease Levels I-V, VII, and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos PI Trust's Individual Review process described in section 5.3(b). In the case of Disease Levels I – III, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Asbestos PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

Asbestos Unsecured PI Trust Claims involving Disease Levels IV-VIII tend to raise more complex valuation issues than the Asbestos Unsecured PI Trust Claims in Disease Levels I-III. Accordingly, claimants holding claims involving these Disease Levels may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos PI Trust's Individual Review process. However, the liquidated value of a more serious Disease Level IV, V, VII, or VIII claim that undergoes the Individual Review process for valuation purposes may be determined to be less than its Scheduled Value and, in any event, shall not exceed the Maximum Value for the relevant Disease Level set forth in sections 5.3(b)(3) and 5.3(b)(4) below, unless the claim qualifies as an Extraordinary Claim as defined in section 5.4(a) below, in which case its liquidated value cannot exceed the maximum value specified in that provision for such claims. Disease Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated only pursuant to the Asbestos PI Trust's Individual Review process.

Based upon the Halliburton Entities' and the Harbison-Walker Entities' claims settlement history in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in sections 5.3(b)(3) and 5.3(b)(4) have been established for each of the (5) five more serious Disease Levels that are eligible for Individual Review of their liquidated values. The Trustees shall use their reasonable best efforts to ensure that the Asbestos PI Trust processes claims such that over time the average Liquidated Amount of all Asbestos Unsecured PI Trust Claims in each of the (5) five more serious Disease Levels that are paid by the Asbestos PI Trust approximate the "Average Value" set forth in sections 5.3(b)(3) and 5.3(b)(4) for each such Disease Level.

All unresolved disputes over a claimant's medical condition, exposure history, and/or the liquidated value of the Asbestos PI Trust Claim shall be subject to binding or nonbinding arbitration as set forth in section 5.10 below, at the election of the claimant, under the ADR Procedures that are provided in Attachment A hereto. Disputes over whether an Asbestos PI Trust Claim is an Asbestos Final Judgment Claim shall also be resolved pursuant to the ADR Procedures attached hereto. Asbestos Unsecured PI Trust Claims that are the subject of a dispute with the Asbestos PI Trust that cannot be resolved by such ADR Procedures, including nonbinding arbitration, may enter the tort system as provided in sections 5.11 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in section 7.7.

Disputes over whether an Asbestos PI Trust Claim is a Qualifying Settled Asbestos PI Trust Claim shall be resolved solely pursuant to the terms of the applicable Asbestos Claimant Settlement Agreement and the Plan.

### 2.3     Asbestos PI Trust Application of the Payment Percentage

After the Liquidated Amount of an Asbestos PI Trust Claim, other than a claim involving Other Asbestos Disease (Disease Level I) as defined in section 5.3(a)(3), is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, litigation in the tort system, or by settlement, the claimant shall ultimately receive a pro-rata share of that value based on the Payment Percentage described in section 4.2.

As defined in the Plan, the Payment Percentage (a) shall be the Initial Payment Percentage with respect to all Qualifying Settled Asbestos Unsecured PI Trust Claims and Asbestos Final Judgment Claims and (b) the Payment Percentage selected by the Trustees of the Asbestos PI Trust with consent of the Asbestos TAC and the Legal Representative with respect to all claims liquidated under this TDP (other than claims paid as claims for Disease Level I (Other Asbestos Disease)); provided, however, that the Payment Percentage shall not exceed the Initial Payment Percentage prior to the first (1st) anniversary of the Effective Date. The Payment Percentage for Disease Level I shall be 100%. The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative to reflect then-current estimates of the Asbestos PI Trust's assets and its liabilities, as well as the estimated value of then-pending and future claims. The Trustees shall calculate the Payment Percentage based on the assumption that the Average Values set forth in sections 5.3(b)(3) and 5.3(b)(4) will be achieved by the Asbestos PI Trust with respect to existing present claims and projected future claims involving Disease Levels IV-VIII. However, any adjustment to the Payment Percentage shall be made only pursuant to section 4.2. If the Payment Percentage is increased over time, claimants (i) whose claims are subject to the Payment Percentage, (ii) whose claims were liquidated under the TDP or who hold Asbestos Final Judgment Claims, and (iii) who were paid in prior periods under the TDP, shall not receive additional payments except as provided in section 4.2, relating to circumstances in which the Asbestos PI Trust has received additional contributions under the Asbestos PI Trust Additional Funding Agreement, or section 5.1(c), relating to the Asbestos PI Trust's adjusting payment options. Because there is uncertainty in the prediction of both the number and severity of future claims and the amount of the Asbestos PI Trust's assets, no guarantee can be made of the Payment Percentage that will be applied to a particular Asbestos PI Trust Claim.

### 2.4     Asbestos PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment

The Asbestos PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future claimants in a substantially similar manner. In each year, the Asbestos PI Trust shall be empowered to pay out all of the interest earned during the year, together with a portion of its principal, calculated so that the application of Asbestos PI Trust funds over its life shall correspond with the needs created by the anticipated flow of claims (the "Maximum Annual Payment") taking into account the Payment Percentage provisions set forth in sections 2.3 above and 4.2 below. The Asbestos PI Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment determined for that year; provided, however, that the

Maximum Annual Payment limitation shall not apply to any Qualifying Settled Asbestos Unsecured PI Trust Claims as defined in section 5.2(a).

In distributing the Maximum Annual Payment, the Asbestos PI Trust shall first allocate the amount in question to Asbestos Final Judgment Claims and to liquidated Asbestos Unsecured PI Trust Claims involving Disease Level I.  Asbestos Final Judgment Claims and liquidated Disease Level I claims for which there are insufficient funds shall be carried over to the next year and placed at the head of the FIFO Payment Queue.  In any given year, after payment of all outstanding Asbestos Final Judgment Claims and Disease Level I claims, the remaining portion of the Maximum Annual Payment (the "Maximum Available Payment"), if any, shall then be allocated and used to satisfy all other liquidated Asbestos Unsecured PI Trust Claims, subject to the Claims Payment Ratio, if any, set forth in section 2.5 below.

### 2.5     Asbestos Unsecured PI Trust Claims Payment Ratio and Reduced Payment Option

In the event the Payment Percentage is less than 100%, the Asbestos PI Trust shall implement a payment ratio (the "Claims Payment Ratio") to control the distribution of Asbestos PI Trust funds between Category A claims, which consist of Asbestos Unsecured PI Trust Claims involving severe asbestosis and malignancies (Disease Levels IV-VIII), that were unliquidated as of the DII Industries Petition Date,[2] and Category B claims, which are Asbestos Unsecured PI Trust Claims involving non-malignant asbestosis or pleural disease (Disease Levels II and III) that were similarly unliquidated as of the DII Industries Petition Date.  Based on the Halliburton Entities' and the Harbison-Walker Entities' settlement history and analysis of present and future claims, the Claims Payment Ratios initially established by the Asbestos PI Trust shall be 60% for Category A claims and 40% for Category B claims.  In no event shall the Claims Payment Ratio apply to any Qualifying Settled Asbestos PI Trust Claim, to any Asbestos Final Judgment Claim, or to any claims for Other Asbestos Disease (Disease Level I).

In the event the Asbestos PI Trust implements a Claims Payment Ratio in each year, after the annual determination of the Maximum Available Payment described in section 2.4 above, the Claim Payment Ratio shall be applied to determine the proportion of the Maximum Available Payment that is available for Category A and Category B claims.

In the event the Asbestos PI Trust implements a Claims Payment Ratio and there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in section 5.1(b) below based upon the date of claim liquidation.  Claims for which there are insufficient

---

[2]  Notwithstanding any definitions to the contrary in the Definitive Uniform Glossary of Defined Terms for Plan Documents filed of record with the Bankruptcy Court on November 22, 2004 [Docket # 2086], the term "DII Industries Petition Date" when used herein shall mean December 16, 2003.  The term "Harbison-Walker Petition Date" shall mean February 14, 2002.  In addition, the term "Halliburton Claim" shall mean an Asbestos PI Trust Claim filed against the Halliburton Entities.  The term "Harbison-Walker Claim" shall mean an Asbestos PI Trust Claim filed against the Harbison-Walker Entities.

funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue. If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

Except to the extent the Payment Percentage is adjusted upward to 100% (in which case the Trustees may suspend the use of the Claims Payment Ratio), the 60%/40% Claims Payment Ratio and its rollover provision shall not be amended until the fifth anniversary of the Effective Date. Thereafter, both the Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims resulting from the application of the Claims Payment Ratio, shall not, in and of itself, constitute such circumstances. Nor may an increase in the numbers of Category B claims beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall also consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants. In any event, no amendment to the Claims Payment Ratio may be made without the consent of the Asbestos TAC and the Legal Representative. However, the Trustees at any time may offer the option of a reduced payment percentage to either Category A or Category B in return for prompter payment (the "Reduced Payment Option").

### 2.6     Asbestos PI Trust Indemnity and Contribution Claims

Indirect Asbestos Unsecured PI Trust Claims based on indemnity, contribution, or other theory of reimbursement, if any, shall be subject to the provisions of section 5.6 below.

### SECTION 3
### TDP Administration

### 3.1     Asbestos TAC and Legal Representative

Pursuant to the Plan and the Asbestos PI Trust Agreement, the Asbestos PI Trust and this TDP shall be administered by the Trustees in consultation with the Asbestos TAC and the Legal Representative. The Trustees shall obtain the consent of the Asbestos TAC and the Legal Representative on any amendments to this TDP pursuant to section 8.1 below, and on such other matters as are otherwise required below and in section 2.2(f) of the Asbestos PI Trust Agreement. The Trustees shall also consult with the Asbestos TAC and the Legal Representative on such matters as are provided below and in section 2.2(e) and (f) of the

Asbestos PI Trust Agreement.  The initial members of the Asbestos TAC and the initial Legal Representative are identified in the Asbestos PI Trust Agreement.

**3.2     Consultation and Consent Procedures**

In those circumstances in which their consultation or consent is required, the Trustees shall provide written notice to the Asbestos TAC and the Legal Representative of the specific amendment or other action that is proposed.  The Trustees shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in sections 5.7(a) and 6.6(a), or the Consent Process described in sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement, respectively.

**SECTION 4**
**Payment Percentage; Periodic Estimates**

**4.1     Uncertainty of the Halliburton Entities' and the Harbison-Walker Entities' Asbestos Personal Injury Liabilities**

As discussed herein, there is inherent uncertainty regarding the Halliburton Entities' and the Harbison-Walker Entities' total asbestos-related tort liabilities, as well as the total value of the assets available to the Asbestos PI Trust to pay Asbestos Unsecured PI Trust Claims.  There is also uncertainty surrounding the totality of the Asbestos Unsecured PI Trust Claims to be paid over time as well as the extent to which changes in applicable law could affect the Asbestos PI Trust's liabilities under this TDP.  Consequently, there is inherent uncertainty regarding the amounts that holders of those Asbestos Unsecured PI Trust Claims will receive.  To seek to ensure substantially equivalent treatment of all present and future Asbestos Unsecured PI Trust Claims, the Trustees shall determine from time to time the percentage of full liquidated value that holders of present and future Asbestos Unsecured PI Trust Claims will be likely to receive from the Asbestos PI Trust, i.e., the "Payment Percentage" described in section 2.3 above and section 4.2 below.

**4.2     Payment Percentage**

The Payment Percentage (as defined in the Plan) shall apply to all payments made from the Asbestos PI Trust, other than payments made on account of claims involving Other Asbestos Disease (Disease Level I), to assure that such Asbestos PI Trust will be in a financial position to pay holders of present and future Asbestos Unsecured PI Trust Claims in substantially the same manner.  Any subsequent changes to the Payment Percentage shall require the consent of the Asbestos TAC and the Legal Representative.  The Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Asbestos PI Trust if the Trustees determine that an adjustment is required.  No less frequently than once every three (3) years, but no more frequently than annually (unless the requesting party can demonstrate the occurrence of a materially adverse change warranting greater frequency), commencing with the first day of January occurring after the Plan is consummated, the Trustees shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage, if necessary, with the consent of the Asbestos TAC and the Legal Representative.  The Trustees also shall reconsider the then-

applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the Asbestos TAC or the Legal Representative.  The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future Asbestos Unsecured PI Trust Claims, the value of the assets then available to the Asbestos PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of Asbestos PI Trust funds to pay a comparable percentage of full value to all holders of Asbestos Unsecured PI Trust Claims.  When making these determinations, the Trustees shall exercise common sense and shall flexibly evaluate all relevant factors.  However, the Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

The uncertainty surrounding the amount of the Asbestos PI Trust's future assets is due in part to the fact that the Asbestos PI Trust may receive additional contributions under the Asbestos PI Trust Additional Funding Agreement.  Any additional contributions shall be used first to maintain the then-applicable Payment Percentage.

In determining the Payment Percentage, it shall be reasonable, so long as there has been no default in the Asbestos PI Trust Funding Agreement, for the Trustees to disregard the payment of Qualifying Settled Asbestos Claims, which claims are to be paid solely from funds provided through the Asbestos PI Trust Funding Agreement.  In determining the Payment Percentage, it shall also be reasonable for the Trustees to disregard amounts which may be due under the Asbestos PI Trust Additional Funding Agreement until any amounts due under that Agreement become known and payable to the Trust.

However, if the additional contributions exceed the amount estimated to be reasonably necessary to maintain the Payment Percentage then in effect, the Asbestos PI Trust, with the consent of the Asbestos TAC and the Legal Representative, shall adjust the Payment Percentage upward to reflect the increase in available assets and shall also make supplemental payments to claimants who previously liquidated their claims against the Asbestos PI Trust and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to a sequencing adjustment paid pursuant to Section 7.5 below).  In no event shall the Asbestos PI Trust make such supplemental payments to holders of Qualifying Settled Asbestos Unsecured PI Trust Claims.

## 4.3     Applicability of the Payment Percentage

Except as otherwise provided in section 5.1(b) below for Asbestos Unsecured PI Trust Claims involving deceased or incompetent claimants for which approval of the Asbestos PI Trust's offer by a court or through a probate process is required, no holder of any other Asbestos PI Trust Claim, other than an Asbestos PI Trust Claim for Other Asbestos Disease (Disease Level I), shall receive from the Asbestos PI Trust a payment that exceeds the Liquidated Amount of the claim times the Payment Percentage in effect at the time of payment unless a Reduced

Payment Option applies.  Asbestos Unsecured Pl Trust Claims involving Other Asbestos Disease (Disease Level I) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in section 5.3(a)(3) below.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the Asbestos TAC and the Legal Representative but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower amount but is not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and is subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

## SECTION 5
## Resolution of Asbestos Unsecured PI Trust Claims

**5.1      Ordering, Processing, and Payment of Claims**

**5.1(a)  Ordering of Claims**

**5.1(a)(1)  Establishment of the FIFO Processing Queue**

Other than Qualifying Settled Asbestos Unsecured PI Trust Claims, which are addressed in section 5.2, the Asbestos PI Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis, except as otherwise provided herein (the "FIFO Processing Queue").  For all claims filed between November 9, 2005, (the "Claims Acceptance Date") and before May 9, 2006, a claimant's position in the FIFO Processing Queue shall be determined as of the earlier of (i) the date prior to December 16, 2003 (the "DII Industries Petition Date") that the specific claim was either filed against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system or was actually submitted to one or more of the Halliburton Entities or the Harbison-Walker Entities pursuant to an administrative settlement agreement, (ii) the date before the DII Industries Petition Date that a claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with one or more of the Halliburton Entities or the Harbison-Walker Entities, or (iii) the date after the DII Industries Petition Date (if any) but before the Claims Acceptance Date that the claim was filed against another defendant in the tort system.  Following May 9, 2006, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos PI Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

### 5.1(a)(2)  Effect of Statutes of Limitations and Repose

#### 5.1(a)(2)(A)  Halliburton Claims

Except as otherwise provided in this subsection, all Halliburton Claims must satisfy one of the following statutes of limitations: (i) for claims first filed in the tort system against a Halliburton Entity prior to the DII Industries Petition Date, the applicable federal, state, or foreign statute of limitation or repose that was in effect when the claim was filed in the tort system or (ii) for claims not filed against a Halliburton Entity in the tort system prior to the DII Industries Petition Date, the applicable statute of limitation that was in effect when the claim was filed with Asbestos PI Trust.

The running of the statute of limitation or repose governing a Halliburton Claim shall be tolled as of the earliest of (i) the filing of the claim against a Halliburton or Harbison-Walker Entity in the tort system or by submission to a Halliburton or Harbison-Walker Entity pursuant to an administrative settlement agreement; (ii) the tolling of the statute by agreement or otherwise; or (iii) the DII Industries Petition Date.

If the running of the statute of limitation or repose governing a Halliburton Claim is tolled pursuant to the preceding paragraph, and the claim was not barred by such statute when the tolling event occurred, the claim shall be treated as timely filed if it is filed with the Asbestos PI Trust within three years after the Claims Acceptance Date.  Additionally, any Halliburton Claimant that was first diagnosed after the DII Industries Petition Date may timely file with the Asbestos PI Trust within three years after the date of diagnosis or the Claims Acceptance Date, whichever occurs later, even if the applicable federal, state, or foreign statute of limitation or repose has expired.

#### 5.1(a)(2)(B)  Harbison-Walker Claims

Except as otherwise provided in this subsection, Harbison-Walker Claims must satisfy one of the following statutes of limitations: (i) for claims first filed in the tort system against a Harbison-Walker Entity prior to the Harbison-Walker Petition Date, the applicable federal, state, or foreign statute of limitation or repose that was in effect when the claim was filed in the tort system or (ii) for claims not filed against a Harbison-Walker Entity in the tort system prior to the Harbison-Walker Petition Date, the applicable statute of limitation that was in effect when the claim was filed with Asbestos PI Trust.

The running of the statute of limitation or repose governing a Harbison-Walker Claim shall be tolled as of the earliest of (i) the filing of the claim against a Halliburton or Harbison-Walker Entity in the tort system or by submission to a Halliburton or Harbison-Walker Entity pursuant to an administrative settlement agreement; (ii) the tolling of the statute by agreement or otherwise; or (iii) the Harbison-Walker Petition Date.

If the running of the statute of limitation or repose governing a Harbison-Walker Claim is tolled pursuant to the preceding paragraph, and the claim was not barred by such statute when the tolling event occurred, the claim shall be treated as timely filed if it is filed with the Asbestos PI Trust within three years after the Claims Acceptance Date.  Additionally, any Harbison-

Walker Claimant that was first diagnosed after the Harbison-Walker Petition Date may timely file with the Asbestos PI Trust within three years after the date of diagnosis or the Claims Acceptance Date, whichever occurs later, even if the applicable federal, state, or foreign statute of limitation or repose has expired.

### 5.1(b)  Payment of Claims

Asbestos Unsecured PI Trust Claims that have been liquidated by the Asbestos PI Trust's Expedited Review process ("Expedited Review") as provided in section 5.3(a) below, by the Asbestos PI Trust's Individual Review process ("Individual Review") as provided in section 5.3(b) below, by arbitration as provided in section 5.10 below, or by litigation in the tort system as provided in sections 5.11 and 7.6 below shall be paid in FIFO order based on the date their liquidation became final (the "FIFO Payment Queue"), all such payments being subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, and, if any, the Claims Payment Ratio, except as otherwise provided herein. Qualifying Settled Asbestos Unsecured PI Trust Claims shall be paid solely pursuant to the Plan, the Asbestos PI Trust Funding Agreement, and section 5.2(a) below.  Asbestos Final Judgment Claims shall be paid solely pursuant to section 5.2(b) below.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Asbestos PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

### 5.1(c)  Adjusting Payments Option

At the sole discretion of the Trustees (with the consent of the Asbestos TAC and the Legal Representative), the Asbestos PI Trust may authorize supplemental payments, on account of any future increase in the Payment Percentage, to any or all previously allowed Asbestos Unsecured PI Trust Claims (other than Qualifying Settled Asbestos PI Trust Claims) in an amount equal to the Liquidated Value multiplied by the then-current Payment Percentage less the amount of any previous payments on account of such Claims (other than payments on account of any sequencing adjustment under section 7.5 below); provided, however, that the Asbestos PI Trust shall not be obligated, under this paragraph, to make a supplemental payment on account

of any allowed Asbestos Unsecured PI Trust Claim and shall not make any supplemental payment to the extent that the amount of such supplemental payment would be less than $100. However, the Trustees' obligation shall resume and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the accumulated and unpaid total exceeds $100.

In addition, at the sole discretion of the Trustees (with the consent of the Asbestos TAC and the Legal Representative), the Asbestos Pl Trust may authorize supplemental payments, on account of any future increase of any Scheduled Value, Average Value or Maximum Value under section 5.3(c) of this Asbestos TDP, to any or all previously allowed Asbestos Unsecured PI Trust Claims (other than Qualifying Settled Asbestos PI Trust Claims) in the affected Disease Level. The amount of any such supplemental payments shall be determined by the Trustees (with the consent of the Asbestos TAC and the Legal Representative) at the time of any such future increase under section 5.3(c); provided, however, that in no event shall the Asbestos PI Trust be obligated, under this paragraph, to make a supplemental payment on account of any allowed Asbestos Unsecured PI Trust Claim to the extent that the amount of such supplemental payment would be less than $100.

### 5.2    Resolution of Liquidated Asbestos Unsecured PI Trust Claims.

#### 5.2(a)  Qualifying Settled Asbestos PI Trust Claims.

Qualifying Settled Asbestos PI Trust Claims shall be paid by the Asbestos Pl Trust pursuant to the terms of the Plan and the Asbestos PI Trust Funding Agreement. Any dispute concerning whether a Settled Asbestos Pl Trust Claim is a Qualifying Settled Asbestos PI Trust Claim shall be resolved between the claimant and the Debtors or Reorganized Debtors solely in accordance with the applicable Asbestos Claimant Settlement Agreement and the Plan. The Asbestos PI Trust shall not participate in such dispute and shall have no responsibility to pay a Settled Asbestos Pl Trust Claim that has not been determined in accordance with the terms of the applicable Asbestos Claimant Settlement Agreement and the Plan to be a Qualifying Settled Asbestos PI Trust Claim; provided, however, that nothing in this section 5.2(a) shall preclude the holder of an alleged Settled Asbestos PI Trust Claim that is determined not to be a Qualifying Settled Asbestos PI Trust Claim from submitting an Asbestos Unsecured PI Trust Claim to the Asbestos PI Trust. Qualifying Settled Asbestos PI Trust Claims shall not be subject to the Payment Percentage, Maximum Annual Payment, Maximum Available Payment or Claims Payment Ratio, if any, limitations provided above.

#### 5.2(b)  Asbestos Final Judgment Claims

Asbestos Final Judgment Claims as defined in the Plan shall be processed by the Asbestos PI Trust based on their place in a separate FIFO queue to be established for such claims. The placement of such claims in the FIFO queue shall be based on the date on which the claim was liquidated by a final judgment in the tort system. The Liquidated Amount of such claims shall be the unpaid amount of the judgment plus any interest on the claim that has accrued under applicable state law. All payments of Asbestos Final Judgment Claims shall be subject to the applicable Payment Percentage and the Maximum Annual Payment provisions set forth

above.  Such claims, however, shall not be subject to the Maximum Available Payment or Claims Payment Ratio, if any, limitations.

### 5.3    Resolution of Unliquidated Asbestos PI Trust Claims

Within six months after the establishment of the Asbestos PI Trust, the Trustees, with the consent of the Asbestos TAC and the Legal Representative, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos Unsecured PI Trust Claims, which shall include deadlines for processing such claims.  Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos Unsecured PI Trust Claims first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of sections 6.1 and 6.2 below.  It is anticipated that the Asbestos PI Trust shall provide an initial response to the claimant within six months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in section 5.1(a) above.  If a claim has been pending in the FIFO Processing Queue for more than 270 days, the Asbestos PI Trust shall provide the claimant with reasonable notice of the date by which it expects to reach the claim in the FIFO Processing Queue, following which the claimant shall promptly (i) advise the Asbestos PI Trust whether the claimant wishes to change his or her initial election as between Expedited Review and Individual Review;  (ii) provide the Asbestos PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the Asbestos PI Trust of any change in the claimant's Disease Level.  If a claimant fails to respond to the Asbestos PI Trust's notice on a timely basis, the Asbestos PI Trust shall process and liquidate the claim under the review process initially elected based upon the medical/exposure evidence previously submitted by the claimant.

Claimants may supplement or otherwise update information submitted with claims filed with the Asbestos PI Trust at any time before the Asbestos PI Trust issues a notice of determination with respect to the claim.

### 5.3(a)   Expedited Review Process

#### 5.3(a)(1) In General

Expedited Review is designed primarily to provide an expeditious, efficient, and inexpensive method for liquidating all Asbestos Unsecured PI Trust Claims (except those involving Lung Cancer 2 (Disease Level VI) and all Foreign Claims as defined below, which shall be liquidated only pursuant to the Asbestos PI Trust's Individual Review process) where the claim can easily be verified by the Asbestos PI Trust as meeting the presumptive

Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos Unsecured PI Trust Claims than does the Individual Review process described in section 5.3(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in section 5.3(a)(3) below.  However, except for claims involving Other Asbestos Disease (Disease Level 1), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment, and, if any, the Claims Payment Ratio limitations set forth above. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect Individual Review set forth in section 5.3(b) below.

Further, the claimant's eligibility to receive the Scheduled Value for his or her Asbestos Unsecured PI Trust Claim pursuant to the Expedited Review Process shall be determined by reference to the Medical/Exposure Criteria set forth below (rather than by reference to the law of the Claimant's Jurisdiction) for each of the Disease Levels eligible for Expedited Review.

### 5.3(a)(2)  Claims Processing under Expedited Review

All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the Asbestos PI Trust's proof of claim form provided in Attachment B hereto.  As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review and shall advise the claimant of its determination. If a Disease Level is determined, the Asbestos PI Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos PI Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

### 5.3(a)(3)        Disease   Levels,   Scheduled   Values,   and Medical/Exposure Criteria

The eight Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each and the separate Scheduled Values for the unliquidated Asbestos Unsecured PI Trust Claims for which any of the Harbison-Walker Entities have legal responsibility (the "Harbison-Walker Asbestos Unsecured PI Trust Claims") and for the unliquidated Asbestos Unsecured PI Trust Claims for which any of the Halliburton Entities or their predecessors other than Harbison-Walker Entities have legal responsibility (the "Non-Harbison-Walker Asbestos Unsecured PI Trust Claims") for the seven Disease Levels eligible for Expedited Review, are set forth below.  For those claimants who (i) vote to accept or reject the plan and (ii) file their claims

with the Asbestos PI Trust on or before six months after the Claims Acceptance Date provided in section 5.1 above, these Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Asbestos Unsecured PI Trust Claims (except Qualifying Settled Asbestos Unsecured PI Trust Claims) for which the claimant elects Expedited Review.  Thereafter for purposes of administering Expedited Review and with the consent of the Asbestos TAC and the Legal Representative, the Trustees may add to, change, or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values, or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then-current Disease Levels.

**[remainder of page intentionally left blank]**

## Schedule I-Non-Harbison-Walker Asbestos Unsecured PI Trust Claims and Harbison-Walker Asbestos Unsecured PI Trust Claims

| Disease Level | Non-Harbison-Walker Asbestos Unsecured PI Trust Claims/ Harbison-Walker Asbestos Unsecured PI Trust Claims | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $57,200/$136,500 | (1) Diagnosis[3] of mesothelioma and (2) credible evidence of Company Exposure.[4] |
| Lung Cancer 1 (Level VII) | $9,300/$44,900 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,[5] (2) six months Company Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[6] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |

---

[3]   The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in section 5.7 below.

[4]   The term "Company Exposure" is defined in section 5.7(c) below.

[5]   Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against the Halliburton Entities and/or the Harbison-Walker Entities or another defendant in the tort system prior to the DII Industries Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V, and VII. Pathological evidence of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-Associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of Asbestos PI Trust Claims.

[6]   The term "Significant Occupational Exposure" is defined in section 5.7(b)(2) below.

| Disease Level | Non-Harbison-Walker Asbestos Unsecured PI Trust Claims/ Harbison-Walker Asbestos Unsecured PI Trust Claims | Medical/Exposure Criteria |
|---|---|---|
| Lung Cancer 2 (Level VI) | N/A | (1) Diagnosis of a primary lung cancer, (2) Company Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VII) claims. All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $4000 (Non-Harbison-Walker Asbestos Unsecured PI Trust Claims)/$19,200 (Harbison-Walker Asbestos Unsecured PI Trust Claims), with such awards capped at $13,300 (Non-Harbison-Walker Asbestos Unsecured PI Trust Claims)/ $64,000 (Harbison-Walker Asbestos Unsecured PI Trust Claims) unless the claim qualifies for Extraordinary Claim treatment. Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a Smoker.[7]  In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level V) | $8,000/$24,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Company Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $9,400/$29,500 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (a) TLC less than 65% or (b) FVC less than 65% and FEVI/FVC ratio greater than 65%, (2) six (6) months Company Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |

---

[7]   There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Asbestos PI Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VII) shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| Disease Level | Non-Harbison-Walker Asbestos Unsecured PI Trust Claims/ Harbison-Walker Asbestos Unsecured PI Trust Claims | Medical/Exposure Criteria |
|---|---|---|
| Asbestosis/ Pleural Disease (Level III) | $2,400/$7,200 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80% or (b) FVC less than 80% and FEVI/FVC ratio equal to or greater than 65%, (2) six months Company Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/ Pleural Disease (Level II) | $1,100/$3,800 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Company Exposure, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I) | $100/$300 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma and (2) Company Exposure prior to December 31, 1982. |

### 5.3(b)  Individual Review Process

#### 5.3(b)(1) In General

Subject to the provisions set forth below, an Asbestos PI Trust claimant may elect to have his or her Asbestos Unsecured PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in section 5.3(a)(3) above.  In addition, or alternatively, an Asbestos PI Trust claimant may elect to have a claim involving Disease Levels IV-VIII undergo the Individual Review process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, until such time as the Asbestos PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Asbestos PI Trust's Expedited Review process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under this Asbestos TDP shall be established pursuant to the Asbestos PI Trust's Individual Review process.  Because Asbestos Unsecured PI Trust Claims of individuals exposed in Canada who were resident in Canada when such claims were filed were routinely litigated and resolved in the courts of the United States, and because the resolution history of these claims has been included in developing the Expedited Review process, such claims shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process.  Accordingly, a "Foreign Claim" is an Asbestos PI Trust Claim with respect to which the claimant's exposure to an asbestos-containing product for which any Halliburton Entity or Harbison-Walker Entity has legal

18

responsibility occurred outside of the United States and its Territories and Possessions, and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the Asbestos PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in section 5.3(b)(2) below.  The Asbestos PI Trust shall determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in section 5.3(b)(2) below.

For purposes of the Individual Review process, the Trustees, with the consent of the Asbestos TAC and the Legal Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to Foreign Claims; provided, however, that such criteria, standards, or requirements shall not effectuate substantive changes to the claims-eligibility requirements under this Asbestos TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the Asbestos PI Trust has sufficient historical settlement, verdict, and other valuation data for claims from a particular foreign jurisdiction, the Trustees, with the consent of the Asbestos TAC and the Legal Representative, may also establish a separate valuation matrix for such claims based on that data.

### 5.3(b)(1)(A)  Disease Levels I-III

Individual Review provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos Unsecured PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I-III.  In such a case, the Asbestos PI Trust shall either deny the claim, or, if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Asbestos PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the claim qualifies as an Extraordinary Claim as defined in section 5.4(a) below, in which case its liquidated value cannot exceed the maximum value for such a claim set forth in that provision.

### 5.3(b)(1)(B)  Disease Levels IV-VIII

Claimants holding claims in the five more serious Disease Levels IV-VIII shall be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence.  The Individual Review process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Asbestos Unsecured PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels IV-VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in section 5.3(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in section 5.4(a) below, in which case its liquidated value cannot exceed the maximum value set forth in that provision for such claims.  Because the detailed examination and valuation

19

process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review process may be paid the liquidated value of their Asbestos Unsecured Pl Trust Claims later than would have been the case had the claimant elected the Expedited Review process.

### 5.3(b)(2)   Valuation Factors to be Considered in Individual Review

The Asbestos Pl Trust shall liquidate the value of each Asbestos Unsecured Pl Trust Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level.  The Asbestos PI Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to:  (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family, or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including Company Exposure as defined in section 5.7(c) below prior to December 31, 1982 (for example, alternative causes and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories in the Claimant's Jurisdiction for similarly situated claims; and (vi) the greater of (a) settlement and verdict histories for the claimant's law firm for similarly situated claims or (b) settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction including all cases where the claimant's law firm submits clear and convincing evidence to the Asbestos Pl Trust that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery, or trial of the cases (the mere referral of a case, without further involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case), irrespective of whether a second law firm also was involved and would be entitled to include the cases in its settlement and verdict histories.

The "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system prior to either the DII Industries Petition Date (for Halliburton Claims) or the Harbison-Walker Petition Date (for Harbison-Walker Claims).  If the claim was not filed against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system prior to either the DII Industries Petition Date (for Halliburton Claims) or the Harbison-Walker Petition Date (for Harbison-Walker Claims), the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Asbestos Pl Trust or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which any of the Halliburton Entities or the Harbison-Walker Entities has legal responsibility.  With respect to the "Claimant's Jurisdiction," in the event a personal representative or authorized agent of a deceased claimant makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction would only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be Commonwealth of Pennsylvania, and such claimant's damages for purposes of Individual Review shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.

### 5.3(b)(3)  Scheduled, Average, and Maximum Values
### (Non-Harbison-Walker Asbestos PI Trust Claims)

The Scheduled, Average, and Maximum Values for all Asbestos Unsecured PI Trust Claims, other than Harbison-Walker Asbestos Unsecured PI Trust Claims, are the following:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $57,200 | $76,400 | $256,000 |
| Lung Cancer 1 (Level VII) | $9,300 | $12,000 | $39,900 |
| Lung Cancer 2 (Level VI) | N/A | $4,000 | $13,300 |
| Other Cancer (Level V) | $8,000 | $9,800 | $32,700 |
| Severe Asbestosis (Level IV) | $9,400 | $9,900 | $40,100 |
| Asbestosis/Pleural Disease (Level III) | $2,400 | N/A | N/A |
| Asbestosis/Pleural Disease (Level II) | $1,100 | N/A | N/A |
| Other Asbestos Disease (Level I) | $100 | N/A | N/A |

The Asbestos PI Trust, with the consent of the Asbestos TAC and the Legal Representative pursuant to sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement, may change these valuation amounts for good cause in accordance with section 5.3(c) below.

### 5.3(b)(4)  Scheduled, Average, and Maximum Values
### (Harbison-Walker Asbestos PI Trust Claims)

The Scheduled, Average, and Maximum Values for all Harbison-Walker Asbestos Unsecured PI Trust Claims are the following:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $136,500 | $182,000 | $610,000 |
| Lung Cancer 1 (Level VII) | $44,900 | $57,700 | $192,200 |
| Lung Cancer 2 (Level VI) | N/A | $19,200 | $64,000 |
| Other Cancer (Level V) | $24,000 | $29,000 | $96,500 |
| Severe Asbestosis (Level IV) | $29,500 | $31,000 | $125,600 |
| Asbestosis/Pleural Disease (Level III) | $7,200 | N/A | N/A |
| Asbestosis/Pleural Disease (Level II) | $3,800 | N/A | N/A |
| Other Asbestos Disease (Level 1) | $300 | N/A | N/A |

The Asbestos PI Trust, with the consent of the Asbestos TAC and the Legal Representative pursuant to sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement, may change these valuation amounts for good cause in accordance with section 5.3(c) below.

### 5.3(c)  Review and Adjustment of Scheduled Values, Average
### Values and Maximum Values

Before the end of 2010, and no later than every five years thereafter, the Asbestos PI Trust shall review the Scheduled Values, Average Values and Maximum Values set forth for each Disease Level in this Asbestos TDP to determine whether such values should be adjusted

21

either upwards of downwards, including in relationship to one another.  The Trustees also may review the then-applicable values if requested to do so by the Asbestos TAC or the Legal Representative, except that no review may be requested until at least one year after the last such review (unless the requesting party can demonstrate the occurrence of a material change warranting a review on a shorter interval).  In such review, the Asbestos PI Trust may consider all factors that the Trustees, in their discretion, deem appropriate, including, but not limited to: (i) the latest projections of future claims; (ii) the Asbestos PI Trust's available assets; (iii) the Asbestos PI Trust's past claims experience (including, among other things, the number of claims filed, the percentage of claimants electing Individual Review and Expedited Review, and the mix of Disease Levels asserted) in relation to what was projected when the Scheduled Values, Average Values and Maximum Values were originally established; and (iv) the values being awarded relative to claims with similar characteristics outside of the Asbestos PI Trust process. The actual timing of such review, within the guidelines established above, shall be in the Trustees' discretion.  The Asbestos PI Trust may implement its proposed adjustments, if any, to the Scheduled Values, Average Values and Maximum Values with the consent of the Asbestos TAC and the Legal Representative pursuant to sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement.

### 5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship

#### 5.4(a)(1) Extraordinary Claims

"Extraordinary Claim" means an Asbestos Unsecured PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II-VIII and that is held by a claimant whose exposure to asbestos (i) occurred primarily as a result of working in manufacturing facilities of one or more of the Halliburton Entities or the Harbison-Walker Entities or their predecessors during a period in which they were manufacturing asbestos-containing products at the facility, provided that the claim is a tort claim that is not otherwise barred by an applicable statutory workers' compensation program, or (ii) was at least 75% the result of Company Exposure as defined in section 5.7(c) below, and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to (i) for Disease Levels II-V, VII, and VIII, five (5) times the Scheduled Value for such claims and (ii) for Disease Level VI, five (5) times the Average Value for such claims, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.

An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Asbestos Unsecured PI Trust Claims except Exigent Hardship Claims, Disease Level I (Other Asbestos Disease) Claims, and Asbestos Final Judgment Claims, which shall be first in said queue and shall be paid in that order, based on its date of liquidation, subject to the Maximum Available Payment and Claims Payment Ratio described above.

22

### 5.4(a)(2)  Exigent Hardship Claims

At any time the Asbestos PI Trust may liquidate and pay Asbestos Unsecured PI Trust Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP. An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated Asbestos Unsecured PI Trust Claims, except Asbestos Final Judgment Claims and Disease Level I (Other Asbestos Disease) Claims, which shall be first in said queue and shall be paid first in that order, subject to the Maximum Available Payment and Claims Payment Ratio described above.  An Asbestos Unsecured PI Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII) and the Asbestos PI Trust, in its sole discretion, determines (a) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income and (b) that there is a  causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease ("Exigent Hardship Claims").

### 5.5    Secondary Exposure Claims

If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant may seek Individual Review of his or her claim pursuant to section 5.3(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the Asbestos PI Trust.  In addition, the claimant with secondary exposure must establish (a) that he or she is suffering from one of the eight Disease Levels described in section 5.3(b)(3) above or an asbestos-related disease otherwise compensable under this TDP, (b) that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person experienced Company Exposure as defined in section 5.7(c)(1) below, and (c) that such secondary exposure to such occupationally exposed person was a cause of the claimed disease.  The proof of claim form included in Attachment B hereto contains an additional section for such secondary exposure claims.  All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

### 5.6    Indirect Asbestos PI Trust Claims

### 5.6(a)  In General

Except as provided in section 5.6(b) below, Indirect Asbestos PI Trust Claims that are asserted against the Asbestos PI Trust based upon theories of contribution or indemnification under applicable law may not be processed or paid by the Asbestos PI Trust unless the holder of such claim (the "Indirect Asbestos Claimant") establishes to the satisfaction of the Trustees that (a) the Indirect Asbestos Claimant has paid in full obligations that the Asbestos PI Trust otherwise would have had to an individual claimant (the "Direct Asbestos Claimant"), (b) the Asbestos PI Trust has been or shall be forever and fully released from all liability to both the Direct Asbestos Claimant and the Indirect Asbestos Claimant, and (c) the claim is not otherwise barred by a statute of limitation, repose, or other applicable non-bankruptcy law.  In no event

shall any Indirect Asbestos Claimant have any rights against the Asbestos PI Trust superior to the rights of the related Direct Asbestos Claimant against the Asbestos PI Trust, including any rights with respect to the timing, amount, or manner of payment; provided, however, that, in addition, no Indirect Asbestos PI Trust Claim may be liquidated and paid in an amount that exceeds the lesser of (a) the amount the Direct Asbestos Claimant would have been entitled to recover from the Asbestos PI Trust or (b) the amount that the Indirect Asbestos Claimant has actually paid the related Direct Asbestos Claimant.  Except as may be permitted after individual review, the Asbestos PI Trust shall not pay any Indirect Asbestos Claimant unless and until the Indirect Asbestos Claimant's aggregate liability for the Direct Asbestos Claimant's claim has been fixed, liquidated, and paid by the Indirect Asbestos Claimant by settlement (with an appropriate full release in favor of the Asbestos PI Trust) or a Final Order provided that such claim is valid under the applicable non-bankruptcy law. In any case where the Indirect Asbestos Claimant has satisfied the claim of a Direct Asbestos Claimant against the Asbestos PI Trust under applicable law by way of a settlement, the Indirect Asbestos Claimant shall obtain for the benefit of the Asbestos PI Trust a release in form and substance satisfactory to the Trustees.  The liquidated value of any Indirect Asbestos PI Trust Claim paid by the Asbestos PI Trust to an Indirect Asbestos Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Unsecured PI Trust Claim that might be subsequently asserted by the Direct Asbestos Claimant against the Asbestos PI Trust.

If an Indirect Asbestos Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Asbestos Claimant provide the Asbestos PI Trust with a full release of the Direct Asbestos Claimant's claim, the Indirect Asbestos Claimant may request that the Asbestos PI Trust review the Indirect Asbestos PI Trust Claim under its Individual Review Process to determine whether the Indirect Asbestos Claimant can establish under applicable law that the Indirect Asbestos Claimant has paid a liability or obligation that the Asbestos PI Trust would otherwise have to the Direct Asbestos Claimant as of the effective date of this Asbestos TDP.  If the Indirect Asbestos Claimant can show that it has paid such a liability or obligation, the Asbestos PI Trust shall reimburse the Indirect Asbestos Claimant the amount of the liability or obligation so satisfied subject to the terms and provisions of the Asbestos TDP. However, in no event shall such reimbursement to the Indirect Asbestos Claimant be greater than the amount to which the Direct Asbestos Claimant would have otherwise been entitled.

Any dispute between the Asbestos PI Trust and an Indirect Asbestos Claimant over whether the Indirect Asbestos Claimant has a right to reimbursement for any amount paid to a Direct Asbestos Claimant shall be subject to the ADR procedures provided in section 5.10 below and set forth in Attachment A hereto.  If such dispute is not resolved by said ADR procedures, the Indirect Asbestos Claimant may litigate the dispute in a judicial forum pursuant to sections 5.11 and 7.6 below.  The Trustees may develop and approve a separate proof of claim form for such Indirect Asbestos PI Trust Claims.

Indirect Asbestos PI Trust Claims shall be processed in accordance with procedures to be developed and implemented by the Trustees, which procedures (a) shall determine the validity and enforceability of such claims and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos PI Trust would have afforded the holders of the underlying valid Asbestos Unsecured PI Trust Claims.  Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from

24

asserting an Indirect Asbestos PI Trust Claim against the Asbestos PI Trust subject to the requirements set forth herein.

### 5.6(b)  Certain Indemnification Claims.

In the case of a claim for indemnification that has been channeled to the Asbestos PI Trust pursuant to Article 10.3(a) of the Plan and that involves an underlying liability that is asserted by current or past employee of a Halliburton Entity or a Harbison-Walker Entity against an indemnitee that is not directly assertable by the direct claimant against a Halliburton Entity or Harbison-Walker Entity, the rights of the indemnitee Indirect Asbestos Claimant shall be coextensive with both the rights the employee would have had against the Asbestos PI Trust had the underlying related claim been compensable under this TDP and with the limitations to which such claim would have been subject under this TDP concerning the time, amount and manner of its processing and payment.

Notwithstanding anything to the contrary in this section 5.6, the Asbestos PI Trust shall not assert as a defense to an Indirect Asbestos PI Trust Claim brought by an indemnitee covered by this provision that the Asbestos PI Trust does not have liability to such indemnitee on the grounds that the current or former employee of a Halliburton Entity or Harbison-Walker Entity would have been precluded from asserting the underlying related claim against the Asbestos PI Trust.

### 5.7     Evidentiary Requirements

#### 5.7(a)  Medical Evidence

##### 5.7(a)(1)  In General

All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis or (ii) a history of the claimant's exposure sufficient to establish a ten (10) year latency period.  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the Asbestos PI Trust as a diagnosis.

##### 5.7(a)(1)(A)  Disease Levels I-IV

Except for claims filed against the Halliburton Entities and/or the Harbison-Walker Entities or another asbestos defendant in the tort system prior to the DII Industries Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based, in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide:  (i) for claims involving Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 5 above);

(ii) for claims involving Disease Level IV,[8] an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iii) for claims involving either Disease Level III or IV, pulmonary function testing.[9]  In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either:  (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii)(a) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 5 above) or (b) for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

### 5.7(a)(1)(B)  Disease Levels V-VIII

All diagnoses of an asbestos-related malignancy (Disease Levels V-VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

### 5.7(a)(1)(C)   Exception to the Exception for Certain Pre-Petition Claims

If the holder of an Asbestos Unsecured PI Trust Claim that was filed against a Halliburton Entity or a Harbison-Walker Entity or another defendant in the tort system prior to the DII Industries Petition Date has not provided the Asbestos PI Trust with a diagnosis of the asbestos-related disease by a physician who conducted a physical examination of the claimant described in section 5.7(a)(1)(A), but the claimant has available such a diagnosis by an examining physician engaged by the claimant or his or her law firm, or the claimant has filed such a diagnosis with another asbestos-related personal injury settlement trust that requires such

---

[8]  All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy. However, the Asbestos PI Trust may rebut such presumptions.

[9]  "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment that is in material compliance with ATS standards for technical quality and calibration.  The Asbestos PI Trust may presume that these ATS criteria and standards were satisfied if the pulmonary function testing was performed in an accredited JCAHO hospital or performed, reviewed or supervised by a Board Certified Pulmonologist.  If the pulmonary function testing was not performed in an accredited JCAHO hospital or performed, reviewed or supervised by a Board Certified Pulmonologist, then the full testing report (as opposed to a summary report) must be submitted to the Asbestos PI Trust.  If the full report is required by the foregoing sentence, the pulmonary function testing was conducted prior to November 1, 2005, and the full pulmonary function testing report is not available, the claimant may submit a declaration signed by a Qualified Physician or other party who is qualified to make a certification regarding the PFT in the form provided by the Asbestos PI Trust certifying that the pulmonary function testing was conducted in material compliance with ATS standards.

evidence without regard to whether the claimant or the law firm engaged the diagnosing physician, the claimant shall provide such diagnosis to the Asbestos PI Trust notwithstanding the exception in section 5.7(a)(1)(A).

### 5.7(a)(2)  Credibility of Medical Evidence

Before making any payment to a claimant, the Asbestos PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is competent medical evidence of an asbestos-related injury and is consistent with recognized medical standards. The Asbestos PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination, or reviews of other medical evidence and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to the Halliburton Entities or the Harbison Walker Entities to settle for payment similar disease cases prior to the Reorganization Cases, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption. In addition, claimants who otherwise meet the requirements of this TDP for payment of an Asbestos Unsecured PI Trust Claim shall be paid without regard to the results of any litigation at anytime between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Asbestos PI Trust in any Individual Review proceeding conducted pursuant to 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

### 5.7(b)  Exposure Evidence

### 5.7(b)(1)  In General

As set forth in section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate by credible evidence a minimum exposure to an asbestos-containing product manufactured or distributed by one or more of the Harbison-Walker Entities or the Halliburton Entities or their predecessors. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product produced by the Halliburton Entities or the Harbison-Walker Entities or their predecessors are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in section 5.3(a)(3) above, the claimant must show by credible evidence (i) for all Disease Levels, Company Exposure as defined in section 5.7(c) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six months Company Exposure prior to December 31, 1982, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V), or Lung Cancer 1 (Disease Level VII), six months Company Exposure prior to December 31. 1982, plus Significant Occupational Exposure to asbestos as defined in section 5.7(b)(2) below. If the claimant cannot meet the relevant

presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim.

### 5.7(b)(2)  Significant Occupational Exposure

"Significant Occupational Exposure" means employment for a cumulative period of at least five years, with a minimum of two years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired, or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b), and/or (c).

### 5.7(c)  Company Exposure

"Company Exposure" means meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, used, installed, or manufactured by one or more of the Halliburton Entities or the Harbison-Walker Entities or for which a Halliburton Entity or Harbison-Walker Entity is otherwise liable, in accordance with the exposure requirements described in sections 5.7(b)(1) and (2) above. Working at a Documented Site (as defined below) shall constitute presumptive evidence of Company Exposure.  Company Exposure must be established by:

- an affidavit, sworn statement, deposition, interrogatory answer, sworn work history or other credible evidence that establishes by credible evidence that asbestos or asbestos-containing products supplied, specified, used, installed, or manufactured by a Halliburton Entity and/or a Harbison-Walker Entity or for which a Halliburton Entity as Harbison-Walker Entity is otherwise liable, were present at the time of the alleged exposure, or

- sales, construction, employment, or other contemporaneous records that establishes by credible evidence that asbestos or asbestos-containing products supplied, specified, used, installed, or manufactured by a Halliburton Entity and/or a Harbison-Walker Entity or for which a Halliburton Entity or Harbison-Walker Entity is otherwise liable, were present at the time of the alleged exposure.

A "Documented Site" means an exposure location identified to the Asbestos PI Trust where there is clear and convincing evidence that asbestos or asbestos-containing products supplied, specified, used, installed, or manufactured by a Halliburton Entity and/or a Harbison-Walker Entity or their predecessors, successors, and assigns were present at the time of the alleged exposure.  The Asbestos PI Trust shall make available a non-exclusive list of Documented Sites.  Not less than annually, the Asbestos PI Trust shall review the list of Documented Sites.  To the extent the Trustees deem necessary, upon consultation with the

Asbestos TAC and the Legal Representative, the Trustees shall supplement such non-exclusive list of Documented Sites.

Evidence submitted to establish proof of Company Exposure is for the sole benefit of the Asbestos PI Trust, not third parties or defendants in the tort system. The Asbestos PI Trust has no need for, and therefore claimants are not required to furnish the Asbestos PI Trust with, evidence of exposure to specific asbestos products other than those for which the Halliburton Entities or the Harbison-Walker Entities have legal responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify Halliburton or Harbison-Walker products in the claimant's underlying tort action, or to other bankruptcy trusts does not preclude the claimant from recovering from the Asbestos PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

### 5.8    Claims Audit Program

The Asbestos PI Trust, with the consent of the Asbestos TAC and the Legal Representative, may develop methods for auditing the reliability of medical evidence, including additional reading of x-rays, CT scans, and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by the Halliburton Entities or Harbison Walker Entities prior to December 31, 1982. In the event that the Asbestos PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Asbestos PI Trust, it may decline to accept additional evidence from such provider in the future. Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos PI Trust, the Asbestos PI Trust may penalize any claimant or claimant's attorney by disallowing the Asbestos Unsecured PI Trust Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Unsecured PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

### 5.9    Second Disease (Malignancy) Claims

The holder of an Asbestos Unsecured PI Trust Claim (including a holder of a Qualifying Settled Asbestos PI Trust Claim) involving a non-malignant asbestos-related disease (Disease Levels l-IV) may file a new Asbestos Unsecured PI Trust Claim against the Asbestos PI Trust for a malignant disease (Disease Levels V-VIII) that is subsequently diagnosed; provided, however, that, with respect to a holder of a Qualifying Settled Asbestos PI Trust Claim, the Asbestos PI Trust may assert as a defense to such second disease claim any release made pursuant to the applicable Asbestos/Silica PI Trust Claimant Settlement Agreement. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the nonmalignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to the original claim involving the non-malignant disease.

### 5.10    Arbitration

#### 5.10(a)  Establishment of Alternative Dispute Resolution Procedures

The Asbestos PI Trust, with the consent of the Asbestos TAC and the Legal Representative, shall institute binding and nonbinding arbitration procedures in accordance with the Alternative Dispute Resolution ("ADR") Procedures included in Attachment A hereto to attempt to resolve whether the Asbestos PI Trust's outright rejection or denial of a claim was proper or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I-VIII. Disputes of whether an Asbestos Unsecured PI Trust Claim is a Qualifying Settled Asbestos PI Trust Claim shall be resolved pursuant to the terms of the applicable Asbestos Claimant Settlement Agreement and the Plan. Binding and nonbinding arbitration shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels IV-VIII, as well as disputes over the validity of Indirect Asbestos PI Trust Claims. In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in section 5.7 above.  In the case of an arbitration involving the liquidated value of a claim involving Disease Levels IV-VIII, the arbitrator shall consider the same valuation factors that are set forth in section 5.3(b)(2) above.  To facilitate the Individual Review Process with respect to claims involving Disease Levels IV-VIII, the Asbestos PI Trust may develop a valuation model that enables it to efficiently make initial settlement offers on such claims.  In an arbitration involving any such claim, the Asbestos PI Trust shall not offer into evidence or describe any such model or assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in arbitration. The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten days prior to the arbitration proceeding.  With respect to all claims eligible for arbitration, the claimant, but not the Asbestos PI Trust, may elect either nonbinding or binding arbitration.  The ADR Procedures set forth in Attachment A hereto may be modified by the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative. Such amendments may also include adoption of mediation procedures as well as establishment of an Extraordinary Claims Panel to review such claims pursuant to section 5.4(a) above.

#### 5.10(b)  Claims Eligible for Arbitration

In order to be eligible for arbitration, the claimant must first complete the Individual Review process with respect to the disputed issue as well as either the Pro Bono Evaluation or the Mediation processes set forth in the ADR Procedures.  Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Asbestos PI Trust, the Asbestos PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Asbestos PI Trust of the rejection in writing.  Individual Review also shall be treated as completed if the Asbestos PI Trust has rejected the claim.  The claimant must send the Asbestos PI Trust a written request for ADR pursuant to the ADR Procedures within 180 days after Individual Review is treated as complete, or else the claimant shall be deemed to have waived ADR and all of the claimant's rights under section 7.6 below.

**5.10(c)  Limitations on and Payment of Arbitration Awards**

In the case of a non-Extraordinary Claim involving Disease Levels I-III, the arbitrator shall not return an award in excess of the Scheduled Value for such claim.  In the case of a non-Extraordinary Claim involving Disease Levels IV-VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in section 5.3(a)(3) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the maximum value for such a claim as set forth in section 5.4(a) above.  A claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the Asbestos PI Trust's original valuation of the claim.

**5.11     Litigation**

Claimants who elect nonbinding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in a judicial forum against the Asbestos PI Trust pursuant to section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in a judicial forum from the Asbestos PI Trust's available cash only as provided in section 7.7 below.

<div align="center">

**SECTION 6**
**Claims Materials**

</div>

**6.1     Claims Materials**

The Asbestos PI Trust shall prepare suitable and efficient claims materials ("Claims Materials"), for all Asbestos Unsecured PI Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the Asbestos PI Trust.  The proof of claim form to be submitted to the Asbestos PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing and shall require the claimant to identify the Halliburton Entities or the Harbison Walker Entities his or her claim alleges liability against.  The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim-filing procedures, the Asbestos PI Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-rom.  A copy of the proof of claim form to be used by the Asbestos PI Trust for unliquidated Asbestos Unsecured PI Trust Claims is included in Attachment B hereto.  The proof of claim form may be changed by the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative.

**6.2     Content of Claims Materials**

The Claims Materials shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form.  If feasible, the forms used by the Asbestos PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations.  If requested by the claimant, the Asbestos PI Trust shall accept information provided electronically.  The claimant may, but shall not be

required to, provide the Asbestos PI Trust with evidence of recovery from other asbestos defendants and claims resolution organizations.

### 6.3    Withdrawal or Deferral of Claims

A claimant can withdraw an Asbestos Unsecured PI Trust Claim at any time upon written notice to the Asbestos PI Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant can also request that the processing of his or her Asbestos Unsecured PI Trust Claim by the Asbestos PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue.  During the period of such deferral, any sequencing adjustment on such claimant's Asbestos Unsecured PI Trust Claim provided for in section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant.  Except for Asbestos Unsecured PI Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos PI Trust's offer is required, or an Asbestos Unsecured PI Trust Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months of the Asbestos Pl Trust's offer of payment or rejection of the claim.   Upon written request and good cause, the Asbestos PI Trust may extend the withdrawal or deferral period for an additional six months.

### 6.4    Filing Requirements and Fees

The Trustees shall have the discretion to determine, with the consent of the Asbestos TAC and the Legal Representative, (a) whether a claimant must have previously filed an asbestos-related personal injury claim in the tort system to be eligible to file an Asbestos Unsecured PI Trust Claim with the Asbestos Pl Trust and (b) whether a filing fee should be required for any Asbestos Unsecured PI Trust Claims.

## SECTION 7
## General Guidelines for Liquidating and Paying Claims

### 7.1    Showing Required

To establish a valid Asbestos Unsecured Pl Trust Claim, a claimant must meet the requirements set forth in this TDP.  The Asbestos Pl Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the claim and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

### 7.2    Costs Considered

Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos Unsecured PI Trust Claims so that the payment of valid Asbestos Unsecured PI Trust Claims is

not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos PI Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Asbestos PI Trust so that valid Asbestos Unsecured PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the Asbestos PI Trust whatever the costs or declining acceptance of medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in section 5.8 above.

### 7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity

Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, the Maximum Available Payment, and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid Asbestos Unsecured PI Trust Claims and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.  Because the Asbestos PI Trust's income and value over time remains uncertain and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Asbestos PI Trust, and the practical limitations imposed by the inability to predict the future with precision.  In the event that the Asbestos PI Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the Asbestos TAC and the Legal Representative, suspend the normal order of payment and may temporarily limit or suspend payments altogether and may offer a Reduced Payment Option as described in section 2.5 above.

### 7.4    Punitive Damages

In determining the value of any claim, punitive damages shall not be considered or allowed, notwithstanding their availability in the tort system.   Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos PI Trust in the tort system pursuant to sections 5.11 above and 7.6 below.  The only damages that may be awarded pursuant to this TDP to Alabama claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law provision.

### 7.5    Sequencing Adjustments

#### 7.5(a)  In General.

Except for an Asbestos Unsecured PI Trust Claim involving Other Asbestos Disease (Disease Level I) and subject to the limitations set forth below, sequencing adjustments shall be

paid on all liquidated Asbestos Unsecured PI Trust Claims with respect to which the claimant has had to wait a year or more for payment after the later of the DII Industries Effective Date or the date the claim was placed in the FIFO Payment Queue; provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, provided further, however, in no event shall sequencing adjustments be paid or accrue on account of any supplemental payment made to a claimant pursuant to section 5.1(c) above. Sequencing adjustments shall begin to accrue one year after the date the claim was placed in the FIFO Payment Queue at the one-year Treasury Bond interest rate in effect on January 1 of the year in which such accrual commences. The rate of the sequencing adjustment shall be adjusted each January 1 to correspond to the one-year Treasury Bond interest rate then in effect. The applicable sequencing adjustment shall be calculated based only on the liquidated value of the claim, subject to the Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in such calculation. Notwithstanding the foregoing, the Asbestos PI Trust shall not be obligated to pay sequencing adjustments on Qualifying Settled Asbestos Unsecured PI Trust Claims.

### 7.5(b)  Unliquidated Asbestos Trust Claims.

Sequencing adjustments shall be payable on the Scheduled Value of any unliquidated Asbestos Unsecured PI Trust Claim that meets the requirements of Disease Levels II-V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. No sequencing adjustment shall be paid on any claim liquidated in the tort system pursuant to section 5.11 above and 7.6 below. Sequencing adjustments on an unliquidated Asbestos Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Sequencing adjustments on all unliquidated claims shall be measured from 30 days after the date of the Notice of Determination – Allowance letter back to the earlier of the date that is one year after the date on which (i) the claim was filed against a Halliburton or Harbison-Walker Entity prior to the DII Industries Petition Date; (ii) the claim was filed against another defendant in the tort system on or after the DII Industries Petition Date but before the Claims Acceptance Date; or (iii) the claim was filed with the Asbestos PI Trust after the Claims Acceptance Date.

### 7.6    Suits in a Judicial Forum

If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history, or the liquidated value of the claim, and if the holder has first submitted the claim to nonbinding arbitration as provided in section 5.10 above, the holder may file a lawsuit against the Asbestos PI Trust in the Claimant's Jurisdiction as defined in section 5.3(b)(2) above or, in the case of the holder of an Indirect Asbestos PI Trust Claim, in a court of competent jurisdiction in the United States. Such lawsuit must be commenced within 180 days after the claimant receives an authorization to commence litigation pursuant to the Alternative Dispute Resolution Procedures. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos PI Trust, all defenses that could have been asserted by a Halliburton Entity or Harbison-Walker Entity) shall be available to both sides at trial; however, the Asbestos PI Trust may waive any defense and/or concede any issue of fact or

law.  If the claimant is an individual who was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim was filed with the Asbestos PI Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

### 7.7     Payment of Judgments for Money Damages

A claimant whose claim was liquidated in a judicial forum pursuant to sections 5.11 and 7.6 above after the DII Industries Effective Date shall receive from the Asbestos PI Trust an initial payment (subject to the Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, and, if any, the Claims Payment Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the greater of (i) the Asbestos PI Trust's last offer to the claimant or (ii) the award that the claimant declined in nonbinding arbitration. Subject to the limitations set forth herein, the claimant shall receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the Payment Percentage, the Maximum Available Payment, and, if any, the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).  In the case of non-Extraordinary Claims involving Disease Levels I, II, and III, the total amounts paid with respect to such claims shall not exceed the relevant Scheduled Value for such Disease Levels as set forth above. In the case of claims involving a nonmalignant asbestos-related disease that does not attain classification under Disease Levels I, II, or III, the amount payable shall not exceed the Scheduled Value for the Disease Level most comparable to the disease proven.  In the case of non-Extraordinary Claims involving severe asbestosis and malignancies (Disease Levels IV-VIII), the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in sections 5.3(b)(3) and 5.3(b)(4).  In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum value for such claims set forth in section 5.4(a) above. Except as provided in section 7.4 above with respect to Asbestos Unsecured PI Trust Claims arising under the Alabama Wrongful Death Statute, neither punitive damages nor interest shall be paid on any judgments obtained in a judicial forum after the DII Industries Petition Date.

### 7.8     Releases

The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the Asbestos PI Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the Asbestos PI Trust.  As a condition to making any payment to a claimant, the Asbestos PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law.  Such release shall include language evidencing the assignment to the applicable Reorganized Debtor of any Direct Action that may be assertable on account of such Asbestos Unsecured PI Trust Claims.  If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

### 7.9     Third-Party Services

Nothing in this TDP shall preclude the Asbestos PI Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos PI Trust so long as

decisions about the categorization and liquidated value of Asbestos Unsecured PI Trust Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

## SECTION 8
## Miscellaneous

### 8.1     Amendments

Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the Asbestos TAC and the Legal Representative pursuant to the Consent Process set forth in sections 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in section 2.5 above and the right to adjust the Payment Percentage is governed by section 4.2 above. Whenever consent of the Asbestos TAC or the Legal Representative is required in these Trust Distribution Procedures, the consent process of Section 5.7(b) and 6.6(b) of the Asbestos PI Trust Agreement apply.

### 8.2     Severability

Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to any of the Harbison-Walker Entities' or the Halliburton Entities' obligations to any insurance company providing insurance coverage to any of the Harbison-Walker Entities or the Halliburton Entities in respect of claims for personal injury based on Company Exposure, the Asbestos PI Trust with the consent of the Asbestos TAC and the Legal Representative may amend this TDP and/or the Asbestos PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of any of the Halliburton Entities or the Harbison-Walker Entities to said insurance company.

### 8.3     Governing Law

Except for purposes of determining the Liquidated Amount of any Asbestos Unsecured PI Trust Claim by the Trust, administration of this TDP shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania. Except for Asbestos PI Trust Claims arising under the Alabama Wrongful Death Statute as provided in section 7.4 above, the law governing the liquidation of Asbestos Unsecured PI Trust Claims in the case of Individual Review, arbitration, or litigation in the tort system shall be the law of the Claimant's Jurisdiction as determined in accordance with section 5.3(b)(2) above.

### 8.4     Confidentiality of Claimant Submissions

All submissions to the Asbestos PI Trust by a holder of an Asbestos PI Trust Claim of a proof of claim form and materials related thereto shall be treated as made in the course of settlement discussions between the holder and the Asbestos PI Trust, and such submissions and

all communications related thereto are intended by the parties to be confidential and to be protected by all applicable state and federal privileges, laws, rules and regulations including but not limited to those directly applicable to settlement discussions, patient confidentiality and the Health Insurance Portability and Accountability Act of 1996.  Absent the claimant's written consent authorizing the release of information to a particular party, the Asbestos PI Trust shall preserve the confidentiality of such claimant submissions and communications, and may disclose the contents thereof only (a) to its claims processing agent to the extent necessary to facilitate the processing of claims pursuant to this TDP; and (b) in response to a valid order issued by the Bankruptcy Court.  The Asbestos PI Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve any privileges in the Bankruptcy Court and on any appeal from the Bankruptcy Court.

Notwithstanding anything in the foregoing to the contrary, with the consent of the Asbestos TAC and the Legal Representative, the Asbestos PI Trust may, in specific limited instances, disclose information, documents, or other materials reasonably necessary in the Asbestos PI Trust`s judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement directly related to the funding of the Asbestos PI Trust; provided, however, that the Asbestos PI Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos PI Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos PI Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party.

# EXHIBIT C

**DII INDUSTRIES, LLC ASBESTOS PI TRUST**

**UNLIQUIDATED ASBESTOS PI TRUST**
**PRO SE CLAIM FORM**

**Part 1: Injured Party Information**

Name: ANGELO PALERMO    Social Security #:

Date of Birth:

1.1    Home Address:

City:                        State:            Zip:

Country (if not U.S.):

Daytime Phone: (        )                Email:

1.2    Is Injured Party living?    ☐ Yes  ☒ No

1.3    If Injured Party is deceased: (Death certificate must be enclosed)

Date of death: 4 / 23 / 1966

1.4    Was death asbestos-related?    ☒ Yes  ☐ No

1.5    If the Injured Party or the Injured Party's estate or heirs has a representative, (the "Official Representative")
provide the following for the Injured Party Representative:

Name: GAIL GARNER (PALERMO)

Address: 983 BROWN ROAD

City: ROCHESTER            State: NEW YORK  Zip: 14622

Country (if not U.S.):

Daytime Phone: (585) 544-8678  Email:

Official Representative's Capacity (*choose one*):

☐ Executor/Administrator/Trustee  ☐ Guardian  ☐ Power of Attorney  ☒ Other: DAUGHTER, HEIR

1.6    State and Country of Injured Party's Current (or Last) Residence: NEW YORK, USA

1.7    Has the Injured Party ever received money for an asbestos related injury or asbestos claim from any of the entities
listed on the attached Exhibit "A"?  ☐ Yes  ☒ No.  If Yes, the Release must be provided to the Trust if available.
If not available, please provide the Trust with the following information, if known, that may assist to locate the
document:

1 of 10

Parties to the Release: _____

Parties Released: _____

Names of Injured Party's Attorney and defense counsel: _____
                                                    _____
                                                    Injured Party's Attorney

                                                    _____
                                                    Defense Attorney

Information on the lawsuit that resulted in the Release: _____  _____
                                                        County              State

                                                        _____  _____
                                                        Court               Cause Number

**Part 2: Diagnosed Asbestos-Related Injuries**

Check the highest level (most serious) asbestos related Disease Level that has been diagnosed for the Injured Party and for which medical documentation is attached to this claim form. See instructions for listing of the specific medical criteria and records that must be enclosed for each Disease Level.

For the Expedited Review process, claims must meet the relevant medical criteria and be supported by appropriate medical documentation as delineated in the Trust Distribution Procedures (TDP). The presumptive medical criteria for the seven Disease Levels that are eligible for Expedited Review are attached to this Claim Form. Note: All foreign claims (other than Canadian claims) and all Disease Level VI claims must undergo Individual Review. In addition, all claims involving Disease Levels I, II, III, IV, V, VII, and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect to undergo Individual Review for purposes of determining whether the claim would be valid and cognizable in the tort system. Finally claims involving Disease Levels IV, V, VI, VII, and VIII may seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing Individual Review. To undergo Individual Review, complete the remainder of this claim form to the extent applicable and then complete Addendum A.

| | | |
|---|---|---|
| ☐ Level I. Other Asbestos Disease (Cash Discount Payment) | Date of Diagnosis ____/____/____ | |
| ☐ Level II. Asbestosis/Pleural Disease | Date of Diagnosis ____/____/____ | |
| ☐ Level III. Asbestosis/Pleural Disease | Date of Diagnosis ____/____/____ | |
| ☐ Level IV. Severe Asbestosis | Date of Diagnosis ____/____/____ | |
| Level V. Other Cancer: | Date of Diagnosis ____/____/____ | |
| ☐ Colo-rectal | | |
| ☐ Laryngeal | | |
| ☐ Esophageal | | |
| ☐ Pharyngeal | | |
| ☐ Stomach | | |
| ☐ Level VI. Lung Cancer 2 | Date of Diagnosis ____/____/____ | |
| ☐ Level VII. Lung Cancer 1 | Date of Diagnosis ____/____/____ | |
| ☒ Level VIII. Mesothelioma | Date of Diagnosis 4/23/66 | |

*Confirmed Oct. 2003*

2 of 10

**Part 3: Occupational Exposure**

Complete this Part to demonstrate the necessary Company Exposure, Significant Occupational Exposure and/or Five Years Cumulative Occupational Exposure as required by the TDP for the Disease Level claimed.  To meet the presumptive exposure requirements for Expedited Review, the claimant must show (i) for all Disease Levels, Company Exposure prior to December 31, 1982; (ii) for Disease Level II, six months Company Exposure prior to December 31, 1982, plus five years cumulative occupational exposure; and (iii) for Disease Levels III, IV, V, and VII, six months Company Exposure prior to December 31, 1982, plus Significant Occupational Exposure.  It is not necessary to provide the Injured Party's complete asbestos exposure history; instead, provide only sufficient information to meet the applicable TDP requirements. Proof of exposure must be enclosed as required by the Instructions.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may elect Individual Review of his or her claim by completing Addendum A to this Claim Form.

Note:  If the Injured Party is claiming secondary exposure through another Occupationally Exposed Person (an "OEP"), then this claim must be submitted for Individual Review and Part 14 of the Addendum must be completed for the Injured Party.  Complete this Part 3 from the perspective of the OEP.

*Please photocopy this page and list separately each company site, industry or occupation upon which Injured Party relies to establish the necessary exposure.*

A.   **HALLIBURTON ENTITY/HARBISON-WALKER ENTITY ASBESTOS EXPOSURE:**

**Complete this subpart A to satisfy the Company Exposure requirement and, if applicable to the Disease Level claimed, to satisfy the Significant Occupational Exposure and Five Years Cumulative Occupational Exposure requirements.  If the Injured Party claims a Disease Level for which Significant Occupational Exposure or Five Years Cumulative Occupational Exposure is required, but the Injured Party's exposure to asbestos for which a Halliburton Entity/Harbison-Walker Entity is legally responsible does not satisfy the applicable requirements, subpart B must also be completed.  This subpart A relates only to Halliburton Entity and Harbison Walker Entity asbestos exposure.  Subpart B below relates to exposure to ANY asbestos.**

3A.1   Name of Halliburton Entity/Harbison-Walker Entity against which claim asserted  *SYMINGTON   A-109*
*(Refer to the attached Exhibit A of Instructions for list of Company Names and insert Code)*

3A.2   Plant/Site of Exposure:  *82434 Dallas (Refer to the attached Exhibit B of Instructions for list of Sites and insert Code)*
*B8436   B4247*

3A.3   If the site is not on the list, insert the name and address of the site of exposure to Halliburton Entity and/or Harbison-Walker Entity asbestos, as well as the name of the asbestos-containing product to which exposed.
*City of ALBANY NAT'L GYPSUM DAVIS FETCH, HUBER CONSTRUCTION,*
*PENETRYN SYSTEM, Ritter PFAUDLER, S.P. VASILE, etc. See Social Security*
*Symington-Gould                                                           RECORDS*

3A.4   Month/Year Exposure to Site/Product Listed Above Began:  *1 , 1937*

Month/Year Exposure to Site/Product Listed Above Ended:  *4 , 1966*

3A.5   Occupation at time of exposure listed above  *C2, C3, C8, C11, C14, C16, C22, C26, C27,*
*(Refer to the attached Exhibit C of Instructions for list of Occupation Codes and insert Code)*  *C32, C37, C38, C43, C45, C49,*
*C51, C62, C72,*
*C73, C74*

If Other, specify the other occupation: _____

3A.6   Industry in which exposure listed above occurred  *D4, D8, D12, D15*
*(Refer to the attached Exhibit D of Instructions for list of Industry Codes and insert Code)*

If Other, specify the other industry: _____

3 of 10

3A.7  Indicate circumstances of exposure to the Halliburton Entity and/or Harbison-Walker Entity asbestos listed above:

[X]  Injured Party handled raw asbestos fibers on a regular basis; or

[ ]  Injured Party fabricated asbestos-containing products such that the Injured Party, in the fabrication   process, was   exposed on a regular basis to raw asbestos fibers; or

[X]  Injured Party altered, repaired or otherwise worked with an asbestos-containing product such that the Injured Party was exposed on a regular basis to raw asbestos fibers; or

[X]  Injured Party was employed in an industry or occupation such that the Injured Party worked on a regular basis in close proximity to workers who did one or more of the above three activities.

*1937-1966 — UNION MASON - CONSTRUCTION - ASBESTOS*

[ ]  Other.  Briefly describe, in the space below, the circumstances of exposure:  *spray - Coated and installed ASBESTOS INSULATION, ACCOUSTICAL TILES, CEILINGS, WALL BOARDS, FURNACES, etc. SEE OUR LETTER -*

B.   ADDITIONAL ASBESTOS EXPOSURE:

**Complete this Subpart B only if (i) the Injured Party is asserting a Disease Level that requires Significant Occupational Exposure (Disease Levels III, IV, V, or VII) or Five Years Cumulative Occupational Exposure (Disease Level II); and (ii) the responses to subpart A above do not satisfy the applicable requirements.  This Subpart B relates to exposure to ANY asbestos OTHER THAN asbestos for which a Halliburton Entity or Harbison-Walker Entity is legally responsible.**

**Provide the following information for each additional job site, where the Injured Party experienced exposure to asbestos, that the Injured Party is relying upon in order to establish the Significant Occupational Exposure or Five Years Cumulative Occupational Exposure requirements in the TDP (Please photocopy and use separate page for each job site):**

| 3B.1  Job Site | City/State | Years of Asbestos Exposure |
|---|---|---|
|  |  |  |

3B.2  Occupation Code at time of exposure: _____ If Other, specify the other occupation _____

3B.3.  Industry Code at time of exposure: _____ If Other, specify the other industry_____

3B.4  Indicate circumstances of asbestos exposure listed above:

[ ]  Injured Party handled raw asbestos fibers on a regular basis; or

[ ]  Injured Party fabricated asbestos-containing products such that the Injured Party, in the fabrication   process, was   exposed on a regular basis to raw asbestos fibers; or

[ ]  Injured Party altered, repaired or otherwise worked with an asbestos-containing product such that the Injured Party was exposed on a regular basis to raw asbestos fibers; or

[ ]  Injured Party was employed in an industry or occupation such that the Injured Party worked on a regular basis in close proximity to workers who did one or more of the above three activities.

[ ]  Other.  Briefly describe, in the space below, the circumstances of exposure: _____

4 of 10

**Part 4: Prior Asbestos Claims (Optional)**  2 *ASBESTOS TRUSTS:*  *Johns-MANVILLE*  *CELOTEX*

The Trust will process claims on a First In, First Out ("FIFO") basis as specified in section 5.1(a) of the TDP. Responses to this Part 4 are optional at this time, but completing this Part 4 may reduce claim processing time.

4.1   Has an asbestos-related lawsuit ever been filed on behalf of the Injured Party? ☐ Yes ☒ No

If Yes, two-letter abbreviation of the state in which the suit was originally filed: ☐ ☐

Name of court in which suit was originally filed: _____

Date on which the suit was originally filed: _____

Was one or more Halliburton Entity or Harbison-Walker Entity a defendant? ☐ Yes ☐ No

What is the current status of this suit?
☐ Pending   ☐ Judgment   ☐ Settled   ☐ Dismissed (Date) ____/____/____

4.2   Has the Injured Party ever submitted a claim against one or more of the Halliburton Entities or Harbison-Walker Entities pursuant to an administrative settlement agreement (an agreement to settle that was reached without filing a lawsuit)? ☐ Yes ☒ No

If Yes, state the date of such submission: ____/____/____.

4.3   Was the Injured Party a party to a tolling agreement (a agreement that extends the date for when you must file your lawsuit) with one or more of the Halliburton Entities or Harbison-Walker Entities? ☐ Yes ☒ No

If Yes, please state the beginning and ending dates of the tolling AND attach a copy of the Tolling Agreement.

____/____/____ Beginning Date   ____/____/____ Ending Date

**Part 5:  Injured Party or Official Representative Signature Page**

I have reviewed the information submitted on this claim form (including Addendum A, if applicable) and all documents submitted in support of this claim. To the best of my knowledge, under penalty of perjury, the information submitted is accurate and complete.

*Gail Garner*                                    GAIL GARNER

Signature of Injured Party or Official Representative           Printed Name

**Part 6 and Part 7:  Intentionally left blank. No information required.**

**Please review your submission to ensure it is complete.**

☒ Death Certificate (If applicable)

☐ Prior Release (if applicable)

☒ Official Capacity Documents (if personal or other Official Representative is filing form)

☒ Medical Records as required by the TDP and as requested in the Instructions

☒ Proof of asbestos exposure as required by the TDP and as requested in the Instructions

☐ Tolling Agreement referred to in Part 4, if applicable
                                                                    5 of 10

DII INDUSTRIES, LLC ASBESTOS PI TRUST
UNLIQUIDATED ASBESTOS PI TRUST PRO SE CLAIM FORM

ADDENDUM A
DII – INDIVIDUALLY REVIEWED CLAIM ("IRC")

*Only complete Addendum A if you are requesting Individual Review.*

The Trust shall liquidate the value of each claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level. The Trust will thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to: (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family, or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including Company Exposure as defined in section 5.7(c) of the TDP prior to December 31, 1982 (for example, alternative causes and the strength of documentation of injuries); (iv) the industry of exposure; and (v) settlements, verdicts, and the claimant's and other law firms' experience in the Claimant's Jurisdiction (as described in Part 12 below) for similarly situated claims.

**Complete only those Parts below that are applicable to the Injured Party.**

**Part 8: Economic Losses**

Each Injured Party will be presumed to have $300,000 in Economic Losses. Complete this Part only if the Injured Party has documented asbestos-related Economic Losses in excess of $300,000. Economic Losses include lost wages, loss of earning capacity, loss of household services, loss of pension and social security benefits and medical expenses directly attributable to the claimed asbestos-related disease. Documentation to support the claimed losses must include evidence from an unrelated party, such as an employer, physician or government agency, of death or a disability directly related to an asbestos-related disease and an analysis and documentation of the resulting Economic Losses.

8.1 Total Economic Losses, in excess of $300,000, claimed: $ _EXCEEDS_ (attach supporting documentation.) _NOT SURE - THE EXACT AMOUNT_
_ONLY 5½ years ⁴ᵗ⁴⁴ years OF LOST INCOME, plus_

**Part 9: Dependants**
_How was the figure of $300,000 determined ?_

List any dependents that derive at least one-half of their financial support from the Injured Party or any beneficiaries who are entitled to pursue an action for wrongful death under applicable law:

Name _JOSEPHINE PALERMO_ Date of Birth _3, 15, 15_

Relationship to Injured Party _WIFE_

Name _MARLENE FARGO_ Date of Birth _3, 24, 38_

Relationship to Injured Party _DAUGHTER_

Name _BALL GARNER_ Date of Birth _9, 30, 46_

Relationship to Injured Party _DAUGHTER_
*(If more than three, please photocopy this section and insert after current page)*

6 of 10

**Part 10: Other Damages**

If the Injured Party claims to have suffered "Other Damages," provide a written explanation, not to exceed three (3) pages in length, explaining the amount of claimed monetary damages, and the basis for those damages. Documentation related to the claimed damages, if any, should be attached. Other Damages include disruption of household, family or recreational activities, as well as pain and suffering. *DOCUMENTED*

**Part 11: Smoking History**

*NOTE: This information will only be considered, for claims involving Disease Level VII, Lung Cancer 1 or Disease Level VI, Lung Cancer 2.*

11.1   At the time this claim is filed, the Injured Party (*choose one*):

☐ Never Smoked Cigarettes   ☐ Currently Smokes Cigarettes   ☒ Formerly Smoked Cigarettes

If **Currently Smokes** or **Formerly Smoked** is checked, the following <u>must</u> be provided:

How many years? *20*   Average number of packs a day? *1/2*   Date last smoked? _____/_____
*(Indicate fractional packs as appropriate, e.g., three and one-half packs would be entered as 3.5)*

11.2   At the time this claim is filed, the Injured Party (*choose one*):

☒ Never Smoked Cigars   ☐ Currently Smokes Cigars   ☐ Formerly Smoked Cigars

If **Currently Smokes** or **Formerly Smoked** is checked, the following <u>must</u> be provided:

How many years? _____   Average number smoked per day? _____   Date last smoked? _____/_____

**Part 12: Extraordinary Claims**

**For the definition of what constitutes an Extraordinary Claim refer to Section 5.4(a)(1) of the TDP or to the Instructions. The Injured Party can meet the requirements for an Extraordinary Claim by completing *either* Part 12.1 or 12.2.**

12.1   Did the Injured Party's exposure occur primarily as the result of working at a manufacturing facility of one or more of the Halliburton Entities or Harbison-Walker Entities during the period the entities were engaged in manufacturing asbestos-containing materials ("ACM")?  ☐ Yes   ☐ No

If Yes, Social Security records or other independent 3rd party evidence substantiating the Injured Party's employment at one or more of the sites is required.

                                    *OR*

12.2   Was at least 75% of his/her total asbestos exposure from Company Exposure?   ☐ Yes   ☐ No

If Yes, Social Security records or other independent 3rd party evidence substantiating the Injured Party's percentage of Company Exposure is required, and the Injured Party or Official Representative must complete the following certification.

*WE ARE ASSERTING AN EXTRAORDINARY CLAIM ~*
*PLEASE REVIEW THE SOCIAL SECURITY*
*records and our letter of claim.*
*RE: white v Johns-Manville* 7 of 10 *Ref. 103 Wh. 2d 344, 693 P. 2d 687*

### DII INDUSTRIES, LLC ASBESTOS PI TRUST
### EXPOSURE PERCENTAGE CERTIFICATION

I, *GAIL GARNER*, certify under penalty of perjury that (i) at least 75% of the Injured Party's total asbestos exposure over the Injured Party's lifetime was to asbestos-containing products for which one or more of the entities listed immediately below is legally responsible, and (ii) that the true and correct percentage of the Injured Party's exposure to asbestos-containing products for which the entity is legally responsible is indicated immediately to the right of the entity's name.

- Mid-Valley, Inc. _____%;
- DII Industries, LLC (f/k/a Dresser Industries, Inc.) _____%;
- Kellogg, Brown & Root, Inc. _____%;
- KBR Technical Services, Inc. _____%;
- Kellogg Brown & Root Engineering Corporation_____%;
- Kellogg Brown & Root International, Inc., a Delaware corporation_____%;
- Kellogg Brown & Root International, Inc., a Panamanian corporation_____%;
- BPM Minerals, LLC_____%;
- Halliburton Company_____%;
- Harbison-Walker Refractories Company_____%;
- Harbison-Walker Refractories Europe, Ltd. _____%;
- Indresco International Ltd. _____%; or
- Indresco Jeffrey Industria e Commercio Ltda._____%
- Other _____ _____%
  *Insert Code (see Exhibit "A")*

*SEE Social Security RECORDS - 1937-1966 WORKED DIRECTLY FOR Companies listed on EXHIBIT B*

*Inverse EXPOSURE*

I further certify under penalty of perjury that it is my belief there is little likelihood that the Injured Party can receive substantial recovery for his/her asbestos bodily injuries from any source other than the DII Industries, LLC Asbestos PI Trust.

Executed under penalty of perjury this 4th day of *April*, 20 *06*.

Signature: *Gail Garner*

Printed Name: *GAIL GARNER*

Date: *4/4/06*

8 of 10

**Part 13: Claimant's Jurisdiction**

In liquidating the value of a claim under Individual Review, the Trust will take into consideration, among other things, settlements, verdicts, and the claimant's and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims. For these purposes, the Claimant's Jurisdiction is the jurisdiction in which the claim was filed (if at all) against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system prior to December 16, 2003. If the claim was not filed against one or more of the Halliburton Entities or the Harbison-Walker Entities in the tort system prior to December 16, 2003, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resided at the time of diagnosis or when the claim was filed with the Trust or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which any of the Halliburton Entities or Harbison-Walker Entities has legal responsibility.

13.1   Did the claimant file a lawsuit against one or more Halliburton Entity or Harbison-Walker Entity prior to December 16, 2003?

☐ Yes  ☒ No

If Yes, provide:
Name of court in which suit was originally filed: _____
Date on which the suit was originally filed: _____

If No, provide the following information:
The county, state and country in which the claimant resided at the time of diagnosis: _____

The county, state and country in which the claimant resided when this claim is filed with the Trust: _____

The county(ies), state(s) and country(ies) in which the claimant experienced exposure to an asbestos-containing product, or to conduct related to an asbestos-containing product, for which one or more of the Halliburton Entities or Harbison-Walker Entities has legal responsibility: _____

Of the three responses provided immediately above, indicate the county, state and country that the claimant elects as the Claimant's Jurisdiction: _____

**Part 14: Exposure to an Occupationally Exposed Person**

14.1   Is the Injured Party alleging an asbestos-related disease resulting in whole or in part from another person's occupational exposure ("OEP"), such as a family member (spouse, father, sister, etc.?) Yes ☒ No

If Yes, Part 3 above must also be completed for each occupationally exposed person.

Name of OEP _____

Social Security Number of OEP _____/_____/_____

Month/Year Exposure to OEP began: ____/____
Month/Year Exposure to OEP ended: ____/____

Describe the Injured Party's contact with the OEP and how the Injured Party was exposed to the Halliburton Entity or Harbison Walker Entity asbestos product through the OEP: _____

Reminder: Part 3 must be completed for the occupationally exposed person.

**Part 15: Claims Failing to Meet Presumptive Medical/Exposure Criteria**

Claims involving Disease Levels I, II, III, IV, V, VII, and VIII that do not meet the presumptive Medical/Exposure criteria as required by the TDP for the relevant Disease Level may undergo Individual Review. If the claim does not meet the presumptive Medical/Exposure Criteria, then provide a written explanation, not to exceed three (3) pages in length, explaining why the claim would be cognizable and valid under the law of the Claimant's Jurisdiction elected above in Part 13. If applicable and available, relevant legal citations must be provided.

**Part 16: Claims Exceeding Presumptive Medical/Exposure Criteria**

For purposes of Expedited Review, Part 3 of this Claim Form requested only the minimum exposure information for the Disease Level being claimed. For purposes of Individual Review, however, the Trust will take into consideration the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question. If the Injured Party's Company Exposure exceeded the presumptive exposure requirements listed under Part 3 above (and contained in section 5.7(b)(1) of the TDP), and the Injured Party's total Company Exposure is not already reflected in the responses to Part 3, please state when the Injured Party's Company Exposure, prior to December 31, 1982, began and ended in the space below.

16.1    Month/Year Company Exposure Began: _____/_____
        Month/Year Company Exposure Ended: _____/_____

**Part 17: Halliburton Entity/Harbison-Walker Entity Employees**

17.1    Did the Injured Party experience the asbestos exposure that is the basis for this claim during a period of time when the Injured Party was an employee of one of the Halliburton Entities or Harbison-Walker Entities?

⊓ Yes  ⊓ No

If Yes, provide a written explanation, not to exceed three (3) pages in length, explaining why the claim would not be barred or disallowed under the applicable Workers' Compensation Program.

10 of 10



ANGELO PALERMO
CLAIM PACKAGE

# CONTENTS

- PRO SE CLAIM FORM
- DETAILED LETTER
- SWORN AFFIDAVIT AUTHORIZED REPRESENTATIVE
- SWORN AFFIDAVIT OF INJURED PARTY EXPOSURE
- DEATH CERTIFICATE
- SOCIAL SECURITY RECORDS
- INCOME TAX RETURNS FOR 1949, 1951, 1963
- SOCIAL SECURITY RECORDS SUMMARY
- NEW YORK STATE SWORN AFFIDAVIT
- NEW YORK STATE DOCTOR LICENSE INFORMATION
- DR. WILLIAM S. BECKETT EVALUATION
- ROCHESTER GENERAL HOSPITAL RECORD REQUEST
- FUNERAL BILL
- MASON UNION DOCUMENT
- DESCRIPTION OF PERITONEAL MESOTHELIOMA
- DOCUMENT ABOUT MESOTHELIOMA TREATMENT
- ASBESTOS HIGH RISK JOB SITES
- COPY OF POST CARD AND SOCIAL SECURITY RECORD
- JOHNS-MANVILLE AD 1919
- LOCAL COMPANY'S AD 1965
- HANDBOOK OF ASBESTOS TEXTILES
- TIMELINE OF ASBESTOS HISTORY
- COMPANY DOCUMENTS
- BANKRUPTCY CODE MODELED AFTER JOHNS-MANVILLE
- PERSONAL POST CARDS AND LETTERS
- CLAIM SETTLEMENTS
- PICTURES

# Falvo Funeral Home

### 1395 GOODMAN STREET, NORTH
### ROCHESTER 9, NEW YORK

*Richard Falvo*                                                         *Arthur Falvo*

#### HOPKINS 7-2200

May, 1966

## Funeral of Angelo Palermo

| | |
|---|---:|
| Metal Casket | $425.00 |
| Metal Vault | 210.00 |
| Embalming | 50.00 |
| Professional Service | 185.00 |
| Underclothing | 3.75 |
| Acknowledgement Cards, and Sundaries | 20.00 |
| | $893.75 |

### Cash Expenditures:

| | | |
|---|---:|---:|
| Flowers to the cemetery | $ 12.00 | |
| Newspaper Notices | 15.00 | |
| Annunciation Church | 20.00 | |
| Hearse Service | 50.00 | |
| Duplicate Death Certificates 2 @ $1 | 2.00 | |
| Escort Service | 15.00 | |
| | | 114.00 |

### Holy Sepulchre Cemetery:

| | | |
|---|---:|---:|
| ¼ of Six grave lot | $375.00 | |
| Opening and closing the grave | 50.00 | |
| Lowering device | 5.00 | |
| Setting vault by the cemetery | 15.00 | |
| | | 445.00 |
| | | $1452.75 |
| | | 130.00 |
| | | 1322.75 |
| | | |
| Paid by cash 4/26/66 | | |
| | | |
| Balance of funeral for Gaetana Romano | | |
| and Rosene Palermo | | 195.00 |
| Total Balance | | $1517.75 |

*[signature]*
5/26/66
*Arthur N. Falvo*



April 4, 2006

983 Brown Road
Rochester, NY 14622
(716) 544-8678

DII Industries, LLC Asbestos PI Trust
P.O. Box 1319
Greenville, TX 75403-1319

## THE ESTATE OF ANGELO PALERMO
## V DII INDUSTRIES, LLC
## ASBESTOS PI TRUST

INJURED PARTY: ANGELO PALERMO

Dear Claims Representative:

**ASBESTOS INJURY CLAIM**

I am filing an asbestos personal injury claim against DII Industries, LLC Asbestos PI Trust for my deceased father, Angelo Palermo. I am the personal representative pro se for his estate on behalf of my mother Josephine Palermo, my sister Marlene Palermo Fargo and myself Gail Palermo Garner.

This letter will provide information relevant to the widespread dangers of asbestos; the tortuous acts of the asbestos industry; and my father's early death, at age 51 of mesothelioma, after working 29 years in the asbestos spray coating-insulation-union mason-construction field.

Angelo Palermo's intense asbestos exposure and the asbestos industries lack of warning and no protection caused his extensive pain; suffering; and death. He left a wife and 3 children without mental, emotional, physical and financial support.

This case is not your normal day-to-day routine claim per your procedures. I know this because I have completed two other United States Bankruptcy Court Asbestos Trust claims and the claims processing administration departments did not know what to do with our claim, as they were not accustomed to exception processing. Our claims eventually went before two Extraordinary Claim Panels and we were awarded a favorable outcome of 'Extraordinary Mesothelioma' for both, at record high settlements.

1



Angelo Palermo

## Exception Processing

Without pathology reports and no x-rays, I am requesting the same Claim Resolution Procedure (CRP) from the DLL Industries, Inc. Asbestos PI Trust per the following:

*Failure to Meet Criteria for a Scheduled Disease. There are no criteria that could fairly include or compensate all meritorious claims involving asbestos-related diseases. A claimant's right to assert a valid claim for the liquidated value of an asbestos-related disease is not prejudiced by failure to meet the Categorization Criteria for a Scheduled Disease and, despite such failure, the Trust should provide compensation if the Trust determines that the claimant has suffered injury or damages from exposure to asbestos containing products....... ...*

*...The Trust may determine that although a particular requirement in the Criteria for a Scheduled Disease Category has not been met, in an exceptional claim other factors and evidence satisfy the objective of that requirement and, therefore, the claim should be considered to be within the Scheduled Disease Category.*

## This IS The Story Of Asbestos

Angelo Palermo worked at the time (1937-1966) when asbestos was the best thing going. You couldn't beat it for insulation and it made a lot of people rich. The unfortunate part, it made a lot of people dead and a lot of people sick with heartbreak, of whom three are represented in this claim. The greed, lies, cover-ups and tortuous acts of the asbestos industry destroyed lives.

As quoted by the Federal Judicial Conference Ad Hoc Committee on Asbestos Litigation in September of 1990:

*"It is a tale of danger known in the 1930's, exposure inflicted upon millions of Americans in the 1940's and 1950's, injuries that began to take their toll in the 1960's, and a flood of lawsuits beginning in the 1970's. Between 13 and 21 million workers have been exposed to asbestos in the workplace over the past 40 or 50 years, but the most severe instances of such exposure probably occurred three or four decades ago".*

## Cause of Death

The death of Angelo Palermo was caused by asbestos contracted in the course of employment by the companies you represent, and their negligence in providing improper working conditions. Angelo Palermo was a hard worker in the insulation industry, who supported a family during the timeframe of an asbestos boom, with a payback of death at 51 year's old. He was not warned of the dangers of inhaling asbestos contaminated dust that causes incurable disease, and he was not told that exposure guidelines existed, and he did not have any protective wear or laundry facilities for washing work clothes.

2

Angelo Palermo

## PROOF OF CLAIM

Our claim shows evidence of exposure to Harbison-Walker and Non-Harbison-Walker entities asbestos worksites and products as an employee.

Our claim includes a death certificate; a sworn affidavit from the New York State Department of Labor by the decedent, Angelo Palermo; affidavit of exposure by claimant; history and facts of asbestos; medical evidence documented by the legal and medical community, Federal Rule 702, Testimony by experts; court decisions; social security records; and the extraordinary verdict awards that confirms a diagnosis of the asbestos disease of mesothelioma and the credible link between that disease and my father's exposure to the companies asbestos worksites and products you represent.

## ASBESTOS FACTS

A known fact that after years of denying any link between illness and asbestos conclusions were made:

Dr. John Dement, an expert in industrial hygiene, testified:  It is a known fact by the 1920's, and well established in the 1930's, that asbestos exposure caused disease.

Published literature from 1913 to 1960 demonstrated that makers and sellers of asbestos products knew or clearly should have known that inhaling asbestos contaminated dust could cause incurable disease.

In 1955, a major human epidemiologist study concluded that asbestos inhalation caused lung cancer in humans, confirming reports from 1940 and earlier.

Construction trades had a 27.4% rate of asbestos prevalence.

IN 1964, Dr. Selikoff found that asbestos workers died from mesothelioma, lung cancer, gastrointestinal cancer and asbestosis at a rate far above the national average for non-asbestos workers.

The risk of developing a mesothelioma is related to how much asbestos a person was exposed to and how long this exposure lasted.  People exposed at an early age, for a long period of time, and/or at high levels are most likely to develop this cancer.

Asbestos-containing products were used extensively in the construction of schools and other public buildings, until the 1970's.

In the late 1970's, the U.S. Consumer Product Safety Commission banned the use of asbestos in wallboard patching compounds.

These and other regulatory actions, coupled with widespread public concern about the hazards of asbestos, have resulted in a significant annual decline in U.S. use of asbestos.

3

Angelo Palermo

## ANGELO PALERMO'S WORK EXPERIENCE

### Asbestos Jobs

For 29 years (1937-1966), Angelo Palermo worked as an asbestos installer and spray coater, mason, bricklayer and carpenter.  He did some electrical and plumbing.

Angelo Palermo was an employee of Johns-Manville, Symington Gould, City of Albany, National Gypsum, Davis Fetch, Huber Construction, Penetryn System, Ritter Pfaudler, S. P. Vasile and many other employers who produced or used your asbestos products.

I wish to use Angelo Palermo's Social Security Records as evidence of asbestos exposure to your company's asbestos products.

A listing is included showing 48 job sites from Mr. Palermo's social security records, although it was many more because there were blanks where the company name should have been shown.

All jobs were related as large union job sites, performed under specific employers or contractors (i.e. corporations, factories, mills, schools, hospitals, government and military facilities including ships, Quonset huts, bridges, pipelines, buildings, etc.).

He worked on school asbestos insulation in Albany, Glen Falls, Utica, Buffalo, etc.

A copy of a post card (September 20, 1950) from the State College For Teachers in Albany, NY, shows the same date on the social security records with no name next to it.  The Asbestos Industry, New York – Job Sites lists New Dorm-Albany State Teachers as a high asbestos exposure location, in addition, to other high-risk locations.

### Asbestos Exposure

He worked for 29 years with insulation, soundproofing, asbestos acoustical tiles, flooring, drywall products, cements, textures and other asbestos containing construction materials.

These asbestos products became friable (released in the air) when he installed, cut, mixed, sprayed, handled, repaired, tore out, or otherwise disturbed in construction, maintenance, or repair.

The most direct contacts he had with asbestos was spray coating asbestos and school asbestos insulation.  At times, my mother visited my father at his job sites where he was coated with asbestos all over himself from head to toe.

No special equipment was issued to him.  He was not protected or told of the dangers of asbestos.

Using the guidelines of Calculation of Exposure, Angelo Palermo's exposure to asbestos was very long and intense during the years 1937-1966 (including wartime).  The calculations shall be based on the following:

4

Angelo Palermo

- Each year that an exposed person's primary occupation, during a substantial portion of a normal work year for that occupation, involved working in areas immediately proximate to where asbestos-containing products were being installed, repaired, or removed under circumstances that involved regular airborne emissions of visible asbestos dust, shall count as 1 year.

- Each year that an exposed person's primary occupation, during a substantial portion of a normal work year for that occupation, involved the direct installation, repair, or removal of asbestos-containing products, shall count as 2 years.

- Each year that an exposed person's primary occupation, during a substantial portion of a normal work year for that occupation, involved the direct manufacture of asbestos-containing products using raw asbestos fiber, or the direct installation, repair, or removal of asbestos-containing products in a shipyard during World War II, shall count as 4 years.

- Except as provided above, for purposes of calculating years of exposure under this subsection—

  o Each year of exposure before 1976 shall be counted fully;

  o Each year of exposure from 1976 through 1979 shall be counted ½; and

  o Exposures after 1979 shall not be counted.

## MESOTHELIOMA FACTS

Mesothelioma was recognized as a tumor of the pleura, peritoneum and pericardium in the late 1700's. However it was not until much later, in 1960, that this particular type of tumor was described in more detail and even more importantly, its association with asbestos exposure was recognized.

It is a rare disease and many hospitals and physicians do not make the appropriate diagnosis. The tumors may be confused with those of metastasis cancer, etc.

Malignant mesothelioma is virtually always the result of asbestos exposure, even if the exposure was of short duration.

## ANGELO PALERMO'S PHYSICAL CONDITION

Strong active healthy man.

Became thin and frail

Started coughing continuously with shortness of breathes and had severe pains in his chest and stomach.

His fingers were clubbing. Please review the pictures of Angelo Palermo's digital clubbing (indicative of impaired blood oxygenation resulting from advanced lung scarring) and enlarged stomach.

5

Treated for pneumonia, hernia, and stomach trouble thought to be a cold.

## Medical History

Attached is an affidavit from the New York State Department of Labor dated 3/17/66 initiated by the State of New York and dictated to a state interviewer and sworn to be true, by Angelo Palermo, 6 weeks prior to his death of 4/23/66. (1949 U.S. Federal Income Tax return with his signature is also included.)  He stated he went into the hospital on 1/14/66 through 1/21/66 to be treated for pneumonia. Also stated he had stomach trouble as a result of a cold.  He mentioned a hernia he had for 3 years.  At that time, hospital records were available for confirmation. Under penalty of law he stated: "he understood there are serious penalties for willful false statements to collect benefits."  This document confirms that no early diagnosis was made.  There was a lack of medical knowledge.

Angelo Palermo was admitted to the hospital several times which reconfirms that there was no early diagnosis of cancer.  In April 1966, unnecessary surgery was performed in which he was opened and closed.  The doctors said it was cancer and it had spread all over, as his death certificate states.    They couldn't do anything for him.  A couple of days later he died.  The hospital records were destroyed after 10 years.

## Attending Doctor

The attending doctor, Dr. Magdi S. Kodsi, M.D, as listed and signed the death certificate, attended Angelo from 4/12/66 to 4/23/66 (at the time of his death).

I called Albany for information about the credentials of Dr. Kodsi and I was told that Dr. Magdi Saleh Kodsi (not Magda, as typed on the death certificate) was a resident until he received a license (License No: 100314) on November 8, 1967, one and a half (1 ½) years after treating Angelo Palermo.  He practiced in Pennsylvania as a plastic surgeon.  Information confirmed by a member of the doctor's family (phone number from Internet).  Claimant was advised that doctor had died last year.

This information confirms an inexperienced resident doctor in an unrelated medical field diagnosed the death of Angelo Palermo.

## Death Certificate

The immediate cause of death: acute liver failure due to metastasis cancer due to primary stomach (place of origin).    The dictionary explains: "metastasis" *Me.tas.ta.sis* the transfer as of malignant cells, from one part of the body to another, as through the bloodstream; "stomach" *Stom.ach* (abdomen).

The full details of the death certificate states:  the decedent's name-Angelo Palermo; date of death- April 23, 1966 (no early diagnosis, 1960's timeframe when mesothelioma was a newly described tumor); race-white (rare for stomach cancer); date of birth (51 years old, rare for stomach cancer); birthplace-NY (rare for stomach cancer); occupation and business or industry–construction (conducive

6

Angelo Palermo

to mesothelioma); cause of death–Acute liver failure–due to: Metastatic Ca–due to: Primary stomach (conducive to peritoneal mesothelioma); doctor attended (11 days without a diagnosis); and doctor (inexperienced resident without a license).

**Medical Comparison Chart**

| STOMACH CANCER | MESOTHELIOMA | ANGELO PALERMO |
|---|---|---|
| | Identified in 1960's. | Died in April 1966 |
| Stomach cancer is very rare in the United States of America (about 3% of new cancers yearly and continues to decrease). | It is hard to diagnose mesothelioma by looking at the cells from the fluid around the lungs, abdomen or heart and even hard to diagnose with tissue from biopsies under the microscope. About 75% of mesotheliomas start in the chest cavity; 10%-20% begin in the abdomen. Although recently the ratio of pleural to peritoneal disease in asbestos exposed population has been in the order of 12:1 but it is slowly increasing (longer, heavier exposure to asbestos and better diagnosis).<br><br>Since pleural mesothelioma occurs most frequently and studied the most, it is the only mesothelioma for which a staging classification exists. By the time the symptoms appear and cancer is diagnosed, the disease is often advanced. Early detection has virtually no medical benefit. Invariably results in death. | Resident doctor diagnosed; received a license 1½ year's after the death of Angelo; practiced as a plastic surgeon. |
| Stomach cancer is a common cancer in the third World Countries due to lack of refrigeration, preservatives, unsanitary conditions and/or family history of stomach cancer. Helicobacter pylori (H. pylori) infection of the stomach increases the risk of stomach cancer. It is a bacterium that infects the lining of the stomach and causes chronic inflammation and ulcers. | It may result from coughing up and swallowing inhaled asbestos fibers, and the prognosis is poorer than pleural mesothelioma.<br><br>People exposed at an early age, for a long period of time, and at higher levels are most likely to develop this cancer. Main risk factors: exposure to asbestos in occupational jobs (construction workers installing insulation.) | 29 years (1937-1966) as a Union Mason in the construction industry, spray coating and installing insulation, cement and other asbestos products. Prolonged excessive exposure to asbestos. Occupation most at risk of mesothelioma.<br><br>No history of stomach cancer or chronic inflammation or ulcers. |

7



Angelo Palermo

| Stomach Cancer, continued | Peritoneal Mesothelioma, continued | Angelo Palermo continued |
|---|---|---|
| Stomach cancers are classified according to the type of tissue where they originate. The types of stomach cancer are adenocarcinoma, lymphomas, and sarcomas. | No early symptoms (usually only 2 to 3 months before they are diagnosed) people often ignore them or mistake them for common, minor ailments.<br><br>Peritoneal mesothelioma involves the abdominal cavity, infiltrating the liver, spleen or the bowel. Includes a hernia, digital clubbing, enlarged stomach, coughing up blood, excessive pain and suffering and leads to death. In two thirds of patients the disease remains confined in the abdomen. | Affidavit from New York State Department of Labor, 6 weeks prior to his death: treated for pneumonia, hernia, stomach trouble thought to be a cold. Death certificate: Acute liver failure, metastasis cancer, 'primary stomach.' The doctor did not classify it as stomach cancer, just 'primary, where the cancer originated. |
| Common in Orientals, Blacks and Hispanics. Rare in Whites. | Common in White Americans | White Italian American |
| Average diagnosis age: 60 to 70 years | Average diagnosis age: 50-70 years | Died at 51 years old |
| Symptoms: Stomach Cancer<br>• Indigestion that does not go away<br>• Loss of appetite<br>• Loss of weight<br>• Bloated feeling after eating<br>• Nausea<br>• Vomiting<br>• Heartburn<br>• Blood in the stools or black stools<br>• Epigastric (mid abdomen) pain or discomfort.<br>• Advanced stomach cancer can be treated and symptoms can be relieved. | Symptoms: Peritoneal Mesothelioma<br>• Starts from a single lung cell<br>• Fluid in the abdominal cavity or a mass in the abdomen<br>• infiltrating the liver, spleen or the bowel<br>• Includes a hernia<br>• Digital clubbing<br>• Enlarged stomach<br>• Coughing up blood<br>• Excessive pain and suffering<br>• Leads to death | Angelo Palermo<br>• Death certificate: Acute liver failure, metastasis cancer, 'primary stomach (place where cancer originated)<br>• Pictures of digital clubbing and enlarged stomach<br>• NY State Unemployment affidavit: treated for pneumonia, hernia, stomach trouble thought to be a cold<br>• Excessive pain/suffering<br>• Coughed continuously, gushed up blood and went for surgery and died |

**Angelo Palermo's Medical Summary**

Angelo Palermo worked 29 years (1937-1966) as a union mason in the construction industry, spray coating and installing insulation, cement and other asbestos products. Occupation most at risk of mesothelioma, during a time of excessive asbestos exposure with no government regulations or protective equipment. Angelo Palermo went for medical treatment. He was examined many times at the doctor's office and the hospital. There was a lack of medical knowledge. Angelo experienced excessive pain and suffering, coughed

8

Angelo Palermo

continuously, gushed up blood and went for unnecessary surgery and then died. He had no history of stomach cancer or chronic inflammation or ulcers. No medical testing was done except for the unnecessary surgery and the death certificate. Malignant peritoneal mesothelioma is a rare disease and many hospitals and physicians do not make the appropriate diagnosis, let alone an inexperienced doctor in an unrelated medical field. The death certificate states: acute liver failure due to metastasis cancer due to primary stomach (where the cancer originated). Stomach cancer is rare and Angelo Palermo did not fit the description and stomach cancer has classifications but none are noted on the death certificate. The mesothelioma tumors may be confused with those of metastasis cancer, etc. Per all the documentation, Angelo Palermo experienced all the symptoms of peritoneal mesothelioma, in addition to, being confirmed 'mesothelioma' by asbestos experts.

## LOCAL ASBESTOS EXPERT

Dr. William Beckett, MD, MPH (Master of Public Health) Professor, Department of Environmental Medicine (Occupational Medicine Program) Medical Director, Finger Lakes Occupational Health Services, Member of the New York State Occupational health Network; a University of Rochester Medical Center Program reviewed Angelo Palermo's medical and work record.

### Expert Opinion of Dr. William Beckett

*"It is true that workers who have been heavily exposed to asbestos develop malignant mesothelioma, which can originate in the peritoneum or the pleura. Peritoneal mesothelioma is a difficult diagnosis to distinguish from carcinoma metastatic to the abdominal cavity or primary to the stomach, and it seems quite possible that the patient's fatal malignancy could have been a diffuse malignant mesothelioma of the peritoneum rather than the stomach."*

*"There is certainly a suggestion in the photograph that he had digital clubbing, but I cannot make out from the photograph (black& white) whether this was present or not. This is a relevant issue because patients with malignant mesothelioma can develop digital clubbing".*

### Insurance Language

The fundamental principle of insurance policy language guiding judicial interpretation of language is that words must be construed in their ordinary and popular sense.... (Civ. Code, §1644; *AIU Ins. Co. v. Superior Court*, supra, 51 Cal. 3d at pp. 821-822). The plain and ordinary meaning of "expect," as reflected in dictionary definitions, is to anticipate, to consider probable or certain. N28 Hence, in *Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal. App 4th 715 [15 Cal. Rptr. 2d 815]*, this court concluded that "expected" as used in the language of insurance policies, means anticipation with a high degree of probability, no matter whether the degree of that probability is expressed as "substantially certain, practically certain, highly likely, or highly probable." (Id. At p. 746.)

9

Angelo Palermo

## FAMILY LIFE

Included in this claim are personal cards and letters to show you Angelo Palermo and his thoughts and feelings about love of his family and friends, home, responsibilities, money, and job at the many times he was apart from us doing asbestos insulation/spray coating jobs.

During our years together, we were happy in a nice family home we owned. We always had a nice car we drove. We paid our bills. We were healthy, we had lots of friends and we had lots of fun. We were living the American dream 'a happy life'.

Angelo Palermo was a devoted husband and father and then Mrs. Josephine Palermo, my mother, became the head of the household with all the responsibilities of keeping the family together, finances, housework, yard work, home improvement and child rearing.

## Tragedy Hits Home

There were four (4) children all together.  Daughter Rosene, at age 12, drowned (June 1962, less than 4 years prior to Angelo's death).   That same day, my grandmother (Josephine's mother), died hearing about Rosene's death.  We were devastated by both their deaths.  My father was sick with pain, thin, frail, depressed and then robbed of his life.  We needed my father's support and then we had to cope with his death.  It is hard to explain what we were going through.

## Life After Angelo Palermo

Most claims you review do not have the ability of hind side.  We know the happy secure life we had with my father, and we know what it was like without him.

Although there were a lot of happy times with my father, we then have this image of seeing him hunched over in a chair, with his swollen clubbed fingers laying against his brow, in excessive pain and suffering, and doctors saying it was a flu or his hernia or other non-life threatening conditions.  But then we experienced his death.

No husband to love, no father to walk down the aisle, no grandfather to dote over the kids.  These are memories no one can take away from us.

## Son Christopher

My brother, Christopher, was mentally disturbed about my father's death. He started to impersonate my father. He was admitted from time-to-time to the Rochester General Hospital mental facilities. Chris was married and divorced two times without children. Chris died in 1999 of heart failure.

Angelo Palermo

### Daughter Marlene

Prior to Angelo Palermo's death, he remodeled our basement and made a bridal shop. Marlene had a business of selling wedding gowns. After he died, Marlene took on the responsibilities of the house and the bills because my mother was on high doses on medicine because she was not mentally or physically able to cope. Marlene married at age 46 and is now divorced.

### Daughter Gail

I dropped out of college and worked full time because my mother could not afford the tuition and the family needed the added financial help. I retired after working 29 years for Xerox Corporation. There were many lost opportunities without a college degree. I am married for the second time and I have 3 children and three grandchildren.

### Apartment Living

After my sister and I moved out, my mother and brother lived in an apartment. They couldn't take care of the financial and maintenance responsibilities of the house. After my brother past away, my mother lived in the apartment alone until she moved in with my sister, over a year ago, because of health and financial reasons.

### Our Loss

We all (Angelo, wife Josephine, children, family and friends) endured much mental anguish, pain and suffering during his illness and death. My father was an active, hard working, good family man. He did everything around the house and gave moral, emotional, and financial support. He provided social activities and vacations. He kept the family together. He loved us and made us laugh.

It was and still is difficult to endure. My father had a lot to live for. My mother lost out on a long happy loving marriage. He missed out on seeing his children grow up and having families of their own. He never saw his three (3) grandchildren and his three (3) great-grandchildren and they missed out on him.

My father and our family lost out on a long happy life together. Instead endured excruciating pain and suffering, loss of consortium, no future earning potential and funeral expenses because of this wrongful death claim.

### FAMILY FINANCES

### Working Years

You may say his income was small from his social security records but not during the timeframe we are discussing (cost of living 1937-1966 versus today). It was a lot during that time, especially working out of town spray coating asbestos. He worked at large union job sites during war-time.

11

Angelo Palermo

As stated:  *"It cost 25 cents per square foot to install asbestos in the 1960's and $25-$50 per square foot to remove asbestos in the 1990's".*

Being a young man, my father had at least 14 years of earning potential.  He had dreams and goals that could not be fulfilled.

Because of his illness, Angelo was having a difficult time receiving unemployment benefits (see the affidavit from NYS Labor Department). He did not receive disability benefits.   Angelo did not have any medical insurance. All bills were paid out of pocket.

## Death Benefits

Angelo was a member of the mason's union for all those years and because of his illness and financial reasons, we could not pay his yearly dues and the union dropped him.  We were unable to collect union death benefits.  We did not have any life insurance policy.

We had no money, we had no future earning potential, and we had funeral expenses because of this wrongful death claim.

There went the car, there went the house, and there went the life we were accustomed to.

## JOHNS-MANVILLE AND CELOTEX EXTRAORDINARY CLAIM PANELS

All trust procedures (Johns-Manville, Celotex, DLL Industries, Inc., etc.) are based on the United States Bankruptcy Law and approved through the courts for Trust processing.

The Johns-Manville and Celotex Extraordinary Claim Panels were made up of three designated United States Bankruptcy Court asbestos experts.

The members of the Johns-Manville Panel were Elihu Inselbuch, Esq. of Caplin & Drysdale, Counsel for the Selected Counsel for the Beneficiaries; David Austern, President Claims Resolution Management Corporation; and Dr. Mark A. Peterson, Special Court Advisor to the Trust.

The members of the Celotex Panel were Elihu Inselbuch. Esq., Dr. Mark A. Peterson and John Mekus, Executive Director of Celotex Trust.

## Johns-Manville Panel Review

*"The Panel finds this decision to be a particularly difficult one.  On the one hand, the deceased claimant has been able to produce very little by way of medical evidence to challenge the diagnosis/death decision that was made 34 years ago. On the other hand, there was extensive pain and suffering in this case, and early death, and abundant and apparent exposure to asbestos.  In the totality of the circumstances,   the   Panel   believes   this   claim   deserves   extraordinary*

12

Angelo Palermo

*consideration. In addition, the Panel believes that the CRMC should consider encouraging the pro se claimant to secure the advice of an attorney in negotiating the ultimate disposition of this case."*

## Trust Conclusions

After due process, the Manville and Celotex Trusts confirmed that the estate of Angelo Palermo established a valid cause of action, convincing proof of exposure to their asbestos containing product(s), and convincing proof of an asbestos-related disease of 'mesothelioma' against their companies and compensated us as 'extraordinary'.

Per CRP: Eligible for an award in excess of the Trust Distribution Process (TDP) Maximum Value for the Scheduled Disease Category asserted by the claimant.

## PREVIOUS SETTLEMENTS

### Manville Asbestos Settlement Trust

In 2003 our family was awarded a settlement of $750,000 representing a 10% pro rata value of **$75,000** for a Mesothelioma/Extraordinary injury claim from Johns-Manville for their part. This was the 2nd highest settlement of the Manville Trust. The highest was $100,000 with counsel. We were 1 of 12 'extraordinary claimants' of a total population of 667,500 claimants as of 2003.

### Celotex Asbestos Settlement Trust

We just settled a claim from Celotex for their part. Awarded settlement of $353,983 representing an 11.8% pro rata value of **$40,000** for a Mesothelioma/Extraordinary injury claim. We are 1 of 8 'extraordinary claimants', and we received the highest settlement ever paid by Celotex.

## LEGAL AND MEDICAL STANDARDS

### White v Johns-Manville Ref. 103 Wn.2d 344, 693 P.2d 687

Discovery rule/Errors in Death Certificates/Defendant's knowledge of information relevant to asbestos related deaths.

### Borel v Fibreboard Paper Products Corporation 493.F.2d.1076 (1973)

Affirmed, holding that the dangers were not sufficiently obvious to relieve manufacturers of the duty to warn and multiple defendants could be held jointly and severally liable for total damages.

### Karjala v Johns-Manville

Required the manufacturer to warn of dangers inherent in asbestos products that the application of reasonable foresight would reveal to a company charged with the knowledge and skill of an expert.

13

Angelo Palermo

## Medical Evidence

Evidence furnished by a doctor, nurse, or other qualified medical person testifying in a professional capacity as an expert, or by a standard treatise (a formal, systematic article or book on some subject) on medicine or surgery.

## Scientific Medical Evidence

Where no such medical records exist, information and recommendations are based on scientific evidence such as data from published clinical trials, or combined analyzes of trials. Where such evidence is not available, recommendations are based on a consensus view of experts.

## Finding a Fact

Burden of persuasion of a fact means that the burden which is discharged when the tribunal which is to determine the existence or the non-existence of the fact is persuaded by sufficient evidence to find that the fact exists.

## Standard For Acceptance

The exceptional medical claims panel shall designate a claim as an exceptional medical claim only if the claimant cannot satisfy the requirements for a given eligible medical category for reasons beyond the control of the claimant, but demonstrates, through clear and convincing evidence, that the exposed person has an asbestos-related condition that is substantially comparable to the condition of an exposed person who would satisfy the requirements of a given eligible medical category.

## Decision

The decision of the exceptional medical claims panel shall not be subject to further review within the Corporation. If the exceptional medical claims panel decides that a claim should be designated, wholly or in part, as an exceptional medical claim, the Corporation shall issue a certificate of medical eligibility which shall designate the claim as an exceptional medical claim and state the eligible medical category or categories for which the claim qualifies by virtue of that designation.

## Tort Law

Factors affecting the amount of damages: disease, age, current settlements and verdicts in the tort system, whether claimant is living or dead, dependency, special damages, pain and suffering.

## Trust Distribution Procedure (TDP)

Before making any payment to a claimant, the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.

Angelo Palermo

## The Bankruptcy Report

Equality of treatment thus becomes a matter of degree, not one of mathematical exactitude. (Bankr.e.D. Pa.1987) different treatment permissible "if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan".

The compensation process in part operates in the shadows of the tort system. Tort litigation typically affords those with more serious claims an opportunity to expedite their cases and juries generally award larger verdicts in such circumstances. That the parties chose to retain those distinctions does not render the Settlement discriminatory.

Ultimately, the distinction between claimants reflects underlying differences in the nature and strength of the claims. The loss suffered is more severe when someone's life has been taken etc...than when an individual suffers minor disability; the trauma experienced by the victim and by the families varies accordingly; the cost of necessary medical treatment differs; and the physical and mental anguish demands greater consideration and attention. The incorporation of a preference in the Settlement in extent of compensation and timing of payments to those who have suffered the most appears justifiable and wholly appropriate. ...This one certainly does not offend principles of equity, fairness and due process.

The court will tolerate distinctions among groups where created on a rational basis (permits the unequal treatment of groups).

## Precedent

A court decision in an earlier case with facts and law similar to a dispute currently before a court. Precedent will ordinarily govern the decision of a later similar case, unless a party can show that it was wrongly decided or that it differed in some significant way.

## CLAIM AGAINST DII INDUSTRIES, LLC ASBESTOS PI TRUST

## Our Position

Angelo Palermo is dead at an early age: 51 years old of Peritoneal Mesothelioma due to prolonged intense abundant and excessive occupational exposure of asbestos-containing products supplied or manufactured by DLL Industries, Inc., or any affiliate of those companies' asbestos products due to the nature of his employment for 29 years (social security records) through the Mason Union; meets latency period; industry most at risk (insulator, mason, construction): job sites with high levels of asbestos exposure (i.e. Albany State Teachers, post card); extreme pain and suffering; loss of family life; loss of financial income; horrendous tortuous acts of the asbestos industry; intentional tort, knowledge of hazards, concealment, falsely advised, failed to provide protection and safe environment; spray coating Quonset huts and school insulation with no government regulation: dangers of excessive friable asbestos well documented; no protective equipment; not told of the dangers of inhaling asbestos; during an insulation boom; new government regulations and ban of use of asbestos; inexperienced resident doctor diagnosed (practiced as a plastic surgeon); settlement from Johns-Manville and Celotex Trusts for wrongful death; fits the

15

Angelo Palermo

profile for mesothelioma and does not fit the profile of stomach cancer; deemed Extraordinary Mesothelioma by experts and compensated as such.

I claim an intentional tort was committed that caused the death of my father, claiming that they knew that exposing my father to asbestos would result in harm.

They willfully concealed their knowledge of the hazards of asbestos and failed to provide protective equipment and falsely advised him that it was safe to work in asbestos-contaminated areas.

### Specific Counts in Complaint

*(1) Negligent failure to warn*
*(2) Strict product liability*
*(3) Breach of express and implied warranty*
*(4) Concert of action and conspiracy*
*(5) All other viable claims (every claim or cause of action that the plaintiffs can assert)*

## SUMMARY

- Documented proof of being an employee of companies represented by the DII Industries, LLC Asbestos PI Trust.

- Documented 'concrete' proof of 29 years (1937-1966) of excessive intense asbestos exposure to your company's worksites and asbestos products.

- Meets latency period.

- Meets industry of exposure.

- Not warned of dangers, horrendous tortuous acts of asbestos industry.

- Qualifies for exception processing of medical criteria.

- After due process, the Manville and Celotex Trusts confirmed that we established a valid cause of action, convincing proof of exposure to asbestos containing products and convincing proof of an asbestos-related disease of mesothelioma.

- Qualifies as extraordinary by Tort Law under Trust guidelines.  Died young; left dependents, a wife and 3 children; loss of family life; excessive pain and suffering; medical expenses; 14 years of lost earnings and the potential to achieve goals of advancement; company's products and work sites; failure to warn and protect, tortuous acts, etc.

- Deemed 'extraordinary/mesothelioma' by qualified Bankruptcy Court approved asbestos experts within Trust guidelines.

- By precedent, our claim of The Estate of Angelo Palermo v DII Industries, LLC Asbestos PI Trust, should render the same results as the Manville and Celotex Trusts, as all are governed under the United States Bankruptcy Court.

Angelo Palermo

## IN HIS OWN WORDS

Below is an example of one letter Angelo sent to his wife Josephine. Angelo was an excellent and talented worker. He could do any type of job. We were so proud of him. He had a wonderful heart and wrote to us all the time, even though he didn't like writing.

"Hi honey, I got your letter and was happy to see the card that your sent me. I got them near my bed. Well you want to know about the pay well I join the union that it what you want to do. I had to Pay $75 to join. You know I don't like that but I had to do it or I could not work so I had to Pay it. I work one week for nothing well hows thing I feel find, and hope to hear that you and the kids are good, it is cold hear if it get colder we may come home. I hope. How is it in Rochester cold to. How are my ashes still Piling up well don't let that bother you want I come home I will have some thing to do. Honey miss you a hole lot went I was home I was so happy just kissing you. And I hope it will always be that way. And I am saying it with all my hart well I have not much to say out side of this city I do not like it hear, and I want you to eat good and kids and give them a big kiss XX and hear is a big kiss from me XX  Love you  So Long  honey be happy until I come home Love Ange"

## CONCLUSION

Our life should have been different. My father was robbed of his life. My father worked hard, he couldn't help that he was breathing and eating asbestos, and lost his life because of asbestos. He didn't have a chance.

No human being (including the decedent Angelo Palermo) handling and spray coating asbestos with his work record; degree of exposure without protective equipment; during a time of no government regulations and an insulation boom, could come to any other conclusion except: DEATH BY ASBESTOS.

Our family lost out on a long happy life together. Much pain and suffering was experienced with his loss of life; leaving a wife and children devastated; missed out on grandchildren and great-grandchildren and they never experienced life with a grandfather; our emotional, mental, physical and financial loss should be compensated above the highest amount, 'due to the most severe combination of factors to be anticipated that qualifies this case for 'Mesothelioma/Extraordinary status'.

We appreciate your consideration.

Sincerely,

Gail Palermo Garner, Daughter
Personal Representative, Pro Se
Attachments

17

Angelo Palermo

## THE EXTRAORDINARY CLAIM PANELS

### Background and Expertise:

Mr. Inselbuch's practice consists largely of representing plaintiffs and defendants in a whole range of commercial and tort litigation in federal and state courts. His commercial litigation work has included representation of mass tort victim constituencies in substantial corporate reorganizations, plaintiffs and defendants in securities fraud litigation, and defending product liability claims involving both consumer goods and high technology products. He also has represented a number of prominent figures in connection with congressional hearings and the criminal investigations which flowed from them, including proceedings involving the Watergate Special Prosecutor. Since 1985, when he was first retained to act for the Asbestos Claimants' Committee in the Manville reorganization, Mr. Inselbuch has gained prominence as one of the nation's leading attorneys in asbestos creditors' rights litigation. Working with the asbestos plaintiffs bar, Mr. Inselbuch has represented their constituency in a number of large bankruptcies and class actions, including Johns Manville, Jim Walter Corp., Raytech Corporation, Babcock & Wilcox, Pittsburgh Corning, Armstrong World Industries, GAF, W.R. Grace, United States Gypsum, Federal Mogul, Owens Corning, and Ortiz v. Fibreboard.

David Austern oversees the Manville Personal Injury Settlement Trust, which compensates asbestos disease victims.   David Austern once helped defend Watergate defendant Richard Kliendienst, is general counsel of the trust.   The Manville employs 77 people and exists for one reason only: to identify legitimate asbestos victims and write them checks. When Johns-Manville Corp., once the nation's largest producer of asbestos goods, filed for bankruptcy in 1982, it was No. 181 on the Fortune 500 list of America's wealthiest companies. When it emerged from bankruptcy in November 1988, it was still a viable company, still manufacturing building and insulation products. But it owed its corporate soul -- nearly 80 percent of it, at least -- to the newly created trust that bore its name. This is how the trust works: As claims are filed by lawyers for would-be asbestos victims, they are reviewed by the trust's legal and medical experts. Claims deemed valid are paid by revenues generated primarily by Johns-Manville Corp. The trust is, in effect, J-M's largest stockholder. When the trust was set up, medical experts estimated that it would pay up to 100,000 asbestos claims by the year 2040, when the trust expires. The doctors and actuaries were very shortsighted. In March, the 500,000th claim was filed. By 2040, the total may reach 1 million. So far, the trust has paid about $2.5 billion in claims. Mr. Austern teaches a legal-ethics course at American University. Interpreting the results of a soft-tissue illness such as asbestosis often is as much art as science, he says.

Dr. Mark A. Peterson for twenty years has studied, written about and participated as an expert in asbestos litigation and other mass tort litigation.  Worked for four U.S. District and Bankruptcy Courts as the Courts' expert on how asbestos claims are valued and on asbestos claims procedures and trusts.  For thirteen years he has been the "special Advisor to the courts" regarding the Manville Trust, serving Judges Jack Weinstein and Burton Lifland for five years and the Manville Trust and all of its beneficiaries for the past eight years.  He is a consultant and expert for ten asbestos trusts.  Developed claims procedures for ten asbestos trusts.  Trustee of an asbestos trust.  Director of a nonprofit corporation that administers the process for allowing and paying claims for four asbestos trusts.  Worked as an expert on asbestos litigation for defendants, insurance companies, actuarial firms, other businesses, law firms and claimants' committees in bankruptcy.  Participated as an expert on asbestos

18

Angelo Palermo

liabilities in over 20 bankruptcies of asbestos defendants.  Studied asbestos litigation for over twenty years as a founding member of the RAND Corporation's Institute for Civil Justice. Published peer-reviewed scholarly articles on mass torts, asbestos litigation, claims facilities for paying asbestos and other mass tort claims, workers compensation and how medical and legal issues determine the values of asbestos bodily injury claims and other subjects related to asbestos litigation.  Taught courses on mass torts at UCLA Law School and the RAND Graduate Institute.  A lawyer, a graduate of Harvard Law School and have a doctorate in social psychology from UCLA.  Recognized by courts as an expert on all areas addressed and all comments come from scholarship and work as an expert on asbestos litigation.

**JOHN MEKUS** is the Executive Director of the Celotex Asbestos Settlement Trust and also a member of the Extraordinary Claim Panel.

19

DII Industries, LLC Asbestos PI Trust
P.O. Box 1319
Greenville, TX 75403-1319

Sworn Affidavit of:
**GAIL GARNER**

BEFORE ME, the undersigned authority, on this day personally appeared **GAIL GARNER** _____ (claimant's full name and social security #), who, being duly sworn upon her oath, deposed and stated as follows:

My name is **GAIL GARNER**, I am of sound mind and over twenty-one years of age, and I am fully competent to testify and aver to the facts set forth in this affidavit. I make this Affidavit in support of the claim of **ANGELO PALERMO** being DII Industries, LLC Asbestos PI Trust Claim Number_____

That based on the laws of the State of **NEW YORK**, the undersigned hereby represents and warrants that she is the duly authorized representative to act on behalf of the Injured Party or the Injured Party's Estate, and/or the lawful beneficiary to receive any and all compensation for the above-referenced claim. Further, the undersigned represents and warrants that no court order, Letters Testamentary, Letters of Administration, or any other documentation is available to substantiate the foregoing.

Further, that in consideration of the DII Industries, LLC Asbestos PI Trust (the "Trust") accepting this representation in place of a Certificate of Official Capacity, I accept any and all liability for mistakes or misrepresentations made with respect to the authorized representative and/or beneficiary of the Injured Party's Claim. Further, I agree to fully indemnify the Trust in the event any settlement money is paid in error based upon the Trust's reliance on the representations contained in this Affidavit.

Further Affiant sayeth not

_Gail Garner_
(Signature of Affiant)

Subscribed and sworn to me this _6th_ day of _April_ _____ 2006 in and for the State and County First above written _(Monroe County)_

_Teresa M. Mueller_
Notary Public

TERESA M. MUELLER
Notary Public, State of New York
No. 01MU5023717
Qualified in Monroe County
Commission Expires Feb. 14, 2010

My Commison Expires: _____

33 of 160

April 5, 2006

983 Brown Road
Rochester, NY 14622
(716) 544-8678

DII Industries, LLC Asbestos PI Trust
P.O. Box 1319
Greenville, TX 75403-1319

RE:   Injured Name: **Angelo Palermo**

### CLAIMANT REPRESENTATIVE AFFIDAVIT

In addition to the Certified Claim Form, Verified Work History (United States Social Security Records) and Injured Party Affidavit (signed New York State Unemployment Affidavit), we submit this Claimant Representative Affidavit as proof that Angelo Palermo was exposed to DII Industries Inc. asbestos containing products.

The products used were: H-W Lightweight Castable 10 Refractory Cement, Mineral Fiber Coating Asbestos Millboard, Harwaco Bond, Chromepak G Micacrete 7 Cement, Metalkase Brick with Asbestos, Firebrick, Nucon Firebrick, Asbestos Rope, etc.

As family representatives, we are aware of Angelo Palermo's occupational (job-related) exposure to DII Industries, Inc. asbestos-containing product(s) used, evidencing the dates: 1937 until his death in 1966.

I wish to use Angelo Palermo's Social Security Records as evidence of employment and asbestos exposure to your company's asbestos products.

A summary listing of job sites from Angelo Palermo's social security records with Harbison-Walker and Non-Harbison-Walker entities asbestos products used was included in our claim package.   He was an employee of Johns-Manville, Symington Gould (Foundry, Ship, Navy Excellence in War Production), City of Albany, National Gypsum, Davis Fetch, Huber Construction (Furnaces, spray coating), Penetryn System (pipelines, concrete used on railroad bridges during WWII), Ritter Pfaudler (now Sybron), S. P. Vasile (steel), Frank X. Connelly (large contractor), LeCesse, LeChase and many other employers (see listing) who produced or used your asbestos products.

Although we listed 48 job sites, it was many more because there were blanks where the company name should have been shown on the social security report. Enclosed is a copy of a post card dated September 1950 from the State College For Teachers Albany, NY.   It shows the same date on the social security records with no name next to it.   A copy of Asbestos industry, New York - Job Sites lists New Dorm-Albany State Teachers as a high level of asbestos exposure.

For 29 years (1937-1966), Angelo Palermo worked as an asbestos installer and spray coater, mason, bricklayer and carpenter. He did some electrical and plumbing. Angelo Palermo belonged to the Bricklayer/Mason Union and all construction jobs during his 29 years (1937-1966) were related; as large union job sites, performed under different contractors or employers, i.e. schools; hospitals; government and military facilities including ships, Quonset huts, etc.; corporations; bridges; pipelines; factories; mills; etc., working with DII Industries, LLC asbestos products.

Mr. Palermo worked with insulation, soundproofing, asbestos acoustical tiles, drywall products, textures and other asbestos containing construction materials. These asbestos products became friable (released in the air) when he installed, cut, mixed, sprayed, handled, repaired, tore out, or otherwise disturbed in construction, maintenance, or repair, as his 29 years construction fieldwork record clearly documents.

Our original letter includes *deposition evidence* (testimony of a witness reduced to writing, in due form of law, taken by virtue of a commission or other authority of a competent tribunal). This evidence is the letters from the Extraordinary Panel Tribunal appointed by the United States Bankruptcy Court assigned to Johns Manville Corporation and Celotex/and or Carey Trust Distribution Process.

The Panels were made up of asbestos experts: Elihu Inselbuch, Esq. of Caplin & Drysdale, Counsel for the Johns-Manville Selected Counsel for the Beneficiaries; David Austern, President Claims Resolution Management Corporation; John Mekus, Executive Director of Claims Processing Facility, Inc. and Dr. Mark A. Peterson, Special Court Advisor to the Johns-Manville and Celotex Trust.

Johns-Manville deemed our claim Mesothelioma and Extraordinary and we received a settlement award of $750,000 and a check for $75,000. Celotex also deemed our claim Mesothelioma and Extraordinary and we received a settlement award of $353,983 and a check for $40,000.

In addition, I sign this sworn statement of Mr. Palermo's exposure to DLL Industries, Inc. asbestos products, that affirms I declare the truth, the whole truth, and nothing but the truth, so help me God.

Sincerely,

*Gail Garner*

Gail Garner, Daughter, Personal Representative, Pro Se

**NOTARY**

STATE OF NEW YORK
COUNTY OF MONROE

Sworn to and subscribed to before me on 6th April 2006

By      Gail Garner

My Commission expires:

Notary Public's Signature

TERESA M. MUELLER
Notary Public, State of New York
No. 01MU5023737
Qualified in Monroe County
Commission Expires Feb. 14, 20/6

```
                    WORKSHEET REMARKS              01/12/00    ERMK

   NH NAME ANGELO      PALERMO              NH SSN
   3P NAME JOSEPHINE   PALERMO
                                    OFFICE 108 COMP    UNIT 1SR1SR

   01/12/00   PRE78  1937-1950    1951-1965
   NEED IDENTIFICATION OF THE EMPLOYERS FOR THE PERIOD LISTED.
   PLEASE SEND INFORMATION TO DO 108 100 STATE STREET ROCHESTER NY 14614
   ATTN: 1CR RAGONESE
```

MORE REMARKS (Y/N): N                          PAGE 01 OF 01

*Social Security Admin.*

*Phone #*

*SS(85)/232-3890*

*Supervisor Mrs. Margaret McCurry*

```
        REC 2000031  171/45 HE5E19E0 n3ml  CIPQYAE   PQAE   (F-n3m )  ***

QRY    DATE: 01/31/00  AN:             DOC:108   UNIT:SAN        DEQR   PG:001+
  INPUT: YRE REQ: 1937-1954; COVERED DETAILS; EMPLOYER ADDRESS
  MEF: NA:      PALERM DB: 12/1914 SX: M AK:

  DETAIL COVERED FICA EARNINGS AND EMPLOYER NAME AND ADDRESS FOR YEARS
  REQUESTED
  RPYR REO EIN-SEI    LOAC NAME       EARNINGS   TOTAL COMP CONTROL NUMBER PR  S
  0637 WA              A    PALERM      183.16     .00 1-0000-00-0000 04999M
  1237 WA              A    PALERM       60.72     .00 1-0000-00-0000 04999M
  1237 WA              A    PALERM      175.20     .00 1-0000-00-0000 04999M
```

THE SYMINGTON GOULD CORP
2 MAIN ST
DEPEW                      NY  14043-0000


W N CLARK CO
2 STATE STREET
ROCHESTER                  NY  14614-0000

  38      21612.69 EARNED 37-50/NO DETAIL AVAILABLE

  39      21612.69 EARNED 37-50/NO DETAIL AVAILABLE

```
  0640 WA              A    PALERM        7.75     .00 5-0000-00-0000 04999M
  0940 WA              A    PALERM      256.65     .00 1-0000-00-0000 04999M
  1240 WA              A    PALERM       10.80     .00 1-0000-00-0000 04999N
  1240 WA              A    PALERM       51.48     .00 1-0000-00-0000 04999M
  1240 WA              A    PALERM       30.09     .00 1-0000-00-0000 04999M
```

BUFFALO MERCHANDISE WAREHOUSE INC
1200 NIAGARA ST
BUFFALO                    NY  00000-0000


GEO KIRCHER & SONS
14 MANITORE ST
ROCHESTER                  NY  00021-0000


DELCARO ASSOCIATES INC
BOX 165
OLD FORGE                  NY  13420-0000


Z SARTINI & SON INC
48 N WATER ST
ROCHESTER                  NY  00000-0000

```
  0641 WA              A    PALERM      316.07     .00 1-0000-00-0000 04999M
  0941 WA              A    PALERM      429.74     .00 1-0000-00-0000 04999M
  1241 WA              A    PALERM      483.31     .00 1-0000-00-0000 04999M
```

        THE SYMINGTON GOULD CORP

```
  0342 WA 160657375    A    PALERM      604.48     .00 1-0000-00-0000 04999M
  0542 WA              A    PALERM      500.86     .00 1-0000-00-0000 04999M
  0942 WA              A    PALERM      509.29     .00 1-0000-00-0000 04999M
```

```
DATE:01/31/00                    DOC:108   UNIT:SAN        DEQR   PG:C024
242 WA                A    PALERM    494.50         .00 1-0000-00-0000 04999M

         THE SYMINGTON GOULD CORP

0343 WA               A    PALERM    526.27         .00 1-0000-00-0000 04999M
0643 WA               A    PALERM    569.86         .00 1-0000-00-0000 04999M
0943 WA               A    PALERM    495.76         .00 1-0000-00-0000 04999M
1243 WA               A    PALERM    681.60         .00 1-0000-00-0000 04999M

         THE SYMINGTON GOULD CORP

0344 WA               A    PALERM    722.93         .00 1-0000-00-0000 04999M
0644 WA               A    PALERM    709.39         .00 1-0000-00-0000 04999M
0944 WA               A    PALERM    639.41         .00 1-0000-00-0000 04999M
1244 WA               A    PALERM    633.80         .00 1-0000-00-0000 04999M

         THE SYMINGTON GOULD CORP

         EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE

0345 WA               A    PALERM    713.99         .00 1-0000-00-0000 04999M
0645 WA               A    PALERM    609.90         .00 1-0000-00-0000 04999M
0945 WA               A    PALERM     68.23         .00 1-0000-00-0000 04999M
1245 WA               A    PALERM    426.50         .00 1-0000-00-0000 04999M
1245 WA               A    PALERM      1.97         .00 1-0000-00-0000 04999M

         EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE

         THE SYMINGTON GOULD CORP

         GEO KIRCHER & SONS

1246 WA               A    PALERM     98.75         .00 1-0000-00-0000 04999M
1246 WA               A    PALERM    103.00         .00 1-0000-00-0000 04999M


         JOHN B PIKE & SON INC
         JOHN PIKE & SON INC
         1 CIRCLE ST
         ROCHESTER            NY  14607-1099


         ROER P WIDING AND
         JOHN S JOHNSTON
         146 EAST AVENUE
         ROCHESTER            NY  00000-0000

0347 WA               A    PALERM    140.69         .00 1-0000-00-0000 04999M
0347 WA               A    PALERM     20.80         .00 1-0000-00-0000 04999M
0347 WA               A    PALERM    270.78         .00 1-0000-00-0000 04999M
0647 WA               A    PALERM    123.00         .00 1-0000-00-0000 04999M
0647 WA               A    PALERM    204.10         .00 5-0000-00-0000 04999M
0647 WA               A    PALERM    206.05         .00 5-0000-00-0000 04999M
0647 WA               A    PALERM    165.75         .00 1-0000-00-0000 04999M
0947 WA               A    PALERM     63.15         .00 1-0000-00-0000 04999M
1247 WA               A    PALERM    189.80         .00 1-0000-00-0000 04999M
1247 WA               A    PALERM     68.25         .00 1-0000-00-0000 04999M
```

DATE:01/31/00                    DOC:108    UNIT:SAN        DEQR    PG:003+
    RITTER PFAUDLER CORP
    1100 MIDTOWN TOWER
    ROCHESTER               NY  14604-0000

        EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE


    L T PFLANZ INC
    3910 DEWEY AV
    ROCHESTER               NY  14616-0000


    FRED C KEEGAN CONTRACTORS INC
    470 EAST MAIN ST
    ROCHESTER               NY  00000-0000

        EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE


    W R SPROUL INC
    119 MAIN ST E
    ROCHESTER               NY  00000-0000


    S P VASILE & SON INC
    PO BOX 1412
    ROCHESTER               NY  14603-0000

        EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0348 | WA | A | PALERM | 430.07 | .00 | 1-0000-00-0000 | 04999M |
| 0648 | WA | A | PALERM | 718.96 | .00 | 1-0000-00-0000 | 04999M |
| 0948 | WA | A | PALERM | 1023.88 | .00 | 1-0000-00-0000 | 04999M |
| 0948 | WA | A | PALERM | 31.50 | .00 | 1-0000-00-0000 | 04999M |
| 1248 | WA | A | PALERM | 14.00 | .00 | 1-0000-00-0000 | 04999M |
| 1248 | WA | A | PALERM | 443.51 | .00 | 1-0000-00-0000 | 04999M |

        EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE


    FRANK X CONNELLY
    10281 IMPERIAL
    CUPERTINO               CA  95014-0000

        EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE


    DAVIS FETCH & CO INC
    170 SWEENEY ST
    N TONAWANDA             NY  14120-0000

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0349 | WA | A | PALERM | 183.16 | .00 | 1-0000-00-0000 | 04999M |
| 0349 | WA | A | PALERM | 52.20 | .00 | 1-0000-00-0000 | 04999M |
| 0649 | WA | A | PALERM | 64.00 | .00 | 1-0000-00-0000 | 04999M |
| 0649 | WA | A | PALERM | 156.50 | .00 | 1-0000-00-0000 | 04999M |
| 0649 | WA | A | PALERM | 835.01 | .00 | 1-0001-08-5530 | 04999M |
| 0949 | WA | A | PALERM | 1283.95 | .00 | 1-0001-03-0417 | 04999M |
| 1249 | WA | A | PALERM | 180.25 | .00 | 1-0002-02-3734 | 04999M |
| 1349 | WA | A | PALERM | 613.00 | .00 | 1-0001-52-5293 | 04999M |

*Frank Connelly* (handwritten annotation)

*See Income tax return* (handwritten annotation)

```
DATE:01/31/              DOC:108   UNIT:SAN      DEOR   PG:004+
```

F E REED GLASS CO
860 MAPLE ST
ROCHESTER              NY  00000-0000

    FRANK X CONNELLY

    GEO KIRCHER & SONS

    DAVIS FETCH & CO INC

TRANSPORTATION CLUB OF BUFFALO INC
365 HAMBURG ST
BUFFALO              NY  14204-0000

```
0350 WA         A    PALERM      14.88      .00 1-0002-05-0634 04999M
0350 WA         A    PALERM     501.26      .00 1-0001-52-5293 04999M
0650 WA         A .  PALERM    1016.63      .00 1-0001-03-2347 04999M
0950 WA         A    PALERM    1290.00      .00 1-9002-06-7531 04999M
1250 WA         A    PALERM     192.11      .00 1-0001-01-0187 04999M
```

    DAVIS FETCH & CO INC

    FRANK X CONNELLY

*See Income Tax return*

```
0351 WA         A    PALERM     615.88      .00 1-0001-03-2011 04999M
0651 WA         A    PALERM      32.00      .00 1-0003-15-0450 04999M
0651 WA         A    PALERM     841.00      .00 1-0001-12-1607 04999M
0951 WA         A    PALERM     985.75      .00 1-0001-01-3871 04999M
1251 WA         A    PALERM      89.25      .00 1-9081-11-6425 04999M
1251 WA         A    PALERM     691.50      .00 1-0001-05-1522 04999M
```

    FRANK X CONNELLY

BRISTOL INSULATION CO INC
11 PARK PL
NEW YORK              NY  10007-0000

GEORGE J & JOSEPH KIRCHER
EMPIRE EX
855 MERCHANT RD
ROCHESTER              NY  00000-0000

```
0352 WA         A    PALERM     836.00      .00 1-0003-09-3531 04999M
0352 WA         A    PALERM      90.00      .00 1-0001-07-3531 04999M
0652 WA         A    PALERM      66.00      .00 1-0002-15-1423 04999M
0952 WA         A    PALERM     260.00      .00 1-0001-05-2632 04999M
0952 WA         A    PALERM      62.25      .00 5-9013-12-7359 04999X
1252 WA         A    PALERM     464.00      .00 1-0162-08-0398 04999H
1252 WA         A    PALERM     155.43      .00 1-0025-07-0284 04999X
1252 WA         A    PALERM     152.00      .00 1-9189-19-6019 04999M
```

    DAVIS FETCH & CO INC

    FRANK X CONNELLY

DATE:01/31/00                    DOC:108   UNIT:SAN        DEQR   PG:005+

JAMES L & JOHN J COYNE
COYNE BROS
11 WESTBOURNE RD
ROCHESTER            NY  00000-0000

160767996   EMPLOYER NAME AND ADDRESS NOT ELECTRONICALLY AVAILABLE

JOHNS MANVILLE INTERNATIONAL INC
% PAYROLL DEPT
717 SEVENTEENTH ST
DENVER               CO  80202-3330

FASCO CONTROL CORP
8609 SIX FORKS RD
RALEIGH              NC  27613-0000

| 0353 WA | A | PALERM | 414.84 | .00 | 1-0119-03-2159 | 04999M |
| 0353 WA | A | PALERM | 97.56 | .00 | 1-0003-02-3411 | 04999M |
| 0653 WA | A | PALERM | 34.80 | .00 | 1-0003-11-1565 | 04999M |
| 1253 WA | A | PALERM | 40.25 | .00 | 1-0001-05-0170 | 04999M |
| 1253 WA | A | PALERM | 320.32 | .00 | 1-0005-06-0889 | 04999M |

BEECHNUT LIFE SAVERS INC
CANAJOHARIE          NY  13317-0000

GAYLORD BROS OF NORTH CAROLINA INC
2645 MT PISGAH CHURCH RD
SANFORD              NC  27330-8508

FRED B YAEGER
1094 JOSEPH AVE
ROCHESTER            NY  00000-0000

PENETRYN SYSTEM INC
PO BOX 87
KNOXVILLE            TN  37901-0000

| 0354 WA | A | PALERM | 639.60 | .00 | 1-0003-04-3387 | 04999M |
| 0654 WA | A | PALERM | 1476.28 | .00 | 1-0003-02-1362 | 04999M |
| 0654 WA | A | PALERM | 22.00 | .00 | 1-9076-18-6059 | 04999M |
| 0954 WA | A | PALERM | 1414.01 | .00 | 1-0003-20-3023 | 04999M |
| 1254 WA | A | PALERM | 70.11 | .00 | 1-0003-05-0442 | 04999M |

DAVIS FETCH & CO INC

MATTHEW TAVORMINA
RITZ HOME IMPROVEMENT CO
919 STATE RD
WEBSTER              NY  14580-0000

41 of 160

REC 2000031   171626 HESM19EO n.sm1  C1PQIAE     FQAZ   (E-n3m )   ---

```
QRY   DATE:01/31/00                   DOC:108   UNIT:SAN      DEQR   PG:001+
 INPUT: YRS REQ: 1955-1965; COVERED DETAILS; EMPLOYER ADDRESS
 MEF: NA:      PALERM DB: 12/1914 SX: M AK:
```

DETAIL COVERED FICA EARNINGS AND EMPLOYER NAME AND ADDRESS FOR YEARS
REQUESTED

| RPYR | REO | EIN-SEI | LOAC | NAME | EARNINGS | TOTAL COMP | CONTROL NUMBER | PR | S |
|------|-----|---------|------|------|----------|------------|----------------|-----|---|
| 0355 | WA | - - - - - - | A | PALERM | 1621.06 | .00 | 1-0003-11-2440 | 04999M | |
| 0655 | WA | | A | PALERM | 513.60 | .00 | 1-0004-04-1276 | 04999M | |
| 0655 | WA | | A | PALERM | 170.08 | .00 | 1-0005-14-0626 | 04999M | |
| 0655 | WA | | A | PALERM | 236.12 | .00 | 1-0003-10-0622 | 04999M | |
| 0955 | WA | | A | PALERM | 288.48 | .00 | 5-0007-12-0713 | 04999M | |
| 0955 | WA | | A | PALERM | 1230.62 | .00 | 1-0003-14-0895 | 04999M | |
| 1255 | WA | | A | PALERM | 592.81 | .00 | 1-0003-02-0305 | 04999M | |
| 1255 | WA | | A | PALERM | 598.60 | .00 | 1-0002-07-0302 | 04999M | |

```
          DAVIS FETCH & CO INC
          170 SWEENEY ST
          N TONAWANDA         .     NY  14120-0000


          LECESSE CORPORATION
          740 DRIVING PARK AVE
          ROCHESTER             NY  14613-1542


          ROCHESTER DAVIS FETCH CORP
          175 DODGE ST
          ROCHESTER             NY  14606-1503


          COLLUM ACOUSTICAL CO INC
          918 CANAL ST
          SYRACUSE              NY  13210-0000


          WERNER SPITZ CONSTURCTION CO INC
          14 STONEY CLOVER LN
          PITTSFORD             NY  14534-0000
```

| RPYR | REO | EIN-SEI | LOAC | NAME | EARNINGS | TOTAL COMP | CONTROL NUMBER | PR | S |
|------|-----|---------|------|------|----------|------------|----------------|-----|---|
| 0356 | WA | | A | PALERM | 290.14 | .00 | 1-0005-01-0562 | 04999M | |
| 0356 | WA | | A | PALERM | 1228.95 | .00 | 1-0002-10-0488 | 04999M | |
| 0656 | WA | | A | PALERM | 168.48 | .00 | 1-0170-04-0443 | 04999M | |
| 0656 | WA | | A | PALERM | 159.01 | .00 | 1-0005-02-1717 | 04999M | |
| 0656 | WA | | A | PALERM | 128.20 | .00 | 1-0004-04-1452 | 04999M | |
| 0656 | WA | | A | PALERM | 312.80 | .00 | 1-0001-03-1314 | 04999M | |
| 0956 | WA | | A | PALERM | 986.31 | .00 | 1-0153-04-1568 | 04999M | |
| 0956 | WA | | A | PALERM | 99.30 | .00 | 1-0001-08-0544 | 04999M | |
| 0956 | WA | | A | PALERM | 393.68 | .00 | 1-0002-06-0062 | 04999M | |
| 1256 | WA | | A | PALERM | 1189.89 | .00 | 1-0131-03-1001 | 04999M | |
| 1256 | WA | | A | PALERM | 253.08 | .00 | 1-0002-06-0105 | 04999M | |

```
          COLLUM ACOUSTICAL CO INC

          ROCHESTER DAVIS FETCH CORP


          JOHNS MANVILLE INTERNATIONAL INC
          % PAYROLL DEPT
```

```
DATE:01/31/00            01   DOC:108   UNIT:SAN      DEQR   PG:002+
         717 SEVENTEENTH ST
         DENVER              CO  80202-3330
```

WERNER SPITZ CONSTURCTION CO INC


W O LOCKLIN & SON INC
48 VISTA DR
ROCHESTER              NY  14615-0000


BUFFALO ACOUSTICAL CORPORATION
605 INDIAN CHURCH RD
BUFFALO                NY  14224-0000

```
0357 WA            A   PALERM     280.80    .00 5-0156-14-1556 04999M
0357 WA            A   PALERM     266.76    .00 1-0005-16-1061 04999M
0357 WA            A   PALERM      77.22    .00 1-0002-02-1381 04999M
0657 WA            A   PALERM      26.48    .00 1-0006-28-0338 04999M
0657 WA            A   PALERM     545.38    .00 1-0004-29-0007 04999M
0657 WA            A   PALERM     728.60    .00 1-0005-44-1535 04999M
0657 WA            A   PALERM      28.08    .00 1-0006-38-1430 04999M
0957 WA            A   PALERM     904.72    .00 1-0001-56-1323 04999M
0957 WA            A   PALERM     265.32    .00 1-0005-54-0463 04999M
0957 WA            A   PALERM      38.65    .00 1-0003-58-1389 04999M
1257 WA            A   PALERM     976.47    .00 1-0010-98-6474 04999M
```

JOHNS MANVILLE INTERNATIONAL INC

COLLUM ACOUSTICAL CO INC


ROCHESTER PLASTERING CO INC
508 GLIDE ST
ROCHESTER              NY  14606-0000


HARRY HALLORAN & SONS INC
% MAXWELL SHMERLER & CO
630 3RD AVE
NEW YORK               NY  10017-0000


JOHN W RYAN CONSTRUCTION CO INC
321 RAILROAD AAVE
GREENWICH              CT  06830-6306


WILLIAM E BOULEY CO INC
PO BOX 67
AUBURN                 NY  13021-0067


GEORGE HOFMANN
302 LONGACRE AVE
WOODMERE               NY  00000-0000


WHITACRE CONSTRUCTION

```
DATE:01/31/00                    DOC:108   UNIT:SAN        DEQR   PG:003+
      SPECIALTIES INC
      5860 MCKINLEY RD
      BREWERTON            NY  13029-0000

 0358 WA              A    PALERM      283.75    .00 1-0003-04-1348 04999M
 0658 WA              A    PALERM      276.12    .00 1-0130-28-1123 04999M
 0658 WA              A    PALERM       19.03    .00 1-0024-61-8014 04999M
 0658 WA              A    PALERM      216.91    .00 1-0033-29-1779 04999M
 0958 WA              A    PALERM     1411.28    .00 1-0123-58-1562 04999M
 1258 WA              A    PALERM      317.16    .00 1-0009-78-0775 04999M
 1258 WA              A    PALERM      705.19    .00 1-0002-76-0009 04999M

         ROCHESTER DAVIS PETCH CORP

         JOHNS MANVILLE INTERNATIONAL INC


      GYPSUM CONSTRUCTOR INC
      3255 MIDDLEBELT RD
      INKSTER             MI  48142-0000


      S J GROVES & SONS CO
      965 HWY 169 N
      PLYMOUTH            MN  55441-6405


      A FRIEDERICH & SONS CO
      710 LAKE AVE
      ROCHESTER           NY  14613-0000


      SAUCKE BROS CONST CO INC
      184 SMITH ST
      ROCHESTER           NY  14608-1418

 0359 WA              A    PALERM      184.08    .00 1-0008-02-1182 04999M
 0659 WA              A    PALERM       61.36    .00 1-0006-29-0217 04999M
 0659 WA              A    PALERM      123.25    .00 1-0005-84-8005 04999M
 0659 WA              A    PALERM      549.04    .00 1-0003-26-0308 04999M
 0959 WA              A    PALERM     2067.97    .00 1-0003-54-1046 04999M
 1259 WA              A    PALERM      179.28    .00 1-0003-79-0104 04999M


      HUDSON PLASTERING CORP
      122 BURBANK DR
      SNYDER              NY  14226-0000


      LECHASE CONST CORP
      318 SMITH ST PO BOX 1789
      ROCHESTER           NY  14608-0000


      HUBER CONSTRUCTION INC
      136 TAYLOR DR
      DEPEW               NY  14043-2015
```

44 of 160

DATE:01/31/00                    DOC:108    UNIT:SAN        DEQR   PG:004*
TENNEB INC & SUBSIDIARY
BOX 23317
ROCHESTER              NY  14692-0000

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0960 WA | | A | PALERM | 921.50 | .00 | 1-0922-61-6267 | 04999M |
| 1260 WA | | A | PALERM | 316.80 | .00 | 1-0011-83-0580 | 04999M |
| 1260 WA | | A | PALERM | 153.00 | .00 | 5-0927-88-6197 | 04999M |

WILLIAM NICHOLSON 638 BAY ST ROCHESTER 9
CO OSCAR S BLOCK
533 UNIVERSITY AV
ROCHESTER              NY  14607-0000

WILLIAM E BOULEY CO INC

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0961 WA | | A | PALERM | 29.20 | .00 | 1-0011-64-2435 | 04999M |
| 0961 WA | | A | PALERM | 573.35 | .00 | 1-0002-63-0359 | 04999M |
| 0961 WA | | A | PALERM | 584.86 | .00 | 5-0154-73-6683 | 04999M |
| 1261 WA | | A | PALERM | 73.24 | .00 | 1-0012-75-1911 | 04999M |
| 1261 WA | | A | PALERM | 53.35 | .00 | 1-0003-78-0572 | 04999M |
| 1261 WA | | A | PALERM | 424.78 | .00 | 1-0222-94-1533 | 04999M |
| 1261 WA | | A | PALERM | 59.32 | .00 | 1-0004-82-2072 | 04999M |

D W WINKELMAN CO INC
BOX 366
DEL RAY BEACH          FL  33447-0000

ARC CONSTRUCTION COMPANY INC
109 SOUTH UNION ST
ROCHESTER              NY  14607-0000

MARLEN FLOOR CO INC
64 BRAMBLEWOOD LN
ROCHESTER              NY  14624-1449

WININGER CONSTRUCTION CORP
10 ROCKEFELLER PLAZA
NEW YORK               NY  10020-0000

WM SUMMERHAYS SONS CORP
620 CLINTON AVE S
ROCHESTER              NY  14620-1349

AUSTIN COMPANY
3650 MAYFIELD RD
CLEVELAND HTS          OH  44121-1734

ALLEN & OHARA INC
3385 AIRWAYS BLVD
P O BOX 30189
MEMPHIS                TN  38130-0189

DATE:01/31/00                    1.  DOC:106   UNIT:SAN        DEOR   PG:005

0662 WA              A   PALERM    598.00        .00 1-0002-37-0575 04999X

        CAREY LATHING & ACOUSTICAL CO INC
        1024 PLYMOUTH AVE S
        ROCHESTER            NY  14608-2941     *Collum Acoustical see one to income return*

0963 WA              A   PALERM   1183.20        .00 5-0002-61-0013 04999X
0963 WA              A   PALERM   1030.94        .00 1-0002-53-0820 04999X
1263 WA              A   PALERM    226.76        .00 1-0004-80-0433 04999X

        COLLUM ACOUSTICAL CO INC

        CAREY LATHING & ACOUSTICAL CO INC

        M S KELLIHER CO CORP
        15 COURT SQ
        BOSTON              MA  02108-0000

1264 WA              A   PALERM    176.75        .00 1-0001-89-0511 04999X

        CAREY LATHING & ACOUSTICAL CO INC

0365 WA              A   PALERM    600.55        .00 1-0002-06-0492 04999X
0665 WA              A   PALERM   1492.22        .00 1-0003-32-0293 04999X
0965 WA              A   PALERM    851.73        .00 1-0002-54-0343 04999X

        CAREY LATHING & ACOUSTICAL CO INC

REMARKS
  EM ITEM CORRECTION IS PENDING
  DEATH INDICATED 03/1975-SOURCE: NON-DISABLED SURVIVOR CLAIM
  CLAIMS ACTIVITY--SEE MBR

46 of 160

**FORM 1040**
U.S. Treasury Department
Internal Revenue Service

# U. S. INDIVIDUAL INCOME TAX RETURN

# 1949

For calendar year 1949 or fiscal year beginning _____ 1949, and ending _____ 1950

Do not write in these spaces

File Code ____

Serial No. ____

(Cashier's Stamp)

EMPLOYEES: Instead of this form, you may use Form 1040A if your total income was less than $5,000, consisting wholly of wages shown on Forms W-2, or of such wages and not more than $100 of other wages, dividends, and interest.

Name: **ANGELO PALERMO**
(PLEASE PRINT. If this is a joint return of husband and wife, use first names of both)

HOME ADDRESS: **46 Venice Street**
(PLEASE PRINT. Street and number or rural route)

**Rochester   7   New York**
(City, town)   (Postal zone number)   (State)

Social Security No. _____     Occupation **Mason**

**1.** List your own name. If married and your wife (or husband) had no income, or if this is a joint return of husband and wife, list name of your wife (or husband).

List names of other close relatives (as defined in instructions) with 1949 incomes of less than $500 who received more than one-half of their support from you in 1949. If this is a joint return of husband and wife, list dependent relatives of both.

| Name (please print) | Check below whether you (or your wife) were at the end of your taxable year— | | On lines a and b below— Write 1 if neither 65 nor blind; Write 2 if either 65 or blind; Write 3 if both 65 and blind. |
|---|---|---|---|
| | 65 OR OVER | BLIND | |

Your exemptions

Your name **Angelo**   Yes ☐ No ☐   Yes ☐ No ☐   **a.** Number of exemptions for you
Wife's (or husband's) name **JOSEPHINE**   Yes ☐ No ☐   Yes ☐ No ☐   **b.** Number of her (his) exemptions

Name of Other Dependent Persons | Relationship | Address (if different from yours)
**MARLENE** — daughter
**CHRISTOPHER** — son
**GAIL** — daughter
**ROSE** — daughter

Enter here total number of exemptions claimed (yours and your wife's plus one for each dependent listed above) ➤ ____

**2.** Enter your total wages, salaries, bonuses, commissions, and other compensation received in 1949, BEFORE PAY-ROLL DEDUCTIONS for taxes, dues, insurance, bonds, etc. Also enter amount of income tax withheld. Persons claiming traveling or reimbursed expenses, see instructions.

Your Income

| Print Employer's Name (City and State) | | Amount of Income Tax Withheld | | Total Wages | |
|---|---|---|---|---|---|
| REED GLASS Co   269 Maple St. | | $ | 1 83 | $ 183 | 76 |
| FRANK X. Connell Inc   163 A TEST | | 119 10 | | 2784 | 16 |
| DAVIS FETCH Co   236 Scaraguad St   Buffalo, N.Y. | | | | 336 | 75 |
| | | Enter totals ► $ 120 | 93 | $3304 | 07 |

**3.** Enter here the total amount of your dividends ____

**4.** Enter here the total amount of your interest (including interest credited on savings accounts; also interest from Government obligations unless wholly exempt from taxation) ____

**5.** If you received any other income, give details on page 2 and enter the total here ____

**6.** Add income shown in items 2, 3, 4, and 5, and enter the total here ____ $ 3304 | 07

How to figure the tax

IF YOUR INCOME WAS LESS THAN $5,000.—You may find your tax in table on page 4. This table allows about 10 percent of your total income for charitable contributions, interest, taxes, medical expenses, etc. If such deductions exceed 10 percent, it will usually be to your advantage to itemize them and compute your tax on page 3.

IF INCOME WAS $5,000 OR MORE.—Do not use tax table. Compute tax on page 3. Use standard deduction or itemize deductions, whichever it to your advantage.

HUSBAND AND WIFE—For split-income benefits, file a joint return. If filing separate returns, and one itemizes deductions, both must itemize.

**7.** Enter your tax from table on page 4, or from line 18, page 3 ____ 0

**8.** How much tax you paid on your 1949 income tax?
(A) By tax withheld (in item 2, above). Attach Original Forms W-2 ... $ 120 | 93
(B) By payments on 1949 Declaration of Estimated Tax ...
Enter total here ► 120 | 93

Tax due or refund

**9.** If your tax (item 7) is larger than payments (item 8), enter BALANCE OF TAX DUE here ► $ ____
This balance of tax due must be paid in full with return.

**10.** If your payments (item 8) are larger than your tax (item 7), enter the OVERPAYMENT here ► $ 120 | 93
Check (✓) whether you want this overpayment: Refunded to you ☒ or Credited on your 1950 estimated tax ☐
Do you owe any prior year Federal tax for which you have been billed? **no** (Yes or No)

If you filed a return for a prior year, state latest year **1949**
Where filed **Buffalo, N.Y.**
To which Collector's office did you pay amount claimed in item 8 (B), above?

County in which you reside **Monroe**
Is your wife (or husband) making a separate return for 1949? **no** (Yes or No)
If "Yes," write her (or his) name ____

I declare under the penalties of perjury that this return (including any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is a true, correct, and complete return.

(Signature of person, other than taxpayer, preparing this return)   2/10/50 (Date)

**Angelo Palermo**   2/10/50
(Signature of taxpayer)   (Date)

(Name of firm or employer, if any)

(Signature of taxpayer's wife or husband if this is a joint return)   (Date)

► To assure any benefits of split-income provisions, husband and wife must include all their income, and BOTH MUST SIGN, even though only one has income.

FORM 1040
U. S. Treasury Department
Internal Revenue Service

# U. S. INDIVIDUAL INCOME TAX RETURN

FOR CALENDAR YEAR 1951

**1951**

or taxable year beginning ________, 195__, and ending ________, 195__

Do not write in these spaces
Serial No.
(Cashier's Stamp)

Name ANGELO PALERMO
(PLEASE PRINT. If this is a joint return of husband and wife, use first names of both)

HOME ADDRESS 116 Fieldwood Drive
(PLEASE PRINT. Street and number or rural route)

Roch... N. Y.
(City, town, o[redacted] (State)

Social Security No. [redacted]ation ...

## Your exemptions

1. List your name. If your wife (or husband) had no income, or if this is a joint return, list also her (or his) name.

| | Check below if at the end of your taxable year you or your wife were— | On lines A and B below— If neither 65 nor blind, write the figure 1; If either 65 or blind, write the figure 2; If both 65 and blind, write the figure 3 |
|---|---|---|
| A. ANGELO (Your name) | 65 or over ☐ Blind ☐ | Number of exemptions for you |
| B. JASEPHINE (Your wife's name—do not list if exemption is claimed on another return) | 65 or over ☐ Blind ☐ | Number of her (or his) exemptions |

C. List names of your children (including stepchildren and legally adopted children) with 1951 gross incomes of less than $600 who received more than one-half of their support from you in 1951. See Instructions.

Name and address if different from yours:
NARLENE
CHRISTOPHER
CAROL
ROSEANNE

Enter number of children listed ... 4

D. Enter number of exemptions claimed for close relatives listed in Schedule J on page 2

E. Enter total number of exemptions claimed in A to D above ... 7

## Your income

*Please Attach All W-2 Forms Here*

2. Enter your total wages, salaries, bonuses, commissions, and other compensation received in 1951, *before payroll deductions*. Persons claiming traveling or reimbursed expenses, see Instructions.

| Print Employer's Name | Where Employed (City and State) | Income Tax Withheld | | Total Wages | |
|---|---|---|---|---|---|
| FRANK X. CONNELLY | Rochester | $ 51 | 70 | $ 3,1... | 13 |
| | | | | | |
| | | | | | |
| | Enter totals | $ 51 | 70 | $ 3,1... | 13 |

3. If you received dividends, interest, or any other income, give details on page 2 and enter the total here ... 1.. | 0..

4. Add income shown in items 2 and 3, and enter the total here ... $3,3.4 | 13

## How to figure the tax

IF YOUR INCOME WAS LESS THAN $5,000—Use the tax table on page 4 *unless you itemize deductions*. The table allows about 10 percent of your income for charitable contributions, interest, taxes, medical expenses, etc. If your deductions exceed 10 percent, it will usually be to your advantage to itemize them and compute your tax on page 3.

IF INCOME WAS $5,000 OR MORE—Compute tax on page 3. Use standard deduction or itemize deductions, whichever is to your advantage.

## Tax due or refund

5. (A) Enter your tax from table on page 4, or from line 13, page 3 ... $ ... | 00
(B) Enter your self-employment tax from line 31, separate Schedule C
Enter total here → $ ...

6. How much have you paid on your 1951 income tax?
(A) By tax withheld (in item 2, above). Attach Original Forms W-2 ... $ 51 | 70
(B) By payments on 1951 Declaration of Estimated Tax (include any overpayment on your 1950 tax not claimed as a refund)
Enter total here → 51 | 70

7. If your tax (item 5) is larger than payments (item 6), enter *balance of tax due* here. This balance must be paid in full with return ... $

8. If your payments (item 6) are larger than your tax (item 5), enter the *overpayment* here ... $ 51 | 70
Enter amount of item 8 you want: $ 51.70 (Refunded); $ ________ (Credited on 1952 estimated tax)

Do you owe any prior year Federal tax for which you have been billed? (Yes or No) No. Is your wife (or husband) making a separate return for 1951? (Yes or No) No. If "yes," write her (or his) name ________

If you have filed a return for a prior year, state latest year 1950 Where filed? Roch...

To which Collector's office did you pay amount claimed in item 6 (B), above? ________

I declare under the penalties of perjury that this return (including any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is a true, correct, and complete return.

(Signature of person, other than taxpayer, preparing this return) (Date) (Signature of taxpayer) (Date)

(Name of firm or employer, if any) (Signature of taxpayer's wife or husband if this is a joint return) (Date)

➧ To assure split-income benefits, husband and wife must include all their income and, even though only one has income, BOTH MUST SIGN.

Form **1040** | **U.S. INDIVIDUAL INCOME TAX RETURN—1963**

U.S. Treasury Department
Internal Revenue Service | or taxable year beginning _____ 1963, ending _____ 19__ | Your social security number

First name and initial | Last name | Occupation

Name
Address | Home (or) street or rural route | Wife's number if joint return

| City, town or post office, and State | Postal ZIP code | Occupation

Did you file a return for 1962? ☐ Yes ☐ No. If name or address was different than shown above, enter name and address used.

Check one: ☐ Single ☐ Married filing joint return (even if only one had income) ☐ Unmarried Head of Household ☐ Surviving widow(er) with dependent child ☐ Married filing separately—Give name of wife or husband only if also filing separately

**INCOME**

| | (a) Federal income tax withheld | (b) Wages, etc. |
|---|---|---|
| 1. Wages, salaries, tips, etc., and excess of allowances over business expenses. | | |
| Culliani Capital Co., Brooklyn N.Y. | 157 80 | 1185 32 |
| Army fitting | 69 60 | 1030 44 |
| M.E. Katahel, Red N.J. | 28 40 | 226 26 |
| 2. Totals | 255 60 | 2440 90 |
| 3. "Sick pay" if included in line 1 (attach required statement) | | |
| 4. Subtract line 3 from line 2. | | |
| 5a. Dividends (Schedule B) | | |
| b. Interest (Schedule B or list of payers and amounts) | | 28 10 |
| c. Rents, royalties, pensions, etc. (Schedule B) | | |
| 6a. Business income (Schedule C) | | |
| b. Sale or exchange of property (Schedule D) | | |
| c. Farm income (Schedule F) | | |
| 7. Total (add lines 4 through 6c) | | 2469 00 |
| 8. Payments by self-employed persons to retirement plans, etc. (attach Form 2950 SE) | | |
| 9. Total income (subtract line 8 from line 7) | | 2469 00 |
| 10. Tax Table (FIGURE YOUR TAX BY USING EITHER 10 OR 11) Tax Rate Schedule | | 642 72 |
| a. If you itemize deductions, enter total from page 2. If line 9 is $5,000 or more and you do not itemize, enter 10% of line 9 but not more than $1,000 ($500 if married and filing separately here). | | |
| b. Subtract line 11a from line 9. | | 1776 28 |
| c. Copy total exemptions from page 2 here _____ multiply by $600 | | 1200 00 |
| d. Subtract line 11c from line 11b. (Figure your tax on the amount by using tax rate schedule on page 9 of instructions and enter tax on line 12.) | | 576 28 |

**TAX—CREDITS—PAYMENTS**

| 12. Tax (from either tax table or tax rate schedule) | | |
|---|---|---|
| 13a. Dividends received credit | | |
| b. Retirement income credit | | |
| c. Investment credit (Form 3468) | | |
| d. Other credits (Specify—see page 5 of instructions) | | |
| e. Total (add lines 13a, b, c, and d) | | |
| 14. Balance (subtract line 13e from line 12) | | 462 25 |
| 15. Tax from recomputing prior year investment credit (attach statement) | | |
| 16. Total (add lines 14 and 15) | | |
| 17. Self-employment tax (Schedule C-3 or F-1) | | |
| 18. Total tax (add lines 16 and 17) | | |
| 19a. Tax withheld (line 2, column (a) above) | | |
| b. 1963 Estimated tax payments and credits | | |
| c. Total (add lines 19a and b) | | |
| 20. If payments (line 19c) are less than tax (line 18), enter Balance Due. Pay in full with your return. | | 193 55 |
| 21. If payments (line 19c) are larger than tax (line 18), enter Overpayment. | | |
| 22. Amount of line 21 you wish credited to 1964 Estimated Tax | | |
| 23. Subtract line 22 from 21. Apply to: ☐ U.S. Savings Bonds, with excess refunded or ☐ Refund only | | 35 10 |

★ LIST YOUR EXEMPTIONS AND SIGN ON OTHER SIDE

Social Security Records Summary

| Occupation: Union Bricklayer/Mason, Asbestos Insulator and Spray Coater, Construction, Cement Finisher, Tilesetter, Lather, Carpenter, Electrical, Plumbing, 1937-1966 | All jobs for 29 years were related as large union job sites, performed under different contractors or employers, i.e. schools; hospitals; gov't- military facilities; corporations; pipelines; factory; mills; etc. | Job Duties: Install, repair, rip out, handle asbestos insulation and spray coating; including acoustical tiles, ceilings, wall boards, flooring, pipe covering, cement, plaster walls, metal stud framing & furring & attach gypsum lath, etc. | Products Used:  H-W Lightweight Castable 10 Refractory Cement, Mineral Fiber Coating Asbestos Millboard, Harwaco Bond, Chromepak G Micecrete 7 Cement, Metalkase Brick with Asbestos, Firebrick, Nucon Firebrick, Asbestos Rope | |
|---|---|---|---|---|
| **Employer** | **Address** | **City and State** | **Description of Job** | **Location of Job Site** |
| A Friederich & Sons Co | 710 Lake Ave | Rochester, NY 14613 | Union Construction Company Various Locations | Rochester, NY |
| Beechnut Life Savers Inc | | Canajoharie, NY 13317 | On-site Job (high asbestos) | Rochester, NY |
| Bristol Insulation Co Inc | 11 Park Pl | New York, NY 10007 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Buffalo Acoustical Corp | 605 Indian Church Rd | Buffalo, NY 14224 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Buffalo Merchandise Warehouse Inc | 1200 Niagara St | Buffalo, NY | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Carey Lathing & Accoustical Co Inc | 1024 Plymouth Ave S | Rochester, NY 14608 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Collium Acoustical Co Inc | 918 Canal St | Syracuse, NY 13210 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Davis Fetch & Co Inc | 170 Sweeney St | N. Tonewanda, NY 14120 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |

Page 1

Social Security Records Summary

| Employer | Address | City and State | Description of Job | Location of Job Site |
|---|---|---|---|---|
| Delcaro Associates Inc | Box 165 | Old Forge, NY 13420 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| F E Reed Glass Co | 880 Maple St | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |
| Fasco Control Corp | 8609 Six Forks Rd | Raleigh, NC 27613 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, Raleigh NC |
| Frank X Connelly | 10281 Imperial | Cupertino, CA 85014 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, Raleigh NC |
| Fred B Yeager | 1094 Joseph Ave | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |
| Fred C. Keegan Contractors Inc | 470 East Main St | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |
| Gaylord Bros of North Carolina Inc | 2845 Mt Plagah Church Rd | Sanford, NC 27330 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, Sanford NC |
| Geo Kircher & Sons | 14 Manitore St | Rochester, NY 14621 | Union Construction Company Various Locations | Rochester, NY |
| George Hofmann | 302 Longacre Ave | Woodmere, NY | Union Construction Company Various Locations | Rochester, NY |
| George J & Joseph Kircher Empire EX | 855 Merchant Rd | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |
| Gypsum Constructor Inc | 3255 Middlebelt Rd | Inkster, MI 48142 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, Sanford NC, MI |
| Harry Halloran & Sons Inc/ Maxwell Shmerler & Co | 830 3rd Ave | New York, NY 10017 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Huber Construction Inc | 135 Taylor Dr | Depew, NY 14043 | Union Construction Various Locations Furnaces, Spraycoating | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |

Page 2

51 of 160

Social Security Records Summary

| Employer | Address | City and State | Description of Job | Location of Job Site |
|---|---|---|---|---|
| Hudson Plastering Corp | 122 Burbank Dr | Snyder, NY 14226 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| James L & John J Coyne / Coyne Bros | 11 Westbourne Rd | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |
| John Pike & Son Inc | 1 Circle St | Rochester, NY 14607 | Union Construction Company Various Locations | Rochester, NY |
| John W Ryan Construction Co Inc | 321 Railroad Ave | Greenwich, CT 06830 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, Greenwich CT |
| Johns Manville International Inc | 717 Seventeenth St | Denver, CO 80202 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| L.T. Pfanz Inc | 3910 Dewye Ave | Rochester, NY 14616 | Union Construction Company Various Locations | Rochester, NY |
| LeCesse Corp | 740 Driving Park Ave | Rochester, NY 14613 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, NC |
| LeChase Construction Corp | 318 Smith St PO Box 1789 | Rochester, NY 14608 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, NC |
| M S Kelliher Co Corp | 15 Court SQ | Boston, MA 02108 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, NC |
| Matthew Tavormina/Ritz Home Improvement Co | 919 State Rd | Webster, NY 14580 | Union Construction Co Various Locations | Rochester, NY |
| Penetryn System Inc | PO Box 87 | Knoxville, TN 37901 | Union Construction - Pipelines, Concrete used on railroad bridges during WWII -Various Location | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, Knoxville, TN |
| Ritter Pfaudler Corp | 1100 Midtown Tower | Rochester, NY 14604 | On-site Job Now: Sybron | Rochester, NY |

Page 3

Social Security Records Summary

| Employer | Address | City and State | Description of Job | Location of Job Site |
|---|---|---|---|---|
| Rochester Davis Fetch Corp | 175 Dodge St | Rochester, NY 14606 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Rochester Plastering Co Inc | 508 Glide St | Rochester, NY 14606 | Union Construction Company Various Locations | Rochester, NY |
| Rose P. Widing and John S. Johnston | 146 East Ave | Rochester, NY | Union Construction Company Various | Rochester, NY |
| S J Groves & Sons Co | 985 HWY 169 N | Plymouth, MN 55441 | Union Large Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Plymouth MN |
| S.P. Vaaile & Son Inc | PO Box 1412 | Rochester, NY | Union Construction Company Steel Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse |
| Saucke Bros Construction Co Inc | 184 Smith St | Rochester, NY 14606 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, etc. |
| The Symington Gould Corp | 2 Main Street | Depew, NY 14043 | Union Construction Company Foundry/Ship-Navy excellence in War production - Various | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, etc. |
| Transportation Club of Buffalo Inc | 385 Hamburg St | Buffalo, NY 14204 | Union Construction Company Various Locations Shippers, Carriers | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, etc. |
| W O Locklin & Son Inc | 48 Vista Dr | Rochester, NY 14615 | Union Construction Company Various Locations | Rochester, NY |
| W. N. Clark Co. | 2 State Street | Rochester, NY 14614 | Union Construction Company Various Locations Wood Power Plant | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, etc. |
| W.R. Sproul Inc | 119 Main St E | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |

Page 4

53 of 160

Social Security Records Summary

| Employer | Address | City and State | Description of Job | Location of Job Site |
|---|---|---|---|---|
| Werner Spitz Construction Co Inc | 14 Stoney Clover Ln | Pittsford, NY 14534 | Union Construction Company Various Locations | Rochester, NY University Of Rochester |
| Whitacre Construction Specialties Inc | 5880 McKinley Rd | Brewerton, NY 13029 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, etc. |
| William E Bouley Co Inc | PO Box 87 | Auburn, NY 13021 | Union Construction Company Various Locations | New York City, Rochester, Buffalo, Albany, Glens Falls, Utica, Syracuse, etc. |
| Z Santini & Son Inc | 48 N Water St | Rochester, NY | Union Construction Company Various Locations | Rochester, NY |

NEW YORK STATE DEPARTMENT OF LABOR
Division of Employment
**SUMMARY OF INTERVIEW**

I was treated at Highland Hospital thru the clinic from 1/17/66 thru 1/21/66
for pneumonia as I have already reported to this office.  I have been fully
capable of working since 1/22/66.  I have not belonged to union 11 in about
a year, but am able to get union jobs by getting a permit from the union.
This is how I got my job with Carey Lathing.  I have not applied for
disability benefits.  My illness was pneumonia.  I have checked with Carey
Lathing, and have also contacted Mr. Darin at the union for work.  I have also
sought work with Colum Accoustical.  They did not take an application.  I
understand I must make an active, personal search for work each week and also
that there are serious penalties for wilful false statements to collect benefits.

NEW YORK STATE DEPARTMENT OF LABOR
Division of Employment
**SUMMARY OF INTERVIEW**

I had entered the hospital on the evening of 1/14/66 about 7PM.  I
was treated for pneumonia and not for a hernia.  I have had this trouble
with hernia for about three years and do not feel that this interferes
with my work at all.  However, as long as I was unemployed I decided to see
the doctor about having the hernia taken care of.  I saw the doctor at
Highland Clinic on 3/10/66 at which time I decided to have the hernia
taken care of.  I didnot report to this office on 3/11/66 because I
felt that I would be having an operation soon.  However, I see the doctor
today 3/17/66 and they are not going to operate for a while.  I am
not claiming unemployment insurance benefits until I get my hernia taken
care of.  I understand there are serious penalties for wilful false
statements to collect benefits.   On 1/26/66 when interviewed in this
office I told the interviewer that I went into the hospital on the evening
of 1/14/66 and not 1/17/66.  I had stomach trouble as the result of a cold
and they were testing me for pneumonia.  I did not receive disability
benefits.

Palermo Angelo

Dropped-1964.

2
1950

BRICKLAYERS AND ALLIED CRAFTWORKERS
LOCAL 11 NEW YORK
FUNDS OFFICE

BUILD ARTISTICALLY
WITH UNION BRICKLAYERS

U.S.POSTAGE

| YEAR | MONTH | 1951 | 1954 | 4 | | | | 1960 | |
|---|---|---|---|---|---|---|---|---|---|
| | JAN. | | | | | | | | |
| | FEB. | | | | | | | | |
| | MAR. | DAVIS & PETER | | 180 | Tilina-ADMT | 6.00 | | | |
| | APR. | | " | 27.60 | | 2.40 | 535.55 | | |
| | MAY | | | 24.00 | HOLIDAY | 1.80 | | | |
| | JUNE | | | | AHM | 1.50 | | | |
| | JULY | | " | | " | 80.40 | | | |
| | AUG. | | | | | | | | |
| | SEPT. | | | | | | | | |
| | OCT. | | " " | 127.35 | 180.75 | | | | |
| | NOV. | | " " | 16.45 | | | Burlap | 12.24 | |
| | DEC. | | " " | 13.05 | | | | | |
| | TOTAL | | | 818.22 | 214.32 | 63.30 | 582.65 | 12.00 | 770.28 |
| | | | | 212.35 | | | | | |

| | | 1952 | 1955 | | | | | 1961 | |
|---|---|---|---|---|---|---|---|---|---|
| | JAN. | | | | | | | | |
| | FEB. | D Burts Beth. | | 21.60 | | | | | |
| | MAR. | " | | 24.00 | misc-ASTOR | 1.85 | | | |
| | APR. | | " | 29.92 | " | 2.20 | 596.30 | | |
| | MAY | | " | 24.00 | | | | | |
| | JUNE | | " | 4.80 | | | | | |
| | JULY | | " | 21.00 | | | ABC | 12.50 | |
| | AUG. | | " | 28.20 | | | | | |
| | SEPT. | | SPITZ | 2.40 | | | | | |
| | OCT. | | " | 22.96 | 409.10 | 12.00 | Averol | 1.38 | |
| | NOV. | | Davis Fitch | 11.20 | SPRUCE | 12.60 | | 35.67 | |
| | DEC. | | " " | 22.30 | | 16.20 | | | |
| | TOTAL | | | 230.18 | 444.50 | 50.26 | 697.80 | 57.30 | 82766 |

| | | 1956 | | | 1959 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | JAN. | | | | | | | | |
| | FEB. | Davis Fitch | | 22.80 | | | | | |
| | MAR. | | | 27.60 | | | | | |
| | APR. | " " | | 4.80 | LeChase | 4.77 | | | |
| | MAY | SPITZ | | 9.60 | | | | | |
| | JUNE | " | | 2.40 | | | | | |
| | JULY | | | | " | 27.60 | | | |
| | AUG. | Belklin | | 13.65 | " | 30.00 | | | |
| | SEPT. | | | | " | 26.10 | | | |
| | OCT. | " | | 9.50 | " | 24.39 | | | |
| | NOV. | 2.10 | | | | | | | |
| | DEC. | | | | 8*8 | 7.20 | | | |
| | TOTAL | 2.10 | | 79.35 | | 120.88 | 758.23 | | DUE |

Carried Foward 8 27 66

# Peritoneal Cancer and Occupational Exposure to Asbestos: Results From the Application of a Job-Exposure Matrix

**BACKGROUND:** Because of the rarity of peritoneal mesothelioma, occupational risks associated with it have seldom been studied, particularly among women. In this respect, death certificates databases may provide numbers large enough for analysis, although the International Classification of Diseases, 9th revision (ICD-9) does not single out mesothelioma from the rest of peritoneal cancers. The aim of this paper is twofold: to explore occupational risks of peritoneal cancer among men and women, and to test the performance of a job-exposure matrix in detecting its association with asbestos exposure using the occupation and industry reported in the death certificate.

**METHODS:** From a large database containing information on the 1984-1992 death certificates of 24 U.S. states, we identified 657 deaths from peritoneal cancer and 6,570 controls who died from non-malignant diseases, 1:10 matched by region, gender, race, and 5-year age group.

**RESULTS:** Occupations at risk included insulators among men, and machine operators among women. Among men, we found a significant increase in risk associated with employment in manufacturing industries, such as industrial and miscellaneous chemicals; miscellaneous non-metallic mineral and stone products; construction and material handling machines; and electrical machinery, equipment, and supplies; as well as in services to dwellings and other buildings. Industries at increased risk among women included elementary and secondary schools; miscellaneous retail stores; and publishing and printing. Our job-exposure matrix classified 17 male cases and 3 controls in the high probability category of exposure to asbestos (OR = 61.6). Among men, risk of peritoneal cancer increased significantly by probability and intensity of exposure to asbestos. No such pattern was observed among women. The job-exposure matrix did not classify any female subjects in the high probability or intensity of asbestos exposure.



**DISCUSSION:** This study provides evidence that death certificate data and job-exposure matrices are useful tools to observe well-established associations, such as the one existing between peritoneal cancer and asbestos exposure among men, in spite of crude information, disease misclassification, and occupational misclassification. These factors are more likely to preclude meaningful results among women.

*Am J Ind Med 1999 Jan;35(1):9-14*
*Cocco P, Dosemeci M*
*Occupational Studies Section, National Cancer Institute, Bethesda, MD 20892, USA.*

PMID: 9884740, UI: 99100476

## Mounting mesothelioma and asbestosis mortality

To develop our projections, EWG Action Fund researchers began by examining 25 years-worth of U.S. government data on asbestos mortality derived from death certificates. We found that deaths have been increasing steadily for the past 20 years and are still on the rise for the two asbestos diseases where data are available (see figure 2). Between 1979 and 2001, at least 43,000 Americans died from the signature asbestos cancer, mesothelioma, and an often-fatal non-cancer disease of the lungs called asbestosis. The actual number of deaths from these two diseases could easily be twice as high due to chronic misdiagnoses of both diseases (Markowitz 1997) and the absence of federal tracking for mesothelioma for nearly all of the time period analyzed.

In 2001, almost 1,500 people died with asbestosis listed as the primary or contributing cause of death, a 50 percent increase since 1990 and 340 percent increase since 1980 (NCHS, 2003). Between 1990 and 1999, the National Institute for Occupational Safety and Health estimates that a total of 114,506 years of potential life lost was due to asbestosis (NIOSH, 2002). The estimated number of discharges from non-federal hospitals for asbestosis has also increased dramatically, about four-fold, since 1990 and numbered 20,000 in 1999 (NIOSH 2002).

Mesothelioma was not tracked as a cause of death by federal health officials until 1999. Prior to that time, the National Center for Health Statistics (NCHS) and National Institute for Occupational Safety and Health (NIOSH) tried to estimate the number of deaths due to malignant mesothelioma by using "malignant neoplasm of pleura" (NIOSH) or "malignant neoplasms of the pleura or peritoneum" (NCHS) as surrogate measures because other studies show that a high percentage of these tumors are mesotheliomas. Scientists now know that estimates of mesothelioma based on these surrogate indicators dramatically underestimate the number of deaths due to mesothelioma. The first year that federal officials began tracking mesothelioma as a distinct cause of death, official mortality more than doubled. In 1998, the last year surrogate indicators were used, the estimated number of mesothelioma deaths was 935. One year later, when malignant mesothelioma was specifically coded as a cause of death, the number of deaths was 2,343.



David T. A?
Pre

October 27, 2003

**FEDERAL EXPRESS**

Mrs. Josephine Palermo
Mrs. Gail Garner
Mrs. Marlene Fargo
90 Woodman Park
Rochester, New York  14609

    Re:    Manville Personal Injury Settlement Trust
           Claim of the Estate of Angelo Palermo, Extraordinary Claim
           Mesothelioma/ Proof of Claim Number 519169

Dear Mrs. Garner

       In August of this year you received a final offer to settle your family's claim against the Manville Personal Injury Settlement Trust ("the Trust"). Since that offer was made, your claim has been the subject of considerable discussion among the members of the Extraordinary Claim Panel. As Mrs. Garner and I have discussed, I have been persuaded by the Panel members to increase the Trust's offer to $750,000. I understand that you will accept this offer.

       Given the circumstances presented by this claim, this offer reflects the extraordinary effort you have made as an advocate on behalf of your family. Please confirm the correct payee name that appears on the enclosed check and please call me if you have any questions <u>before</u> you negotiate the enclosed check.

       We have previously received the executed release signed by you, your mother and your sister.

                           Very truly yours,

                           David T. Austern

Enclosure: Check

3110 Fairview Park Drive, Suite 200 P.O.Box 12003, Falls Church, Virginia 22042-0683

Phone: 703-204-9300 Fax: 703-205-6249



THIS DOCUMENT CONTAINS ULTRAVIOLET FIBERS, A PRIOR STAIN VOID FEATURE, A VOID PANTOGRAPH, AND A SIMULATED WATERMARK BACK'R.

**CLAIMS RESOLUTION**
**MANAGEMENT CORPORATION**

SUITE 600
8280 WILLOW OAKS CORPORATE DRIVE
FAIRFAX, VA 22031

Seventy-five thousand and xx /100 Dollars

PAY
TO THE
ORDER OF

Gail Gainer
983 Brown Road
Rochester NY 14622
USA

Deutsche Bank Trust Co. (Delaware)
Wilmington, Delaware

| CHECK NO. | CHECK DATE | VENDOR NO. |
|---|---|---|
| 0002005811 | 10/21/2003 | 519169-229 |

**2005811**

82-38
311

CHECK AMOUNT
*******75,000.00*

⑈2005811⑈ ⑆031100380⑆

0053505

...ORT AND DECISION OF EXTRAORDINARY CLAIMS REVIEW PANEL

Claim number IRC 1261939 came before the Extraordinary Claims Review Panel on December 13, 2005. This claim is governed by the procedures set forth in the Second Amended Restated Asbestos Personal Injury Claims Resolution Procedures ("CRP"). Based upon the submissions reviewed, the Extraordinary Claims Review Panel has reached a majority decision that the claim:

☐ **SHOULD NOT** be considered an Extraordinary Asbestos Personal Injury Claims under Section 5.4 of the CRP. The claimant must, therefore, confine a demand for payment to the Scheduled Values for the appropriate Asbestos Related Disease category set forth in the CRP. Any arbitration award must be limited to the Maximum Value for the Asbestos Related Disease Category.

☒ **SHOULD** be considered an **Extraordinary Asbestos Personal Injury Claim** under Section 5.4 of the CRP. This claim may be settled beyond the Maximum Value for the Asbestos Related Disease Category as set forth in the CRP. And, in the event of arbitration, the claimant may, in the sole discretion of the arbitrator, obtain an award in *excess of the Maximum Value for the appropriate Asbestos Related Disease Category* as set forth in the CRP.

_____
Authorized Representative of Extraordinary
Claims Review Panel

Date: _12/14/05_____

61 of 160

Asbestos Settlement Trust
P.O. Box 1036
Wilmington, Delaware 19899-1036

**CELOTEX RELEASE AND SETTLEMENT**
**OF INDIVIDUALLY REVIEWED**
**DEATH AND SURVIVORSHIP CLAIM**

Claim No. 1261939

The Asbestos Settlement Trust (the "Trust"), a successor to The Celotex Corporation and Carey Canada, Inc., and the undersigned (the "Releasor"), being all of the heirs and personal representatives of Angelo Palermo, deceased, Social Security No. _____ agree as follows:

1.    Releasor has sought individualized review of Releasor's claim against the Trust (the "Claim"). Releasor has accepted the Trust's offer of settlement for the Claim. The agreed Gross Settlement Value ("GSV") of Releasor's Claim is $353,982. The Trust expects to pay only a percentage of the GSV (the "Payment Percentage"). The Payment Percentage may change over time; therefore, there is absolutely no guaranty that Releasor will receive a total payment equal to the GSV times the now current Payment Percentage.

2.    Upon the return to the Trust of this Release and Settlement signed by Releasor and counsel, the Trust will mail to Releasor a check representing the GSV times the then current Payment Percentage, expected as of February 15, 2006 to total $40,000. Releasor will receive no consideration from the Trust other than the payments described in this paragraph.

3.    In consideration for the agreements described above, Releasor hereby fully releases the Trust, The Celotex Corporation, Celotex Corporation, Carey Canada, Inc. and their respective settlors, trustors, trustees, directors, officers, agents, consultants, financial advisors, employees, attorneys, and, except as noted below, predecessors, successors and assigns, and any and all persons or organizations who were entitled to benefit from the injunction entered pursuant to the Modified Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code for the Celotex Corporation and Carey Canada, Inc. (the "Plan") confirmed in Consolidated Case Nos. 90-10016-8B1 and 90-10017-8B1 by the United States District Court for the Middle District of Florida, Tampa Division on March 4, 1997 (collectively "Releasees"), from all claims of any nature allegedly resulting from any exposure to asbestos or asbestos-containing products whether such claims are known or unknown including all claims for death, survivorship, funeral and medical expenses and all spousal claims for injury, loss of services or consortium. This Celotex Release and Settlement of Individually Reviewed Death and Survivorship Claim ("Release and Settlement") does not release any claim of Releasor other than in Releasor's capacity as heir and personal representative. The sole right Releasor retains against any Releasees is the right to the payment from the Trust described in Paragraph 2.

4.    The predecessors, affiliates, subsidiaries, successors and assigns, included among Releasees shall be limited to those specific persons or organizations who were entitled to benefit from the injunction entered pursuant to the Plan (the "Protected Parties" as defined in the Plan). Releasor reserves all rights and preserves all claims against all other persons or entities who may be considered predecessors, affiliates, subsidiaries, successors and assigns of The Celotex Corporation, Celotex Corporation, Carey Canada, Inc. who are not Protected Parties.

5.    Releasor agrees that the law of the State of Florida shall govern the construction, operation and enforcement of this Release and Settlement. Releasor acknowledges that Releasor has carefully read the above Release and Settlement and knows the contents thereof, and Releasor signs the same as Releasor's own free act and deed. Releasor also acknowledges that all information submitted to the Trust with Releasor's claim and, if applicable, thereafter in response to any inquiry, is true and accurate to the best of Releasor's knowledge, information and belief.

6.    Releasor understands that the Trust cannot say with any assurance what the Payment Percentage will be in future years, and Releasor acknowledges that the Trust has made no representation or agreement as to the likely level of any such future Payment Percentage. Releasor understands that because of the variables affecting the Payment Percentage, it is possible that holders of similar claims

above, the person(s) executing this Agreement has (have) all requisite legal authority to act for, bind, and accept payment on behalf of the decedent and shall defend and indemnify the Trust upon any claim that any other person may assert on behalf of the decedent.

_____
Personal
Representative/Executor

Or, if no Personal Representative

*Josephine Palermo*
Decedent's Spouse

Witnessed:

*Mary C Marks*
Witness

*3-10-06*
Date

*Josephine Palermo*
Josephine Palermo, representative

### NOTICE

No claimant under that plan is or will be, pursuant to orders entered by the United States District Court for the Northern District of Ohio, receiving any so-called "Dana Rights" or "Dana Liabilities".

Accordingly, the Celotex Trust is transferring no right or cause of action whatsoever against the Dana Corporation to any claimant.

In 1999, the United States District Court for the Northern District of Ohio issued a permanent injunction requiring that any claims against Dana referred to in the Plan as Dana Rights or Dana Liabilities may be brought only in the United States District Court for the Northern District of Ohio.

Pursuant to orders of United States District Court for the Northern District of Ohio, any attempt to transfer any right or cause of action, or to seek to enforce any such right or cause of action against Dana Corporation contrary to the orders of that court will be deemed, and sanctioned as, contempt of that court.

The Trust has provided a copy of the Final Judgment to your counsel and this order is available on request from your counsel.

No claim against the Trust shall be approved or allowed until a claimant, either individually or through counsel, has, by signing a copy hereof, acknowledged receipt of this notice and his, her, or its understanding of its terms.

### ACKNOWLEDGEMENT

I (WE) HAVE RECEIVED AND READ AND UNDERSTAND THE FOREGOING NOTICE, AND UNDERSTAND (1) THAT WE HAVE NOT RECEIVED AND ARE NOT RECEIVING ANY TRANSFER OF ANY RIGHT OR CAUSE OF ACTION AGAINST THE DANA CORPORATION FROM THE CELOTEX ASBESTOS SETTLEMENT TRUST AND (2) THAT ANY ACTION OR CLAIM CONCERNING ANY PUTATIVE CAUSE OR RIGHT OF ACTION AGAINST DANA ASSIGNED, RECEIVED, OR OBTAINED FROM OR THROUGH THE TRUST MUST BE BROUGHT ONLY IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO AND IN NO OTHER TRIBUNAL OR COURT.

*Josephine Palermo*

Dated: *3/10/06*













MARGIN RESERVED FOR BINDING

THIS CERTIFICATE MUST BE FILED WITH THE LOCAL REGISTRAR WITHIN 72 HOURS AFTER DEATH. TYPEWRITE, HAND-PRINT OR WRITE LEGIBLY IN PERMANENT BLACK OR BLUE-BLACK INK. SIGNATURES SHOULD BE LEGIBLE. THIS IS A PERMANENT RECORD.

(See Reverse for Instructions)

**New York State Department of Health**
**OFFICE OF VITAL RECORDS**
**CERTIFICATE OF DEATH**

Dist. No. ____    2701    Registered No. ____

1. PLACE OF DEATH   a. COUNTY — Monroe   b. STATE — New York

2. USUAL RESIDENCE — a. STATE New York   b. COUNTY Monroe   b. CITY OR TOWN Rochester

3a. NAME OF DECEASED — ANGELO PALERMO

4. SEX — male   5. COLOR OR RACE — white   6. MARRIED — married

WIFE — Josephine

MOTHER — Cornelia Lombardo

FATHER — Christopher Palermo

Residence — 796 Randolph St.

MEDICAL CERTIFICATION

22. CAUSE OF DEATH —
PART I. IMMEDIATE CAUSE (a) — Acute Liver Failure
DUE TO (b) — M. GITIS TOXIC Ca
DUE TO (c) — PRIMARY STOMACH

PART II. OTHER SIGNIFICANT CONDITIONS

I hereby certify that I attended the deceased from 4-12, 19.66 to 4-23, 19.66 and that death occurred at 12.50 a.m. from the causes and on the date stated above.

24b. SIGNATURE — Biagio Foresta Vincenzo M.D.

21a. DATE SIGNED — 4/25/66

BURIAL — Holy Sepulchre Cemetery Rochester New York

22. DATE — 4/26/1966

23. FUNERAL DIRECTOR — B. F. Giacalone

Certified to be a true copy of a record on file in the Office of Vital Statistics

_____ Commissioner of Deeds

70 of 100



**EARLY ♦ LUDWICK ♦ SWEENEY ♦ STRAUSS**

MESOTHELIOMA

- **Treatment Update**
- What is Mesothelioma
- Conventional Therapies
- Experimental Therapies
- Clinical Trials
- Treatment by Stage
- Ask your Doctor?
- Cancer Centers
- Leading Physicians
- Articles & Abstracts
- Other Sources





# Mesothelioma Treatment

## What is Mesothelioma?

Malignant mesothelioma is an uncommon, but no longer rare, cancer that is difficult to diagnose and poorly responsive to therapy. Malignant mesothelioma is the most serious of all asbestos-related diseases.

A layer of specialized cells called mesothelial cells lines the chest cavity, abdominal cavity, and the cavity around the heart. These cells also cover the outer surface of most internal organs. The tissue formed by these cells is called mesothelium.

The mesothelium helps protect the organs by producing a special lubricating fluid that allows organs to move around. For example, this fluid makes it easier for the lungs to move inside the chest during breathing. The mesothelium of the chest is called the pleura and the mesothelium of the abdomen is known as the peritoneum. The mesothelium of the pericardial cavity (the "sac-like" space around the heart) is called the pericardium.

Tumors of the mesothelium can be benign (noncancerous) or malignant (cancerous). A malignant tumor of the mesothelium is called a malignant mesothelioma. Because most mesothelial tumors are cancerous, malignant mesothelioma is often simply called mesothelioma.

Mesothelioma was recognized as a tumor of the pleura, peritoneum and pericardium in the late 1700's. However it was not until much later, in 1960, that this particular type of tumor was described in more detail and even more importantly, its association with asbestos exposure was recognized. The first report linking mesothelioma to asbestos exposure was written by J.C.Wagner, and described 32 cases of workers in the "Asbestos Hills" in South Africa. Since than the relationship between mesothelioma and asbestos exposure has been confirmed in studies around the world.

The incidence of mesothelioma in the United States remains very low, with 14 cases occurring per million people per year. Despite these numbers the noticed threefold increase in mesothelioma in males between 1970 and 1984, is directly associated with environmental and occupational exposure to asbestos, mostly in areas of asbestos product plants and shipbuilding facilities.

Although the disease is much more commonly seen in 60-year old men, it has been described in women and early childhood as well. The cause of the disease is not so well understood in these latter two groups, but there is some evidence of possible asbestos exposure for some of these cases as well.

Malignant mesotheliomas are divided into three main types. About 50% to 70% of mesotheliomas are the epithelioid type. This type has the best prognosis (outlook for survival). The other two types are the sarcomatoid type (7%-20%), and the mixed/biphasic type (20%-35%). Treatment options for all three types are the same.

About three-fourths of mesotheliomas start in the chest cavity. They are known as pleural mesotheliomas. Another 10% to 20% begin in the abdomen. These are called peritoneal mesotheliomas. Pericardial mesotheliomas, those starting in the cavity around the heart, are very rare. The covering layer of the testicles is actually an outpouching of peritoneum into the scrotum. Mesotheliomas that affect this covering of the testicles are quite rare.

## What are the key statistics about mesothelioma?

Mesothelioma is fairly rare. There are an estimated 2,000 to 3,000 new cases per year of mesothelioma in the United States, but this figure appears to be increasing.



The average age at diagnosis is 50 to 70 years old. The disease affects men 3 to 5 times more often than women. Mesothelioma is less common in African Americans than in white Americans.

Mesothelioma is a serious disease. By the time the symptoms appear and cancer is diagnosed, the disease is often advanced. The average survival time is about one year. However, if the cancer is found early and treated aggressively, almost half of the patients whose cancer is found early reach the two-year mark, and about 20% survive five years.

The 5-year survival rate refers to the percent of patients who live at least 5 years after their cancer is diagnosed. Many of these patients live much longer than 5 years after diagnosis, and 5-year rates are used to produce a standard way of discussing prognosis. Five-year relative survival rates exclude from the calculations patients dying of other diseases, and are considered to be a more accurate way to describe the prognosis for patients with a particular type and stage of cancer. Of course, 5-year survival rates are based on patients diagnosed and initially treated more than 5 years ago.



Improvements in treatment often result in a more favorable outlook for recently diagnosed patients.

## What are the different types of mesothelioma?

### Pleural Mesothelioma

Pleural mesothelioma spreads within the chest cavity, sometimes involving the lung. Metastases can occur in any organ, including the brain, and are much more common than previously thought.

The onset of mesothelioma is usually very slow, the most common presenting symptom is persistent pain localized in the chest. Sometimes the pain is accompanied by severe difficulty breathing, due to an accumulation of fluid in the pleural space known as pleural effusion. Cough, weight loss and fever are not uncommon. The most valuable single test to show the extent of the disease is a computed chest tomograph (CT-scan).

There are currently no serum markers available for the diagnosis of mesothelioma. The detection of elevated serum levels of hyaluronic acid may be useful in differentiating mesotheliomas from other tumors, or to follow the effect of treatment.

The median survival is about 17 months from the beginning of symptoms. The 3-year survival is 10% the 5-year survival is approximately 5% ( if 100 patients are diagnosed with mesothelioma at a specific point in time, that means that 10 patients will still be alive at the end of 3 years and 5 patients will only be alive at the end of 5 years).

### Peritoneal Mesothelioma

Peritoneal mesothelioma involves the abdominal cavity, infiltrating the liver, spleen or the bowel. As with pleural mesothelioma pain is the most common presenting complaint. In addition, due to fluid accumulation in the abdominal cavity (ascites), the abdomen appears enlarged. The patients experience nausea, vomiting, swelling of their feet, fever and difficulty in moving their bowels.

The prognosis is poorer than for pleural mesothelioma with a median survival time of about 10 months from the onset of symptoms.

### Benign Mesothelioma:

A rare form of mesothelioma is the cycstic mesothelioma of

the peritoneum. Its prognosis is benign. Its occurrence has been described primarily in young women. However the diagnosis presents difficulties, requiring extensive electron miscroscopy and immunohistochemical studies.

**Rare Sites:**

Mesothelioma of the pericardium, is a very seldom seen cardiac cancer. The mass is usually detected at a late stage by echocardiography, the prognosis is very poor , with or without therapy. Mesothelioma of the ovaries and the scrotum have also been reported in the literature. The management differs based on the stage of the disease, the prognosis is also very poor. The etiology of the few cases of mesothelioma described in children remains unclear and is not believed to be asbestos-related, the therapy and prognosis differ on an individual basis.

## What are the risk factors for malignant mesothelioma?

A risk factor is anything that increases a person's chance of getting a disease such as cancer. Different cancers have different risk factors. For example, unprotected exposure to strong sunlight is a risk factor for skin cancer and smoking is a risk factor for lung cancer as well as other types of cancer. Scientists have found several risk factors that make a person more likely to develop mesothelioma.



**Asbestos:** The main risk factor for developing mesothelioma is exposure to asbestos. Asbestos refers to a family of magnesium-silicate mineral fibers. In the past, asbestos was used widely for insulation because it does not conduct heat well and it is resistant to melting or burning. As the link between asbestos and mesothelioma has become well known, the use of this material has decreased. However, up to 8 million Americans may already have been exposed to asbestos.



According to the United States Environmental Protection Agency, as many as 733,000 schools and public buildings in the country today contain asbestos insulation. As many as 10% to 15% of schools in the United States may contain asbestos insulation. People who may be at risk for occupational asbestos exposure include some miners, factory workers, insulation manufacturers, railroad workers, ship builders, gas mask manufacturers, and construction workers, particularly those involved with installing insulation. Several studies have shown that family members of people exposed to asbestos at work have an increased risk of developing mesothelioma, because asbestos fibers are carried home on the clothes of the workers.

http://www.elslaw.com/treatment_info.htm                    10/31/2001

There are two main forms of asbestos -- serpentine and amphiboles. Serpentine fibers are curly and pliable. Chrysotile is the only type of serpentine fiber and it is the most widely used form of asbestos. Amphiboles are thin, rod-like fibers of which there are 5 main types-crocidolite, amosite, anthrophylite, tremolite, and actinolyte. Amphiboles (particularly crocidolite) are considered to be the most carcinogenic (cancer-causing). However, even the more commonly used chrysotile fibers have been associated with malignant (cancerous) mesotheliomas and should be considered dangerous as well.

It may be that asbestos causes cancer by physically irritating cells rather than by a chemical effect. When fibers are inhaled, most are cleared in the nose, throat, trachea (windpipe), or bronchi (large breathing tubes of the lungs). Fibers are cleared by sticking to mucus inside the air passages and being coughed up or swallowed. The long, thin, fibers are less readily cleared, and they may reach the ends of the small airways and penetrate into the pleural lining of the lung and chest wall. These fibers may then directly injure mesothelial cells of the pleura, and eventually cause mesothelioma.

Asbestos fibers can also damage cells of the lung and result in asbestosis (formation of scar tissue in the lung), and/or lung cancer. The risk of lung cancer among people exposed to asbestos is increased by 7 times, compared with the general population. Indeed, asbestosis, mesothelioma, and lung cancer are the three most frequent causes of death and disease among people with heavy asbestos exposure. Peritoneal mesothelioma, which forms in the abdomen, may result from coughing up and swallowing inhaled asbestos fibers. Cancers of the larynx, pancreas, esophagus, colon, and kidney have also been linked to asbestos exposure, but the increased risk is not as great as with lung cancer.

The risk of developing a mesothelioma is related to how much asbestos a person was exposed to and how long this exposure lasted. People exposed at an early age, for a long period of time, and at higher levels are most likely to develop this cancer. Mesotheliomas take a long time to develop. The time between exposure to asbestos and diagnosis of mesothelioma is usually between 20 and 40 years.

Although the risk of developing mesothelioma rises with the amount of asbestos exposure, it is clear that genetic factors also play a role in determining who develops the disease. This explains why not all persons exposed to high levels of asbestos dust develop mesothelioma.

**Radiation:** There have been a few published reports of pleural and peritoneal mesotheliomas that developed following exposure to thorium dioxide (Thorotrast). This material was used in the past by doctors for certain x-ray

tests. Because Thorotrast was found to cause cancers, it has not been used for many years.

**Zeolite:** This is a silicate mineral, chemically related to asbestos, common in the soil of the Anatoli region of Turkey. A few cases of mesothelioma have been described in this region and may have been caused by this mineral.

**Simian Virus 40 (SV40):** This virus has recently been identified by researchers in human mesothelioma cells, and has been shown to induce mesothelioma in the animal model. Polio vaccines administered as a primary prevention measure during 1955 - 1961 have been shown to be contaminated with SV40. However the implications of these facts are not totally understood and further research will be needed to clarify the link between malignant mesothelioma and a viral etiology.

**Tobacco:** Although tobacco smoking has not been associated with the development of mesotheliomas, the combination of smoking and asbestos exposure greatly increases the risk of lung cancer. Asbestos workers who also smoke have a lung cancer risk 50 to 90 times greater than that of the general population. More asbestos workers die of lung cancer than of mesothelioma.

## What causes mesothelioma?

Asbestos exposure is the main cause of mesothelioma. After these fibers are breathed in, they travel to the ends of small air passages and reach the pleura where they cause physical damage to mesothelial cells that may result in cancer. In addition, they also cause injury to lung cells that can result in lung cancer and/or asbestosis (replacement of lung tissue by scar tissue). If swallowed, these fibers can reach the abdominal cavity where they have a role in causing peritoneal mesothelioma.

Exposure to asbestos, though mostly occupational, can also be environmental, or familial by household contamination, through the work clothes of an asbestos worker for instance.

Beginning 15 years after the onset of exposure, about 6% of asbestos workers die of mesothelioma. In one study of asbestos insulation workers, the death rate from mesothelioma was 344 times higher than in the general population. (Selikoff IJ et al. Relation between exposure to asbestos and mesothelioma. NEJM)

## What are the signs and symptoms of mesothelioma?

Early symptoms of mesotheliomas are not specific to the disease. People often ignore them or mistake them for common, minor ailments. Most people with mesothelioma have symptoms for only 2 to 3 months before they are diagnosed. About one-fourth have symptoms for at least six months prior to their diagnosis.

Over half of patients with pleural mesothelioma have pain in the lower back or at the side of the chest. Many report shortness of breath. A smaller percentage have trouble swallowing, cough, fever, sweating, fatigue, and weight loss. Other symptoms include hoarseness, coughing up blood, swelling of the face and arms, muscle weakness, and sensory loss.

Symptoms of peritoneal mesothelioma include abdominal (belly) pain, weight loss, nausea, and vomiting. There may also be a hernia, fluid in the abdominal cavity or a mass in the abdomen.

A person with any of these symptoms who has been exposed to asbestos should see a doctor right away.

## How is mesothelioma diagnosed?

If there is a reason to suspect you may have a mesothelioma, the doctor will use one or more methods to find out if the disease is really present.

**Medical history and physical examination:**

A complete medical history (interview) is taken to check for risk factors and symptoms. This will include questions to determine if you have been exposed to asbestos.

A physical exam will provide information about signs of mesothelioma and other health problems. Patients with pleural mesotheliomas (mesotheliomas of the chest) often have pleural effusion (fluid in their chest cavity) caused by the cancer. Ascites (fluid in the abdominal cavity) in cases of peritoneal mesothelioma, and pericardial effusion (fluid in the pericardium) in cases of pericardial mesothelioma can also be detected during a physical exam.

**Imaging tests:**

A chest x-ray may show irregular thickening of the pleura, pleural calcifications (mineral deposits), lowering of the lung fissures (spaces between the lobes of the lungs), and fluid in the pleural space. These findings suggest asbestos exposure leading to the development of a mesothelioma.

Imaging studies such as x-rays, computed tomography (CT)

scans, and magnetic resonance imaging (MRI) scans will help determine the location, size, and extent of the cancer. The CT scan uses a rotating x-ray beam to create a series of pictures of the body from many angles. A computer combines these pictures to produce detailed cross-sectional images of a selected part of the body. To highlight details on the CT scan, you may be asked for permission to have a harmless dye injected into a vein. MRI uses magnetic fields instead of x-rays to create images of selected areas of the body. As with the CT scan, a computer generates a detailed cross-sectional image.

**Tests of fluid and tissue samples:**

In patients with a pleural effusion, a sample of this fluid can be removed by inserting a needle into the chest cavity. A similar technique can be used to obtain abdominal fluid and pericardial fluid. The fluid is then tested to show its chemical make up and viewed under a microscope to determine whether cancer cells are present.

A tissue sample of a pleural or pericardial tumor can be obtained using a relatively new technique called thoracoscopy. A thoracoscope (telescope-like instrument connected to a video camera) is inserted through a small incision into the chest. The doctor can see the tumor through the thoracoscope, and can use special forceps to take a tissue biopsy. Similarly, laparoscopy can be used to see and obtain a biopsy of a peritoneal tumor. In this procedure, a flexible tube attached to a video camera is inserted into the abdominal cavity through small incisions on the front of the abdomen. Fluid can also be collected during thoracoscopy or laparoscopy.

Surgery, either a thoracotomy (which opens the chest cavity) or a laparotomy (which opens the abdominal cavity), allows the surgeon to remove a larger sample of tumor or, sometimes, to remove the entire tumor.

For patients who might have pleural mesothelioma, the doctor may also do a bronchoscopy. In this procedure a flexible lighted tube is inserted through the mouth, down the trachea, and into the bronchi to see if there are other masses in the airway. Small samples of abnormal-appearing tissue can be removed for testing.

The patient may also have a mediastinoscopy. A lighted tube is inserted under the sternum (chest bone) at the level of the neck and moved down into the chest. Mediastinoscopy allows the surgeon to view the lymph nodes in this area and remove samples to check for cancer. Lymph nodes are bean-sized collections of immune system cells that help the body fight infections and cancers. Cancers arising in the lung often spread to lymph nodes, but mesotheliomas rarely do this. Tests of lymph nodes can give the doctor information on

whether a cancer is still localized or if it has started to spread, and can help distinguish lung cancer from mesothelioma.

It is often hard to diagnose mesothelioma by looking at the cells from the fluid around the lungs, abdomen or heart. It is even hard to diagnose mesothelioma with tissue from biopsies. Under the microscope, mesothelioma can look like several other types of cancer. For example, pleural mesothelioma may resemble some types of lung cancer and peritoneal mesothelioma may resemble some cancers of the ovaries. For this reason, special laboratory tests are often done to help distinguish mesothelioma from some other cancers. These tests often use special techniques to recognize certain markers (types of chemicals) known to be contained in mesotheliomas. Different markers are present in cancer of the lung or ovary. The electron microscope can sometimes be helpful in diagnosing mesothelioma. This microscope can magnify samples more than 100 times greater than the light microscope which is generally used in cancer diagnosis. This stronger microscope makes it possible to see small parts of the cancer cells that distinguish mesothelioma from other types of cancer.

The diagnosis of mesothelioma presents problems primarily initially in the distinction between mesothelioma and other forms of cancer such as adenocarcinoma or benign, noncancerous pleural inflammation. The best diagnostic tools at the moment remain the open pleural biopsy performed during thoracoscopy. This procedure also allows for direct visualization of the inside of the chest, and information of involvement of other organs and extension of disease. Other procedures with lower yields are CT guided pleural biopsy, or blind pleural biopsy. In addition to the gross appearance of the tumor, pathologists often rely on a panel of histochemical and immunohistochemical stains to diagnose or exclude meosothelioma. Currently markers linked to prognosis of mesothelioma are under study, but have not been validated for the general use.

## How is mesothelioma staged?



Staging is the process of finding out how far the cancer has spread. Staging of mesothelioma is based on imaging studies such as x-rays, CT scans, and MRI scans. The treatment and outlook for patients with mesothelioma largely depends on the stage (extent of spread) of their cancer. Since pleural mesothelioma occurs most frequently and has been studied the most, it is the only mesothelioma for which a staging classification exists.

The staging system most often used for mesothelioma is the Butchart system. This system is based mainly on the extent of the primary tumor mass, and divides mesotheliomas into stages I through IV.

## Butchart Staging System

**Stage I:** Mesothelioma is present within the right or left pleura, and may also involve the lung, pericardium, or diaphragm (the muscle separating the chest from the abdomen) on the same side.

**Stage II:** Mesothelioma invades the chest wall or involves the esophagus (food passage connecting the throat to the stomach), heart, or pleura on both sides. The lymph nodes in the chest may also be involved.

**Stage III:** Mesothelioma has penetrated through the diaphragm into the peritoneum (lining of the abdominal cavity). Lymph nodes beyond those in the chest may also be involved.

**Stage IV:** There is evidence of distant metastases (spread through the bloodstream to other organs).

Another staging system has recently been developed by the American Joint Committee on Cancer (AJCC). This is a TNM system, similar to staging systems used for most other cancers. T stands for tumor (its size and how far it has spread to nearby organs), N stands for spread to lymph nodes and M is for metastasis (spread to distant organs). In TNM staging, information about the tumor, lymph nodes, and metastasis is combined in a process called stage grouping to assign a stage described by Roman numerals from I to IV. Minor differences exist between the AJCC TNM staging system and the Butchart staging system.

## TNM Staging System

**Stage I:** Mesothelioma involves the right or left pleura. It may also have spread into the lung, pericardium, or diaphragm on the same side. It has not yet spread to the lymph nodes.

**Stage II:** Mesothelioma has spread from the pleura on one side to the nearby peribronchial and/or hilar lymph nodes next to the lung on the same side. It may also have spread into the lung, pericardium, or diaphragm on the same side.

**Stage III:** Mesothelioma has spread into the chest wall muscle, ribs, heart, esophagus, or other organs in the chest on the same side as the primary tumor, with or without spread to subcarinal and/or mediastinal lymph nodes on the same side as the main tumor. Subcarinal nodes are located at the point where the windpipe branches to the left and right lungs. Mediastinal lymph nodes are located in the space behind the chest bone in front of the heart. Mesotheliomas with the same extent

of local spread as in stage II that have also spread to subcarinal and/or mediastinal lymph nodes on the same side are also included in stage III.

 **Stage IV:** Mesothelioma has spread into the lymph nodes in the chest on the side opposite that of the primary tumor, or directly extends to the pleura or lung on the opposite side, or directly extends into the peritoneum, or directly extends into organs in the abdominal cavity or neck. Any mesothelioma with evidence of distant metastases (spread to other organs through the bloodstream) or spread to organs beyond the chest or abdomen is included in this stage.

Although the recently developed TNM classification is the most detailed and precise, the original Butchart staging system is still used most often to describe the spread of pleural mesotheliomas. Understanding these staging systems for mesothelioma is important both for estimating and better understanding prognosis, and also for assessing therapeutic options.

**Prognostic Factors:**

 Because pleural mesothelioma has been better studied than peritoneal mesothelioma we know more about factors associated with prognosis for pleural mesothelioma. Younger age at diagnosis, performance status (functional status) and absence of weight loss are associated with a more favorable prognosis.

Mesotheliomas are usually of three different cell types (histological analysis): 1) epithelial cell type - has the most favorable prognosis; 2) fibrosarcomatous cell type - carries the worst prognosis and 3) mixed cell type - has an intermediate prognosis.

## Glossary of terms

**asbestos:** combination of several minerals that separate into long, threadlike fibers. Because they do not burn, do not conduct heat or electricity, and are very resistant to chemicals, these minerals are often used for making fireproof materials, electrical insulation, roofing, filters, etc. benign: doing no harm, good incidence: the frequency with which an event occurs (usually in a group at risk) pericardium: a thin membrane surrounding the heart and the roots of the great blood vessels.

**peritoneum:** a thin membrane that covers the abdominal cavity and partially covers some of the abdominal organs.

**pleura:** a thin membrane that covers the lungs (visceral

pleura) and lines the chest cavity (parietal pleura) malignant: harmful, dangerous (a malignant tumor is a cancer).

**median:** middle number in a series of numbers (for example: median survival of 10 months means that for that specific group of patients the survival varied from probably 2 months to 30 months).

**mesoderm:** the middle layer of cells in an embryo, from which the muscular, skeletal, vascular, connective etc. tissues develop.

 **mesothelioma:** a tumor of the mesothelium, that can be benign (localized) or malignant (diffusely spread), and that is most commonly caused by the ingestion of asbestos particles.

**mesothelium:** the thin layer of mesodermal epithelial cells that forms the pleura, peritoneum, pericardium.

 **metastases:** the spread of tumor cells from one part of the body to another unrelated part of the body by the way of the bloodstream or lymphatics.

**prognosis:** prediction of the probable course of the disease in an individual. Prognostic factors are factors associated with prognosis.

**TNM staging:** assigning a stage to the tumor based on size, local versus disseminated growth, lymph node involvement and presence or absence of distant metastases.

**tumor:** a mass of tissue, a growth independent of its surrounding structures and having no physiological function/ a neoplasm. A tumor can be benign or malignant.

**If you have any questions regarding your legal rights, please contact us.**

---

If you have any questions regarding your legal rights, please contact us.

Disclaimer | Privacy Statement

---

Asbestos | Mesothelioma | Other Areas | About ELSS
Bulletin Boards | Site Map | Home

---

**EARLY ♦ LUDWICK ♦ SWEENEY ♦ STRAUSS**

http://www.elslaw.com/treatment_info.htm                          10/31/2001

82 of 160

## 1-800-336-0086

**New York Offices**
360 Lexington Ave., 20th Floor
New York, New York, 10017
(P): 212-986-2233
(F): 212-986-2259

**New Haven Office**
One Century Tower
265 Church Street
New Haven, CT 06508-1866
(P): 203-777-7799
(F): 203-785-1871

Copyright © 1998 by James F. Early LLC.
All Rights Reserved.

Web Site Development By: Innovative Internet Marketing Solutions

EARLY, LUDWICK, SWEENEY AND STRAUSS - New York Asbestos Exposure, Manufacturers, Job... Page 1 of 1

# Asbestos Industry

## All Job Sites

### New York - Job Sites

State ▼ | Go

If you or a relative has ever worked at one of the job sites listed below, you may have been exposed to high levels of asbestos.

Towns / Boroughs: A-F, G-Man, Mas-Z

### Albany

A.J. Eckert
Albany Five & Ten Cent Bank
Albany Government Center
Albany Housing Project
Albany Medical College
Albany Power Plant
Albany South Mall
Albany State Mental Hospital
Albany Steam Station
Albany VA Hospital
Albany Veterinarian Hospital
Beacon Oil
Cabro Oil Co.
G.A. Fuller
Glenmont Power Station
Lincoln Housing
New Dorm-Albany State Teachers
Niagara Mowhawk Powerhouse
Sheridan Ave. Steam Station

## Auburn

Mercy Hospital Health &
  Rehabilitation
Mercy Hospital Nursing Home

## Buffalo

Food Machinery Corp.
**Hooker Chemical Plant**
Huntley Station
Main Place at Pearl & Court St.
Police Headquarters Garage
Sealtest Foods Inc.
Temple Beth Zion

## Glen Falls

Finch & Prive Paper Mill

## Rochester

Bee Bee Station
Kodak
Oden Bach Shipyard
Red Cross Building
Russel Station
St. Mary's Hospital
University of Rochester
  Dining Hall

## Schenectady

St. Clair Hospital
General Electric

## Utica

St. Elizabeth Hospital
St. Mary's Hospital

EARLY, LUDWICK, SWEENEY AND STRAUSS - New York Asb████████ ████tos Expo

# Asbestos Industry

## All Job Sites

## New York - Job Sites

State ▼

If you or a relative has ever worked at one of t██████████ ████ Job sites
listed below, you may have been exposed to hi████████ ███h levels c
asbestos.

Towns / Boroughs: A-F, G-Man, Mas-Z

### Albany

A.J. Eckert
Albany Five & Ten Cent Bank
Albany Government Center
Albany Housing Project
Albany Medical College
Albany Power Plant
Albany South Mall
Albany State Mental Hospital
Albany Steam Station
Albany VA Hospital
Albany Veterinarian Hospital
Beacon Oil
Cebro Oil Co.
G.A. Fuller
Glenmont Power Station
Lincoln Housing
New Dorm-Albany State Teachers
Niagara Mowhawk Powerhouse
Sheridan Ave. Steam Station

ttp://www.lungcancer.com/jobsites_ny.htm

## Manufacturing Plants in New York State
## With Asbestos Exposures

Alcan (Oswego)
Alcoa (Massena)
Beech Nut (Montgomery)
Bethlehem Steel (Buffalo)(Lackawanna)
Blue Circle Cement (Ravena)
Borg Warner (Ithaca)
Bristol-Meyers (East Syracuse)
Ciba Geigy-Hercules (Queensbury)
Corning
Eastman Kodak (Rochester)
Fairchild Republic (Farmingdale)
Foster Wheeler (Dansville)
Garlock (Palmyra)
General Electric ( Auburn, Waterford,
Schenectady, Hornell, Hudson Falls, Fort
Edward)
General Motors Powertrain (Massena)
Goulds Pumps (Seneca Falls)
IBM (Poughkeepsie, Endicott, Hopewell Junction,
Owego, Kingston, Yorktown)
International Paper (Ticonderoga)(Corinth)
International Wire (Camden)
Kraft Foods (North Lawrence)
Lockheed Martin (Owego)
Nabisco (Buffalo)
Nestle Foods (Fulton)
Northrop Grumman (Bethpage)
Occidental Chemical (Niagra Falls)
Revere Cooper (Rome)
Revere Smelting (Middletown)
Reynolds Metals (now Alcoa) (Massena)
Stauffer Chemical (Skianeateles Falls)
Union Fork & Hoe (Utica)
Wabash Alloys (Syracuse)
Wyeth-Ayerst (Pearl River)
Xerox (Rochester)





M. STATE COLLEGE FOR TEACHERS. ALBANY. N. Y.

QRI    DATB101/31/00    *PAY120-03 9001    *DD1*00

```
F E REED GLASS CO
860 MAPLE ST
ROCHESTER            NY  00000-0000

       FRANK X CONNELLY

       GEO KIRCHER & SONS

       DAVIS FETCH & CO INC

    EIN 160727621
    TRANSPORTATION CLUB OF BUFFALO INC
    365 HAMBURG ST
    BUFFALO             NY  14204-0000
```

*postcard*

```
0350 WA              A   PALERM       14.88        .00 1-0002-05-0634 049
0350 WA              A   PALERM      501.26        .00 1-0001-52-5293 049
0650 WA              A   PALERM     1016.63        .00 1-0001-03-2347 049
0950 WA              A   PALERM     1290.00        .00 1-9002-06-7531 049
1250 WA              A   PALERM      192.11        .00 1-0001-01-0187 049

       DAVIS FETCH & CO INC

       FRANK X CONNELLY

0351 WA              A   PALERM      615.88        .00 1-0001-03-2011 049
0651 WA              A   PALERM       32.00        .00 1-0003-15-0450 049
0651 WA              A   PALERM      841.00        .00 1-0001-12-1667 049
0951 WA              A   PALERM      985.75        .00 1-0001-01-3871 049
1251 WA              A   PALERM       89.25        .00 1-9081-11-6425 049
1251 WA              A   PALERM      691.50        .00 1-0001-05-1522 049

       FRANK X CONNELLY


    BRISTOL INSULATION CO INC
    11 PARK PL
    NEW YORK            NY  10007-0000


    GEORGE J & JOSEPH KIRCHER
    EMPIRE EX
    855 MERCHANT RD
    ROCHESTER           NY  00000-0000

0352 WA              A   PALERM      836.00        .00 1-0003-09-3531 0499
0352 WA              A   PALERM       90.00        .00 1-0001-07-3531 0499
0652 WA              A   PALERM       66.00        .00 1-0002-15-1423 0499
0952 WA              A   PALERM      260.00        .00 1-0001-05-2632 0499
0952 WA              A   PALERM       62.25        .00 5-9013-12-7359 0499
1252 WA          :   A   PALERM      464.00        .00 1-0162-08-0398 0499
1252 WA              A   PALERM      155.43        .00 1-0025-07-0284 0499
1252 WA              A   PALERM      152.00        .00 1-9189-19-6019 0499

       DAVIS FETCH & CO INC

       FRANK X CONNELLY
```

THE TOP 20 IN CHEMICAL PLANTS





Speed and Precision Worldwide



► **THE TOP 20 IN CHEMICAL PLANTS***

| RANK | FIRM | $ MIL |
|---|---|---|
| 1 | Fluor Daniel Inc. | 1,877.00 |
| 2 | Kellogg Brown & Root | 413 |
| 3 | Foster Wheeler Corp. | 313.8 |
| 4 | Morrison Knudsen Corp. | 303 |
| 5 | Jacobs Sverdrup | 296 |
| 6 | Dillingham Construction Holdings Inc. | 76 |
| 7 | Suitt Construction Co. | 73.6 |
| 8 | Day & Zimmermann International Inc. | 55.4 |
| 9 | Austin Industries | 52 |
| 10 | PCL Enterprises Inc. | 40 |
| 11 | J.A. Jones Inc. | 31 |
| 12 | Brinderson Corp | 30.5 |
| 13 | Skanska (USA) Inc. | 30 |
| 14 | Lockwood Greene Engineers Inc. | 29 |
| 15 | McCarthy | 28 |
| 16 | Fru-Con Construction Corp. | 21.8 |
| 17 | LeChase Construction Services LLC | 20 |
| 18 | Raytheon Engineers & Constructors | 19 |
| 19 | The Whiting-Turner Contracting Co. | 18.5 |
| 20 | Performance Contractors Inc. | 18.1 |

*Based on total 1998 contracting revenue as reported in ENR's Sourcebook M

Return to 1999 TOP 400 CONTRACTORS SOURCEBOOK Main P



Home

This week's magazine
› Cover story
› Covers and Features
› Information
  Technology
› Stock Tracker
› Equipment Tracks &
  Trends
› Industry calendar
› Opinion
› People and awards
› Cost Indexes
› Construction
  Economics
› 125 Years in ENR
  History

Headline News
› Buildings
› Business & Labor
› Environment
› Finance
› Technology
› Transportation
› Industrial
› Power

Weather

Career Opportunities

Project Bids and Legal
Notices

Special Sections

ENR'S Top Ranked
Firms
› Top Design Firms
› Top Contractors
› Top Specialty
  Contractors
› Top International
  Contractors
› Top International

http://www.enr.com/sourcebk/a400b99cp.asp

05/18/2001

# Asbestos—

## the only rock on which plants thrive

INDUSTRY thrives most where waste is least. And since the development of Asbestos has gone hand in hand with the saving of heat, power and friction, this mineral of wonderful qualities has played an important part in Industrial Conservation.

It is the base of all efficient heat insulation—the necessary other 15% in 85% magnesia.

It is, as well, the basic material in the most efficient of friction reducing packings.

As roofing it has qualities of durability and fire-resistance that no other material can approach.

And in innumerable other forms it works miracles of industrial economy that a decade ago would have seemed impossible.

For more than half a century the Johns-Manville Company has steadily grown with the growth of industrial demand for Asbestos.

The Johns-Manville asbestos mines are the largest in the world. In the Johns-Manville plants every Asbestos product is produced under super advantages both of experience and equipment. The Johns-Manville sales organization, operating through branches in all large cities, is an engineering organization as well, carrying a helpful practical Service, that varies to meet each new requirement but always has for its object—Conservation.

H. W. JOHNS-MANVILLE CO.
New York City

10 Factories—Branches in 64 Large Cities

For Canada
The Canadian Johns-Manville Co. Ltd.,
Toronto

*Johns-Manville Asbestos Products include Roofings, Shingles, Boiler Linings and Blocks, Insulations, Cements, Packings, Electrical Devices, Tapes, Clothes, Yarns—hundreds of products that enter every avenue of science and Our world sets.*



## JOHNS-MANVILLE
### Serves in Conservation





# Handbook
## *of*
## ASBESTOS TEXTILES

SECOND EDITION

ASBESTOS TEXTILE INSTITUTE

This complimentary copy comes to you through the courtesy of

**Johns-Manville**

a member of the Asbestos Textile Institute

3 9077 00642488 9

3 9077 00662488 9

R

677.51
A79h2
Asbestos Textile
Institute
Handbook of asbestos
textiles

ROCHESTER PUBLIC LIBRARY



## FOREWORD

The Asbestos Textile Institute is a non-profit organization of manufacturers of asbestos textile products and producers of asbestos fibre. One of its primary aims is the development, through a continuous program of research and practical testing, of improved quality standard in the various products made by its members; it also serves as a clearing house for the dissemination of useful information relating to asbestos textiles and their applications.

This Handbook contains data which it is hoped will prove helpful to users and others who may benefit from knowing about asbestos textiles and their adaptability to numerous industrial requirements. The Institute is indebted to the Quebec Asbestos Mining Association for invaluable technical assistance in the preparation of tables and text; it is also grateful to the American Society for Testing Materials for permission to reproduce the specifications and test methods for asbestos textiles.

ASBESTOS TEXTILE INSTITUTE
Dr. Byrd C. Shaw, Secretary
Ambler, Penna.

670.51
A999k 2

# CONTENTS

| | PAGE |
|---|---|
| INTRODUCTION | v |
| THE MINERAL ASBESTOS | 1 |
| THE MINING, MILLING AND GRADING OF ASBESTOS FIBERS | 15 |
| PROCESSING ASBESTOS TEXTILES | 24 |
| ASBESTOS TEXTILE PRODUCTS | 29 |
| Carded Asbestos Fiber | 33 |
| Asbestos Lap | 34 |
| Asbestos Roving | 36 |
| Asbestos Yarn | 38 |
| Asbestos Cord | 40 |
| Asbestos Thread | 42 |
| Asbestos Cloth | 43 |
| Asbestos Tape | 48 |
| Asbestos Tubing | 52 |
| Asbestos Wick | 54 |
| Asbestos Rope | 55 |
| Non-Woven Asbestos Felts | 57 |
| A.S.T.M. SPECIFICATIONS AND METHODS OF TESTING | 58 |
| GLOSSARY | 96 |
| INDEX | 99 |
| | 1-5 |

ii

Copyright 1961
ASBESTOS TEXTILE INSTITUTE
PHILADELPHIA, PA.

Litho. in U. S. A.

Price $1.50 per copy

# INTRODUCTION

Legend tells us that the Emperor Charlemagne delighted to mystify his dinner guests by throwing an asbestos tablecloth into a roaring fire and then removing it, unharmed, from the flames.

Thus was demonstrated, more than eleven hundred years ago, one of the outstanding characteristics of textiles made from the fibers of that remarkable mineral, asbestos.

Today, the products which come from the carch, spinning frames and looms of asbestos textile manufacturers constitute a virtually indispensable part of our modern industrial economy.

In the electrical industry, for example, asbestos textiles meet the special requirements of an efficient insulation for wires and cables. As such, they are widely used in ranges, refrigeration and other home appliances, as well as in industrial furnaces, oven, welding machines, motors and transformers. They are a basic component of mechanical packing and gaskets. They assure the stamina and heat resistance so essential on automotive and industrial friction materials, gears, bushings, bearings and other vital mechanical parts.

Impregnated with resins and ceramics, asbestos textiles increase the strength and durability of numerous products. In one of their newer applications in this form, they serve as thermal insulation in the nose cone, fins, combustion chambers and other areas of missiles and rockets where temperatures in excess of 3000° F may be encountered.

Asbestos textiles are also found in such widely diversified uses as safety clothing, fire-smothering blankets, conveyor belts, filter cloths, fireproof curtains and draperies, and as thermal insulation for exhaust pipes.

In fact, there is scarcely a major industry or activity that does not benefit in some way from the use of asbestos textiles. They have raised safety standards, improved product performance, lowered costs and contributed other important advantages in numerous fields—and their range of usefulness is ever-increasing.



*From the mineral asbestos, hard and rocklike in structure, come the soft, silky fibers that are made into many forms of textile products*





Serpentine rock and veins of chrysotile asbestos (below), they appear before separation.

# The Mineral Asbestos

Asbestos is the name given to a group of fibrous minerals that occur in different forms in many countries throughout the world. The word is derived from the ancient Greek language and its first recorded use was by the Roman naturalist, Pliny the Elder, in the first century A. D., although asbestos itself was known to the Greeks and used by them at an even earlier date.

Early in the first century, the Greek geographer Strabo referred to a stone from southern Greece that was carded and woven into handkerchiefs. "Karystos lithos," the Greeks called it, naming it after the city where it was found. The Romans had also developed uses for this amazing stone for it is known that they wove it into lamp wicks and cremation cloth for wrapping their dead. And that famous Venetian traveler Marco Polo, home from wandering in Siberia in the thirteenth century, brought news of a "fossil substance" which, "when woven into cloth and thrown into the fire, remains incombustible." He, too, had become acquainted with asbestos.

These early uses were of minor significance, however, and it was not until the advent of the steam engine, with its need for insulation and packing, that asbestos really began to assume commercial importance. The nineteenth century saw the discovery of large deposits in Canada and South

1





## Asbestos Rope

This product is produced in two styles: twisted and braided.

Twisted asbestos rope is made by twisting tightly together two or more strands of asbestos wick. In the heavier ropes, a binder is generally used to hold the twist.

Braided asbestos rope is made in three constructions: (1) by braiding one or more jackets of asbestos yarn over a core of asbestos rope or wick; (2) by braiding asbestos yarn braid over braid to form a finished product of either square or round cross-section; and (3) by plaiting asbestos yarn into square cross-section. The braid over braid rope is firmer and stronger; the plaited rope is softer and conforms more readily when compressed.

Uses: Asbestos rope, a companion product to asbestos wick, is used where a thicker material than wick is desired. The twisted style is widely used as a seal between furnace doors and brickwork, as a filling for expansion joints in plastic walls of boiler settings, for covering diesel engine exhaust lines, for packing boiler expansion and gas generator doors, as a gasketing material for manhole covers and as a core for high temperature packing.

The braided style is used as a groover packing for inspection doors, as

55

## Asbestos Wick



Asbestos wick is a soft pliable strand of asbestos formed by loosely twisting together several strands of roving, slubbing or felted asbestos. It is supplied either with or without cotton yarn reinforcement.

Uses: Furnished in convenient ready-to-use form, asbestos wick is a general utility product of many and varied applications. The power plant engineer keeps it handy as an emergency packing. The plumber finds it useful for packing steam and hot water valves. The roofer depends on it as a weather seal for corrugated roofing. Maintenance workers use it for caulking retorts, for sealing ovens and furnace doors and similar jobs. Specially designed asbestos wick is used to wipe excess metal from wire in the process of tinning and galvanizing and as a core for high temperature packings.

Grades: The standard grade of asbestos wick is Commercial but other grades are supplied on order by most manufacturers. (See Table K for percentage of asbestos content in each grade.)

Sizes: The ¼″ diameter is standard for most purposes but other diameters (usually from ⅛″ or ¾₆″ up to ⅝₆″ or ½″) are also furnished.

Standard Packages: Asbestos wick is sold in handy ¼, ½ and 1 pound balls and in larger quantities (usually 10, 25 and 50 pounds) wound on spools or reels.

54

filling for expansion joints in furnace brickwork, as a gasket for sealing doors of water gas generators and similar services.

**Grades:** Asbestos rope is furnished in Commercial grade for most general uses and in Underwriters, AA, AAA and AAAA grades to meet particular service requirements. The grades with higher asbestos content are used for high temperature applications. (See Table K for percentage of asbestos content in each grade.)

**Sizes:** Asbestos rope is made in a wide range of diameters, usually from 1/4" up to 1-1/4" or 2".

**Standard Packages:** Asbestos rope is generally sold in 10, 25 and 50 pound units wound in coils or on reels and packed in individual cartons.

TABLE 5—APPROXIMATE WEIGHTS AND FOOTAGES
OF ASBESTOS ROPE

| Nominal Diameter Inches | Approx. Lbs. per 100 Ft. | Approx. Ft. per Lb. |
| --- | --- | --- |
| ⅛ | 2.5 | 40.00 |
| ¾₁₆ | 3.0 | 30.00 |
| ¼ | 4.5 | 13.75 |
| ⅜ | 10.5 | 6.00 |
| ½ | 16.5 | 4.30 |
| ⅝ | 23.0 | 4.00 |
| ¾ | 33.0 | 3.00 |
| 1 | 40.0 | 2.50 |
| 1¼ | 54.0 | 1.80 |

56

## Non-Woven Asbestos Felts

Non-woven asbestos felts are produced in sheet formation by cards or other fiber orienting processes. Special binders may be added to processing strength. They are available both with and without glass reinforcement and are produced as sheets, tapes and rolls.

**Uses:** These non-woven materials extend the useful range of asbestos felts by providing a strong thin felt readily saturable with resins. They are extensively used as basic reinforcement in both high and low pressure plastics. They also provide the basic reinforcement in impregnated beater tapes used as primary and secondary insulation in high temperature resistant wire and cable.

Exhibiting a strength to weight ratio unsurpassed by most other flexible materials, resinated non-woven asbestos felts are finding important applications as components of rockets and missiles. Other properties which adapt them particularly to the requirements of this service are: uniform ablation, low thermal conductivity, low thermal diffusivity and good dimensional stability. Resinated asbestos felts retain a higher percentage of physical properties after exposure to extremely elevated temperatures than other inorganic reinforcements or fillers.

**Grades:** Non-woven asbestos felts are made in standard A.S.T.M. grades from Commercial through grade AAAA.

**Thicknesses, Widths:** Standard thicknesses range from .010" to .064". Available in widths from ½" to 54".

57

## Medical History

The following outlines the medical history of asbestos disease as reported in recent medical literature.

| Year | Author | Description of Text |
|------|--------|---------------------|
| 1879 | | Commercial production of asbestos insulation material begins. |
| 1899 | Murray | First case of asbestosis described in "Curious Bodies." |
| 1906 | Auribault | First reported case of asbestos lung disease: linked 50 deaths to asbestos dust in weaving mill. |
| 1918 | Hoffman | U.S. Department of Labor bulletin – "urgent need for more qualified extensive investigation. . . ." |
| 1924–27 | Cooke | First "asbestosis" case in British literature. |
| 1928–29 | Seiller; Haddow | Case reports: average age at death, 41 (4 cases). |
| 1920–29 | | 25+ asbestos-related publications. |
| 1930 | Mereweather & Price | 363 asbestos textile workers studied. 95 (26%) had asbestosis and 21 had precursive signs. Saw dose-response relationship and importance of intensity and duration of exposure. |
| 1930 | International Labor Office, Geneva, Encyclopedia, Occupation & Health | "the lack of more accurate and detailed data in medical literature regarding this industry in its various branches, |

|  |  |  |
|------|------|------|
|  |  | including the utilization of by-products, is to be deplored . . . especially since the *rapidly increasing* development of industries utilizing asbestos adds greatly to the urgency of studying the conditions with a view to their amelioration." |
| 1930– 31 | Soper, Panacost & Pendergrass | Progression of the disease, even after cessation of exposure; long clinical latency – 15, 20, or 25 years. |
| 1931 | Lynch & Smith | Noted 172 cases reported in literature. |
| *1931* | *Wood & Gloyne* | *Asbestosis in a "sawyer" description of industries and processes in which asbestosis occurs, includes insulation work.* |
| 1933 | Ellman | First U.S. case report of asbestosis in an insulation worker. |
| 1933 | Donnelly | Describes short exposures as definite, serious industrial hazard. Consensus is that protective devices used in plants are inadequate. |
| 1933– 34 | Mereweather | Risk in milling and *manufacturing* processes is patent and serious. Concludes affected workers face inevitable death. |
| 1934 | Wood & Gloyne | Review of the first 100 cases of asbestosis they had |

|  |  |  |
|---|---|---|
|  |  | seen. It includes two cases of individuals working outdoors, one office worker, and a boiler-riveter. Two cases had serious lung cancer. |
| 1934–35 | Dept. of Labor, Commonwealth of PA, Special Bulletin I, II, & III | Bibliography contains 125 publications. Dust measurement and disease correlated to 8% disease at 5 mppcf, 22% at 17 mppcf, and 57% at 44 mppcf. Overall, approximately 25% of those who survived had asbestosis. |
| 1935 | Lanza | Survey of U.S. mines and mills. 126 random exams (all more than three years of exposure) with 67 cases of asbestosis. Dust control only partly effective; industry must face this problem. |
| 1935 | Lynch & Smith | First asbestosis and lung cancer case reported in the U.S. |
| 1936 | Donnelly | Asbestosis in 34% of workers; seriousness of hazard has received insufficient attention. Greater number of exposed workers means asbestosis of greater importance. |
| 1936–38 | Egbert; Nordmann, British Factory Inspectorate Report | Additional cases of lung cancer in asbestosis. |
| 1938 | Dreessen | U.S.P.H.S. study – "tentative" threshold value set at five |

| | | |
|---|---|---|
| | | mppcf "until better data are available." |
| 1938 | Lanza | Reports that 1931 British regulations applied to all factories and workshops where asbestos-containing products were either manufactured or sold. |
| 1930–39 | | 150+ published articles |
| 1941 | Kuhn | Reports German case of shipyard insulator receiving disability compensation for asbestosis. |
| 1942 | Holleb | Reports two cases of lung cancer in insulation workers. |
| 1942 | Hueper | Book on occupational tumors discusses asbestos exposure and lung cancer – "suggestive of an occupational origin." |
| 1942 | | Germany recognizes combination of asbestosis and lung cancer as compensable occupational disease. |
| 1943 | Hueper | Convinced of occupational origin of lung cancer with asbestosis, concerned about industry reactions, and stresses need for workers to be informed. |
| 1943 | Welder | First pleural tumor reported. |
| 1946 | Fleischer | U.S. Navy survey of three shipyards, hygiene and clinical – high dust counts during cutting, |

| | | |
|---|---|---|
| | | sawing, and mixing asbestos products. Disease expected among workers in these operations. *Clinical survey found three cases of asbestosis among the 51 men with more than ten years experience in the yards.* |
| 1946 | ACGIH | Adopts five mppcf into a list of MAC values (called TLVs after 1948). |
| 1947 | Mereweather | 31/235 (13%) autopsied cases of asbestosis had cancer of the lungs or pleura. Only 1% seen in silicotics and general population. |
| 1949 | AMA editorial | Increased attention needed to probable occupational hazards of cancer. |
| 1940–49 | | 50+ new published articles |
| 1951 | 1949 British Factory Inspectorate Report | Burlap packaging criticized as a health hazard. Stresses need to be watchful for disease among those *who are not fully aware of risks.* |
| 1953 | Weiss | First mesothelioma case reported in an insulation worker. |
| 1955 | Doll | Mortality study of 113 asbestos textile workers, all with more than 20 years of exposure. Excess mortality found (39 deaths; 15 expected – 11 lung cancer; 0.8 expected). |

http://www.asbestosoregon.com/pages/history.html

2/17/04

| | | |
|---|---|---|
| 1955 | McLaughlin | Reports increasing cases of asbestosis in Great Britain, including insulators. |
| 1955 | Schepers | Reports asbestos-containing insulation products produce asbestosis in animals. |
| 1956 | Frost | Of 31 insulation workers in Denmark with more than 20 years in the trade, 22 abnormal. |
| 1958 | Van Der Shoot | Reports pleural mesothelioma in a Dutch insulation worker in a refinery. |
| 1950–59 | | 125+ publications |
| 1960 | Wagner | Asbestos exposure and mesothelioma – 32/33 cases had asbestos exposure, occupational or environmental. |
| 1960 | Kiviluoto | Pleural calcifications seen more frequently among residents in county with asbestos mine or mill (7.9%). |
| 1960–63 | Eisenstadt, Wilson, McCaughey, Wade, Elmes, Castleman, Kibbee | Case reports of mesothelioma seen among workers using asbestos products in Great Britain & U.S. |
| 1963 | Mancuso | Mortality study in the U.S. shows asbestos plant workers have increased mortality rates. |
| 1964 | Marr | Six cases of shipyard asbestosis. Industrial hygiene survey done, some counts exceed TLV. "During sawing of blocks and pipe |

|      |          | sections and removal of old insulation, the work environment appears extremely dusty." |
|------|----------|------------------------------------------------------------------------------------------|
| 1964 | Selikoff | *Mortality study of asbestos insulation workers, excess asbestosis, lung cancer, and mesothelioma deaths. Clinical survey of 1,117 workers.* |
| 1965 | Newhouse | Nine cases of mesothelioma among family members of asbestos workers, 11 neighborhood cases. |
| 1965 | McVittie | Between 1955 and 1963, 41% of new cases of asbestosis diagnosed by the Great Britain pneumoconiosis panels were workers in the insulation industry; 21% were workers in textile factories. |
| 1960–69 |        | 200+ publications |

What Asbestos Companies Knew And When They Knew It!

1890s - Asbestos, which previously had few industrial uses, becomes a raw material for large manufacturing industries, exposing large numbers of workers to asbestos dust for the first time. Asbestos-caused disease often develops decades after a person was first exposed. As a result, it was not until the early 1900s that large numbers of workers developed symptoms. *David Kotelchuck, "Asbestos: 'The Funeral Dress of Kings' - and Others" in Dying for Work: Workers' Safety and Health in Twentieth-Century America, ed. by David Rosner and Gerald Markowitz, Indiana University Press, Bloomington, IN 1987, p193*

1918 - A Prudential Insurance Company official notes that life insurance companies will not cover asbestos workers, because of the "health-injurious conditions of the industry." *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.5-6*

1930 - Major asbestos company Johns-Manville produces report, for internal company use only, about medical reports of asbestos worker fatalities. *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.663*

1932 - Letter from U.S. Bureau of Mines to asbestos manufacturer Eagle-Picher states: "It is now known that asbestos dust is one of the most dangerous dusts to which man is exposed." *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p.327*

1933 - Metropolitan Life Insurance Co. doctors find that 29 percent of workers in a Johns-Manville plant have asbestosis. *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.26* Johns-Manville officials settle lawsuits by 11 employees with asbestosis on the condition that the employees' lawyer agree to never again "directly or indirectly participate in the bringing of new actions against the Corporation." *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p.114*

1934 - Officials of two large asbestos companies, Johns-Manville and Raybestos-Manhattan, edit an article about the diseases of asbestos workers written by a Metropolitan Life Insurance Company doctor. The changes minimize the danger of asbestos dust. *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p. 114-15*

1935 - Officials of Johns-Manville and Raybestos-Manhattan instruct the editor of Asbestos magazine to publish nothing about asbestosis. *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p.116*

1936 - A group of asbestos companies agrees to sponsor research on the health effects of asbestos dust, but require that the companies maintain complete control over the disclosure of the results. *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.587*

1942 - Internal Owens-Corning corporate memo refer to "medical literature on asbestosis .... scores of publications in which the lung and skin hazards of asbestos are discussed." *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.195*

1942 or 1943 - The president of Johns-Manville says that the managers of another asbestos company were "a bunch of fools for notifying employees who had asbestosis." When one of the managers asks, "do you mean to tell me you would let them work until they dropped dead?" The response is reported to have been, "Yes. We save a lot of money that way." *Testimony of Charles H. Roemer, Deposition taken April 25, 1984, Johns-Manville Corp., et al v. the United States of America, U.S. Claims Court Civ. No. 465-83C, cited in Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.581*

1944 - Metropolitan Life Insurance Company report finds 42 cases of asbestosis among 195 asbestos miners. *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.554*

1951 - Asbestos companies remove all references to cancer before allowing publication of research they sponsor. *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.71*

1952 - Dr. Kenneth Smith, Johns-Manville medical director, recommends (unsuccessfully) that warning labels be attached to products containing asbestos. Later Smith testifies: "It was a business

decision as far as I could understand . . . the corporation is in business to provide jobs for people and make money for stockholders and they had to take into consideration the effects of everything they did and if the application of a caution label identifying a product as hazardous would cut into sales, there would be serious financial implications." *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.666*

1953 - National Gypsum's safety director writes to the Indiana Division of Industrial Hygiene, recommending that acoustic plaster mixers wear respirators "because of the asbestos used in the product." Another company official notes that the letter is "full of dynamite," urges that it be retrieved before reaching its destination. A memo in the files notes that the company "succeeded in stopping" the letter, which "will be modified." *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.669-70*

1964 - Dr. Irving Selikoff publishes a study of asbestos workers in the Journal of the American Medical Association, proving that people who work with asbestos-containing materials have an abnormal incidence of asbestosis, lung cancer, and mesothelioma. *Barry I. Castleman, Asbestos: Medical and Legal Aspects. 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.126*

1966 - Raybestos-Manhattan official writes: "We feel that the recent unfavorable publicity over the use of asbestos fibers in many different kinds of industries has been a gross exaggeration of the problems. There is no data available to either prove or disprove the dangers of working closely with asbestos." *Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.590*

1971 - First OSHA asbestos-exposure standard issued. *Federal Register, vol.36, p.10466 et. seq.; May 29, 1971*

1973 - The U.S. Environmental Protection Agency (EPA) bans spray-on asbestos insulation as an air pollution hazard. *Federal Register, vol.38, p.8820 et. seq.; April 6, 1973*

1977 - Lawyers for injured workers obtain the Sumner Simpson papers, which show that the companies had suppressed information about the danger of asbestos for at least 40 years. *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p.111.* The first bill to limit the product liability of asbestos companies is introduced in Congress. *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p.194*

1978 - Judge rules there had been "a conscious effort by the [asbestos] industry in the 1930s to downplay or arguably suppress, the dissemination of information to employees and the public for fear of the promotion of lawsuits." *Amended order, Barrett v. Owens-Corning Fiberglas Corp et al, State of South Carolina, County of Greenville, Court of Common Pleas, Aug. 23, 1978, cited in Barry I. Castleman, Asbestos: Medical and Legal Aspects, 4th edition, Aspen Law and Business, Englewood Cliffs, NJ 1996, p.585*

1979 - U.S. EPA announces intention to issue rule that bans all uses of asbestos. *Federal Register, vol. 44, p.60061 (Rulemaking completed after 10 years, in 1989)*

1982 - Johns-Manville files for bankruptcy protection. *Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial, Pantheon Books, New York NY, 1985, p.249*

1986 - U.S. EPA publishes text of proposed rule to ban all uses of asbestos. *Environmental Defense Newsletter, XVII:2 May 1986.* OSHA tightens asbestos-exposure standard. *Federal Register vol. 51, p.22733, June 20, 1986*

1989 - The U.S. EPA bans asbestos in most of its major uses, but . . . . *Federal Register, vol.59, p.41027, August 10, 1994*

1991 - Asbestos companies win federal lawsuit, court revokes EPA's 1989 asbestos ban. *Federal Register, vol.59, p.41027, August 10, 1994*

1994 - OSHA tightens asbestos-exposure standard. *Federal Register, vol. 59, p.40964 et. seq., August 10, 1994*

1999 - Florida Supreme Court rules that Owens Corning willfully withheld information about the danger of working with the company's asbestos products: "it would be difficult to envision a more egregious set of circumstances . . . . a blatant disregard for human safety involving large numbers of people put at life-threatening risk." *Opinion No. 92,963, August 26, 1999*

# SOMETHING IN THE AIR:
# The asbestos document story

"The documents noted above, however, show
corporate knowledge of the dangers associated
with exposure to asbestos dating back to 1934.
In addition, the plaintiffs' bar will probably
take the position — not unreasonably — that
the documents are evidence of a corporate
conspiracy to prevent asbestos workers from
learning that their exposure to asbestos could
kill them."

— Memo from a trustee of the Manville Trust, 1988

[Excerpt | Full document]

Nothing proves the culpability of the asbestos manufacturers in the death and injury of asbestos workers quite like internal documents from the companies themselves. These papers, just a handful of which we present here, prove beyond a shadow of a doubt that the companies and their insurers knew the hazards of asbestos and concealed this information from workers for decades. More than any other piece of evidence, it is the companies' own internal papers that have convinced juries of citizens across the country that workers and their families deserve compensation to help them manage the severe and often fatal health consequences of working with asbestos.

The current push by defendant industries to establish a national asbestos victims trust fund is driven in large part by the fact that courts consistently find asbestos companies guilty, not just of exposing their workers to a substance — asbestos — that could kill or severely injure them, but of doing this with full knowledge of the fatal consequences of their actions, and of actively concealing this truth from these same workers.

**Document Gallery**

Browse a selection of asbestos industry documents dating from 1948 through 1988.

The 1966 comments of the Director of Purchasing for Bendix Corporation, now a part of Honeywell, capture the complete disregard of an industry for its workforce that is expressed over and over again in company documents spanning the past 60 years.

"...if you have enjoyed a good life while working with asbestos products, why not die from it."

— 1966 Bendix Corporation letter [view document]

## Sweeping culpability

Proponents of asbestos tort reform argue that companies that "had nothing to do with" asbestos manufacturing are being dragged into court unfairly. The documents presented here, while just a smattering, illuminate the dimensions of what was clearly, and remains today, a sweeping deception of American workers across entire sectors of the economy.

It took more than just Johns Manville and W.R. Grace lying to their workers to produce the ten thousand Americans currently dying each year of asbestos diseases. It took similar behavior at Exxon, Dow (Union Carbide), DuPont, Bendix (now Honeywell), The Travelers, Metropolitan Life, Dresser Industries (now Halliburton), National Gypsum, Owens-Corning, General Electric, Ford,

and General Motors, just to name a few. The list is a roll call of major American corporations. What they did to their workers, the public, and their communities, we can only hope will never be repeated.

## Early knowledge that asbestos was deadly

Asbestos diseases have been known and documented for over 100 years. During an autopsy in 1900, Dr. H. Montague Murray, a physician in London's Charring Cross Hospital, discovered asbestos fibers in the lungs of a thirty-three-year old man who had worked fourteen years in an asbestos textile factory and died of severe pulmonary fibrosis, which the doctor linked to his occupation (Brodeur, pg. 11).

In 1924, the first clear case of death due to asbestosis was published in the British Medical Journal. Dr. W.E. Cooke, an English physician who gave the disease its name, reported the results of an autopsy on a thirty-three-year old woman who had worked in an asbestos textile factory for thirteen years. The publication led to years of intensive study of asbestosis in Britain, during which hundreds of asbestos-textile workers were examined. Doctors and scientists found that a quarter of the workers developed pulmonary fibrosis, the condition which Cooke dubbed asbestosis (Brodeur 1985, pg. 13).

In the United States, in 1917, Dr. Henry K. Pancoast, of the University of Pennsylvania School of Medicine, observed lung scarring in the X-rays of fifteen asbestos-factory workers. In 1918, the U.S. Bureau of Labor Statistics published a report by an insurance statistician noting the unusually early deaths of asbestos workers and revealing that it had become common practice for insurers to deny coverage for workers because of the "assumed health-injurious conditions" in the asbestos industry (Hoffman 1918). In 1927, the first workmen's compensation disability claim for asbestosis was upheld by the Massachusetts Industrial Accident Board; and in 1930 the first U.S. case of asbestosis was reported in the journal Minnesota Medicine (Brodeur, pg. 14).

By the 1930s, asbestos manufacturers and their insurance companies knew that asbestos was killing workers at alarming rates. In 1934, Aetna Insurance company published the Attorney's Textbook of Medicine, which devoted a full chapter to asbestos exposure, noting that asbestosis was "incurable and usually results in total permanent disability followed by death." (Bowker, pg. 18)

In October 1935, the Eastern Underwriter reported on the "alarming increase of asbestos cases" in the United States (Bowker, pg. 18). Beginning in 1931 and throughout the 1930s, the asbestos industry commissioned research to determine the toxicity of various fibrous silicates such as talc and tremolite when inhaled (Michelbacher 1942, pg. 490).

So severe were the hazards of asbestos that by the eve of World War II, asbestos manufacturing was in decline. The war, however, reversed the fortunes of the asbestos industry and launched an era of massive use of asbestos in ships that led to an explosion of asbestos products for the next three decades.

The resulting atrocity has been described and documented in detail by Paul Brodeur, in Outrageous Misconduct; Barry Castleman, in Asbestos: Medical and Legal Aspects; and more recently by Michael Bowker, in Fatal Deception, and Andrew Schneider, in An Air That Kills, with a particular focus on the W.R. Grace asbestos mine in Libby, Montana.

## "So many embarrassing documents"

We present here a small selection of insurance and manufacturing company documents made public through litigation. These papers reveal a brazen disregard for the men and women who, by the 1960s, were dying by the thousands each year for these businesses, a history of abuse and deception that is unparalleled in American industrial history. In large measure, it is the written words of these company executives that have convinced juries across America that workers and their families deserve full compensation for their suffering.

Both insurers and manufacturers understand the power of these documents. As litigation by asbestos workers began to heat up in the 1980s, industry officials recognized the potential significance of the documents being extracted from the

companies by the courts. A 1988 memo written by an asbestos litigation fund trustee lamented that: "there are so many embarrassing documents that people disagree as to which group of any ten documents is the worst." [Excerpt | Full document]

As the author notes, more documents were certain to become public during litigation, and the outlook for the companies was bleak:

> "The documents noted above, however, show corporate knowledge of the dangers associated with exposure to asbestos dating back to 1934. In addition, the plaintiffs' bar will probably take the position — not unreasonably — that the documents are evidence of a corporate conspiracy to prevent asbestos workers from learning that their exposure to asbestos could kill them. (One employee of Manville, who co-authored a 30-year-old document which is among the group of documents described above, was told by Manville's Chief of Litigation to hire his own lawyer after the document came to light because it was the opinion of the Chief of Litigation that the employee could be indicted for manslaughter.)"
>
> — Memo from a trustee of the Manville Trust, 1988
> [Excerpt | Full document]

## Industry-wide knowledge of the hazards

During the 1950s and 60s, companies were fully aware of the potentially fatal consequences of working with asbestos, including its ability to cause cancer, yet millions of workers were exposed to asbestos on the job with virtually no health protections.

As early as WWII, ASARCO knew that asbestos permanently damaged the lungs leading to a progressive disease called asbestosis, which is sometimes fatal. "We knew very well then that inhalation of excessive asbestos dust over a period of time could cause asbestosis." [View document]

In a 1949 document, Exxon admitted that asbestos causes lung cancer, silicosis, fibrosis and erythema. This relatively early admission that asbestos causes lung cancer foretold literally hundreds of thousands of deaths from asbestos in subsequent decades, mortality that continues today in the United States at a rate of at least 5,000 deaths per year. In line with the policies of all asbestos users and manufacturers, this information was under the banner: "COMPANY CONFIDENTIAL: Not For Publication In Present Form." [View document]

National Gypsum was quite explicit about asbestos risks. In a 1958 memo, the company states:

> "We know that you will never lose sight of the fact that perhaps the greatest hazard in your plant is with men handling asbestos. Because just as certain as death and taxes is the fact that if you inhale asbestos dust you get asbestosis."
>
> — 1958 National Gypsum Memo [View document]

But perhaps the most authoritative account of the dangers of asbestos can be found in a blistering 1964 report from a medical doctor hired by Philip Carey Manufacturing, in which the doctor describes in no uncertain terms to the company's legal department the health hazards of asbestos to the company's workers and customers. (The doctor was fired soon after the company received his report.)

> "There is an irrefutable association between asbestos and cancer. This association has been established for cancer of the lung and for mesothelioma. There is suggestive evidence... for cancer of the stomach, colon and rectum also. There is substantial evidence that cancer and mesothelioma have developed in environmentally exposed groups, i.e., due to air pollution for groups living near asbestos plants and mines. Evidence has been established for cancer developing among members of the household. Mesotheliomas have developed among wives, laundering the work clothes of asbestos workers. Substantial evidence has been presented that slight and intermittent exposures may be sufficient to produce lung cancer and mesothelioma. There should be no delusion that the problem will disappear or that the consumer or working population will not become aware of the problem and the compensation and legal liability involved." (Bowker, pg. 171)

## Insurance companies try to dodge a bullet

By the 1970s, the insurance industry was deeply concerned about its financial vulnerability to asbestos claims. In 1980, the American Insurance Association predicted that there would be between 8,000 and 13,000 claims a year from asbestos-caused cancer from 1977 through 1995 [View document]. This estimate did not include anything but pure occupational exposure to asbestos, even though asbestos was used in several thousand consumer and industrial products at that time, and exposure to the general public was not only staggering in size, but also essentially uncontrolled.

> "Control of asbestos in the community air is impossible when you consider the contribution from brake linings, abrasion of piping,

house siding or other materials widely handled by the general
public."

— 1969 The Travelers Insurance Co. memo
[Excerpt | Full document]

Companies facing legal action were growing concerned about the implications of
their extensive asbestos releases into the environment. The potential liability
represented by environmental pollution with asbestos and the release of
asbestos fibers in the home became a subject of grave financial concern within
the industry.

"Asbestosis, lung or colon cancer claims whether comp or liability,
from asbestos workers or those working with asbestos materials,
are one thing, but the general public exposure and claim potential is
much more serious."

— 1969 The Travelers Insurance Co. memo
[Excerpt | Full document]

Even worse, reductions of these exposures seemed futile:

"If indeed there is at least a causal relationship of asbestos to the
cited diseases, which there appears there is, then a most serious
loss potential to the Travelers exists. Even with the engineering
controls we have available, the exposure will continue and the long
development period of the disease suggests past exposures will
continue to haunt us.

— 1969 The Travelers Insurance Co. memo
[Excerpt | Full document]

In 1968, The Travelers Insurance Company concluded that they faced major
financial exposure from deaths due to non-occupational asbestos exposure near
asbestos manufacturing facilities. In particular, the company concluded that it
had "no chance of winning" a case brought by a resident living near the Johns
Manville plant in New Jersey, who died of mesothelioma in June 1967. This
certainty of defeat was no doubt solidified when a Manville attorney informed
the Travelers that:

"Confidentially Johns-Manville has been contaminating the 'Hell' out
of both the air and the water for quite some time."

— 1969 The Travelers Insurance Co. memo
[Excerpt | Full document]

A 1975 insurance industry memo summarized non-workplace exposure as a
major risk facing the industry. Forty percent of housewives and 50 percent of
blue-collar workers had identifiable asbestos fibers in their lungs at death. The
author concluded that, "It is now found (that) the public in general is or has
been exposed to asbestos products to a far greater degree than previously
recognized." [Source: Insurance Industry memo 10/09/75]

At the same time, the hazards of asbestos to family members were well known,
and nothing was being done about it. Workers were taking home huge amounts
of asbestos dust on their clothes, contaminating their homes and exposing their
wives who regularly, and unsuspectingly, handled and washed the dust-laden
garments.

A 1974 memo from Exxon declares:

"Not only are we violating the existing regulations concerning
clothing by not providing such clothing and laundering it, but we are
also failing to protect our employees and the families of our
employees from asbestos exposure."

— 1974 Exxon memo [View document]

On June 18, 1975, The Travelers Insurance Company's Catastrophe Products Committee laid out "facts" well known to the asbestos industry and its insurers at the time:

> "1) Asbestos causes cancer. Once asbestos fibers are ingested by a person, in no matter how small a quantity, they remain in the body and can be the cause of cancer 10 or 20 years later. There is no known way of removing the fibers from the body.
>
> 2) Asbestos is used in a wide variety of products: insulation, roofing, chemicals, wallboard, piping, etc."
>
> — 1975 The Travelers Insurance Co. memo [View document]

Asbestos was clearly a potential catastrophe in the making for the industry. An Insurance Company of North America (INA) memo from the time predicts at least $20 billion dollars in payouts for asbestos-caused cancers alone. This figure assumes just $10,000 per case, a relatively low figure for asbestos cancers, which are almost always fatal. It does not include any deaths from non-occupational exposure.

> "The attached article is an estimate of the possible numbers (plaintiffs) of Asbestos workers who will die from cancer in the next half century.
>
> This figure does not take into consideration "other" possible cancer victims of Asbestosis such as wives of workers, persons living near asbestos factories, school children, etc."
>
> "400,000 potential plaintiffs could generate 2,000,000 files (5 INA insureds per plaintiff).
>
> INA's possible exposure: 2,000,000 x $10,000.00 = 20 Billion dollars"
>
> — Undated INA memo [View document]

The goal of The Travelers' "Catastrophe Products Committee" was to study the potential for asbestos to wipe out the company's assets, and then, in the company's own words, "make the catastrophe reducible to a level which would not imperil the assets of The Travelers." [View document]

The question was how to do it. The decision, on the part of insurers, was to adopt the same strategy as producers: deny prior knowledge and admit no liability.

In 1977, the insurance industry's "discussion group on asbestosis" unanimously decided not to admit liability in asbestosis cases. The strategies considered by the insurance companies are also laid out in the minutes of the meeting, including the "possible use of governmental immunity as a defense" in an effort to place the blame on the government for not warning workers of the dangers of working with asbestos.

> "The meeting closed with a unanimous rejection of a suggestion that liability in asbestosis cases be admitted ..."
>
> — 1977 "discussion group on asbestosis" memo [View document]

## The cover up

### "KEEP THIS INFORMATION MOST CONFIDENTIAL"

By the late 1940s, asbestos manufacturers, industries that used significant amounts of asbestos in their operations, and their insurance companies all acknowledged internally that asbestos caused lung cancer, asbestosis and mesothelioma. Rather than adopt safety standards, switch to safer products, or provide protections for workers, these companies went to extraordinary lengths

conceal the truth about asbestos from workers, the public and the press. In some cases company officials went so far as to monitor the health of workers while deliberately withholding the results of this monitoring from them. Typically, however, worker health was not actively monitored, but decisive information on the dangers of asbestos was held secret. In other cases, companies interfered with and even rewrote scientific study results, restricted key information on asbestos hazards to management while keeping it from workers, and deliberately failed to label, or altered labels on, products.

A 1949 Exxon document described above illustrates the point. The document lists the diseases from asbestos exposure as "Silicosis, Fiberosis, Erythema & Cancer of Lungs" under the banner "COMPANY CONFIDENTIAL: Not For Publication In Present Form." [View document]

Asbestos diseases are latent, taking decades to appear after initial exposure. This latency period allowed companies to use workers for decades, knowing they were being injured or perhaps even killed by their work, yet also knowing that the men and women on the job would have no early warning that they might die from the asbestos they were exposed to.

For companies like Exxon, DuPont, and Dow that were sufficiently removed from basic asbestos manufacturing, withholding this information was relatively simple — workers would not ordinarily think of asbestos risks — and concealing information was a very effective way to reduce compensation payouts.

As put in a memo from Johns-Manville's medical director to corporate headquarters:

> "The fibrosis of this disease is irreversible and permanent so that eventually compensation will be paid to each of these men. But, as long as the man is not disabled it is felt that he should not be told of his condition so that he can live and work in peace and the company can benefit by his many years of experience." (Brodeur, pg. 102)

By the early 1960s, the hazards of asbestos were well known within the management level of most companies that dealt with it. Workers and customers, in contrast, were generally kept in the dark or even lied to. A significant part of the asbestos industry, represented by the member companies of the Asbestos Textile Institute, described their management-only information strategy this way:

> "...this subject should not be brought to the attention of other than management of our several companies, as any general discussion on this situation by sales personnel with users of our products, could possibly aggravate the situation and result in individual opinions which could be damaging."

> [Source: Asbestos Textile Institute memo 11/6/64]

## Even work histories on deceased employees were deemed top secret

In 1966, DuPont hoped a company doctor examining an "expired" worker's history of asbestos exposure would keep a lid on the information he was asked to produce for the company:

> "We have on record that [blacked out name] a 36 year old employee of your plant expired sometime in 1964 from mesothelioma of the pleura.

> Please do a careful investigation and let me know if this individual was ever exposed to asbestos in our employ, how long he was, in what type of work, or any other information that may be available. If at all possible, try to ascertain whether there is any information that this individual worked as a roofer, pipe coverer or any other type of asbestos exposure prior to joining Du Pont. This inquiry is for our own edification only, as no one outside of the Company has raised the question.

We are hopeful you will keep this information most confidential, and
let me have your reply as soon as possible. Thank you for your
cooperation."

— 1966 DuPont internal memo [View document]

Keeping employees in the dark meant leaving no stone unturned, even if it
meant putting pressure on outside physicians. In November, 1980, DuPont sent
a letter to a doctor asking him to remove the word asbestos from a rubber
stamp used to mark X-rays which show changes in lung tissue, perhaps due to
asbestos exposures. DuPont requested that the language of the stamp, which
read "could be due to previous exposure to asbestos or other irritant materials"
be changed to "could be due to previous exposure to irritant materials."[View
document]

For at least 50 years, from the 1930s through the 1980s the unswerving goal of
asbestos users and makers was to keep from workers the undisputed fact that
asbestos was a major threat to their health. An internal memo from a W.R.
Grace executive summed up the strategy quite clearly:

> "The point I am trying to get across is that our present policy is to
> tell no one anything, no visitors, or discussion of our operations.
> period."

> — 1972 W.R. Grace internal memo [View document]

## Manipulating science

Objective science was a big problem for the industry because it repeatedly
showed how extraordinarily dangerous asbestos really was. In response, the
industry manipulated results and eviscerated papers in largely successful efforts
to bury or obscure results that might damage the bottom line. Some companies
simply stopped conducting studies at all, knowing what the results would be and
fearing that the public might find out.

A 1948 memo from a New York University professor of industrial medicine,
himself a former Metropolitan Life Insurance Company employee, revealed that
a report summarizing studies conducted by NYU College of Medicine scientists
was revised prior to publication at the request of Metropolitan Life Insurance
and other asbestos insurance companies in order to omit references to cancer:

> "A meeting of the representatives of the underwriting companies
> was held in New York... It was the feeling of this group that all
> references to cancer or tumors should be omitted... It was decided
> that after these revisions have been concluded the report of these
> experimental studies should be published as promptly as possible,
> preferably in the Journal of Industrial Hygiene. Any report on human
> asbestosis should be separate and not a part of this report."

> — 1948 NYU College of Medicine memo [View document]

In November 1948, a year after receiving promising results that their Kaylo
asbestos product hadn't produced negative health effects in experiments on lab
animals, Owens-Corning received a discouraging letter from the lab that had
performed the tests. The lab's initial clean bill-of-health finding was premature,
and in fact the animals had developed asbestosis as more time elapsed. In
conclusion the lab wrote to the company:

> "I realize that our findings regarding Kaylo are less favorable than
> anticipated. However, since Kaylo is capable of producing
> asbestosis, it is better to discover it now in animals rather than later
> in industrial workers. Thus the company, being forewarned, will be
> in a better position to institute adequate control measures for safe-
> guarding exposed employees and protecting its own interests."

> — 1948 Owens-Corning memo [View document]

Yet, decades later in 1970, intra-company correspondence shows that Owens-Corning was still reluctant to properly label the product to indicate health hazards from asbestos:

> "...regarding the warning label that should appear on Kaylo. Are you saying that we have to do this now? I naturally would like to delay this requirement as long as possible."

> — 1970 Owens-Corning memo [View document]

A March 30, 1977 memo from a W.R. Grace health and safety official advised against conducting further study of asbestos-diseased workers out of concern that the information would become public:

> "I believe that the results of a study of this nature would become public knowledge within a relatively short period of time regardless of confidentiality agreements. If we are not prepared to deal with that situation, I would advise against proceeding."

> — 1977 W.R. Grace memo [View document]

## Keeping information from consumers

Companies with significant asbestos sales used extreme measures to keep their customers in the dark about the risks of using asbestos products. The intimidation tactics and reassuring messages used by these companies no doubt led to complacency about asbestos hazards on the part of consumers, contributing to the incidence of clearly avoidable asbestos diseases now emerging among the general public.

In a 1970 W.R. Grace memo regarding sales of its Mono-Kote fire-proofing spray product, which contained twelve percent asbestos, an employee urged:

> "Stay unscrupulous, unethical, mean and selling Mono-Kote."

> [View document]

According to a New York Times investigation of Grace's Monokote product, the company continued selling "re-formulated" Monokote until the late 1980s, labeling it "asbestos-free" despite its knowledge that the product still contained up to 1 percent asbestos. Grace management instructed employees that inquiring customers were to be told the product did not contain any asbestos. Due to Grace's "asbestos free" claim, workers using Monokote stopped wearing protective respirators, believing the reformulated product was safe [The New York Times, 7/9/01].

A 1972 Union Carbide memorandum instructed managers to handle inquiries from concerned customers aggressively:

> "If the customer is persistent and threatens to eliminate asbestos — a certain amount of aggressiveness may be effective. Words and catch phrases such as "premature", "irrational" or "avoiding the inevitable" will sometimes turn the table. The main objective is to keep the customer on the defensive, make him justify his position."

> — 1972 Union Carbide memo [View document]

A year later, Union Carbide management instructed its sales personnel that customers should be told "asbestos is not a carcinogen." [View document]

In 1973, Union Carbide's own medical department advised the company to stop belittling the dangers of asbestos exposure in marketing literature for asbestos products, noting several "misleading" and "half truth" statements in the company's literature. Company doctors referenced government studies indicating asbestos exposures "as short as one day" had produced lung disease, contrary to the company's assertion that "massive long term exposure to

...stos" was required to produce asbestos diseases. [View document]

## Manipulating the media

As word began to trickle out to the mainstream media about the appalling hazards of asbestos, controlling information flow and manipulating the media became a top priority for the industry. In June 1973, at a meeting of the Asbestos Textile Institute, asbestos industry representatives predicted the deaths of tens of thousands of employees from asbestos disease, and then noted that "the good news" was that the public was still vastly unaware of the problem.

The meeting's guest speaker, an executive from the Asbestos Information Association, began his presentation by laying out the facts:

> "First, there is no doubt that the inhalation of substantial amounts of asbestos can lead to increased rates of various types of lung disease, including two forms of cancer. These are facts which cannot be denied, even if they do not apply in all circumstances and under all conditions. The medical literature is full of solid evidence linking asbestos to disease. In my office, I have on file more than 2,000 medical papers dealing with the health risks of asbestos and hundreds more are published every year."
>
> — 1973 Asbestos Textile Institute memo
> [View document]

The presenter plainly stated that insulation workers "were and still are dying from asbestos disease at an appalling rate." [View document]

Figures were put forward about what the industry expected to happen to its workers:

> "Our prediction is that approximately 25,000 past and present employees in the asbestos industry have died or will eventually die of asbestos-related disease."
>
> — 1973 Asbestos Textile Institute memo
> [Excerpt | Full document]

Then came the "good news:"

> "And the good news is that despite all the negative articles on asbestos-health that have appeared in the press over the past half-dozen years, very few people have been paying attention."
>
> — 1973 Asbestos Textile Institute memo
> [Excerpt | Full document]

Finally, the guest speaker laid out his thoughts about media coverage of asbestos issues:

> "The press relations battle will therefore be won, not when the media starts to print positive or balanced articles about asbestos, but when the press ceases to print anything about asbestos at all. As long as negative news on asbestos-health continues to be generated, the media will continue to eat it up. The media will only cease to carry such stories when the generation of negative news ceases. It is as simple as that. Positive or balanced stories are a chimera, since they are, by definition, not newsworthy."
>
> — 1973 Asbestos Textile Institute memo
> [Excerpt | Full document]

Anticipating a government investigation into its widespread knowledge of the dangers of asbestos, the industry worried internally and began to ready its defenses. A 1981 Dow internal memo marked "CONFIDENTIAL" had the

sbestos Epidemic in A   erica                                          Page 8 of 8

owing note scrawled across the top by a worried executive:

"We are in trouble and would be more so if we had an investigation.
We need a crash program."

— 1981 Dow confidential memo [View Document]

Asbestos industry and insurance experts readily acknowledge in court proceedings that asbestos fibers begin causing tissue or cellular damage shortly after asbestos fibers are first deposited in the lung and that the disease is progressive and irreversible. These experts also agree that the disease is typically diagnosed only in the advanced stages.

"The undisputed medical facts [are that] ... [a]ctual bodily injury, in the form of tissue or cellular damage caused by lodged asbestos fibers, begins shortly after such fibers are first inhaled."

(Source: Pittsburgh Corning Corporation. 1984, at 8.)

"Injury and the onset of fibrosis occur soon after the initial deposition of asbestos fibers in the lung ...is supported by the overwhelming weight of the medical evidence."

(Source: Armstrong World Industries, Inc. 1987, at 21.)

"The only conclusion that can be drawn from the medical evidence is the conclusion that is virtually uniform in the medical literature — asbestos-related injuries are the result of a continuous injurious process, beginning with first exposure and continuing through clinical manifestation."

(Source: Post-Trial Phase III Brief of Policy Holders on the Medical Evidence, 1986, at 8.)

"Moreover, that injury occurs continuously from the first day of occupational exposure through clinical diagnosis whether or not there has been an intervening period of no exposure"

(Source: Post-Trial Phase III Brief of Policy Holders on the Medical Evidence, 1986, at 20.)

"The first injury leading to the development of bronchogenic carcinoma or mesothelioma ... is the inflammatory reaction and onset of fibrosis which occur at the time of initial exposure."

(Source: Armstrong World Industries, Inc., 1987, at 41.)

"Once the gas exchange capacity of an individual alveolar/capillary unit is compromised, the loss is permanent."

(Source: Armstrong World Industries, Inc., 1987, at 10.)

"The accumulation of scar-like tissue decreases the functional volume of the lungs, stiffens the passage ways, and impedes the transfer of gases in and out of the blood. If the process continues, the functional capacity of the lungs becomes inadequate to support normal activities and may eventually be unable to support life."

(Source: Brief of The Travelers Insurance Co., 1981.) [View document]

"The injury to the body begins at the first inhalation of the asbestos fibers. Although the eventual change in the lungs begins to develop at this time, it is not until the disease is relatively advanced that a firm diagnosis of asbestosis can be made."

(Source: Internal Memo of The Travelers Ins. Co., Liability Claims Administration, Section 18, Injurious Exposure Claims, at sec. 18.1.)

"It is estimated that in order for the disease asbestosis to be clinically diagnosed, the gas exchange function of at least 100 million alveolar/capillary units [1/3 of the lung] must be affected."

(Source: Armstrong World Industries, Inc., 1987, at 12.)

f asbestosis becomes severe, classified in ILO category 3, 35 percent of insulation workers will die from the disease within ten years (Markowitz 1997). One third of workers with advanced asbestosis (ILO categories 2 and 3) will die of lung cancer (Selikoff 1990).

Additional research links asbestosis progression with lung cancer. In a ten-year Finnish study, risk of lung cancer increased dramatically if asbestosis progressed during the period analyzed; approximately 46 percent of progressors developed lung cancer compared to nine percent of patients whose asbestosis did not progress. All lung cancer cases were current or former smokers (Oksa 1998b). According to an insurance industry association (AIA) review, approximately 50 percent of patients diagnosed with asbestosis will die of or with lung cancer. [Excerpt | Full document]

**More than one third of asbestos insulation workers diagnosed as "unimpaired" died from asbestos disease within 27 years. (Selikoff 1990).**

8                                  JOURNAL OF BANKRUPTCY LAW AND PRACTICE [VOL. 10]

for national legislation."[36] Chief Justice Rehnquist and Justices Scalia and Kennedy concurred separately to highlight that the national asbestos litigation problem cannot be resolved under the present Federal Rules of Civil Procedure and, consequently, "cries out for a legislative solution."[37]

Following *Windsor* and *Ortiz*, Chapter 11 appears to be the only viable legal procedure for global resolution of a company's mass asbestos-related exposure. In fact, two companies that recently filed for Chapter 11 protection to stave off mounting asbestos-related claims, Owens Corning[38] and The Babcock & Wilcox Company,[39] stated in bankruptcy court filings that, in their view, no legal alternative to Chapter 11 exists.

II.     How Corporations Facing Mass Asbestos-Related Claims Reorganize Under Chapter 11

    A.     The Restructuring Model

        1.     Bankruptcy Code Section 524(g)

Companies facing mass asbestos-related claims generally reorganize following a model first developed in 1986 for the Chapter 11 reorganization of Johns-Manville Corporation.[40] Under the Johns-Manville model, (a) the plan *of reorganization creates a trust vested with, among other assets, at least a majority of the reorganized debtor's stock,* from which asbestos-related claims will be satisfied,[41] and (b) in connection with plan confirmation, the bankruptcy court issues an injunction channeling asbestos-related claims to the trust and away from the reorganized debtor.[42] In 1994, Congress amended

*[handwritten: Bankruptcy code modeled after Johns-Manville]*

---

[36] *Id.* at 2302.

[37] *Id.* at 2324.

[38] *See Motion for Order Under 11 U.S.C. § 105(a) Authorizing Payment of Critical Prepetition Trade Vendor Claims* at ¶ 8, filed with the United States Bankruptcy Court for the District of Delaware, Case No. 00-03837 (MFW) (Owens Corning "commenced [its] chapter 11 case[] to protect the Company's business and value for all of its constituents, and to finally resolve all claims, including asbestos claims, asserted against it.").

[39] *See The Babcock & Wilcox Company's Information Brief* at 2, filed with the United States Bankruptcy Court for the Eastern District of Louisiana, Case No. 00-10992 (JAB) ("Chapter 11 affords the only solution for Babcock & Wilcox. Other paths to resolution have been foreclosed. The Supreme Court has restricted class action settlements under Rule 23, and Congress has failed to enact legislation to address the burgeoning problem. The only remaining solution is Chapter 11.").

[40] *See In re Johns-Manville Corp.*, 68 B.R. 618, 624, 15 Bankr. Ct. Dec. (CRR) 480, 16 Collier Bankr. Cas. 2d (MB) 98, Bankr. L. Rep. (CCH) ¶ 71531 (Bankr. S.D.N.Y. 1986), decision aff'd in part, rev'd in part, 78 B.R. 407 (S.D.N.Y. 1987), order aff'd, 843 F.2d 636, 17 Bankr. Ct. Dec. (CRR) 695, Bankr. L. Rep. (CCH) ¶ 72264 (2d Cir. 1988).

[41] *Id.* at 621.

[42] *Id.* at 624.

the Bankruptcy Code, adding Section 524(g), to specifically authorize the Johns-Manville model for reorganizing companies facing mass asbestos-related liabilities.[43]

There are several stringent requirements listed in Section 524(g) for a court to issue the channeling injunction.[44] First, there are requirements pertaining to the trust.[45] In particular, the trust must assume the debtor's asbestos-related tort liabilities.[46] The trust must also be funded in whole or in part by the securities of the reorganized debtor and by the obligation of the reorganized debtor to make future payments, including dividends.[47] The trust must own or, by the exercise of rights granted under the plan, would be entitled to own a majority of the voting shares of the reorganized debtor, its corporate parent or a subsidiary.[48] And, the trust must use its assets or income to pay asbestos-related claims.[49]

Second, the court must make several findings of fact. The court must find that the debtor is likely to be subject to substantial future asbestos-related claims.[50] The court must also find that the actual amount, number and timing of such future claims cannot be determined.[51] There must be a finding that pursuit of such claims outside the procedures prescribed by the plan is likely to threaten the plan's purpose to deal equitably with present and future claims.[52] There must also be a finding that, as part of the process of seeking confirmation of such plan, the terms of the channeling injunction are set out in the plan and attendant disclosure statement[53] and that asbestos claimants accept the plan by at least 75 percent of those voting.[54] Finally, the court must make a specific finding that the trust will operate through mechanisms

---

[43] The Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 (enacted October 22, 1994); *see* Ralph R. Mabey & Peter A. Zisser, *Improving Treatment of Future Claims: The Unfinished Business Left by the Manville Amendments*, 69 Am. Bankr. L. J. 487, 497-98 (1995)(referring to Section 524(g) as the "Manville Amendment" because the provision "bespeak[s] and idiosyncratic and narrow intent to shore up the Manville reorganization, and other very nearly parallel asbestos-related reorganizations.").

[44] See 11 U.S.C. § 524(g)(2).

[45] See 11 U.S.C. § 524(g)(2)(B)(i).

[46] See 11 U.S.C. § 524(g)(2)(B)(i)(I).

[47] See 11 U.S.C. § 524(g)(2)(B)(i)(II).

[48] See 11 U.S.C. § 524(g)(2)(B)(i)(III).

[49] See 11 U.S.C. § 524(g)(2)(B)(i)(IV).

[50] See 11 U.S.C. § 524(g)(2)(B)(ii)(I).

[51] See 11 U.S.C. § 524(g)(2)(B)(ii)(II).

[52] See 11 U.S.C. § 524(g)(2)(B)(ii)(III).

[53] See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).

[54] See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). This is markedly different from plan voting requirements in all other Chapter 11 cases. Under Bankruptcy Code Section 1126(c), a plan is

10                    JOURNAL OF BANKRUPTCY LAW AND PRACTICE [VOL. 10]

that provide "reasonable assurance that the trust will value, and be in a
financial position to pay, present and future asbestos-related claims."[55] Such
mechanisms may include structured, periodic or supplemental payments,
*pro rata* distributions, matrices, or periodic review of estimates of the
numbers and values of present claims and future demands or other compara-
ble mechanisms.[56]

Provided that these requirements are met, the court's channeling injunc-
tion is valid and enforceable and may not be revoked or modified by any
court except through an appropriate appeal.[57]

Section 524(g) authorizes bankruptcy courts to issue channeling injunc-
tions that protect a broad group of parties in interest. In particular, the chan-
neling injunction may provide that no entity that becomes a direct or indirect
transferee or successor to any assets of the debtor or the trust shall be liable
for any asbestos-related claims channeled to the trust.[58] It may provide that
no entity that makes a loan to the reorganized debtor, the trust or a successor
or transferee of assets of the debtor or the trust shall, by reason of making
the loan, be liable for any asbestos-related claim channeled to the trust, nor
shall any pledge of assets made in connection with such a loan be upset for
that reason.[59] The injunction may bar legal action against a third party that is
allegedly also liable for asbestos-related claims because of its ownership of a
financial interest in the debtor, a past or present affiliate of the debtor or pre-
decessor in interest of the debtor.[60] The injunction may bar action against a
person involved in the management of the debtor or a predecessor in interest
of the debtor, or served as an officer, director or employee of the debtor or a
related party.[61] Parties may also be protected from claims arising because of
their provision of insurance to the debtor or a related party.[62] Furthermore,
the court may enjoin claims against parties arising because of their involve-
ment in a transaction changing the corporate structure, or in a loan or other
financial transaction affecting the financial condition, of the debtor or a re-
lated party, including the provision of financing (debt or equity), advice to an

---

deemed accepted by a class of creditors if two-thirds in amount and half in number of the al-
lowed claims in that class vote in favor of the plan. *See* 11 U.S.C. § 1126(c).

[55] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V).

[56] *See id.*

[57] *See* 11 U.S.C. § 524(g)(3)(i).

[58] *See* 11 U.S.C. § 524(g)(3)(ii).

[59] *See* 11 U.S.C. § 524(g)(3)(iii).

[60] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I).

[61] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(II).

[62] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(III).

entity involved in such a transaction or acquiring or selling a financial interest in an entity as part of such a transaction.[63]

Moreover, the channeling injunction is valid and enforceable with respect to asbestos-related claims asserted after the plan is confirmed, provided that two requirements are met.[64] First, as part of the Chapter 11 case, the court must appoint a legal representative for the purpose of protecting the rights of future asbestos claimants.[65] Second, the court must make a finding, before confirming the plan, that enjoining future asbestos-related claims against the reorganized debtor and third parties is fair and equitable in light of the benefits provided, or to be provided, to the trust.[66]

One recent case, however, deserves limited discussion in this context. In *New National Gypsum Co. v. National Gypsum Co. Settlement Trust (In re National Gypsum Co.)*,[67] the Fifth Circuit Court of Appeals raised an issue relating to the effectiveness of a channeling injunction in resolving mass asbestos claims. In that case, the asbestos-claimants' trust sought a declaratory judgment that the order confirming National Gypsum's plan of reorganization contemplated that reorganized National Gypsum would be held liable for unknown asbestos-related claims that could not be satisfied by the trust.[68] The Fifth Circuit held that the reorganized debtor could, conceivably, still be held liable to future tort claimants based upon successor liability theories.[69] It is arguable, however, that the *National Gypsum* opinion is an anomaly and does not create an exception to the broad protections afforded a reorganized debtor by Bankruptcy Code Section 524(g). That is because the plan of reorganization in National Gypsum's Chapter 11 case was confirmed before enactment of Section 524(g) and, consequently, the confirmation order and attendant channeling injunction were not as broadly worded as would

[63] See 11 U.S.C. § 524(g)(4)(A)(ii)(IV).

[64] See 11 U.S.C. § 524(g)(4)(B).

[65] See 11 U.S.C. § 524(g)(4)(B)(i). Prior to enactment of Section 524(g), representatives for future asbestos-related personal injury claimants were appointed in the following Chapter 11 cases: In re Johns-Manville Corp., 52 B.R. 940 (S.D.N.Y. 1985); In re UNR Industries, Inc., 46 B.R. 671, 12 Bankr. Ct. Dec. (CRR) 1002, 12 Collier Bankr. Cas. 2d (MB) 316 (Bankr. N.D. Ill. 1985); In re Amatex Corp., 755 F.2d 1034, 12 Bankr. Ct. Dec. (CRR) 1373, 12 Collier Bankr. Cas. 2d (MB) 147, Bankr. L. Rep. (CCH) ¶ 70279 (3d Cir. 1985). See, generally, Barbara J. Houser, *Chapter 11 as a Mass Tort Solution*, 31 Loy. L.A. L. Rev. 451, 467-68 (1998)(describing the roles and duties of the legal representative of future claimants); Note, *Toxic Torts and Chapter 11 Reorganization: The Problem of Future Claims*, 38 Vand. L. Rev. 1569 (1985)(addressing whether the appointment of a legal representative is appropriate in mass tort cases in article published prior to enactment of Section 524(g)).

[66] See 11 U.S.C. § 524(g)(4)(B)(ii).

[67] 219 F.3d 478 (5th Cir. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 2238 (2001).

[68] Id. at 479.

[69] Id. at 493; see, infra, Section II.A.2 for a discussion of the successor liability doctrine.

be expected for a plan confirmed pursuant to Section 524(g).[70] Further, the plan in *National Gypsum* was premised on the CCR settlement" that, as noted in Section I above, was overturned by the Supreme Court in *Windsor*. Thus, the Fifth Circuit's opinion can be seen as an interpretation of a confirmation order entered pursuant to outdated law and under a factual scenario not likely to be repeated.

### 2.   M&A Solutions

The Bankruptcy Code includes several provisions that are geared towards enabling "clean" sales of estate assets and, by extension, an M&A (*i. e.*, mergers and acquisitions) solution in the appropriate Chapter 11 case. For example, under Bankruptcy Code Section 363(f), the debtor may sell assets of the estate to a purchaser "free and clear of any interest in such property."[72] Bankruptcy Code Section 1123(a)(5)(D) provides that a plan of reorganization may incorporate a sale of estate assets "free of any lien."[73] And, Bankruptcy Code Section 1129(b)(2)(A)(ii) permits a bankruptcy court to confirm a plan over the dissenting vote of a class of secured creditors that calls for the sale of their collateral "free and clear" of the creditors' liens, provided that their liens attach to the sale proceeds.[74] Based upon these Bankruptcy Code protections, it is conceivable that a third party might be given incentive to provide greater value for the assets of the Chapter 11 estate than could be realized through a restructuring under the Section 524(g) model.

Nevertheless, sales of estate assets implicate a common law doctrine referred to as "successor liability," which can affect the offer price for estate assets.[75] Under the successor liability doctrine, a purchaser of assets may be held liable for obligations of the seller upon an appropriate evidentiary showing. Generally, there are four circumstances in which courts permit a plaintiff to sue the purchaser of assets from the party with original liability: (1) where the purchaser expressly or impliedly agrees to assume such liabilities; (2) where there is a *de facto* consolidation or merger of the purchaser and seller, such as where the purchaser "pays" for the assets with its stock; 13) where the transaction is fraudulent and geared towards escaping liability; and (4)

---

[70] *See* 219 F.3d at 486.

[71] *See id.* at 480-81.

[72] 11 U.S.C. § 363(f).

[73] 11 U.S.C. § 1123(a)(5)(D).

[74] 11 U.S.C. § 1129(b)(2)(A)(ii).

[75] Tort plaintiffs in the asbestos field have relied upon the successor liability doctrine as one of the principal means, both inside and outside of bankruptcy, of upsetting efforts by former asbestos manufacturers to shield value from the plaintiffs' reach by transferring assets to separate corporate entities. *See, infra,* Section II.D.3. Thus, this doctrine may also be considered with the other legal principles discussed in Section III hereof regarding the "capture" and "leakage" of estate value from and to asbestos claimants.

PROTECTING DISTRIBUTIONS IN ASBESTOS-RELATED CHAPTER 11 CASES        **13**

where the purchaser is a mere "continuation" of the selling entity.[76] There are two schools of thought respecting the "continuation" theory. Under traditional "continuation" analysis, a purchaser may be held accountable for the seller's liabilities if (a) the purchaser retains the seller's general operations, (b) the seller dissolves, (c) the purchaser assumes the normal business obligations of the seller and (d) the purchaser holds itself out as a continuation of the seller.[77] Under more modern "continuation" analysis, a purchaser of assets related to a particular product-line (as opposed to all of the seller's operations, as required under traditional analysis) may be held liable for the seller's torts related to that product-line if the purchaser continues to manufacture that line, under the same name and with no outward indication of a change in ownership.[78]

There is a split of authority respecting whether successor liability is, generally speaking, a doctrine that is applicable to sales of assets from a Chapter 11 estate.[79] Thus, a purchaser of assets from a Chapter 11 estate generally bears some risk that one or more of the debtor's creditors will subsequently

---

[76] See, e.g., Conn v. Fales Div. of Mathewson Corp., 835 F.2d 145, 146 (6th Cir. 1987); Leannais v. Cincinnati, Inc., 565 F.2d 437, 439 (7th Cir. 1977); Lefever v. K.P. Hovnanian Enterp., Inc., 160 N.J. 307, 310 (1999) (citing 15 William & Fletcher, Cyclopedia of the Law of Corporations § 70, 122 nn. 9-15 (1990)); see also Restatement (Third) of Torts: Products Liability § 12 (1997) ("A successor corporation of another business entity that acquires assets of a predecessor corporation or other business entity is subject to liability for harm to persons or property caused by a defective product sold or otherwise distributed commercially by the predecessor if the acquisition: (a) is accompanied by an agreement for the successor to assume such liability; or (b) results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor; or (c) constitutes a consolidation or merger with the predecessor; or (d) results in the successor becoming a continuation of the predecessor.")

[77] See, e.g., Conway v. White Trucks, 885 F.2d 90, 93 (3d Cir. 1989); Rothstein v. Tenn. Gas Pipeline Co., 664 N.Y.S.2d 213, 219 (Sup. Ct. 1997); see also Restatement (Third) of Torts: Products Liability § 12 cmt. g ("The exception recognized in subsection (d), referred to by many courts as the 'mere continuation' exception, applies when there has been little or no change in underlying substance. The most important indicia of continuation, in addition to the continuation of the predecessor's business activities, are common identities of officers, directors, and shareholders in the predecessor and successor corporations.").

[78] See, e.g., Ramirez v. Amsted Indus. Inc., 86 N.J. 332 (1981); see also Restatement (Third) of Torts: Products Liability § 12 cmt. g ("A minority of jurisdictions recognize a broader exception, referred to as the 'continuity of enterprise' exception, that imposes liability on the successor for continuing the business activities of the predecessor even when the corporate form of the successor is different from the predecessor.").

[79] Compare, e.g., In re Paris Industries Corp., 132 B.R. 504, Bankr. L. Rep. (CCH) ¶ 74283 (D. Me. 1991)(enjoining plaintiff from prosecuting successor liability claim against purchaser of estate assets "free and clear" of encumbrances), Forde v. Kee-Lox Mfg. Co., Inc., 437 F. Supp. 631, 16 Fair Empl. Prac. Cas. (BNA) 262 (W.D.N.Y. 1977) (same), judgment aff'd, 584 F.2d 4, 17 Fair Empl. Prac. Cas. (BNA) 1603, 17 Empl. Prac. Dec. (CCH) ¶ 8611 (2d Cir. 1978), with, e.g., National Gypsum, 219 F.3d 478 (described above), Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 25 Bankr. Ct. Dec. (CRR) 965, 30 Collier Bankr. Cas. 2d (MB) 1763, Bankr. L. Rep. (CCH) ¶ 75862 (7th Cir. 1994)(holding that bankruptcy court lacked jurisdiction to enjoin plaintiff from prosecuting successor liability claim against purchaser of

pursue it under a successor liability theory. That risk may be accounted for in a reduced offering price for estate assets.

Section 524(g), nevertheless, affords the bankruptcy court authority to issue channeling injunctions shielding transferees of estate assets.[80] Thus, the bankruptcy court may enjoin any and all successor liability claims from being asserted against a purchaser of estate assets, provided that the sale is consummated in connection with a restructuring pursuant to Section 524(g).[81]

### B.    An Unusual Dynamic For Negotiations

Typically, a Chapter 11 case is an adversary process[82] in which an official committee of unsecured creditors, representing all of the debtor's unsecured creditors, serves as the debtor's primary counter-balance.[83] Both the debtor and the official committee may, with bankruptcy court authorization, retain counsel, financial advisors and, perhaps, other professionals,[84] and the costs of these professionals will be borne by the Chapter 11 estate as an administrative expense.[85] Since both the debtor and the creditors' committee may dip into the Chapter 11 estate as a "war chest," the Bankruptcy Code creates incentive for the two parties to reach consensus on a plan of reorganization, rather than engage in expensive and protracted litigation to their mutual economic detriment.[86]

Chapter 11 cases that are commenced to resolve mass asbestos-related liabilities, however, are more complicated and costly because they tend to involve more parties at the bargaining table entitled to dip into the estate "war chest." Besides the debtor and the official committee of unsecured creditors, the bankruptcy court is likely to appoint an official committee

---

estate assets "free and clear" of encumbrances); *see, generally,* William T. Bodoh & Michelle M. Morgan, *Inequality Among Creditors: the Unconstitutional Use of Successor Liability to Create a New Class of Priority Claimants,* 4 Am. Bankr. Inst. L. Rev. 325 (1996)(describing the split of authority in this area).

[80] *See* 11 U.S.C. § 524(g)(3)(ii).

[81] *See Id.*

[82] *See* 11 U.S.C. § 1109(b); Fed. R. Bankr. P. 9014.

[83] *See* 11 U.S.C. § 1103(c).

[84] *See* 11 U.S.C. §§ 328(a), 1103(a).

[85] *See* 11 U.S.C. § 503.

[86] *See, Tung,* 3 Chap. L. Rev., at 50 ("The possibility of mutually assured destruction always lurks in the background, and collective avoidance of this worst case scenario is a primary goal of reorganization."); Elizabeth Warren & Jay Lawrence Westbrook, *The Law of Debtors and Creditors* 477 (3d ed. 1996)("We can think of a Chapter 11 negotiation as taking place in a conference room with the debtor sitting in the window threatening to jump ... while the creditors threaten to push.").

Room and thanks for the one
229

**ROCKWELL HOTEL**
150 GLEN STREET
GLENS FALLS, N.Y.

MARTIN H. BRYGSLER HOTELS

ROCKWELL HOTEL, Glens Falls, N.Y.
NEW CASCO HOTEL, Portland, Me.

THE BERLIN HOUSE, Berlin.
THE PARK HOTEL, Lewiston

Hi honey
I got your letter and u
happy to hear from y
and the kids I am so
happy to see the ca
that your sent me
I got them near my
bed. well you want
to know about the Pa
well I Join the unic
that it what you
want to do. I had.
Pay $75 to Join. you
know I don't like th
but I had to do it o
I could not work so
had to pay it. I work

Miss _____
4 6 venice St
Rochester N.y.

1848

129 of 160

Room 220

ROCKWELL HOTEL
190 GLEN STREET
GLENS FALLS,
N. Y.

Miss Judy
46 Venice St
Rochester N.y.

one week for nothing
well hows thing I
find. and hope to hear
that your and the
are good. it is cold
hear and we had snow
hear if it get colder w
may come home I hope
hows is it in Rochester
cold to. how are my ashe
still Bling up well dont-
that bother you want I
come home I will have some
thing to do. Honey miss y
cry a hole lot went I way ho
it was so happy just kissin
you. and I hope it will alwa
be that way. and I am
saying it with all my hear
well I have not much to say
out side of this city I do no
like it hear. and I want you
to eat good and kids and giv
them a big kiss and hear
a big kiss from me xx     Jackon
honey be happy untill I come Love and

130 of 160



1951

NY 531
PUBLIC LIBRARY,
5th Avenue and 42nd Street,
New York City

Hello Everybody:
How you all & doing swell so far...

Executive
Salary of
$75 a week
Come rain
or shine

Mr. & Mrs. A. Palermo
46 Venice St.
Rochester 9, N.Y.

TIMES SQ.
STATION

Friend + Co-worker died of mesothelioma

Best part of deal
Angelo's position

LE MOYNE COLLEGE, SYRACUSE, N.Y.
The new Jesuit School is located at LeMoyne Heights on
Salt Springs Road.

Le Moyne
College
Syracuse
NY

"I like
to be home"

Seymour Roth
Room 16

GIVE
RED CROSS
FUNDS
POST CARD

Miss Josephine Palermo
46 Fieldwood Dr.
Rochester, N.Y.

3/54  name on social security records - DAVIS-Fetch



*Albany*



9/48
No name
on Social
Security records
(11 hour work
day)

142

**ROCKWELL HOTEL**
150 GLEN STREET
GLENS FALLS. N.Y.

MARTIN M. BRESSLER HOTELS

ROCKWELL HOTEL, Glens Falls, N. Y.
NEW CASCO HOTEL, Portland, Me.

THE BERLIN HOUSE, Berlin, N. H.
THE PARK HOTEL, Lewiston, Me.

Hy. honey.
hope this letter find yous
all well I am feeling good.
well mike went home with
Pat. they are lucky, for
me I think I am taking a
lot of shit. your are
right. and I shit this
Place, and I hope I was.
home now, after this
job I think that is
all, and I do not like
it here, I miss you and.
the kid a lot, I have not
much to say. But in person
it make me fell better to
tell you things. if I was
home now I wood kiss you

and be happy, well untill I get home. well how is Christ coming along bad as alway, and gieo the same to Marlin to write to me I would like to hear from her I like to read her letters, I feel happy to hear from her, well I think I will be home 3 weeks. I hope. right now me and carm is writing lettersffa. well heony that is all I get to say out side of Jove and kiss to you and the kids untill we meet.

Love





Oct 4, 1948

(3)

nak is depression or something would happen or that would have you home with me, just think it is all, well I'm gonna tell it not unless you come home, honey doesn't mean anything, for me if I don't have all these things that money can't buy.

Angie, tell Carm, I appreciated all he did for me. He sure was nice guy, tell him everybody is just swell at home. Angie I will send you the pictures to you Monday I'm taking pictures of Bill, Ir-brunde yesterday. Camera, these pictures I'd like to see, but not in the cold, Bye-Bye.

(2)

I haven't seen the Leads, but that's over and we over with, Bill when he did what about him, we were sick and he told him Angie Bill Mike came and tell him that John would call him, he kept on me till the north on the step and tell his stockings seemed and him how by taking off that ear and how much he that ear was out, got it.

Carm, I went over Francis and got quite a bit of junk at, the oil furnace is figured, so hot water tank. Found out from Monday, to see that everything was in swell night. I flight pretty good... I think, I filled, got to eat Sunday night, was having a grand time, see hows, angie you should see hows...

46 Vernon Street
Paterson, N. J.
October 4, 1968

Hi Honey,

Well your letter came all right, but your letter to me sounded like a train, and it got home at 2:00 P.M. the letter was fine. The first thing she asked me was, "Is Daddy."

Everything you said about all that going on there ever since the people I would love to have so long as there with you, anyway. I been trying very hard to get me all day, but if they want you to do it, I mean it doesn't change. So I'm very tired anyway, so I just went until everything ...

①

---

Please write me real soon, we were hoping what was got me. Anyway, come home, come on your own. She disposted and I don't mean anything. What forget to eat and drink, keep about me something was not happy. Time except were not happy. Say Hello to Connie and Julie, Say hello to you all. My that friends all away too. Jane and Hannah from the fred and myself, and come home.

Write me Angie
Love your wife
Jo.

④

137 of 160

46 Vincent Street
Robstown, N.Y.
October 14, 648

Hi Nancy!

I just got your card and the first thing I did was to sit down to write to you. The kids are fine, but me, I had a terrible cold all... are throat. I'm feeling better now. Pat and Peggy just dropped but told me that make is back in Robston, a fine thing. I did I do she most anything you going anything by it. Dann, was was you anyways. I'm glad to have the kids in little the Albany and that you found a restaurant that has nice meals cheap. Well, I'm like...

(1)

...to the inside you, anyways you know I would feed you from me, went it matter, and when you were sick was I would we is bed with you, and... and the kids are going up a bit, so take care of yourself, were all fine in health and we want you to be... Anyway, I'm writing you now anyway ...of to take of the kids, and having you like to see them. And meanwhile you a lot and do make me cheer, and you should no how quiet they got to get that event. Nancy, write me letters, please, in or anyway when I get me, anyway; you're getting to write well, not new me installed is fifty. But I don't mind and nobody will I are there, I hope my letters. Well, I'm fine, don't worry about anything and my be so on nice ones and as soon finish go.

(2)





Whitewater Street
Whiting 9, N.J.
September 18, 1948

Dear Nancy,
Dear Cit,



Sept. 11, 1948





Sept 15, 1948

②

③









46 Venice Street
Rochester N.Y
August 2, 1950

Dear George,

You know I don't like to [...] say [...] is my own [...]
so [...] I and [...] write to
don't [...] your little [...]
about the [...], there's enough
dirt to fill up the last [...]
now that no money in it,
the manner don't cover that.
What are you worried about
[...] were a living worthwhile
I did [...] [...] what I am.
[...] was war [...]
[...] wife or just a dope.

You don't tell it in Albany
the [...] wire [...]
[...] and I could [...]
[...] they might do
something [...] my [...]
[...] extravagant, you're
got the wrong wife [...]
but went [...]
[...] I don't miss anything
get your money worthwhile
[...] you got it.
[...] I steel
[...] $9.95 left. I gave
Gail or [...] gum, that
[...] I wasn't [...]
[...] [...] may
[...] but well write you

① ③

146 of 160



Just like you say, we're going
to have piles and bottles
you have them and so do I.
So what's the difference if
Jim oil loves with everybody
next to me, like everyone else
you children don't know what
it is to run to there father, they
_____

for_____ don't_____ far ahead
In the eat's feet, clothes, bills,
must send everything.
I don't want this di.

you are ____ ____ get our health
but plenty "to company, I bid
_____,
we're getting few, I'm leaving

②

_____ Friday, is that the
day, we get the big
Church.
The kids are fine
take everything _____
say that ____ and _____ of
__ ___.
your ____ I don't know
what

JC

④

46 Venice Street
Roluti, N.
Octo 20/ 1942

Hi Honey,

I will glad to hear that you are well, so are the rest of us. Just got a letter from the principal and I have to go talk to him about...

② [circled]

① [circled]

of telling Jean that it would
be inconvenient for you to send
me the money and that it
would be easier for me to
send you whatever you need.
I just about left and it was
all over town that I made a
fuss. John was with me and
he can't tell you what I said.
Ange, the whole bunch are
like a bunch of idiots talking about
each other, you could call each
other write to me not to go
to the office brother Jay. I
really not because I found
myself the money and
all minimum and

②

you wanted some money sent.
I'm not going anymore. It's
the easiest set up I ever
saw. Mike is working here
with Pat, putting in 9 & he
can stay from 11 PM till 2 in
the afternoon, you'll not there
not working because it's cold.
Ange, why don't you get away.
It's not working for your faith,
let him do some running.
ask for money in the church.
you're not nothing and nothing,
you're in the union, don't make
him money anytime, you want
get a mobile for it. It's up
to you Ange. There is no
ways, there are no jobs in the
city so why be away

③





Hi Honey,   IT'S A BOY!!!! Just kidding ange.

How are you? The kids are fine, the Kids certainly miss you, especially Chris, Boy, have I got a surprize for you, dear, I'm mad you haven't written me a letter, I haven't been nothin till Pat's that's why I had to use a 3¢ stamp. Hi' Ang how are you? Your wife wants you Hootie Hurry Hurry love Me

POST CARD

Mr. Angelo Palermo
73 Eagles Hotel
Room 36
Albany, N.Y

HIRE THE HA___
IT'S GOOD

Hi Honey —

— How are you? Please take good care of yourself. the kids are fine. Don't feel bad about not taking them to the show, there will be a lot of time for that. Gail isn't taking the bottle anymore. She misses you ange, No body has been over, I've been trying to get most of the work done, but I can't do very much ange, my side is bothering me more than ever. I have to go to the hospital again monday. Write to me ange. take good care of yourself and eat and don't worry about anything. I hope to see you soon for all of us want you. Kisses from the kids Love Jo



**HOTEL HOLLAND**
351 WEST 42ND STREET
JUST WEST OF TIMES SQUARE
NEW YORK'S MOST CONVENIENT HOTEL FOR
THE MOTORIST

In the heart of the midtown section, but removed from traffic congestion. Parking facilities across the street. Garage within a block. Over 50 theatres within walking distance. Convenient to the shopping district. Every room with bath and shower.

Fine coffee shop and cocktail lounge.

FIGHT
YOUR INSE[CT]
ENEMIES

POST CARD

2 CENT

Hi Honey,
How are you,
do you miss me,
how are the kids,
I'm back home in
two weeks today,

love,
Mrs. Angelo Palamo

Mrs. Angelo Palamo
46 Field will
Rochester 9, N.y.



**CRMC**
CLAIMS RESOLUTION
MANAGEMENT CORPORATION

Office of the General Counsel

June 10, 2003

Josephine Palermo
983 Brown Road
Rochester, NY 14622

> Re:   **Maxville Personal Injury Settlement Trust**
> **Extraordinary Claim Status – Granted**
> **Trust Claimant: Angelo Palermo**
> **POC#: 519169**

Dear Mrs. Palermo:

On June 6, 2003, the Extraordinary Claims Panel (the Panel) decided that the above-referenced claim is eligible for an award in excess of the Trust Distribution Process (TDP) Maximum Value for the Scheduled Disease Category determined applicable to this claim. Enclosed please find the award forms completed by each member of the Panel. The Trust, which has reviewed this claim at Individual Evaluation, is currently re-evaluating the claim in light of the Panel's decision. Upon completion of this review, the Trust will issue a Last Best Offer following Individual Evaluation and the Extraordinary Claims Panel decision. With the offer you will receive a response form that lists the claimant's TDP options available for responding to the offer.

Please let me know if you have any questions concerning this decision. I can be reached at (703) 205-0821.

Sincerely,

Adam J. Mercer
ADR Administrator

cc: Bob Stratton
Enclosures

## Manville Personal Injury Settlement Trust
### Award Form for Extraordinary Claims Panel Review

Trust Claimant: Angelo Palarmo
POC#: 519169

Closest TDP Scheduled Disease Category: **4**          TDP Maximum Value: **$200,000**

Extraordinary Claims Panel member decision:

✓ This claim is Extraordinary.

☐ This claim is not Extraordinary.

Date of decision: __6/6/2003__

Key factors that influenced this decision:

The Panel finds this decision to be a particularly difficult one. On the one hand, the deceased claimant has been able to produce very little by way of medical evidence to challenge the diagnosis/death decision that was made 34 years ago. On the other hand, there was extensive pain and suffering in this case, and early death, and abundant and apparent exposure to asbestos. In the totality of the circumstances, the Panel believes this claim deserves extraordinary consideration. In addition, the Panel believes that the CRMC should consider encouraging the pro se claimant to secure the advice of an attorney in negotiating the ultimate disposition of this case.

Factors that were under- or over-valued by either party:

See above.

For the Panel:

David T. Austern
*Extraordinary Panel Member*

(703) 205-0835

154 of 166



# CRMC
### CLAIMS RESOLUTION
### MANAGEMENT CORPORATION

David T. Austern
President

October 16, 2003

**FEDERAL EXPRESS**

Mrs. Josephine Palermo
Mrs. Gail Garner
Mrs. Marlene Fargo
90 Woodman Park
Rochester, New York  14609

    Re:    **Manville Personal Injury Settlement Trust
                Claim of the Estate of Angelo Palermo
                Proof of Claim Number 519169**

Dear Mrs. Palermo, Mrs. Garner and Mrs. Fargo:

    In August of this year you received a final offer to settle your family's claim against the Manville Personal Injury Settlement Trust ("the Trust"). Since that offer was made, your claim has been the subject of considerable discussion among the members of the Extraordinary Claim Panel. As Mrs. Garner and I have discussed, I have been persuaded by the Panel members to increase the Trust's offer to $750,000. Mrs. Garner has indicated that the family will accept this offer.

    Your claim was filed pursuant to the 1995 Trust Distribution Process (TDP). Upon receipt of your executed release (enclosed), you will receive a check in the amount of $75,000, representing a ten percent (10%) pro rata payment. As previously indicated, and as stated in the release, it is unlikely that the Trust will be able to make any additional payments. Since 1995, Trust claimants have received initial payments representing no more than ten percent (10%) of the value of their claims. Since June 2001, Trust claimants have been receiving payments that represent only five percent (5%) of the Liquidated Value of their claims.

    Given the circumstances presented by this claim, this offer reflects the extraordinary effort Mrs. Garner has made as an advocate on behalf of your family. To accept this offer, please execute the enclosed release before a Notary Public or two witnesses who are not related to you by blood or marriage. Confirm the correct payee name that should appear on your check as well as the mailing address to which it should be sent. The executed release should be returned to the CRMC in the enclosed Federal.

3110 Fairview Park Drive, Suite 200 P.O. Box 12003, Falls Church, Virginia 22042-0683
Phone: 703-204-9300 Fax: 703-205-6249 www.claimsres.com

Mrs. Josephine Palermo, et al.
October 16, 2003
Page 2

Express envelope that has been provided for your use.  Upon receipt of your executed release, a check in the amount of $75,000 will be sent to you.

Very truly yours,

David T. Austern

Enclosures:  Release
Federal Express envelope for returning the executed release



# MANVILLE TRUST DISTRIBUTION PROCESS RELEASE

**INJURED PARTY NAME:** Angelo Palermo

**POC NUMBER:** 519169-M

**LAW FIRM, if any:**

**LIQUIDATED VALUE:** $750,000.00

## DEFINITIONS

I understand that certain words used in this Release will be considered to have the meanings defined below:

a. *TRUST is* the Manville Personal Injury Settlement Trust. *PLAN is* the Manville Corporation's Second Amended and Restated Plan of Reorganization. *RELEASED PARTIES* are the people and organizations that I agree to discharge from actual or potential legal duties, claims or liabilities, and include the Trust, Manville Corporation and subsidiaries, all Settling Insurance Companies as defined in the Plan, the distributor Pacor, their trustors, trustees, directors, officers, agents, servants, employees, attorneys, successors and assigns, heirs and executors, and any and all other persons or organizations who were entitled to benefit from the injunction that took effect on November 28, 1988, pursuant to the Order Confirming the Plan dated December 22, 1986, and subsequent Orders issued by the U.S. Bankruptcy Court for the Southern District of New York or the U.S. District Courts for the Eastern and Southern Districts of New York, all of whom are collectively referred to as the "Trust." *PAYMENT PLAN is* the compensation program described in the Trust Distribution Process ("TDP") attached to the Stipulation of Settlement in the Class Action Findley v. Falise.

b. This document is a *RELEASE* or covenant not to sue releasing any and all claims (except as noted in the last sentence of Paragraph 3) including, but not limited to personal injury and wrongful death claims asserted against the Trust and those persons or organizations defined as the Released Parties. *SETTLEMENT PAYMENT(S)* are the amounts of money I will actually receive under the Payment Plan. The total amount I will receive from the Trust is uncertain and will depend on the number of claims filed with and the income received by the Trust. It is likely I will never receive any settlement payments other than my first settlement payment. *LIQUIDATED VALUE is* the payment amount I would receive if the Trust could fully pay my claim. Because the Trust cannot fully pay my claim, my Settlement Payments will total less than the Liquidated Value of my claim.

NYS Professions

Page 1 of 2



## License Information *

10/21/2003

**Name :** KODSI MAGDI SALEH
**Address :** ABINGTON PA
**Profession :** MEDICINE
**License No:** 100314
**Date of Licensure :** 11/06/67
**Additional Qualification :**
**Status :** NOT REGISTERED
**Registered through last day of :**
**Medical School:** Not on file    **Degree Date :** Not on file

*1½ years after my father died 4/23/66*

(Use your browser's back key to return to licensee list.)

* Use of this online verification service signifies that you have read and agree to the terms and conditions of use. See HELP glossary for further explanations of terms used on this page.

Note: The Board of Regents does not discipline *physicians(medicine), physician assistants,* or *specialist assistants.* The status of individuals in these professions may be impacted by information provided by the NYS Department of Health. To search for the latest discipline actions against individuals in these professions, please check the New York State Department of Health's Office of Professional Medical Conduct homepage.

Further information on physicians may be found on the following external sites (The State Education Department is not responsible for the accuracy or completeness of information located on external Internet addresses.):

American Board of Medical Specialties

American Medical Association:
- For the general public: AMA Physician Select, On-line Doctor Finder
- For organizations that verify physician credentials: AMA Physician Profiles

American Osteopathic Association, AOA-Net

Association of State Medical Board Executive Directors (A.I.M. "DOCFINDER")

New York State Department of Health Physician Profiles

The following sites provide additional information concerning the medical profession:

http://www.nysed.gov/coms/op001/opscr2?profcd=60&plicno=100314

10/21/03



**FINGER LAKES**
OCCUPATIONAL HEALTH
SERVICES

MEMBER OF THE NEW YORK STATE
OCCUPATIONAL HEALTH NETWORK
A UNIVERSITY OF ROCHESTER
MEDICAL CENTER PROGRAM

980 WESTFALL ROAD • SUITE 210 • ROCHESTER, NEW YORK 1461
(585) 274-0809 • FAX 256 227

(585) 274-4554

**ANGELO PALERMO**
Record Review: 7/11/02

Date of Birth:
Date of Death: 4/23/66

Angelo Palermo was a married, father, and building construction worker in Rochester for many years. His daughter, Gail Palermo-Garner, brings his records to me for review.

He was an employee of the Johns-Manville Company, and worked with asbestos in the usual conditions of his employment for many years. For example, he worked as a mason, bricklayer, and carpenter, as well as some electrical work and plumbing. He had direct contact with asbestos, spray coating Quonset huts with asbestos insulation.

His daughter brings his death certification from April 23, 1966, which was signed by Magda Kodsi, MD. The immediate cause of death was acute liver failure. This was due to metastatic carcinoma with a primary of the stomach.

His daughter wonders whether his death was as a result of his asbestos exposure.

Of course, I never treated the patient and never examined him, and so I can really only speculate as to the primary source of his cancer. It is true that workers who have been heavily exposed to asbestos develop malignant mesothelioma, which can originate in the peritoneum or the pleura. Peritoneal mesothelioma is a difficult diagnosis to distinguish from carcinoma metastatic to the abdominal cavity or primary to the stomach, and it seems quite possible that the patient's fatal malignancy could have been a diffuse malignant mesothelioma of the peritoneum rather than a primary from the stomach.

In order to help answer this question, I have written to Rochester General Hospital for records of the biopsy, which he had prior to his death. I understand from his daughter that no autopsy was performed. However, I received a report from Rochester General Hospital Pathology Department that records from 1966 are no longer maintained, and therefore the tissue block from the biopsy that he underwent in the diagnosis of his carcinoma is not available for rereview by the pathologist.

His daughter also brings a photograph of him shortly before his death with a question as to whether he had digital clubbing. There is certainly a suggestion in the photograph that he had digital clubbing, but I cannot make out from the photograph whether this was present or not. This is a relevant issue because patients with malignant mesothelioma can develop digital clubbing.

I would be happy to rereview his situation if we are able to obtain any more medical information.

*William S. Beckett*

William S. Beckett, MD, MPH
Professor, Department of Environmental Medicine
(Occupational Medicine Program)
Medical Director, Finger Lakes Occupational Health Services

c:      Gail Palermo-Garner, 983 Brown Road, Rochester, NY 14622

WSB/ESI/VL

**via**Health
Rochester
General
Hospital

1425 Portland Avenue
Rochester, NY 14621-3095

716 338 4000

tax ID #

## YOUR REQUEST FOR MEDICAL RECORD INFORMATION HAS BEEN RECEIVED.

(   )   The information requested is enclosed.  This information is privileged, it's
confidentiality   must be maintained.

## DUE TO THE CIRCUMSTANCES CHECKED BELOW, WE ARE UNABLE TO FULFILL YOUR REQUEST AT THIS TIME:

(   )   We are unable to identify this individual.  If you can furnish additional information such
as birthdate, Social Security Number, Maiden name, dates of treatment and or verify
spelling of name, we will attempt another search.

(   )   We did not receive an adequate authorization with the request and cannot release
information.  Authorization must be for Rochester General Hospital, signed and dated
within 90 days of current date by patient/parent or legal guardian.  *Note: next of kin,
legal guardians and executors must provide legal documentation*

(   )   If you wish us to respond to the attached request, please sign and date the enclosed
consent form and return it to us in the enclosed envelope.

(   )   The patient has informed us they do not wish to consent to the requested   disclosure or
has restricted release at this time.  Please have the patient contact us to discuss your
request.

(   )   All photocopies are prepaid at a charge of $0.75 per page. The  charge for the entire
record is $_____ # of pages_____.  The charge for a summary is $_____
# of pages_____.  Checks are payable to Rochester General Hospital, Health
Information Management Department and can be mailed to us in the envelope provided.

(   )   Please call our office at 338-4398 to make an appointment to review requested material.

(✗)   Information requested has exceeded our retention policy and has been destroyed.

(   )   Access to the medical record has been denied by your Physician, an appeal can be made
to the Department of Health, instructions are on the enclosed form.

(   )   _____
_____

If you have any questions regarding the above, please contact us at (716) 338-4398.

3/97 RGHREQ.DOC, revised 3/98

An Affiliated Hospital of The University of Rochester School of Medicine and Dentistry

160 of 160

# EXHIBIT D



*rec'd march 17, 2003   -800-536-272 x821*

March 5, 2003

Josephine Palermo
983 Brown Road
Rochester, NY 14622

*Pam Crowe Allen*

Re:     **Manville Personal Injury Settlement Trust**
        **Closest Categorization Arbitration (AD-Other)**
        **Decision in Favor of the Trust**
        **Trust Claimant: Angelo Palermo**
        **POC #: 519169**

Dear Mrs. Palermo:

On February 14, 2003, Arbitrator William Aileo, Esq. rendered the enclosed decision affirming the Trust's position that Trust Distribution Process (TDP) Scheduled Disease Category 4 is the "Closest Scheduled Disease Category" applicable to the above-referenced claim.  Your current demand exceeds the TDP Maximum Value of $200,000.00 for the Closest Scheduled Disease Category determined applicable to this claim.  Accordingly, unless you agree to accept the Trust's Last Best Offer Following Individual Evaluation ($0.00), or otherwise revise your demand to an amount equal to or below the Maximum Value for this claim, the Extraordinary Claim Panel must determine whether your claim is eligible for Extraordinary Claim status before the claim may continue to value arbitration (AD2).  Please note that when the Extraordinary Claim Panel determines that a claim is not eligible for Extraordinary Claim status, the Panel's decision must be disclosed to the AD2 arbitrator, and the arbitrator will be prohibited from making an award in excess of the Maximum Value for the claim.

You have a number of TDP processing options available to you, including accepting the Trust's Last Best Offer ($0.00) or proceeding to arbitration by the Extraordinary Claim Panel.  In a few days you will receive a payment offer based on the Trust's Last Best Offer, accompanied by a response form that will describe your TDP options for further processing of this claim.

Please let me know if you have any questions concerning the decision.  I can be reached at (703) 205-0821.

Sincerely,

Adam Mercer
ADR Administrator

Enclosure

**Manville Personal Injury Settlement Trust**
**AD-Other Award Form**
For use in Arbitration of Closest Disease Categorization

Trust Claimant: «Angelo Palermo»
POC#: «5191692»

|  | Alleged | Acknowledged |
|---|---|---|
| Closest TDP Scheduled Disease Category: | «7» | «4» |

Decision: This claim most closely meets the criteria for a Category ____4____ claim.

Date of Decision: __2/14/03__

Key factors that influenced the arbitrator's decision:

__Absence of medical evidence__

Factors that were under- or over-valued by either party:

_Arbitrator's signature_

Rec'd 3/17/03



*rec'd 7/*

May 5, 2003

Office of the General C

Mrs. Josephine Palermo
983 Brown Road
Rochester, New York 14622

RE:   **Manville Trust Claim for:**   **Angelo Palermo**   POC# 519169

Dear Mrs. Palermo:

This responds to your letter requesting further explanation for the decision rendered by Arbitrator William Aileo.  As previously explained, that arbitration was conducted to determine the closest Scheduled Disease category for the purpose of establishing the applicable Maximum Value for your husband's claim.  In the attached Memorandum, Mr. Aileo explains that he could not conclude that the closest disease was Category VII malignant mesothelioma because there was no evidence to support that conclusion.

Also attached is an Addendum to the Trust Position that will inform the Extraordinary Claim Panel concerning Arbitrator Aileo's decision.  You also ask for a definition of an "extraordinary claim."  That definition is provided in the TDP at Section C.9:

> In extraordinary situations such as where a claimant was exposed only to Manville asbestos products, or where Manville asbestos products constituted the overwhelming majority of the claimant's asbestos exposure, or where special damages are exceptionally large, the Trust may individually evaluate and liquidate a claim for an amount that exceeds the Maximum Value for the particular Scheduled Disease asserted by the claimant.  Any dispute as to the Extraordinary Claim status shall be submitted to arbitration by a special Extraordinary Claim Panel established by the Trust with the concurrence of the SCB [Selected Counsel for the Beneficiaries] after consultation with the Special Advisor.

Finally, you asked for an explanation with respect to TDP, Section C.2, which provides that claimants may assert a valid claim for an asbestos-related disease even where they have not met the specific categorization criteria for any of the Scheduled Diseases.  There is no adverse presumption that their claims have value that is either



more or less than the Scheduled Value.  The Trust is obligated to individually evaluate those claims based on the CRPs [Claims Resolution Procedures] Factors, which are based on traditional principles of damages taking into account such things as: "the type, nature and extent of a diagnosed asbestos-related disease or condition or condition of any kind; questions of medical causation; questions of existence and/or degree of physical injury … the likelihood of the claimant having been exposed to Manville asbestos and/or asbestos-containing products … and any other relevant criteria generally utilized in the settlement of litigated tort cases."  Claims Resolution Procedures, Sec. II.B.6., Annex B to the Trust Agreement.  Following the individual evaluation of your claim, it was determined that evidence presented failed to credibly support a claim for asbestos-related disease and the claim was therefore denied.  In response to that denial you requested arbitration of the value of this claim which will take place after the Extraordinary Claim Panel makes a determination as to whether the arbitrator during value arbitration may or may not award a sum that exceeds the Maximum Value for Category IV other cancer.

I hope this is responsive to your questions.  You will be provided with a copy of the Extraordinary Panel's decision when it is rendered.

Sincerely,

*Pamela L. Crewe-Allen*

Pamela L. Crewe-Allen
Attorney

Enclosures

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 4, 2010 a true and correct copy of the foregoing document was served upon counsel for Plaintiffs Gail Garner and the Estate of Angelo Palermo at the following address by way of the Court's ECF SYSTEM and by FedEx:

Christina A. Agola, Esq.
Law Offices of Christina A. Agola, PLLC
2100 First Federal Plaza
Rochester, New York 14614

s/ Andrew L. Morrison
Andrew L. Morrison

NY-798531 v1

# EXHIBIT D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GAIL GARNER AND THE ESTATE OF ANGELO PALERMO,

                            Plaintiff,                  MOTION SCHEDULING
                                                      ORDER

-vs-

                                                    10-CV-6345

DII INDUSTRIES, LLC ASBESTOS PI TRUST,

                            Defendant.

_____

      A motion to dismiss [#11] having been filed on August 4, 2010 by the defendant in the above-captioned case, it is hereby

      ORDERED, that any responding papers submitted in connection with this motion be filed and served on or before September 10, 2010; and it is further

      ORDERED, that since the moving party has stated, pursuant to Western District of New York Local Rules of Civil Procedure, Rule 7.1(c), in the notice of motion that the moving party intends to file and serve reply papers, such papers must be filed and served on or before October 8, 2010; and it is further

      ORDERED, that unless a different date is specified in this Order, the time for service and the content of papers must be in accordance with Local Rules of Civil Procedure, Rules 7.1 and 5.2 (**papers not in compliance will not be considered**); and it is further

      ORDERED, that oral argument will be heard before the undersigned on December 2, 2010  at 3:00 p.m. at 1360 United States Courthouse, 100 State Street, Rochester, New York; and it is further

      **ORDERED, THAT ONE COURTESY COPY OF EACH FILING BE PROVIDED TO THE COURT.**

Dated: Rochester, New York
       August 5, 2010

                                   ENTER:


                                   /s/ Charles J. Siragusa_____
                                   CHARLES J. SIRAGUSA
                                   United States District Judge