# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:10-cv-22891-AJ

GALE LYAUTEY and PATRICIA LYAUTEY,
his wife,

      Plaintiffs,

v.

ALFA-LAVAL, INC., et al.,

      Defendants.

## DEFENDANT ELLIOTT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION TO REMAND (D.E. 60)

Defendant, sued as Elliott Turbomachinery Co., Inc. (hereinafter "Elliott" or Defendant), by and through undersigned counsel, hereby respectfully submits the following memorandum of law in opposition to Plaintiff's Emergency Motion to Remand (D.E. 60) and states:

### I. SUMMARY OF ARGUMENT

Virtually the same arguments advanced by Plaintiffs Gale Lyautey and Patricia Lyautey (collectively "Lyautey or Plaintiff") in support of remand were made to this Court in *Marley v. Elliott Turbomachinery Co., Inc.,* 545 F. Supp. 2d 1266 (S.D. Fla. 2008), and *rejected*.[1] This Court held in *Marley* that Elliott had properly removed the case on the basis of federal officer jurisdiction because the affidavit of Rear Admiral Ben Lehman, also submitted in the instant case, was sufficient to advance a *colorable* government contractor defense and establish a causal nexus, and that at the removal stage of a failure to warn case, military contractors were not required to show that the Navy

---

[1] Plaintiff's counsel in the *Marley* case is also Lyautey's counsel in this case.

CASE NO.: 1:10-cv-22891-AJ

prohibited asbestos warnings.  Notwithstanding Plaintiff's shrill rhetoric that Defendants are conducting a "charade" by removing the case (Pl. Mot. at 2), and that the "government contractor defense is an outright farce" (*id.* at 9), Plaintiff has not advanced any arguments that were not raised and rejected in *Marley,* and that have not been rejected by numerous courts nationwide subsequent to *Marley,* including the asbestos MDL in *Boston v. Eastern Refractories Co.*, Case No. 07-63993 (E.D. Pa. Aug. 25, 2010). (Order attached as Ex. 1).  Although Plaintiff contends that *Marley* "was based on a less complete record than is now available" (Pl. Mot. at 2), and that post-*Marley* depositions demonstrate that Admiral Lehman's affidavit is not based on personal knowledge and lacks foundation, these arguments are *deja vu* and without merit.  In *Marley,* the Plaintiffs likewise relied on prior testimony of Admiral Lehman in an attempt to undermine his credibility and opinions. Properly rejecting "a narrow, grudging interpretation" of the colorable federal defense requirement, *Jefferson County v. Acker,* 527 U.S. 423, 431 (1999), this Court ruled in *Marley* that "factual disputes about the Admirals' testimony should be resolved in federal court as long as the defendants have a good faith foundation for their contractor defense." *Marley,* 545 F. Supp. 2d at 1273.[2] Moreover, MDL 875 held in *Boston* that expert testimony similar to Admiral Lehman's established that the Navy "provided precise specifications, which conflicted with General Dynamics' ability to plac[e] warnings on asbestos-containing components." *Boston*, at 3.

Removal in government contractor cases "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that

---

[2] Admiral Lehman's affidavit in *Marley* is attached hereto as Ex. 2.

-2-

CASE NO.: 1:10-cv-22891-AJ

the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133

(2d Cir. 2008) (citing *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007)).  Policy

considerations supporting federal officer removal based upon the military contractor defense would

be substantially undermined if Navy contractors, such as Elliott, that "helped carry out the Navy's

duties or tasks," *Marley*, 545 F. Supp. 2d at 1274 n.4., were denied the protection of a federal forum:

> The military contractor defense is based upon substantive
> policy considerations as well as pragmatic procedural factors in
> controlling litigation. The government contractor defense,
> provides substantive protection for the armed forces and its
> suppliers. *See Boyle v. United Technologies Corp.*, 487 U.S.
> 500, 512, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988). Section
> 1442(a)(1) provides procedural protection. Failure to apply the
> federal officer removal statute would allow into the back door
> of state litigation what the government contractor  defense
> barred at the front door.
> * * *
> Because government contractor cases are freighted with factual
> findings, Boyle, while laying down a substantive rule, may be
> readily circumvented by state courts unsympathetic to the
> defendants.

*Isaacson v. Dow Chem. Co. (In re Agent Orange Prod. Liab. Litig.)*, 304 F. Supp. 2d 442, 451

(E.D.N.Y. 2004), *aff'd*, 517 F.3d 129 (2d Cir. 2008).

## II. STATEMENT OF THE CASE AND FACTS

While serving in the U.S. Navy as a boiler tender and fireman, Gale Lyautey was allegedly

exposed to asbestos-containing products of the Defendants, which caused injury.  Plaintiff filed an

action in Florida state court seeking damages for negligence and strict liability based on alleged

failure to warn.  Defendant Foster Wheeler removed the action to federal court on August 9, 2010,

on the basis of federal officer removal. (D.E. 1). Elliot, a military contractor, joined in the removal.

-3-

CASE NO.: 1:10-cv-22891-AJ

(D.E. 32). Plaintiff filed an Emergency Motion to Remand or, in the Alternative, Motion for

Summary Judgment as to Defendants' Government Contractor Defense (only as to Wheeler). (D.E.

60). Foster Wheeler moved for a stay of proceedings until such time as the Judicial Panel on

Multidistrict Litigation rules on transfer of the case to MDL 875 in the Eastern District of

Pennsylvania. (D.E. 62). Elliott joined in the stay motion. (D.E. 64). The Judicial Panel on

Multidistrict Litigation entered a Conditional Transfer Order on September 1, 2010 (Ex. 3).[3]

    *A.*   *Affidavit of Rear Admiral (USN, Retired) Ben J. Lehman.* Admiral Lehman is a retired

Rear Admiral of the United States Navy, where he served on active duty, in part, as Ship

Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944, and

as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, where he

personally supervised and oversaw ship alterations and equipment overhauls. (D.E. 1-6, Lehman Aff.

¶¶1, 3). He also worked at two major ship building companies from 1969 to 1975. (*Id.*, ¶1). By virtue

of his experience, professional training, education, and research, Admiral Lehman is familiar with

the plans, designs and specifications used in the construction and repair of Navy ships, the Navy's

knowledge of asbestos hazards and use of asbestos insulation, the Navy's occupational hazard

communication program, and Navy equipment manuals and regulations governing the warnings

permitted by the Navy. (*Id.*, ¶¶1, 3). His testimony is based *inter alia* on his review of specifications,

---

    [3]The issuance of a Conditional Transfer Order supports a stay of the case, in the interest of
judicial economy, until the Panel rules dispositively on the transfer to MDL 875. *Reaser v. A.W.
Chesterton, Co.*, 2008 U.S. Dist. LEXIS, at *4 (M.D. Fla. Nov. 25, 2008).

FOWLER WHITE BURNETT P.A. • ESPIRITO SANTO PLAZA, 1395 BRICKELL AVENUE, 14TH FLOOR, MIAMI, FLORIDA 33131-3302 • (305) 789-9200

CASE NO.: 1:10-cv-22891-AJ

documents regarding the Navy's hazard communication program, and his extensive career experience in the Navy and personal knowledge of Navy procurement practices. (*Id.* ¶¶ 1, 5, 13).

Admiral Lehman attested to the following: (1) the Navy did not permit government contractors to deviate from military specifications of equipment to be installed on Navy vessels (D.E. 1-6, ¶¶5-6); (2) "the Navy had complete control over every aspect of every piece of equipment" (*id.*,¶10); (3) military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings and the decisions of what warnings should or should not be included." (*id.*, ¶10); (4) the Navy "dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors" (*id.*, ¶11); (5) starting in the 1930s, the Navy conducted extensive research concerning the hazard of exposure to asbestos (*id.*, ¶13); (6) the Navy "made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships" (*id.*); (7) the Navy would not have allowed its equipment suppliers to affix any warning related to asbestos hazards on their equipment and "[t]o do so would have interfered with the U.S. Navy's mission and control of its ships and personnel" (*id.*, ¶14); and (8) the Navy "would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view,"

-5-

such as the provision of respiratory protection and the implementation of wet down procedures (*id.*, ¶¶10, 13).

B.   *Plaintiff's Evidence.* Plaintiff has not provided any expert testimony which controverts Admiral Lehman's testimony.  Although Plaintiff argues (Pl. Mot. at 13) that Admiral Lehman "wholly exaggerate[s] the Navy's control over warnings . . . ," Plaintiff does not offer even a scintilla of evidence to support this contention.

## ARGUMENT

1.   **ELLIOTT HAS ESTABLISHED A COLORABLE MILITARY CONTRACTOR DEFENSE AND A CAUSAL NEXUS SUFFICIENT TO SUPPORT FEDERAL OFFICER REMOVAL**

In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), the Supreme Court held that a government contractor is immune from state tort liability for design defects in equipment manufactured for the Government when: (1) the Government approved reasonably precise specifications; (2) the equipment conformed to the specifications; and (3) the supplier warned the Government about hazards known to the supplier but not to the Government.  The Eleventh Circuit held in *Dorse v. Eagle-Picher Indus., Inc.*, 898 F. 2d 1487, 1489 (11th Cir. 1990), in a failure to warn case the government must show "significant conflict" between its state law duty to warn and the governments' warning specifications. Granting summary judgment for the plaintiff, the Eleventh Circuit ruled that the defendant had not shown that its contractual duties prevented compliance with its state law duty to warn. *Id.* at 1489-90.

In *Marley*, 545 F. Supp. 2d at 1270, the Plaintiffs alleged that Elliott and other military contractors failed to warn of the hazards of asbestos.  Marley argued in support of remand, as does

-6-

Lyautey, that Defendants had not shown a conflict because they had not adduced evidence that the Navy prohibited them from warning; the affidavit of Admiral Lehman was speculative and without foundation; and MDL 875 was a "black hole." (Case No. 07-23042, D.E. 2-1 at 15). Based in part on the affidavit of Admiral Lehman, this Court ruled that Elliott had established a *colorable* federal defense, noting that "a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage. All a removing defendant needs to do is to make a showing that his federal defense 'is not without foundation and made in good faith.'" *Id.* at 1271 (quoting *Nesbiet v. Gen. Electric*, 399 F. Supp.2d 205, 211 n.44 (S.D.N.Y. 2005)). Acknowledging that "[a]lmost identical" affidavits of Admiral Lehman had been filed in other lawsuits, that the "[d]istrict courts, however, are split on whether these are sufficient to 'advance' a colorable government contractor defense," *Marley*, 545 F. Supp. 2d at 1272, and that the affidavits left room for speculation, this Court nonetheless concluded that Elliott had met its burden because the affidavit provided

> a good faith foundation to show (1) that the Navy controlled the warnings to be affixed on parts manufactured by independent contractors, and (2) that the Navy was likely to reject any asbestos warning given its policy to deal with the asbestos problem exclusively through training.
>
> I agree that the Admirals' depositions in other cases suggest that they do not know of any instance when the Navy prohibited a warning proposed by a manufacturer or supplier. I also understand that there is a dispute as to whether the Navy manuals encouraged or prohibited the use of warnings. These arguments undermine the credibility of the Admirals, and raise a number of questions that the defendants will have to answer to ultimately prevail on their defense. But that is a merits question for another day. I do not need to determine credibility

-7-

CASE NO.: 1:10-cv-22891-AJ

> or likelihood of success at the removal stage. Factual disputes about the Admirals' testimony should be resolved in federal court as long as the defendants have a good faith foundation for their contractor defense. *See Magnin,* 91 F.3d at 1427-28. Because I find that the defendants have satisfied this low standard, removal was proper.

*Id.* at 1273. This Court also concluded in *Marley* that Elliot had established the requisite causal connection for purposes of federal officer removal: "[T]here is no question that the defendants' relationship with the plaintiff derived solely from the defendants' official duties. This is sufficient to establish a causal nexus under *Magnin* [*v. Teledyne Continental Motors,* 91 F.3d 1424, 1429 (11th Cir. 1996)] . . . . ". *Marley,* 545 F. Supp. 2d. at 1274.

Accordingly, this Court concluded in *Marley* that "removal of this action was appropriate under the federal office removal statute," *id.* at 1270, and should do so as well in the instant case for precisely the same reasons. Admiral Lehman's affidavit establishes a colorable federal defense and causal nexus sufficient to support removal. Admiral Lehman's testimony that the Navy's specifications governed all aspects of the equipment or Navy vessels, including warnings; the Navy did not permit its contractors to make any changes; and the Navy would not allow contractors to place asbestos warnings on equipment (D.E. 1-6, ¶¶ 6, 8-10), shows that the Navy provided precise specifications which excluded asbestos warnings.

There is no merit to any arguments advanced by Plaintiff here in support of remand. First, although Plaintiff contends that remand should be granted because Admiral Lehman does not state that the Navy expressly *prohibited* warnings (*see* Pl. Mot. at 7-9), this argument was rejected in *Marley* and has not improved with the passage of time:

-8-

CASE NO.: 1:10-cv-22891-AJ

> The Plaintiffs suggest that the defendants need to show that the Navy actually prohibited asbestos warnings to establish a "causal nexus" at the removal stage. I disagree. "Just as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County*, 527 U.S. at 432-33, 119 S.Ct. 2069. All a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract with the Navy. *See Magnin*, 91 F.3d at 1427-28. This the defendants have done.

*Marley*, 545 F. Supp. 2d at 1274.

Second, contrary to Plaintiff's contention (Pl. Mot. at 8), the instant case is *not* "precisely analogous to *Dorse*." As recognized in *Marley*, 545 F. Supp. 2d at 1272 n.3, *Dorse* is distinguishable because it was based on the "summary judgment standard [which] is obviously significantly higher than the colorable defense standard."

Third, Plaintiff argues that remand should be granted because other courts have "consistently" concluded that the affidavit of Admiral Lehman is insufficient to support removal (*see* Pl. Mot. at 9, *see also* 9-12). They are less than candid in failing to acknowledge that numerous courts post-*Marley* have held that the affidavit of Admiral Lehman, and similar affidavits, are sufficient to support federal officer removal based on the government contractor defense. Significantly, MDL 875 very recently entered an order in *Boston* (Case No. 07-63993 D.E. 82) (Ex. 1), granting the defendants' motion for summary judgment on the basis of the government contractor defense. Based upon the affidavit of Admiral Horne, Judge Robreno found that the defendant "had produced evidence showing that the United States provided precise specifications, which conflicted with

-9-

CASE NO.: 1:10-cv-22891-AJ

General Dynamics' ability to place warnings on asbestos-containing components." Boston, (Ex. 1 at 3). Admiral Horne testified in relevant part:

> "[N]o private contractor, such as Electric Boat, could have affixed a written warning anywhere aboard an active Naval warship during its construction or repair, advising of the risk of asbestos exposure, except by express permission of the United States Navy. To do so without the Navy's express approval would be deviation from the detailed and specific instructions mandated by the Navy. The Navy's detailed specifications did not leave room for individual vendors to make determinations about inclusion of asbestos warnings."

(*Id.*). The court concluded that the affidavit "shows that the United States government provided precise and exacting specifications for the product at issue, and that these specifications excluded warnings from individual manufacturers." *Id.* Judge Robreno rejected Plaintiffs' argument that the contractor had not shown that it had tried to warn the Navy: "Plaintiffs have asserted no specific facts to controvert Admiral Horne's testimony." *Id.* at 4. The same is true in the instant case.

In addition, *Marley* was followed in the similar case of *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1334 (N.D. Ala. 2010), in which the court held that the affidavit "raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning," thereby establishing that the Navy controlled all warnings, in turn supporting an inference that no warnings appeared because the Navy prohibited them. The defendants were not required to show that the Navy prohibited asbestos warnings. *Id.* at 1334-35. The *Corley* court distinguished *Dorse*, and held that factual disputes about the affiant's testimony "should be resolved in federal court because defendants have a good faith foundation for their contractor defense." *Id.*

-10-

CASE NO.: 1:10-cv-22891-AJ

Numerous cases subsequent to *Marley* have held that the affidavit of Admiral Lehman is sufficient to show a good faith basis for the government contractor defense. *See, e.g., Beckwith v. General Electric Co.*, 2010 U.S. Dist LEXIS 30360, at *16-17 (D. Conn. March 30, 2010) (affidavit of Admiral Lehman showed that Navy would not have permitted manufacturers to place warnings on equipment without approval and that defendants were not "required to disclose the exact government specifications or contracts stating specifically that the defendants were not to affix their particular asbestos warnings or . . . an actual time when the asbestos warnings were actually rejected . . . ."); *Curry v. American Standard, Inc.*, 2009 U.S. Dist. LEXIS 12101 (S.D.N.Y. Feb. 6, 2009) (rejecting argument that the Navy did not prohibit warnings and that the affidavits did not cite military specifications requiring the removal of asbestos warnings from manuals); *Kirks v. General Elec. Co.*, 654 F. Supp 2d 220, 224 (D. Del. 2009) (relying in part on Admiral Lehman's affidavit, the Court concluded that the defendant raised a colorable federal defense, and established a causal nexus between the failure to warn claims and the Navy's control over the warnings provided by GE on its turbines); *Kotecki v. Buffalo Pumps, Inc.*, 2009 U.S. Dist. LEXIS 65170, at *12-13 (D. Conn. July 28, 2009) (same); *Murphy v. GE*, 2009 U.S. Dist. LEXIS 60177, at *12 (D. Conn. July 15, 2009) (same) Lehman Affidavit stating that (contractors could not deviate from Navy specifications established that the Navy imposed "reasonably precise specifications" on its contractors with respect to warnings and that materials supplied by a contractor that "were not entirely consistent with the Navy's extensive specifications probably would have been rejected"); *Siegfried v. Allegheny Ludlum Corp.*, 2009 U.S. Dist. LEXIS 128350, at *52 (W.D. Pa. March 25, 2009) (same); *Reaser v. Allis Chalmers Corp.*, 2008 U.S. Dist. LEXIS 112344, at *11-12 (C.D. Cal. June 23, 2008) ("The absence

-11-

of specific prohibitions, however, does not render these declarations [of Admiral Lehman] useless; rather, the declarations provide Defendants with a basis for asserting a colorable federal defense, which is all that is needed at the removal stage.").

Fourth, Plaintiff's reliance on *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) (Pl. Mot. at 10-11) is misplaced. Although *Holdren* held that affirmative evidence of an express prohibition against asbestos warnings was required to remove the action, its strict interpretation of the removal statute is contrary to the *colorable* standard and is contrary to *Marley*.[4]

Further, there is no merit to Plaintiff's argument (Pl. Mot. at 18-20) that Admiral Lehman's testimony in prior proceedings is inconsistent with his affidavit here, and that he previously admitted that there is no evidence that the Navy prohibited any manufacturer from warning. (*Id.* at 16). Similar arguments were made and rejected in *Marley,* where this Court held that such contentions simply present "a merits question for another day." *Id.* at 1273. Moreover, although Admiral Lehman has testified that he was not aware of any *document* specifically prohibiting vendors from

---

[4] Moreover, Massachusetts federal courts are divided. In *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54-7 (D. Mass. 2008) this Court denied a motion to remand where an Affidavit established the Navy's pervasive control over all cautionary material supplied by its contractors, and the reason for such control, showed that the Navy "exercised its discretion and approved certain warnings" and the contractor provided the warnings required by the Navy.

Plaintiff also relies on *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187 (D. Mass. 2008) (Pl. Mot. at 12), in which the court held that the affiants merely speculated that the Navy would have rejected manufacturers' attempts to affix warnings. It was noted in *Siegfried*, 2009 U.S. Dist. LEXIS 128350, at *50, that "[c]ontrary to the *Hilbert* case . . . a majority of courts have held that because federal officer removal is to be broadly construed and because the removing defendant only has to assert a colorable defense . . . affidavits such as those produced in this case [including Admiral Lehman] are sufficient."

-12-

CASE NO.: 1:10-cv-22891-AJ

warning about asbestos (*see* Pl. Mot. at 16), and that the Navy did not prohibit manufacturers from asking the Navy for permission to do things not in military specifications (*id.* at 18), such testimony does not conflict with his affidavit or render it speculative.[5] As he has explained, the Navy would have rejected asbestos warnings suggested by the manufacturers because such warnings might cause sailors or workers to deviate from their mission or cause the Navy to denote scarce resources to programs such as provision of respiratory protection and implementation of wet down or containment procedures. (Lehman Aff. at 10, 13).[6] Admiral Lehman's prior testimony that he was not aware of a situation in which a vendor's request to affix an asbestos warning label had been made

---

[5] Although Plaintiff asserts (Pl. Mot. at 16-17) that Admiral Lehman previously testified that the government never rejected equipment or a manual including an asbestos warning, he does not cite any supporting testimony.   In response to the question whether the Navy prohibited manufacturers from seeking consent to include something "above and beyond what the military specification called for" (Pl. Mot., Ex. J at 121-22), the following exchange occurred (*id.*):

| THE WITNESS: | Did the Navy prohibit people from asking for permission to do other things? |
| MR. KIRBY: | Yes. |
| THE WITNESS: | No, there was no prohibition, and sometimes manufacturers did ask the Navy for permission to do things. |

[6] Admiral Lehman's prior deposition testimony in *Sweeney v. Saberhagen Holdings* (Case No. 05-01637, W.D. Wash. December 23, 2005), and trial testimony in *Riggle v. Allis-Chalmers Corp.* (Case No. 04-01018-L, Dallas District Court), which Plaintiffs cited in *Marley* in support of remand (D.E. 37 and D.E. 30, respectfully) are consistent with his testimony in *Marley* and the subject affidavit.

-13-

CASE NO.: 1:10-cv-22891-AJ

and refused, is *consistent* with the Navy procurement practice of controlling all aspects of equipment production and warnings, and permitting no deviations.

Equally flawed is the argument (Pl. Mot. at 14-15) that "SECNAVINST 5160.8" (D.E. 60-4, Ex. I) shows that defendants were not precluded from placing asbestos warnings on equipment. As several courts have held, this "Uniform Labeling Program for Hazardous Industrial Chemicals and Materials" "would not have applied to product manufacturers . . . that contracted with the Navy because, by its terms, 'it governed the labeling of hazardous chemicals by Navy personnel, not outside product manufacturers.'" *Murphy v. General Elec. Co.*, 2009 U.S. Dist. LEXIS 60177, at *7 (D. Conn. July 15, 2009) (quoting *Contois v. Able Indus. Inc.*, 523 F. Supp. 2d 155, 162 (D. Conn. 2007) (citing *Machnik v. Buffalo Pumps, Inc.*, 506 F. Supp. 2d 99, 104 n.3 (D. Conn. 2007)).

As in *Marley*, Plaintiff has not shown -- and cannot show -- that it is "crystal clear that there is absolutely no foundation to the statements . . ." (Pl. Mot. at 15) in Admiral Lehman's affidavit. Based upon his extensive experience in the Navy, where he was integrally involved in all aspects of Navy procurement practices and procedures with regard to ships, the contention that his affidavit lacks foundation is baseless. *See, e.g., Nesbiet*, 399 F. Supp. 2d at 207-09 (finding that Admiral Lehman had sufficient personal knowledge of military contracts during the 1940's to establish that the Navy imposed reasonably precise specifications on military contractors); *Reaser*, 2008 U.S. Dist. LEXIS 112344, at 10 n.2 (the argument that affidavit lacks foundation and is speculative "lack[s] merit because Admiral Lehman['s] . . . declaration [] [is] based on years of experience and training in regard to the design and operation of U.S. Navy vessels. Both declarants state that they are

-14-

CASE NO.: 1:10-cv-22891-AJ

personally familiar with the degree of supervision and control of the Navy over the actions of its contractors.").[7]

Finally, there is no merit to Plaintiff's argument that the subject case was "unfairly" removed in order to bury it in the MDL. (*See* Pl. Mot. at 9, 13). MDL 875 rejected the argument that *Marley* should have been transferred back to the District Court for the Southern District of Florida following a conditional transfer to the MDL, noting that it had "previously rejected the contention, which is again raised by plaintiffs in the three Florida actions here, that 'the way in which MDL 875 is being administered effectively denies [plaintiff] their constitutional right to a jury trial.'" *In re Asbestos Prods. Liab. Litig.*, 560 F. Supp. 2d 1367, 1369 n.3 (J.P.M.L. 2008). The MDL further noted that "[u]nder the stewardship of the transferee court, as of June 2, 2008, (1) over 77,000 actions have been closed in the transferee district . . ."*id.* at 1369, and "the vast majority of transferred actions have been able to be concluded in the transferee district during the course of pretrial proceedings." *Id.* at 1369 n.4.[8]

---

[7] Plaintiff also argues (Pl. Mot. at 13) that Lehman's opinion "flatly misrepresents the content of the very military specifications to which they cite in support, their conclusion [that] the Navy precluded asbestos warnings."

[8] The notion that cases are buried in MDL 875 is effectively undercut by the following time table in an asbestos case recently transferred to MDL 875 -- *Krieger v. Alfa Laval, Inc.* Case No. 10-69373 (E.D. Pa.), Case No. 10-80594 (S.D. Fla.) -- which reflects that the cases are moved along expeditiously: (1) May 10, 2010: Defendant filed Notice of Removal (S.D. Fla. D.E. 1); (2) May 25, 2010: MDL Conditional Transfer Order filed (S.D. Fla. D.E. 64); (3) July 1, 2010: confirming transfer of case to MDL (E.D. Pa. D.E. 1); (4) July 8, 2010: MDL Order Setting Status and Scheduling Conference (E.D. Pa. D.E. 7); (5) July 21, 2010: MDL Status and Scheduling Conference; and (6) August 9, 2010: MDL Scheduling Order issued (E.D. Pa. D.E. 32).

Plaintiff's assertion that in *Marley* "despite every effort to expeditiously move the estates case to trial, it still remains pending in the MDL 2½ years later" (Pl. Mot. at 2 n.1) is misleading.

-15-

CASE NO.: 1:10-cv-22891-AJ

In sum, removal was appropriate.

## CONCLUSION

Based upon the foregoing arguments and authorities, Defendant Elliott respectfully requests that the Plaintiff's motion to remand be denied.

Respectfully submitted,

*s/Helaine S. Goodner*
Edward J. Briscoe
Fla. Bar No. 109691
Email: ebriscoe@fowler-white.com
Helaine S. Goodner
Fla. Bar No. 462111
Email: hgoodner@fowler-white.com
FOWLER WHITE BURNETT P.A.
1395 Brickell Avenue, 14th Floor
Miami, Florida 33131-3302
Telephone: (305) 789-9200

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2010, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/Helaine* S. Goodner
Helaine S. Goodner

---

*Plaintiffs'* counsel in *Marley* requested a three-month extension of the discovery deadline. While Plaintiffs' counsel in the *Marley* case tried to place the blame on removal for the lack of an opportunity to testify the fact is that removal of that case did not have any effect on Mr. Marley's ability to testify; Plaintiffs' counsel could have taken an evidentiary deposition of Mr. Marley while he was still alive, as is typically done in asbestos cases to perpetuate testimony, despite the fact that the case was in federal court.

-16-

# EXHIBIT 1



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOSTON ET AL.,                       :

     Plaintiffs,                    :         Consolidated Under
                             :         MDL DOCKET NO 875

     v.                             :         Civil Action
                             :         No. 07-63993

EASTERN REFRACTORIES COMPANY         :
INC., ET AL.                         :

     Defendants.                    :

**FILED**

AUG 3 0 2010

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

O R D E R

    AND NOW, this 25th day of August 2010 it is hereby ORDERED

that Defendant General Dynamic's Motion for Summary Judgment

(doc. no. 61), filed on June 1, 2010 is GRANTED.[1]

_____

    [1] Plaintiffs, Gail Boston and his wife Elizabeth Boston,
filed this case against approximately 25 defendants in York
County Maine in 2004, alleging injuries caused to Mr. Boston due
to asbestos exposure. (Pl.'s Compl., doc. no. 61-1). The case
was subsequently removed to federal court on the basis of federal
enclave and federal officer jurisdiction and transferred to the
Eastern District of Pennsylvania as part of MDL 875 in April 2007
(doc no. 1). Mr. Boston passed away on January 24, 2005, as a
result of lung cancer.

    Mr. Boston was employed at the Portsmouth Naval Shipyard
from 1973-1988, where he alleges that he was exposed to asbestos
dust and fibers that were present in the work area. (Pl.'s
Compl. at 6). The Portsmouth Naval Shipyard was in the business
of repairing and overhauling United States Navy nuclear
submarines, as well as the original construction of submarines.
(Id.) Many of the submarines on which Mr. Boston worked were
constructed by defendant General Dynamics in a separate facility,
located in Connecticut.

    Mr. Boston testified that he was exposed to asbestos during
the "blowing down" process, wherein the crew used air hoses at 90
PSI to clean the ship from top to bottom. (Dep. of Gail Boston,
doc no. 71-1, at 16). Mr. Boston testified that he was exposed

1



to asbestos-containing insulation from turbines, pumps, valves, pipes during the blowing-down process and that ". . . it would be so cloudy there . . . dusty that it would be like working in a cotton mill." (Id. at 17).

When evaluating a motion for summary judgment, Federal Rule of Civil Procedure 56 provides that the Court must grant judgment in favor of the moving party when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c)(2).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact.  Id. at 248-249.  "In considering the evidence the court should draw all reasonable inferences against the moving party." El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing — that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004) (quoting Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  Once the moving party has thus discharged its burden the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in [Rule 56] - set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

In the instant case, Defendant General Dynamics argues that summary judgment is appropriate because, as a government contractor for the construction of U.S Navy submarines, it is immune from tort liability for Mr. Boston's injuries.  To invoke the government contractor defense, General Dynamics must establish that (1) the United States approved reasonably precise specifications for the product at issue (2) the equipment conformed to those specifications and (3) it warned the United States about the dangers in the use of the equipment that were known to it but not to the United States.  Boyle v. United Technologies Corporation, 487 U.S. 500, 512 (1988).  The third

prong may also be established by showing that the government "knew as much or more than the defendant contractor about the hazards" of the product.  <u>Beaver Valley Power Co. v. National Engineering & Contracting Co.</u>, 883 F.2d 1210, 1216 (3d Cir. 1989).  In a failure to warn context, a defendant must show that the government's warning specifications conflicted with the contractor's state law duty to warn.  <u>In re Joint Eastern & Southern District New York Asbestos Litigation</u>, 897 F.2d 626, 630 (2d Cir. 1990).

As to the first prong, General Dynamics has produced evidence showing that the United States provided precise specifications, which conflicted with General Dynamics' ability to placing warnings on asbestos-containing components.  Retired Naval Admiral Roger B. Horne Jr. testified that,

"[N]o private contractor, such as Electric Boat, could have affixed a written warning anywhere aboard an active Naval warship during its construction or repair, advising of the risk of asbestos exposure, except by express permission of the United States Navy.  To do so without the Navy's express approval would be a deviation from the detailed and specific instructions mandated by the Navy. The Navy's detailed specifications did not leave room for individual vendors to make determinations about inclusion of asbestos warnings.  (Aff. of Admiral Roger B. Horne, Jr., Exhibit E, ¶ 21).

This testimony satisfies Defendant's burden as to the first prong of <u>Boyle</u>.  It shows that the United States government provided precise and exacting specifications for the product at issue, and that these specifications excluded warnings from individual manufacturers.

As to the second prong, there is no dispute that General Dynamics complied with the specifications, as they did not affix warnings to asbestos-containing components.

As to the third prong, General Dynamics has established that the U.S. Navy knew of the hazards of asbestos.  (<u>See</u> Aff. of Admiral Roger B. Horne, Jr., doc. no. 61, Exhibit E, ¶ 19, 20, discussing safety procedures instituted by the Navy regarding asbestos removal dating back to 1950).

Plaintiffs' counsel asserted at oral argument that there is no evidence on record that General Dynamics warned the Navy

**AND IT IS SO ORDERED.**

EDUARDO C. ROBRENO, J.

---

of the hazards of asbestos, or inquired as to whether warnings were permissible. Plaintiffs' counsel argued that because General Dynamics failed to do so, it is essentially called upon to prove the negative, i.e., General Dynamics did not attempt to produce warnings.

However, under Fed. R. Civ. P. 56(e)(2), Plaintiffs must do more than point to an absence of evidence to defeat a motion for summary judgment. Under Rule 56, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

In the instant case, Plaintiffs have asserted no specific facts to controvert Admiral Horne's testimony. Therefore, there is no genuine issue of material fact for trial, as Admiral Horne's testimony established the first and third prongs of the government contractor defense in this case; that the Navy provided precise specifications precluding General Dynamic's ability to warn, and that the Navy knew of the hazards of asbestos.

Therefore, General Dynamic's Motion for Summary Judgment will be granted.

4

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-23042 CIV-Jordan/Torres

DAVID A. MARLEY and
PAULINE E. MARLEY, his wife,

     Plaintiffs,

v.

ELLIOTT TURBOMACHINERY CO., INC.,

     Defendants.

                                       /

## AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN

Rear Admiral (USN, Retired) Ben J. Lehman, being duly sworn, deposes and states as follows:

1.     I am a retired Rear Admiral of the United States Navy. Before joining the Navy in 1942, I received a Bachelor of Mechanical Engineering degree from the College of the City of New York. After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design at the Naval Academy in Annapolis. The curriculum was primarily in electrical and mechanical engineering. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University.

I joined the United States Navy in 1942 and remained on active duty until 1946. While on active duty in the United States Navy, I served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944.

In 1946, I left active duty and joined the Naval Reserve. In 1950, I returned to active duty and was assigned as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952. I was then transferred to the Assistant Industrial Manager Office in San Francisco from 1952 to 1954 as a Planning Officer.

In 1954, I returned to the Naval Reserve where I was a member and then Commanding Officer of Naval Reserve Engineering Companies.

I was promoted to Rear Admiral in 1977 in the Naval Reserve.

I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods, I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975 providing engineering consultation services to various industries including the shipbuilding industry. During my Naval service, I have personally been responsible for the creation of Navy specifications for the procurement of materials and machinery for use on Navy ships. A true, complete and accurate copy of my Curriculum Vitae is attached as Exhibit A. I am an adult and have personal knowledge of the facts contained herein.

2.      Based on my experience, professional training and education, I am familiar with the plans, designs and specifications used in the construction and repair of commercial and Navy ships. In addition, I am familiar with Navy specifications, equipment manuals and qualified products lists which are used in the construction and repair of Navy and commercial ships. I am also familiar with the Navy regulations regarding the use of, placement of, and repairs or maintenance of asbestos products generally during the periods in which they were used and the

2

Navy regulations regarding such maintenance, technical manuals and warnings permitted by the Navy.

3.      I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design, manufacture and use of equipment intended for installation on Navy vessels.

4.      During my service in the Navy as a Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard) and at the San Francisco Naval Shipyard (Hunter's Point).

5.      During the 1940s and 1950s, the Navy generally utilized a system of ship design and construction that established and set the designs of ships, which designs were known to the Navy to meet particular performance capabilities. The Navy then restricted any deviations from such designs by any suppliers and/or contractors. When a change in the design and/or construction of a ship was required, the Navy would oversee, control and approve all aspects of the change. Design drawings were prepared by the design agent for the Navy or by the Navy itself. The Navy reviewed and approved the drawings and then submitted them to the individual suppliers and contractors to use in the manufacturing, supply and/or installation of the equipment and the construction of the ship. These pertained to the original designs, as well as changes initiated and controlled by the Navy.

6.      Any deviation from military specifications of equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other item of

3

equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew in maintaining the ship during its service using materials carried on board when shipyard help was not available.

7.    In the 1940s, 1950s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel were approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

8.    The Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation by any of its contractors.

9.    The Navy specified the use and placement of insulation, including asbestos insulation, on Navy ships during World War II and the 1950s. Mechanical equipment for use aboard Navy ships was delivered without insulation. This was to prevent damage to the insulation during shipment and installation, and to allow the equipment to be effectively

4

connected to other equipment and systems on board, which connections as well as the equipment could then be effectively insulated. If mechanical equipment such as deaerating equipment, evaporators and heaters were to be insulated, it was not insulated by the manufacturers, but rather by shipyard personnel.

Shipyards and shipyard personnel were solely responsible for installing and insulating the equipment. Insulation was installed in accordance with plans, specifications, and schedules developed for and controlled by the Navy. Based upon my experience, professional training, education and research, it is my opinion that the United States Navy was aware of the dangers of asbestos by the 1940s. Despite such knowledge, the Navy did not provide any warnings. The research by LCdr S. A. Forman, MC, US Navy [Par. 13 h, below] supports my opinion.

10.     Based upon my experience, professional training, education and research, it is my opinion that equipment suppliers were prohibited from providing any warnings to be placed on or to accompany equipment supplied to the Navy without the consent and approval of the Navy. Moreover, certain types of warnings would not have been approved by the Navy given the necessary performance needs and capabilities of the shipboard equipment, the ships and Navy personnel. This would have included, but not been limited to, any potential warnings associated with asbestos including, but not limited to, recommendations regarding respiratory protection, and repair and maintenance practices. This was due to the inability to effectively and comprehensively observe, implement, and comply with such recommendations under the multitude of varying conditions likely to be encountered by Navy ships at sea, and especially at war.

All equipment and procedures had to be standardized to assure that personnel were familiar with the procedures for operating, repairing and maintaining the equipment, and that the

tools and equipment aboard ship or at ports world-wide were available to perform such procedures. Thus, a contractor or supplier could not provide warnings or recommendations without the consent and authorization of the Navy.

11.     During the 1940s and early 1950s, the Navy did not have the tools, equipment and/or personnel capabilities to meet or comply with any potential warnings or recommendations pertaining to the health hazards of asbestos aboard ship, especially under the exigencies of war. Further, the Navy limited the areas of interest of each manufacturer to the equipment supplied by that manufacturer. Because equipment was required by the Navy to be supplied without insulation, it would have been improper and unauthorized for the manufacturer or supplier of such equipment to supply warnings or other recommendations with respect to insulation, which would not have been within its particular area of interest. As the manufacturer and/or supplier would not have been responsible for the insulation, it likely would not have been aware of any hazard associated with such insulation or required to determine whether any existed, and thus it had no ability or obligation to supply warnings about insulation. As the Navy would have been the entity which required the insulation, designated the type and placement of the insulation, and directed a different entity to supply, install it, or both e.g., the shipyard, the Navy's knowledge of any potential hazards associated with the insulation would have been equal or superior to that of the equipment manufacturers and suppliers that provided the uninsulated equipment, such as heaters, evaporators and deaerating equipment.

12.     A further question has been asked of me as to whether Navy specifications  MIL-M-15071D (dated June 6, 1961) [Exhibit B to Plaintiffs' Emergency Motion to Remand] supports the notion that manufacturers of equipment such as heaters, evaporators and deaerating

equipment were free to provide additional warning information about hazards associated with products that they did not manufacture or supply.

13.     Based upon my review of these documents, many other documents regarding the Navy's hazard communication program, my career experience in the Navy, and personal knowledge of the Navy's hazard communication program and naval practices generally, I can state as follows:

a.     Uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy could simply not operate if various personnel were trained differently and received additional inconsistent information from different manufacturers.

b.     MILSPEC-M-15071D, Para. 3.3.1 makes clear that equipment manufacturers' manuals must first be approved by the Bureau of Ships and the "manual shall not be modified without approval of the Bureau of Ships." Moreover, it cautions:

> Notes, cautions, and warnings should be used to emphasize important critical instructions. The use should be as sparing as is consistent with real need.

This specification applies to risks inherent in the operation of the equipment. Gratuitous warnings about the possible use of materials made by others do not comport with this specification. Any suggestion that equipment manufacturers were free to depart from Navy-approved manuals is incorrect.

c.     Asbestos insulation products began containing hazard warning labels from the insulation manufacturers in the mid-1960s. Prior to that time, beginning more than two decades earlier, the Navy's own occupational health

program provided training, engineering and administrative controls, personal protective equipment, and medical surveillance to prevent the hazards of asbestos to shipyard workers.

d.    Any additional warning about the hazards of asbestos by an equipment manufacturer would be only partial in scope as well as inherently redundant, eventually obsolete, and almost certainly inconsistent with the Navy's own training. The Navy could not permit unauthorized hazard labels which might interfere with the abilities of sailors to perform their duties in the heat of battle.

e.    At most, it is possible that manufacturers of equipment delivered to the Navy without insulation (such as heaters, evaporators and deaerating equipment), could merely have told personnel to follow the Navy's own mandates for handling asbestos. This redundant information is not informative, diverts attention from hazards inherent in the equipment, and would certainly become obsolete. Heaters, evaporators and deaerating equipment last many years and the Navy's asbestos hazard communication program evolved over the years to keep pace with scientific developments and changes in materials.

f.    If each equipment manufacturer (and conceivably even the pipe and structural steel manufacturers) provided its own warning about asbestos insulation that might be used on or around its product, inconsistent warnings would certainly have resulted. Many other hazardous substances (for example boiler feed water chemicals, fuels, solvents, heavy metals) are used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the possible substances that might be used on or around its equipment, sailors would

8

quickly become inundated with inconsistent information on a myriad of substances.

g.    Some types of insulation used by the Navy on equipment were non-asbestos (e.g., fiberglass blankets) and any general warning about asbestos on such equipment would simply be wrong. In fact, asbestos was designated as a "critical material" by the Army and Navy Munitions Board on or about January 30, 1940. See Exhibit B. The Navy directed that substitutes for asbestos, including fiberglass, cotton duck lagging and hair felt, should be used where possible, including on low temperature pieces of equipment such as deaerating equipment, evaporators and heaters, in order to conserve available asbestos. See Exhibit C.

h.    Based on my experience, the United States Navy, as the biggest user of asbestos in World War II, and thereafter in shipbuilding, was more knowledgeable about any hazard of asbestos than any of the vendors who supplied it and upon whom plaintiff seeks to impose a duty not consistent with or imposed by the above naval specification. In Par. 9, I mentioned the extent of the Navy's knowledge with regard to asbestos. As an aid to the Court, I submit herewith as Exhibit D an affidavit of Samuel A. Forman, M.D., with attached exhibits, with which I am thoroughly familiar from various other litigations involving the U.S. Navy. Dr. Forman compiled the documents attached to his affidavit while detailed by the Navy and under Navy orders to perform a n investigation into the state of Naval hygiene and asbestos. I agree with the conclusion of Dr. Forman that the state of knowledge of the United States Navy regarding hazards of asbestos was quite complete when compared to available

9

knowledge at the time of World War H, and that by 1940 the United States Navy was a leader in the field of occupational medicine relating to, among other things, asbestos exposure. I myself, was exposed to asbestos in inspecting the work of insulating shops under my supervision during my tenure at the Brooklyn Navy Yard and also in San Francisco. Accordingly, my interest in the Navy's knowledge in this field was both personal and professional, and continuing to this day.

I have reviewed all of the exhibits attached to the affidavit of Dr. Forman including the article attached as Exhibit C thereto, as well as the documents listed in Paragraph 9, sub-paragraph (a) through (f), as either official. United States Navy Documents or articles reproduced from recognized and reputable magazines and reviews of the kind relied upon by experts.

14.   Based on my experience, the United States Navy is bound by its own regulations and would not permit any vendor gratuitously to do anything not provided for in its own regulations. The Navy would not allow any warnings to be placed on any product without specific authority by way of an order or a regulation.

Therefore, I conclude:

The information possessed by the Navy with respect to the specification and use of asbestos, and the health hazards associated with its use aboard Navy vessels, represented the state-of-the-art and far exceeded any information that possibly could have been provided by manufacturers of equipment like heaters, evaporators and deaerating equipment. Based upon the knowledge at a given period in time, the Navy was fully aware of the recognized health hazards of asbestos and had a robust program to control exposure of personnel and monitor their health.

There was no information concerning any asbestos hazard or danger posed by any asbestos-containing product applied to any equipment on a United States Navy ship known to a manufacturer of equipment such as heaters, evaporators and deaerating equipment, that was not previously known to the United States and the United States Navy.

It would be unreasonable to assume that the Navy would have accepted gratuitous comments from equipment manufacturers about hazards associated with a product they neither made nor sold and about which the Navy was already aware.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this 3rd day of December, 2007.

Ben J.Lehman

Rear Admiral

11

# EXHIBIT 3

UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Sep 01, 2010

**FILED**
**CLERK'S OFFICE**

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                                    MDL No. 875

(SEE ATTACHED SCHEDULE)

**CONDITIONAL TRANSFER ORDER (CTO-339)**

On July 29, 1991, the Panel transferred 21,937 civil actions to the United States District Court for the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 771 F.Supp. 415 (J.P.M.L. 1991). Since that time, 85,362 additional actions have been transferred to the Eastern District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable Eduardo C. Robreno.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Eastern District of Pennsylvania and assigned to Judge Robreno.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Eastern District of Pennsylvania for the reasons stated in the order of July 29, 1991, and, with the consent of that court, assigned to the Honorable Eduardo C. Robreno.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 14 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 14-day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                    MDL No. 875

## SCHEDULE CTO-339 - TAG-ALONG ACTIONS

| DIST. | DIV. | C.A. # | CASE CAPTION |
|-------|------|--------|--------------|

**ARIZONA**

| AZ | 3 | 10-8092 | Samuel Martin v. Burlington Northern & Sante Fe Railway Co., et al. |
|----|----|---------|--------------|

**CALIFORNIA NORTHERN**

| CAN | 3 | 10-3329 | Theresa Hinkle, et al. v. A.W. Chesterton Co., Inc., et al. |
|-----|----|---------|--------------|
| CAN | 3 | 10-3371 | Joy Stevens, et al. v. A.W. Chesterton Co., et al. |
| CAN | 3 | 10-3382 | Elizabeth Taylor, et al. v. General Electric Co., et al. |
| CAN | 3 | 10-3468 | Thomas O. Morris v. Crown Cork & Seal Co., Inc., et al. |
| CAN | 3 | 10-3714 | Billy Goss v. Armstrong International, Inc., et al. |

**CONNECTICUT**

| CT | 3 | 10-846 | Lenore Waddington, etc. v. Air & Fluid Corp., et al. |
|----|----|--------|--------------|
| CT | 3 | 10-953 | William Turner v. General Electric Co., et al. |
| CT | 3 | 10-965 | Alberta F. Houlihan v. General Electric Co., et al. |
| CT | 3 | 10-1003 | Rudolph Bigda, et al. v. Air & Liquid Systems Corp., et al. |
| CT | 3 | 10-1004 | Mario Zerbarini, et al. v. Air & Liquid Systems Corp., et al. |
| CT | 3 | 10-1005 | Joyce Batchelder, etc. v. Air & Liquid Systems Corp., et al. |
| CT | 3 | 10-1055 | Loring Bailey v. General Electric Co., et al. |

**FLORIDA SOUTHERN**

| FLS | 1 | 10-22891 | Gale Lyautey, et al. v. Alfa Laval, Inc., et al. |
|-----|----|----------|--------------|

**GEORGIA SOUTHERN**

| GAS | 5 | 10-75 | Gloria F. Johns, et al. v. CSX Transportation, Inc. |
|-----|----|-------|--------------|

**ILLINOIS NORTHERN**

| ILN | 1 | 10-4145 | Pauline A. Love, et al. v. A.W. Chesterton Co., et al. |
|-----|----|---------|--------------|

**NEW JERSEY**

| NJ | 3 | 10-4299 | Julia Denny v. Benjamin Foster Co., et al. |
|----|----|---------|--------------|

**TENNESSEE EASTERN**

| TNE | 3 | 10-358 | Robert W. Millsaps, et al. v. Aluminum Co. of America, et al. |
|-----|----|--------|--------------|