## U.S. District Court
### Middle District of Louisiana (Baton Rouge)
### CIVIL DOCKET FOR CASE #: 3:10-cv-00730-BAJ -SCR

McKenzie v. North Bros. Co., Inc et al
Assigned to: Judge Brian A. Jackson
Referred to: Magistrate Judge Stephen C. Riedlinger
Cause: 28:1332 Diversity-Asbestos Litigation

Date Filed: 10/22/2010
Jury Demand: Plaintiff
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Diversity

**Plaintiff**

**Wilmer Jerry McKenzie**

V.

**Defendant**

**National Service Industries, Inc.**

**Defendant**

**Avon-International Safety Instruments, Inc.**

**Defendant**

**Mine Safety Appliances Company**     represented by **Stacey Leigh Strain**
Wells, Moore, Simmons & Hubbard, PLLC
Post Office Box 1970
Jackson, MS 39215
601-354-5400
Fax: 601-355-5850
Email: strain@wellsmoore.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**North Bros. Co., Inc.**
*also known as*
Performance Contracting, Inc.

**Notice Only**

**Timothy W. Porter**
*Attorney for the Plaintiff, Not Admitted to LAMD*

represented by **Timothy W. Porter**
Porter and Malouf
P.O. Box 12768
Jackson, MS 39236
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 10/22/2010 | 1 | NOTICE OF REMOVAL from 19th Judicial District Court for East Baton |

|  |  |  |
|---|---|---|
|  |  | Rouge Parish, Louisiana, Case Number 592151-23. (Filing fee $ 350 receipt number 053N-614042), filed by Mine Safety Appliances Company. (Attachments: # 1 Exhibit 1)(Strain, Stacey) (Entered: 10/22/2010) |
| 10/22/2010 | 2 | NOTICE of Civil Cover Sheet by Mine Safety Appliances Company (Strain, Stacey) (Entered: 10/22/2010) |
| 10/25/2010 | 3 | 90 DAY CONFERENCE ORDER: Scheduling Conference set for 1/27/2011 at 01:30 PM in chambers before Magistrate Judge Stephen C. Riedlinger. Status Report due by 1/13/2011.. Signed by Magistrate Judge Stephen C. Riedlinger on 10/25/2010. (NLT) (Entered: 10/25/2010) |
| 10/26/2010 | 4 | AMENDED NOTICE OF REMOVAL against Wilmer Jerry McKenzie, filed by Mine Safety Appliances Company. (Attachments: # 1 Exhibit 1)(Strain, Stacey) (Entered: 10/26/2010) |
| 10/26/2010 | 5 | Letter to Attorney Timothy Porter who is Lead for party Wilmer McKenzie. Attorney is not admitted to practice in LAMD. (NLT) (Entered: 10/26/2010) |
| 11/10/2010 | 6 | ORDER OF RECUSAL. Judge Frank J. Polozola recused. Case reassigned to Judge Brian A. Jackson for all further proceedings. Signed by Judge Frank J. Polozola on 11/10/2010. (JDL) (Entered: 11/10/2010) |
| 11/12/2010 | 7 | Letter to MDL Panel notifying panel of possible MDL case (NLT) (Entered: 11/12/2010) |

| PACER Service Center ||||
|---|---|---|---|
| Transaction Receipt ||||
| 11/29/2010 12:39:03 ||||
| PACER Login: | jp0001 | Client Code: |  |
| Description: | Docket Report | Search Criteria: | 3:10-cv-00730-BAJ - SCR |
| Billable Pages: | 1 | Cost: | 0.08 |

19th DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 590.151-23

DIVISION "     "

WILMER JERRY MCKENZIE

VERSUS

NORTH BROS. CO., INC., A DIVISION OF
NATIONAL SERVICE INDUSTRIES, INC., NOW
KNOWN AS PERFORMANCE CONTRACTING, INC., ET AL.

FILED: _____    _____
                                    DEPUTY CLERK

PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Wilmber Jerry McKenzie, who had exposure to asbestos in the State of Louisiana, and, with respect, represent:

1. The Petitioner is an adult resident citizen of the State of Mississippi whose residence address is 381 New Hope Church Road, Foxworth, Mississippi 39483.

2. Defendant, NORTH BROS. CO., INC., A DIVISION OF NATIONAL SERVICE INDUSTRIES, INC., now known as PERFORMANCE CONTRACTING, INC., is a foreign corporation that has done and/or is doing business in the State of Mississippi whose principal place of business is located at 16400 College Blvd., Lenexa, Kansas 66219, and who may be served with process through its registered agent, National Registered Agents, Inc., 840 Trustmark Building, 248 East Capitol Street, Jackson, MS 39201.

3. Defendant, NATIONAL SERVICE INDUSTRIES, INC., is a corporation organized and existing under and by virtue of the laws of the State of California that has done and/or is doing business in the State of Mississippi and whose principal place of business is located at 4111 Pleasantdale Road, Doraville, GA 30340. However, said Defendant does not maintain either a regular place of business or an agent for service of process in this state. Said Defendant, therefore, may be served with citation by serving the President of the Defendant, to-wit: Carol Ellis Morgan, 4111 Pleasantdale Road, Doraville, GA 30340, via certified mail.

REC'D C.P.

SEP 0 9 2010

1

4. Defendant, MINE SAFETY APPLIANCES, INC., is a corporation organized and existing under and by virtue of the laws of the State of Pennsylvania and doing business in the State of Mississippi. However, said defendant does not maintain either a regular place of business or an agent for service of process in this state. Said defendant, therefore, may be served with citation by serving the current Commanding Executive Officer of the Defendant, to wit: Thomas B. Hottop, CEO, 121 Gamma Dr., RIDC Industrial Park, Pittsburgh, Pennsylvania 13528, via certified mail. This is a Defendant that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around asbestos. Plaintiff wore defective personal respiratory products manufactured by this Defendant while working as a firefighter from 1985 through 2007.

5. Defendant, AVON-INTERNATIONAL SAFETY INSTRUMENTS, INC., is a Georgia corporation that has done and/or is doing business in the State of Mississippi whose principal place of business is located at 922 Hurricane Shoals Road, Northeast, Lawrenceville, Georgia 30043, and who may be served with process through its registered agent, Mary C. Bettinger, 922 Hurricane Shoals Road, Northeast, Lawrenceville, Georgia 30043.

6. JOHN DOE DEFENDANTS 1-500 are Defendants whose identities are unknown at this time. It is believed that these other corporations and/or individuals supplied, manufactured, and or distributed asbestos containing products to the Plaintiff's work sites and the Plaintiff was exposed to said asbestos-containing products or that these corporations and/or individuals manufactured, supplied, distributed products which caused asbestos containing products to become airborne, and the Plaintiff was exposed to said asbestos and/or these corporations and/or individuals which caused asbestos to become airborne, and the Plaintiff was exposed to said asbestos. When their identities are known, this complaint will be amended to properly name same.

7. JOHN DOE CORPORATE DEFENDANTS 1-500 are Defendants whose identities are unknown at this time. It is believed that these other corporations and/or individuals supplied, manufactured, and or distributed asbestos containing products to the Plaintiff's work sites and the Plaintiff was exposed to said asbestos-containing products or that these corporations and/or individuals manufactured, supplied, distributed products which caused asbestos

containing products to become airborne, and the Plaintiff was exposed to said asbestos and/or these corporations and/or individuals which caused asbestos to become airborne, and the Plaintiff was exposed to said asbestos. When their identities are known, this complaint will be amended to properly name same.

8. All of the above Defendant corporations are citizens of Mississippi or have either obtained certificates of authority to transact business in Mississippi pursuant to §79-1-211 et seq., Mississippi Code of 1972, or have transacted business in Mississippi without a certificate of authority, but within the contemplation of § 13-3-57 of said Code.

## BACKGROUND

9. Each of the Defendants mined, designed, evaluated, manufactured, packaged, furnished, supplied and/or sold adhesives, construction materials, insulation, fiber or other products, that each contained fibrous, incombustible, chemical-resistant, mineral substances commonly called "asbestos," or other substances such as diatomaceous earth more fully set forth below.

10. The Defendants are as follows:

A. NORTH BROS. CO., INC., A DIVISION OF NATIONAL SERVICE INDUSTRIES, INC., now known as PERFORMANCE CONTRACTING, INC., was the contracting abatement company that contracted to remove the asbestos from the fire stations in the City of Jackson, Mississippi.

B. NATIONAL SERVICE INDUSTRIES, INC. had the subsidiary, North Bros. Co., Inc., and was the abatement company that contracted to remove the asbestos from the fire stations in the City of Jackson, Mississippi.

C. MINE SAFETY APPLIANCES, INC., that manufactured, marketed, distributed and sold defective personal respiratory equipment that was used around asbestos.

D. AVON-INTERNATIONAL SAFETY INSTRUMENTS, INC. that manufactured, marketed, distributed and sold defective equipment that was used around asbestos.

All references to "asbestos" in this Complaint shall mean and be limited to the Defendants' products described in this paragraph.

11. Petitioner is an adult resident citizen of the State of Mississippi who worked for the Baton Rouge Fire Department from September of 1967 until September of 1994. In July of

2009, Mr. McKenzie was diagnosed with lung cancer and asbestos-related injuries after lengthy periods of occupational exposure.

12. Venue is proper in East Baton Rouge Parish, Louisiana, as his exposure took place in East Baton Rouge Parish, Louisiana.

13. When inhaled or otherwise ingested, asbestos causes irreparable and progressive lung damage that can manifest itself in lung disease, asbestosis, mesothelioma, pulmonary and broncho genic carcinoma, and cardiac disease, among other diseases and injuries.

14. Each of the Defendants knew or should have known through industry and medical studies, the existence of which was unknown to Plaintiff of the health hazards to Plaintiff inherent in the asbestos-containing products prepared, supplied, and sold for use in the State of Louisiana. Instead of warning the Plaintiff, other intended users, and the general public about these dangers, the Defendants ignored or actively and fraudulently concealed such information, or condoned such concealment, and commanded, directed, advised, encouraged, aided, abetted, or conspired with others or each other in so doing in order to sell asbestos and avoid litigation by those who were injured from asbestos inhalation. Said actions or inactions constitute gross negligence and show a callous disregard for the rights and safety of the Plaintiff and others giving rise to the imposition of punitive damages against the Defendants herein.

15. In connection with his work during the exposure period, the Plaintiff was exposed to and inhaled, or otherwise ingested, significant quantities of such asbestos, having neither knowledge nor reason to believe that asbestos was dangerous.

16. As a direct and proximate contributing result of having inhaled, ingested or otherwise being exposed to asbestos during the exposure period, the Plaintiff has received injuries, both physically and mentally including, without limitation, the following conditions:

    a. Asbestosis;

    b. Impaired Pulmonary Capacity;

    c. Reduced Lung Volume;

    d. Interstitial Lung Fibrosis;

    e. Injury to lung tissue and/or pleura;

    f. Increased Risk for Cancer; and

  b. Physical and mental anguish associated with one or more of the preceding conditions.

17. Plaintiff further charges that as a direct and proximate result of having inhaled, ingested, or otherwise being exposed to asbestos, he has received permanent and painful injuries. Plaintiff would further show that he has suffered physical and mental pain and anguish, medical expenses, loss of wages, loss of wage earning capacity and will continue to sustain damages of the above type in the future including, but not limited to, physical and mental pain and anguish, disability, future medical expenses and loss of the enjoyment of life.

18. Because of the latency period of the above asbestos injuries and because of the active concealment by the Defendants of the causes and effects of exposure to asbestos, the Plaintiff has only recently discovered his injuries.

## COUNT ONE

### Strict Liability

19. Plaintiff re-alleges and incorporates the foregoing allegations of this Petition for all purposes.

20. The Defendants and/or their predecessor entities were engaged in, or materially participated in, or aided and abetted in the business of selling asbestos and materials containing asbestos, which were expected to and did reach Louisiana and equipment in and around Louisiana, as well as other work sites where Plaintiff was employed, without substantial change in the condition in which they were sold, where said products released asbestos fibers which were inhaled and ingested by the Plaintiff in connection with his work.

21. The asbestos was in a defective condition unreasonably dangerous to the Plaintiff who was the intended and foreseeable user or bystander of the asbestos. These defects included, without limitation, the following:

  a. Inherent and known properties common to the asbestos sold by the Defendants that created unreasonably high potential for causing respiratory diseases, cancer and other health problems to workers or members of such workers' households who would be exposed to asbestos.

  b. Lack of warnings or lack of sufficient warnings by the Defendants of the inherently dangerous properties of asbestos when used for the purpose for which it was manufactured and sold.

  c. Lack of instructions or lack of sufficient instructions by the Defendants for eliminating or minimizing the health risks inherent in the use of asbestos.

5

    d.    Lack of reasonable inspections by the Defendants of their asbestos products to ensure that such asbestos products contained sufficient warnings of the dangerous properties of asbestos.

    e.    Lack of reasonable inspections by the Defendants of their asbestos products to ensure that such asbestos products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of asbestos.

    f.    Lack of tests or lack of sufficient tests by the Defendants to determine the harmful effects of asbestos on intended users and bystanders.

    g.    Defective designs by the Defendants calling for the inclusion of asbestos in products that did not require asbestos, and where alternate, equally suitable substances were available.

    h.    Lack of warnings or lack of sufficient warnings by the Defendants upon their discovering the full extent of the dangers presented by asbestos-containing materials and products.

22.    Each of the Defendants knew or should have known that the Plaintiff would be exposed to their asbestos products without inspection of the medical literature by the Plaintiff on the adverse health effects of asbestos. By marketing the asbestos-containing products without warning of the dangerous characteristics of the products, the Defendants represented to the Plaintiff and the public, who justifiably relied thereon, that asbestos was not dangerous.

23.    The defective conditions of the Defendants' asbestos products proximately caused or contributed to the Plaintiff's injuries and damages as described in this Complaint.

24.    Defendants' actions were performed intentionally or with disregard for the health and safety of Plaintiff.

25.    WHEREFORE, the Plaintiff demands both compensatory and punitive damages against the Defendants in an amount to be determined by a jury at trial.

### COUNT TWO

#### Negligence

26.    Plaintiff re-alleges and incorporates the foregoing allegations of this Complaint for all purposes.

27.    Each of the Defendants had, but breached, a duty to the Plaintiff to exercise the highest standard of care in designing, testing, manufacturing, marketing, and selling asbestos which is an extraordinarily and inherently dangerous substance. The breached duties included, without limitation, the duty:

    a.    To select the types of asbestos or alternate materials that would reduce or eliminate health hazards to those who would work with, and in the vicinity of asbestos.

  b. To warn adequately of the extraordinary health hazards known by the Defendants to be associated with asbestos use.

  c. To instruct adequately in methods of using asbestos that would reduce the danger of inhalation or ingestion of asbestos dust.

  d. To test adequately the asbestos products to determine the dangers concomitant with their use.

  e. To remove the asbestos products from the stream of commerce upon discovering their dangerous properties.

  f. To inspect the asbestos products for adequate warnings and instructions.

28. As a direct and proximate result of the Defendants' aforesaid breaches of their duties to the Plaintiff, the Plaintiff has sustained the injuries and damages described herein.

29. In breaching or materially assisting others in breaching their duties to the Plaintiff, as described above, the Defendants acted intentionally, with gross negligence, recklessly, maliciously and wantonly in that the Defendants and each of them knew or should have known through data available exclusively to them that asbestos was inherently and extraordinarily dangerous if used in the manner intended and foreseen by the Defendants, and that each of their aforesaid breaches of duty would result in the injuries suffered by Plaintiff.

30. WHEREFORE, the Plaintiff demands judgment against the Defendants in an amount to be determined by a jury at trial.

### COUNT THREE

#### Breach of Warranties

31. Plaintiff re-alleges and incorporates the foregoing allegations of this Complaint for all purposes.

32. The Plaintiff reasonably relied upon the Defendants who were manufacturers, sellers, or distributors of asbestos-containing products to exercise their skills and judgment to select and furnish goods of a suitable and reasonably safe nature and to furnish products fit for the particular purposes intended and to be supplied in a merchantable condition.

33. Defendants breached their legal duties in that their products were not sold and furnished in a merchantable and reasonably safe condition and were not fit for the particular purpose intended in accordance with the laws of the State of Louisiana.

7

34.  As a direct and proximate result of the Defendants' aforesaid breaches and breaches of their legal duties owed to the Plaintiff, the Plaintiff has sustained injuries and damages as described herein.

35.  WHEREFORE, the Plaintiffs demand judgment of, from, and against the Defendants jointly, severally, and collectively in an amount to be determined by a jury at trial.

## COUNT FOUR

### Fraudulent Concealment/Misrepresentation/

### Alteration of Medical Studies/Conspiracy

36.  Plaintiff re-alleges and incorporates the foregoing allegations of this Complaint for all purposes.

37.  Defendants named herein, individually and as agents of one another and a co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiff.

38.  Defendants named herein knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the others to conduct itself likewise.

39.  The Defendants acted in the following fashion:

   a.  Metropolitan Life Insurance Company ("Met Life") required a tangible *quid pro quo* from MaGill University in the 1920s in exchange for their providing funding for a study of asbestos disease in Canadian miners. The study revealed asbestos miners suffered from asbestosis. The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

   b.  In 1932, Met Life, through its agents, Dr. Anthony Lanza, Dr. Fellos, and others, assisted the Johns-Manville corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of his study shows that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and, therefore, was unavailable to scientist studying the issue of the asbestos disease. Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

   c.  Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney, J. C. Hobart, and conspirator, Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrback, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure, i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza' description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is

8

and was then known to be. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The Defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and others, as well as Met Life, the insurer.

d. In 1936, conspirators, American Brake Block Corporation, Asbestos Manufacturing Company, Gate Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H. K. Porter Company), Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientist from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

e. On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gate Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H. K. Porter Company), Union Asbestos and Rubber Company, and U. S. Gypsum Company. U. S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

f. At this November 11, 1948, meeting, these Defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

g. At this meeting, the Defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these Defendants were carried out by co-conspirator Defendant Met Life's agent, Dr. Lanza. These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiffs.

h. As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the *Archives of Industrial Hygiene and Occupational Medicine* (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the

9

inadequacy of the then-established threshold limit values (TLVs). Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work. The Defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

i. Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

j. The following conspirators and others were members of the trade association 'known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation), National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives *of Industrial Health* in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

k. Defendants who were members of Q.A.M.A. began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l. This plan of misrepresentation and influence over the medical literature began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

m. As a result of the termination of this study, these Defendants Fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. Smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being direct to, *inter alia,* U.S. Government officials, Canadian government officials. U.S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs.

n. Subsequently, the Q.A.M.A. Defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) And Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Dr. Braun and Truan reported to the Q.A.M.A. asbestosis did increase a worker's chances of incurring lung cancer.

10

o. The Q.A.M.A. Defendants thereafter caused in 1958 a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the Defendant conspirators to be patently false.

p. By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a document finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. Defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

q. In approximately 1958, the Q.A.M.A. Defendants publicized the edited works of Dr. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

r. The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for TLVs and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

s. In 1967, the Q.A.M.A. Defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t. In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators ere in attendance: Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of theirs agents, Cartier, Sabourin, and Lechance.

u. At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record in this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess tumors in animals, thereby fraudulently misrepresenting existing data, albeit secret, that should not be publicized because of the secrecy provisions contained in the 1936 Saranac Agreement required by the asbestos industry members.

v. The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessor to Celotex), Johns-Manville and others.

w. In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos containing products offered no hazard to workers who used these products.

x. The following conspirators were members of the trade organizations known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H. K. Porter, Keasby & Mattison (individually and

11

through its alter-ego Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

y. In 1947, the members of the ATI received a report from W.C. L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These Defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these Defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienist (ACGIH), thereby further influencing evaluations for asbestos exposure.

z. In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an injury from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

aa. In 1955, Johns-Manville, through its agent, Kenneth W. Smith, M.D., caused to be published in the AMA *Archives of Industrial Health*, an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

ab. In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

ac. In 1957, the members of the ATI jointly rejected a proposed research study on cancer and asbestos, and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

ad. In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ae. In 1970, through their agents, Defendants, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

af. All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan,

12

and Anthony J. Lanza, M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

40. As a direct and proximate result of the Defendants' intentional publication of deceptive and misleading medical data and information, as described in the preceding paragraphs, and upon which data the Plaintiff and/or those charged with warning them reasonably relied, the Plaintiff inhaled or otherwise was exposed and ingested hazardous asbestos dust, resulting in the injuries described above.

41. Additionally, and alternatively, as a direct and proximate result of the Defendant's actions and omissions as described above, the Plaintiffs were caused to remain ignorant concerning the danger of human exposure to asbestos, resulting in damage to the Plaintiff by depriving the Plaintiff, his employers, and the general public of opportunities to be aware of the hazards of asbestos exposure, and thus the opportunity to take proper safety precautions and/or avoid this exposure. Because of this ignorance and intentional failure to warn, the Plaintiff inhaled, was exposed to or otherwise ingested hazardous asbestos dusts, resulting in the injuries described above.

42. The Defendants fraudulently concealed from the Plaintiff the alteration of its published test results, the actions and omissions and concerted design and conspiracy, all as described in the paragraphs above, until the Plaintiff discovered said conduct following these diagnoses of asbestos related injuries.

43. WHEREFORE, the Plaintiff demands both compensatory and punitive damages from Defendants in sums to be determined at trial.

## COUNT FIVE

### (Conspiracy of Silence)

44. Plaintiff re-alleges and incorporates the foregoing allegations of this Complaint for all purposes.

45. Additionally, all Defendants herein were members of various asbestos trade organizations like Asbestos Textile Institute, the Magnesia Insulation Manufacturers and National Insulation Manufacturers Association and sponsors of medical and scientific research organizations like the Industrial Hygiene Foundation.

46. These trade organizations were created and did promote the use of asbestos and asbestos containing products and participated in supporting and sponsoring research into the health dangers of asbestos at laboratories. This research showed a link between asbestos inhalations and lung cancer. However, this research was never made public. In fact, this research was deliberately withheld in order to minimize public awareness of the dangers of working with their asbestos containing products and to maximize the profits of defendants.

47. The Defendants, individually and as members of these various trade organization, conspired within its own organization and with each other and others, to materially alter scientific research, to withhold information from the public about the dangers of asbestos, to falsely advertise their products as safe and non-toxic, and to misrepresent the dangers and hazards of asbestos to the public, consumers and governmental agencies.

48. As a result of this conspiracy of silence, Plaintiff suffered injuries.

## COUNT SIX

### Damages

49. Plaintiff re-alleges and incorporates the foregoing allegations of this Complaint for all purposes.

50. As a direct and proximate result of Defendants' breach of its duties to the Plaintiff as delineated in all counts above, the Plaintiff has sustained the asbestos related injuries, diseases, illnesses and/or conditions set forth above along with pain and suffering, the undergoing and continuing undergoing of medical treatment, medical expenses, along with past, present and future disability, impairment of wage earning capacity, lost wages, and a diminution in quality and enjoyment of life, which includes mental anguish, fear, and severe emotional distress associated with knowing that there is no cure for these diseases and illnesses.

51. In breaching their duties to the Plaintiff as described above, the Defendants have acted intentionally, with gross negligence, recklessly, maliciously or wantonly in that the Defendants knew or should have known through data available to them that asbestos was inherently and extraordinarily dangerous if used in the manner intended or foreseen by the Defendants, and that their aforesaid breaches of duty would result in the complained of injuries and damages to the Plaintiff, thus entitling the Plaintiff to recover punitive or exemplary damages for the Defendant outrageous conduct as set forth herein.

14

52. Plaintiff in this action does not assert any claims for, does not seek damages for, and disclaims recovery for any injuries, if any arising out of exposure to asbestos containing products designed, manufactured, distributed, sold, or marketed by or any actions or inactions of Asbestos Corp. Ltd., Atlas Turner, Inc., Lac D'Aminate du Quebec, Les Mines D'Amiante Bell, Ltd., and/or Societe Miniere Mazarin, Inc. To the extent plaintiff has been exposed to such asbestos containing products, if at all, plaintiff hereby waives his right to recover damages for such injuries.

53. Should any verdict in this case assign responsibility in whole or in part for any or all Plaintiff's injuries to damages to the entities Asbestos Corp. Ltd, Atlas Turner, Inc., Lac D'Amiante du Quebec, Les Mines D'Amiante Bell, Ltd., and/or Societe Miniere Mazarin, Inc., and if such verdict should be upheld upon proper post judgment motion, plaintiff hereby waives, and will remit and release, that portion of his damages. Plaintiff seeks and will seek the entry of a final judgment in this action against defendants that rewards them only that portion of their damages assigned by the jury and court to the named defendants.

54. Due to the passage of time since the Plaintiff was exposed to asbestos, the Plaintiff has been unable to ascertain the identities of all manufacturers, suppliers, distributors, and installers of asbestos-containing products to which he was exposed and hereby re-assert each of the foregoing allegations against John Doe Defendants #1-500 and John Doe Corporate Defendants #1-500.

55. Petitioner is also entitled to punitive damages for the wanton and/or reckless handling of a hazardous and toxic material.

Petitioner hereby request a trial by jury. Petitioner further request that, pursuant to Louisiana Code of Civil Procedure Article 1734, this Honorable Court fix the amount of the bond to cover all costs related to the trial by jury, and that this Court fix the date for filing of the bond.

Petitioner FURTHER PRAY that defendants be duly served and cited to appear and answer this petition and after all legal delays and due proceedings be had that there be judgment in favor of Petitioner, and against defendants for all damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid and all costs of these proceedings.

Petitioner FURTHER PRAY for all general and equitable relief required or reasonable in the premises.

Petitioner FURTHER PRAY for a trial by jury.

This the 29th day of June, 2010.

Respectfully submitted,

WILMER JERRY MCKENZIE

By: _____
Timothy W. Porter
*Attorney for Plaintiff*

Timothy W. Porter, LA Bar No. 24863
PORTER & MALOUF, P.A.
Post Office Box 12768
Jackson, Mississippi 39236-2768
Telephone: (601) 957-1173
Facsimile: (601) 957-7366

FILED 7-2-10
Signed S/ Danille Anderson
Deputy Clerk of Court
A True Copy 9-20-20 10
Deputy Clerk of Court

16

**PLEASE SERVE THE FOLLOWING DEFENDANTS:**

North Bros. Co., Inc., A Division of
National Service Industries, Inc., now
known as Performance Contracting, Inc.
(through the Louisiana Long Arm Statute)
through its agent for service of process
National Registered Agents, Inc.
840 Trustmark Building
248 East Capitol Street
Jackson, Mississippi 39201

National Service Industries, Inc.
(through the Louisiana Long Arm Statute)
through its agent for service of process
Carol Ellis Morgan, President
4111 Pleasantdale Road
Donville, Georgia 300340

Mine Safety Appliances, Inc.
(through the Louisiana Long Arm Statute)
through its agent for service of process
Thomas B. Hottop, CEO
121 Gamma Drive
RIDC Industrial Park
Pittsburgh, Pennsylvania 13528

Avon-International Safety Instruments, Inc.
(through the Louisiana Long Arm Statute)
through its agent for service of process
Mary C. Bettinger
922 Hurricane Shoals Road, Northeast
Lawrenceville, Georgia 30043