(JTLx), CLOSED, DISCOVERY, RELATED-G

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:08-cv-07434-R -JTL

| | |
|---|---|
| Carol S. Dudash et al v. Alstom Power, Inc. et al | Date Filed: 11/10/2008 |
| Assigned to: Judge Manuel L. Real | Date Terminated: 01/23/2009 |
| Referred to: Magistrate Judge Jennifer T. Lum | Jury Demand: None |
| Related Case: 2:07-cv-02241-R-JTL | Nature of Suit: 368 P.I. : Asbestos |
| Case in other court: Superior Court of CA for the County of Los Angeles, BC392242 | Jurisdiction: Federal Question |
| Cause: 28:1441 Notice of Removal - Asbestos Litigation | |

### Plaintiff

**Carol S. Dudash**
*individually*

represented by **Carlos J E Guzman**
Paul and Hanley LLP
1608 Fourth Street Suite 300
Berkeley, CA 94710
510-559-9980
Fax: 510-559-9970
Email: cguzman@paulandhanley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dean A Hanley**
Paul and Hanley LLP
1608 4th Street Suite 300
Berkeley, CA 94710
510-559-9980
Fax: 510-559-9970
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deborah R Rosenthal**
Paul and Hanley
1608 Fourth Street Suite 300
Berkeley, CA 94710
510-559-9980
Fax: 510-559-9970
Email: drosenthal@paulandhanley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Carol S. Dudash**
*as successor-in-interest to Jimmie J.*

represented by **Carlos J E Guzman**
(See above for address)

*Dudash, deceased*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dean A Hanley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Plaintiff
**Carol S. Dudash**
*as legal heirs of Jimmie J. Dudash,*
*deceased*

represented by  **Carlos J E Guzman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dean A Hanley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Plaintiff
**Melita Rene Phillips**
*as legal heirs of Jimmie J. Dudash,*
*deceased*

represented by  **Carlos J E Guzman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dean A Hanley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Alstom Power, Inc.**
*individually and as successor-in-interest to*
*Griscom-Rusell-Schack Company, Inc.*

### Defendant

**Atlas Valve Company, Inc.**

### Defendant

**Aurora Pump Company**

### Defendant

**BW/IP International, Inc.**
*individually, and successor-in-interest to*
*Byron Jackson Pump Co.*

### Defendant

**Asbestos Corporation, Ltd.**

**Defendant**

**Buffalo Pumps, Inc.**

**Defendant**

**Clayton Industries**

**Defendant**

**Crosby Valve Inc.**

**Defendant**

**Crown Cork & Seal Company, Inc.**
*individually, and as successor-in-interest*
*to Mundet Cork Company, Inc.*

**Defendant**

**Cyclotherm Corporation**

**Defendant**

**Dover Corporation**
*individually and as successor-in-interest to*
*Blackmer Pump Company*

**Defendant**

**FMC Corporation**
*individually and as successor-in-interest to*
*Northern Pump*

**Defendant**

**Foster Wheeler USA Corporation**

**Defendant**

**Garlock Sealing Technologies, LLC**
*formerly known as*
Garlock, Inc.

**Defendant**

**Goulds Pumps (IPG), Inc.**

**Defendant**

**Greene Tweed & Co. I, L.P.**

**Defendant**

**Ingersoll-Rand Company**

**Defendant**

**Kunkle Industries, Inc.**
*individually and as successor-in-interest to*

*J.E. Lonergan Company*

**Defendant**

**Leslie Controls, Inc.**

**Defendant**

**McNally Industries LLC**
*individually and as successor-in-interest to*
*Northern Pumps*

**Defendant**

**Plant Insulation Company**

**Defendant**

**SB Decking, Inc.**
*formerly known as*
Selby Battersby & Company

**Defendant**

**SOCO West, Inc.**
*individually and as successor-in-interest to*
*Western Chemical and Manufacturing*
*Company*
*formerly known as*
Soco-Lynch Corporation
*formerly known as*
Brenntag West, Inc.
*formerly known as*
Stinnes-Western Chemical Corporation
*formerly known as*
Soco-Western Chemical Corporation

**Defendant**

**Vacco Industries**
*individually and as successor-in-interest to*
*Vacco Valve Co.*

**Defendant**

**Viad Corp**                              represented by   **Peter B Langbord**
*as successor-in-interest to Griscom Russell*              Foley & Mansfield PLLP
                                                          300 South Grand Avenue Suite 2800
*formerly known as*                                        Los Angeles, CA 90071
Dial Corporation                                          213-283-2100
                                                          Fax: 213-283-2101
                                                          Email: plangbord@foleymansfield.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Viking Pump, Inc.**
*individually and as successor-in-interest to*
*Viking Pump Company, Houdaille*
*Industries, Inc. and Viking Pump-*
*Houdaille,, Inc.*

**Defendant**

**Warren Pumps, Inc.**

**Defendant**

**Yarway Corporation**
*formerly known as*
Yarnall-Waring Company
*formerly known as*
Yarnall-Waring Co.

**Defendant**

**DOES**
*1-820*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/10/2008 | 1 | NOTICE OF REMOVAL from Superior Court of CA for the County of Los Angeles-Court of Unlimited Jurisdiction, case number BC392242 with CONFORMED FILED copy of summons and First Amended complaint and Answer to First Amended Complaint and NO CONFORMED COPY OF COMPLAINT. Case assigned to Judge Stephen V. Wilson, Discovery to Magistrate Judge Carolyn Turchin. (Filing fee $ 350 PAID. ), filed by Defendant Viad Corp. (et) (ds). (Entered: 11/13/2008) |
| 11/10/2008 | | CONFORMED COPY OF FIRST AMENDED COMPLAINT against Defendants Alstom Power, Inc., Atlas Valve Company, Inc., Aurora Pump Company, BW/IP International, Inc., Asbestos Corporation, Ltd., Buffalo Pumps, Inc., Clayton Industries, Crosby Valve Inc., Crown Cork & Seal Company, Inc., Cyclotherm Corporation, Dover Corporation, FMC Corporation, Foster Wheeler USA Corporation, Garlock Sealing Technologies, LLC, Goulds Pumps (IPG), Inc., Greene Tweed & Co. I, L.P., Ingersoll-Rand Company, Kunkle Industries, Inc., Leslie Controls, Inc., McNally Industries LLC, Plant Insulation Company, SB Decking, Inc., SOCO West, Inc., Vacco Industries, Viad Corp, Viking Pump, Inc., Warren Pumps, Inc., Yarway Corporation, DOES 1-820 amending Notice of Removal, 1 ,filed by Plaintiffs Melita Rene Phillips, Carol S. Dudash(individually), Carol S. Dudash(as successor-in-interest to Jimmie J. Dudash, deceased), Carol S. Dudash(as legal heirs of Jimmie J. Dudash, deceased). [FILED IN STATE COURT OF 10/03/2008 SUBMITTED ATTACHED TO EXHIBIT A TO NOTICE OF REMOVAL.] (et) (Entered: 11/13/2008) |
| 11/10/2008 | | CONFORMED COPY OF ANSWER to First Amended Complaint filed by Defendant Viad Corp. [FILED IN STATE COURT ON 11/4/2008 SUBMITTED ATTACHED TO EXHIBIT D TO NOTICE OF REMOVAL.] (et) (Entered: 11/13/2008) |
| 11/10/2008 | 2 | CERTIFICATION AND NOTICE of Interested Parties and Corporate Disclosure |

| | | STatement filed by Defendant Viad Corp. (et) (ds). (Entered: 11/13/2008) |
|---|---|---|
| 11/10/2008 | 3 | NOTICE OF TAG-ALONG ACTION filed by Defendant Viad Corp. (et) (ds). (Entered: 11/13/2008) |
| 11/10/2008 | 4 | NOTICE of Related Case(s) filed by Defendant Viad Corp. Related Case(s): CV 07-8338-VBF (RCx); CV 08-0118 R (JTLx). (et) (ds). (Entered: 11/13/2008) |
| 11/10/2008 | 5 | CERTIFICATE OF SERVICE filed by Defendant Viad Corp, re Notice of Related Case(s) 4 , Notice of Removal, 1 , Certificate/Notice of Interested Parties 2 , Notice of Tag-Along Action 3 and civil cover sheet served on 11/10/2008. (et) (ds). (Entered: 11/13/2008) |
| 11/13/2008 | 6 | NOTICE OF REFILING STATE COURT ANSWER TO COMPLAINT filed by DEFENDANT Viad Corp. (Langbord, Peter) (Entered: 11/13/2008) |
| 11/13/2008 | 7 | CERTIFICATE OF SERVICE filed by DEFENDANT Viad Corp, *CERTIFICATE OF SERVICE RE: NOTICE TO ADVERSE PARTY* served on November 13, 2008. (Langbord, Peter) (Entered: 11/13/2008) |
| 11/13/2008 | 8 | PROOF OF SERVICE filed by DEFENDANT Viad Corp, *PROOF OF SERVICE RE: COURT DOCUMENTATION* served on November 13, 2008. (Langbord, Peter) (Entered: 11/13/2008) |
| 11/14/2008 | 9 | NEW CASE ORDER by Judge Stephen V. Wilson: This case has been assigned to the calendar of Judge Stephen V. Wilson. The Court fully adheres to Rule 1 of the Federal Rules of Civil Procedure which requires that the Rules be construed to secure the just, speedy and inexpensive determinationof every action. (See document for details.) (ake) (Entered: 11/14/2008) |
| 11/14/2008 | 10 | ORDER RE: STATUS CONFERENCE by Judge Stephen V. Wilson: IT IS HEREBY ORDERED that a Status Conference be set for Monday, January 12, 2009 at 3:00 p.m. before the Honorable Stephen V. Wilson. The attorneys attending this conference MUST be those who are in charge of the conduct of the trial. Attendance is mandatory. (See document for details.) (ake) (Entered: 11/14/2008) |
| 11/26/2008 | 11 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 08-052 -Related Case- filed. Related Case No: CV 07-2241 R (JTLx). Case transferred from Magistrate Judge Carolyn Turchin and Judge Stephen V. Wilson to Judge Manuel L. Real and Magistrate Judge Jennifer T. Lum for all further proceedings. The case number will now reflect the initials of the transferee Judge CV 08-7434 R (JTLx).Signed by Judge Manuel L. Real (rn) (Entered: 11/26/2008) |
| 12/05/2008 | 12 | ORDER RE: NOTICE TO COUNSEL by Judge Manuel L. Real: This case has been assigned to the calendar of Judge Manuel L. Real. Counsel are advised that the Court expects strict compliance with the provisions of the Local Rules and the Federal Rules of Civil Procedure. NONCOMPLIANCE MAY LEAD TO THE IMPOSITION OF SANCTIONS WHICH MAY INCLUDE THE STRIKING OF PLEADINGS AND ENTRY OF JUDGMENT OR DISMISSAL OF THE ACTION. The attention of counsel is particularly directed to Local Rule 16. Counsel should also be guided by the following special requirements when litigating cases assigned to Judge Real: [See document for details.] (ake) (Entered: 12/08/2008) |
| 12/05/2008 | 13 | MINUTES OF IN CHAMBERS ORDER held before Judge Manuel L. Real: This case |

| | | |
|---|---|---|
| | | has been transferred from the docket of Judge Wilson to that of Judge Real. The New Case Status Conference set before Judge Wilson on January 12, 2009 at 3:00 p.m. is hereby Vacated and taken Off Calendar. The parties are referred to Judge Reals Order re Notice to Counsel as to how they shall proceed in this matter. (pj) (Entered: 12/09/2008) |
| 12/10/2008 | 14 | NOTICE OF MOTION AND MOTION to Remand Case to Los Angeles Superior Court filed by plaintiff Carol S. Dudash(individually). Motion set for hearing on 1/5/2009 at 10:00 AM before Judge Manuel L. Real. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration Declaration of Deborah R. Rosenthal, # 3 Exhibit Exhibits A-B, # 4 Exhibit Exhibits C-E, # 5 Exhibit Exhibits F-I, # 6 Exhibit Exhibits J-N, # 7 Exhibit Exhibits O-R, # 8 Proposed Order [Proposed] Order Remanding Case to State Court)(Rosenthal, Deborah) (Entered: 12/10/2008) |
| 12/10/2008 | 15 | Certificate of Interested Parties filed by plaintiff Carol S. Dudash(individually), (Rosenthal, Deborah) (Entered: 12/10/2008) |
| 12/22/2008 | 16 | Opposition re: MOTION to Remand Case to Los Angeles Superior Court 14 filed by Defendant Viad Corp. (Attachments: # 1 Exhibit A-E, # 2 Exhibit F-M)(Langbord, Peter) (Entered: 12/22/2008) |
| 12/22/2008 | 17 | DECLARATION of Charles R. Cushing In opposition to MOTION to Remand Case to Los Angeles Superior Court 14 filed by Defendant Viad Corp. (Langbord, Peter) (Entered: 12/22/2008) |
| 12/22/2008 | 18 | DECLARATION of Rear Admiral Ben J. Lehman In opposition to MOTION to Remand Case to Los Angeles Superior Court 14 filed by Defendant Viad Corp. (Attachments: # 1 Exhibit 1-3, # 2 Exhibit 4 -part1-2, # 3 Exhibit 4 -part 2-2, # 4 Exhibit 5, # 5 Exhibit 6 -part 1-2, # 6 Exhibit 6 -part 2-2)(Langbord, Peter) (Entered: 12/22/2008) |
| 12/22/2008 | 19 | Objection to evidence re: MOTION to Remand Case to Los Angeles Superior Court 14 filed by Defendant Viad Corp. (Langbord, Peter) (Entered: 12/22/2008) |
| 12/29/2008 | 20 | REPLY IN SUPPORT OF MOTION TO REMAND filed by Plaintiff Carol S. Dudash. (Rosenthal, Deborah) (Entered: 12/29/2008) |
| 12/29/2008 | 21 | OBJECTION TO EVIDENCE OFFERED BY VIAD CORPORATION AND MOTION TO STRIKE CUSHING AND LEHMAN DECLARATIONS IN SUPPORT re: MOTION to Remand Case to Los Angeles Superior Court 14 filed by Plaintiff Carol S. Dudash. (Rosenthal, Deborah) (Entered: 12/29/2008) |
| 12/29/2008 | 22 | PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS TO EVIDENCE re: MOTION to Remand Case to Los Angeles Superior Court 14 filed by Plaintiff Carol S. Dudash. (Rosenthal, Deborah) (Entered: 12/29/2008) |
| 12/29/2008 | 23 | SUPPLEMENT to MOTION to Remand Case to Los Angeles Superior Court 14 *SUPPLEMENTAL DECLARATION OF DEBORAH R. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND* filed by Plaintiff Carol S. Dudash. (Rosenthal, Deborah) (Entered: 12/29/2008) |
| 12/29/2008 | 24 | PROOF OF SERVICE OF SERVICE filed by PLAINTIFF Carol S. Dudash(as successor-in-interest to Jimmie J. Dudash, deceased), re Objection/Opposition (Motion related) 21 , Objection/Opposition (Motion related) 22 , Reply (Motion related) 20 , |

| | | |
|---|---|---|
| | | Supplement(Motion related) 23 served on 12-29-08. (Rosenthal, Deborah) (Entered: 12/29/2008) |
| 01/05/2009 | 25 | MINUTES OF PLAINTIFF'S MOTION TO REMAND Hearing held before Judge Manuel L. Real: The Court hears arguments of counsel. The Court DENIES the motion, as stated on the record. Defendant shall submit a proposed order. 14 Court Reporter: Bridget Montero. (ake) (Entered: 01/05/2009) |
| 01/07/2009 | 26 | NOTICE OF LODGING filed *NOTICE OF LODGING [PROPOSED] ORDER DENYING MOTION TO REMAND TO STATE COURT* re Motion Hearing, 25 (Attachments: # 1 Proposed Order [Proposed] Order Denying Motion to Remand to State Court)(Langbord, Peter) (Entered: 01/07/2009) |
| 01/08/2009 | 27 | ORDER by Judge Manuel L. Real, denying Plaintiffs' MOTION to Remand Case to Los Angeles Superior Court 14 . (lom) (Entered: 01/09/2009) |
| 01/20/2009 | 28 | STIPULATION to Remand Case to State Court filed by plaintiff Carol S. Dudash (individually). (Attachments: # 1 Proposed Order)(Rosenthal, Deborah) (Entered: 01/20/2009) |
| 01/20/2009 | 29 | PROOF OF SERVICE filed by plaintiff Carol S. Dudash(individually), re Stipulation to Remand Case to State Court 28 served on 1-20-09. (Rosenthal, Deborah) (Entered: 01/20/2009) |
| 01/23/2009 | 30 | STIPULATION REQUESTING ORDER DISMISSING DEFENDANT VIAD CORP WITH PREJUDICE AND REMANDING CASE IN ITS ENTIRETY TO STATE COURT by Judge Manuel L. Real PURSUANT TO STIPULATION, IT IS SO ORDERED that defendant Viad Corp. is hereby dismissed with prejudice from the instant action. It is further ordered that the above-captioned case, Carol Dudash et. al. v. Alstom Power, Inc., et. al., U.S. District Court Case No. CV 08-7434 R (JTLx), is hereby remanded to the Superior Court ofthe State of California in and for the County of Los Angeles. Each party shall bear its own costs and expenses in relation to this action as against each other.remanding case toLos Angeles Superior Court, Case number BC392242, (Made JS-6. Case Terminated.) (Attachments: # 1 Transmittal letter) (pj) (Entered: 01/30/2009) |
| 02/05/2009 | 31 | MDL ORDER VACATING CONDITIONAL TRANSFER ORDER: A conditional transfer order was filed in these actions (Dudash and Redman) on January 9, 2009. Prior to expiration ofthat order's IS-day stay of transmittal, plaintiffs in Dudash and Redman filed notices of opposition to the proposed transfer. The Panel has now been advised that Dudash was remanded to the Superior Court ofthe State of California in and for the County of Los Angeles by the Honorable Manuel L. Real in an order filed on January 23,2009. The Panel has also been advised that Redman was remanded to the Superior Court of the State of California in and for the County of San Francisco by the Honorable Jeffrey S. White in an order filed on February 2,2009. IT IS THEREFORE ORDERED that the Panel's conditional transfer order designated as "CTO-3I8" filed on January 9,2009, is VACATED insofar as it relates to these actions. by Jeffrey N Luthi Clerk of the Panel (pj) (Entered: 02/05/2009) |
| 02/06/2009 | 32 | ACKNOWLEDGMENT of Receipt of Order of Remand and docket sheet by Los Angeles County Superior Court; their case number BC392242. (mg) (Entered: 02/13/2009) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/09/2010 12:05:53 | | |
| **PACER Login:** | fm1158 | **Client Code:** 8027-0049 |
| **Description:** | Docket Report | **Search Criteria:** 2:08-cv-07434-R -JTL End date: 12/9/2010 |
| **Billable Pages:** | 7 | **Cost:** 0.56 |

1   Dean A. Hanley, Esq. (State Bar No. 169507)
    Carlos J.E. Guzman, Esq. (State Bar No. 219185)
2   PAUL & HANLEY LLP
    1608 Fourth Street, Suite 300
3   Berkeley, California 94710
    Telephone:    (510) 559-9980
4   Facsimile:    (510) 559-9970

5   Attorneys for Plaintiffs

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

OCT 03 2008

John A. Clarke, Executive Officer/Clerk

By_____ Deputy
   NANCY ALVAREZ

6

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF LOS ANGELES – COURT OF UNLIMITED JURISDICTION

10

11  CAROL S. DUDASH, individually and as          )   Case No. BC392242
    successor-in-interest to JIMMIE J. DUDASH,    )
12  deceased; and CAROL S. DUDASH and MELITA      )   **FIRST AMENDED**
    RENE PHILLIPS, as legal heirs of JIMMIE J.    )   **COMPLAINT FOR**
13  DUDASH, deceased,                             )   **SURVIVAL / WRONGFUL**
                                                  )   **DEATH AND LOSS**
14          Plaintiffs,                           )   **OF CONSORTIUM-**
                                                  )   **ASBESTOS**
15  vs.                                           )
                                                  )
16  ALSTOM POWER, INC. individually and as        )
17         successor-in-interest to GRISCOM-      )
           RUSSELL-SCHACK COMPANY, INC.           )
18  ATLAS VALVE COMPANY, INC.,                    )
    AURORA PUMP COMPANY,                          )
19  BW/IP INTERNATIONAL, INC., Individually and   )
           Successor-In-Interest to BYRON        )
20         JACKSON PUMP CO.,                      )
    ASBESTOS CORPORATION, LTD.,                   )
21  BUFFALO PUMPS, INC.,                          )
    CLAYTON INDUSTRIES,                           )
22  CROSBY VALVE INC.,                            )
    CROWN CORK & SEAL COMPANY, INC,               )
23         Individually and as Successor–In-     )
           Interest to MUNDET CORK               )
24         COMPANY,                               )
    CYCLOTHERM CORPORATION,                       )
25  DOVER CORPORATION individually and as         )
           successor-in-interest to BLACKMER     )
26         PUMP COMPANY,                          )
    FMC CORPORATION, individually and as          )
27         successor-in-interest to NORTHERN     )
           PUMP,                                  )
28  FOSTER WHEELER USA CORPORATION,               )

FIRST AMENDED COMPLAINT FOR SURVIVAL / WRONGFUL DEATH AND LOSS OF CONSORTIUM - ASBESTOS          PAGE 1
S:\Clients\Plaintiffs\D\Dudash, Jimmie (Carol LP) 1178\Complaint\ALLD FAC.doc

| | |
|---|---|
| 1 | GARLOCK SEALING TECHNOLOGIES, LLC, ) |
|   |     fka GARLOCK, INC., ) |
| 2 | GOULDS PUMPS (IPG), INC., ) |
|   | GREENE, TWEED & CO. I, L.P., ) |
| 3 | INGERSOLL-RAND COMPANY, ) |
|   | KUNKLE INDUSTRIES, INC., individually and as ) |
| 4 |     successor-in-interest to and J.E. ) |
|   |     LONERGAN COMPANY, ) |
| 5 | LESLIE CONTROLS, INC., ) |
|   | McNALLY INDUSTRIES LLC, individually and ) |
| 6 |     as successor-in-interest to NORTHERN ) |
|   |     PUMPS, ) |
| 7 | PLANT INSULATION COMPANY, ) |
|   | SB DECKING, INC. fka SELBY BATTERSBY & ) |
| 8 |     COMPANY, ) |
|   | SOCO WEST, INC. fka BRENNTAG WEST, ) |
| 9 |     INC., SOCO-LYNCH CORPORATION, ) |
|   |     SOCO-WESTERN CHEMICAL ) |
| 10 |     CORPORATION, and STINNES- ) |
|   |     WESTERN CHEMICAL CORPORATION ) |
| 11 |     individually and as successor-in-interest to ) |
|   |     WESTERN CHEMICAL AND ) |
| 12 |     MANUFACTURING COMPANY, ) |
|   | VACCO INDUSTRIES, individually and as ) |
| 13 |     successor-in-interest to VACCO VALVE ) |
|   |     CO., ) |
| 14 | VIAD CORP. fka and as successor-in-interest to ) |
|   |     DIAL CORPORATION and GRISCOM ) |
| 15 |     RUSSELL, ) |
|   | VIKING PUMP, INC. individually and as ) |
| 16 |     successor-in-interest to VIKING PUMP ) |
|   |     COMPANY, HOUDAILLE INDUSTRIES, ) |
| 17 |     INC. and VIKING PUMP-HOUDAILLE, ) |
|   |     INC., ) |
| 18 | WARREN PUMPS, INC., ) |
|   | YARWAY CORPORATION fka YARNALL- ) |
| 19 |     WARING COMPANY and YARNALL- ) |
|   |     WARING CO., ) |
| 20 | ) |
|   | and DOES 1 - 820, ) |
| 21 | ) |
| 22 |     Defendants ) |
|   | ) |

      1.     The true names and capacities, whether individual, corporate, associate,

governmental or otherwise, of defendants DOES 1 through 800, are unknown to plaintiff at this

time, who therefore sues said defendants by such fictitious names. When the true names and

capacities of said defendants have been ascertained, plaintiff will amend this complaint

accordingly. Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages thereby to the Plaintiffs, as hereinafter alleged.

2.      At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture.

3.      Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, defendants on Exhibits "B" and "C", and DOES 1 through 800, inclusive, were and are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California, and that said defendants have regularly conducted business in the  State of California.

## FIRST CAUSE OF ACTION
### [Negligence – Survival]

**PLAINTIFF CAROL S. DUDASH, AS SUCCESSOR-IN-INTEREST TO JIMMIE J. DUDASH, DECEASED ("DECEDENT") COMPLAINS OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-300, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE (SURVIVAL) ALLEGES:**

4.      Plaintiff CAROL S. DUDASH brings this action pursuant to Section 377.32 of the Code of Civil Procedure, as successor-in-interest to Decedent JIMMIE J. DUDASH.

5.      At all times herein mentioned, each of the named defendants and DOES 1 through 300 was the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion

thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain product, namely asbestos, and other products containing asbestos. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein named defendants is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others and advertised a certain product, namely asbestos, and other products containing asbestos. The following defendants, and each of them, are liable for the acts of each and every "alternate entity", and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such alternate entity"; defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
| --- | --- |
| BW/IP INTERNATIONAL, INC. | BYRON JACKSON PUMP CO. |

| | |
|---|---|
| CROWN CORK & SEAL COMPANY, INC, | MUNDET CORK COMPANY |
| GARLOCK SEALING TECHNOLOGIES, LLC | GARLOCK, INC. |
| SB DECKING, INC. | SELBY BATTERSBY & COMPANY |
| SOCO WEST, INC. | BRENNTAG WEST, INC. SOCO-LYNCH CORPORATION, SOCO-WESTERN CHEMICAL CORPORATION, STINNES-WESTERN CHEMICAL CORPORATION WESTERN CHEMICAL AND MANUFACTURING COMPANY |
| VIAD CORP. | DIAL CORPORATION GRISCOM RUSSELL |
| YARWAY CORPORATION | YARNALL-WARING COMPANY YARNALL WARING CO. |
| DOVER CORPORATION | BLACKMER PUMP COMPANY |
| VIKING PUMP, INC. | VIKING PUMP COMPANY, HOUDAILLE INDUSTRIES, INC., VIKING PUMP-HOUDAILLE, INC. |
| FMC CORPORATION | NORTHERN PUMP |
| McNALLY INDUSTRIES LLC | NORTHERN PUMPS |
| KUNKLE INDUSTRIES, INC. | J.E. LONERGAN COMPANY |
| VACCO INDUSTRIES | VACCO VALVE CO. |
| ALSTOM POWER, INC. | GRISCOM-RUSSELL-SCHACK COMPANY, INC. |

6. At all times herein mentioned, defendants, their "alternate entities," and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain product, namely asbestos and other products containing asbestos.

7.     At all times herein mentioned, defendants, their "alternate entities" and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, and other products containing asbestos, in that said products caused personal injuries to users, consumers, workers, bystanders and others, including the Decedent herein, (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said products unsafe and dangerous for use by "exposed persons".

8.     Defendants, their "alternate entities," and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

9.     Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out", and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons", including Decedent herein, would use or be in proximity to and exposed to said asbestos fibers.

10.     Decedent used, handled or was otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

exposure to asbestos and asbestos-containing products occurred at various locations as set forth in Exhibit A, attached hereto and incorporated herein by reference.

11.    As a direct and proximate result of the conduct of the defendants, their "alternate entities," and each of them, as aforesaid, Decedent's exposure to asbestos and asbestos-containing products caused severe and permanent injury and death to Decedent.

12.    Plaintiff is informed and believes, and thereon alleges, that progressive lung disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

13.    Decedent suffered and died from mesothelioma, a disease related to exposure to asbestos and asbestos-containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.  Decedent retired from the Navy in 1976.  He was working at the time of diagnosis and treatment for the Central United Methodist Church in Webb City, MO, and remained employed by them on disability until his death.

14.    As a direct and proximate result of the aforesaid conduct of defendants, their "alternate entities", and each of them, Decedent suffered permanent injuries and death, including, but not limited to, asbestosis, other lung damage, and cancer, from the effect of exposure to asbestos fibers, all to plaintiff's damage in the sum in excess of the jurisdictional limits of Court of Limited Jurisdiction.

15.    As a direct and proximate result of the aforesaid conduct of the defendants, their "alternate entities," and each of them, Decedent incurred for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

16.     As a further direct and proximate result of the said conduct of the defendants, their "alternate entities," and each of them, Decedent incurred, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend this complaint to conform to proof at the time of trial.

17.     Defendants, their "alternate entities", and each of them, and their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

18.     Defendants, their "alternate entities," and each of them, are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities", and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.

19.     The herein-described conduct of said defendants, their "alternate entities", and each of them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of "exposed persons". Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive damages according to proof.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

///

///

///

///

///

## SECOND CAUSE OF ACTION
### [Strict Liability – Survival]

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFF CAROL S. DUDASH, AS SUCCESSOR-IN-INTEREST TO JIMMIE J. DUDASH, DECEASED ("DECEDENT") COMPLAINS OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-300, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE (STRICT LIABILITY) ALLEGES:

20.    Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations contained in Paragraphs 5-6 and 10-19 of the First Cause of Action herein.

21.    Defendants, their "alternate entities", and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

22.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, their "alternate entities," and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons", including Decedent herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

23.    "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons". Said defendants, their "alternate entities", and each of them, further failed to adequately warn of the risks to which decedent and others similarly situated were exposed.

24.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation,

repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products, defendants, their "alternate entities", and each of them, did so with conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in that said defendants, their "alternate entities", and each of them, had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products, including, but not limited to, asbestosis, other lung damages and cancer. Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their "alternate entities", and each of them, and which knowledge was obtained by said defendants, their "alternate entities", and each of them on or before 1930, and thereafter.

25.     On or before 1930, and thereafter, said defendants, their "alternate entities" and each of them, were aware that members of the general public and other "exposed persons", who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, their "alternate entities", and each of them, knew that members of the general public and other "exposed persons", who came in contact with asbestos and asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

26.     With said knowledge, said defendants, their "alternate entities", and each of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said asbestos and asbestos-containing products without attempting to protect "exposed persons" from or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products, defendants, their "alternate entities", and each of them, intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said knowledge from "exposed persons" and members of the general public, thus impliedly representing to "exposed persons" and members of the general public that asbestos and asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their "alternate entities", and each of them, engaged in this conduct and made these implied representations with the knowledge of the falsity of said implied representations.

27.    The above-referenced conduct of said defendants, their "alternate entities", and each of them, was motivated by the financial interest of said defendants, their "alternate entities", and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos and asbestos-containing products. In pursuance of said financial motivation, said defendants, their "alternate entities", and each of them, consciously disregarded the safety of "exposed persons" and in fact were consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced persons to work with and be exposed thereto, including decedent.

28.    Plaintiff alleges that the aforementioned defendants, their "alternate entities", and each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for their intended use but that their asbestos and asbestos-containing products, created an unreasonable risk of bodily harm to exposed persons.

29.    Plaintiff further alleges decedent's injuries are a result of cumulative exposure to asbestos and various asbestos-containing products manufactured, fabricated, inadequately researched, designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised by the aforementioned defendants, their "alternate entities", and each of them, and that plaintiff cannot identify precisely which asbestos or asbestos-containing products caused the injuries and damages complained of herein.

30.    Decedent relied upon defendants', their "alternate entities'", and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable and proximate result thereof, Decedent suffered injury and death as alleged herein.

31.    As a direct and proximate result thereof, plaintiff has suffered the damages previously alleged.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities", and each of them, as hereinafter set forth.

### THIRD CAUSE OF ACTION
[False Representation Under Restatement
of Torts Section 402-B – Survival]

**AS AND FOR A FURTHER, THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B, PLAINTIFF CAROL S. DUDASH, AS SUCCESSOR-IN-INTEREST TO JIMMIE J. DUDASH, DECEASED ("DECEDENT") COMPLAINS OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-300, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGES AS FOLLOWS:**

32.    Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First and Second Causes of Action.

33.   At the aforementioned time when defendants, their "alternate entities", and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised the said asbestos and asbestos-containing products, as herein above set forth, the defendants, their "alternate entities", and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other "exposed persons", including the decedent herein and his employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

34.   The purchasers and users of said asbestos and asbestos-containing products, and other "exposed persons", including the decedent and decedent's employers, relied upon said representations of defendants, their "alternate entities", and each of them, in the selection, purchase and use of asbestos and asbestos-containing products.

35.   Said representations by defendants, their "alternate entities", and each of them, were false and untrue, and defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products, were not safe for their intended use, nor were they of merchantable quality as represented by defendants, their "alternate entities", and each of them, in that asbestos and asbestos-containing products have very dangerous properties and defects whereby said products cause asbestosis, other lung damages and cancer, and have other defects that cause injury and damage to the users of said products and other "exposed persons", thereby threatening the health and life of said persons including Decedent herein.

36.   As a direct and proximate result of said false representations by defendants, their "alternate entities", and each of them, decedent sustained the injuries, death and damages herein above set forth.

1    WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities",

2  and each of them, as hereinafter set forth.

### FOURTH CAUSE OF ACTION
### [Intentional Tort – Survival]

**AS AND FOR A FURTHER, FOURTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR AN INTENTIONAL TORT UNDER CIVIL CODE SECTIONS 1708 THROUGH 1710, PLAINTIFF CAROL S. DUDASH, AS SUCCESSOR-IN-INTEREST TO JIMMIE J. DUDASH, DECEASED ("DECEDENT") COMPLAINS OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-300, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGES AS FOLLOWS:**

37.    Plaintiff, by this reference, hereby incorporates, as though fully set forth herein, each and every allegation contained in the First and Third Causes of Action herein excepting therefrom allegations pertaining to negligence.

38.    At all times pertinent hereto, the defendants, their "alternate entities," and each of them, owed decedent a duty, as provided for in Section 1708 through 1710 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of the decedent. When a duty to act was imposed, as set forth herein, the defendants, their "alternate entities," and each of them, did do the acts and omissions in violation of that duty, thereby causing injury and subsequent death to decedent and the damages suffered by plaintiff, as is more fully set forth herein. Such acts and omissions consisted of acts falling within Section 1709 (Fraudulent Deceit) and Section 1710 (Deceit) and, more specifically, included suggestions of fact which were not true and which defendants, their "alternate entities," and each of them, did not believe to be true; assertions of fact which were not true and which defendants, their "alternate entities," and each of them, had no reasonable ground for believing to be true, and the suppression of fact when a duty existed to disclose it, all as are more fully set forth herein; the violation of any one such duty gave rise to a cause of action for violation of the rights of the Decedent as provided for in the aforementioned Civil Code sections.

39.     Since on or before 1930, the defendants, their "alternate entities," and each of them, have known and have possessed the true facts of medical and scientific data and other knowledge which clearly indicated that the asbestos and asbestos-containing products referred to in plaintiff's First Cause of Action were and are hazardous to the health and safety of Decedent, and others in Decedent's position working in close proximity with such materials. The defendants, their "alternate entities," and each of them, have known of the dangerous propensities of other of the aforementioned materials and products since before that time. With intent to deceive Decedent, and others in decedent's position, and with intent that he and such others should be and remain ignorant of such facts with intent to induce decedent and such others to alter his and their positions to his and their injury and/or risk and in order to gain advantages, the following acts occurred:

40.     Defendants, their "alternate entities," and each of them, did not label any of the aforementioned asbestos-containing materials and products regarding the hazards of such materials and products to the health and safety of Decedent and others in Decedent's position working in close proximity with such materials until 1964 when certain of such materials were labeled by some, but not all, of defendants, their "alternate entities," and each of them, herein when the knowledge of such hazards was existing and known to defendants, their "alternate entities," and each of them, since 1924. By not labeling such materials as to their said hazards, defendants, their "alternate entities," and each of them, caused to be suggested as a fact to decedent that it was safe for decedent to work in close proximity to such materials when in fact it was not true and defendants, their "alternate entities," and each of them, did not believe it to be true;

41.     Defendants, their "alternate entities," and each of them, suppressed information relating to the danger of use of the aforementioned materials by requesting the suppression of information to the decedent and the general public concerning the dangerous nature of the

1   aforementioned materials to workers, by not allowing such information to be disseminated in a

2   manner which would given general notice to the public and knowledge of the hazardous nature

3   thereof when defendant, their "alternate entities," and each of them, were bound to disclose such

4   information;

5        42.    Defendants, their "alternate entities," and each of them, sold the aforementioned

6

7   products and materials to decedent's employer and others without advising Decedent and others

8   of the dangers of use of such materials to persons working in close proximity thereto when

9   defendants, their "alternate entities," and each of them, knew of such dangers, and had a duty to

10   disclose such dangers all as set forth herein. By said conduct, defendants, their "alternate

11   entities," and each of them, caused to be positively asserted to decedent that which was not true

12   and that which defendants, their "alternate entities," and each of them, had no reasonable ground

13   for believing to be true, to wit, that it was safe for decedent to work in close proximity to such

14   materials;

15        43.    Defendants, their "alternate entities," and each of them, suppressed from

16

17   decedent medical and scientific data and knowledge of the results of studies including, but not

18   limited to, the information and knowledge of the contents of the Lanza report. Although bound

19   to disclose it, defendants, their "alternate entities," and each of them influenced A. J. Lanza to

20   change his report, the altered version of which was published in Public Health Reports, Volume

21   50 at page 1 in 1935, thereby causing decedent and others to be and remain ignorant thereof.

22   Defendants, their "alternate entities," and each of them, caused Asbestos Magazine, a widely

23   disseminated trade journal, to omit mention of danger, thereby lessening the probability of

24   notice of danger to the users thereof;

25        44.    Defendants, their "alternate entities," and each of them, belonged to, participated

26

27   in, and financially supported the Asbestos Textile Institute and other industry organizations

28   which, for and on behalf of defendants, their "alternate entities," and each of them, actively

promoted the suppression of information of danger to users of the aforementioned products and materials, thereby misleading decedent by the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute was specifically enlisted to study the subject of dust control. Discussions in this committee were held many times regarding the dangers inherent in asbestos and the dangers which arise from the lack of control of dust, and such information was suppressed from public dissemination from 1946 to a date unknown to plaintiff at this time;

45.     Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina, defendants, their "alternate entities," and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis, which information was disseminated through the Asbestos Textile Institute and other industry organizations to all other defendants, their "alternate entities," and each of them, herein. Between 1942 and 1950, the defendants, their "alternate entities," and each of them, acquired medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the Asbestos Textile Institute and other industry organizations to defendant herein. Thereby, defendants, their "alternate entities," and each of them, suggested to the public as a fact that which is not true and disseminated other facts likely to mislead decedent. Such facts did mislead decedent and others by withholding the afore-described medical and scientific data and other knowledge and by not giving decedent the true facts concerning such knowledge of danger, which defendants, their "alternate entities," and each of them, were bound to disclose;

46.     Defendants, their "alternate entities," and each of them, failed to warn decedent and others of the nature of said materials which were dangerous when breathed and which could

cause pathological effects without noticeable trauma, despite the fact that defendants, their "alternate entities," and each of them, possessed knowledge and were under a duty to disclose that said materials were dangerous and a threat to the health of persons coming into contact therewith;

47.    Defendants, their "alternate entities," and each of them, failed to provide decedent with information concerning adequate protective masks and other equipment devised to be used when applying and installing the products of the defendants, and each of them, despite knowing that such protective measures were necessary, and that they were under a duty to disclose that such materials were dangerous and would result in injury and death to the decedent and others applying and installing such material;

48.    Defendants, their "alternate entities," and each of them, when under a duty to so disclose, concealed from decedent the true nature of the industrial exposure of decedent and knew that decedent and anyone similarly situated, upon inhalation of asbestos would, in time, develop irreversible conditions of pneumoconiosis, asbestosis and/or cancer. Defendants, their "alternate entities," and each of them, also concealed from decedent and others that harmful materials to which they were exposed would cause pathological effects without noticeable trauma;

49.    Defendants, their "alternate entities," and each of them, failed to provide information of the true nature of the hazards of asbestos materials and that exposure to these materials would cause pathological effects without noticeable trauma to the public, including buyers, users, and physicians employed by decedent and decedent's employers so that said physicians could examine, diagnose and treat decedent and others who were exposed to asbestos, despite the fact that defendants, their "alternate entities," and each of them, were under a duty to so inform and said failure was misleading; and

50.     Defendants, their "alternate entities," and each of them, failed to provide adequate information to physicians and surgeons retained by decedent's employers and their predecessor companies, for purposes of making physical examinations of decedent and other employees as to the true nature of the risk of such materials and exposure thereto when they in fact possessed such information and had a duty to disclose it.

51.     Defendants, their "alternate entities," and each of them, willfully failed and omitted to complete and file First Report of Occupational Injury of Illness regarding decedent's injuries, as required by law, and did willfully fail and omit to file report of injury and occupational disease with the State of California. Decedent was in the class of persons with respect to whom a duty was owed to file such reports and who would have been protected thereby if the fact of danger from products complained of had become known.

52.     Defendants, their "alternate entities," and each of them, having such aforementioned knowledge, and the duty to inform decedent about the true facts, and knowing the decedent did not possess such knowledge and would breathe such material innocently, acted falsely and fraudulently and with full intent to cause decedent to remain unaware of the true facts and to induce decedent to work in a dangerous environment, all in violation of Sections 1708, 1709, and 1710 of the Civil Code of the State of California.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

## FIFTH CAUSE OF ACTION
### [Negligence - Wrongful Death]

AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR WRONGFUL DEATH, PLAINTIFFS CAROL S. DUDASH and MELITA RENE PHILLIPS, AS LEGAL HEIRS OF JIMMIE J. DUDASH, DECEASED, COMPLAIN OF DEFENDANTS ON EXHIBIT "B", DOES 1-300, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM AND ALLEGE:

53.     Plaintiffs incorporate by reference, as though fully set forth herein, Paragraphs 6-17 of the First Cause of Action.

54.    Plaintiffs bring this action as specified in Section 377.60 of the Code of Civil Procedure.

55.    The heirs-at-law of the decedent and their relationship to the decedent are: CAROL S. DUDASH is the surviving spouse of the Decedent; MELITA RENE PHILLIPS is the adult child of the Decedent.

56.    At all times prior to his death, decedent was a faithful and dutiful spouse and parent.

57.    The individuals set forth as heirs constitute all of the surviving heirs of decedent pursuant to California Code of Civil Procedure Section 377.60.

58.    Defendants DOES 801-820 may be heirs of Plaintiff' decedent entitled to recover damages under California Code of Civil Procedure Section 377.60.  Plaintiff had not at this time ascertained the true names of said defendants and, therefore, names them as nominal defendants pursuant to California Code of Civil Procedure Section 382.

59.    As a direct and proximate result of the conduct of the defendants, their "alternate entities," and each of them, as aforesaid, the exposure to asbestos and asbestos-containing products caused decedent to develop diseases from which decedent died.  Plaintiff was unaware that death was caused by asbestos-related disease until within one year of filing complaint.

60.    As a direct and proximate result of the conduct of defendants, and each of them, and the death of decedent, decedent's heirs have sustained pecuniary loss resulting from the loss of care, society, comfort, attention, services, and support of decedent, all to their damage as herein alleged.

61.    As a further direct and proximate result of the conduct of defendants, and each of them, and the death of decedent, decedent's heirs have incurred funeral expenses in an amount currently not ascertained.

WHEREFORE, Plaintiffs pray judgment against defendant, and each of them, as is hereinafter set forth.

## SIXTH CAUSE OF ACTION
### [Strict Liability - Wrongful Death]

**AS AND FOR A SIXTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR WRONGFUL DEATH, PLAINTIFFS CAROL S. DUDASH and MELITA RENE PHILLIPS, AS LEGAL HEIRS OF, JIMMIE J. DUDASH, DECEASED, COMPLAIN OF DEFENDANTS ON EXHIBIT "B", DOES 1-300, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM, AND ALLEGE:**

62.     Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation contained in Paragraphs 6 and 10-16 of the First Cause of Action, Paragraphs 21-31 of the Second Cause of Action, and Paragraphs 54-61 of the Fifth Cause of Action herein.

63.     As a direct and proximate result of the conduct of defendants, and each of them, decedent's heirs have sustained the injuries and damages previously alleged.

WHEREFORE, Plaintiffs pray judgment against defendant, and each of them, as is hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### [False Representation Under Restatement of Torts Section 402-B – Wrongful Death]

**AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B, PLAINTIFFS CAROL S. DUDASH and MELITA RENE PHILLIPS, AS LEGAL HEIRS OF, JIMMIE J. DUDASH, DECEASED, COMPLAIN OF DEFENDANTS ON EXHIBIT "B", DOES 1-300, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM AND ALLEGE:**

64.     Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation contained in Paragraphs 6-15 of the First Cause of Action, 21-31 of the Second Cause of Action, Paragraphs 54-61 of the Fifth Cause of Action.

65.     As a direct and proximate result of the conduct of defendants, and each of them, decedent's heirs have sustained the injuries and damages previously alleged.

WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as is hereinafter set forth.

## EIGHTH CAUSE OF ACTION
### [Intentional Tort - Wrongful Death]

**AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR INTENTIONAL TORT, PLAINTIFFS CAROL S. DUDASH AND MELITA RENE PHILLIPS, AS LEGAL HEIRS OF, JIMMIE J. DUDASH, DECEASED, COMPLAIN OF DEFENDANTS ON EXHIBIT "B", DOES 1-300, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM, AND ALLEGE:**

66.     Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation contained in Paragraphs 6-15 of the First Cause of Action, Paragraphs 21-30 of the Second Cause of Action, 33-36 of the Third Cause of Action, and Paragraphs 54-61 of the Fifth Cause of Action.

67.     As a direct and proximate result of the conduct of defendants, and each of them, decedent's heirs have sustained the injuries and damages previously alleged.

WHEREFORE, Plaintiffs pray judgment against defendant, and each of them, as is hereinafter set forth.

## NINTH CAUSE OF ACTION
### (Premise Owner/Contractor Liability – Survival)

**AS AND FOR A FURTHER AND NINTH, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFF CAROL S. DUDASH, AS SUCCESSOR-IN-INTEREST TO JIMMIE J. DUDASH, DECEASED ("DECEDENT"), COMPLAINS OF DEFENDANTS ON EXHIBIT "C", DOES 301-500, THEIR "ALTERNATE ENTITIES" (HEREINAFTER "PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS"), AND EACH OF THEM, AND ALLEGES AS FOLLOWS:**

68.     Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in paragraphs 6 and 12-16 of the First Cause of Action.

69.     At all times herein mentioned, each of the Premises Owner/Contractor Liability Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos- and silica-containing insulation, other building materials,

products and toxic substances to be constructed, installed, maintained, used, replaced, repaired, disturbed and/or removed on the respective premises owned, leased, maintained, managed and/or controlled by them. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein-named defendants is liable for the tortious conduct of each successor, successor-in-business, assign, predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, that caused the presence as aforesaid of said asbestos- and silica-containing insulation and other toxic substances. The following defendants, and each of them, are liable for the acts of each and every "alternate entity," and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such alternate entity; defendants, and each of them, have acquired the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have caused the destruction of plaintiff's remedy against each such alternate entity; each such defendant has the ability to assume the risk-spreading role of each such alternate entity, and that each such defendant enjoys the goodwill originally attached to each such alternate entity.

70.    At all times mentioned herein, the Premises Owner/Contractor Liability Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or controlled the premises listed on Exhibit "A" where decedent was present. The information provided on Exhibit "A" is preliminary, based on recall over events covering many years and further investigation and discovery may produce more reliable information. Additionally, decedent might have been present at these or other Premises Owner/Contractor Liability Defendants' premises at other locations and on other occasions.

71.    Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, supplied, replaced, repaired, disturbed and/or removed on each of the

aforesaid respective premises, by their own workers and/or by various contractors and/or subcontractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to decedent and other persons exposed to said asbestos fibers and toxic substances while present at said premises.

72.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition and unreasonable risk of harm and personal injury to decedent and other workers or persons so exposed present on each of the aforesaid respective premises.

73.     At all times relevant herein, decedent entered said premises and used or occupied each of said respective premises as intended and for each of the respective Premises Owner/Contractor Liability Defendants' benefit and advantage and at each of the respective Premises Owner/Contractor Liability Defendants' request and invitation. In so doing, decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor Liability Defendants, and each of them.

74.     Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

75.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, remained in control of the premises where decedent was performing his work.

76.     At all times mentioned herein, the Premises Owner/Contractor Liability Defendants owed to decedent s and others similarly situated a duty to exercise ordinary care in the management of such premises in order to avoid exposing workers such as decedent to an unreasonable risk of harm and to avoid causing injury to said person.

77.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises.

78.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn decedent of, the existence of the aforesaid dangerous conditions and hazards on said premises.

79.     Prior to and at the times and places aforesaid, said Premises Owner/Contractor Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured and was a cause of death of decedent.

80.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm Decedent and others unless special precautions were taken.

81.   In part, decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

82.   The work of contractors on premises controlled by the Premises Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances including but not limited to asbestos.

83.   The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Premises Owner/Contractor Defendants. Said negligent conduct includes but is not limited to:

   (a)   Failure to warn of asbestos and other toxic dusts;

   (b)   Failure to suppress the asbestos-containing or toxic dusts;

   (c)   Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

   (d)   Failure to provide adequate breathing protection, i.e., approved respirators or masks;

   (e)   Failure to inspect and/or test the air;

   (f)   Failure to provide medical monitoring.

84.   The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code §1714, and Labor Code §6400, et seq., or Health and Safety Code §40.200, et seq., and regulations promulgated thereunder. Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

85.   Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but

not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code §6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code §40.200, et seq., which empowers the South Coast Air Quality Management District to promulgate regulations including but not limited to Regulation XIV, Rules 1403 and 1414, Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required said Premises Owner/Contractor Liability Defendants to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions, or contractors employed by the Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions. Defendants' violations of said codes include but are not limited to:

(a)     Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

(b)     Failing to segregate work involving the release of asbestos or other toxic dusts;

(c)     Failing to suppress dust using prescribed ventilation techniques;

(d)     Failing to suppress dust using prescribed "wet down" techniques;

(e)     Failing to warn or educate decedent or others regarding asbestos or other toxic substances on the premises;

(f)     Failing to provide approved respiratory protection devices;

(g)     Failing to ensure "approved" respiratory protection devices were used properly;

(h)     Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

(i)     Failing to provide adequate housekeeping and clean-up of the work place;

(j)     Failing to properly warn of the hazards associated with asbestos as required by these statutes;

(k)     Failing to properly report renovation and disturbance of asbestos-containing materials, including but not limited to SCQAMD Rule 1403 D(1);

(l)     Failing to have an asbestos removal supervisor as required by regulation;

(m)     Failing to get approval for renovation as required by statutes; and

(n)     Failing to maintain records as required by statute.

86.     Premises Owner/Contractor Liability Defendants, and each of them, were the "statutory employer" of decedent as defined by the California Labor Code and California case law.

87.     Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by defendants' violation of said regulations, ordinances or statutes.

88.     At all times mentioned herein, decedent was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

89.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises, and that such persons were unaware of the aforesaid violations of codes, regulations and statutes.

90.     As a legal consequence of the foregoing, decedent developed an asbestos-related illness, which caused great injury, disability and death as previously set forth, and plaintiff has thereby suffered damages as herein alleged.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

## TENTH CAUSE OF ACTION
### [Premise Owner/Contractor Liability – Wrongful Death]

**AS AND FOR A FURTHER AND TENTH, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFFS CAROL S. DUDASH and MELITA RENE, AS LEGAL HEIRS OF, JIMMIE J. DUDASH, DECEASED, COMPLAIN OF DEFENDANTS ON EXHIBIT "C", DOES 301-500, THEIR "ALTERNATE ENTITIES" (HEREINAFTER "PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS"), AND EACH OF THEM, AND ALLEGE AS FOLLOWS:**

91.     Plaintiffs, by this reference, incorporate the allegations, as though fully set forth herein, contained in Paragraphs 54-61 of the Fifth Cause of Action and Paragraphs 69-90 of the Ninth Cause of Action.

92.     As a direct and proximate result of the conduct of defendants, and each of them, decedent's heirs have sustained the injuries and damages previously alleged.

WHEREFORE, Plaintiffs pray judgment against defendant, and each of them, as is hereinafter set forth.

///

///

///

///

///

///

///

### ELEVENTH CAUSE OF ACTION
#### [(Fraud and Deceit/Concealment (Survival & Wrongful Death)]

AS AND FOR A FURTHER, ELEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/CONCEALMENT, PLAINTIFFS COMPLAIN OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, RAYMARK INDUSTRIES, INC. (formerly known as RAYBESTOS-MANHATTAN), UNITED STATES GYPSUM COMPANY, PNEUMO ABEX CORPORATION (formerly known as ABEX CORPORATION and successor-in-interest to AMERICAN BRAKEBLOK CORPORATION), and T&N PLC (formerly known as TURNER AND NEWALL and alter-ego to KEASBY-MATTISON COMPANY), DOES 651-675, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

93.     Plaintiffs, by this reference, incorporate and makes a part hereof as though fully set forth herein at length, each and every allegation of the First through Fourth Causes of Action and Paragraphs 54-61 of the Fifth Cause of Action.

94.     The term "conspirators" as used herein includes but is not limited to: METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville, Raybestos-Manhattan (now RAYMARK INDUSTRIES, INC. [RAYMARK]), UNITED STATES GYPSUM COMPANY [USG]), American Brakeblok Corporation (now PNEUMO ABEX CORPORATION [PNEUMO ABEX]), Keasbey-Mattison Company (now T&N PLC [T&N]), all members of the Asbestos Textile Institute [ATI], and the other entities and individuals identified in this Eleventh Cause of Action.

95.     Plaintiffs are informed and believes, and thereon allege, that at all times herein mentioned, the conspirator defendants were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of Los Angeles, State of California.

96.     Decedent was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the conspirators

named below. The exposure to the asbestos or asbestos-related products supplied by the

conspirator(s) caused decedent's asbestos-related disease, injuries and death.

97.     The conspirators, individually and as agents of one another and as co-

conspirators, agreed and conspired among themselves, with other asbestos manufacturers and

distributors, and with certain individuals including but not limited to Anthony Lanza, M.D.

(Lanza), and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE) to

injure the decedent in the following fashion (the following is not an exclusive list of the

wrongful acts of the conspirators but a representative list):

a)     Beginning in 1929, MET LIFE entered agreements with Manville and

others to fund studies of the affects of asbestos exposure on Canadian asbestos miners. When

the data from these studies proved that Canadian asbestos miners were developing asbestosis,

MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony Lama,

M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian study

for many years thereafter to meetings of health care professionals seeking information regarding

asbestos exposure.

b)     In approximately 1934, conspirators Manville and MET LIFE, through

their agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan

(Raybestos), through its agents, Sumner Simpson and J. Rohrbach, suggested to Lanza,

Associate Director, MET LIFE (insurers of Manville and Raybestos), that Lanza publish a study

on asbestosis in which Lanza would affirmatively misrepresent a material facts and conclusions

about asbestos exposure; including but not limited to descriptions of the seriousness of the

disease process, asbestosis. The misrepresentation was accomplished through intentional

deletion of Lanza's description of asbestosis as "fatal" and through other selective editing that

affirmatively misrepresented asbestosis as a disease process less serious than it was known to be

by the conspirators. As a result, Lanza's study was published in the medical literature containing

said misleading statements in 1935. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Manville, Raybestos, and MET LIFE, as insurer, and to promote the use of their asbestos products.

c)      The above-described conspiracy continued in 1936, when additional co-conspirators American Brakeblok Corporation (defendant PNEUMO ABEX), Asbestos Manufacturing Company, Gatke Corporation, Manville, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall, defendant T&N), Raybestos-Manhattan (defendant RAYMARK), Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and USG, entered into an agreement with a leading medical research facility named Saranac Laboratories. Under the agreement, the conspirators acquired the power to decide what information Saranac Laboratories could publish regarding asbestos disease and could also control in what form such publications were to occur. Their agreement provided these conspirators the power and ability to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact regarding the health affects of asbestos exposure being made at scientific meetings.

d)      The conspiracy was furthered when on November 11, 1948, when representatives of the following conspirators met at Manville headquarters: Manville, American Brakeblok Division of American Brake and Shoe Foundry (defendant PNEUMO ABEX), Gatke Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall (defendant T&N)), Raybestos (now defendant RAYMARK), Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber

Company, defendant United States Gypsum Company and MET LIFE. Defendant U.S. Gypsum did not send a company employee to the meeting, but instead authorized Vandiver Brown of Manville to represent its interest at the meeting and to take action on its behalf.

e)      At the November 11, 1948 meeting, these conspirators, and their representatives, decided to exert their influence to materially alter and misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards for asbestos dust exposure.

f)      At this meeting, these conspirators intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on humans and the critique of the dust standards. The conspirators then published these deceptive and fraudulent statements in the medical literature as edited by Dr. Vorwald. These conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including the decedent.

g)      As a direct result of influence exerted by the conspirators, a Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Garner's work that the conspirators wished stressed, but which omitted reference to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald publication to university libraries, government officials, agencies and others.

h)      Such actions constitute a material affirmative misrepresentation of the total context of material facts involved in Dr. Garner's work and resulted in creating an

appearance that inhalation of asbestos was less of health problem than Dr. Garner's unedited work indicated.

i)      When Dr. Vorwald subsequently tried to publish more complete information regarding Dr. Gardner's animal studies and the conspirators required his discharge from the Saranac Laboratories, denied him permission to publish or complete Gardner's work, and actively discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

j)      The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National Gypsum Company, and Turner & Newall (defendant T&N), individually and successor to Bell Asbestos. These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A's involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/38, 10/15/48, 3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

k)      As a furtherance of the conspiracy commenced in 1929, conspirators who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos

with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l)      This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study, terminated the study, and prevented any public discussion of dissemination of the results.

m)      As a result of the termination of Q.A.M.A./Saranac study, the conspirators fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators and conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Lanza, Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to *inter alia*, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, medical organizations, health professionals, and the general public, including decedent.

n)      Subsequently, the Q.A.M.A. conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

o)      The Q.A.M.A. conspirators as a furtherance of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of Braun/Truan study

1  contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung

2  cancer, a conclusion known by the conspirators to be false.

3            p)      By falsifying and causing publication of studies concluding that asbestos

4  exposure did not cause lung cancer and simultaneously omitting documented findings that

5  asbestosis did increase the risk of lung cancer, the conspirators affirmatively misrepresented to

6  the public and concealed from the public the extent of risks associated with inhalation of

7  asbestos fibers.

8

9            q)      In furtherance of the ongoing 1929 conspiracy, in approximately 1958,

10 these Q.A.M.A. conspirators publicized the fraudulently edited works of Drs. Braun and Truan

11 at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to

12 asbestos that the inhalation of asbestos dust would not cause cancer.

13            r)      The fraudulent misrepresentations beginning in 1929 as elaborated above

14 and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

15 for asbestos exposure. The developers of such standards failed to lower the maximum exposure

16 limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

17

18            s)      In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. conspirators

19 decided, at their trade association meeting, that they would intentionally mislead consumers

20 about the extent of risks involved in inhalation of asbestos products.

21            t)      In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding

22 the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators

23 were in attendance: MET LIFE, Lanza, Manville, Turner & Newall (defendant T&N),

24 Raybestos (defendant RAYMARK), and Q.A.M.A. members by way of their agents, Cartier,

25 Sabourin and LaChance.

26

27            u)      At the 1952 Saranac meeting, the occurrence of lung cancer and

28 asbestosis in product users was discussed and the carcinogenic properties of all fiber types of

asbestos were also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the pubic, these conspirators conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Vorwald not to announce the results of his and Garner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

v)    The following co-conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (defendant RAYMARK), Manville, H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall (defendant T&N) and National Gypsum, Uniroyal, Inc., individually and through its alter-egos, CDU Holding Company, Uniroyal Holding Company and Uniroyal Goodrich Tire Company.

w)    In furtherance of the forgoing conspiracy, in 1947, these conspirators, members of the ATI, received a report from industrial hygienist W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-existing maximum exposure limits for asbestos exposure. These conspirators caused the Hemeon report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then existing maximum exposure limit for asbestos was acceptable. Thereafter, these conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of their Threshold Limit Values for asbestos exposure.

x)    In furtherance of the forgoing conspiracy, in 1953, co-conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a

proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators and thereby misrepresented the risks associated with asbestos exposure.

y)     In furtherance of the forgoing conspiracy, in 1955, conspirator Manville, through its agent Dr. Kenneth Smith, caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

z)     In furtherance of the forgoing conspiracy, in 1955, the National Cancer Institute held a meeting at which conspirator Manville, individually and as an agent for other co-conspirators and A. Vorwald, as agent of co-conspirators, affirmatively misrepresented that there was no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several suppressed studies which demonstrated that positive evidence did exist.

aa)     In furtherance of the forgoing conspiracy, in 1957, these conspirators and members of the ATI, jointly rejected a propose research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

bb)     In furtherance of the forgoing conspiracy, in 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of Mount Sirani

Research Center. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

cc)    The conspirators, the Mellon Institute and the Industrial Hygiene Foundation (IHF) were a research institute those functions included involvement in research regarding the health effects of inhaling asbestos dust.

dd)    Beginning in the early 1940's, the IHF was involved in a study by Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This study was done in connection with members of the Asbestos Textile Institute (ATI). This study found that workers exposed to less than the recommended maximum exposure level for asbestos were nonetheless developing disease. As a part of the conspiracy, the IHF never published this study.

ee)    Beginning in the mid 1950's, the IHF and the Mellon Institute were involved in the publication of works by Braun and Truan entitled An Epidemiological Study of Lung Cancer in Asbestos Miners. In its original, unedited form in September, 1957, this study had concluded that workers with asbestosis have an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis. The final, published version of this study in June, 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting asbestosis cases. The IHF and the Mellon Institute conspired with the members of the Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other conspirators to delete the above-describe information regarding asbestos and cancer.

ff)    The above-described actions of the IHF and the Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of the hazards connected with breathing asbestos dust.

gg)    The above-described conspiratorial and fraudulent actions of the IHF and the Mellon Institute substantially contributed to retarding the development of knowledge about the hazards of asbestos and thereby substantially contributed to injuries suffered by the decedent.

hh)    All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Manville, Raybestos (now defendant RAYMARK), Lanza, and MET LIFE, and all the alleged co-conspirators during the date and circumstances set forth above, acted as agents and co-conspirators for the other conspirators.

ii)    As evidence of defendant RAYMARK's fraud, concealment, suppression, and conspiratorial misconduct and of the referenced conspirators, and each of them, as herein set forth, RAYMARK's President and/or other senior executives corresponded with other senior executives of RAYMARK's co-conspirators, which series of correspondence and related documents and papers are commonly referenced as "The Sumner Simpson Papers."

jj)    Further as evidence of the fraud, concealment, suppression, and conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions, resolutions, and related actions, recorded in "The ATI Minutes." MET LIFE was an active participant in the foregoing conspiracy and benefited thereby. MET LIFE's involvement but benefited from their involvement because of the following non-exclusive lists:

1.    by providing workers' compensation insurance to co-conspirators;
2.    by providing life insurance for employees of the co-conspirators;
3.    by providing health insurance or health care for the employees of the co-conspirators;
4.    by providing health information and resources; and
5.    by purchasing substantial stock in asbestos-related companies including stock of co-conspirators.
6.    by developing information by which asbestos-related claims for compensation could be defeated.

98.     The acts of the conspirators as described above, constitute fraudulent concealment, which caused injury to the decedent, in the following manner (the list is not exclusive):

(a)     The material published or caused to be published by the conspirators was false and incomplete in that the conspirators knowingly and deliberately deleted, concealed, and otherwise suppressed references to    and material facts regarding the known health hazards of asbestos and asbestos-related products.

(b)     The conspirators, with intent to defraud, individually, as members of a conspiracy, and as agents of other conspirators, intended that the publication of false and misleading reports to the general public and individuals therein, and/or the intentional suppression and nondisclosure of documented reports of health hazards of asbestos:

1.     maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;
2.     assist in the continued pecuniary gain of conspirators through the sale of their products;
3.     influence in the conspirator's favor proposed legislation to regulate asbestos exposure and;
4.     provide a defense in law suits brought for injury resulting from asbestos disease.

(c)     The conspirators individually, as members of a conspiracy, and as agents of other conspirators, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control.  The conspirators knowingly and intentionally breached this duty through their fraudulent concealment as described herein.

(d)     Decedent and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products and in the absence of published medical and scientific reports of the hazards of asbestos and continued exposure to asbestos.  Decedent believed asbestos to be safe and was unaware of the hazards due to conspiratorial and fraudulent conduct. Decedent was not

1  warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and

2  fraudulent concealment. If decedent had known of the health hazards of asbestos, of which

3  decedent was unaware as a direct result of the conspirators' fraudulent concealment, decedent

4  would have acted differently regarding decedent's exposure to asbestos and asbestos-related

5  products.

6

7         (e)     Conspirators, individually, as members of a conspiracy, and as agents of

8  other conspirators intended that decedent relied on the deceptive and fraudulent reports that the

9  conspiracy caused to be published throughout the United States regarding the safety of asbestos

10  and asbestos-related products and to rely on the absence of published medical and scientific data

11  (because of the conspiracy's concealment) regarding the hazards of asbestos and asbestos-related

12  products and thereby caused decedent and others to continue their exposure to asbestos

13  products.

14         (f)     Conspirators individually, as members of a conspiracy, and as agents of

15  other co-conspirators were and are in a position of superior knowledge regarding the health

16  hazards of asbestos and therefore the decedent reasonably relied (both directly and indirectly) on

17  the published reports commissioned by the conspirators regarding the health hazards of asbestos

18  and the absence of published information (because of the suppression by the conspiracy)

19  regarding the hazards of asbestos and asbestos-related products.

20         (g)     As a direct result of the continuing and on-going conduct of the

21  conspirators as alleged herein, decedent contracted asbestos-related disease and suffered

22  injuries, died and he and his family incurred damages which are described in greater detail in the

23  forgoing paragraphs.

24       99.    MET LIFE acted in concert with the foregoing described parties (the

25  conspirators) and pursuant to a common design, as previously described, to cause injury to

26  decedent.

100.    MET LIFE knew that the conduct of Manville, Raybestos (defendant RAYMARK), USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-Mattison Company (now defendant T&N), and the other conspirators was coercive, fraudulent, and deceitful towards others (including decedent and Plaintiffs) and that conspirators' conduct was a breach of dut(y)(ies) owed Plaintiffs and decedent; and MET LIFE gave substantial assistance and encouragement to Manville and the other conspirators in breaching their duties to decedent, plaintiff and others.

101.    MET LIFE provided substantial assistance to the foregoing conspirators in accomplishing their tortuous result and their breach of duties to decedent.

102.    Decedent was insured, directly or indirectly, by MET LIFE and as such was owed a fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy, which thereby caused decedent's asbestos-related injuries and death.

103.    The conspirators made representations to decedent and others concerning asbestos-containing products including but not limited to:

(a)    the statements set forth and summarized in the foregoing paragraphs

(b)    that asbestos in commercially used insulation products was not hazardous (this statement was known to be false by the conspirators)

(c)    the amount of asbestos in the air necessary to cause disease was five million particles per cubic foot (this statement was known to be false by the conspirators)

(d)    that asbestos does not cause cancer (this statement was known to be false by the conspirators);

(e)    in addition, the conspirators actively and fraudulently concealed facts from the decedent and others including, but not limited to:

1.    that asbestos-related disease can be a fatal disease
2.    that asbestos causes various forms of lung cancer

3.      that individuals should protect themselves from breathing asbestos dust
4.      the extent of asbestos disease in exposed populations
5.      information regarding the levels of airborne asbestos which can cause disease
6.      their experience with workers' compensation claims related to asbestos exposure
7.      the statements set forth in foregoing paragraphs.

104.    Further, the conspirators knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the conspirators made the false statements and concealed the information with the intent to deceive; decedent and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

105.    The asbestos-containing products that conspirators manufactured, marketed, distributed, sold and otherwise supplied were defective; decedent was exposed to asbestos from the conspirators' products which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

106.    Additionally and alternatively, as a direct result of MET LIFE's actions and omissions, decedent was caused to remain ignorant of all the dangers of asbestos resulting in decedent, his agents, employers and the general public to be aware of the true and full dangers of asbestos, deprive decedent of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied decedent the opportunity to take precautions against the dangers of asbestos and caused plaintiffs' damages herein.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

/ / /

## TWELFTH CAUSE OF ACTION
### [Fraud and Deceit/Negligent Misrepresentation (Survival & Wrongful Death)]

AS AND FOR A FURTHER, TWELFTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/NEGLIGENT MISREPRESENTATION, PLAINTIFFS COMPLAIN OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, RAYMARK INDUSTRIES, INC., (formerly known as RAYBESTOS-MANHATTAN), UNITED STATES GYPSUM COMPANY, PNEUMO ABEX CORPORATION (formerly known as ABEX CORPORATION and successor-in-interest to AMERICAN BRAKEBLOCK CORPORATION), and T&N PLC (formerly known as TURNER AND NEWALL and alter-ego to KEASBY-MATTISON COMPANY), DOES 651-675, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

107.    Plaintiffs, by this reference, incorporate and makes a part hereof as though fully set forth herein at length each and every allegation of the First through Tenth Causes of Action.

108.    The acts of the conspirators, as incorporated herein and described above, constitute fraudulent negligent misrepresentation, which caused injury and death to the Decedent, in the following manner:

(a)    The material published or caused to be published by the conspirators was false, untrue, and incomplete in that the conspirators knowingly, deliberately, and with intent to deceive made representations, product sales and assertions regarding the safety of asbestos and asbestos-related products.

(b)    The conspirators made these false, untrue and incomplete representations without any reasonable grounds for believing and/or relying on their truth and with the intent to induce the general consuming public and individuals therein, including decedent, and others' direct and indirect reliance on these false, untrue, and incomplete representations.

(c)    Decedent and others reasonably, justifiably, and without knowledge of the falsity of the conspirators' misrepresentations, relied, both directly and indirectly, upon published data documenting the purported safety of asbestos and asbestos-related products and in the absence of published information of the hazards of asbestos and cautionary warning

language on or with said conspirators' product, all resulting in continued injurious exposure to

asbestos. Decedent was unaware of the hazards due to the conspirators' conduct.

### THIRTEENTH CAUSE OF ACTION
**(Negligence – Clutch & Brake Components [Survival and Wrongful Death])**

**AS AND FOR A FURTHER AND THIRTEENTH AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (NEGLIGENCE) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS COMPLAIN OF DOES 250-275, AND ALLEGE AS FOLLOWS:**

109.    Plaintiffs, by this reference, incorporate the allegations contained in the First and

Fifth Causes of Action, as though fully set forth herein.

110.    DOES 250-275, manufactured or supplied defective clutch components and brake

assemblies or mechanisms which were incorporated into various makes and models of

automobiles, trucks and vehicles manufactured, sold or supplied by said defendants. Said clutch

components and brake assemblies or mechanisms were negligently manufactured sold or

supplied in that:

a)    The design of said clutch components and brake assemblies or

mechanisms incorporated the use of asbestos-containing clutch facings/plates and brake

linings;

b)    Asbestos clutch components brake linings wear and/or deteriorate during

regular and ordinary use thus creating friable asbestos dust, which accumulates in the

clutch brake assemblies and/or mechanisms;

c)    The design of said clutch components brake assemblies require as a part

of their normal operation, use and maintenance that the asbestos clutch components and

brake linings be removed and replaced;

d)    Said defendants required the use of asbestos-containing clutch

components and brake linings throughout the time period 1940-1985;

e)     During the removal and replacement of asbestos-containing clutch components and brake linings, asbestos-containing dust was inherently generated because of the design of the clutch components and brake assemblies and/or mechanisms;

f)     Defendants knew or should have known that the asbestos-containing dust would be generated during the regular use and maintenance of the clutch components and brake assemblies, mechanisms and linings, and that such dust created an increased risk of asbestos disease for all users, consumers, or others who breathed said asbestos-containing dust;

g)     The defendants, and each of them, failed to warn and/or properly instruct users, consumers, or others of the asbestos-containing dust hazard which existed at the time of regular maintenance or replacement of asbestos clutch components and brake linings.  Such failure includes, but is not limited to:

a.     Failure to place prominent and adequate warnings or instructions in and on the clutch components and brake pads and wheel drums;

b.     Failure to place adequate warnings or instructions in the owners' manuals accompanying said automobiles, trucks and vehicles;

c.     Failure to place adequate warnings or instructions on various repair manuals and instructions published by defendants; and

d.     Failure to provide adequate information regarding the asbestos hazards associated with the regular use and maintenance of the clutch components and brake mechanisms, assemblies and/or linings.

111.   The clutch components and brake assemblies, mechanisms and/or linings manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer would expect, even though they performed as designed.

112.     Defendants' use and design of asbestos-containing clutch components and brake linings, both as original equipment and as replacement parts, created unreasonable inherent risks which outweighed the benefits of said use and/or design.

113.     The dangers inherent in asbestos-containing clutch components and brake linings were unknown and unforeseeable to the decedent.

114.     Decedent's exposure to asbestos-containing dust, which caused his injury, was from his use and maintenance of defendants' clutch components and brake mechanisms, assemblies and/or linings.  Said work produced the release of asbestos dust, which decedent inhaled, thus increasing his risk for all asbestos-related disease.

115.     Defendants' negligence and defective products as described in this cause of action were a direct cause of decedent's injuries and subsequent death, and the injuries and damages thereby sustained by plaintiff.

116.     Nothing hereinabove claimed seeks to impose liability on the defendants named in this cause of action for the products or actions of any third party that may have supplied replacement brake linings used in the hereinabove described brake assemblies.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

## FOURTEENTH CAUSE OF ACTION
### (Strict Liability – Clutch & Brake Components [Survival and Wrongful Death])

**AS AND FOR A FURTHER AND FOURTEENTH SEPARATE AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (STRICT LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS COMPLAIN OF DOES 250-275, AND ALLEGE AS FOLLOWS:**

117.     Plaintiffs, by this reference, incorporate the allegations contained in the Second, Sixth and Thirteenth Causes of Action as though fully set forth herein, excepting therefrom allegations of negligence.

118.   Defendants' defective products as described in this cause of action did not perform as safely as an ordinary consumer would have expected at time of decedent's use.

119.   Defendants' defective products as described in this cause of action were used in a manner foreseeable by defendants.

120.   The gravity of the potential harm resulting from the use of defendants' defective products as described in this cause of action, and the likelihood such harm would occur, outweighed the cost of feasible alternative designs, including providing adequate warning of such potential harm, including asbestos-related disease.

121.   Defendants' conduct and defective products as described in this cause of action were a direct cause of decedent's injuries and subsequent death, and the injuries and damages thereby sustained by plaintiffs.

122.   Nothing hereinabove claimed seeks to impose liability on the defendants named in this cause of action for the products or actions of any third party that may have supplied replacement brake linings used in the hereinabove described brake assemblies.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

### FIFTEENTH CAUSE OF ACTION
#### (Loss of Consortium)

**AS AND FOR A FIFTEENTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF CAROL S. DUDASH COMPLAINS OF DEFENDANTS, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGES AS FOLLOWS:**

123.   Plaintiff incorporates by reference as though fully set forth herein, each and every paragraph of the First through Fourteenth Causes of Action.

124.   Plaintiff CAROL S. DUDASH and decedent were married on January 30, 1951, and at all times relevant to this action were husband and wife.

125.   Prior to decedent's injuries as alleged, plaintiff CAROL S. DUDASH'S spouse was able to and did perform the duties as a spouse. As a proximate result of decedent's injuries hereinabove complained of, subsequent to the injuries and until decedent's death, plaintiff CAROL S. DUDASH'S spouse was unable to perform the necessary duties as a spouse and the work and service usually performed in the care, maintenance and management of the family home. As a proximate result thereof, plaintiff CAROL S. DUDASH was permanently deprived of the consortium of her spouse, including the performance of duties, all to plaintiff's damages, in an amount presently unknown to plaintiff but which will be proved at time of trial.

126.   Plaintiff's discovery of the cause of his loss of consortium, as herein alleged, first occurred within one year of the date this complaint was filed.

127.   As a direct and proximate result of the acts of defendants, their "alternate entities," and each of them, and the severe injuries caused thereby to plaintiff CAROL S. DUDASH'S spouse as set forth in the complaint, plaintiff suffered loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

* * * * *

128.   Defendants BW/IP INTERNATIONAL, INC., Individually and Successor-In-Interest To BYRON JACKSON PUMP CO., BUFFALO PUMPS, INC., LESLIE CONTROLS, INC., GOULDS PUMPS (IPG), INC., INGERSOLL-RAND COMPANY, WARREN PUMPS, INC., VIAD CORP. fka and as successor-in-interest to DIAL CORPORATION and GRISCOM RUSSELL, VIKING PUMP, INC. individually and as successor-in-interest to VIKING PUMP COMPANY, HOUDAILLE INDUSTRIES, INC. and VIKING PUMP-HOUDAILLE, INC., CLAYTON INDUSTRIES, AURORA PUMP COMPANY, ATLAS VALVE COMPANY, INC., FMC CORPORATION, individually and as successor-in-interest to NORTHERN PUMP,

1  McNALLY INDUSTRIES LLC, individually and as successor-in-interest to NORTHERN

2  PUMPS, DOVER CORPORATION individually and as successor-in-interest to BLACKMER

3  PUMP COMPANY, CYCLOTHERM CORPORATION, KUNKLE INDUSTRIES, INC.,

4  individually and as successor-in-interest to and J.E. LONERGAN COMPANY, YARWAY

5  CORPORATION fka YARNALL-WARING COMPANY and YARNALL-WARING CO.,

6  VACCO INDUSTRIES, individually and as successor-in-interest to VACCO VALVE CO.,

7  CROSBY VALVE INC., FOSTER WHEELER USA CORPORATION, are only being sued for

8  their failure to warn of the hazards of asbestos exposure.  The Defendants' failure to warn

9

10  renders them liable in negligence and/or strict product liability as defined in *Anderson v. Owens-*

11  *Corning Fiberglas* (1991) 53 Cal.3d 987 and in the California Civil Jury Instructions.

12       129.    As to defendants BW/IP INTERNATIONAL, INC., Individually and Successor-

13  In-Interest To BYRON JACKSON PUMP CO., BUFFALO PUMPS, INC., LESLIE

14  CONTROLS, INC., GOULDS  PUMPS (IPG), INC., INGERSOLL-RAND COMPANY,

15  WARREN PUMPS, INC., VIAD CORP. fka and as successor-in-interest to DIAL

16  CORPORATION and GRISCOM RUSSELL, VIKING PUMP, INC. individually and as

17  successor-in-interest to VIKING PUMP COMPANY, HOUDAILLE INDUSTRIES, INC. and

18  VIKING PUMP-HOUDAILLE, INC., CLAYTON INDUSTRIES, AURORA PUMP

19  COMPANY, ATLAS VALVE COMPANY, INC., FMC CORPORATION, individually and as

20  successor-in-interest to NORTHERN PUMP, McNALLY INDUSTRIES LLC, individually and

21  as successor-in-interest to NORTHERN PUMPS, DOVER CORPORATION individually and as

22  successor-in-interest to BLACKMER PUMP COMPANY, CYCLOTHERM CORPORATION,

23  KUNKLE INDUSTRIES, INC., individually and as successor-in-interest to and J.E.

24  LONERGAN COMPANY, YARWAY CORPORATION fka YARNALL-WARING

25  COMPANY and YARNALL-WARING CO., VACCO INDUSTRIES, individually and as

26

27  successor-in-interest to VACCO VALVE CO., CROSBY VALVE INC., FOSTER WHEELER

28

USA CORPORATION, plaintiffs exclude claims arising from exposure to equipment supplied under contract to the United States government at military and/or other government jobsites except as to that equipment which defendants also marketed to private industry and sold on the commercial market.

WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities", and each of them in an amount to be proved at trial, as follows:

1.   For Plaintiffs' general damages according to proof;

2.   For medicals and related expenses according to proof;

3.   For loss of earnings according to proof;

4.   For funeral expenses according to proof;

5.   For loss of support according to proof;

6.   For loss of care, comfort and society;

7.   For exemplary or punitive damages according to proof;

8.   For Plaintiffs' cost of suit herein;

9.   For damages for fraud according to proof; and

10.   For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided in C.C.P. §998, C.C.P. §1032 and related provisions of law.

DATED:  October 3, 2008

PAUL & HANLEY LLP

By: _____ for

Carlos J.E. Guzman
Attorneys for Plaintiffs

## EXHIBIT "A"

Decedent Jimmie J. Dudash's exposure stemmed from occupational exposure to asbestos and asbestos-containing products while working as a laborer, boilertender, boilermaker and custodian. Decedent was exposed to asbestos and asbestos-containing thermal insulation materials while present at Decedent's jobsites, which include but are not limited to the sites listed below. Decedent Jimmie J. Dudash suffered and died from asbestos-related disease, including mesothelioma, on December 9, 2007.

| Jobsite/Defendant | Employer | BD | ED |
|---|---|---|---|
| UNKNOWN | Bill & Hubert Gwin Concrete Company | 1/1/1953 | 12/31/1955 |
| UNKNOWN | Bill & Hubert Gwin Concrete Company | 1/1/1953 | 12/31/1955 |
| Odom Tract Homes, Oklahoma City, OK | Bill & Hubert Gwin Concrete Company | 6/1/1955 | 9/30/1955 |
| Naval Training Center, San Diego, CA | U.S. Navy | 9/27/1955 | 1/5/1956 |
| UNKNOWN | U.S. Navy | 1/1/1956 | 12/31/1968 |
| USS ORISKANY (CVA-34) | U.S. Navy | 1/19/1956 | 2/5/1957 |
| USS TAWASA (STF-92) | U.S. Navy | 2/25/1957 | 3/30/1958 |
| USS MISPILLION - A0105 | U.S. Navy | 4/30/1958 | 4/30/1959 |
| USS MOUNT BAKER | U.S. Navy | 5/15/1959 | 10/10/1959 |
| YARD TUG B-NO (YTB-NO) | U.S. Navy | 6/9/1960 | 2/10/1961 |
| USS INFLICT | U.S. Navy | 3/4/1961 | 10/26/1963 |
| USS DASH (MSO-458) | U.S. Navy | 4/10/1964 | 11/23/1964 |
| USS LAKE CHAMPLAIN | U.S. Navy | 12/5/1964 | 5/3/1966 |
| USS TILLS (DE-748) | U.S. Navy | 6/23/1966 | 10/2/1967 |
| USS ARLINGTON (AGMR-2, fka USS SAIPAN CVL-48) | U.S. Navy | 1/18/1968 | 12/2/1968 |
| Jobsite/Defendant | Employer | BD | ED |

| | | | |
|---|---|---|---|
| Development & Training Center, Naval Station, San Diego, CA | U.S. Navy | 1/3/1969 | 1/5/1971 |
| USS SOUTHERLAND | U.S. Navy | 4/3/1971 | 5/1/1972 |
| USS OGDEN | U.S. Navy | 7/10/1972 | 9/18/1973 |
| Naval Station San Diego, CA (AKA "32ND ST. NAVAL STATION") | U.S. Navy | 3/7/1974 | 7/5/1976 |
| Naval Station San Diego, CA (AKA "32ND ST. NAVAL STATION") | Naval Station San Diego Police Department | 1/1/1976 | 12/31/1978 |
| Pine Top Lakeside Summer Homes, Pine Top, CA | Pine Top Lakeside Summer Homes | 1/1/1978 | 12/31/1981 |
| Pine Top Lakeside School District, Pine Top, CA | Pine Top Lakeside School District | 1/1/1981 | 12/31/1994 |
| Central United Methodist Church, Webb City, MO | Central United Methodist Church | 1/1/1994 | |

1

## EXHIBIT "B"

2 ALSTOM POWER, INC. individually and as successor-in-interest to GRISCOM-RUSSELL-
SCHACK COMPANY, INC.,

3 ATLAS VALVE COMPANY, INC.,
AURORA PUMP COMPANY,

4 BW/IP INTERNATIONAL, INC., Individually and Successor-In-Interest to BYRON
JACKSON PUMP CO.,

5 ASBESTOS CORPORATION, LTD.,

6 BUFFALO PUMPS, INC.,
CLAYTON INDUSTRIES,

7 CROSBY VALVE INC.,
CROWN CORK & SEAL COMPANY, INC, Individually and as Successor–In-Interest to
MUNDET CORK COMPANY,

8 CYCLOTHERM CORPORATION,

9 DOVER CORPORATION individually and as successor-in-interest to BLACKMER PUMP
COMPANY,

10 FMC CORPORATION, individually and as successor-in-interest to NORTHERN PUMP,
FOSTER WHEELER USA CORPORATION,

11 GARLOCK SEALING TECHNOLOGIES, LLC, fka GARLOCK, INC.,
GOULDS  PUMPS (IPG), INC.,

12 GREENE, TWEED & CO. I, L.P.,
INGERSOLL-RAND COMPANY,

13 KUNKLE INDUSTRIES, INC., individually and as successor-in-interest to and J.E.
LONERGAN COMPANY,

14 LESLIE CONTROLS, INC.,
McNALLY INDUSTRIES LLC, individually and as successor-in-interest to NORTHERN
PUMPS,

15 PLANT INSULATION COMPANY,

16 SB DECKING, INC. fka SELBY BATTERSBY & COMPANY,
SOCO WEST, INC. fka BRENNTAG WEST, INC., SOCO-LYNCH CORPORATION, SOCO-
WESTERN CHEMICAL CORPORATION, and STINNES-WESTERN CHEMICAL

17 CORPORATION individually and as successor-in-interest to WESTERN CHEMICAL
AND MANUFACTURING COMPANY,

18 VACCO INDUSTRIES, individually and as successor-in-interest to VACCO VALVE CO.,
VIAD CORP. fka and as successor-in-interest to DIAL CORPORATION and GRISCOM

19 RUSSELL,
VIKING PUMP, INC. individually and as successor-in-interest to VIKING PUMP COMPANY,

20 HOUDAILLE INDUSTRIES, INC. and VIKING PUMP-HOUDAILLE, INC.,

21 WARREN PUMPS, INC.,
YARWAY CORPORATION fka YARNALL-WARING COMPANY and YARNALL

22 WARING CO.,

23 and DOES 1 – 300.

24

25

26

27

28

1

## **EXHIBIT "C"**

2  FOSTER WHEELER USA CORPORATION,
PLANT INSULATION COMPANY,

3

4

  and DOES 301 – 500.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28