ORIGINAL
FILED
2000 OCT 29 P 2.54
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1  Theodore T. Cordery, Esq. (Bar No. 114730)
   tcordery@itkc.com
2  Michael J. Boland, Esq. (Bar No. 98343)
   mboland@itkc.com
3  Stephen E. Carlson, Esq. (Bar No. 104279)
   scarlson@itkc.com
4  IMAI, TADLOCK, KEENEY & CORDERY, LLP
   100 BUSH STREET, SUITE 1300
5  SAN FRANCISCO, CA  94104-3915
   Telephone:    (415) 675-7000
6  Facsimile:    (415) 675-7008

7  Attorneys for Defendant
   ELLIOTT COMPANY f/k/a ELLIOTT TURBOMACHINERY CO., INC.

8

9

10              UNITED STATES DISTRICT COURT

11        NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

12  HAZEL KING, individually and as successor   (ASBESTOS)
    in interest to KENNETH KAY KING,
13  Deceased; LORI KING; TERI PARSLOW;           CASE NO. CV10 4921
    and KERRY KING,
                                                 San Francisco Superior Court Case No. CGC-
14                                               10-275540
            Plaintiffs,
15                                               DEFENDANT ELLIOTT COMPANY'S
        v.                                       NOTICE OF REMOVAL
16
                                                 Complaint Filed: July 29, 2009
17  A.O. SMITH CORP., A.W. CHESTERTON
    COMPANY; ADVOCATE MINES, LTD;
18  AKER KVAERNER POWER, INC.; ALFA
    LAVAL, INC., individually and as successor in
19  interest to SHARPLES, INC., ALFA LAVAL
    SEPARATOR, INC., and DELAVAL
20  SEPARATOR COMPANY; ALLIED
    PACKING & SUPPLY, INC.; ALLIS-
21  CHALMERS PRODUCT LIABILITY
    TRUST; BETHEHEM STEEL COMPANY;
22  BRYAN STEAM, LLC.; BUFFALO PUMPS,
    INC., individually and as successor in interest
23  to AMPCO PITTSBURGH CORPORATION
    and BUFFALO FORGE COMPANY;
24  CARRIER CORPORATION; CBS
    CORPORATION, formerly known as
25  VIACOM, INC.  individually and as successor
    in interest to WESTINGHOUSE ELECTRIC,
26  and WECO INTERNATIONAL; CLEAVER-
    BROOKS, INC.; COLTEC INDUSTRIES,
27  INC., Fairbanks Morse Engine Division;
    CRANE CO.; CROWN CORK & SEAL
28  COMPANY, INC. individually and as
    successor in interest to MUNDET CORK
    COMPANY; DRESSER-RAND GROUP,

-1-

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 1300
100 BUSH STREET
SAN FRANCISCO, CA  94104
(415) 675-7000

LAW OFFICES
IMAI, TADLOCK, KEENEY & CORDERY, LLP
SUITE 1100
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

1  INC., individually and as successor in interest
   to TERRY STEAM TURBINE COMPANY;
2  DURABLA MANUFACTURING
   COMPANY; DURO DYNE WEST
3  CORPORATION; EATON HYDRAULICS
   LLC, formerly known as VICKERS, INC.;
4  ELLIOTT COMPANY, also known as
   ELLIOTT TURBOMACHINERY
5  COMPANY, INC.; FAIRBANKS MORSE
   PUMP CORPORATION; FEDERAL
6  SHIPBUILDING AND DRYDOCK
   COMPANY; FLOWSERVE
7  CORPORATION, individually and as
   successor in interest to and/or the entities
8  formerly known as THE DURIRON
   COMPANY and DURCO INTERNATIONAL,
9  INC.; FLOWSERVE INTERNATIONAL,
   INC. individually and as successor in interest,
10 successor by merger, alter ego, and/or formerly
   known as BW/P INTERNATIONAL, INC.,
11 BW/IP, INC., and BYRON JACKSON PUMP
   CO.; FLOWSERVE US, INC. individually
12 and as successor in interest to VOGT VALVE
   COMPANY; FMC CORPORATION;
13 FOSTER WHEELER USA CORPORATION;
   FRASER'S BOILER SERVICE, INC.;
14 FRYER-KNOWLES, INC.; GARDNER
   DENVER, INC., formerly known as
15 GARDNER DENVER MACHINERY, INC.,
   individually and as successor in interest to
16 CHAMPION AIR COMPRESSORS;
   GARLOCK SEALING TECHNOLOGIES,
17 LLC, individually and as successor in interest
   to ANCHOR PACKING COMPANY;
18 GENERAL DYNAMICS CORPORATION,
   individually and as successor in interest to
19 ASBESTOS CORPORATION, LTD.;
   GENERAL ELECTRIC COMPANY; (THE)
20 GOODYEAR TIRE & RUBBER COMPANY;
   GOULDS PUMPS, INCORPORATED;
21 HENRY VOGT MACHINE COMPANY;
   HOPEMAN BROTHERS, INC.; IMO
22 INDUSTRIES, INC., individually and as
   successor in interest to DELAVAL STGEAM
23 TURBINE CO.; INGERSOLL-RAND
   COMPANY; ITT CORPORATION, formerly
24 known as ITT INDUSTRIES, INC.,
   individually and as successor in interest to
25 ALLIS-CHALMERS CORP. and BELL &
   GOSSETT; J.T. THORPE & SON, INC.;
26 JOHNSON CONTROLS, INC.; LAKE
   WASHINGTON SHIPYARDS; LAMONS
27 GASKET COMPANY, individually and as
   successor in interest to POWER
28 ENGINEERING AND EQUIPMENT, INC.;
   LAMONS GASKET COMPANY; LESLIE

-2-

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 1300
1110 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

1  CONTROLS, INC.; M. SLAYEN &
   ASSOCIATES, INC.; MASTER PUMPS &
2  EQUIPMENT CORPORATION;
   METALCLAD INSULATION
3  CORPORATION, individually and as
   successor in interest to NORTHERN
4  CALIFORNIA INSULATIONS; MOORE
   DRY DOCK COMPANY; (THE) NASH
5  ENGINEERING COMPANY; NEWPORT
   NEWS SHIPBUILDING AND DRYDOCK
6  CO.; NIBCO, INC., which will do business in
   California s CAL NIBCO; OAKFABCO, INC.,
7  individually and as successor in interest to
   KEWANEE BOILERS; PARKER-
8  HANNIFIN, individually and as successor in
   interest to SACOMO-SIERRA; PATTERSON
9  PUMP COMPANY; PENTAIR PUMP
   GROUP, individually and as successor in
10 interest to AURORA PUMPS; PLANT
   INSULATION COMPANY; PLANT
11 INSULATION COMPANY; QUINTEC
   INDUSTIRES, INC.; RAPID-AMERICAN
12 CORPORATION; RED-WHITE VALVE
   CORP.; RICHARD KLINGER, INC.; RILEY
13 POWER, INC., formerly known as DB RILEY,
   INC., individually and as successor in interest
14 to RILEY STOKER CORPORATION; SB
   DECKING, INC., formerly known as SELBY
15 BATTERSBY & COMPANY; SEPCO
   CORPORATION; SQUARE D CO.;
16 STERLING FLUID SYSTEM (USA), LLC,
   formerly known as PEERLESS PUMP
17 COMPANY; SULZER PUMPS (US) INC.;
   SYD CARPENTER MARINE
18 CONTRACTOR, INC.; TATE ANDALE,
   INC. individually and as successor in interest
19 to C.H. WHEELER, MANUFACTURING
   CO.; THE DARCOID COMPANY OF
20 CALIFORNIA; TRAC REGULATOR CO.,
   INC., individually and as the parent and/or
21 successor in interest to ATLAS VALVE
   COMPANY, INC.; TRANE US. INC.;
22 TRIPLE A MACHINE SHOP, INC.;
   TUTHILL CORPORATION; UNION
23 CARBIDE CORPORATION: UNIROYAL
   HOLDING, INC.; VIAD CORPORATION,
24 individually and as successor in interest to
   GRISCOM-RUSSELL; WARREN PUMPS,
25 LLC; (THE) WILLIAM POWELL
   COMPANY; YARWAY CORPORATION;
26 YORK INTERNATIONAL CORPORATION;
   ZURN INDUSTRIES, LLC, formerly known
27 as ZURN INDUSTRIES, and DOES 1-500,
   inclusive,
28
                    Defendants.

DEFENDANT ELLIOTT COMPANY'S NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Notice is hereby given that pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446(a), Defendant ELLIOTT COMPANY a/ka/ ELLIOTT TURBOMACHINERY, CO., INC., ("Elliott"), hereby removes this action, which was filed against it in the Superior Court of the State of California, County of San Francisco, to the United States District Court for the Northern District of California. In support, Elliott respectfully offers the following:

## JURISDICTIONAL STATEMENT

Elliott seeks removal jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), which states that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office," on the grounds that Elliott acted under the direction of a federal officer with respect to the design, manufacture and distribution of the products which allegedly caused or contributed to plaintiff's alleged injuries.

## PRELIMINARY MATTERS

1.      On or about July 29, 2009, HAZEL KING, individually and as successor in interest to KENNETH KAY KING, Deceased; LORI KING; TERI PARSLOW; and KERRY KING ("Plaintiffs"), filed in the Superior Court of California, County of San Francisco a Complaint for Damages Wrongful Death-Asbestos seeking damages against defendant Elliott and a number of other defendants for personal injuries allegedly caused by exposure to asbestos and asbestos-containing products. *See* Summons and Complaint a true and correct copy of which is attached hereto as Exhibit 1.

2.      Elliott was served with the Summons and Complaint on September 29, 2010. Plaintiffs allege that decedent KENNETH KAY KING developed lung cancer as a result of exposure to asbestos occurring during his service as a Chief Hospital Corpsman in the US Navy from 1952 to 1968, while serving aboard the USS Floyd Bay, USS Boxer (CVA-21), USS Torcan MS, USS Hopewell (DD), and USS Wiltsie (DD), and during shore duty at the Hunters Point, Pearl Harbor, and San Diego Naval Shipyards. *See* Exhibit A to Preliminary Fact Sheet New

LAW OFFICES
IMAI, TADLOCK, KEENEY & CORDERY, LLP
100 BUSH STREET
SUITE 1300
SAN FRANCISCO, CA 94104
(415) 675-7000

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 1300
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

1  Filing/Asbestos Litigation appended to Plaintiffs' Summons and Complaint for Damages

2  Wrongful Death-Asbestos, attached hereto as Exhibit 1.

3      3.      This Notice of Removal is timely because it is filed within 30 days of September

4  29, 2010, which is the date on which Plaintiffs served Elliott with the Summons and Complaint.

5                              NATURE OF THE CASE

6      4.      This case is based on Plaintiffs' allegations that the decedent KENNETH KAY

7  KING'S alleged asbestos-related injury, specifically lung cancer, was caused by his exposure to

8  asbestos while serving as a Chief Hospital Corpsman in the US Navy from 1952 to 1968, while

9  serving aboard the USS Floyd Bay, USS Boxer (CVA-21), USS Torcan MS, USS Hopewell

10  (DD), and USS Wiltsie (DD), and during shore duty at the Hunters Point, Pearl Harbor, and San

11  Diego Naval Shipyards.  See Exhibit A to  Id.

12      5.      Plaintiffs assert claims against Elliott and other defendants based on causes of

13  action for Negligence, Strict Products Liability, Failure to Warn, Breach of Implied Warranties,

14  Fraud and Conspiracy, False Representation, Loss of Consortium, Survival Action, and Punitive

15  Damages. See Exhibit 1, Summons and Complaint for Damages Wrongful Death-Asbestos.

16                              GROUNDS FOR REMOVAL

17      6.      This Notice of Removal is filed within thirty (30) days of Plaintiffs' service of the

18  Summons and Complaint.  28 U.S.C. § 1446(b).

19      7.      Plaintiffs contend that the Decedent was exposed to asbestos while serving as a

20  Chief Hospital Corpsman in the US Navy from 1952 to 1968, while serving aboard the USS

21  Floyd Bay, USS Boxer (CVA-21), USS Torcan MS, USS Hopewell (DD), and USS Wiltsie

22  (DD), and during shore duty at the Hunters Point, Pearl Harbor, and San Diego Naval Shipyards.

23  See ¶¶ 7-8 of Plaintiffs' Summons and Complaint for Damages Wrongful Death-Asbestos,

24  attached hereto as Exhibit 1.

25      8.      As Plaintiffs' causes of action against Elliott include failure to warn claims,

26  Plaintiffs effectively allege that Elliott supplied equipment to the U.S. Navy that was defectively

27  designed and failed to include warnings regarding the potential dangers associated with asbestos-

28  containing insulation applied to the Elliott equipment.  As Elliott manufactured its equipment for

-5-

IMAI, TADLOCK, KEENEY & CORDERY, LLP

LAW OFFICES
SUITE 1300
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

1   Naval applications under the direction of a federal officer, it has a colorable federal defense to

2   Plaintiffs' claims against it.   Also, a causal nexus between Plaintiffs' allegations and Elliott's

3   federal officer defense exists.

4       9.    Elliott may thus remove this case because any equipment that it manufactured for

5   use on U.S. Navy ships was manufactured pursuant to contracts and specifications executed by

6   the Navy.  Thus, the basis for removal is that, in the manufacture and sale of that equipment for

7   the Navy, including all aspects of the design and warnings associated with said equipment, Elliott

8   was acting under an officer or agency of the United States within the meaning of 28 U.S.C. §

9   1442(a)(1).

10       10.    In the event Plaintiff files a motion to remand this case, Elliott respectfully

11   requests an opportunity to respond more fully in writing and to submit additional evidence in

12   support of its defense that it was acting under an officer or agency of the United States of

13   America.  Notwithstanding, Elliott offers the following authorities at this time:

14       11.    Title 28 U.S.C. § 1442(a)(1) states that an action may be removed by "[a]ny

15   officer of the United States or any agency thereof, or person acting under him, for any act under

16   color of such office." *Fung v. Ajex Corp.,* 816 F.Supp. 569, 571-72 (N.D. Cal. 1992).  Removal

17   pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the removing party can (1) demonstrate

18   that it acted under the direction of a federal officer, (2) raise a colorable federal defense to

19   plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it

20   performed under color of federal office. *Mesa v. California,* 489 U.S. 121, 124-25, 129-31, 134-

21   35 (1989).

22       12.    In *Isaacson v. Dow Chemical Company,* 304 F.Supp.2d 442 (E.D.N.Y. 2004), the

23   sufficiency of the federal officer removal statute to deny a motion to remand was examined.  The

24   federal officer removal statute expands the scope of federal jurisdiction, overcoming the "well

25   pleaded complaint" to allow removal if three elements are satisfied. *Id.* at 446.  First, a defendant

26   must demonstrate that it is a person within the meaning of the statute.  Second, a defendant must

27   establish that the suit is under color of federal office, that is, there is a causal connection between

28   the plaintiff's claims and the defendant's asserted authority.  Third, a defendant must raise a

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 2800
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

colorable federal defense to the plaintiff's claims. *Id.*

13. The *Isaacson* court discussed that a corporation is included in the definition of "person" in this statute. *Isaacson* at 446. The second prong of *Isaacson* calling for a causal connection between the defendant's actions under the authority of a federal officer and the plaintiff's state court claims requires a substantial degree of direct and detailed federal control over the defendant's work. *Id.* at 447. What constitutes sufficient federal control is often central to a court's decision to uphold removal or remand a case. Several courts have upheld removal because defendants were sued as a result of building products pursuant to military specifications. *See Crocker v. Borden*, 852 F.Supp. 132 (E.D. La. 1994) (holding that removal was proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications); *see also, Pack v. AC and S, Inc.*, 838 F.Supp. 1099 (D.Md. 1993) (holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth).

14. The *Isaacson* court concluded that the government-ordered specifications differed from the specifications for the defendants' commercial application of the product. *Isaacson, supra* at 450. In addition, the method of warning and application was completely in the government's hands. *Id.* Finally, the government had full knowledge of the dioxin "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated the control with which the government operated.

15. This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning." *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 438 (5th Cir.), *cert. denied,* 531 U.S. 919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the

DEFENDANT ELLIOTT COMPANY'S NOTICE OF REMOVAL

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 2600
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

1    manufacturer warned the government as to any product hazards known by the manufacturer, but

2    unknown by the government. *Kerstetter*, 210 F.3d at 438.

3        16.    As stressed in *Kerstetter*, "[t]he government need not prepare the specifications to

4    be considered to have approved them." *Id.* at 435. The only material issue is whether the

5    manufacturer's designs and specifications were subjected to "substantial review" rather than a

6    mere "rubber stamp" approval. *Id.* In this regard, "[t]he specifications need not address the

7    specific defect alleged; the government need only evaluate the design feature in question." *Id.*

8    Once again, applying these general principles to "failure to warn" claims, the fact that

9    governmental specifications or regulations did not specifically preclude the exact warning desired

10   by the plaintiff does not take a "failure to warn" claim outside the scope of the government

11   contractor defense so long as the government was involved generally as to the issue of product

12   warnings (or specifically approved the warnings provided by the contractor) and was generally

13   aware of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is

14   not an issue when it is the government's warning in the first place." *Id.* at 438.

15       17.    Here, Elliott constructed its equipment according to the *Navy's* rigid

16   specifications, including specifications for minor asbestos-containing components, such as

17   gaskets or valve packing. Indeed, no equipment would be allowed aboard a Navy ship unless it

18   was manufactured according to the Navy's exacting specifications. *See* Affidavit of Rear Admiral

19   Ben. J. Lehman (Retired USN) attached hereto as <u>Exhibit 3</u>. This case is substantially similar to

20   *Isaacson, supra,* as during construction of its marine equipment for the Navy, Elliott, as a

21   government contractor, acted under the direction of a federal officer when it manufactured and

22   designed the marine equipment at issue within the precise and exacting specifications

23   promulgated by the United States Navy. *Id.*

24       18.    Additionally, Elliott Naval equipment was required to be shipped to the U.S. Navy

25   bare of exterior insulation of any kind. Consequently, it did not supply the Navy with asbestos-

26   containing exterior insulation. Furthermore, upon delivery, the Navy, and not Elliott, controlled

27   the installation of exterior insulation on Elliott equipment. *Id.* Thus, the Navy exercised its own

28   discretion regarding the insulation of Elliott equipment.

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 1200
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

19. A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related State court cases or a contention that judicial economy compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v. Morgan*, 395 U.S. 402, 405 (1960).

20. Elliott is <u>not</u> required to notify and obtain the consent of any other defendant in this action in order to remove Plaintiffs' action under § 1442(a)(1). *See Torres v. CBS News*, 854 F. Supp. 245 (S.D.N.Y. 1994).

21. As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon Elliott to date are being filed with this Notice of Removal. Plaintiff's Complaint for Damages Wrongful Death-Asbestos is the only pleading Plaintiffs served on Elliott in connection with this Wrongful Death action. *See* <u>Exhibit 1</u>. Additionally, Elliott has filed and served an answer to Plaintiff's Complaint for Damages Wrongful Death-Asbestos in state court. A true and correct copy of Elliott's answer is attached hereto as <u>Exhibit 2</u>.

## CONCLUSION

22. Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. 1442(a)(1) based on Elliott having acted under the control of an officer or agency of the United States.

23. By the signature below, counsel for defendant Elliott is executing a certification of this Notice of Removal pursuant to 28 U.S.C. §1446.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

THEREFORE, Elliott, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the Superior Court of the State of California in and for the County of San Francisco.

Dated: October 28, 2010

IMAI, TADLOCK, KEENEY & CORDERY, LLP

By: _____
Stephen E. Carlson
Attorneys for Defendant
ELLIOTT COMPANY f/k/a ELLIOTT
TURBOMACHINERY CO., INC.

DEFENDANT ELLIOTT COMPANY'S NOTICE OF REMOVAL

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

A.O. SMITH CORPORATION; A.W. CHESTERTON COMPANY;
ADDITIONAL PARTIES ATTACHMENT FORMS ARE ATTACHED

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

HAZEL KING, individually and as successor in interest to KENNETH
KAY KING, Deceased; ADDITIONAL PAGE IS ATTACHED

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

CASE NUMBER:
*(Número del Caso):*
CGC-09-275285

San Francisco County Superior Court of CA
400 McAllister Street, San Francisco, CA 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brent Coon & Assoc., 44 Montgomery St., Ste. 800, San Francisco, CA 94104, 415-489-7420

DATE: JUL 28 2009    Gordon Park-Li    Clerk, by _____ , Deputy
*(Fecha)*                 *(Secretario)*    D. NIATT    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

NOTICE TO THE PERSON SERVED: You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:

3. [ ] on behalf of *(specify)*:

under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
       [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
       [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
       [ ] other *(specify)*:
4. [ ] by personal delivery on *(date)*:

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

1  LORI KING; TERI PARSLOW; and KERRY KING.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26  *(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, not line numbers)*:
27  This page may be used with any Judicial Council form or any other paper filed with the court.                    Page ____ 1

Form Approved by the
Judicial Council of California's
MC-020 (New January 1, 1997)

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

CRC 201, 301

American LegalNet, Inc. | www.USCourtForms.com

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| King, et al. v. A.O. Smith Corporation, et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[ ] Plaintiff   [✓] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

A.O. SMITH CORPORATION; A.W. CHESTERTON COMPANY; ADVOCATE MINES, LTD.; AKER KVAERNER POWER, INC.; ALFA LAVAL, INC., individually and as successor in interest to SHARPLES, INC., ALFA LAVAL SEPARATION, INC., and DELAVAL SEPARATOR COMPANY; ALLIED PACKING & SUPPLY, INC.; ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST; AMERICAN SHIPBUILDING COMPANY; ARMSTRONG INTERNATIONAL, INC.; ASBESTOS CORPORATION, LTD.; BALDOR ELECTRIC COMPANY; BARTELLS ASBESTOS SETTLEMENT TRUST; BETHLEHEM STEEL COMPANY; BRYAN STEAM, LLC.; BUFFALO PUMPS, INC., individually and as successor in interest to AMPCO PITTSBURGH CORPORATION and BUFFALO FORGE COMPANY; CARRIER CORPORATION; CBS CORPORATION, formerly known as VIACOM, INC., individually and as successor in interest to WESTINGHOUSE ELECTRIC, and WESCO INTERNATIONAL; CLEAVER-BROOKS, INC.; COLTEC INDUSTRIES, INC., Fairbanks Morse Engine division; CRANE CO.; CROWN CORK & SEAL COMPANY, INC., individually and as successor to MUNDET CORK COMPANY; DRESSER-RAND GROUP, INC., individually and as successor in interest to TERRY STEAM TURBINE COMPANY; DURABLA MANUFACTURING COMPANY; DURO DYNE WEST CORPORATION; EATON HYDRAULICS LLC, formerly known as VICKERS, INC.; ELLIOTT COMPANY, also known as ELLIOTT TURBOMACHINERY COMPANY, INC.; FAIRBANKS MORSE PUMP CORPORATION; FEDERAL SHIPBUILDING AND DRYDOCK COMPANY; FLOWSERVE CORPORATION, as successor in interest to DURAMETALLIC CORPORATION; FLOWSERVE CORPORATION, individually and as successor in interest and/or the entities formerly known as THE DURIRON COMPANY and DURCO INTERNATIONAL, INC.; FLOWSERVE INTERNATIONAL, INC., individually and as successor in interest, successor by merger, alter ego, and/or the entities formerly known as BW/IP INTERNATIONAL, INC., BW/IP, INC., and BYRON JACKSON PUMP CO.; FLOWSERVE US, INC., individually and as successor in interest to VOGT VALVE COMPANY; FMC CORPORATION; FOSTER WHEELER USA CORPORATION; FRASER'S BOILER SERVICE, INC.; FRYER-KNOWLES, INC.; GARDNER DENVER, INC., formerly known as GARDNER DENVER MACHINERY, INC., individually and as successor to CHAMPION AIR COMPRESSORS; GARLOCK SEALING TECHNOLOGIES, LLC, individually and as successor in interest to ANCHOR PACKING COMPANY; GENERAL DYNAMICS CORPORATION, individually and as successor in interest to ASBESTOS CORPORATION, LTD.; GENERAL ELECTRIC COMPANY; (THE) GOODYEAR TIRE & RUBBER COMPANY; GOULDS PUMPS, INCORPORATED; HENRY VOGT MACHINE COMPANY; HOPEMAN BROTHERS, INC.; IMO INDUSTRIES, INC., individually and as successor in interest to DELAVAL STEAM TURBINE CO.; INGERSOLL-RAND COMPANY; ITT CORPORATION, formerly known as ITT INDUSTRIES, INC., individually and as successor to ALLIS –CHALMERS CORP. and BELL & GOSSETT; J.T. THORPE & SON, INC.; JOHNSON CONTROLS, INC.; LAKE WASHINGTON SHIPYARDS; LAMONS GASKET COMPANY, individually and as successor in interest to POWER ENGINEERING AND EQUIPMENT COMPANY, INC.; LAMONS GASKET COMPANY; LESLIE CONTROLS, INC.; M. SLAYEN & ASSOCIATES, INC.;

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

American LegalNet, Inc.
www.FormsWorkflow.com

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| King, et al. v. A.O. Smith Corporation, et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[ ] Plaintiff     [✓] Defendant     [ ] Cross-Complainant     [ ] Cross-Defendant

MASTER PUMPS & EQUIPMENT CORPORATION; METALCLAD INSULATION CORPORATION, individually and as successor in interest to NORTHERN CALIFORNIA INSULATION; MOORE DRY DOCK COMPANY; (THE) NASH ENGINEERING COMPANY; NEWPORT NEWS SHIPBUILDING AND DRYDOCK CO.; NIBCO, INC. which will do business in California as CAL NIBCO; OAKFABCO, INC., individually and as successor in interest to KEWANEE BOILERS; PARKER-HANNIFIN, individually and as successor in interest to SACOMO-SIERRA; PATTERSON PUMP COMPANY; PENTAIR PUMP GROUP, individually and as successor in interest to AURORA PUMPS; PLANT INSULATION COMPANY; PLANT INSULATION COMPANY; QUINTEC INDUSTRIES, INC.; RAPID-AMERICAN CORPORATION; RED-WHITE VALVE CORP.; RICHARD KLINGER, INC.; RILEY POWER, INC., formerly known as DB RILEY, INC., individually and as successor to RILEY STOKER CORPORATION; SB DECKING, INC., formerly known as SELBY, BATTERSBY & COMPANY; SEPCO CORPORATION; SQUARE D CO.; STERLING FLUID SYSTEM (USA), LLC, formerly known as PEERLESS PUMP COMPANY; SULZER PUMPS (US) INC.; SYD CARPENTER MARINE CONTRACTOR, INC.; TATE ANDALE, INC., individually and as successor in interest to C.H. WHEELER MANUFACTURING CO.; THE DARCOID COMPANY OF CALIFORNIA; TRAC REGULATOR CO., INC., individually and as the parent and/or successor in interest to ATLAS VALVE COMPANY, INC.; TRANE U.S. INC.; TRIPLE A MACHINE SHOP, INC.; TUTHILL CORPORATION; UNION CARBIDE CORPORATION; UNIROYAL HOLDING, INC.; VIAD CORPORATION, individually and as successor in interest to GRISCOM-RUSSELL; WARREN PUMPS, LLC.; (THE) WILLIAM POWELL COMPANY; YARWAY CORPORATION; YORK INTERNATIONAL CORPORATION; ZURN INDUSTRIES, LLC., formerly known as ZURN INDUSTRIES, INC.; and DOES 1-500, inclusive.

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

American LegalNet, Inc.
www.FormsWorkflow.com

**EXHIBIT "1"**

1 │ Richard A. Brody, Esq. (SBN 100379)
2 │ BRENT COON & ASSOCIATES
   │ 44 Montgomery Street, Suite 800
3 │ San Francisco, CA 94104
   │ Telephone: 415.489.7420
4 │ Facsimile: 415.489.7426

ENDORSED
FILED
San Francisco County Superior Court

JUL 28 2009

GORDON PARK-LI, Clerk
BY: PARAM NATT
                Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

Attorneys for Plaintiffs

AUG 18, 2010 -1:30 PM

DEPARTMENT 206

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

CGC-09-275285

| | |
|---|---|
| HAZEL KING, individually and as successor in interest to KENNETH KAY KING, Deceased; LORI KING; TERI PARSLOW; and KERRY KING, <br><br> Plaintiffs, <br><br> v. <br><br> A.O. SMITH CORPORATION; A.W. CHESTERTON COMPANY; ADVOCATE MINES, LTD.; AKER KVAERNER POWER, INC.; ALFA LAVAL, INC., individually and as successor in interest to SHARPLES, INC., ALFA LAVAL SEPARATION, INC., and DELAVAL SEPARATOR COMPANY; ALLIED PACKING & SUPPLY, INC.; ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST; AMERICAN SHIPBUILDING COMPANY; ARMSTRONG INTERNATIONAL, INC.; ASBESTOS CORPORATION, LTD.; BALDOR ELECTRIC COMPANY; BARTELLS ASBESTOS SETTLEMENT TRUST; BETHLEHEM STEEL COMPANY; BRYAN STEAM, LLC.; BUFFALO PUMPS, INC., individually and as successor in interest to AMPCO PITTSBURGH CORPORATION and BUFFALO FORGE COMPANY; CARRIER CORPORATION; CBS | Case No. <br><br> **COMPLAINT FOR DAMAGES (WRONGFUL DEATH – ASBESTOS)** <br><br> 1. Negligence <br> 2. Strict Products Liability <br> 3. Failure to Warn <br> 4. Breach of Implied Warranties <br> 5. Fraud and Conspiracy <br> 6. False Representation Under Restatement Section 402-B <br> 7. Loss of Consortium <br> 8. Survival Action and Punitive Damages <br><br><br><br> THIS CASE IS SUBJECT TO MANDATORY ELECTRONIC FILING PURSUANT TO AMENDED G.O. 158 |

1

CORPORATION, formerly known as VIACOM,
INC., individually and as successor in interest to
WESTINGHOUSE ELECTRIC, and WESCO
INTERNATIONAL; CLEAVER-BROOKS,
INC.; COLTEC INDUSTRIES, INC., Fairbanks
Morse Engine division; CRANE CO.; CROWN
CORK & SEAL COMPANY, INC., individually
and as successor to MUNDET CORK
COMPANY; DRESSER-RAND GROUP, INC.,
individually and as successor in interest to
TERRY STEAM TURBINE COMPANY;
DURABLA MANUFACTURING COMPANY;
DURO DYNE WEST CORPORATION;
EATON HYDRAULICS LLC, formerly known
as VICKERS, INC.; ELLIOTT COMPANY, also
known as ELLIOTT TURBOMACHINERY
COMPANY, INC.; FAIRBANKS MORSE
PUMP CORPORATION; FEDERAL
SHIPBUILDING AND DRYDOCK
COMPANY; FLOWSERVE CORPORATION,
as successor in interest to DURAMETALLIC
CORPORATION; FLOWSERVE
CORPORATION, individually and as successor
in interest and/or the entities formerly known as
THE DURIRON COMPANY and DURCO
INTERNATIONAL, INC.; FLOWSERVE
INTERNATIONAL, INC., individually and as
successor in interest, successor by merger, alter
ego, and/or the entities formerly known as BW/IP
INTERNATIONAL, INC., BW/IP; INC., and
BYRON JACKSON PUMP CO.; FLOWSERVE
US, INC., individually and as successor in
interest to VOGT VALVE COMPANY; FMC
CORPORATION; FOSTER WHEELER USA
CORPORATION; FRASER'S BOILER
SERVICE, INC.; FRYER-KNOWLES, INC.;
GARDNER DENVER, INC., formerly known as
GARDNER DENVER MACHINERY, INC.,
individually and as successor to CHAMPION
AIR COMPRESSORS; GARLOCK SEALING
TECHNOLOGIES, LLC, individually and as
successor in interest to ANCHOR PACKING
COMPANY; GENERAL DYNAMICS
CORPORATION, individually and as successor
in interest to ASBESTOS CORPORATION,
LTD.; GENERAL ELECTRIC COMPANY;

2

*King, et al. v. A.O. Smith Corporation, et al.*              COMPLAINT FOR DAMAGES (WRONGFUL
DEATH)

1    (THE) GOODYEAR TIRE & RUBBER
     COMPANY; GOULDS PUMPS,
2    INCORPORATED; HENRY VOGT MACHINE
     COMPANY; HOPEMAN BROTHERS, INC.;
3    IMO INDUSTRIES, INC., individually and as
     successor in interest to DELAVAL STEAM
4    TURBINE CO.; INGERSOLL-RAND
     COMPANY; ITT CORPORATION, formerly
5    known as ITT INDUSTRIES, INC., individually
     and as successor to ALLIS –CHALMERS CORP.
6    and BELL & GOSSETT; J.T. THORPE & SON,
7    INC.; JOHNSON CONTROLS, INC.; LAKE
     WASHINGTON SHIPYARDS; LAMONS
8    GASKET COMPANY, individually and as
     successor in interest to POWER ENGINEERING
9    AND EQUIPMENT COMPANY, INC.;
10    LAMONS GASKET COMPANY; LESLIE
     CONTROLS, INC.; M. SLAYEN &
11    ASSOCIATES, INC.; MASTER PUMPS &
12    EQUIPMENT CORPORATION; METALCLAD
     INSULATION CORPORATION, individually
13    and as successor in interest to NORTHERN
14    CALIFORNIA INSULATION; MOORE DRY
     DOCK COMPANY; (THE) NASH
15    ENGINEERING COMPANY; NEWPORT
16    NEWS SHIPBUILDING AND DRYDOCK CO.;
     NIBCO, INC. which will do business in
17    California as CAL NIBCO; OAKFABCO, INC.,
18    individually and as successor in interest to
     KEWANEE BOILERS; PARKER-HANNIFIN,
19    individually and as successor in interest to
20    SACOMO-SIERRA; PATTERSON PUMP
     COMPANY; PENTAIR PUMP GROUP,
21    individually and as successor in interest to
22    AURORA PUMPS; PLANT INSULATION
     COMPANY; PLANT INSULATION
23    COMPANY; QUINTEC INDUSTRIES, INC.;
     RAPID-AMERICAN CORPORATION; RED-
24    WHITE VALVE CORP.; RICHARD KLINGER,
     INC.; RILEY POWER, INC., formerly known as
25    DB RILEY, INC., individually and as successor
26    to RILEY STOKER CORPORATION; SB
     DECKING, INC., formerly known as SELBY,
27    BATTERSBY & COMPANY; SEPCO
     CORPORATION; SQUARE D CO.; STERLING
28    FLUID SYSTEM (USA), LLC, formerly known

3

1   as PEERLESS PUMP COMPANY; SULZER
2   PUMPS (US) INC.; SYD CARPENTER
   MARINE CONTRACTOR, INC.; TATE
3   ANDALE, INC., individually and as successor in
   interest to C.H. WHEELER
4   MANUFACTURING CO.; THE DARCOID
   COMPANY OF CALIFORNIA; TRAC
5   REGULATOR CO., INC., individually and as the
   parent and/or successor in interest to ATLAS
6   VALVE COMPANY, INC.; TRANE U.S. INC.;
7   TRIPLE A MACHINE SHOP, INC.; TUTHILL
   CORPORATION; UNION CARBIDE
8   CORPORATION; UNIROYAL HOLDING,
   INC.; VIAD CORPORATION, individually and
9   as successor in interest to GRISCOM-RUSSELL;
10   WARREN PUMPS, LLC.; (THE) WILLIAM
   POWELL COMPANY; YARWAY
11   CORPORATION; YORK INTERNATIONAL
12   CORPORATION; ZURN INDUSTRIES, LLC.,
   formerly known as ZURN INDUSTRIES, INC.;
13   and DOES 1-500, inclusive,

14     Defendants.

15

16     Plaintiffs HAZEL KING, individually and as successor in interest to KENNETH KAY

17 KING, Deceased; LORI KING; TERI PARSLOW; and KERRY KING (hereinafter "plaintiff")

18 complain of all defendants, and each of them, and allege:

19    <u>GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION</u>

20     1.   (a)   Plaintiffs are the legal heirs of KENNETH KAY KING, Deceased

21 (hereinafter referred to as the "Decedent"). The decedent died from asbestos related lung cancer on

22 January 29, 2009. The name of each plaintiff and the relationship to Decedent is as follows:

23    **Name**                       **Relationship**

24    Hazel King                     Wife

25    Lori King                      Daughter

26    Teri Parslow                  Daughter

27    Kerry King                   Son

28 /// 

4

1      (b)     Each plaintiff brings this action on his or her own behalf. In addition,

2 HAZEL KING brings this action as successor in interest to KENNETH KAY KING, Deceased.

3      (c)     Plaintiffs are collectively referred to as "plaintiffs" herein. Plaintiffs know

4 of no other parties who should be named as a plaintiff herein.

5     2.     Plaintiffs are ignorant of the true names and capacities of DOES 1-500 named as

6 plaintiffs herein. Plaintiffs are ignorant of the true names and capacities of defendants sued herein

7 as DOES 1 through 500, inclusive, and therefore sue these defendants by such fictitious names.

8 Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

9 Plaintiffs are informed and believe and thereon allege that each of said fictitiously named

10 defendants are, through their negligence, intentional torts, and/or conduct giving rise to strict

11 liability, responsible or liable in some manner for the occurrences herein alleged, and that the

12 injuries herein alleged were the direct and legal result of said negligence, intentional torts, and/or

13 conduct giving rise to strict liability.

14     3.     At all times mentioned in this complaint, each of the defendants was the agent and

15 employee of each of the remaining defendants, and by their actions as alleged in this complaint

16 each defendant was acting within the course and scope of this agency and employment, and each

17 defendant has ratified and approved the acts of the remaining defendants. The federal courts lack

18 subject matter jurisdiction over this action, as there is no federal question and incomplete diversity

19 of citizenship exists due to the presence of one or more California defendants. Removal is

20 improper. Every claim arising under the constitution, treaties, or laws of the United States is

21 expressly disclaimed (including any claim arising from an act or omission of a federal enclave, or

22 of any officer of the U.S. or any agency or person acting under him occurring under color of such

23 office). No claim of admiralty or maritime law is raised. Plaintiffs sue no foreign state or agency.

24 Venue is proper in San Francisco County.

25     Plaintiffs specifically disclaim any federal cause of action or any claim that would give rise

26 to federal jurisdiction. To the extent that any of Decedent's asbestos exposure took place on a

27 federal enclave, or to the extent that any of Decedent's asbestos exposure occurred on board vessels

28 of the United States military (including Naval ships) or in the construction, maintenance and/or

5

1 repair of United States military vessels and/or aircraft, Plaintiffs' negligence claims against
2 manufacturers, sellers and suppliers of asbestos-containing products installed on such vessels
3 and/or aircraft are not based on the theory of defective design, but rather are based only on the
4 theory of failure to warn. Since there is no evidence that the United States Government, or any of
5 its military branches, specifically instructed manufacturers from which it purchased asbestos-
6 containing products not to warn about the health hazards associated with exposure to asbestos,
7 there can be no valid claim to federal jurisdiction pursuant to federal enclave, federal officer or
8 federal contractor provisions of the United States Code. This disclaimer pertains to all of plaintiffs'
9 claims, including those of negligence and products liability, as asserted herein.

10     4.     A.O. SMITH CORPORATION; A.W. CHESTERTON COMPANY; ADVOCATE
11 MINES, LTD.; AKER KVAERNER POWER, INC.; ALFA LAVAL, INC., individually and as
12 successor in interest to SHARPLES, INC., ALFA LAVAL SEPARATION, INC., and DELAVAL
13 SEPARATOR COMPANY; ALLIED PACKING & SUPPLY, INC.; ALLIS-CHALMERS
14 CORPORATION PRODUCT LIABILITY TRUST; AMERICAN SHIPBUILDING COMPANY;
15 ARMSTRONG INTERNATIONAL, INC.; ASBESTOS CORPORATION, LTD.; BALDOR
16 ELECTRIC COMPANY; BARTELLS ASBESTOS SETTLEMENT TRUST; BETHLEHEM
17 STEEL COMPANY; BRYAN STEAM, LLC.; BUFFALO PUMPS, INC., individually and as
18 successor in interest to AMPCO PITTSBURGH CORPORATION and BUFFALO FORGE
19 COMPANY; CARRIER CORPORATION; CBS CORPORATION, formerly known as VIACOM,
20 INC., individually and as successor in interest to WESTINGHOUSE ELECTRIC, and WESCO
21 INTERNATIONAL; CLEAVER-BROOKS, INC.; COLTEC INDUSTRIES, INC., Fairbanks
22 Morse Engine division; CRANE CO.; CRANE CO.; CROWN CORK & SEAL COMPANY, INC.,
23 individually and as successor to MUNDET CORK COMPANY; DRESSER-RAND GROUP,
24 INC., individually and as successor in interest to TERRY STEAM TURBINE COMPANY;
25 DURABLA MANUFACTURING COMPANY; DURO DYNE WEST CORPORATION; EATON
26 HYDRAULICS LLC, formerly known as VICKERS, INC.; ELLIOTT COMPANY, also known as
27 ELLIOTT TURBOMACHINERY COMPANY, INC.; FAIRBANKS MORSE PUMP
28 CORPORATION; FEDERAL SHIPBUILDING AND DRYDOCK COMPANY; FLOWSERVE

6

COMPLAINT FOR DAMAGES (WRONGFUL
                                                        DEATH)

1 | CORPORATION, as successor in interest to DURAMETALLIC CORPORATION; FLOWSERVE
2 | CORPORATION, individually and as successor in interest and/or the entities formerly known as
3 | THE DURIRON COMPANY and DURCO INTERNATIONAL, INC.; FLOWSERVE
4 | INTERNATIONAL, INC., individually and as successor in interest, successor by merger, alter ego,
5 | and/or the entities formerly known as BW/IP INTERNATIONAL, INC., BW/IP, INC., and
6 | BYRON JACKSON PUMP CO.; FLOWSERVE US, INC., individually and as successor in
7 | interest to VOGT VALVE COMPANY; FMC CORPORATION; FOSTER WHEELER USA
8 | CORPORATION; FRASER'S BOILER SERVICE, INC.; FRYER-KNOWLES, INC.; GARDNER
9 | DENVER, INC., formerly known as GARDNER DENVER MACHINERY, INC., individually and
10 | as successor to CHAMPION AIR COMPRESSORS; GARLOCK SEALING TECHNOLOGIES,
11 | LLC, individually and as successor in interest to ANCHOR PACKING COMPANY; GENERAL
12 | DYNAMICS CORPORATION, individually and as successor in interest to ASBESTOS
13 | CORPORATION, LTD.; GENERAL ELECTRIC COMPANY; (THE) GOODYEAR TIRE &
14 | RUBBER COMPANY; GOULDS PUMPS, INCORPORATED; HENRY VOGT MACHINE
15 | COMPANY; HOPEMAN BROTHERS, INC.; IMO INDUSTRIES, INC., individually and as
16 | successor in interest to DELAVAL STEAM TURBINE CO.; INGERSOLL-RAND COMPANY;
17 | ITT CORPORATION, formerly known as ITT INDUSTRIES, INC., individually and as successor
18 | to ALLIS –CHALMERS CORP. and BELL & GOSSETT; J.T. THORPE & SON, INC.;
19 | JOHNSON CONTROLS, INC.; LAKE WASHINGTON SHIPYARDS; LAMONS GASKET
20 | COMPANY, individually and as successor in interest to POWER ENGINEERING AND
21 | EQUIPMENT COMPANY, INC.; LAMONS GASKET COMPANY; LESLIE CONTROLS, INC.;
22 | M. SLAYEN & ASSOCIATES, INC.; MASTER PUMPS & EQUIPMENT CORPORATION;
23 | METALCLAD INSULATION CORPORATION, individually and as successor in interest to
24 | NORTHERN CALIFORNIA INSULATION; METALCLAD INSULATION CORPORATION,
25 | individually and as successor in interest to NORTHERN CALIFORNIA INSULATION; MOORE
26 | DRY DOCK COMPANY; (THE) NASH ENGINEERING COMPANY; NEWPORT NEWS
27 | SHIPBUILDING AND DRYDOCK CO.; NIBCO, INC. which will do business in California as
28 | CAL NIBCO; OAKFABCO, INC., individually and as successor in interest to KEWANEE

7

1 | BOILERS; PARKER-HANNIFIN, individually and as successor in interest to SACOMO-SIERRA;
2 | PATTERSON PUMP COMPANY; PENTAIR PUMP GROUP, individually and as successor in
3 | interest to AURORA PUMPS; PLANT INSULATION COMPANY; PLANT INSULATION
4 | COMPANY; QUINTEC INDUSTRIES, INC.; RAPID-AMERICAN CORPORATION; RED-
5 | WHITE VALVE CORP.; RICHARD KLINGER, INC.; RILEY POWER, INC., formerly known as
6 | DB RILEY, INC., individually and as successor to RILEY STOKER CORPORATION; SB
7 | DECKING, INC., formerly known as SELBY, BATTERSBY & COMPANY; SEPCO
8 | CORPORATION; SQUARE D CO.; STERLING FLUID SYSTEM (USA), LLC, formerly known
9 | as PEERLESS PUMP COMPANY; SULZER PUMPS (US) INC.; SYD CARPENTER MARINE
10 | CONTRACTOR, INC.; TATE ANDALE, INC., individually and as successor in interest to C.H.
11 | WHEELER MANUFACTURING CO.; THE DARCOID COMPANY OF CALIFORNIA; TRAC
12 | REGULATOR CO., INC., individually and as the parent and/or successor in interest to ATLAS
13 | VALVE COMPANY, INC.; TRANE U.S. INC.; TRIPLE A MACHINE SHOP, INC.; TUTHILL
14 | CORPORATION; UNION CARBIDE CORPORATION; UNIROYAL HOLDING, INC.; VIAD
15 | CORPORATION, individually and as successor in interest to GRISCOM-RUSSELL; WARREN
16 | PUMPS, LLC.; (THE) WILLIAM POWELL COMPANY; YARWAY CORPORATION; YORK
17 | INTERNATIONAL CORPORATION; ZURN INDUSTRIES, LLC., formerly known as ZURN
18 | INDUSTRIES, INC.; and Does 1-500, inclusive, are at all times herein mentioned, and were
19 | corporations or other business entities organized and existing under the laws of the state of
20 | California and/or qualified to do business in this State.

21 |      5.      At all times mentioned herein defendants, and each of them, were engaged in the
22 | business of mining, milling, manufacturing, testing, developing, processing, importing, converting,
23 | compounding, assembling, fabricating, modifying, designing, specifying, approving, supplying,
24 | distributing, delivering, packaging, labeling, advertising, marketing, warranting, applying,
25 | installing, and inspecting asbestos, and products produced therefrom, for sale to and use by
26 | members of the general public, as well as for sale to and use by other parties to manufacture,
27 | assemble, supply, distribute, label, apply and install products made therefrom, or both.
28 | ///

COMPLAINT FOR DAMAGES (WRONGFUL DEATH)

1      6.     The defendants, and each of them, acting through their agents, servants and/or

2  employees, cause, and have caused in the past, certain asbestos-containing products and asbestos-

3  related insulation, refractory materials, fireproofing, gasket and packing materials, bulkhead

4  insulation, decking materials, rope, cloth, tile flooring, boiler and turbine covers, as well as various

5  automotive gaskets, brakes, clutch and other materials to be placed on the market and in the stream

6  of interstate commerce with the result that said products and materials came into use by decedent

7  and those working in close proximity to decedent at relevant times herein.

8      7.     Decedent Kenneth Kay King was exposed to asbestos during the course of his life in

9  the manner and during the time periods set forth below:

| YEARS | EMPLOYER/LOCATION | JOB TITLE | JOB DUTIES |
|---|---|---|---|
| 1952 to 1968 | United States Navy USS Floyd Bay; USS Boxer (CVA-21); USS Pictor (AF-54); USS Torcan MS; USS Hopewell; (DD); USS Wiltsie (DD); Hunters Point Naval Shipyard; Pearl Harbor Naval Shipyard; and San Diego Naval Shipyard. | Chief Hospital Corpsman | Decedent served aboard the USS Floyd Bay; USS Boxer (CVA-21); USS Pictor (AF-54); USS Torcan MS; USS Hopewell; (DD); and USS Wiltsie (DD). Decedent was stationed at numerous land-based locations, including Hunters Point Naval Shipyard, Pearl Harbor Naval Shipyard, and San Diego Naval Shipyard. |
| May 23, 1969 to August 2, 1993 | Defense Department Ogden, Utah | Warehouse Man | |

22      8.     During the course and scope of his employment, Decedent continually worked with

23  and in close proximity to others who were working with asbestos and asbestos-containing products.

24  He routinely and regularly worked in close proximity to asbestos and asbestos-containing products,

25  and was continually exposed to asbestos fibers which were released from asbestos and asbestos-

26  containing products which were mined, milled, manufactured, processed, imported, converted,

27  compounded, applied, installed, designed, specified, inspected, approved, supplied, distributed and

28  sold by defendants, and each of them.

9

1     9.     Decedent's exposure to asbestos was the direct and legal cause of his development

2 of an asbestos-related lung cancer and other illnesses and disabilities whose relationship to asbestos

3 is as yet unknown to plaintiffs herein.

### FIRST CAUSE OF ACTION

### (Negligence)

6     FOR A FIRST CAUSE OF ACTION, plaintiffs complain of the defendants, and each of

7 them, and allege:

8     10.     Plaintiffs, by this reference, hereby incorporate and make a part hereof, as though

9 fully set forth herein, each and every allegation contained in the General Allegations herein.

10     11.     At all times relevant herein, defendants and each of them, owed a duty of due care

11 which required them to exercise ordinary care to protect against an unreasonable risk of harm. This

12 duty was owed to Decedent and plaintiffs.

13     12.     Decedent's development of lung cancer and related conditions is the direct and legal

14 result of the conduct of the defendants, and each of them, in that they negligently and carelessly

15 researched, tested or failed to test, manufactured, designed, specified, developed, labeled,

16 advertised, marketed, warranted, inspected, fabricated, modified, applied, installed, distributed and

17 supplied asbestos and asbestos-containing products. Defendants, and each of them, without any

18 adequate warning to the consumer or user, produced, sold, and otherwise put into the stream of

19 interstate commerce the foregoing materials which said defendants and each of them knew, or in

20 the exercise of ordinary care should have known, were deleterious, poisonous and highly harmful

21 to decedent's body, lungs, respiratory system, skin and health. Further, defendants and each of

22 them knew, or through the exercise of ordinary care should have known, that exposure to asbestos

23 is, and at all times relevant herein has been, associated with terminal and incurable diseases which

24 have caused and continue to cause death.

25     13.     During the time period when Decedent was exposed to asbestos in the manner

26 described above, he had no knowledge that said exposure placed him at risk for developing the

27 diseases described herein and therefore had no opportunity, nor can he be charged with a duty or

28 breach of duty, to protect himself against said harmful asbestos exposure. Plaintiffs had no

1 knowledge that the alleged conduct, misconduct and culpability of defendants, and each of them,
2 were actionable at law when they were committed and cannot be charged with knowledge or
3 inquiry thereof.

4      14.    The lung cancer, asbestosis, pleural plaques, and related conditions that afflicted
5 Decedent developed at a microscopic and undetectable level over an extended period of time,
6 without noticeable trauma, and was therefore unknown and unknowable to Decedent until his
7 physicians diagnosed him with lung cancer, asbestosis, pleural plaques and related conditions
8 within the pertinent statute of limitations. Prior to his diagnosis, Decedent did not know, nor
9 through the exercise of reasonable diligence could he have known, that his disease and related
10 conditions were caused by his exposure to the defendants' asbestos and asbestos-containing
11 products.

12      15.    As a direct and legal result of the conduct of the defendants, and each of them,
13 Decedent developed a disease known and designated as lung cancer, asbestosis, pleural plaques and
14 related conditions, from which he died.

15      16.    And as a further direct and legal result it was necessary for Decedent to retain the
16 services of physicians, hospitals, hospice, and other health care professionals to diagnose, treat, and
17 provide palliative care for Decedent from when he first experienced symptoms related to his
18 asbestos-caused conditions until the end of his life. Plaintiffs do not yet know the full extent of
19 treatment rendered to Decedent nor the reasonable value of medical services rendered to Decedent
20 herein and therefore requests leave to amend this complaint when that sum is determined.

21      17.    As a direct and legal result of the conduct of the defendants, and each of them, and
22 of Decedent's diagnosis of, and death from, lung cancer, asbestosis, pleural plaques and related
23 conditions, Decedent was unable to follow his normal or any gainful occupation for certain periods
24 of time preceding his diagnosis and until Decedent's death. Plaintiffs and Decedent incurred, and
25 will incur, loss of income, wages, pensions, earning potential, profits and commissions, and other
26 pecuniary losses. Plaintiffs do not know the amount of said past losses and therefore request leave
27 to amend this complaint when that sum is determined.

28 /// 

11

18.    As a further, direct and proximate result of the conduct of defendants, and each of them, plaintiffs buried Decedent and incurred damages for consequential costs of Decedent's funeral, burial and related expenses in a sum to be subsequently determined.

19.    As a further direct and legal result of the conduct of the defendants, and each of them, plaintiffs sustained the loss of Decedent's love, companionship, comfort, care, assistance, protection, affection, society, support, teaching and tutelage, all to plaintiffs' damage in an amount of at least $50,000.

20.    Since 1924, the defendants, and each of them, knew or should have known of medical and scientific data and other knowledge which clearly indicated that the materials and products referred to herein were and are hazardous to the health and safety of the Decedent, and others in Decedent's position working in close proximity with such materials.  The defendants, and each of them, knew or should have known of the dangerous propensities of the aforementioned materials and products since before that time.

21.    Although defendants knew or should have known of the aforementioned information, defendants, and each of them, negligently, carelessly, and recklessly failed to label any of the aforementioned asbestos-containing materials and products, including those with which and around which Decedent worked such as thermal insulation materials specified for or on/in boilers, regarding the hazards of such materials and products to the health and safety of Decedent and others in Decedent's position working in close proximity with such materials until 1964.

22.    Commencing in 1964, many of such asbestos-containing materials were not labeled as hazardous by all of the defendants herein, despite the fact that the knowledge of such hazards existed and that defendants, and each of them, knew or should have known of such hazards since 1924.  At all times herein mentioned, defendants, and each of them, negligently, carelessly, and recklessly:

A.  failed to provide information relating to the danger of the use of the aforementioned materials to Decedent and others in Decedent's position and the general public concerning the dangerous nature of the aforementioned materials to workers;

///

12

B. failed to disseminate such information in a manner which would give general notice to the public and knowledge of the hazardous nature thereof, when defendants were bound to disclose such information;

C. sold the aforementioned products and materials to Decedent's employer(s) and others without advising such employers and others of dangers of the use of such materials to persons working in close proximity thereto, when defendants knew or should have known of such dangers, as set forth herein, and, as set forth above, had a duty to disclose such dangers.

D. negligently, carelessly and recklessly misrepresented to Decedent, others in Decedent's position, and Decedent's employer that it was safe for Decedent to work in close proximity to such materials, when they knew that this was not the case.

E. negligently, carelessly and recklessly failed to disclose to Decedent, others in Decedent's position, Decedent's employer, and members of the general public, medical and scientific data and knowledge of the results of studies including, but not limited to, the information and knowledge of the contents of the Lanza report.

23. Defendants, and each of them, knew or should have known of the connection between inhalation of asbestos fibers and lung cancer, asbestosis, pleural plaques, and related conditions which information was disseminated through the Asbestos Textile Institute and other industry organizations to all other defendants, and each of them, herein.

24. At all times mentioned herein, defendants, and each of them, knew or should have known of the connection between inhalation of asbestos fibers and cancer, which information disseminated through the Asbestos Textile Institute and other industry organizations to all other defendants herein.

25. Defendants, and each of them, negligently, carelessly and recklessly failed to provide the above described medical and scientific data to Decedent, others in Decedent's position, Decedent's employer(s), and members of the general public concerning such knowledge of danger, when defendants were bound to disclose it;

/ / /

/ / /

13

26. Defendants, and each of them, knew or should have known that said asbestos-containing materials were dangerous when breathed and caused pathological effects without noticeable trauma, and that such material was dangerous and a threat to the health of persons coming into contact therewith. Defendants, and each of them negligently, carelessly and recklessly did not warn Decedent, other's in Decedent's position, Decedent's employer(s) and the general public of this information.

27. Defendants, and each of them, knew or should have known that adequate protective masks and devices should be used by workers such as Decedent when applying and installing the asbestos-containing products of the defendants. Defendants, and each of them, knew or should have known that not wearing an adequate protective mask and/or device would result in injury to the Decedent and others applying and installing such materials. Defendants, and each of them, negligently, carelessly and recklessly do not inform workers such as Decedent, and others applying and installing such materials of the aforementioned information.

28. Defendants, and each of them, knew or should have known that Decedent and anyone similarly situated in an industrial and construction setting would be exposed to defendants' asbestos-containing products, and that, upon inhalation of asbestos such persons would, in time, develop irreversible conditions of either pneumoconiosis, asbestosis or cancer, or all. Defendants, and each of them, negligently, carelessly and recklessly failed to provide information to the public at large and buyers, users, and physicians employed by Decedent and Decedent's employer for the purpose of conducting physical examinations of Decedent and others working with or near asbestos that exposure to these materials would cause pathological effects without noticeable trauma.

29. The foregoing acts of the defendants, and each of them, and the negligent, careless and reckless conduct of the defendants, and each of them, as described hereinabove, and were done recklessly, wantonly, willfully, oppressively, and in conscious disregard of the safety of Decedent herein, in that

A. The defendants, and each of them, prior to and at the time of sale, distribution or supply of the aforementioned products to Decedent s employer or to others who in turn sold to Decedent's employers, and to other persons relevant herein, knew or should have known that the

14

1   foregoing asbestos fibers released from said products during the foreseeable operations of applying

2   and removing same, were dangerous when inhaled.

3         B.  Defendants, and each of them, knew or should have known of the hazards and

4   dangers of working with or around asbestos products produced or supplied by defendants, and each

5   of them. The defendants, and each of them, knew or should have known that said products would

6   be used by Decedent and others who had no knowledge of the dangerous and hazardous nature

7   thereof.

8         C.  Defendants, and each of them, either did not warn or insufficiently warned

9   regarding the dangerous nature of said products.  Defendants, and each of them, did not place a

10  sufficient warning on the said product or package thereof regarding said dangerous nature.

11  Accordingly, plaintiffs are entitled to an award of punitive damages.

12        WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Strict Products Liability)

15  AS AND FOR A SECOND CAUSE OF ACTION, plaintiffs complain of the defendants,

16  and each of them, and allege:

17        30.   Plaintiffs, by this reference, hereby incorporate and make a part hereof, as though

18  fully set forth herein, each and every allegation contained in the General Allegations and the First

19  Cause of Action herein, except allegations pertaining to negligence contained in Paragraphs 11

20  through 14 herein.

21        31.   At all times mentioned herein defendants, and each of them, during the ordinary

22  course of business, mined, milled, manufactured, imported, supplied, distributed, delivered,

23  packaged, labeled, advertised, sold, marketed, distributed, delivered, installed, applied and

24  otherwise introduced into the stream of commerce asbestos and asbestos-containing products which

25  were defective due to their design, manufacture, sufficiency or lack of warning, and/or failure to

26  meet ordinary use or consumer expectations of safety when used in an intended or reasonably

27  foreseeable manner.

28  / / /

32.     The asbestos and asbestos-containing products were defective when the defendants, and each of them, marketed and introduced them into the stream of commerce. Defendants, and each of them, knew that the aforementioned products would be used without inspection for defects by the user thereof.

33.     At all times herein mentioned Decedent, Decedent's employer, and other persons relevant herein, purchased from defendants, and each of them, asbestos and asbestos-containing products.

34.     *Defective Design*: The products were defectively designed in that:

A.     The products failed to perform as safely as an ordinary consumer would expect in their intended or reasonably foreseeable use or manner of operation, or,

B.     The products had inherent risks of danger that outweighed their benefits; alternate and safer substitute products existed and the state-of-the-art required their use given the seriousness of the potential danger, likelihood of its occurrence, feasibility, cost and adverse consequences to the product and to the consumer of a safer alternative design.

35.     *Failure to Warn*: Defendants knew or reasonably should have known of the dangerous propensities of their products but nonetheless distributed and marketed their products with inadequate warning of its dangers.

36.     Each of Defendants' products reached Decedent without substantial change in its condition.

37.     The aforementioned products were used by Decedent and those in close proximity to Decedent in a foreseeable manner, and in the manner for which they were intended. Defendants' products were used in a manner reasonably foreseeable by Defendants, which Defendants intended or knew they would be used, or for which they marketed them or knew they were marketed to be used.

38.     At all times mentioned herein, plaintiffs and Decedent were unaware of the dangerous nature of the aforementioned products.

39.     The defective design of Defendants' products and failure to warn were the proximate causes of Decedent's injuries and death.

16

40. As a direct and legal result of the conduct of the defendants, and each of them, Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related conditions and disabilities as previously set forth, from which he died.

41. The aforementioned products were used by Decedent and those in close proximity to Decedent in a foreseeable manner, and in the manner for which they were intended.

42. A. Defendants, and each of them, knew that defendants' asbestos-containing products would be used by Decedent and anyone similarly situated in an industrial and construction setting without inspection for defects.

B. Defendants, and each of them, knew that such persons would be exposed to defendants' asbestos-containing products

C. Defendants, and each of them, knew that, upon inhalation of asbestos from defendant's asbestos-containing products, such persons would, in time, develop irreversible conditions of either pneumoconiosis, asbestosis or cancer, or all.

D. At the time defendants, and each of them, placed such asbestos-containing products in to the stream of commerce, defendants and each of them knew or should have known of the risks and hazards associated with the use and/or exposure of its products.

E. At the time defendants, and each of them, placed such asbestos-containing products in to the stream of commerce, and subsequent thereto, defendants, and each of them failed to warn or provided inadequate warnings to persons who used or would be exposed to its defective asbestos-containing products, including Decedent, of the dangers and hazards associated with its products.

F. At the time defendants, and each of them, placed such asbestos-containing products in to the stream of commerce, and subsequent thereto, defendants, and each of them failed to provide instructions or provided inadequate instructions to persons who used its defective asbestos-containing products, or who would be exposed to said products, including Decedent, of the dangers and hazards associated with its products.

///

///

17

1      G. Defendants, and each of them, prior to and at the time of placing the

2 aforementioned products in to the stream of commerce, including but not limited to supplying said

3 products to Decedent's employer or to others who in turn sold to Decedent's employers, and to

4 other persons relevant herein, knew that the asbestos which Decedent and others around him were

5 exposed to was dangerous. The defendants, and each of them, either did not warn or insufficiently

6 warned regarding the dangerous nature of said products, and failed to place a sufficient warning on

7 the said product or package thereof regarding said dangerous nature, despite knowing that said

8 products would be used by Decedent and others around him who had no knowledge of the

9 dangerous and hazardous nature thereof.

10      43.    The conduct of the Defendants, and each of them, was motivated by their financial

11 interests. In this financial pursuit, Defendants consciously disregarded the safety of users, and

12 persons exposed to their products, and were consciously willing to permit their products and

13 premises to injure workers and others, including Decedent in order to maximize profits. They

14 consciously disregarded the well-publicized risks of asbestos exposure because to have kept

15 consumers and end users like Decedent safe would have required said defendants to make less

16 money or limit distribution of their products. The defendants, and each of them, either did not

17 warn or insufficiently warned regarding the dangerous nature of said products, nor placed a

18 sufficient warning on the said product or package thereof regarding said dangerous nature, despite

19 knowing that said products would be used by Decedent and others around him who had no

20 knowledge of the dangerous and hazardous nature thereof. Defendants' conduct as described

21 herein was and is willful, malicious, outrageous, and in conscious disregard and indifferent to the

22 safety and health of workers and others exposed to asbestos, including Decedent, and therefore

23 Plaintiffs are entitled to an award of punitive damages.

24      WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

25               **THIRD CAUSE OF ACTION**

26                 **(Failure to Warn)**

27      AS AND FOR A THIRD CAUSE OF ACTION, plaintiffs complain of the defendants, and

28 each of them, and allege:

18

1    44.    Plaintiffs, by this reference, hereby incorporate and make a part hereof, as though

2    fully set forth herein, each and every allegation contained in the General Allegations and the First

3    and Second Causes of Action herein, except allegations pertaining to negligence contained in

4    Paragraphs 11 through 14 herein and those allegations pertaining to design and manufacturing

5    defect contained in the Second Cause of Action.

6    45.    At all relevant times, the asbestos and asbestos-containing products which were

7    mined, milled, manufactured, tested, developed, processed, imported, converted, compounded

8    assembled, fabricated, modified, designed, specified, approved, sold, supplied, distributed,

9    delivered, packaged, labeled, advertised, marketed, warranted, applied, installed, and inspected by

10   defendants, and each of them, were defective as a result of defendants' failure to warn or give

11   adequate warning that the particular risk of developing an asbestos-related disease, and risk of

12   death from an asbestos-related disease resulting from exposure to asbestos, rendered the product

13   unsafe for its intended or reasonably foreseeable use.

14   46.    At all relevant times, the defendants and each of them had specific knowledge of

15   these risks or could have known of these risks by the application of scientific knowledge available

16   at the time of mining, manufacturing, selling, supplying, distributing, marketing, specifying,

17   approving, inspecting, applying and installing the asbestos and asbestos-containing products.

18   47.    As a direct and legal result of the conduct of the defendants, and each of them,

19   Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

20   conditions and disabilities as previously set forth, and has incurred damages in excess of

21   $50,000.00 in addition to the special damages alleged herein.

22   WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

23   ### FOURTH CAUSE OF ACTION

24   **(Breach of Warranties)**

25   AS AND FOR A FOURTH CAUSE OF ACTION, plaintiffs complain of defendants, and

26   each of them, and allege:

27   ///

28   ///

19

1     48.    Plaintiffs, by this reference, hereby incorporate and make a part hereof, as though

2   fully set forth herein, each and every allegation contained in the General Allegations and the First

3   Cause of Action herein, except allegations pertaining to negligence contained in Paragraphs 11

4   through 14 herein.

5     49.    The defendants, and each of them, sold, supplied, delivered or otherwise distributed

6   to Decedent, or to another purchaser or user who subsequently sold, supplied, delivered or

7   otherwise distributed to Decedent, or to others working in close proximity to Decedent, the above-

8   described asbestos and asbestos-containing products to which Decedent was exposed.

9     50.    The defendants, and each of them, knew the intended purpose of the asbestos and

10   asbestos-containing products prior to marketing said products, and knew or should have known that

11   dangerous levels of asbestos fiber would be released during the process of applying, installing and

12   removing these products.

13     51.    The defendants, and each of them, placed said asbestos and asbestos-containing

14   products on the market without any warning, or with an inadequate warning, and by so doing

15   impliedly warranted that said products were of good and merchantable quality and fit for their

16   intended purpose.

17     52.    Defendants, and each of them, impliedly warranted that their products were of

18   merchantable quality and safe, fit and proper for the uses which Defendants knew or intended were

19   to be made of them at the time of selling them.

20     53.    Decedent reasonably relied on the skill, knowledge and judgment of defendants, and

21   each of them, in Decedent's use of the products as a basis of the bargain under which such products

22   were bought and used.

23     54.    The products were neither safe for their intended use nor of merchantable quality or

24   fit for use as warranted by defendants, and each of them, in that said products had dangerous

25   propensities when put to the use for which each of these Defendants knew or intended they were

26   marketed or sold, and would cause severe injury to users or bystanders, such as Decedent.

27   ///

28   ///

<center>20</center>

1    55.    The defendants, and each of them, breached the implied warranties of

2    merchantability and fitness for an intended purpose by marketing asbestos and asbestos-containing

3    products without a warning, or with an inadequate warning, advising Decedent and others working

4    in close proximity to Decedent that dangerous levels of asbestos fiber would be released during the

5    process of applying, installing and removing said products.

6        56.    As a direct and legal result of the conduct of the defendants, and each of them,

7    Decedent developed an asbestos-related disease known and designated as asbestos related lung

8    cancer, from which he died.  Plaintiffs have incurred damages in excess of $50,000.00 in addition

9    to the special damages alleged herein.

10        WHEREFORE, plaintiffs pray judgment as is hereinafter set forth.

11                          **FIFTH CAUSE OF ACTION**

12                          (Fraud and Conspiracy)

13        AS AND FOR A FIFTH CAUSE OF ACTION, plaintiffs complain of the defendants, and

14    each of them, and allege:

15        57.    Plaintiffs, by this reference, hereby incorporate and make a part hereof, as though

16    fully set forth herein, each and every allegation contained in the First through Fourth Causes of

17    Action herein.

18        58.    Pursuant to Section 1708 of the Civil Code of California, the defendants and each of

19    them, owed a duty to Decedent at all times relevant herein to abstain from injuring the Decedent or

20    infringing upon any of his rights.

21        59.    The defendants, and each of them, breached the duty they owed to Decedent and

22    plaintiffs pursuant to Section 1708 of the Civil Code of California by willfully deceiving him with

23    the intent to induce him to alter his position to his injury or risk. The defendants, and each of them,

24    deceived the Decedent and committed actionable fraud pursuant to Section 1709 and Section

25    1710 of the Civil Code of California.

26        60.    The defendants, and each of them, as more fully set forth below, suggested as fact

27    that which was not true, and that which defendants, and each of them, did not believe was true.

28    / / /

                                    21

1    61.    The defendants, and each of them, as more fully set forth below, asserted as fact that

2    which was not true, and that which defendants, and each of them, had no reasonable grounds for

3    believing was true.

4    62.    The defendants, and each of them, as more fully set forth below, suppressed facts

5    which they were obligated to disclose, and gave information of other facts which were likely to

6    mislead for want of communication of the undisclosed facts.

7    63.    The defendants, and each of them, made promises without any intention of keeping

8    those promises.

9    64.    Since 1924, the defendants, and each of them, have known and have possessed the

10   true facts of medical and scientific data and other knowledge which clearly indicated that the

11   materials and products referred to herein were and are hazardous to the health and safety of the

12   Decedent, and others in plaintiffs' position working in close proximity with such materials. The

13   defendants, and each of them, have known of the dangerous propensities of the aforementioned

14   materials and products since before that time, and with intent to deceive Decedent, and others in his

15   position, and with intent that he and such others should be and remain ignorant of such facts, and

16   with intent to induce Decedent and such others to alter his and their positions to his and their injury

17   and/or risk and in order to gain advantages did do the following acts:

18   A.    Defendants, and each of them, did not label any of the aforementioned asbestos-

19   containing materials and products regarding the hazards of such materials and products to the

20   health and safety of Decedent and others in Decedent's position working in close proximity with

21   such materials until 1964, when certain of such materials were labeled by some, but not all, of the

22   defendants herein, despite the fact that the knowledge of such hazards existed and was known to

23   defendants, and each of them, since 1924. By not labeling such materials as to their said hazards,

24   defendants, and each of them, caused to be suggested as a fact to Decedent and Decedent's

25   employer that it was safe for Decedent to work in close proximity to such materials when in fact it

26   was not true and defendants did not believe it to be true;

27   ///

28   ///

22

B.     Defendants, and each of them, suppressed information relating to the danger of the use of the aforementioned materials by requesting the suppression of information to the Decedent and the general public concerning the dangerous nature of the aforementioned materials to workers and by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof, when defendants were bound to disclose such information;

C.     Defendants, and each of them, sold the aforementioned products and materials Decedent's employer and others without advising such employers and others of dangers of the use of such materials to persons working in close proximity thereto, when defendants knew of such dangers, as set forth herein, and, as set forth above, had a duty to disclose such dangers. Thereby, defendants caused to be positively asserted to Decedent's employer that which was not true and which defendants had no reasonable ground for believing to be true, and in a manner not warranted by the information possessed by said defendants, and each of them, to wit, that it was safe for Decedent to work in close proximity to such materials;

D.     Defendants, and each of them, suppressed and continue to suppress from everyone, including Decedent and Decedent's employer, medical and scientific data and knowledge of the results of studies including, but not limited to, the information and knowledge of the contents of the Lanza report. Although bound to disclose it, defendants, and each of them, influenced A. J. Lanza to change his report, the altered version of which was published in Public Health Volume at page I in 1935, thereby causing Decedent to be and remain ignorant thereof. Defendants, and each of them, caused Asbestos Magazine, a widely disseminated trade journal, to omit mention of danger, thereby lessening the probability of notice of danger to the users thereof;

E.     Defendants, and each of them, belonged to, participated in, and financially supported the Asbestos Textile Institute and other industry organizations which, and on behalf of defendants, and each of them, actively promoted the suppression of information of danger to users of the aforementioned products and materials, thereby misleading Decedent and Decedent's employer by the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos

COMPLAINT FOR DAMAGES (WRONGFUL DEATH)

1  Textile Institute was specifically enjoined to study the subject of dust control.   Discussions in this
2  committee were held many times regarding the dangers inherent in asbestos and the dangers which
3  arise from the lack of control of dust, and the suppression of such information from 1946 to a date
4  unknown to plaintiffs at this time;

5          F.      Commencing in 1930 with the study of mine and mill workers at Asbestos and
6  Thetford Mines in Quebec, Canada, and the study of workers at Raybestos- Manhattan plants in
7  Manheim and Charleston, South Carolina, defendants knew and possessed medical and scientific
8  information of the connection between inhalation of asbestos fibers and lung cancer, asbestosis,
9  pleural plaques, and related conditions which information was disseminated through the Asbestos
10  Textile Institute and other industry organizations to all other defendants, and each of them, herein.
11  Between 1942 and 1950, the defendants, and each of them, acquired medical and scientific
12  information of the connection between inhalation of asbestos fibers and cancer, which information
13  disseminated through the Asbestos Textile Institute and other industry organizations to all other
14  defendants herein. Thereby, defendants suggested as a fact that which is not true and disseminated
15  other facts likely to mislead Decedent and Decedent's employer and which did mislead them by
16  withholding afore described medical and scientific data and by not giving Decedent or Decedent's
17  employer the true facts concerning such knowledge of danger, when defendants were bound to
18  disclose it;

19          G.      Defendants, and each of them, failed to warn Decedent and Decedent's employer
20  that said materials were dangerous when breathed and caused pathological effects without
21  noticeable trauma, despite the fact that defendants possessed knowledge and were under a duty to
22  disclose that such material was dangerous and a threat to the health of persons coming into contact
23  therewith;

24          H.      Defendants, and each of them, failed to provide Decedent with information
25  concerning adequate protective masks and devices to be used when applying and installing the
26  products of the defendants, and each of them, despite the knowledge of defendants and a duty to
27  disclose that such protective measures were necessary and would result in injury to the Decedent
28  and others applying and installing such materials if not so advised;

<div align="center">24</div>

1      I.     Defendants, and each of them, concealed from Decedent the true nature of the

2 industrial and construction exposure of Decedent, and knew that Decedent and anyone similarly

3 situated, upon inhalation of asbestos would, in time, develop irreversible conditions of either

4 pneumoconiosis, asbestosis or cancer, or all, and that the materials to which he was exposed would

5 cause pathological effects without noticeable trauma despite the fact that defendants were under a

6 duty to and bound to disclose it; and

7      J.    Defendants, and each of them, failed to provide information to the public at large

8 and buyers, users, and physicians employed by Decedent and Decedent's employer for the purpose

9 of conducting physical examinations of Decedent and others working with or near asbestos of the

10 true nature of the hazards of asbestos, and that exposure to these materials would cause

11 pathological effects without noticeable trauma to the public, including buyers, users, and

12 physicians employed by Decedent and Decedent's employer so that said physicians could examine,

13 diagnose and treat Decedent and others who were exposed to asbestos, despite the fact that

14 defendants, and each of them, were under a duty to so inform and said failure was misleading.

15      65.    Defendants, and each of them, having the aforementioned knowledge of facts and

16 knowing that the Decedent did not possess such knowledge, acted falsely and fraudulently and with

17 full intent to cause Decedent to remain unaware of those facts and to induce Decedent to work with

18 and around unsafe products in a dangerous environment, all in violation of Section 1710 of the

19 Civil Code of the State of California.

20      66.    At all times mentioned, the defendants, and each of them, knowingly and willfully

21 conspired and agreed among themselves to perpetrate upon Decedent the unlawful acts complained

22 of in Paragraph 20 through 29 of the First Cause of Action, and this Fifth Causes of Action.

23      67.    The defendants, and each of them, and at least one of them, did the acts herein

24 alleged in Paragraphs 59 through 64 of this Cause of Action in furtherance of the conspiracy and

25 agreement as herein alleged, and also acted in furtherance of a conspiracy and agreement between

26 and among the defendants, and each of them, to violate State and Federal laws and regulations, the

27 exact nature and extent of which are unknown at this time, but known full well to defendants, and

28 each of them. These actions were done maliciously, wantonly, and in reckless disregard for the

1 | health and safety of others, including Decedent herein.

2 | 68. Decedent reasonably relied upon the misrepresentations of the defendants, and each

3 | of them, and in reliance on same continued to work with and around asbestos and asbestos-

4 | containing products. Decedent would have taken steps to protect his health and life had he known

5 | the facts, which were known to the defendants, and each of them, about exposure to asbestos and

6 | asbestos-containing products. Decedent would not have knowingly continued to work in an unsafe

7 | environment. He had no knowledge of the foregoing facts and actions of the defendants, and each

8 | of them, at the time when they were committed, and cannot be charged with knowledge or inquiry

9 | thereof.

10 | 69. As a direct and legal result of the conduct of the defendants, and each of them,

11 | Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

12 | conditions and disabilities as previously set forth, from which he died. Plaintiffs have incurred

13 | damages in excess of $50,000.00 in addition to the special damages alleged.

14 | WHEREFORE, plaintiffs pray judgment as is hereinafter set forth.

15 | <center>SIXTH CAUSE OF ACTION</center>

16 | <center>(False Representation Under Restatement Torts Section 402-B)</center>

17 | AS AND FOR A SIXTH CAUSE OF ACTION, plaintiffs complain of the defendants, and

18 | each of them, and allege:

19 | 70. Plaintiffs incorporate by reference as though fully set forth herein, each and every

20 | allegation of the First, Second, Third, Fourth, and Fifth Causes of Actions herein.

21 | 71. At the aforementioned time when defendants, and each of them, researched,

22 | manufactured, tested or failed to test, warned or failed to warn, designed, labeled, distributed,

23 | advertised, marketed, warranted, inspected, repaired, offered for sale and sold the said asbestos and

24 | asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly

25 | and impliedly represented to members of the general public, including the purchasers and users of

26 | said product, and including Decedent herein and his employers, that asbestos and asbestos-

27 | containing products were of merchantable quality, and safe for the use for which they were

28 | intended.

<center>26</center>

1    72.    The purchasers and users of said asbestos and asbestos-containing products,

2    including Decedent and his employers, relied upon said representations of defendants and each of

3    them, in the selection, purchase and use of asbestos and asbestos-containing products.

4    73.    Said representations by defendants, and each of them, were false and untrue, in that

5    the asbestos and asbestos-containing products were not safe for their intended use, nor were they of

6    merchantable quality as represented by defendants, and each of them, in that asbestos and asbestos

7    containing products have very dangerous properties and defects whereby said products cause lung

8    cancer, asbestosis, pleural plaques, and other diseases, and have other defects that cause injury and

9    damage to the users of said products, including the Decedent herein, thereby threatening the health

10    and life of Decedent.

11    74.    As a direct and legal result of the conduct of the defendants, and each them

12    Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

13    conditions and disabilities as previously set forth, from which he died.  Plaintiffs have incurred

14    damages in excess of $50,000.00 in addition to the special damages alleged herein.

15        WHEREFORE, plaintiff prays judgment as hereinafter set forth.

16            SEVENTH CAUSE OF ACTION

17            (Loss of Consortium)

18    75.    AS AND FOR A SEVENTH CAUSE of action, plaintiff Hazel King complains of

19    defendants, and each of them, as follows:

20    76.    Plaintiff, by this reference, hereby incorporates and makes a part thereof, as though

21    fully set forth herein, each and every allegation contained in the General Allegations and each of

22    the foregoing Causes of Action herein.

23    77.    At the time that Decedent sustained injury as more fully alleged in the First through

24    Seventh Causes of Action, and at all times thereafter, plaintiff Hazel King was the spouse of

25    Decedent.

26    78.    Prior to said injuries and death, Decedent was able to and did perform his duties as

27    the spouse of plaintiff Hazel King.  Plaintiff is informed and believes and thereon alleges that

28    subsequent to said injuries and as a proximate result thereof, Decedent was incapacitated, and

27

remained so until the time of his death and was unable to perform the necessary duties as spouse of plaintiff Hazel King and the work and service usually performed in the care, maintenance, and management of the family home.

79.    As a proximate result of Decedent's injuries, as alleged herein, plaintiff Hazel King was deprived of consortium with Decedent, including the performance of his spouse's duties, thus requiring plaintiff to perform the duties previously performed by Decedent, all to plaintiff's damage in a sum which cannot be ascertained at this time. Plaintiff requests the right to amend this complaint to allege the amount of said damages when they are ascertained.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## EIGHTH CAUSE OF ACTION

### (Survival Action and Punitive Damages)

AS AND FOR A EIGHTH CAUSE OF ACTION, plaintiffs complain of the defendants, and each of them, and allege as follows:

80. .   Plaintiffs hereby incorporate each allegation contained in each and every paragraph of the General Allegations and the First through Seventh Causes of Action, inclusive, as though fully realleged in respect to this cause of action.

81.    Prior to his death, Decedent had a cause of action against defendants herein for personal injuries arising from his exposure to asbestos. Subsequent to the arisal of this cause of action and within the pertinent statutes of limitation, Decedent who would have been the plaintiff in this action if he had lived, died.

82.    As a proximate result of the conduct of defendants, and each of them, Decedent was required to, and did, employ physicians and surgeons to examine, treat and care for him and did incur medical and incidental expenses in a sum to be subsequently determined.

83.    As a further, direct and proximate result of the conduct of defendants, and each of them, Decedent was prevented from attending to his usual occupation for a period of time and thereby incurred damages for loss of earnings in a sum to be subsequently determined.

///
///

28

1      84.    As a further, direct and proximate result of the conduct of defendants, and each of

2  them, Plaintiffs buried Decedent and incurred damages for consequential costs of Decedent's

3  funeral and burial in a sum to be subsequently determined.

4      85.    As a direct and legal result of the conduct of the defendants, and each of them, prior

5  to Decedent's death, Decedent sustained the damages alleged herein, in an amount of at least

6  $50,000.

7      WHEREFORE, plaintiffs HAZEL KING, LORI KING, TERI PARSLOW, and KERRY

8  KING pray judgment as follows:

9  **First, Second, and Fifth Causes of Action**

10     1.    General damages in an amount in excess of $50,000.00 in accordance with proof;

11     2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

12 accordance with proof;

13     3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

14 in accordance with proof;

15     4.    Special damages in accordance with the proof;

16     5.    Prejudgment interest and post-judgment interest in accordance with law;

17     6.    Costs of suit; and,

18     7.    Such and other and further relief as the Court deems just and proper.

19 **Third, Fourth, and Sixth Causes of Action**

20     1.    General damages in an amount in excess of $50,000.00 in accordance with proof;

21     2.    Special damages in accordance with the proof;

22     3.    Prejudgment interest and post-judgment interest in accordance with law;

23     4.    Costs of suit; and,

24     5.    Such and other and further relief as the Court deems just and proper.

25     WHEREFORE, plaintiff Hazel King prays judgment as follows:

26 **Seventh Cause of Action**

27     1.    General damages in an amount in excess of $50,000.00 in accordance with proof;

28     2.    Special damages in accordance with the proof;

29

3.   Prejudgment interest and post-judgment interest in accordance with law;

4.   Costs of suit; and,

5.   Such and other and further relief as the Court deems just and proper.

WHEREFORE, plaintiffs HAZEL KING, LORI KING, TERI PARSLOW, and KERRY KING pray judgment as follows:

**Eighth Cause of Action**

1. General damages in an amount in excess of $50,000.00 in accordance with proof;

2. Special damages in accordance with the proof;

3. Punitive and exemplary damages in an amount found appropriate by the trier of fact in accordance with proof;

4. Prejudgment interest and post-judgment interest in accordance with law;

5. Costs of suit; and

6. Such and other and further relief as the Court deems just and proper.

DATED:  July 28, 2009                          BRENT COON & ASSOCIATES

By:
RICHARD A. BRODY
Attorneys for Plaintiffs

30

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Richard A. Brody, Esq. (SBN 100739)
Brent Coon & Associates
44 Montgomery Street, Suite 800
San Francisco, CA 94104
TELEPHONE NO.: 415-489-7420    FAX NO.: 415-489-7426
ATTORNEY FOR *(Name):* Plaintiffs Hazel King, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Civil Jurisdiction

CASE NAME:
King, et al. v. A.O. Smith Corporation, et al.

FOR COURT USE ONLY

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 8 2009

GORDON PARK-LI, Clerk
BY: PARAM NATT
Deputy Clerk

CASE NUMBER: CGC-09-275285

| CIVIL CASE COVER SHEET | Complex Case Designation | |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[✓] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action *(specify):* 8
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 27, 2009
Richard A. Brody, Esq. (SBN 100739)
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

# ⊔ORIGINAL

CIV-050

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*<br>Richard A. Brody, Esq. (SBN 100379)<br>Brent Coon & Associates<br>44 Montgomery Street, Suite 800<br>San Francisco, CA 94104<br>TELEPHONE NO.: 415-489-7420<br>ATTORNEY FOR *(name):* Plaintiffs Hazel King, et al. | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco

STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Civil Jurisdiction

PLAINTIFF: Hazel King, et al.
DEFENDANT: A.O. Smith Corporation, et al.

**STATEMENT OF DAMAGES**
**(Personal Injury or Wrongful Death)**

CASE NUMBER:
CGC-09-275285

To *(name of one defendant only):* A.O. Smith Corporation
Plaintiff *(name of one plaintiff only):* Hazel King
seeks damages in the above-entitled action, as follows:

AMOUNT

**1. General damages**

| | | | |
|---|---|---|---|
| a. ☐ | Pain, suffering, and inconvenience | $ | |
| b. ☐ | Emotional distress | $ | |
| c. ☑ | Loss of consortium | $ | 5,000,000.00 |
| d. ☑ | Loss of sociey and companionship *(wrongful death actions only)* | $ | 5,000,000.00 |
| e. ☐ | Other *(specify)* | $ | |
| f. ☐ | Other *(specify)* | $ | |
| g. ☐ | Continued on Attachment 1.g. | | |

**2. Special damages**

| | | | |
|---|---|---|---|
| a. ☐ | Medical expenses *(to date)* | $ | |
| b. ☐ | Future medical expenses *(present value)* | $ | |
| c. ☐ | Loss of earnings *(to date)* | $ | |
| d. ☑ | Loss of future earning capacity *(present value)* | $ | 500,000.00 |
| e. ☐ | Property damage | $ | |
| f. ☑ | Funeral expenses *(wrongful death actions only)* | $ | 50,000.00 |
| g. ☑ | Future contributions *(present value) (wrongful death actions only)* | $ | 1,000,000.00 |
| h. ☑ | Value of personal service, advice, or training *(wrongful death actions only)* | $ | 1,000,000.00 |
| i. ☐ | Other *(specify)* | $ | |
| j. ☐ | Other *(specify)* | $ | |
| k. ☐ | Continued on Attachment 2.k. | | |

**3. ☑ Punitive damages:** Plaintiff reserves the right to seek punitive damages in the amount of *(specify)..* $ 10,000,000.00
when pursuing a judgment in the suit filed against you.

Date: July 27, 2009

Richard A. Brody, Esq. (SBN 100379)

(TYPE OR PRINT NAME)                    ▶                    (SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

(Proof of service on reverse)

Form Adopted for Mandatory Use<br>
Judicial Council of California<br>
CIV-050 [Rev. January 1, 2007]

**STATEMENT OF DAMAGES**
**(Personal Injury or Wrongful Death)**

Code of Civil Procedure, §§ 425.11, 425.115
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

1  Richard A. Brody, Esq. (SBN 100379)
   BRENT COON & ASSOCIATES
2  44 Montgomery Street, Suite 800
   San Francisco, CA 94104
3  Telephone: 415.489.7420
   Facsimile: 415.489.7426
4
   Attorneys for Plaintiffs
5

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 8 2009

GORDON PARK-LI, Clerk
BY: PARAM NATT
                    Deputy Clerk

6

7

8

9           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10               IN AND FOR THE COUNTY OF SAN FRANCISCO

11

12  HAZEL KING, individually and as successor in      Case No. CGC-09-275265
    interest to KENNETH KAY KING, Deceased;
13  LORI MONTOYA; TERI PARSLOW; and                   PRELIMINARY FACT SHEET
    KERRY KING,                                       NEW FILING
14                                                     ASBESTOS LITIGATION
15          Plaintiffs,                                (General Order No. 129)

16  v.

17  A.O. SMITH CORPORATION, et al.,

18          Defendants.

19                              **NOTICE**

20      **TO NEW DEFENDANTS SERVED IN THE ABOVE-CAPTIONED CASE SUBJECT
    TO THE GENERAL ORDERS OF COMPLEX ASBESTOS LITIGATION IN THE**
21  **ABOVE-CAPTIONED COURT:**

22      You have been served with process in an action which has been designated by the Court as

23  complex litigation pursuant to Standard 19 of the Standards of Judicial Administration. This

24  litigation bears the caption "In Re: Complex Asbestos Litigation" and the Court No. 828684.

25      This litigation is governed by various general orders, some of which affect the judicial

26  management and/or discovery obligations, including your responsibility to answer interrogatories

27  deemed propounded in this case. You may download this Court's General Orders from the

28  internet, or contact the Court or Designated Defense Counsel, Berry & Berry, Post Office Box

                                    1.

1    16070, Oakland, CA 94612; telephone (510) 250-0200; Facsimile (510) 835-5117, for further

2    information and/or for copies of these orders, at your expense.

3    I.      State the complete name and address of each person whose claimed exposure to

4           asbestos is the basis of this lawsuit ("exposed person"): Kenneth Kay King

5    II.      Does plaintiff anticipate filing a motion for preferential trial date within the next

6           four months? _____ Yes          __X__ No

7    III.      Date of birth of each exposed person in item one and, if applicable, date of death:

8            Date of Birth: May 13, 1932      Date of Death: January 29, 2009

9           Social Security Number of each exposed person:

10           Kenneth Kay King – 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

11    IV.      Specify the nature of type of asbestos-related disease alleged by each exposed

12           person:

            _____ Asbestosis                 _____ Mesothelioma

13           _____ Pleural Thickening/Plaques      _____ Other Cancer: Specify:

14           _XXX_ Lung Cancer Other Than Mesothelioma    _____ Other: Specify

15

16    V.      For purposes of identifying the nature of exposure allegations involved in this

17           action, please check one or more:

18           _X_ Shipyard       _____ Construction       _____ Friction/Automotive

19           _____ Premises       _____ Aerospace       _X_ Military

20           _____ Other: Specify all that apply:

21

22           If applicable, indicate which exposure allegations apply to which exposed person.

23    VI.      Identify each location alleged to be a source of an asbestos exposure, and to the

24           extent known, provide the beginning and ending year(s) of each such exposure.

            Also specify each exposed person's employer and job title or job description during

25           each period of exposure. (For example, "San Francisco Naval Shipfitter

            1939-1948"). Examples of locations of exposure might be a specific shipyard, a

26           specific railroad maintenance yard, or perhaps more generalized descriptions such as

27           "merchant marine" or "construction". If an exposed person's claims exposure during

            only a portion of a year, the answer should indicate that year as the beginning and

28           ending year (e.g., 1947-1947).

| YEARS | EMPLOYER/LOCATION | JOB TITLE | JOB DUTIES |
|---|---|---|---|
| 1952 to 1968 | United States Navy USS Floyd Bay; USS Boxer (CVA-21); USS Pictor (AF-54); USS Torcan MS; USS Hopewell; (DD); USS Wiltsie (DD); Hunters Point Naval Shipyard; Pearl Harbor Naval Shipyard; and San Diego Naval Shipyard. | Chief Hospital Corpsman | Decedent served aboard the USS Floyd Bay; USS Boxer (CVA-21); USS Pictor (AF-54); USS Torcan MS; USS Hopewell; (DD); and USS Wiltsie (DD). Decedent was stationed at numerous land-based locations, including Hunters Point Naval Shipyard, Pearl Harbor Naval Shipyard, and San Diego Naval Shipyard. |
| May 23, 1969 to August 2, 1993. | Defense Department Ogden, Utah | Warehouse Man | |

DATED: July 27, 2009

BRENT COON & ASSOCIATES

By: _____
RICHARD A. BRODY
Attorneys for Plaintiffs

3

EXHIBIT "2"

1 | Theodore T. Cordery, Esq. (Bar No. 114730)
tcordery@itkc.com
2 | Michael J. Boland, Esq. (Bar No. 98343)
mboland@itkc.com
3 | Stephen E. Carlson, Esq. (Bar No. 104279)
scarlson@itkc.com
4 | IMAI, TADLOCK, KEENEY & CORDERY, LLP
100 BUSH STREET, SUITE 1300
5 | SAN FRANCISCO, CA 94104-3915
Telephone:    (415) 675-7000
6 | Facsimile:    (415) 675-7008

7 | Attorneys for Defendant
ELLIOTT COMPANY f/k/a ELLIOTT TURBOMACHINERY CO., INC.

8

9                          UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11 | HAZEL KING, individually and as successor | (ASBESTOS)
12 | in interest to KENNETH KAY KING,
Deceased; LORI KING; TERI PARSLOW; | CASE NO. _____
13 | and KERRY KING,
| San Francisco Superior Court Case No. CGC-
14 | | 10-275540
| Plaintiffs,
15 | | **AFFIDAVIT OF REAR ADMIRAL (USN,
RETIRED) BEN J. LEHMAN IN SUPPORT
16 | v. | OF DEFENDANT ELLIOTT COMPANY'S
NOTICE OF REMOVAL**
17 | A.O. SMITH CORP., A.W. CHESTERTON
COMPANY; ADVOCATE MINES, LTD; | Complaint Filed: July 29, 2009
18 | AKER KVAERNER POWER, INC.; ALFA
LAVAL, INC., individually and as successor in
19 | interest to SHARPLES, INC., ALFA LAVAL
SEPARATOR, INC., and DELAVAL
20 | SEPARATOR COMPANY; ALLIED
PACKING & SUPPLY, INC.; ALLIS-
21 | CHALMERS PRODUCT LIABILITY
TRUST; BETHLEHEM STEEL COMPANY;
22 | BRYAN STEAM, LLC.; BUFFALO PUMPS,
INC., individually and as successor in interest
23 | to AMPCO PITTSBURGH CORPORATION
and BUFFALO FORGE COMPANY;
24 | CARRIER CORPORATION; CBS
CORPORATION, formerly known as
25 | VIACOM, INC. individually and as successor
in interest to WESTINGHOUSE ELECTRIC,
26 | and WECO INTERNATIONAL; CLEAVER-
BROOKS, INC.; COLTEC INDUSTRIES,
27 | INC., Fairbanks Morse Engine Division;
CRANE CO.; CROWN CORK & SEAL
28 | COMPANY, INC. individually and as
successor in interest to MUNDET CORK

-1-
AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN IN SUPPORT OF DEFENDANT
ELLIOTT COMPANY'S NOTICE OF REMOVAL

LAW OFFICES
IMAI, TADLOCK, KEENEY & CORDERY, LLP
SUITE 1040
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

1  COMPANY; DRESSER-RAND GROUP,
   INC., individually and as successor in interest
2  to TERRY STEAM TURBINE COMPANY;
   DURABLA MANUFACTURING
3  COMPANY; DURO DYNE WEST
   CORPORATION; EATON HYDRAULICS
4  LLC, formerly known as VICKERS, INC.;
   ELLIOTT COMPANY, also known as
5  ELLIOTT TURBOMACHINERY
   COMPANY, INC.; FAIRBANKS MORSE
6  PUMP CORPORATION; FEDERAL
   SHIPBUILDING AND DRYDOCK
7  COMPANY; FLOWSERVE
   CORPORATION, individually and as
8  successor in interest to and/or the entities
   formerly known as THE DURIRON
9  COMPANY and DURCO INTERNATIONAL,
   INC.; FLOWSERVE INTERNATIONAL,
10 INC. individually and as successor in interest,
   successor by merger, alter ego, and/or formerly
11 known as BW/P INTERNATIONAL, INC.,
   BW/IP, INC., and BYRON JACKSON PUMP
12 CO.; FLOWSERVE US, INC. individually
   and as successor in interest to VOGT VALVE
13 COMPANY; FMC CORPORATION;
   FOSTER WHEELER USA CORPORATION;
14 FRASER'S BOILER SERVICE, INC.;
   FRYER-KNOWLES, INC.; GARDNER
15 DENVER, INC., formerly known as
   GARDNER DENVER MACHINERY, INC.,
16 individually and as successor in interest to
   CHAMPION AIR COMPRESSORS;
17 GARLOCK SEALING TECHNOLOGIES,
   LLC, individually and as successor in interest
18 to ANCHOR PACKING COMPANY;
   GENERAL DYNAMICS CORPORATION,
19 individually and as successor in interest to
   ASBESTOS CORPORATION, LTD.;
20 GENERAL ELECTRIC COMPANY; (THE)
   GOODYEAR TIRE & RUBBER COMPANY;
21 GOULDS PUMPS, INCORPORATED;
   HENRY VOGT MACHINE COMPANY;
22 HOPEMAN BROTHERS, INC.; IMO
   INDUSTRIES, INC., individually and as
23 successor in interest to DELAVAL STGEAM
   TURBINE CO.; INGERSOLL-RAND
24 COMPANY; ITT CORPORATION, formerly
   known as ITT INDUSTRIES, INC.,
25 individually and as successor in interest to
   ALLIS-CHALMERS CORP. and BELL &
26 GOSSETT; J.T. THORPE & SON, INC.;
   JOHNSON CONTROLS, INC.; LAKE
27 WASHINGTON SHIPYARDS; LAMONS
   GASKET COMPANY, individually and as
28 successor in interest to POWER
   ENGINEERING AND EQUIPMENT, INC.;

-2-

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 250
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7800

1  LAMONS GASKET COMPANY; LESLIE
   CONTROLS, INC.; M. SLAYEN &
2  ASSOCIATES, INC.; MASTER PUMPS &
   EQUIPMENT CORPORATION;
3  METALCLAD INSULATION
   CORPORATION, individually and as
4  successor in interest to NORTHERN
   CALIFORNIA INSULATIONS; MOORE
5  DRY DOCK COMPANY; (THE) NASH
   ENGINEERING COMPANY; NEWPORT
6  NEWS SHIPBUILDING AND DRYDOCK
   CO.; NIBCO, INC., which will do business in
7  California s CAL NIBCO; OAKFABCO, INC.,
   individually and as successor in interest to
8  KEWANEE BOILERS; PARKER-
   HANNIFIN, individually and as successor in
9  interest to SACOMO-SIERRA; PATTERSON
   PUMP COMPANY; PENTAIR PUMP
10 GROUP, individually and as successor in
   interest to AURORA PUMPS; PLANT
11 INSULATION COMPANY; PLANT
   INSULATION COMPANY; QUINTEC
12 INDUSTIRES, INC.; RAPID-AMERICAN
   CORPORATION; RED-WHITE VALVE
13 CORP.; RICHARD KLINGER, INC.; RILEY
   POWER, INC., formerly known as DB RILEY,
14 INC., individually and as successor in interest
   to RILEY STOKER CORPORATION; SB
15 DECKING, INC., formerly known as SELBY
   BATTERSBY & COMPANY; SEPCO
16 CORPORATION; SQUARE D CO.;
   STERLING FLUID SYSTEM (USA), LLC,
17 formerly known as PEERLESS PUMP
   COMPANY; SULZER PUMPS (US) INC.;
18 SYD CARPENTER MARINE
   CONTRACTOR, INC.; TATE ANDALE,
19 INC. individually and as successor in interest
   to C.H. WHEELER, MANUFACTURING
20 CO.; THE DARCOID COMPANY OF
   CALIFORNIA; TRAC REGULATOR CO.,
21 INC., individually and as the parent and/or
   successor in interest to ATLAS VALVE
22 COMPANY, INC.; TRANE US. INC.;
   TRIPLE A MACHINE SHOP, INC.;
23 TUTHILL CORPORATION; UNION
   CARBIDE CORPORATION; UNIROYAL
24 HOLDING, INC.; VIAD CORPORATION,
   individually and as successor in interest to
25 GRISCOM-RUSSELL; WARREN PUMPS,
   LLC; (THE) WILLIAM POWELL
26 COMPANY; YARWAY CORPORATION;
   YORK INTERNATIONAL CORPORATION;
27 ZURN INDUSTRIES, LLC, formerly known
   as ZURN INDUSTRIES, and DOES 1-500,
28 inclusive,

-3-

1        Defendants.

2

3

4         <u>**AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN**</u>

5      I, Ben J. Lehman, on oath and of my own personal knowledge, background, training, and
experience state the following:

6       1.      I am a retired Rear Admiral of the United States Navy. Before joining the Navy in

7 1942, I received a Bachelor of Mechanical Engineering degree from the College of the City of

8 New York. After joining the Navy, I was ordered to study naval architecture and marine

9 engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States

10 Navy Post-Graduate School program in Naval Engineering Design at the Naval Academy in

11 Annapolis. The curriculum was primarily in electrical and mechanical engineering. I received a

12 Master of Science in Mechanical Engineering from Harvard University of 1949. I have also

13 studied Design Philosophy and Advanced Stress Analysis at Stanford University.

14       2.      I joined the United States Navy in 1942 and remained on active duty until 1946.

15 While on active duty in the United States Navy, I served as Ship Superintendent and Dry Docking

16 Officer at the Brooklyn Navy Yard between 1942 and 1944. In 1946, I left active duty and joined

17 the Naval Reserve. In 1950, I returned to active duty and was assigned as a Ship Superintendent

18 at the San Francisco from 1950 to 1952. I was then transferred to the Assistant Industrial

19 Manager Office in San Francisco from 1952 to 1954 as a Planning Officer. In 1954, I returned to

20 the Naval Reserve where I was a member and the Commanding Officer of Naval Reserve

21 Engineering Companies.

22       3.      In 1977, I was promoted to Rear Admiral in the Naval Reserve.

23       4.      I worked as an engineer at the General Electric Company between 1946 and 1948.

24 I held the positions of Director of Engineering and Vice-President of Engineering at two major

25 ship building companies between 1969 and 1975. During all these periods, I maintained close

26 contact with the U.S. Navy, including periods of active duty in the Department of Defense and the

27 Naval Sea Systems Command in Washington, D.C. I have personally been responsible for the

28

AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN IN SUPPORT OF DEFENDANT
ELLIOTT COMPANY'S NOTICE OF REMOVAL

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 675-7000

LAW OFFICES
MAL TADLOCK, KEENEY & CORDERY, LLP
SUITE 1740
100 BUSH STREET
SAN FRANCISCO, CA  94104
(415) 875-7000

1   creation of Navy specifications for the procurement of materials and machinery for use on Navy

2   ships. A true and correct copy of my Curriculum Vitae is attached as Exhibit A.

3          5.      Based on my experience, professional training and education, I am familiar with

4   the plans, designs and specifications used in the construction and repair of commercial and Navy

5   ships. In addition, I am familiar with Navy specifications, equipment manuals and qualified

6   products lists which are used in the construction and repair of Navy and commercial ships. I am

7   also familiar with the Navy regulations regarding the use of, placement of, and repairs or

8   maintenance of asbestos products generally during the periods in which they were used and the

9   Navy regulations regarding such maintenance, technical manuals and warnings permitted by the

10  Navy.

11         6.      I submit this affidavit to attest to the level of supervision and control by the United

12  States Navy and its officers over every aspect of the design, manufacture, and use of equipment

13  such as Elliott Company deaerating feed tanks ("DA tanks") intended for installation on Navy

14  vessels.

15         7.      During my service in the Navy as a Ship Superintendent, I was personally

16  involved with the supervision and oversight of ship alterations and equipment overhauls at the

17  New York Naval Shipyard (formerly the Brooklyn Navy Yard) and at the San Francisco Naval

18  Shipyard (Hunter's Point).

19         8.      During the 1940s and 1950s, the Navy implemented a system of ship design and

20  construction that established and set designs of ships, which were known to the Navy to meet

21  specific performance capabilities. The Navy then restricted any deviations from such designs by

22  any suppliers and/or contractors, such as Elliott Company. When a change in the design and/or

23  construction of a ship was required, the Navy would oversee, control and approve all aspects of

24  the change. Manufacturers like Elliott Company had no authority to modify, change, or alter

25  Navy specifications or designs. Design drawings were prepared by the design agent for the Navy

26  or by the Navy itself. The Navy reviewed and approved the drawings and then submitted them to

27  the individual suppliers and contractors to use in the manufacturing, supply and/or installation of

28  the equipment and the construction of the ship. These pertained to the original designs, as well as

AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN IN SUPPORT OF DEFENDANT
ELLIOTT COMPANY'S NOTICE OF REMOVAL

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
SUITE 200
100 BUSH STREET
SAN FRANCISCO, CA  94104
(415) 675-7050

1  changes initiated and controlled by the Navy.

2      9.    The Navy also issued contracts to build prototypes and/or a number of production

3  units.  The prototype specifications and/or design concepts were issued directly from the Navy or

4  via a naval shipyard.

5      10.   Once a prototype was qualified, the Navy placed orders for production of the

6  equipment.  If Elliott Company was awarded the manufacturing contract, it would be supervised

7  by onsite naval inspectors during production.  Naval inspectors were typically civilian inspectors

8  employed by BUSHIPS, which later became NAVSEA (or DECAS) – all of which were agents of

9  the Navy.

10     11.   Naval contracts were processed through BUSHIPS/NAVSEA.  NAVSEA officers

11 supervised, enforced and approved a manufacturer's compliance with plans and specifications.

12     12.   Agents of the Navy supervised Elliott Company's production of Naval equipment

13 for Navy vessels.  The inspector, who worked onsite at Elliott's manufacturing plant in Jeanette,

14 Pennsylvania, exercised direct control over all aspects of Elliott's production of equipment for

15 Navy vessels.  The agent observed the manufacturing process and enforced compliance with

16 design specifications.  All aspects of the design, performance requirements, and materials used

17 for construction, including thermal insulation, were specified by NAVSEA.

18     13.   Navy supervision and control were exercised through contract documents, design

19 drawings, written specifications and personal oversight of the manufacturing process.  During all

20 aspects of Elliott Company's work related to Navy vessels, Elliott Company would have

21 performed its work under the immediate supervision of the Navy through BUSHIPS/NAVSEA

22 officers or their civilian agents.

23     14.   Any deviation from military specifications of equipment to be installed on ships

24 would have resulted in significant problems and probable rejection of the equipment.  The Navy

25 could not, and did not, permit its contractors to implement any changes because every aspect of

26 every item of equipment had to be: (1) functionally compatible with every other item of

27 equipment and with available materials from the Navy Supply System; (2) compatible with

28 shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew

-6-

1    in maintaining the ship during its service using materials carried on board when shipyard help

2    was not available.

3        15.    Elliott Company necessarily followed Navy guidelines for its specifications and/or

4    design concepts. It was required to follow Navy specifications for materials, temperatures, flows,

5    weight limits, shock (this is a non-inclusive list) or face rejection. Elliott Company, as a navy

6    contractor, had no authority to modify, change, or alter Navy specifications or designs. It was

7    required to submit any design change proposals to the navy or its agent for approval or rejection

8    by SUPSHIPS, the Supervisor of Shipbuilding in charge of ship construction.

9        16.    In the 1940s, 1950s, and afterward, the Navy had complete control over every

10    aspect of each piece of equipment. Military specifications governed every characteristic of the

11    equipment used on Navy ships, including the instructions and warnings. Drawings for

12    nameplates, texts of instruction manuals, and every other document relating to construction,

13    maintenance, and operation of the vessel were approved by the Navy. This control included the

14    decision of what warnings should or should not be included. Thus, the Navy controlled the

15    decision making with respect to instructions and warnings on every piece of equipment by all

16    Navy contractors including Elliott Company.

17        17.    The Navy had specifications as to the nature and content of all written material

18    that was delivered with each piece of equipment. The Navy was intimately involved with and had

19    final approval of all technical and engineering drawings, operating manuals, safety or hazard

20    information and any other written information that accompanied equipment, like Elliott Company

21    DA tanks. The Navy determined the nature of hazards to be subject to any such labeling. In

22    short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written

23    documentation and warnings associated with its ships and did not permit deviation by any of its

24    contactors including Elliott Company.

25        18.    The Navy specified the use and placement of insulation, including asbestos

26    insulation, on Navy ships during World War II and the 1950s. Mechanical equipment for use

27    aboard Navy ships, like Elliott Company DA tanks, were delivered without insulation. This was

28    to prevent damage to the insulation during shipment and installation, and to allow the equipment

LAW OFFICES
IMAI, TADLOCK, KEENEY & CORDERY, LLP
SUITE 1300
100 BUSH STREET
SAN FRANCISCO, CA 94104
(415) 673-7080

-7-

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
100 BUSH STREET
SAN FRANCISCO, CA  94104
(415) 625-7000

1   to be effectively connected to other equipment and systems on board only after installation and

2   connection could a piece of equipment like DA tank be effectively insulated. Manufacturers,

3   including Elliott Company, did not insulate equipment; rather, shipyard personnel did.

4        19.    Shipyards and shipyard personnel were solely responsible for installing and

5   insulating the equipment. Insulation was installed in accordance with plans, specifications, and

6   schedules developed for and controlled by the Navy.

7        20.    Based upon my experience, professional training, education and research, it is my

8   opinion that the United States Navy was aware of the dangers of asbestos by the 1940s.

9   Despite such knowledge, the Navy did not provide any warnings.

10       21.    Based upon my experience, professional training, education and research, it is my

11   opinion that equipment suppliers were prohibited from providing any warnings to be placed on or

12   to accompany equipment supplied to the Navy without the consent and approval of the Navy.

13   Moreover, certain types of warnings would not have been approved by the Navy given the

14   necessary performance needs and capabilities of the shipboard equipment, the ships and the Navy

15   personnel. This would have included, but would not been limited to, any potential warnings

16   associated with asbestos, including, but not limited to, recommendations regarding respiratory

17   protection and repair and maintenance practices. This was due to the inability to effectively and

18   comprehensively observe, implement, and comply with such recommendations under the

19   multitude of varying conditions likely to be encountered by Navy ships at sea, and especially at

20   war.

21       22.    All equipment and procedures had to be standardized to assure that personnel were

22   familiar with the procedures for operating, repairing and maintaining, repairing and maintaining

23   the equipment, and that the tools and equipment aboard ship or at ports world-wide were

24   available to perform such procedures. Thus, a contractor or supplier like Elliott Company could

25   not provide warnings or recommendations without the consent and authorization of the Navy.

26       23.    During the 1940s and the early 1950s, the Navy did not have the tools equipment

27   and/or personnel capabilities to meet or comply with any potential warnings or recommendations

28   pertaining to the health hazards of asbestos aboard ship, especially under the exigencies of war.

-8-

AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN IN SUPPORT OF DEFENDANT
ELLIOTT COMPANY'S NOTICE OF REMOVAL

LAW OFFICES
IMAI, TADLOCK, KEENEY & CORDERY, LLP
100 BUSH STREET
SUITE 1300
SAN FRANCISCO, CA 94104
(415) 675-7000

1   Further, the Navy limited the areas of interest of each manufacturer to the equipment supplied by

2   that manufacturer. Because equipment like Elliott Company DA tanks were required by the Navy

3   to be supplied without insulation, it would have been improper and unauthorized for the

4   manufacturer or supplier of such equipment to supply warnings or other recommendation with

5   respect to insulation, which would not have been within its particular area of interest. As the

6   manufacturer and/or supplier would not have been responsible for the insulation, it likely would

7   not have been aware of any hazard associated with such insulation or required to determine

8   whether any existed, and thus it had no ability or obligation to supply warnings about insulation.

9   As the Navy would have been the entity which required the insulation, designated the type and

10   placement of the insulation, and directed a different entity to supply, install it, or both e.g. the

11   shipyard, the Navy's knowledge of any potential hazards associated with the insulation would

12   have been equal or superior to that of the equipment manufacturers and suppliers that provided

13   the un-insulated equipment, such as Elliott Company DA tanks.

14       24.     Based upon my review of many documents regarding the Navy's hazard

15   communication program, my career experience in the Navy, and personal knowledge of the

16   Navy's hazard communication program and naval practices generally, I can state as follows:

17       a.     Uniformity and standardization of any communication, and in particular

18   safety information, are crucial to the operation of the Navy. The Navy could simply not operate if

19   various personnel were trained differently and received additional inconsistent information from

20   different manufacturers.

21       b.     Asbestos insulation products began containing hazard warning labels from

22   the insulation manufacturers in the mid-1960s. Prior to that time, beginning more than two

23   decades earlier, the Navy's own occupational health program provided training, engineering and

24   administrative controls, personal protective equipment, and medical surveillance to prevent the

25   hazards of asbestos to shipyard workers.

26       c.     Any additional warning about the hazards of asbestos by any equipment

27   manufacturer would be only partial in scope as well as inherently redundant, eventually obsolete,

28   and almost certainly inconsistent with the Navy's own training. The Navy could not permit

-9-

1 || unauthorized hazard labels which might interfere with the abilities of sailors to perform their

2 || duties in the heat of battle.

3 ||        d.      If each equipment manufacturer (and conceivably even the pipe and

4 || structural steel manufacturers) provided its own warning about asbestos insulation that might be

5 || used on or around its product, inconsistent warnings would certainly have resulted. Many other

6 || hazardous substances (for example boiler feed water chemicals, fuels, solvents, heavy metals) are

7 || used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the

8 || possible substances that might be used on or around its equipment, sailors would quickly become

9 || inundated with inconsistent information on a myriad of substances.

10 ||        e.      Some types of insulation used by the Navy on equipment were non-

11 || asbestos (e.g. fiberglass blankets) and any general warning about asbestos on such equipment

12 || would simply be wrong. In fact, asbestos was designated as a "critical material" by the Army and

13 || Navy Munitions Board on or about January 30, 1940. The Navy directed that substitutes for

14 || asbestos, including fiberglass, cotton duck lagging and hair felt, should be used where possible,

15 || including on low temperature pieces of equipment such Elliott Company DA tanks. This was to

16 || conserve available asbestos.

17 ||        f.      Based on my experience, The United States Navy, as the biggest user of

18 || asbestos in World War II and thereafter in shipbuilding, was more knowledgeable about any

19 || hazard of asbestos than any of the vendors who supplied it and upon whom plaintiff seeks to

20 || impose a duty not consistent with or imposed by the above naval specifications. Further, by

21 || 1940 the United States Navy was a leader in the field of occupational medicine relating to, among

22 || other things, asbestos exposure. I, myself, was exposed to asbestos in inspecting the work

23 || insulating shops under my supervision during my tenure at the Brooklyn Navy Yard and also in

24 || San Francisco. Accordingly, my interest in the Navy's knowledge in this field was both personal

25 || and professional, and continuing to this day.

26 ||        25.     Based on my experience, the United States Navy is bound by its own regulations

27 || and would not permit any vendor gratuitously to do anything not provided for in its own

28 || regulations. The Navy would not allow any warnings to be placed on any product without

LAW OFFICES
IMAI, TADLOCK, KEENEY & CORDERY, LLP
SUITE 1100
MEMBERS STREET
SAN FRANCISCO, CA  94144
(415) 675-7800

-10-

1   specific authority by way of an order or a regulation.

2        26.     The information possessed by the Navy with respect to the specification and use of

3   asbestos, and the health hazards associated with its use aboard Navy vessels, represented the

4   state-of-the-art and far exceeded any information that possibly could have been provided by

5   manufacturers of equipment like Elliott Company. Based upon the knowledge at a given period

6   of time, the Navy was fully aware of the recognized health hazards of asbestos and had a robust

7   program to control exposure of personnel and to monitor their health.

8        27.     There was no information concerning any asbestos hazard or danger posed to any

9   asbestos-containing product applied to any equipment on a United States Navy ship known to a

10  manufacturer of equipment such as Elliott Company that was not previously known to the United

11  States and the United States Navy.

12       It would be unreasonable to assume that the Navy would have accepted gratuitous

13  comments from equipment manufacturers about hazards associated with a product they neither

14  made nor sold, about which the Navy was already aware.

15       I declare under penalty of perjury under the laws of the United States that the foregoing is

16  true and correct.

17       Dated this 28th day of October 2010, at *Lake Tahoe (Stateline)* (city),

18  *Nevada* (state).

19

20

21                                   Ben J. Lehman
                                     Rear Adm. (USN, Retired)

22

23

24

25

26

27

28

AFFIDAVIT OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN IN SUPPORT OF DEFENDANT
ELLIOTT COMPANY'S NOTICE OF REMOVAL

IMAI, TADLOCK, KEENEY & CORDERY, LLP
LAW OFFICES
100 BUSH STREET
SUITE 1300
SAN FRANCISCO, CA 94104
(415) 675-1006