ORIGINAL

E-filing

1  Robert E. Boone III, California Bar No. 132780
   James C. Pettis, California Bar No. 223953
2  Linda C. Hsu, California Bar No. 239880
   **BRYAN CAVE LLP**
3  120 Broadway, Suite 300
   Santa Monica, California 90401-2386
4  Telephone:  (310) 576-2100
   Facsimile:  (310) 576-2200
5  Emails:     reboone@bryancave.com
               james.pettis@bryancave.com
6              linda.hsu@bryancave.com

7  Attorneys for Defendant
   McDONNELL DOUGLAS CORPORATION
8

FILED
JAN - 6 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Fee Paid
NP

9              UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

ADR

11

12  TIMOTHY VEST and CAROLINE         Case No.: **C11-00061**
    VEST,
13                                    (Alameda County Superior Court
                                      Case No. RG09489518)
14              Plaintiffs,

15      vs.                           **NOTICE OF REMOVAL OF
                                      ACTION UNDER 28 U.S.C.
16  ALLIED PACKING AND SUPPLY;        SECTION 1442(a)(1) (FEDERAL
    ALTA BUILDING MATERIALS CO.;      OFFICER)**
17  CYPRUS AMAX MINERALS
    COMPANY, individually, and as
18  successor in interest, parent, alter ego,
    and equitable trustee of CYPRUS MINES
19  CORPORATION, SIERRA TALC &
    CHEMICAL COMPANY, UNITED
20  SIERRA DIVISION CYPRUS MINES
    CORPORATION, and PAUL W. WOOD
21  COMPANY; DEAN'S MATERIALS,
    INC. dba CONSTRUCTION
22  MATERIAL SUPPLIER; THE DEXTER
    CORPORATION; DOWMAN
23  PRODUCTS, INC.; GARLOCK
    SEALING AND TECHNOLOGIES,
24  LLC; GEORGIA-PACIFIC LLC,
    formerly known as GEORGIA-PACIFIC
25  CORPORATION; HAMILTON
    MATERIALS, INC.; HENKEL
26  CORPORATION, individually and as
    successor in interest, parent, alter ego,
27  and equitable trustee to HENKEL
    LOCTITE CORPORATION,
28  individually, and as successor in interest,

FAXED
FIRST LEGAL SUPPORT SERVICES

818741\0307472

MDC'S NOTICE OF REMOVAL

parent, alter ego, and equitable trustee to THE DEXTER CORPORATION; HEXCEL CORPORATION; KAISER GYPSUM COMPANY, INC.; KELLY MOORE PAINT COMPANY, INC.; KENTILE FLOORS, INC.; THE PORT OF OAKLAND; RAYMOND INTERIOR SYSTEMS-NORTH, individually, and as successor in interest, parent, alter ego, and equitable trustee to JAMES L. WHITTAKER, INC.; MCDERMOTT/SEALY, INC.; PARKER HANNIFIN, individually, and as successor in interest, parent, alter ego, and equitable trustee of CLEVELAND WHEELS & BRAKES; GEORGE E. MASKER, INC.; F.P. LATHROP CORPORATION; MCDONNELL DOUGLAS CORPORATION; LIFE TECHNOLOGIES CORPORATION, successor by merger to INVITROGEN CORPORATION, individually, and as successor in interest, parent, alter ego, and equitable trustee of THE DEXTER CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC., individually, and as successor in interest, parent, alter ego, and equitable trustee of F.P. LATHROP CONSTRUCTION COMPANY; WORLD AIRWAYS, INC.; METROPOLITAN LIFE INSURANCE COMPANY; and TENTH DOE through THREE HUNDRED THIRTIETH DOE, inclusive,

Defendants.

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant McDonnell Douglas Corporation ("MDC") files this Notice of Removal of the state court action filed by Plaintiffs Timothy Vest and Caroline Vest as described below to this Court pursuant to 28 U.S.C. Section 1442(a)(1):

I. **BACKGROUND**

1. This is an asbestos personal injury action in which Plaintiffs alleges that Timothy Vest contracted mesothelioma caused by his exposure to asbestos in

1  United States Government-procured and Government-furnished and/or selected
2  aircraft components, including engines, installed by MDC in the KC-10 tanker/cargo
3  military aircraft and B-23 Dragon military aircraft, among other aircraft during the
4  manufacture and assembly of such planes, as required by MDC's procurement
5  contracts with the United States Government, and under the direction and control of
6  federal officers, *i.e.*, procurement personnel and military officials from the
7  Department of the Defense, the United States Air Force, Navy and Marines.
8      2.   The KC-10 and B-23 (the "Aircraft") were military aircraft
9  manufactured by MDC for the United States military. The Government, through the
10 Air Force, procured the Aircraft from MDC pursuant to a series of military
11 equipment procurement contracts. MDC designed the Aircraft pursuant to
12 Government-issued and/or Government-approved detail design specifications and
13 requirements and continued to make Government-mandated changes throughout the
14 life of the Aircraft.
15     3.   As set forth in more detail below, federal officers (Air Force and
16 Department of Defense personnel) selected the Aircraft component parts, including
17 engines, brakes, and/or landing gear, approved their design, including the use of any
18 asbestos in them, independently selected and in some cases procured the component
19 parts from the engine and brake manufacturers, supplied the component parts to
20 MDC, and <u>required</u> MDC to install those components on the Aircraft. In other
21 words, MDC had no choice but to install the component parts, including any
22 asbestos components, on such Aircraft. Now, MDC is being sued for allegedly
23 using asbestos in those component parts. MDC removes this action to this Court on
24 "federal officer" grounds pursuant to 28 U.S.C. Section 1422(a)(1).
25     4.   On or about December 17, 2009, Plaintiff filed a Complaint in the
26 action entitled *Timothy Vest and Caroline Vest v. Allied Packing and Supply, et al.*,
27 in the Superior Court of the State of California for the County of Alameda ("State
28 Court"), Case No. RG09489518 ("State Court Action"). MDC was served with the

Complaint on January 27, 2010. MDC was served with the Second Amended Complaint, which is the operative complaint, on June 3, 2010. True and correct copies of the Complaint and Second Amended Complaint are attached as Exhibit A.

5. Neither the Complaint nor the Second Amended Complaint identified any MDC aircraft or other products that Plaintiffs claimed were a source of Mr. Vest's alleged asbestos exposure. Specifically, the Complaint and Second Amended Complaint do not include identification of any military aircraft or component part for which Mr. Vest alleges exposure and which he claimed exposure. Thus, a basis for removal jurisdiction was not apparent from the Complaint or Second Amended Complaint.

6. On March 16, 2010, MDC filed and served its Demurrer to the Complaint in the State Court and filed and served its Answer to the Second Amended Complaint on June 9, 2010, true and correct copies of which are attached as Exhibit B.

7. Among other alleged sources of exposure, Plaintiffs claim that Mr. Vest was exposed while his father, Warren Vest, worked at World Airways, Inc., Oakland Airport, Hangar 110, from 1973 to 1983 (Plaintiffs allege secondary exposure at home and when Mr. Vest accompanied his father to work on weekends). (*See* Ex. A at p. 5.) Plaintiffs' claims focused on alleged exposure to asbestos from MDC's commercial aircraft, specifically DC-8 and DC-10 planes.

8. On December 30, 2010, Plaintiffs served MDC with his Opposition to MDC's Motion for Summary Judgment ("MSJ"), which was brought, in part, on the grounds that Plaintiffs lacked sufficient evidence of asbestos exposure with regard to the DC-8 and DC-10. Plaintiffs supported their Opposition with a declaration from their retained and designated expert industrial hygienist witness John Templin. A true and correct copy of John Templin's Declaration is attached as Exhibit C. Mr. Templin opined in his declaration that Mr. Vest was exposed to asbestos via "re-entrainment" or "re-suspension" of all asbestos fibers that were released in

Hangar 110 between 1972 and 1983, and that all such asbestos fibers were a significant factor in causing Mr. Vest's alleged asbestos-related injury. (Ex. C: Templin Decl. ¶¶ 14, 21, 23, 24.) Pursuant to Plaintiffs' new theory that <u>any and all</u> maintenance work done on <u>any and all</u> aircraft caused asbestos to be released into Hangar 110 and settle in the hangar (*e.g.*, on the rafters), <u>and</u> at all times after the initial release, this asbestos would be disturbed and be re-introduced into the air where it was inhaled by Mr. Vest, thus causing his mesothelioma.

9. As part of Plaintiffs' Opposition to MDC's MSJ, Plaintiffs also stated that third-party witnesses Plaintiffs had subpoenaed for deposition were scheduled to be deposed and would provide testimony, upon which Plaintiffs would rely in opposition to MDC's MSJ, to demonstrate that "MDC's asbestos-containing aircraft parts were pervasively used in Hangar 110 from 1973 through 1983." Plaintiffs' MSJ Opposition Memorandum of Points and Authorities at 20:12-14. (A true and correct copy of Plaintiffs' Opposition is attached as Exhibit D.) In their Opposition, Plaintiffs specifically identified non-party witnesses David Miller and Mike Pociecha, both former World Airways aircraft mechanics/painters.

10. On December 29 and 30, 2010, Plaintiffs deposed non-party witness David Miller. Mr. Miller testified during his deposition that World Airways performed "heavy checks, like a C check" in Hangar 110 on MDC's KC-10 military airplanes. (Miller Dep. at 273:14-274:4, a true and correct copy is attached as Ex. E.) According to Mr. Miller, this work was done by World Airways for the U.S. military during the relevant time period of 1973 to 1983. MDC manufactured KC-10 aircraft pursuant to stringent procurement contracts with the Government. Mr. Miller's December 29, 2010 deposition testimony was the first time in the State Action that Plaintiffs or any witness provided any evidence that "heavy" maintenance was performed on MDC's KC-10 military aircraft in Hangar 110. "Heavy" maintenance such as that normally performed during a C-check on a KC-10 aircraft includes maintenance on numerous components of the aircraft,

1  including the engines, brakes, etc.

2     11.   On January 4, 2011, Plaintiffs deposed non-party witness Mike Pociecha (an ex-World Airways "aircraft painter" and carpenter/construction worker). Mr. Pociecha testified during his deposition that he saw maintenance being performed at Hangar 110 on Edward Daly's (ex-owner of World Airways) B-23 military bomber aircraft, including work on brakes and landing gear during the relevant time period. According to Mr. Pociecha, this maintenance work was done by World Airways during the relevant time period of 1973 to 1983. Mr. Daly's B-23 was originally manufactured by MDC for the Air Force pursuant to stringent procurement contracts with the Government. Mr. Pociecha's January 4, 2010 deposition testimony was the first time in the State Action that Plaintiffs or any witness provided any evidence that "heavy" maintenance was performed on MDC's B-23 in Hangar 110.

12.   Under *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006), federal officer removal is not triggered until a plaintiff discloses sufficient information from which it is apparent that a valid basis for federal officer removal exists—that is, enough detailed facts to support each of the substantive requirements for federal officer removal. MDC's right to remove was triggered with regard to the KC-10 on December 30, 2010, when Plaintiffs proffered Templin's testimony that Mr. Vest was exposed to asbestos from any and all aircraft on which maintenance was performed in Hangar 110, and such exposure caused Mr. Vest's mesothelioma, coupled with Miller's deposition testimony that World Airways performed "heavy" maintenance on KC-10 military aircraft for the U.S. Government in Hangar 110. The removal clock regarding the B-23 was not triggered until January 4, 2011, when Pociecha testified that World Airways personnel performed maintenance on MDC's B-23 military bomber aircraft in Hangar 110.

13.   Plaintiffs assert broad product liability claims against MDC, including claims for negligence, strict liability and false representation. Further, the other 18

defendants in the State Action have alleged in their answers to the Complaint and/or will no doubt allege at trial that liability/fault for Plaintiffs' injuries must be apportioned between and amongst each other defendant and/or non-party responsible for any source of asbestos exposure to Mr. Vest, as determined by the jury. Thus, MDC must defend itself against co-defendants' comparative fault and apportionment claims, which, like Plaintiffs' claims of exposure to MDC's Aircraft, seek to implicate MDC for conduct under color of a federal officer and which it is immune from suit under the military defenses described in this petition.

14. MDC built the Aircraft for the United States Government pursuant to military procurement contracts with the Air Force. MDC built such equipment while acting under the direction and control of Air Force officers. Such procurement contracts and federal officers required MDC to manufacture the Aircraft in strict compliance with reasonably precise design specifications and detailed design drawings, among other things, that were reviewed and approved by the Air Force. More importantly, such contracts and federal officers required MDC to install on the Aircraft certain components and systems, designated by the Government as "Government Furnished Aircraft Equipment" (aka "GFAE") and/or "Contractor Furnished Aircraft Equipment" (aka "CFAE"). The Government separately procured GFAE components from the original equipment manufacturers ("OEMs") of that equipment under separate procurement contracts with those OEMs, provided to MDC for installation on the Aircraft during manufacture, and required MDC to install on the Aircraft. The Government independently selected CFAE components for inclusion in the aircraft design, after extensive and formal reviews of the designs of such components with the OEMs for those components, required MDC to procure such components from the OEMs, and required MDC to install CFAE components on the Aircraft. For example, various components, including engines, brakes, and/or landing gear in the Aircraft, which Plaintiffs contends contained asbestos to which Mr. Vest was allegedly exposed, were GFAE

1  and/or CFAE.

2  15.  MDC has attached to this Notice of Removal pleadings and other papers identified that it was served with in the State Court Action. MDC will supplement this Notice with an Appendix of Pleadings Filed in the State Court Action as necessary within 30 days of the date of filing this Notice of Removal to include any other pleadings or papers not included at this time.

16.  This Notice of Removal is filed within 30 days of December 30, 2010, which is the day that Plaintiffs e-served their Opposition to MDC's MSJ, which included the Templin Declaration. This removal is therefore filed within the time period prescribed by law. *See* 28 U.S.C. § 1446(b).

17.  This action is one which may be removed to this Court by MDC, and over which this Court may properly exercise jurisdiction, on the ground of federal officer removal jurisdiction pursuant to 28 U.S.C. Section 1442(a)(1).

## II.  FEDERAL OFFICER REMOVAL IS APPROPRIATE UNDER 28 U.S.C. SECTION 1442(a)(1)

18.  Removal is proper under 28 U.S.C. Section 1442(a)(1) when (a) defendant seeking removal demonstrates that it is a "person" within the meaning of the statute; (b) defendant demonstrates a causal nexus between defendant's actions, taken pursuant to a federal officer's directions and under color of federal office, and plaintiff's claims; and (c) defendant asserts a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 124-25, 134-35 (1989).

19.  MDC is a "person" within the meaning of 28 U.S.C. Section 1442(a)(1). *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

20.  Plaintiffs have asserted claims against MDC for product liability based on Mr. Vest's alleged exposure to asbestos-containing components MDC allegedly installed in the Aircraft. In particular, Plaintiffs assert in their Opposition to MDC's MSJ, more specifically in the supporting Templin Declaration, that Mr. Vest was exposed to asbestos in the Aircraft and components, including engines, brakes, and

1 landing gear.

2     21. MDC manufactured the Aircraft pursuant to military procurement
3 contracts with the Air Force and in compliance with reasonably precise design
4 specifications, as well as detailed design drawings, which were reviewed and
5 approved by the Air Force. The Aircraft procurement contracts required the
6 Aircraft, as with all military aircraft, to be built in strict conformance with detailed
7 design specifications for the Aircraft, and these specifications were expressly
8 incorporated by reference in the contracts. The Air Force were intimately involved
9 in the design, development and testing of the Aircraft and their components and
10 systems, including control of warnings, and monitored MDC's performance under
11 the contracts at all times and required MDC to construct the Aircraft in accordance
12 with the applicable and approved specifications and drawings incorporated into the
13 contracts. All Aircraft built pursuant to these contracts were subject to inspection,
14 testing and approval by the Air Force. Government personnel had unrestricted
15 access to MDC's plant and operations so that the Government could conduct
16 inspections and tests of all material and workmanship. In addition, the Air Force
17 performed extensive flight tests of the aircraft and their components and systems
18 prior to commission, to ensure complete conformity with the design specifications.
19 To the extent that any part of the Aircraft from which Plaintiff was allegedly
20 exposed was installed in the Aircraft during the initial manufacturing process, any
21 asbestos contained in the Aircraft, or any component part, was explicitly and
22 directly required by the Government under the direction of one or more of the
23 following officers: Secretary of the Air Force; the Air Force Surgeon General;
24 Office of the Air Force Representative, Air Material Command ("AMC"); Air
25 Force/AMC Contracting Officers B.N. Warren, H.R. Zahn, O.L. Weddell, G.
26 Kinnier, E.S. Jackson, H.R. Kimes, J. Grogan, A.L. Maddox, Cpt. W.H. Cobine,
27 F.H. Englehardt, L.A. Weaver, T.C. Fox, J.E. Tolnitch, H.G. Egbert, H.P. Powell,
28 Maj. J.R. Kerr, R.J. Knight, James D. Price, H.M. Zinn, V.L. Whiter, Porter B.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Coolidge, Maj. John J. Smythe, Lt. Col. Carl J. Chapman, Lt. Col. Horace W. Lanford, Jr., G. Graham Whipple, Brig. Gen. W.B. Farnsworth, Maj. R.E. Lee, Brig. Gen. P.H. Smith, Brig. Gen. M.E. Bradley, Col. B.I. Funk, Maj. Gen. O.R. Cook, Brig. Gen. H.A. Shepard, Col. G.E. Schaetzel, Col. J. B. McFarland, Chief, Services Branch, Services Subdivision, Procurement Division, AMC Headquarters; and/or Maj. Gen. Orval R. Cook, Director, Procurement and Industrial Planning. *See Fung*, 816 F. Supp. 572-73.

22. Military quality control representatives maintained offices at MDC's production facilities at Long Beach, California (and later, Palmdale, California) and St. Louis, Missouri. Military officers, engineers, contract administrators and technicians had, and exercised, complete access to MDC's facilities to oversee the design, development and production of the military aircraft, including the Aircraft. Military personnel also conducted aircraft inspections and acceptance flights for each production Aircraft.

23. The Detail Specification and design specifications and drawings that the Aircraft contracts incorporated by reference defined the design of the Aircraft and components, systems and parts, including warnings. The Government had authority to reject any Aircraft that failed to conform to these specifications.

24. The design of the Aircraft could not be changed by MDC without Government authorization. Government approval for a major design change occurred through an engineering change proposal ("ECP"), which would define the change, establish a feasible production effectivity, determine retrofit activity, and calculate the costs of the change, following which the Government evaluated, review and approved the design change. The Government retained absolute authority to accept, reject or modify any aspect or portion of an ECP. For example, major changes controlled by the Government regarding the KC-10 involved a boom control station in the rear of the fuselage, extra fuel tanks below the main deck, and removal of most cargo doors and windows. In addition, all minor changes (*i.e.*,

non-ECP changes) also required review and approval by the Government.

25. Further and perhaps more importantly, the Government <u>required</u> MDC to install all GFAE/CFAE components on the Aircraft, including alleged asbestos-containing components for which Plaintiff contends he was exposed and caused him to contract an asbestos-related disease. The Government also controlled all warnings, including warnings associated with GFAE/CFAE components. Such GFAE/CFAE components include many components, including engines, brakes, and landing gear.

26. Insofar as these GFAE/CFAE components contained asbestos, the procurement contracts and federal officers required MDC to install such asbestos on the Aircraft. MDC did not design, select and/or procure these GFAE/CFAE components, including any asbestos in such components. MDC did not know the extent, if any, to which GFAE/CFAE components contained asbestos because this information was proprietary to the component manufacturers, and could not provide warnings relating to these components. Rather, the Government approved the design of, selected and separately procured or directed the procurement of all GFAE/CFAE components from the OEM, and required MDC to install such GFAE/CFAE on the Aircraft, and controlled warnings related to these components.

27. Under the Aircraft procurement contracts and detail design specifications and drawings, MDC was also required by the Government to comply with numerous and extensive Military Specifications ("MIL specs") in the manufacture of the Aircraft. These MIL specs required MDC to use Government-specified and approved materials, components, processes and/or techniques that were developed by the Government over many years of procuring, designing and manufacturing military equipment, including aircraft. Pursuant to various MIL specs, the Government required the use of specific materials on, and controlled warning relating to, the Aircraft.

28. MDC asserts a colorable federal defense, namely the "government

contractor" immunity defense as stated in *Boyle v. United Technologies, Inc.*, 487 U.S. 500, 101 L.Ed. 442, 108 S.Ct. 2510 (1988) (government contractors are not liable for injuries caused by design defects in equipment when the contractor built such equipment according to reasonably precise government-approved design specifications), and its progeny, including *Niemann v. McDonnell Douglas Corp.*, 721 F.Supp. 1019 (S.D. Ill. 1989) (in which MDC obtained a grant of summary judgment under *Boyle* against asbestos claims regarding the manufacture of military aircraft); *see also Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996). *Boyle* establishes that a government contractor is not liable for injuries caused by design defects in equipment when the contractor built such equipment according to reasonably precise government-approved design specifications. The government contractor defense is satisfied because the design specifications for the Aircraft were government-approved, the Aircraft conformed to these specifications, and, to the extent that asbestos was known at the time to be a hazardous material, the Government's knowledge of such hazards was superior to the knowledge of MDC. *Fung*, 816 F. Supp. at 573.

29.     There is a causal nexus between MDC's actions under color of military procurement officers and Mr. Vest's alleged exposure to asbestos because Miller's December 29, 2010, and Pociecha's January 4, 2011, deposition testimony identifying that maintenance was performed in Hangar 110 on MDC's KC-10 and B-23 military airplanes, coupled with the extensive procurement contracts between MDC and the Government and the Government's pervasive control over the design of the aircraft, demonstrate that MDC as was "acting under" the direction of a federal officer when that officer had "direct and detailed control" over MDC in the design and manufacture of the aircraft. *See Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992). "This control requirement can be satisfied by strong government intervention and the threat that a corporate defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'" *Id.*

30. Further, Mr. Vest's alleged exposure from asbestos-containing components in the Aircraft built by MDC in compliance with Government specifications, and the purported asbestos that allegedly caused his injuries, was installed by MDC while it was acting under the direction of the federal officers. Indeed, since federal officers <u>directed and required</u> MDC to install those parts and components, including controlling all warnings, such as GFAE/CFAE engines, brakes, and landing gear on the Aircraft, there is an unequivocal "causal nexus" between the direction MDC received from the military, which it followed, and Plaintiff's alleged injury. *Akin v. Big Three Indus.*, 851 F. Supp. 819, 823-824 (E.D. Tex. 1994) ("[W]hen a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied."); *Fung*, 816 F. Supp. at 572 (causal nexus is satisfied upon showing of "strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction'"); *Pack v. ACandS, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993) (defendant satisfied the causal nexus requirement because "the government here contracted with [defendant] to build turbine generators under government specifications during the World War II period"); *see also Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).

### III. INTRADISTRICT ASSIGNMENT

31. Because this Court is the United States District Court for the district and division embracing the place where the original State Court Complaint was filed, it is the appropriate court for removal under 28 U.S.C. Section 1446(a).

### IV. TRANSFER OF THIS ACTION TO MULTI-DISTRICT LITIGATION ASBESTOS PROCEEDINGS

32. MDC also intends to seek transfer of this action to the Eastern District of Pennsylvania, where all Federal Court asbestos actions have been centralized in a single forum, *i.e., In re Asbestos Products Liability Litigation (Multi District*

*Litigation Docket No. 875)*, pursuant to 28 U.S.C. Section 1407. Accordingly, MDC is concurrently filing a Notice of Pendency of Other Action regarding MDL 875.

## V. **PROCEDURAL COMPLIANCE**

33. Because MDC satisfies the requirements for removal under 28 U.S.C. Section 1442(a)(1), it is entitled to remove this entire action. Joinder of the other defendants in this action is not necessary to remove under 28 U.S.C. Section 1442(a)(1). *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1314 (9th Cir. 1981).

34. MDC will give notice of the filing of this Notice as required by 28 U.S.C. Section 1442(a)(1).

**WHEREFORE**, MDC requests that this action proceed in this Court as a properly removed action.

Dated: January 6, 2011

Respectfully submitted,

Robert E. Boone III
James C. Pettis
Linda C. Hsu
**BRYAN CAVE LLP**

By: _____
James C. Pettis
Attorneys For Defendant
McDONNELL DOUGLAS
CORPORATION