1   **BRYAN CAVE LLP**
    Robert E. Boone III, California Bar No. 132780
2   James C. Pettis, California Bar No. 223953
    M. Angela Buenaventura, California Bar No. 264130
3   120 Broadway, Suite 300
    Santa Monica, California 90401
4   Telephone:      (310) 576-2100
    Facsimile:      (310) 576-2200
5
    Attorneys for Defendant
6   MCDONNELL DOUGLAS CORPORATION

7

8                    **SUPERIOR COURT OF CALIFORNIA**

9                         **COUNTY OF ALAMEDA**

10

11  TIMOTHY VEST and CAROLINE VEST,          | Case No. RG09489518

12          Plaintiff,                        | Assigned for all pre-trial purposes to the Hon.
                                              | Kenneth Mark Burr
13          vs.
                                              | **DEFENDANT MCDONNELL DOUGLAS**
14  ALLIED PACKING AND SUPPLY, et al.,        | **CORPORATION'S NOTICE OF**
                                              | **DEMURRER AND DEMURRER TO**
15          Defendants.                       | **COMPLAINT; MEMORANDUM OF**
                                              | **POINTS AND AUTHORITIES**
16
                                              | [Filed concurrently with [Proposed] Order and
17                                            | Proof of Service]

18                                            | Date:          April 23, 2010
                                              | Time:          9:34 a.m.
19                                            | Dept.:         30
                                              | Reservation No: 1046731
20
                                              | Complaint Filed:   December 17, 2009
21                                            | Trial Date:        None set

22

23

24

25

26

27

28

ENDORSED
FILED
ALAMEDA COUNTY

MAR 16 2010
CLERK OF THE SUPERIOR COURT
By _____ M. ORTIZ
                              Deputy

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SM01DOCS\773008.1

MDC'S DEMURRER TO PLAINTIFFS' COMPLAINT
**EXHIBIT B - Page 109**

FAXED

1     **TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:**

2     **PLEASE TAKE NOTICE** that on April 23, 2010 at 9:34 a.m., or as soon after that as

3 possible, in Department 30 of the Alameda County Superior Court located at U.S. Post Office

4 Building, 201 13th Street, Oakland, California, Defendant McDonnell Douglas Corporation

5 ("MDC") will and does demurrer to the second and sixth through tenth causes of action contained in

6 Plaintiffs Timothy and Caroline Vest's Complaint pursuant to Code of Civil Procedure Code

7 sections 430.10(e) and 430.50 on the grounds that Plaintiffs' Complaint fails to state sufficient facts

8 to constitute those causes of action against MDC pursuant to Code of Civil Procedure section

9 430.10(e) because Plaintiffs have not alleged facts to support each required element of those causes

10 of action.

11     This Demurrer is based on this Notice of Demurrer and Demurrer, the attached

12 Memorandum of Points and Authorities, records on file in this case, and argument by counsel that

13 the Court may entertain in this matter.

14

15 Dated: March 15, 2010               Respectfully submitted,

16                                   **BRYAN CAVE LLP**

17                                   Robert E. Boone III
    James C. Pettis

18                                   M. Angela Buenaventura

19

20                         By: _____

21                                 James C. Pettis
    Attorneys for Defendant
    MCDONNELL DOUGLAS CORPORATION

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

## DEMURRER

2   McDonnell Douglas Corporation demurs to the second and sixth through tenth causes of

3   action in Plaintiffs Timothy and Caroline Vest's Complaint pursuant to Code of Civil Procedure

4   sections 430.10(e) and 430.50 on the following grounds:

5   ### Demurrer to Second Cause of Action

6   ### (Breach of Implied Warranty)

7   MDC demurs to Plaintiffs' second cause of action for breach of implied warranty pursuant to

8   Code of Civil Procedure section 430.10(e) on the ground that the pleading does not state facts

9   sufficient to constitute a cause of action.  Plaintiffs have not and cannot allege privity between MDC

10   and Plaintiffs.

11   ### Demurrer to Sixth Cause of Action

12   ### (Market Share/Enterprise Liability/Negligence)

13   MDC demurs to Plaintiffs' sixth cause of action for market share/enterprise

14   liability/negligence pursuant to Code of Civil Procedure section 430.10(e) on the ground that the

15   market share theory of liability is inapplicable to asbestos actions.

16   ### Demurrer to Seventh Cause of Action

17   ### (Market Share/Enterprise Liability/Strict Liability/Defective Product Design, Manufacturing,

18   ### Labeling, Marketing and/or Warning)

19   MDC demurs to Plaintiffs' seventh cause of action for market share/enterprise

20   liability/strict liability/defective product design, manufacturing, labeling, marketing and/or

21   warning pursuant to Code of Civil Procedure section 430.10(e) on the ground that the market

22   share theory of liability is inapplicable to asbestos actions.

23   ### Demurrer to Eighth Cause of Action

24   ### (Market Share/Concert of Action/Negligence)

25   MDC demurs to Plaintiffs' eighth cause of action for market share/concert of

26   action/negligence pursuant to Code of Civil Procedure section 430.10(e) on the ground that the

27   market share theory of liability is inapplicable to asbestos actions.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

**Demurrer to Ninth Cause of Action**

2

(Market Share/Concert of Action/Strict Liability/Defective Product Design)

3

MDC demurs to Plaintiffs' ninth cause of action for market share/concert of action/strict

4

liability/defective product design pursuant to Code of Civil Procedure section 430.10(e) on the

5

ground that the market share theory of liability is inapplicable to asbestos actions.

6

**Demurrer to Tenth Cause of Action**

7

(Market Share/Concert of Action/Conspiracy to Defraud/ Failure to Warn)

8

MDC demurs to Plaintiffs' tenth cause of action for market share/concert of

9

action/conspiracy to defraud/failure to warn pursuant to Code of Civil Procedure section 430.10(e)

10

on the ground that the market share theory of liability is inapplicable to asbestos actions.

11

12

Dated:  March 15, 2010

Respectfully submitted,

13

14

**BRYAN CAVE LLP**
Robert E. Boone III
James C. Pettis

15

M. Angela Buenaventura

16

By:  _____

17

James C. Pettis

18

Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

19

20

21

22

23

24

25

26

27

28

MDC'S DEMURRER TO PLAINTIFFS' COMPLAINT
EXHIBIT B - Page 112

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  ALLEGATIONS FROM PLAINTIFFS' COMPLAINT ........................................ 1

III. THE COURT'S ORDER SUSTAINING (IN PART) CO-DEFENDANT WORLD
AIRWAYS' DEMURRER WITHOUT LEAVE TO AMEND ................................... 2

IV.  A DEMURRER DISREGARDS CONCLUSIONS OF LAW ................................ 3

V.   PLAINTIFFS' SECOND CAUSE OF ACTION FOR BREACH OF WARRANTY
FAILS FOR LACK OF PRIVITY ............................................................. 4

VI.  PLAINTIFFS' SIXTH THROUGH TENTH CAUSES OF ACTION FAIL BECAUSE
THE MARKET SHARE THEORY IS INAPPLICABLE TO ASBESTOS ..................... 4

VII. CONCLUSION .................................................................................. 7

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## TABLE OF AUTHORITIES

**Page**

**Cases**

*All West Electronics, Inc. v. M-B-W, Inc.,*
   64 Cal. App. 4th 717 (1998)..............................................................................4

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
   7 Cal. 4th 503 (1994)......................................................................................6

*Beeler v. City Title Ins. Co.,*
   201 Cal. App. 2d 702 (1962)...........................................................................6

*Blain v. Doctor's Co.,*
   222 Cal. App. 3d 1048 (1990).........................................................................7

*Bockrath v. Aldrich Chemical Co., Inc.,*
   21 Cal. 4th 71 (1999)..................................................................................3, 4

*Burr v. Sherwin Williams Co.,*
   42 Cal. 2d 682 (1954)......................................................................................4

*Curcini v. County of Alameda,*
   164 Cal. App. 4th 629 (2008)...........................................................................3

*Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,*
   122 F.3d 1211 (9th Cir. 1997).........................................................................6

*Jerry Setliff v. E.I. Du Pont De Nemours & Co.,*
   32 Cal. App. 4th 1525 (1995)...........................................................................3

*McKenney v. Purepac Pharmaceutical Co.,*
   167 Cal. App. 4th 72 (2008)............................................................................3

*Mountain Ranch Ass'n v. Sup. Ct.,*
   109 Cal. App. 4th 1162 (2003).........................................................................4

*Mullen v. Armstrong World Industries,*
   200 Cal. App. 3d 250 (1988)....................................................................4, 5, 6

*Rakestraw v. Cal. Physicians' Serv.,*
   81 Cal. App. 4th 39 (2000)..............................................................................3

*Sindell v. Abbott Laboratories,*
   26 Cal.3d 588 (1980).......................................................................................5

*Stevens v. Owens-Corning,*
   49 Cal. App. 4th 1645 (1996)...........................................................................5

*Wheeler v. Raybestos-Manhattan,*
   8 Cal. App. 4th 1152 (1992)........................................................................5, 6

**Statutes**

Cal. Civ. Proc. Code § 430.10(e)...........................................................................3

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Plaintiff Timothy Vest allegedly suffers from mesothelioma caused by exposure to asbestos. His Complaint asserts ten product liability causes of action against McDonnell Douglas Corporation ("MDC"), based upon his alleged (1) secondary exposure at home to asbestos supposedly retained on his father's person and work clothes when his father returned home from his employ as a pilot at co-defendant World Airways, Inc. from 1965 to 2005, and (2) direct exposure while working as a ramp supervisor at Continental Airlines from 1985 to 1988 and while employed at a commercial airline pilot for Emery Worldwide Airlines from 1990 to 2001. Mr. Vest's wife also brings a cause of action for loss of consortium.

However, Plaintiffs cannot establish their second or sixth through tenth causes of action against MDC. In fact, the Court already found that Plaintiffs have not properly alleged (and cannot allege) these causes of action when it sustained World Airways' demurrer to them without leave to amend. Similarly, Plaintiffs have not properly alleged (and cannot allege) these exact causes of action alleged against MDC, and they should be dismissed. Specifically, Plaintiffs' second cause of action for breach of implied warranty claim fails because there was no privity between Plaintiff and MDC. Plaintiffs' sixth through tenth causes of action based on purported "market share liability" fail because that liability theory is inapplicable. Therefore, MDC's Demurrer to Plaintiffs' second and sixth through tenth causes of action should be sustained without leave to amend.

**II.   ALLEGATIONS FROM PLAINTIFFS' COMPLAINT**

The Complaint alleges that Mr. Vest was secondarily and directly exposed to asbestos and asbestos-containing products at various locations from 1965 to 2005, and asserts ten product liability causes of action against a host of "Product Defendants," including MDC who was added in place of DOE 3. (Compl. at 3:2-17; Amend't to Compl.) Plaintiffs have not identified any particular MDC product to which Mr. Vest was occupationally or para-occupationally exposed. Rather, Plaintiffs have named several defendants and alleged that each manufactured, sold, distributed, or performed a long list of activities related to asbestos and asbestos-containing products. (*Id.* at 3:2-5:4.) Plaintiffs also assert two premises liability causes of action and a Metropolitan Life conspiracy claim

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   against other defendants. (*Id.* at 22-28.) As to MDC, the Complaint asserts that Mr. Vest was

2   secondarily exposed at home to asbestos from his father's "clothes, shoes, person" while his father

3   was employed by World Airways as a pilot from 1965 to 2005. (*Id.* at 4:12-14.) The Complaint

4   also alleges that Mr. Vest was directly exposed to asbestos through his own employment as a "ramp

5   supervisor" at Continental Airlines, Inc. at Los Angeles International Airport ("LAX") from 1985 to

6   1988; while working for Sandy's Ski Rentals in Santa Monica in 1986; while working for Fletcher's

7   Team and Ski in Livermore in 1989; and while working as a commercial airline pilot at Emery

8   Worldwide Airlines, Inc. in New York, Dayton, Ohio, Oakland and Los Angeles from 1990 to 2001.

9   (*Id.* at 4:12-26.)

10   **III.    THE COURT'S ORDER SUSTAINING (IN PART) CO-DEFENDANT WORLD**

11   **AIRWAYS' DEMURRER WITHOUT LEAVE TO AMEND**

12   On March 12, 2010, the Court issued an Order on co-defendant World Airways' demurrer to

13   Plaintiffs' Complaint wherein it sustained (in part) the demurrer without leave to amend. (Court's

14   3/12/10 Order:  Demurrer to Complaint Overruled ("3/12/10 Order").)  The Court sustained World

15   Airways' demurrer with regard to causes of actions addressed in MDC's instant Demurrer (and

16   overruled the demurrer with regard to causes of action not addressed).  In particular, the Court

17   sustained without leave to amend, the demurrer as to Plaintiffs' second and sixth through tenth

18   causes of action.

19   The demurrer to the Second Cause of Action for breach of implied warranty is

20   SUSTAINED WITHOUT LEAVE TO AMEND. Plaintiffs have not alleged that

21   World was in the business of selling goods, that plaintiff was a user of such goods,

22   or privity of contract between World and Plaintiffs. A claim for breach of implied

23   warranty requires privity of contract. All West Electronics, Inc. v. M-B-W, Inc.

24   (1998) 64 Cal.App.4th 717, 725. It is apparent that Plaintiffs will not be able to

25   allege privity of contract against World. The demurrer to the Third Cause of Action

26   for strict products liability is SUSTAINED WITHOUT LEAVE TO AMEND.

27   ***

28   The demurrer to the Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action is

1   SUSTAINED WITHOUT LEAVE TO AMEND. All of these causes of action rely

2   on the theory of "market share," based on the facts alleged in para. II of the Sixth

3   Cause of Action. Plaintiffs' allegations do not show that World manufactured or

4   marketed any asbestos-containing product. In addition, the allegations do not take

5   Plaintiffs' claims outside the scope of the holding in Mullen v. Armstrong World

6   Industries, Inc. (1988) 200 Cal.App.3d 250, 255-257, in which the court held that a

7   market share claim was not viable with respect to "asbestos products" generally.

8   The facts alleged do not bring this case with the narrow circumstances present in

9   Wheeler v. Raybestos-Manhattan (1992) 8 Cal.App.4th 1152, 1155. It is apparent

10   that Plaintiffs do not possess knowledge of facts at this time to support a market

11   share theory of liability against World.

12   (3/12/10 Order.)  MDC's instant Demurrer attacks the same six causes of action in Plaintiffs'

13   Complaint on the same grounds—lack of privity and inapplicability of market share liability.

14   Therefore, the Court should also sustained MDC's Demurrer without leave to amend.

15   **IV.     A DEMURRER DISREGARDS CONCLUSIONS OF LAW**

16          A party may respond to a complaint by a general demurrer if "the pleading does not state

17   facts sufficient to constitute a cause of action."  Civ. Proc. Code § 430.10(e).  "A demurrer tests the

18   legal sufficiency of factual allegations in a complaint." *Rakestraw v. Cal. Physicians' Serv.*, 81 Cal.

19   App. 4th 39, 42 (2000).  A court "treats the demurrer as admitting all material facts properly

20   pleaded, but not contentions, deductions, or conclusions of fact or law." *Id.* at 42-43.  "Conclusory

21   allegations . . . are insufficient to survive a demurrer." *Curcini v. County of Alameda*, 164 Cal. App.

22   4th 629, 650 (2008); *see also Bockrath v. Aldrich Chem. Co., Inc.*, 21 Cal. 4th 71, 80 (1999) and

23   *Jerry Setliff v. E.I. Du Pont De Nemours & Co.*, 32 Cal. App. 4th 1525, 1529 (1995).  As stated in

24   *Bockrath*, plaintiff is required to plead specific factual allegations and generic allegations that a

25   plaintiff was exposed to a list of products are insufficient. *See id.* at 79- 80.

26   **V.     PLAINTIFFS' SECOND CAUSE OF ACTION FOR BREACH OF WARRANTY**

27          **FAILS FOR LACK OF PRIVITY**

28          As the Court has previously found: "A claim for breach of implied warranty requires

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  privity of contract." (3/12/10 Order.)  Further, "the general rule is that privity of contract is

2  required in an action for breach of either express or implied warranty and that there is no privity

3  between the original seller and a subsequent purchaser who is in no way a party to the original

4  sale." *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695 (1954); *Mountain Ranch Ass'n v. Sup.*

5  *Ct.*, 109 Cal. App. 4th 1162, 1169 (2003) (lack of privity justifies dismissal of implied warranty

6  claim); *see also All West Electronics, Inc. v. M-B-W, Inc.*, 64 Cal. App. 4th 717, 725 (1998).

7       The Complaint does not allege facts to establish that Mr. Vest was in privity with MDC;

8  nor can it.  MDC manufacturers military and commercial airplanes.  Plaintiffs do not allege that

9  Mr. Vest or his father were original purchasers of any military or commercial airplane attributable

10  to MDC (Compl. at 4:12-26; 7:7-11), and therefore, cannot establish privity.  Similarly, as the

11  Court stated while sustaining co-defendant World Airways' demurrer to Plaintiffs' breach of

12  implied warranty cause of action without leave to amend, "it is apparent that Plaintiffs will not be

13  able to allege privity of contract against [co-defendant] World." (3/12/10 Order.)  Therefore,

14  MDC's Demurrer to Plaintiffs' second cause of action should be also sustained without leave to

15  amend.

16  **VI.**  **PLAINTIFFS' SIXTH THROUGH TENTH CAUSES OF ACTION FAIL BECAUSE**

17       **THE MARKET SHARE THEORY IS INAPPLICABLE TO ASBESTOS**

18       As the Court has previously found:  "[T]he allegations do not take Plaintiffs' claims outside

19  the scope of the holding in *Mullen v. Armstrong World Industries* (1988) 200 Cal.App.3d 250, 255-

20  257, in which the court held that market share claim was not viable with respect to 'asbestos

21  products' generally." (3/12/10 Order.)  The market share theory of liability simply is inapplicable to

22  actions involving exposure to asbestos-containing products. *Stevens v. Owens-Corning*, 49 Cal.

23  App. 4th 1645, 1669 (1996); *Mullen v. Armstrong World Industries*, 200 Cal. App. 3d 250, 257

24  (1988).  *Mullen* held: "We thus align California, the progenitor of the market share theory of

25  liability, with the great majority of jurisdictions which have declined to extend it to the field of

26  asbestos-related injuries." *Id.*; *see also* Los Angeles County Superior Court, General Order 37.04

27  ("IT IS HEREBY ORDERED that the market share theory of liability established by *Sindell v.*

28  *Abbott Laboratories* (1980) 26 Cal.3d 588 is inapplicable to actions involving exposure to asbestos-

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   containing products.'").

2       In their Opposition, Plaintiffs will likely cite to *Wheeler v. Raybestos-Manhattan*, 8 Cal.

3   App. 4th 1152 (1992) and attempt to argue that the market share theory of liability applies to this

4   asbestos action. As the Court has already found, this argument by Plaintiffs is without merit: "The

5   facts alleged do not bring this case within the narrow circumstances present in *Wheeler v. Raybestos-*

6   *Manhattan* (1992) 8 Cal.App.4th 1152, 1155." (3/12/10 Order.) *Wheeler* created a very narrow

7   exception to the rule that market share liability is inapplicable to actions involving exposure to

8   asbestos-containing products. *Wheeler* applied the market share theory of liability to a case in which

9   plaintiffs sought to proceed on market share theory only as to the makers of brake pads because of

10  the peculiar circumstances presented by exposure to asbestos fiber from brake pads (including the

11  inability to identify brakes pads by brand during the inspection and replacement of worn pads, and

12  that a pad of a given size can be used on a variety of vehicles, regardless of the maker). *Id.* at 1156-

13  1157. Plaintiffs do not allege that Mr. Vest was exposed to asbestos from any brake pad

14  manufactured by MDC, nor can they. Thus, the *Wheeler* exception is inapplicable, and Plaintiffs

15  cannot state a valid claim for market share liability.

16      Further, the court of appeal distinguished *Wheeler* from *Mullen*, noting that the market share

17  theory of liability was inapplicable in *Mullen* because plaintiffs alleged asbestos exposure from a

18  variety of different products rather than seeking recover for damages caused by a single fungible

19  product such as brake pads. *Id.* at 1155; *see Mullen*, 200 Cal. App. 3d at 257. Like *Mullen*, this

20  lawsuit involves allegations of exposure to asbestos from a variety of different products, and thus,

21  the market share theory of liability is inapplicable. Plaintiffs' sixth through tenth causes of action

22  fail.

23      However, even the market share theory of liability were applicable to actions involving

24  exposure to asbestos-containing products, it is inapplicable to MDC because no facts are alleged that

25  if proven would show MDC marketed any asbestos-containing product.

26      In addition, to the extent that these are causes of action for "conspiracy/concert of action",

27  they fail for two reasons. First, civil conspiracy is not an independent tort. *Applied Equip. Corp. v.*

28  *Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994); *Entm't Research Group, Inc. v. Genesis*

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  *Creative Group, Inc.,* 122 F.3d 1211, 1228 (9th Cir. 1997).  Second, to allege conspiracy liability,

2  Plaintiffs must show (1) a concert of action between the defendants to accomplish the purpose of the

3  conspiracy, (2) that their actions were illegal and in furtherance of a common scheme or design to

4  achieve the unlawful purpose of the conspiracy, and (3) knowledge of the conspiracy and its

5  unlawful purpose.  *Beeler v. City Title Ins. Co.,* 201 Cal. App. 2d 702, 707 (1962).  The Complaint

6  fails to allege any of these elements.  Instead, it merely includes boilerplate allegations directed at

7  "Defendants," collectively.  (Compl. at 6:14-28; 19:1-28; 20:1-28; 21:1-28.)  It alleges no facts to

8  show that MDC actually acted in concert, in furtherance of any common scheme or design, or had

9  any knowledge of the alleged conspiracy.

      Therefore, MDC's Demurrer to Plaintiffs' sixth through tenth causes of action should be

11  sustained without leave to amend.

12  **VII.**    **CONCLUSION**

13        For reasons stated above and stated in the Court's ruling sustaining (in part) co-defendant

14  World Airways' demurrer without leave to amend, MDC requests that the Court sustain its

15  Demurrer to the Second and Sixth through Tenth Causes of Action in Plaintiffs' Complaint without

16  leave to amend.

17  Dated:  March 15, 2010

18                          Respectfully submitted,

19

20                          **BRYAN CAVE LLP**
                        Robert E. Boone III

21                          James C. Pettis
                        M. Angela Buenaventura

22

23               By: _____

24                         James C. Pettis
                   Attorneys for Defendant

25                   MCDONNELL DOUGLAS CORPORATION

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1 | **BRYAN CAVE LLP**
Robert E. Boone III, California Bar No. 132780
2 | James C. Pettis, California Bar No. 223953
M. Angela Buenaventura, California Bar No. 264130
3 | 120 Broadway, Suite 300
Santa Monica, California 90401-2386
4 | Telephone:   (310) 576-2100
Facsimile:    (310) 576-2200
5 |
Attorneys For Defendant
6 | MCDONNELL DOUGLAS CORPORATION

ENDORSED
FILED
ALAMEDA COUNTY

JUN 0 9 2010

CLERK OF THE SUPERIOR COURT
By _____ H. Lovett _____ Deputy

7

8 | **SUPERIOR COURT OF CALIFORNIA**

9 | **COUNTY OF ALAMEDA**

10

11 | TIMOTHY VEST and CAROLINE VEST,          Case No. RG09489518

12 |                                                                       Assigned for all pre-trial purposes to the
                                                                           Hon. Kenneth Mark Burr
13 |                              Plaintiff,

14 |          vs.                                               **MDC'S ANSWER TO PLAINTIFFS'
                                                                           SECOND AMENDED COMPLAINT**
15 | ALLIED PACKING AND SUPPLY, et al.,

16 |                              Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

MDC'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

**EXHIBIT B - Page 122**

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1       Defendant McDonnell Douglas Corporation ("MDC") answers the Second Amended

2   Complaint of Plaintiffs Timothy and Caroline Vest ("Plaintiffs") as follows:

3       Pursuant to Code of Civil Procedure section 431.30, MDC denies generally and

4   specifically each and every allegation of each cause of action contained in the Second Amended

5   Complaint, and further denies that Plaintiffs have been damaged in the sum or sums alleged or in

6   any other sum or sums, or at all.

7       MDC states the following defenses to each and every cause of action alleged in the Second

8   Amended Complaint:

9

10   <div align="center"><u>FIRST DEFENSE</u></div>

11       1.    The Second Amended Complaint does not state facts sufficient to constitute a cause

12   of action.

13

14   <div align="center"><u>SECOND DEFENSE</u></div>

15       2.    Plaintiffs' claims are barred by applicable statutes of limitation, including, but not

16   limited to, California Code of Civil Procedure sections 340 and 340.2.

17

18   <div align="center"><u>THIRD DEFENSE</u></div>

19       3.    Venue is improper in this Court.

20

21   <div align="center"><u>FOURTH DEFENSE</u></div>

22       4.    Plaintiffs' claims are barred by the doctrine of estoppel.

23

24   <div align="center"><u>FIFTH DEFENSE</u></div>

25       5.    Plaintiffs' claims are barred by the doctrine of laches.

26

27   <div align="center"><u>SIXTH DEFENSE</u></div>

28       6.    Plaintiffs' claims are barred by the doctrine of waiver.

<div align="center">2</div>

<div align="center">**EXHIBIT B - Page 123**</div>

<div style="text-align: right; writing-mode: vertical-rl;">
BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386
</div>

#### SEVENTH DEFENSE

7.    Plaintiffs' claims are barred by Mr. Vest's express assumption of the risks and dangers, if any, associated with the alleged conditions, conduct or injuries.

#### EIGHTH DEFENSE

8.    Plaintiffs' claims are barred by Mr. Vest's implied assumption of the risks and dangers, if any, associated with the alleged conditions, conduct or injuries.

#### NINTH DEFENSE

9.    Some or all of the damages claimed by Plaintiffs are not recoverable under applicable law.  In the event that there is a finding of damages for Plaintiff, such damages should be reduced or offset by various benefits received by Plaintiffs under applicable law.

#### TENTH DEFENSE

10.    If Plaintiffs sustained injury or damage, said injury or damage was caused wholly or in part by the conduct, negligent acts or omissions, and/or fault of third parties or entities other than MDC, which conduct, acts or omissions, or fault was the sole proximate cause or an intervening or superseding cause of any injury or damage to Plaintiffs.  Plaintiffs' claims and damages sought with respect thereto, if any, against MDC are barred completely or must be reduced in proportion to the fault attributable to other third parties or entities as are found culpable.

#### ELEVENTH DEFENSE

11.    Any injury, damage or loss allegedly sustained by Plaintiffs were proximately and actually caused by and contributed to by the negligence and carelessness on the part of Mr. Vest in that Mr. Vest failed to exercise ordinary care on his own behalf at the times and in the places set forth in the Second Amended Complaint.  Accordingly, any recovery by Plaintiffs should be

3

1 | barred or reduced to the extent of such responsibility.

2

3 | **TWELFTH DEFENSE**

4 |     12.   Plaintiffs' claims are barred because Plaintiffs failed and refused to mitigate their

5 | alleged damages and losses.

6

7 | **THIRTEENTH DEFENSE**

8 |     13.   The product(s) in question, if any, was/were modified by persons other than MDC

9 | after leaving MDC's custody and control and before the incidents alleged in the Second Amended

10 | Complaint, and said modifications were the proximate cause of Plaintiffs' alleged injury, thereby

11 | barring any and all claims against MDC.

12

13 | **FOURTEENTH DEFENSE**

14 |     14.   Any and all injuries and damages allegedly suffered by Plaintiffs were solely and

15 | proximately caused by the abuse or misuse by Mr. Vest and/or others of the product(s) in question,

16 | which abuse and misuse was not reasonably foreseeable, thereby barring Plaintiffs from any

17 | recovery from MDC.

18

19 | **FIFTEENTH DEFENSE**

20 |     15.   At all times relevant to the alleged conditions, conduct or injuries, Mr. Vest had or

21 | should have had notice and knowledge of the risks and dangers, if any, associated with such

22 | conditions, conduct and injuries because any such risk or danger was open, obvious and apparent

23 | to Mr. Vest, he appreciated the danger or risk, and he voluntarily assumed any such danger or risk.

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

4

<div style="margin-left: auto; writing-mode: vertical">BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386</div>

## SIXTEENTH DEFENSE

16.     If Plaintiffs sustained any injury or damage as alleged in the Second Amended Complaint, said injury or damage was the sole and proximate cause of conditions, circumstances and/or conduct of others beyond the control of MDC which are unrelated to any use of its product(s) by Mr. Vest.

## SEVENTEENTH DEFENSE

17.     The plans or designs, method or technique of manufacturing, assembling, testing, and labeling of any product alleged in the Second Amended Complaint to have caused all or part of Plaintiffs' alleged damages conformed with the state of the art at the time any such product was designed, manufactured and/or sold by MDC.

## EIGHTEENTH DEFENSE

18.     The benefits of the design of the product(s) in question outweigh any risk associated with said product(s), if any risk there actually was, which MDC denies.

## NINETEENTH DEFENSE

19.     The actions of MDC were in conformity with the state of the medical, industrial, and scientific arts, so that there was no duty to warn Mr. Vest under the circumstances, or to the extent such a duty arose, MDC provided adequate warnings, labels and/or instructions concerning any product in question.  If those warnings, labels and/or instructions were not made available or heeded, it is the fault of others and not MDC.

## TWENTIETH DEFENSE

20.     Plaintiffs have failed to join all necessary and indispensable parties.

## TWENTY-FIRST DEFENSE

21.     MDC did not design and/or manufacture some or all of the products alleged in the

5

1  Second Amended Complaint.

2  <u>TWENTY-SECOND DEFENSE</u>

3       22.    MDC owed no duty of care to Mr. Vest.  If MDC did, it did not breach any such

4  duty.

5

6  <u>TWENTY-THIRD DEFENSE</u>

7       23.    MDC made no express or implied representations or warranties of any kind to Mr.

8  Vest.  To the extent that the alleged representations or warranties were made, they were made by

9  persons or entities other than MDC.

10

11  <u>TWENTY-FOURTH DEFENSE</u>

12       24.    Mr. Vest did not rely upon any representations or warranties made by MDC.  To

13  the extent Mr. Vest relied upon any alleged representations or warranties, such reliance was

14  unjustified.

15

16  <u>TWENTY-FIFTH DEFENSE</u>

17       25.    Plaintiffs' claim for punitive damages, if granted, would be grossly excessive and

18  would violate the Due Process clause of the Fourteenth Amendment to the U.S. Constitution.

19  MDC has not received fair notice that it could be subject to substantial punitive damages in this

20  State for the conduct alleged.  MDC's conduct was not deliberate, and the damages, if any, to

21  Plaintiffs were economic.  The punitive damages sought by Plaintiffs are greatly disproportionate

22  to any actual damages and far exceed any civil or criminal sanctions that could be imposed for

23  similar alleged conduct.

24

25  <u>TWENTY-SIXTH DEFENSE</u>

26       26.    Plaintiffs' claim for punitive damages would violate the Eighth Amendment to the

27  U.S. Constitution and Article I, sections 1 and 17 of the California Constitution because it seeks to

28  impose an excessive fine upon MDC, is penal in nature, and seeks to punish MDC upon vague

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

6

1    standards.

2                          **TWENTY-SEVENTH DEFENSE**

3            27.    Plaintiffs' claim for punitive damages would violate the Equal Protection clause of

4    the Fourteenth Amendment to the U.S. Constitution and Article I, section 7 of the California

5    Constitution because it discriminates against MDC on the basis of wealth and because different

6    amounts can be awarded against two or more defendants for the same act where those defendants

7    differ only in material wealth.

8

9                           **TWENTY-EIGHTH DEFENSE**

10           28.    Plaintiffs' claim for punitive damages violates the Due Process clause of the Fifth

11   and Fourteenth Amendments to the U.S. Constitution because it seeks to punish MDC based upon

12   unconstitutionally vague standards.

13

14                            **TWENTY-NINTH DEFENSE**

15           29.    Plaintiffs' claim for punitive damages would violate the Fifth Amendment to the

16   U.S. Constitution and Article I, section 15 of the California Constitution because it would expose

17   MDC to multiple punishments and fines for the same act or conduct.

18

19                             **THIRTIETH DEFENSE**

20           30.    Plaintiffs' claim for punitive damages violates the Due Process clause of the Fifth

21   and Fourteenth Amendments to the United States Constitution in the absence of an order

22   bifurcating that claim from the issue of liability.

23

24                            **THIRTY-FIRST DEFENSE**

25           31.    Any award of punitive damages in this case would violate the Separation of Powers

26   Doctrine since this Court and the jury would be usurping the exclusive power of the legislature to

27   define crimes and establish punishment.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

<div align="center">7</div>

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### THIRTY-SECOND DEFENSE

32.  Any award of punitive damages in this case would be constitutionally defective as an ex post facto law prohibited by the U.S. and California Constitutions.  The jury, in making any such punitive award, would be effectively criminalizing conduct after it has occurred and without appropriate advance notice to a defendant that such conduct may subject it to criminal punishment.

### THIRTY-THIRD DEFENSE

33.  The punitive damages sought by Plaintiffs would violate the Due Process clause of the Fifth and Fourteenth Amendments to the U.S. Constitution because Plaintiffs seek to punish MDC in California for alleged conduct that occurred elsewhere.

### THIRTY-FOURTH DEFENSE

34.  Plaintiffs' burden of proof is to support a punitive damage recovery by clear and convincing evidence.

### THIRTY-FIFTH DEFENSE

35.  The Second Amended Complaint fails to state a cause of action against MDC upon which relief can be granted.

### THIRTY-SIXTH DEFENSE

36.  At no time relevant herein was Mr. Vest exposed to any asbestos from products designed or manufactured by MDC.

### THIRTY-SEVENTH DEFENSE

37.  Any exposure by Mr. Vest to any MDC product was so minimal as to be insufficient, as a matter of law, to have constituted a substantial factor in causing any asbestos-related disease.

8

**EXHIBIT B - Page 129**

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

### THIRTY-EIGHTH DEFENSE

38.    Any and all "market share," "enterprise," and/or "concert of action" theories of liability are inapplicable to MDC and/or any of its products in question.

### THIRTY-NINTH DEFENSE

39.    Under the doctrine of forum *non conveniens*, this case should be dismissed from this and any other district or jurisdiction in the United States.

### FORTIETH DEFENSE

40.    Although Plaintiffs purportedly do not allege any claims against MDC involving any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that Plaintiffs' claims are barred by the doctrine known as the "Government Contractor Defense" adopted by the United States Supreme Court in the case of Boyle v. United Technologies Corp., 108 S. Ct. 2510 (1988).

### FORTY-FIRST DEFENSE

41.    Although Plaintiffs purportedly do not allege any claims against MDC involving any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that any military products made by MDC were procured by the United States Government, which was sophisticated and knowledgeable concerning the use of, and any potential hazards of, asbestos products.  MDC reasonably relied upon the sophistication of the United States Government and is not responsible for any failure of the United States Government to warn or take proper precautions for the protection of its own employees or civil servants, including Mr. Vest.

### FORTY-SECOND DEFENSE

42.    Although Plaintiffs purportedly do not allege any claims against MDC involving

9

1   any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

2   attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

3   any products manufactured by MDC which incorporated asbestos-containing materials alleged to

4   have been a cause of any disease contracted by Mr. Vest was manufactured under and in

5   conformity with the direction and control of the United States Government, which at all times

6   material hereto had knowledge superior to that of MDC with respect to the potential hazards of

7   asbestos products; accordingly, no liability can be imposed upon MDC.

8

9                          FORTY-THIRD DEFENSE

10       43.      Although Plaintiffs purportedly do not allege any claims against MDC involving

11   any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

12   attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

13   MDC satisfied any duty to warn by providing the United States Government with detailed

14   specifications of each and every one of its products to which Mr. Vest was allegedly exposed.

15

16                          FORTY-FOURTH DEFENSE

17       44.      Although Plaintiffs purportedly do not allege any claims against MDC involving

18   any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

19   attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

20   Plaintiffs' claims are barred by the derivative sovereign immunity defense doctrine under <u>Yearsley</u>

21   <u>v. W.A. Ross Construction Co.</u>, 309 U.S. 18 (1940).

22

23                          FORTY-FIFTH AFFIRMATIVE DEFENSE

24       45.      Plaintiffs' claims are barred or preempted, in whole or in part, by federal law,

25   statutes, and regulations.

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

10

**EXHIBIT B - Page 131**

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

### FORTY-SIXTH AFFIRMATIVE DEFENSE

2      46.     Plaintiffs' claims may be barred by the learned intermediary and/or sophisticated

3 user doctrines.

4

### FORTY-SEVENTH DEFENSE

6      47.     MDC was not the owner, occupier or controller of any premises at which, or

7 materials from which, Mr. Vest claims he was exposed to any asbestos.

8

### FORTY-EIGHTH DEFENSE

10      48.     MDC did not violate any state or federal statute, regulation, or ordinance to cause

11 Plaintiffs' alleged injuries.

12

### FORTY-NINTH DEFENSE

14      49.     Plaintiffs' causes of action are barred by California's Workers' Compensation Act,

15 Labor Code sections 3600 et seq., including more specifically the exclusive remedy rule embodied

16 therein at Labor Code sections 3601 and 3602(a).

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

11

1    MDC reserves the right, upon completion of its investigation and discovery, to assert such

2  additional defenses as may be appropriate.

3

4    WHEREFORE, MDC prays for judgment against Plaintiffs dismissing the Second

5  Amended Complaint and each and every cause of action alleged therein, and awarding to MDC

6  costs, interest, reasonable attorneys' fees and disbursements.

7

8  Dated:  June 9, 2010

9                                                              BRYAN CAVE LLP
                                                                Robert E. Boone III
10                                                             James C. Pettis
                                                                M. Angela Buenaventura
11

12                                                             By: _____
13                                                                    M. Angela Buenaventura
                                                                Attorneys for Defendant
14                                                             MCDONNELL DOUGLAS CORPORATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

12

C000109/0307472/789266.1

**EXHIBIT B - Page 133**

**PROOF OF SERVICE**

1

2      I am employed in the City and County of Los Angeles, State of California. I am over the
age of 18 and not a party to the within action. My business address is 120 Broadway, Suite 300,

3      Santa Monica, CA 90401.

4      On June 9, 2010, I served the foregoing document, described as: **MDC'S
ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT**, on each interested

5      parties in this action, as follows:

6                        **SEE ATTACHED SERVICE LIST**

7      ☒      (BY OVERNIGHT COURIER) I deposited in a box or other facility maintained by
Overnight Express, an express carrier service, or delivered to a courier or driver authorized by said

8      express carrier service to receive documents, a true copy of the foregoing document, in an
envelope designated by said express service carrier, with delivery fees paid or provided for.

9

10             (BY MAIL) I am "readily familiar" with the firm's practice of collection and
processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal

11     Service on that same day with postage thereon fully prepaid at San Francisco, California in the
ordinary course of business. I am aware that on motion of the party served, service is presumed

12     invalid if postal cancellation date or postage meter date is more than one day after date of deposit
for mailing in affidavit.

13

14             (BY FAX) I caused a true copy of the foregoing document to be served by
facsimile transmission at the time shown on each attached transmission report from sending

15     facsimile machine telephone number_____ to each interested party at the facsimile number
shown above. Each transmission was reported as complete and without error. A transmission

16     report was properly issued by the sending facsimile machine for each interested party served. A
true copy of each such transmission report is attached hereto.

17

18             Executed on **June 9, 2010**, at San Francisco, California. I declare under penalty of perjury
under the laws of the State of California that the foregoing is true and correct.

19

20                                              Alicia Moore

21

22

23

24

25

26

27

28

SM01DOCS775784.2

PROOF OF SERVICE

**EXHIBIT B - Page 134**



**SERVICE LIST**
Timothy Vest and Caroline Vest v. Allied Packing and Supply, et al.
Alameda County Superior Court No. RG09489518

Denise Abrams, Esq.
Justin A. Bosl, Esq.
KAZAN, McCLAIN, LYONS, GREENWOOD
& HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, CA 94607
Telephone:     (510) 302-1000
Facsimile:
*Attorney for Plaintiffs*

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

C146342/0306464/775784.2

1
PROOF OF SERVICE

**EXHIBIT B - Page 135**

1  James L. Oberman, Esq. (C.S.B. #120938)
   Michael T. Stewart, Esq. (C.S.B. #253851)
2  KAZAN, McCLAIN, LYONS,
   GREENWOOD & HARLEY
3  A Professional Law Corporation
   Jack London Market
4  55 Harrison Street, Suite 400
   Oakland, California  94607
5  Telephone:  (510) 302-1000

6  Attorneys for Plaintiffs

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF ALAMEDA

10

11 TIMOTHY VEST and CAROLINE VEST,   No. RG09489518

       Plaintiffs,                   **PLAINTIFFS' MEMORANDUM OF POINTS**
12                                    **AND AUTHORITIES IN OPPOSITION TO**
       vs.                           **DEFENDANT McDONNELL DOUGLAS**
13                                   **CORPORATION'S MOTION FOR SUMMARY**
   ALLIED PACKING & SUPPLY, INC., et **JUDGMENT OR, IN THE ALTERNATIVE,**
14 al.,                              **SUMMARY ADJUDICATION**

       Defendants.                   Date:        January 14, 2011
15                                   Time:        9:36 am
                                     Dept.:       30 (Hon. Kenneth Mark Burr)
16                                   Case Filed:  December 17, 2009
                                     Trial Date:  February 14, 2011
17
                                     **Reservation No: R1092700**
18

19

20

21

22

23

24

KAZAN, McCLAIN,
LYONS,          25
GREENWOOD &
HARLEY, PLC     26
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400       27
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913  28

MSTEWART/724515.1   Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA

EXHIBIT C - Page 136

1

## TABLE OF CONTENTS

2  I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  II.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4       A.   Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'
            Hangar 110, and as a Pilot for Emery Worldwide . . . . . . . . . . . . . . . . . . . . . . . 2

5       B.   Timothy Vest's Mesothelioma was Caused by Asbestos . . . . . . . . . . . . . . . . 12

6  III. Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7       A.   Moving Defendant's Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8       B.   MDC Fails to Establish Plaintiffs Lack Evidence of Causation . . . . . . . . . . . . . 16

9            1.   Plaintiffs' Additional Evidence Requires a Trial . . . . . . . . . . . . . . . . . . . 18

10      C.   Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid . . . . . . . . 19

11      D.   The Motion must be Continued or Denied Under CCP 437c(h) . . . . . . . . . . . . . 20

12 IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

13

14

15

16

17

18

19

20

21

22

23

24

25  KAZAN, McCLAIN,
       LYONS,
26  GREENWOOD &
     HARLEY, PLC
   JACK LONDON MARKET,
      SUITE 400
27  55 HARRISON STREET,
   OAKLAND, CA 94607
      (510) 302-1000
      (510) 465-7728
28  FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          i

**EXHIBIT C - Page 137**

1

## TABLE OF AUTHORITIES

2

**State Statutes**

3   Civil Code section 1708................................................................. 19

4   Civil Code section 1710................................................................. 19

5   Civil Code section 3294................................................................. 19

6   Code of Civil Procedure section 437c(b)............................... 15, 17

7   Code of Civil Procedure section 437c(c)................................... 14

8   Code of Civil Procedure section 437c(d)............................... 15, 17

9   Code of Civil Procedure section 437c(h)........................... 1, 17, 20

10  Code of Civil Procedure section 437c(p)(2). ........................... 14

11  Evidence Code section 1200. ...................................................... 17

12  Evidence Code section 1220. ................................................... 7, 8

13  Evidence Code section 1221. ................................................... 7, 8

14  Evidence Code section 1222. ................................................... 7, 8

15  Evidence Code section 1230. ................................................... 7, 8

16  Evidence Code section 1290. ...................................................... 7

17  Evidence Code section 1291. ...................................................... 7

18  Evidence Code section 1292. ...................................................... 7

**State Cases**

20  *Aguilar v. Atlantic Richfield Co.*
    (2001) 25 Cal.4th 826. ......................................................... 14-16
21

22  *Bahl v. Bank of America*
    (2001) 89 Cal.App.4th 389. ...................................................... 20

23  *Binder v. Aetna Life Ins. Co.*
    (1999) 75 Cal.App.4th 832. ...................................................... 16
24

25  *DeLeon v. Commercial Manufacturing & Supply Co.*
    (1983) 148 Cal.App.3d 336. ...................................................... 16

26  *Elmore v. American Motors Corp.*
    (1969) 70 Cal.2d 578. ............................................................ 16
27

28  *Haney v. Aramark Uniform Services, Inc.*
    (2004) 121 Cal.App.4th 623. ................................................... 15

19

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

*Hilliard v. A.H. Robins Co.*
(1983) 148 Cal.App.3d 374 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Huynh v. Ingersoll-Rand*
(1993) 16 Cal.App.4th 825 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jiminez v. Sears, Roebuck & Co.*
(1971) 4 Cal.3d 379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Kahn v. East Side Union High School Dist.*
(2003) 31 Cal.4th 990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nelson v. Superior Court*
(2006) 144 Cal.App.4th 689 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Oddone v. Superior Court (Technicolor, Inc.)*
(2009) 179 Cal.App.4th 813 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Potter v. Firestone Tire & Rubber Co.*
(1993) 6 Cal.4th 965 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Quirici v. Freeman*
(1950) 98 Cal.App.2d 194 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rutherford v. Owens-Illinois, Inc.*
(1997) 16 Cal.4th 953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*SKF Farms v. Super. Ct.*
(1984) 153 Cal.App.3d 902 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stone v. Regents of University of Cal.*
(1999) 77 Cal.App.4th 736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Taylor v. Elliott Turbomachinery Co., Inc.*
(2009) 171 Cal.App.4th 564 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.*
(2004) 129 Cal.App.4th 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Torres v. Xomox Corporation*
(1996) 49 Cal.App.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United Community Church v. Garcin*
(1991) 231 Cal.App.3d 327 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Vandermark v. Ford Motor Co.*
(1964) 61 Cal.2d 256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Weber v. John Crane, Inc.*
(2006) 143 Cal.App.4th 1433 . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Wright v. Stang Manufacturing Co.*
(1997) 54 Cal.App.4th 1218 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  <u>Other Authorities</u>

2  5 Witkin, Cal. Procedure
   (4th ed. 1997) Pleading § 678. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3
   Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial
4  (The Rutter Group 2010) ¶¶ 10:51, 10:51.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  KAZAN, MCCLAIN,
    LYONS,
26  GREENWOOD &
    HARLEY, PLC
    JACK LONDON MARKET
    55 HARRISON STREET,
27  SUITE 400
    OAKLAND, CA 94607
    (510) 302-1000
    (510) 465-7728
28  FAX (510) 835-4913

MSTEWART/724515.1

## I.    Introduction

1
2          The motion of defendant McDonnell Douglas Corporation ("MDC") for summary

3    judgment or, in the alternative, summary adjudication fails for three reasons.  First, this Court on

4    December 10, 2010 ordered MDC to produce aircraft manuals, parts catalogues, All Operator

5    Letters and records pertaining to MDC's historical knowledge of asbestos hazards.  The order cites

6    MDC's representation that it could and would immediately comply.  But instead, MDC produced

7    14 encrypted CDs that cannot be printed or electronically searched without a password – which

8    MDC will not share.  And MDC bases this motion on the declarations of Larry Fogg, Timothy

9    Lloyd and Michael Schmidt, while at the same time refusing to make these percipient witnesses

10   available for deposition.  MDC cannot benefit from its misuses of the discovery process, so this

11   motion should be denied, and at a minimum must be continued, under Code of Civil Procedure

12   section 437c(h).

13          Second, MDC demonstrates no lack of evidence in support of any cause of action or claim

14   for damages raised in the complaint.  Nothing in MDC's separate statement shows MDC

15   propounded any special interrogatories seeking all of plaintiffs' witnesses and documents, much

16   less that plaintiffs' responses were in any way factually devoid.  Instead, MDC cites limited

17   excerpts of the deposition testimony of plaintiff Timothy Vest and his father, Warren Vest.  While

18   ignoring the availability of other competent evidence, MDC improperly asserts all of plaintiffs'

19   claims must fail for lack of asbestos-exposure evidence.  And MDC asserts Timothy Vest's

20   mesothelioma was not caused by asbestos exposure.  But MDC's proffered declaration of Dr.

21   Travis is easily contradicted by the opinions of plaintiffs' medical expert witnesses.

22          Third, plaintiffs' additional evidence, including the declarations of industrial hygienist

23   John Templin, pathologist Samuel P. Hammar, M.D. and pathologist William R. Salyer, M.D.,

24   raises triable issues of fact as to whether MDC is liable for the injuries to Timothy Vest caused by

25   its defective aircraft – including the planes' originally-installed asbestos-containing parts and the

26   replacement asbestos-containing parts that MDC required to be used.  Based on the relevant

27   percipient-witness testimony and the historically available scientific knowledge, John Templin

28   explains MDC should have known Timothy Vest and others in aircraft maintenance facilities were

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   at risk of mesothelioma.  Mr. Vest foreseeably inhaled substantial amounts of airborne asbestos

2   fibers from parts used on the MDC aircraft operated by World Airways and Emery Worldwide in

3   the 1970s, 1980s and 1990s.  Based on Timothy Vest's tissue samples, his documented history of

4   occupational-level asbestos exposure and other scientific evidence, Dr. Hammar and Dr. Salyer

5   explain Timothy Vest's mesothelioma was unquestionably caused by asbestos.

6   II.      **Statement of Facts**

7        A.      **Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'**
             **Hangar 110, and as a Pilot for Emery Worldwide**
8
9              On May 28, 2010, plaintiffs filed their Second Amended Complaint for personal injuries,

10   negligence, strict products liability, fraud, conspiracy to defraud and loss of consortium against

11   defendants, including MDC, who are alleged to have exposed Timothy Vest to asbestos that was a

12   substantial factor in causing his mesothelioma.[1]  [Facts 64-65.]  The complaint alleges, among

13   other things, that Timothy Vest was continually exposed to defendants' asbestos-containing

14   materials from at least 1973 to 1983 at World Airways' facilities in Oakland, California; and as a

15   pilot for Emery Worldwide from 1990 to 2001.  [*Id.*]

16              Timothy Vest lived in Dublin, California as a child from at least 1972 to 1983.  [Facts 66-

17   77.]  After working abroad, his father Warren Vest lived in the family home from mid-1973

18   onward.  [*Id.*]  Warren was an airline pilot based out of World's headquarters at the Oakland

19   Airport.  [*Id.*]  He worked at World's new office building and maintenance hangar, known as

20   Hangar 110, from the early 1970s through the late 1980s.  [*Id.*]  After the construction was

21   finished, Timothy regularly visited Hangar 110 because his father worked in the building.  [*Id.*]

22   Timothy spent approximately an hour in the hangar before his father flew away on multi-day trips.

23   [*Id.*]  And he spent several hours in the hangar when his father did weekend office work, at least

24   twice a month.  [*Id.*]  Timothy continuously visited the hangar at this rate from the time he was

25   eight years of age until he was seventeen.  [*Id.*]  As a teenager he wanted to be in the hangar

26   because he was training for his own pilot's license.  [*Id.*]  Timothy never was told of restrictions

27   against being in the hangar, and there were no signs posted.  [*Id.*]  Nor was he warned about the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

28

---

[1] The complaint is admissible here to frame the issues raised in the pleadings and to
assess the materiality of the facts in dispute.  [Rylaarsdam & Edmon, Cal. Practice Guide:
Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.]

1    asbestos in the hangar.  [*Id.*]  He did not learn until after 2000 that asbestos is hazardous.  [*Id.*]

2        On those weekend trips, Timothy spent his time exploring the nooks and crannies

3    throughout the hangar and watching the nearly constant aircraft maintenance work.  [Facts 78-87.]

4    The hangar had an office complex at the front entrance, and an enclosed maintenance area for the

5    aircraft.  [*Id.*]  He befriended one of the security guards, so he had free run of the hangar.  [*Id.*]

6    Timothy explored throughout the internal buildings and structures, including where the aircraft

7    maintenance tools and parts were stored.  [*Id.*]  He explored the maintenance facility in this way

8    until he became a teenager, and then was more interested in aircraft.  [*Id.*]  Aircraft maintenance

9    workers were nearby when Timothy was exploring.  [*Id.*]  The mechanics in the hangar knew he

10   was Warren Vest's son, so they allowed Timothy near the aircraft to learn how they worked.  [*Id.*]

11   He saw McDonnell Douglas aircraft in the hangar, including the DC-10 model.  [*Id.*]  There was

12   almost always aircraft maintenance and painting occurring in the hangar during the dozens of

13   times he visited each year from the 1970s to 1980s.  [*Id.*]  He saw engines being worked on,

14   airplanes jacked up off the floor and inspection panels removed, including on the DC-10s.  [*Id.*]

15       On days when Timothy did not accompany his father to the hangar, the two hugged when

16   his father came home from work.  [Facts 88-95.]  Warren did not immediately change out of his

17   work clothes.  [*Id.*]  Timothy's mother did most of the laundry, but Timothy helped by carrying the

18   family's dirty clothes out to the garage, where they were shaken out and washed.  [*Id.*]  Timothy's

19   own clothes were visibly dirty when he returned from the hangar.  [*Id.*]  His father wore varying

20   attire, including a pilot's uniform, a suit or business-casual clothes.  [*Id.*]  Warren worked 12 hours

21   per day and 6 days per week.  [*Id.*]  Warren's clothes appeared visibly dusty, with a chalky-white

22   color, when he returned home from the hangar.  [*Id.*]  Timothy carried his father's dirty work

23   clothes to help his mother.  [*Id.*]

24       Warren Vest confirms he started working in World's Hangar 110 a few months after its

25   grand opening in 1973.  [Facts 96-103.]  He reported to the hangar every time he left for and

26   returned from a flight.  [*Id.*]  From the mid-1970s to the mid-1980s, Warren spent approximately

27   half of each month in the office, and half on flights.  [*Id.*]  He did his paperwork on the weekends

28   because he was a pilot; and his son Timothy came to the hangar on those days.  [*Id.*]  Timothy Vest

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    came to the hangar from 1973 through 1983, up to several times per month. [*Id.*] He spent some

2    of his time in the office area, where Warren had an office, and also spent hours in other areas of

3    the hangar. [*Id.*] Timothy Vest was allowed to be on the hangar floor, and he had the permission

4    of the security guards. [*Id.*] Aircraft maintenance occurred 24 hours per day, 7 days per week,

5    including when Timothy was present. [*Id.*]

6          Warren spent a lot of time in the maintenance area to ensure the work was on schedule and

7    the aircraft would be ready to fly. [Facts 104-115.] He was on the hangar floor up to several times

8    every day. [*Id.*] Warren spoke to the maintenance foreman in charge of a particular plane. [*Id.*]

9    His conversations lasted from 5 to 30 minutes. [*Id.*] During the 1973 to 1983 period, the planes in

10   the hangar included McDonnell Douglas DC-8 (six total) and DC-10 (ten total) models. [*Id.*]

11   Three of the DC-8s and nine of the DC-10s were purchased new by World. Those new DC-10s

12   were bought in 1979, 1980 and 1981. [*Id.*] Warren saw dust in the maintenance area, especially

13   when the large doors were opened and the wind blew in, stirring up the dust. [*Id.*] Normally only

14   one set of doors were opened, to avoid creating a dangerous wind tunnel in the hangar. [*Id.*] He

15   saw the mechanics install many parts, including engine parts, on the DC-8s and DC-10s in the

16   hangar. [*Id.*] The work included minor maintenance and major overhauls, lasting from one day to

17   several weeks. [*Id.*] Up to 40 mechanics worked on the planes together. [*Id.*]

18         Warren did not immediately change out of his work clothes when he returned home. [Facts

19   116-119.] Instead, he hugged and played with Timothy and had dinner. [*Id.*] Timothy Vest also

20   rode in the car that Warren drove to and from the hangar. [*Id.*] Warren Vest never received any

21   asbestos warnings during his employment at World. [*Id.*]

22         Claude Fross was World's facilities manager for Hangar 110 from its opening in 1973 until

23   1986. [Facts 120-127.] The hangar included an office area, shop areas and a large open space for

24   the aircraft. [*Id.*] There were "no holidays" in aircraft maintenance, so work on the planes

25   occurred all day, every day in the hangar. [*Id.*] They underwent varying degrees of maintenance

26   based on their hours in flight. [*Id.*] The planes included DC-8 and DC-10 models. [*Id.*] Every

27   time a plane was pushed out of the hangar, the cleaning crew came to clean up the mess. [*Id.*] The

28   large doors on each end of the hangar were usually closed. [*Id.*] And they were not opened at the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA     4

**EXHIBIT C - Page 144**

1    same time because that would cause a wind tunnel,  [*Id.*]

2         James Hales was an aircraft maintenance controller for World at Hangar 110 from 1984 to

3    1986. [Facts 128-139.] He had an office job in which he coordinated the schedule and ordered

4    parts, primarily for DC-10 models and some DC-8s.  [*Id.*]  World serviced those DC-10s and DC-

5    8s in the hangar.  [*Id.*]  Mr. Hales is now vice president of technical operations for World.  [*Id.*]

6    The aircraft maintenance that occurred in Hangar 110 followed a precise schedule for each plane.

7    [*Id.*]  The work on a DC-10 plane could last from days to weeks.  [*Id.*]  The lightest scheduled

8    maintenance, an "A" check, involved opening access panels and inspecting internal components

9    and systems.  [*Id.*]  A "B" check was similar but more extensive.  [*Id.*]  A "C" check involved

10   more invasive removal of structural parts and replacement of worn components.  [*Id.*]  A "D"

11   check took at least a month to complete and returned the plane to like-new condition.  [*Id.*]  Every

12   access panel was opened, landing gear was removed, engines were replaced, the cabin was stripped

13   and the plane was repainted.  [*Id.*]  The hangar floor was swept after each job.  [*Id.*]

14        Maintenance programs for the aircraft changed as the planes aged and the airlines gave

15   feedback to the original manufacturer.  [Facts 140-154.] The manufacturer of the plane

16   established the initial maintenance plan for an aircraft, and that plan was approved by the Federal

17   Aviation Administration.  [*Id.*]  MDC, as the manufacturer, supplied the aircraft maintenance

18   manual, the Illustrated Parts Catalogue, the wiring diagram manual and the structural repair

19   manual.  [*Id.*]  World relied on those publications and stored them in the technical library at

20   Hangar 110.  [*Id.*]  MDC also issued service bulletins and updated manuals that World conveyed

21   to its mechanics.  [*Id.*]  The mechanics working on DC-10s and DC-8s obtained replacement parts

22   by first consulting MDC's Illustrated Parts Catalogue, which showed exactly what part – listed by

23   number – needed to be retrieved from the stockroom or specially ordered.  [*Id.*]  MDC did not

24   make all the parts it specified, so some replacement parts were obtained from third-party suppliers.

25   [*Id.*]  World needed MDC's approval to make any deviations from standard maintenance

26   procedures.  [*Id.*]  Any changes in the plan required the approval of the manufacturer.  [*Id.*]  The

27   airline was required to suggest the change to the manufacturer via a formal petition, and the

28   manufacturer then relied on its own engineers to gather data and evaluate the issue.  [*Id.*]  The

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4513

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          5

**EXHIBIT C - Page 145**

1    main reason for this process was that changes to the flight characteristics of the plane could affect

2    its safety. [*Id.*] The base design of the plane, its type certificate, could not be changed without

3    permission from the manufacturer. [*Id.*] World also contacted the manufacturer to order certain

4    parts and to obtain drawings and technical data. [*Id.*] And MDC hosted annual conferences with

5    the airlines to discuss the operation of the DC-10 and DC-8 models. [*Id.*] It also issued All

6    Operator Letters to alert the airlines to safety issues, including asbestos. [*Id.*]

7         When aircraft engine access panels were opened for inspections, there were heat shields or

8    insulation blankets placed around the pneumatic systems. [Facts 155-166.] The shields and

9    blankets were bolted or wired in place, and had to be unfastened. [*Id.*] The outside surface of a

10   heat shield was metal, with a bolt hole running through it. [*Id.*] Heat shields were among the

11   asbestos-containing products which were used on aircraft in Hangar 110, and which required

12   hands-on contact. [*Id.*] Clamps were another asbestos part. [*Id.*] The clamps had an asbestos

13   sleeve covering the metal loop, and their purpose was to hold hydraulic lines, pneumatic lines and

14   wiring. [*Id.*] Asbestos materials were typically used in hot areas, while asbestos-free materials

15   were used in cooler areas. [*Id.*] Asbestos gaskets were used in the engines, and sometimes worn

16   gaskets had to be scraped off to leave a clean surface for the replacement part. [*Id.*] A wire brush

17   or sandpaper was used to scrape the gaskets. [*Id.*] Asbestos tape was also used in planes, to seal

18   the exhaust system. [*Id.*] Worn tape had to be scraped off before applying a new strip. [*Id.*] Mr.

19   Hales also recalls the use of epoxy adhesives made by Dexter. [*Id.*]

20         Stanley Lehmann is the designated corporate witness for Henkel Corporation, manufacturer

21   of Dexter-brand adhesive products – one of the asbestos-containing materials MDC required to be

22   used on its aircraft through at least 1992. [Facts 167-179, 217.] Attached to Mr. Lehmann's

23   declaration are some historical invoices showing sales of Dexter EA 934 two-part epoxy adhesive

24   from Henkel to World at Hangar 110. [*Id.*] These invoices are dated as late as October 1981.

25   [*Id.*] In addition to such direct sales, Henkel sold products through distributors. [*Id.*] Dexter-

26   brand products were sold in distinctive packaging that bore yellow labels with black printing. [*Id.*]

27   Dexter EA 934 was capable of bonding metal to metal. [*Id.*] It consisted of two parts, one of

28   which contained chrysotile asbestos, mixed together to form the adhesive. [*Id.*] Henkel purchased

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   raw asbestos fiber from Johns-Manville for use in the Dexter epoxies. [*Id.*] Johns-Manville

2   provided some asbestos warnings to Henkel beginning in the early 1970s. [*Id.*] And OSHA

3   provided to Henkel notice of asbestos hazards in 1972. [*Id.*] But Henkel issued no asbestos

4   warnings until 1977. [*Id.*] Its products then had an OSHA-type label, and Henkel issued a

5   separate bulletin instructing how to use the products safely. [*Id.*] That bulletin, but not the

6   product packaging, instructed not to sand the epoxy adhesives without wet-down methods. [*Id.*]

7        The epoxy contained asbestos beginning in 1962, the asbestos-free version did not exist

8   until 1979, and the asbestos-containing version was still sold after that date, until at least 1985.

9   [Facts 180-188.] Henkel developed the asbestos-free version to minimize its employees' exposure

10  to asbestos. [*Id.*] It continued to sell the asbestos-containing version after 1979 because aircraft

11  products had to go through a rigorous qualification process, and not all airline customers had

12  gained approval to use the asbestos-free version. [*Id.*] This process was required to ensure the

13  new product met the aircraft manufacturer's performance specification. [*Id.*] As of 1979, only a

14  single customer had gained approval, but Mr. Lehmann does not recall who that was. [*Id.*] The

15  approval needed to be issued by McDonnell Douglas, as the aircraft manufacturer, stating that EA

16  934 "NA" (nonasbestos) had been added to its qualified products list. [*Id.*] Such approval came

17  only after a successful application process. [*Id.*] Until MDC sent Henkel written approval after

18  testing the proposed new product, Henkel did not sell the asbestos-free material for use on MDC

19  aircraft. [*Id.*] All of the available invoices from Henkel to World, dated as late as October 1981,

20  demonstrate sales of the asbestos-containing version of the Dexter epoxy to World. [*Id.*]

21        Murray Gordon, deceased, testified in 1981 as the designated corporate witness for

22  McDonnell Douglas.[2] [Facts 189-194.] His title at the time of his 1981 deposition was Director of

23  Occupational Safety and Medical Services. [*Id.*] He had the overall responsibility for the

24  company's policies and procedures for hazardous materials, including asbestos. [*Id.*] A decade

25  earlier, in 1972, MDC responded to the newly enacted OSHA rules by determining, throughout the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

26

27

28

---

[2]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It is also admissible because the witness is dead, and MDC satisfied its interest in cross-examination at the deposition. [Evid. Code §§ 1290, 1291, 1292.] And it is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

MSTEWART/72461̄5.1    Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    7

EXHIBIT C - Page 147

1  company, where it was using asbestos-containing materials. [*Id.*] MDC tried to eliminate asbestos

2  "where [it] could.," and tried to change how asbestos was handled in its facilities. [*Id.*] Before

3  1972, the company took no measures to protect people exposed to asbestos from its aircraft. [*Id.*]

4       Colleen Rule testified in 1999 on behalf of McDonnell Douglas Corp. (Boeing) and was

5  represented at the deposition by the company's counsel.[3] [Facts 195-200.] Her job in the

6  company's product support group was to assist the airlines who operate MDC aircraft to ensure

7  proper maintenance. [*Id.*] Ms. Rule kept the records of all communications between the company

8  and its airline customers, including the All Operator Letters (AOL). [*Id.*] MDC also staffed a call-

9  in center where airlines could ask whether a part number is interchangeable with any other part

10 number, in order to keep the aircraft flying without delay. [*Id.*] At no time were MDC's

11 customers cut-off from the technical assistance services, even long after the aircraft was sold. [*Id.*]

12 And the subsequent owners of a used aircraft had the benefit of MDC's services. [*Id.*]

13       Attached to Ms. Rule's deposition is the October 22, 1992 All Operator Letter issued by

14 MDC to all its customers, pertaining to asbestos-containing materials used in its aircraft.[4] [Fact

15 201-217.] The 1992 AOL was a revised edition of a 1989 AOL, also involving asbestos. [*Id.*]

16 Those were the only AOLs that discussed asbestos, and they demonstrate MDC's first

17 communications with its customers about asbestos. [*Id.*] The 1992 AOL was issued to encompass

18 more models of aircraft. [*Id.*] The 1992 AOL began with a series of codes that identified what

19 model aircraft and what system was being addressed. [*Id.*] For example, the code 8-20-0 meant

20 the AOL related to chemicals and materials on all DC-8 planes. [*Id.*] The AOL also expressly

21 stated it applied to all DC-8 and DC-10 aircraft, among others. [*Id.*] The AOL included a list of

22 asbestos parts divided into several columns and rows. [*Id.*] For each asbestos part, the chart

23 identified the specification, blueprint and part numbers that corresponded to MDC's Illustrated

24 Parts Catalogue. [*Id.*] That catalogue was created and maintained by MDC's technical

25

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

26

27

28

[3]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It also is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

[4]The AOL is an admissible business record and admission. [Evid. Code §§ 1271, 1220, 1221, 1222.] It also is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1  publications department. [*Id.*] Some of the asbestos parts, but not all, were listed with a specific

2  asbestos-free replacement part. [*Id.*] The AOL explained its purpose was to warn customers of

3  the presence and dangers of all asbestos-containing materials used in MDC aircraft, including DC-

4  8s and DC-10s. [*Id.*] It stated MDC was required to share updated safety information about tasks

5  and functions needed to maintain and repair its aircraft. [*Id.*] The AOL was prompted by a

6  "foreign" customer that desired to know all asbestos materials in certain MDC aircraft, and how to

7  substitute asbestos-free alternatives. [*Id.*] It stated asbestos materials were used in high-heat

8  applications, and asbestos was mixed into sealants and adhesives. [*Id.*] The AOL warned that

9  asbestos fibers were released when the materials were sanded, creating toxic dust that was inhaled

10  by nearby persons. [*Id.*] Among the dozens of asbestos parts listed in the AOL were Dexter-brand

11  epoxy filler adhesives, heat shields, pneumatic duct insulation, gaskets, tape, and insulation. [*Id.*]

12       David Miller in his December 13, 2010 declaration explains he was an aircraft mechanic

13  for World at Hangar 110 from 1973 to 1987. [Facts 218-236.] McDonnell Douglas

14  representatives were sometimes at Hangar 110, identified by their badges. [*Id.*] Mr. Miller and

15  the other mechanics handled heat blankets and shields used in the DC-8 and DC-10 aircraft

16  exhaust systems. [*Id.*] The blankets were woven and protected the pneumatic and hydraulic lines

17  from high heat. [*Id.*] The process of obtaining replacement blankets required the mechanics to use

18  MDC's Illustrated Parts Catalogue and part-numbering system. [*Id.*] The heat shields used in the

19  DC-8s protected the pneumatic and hydraulic lines, and were held in place with stubs or hooks.

20  [*Id.*] They measured up to several feet long and six inches wide. [*Id.*] Each engine had two to

21  four shields. [*Id.*] The outer case was metal, but the interior was a non-metal thick fibrous

22  material. [*Id.*] The metal case did not completely cover the internal material at the corners and

23  edges, so that material was disturbed every time the shields were removed and replaced. [*Id.*] The

24  corners and edges became more frayed and deteriorated over time. [*Id.*] The color also varied

25  over time, but most were gray-white. [*Id.*] The shields were removed and thrown aside when the

26  mechanics needed access to the engines; and then were reinstalled. [*Id.*] The shields became bent

27  through wear and tear, and developed holes in their metal shell. [*Id.*] Engine work on the DC-8s

28  required the removal and replacement of the heat shields. [*Id.*] Mr. Miller believes, based on his

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      9

**EXHIBIT C - Page 149**

1   experience and knowledge as a mechanic, the shields contained asbestos. [*Id.*] Mr. Miller and

2   others used Dexter-brand "black and yellow" two-part epoxies. [*Id.*] He also used thousands of

3   "Adell" clamps that had an asbestos-like padding or sleeve material lining the metal portion. [*Id.*]

4   And he removed and installed fuselage insulation. [*Id.*]

5        As an adult, Timothy Vest flew planes for Emery from 1990 to 2001. [Facts 237-245.]

6   Emery operated primarily McDonnell Douglas DC-8 aircraft on cargo flights throughout the

7   United States and the world. [*Id.*] Unlike domestic flights, on international flights the planes

8   carried a mechanic and thousands of pounds of aircraft tools and parts. [*Id.*] The planes traveled

9   to third-world countries and needed to perform their own repairs to avoid getting stranded. [*Id.*]

10  Timothy observed the mechanics working on the engines, and he helped by lending a hand where

11  possible. [*Id.*] When flying domestically, Timothy observed aircraft maintenance work at all

12  airports where Emery had facilities. [*Id.*] Most of Emery's planes were old and needed repairs all

13  the time, including pneumatic-system and engine work. [*Id.*] That maintenance work occurred at

14  airports around the country. [*Id.*] Apart from Timothy's pre-flight inspections of Emery's 40 DC-

15  8 aircraft, and its several DC-10s, he saw the mechanics doing their jobs hundreds of times. [*Id.*]

16       He saw the noses and side-panels of the planes being repaired, repairs of the hydraulic

17  systems, and repairs of the engine components. [Facts 246-253.] Timothy closely observed the

18  Emery mechanics' work on the MDC aircraft to ensure they were doing a proper job, and he

19  assisted them when possible. [*Id.*] Apart from the work at Emery's airport bases, Timothy

20  observed work on the DC-8s hundreds of times at specialized maintenance facilities. [*Id.*] He saw

21  the different levels of heavy maintenance, termed A, B, C and D checks, where the planes were

22  torn apart and put back together. [*Id.*] All of the hydraulic, pneumatic, fire-protection and engine

23  systems were overhauled over a period of hours or days. [*Id.*] He has seen mechanics use epoxy

24  adhesives to repair damaged surfaces on the aircraft, which included sanding the epoxy once it

25  dried. [*Id.*] When nose-cones were damaged by bird or lightning strikes, the affected areas were

26  filled with epoxies and sanded smooth. [*Id.*] The epoxies also were used to seal leaks and for

27  other applications in the engine spaces. [*Id.*]

28       John Templin is a certified industrial hygienist who, in his accompanying declaration,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    explains Timothy Vest's asbestos-exposure levels and the historical knowledge of asbestos-related

2    health hazards. [Facts 254-255.] John Templin's extensive qualifications and the detailed bases

3    for his conclusions are set forth in his declaration, which is incorporated fully herein by reference.

4    [Id.] The physical and aerodynamic properties of asbestos facilitate re-entrainment and

5    re-suspension of asbestos fibers once a space is contaminated. [Id.] The respirable asbestos fibers

6    that are released into the air will remain there for up to many hours before they alight on surfaces.

7    [Id.] Those fibers, once they do come to rest, are then subject to re-entrainment. [Id.]

8    Re-entrainment describes the physical action of air, movement, vibration, and physical impact that

9    aerodynamically causes asbestos fibers to take flight and become airborne. [Id.] It can be caused

10   by ordinary movement of people and objects and also by air currents. [Id.] It is also caused by

11   disturbances to the environment such as sweeping, cleaning, blowing areas down, and even

12   walking through microscopic asbestos-containing debris or dust. [Id.] Fibers can move laterally

13   with air currents and contaminate areas far from the release point, up to hundreds of meters away.

14   [Id.] They can also move across contamination barriers with the passage of workers during

15   removal of material. [Id.] And the fibers persist almost indefinitely and create a continuous

16   source of exposure when they are present in occupied buildings. [Id.] John Templin explains that

17   these principles of re-entrainment, and the risk of asbestos exposure to those well beyond the

18   source of fiber release, have been widely scientifically known since at least the 1960s. [Id.] He

19   cites several scientific sources from the 1920s to 1940s addressing this topic. [Id.]

20        Based on John Templin's review of the case-specific evidence enumerated in his

21   declaration, Timothy Vest was exposed to substantial levels of asbestos-containing dust from the

22   aircraft parts used in Hangar 110 from 1972 to 1983; and from parts used on Emery's aircraft

23   during the 1990s. [Facts 256-258.] Timothy breathed large amounts of visible

24   asbestos-containing dust that was created by his own activities, and by work done in his and his

25   father's vicinity. [Id.] Hangar 110 at the Oakland Airport, occupied by World Airways, was the

26   primary location where Timothy Vest inhaled asbestos. [Id.] He was exposed while at the hangar

27   on dozens of occasions, and was exposed to dust tracked home on his father's clothing. [Id.] The

28   materials that released respirable asbestos fibers to which he was exposed included aircraft parts

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART//26515.1    Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    11

EXHIBIT C - Page 151

1    used on the DC-8 and DC-10 models operated by World and continuously maintained in the

2    hangar. [*Id.*]  Visible dust was released by the sanding of Dexter-brand epoxy adhesives; the

3    removal and reinstallation of worn heat blankets and shields; the handling of old insulated clamps;

4    and the scraping of gaskets and tapes. [*Id.*]  Timothy Vest experienced substantial levels of

5    asbestos exposure as a pilot for Emery in the 1990s. [*Id.*]  He assisted and observed aircraft

6    mechanics, on hundreds of occasions, working on Emery's fleet of McDonnell Douglas DC-8 and

7    DC-10 models. [*Id.*]  The aircraft parts that released asbestos dust to which he was exposed

8    include all the materials described above: Dexter-brand epoxy adhesives, heat blankets and

9    shields, insulated clamps, gaskets and tapes. [*Id.*]  Although these exposures occurred in the

10   1990s, MDC's 1992 All Operator Letter confirms the relevant asbestos-containing parts still were

11   required to be used on the aircraft. [*Id.*]

12        John Templin further explains, in great detail, that it was widely known and understood by

13   1960 – certainly within the industrial-hygiene community – that workers, bystanders and even

14   household members of those working with and around asbestos-containing products were at

15   substantially increased risk of being exposed to asbestos from the type of products and activities

16   that Timothy Vest and his father encountered; and of developing an asbestos-related disease, such

17   as mesothelioma, as a result of those exposures. [Fact 259.]  In fact, by 1964 when Dr. Irving

18   Selikoff and his colleagues published their seminal epidemiological study demonstrating the

19   mortality experience of workers who had been exposed to asbestos insulation, the causal

20   connection between asbestos exposure and mesothelioma was unquestioned in the medical and

21   scientific communities in the United States. [*Id.*]  When Timothy Vest inhaled asbestos-

22   containing dust from aircraft parts in the 1970s, 1980s and 1990s, it was entirely foreseeable that

23   his asbestos exposure could cause him to suffer serious or fatal diseases including, among others,

24   mesothelioma cancer. [*Id.*]

25   **B.    Timothy Vest's Mesothelioma was Caused by Asbestos**

26        Samuel P. Hammar, M.D. is a pathologist who, in his accompanying declaration, explains

27   Timothy Vest's asbestos-caused malignant mesothelioma. [Facts 260-261.]  Dr. Hammar's

28   extensive qualifications and the detailed bases for his conclusions are set forth in his declaration,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA     12

**EXHIBIT C - Page 152**

1  which is incorporated fully herein by reference. [*Id.*] There is an extraordinarily strong link

2  between mesothelioma and asbestos dust, such that it is largely undisputed in the scientific

3  community that asbestos causes diffuse malignant mesothelioma. [*Id.*] And because diffuse and

4  localized mesothelioma cells are chemically and structurally identical, it is also true that asbestos

5  causes localized malignant mesothelioma – regardless of the tumor's size when detected. [*Id.*]

6  This fact is supported by the documented asbestos-exposure histories of the patients described in

7  the articles by Nakas, et al. and Allen, et al. (which Dr. Hammar co-authored) [*Id.*] For the Nakas,

8  et al. patients, nine out of ten had prior occupational-level exposures to asbestos. [*Id.*] And the

9  limited available information pertaining to the Allen, et al. patients revealed that four had prior

10  occupational-level exposures to asbestos. [*Id.*]

11       Timothy Vest's pathology slides demonstrate malignant mesothelioma cancer cells on the

12  pleural tissue in his chest. [Fact 262.] Adjacent to the cancer cells is mildly to markedly

13  thickened pleural tissue with a hyaline (glassy) appearance, which are pleural plaques caused by

14  asbestos. [*Id.*] Given the presence of pleural plaques, his mesothelioma was unquestionably

15  caused by occupational-level exposure to asbestos. [*Id.*] Pleural plaques are localized scars that

16  form due to prolonged exposure to asbestos fibers. [*Id.*] These scars almost never form for

17  reasons other than asbestos exposure. [*Id.*] But even if the pleural plaques did not exist, it remains

18  true that Timothy Vest's mesothelioma was caused by asbestos because of his documented

19  exposure to asbestos in occupational and para-occupational settings. [*Id.*] His mesothelioma was

20  caused by his total lifetime dose of asbestos. [*Id.*] All of Timothy Vest's individual asbestos

21  exposures contributed to his total dose and increased his risk of developing the disease. [*Id.*]

22  There is no known safe level of asbestos exposure. [*Id.*]

23       William R. Salyer, M.D. is a pathologist who, in his accompanying declaration, further

24  explains Timothy Vest's asbestos-caused diffuse malignant mesothelioma. [Facts 263-264.]

25  Dr. Salyer's extensive qualifications and the detailed bases for his conclusions are set forth in his

26  declaration, which is incorporated fully herein by reference. [*Id.*] Dr. Salyer has treated several

27  patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. [*Id.*] That

28  is, when the mesotheliomas were first detected in the patients, the tumors appeared to be localized

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1       Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA       13

EXHIBIT C - Page 153

1   masses – what some in the scientific literature have described as "localized malignant

2   mesothelioma." [*Id.*] All of those patients died of the disease soon after diagnosis. [*Id.*] Those

3   patients' tumors, although localized in their initial appearance, were in fact diffuse mesotheliomas

4   that were detected earlier than usual. [*Id.*] And each patient's diffuse mesothelioma was caused

5   by exposure to asbestos. [*Id.*]

6        Based on the scientific literature pertaining to "localized" malignant mesothelioma, there is

7   no evidence it is a different disease from diffuse mesothelioma. [Facts 265-266.] Although there

8   may appear to be a larger number of longer-term survivors whose disease was "localized," that is

9   because the patients were very fortunate to have an early discovery of their disease and underwent

10   surgical amelioration to slow its progression. [*Id.*] Many of those patients developed a recurrence

11   of the disease and died. [*Id.*] Timothy Vest suffers from malignant mesothelioma that was

12   detected at an early stage of its development. [*Id.*] Even if Timothy Vest's tumor was initially

13   localized, he has a very high risk of local recurrence of his tumor and of metastatic disease. [*Id.*]

14   Timothy Vest almost certainly will die of the disease. [*Id.*] His pathology slides demonstrate

15   what are, in fact, diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest.

16   [*Id.*] Adjacent to the cancer cells are pleural plaques caused by asbestos. [*Id.*] Given the presence

17   of pleural plaques, and Timothy Vest's documented exposure to asbestos in occupational and para-

18   occupational settings, his mesothelioma was unquestionably caused by asbestos. [*Id.*] Even if the

19   pleural plaques did not exist, it remains true that Timothy Vest's mesothelioma was caused by

20   asbestos. [*Id.*] All of his individual exposures contributed to his total lifetime dose of asbestos

21   and thereby caused the disease. [*Id.*]

22   **III.    Legal Argument**

23        **A.    Moving Defendant's Burden of Proof**

24        A defendant's motion for summary judgment should be granted [only] if no triable
     issue exists as to any material fact and the defendant is entitled to a judgment as a
25   matter of law. [Code Civ. Proc. § 437c(c).] The burden of persuasion remains with
     the party moving for summary judgment. [*Aguilar v. Atlantic Richfield Co.* (2001)
26   25 Cal.4th 826, 850, 861.]

27   [*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see Code Civ. Proc.

28   § 437c(p)(2).] "[F]rom commencement to conclusion, the party moving for summary judgment

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

MSTEWART/724515.1         Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA         14

EXHIBIT C - Page 154

1    bears the burden of persuasion that there is no triable issue of material fact . . ." [*Aguilar, supra,*

2    25 Cal.4th 826, 850.] This means the moving defendant must show that if the defendant's

3    evidence is uncontroverted, no reasonable trier of fact could find for the plaintiff. [*Id.* at 851.]

4    Only if the defendant makes that showing does the burden shift to plaintiff to demonstrate the

5    existence of a triable issue of material fact. [*Id.*]

6       The defendant must show that the plaintiff *does not possess* needed evidence,
        because otherwise the plaintiff might be able to establish the elements of the cause

7       of action; the defendant must also show that the plaintiff *cannot reasonably obtain*
        needed evidence, because the plaintiff must be allowed a reasonable opportunity to

8       oppose the motion. [*Id.* at 854 (emphasis in original).]

9       A moving defendant must affirmatively show the plaintiff lacks the needed evidence;

10   simply pointing to a claimed absence is not enough. [*Id.* at 854-855.] The defendant's evidence

11   must include "affidavits, declarations, admissions, answers to interrogatories, depositions, and

12   matters of which 'judicial notice' must or may 'be taken.'" [*Id.* at 855, citing Code Civ. Proc. §

13   437c(b).] Nor is it enough to merely assert that plaintiff failed to provide the information. The

14   defendant must prove "plaintiffs failed to provide meaningful responses to comprehensive

15   interrogatories designed to elicit all the evidence plaintiffs had to support their contention of

16   liability." [*Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1442.]

17      Only admissible evidence may be considered, and the moving defendant must include all

18   evidence offered to meet its evidentiary burden in its "separate statement." [Code Civ. Proc.

19   § 437c(d).] "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate

20   statement, *it does not exist.*" [*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327,

21   337 (emphasis in original).] The strict requirements a moving party must satisfy were explained in

22   *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631-632:

23      One of the more basic requirements is that the papers supporting a section 437c
        motion "shall include a separate statement setting forth plainly and concisely all

24      material facts which the moving party contends are undisputed." [*Id.*, Code Civ.
        Proc. § 437c(b)(1); see CRC 3.1350(d).] In addition, each material fact set forth in

25      the separate statement "shall be followed by a reference to the supporting
        evidence." [Code Civ. Proc. § 437c(b)(1.).]

26      In ruling, "the court must consider all of the evidence and all of the inferences reasonably

27   drawn therefrom ... and must view such evidence ... and such inferences ... in the light most

28   favorable to the opposing party." [*Aguilar*, 25 Cal.4th 826, 844-845.] "'[B]ecause of the drastic

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1        Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA        15

**EXHIBIT C - Page 155**

1   nature of the summary judgment procedure, and the importance of safeguarding the adverse

2   party's right to a trial, the moving party must make a strong showing. [Its] affidavits are strictly

3   construed ...On the other hand, the affidavits of the party opposing the motion are liberally

4   construed.'" [*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 838-839 (emphasis

5   added).]

6   **B.      MDC Fails to Establish Plaintiffs Lack Evidence of Causation**

7           MDC is responsible under products liability principles for all injuries caused by its

8   defective asbestos-containing aircraft – including the originally-installed parts and the parts MDC

9   required to be used in its planes' maintenance. [*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d

10   379, 382-383; *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261.][5] Bystander victims are

11   owed a duty of care, and are entitled to even greater protection, because they are perfectly

12   foreseeable victims of defective products and have no opportunity to discover the hazards.

13   [*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 585-586; *Nelson v. Superior Court*

14   (2006) 144 Cal.App.4th 689, 695.] Even household members injured by toxins unwittingly

15   tracked home by workers are owed a duty of care, so long as there is evidence of a specific toxin

16   that caused a specific injury. [*Oddone v. Superior Court (Technicolor, Inc.)* (2009) 179

17   Cal.App.4th 813, 872-873.]

18           The California Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953

19   established the causation standard for asbestos-cancer cases:

20

21   _____

22       [5]Manufacturers owe a duty to warn of hazards arising from the foreseeable and
     required uses of their products, including such uses in conjunction with other defective
23   products. [*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129
     Cal.App.4th 577, 581-583 (power tools and attachments); *Torres v. Xomox Corporation*
24   (1996) 49 Cal.App.4th 1, 17-19 (valve and acid); *Huynh v. Ingersoll-Rand* (1993) 16
     Cal.App.4th 825, 833 (grinder and disc); *Wright v. Stang Manufacturing Co.* (1997) 54
25   Cal.App.4th 1218, 1230-1231 (water gun and fire truck); *DeLeon v. Commercial
     Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 343-347 (holding bin and
26   overhead equipment). The court in *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171
     Cal.App.4th 564, did not hold that manufacturers would be immune if they had specifically
27   intended and required that asbestos-containing replacement parts be used with their
     equipment. [*Id.* at 590-591.] In fact, the court cited with approval a Washington Supreme
28   Court case that held equipment manufacturers could be liable if they specified
     asbestos-containing replacement components for use with their equipment. [*Id.*]

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1       Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA       16

**EXHIBIT C - Page 156**

1    [P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in
2    reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence
3    to the *risk* of developing asbestos-related cancer . . .

4    [*Id.* at 976-977 (emphasis original).] Plaintiffs may prove Timothy Vest's mesothelioma was

5    "cumulative in nature, with many separate exposures each having constituted a 'substantial factor'

6    (citation) that contributed to his risk of injury." [*Id.* at 958.] But plaintiffs "need *not* prove that

7    fibers from the defendant's product were the ones, or among the ones, that actually began the

8    process of malignant cellular growth." [*Id.* at 982-983 (emphasis original).]

9        MDC demonstrates no lack of proof its asbestos-containing aircraft constituted a

10    substantial-factor cause of Timothy Vest's asbestos-related mesothelioma. First, MDC presents no

11    evidence it propounded comprehensive discovery requests, much less that plaintiffs' responses to

12    any such discovery it propounded were in any way devoid of facts and evidence supporting each

13    essential element of the complaint's causes of action and damages claims against MDC. [Alleged

14    Facts 1-63; *Weber, supra*, 143 Cal.App.4th 1433, 1442.] MDC in its separate statement simply

15    mentions <u>no</u> special interrogatories propounded by MDC to plaintiffs. [*Id.*] Instead, MDC cites

16    limited portions of Timothy Vest's and Warren Vest's deposition testimony, ignoring the portions

17    that are unfavorable to MDC's position.

18        Second, MDC cites the inadmissible declarations of Larry Fogg, Timothy Lloyd and

19    Michael Schmidt in a failed effort to prove MDC's aircraft had few asbestos-containing parts, and

20    that MDC had no involvement in those planes' maintenance. [Alleged Facts 1-63; Fact 267.] As

21    plaintiffs explain in their evidentiary objections, Mr. Fogg's declarations are inadmissible hearsay

22    created several years ago for other lawsuits. [Evid. Code § 1200; Code Civ. Proc. § 437c(b),(d).]

23    All of the declarations must be disregarded because MDC refuses to produce Mr. Fogg, Mr. Lloyd

24    and Mr. Schmidt for deposition – thereby concealing relevant evidence. [Fact 267; Code Civ.

25    Proc. § 437c(h).] At most, these witnesses set forth MDC's one-sided view of the case, all of

26    which is contradicted by plaintiffs' additional evidence. [Facts 64-267.]

27        Third, on the medical-causation issue, MDC offers no conclusive evidence that Timothy

28    Vest's mesothelioma purportedly is unrelated to his asbestos exposure. [Alleged Facts 1-63.]

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
Suite 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    17

**EXHIBIT C - Page 157**

1   Instead, MDC offers the unpersuasive opinion of Dr. Travis who, based on his status as a co-

2   author of a single article, opines that no scientist could ever determine the cause of Timothy Vest's

3   cancer because it has been described as "localized." [*Id.*] Dr. Travis's opinion demonstrates

4   nothing about plaintiffs' ability to marshal competent expert testimony to prove Timothy Vest's

5   malignant mesothelioma is, indeed, asbestos-related. [*Id.*] In fact, plaintiffs submit the

6   declarations of Dr. Salyer and Dr. Hammar (co-author of Dr. Travis's article), showing Timothy

7   Vest's mesothelioma was unquestionably caused by asbestos and will kill him. [Facts 260-266.]

8        **1.    Plaintiffs' Additional Evidence Requires a Trial**

9         Under *Jiminez*, *supra*, *Vandermark*, *supra* and *Rutherford*, supra, MDC is liable for its

10  supply and specification of asbestos-containing aircraft parts that were a substantial-factor cause of

11  Timothy Vest's mesothelioma. MDC installed dozens of asbestos materials on its aircraft, and

12  World operated approximately 16 of those planes when Timothy and his father were in Hangar

13  110 from 1973 to 1983. [Facts 64-259.] Many of those planes were purchased new from 1979 to

14  1981. [Facts 64-259.] Timothy Vest was also exposed to Emery's fleet of MDC planes in the

15  1990s. [*Id.*] Many of the toxic components – including heat shields, heat blankets, clamps,

16  gaskets, tape and insulation – remained in the aircraft for extended periods and released asbestos

17  fibers whenever they were handled, removed and reinstalled during inspections. [*Id.*] And MDC

18  required that other toxic components – including Dexter adhesive – were required to be used and

19  sanded in a manner that released asbestos in maintaining MDC's planes. [*Id.*] MDC controlled

20  every aspect of its planes' maintenance and operation, and its catalogues and manuals specified the

21  use of asbestos parts into the 1990s – decades after MDC became aware of the hazards. [*Id.*] Safe

22  alternative materials could not be used without MDC's analysis and express permission. [*Id.*]

23  MDC maintained a constant connection to its aircraft, even after they were transferred between

24  owners. [*Id.*]

25        Industrial hygienist John Templin explains how Timothy Vest inhaled substantial levels of

26  asbestos from these products and activities; and that the hazards were foreseeable to MDC and it

27  could have discovered and fixed the problems at any time from the 1970s through the 1990s. [*Id.*]

28  Pathologists Samuel Hammar and William Salyer confirm that Timothy Vest's mesothelioma –

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1     Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA   18

EXHIBIT C - Page 158

1  whether described as "localized" or not – was unquestionably caused by Timothy's occupational-

2  levels of asbestos exposure from all sources. [*Id.*] All of these facts are supported by the sworn

3  statements of Timothy Vest, Warren Vest, Claude Fross, James Hales, Stanley Lehmann, Murray

4  Gordon, Colleen Rule, David Miller, John Templin, Samuel Hammar and William Salyer. [*Id.*]

5        **C.**    **Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid**

6       MDC may be liable under Civil Code sections 1708 and 1710 for concealing important

7  facts pertaining to hidden asbestos-related health hazards. The active concealment of facts by even

8  "a non-fiduciary is the equivalent of a false representation, i.e., *actual fraud.*" [5 Witkin, Cal.

9  Procedure (4th ed. 1997) Pleading § 678, p. 136 (emphasis added); *Quirici v. Freeman* (1950) 98

10  Cal.App.2d 194, 201 (intentional concealment supports fraud claim).] And MDC may be liable

11  for asbestos exposures from any source caused by the conspiracy in which MDC participated to

12  suppress information about asbestos dangers. [*Stone v. Regents of University of Cal.* (1999) 77

13  Cal.App.4th 736, 748 fn. 9.] The jury may award punitive damages in intentional-tort and

14  unintentional-tort actions for negligent conduct. [*Potter v. Firestone Tire & Rubber Co.* (1993) 6

15  Cal.4th 965, 1005; *SKF Farms v. Super. Ct.* (1984) 153 Cal.App.3d 902, 907.] Punitive damages

16  may be based on a defendant's knowing and reckless failure to warn of hazards, where it is shown

17  that actions were taken in conscious disregard of the rights or safety of others, including the

18  plaintiffs. [Civ. Code § 3294; *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-401.]

19       Here, as previously explained, MDC demonstrates no absence of evidence it concealed the

20  latent asbestos hazards of its aircraft. But plaintiffs nevertheless present the testimony of Murray

21  Gordon, Colleen Rule and Stanley Lehman, proving MDC knew of asbestos hazards in 1972 and

22  took steps to protect its own workers; received further knowledge in 1977 when the manufacturer

23  of Dexter adhesives issued warnings; but MDC communicated nothing to its customers until 1989

24  and 1992, when it issued the AOLs on asbestos parts. So MDC knew it was exposing workers and

25  their families to toxic asbestos, yet MDC failed to warn or use safe products. Such evidence easily

26  supports the reasonable inference that MDC acted fraudulently and in conscious disregard of the

27  health and safety of others, including Timothy Vest and his father.

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

**D.     The Motion must be Continued or Denied Under CCP 437c(h)**

1

2       Despite the Court's order to produce specific aircraft manuals, parts catalogues, All

3  Operator Letters and documents demonstrating MDC's historical knowledge of asbestos hazards,

4  MDC has not satisfied its discovery obligations. [Fact 267]  MDC provided 14 encrypted compact

5  discs, which contain images of documents that cannot be printed, cannot be electronically searched

6  and cannot be converted to a format that is electronically searchable. [*Id.*]

7       MDC relies on witnesses Timothy Lloyd, Michael Schmidt and Larry Fogg. [*Id.*]  Despite

8  MDC's submission of these witnesses' declarations in support of its motion for summary

9  judgment/adjudication, MDC refuses to make Mr. Lloyd, Mr. Schmidt and Mr. Fogg available for

10 deposition. [*Id.*]  These percipient witnesses have information concerning the originally-installed

11 and replacement asbestos-containing parts that MDC required to be used on its aircraft. [*Id.*]

12      David Miller's and Joseph Robison's upcoming deposition testimony will further confirm

13 that MDC's asbestos-containing aircraft parts were pervasively used in Hangar 110 from 1973

14 through 1983. [*Id.*]  Both Miller and Robison worked in Hangar 110 during all relevant years and

15 are essential percipient witnesses. [*Id.*]  Additional percipient witnesses who will be deposed

16 include Glen Cartwright and Mike Pociecha, both of whom worked for World in Hangar 110.

17 [*Id.*]  Further, pared-down expert witness disclosures are due January 14, 2011, and the subsequent

18 depositions of all parties' medical-causation expert witnesses will produce further evidence that

19 Timothy Vest's mesothelioma was caused by asbestos. [*Id.*]  Facts that further justify opposition

20 to this motion may exist, but cannot now be presented. [*Id.*]  So this motion must be denied, but at

21 a minimum it must be continued. [Code Civ. Proc. § 437c(h); *Bahl v. Bank of America* (2001) 89

22 Cal.App.4th 389, 395.]

23 **IV.    Conclusion**

24      MDC demonstrates no absence of evidence in support of any cause of action or claim for
damages raised in the complaint.  And plaintiffs' additional evidence requires a trial to resolve all
25 challenged causes of action and claims for damages.
   DATED: December 30, 2010          KAZAN, McCLAIN, LYONS,
26                                     GREENWOOD & HARLEY
                                       A Professional Law Corporation
27
                                       By
28
                                          Michael T. Stewart
                                          Attorneys for Plaintiffs

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728.
FAX (510) 835-4913

MSTEWART/724515.1       Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      20

**EXHIBIT C - Page 160**

1  James L. Oberman, Esq. (C.S.B. #120938)
   Michael T. Stewart, Esq. (C.S.B. #253851)
2  KAZAN, McCLAIN, LYONS,
   GREENWOOD & HARLEY
3  A Professional Law Corporation
   Jack London Market
4  55 Harrison Street, Suite 400
   Oakland, California  94607
5  Telephone:  (510) 302-1000

6  Attorneys for Plaintiffs

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF ALAMEDA

10  TIMOTHY VEST and CAROLINE VEST,        No. RG09489518

11           Plaintiffs,                    **PLAINTIFFS' MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN OPPOSITION TO**
12      vs.                                 **DEFENDANT McDONNELL DOUGLAS
                                            CORPORATION'S MOTION FOR SUMMARY**
13  ALLIED PACKING & SUPPLY, INC., et       **JUDGMENT OR, IN THE ALTERNATIVE,**
    al.,                                    **SUMMARY ADJUDICATION**
14
                                            Date:        January 14, 2011
15           Defendants.                    Time:        9:36 am
                                            Dept.:       30 (Hon. Kenneth Mark Burr)
16                                          Case Filed:  December 17, 2009
                                            Trial Date:  February 14, 2011
17
                                            **Reservation No: R1092700**
18

19

20

21

22

23

24

KAZAN, McCLAIN, 25
LYONS,
GREENWOOD & 26
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, 27
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728 28
FAX (510) 835-4913

MSTEWART/724515.1

## TABLE OF CONTENTS

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'
        Hangar 110, and as a Pilot for Emery Worldwide . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Timothy Vest's Mesothelioma was Caused by Asbestos . . . . . . . . . . . . . . . . . 12

III.  Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.  Moving Defendant's Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.  MDC Fails to Establish Plaintiffs Lack Evidence of Causation . . . . . . . . . . . . . 16

        1.  Plaintiffs' Additional Evidence Requires a Trial . . . . . . . . . . . . . . . . . . 18

    C.  Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid . . . . . . . 19

    D.  The Motion must be Continued or Denied Under CCP 437c(h) . . . . . . . . . . . . . 20

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

**EXHIBIT D - Page 162**

1       TABLE OF AUTHORITIES

2   State Statutes

3   Civil Code section 1708.......................................................... 19

4   Civil Code section 1710.......................................................... 19

5   Civil Code section 3294.......................................................... 19

6   Code of Civil Procedure section 437c(b)........................................ 15, 17

7   Code of Civil Procedure section 437c(c)........................................ 14

8   Code of Civil Procedure section 437c(d)........................................ 15, 17

9   Code of Civil Procedure section 437c(h)........................................ 1, 17, 20

10  Code of Civil Procedure section 437c(p)(2). .................................... 14

11  Evidence Code section 1200....................................................... 17

12  Evidence Code section 1220....................................................... 7, 8

13  Evidence Code section 1221....................................................... 7, 8

14  Evidence Code section 1222....................................................... 7, 8

15  Evidence Code section 1230....................................................... 7, 8

16  Evidence Code section 1290....................................................... 7

17  Evidence Code section 1291....................................................... 7

18  Evidence Code section 1292....................................................... 7

19  State Cases

20  Aguilar v. Atlantic Richfield Co.
    (2001) 25 Cal.4th 826. ......................................................... 14-16
21
    Bahl v. Bank of America
22  (2001) 89 Cal.App.4th 389. ..................................................... 20

23  Binder v. Aetna Life Ins. Co.
    (1999) 75 Cal.App.4th 832. ..................................................... 16
24
    DeLeon v. Commercial Manufacturing & Supply Co.
25  (1983) 148 Cal.App.3d 336. ..................................................... 16

26  Elmore v. American Motors Corp.
    (1969) 70 Cal.2d 578. .......................................................... 16
27
    Haney v. Aramark Uniform Services, Inc.
28  (2004) 121 Cal.App.4th 623. .................................................... 15

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

*Hilliard v. A.H. Robins Co.*
(1983) 148 Cal.App.3d 374. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Huynh v. Ingersoll-Rand*
(1993) 16 Cal.App.4th 825. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jiminez v. Sears, Roebuck & Co.*
(1971) 4 Cal.3d 379. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Kahn v. East Side Union High School Dist.*
(2003) 31 Cal.4th 990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nelson v. Superior Court*
(2006) 144 Cal.App.4th 689. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Oddone v. Superior Court (Technicolor, Inc.)*
(2009) 179 Cal.App.4th 813. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Potter v. Firestone Tire & Rubber Co.*
(1993) 6 Cal.4th 965. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Quirici v. Freeman*
(1950) 98 Cal.App.2d 194. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rutherford v. Owens-Illinois, Inc.*
(1997) 16 Cal.4th 953. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*SKF Farms v. Super. Ct.*
(1984) 153 Cal.App.3d 902. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stone v. Regents of University of Cal.*
(1999) 77 Cal.App.4th 736. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Taylor v. Elliott Turbomachinery Co., Inc.*
(2009) 171 Cal.App.4th 564. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.*
(2004) 129 Cal.App.4th 577. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Torres v. Xomox Corporation*
(1996) 49 Cal.App.4th 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United Community Church v. Garcin*
(1991) 231 Cal.App.3d 327. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Vandermark v. Ford Motor Co.*
(1964) 61 Cal.2d 256. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Weber v. John Crane, Inc.*
(2006) 143 Cal.App.4th 1433. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Wright v. Stang Manufacturing Co.*
(1997) 54 Cal.App.4th 1218. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1 | <u>Other Authorities</u>

2 | 5 Witkin, Cal. Procedure
3 | (4th ed. 1997) Pleading § 678. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial
4 | (The Rutter Group 2010) ¶¶ 10:51, 10:51.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      iv

**EXHIBIT D - Page 165**

I.   **Introduction**

1

2      The motion of defendant McDonnell Douglas Corporation ("MDC") for summary

3   judgment or, in the alternative, summary adjudication fails for three reasons. First, this Court on

4   December 10, 2010 ordered MDC to produce aircraft manuals, parts catalogues, All Operator

5   Letters and records pertaining to MDC's historical knowledge of asbestos hazards. The order cites

6   MDC's representation that it could and would immediately comply. But instead, MDC produced

7   14 encrypted CDs that cannot be printed or electronically searched without a password – which

8   MDC will not share. And MDC bases this motion on the declarations of Larry Fogg, Timothy

9   Lloyd and Michael Schmidt, while at the same time refusing to make these percipient witnesses

10   available for deposition. MDC cannot benefit from its misuses of the discovery process, so this

11   motion should be denied, and at a minimum must be continued, under Code of Civil Procedure

12   section 437c(h).

13      Second, MDC demonstrates no lack of evidence in support of any cause of action or claim

14   for damages raised in the complaint. Nothing in MDC's separate statement shows MDC

15   propounded any special interrogatories seeking all of plaintiffs' witnesses and documents, much

16   less that plaintiffs' responses were in any way factually devoid. Instead, MDC cites limited

17   excerpts of the deposition testimony of plaintiff Timothy Vest and his father, Warren Vest. While

18   ignoring the availability of other competent evidence, MDC improperly asserts all of plaintiffs'

19   claims must fail for lack of asbestos-exposure evidence. And MDC asserts Timothy Vest's

20   mesothelioma was not caused by asbestos exposure. But MDC's proffered declaration of Dr.

21   Travis is easily contradicted by the opinions of plaintiffs' medical expert witnesses.

22      Third, plaintiffs' additional evidence, including the declarations of industrial hygienist

23   John Templin, pathologist Samuel P. Hammar, M.D. and pathologist William R. Salyer, M.D.,

24   raises triable issues of fact as to whether MDC is liable for the injuries to Timothy Vest caused by

25   its defective aircraft – including the planes' originally-installed asbestos-containing parts and the

26   replacement asbestos-containing parts that MDC required to be used. Based on the relevant

27   percipient-witness testimony and the historically available scientific knowledge, John Templin

28   explains MDC should have known Timothy Vest and others in aircraft maintenance facilities were

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

**EXHIBIT D - Page 166**

1    at risk of mesothelioma.  Mr. Vest foreseeably inhaled substantial amounts of airborne asbestos

2    fibers from parts used on the MDC aircraft operated by World Airways and Emery Worldwide in

3    the 1970s, 1980s and 1990s. Based on Timothy Vest's tissue samples, his documented history of

4    occupational-level asbestos exposure and other scientific evidence, Dr. Hammar and Dr. Salyer

5    explain Timothy Vest's mesothelioma was unquestionably caused by asbestos.

6    **II.    Statement of Facts**

7        A.    **Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'**
              **Hangar 110, and as a Pilot for Emery Worldwide**
8
              On May 28, 2010, plaintiffs filed their Second Amended Complaint for personal injuries,
9
     negligence, strict products liability, fraud, conspiracy to defraud and loss of consortium against
10
     defendants, including MDC, who are alleged to have exposed Timothy Vest to asbestos that was a
11
     substantial factor in causing his mesothelioma.[1] [Facts 64-65.] The complaint alleges, among
12
     other things, that Timothy Vest was continually exposed to defendants' asbestos-containing
13
     materials from at least 1973 to 1983 at World Airways' facilities in Oakland, California; and as a
14
     pilot for Emery Worldwide from 1990 to 2001. [Id.]
15
              Timothy Vest lived in Dublin, California as a child from at least 1972 to 1983. [Facts 66-
16
     77.] After working abroad, his father Warren Vest lived in the family home from mid-1973
17
     onward. [Id.] Warren was an airline pilot based out of World's headquarters at the Oakland
18
     Airport. [Id.] He worked at World's new office building and maintenance hangar, known as
19
     Hangar 110, from the early 1970s through the late 1980s. [Id.] After the construction was
20
     finished, Timothy regularly visited Hangar 110 because his father worked in the building. [Id.]
21
     Timothy spent approximately an hour in the hangar before his father flew away on multi-day trips.
22
     [Id.] And he spent several hours in the hangar when his father did weekend office work, at least
23
     twice a month. [Id.] Timothy continuously visited the hangar at this rate from the time he was
24
     eight years of age until he was seventeen. [Id.] As a teenager he wanted to be in the hangar
25
     because he was training for his own pilot's license. [Id.] Timothy never was told of restrictions
26
     against being in the hangar, and there were no signs posted. [Id.] Nor was he warned about the
27

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

28        [1] The complaint is admissible here to frame the issues raised in the pleadings and to
     assess the materiality of the facts in dispute. [Rylaarsdam & Edmon, Cal. Practice Guide:
     Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.]

1   asbestos in the hangar. [*Id.*] He did not learn until after 2000 that asbestos is hazardous. [*Id.*]

2   On those weekend trips, Timothy spent his time exploring the nooks and crannies

3   throughout the hangar and watching the nearly constant aircraft maintenance work. [Facts 78-87.]

4   The hangar had an office complex at the front entrance, and an enclosed maintenance area for the

5   aircraft. [*Id.*] He befriended one of the security guards, so he had free run of the hangar. [*Id.*]

6   Timothy explored throughout the internal buildings and structures, including where the aircraft

7   maintenance tools and parts were stored. [*Id.*] He explored the maintenance facility in this way

8   until he became a teenager, and then was more interested in aircraft. [*Id.*] Aircraft maintenance

9   workers were nearby when Timothy was exploring. [*Id.*] The mechanics in the hangar knew he

10   was Warren Vest's son, so they allowed Timothy near the aircraft to learn how they worked. [*Id.*]

11   He saw McDonnell Douglas aircraft in the hangar, including the DC-10 model. [*Id.*] There was

12   almost always aircraft maintenance and painting occurring in the hangar during the dozens of

13   times he visited each year from the 1970s to 1980s. [*Id.*] He saw engines being worked on,

14   airplanes jacked up off the floor and inspection panels removed, including on the DC-10s. [*Id.*]

15   On days when Timothy did not accompany his father to the hangar, the two hugged when

16   his father came home from work. [Facts 88-95.] Warren did not immediately change out of his

17   work clothes. [*Id.*] Timothy's mother did most of the laundry, but Timothy helped by carrying the

18   family's dirty clothes out to the garage, where they were shaken out and washed. [*Id.*] Timothy's

19   own clothes were visibly dirty when he returned from the hangar. [*Id.*] His father wore varying

20   attire, including a pilot's uniform, a suit or business-casual clothes. [*Id.*] Warren worked 12 hours

21   per day and 6 days per week. [*Id.*] Warren's clothes appeared visibly dusty, with a chalky-white

22   color, when he returned home from the hangar. [*Id.*] Timothy carried his father's dirty work

23   clothes to help his mother. [*Id.*]

24   Warren Vest confirms he started working in World's Hangar 110 a few months after its

25   grand opening in 1973. [Facts 96-103.] He reported to the hangar every time he left for and

26   returned from a flight. [*Id.*] From the mid-1970s to the mid-1980s, Warren spent approximately

27   half of each month in the office, and half on flights. [*Id.*] He did his paperwork on the weekends

28   because he was a pilot; and his son Timothy came to the hangar on those days. [*Id.*] Timothy Vest

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA   3

**EXHIBIT D - Page 168**

1   came to the hangar from 1973 through 1983, up to several times per month. [*Id.*] He spent some

2   of his time in the office area, where Warren had an office, and also spent hours in other areas of

3   the hangar. [*Id.*] Timothy Vest was allowed to be on the hangar floor, and he had the permission

4   of the security guards. [*Id.*] Aircraft maintenance occurred 24 hours per day, 7 days per week,

5   including when Timothy was present. [*Id.*]

6       Warren spent a lot of time in the maintenance area to ensure the work was on schedule and

7   the aircraft would be ready to fly. [Facts 104-115.] He was on the hangar floor up to several times

8   every day. [*Id.*] Warren spoke to the maintenance foreman in charge of a particular plane. [*Id.*]

9   His conversations lasted from 5 to 30 minutes. [*Id.*] During the 1973 to 1983 period, the planes in

10   the hangar included McDonnell Douglas DC-8 (six total) and DC-10 (ten total) models. [*Id.*]

11   Three of the DC-8s and nine of the DC-10s were purchased new by World. Those new DC-10s

12   were bought in 1979, 1980 and 1981. [*Id.*] Warren saw dust in the maintenance area, especially

13   when the large doors were opened and the wind blew in, stirring up the dust. [*Id.*] Normally only

14   one set of doors were opened, to avoid creating a dangerous wind tunnel in the hangar. [*Id.*] He

15   saw the mechanics install many parts, including engine parts, on the DC-8s and DC-10s in the

16   hangar. [*Id.*] The work included minor maintenance and major overhauls, lasting from one day to

17   several weeks. [*Id.*] Up to 40 mechanics worked on the planes together. [*Id.*]

18       Warren did not immediately change out of his work clothes when he returned home. [Facts

19   116-119.] Instead, he hugged and played with Timothy and had dinner. [*Id.*] Timothy Vest also

20   rode in the car that Warren drove to and from the hangar. [*Id.*] Warren Vest never received any

21   asbestos warnings during his employment at World. [*Id.*]

22       Claude Fross was World's facilities manager for Hangar 110 from its opening in 1973 until

23   1986. [Facts 120-127.] The hangar included an office area, shop areas and a large open space for

24   the aircraft. [*Id.*] There were "no holidays" in aircraft maintenance, so work on the planes

25   occurred all day, every day in the hangar. [*Id.*] They underwent varying degrees of maintenance

26   based on their hours in flight. [*Id.*] The planes included DC-8 and DC-10 models. [*Id.*] Every

27   time a plane was pushed out of the hangar, the cleaning crew came to clean up the mess. [*Id.*] The

28   large doors on each end of the hangar were usually closed. [*Id.*] And they were not opened at the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

1   same time because that would cause a wind tunnel. [*Id.*]

2   James Hales was an aircraft maintenance controller for World at Hangar 110 from 1984 to

3   1986. [Facts 128-139.] He had an office job in which he coordinated the schedule and ordered

4   parts, primarily for DC-10 models and some DC-8s. [*Id.*] World serviced those DC-10s and DC-

5   8s in the hangar. [*Id.*] Mr. Hales is now vice president of technical operations for World. [*Id.*]

6   The aircraft maintenance that occurred in Hangar 110 followed a precise schedule for each plane.

7   [*Id.*] The work on a DC-10 plane could last from days to weeks. [*Id.*] The lightest scheduled

8   maintenance, an "A" check, involved opening access panels and inspecting internal components

9   and systems. [*Id.*] A "B" check was similar but more extensive. [*Id.*] A "C" check involved

10   more invasive removal of structural parts and replacement of worn components. [*Id.*] A "D"

11   check took at least a month to complete and returned the plane to like-new condition. [*Id.*] Every

12   access panel was opened, landing gear was removed, engines were replaced, the cabin was stripped

13   and the plane was repainted. [*Id.*] The hangar floor was swept after each job. [*Id.*]

14   Maintenance programs for the aircraft changed as the planes aged and the airlines gave

15   feedback to the original manufacturer. [Facts 140-154.] The manufacturer of the plane

16   established the initial maintenance plan for an aircraft, and that plan was approved by the Federal

17   Aviation Administration. [*Id.*] MDC, as the manufacturer, supplied the aircraft maintenance

18   manual, the Illustrated Parts Catalogue, the wiring diagram manual and the structural repair

19   manual. [*Id.*] World relied on those publications and stored them in the technical library at

20   Hangar 110. [*Id.*] MDC also issued service bulletins and updated manuals that World conveyed

21   to its mechanics. [*Id.*] The mechanics working on DC-10s and DC-8s obtained replacement parts

22   by first consulting MDC's Illustrated Parts Catalogue, which showed exactly what part – listed by

23   number – needed to be retrieved from the stockroom or specially ordered. [*Id.*] MDC did not

24   make all the parts it specified, so some replacement parts were obtained from third-party suppliers.

25   [*Id.*] World needed MDC's approval to make any deviations from standard maintenance

26   procedures. [*Id.*] Any changes in the plan required the approval of the manufacturer. [*Id.*] The

27   airline was required to suggest the change to the manufacturer via a formal petition, and the

28   manufacturer then relied on its own engineers to gather data and evaluate the issue. [*Id.*] The

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  main reason for this process was that changes to the flight characteristics of the plane could affect

2  its safety. [*Id.*] The base design of the plane, its type certificate, could not be changed without

3  permission from the manufacturer. [*Id.*] World also contacted the manufacturer to order certain

4  parts and to obtain drawings and technical data. [*Id.*] And MDC hosted annual conferences with

5  the airlines to discuss the operation of the DC-10 and DC-8 models. [*Id.*] It also issued All

6  Operator Letters to alert the airlines to safety issues, including asbestos. [*Id.*]

7  　　　　When aircraft engine access panels were opened for inspections, there were heat shields or

8  insulation blankets placed around the pneumatic systems. [Facts 155-166.] The shields and

9  blankets were bolted or wired in place, and had to be unfastened. [*Id.*] The outside surface of a

10  heat shield was metal, with a bolt hole running through it. [*Id.*] Heat shields were among the

11  asbestos-containing products which were used on aircraft in Hangar 110, and which required

12  hands-on contact. [*Id.*] Clamps were another asbestos part. [*Id.*] The clamps had an asbestos

13  sleeve covering the metal loop, and their purpose was to hold hydraulic lines, pneumatic lines and

14  wiring. [*Id.*] Asbestos materials were typically used in hot areas, while asbestos-free materials

15  were used in cooler areas. [*Id.*] Asbestos gaskets were used in the engines, and sometimes worn

16  gaskets had to be scraped off to leave a clean surface for the replacement part. [*Id.*] A wire brush

17  or sandpaper was used to scrape the gaskets. [*Id.*] Asbestos tape was also used in planes, to seal

18  the exhaust system. [*Id.*] Worn tape had to be scraped off before applying a new strip. [*Id.*] Mr.

19  Hales also recalls the use of epoxy adhesives made by Dexter. [*Id.*]

20  　　　　Stanley Lehmann is the designated corporate witness for Henkel Corporation, manufacturer

21  of Dexter-brand adhesive products – one of the asbestos-containing materials MDC required to be

22  used on its aircraft through at least 1992. [Facts 167-179, 217.] Attached to Mr. Lehmann's

23  declaration are some historical invoices showing sales of Dexter EA 934 two-part epoxy adhesive

24  from Henkel to World at Hangar 110. [*Id.*] These invoices are dated as late as October 1981.

25  [*Id.*] In addition to such direct sales, Henkel sold products through distributors. [*Id.*] Dexter-

26  brand products were sold in distinctive packaging that bore yellow labels with black printing. [*Id.*]

27  Dexter EA 934 was capable of bonding metal to metal. [*Id.*] It consisted of two parts, one of

28  which contained chrysotile asbestos, mixed together to form the adhesive. [*Id.*] Henkel purchased

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   raw asbestos fiber from Johns-Manville for use in the Dexter epoxies. [*Id.*] Johns-Manville

2   provided some asbestos warnings to Henkel beginning in the early 1970s. [*Id.*] And OSHA

3   provided to Henkel notice of asbestos hazards in 1972. [*Id.*] But Henkel issued no asbestos

4   warnings until 1977. [*Id.*] Its products then had an OSHA-type label, and Henkel issued a

5   separate bulletin instructing how to use the products safely. [*Id.*] That bulletin, but not the

6   product packaging, instructed not to sand the epoxy adhesives without wet-down methods. [*Id.*]

7       The epoxy contained asbestos beginning in 1962, the asbestos-free version did not exist

8   until 1979, and the asbestos-containing version was still sold after that date, until at least 1985.

9   [Facts 180-188.] Henkel developed the asbestos-free version to minimize its employees' exposure

10  to asbestos. [*Id.*] It continued to sell the asbestos-containing version after 1979 because aircraft

11  products had to go through a rigorous qualification process, and not all airline customers had

12  gained approval to use the asbestos-free version. [*Id.*] This process was required to ensure the

13  new product met the aircraft manufacturer's performance specification. [*Id.*] As of 1979, only a

14  single customer had gained approval, but Mr. Lehmann does not recall who that was. [*Id.*] The

15  approval needed to be issued by McDonnell Douglas, as the aircraft manufacturer, stating that EA

16  934 "NA" (nonasbestos) had been added to its qualified products list. [*Id.*] Such approval came

17  only after a successful application process. [*Id.*] Until MDC sent Henkel written approval after

18  testing the proposed new product, Henkel did not sell the asbestos-free material for use on MDC

19  aircraft. [*Id.*] All of the available invoices from Henkel to World, dated as late as October 1981,

20  demonstrate sales of the asbestos-containing version of the Dexter epoxy to World. [*Id.*]

21      Murray Gordon, deceased, testified in 1981 as the designated corporate witness for

22  McDonnell Douglas.[2] [Facts 189-194.] His title at the time of his 1981 deposition was Director of

23  Occupational Safety and Medical Services. [*Id.*] He had the overall responsibility for the

24  company's policies and procedures for hazardous materials, including asbestos. [*Id.*] A decade

25  earlier, in 1972, MDC responded to the newly enacted OSHA rules by determining, throughout the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

26

27

28

---

[2]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It is also admissible because the witness is dead, and MDC satisfied its interest in cross-examination at the deposition. [Evid. Code §§ 1290, 1291, 1292.] And it is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1 company, where it was using asbestos-containing materials. [*Id.*] MDC tried to eliminate asbestos

2 "where [it] could.," and tried to change how asbestos was handled in its facilities. [*Id.*] Before

3 1972, the company took no measures to protect people exposed to asbestos from its aircraft. [*Id.*]

4      Colleen Rule testified in 1999 on behalf of McDonnell Douglas Corp. (Boeing) and was

5 represented at the deposition by the company's counsel.[3] [Facts 195-200.] Her job in the

6 company's product support group was to assist the airlines who operate MDC aircraft to ensure

7 proper maintenance. [*Id.*] Ms. Rule kept the records of all communications between the company

8 and its airline customers, including the All Operator Letters (AOL). [*Id.*] MDC also staffed a call-

9 in center where airlines could ask whether a part number is interchangeable with any other part

10 number, in order to keep the aircraft flying without delay. [*Id.*] At no time were MDC's

11 customers cut-off from the technical assistance services, even long after the aircraft was sold. [*Id.*]

12 And the subsequent owners of a used aircraft had the benefit of MDC's services. [*Id.*]

13      Attached to Ms. Rule's deposition is the October 22, 1992 All Operator Letter issued by

14 MDC to all its customers, pertaining to asbestos-containing materials used in its aircraft.[4] [Fact

15 201-217.] The 1992 AOL was a revised edition of a 1989 AOL, also involving asbestos. [*Id.*]

16 Those were the only AOLs that discussed asbestos, and they demonstrate MDC's first

17 communications with its customers about asbestos. [*Id.*] The 1992 AOL was issued to encompass

18 more models of aircraft. [*Id.*] The 1992 AOL began with a series of codes that identified what

19 model aircraft and what system was being addressed. [*Id.*] For example, the code 8-20-0 meant

20 the AOL related to chemicals and materials on all DC-8 planes. [*Id.*] The AOL also expressly

21 stated it applied to all DC-8 and DC-10 aircraft, among others. [*Id.*] The AOL included a list of

22 asbestos parts divided into several columns and rows. [*Id.*] For each asbestos part, the chart

23 identified the specification, blueprint and part numbers that corresponded to MDC's Illustrated

24 Parts Catalogue. [*Id.*] That catalogue was created and maintained by MDC's technical

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25

26

27

28

_____

[3]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It also is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

[4]The AOL is an admissible business record and admission. [Evid. Code §§ 1271, 1220, 1221, 1222.] It also is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1    publications department.  [*Id.*]  Some of the asbestos parts, but not all, were listed with a specific

2    asbestos-free replacement part.  [*Id.*]  The AOL explained its purpose was to warn customers of

3    the presence and dangers of all asbestos-containing materials used in MDC aircraft, including DC-

4    8s and DC-10s.  [*Id.*]  It stated MDC was required to share updated safety information about tasks

5    and functions needed to maintain and repair its aircraft.  [*Id.*]  The AOL was prompted by a

6    "foreign" customer that desired to know all asbestos materials in certain MDC aircraft, and how to

7    substitute asbestos-free alternatives.  [*Id.*]  It stated asbestos materials were used in high-heat

8    applications, and asbestos was mixed into sealants and adhesives.  [*Id.*]  The AOL warned that

9    asbestos fibers were released when the materials were sanded, creating toxic dust that was inhaled

10    by nearby persons.  [*Id.*]  Among the dozens of asbestos parts listed in the AOL were Dexter-brand

11    epoxy filler adhesives, heat shields, pneumatic duct insulation, gaskets, tape, and insulation.  [*Id.*]

12         David Miller in his December 13, 2010 declaration explains he was an aircraft mechanic

13    for World at Hangar 110 from 1973 to 1987.  [Facts 218-236.]  McDonnell Douglas

14    representatives were sometimes at Hangar 110, identified by their badges.  [*Id.*]  Mr. Miller and

15    the other mechanics handled heat blankets and shields used in the DC-8 and DC-10 aircraft

16    exhaust systems.  [*Id.*]  The blankets were woven and protected the pneumatic and hydraulic lines

17    from high heat.  [*Id.*]  The process of obtaining replacement blankets required the mechanics to use

18    MDC's Illustrated Parts Catalogue and part-numbering system.  [*Id.*]  The heat shields used in the

19    DC-8s protected the pneumatic and hydraulic lines, and were held in place with stubs or hooks.

20    [*Id.*]  They measured up to several feet long and six inches wide.  [*Id.*]  Each engine had two to

21    four shields.  [*Id.*]  The outer case was metal, but the interior was a non-metal thick fibrous

22    material.  [*Id.*]  The metal case did not completely cover the internal material at the corners and

23    edges, so that material was disturbed every time the shields were removed and replaced.  [*Id.*]  The

24    corners and edges became more frayed and deteriorated over time.  [*Id.*]  The color also varied

25    over time, but most were gray-white.  [*Id.*]  The shields were removed and thrown aside when the

26    mechanics needed access to the engines; and then were reinstalled.  [*Id.*]  The shields became bent

27    through wear and tear, and developed holes in their metal shell.  [*Id.*]  Engine work on the DC-8s

28    required the removal and replacement of the heat shields.  [*Id.*]  Mr. Miller believes, based on his

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   experience and knowledge as a mechanic, the shields contained asbestos.  [*Id.*]  Mr. Miller and

2   others used Dexter-brand "black and yellow" two-part epoxies.  [*Id.*]  He also used thousands of

3   "Adell" clamps that had an asbestos-like padding or sleeve material lining the metal portion.  [*Id.*]

4   And he removed and installed fuselage insulation.  [*Id.*]

5        As an adult, Timothy Vest flew planes for Emery from 1990 to 2001.  [Facts 237-245.]

6   Emery operated primarily McDonnell Douglas DC-8 aircraft on cargo flights throughout the

7   United States and the world.  [*Id.*]  Unlike domestic flights, on international flights the planes

8   carried a mechanic and thousands of pounds of aircraft tools and parts.  [*Id.*]  The planes traveled

9   to third-world countries and needed to perform their own repairs to avoid getting stranded.  [*Id.*]

10  Timothy observed the mechanics working on the engines, and he helped by lending a hand where

11  possible.  [*Id.*]  When flying domestically, Timothy observed aircraft maintenance work at all

12  airports where Emery had facilities.  [*Id.*]  Most of Emery's planes were old and needed repairs all

13  the time, including pneumatic-system and engine work.  [*Id.*]  That maintenance work occurred at

14  airports around the country.  [*Id.*]  Apart from Timothy's pre-flight inspections of Emery's 40 DC-

15  8 aircraft, and its several DC-10s, he saw the mechanics doing their jobs hundreds of times.  [*Id.*]

16       He saw the noses and side-panels of the planes being repaired, repairs of the hydraulic

17  systems, and repairs of the engine components.  [Facts 246-253.]  Timothy closely observed the

18  Emery mechanics' work on the MDC aircraft to ensure they were doing a proper job, and he

19  assisted them when possible.  [*Id.*]  Apart from the work at Emery's airport bases, Timothy

20  observed work on the DC-8s hundreds of times at specialized maintenance facilities.  [*Id.*]  He saw

21  the different levels of heavy maintenance, termed A, B, C and D checks, where the planes were

22  torn apart and put back together.  [*Id.*]  All of the hydraulic, pneumatic, fire-protection and engine

23  systems were overhauled over a period of hours or days.  [*Id.*]  He has seen mechanics use epoxy

24  adhesives to repair damaged surfaces on the aircraft, which included sanding the epoxy once it

25  dried.  [*Id.*]  When nose-cones were damaged by bird or lightning strikes, the affected areas were

26  filled with epoxies and sanded smooth.  [*Id.*]  The epoxies also were used to seal leaks and for

27  other applications in the engine spaces.  [*Id.*]

28       John Templin is a certified industrial hygienist who, in his accompanying declaration,

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1   explains Timothy Vest's asbestos-exposure levels and the historical knowledge of asbestos-related

2   health hazards. [Facts 254-255.] John Templin's extensive qualifications and the detailed bases

3   for his conclusions are set forth in his declaration, which is incorporated fully herein by reference.

4   [*Id.*] The physical and aerodynamic properties of asbestos facilitate re-entrainment and

5   re-suspension of asbestos fibers once a space is contaminated. [*Id.*] The respirable asbestos fibers

6   that are released into the air will remain there for up to many hours before they alight on surfaces.

7   [*Id.*] Those fibers, once they do come to rest, are then subject to re-entrainment. [*Id.*]

8   Re-entrainment describes the physical action of air, movement, vibration, and physical impact that

9   aerodynamically causes asbestos fibers to take flight and become airborne. [*Id.*] It can be caused

10  by ordinary movement of people and objects and also by air currents. [*Id.*] It is also caused by

11  disturbances to the environment such as sweeping, cleaning, blowing areas down, and even

12  walking through microscopic asbestos-containing debris or dust. [*Id.*] Fibers can move laterally

13  with air currents and contaminate areas far from the release point, up to hundreds of meters away.

14  [*Id.*] They can also move across contamination barriers with the passage of workers during

15  removal of material. [*Id.*] And the fibers persist almost indefinitely and create a continuous

16  source of exposure when they are present in occupied buildings. [*Id.*] John Templin explains that

17  these principles of re-entrainment, and the risk of asbestos exposure to those well beyond the

18  source of fiber release, have been widely scientifically known since at least the 1960s. [*Id.*] He

19  cites several scientific sources from the 1920s to 1940s addressing this topic. [*Id.*]

20      Based on John Templin's review of the case-specific evidence enumerated in his

21  declaration, Timothy Vest was exposed to substantial levels of asbestos-containing dust from the

22  aircraft parts used in Hangar 110 from 1972 to 1983; and from parts used on Emery's aircraft

23  during the 1990s. [Facts 256-258.] Timothy breathed large amounts of visible

24  asbestos-containing dust that was created by his own activities, and by work done in his and his

25  father's vicinity. [*Id.*] Hangar 110 at the Oakland Airport, occupied by World Airways, was the

26  primary location where Timothy Vest inhaled asbestos. [*Id.*] He was exposed while at the hangar

27  on dozens of occasions, and was exposed to dust tracked home on his father's clothing. [*Id.*] The

28  materials that released respirable asbestos fibers to which he was exposed included aircraft parts

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC.
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  used on the DC-8 and DC-10 models operated by World and continuously maintained in the

2  hangar. [*Id.*] Visible dust was released by the sanding of Dexter-brand epoxy adhesives; the

3  removal and reinstallation of worn heat blankets and shields; the handling of old insulated clamps;

4  and the scraping of gaskets and tapes. [*Id.*] Timothy Vest experienced substantial levels of

5  asbestos exposure as a pilot for Emery in the 1990s. [*Id.*] He assisted and observed aircraft

6  mechanics, on hundreds of occasions, working on Emery's fleet of McDonnell Douglas DC-8 and

7  DC-10 models. [*Id.*] The aircraft parts that released asbestos dust to which he was exposed

8  include all the materials described above: Dexter-brand epoxy adhesives, heat blankets and

9  shields, insulated clamps, gaskets and tapes. [*Id.*] Although these exposures occurred in the

10  1990s, MDC's 1992 All Operator Letter confirms the relevant asbestos-containing parts still were

11  required to be used on the aircraft. [*Id.*]

12       John Templin further explains, in great detail, that it was widely known and understood by

13  1960 – certainly within the industrial-hygiene community – that workers, bystanders and even

14  household members of those working with and around asbestos-containing products were at

15  substantially increased risk of being exposed to asbestos from the type of products and activities

16  that Timothy Vest and his father encountered; and of developing an asbestos-related disease, such

17  as mesothelioma, as a result of those exposures. [Fact 259.] In fact, by 1964 when Dr. Irving

18  Selikoff and his colleagues published their seminal epidemiological study demonstrating the

19  mortality experience of workers who had been exposed to asbestos insulation, the causal

20  connection between asbestos exposure and mesothelioma was unquestioned in the medical and

21  scientific communities in the United States. [*Id.*] When Timothy Vest inhaled asbestos-

22  containing dust from aircraft parts in the 1970s, 1980s and 1990s, it was entirely foreseeable that

23  his asbestos exposure could cause him to suffer serious or fatal diseases including, among others,

24  mesothelioma cancer. [*Id.*]

25       **B.     Timothy Vest's Mesothelioma was Caused by Asbestos**

26       Samuel P. Hammar, M.D. is a pathologist who, in his accompanying declaration, explains

27  Timothy Vest's asbestos-caused malignant mesothelioma. [Facts 260-261.] Dr. Hammar's

28  extensive qualifications and the detailed bases for his conclusions are set forth in his declaration,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    which is incorporated fully herein by reference. [*Id.*] There is an extraordinarily strong link

2    between mesothelioma and asbestos dust, such that it is largely undisputed in the scientific

3    community that asbestos causes diffuse malignant mesothelioma. [*Id.*] And because diffuse and

4    localized mesothelioma cells are chemically and structurally identical, it is also true that asbestos

5    causes localized malignant mesothelioma – regardless of the tumor's size when detected. [*Id.*]

6    This fact is supported by the documented asbestos-exposure histories of the patients described in

7    the articles by Nakas, et al. and Allen, et al. (which Dr. Hammar co-authored) [*Id.*] For the Nakas,

8    et al. patients, nine out of ten had prior occupational-level exposures to asbestos. [*Id.*] And the

9    limited available information pertaining to the Allen, et al. patients revealed that four had prior

10    occupational-level exposures to asbestos. [*Id.*]

11       Timothy Vest's pathology slides demonstrate malignant mesothelioma cancer cells on the

12    pleural tissue in his chest. [Fact 262.] Adjacent to the cancer cells is mildly to markedly

13    thickened pleural tissue with a hyaline (glassy) appearance, which are pleural plaques caused by

14    asbestos. [*Id.*] Given the presence of pleural plaques, his mesothelioma was unquestionably

15    caused by occupational-level exposure to asbestos. [*Id.*] Pleural plaques are localized scars that

16    form due to prolonged exposure to asbestos fibers. [*Id.*] These scars almost never form for

17    reasons other than asbestos exposure. [*Id.*] But even if the pleural plaques did not exist, it remains

18    true that Timothy Vest's mesothelioma was caused by asbestos because of his documented

19    exposure to asbestos in occupational and para-occupational settings. [*Id.*] His mesothelioma was

20    caused by his total lifetime dose of asbestos. [*Id.*] All of Timothy Vest's individual asbestos

21    exposures contributed to his total dose and increased his risk of developing the disease. [*Id.*]

22    There is no known safe level of asbestos exposure. [*Id.*]

23       William R. Salyer, M.D. is a pathologist who, in his accompanying declaration, further

24    explains Timothy Vest's asbestos-caused diffuse malignant mesothelioma. [Facts 263-264.]

25    Dr. Salyer's extensive qualifications and the detailed bases for his conclusions are set forth in his

26    declaration, which is incorporated fully herein by reference. [*Id.*] Dr. Salyer has treated several

27    patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. [*Id.*] That

28    is, when the mesotheliomas were first detected in the patients, the tumors appeared to be localized

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
Jack London Market
55 Harrison Street,
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

MSTEWART/724515.1     Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    13

EXHIBIT D - Page 178

1   masses – what some in the scientific literature have described as "localized malignant

2   mesothelioma." [*Id.*] All of those patients died of the disease soon after diagnosis. [*Id.*] Those

3   patients' tumors, although localized in their initial appearance, were in fact diffuse mesotheliomas

4   that were detected earlier than usual. [*Id.*] And each patient's diffuse mesothelioma was caused

5   by exposure to asbestos. [*Id.*]

6         Based on the scientific literature pertaining to "localized" malignant mesothelioma, there is

7   no evidence it is a different disease from diffuse mesothelioma. [Facts 265-266.] Although there

8   may appear to be a larger number of longer-term survivors whose disease was "localized," that is

9   because the patients were very fortunate to have an early discovery of their disease and underwent

10   surgical amelioration to slow its progression. [*Id.*] Many of those patients developed a recurrence

11   of the disease and died. [*Id.*] Timothy Vest suffers from malignant mesothelioma that was

12   detected at an early stage of its development. [*Id.*] Even if Timothy Vest's tumor was initially

13   localized, he has a very high risk of local recurrence of his tumor and of metastatic disease. [*Id.*]

14   Timothy Vest almost certainly will die of the disease. [*Id.*] His pathology slides demonstrate

15   what are, in fact, diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest.

16   [*Id.*] Adjacent to the cancer cells are pleural plaques caused by asbestos. [*Id.*] Given the presence

17   of pleural plaques, and Timothy Vest's documented exposure to asbestos in occupational and para-

18   occupational settings, his mesothelioma was unquestionably caused by asbestos. [*Id.*] Even if the

19   pleural plaques did not exist, it remains true that Timothy Vest's mesothelioma was caused by

20   asbestos. [*Id.*] All of his individual exposures contributed to his total lifetime dose of asbestos

21   and thereby caused the disease. [*Id.*]

22   **III.**   **Legal Argument**

23        **A.**   **Moving Defendant's Burden of Proof**

24        A defendant's motion for summary judgment should be granted [only] if no triable
issue exists as to any material fact and the defendant is entitled to a judgment as a

25   matter of law. [Code Civ. Proc. § 437c(c).] The burden of persuasion remains with
the party moving for summary judgment. [*Aguilar v. Atlantic Richfield Co.* (2001)

26   25 Cal.4th 826, 850, 861.]

27   [*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see Code Civ. Proc.

28   § 437c(p)(2).] "[F]rom commencement to conclusion, the party moving for summary judgment

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1   Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA   14

**EXHIBIT D - Page 179**

1    bears the burden of persuasion that there is no triable issue of material fact . . ." [*Aguilar, supra,*

2    25 Cal.4th 826, 850.] This means the moving defendant must show that if the defendant's

3    evidence is uncontroverted, no reasonable trier of fact could find for the plaintiff. [*Id.* at 851.]

4    Only if the defendant makes that showing does the burden shift to plaintiff to demonstrate the

5    existence of a triable issue of material fact. [*Id.*]

6            The defendant must show that the plaintiff *does not possess* needed evidence,
         because otherwise the plaintiff might be able to establish the elements of the cause

7         of action; the defendant must also show that the plaintiff *cannot reasonably obtain*
         needed evidence, because the plaintiff must be allowed a reasonable opportunity to

8         oppose the motion. [*Id.* at 854 (emphasis in original).]

9            A moving defendant must affirmatively show the plaintiff lacks the needed evidence;

10   simply pointing to a claimed absence is not enough. [*Id.* at 854-855.] The defendant's evidence

11   must include "affidavits, declarations, admissions, answers to interrogatories, depositions, and

12   matters of which 'judicial notice' must or may 'be taken.'" [*Id.* at 855, citing Code Civ. Proc. §

13   437c(b).] Nor is it enough to merely assert that plaintiff failed to provide the information. The

14   defendant must prove "plaintiffs failed to provide meaningful responses to comprehensive

15   interrogatories designed to elicit all the evidence plaintiffs had to support their contention of

16   liability." [*Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1442.]

17           Only admissible evidence may be considered, and the moving defendant must include all

18   evidence offered to meet its evidentiary burden in its "separate statement." [Code Civ. Proc.

19   § 437c(d).] "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate

20   statement, *it does not exist.*" [*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327,

21   337 (emphasis in original).] The strict requirements a moving party must satisfy were explained in

22   *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631-632:

23           One of the more basic requirements is that the papers supporting a section 437c
         motion "shall include a separate statement setting forth plainly and concisely all

24         material facts which the moving party contends are undisputed." [*Id.*, Code Civ.
         Proc. § 437c(b)(1); see CRC 3.1350(d).] In addition, each material fact set forth in

25         the separate statement "shall be followed by a reference to the supporting
         evidence." [Code Civ. Proc. § 437c(b)(1).]

26           In ruling, "the court must consider all of the evidence and all of the inferences reasonably

27   drawn therefrom ... and must view such evidence ... and such inferences ... in the light most

28   favorable to the opposing party." [*Aguilar,* 25 Cal.4th 826, 844-845.] "'[B]ecause of the drastic

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1   nature of the summary judgment procedure, and the importance of safeguarding the adverse

2   party's right to a trial, the moving party must make a strong showing.  [Its] affidavits are <u>strictly</u>

3   construed ...On the other hand, the affidavits of the party opposing the motion are <u>liberally</u>

4   construed.'" [*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 838-839 (emphasis

5   added).]

6       **B.     MDC Fails to Establish Plaintiffs Lack Evidence of Causation**

7           MDC is responsible under products liability principles for all injuries caused by its

8   defective asbestos-containing aircraft – including the originally-installed parts and the parts MDC

9   required to be used in its planes' maintenance.  [*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d

10  379, 382-383; *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261.][5]  Bystander victims are

11  owed a duty of care, and are entitled to even greater protection, because they are perfectly

12  foreseeable victims of defective products and have no opportunity to discover the hazards.

13  [*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 585-586; *Nelson v. Superior Court*

14  (2006) 144 Cal.App.4th 689, 695.]  Even household members injured by toxins unwittingly

15  tracked home by workers are owed a duty of care, so long as there is evidence of a specific toxin

16  that caused a specific injury.  [*Oddone v. Superior Court (Technicolor, Inc.)* (2009) 179

17  Cal.App.4th 813, 872-873.]

18          The California Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953

19  established the causation standard for asbestos-cancer cases:

20

21  _____

22      [5]Manufacturers owe a duty to warn of hazards arising from the foreseeable and
    required uses of their products, including such uses in conjunction with other defective
23  products.  [*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129
    Cal.App.4th 577, 581-583 (power tools and attachments); *Torres v. Xomox Corporation*
24  (1996) 49 Cal.App.4th 1, 17-19 (valve and acid); *Huynh v. Ingersoll-Rand* (1993) 16
    Cal.App.4th 825, 833 (grinder and disc); *Wright v. Stang Manufacturing Co.* (1997) 54
25  Cal.App.4th 1218, 1230-1231 (water gun and fire truck); *DeLeon v. Commercial
    Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 343-347 (holding bin and
26  overhead equipment).  The court in *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171
    Cal.App.4th 564, did <u>not</u> hold that manufacturers would be immune if they had specifically
27  intended and required that asbestos-containing replacement parts be used with their
    equipment.  [*Id.* at 590-591.]  In fact, the court cited with approval a Washington Supreme
28  Court case that held equipment manufacturers could be liable if they specified
    asbestos-containing replacement components for use with their equipment.  [*Id.*]

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          16

**EXHIBIT D - Page 181**

1        [P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating
that the plaintiff's exposure to defendant's asbestos-containing product in
2        reasonable medical probability was a substantial factor in contributing to the
aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence
3        to the *risk* of developing asbestos-related cancer . . .

4   [*Id.* at 976-977 (emphasis original).] Plaintiffs may prove Timothy Vest's mesothelioma was

5   "cumulative in nature, with many separate exposures each having constituted a 'substantial factor'

6   (citation) that contributed to his risk of injury." [*Id.* at 958.] But plaintiffs "need *not* prove that

7   fibers from the defendant's product were the ones, or among the ones, that actually began the

8   process of malignant cellular growth." [*Id.* at 982-983 (emphasis original).]

9        MDC demonstrates no lack of proof its asbestos-containing aircraft constituted a

10   substantial-factor cause of Timothy Vest's asbestos-related mesothelioma. First, MDC presents no

11   evidence it propounded comprehensive discovery requests, much less that plaintiffs' responses to

12   any such discovery it propounded were in any way devoid of facts and evidence supporting each

13   essential element of the complaint's causes of action and damages claims against MDC. [Alleged

14   Facts 1-63; *Weber, supra,* 143 Cal.App.4th 1433, 1442.] MDC in its separate statement simply

15   mentions <u>no</u> special interrogatories propounded by MDC to plaintiffs. [*Id.*] Instead, MDC cites

16   limited portions of Timothy Vest's and Warren Vest's deposition testimony, ignoring the portions

17   that are unfavorable to MDC's position.

18        Second, MDC cites the inadmissible declarations of Larry Fogg, Timothy Lloyd and

19   Michael Schmidt in a failed effort to prove MDC's aircraft had few asbestos-containing parts, and

20   that MDC had no involvement in those planes' maintenance. [Alleged Facts 1-63; Fact 267.] As

21   plaintiffs explain in their evidentiary objections, Mr. Fogg's declarations are inadmissible hearsay

22   created several years ago for other lawsuits. [Evid. Code § 1200; Code Civ. Proc. § 437c(b),(d).]

23   All of the declarations must be disregarded because MDC refuses to produce Mr. Fogg, Mr. Lloyd

24   and Mr. Schmidt for deposition – thereby concealing relevant evidence. [Fact 267; Code Civ.

25   Proc. § 437c(h).] At most, these witnesses set forth MDC's one-sided view of the case, all of

26   which is contradicted by plaintiffs' additional evidence. [Facts 64-267.]

27        Third, on the medical-causation issue, MDC offers no conclusive evidence that Timothy

28   Vest's mesothelioma purportedly is unrelated to his asbestos exposure. [Alleged Facts 1-63.]

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    17

**EXHIBIT D - Page 182**

1  Instead, MDC offers the unpersuasive opinion of Dr. Travis who, based on his status as a co-

2  author of a single article, opines that no scientist could ever determine the cause of Timothy Vest's

3  cancer because it has been described as "localized." [*Id.*] Dr. Travis's opinion demonstrates

4  nothing about plaintiffs' ability to marshal competent expert testimony to prove Timothy Vest's

5  malignant mesothelioma is, indeed, asbestos-related. [*Id.*] In fact, plaintiffs submit the

6  declarations of Dr. Salyer and Dr. Hammar (co-author of Dr. Travis's article), showing Timothy

7  Vest's mesothelioma was unquestionably caused by asbestos and will kill him. [Facts 260-266.]

        **1.   Plaintiffs' Additional Evidence Requires a Trial**

9      Under *Jiminez, supra, Vandermark, supra* and *Rutherford,* supra, MDC is liable for its

10  supply and specification of asbestos-containing aircraft parts that were a substantial-factor cause of

11  Timothy Vest's mesothelioma. MDC installed dozens of asbestos materials on its aircraft, and

12  World operated approximately 16 of those planes when Timothy and his father were in Hangar

13  110 from 1973 to 1983. [Facts 64-259.] Many of those planes were purchased new from 1979 to

14  1981. [Facts 64-259.] Timothy Vest was also exposed to Emery's fleet of MDC planes in the

15  1990s. [*Id.*] Many of the toxic components – including heat shields, heat blankets, clamps,

16  gaskets, tape and insulation – remained in the aircraft for extended periods and released asbestos

17  fibers whenever they were handled, removed and reinstalled during inspections. [*Id.*] And MDC

18  required that other toxic components – including Dexter adhesive – were required to be used and

19  sanded in a manner that released asbestos in maintaining MDC's planes. [*Id.*] MDC controlled

20  every aspect of its planes' maintenance and operation, and its catalogues and manuals specified the

21  use of asbestos parts into the 1990s – decades after MDC became aware of the hazards. [*Id.*] Safe

22  alternative materials could not be used without MDC's analysis and express permission. [*Id.*]

23  MDC maintained a constant connection to its aircraft, even after they were transferred between

24  owners. [*Id.*]

25      Industrial hygienist John Templin explains how Timothy Vest inhaled substantial levels of

26  asbestos from these products and activities; and that the hazards were foreseeable to MDC and it

27  could have discovered and fixed the problems at any time from the 1970s through the 1990s. [*Id.*]

28  Pathologists Samuel Hammar and William Salyer confirm that Timothy Vest's mesothelioma –

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART//724515.1     Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA     18

**EXHIBIT D - Page 183**

1  whether described as "localized" or not -- was unquestionably caused by Timothy's occupational-

2  levels of asbestos exposure from all sources.  [*Id.*]  All of these facts are supported by the sworn

3  statements of Timothy Vest, Warren Vest, Claude Fross, James Hales, Stanley Lehmann, Murray

4  Gordon, Colleen Rule, David Miller, John Templin, Samuel Hammar and William Salyer.  [*Id.*]

5      **C.**    **Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid**

6      MDC may be liable under Civil Code sections 1708 and 1710 for concealing important

7  facts pertaining to hidden asbestos-related health hazards.  The active concealment of facts by even

8  "a non-fiduciary is the equivalent of a false representation, i.e., *actual fraud*."  [5 Witkin, Cal.

9  Procedure (4th ed. 1997) Pleading § 678, p. 136 (emphasis added); *Quirici v. Freeman* (1950) 98

10  Cal.App.2d 194, 201 (intentional concealment supports fraud claim).]  And MDC may be liable

11  for asbestos exposures from any source caused by the conspiracy in which MDC participated to

12  suppress information about asbestos dangers.  [*Stone v. Regents of University of Cal.* (1999) 77

13  Cal.App.4th 736, 748 fn. 9.]  The jury may award punitive damages in intentional-tort and

14  unintentional-tort actions for negligent conduct.  [*Potter v. Firestone Tire & Rubber Co.* (1993) 6

15  Cal.4th 965, 1005; *SKF Farms v. Super. Ct.* (1984) 153 Cal.App.3d 902, 907.]  Punitive damages

16  may be based on a defendant's knowing and reckless failure to warn of hazards, where it is shown

17  that actions were taken in conscious disregard of the rights or safety of others, including the

18  plaintiffs.  [Civ. Code § 3294; *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-401.]

19      Here, as previously explained, MDC demonstrates no absence of evidence it concealed the

20  latent asbestos hazards of its aircraft.  But plaintiffs nevertheless present the testimony of Murray

21  Gordon, Colleen Rule and Stanley Lehman, proving MDC knew of asbestos hazards in 1972 and

22  took steps to protect its own workers; received further knowledge in 1977 when the manufacturer

23  of Dexter adhesives issued warnings; but MDC communicated nothing to its customers until 1989

24  and 1992, when it issued the AOLs on asbestos parts.  So MDC knew it was exposing workers and

25  their families to toxic asbestos, yet MDC failed to warn or use safe products.  Such evidence easily

26  supports the reasonable inference that MDC acted fraudulently and in conscious disregard of the

27  health and safety of others, including Timothy Vest and his father.

28

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1    Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    19

**EXHIBIT D - Page 184**

1    **D.    The Motion must be Continued or Denied Under CCP 437c(h)**

2         Despite the Court's order to produce specific aircraft manuals, parts catalogues, All

3    Operator Letters and documents demonstrating MDC's historical knowledge of asbestos hazards,

4    MDC has not satisfied its discovery obligations. [Fact 267] MDC provided 14 encrypted compact

5    discs, which contain images of documents that cannot be printed, cannot be electronically searched

6    and cannot be converted to a format that is electronically searchable. [*Id.*]

7         MDC relies on witnesses Timothy Lloyd, Michael Schmidt and Larry Fogg. [*Id.*] Despite

8    MDC's submission of these witnesses' declarations in support of its motion for summary

9    judgment/adjudication, MDC refuses to make Mr. Lloyd, Mr. Schmidt and Mr. Fogg available for

10   deposition. [*Id.*] These percipient witnesses have information concerning the originally-installed

11   and replacement asbestos-containing parts that MDC required to be used on its aircraft. [*Id.*]

12        David Miller's and Joseph Robison's upcoming deposition testimony will further confirm

13   that MDC's asbestos-containing aircraft parts were pervasively used in Hangar 110 from 1973

14   through 1983. [*Id.*] Both Miller and Robison worked in Hangar 110 during all relevant years and

15   are essential percipient witnesses. [*Id.*] Additional percipient witnesses who will be deposed

16   include Glen Cartwright and Mike Pociecha, both of whom worked for World in Hangar 110.

17   [*Id.*] Further, pared-down expert witness disclosures are due January 14, 2011, and the subsequent

18   depositions of all parties' medical-causation expert witnesses will produce further evidence that

19   Timothy Vest's mesothelioma was caused by asbestos. [*Id.*] Facts that further justify opposition

20   to this motion may exist, but cannot now be presented. [*Id.*] So this motion must be denied, but at

21   a minimum it must be continued. [Code Civ. Proc. § 437c(h); *Bahl v. Bank of America* (2001) 89

22   Cal.App.4th 389, 395.]

23   **IV.    Conclusion**

24        MDC demonstrates no absence of evidence in support of any cause of action or claim for
     damages raised in the complaint. And plaintiffs' additional evidence requires a trial to resolve all
25   challenged causes of action and claims for damages.
     DATED:  December *30*, 2010            KAZAN, McCLAIN, LYONS,
26                                          GREENWOOD & HARLEY
                                            A Professional Law Corporation
27
                                            By
28                                              Michael T. Stewart
                                            Attorneys for Plaintiffs

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728,
FAX (510) 835-4913

MSTEWART/724515.1          Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          20

**EXHIBIT D - Page 185**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

TIMOTHY VEST and CAROLINE VEST,

     Plaintiffs,

vs.                    No. RG09489518

ALLIED PACKING AND SUPPLY, et al.,

     Defendants.

_____/


VIDEOTAPED DEPOSITION OF DAVID L. MILLER

Volume I

(Pages 1 to 281)


Taken before Catherine M. Meyer

CSR No. 11596

December 29, 2010

Page 273

1   hangar 110 because United took that hangar over.   And he

2   was a foreman over there.

3          MS. JOHNSON:   Okay.   Thank you for that

4   clarification, sir.

5          THE WITNESS:   Sure.

6          MS. HSU:   Can I just ask a couple follow-ups

7   since we have some time?

8   EXAMINATION BY MS. HSU:

9       Q.   You mentioned earlier that there were military

10  aircraft being worked on --

11      A.   Yes.

12      Q.   -- at hangar 110.

13      A.   Yes.

14      Q.   You mentioned the KC-10 which had a rope around

15  it.   Do you know what type of work was being done on the

16  KC-10?

17      A.   We had a contract to do like heavy checks, like

18  a C check.   There's many different types of checks in

19  aviation.

20      Q.   Do you recall how many KC-10s there were at

21  hangar 110 that you guys were servicing?

22      A.   I think at the height we were doing like one a

23  month.

24      Q.   And when you said there was a rope around the

25  area, it was still on the maintenance hangar floor --

EXHIBIT E - Page 187                        266c89cf-1c88-4945-8535-7405f22069f7

Page 274

1     A.   Yes.

2     Q.   -- correct, except it was just roped up; is

3  that right?

4     A.   Yes.

5     Q.   Aside from the KC-10, do you recall any other

6  type of military aircraft that were being worked on in

7  hangar 110?

8     A.   Yes.  They had the -- like Air Force One, 747.

9     Q.   Any other ones?

10    A.   No.  I think a couple C-5As came in there.  But

11  they were just parked there because of the fog up in

12  Travis.

13    Q.   You don't believe that there was any work

14  performed on the C --

15    A.   I don't believe we did any work on them.

16    Q.   And also -- sorry.  Aside from the --

17    A.   Oh, excuse me.  I'll take that back.  We had a

18  contract to paint.  I don't know what the nomenclature

19  was.  It was a small fighter trainer for the Air Force.

20  T-38s maybe.

21    Q.   And that was to paint the aircraft?

22    A.   Yes.

23    Q.   Any other ones that you can recall?

24    A.   That's all I can recall right now.

25    Q.   Okay.  Earlier when I asked you about the heat

Aiken Welch Court Reporters    D. Miller   V1   12-29-10

Page 281

```
1   STATE OF CALIFORNIA     )

2                           )

3   COUNTY OF ALAMEDA       )

4

5       I, CATHERINE M. MEYER, do hereby certify:

6       That DAVID L. MILLER, in the foregoing deposition

7   named, was present and by me sworn as a witness in the

8   above-entitled action at the time and place therein

9   specified;

10      That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me, a

12  Certified Shorthand Reporter of the State of California,

13  and was thereafter transcribed into typewriting, and

14  that the foregoing transcript constitutes a full, true

15  and correct report of said deposition and of the

16  proceedings that took place;

17      IN WITNESS WHEREOF, I have hereunder subscribed my

18  hand this 4th day of January 2011.

19

20

21

22

23                      _____

24                      CATHERINE M. MEYER, CSR No. 11596
                        State of California
25
```

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 120 Broadway, Suite 300, Santa Monica, California 90401-2386.

On January 6, 2011, I served the foregoing document, described as **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1442(a)(1) (FEDERAL OFFICER)**, on each interested party in this action, as follows:

*Attorneys for Plaintiffs*

Justin A. Bosl, Esq.
Andrea Huston, Esq.
Elina Agnoli, Esq.
Kazan, McClain, Lyons, Greenwood & Harley
55 Harrison Street, Suite 400
Oakland, California 94607
Email:    jbosl@kazanlaw.com
          ahuston@kazanlaw.com
          eagnoli@kazanlaw.com

☒   (BY MAIL) I placed a true copy (or original) of the foregoing document in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, for collection and mailing at Bryan Cave LLP, Santa Monica, California. I am readily familiar with Bryan Cave LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

☐   (BY FAX) I caused a true copy of the foregoing document to be served by facsimile transmission from sending facsimile machine telephone number (310) 576-2200 to each interested party at the facsimile number set forth above. Each transmission was reported as complete and without error. A transmission report was properly issued by the sending facsimile machine for each interested party served.

☐   (BY E-MAIL, pursuant to agreement of the parties) I caused a true copy of the foregoing document to be served by e-mail at the e-mail address(es) set forth above. Each e-mail was complete and no reports of error were received.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 6, 2011, at Santa Monica, California.

_____
Karen Minutelli

818741\0307472

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

4:11-CV-61-LB
ADR ECF

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| TIMOTHY VEST and CAROLINE VEST | As Reflected on Exhibit 1 |

**(b)** County of Residence of First Listed Plaintiff  Unknown
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Unknown
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Steven Kazan; Justin A. Bosl; Andrea Huston; Kazan, McClain, Lyons, Greenwood & Harley; Jack London Market 55 Harrison Street, Suite 400, Oakland, CA 94607; Telephone: (510) 302-1000

Attorneys (If Known)
Robert E. Boone, III; James C. Pettis; Linda C. Hsu; Bryan Cave LLP; 120 Broadway, Suite 300, Santa Monica, CA, 90401; Telephone: (310) 576-2100

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane     **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   ☐ 362 Personal Injury - | ☐ 625 Drug Related Seizure | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability       Med. Malpractice | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   ☐ 365 Personal Injury - | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander        Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'  ☒ 368 Asbestos Personal | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability        Injury Product | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine        Liability | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| | ☐ 370 Other Fraud | | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| | ☐ 380 Other Personal | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| | Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| | ☐ 385 Property Damage | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | Product Liability | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| | ☐ 530 General | | 26 USC 7609 | Act |
| | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | | ☐ 465 Other Immigration | | State Statutes |
| | | Actions | | |

[The following region is a faded/overlapping receipt image:]

Court Name: U.S. District Court, NDCA
Division: 4
Receipt Number: 44611006240
Cashier ID: jenahac
Transaction Date: 01/06/2011
Payer Name: San Francisco Legal Support,

CIVIL FILING FEE
For: McDonnell Douglas Corp.
Case/Party: D-CAN-4-11-CV-000061-001
Amount: $350.00

PAPER CHECK CONVERSION
Check/Money Order Num: 73613
Amt Tendered: $350.00

Total Due: $350.00
Total Tendered: $350.00
Change Amt: $0.00

LB

Checks and drafts are accepted subject to collections and full credit will only be given when the check or draft has been accepted by the financial institution on which it was drawn.

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☒ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**  Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Removal action based on Federal Officer grounds pursuant to 28 U.S.C. Section 1442(a)(1).

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION  DEMAND $  CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):  JUDGE  DOCKET NUMBER

DATE  SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #  AMOUNT  APPLYING IFP  JUDGE  MAG. JUDGE

and Venue

FAXED