*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 12

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs. No. RG 09-489518

ALLIED PACKING AND SUPPLY, et al.,

Defendants.

_______________________________________/

DEPOSITION OF JAMES HALES

(Pages 1 to 200)

Taken before SUZANNE BEASLEY

CSR No. B-1184

June 3, 2010

INDEX

| | PAGE |
|---|---|
| EXAMINATION BY MR. BOSL | 10 |
| EXAMINATION BY MS. FAKHIMI | 191 |
| EXAMINATION BY MS. GOW | 195 |
| EXAMINATION BY MR. ROBERTS | 196 |
| EXAMINATION BY MR. GOLDBERG | 197 |

INDEX TO PLAINTIFFS' EXHIBITS

Exhibit No. Page No.

Plaintiff's Exhibit No. 1 .................. 10
Notice of taking deposition and notice of videotaping deposition

Plaintiff's Exhibit No. 2 .................. 10
May 11, 2010 Important deposition information, date and time changes

Plaintiff's Exhibit No. 3 .................. 10
Notice of taking deposition of defendant World Airways, Inc.'s custodian of records and person(s) most qualified

Plaintiff's Exhibit No. 4 .................. 79
Notice of taking deposition of defendant World Airways, Inc.'s custodian of records and person(s) most qualified

Plaintiff's Exhibit No. 5 .................. 83
Defendant World Airways, Inc.'s amended responses to special interrogatories, set one

Plaintiff's Exhibit No. 6 .................. 162
Defendant World Airways, Inc.'s responses to plaintiffs' request for production of documents, set one

Plaintiff's Exhibit No. 7 .................. 162
Defendant World Airways, Inc.'s responses to plaintiffs' request for production of documents, set two

Plaintiff's Exhibit No. 8 .................. 174
Global Aviation Holdings Document Retention policy, Bates labeled WA 000001 through 000013

INDEX TO PLAINTIFFS' EXHIBITS (continued)

Exhibit No. Page No.

Plaintiff's Exhibit No. 9 .................. 174
World Airways, Inc. Code of Professional Conduct & Business Ethics

INDEX TO DEFENDANTS' EXHIBITS

Exhibit No. Page No.

Defendant's Exhibit No. 1 .................. 198
Defendant World Airways, Inc.'s objections to plaintiffs' notice of taking deposition of defendant World Airways, Inc.'s custodian of records and person(s) most qualified

Defendant's Exhibit No. 2 .................. 198
Defendant World Airways, Inc.'s objections to plaintiffs' notice of taking deposition of defendant World Airways, Inc.'s custodian of records and person(s) most qualified

DEPOSITION OF JAMES HALES

BE IT REMEMBERED, that pursuant to Notice, and on the 3rd day of June, 2010, commencing at the hour of 9:38 a.m., at the Hampton Inn, 300 Westpark Drive, Peachtree City, Georgia, before me, SUZANNE BEASLEY, a Certified Shorthand Reporter, state of Georgia, personally appeared JAMES HALES, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES:

For the Plaintiffs:

JUSTIN A. BOSL
Kazan, McClain, Lyons, Greenwood & Harley
171 Twelfth Street, Third Floor
Oakland, California 94607

For the Defendant Cyprus Amax Minerals Company:

ANTHONY BENTIVEGNA
(Via phone)
Becherer, Kannett & Schweitzer
1255 Powell Street
Emeryville, California 94608

For the Defendant McDonnell Douglas Corporation:

SHALEM A. MASSEY
Bryan Cave LLP
3161 Michelson Drive, Suite 1500
Irvine, California 92612

Page 6

APPEARANCES (continued):

For the Defendant World Airways, Inc.:

JAMES GOLDBERG
Bryan Cave LLP
2 Embarcadero Center, Suite 1410
San Francisco, California 94111

For the Defendant Henkel Corporation:

JESSICA A. FAKHIMI
Chapman & Intrieri, L.L.P.
2236 Mariner Square Drive, Suite 300
Alameda, California 94501

For the Defendants Kelly-Moore Paint Company, Inc., and Raymond Interior Systems-North

MICHAEL R. ROBERTS
(Via phone)
Foley & Mansfield, P.L.L.P.
1111 Broadway, 10th Floor
Oakland, California 94607

For the Defendant Kaiser Gypsum Company, Inc.

THOMAS W. BURCH, III
Dehay Elliston, LLP
1300 Clay Street, Suite 840
Oakland, California 94612

For the Defendant Hexcel Corporation:

D. PAUL BIRD, II
(Via phone)
McKenna Long & Aldridge LLP
101 California Street, 41st Floor
San Francisco, California 94111

For the Defendants F.P. Lathrop Construction Company and Lathrop Construction Associates, Inc.

TANYA X. JOHNSON
Wilson Elser Moskowitz Edelman & Dicker, LLP
525 Market Street, 17th Floor
San Francisco, California 94105

Page 7

APPEARANCES (continued):

For the Defendants Dowman Products, Inc. and Hamilton Materials, Inc.:

PAMELA RICHARDSON
(Via phone)
Walsworth Franklin Bevins & McCall, LLP
601 Montgomery Street, Ninth Floor
San Francisco, California 94111

For the Defendant Parker Hannifin Corporation:

MIKAYLA M. GOW
(Via phone)
Sedgwick Detert Moran & Arnold, LLP
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105

For the Defendant Kentile Floors, Inc.:

ELIZA M. RODRIGUES
(Via phone)
Selman Breitman, LLP
33 New Montgomery, Sixth Floor
San Francisco, California 94105

For the Defendant Georgia-Pacific LLC formerly known as Georgia-Pacific Corporation:

HANK HOLMBERG
(Via phone)
Perkins Coie
Four Embarcadero Center, Suite 2400
San Francisco, California 94111

Also Present: Rosemary Bilello, Videographer

Page 8

THE VIDEOGRAPHER: One moment. We're now on video record. This begins tape number one. Today's date is June 3rd, 2010. The time on the video monitor is 9:38.

This begins the deposition of Jim Hales in the case of Vest versus Allied Parking and Supply, Inc., et al., number RG 09-489518, being heard in the Superior Court of the State of California in and for the County of Alameda.

My name is Rosemary Bilello. I'm the court reporter. I'm the videographer, sorry. The court reporter is Suzanne Beasley. Both of us are for Aiken & Welch Court Reporters.

Will counsel please introduce themselves and state who they represent.

MR. BOSL: Justin Bosl for the Vest family.

MS. FAKHIMI: Jessica Fakhimi from the law firm of Chapman & Intrieri for Henkel Corporation.

MR. MASSEY: Shalem Massey for McDonnell Douglas.

MR. BURCH: Thomas Burch, Dehay & Elliston, representing Kaiser Gypsum Company, Incorporated.

MS. JOHNSON: Tanya Johnson representing F.P. Lathrop Construction Company and Lathrop Construction -- let me take that back, Lathrop

Page 9

Associates, Inc.

MR. GOLDBERG: James Goldberg representing World Airways, Inc.

MR. BOSL: On the phone?

MS. GOW: I'm sorry, I'm having trouble hearing.

MR. BOSL: State your appearances, please.

MS. GOW: My name is Mikayla Gow on behalf of Parker Hannifin Corporation.

MS. RICHARDSON: Pamela Richardson on behalf of Walsworth, Franklin, Bevins & McCall -- or sorry, that's my law firm, appearing today on behalf of Dowman Products, Incorporated and Hamilton Materials, Incorporated.

MR. ROBERTS: This is Michael Roberts on behalf of the Kelly-Moore Paint Company, Incorporated, and Raymond Interior Systems-North.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

MR. HOLMBERG: Excuse me, I had my mute button on. Hank Holmberg appearing on behalf of Georgia-Pacific.

- - -

JAMES HALES,
having been duly sworn,
testified as follows:
EXAMINATION BY MR. BOSL:
Q. Good morning, sir. I introduced myself to you off the record. I'm Justin Bosl. I represent the Vest family, and I'll be taking your deposition this morning.
A couple of matters of housekeeping before we proceed. I'm going to attach as Plaintiff's Exhibit 1 the notice of taking deposition and notice of videotaping deposition of Jim Hales signed on April 26th, 2010; as Number 2, a May 11th, 2010, letter to all counsel from my office changing the deposition to June 3rd at 9:30 a.m. at this location; and as Number 3, which I don't have presently and is being faxed to me and we'll attach it shortly, will be the notice of taking deposition of World Airways person most qualified and custodian of records.
(Plaintiff's Exhibits 1, 2 and 3 were marked for identification.)
BY MR. BOSL:
Q. With that, good morning. Sir, have you ever had your deposition taken before?
A. I have.

Q. And on how many occasions?
A. I believe three previous.
Q. And when were those depositions?
A. I honestly can't remember the years, but over the last ten years.
Q. When was the most recent deposition you gave?
A. Within the last three to four years.
Q. What were the -- was the nature of the case in which you gave your first deposition?
A. If I remember right, it was a technical issue with an aircraft. It was an aircraft involved in an incident, and we had a concern with an MRO that performed maintenance on the aircraft.
Q. And I'm sorry, "MRO" stands for what?
A. Maintenance repair organization.
Q. And in that case, were you testifying on behalf of World Airways?
A. I was.
Q. And in the second deposition, what was the nature of that dispute?
A. It was -- if I remember right, it was an issue with a flight attendant who had had an accident.
Q. Same question, you were testifying on behalf of World Airways in that incident?
A. I was.

Q. And finally, the third deposition, what was the nature of that dispute?
A. It was the most recent one. It was an incident in one of our aircraft in Los Angeles. It had some ground damage.
Q. And same question again, you were testifying on behalf of World Airways there?
A. I was.
Q. You've probably heard these in the last deposition, but I'm going to go through just a few basic admonitions just to refresh your memory about them. Now, you're doing a very good job with this already, but I'll just remind you that it's very important that all of your answers be verbal, no uh-huh or huh-uh, shaking your head, nodding your head. That doesn't translate onto the written record, and that's what controls here; so it's very important to always give verbal answers to my questions.
And what goes along with that is it's very important that you wait until I finish asking a question before you answer it, and similarly, I'll try and give you the respect to let you finish your answer before I start asking the next question. Otherwise, the court reporter is going to start hitting both of us. Do you understand that?

A. I do.
Q. And at any time if you don't understand a question, it's important that you let me know, and I'll do my best to, if in any way possible, rephrase it such that we can be understood. And on the flip side of that, though, if you don't tell me that you misunderstand the question, we are all going to assume that you understood what I was asking you. Is that fair?
A. Yeah, it's fair.
Q. Okay. Now, at the end of this deposition, the court reporter here is going to type up the record, and you'll have an opportunity to review that and make any changes that you need to make to your testimony; but it's very important that you provide your best and most honest testimony here this morning, because at the end if you do make any changes that are substantive, anything beyond simply changing the spelling of a name or something like that, I will have the opportunity to comment on that at time of trial and it could affect your credibility. Do you understand that?
A. I do.
Q. Okay. Sir, have you taken any medication in the last 24 hours that could potentially affect your ability to testify or provide clear and honest answers?

Page 14

A. Not to the best of my knowledge.
Q. And have you had any alcohol or any other kind of drugs in the last 24 hours?
A. No.
Q. I'm going to try and take a break every hour to hour and a half, but if at any other time you need a short recess, let me know, and I'll do my best to accommodate you. The only thing that I'm going to ask is that if I have a question pending to you, you answer that question before we take any breaks. Is that fair?
A. I understand.
Q. Okay. All right. Sir, what is your business address?
A. It's 101 World Drive, Peachtree City, Georgia.
Q. And in what city do you currently live?
A. Fayetteville, Georgia.
Q. Can you describe for me a little bit about your educational background?
A. Junior school, secondary school. In England it's a little bit different from here the way it works, but you change schools at 11. You stay in your secondary school or high school until 16. I decided to do an aircraft engineering apprenticeship, which means you have to leave school at 16 after your finals, and I entered into a four-year aircraft engineering

Page 15

apprenticeship with BOAC, British Overseas Airways Corporation.
Q. When did you begin that internship?
A. 1972.
Q. And I'm sorry, can you say the name of the entity again?
A. BOAC. It's British Overseas Airways Corporation, which is now British Airways.
Q. And where was the internship?
A. London Heathrow.
Q. What did the internship entail?
Let me back up. Was there classroom instruction?
A. There was.
Q. And what was the course of classroom instruction as part of this internship?
A. I don't understand the question.
Q. Okay. What types of courses did you take?
A. Well, again, it's a four-year course. The first year you do a series of workshop training, sheet metal, bench fitting, machining, welding. As far as classroom goes, you do theory of flight, theory of propulsion, electrical avionics, all basic systems, just about everything to do with the construction of systems of aircraft.

Page 16

Q. Is there classroom instruction throughout the entire four years?
A. Well, you do -- as well as being at the airline training school, you also do city and guild to a technical college. So one day a week you go to technical college, and one night a week you will go to technical college. And then the training was scheduled.
So one week you'd be doing sheet metal. The next week you would be doing, in those days it was bench fitting. The next week, it would be machining. The next week, it would be -- it could be a class of propulsion. The next week you could be back in workshops again, so you'd be applying the schedule for the first year. So it was basically all general training. And then the second year, you start to -- you start to specialize a little more.
Q. Did you -- what did you specialize in as you went through your internship?
A. My decision was to go with, at that time, engines.
Q. What did --
A. Can I -- I'd like to correct that.
Q. Sure.
A. In the English system, there was a decision.

Page 17

You could either go avionics electrical or airframe engines, so my specialty really was in engines, pneumatics, hydraulics systems.
Q. What did the specialization mean for your course of study as you went through the second through fourth years in terms of both classroom instruction and hands on?
A. Well, the first two years was the training school. You don't see an aircraft for the first two years. At the third -- at the start of the third year, you actually move on to the base or the engineering center where all the workshops are.
Six months, you spend six months going through a week at a time through different workshops, and you get hands-on experience with a variety of different components. And then the last six months, I was on 747 heavy maintenance, overhauls. Then the fourth year, I did three months of heavy maintenance 747s. Six months, I think it was, line maintenance. The last three was workshops again.
Q. So the 747s that you're working on during the internship, are these training craft or are these --
A. No, no.
Q. -- operational?
A. The real thing --

for us.

A. Well, if you wanted to -- say you're looking at a certain area and you've looked at this area so many times and you just -- you keep looking and you don't find problems, you could then petition the manufacturer, and they would then petition the other airlines. And it's a long process.

And they would -- the engineers at the manufacturer would look at this data, and once they gather enough data, if they saw that, then they would escalate that particular function. Say, okay, we've definitely proven this area doesn't seem to be incurring any issues or problems, corrosion or whatever. And rather than having to look at it every thousand hours, now we've proven by engineering analysis that we can look at it every 2,000 hours.

MR. BOSL: Give me one moment to pull out a document here.

During the break, I did receive a copy of what I previously identified as Plaintiff's Exhibit 3, which is notice of taking the deposition of World Airways custodian of records person most qualified. That is the one that was noticed for March 2nd.

Then I'm also attaching as Exhibit 4 the notice of taking deposition of defendant World Airways

custodian of records and person most qualified set for April 28th, which is the second notice.

(Plaintiff's Exhibit 4 was marked for identification.)

MR. HOLMBERG: Excuse me. This is Hank Holmberg. I am having trouble hearing the attorney who is asking questions. Did I hear correctly that this witness is a custodian of records and a person most knowledgeable?

MR. BOSL: Well, I can let Mr. Goldberg say more specifically, but my understanding -- well, Mr. Hales is being produced both pursuant to an individual notice that we had served, but he has also been designated as the person most qualified for certain categories, and I'll let Mr. Goldberg make that representation.

MR. GOLDBERG: Yes, he's being produced to speak to certain subject matter categories in the deposition notices pursuant to responses and objections to notices. I'm happy to put those in the record also.

And with respect to the custodial, he's not the official custodian of records designated by the company for that function as a matter of corporate practice on a day-to-day basis, but he is prepared to testify to how the records pertaining to aircraft maintenance were

maintained and how they were passed along to subsequent owners of the aircraft.

MR. HOLMBERG: Okay. Thank you. Thank you.

MR. GOLDBERG: You're welcome.

MR. BOSL: Well, while we're doing this, why don't we take just a couple-minute break so that we can change the videotape.

THE VIDEOGRAPHER: This is the end of tape number one. We're going off the video record at 11:50 a.m.

(A recess was taken.)

MR. BOSL: We can go back.

THE VIDEOGRAPHER: All right. One moment. This begins tape number two. We're back on video record at 11:52 a.m.

BY MR. BOSL:

Q. Mr. Hales, when you were at the Oakland facility, what types of planes do you recall being in the fleet that were serviced there in the hangar?

A. In the World Airways fleet?

Q. Yes.

A. DC-8, DC-10, 747, 727.

Q. Did World Airways service any planes there that were not of its own fleet?

A. Yes.

Q. And what planes were those?

A. DC-9s, DC-8s, L1011 Tristars. Mr. Daly had his own. It was a CV -- it was a Convair. I can't remember if it was a 440 or a 340. I'm not sure about that. He also had a B -- one of the old bombers, a B-17. No, it wasn't B-17. Well, he had an old aircraft there. MD-80s, C-130s. I think that's it.

Q. What airlines was World Airways -- I assume the aircraft that were non-World Airways were by contract with other airlines; is that right?

A. Correct.

Q. What airlines were those?

A. Transamerica, Jet America, Hawaiian Air, United States Air Force. Those were KC-10s. That's all I remember seeing during my time there.

Q. Did you hear about any other companies?

A. Yes.

Q. Which companies did you hear also had contracts with World Airways?

A. I don't know what types of contracts, but I mean, many, many airlines brought aircraft into that facility for -- it could have been on-call maintenance, could have been emergency maintenance, schedule checks, heavy overhauls. I mean, Pan Am, everybody. I mean, I remember we had a board there, if I remember right,

Page 82

with the different tail emblems that had been there in the hangar, and it was massive, all around the world.
MS. JOHNSON: Can I have the answer read back, please?
(Whereupon, the record was read by the reporter.)
BY MR. BOSL:
Q. You had said that the tail emblems of the aircraft that had been there in the hanger?
A. Some were in the hangar. I think it was in the offices there was a board that was on the wall where they'd had -- they'd taken the emblems of the airlines and they pasted them, glued them, whatever, onto this board so you could see who had actually visited the hangar over the years and everything. It was quite an exhaustive number.
Q. When other airlines brought their aircraft into the World Airways hangar there, was it World Airways mechanics that worked on it?
A. Yes.
Q. When it came to aircraft such as, for example, you mentioned the U.S. Air Force KC-10, did World have mechanics that were approved for that aircraft, or how did it work when you had a less common aircraft come in and the mechanics had to work on it?

Page 83

A. There were specific mechanics and crews who were approved to work on the KC-10.
Q. So World Airways would actually have its mechanics get approvals for aircraft that it didn't specifically have in its own fleet; is that right?
A. Yes.
(Plaintiff's Exhibit 5 was marked for identification.)
BY MR. BOSL:
Q. Sir, I'm looking at what I'll mark as Plaintiff's Exhibit 5, which is defendant World Airways Inc.'s amended responses to special interrogatories, set one, served on May 24th, 2010. The first thing I'll ask you, other than a little bit of writing on the front my assistant didn't blot out, have you seen these before?
MR. GOLDBERG: Do you have copies?
MR. BOSL: I do.
THE WITNESS: If my signature's there, I would say yes, I've seen this before.
BY MR. BOSL:
Q. Do you have a memory of seeing them?
A. Yes.
Q. On the second to last page, is that your signature?

Page 84

A. It is.
Q. I want to turn to -- sorry, I gave you the copy that I folded. If you turn, sir, to page 15, and I'm looking at the response to interrogatory number 44. What is the difference between the various checks that we spoke about and general and system repairs?
A. Well, the checks, as we discussed, are scheduled checks, they're built around maintenance programs. General and system repairs could be part of the scheduled check, but as I -- as I talked about them in this particular case, whereas an aircraft might be in Oakland for an overnight and we needed mechanics and their experience to work on, could be deferred items, items which you're allowed to fly with certain systems inoperative. So those are just, say, general servicing. Could be filter changes, general system failures, just systems that require repair because they're broken at the time.
Q. Your answer brings up a good point. Were there ever times where checks were done in somewhat of an ongoing basis where you might say the full-time period hasn't quite come up and you check a certain part of it and send it out for a flight and check the next part of it on the next flight?
A. You can't partition a check.

Page 85

Q. Okay.
A. It's all or nothing.
Q. Looking again at answer 44, it talks about modifications. Do you know what that refers to?
A. Uh-huh.
Q. What does that refer to?
A. Oh, yes. I'm sorry. It could be interior modifications, could be avionics modifications, structural modifications, system modifications.
Q. And by modifications, are these -- well, help me out. Describe a little bit better for me what you mean by a modification.
A. It could be a new system that could be added to the aircraft. Through the years we've got, you know, better radar systems, so you could be taking out one radar system and putting in a -- well, we went from, say, the old analog type to the digital system. We've gone from the gray scale or the black-and-white kind of radar tubes. Now they're color, and that kind of modification.
They found over the years a certain area may -- part of the structure may crack, so you could -- you could actually put double repairs in there to strengthen that area, that kind of modification.
Q. Do these modifications come from the

Page 198

PMKs.

Justin, did you want to do these sequentially or do you want to have plaintiffs' and defendants'?

MR. BOSL: Keep them separate.

MR. GOLDBERG: Okay. And we'll mark as defendant's objections -- excuse me, Defendant's 1 the objections, the objections to the plaintiffs' notice of taking deposition of defendant World Airways custodian of records and persons most qualified that was served on February 5th, and the objections themselves are dated March 18th, and then mark as Defendant's Exhibit 2 defendant World Airways objections to plaintiffs' notice of taking deposition of defendant World Airways, Inc.'s custodian of records and persons most qualified that was served on World on April 7th, and the objection itself is dated April 20th, 2010.

(Defendant's Exhibits 1 and 2 were marked for identification.)

MR. GOLDBERG: That's all I have.

MR. BOSL: Okay. With that, I guess we're done today.

MR. GOLDBERG: Thank you very much.

THE VIDEOGRAPHER: This is the end of tape number three. Going off video record at 4:08 p.m.

(Deposition concluded at 4:08 p.m.)

Page 199

SIGNATURE OF DEPONENT

I, the undersigned, JAMES HALES, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

| PAGE | LINE | CHANGE |
|---|---|---|
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |

______________________________
JAMES HALES, Date

Page 200

STATE OF GEORGIA )
)
COUNTY OF FULTON )

I, Suzanne Beasley, a Shorthand Reporter, State of Georgia, do hereby certify:

That James Hales, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of Georgia, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 18th day of June, 2010.

______________________________
SUZANNE BEASLEY, B-1184
My commission expires on the 3rd day of October, 2010.

STATE OF GEORGIA )

)

COUNTY OF FULTON )

I, Suzanne Beasley, a Shorthand Reporter, State of Georgia, do hereby certify:

That James Hales, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of Georgia, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 18th day of June, 2010.

SUZANNE BEASLEY NOTARY EXPIRES GEORGIA OCT. 3, 2010 PUBLIC FULTON COUNTY

Suzanne Beasley

SUZANNE BEASLEY, B-1184
My commission expires on the 3rd day of October, 2010.

Case4:11-cv-00061-LB Document27-11 Filed01/10/11 Page11 of 39

Denise Abrams, Esq. (C.S.B. #124139)
Justin A. Bosl, Esq. (C.S.B. #241117)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

PLAINTIFF'S EXHIBIT NO. Hales 1
FOR IDENTIFICATION
DATE: 6/3/10 RPTR: SB
PENGAD 800-631-6989

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br>Plaintiffs,<br>v.<br>ALLIED PACKING AND SUPPLY, et al.,<br>Defendants. | No. RG09489518<br>**NOTICE OF TAKING DEPOSITION AND NOTICE OF VIDEOTAPING DEPOSITION**<br>Deponent: Jim Hales<br>Date: June 3, 2010<br>Time: 10:00 a.m.<br>Location: Hampton Inn<br>300 Westpark Drive<br>Peachtree City, Georgia 30269<br><br>Case Filed: December 17, 2009 |

TO: All Defendants and Their Attorneys of Record:

PLEASE TAKE NOTICE that in accordance with Code of Civil Procedure §§ 2025.220 and 2025.270(a) and the attached Deposition Subpoena for Personal Appearance, plaintiffs, through their counsel, will take the deposition of Jim Hales at 10:00 a.m. on June 3, 2010 at the Hampton Inn, 300 Westpark Drive, Peachtree City, Georgia 30269, telephone (770) 486-8800. The deposition will be taken before a duly authorized Notary Public and shall continue from day to day thereafter, until completed.

The deposition may be videotaped pursuant to C.C.P. §§ 2025.220(a)(5), 2025.330(a) and 2025.340. Plaintiffs reserve the right to use the videotaped depositions at trial pursuant to provisions of C.C.P. §§ 2025.220(a)(6) and 2025.620. In addition, the deposition testimony will be recorded stenographically, and/or through instant visual

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

display pursuant to C.C.P. § 2025.220.

The deponent, Jim Hales is a current or former employee of World Airways, Inc.. A list of all attorneys for parties on whom this notice is being served is contained in the service list attached to the proof of service.

DATED: April 26, 2010

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation

By ______________________
Justin Bosl
Attorneys for Plaintiff

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

SUBP-015

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Justin A. Bosl, Esq. (C.S.B. #241117)
Kazan, McClain, Lyons, Greenwood & Harley
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, CA 94607
TELEPHONE NO.: 510-465-7728 FAX NO. (Optional): 510-835-4913
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiffs

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

PLAINTIFF/ PETITIONER: Timothy Vest and Caroline Vest

DEFENDANT/ RESPONDENT: Allied Packing and Supply, et al.

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE**

CASE NUMBER: RG09489518

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known)*:
Jim Hales c/o of Bryan Cave LLP, attorneys for World Airways, Inc.

1. YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:

Date: June 3, 2010 Time: 10:00 a.m. Address: Hampton Inn
300 Westpark Drive, Peachtree City, GA 30269

a. [ ] As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 2. (Code Civ. Proc., § 2025.230.)

b. [x] This deposition will be recorded stenographically [x] through the instant visual display of testimony and by [ ] audiotape [x] videotape.

c. [ ] This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. [x] If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are as follows:

See attachment A.

3. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: April 26, 2010

Justin A. Bosl, Esq. (C.S.B. #241117)
(TYPE OR PRINT NAME)

(SIGNATURE OF PERSON ISSUING SUBPOENA)

Attorney for Plaintiffs
(TITLE)

(Proof of service on reverse)

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-015 [Rev. January 1, 2009]

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE**

Legal Solutions Plus

Code of Civil Procedure §§ 2020.310, 2025.220, 2025.230, 2025.250, 2025.620
Government Code, § 68097.1

Exhibit 12-393

Case4:11-cv-00061-LB Document27-11 Filed01/10/11 Page14 of 37

## ATTACHMENT A

1. DEFENDANT's membership in trade associations during the years 1960 to 1987.

"DEFENDANT" shall refer to defendant, World Airways, Inc., and to its attorneys agents employees, officers, parent entities, predecessors, subsidiaries, divisions, and contract units.

2. AOLs DEFENDANT received from McDonnell Douglas Corporation at any time.

"AOL" shall mean an All Operator Letter.

3. Contacts and communications regarding asbestos between McDonnell Douglas Corporation and DEFENDANT at any time.

4. Contacts and communications regarding asbestos between DEFENDANT and manufacturers of aircraft that DEFENDANT operated prior to 1988.

5. Worker's compensation cases filed against DEFENDANT that allege asbestos disease.

6. The types of work performed in CHECKS during the years 1973 through 1984.

"CHECKS" shall refer to A-Checks, B-Checks, C-Checks, and D-Checks.

CSONGSTAD/490448.1

PROOF OF SERVICE

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.* Alameda County Superior Court No. RG09489518

I declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. On **April 26, 2010**, I served the following document(s):

**NOTICE OF TAKING DEPOSITION AND NOTICE OF VIDEOTAPING DEPOSITION OF JIM HALES**

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE**

**ATTACHMENT A**

by transmitting a true copy via the following methods:

________ (By Facsimile) By personally transmitting a true copy thereof via facsimile to

________ (By PERSONAL SERVICE) By causing to be hand delivered via Modern Express Courier, tracking number____________ a true copy thereof to

________ (By OVERNIGHT DELIVERY) By delivering to an authorized courier authorized by the express service to receive documents or depositing in a box or other facility regularly maintained by the express carrier a true copy thereof, on this date, and addressed to

___xx___ (By U.S. MAIL) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business, in an envelope addressed to
**All Counsel**
**[See attached service list]**

I declare under penalty of perjury that the foregoing is true and correct. Executed on **April 26, 2010** at Oakland, California.

Chehie Songstad

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

SERVICE LIST CASE: Vest, Timothy [NE 1430] ACTION #: RG09489518 April 26, 2010 3:28 PM

BECHERER, KANNETT & SCHWEITZER
1255 Powell Street, , Emeryville, CA 94608-2604
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD COMPANY; CYPRUS AMAX MINERALS COMPANY
PH: (510) 658-3600
FAX: (510) 658-1151

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610
FOR: DESIGNATED DEFENSE COUNSEL
PH: (510) 835-8330
FAX: (510) 835-5117

BRYAN CAVE LLP
2 Embarcadero Center, Suite 1410, San Francisco, CA 94111
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.
PH: 415-675-3400
FAX: 415-675-3434

BRYAN CAVE, LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2305
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.
PH: (310) 576-2100
FAX: (310) 576-2200

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION
PH: (510) 864-3600
FAX: (510) 864-3601

COUNSEL UNKNOWN
FOR: LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION; MCDERMOTT/SEALY, INC.; PLANT INSULATION BANKRUPTCY

FOLEY & MANSFIELD
1111 Broadway, 10th Floor, Oakland, CA 94607
FOR: KELLY-MOORE PAINT COMPANY, INC.; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER
PH: 510-590-9500
FAX: 510-590-9595

GLASPY & GLASPY
One Walnut Creek Center, 100 Pringle Ave Ste 750, Walnut Creek, CA 94596
FOR: GARLOCK SEALING TECHNOLOGIES LLC
PH: (925) 947-1300
FAX: (925) 947-1594

HASSARD BONNINGTON
2 Embarcadero Center, Suite 1800, San Francisco, CA 94111
FOR: KAISER GYPSUM COMPANY, INC.
PH: (415) 288-9800
FAX: (415) 288-9802

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112
FOR: ALLIED PACKING AND SUPPLY
PH: (408) 287-7788
FAX: (408) 927-0408

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111
FOR: HEXCEL CORPORATION
PH: (415) 267-4000
FAX: (415) 267-4198

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071
FOR: HEXCEL CORPORATION
PH: 213-688-1000
FAX: 213-243-6330

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111
FOR: GEORGIA PACIFIC LLC fka GEORGIA PACIFIC CORPORATION
PH: (415) 344-7000
FAX: (415) 344-7288

SEDGWICK, DETERT, MORAN & ARNOLD
One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES
PH: (415) 781-7900
FAX: (415) 781-2635

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page17 of 39

SERVICE LIST Page Two CASE: Vest, Timothy [NE 1430] ACTION #: RG09489518 April 26, 2010 3:28 PM

SELMAN & BREITMAN
33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105
FOR: KENTILE FLOORS, INC.
PH: (415) 979-0400
FAX: (415) 979-2099

STEPTOE & JOHNSON
633 West Fifth Street, Suite 700, Los Angeles, CA 90071
FOR: METROPOLITAN LIFE INSURANCE COMPANY
PH: (213) 439-9400
FAX: (213) 439-9599

THE MAU LAW FIRM
950 Harrison Street, Suite 213, San Francisco, CA 94107
FOR: GEORGE E. MASKER, INC.
PH: 415-495-8082
FAX: 415-495-8084

WALSWORTH, FRANKLIN, BEVINS & McCALL
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: HAMILTON MATERIALS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: DOWMAN PRODUCTS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WILLIAMS KASTNER
Two Union Square, 601 Union Street, Suite 4100, Seattle, WA 98101
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES
PH: 206-628-6621
FAX: 206-628-6611

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
525 Market Street, 17th Floor, San Francisco, CA 94105-2722
FOR: F.P. LATHROP CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION
PH: (415) 433-0990
FAX: (415) 434-1370

End of Service List

KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY

*A Professional Law Corporation*

Steven Kazan
David M. McClain
Dianna Lyons
Gordon D. Greenwood
Philip A. Harley (1947-2009)
James L. Oberman*
Francis E. Fernandez
Leigh A. Kirmssé

171 Twelfth Street, Third Floor
Oakland, California 94607
(510) 302-1000 • (510) 465-7728
FAX: (510) 835-4913
e-mail: postmaster@kazanlaw.com
www.kazanlaw.com

Of Counsel
Denise Abrams
Frances C. Schreiberg

Andrea Huston
Petra DeJesus
Ian A. Rivamonte
Matthew L. Thiel
Barbra Ferre
Justin A. Bosl
Michael T. Stewart
Daniel Wasson
William F. Ruiz
Elina Agnoli
Gloria C. Amell

May 11, 2010

# IMPORTANT DEPOSITION INFORMATION
# DATE AND TIME CHANGES

***VIA FACSIMILE***

All Defense Counsel
(Broadcast)

Re: ***Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.***
***Alameda County Superior Court Case No. RG09489518***

Dear Counsel:

**PLEASE BE ADVISED** that the videotaped deposition of **Malcolm Benge** previously scheduled for June 2, 2010 **is going forward** on Friday, June 4, 2010 at 1:00 p.m. (EDT) at the Doubletree Hotel (Dulles Airport-Sterling), 21611 Atlantic Boulevard, Sterling, Virginia, 20166, Phone: (703) 230-0077.

**FURTHER**, please be advised that the videotaped deposition of **James (Jim) Hale** is going forward on Thursday, June 3, 2010 **at 9:30 a.m. (EDT)** (not 10:00 a.m.) at the Hampton Inn Atlanta/Peachtree City, 300 Westpark Drive, Peachtree City, Georgia, 30269, Phone: (770) 486-8800.

Very truly yours,

Troy K. Cartwright
Senior Litigation Paralegal

PLAINTIFF'S EXHIBIT NO. 2 HALES
FOR IDENTIFICATION
DATE: 6/3/10 RPTR: SB
PENGAD 800-631-6989

TKC/tkc

TCARTWRIGHT/491873.1

*Certified Appellate Specialist, The State Bar of California Board of Legal Specialization

P. 1

* * * COMMUNICATION RESULT REPORT ( MAY. 11. 2010 11:06AM ) * * *

TTI KAZAN, McCLAIN 510 835 4913

TRANSMITTED/STORED MAY. 11. 2010 10:48AM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 0650 | MEMORY TX | | (G14) G3-AT:BRYAN-CAVE-SF | OK | 1/1 |
| | | | (G14) G3-AT:BERRY_AND_BERRY | OK | 1/1 |
| | | | (G14) G3-AT:BRYAN_CAVE | OK | 1/1 |
| | | | (G14) G3-AT:BECHERER_KANNETT | OK | 1/1 |
| | | | (G14) G3-AT:CHAPMAN | OK | 1/1 |
| | | | (G14) G3-AT:DEHAY-ELLISON | OK | 1/1 |
| | | | (G14) G3-AT:FOLEY_MANSFIELD | OK | 1/1 |
| | | | (G14) G3-AT:GLASPY_AND_GLASPY | OK | 1/1 |
| | | | (G14) G3-AT:HERR@ZAPALA | OK | 1/1 |
| | | | (G14) G3-AT:MAU-LAW-FIRM | OK | 1/1 |
| | | | (G14) G3-AT:MCKENNA-LA | OK | 1/1 |
| | | | (G14) G3-AT:MCKENNA-LONG-SF | OK | 1/1 |
| | | | (G14) G3-AT:PERKINS_COIE | OK | 1/1 |
| | | | (G14) G3-AT:SEDGWICK | OK | 1/1 |
| | | | (G14) G3-AT:SELMAN_ET_AL.-SF | OK | 1/1 |
| | | | (G14) G3-AT:STEPTOE | OK | 1/1 |
| | | | (G14) G3-AT:WILLIAMS-KASTNER | OK | 1/1 |
| | | | (G14) G3-AT:WALSWORTH | OK | 1/1 |
| | | | (G14) G3-AT:WILSON ESLER | OK | 1/1 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

**KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY**

*A Professional Law Corporation*

Steven Kazan
David M. McClain
Dianna Lyons
Gordon D. Greenwood
Philip A. Harley (1947-2009)
James L. Oberman*
Francis E. Fernandez
Leigh A. Kirmssé

171 Twelfth Street, Third Floor
Oakland, California 94607
(510) 302-1000 • (510) 465-7728
FAX: (510) 835-4913
e-mail: postmaster@kazanlaw.com
www.kazanlaw.com

Of Counsel
Denise Abrams
Frances C. Schreiberg

Andrea Huston
Petra DeJesus
Ian A. Rivamonte
Matthew L. Thiel
Barbra Ferre
Justin A. Bosl
Michael T. Stewart
Daniel Wasson
Fabian F. Ruiz
Elina Agnoli
Gloria C. Amell

May 11, 2010

**IMPORTANT DEPOSITION INFORMATION
DATE AND TIME CHANGES**

***VIA FACSIMILE***

All Defense Counsel
(Broadcast)

Re: ***Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.
Alameda County Superior Court Case No. RG09489518***

Dear Counsel:

**PLEASE BE ADVISED** that the videotaped deposition of **Malcolm Benge** previously scheduled for June 2, 2010 **is going forward** on Friday, June 4, 2010 at 1:00 p.m. (EDT) at the Doubletree Hotel (Dulles Airport-Sterling), 21611 Atlantic Boulevard, Sterling, Virginia, 20166, Phone: (703) 230-0077.

**FURTHER**, please be advised that the videotaped deposition of **James (Jim) Hale** is going forward on Thursday, June 3, 2010 **at 9:30 a.m. (EDT)** (not 10:00 a.m.) at the Hampton Inn Atlanta/Peachtree City, 300 Westpark Drive, Peachtree City, Georgia, 30269, Phone: (770) 486-8800.

Very truly yours,

Troy K. Cartwright
Senior Litigation Paralegal

TKC/tkc

TCARTWRIGHT/491073.1

*Certified Appellate Specialist, The State Bar of California Board of Legal Specialization

Case4:11-cv-00061-LB Document27-11 Filed01/10/11 Page20 of 39
Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 20 of 226

JUN. 3. 2010 7:31AM KAZAN, McCLAIN 510 835 4913 NO. 0732 P. 2

Mail dure 2/05/2010

Gordon D. Greenwood, Esq. (C.S.B. #136097)
Justin A. Bosl, Esq. (C.S.B. #241117)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

PLAINTIFF'S EXHIBIT NO. Hales 3 FOR IDENTIFICATION DATE: 6/3/10 RPTR SB PENGAD 800-631-6989

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs.

ALLIED PACKING AND SUPPLY, et al.,

Defendants.

No. RG09489518

**NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED**

COR: DATE: **March 2, 2010**
TIME: 9:00 a.m.
PLACE: Kazan, McClain, Lyons, Greenwood & Harley

PMQ: DATE: **March 2, 2010**
TIME: 1:00 p.m.
PLACE: Kazan, McClain, Lyons, Greenwood & Harley

TO DEFENDANTS HEREIN AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that plaintiffs, through their counsel, will take the deposition of the Custodian(s) of Records of defendant **World Airways, Inc.** at 9:00 a.m. on **March 2, 2010** at the law offices of Kazan, McClain, Abrams, Lyons, Greenwood & Harley, 171 Twelfth Street, Third Floor, Oakland California, 94607. The deposition will be taken before a duly authorized Notary Public and shall continue from day to day thereafter, until completed.

///

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

KAZAN/471216.1

NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED

1

3

Exhibit 12-400

Said deposition may be videotaped pursuant to C.C.P. §§ 2025.220(a)(5), 2025.330(a) and 2025.340. Plaintiffs reserve the right to use the videotaped depositions at trial pursuant to provisions of C.C.P. §§ 2025.220(a)(6) and 2025.620. In addition, the deposition testimony will be recorded stenographically, and/or through instant visual display pursuant to C.C.P. § 2025.220.

The deponent, defendant **World Airways, Inc.**, is a party to this action and is required to produce at deposition, through its Custodian(s) of Records, the following documents, records or other materials that are in the possession or under the control of the defendant or deponent, or in the possession or under the control of defendant's attorneys at the commencement of said deposition:

1. DEFENDANT's RECORD RETENTION POLICIES.

"DEFENDANT" shall refer to defendant, World Airways, Inc., and to its attorneys, agents, employees, officers, parent entities, predecessors, subsidiaries, divisions, and contract units.

"RECORD RETENTION POLICY(IES)" shall refer to any policy, formal or informal, pursuant to which defendant's DOCUMENTS are maintained or destroyed, including the legal and financial basis for deciding how long to retain documents, the period of time required and what categories of documents are subject to defendant's document retention policy.

"DOCUMENTS" shall mean all writings, as defined in California Evidence Code § 250, including without limitation: all originals and all duplicates of handwriting, typewriting, printing, photostats, photographs, electronic data on any of DEFENDANT's computers, facsimile, e-mail, and every other means of recording upon any tangible thing or other form of communication or representation.

2. All DOCUMENTS that contain information regarding DEFENDANT's OCCUPATION of HANGER 110.

"OCCUPY," "OCCUPIED" and "OCCUPATION" shall refer to DEFENDANT's use of said facility, whether as owner, renter or lessor.

"HANGER 110" shall refer to World Airways Hanger 110, 1100 Airport Drive, Oakland, California, also known as the George P. Miller World Air Center and as the Oakland Maintenance Center Hanger, and to any associated offices, structures, shops, sheds, or buildings.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

3. All DOCUMENTS that contain information regarding the original construction of HANGER 110.

4. All DOCUMENTS that contain information regarding WORK conducted on HANGER 110 between its original construction and 1984.

"WORK" shall refer to construction, refurbishing, remodeling, handling, renovating, installation, manipulation, removal, repair and/or maintenance work.

5. All DOCUMENTS that contain information regarding DEFENDANT's SUPERVISION of WORK on HANGER 110 at any time prior to 1984.

"SUPERVISING," "SUPERVISION," and "SUPERVISE" shall refer to inspecting, reviewing, overseeing, managing, directing the details of the work, and/or approving the work.

6. All DOCUMENTS that contain information regarding WORK done by CONTRACTORS on HANGER 110 at any time prior to 1984.

"CONTRACTORS" shall refer to all contractors and sub-contractors, including but not limited to general contractors, insulation contractors, erection contractors, setting contractors, heating, ventilation and air conditioning (HVAC) contractors, fireproofing application contractors, boiler installation contractors, sheet metal contractors, drywall contractors, plastering contractors, acoustical materials contractors, mechanical contractors, plumbing contractors, electrical contractors, flooring contractors, and/or wall finishing contractors.

7. All DOCUMENTS that contain information regarding the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

"ASBESTOS-CONTAINING PRODUCTS"shall refer to any and all products that contain any asbestos dust or fiber, including but not limited to pipe covering, refractory materials, block, cloth, cement, adhesives, drywall and joint compounds, sheetrock, topping compounds, tape, textures, paper, aircell, duct insulation materials, fireproofing sprays, transite board, transite pipe, acoustical materials, floor tiles, ceiling tiles, welding blankets, packing materials, insulated electrical wiring and cables, gaskets, rope, millboard, brick, hot tops, hot toppings, plastics, moldings, packing, side boards, insulated electrical switches, insulation, and product(s) used in conjunction with burners, gauges, pumps, boilers, furnaces, condensers and/or feedwater heaters.

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

"USE," "USED" shall refer to the installation, removal, repair, handling, disturbance, or manipulation in any manner of said products.

8. All DOCUMENTS that contain information regarding who SPECIFIED the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

"SPECIFICATION", "SPECIFIED", SPECIFY" shall mean to require, suggest, recommend, call for, designate, and/or direct the use of a particular product or material.

9. All DOCUMENTS that contain information regarding DEFENDANT's role in the SPECIFICATION of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

10. All DOCUMENTS that contain information regarding the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

"SOURCE(S)" shall refer to and include but not be limited to manufacturers, distributors, wholesalers, resellers, jobbers, brokers, agents or other entities.

11. All DOCUMENTS that contain information regarding aircraft maintenance DEFENDANT performed at HANGER 110 between 1973 and 1984.

12. All DOCUMENTS that contain information regarding DEFENDANT's USE of ASBESTOS-CONTAINING PRODUCTS during aircraft maintenance at HANGER 110 between 1973 and 1984.

13. All DOCUMENTS that contain information regarding the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during aircraft maintenance at HANGER 110 between 1973 and 1984.

14. All DOCUMENTS that contain information regarding any SAFETY MEASURES DEFENDANT had in effect at HANGER 110 any time prior to 1984.

"SAFETY MEASURES" shall refer to all wet down procedures, segregated work areas, ventilation systems, warnings, instructions, and/or provision of respiratory devices, intended to reduce the risk of exposure to asbestos.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

15. All DOCUMENTS DEFENDANT provided to anyone prior to1984 regarding the HANDLING OF ASBESTOS.

"HANDLING OF ASBESTOS" shall refer to how to process, use, and/or handle asbestos materials to minimize dust and exposure to dust.

16. All DOCUMENTS DEFENDANT provided to anyone prior to 1984 regarding the HAZARDS OF ASBESTOS.

"HAZARDS OF ASBESTOS" shall refer to the deadly nature of asbestos, including but not limited to the hazards of inhaling asbestos fibers which may include, disability, disease, and death.

17. All DOCUMENTS which contain information regarding DUST STUDIES conducted at HANGER 110.

"DUST STUDIES" shall refer to any tests, studies, and/or surveys, to determine ambient asbestos dust levels at said location.

18. All DOCUMENTS that contain information regarding any ASBESTOS ABATEMENT conducted on HANGER 110.

"ASBESTOS ABATEMENT" shall refer to any and all removal, containment and/or encapsulation of asbestos, asbestos surveys studies, and/or asbestos containment.

19. All DOCUMENTS that contain information regarding each Workers' Compensation claim made for an asbestos-related injury against DEFENDANT.

20. All DOCUMENTS that contain information regarding any communications between DEFENDANT and OAKLAND regarding the presence of asbestos at HANGER 110.

"OAKLAND" shall refer to The City of Oakland, including but not limited to The Port of Oakland, The Board of Port Commissioners, and to their attorneys, agents, employees, and officers.

21. All DOCUMENTS that contain information regarding any communications between DEFENDANT and UNITED regarding the presence of asbestos at HANGER 110.

///

///

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

"UNITED"shall refer to United Airlines, and to its parent entities, predecessors, subsidiaries, divisions, and contract units, and to any of its attorneys, agents, employees, and officers.

22. All DOCUMENTS that contain information regarding any communications between OAKLAND and UNITED, that DEFENDANT is aware of, regarding the presence of asbestos at HANGER 110.

///

YOU ARE FURTHER NOTIFIED THAT THE DEPOSITION OF the PERSON(S) who is MOST QUALIFIED to testify about one or more of the matters set forth below regarding defendant **World Airways, Inc.** will be taken at the law offices of Kazan, McClain, Abrams, Lyons, Greenwood & Harley, 171 Twelfth Street, Third Floor, Oakland, California 94607 commencing at 1:00 p.m. **March 2, 2010**. The deposition will be taken before a duly authorized Notary Public and shall continue from day to day thereafter, until completed.

Said deposition may be videotaped pursuant to C.C.P. §§ 2025.220(a)(5), 2025.330(a) and 2025.340. Plaintiffs reserve the right to use the videotaped depositions at trial pursuant to provisions of C.C.P. §§ 2025.220(a)(6) and 2025.620. In addition, the deposition testimony will be recorded stenographically, and/or through instant visual display pursuant to C.C.P. § 2025.220.

The deponent, defendant **World Airways, Inc.** is not a natural person and is therefore required, pursuant to Code of Civil Procedure § 2025.230 to designate its "Person(s) Most Qualified" to testify regarding each of the matters set forth below.

1. DEFENDANT's RECORD RETENTION POLICIES.
2. DEFENDANT's OCCUPATION of HANGER 110.
3. The original construction of HANGER 110.
4. WORK conducted on HANGER 110 between its original construction and 1984.
5. DEFENDANT's SUPERVISION of WORK on HANGER 110 at any time prior to 1984.
6. WORK done by CONTRACTORS on HANGER 110 at any time prior to 1984.

///

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

7. The USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

8. Who SPECIFIED the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

9. DEFENDANT's role in the SPECIFICATION of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

10. The SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

11. Aircraft maintenance DEFENDANT performed at HANGER 110 between 1973 and 1984.

12. DEFENDANT's USE of ASBESTOS-CONTAINING PRODUCTS during aircraft maintenance at HANGER 110 between 1973 and 1984.

13. The SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during aircraft maintenance at HANGER 110 between 1973 and 1984.

14. SAFETY MEASURES DEFENDANT had in effect at HANGER 110 any time prior to 1984.

15. Information DEFENDANT provided to anyone prior to1984 regarding the HANDLING OF ASBESTOS.

16. Information DEFENDANT provided to anyone prior to 1984 regarding the HAZARDS OF ASBESTOS.

17. DUST STUDIES conducted at HANGER 110.

18. ASBESTOS ABATEMENT conducted on HANGER 110.

19. Workers' Compensation claims made for asbestos-related injuries against DEFENDANT.

20. Communications between DEFENDANT and OAKLAND regarding the presence of asbestos at HANGER 110.

21. Communications between DEFENDANT and UNITED regarding the presence of asbestos at HANGER 110.

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 27 of 226
Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page27 of 39

JUN. 3. 2010 7:40AM KAZAN, McCLAIN 510 835 4913 NO. 0732 P. 9

22. Communications between OAKLAND and UNITED, that DEFENDANT is aware of, regarding the presence of asbestos at HANGER 110.

///

A list of all parties or attorneys for parties on whom this Notice of Deposition is being served is shown on the accompanying Proof of Service.

DATED: February 3, 2010

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation

By [signature]
Justin A. Bosl

Attorneys for Plaintiffs

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

JKAZAN/471216.1

NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED

8

Exhibit 12-407



JUN. 3. 2010 7:41AM KAZAN, McCLAIN 510 835 4913 NO. 0732 P. 10

## PROOF OF SERVICE

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.*
Alameda County Superior Court No. RG09489518

I declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. On **February 5, 2010**, I served the following document(s):

**Notice of Taking Deposition of Defendant World Airways, Inc.'s Custodian of Records and Person(s) Most Qualified**

by transmitting a true copy via the following methods:

__xx__ (By PERSONAL SERVICE) By causing to be hand delivered via courier, a true copy thereof to

**Bryan Cave LLP**
**2 Embarcadero Center, Suite 1410**
**San Francisco, CA 94111**

**Bryan Cave LLP**
**120 Broadway, Suite 300**
**Santa Monica, CA 90401**

__XX__ (By U.S. MAIL) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business, in envelopes addressed to

**PROOF OF SERVICE**

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.*
Alameda County Superior Court No. RG09489518

I declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. On **February 5, 2010**, I served the following document(s):

**Notice of Taking Deposition of Defendant World Airways, Inc.'s Custodian of Records and Person(s) Most Qualified**

by transmitting a true copy via the following methods:

__xx__ (By PERSONAL SERVICE) By causing to be hand delivered via courier, a true copy thereof to

**Bryan Cave LLP**
**2 Embarcadero Center, Suite 1410**
**San Francisco, CA 94111**

**Bryan Cave LLP**
**120 Broadway, Suite 300**
**Santa Monica, CA 90401**

__XX__ (By U.S. MAIL) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business, in envelopes addressed to **See attached service list**

I declare under penalty of perjury that the foregoing is true and correct. Executed on **February 5, 2010** at Oakland, California.

[signature]
Chehie Songstad

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

CSONGSTAD/471605.1

SERVICE LIST CASE: Vest, Timothy [NE 1430] ACTION #: RG09489518 February 5, 2010 12:01 PM

BECHERER, KANNETT & SCHWEITZER
1255 Powell Street, , Emeryville, CA 94608-2604 PH: (510) 658-3600
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD COMPANY; CYPRUS AMAX MINERALS COMPANY FAX: (510) 658-1151

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610 PH: (510) 835-8330
FOR: DESIGNATED DEFENSE COUNSEL FAX: (510) 835-5117

~~BRYAN CAVE LLP~~
~~2 Embarcadero Center, Suite 1410, San Francisco, CA 94111~~ service by hand ~~PH: 415-675-3400~~
FOR: MCDONNELL ~~DOUGLAS CORPORATION~~; WORLD AIRWAYS, INC. ~~FAX: 415-675-3434~~

BRYAN CA~~VE, LLP~~
120 Broadway, Suite 300, ~~Santa Monica, CA 90401-2305~~ ~~PH: (310) 576-2100~~
FOR: MCDONNELL DOUGLAS ~~CORPORATION; WORLD~~ AIRWAYS, INC. ~~FAX: (310) 576-2200~~

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019 PH: (510) 864-3600
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION FAX: (510) 864-3601

COUNSEL UNKNOWN
FOR: F.P. LATHROP CORPORATION; LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION; PLANT INSULATION BANKRUPTCY

FOLEY & MANSFIELD
1111 Broadway, 10th Floor, Oakland, CA 94607 PH: 510-590-9500
FOR: KELLY-MOORE PAINT COMPANY, INC.; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER FAX: 510-590-9595

GLASPY & GLASPY
One Walnut Creek Center, 100 Pringle Ave Ste 750, Walnut Creek, CA 94596 PH: (925) 947-1300
FOR: GARLOCK SEALING TECHNOLOGIES LLC FAX: (925) 947-1594

HAIGHT BROWN & BONESTEEL LLP
71 Stevenson Street, 20th Floor, San Francisco, CA 94105-2981 PH: (415) 546-7500
FOR: KENTILE FLOORS, INC. FAX: 415-546-7505

HASSARD BONNINGTON
2 Embarcadero Center, Suite 1800, San Francisco, CA 94111 PH: (415) 288-9800
FOR: KAISER GYPSUM COMPANY, INC. FAX: (415) 288-9802

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112 PH: (408) 287-7788
FOR: ALLIED PACKING AND SUPPLY FAX: (408) 927-0408

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111 PH: (415) 267-4000
FOR: HEXCEL CORPORATION FAX: (415) 267-4198

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071 PH: 213-688-1000
FOR: HEXCEL CORPORATION FAX: 213-243-6330

PERKINS COIE
1620 26th Street, 6th Floor, Santa Monica, CA 90404 PH: (310) 788-9900
FOR: MCDONNELL DOUGLAS CORPORATION FAX: (310) 843-1284

SERVICE LIST CASE: Vest, Timothy [NE 1430] ACTION #: RG09489518 February 5, 2010 12:01 PM
Page Two

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111
FOR: GEORGIA PACIFIC LLC fka GEORGIA PACIFIC CORPORATION
PH: (415) 344-7000
FAX: (415) 344-7288

SELMAN & BREITMAN
33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105
FOR: KENTILE FLOORS, INC.
PH: (415) 979-0400
FAX: (415) 979-2099

STEPTOE & JOHNSON
633 West Fifth Street, Suite 700, Los Angeles, CA 90071
FOR: METROPOLITAN LIFE INSURANCE COMPANY
PH: (213) 439-9400
FAX: (213) 439-9599

WALSWORTH, FRANKLIN, BEVINS & McCALL
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: HAMILTON MATERIALS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: DOWMAN PRODUCTS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

End of Service List

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page32 of 39
Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 32 of 226

JUN. 3. 2010 7:56AM KAZAN, McCLAIN 510 835 4913 NO. 0732 P. 13

Denise Abrams, Esq. (C.S.B. #124139)
Justin A. Bosl, Esq. (C.S.B. #241117)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

PLAINTIFF'S
EXHIBIT NO.
HALES 4
FOR IDENTIFICATION
4/23/10
SB
DATE:
RPTR:
PENGAD 800-631-6989

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs.

ALLIED PACKING AND SUPPLY, et al.,

Defendants.

No. RG09489518

**NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED**

COR: DATE: **April 28, 2010**
TIME: 9:00 a.m.
PLACE: Kazan, McClain, Lyons, Greenwood & Harley

PMK: DATE: **April 28, 2010**
TIME: 1:00 p.m.
PLACE: Kazan, McClain, Lyons, Greenwood & Harley

TO DEFENDANTS HEREIN AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that plaintiffs, through their counsel, will take the deposition of the Custodian(s) of Records of defendant **World Airways, Inc.** at 9:00 a.m. on **April 28, 2010** at the law offices of Kazan, McClain, Abrams, Lyons, Greenwood & Harley, 171 Twelfth Street, Third Floor, Oakland California, 94607. The deposition will be taken before a duly authorized Notary Public and shall continue from day to day thereafter, until completed.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

NICKEL/484728.1

NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED

1

4

Exhibit 12-412

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 33 of 226

JUN. 3. 2010 7:56AM KAZAN, McCLAIN 510 835 4913 NO. 0732 P. 14

Said deposition may be videotaped pursuant to C.C.P. §§ 2025.220(a)(5), 2025.330(a) and 2025.340. Plaintiffs reserve the right to use the videotaped depositions at trial pursuant to provisions of C.C.P. §§ 2025.220(a)(6) and 2025.620. In addition, the deposition testimony will be recorded stenographically, and/or through instant visual display pursuant to C.C.P. § 2025.220.

The deponent, defendant **World Airways, Inc.**, is a party to this action and is required to produce at deposition, through its Custodian(s) of Records, the following documents, records or other materials that are in the possession or under the control of the defendant or deponent, or in the possession or under the control of defendant's attorneys at the commencement of said deposition:

1. All DOCUMENTS with information regarding DEFENDANT's membership in trade associations during the years 1960 to 1987.

"DEFENDANT" shall refer to defendant, World Airways, Inc., and to its attorneys, agents, employees, officers, parent entities, predecessors, subsidiaries, divisions, and contract units.

"DOCUMENTS" shall mean all writings, as defined in California Evidence Code § 250, including without limitation: all originals and all duplicates of handwriting, typewriting, printing, photostats, photographs, electronic data on any of DEFENDANT's computers, facsimile, e-mail, and every other means of recording upon any tangible thing or other form of communication or representation.

2. All AOLs DEFENDANT received from McDonnell Douglas Corporation at any time.

"AOL" shall mean an All Operator Letter.

3. All correspondence regarding asbestos that DEFENDANT received from McDonnell Douglas Corporation at any time.

4. All correspondence regarding asbestos that DEFENDANT received from manufacturers of aircraft that DEFENDANT operated prior to 1988.

5. All repair manuals for aircraft DEFENDANT operated prior to 1988.

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

INICKEL/484728.1

NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED

2

Exhibit 12-413

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 34 of 226
Case4:11-cv-00061-LB Document27-11 Filed01/10/11 Page34 of 59

JUN. 3. 2010 7:57AM KAZAN, McCLAIN 510 835 4913 NO. 0732 P. 15

6. All maintenance manuals for aircraft DEFENDANT operated prior to 1988.

7. All parts lists for aircraft DEFENDANT operated prior to 1988.

8. All parts specifications for aircraft DEFENDANT operated prior to 1988.

9. All transcripts of sworn testimony given by former or present employees of DEFENDANT in worker's compensation cases filed against DEFENDANT that allege asbestos disease.

10. All exhibits to sworn testimony given by former or present employees of DEFENDANT in worker's compensation cases filed against DEFENDANT that allege asbestos disease.

11. All DOCUMENTS with information regarding AIRCRAFT DEFENDANT operated during the years 1973 through 1984.

"AIRCRAFT" shall refer to the following models of aircraft: DC-IO; Boeing 707, 727, 737 and 747; Lockheed LI00, L188, L1011, MDI1, and 22 YS11.

12. All DOCUMENTS with information regarding the types of work performed in CHECKS during the years 1973 through 1984.

"CHECKS" shall refer to A-Checks, B-Checks, C-Checks, and D-Checks.

YOU ARE FURTHER NOTIFIED THAT THE DEPOSITION OF the PERSON(S) who is MOST QUALIFIED to testify about one or more of the matters set forth below regarding defendant **World Airways, Inc.** will be taken at the law offices of Kazan, McClain, Abrams, Lyons, Greenwood & Harley, 171 Twelfth Street, Third Floor, Oakland, California 94607 commencing at 1:00 p.m. **April 28, 2010**. The deposition will be taken before a duly authorized Notary Public and shall continue from day to day thereafter, until completed.

Said deposition may be videotaped pursuant to C.C.P. §§ 2025.220(a)(5), 2025.330(a) and 2025.340. Plaintiffs reserve the right to use the videotaped depositions at trial pursuant to provisions of C.C.P. §§ 2025.220(a)(6) and 2025.620. In addition, the deposition testimony will be recorded stenographically, and/or through instant visual display pursuant to C.C.P. § 2025.220.

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

NICKEL/484728.1

NOTICE OF TAKING DEPOSITION OF DEFENDANT WORLD AIRWAYS, INC.'S CUSTODIAN OF RECORDS AND PERSON(S) MOST QUALIFIED

3

Exhibit 12-414

The deponent, defendant **World Airways, Inc.**, is not a natural person and is therefore required, pursuant to Code of Civil Procedure § 2025.230 to designate its "Person(s) Most Qualified" to testify regarding each of the matters set forth below.

1. DEFENDANT's membership in trade associations during the years 1960 to 1987.

2. AOLs DEFENDANT received from McDonnell Douglas Corporation at any time.

3. Contacts and communications regarding asbestos between McDonnell Douglas Corporation and DEFENDANT at any time.

4. Contacts and communications regarding asbestos between DEFENDANT and manufacturers of aircraft that DEFENDANT operated prior to 1988.

5. Worker's compensation cases filed against DEFENDANT that allege asbestos disease.

6. The types of work performed in CHECKS during the years 1973 through 1984.

A list of all parties or attorneys for parties on whom this Notice of Deposition is being served is shown on the accompanying Proof of Service.

DATED: April 6, 2010

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation

By [signature]
Justin A. Bosl
Attorneys for Plaintiffs

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

## PROOF OF SERVICE

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.* Alameda County Superior Court No. RG09489518

I declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. On **April 6, 2010**, I served the following document(s):

**Notice of Taking Deposition of Defendant World Airways, Inc.'s Custodian of Records and Person(s) Most Qualified**

by transmitting a true copy via the following methods:

________ (By Facsimile) By personally transmitting a true copy thereof via facsimile to

________ (By PERSONAL SERVICE) By causing to be hand delivered via Modern Express Courier, tracking number________ a true copy thereof to

________ (By OVERNIGHT DELIVERY) By delivering to an authorized courier authorized by the express service to receive documents or depositing in a box or other facility regularly maintained by the express carrier a true copy thereof, on this date, and addressed to

XX (By U.S. MAIL) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business, in an envelope addressed to **All Counsel [See attached service list]**

I declare under penalty of perjury that the foregoing is true and correct. Executed on **April 6, 2010** at Oakland, California.

Chehie Songstad

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

CSONGSTAD/471606.1

SERVICE LIST CASE: Vest, Timothy [... 1430] ACTION #: RG09489..8 April 6, 2010 3:02 PM

BECHERER, KANNETT & SCHWEITZER
1255 Powell Street, , Emeryville, CA 94608-2604 PH: (510) 658-3600 FAX: (510) 658-1151
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD COMPANY; CYPRUS AMAX MINERALS COMPANY

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610 PH: (510) 835-8330 FAX: (510) 835-5117
FOR: DESIGNATED DEFENSE COUNSEL

BRYAN CAVE LLP
2 Embarcadero Center, Suite 1410, San Francisco, CA 94111 PH: 415-675-3400 FAX: 415-675-3434
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.

BRYAN CAVE, LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2305 PH: (310) 576-2100 FAX: (310) 576-2200
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019 PH: (510) 864-3600 FAX: (510) 864-3601
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION

COUNSEL UNKNOWN
FOR: LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION; MCDERMOTT/SEALY, INC.; PLANT INSULATION BANKRUPTCY

FOLEY & MANSFIELD
1111 Broadway, 10th Floor, Oakland, CA 94607 PH: 510-590-9500 FAX: 510-590-9595
FOR: KELLY-MOORE PAINT COMPANY, INC.; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER

GLASPY & GLASPY
One Walnut Creek Center, 100 Pringle Ave Ste 750, Walnut Creek, CA 94596 PH: (925) 947-1300 FAX: (925) 947-1594
FOR: GARLOCK SEALING TECHNOLOGIES LLC

HASSARD BONNINGTON
2 Embarcadero Center, Suite 1800, San Francisco, CA 94111 PH: (415) 288-9800 FAX: (415) 288-9802
FOR: KAISER GYPSUM COMPANY, INC.

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112 PH: (408) 287-7788 FAX: (408) 927-0408
FOR: ALLIED PACKING AND SUPPLY

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111 PH: (415) 267-4000 FAX: (415) 267-4198
FOR: HEXCEL CORPORATION

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071 PH: 213-688-1000 FAX: 213-243-6330
FOR: HEXCEL CORPORATION

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111 PH: (415) 344-7000 FAX: (415) 344-7288
FOR: GEORGIA PACIFIC LLC fka GEORGIA PACIFIC CORPORATION

SEDGWICK, DETERT, MORAN & ARNOLD
One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105 PH: (415) 781-7900 FAX: (415) 781-2635
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES

SERVICE LIST CASE: Vest, Timothy [... 1430] ACTION #: RG0948...8 April 6, 2010 3:02 PM
Page Two

SELMAN & BREITMAN
33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105
FOR: KENTILE FLOORS, INC.
PH: (415) 979-0400
FAX: (415) 979-2099

STEPTOE & JOHNSON
633 West Fifth Street, Suite 700, Los Angeles, CA 90071
FOR: METROPOLITAN LIFE INSURANCE COMPANY
PH: (213) 439-9400
FAX: (213) 439-9599

THE MAU LAW FIRM
950 Harrison Street, Suite 213, San Francisco, CA 94107
FOR: GEORGE E. MASKER, INC.
PH: 415-495-8082
FAX: 415-495-8084

WALSWORTH, FRANKLIN, BEVINS & McCALL
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: HAMILTON MATERIALS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: DOWMAN PRODUCTS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WILLIAMS KASTNER
Two Union Square, 601 Union Street, Suite 4100, Seattle, WA 98101
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES
PH: 206-628-6621
FAX: 206-628-6611

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
525 Market Street, 17th Floor, San Francisco, CA 94105-2722
FOR: F.P. LATHROP CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION
PH: (415) 433-0990
FAX: (415) 434-1370

End of Service List

# KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY

*A Professional Law Corporation*

Steven Kazan
David M. McClain
Dianna Lyons
Gordon D. Greenwood
Philip A. Harley
James L. Oberman*

171 Twelfth Street, Third Floor
Oakland, California 94607
(510) 302-1000 • (510) 465-7728
FAX: (510) 835-4913
e-mail: postmaster@kazanlaw.com
www.kazanlaw.com

Of Counsel
Denise Abrams
Francis E. Fernandez
Frances C. Schreiberg

Andrea Huston
Petra DeJesus
Ian A. Rivamonte
Matthew L. Thiel
Barbra Ferre
Justin A. Bosl
Ariel D. Clark
Michael T. Stewart
Daniel Wasson
William F. Ruiz
Elina Agnoli
Rafael Vazquez

## FACSIMILE COVER SHEET

____________________
Date

**PLEASE DELIVER TO:**

Justin Bosl — Fax No. 770-486-8822

____________________ Fax No. ____________

____________________ Fax No. ____________

____________________ Fax No. ____________

**FROM:** Troy K. Cartwright
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY

**RE:** World Depo Notices

Transmitting a total of __________ pages including this cover page. If you do not receive all of the pages, please call ______________ as soon as possible at (510) 302-1000.

Remarks: ______________________________________________

[ ] Original will not follow. [ ] Original will follow via ______________

IMPORTANT/CONFIDENTIAL: *This message contains information from the law firm Kazan, McClain, , Lyons, Greenwood & Harley which may be privileged, confidential and exempt from disclosure under applicable law. If you have received this communication in error, please notify us immediately at our phone number set forth above, and we will be happy to arrange for the return of this message via United States Postal Service to us at no cost to you. Please do not disseminate, distribute or copy this communication. THANK YOU*

JTRINH/243486.1

*Certified Appellate Specialist, The State Bar of California Board of Legal Specialization

Meet + Confer 6/7
Last Day to File MTC 7/13

**BRYAN CAVE LLP**
James Goldberg, California Bar No. 107990
Two Embarcadero Center, Suite 1410
San Francisco, California 94111
Telephone: (415) 675-3400
Facsimile: (415) 675-3434

**BRYAN CAVE LLP**
James C. Pettis, California Bar No. 223953
M. Angela Buenaventura, California Bar No. 264130
120 Broadway, Suite 300
Santa Monica, California 90401
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys For Defendant
WORLD AIRWAYS, INC.

RECEIVED
MAY 2 5 2010
PAA/TAB/ENA/TFC
KAZAN, McCLAIN, LYONS
GREENWOOD & HARLEY
Records

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF ALAMEDA**

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLIED PACKING AND SUPPLY, et al.,<br><br>Defendants. | Case No. RG09489518<br><br>Assigned for all pre-trial purposes to the Hon. Kenneth Mark Burr<br><br>**DEFENDANT WORLD AIRWAYS, INC.'S AMENDED RESPONSES TO SPECIAL INTERROGATORIES, SET ONE** |

PLAINTIFF'S EXHIBIT NO. Hales 6
FOR IDENTIFICATION
DATE: 6/3/10 RPTR: SB
PENGAD 800-631-6989

PROPOUNDING PARTIES: TIMOTHY AND CAROLINE VEST

RESPONDING PARTY: WORLD AIRWAYS, INC.

SET NO.: ONE (1)

**INTRODUCTION**

World Airways has not completed its investigation or its discovery relating to this action or its preparation for trial. Consequently, the following responses are given without prejudice to World Airways' right to produce, at the time of any trial, subsequently discovered evidence.

**RESPONSE TO SPECIAL INTERROGATORIES**

**INTERROGATORY NO. 1**

Please IDENTIFY each individual who provided information for the preparation of DEFENDANT's responses to this set of interrogatories.

"IDENTIFY" shall refer to the full name, current or last known address, and telephone number, and if individual is or was an employee of DEFENDANT, all job titles, of the named individual(s) or entity(ies).

"DEFENDANT" shall refer to defendant, World Airways, Inc., and to its attorneys, agents, employees, officers, parent entities, predecessors, subsidiaries, divisions, and contract units.

**RESPONSE TO INTERROGATORY NO. 1**

James Hales, Vice President Technical Operations (Mr. Hales may be contacted only through counsel); Malcolm Benge, former General Counsel (Mr. Benge may be contacted only through counsel); George Wagenseller, telephone (360) 424-7771; Richard Kalman, (510) 537-8962; Claude Fross, former World Airways Employee, (760) 251-2730; Mick Wurth, telephone (650) 961-8468; Joseph D'Antonio, telephone (916) 7991-3254; John Savage, former employee of McDermott Sealy Plastering, telephone (925) 462-0175; Anthony Albers, former Word Airways employee (216) 210-7727.

**INTERROGATORY NO. 2**

Please IDENTIFY each individual who was consulted in the course of the preparation of DEFENDANT's responses to these interrogatories.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case4:11-cv-00061-LB Document7-11 Filed01/10/11 Page42 of 97

**RESPONSE TO INTERROGATORY NO. 2**

See Response to No. 1.

**INTERROGATORY NO. 3**

Please describe fully all INVESTIGATIONS undertaken by DEFENDANT to obtain the information sought in these interrogatories.

"INVESTIGATIONS" shall refer to all research, interviews, communications and other efforts to obtain information.

**RESPONSE TO INTERROGATORY NO. 3**

World Airways objects to this interrogatory because it demands information protected by the attorney-client communication privilege and work product doctrine.

**INTERROGATORY NO. 4**

Please set forth DEFENDANT's RECORD RETENTION POLICIES.

"RECORD RETENTION POLICY(IES)" shall refer to any policy, formal or informal, pursuant to which defendant's DOCUMENTS are maintained or destroyed, including the legal and financial basis for deciding how long to retain documents, the period of time required and what categories of documents are subject to defendant's document retention policy.

"DOCUMENTS" shall mean all writings, as defined in California Evidence Code § 250, including without limitation all originals and all duplicates of handwriting, typewriting, printing, photostats, photographs, electronic data on any of DEFENDANT's computers, facsimile, e-mail, and every other means of recording upon any tangible thing or other form of communication or representation.

**RESPONSE TO INTERROGATORY NO. 4**

Pursuant to C.C.P. § 2030.210(a)(2), World Airways refers Plaintiffs to the produced record retention policies.

**INTERROGATORY NO. 5**

Please state the inclusive years in which DEFENDANT OCCUPIED HANGER 110.

"OCCUPY," "OCCUPIED" and "OCCUPATION" shall refer to DEFENDANT's use of said facility, whether as owner, renter or lessor.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

"HANGER 110" shall refer to World Airways Hanger 110, 1100 Airport Drive, Oakland, California, also known as the George P. Miller World Air Center and as the Oakland Maintenance Center Hanger, and to any associated offices, structures, shops, sheds, or buildings.

**RESPONSE TO INTERROGATORY NO. 5**

1973 to 1987.

**INTERROGATORY NO. 6**

In what manner (e.g., as owner, renter, or lessor) did DEFENDANT OCCUPY HANGER 110.

**RESPONSE TO INTERROGATORY NO. 6**

World Airways leased Hanger 110 from the Port of Oakland.

**INTERROGATORY NO. 7**

Please IDENTIFY all individuals who have knowledge concerning DEFENDANT's OCCUPATION of HANGER 110.

**RESPONSE TO INTERROGATORY NO. 7**

World Airways objects to this interrogatory as vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome. Subject to these objections, World Airways responds: Claude Fross, Malcolm Benge, James Hales.

**INTERROGATORY NO. 8**

Please DESCRIBE all DOCUMENTS that contain information regarding DEFENDANT's OCCUPATION of HANGER 110.

"DESCRIBE" shall refer to a complete description that is sufficient for the requirements of a request for production of documents under Chapter 14 of the Civil Discovery Code.

**RESPONSE TO INTERROGATORY NO. 8**

World Airways objects to this interrogatory as assuming it has such documents and as unduly burdensome. Subject to these objections, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 9**

Please state the date(s) of original construction of HANGER 110.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case4:11-cv-00061-LB Document7-11 Filed01/10/11 Page44 of 59

**RESPONSE TO INTERROGATORY NO. 9**

Based on information and belief, the Port of Oakland constructed Hanger 110 in 1972 and 1973.

**INTERROGATORY NO. 10**

Please IDENTIFY all person(s) with any knowledgeable [sic] regarding the original construction of HANGER 110.

**RESPONSE TO INTERROGATORY NO. 10**

World Airways objects pursuant to C.C.P. § 2030.220 that it does not have knowledge sufficient to respond and the information is equally available to Plaintiff. Subject to this objection, World Airways responds: Although he did not supervise the construction of HANGER 110, Claude Fross can identify which components of Hanger 110 were constructed by the Port before World Airways occupied the Hanger.

**INTERROGATORY NO. 11**

Please DESCRIBE all DOCUMENTS that contain information regarding the original construction of HANGER 110.

**RESPONSE TO INTERROGATORY NO. 11**

World Airways objects to this interrogatory as assuming it has such documents and as unduly burdensome. Subject to these objections, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 12**

Was any WORK conducted on HANGER 110 between its original construction and 1984?

"WORK" shall refer to construction, refurbishing, remodeling, handling, renovating, installation, manipulation, removal, repair and/or maintenance work.

**RESPONSE TO INTERROGATORY NO. 12**

World Airways objects to this interrogatory as not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Subject to these objections, World Airways responds: Yes.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**INTERROGATORY NO. 13**

Please set forth fully all WORK conducted on HANGER 110 at any time between its original construction and 1984.

**RESPONSE TO INTERROGATORY NO. 13**

World Airways objects to this interrogatory as vague, ambiguous, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Subject to these objections, World Airways responds: Based on information and belief, beginning in about 1975, World Airway's carpenters and electricians constructed about a dozen offices in Core A and B using lumber, sheetrock and mud. First, the crew built about six offices in Core A on the third and fourth floors using sheetrock; several years later, in approximately 1978, the crew built about six offices in Core B using sheetrock. At some point, they also built an office for the founder of World Airways, but did not use sheetrock in that office. In addition, the crew assembled offices and carrels out of pre-fabricated metal components. The office walls they constructed were curtain walls that went from the pre-existing floor to the ceiling tiles that were installed by the Port as part of the Port's original construction of the space.

**INTERROGATORY NO. 14**

Please state the inclusive dates of all WORK conducted on HANGER 110 between its original construction and 1984.

**RESPONSE TO INTERROGATORY NO. 14**

World Airways objects to this interrogatory as vague, ambiguous, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Subject to these objections, World Airways responds: See Response No. 13 above.

**INTERROGATORY NO. 15**

Please IDENTIFY all individuals who have any knowledge of WORK conducted on HANGER 110 between its original construction and 1984.

**RESPONSE TO INTERROGATORY NO. 15**

World Airways objects to this interrogatory as vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome. Subject to

these objections, World Airways responds: Claude Fross.

**INTERROGATORY NO. 16**

Please DESCRIBE all DOCUMENTS that contain information regarding WORK conducted on HANGER 110 between its original construction and 1984.

**RESPONSE TO INTERROGATORY NO. 16**

World Airways objects to this interrogatory as assuming it has such documents and as unduly burdensome. Subject to these objections, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 17**

Did DEFENDANT SUPERVISE any WORK conducted on HANGER 110 at any time prior to 1984?

"SUPERVISING," "SUPERVISION," and "SUPERVISE" shall refer to inspecting, reviewing, overseeing, managing, directing the details of the work, and/or approving the work.

**RESPONSE TO INTERROGATORY NO. 17**

World Airways objects to this interrogatory as vague, ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Subject to these objections, World Airways responds: Yes.

**INTERROGATORY NO. 18**

Please fully describe the nature of DEFENDANT's SUPERVISION of WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 18**

World Airways objects to this interrogatory as vague, ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Subject to these objections, World Airways responds that after it occupied Hanger 110 its employees built out offices as described in Response to Interrogatory No. 13 above, and their work was supervised by a foreman.

**INTERROGATORY NO. 19**

Please IDENTIFY each individual responsible for SUPERVISING WORK on HANGER

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 19**

World Airways objects to this interrogatory as vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome. Subject to these objections, World Airways responds: Cecil Thomas (address unknown) was the foreman of the work crew.

**INTERROGATORY NO. 20**

Please IDENTIFY all individuals who have knowledge regarding DEFENDANT's SUPERVISION of WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 20**

World Airways objects to this interrogatory as vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome. Subject to these objections, World Airways responds: Claude Fross.

**INTERROGATORY NO. 21**

Please DESCRIBE all DOCUMENTS that contain information regarding DEFENDANT's SUPERVISION of WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 21**

World Airways objects to this interrogatory as assuming it has such documents and as unduly burdensome. Subject to these objections, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 22**

Please IDENTIFY all CONTRACTORS who did any WORK on HANGER 110 at any time prior to 1984.

"CONTRACTORS" shall refer to all contractors and sub-contractors, including but not limited to general contractors, insulation contractors, erection contractors, setting contractors, heating, ventilation and air conditioning (HVAC) contractors, fireproofing application contractors, boiler installation contractors, sheet metal contractors, drywall contractors, plastering contractors, acoustical materials contractors, mechanical contractors, plumbing contractors, electrical

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

contractors, flooring contractors, and/or wall finishing contractors.

**RESPONSE TO INTERROGATORY NO. 22**

World Airways objects to this interrogatory as vague, ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. World Airways objects pursuant to C.C.P. § 2030.220 that it does not have knowledge sufficient to respond and the information is equally available to Plaintiff. Subject to these objections, World Airways responds: Based on information and belief, McDermott Sealy Plastering may have done some work on the original construction by the Port of Oakland.

**INTERROGATORY NO. 23**

Please fully set forth all WORK done by each CONTRACTOR on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 23**

World Airways objects to this interrogatory as vague, ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. World Airways objects pursuant to C.C.P. § 2030.220 that the information is equally available to Plaintiff. Subject to these objections, World Airways responds: Based on information and belief, the Port hired contractors to construct and finish Hanger 110 and its three core buildings, including the first and second floor offices and shops in Cores A, B and C, the third floor storage in Core C, third and fourth floor offices in the portion of Core A located outside of the hangar wall, and structural steel (but no slab) for future third floor in Core B and the portion of Core A inside of the hangar wall, with fireproofing, plumbing, electrical and HVAC, so that the entire leased premises was fully ready for occupancy and use by World Airways when it moved in, in 1973.

**INTERROGATORY NO. 24**

Please state the inclusive dates of all WORK done by each CONTRACTOR on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 24**

World Airways objects to this interrogatory as vague, ambiguous, not reasonably

calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. World Airways objects pursuant to C.C.P. § 2030.220 that the information is equally available to Plaintiff. Subject to these objections, World Airways responds that the Port's contractors constructed and finished Hanger 110 in 1972 and 1973.

**INTERROGATORY NO. 25**

Please IDENTIFY all individuals who have knowledge of WORK done by CONTRACTORS on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 25**

World Airways objects to this interrogatory as vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome. World Airways objects pursuant to C.C.P. § 2030.220 that the information is equally available to Plaintiff. Subject to these objections, World Airways responds: Claude Fross.

**INTERROGATORY NO. 26**

Please DESCRIBE all DOCUMENTS that contain information regarding WORK done by CONTRACTORS on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 26**

World Airways objects to this interrogatory as assuming it has such documents and as unduly burdensome. Subject to these objections, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 27**

Were any ASBESTOS-CONTAINING PRODUCTS USED during any WORK on HANGER 110 prior to 1984?

"ASBESTOS-CONTAINING PRODUCTS" shall refer to any and all products that contain any asbestos dust or fiber, including but not limited to pipe covering, refractory materials, block, cloth, cement, adhesives, drywall and joint compounds, sheetrock, topping compounds, tape, textures, paper, aircell, duct insulation materials, fireproofing sprays, transite board, transite pipe, acoustical materials, floor tiles, ceiling tiles, welding blankets, packing materials, insulated electrical wiring and cables, gaskets, rope, millboard, brick, hot tops, hot toppings, plastics,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

moldings, packing, side boards, insulated electrical switches, insulation, and product(s) used in conjunction with burners, gauges, pumps, boilers, furnaces, condensers and/or feedwater heaters.

"USE," "USED" shall refer to the installation, removal, repair, handling, disturbance, or manipulation in any manner of said products.

**RESPONSE TO INTERROGATORY NO. 27**

World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110. It does not have sufficient information to state whether ASBESTOS CONTAINING PRODUCTS were used prior to its occupation of HANGER 110.

**INTERROGATORY NO. 28**

Please NAME each ASBESTOS-CONTAINING PRODUCT USED during WORK on HANGER 110 at any time prior to 1984.

"NAME" shall refer to the name of the product, whether trade, brand, generic, or by manufacturer or model.

**RESPONSE TO INTERROGATORY NO. 28**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110. It does not have sufficient information to state whether ASBESTOS-CONTAINING PRODUCTS were used prior to its occupation of HANGER 110.

**INTERROGATORY NO. 29**

Please IDENTIFY all individuals who have knowledge regarding the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 29**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110; it does not have sufficient information to state whether ASBESTOS-CONTAINING

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

PRODUCTS were used prior to its occupation of HANGER 110; it is unable to identify any such individual.

**INTERROGATORY NO. 30**

Please DESCRIBE all DOCUMENTS that contain information regarding the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 30**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information or documents that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110.

**INTERROGATORY NO. 31**

Please IDENTIFY who SPECIFIED the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

"SPECIFICATION", "SPECIFIED", SPECIFY" shall mean to require, suggest, recommend, call for, designate, and/or direct the use of a particular product or material.

**RESPONSE TO INTERROGATORY NO. 31**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110; it does not have sufficient information to state whether ASBESTOS-CONTAINING PRODUCTS were used prior to its occupation of HANGER 110.

**INTERROGATORY NO. 32**

Please IDENTIFY all individuals who have knowledge of who SPECIFIED the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 32**

World Airways objects that this interrogatory is argumentative.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110; it does not have sufficient information to state whether ASBESTOS-CONTAINING PRODUCTS were used prior to its occupation of HANGER 110; it is unable to identify any such individual.

**INTERROGATORY NO. 33**

Please DESCRIBE all DOCUMENTS that contain information regarding who SPECIFIED the USE of ASBESTOS-CONTAINING PRODUCTS during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 33**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information or documents that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110.

**INTERROGATORY NO. 34**

Did DEFENDANT have any role in the SPECIFICATION of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 34**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: No; World Airways did not specify the use of ASBESTOS-CONTAINING PRODUCTS during its occupation of HANGER 110.

**INTERROGATORY NO. 35**

Please set forth fully DEFENDANT's role in the SPECIFICATION of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 35**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways did not specify the use of ASBESTOS-CONTAINING PRODUCTS during its occupation of HANGER 110.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**INTERROGATORY NO. 36**

Please IDENTIFY all individuals who have knowledge regarding DEFENDANT's role in the SPECIFICATION of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 36**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways did not specify the use of ASBESTOS-CONTAINING PRODUCTS during its occupation of HANGER 110; thus it is unable to identify any such individual.

**INTERROGATORY NO. 37**

Please DESCRIBE all DOCUMENTS that contain information regarding DEFENDANT's role in the SPECIFICATION of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 37**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information or documents that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110.

**INTERROGATORY NO. 38**

Please IDENTIFY the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 any time prior to 1984.

"SOURCE(S)" shall refer to and include but not be limited to manufacturers, distributors, wholesalers, resellers, jobbers, brokers, agents or other entities.

**RESPONSE TO INTERROGATORY NO. 38**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110; it has no information regarding the source of any product used in the initial construction of

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Hanger 110 by the Port's contractors.

**INTERROGATORY NO. 39**

Please IDENTIFY all individuals who have knowledge regarding the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 39**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110; it has no information regarding the source of any product used in the initial construction of Hanger 110 by the Port's contractors; thus it is unable to identify any such individual.

**INTERROGATORY NO. 40**

Please DESCRIBE all DOCUMENTS that contain information regarding the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during WORK on HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 40**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: World Airways has no information that ASBESTOS-CONTAINING PRODUCTS were USED during its occupation of HANGER 110; it has no information or documents regarding the source of any product used in the initial construction of Hanger 110 by the Port's contractors.

**INTERROGATORY NO. 41**

Did DEFENDANT perform any aircraft maintenance at HANGER 110 between 1973 and 1984?

**RESPONSE TO INTERROGATORY NO. 41**

Yes.

**INTERROGATORY NO. 42**

Please state the inclusive dates that DEFENDANT performed aircraft maintenance at

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 42**

1973-1984.

**INTERROGATORY NO. 43**

Please state all models of aircraft upon which DEFENDANT performed aircraft maintenance at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 43**

DC-8, DC-10, Boeing 707, 727, 737 and 747; Lockheed L100, L188 and L1011.

**INTERROGATORY NO. 44**

Please set forth fully the extent of aircraft maintenance that DEFENDANT performed at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 44**

World Airways responds: A-Checks, B-Checks, C-Checks and D-Checks; general and system repairs; structural repairs; engine changes; modifications; passenger to freight and freight to passenger conversions, passenger cabin reconfigurations; aircraft painting, and aircraft cleaning.

**INTERROGATORY NO. 45**

Please IDENTIFY all individuals who have knowledge of aircraft maintenance performed by DEFENDANT at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 45**

James Hales (Mr. Hales may be contacted only through counsel); Joe D'Antonio.

**INTERROGATORY NO. 46**

Please DESCRIBE all DOCUMENTS that contain information regarding aircraft maintenance DEFENDANT performed at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 46**

World Airways objects to this interrogatory as unduly burdensome. Subject to this objection, World Airways responds that it has no information or documents responsive to this interrogatory.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**INTERROGATORY NO. 47**

Did any aircraft maintenance performed by DEFENDANT at HANGER 110 between 1973 and 1984 involve the USE of ASBESTOS-CONTAINING PRODUCTS?

**RESPONSE TO INTERROGATORY NO. 47**

World Airways objects to this interrogatory as calling for expert opinion regarding whether certain aircraft parts contained asbestos. Subject to this objection, World Airways responds: In 1989 and 1992, McDonnell Douglas reportedly sent all DC-8, DC-9, MD-80 and DC-10 operators, which World Airways was, an "All Operator Letter" or "AOL" that listed parts its suppliers had identified as containing asbestos. In the course of its aircraft maintenance at Hangar 110 between 1973 and 1984, World Airways may have removed or used some of those items in its aircraft maintenance, including tape, harness clamps, engine valve heat blankets, and brake assemblies; however, World Airways no longer has its servicing records from the period 1973 to 1984, so it cannot identify precisely which products were removed or used during that time period.

**INTERROGATORY NO. 48**

Please set forth all aircraft maintenance performed by DEFENDANT at HANGER 110 between 1973 and 1984 that involved the USE of ASBESTOS-CONTAINING PRODUCTS.

**RESPONSE TO INTERROGATORY NO. 48**

World Airways objects that this interrogatory is argumentative.

See Response No. 47 above.

**INTERROGATORY NO. 49**

Please NAME all ASBESTOS-CONTAINING PRODUCTS USED by DEFENDANT during aircraft maintenance at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 49**

World Airways objects that this interrogatory is argumentative.

See Response No. 47 above.

**INTERROGATORY NO. 50**

Please IDENTIFY all individuals who have knowledge of DEFENDANT's USE of ASBESTOS-CONTAINING PRODUCTS during aircraft maintenance at HANGER 110 between

1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 50**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: James Hales.

**INTERROGATORY NO. 51**

Please DESCRIBE all DOCUMENTS that contain information regarding DEFENDANT's USE of ASBESTOS-CONTAINING PRODUCTS during aircraft maintenance at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 51**

World Airways objects that this interrogatory is argumentative. See Response No. 47 above.

**INTERROGATORY NO. 52**

Please IDENTIFY the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during aircraft maintenance at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 52**

World Airways objects that this interrogatory is argumentative.

See Response No. 47 above.

**INTERROGATORY NO. 53**

Please IDENTIFY all individuals who have knowledge regarding the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during aircraft maintenance at HANGER 110 between 1973 and 1984.

**RESPONSE TO INTERROGATORY NO. 53**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: James Hales.

**INTERROGATORY NO. 54**

Please DESCRIBE all DOCUMENTS that contain information regarding the SOURCE(S) of ASBESTOS-CONTAINING PRODUCTS USED during aircraft maintenance at HANGER 110 between 1973 and 1984.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**RESPONSE TO INTERROGATORY NO. 54**

Based on information and belief, World Airways objects to this interrogatory as argumentative. See Response No. 47 above.

**INTERROGATORY NO. 55**

Did DEFENDANT have any SAFETY MEASURES in effect at the HANGER 110 at any time prior to 1984?

"SAFETY MEASURES" shall refer to all wet down procedures, segregated work areas, ventilation systems, warnings, instructions, and/or provision of respiratory devices, intended to reduce the risk of exposure to asbestos.

**RESPONSE TO INTERROGATORY NO. 55**

Based on information and belief, World Airways did not have any safety measures intended specifically to reduce the risk of exposure to asbestos; it did have safety measures intended to reduce the risk of exposure to workplace chemicals generally, including training instruction, respiratory devices and segregated work areas.

**INTERROGATORY NO. 56**

Please set forth fully all SAFETY MEASURES DEFENDANT had in effect at HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 56**

See Response No. 55.

**INTERROGATORY NO. 57**

Please IDENTIFY all individuals who have knowledge of any SAFETY MEASURES DEFENDANT had in effect at HANGER 110 at any time prior to 1984.

**RESPONSE TO INTERROGATORY NO. 57**

Anthony Albers (216-210-7727).

**INTERROGATORY NO. 58**

Please DESCRIBE all DOCUMENTS that contain information regarding any SAFETY MEASURES DEFENDANT had in effect at HANGER 110 any time prior to 1984.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**RESPONSE TO INTERROGATORY NO. 58**

World Airways has no responsive information or documents.

**INTERROGATORY NO. 59**

Please set forth all information DEFENDANT provided to anyone prior to 1984 regarding the HANDLING OF ASBESTOS.

"HANDLING OF ASBESTOS" shall refer to how to process, use, and/or handle asbestos materials to minimize dust and exposure to dust.

**RESPONSE TO INTERROGATORY NO. 59**

World Airways has no responsive information.

**INTERROGATORY NO. 60**

Please IDENTIFY all individuals who have knowledge regarding DEFENDANT providing information regarding the HANDLING OF ASBESTOS to anyone prior to 1984.

**RESPONSE TO INTERROGATORY NO. 60**

Not applicable.

**INTERROGATORY NO. 61**

Please DESCRIBE all DOCUMENTS DEFENDANT provided to anyone prior to 1984 regarding the HANDLING OF ASBESTOS.

**RESPONSE TO INTERROGATORY NO. 61**

World Airways has no information or documents responsive to this interrogatory.

**INTERROGATORY NO. 62**

Please set forth fully all information DEFENDANT provided to anyone regarding the HAZARDS OF ASBESTOS.

"HAZARDS OF ASBESTOS" shall refer to the deadly nature of asbestos, including but not limited to the hazards of inhaling asbestos fibers which may include, disability, disease, and death.

**RESPONSE TO INTERROGATORY NO. 62**

World Airways has no responsive information.

Case 4:11-cv-00061-LB Document 1-7 Filed 01/10/11 Page 60 of 97

**INTERROGATORY NO. 63**

Please IDENTIFY all individuals who have knowledge regarding DEFENDANT providing information regarding the HAZARDS OF ASBESTOS to anyone prior to 1984.

**RESPONSE TO INTERROGATORY NO. 63**

World Airways has no responsive information.

**INTERROGATORY NO. 64**

Please DESCRIBE all DOCUMENTS DEFENDANT provided to anyone prior to 1984 regarding the HAZARDS OF ASBESTOS.

**RESPONSE TO INTERROGATORY NO. 64**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 65**

Were any DUST STUDIES ever done at HANGER 110 at any time?

"DUST STUDIES" shall refer to any tests, studies, and/or surveys, to determine ambient asbestos dust levels at said location.

**RESPONSE TO INTERROGATORY NO. 65**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 66**

Please state the dates of any DUST STUDIES done at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 66**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 67**

Please IDENTIFY any ENTITIES who performed any DUST STUDIES at the HANGER 110.

**RESPONSE TO INTERROGATORY NO. 67**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 68**

Please set forth fully the results of any DUST STUDIES conducted at HANGER 110.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**RESPONSE TO INTERROGATORY NO. 68**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 69**

Please IDENTIFY all individuals who have knowledge of any DUST STUDIES conducted at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 69**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 70**

Please DESCRIBE all DOCUMENTS which contain information regarding DUST STUDIES conducted at the HANGER 110.

**RESPONSE TO INTERROGATORY NO. 70**

World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 71**

Has any ASBESTOS ABATEMENT been conducted on HANGER 110.

"ASBESTOS ABATEMENT" shall refer to any and all removal, containment and/or encapsulation of asbestos, asbestos surveys studies, and/or asbestos containment.

**RESPONSE TO INTERROGATORY NO. 71**

World Airways objects that this interrogatory calls for expert opinion regarding whether material contained asbestos. Subject to that objection, World Airways responds that is has insufficient information to answer. Based on information and belief, some fireproofing that may have contained asbestos may have been removed by a contractor from a beam in a workshop on the first floor of Core B sometime during World Airways' occupation of Hangar 110. World Airways is unable to identify the contractor.

**INTERROGATORY NO. 72**

Please set forth fully all ASBESTOS ABATEMENT conducted on HANGER 110.

**RESPONSE TO INTERROGATORY NO. 72**

See Response No. 71.

**INTERROGATORY NO. 73**

Please state the date(s) of any ASBESTOS ABATEMENT conducted on HANGER 110.

**RESPONSE TO INTERROGATORY NO. 73**

See Response No. 71.

**INTERROGATORY NO. 74**

Please IDENTIFY all CONTRACTORS who performed ASBESTOS ABATEMENT on HANGER 110.

**RESPONSE TO INTERROGATORY NO. 74**

See Response No. 71.

**INTERROGATORY NO. 75**

Please IDENTIFY any individuals who have knowledge of any ASBESTOS ABATEMENT conducted on HANGER 110.

**RESPONSE TO INTERROGATORY NO. 75**

World Airways objects to this interrogatory as argumentative. Subject to that objection, World Airways responds: Claude Fross.

**INTERROGATORY NO. 76**

Please DESCRIBE all DOCUMENTS that contain information regarding any ASBESTOS ABATEMENT conducted on HANGER 110.

**RESPONSE TO INTERROGATORY NO. 76**

World Airways responds that it has no information or documents responsive to this interrogatory.

**INTERROGATORY NO. 77**

Has any person filed a Workers' Compensation claim for an asbestos-related injury against DEFENDANT?

**RESPONSE TO INTERROGATORY NO. 77**

No.

**INTERROGATORY NO. 78**

Please CLASSIFY each Workers' Compensation claim made for an asbestos-related injury

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page63 of 97

against DEFENDANT.

"CLASSIFY" shall refer to the date of the claim, the name of the claimant, the case number, and the court in which the claim was filed.

**RESPONSE TO INTERROGATORY NO. 78**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: Not applicable.

**INTERROGATORY NO. 79**

Please IDENTIFY all individuals who have knowledge regarding each Workers' Compensation claim made for an asbestos-related injury against DEFENDANT.

**RESPONSE TO INTERROGATORY NO. 79**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: Not applicable.

**INTERROGATORY NO. 80**

Please DESCRIBE all DOCUMENTS that contain information regarding each Workers' Compensation claim made for an asbestos-related injury against DEFENDANT.

**RESPONSE TO INTERROGATORY NO. 80**

World Airways objects to this interrogatory as argumentative. Subject to this objection, World Airways responds that it has no information or documents responsive to this interrogatory.

**INTERROGATORY NO. 81**

Has DEFENDANT ever had any communications with OAKLAND regarding the presence of asbestos at HANGER 110?

"OAKLAND" shall refer to The City of Oakland, including but not limited to The Port of Oakland, The Board of Port Commissioners, and to their attorneys, agents, employees, and officers.

**RESPONSE TO INTERROGATORY NO. 81**

No.

**INTERROGATORY NO. 82**

Please set forth fully all communications between DEFENDANT and OAKLAND

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 82**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: Not applicable.

**INTERROGATORY NO. 83**

Please IDENTIFY all individuals who have knowledge regarding any communications between DEFENDANT and OAKLAND regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 83**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: Not applicable.

**INTERROGATORY NO. 84**

Please DESCRIBE all DOCUMENTS that contain information regarding communications between DEFENDANT and OAKLAND regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 84**

World Airways objects to this interrogatory as argumentative. Subject to this objection, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 85**

Has DEFENDANT ever had any communications with UNITED regarding the presence of asbestos at HANGER 110?

"UNITED" shall refer to United Airlines, and to its parent entities, predecessors, subsidiaries, divisions, and contract units, and to any of its attorneys, agents, employees, and officers.

**RESPONSE TO INTERROGATORY NO. 85**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: No.

**INTERROGATORY NO. 86**

Please set forth fully all communications between DEFENDANT and UNITED regarding the presence of asbestos at HANGER 110.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**RESPONSE TO INTERROGATORY NO. 86**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: Not applicable.

**INTERROGATORY NO. 87**

Please IDENTIFY all individuals who have knowledge regarding any communications between DEFENDANT and UNITED regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 87**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: Not applicable.

**INTERROGATORY NO. 88**

Please DESCRIBE all DOCUMENTS that contain information regarding communications between DEFENDANT and UNITED regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 88**

World Airways objects to this interrogatory as argumentative. Subject to this objection, World Airways responds that it has no information responsive to this interrogatory.

**INTERROGATORY NO. 89**

Please set forth fully all communications between OAKLAND and UNITED regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 89**

World Airways objects that this interrogatory is argumentative.

Subject to this objection, World Airways responds: After a reasonable inquiry and diligent investigation, World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 90**

Please IDENTIFY all individuals who have knowledge regarding any communications between OAKLAND and UNITED, that DEFENDANT is aware of, regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 90**

World Airways objects that this interrogatory is argumentative.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page66 of 97

Subject to this objection, World Airways responds: After a reasonable inquiry and diligent investigation, World Airways has no information responsive to this interrogatory.

**INTERROGATORY NO. 91**

Please DESCRIBE all DOCUMENTS that contain information regarding communications between OAKLAND and UNITED regarding the presence of asbestos at HANGER 110.

**RESPONSE TO INTERROGATORY NO. 91**

World Airways objects to this interrogatory as argumentative. Subject to this objection, World Airways responds that it has no information responsive to this interrogatory.

Dated: May 24, 2010

Respectfully submitted,

**BRYAN CAVE LLP**
James Goldberg
James C. Pettis
M. Angela Buenaventura

By: [signature]
James Goldberg
Attorneys for Defendant
WORLD AIRWAYS, INC.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, INC.*
Alameda County Superior Court No. RG09489518

**VERIFICATION**

James Hales hereby declares under penalty of perjury under the laws of the State of California that the following is true and correct.

That declarant is Vice President, Technical Operations, of World Airways, Inc., Defendants in the above-entitled action; that declarant has read:

**DEFENDANT WORLD AIRWAYS, INC.'S AMENDED RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES**

and knows the contents thereof; that the same is true of declarant's own knowledge except as to those matters stated therein upon declarant's information and belief and as to those matters, declarant believes it to be true.

Executed at PeachTree, Georgia on May 24, 2010.

James Hales

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page68 of 97

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is Two Embarcadero Center, Suite 1410, San Francisco, CA 94111.

On May 24, 2010, I served the foregoing document, described as

**DEFENDANT WORLD AIRWAYS, INC.'S AMENDED RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES**

on each interested parties in this action, as follows:

**Justin A. Bosl, Esq.**
**Kazan, McClain, Lyons**
**Greenwood & Harley**
**A Professional Law Corporation**
**171 Twelfth Street, Third Floor**
**Oakland, California 94607**

(BY FEDEX) I deposited in a box or other facility maintained by FedEx, an express carrier service, or delivered to a courier or driver authorized by said express carrier service to receive documents, a true copy of the foregoing document, in an envelope designated by said express service carrier, with delivery fees paid or provided for.

☒ (BY MAIL) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

(BY PERSONAL DELIVERY) - I hand delivered the documents via Western Messenger to party by close of business day today.

Executed on **May 24, 2010**, at San Francisco, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

[signature]

Marilou P. Sana

SF01DOCS16762.3

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 13



Vest vs Allied Packing Disc. Depo of Malcolm Benge 6-4-10

***Page 1 to Page 97***

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

AIKEN WELCH COURT REPORTERS
One Kaiser Plaza, Suite 505
Oakland, CA 94612
Phone: (510) 451-1580
FAX: (510) 451-3797

Page 1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST, :
Plaintiffs, :
v. : No.: RG9489518
ALLIED PACKING AND SUPPLY, et al., :
Defendants. :

**********************************************

ORAL DISCOVERY DEPOSITION OF
MALCOLM L. BENGE, ESQUIRE
June 4, 2010

**********************************************

PURSUANT to Notice of Taking of Videotaping Deposition, the witness was called for examination by counsel for the Plaintiffs, scheduled to begin at 1:00 p.m., at the Doubletree Hotel, 21611 Atlantic Boulevard, Sterling, Virginia, before Donna L. Linton, RMR-CCR-CLR, and a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

Page 2

A P P E A R A N C E S

**FOR THE PLAINTIFFS:**
JUSTIN A. BOSL, ESQUIRE
KAZAN, McCLAIN, LYONS
GREENWOOD & HARLEY, PLC
171 12th Street, Third Floor
Oakland, California 94607
Phone: 510-302-1000
E-Mail: jbosl@kazanlaw.com

FOR THE DEFENDANT, WORLD AIRWAYS:
JAMES GOLDBERG, ESQUIRE
BRYAN CAVE, LLP
2 Embarcadero Center, Suite 1410
San Francisco, California 94111
Phone: 415-675-3425
E-Mail: jim.goldberg@bryancave.com

FOR THE DEFENDANT, MCDONNELL DOUGLAS CORPORATION:
SHALEM A. MASSEY, ESQUIRE
BRYAN CAVE, LLP
3161 Michelson Drive, Suite 1500
Irvine, California 92612
Phone: 949-223-7310
E-Mail: shalem.massey@bryancave.com

FOR THE DEFENDANTS, CYPRUS AMAX MINERALS, et al.:
**(Via Telephonic Communications)**
ANTHONY BENTIVEGNA, ESQUIRE
BECHERER, KANNETT & SCHWEITZER
1255 Powell Street
Emeryville, California 94608
Phone: 510-658-3600
E-Mail: abentivegna@bkscal.com

- continued -

Page 3

A P P E A R A N C E S (Continued)

FOR THE DEFENDANTS, HENKEL CORPORATION, et al.:
JESSICA A. FAKHIMI, ESQUIRE
CHAPMAN & INTRIERI, L.L.P.
2236 Mariner Square Drive, Suite 300
Alameda, California 94501
Phone: 510-864-3600
E-Mail: jfakhimi@chapmanandintrieri.com

FOR THE DEFENDANT, KAISER GYPSUM COMPANY, INC.:
JILLIAN J. KEITH, ESQUIRE
DeHAY ELLISTON, LLP
901 Main Street, Suite 3500
Dallas, Texas 75202
Phone: 214-210-2400
E-Mail: jkeith@dehay.com

FOR THE DEFENDANTS, RAYMOND INTERIOR SYSTEMS to **RAYMOND INTERIOR SYSTEMS-NORTH:**
**(Via Telephonic Communications)**
LAUREN MCLEOD, ESQUIRE
FOLEY & MANSFIELD, PLLP
1111 Broadway, 10th Floor
Oakland, California 94607
Phone: 510-590-9566
E-Mail: lmcleod@foleymansfield.com

FOR THE DEFENDANT, HEXCEL CORPORATION:
**(Via Telephonic Communications)**
D. PAUL BIRD, ESQUIRE
MCKENNA, LONG & ALDRIDGE, LLP
101 California Street, 41st Floor
San Francisco, California 94111
Phone: 415-267-4075
E-Mail: pbird@mckennalong.com

- continued -

Page 4

**APPEARANCES:** (Continued)

FOR THE DEFENDANT, GEORGIA-PACIFIC:
**(Via Telephonic Communications)**
HANK HOLMBERG, ESQUIRE
PERKINS COIE, LLP
Four Embarcadero Center, Suite 2400
San Francisco, California 94111
Phone: 415-344-7000
E-Mail: HHolmberg@perkinscoie.com

FOR THE DEFENDANT, PARKER HANNIFIN CORPORATION:
**(Via Telephonic Communications)**
MIKAYLA M. GOW, ESQUIRE
SEDGWICK, DETERT, MORAN & ARNOLD, LLP
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California 94105
Phone: 415-781-7900
E-Mail: mikayla.gow@sdma.com

FOR THE DEFENDANT, KENTILE FLOORS, Inc.:
**(Via Telephonic Communications)**
ELIZA M. RODRIGUES, ESQUIRE
SELMAN BREITMAN, LLP
33 New Montgomery, Sixth Floor
San Francisco, California 94105
Phone: 415-979-2082
E-Mail: erodrigues@selmanbreitman.com

FOR THE DEFENDANT, DOWMAN PRODUCTS, INC. and **HAMILTON MATERIALS, INC.:**
**(Via Telephonic Communications)**
PAMELA RICHARDSON, ESQUIRE
WALSWORTH, FRANKLIN, BEVINS & MCCALL, LLP
601 Montgomery Street, Ninth Floor
San Francisco, California 94111
Phone: 415-781-7072
E-Mail: prichardson@wfbm.com

- continued -

Page 5

APPEARANCES (Continued)

FOR THE DEFENDANT, F.P. LATHROP CORPORATION and LATHROP CONSTRUCTION ASSOCIATES, INC.:
TANYA X. JOHNSON, ESQUIRE
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
525 Market Street, 17th Floor
San Francisco, California 94105
Phone: 415-433-0990
E-Mail: tanya.johnson@wilsonelser.com

**ALSO PRESENT:**

MR. NOOJAN ETTEHAD
The Videographer

MS. DONNA L. LINTON
The Court Reporter

Page 6

INDEX

| | PAGE |
|---|---|
| Appearances | 2-5 |
| **WITNESS:** MALCOLM L. BENGE, ESQUIRE | |
| By Mr. Bosl | 10, 93 |
| By Ms. Johnson | 91 |
| By Mr. Goldberg | 92 |
| Reporter's Certificate | 97 |

EXHIBITS

**(Exhibits 1 and 2 included in transcript.)**
**(Exhibits 3 and 4 retained by Mr. Goldberg.)**

| | | |
|---|---|---|
| 1 | Notice of Taking Video Deposition | 11 |
| 2 | May 11th, 2010 fax re: deposition | 11 |
| 3 | Exhibit WOA-101 to Joint Application for Emergency Extension | 19 |
| 4 | Photograph | 80 |

Page 7

QUESTIONS MARKED FOR RULING

Page 61, line 16 through page 62, line 2:
**Q.** What excerpts have you read?

Page 65, line 18 through page 66, line 3:
**Q.** Did you ever discuss asbestos with the president of World Airways when you were there?

Page 66, line 4 through line 11:
**Q.** Just so we have it clear in the record, have you ever provided any legal advice to World Airways with regards to asbestos?

Page 8

P-R-O-C-E-E-D-I-N-G-S

**THE VIDEOGRAPHER:** Good afternoon. This is the Video Deposition of Malcolm Benge in the matter of Timothy Vest versus Allied Packing taken on June 4, 2010 beginning at 13:06. Case Number is RG0948958 with the Superior Court of Carolina [sic], County of Alameda. This deposition is being taken at 21611 Atlantic Boulevard, Sterling, Virginia.

The court reporter today is Donna Linton with Aiken Welch Court Reporters and I'm the videographer, Noojan Ettehad, also with Aiken Welch reporters.

Will all the attorneys please introduce yourselves and whom you represent?

**MR. GOLDBERG:** Just for the record, it's in the Superior Court of the State of California, not North Carolina.

**THE VIDEOGRAPHER:** Sorry.

**MR. BOSL:** I'm Justin Bosl on behalf of the Vest family.

**MR. GOLDBERG:** James Goldberg for World Airways, Inc., and the witness.

**MS. FAKHIMI:** Jessica Fakhimi for Hekel Corporation.

Page 9

**MS. KEITH:** Jillian Keith for Kaiser Gypsum Corporation.
**MR. MASSEY:** Shalem Massey for McDonald.
**MS. JOHNSON:** Tanya Johnson for F.P. Lathrop Construction Company and Lathrop Construction Associates, Inc.
**THE VIDEOGRAPHER:** And on the phone?
**MS. GOW:** I'm Mikayla Gow on behalf of Parker Hannifin Corporation.
**MS. RICHARDSON:** Pamela Richardson on behalf of Hamilton Materials, Inc. and Dowman Products, Inc.
**MR. HOLMBERG:** I'm Hank Holmberg on behalf of Georgia-Pacific.
**MS. MCLEOD:** I'm Lauren McLeod on behalf of Kelly-Moore Paint Company and Raymond Interior Systems.
**MR. BENTIVEGNA:** Anthony Bentivegna for Cyprus Amax Minerals Company.
**MR. BIRD:** Paul Bird from McKenna, Long & Aldridge for Hexcel Corporation.
**THE VIDEOGRAPHER:** The court reporter can swear the witness now.
MALCOLM L. BENGE, ESQUIRE,
having been duly sworn by the notary public,

Page 10

testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
**BY MR. BOSL:**
**Q.** Good morning, sir. I introduced myself off the record. I'm Justin Bosl. I represent the Vest family.
If you would state your name for the record.
**A. Sure. It's Malcolm Leroy Benge.**
**Q.** And, sir, you're an attorney; is that right?
**A. Correct.**
**Q.** So you're very familiar with the deposition process?
**A. I am.**
**Q.** Probably attended many depositions in the past?
**A. I have.**
**Q.** So if it's all right with you and your attorney, I'll dispense with the normal instructions we do with witnesses.
**MR. GOLDBERG:** You're in agreement with me.
**THE WITNESS:** That's fine.
**BY MR. BOSL:**

Page 11

**Q.** Just a quick matter of housekeeping, I'm attaching as Plaintiff's 1 the Notice of Taking Deposition and Notice of Videotaping Deposition of Malcolm L. Benge, originally noticed for June 2nd and it was signed April 26th, 2010?
**(Plaintiff's Deposition Exhibit Number 1 was marked for identification.)**
**BY MR. BOSL:**
**Q.** And as Plaintiff's 2 the May 11th, 2010 fax to all counsel changing the deposition of Mr. Benge to June 4th, 2010.
**(Deposition Exhibit Number 2 was marked for identification.)**
**BY MR. BOSL:**
**Q.** Sir, first of all, tell us your business address?
**A. Yes. Our firm is located at 888-17th Street, Northwest, Suite 700, Washington, D.C. 20006.**
**Q.** What is the name of your law firm?
**A. The name of the firm is Zuckert, Scoutt & Rasenberger, L.L.P.**
**Q.** What position do you hold at the law firm?
**A. I'm a partner of the firm.**
**Q.** Can you also tell us just the city that

Page 12

you live in?
**A. I live in Bethesda, Maryland.**
**Q.** Where were you born?
**A. Wilmington, Delaware.**
**Q.** Can you give us a little bit of your educational background?
**A. Sure. I have a Bachelor of Arts from Wesley University. I graduated in 1977. I have a Juris Doctorate from University of Pennsylvania and I graduated in 1983.**
**Q.** What was your B.A. in?
**A. Government.**
**Q.** If you could detail for me your work history since then.
**A. Sure. Upon graduation I worked for the General Services Administration in Washington, D.C. in the Office of Business Affairs.**
**In 1978 I moved to the Department of Labor as a budget analyst and I worked there until I matriculated at the University of Pennsylvania in the fall of 1980.**
**Q.** Did you work at all or have any types of internships or externships during law school?
**A. Yes. In the year following my first year I worked as a summer clerk for a U.S. District**

Page 13

**Court judge in the District of New Jersey. The name of the judge was Stanley Brotman. B-R-O-T-A -- B-R-O-T-M-A-N.**
**Between my second year and third year I worked for the firm of Morris, Nichols, Arsht & Tunnel, in Wilmington, Delaware.**
Q. After law school where did you go to work?
**A. I -- after law school I started with Zuckert Scoutt in the fall of 1983 and I've been there ever since.**
Q. Can you detail for me, since law school, what the progression of your practice has been, the areas of practice that you have been involved in up to the present?
**A. I have been a practitioner of aviation law from when I started with Zuckert Scoutt until the present. That includes both regulatory work and also air traffic transactions.**
Q. What year did you become a partner?
**A. 1991.**
Q. How long have you been representing World Airways?
**A. I've been representing World since I started working for Zuckert Scoutt in '83.**
Q. In what capacity have you represented

Page 14

World Airways?
Well, let me ask a better question: Has the way that you have represented World Airways, your capacity changed over the years?
**A. I have represented World on regulatory issues. I have also represented World with respect to transaction matters. In 1986 -- in August of 1986 I was secunded to World as an assistant general counsel and that lasted from August of '86 until mid October of '86.**
**I was secunded to World as an acting general counsel for the period from January of '87 until mid October of '87.**
Q. I'm sorry, the starting date on that was again --
**A. January 1st, 1987 until approximately the third week of October '87.**
Q. Then after October of '87 --
**A. I returned to Zuckert Scoutt, yes.**
Q. Do you still represent World Airways today in transactional regulatory matters?
**A. Yes, I do.**
Q. I want to ask you a little bit about what I've marked as Plaintiff's Exhibit 1, which is the Notice, and attached to it is the subpoena for your

Page 15

deposition.
I guess I'll first ask you have you had an opportunity to review the notice and the subpoena?
**A. Yes. I reviewed this, yes.**
Q. Did you see that there is a request for documents attached to the subpoena?
**A. Yes.**
Q. Can you tell me what steps you took to search for any response of documents to that subpoena?
**A. I went to our file room in our office to see what files we had remaining with respect to World Airways and I determined that there were no documents responsive to this request except with, perhaps, respect to item 11.**
Q. For the sake of the record, can you read for us what number 11 is?
**A. Item 11 states all documents with information regarding aircraft the defendant operated during the years 1973 through 1994.**
Q. I understand that you did bring with you a particular logbook here. Why don't you explain for me what you brought and what it is?
**A. The document I brought is Exhibit WOA-101 to Joint Application for Emergency Extension. This**

Page 16

**was an exhibit to an application submitted by World Airways along with several aircraft or engine manufacturing companies that was filed with the Civil Aeronautics Board. The context of the filing was an emergency exemption and the exemption was sought because World was entering into various agreements with companies that were in the business of aeronautics which required DOT approval -- I'm sorry, I said DOT. I meant CAB approval for the agreements that World was entering into with these various companies.**
Q. And what was World Airways seeking exemptions from?
**A. There is an exemption that required an air carrier when it is entering into a commercial agreement with other companies that are in the business of aeronautics to seek the approval of the -- what was then the Civil Aeronautics Board.**
Q. What in that document is responsive to the request?
**A. These documents relate to the recapitalization of World Airways or proposed recapitalization of World Airways. The other parties that were included in this application are the McDonnell Douglas Corporation, the McDonnell**

Page 29

**were performing maintenance for. They had vendor contracts for supplies that they were required for their work.**
Q. Anything else?
A. **No, I don't think so.**
Q. During that time who did World Airways have contracts with?
A. **I can remember three: American Airlines; the Air Force, the United States Air Force; and United.**
Q. What was the agreement between World Airways and American Airlines?
A. **World performed maintenance on American Airlines' aircraft.**
Q. Which aircraft?
A. **The aircraft were 727s.**
Q. What type of maintenance did World Airways conduct?
A. **I can't say what specific maintenance tasks World performed -- yeah.**
Q. What was the time period on the maintenance contract between World Airways and American Airlines?
A. **I don't remember.**
Q. With regards to the U.S. Air Force, what

Page 30

was the agreement between World and the USAF?
A. **World performed maintenance on KC-130 tankers. These were aircraft that were used to refuel in-flight other Air Force aircraft.**
Q. Do you recall the time period on that contract?
A. **No. I said KC-130s. That's not correct. They were KC-10s. That's what they were.**
Q. Do you recall what base or squadron --
A. **No.**
Q. -- the tankers were from?
A. **No.**
Q. Did you ever negotiate any of these contracts with American Airlines and U.S. Air Force?
A. **No. They were in existence before I arrived at the facility.**
Q. Do you know how long they remained in place?
A. **No.**
Q. Same question with regards to United; what was the nature of that agreement?
A. **World performed maintenance on United Aircraft. I don't recall the type.**
Q. Was that also in existence prior to you

Page 31

coming there?
A. **Yes.**
Q. Then you spoke of contracts with vendors. What vendors do you recall World having contracts with during that time?
A. **I can't remember any of the vendor contracts.**
Q. Do you remember what types of products any of the particular vendors provided?
A. **No.**
Q. Do you recall the locations of any of the vendors?
A. **No.**
Q. Prior to your coming to Oakland, had you been involved in any way with the maintenance contracts or the vendor contracts for World Airways?
A. **No.**
Q. Have you since then, since leaving Oakland?
A. **I have reviewed the occasional maintenance contract, yes.**
Q. How about vendor contracts?
A. **None that I can recall.**
Q. Prior to your coming to Oakland, do you

Page 32

have an understanding as to who handled vendor contracts?
A. **The only person I can remember as handling contracts, vendor contracts, would have been Caryl Benbasat. C-A-R-Y-L B-E-N-B-A-S-A-T.**
Q. What was Caryl's position in World Airways?
A. **She was contract administrator in the maintenance department.**
Q. Do you know when she started at World Airways?
A. **No.**
Q. Was she there prior to your coming to Oakland?
A. **Yes.**
Q. How long did she remain in Oakland?
A. **Until the company left in October of '87.**
Q. Did she remain with World Airways after World moved?
A. **I don't -- well, I don't know. I don't think so. She's not with World Airways today.**
Q. Outside of the maintenance department, did World Airways have any other vendor contracts?
A. **Yes.**
Q. What were the nature of those contracts?

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 76 of 226

Page 97

CERTIFICATE OF NOTARY PUBLIC

I, DONNA L. LINTON, RMR-CCR-CLR, and a Notary Public in and for the Commonwealth of Virginia, before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in Shorthand at the time and place mentioned in the caption hereof and thereafter transcribed by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DONNA L. LINTON, RMR-CCR-CLR
Notary Public in and for
COMMONWEALTH OF VIRGINIA

My commission expires: March 31, 2014
My notary registration number: 118816

CERTIFICATE OF NOTARY PUBLIC

I, DONNA L. LINTON, RMR-CCR-CLR, and a Notary Public in and for the Commonwealth of Virginia, before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in Shorthand at the time and place mentioned in the caption hereof and thereafter transcribed by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DONNA L. LINTON, RMR-CCR-CLR
Notary Public in and for
COMMONWEALTH OF VIRGINIA

My commission expires: March 31, 2014

My notary registration number: 118816

DONNA L. LINTON NOTARY PUBLIC COMMONWEALTH OF VIRGINIA

Denise Abrams, Esq. (C.S.B. #124139)
Justin A. Bosl, Esq. (C.S.B. #241117)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br>Plaintiffs,<br>v.<br>ALLIED PACKING AND SUPPLY, et al.,<br>Defendants. | No. RG09489518<br>**NOTICE OF TAKING DEPOSITION AND NOTICE OF VIDEOTAPING DEPOSITION**<br>Deponent: Malcolm L. Benge<br>Date: June 2, 2010<br>Time: 10:00 a.m.<br>Location: Doubletree Hotel<br>21611 Atlantic Blvd.<br>Sterling, Virginia 20166<br><br>Case Filed: December 17, 2009 |

TO: All Defendants and Their Attorneys of Record:

PLEASE TAKE NOTICE that in accordance with Code of Civil Procedure §§ 2025.220 and 2025.270(a) and the attached Deposition Subpoena for Personal Appearance and Production of Documents and Things, plaintiffs, through their counsel, will take the deposition of Malcolm L. Benge at 10:00 a.m. on June 2, 2010 at the Doubletree Hotel, 21611 Atlantic Blvd., Sterling, Virginia 20166, telephone (703) 230-0077. The deposition will be taken before a duly authorized Notary Public and shall continue from day to day thereafter, until completed.

The deposition may be videotaped pursuant to C.C.P. §§ 2025.220(a)(5), 2025.330(a) and 2025.340. Plaintiffs reserve the right to use the videotaped depositions at trial pursuant to provisions of C.C.P. §§ 2025.220(a)(6) and 2025.620. In addition, the

'AN, McCLAIN, LYONS, ŒEENWOOD & HARLEY PROFESSIONAL CORPORATION TWELFTH STREET ... OOR 94607 ...-1000 10) 465-7728 (510) 835-4913

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page79 of 97

deposition testimony will be recorded stenographically, and/or through instant visual display pursuant to C.C.P. § 2025.220.

The deponent, Malcolm L. Benge is a current or former employee of World Airways, Inc.. A list of all attorneys for parties on whom this notice is being served is contained in the service list attached to the proof of service.

Pursuant to C.C.P. 2025.220(a)(6), the deponent, Malcolm L. Benge, is requested to bring to the deposition the documents and things listed on Attachment 3 to the Subpoena for Personal Appearance and Production of Documents and Things, attached hereto as Exhibit A.

DATED: April 26, 2010

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation

By [signature]
Justin Bosl
Attorneys for Plaintiff

ZAN, McCLAIN, LYONS, REENWOOD & HARLEY PROFESSIONAL V CORPORATION TWELFTH STREET FLOOR \ 94607 -1000 10) 465-7728 (510) 835-4913

SUBP-020

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Justin A. Bosl, Esq. (C.S.B. #241117)
Kazan, McClain, Lyons, Greenwood & Harley
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, CA 94607
TELEPHONE NO.: 510-465-7728 FAX NO. (Optional): 510-835-4913
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiffs

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

PLAINTIFF/PETITIONER: Timothy Vest and Caroline Vest

DEFENDANT/RESPONDENT: Allied Packing and Supply, et al.

**DEPOSITION SUBPOENA**
**FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

CASE NUMBER: RG09489518

THE PEOPLE OF THE STATE OF CALIFORNIA, TO (*name, address, and telephone number of deponent, if known*):
Malcolm L. Benge c/o Bryan Cave LLP, attorneys for World Airways, Inc.

1. YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:

Date: June 2, 2010 Time: 10:00 a.m. Address: Doubletree Hotel
21611 Atlantic Blvd., Sterling, Virginia 20166

a. [ ] As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc., § 2025.230.)
b. [ ] You are ordered to produce the documents and things described in item 3.
c. [x] This deposition will be recorded stenographically [x] through the instant visual display of testimony and by [ ] audiotape [x] videotape.
d. [ ] This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows: See attachment 3.

[x] Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

[ ] Continued on Attachment 4.

5. IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.

6. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: April 26, 2010

Justin A. Bosl, Esq. (C.S.B. #241117)
(TYPE OR PRINT NAME)

(SIGNATURE OF PERSON ISSUING SUBPOENA)
Attorney for Plaintiffs
(TITLE)

(Proof of service on reverse)

Form Adopted for Mandatory Use
Judicial Council of California
SUBP-020 [Rev. January 1, 2009]

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

Code of Civil Procedure §§ 2020.510, 2025.220, 2025.230, 2025.250, 2025.620; Government Code, § 68097.1

Legal Solutions Plus

Case4:11-cv-00061-LB Document17-11 Filed01/10/11 Page81 of 97

## ATTACHMENT 3

1. Information and DOCUMENTS pertaining in any way to DEFENDANT's membership in trade associations during the years 1960 to 1987.

"DEFENDANT" shall refer to defendant, World Airways, Inc., and to its attorneys agents employees, officers, parent entities, predecessors, subsidiaries, divisions, and contract units.

"DOCUMENTS" shall mean all writings, as defined in California Evidence Code § 250, including without limitation: all originals and all duplicates of handwriting, typewriting, printing, photostats, photographs, electronic data on any of DEFENDANT's computers, facsimile, e-mail, and every other means of recording upon any tangible thing or other form of communication or representation.

2. All AOLs DEFENDANT received from McDonnell Douglas Corporation at any time.

"AOL" shall mean an All Operator Letter.

3. All correspondence regarding asbestos that DEFENDANT received from McDonnell Douglas Corporation at any time.

4. All correspondence regarding asbestos that DEFENDANT received from manufacturers of aircraft that DEFENDANT operated prior to 1988.

5. All repair manuals for aircraft DEFENDANT operated prior to 1988.

6. All maintenance manuals for aircraft DEFENDANT operated prior to 1988.

7. All parts lists for aircraft DEFENDANT operated prior to 1988.

8. All parts specifications for aircraft DEFENDANT operated prior to 1988.

9. All transcripts of sworn testimony given by former or present employees of DEFENDANT in worker's compensation cases filed against DEFENDANT that allege asbestos disease.

10. All exhibits to sworn testimony given by former or present employees of DEFENDANT in worker's compensation cases filed against DEFENDANT that allege asbestos disease.

11. All DOCUMENTS with information regarding AIRCRAFT DEFENDANT operated during the years 1973 through 1984.

CSONGSTAD/490447.1

Case 4:11-cv-00061-LB Document 1-11 Filed 01/10/11 Page 82 of 97

"AIRCRAFT" shall refer to the following models of aircraft: DC-IO; Boeing 707, 727, 737 and 747; Lockheed LI00, L188, L1011, MDI1, and 22 YS11.

12. All DOCUMENTS with information regarding the types of work performed in CHECKS during the years 1973 through 1984.

"CHECKS" shall refer to A-Checks, B-Checks, C-Checks, and D-Checks.

CSONGSTAD/490447.1

PROOF OF SERVICE

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.*
Alameda County Superior Court No. RG09489518

I declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. On **April 26, 2010**, I served the following document(s):

**NOTICE OF TAKING DEPOSITION AND NOTICE OF VIDEOTAPING DEPOSITION OF MALCOLM L. BENGE**

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

**ATTACHMENT 3**

by transmitting a true copy via the following methods:

________ (By Facsimile) By personally transmitting a true copy thereof via facsimile to

__________ (By PERSONAL SERVICE) By causing to be hand delivered via Modern Express Courier, tracking number____________ a true copy thereof to

__________ (By OVERNIGHT DELIVERY) By delivering to an authorized courier authorized by the express service to receive documents or depositing in a box or other facility regularly maintained by the express carrier a true copy thereof, on this date, and addressed to

____xx____ (By U.S. MAIL) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business, in an envelope addressed to
**All Counsel**
**[See attached service list]**

I declare under penalty of perjury that the foregoing is true and correct. Executed on **April 26, 2010** at Oakland, California.

Chehie Songstad

BRAYTON PURCELL? — ...ZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
... TWELFTH STREET
... FLOOR
... A 94607
... 2-1000
(510) 465-7728
...x (510) 835-4913

SERVICE LIST CASE: Vest, Timothy [NE 1430] ACTION #: RG09489518 April 26, 2010 3:28 PM

BECHERER, KANNETT & SCHWEITZER — PH: (510) 658-3600, FAX: (510) 658-1151
1255 Powell Street, , Emeryville, CA 94608-2604
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD COMPANY; CYPRUS AMAX MINERALS COMPANY

BERRY & BERRY — PH: (510) 835-8330, FAX: (510) 835-5117
P.O. Box 16070, Oakland, CA 94610
FOR: DESIGNATED DEFENSE COUNSEL

BRYAN CAVE LLP — PH: 415-675-3400, FAX: 415-675-3434
2 Embarcadero Center, Suite 1410, San Francisco, CA 94111
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.

BRYAN CAVE, LLP — PH: (310) 576-2100, FAX: (310) 576-2200
120 Broadway, Suite 300, Santa Monica, CA 90401-2305
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.

CHAPMAN & INTRIERI — PH: (510) 864-3600, FAX: (510) 864-3601
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION

COUNSEL UNKNOWN
FOR: LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION; MCDERMOTT/SEALY, INC.; PLANT INSULATION BANKRUPTCY

'.EY & MANSFIELD — PH: 510-590-9500, FAX: 510-590-9595
1111 Broadway, 10th Floor, Oakland, CA 94607
FOR: KELLY-MOORE PAINT COMPANY, INC.; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER

GLASPY & GLASPY — PH: (925) 947-1300, FAX: (925) 947-1594
One Walnut Creek Center, 100 Pringle Ave Ste 750, Walnut Creek, CA 94596
FOR: GARLOCK SEALING TECHNOLOGIES LLC

HASSARD BONNINGTON — PH: (415) 288-9800, FAX: (415) 288-9802
2 Embarcadero Center, Suite 1800, San Francisco, CA 94111
FOR: KAISER GYPSUM COMPANY, INC.

HERR & ZAPALA — PH: (408) 287-7788, FAX: (408) 927-0408
152 North 3rd Street, Suite 500, San Jose, CA 95112
FOR: ALLIED PACKING AND SUPPLY

McKENNA, LONG & ALDRIDGE — PH: (415) 267-4000, FAX: (415) 267-4198
101 California Street, 41st Floor, San Francisco, CA 94111
FOR: HEXCEL CORPORATION

McKENNA, LONG & ALDRIDGE LLP — PH: 213-688-1000, FAX: 213-243-6330
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071
FOR: HEXCEL CORPORATION

PERKINS COIE LLP — PH: (415) 344-7000, FAX: (415) 344-7288
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111
FOR: GEORGIA PACIFIC LLC fka GEORGIA PACIFIC CORPORATION

›GWICK, DETERT, MORAN & ARNOLD — PH: (415) 781-7900, FAX: (415) 781-2635
One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES

SERVICE LIST CASE: Vest, Timothy [NE 1430] ACTION #: RG09489518 April 26, 2010 3:28 PM
Page Two

| | |
|---|---|
| ˙MAN & BREITMAN<br>33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105<br>FOR: KENTILE FLOORS, INC. | PH: (415) 979-0400<br>FAX: (415) 979-2099 |
| STEPTOE & JOHNSON<br>633 West Fifth Street, Suite 700, Los Angeles, CA 90071<br>FOR: METROPOLITAN LIFE INSURANCE COMPANY | PH: (213) 439-9400<br>FAX: (213) 439-9599 |
| THE MAU LAW FIRM<br>950 Harrison Street, Suite 213, San Francisco, CA 94107<br>FOR: GEORGE E. MASKER, INC. | PH: 415-495-8082<br>FAX: 415-495-8084 |
| WALSWORTH, FRANKLIN, BEVINS & McCALL<br>601 Montgomery Street, 9th Floor, San Francisco, CA 94111<br>FOR: HAMILTON MATERIALS, INC. | PH: (415) 781-7072<br>FAX: (415) 391-6258 |
| WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN<br>601 Montgomery Street, 9th Floor, San Francisco, CA 94111<br>FOR: DOWMAN PRODUCTS, INC. | PH: (415) 781-7072<br>FAX: (415) 391-6258 |
| WILLIAMS KASTNER<br>Two Union Square, 601 Union Street, Suite 4100, Seattle, WA 98101<br>FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES | PH: 206-628-6621<br>FAX: 206-628-6611 |
| WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER<br>525 Market Street, 17th Floor, San Francisco, CA 94105-2722<br>FOR: F.P. LATHROP CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION | PH: (415) 433-0990<br>FAX: (415) 434-1370 |

_.d of Service List

Case 4:11-cv-00061-LB Document 7-11 Filed 01/10/11 Page 86 of 97

# KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY

*A Professional Law Corporation*

Steven Kazan
David M. McClain
Dianna Lyons
Gordon D. Greenwood
Philip A. Harley (1947-2009)
James L. Oberman*
Francis E. Fernandez
Leigh A. Kirmssé

171 Twelfth Street, Third Floor
Oakland, California 94607
(510) 302-1000 • (510) 465-7728
FAX: (510) 835-4913
e-mail: postmaster@kazanlaw.com
www.kazanlaw.com

Of Counsel
Denise Abrams
Frances C. Schreiberg

Andrea Huston
Petra DeJesus
Ian A. Rivamonte
Matthew L. Thiel
Barbra Ferre
Justin A. Bosl
Michael T. Stewart
Daniel Wasson
William F. Ruiz
Elina Agnoli
Gloria C. Amell

May 11, 2010

## IMPORTANT DEPOSITION INFORMATION
## DATE AND TIME CHANGES

***VIA FACSIMILE***

All Defense Counsel
(Broadcast)

Re: ***Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.***
***Alameda County Superior Court Case No. RG09489518***

Dear Counsel:

**PLEASE BE ADVISED** that the videotaped deposition of **Malcolm Benge** previously scheduled for June 2, 2010 **is going forward** on Friday, June 4, 2010 at 1:00 p.m. (EDT) at the Doubletree Hotel (Dulles Airport-Sterling), 21611 Atlantic Boulevard, Sterling, Virginia, 20166, Phone: (703) 230-0077.

**FURTHER**, please be advised that the videotaped deposition of **James (Jim) Hale** is going forward on Thursday, June 3, 2010 **at 9:30 a.m. (EDT)** (not 10:00 a.m.) at the Hampton Inn Atlanta/Peachtree City, 300 Westpark Drive, Peachtree City, Georgia, 30269, Phone: (770) 486-8800.

Very truly yours,

Troy K. Cartwright
Senior Litigation Paralegal

TKC/tkc

TCARTWRIGHT/491873.1

*Certified Appellate Specialist, The State Bar of California Board of Legal Specialization

2

P. 1

* * * COMMUNICATION RESULT REPORT ( MAY. 11. 2010 11:06AM ) * * *

TTI KAZAN, McCLAIN 510 835 4913

TRANSMITTED/STORED MAY. 11. 2010 10:48AM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 0 | MEMORY TX | | (G14) G3-AT:BRYAN-CAVE-SF | OK | 1/1 |
| | | | (G14) G3-AT:BERRY_AND_BERRY | OK | 1/1 |
| | | | (G14) G3-AT:BRYAN_CAVE | OK | 1/1 |
| | | | (G14) G3-AT:BECHERER_KANNETT | OK | 1/1 |
| | | | (G14) G3-AT:CHAPMAN | OK | 1/1 |
| | | | (G14) G3-AT:DEHAY-ELLISON | OK | 1/1 |
| | | | (G14) G3-AT:FOLEY_MANSFIELD | OK | 1/1 |
| | | | (G14) G3-AT:GLASPY_AND_GLASPY | OK | 1/1 |
| | | | (G14) G3-AT:HERR@ZAPALA | OK | 1/1 |
| | | | (G14) G3-AT:MAU-LAW-FIRM | OK | 1/1 |
| | | | (G14) G3-AT:MCKENNA-LA | OK | 1/1 |
| | | | (G14) G3-AT:MCKENNA-LONG-SF | OK | 1/1 |
| | | | (G14) G3-AT:PERKINS_COIE | OK | 1/1 |
| | | | (G14) G3-AT:SEDGWICK | OK | 1/1 |
| | | | (G14) G3-AT:SELMAN_ET_AL.-SF | OK | 1/1 |
| | | | (G14) G3-AT:STEPTOE | OK | 1/1 |
| | | | (G14) G3-AT:WILLIAMS-KASTNER | OK | 1/1 |
| | | | (G14) G3-AT:WALSWORTH | OK | 1/1 |
| | | | (G14) G3-AT:WILSON ESLER | OK | 1/1 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-2) BUSY
E-3) NO ANSWER
E-4) NO FACSIMILE CONNECTION

# KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY

*A Professional Law Corporation*

171 Twelfth Street, Third Floor
Oakland, California 94607
(510) 302-1000 • (510) 465-7728
FAX: (510) 835-4913
e-mail: postmaster@kazanlaw.com
www.kazanlaw.com

Steven Kazan
David M. McClain
Dianna Lyons
Gordon D. Greenwood
Philip A. Harley (1947-2009)
James L. Oberman*
Francis E. Fernandez
Leigh A. Kirmssé

Of Counsel
Denise Abrams
Frances C. Schreiberg

Andrea Huston
Petra DeJesus
Ian A. Rivamonte
Matthew L. Thiel
Barbara Ferre
Justin A. Bosl
Michael T. Stewart
Daniel Wasson
William F. Ruiz
Elaina Agnoli
Gloria C. Amell

May 11, 2010

## IMPORTANT DEPOSITION INFORMATION DATE AND TIME CHANGES

***VIA FACSIMILE***

All Defense Counsel
(Broadcast)

Re: ***Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al. Alameda County Superior Court Case No. RG09489518***

Dear Counsel:

**PLEASE BE ADVISED** that the videotaped deposition of **Malcolm Benge** previously scheduled for June 2, 2010 **is going forward** on Friday, June 4, 2010 at 1:00 p.m. (EDT) at the Doubletree Hotel (Dulles Airport-Sterling), 21611 Atlantic Boulevard, Sterling, Virginia, 20166, Phone: (703) 230-0077.

**FURTHER,** please be advised that the videotaped deposition of **James (Jim) Hale** is going forward on Thursday, June 3, 2010 **at 9:30 a.m. (EDT)** (not 10:00 a.m.) at the Hampton Inn Atlanta/Peachtree City, 300 Westpark Drive, Peachtree City, Georgia, 30269, Phone: (770) 486-8800.

Very truly yours,

Troy K. Cartwright
Senior Litigation Paralegal

TKC/tkc

TCARTWRIGHT/491673.1

*Certified Appellate Specialist, The State Bar of California Board of Legal Specialization

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 14

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST, )
Plaintiffs, )
vs. ) Case No. RG09489518
ALLIED PACKING AND SUPPLY, et )
al., )
Defendants. )
______________________________)

Deposition of CLAUDE FROSS, taken on behalf of the Plaintiffs, at Courtyard by Marriott, 1300 East Tahquitz Canyon Way, Palm Springs, California, commencing at 10:09 a.m., Thursday, July 8, 2010, before Lori Arias, CSR No. 9433.

APPEARANCES:

For the Plaintiffs:
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
BY: JUSTIN A. BOSL, ESQ.
171 Twelfth Street, Third Floor
Oakland, California 94607
(510) 302-1000

For the Defendant World Airways, Inc.:
BRYAN CAVE LLP
BY: JAMES GOLDBERG, ESQ.
3161 Michelson Drive, Suite 1500
Irvine, California 92612
(949) 223-7310

For the Defendant McDonnell Douglas Corporation:
BRYAN CAVE LLP
BY: SHALEM A. MASSEY, ESQ.
3161 Michelson Drive, Suite 1500
Irvine, California 92612
(949) 223-7310

APPEARANCES (continued):

For the Defendant F.P. Lathrop Construction Company and Lathrop Construction Associates:
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
BY: TANYA X. JOHNSON, ESQ.
525 Market Street, 17th Floor
San Francisco, California 94105
(415) 433-0990

For the Defendant Georgia Pacific, Specially appearing for Honeywell:
PERKINS COIE LLP
BY: HANK HOLMBERG, ESQ.
Four Embarcadero Center, Suite 2400
San Francisco, California 94111
(415) 344-7019

For the Defendant Kelly Moore and Raymond Interior Systems North:
FOLEY & MANSFIELD
BY: BETH C. HOPWOOD, ESQ.
300 Lakeside Drive, Suite 1900
Oakland, California 94612
(510) 590-9500

APPEARANCES (continued):

For the Defendants Kentile Floors, Inc. and Alta Building Material Company:
SELMAN BREITMAN, LLP
BY: THERESA A. LOSS, ESQ.
33 New Montgomery Street, 6th Floor
San Francisco, California 94105
(415) 979-0400

For the Defendants Dowman Products, Inc. and Hamilton Materials, Inc.:
WALSWORTH, FRANKLIN, BEVINS & McCALL, LLP
BY: ALICIA MAC, ESQ.
One City Boulevard West, Fifth Floor
Orange, California 92868
(714) 634-2522

For the Defendant The Port of Oakland:
HANSON BRIDGETT
BY: CHRISTINE HILER, ESQ.
425 Market Street, 26th Floor
San Francisco, California 94105
(415) 777-3200

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

APPEARANCES (continued):

For the Defendant Dean's Materials, Inc.:
LAW OFFICES PRINDLE, AMARO, GOETZ, HILLYARD, BARNES & REINHOLTZ LLP
BY: STEVEN H. CHIN, ESQ.
310 Golden Shore, 4th Floor
Long Beach, California 90802
(562) 436-3946

For the Defendant George E. Masker, Inc.:
DONGELL LAWRENCE FINNEY LLP
BY: IAN P. CULVER, ESQ.
707 Wilshire Boulevard, 45th Floor
Los Angeles, California 90017
(213) 943-6100

For the Defendant Henkel Corporation:
CHAPMAN & INTRIERI, LLP
BY: JESSICA A. FAKHIMI, ESQ.
2236 Mariner Square Drive, Suite 300
Alameda, California 94501
(510) 864-3600

APPEARANCES APPEARING TELEPHONICALLY (continued):

For the Defendant Cyprus Amax Minerals:
BECHERER, KANNETT & SCHWEITZER
BY: PAUL LECKY, ESQ.
1255 Powell Street
Emeryville, California 94608
(510) 658-3600

For the Defendant Kaiser Gypsum Company, Inc.:
DeHAY & ELLISTON, LLP
BY: FABIAN HENRY, ESQ.
1300 Clay Street, Suite 840
Oakland, California 94612
(510) 285-0750

For the Defendant Allied Packing and Supply:
HERR & ZAPALA
BY: BONNIE WRIGHT, ESQ.
152 North 3rd Street, Suite 500
San Jose, California 95112
(408) 287-7788

For the Defendant Hexcel Corporation:
McKENNA, LONG & ALDRIDGE
BY: PAUL BIRD, ESQ.
101 California Street, 41st Floor
San Francisco, California 94111
(415) 267-4000

APPEARANCES (continued):

For the Defendant Parker Hannifin:
SEDGWICK, DETERT, MORAN & ARNOLD
BY: JOHN GHERINI, ESQ.
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California 94105
(415) 781-7900

The Videographer:
Bill Varble

INDEX

Deposition of CLAUDE FROSS
Taken on July 8, 2010

| Examination by: | Page |
|---|---|
| MR. BOSL | 13, 190, 200 |
| MR. GOLDBERG | 66, 180, 195 |
| MS. HILER | 99, 199 |
| MR. CHIN | 107 |
| MS. JOHNSON | 116, 189 |
| MS. LOSS | 126, 190 |
| MS. FAKHIMI | 139 |
| MR. HOLMBERG | 142 |
| MS. MAC | 148, 187 |
| MS. HOPWOOD | 159 |
| MR. MASSEY | 163 |
| MR. GHERINI | 168 |
| MR. LECKY | 170 |
| MR. BIRD | 171 |
| MR. HENRY | 171 |
| MS. WRIGHT | 179 |

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

Information requested:
(None)

Questions Instructed Not to Answer:
(None)

Exhibits:

| Plaintiffs' | | Page |
|---|---|---|
| A | Notice of Taking Deposition and Notice of Videotaping Deposition of Claude Fross | 14 |
| B | Letter to all counsel regarding deposition going forward dated July 2, 2010 | 14 |

| Defendant's | | |
|---|---|---|
| A | As-Built drawings produced by The Port of Oakland | 70 |

THE VIDEOGRAPHER: All right. Good morning, everyone. I'm Bill Varble. I'm your videographer, and I represent Atkinson-Baker, Incorporated, located in Glendale, California. I'm not financially interested in this action, nor am I a relative or employee of any attorney or any of the parties.

The date today is July 8, 2010. The time right now is 10:09 a.m., and this deposition is taking place at the Courtyard by Marriott, 1300 East Tahquitz Canyon Way, Palm Springs, California, and this is case number RG09489518 entitled Timothy Vest and Caroline Vest versus Allied Packing and Supply, et al.

The deponent today is Claude Fross. This deposition is being taken on behalf of the plaintiffs in this action. Your court reporter is Lori Arias from Atkinson-Baker.

Could we have all counsel state their appearances, please.

MR. BOSL: This is Justin Bosl on behalf of the Vest family.

MR. GOLDBERG: James Goldberg of Bryan Cave on behalf of World Airways.

MR. MASSEY: Shalem Massey for Bryan Cave on

behalf of McDonnell Douglas.

MS. MAC: Alicia Mac on behalf of defendants Dowman Products, Incorporated, and Hamilton Materials, Incorporated.

MS. FAKHIMI: Jessica Fakimi from Chapman and Intrieri for Henkel Corporation.

MS. LOSS: Theresa Loss on behalf of Kentile Floors, Inc., and Alta Building Material Company.

MS. JOHNSON: Tanya Johnson with Wilson Elser here on behalf of defendants F.P. Lathrop Construction Company and Lathrop Associates, Inc.

MR. HOLMBERG: I'm Hank Holmberg. I'm here representing Georgia Pacific and specially appearing for Honeywell.

MS. HILER: I'm Christine Hiler from Hanson Bridgett representing The Port of Oakland.

MR. CHIN: Good morning, sir. My name is Steven Chin specially appearing for Dean's Materials, Inc. Good to meet you, sir.

MS. HOPWOOD: Good morning, sir. Beth Hopwood for Raymond Interior Systems North and Kelly Moore.

MR. CULVER: Ian Culver for George E. Masker, Inc.

MR. BOSL: On the phone?

THE VIDEOGRAPHER: Would those on the telephone

please state their appearances.

MR. LECKY: Paul Lecky on behalf of Cypress Amax Minerals Company, et al.

MR. GHERINI: John Gherini on behalf of Parker Hannifin.

MR. HENRY: Fabian Henry for Kaiser Gypsum and Kaiser Cement.

MS. WRIGHT: Bonnie Wright for Allied Packing and Supply.

MR. BIRD: Paul -- Paul Bird of McKenna, Long and Aldridge for defendant Hexcel Corporation.

THE VIDEOGRAPHER: Thank you. Would the court reporter please swear in the witness.

THE REPORTER: Raise your right hand, please.

Do you solemnly state that the testimony you're about to give in this matter to be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

EXAMINATION

BY MR. BOSL:

Q. Good morning, sir.

And before we start, we'll do a couple of housekeeping matters. In talking with defense counsel, we've agreed that for my questioning, an

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

Page 14

objection by one defense counsel will be an objection by all, but that will not be in effect during defense questioning.
As a preliminary matter, as Exhibit A I'm
10:12:04 going to mark the Notice of Taking Deposition and Notice of Videotaping Deposition of Claude Fross for July 8th, which was served May 25th, 2005, as well as the accompanying subpoena.
(Exhibit A marked for identification.)
10:12:27 BY MR. BOSL:
Q. Okay. And, sir, I see you're unfolding a paper. Is that the subpoena that you received?
A. Yes.
MR. BOSL: Okay. And then as Exhibit B we're
10:12:38 going to go ahead and mark the July 2nd letter to all counsel saying that the deposition would be going forward.
(Exhibit B marked for identification.)
BY MR. BOSL:
10:12:48 Q. Good morning, sir.
A. Good morning.
Q. We've had a chance to meet.
A. Yeah.
Q. If you'll go ahead and say your name for
10:12:54 the record, please.

Page 15

A. Claude Fross.
Q. Okay. And if you would give us your address, please.
A. 64052 Doral Drive, Desert Hot Springs.
10:13:04 Q. And if you'll confirm also that with -- when you received the subpoena, you also received a check for traveling fees and that --
A. Yes, I did.
Q. -- sort of thing? Okay.
10:13:18 And, sir, are you represented by any lawyer here today?
A. No.
Q. Okay. All right. Sir, what's your date of birth?
10:13:29 A. July 12th, 1934.
Q. And where were you born?
A. St. Francis, Kansas.
Q. And did you -- how long did you live in Kansas?
10:13:37 A. About a year.
Q. And where did you move from there?
A. Colorado. Las Animas, Colorado.
Q. And at some point you moved to California. When did you move there?
10:13:48 A. When I was nine years old.

Page 16

Q. Okay. And where did you move?
A. Oakland, California.
Q. Okay. How long have you lived down here in Palm Springs?
10:13:56 A. I think it's about 17 years now.
Q. Can you briefly describe for me your educational background?
A. Oh, I've gone through all the grades in school. I didn't finish high school. I took a GED
10:14:15 test afterwards, and I finished two years of college after that on the G.I. Bill, and that's about it.
Q. Where did you do your two years of college?
10:14:24 A. At Chabot College in Oakland. I guess it's Hayward. I'm not sure.
Q. Was there any course of study that you were following there?
A. No. It was general.
10:14:36 Q. All right. I want to talk to you just a little bit about some of the basic ground rules and ways that we're going to go about today.
Obviously I'll be asking you some questions, and then the other lawyers in the room
10:14:50 will have a chance to ask questions as well.

Page 17

Even though there's no judge and jury here and we're in an informal setting, you understand that your testimony is under oath and has the same effect as if you were in a courtroom?
10:15:03 A. Yeah. I understand.
Q. Okay. As a result, we're -- it's very important that you give us your best and most accurate testimony that you can provide today.
At the end of the deposition, the court
10:15:17 reporter will put together a little booklet with all of your testimony for today, and you will have a chance to go back and review that and make any corrections that you need to make. But if those corrections are substantive, such as changing the
10:15:32 light was red to the light was green, we -- it could affect your credibility.
Do you understand that?
A. Yeah.
Q. Okay. It's important that in response to
10:15:43 any of the questioning I give you, that the response be verbal, yes, no. Uh-huhs, uh-huhs, shaking the head doesn't correspond to a very good written record, so it's very important that you give verbal answers.
10:15:58 A. Okay.

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

Q. All right. Likewise, it's very important that we don't talk over each other. In normal conversation, it's very common to finish people's sentences and the like.

Today, because the court reporter is trying to take everything down, it's important that you let me and the other attorneys finish our questions before answering, and, similarly, we'll try and let you finish all of your answer before we cut in with the next one.

A. Okay.

Q. Does that sound fair?

A. Yeah. That's fine.

Q. The only other thing, it's very important that you not guess today. We're entitled to your best memory, and we're entitled to any estimates you may have, if you have a basis for estimating or approximating, but we don't want you to guess today.

A. Okay.

Q. Is that fair?

A. Yep.

Q. One other question. Have you taken any medication in the last 24 hours that you think will affect your ability to remember or to give accurate

testimony?

A. No.

Q. I understand that you were under the weather yesterday. If at any time you need a break or for any reason, please just let us know, and we'll accommodate you.

A. Okay.

Q. All right. You mentioned that you went to college on the G.I. Bill.

A. Yes.

Q. Were you in the military?

A. Yes, I was.

Q. And what branch?

A. Air Force.

Q. And when was that?

A. 1952 to 1956, I think it was.

Q. And what were you doing in the Air Force?

A. I was an aircraft mechanic.

Q. What kind of aircraft?

A. B-29s.

Q. And where were you stationed?

A. Well, let's see. I started off at Camp Parks, which is in San Ramon, and then I went to Wichita Falls, Texas for aircraft mechanic school, then I went to Guam, and then I came back to

Hamilton Air Force Base.

Q. And where is Hamilton Air Force Base?

A. It's over in -- the other side of the bay. Let's see. How would I describe it? By San Rafael and that area over there.

Q. Okay. When you got out of the Air Force, where did you go from there?

A. Let's see. The first thing I did when I got out -- oh, I went to cabinetmaking school at Laney trade school for being a cabinetmaker.

Q. And we can maybe cut to the chase a little bit. At some point you went to work at World Airways; is that right?

A. Yes.

Q. And when did you do that?

A. 1968, I believe it was.

Q. Between getting out of the Air Force and then going to World Airways, can you just give a summary of where you worked and what you were doing?

A. Okay. I went to -- I was a cabinetmaker for about a year, and then I went to being a truck driver or a mechanic at Ross Drugs and Sundry in Emeryville, and then there I became a line driver -- a truck driver. And after that, I was

in -- I was an operating engineer with an unlimited license for operating equipment, and then after that, I went to work for World Airways, and I stayed there until 1986.

Q. Okay. And just so that we have a complete picture, after you left World Airways, where did you go to work?

A. Air Cal, which was at Hangar 6 in Oakland Airport, and then I went to work for -- American bought Air Cal, and then after that, I went to work for Alaska Airlines.

Q. Did you retire from Alaska?

A. Yes, I did.

Q. And when was that?

A. A year and a half after I went to work there. Let's see. I can't recall the exact date. Oh, wait a minute. I may have it --

Q. Okay.

A. -- on my retirement card. Ah, there it is. Holy cow. Yeah, I think I can see it.

Let's see. I went to work there on 08/27/89, and I retired from there in '91, I believe it was.

Q. Okay. And just very briefly, at Air Cal, American and Alaska, what were your job duties?

Case 4:11-cv-00061-LB Document 1-7 Filed 01/10/11 Page 34 of 39

Page 50

DEF COUNSEL: Foundation.
THE WITNESS: For Core A, the air-conditioning systems were on the roof, and it went through big ducts as normal, and it would ventilate outside, not in the -- you know, the hangar or in the core. It would be vented out above the hangar, and we had all of that equipment on the hangar roof in between Core A and Core B, and that's how it was done.
BY MR. BOSL:
Q. Did the different cores have separate ventilation systems?
A. Yes, they did. Some of them -- Core A and B were connected -- no. Wait a minute now. Let me think about that. Core A had its -- and Core B was a smaller system. Core C had a smaller system than Core A, because Core A was the offices, and the rest of them were open shops, and they didn't need the air conditioning like the offices did, and I believe that's how it was set up.
Q. How are we doing on time? Sir, I should have asked you, do you need a cup of water or anything?
A. No. That's all right. It's all right now.
Q. All right. We talked about the fact that

Page 51

the hangar was a maintenance facility --
A. Yes, it was.
Q. -- for aircraft?
A. Yes.
Q. When was maintenance being done on airplanes there?
A. 24/7.
Q. So weekends, nights, no matter what, it was going on?
A. There was no holidays in aircraft maintenance.
Q. Okay. Aircraft that were being worked on in the hangar would stay for varying lengths of time; is that right?
A. Right.
Q. Sometimes they'd be in for a short time, sometimes they'd be in for days or weeks; is that right?
A. Yes. Well, aircraft have to go in every so many hours, say a 100-hour check, or whatever they had come up with, so it would vary.
And if you was -- like in our aircraft at World and TIA and Braniff Airlines at that time, if it was going to be converted from cargo to passenger, it would take a little bit longer to

Page 52

convert them, and you do your inspections and your maintenance on the aircraft as such, and then they take all the seats out and put them out on the hangar floor, and they go on cargo run.
So it varied depending on the check. If you have to do a 100-hour inspection on an A engine -- you call it a heavy engine -- and the rest of the aircraft, there's specific things laid out by of the FAA and the governing bodies to what you have to do and -- otherwise you cannot release it.
And to release an aircraft from that, you have to have an A and P license, which I have, but it's a varied situation, and today's -- well, even in those days, the 747, DC-10s were not little putt-putts. You know, they were huge airplanes, so it took a little longer to do an inspection.
You couldn't -- like in the old days when I was actually an A and P mechanic on the floor, super Connie or a DC-6 or something like that, we could go in and out of one of them in a 12-hour shift, and it's gone. But a big airplane, it takes so much equipment -- even the forklifts are humongous -- to get up to wherever you had to work. So it isn't a push, pull, click, click situation on

Page 53

maintaining large aircraft. It's a lot of manual labor and time-consuming processes.
Q. How often -- or let me back up.
You were in charge of custodial staff that took care of cleaning the maintenance hangar as well, right?
A. Yes, I was.
Q. How often did the maintenance -- I'm sorry -- the custodial crew clean the floors of the maintenance facility?
A. Actually it was pretty much constant. But when an aircraft was in for a check, when it was over and that airplane was pushed out of the hangar, then they completely scrubbed the floor and cleaned up everything, because you could not have any oil or anything of that type on the concrete -- slick concrete floor, otherwise, people would fall down. So you have to clean it and dry it, all -- basically the same operation, and the floor was very clean.
Q. Did the custodial staff clean the floors under and around an aircraft while it was being worked on?
A. Only if there was a spill of some sort, then they would go in and clean whatever had to be

Exhibit 14-472

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

Page 86

built out?
A. Yes. They were all built.
Q. Okay. And around the perimeter, there are a number of offices here, correct?
12:18:21 A. Right. They were all executive offices.
Q. Okay. And there's -- if I count, there's -- starting and going counterclockwise at the top, there's one, two, three, four, five, six, seven, eight, nine, ten -- 11 offices, correct?
12:18:38 A. I think there's 12. One, two, three, four, five, six, seven, eight, nine, ten -- oh, 11.
Q. Okay. So there are 11 offices built out --
A. Yeah.
12:18:51 Q. -- around the executive office and the planning and estimating office when you moved in in 1973?
A. Yes, they were.
Q. Okay. And then there's some bathrooms,
12:19:04 correct?
A. Right.
Q. And there are elevators and a corridor, correct?
A. Right.
12:19:10 Q. And all that was built out in --

Page 87

A. Yes.
Q. -- 1973?
A. And a conference room.
Q. And a conference room, correct. That's sort of a -- in the center.
A. Yeah.
THE REPORTER: Please, slow down, and one and a time. Thank you.
THE WITNESS: Oh, I'm sorry.
THE REPORTER: I didn't get your last question.
MR. GOLDBERG: Can you read back --
THE REPORTER: "And a conference room --"
BY MR. GOLDBERG:
Q. And so there's a conference room that was
12:19:31 built out in the center there when you moved in in 1973?
A. Yes.
Q. Thank you. Okay. Let's turn the page, then, please, if we can, to a sheet -- one of the
12:19:44 as-built drawings that's labeled A-11 and bears the Bates stamp label POV005759.
Do you see that?
A. Yes.
Q. And on the left, does it depict the fourth
12:19:58 floor plan of Core A as it was built when World

Page 88

moved in in 1973?
A. Yes.
Q. Okay. And so there was an area in the upper -- and, again, we're looking at half of
12:20:16 Core A that's occupied that is the side that's closest to the exterior, correct? The front of the building?
A. Yes.
Q. Okay. And was the right half built out?
12:20:29 A. Yes. Everything was just like it shows here.
Q. Okay. Are we -- the area -- so there was -- we looked at the third floor of Core A and saw that it was unoccupied on the right-hand
12:20:43 side -- on the interior side, correct?
A. There was no floor.
Q. No floor. Okay.
A. Right.
Q. So the fourth floor plan for Core A is
12:20:50 half the size of the lower floors, correct?
A. Yes.
Q. Okay. So looking at the floor plan for Core A that we have in front of us, does it show that there was a sales and corporate aviation
12:21:06 operations area on the top and a military sales

Page 89

area on the bottom?
A. Yes.
Q. And along the exterior wall, when World moved in in 1973, were there, let's see, ten
12:21:21 offices built out?
A. Yes.
Q. And am I correct that, again, all these areas that we've been looking at that have been built out, they were all covered in sheetrock when
12:21:38 World moved in?
A. Yes.
Q. Okay. There's nothing unexposed -- nothing exposed on the walls; is that correct?
A. No.
12:21:44 Q. And the ceiling tiles were hung throughout, correct?
A. Yes.
Q. And the -- all the flooring was laid, correct?
12:21:51 A. Right.
Q. Okay. You mentioned that at a certain point in time, the accounting and the banking areas or departments moved into Core A; is that correct?
A. Right.
12:22:20 Q. Were some of the offices that you built

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

Page 90

12:22:36 for the accounting and banking people consist of prefabricated metal?
A. No, not prefabricated metal.
Q. Okay. Were any of them like carals (phonetic) that you constructed?
A. They were -- the offices were built with the normal process of building an office, you know, wood and sheetrock and paint. There was several of dividers, they called them, like for a computer --
12:22:55 a little computer office where they put up these stanchions --
Q. Right.
A. -- cubicles --
Q. Right.
12:23:01 A. -- and there were several of those.
Q. Okay.
A. But that was for individual people.
Q. Okay. So not everybody in the banking staff and everybody in the accounting staff got an
12:23:11 office --
A. Oh, no.
Q. -- correct?
A. No, no, no.
Q. Okay. Some of them got these cubicles,
12:23:18 correct?

Page 91

A. Yeah.
Q. And that didn't involve any two-by-four or sheetrock construction?
A. No, nothing. It was material and, I
12:23:27 guess, pressboard where they -- they made them, and we just bought them and stood them up.
Q. Okay. Thank you. When World moved into the building hangar in Cores A, B and C in 1973, were all the bathrooms completely finished?
12:24:03 A. Yes.
Q. Okay. Do you recall that there were marble lentils in some of the bathrooms?
A. Yes.
Q. Okay. Did you ever put any marble lentils
12:24:14 in yourself?
A. No.
MS. JOHNSON: I'm sorry. What's the word? Marble --
MR. GOLDBERG: Lentils.
12:24:19 Q. By that I mean a threshold -- like a threshold plate?
A. Yeah.
Q. Okay. And your crew never installed marble --
A. No --

Page 92

Q. -- thresholds?
A. -- we didn't. We didn't have to do none of that.
THE REPORTER: Please slow down.
THE WITNESS: Oh, okay.
BY MR. GOLDBERG:
Q. Can you tell me -- can you identify how many offices -- actual two-by-four framed offices you created for the accounting staff -- or the
12:25:10 accounting officers?
A. Well, we didn't create hardly any, because they were there. We had to create one, two -- three offices for -- in the accounting on the fourth floor.
12:25:26 Q. Okay. Then let's go then to -- what page are you looking at?
A. 5754 or 59.
Q. 5759 --
A. Yeah.
12:25:36 Q. -- which has the sheet number A-11?
A. Yeah.
Q. And so are you indicating that you created four offices for accounting at the bottom of the military sales area?
12:25:48 A. Well, yes. Because, you know, the titles

Page 93

on these areas are not realistic, because we -- you know, they were good names, I guess, at the time, but it didn't respond to what we had in them.
Q. Okay. So the four accounting offices were
12:26:07 essentially built in that open area that's labeled "Military Sales"?
A. Right. To the bottom left of the area.
Q. Okay.
A. And then there was -- on the upper right,
12:26:22 payroll was in there.
Q. Okay.
A. This area here, that's where payroll was.
Q. Okay.
A. And we didn't even have an office in
12:26:34 there. It was just a wall separating them from the other folks out in the bullpen area.
Q. Okay. So, again, that wall for payroll was created in an otherwise open area?
A. Yes.
12:26:45 Q. Okay. Then you mentioned that you built an office for Ken Healy as the chief pilot?
A. Yes. That's on the first floor of Core A.
Q. Okay. So if we want to turn back, perhaps, to -- I guess it would be 5753 --
12:27:13 A. Wait a minute.

67fe4aab-e6a1-42f4-8c66-3a452cd4dd7a

Page 202

I hereby declare under penalty of perjury under the laws of the State of California that I have read the foregoing deposition and that the testimony contained therein is a true and correct transcript of my testimony given at said time and place.

Dated this ______ day of ______________, 2010, at _________________, _________________

(City) (State)

____________________________

CLAUDE FROSS

Page 203

CERTIFICATE
OF
CERTIFIED SHORTHAND REPORTER

I, Lori L. Arias, Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of examination were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof, and a true record of the testimony given by the witness.

IN WITNESS WHEREOF, I have subscribed my name this 19th day of July, 2010.

____________________________

Lori L. Arias, CSR
Certificate No. 9433

Case4:11-cv-00061-LB Document17-12 Filed01/10/11 Page1 of 88

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 15

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs. No. RG09489518

ALLIED PACKING and SUPPLY, et al.,

Defendants.

/

DEPOSITION OF WARREN K. VEST

Volume I (Pages 1 through 281)

Taken before KIMBERLY R. JENSEN, RPR

CSR NO. 12552

August 19, 2010

INDEX

| | PAGE |
|---|---|
| EXAMINATION BY MR. BOSL | 8 |
| EXAMINATION BY MR. GOLDBERG | 21 |
| EXAMINATION BY MS. JOHNSON | 184, 234, 265 |
| EXAMINATION BY MR. KHOSRAVIRAD | 196, 226, 253, 263, 274, 278 |
| EXAMINATION BY MR. YUEN | 197 |
| EXAMINATION BY MR. BARTEAU | 199, 230, 277 |
| EXAMINATION BY MS. HSU | 199, 225 |
| EXAMINATION BY MR. GHERINI | 216 |
| EXAMINATION BY MR. INTRIERI | 231, 251 |
| EXAMINATION BY MS. WELLS | 258 |

EXHIBITS

| PLAINTIFF'S | | PAGE |
|---|---|---|
| Exhibit A | Curriculum Vitae | 9 |
| DEFENDANTS' | | |
| Exhibit A | Document titled "My 'World' History" | 178 |
| Exhibit B | Photocopy of photograph | 191 |
| Exhibit C | Photocopy of photograph | 191 |
| Exhibit D | Photocopy of photograph | 192 |

DEPOSITION OF WARREN K. VEST

BE IT REMEMBERED, that pursuant to Notice, and on the 19th day of August 2010, commencing at the hour of 9:06 a.m., in the offices of HILTON PLEASANTON, 7050 Johnson Drive, Pleasanton, California 94588, before me, KIMBERLY R. JENSEN, a Certified Shorthand Reporter, personally appeared WARREN K. VEST, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES:

For the Plaintiffs:

JUSTIN A. BOSL
Kazan, McClain, Lyons, Greenwood & Harley
171 Twelfth Street, Third Floor
Oakland, California 94607

For the Defendant, Dean's Materials, Inc.:

E. JANE WELLS
Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholtz LLP
One California Street, Suite 1910
San Francisco, California 94111

For the Defendant, Hamilton Materials and Dowman Products:

JUNIPER BACON
Walsworth, Franklin, Bevins & McCall, LLP
601 Montgomery Street, Ninth Floor
San Francisco, California 94111

For the Defendant, Henkel Corporation:

MARK G. INTRIERI
Chapman & Intrieri
2236 Mariner Square Drive, Suite 300
Alameda, California 94501

For the Defendant, McDonnell Douglas Corporation:

LINDA C. HSU
Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, California 90401

For the Defendant, George E. Masker, Inc.:

RAFAEL CONTRERAS SWEET
Dongell, Lawrence & Finney LLP
707 Wilshire Boulevard, 45th Floor
Los Angeles, California 90017

For the Defendant, Honeywell and Georgia Pacific:

HANK HOLMBERG
(specially appearing)
Perkins Coie
Four Embarcadero Center, Suite 2400
San Francisco, California 94111

For the Defendant, F.P. Lathrop Construction Co.; and Lathrop Construction Associates, Inc.:

TANYA X. JOHNSON
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
525 Market Street, 17th Floor
San Francisco, California 94105

For the Defendant, Kaiser Gypsum Company, Inc.:

VANDAD KHOSRAVIRAD
DeHay Elliston LLP
1300 Clay Street, Suite 840
Oakland, California 94612

For the Defendant, World Airways, Inc.:

JAMES GOLDBERG
Bryan Cave LLP
2 Embarcadero Center, Suite 1410
San Francisco, California 94111

For the Defendant, Hexcel Corporation:

D. PAUL BIRD II
McKenna, Long & Aldridge, LLP
101 California Street, 41st Floor
San Francisco, California 94111

For the Defendant, Raymond Interior Systems and Kelly-Moore Paint Co.:

ROGER D. YUEN
Foley & Mansfield
300 Lakeside, Suite 1900
Oakland, California 94612

For the Defendant, Parker Hannifin:

JOHN G. GHERINI
Sedgwick, Detert, Moran & Arnold LLP
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California 94105

For the Defendant, The Port of Oakland:

MERTON HOWARD
Hanson Bridgett
425 Market Street, 26th Floor
San Francisco, California 94105

For the Defendant, Cyprus Amax Mineral Co.:
ANGUS M. MACLEOD
Becherer, Kannett & Schweitzer
The Water Tower
1255 Powell Street
Emeryville, California 94608

For the Defendant, Kentile Floors and Alta Building:
TIM BARTEAU
Selman Breitman
33 New Montgomery Street, 6th Floor
San Francisco, California 94105

For the Defendant, Allied Packing & Supply:
DAVID POLL
(via phone)
Herr & Zapala, LLP
152 N. 3rd Street, Suite 500
San Jose, California 95112

WARREN K. VEST,
sworn as a witness,
testified as follows:

MR. BOSL: Let's go ahead. I'm Justin Bosl on behalf of the Vest family.

MR. BIRD: Paul Bird of McKenna, Long & Aldridge for Defendant, Hexcel Corporation.

MS. BACON: Juniper Bacon from Walsworth, Franklin, Bevins & McCall on behalf of Dowman Products, Incorporated; and Hamilton Materials.

MR. YUEN: Good morning, sir. My name is Roger Yuen, and I represent Kelly-Moore Paint Company and Raymond Interior Systems.

MR. KHOSRAVIRAD: Good morning, Mr. Vest. My name is Vandad Khosravirad. I'm here from DeHay and Elliston, and we represent Kaiser Gypsum Company.

MR. INTRIERI: Mark Intrieri for Henkel Corporation.

MR. HOWARD: Good morning. Martin Howard from Hanson Bridgett for the Port of Oakland.

MS. WELLS: Good morning, sir. My name is Jane Wells from Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholtz, representing Dean's Materials.

MR. SWEET: Rafael Sweet with Dongell, Lawrence, Finney, representing George E. Masker, Inc.

MR. GHERINI: John Gherini for Parker Hannifin.

MS. JOHNSON: Good morning, Mr. Vest, my name is Tanya Johnson. I'm from the law firm of Wilson, Elser, and we're representing Defendants F.P. Lathrop Construction Company and Lathrop Construction Associates, Inc.

MS. HSU: Good morning, Mr. Vest. My name is Linda Hsu, and I'm here on behalf of McDonnell Douglas Corporation.

MR. GOLDBERG: Good morning, Mr. Vest. My name is Jim Goldberg, and I represent World Airways, Inc.

MR. HOLMBERG: Good morning, Mr. Vest. My name is Hank Holmberg. I'm here representing Honeywell and Georgia Pacific.

THE WITNESS: Thank you all.

EXAMINATION BY MR. BOSL:

Q. All right. Good morning, Mr. Vest. I'm going to start out asking you a few questions. First of all, if you would state your name and date of birth for the record.

A. Warren K. Vest, 4/28/1935.

MR. GOLDBERG: Mr. Bosl, I'd like to state for the record an objection to your going first on the

deposition given that this is your client and your witness. I think that's inappropriate. We had also noticed the deposition. The appropriate procedure would be for the defendants to go first and then the plaintiff can do that.

MR. BOSL: I'll point out we initially noticed Mr. Vest's deposition back in, I believe, it was April, and we met and conferred previously and set it up for this date, but we maintain our right of our initial notice.

(Plaintiffs' Exhibit A marked for identification.)

BY MR. BOSL:

Q. Mr. Vest, I'm going to go ahead and attach as Exhibit A document with the title Warren K. Vest 11490 Cresta Lane, Dublin, California. At the top, sir, do you recognize that?

A. Yes.

Q. And what is it?

A. It was a few weeks before I retired. I can't -- people keep asking me for a history, because I've been with World for about forty years. So I sat down went through my personnel files and off of each payroll authorization, wrote down the dates and title changes, and so that's what it's all about. At the end

I think I added something about my history prior to World Airways. But this is just a log of exactly what was in my personnel file for World Airways.
Q. Okay. And so to clarify, you retired then from World Airways?
A. Yes.
Q. And when was that?
A. March 31st of 2005.
Q. Okay. And per your CV, you began working at World Airways December 9th, 1965; is that correct?
A. That's correct.
Q. Okay. I'm not going to go through every step of your CV right now. What I want to ask you is at some point in your tenure at World Airways, you moved to Japan. When was that?
A. That was in August or September of 1971.
Q. And what was the reason for moving to Japan?
A. I was appointed vice president of far East operations.
Q. And did your family come with you to Japan?
A. Yes.
Q. And who was your family at that time?
A. My wife Ingrid and son Timothy and my youngest hadn't been born yet.
Q. At some point, your family returned to

California. When was that?
A. That was -- well, the family returned a little earlier than me. They came back for school in the fall of '73, and I returned later in 1973.
Q. When was your son Brian born?
A. He was born October 4th of 1972, while we were in Japan.
Q. And are you familiar with the World Airways hangar. What was previously known as World Airways hangar at the Oakland airport?
A. Yes.
Q. When was the first time you visited that facility?
A. The first time I visited was May of 1973.
Q. And what was the reason for visiting?
A. It was the grand opening of the hangar and the delivery of our first 747 aircraft.
Q. Did anyone come with you to the grand opening?
A. My wife and Timothy.
Q. Had your wife and Timothy already returned from Japan for good at that point?
A. They -- no, they came -- we flew back for that occasion and then went back. And shortly after that they returned to get ready for school.
Q. When did you permanently return then from

Japan?
A. It would have been late September or early October of 1973.
Q. And what was your job at World Airways at that time?
A. I returned to Oakland as a check pilot of rating out of the Oakland operations department.
Q. And what was your work schedule at that time?
A. Well, I would be going out on the line and checking other pilots, probably being away from home 18 to 19 days a month. And some assignments we had operations overseas, Air Malle and Africa and a little later Air Malle and -- Yemen Airways in Yemen. And occasionally I'd be sent over to look at the operation for a month or so.
Q. And how long did you have that job at World Airways?
A. I was appointed assistant chief pilot in January of 1976. And at that time I maintained an office with the hangar facility.
Q. Now, during the time that you were a check pilot, between your return from Japan until becoming assistant chief pilot, did you ever have any office work to do?
A. Well, I'd re return from these assignments and

I'd have reports to make to write up. Because in those places, there was no facilities for typing or anything. So when I'd get back, I'd go in the office and do -- complete a lot of my paperwork. Same thing with check rights on pilots. You'd go out and check four or five pilots and you'd make a lot of notes so that would come back in and go to an office and complete that paperwork.
Q. Did anyone ever accompany you to the office when you did your paperwork as a check pilot during that time?
MR. HOWARD: Objection. Overbroad. Vague.
MR. BOSL: Go ahead.
THE WITNESS: I can remember occasions going out on a Saturday or a Sunday to do this work and taking my son with me.
MR. KHOSRAVIRAD: Can I get the question read back, please.
(Record read.)
BY MR. BOSL:
Q. And while you were doing your paperwork, what would Tim be doing?
A. He'd normally be around the office with me. Occasionally he would -- we had several security people there at the hangar, and he'd -- he befriended a couple

BY MR. GOLDBERG:
Q. Okay. Did you ever observe any dust in the airplane on the maintenance floor of hangar floor?
A. Yeah. I observed it just sometimes when they would be moving airplanes out, they would have to open up the doors on both sides. And of course the afternoon wind in Oakland. And you'd see some dust blowing through.
Q. Okay.
A. Whether it came from outside or inside, but I can remember being out there and seeing it when they had the doors all open, because the afternoon wind in Oakland airport is 115, 20 miles an hour.
Q. Right. So take it you don't know whether the dust was particularly from outside or inside?
A. Couldn't tell you.
Q. Do you recall observing any maintenance procedures that created any dust?
MR. BOSL: Lacks foundation. Calls for expert opinion.
THE WITNESS: No.
BY MR. GOLDBERG:
Q. Do you recall whether World Airways ever manufactured any products?
MR. BOSL: Vague and ambiguous. Lacks

foundation.
THE WITNESS: That -- excuse me. They had a machine shop, so they must have machined some kind of parts or material, but I -- I don't know what they would have been.
BY MR. GOLDBERG:
Q. Okay. Did you know what they did with those parts that they machined?
A. Probably using them to put on airplanes.
Q. Okay. Were those parts that they were taking off on airplane machining and putting back on airplane?
MR. BOSL: Lacks foundation.
THE WITNESS: I don't know.
BY MR. GOLDBERG:
Q. So it could be the only thing they machined were parts that they machined or existing on the airplane?
MR. BOSL: Calls for speculation. Lacks foundation.
THE WITNESS: Could have been, but I know we had a machine shop, so they must have done something in the machine shop. What it was, I don't know. What it was for I don't know.
BY MR. GOLDBERG:
Q. Do you know whether your son ever went in

to -- onto the hangar floor?
A. Yes.
Q. Okay. What information do you have in that regard? What do you recall in that regard?
A. Oh, I don't know. I remember -- he got to be buddies with a couple of security guards, and if he wasn't in my office, he was with them or something. They were out looking around the hangar. And --
Q. Okay. Did the security guards have an office?
A. No, not that I recall.
Q. They didn't have a booth at the front of the building?
A. I can't recall them having an office.
Q. Okay. Was it their job to patrol the whole facility?
A. Yes.
Q. Okay. Did you consent to him wandering around with them whenever they went in the building?
A. If he was with them, yeah.
Q. Okay. Did he ever tell you specifically where he went?
A. No.
Q. Okay.
A. Other than tell me about some airplane or something, but nothing specific.

Q. Do you know whether he ever went onto aircraft that were being serviced or maintained?
A. Not that I know of.
Q. Would that have been permitted?
MR. BOSL: Lacks foundation.
THE WITNESS: Depends on what airplane it was, probably.
BY MR. GOLDBERG:
Q. And how is that?
A. Well, if it was Mr. Daly's airplane, it was on that airplane. We used to fly in it.
Q. Okay.
A. But if it was a customer airplane, I doubt very much that he would -- they would take him on that.
Q. Okay. And by Mr. Daly's airplane, which airplane are you referring to?
A. We had two. We had the conveyor 340 and he had a B-23.
Q. And were those kept parked outside the hangar?
A. Yes.
Q. And if he went on those planes that would have been while he was outside the hangar, correct?
A. Most likely, but they may have had one of them in the airplane -- in the hangar for maintenance or something.

Q. You don't know that for sure?
A. No.
Q. Okay. Did you ever borrow Mr. Daly's planes to go flying?
A. No we took one of his B-23s down to San Diego to the north island air show, and I took Tim and -- both my sons on that. Went down for the weekend.
Q. Okay. Was there any other occasion in which you borrowed Mr. Daly's plane or took your sons on board?
A. No.
Q. Okay. And do you recall what year that was?
A. Oh, Brian was about six probably and Tim was probably 13.
Q. So that was about 1978?
A. '78, yeah.
Q. Okay. At the time you boarded the aircraft, was that outside the hangar?
A. It was sitting right outside the hangar door.
Q. Okay. How far is it from the hangar door to a runway where you can take off?
A. It's close to a mile.
Q. And does the plane get tugged there?
A. Start the engines there at the hangar.
Q. How about the big planes that belong to World

Airways like the DC-10 or the 747s? When do they get them to their own power?
A. They started right there at the hangar.
Q. Inside the hangar?
A. No, outside.
Q. So do they ever come in or go out -- well, so they're tugged in to the hangar?
A. Tugged out of the hangar.
Q. And tugged out of the hangar?
A. Right.
Q. And someplace close by they turn on their engines?
A. Right.
Q. Okay. So were they tugged for hundred yards or couple hundreds yards in each direction?
MR. BOSL: Lacks foundation.
THE WITNESS: It's from the hangar to the glass beds would be about 100 yards, length of a football field.
BY MR. GOLDBERG:
Q. Okay. And how long does that take?
A. To tug it out, push it back, probably four or five minutes.
Q. And to pull it in, the same amount?
A. Yeah.

Q. Okay. Did you fly the conveyor 340?
A. Yes.
Q. Did you ever fly it with your son?
A. No.
Q. Okay. Are you aware of World Airways ever marketing any products?
MR. BOSL: Lacks foundation. Calls for speculation. Vague and ambiguous.
THE WITNESS: In there 62 year history.
BY MR. GOLDBERG:
Q. Let's say from 1973 to 1985?
MR. BOSL: Same objections.
THE WITNESS: I can't recall marketing any products.
BY MR. GOLDBERG:
Q. Okay. Or World Airways marketing any products?
A. Yeah.
MR. BOSL: Same objections.
BY MR. GOLDBERG:
Q. Did World Airways ever sell you or your son any products?
MR. BOSL: Same objections.
THE WITNESS: They sold me some products.
BY MR. GOLDBERG:

Q. What did they sell you?
A. When we went out to schedule services, we had thousands and thousands of pieces of China, so they had to say anybody want to buy it. So I bought some China and end up giving it back to World Airways for their executive office years later.
Q. Okay. That was dinnerware?
A. Yeah.
Q. Anything else that World Airways ever sold to your son?
A. No.
MR. BOSL: Same objections.
BY MR. GOLDBERG:
Q. Okay. Are you aware of any documents that ever put World on notice while at hangar 110 that any of the remodeling work did pose any hazard of exposure to asbestos?
MR. BOSL: Lacks foundation. Calls for speculation.
THE WITNESS: Not aware of anything.
BY MR. GOLDBERG:
Q. Are you aware of any person that put World while it was at hangar 110 on any notice of any potential hazard of exposure to asbestos in any remodeling work it did?

many times a month he might -- or how many times a year he might come to the office with you and go off with the security guards?
MR. BOSL: Overbroad.
THE WITNESS: I would estimate, like I say, might not happen for two months, and then it might happen four or five times in one month. I would estimate that he probably went out to the -- to the hangar with me 12 to 15 times a year.
BY MR. GOLDBERG:
Q. Okay. For which years would that estimate hold?
A. Oh, that would be probably starting in -- probably starting '71 -- '77 through -- through '81.
Q. Okay. And of those 12 to 15 times a year, in that time period, 1977 to 1981, what percentage of the time do you recall him going off with the security guards?
A. Oh, I --
MR. BOSL: Calls for speculation.
THE WITNESS: I have no idea.
MR. BOSL: Calls for speculation.
BY MR. GOLDBERG:
Q. Okay. Was there -- you said sometimes -- well, let me ask you this question. Were there

aircrafts serviced that belonged to the government?
A. Yes.
Q. Which ones were those?
A. The KC-10 and the E-4s, which is the 747.
Q. And then what was the presidential backup aircraft?
A. The E-4.
Q. Would he be permitted to go on those aircraft?
A. No.
Q. Okay. Would he be permitted to go on any aircraft other than Mr. Daly's?
MR. BOSL: Vague and ambiguous. Overbroad and lacks foundation.
THE WITNESS: I don't -- it would depend on the airplane and what was happening to it, but I doubt that very often -- seldom did I think he went on any aircraft.
BY MR. GOLDBERG:
Q. Did the security guards have any reason to go on aircraft?
A. No.
Q. Did the security guards have a particular workweek?
A. They just -- you know, normal shift.
Q. Was there --

A. I'm sure they work 40 hours a week.
Q. Was there a security guard at all times?
A. Yes.
Q. Okay. Was there any official like take your kids to work day?
A. Yes, there was.
Q. Okay. When was that?
A. I don't recall when it was, but I can remember, you know, kids all over the place.
Q. Okay. And how often did that happen?
A. Probably once a year.
Q. Okay. And when you said you recall kids all over the place, what do you mean by all over the place?
A. Well, secretary would bring her daughter or son.
Q. Okay. Were there organized activities?
A. I don't recall. Actually I just hung out with her parent.
Q. Okay. Was there any official show and tell of the maintenance floor that day?
A. I don't recall any.
Q. Okay. Was there any occasion when your son visited hangar 110 other than that day and the times when you brought him?
A. The only way he would have been there is if I

took him or what we referred to before, my wife went up to take pictures of the conveyor, which I don't remember if that was the new hangar or the old hangar at the time. But that would have been the only time that I know of.
MS. JOHNSON: Sorry. Can you read back the question and answer.
(Record read.)
BY MR. GOLDBERG:
Q. So you're not aware of anybody other than your wife or yourself inviting him to the hangar, correct?
A. Not that I'm aware of. No. Of course remember I was in Japan.
Q. Right. Did you personally ever set any limits on where he could go?
A. No.
Q. Okay. Did you ever tell him to stay off aircraft?
A. I don't recall specifically, but I probably did.
Q. Okay. Did you -- do you recall him ever visiting when mechanics were doing work on the aircraft floor?
A. Well, they were doing work 24 hours a day.
Q. Did you ever tell him to not get in the way of

the mechanics?
A. Yes.
Q. Okay.
A. In fact I think he -- when he went throughout, I think he wore a hard hat.
Q. Okay. Were there any maintenance closets?
A. Maintenance what?
Q. Closets, at hangar 110?
A. You mean like lockers?
Q. I guess. It's -- a locker or a closet that -- you know, is a small room where utilities maintenance might keep supplies for cleaning and things like that?
A. I'm sure there were. I'm not aware of where they were at.
Q. Okay. Were there anything you referred to as maintenance closets while you worked there?
A. No.
Q. Okay. Were there any crawl spaces?
A. Not that I know of.
Q. Okay.
MR. BOSL: Lacks foundation.
BY MR. GOLDBERG:
Q. How often would you yourself visit the maintenance area on the hangar floor?
MR. BOSL: Vague and overbroad as to time.

BY MR. GOLDBERG:
Q. Maybe you want to split it up into time periods, but I sort of want to go through from the time you returned to Japan from 1973 to 1983?
A. Oh, from the time I became assistant chief pilot, I had an office in a hangar till I -- probably became executive vice president. I was out there quite a bit, because I was -- as I mentioned, almost same question was asked before. I was concerned about World Airways aircraft maintenance being completed on time so that we could operate flights that were scheduled. So I and the chief engineer spent quite a bit of time out there just double-checking that the maintenance was progressing on our own aircraft.
Q. Okay. When you were assistant vice president of flight operations and executive -- and senior vice president of flight operations and executive vice president, did you delegate that task to the chief engineer?
A. Normally we would -- our offices were right next together, so a lot of times we would just walk out there together to see what the progress, because the maintenance people had a big obligation to the military, and sometimes they would get priority. So we were always concerned that our aircraft were getting

done on time. So you go out there. It might be for five minutes.
Q. Okay. And this you would do then principally when your aircraft were also on the hangar to be -- World Airways aircraft were being serviced at the same time as the military aircraft?
A. Yes.
Q. How often did that occur?
A. Probably every day.
Q. Every day in the course of these years from 1976 to 1985?
A. Yeah.
Q. And how frequently would you go out onto the floor to check the progress of the work on the World Airways aircraft?
A. It might be once every three or four days or if it's getting out of the deadline, we have a flight tomorrow, I might be out there five times a day.
Q. Okay.
A. Pushing.
Q. Okay. And was there one particular person you would go out to speak to?
A. The maintenance foreman that was in charge of that airplane.
Q. Okay. And that guy is usually on the floor?

A. Yes.
Q. Not in an office some place?
A. No, he was on the floor.
Q. So you would go out and speak to him four or five minutes?
A. Four or five, ten, 15, whatever.
Q. And is the maintenance foreman a guy who's working hands-on himself?
A. No, he's just overseeing everybody.
Q. Okay. So he's not down on the ground with a wrench?
A. Yeah, he's out there by the airport making sure everything is getting done.
Q. But is he holding a tool and doing things?
A. No, probably not.
Q. So your visits would have consisted of talking to him?
A. Yes.
Q. Anything else?
MR. BOSL: Overbroad.
THE WITNESS: It might be talking to the mechanic.
BY MR. GOLDBERG:
Q. Okay.
A. To make sure I'm gathering the right story.

question is, other than Tim being at World Air Center, do you have a recollection of seeing any other children there?
A. No.
Q. While you were stationed -- strike that.
While you worked for World Airways, did you ever see Tim on any scaffolding inside the World Airway maintenance hangar?
A. No.
Q. If you had seen Tim on any scaffolding, would you have told him to get down?
MR. BOSL: Calls for speculation. It's an improper hypothetical of a lay witness.
MS. JOHNSON: Strike that.
BY MS. JOHNSON:
Q. While you worked for World Airways, did you ever see Tim on any catwalks inside the World Airway maintenance hangar in Oakland?
A. No.
Q. Would you agree that any personnel that did not have yellow cards -- strike that.
Would you agree that it would be a breach of company policy of any persons who did not have yellow badges to be on scaffolding and/or catwalks inside the hangar?

MR. BOSL: Lacks foundation. Assumes facts. Calls for speculation.
THE WITNESS: I've never seen a written policy on it. I know that some of us had yellow badges, some of us had white badges. I've never seen the written policy. And I've never seen it. Don't remember anyone ever being disciplined for violating it. So -- but I'm aware that the understanding was you needed the yellow badge to go on the hangar.
BY MS. JOHNSON:
Q. While you worked for World Airways, did you ever observe Tim climbing up on any of the hangar walls inside the World Airway maintenance hangar?
A. No.
Q. While you worked for World Airways, did you ever observe Tim squeezing between beams or posts inside the World Airways maintenance hangar in Oakland?
A. No.
Q. Do you know if you need FAA clearance to be on a airplane maintenance hangar floor?
MR. BOSL: Lacks foundation.
THE WITNESS: No, we don't need FAA clearance.
BY MS. JOHNSON:
Q. Do you know if World Airways had any special requirements with regard to who was allowed to have

access to maintenance hangar floor because of your ongoing military contract?
MR. BOSL: Lacks foundation. Vague and ambiguous. Compound.
THE WITNESS: No.
BY MS. JOHNSON:
Q. Do you know what the name of the military contract with the Navy was?
MR. BOSL: Military contract.
BY MS. JOHNSON:
Q. Yeah, or the agreement -- I've seen some reference to a Long Air.
A. The what?
Q. Long Air?
A. Never heard of it.
MR. BOSL: I don't appreciate the fact that you're testifying to my client. Just ask the question. If he doesn't know, he doesn't know.
BY MS. JOHNSON:
Q. Are you aware of any name that the contract or agreement the military was referred to by?
A. No.
Q. Okay. And you told us that Tim got his pilots license in 1981, correct?
A. He started -- he started his training in '81.

I think he finally got his pilots license in '82.
Q. And did that require him to undergo classes and take steps to become a pilot?
A. Yes.
Q. And during that time frame of 1981 to 1982, was that something Tim took special interest in?
A. Yes.
Q. And during the time frame of 1981 to 1982, did Tim spend a lot of time going to Earhart and working towards getting his pilot -- strike that.
Going to Earhart and getting his training in order to become a pilot?
MR. BOSL: Vague and ambiguous. Overbroad.
THE WITNESS: I don't know if Earhart was in business at that time. It was after he came back from UCLA that he got involved with Earhart. Got his commercial license, multiengine license, and became flight instructor.
BY MS. JOHNSON:
Q. And I apologize. I think I got confused. Do you know the name of the outfit or the school where Tim studied to be a pilot?
A. No, I don't remember the name of it.
Q. Was it located somewhere near your home?
A. It was in Livermore airport.

EXAMINATION BY MR. KHOSRAVIRAD:

Q. Mr. Vest, I promise I just got two more questions.

MR. BOSL: Like his one. Go ahead.

BY MR. KHOSRAVIRAD:

Q. For any of the drywall at your home on Crest Lane, was it textured or was it smooth?

A. It was textured.

Q. It was textured?

A. Yeah.

Q. Do you know what was used to texture those walls?

A. No.

Q. How about the ceiling in the house? Was it a smooth ceiling or was it textured?

A. Well, it was textured but not like this. You know, it was pretty smooth, blue you could tell something had been put on it.

Q. Okay. Do you know what it was textured with?

A. No.

MR. KHOSRAVIRAD: All right. Thank you.

MR. BOSL: Before you go, do we have a time estimate? Is Mr. Howard the only one left?

MR. GOLDBERG: I have a few follow-up question. Probably take five to ten minutes.

MS. JOHNSON: I have about five minutes.

MR. BOSL: Do you have an estimate?

MR. HOWARD: 15. 10 to 15.

MR. HOLMBERG: Why don't we go off the record and discuss it.

MR. BOSL: Let's go off the record for a moment.

(Discussion held off the record.)

(Whereupon, the deposition was adjourned at 5:17 p.m.)

SIGNATURE OF DEPONENT

I, the undersigned, WARREN K. VEST, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE LINE CHANGE

____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________

______________________________
WARREN K. VEST DATE

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

I, KIMBERLY R. JENSEN, a Shorthand Reporter, State of California, do hereby certify:

That WARREN K. VEST, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 20th day of August 2010.

KIMBERLY R. JENSEN, RPR, CSR NO. 12552
State of California

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

I, KIMBERLY R. JENSEN, a Shorthand Reporter, State of California, do hereby certify:

That WARREN K. VEST, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 20th day of August 2010.

KIMBERLY R. JENSEN, RPR, CSR NO. 12552
State of California

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 16

Denise Abrams, Esq. (C.S.B. #124139)
Barbra Ferre, Esq. (C.S.B. #237662)
Justin A. Bosl, Esq. (C.S.B. #241117)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

ENDORSED
FILED
ALAMEDA COUNTY
JUN 0 4 2010
CLERK OF THE SUPERIOR COURT
By H Lovett
Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs.

ALLIED PACKING & SUPPLY, et al.,

Defendants.

No. RG09489518

**NOTICE OF MOTION AND MOTION TO COMPEL DEFENDANT MCDONNELL DOUGLAS CORPORATION'S COMPLIANCE WITH PLAINTIFFS' NOTICE OF PMQ/COR DEPOSITION AND FOR SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES; SEPARATE STATEMENT; DECLARATION OF BARBRA FERRE; [PROPOSED] ORDER**

DATE: July 2, 2010
TIME: 9:30 a.m.
DEPT: 30 (Hon. Kenneth Mark Burr)
ACTION FILED: December 17, 2009
TRIAL DATE: Not yet set

Reservation No. 1073025

**TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 9:30 a.m. on **July 2, 2010** or as soon thereafter as this matter can be heard before the Honorable Kenneth M. Burr in Department 30, plaintiffs Timothy and Caroline Vest will and do hereby move to compel defendant McDonnell Douglas Corporation(MDC) to comply with plaintiffs' Notice of taking the Deposition of its Custodian of Records and Person Most Qualified and for Sanctions.

///

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case4:11-cv-00061-LB Document17-12 Filed01/10/11 Page15 of 88

MDC refuses to produce any witness, claiming that plaintiffs' notice does not seek "information at-issue in this case." Plaintiffs' Notice is directly tailored to seeking information regarding plaintiffs' claims of products liability and negligence against MDC for Mr. Vest's exposure to asbestos as a bystander to work on MDC planes and from dust brought home on his father's clothes. MDC's refusal to comply with valid discovery is improper and abusive.

This motion is based on C.C.P. §§ 2017.010, 2023.010, 2025.010 et seq., and 2031.010 et seq.; the attached Memorandum of Points and Authorities; the Declaration of Barbra Ferre; plaintiffs' CRC 3.1345 separate statement, the files and records in this case, and such oral arguments as may be made at the hearing on this matter.

DATED: June 4, 2010

Respectfully submitted,

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation

By [signature]
Barbra Ferre

Attorneys for Plaintiffs

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

**PROOF OF SERVICE**

Re: ***TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.*** Alameda County Superior Court No. RG09489518

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. June 4, 2010, I served the following document(s):

**NOTICE OF MOTION AND MOTION TO COMPEL DEFENDANT MCDONNELL DOUGLAS CORPORATION'S COMPLIANCE WITH PLAINTIFFS' NOTICE OF PMQ/COR DEPOSITION AND FOR SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES; SEPARATE STATEMENT; DECLARATION OF BARBRA FERRE; [PROPOSED] ORDER**

by transmitting a true copy to:

Bryan Cave, LLP
2 Embarcadero Center, Suite 1410
San Francisco, CA 94111

__XX__ (By Personal Service) By causing to be personally delivered.

***All defense counsel (see attached service list)***

via the following method:

_____ (By Facsimile Machine [FAX]) By personally transmitting a true copy thereof via an electronic facsimile machine between the hours of 9:00 a.m. and 5:00 p.m.

__XX__ (By Mail) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document, which is in an envelope addressed as stated above, will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business.

_____ (By e-mail or electronic transmission) By personally transmitting a true copy thereof via email.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 4, 2010 at Oakland, California.

Claire Schober

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
71 TWELFTH STREET THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

SERVICE LIST CASE: Vest, Timothy & Caroline [NE 1430] ACTION #: RG09489518 June 4, 2010 1:56 PM

BECHERER, KANNETT & SCHWEITZER
1255 Powell Street, , Emeryville, CA 94608-2604
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD COMPANY; CYPRUS AMAX MINERALS COMPANY
PH: (510) 658-3600
FAX: (510) 658-1151

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610
FOR: DESIGNATED DEFENSE COUNSEL
PH: (510) 835-8330
FAX: (510) 835-5117

WORLD AIRWAYS, INC.

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION; LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION
PH: (510) 864-3600
FAX: (510) 864-3601

COUNSEL UNKNOWN
FOR: DEAN'S MATERIALS, INC. dba CONSTRUCTION MATERIAL SUPPLIER; MCDERMOTT/SEALY, INC.

DeHAY & ELLISTON, LLP
1300 CLAY STREET, SUITE 840, Oakland, CA 94612
FOR: KAISER GYPSUM COMPANY, INC.
PH: 510-285-0750
FAX: 510-285-0740

DONGELL LAWRENCE FINNEY LLP
707 Wilshire Boulevard, 45th Floor, Los Angeles, CA 90017-3609
FOR: GEORGE E. MASKER, INC.
PH: 213-943-6100
FAX: 213-943-6101

FOLEY & MANSFIELD
1111 Broadway, 10th Floor, Oakland, CA 94607
FOR: KELLY-MOORE PAINT COMPANY, INC.; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER
PH: 510-590-9500
FAX: 510-590-9595

GLASPY & GLASPY
One Walnut Creek Center, 100 Pringle Ave Ste 750, Walnut Creek, CA 94596
FOR: GARLOCK SEALING TECHNOLOGIES LLC
PH: (925) 947-1300
FAX: (925) 947-1594

HANSON BRIDGETT LLP
425 Market Street, 26th Floor, San Francisco, CA 94105-2173
FOR: THE PORT OF OAKLAND
PH: (415) 777-3200
FAX: (415) 541-9366

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112
FOR: ALLIED PACKING AND SUPPLY
PH: (408) 287-7788
FAX: (408) 927-0408

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111
FOR: HEXCEL CORPORATION
PH: (415) 267-4000
FAX: (415) 267-4198

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071
FOR: HEXCEL CORPORATION
PH: 213-688-1000
FAX: 213-243-6330

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111
FOR: GEORGIA PACIFIC LLC fka GEORGIA PACIFIC CORPORATION
PH: (415) 344-7000
FAX: (415) 344-7288

SEDGWICK, DETERT, MORAN & ARNOLD
One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES
PH: (415) 781-7900
FAX: (415) 781-2635

SELMAN & BREITMAN
33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105
FOR: KENTILE FLOORS, INC.
PH: (415) 979-0400
FAX: (415) 979-2099

STEPTOE & JOHNSON
633 West Fifth Street, Suite 700, Los Angeles, CA 90071
FOR: METROPOLITAN LIFE INSURANCE COMPANY
PH: (213) 439-9400
FAX: (213) 439-9599

THE MAU LAW FIRM
950 Harrison Street, Suite 213, San Francisco, CA 94107
FOR: GEORGE E. MASKER, INC.
PH: 415-495-8082
FAX: 415-495-8084

VASQUEZ, ESTRADA & CONWAY LLP
Courthouse Square, 1000 Fourth Street, Suite 700, San Rafael, CA 94901
FOR: ALTA BUILDING MATERIALS CO.
PH: (415) 453-0555
FAX: (415) 453-0549

WALSWORTH, FRANKLIN, BEVINS & McCALL
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: HAMILTON MATERIALS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: DOWMAN PRODUCTS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WILLIAMS KASTNER
Two Union Square, 601 Union Street, Suite 4100, Seattle, WA 98101
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES
PH: 206-628-6621
FAX: 206-628-6611

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
525 Market Street, 17th Floor, San Francisco, CA 94105-2722
FOR: F.P. LATHROP CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION
PH: (415) 433-0990
FAX: (415) 434-1370

End of Service List

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 17

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 117 of 226
Case 4:11-cv-00061-LB Document17-12 Filed01/10/11 Page20 of 88

ORIGINAL RCD

**BRYAN CAVE LLP**
Robert E. Boone III, California Bar No. 132780
James C. Pettis, California Bar No. 223953
M. Angela Buenaventura, California Bar No. 264130
120 Broadway, Suite 300
Santa Monica, California 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys For Defendant
MCDONNELL DOUGLAS CORPORATION

FILED
ALAMEDA COUNTY
JUN 21 2010
CLERK OF THE SUPERIOR COURT
By M. Ortiz Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF ALAMEDA**

TIMOTHY VEST and CAROLINE VEST,

Plaintiff,

vs.

ALLIED PACKING AND SUPPLY, et al.,

Defendants.

Case No. RG09489518
Hon. Kenneth Mark Burr

**MCDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PMQ/COR DEPOSITIONS AND FOR SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES**

[Filed concurrently with Declaration of Marguerite Panzica; and Proof of Service]

Date: July 2, 2010
Time: 9:30 a.m.
Dept.: 30

**Reservation No. 1073025**

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SM01DOCS\789451.6

MCDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PMQ/COR DEPOSITIONS AND FOR SANCTIONS

Exhibit 17-492

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs Timothy and Caroline Vest's ("Plaintiffs") Motion to Compel Defendant McDonnell Douglas Corporation's ("MDC") Person Most Qualified ("PMQ") and Custodian of Records ("COR") Depositions and For Sanctions (the "Motion") should be denied for a variety of reasons.

First, Plaintiffs' discovery is burdensome. Indeed, Plaintiffs seek to compel MDC, an entity that no longer exists, to literally spend thousands of man-hours combing through tens of thousands of records dating back decades concerning millions of components on numerous aircraft, with no reasonable or cognizable connection to this case. Plaintiffs also seek to depose corporate designees about a wide variety of limitless subject areas spanning decades. There is ***no*** basis, let alone a reasonable and justified basis, for compelling MDC to comply with such onerous discovery.

Second, Plaintiffs' discovery is overbroad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs seek unlimited categories of information about numerous aircraft when they do not have credible evidence that Timothy Vest, who was a pilot, not a mechanic, was exposed to asbestos from even one particular model MDC aircraft.

Finally, Plaintiffs' Motion should be summarily denied because Plaintiffs failed to meet and confer with MDC before filing the Motion. Plaintiffs were completely silent for a month after MDC objected to the subject deposition notice. Plaintiffs' counsel then simply sent MDC a letter unilaterally demanding that it comply with their requests within a matter of weeks. In response, MDC proposed that Plaintiffs serve an amended, narrowly tailored deposition notice. Then, Plaintiffs' counsel ignored MDC's invitation to conduct a meaningful meet and confer regarding these requests, as is required by the discovery statutes, and instead ***immediately*** filed this Motion. Such tactics violate the discovery statutes.

Accordingly, Plaintiffs' Motion should be denied.

## II. BACKGROUND

Case 4:11-cv-00061-LB Document 17-12 Filed 01/10/11 Page 22 of 88

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**A. Plaintiffs' Claims**

Plaintiffs' SAC alleges that Mr. Vest was secondarily and directly exposed to asbestos and asbestos-containing products at various locations from 1965 to 2005, and asserts fifteen premises and product liability causes of action against a host of "Product" and "Premises" Defendants. (See SAC.) MDC was added as a Product Defendant and Plaintiffs assert only five causes of action against it for negligence, strict product liability, fraud, conspiracy to defraud, and loss of consortium. Plaintiffs' SAC does not identify any MDC product to which Mr. Vest was occupationally or para-occupationally exposed. As to MDC, Plaintiffs have asserted in discovery that Mr. Vest was exposed to asbestos (1) while Mr. Vest's father worked at World Airways, Inc. from 1973-1983 (Plaintiffs allege secondary exposure at home and when Mr. Vest accompanied his father to work on weekends), (2) while Mr. Vest worked as a ramp agent for Continental Airlines from 1985-1987, (3) while Mr. Vest worked as a commercial pilot for Emery Worldwide Airlines from 1990-2001, and (4) while Mr. Vest worked as an accident investigator for Emery Worldwide Airlines in 2000. Plaintiffs broadly claim that Mr. Vest was exposed to asbestos from DC-8 and DC-10 aircraft during the above time periods, but do not identify the specific aircraft or aircraft component manufactured or supplied by MDC from which Mr. Vest allegedly breathed airborne asbestos fibers.

**B. The Burden of Responding to Plaintiffs' Deposition Notice**

**1. The Deposition Notice**

Rather than taking the time to prepare discovery requests that are tailored to their narrow claims against MDC, Plaintiffs instead served – and now seek to enforce – their onerous Notice. Plaintiffs' Notice contains no less than 21 extremely broad-based document requests and 14 vast categories for PMQ witnesses. The Notice is far too broad, among other deficiencies, and imposes an unreasonable burden on MDC to respond to it. The Notice seeks information concerning unidentified MDC products with which Mr. Vest admittedly never came into contact and about which Plaintiffs do not even allege any claim against MDC. For instance, the Notice requests MDC to produce "all documents" regarding the following, among other things:

- "All DOCUMENTS regarding aircraft DEFENDANT sold to Emery Worldwide Airlines prior to 2002." (COR ¶ 4.)
- "All DOCUMENTS regarding aircraft DEFENDANT sold to World Airways prior to 1986." (COR ¶ 5.)
- "All parts list for aircraft DEFENDANT sold to Emery Worldwide Airlines prior to 2002." (COR ¶ 8.)
- "All repair manuals for aircraft DEFENDANT sold to World Airways prior to 1986." (COR ¶ 9.)
- "All DOCUMENTS with information regarding DEFENDANT's supply of ASBESTOS-CONTAINING PRODUCTS to World Airways prior to 1986." (COR ¶ 14.)

Similarly, the Notice requests that MDC produce a PMQ witness to testify regarding the following matters, among other things:

- "Aircraft DEFENDANT sold to World Airways prior to 1986." (PMQ ¶ 5.)
- "DEFENDANT's supply of ASBESTOS-CONTAINING PRODUCTS to World Airways prior to 1986." (PMQ ¶ 8.)
- "Information, whether written or verbal, that DEFENDANT provided to anyone prior to 2002 regarding the HANDLING OF ASBESTOS." (PMQ ¶ 12.)
- "Information, whether written or verbal, that DEFENDANT provided to anyone prior to 2002 regarding the HAZARDS OF ASBESTOS." (PMQ ¶ 13.)

MDC served timely written objections to the Notice on a variety of grounds. MDC objected that the Notice is overbroad and unduly burdensome, as will be further discussed throughout this Motion.

**2. MDC's Burden of Responding**

Prior to 1986 and/or 2002, MDC produced more than 350 different types of commercial and military aircraft. (See Panzica Decl. ¶ 6.) Each of these aircraft had numerous versions built, each version consisting of hundreds of thousands of component parts, and in the case of the large commercial jet transport aircraft, such as the numerous series of DC-8 and DC-10 aircraft,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case 4:11-cv-00061-LB Document 17-12 Filed 01/10/11 Page 24 of 38

millions of parts. (Id.) In addition, the design of a specific series of a commercial aircraft varied from operator to operator because the operators selected and/or furnished operator specific components for their aircraft. (Id. at ¶ 8.) Thus, for example, a series 40 DC-10 (or DC-10-40) for one airline would not be the same as a DC-10-40 for another airline. (Id.) Even aircraft with the same designation, operated by the same airline, would be different from each other because the design of the aircraft constantly evolved over time. (Id.) Furthermore, after delivery of new aircraft to Emery Worldwide Airlines, World Airways, or other operators, any modifications, alterations, maintenance, repairs and/or replacement of the original components would have been performed by individuals and/or entities other than MDC. (Id. at ¶ 9.) Many operators installed additional equipment on their aircraft, manufactured their own replacement parts, and purchased spare parts from "second-source" suppliers – that is, non-original type components from sources other than the component part Original Equipment Manufacturers, known as "OEMs." (Id.) Thus, which particular part was on a specific aircraft at any point in time after the plane was placed in service is almost impossible to ascertain unless specifically evidenced by the aircraft's maintenance records.

The aircraft specifications, design drawings, maintenance manuals, and illustrated parts for these various aircraft and their component parts are not cataloged or maintained according to whether or not the particular document references the use, if any, of asbestos and/or an asbestos-containing component or material in the specific aircraft designation(s) to which the document pertains. (Id. at ¶ 11.) Such materials consist of tens of thousands of pages. One would have to carefully review each such document to ascertain if it makes any such reference(s). (Id.) Such review would likely require reference to other materials, for instance, to determine the effectivity of certain parts on specific aircraft designations. (Id.) Further, to produce design drawings, specifications, maintenance manuals and illustrated parts catalogs for the all of the aircraft MDC produced prior to 1986 and/or 2002, MDC would have to identify, collect, review, analyze for responsiveness, index, mark for production and copy millions of pages of documents from facilities located in several different states. (Id. at ¶ 12.) Reviewing and analyzing the technical documents would consume an enormous amount of time, even if performed by an engineer

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

involved in the design and/or production of the particular aircraft design involved.[1] (Id.) This would require a staff of employees at multiple facilities to work full time for at least six months. (Id.) MDC does not have the resources to devote to such an enormous project. (Id.)

Moreover, prior to 1986 and/or 2002, MDC designed and built aircraft at more than a dozen different facilities in at least five different states. (Id. at ¶ 13.) As a result, documents regarding the aircraft produced by MDC during this period are maintained at multiple facilities in several different states. (Id.) The vast majority of these documents are in storage facilities, and stored on microfiche and/or microfilm. (Id.) Many of the documents are large, oversized blueprints that are difficult and expensive to duplicate. (Id.)

As indicated above, it would take at least 5,000 man-hours for MDC to search its records for documents responsive to Plaintiffs' Notice. To undertake such a task, MDC would need to take a staff of employees, from more than a dozen different facilities in various states, away for their ordinary job duties and dedicate those people to working, full time, for *at least six months* in order to produce such documents and to compile the information requested. (See id. at ¶ 12.)

In addition, MDC does not have the means to ascertain, let lone compile, information such as "All parts list for aircraft DEFENDANT sold to Emery Worldwide Airlines prior to 2002," or "All DOCUMENTS with information regarding DEFENDANT's supply of ASBESTOS-CONTAINING PRODUCTS to World Airways prior to 1986." (See id. at ¶¶ 14-15.) For example, MDC has no way of identifying each person or entity who may have delivered alleged asbestos-containing products to the countless sites to which its aircraft were delivered and maintained. (Id.) In addition, many of the engineers and employees involved in the production of such aircraft have long since retired or passed away. (Id.) Thus, in order to respond to these topics, MDC would have to research, locate and interview thousands of former engineers, employees, contractors, subcontractors, and military officials. (Id.) That task alone would take a team of people literally thousands of hours, even assuming that it could be done at all. (Id.)

### C. Plaintiffs' Failure to Properly Meet and Confer

[1] Due to the passage of time, such employees no longer exist for virtually all MDC aircraft.

Plaintiffs did not conduct a reasonable and good faith meet and confer before filing this Motion.

MDC served its objections to the Notice on April 22, 2010. After hearing nothing for nearly a month, MDC received a letter from Plaintiffs' counsel. (See Ferre Declaration in support of Plaintiffs' Motion, Ex. A.) Though the letter purported to be a meet and confer, it simply stated its belief that MDC's objections were not valid, and requested a response by June 3, 2010. (Id.) On June 3, 2010, MDC wrote to Plaintiffs' counsel requesting an amended, narrowly-tailored deposition notice. (See id. at Ex. B.) The next morning, Plaintiffs' counsel responded that Plaintiffs had no choice but to move to compel. (See id. at Ex. C.) Mere hours later ***that same day***, MDC was served with the instant Motion.

## III. ARGUMENT

### A. The Burdensomeness of Plaintiffs' Requests Far Outweighs the Benefit of the Information Sought

"Although the scope of civil discovery is broad, it is not limitless." Calcor Space Facility, Inc. v. Sup. Ct., 53 Cal. App. 4th 216, 223 (1997) (citing Code Civ. Proc. § 2017). Matters are subject to discovery "if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." Code Civ. Proc. § 2017.010. "The burden rests upon the party seeking discovery to provide *evidence* from which the court may determine that these conditions are met." Calcor, 53 Cal. App. 4th at 223-224. Parties seeking to compel document production must "set forth specific *facts* showing good cause justifying the discovery sought by the inspection demand ...." Calcor, 53 Cal. App. 4th at 224. In addition, regarding a corporate representative, "the deposition notice shall describe with reasonable particularity the matters on which examination is requested." Code Civ. Proc. § 2025.230. Finally, regarding document production, the party seeking to compel production must "set forth specific facts showing good cause justifying the production for inspection of any documents or tangible thing described in the deposition notice." Code Civ. Proc. § 2025.450(b)(1).

"In law and motion practice, factual evidence is supplied to the court by way of declarations." Calcor, 53 Cal. App. 4th at 224. Here, as was the case in Calcor, "[t]here is an

absence of specific facts relating to each category of materials sought to be produced; the justifications offered for the production are mere generalities. The very vice of the subpoena's promiscuity is well illustrated by [party seeking discovery's] inability to provide focused, fact-specific justifications for its demands." Id. Plaintiffs here do not present any facts, let alone "focus, fact-specific justifications for its demands," and their Motion should be denied on this ground alone.

When considering a burdensomeness objection, the court is to "weigh the relative importance of the information sought against the hardship which its production might entail." Columbia Broadcasting System, Inc. v. Sup. Ct., 263 Cal. App. 2d 12, 21 (1968). The court must limit the scope of discovery if it determines that the burden, expense, or intrusiveness of that discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence. Code Civ. Proc. § 2017(c); see also Columbia Broadcasting, 263 Cal. App. 2d at 21; Ryan v. Sup. Ct., 186 Cal. App. 2d 813, 819 (1960).

As set forth above, Plaintiffs' Deposition Notice is extremely overbroad. MDC does not maintain records according to the categories Plaintiffs have requested, including, among other things, "[a]ll repair manuals for aircraft DEFENDANT sold to Emery Worldwide Airlines prior to 2002" or "[a]ll DOCUMENTS with information regarding DEFENDANT'S supply of ASBESTOS-CONTAINING PRODUCTS to Emery Worldwide Airways prior to 2002." These requests do not even specify to which aircraft they are referring, and each individual aircraft model contains hundreds, if not thousands, of components, all of which are manufactured and supplied by different companies. During this time period, MDC produced more than 350 different types of commercial and military aircraft. (See Panzica Decl. ¶ 6.) These aircraft had hundreds of thousands of component parts, and in the case of the large commercial jet transport aircraft, such as the numerous DC-8 and DC-10 aircraft designations, millions of parts. (Id.) In addition, the design of specific commercial aircraft designations varied from operator to operator because they selected and/or furnished operator specific components for their aircraft. (Id. at ¶ 8.) Thus, for example, DC-10-30 for one airline would not be the same as a DC-10-30 for another airline. (Id.) Even aircraft with the same designation, operated by the same airline, would be different from

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

each other. (Id.) After delivery of new aircraft to Emery Worldwide Airlines, World Airways, or other operators, any modifications, alterations, maintenance, repairs and/or replacement of the original components would have been performed by individuals and/or entities other than MDC. (Id. at ¶ 9.) In other words, no two aircraft were exactly alike.

The aircraft specifications, design drawings, maintenance manuals, and illustrated parts for the Aircraft and their component parts are not cataloged or maintained according to whether or not the particular document references the use, if any, of asbestos and/or an asbestos-containing component or material in the specific aircraft designation(s) to which the document pertains. (Id. at ¶ 11.) One would have to carefully review each such document to ascertain if it makes any such reference(s). (Id.) Such review would likely require reference to other materials, for instance, to determine the effectivity of certain parts on specific aircraft designations. (Id.) Further, to produce design drawings, specifications, maintenance manuals and illustrated parts catalogs for the aircraft MDC produced prior to 1986 and/or 2002, MDC would have to identify, collect, review, analyze for responsiveness, index, mark for production and copy tens of millions of pages of documents from facilities located in several different states. (Id. at ¶ 12.) Reviewing and analyzing the technical documents would consume an enormous amount of time, even if performed by an engineer involved in the design and/or production of the particular aircraft design involved. (Id.) This would require a staff of employees at multiple facilities to work full time for at least six months. (Id.) MDC does not have the resources to devote to such an enormous project. (Id.) Moreover, prior to 1986 and/or 2002, MDC designed and built aircraft at more than various different facilities in various different states. (Id. at ¶ 13.) As a result, documents regarding the aircraft produced by MDC during this period are maintained at multiple facilities in several different states. (Id.) The vast majority of these documents are in storage facilities, and stored on microfiche and/or microfilm. (Id.) Many of the documents are large, oversized blueprints that are difficult and expensive to duplicate. (Id.)

As indicated above, it would require at least 5,000 man-hours to identify, locate and search its records for documents and information responsive to Plaintiffs' Notice. Such an undertaking would require MDC to re-assign numerous employees from more than a dozen

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

different facilities in five states away for their ordinary job duties and dedicate them to working, full time, for *at least six months* in order to produce such documents and to compile the information requested. (See id. at ¶ 12.)

In addition, MDC does not have the means to ascertain, let lone compile, information such as "All parts list for aircraft DEFENDANT sold to Emery Worldwide Airlines prior to 2002," or "All DOCUMENTS with information regarding DEFENDANT's supply of ASBESTOS-CONTAINING PRODUCTS to World Airways prior to 1986." (See id. at ¶¶ 14-15.) For example, MDC has no way of identifying each person or entity who may have delivered alleged asbestos-containing products to the countless sites to which its aircraft were delivered and maintained. (Id.) In addition, many of the engineers and employees involved in the production of such aircraft have long since retired or passed away. (Id.) Thus, in order to respond to these topics, MDC would have to research, locate and interview thousands of former engineers, employees, contractors, subcontractors, and military officials. (Id.) That task alone would take a team of people literally thousands of hours, even assuming that it could be done at all. (Id.)

In short, there is simply no economical or practical way to produce the documents and information that Plaintiff has requested. Rather than saddle MDC with the impossible burden of uncovering "all documents" related to products containing asbestos, Plaintiffs' counsel should be required to seek information from the relevant sources – the manufacturers or suppliers of these parts or components, not MDC. Even assuming that MDC had the ability or resources to locate some of the requested information, it would be a monumentally burdensome task to do so, requiring hundreds of house of research time.

**B. Plaintiffs' Discovery Seeks Information That Is Neither Relevant Nor Reasonably Calculated To Lead To Admissible Evidence**

In any event, these efforts would not lead to relevant evidence, as there is no suggestion that Mr. Vest was ever exposed to airborne asbestos fibers from any MDC product or component, let alone the multitude of aircraft spanning decades of production about which Plaintiffs seek discovery. Accordingly, the connection between Plaintiffs' allegations and the requested documents is tenuous at best. For instance, Plaintiffs allege that Mr. Vest was a DC-8 Captain

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

with Emery Worldwide Airways from 1990-2001, and that he was occasionally present for maintenance work on these MDC aircraft. Even assuming these allegations are true, Plaintiffs fail to explain the connection between Mr. Vest's employment as a pilot and their request, for instance, for all documents relating to any "asbestos-containing products" that MDC supplied to Emery anytime prior to 2002. Without any suggestion – much less credible evidence – that Mr. Vest was actually exposed to any asbestos during his employment at Emery, the requested information is irrelevant. Moreover, Mr. Vest does not even specify which MDC aircraft model, part, or component that he may have been exposed to. Accordingly, even if MDC were to produce information about various aircraft models, parts or components, such information would have no bearing on this case.

Plaintiffs' requests relating to World Airways are similarly irrelevant. The only connection between Mr. Vest and World Airways is that he allegedly accompanied his father to his employment there during childhood, and he suggests that his father may have also brought home some asbestos dust on his clothes. Mr. Vest does not, for example, testify that he was exposed to specific MDC products or components while visiting his father at World Airways, nor does he suggest that his father worked on any particular MDC aircraft or component. He does not even generally testify that he breathed in any airborne asbestos fibers in connection with his father's employment at World Airways, much less that he was exposed to any specific MDC aircraft model, product or component. Accordingly, even if MDC somehow provided the information that Plaintiffs seek, such information would be virtually useless. All documents related to parts that MDC provided to World Airways prior to 1986, to reference just one of Plaintiffs' requests, would not establish that Mr. Vest was exposed asbestos fibers originating from an MDC product or component. This information would not be relevant to any issue in this case, nor would it help lead to admissible evidence.

In sum, Mr. Vest has never testified that he ever worked with any of the parts or components that are referenced in Plaintiffs' Notice, which even further emphasizes the wide gap between Plaintiffs' allegations and their requested discovery.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Plaintiffs argue that the requested information at least might be used to refresh Mr. Vest's recollection of what asbestos- containing products to which he may have been exposed. (Plaintiffs' Motion, Separate Statement at 3:25-28.) But this argument has no merit and merely highlights why Plaintiffs' discovery is a fishing expedition. What Plaintiffs suggest is not a proper use of documents to refresh a witness' recollection to testify. Refreshing the recollection of a witness is limited to documents prepared by or actually seen by the testifying witness. Evid. Code § 771. None of the MDC documents sought by Plaintiffs would have been used or even seen by Mr. Vest because he was not involved in aircraft maintenance.

C. **Plaintiffs' Motion Should Be Denied Because Plaintiffs Failed to Satisfy the Meet and Confer Requirement**

Civil Procedure Code section 2025.480(b) requires that a motion to compel "be accompanied by a declaration under Section 2016.040." Section 2016.040 requires that "a meet and confer declaration ... shall state facts showing a reasonable and good faith attempt at an informal resolution of each issue presented by the motion." The rule is designed "to encourage the parties to work out their differences informally so as to avoid the necessity for a formal order ...." Townshend v. Sup. Ct., 61 Cal. App. 4th 1431, 1435 (1998) (citations omitted). The determination of whether an attempt at informal resolution is adequate rests within the discretion of the trial court. See, e.g., Obregon v. Sup. Ct., 67 Cal. App. 4th 424, 430-31 (1998) (finding that a single letter, followed by response that refused concessions, was inadequate). The over-breadth of discovery requests, the time available before the motion filing deadline, and the extent to which the responding party was complicit in the lapse of available time can all be relevant to the adequacy of movant's efforts at informal resolution. Id. at 432. When discovery requests are grossly overbroad on their face, and do not appear reasonably related to a legitimate discovery need, a reasonable inference of intent to harass and improperly burden may be drawn, lending support to a finding that movant's "meet and confer" attempts were inadequate. Id. at 431.

Here, all of Plaintiffs' deposition requests are overbroad. For example, Plaintiffs' request for "[a]ll DOCUMENTS regarding aircraft DEFENDANT sold to Emery Worldwide Airlines prior to 2002" would require the identification of hundreds of thousands of documents, with no

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

temporal limit. As noted in MDC's objection to this request, this request (like all the others) fails to specify or describe what information and/or materials are being requested with sufficient particularity. These requests also fail to specify any particular aircraft or component thereof which may be at issue in this action. In Plaintiffs' CRC 3.1345 Statement in Support of their Motion ("CRC Statement"), Plaintiffs ignore the deficiencies pointed out in MDC's objections, and merely state generic reasons to compel such as "[t]he inquiries are specific as to relevant products and relevant times." It is unclear how Plaintiffs can state such reasons, when these inquiries expressly *do not* reference specific products and specific times. A temporal limit of "prior to 2002" or "prior to 1986" can hardly be called a specific time limit, nor can a blanket question about "all documents" or "all aircraft" sold from one massive corporation to another be considered sufficiently precise so as to compel a response.

Another example is Plaintiffs' request for "[a]ll DOCUMENTS that outline DEFENDANT'S RECORD RETENTION POLICIES," (COR ¶ 1) or a PMQ to testify regarding "DEFENDANT's RECORD RETENTION POLICIES." (PMQ ¶ 1.) MDC was a large corporation that was in operation for decades. Since MDC had revised its document retention policy numerous times, responding to Plaintiffs' generic requests would requires hours of research, review and analysis of some 300 to 500 boxes, in addition to identifying individuals with knowledge of that policy. In their CRC Statement, Plaintiffs offer no valid reason to compel such discovery and merely incorporate the same generic reasons stated throughout. Indeed, Plaintiffs cannot possibly conceive of a reason to compel such information, as none exists. This request provides another example of Plaintiffs' attempt to harass MDC instead of seeking relevant evidence for their case.

Though Plaintiffs contend that MDC's objections are made in "boilerplate fashion," this criticism ignores the fact that MDC is responding to a set of boilerplate discovery requests that all suffer from the exact same defects. Therefore, MDC logically made similar objections to each and every request.

Here, given the extremely broad scope of Plaintiffs' Notice and both the substance and timing of Plaintiffs' purported efforts, it is clear that Plaintiffs' so-called meet and confer effort

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 130 of 226
Case 4:11-cv-00061-LB Document17-12 Filed01/10/11 Page33 of 38

was wholly inadequate. Indeed, the very next morning after MDC requested that Plaintiffs amend and narrow the Deposition Notice, Plaintiffs responded that they would be moving to compel, and served that Motion ***within hours***. At no time did Plaintiffs attempt to engage in any meaningful discussions regarding their purported need for the requested information from MDC, or even suggest that they would be willing to discuss narrowing the scope of their deposition topics. This demonstrates that any purported "meet and confer" was carried out with the intent to set up a Motion *regardless* of MDC's good faith efforts to resolve the dispute informally.

In addition, Plaintiffs have failed to provide a single reason why their overbroad requests are relevant as against MDC. MDC objected to these questions and explained that there is absolutely no evidence demonstrating that Mr. Vest ever breathed airborne asbestos fibers from any product or component manufactured or supplied by MDC. In their CRC Statement, Plaintiffs could not refute this objection, and simply ignored it.

Plaintiffs' abusive and burdensome requests, followed by their gamesman-like strategy, fly in the face of California's discovery laws. Accordingly, Plaintiffs' Motion should be denied. See, e.g., Obregon, 67 Cal. App. 4th at 434.

## IV. PLAINTIFFS' REQUESTS FOR SANCTIONS SHOULD BE DENIED

Plaintiffs apparently base their requests for costs on MDC's "so-called refusal to submit to authorized discovery." However, as set forth above, it is actually Plaintiffs who failed to comply with their obligation to meet and confer in a good faith effort to resolve this discovery dispute. By contrast, MDC requested that Plaintiffs' counsel propound a narrowly tailored Notice, to which Plaintiffs sole response was to indicate their plans to file a motion to compel, after which they carried out this threat mere hours later and without engaging in any meaningful discussion in an attempt to resolve the dispute. Moreover, even if the information Plaintiffs have requested could be produced by MDC, it would be an extremely burdensome task and would be unlikely to lead to the discovery of admissible evidence. MDC has ample justification for objecting to the production of these overbroad and unduly burdensome requests, and Plaintiffs' requests for sanctions should be denied.

## V. CONCLUSION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SM01DOCS\789451.6

13

MCDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PMQ/ COR DEPOSITIONS AND FOR SANCTIONS

Exhibit 17-505

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 131 of 226

For the reasons stated above, MDC has provided sufficient and meaningful responses to discovery and made a good faith attempt to informally resolve the issues raised by Plaintiffs. Plaintiffs, on the other hand, have not provided legal or factual reasoning for their insistence on enforcing their generic Notice. Plaintiffs have pursued their discovery and this Motion in bad faith and without substantial justification. Consequently, MDC respectfully requests that the Court deny Plaintiffs' Motion.

Dated: June 21, 2010

**BRYAN CAVE LLP**
Robert E. Boone III
James C. Pettis
M. Angela Buenaventura

By: [signature]
M. Angela Buenaventura
Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SM01DOCS\789451.6

14

MCDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PMQ/COR DEPOSITIONS AND FOR SANCTIONS

Exhibit 17-506

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 18

Kazan, McClain, Lyons, Greenwood &
Harley A Professional Law Corporation
Attn: Kazan Esq, Steve
55 Harrison St.
Ste 400
Oakland, CA 94607____

Herr & Zapala, llp
Attn: Zapala, Alan J
152 N. Third Street
Suite 500
San Jose, CA 95112

**Superior Court of California, County of Alameda**
**Rene C. Davidson Alameda County Courthouse**

| Vest Plaintiff/Petitioner(s) vs. Allied Packing And Supply Defendant/Respondent(s) (Abbreviated Title) | No. RG09489518<br>Order<br>Motion to Compel (Motion)<br>Granted |
|---|---|

Plaintiffs' Motion to Compel the Deposition of McDonnell-Douglas' Person Most Qualified/Custodian of Records was set for hearing on 12/10/2010 at 09:31 AM in Department 30 before the Honorable Kenneth Mark Burr.
The Tentative Ruling was published and was contested.

The matter was argued and taken under submission. Comes now the Court and renders its decision as follows:

IT IS HEREBY ORDERED THAT:

1.
The motion by Plaintiffs Timothy Vest and Caroline Vest ("Plaintiffs") to compel Defendant McDonnell Douglas ("MDC") to provide a Person Most Qualified and Custodian of Records for deposition is ruled upon as follows:

Plaintiffs and MDC are ordered to sign the Confidentiality Agreement attached as Exhibit C to the declaration of James Pettis filed on November 17, 2010. The Court is persuaded that the information at issue is confidential and proprietary in nature.

The parties have reached agreement on COR categories 4 and 5.

MDC is ordered to produce the following documents: (1) Illustrated Parts Catalogues for DC-8 and DC-10 aircraft operated by World and Emery; (3) Maintenance manuals for DC-8 and DC-10 aircraft operated by World and Emery; and (4) Contract documents for the sale of these aircraft to World and Emery. MDC has represented that it is prepared to produce the documents, and the Court sets a deadline of December 15, 2010.

MDC is also ordered to provide responses and produce the following documents, by category, on or before January 10, 2011:
COR 1: Document retention policies related to topics in PMQ 2-14 and COR 9-11.
COR 2 and 3: AOLs regarding asbestos provided to World Airways at any time, and what types of information are communicated in AOLs, how often they are sent, and to whom they are sent.
COR 6-17: Repair Manuals, Illustrated Parts Catalogues, and Maintenance Manuals for the DC-8 and DC-10 aircraft operated by World Airways from 1973 to 1983 and by Emery from 1990 to 2000, and heat shields and epoxies responsive to PMQ 12-17. Plaintiffs have identified epoxies number EA911F,

EA934, EA9309. Plaintiff are not required to identify specific hydraulic lines and hot air ducts about which they seek information. The Court accepts the representation of counsel that this task is large, but is not persuaded that such information is not reasonably calculated to lead to the discovery of admissible evidence or that the burden outweighs Plaintiffs' need to discovery this information.
COR 18-19: Information and documents provided to anyone prior to 2002 regarding the handling of asbestos and the hazards of asbestos. If documents are withheld based on privilege, MDC must provide a privilege log.
COR 20-21: Information concerning workers compensation claims, limited to communications prior to 2001.

MDC is ordered to educate a Person or Persons Most Qualified for deposition regarding the the COR categories listed above and the PMQ categories corresponding to the categories above. Any request for subsequent deposition shall be made according to the procedures in the statutory scheme. See, e.g., Code of Civil Procedure section 2025.610(c).

Thereafter, Plaintiffs may schedule the deposition of MDC's Person Most Qualified on 10 days notice. The deposition will be conducted at the office of Bryan Cave in Santa Monica, California, unless the parties stipulate to an alternate location. Plaintiffs asked for further clarification about whether they could notice the deposition after receipt of documents from MDC. The Court's order allows the COR/PMQ deposition to be noticed on 10 days notice at any time.

Plaintiffs' request for an award of monetary sanctions is DENIED.

Dated: 12/10/2010

facsimile

Judge Kenneth Mark Burr

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number: RG09489518
Order After Hearing Re: of 12/10/2010

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at 1225 Fallon Street, Oakland, California.

Executed on 12/10/2010.

Executive Officer / Clerk of the Superior Court

By ____________________ digital

Deputy Clerk

| SHORT TITLE: Vest VS Allied Packing And Supply | CASE NUMBER: RG09489518 |
| --- | --- |

ADDITIONAL ADDRESSEES

Becherer, Kannett & Schweitzer
Attn: Bentivegna, Anthony
1255 Powell Street
Emeryville, CA 94608

WALSWORTH, FRANKLIN, BEVINS & McCall, LLP
Attn: McCall, Michael T.
601 Montgomery Street
Ninth Floor
San Francisco, CA 94111-2612

Law Offices of Glaspy & Glaspy, Inc.
Attn: Glaspy, David M
One Walnut Creek Center
100 Pringle Avenue, Suite 750
Walnut Creek, CA 94596

PERKINS COIE LLP
Attn: McMahon, Brien F.
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111____

Chapman & Intrieri LLP
Attn: Intrieri, Mark G
2236 Mariner Square Drive
Third Floor, Suite 300
Alameda, CA 94501-1090

Case 4:11-cv-00061-LB Document 17-12 Filed 01/10/11 Page 40 of 88

DeHay & Elliston, L.L.P.
Attn: Judin Esq, Jennifer
1300 Clay Street
Suite 840
Oakland, CA 94612

Foley & Mansfield PLLP
Attn: Foley, Stephen J.
1111 Broadway
10th Floor
Oakland, CA 94607

Kentile Floors, Inc.
Claims Administrator Gary Cropper
4 Rita Street
Syosset, NY 11791____

Bryan Cave LLP
Attn: Goldberg, James
Two Embarcardo Center,
Suite 1410
San Francisco, CA 94111-3907

Steptoe & Johnson LLP
Attn: Kahn, Ruth D
633 West Fifth Street
Siute 700
Los Angeles, CA 90071

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Attn: Gambino, Mary Ellen
525 Market Street, 17th Floor
Spear Street Tower, Thirty-Second Floor
San Francisco, CA 94105-2725

Pettis, James C
120 Broadway, Ste 300
Santa Monica, CA 90401

Law offices of Michael L. Mau
Attn: Mau, Michael L.
950 Harrison Street
Suite 213
San Francisco, CA 94107-1078

Sedgwich, Detert, Morgan & Arnold LLP
Attn: Fox, Michael L.
One Market Plaza
Steuart Tower, 8th Floor
San Francsico, CA 94105

STEPTOE & JOHNSON LLP
Attn: Swenson, John P.
633 West Fifth Street
Suite 700
Los Angeles, CA 90071

Selman Breitman LLP
Attn: Dumont, Richard D.
33 New Montgomery, Sixth Floor
San Francisco, CA 94105

Hillyard, Barnes & Reinholtz LLP
Attn: Prindle, Kenneth B
One California Street
Suite 1910
San Francisco, CA 94111

Port of Oakland/Legal Dept.
Attn: Alexander, David L.
530 Water Street
4th Floor
Oakland, CA 94607-3524

Pettis, James C
120 Broadway, Ste 300
Santa Monica, CA 90401

Finney LLP, Dongell Lawrence
707 Wilshire Boulevard, 45th Floor
Los Angeles, CA 90017-3609

Finney LLP, Dongell Lawrence
707 Wilshire Boulevard, 45th Floor
Los Angeles, CA 90017-3609

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 140 of 226
Case4:11-cv-00061-LB Document17-12 Filed01/10/11 Page43 of 88

Order

Exhibit 18-514

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 19

David M. McClain, Esq. (C.S.B. #54085)
Francis E. Fernandez, Esq. (C.S.B. #65775)
Andrea Huston, Esq. (C.S.B. #200610)
Elina Agnoli, Esq. (C.S.B. #261732)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

ENDORSED
FILED
ALAMEDA COUNTY
DEC 28 2010
CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs.

ALLIED PACKING & SUPPLY, INC., et al.,

Defendants.

No. RG09489518

**NOTICE OF MOTION AND MOTION TO COMPEL DEFENDANT MCDONNELL DOUGLAS CORPORATION'S COMPLIANCE WITH THIS COURT'S DECEMBER 10, 2010 DISCOVERY ORDER AND FOR MONETARY SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ELINA AGNOLI AND TARA RUNYON; INDEX OF OUT-OF-STATE AUTHORITIES; [PROPOSED] ORDER**

DATE: January 7, 2011
TIME: 9:34 a.m.
DEPT: 30
ACTION FILED: December 17, 2009
TRIAL DATE: February 14, 2011

**Reservation No. 1136974**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that at 9:34 a.m. on Friday, January 7, 2011 in Department 30 of the above-entitled court, plaintiffs will and hereby do move to compel defendant McDonnell Douglas Corporation's ("MDC") Compliance with this Court's December 10, 2010 Discovery Order and for Monetary Sanctions.

The basis for this motion is that MDC failed to comply with this Court's December

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

10, 2010 discovery order; rather than producing reasonably usable electronic copies of responsive documents, MDC produced 14 password-encrypted cds that prevent plaintiffs from printing or searching the hundreds of thousands of pages for actual responsive content, and also prevents plaintiffs from converting the files into a searchable format. MDC disingenuously claims these restrictions are necessary to protect the confidentiality of the documents, but this excuse lacks merit and rings hollow as the documents were already produced pursuant to a confidentiality agreement which adequately protects any proprietary information.

The password-protected files MDC produced are virtually useless for purposes of organizing, reviewing, and using the documents for purposes of deposition, trial, and/or resolution. It appears MDC is intentionally thwarting plaintiffs' legitimate attempts to obtain discovery and prepare this case for trial and/or resolution. Judicial intervention is needed to compel MDC to provide the password to unlock the documents. Moreover, monetary sanctions are warranted for MDC's failure to comply with the Court Order.

This motion is based on C.C.P. §§ 2017.010, 2017.710 et seq., 2023.010 et seq., and 2031.010 et seq.; the attached Memorandum of Points and Authorities; the Declarations of Elina Agnoli and Tara Runyon; the Index of Out-of-State Authorities; the files and records in this case, and such oral arguments as may be made at the hearing on this matter.

DATED: December 28, 2010

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC

By [signature]
Elina Agnoli

Attorneys for Plaintiffs

AZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
CK LONDON MARKET
HARRISON STREET, SUITE 400
KLAND, CA 94607
(510) 302-1000
(510) 465-7728
X (510) 835-4913

**PROOF OF SERVICE**

I declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607.

On December 28, 2010 I served the following document(s) in the following manner(s):

- **NOTICE OF MOTION AND MOTION TO COMPEL DEFENDANT MCDONNELL DOUGLAS CORPORATION'S COMPLIANCE WITH THIS COURT'S DECEMBER 10, 2010 DISCOVERY ORDER AND FOR MONETARY SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ELINA AGNOLI AND TARA RUNYON; INDEX OF OUT-OF-STATE AUTHORITIES; [PROPOSED] ORDER**

on the party in said action as follows:

reboone@BryanCave.com; james.pettis@bryancave.com; linda.hsu@bryancave.com;

__XX__ BY ELECTRONIC MAIL: By personally transmitting a true copy thereof via email.

and on all parties in said action by placing a true copy in a sealed envelope and each envelope addressed as follows: via the following method:

(see attached service list)

__XX___ (By Mail) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document, which is in an envelope addressed as stated above, will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 28, 2010 at Oakland, California.

[signature]
Troy K. Cartwright

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

SERVICE LIST CASE: Vest, Timothy & Caroline [NE 1430] ACTION #: RG09489518 December 28, 2010 10:44 AM

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610
FOR: DESIGNATED DEFENSE COUNSEL
PH: (510) 835-8330
FAX: (510) 835-5117

BRYAN CAVE LLP
2 Embarcadero Center, Suite 1410, San Francisco, CA 94111
FOR: WORLD AIRWAYS, INC.
PH: 415-675-3400
FAX: 415-675-3434

BRYAN CAVE LLP
One Atlantic Center, 1201 W. Peachtree Street, NE, 14th Floor, Atlanta, GA 30309-3488
FOR: WORLD AIRWAYS, INC.
PH: 404-572-6633
FAX: 404-420-0633

BRYAN CAVE, LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2305
FOR: MCDONNELL DOUGLAS CORPORATION; MCDONNELL DOUGLAS CORPORATION
PH: (310) 576-2100
FAX: (310) 576-2200

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION; LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION
PH: (510) 864-3600
FAX: (510) 864-3601

COUNSEL UNKNOWN
FOR: MCDERMOTT/SEALY, INC.

DeHAY & ELLISTON, LLP
1300 CLAY STREET, SUITE 840, Oakland, CA 94612
FOR: KAISER GYPSUM COMPANY, INC.
PH: 510-285-0750
FAX: 510-285-0740

DONGELL LAWRENCE FINNEY LLP
707 Wilshire Boulevard, 45th Floor, Los Angeles, CA 90017-3609
FOR: GEORGE E. MASKER, INC.
PH: 213-943-6100
FAX: 213-943-6101

HANSON BRIDGETT LLP
425 Market Street, 26th Floor, San Francisco, CA 94105-2173
FOR: THE PORT OF OAKLAND
PH: (415) 777-3200
FAX: (415) 541-9366

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112
FOR: ALLIED PACKING AND SUPPLY
PH: (408) 287-7788
FAX: (408) 927-0408

MCGIVNEY, KLUGER & GLASPY
One Walnut Creek Center, 100 Pringle Ave., Ste 750, Walnut Creek, CA 94596
FOR: KENTILE FLOORS, INC.
PH: (925) 947-1300
FAX: (925) 947-1594

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111
FOR: HEXCEL CORPORATION
PH: (415) 267-4000
FAX: (415) 267-4198

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071
FOR: HEXCEL CORPORATION
PH: 213-688-1000
FAX: 213-243-6330

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111
FOR: GEORGIA-PACIFIC LLC fka GEORGIA PACIFIC CORPORATION; HONEYWELL INTERNATIONAL INC. fka ALLIED SIGNAL, INC./sii/BENDIX CORP
PH: (415) 344-7000
FAX: (415) 344-7288

PORT OF OAKLAND LEGAL DEPARTMENT
530 Water Street, 4th Floor, P.O. Box 2064, Oakland, CA 94607 United States
FOR: THE PORT OF OAKLAND
PH: (510) 627-1348
FAX: (510) 444 2093

PRINDLE, AMARO, GOETZ, HILLYARD, BARNES & REINHOLTZ LLP
One California Street, Suite 1910, San Francisco, CA 94104
FOR: DEAN'S MATERIALS, INC. dba CONSTRUCTION MATERIAL SUPPLIER
PH: (415) 788-8354
FAX: (415) 788-3625

SEDGWICK, DETERT, MORAN & ARNOLD
One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES
PH: (415) 781-7900
FAX: (415) 781-2635

SELMAN & BREITMAN
33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105
FOR: ALTA BUILDING MATERIALS CO.
PH: (415) 979-0400
FAX: (415) 979-2099

STEPTOE & JOHNSON
633 West Fifth Street, Suite 700, Los Angeles, CA 90071
FOR: METROPOLITAN LIFE INSURANCE COMPANY
PH: (213) 439-9400
FAX: (213) 439-9599

THE MAU LAW FIRM
950 Harrison Street, Suite 213, San Francisco, CA 94107
FOR: GEORGE E. MASKER, INC.
PH: 415-495-8082
FAX: 415-495-8084

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN
601 Montgomery Street, 9th Floor, San Francisco, CA 94111
FOR: DOWMAN PRODUCTS, INC.
PH: (415) 781-7072
FAX: (415) 391-6258

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
525 Market Street, 17th Floor, San Francisco, CA 94105-2722
FOR: F.P. LATHROP CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION
PH: (415) 433-0990
FAX: (415) 434-1370

End of Service List

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 20

*9065458*

ORIGINAL

**BRYAN CAVE LLP**
Robert E. Boone III, California Bar No. 132780
James C. Pettis, California Bar No. 223953
Linda C. Hsu, California Bar No. 239880
120 Broadway, Suite 300
Santa Monica, California 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys For Defendant
MCDONNELL DOUGLAS CORPORATION

FILED
ALAMEDA COUNTY
JAN 04 2011
CLERK OF THE SUPERIOR COURT
By ______ Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF ALAMEDA**

TIMOTHY VEST and CAROLINE VEST,

Plaintiff,

vs.

ALLIED PACKING AND SUPPLY, et al.,

Defendants.

Case No. RG09489518

Assigned for all pre-trial purposes to the Hon. Kenneth Mark Burr

**DEFENDANT MCDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH DECEMBER 10, 2010 ORDER AND REQUEST FOR SANCTIONS; DECLARATION OF JAMES C. PETTIS**

Date: January 7, 2011
Time: 9:34 a.m.
Dept.: 30

**Reservation No: 1136974**

Complaint Filed: December 17, 2009
Trial Date: February 14, 2011

FAXED

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs' Motion to Compel Compliance with the Court's December 10, 2010 Order and Request for Sanctions ("Motion") should be denied. MDC did not violate the Court's Order or any discovery statute, and there is no evidence that MDC acted in bad faith. Rather, the evidence shows that MDC has repeatedly attempted to produce the documents in a mutually agreeable way that would preserve their confidentiality and proprietary nature while allowing Plaintiffs reasonable access to the documents. What Plaintiffs now seek, by their unfounded Motion, is access to freely manipulate, search, assemble, tag, bookmark and print MDC's confidential information, without appropriate Bates numbers and labels identifying the documents as confidential. Plaintiffs are not entitled to such unfettered, unreasonable and unnecessary access to MDC's confidential information.

More specifically:

- Plaintiffs created the current situation by refusing to cooperate and be reasonable. Plaintiffs rebuffed MDC's meet and confer efforts to produce documents under a confidentiality agreement for more than four months, ultimately refusing to agree to a confidentiality agreement after two months of silence.
- Plaintiffs' contention that MDC "delayed producing documents" is false. On December 10, 2010, this Court ordered MDC to produce the documents within three business days, and MDC did so.
- MDC fully complied with the Court's December 10 Order. MDC maintains the subject documents on microfilm in the ordinary course. The documents are not electronically stored information ("ESI"). MDC could have complied with the Order (and the CCP) by simply permitting Plaintiffs' counsel to review dozens of rolls of microfilm – one page at a time – for days on end at MDC's or its counsel's offices. MDC did not do so. Instead, MDC incurred the expense of copying the documents in PDF format onto accessible CDs, which actually provides easier access to the documents than microfilm. Plaintiffs never specifically requested that the documents be produced in a searchable or printable format, and they do not cite to any authority that would entitle them to this. The Court's December 10 Order did not allow

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

MDC time to number and label each of the several hundred thousand pages of documents contained on the CDs before the December 15 deadline. MDC did not label and number the documents before December 10 because the Court had initially indicated (in November) that it would not approve a protective order. But the Court ultimately concluded – on December 10 – that the documents are confidential.

- The integrity of MDC's confidential documents must be preserved – Plaintiffs cannot have the password to the CDs, and each page printed must be appropriately marked. Plaintiffs cannot be allowed to have the password to the CDs because it would permit MDC's confidential documents to be manipulated, edited and printed without any Bates numbers or any confidentiality labeling, and thus jeopardize the integrity of the documents. MDC would have no control over its proprietary information, especially given the sheer volume of the documents contained on the CDs. In addition, such unfettered access to the documents creates significant evidentiary issues, particularly regarding the foundation and authenticity of any unlabeled, unnumbered documents, that will cause delays at trial. Password access also would constitute greater access to the documents than the manner in which they are normally maintained – Plaintiffs are not entitled to such access.
- MDC has prepared additional CDs that allow printing and searching – Plaintiffs should be required to bear that expense. Plaintiffs previously rejected MDC's offer to produce printable CDs or paper documents, but Plaintiffs refused. Nonetheless, MDC has prepared printable and searchable CDs, at an expense of $25,934.47. Plaintiffs should be required to bear that expense (or at least some of it.).
- Plaintiffs are not entitled to any sanctions. There are no grounds for any sanctions against MDC.

Plaintiffs' Motion should be denied, and Plaintiffs should be ordered to reimburse MDC for the costs of the CDs.

## II. HISTORY OF EVENTS LEADING TO PLAINTIFFS' MOTION

The Court ruled on Plaintiffs' Motion to Compel regarding the deposition of MDC's person most qualified (the "PMQ Motion") on December 10, 2010. In full compliance with the Court's

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

December 10 Order, MDC produced the required documents three business days later, on December 15, 2010. The documents were produced on fourteen secured CDs. Each CD is marked confidential.

The CDs allow Plaintiffs to view all of the documents but do now allow the documents to be manipulated, searched, bookmarked, tagged, or assembled. MDC cannot manipulate, search, bookmark, tag or assemble the documents because, in the ordinary course, MDC maintains the documents on rolls of microfilm. In other words, the documents are not electronically-stored information ("ESI"). To view the documents as they are normally maintained, one has to review each document on a microfilm reviewer machine, one page at a time. The CDs allow the same type viewing access as the microfilm viewer, but access via the CDs is much easier than with the microfilm viewer. At significant expense, MDC's counsel copied the documents onto CDs to provide the easier viewing access, and save the time and expense of Plaintiffs' counsel having to review the rolls of microfilm on viewers at MDC's or its counsel's offices.

The CDs also do not permit the documents to printed without each page being individually Bates numbered and labeled confidential first, which must be done to protect the confidential nature of the information contained in the documents. MDC did not have time to number and label each of the hundreds of thousands of pages of documents contained on the CDs before the December 15 deadline because MDC did not know until December 10 if the Court would in fact find that the documents were confidential. Indeed, the Court stated in its November 23, 2010 tentative ruling on the PMQ Motion (when that motion was set for hearing in November 2010) that it was not inclined to find that MDC's documents were confidential. (*See* Nov. 23, 2010, TR – Motion to Compel (Motion) – Motion Rescheduled.) But the Court changed its mind and, as part of its December 10 Order, mandated that Plaintiffs execute the proposed Confidentiality Agreement which MDC had proposed months beforehand.

The events leading up to the PMQ Motion are important to understand what MDC had agreed to produce and what the Court ordered MDC to produce. Initially, on July 26, 2010, during an in person meet-and-confer session at Plaintiffs' counsel's office in Oakland over the scope of Plaintiffs' PMQ Deposition Notice to MDC, the parties reached an agreement that:

BRYA 'E LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

(1) MDC would informally produce the following documents to Plaintiffs: List of MDC aircraft operated by World Airways ("World") and Emery Worldwide ("Emery") during the relevant time periods; Illustrated Parts Catalogues for DC-8 and DC-10 aircraft operated by World and Emery; Maintenance manuals for DC-8 and DC-10 aircraft operated by World and Emery; and Contract documents for the sale of these aircraft to World and Emery.

(2) Plaintiffs would review the documents under a protocol laid out in a protective order.

(3) After Plaintiffs reviewed these initial documents, Plaintiffs would identify specific parts for which they required additional information.

Based on this agreement, MDC informally produced the first document (list of MDC aircraft operated by World and Emery) on July 28, 2010. (*See* Pettis Decl. in Support of MDC's Supplemental Brief in Opposition to Plaintiffs' Motion to Compel PMQ/COR Deposition and for Sanctions ("Pettis Suppl. Decl.") at ¶ 3.) MDC reviewed and prepared thousands of documents to produce to Plaintiffs, and on August 4, 2010, sent its first of three proposed Stipulated Protective Orders/Confidentiality Agreements. (*Id.*) Three months later, on November 5, 2010, MDC received a letter from Plaintiffs' counsel stating that Plaintiffs were unilaterally calling off the agreement and proceeding with their motion to compel, after almost two months of complete silence about the last proposed Stipulated Protective Order/Confidentiality Agreement. (*Id.*)

The Court's December 10 Order states: "MDC has represented that it is prepared to produce the documents, and the Court sets a deadline of December 15, 2010." (*Id.*) The documents MDC represented it was prepared to produce and of which the Court ordered production in three court days, were prepared by MDC in August based on the July 26 agreement with Plaintiffs. Based on that agreement, Plaintiffs were to informally review the documents under an agreement upon protective order and identify those which they believed were relevant to this case. (Pettis Suppl. Decl. ¶ 2.) MDC would then need to individually label the documents identified for formal production, and as such, the documents are not currently individually labeled and are secured on the CDs with a password. (Pettis Decl. ¶ 2.) MDC never represented that Plaintiffs would be able to print the documents from the CDs, or that the documents would be searchable. (*Id.* at ¶ 3.)

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

After MDC produced the CDs, Plaintiffs demanded that MDC provide the password to the CDs so they could unlock all of the document manipulation features, which would include manipulation of the content of the documents, as well as bookmarking, tagging, assembling and printing the documents. MDC cannot provide Plaintiffs with the password because doing so would jeopardize the integrity of the confidential information by allowing anyone with access to change the content and order of the documents, and print any or all of the documents without any marking indicating that the documents are subject to the Confidentiality Agreement ordered by the Court, or any numbering of each page of the documents. Plaintiffs are not entitled to that kind of access. (*Id.*) It is imperative that the integrity and proper identification of the documents be maintained because of (a) the nature of the information, and (b) the fact that the documents have been produced in litigation. (*Id.*)

As a result, MDC offered the following options, which it stated to Plaintiffs' counsel in writing on December 22, 2010:

1) MDC can produce another set of CDs from which Plaintiffs can print the documents, each page of which will be numbered and marked. The estimated cost to Plaintiffs is approximately $17,000.00. These documents may be provided in approximately one week's time. Upon receipt of this second set of CDs, Plaintiffs must return the first set of CDs.

2) MDC can mark, number, print out and produce each page of the actual documents contained on the CDs. The estimated cost to Plaintiffs is approximately $21,000.00. These documents may be provided in approximately one week's time. Upon receipt of the documents, Plaintiffs must return the first set of CDs.

3) Plaintiffs may use the CDs already produced. If Plaintiffs want particular pages printed out, they can identify them and MDC can, at Plaintiffs' expense, number, mark and print out those pages for production. The estimated cost per page is approximately 20 cents.

Plaintiff rejected each of these solutions and instead filed this Motion.

MDC nonetheless has prepared additional CDs, with each page of the documents numbered and labeled confidential. These additional CDs allow the documents to be printed. The CDs also allow Plaintiffs to search the documents, something Plaintiffs would not be able to do with the

BRYA[illegible] LLP
120 BROAD[illegible]Y, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

original documents stored on microfilm. The cost MDC incurred preparing the additional CDs is more than $25,934.47. (Pettis Decl. ¶ 4.) MDC is prepared to produce these additional CDs to Plaintiffs but asks that Plaintiffs reimburse MDC for those costs.

## III. PLAINTIFFS' MOTION SHOULD BE DENIED

### A. Plaintiffs' Legal Arguments Regarding ESI Don't Apply

The legal argument in Plaintiffs' Motion is based entirely on Code of Civil Procedure section 2031.280 and the analogous Federal Rule of Civil Procedure 34, which deal with the production of ESI. Plaintiffs' argument is a red-herring and wholly inapposite. These statutory provisions regarding ESI do not apply to MDC's documents for the simple reason that MDC's documents do not constitute ESI. In the ordinary course of business, MDC maintains these documents on rolls of microfilm. (Pettis Dec. ¶ 3.) Microfilm is not a medium of electronic storage. Microfilm is akin to paper documents – the only difference is that the information is stored on film. That film is not electronic – indeed, a roll of microfilm cannot be inserted into, loaded onto or stored in a computer or computer database.

MDC could elect to permit Plaintiffs access to the documents on the microfilm. That microfilm is not searchable and does not permit content manipulation, bookmarking, document assembly or tagging. The documents on the microfilm can only be viewed on a microfilm viewer machine, page-by-page, and printed one page at a time. Each printed page would then need to be numbered and labeled. Thus, Plaintiffs are not entitled to the CD password(s) and the access they seek.

### B. MDC Has Already Fully Complied With The Court's December 10 Order By Producing The Documents in Reasonably Usable Form

In the event that the Court determines that MDC's documents do constitute ESI (which they do not) and the statutes cited by Plaintiffs apply, the Motion should still be denied because MDC fully complied with the Court's December 10 Order, as well as Section 2031.280, by producing the documents to Plaintiffs on fourteen CDs within the three-day timeframe. Plaintiffs concede that MDC produced the documents, but argue that the documents were not produced in "reasonably usable" form, since Plaintiffs could not search or print the CDs. This argument lacks legal support.

BRYAN ... E LLP
120 BROAD..., SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

California Code of Civil Procedure Section 2031.280 states, in relevant part:

> (d) Unless the parties otherwise agree or the court otherwise orders, the following shall apply:
> (1) If a demand for production does not specify a form or forms for producing a type of electronically stored information, the responding party shall produce the information in the form or forms in which it is ordinarily maintained or in a form that is reasonably usable.
> (2) A party need not produce the same electronically stored information in more than one form.

Here, in accordance with the statute and the Court's order, MDC produced the documents on December 15. The statute gives the responding party the option to produce documents in the form in which they are ordinarily maintained or in a reasonably usable form. As discussed above, by producing the documents on CDs instead of microfilm, MDC was actually making the documents more accessible and convenient for Plaintiffs to view. Without citing a single binding authority, Plaintiffs argue that the documents were not produced in "reasonably usable" form. This is contradicted by the case law interpreting Section 2031.280 and its analogous federal counterpart, Federal Rule of Civil Procedure 34(a)(1)(A). In *Toshiba America Electronic Components v. Superior Court,* 124 Cal. App. 4th 762 (2004), the seminal California case dealing with electronic discovery issues, the Court of Appeal considered whether the statute required the demanding party to pay for translation of data to a usable form.[1] Although *Toshiba* focused on cost-shifting and will be discussed more fully in Section C below, the Court provided some relevant analysis to the distinction between usable and not usable. The discovery dispute in *Toshiba* involved backup tapes, some of which were made with obsolete software and were incorrectly labeled. *Id.* at 766. The parties conceded that such tapes were not "reasonably usable," since the files on the tapes would need to be manipulated, converted, processed and/or analyzed in order to view their contents. *Id.* at 766-67. This provides a sharp contrast to the documents that MDC produced here, which Plaintiffs can freely view on a computer without any processing or analysis.

[1] The identical statutory language analyzed by the *Toshiba* court has been renumbered as *Code of Civil Procedure section* 2031.280, subdivision (c). (Compare *Code Civ. Proc., § 2031.280*, subd. (c) with *Toshiba, supra*, 124 *Cal.App.4th at p. 767* [quoting the pertinent language of the statute in effect when the opinion was issued, *Code of Civil Procedure section 2031*, subdivision (g)(1)].) Therefore, the Toshiba court's analysis of *Code of Civil Procedure section* 2031, subdivision (g)(1) applies equally to section 2031.280.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYA /E LLP
120 BROAD...Y, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

District courts construing Fed. R. Civ. P. 34 have reached similar conclusions.[2] In *Zubulake v. USB Warburg, LLC*, 217 F.R.D. 309, 320 (S.D.N.Y. 2003), the Court made the following distinction: "Information deemed 'accessible' is stored in a readily usable format. Although the time it takes to actually access the data ranges from milliseconds to days, the data does not need to be restored or otherwise manipulated to be usable. 'Inaccessible' data, on the other hand, is not readily usable." The Court held that active e-mail files and archived e-mail files were both accessible and usable, but, as in *Toshiba*, backup data stored on tapes was not usable and thus the Court moved on to its cost-shifting analysis. *See id.* at 320. Other district courts have relied on this definition. *See, e.g., OpenTV v. Liberate Technologies*, 219 F.R.D. 474, 477 (N. D. Cal. 2003) ("[w]hile the source code at issue is not 'backed up' in the manner of the e-mails at issue in the Zubulake cases, it is similarly expensive and time consuming to make it available in a usable form for discovery. For this reason, the Court finds that the requested electronic data is stored in an inaccessible format for the purposed of discovery."). Here, by contrast, Plaintiffs can simply view the contents of the discs on a computer. They do not need to convert, process or otherwise manipulate the files in order to review them. It is also worth noting that if MDC had instead produced hard copies of the documents, which would have also been fully compliant with the Court's December 10 Order, the paper documents would *still* not be searchable. Accordingly, MDC has already complied with the statute and Court's Order, and produced the documents in a reasonably usable form.

Moreover, Plaintiffs reference no binding legal authority to support their argument that MDC must produce these documents in a searchable or printable format. Their Motion cites the Advisory Committee Notes to the 2006 Federal Rules Amendment, which explains that a party should not convert electronically stored information from the form in which it is ordinarily maintained into a different form that makes it more difficult for the requesting party to use in litigation. As a threshold matter, federal advisory notes are not binding to a California state court case. Even if the federal rules did apply here, district courts have rejected arguments like Plaintiffs' in this precise context. In *Autotech Technologies Limited Partnership v. AutomationDirect.com, Inc.*, 248 F.R.D. 556 (N.D. Ill. 2008), the

---

[2] Rule 34 and its California counterpart are virtually identical, except that California has a mandatory cost-shifting provision when it is necessary for a party to translate data into usable form.

demanding party complained that the responding party produced a document after converting it from its native Word format to PDF format, which stripped the document of its metadata. The Court rejected the demanding party's motion to compel production of the document in Word format for several reasons. First, the Court noted that the moving party presented no proof that the document was converted from the form in which it was ordinarily maintained. *Id.* at 559 ("[Demanding party] argues that the document at issue... was not produced in the form in which it is ordinarily maintained. But that is all it is – an argument – and [the party] does not provide evidence, such as an affidavit to support its version of the production. An uncorroborated statement in a brief doesn't count.").

Similarly, here Plaintiffs make bald contentions regarding MDC's maintenance of these documents, with no evidentiary support. (*See* Plaintiffs' Motion at 6:4-5.) There is no evidence, for instance, that MDC ordinarily maintains these documents on CDs in a searchable, printable format. There is also no evidence that MDC converted the documents to a form that makes it more difficult or burdensome to use in litigation. Indeed, the evidence is quite to the contrary: the CDs provide better access to the documents than microfilm.

Furthermore, MDC has repeatedly attempted to facilitate the document production through various proposed agreements with Plaintiffs' counsel, as outlined above. The CDs' password protection does not make the documents more difficult to use; rather, it protects MDC's confidential, proprietary information while allowing Plaintiffs to review the contents for relevant information and then, upon their request, to obtain specific documents individually with proper labeling.

Moreover, as discussed in *Autotech*, Plaintiffs are not entitled to compel production of documents in a particular format unless they request that it be produced in that format. *Autotech*, 248 F.R.D. at 559; *see also Wyeth v. Impax Labs, Inc.*, 248 F.R.D. 169, 171 (D. Del. 2006) (denying plaintiff's motion to compel where defendant produced documents converted to image files and the parties had never agreed that the documents would be produced in any particular format); *Covad Communs. Co. v. Revonet, Inc.*, 260 F.R.D. 5, 8 (D.D.C. 2009).

Here, the parties have met and conferred regarding this discovery numerous times, including an in-person meeting at Plaintiffs' counsel's office in July, as well as numerous letters and telephone conferences. Plaintiffs never specifically requested that MDC produce the documents in a searchable

BRYA (E LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

or printable form; rather, Plaintiffs' counsel agreed to review the documents produced informally and then select which documents they wanted to be produced formally, with proper Bates stamps and confidentiality labeling. Three months later, Plaintiffs' counsel unilaterally reneged on this agreement. At no point in the original requests for production or in the course of the parties' negotiations did Plaintiffs demand the documents to be produced in any particular format. The Court's December 10 Order was also silent regarding the documents' format. Furthermore, the Order only gave MDC three court days in which to produce the documents, so MDC had no choice but to produce the documents in the format in which they existed at that time, which was on the secured CDs. Just as in *Autotech*, "[t]here was not mention of it in the earlier motions to compel. The court order certainly did not require it to be produced." *Autotech*, 248 F.R.D. at 559. Accordingly, since MDC has already produced the requested documents in a reasonably usable form and in compliance with the Court's December 10 Order, Plaintiffs' Motion should be denied.

C. <u>California's Mandatory Cost-Shifting Provision Requires Plaintiffs to Bear the Expense of Producing the CDs</u>

Plaintiffs should be required to pay the reasonable costs of the CDs – at least the cost of the additional CDs. California Code of Civil Procedure section 2031.280 subdivision (e) provides: "If necessary, the responding party at the reasonable expense of the demanding party shall, through detection devices, translate any data compilations included in the demand into reasonably usable form." Unlike the federal rules, which simply *permit* cost-shifting through an undue burden analysis, California *requires* cost-shifting to the demanding party in these circumstances. *Toshiba*, 124 Cal. App. 4th 762, 772 ("the statute automatically shifts the expense of translating a data compilation into usable form to the demanding party.").

By copying the documents onto CDs, MDC actually produced the documents in a *more* accessible and user-friendly format than if they had been produced on microfilm. By preparing the additional CDs, MDC will be providing Plaintiffs with the documents in a form significantly more usable than the documents native form, i.e., microfilm. Since Plaintiffs demanded such access, which costs less than the cost of reviewing and printing the documents from microfilm, CDs, Plaintiffs should have to pay the expense of the CDs.

BRYA E LLP
120 BROAD...Y, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case 4:11-cv-00061-LB Document 17-12 Filed 01/10/11 Page 62 of 88

The Court should order Plaintiffs to reimburse MDC for the cost of preparing the CDs.

## IV. PLAINTIFFS ARE NOT ENTITLED TO SANCTIONS

Plaintiffs seek sanctions under California Code of Civil Procedure sections 2023.030(a) and 2023.010(g), which allow the Court to impose sanctions on a party for engaging in discovery misconduct, which includes disobeying a court order to provide discovery. Plaintiffs are not entitled to sanctions, however, because MDC did not disobey any court order. The Court's December 10 Order required MDC to produce the relevant documents by December 15, and MDC complied by immediately sending 14 CDs of responsive documents to Plaintiffs. The Court order did not require the documents to be produced in any particular format and, as discussed above, Plaintiffs never demanded, nor did MDC promise, that the documents be produced in searchable or printable form.

In support of their request for sanctions, Plaintiffs also argue that MDC acted in bad faith. This argument lacks factual support and, in any event, it is irrelevant. Plaintiffs are seeking sanctions for MDC's purported non-compliance with the Order, not for any other alleged misconduct. Accordingly, since MDC ***did*** comply with the Court's December 10 Order, sanctions are simply not warranted. Plaintiffs' accusations about MDC's alleged intentions are irrelevant and false – the evidence shows that MDC has repeatedly attempted to produce the requested documents in a mutually agreeable fashion, while Plaintiffs have been largely uncooperative and unresponsive. Plaintiffs' request for sanctions should be denied.

///

///

///

///

///

///

///

///

///

///

BRYA[...]E LLP
120 BROAD[...]Y, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 160 of 226
Case4:11-cv-00061-LB Document17-12 Filed01/10/11 Page63 of 88

## V. CONCLUSION

MDC respectfully requests that the Court deny Plaintiffs' Motion to Compel and Request for Sanctions because MDC has fully complied with the Court's December 10 Order and produced the documents in reasonably usable form. Further, MDC respectfully requests that the Court order Plaintiffs to pay the cost of the CDs ($25,934.47).

Dated: January 4, 2011

Respectfully submitted,

BRYAN CAVE LLP
Robert E. Boone III
James C. Pettis
Linda C. Hsu

By: ______________________
James C. Pettis
Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

BRYA[illegible]E LLP
120 BROAD[illegible]Y, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

816750

13

MDC'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH COURT'S DECEMBER 10, 2010 ORDER

Exhibit 20-532

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

DECLARATION OF JAMES C. PETTIS

I, James C. Pettis, declare:

1. I am an attorney duly licensed to practice law before the Courts of the State of California. I am an associate at Bryan Cave LLP, counsel of record for defendant McDonnell Douglas Corporation. ("MDC"). I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, I could testify competently to them.

2. The documents we represented MDC was prepared to produced were prepared for informal production to Plaintiffs in August based on a July 26, 2010 agreement with Plaintiffs' counsel. Based on that agreement, Plaintiffs were to informally review the documents under an agreed upon protective order and identify those which they believed were relevant to this case. We would then need to individually label the documents identified for formal production. Thus, the documents are not currently individually labeled and are secured on fourteen CDs with a password.

3. We never represented to Plaintiffs that they would be able to print the documents from the CDs, or that the documents would be searchable. In fact, in the ordinary course of business, MDC maintains these documents on rolls of microfilm. We cannot provide Plaintiffs with the password to unlock the CDs because doing so would permit Plaintiffs to manipulate the documents, including changing the content of the documents and content copying. The documents are proprietary and confidential documents, and each page of the documents has not been individually numbered and marked as "confidential" for purposes of the litigation. The integrity and proper identification of the documents must be maintained because of (a) the nature of the information, and (b) the fact that the documents have been produced in litigation.

4. The cost of converting and individually Bates-stamping each of the documents is $25,934.47.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4th day of January, 2011, at Santa Monica, California.

James C. Pettis

Case 4:11-cv-00061-LB Document 17-12 Filed 01/10/11 Page 65 of 88

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 120 Broadway, Suite 300, Santa Monica, California 90401-2305.

On January 4, 2011, I served the foregoing document, described as **DEFENDANT MCDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH DECEMBER 10, 2010 ORDER AND REQUEST FOR SANCTIONS; DECLARATION OF JAMES C. PETTIS,** on each interested party in this action, as follows:

Andrea Huston, Esq.
Elina Agnoli, Esq.
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, CA 94607
Telephone: (510) 302-1000
Facsimile: (510) 835-4913

☒ (BY E-MAIL OR ELECTRONIC TRANSMISSION): Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to each person at the e-mail address(es) set forth in the attached service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Executed on January 4, 2011, at Santa Monica, California.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Karina Lopez

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 21



Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 164 of 226

Superior Court of California
County of Alameda

Welcome Page | Calendar Information | Case Summary | Complex Litigation | Public Reports (Filings) | Direct Calendar Departments | La

## Case Summary

**RG09489518** **Vest VS Allied Packing And Supply**

General Information
Parties
Attorneys
Register of Actions
Future Hearings
Minutes
Rulings & CMC Orders
Tentative Rulings
Judgments
Related Cases

### Tentative Rulings

| Date | Action | Image (Java) | Image (TIFF) |
|---|---|---|---|
| 01/06/11 | TR - Motion for Summary Judgment - Parties To Appear *This Tentative Ruling is issued by Judge Jo-Lynne Q. Lee PARTIES ARE TO APPEAR on Henkel Corporation's motion for summary judgment or summary adjudication.* | | |
| 01/06/11 | TR - Motion to Compel (Motion) - Granted *This Tentative Ruling is issued by Judge Jo-Lynne Q. Lee The motion by Plaintiffs Timothy Vest and Caroline Vest ("Plaintiffs") to compel Defendant McDonnell Douglas ("MDC") to comply with the Court's Order of December 10, 2010, and for an award of monetary sanctions, is GRANTED as follows: MDC is ordered to produce the printable and searchable CDs it prepared not later than January 10, 2011. MDC's request for reimbursement for its costs is DENIED. MDC was required to produce the documents in a format that was reasonably useable, in response to the Court's order, but failed to do so. Code of Civil Procedure section 2031.280(d)(1). The arguments raised in the opposition papers should have been raised no later than the December 10, 2010 hearing. The printable CDs must be produced by January 10, 2011. Plaintiffs have agreed to waive their claim for monetary sanctions if they are not required to pay the costs claimed by MDC to prepare the CDs in a printable, searchable format.* | | |
| 12/02/10 | TR - Motion - Granted in Part *This Tentative Ruling is issued by Judge Kenneth Mark Burr The motion by Plaintiffs Timothy Vest and Caroline Vest ("Plaintiffs") to compel Defendant Kaiser Gypsum ("Kaiser") to produce a corporate representative for deposition, and to produce documents listed in the Notice of Deposition, is ruled upon as follows: The motion to compel Kaiser's Custodian(s) of Records ("COR") and Person(s) Most Qualified ("PMQ") to appear for deposition is moot. The parties have agreed that Kaiser's corporate representative will appear for deposition on December 9, 2010, in Texas. The issues remaining concern the scope of the deposition and the document production. The motion is GRANTED IN PART as to Document Requests Nos. 3-4 and Deposition Categories Nos. 3-4. The production of documents and scope of the deposition is limited to the time period of 1965 to 1984. The possibility of discovering relevant information for periods beyond 1965 to 1984 is remote. However, the fact that Plaintiff cannot remember periods of time prior to 1972 is not determinative of his potential exposure during that period, since there is no dispute that he moved into the house in Dublin in 1966. In addition, these requests and Categories are limited to Perma Bilt entities in Dublin and the area within 40 miles of Dublin. The motion is GRANTED IN PART as to Document Requests Nos. 1-2 and* | | |

http://apps.alameda.courts.ca.gov/domainweb/html/index.html 1/7/2011

Exhibit 21-595

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 22

Opp due 8/16
Reply to Opp due 8/20

**BRYAN CAVE LLP**
Robert E. Boone III, California Bar No. 132780
James C. Pettis, California Bar No. 223953
M. Angela Buenaventura, California Bar No. 264130
120 Broadway, Suite 300
Santa Monica, California 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys For Defendant
MCDONNELL DOUGLAS CORPORATION

RECEIVED *
UPS 1:15
JUL 02 2010
DAA/GDG/JAB/TKC
KAZAN, McCLAIN, LYONS
GREENWOOD & HARLEY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ALAMEDA**

TIMOTHY VEST and CAROLINE VEST,

Plaintiff,

vs.

ALLIED PACKING AND SUPPLY, et al.,

Defendants.

Case No. RG09489518
Hon. Kenneth Mark Burr

**DEFENDANT McDONNELL DOUGLAS CORPORATION'S NOTICE OF MOTION AND MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES AND PRODUCTION OF DOCUMENTS AND REQUEST FOR SANCTIONS IN THE AMOUNT OF $3950; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Filed concurrently with Separate Statement of Items in Dispute; Declaration of M. Angela Buenaventura; and [Proposed] Order]

Date: August 27, 2010
Time: 9:32 a.m.
Dept: 30
**RESERVATION NO.: 1081256**

C

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on August 27, 2010, at 9:32 a.m. or as soon thereafter as counsel may be heard in Department 30 of the Alameda County Superior Court located at U.S. Post Office Building, 201 13th Street, Oakland, California, defendant McDonnell Douglas Corporation ("MDC") will and hereby does move the Court for an order pursuant to Sections 2023.010, et seq., 2030.010, et seq. and 2031.010, et seq. of the Code of Civil Procedure compelling plaintiffs Timothy and Caroline Vest ("Plaintiffs") to provide further responses and produce documents in response to MDC's Special Interrogatories, Set One, and Requests for Production, Set One. MDC also requests monetary sanctions against Plaintiffs and/or their counsel in the amount of $3950, representing MDC's reasonable attorneys' fees incurred in bringing this Motion.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities attached hereto, the Separate Statement of Items in Dispute and Declaration of M. Angela Buenaventura filed concurrently herewith, all pleadings and records on file in this action, all arguments made at the time of the hearing on this Motion, and such other matters as the Court deems appropriate.

MDC met and conferred with Plaintiffs before filing this Motion. On June 10, 2010, MDC's counsel faxed Plaintiffs' counsel a letter in an attempt to meet and confer in the hopes of resolving these issues informally. The letter detailed the deficiencies in Plaintiffs' responses to MDC's First Set of Special Interrogatories and First Set of Requests for Production, and MDC's counsel requested that Plaintiffs supplement their responses by June 21, 2010. Plaintiffs' counsel telephoned MDC's counsel on June 21, 2010. Plaintiffs' counsel stated that he would fax MDC's counsel an exhibit that Plaintiffs failed to attach to their responses to MDC's First Set of Requests for Production. He also said that he would fax the verifications that Plaintiffs failed to attach to their responses. Plaintiffs did not explain how the exhibit that they faxed to MDC, which is purportedly responsive to Request for Production No. 19, relates to the claims against MDC. Plaintiffs' counsel indicated that other than faxing the exhibit and verifications, Plaintiffs would not further supplement their responses to the MDC's discovery

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 168 of 236
Case4:11-cv-00061-LB Document17-12 Filed01/10/11 Page71 of 88

Dated: July 1, 2010

**BRYAN CAVE LLP**
Robert E. Boone III
James C. Pettis
M. Angela Buenaventura

By: [signature]
M. Angela Buenaventura
Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

C000109/0307472/791773.7
3
NOTICE AND MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES

Exhibit 22-598

Case 4:11-cv-00061-LB Document17-12 Filed01/10/11 Page72 of 88

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 2

III. PLAINTIFFS' RESPONSES ARE LEGALLY DEFICIENT AND THUS THE MOTION SHOULD BE GRANTED .......... 4

A. MDC Is Entitled To The Discovery It Seeks .......... 4

B. Plaintiffs' Responses To The Interrogatories Are Incomplete, Non-Responsive And Evasive .......... 5

C. Plaintiffs' Responses To The Requests For Production Are Incomplete, Non-Responsive And Evasive .......... 10

D. The Court Should Impose Monetary Sanctions Against Plaintiffs .......... 12

IV. CONCLUSION .......... 13

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# TABLE OF AUTHORITIES

Page

## Cases

*Deyo v. Kilbourne*, 84 Cal. App. 3d 771 (1978) ........ passim

*Fairmont Ins. Co. v. Sup. Ct.*, 22 Cal. 4th 245 (2000) ........ 9

*Korea Data Systems Co. Ltd. v. Sup. Ct.*, 51 Cal. App. 4th 1513 (1997) ........ 9

*West Pico Furn. Co. v. Sup. Ct.*, 56 Cal. 2d 407 (1961) ........ 10

## Statutes

Cal. Civ. Proc. Code § 2023(b) ........ 13

Cal. Civ. Proc. Code § 2023.010(d) ........ 13

Cal. Civ. Proc. Code § 2023.010(e) ........ 13

Cal. Civ. Proc. Code § 2023.010(f) ........ 13

Cal. Civ. Proc. Code § 2023.030(a) ........ 12

Cal. Civ. Proc. Code § 2030(l) ........ 13

Cal. Civ. Proc. Code § 2030.210(a)(3) ........ 9

Cal. Civ. Proc. Code § 2030.220(a) ........ 5, 8

Cal. Civ. Proc. Code § 2031.210(a) ........ 5, 12

Cal. Code Civ. Proc. § 2030.220(c) ........ 9

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant McDonnell Douglas Corporation ("MDC") brings this Motion to Compel plaintiffs Timothy and Caroline Vest ("Plaintiffs") to provide further responses to its First Set of Special Interrogatories (the "Interrogatories") and First Set of Requests for Production of Documents ("Requests for Production") because Plaintiffs' current responses do not provide the information actually requested by MDC's discovery. Plaintiffs' current responses consist of general information that is not responsive to MDC's requests, and are clearly intended to conceal their inability to articulate specific facts and identify and produce documents that support their purported claims against MDC.

MDC's discovery requests detailed information about Mr. Vest's alleged exposure to asbestos from MDC products – for instance, specific product identification, and specific facts as to when, where and how Mr. Vest was purportedly exposed, including the details of the work performed by Mr. Vest and/or others. In their responses, Plaintiffs make some general statements and provide a list of several aircraft serial numbers and model numbers in response to MDC's interrogatories, and refer to an All Operators Letter ("AOL") issued by MDC 20 years ago. But Plaintiffs' responses do not provide the information actually requested by MDC's discovery. When one carefully reads Plaintiffs' cleverly-crafted responses, it is clear that nowhere do Plaintiffs actually answer the particular question asked. Plaintiffs never state in their responses that Mr. Vest was actually exposed to asbestos from any specific parts or components of any specific aircraft made or supplied by MDC, nor do Plaintiffs state that Mr. Vest actually worked on any of these aircraft. Plaintiffs provide no details of any work by Mr. Vest on any particular MDC product. Mere reference to documents, including the AOL, is not sufficient because those documents are not evidence or facts demonstrating that Mr. Vest was in fact exposed to asbestos from a MDC product, or the details requested regarding the work related to any such exposure.

Similarly, Plaintiffs fail to provide the requested information about Mr. Vest's alleged secondary exposure. While Plaintiffs allege that Mr. Vest worked around mechanics who worked on aircraft, and that Mr. Vest was exposed to asbestos when he accompanied his father to work

and secondarily through his father at home, Plaintiffs' discovery response do not identify any specific parts or components of any aircraft that Mr. Vest's father or any mechanics worked on, and do not provide the details (who, what, when, where, etc.) of any work by the father or any co-workers. Only Mr. Vest or actual eyewitnesses would know this information, yet Plaintiffs refuse to provide, or state in their discovery responses that they have no such information.

Plaintiffs' current responses are clearly intended to conceal their inability to support their purported claims against MDC. Such gamesmanship should not be tolerated. Accordingly, MDC respectfully requests that the Court compel Plaintiffs to provide further and complete responses, without objection, and produce documents in connection with the Requests for Production and Interrogatories at issue. If Plaintiffs cannot provide the information requested, they should be ordered to withdraw their current responses and provide supplemental responses stating, under oath, that they have no responsive information.

Finally, as discussed below, Plaintiffs' conduct in connection with MDC's discovery requests represents a misuse of the discovery process. Therefore, MDC is entitled to sanctions against Plaintiffs and/or their counsel in the amount of $3950, which represents the reasonable attorneys' fees MDC has incurred in bringing this Motion.

MDC met and conferred with Plaintiffs before filing this Motion.

## II. FACTUAL BACKGROUND

Plaintiffs' Second Amended Complaint ("SAC") alleges that Mr. Vest was secondarily and directly exposed to asbestos and asbestos-containing products at various locations from 1965 to 2005, and asserts fifteen premises and product liability causes of action against a host of "Product" and "Premises" Defendants. (See SAC.) MDC was added as a Product Defendant and Plaintiffs assert only five causes of action against it for negligence, strict product liability, fraud, conspiracy to defraud, and loss of consortium. Plaintiffs' SAC does not identify any MDC product to which Mr. Vest was occupationally or para-occupationally exposed. As to MDC, Plaintiffs have asserted in discovery that Mr. Vest was exposed to asbestos (1) while Mr. Vest's father worked at World Airways, Inc. from 1973-1983 (Plaintiffs allege secondary exposure at home and when Mr. Vest accompanied his father to work on weekends), (2) while Mr. Vest worked as a ramp agent for

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Continental Airlines from 1985-1987, (3) while Mr. Vest worked as a commercial pilot for Emery Worldwide Airlines from 1990-2001, and (4) while Mr. Vest worked as an accident investigator for Emery Worldwide Airlines in 2000. Plaintiffs broadly claim that Mr. Vest was exposed to asbestos from DC-8 and DC-10 aircraft during the above time periods, but do not identify the specific aircraft or specific aircraft component manufactured or supplied by MDC from which Mr. Vest allegedly breathed airborne asbestos fibers.

MDC served its Interrogatories and its First Set of Requests for Production of Documents on Plaintiffs on March 31, 2010. (See Declaration of M. Angela Buenaventura ("Buenaventura Decl."), Exs. A and B.) MDC's Interrogatories and Requests seek the critical factual information and supporting documents, if any, upon which Plaintiffs base their claims against MDC. MDC sought to discover the following types of information, among others, through its Interrogatories: the identity of any aircraft component or other product manufactured or supplied by MDC that allegedly contained asbestos to which Mr. Vest was purportedly exposed; the supplier of each particular component or part of any aircraft or other product that allegedly contained asbestos to which Mr. Vest was purportedly exposed; the details of any work performed by others on MDC aircraft or components that allegedly caused Mr. Vest to be exposed to asbestos; how any work or other activity performed by Mr. Vest caused Mr. Vest to be exposed to asbestos; and the identity of individuals who witnessed Mr. Vest perform work on MDC aircraft or components.

In addition, MDC sought the following types of documents, among others, through its Requests for Production: documents that support Plaintiffs' contention that Mr. Vest was exposed to asbestos from any aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC; documents that relate to, describe or identify any aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC from which Mr. Vest was allegedly exposed to asbestos; documents that evidence or memorialize how Mr. Vest was allegedly exposed to asbestos from any aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC; and documents that relate to, evidence or describe the composition and/or asbestos content of any aircraft, aircraft component or part, or other product(s) from which Mr. Vest was allegedly exposed to asbestos.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Plaintiffs' Interrogatory Responses and Responses to the Requests for Production fail to identify with any particularity how Mr. Vest was allegedly exposed to any asbestos-containing part manufactured by MDC. (See Buenaventura Decl., Exs. C and D.) In other words, Plaintiffs have failed to provide any substantive information whatsoever that would enable MDC to evaluate Plaintiffs' claims against it. (See id.) This information must be demonstrated by Plaintiffs at trial in order to prevail on their claims against MDC.

MDC met and conferred with Plaintiffs before filing this Motion. On June 10, 2010, MDC's counsel faxed Plaintiffs' counsel a letter in an attempt to meet and confer in the hopes of resolving these issues informally. (See Buenaventura Decl., Ex. E.) The letter detailed the deficiencies in Plaintiffs' responses to MDC's First Set of Special Interrogatories and First Set of Requests for Production, and MDC's counsel requested that Plaintiffs supplement their responses by June 21, 2010. (See Buenaventura Decl., Ex. E.) Plaintiffs' counsel telephoned MDC's counsel on June 21, 2010. (Buenaventura Decl., ¶ 6.) Plaintiffs' counsel stated that he would fax MDC's counsel an exhibit that Plaintiffs failed to attach to their responses to MDC's First Set of Requests for Production. (Buenaventura Decl., ¶ 7.) He also said that he would fax the verifications that Plaintiffs failed to attach to their responses. Plaintiffs did not explain how the exhibit that they faxed to MDC, which is purportedly responsive to Request for Production No. 19, relates to the claims against MDC. (Buenaventura Decl., ¶ 9; Buenaventura Decl., Ex. F.) Plaintiffs' counsel indicated that other than faxing the exhibit and verifications, Plaintiffs would not further supplement their responses to the MDC's discovery. (Buenaventura Decl., ¶ 10.) Plaintiffs' counsel sent a letter to MDC's counsel after the phone call, which purported to memorialize the conversation. (See Buenaventura Decl., Ex. G.)

## III. PLAINTIFFS' RESPONSES ARE LEGALLY DEFICIENT AND THUS THE MOTION SHOULD BE GRANTED

### A. MDC Is Entitled To The Discovery It Seeks

The objective of pretrial discovery is "to allow a party to obtain all of the facts relative to a claim or defense." *Deyo v. Kilbourne*, 84 Cal. App. 3d 771, 781 (1978). Thus, an interrogatory response must be complete, and must include all of the information which is then available to the

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

responding party. *Id.* at 782; Cal. Civ. Proc. Code § 2030.220(a) (a party's interrogatory responses must be "as complete and straightforward as the information reasonably available to the responding party permits"). A response is not sufficient if it provides only conclusory information. *Deyo*, 84 Cal. App. 3d at 783.

With respect to requests for production of documents, a plaintiff must respond to each request in one of three ways: (1) by a statement that the plaintiff will comply with the particular demand; or (2) by a statement that the plaintiff lacks the ability to comply with the particular demand; or (3) by an objection to all or part of the demand. Cal. Civ. Proc. Code § 2031.210(a).

Plaintiffs have violated these basic rules. MDC's discovery requests detailed information about Mr. Vest's alleged exposure to asbestos from MDC products. In their responses, Plaintiffs make some general statements and provide a list of several aircraft serial numbers and model numbers in response to MDC's interrogatories, and refer to an AOL issued by MDC 20 years ago. But Plaintiffs' responses do not provide the information actually requested by MDC's discovery. Plaintiffs' current responses are a smokescreen of irrelevant information, clearly intended to conceal their inability to identify and produce documents and articulate specific facts that support their purported claims against MDC. Accordingly, the Court should compel Plaintiffs to provide documents and further responses. If Plaintiffs cannot provide the information requested, they should be ordered to withdraw their current responses and provide supplemental responses stating, under oath, that they have no responsive information.

**B. Plaintiffs' Responses To The Interrogatories Are Incomplete, Non-Responsive And Evasive**

Plaintiffs fail to provide the following information requested by these interrogatories, all of which information MDC is entitled to learn through candid responses:

-- the identity of each aircraft component or part or other product manufactured or supplied by MDC that allegedly contained asbestos to which Mr. Vest was purportedly exposed (Interrogatory No. 2);

-- specifically when and where Mr. Vest was allegedly exposed to asbestos from each such aircraft/component (Interrogatory Nos. 9 and 10);

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

-- the details of Mr. Vest's work with respect to each such aircraft/component (Interrogatory No. 11);

-- how such work caused him to be exposed to airborne asbestos fibers from such aircraft/components (Interrogatory No. 12);

-- the identity of each document which memorializes or evidences such work by Mr. Vest (Interrogatory No. 14);

-- the details of any work performed by others on such aircraft/components which Plaintiff claims caused (secondary) exposure to Mr. Vest (Interrogatory No. 15);

-- how such work by others caused Mr. Vest to be exposed (Interrogatory No. 16);

-- the identity of each document which memorializes or evidences such work by others (Interrogatory No. 18);

-- the asbestos content or composition of each such aircraft/component (Interrogatory No. 3);

-- the type of asbestos used in each such aircraft/component (Interrogatory No. 4);

-- how airborne asbestos fibers were allegedly released from each such aircraft/component (Interrogatory No. 5);

-- facts upon which Plaintiff bases any contention that MDC manufactured each such aircraft/component (Interrogatory Nos. 6 and 8);

-- all facts upon which Plaintiff bases any contention that a particular aircraft/component contained asbestos (Interrogatory No. 19); and

-- the identity of each document upon which Plaintiff bases any such contention (Interrogatory No. 21).

**Nowhere in Plaintiffs' discovery responses do Plaintiffs provide the requested information.**

In their response to Interrogatory No. 2, rather that specifying which asbestos-component of any aircraft Mr. Vest was actually exposed to, Plaintiffs broadly allege that Mr. Vest was exposed to asbestos (1) while Mr. Vest's father worked at World Airways, Inc. from 1973-1983 (Plaintiffs allege secondary exposure at home and when Mr. Vest accompanied his father to work

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

on weekends), (2) while Mr. Vest worked as a ramp agent for Continental Airlines from 1985-1987, (3) while Mr. Vest worked as a commercial pilot for Emery Worldwide Airlines from 1990-2001, and (4) while Mr. Vest worked as an accident investigator for Emery Worldwide Airlines in 2000. Plaintiffs list the aircraft serial numbers and model numbers of the aircraft in the fleets of Mr. Vest's and Mr. Vest's father's employers, despite the fact that there is no evidence that Mr. Vest or his father came into contact with all of the aircraft in these fleets. This response is not what MDC asked for in the interrogatory. Plaintiffs' response consists of nothing but generalized, irrelevant information. Plaintiffs attempt to hide behind this information in order to evade their obligation to specify which asbestos-containing part or component caused Mr. Vest's exposure.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

In response to Interrogatory Nos. 9 and 10, rather than stating specifically when and where Mr. Vest was allegedly exposed to asbestos, Plaintiffs incorporate their responses to Interrogatory Nos. 2 and 5. As noted above, the response to Interrogatory No. 2 is a smokescreen of irrelevant information. Plaintiffs' response to Request No. 5 merely details Mr. Vest and his father's employment history. In other words, Plaintiffs broadly and impermissibly respond that "when" is any period of time while Mr. Vest or his father were employed in the aviation industry. Similarly, Plaintiffs broadly and impermissibly respond that "where" is at the location of any of Mr. Vest or his father's employers. These evasive responses prohibit MDC from investigating and defending itself against Plaintiffs' claims.

In response to Interrogatory Nos. 11, 12, 15 and 16, rather than stating what type of work Mr. Vest, mechanics, or Mr. Vest's father were performing when Mr. Vest was allegedly exposed to asbestos, Plaintiffs again incorporate their broad responses to Interrogatory Nos. 2 and 5. In other words, Plaintiffs broadly and impermissibly respond that Mr. Vest may have been exposed to asbestos during the course of both Mr. Vest and his father's employment in the aviation industry. They do not identify any specific type of work performed by Mr. Vest, his father, or mechanics working near Mr. Vest. These evasive responses prohibit MDC from investigating and defending itself against Plaintiffs' claims.

For decades MDC has been a manufacturer of many different commercial and military

aircraft and other aerospace products. MDC's aircraft and other products were and/or are comprised of hundreds of thousands of components. None of Plaintiffs' responses enlighten MDC as to the specific aircraft and specific aircraft component or components manufactured or supplied by MDC from which Mr. Vest allegedly breathed airborne asbestos fibers. Only Mr. Vest himself, or possibly eyewitnesses with first-hand knowledge from actually observing Mr. Vest, know what parts on any aircraft on which Mr. Vest actually worked. MDC has no possible way of knowing that information, and indeed, that is precisely the information MDC asked for and is entitled to.

At a minimum, MDC is entitled to specific responses that include factual information regarding the basis of Plaintiffs' contentions. Plaintiffs' conclusions without factual details do not satisfy their obligation to provide facts that support their claims. Code Civ. Proc. § 2030.220(a).

In addition, Plaintiffs' references to documents where responsive information allegedly might be found is insufficient. In their responses to Special Interrogatories Nos. 2, 3, 7, 14, 17, 18 and 21, Plaintiffs identify: (1) an "All Operator Letter from 1989 and updated on October 22, 1992" which purportedly "contain lists of some of the asbestos-containing aircraft component parts" (but Plaintiffs also note that "Plaintiff Timothy Vest was also exposed to asbestos-containing products and materials not identified in the *All Operator Letter*"), (2) "deposition transcripts and exhibits to the deposition of Timothy Vest taken in this action," (3) "plaintiff's Response to Joint Defense Interrogatories," (4) "plaintiff's Social Security records and employment records," (5) "all reports, memoranda, and photographs generated by Emery Worldwide Airline and the National Transportation Safety Board's investigation of the crash of Emery Worldwide Airline's DC-8 on February 16, 2000 in Rancho Cordova, California," (6) "Timothy Vest's medical records," (7) "[d]ocuments regarding the sale of defendant's aircraft to World Airways, Continental Airlines, and Emery Worldwide Airlines and which were repaired, maintained, converted and operated during the relevant time periods," (8) "[r]epair, maintenance and conversion records of defendant's aircraft purchased and operated by World Airways, Continental Airlines, and Emery Worldwide Airlines during the relevant time periods," (9) "[m]aintenance manuals for defendant's aircraft," (10) "[s]pecifications, blue prints, plans, drawings and other documents regarding airline engines manufactured by General Electric and

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Whitney Pratt," and (11) "[d]ocuments produced by defendant in *Snyder, et al. v. Owens Corning, et al.*, Alameda County Superior Court No. 804700-1."

But none of these documents constitutes evidence, or provides the particular facts requested, of any actual exposure by Mr. Vest to any asbestos in any MDC product. None of the documents, including the AOL, is evidence of any work by anyone, let alone Mr. Vest, a co-worker or his father, on any MDC plane, let alone any particular component.

With respect to the reference to the deposition transcript, it is well established that Plaintiffs are required to specify what information allegedly contained in that document Plaintiffs are relying on to support their claims. *Deyo*, 84 Cal. App. 3d at 783-84 (interrogatory response may not simply make reference to deposition testimony or other pleadings unless the information therein is "identified and summarized so the answer is fully responsive to the question"). Furthermore, Plaintiffs' references to the other documents where responsive information allegedly might be found (listed above) do nothing to enlighten MDC as to the specific aircraft and specific aircraft component or components manufactured or supplied by MDC from which Mr. Vest allegedly breathed airborne asbestos fibers. Again, only Mr. Vest or actual eyewitnesses would know what aircraft and aircraft components on which Mr. Vest, his father or co-employees worked. MDC is not required to guess what those might be. Plaintiffs are required to supply that information in response to MDC's discovery. If Plaintiffs cannot provide the requested information, they must state under oath that they do not have such information. Code Civ. Proc. § 2030.220(c).

As detailed in the concurrently-filed Separate Statement, the remainder of Plaintiffs' responses consist of boilerplate and generic objections and are fatally deficient. Objections in discovery must be specific and stated separately, and a motion to compel lies where objections are "too general." Code Civ. Proc. §§ 2030.210(a)(3), 2030.300; see *Korea Data Systems Co. Ltd. v. Sup. Ct.*, 51 Cal. App. 4th 1513, 1516 (1997)(objecting party subject to sanctions for "boilerplate" objections.) The burden is on the responding party to justify any objection or failure fully to answer interrogatories. *Fairmont Ins. Co. v. Sup. Ct.*, 22 Cal. 4th 245, 255 (2000). Because the answering party owes a duty to respond in good faith, courts generally do not sustain "ambiguous,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

confusing or overbroad" objections. See *Deyo*, 84 Cal. App. 3d at 783. Similarly, a "burdensome" objection is not enough and it must be shown that the burden of answering is so unjust as to amount to oppression. *West Pico Furn. Co. v. Sup. Ct.*, 56 Cal. 2d 407, 418 (1961). "[S]ome burden is inherent in all demands for discovery. The objection to burden is valid only when the burden is demonstrated to result in injustice." *Id.* at 418. The burden is on the objecting party to sustain the objection by detailed evidence showing precisely how much work is required to answer and conclusory statements are not sufficient. *Id.* at 418.

This Motion should be granted and Plaintiffs should be ordered to serve supplemental responses to Interrogatories Nos. 2-6, 8-12, 14-19, and 21.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

### C. Plaintiffs' Responses To The Requests For Production Are Incomplete, Non-Responsive And Evasive

Plaintiffs fail to provide the following documents requested in MDC's Requests for Production:

-- DOCUMENTS and other tangible items that relate to, describe or identify any aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC from which MR. VEST was allegedly exposed to asbestos (Request for Production No. 6);

-- DOCUMENTS and other tangible items that evidence or memorialize how MR. VEST was allegedly exposed to asbestos from any aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC (Request for Production No. 4);

-- DOCUMENTS and other tangible items that relate to, evidence or describe the composition and/or asbestos content of any aircraft, aircraft component or part, or other product(s) from which MR. VEST was allegedly exposed to asbestos (Request for Production No. 7);

-- DOCUMENTS and other tangible items that relate to, evidence or describe the type of asbestos used in any aircraft, aircraft component or part, or other product(s) from which MR. VEST was allegedly exposed to asbestos (Request for Production No. 8);

-- DOCUMENTS and other tangible items that evidence or memorialize when and where MR. VEST was allegedly exposed to asbestos from any aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC (Requests for Production Nos. 2 and 3);

-- DOCUMENTS and other tangible items that evidence or memorialize any work performed by Mr. Vest, or others in close proximity to Mr. Vest, on any aircraft manufactured by MDC or any component or part of any aircraft. (Request for Production Nos. 15 and 16); and

-- DOCUMENTS and other tangible things that IDENTIFY any PERSON who witnessed MR. VEST working on or with any asbestos-containing aircraft, aircraft component or part, or other product(s) manufactured or supplied by MDC (Request for Production No. 19).

In response to twenty-one of the twenty-eight requests, Plaintiffs merely "refer defendant to the documents identified in plaintiffs' Response to defendant's First Set of Interrogatories to Plaintiffs (Set One), Nos. 2, 3, 7, 14, 17, 18 and 21…" As noted above, in their responses to these interrogatories, Plaintiffs identify: (1) an "All Operator Letter from 1989 and updated on October 22, 1992" which purportedly "contain lists of some of the asbestos-containing aircraft component parts" (but Plaintiffs also note that "Plaintiff Timothy Vest was also exposed to asbestos-containing products and materials not identified in the *All Operator Letter*"), (2) "deposition transcripts and exhibits to the deposition of Timothy Vest taken in this action," (3) "plaintiff's Response to Joint Defense Interrogatories," (4) "plaintiff's Social Security records and employment records," (5) "all reports, memoranda, and photographs generated by Emery Worldwide Airline and the National Transportation Safety Board's investigation of the crash of Emery Worldwide Airline's DC-8 on February 16, 2000 in Rancho Cordova, California," (6) "Timothy Vest's medical records," (7) "[d]ocuments regarding the sale of defendant's aircraft to World Airways, Continental Airlines, and Emery Worldwide Airlines and which were repaired, maintained, converted and operated during the relevant time periods," (8) "[r]epair, maintenance and conversion records of defendant's aircraft purchased and operated by World Airways, Continental Airlines, and Emery Worldwide Airlines during the relevant time periods," (9) "[m]aintenance manuals for defendant's aircraft," (10) "[s]pecifications, blue prints, plans, drawings and other documents regarding airline engines manufactured by General Electric and Whitney Pratt," and (11) "[d]ocuments produced by defendant in *Snyder, et al. v. Owens Corning, et al.*, Alameda County Superior Court No. 804700-1."

The only document that Plaintiffs actually provided was an exhibit that Plaintiffs purported

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

to attach to their responses to the request for production. (Buenaventura Decl., ¶¶ 7, 9; Ex. F.) The exhibit was not faxed to MDC until June 21, 2010. (Buenaventura Decl., ¶ 9.) Plaintiffs did not explain how this exhibit, which is purportedly responsive to Request for Production No. 19, relates to the claims against MDC. (Buenaventura Decl., ¶ 9.)

Again, none of these documents is evidence of Mr. Vest's exposure to asbestos from any particular MDC product – either his work on any MDC aircraft, or work by his father or any co-workers on any MDC aircraft. If Plaintiffs do not have documents evidence such work or exposure (and clearly they do not), then they must say so under oath. Code Civ. Proc. § 2031.210(a).

As noted above, with respect to the reference to the deposition transcript, it is well established that Plaintiffs are required to specify what information allegedly contained in that document Plaintiffs are relying on to support their claims. *Deyo*, 84 Cal. App. 3d at 783-84.

In addition, Plaintiffs' references to the documents listed above and the single exhibit that was purportedly attached in response to Request for Production No. 19 do nothing to enlighten MDC as to the specific aircraft and specific aircraft component or components manufactured or supplied by MDC from which Mr. Vest allegedly breathed airborne asbestos fibers. Again, only Mr. Vest or actual eyewitnesses would know what aircraft and aircraft components on which Mr. Vest worked—Plaintiffs are required to supply that information in response to MDC's discovery.

As further detailed in the concurrently-filed Separate Statement, Plaintiffs should be ordered to serve further responses to Document Request Nos. 2-4, 7-9, 15, 16, and 19 without objection and to produce all documents that are responsive to these Requests.

**D.      The Court Should Impose Monetary Sanctions Against Plaintiffs**

A court has the authority to impose sanctions against a party or its counsel for the misuse of the discovery process. Cal. Code of Civ. Proc. § 2023.030(a). Where that misuse causes the party seeking discovery to incur costs, including attorneys' fees, the party seeking discovery may be awarded a monetary sanction in the amount of such costs and fees. *Id.* Misuse of the discovery process includes failing to respond to discovery, making without substantial justification an unmeritorious objection to discovery and providing evasive responses to discovery. Cal. Civ.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Proc. Code § 2023.010(d),(e),(f). As detailed above, Plaintiffs and their counsel violated these provisions and should be sanctioned accordingly. (See Buenaventura Decl., ¶ 12.) In addition, MDC anticipates that Plaintiffs will oppose this Motion, although without substantial justification. Therefore, sanctions are additionally warranted under California Civil Procedure Code sections 2023(b) and 2030(l).

**IV. CONCLUSION**

MDC's discovery requests detailed information about Mr. Vest's alleged exposure to asbestos from MDC products. In their responses, Plaintiffs make some general statements and provide a list of several aircraft serial numbers and model numbers in response to MDC's interrogatories, and refer to an AOL issued by MDC 20 years ago. But Plaintiffs' responses do not provide the information actually requested by MDC's discovery. Plaintiffs' current responses are a smokescreen of irrelevant information, clearly intended to conceal their inability to identify and produce documents and articulate specific facts that support their purported claims against MDC.

For the reasons set forth above, MDC respectfully requests that the Court order Plaintiffs to provide further responses to all of the Interrogatories and Document Demands, without objection, and to produce documents in connection therewith. MDC further requests that the Court sanction Plaintiffs in the amount of $3950, representing the reasonable attorneys' fees MDC has incurred in bringing this Motion.

Dated: July 1, 2010

**BRYAN CAVE LLP**
Robert E. Boone III
James C. Pettis
M. Angela Buenaventura

By: ______________________
M. Angela Buenaventura
Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case 4:11-cv-00061-LB Document 1-12 Filed 01/10/11 Page 87 of 88

## PROOF OF SERVICE

I am employed in the City and County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 120 Broadway, Suite 300, Santa Monica, CA 90401.

On **July 1, 2010**, I served the foregoing document, described as:

**1. DEFENDANT MCDONNELL DOUGLAS CORPORATION'S NOTICE OF MOTION AND MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES AND PRODUCTION OF DOCUMENTS AND REQUEST FOR SANCTIONS IN THE AMOUNT OF $3950; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**
**2. DECLARATION OF M. ANGELA BUENAVENTURA IN SUPPORT OF MCDONNELL DOUGLAS CORPORATION'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIAL INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS; AND**
**3. MCDONNELL DOUGLAS CORPORATION'S SEPARATE STATEMENT IN SUPPORT OF MOTION TO COMPEL**

on each interested parties in this action, as follows:

**SEE ATTACHED SERVICE LIST**

☒ (BY OVERNIGHT COURIER) I deposited in a box or other facility maintained by Overnight Express, an express carrier service, or delivered to a courier or driver authorized by said express carrier service to receive documents, a true copy of the foregoing document, in an envelope designated by said express service carrier, with delivery fees paid or provided for.

(BY MAIL) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

(BY FAX) I caused a true copy of the foregoing document to be served by facsimile transmission at the time shown on each attached transmission report from sending facsimile machine telephone number_______ to each interested party at the facsimile number shown above. Each transmission was reported as complete and without error. A transmission report was properly issued by the sending facsimile machine for each interested party served. A true copy of each such transmission report is attached hereto.

Executed on **July 1, 2010**, at Santa Monica, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Alicia Moore

SM01DOCS775784.2

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**SERVICE LIST**
**Timothy Vest and Caroline Vest v. Allied Packing and Supply, et al.**
**Alameda County Superior Court No. RG09489518**

| | |
|---|---|
| Denise Abrams, Esq.<br>Justin A. Bosl, Esq.<br>KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY<br>A Professional Law Corporation<br>171 Twelfth Street, Third Floor<br>Oakland, CA 94607<br>Telephone: (510) 302-1000<br>Facsimile:<br>***Attorney for Plaintiffs*** | |

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 23

Denise Abrams, Esq. (C.S.B. #124139)
Andrea Huston, Esq. (C.S.B. #200610)
Elina Agnoli, Esq. (C.S.B. #261732)
KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

ENDORSED
FILED
ALAMEDA COUNTY
NOV 10 2010
CLERK OF THE SUPERIOR COURT
By ERICA BAKER
Deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

TIMOTHY VEST and CAROLINE VEST,

Plaintiffs,

vs.

ALLIED PACKING & SUPPLY, INC., et al.,

Defendants.

No. RG09489518

**PLAINTIFFS' OPPOSITION TO DEFENDANT McDONNELL DOUGLAS CORPORATION'S MOTION TO COMPEL; DECLARATION OF ANDREA HUSTON**

DATE: November 24, 2010
TIME: 9:30 a.m.
DEPT: 30 (Hon Kenneth Mark Burr)
ACTION FILED: December 17, 2009
TRIAL DATE: February 14, 2011

**Reservation No. 1081256**

Plaintiffs served amended and verified objection-free responses to all of defendant McDonnell Douglas Corporation's ("MDC") interrogatories and requests for production, set one upon which defendant has moved to compel on November 10, 2010.[1] These amended responses are based on a good faith investigative effort and are individually responsive to the call of each separate question and request. Plaintiffs have provided all information in their possession, custody and control in response to the interrogatories after a reasonable and good faith effort to obtain the

[1] *See*, Declaration of Andrea Huston, **Exhibit A**, amended verified responses to defendant's interrogatories, set one; **Exhibit B**, amended verified responses to defendant's requests for production, set one. As a courtesy, plaintiffs also served a copy of these responses on MDC's counsel via e-mail on November 9, 2010. *See*, Huston Dec., **Exhibit C** and ¶ 4.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

information pursuant to C.C.P. § 2030.220(c), and have provided all non-equally available documents and described all equally available documents after a diligent search and reasonable inquiry pursuant to C.C.P. § 2031.220.

Plaintiffs' amended responses are not before the Court. The parties have had no opportunity to meet and confer regarding same, should such be necessary, as required by C.C.P. §§ 2016.040, 2030.300(b) and 2031.310(b)(2). MDC's motion should be denied as moot in light of plaintiffs' amended responses, or in the alternative, put over to another hearing date in order to allow the parties to meet and confer about the amended responses should they not be satisfactory to defendant, and to allow any appropriate supplemental briefing.

DATED: November 10, 2010

KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY, PLC

By [signature]
Andrea Huston

Attorneys for Plaintiffs

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case4:11-cv-00061-LB Document7-13 Filed01/10/11 Page4 of 63

PROOF OF SERVICE

Re: *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.*
Alameda County Superior Court No. RG09489518

I am employed in the County of Alameda, State of California. I am over the age of 18 years and not a party to the within action. My business address is 171 Twelfth Street, Third Floor, Oakland, California 94607. November 10, 2010, I served the following document(s):

**PLAINTIFFS' OPPOSITION TO DEFENDANT McDONNELL DOUGLAS CORPORATION'S MOTION TO COMPEL; DECLARATION OF ANDREA HUSTON**

by transmitting a true copy to:

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2305

__XX__ (By Personal Service) By causing to be personally delivered.

***All Defense Counsel***

______ (By Facsimile Machine [FAX]) By personally transmitting a true copy thereof via an electronic facsimile machine between the hours of 9:00 a.m. and 5:00 p.m.

__XX__ (By Mail) I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service. This document, which is in an envelope addressed as stated above, will be sealed with postage fully prepaid and will be deposited with the United States Postal Service this date in the ordinary course of business.

______ (By e-mail or electronic transmission) By personally transmitting a true copy thereof via email.

______ (By Overnight Delivery) By delivering a true copy thereof to an authorized courier authorized by the express service to receive documents or depositing in a box or other facility regularly maintained by the express carrier.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 10, 2010 at Oakland, California.

Claire Copp

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
71 TWELFTH STREET THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

SERVICE LIST CASE: Vest, Timothy & Caroline [NE 1430] ACTION #: RG09489518 November 10, 2010 10:07 AM

BECHERER, KANNETT & SCHWEITZER
1255 Powell Street, , Emeryville, CA 94608-2604
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD COMPANY; CYPRUS AMAX MINERALS COMPANY
PH: (510) 658-3600
FAX: (510) 658-1151

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610
FOR: DESIGNATED DEFENSE COUNSEL
PH: (510) 835-8330
FAX: (510) 835-5117

BRYAN CAVE LLP
2 Embarcadero Center, Suite 1410, San Francisco, CA 94111
FOR: WORLD AIRWAYS, INC.; WORLD AIRWAYS, INC.
PH: 415-675-3400
FAX: 415-675-3434

BRYAN CAVE, LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2305
FOR: MCDONNELL DOUGLAS CORPORATION; MCDONNELL DOUGLAS CORPORATION
PH: (310) 576-2100
FAX: (310) 576-2200

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION; HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION sii/pae/et to THE DEXTER CORPORATION; LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION
PH: (510) 864-3600
FAX: (510) 864-3601

COUNSEL UNKNOWN
FOR: MCDERMOTT/SEALY, INC.

DeHAY & ELLISTON, LLP
1300 CLAY STREET, SUITE 840, Oakland, CA 94612
FOR: KAISER GYPSUM COMPANY, INC.
PH: 510-285-0750
FAX: 510-285-0740

DONGELL LAWRENCE FINNEY LLP
707 Wilshire Boulevard, 45th Floor, Los Angeles, CA 90017-3609
FOR: GEORGE E. MASKER, INC.
PH: 213-943-6100
FAX: 213-943-6101

FOLEY & MANSFIELD, PLLP
300 Lakeside Drive, Suite 1900, Oakland, CA 94612
FOR: KELLY-MOORE PAINT COMPANY; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER
PH: 510-590-9500
FAX: 510-590-9595

HANSON BRIDGETT LLP
425 Market Street, 26th Floor, San Francisco, CA 94105-2173
FOR: THE PORT OF OAKLAND
PH: (415) 777-3200
FAX: (415) 541-9366

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112
FOR: ALLIED PACKING AND SUPPLY
PH: (408) 287-7788
FAX: (408) 927-0408

MCGIVNEY, KLUGER & GLASPY
One Walnut Creek Center, 100 Pringle Ave., Ste 750, Walnut Creek, CA 94596
FOR: KENTILE FLOORS, INC.
PH: (925) 947-1300
FAX: (925) 947-1594

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111
FOR: HEXCEL CORPORATION
PH: (415) 267-4000
FAX: (415) 267-4198

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071
FOR: HEXCEL CORPORATION
PH: 213-688-1000
FAX: 213-243-6330

SERVICE LIST CASE: Vest, Timothy & Caroline [NE 1430] ACTION #: RG09489518 November 10, 2010 10:07 AM
Page Two

PERKINS COIE LLP PH: (415) 344-7000
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111 FAX: (415) 344-7288
FOR: GEORGIA-PACIFIC LLC fka GEORGIA PACIFIC CORPORATION; HONEYWELL INTERNATIONAL INC. fka ALLIED SIGNAL, INC./sii/BENDIX CORP

PORT OF OAKLAND LEGAL DEPARTMENT PH: (510) 627-1348
530 Water Street, 4th Floor, P.O. Box 2064, Oakland, CA 94607 United States FAX: (510) 444 2093
FOR: THE PORT OF OAKLAND

PRINDLE, AMARO, GOETZ, HILLYARD, BARNES & REINHOLTZ LLP PH: (415) 788-8354
One California Street, Suite 1910, San Francisco, CA 94104 FAX: (415) 788-3625
FOR: DEAN'S MATERIALS, INC. dba CONSTRUCTION MATERIAL SUPPLIER

SEDGWICK, DETERT, MORAN & ARNOLD PH: (415) 781-7900
One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105 FAX: (415) 781-2635
FOR: PARKER HANNIFIN; PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES

SELMAN & BREITMAN PH: (415) 979-0400
33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105 FAX: (415) 979-2099
FOR: ALTA BUILDING MATERIALS CO.; KENTILE FLOORS, INC.

STEPTOE & JOHNSON PH: (213) 439-9400
633 West Fifth Street, Suite 700, Los Angeles, CA 90071 FAX: (213) 439-9599
FOR: METROPOLITAN LIFE INSURANCE COMPANY

THE MAU LAW FIRM PH: 415-495-8082
950 Harrison Street, Suite 213, San Francisco, CA 94107 FAX: 415-495-8084
FOR: GEORGE E. MASKER, INC.

WALSWORTH, FRANKLIN, BEVINS & McCALL PH: (415) 781-7072
601 Montgomery Street, 9th Floor, San Francisco, CA 94111 FAX: (415) 391-6258
FOR: HAMILTON MATERIALS, INC.

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN PH: (415) 781-7072
601 Montgomery Street, 9th Floor, San Francisco, CA 94111 FAX: (415) 391-6258
FOR: DOWMAN PRODUCTS, INC.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER PH: (415) 433-0990
525 Market Street, 17th Floor, San Francisco, CA 94105-2722 FAX: (415) 434-1370
FOR: F.P. LATHROP CORPORATION; LATHROP CONSTRUCTION ASSOCIATES, INC.; LATHROP ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION

End of Service List

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 24

Kazan, McClain, Lyons, Greenwood & Harley A Professional Law Corporation
Attn: Kazan Esq, Steve
55 Harrison St.
Ste 400
Oakland, CA 94607

Herr & Zapala, llp
Attn: Zapala, Alan J
152 N. Third Street
Suite 500
San Jose, CA 95112

**Superior Court of California, County of Alameda**
**Rene C. Davidson Alameda County Courthouse**

| Vest<br>Plaintiff/Petitioner(s)<br>VS.<br>Allied Packing And Supply<br>Defendant/Respondent(s)<br>(Abbreviated Title) | No. RG09489518<br>Order<br>Motion to Compel Further Answers to Interrogatories<br>Dropped |
|---|---|

Defendant McDonnell-Douglas' Motion to Compel Further Answers to Interrogatories was set for hearing on 11/24/2010 at 09:31 AM in Department 30 before the Honorable Kenneth Mark Burr. The Tentative Ruling was published and has not been contested.

IT IS HEREBY ORDERED THAT:

The tentative ruling is affirmed as follows:
The Motion of Defendant McDonnell Douglas Corporation ("MDC") to Compel Further Responses to Special Interrogatories Set No. 1 and Request for Production, Set No. 1 is dropped by the Court at the request of the moving party.

Dated: 11/24/2010

facsimile

Judge Kenneth Mark Burr

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 25



*8883336*

**BRYAN CAVE LLP**
Robert E. Boone III, California Bar No. 132780
James C. Pettis, California Bar No. 223953
Linda C. Hsu, California Bar No. 239880
120 Broadway, Suite 300
Santa Monica, California 90401
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

FILED
ALAMEDA COUNTY
OCT 2 9 2010
CLERK OF THE SUPERIOR COURT
By Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLIED PACKING AND SUPPLY, *et al.*,<br><br>Defendants. | Case No. RG09489518<br><br>Assigned for all pre-trial purposes to the Hon. Kenneth Mark Burr<br><br>**DEFENDANT MCDONNELL DOUGLAS CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>[Filed with Memorandum of Points and Authorities; Separate Statement of Material Facts; Declarations of Dr. William D. Travis, Timothy S. Lloyd, Michael J. Schmidt, and James C. Pettis; Appendix of Non-California Authority; and [Proposed] Order]<br><br>Date: January 14, 2011<br>Time: 9:36 A.M.<br>Dept: 30<br><br>**Reservation No. 1092700**<br><br>Complaint Filed: December 17, 2009<br>Trial Date: February 14, 2011 |

FAXED
FIRST LEGAL SUPPORT SERVICES

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Case 4:11-cv-00061-LB Document 1-13 Filed 01/10/11 Page 11 of 63

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 14, 2011, at 9:36 A.M., or as soon after that as the matter can be heard, in Department 30 of the Alameda County Superior Court located at U.S. Post Office Building, 201 13th Street, Oakland, California, Defendant McDonnell Douglas Corporation ("MDC") will and does move the Court for an order granting summary judgment in its favor and against Plaintiffs Timothy and Caroline Vest ("Plaintiffs"). MDC makes this motion on the following independent grounds:

1. As a matter of law, Plaintiffs' claims against MDC fail because there is no triable issue of fact that Plaintiff Timothy Vest does not suffer from mesothelioma caused by exposure to asbestos. All of Plaintiffs' claims are based on Mr. Vest's alleged asbestos-related diffuse mesothelioma when Mr. Vest suffered from *non* asbestos-related localized mesothelioma. Thus, summary judgment should be granted.

2. As a matter of law, Plaintiffs' claims against MDC fail because there is no triable issue of fact that Plaintiffs cannot demonstrate with a reasonable medical probability that Mr. Vest's alleged contact with MDC's commercial airplanes was a substantial factor in bringing about his alleged injury.

In the alternative, if for any reason summary judgment cannot be had, MDC moves the Court for summary adjudication against Plaintiffs as follows:

1. Plaintiffs' First Cause of Action for Negligence has no merit and fails as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma; and

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes was a substantial factor in bringing about his alleged injury.

2. Plaintiffs' Third Cause of Action for Strict Liability has no merit and fails as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that

Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma; and

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes was a substantial factor in bringing about his alleged injury.

3. Plaintiffs' Fourth Cause of Action for Fraud has no merit and fails as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma;

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes was a substantial factor in bringing about his alleged injury; and

c. MDC did not have any special relationship with Plaintiffs, did not owe Plaintiffs a duty to disclose, and there is no evidence that could establish the required elements of fraud.

4. Plaintiffs' Fifth Cause of Action for Conspiracy to Defraud has no merit and fails as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma;

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes was a substantial factor in bringing about his alleged injury; and

c. Conspiracy is not an independent tort, and Plaintiff cannot prove any underlying fraud or that MDC acted in concert with any co-defendant in furtherance of any common scheme or design to injure Plaintiffs, or had any knowledge of a scheme or design aimed at injuring Plaintiffs.

5. Plaintiffs' Fourteenth Cause of Action for Loss of Consortium has no merit and fails as a matter of law because it is derivative of Plaintiffs' other causes of action. Because those other causes of action fail, this cause of action similarly fails.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

6. Plaintiffs' causes of action based on asbestos exposure while visiting World Airways Hangar 110 at the Oakland International Airport from 1973 to 1983 fail as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma;

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes at World Airways Hangar 110 was a substantial factor in bringing about his alleged injury; and

c. Plaintiff cannot prove fraud or conspiracy. First, MDC did not have any special relationship with Plaintiffs, did not owe Plaintiffs a duty to disclose, and there is no evidence that could establish the required elements of fraud. Second, conspiracy is not an independent tort, and Plaintiff cannot prove any underlying fraud or that MDC acted in concert with any co-defendant in furtherance of any common scheme or design to injure Plaintiffs, or had any knowledge of a scheme or design aimed at injuring Plaintiffs.

7. Plaintiffs' causes of action based on asbestos exposure while working at Continental Airlines, Inc. from 1985 to 1988 fail as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma;

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes while working at Continental Airlines, Inc. was a substantial factor in bringing about his alleged injury; and

c. Plaintiff cannot prove fraud or conspiracy. First, MDC did not have any special relationship with Plaintiffs, did not owe Plaintiffs a duty to disclose, and there is no evidence that could establish the required elements of fraud. Second, conspiracy is not an independent tort, and Plaintiff cannot prove any underlying fraud or that MDC acted in concert with any co-defendant in furtherance of any common scheme or design to injure Plaintiffs, or had any knowledge of a scheme or design aimed at injuring Plaintiffs.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

8. Plaintiffs' causes of action based on asbestos exposure while working at Emery Worldwide Airlines, Inc. from 1990 to 2001 fail as a matter of law because:

a. Plaintiffs cannot demonstrate beyond a preponderance of the evidence that Plaintiff Timothy Vest suffered or suffers from asbestos-related mesothelioma;

b. Plaintiffs cannot demonstrate with a reasonable medical probability that Plaintiff Timothy Vest's alleged contact with MDC's commercial airplanes while working at Emery Worldwide Airlines, Inc. was a substantial factor in bringing about his alleged injury; and

c. Plaintiff cannot prove fraud or conspiracy. First, MDC did not have any special relationship with Plaintiffs, did not owe Plaintiffs a duty to disclose, and there is no evidence that could establish the required elements of fraud. Second, conspiracy is not an independent tort, and Plaintiff cannot prove any underlying fraud or that MDC acted in concert with any co-defendant in furtherance of any common scheme or design to injure Plaintiffs, or had any knowledge of a scheme or design aimed at injuring Plaintiffs.

This Motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities; the accompanying Separate Statement of Undisputed Material Facts; the Declarations of Dr. William D. Travis, Timothy S. Lloyd, Michael J. Schmidt, and James C. Pettis and exhibits to those Declarations; the deposition testimony taken in this case attached; the records and pleadings on file herein, argument presented at the time of hearing, and such other and further matters that the Court may properly consider.

Dated: October 29, 2010

Respectfully submitted,

**BRYAN CAVE LLP**
Robert E. Boone III
James C. Pettis
Linda C. Hsu

By: ______________________
James C. Pettis
Attorneys for Defendant
McDONNELL DOUGLAS CORPORATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 26

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 201 of 226
Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page16 of 63

*9056765*

James L. Oberman, Esq. (C.S.B. #120938)
Michael T. Stewart, Esq. (C.S.B. #253851)
KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

FILED
ALAMEDA COUNTY
2010 DEC 30 PM 1:48
CLERK OF THE SUPERIOR COURT
BY ______ DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br>Plaintiffs,<br>vs.<br>ALLIED PACKING & SUPPLY, INC., et al.,<br>Defendants. | No. RG09489518<br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT McDONNELL DOUGLAS CORPORATION'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br>Date: January 14, 2011<br>Time: 9:36 am<br>Dept.: 30 (Hon. Kenneth Mark Burr)<br>Case Filed: December 17, 2009<br>Trial Date: February 14, 2011<br>**Reservation No: R1092700** |

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA

Exhibit 26-627

Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page17 of 63

James L. Oberman, Esq. (C.S.B. #120938)
Michael T. Stewart, Esq. (C.S.B. #253851)
KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLIED PACKING & SUPPLY, INC., et al.,<br><br>Defendants. | No. RG09489518<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT McDONNELL DOUGLAS CORPORATION'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date: January 14, 2011<br>Time: 9:36 am<br>Dept.: 30 (Hon. Kenneth Mark Burr)<br>Case Filed: December 17, 2009<br>Trial Date: February 14, 2011<br><br>**Reservation No: R1092700** |

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 203 of 226
Case 4:11-cv-00061-LB Document17-13 Filed01/10/11 Page18 of 63

TABLE OF CONTENTS

I. Introduction. . . . 1

II. Statement of Facts. . . . 2

A. Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways' Hangar 110, and as a Pilot for Emery Worldwide. . . . 2

B. Timothy Vest's Mesothelioma was Caused by Asbestos. . . . 12

III. Legal Argument. . . . 14

A. Moving Defendant's Burden of Proof. . . . 14

B. MDC Fails to Establish Plaintiffs Lack Evidence of Causation. . . . 16

1. Plaintiffs' Additional Evidence Requires a Trial. . . . 18

C. Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid. . . . 19

D. The Motion must be Continued or Denied Under CCP 437c(h). . . . 20

IV. Conclusion. . . . 20

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA i

EXHIBIT C - Page 137

Exhibit 26-629

TABLE OF AUTHORITIES

State Statutes

Civil Code section 1708 . . . . . 19
Civil Code section 1710 . . . . . 19
Civil Code section 3294 . . . . . 19
Code of Civil Procedure section 437c(b) . . . . . 15, 17
Code of Civil Procedure section 437c(c) . . . . . 14
Code of Civil Procedure section 437c(d) . . . . . 15, 17
Code of Civil Procedure section 437c(h) . . . . . 1, 17, 20
Code of Civil Procedure section 437c(p)(2) . . . . . 14
Evidence Code section 1200 . . . . . 17
Evidence Code section 1220 . . . . . 7, 8
Evidence Code section 1221 . . . . . 7, 8
Evidence Code section 1222 . . . . . 7, 8
Evidence Code section 1230 . . . . . 7, 8
Evidence Code section 1290 . . . . . 7
Evidence Code section 1291 . . . . . 7
Evidence Code section 1292 . . . . . 7

State Cases

*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 . . . . . 14-16
*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389 . . . . . 20
*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832 . . . . . 16
*DeLeon v. Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336 . . . . . 16
*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578 . . . . . 16
*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623 . . . . . 15

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

*Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374. . . . . 19

*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825. . . . . 16

*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379. . . . . 16, 18

*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990. . . . . 14

*Nelson v. Superior Court* (2006) 144 Cal.App.4th 689. . . . . 16

*Oddone v. Superior Court (Technicolor, Inc.)* (2009) 179 Cal.App.4th 813. . . . . 16

*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965. . . . . 19

*Quirici v. Freeman* (1950) 98 Cal.App.2d 194. . . . . 19

*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953. . . . . 16, 18

*SKF Farms v. Super. Ct.* (1984) 153 Cal.App.3d 902. . . . . 19

*Stone v. Regents of University of Cal.* (1999) 77 Cal.App.4th 736. . . . . 19

*Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564. . . . . 16

*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577. . . . . 16

*Torres v. Xomox Corporation* (1996) 49 Cal.App.4th 1. . . . . 16

*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327. . . . . 15

*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256. . . . . 16, 18

*Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433. . . . . 15, 17

*Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218. . . . . 16

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 206 of 226
Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page21 of 63

Other Authorities

5 Witkin, Cal. Procedure (4th ed. 1997) Pleading § 678. . . . . . . 19

Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 10:51, 10:51.1. . . . . . . 2

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA iv

EXHIBIT C - Page 140

Exhibit 26-632

## I. Introduction

The motion of defendant McDonnell Douglas Corporation ("MDC") for summary judgment or, in the alternative, summary adjudication fails for three reasons. First, this Court on December 10, 2010 ordered MDC to produce aircraft manuals, parts catalogues, All Operator Letters and records pertaining to MDC's historical knowledge of asbestos hazards. The order cites MDC's representation that it could and would immediately comply. But instead, MDC produced 14 encrypted CDs that cannot be printed or electronically searched without a password – which MDC will not share. And MDC bases this motion on the declarations of Larry Fogg, Timothy Lloyd and Michael Schmidt, while at the same time refusing to make these percipient witnesses available for deposition. MDC cannot benefit from its misuses of the discovery process, so this motion should be denied, and at a minimum must be continued, under Code of Civil Procedure section 437c(h).

Second, MDC demonstrates no lack of evidence in support of any cause of action or claim for damages raised in the complaint. Nothing in MDC's separate statement shows MDC propounded any special interrogatories seeking all of plaintiffs' witnesses and documents, much less that plaintiffs' responses were in any way factually devoid. Instead, MDC cites limited excerpts of the deposition testimony of plaintiff Timothy Vest and his father, Warren Vest. While ignoring the availability of other competent evidence, MDC improperly asserts all of plaintiffs' claims must fail for lack of asbestos-exposure evidence. And MDC asserts Timothy Vest's mesothelioma was not caused by asbestos exposure. But MDC's proffered declaration of Dr. Travis is easily contradicted by the opinions of plaintiffs' medical expert witnesses.

Third, plaintiffs' additional evidence, including the declarations of industrial hygienist John Templin, pathologist Samuel P. Hammar, M.D. and pathologist William R. Salyer, M.D., raises triable issues of fact as to whether MDC is liable for the injuries to Timothy Vest caused by its defective aircraft – including the planes' originally-installed asbestos-containing parts and the replacement asbestos-containing parts that MDC required to be used. Based on the relevant percipient-witness testimony and the historically available scientific knowledge, John Templin explains MDC should have known Timothy Vest and others in aircraft maintenance facilities were

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

at risk of mesothelioma. Mr. Vest foreseeably inhaled substantial amounts of airborne asbestos fibers from parts used on the MDC aircraft operated by World Airways and Emery Worldwide in the 1970s, 1980s and 1990s. Based on Timothy Vest's tissue samples, his documented history of occupational-level asbestos exposure and other scientific evidence, Dr. Hammar and Dr. Salyer explain Timothy Vest's mesothelioma was unquestionably caused by asbestos.

## II. Statement of Facts

### A. Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways' Hangar 110, and as a Pilot for Emery Worldwide

On May 28, 2010, plaintiffs filed their Second Amended Complaint for personal injuries, negligence, strict products liability, fraud, conspiracy to defraud and loss of consortium against defendants, including MDC, who are alleged to have exposed Timothy Vest to asbestos that was a substantial factor in causing his mesothelioma.[1] [Facts 64-65.] The complaint alleges, among other things, that Timothy Vest was continually exposed to defendants' asbestos-containing materials from at least 1973 to 1983 at World Airways' facilities in Oakland, California; and as a pilot for Emery Worldwide from 1990 to 2001. [*Id.*]

Timothy Vest lived in Dublin, California as a child from at least 1972 to 1983. [Facts 66-77.] After working abroad, his father Warren Vest lived in the family home from mid-1973 onward. [*Id.*] Warren was an airline pilot based out of World's headquarters at the Oakland Airport. [*Id.*] He worked at World's new office building and maintenance hangar, known as Hangar 110, from the early 1970s through the late 1980s. [*Id.*] After the construction was finished, Timothy regularly visited Hangar 110 because his father worked in the building. [*Id.*] Timothy spent approximately an hour in the hangar before his father flew away on multi-day trips. [*Id.*] And he spent several hours in the hangar when his father did weekend office work, at least twice a month. [*Id.*] Timothy continuously visited the hangar at this rate from the time he was eight years of age until he was seventeen. [*Id.*] As a teenager he wanted to be in the hangar because he was training for his own pilot's license. [*Id.*] Timothy never was told of restrictions against being in the hangar, and there were no signs posted. [*Id.*] Nor was he warned about the

[1]The complaint is admissible here to frame the issues raised in the pleadings and to assess the materiality of the facts in dispute. [Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.]

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case 4:11-cv-00061-LB Document 17-13 Filed 01/10/11 Page 24 of 63

asbestos in the hangar. [Id.] He did not learn until after 2000 that asbestos is hazardous. [Id.]

On those weekend trips, Timothy spent his time exploring the nooks and crannies throughout the hangar and watching the nearly constant aircraft maintenance work. [Facts 78-87.] The hangar had an office complex at the front entrance, and an enclosed maintenance area for the aircraft. [Id.] He befriended one of the security guards, so he had free run of the hangar. [Id.] Timothy explored throughout the internal buildings and structures, including where the aircraft maintenance tools and parts were stored. [Id.] He explored the maintenance facility in this way until he became a teenager, and then was more interested in aircraft. [Id.] Aircraft maintenance workers were nearby when Timothy was exploring. [Id.] The mechanics in the hangar knew he was Warren Vest's son, so they allowed Timothy near the aircraft to learn how they worked. [Id.] He saw McDonnell Douglas aircraft in the hangar, including the DC-10 model. [Id.] There was almost always aircraft maintenance and painting occurring in the hangar during the dozens of times he visited each year from the 1970s to 1980s. [Id.] He saw engines being worked on, airplanes jacked up off the floor and inspection panels removed, including on the DC-10s. [Id.]

On days when Timothy did not accompany his father to the hangar, the two hugged when his father came home from work. [Facts 88-95.] Warren did not immediately change out of his work clothes. [Id.] Timothy's mother did most of the laundry, but Timothy helped by carrying the family's dirty clothes out to the garage, where they were shaken out and washed. [Id.] Timothy's own clothes were visibly dirty when he returned from the hangar. [Id.] His father wore varying attire, including a pilot's uniform, a suit or business-casual clothes. [Id.] Warren worked 12 hours per day and 6 days per week. [Id.] Warren's clothes appeared visibly dusty, with a chalky-white color, when he returned home from the hangar. [Id.] Timothy carried his father's dirty work clothes to help his mother. [Id.]

Warren Vest confirms he started working in World's Hangar 110 a few months after its grand opening in 1973. [Facts 96-103.] He reported to the hangar every time he left for and returned from a flight. [Id.] From the mid-1970s to the mid-1980s, Warren spent approximately half of each month in the office, and half on flights. [Id.] He did his paperwork on the weekends because he was a pilot; and his son Timothy came to the hangar on those days. [Id.] Timothy Vest

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case 4:11-cv-00061-LB Document17-13 Filed01/10/11 Page25 of 63

came to the hangar from 1973 through 1983, up to several times per month. [*Id.*] He spent some of his time in the office area, where Warren had an office, and also spent hours in other areas of the hangar. [*Id.*] Timothy Vest was allowed to be on the hangar floor, and he had the permission of the security guards. [*Id.*] Aircraft maintenance occurred 24 hours per day, 7 days per week, including when Timothy was present. [*Id.*]

Warren spent a lot of time in the maintenance area to ensure the work was on schedule and the aircraft would be ready to fly. [Facts 104-115.] He was on the hangar floor up to several times every day. [*Id.*] Warren spoke to the maintenance foreman in charge of a particular plane. [*Id.*] His conversations lasted from 5 to 30 minutes. [*Id.*] During the 1973 to 1983 period, the planes in the hangar included McDonnell Douglas DC-8 (six total) and DC-10 (ten total) models. [*Id.*] Three of the DC-8s and nine of the DC-10s were purchased new by World. Those new DC-10s were bought in 1979, 1980 and 1981. [*Id.*] Warren saw dust in the maintenance area, especially when the large doors were opened and the wind blew in, stirring up the dust. [*Id.*] Normally only one set of doors were opened, to avoid creating a dangerous wind tunnel in the hangar. [*Id.*] He saw the mechanics install many parts, including engine parts, on the DC-8s and DC-10s in the hangar. [*Id.*] The work included minor maintenance and major overhauls, lasting from one day to several weeks. [*Id.*] Up to 40 mechanics worked on the planes together. [*Id.*]

Warren did not immediately change out of his work clothes when he returned home. [Facts 116-119.] Instead, he hugged and played with Timothy and had dinner. [*Id.*] Timothy Vest also rode in the car that Warren drove to and from the hangar. [*Id.*] Warren Vest never received any asbestos warnings during his employment at World. [*Id.*]

Claude Fross was World's facilities manager for Hangar 110 from its opening in 1973 until 1986. [Facts 120-127.] The hangar included an office area, shop areas and a large open space for the aircraft. [*Id.*] There were "no holidays" in aircraft maintenance, so work on the planes occurred all day, every day in the hangar. [*Id.*] They underwent varying degrees of maintenance based on their hours in flight. [*Id.*] The planes included DC-8 and DC-10 models. [*Id.*] Every time a plane was pushed out of the hangar, the cleaning crew came to clean up the mess. [*Id.*] The large doors on each end of the hangar were usually closed. [*Id.*] And they were not opened at the

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 211 of 226
Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page26 of 63

same time because that would cause a wind tunnel. [Id.]

James Hales was an aircraft maintenance controller for World at Hangar 110 from 1984 to 1986. [Facts 128-139.] He had an office job in which he coordinated the schedule and ordered parts, primarily for DC-10 models and some DC-8s. [Id.] World serviced those DC-10s and DC-8s in the hangar. [Id.] Mr. Hales is now vice president of technical operations for World. [Id.] The aircraft maintenance that occurred in Hangar 110 followed a precise schedule for each plane. [Id.] The work on a DC-10 plane could last from days to weeks. [Id.] The lightest scheduled maintenance, an "A" check, involved opening access panels and inspecting internal components and systems. [Id.] A "B" check was similar but more extensive. [Id.] A "C" check involved more invasive removal of structural parts and replacement of worn components. [Id.] A "D" check took at least a month to complete and returned the plane to like-new condition. [Id.] Every access panel was opened, landing gear was removed, engines were replaced, the cabin was stripped and the plane was repainted. [Id.] The hangar floor was swept after each job. [Id.]

Maintenance programs for the aircraft changed as the planes aged and the airlines gave feedback to the original manufacturer. [Facts 140-154.] The manufacturer of the plane established the initial maintenance plan for an aircraft, and that plan was approved by the Federal Aviation Administration. [Id.] MDC, as the manufacturer, supplied the aircraft maintenance manual, the Illustrated Parts Catalogue, the wiring diagram manual and the structural repair manual. [Id.] World relied on those publications and stored them in the technical library at Hangar 110. [Id.] MDC also issued service bulletins and updated manuals that World conveyed to its mechanics. [Id.] The mechanics working on DC-10s and DC-8s obtained replacement parts by first consulting MDC's Illustrated Parts Catalogue, which showed exactly what part – listed by number – needed to be retrieved from the stockroom or specially ordered. [Id.] MDC did not make all the parts it specified, so some replacement parts were obtained from third-party suppliers. [Id.] World needed MDC's approval to make any deviations from standard maintenance procedures. [Id.] Any changes in the plan required the approval of the manufacturer. [Id.] The airline was required to suggest the change to the manufacturer via a formal petition, and the manufacturer then relied on its own engineers to gather data and evaluate the issue. [Id.] The

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1
Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA
5
EXHIBIT C - Page 145
Exhibit 26-637

main reason for this process was that changes to the flight characteristics of the plane could affect its safety. [Id.] The base design of the plane, its type certificate, could not be changed without permission from the manufacturer. [Id.] World also contacted the manufacturer to order certain parts and to obtain drawings and technical data. [Id.] And MDC hosted annual conferences with the airlines to discuss the operation of the DC-10 and DC-8 models. [Id.] It also issued All Operator Letters to alert the airlines to safety issues, including asbestos. [Id.]

When aircraft engine access panels were opened for inspections, there were heat shields or insulation blankets placed around the pneumatic systems. [Facts 155-166.] The shields and blankets were bolted or wired in place, and had to be unfastened. [Id.] The outside surface of a heat shield was metal, with a bolt hole running through it. [Id.] Heat shields were among the asbestos-containing products which were used on aircraft in Hangar 110, and which required hands-on contact. [Id.] Clamps were another asbestos part. [Id.] The clamps had an asbestos sleeve covering the metal loop, and their purpose was to hold hydraulic lines, pneumatic lines and wiring. [Id.] Asbestos materials were typically used in hot areas, while asbestos-free materials were used in cooler areas. [Id.] Asbestos gaskets were used in the engines, and sometimes worn gaskets had to be scraped off to leave a clean surface for the replacement part. [Id.] A wire brush or sandpaper was used to scrape the gaskets. [Id.] Asbestos tape was also used in planes, to seal the exhaust system. [Id.] Worn tape had to be scraped off before applying a new strip. [Id.] Mr. Hales also recalls the use of epoxy adhesives made by Dexter. [Id.]

Stanley Lehmann is the designated corporate witness for Henkel Corporation, manufacturer of Dexter-brand adhesive products – one of the asbestos-containing materials MDC required to be used on its aircraft through at least 1992. [Facts 167-179, 217.] Attached to Mr. Lehmann's declaration are some historical invoices showing sales of Dexter EA 934 two-part epoxy adhesive from Henkel to World at Hangar 110. [Id.] These invoices are dated as late as October 1981. [Id.] In addition to such direct sales, Henkel sold products through distributors. [Id.] Dexter-brand products were sold in distinctive packaging that bore yellow labels with black printing. [Id.] Dexter EA 934 was capable of bonding metal to metal. [Id.] It consisted of two parts, one of which contained chrysotile asbestos, mixed together to form the adhesive. [Id.] Henkel purchased

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

raw asbestos fiber from Johns-Manville for use in the Dexter epoxies. [Id.] Johns-Manville provided some asbestos warnings to Henkel beginning in the early 1970s. [Id.] And OSHA provided to Henkel notice of asbestos hazards in 1972. [Id.] But Henkel issued no asbestos warnings until 1977. [Id.] Its products then had an OSHA-type label, and Henkel issued a separate bulletin instructing how to use the products safely. [Id.] That bulletin, but not the product packaging, instructed not to sand the epoxy adhesives without wet-down methods. [Id.]

The epoxy contained asbestos beginning in 1962, the asbestos-free version did not exist until 1979, and the asbestos-containing version was still sold after that date, until at least 1985. [Facts 180-188.] Henkel developed the asbestos-free version to minimize its employees' exposure to asbestos. [Id.] It continued to sell the asbestos-containing version after 1979 because aircraft products had to go through a rigorous qualification process, and not all airline customers had gained approval to use the asbestos-free version. [Id.] This process was required to ensure the new product met the aircraft manufacturer's performance specification. [Id.] As of 1979, only a single customer had gained approval, but Mr. Lehmann does not recall who that was. [Id.] The approval needed to be issued by McDonnell Douglas, as the aircraft manufacturer, stating that EA 934 "NA" (nonasbestos) had been added to its qualified products list. [Id.] Such approval came only after a successful application process. [Id.] Until MDC sent Henkel written approval after testing the proposed new product, Henkel did not sell the asbestos-free material for use on MDC aircraft. [Id.] All of the available invoices from Henkel to World, dated as late as October 1981, demonstrate sales of the asbestos-containing version of the Dexter epoxy to World. [Id.]

Murray Gordon, deceased, testified in 1981 as the designated corporate witness for McDonnell Douglas.[2] [Facts 189-194.] His title at the time of his 1981 deposition was Director of Occupational Safety and Medical Services. [Id.] He had the overall responsibility for the company's policies and procedures for hazardous materials, including asbestos. [Id.] A decade earlier, in 1972, MDC responded to the newly enacted OSHA rules by determining, throughout the

[2]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It is also admissible because the witness is dead, and MDC satisfied its interest in cross-examination at the deposition. [Evid. Code §§ 1290, 1291, 1292.] And it is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 214 of 226
Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page29 of 63

company, where it was using asbestos-containing materials. [Id.] MDC tried to eliminate asbestos "where [it] could.," and tried to change how asbestos was handled in its facilities. [Id.] Before 1972, the company took no measures to protect people exposed to asbestos from its aircraft. [Id.]

Colleen Rule testified in 1999 on behalf of McDonnell Douglas Corp. (Boeing) and was represented at the deposition by the company's counsel.[3] [Facts 195-200.] Her job in the company's product support group was to assist the airlines who operate MDC aircraft to ensure proper maintenance. [Id.] Ms. Rule kept the records of all communications between the company and its airline customers, including the All Operator Letters (AOL). [Id.] MDC also staffed a call-in center where airlines could ask whether a part number is interchangeable with any other part number, in order to keep the aircraft flying without delay. [Id.] At no time were MDC's customers cut-off from the technical assistance services, even long after the aircraft was sold. [Id.] And the subsequent owners of a used aircraft had the benefit of MDC's services. [Id.]

Attached to Ms. Rule's deposition is the October 22, 1992 All Operator Letter issued by MDC to all its customers, pertaining to asbestos-containing materials used in its aircraft.[4] [Fact 201-217.] The 1992 AOL was a revised edition of a 1989 AOL, also involving asbestos. [Id.] Those were the only AOLs that discussed asbestos, and they demonstrate MDC's first communications with its customers about asbestos. [Id.] The 1992 AOL was issued to encompass more models of aircraft. [Id.] The 1992 AOL began with a series of codes that identified what model aircraft and what system was being addressed. [Id.] For example, the code 8-20-0 meant the AOL related to chemicals and materials on all DC-8 planes. [Id.] The AOL also expressly stated it applied to all DC-8 and DC-10 aircraft, among others. [Id.] The AOL included a list of asbestos parts divided into several columns and rows. [Id.] For each asbestos part, the chart identified the specification, blueprint and part numbers that corresponded to MDC's Illustrated Parts Catalogue. [Id.] That catalogue was created and maintained by MDC's technical

---

[3]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It also is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

[4]The AOL is an admissible business record and admission. [Evid. Code §§ 1271, 1220, 1221, 1222.] It also is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA

8

EXHIBIT C - Page 148

Exhibit 26-640

publications department. [Id.] Some of the asbestos parts, but not all, were listed with a specific asbestos-free replacement part. [Id.] The AOL explained its purpose was to warn customers of the presence and dangers of all asbestos-containing materials used in MDC aircraft, including DC-8s and DC-10s. [Id.] It stated MDC was required to share updated safety information about tasks and functions needed to maintain and repair its aircraft. [Id.] The AOL was prompted by a "foreign" customer that desired to know all asbestos materials in certain MDC aircraft, and how to substitute asbestos-free alternatives. [Id.] It stated asbestos materials were used in high-heat applications, and asbestos was mixed into sealants and adhesives. [Id.] The AOL warned that asbestos fibers were released when the materials were sanded, creating toxic dust that was inhaled by nearby persons. [Id.] Among the dozens of asbestos parts listed in the AOL were Dexter-brand epoxy filler adhesives, heat shields, pneumatic duct insulation, gaskets, tape, and insulation. [Id.]

David Miller in his December 13, 2010 declaration explains he was an aircraft mechanic for World at Hangar 110 from 1973 to 1987. [Facts 218-236.] McDonnell Douglas representatives were sometimes at Hangar 110, identified by their badges. [Id.] Mr. Miller and the other mechanics handled heat blankets and shields used in the DC-8 and DC-10 aircraft exhaust systems. [Id.] The blankets were woven and protected the pneumatic and hydraulic lines from high heat. [Id.] The process of obtaining replacement blankets required the mechanics to use MDC's Illustrated Parts Catalogue and part-numbering system. [Id.] The heat shields used in the DC-8s protected the pneumatic and hydraulic lines, and were held in place with stubs or hooks. [Id.] They measured up to several feet long and six inches wide. [Id.] Each engine had two to four shields. [Id.] The outer case was metal, but the interior was a non-metal thick fibrous material. [Id.] The metal case did not completely cover the internal material at the corners and edges, so that material was disturbed every time the shields were removed and replaced. [Id.] The corners and edges became more frayed and deteriorated over time. [Id.] The color also varied over time, but most were gray-white. [Id.] The shields were removed and thrown aside when the mechanics needed access to the engines; and then were reinstalled. [Id.] The shields became bent through wear and tear, and developed holes in their metal shell. [Id.] Engine work on the DC-8s required the removal and replacement of the heat shields. [Id.] Mr. Miller believes, based on his

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

experience and knowledge as a mechanic, the shields contained asbestos. [*Id.*] Mr. Miller and others used Dexter-brand "black and yellow" two-part epoxies. [*Id.*] He also used thousands of "Adell" clamps that had an asbestos-like padding or sleeve material lining the metal portion. [*Id.*] And he removed and installed fuselage insulation. [*Id.*]

As an adult, Timothy Vest flew planes for Emery from 1990 to 2001. [Facts 237-245.] Emery operated primarily McDonnell Douglas DC-8 aircraft on cargo flights throughout the United States and the world. [*Id.*] Unlike domestic flights, on international flights the planes carried a mechanic and thousands of pounds of aircraft tools and parts. [*Id.*] The planes traveled to third-world countries and needed to perform their own repairs to avoid getting stranded. [*Id.*] Timothy observed the mechanics working on the engines, and he helped by lending a hand where possible. [*Id.*] When flying domestically, Timothy observed aircraft maintenance work at all airports where Emery had facilities. [*Id.*] Most of Emery's planes were old and needed repairs all the time, including pneumatic-system and engine work. [*Id.*] That maintenance work occurred at airports around the country. [*Id.*] Apart from Timothy's pre-flight inspections of Emery's 40 DC-8 aircraft, and its several DC-10s, he saw the mechanics doing their jobs hundreds of times. [*Id.*]

He saw the noses and side-panels of the planes being repaired, repairs of the hydraulic systems, and repairs of the engine components. [Facts 246-253.] Timothy closely observed the Emery mechanics' work on the MDC aircraft to ensure they were doing a proper job, and he assisted them when possible. [*Id.*] Apart from the work at Emery's airport bases, Timothy observed work on the DC-8s hundreds of times at specialized maintenance facilities. [*Id.*] He saw the different levels of heavy maintenance, termed A, B, C and D checks, where the planes were torn apart and put back together. [*Id.*] All of the hydraulic, pneumatic, fire-protection and engine systems were overhauled over a period of hours or days. [*Id.*] He has seen mechanics use epoxy adhesives to repair damaged surfaces on the aircraft, which included sanding the epoxy once it dried. [*Id.*] When nose-cones were damaged by bird or lightning strikes, the affected areas were filled with epoxies and sanded smooth. [*Id.*] The epoxies also were used to seal leaks and for other applications in the engine spaces. [*Id.*]

John Templin is a certified industrial hygienist who, in his accompanying declaration,

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

explains Timothy Vest's asbestos-exposure levels and the historical knowledge of asbestos-related health hazards. [Facts 254-255.] John Templin's extensive qualifications and the detailed bases for his conclusions are set forth in his declaration, which is incorporated fully herein by reference. [*Id.*] The physical and aerodynamic properties of asbestos facilitate re-entrainment and re-suspension of asbestos fibers once a space is contaminated. [*Id.*] The respirable asbestos fibers that are released into the air will remain there for up to many hours before they alight on surfaces. [*Id.*] Those fibers, once they do come to rest, are then subject to re-entrainment. [*Id.*] Re-entrainment describes the physical action of air, movement, vibration, and physical impact that aerodynamically causes asbestos fibers to take flight and become airborne. [*Id.*] It can be caused by ordinary movement of people and objects and also by air currents. [*Id.*] It is also caused by disturbances to the environment such as sweeping, cleaning, blowing areas down, and even walking through microscopic asbestos-containing debris or dust. [*Id.*] Fibers can move laterally with air currents and contaminate areas far from the release point, up to hundreds of meters away. [*Id.*] They can also move across contamination barriers with the passage of workers during removal of material. [*Id.*] And the fibers persist almost indefinitely and create a continuous source of exposure when they are present in occupied buildings. [*Id.*] John Templin explains that these principles of re-entrainment, and the risk of asbestos exposure to those well beyond the source of fiber release, have been widely scientifically known since at least the 1960s. [*Id.*] He cites several scientific sources from the 1920s to 1940s addressing this topic. [*Id.*]

Based on John Templin's review of the case-specific evidence enumerated in his declaration, Timothy Vest was exposed to substantial levels of asbestos-containing dust from the aircraft parts used in Hangar 110 from 1972 to 1983; and from parts used on Emery's aircraft during the 1990s. [Facts 256-258.] Timothy breathed large amounts of visible asbestos-containing dust that was created by his own activities, and by work done in his and his father's vicinity. [*Id.*] Hangar 110 at the Oakland Airport, occupied by World Airways, was the primary location where Timothy Vest inhaled asbestos. [*Id.*] He was exposed while at the hangar on dozens of occasions, and was exposed to dust tracked home on his father's clothing. [*Id.*] The materials that released respirable asbestos fibers to which he was exposed included aircraft parts

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

used on the DC-8 and DC-10 models operated by World and continuously maintained in the hangar. [*Id.*] Visible dust was released by the sanding of Dexter-brand epoxy adhesives; the removal and reinstallation of worn heat blankets and shields; the handling of old insulated clamps; and the scraping of gaskets and tapes. [*Id.*] Timothy Vest experienced substantial levels of asbestos exposure as a pilot for Emery in the 1990s. [*Id.*] He assisted and observed aircraft mechanics, on hundreds of occasions, working on Emery's fleet of McDonnell Douglas DC-8 and DC-10 models. [*Id.*] The aircraft parts that released asbestos dust to which he was exposed include all the materials described above: Dexter-brand epoxy adhesives, heat blankets and shields, insulated clamps, gaskets and tapes. [*Id.*] Although these exposures occurred in the 1990s, MDC's 1992 All Operator Letter confirms the relevant asbestos-containing parts still were required to be used on the aircraft. [*Id.*]

John Templin further explains, in great detail, that it was widely known and understood by 1960 – certainly within the industrial-hygiene community – that workers, bystanders and even household members of those working with and around asbestos-containing products were at substantially increased risk of being exposed to asbestos from the type of products and activities that Timothy Vest and his father encountered; and of developing an asbestos-related disease, such as mesothelioma, as a result of those exposures. [Fact 259.] In fact, by 1964 when Dr. Irving Selikoff and his colleagues published their seminal epidemiological study demonstrating the mortality experience of workers who had been exposed to asbestos insulation, the causal connection between asbestos exposure and mesothelioma was unquestioned in the medical and scientific communities in the United States. [*Id.*] When Timothy Vest inhaled asbestos-containing dust from aircraft parts in the 1970s, 1980s and 1990s, it was entirely foreseeable that his asbestos exposure could cause him to suffer serious or fatal diseases including, among others, mesothelioma cancer. [*Id.*]

**B. Timothy Vest's Mesothelioma was Caused by Asbestos**

Samuel P. Hammar, M.D. is a pathologist who, in his accompanying declaration, explains Timothy Vest's asbestos-caused malignant mesothelioma. [Facts 260-261.] Dr. Hammar's extensive qualifications and the detailed bases for his conclusions are set forth in his declaration,

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 219 of 226

which is incorporated fully herein by reference. [*Id.*] There is an extraordinarily strong link between mesothelioma and asbestos dust, such that it is largely undisputed in the scientific community that asbestos causes diffuse malignant mesothelioma. [*Id.*] And because diffuse and localized mesothelioma cells are chemically and structurally identical, it is also true that asbestos causes localized malignant mesothelioma – regardless of the tumor's size when detected. [*Id.*] This fact is supported by the documented asbestos-exposure histories of the patients described in the articles by Nakas, et al. and Allen, et al. (which Dr. Hammar co-authored) [*Id.*] For the Nakas, et al. patients, nine out of ten had prior occupational-level exposures to asbestos. [*Id.*] And the limited available information pertaining to the Allen, et al. patients revealed that four had prior occupational-level exposures to asbestos. [*Id.*]

Timothy Vest's pathology slides demonstrate malignant mesothelioma cancer cells on the pleural tissue in his chest. [Fact 262.] Adjacent to the cancer cells is mildly to markedly thickened pleural tissue with a hyaline (glassy) appearance, which are pleural plaques caused by asbestos. [*Id.*] Given the presence of pleural plaques, his mesothelioma was unquestionably caused by occupational-level exposure to asbestos. [*Id.*] Pleural plaques are localized scars that form due to prolonged exposure to asbestos fibers. [*Id.*] These scars almost never form for reasons other than asbestos exposure. [*Id.*] But even if the pleural plaques did not exist, it remains true that Timothy Vest's mesothelioma was caused by asbestos because of his documented exposure to asbestos in occupational and para-occupational settings. [*Id.*] His mesothelioma was caused by his total lifetime dose of asbestos. [*Id.*] All of Timothy Vest's individual asbestos exposures contributed to his total dose and increased his risk of developing the disease. [*Id.*] There is no known safe level of asbestos exposure. [*Id.*]

William R. Salyer, M.D. is a pathologist who, in his accompanying declaration, further explains Timothy Vest's asbestos-caused diffuse malignant mesothelioma. [Facts 263-264.] Dr. Salyer's extensive qualifications and the detailed bases for his conclusions are set forth in his declaration, which is incorporated fully herein by reference. [*Id.*] Dr. Salyer has treated several patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. [*Id.*] That is, when the mesotheliomas were first detected in the patients, the tumors appeared to be localized

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1
Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA 13
EXHIBIT C - Page 153
Exhibit 26-645

masses – what some in the scientific literature have described as "localized malignant mesothelioma." [*Id.*] All of those patients died of the disease soon after diagnosis. [*Id.*] Those patients' tumors, although localized in their initial appearance, were in fact diffuse mesotheliomas that were detected earlier than usual. [*Id.*] And each patient's diffuse mesothelioma was caused by exposure to asbestos. [*Id.*]

Based on the scientific literature pertaining to "localized" malignant mesothelioma, there is no evidence it is a different disease from diffuse mesothelioma. [Facts 265-266.] Although there may appear to be a larger number of longer-term survivors whose disease was "localized," that is because the patients were very fortunate to have an early discovery of their disease and underwent surgical amelioration to slow its progression. [*Id.*] Many of those patients developed a recurrence of the disease and died. [*Id.*] Timothy Vest suffers from malignant mesothelioma that was detected at an early stage of its development. [*Id.*.] Even if Timothy Vest's tumor was initially localized, he has a very high risk of local recurrence of his tumor and of metastatic disease. [*Id.*] Timothy Vest almost certainly will die of the disease. [*Id.*] His pathology slides demonstrate what are, in fact, diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest. [*Id.*] Adjacent to the cancer cells are pleural plaques caused by asbestos. [*Id.*] Given the presence of pleural plaques, and Timothy Vest's documented exposure to asbestos in occupational and para-occupational settings, his mesothelioma was unquestionably caused by asbestos. [*Id.*] Even if the pleural plaques did not exist, it remains true that Timothy Vest's mesothelioma was caused by asbestos. [*Id.*] All of his individual exposures contributed to his total lifetime dose of asbestos and thereby caused the disease. [*Id.*]

## III. Legal Argument

### A. Moving Defendant's Burden of Proof

> A defendant's motion for summary judgment should be granted [only] if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Code Civ. Proc. § 437c(c).] The burden of persuasion remains with the party moving for summary judgment. [*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861.]

[*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see Code Civ. Proc. § 437c(p)(2).] "[F]rom commencement to conclusion, the party moving for summary judgment

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

bears the burden of persuasion that there is no triable issue of material fact . . ." [*Aguilar*, *supra*, 25 Cal.4th 826, 850.] This means the moving defendant must show that if the defendant's evidence is uncontroverted, no reasonable trier of fact could find for the plaintiff. [*Id.* at 851.] Only if the defendant makes that showing does the burden shift to plaintiff to demonstrate the existence of a triable issue of material fact. [*Id.*]

> The defendant must show that the plaintiff *does not possess* needed evidence, because otherwise the plaintiff might be able to establish the elements of the cause of action; the defendant must also show that the plaintiff *cannot reasonably obtain* needed evidence, because the plaintiff must be allowed a reasonable opportunity to oppose the motion. [*Id.* at 854 (emphasis in original).]

A moving defendant must affirmatively show the plaintiff lacks the needed evidence; simply pointing to a claimed absence is not enough. [*Id.* at 854-855.] The defendant's evidence must include "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which 'judicial notice' must or may 'be taken.'" [*Id.* at 855, citing Code Civ. Proc. § 437c(b).] Nor is it enough to merely assert that plaintiff failed to provide the information. The defendant must prove "plaintiffs failed to provide meaningful responses to comprehensive interrogatories designed to elicit all the evidence plaintiffs had to support their contention of liability." [*Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1442.]

Only admissible evidence may be considered, and the moving defendant must include all evidence offered to meet its evidentiary burden in its "separate statement." [Code Civ. Proc. § 437c(d).] "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate statement, *it does not exist*." [*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 (emphasis in original).] The strict requirements a moving party must satisfy were explained in *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631-632:

> One of the more basic requirements is that the papers supporting a section 437c motion "shall include a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed." [*Id.*, Code Civ. Proc. § 437c(b)(1); see CRC 3.1350(d).] In addition, each material fact set forth in the separate statement "shall be followed by a reference to the supporting evidence." [Code Civ. Proc. § 437c(b)(1).]

In ruling, "the court must consider all of the evidence and all of the inferences reasonably drawn therefrom ... and must view such evidence ... and such inferences ... in the light most favorable to the opposing party." [*Aguilar*, 25 Cal.4th 826, 844-845.] "'[B]ecause of the drastic

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

nature of the summary judgment procedure, and the importance of safeguarding the adverse party's right to a trial, the moving party must make a strong showing. [Its] affidavits are strictly construed ...On the other hand, the affidavits of the party opposing the motion are liberally construed.'" [*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 838-839 (emphasis added).]

**B. MDC Fails to Establish Plaintiffs Lack Evidence of Causation**

MDC is responsible under products liability principles for all injuries caused by its defective asbestos-containing aircraft – including the originally-installed parts and the parts MDC required to be used in its planes' maintenance. [*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 382-383; *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261.][5] Bystander victims are owed a duty of care, and are entitled to even greater protection, because they are perfectly foreseeable victims of defective products and have no opportunity to discover the hazards. [*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 585-586; *Nelson v. Superior Court* (2006) 144 Cal.App.4th 689, 695.] Even household members injured by toxins unwittingly tracked home by workers are owed a duty of care, so long as there is evidence of a specific toxin that caused a specific injury. [*Oddone v. Superior Court (Technicolor, Inc.)* (2009) 179 Cal.App.4th 813, 872-873.]

The California Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 established the causation standard for asbestos-cancer cases:

---

[5]Manufacturers owe a duty to warn of hazards arising from the foreseeable and required uses of their products, including such uses in conjunction with other defective products. [*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577, 581-583 (power tools and attachments); *Torres v. Xomox Corporation* (1996) 49 Cal.App.4th 1, 17-19 (valve and acid); *Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 833 (grinder and disc); *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1230-1231 (water gun and fire truck); *DeLeon v. Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 343-347 (holding bin and overhead equipment). The court in *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, did not hold that manufacturers would be immune if they had specifically intended and required that asbestos-containing replacement parts be used with their equipment. [*Id.* at 590-591.] In fact, the court cited with approval a Washington Supreme Court case that held equipment manufacturers could be liable if they specified asbestos-containing replacement components for use with their equipment. [*Id.*]

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Case 4:11-cv-00061-LB Document 17-13 Filed 01/10/11 Page 38 of 63

> [P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer . . .

[*Id.* at 976-977 (emphasis original).] Plaintiffs may prove Timothy Vest's mesothelioma was "cumulative in nature, with many separate exposures each having constituted a 'substantial factor' (citation) that contributed to his risk of injury." [*Id.* at 958.] But plaintiffs "need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth." [*Id.* at 982-983 (emphasis original).]

MDC demonstrates no lack of proof its asbestos-containing aircraft constituted a substantial-factor cause of Timothy Vest's asbestos-related mesothelioma. First, MDC presents no evidence it propounded comprehensive discovery requests, much less that plaintiffs' responses to any such discovery it propounded were in any way devoid of facts and evidence supporting each essential element of the complaint's causes of action and damages claims against MDC. [Alleged Facts 1-63; *Weber, supra*, 143 Cal.App.4th 1433, 1442.] MDC in its separate statement simply mentions <u>no</u> special interrogatories propounded by MDC to plaintiffs. [*Id.*] Instead, MDC cites limited portions of Timothy Vest's and Warren Vest's deposition testimony, ignoring the portions that are unfavorable to MDC's position.

Second, MDC cites the inadmissible declarations of Larry Fogg, Timothy Lloyd and Michael Schmidt in a failed effort to prove MDC's aircraft had few asbestos-containing parts, and that MDC had no involvement in those planes' maintenance. [Alleged Facts 1-63; Fact 267.] As plaintiffs explain in their evidentiary objections, Mr. Fogg's declarations are inadmissible hearsay created several years ago for other lawsuits. [Evid. Code § 1200; Code Civ. Proc. § 437c(b),(d).] All of the declarations must be disregarded because MDC refuses to produce Mr. Fogg, Mr. Lloyd and Mr. Schmidt for deposition – thereby concealing relevant evidence. [Fact 267; Code Civ. Proc. § 437c(h).] At most, these witnesses set forth MDC's one-sided view of the case, all of which is contradicted by plaintiffs' additional evidence. [Facts 64-267.]

Third, on the medical-causation issue, MDC offers no conclusive evidence that Timothy Vest's mesothelioma purportedly is unrelated to his asbestos exposure. [Alleged Facts 1-63.]

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 224 of 226

Instead, MDC offers the unpersuasive opinion of Dr. Travis who, based on his status as a co-author of a single article, opines that no scientist could ever determine the cause of Timothy Vest's cancer because it has been described as "localized." [*Id.*] Dr. Travis's opinion demonstrates nothing about plaintiffs' ability to marshal competent expert testimony to prove Timothy Vest's malignant mesothelioma is, indeed, asbestos-related. [*Id.*] In fact, plaintiffs submit the declarations of Dr. Salyer and Dr. Hammar (co-author of Dr. Travis's article), showing Timothy Vest's mesothelioma was unquestionably caused by asbestos and will kill him. [Facts 260-266.]

**1. Plaintiffs' Additional Evidence Requires a Trial**

Under *Jiminez, supra, Vandermark, supra* and *Rutherford*, supra, MDC is liable for its supply and specification of asbestos-containing aircraft parts that were a substantial-factor cause of Timothy Vest's mesothelioma. MDC installed dozens of asbestos materials on its aircraft, and World operated approximately 16 of those planes when Timothy and his father were in Hangar 110 from 1973 to 1983. [Facts 64-259.] Many of those planes were purchased new from 1979 to 1981. [Facts 64-259.] Timothy Vest was also exposed to Emery's fleet of MDC planes in the 1990s. [*Id.*] Many of the toxic components – including heat shields, heat blankets, clamps, gaskets, tape and insulation – remained in the aircraft for extended periods and released asbestos fibers whenever they were handled, removed and reinstalled during inspections. [*Id.*] And MDC required that other toxic components – including Dexter adhesive – were required to be used and sanded in a manner that released asbestos in maintaining MDC's planes. [*Id.*] MDC controlled every aspect of its planes' maintenance and operation, and its catalogues and manuals specified the use of asbestos parts into the 1990s – decades after MDC became aware of the hazards. [*Id.*] Safe alternative materials could not be used without MDC's analysis and express permission. [*Id.*] MDC maintained a constant connection to its aircraft, even after they were transferred between owners. [*Id.*]

Industrial hygienist John Templin explains how Timothy Vest inhaled substantial levels of asbestos from these products and activities; and that the hazards were foreseeable to MDC and it could have discovered and fixed the problems at any time from the 1970s through the 1990s. [*Id.*] Pathologists Samuel Hammar and William Salyer confirm that Timothy Vest's mesothelioma –

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

MSTEWART/724515.1
Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA 18
EXHIBIT C - Page 158
Exhibit 26-650

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 225 of 226
Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page40 of 43

whether described as "localized" or not – was unquestionably caused by Timothy's occupational-levels of asbestos exposure from all sources. [*Id.*] All of these facts are supported by the sworn statements of Timothy Vest, Warren Vest, Claude Fross, James Hales, Stanley Lehmann, Murray Gordon, Colleen Rule, David Miller, John Templin, Samuel Hammar and William Salyer. [*Id.*]

**C. Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid**

MDC may be liable under Civil Code sections 1708 and 1710 for concealing important facts pertaining to hidden asbestos-related health hazards. The active concealment of facts by even "a non-fiduciary is the equivalent of a false representation, i.e., *actual fraud.*" [5 Witkin, Cal. Procedure (4th ed. 1997) Pleading § 678, p. 136 (emphasis added); *Quirici v. Freeman* (1950) 98 Cal.App.2d 194, 201 (intentional concealment supports fraud claim).] And MDC may be liable for asbestos exposures from <u>any</u> source caused by the conspiracy in which MDC participated to suppress information about asbestos dangers. [*Stone v. Regents of University of Cal.* (1999) 77 Cal.App.4th 736, 748 fn. 9.] The jury may award punitive damages in intentional-tort and unintentional-tort actions for negligent conduct. [*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1005; *SKF Farms v. Super. Ct.* (1984) 153 Cal.App.3d 902, 907.] Punitive damages may be based on a defendant's knowing and reckless failure to warn of hazards, where it is shown that actions were taken in conscious disregard of the rights or safety of others, including the plaintiffs. [Civ. Code § 3294; *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-401.]

Here, as previously explained, MDC demonstrates no absence of evidence it concealed the latent asbestos hazards of its aircraft. But plaintiffs nevertheless present the testimony of Murray Gordon, Colleen Rule and Stanley Lehman, proving MDC knew of asbestos hazards in 1972 and took steps to protect its own workers; received further knowledge in 1977 when the manufacturer of Dexter adhesives issued warnings; but MDC communicated nothing to its customers until 1989 and 1992, when it issued the AOLs on asbestos parts. So MDC knew it was exposing workers and their families to toxic asbestos, yet MDC failed to warn or use safe products. Such evidence easily supports the reasonable inference that MDC acted fraudulently and in conscious disregard of the health and safety of others, including Timothy Vest and his father.

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1
Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA 19
EXHIBIT C - Page 159
Exhibit 26-651

Case MDL No. 875 Document 6658-2 Filed 01/28/11 Page 226 of 226
Case4:11-cv-00061-LB Document17-13 Filed01/10/11 Page41 of 63

D. **The Motion must be Continued or Denied Under CCP 437c(h)**

Despite the Court's order to produce specific aircraft manuals, parts catalogues, All Operator Letters and documents demonstrating MDC's historical knowledge of asbestos hazards, MDC has not satisfied its discovery obligations. [Fact 267] MDC provided 14 encrypted compact discs, which contain images of documents that cannot be printed, cannot be electronically searched and cannot be converted to a format that is electronically searchable. [*Id.*]

MDC relies on witnesses Timothy Lloyd, Michael Schmidt and Larry Fogg. [*Id.*] Despite MDC's submission of these witnesses' declarations in support of its motion for summary judgment/adjudication, MDC refuses to make Mr. Lloyd, Mr. Schmidt and Mr. Fogg available for deposition. [*Id.*] These percipient witnesses have information concerning the originally-installed and replacement asbestos-containing parts that MDC required to be used on its aircraft. [*Id.*]

David Miller's and Joseph Robison's upcoming deposition testimony will further confirm that MDC's asbestos-containing aircraft parts were pervasively used in Hangar 110 from 1973 through 1983. [*Id.*] Both Miller and Robison worked in Hangar 110 during all relevant years and are essential percipient witnesses. [*Id.*] Additional percipient witnesses who will be deposed include Glen Cartwright and Mike Pociecha, both of whom worked for World in Hangar 110. [*Id.*] Further, pared-down expert witness disclosures are due January 14, 2011, and the subsequent depositions of all parties' medical-causation expert witnesses will produce further evidence that Timothy Vest's mesothelioma was caused by asbestos. [*Id.*] Facts that further justify opposition to this motion may exist, but cannot now be presented. [*Id.*] So this motion must be denied, but at a minimum it must be continued. [Code Civ. Proc. § 437c(h); *Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 395.]

**IV. Conclusion**

MDC demonstrates no absence of evidence in support of any cause of action or claim for damages raised in the complaint. And plaintiffs' additional evidence requires a trial to resolve all challenged causes of action and claims for damages.

DATED: December 30, 2010

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation

By [signature]
Michael T. Stewart
Attorneys for Plaintiffs

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA 20

EXHIBIT C - Page 160

Exhibit 26-652