*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 27

*9082177*

FAXED

RS

ORIGINAL

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1 | **BRYAN CAVE LLP**
Robert E. Boone III, California Bar No. 132780
2 | James C. Pettis, California Bar No. 223953
Linda C. Hsu, California Bar No. 239880
3 | 120 Broadway, Suite 300
Santa Monica, California 90401
4 | Telephone: (310) 576-2100
Facsimile: (310) 576-2200
5 |
6 | Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION
7 |

**F I L E D**
ALAMEDA COUNTY

DEC 1 6 2010

CLERK OF THE ?????? COURT
By _____

8 |
9 | SUPERIOR COURT OF CALIFORNIA
10 | COUNTY OF ALAMEDA
11 |
12 | TIMOTHY VEST and CAROLINE VEST,
13 |
14 | Plaintiffs,
15 | vs.
16 | ALLIED PACKING AND SUPPLY, *et al.*,
17 | Defendants.

Case No. RG09489518

Assigned for all pre-trial purposes to the
Hon. Kenneth Mark Burr

**DEFENDANT MCDONNELL DOUGLAS
CORPORATION'S NOTICE OF MOTION
AND MOTION FOR SEPARATE TRIAL
RE MEDICAL CAUSATION AND/OR
ORDER BIFURCATING TRIAL**

[Filed with Memorandum in Support of Motion
for Separate Trial Re Medical Causation and/or
Order Bifurcating Trial; Declaration of James C.
Pettis; and [Proposed] Order]

Date: January 14, 2011
Time: 9:38 A.M.
Dept.: 30

**Reservation No. R-1128821**

Complaint Filed: December 17, 2009
Trial Date: February 14, 2011

18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

815788

MDC'S NOTICE OF MOTION AND MOTION FOR SEPARATE TRIAL RE MEDICAL CAUSATION AND/OR
ORDER BIFURCATING TRIAL

Exhibit 27-653

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 14, 2011, at 9:38 A.M., or as soon after that as the matter can be heard, in Department 30 of the Alameda County Superior Court located at U.S. Post Office Building, 201 13th Street, Oakland, California, Defendant McDonnell Douglas Corporation ("MDC") will and does move the Court for an order granting separate trial re medical causation and/or seeks an order from the Court bifurcating trail. MDC makes this motion on the following independent grounds:

1. The economy and efficiency of handling the litigation will be promoted by bifurcating trial of this matter. Cal. Civ. Proc. Code § 598. The most efficient way to handle the case is through a separate trial, proceeding first with an evidentiary hearing under Evidence Code section 402, and then if the Court admits Plaintiffs' evidence, a trial on the medical causation issue. Plaintiffs' case ends if the medical issue is decided against them, either based on an evidentiary ruling precluding their evidence, or a finding by the trier of fact after consideration of Plaintiffs' expert testimony. The remaining issues, including causation liability and damages, should be tried second and only if required. A shorter trial on the medical issues has the potential to resolve this action quickly with minimal expense to both the litigants and the Court. Evidence of causation liability and damages do not overlap with evidence related to medical causation.

2. Bifurcating the trial will promote the ends of justice. Cal. Civ. Proc. Code § 598. Trial on medical causation first will avoid confusion and prejudice. There is substantial danger that the jury might confuse the medical causation and exposure causation issues, or simply ignore the medical causation issue out of sympathy for Plaintiffs. This confusion and sympathy can be eliminated, without inconvenience, delay, or other prejudice, by trying the issues separately in succession. Plaintiffs will suffer no prejudice by a separate or bifurcated trial on the medical causation issue. Plaintiffs must prove that part of their case anyway, and doing so first and in a separate trial will not cause duplication of effort or create any delay

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

MDC'S NOTICE OF MOTION AND MOTION FOR SEPARATE TRIAL RE MEDICAL CAUSATION AND/OR
ORDER BIFURCATING TRIAL

Exhibit 27-654

1    This Motion is based upon this Notice of Motion, the attached Memorandum of Points and

2    Authorities; the Declaration of James C. Pettis and exhibits; the records and pleadings on file herein,

3    argument presented at the time of hearing, and such other and further matters that the Court may

4    properly consider.

5

6    Dated: December 16, 2010                    Respectfully submitted,

7
                                                 **BRYAN CAVE LLP**
8                                                Robert E. Boone III
                                                 James C. Pettis
9                                                Linda C. Hsu

10                                               By:

11                                                   James C. Pettis
                                                 Attorneys for Defendant
12                                               MCDONNELL DOUGLAS CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

815788                                          2

MDC'S NOTICE OF MOTION AND MOTION FOR SEPARATE TRIAL RE MEDICAL CAUSATION AND/OR
ORDER BIFURCATING TRIAL

Exhibit 27-655

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

## PROOF OF SERVICE

2

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and
3   not a party to the within action. My business address is 120 Broadway, Suite 300, Santa Monica, CA
90401. My e-mail address is karina.lopez@bryancave.com.

4

On December 16, 2010, I caused the following documents described as follows:
5   **DEFENDANT MCDONNELL DOUGLAS CORPORATION'S NOTICE OF MOTION
AND MOTION FOR SEPARATE TRIAL RE MEDICAL CAUSATION AND/OR ORDER**
6   **BIFURCATING TRIAL**, to be served on each interested party in this action as follows:

7                     SEE ATTACHED SERVICE LIST

8        ☒    **(BY E-MAIL OR ELECTRONIC TRANSMISSION):**  Based on a court order or
9   an agreement of the parties to accept service by e-mail or electronic transmission, I caused the
document(s) to be sent to each person at the e-mail address(es) set forth in the attached service list. I
10  did not receive, within a reasonable time after the transmission, any electronic message or other
indication that the transmission was unsuccessful.

11

Executed on December 16, 2010, at Santa Monica, California.
12

13      I declare under penalty of perjury that the foregoing is true and correct.

14
                                    */s/ Karina Lopez*
15                                    Karina Lopez

16

17

18

19

20

21

22

23

24

25

26

27

28

815788                                3

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 28

1  James L. Oberman, Esq. (C.S.B. #120938)
   Denise Abrams, Esq. (C.S.B. #124139)
2  Gloria C. Amell, Esq. (C.S.B. #230255)
   KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
3  Jack London Market
   55 Harrison Street, Suite 400
4  Oakland, California 94607
   Telephone: (510) 302-1000
5
   Attorneys for Plaintiffs
6

**ENDORSED**
**FILED**
ALAMEDA COUNTY

JAN 0 3 2011

CLERK OF THE SUPERIOR COURT
By _____ S. McMullen

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    IN AND FOR THE COUNTY OF ALAMEDA

10

| | |
|---|---|
| 11  TIMOTHY VEST and CAROLINE VEST, | No. RG09489518 |
| 12            Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT MCDONNELL DOUGLAS CORPORATION'S MOTION FOR SEPARATE TRIAL RE: MEDICAL CAUSATION AND/OR ORDER BIFURCATING TRIAL** |
| 13       vs. | |
| 14  ALLIED PACKING AND SUPPLY, INC., et al., | |
| 15            Defendants. | Date:        January 14, 2011 |
| 16 | Time:        9:38 a.m. |
| 17 | Dept:        30 (Hon. Jo-Lynne Q. Lee) |
|  | Action Filed:  December 17, 2009 |
|  | Trial Date:   February 14, 2011 |
| 18 | |
| 19 | **Reservation No. 1128821** |

20

21

22

23

24

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

25

26

27

28

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL

GAMELL\716434.1

Exhibit 28-657

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiffs' Allegations and Burden of Proof at Trial . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Timothy Vest Has Incurable Mesothelioma Caused by Asbestos Exposure . . . . . . 2

        1.    Mr. Vest's Tumor is Likely to Recur and Cause His Death . . . . . . . . . . . 3

        2.    Asbestos Exposure Caused Mr. Vest's Mesothelioma . . . . . . . . . . . . . . . 4

    C.    There is No Difference Between Localized and Diffuse Mesothelioma . . . . . . . . . 5

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    The Court May Not Bifurcate Parts of a Trial That Require The Same Proof . . 6

    B.    Defendant's Arguments are Merely Part of Its Defense to Plaintiffs' Claims Rather Than a Separate, Severable Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    One Trial Will Not Confuse the Jury or Prejudice Defendants . . . . . . . . . . . . . 10

    D.    Defendants Are Not Entitled to an Offer of Proof . . . . . . . . . . . . . . . . . . . . . . 10

    E.    Defendant Unduly Delayed In Seeking a Bifurcated Trial . . . . . . . . . . . . . . . . 11

    F.    The Court Must Strike And/Or Disregard All Purported "Joinders" . . . . . . . . . . 12

        1.    All Joinders are Untimely And/Or Invalid . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    Should the Moving Defendant Settle Before the Hearing, the Court Must Strike All Joinders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

SAMELL/716434.1

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL

i

Exhibit 28-658

# TABLE OF AUTHORITIES

**CASES** Page(s)

*Carpenson v. Najaria*
  (1967) 254 Cal.App.2d 856 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cohn v. Bugas*
  (1974) 42 Cal.App.3d 381 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cook v. Sup. Ct.*
  (1971) 19 Cal.App.3d 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Horton v. Jones*
  (1972) 26 Cal.App.3d 952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

*People v. Kelly*
  (1976) 17 Cal.3d 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Roberti v. Andy's Termite & Pest Control, Inc.*
  (2003) 113 Cal.App.4th 893 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rutherford v. Owens-Illinois, Inc.*
  (1997) 16 Cal.4th 953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7

**STATUTES**

Code of Civil Procedure § 598 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8

Code of Civil Procedure § 1005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Code of Civil Procedure § 1005(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Code of Civil Procedure § 1048(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

Evidence Code § 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Evidence Code § 402(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Evidence Code § 402(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**OTHER AUTHORITES**

Allen, T.C., et al. *Localized Malignant Mesothelioma.*
  Am. J. Surg. Pathol. 2005; 29:866-873 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Nakas, A., et al., *Localised Malignant Pleural Mesothelioma: A Separate Clinical Entity
  Requiring Aggressive Local Surgery.* Eur. J. Card.-Thor. Surg. 2008; 33:303-306 . . . . . . 5

Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial
  (The Rutter Group 2010) ¶¶ 12:420, 12:424 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL

ii

GAMELL/716434.1

Exhibit 28-659

# I.   INTRODUCTION

Defendant McDonnell Douglas ("McDonnell") improperly seeks bifurcation, which is only permitted in a situation in which resolving one issue may preclude prosecuting another, and bifurcating would thus save the court's and parties' time and money. However, this case does not involve one threshold issue – whether asbestos causes "localized" malignant mesothelioma – that the Court may quickly and effectively adjudicate, either for convenience or to avoid trial on remaining issues. Rather, in this case, causation and liability are inextricably linked and require overlapping evidence because California law compels plaintiffs both to prove asbestos exposure for which defendants are responsible and that in reasonable medical probability the asbestos exposure was a substantial factor in bringing about Mr. Vest's mesothelioma. [*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982-983.]

Here, the jury cannot determine whether defendants are liable without considering whether their products and premises had asbestos, and whether exposure to that asbestos caused Mr. Vest's illness. Requiring a separate trial or phase of trial to address the sole question of whether asbestos caused Mr. Vest's mesothelioma, then, will require plaintiffs to present the same evidence twice. Ordering separate trials or a bifurcated trial in this situation would exceed the limits of the statutory rationale for bifurcating a trial, which is to further convenience and economy.

Additionally, McDonnell's arguments about medical causation are not a separate cause of action or legal issue that the Court may sever from this trial. Rather, McDonnell's claims are merely a part of its defenses to plaintiffs' claims, and as such, cannot be presented to the jury before plaintiffs present their case. Additionally, this claimed "defense" has virtually no scientific support, and is instead supported by the opinion of one or more experts whose testimony will likely be excluded at trial. For this additional reason, the Court must deny McDonnell's motion.

The Court must also for the same reasons deny all purported "joinders" in McDonnell's motion. Additionally, all joinders to McDonnell's motion are invalid or untimely, because they fail to give plaintiffs the statutorily required notice before the hearing on McDonnell's motion.

Finally, McDonnell's motion itself is untimely. McDonnell unduly delayed filing this motion claiming that asbestos exposure did not cause Mr. Vest's mesothelioma, despite having

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER BIFURCATING TRIAL

1

1  known of Mr. Vest's diagnosis and treatment for about a year. McDonnell, as well as other

2  defendants, moved for summary judgment on the same basis in October, and could and should

3  have moved for bifurcation earlier as well.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs' Allegations and Burden of Proof at Trial

Plaintiffs allege that each defendant named in this case exposed Timothy Vest to asbestos, which caused his mesothelioma. [Second Amended Complaint, Ex. J to Decl. of James Pettis in support of McDonnell's motion, at 2:15-42:6.] At all times at trial, plaintiffs will have the burden to establish facts showing each defendant's liability for their injuries. [*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982-983.] Under California law, plaintiffs will be required to establish: (1) a threshold exposure to asbestos from each defendant's product or premises; and (2) that, in reasonable medical probability, such exposure was a substantial factor in bringing about Mr. Vest's mesothelioma. [*Id.* at 982.]

Thus, plaintiffs will have to show Mr. Vest was exposed to asbestos in defendants' products, or on defendants' premises, and that this exposure in reasonable medical probability caused his illness, in order to prove both liability and causation at trial. The jury cannot determine whether defendants are liable without considering whether their products and premises had asbestos, and whether exposure to that asbestos in reasonable medical probability caused Mr. Vest's illness.

### B.    Timothy Vest Has Incurable Mesothelioma Caused by Asbestos Exposure

As plaintiffs detail below, two medical experts who have reviewed Mr. Vest's pathology records and history of asbestos exposure agree that Mr. Vest has mesothelioma caused by asbestos exposure.

Even Dr. William Travis, on whom McDonnell relies, acknowledges that Mr. Vest has mesothelioma. [Decl. of Dr. William Travis ("Travis Decl."), Ex. D to Decl. of James Pettis filed with McDonnell's motion to bifurcate, ¶ 7.] Dr. Travis offers no alternative diagnosis, nor could he since he does not even claim to have reviewed Mr. Vest's pathology slides or pathology reports. [*Id.*, ¶ 7.] Further, Dr. Travis acknowledges that "[localized malignant mesothelioma] is

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER BIFURCATING TRIAL

GAMELL/716434.1

Exhibit 28-661

1  microscopically, immunohistochemically, and ultrastructurally identical to [diffuse malignant

2  mesothelioma]. Such tests yield similar results for an LMM and a DMM because *both are types of*

3  *mesotheliomas.*" [*Id.*, ¶ 4 (emphasis added).)] Finally, nowhere in Dr. Travis' declaration does he

4  even claim that mesothelioma is curable. [*Id.*, ¶¶ 1-7.] McDonnell's own expert witness, then,

5  offers no diagnosis for Mr. Vest other than mesothelioma, acknowledges that "localized"

6  mesothelioma is simply a type of mesothelioma, and presents no possibility of cure or prognosis

7  for mesothelioma other than death.

8  **1.    Mr. Vest's Tumor is Likely to Recur and Cause His Death**

9  In its motion, McDonnell misrepresents opinions and testimony from Dr. Joseph Shrager,

10  the thoracic surgeon who removed a tumor and portions of Mr. Vest's fifth, sixth and seventh ribs

11  in October 2009. [Deposition of Dr. Joseph Shrager ("Shrager Depo."), Ex. A to Decl. of Gloria

12  C. Amell, at 13:16-21; 14:17-15:2; 21:22-22:4.] When asked whether he had "cleared Mr. Vest to

13  return to work," Dr. Shrager testified that he is not the only person who determines whether Mr.

14  Vest is able to work. [*Id.* at 25:14-24.] Dr. Shrager also testified that the last time he examined

15  Mr. Vest, he believed Mr. Vest was suffering from psychological symptoms that could interfere

16  with his work and advised him to consult with a psychiatrist. [*Id.* at 26:1-6; 32:12-19; 41:13-

17  42:19.] Nevertheless, McDonnell erroneously claims that Dr. Shrager "cleared" Mr. Vest to return

18  to work. [McDonnell's motion at 3:10-11.]

19  Neither Dr. Shrager nor any other medical expert has declared Mr. Vest to be "cured" of

20  mesothelioma. [McDonnell's motion at 6:16-17.] Dr. Shrager testified that initially after surgery,

21  he believed there was a 50 percent chance that Mr. Vest's tumor would recur, and that if it did

22  recur, Mr. Vest's "chances of being cured are close to zero" and the tumor would cause his death.

23  [Shrager Depo., Ex. A to Amell Decl., at 43:17-46:16.] But Dr. Shrager also testified that a

24  recurrence of a thoracic tumor is "almost certainly a precursor of death," and that tumors such as

25  Mr. Vest's typically recur diffusely somewhere else in the body from the original tumor. [*Id.* at

26  44:14-17; 46:17-47:2; 57:18-58:11.] Crucially, moreover, Dr. Shrager conducted further research

27  after the surgery and now believes that there is a 60 chance that Mr. Vest's tumor will recur. [*Id.*

28  at 50:3-13; 51:18-23.]

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER BIFURCATING TRIAL
3

AMELL/716434.1

Exhibit 28-662

## 2. Asbestos Exposure Caused Mr. Vest's Mesothelioma

Dr. Samuel Hammar and Dr. William Salyer, both board-certified pathologists since 1975, are experts with extensive knowledge on mesothelioma who have reviewed Mr. Vest's pathology slides and reports and, agree that asbestos exposure caused his mesothelioma. [Hammar Decl. and Salyer Decl., Exs. B and C to Amell Decl., respectively.] Pathology is the scientific study of the nature of disease and its causes, processes, development, and consequences. [Hammar Decl., Ex. B to Amell Decl., ¶ 3; Salyer Decl., Ex. C to Amell Decl., ¶ 3.]

Malignant mesothelioma is a cancer that starts in the cells that line certain parts of the body, including the pleura membrane that lines the lungs and the chest cavity. [Hammar Decl., Ex. B to Amell Decl., ¶ 6; Salyer Decl., Ex. C to Amell Decl., ¶ 9.] Pleural malignant mesothelioma nearly always presents as multiple nodules or as a diffuse tumor. [Hammar Decl., Ex. B to Amell Decl., ¶ 6.] But in rare cases, including that of Timothy Vest, it presents as a localized tumor mass. [*Id.*] It is irrelevant that the sizes and shapes of diffuse and localized mesothelioma tumors appear different when they are first detected in a patient. [*Id.*] One likely explanation for these differences in tumor appearance is that localized tumors are in fact diffuse tumors that are detected at a very early stage of their development. [*Id.*]

In fact, Dr. Salyer has treated several patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. [Salyer Decl., Ex. C to Amell Decl., ¶ 5.] When the mesotheliomas were first detected in the patients, the tumors appeared to be localized masses – what some in the scientific literature have described as "localized malignant mesothelioma." [*Id.*] All of those patients died of the disease soon after diagnosis. [*Id.*] Those patients' tumors, although localized in their initial appearance, were in fact diffuse malignant mesotheliomas that were detected earlier than usual. [*Id.*] And each patient's diffuse malignant mesothelioma was caused by exposure to asbestos. [*Id.*]

Both Drs. Hammar and Salyer reviewed Mr. Vest's pathology slides and pathology reports. [Hammar Decl., Ex. B to Amell Decl., at ¶ 10; Salyer Decl., Ex. C to Amell Decl., ¶ 4.] Both conclude that Mr. Vest's pathology slides show diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest. [Hammar Decl., Ex. B to Amell Decl., at ¶ 11; Salyer Decl., Ex. C

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER BIFURCATING TRIAL

4

KAZAN/716434.1

Exhibit 28-663

1   to Amell Decl., ¶ 8.]  Adjacent to the cancer cells are pleural plaques caused by asbestos.  [*Id.*]

2         Given the presence of pleural plaques, both Drs. Hammar and Salyer give their expert

3   medical opinions that Mr. Vest's mesothelioma was without a doubt caused by occupational-level

4   exposure to asbestos. [Hammar Decl., Ex. B to Amell Decl., at ¶ 11; Salyer Decl., Ex. C to Amell

5   Decl., ¶ 8.]  Pleural plaques are localized scars that form due to prolonged exposure to asbestos

6   fibers.  [*Id.*]  These scars almost never form for reasons other than asbestos exposure, and if

7   examined by digestion analysis, contain asbestos fibers.  [*Id.*]  But even if the pleural plaques did

8   not exist, it remains true that Mr. Vest's mesothelioma was caused by asbestos.  [*Id.*]  Both Drs.

9   Hammar and Salyer have reviewed documentation of Mr. Vest's occupational and para-

10  occupational exposure to asbestos, which further supports their conclusion that Mr. Vest's

11  mesothelioma was without a doubt caused by asbestos exposure.  [*Id.*]

12        Aside from Dr. Salyer's treatment of patients with tumors initially similar to Mr. Vest's,

13  scientific studies and literature also support the doctors' conclusions.  For example, Dr. Hammar

14  has reviewed a journal article by Nakas, A., et al., *Localised Malignant Pleural Mesothelioma: A*

15  *Separate Clinical Entity Requiring Aggressive Local Surgery.* Eur. J. Card.-Thor. Surg. 2008;

16  33:303-306.[1]  [*Id.*, ¶ 4.]  The authors managed the care of ten patients with localized malignant

17  mesothelioma.  Nine of those ten patients had occupational-level exposure to asbestos.  [*Id.*]

18  Additionally, Dr. Hammar is an author of a journal article that analyzed 23 patients' localized

19  malignant mesotheliomas: Allen, T.C., et al. *Localized Malignant Mesothelioma.* Am. J. Surg.

20  Pathol. 2005; 29:866-873.  [*Id.*, ¶ 5.]  From the limited information available, four of those

21  patients had identified histories of occupational-level asbestos exposure.  [*Id.*]  There was no

22  available information about the other patients' asbestos exposure.  [*Id.*]

23      **C.**    **There is No Difference Between Localized and Diffuse Mesothelioma**

24        As McDonnell's expert, Dr. Travis, acknowledged, diffuse and localized malignant

25  mesotheliomas share the same mesothelial cell origin and microscopic features.  [Hammar Decl.,

26  Ex. B to Amell Decl., ¶ 7.]  By definition, diffuse and localized malignant mesotheliomas are

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

27

28  [1] All articles, pathology materials and reports referenced in Drs. Hammar's and Salyer's
declarations are attached to their declarations.

1  histopathologically, histochemically, immunohistochemically and ultrastructurally identical.[2] [*Id.*]

2       It is largely undisputed in the scientific community that asbestos causes diffuse malignant

3  mesothelioma. [Hammar Decl., Ex. B to Amell Decl., ¶ 8.] Because diffuse and localized

4  mesothelioma cells are chemically and structurally identical, asbestos exposure also causes

5  localized malignant mesothelioma – regardless of the tumor's size when detected. [*Id.*] Asbestos

6  is the only known cause of malignant mesothelioma in the United States. [Salyer Decl., Ex. C to

7  Amell Decl., ¶ 9.] There is no scientific evidence that localized malignant mesothelioma is a

8  different disease from diffuse malignant mesothelioma. [*Id.*, ¶ 6.]

9       There is no known cure for malignant mesothelioma. [Salyer Decl., Ex. C to Amell Decl.,

10  ¶ 9.] Given that malignant mesothelioma is a very rare cancer in general, and that the disease very

11  rarely presents as a localized tumor, it is difficult to predict how long a patient suffering from

12  localized malignant mesothelioma will survive. [Hammar Decl., ¶ 9.] The average survival time

13  for patients with malignant mesothelioma, considered as a group, is only 4 to 18 months from

14  diagnosis. [*Id.*] The limited available data demonstrates that patients with localized malignant

15  mesothelioma may survive from three months to several years from diagnosis. [*Id.*] All the

16  patients that Dr. Salyer has treated with malignant mesotheliomas that presented similarly to Mr.

17  Vest's died of the disease soon after diagnosis. [Salyer Decl., Ex. C to Amell Decl., ¶ 5.]

18  **III.   ARGUMENT**

19      **A.   The Court May Not Bifurcate Parts of a Trial That Require The Same Proof**

20       Courts should only bifurcate trials when doing so would further the statutory purpose of

21  allowing bifurcation – to avoid wasting time and money by trying questions of damages when the

22  liability issue is resolved against the plaintiff. [*Horton v. Jones* (1972) 26 Cal.App.3d 952, 954-

23  955; Code Civ. Proc. § 598 (allowing bifurcation to promote "the convenience of the witnesses,

24  the ends of justice, or the economy and efficiency of handling the litigation"); Code Civ. Proc. §

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25

26

27

28

---

[2] "Histopathology" refers to the microscopic examination of diseased cells and tissues removed from a patient's body and placed onto glass slides. "Histochemistry" refers to the chemical composition of the cells and tissues of the body. "Immunohistochemistry" refers to the diagnosis of cancer cells through the use of stains that react to particular chemicals in a patient's tissue samples. "Ultrastructure" refers to detailed cellular structures that are too small to be seen with an optical microscope, and must be viewed with an electron microscope.

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER BIFURCATING TRIAL

6

KAMELL/716434.1

Exhibit 28-665

1  |  1048(b) (allowing separate trials "in furtherance of convenience or to avoid prejudice, or when

2  |  separate trials will be conducive to expedition and economy").]

3  |      A court's "authority ... to bifurcate a trial of the issues in a case is conferred and limited by

4  |  the provisions of Code of Civil Procedure section 598. ... An act which exceeds the defined

5  |  statutory power of a court is in excess of its jurisdiction and may be restrained by a writ of

6  |  prohibition." [*Cook v. Sup. Ct.* (1971) 19 Cal.App.3d 832, 834.]

7  |      In *Cook*, the plaintiff alleged that his former attorneys negligently failed to bring his action

8  |  for medical malpractice to trial. [*Id.* at 833.] The trial court bifurcated the trial to try issues

9  |  related to the claimed medical malpractice before issues of legal malpractice. [*Id.*] The plaintiff

10 |  sought a writ of prohibition from the Court of Appeal restraining enforcement of the order. [*Id.* at

11 |  833-834.] The Court of Appeal concluded that the trial court exceeded its authority because

12 |  proving liability and damages required overlapping factors:

> In an action by a client against his attorney to establish liability for malpractice in the prosecution of a case, the client must show the attorney was negligent in prosecuting the case and, but for such negligence, the case would have resulted in the recovery and collection of a judgment favorable to the client. [Citation.] Thus the issue of liability includes not only a showing the attorney was negligent but also a showing his negligence caused damage. Factors of damage essential to proof of the issue of liability against the attorney would also be factors essential to proof on the issue of damages. [*Id.* at 834.]

18 |      Code of Civil Procedure section 598 "does not authorize the court to order the trial of a

19 |  part of the issue of liability and a part of the issue of damages before the trial of another part of the

20 |  issue of liability. [*Id.* at 834.] Because, in substance, the trial court's bifurcation order did just

21 |  that, the Court of Appeal issued a peremptory writ reversing the trial court's order to bifurcate the

22 |  trial. [*Id.* at 835.]

23 |      As in *Cook*, bifurcating trial in this case would exceed the defined statutory power to

24 |  bifurcate only for convenience or economy because proving liability and causation will require

25 |  overlapping evidence from plaintiffs. To prove that defendants are liable, plaintiffs must not only

26 |  show that defendants exposed Timothy Vest to asbestos, but also show that the exposure caused

27 |  his mesothelioma. [*Rutherford, supra,* 16 Cal.4th 953, 982.] Many facts essential to prove

28 |  liability will be the same facts necessary to prove causation, i.e., that defendants' products

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC JACK LONDON MARKET 55 HARRISON STREET, SUITE 400 OAKLAND, CA 94607 (510) 302-1000 (510) 465-7728 FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER BIFURCATING TRIAL

7

Exhibit 28-666

AMELI/716434.1

1  contained asbestos, that Mr. Vest or others used products in a way that released asbestos, and that

2  the asbestos to which Mr. Vest was exposed caused his mesothelioma. Thus, an order bifurcating

3  trial in this case would impermissibly order the trial of a part of the issue of liability (whether

4  asbestos causes mesothelioma) and a part of the issue of damages (whether defendants exposed

5  Mr. Vest to asbestos that caused his mesothelioma) before the trial of another part of the issue of

6  liability (whether defendants are liable for exposing Mr. Vest to asbestos and causing his

7  mesothelioma).

8          A bifurcated trial would require plaintiffs, first, to prove exposure to defendant's asbestos-

9  containing products and premises to show that asbestos exposure caused Mr. Vest's mesothelioma,

10  then present the same evidence again to prove that each defendant exposed Mr. Vest to asbestos,

11  which caused his mesothelioma. Expert witnesses would have to testify twice, first to testify that

12  asbestos causes localized malignant mesothelioma, then again to testify that asbestos in

13  defendants' products, or on their premises, caused Mr. Vest's mesothelioma. Plaintiffs and lay

14  witnesses would also have to testify first to establish that Mr. Vest worked with and around

15  asbestos-containing materials that caused his mesothelioma generally, then again to establish that

16  defendants' products and premises exposed him to asbestos and caused his mesothelioma. Finally,

17  in the first phase, plaintiffs would have to present evidence that defendants' products and premises

18  exposed Mr. Vest to asbestos to prove that asbestos exposure caused his mesothelioma. Plaintiffs

19  would then have to re-present the same evidence to establish that each defendant is liable for

20  exposing Mr. Vest to asbestos and causing his illness.

21          A bifurcated trial would require the same expert, lay and corporate witnesses to testify

22  twice before the Court. The separate trials or phases of a trial would only prolong the trial, waste

23  the Court's time and resources, and prejudice plaintiffs by requiring them to incur the unnecessary

24  expense of presenting identical evidence and witnesses twice. The repetitive phases would unduly

25  inconvenience and waste resources of the Court and the parties, particularly because, in light of

26  plaintiffs' expert and medical evidence, the jury will conclude that asbestos exposure caused Mr.

27  Vest's illness. In this case, bifurcating the trial would not fulfill the purpose of Code of Civil

28  Procedure section 598, which limits the Court's authority to bifurcate trials only to promote

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL

8

Exhibit 28-667

3AMELL/716434.1

1    convenience, justice, economy and efficiency.

2    A court, "over the objection of a party, cannot order the separate trial of an issue of liability

3    when because of the nature of the case it is necessary to prove the plaintiff's damages in order to

4    establish that liability." [*Cohn v. Bugas* (1974) 42 Cal.App.3d 381, 385-386.]  Here, by the nature

5    of plaintiffs' claims and California law, plaintiffs must prove that asbestos for which defendants

6    are liable caused his mesothelioma to show liability and damages.  The jury cannot consider

7    whether defendants' asbestos-containing products were defective without considering whether

8    asbestos in defendants' products caused Mr. Vest's mesothelioma.  Similarly, the jury cannot

9    decide whether defendants' premises were hazardous without considering whether Mr. Vest was

10   exposed to asbestos there that caused his mesothelioma.

11   The Court must therefore deny McDonnell's motion.

12   **B.    Defendant's Arguments are Merely Part of Its Defense to Plaintiffs' Claims
         Rather Than a Separate, Severable Issue**

13

14   Any arguments that McDonnell and other defendants wish to make at trial about alleged

15   differences between localized and diffuse mesothelioma are merely a "defense" to plaintiffs'

16   claims, and not a distinct cause of action or issue that may be severed for a separate trial under

17   Code of Civil Procedure section 1048(b).  Further, this is a "defense" that defendants have quite

18   obviously conjured with virtually no scientific proof, and is supported by the dubious opinions of

19   one or more experts whose testimony will likely be excluded at trial.  Thus, there is no basis for

20   trying any cause of action or issue separately, as section 1048(b) allows in certain prescribed

21   situations.

22   At trial, plaintiffs will present their evidence, including evidence that asbestos for which

23   defendants are responsible caused Mr. Vest's mesothelioma.  Defendants will be able to cross-

24   examine plaintiffs' witnesses and present evidence supporting their claimed "defenses," including

25   any argument that asbestos causes only diffuse mesothelioma.  Allowing a separate trial on this

26   issue would only improperly allow defendants to present one of their defenses before plaintiffs'

27   opportunity to present their case.

28   Bifurcating the trial, or severing an issue of whether asbestos causes both localized and

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

---

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL                                                                            9

KAMELL/716434.1

Exhibit 28-668

1  diffuse mesothelioma, would only adopt McDonnell's defense at great inconvenience and wasted

2  time to witnesses, plaintiffs, the Court and the jury.  Additionally, a bifurcated trial would only

3  give defendants an unfair preview of plaintiffs' case during the first phase, allowing them to adjust

4  their strategy for the second phase.

5  **C.    One Trial Will Not Confuse the Jury or Prejudice Defendants**

6      A principle reason for allowing bifurcated trials is avoiding wasted time and money.

7  [*Horton, supra*, 26 Cal.App.3d 952, 954-955.]  As previously discussed, however, bifurcating this

8  trial would not only fail to serve this purpose, but would in fact waste significant time and money

9  by requiring plaintiffs to present much of their evidence twice.  In light of the inconvenience,

10  delay, expense and prejudice a bifurcated trial would cause plaintiffs, defendants' claim that

11  holding one trial might cause the jury to sympathize with plaintiffs and therefore confuse the

12  issues lacks merit.  There are two plaintiffs in this case, a husband and wife, who claim that each

13  defendant exposed Timothy Vest to asbestos that caused and contributed to his mesothelioma.

14  Nothing about a multi-defendant trial or the issues in this trial inherently raises a risk of juror

15  confusion at all, and certainly not such a high risk of prejudice to defendants as to warrant the

16  great inconvenience, delay, and cost that a bifurcated trial would require.

17  **D.    Defendants Are Not Entitled to an Offer of Proof**

18      McDonnell erroneously asks the Court to bifurcate the trial and begin the first phase with

19  an evidentiary hearing under Evidence Code section 402.  [McDonnell's motion at 8:4-21.]  With

20  no proffered evidence at issue, McDonnell's request for an evidentiary hearing is merely an

21  attempt to gain an unfair advantage by giving defendants a preview of plaintiffs' case prior to trial

22  under the guise of an "offer of proof."

23      Plaintiffs at this point have offered no evidence or expert medical testimony at trial, and

24  thus there is no preliminary fact for defendants to dispute, nor any question of admissibility for the

25  Court to determine.  [Evid. Code §§ 402(a), (b).]  As required, plaintiffs will present only

26  admissible evidence at trial, and will establish sufficient foundation for their evidence.  This

27  includes establishing foundation for expert opinions and testimony.

28      McDonnell also incorrectly relies on "the *Kelly* rule" to prematurely seek an offer of proof,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL

10

Exhibit 28-669

1   even though the admissibility test established in *People v. Kelly* (1976) 17 Cal.3d 24 does not

2   apply to expert medical opinion on causation of a disease. [*Roberti v. Andy's Termite & Pest*

3   *Control, Inc.* (2003) 113 Cal.App.4th 893, 901.] Expert medical opinion on the cause of a disease

4   does not rely on new scientific techniques, devises or procedures. [*Id.*] Further, the *Kelly* rule

5   would not apply even if plaintiffs' experts presented a new theory of causation. [*Id.*] Thus, the

6   Court of Appeal has concluded that applying the *Kelly* test to expert medical opinion advancing a

7   theory of causation "is directly contrary to California case law." [*Id.* at 901-902.]

8        The Court must therefore deny McDonnell's premature and legally unsupported demand

9   for an evidentiary hearing.

10       **E.      Defendant Unduly Delayed In Seeking a Bifurcated Trial**

11       A party seeking bifurcation "should request such relief as soon as the need becomes

12   apparent. Delay may be a factor affecting the court's exercise of discretion." [Rylaarsdam &

13   Edmon, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 12:420,

14   12:424.] Here, this Court can and should consider undue delay as a factor affecting the Court's

15   broad discretion to deny McDonnell's motion to bifurcate. [*Carpenson v. Najaria* (1967) 254

16   Cal.App.2d 856, 862.] Defendants in this case, including McDonnell, have long known of Mr.

17   Vest's surgery, diagnosis and subsequent medical care. In fact, in support of its motion,

18   McDonnell cites to the following:

    (1) the October 22, 2009 pathology report from Stanford Hospital [Pettis Decl., Ex. A];
19  (2) Dr. Shrager's October 27, 2009 and November 10, 2010 reports [Pettis Decl., Exs. B &
20      L];
    (3) Dr. Shrager's August 10, 2010 letter [Pettis Decl., Ex. C];
21  (4) Dr. Travis' October 28, 2010 declaration, filed on October 29, 2010 with McDonnell's
        summary-judgment motion [Pettis Decl., Ex. D];
22  (5) articles published from 1996 to 2009 [Pettis Decl., Exs. E-H]; and
    (6) excerpts of Dr. Shrager's December 13, 2010 deposition, in which he testified about his
23      October 2009 surgery on Mr. Vest [Pettis Decl., Ex. K].

24       The documents on which McDonnell relies show that defendants have had details about

25   Mr. Vest's surgery and subsequent care for nearly six months. McDonnell even obtained an expert

26   declaration for its motion for summary judgment, filed in October 2010, discussing Mr. Vest's

27   diagnosis, prognosis and cause of his mesothelioma,. [McDonnell's notice of summary-judgment

28   motion, Ex. D to Amell Decl.; *see also* Travis Decl., filed October 29, 2010, Ex. D to Pettis

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

GAMELL/716434.1    PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL                                                                              11

Exhibit 28-670

1   Decl.][3]  McDonnell and other defendants moved for summary judgment months ago based, in part,

2   on the same argument that asbestos did not cause Mr. Vest's mesothelioma.  McDonnell could and

3   should have also moved to bifurcate this trial then.  Its delayed motion now can only be taken as an

4   effort to delay this trial at the last possible moment.

5          **F.**        **The Court Must Strike And/Or Disregard All Purported "Joinders"**

6          Because the Court must deny McDonnell's motion, it must also deny all purported

7   "joinders" filed in support of the motion.  Plaintiffs further object to all purported "joinders" in

8   filed by other defendants as untimely and as efforts to discourage pre-trial settlement.

9          **1.**        **All Joinders are Untimely And/Or Invalid**

10         First and most importantly, the Court must strike and/or disregard all joinders to

11  McDonnell's motion as invalid and/or untimely.  McDonnell filed its motion on December 16,

12  2010 with a January 14, 2011 hearing date.  [McDonnell's notice of motion, Ex. G to Amell Decl.]

13  Defendant F.P. Lathrop Construction Company filed a purported joinder one day before

14  McDonnell even filed its motion, on December 15, 2010.  [Lathrop's joinder, Ex. H to Amell

15  Decl.]  The Court should strike and/or disregard this joinder as invalid because a defendant cannot

16  possibly "join" a filing that does not exist at the time it files a purported joinder.

17         The Court must also strike and/or disregard all other joinders as untimely.  Under Code of

18  Civil Procedure section 1005(b), all moving and supporting papers were due to be filed at least 16

19  court days before the January 14, 2011 hearing, or December 20, 2010 (accounting for court

20  holidays on December 24 and 31, 2010).  However, Hexcel Corporation filed a purported joinder

21  on December 22, Henkel Corporation on December 23, and Dowman Products, Inc. on December

22  28.[4]  [Hexcel, Henkel and Dowman joinders, Exs. H, I, and J to Amell Decl., respectively.]

23         Dowman Products, Inc. ("Dowman"), in particular, improperly submits its own expert

24

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25  [3]Similarly, Dowman, which filed a joinder in McDonnell's motion, also obtained a declaration in

26  October 2010 claiming that asbestos exposure did not cause Mr. Vest's mesothelioma, filed with

    its own summary-judgment motion on October 27, 2010.  [Notice of Dowman's motion for

27  summary judgment/adjudication, Decl. of Katherine M. Watts and 10/22/10 Decl. of William G.

    Hughson, M.D., Ex. E to Amell Decl.]

28  [4]Defendant Parker-Hannifin Corporation also filed a joinder, but has since resolved this case and
    been dismissed.

---

PLAINTIFFS' OPPOSITION TO MCDONNELL DOUGLAS' MOTION FOR SEPARATE TRIAL AND/OR ORDER
BIFURCATING TRIAL

Exhibit 28-671

GAMELL/716434.1

1 declaration with its purported joinder. [Dowman's joinder, Ex. J to Amell Decl. (see Decl. of

2 William Hughson, Ex. A to Decl. of L. Judiee Tran).] Dowman purports to submit this declaration

3 in addition to the authorities in McDonnell's motion. [Dowman's joinder, Ex. J to Amell Decl., at

4 2:5-3:2.] The Court must strike Dowman's untimely submitted declaration and arguments, filed

5 only 11 court days before the hearing on McDonnell's motion. In the alternative, if the Court

6 wishes to consider Dowman's declaration and arguments, Dowman must file a notice of motion,

7 memorandum of points and authorities, and supporting evidence, set hearing at least 16 court days

8 from the date it files and serves such a motion. [Code Civ. Proc. § 1005.]

9        **2.**      **Should the Moving Defendant Settle Before the Hearing, the Court**
                   **Must Strike All Joinders**

10

11      If McDonnell should resolve this case with plaintiffs before the hearing on its motion, the

12 Court must deny any effort from the "joining" defendants to obtain a ruling on McDonnell's

13 motion. Plaintiffs oppose defendants' attempt to discourage settlement by moving to join in the

14 motions of other defendants who settled with plaintiffs and withdrew their pending motions.

15 Allowing a defendant who fails to resolve the case to adopt the work of a defendant who settles

16 would discourage plaintiffs from compromising claims by entering pre-trial settlements and

17 thereby removing parties and issues from those that require the Court's resources at trial.

18 **IV.**    **CONCLUSION**

19      Rather than furthering the statutory purpose of convenience, economy and efficiency, a

20 bifurcated trial in this case would require plaintiffs to present the same evidence twice at great

21 delay, expense to the parties and the Court, and inconvenience to witnesses. Further, a bifurcated

22 trial would only improperly enable McDonnell to present a defense before plaintiffs' case. The

23 Court should therefore deny McDonnell's motion, as well as all purported "joinders."

24 DATED: December 30, 2010        KAZAN, McCLAIN, LYONS, GREENWOOD &
                                     HARLEY, PLC

25

26                              By        *Gloria Amell*

27                                  Gloria C. Amell

                               Attorneys for Plaintiffs

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 29

*9051975*

1   James L. Oberman, Esq. (C.S.B. #120938)
    Michael T. Stewart, Esq. (C.S.B. #253851)
2   KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
    A Professional Law Corporation
3   Jack London Market
    55 Harrison Street, Suite 400
4   Oakland, California 94607
    Telephone: (510) 465-7728
5

6   Attorneys for Plaintiffs

Filed ed

ENDORSED

FILED

ALAMEDA COUNTY

DEC 23 2010

CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            IN AND FOR THE COUNTY OF ALAMEDA

10

11   TIMOTHY VEST and CAROLINE VEST,     Case No.

12          Plaintiffs,         **DECLARATION OF JOHN TEMPLIN IN**
                                  **SUPPORT OF PLAINTIFFS'**
13       vs.                **OPPOSITIONS TO DEFENDANTS'**
                                    **MOTIONS FOR SUMMARY**
14   ALLIED PACKING & SUPPLY, INC.,     **JUDGMENT/ADJUDICATION**

15          Defendants.       Dept.:       30 (Hon. Kenneth Mark Burr)
                                Case Filed:   December 17, 2009
16                              Trial Date:   February 14, 2011

17       I, John Templin, declare:

18       1. I am an adult over the age of 18 years and am not a party to this lawsuit. I have

19   personal knowledge of the matters set forth in this declaration, except for such matters that have

20   been made known to me in forming an opinion, in which case each such matter is of a type on

21   which professionals in my field reasonably rely in forming such opinions. The matters stated in

22   this declaration that are within my personal knowledge are true. If asked, I could and would

23   testify competently to the truth of each matter and opinion asserted within this declaration, as

24   well as to the foundation for each such matter and opinion. All opinions and conclusions in this

25   declaration are made to a reasonable degree of scientific certainty.

26       2. Attached as Exhibit 1 hereto, and incorporated fully herein by reference, is a true copy

27   of my *curriculum vitae*. The information contained in my *curriculum vitae* is true.

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

1

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-673

1    3. I am a certified industrial hygienist and currently a senior consultant for MAS LLC, in

2    Los Angeles. I have also served as an associate industrial hygienist for the Cal/OSHA

3    Consultation Service. In that position, my duties consisted of performing work-place evaluations

4    to identify potential occupational health hazards, preparing written reports to recommend

5    appropriate control alternatives, and similar duties. With respect to asbestos, I have performed

6    building surveys, hazard assessments, project monitoring and reporting, employee training; and I

7    have prepared recommendations for control alternatives, removal specifications, and operations

8    and maintenance programs. This work has been performed on behalf of numerous clients,

9    including Hines Interests Limited Partnership, the State of California, Universal Studios, Inc.,

10   Dodger Stadium, Shell Oil Company, Santa Fe Realty, City of Burbank, and Bakersfield City

11   Schools. In the course of this work, I have become an expert at recognizing suspect asbestos-

12   containing materials, assessing such materials to determine their asbestos content, and

13   recognizing and mitigating the hazards to human health presented by routine handling of such

14   materials.

15   4. I have also served as a consultant and expert witness in dozens of asbestos-injury

16   lawsuits. Approximately 75 percent of my time devoted to litigation matters has involved

17   asbestos-injury litigation. Among other industrial hygiene issues, I have testified about asbestos

18   exposure levels, and about the historical knowledge of asbestos-related health hazards, or "state-

19   of-the-art" evidence.

20   5. In the course of my education, training, experience and professional development as

21   an industrial hygienist, particularly in assessing the industrial hygiene issues posed by the

22   presence of friable asbestos-containing dust in a broad array of workplace settings, I have

23   reviewed hundreds of industrial hygiene and other scientific articles and treatises addressing and

24   documenting, beginning in the early 1900's, the link between human exposure to asbestos and

25   lung disease, particularly mesothelioma and lung cancer. I have also surveyed the industrial

26   hygiene and other scientific literature documenting the virtually ubiquitous sources of exposure

27   to asbestos dust and the link between exposure from those sources and disease.

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

2

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-674

6. The industrial hygiene community has known since the early 1900's that exposure to asbestos-containing dust from any source – whatever the type of product within which that dust originated – significantly increases the exposed person's risk of developing serious or fatal diseases. Regulations of the workplace and the environment in general as it concerns asbestos exposure focus exclusively on whether there is or is not exposure to asbestos, irrespective of the specific product from which that asbestos emanates. To my knowledge, no product has been exempted from any of the regulations or standards seeking to control, mitigate or eliminate exposure to asbestos-containing dust. Below is a brief review of the knowledge concerning the hazards of exposure to asbestos-containing dust – and the means of mitigating or preventing such exposure – that has developed within the industrial hygiene community since the early 1900's.

7. No later than the beginning of World War II it was widely known in the industrial hygiene community that protecting workers from the hazards posed by asbestos dust also required protecting those who did not themselves work directly with the asbestos-containing materials. Electrostatic charges, such as are typically found on clothing, attract and retain asbestos-containing dust, which can be carried far from the original source. For example, changing work garments, leaving them at work or in some way packaging them so they can be safely laundered at the workplace has long been recognized – since at least World War II – as an important aspect of proper industrial hygiene.

8. The rail, oil and steel industries by the 1930's recognized asbestos-containing dust as an industrial hazard that could be suppressed by wetting the dust-releasing material at its point of origin. By 1931, the industrial hygiene literature reflected both that asbestos was a pneumoconiosis-producing dust, or "dust hazard," and that the hazard could be mitigated by either eliminating the sources of dust or suppressing the dispersion of dust. The British Medical Association's The Lancet on August 3, 1929 published a presentation to a symposium addressing occupational diseases. A true and correct copy of this article is attached as Exhibit 2 hereto and incorporated fully herein by reference. The article describes that "Dr. W. E. Cooke (Wigan) read a paper on asbestos dust, and the curious bodies found in pulmonary asbestosis." "Dr. A.C. Haddow (Leeds) described the clinical aspects of asbestosis, and quoted a case in which the

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

3

Exhibit 29-675

1    curious bodies were found in a man who was not employed in the industry, but who lived next
2    door to an asbestos factory."

3        9.  At about the same time, it came to be understood that secondary exposures to
4    asbestos-containing dust – exposures by persons other than those working directly with the
5    material – also posed a threat to human health.  Textbooks in occupational medicine and the
6    industrial hygiene literature by the 1930's advised that showers be provided to workers exposed
7    to toxic dust to prevent such dust from being brought home with them.  The same information
8    was disseminated during a meeting, in 1935, of the Air Hygiene Foundation in which more than
9    300 companies, representing the steel, asbestos and refractories industries, participated.

10        10.  The trade journal Safety Engineering in November 1931 contained an article in
11    which it was stated "[w]e do know, however, that breathing of dust under the following
12    conditions is seriously harmful ... [¶]  Asbestos and every operation in which it is used."  A true
13    and correct copy of a relevant excerpt of this article is attached as Exhibit 3 hereto and
14    incorporated fully herein by reference.

15        11.  By the 1930's, states throughout the nation began enacting workplace asbestos-
16    exposure limits.  For example, by 1936, California's Department of Industrial Relations adopted
17    certain Dust, Fumes, Vapors and Gases Safety Orders setting forth detailed regulations to
18    mitigate toxic-dust hazards at state-wide industrial sites.  A true and correct copy of these Safety
19    Orders is attached as Exhibit 4 hereto and incorporated fully herein by reference.  As set forth at
20    Order No. 1901(a) on page 7, the Safety Orders applied to every California place of employment
21    where a work or process was carried on by which dusts, fumes, vapors or gases of a harmful
22    nature were produced or generated, or even existed independently of the work, and might be
23    inhaled in harmful quantities.  The Safety Orders specifically cited asbestos as a dust hazard (at
24    Appendix A on page 16) and mandated numerous precautions whenever such "harmful" dust
25    appeared.  The precautions required, among other things, that workplaces deploy proper
26    ventilation during dust-generating operations, use water to suppress the dust at its source, isolate
27    the dust-creating activity and provide those who might be exposed to the dust with personal
28    protective gear, as well as adequate showers and change facilities.  The same measures that by

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

4

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-676

the 1930's were recommended to protect workers from asbestosis caused by asbestos exposure would have also substantially reduced the risk that bystanders would contract mesothelioma stemming from second-hand exposure to dust.

12. The "Manual of Industrial Hygiene and Medical Service in War Industries," prepared by the Division of Industrial Hygiene, National Institute of Health, United States Public Health Service (the "Manual") was published in 1943. A true and correct copy of relevant excerpts of the Manual is attached as Exhibit 5 hereto and incorporated fully herein by reference. At page 151, the Manual describes asbestosis as interstitial fibrosis of the lungs induced by asbestos. At page 350, the Manual sets forth several recommendations to prevent and control asbestosis and other industrial diseases, including that:

- In all places of employment where it is necessary for male employees to change clothes or where females are employed, separate dressing rooms with lockers should be provided and maintained in sanitary condition.

- Dressing rooms should be provided for men whenever the type of work performed involves exposure to excessive dust, dirt, heat, fumes, vapor, or moisture of such degree as is declared by the enforcing authority to require the same. Two-compartment lockers, or preferably, two individual lockers should be provided in dressing rooms for employees whose clothes are exposed to contamination with poisonous, infectious, or irritating material. Workers exposed to toxic substances, such as TNT and tetryl, should be required to change clothes completely and to take a shower bath at the end of each shift. The work clothes should be provided and laundered by the employer.

13. It was known and understood by the 1930's – certainly within the industrial hygiene community – that exposure to asbestos-containing dust posed serious health risks both for those who created the dust by working directly with asbestos-containing materials, and for bystanders who breathed second-hand dust.

14. I have studied how asbestos is released into the air, and how it behaves once released. I am familiar with the physical and aerodynamic properties of asbestos, which facilitate re-entrainment and re-suspension of asbestos fibers once a space is contaminated. In sum, the respirable asbestos fibers that are released into the air will remain in the air for some time before they alight on surfaces. Those fibers, once they do come to rest, are then subject to

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

5

MSTEWART/710236.1

Exhibit 29-677

re-entrainment. Re-entrainment is a well-recognized principle in the industrial hygiene field. It describes the physical action of air, movement, vibration, and physical impact that aerodynamically causes asbestos fibers to take flight and become airborne. Re-entrainment can be caused by ordinary movement of people and objects and also by air currents. It is also caused by disturbances to the environment such as sweeping, cleaning, blowing areas down, and even walking through microscopic asbestos-containing debris or dust.

15. I have reviewed excerpts of the EPA's guidance document, "Asbestos-Containing Materials in School Buildings, Part 2" (March 1979). This report notes that asbestos fiber contamination can occur "without actual physical disruption" of asbestos-containing products. Contamination is caused by "structure vibrations, humidity variations, air movement from heating and ventilating equipment, and air turbulence and vibration caused by human activity." This report identifies several important features of asbestos, such as small fiber size, which allows for prolonged buoyancy even in still air, and re-entrainment of settled fibers. For example, this report found that a typical one micrometer asbestos fiber falling to the ground from a nine-foot ceiling would take approximately 80 hours to settle in still air, and that turbulence will prolong the settling out and also cause re-entrainment of fallen fibers. Also, fibers can move laterally with air currents and contaminate areas far from the release point, up to hundreds of meters away. Fibers can also move across contamination barriers with the passage of workers during removal of material. And, unlike most carcinogens, asbestos fibers persist almost indefinitely and create a continuous source of exposure when they are present in occupied buildings. [Excerpts of 1979 EPA "Asbestos-Containing Materials in School Buildings, Part 2," are attached as Exhibit 6 hereto and incorporated fully herein by reference.]

16. I have reviewed excerpts of a 1991 publication, produced by an independent, non-profit organization known as Health Effects Institute-Asbestos Research, titled "Asbestos in Public and Commercial Buildings: A Literature Review and Synthesis of Current Knowledge." This collaborative work is a review of literature on re-suspension of surface dust. It confirms the multiple means by which asbestos fibers can leave asbestos-containing materials and become airborne. Such release mechanisms include impact, abrasion, fallout, vibration, air erosion, and

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

6

1  fire damage. [Excerpts of "Asbestos in Public and Commercial Buildings" are attached as

2  Exhibit 7 hereto and incorporated fully herein by reference.]

3      17. I have reviewed Dr. Richard Lemen's article entitled "Asbestos in Brakes: Exposures

4  and Risk of Disease," a true copy of which is attached as Exhibit 27 hereto and incorporated

5  fully herein by reference. Dr. Lemen notes in his article that the U.S. Public Health Service

6  reported a study by Lynch in 1968 of brake linings' decomposition. That study noted that – even

7  ignoring the potential release of asbestos fibers during repair and servicing of the brake linings –

8  some asbestos fiber was released from the linings during normal wear into the urban

9  environment. As Dr. Lemen notes, by 1970, a British study of brake servicing measured

10  significant exposures to friable asbestos, particularly in the vicinity of the operation. Dr. Lemen

11  further observes that "any assumption that short fibers, less than $5\mu m$ in length, are not

12  hazardous cannot be justified based on the available science."

13      18. As Dr. Lemen notes in his article, by 1975, the National Institute for Occupational

14  Safety and Health ("NIOSH") convened a meeting at which NIOSH concluded that enough

15  asbestos is released (and preserved) during ordinary brake-servicing operations to produce

16  significant asbestos exposures during brake servicing procedures. At that time, therefore,

17  NIOSH "specifically recommended posting warnings signs at all areas where brake repair work

18  was to be done." The recommended sign was to read:

19  Asbestos

20  Dust Hazard

21  Avoid Breathing Dust

22  Wear Assigned Protective Equipment

23  Do Not Remain In Area Unless Your Work Requires It

24  Breathing Dust May Cause Asbestosis and Cancer

Based on the knowledge and information widely known within the industrial-hygiene

26  community both now and in 1975, these precautions NIOSH recommended would have also

27  mitigated the risk to workers' household members of being exposed to – and injured by – the

28  asbestos-containing dust released during brake-servicing operations.

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-679

19. A number of papers were published in the 1970's documenting the risk of disease wrought by asbestos exposures suffered during brake-lining maintenance and repair. These include the following articles: Rohl, et al., "Asbestos Exposure During Brake Lining Maintenance and Repair" published in 1976 in the Environmental Research journal; Castleman, et al., "The Hazards of Asbestos for Brake Mechanics," published in 1975 in Public Health Reports; Lorimer, et al., "Asbestos Exposure of Brake Repair Workers In the United States," published in 1976 in The Mount Sinai Journal of Medicine; and Rohl, et al., "Asbestos Content of Dust Encountered in Brake Maintenance and Repair," published in January 1977 in the Proceedings of the Royal Society of Medicine in Great Britain. A true and correct copy of each of these articles is attached, respectively, as Exhibits 28, 29, 30 and 31 hereto, and incorporated fully herein by reference.

20. Moreover, California's General Industry Safety Orders, at Title 8 of the California Administrative Code, Section 5208(l) (pages 442.2.2-442.2.3), required that by "Not later than September 1, 1977," brake and clutch repair operations involving asbestos-containing friction materials that were processed in a manner that might produce airborne asbestos fibers – such as grinding, sanding, drilling, brake shoe arcing and beveling, or removing asbestos-containing dust with compressed air – be reported to the California Chief of the Division of Occupational Safety and Health. A true and correct copy of this order is attached as Exhibit 32 hereto and incorporated fully herein by reference.

21. The above information is only a small sample of studies reported in the scientific literature that evidence the ability of asbestos fibers to become airborne, remain suspended for long periods of time, migrate away from the source of original fiber release, and cause successive and repeated exposures. In the majority of studies I have reviewed, industrial hygienists and other scientists conclude that asbestos fibers contaminating an area have a propensity to continuously repeat in cycles of settling and re-suspension.

22. I have relied upon the following case-specific evidence pertaining to Timothy Vest's asbestos exposure:

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-680

**Timothy Vest Deposition Testimony**

- Relevant excerpts of plaintiff Timothy Vest's deposition testimony are attached as Exhibits 8, 9 and 10 hereto and incorporated fully herein by reference. Timothy lived in Dublin, California as a child from at least 1972 to 1983. After working abroad, his father Warren Vest lived in the family home from mid-1973 onward. Warren was an airline pilot based out of World Airways' ("World") headquarters at the Oakland International Airport. He worked at World's new office building and maintenance hangar, known as Hangar 110, from the early 1970s through the late 1980s. In the early 1970s, Timothy was introduced to Edward Daly, founder and president of World. Timothy saw Mr. Daly several times at Hangar 110 and was never told he should not be there.

- Timothy twice visited Hangar 110 during the construction process, and went inside the building on his second trip. He saw dozens of workers, including people with hoses spraying material on girders, beams and a wall. The off-white sprayed material flew up in the air creating visible dust, which he inhaled. The material that stuck to the metal building surfaces formed a rough texture. It was not paint. These initial visits to the hangar occurred in 1972 or 1973, before the grand opening in Spring 1973. His second visit occurred when the hangar was nearly complete. He was fully inside the structure. The sight of a person on a raised platform spraying the texture material above him, and seeing the dust in the air, left a strong impression in his memory. He also recalls the experience because an adult gave him a hardhat to wear. Soon afterward at the inauguration, Timothy met Mr. Daly on the hangar floor.

- After the construction was finished, Timothy regularly visited Hangar 110 because his father worked in the building. Timothy spent approximately an hour in the hangar before his father flew away on multi-day trips and he spent several hours in the hangar when his father did weekend office work, at least twice a month. Timothy continuously visited the hangar at this rate from the time he was eight years of age until he was seventeen. As a teenager he still wanted to be in the hangar because, at the time, he was training for his own pilot's license. Timothy never was told of restrictions against being in the hangar, and there were no signs posted. Nor was he warned about the asbestos in the hangar. Timothy did not learn until after 2000 that asbestos is hazardous.

- On those weekend trips, Timothy spent his time exploring the nooks and crannies throughout the hangar and watching the nearly constant aircraft maintenance work. The hangar had an office complex at the front entrance, and an enclosed maintenance area for the aircraft. He befriended one of the security guards so he had free run of the hangar. And he was not the only child who played in the hangar. Timothy was even issued a World Airways badge with his photo and identification number. He kept the badge throughout his childhood, and received an updated one as he grew older.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

9

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-681

- Timothy explored throughout the internal buildings and structures, including where the aircraft maintenance tools and parts were stored, and along walkways and catwalks that were like a jungle gym. The girders and walls were coated in a white-gray rough textured material that Timothy rubbed and squeezed against, getting dust all over his hands and clothes and creating airborne dust that he breathed. The white-gray material was not very sharp and pointy, nor was it smooth. He never intentionally tried to break the textured material. He explored the maintenance facility in this way until he became a teenager, and then was more interested in aircraft. Aircraft maintenance workers were nearby when Timothy was exploring.

- The mechanics in the hangar knew he was Warren Vest's son, so they allowed Timothy near the aircraft to learn how they worked. He saw McDonnell Douglas (MDC) aircraft in the hangar, including the DC-10 model. There was almost always aircraft maintenance and painting occurring in the hangar during the dozens of times he visited each year from the 1970s to 1980s. He saw engines being worked on, airplanes jacked up off the floor and inspection panels removed, including on the DC-10s.

- The office area had four floors, with a pathway through the ground floor that exited into the aircraft maintenance facility. Timothy saw ongoing construction all the time in the office building, including internal walls being moved and the cafeteria being changed. He saw the various stages of sheetrock/drywall installation, including the joint-taping work, and there was visible dust that he breathed. Some of the drywall work was separated with hanging sheets of plastic, which Timothy walked through. The apparent purpose of the remodeling was to create more or different offices. There was always some sort of remodeling during the years Timothy visited the hangar. The building was dirty and dusty from the construction. Timothy was present both while drywall work was ongoing, and while the remodel sites were unattended. He spent time on multiple levels of the office building, including in Mr. Daly's office.

- On days when Timothy did not accompany his father to the hangar, the two hugged when his father came home from work. Warren did not immediately change out of his work clothes. Timothy's mother did most of the laundry, but Timothy helped by carrying the family's dirty clothes out to the garage, where they were shaken out and washed. Timothy's own clothes were visibly dirty when he returned from the hangar. His father wore varying attire, including a pilot's uniform, a suit or business-casual clothes. Warren worked 12 hours per day and 6 days per week. Warren's clothes appeared visibly dusty, with a chalky-white color, when he returned from the hangar. Timothy carried his father's dirty work clothes to help his mother.

- As an adult, Timothy was a certified flight instructor at Ahart Aviation in Livermore, California ("Ahart") from 1988 to 1990. Timothy primarily flew lightweight, training aircraft including Cessna 152s and 172s, and Piper Warriors and Archers. Before flying such aircraft, Timothy did a pre-flight check of,

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

10

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-682

among other things, the wear indicators on the aircraft's brakes. He also taught his students how to do a pre-flight check of the aircraft. Timothy testified that he assisted Ahart's mechanic in replacing the brakes on the Cessnas and Pipers. He also testified that he removed the brake pads, was present when the mechanic used compressed air to remove brake dust and breathed the brake dust.

- Timothy also flew planes for Emery Worldwide Airlines ("Emery") from 1990 to 2001. Emery operated primarily McDonnell Douglas DC-8 aircraft on cargo flights throughout the United States and the world. Unlike domestic flights, on international flights the planes carried a mechanic and thousands of pounds of aircraft tools and parts. The planes traveled to third-world countries and needed to perform their own repairs to avoid getting stranded. Timothy observed the mechanics working on the engines, and he helped by lending a hand where possible.

- When flying domestically, Timothy observed aircraft maintenance work at all airports where Emery had facilities. Most of Emery's planes were old and needed repairs all the time, including pneumatic-system and engine work. That maintenance work occurred at airports around the country. Apart from Timothy's pre-flight inspections of Emery's 40 DC-8 aircraft, and its several DC-10 aircraft, he saw the mechanics doing their jobs hundreds of times. He saw the noses and side-panels of the planes being repaired, repairs of the hydraulic systems, and repairs of the engine components. Timothy closely observed the Emery mechanics' work on the MDC aircraft to ensure they were doing a proper job, and he assisted them when possible. Apart from the work at Emery's airport bases, Timothy observed work on the DC-8s hundreds of times at specialized maintenance facilities. He saw the different levels of heavy maintenance, termed A, B, C and D checks, where the planes are torn apart and put back together. All of the hydraulic, pneumatic, fire-protection and engine systems were overhauled over a period of hours or days. He has seen mechanics use epoxy adhesives to repair damaged surfaces on the aircraft, which included sanding the epoxy once it dried. When nose-cones are damaged by bird or lightning strikes, the affected areas are filled with epoxies and sanded smooth. The epoxies also were used to seal leaks and for other applications in the engine spaces.

**Warren Vest Deposition Testimony**

- Relevant excerpts of Warren Vest's deposition testimony are attached as Exhibit 11 hereto and incorporated fully herein by reference. Warren confirms he started working in World's Hangar 110 a few months after its grand opening in 1973. He reported to the hangar every time he left for and returned from a flight. From the mid-1970s to the mid-1980s, Warren spent approximately half of each month in the office, and half on flights. He did his paperwork on the weekends because he was a pilot; and his son Timothy came to the hangar on those days. Timothy came to the hangar from 1973 through 1983, up to several times per month. He spent some of his time in the office area, where Warren had an office, and also spent hours in other areas of the hangar. Timothy was allowed to be on the hangar floor, and he had the permission of the security guards. Aircraft

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

11

maintenance occurred 24 hours per day, 7 days per week, including when Timothy was present.

- World's facilities personnel did almost continuous remodeling in the office area until the mid-1980s. The interior walls were moved around to create and modify office and classroom space. Another project involved modifications to the cafeteria, which required a lot of work. A technical library was also built. The construction occurred on multiple floors. Sheets of plastic were hung to try to keep the dust from spreading, but the plastic was merely taped on the sides, leaving an opening in the middle for workers to pass through. The workers demolished existing walls and built new walls using sheetrock. He saw the workers seal the joints between the pieces of sheetrock. The remodeling occurred during weekdays, and there were plastic sheets hanging within ten feet of Warren's office. He and other office workers complained about the mess and dust that got all over everything, including outside the areas surrounded by plastic. During those times, Warren's secretary wiped the visible layer of dust from his desk every morning.

- Warren spent a lot of time in the maintenance area to ensure the work was on schedule and the aircraft would be ready to fly. He was on the hangar floor up to several times every day. Warren spoke to the maintenance foreman in charge of a particular plane. His conversations lasted from 5 to 30 minutes. During the 1973 to 1983 period, the planes in the hangar included McDonnell Douglas DC-8 (six total) and DC-10 (ten total) models. Three of the DC-8s and nine of the DC-10s were purchased new by World. Those new DC-10s were bought in 1979, 1980 and 1981.

- Warren saw dust in the maintenance area, especially when the large doors were opened and the wind blew in, stirring up the dust. Normally only one set of doors were opened, to avoid creating a dangerous wind tunnel in the hangar. He saw the mechanics install many parts, including engine parts, on the DC-8s and DC-10s in the hangar. The work included minor maintenance and major overhauls, lasting from one day to several weeks. Up to 40 mechanics worked on the planes together, each doing different tasks.

- Warren did not immediately change out of his work clothes when he returned home. Instead, he hugged and played with Timothy and had dinner. Timothy also rode in the car that Warren drove to and from the hangar. Warren never received any asbestos warnings during his employment at World.

## Jeffrey Jones Declaration

- The October 7, 2010 declaration of Jeffrey Jones is attached as Exhibit 12 hereto and incorporated fully herein by reference. Mr. Jones, a Port of Oakland employee, explains two asbestos survey/abatement reports pertaining to Hangar 110. The Port maintains these historical business records as part of its employee and environmental safety program. The first report was prepared by Hygienetics

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

12

Inc. in 1989. It describes the selective removal and encapsulation of asbestos-containing fireproofing in one of the hangar's internal buildings. The fireproofing was attached to beams, columns and walls in the mezzanine and receiving areas.

- The second report was prepared by Hygienetics in 1997. It describes the condition of the spray-applied asbestos-containing fireproofing located in the hangar's internal buildings. The fireproofing is friable and "easily crumbled with hand-pressure." The most dangerous fireproofing was the exposed material in close proximity to workers in the storage areas. Dislodged fireproofing debris, created by vibrations, was found on top of ceiling tiles at the first-floor and mezzanine levels.

### RGA Environmental Report

- Plaintiffs' subpoena to RGA, and excerpts of RGA's January 11, 2008 report produced in response, are attached as Exhibit 13 hereto and incorporated fully herein by reference. RGA's historical business record pertains to asbestos in Hangar 110. RGA's Hazardous Materials Survey Report, dated 2008, was prepared for the Port of Oakland's Environmental Department. It describes 85 confirmed asbestos-containing materials located in the hangar. RGA did bulk-sample analysis to determine the type and amount of asbestos in each material. The gray fireproofing throughout the first and mezzanine levels contains at least 5 to 15 percent chrysotile asbestos. The vermiculite, texture and plaster on columns and beams throughout the building contains approximately 1 percent tremolite asbestos. The drywall joint compound and wall texture throughout the building contains approximately 1 percent chrysotile asbestos.

### John Savage Declaration

- The December 3, 2010 declaration of John Savage is attached as Exhibit 14 hereto and incorporated fully herein by reference. Mr. Savage explains the original installation of the fireproofing in Hangar 110. The brand name of the material was Monokote, and thousands of bags were spray-applied in 1972. Mr. Savage's job was very dirty and dusty, there was a coating of fireproofing dust everywhere and much of the material fell down when sprayed onto surfaces. Anyone who was in the hangar was exposed to the dust.

### Robert Chaney Deposition Testimony

- Relevant excerpts of Robert Chaney's February 25, 1998 deposition testimony are attached as Exhibit 15 hereto and incorporated fully herein by reference. Mr. Chaney worked for the Zonolite Company, which W.R. Grace later purchased in 1965, from 1961 to 1971. He was a sales representative for those entities. Vermiculite that Grace and Zonolite used in its products originated from Libby, Montana. Grace had a manufacturing facility in Newark, California. That plant manufactured Monokote. Monokote was fireproofing material that was first marketed in 1962. Monokote 3, also called MK3, contained roughly 10 percent asbestos by volume. MK3 also contained vermiculite and gypsum. MK3 was

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

13

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-685

marketed in California from 1962 through the fall of 1973. Mr. Chaney has seen Monokote applied in various building projects in San Francisco when he worked at Grace/Zonolite (1961-1971). He visited such worksites daily. Fireproofing application would be on the steel structural beams of the building and would be continuous throughout the day except for a break during lunch time. Monokote would be applied in two phases, the first being a half-inch thick then another layer applied one to two days later.

### Dr. William Longo's Report on W.R. Grace

- Dr. Longo, my colleague at MAS LLC, prepared a December 29, 2008 report entitled "W.R. Grace Asbestos-Containing Construction Products: A Review of Asbestos Types, Source and Libby Vermiculite." A copy of the report is attached as Exhibit 16 hereto, and incorporated fully herein by reference. Eighteen of the 34 chrysotile-containing products that W.R. Grace and the Zonolite Company manufactured contained significant amounts of Libby Montana vermiculite. These products thus contained tremolite/actinolite from both the vermiculate and Canadian chrysotile. [p. 5, ¶ 9.] Spraying or application of W.R. Grace's Libby vermiculite will generate significant amounts of airborne tremolite fibers. [p. 5, ¶ 10.] Application of W.R. Grace's asbestos-containing construction products will result in exposure to elevated airborne levels of chrysotile and tremolite/actinolite asbestos fibers. This includes bystander exposure and for workers directly handling these materials. [p. 5, ¶ 11.]

- Monokote, regardless of type, contained between 10 to 13 percent chrysotile. [pp. 6-7.] The Vermiculite amount of Monokote, regardless of type, is between 28 to 46 percent. [p. 12.] Merely pouring the Monokote into a hopper can produce airborne fiber exposures in excess of any current or past OSHA excursion limits, per MAS study. [p. 15, fn. 31.] Dr. Longo's opinion is that all current and historical OSHA permissible exposure limits would also be violated. [p. 15.] The range of asbestos fiber exposures found by Grace for Monokote spraying was in the range of 1.1 to 7.5 fibers per cubic centimeter of air. [p. 15.] Hardened Monokote fireproofing can be crushed by hand pressure thus causing the release of asbestos-containing dust. [p. 16.] Such conduct would expose a person to significant levels of airborne asbestos fibers. [p. 16.]

### Claude Fross Deposition Testimony

- Relevant excerpts of Claude Fross's deposition testimony are attached as Exhibit 17 hereto and incorporated fully herein by reference. Claude Fross was World's facilities manager for Hangar 110 from its opening in 1973 until 1986. The hangar included an office area, shop areas and a large open space for the aircraft. Mr. Fross and his team did ongoing construction in the office area beginning soon after World's employees occupied the building, until the mid-1980s. The purpose of the office remodeling was to accommodate the changing needs of World's administrative and flight crews, and the office sizes varied by the type of employee. World did not need to seek individual approval from the Port of

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

14

Oakland for each job in the hangar because no structural load-bearing walls were affected.

• The construction involved use of drywall products including joint compound and wall texture. When building a new wall, the workers built a wood frame, attached the sheetrock boards, applied joint compound to the seams and finished the wall with texture. The joint compound required sanding once it dried. It came in dry or wet "premixed" forms, and World mostly used the dry type to reduce waste. The workers dumped the dry compound into a bucket, poured in water and mixed it with a drill. Nearly all of World's joint compound was purchased from Lind's Hardware in San Leandro. When moving a pre-existing wall, the workers cut through the drywall, ripped out the nails, moved the wall and reapplied the joint compound – including sanding it.

• World did most of the office construction in the evening and on weekends to interfere less with others' work. The larger multi-office jobs were saved for weekends. The workers tried to contain the dust within the construction area by hanging plastic sheets. The very fine dust was vacuumed from the carpet when the work was finished. Pieces of drywall debris were placed in the garbage. The ventilation system included forced-air ducts running throughout the office area. Beyond the building materials in the office area, Mr. Fross observed exposed fireproofing in the shop areas, covering the wall from floor to ceiling.

• There were "no holidays" in aircraft maintenance, so work on the planes occurred all day, every day in the hangar. They underwent varying degrees of maintenance based on their hours in flight. The planes included DC-8 and DC-10 models. Every time a plane was pushed out of the hangar, the cleaning crew came to clean up the mess. The large doors on each end of the hangar were usually closed and they were not opened at the same time, because that would cause a wind tunnel.

• Mr. Fross's job included leading schoolchildren on organized tours throughout the hangar. He showed them the ongoing maintenance and explained how the planes flew. World kept track of how many schoolchildren went on the tours, but there was no formal sign-in procedure for friends or family who visited the hangar.

**Claude Fross Declaration**

• The December 15, 2010 declaration of Claude Fross is attached as Exhibit 26 hereto and incorporated fully herein by reference. Mr. Fross clarified his testimony pertaining to the joint compound used on the remodeling jobs in Hangar 110. The joint compound came in both dry and wet "pre-mixed" forms. The dry material came in bags and had to be mixed with water. World also purchased and used pre-mixed joint compound that came in five-gallon buckets. Those buckets were bought at Lind's Hardware in San Leandro. The application and sanding process was identical for both the dry and pre-mixed joint compound.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

15

### Carl Lind Declaration

- The declaration of Carl Lind, prepared for this lawsuit, is attached as Exhibit 18 hereto and incorporated fully herein by reference. Mr. Lind's father owned Lind's Hardware in San Leandro from 1967 to 1978. Mr. Lind worked at the store as a clerk and manager during those years. The store was an ACE hardware dealer so it obtained discounted goods, including all its joint compound, through ACE's supply chain. The only joint compound sold in 5 gallon buckets was Dowman-brand. World had an account with the store from 1967 through 1978.

### Donald Wellington Deposition Testimony

- Donald Wellington's Social Security Administration death record, and relevant excerpts of his January 27, 1997 deposition testimony are attached as Exhibit 19 hereto and incorporated fully herein by reference. Mr. Wellington was the former president of Dowman Products, Inc. He worked for Dowman in Long Beach from 1958 to 1989. Dowman made joint compounds during those years by mixing dry ingredients. The joint compounds were sold in dry or wet "ready mixed" forms, and were packaged in various sizes. They could be used for taping, topping or texture applications. All Dowman joint compounds, dry and wet, contained five percent asbestos from 1958 to 1975.

### James Hales Deposition Testimony

- Relevant excerpts of James Hales' deposition testimony are attached as Exhibit 20 hereto and incorporated fully herein by reference. Mr. Hales was an aircraft maintenance controller for World at Hangar 110 from 1984 to 1986. He had an office job in which he coordinated the schedule and ordered parts, primarily for DC-10 models and some DC-8s. World serviced those DC-10s and DC-8s in the hangar. Mr. Hales is now vice president of technical operations for World. The aircraft maintenance that occurred in Hangar 110 followed a precise schedule for each plane. The work on a DC-10 plane could last from days to weeks. The lightest scheduled maintenance, an "A" check, involved opening access panels and inspecting internal components and systems. A "B" check was similar but more extensive. A "C" check involved more invasive removal of structural parts and replacement of worn components. A "D" check takes at least a month to complete and returns the plane to like-new condition. Every access panel is opened, landing gear is removed, engines are replaced, the cabin is stripped and the plane is repainted. The hangar floor was swept after each job.

- Maintenance programs for the aircraft changed as the planes aged and the airlines gave feedback to the original manufacturer. The manufacturer of the plane establishes the initial maintenance plan for an aircraft, and that plan is approved by the Federal Aviation Administration. MDC, as the manufacturer, supplied the aircraft maintenance manual, the Illustrated Parts Catalogue, the wiring diagram manual and the structural repair manual. World relied on those publications and stored them in the technical library at Hangar 110. MDC also issued service bulletins and updated manuals that World conveyed to its mechanics. The

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

16

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-688

mechanics working on DC-10s and DC-8s obtained replacement parts by first consulting MDC's Illustrated Parts Catalogue, which showed exactly what part – listed by number – needed to be retrieved from the stockroom or specially ordered. MDC did not make all the parts it specified, so some replacement parts were obtained from third-party suppliers.

- World needed the manufacturer's, including MDC's, approval to make any deviations from standard maintenance procedures. Any changes in the plan required the approval of the manufacturer. The airline had to suggest the change to the manufacturer via a formal petition, and the manufacturer then relied on its own engineers to gather data and evaluate the issue. The main reason for this process was that changes to the flight characteristics of the plane could affect its safety. The base design of the plane, its type certificate, could not be changed without permission from the manufacturer. World also contacted the manufacturer to order certain parts and to obtain drawings and technical data. Further, MDC hosted annual conferences with the airlines to discuss the operation of the DC-10 and DC-8 models. It also issued All Operator Letters to alert the airlines to safety issues, including asbestos hazards.

- When aircraft engine access panels are opened for inspections, there are heat shields or insulation blankets placed around the pneumatic systems. The shields and blankets are bolted or wired in place, and must be unfastened. The outside surface of a heat shield is metal, with a bolt hole running through it. Heat shields were among the asbestos-containing products which were used on aircraft in Hangar 110, and which required hands-on contact. Clamps were another asbestos part. The clamps had an asbestos sleeve covering the metal loop, and their purpose was to hold hydraulic lines, pneumatic lines and wiring. Asbestos materials were typically used in hot areas, while asbestos-free materials were used in cooler areas. Asbestos gaskets were used in the engines, and sometimes worn gaskets had to be scraped off to leave a clean surface for the replacement part. A wire brush or sandpaper was used to scrape the gaskets. Asbestos tape was also used in planes, to seal the exhaust system. Worn tape must be scraped off before applying a new strip. Mr. Hales also recalls the use of epoxy adhesives made by Dexter.

## Stanley Lehmann Deposition Testimony

- Relevant excerpts of Stanley Lehmann's deposition testimony are attached as Exhibit 21 hereto and incorporated fully herein by reference. Mr. Lehmann is the designated corporate witness for Henkel Corporation, manufacturer of Dexter-brand products. Attached to Mr. Lehmann's declaration are some historical invoices showing sales of Dexter EA 934 two-part epoxy adhesive from Henkel to World at Hangar 110. These invoices are dated as late as October 1981. In addition to such direct sales, Henkel sold products through distributors. Dexter-brand products were sold in distinctive packaging that bore yellow labels with black printing.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

17

- Dexter EA 934 was capable of bonding metal to metal. It consisted of two parts, one of which contained chrysotile asbestos, mixed together to form the adhesive. Henkel purchased raw asbestos fiber from Johns-Manville for use in the Dexter epoxies. Johns-Manville provided some asbestos warnings to Henkel beginning in the early 1970s and OSHA provided to Henkel notice of asbestos hazards in 1972, but Henkel issued no asbestos warnings until 1977. Its products then had an OSHA-type label, and Henkel issued a separate bulletin instructing how to use the products safely. That bulletin, but not the product packaging, instructed not to sand the epoxy adhesives unless wet-down methods were used.

- The epoxy contained asbestos beginning in 1962, the asbestos-free version did not exist until 1979, and the asbestos-containing version was still sold after that date, until at least 1985. Henkel developed the asbestos-free version to minimize its employees' exposure to asbestos. It continued to sell the asbestos-containing version after 1979 because aircraft products were required to go through a rigorous qualification process, and not all airline customers had gained approval to use the asbestos-free version. This process was required to ensure the new product met the aircraft manufacturer's performance specification.

- As of 1979, only a single customer had gained approval, but Mr. Lehmann does not recall who that was. The approval needed to be issued by McDonnell Douglas, as the aircraft manufacturer, stating that EA 934 "NA" (nonasbestos) had been added to its qualified products list. Such approval came only after a successful application process. Until MDC sent Henkel written approval after testing the proposed new product, Henkel could not sell the asbestos-free material for use on MDC aircraft. All of the available invoices from Henkel to World, dated as late as October 1981, demonstrate sales of the asbestos-containing version of the Dexter epoxy.

### Henkel/Dexter Historical Documents

- Henkel/Dexter's November 11, 2003 discovery responses and cross-referenced historical documents are attached as Exhibit 22 hereto and incorporated fully herein by reference. These materials include the following:

- In 1976, Hysol studied the amount of asbestos generated by dry sanding cured epoxy. The study results (with the types of adhesives redacted) showed between 0.05 f/cc to 4.27 f/cc from sanding for either 5 or 15 minutes.

- January 12, 1977 bulletin noting that Hysol adhesives pose an asbestos hazard when dry sanded after cure. Also notes that Hysol uses exhaust and respirators to avoid exposing its employees during the manufacturing process.

- January 24, 1977 letter noting that Hysol adhesives pose an asbestos hazard when sanded after cure. The letter also notes that Hysol/Henkel had measured the concentration of airborne asbestos during dry sanding, which showed that an adhesive containing 3 percent by weight of asbestos created airborne dust

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

18

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-690

containing 0.7 asbestos fibers per cubic centimeter of air. The letter states that the company recognized that its adhesives are sometimes sanded and proposes a warning on packaging that says the product contains asbestos and to "avoid creating dust." The letter also lists EA 934 as an asbestos-containing adhesive.

- July 18, 1977 letter from Dexter to NIOSH about proposed warning on packaging, which also notes that Dexter used ventilation and bag collectors, monitored air during asbestos handling, gave dust masks to all workers handling asbestos, and gave full chest x-rays to all production workers.

- April 2, 1985 Material Safety Data Sheet shows that "Part A" of EA 934 contained 14 percent asbestos.

- January 10, 1986 Material Safety Data Sheet shows that "Part A" of EA 934 contained 14 percent asbestos. Also notes that "asbestos [was] listed by Cal/OSHA, OSHA, IARC and NTP as a carcinogen."

- With the 1985 and 1986 MSDS sheets for EA 934, there is also a document called "Health Effects and Safe Handling of Hysol Two Part Alkylamine Cure Epoxy Resin Systems." The document notes that inhaling dust from sanding or grinding the adhesive "can lead to exposure and possible health effects due to the presence of asbestos and irritations from the particulates." Hysol/Henkel recommends wet sanding, or if dry sanding, using local exhaust ventilation and a NIOSH/MSHA approved respirator.

**Murray Gordon Deposition Testimony**

- Murray Gordon's Social Security Administration death record, and relevant excerpts of his May 20, 1981 deposition testimony, are attached as Exhibit 23 hereto and incorporated fully herein by reference. Mr. Gordon testified in 1981 as the designated corporate witness for McDonnell Douglas Corp. His title at the time of his 1981 deposition was Director of Occupational Safety and Medical Services. He had the overall responsibility for the company's policies and procedures for hazardous materials, including asbestos. A decade earlier, in 1972, MDC responded to the newly enacted OSHA rules by determining, throughout the company, where it was using asbestos-containing materials. It tried to eliminate asbestos "where [it] could.," and tried to change how asbestos was handled in its facilities. Before 1972, the company took no measures to protect people exposed to asbestos from its aircraft.

**Colleen Rule Deposition Testimony**

- Relevant excerpts of Colleen Rule's April 6, 1999 deposition testimony are attached as Exhibit 24 hereto and incorporated fully herein by reference. Ms. Rule testified in 1999 on behalf of McDonnell Douglas Corp. (Boeing) and was represented by the company's counsel. Her job in the company's product support group was to assist the airlines who operate MDC aircraft to ensure proper maintenance. Ms. Rule kept the records of all communications between the

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

MSTEWART/710236.1

Exhibit 29-691

company and its airline customers, including the All Operator Letters (AOL). MDC also staffed a call-in center where airlines could ask whether a part number is interchangeable with any other part number, in order to keep the aircraft flying without delay. At no time were MDC's customers cut-off from the technical assistance services, even long after the aircraft was sold. In addition, the subsequent owners of a used aircraft had the benefit of MDC's services.

- Attached to Ms. Rule's deposition is the October 22, 1992 All Operator Letter issued by MDC to all its customers, pertaining to asbestos-containing materials used in its aircraft. The 1992 AOL was a revised edition of a 1989 AOL, also involving asbestos. Those were the only AOLs that discussed asbestos, and they demonstrate MDC's first communications with its customers about asbestos. The 1992 AOL was issued to encompass more models of aircraft.

- The 1992 AOL begins with a series of codes that identify what model aircraft and what system is being addressed. For example, the code 8-20-0 means the AOL relates to chemicals and materials on all DC-8 planes. The AOL also expressly states it applies to all DC-8 and DC-10 aircraft, among others. The AOL includes a list of asbestos parts divided into several columns and rows. For each asbestos part, the chart identifies specification, blueprint and part numbers that correspond to MDC's Illustrated Parts Catalogue. That catalogue was created and maintained by MDC's technical publications department. Some of the asbestos parts, but not all, were listed with a specific asbestos-free replacement part.

- The AOL explains its purpose was to warn customers of the presence and dangers of all asbestos-containing materials used in MDC aircraft, including DC-8s and DC-10s. It states MDC was required to share updated safety information about tasks and functions needed to maintain and repair its aircraft. The AOL was prompted by a "foreign" customer that desired to know all asbestos materials in certain MDC aircraft, and how to substitute asbestos-free alternatives. It states that asbestos materials were used in high-heat applications, and asbestos was mixed into sealants and adhesive compounds. The AOL warned that asbestos fibers were released when the materials were sanded, creating toxic dust that was inhaled by nearby persons. Among the dozens of asbestos parts listed in the AOL were Dexter-brand epoxy filler adhesives, heat shields, pneumatic duct insulation, gaskets, tape, and insulation strips.

### David Miller Declaration

- The December 13, 2010 declaration of David Miller is attached as Exhibit 25 hereto and incorporated fully herein by reference. Mr. Miller was an aircraft mechanic for World at Hangar 110 from 1973 to 1987. McDonnell Douglas representatives were sometimes at Hangar 110, identified by their badges.

- Mr. Miller and the other mechanics handled heat blankets and shields used in the DC-8 and DC-10 aircraft exhaust systems. The blankets were woven and protected the pneumatic and hydraulic lines from high heat. The process of

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

20

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-692

obtaining replacement blankets required the mechanics to use MDC's Illustrated Parts Catalogue and part-numbering system.

- The heat shields used in the DC-8s protected the pneumatic and hydraulic lines, and were held in place with stubs or hooks. They measured up to several feet long and six inches wide. Each engine had two to four shields. The outer case was metal, but the interior was a non-metal thick fibrous material. The metal case did not completely cover the internal material at the corners and edges, so that material was disturbed every time the shields were removed and replaced. The corners and edges became more frayed and deteriorated over time. The color also varied over time, but most were gray-white. The shields were removed and thrown aside when the mechanics needed access to the engines; and then were reinstalled. The shields became bent through wear and tear, and developed holes in their metal shell. Engine work on the DC-8s required the removal and replacement of the heat shields. Mr. Miller believes, based on his experience and knowledge as a mechanic, the shields contained asbestos.

- Mr. Miller and others used Dexter-brand "black and yellow" two-part epoxies. He also used thousands of "Adell" clamps that had an asbestos-like padding or sleeve material lining the metal portion. He also removed and installed fuselage insulation.

23. Based on my experience and training as an industrial hygienist, and my review of the above-cited materials, it is my opinion that Timothy Vest was exposed to substantial levels of asbestos-containing dust from the construction materials and aircraft parts used in Hangar 110 from 1972 to 1983; and from parts used on Emery Worldwide Airlines' aircraft during the 1990s. Further, assuming the brakes used and removed from Piper and Cessna training aircraft at Ahart contained asbestos, Timothy was also exposed to substantial levels of asbestos-containing dust from those brakes. Timothy breathed large amounts of visible asbestos-containing dust that was created by his own activities, and by work done in his and his father's vicinity. These exposures are extensively described above, and briefly set forth below.

24. Hangar 110 at the Oakland Airport, occupied by World Airways, was the primary location where Timothy Vest inhaled asbestos. He was exposed while at the hangar on dozens of occasions, and was exposed to dust brought home on his father's clothing. The materials that released respirable asbestos fibers to which he was exposed include:

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

21

- Monokote-brand spray-applied fireproofing, during its installation and during Timothy's continuous exploration of the hangar as a small child. The fireproofing also released asbestos without human contact, as shown by the layer of dust on the top side of the ceiling tiles.

- Drywall joint compound and wall texture, including the originally installed materials, were used during the ongoing remodeling projects. Dowman-brand products were used in the remodeling, including pre-mixed joint compound in five-gallon buckets. Demolishing the walls and sanding freshly applied materials released visible dust that contaminated the entire office area. The dust was not contained by the unsealed plastic sheets and vacuuming the carpet merely served to further comminute the dust and render it airborne, rather than remove it. The dust traveled through the rooms, hallways and ventilation system; accumulated on Warren Vest's desk; and collected on Warren's clothing.

- Specific aircraft parts were required by McDonnell Douglas to be used on its DC-8 and DC-10 models, many of which were operated by World and continuously maintained in the hangar. Timothy visited the hangar several dozen times over several years to watch the mechanics do their work. Visible dust was released by the sanding of Dexter-brand epoxy adhesives; the removal and reinstallation of worn heat blankets and shields; the handling of old insulated clamps; and the scraping of gaskets and tapes. All these materials were required to be used into the 1990s, as shown by MDC's 1992 All Operator Letter.

25. Timothy Vest experienced substantial levels of asbestos exposure as a pilot for Emery in the 1990s. He assisted and observed aircraft mechanics, on hundreds of occasions, working on Emery's fleet of McDonnell Douglas DC-8 and DC-10 models. The aircraft parts that released asbestos dust to which he was exposed include all the materials described above: Dexter-brand epoxy adhesives, heat blankets and shields, insulated clamps, gaskets and tapes. Although these exposures occurred in the 1990s, MDC's 1992 All Operator Letter confirms the relevant asbestos-containing parts still were required to be used on the aircraft.

26. Assuming the brakes used and removed from the Piper and Cessna training aircraft at Ahart contained asbestos, Timothy Vest also experienced substantial levels of asbestos exposure as a flight instructor for Ahart beginning in 1988. He assisted and observed Ahart's mechanics replacing brakes on Cessna 152s and 172s, as well as Piper Warriors and Archers. According to Timothy, he stood near the mechanic while the mechanic used compressed air to remove dust from the brakes. Timothy also testified that he breathed the dust.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

22

Declaration of John Templin in Support of Plaintiffs' Opposition to Defendant's MSJ/MSA

Exhibit 29-694

27. By the 1930's, the types of asbestos exposures described above were widely known by the industrial hygiene community, and across virtually all major American industries, to increase the risk of serious or fatal asbestos-related diseases among persons suffering such exposures. Therefore, when Timothy Vest inhaled asbestos-containing dust from construction materials and aircraft parts in the 1970s, 1980s and 1990s, it was entirely foreseeable at that time that his asbestos exposure could cause him to suffer serious or fatal diseases including, among others, mesothelioma cancer.

28. In my view, it was widely known and understood by 1960 – certainly within the industrial-hygiene community – that workers, bystanders and even household members of those working with and around asbestos-containing products were at substantially increased risk of being exposed to asbestos from the type of activities that Timothy Vest and his father encountered, and of developing an asbestos-related disease, such as mesothelioma, as a result of those exposures. In fact, by the time in 1964 when Dr. Irving Selikoff and his colleagues published their seminal epidemiological study demonstrating the mortality experience of workers who had been exposed to asbestos insulation, the causal connection between asbestos exposure and mesothelioma was unquestioned in the medical and scientific communities in the United States. A true and correct copy of Dr. Selikoff's April 6, 1964 article entitled "Asbestos Exposure and Neoplasia" is attached as Exhibit 33 hereto and incorporated fully herein by reference.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and that I signed this declaration on December 22, 2010 in Seal Beach, California.

John Templin

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

MSTEWART/710236.1

23

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

TIMOTHY VEST and CAROLINE VEST,

      Plaintiffs,

vs.                             No. RG09489518

ALLIED PACKING and SUPPLY, et al.,

      Defendants.

                          /

DEPOSITION OF WARREN K. VEST

Volume I (Pages 1 through 281)

Taken before KIMBERLY R. JENSEN, RPR

CSR NO. 12552

August 19, 2010

EXHIBIT 11

Exhibit 29-696

2 (Pages 2 to 5)

**2**

I N D E X
PAGE
EXAMINATION BY MR. BOSL                8
EXAMINATION BY MR. GOLDBERG            21
EXAMINATION BY MS. JOHNSON            184, 234,
265
EXAMINATION BY MR. KHOSRAVIRAD       196, 226,
253, 263,
274, 278
EXAMINATION BY MR. YUEN               197
EXAMINATION BY MR. BARTEAU           199, 230,
277
EXAMINATION BY MS. HSU               199, 225
EXAMINATION BY MR. GHERINI           216
EXAMINATION BY MR. INTRIERI          231, 251
EXAMINATION BY MS. WELLS             258

E X H I B I T S
PLAINTIFF'S                          PAGE
Exhibit A   Curriculum Vitae          9
DEFENDANTS'
Exhibit A   Document titled          178
"My 'World' History"

Exhibit B   Photocopy of photograph   191

Exhibit C   Photocopy of photograph   191

Exhibit D   Photocopy of photograph   192

**3**

DEPOSITION OF WARREN K. VEST

BE IT REMEMBERED, that pursuant to Notice, and on the 19th day of August 2010, commencing at the hour of 9:06 a.m., in the offices of HILTON PLEASANTON, 7050 Johnson Drive, Pleasanton, California 94588, before me, KIMBERLY R. JENSEN, a Certified Shorthand Reporter, personally appeared WARREN K. VEST, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES:

For the Plaintiffs:

JUSTIN A. BOSL
Kazan, McClain, Lyons, Greenwood & Harley
171 Twelfth Street, Third Floor
Oakland, California 94607

For the Defendant, Dean's Materials, Inc.:

E. JANE WELLS
Prindle, Amaro, Goetz, Hillyard, Barnes &
Reinholtz LLP
One California Street, Suite 1910
San Francisco, California 94111

**4**

For the Defendant, Hamilton Materials and Dowman Products:

JUNIPER BACON
Walsworth, Franklin, Bevins & McCall, LLP
601 Montgomery Street, Ninth Floor
San Francisco, California 94111

For the Defendant, Henkel Corporation:
MARK G. INTRIERI
Chapman & Intrieri
2236 Mariner Square Drive, Suite 300
Alameda, California 94501

For the Defendant, McDonnell Douglas Corporation:

LINDA C. HSU
Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, California 90401

For the Defendant, George E. Masker, Inc.:
RAFAEL CONTRERAS SWEET
Dongell, Lawrence & Finney LLP
707 Wilshire Boulevard, 45th Floor
Los Angeles, California 90017

For the Defendant, Honeywell and Georgia Pacific:

HANK HOLMBERG
(specially appearing)
Perkins Coie
Four Embarcadero Center, Suite 2400
San Francisco, California 94111

For the Defendant, F.P. Lathrop Construction Co.; and Lathrop Construction Associates, Inc.:
TANYA X. JOHNSON
Wilson, Elser, Moskowitz, Edelman &
Dicker LLP
525 Market Street, 17th Floor
San Francisco, California 94105

**5**

For the Defendant, Kaiser Gypsum Company, Inc.:
VANDAD KHOSRAVIRAD
DeHay Elliston LLP
1300 Clay Street, Suite 840
Oakland, California 94612

For the Defendant, World Airways, Inc.:

JAMES GOLDBERG
Bryan Cave LLP
2 Embarcadero Center, Suite 1410
San Francisco, California 94111

For the Defendant, Hexcel Corporation:
D. PAUL BIRD II
McKenna, Long & Aldridge, LLP
101 California Street, 41st Floor
San Francisco, California 94111

For the Defendant, Raymond Interior Systems and Kelly-Moore Paint Co.:
ROGER D. YUEN
Foley & Mansfield
300 Lakeside, Suite 1900
Oakland, California 94612

For the Defendant, Parker Hannifin:

JOHN G. GHERINI
Sedgwick, Detert, Moran & Arnold LLP
One Market Plaza, Steuart Tower, 8th Floor
San Francisco, California 94105

For the Defendant, The Port of Oakland:
MERTON HOWARD
Hanson Bridgett
425 Market Street, 26th Floor
San Francisco, California 94105

Exhibit 29-697

Case4:11-cv-00865-LB Document65-3 Filed04/10/11 Page49 of 213
Case MDL No. 875 Document 6734 Filed 01/28/11 Page 27 of 64

3 (Pages 6 to 9)

**6**

1  For the Defendant, Cyprus Amax Mineral Co.:
2      ANGUS M. MACLEOD
         Becherer, Kannett & Schweitzer
3       The Water Tower
         1255 Powell Street
4       Emeryville, California 94608
5  For the Defendant, Kentile Floors and Alta Building:
6      TIM BARTEAU
         Selman Breitman
7       33 New Montgomery Street, 6th Floor
         San Francisco, California 94105
8
9  For the Defendant, Allied Packing & Supply:
10     DAVID POLL
         (via phone)
11     Herr & Zapala, LLP
         152 N. 3rd Street, Suite 500
12     San Jose, California 95112
13
14
15
16
17
18
19
20
21
22
23
24
25

**7**

1          WARREN K. VEST,
2          sworn as a witness,
3          testified as follows:
4      MR. BOSL: Let's go ahead. I'm Justin Bosl on
5  behalf of the Vest family.
6      MR. BIRD: Paul Bird of McKenna, Long &
7  Aldridge for Defendant, Hexcel Corporation.
8      MS. BACON: Juniper Bacon from Walsworth,
9  Franklin, Bevins & McCall on behalf of Dowman Products,
10 Incorporated; and Hamilton Materials.
11     MR. YUEN: Good morning, sir. My name is
12 Roger Yuen, and I represent Kelly-Moore Paint Company
13 and Raymond Interior Systems.
14     MR. KHOSRAVIRAD: Good morning, Mr. Vest. My
15 name is Vandad Khosravirad. I'm here from DeHay and
16 Elliston, and we represent Kaiser Gypsum Company.
17     MR. INTRIERI: Mark Intrieri for Henkel
18 Corporation.
19     MR. HOWARD: Good morning. Martin Howard from
20 Hanson Bridgett for the Port of Oakland.
21     MS. WELLS: Good morning, sir. My name is
22 Jane Wells from Prindle, Amaro, Goetz, Hillyard, Barnes
23 & Reinholtz, representing Dean's Materials.
24     MR. SWEET: Rafael Sweet with Dongell,
25 Lawrence, Finney, representing George E. Masker, Inc.

**8**

1      MR. GHERINI: John Gherini for Parker
2  Hannifin.
3      MS. JOHNSON: Good morning, Mr. Vest, my name
4  is Tanya Johnson. I'm from the law firm of Wilson,
5  Elser, and we're representing Defendants F.P. Lathrop
6  Construction Company and Lathrop Construction
7  Associates, Inc.
8      MS. HSU: Good morning, Mr. Vest. My name is
9  Linda Hsu, and I'm here on behalf of McDonnell Douglas
10 Corporation.
11     MR. GOLDBERG: Good morning, Mr. Vest. My
12 name is Jim Goldberg, and I represent World Airways,
13 Inc.
14     MR. HOLMBERG: Good morning, Mr. Vest. My
15 name is Hank Holmberg. I'm here representing Honeywell
16 and Georgia Pacific.
17     THE WITNESS: Thank you all.
18 EXAMINATION BY MR. BOSL:
19     Q. All right. Good morning, Mr. Vest. I'm
20 going to start out asking you a few questions. First
21 of all, if you would state your name and date of birth
22 for the record.
23     A. Warren K. Vest, 4/28/1935.
24     MR. GOLDBERG: Mr. Bosl, I'd like to state for
25 the record an objection to your going first on the

**9**

1  deposition given that this is your client and your
2  witness. I think that's inappropriate. We had also
3  noticed the deposition. The appropriate procedure
4  would be for the defendants to go first and then the
5  plaintiff can do that.
6      MR. BOSL: I'll point out we initially noticed
7  Mr. Vest's deposition back in, I believe, it was April,
8  and we met and conferred previously and set it up for
9  this date, but we maintain our right of our initial
10 notice.
11     (Plaintiffs' Exhibit A marked for
12     identification.)
13 BY MR. BOSL:
14     Q. Mr. Vest, I'm going to go ahead and attach as
15 Exhibit A document with the title Warren K. Vest 11490
16 Cresta Lane, Dublin, California. At the top, sir, do
17 you recognize that?
18     A. Yes.
19     Q. And what is it?
20     A. It was a few weeks before I retired. I
21 can't -- people keep asking me for a history, because
22 I've been with World for about forty years. So I sat
23 down went through my personnel files and off of each
24 payroll authorization, wrote down the dates and title
25 changes, and so that's what it's all about. At the end

**10**

1  I think I added something about my history prior to
2  World Airways. But this is just a log of exactly what
3  was in my personnel file for World Airways.
4       Q. Okay. And so to clarify, you retired then
5  from World Airways?
6       A. Yes.
7       Q. And when was that?
8       A. March 31st of 2005.
9       Q. Okay. And per your CV, you began working at
10  World Airways December 9th, 1965; is that correct?
11      A. That's correct.
12      Q. Okay. I'm not going to go through every step
13  of your CV right now. What I want to ask you is at
14  some point in your tenure at World Airways, you moved
15  to Japan. When was that?
16      A. That was in August or September of 1971.
17      Q. And what was the reason for moving to Japan?
18      A. I was appointed vice president of far East
19  operations.
20      Q. And did your family come with you to Japan?
21      A. Yes.
22      Q. And who was your family at that time?
23      A. My wife Ingrid and son Timothy and my youngest
24  hadn't been born yet.
25      Q. At some point, your family returned to

**11**

1  California. When was that?
2       A. That was -- well, the family returned a little
3  earlier than me. They came back for school in the fall
4  of '73, and I returned later in 1973.
5       Q. When was your son Brian born?
6       A. He was born October 4th of 1972, while we were
7  in Japan.
8       Q. And are you familiar with the World Airways
9  hangar. What was previously known as World Airways
10  hangar at the Oakland airport?
11      A. Yes.
12      Q. When was the first time you visited that
13  facility?
14      A. The first time I visited was May of 1973.
15      Q. And what was the reason for visiting?
16      A. It was the grand opening of the hangar and the
17  delivery of our first 747 aircraft.
18      Q. Did anyone come with you to the grand opening?
19      A. My wife and Timothy.
20      Q. Had your wife and Timothy already returned
21  from Japan for good at that point?
22      A. They -- no, they came -- we flew back for that
23  occasion and then went back. And shortly after that
24  they returned to get ready for school.
25      Q. When did you permanently return then from

**12**

1  Japan?
2       A. It would have been late September or early
3  October of 1973.
4       Q. And what was your job at World Airways at that
5  time?
6       A. I returned to Oakland as a check pilot of
7  rating out of the Oakland operations department.
8       Q. And what was your work schedule at that time?
9       A. Well, I would be going out on the line and
10  checking other pilots, probably being away from home 18
11  to 19 days a month. And some assignments we had
12  operations overseas, Air Malle and Africa and a little
13  later Air Malle and -- Yemen Airways in Yemen. And
14  occasionally I'd be sent over to look at the operation
15  for a month or so.
16      Q. And how long did you have that job at World
17  Airways?
18      A. I was appointed assistant chief pilot in
19  January of 1976. And at that time I maintained an
20  office with the hangar facility.
21      Q. Now, during the time that you were a check
22  pilot, between your return from Japan until becoming
23  assistant chief pilot, did you ever have any office
24  work to do?
25      A. Well, I'd re return from these assignments and

**13**

1  I'd have reports to make to write up. Because in those
2  places, there was no facilities for typing or anything.
3  So when I'd get back, I'd go in the office and do --
4  complete a lot of my paperwork. Same thing with check
5  rights on pilots. You'd go out and check four or five
6  pilots and you'd make a lot of notes so that would come
7  back in and go to an office and complete that
8  paperwork.
9       Q. Did anyone ever accompany you to the office
10  when you did your paperwork as a check pilot during
11  that time?
12      MR. HOWARD: Objection. Overbroad. Vague.
13      MR. BOSL: Go ahead.
14      THE WITNESS: I can remember occasions going
15  out on a Saturday or a Sunday to do this work and
16  taking my son with me.
17      MR. KHOSRAVIRAD: Can I get the question read
18  back, please.
19      (Record read.)
20  BY MR. BOSL:
21      Q. And while you were doing your paperwork, what
22  would Tim be doing?
23      A. He'd normally be around the office with me.
24  Occasionally he would -- we had several security people
25  there at the hangar, and he'd -- he befriended a couple

Exhibit 29-699

**14**

1  of those guys. So he'd hang out with them.
2      Q. And then in 1976 in January, you became
3  assistant chief pilot. You said you got an office.
4  Where did you get your office?
5      A. It was on the second floor on the very front
6  of the building there when you're driving to the
7  airport and seeing the office -- it was called Core A,
8  and my office was on the second floor.
9      Q. Where on the second floor was it?
10     A. The well, the -- there's an elevator cord and
11  you'd come out of that. It was to the -- it's -- it's
12  hard to explain. You turn left and then we had a large
13  space with -- well, there was a vice president of
14  operations, assistant vice president, assistant chief
15  pilot, myself, and the chief engineer, all had offices
16  in that space.
17     Q. How long were you in that office?
18     A. Well, I -- I was in that office probably from
19  '76 up through late 1982.
20     Q. And then where -- what office did you move
21  into at that point?
22     A. Well, 1983 I became senior vice president.
23  I'm trying to think where I moved. I had different
24  offices. I was on the first floor for a while and then
25  moved to the third floor. And then when I went to

**15**

1  executive vice president moved to the fourth floor.
2      Q. Now, once you became assistant chief pilot and
3  moved in to the office on the second floor, did Tim
4  ever visit work with you after that?
5      A. He would -- he would go with me. A lot of
6  times I'd go out and work on a Saturday morning and
7  take him along.
8      Q. And same question during those times what
9  would Tim be doing while you were doing your work in
10  the office?
11     A. Mostly, same way he'd take home work with him,
12  work in the office, or again, he would -- you know,
13  latch onto one of his security buddies and they'd be
14  out of site for the next couple of hours.
15     Q. During the time that you -- well, until what
16  point was Timothy coming to work with you?
17     A. Oh, probably up to when he started college
18  in -- he went to UCLA the fall of '83.
19     Q. At some point in your work at World Airways,
20  in addition -- did you ever have any opportunity to be
21  involved in any airplane crash investigations?
22     A. Later on, when I got back in the office. I
23  don't remember the exact dates. It would have been
24  probably the late -- late '70s. We had an airplane
25  crash in dutch harbor Alaska, DC 8, in 1973. In

**16**

1  September of 1973. Senior management had been handling
2  that, and then they -- they sort of assigned me to the
3  attorneys that were working a case to -- to investigate
4  and try to figure out what happened. And so I worked
5  on that for, oh, several weeks or months. We had a
6  room set aside. Had all the maps and charts and so I
7  worked at that for quite some time. That was a -- sort
8  of a room that had never been used that was down on the
9  first floor of the building.
10     Q. Did you do any of that investigative work on
11  the weekends?
12     A. Yes.
13     Q. And did that cause you to work more weekends
14  than normal?
15     A. Yes.
16     Q. Did Timothy accompany you to the office during
17  that time?
18     A. He did.
19     Q. During the time that you were working out of
20  hangar 110, do you recall any office construction or
21  remodeling going on in the office spaces?
22     A. It was almost continuous, from -- well, not
23  long after we got in there till it was still going on
24  up to probably 1985 or '86. Probably continuously from
25  the time we moved from the hangar till the company

**17**

1  moved their operation doors to her Herndon, Virginia.
2  There was continuously changing walls and making
3  classrooms and things of that nature.
4      Q. Do you know what the reason for the moving of
5  the walls and changing office spaces was?
6      A. Just to make more space and make the
7  classrooms I guess make it more efficient.
8      Q. Okay. During your work in hangar 110, did you
9  ever have to go into the maintenance spaces of the
10  hangar?
11     A. Yes.
12     Q. Okay. And what reason was that?
13     A. Well, we did maintenance for World Airways,
14  all wire craft. We maintained airplanes for
15  TransAmerica, for the U.S. Airforce, and so it was a
16  very very busy place, and being in the assistant chief
17  pilot and the chief pilot, my concern was always are
18  the World Airways airplanes going to get priority they
19  need and get out in time run their next trip. So the
20  chief engineer and I we used to spend a lot of time in
21  and out the hangar making sure the progress was moving
22  along. And then at one time, it was later on, we lost
23  our vice president of maintenance. And engineering, so
24  I was affecting vice president of -- well, not vice
25  president. Just in charge of the maintenance and

Exhibit 29-700

**18**

1  engineering for a few months. So it's been a lot of
2  time out on the floor that time.
3        Q. From the time you became assistant chief pilot
4  in 1976 until 1983, how often were you in the hangar?
5        A. You mean out on the floor of the hangar?
6        Q. Yes, I'm sorry. Out in the maintenance areas?
7        A. Oh, it would just be a wild guess. You know,
8  it was out there at least probably once every day, but,
9  you know, some days I might be in and out of there many
10  times.
11        Q. Do you recall ever seeing any kind of
12  fireproofing on any of the surfaces in the hangar?
13        MR. BARTEAU: Objection. Vague, ambiguous,
14  overbroad.
15        THE WITNESS: Well, I remember the just seeing
16  big pipes up there, but I never given any thought of
17  this part of -- it was part of the hangar.
18  BY MR. BOSL:
19        Q. Were there any posed beams in the hangar?
20        MS. JOHNSON: Object, overbroad.
21        MR. GOLDBERG: Vague.
22        MS. JOHNSON: Vague.
23        THE WITNESS: Yeah, they were exposed beams.
24  BY MR. BOSL:
25        Q. Did these beams have any kind of material on

**19**

1  them?
2        MR. HOWARD: Objection. Overbroad. Vague.
3        THE WITNESS: Well, the beams I don't remember
4  what they had on them. Mainly some kind of coating on
5  them was big like pipes or something. That's the best
6  I can remember the details of the hangar.
7  BY MR. BOSL:
8        Q. At any time while you were working at World
9  Airways, do you ever recall receiving any kind of
10  warning from World Airways about the hazards of
11  asbestos?
12        A. No.
13        Q. Did you ever receive a warning about the
14  hazards of asbestos at that time from anyone?
15        A. No.
16        Q. When you came home from work, did you change
17  your clothes right away?
18        A. No.
19        MR. GOLDBERG: Overbroad.
20        THE WITNESS: Probably took my jacket off.
21  That's about it. Have dinner. By the time I got home,
22  dinner was on the table. So I walked in took my jacket
23  off and had dinner.
24  BY MR. BOSL:
25        Q. Okay. And how affectionate were you with

**20**

1  Timothy while he was growing up?
2        A. I would say quite affectionate. In fact, he's
3  45 and his brother is 37, and we're still that way.
4        Q. Would you give him a hug when you came home
5  from work?
6        A. Absolutely.
7        Q. Did you ever spend time after work rough
8  housing and playing with your sons on the floor,
9  anything like that?
10        A. Yeah.
11        Q. What car did you drive back and forth to work?
12        A. Oh, I had a '68 Cougar. Well, let's see.
13  Yeah from the time -- time I got back, let's see. I
14  guess '68 I drove a '68 Cougar. The whole time I
15  worked at World Airways. In fact I still have the car.
16        Q. Did Tim ever ride in that car?
17        A. Oh, yeah.
18        MR. BOSL: Okay. I think those are all the
19  questions I have at this time. And can we just go off
20  the record for one minute.
21        MR. GOLDBERG: Sure.
22        MR. BOSL: Thank you.
23        (Break taken from 9:29 a.m. to 9:33 a.m.)
24  BY MR. BOSL:
25        Q. Mr. Vest, I wanted to ask you, where was your

**21**

1  son Brian born?
2        A. He was born in Hayward.
3        Q. Okay. At some point then, did your wife and
4  Timothy return from Japan prior to Brian's birth?
5        A. Yes.
6        Q. Okay. And about when was that?
7        A. I'm guessing it was August -- August or
8  September of '72.
9        Q. Okay. And that school year, did your son Tim
10  go to school here in California or back in Japan?
11        A. He went here. I think I misspoke. They did
12  come back from Japan in December. She brought Tim and
13  the baby, and they spent Christmas there, and I was
14  saying they stayed on, but they probably returned right
15  after Christmas for them to go back to school.
16        MR. BOSL: Okay. All right. With that, go
17  ahead.
18  EXAMINATION BY MR. GOLDBERG:
19        Q. All right. Good morning, Mr. Vest. I
20  introduced myself briefly earlier, and I'm Jim
21  Goldberg, and I represent World Airways. I'm going to
22  be asking questions first, and then we'll go around the
23  table and everybody else will ask questions presumably.
24  Have you ever had your deposition taken before?
25        A. Yes.

Exhibit 29-701

**30**

1  apparently it's missing the exact date of transfer
2  back.
3  Q. Okay.
4  A. It was either late September, October.
5  Q. Okay. And from that time period until
6  approximately January 21st, 1976, were you the -- a
7  captain?
8  A. Yes.
9  Q. A line captain?
10  A. Check -- what that called a check captain.
11  Q. What does it mean to be a check captain?
12  A. Well, you get proficiency checks to all the
13  other captains.
14  Q. Okay. And where do you do that?
15  A. Out on the line or in the simulator.
16  Q. Okay. And what do you mean by out on the
17  line?
18  A. On a trip. There was, in other words, the
19  captain has to be -- every six months he has to have a
20  proficiency check and a simulator, and every 12 months
21  he has to be observed flying at least two legs of a
22  trip.
23  Q. Okay. Where was the simulator located that
24  you gave test on?
25  A. That was 75 we were operated DC-8s, 727, so

**31**

1  mostly had been in Los Angeles. We did the CD 8
2  training at flying Tigers Airlines, and the 727
3  training we did at that time at Western Airlines.
4  Q. And were those both based in L.A.?
5  A. Yes.
6  Q. Okay. So your job consisted, I take it,
7  mostly doing flight simulator checks in L.A., and then
8  going on flights with pilots to observe their
9  performance?
10  A. Exactly.
11  Q. Okay. And how many days a month would you do
12  that?
13  A. I would say it would average at least 20.
14  Q. Okay. And did you have an office in L.A. at
15  that time?
16  A. No.
17  Q. Okay. And how would you get to L.A. to do
18  that simulator, proficiency testing?
19  A. That was back in the days of PSA.
20  Q. Okay. I flew that a lot. And where did PSA
21  leave from?
22  A. Oakland.
23  Q. Okay. And did you have to pick up paperwork
24  at hangar 110 prior to going out on those tests?
25  A. I would always stop in the office. Normally I

**32**

1  carry my briefcase full comp of paperwork, but you
2  know, I'd always stop by the office because I'd report
3  to dispatch and then go to the airport to get on PSA.
4  When I returned then I would go to the office to
5  complete paperwork.
6  Q. Okay.
7  A. And turn all that paperwork in.
8  Q. Okay. During those years when you were the
9  check captain from 1973 to 1976, was it part of your
10  responsibility to go out on the maintenance floor of
11  the hangar?
12  A. No.
13  Q. Okay. When you were going out these online
14  checks for the pilots who had already gone through the
15  simulator, where would you leave from?
16  A. I always report to Oakland to dispatch.
17  Q. Okay. And would the planes take off from
18  somewhere outside of hangar 110?
19  A. Well, many times I would report to Oakland and
20  then commercials somewhere to catch up with the flight,
21  because our flights were worldwide.
22  Q. Okay.
23  A. So we had very few trips that originated out
24  of Oakland.
25  Q. Okay. Out of the -- how many times a month

**33**

1  would you say that you went on a trip that originated
2  out of Oakland then, during the '73 to '76 time period?
3  A. Well, it would have been basically the '75
4  period, because '73 -- '71 through '73, I was in Japan.
5  Q. Right.
6  A. So the period from when I came back from Japan
7  until January of '76, I would originate in Oakland
8  every time.
9  Q. Right.
10  A. But the number of trips that actually trips
11  originated I was checking on, would have been very few.
12  Q. Okay.
13  A. And every time I departed on a trip to go do
14  the job, I reported to Oakland.
15  Q. Okay. And you do report to the dispatch
16  office --
17  A. Right.
18  Q. -- which was on the ground floor of core A?
19  A. That's correct.
20  Q. And would you necessarily every time go in to
21  the hangar?
22  A. No.
23  Q. Okay. Do you recall any occasions in that
24  time period where you did go into the hangar when you
25  were reporting to dispatch?

Exhibit 29-702

Case4:11-cv-00361-LB Document665-3 Filed01/28/11 Page54 of 213
Case MDL No. 875 Document 6714 Filed04/10/11 Page32 of 64

11 (Pages 38 to 41)

**38**

1   get some guy from Frankfurt, Dubai to Johannesburg.
2       Q. Okay.
3       A. And then get somebody fly something commercial
4   somewhere else and pick up another guy.
5       Q. Okay. And this could happen any day of the
6   week, correct?
7       A. Yeah.
8       Q. So when you got back to Oakland, that could be
9   any day of the week too; is that correct?
10      A. That's correct.
11      Q. Okay. Do you have any estimate of how often
12  the day you went back in the office in Oakland to do
13  your report would be a Saturday or Sunday?
14      MR. BOSL: Overbroad.
15      THE WITNESS: No, I couldn't give you that
16  figure.
17  BY MR. GOLDBERG:
18      Q. Okay. So just so I understand, in this time
19  period where you were the captain or the check captain,
20  you were -- your primary responsibility was not to fly
21  the airplane yourself?
22      A. When I was checking. That's correct.
23      Q. Okay. Did you also have some parts of those
24  three years when you were check captain where you would
25  be the person to pilot the plane to Japan with cargo or

**39**

1   something like that?
2       A. That's correct, yes.
3       Q. Okay. Do you have any idea of how you split
4   your time?
5       A. Oh, I would say during those years,
6   probably -- probably 65 percent was checking and 35
7   percent flying.
8       Q. Okay. And do you have paperwork
9   responsibilities when you're flying?
10      A. Well, during the trip.
11      Q. Okay.
12      A. In other words, when you return from just a
13  flight that I operated the flight, there would be no --
14  no paperwork to complete the flight. It would be all
15  done in the aircraft.
16      Q. Okay.
17      A. At the time of the flight.
18      Q. Okay. Keeping a log at some sort during your
19  flight?
20      A. Right.
21      Q. Okay. So the next time period I guess is from
22  sometime early in 1976 until I think on or about
23  September 12th, 1977 you were assistant chief pilot?
24      A. Yes.
25      Q. Okay. And at that time, did you get an office

**40**

1   in Oakland?
2       A. Yes.
3       Q. Okay. And that's when your office was on the
4   first floor?
5       A. Second floor.
6       Q. Second floor. Okay. What are the
7   responsibilities of the assistant chief pilot?
8       A. To do what the chief pilot tells you to do.
9       Q. Okay. Well, then maybe it helps by after you
10  were assistant chief pilot for about I guess, what, a
11  year and three quarters, you became the chief pilot?
12      A. Right.
13      Q. And you were the chief pilot for about four
14  years, correct?
15      A. I think that's right.
16      Q. From about September 1977 through October
17  1981?
18      A. That looks like it was February 15th, 1977
19  until October of '81.
20      Q. Okay. What were your responsibilities as
21  chief pilot?
22      A. I was over seeing and manage the -- all the
23  pilots and flight engineers.
24      Q. And what does that entail on a day-to-day
25  basis?

**41**

1       A. Taking care of all the administrative problems
2   which you had with -- when you have four or five
3   hundred employees.
4       Q. So you had four or five hundred employees
5   reporting to you?
6       A. Well, in those days I would say it's probably
7   close to 400.
8       Q. And who was that in addition to pilots?
9       A. Flight engineers.
10      Q. And flight engineers are the guys that used to
11  sit next to pilot in the cockpit?
12      A. Right.
13      Q. Anybody other than the pilots and the flight
14  engineers?
15      A. Not during that time, no.
16      Q. Okay. And during the time you were chief
17  pilot, were you still on the second floor?
18      A. Yes.
19      Q. Okay. And you were doing a lot of paperwork,
20  I take it then?
21      A. Yeah.
22      Q. Okay.
23      A. You know, you're having to update manuals,
24  apply all the FAA regulations, take care of individual
25  personal problems.

Exhibit 29-703

**46**

1   A. Probably still being out on the road 20 days a
2   month.
3   Q. Okay. And are those 20 days a month spent
4   doing line checks or --
5   A. Line checks, flying. It might be running an
6   operation in Malle or Yemen or Muslim Hajj pilgrimage.
7   Q. Flying the Muslim Hajj pilgrimage?
8   A. Yeah. And managing the operation.
9   Q. Okay. The 20 days a month that you were out,
10  would the division be roughly as it was before when you
11  were the check pilot, you know, approximately 35
12  percent flying and another 65 percent doing checks?
13      MR. BOSL: Overbroad.
14      THE WITNESS: It would vary so much. It might
15  be -- from like it was a Hajj operation, I would be
16  managing there, and I would be flying a hundred hours a
17  month.
18  BY MR. GOLDBERG:
19  Q. Okay.
20  A. Aside managing the operation.
21  Q. Okay. In this time period that you were
22  assistant chief pilot, how many days a month would you
23  just come in the office and just all day do paperwork?
24      MR. BOSL: Overbroad.
25      THE WITNESS: It would just be a pure guess.

**47**

1   I couldn't tell you.
2   BY MR. GOLDBERG:
3   Q. You couldn't give me an estimate?
4   A. No.
5   Q. Okay. Were there -- okay. Were there months
6   when you actually worked more than 20 days a month?
7   A. Oh, yeah. Months when it worked 28 and 29
8   days a month.
9   Q. Okay.
10  A. There were months when I would -- there were
11  times when I would go to Yemen for two months.
12  Q. Okay.
13  A. Go to Malaysia or Indonesia or Algiers. Be
14  there for two months.
15  Q. Okay. Do you have any records of these trips
16  in any way, shape, or form?
17  A. My logbooks, I quit keeping them about -- I
18  forget when. No, I don't have -- I have some logbooks,
19  but --
20  Q. Okay. I'd like to ask you to provide those
21  logbooks to your attorneys, please.
22  A. Okay. I --
23      MR. BOSL: There's no other question. We'll
24  talk.
25      THE WITNESS: Okay.

**48**

1   BY MR. GOLDBERG:
2   Q. Okay. And do you have your passports from
3   back in those days?
4   A. Yes.
5   Q. We'd also appreciate it if you'd produce your
6   passports to your attorneys, because that will give us
7   some idea when you were out of the country for an
8   extended length of time?
9   A. Yes.
10  Q. You must have lots of that in pages of your
11  passports?
12  A. I've got one that thick.
13  Q. Inch and a half thick?
14  A. Yeah.
15  Q. Okay. All right. During the time that you
16  were assistant chief pilot, do you remember any of the
17  other extend deployments you had to a foreign base,
18  like Yemen or Algiers that you just mentioned?
19  A. To Malle.
20  Q. Okay. During this time of year, assistant
21  chief pilot, did you have as much line check paperwork
22  to do back in Oakland as you had when you were chief
23  pilot?
24      MR. BOSL: I'm sorry. Can I have that read
25  back, please.

**49**

1   (Record read.)
2       MR. BOSL: Object that it's vague and
3   ambiguous.
4       MR. GOLDBERG: Let me rephrase it. Thank you.
5   BY MR. GOLDBERG:
6   Q. When you were the assistant chief pilot, did
7   you have as much line check paperwork to do as you had
8   when you were the check captain?
9   A. When I was the check captain or chief pilot.
10      MR. BOSL: Check captain.
11  BY MR. GOLDBERG:
12  Q. Check captain. I'm trying to compare.
13  A. Okay. I would say it was about the same.
14  Q. Okay. All right. Then when you became the --
15  well, do you have any idea of how many days a month you
16  were in the Oakland office in Core A when you were the
17  assistant chief pilot?
18  A. I would say probably seven to ten days a
19  month.
20  Q. And those could be any days of the week,
21  correct?
22  A. Yeah.
23      MR. KHOSRAVIRAD: Can I get second to the last
24  question read back, please.
25  (Record read.)

Exhibit 29-704

**50**

1    BY MR. GOLDBERG:
2        Q. Turning now to when you were chief pilot which
3    is a time period of, I think, close to four years,
4    sometime in '77 to sometime in '81?
5        A. Right.
6        Q. Did you continue to fly?
7        A. Yes.
8        Q. How many days a month were you flying?  And by
9    flying I mean going out on an airplane whether you're
10   flying in the airplane yourself or doing checks?
11       A. I would estimate ten days a month.
12       Q. And are you continuing to do on those ten days
13   some portion flying, some portion doing line checks?
14       A. Yes.
15       Q. Okay.  And as assistant chief pilot and chief
16   pilot, are you continuing to do some of the simulator
17   tests in L.A.?
18       A. Yes.
19       Q. On average, how many days a month did
20   you work during these four years that you were chief
21   pilot?
22       A. How many days a month?
23       Q. Yes.
24       A. I can't give you an average.  I can remember
25   writing a letter to senior management at one time where

**51**

1    the most I had off in three or four months was four
2    days a month.
3        Q. Okay.
4        A. So let's say it was somewhere 20 to 25 days on
5    average.
6        Q. Okay.  And so the days of the month that you
7    would be in the office could be again any day of the
8    week, correct?
9        A. Yes.
10       Q. Could be a weekday, could be a weekend day,
11   correct?
12       A. Yes.
13       Q. And there's really no rhyme or reason to that
14   I take it.  In terms of there's no regularity to that?
15       A. No.
16           MR. BOSL: Vague, ambiguous, overbroad.
17   BY MR. GOLDBERG:
18       Q. And when you were chief pilot in this time
19   period, 1977 to 1981, did your office move from the
20   second floor at any point to the first floor?
21       A. No.
22       Q. Or others?
23       A. I was on the second floor the whole time.
24       Q. Okay.  Then in October of '81, you became the
25   assistant VP of flight operations.  It was about that

**52**

1    time?
2        A. Yes.
3        Q. What are your -- what were your
4    responsibilities as assistant VP of flight operations?
5        A. They were about the same, except I worked
6    closer with the -- with the vice president of op- --
7    flight operations.
8        Q. With Doug Larson?
9        A. No, it would have been with Ken Healy.
10       Q. I'm sorry.  Okay.  Okay.  I see.  Because
11   you're the assistant VP of flight operations and Ken
12   Healy was the director of operations or was he?
13       A. Flight operations.
14       Q. Flight operations.  Okay.  Thank you.  In this
15   time period, when you were the assistant VP of flight
16   operations, which I understand lasted until -- when did
17   that last to that you were assistant VP of flight
18   operations?
19       A. I think that was January 1 of '83, wasn't it.
20       Q. My records -- or what I looked at seem to
21   indicate that you were assistant VP of flight
22   operations from sometime in October '81 till sometime
23   in the end of December 1982 when you became VP of
24   flight operations?
25       A. No, so October 7th, '81, I became assistant

**53**

1    vice president of flight operations, and January 1 of
2    1983, I became the vice president of flight operations.
3        Q. Okay.  We'll look at your timetable which is
4    Exhibit A to your deposition.  You said that your
5    responsibilities remained pretty much the same as
6    they'd been previously when you became assistant VP of
7    flight operations except that you worked closer with
8    Mr. Healy who was the director of flight operations?
9        A. Yeah.  Because at that time then we had --
10   someone else was chief pilot, so he was doing a lot of
11   the duties that I'd been doing.
12       Q. Okay.
13       A. So now I was available to work much closer
14   with Captain Healy.
15       Q. Okay.  So are you still flying at this time
16   period when you were assistant VP of flight operations?
17       A. Yes.
18       Q. How many days a month are you flying?
19           MR. BOSL: Overbroad.
20   BY MR. GOLDBERG:
21       Q. If you can estimate on average?
22       A. I would say estimate 14 days a month.
23       Q. Okay.  And in those 14 days a month, you'd be
24   largely out of Oakland; is that correct?
25       A. Yes.

Exhibit 29-705

15. (Pages 54 to 57)

**54**

1  Q. Okay. And how many days a month did you work
2  on average during this time period in which you were
3  assistant VP of flight operations?
4  A. I would say 20 to 23 days a month.
5  Q. Okay.
6  MR. KHOSRAVIRAD: Counsel, when you say work,
7  just to define that, you meantime spent in the hangar.
8  MR. GOLDBERG: No, I meant just doing the job,
9  whether it's flying or paperwork as assistant VP of
10  flight operations. Is that how you understood me?
11  THE WITNESS: Yes.
12  BY MR. GOLDBERG:
13  Q. So then you had something like six to nine
14  days a months where you were doing paperwork in the
15  office in hangar 110 while you were assistant VP of
16  flight operations?
17  A. That's a good estimate.
18  Q. And again it could be any day of the week,
19  weekday or weekend?
20  A. Yes.
21  Q. Okay. Then we're -- some of this time when
22  you were the assistant VP of flight operations were you
23  temporarily based in Kuala Lumpur?
24  A. Yes. '81. I'm not sure I was in Kuala Lumpur
25  for three months in 1980, but that would have probably

**55**

1  been when I was chief pilot. I can't remember if I had
2  a – one of those long two or three month assignments
3  in that period between October '81 and January of '83
4  or not.
5  Q. Okay. Again, would your passport clarify
6  that?
7  A. It should, yes.
8  Q. Okay. And your logs might also be helpful in
9  that?
10  A. By that time, I was -- I had given up on
11  trying to keep a log.
12  Q. Okay.
13  A. Logs.
14  Q. Okay. What did your logs consist of up to
15  that time? Your just -- each flight you're taking?
16  A. Yeah.
17  Q. Okay.
18  MR. BOSL: I'm also going to object it's vague
19  and ambiguous as to that time.
20  BY MR. GOLDBERG:
21  Q. That time while you were keeping them?
22  A. Yeah.
23  Q. Okay. All right. So then it looks like on
24  January 1st, 1983 you became vice president of flight
25  operations?

**56**

1  A. Yes.
2  Q. Okay. Did you continue to fly?
3  A. Yes.
4  Q. And how many days a month on average did you
5  fly during that period of about six months when you
6  were the vice president of flight operations, the first
7  half of 1983?
8  A. Oh, if you include the checking, going to Los
9  Angeles and stuff like that, probably 7 to 10 days,
10  because I'd work in the office any day and fly down to
11  L.A., in the evening do a check wrap and come back from
12  the office the next day.
13  Q. Okay. During that time period that you were
14  VP of flight operations, can you estimate how many days
15  a month you were in the office doing paperwork?
16  A. Probably 20.
17  Q. Okay. And again, those days could be days of
18  the week or they could be weekends depending upon
19  what's going on?
20  A. Yes.
21  Q. Okay. As VP of flight operations, what were
22  your responsibilities?
23  A. I was -- at that time, I was responsible for
24  all the -- well, all the crews, the crew scheduling
25  department.

**57**

1  MR. BOSL: Counsel on the phone, you've got to
2  mute it.
3  MS. JOHNSON: On your cell phone in a car.
4  MR. BOSL: Whoever is on a road somewhere you
5  need to mute your phone.
6  MR. KHOSRAVIRAD: Sounds like a police
7  scanner.
8  THE WITNESS: Where were we here?
9  MR. BOSL: Can you read back the last
10  question, please.
11  (Record read.)
12  THE WITNESS: The dispatch and responsible for
13  the movement of all -- all World Airways aircraft to
14  the FAA.
15  BY MR. GOLDBERG:
16  Q. And what does that mean, be responsible for
17  all movement of the aircraft to the FAA?
18  A. You're the final authority whether the
19  airplane can move or not.
20  Q. I see.
21  A. In other words, the FAA holds you directly
22  responsible for all aircraft movements.
23  Q. Okay. So in any of these jobs that we've
24  discussed before including this one, VP of flight
25  operations, do you have to sign off on whether an

Exhibit 29-706

**70**

1    Q. Okay. Can you tell me who those are, please.
2    A. They contacted me, because they had been
3    contacted by someone.
4    Q. Okay.
5    A. It was George Waggensaller.
6    Q. Okay.
7    A. And Claude Frost.
8    Q. Okay. And you went down to Palm Springs and
9    played golf with Claude Frost one day?
10   A. I was down there and hadn't seen him for about
11   20 years and called him and said why don't you come and
12   play golf, so we played golf.
13   Q. Did you discuss the subject matter of the
14   lawsuit at all?
15   A. No.
16   Q. Did you discuss the subject matter of the
17   lawsuit with George Waggensaller?
18   A. There was some discussion about it.
19   Q. Okay. Do you recall when that conversation
20   took place?
21   A. It's been a few months ago. I don't remember
22   a date.
23   Q. Okay. And was that by phone?
24   A. Yes.
25   Q. Do you recall how long that conversation

**71**

1    lasted?
2    A. Maybe ten minutes.
3    Q. Okay. Do you recall anything that he said?
4    A. Just that hell had been contacted by an
5    attorney.
6    Q. Okay. Anything else you recall about your
7    conversations with him?
8    A. Oh, yeah, I think he mentioned a couple
9    questions he had been asked. Something about the
10   facility, and I think that was about it.
11   Q. Okay. Do you recall any more specifically?
12   A. No, I can't think of anything right offhand.
13   Q. Okay. Have you ever had any discussions with
14   anybody where you have asserted that the environment
15   anywhere in hangar 110 was dusty?
16   A. Was dusty.
17   Q. Yes.
18   A. Again, I don't remember any specific
19   conversation with someone about it being dusty.
20   Probably about the time that it was, probably everybody
21   in the office was complaining about it, talking about
22   it, but I can't remember any specific conversation or
23   complaint about it.
24   Q. Okay. And what do you mean?
25   MS. HSU: Respectfully move to strike portions

**72**

1    that are based on speculation.
2    BY MR. GOLDBERG:
3    Q. So at this point you don't recall any specific
4    conversations; is that correct?
5    A. No.
6    Q. At this point, do you recall anybody that you
7    ever discussed that subject with?
8    A. No.
9    Q. Okay. Earlier this morning, you stated
10   something to the effect that there was continuous
11   construction at hangar 110 from 1973 to 1983. Do
12   you recall that testimony?
13   A. Yes.
14   Q. What did you mean by continuous?
15   A. Well, I don't mean that for ten years, which
16   would be 3,000 some days, that there was construction
17   every day, but, you know, there was always some kind of
18   project to build a new classroom or build a new
19   cafeteria, and so there was moving of walls and I can
20   remember, you know, sheets of plastic hanging up to
21   keep the dust from getting all over everything. And
22   continuously is probably not a good word, but certainly
23   from time to time there was construction going on.
24   Q. Okay. And in fact you weren't in the office
25   continuously, correct?

**73**

1    A. No.
2    Q. Okay. And do you recall that the Claude Frost
3    was responsible for the facility's maintenance?
4    A. Yes.
5    Q. Okay. And do you consider Mr. Frost a
6    trustworthy man?
7    A. Yes.
8    Q. Okay. Do you have any reason to believe that
9    he wouldn't tell the truth with respect to the
10   remodeling construction work?
11   MR. BOSL: Lacks foundation. Calls for
12   speculation.
13   THE WITNESS: I don't know why he would be
14   dishonest about it.
15   BY MR. GOLDBERG:
16   Q. So you have no reason to believe he would be
17   dishonest?
18   A. No.
19   Q. Okay. I'd like to focus on what specific
20   remodeling you can recall being done.
21   A. Well, there was classrooms that we -- one time
22   we tried to move all the training in that building, so
23   they made a lot of new classrooms. They rearranged
24   the -- on the first floor, there was a lunch -- lunch
25   break facility, a lot of work done on that. And those

20 (Pages 74 to 77)

74

1   are the main ones. And like I say, the classrooms,
2   those I can remember us changing those a number of
3   times. Building a new library, technical library that
4   was on the first floor, and when we went in to schedule
5   service, they did a lot of rearranging office space,
6   because we put a -- we had to make room for like 100
7   reservation agents, and so it was just ongoing.
8       Q. Okay. When you're saying the training in the
9   building, is that the classrooms you're referring to?
10      A. Right.
11      Q. And when you talk about the lunch break
12  facility, is that the same as the cafeteria?
13      A. Yes.
14      Q. Okay. And you said there was a new technical
15  library put on the first floor?
16      A. Right.
17      Q. Are you referring to Core A?
18      A. Yes.
19      Q. Okay. And when are you're referring to the
20  classrooms being built, is that in Core A?
21      A. Yes.
22      Q. Okay. Do you recall what floor that was?
23      A. Those were -- there were some on the first
24  floor, some of the second floor.
25      Q. Okay. And you said when we went in to

75

1   schedule service, we had to make room for 100
2   reservation agents?
3       A. Roughly that, yes.
4       Q. And what did they sit at?
5       A. Well, they ended up with a big room. Three
6   times the size of this, and they all had little
7   cubicles.
8       Q. Okay. And what were the cubicles made out of?
9       A. I have no idea.
10      Q. Were they like prefabricated cubicles like
11  metal or plastic?
12      A. I don't remember the detail.
13      Q. Okay. Do you have any recollection?
14      A. I just remember looking in that room and
15  seeing dozens and dozens of people on the telephone
16  making reservations.
17      Q. Okay. Was that in Core A?
18      A. Yes.
19      Q. Do you know what floor that is in Core A?
20      A. I'm not even sure what floor that was. I
21  think -- I think it was on the third, but that's
22  testing my memory.
23      Q. Okay. Okay. Let's go through each of these
24  four things that you've identified. Is there any other
25  remodeling that you can recall?

76

1       A. No.
2       Q. Okay. The classrooms that were built in Core
3   A, which I think you said were some on the first floor
4   and some of the second?
5       A. Yes.
6       Q. Do you recall when those were built?
7       A. I don't remember.
8       Q. Can you?
9       A. We were -- we built a bunch of classrooms and
10  we were able to get a training facility over off the
11  property, so we moved over there. So then they
12  rearranged those and made different type offices out of
13  the classroom, and then they closed down the training
14  center, and right back and trying to squeeze everything
15  back in to the hangar.
16      Q. Okay.
17      A. So we went through the whole process again of
18  making classroom.
19      Q. Okay. So is it your recollection that there
20  was no training classroom in hangar 110 when World
21  Airways moved in?
22      A. Not that I remember in Core A. There may have
23  been something in Core B.
24      Q. Okay.
25      A. For maintenance people.

77

1       Q. Okay.
2       A. But I don't remember that.
3       Q. Okay. And then is it -- do you recall how
4   many classrooms were built in Core A?
5       A. No.
6       Q. Do you know whether it was more than one?
7       A. Yes, it was more than one.
8       Q. Do you know whether it was more than two?
9       A. Yes, it was more than two, but I don't --
10      Q. Do you know whether it was more than three?
11      A. I would guess it's about three.
12      MR. BOSL: We don't want you to guess today.
13  BY MR. GOLDBERG:
14      Q. That's your best estimate?
15      A. Best estimate, yeah.
16      Q. Okay. And do you recall what the size of
17  those classrooms were?
18      A. (Witness shakes head.)
19      Q. You have to give an audible answer?
20      A. They would seat about 20 people.
21      Q. Okay. Do you recall how many of those three
22  were on the first floor, how many were on the second?
23      A. No.
24      Q. Okay. And do you recall approximately, you
25  know, how many years after the move in that

Exhibit 29-708

---

**78**

1 construction of those classrooms occurred?

2    A. No, I don't recall.

3    Q. Okay. Do you recall whether there was any

4 demolition done to make room for those classrooms?

5    MR. BOSL: Lacks foundation. Vague and

6 ambiguous.

7    THE WITNESS: What do you mean by demolition?

8 BY MR. GOLDBERG:

9    Q. Did they pull out any existing walls?

10    A. Yes.

11    Q. Okay. Do you recall what those walls that

12 they pulled out were made out of?

13    MR. BOSL: Lacks foundation.

14    THE WITNESS: I don't recall that. I remember

15 the ones they replaced were two by fours and Sheetrock.

16 BY MR. GOLDBERG:

17    Q. The ones they put in, you mean?

18    A. Yeah.

19    Q. Okay. Do you recall how long it took them to

20 put up the Sheetrock for those classrooms?

21    A. No.

22    Q. Do you recall how long it took to do

23 the demolition to make room for those classrooms?

24    A. No.

25    Q. Okay. You mentioned that there were sheets of

---

**79**

1 plastic up. Do you recall that they put up sheets of

2 plastic around that construction area?

3    A. Yes.

4    Q. Okay. And do you -- but sitting here today,

5 you can't estimate the size of the classrooms they

6 built other than there were 20 people?

7    A. No, that would be the best -- best answer I

8 can give you.

9    Q. Okay. If I showed you a plan of Core A, would

10 you be able to indicate on the plan where those

11 classrooms were put?

12    A. I doubt it.

13    Q. Okay. With respect to those three classrooms

14 I think you indicated that eventually classroom space

15 was acquired elsewhere?

16    A. Yes.

17    Q. Where was that?

18    A. It was off the airport about two miles. So I

19 forget the street address.

20    Q. And do you recall how long the classrooms that

21 were built were used before they moved off to that

22 other location two miles away?

23    A. I don't recall that.

24    Q. Okay. Do you recall how long the classrooms

25 off site two miles away were used for?

---

**80**

1    A. No.

2    Q. Do you?

3    A. I would say -- I would estimate four to five

4 years.

5    Q. Okay. And after four or five years, was it

6 your testimony that the classrooms were reused in Core

7 A?

8    MR. BOSL: Misstates testimony.

9 BY MR. GOLDBERG:

10    Q. Whether the classrooms were moved back into?

11    A. The training returned to Core A.

12    Q. Okay. Okay. And where did the training

13 return to in Core A?

14    A. Well, classrooms.

15    Q. Okay.

16    A. Whether they were the original classrooms or

17 they built new classrooms, I can't remember.

18    Q. Okay. At the time -- do you recall any time

19 during the construction of the classrooms where there

20 wasn't plastic sheeting up while plaster work was being

21 done, Sheetrock work was being done?

22    MR. BOSL: Lacks foundation. Overbroad.

23    THE WITNESS: I don't recall.

24 BY MR. GREENBERG:

25    Q. Okay.

---

**81**

1    A. I can vividly remember plastic sheets, but

2 whether they were there all the time doing all the

3 work, I couldn't tell you.

4    Q. Okay. Do you recall whether their work was

5 done in part at night?

6    A. I can't recall. I don't know if they were

7 working when I was going home or not.

8    Q. Okay. Do you recall whether their work was

9 done during the weekdays or the weekends?

10    A. It was going on during the weekdays.

11    Q. Okay. How close to your office was the work

12 on the classrooms, or did you have an office at that

13 point in the building? Let me ask that?

14    A. Yeah, I had an office. At one time, I had an

15 office on the first floor, and there was like I can

16 remember plastic sheets in the hallway within 10 feet

17 of my office.

18    Q. Okay. I'm sorry. I apologize. I sort of

19 lost the sequence. From '73 to '76, you did not have

20 an office. Then you got an office, correct?

21    A. Right.

22    Q. And your office was initially where in '76?

23    A. Second floor.

24    Q. Second floor. Okay. And do you recall the

25 years that you had that office on the second floor by

---

**86**

Q. Okay. Was that cafeteria -- do you recall when that cafeteria was built?

A. No, I don't remember the date.

Q. Do you recall whether you had an office in Core A at that time?

A. I can't recall the date that it was built so I can't -- I can't recall if I had an office that the time or not.

Q. Right. I'm just trying to figure out?

A. The chances that I did were good, but --

Q. You can't associate with having an office necessarily?

A. No.

Q. Did you ever have cause to complain to Claude Frost that any of the construction work was creating any dust in your office?

MR. BOSL: Vague and ambiguous. Lacks foundation.

MR. GOLDBERG: Let me re-ask the question.

BY MR. GOLDBERG:

Q. Do you recall ever complaining to Claude Frost that any of the construction work that was being done on these projects created any dust in your office?

A. Oh, if you would want to call complaining, giving him hell, then everybody in the office did, and

**87**

I did.

Q. Okay. And was that part --

A. It was understood it had to be done.

Q. Okay.

A. But everybody was giving Claude hell for the mess.

Q. And what was the mess?

A. Well, dust all over everything.

Q. Okay. Dust within the plastic confinement area?

A. Inside -- in the confined area and outside.

Q. Okay. Was there less outside the confined area?

A. Yes, of course.

MR. BOSL: Lacks foundation.

BY MR. GOLDBERG:

Q. Did you think that Claude and his crew took reasonable measures to minimize the amount of dust that was released from the construction area?

MR. BOSL: Lacks foundation. Calls for speculation. Calls for expert testimony.

THE WITNESS: I don't know. I would assume he did, but I don't know.

BY MR. GOLDBERG:

Q. Okay. Do you recall ever asking him to do

**88**

anything more than his crew did to minimize the dust from the construction?

A. No.

Q. Okay. Did you think that Claude Frost generally managed his employees well?

A. Yes.

Q. Okay. The fourth construction project you mentioned is that there had spaces made or places to sit made for the 100 reservation agents that came on board when you went in to schedule service?

A. Right.

Q. Do you recall when World Airways went in to schedule service?

A. Well, that's slipped my mind. I think it was about 1978.

Q. Okay.

A. '79. By the time frame of '78 to '80.

Q. Okay. And did the -- and I -- from the way you described it, it looks like you could walk in the room and you could see all the agents at desks?

A. Yeah.

Q. And there weren't two by four and Sheetrock walls between each agent, correct?

A. No.

Q. Okay. Do you recall whether there was any

**89**

demolition done to make room for those reservation agents?

A. No.

Q. Okay. Do you recall whether there was any construction using two by fours and Sheetrock to accommodate those agents?

A. No.

Q. Okay. Do you recall any other construction projects anywhere in hangar 110?

A. The only one I remember is they built a classroom in Core B or C. I forget which it was, for maintenance training.

Q. Okay. Do you recall how big a classroom that was?

A. No. I'd estimate it was 20 to 25 students type size.

Q. Okay. Do you -- can you associate that -- well, do you recall when that classroom was built?

A. No.

Q. Can you associate it with your having an office or not having an office?

A. No.

Q. Okay. Do you recall whether any demolition work was done in order to accommodate that classroom?

A. I wouldn't know.

Exhibit 29-710

Case MDL No. 875 - Document 665734 Filed 01/28/11 Page 62 of 213
Case 4:11-cv-00061-LB Document 4714 Filed 04/10/11 Page 4 of 64

24 (Pages 90 to 93)

**90**

1    Q. Okay. Do you recall whether there was any
2 construction done with two by fours and Sheetrock to
3 construct that classroom in Core B?
4    A. No.
5    Q. Do you recall that there was plastic around
6 the construction area for the classroom in Core B?
7    A. No.
8    Q. Do you recall any other construction project
9 in the hangar?
10    A. No.
11    Q. Okay. Do you recall how long it took to build
12 the three training classrooms in Core A?
13    MR. BOSL: Lacks foundation.
14    THE WITNESS: I would estimate the project was
15 three weeks.
16 BY MR. GOLDBERG:
17    Q. Okay. Do you have any recollection of how
18 long it took to do the work on the cafeteria that you
19 referenced?
20    A. No.
21    Q. Do you have any recollection of how long it
22 took to build the technical library on the first floor
23 that you referenced?
24    A. The library itself, I would estimate a week
25 and a half.

**92**

1    Q. Do you recall any specific occasion on which
2 your son Timothy came with you to work?
3    A. Not specific, no.
4    Q. Okay. Other than I think you said giving
5 Claude Frost hell for some of the dust that was present
6 during the construction on the first floor near your
7 office, do you recall having any other conversations
8 with Claude about any dust created by any construction
9 work?
10    A. No.
11    Q. Do you recall having any conversations with
12 anybody other than about that one time period and the
13 facility being dusty?
14    A. No.
15    Q. Do you have any estimate of on average or any
16 estimate -- step back. You testified earlier that --
17 well, I'm going to step back. Talk again about this
18 time period when the work was being done near your
19 office, and you complained to -- or you gave Claude
20 hell about the dust. During that time period, did you
21 have to do anything to clean up your office because of
22 the dust?
23    A. Well, my secretary normally every morning wipe
24 up all the dust and stuff like that.
25    Q. Okay. Did she do that before you came in?

**91**

1    Q. Okay. And do you have any estimate of how
2 long it took -- do you have any recollection of how
3 long it took to build the training room in the Core B
4 for maintenance?
5    A. No.
6    Q. Do you recall whether your son Timothy came to
7 work with you during the three weeks in which you
8 recall that the training rooms were built in Core A?
9    A. No.
10    Q. Do you recall whether your son Timothy came to
11 you -- came with you to the office during the time
12 period during which the cafeteria work was done?
13    A. I don't recall.
14    Q. Do you recall whether your son came with you
15 to the office during the time that the new technical
16 library was built?
17    A. I don't recall.
18    Q. Do you recall whether your son Timothy came to
19 you with work at any time during which the reservation
20 agents space was being configured?
21    A. I don't recall.
22    Q. Do you recall whether your son Timothy came to
23 you -- came with you to work during the time that the
24 classroom was built in Core B for maintenance training?
25    A. I don't recall.

**93**

1    A. If he got there before I did, yes.
2    Q. Okay. Do you know what she used to wipe off
3 the desk?
4    A. No.
5    Q. Okay. Did you ever see dust on your desk?
6    A. Yes.
7    Q. During this time period we're talking about?
8    A. Yes.
9    Q. Okay. Do you recall what the dust looked
10 like?
11    A. Well, just dust I don't know if -- you run
12 your finger across it it leaves a streak. It's dust.
13 That's all I remember.
14    Q. Okay. Do you have any estimate of how thick
15 the layer of dust might have been?
16    A. Just there was enough that you -- you know, if
17 you run your finger across it, it left a mark.
18    Q. Okay. Do you recall Timothy ever coming in to
19 your office when there was kind of dust on your desk?
20    A. I don't recall any specific dates that he come
21 or --
22    Q. Okay.
23    A. If it was during that time.
24    Q. Okay. Was the plastic around the construction
25 area sort of sealed in terms of if there were seams in

94

1    the plastic they were taped?
2         MR. BOSL: Lacks foundation.
3         THE WITNESS: It's taped to the walls, but it
4    was like plates you could -- in the middle of it you
5    could separate and walk through.
6    BY MR. GOLDBERG:
7         Q. Okay. Did you ever walk through?
8         A. I'm sure I did. I had to get down the hall so
9    I could do something else.
10        Q. Are you saying that you had to walk through
11   the construction area to go someplace for your job?
12        A. Oh, I can't -- if I specifically had to go
13   through -- go through there to go to something. I
14   can't remember for sure.
15        Q. Okay. So do you specifically recall walking
16   into the construction area through the plastic?
17        A. No, I remember that there was flaps.
18        Q. Okay. And whether you went through them or
19   not, you don't recall?
20        A. Yeah, I don't remember.
21        Q. Okay. Do you ever recall seeing your son go
22   through those flaps?
23        A. No.
24        Q. Okay. Changing the subject of a little bit.
25   I'm going to talk about aircraft maintenance briefly.

95

1    Okay. Do you recall ever telling anybody responsible
2    for air craft maintenance checks or repairs -- I don't
3    know if you make a distinction, that any work they were
4    performing in hangar 110 was dusty?
5         MR. BOSL: I'm sorry. Hold on. Can I have
6    that read back.
7         (Record read.)
8         THE WITNESS: I don't remember talking about
9    dust, and I --
10   BY MR. GOLDBERG:
11        Q. Do you recall ever telling any of the aircraft
12   maintenance people that they should be doing their job
13   differently in some way to minimize dust?
14        A. No.
15        MR. BOSL: Lacks foundation. Assumes facts.
16   BY MR. GOLDBERG:
17        Q. And at a certain point in time, I guess you
18   had the director of maintenance and engineering
19   reporting to you, correct?
20        A. Right.
21        Q. Okay. The -- the various jobs that you had,
22   we went through earlier, and I guess I'd like to know
23   if you had a uniform that you wore to work and if it
24   changed in the course of the various positions you had.
25   So, for example, when you started out in coming back to

96

1    Oakland in 1973, you were a check captain?
2         A. Yes.
3         Q. Did you wear a captain's uniform then?
4         A. When I was on a flight assignment, no, not in
5    the office.
6         Q. Okay. What would you wear to the office?
7         A. Suit and tie.
8         Q. Okay. And did you generally get your suit and
9    tie dry-cleaned?
10        A. Yes.
11        Q. Okay. Then as -- that basically carried
12   through throughout the rest of your career while you
13   were at Oakland if you were going out on the fly, you'd
14   wear a pilots uniform, and if you were coming in to the
15   office, you'd wear a suit and tie?
16        A. Yes.
17        Q. Okay. And did you get your -- your pilots
18   uniform dry-cleaned also?
19        A. Yes.
20        Q. Okay. Do you ever recall getting into your
21   car and observing that there was dust on your uniform
22   on your suit and tie?
23        MR. BOSL: Lacks foundation. Calls for expert
24   opinion.
25        THE WITNESS: I don't recall.

97

1    BY MR. GOLDBERG:
2         Q. Do you recall your wife ever complaining to
3    you that either your uniform or your suit was dusty
4    when you got home?
5         MR. BOSL: Lacks foundation.
6         THE WITNESS: I don't recall her ever
7    complaining.
8    BY MR. GOLDBERG:
9         Q. Okay. Did your children have chores around
10   the house?
11        A. Not specific things. Mainly their homework
12   was their chores.
13        Q. Good priority. Did -- did Timothy have
14   responsibility for doing any laundry?
15        A. No.
16        Q. Okay. Did he ever have responsibility for
17   picking up your clothes?
18        MR. BOSL: Lacks foundation.
19        THE WITNESS: No.
20   BY MR. GOLDBERG:
21        Q. Do you ever recall him doing that?
22        A. I don't recall, no.
23        Q. I'd like to talk a little bit about hangar 110
24   and what it consisted of. Essentially hangar 110 was a
25   very -- well, I'll -- can you explain to me the overall

Exhibit 29-712

---

**122**

BY MR. GOLDBERG:

Q. Okay. Did you ever observe any dust in the airplane on the maintenance floor of hangar floor?

A. Yeah. I observed it just sometimes when they would be moving airplanes out, they would have to open up the doors on both sides. And of course the afternoon wind in Oakland. And you'd see some dust blowing through.

Q. Okay.

A. Whether it came from outside or inside, but I can remember being out there and seeing it when they had the doors all open, because the afternoon wind in Oakland airport is 115, 20 miles an hour.

Q. Right. So take it you don't know whether the dust was particularly from outside or inside?

A. Couldn't tell you.

Q. Do you recall observing any maintenance procedures that created any dust?

MR. BOSL: Lacks foundation. Calls for expert opinion.

THE WITNESS: No.

BY MR. GOLDBERG:

Q. Do you recall whether World Airways ever manufactured any products?

MR. BOSL: Vague and ambiguous. Lacks

---

**123**

foundation.

THE WITNESS: That -- excuse me. They had a machine shop, so they must have machined some kind of parts or material, but I -- I don't know what they would have been.

BY MR. GOLDBERG:

Q. Okay. Did you know what they did with those parts that they machined?

A. Probably using them to put on airplanes.

Q. Okay. Were those parts that they were taking off on airplane machining and putting back on airplane?

MR. BOSL: Lacks foundation.

THE WITNESS: I don't know.

BY MR. GOLDBERG:

Q. So it could be the only thing they machined were parts that they machined or existing on the airplane?

MR. BOSL: Calls for speculation. Lacks foundation.

THE WITNESS: Could have been, but I know we had a machine shop, so they must have done something in the machine shop. What it was, I don't know. What it was for I don't know.

BY MR. GOLDBERG:

Q. Do you know whether your son ever went in

---

**124**

to -- onto the hangar floor?

A. Yes.

Q. Okay. What information do you have in that regard? What do you recall in that regard?

A. Oh, I don't know. I remember -- he got to be buddies with a couple of security guards, and if he wasn't in my office, he was with them or something. They were out looking around the hangar. And --

Q. Okay. Did the security guards have an office?

A. No, not that I recall.

Q. They didn't have a booth at the front of the building?

A. I can't recall them having an office.

Q. Okay. Was it their job to patrol the whole facility?

A. Yes.

Q. Okay. Did you consent to him wandering around with them whenever they went in the building?

A. If he was with them, yeah.

Q. Okay. Did he ever tell you specifically where he went?

A. No.

Q. Okay.

A. Other than tell me about some airplane or something, but nothing specific.

---

**125**

Q. Do you know whether he ever went onto aircraft that were being serviced or maintained?

A. Not that I know of.

Q. Would that have been permitted?

MR. BOSL: Lacks foundation.

THE WITNESS: Depends on what airplane it was, probably.

BY MR. GOLDBERG:

Q. And how is that?

A. Well, if it was Mr. Daly's airplane, it was on that airplane. We used to fly in it.

Q. Okay.

A. But if it was a customer airplane, I doubt very much that he would -- they would take him on that.

Q. Okay. And by Mr. Daly's airplane, which airplane are you referring to?

A. We had two. We had the conveyor 340 and he had a B-23.

Q. And were those kept parked outside the hangar?

A. Yes.

Q. And if he went on those planes that would have been while he was outside the hangar, correct?

A. Most likely, but they may have had one of them in the airplane -- in the hangar for maintenance or something.

---

Exhibit 29-713

142

1    A. I was here probably a week.
2    Q. Okay. And then did she come back with you to
3  Japan at that time?
4    A. No, she came in December.
5    Q. And how long did she stay in December?
6    A. Well, that was where I sort of left it cloudy,
7  and to the best of my recollection now after discussing
8  it, I think she probably came back, because Tim was
9  probably in school. I thought she had -- first I
10 thought she had stayed for a while, but I think she
11 probably came back right after Christmas to get him
12 back in school.
13   Q. In Japan?
14   A. No, here. '71, '72, he attended the Christian
15 academy in Japan. So he would have probably been
16 starting school back here in September of '72.
17   Q. Okay.
18   A. So she probably came for Christmas and then
19 came right back, so he could get back in school.
20   Q. So you think she was here the whole school
21 year, '72, '73?
22   A. Yes.
23   Q. Okay. And then you came back, I think you
24 said somewhere around October '73?
25   A. Right.

143

1    Q. Okay. And Tim was ten years old then?
2    A. He would have been eight. '73.
3    Q. Eight years old?
4    A. Eight and a half when I came back.
5    Q. When is the first time you recall him coming
6  with you to hangar 110?
7    A. I don't recall specifically, but I would
8  imagine because we talked about, I was spending a lot
9  of time away from home. So probably during that first
10 year back here when I was a check airman, and I'd get
11 home, have a lot of paperwork to do, go out there on
12 Saturday or Sunday to the office was probably the first
13 time I started taking him.
14   Q. Okay. And in the younger years, after 1973,
15 did you have sort of a policy that you have to stay
16 close to me in the office?
17   A. I'm sure I did.
18   Q. Okay. So it would have been a few years until
19 he was a little bit older before you'd let him go off
20 with the security guards?
21   A. Right. He was -- he would come -- he would go
22 occasionally to the office with me up until he left for
23 college.
24   Q. Okay. And by occasionally, what do you mean?
25   A. Oh, it would vary. Might be a couple months

144

1  where I'm out on assignment, didn't go at all, and then
2  there might be like I was assigned to attorneys to work
3  on the investigation of the DC-8 craft. So I'd be
4  home. I'd take him in. And he got all wrapped up in
5  that. That was in the early '80s.
6    Q. Okay.
7    A. And got all involved with me. I'm working on
8  that. They had a room set aside with all the charge
9  and everything. That's when Timothy got the flying
10 bug. In fact he started his pilot training in '81 when
11 he was 16.
12   Q. Okay.
13   A. Got his license at 17.
14   MR. GOLDBERG: Did you get the witnesses
15 response? "Right." Is the word, "right"?
16   (Reporter interruption for clarification.)
17   MR. GOLDBERG: I just want to confirm.
18   MR. BOSL: She has what she has. Let's ask
19 questions.
20 BY MR. GOLDBERG:
21   Q. So I would assume it was a few years after
22 1973 before you let him go off with the security
23 guards?
24   A. Yes.
25   Q. And do you have an estimate of how old he was

145

1  before you let him go off with the security guards, 12,
2  13?
3    A. That would be a good estimate.
4    Q. Okay. And you said sort of the height of his
5  involvement in coming to work most frequently was when
6  this investigation was going on in the 1980s, correct?
7    A. Yes.
8    Q. And you had a room where you had the
9  investigation?
10   A. Yes.
11   Q. Where was that room?
12   A. It was on the first floor, floor A.
13   Q. Okay. And on those occasions, did he
14 generally stick with you in that room for that
15 investigation?
16   A. Well, it would be there for a while,
17 disappear.
18   Q. Okay. And when he disappeared, was it your
19 understanding that he was generally off with the
20 security guards?
21   A. Yes.
22   Q. Okay. And do you have any estimate on average
23 how long he'd spend with the security guards?
24   A. No.
25   Q. Do you have any estimate of how often -- how

Exhibit 29-714

---

**146**

1 many times a month he might -- or how many times a year
2 he might come to the office with you and go off with
3 the security guards?
4 MR. BOSL: Overbroad.
5 THE WITNESS: I would estimate, like I say,
6 might not happen for two months, and then it might
7 happen four or five times in one month. I would
8 estimate that he probably went out to the -- to the
9 hangar with me 12 to 15 times a year.
10 BY MR. GOLDBERG:
11 Q. Okay. For which years would that estimate
12 hold?
13 A. Oh, that would be probably starting in --
14 probably starting '71 -- '77 through -- through '81.
15 Q. Okay. And of those 12 to 15 times a year, in
16 that time period, 1977 to 1981, what percentage of the
17 time do you recall him going off with the security
18 guards?
19 A. Oh, I --
20 MR. BOSL: Calls for speculation.
21 THE WITNESS: I have no idea.
22 MR. BOSL: Calls for speculation.
23 BY MR. GOLDBERG:
24 Q. Okay. Was there -- you said sometimes --
25 well, let me ask you this question. Were there

---

**147**

1 aircrafts serviced that belonged to the government?
2 A. Yes.
3 Q. Which ones were those?
4 A. The KC-10 and the E-4s, which is the 747.
5 Q. And then what was the presidential backup
6 aircraft?
7 A. The E-4.
8 Q. Would he be permitted to go on those aircraft?
9 A. No.
10 Q. Okay. Would he be permitted to go on any
11 aircraft other than Mr. Daly's?
12 MR. BOSL: Vague and ambiguous. Overbroad and
13 lacks foundation.
14 THE WITNESS: I don't -- it would depend on
15 the airplane and what was happening to it, but I doubt
16 that very often -- seldom did I think he went on any
17 aircraft.
18 BY MR. GOLDBERG:
19 Q. Did the security guards have any reason to go
20 on aircraft?
21 A. No.
22 Q. Did the security guards have a particular
23 workweek?
24 A. They just -- you know, normal shift.
25 Q. Was there --

---

**148**

1 A. I'm sure they work 40 hours a week.
2 Q. Was there a security guard at all times?
3 A. Yes.
4 Q. Okay. Was there any official like take your
5 kids to work day?
6 A. Yes, there was.
7 Q. Okay. When was that?
8 A. I don't recall when it was, but I can
9 remember, you know, kids all over the place.
10 Q. Okay. And how often did that happen?
11 A. Probably once a year.
12 Q. Okay. And when you said you recall kids all
13 over the place, what do you mean by all over the place?
14 A. Well, secretary would bring her daughter or
15 son.
16 Q. Okay. Were there organized activities?
17 A. I don't recall. Actually I just hung out with
18 her parent.
19 Q. Okay. Was there any official show and tell of
20 the maintenance floor that day?
21 A. I don't recall any.
22 Q. Okay. Was there any occasion when your son
23 visited hangar 110 other than that day and the times
24 when you brought him?
25 A. The only way he would have been there is if I

---

**149**

1 took him or what we referred to before, my wife went up
2 to take pictures of the conveyor, which I don't
3 remember if that was the new hangar or the old hangar
4 at the time. But that would have been the only time
5 that I know of.
6 MS. JOHNSON: Sorry. Can you read back the
7 question and answer.
8 (Record read.)
9 BY MR. GOLDBERG:
10 Q. So you're not aware of anybody other than your
11 wife or yourself inviting him to the hangar, correct?
12 A. Not that I'm aware of. No. Of course
13 remember I was in Japan.
14 Q. Right. Did you personally ever set any limits
15 on where he could go?
16 A. No.
17 Q. Okay. Did you ever tell him to stay off
18 aircraft?
19 A. I don't recall specifically, but I probably
20 did.
21 Q. Okay. Did you -- do you recall him ever
22 visiting when mechanics were doing work on the aircraft
23 floor?
24 A. Well, they were doing work 24 hours a day.
25 Q. Did you ever tell him to not get in the way of

---

Exhibit 29-715

150

1    the mechanics?
2        A. Yes.
3        Q. Okay.
4        A. In fact I think he -- when he went throughout,
5    I think he wore a hard hat.
6        Q. Okay. Were there any maintenance closets?
7        A. Maintenance what?
8        Q. Closets, at hangar 110?
9        A. You mean like lockers?
10       Q. I guess. It's -- a locker or a closet that --
11   you know, is a small room where utilities maintenance
12   might keep supplies for cleaning and things like that?
13       A. I'm sure there were. I'm not aware of where
14   they were at.
15       Q. Okay. Were there anything you referred to as
16   maintenance closets while you worked there?
17       A. No.
18       Q. Okay. Were there any crawl spaces?
19       A. Not that I know of.
20       Q. Okay.
21       MR. BOSL: Lacks foundation.
22   BY MR. GOLDBERG:
23       Q. How often would you yourself visit the
24   maintenance area on the hangar floor?
25       MR. BOSL: Vague and overbroad as to time.

151

1    BY MR. GOLDBERG:
2        Q. Maybe you want to split it up into time
3    periods, but I sort of want to go through from the time
4    you returned to Japan from 1973 to 1983?
5        A. Oh, from the time I became assistant chief
6    pilot, I had an office in a hangar till I -- probably
7    became executive vice president. I was out there quite
8    a bit, because I was -- as I mentioned, almost same
9    question was asked before. I was concerned about World
10   Airways aircraft maintenance being completed on time so
11   that we could operate flights that were scheduled. So
12   I and the chief engineer spent quite a bit of time out
13   there just double-checking that the maintenance was
14   progressing on our own aircraft.
15       Q. Okay. When you were assistant vice president
16   of flight operations and executive -- and senior vice
17   president of flight operations and executive vice
18   president, did you delegate that task to the chief
19   engineer?
20       A. Normally we would -- our offices were right
21   next together, so a lot of times we would just walk out
22   there together to see what the progress, because the
23   maintenance people had a big obligation to the
24   military, and sometimes they would get priority. So we
25   were always concerned that our aircraft were getting

152

1    done on time. So you go out there. It might be for
2    five minutes.
3        Q. Okay. And this you would do then principally
4    when your aircraft were also on the hangar to be --
5    World Airways aircraft were being serviced at the same
6    time as the military aircraft?
7        A. Yes.
8        Q. How often did that occur?
9        A. Probably every day.
10       Q. Every day in the course of these years from
11   1976 to 1985?
12       A. Yeah.
13       Q. And how frequently would you go out onto the
14   floor to check the progress of the work on the World
15   Airways aircraft?
16       A. It might be once every three or four days or
17   if it's getting out of the deadline, we have a flight
18   tomorrow, I might be out there five times a day.
19       Q. Okay.
20       A. Pushing.
21       Q. Okay. And was there one particular person you
22   would go out to speak to?
23       A. The maintenance foreman that was in charge of
24   that airplane.
25       Q. Okay. And that guy is usually on the floor?

153

1        A. Yes.
2        Q. Not in an office some place?
3        A. No, he was on the floor.
4        Q. So you would go out and speak to him four or
5    five minutes?
6        A. Four or five, ten, 15, whatever.
7        Q. And is the maintenance foreman a guy who's
8    working hands-on himself?
9        A. No, he's just overseeing everybody.
10       Q. Okay. So he's not down on the ground with a
11   wrench?
12       A. Yeah, he's out there by the airport making
13   sure everything is getting done.
14       Q. But is he holding a tool and doing things?
15       A. No, probably not.
16       Q. So your visits would have consisted of talking
17   to him?
18       A. Yes.
19       Q. Anything else?
20       MR. BOSL: Overbroad.
21       THE WITNESS: It might be talking to the
22   mechanic.
23   BY MR. GOLDBERG:
24       Q. Okay.
25       A. To make sure I'm gathering the right story.

Exhibit 29-716

198

1  name familiar to you?
2      A. No.
3      Q. Does the name James L. Whittaker ring a bell?
4  Is that name familiar to you?
5      A. No.
6      Q. Okay. With respect to Raymond Interior
7  Systems and James L. Whittaker, do you associate any
8  products or services with either name?
9      A. No.
10     Q. Do you have any information as to whether
11  Raymond Interior Systems or James L. Whittaker
12  performed any work at hangar 110 at any one time.
13         MR. BOSL: Lacks foundation. Go ahead.
14         THE WITNESS: I have no information.
15  BY MR. YUEN:
16     Q. Are there any persons or documents that may
17  refresh your recollection or your memory as to the
18  questions I asked you with respect to James L.
19  Whittaker and Raymond Interior Systems?
20         MR. BOSL: Calls for speculation.
21         THE WITNESS: You'd have to repeat the
22  question.
23  BY MR. YUEN:
24     Q. Are you aware of any documents or persons that
25  you can either speak with or refer to that may refresh

199

1  your recollection as to names I posed to you?
2         MR. BOSL: Same objections.
3         THE WITNESS: No.
4         MR. YUEN: Thank you, sir.
5  EXAMINATION BY MR. BARTEAU:
6      Q. Sir, I think I'm going to be brief. You were
7  asked previously in regards to -- actually I'm sorry.
8  Counsel limiting our questions right now to early
9  construction or later throughout hangar?
10         MR. GOLDBERG: Early construction I think is
11  what we're trying to do.
12         MR. BARTEAU: I'm going to hold off then. My
13  apologies.
14         MS. JOHNSON: Nobody else has anything in
15  regard to the original construction?
16         MR. KHOSRAVIRAD: We did, but I think the stip
17  took care of a lot of my questions.
18         MR. GOLDBERG: Mert, do you have any?
19         MR. HOWARD: I'm going to ask some questions
20  at the end.
21  EXAMINATION BY MS. HSU:
22     Q. Mr. Vest, my name is Linda Hsu. I represented
23  myself to you earlier. I represent McDonald
24  Corporation. I'm going to be asking you some questions
25  regarding that. First, after you stated that you did

200

1  not perform any maintenance on aircraft; is that
2  correct?
3      A. That's correct.
4      Q. Have you ever performed any licenses to
5  perform work on aircraft?
6      A. No.
7      Q. During this 1973 to 1983 period at World
8  Airways, did you ever work around any other people who
9  were performing maintenance work on McDonald Douglas
10  aircraft?
11     A. Well, being there and observing the progress
12  that was going on, I don't know if you'd call that work
13  or not. But when I'd visit the hangar to see what the
14  progress on an airplane was, I observed.
15     Q. What aircraft from McDonald Douglas did you
16  ever observe being worked on by others?
17     A. CD-8, DC-10. That would be -- that would be
18  all during that period.
19     Q. Do you recall the series or the popular name,
20  if any, for the DC-8 aircraft that you may have
21  observed being worked on?
22     A. You'll have to repeat that.
23     Q. I don't know if there's a specific series
24  number or popular name for the DC-8 aircraft that you
25  observed.

201

1      A. Okay. Our DC-8 aircraft was DC-8 -- 63.
2      Q. Did you observe any other DC-8 aircraft
3  besides the DC-8-63 that was being worked on at World
4  Airways during 1973 to 1980 period?
5      A. I observed work or was in the hangar observing
6  work going on with TransAmerica would have their DCN
7  there, and they had some DC-8-61 type aircraft.
8      Q. Do you recall the tail numbers of any of those
9  DC-8 aircrafts that were being worked on?
10     A. November, 801, Whiskey, Alpha, and they all
11  had the N and the WA 802, 803, 804, 805, 806.
12     Q. How many DC -- were these all DC-8-63
13  aircraft?
14     A. Yes.
15     Q. And how many of those do you recall work being
16  performed on World Airways when you were there?
17     A. Six DC-8-63s total, and they would have all
18  been worked on in that hangar. 802 was the one that
19  crashed in '73. That was no longer there.
20     Q. Do you know the tail numbers for any of the
21  TransAmerica DC-8 aircraft you had described earlier?
22     A. No.
23     Q. With respect to the DC-8-63s, where on the
24  premises did you see work performed on these aircraft?
25     A. Well, in the hangar, and then we had somewhat

Exhibit 29-717

**202**

1  you call line maintenance where they were out on the
2  blast and people were working on them outside. So they
3  worked on them outside and inside the hangar.
4      Q. Was the -- I know that you described the
5  hangar has having doors and at one time they were open
6  and wind could blow through them. Was the hangar
7  normally closed doors or was it open air?
8      MR. BOSL: Overbroad.
9      THE WITNESS: Normally if they were open, one
10 side would be open. It was unusual when they opened
11 both sides because of the wind situation.
12 BY MS. HSU:
13     Q. Did you see work being performed on all of the
14 6 DC 8-63 aircraft that you described?
15     A. My answer would be most likely, I saw all of
16 them. I can't specifically say that I saw every one of
17 them.
18     Q. If I were to ask you about each one as far as
19 the N-802 or the N-803 or the N-804, would you be able
20 to decipher which work was done on which of those
21 aircraft?
22     A. No.
23     Q. So you just have a general knowledge that work
24 may have been done on any of those six aircraft; is
25 that correct?

**203**

1      A. Yes.
2      MR. BOSL: Argumentative as stated.
3  BY MS. HSU:
4      Q. How many times can you estimate that you saw
5  others work on DC-8-63 aircraft?
6      MR. BOSL: Overbroad.
7      THE WITNESS: That would just be a wild
8  estimate.
9  BY MS. HSU:
10     Q. Were there any other aircraft besides --
11 strike that.
12     Now, with respect to the DC-10 aircraft.
13     A. Yes.
14     Q. Can you tell me whether there was a specific
15 series number for the DC-10 aircraft that you observed
16 work on?
17     A. November 803 whiskey alpha through November
18 113 whiskey alpha.
19     Q. And do you know if there was a dash number to
20 these DC-10 aircraft?
21     A. Dash 30s.
22     Q. Were they all dash 30s?
23     A. Yes.
24     Q. And how many DC-10-30 aircrafts were at World
25 Airways during this time period?

**204**

1      A. We originally got nine aircraft from Douglas
2  new, and then I forget exactly who he added it, but it
3  came in used.
4      Q. So you originally got nine from Douglas new,
5  and what was the second part you said?
6      A. I think a 10th airplane was added but it came
7  in from another leasing outfit. We didn't get it from
8  Douglas.
9      Q. How do you know that the original nine DC
10 1030s came from Douglas new? What's your personal
11 knowledge of that?
12     A. Because I picked up most of them from the
13 Douglas plant.
14     Q. Do you have a recollection of which ones you
15 picked up --
16     A. No.
17     Q. -- from the Douglas plant? So when you say
18 you picked them up, you -- or you transported yourself
19 down to the Douglas plant and then flew the aircraft up
20 to the hangar 110?
21     A. That's correct.
22     Q. And with respect to the DC-8-63 aircraft, do
23 you know whether those aircraft were new originally
24 from Douglas or did you obtain those from someplace
25 else?

**205**

1      A. The first three I was in Japan when they
2  started getting the DC-8s. The first three, I can't
3  remember where they got those from. And then the next
4  three, I think were airplanes that were designated to
5  go from Douglas to Airlift International. But they
6  went bankrupt, and so World picked those airplanes up.
7      Q. Is your understanding that the three that were
8  supposed to go to Airlift International went directly
9  from Douglas to Airlift International and then to World
10 Airways, or did it go to some other operators in
11 between them?
12     A. Well, no one operated them before World. So
13 whether Douglas had delivered them and then they came
14 from Airlift to us or they came straight from the
15 plant, I'm not sure, because that's the period I was in
16 Japan. I didn't pick up any of those airplanes from
17 the factory.
18     Q. The first three, which you're talking about
19 are the N 802, 803, and 804; is that correct?
20     A. Right.
21     Q. Those were delivered when you were in Japan,
22 so you don't know whether those were delivered directly
23 from Douglas; is that correct?
24     A. Right.
25     Q. And then you stated that the next three were

Exhibit 29-718

Case4:11-cv-00361-LB Document665-14 Filed01/28/11 Page 70 of 213
Case4:11-cv-00361-LB Document665-14 Filed04/10/11 Page 48 of 64

53 (Pages 206 to 209)

**206**

1  supposed to go to Airlift International. Is that an
2  operator? I'm not sure.
3  A. Yeah, it was an airline. It went out of
4  business.
5  Q. And did you state that that airline there went
6  out of business never operated that aircraft?
7  A. To my knowledge, they didn't.
8  Q. And how is it that you know that they never
9  operated that aircraft?
10 A. Something told me that.
11 Q. Do you know if Airlift International did any
12 maintenance work to those three M.D.C -- excuse me.
13 Strike that.
14     Do you know if Airlift International did any
15 maintenance work to the DC-8-63 aircraft that were
16 delivered to it?
17 A. I don't know that they delivered to them. I
18 think we just talked about that. I don't know whether
19 we picked them up straight from Douglas because they
20 didn't take delivery or whether they took delivery and
21 then they came. So I cannot give you an answer to what
22 might have been done.
23 Q. Okay. So you don't know one way or another
24 whether it went to Airlift International or directly
25 from McDonald Douglas; is that correct?

**207**

1     MR. BOSL: Asked and answered.
2     THE WITNESS: For about the third time I don't
3  know if the airplanes were picked up directly from
4  Douglas or whether they delivered the airlift, and they
5  never flew them and we got them from there, so I don't
6  know. And the reason I know they came from Airlift,
7  because my bosses or people around the company said
8  these three airplanes were supposed to go to airlift.
9  BY MS. HSU:
10 Q. You stated that you saw others performing work
11 on DC-8 and DC-10 aircraft. Did you see the others
12 performing work on any other aircraft besides the DC-8
13 and DC-10?
14 A. All the airplanes that were worked on in the
15 hangar.
16 Q. And can you tell me what other airplanes there
17 were in the hangar being worked on besides DC-8 and 10?
18 A. There would have been 727s. There would have
19 been C130s. There would have been airforce case C-10s.
20 There would have been airforce 747s. Then probably
21 many that I've forgotten about. Companies would come
22 in with one airplane and we'd do work on it and long
23 forgotten 30 years ago.
24 Q. Can you estimate that percentage of them that
25 you saw others working on these other aircraft that you

**208**

1  describe versus the DC-8 and the DC-10?
2  A. No.
3  Q. For the DC-8-63, do you know what year those
4  aircrafts were manufactured?
5  A. No.
6  Q. And for the DC-10-30, do you know what year
7  those aircrafts were manufactured?
8  A. We picked three up -- I think three up from
9  the plant in '79; three in '80; and three in '81, I
10 believe.
11 Q. For the DC aircraft that did not come directly
12 from Douglas, do you know whether those aircraft
13 contain the original parts with which it was
14 manufactured?
15 A. No.
16 Q. No you don't know or no they did not contain
17 those original parts?
18 A. I don't know.
19 Q. Did you observe any other person install any
20 parts on either of these DC-8 or DC-10 aircraft?
21 A. Yeah, I observed them putting parts on
22 airplanes.
23 Q. What kind of parts did you observe them
24 putting on airplanes?
25 A. Engines, various miscellaneous parts.

**209**

1  Q. What types of miscellaneous parts?
2  A. Well --
3     MR. BOSL: Lacks foundation.
4     THE WITNESS: Probably thousands of parts on
5  the airplane. I don't -- can't remember particularly
6  what parts.
7  BY MS. HSU:
8  Q. Do you recall the manufacture of the engines
9  that you observed other people install?
10 A. Pratt and Whitney.
11 Q. And to which aircraft did you --
12     Do you recall which aircraft you saw other
13 people install Pratt and Whitney engines into which?
14 A. Airplane, particular by number.
15 Q. By number or model or series?
16 A. Well, they were all model 60 -- DC-8 model 63,
17 and the 30 years remember, was the engine changed on
18 that day, on 802 or 804, no I can't recall that.
19 Q. Besides putting engines into model 63 planes,
20 what other types of work did you see performed on the
21 DC-8s and the DC-10s?
22     MR. BOSL: Lacks foundation.
23     THE WITNESS: I guess I would say minor
24 maintenance to major overhaul, from being in the hangar
25 one day to being in there two months.

Exhibit 29-719

**210**

BY MS. HSU:

Q. How many times did you see major overhaul on the DC-8s or the DC-10s? Do you recall?

A. No.

Q. When you said you saw these people performing these tasks is this when you were going out there and speaking to somebody, the floor man for, I think you said, five to ten minutes regarding where it is in the process they were in terms of finishing the maintenance on the World Airways aircraft?

MR. BOSL: Misstates testimony. Overbroad.

THE WITNESS: Basically that's it. I didn't take a stool out there and sit and watch them for hours. If I was out there checking on the progress, like I say, it might be five minutes, might be 30 minutes trying to get the answers.

BY MS. HSU:

Q. And this would only be during the times when you were actually in the hangar, because you were traveling maybe sometimes two to three months?

A. Yeah, if I wasn't there, I wasn't in the hangar.

Q. Can you describe any of the minor maintenance that you said was performed on these aircraft during the time you were out there speaking to the foreman?

**211**

A. Changing a tire.

Q. Anything else?

A. Nothing in particular. Your question to be honest with you, at least thousands and thousands of parts on a DC-8. When I was out there progress could be -- they could have been changing five things that I didn't even know what it was. So we're getting into --

Q. So the only thing I want to ask you about is what you saw and what you were around?

A. I saw them working on an airplane, big giant airplane, 200 feet long. 40 guys around the airplane, and I'm there to see what the progress is. I'm not there making sure he puts a cotter key in or does that or make sure he gets the lug tight on the wheel. I'm there observing the progress period.

Q. And can you tell me what components these 40 guys were working with or around while you were out there?

MR. BOSL: Lacks foundation.

THE WITNESS: They were working on probably 40 different components.

BY MS. HSU:

Q. But you don't know specifically because you didn't watch them do this work?

A. No, and some of the parts I probably didn't

**212**

know what they were in the first place. I'm a pilot, not a mechanic.

Q. Okay. So is it safe to say that each of these component parts you don't know the brand name, manufacture, or supplier of these component parts; is that true?

A. No, I know the airplane was built by Douglas. You could probably ask Douglas and they could tell you every one of those parts who manufactured it, but I can't.

Q. Did you have any involvement in retaining the replacement parts for any of these aircrafts?

A. No.

Q. For any of this work that may have been performed by others in your presence, can you identify any witnesses that might have information regarding what the work was that was being done or the components that were being worked on?

A. Do I have any witnesses?

Q. Correct.

A. I guess I know people that worked in the hangar that were involved in it.

Q. Okay. And what are their names?

A. Oh, I think one we mentioned was Joe Antonio. He was a chief inspector so he probably knew what was

**213**

going on. And there's a few -- well, a few -- few that I can remember their names, if I can -- I would have to think a couple minutes that worked out there. You remember this has been 35 years.

Q. I understand.

A. A lot of them are dead already.

Q. Are there any other names that you can think of as you sit here today?

A. There's a guy of the name of Peterson. I just can't think of names.

Q. Do you know if Joe Antonio was still alive?

A. He's still alive today. He's 80 years old.

MR. BOSL: We already talked about him with Mr. Goldberg.

BY MS. HSU:

Q. Okay. And do you know whether Mr. Peterson is still alive?

A. I don't know. I saw him at a reunion four or five years ago.

Q. Where was this reunion?

A. In Oakland.

Q. Do you have any contact information for Mr. Peterson?

A. No.

Q. And can you identify any documents that might

Case MDL No. 875 · Document 6657-14 Filed 01/28/11 · Page 72 of 213
Case 4:11-cv-00061-LB · Document 171-4 Filed 04/10/11 · Page 56 of 64

55 (Pages 214 to 217)

**214**

1    contain information relating to the work that was being
2    done on McDonald Douglas --
3        A. No.
4        Q. -- Aircraft. With respect to any of the work
5    that was done on McDonald Douglas Aircraft, is it fair
6    to say that you don't know one way or the other whether
7    it was the original parts that were being worked on or
8    whether there were parts that were being replaced at
9    some time?
10        MR. BOSL: Overbroad. Vague and ambiguous.
11   Lacks foundation.
12        THE WITNESS: Well, when we first got the
13   brand new airplanes from Douglas, I'm sure any of the
14   part they were working on were new. At some point
15   those parts failed and they replaced them with other
16   parts. So, you know, for me to give you an answer of
17   what parts were new and what were used, is impossible.
18   BY MS. HSU:
19        Q. Basically you would not know either way?
20        A. No.
21        MR. BOSL: Argumentative and misstates
22   testimony.
23        THE WITNESS: You would find that in the
24   records with the aircraft that were with the aircraft.
25   BY MS. HSU:

**215**

1        Q. Would you say during the time that you were at
2    World Airways from 1973 to 1983, did the frequency of
3    times that you had to go out to where the maintenance
4    work was being done, did that change? Were there times
5    when you would see them work more often and other times
6    less often?
7        A. It probably depended on how concerned I was
8    about the airplane getting out of the hangar on time.
9    So there might be days when I didn't go out there at
10   all. There might be days when I went out there ten
11   times in one day.
12        Q. And when you went out there, what would be the
13   longest span of time you would be out there when the
14   work was being done on McDonald Douglas Aircraft?
15        A. I would be out there to talk to the supervisor
16   or foreman to find out where we're at at getting this
17   airplane out of the hangar. It took five minutes if
18   that's what it took. Took 15 minute -- if he was on a
19   break and had to find someone, might have taken 15, 20
20   minutes.
21        Q. When you went out to where the work was being
22   performed, did you ever have to wear any type of
23   protective gear?
24        A. No.
25        MS. HSU: I think that's all the questions I

**216**

1    have for now. Thank you.
2        MR. GHERINI: Mr. Vest, good afternoon. I
3    have a couple questions for you here.
4    EXAMINATION BY MR. GHERINI:
5        Q. You mentioned that you opened a Seminole
6    aircraft?
7        A. Right.
8        Q. Do you remember what the N number was on that
9    aircraft?
10       A. I think it was 269 something, but I can't
11   remember for sure.
12       Q. Do you remember what the model year was?
13       A. It was a very early model. I want to say -- I
14   want to say it was about 59, but I'm not sure about
15   that.
16       Q. Okay. Do you know -- do you recall the person
17   you bought it off of?
18       A. No, just the guy that was head of the school
19   that I leased it to, was a personal friend, and he went
20   back to the Midwest somewhere and bought it, so he
21   operated it, and finally he bought it from me.
22       Q. What was the name of the school?
23       A. AR Aviation.
24       Q. That's the same school that your son worked at
25   at some point?

**217**

1        A. Yes.
2        Q. Okay. And do you -- do you know the name of
3    the person that you leased the --
4        A. Yes, John Codorfen (phonetic). But he's
5    passed away, unfortunately from cancer.
6        Q. Do you know what type of cancer he had?
7        A. I'm not sure. I think he had mela -- some
8    kind of mela carcinoma or something.
9        Q. Some type of skin cancer?
10       A. On his back.
11       Q. Okay. And you said that with respect to that
12   particular aircraft, you let Earhart and the folks
13   there take care of all the maintenance on that one?
14       A. They took care of all the insurance, all the
15   maintenance.
16       Q. So fair to say if they had to do any
17   maintenance on it, they wouldn't have told you what any
18   of the parts were, right?
19       A. No.
20       Q. And do you have any knowledge as to whether
21   your son would have performed any work on that
22   aircraft?
23       A. I know he flew it, because he used to train
24   people involving engine training, but I don't think he
25   would have worked on it.

Exhibit 29-721

**226**

BY MS. HSU:

Q. Can you describe what you mean by line maintenance outside?

A. It's not a hangar or the airplane sitting outside, so we refer that to the maintenance line, and then, you know, they do work on the airplane. So they're not concerned about being covered under a roof or whatever.

MS. HSU: Thank you.

EXAMINATION BY MR. KHOSRAVIRAD:

Q. All right. I got a few more questions for you, Mr. Vest. I'll try to be brief here.

With respect to the -- well, you estimated there was about three classrooms that were constructed in the hangar in about '83 or '84.

Do you remember where your office was during that time period?

A. Part of the time it was on the first floor.

Q. Okay. And how close was your office or far in terms of feet was your office from the construction of these approximately three classrooms?

A. Well, the library we had a common wall. I was sitting back in my office, and on this side of the wall was a library, and I -- you go out from behind my desk and here was the door, and I just maybe 15 feet down

**227**

the hallway was the library.

Q. Okay. My question was in reference to the classrooms though.

A. You know, it's been so long and all that jumble of things going on, exactly were those classrooms, you know. I doubt if you showed me the blueprint of the hangar, but they were in the area.

Q. Okay.

A. But they might have been on -- well, they would have been on the other side of the library, that I know right outside my door we had plastic hanging in the hallway.

Q. Okay. You mentioned that the -- library was about 15 feet from your office; is that right?

A. Yeah, well it was a common wall.

Q. Okay.

A. For me to get there I'd probably have to walk 20 feet out my door down the hall.

Q. And when you say the library you're talking about the technical library?

A. Yes.

Q. Do you remember if you had a habit of closing your office door when you left for the day or -- we'll just leave it at that for right now.

A. When I left for the day?

**228**

Q. Yes.

A. Yes.

Q. Okay. And during the day, for those days you were present at hangar 110, did you have a habit of leaving your door closed or was your door open?

A. It was open.

Q. With respect to the construction of the approximately three classrooms, did you ever see anyone applying any materials to the surface or seems of the Sheetrock?

A. Well, remember you'd see where the Sheetrock comes together. They'd put a strip on there. I don't know if they use glue or just paint strips or what it was, but that would be the limit of it.

Q. Okay. So to the best of your recollection, you saw them apply one strip of some material where the Sheetrock came together with respect to the approximately three classrooms?

MR. BOSL: Lacks foundation.

THE WITNESS: This was not something I was watching.

BY MR. KHOSRAVIRAD:

Q. Right.

A. You know, yes, I observed. And as I remember, I remember, you know, when they were finishing up, and

**229**

they were stripping it where the joints are, and that's about all I remember about it.

Q. Okay. Do you -- the product that you saw those individuals apply to those seems, do you know if that material was a dry material or premixed material or wet material?

MR. BOSL: Lacks foundation.

THE WITNESS: No.

BY MR. KHOSRAVIRAD:

Q. Did you ever see anyone sanding that material?

A. No.

Q. Did you ever see anyone mixing it?

A. No.

Q. If I asked you those same questions with respect to the Sheetrock that was installed for the new technical library, would your answers be the same?

MR. BOSL: Vague and ambiguous.

THE WITNESS: Yes.

BY MR. KHOSRAVIRAD:

Q. Did you understand the question? Your attorney had a vague and ambiguous objection. I just wanted to make sure you understood my question?

A. Well, why don't you ask it again.

Q. Okay. I'll just ask them individually so the record is clear.

234

1   establish when he was out of the country.
2         MR. BOSL:  I'll think about it.  We'll talk
3   about it, and I'll think about it.
4         MR. GOLDBERG:  Okay.  Thank you.
5         MS. JOHNSON:  Can I ask a couple follow-ups to
6   what was just asked.
7   EXAMINATION BY MS. JOHNSON:
8         Q. Mr. Vest, while you were gone out of the
9   country, whether it was to Yemen or some other place,
10  for a period of two to three months as you've
11  previously testified, do you know if Tim would have had
12  any reason to visit the World Airway Center?
13        A. He wouldn't have had any reason to.  You know,
14  one of my friends that lives in the same area I do,
15  works out there, worked out there.  They might have had
16  a son the same age.  He might have invited him to go
17  out there with him, but I have no knowledge of him
18  doing that.
19        Q. And you understand when I said the World
20  Airways Center, I meant the office building and the
21  hangar?
22        A. Right.
23        Q. Okay.  So as you sit here today, you have no
24  knowledge of Tim ever going to the World Airway Center,
25  would you?

235

1         A. Correct.
2         MR. BOSL:  Misstates testimony.
3         MS. JOHNSON:  It's a slightly different
4   question.
5         MR. BOSL:  I know and it misstates his
6   question earlier today.
7         MS. JOHNSON:  Okay.  Fair point.
8   BY MS. JOHNSON:
9         Q. I want to move away from the period 1972 and
10  1973.  Okay.  And after the construction of the hangar
11  and the World Air Center, once it was completed, do you
12  have any knowledge that Tim ever went to the World Air
13  Center without you being present?
14        MR. BOSL:  Lacks foundation.
15        THE WITNESS:  I don't have any direct
16  knowledge of that, no.  My wife might have ran
17  throughout for something, but I have no direct
18  knowledge of it, or as I said he may have gone with a
19  coworker that lived in my area.  But I have no
20  knowledge of it.
21  BY MS. JOHNSON:
22        Q. Who is this coworker that lived in your area
23  that had a son approximately Tim's age that he may have
24  visited?
25        A. Chief engineer was Ed Martin.

236

1         Q. And what was the name of his son?
2         A. He washed my wife's windows for years, and I
3   can't think of his name.  He had two sons, one a little
4   older than Tim, one a little younger.
5         Q. Other than yourself -- strike that.
6         I want to clarify the time period I'm talking
7   about.  I'm talking about after the dedication of the
8   hangar, okay.  When World Airway is occupying the
9   building, okay?
10        A. Right.
11        Q. During that time when Tim would accompany you
12  to work on occasion, who else besides yourself and the
13  security guards can you recall who would have observed
14  Tim on the World Airway -- strike that.
15        In the World Airway Center?
16        A. Well, if they were in and out, the hangar
17  mechanics would have seen him.  The security guards.
18  But normally -- normally these happened on Saturdays
19  and Sundays when I would go out there and work without
20  14 telephones ringing and people all over, so I'd go in
21  and just be me and the office.  So there might have
22  been a dispatcher that they remember.
23        Q. I just want to stick to what you observed.
24  Okay.  And let me get clarification on this.  Did you
25  personally ever see him out on the floor of the

237

1   maintenance hangar?
2         A. Yes.
3         Q. On how many occasions?
4         A. Oh, I have no idea.  I think probably five or
5   six times, and I saw him out there.  Obviously I was
6   out there with him if I saw it there.
7         Q. So you believe in the approximately five or
8   six times that you saw -- strike that.
9         You recall Tim being with you approximately
10  five or six times on the floor of the maintenance
11  hangar?
12        A. Yes.
13        Q. And this would have been from the time period
14  of 1973 through 1983?
15        MR. GOLDBERG:  Objection.  Misstates the
16  witness's prior testimony.
17        THE WITNESS:  Yes.
18        MS. WELLS:  I'm sorry.  What were those dates?
19        MS. JOHNSON:  The time period was 1973 to
20  1983.
21        MS. WELLS:  Thank you.
22  BY MS. JOHNSON:
23        Q. Was the floor -- strike that.
24        Was the area of the maintenance hangar a
25  restricted area or could anyone walk into that area?

Exhibit 29-723

Case MDL No. 875 - Document 6657-4 Filed 01/28/11 Page 75 of 213
Case 4:11-cv-00061-LB Document 87-14 Filed 04/01/11 Page 53 of 64

61 (Pages 238 to 241)

**238**

1    A. It was --
2    MR. BOSL: It's argumentative.
3    THE WITNESS: It was restricted to clerical
4  people. They had white badge or people that could go
5  in the hangar had a yellow badge.
6  BY MS. JOHNSON:
7    Q. Okay. I want to make sure I just understood
8  your testimony. There were clerical people and they
9  had a yellow badge?
10   A. White.
11   Q. White badge. Where could they go?
12   A. Just to Core A.
13   Q. Okay. And I'm sorry. That's a white badge,
14 correct?
15   A. Yeah.
16   Q. And that's the clerical people. And the
17 yellow, who got the yellow badges?
18   A. Anybody that was authorized to go in the
19 hangar.
20   Q. Who authorized people to go in the hangar? In
21 other words, who was allowing that privilege to go into
22 the hangar?
23   A. Well, I don't remember who. They -- when you
24 were employed, whatever your position was, you either
25 got a white or yellow badge.

**239**

1    Q. Did Tim ever have a badge?
2    A. He had an ID, and I think he told me once the
3  guard made him up a badge, but I don't remember ever
4  seeing it.
5    Q. Do you know if it would have been a yellow or
6  a white badge?
7    A. I don't know.
8    Q. Do you know why the access to the hangar floor
9  was restricted?
10   A. Well, yes. I didn't want reservation clerks
11 and secretaries running around airplanes.
12   Q. Do you know the reason for that?
13   A. So they wouldn't get in the way probably.
14   Q. Do you have any reason to believe Tim was ever
15 on the floor of the World --
16   (Reporter interruption for clarification.
17   MS. JOHNSON: I'll withdraw the question.
18 BY MS. JOHNSON:
19   Q. When Tim told you that a security guard made
20 up a badge for him, do you have any understanding of
21 what type of badge he made up for him? Let me try to
22 clarify that. You could make a little Post-It card for
23 a kid or little index card and draw something up and
24 stick up on the chest and say this is your badge, or
25 was it a formal badge that was actually made up for

**240**

1  him?
2    A. I have no idea.
3    Q. Do you have any knowledge that Tim ever went
4  to -- into core B?
5    A. I don't.
6    Q. Can you think of any reason why Tim would have
7  gone into Core B?
8    A. No.
9    MR. BOSL: Calls for speculation.
10 BY MS. JOHNSON:
11   Q. What was in Core B?
12   A. Mainly the maintenance offices. I took him to
13 Core C once.
14   Q. Okay. You anticipated my next question. You
15 know that Tim -- well, strike that.
16   Why did you take Tim to Core C once?
17   A. Because his -- that's where the ladies that
18 did all the seat covers and all that type of work, and
19 one of the lady's sons had been in the Olympics, so we
20 just happened to stop in there, and I said hello to
21 her. He was all excited about talking to her -- about
22 her son.
23   Q. And who was her son that was in the Olympics?
24   A. I don't remember. I only remember her name
25 now that it's been so long.

**241**

1    Q. So --
2    A. He was a long jumper. That's all I know.
3    Q. Do you know what Olympics that would have
4  been?
5    A. I think that was Los Angeles. That would
6  probably have been '84, right?
7    Q. I'm not sure.
8    A. Come on, your memory should be better than
9  that.
10   MR. MACLEOD: 1984, yes, it was.
11   MS. JOHNSON: A lot's happened since then.
12   THE WITNESS: The young people are supposed to
13 remember that stuff.
14   MS. JOHNSON: I know.
15 BY MS. JOHNSON:
16   Q. Other than this one trip to talk to this woman
17 about her Olympian son, do you recall any other
18 occasions that Tim went into Core C?
19   A. No.
20   Q. Can you think of any reason other than the one
21 time you told us that Tim would have any purpose in
22 going to Core C?
23   A. No.
24   Q. When Tim visited you at World Air Center, did
25 he ever bring along any friends?

281

```
 1    STATE OF CALIFORNIA    )
 2                           )        ss.
 3    COUNTY OF ALAMEDA      )
 4
 5
 6              I, KIMBERLY R. JENSEN, a Shorthand Reporter,
 7    State of California, do hereby certify:
 8              That WARREN K. VEST, in the foregoing
 9    deposition named, was present and by me sworn as a
10    witness in the above-entitled action at the time and
11    place therein specified;
12              That said deposition was taken before me at
13    said time and place, and was taken down in shorthand by
14    me, a Certified Shorthand Reporter of the State of
15    California, and was thereafter transcribed into
16    typewriting, and that the foregoing transcript
17    constitutes a full, true and correct report of said
18    deposition and of the proceedings that took place.
19              IN WITNESS WHEREOF, I have hereunder
20    subscribed my hand this 20th day of August 2010.
21
22
23              KIMBERLY R. JENSEN, RPR, CSR NO. 12552
                State of California
24
25
```

Aiken Welch Court Reporters   W. Vest   V.1   8-19-10

Exhibit 29-725

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

TIMOTHY VEST and CAROLINE VEST,

      Plaintiffs,

vs.                        No. RG09489518

ALLIED PACKING and SUPPLY, et al.,

      Defendants.

                          /

DEPOSITION OF WARREN K. VEST

Volume II (Pages 282-382)

Taken before KIMBERLY R. JENSEN, RPR

CSR NO. 12552

August 20, 2010

Exhibit 29-726

**283**

I N D E X

                        PAGE

EXAMINATION BY MR. HOLMBERG      288
EXAMINATION BY MR. BIRD       310, 323
EXAMINATION BY MS. HSU        318
EXAMINATION BY MS. JOHNSON    318, 363
EXAMINATION BY MR. HOWARD    323
EXAMINATION BY MR. GOLDBERG   336, 362,
                      377

EXAMINATION BY MR. BARTEAU    358, 362

EXAMINATION BY MR. KHOSRAVIRAD   364

EXAMINATION BY MR. POLL      366

EXAMINATION BY MR. BOSL      367, 380

E X H I B I T S

DEFENDANTS'              PAGE

Exhibit E  Port of Oakland Document   346

**284**

DEPOSITION OF WARREN K. VEST

BE IT REMEMBERED, that pursuant to Notice, and on the 19th day of August 2010, commencing at the hour of 11:37 a.m., in the offices of HILTON PLEASANTON, 7050 Johnson Drive, Pleasanton, California 94588, before me, KIMBERLY R. JENSEN, a Certified Shorthand Reporter, personally appeared WARREN K. VEST, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES:

For the Plaintiffs:

  JUSTIN A. BOSL
  Kazan, McClain, Lyons, Greenwood & Harley
  171 Twelfth Street, Third Floor
  Oakland, California 94607

For the Defendant, Dean's Materials, Inc.:

  E. JANE WELLS
  Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholtz LLP
  One California Street, Suite 1910
  San Francisco, California 94111

**285**

For the Defendant, Hamilton Materials and Dowman Products:

  ERIC PAN
  Walsworth, Franklin, Bevins & McCall, LLP
  601 Montgomery Street, Ninth Floor
  San Francisco, California 94111

For the Defendant, Henkel Corporation:

  MARK G. INTRIERI
  Chapman & Intrieri
  2236 Mariner Square Drive, Suite 300
  Alameda, California 94501

For the Defendant, McDonnell Douglas Corporation:

  LINDA C. HSU
  Bryan Cave LLP
  120 Broadway, Suite 300
  Santa Monica, California 90401

For the Defendant, George E. Masker, Inc.:

  RAFAEL CONTRERAS SWEET
  Dongell, Lawrence & Finney LLP
  707 Wilshire Boulevard, 45th Floor
  Los Angeles, California 90017

For the Defendant, Honeywell and Georgia Pacific:

  HANK HOLMBERG
  (specially appearing)
  Perkins Coie
  Four Embarcadero Center, Suite 2400
  San Francisco, California 94111

For the Defendant, F.P. Lathrop Construction Co.; and Lathrop Construction Associates, Inc.:

  TANYA X. JOHNSON
  Wilson, Elser, Moskowitz, Edelman & Dicker LLP
  525 Market Street, 17th Floor
  San Francisco, California 94105

**286**

For the Defendant, Kaiser Gypsum Company, Inc.:

  VANDAD KHOSRAVIRAD
  DeHay Elliston LLP
  1300 Clay Street, Suite 840
  Oakland, California 94612

For the Defendant, World Airways, Inc.:

  JAMES GOLDBERG
  Bryan Cave LLP
  2 Embarcadero Center, Suite 1410
  San Francisco, California 94111

For the Defendant, Hexcel Corporation:

  D. PAUL BIRD II
  McKenna, Long & Aldridge, LLP
  101 California Street, 41st Floor
  San Francisco, California 94111

For the Defendant, Raymond Interior Systems and Kelly-Moore Paint Co.:

  ROGER D. YUEN
  Foley & Mansfield
  300 Lakeside, Suite 1900
  Oakland, California 94612

For the Defendant, Parker Hannifin:

  JOHN G. GHERINI
  (via phone)
  Sedgwick, Detert, Moran & Arnold LLP
  One Market Plaza, Steuart Tower, 8th Floor
  San Francisco, California 94105

For the Defendant, The Port of Oakland:

  MERTON HOWARD
  Hanson Bridgett
  425 Market Street, 26th Floor
  San Francisco, California 94105

Exhibit 29-727

Case4:11-cv-00061-LB Document665-14 Filed01/28/11 Page79 of 213
Case MDL No. 875 Document665-14 Filed 04/10/11 Page 87 of 64

3 (Pages 287 to 290)

287

For the Defendant, Cyprus Amax Mineral Co.:
    ANGUS M. MACLEOD
    Becherer, Kannett & Schweitzer
    The Water Tower
    1255 Powell Street
    Emeryville, California 94608
For the Defendant, Kentile Floors and Alta Building:
    TIM BARTEAU
    Selman Breitman
    33 New Montgomery Street, 6th Floor
    San Francisco, California 94105

For the Defendant, Allied Packing & Supply:

    DAVID POLL
    (via phone)
    Herr & Zapala, LLP
    152 N. 3rd Street, Suite 500
    San Jose, California 95112

288

                    WARREN K. VEST,
            previously sworn as a witness,
                testified as follows:
EXAMINATION BY MR. HOLMBERG:
    Q. Back on the record. Good morning, Mr. Vest.
    A. Morning.
    Q. Are you ready to continue with your
deposition?
    A. Yes.
    Q. Have you taken any medication within the past
24 hours?
    A. No.
    Q. Okay. Have you spoken to anybody about this
case other than your attorney since we adjourned
yesterday?
    A. Just my wife.
    Q. And do you recall what you spoke to your wife
about?
    A. Just told her that we had run over and she was
going to be delayed today.
    Q. About the scheduling?
    A. Yeah.
    Q. Okay. Did you talk to her about anything
other than scheduling?
    A. No.

289

    Q. All right. Let me ask you first of all, on
any of the occasions when you went in to the aircraft
maintenance area, did you see any brake work being
done?
    A. Yes.
    Q. How many times did you actually see brake work
being done in your presence in the aircraft maintenance
area?
    MR. BOSL: Lacks foundation.
    THE WITNESS: I could give you no -- no
number. That's over a period of years. It would just
be a wild estimate.
BY MR. HOLMBERG:
    Q. Okay. Let me just -- the distinction is
reasonable estimate versus guess. With that in mind,
can you give us a reasonable estimate as to the number
of times you saw brake work being done in the aircraft
maintenance area?
    MR. BOSL: Calls for speculation.
    THE WITNESS: The best estimate, I would say
10 to 15 times.
BY MR. HOLMBERG:
    Q. And to what aircraft?
    A. Most likely all of them.
    Q. And when you say all of them?

290

    A. 707.
    Q. 707?
    A. 727.
    Q. 727?
    A. DC-8, DC-10, 747, and -- well, we didn't have
MD 11s when we were in Oakland, so they weren't in the
hangar.
    Q. So that covers it?
    A. Yeah.
    Q. Do the -- did you ever actually -- well, first
of all, do you know the brand name or manufacturer of
any of the old brakes that were removed?
    A. No.
    Q. From any of those aircraft?
    A. No.
    Q. Do you know who supplied the brakes?
    A. No.
    Q. Now, do you know the supplier of the old
brakes that were removed?
    A. No.
    Q. Okay. And do you know the brand name or
manufacturer of any of the brakes that were installed?
    A. No.
    Q. Do you know who supplied any of the new brakes
that were being installed?

Case MDL No. 875 - LB Document 6653-14 Filed 01/28/11 Page 80 of 213
Case4:11-cv-00061-LB Document7-14 Filed04/10/11 Page83 of 64

6 (Pages 299 to 302)

**299**

1    brake off, backed it out, and they brought in the new
2    brake on the -- another forklift, and put it in place.
3    I remember they used that to get those disks lined up
4    so it would slide in there.
5    BY MR. HOLMBERG:
6        Q.   Okay.  Do you recall any other activities that
7    the mechanic performed in changing the brakes?
8        A.   No.
9        Q.   And I think that you said that Tim went in to
10   the aircraft maintenance five or six times that you
11   were aware of.  Did I understand your testimony
12   correctly?
13       MR. BOSL:  Misstates testimony.
14   BY MR. HOLMBERG:
15       Q.   Okay.
16       A.   We --
17       Q.   I'm sorry?
18       A.   I didn't know the number, a specific number.
19       MR. GOLDBERG:  His testimony was that they
20   together went in five or six times.
21   BY MR. HOLMBERG:
22       Q.   Okay.  Yeah, my question is of those occasions
23   that you have personal knowledge, do I understand your
24   testimony correctly that you have personal knowledge of
25   his being in the aircraft maintenance area on five or

**300**

1    six occasions?  Did I understand?
2        MR. BOSL:  No, misstates testimony.
3        THE WITNESS:  From what he said, about his
4    going in the hangar.
5    BY MR. HOLMBERG:
6        Q.   Okay.  But from what you know from your own
7    observation, would it be true that you saw him in that
8    area five or six -- a total of five or six times?
9        MR. BOSL:  Misstates testimony.
10       THE WITNESS:  My recollection, that's correct.
11   BY MR. HOLMBERG:
12       Q.   Okay.  On any of those occasions do you have
13   any specific recollection that brake work was being
14   done?
15       A.   No.
16       Q.   You mentioned -- and you've already mentioned
17   it earlier today, that some aircraft brakes contained
18   asbestos?
19       A.   No, I didn't say that.
20       Q.   Oh, okay.
21       A.   I didn't say that.
22       Q.   Okay.  Do you have any knowledge regarding
23   whether any aircraft brakes contained asbestos?
24       A.   No.
25       Q.   Okay.  All right.  And the floors of the

**301**

1    maintenance area at the Oakland airport, were they
2    regularly cleaned with a scrubbing machine?
3        MR. BOSL:  Vague and ambiguous as to regular.
4        THE WITNESS:  I don't know that we had a
5    machine.  But when you say regular, I don't know how
6    often they did that.
7    BY MR. HOLMBERG:
8        Q.   Were the floors of the aircraft
9    maintenance area cleaned with a scrubbing machine?
10       A.   Yes.
11       Q.   And what -- to your knowledge, how often was
12   that done?
13       A.   I have no idea.
14       Q.   Can you say one way or another whether it was
15   done daily?
16       MR. BOSL:  Lacks foundation.
17       THE WITNESS:  No, I can't.
18   BY MR. HOLMBERG:
19       Q.   And did the scrubbing machine spray a liquid
20   on the floor before it did its scrubbing?
21       MR. BOSL:  Lacks foundation.
22       THE WITNESS:  I don't know that.
23   BY MR. HOLMBERG:
24       Q.   And can you recall the names of any -- we've
25   been asking you a lot of questions about the security

**302**

1    guards there at the airport.  Have you had a chance to
2    think about it?  Can you identify the names of any of
3    the security guards that, to your knowledge, Tim
4    befriended at the Oakland airport?
5        A.   The only one that I thought of -- that I could
6    remember was the one that I mentioned yesterday, and I
7    remember him well, because he was up at the ranch a lot
8    as well.
9        Q.   And his name is?
10       A.   His last name was Collins.
11       Q.   And did he live in the Oakland area at the
12   time?
13       A.   I don't know.
14       Q.   And is he still living today?
15       A.   I don't know.
16       Q.   One question about the security guards.  Would
17   it have been true -- well, let me ask you this.  Did
18   the -- to your knowledge, did the security guards at
19   the Oakland airport necessarily have the authority to
20   go into the maintenance area?
21       MR. BOSL:  Lacks foundation.
22       THE WITNESS:  Yes, I would -- they did.
23   BY MR. HOLMBERG:
24       Q.   Okay.  So they have military clearance?
25       MR. BOSL:  Lacks foundation and assumes facts.

Exhibit 29-729

**303**

1    THE WITNESS: I don't know that they had -- I
2 don't know if they had military clearances. There was
3 no requirement that I know of to have military
4 clearances.
5 BY MR. HOLMBERG:
6    Q. Would it have been true that the only way for
7 Tim to have gotten into the maintenance area of hangar
8 110 without you being present would have been to be
9 accompanied by a security guard?
10    MR. BOSL: Lacks foundation. Argumentative.
11    THE WITNESS: I don't know that.
12 BY MR. HOLMBERG:
13    Q. Okay. I have a few questions to ask you of
14 the different topics.
15    Have you ever done any home vehicle repair
16 yourself?
17    MR. BOSL: Asked and answered.
18    MS. JOHNSON: Asked and answered.
19    THE WITNESS: Home?
20 BY MR. HOLMBERG:
21    Q. Vehicle repair.
22    MR. BOSL: Same objection.
23    MR. HOLMBERG: I'm sorry. If there was an
24 answer, I would appreciate if you told me.
25    MR. BOSL: He said he did not.

**304**

1    MR. HOLMBERG: All right. I'm going to
2 withdraw that question and rely on that answer.
3 BY MR. HOLMBERG:
4    Q. At any time during your career, have you ever
5 done any vehicle repair work for World Airways?
6    A. No.
7    Q. Have you ever witnessed Tim doing any vehicle
8 repair work himself?
9    MS. JOHNSON: Asked and answered.
10    MR. BOSL: Join.
11    MR. HOLMBERG: I'm sorry. If -- if that has
12 been asked and answered --
13    MR. BOSL: He already discussed that his son
14 did play around to some extent or another with his '68
15 Cougar at some point with a friend of his. We went
16 into this to some extent yesterday.
17    MR. HOLMBERG: I was going to ask more details
18 on that. This was my lead in question to that. So
19 with your indulgence.
20    MR. BOSL: That's fine.
21    THE WITNESS: I didn't observe that work. I
22 testified yesterday that he did some -- he and his
23 buddy changed the brakes and removed an
24 air-conditioning compressor, but I didn't observe that.
25 BY MR. HOLMBERG:

**305**

1    Q. Okay. So the only knowledge that you have
2 about that work is what he told you; is that correct?
3    A. Yes.
4    Q. Okay. All right. And did you ever witness
5 Tim doing any aircraft repair work at any time?
6    A. No.
7    Q. Okay. And did you ever go in to the vehicle
8 repair shop at World Airways?
9    A. The vehicle repair shop?
10    Q. Yeah. I mean do you know whether there was a
11 vehicle repair shop at World?
12    A. I don't remember one in the hangar facility.
13    Q. So I take it then that you never went in to an
14 area where vehicle repair was going on at the World
15 facility; is that correct?
16    A. No.
17    Q. Never?
18    A. No, I did not.
19    Q. Is that correct?
20    A. Yes.
21    Q. All right. Okay. Let me ask you about have
22 you ever heard the name Bendix?
23    A. Yes.
24    Q. And do you associate Bendix with any products
25 or services?

**306**

1    A. Mostly avionics parts.
2    Q. And what avionics parts do you associate with
3 the name Bendix?
4    A. Radios and navigation equipment.
5    Q. Any others?
6    A. That's all I can think of.
7    Q. Okay. Do you have any knowledge or
8 information as to whether your son Tim was ever
9 exposed -- from any Bendix product, exposed to asbestos
10 from any Bendix product?
11    A. No.
12    MR. BOSL: Lacks foundation. Calls for expert
13 opinion.
14 BY MR. HOLMBERG:
15    Q. And do you have any reason to believe that
16 your son Tim was ever exposed to asbestos from any
17 Bendix product?
18    MR. BOSL: Same objections.
19    THE WITNESS: From Bendix products?
20 BY MR. HOLMBERG:
21    Q. Yes.
22    A. I have no knowledge of that.
23    Q. Do you have any persons or documents that you
24 can think of that might have information concerning
25 those issues?

Exhibit 29-730

Case4:11-cv-00061-LB Document665-14 Filed04/10/11 Page82 of 213
Case MDL No. 875 Document 665-14 Filed 01/28/11 Page 86 of 213

12 (Pages 323 to 326)

323

EXAMINATION BY MR. BIRD:
Q. Sir, I apologize if I asked this question. I did not take proper notes on this point.
    Did you see any work on rudders?
A. I can't recall seeing any work on rudders, no.
    MR. BIRD: Okay. Sir, thank you.
EXAMINATION BY MR. HOWARD:
Q. Good afternoon, Mr. Vest.
A. How are you today?
Q. I'm all right.
A. Good.
Q. My name is Martin Howard, and I represent the Port of Oakland.
A. Okay.
Q. Do you know who employed the security guards that worked at hangar 110?
A. I would have to assume that it was World Airways.
Q. Why do you assume that?
A. Well, we had this company that we talked about yesterday, Pipco, that did cleaning. And there's a possibility they could have been under that umbrella, but I would believe it would have been under World Airways.
Q. Were there -- during the time that you worked

324

at hangar 110, did any other security company or entity provide security services at hangar 110?
A. Not that I'm aware of.
Q. When you went to work at hangar 110, how did you enter and exit the building?
A. Through the front door Core A.
Q. And is that the entrance that you took your son Tim in and out of when you entered the hangar?
A. Yes. Yes.
Q. How would you get from Core A into the hangar space?
A. There was a hallway that went there upon the length of Core A, and there was doors that opened, the back of Core A that opened onto the hangar floor.
Q. Was there any security system, whether it be a guard or a lock or an alarm that controlled access from Core A back to the hangar space?
A. No.
Q. What about the front door of Core A? What type of security system was in place for entering and exiting the building?
A. There was no -- none. The door was open.
Q. Was it open 24 hours a day, seven days a week?
A. Yes.
Q. Was there a receptionist area where you went

325

in the front door?
A. No.
Q. Was there a security station in Core A when you went in the front door?
A. No.
Q. Have you been back to hangar 110 since World Airways vacated the premises?
A. Not inside the building.
Q. Did you participate in any of the lease negotiations between the Port of Oakland and World Airways regarding Hangar 110?
A. No.
Q. Did you ever read that lease?
A. No.
Q. Do you have an understanding of any of the terms of the lease between World Airways and the Port of Oakland regarding hangar 110?
A. I understand it was a 40-year lease, and that's about it.
Q. Did you participate in any of the negotiations of the lease termination agreement?
A. Not directly. I was familiar with them but I was not directly in the negotiations.
Q. Who conducted the lease termination negotiations?

326

    MR. GOLDBERG: Foundation.
    THE WITNESS: I'm not aware of the person.
BY MR. HOWARD:
Q. What's your understanding of the terms of any of the lease termination agreement?
    MR. BOSL: Lacks foundation.
    THE WITNESS: My understanding is that United Airlines gave us $7 million to take over the lease.
BY MR. HOWARD:
Q. Do you have any further understanding?
A. No.
Q. Did you ever read the lease termination agreement?
A. No.
Q. Did you participate in the design of hangar 110?
A. No.
Q. Do you know anyone who did?
A. No.
Q. Did you first participate in the specifications of any of the building materials for hangar 110?
A. No.
Q. Do you know anyone who did?
A. No.

Case MDL No. 875 · Document 6657-14 Filed 01/28/11 Page 83 of 213
Case4:11-cv-00061-LB Document17-14 Filed04/10/11 Page81 of 64

13 (Pages 327 to 330)

327

1    Q. Did you participate in the selection of any of
2  the building materials for hangar 110?
3    A. No.
4    Q. Do you know anyone who did?
5    A. No.
6    Q. Did you participate in the selection of
7  contractors or subcontractors for the construction of
8  hangar 110?
9    A. No.
10   Q. Do you know anyone who did?
11   A. No.
12   Q. Did you participate in the selection of the
13 architect for hangar 110?
14   A. No.
15   Q. Do you know anyone who did?
16   A. No.
17   Q. Did you participate in the selection of any of
18 the engineers who designed or participated in the
19 construction of hangar 110?
20   A. No.
21   Q. Do you know anyone who did?
22   A. No.
23   Q. Did you conduct any of the construction,
24 remodel, or repair work that was conducted at hangar
25 110?

328

1    A. No.
2    Q. Do you know anyone who did, by name?
3    A. The facility's manager. Her name was Claude
4  Frost.
5    Q. Anyone else that you can think of?
6    A. No.
7    Q. To your knowledge, did the Port of Oakland
8  through any of its employees or representatives
9  participate in any of the construction of hangar 110?
10   A. To my knowledge, no.
11   Q. To your knowledge, did the Port of -- employee
12 or any of -- employees or any of their representatives
13 participate in any of the remodel, repair, or
14 maintenance work that was conducted at hangar 110?
15   MR. BOSL: Lacks foundation.
16   THE WITNESS: Not that I know of.
17 BY MR. HOWARD:
18   Q. Did you have any, as part of your job, direct
19 communications with any employees of the Port of
20 Oakland?
21   A. No.
22   Q. Did you ever yourself lodge any complaints or
23 express any concerns to the Port of Oakland about the
24 condition of the facility at hangar 110?
25   A. No.

329

1    MR. BOSL: Lacks foundation.
2  BY MR. HOWARD:
3    Q. While you were working at hangar 110, did you
4  have any concerns about your safety or the safety of
5  people around you at hangar 110?
6    A. No.
7    MR. BOSL: Vague and ambiguous.
8  BY MR. HOWARD:
9    Q. Yesterday, you were talking about the overhead
10 piping that had some material on it, and you referenced
11 a union meeting or a meeting with union people at that
12 same time in 1983 to 1984. Do you recall such a
13 meeting taking place at the hangar where you observed
14 the piping on -- up near the ceiling?
15   A. Well, I -- the meeting I'm -- I referred to
16 yesterday was the business agent for the union, came in
17 to see me. It was the period while I was temporarily
18 overseeing the maintenance department, because the
19 absence of a vice president. And so he came by.
20 There's been some complaints about a number of things,
21 union complaints, and so I gave him the authority to go
22 on the hangar floor and spend the day and log all these
23 complaints. And when he finished, he came back and we
24 went over them, and about 90 percent of them he
25 basically -- he threw out as just normal gripes, but

330

1  there was nothing specific that's -- that's what that
2  meeting was all about.
3    Q. As you sit here today, do you recall what any
4  of those complaints were?
5    A. No, I don't.
6    Q. All right. Did you ever have occasion to use
7  or wear any of the asbestos gloves that have been
8  present in any of the cockpits of the planes you've
9  flown?
10   A. Not me, specifically, no.
11   Q. Can you identify the brand name, manufacturer,
12 or supplier of any of those asbestos gloves?
13   A. No.
14   Q. Do you know if your son Tim has ever had
15 occasion to use or wear any asbestos gloves?
16   A. No.
17   Q. During the time period that you worked at
18 hangar 110, did you ever receive any information that
19 there was asbestos present at the hangar?
20   A. Not when I was working there, no.
21   Q. Did you ever learn of the presence of asbestos
22 at the hangar after the time period that you worked
23 there?
24   A. I received secondhand information from
25 employees that worked there for World Airways that

Exhibit 29-732

**367**

1  distributed by Allied Packing and Supply?
2      A. No.
3      MR. POLL: Thank you, sir. Those are all my
4  questions.
5  EXAMINATION BY MR. BOSL:
6      Q. Okay. I have a few redirect.
7      Mr. Vest, when you were out doing overseas
8  trips like the Hajj, did you ever come home on the
9  weekends or anything like that?
10      A. No, we would go out, we would spend a little
11  over a month, flying all the pilgrims to Mecca -- to
12  Jeddah. Excuse me. And then they have what they call
13  a high -- ten days of high holy time, and so we would
14  have a break, and probably take the airplanes to London
15  for maintenance -- heavy maintenance. And so most of
16  the time, I would come home for maybe four or five days
17  during that break and then go back, and when --
18  when high holy time was over, it's been about five
19  weeks flying all the people back from Saudi Arabia,
20  wherever.
21      Q. Yesterday you identified for us some of the
22  remodeling projects in World Airways. You remembered
23  the technical library and the cafeteria and the like.
24      The projects you identified, are those the
25  only remodeling projects that you recall going on in

**368**

1  your time during the World Airways hangar?
2      A. That's the only ones I can recall, yeah.
3      Q. Was there other remodeling going on that you
4  can't recall specifically what they were doing?
5      MR. GOLDBERG: Lack of foundation. Leading.
6      MS. JOHNSON: Calls for speculation.
7      MR. KHOSRAVIRAD: Join in all those
8  objections.
9      MR. BARTEAU: Join in all objections.
10      MS. JOHNSON: Join.
11      MR. YUEN: I think all defendants join unless
12  they opt out.
13      MR. BOSL: Right. I have no problem with all
14  defense counsel all joining on mine. Go ahead, sir.
15      Go ahead, sir.
16      THE WITNESS: Well, like in the case of the
17  maintenance classroom, I had no idea that was going on,
18  only found out about it when I was sitting in a class. So
19  that obviously went on without my knowledge but at the
20  time it was happening.
21  BY MR. BOSL:
22      Q. So you believe there was other construction
23  going on at World Airways that you can't specifically
24  identify?
25      MR. BARTEAU: Same objections. Overbroad.

**369**

1      MR. KHOSRAVIRAD: Leading. Misstates
2  testimony, assumes facts.
3      MS. JOHNSON: Do we have a stipulation that
4  objection by one --
5      MR. BOSL: I already said that.
6      MS. JOHNSON: Just want to make sure, Justin.
7  I can't hear everything.
8      THE WITNESS: Repeat the question, please.
9      (Record read.)
10      THE WITNESS: Yes.
11  BY MR. BOSL:
12      Q. Now, in terms of the World Airways maintenance
13  floor, there was maintenance going on in that floor 24
14  hours a day, seven days a week; is that right?
15      A. Yes.
16      Q. Who was in charge of overseeing all of the
17  maintenance that was going on in any given time? Was
18  there a shift foreman or something like that?
19      A. Yeah, different departments had their lead
20  guy, and then you had -- probably had a shift foreman
21  that was overseeing more of us in charge of running the
22  operation and the hangar during, you know, 24 hours a
23  day, when senior management or no one else was around,
24  had to have a foreman there to oversee everything at
25  night.

**370**

1      Q. Did that shift foreman have the authority to
2  kick out anyone who the shift foreman didn't believe
3  should be there?
4      MR. GOLDBERG: Foundation. Leading.
5      THE WITNESS: I would assume since he would be
6  responsible for the hangar and the hangar floor, he
7  would have.
8  BY MR. BOSL:
9      Q. Where was the shift foreman located at any
10  given time?
11      MR. GOLDBERG: Overbroad. Foundation.
12      THE WITNESS: He would be all over the hangar,
13  whenever he was needed. You know, there was four big
14  bays there. You can see the size of the hangar. So he
15  would have -- might be looking -- overseeing it all.
16  BY MR. BOSL:
17      Q. You spoke some about white badges and yellow
18  badges, and yellow badges meaning you could go on the
19  maintenance floor. How well was that rule enforced?
20      MR. INTRIERI: Objection. Calls for
21  speculation. Lacks foundation.
22      MR. GOLDBERG: Overbroad.
23      THE WITNESS: I don't remember anybody --
24  anybody ever being disciplined that I can recall. When
25  you were hired in, you were either given a white badge

Case4:97-cv-00361-LB Document665-4 Filed01/28/11 Page85 of 213
Case MDL No. 875 Document 665-4 Filed04/10/11 Page 53 of 64

24 (Pages 371 to 374)

---

**371**

1  or yellow badge, and that's about it.
2  BY MR. BOSL:
3    Q. Did anybody check your badge when you went
4  into the maintenance hangar?
5    A. No.
6    Q. Mr. Vest, are you a licensed aircraft
7  mechanic?
8    A. No.
9    Q. You spoke yesterday about there was a period
10  of time where the maintenance department answered to
11  you. Did you have any control at all over the
12  maintenance work that was being done?
13    A. No.
14    MR. GOLDBERG: Vague.
15  BY MR. BOSL:
16    Q. Under FAA regulations, are you allowed to
17  conduct any maintenance work?
18    A. Under FAA rules, without a license I could
19  perform maintenance, but it would have to be under the
20  supervision of the licensed mechanic.
21    Q. At any time, did you tell the maintenance
22  workers how to do their work?
23    A. No.
24    Q. Why not?
25    A. Well, primarily during that period was

**372**

1  probably two months, maybe three months. I'm not sure.
2  I was sort of the caretaker administratively, because
3  we lost our vice president of maintenance. And so we
4  had a director of maintenance, the director of quality
5  control. All these people. They basically run the
6  show. And I was there to just oversee the situation
7  for them to bring their problems to me.
8    Q. Did they ever bring to you problems of
9  specific maintenance requests about a particular
10  aircraft?
11    A. No.
12    Q. Did they ever ask you how to do their
13  maintenance or mechanic work?
14    A. No.
15    Q. Mr. Vest, who's Chuck Patterson?
16    A. Chuck Patterson was the vice president of
17  administration.
18    Q. At World Airways?
19    A. Yes.
20    Q. Do you recall what time period?
21    A. Oh, I think he came to work about in the early
22  '70s, and he would have been there up to close to the
23  time we left Oakland. So it would be probably '71 to
24  '86 or 7.
25    Q. Do you have an understanding of where Chuck

**373**

1  Patterson worked before he came to World Airways?
2    A. I think he worked for a government agency in
3  Oakland. In fact, he -- I think he was involved in
4  getting the hangar project started back in the '60s. I
5  remember sitting down talking to him about his
6  background in Saigon one time. And I think he was -- I
7  forget the organization. It was some government agency
8  that was trying to put this hangar project together.
9  And I think that probably fell through in the late
10  '60s, and then he came to work for us. And so then
11  suddenly the hangar project was revived in '71.
12    Q. Was that governmental agency the economic
13  development agency or the EDA?
14    A. I remember EDA, yes.
15    Q. Okay. Do you know what involvement he had on
16  behalf of World Airways in negotiating the hangar
17  project?
18    MR. GOLDBERG: Foundation.
19    THE WITNESS: Other than he was one of the
20  people in -- EDA people, I have no idea what -- what
21  involvement he had in the negotiation.
22  BY MR. BOSL:
23    Q. Other than performing FAA physicals, did the
24  company doctor over on Pill Hill or any other company
25  doctor perform other medical surveillance at World

**374**

1  Airways?
2    MR. GOLDBERG: Objection. Argumentative.
3  Misstates witness's testimony.
4    THE WITNESS: I'm only familiar with the fact
5  that he did all the FAA physicals for the -- the pilots
6  and the flight engineers. If any other employee might
7  have had some problems, I don't know if the company
8  would have sent them to him or not.
9  BY MR. BOSL:
10    Q. Did the company ever provide any physicals for
11  its executives?
12    A. In '83 -- '83 and '84, I think they required
13  the executives to take an annual physical.
14    Q. What did that physical entail?
15    A. Oh, they had a doctor team from San Francisco.
16  In fact, they would come over to Oakland to use one of
17  Dr. Reich's offices, and my physicals -- in fact, one
18  of them I just had with the FAA two days before, and
19  this lady doctor came over and gave me a thorough
20  physical and a couple of days later, and then I had one
21  the next year. But it was, as far as I was concerned,
22  just a routine physical.
23    Q. You spoke about going in to the office to do
24  your paperwork and said it would be any day of the
25  week. Was it more common that you did that paperwork

Exhibit 29-734

382

STATE OF CALIFORNIA      )

                         )      ss.

COUNTY OF ALAMEDA        )


         I, KIMBERLY R. JENSEN, a Shorthand Reporter,

State of California, do hereby certify:

         That WARREN K. VEST, in the foregoing

deposition named, was present and by me sworn as a

witness in the above-entitled action at the time and

place therein specified;

         That said deposition was taken before me at

said time and place, and was taken down in shorthand by

me, a Certified Shorthand Reporter of the State of

California, and was thereafter transcribed into

typewriting, and that the foregoing transcript

constitutes a full, true and correct report of said

deposition and of the proceedings that took place.

         IN WITNESS WHEREOF, I have hereunder

subscribed my hand this 1st day of September 2010.


                 KIMBERLY R. JENSEN, RPR, CSR NO. 12552
                 State of California

Exhibit 29-735

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 30

James L. Oberman, Esq. (C.S.B. #120938)
Michael T. Stewart, Esq. (C.S.B. #253851)
KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000

Attorneys for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST, | No. RG09489518 |
| Plaintiff, | **DECLARATION OF SAMUEL P. HAMMAR, M.D., IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT/ADJUDICATION** |
| vs. | |
| ALLIED PACKING & SUPPLY, INC., | |
| Defendant. | |

Dept.:          30 (Hon. Kenneth Mark Burr)
Case Filed:   December 17, 2009
Trial Date:    February 14, 2011

Reservation.No.:

I, Samuel P. Hammar, M.D., declare:

1. I am an adult over the age of 18 years and am not a party to this lawsuit. I have personal knowledge of the matters set forth in this declaration, except for such matters that have been made known to me in forming an opinion, in which case each such matter is of a type on which professionals in my field reasonably rely in forming such opinions. The matters stated in this declaration that are within my personal knowledge are true. If asked, I could and would testify competently to the truth of each matter and opinion asserted within this declaration, as well as to the foundation for each such matter and opinion. All opinions and conclusions in this declaration are made to a reasonable degree of medical certainty.

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

Hammar Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

1

EXHIBIT _B_

Exhibit 30-736

2.  Attached as Exhibit 1 hereto, and incorporated fully herein by reference, is a true copy of my most recent curriculum vitae. The information contained in my curriculum vitae is true.

3.  I am a pathologist. Pathology is the scientific study of the nature of disease and its causes, processes, development, and consequences. I earned my undergraduate degree in chemistry from Eastern Washington State College; earned my medical degree from the University of Washington; and completed post-doctorate pathology training at the University of Washington and University Hospital in Seattle. I have been board-certified in anatomic and clinical pathology since 1975. I practice pathology as the director of Diagnostic Specialties Laboratory and as a member of Pathology Associates of Kitsap County in Bremerton, Washington. I am also a clinical professor of pathology at the University of Washington. I serve on the World Health Organization's Panel for the Reclassification of Lung Tumors, and I am a reviewing pathologist on the U.S. and Canadian Mesothelioma Panel. I am an editor of one of the leading textbooks on asbestos exposure and disease: Asbestos: Risk Assessment, Epidemiology, and Health Effects. I have written dozens of publications in the field of pathology, including on the topic of malignant mesothelioma.

4.  I have reviewed a journal article by Nakas, A., et al. *Localised Malignant Pleural Mesothelioma: A Separate Clinical Entity Requiring Aggressive Local Surgery.* Eur. J. Card.-Thor. Surg. 2008; 33:303-306. Attached as Exhibit 2 hereto, and incorporated fully herein by reference, is a true copy of the article. The authors managed the care of ten patients with localized malignant mesothelioma. [See p. 303.] Nine of those ten patients had prior occupational-level exposure to asbestos. [See pp. 303, 305.]

5.  I am an author of a journal article that analyzed 23 patients' localized malignant mesotheliomas: Allen, T.C., et al. *Localized Malignant Mesothelioma.* Am. J. Surg. Pathol. 2005; 29:866-873. From the available information, four of those patients had identified histories of occupational-level asbestos exposure -- three were shipyard workers and one was a lineman. [See p. 872.] There was no available information about the other patients' asbestos exposure. [*Id.*] Attached as Exhibit 3 hereto, and incorporated fully herein by reference, is a true copy of *Localized Malignant Mesothelioma.*

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

Hammar Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

2

Exhibit 30-737

6. Malignant mesothelioma is a cancer that starts in the cells that line certain parts of the body, including the pleural membrane that lines the lungs and the chest cavity. Pleural malignant mesothelioma nearly always presents as multiple nodules or as a diffuse tumor. But in rare cases, including that of Timothy Vest, it presents as a localized tumor mass. It is irrelevant that the sizes and shapes of diffuse and localized mesothelioma tumors appear different when they are first detected in a patient. One likely explanation for these differences in tumor appearance is that localized tumors are in fact diffuse tumors that are detected at a very early stage of their development.

7. Diffuse and localized malignant mesotheliomas share the same mesothelial cell origin and microscopic features. By definition, diffuse and localized malignant mesotheliomas are histopathologically, histochemically, immunohistochemically and ultrastructurally identical. "Histopathology" refers to the microscopic examination of diseased cells and tissues removed from a patient's body and placed onto glass slides. "Histochemistry" refers to the chemical composition of the cells and tissues of the body. "Immunohistochemistry" refers to the diagnosis of cancer cells through the use of stains that react to particular chemicals in a patient's tissue samples. "Ultrastructure" refers to detailed cellular structures that are too small to be seen with an optical microscope, and must be viewed with an electron microscope.

8. There is an extraordinarily strong link between mesothelioma and asbestos dust, such that it is largely undisputed in the scientific community that asbestos causes diffuse malignant mesothelioma. As previously explained, because diffuse and localized mesothelioma cells are chemically and structurally identical, it is also true that asbestos causes localized malignant mesothelioma -- regardless of the tumor's size when detected. This fact is supported by the documented asbestos-exposure histories of the patients described in the articles by Nakas, et al. and Allen, et al. [Exs. 2 and 3 hereto.] For the Nakas, et al. patients, nine out of ten had prior occupational-level exposures to asbestos. The limited available information pertaining to the Allen, et al. patients revealed that four had prior occupational-level exposures to asbestos.

9. Given that malignant mesothelioma is a very rare cancer, in general, and that the disease very rarely presents as a localized tumor, it is difficult to predict how long a patient

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

Hammar Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

3

Exhibit 30-738

1   suffering from localized malignant mesothelioma will survive. The average survival time for

2   patients with malignant mesothelioma, considered as a group, is 4 to 18 months from diagnosis.

3   The limited available data demonstrates that patients with localized malignant mesothelioma

4   may survive from three months to several years from diagnosis. [See Nakas, et al. and Allen, et

5   al., Exs. 2 and 3 hereto.]

6       10.  I reviewed the pathology slides and pathology reports pertaining to Timothy Vest,

7   which were prepared by ValleyCare Health System and Stanford University Medical Center.

8   Attached as Exhibits 4, 5 and 6 hereto, and incorporated fully herein by reference, are true copies

9   of the slides, the ValleyCare reports and the Stanford reports, respectively.  Based on my review

10  of those materials, I generated my own reports describing the nature and cause of Timothy Vest's

11  malignant mesothelioma.  Attached as Exhibit 7 hereto, and incorporated fully herein by

12  reference, is a true copy of my January 15, 2010 report.  Attached as Exhibit 8 hereto, and

13  incorporated fully herein by reference, is a true copy of my November 22, 2010 supplemental

14  report.  My supplemental report incorporates information pertaining to Mr. Vest's medical

15  treatment for malignant mesothelioma as well as his history of occupational and para-

16  occupational exposure to asbestos as set forth in his interrogatory responses.

17      11.  Timothy Vest's pathology slides demonstrate malignant mesothelioma cancer cells

18  on the pleural tissue in his chest.  Adjacent to the cancer cells is mildly to markedly thickened

19  pleural tissue with a hyaline (glassy) appearance, which are pleural plaques caused by asbestos.

20  Given the localized nature of the cancer cells shown in the pathology slides, Mr. Vest has a

21  localized malignant mesothelioma.  Given the presence of pleural plaques, his mesothelioma was

22  without a doubt caused by occupational-level exposure to asbestos.  Pleural plaques are localized

23  scars that form due to exposure to asbestos fibers.  These scars are unique with respect to their

24  morphology and, if examined by digestion analysis, contain asbestos fibers.  Even if pleural

25  plaques did not exist, it remains true that Mr. Vest's mesothelioma was caused by asbestos.  My

26  conclusion that Mr. Vest's mesothelioma was without a doubt caused by asbestos is further

27  supported by his documented exposure to asbestos in occupational and para-occupational

28  settings.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A Professional Law Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

Hammar Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

4

Exhibit 30-739

12. Timothy Vest's localized malignant mesothelioma was caused by his total lifetime dose of asbestos. All of Mr. Vest's individual asbestos exposures contributed to his total dose and increased his risk of developing the disease. There is no known safe level of asbestos exposure.

13. Based on my review of epidemiological studies, animal studies, case reports and other scientific evidence, I know that all asbestos fiber types, including chrysotile, cause malignant mesothelioma. The disease develops when asbestos fibers are inhaled, travel through the lung tissue and reach the pleura, where they cause cells to mutate and grow uncontrollably. Asbestos fibers are invisible to the naked eye, and are small enough to penetrate cells and interfere with the division and replication of DNA material. Chrysotile asbestos fibers cause the same types of genetic errors as other asbestos fibers, and thereby cause mesothelioma. Based on scientific studies, chrysotile is more likely than other asbestos fibers to reach the pleura because, once inhaled into the lung, chrysotile is moved more easily by the body's lymphatic system. Short chrysotile fibers are the type of asbestos most often found in the pleural tissue where mesothelioma starts.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and that I signed this declaration on December 8, 2010 in Bremerton, Washington.

_Samuel P. Hammar, M.D_
Samuel P. Hammar, M.D.

KAZAN, McCLAIN,
LYONS,
GREENWOOD
& HARLEY
A Professional Law
Corporation
Jack London Market
55 Harrison Street
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax: (510) 835-4913

Hammar Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

5

Exhibit 30-740

# Exhibit 1

Exhibit 30-741

## *Curriculum Vitae*
### *October 2010*

## *Samuel P. Hammar, M.D., F.C.C.P.*

**PERSONAL**
| | |
|---|---|
| Birthdate: | July 24, 1943 |
| Birthplace: | Spokane, Washington |
| Citizenship: | USA |

**BUSINESS:** PAKC/DSL, INC., P.S. (Tax ID 91-1091776)
| | |
|---|---|
| Address: | 700 Lebo Blvd, Bremerton, WA 98310 |
| Phone: | 360-479-7707 or 1-800-762-2344 (WA) |
| Fax: | 360-479-7886 |
| E-mail: | hammar.dsl@hotmail.com |

**EDUCATION**

Board Certified Anatomic and Clinical Pathology: May 1975

Post-Doctorate Training:

Straight Pathology Internship -- University Hospital, Seattle, Washington; July 1969 - June 1970.

Pathology Residency -- University of Washington Affiliated Residency Program, Seattle, Washington; July 1970 - September 1973

Experimental Pathology Training -- University of Washington Pathology Department; under the direction of N. Karle Mottet, M.D.; July 1971 - July 1972.

Electron Microscopy Training -- University of Washington Pathology Department; under the direction of Dr. Greta Tyson and Russell Ross; July 1972 - December 1972.

Medical School: University of Washington Medical School, Seattle, Washington, 1965 - 1969; earned M.D. degree.

Undergraduate College: Eastern Washington State College, 1961 - 1965; earned BA degree in chemistry.

**POSITIONS HELD**

Director, Diagnostic Specialties Laboratory, Inc., P.S., Bremerton, Washington, February 1989 to present.

Pathologist, Pathology Associates of Kitsap County, Harrison Medical Center, Bremerton, Washington, February 1989 to present.

Member of the International Mesothelioma Panel.

Member of the International Mesothelioma Interest Group (IMIG).

Panel for the Reclassification of Lung Tumors, World Health Organization (IASLC Panel), 1995 - present.

Reviewing Pathologist, U.S. and Canadian Mesothelioma Panel, February 1988 to present.

Clinical Professor of Pathology, University of Washington School of Medicine, 1990 to present.

Reviewing Pathologist, CARET Study (Carotene and Retinoic Acid Efficacy Trial); Fred Hutchinson Cancer Research Center, Seattle, Washington.

Clinical Associate Professor of Pathology, University of Washington School of Medicine, 1984 to 1990.

Chairman, Institutional Review Board, Virginia Mason Medical Center, 1984 - 1988.

Pathology Chairman, Pathology Reference Center Library, Lung Cancer Study Group, 1980 - 1989.

Pathologist, Virginia Mason Clinic, Seattle, Washington, September 1975 to January 1989.

**EXHIBIT** 1

Exhibit 30-742

Assistant Professor, Department of Pathology, University of Utah College of Medicine; Director, Electron Microscopy, Veterans Administration Hospital, Salt Lake City, Utah, October 1973 to August 1975.

Chief Resident, Department of Pathology, University Hospital, Seattle, Washington; July 1971 to August 1973.

## HONORS AND AWARDS

Senior medical student thesis honors award. June, 1969.

Sheard-Sanford Award from the American Association of Clinical Pathology for meritorious student research. June, 1969.

National Foundation Award for the best original student research in the field of birth defects. June, 1969.

Outstanding Instructor in Pathology, University of Utah School of Medicine. 1975.

## SOCIETY MEMBERSHIPS

American Association of Pathologists
International Academy of Pathology
American Thoracic Society
American Society of Clinical Pathology
American Society of Experimental Biology
American Medical Association
Washington State Medical Association
Pacific Northwest Society of Pathology
King County Medical Society
American College of Chest Physicians
Society for Ultrastructural Pathology
Society for Pulmonary Pathology

## PUBLICATIONS

1. Hammar SP, Mottet NK. *Tetrazolium salt and electron microscopic studies of cellular degeneration and necrosis in the interdigital areas of the developing chick limb.* J Cell Sci 1971; 8:229-251.
2. Mottet NK, Hammar SP. *Ribosome crystals in necrotizing cells from the posterior necrotic zone of the developing chick limb.* J Cell Sci 1972; 11:403-412.
3. Yount J, Nichols P, Ochs HD, Hammar SP, et al. *Absence of erythrocyte adenosine deaminase associated with severe combined immunodeficiency.* J Peds 1974; 291:173-177.
4. Mennemeyer R, Hammar SP, Cathey WJ. *Malignant lymphoma with intracytoplasmic IgM crystalline inclusions.* N Engl J Med 1974; 291:961-963.
5. Hammar SP, Sale G. *Multiple hormone producing islet cell carcinomas of pancreas: a morphological and biochemical investigation.* Hum Pathol 1975; 6:349-362.
6. Kushner JP, Hammar SP, Hansen VL. *Cardiomyopathy after widely separated doses of Adriamycin exacerbated by actinomycin D and mithramycin.* Cancer 1975; 36:1577-1584.
7. Hammar SP, Mennemeyer R. *Lymphomatoid granulomatosis in a renal transplant recipient.* Hum Pathol 1976;111-116.
8. Tolan KG, Hammar SP, Sanella JJ. *Possible hepatotoxicity of Doxidan.* Ann Int Med 1976; 84:290-292.
9. Bowers J, Koehler PR, Hammar SP, et al. *Rupture of a splenic artery aneurysm into the pancreatic duct.* Gastroent. 1976; 70:1152-1155.
10. O'Neill W, Hammar SP, Bloomer, HA. *Giant cell arteritis with visceral angiitis.* Arch Int Med 1976; 136:1157-1160.
11. Hammar SP, Krouse H. *Myocardial mitochondrial calcification in Reyes syndrome.* Hum Pathol 1977; 8:95-98.
12. Farnery RJ, Morris AH, Armstrong JD Jr., Hammar SP. *Diffuse pulmonary disease following therapy with nitrogen mustard, vincristine, procarbazine and Prednisone.* Am Rev Resp Dis 1977; 115:135-145

Exhibit 30-743

13. Kanner RE, Hammar SP. *Chronic eosinophilic pneumonia: ultrastructural evidence of marked immunoglobulin production plus macrophage ingestion of eosinophils and eosinophil lysosomes leading to intracytoplasmic Charcot-Leyden crystals.* Chest 1977; 71:95-98.

14. Lynch, RE, Hammar SP, Lee GR, Cartwright GE. *The anemia of vitamin E deficiency in swine: an experimental model of the human congenital dyserythropoietic anemias.* Am J Hematol 1977; 2:145-158.

15. Hammar SP, Gortner D, Sumida S, Bockus D. *Lymphomatoid granulomatosis: association with retroperitoneal fibrosis and evidence of impaired cell mediated immunity.* Am Rev Resp Dis 1977; 115:1045-1050.

16. Hammar SP, Wheelis RF, Bockus D. *Nuclear Bodies.* Hum Pathol 1977; 8:712-713.

17. Winterbauer RH, Ludwig WR, Hammar SP. *Clinical course, management, and long-term sequelae of respiratory failure due to influenza viral pneumonia.* Johns Hopkins Med J 1977; 141:148-155.

18. Wright PW, Hill LD, Anderson RP, Hammar SP, et al. *Immunotherapy of resectable non-small cell cancer of the lung: a prospective comparison of intrapleural BCG+ levamisole versus intrapleural BCG versus placebo.* Monograph 1977 Oct. 20; pp 217-224.

19. Tolman KG, Peterson P, Gray P, Hammar SP. *Hepatotoxicity of salicylates in monolayer cell cultures.* Gastroenterology 1978; 74(2 Pt 1):205-208.

20. O'Neill WM Jr., Hammar SP, Ramirez G, et al. *Acute pyelonephritis in an adult gorilla (Gorilla gorilla).* Lab Anim Sci 1978; 28(1):100-101.

21. Winterbauer RH, Hammar SP, Hallman KO, et al. *Diffuse interstitial pneumonitis. Clinicopathologic correlations in 20 patients treated with Prednisone/azathioprine.* Am J Med 1978; 65:661-672.

22. Hammar SP, Bloomer HA, McCloskey D. *Adult hemolytic uremic syndrome with arteriole deposition of IgM and C3.* Am J Clin Path 1978; 70:434-439.

23. Hammar SP, Winterbauer H, Bockus D. *Diagnosis of pulmonary eosinophilic granuloma by ultrastructural examination of sputum.* Arch Pathol Lab Med 1978; 102:606.

24. Weinberg JB, Hammar SP. *Blast cell leukemia with IgM monoclonal gammopathy and intracytoplasmic vacuoles and Auer-body-like inclusions.* Am J Clin Path 1979; 71:151-157.

25. Mennemeyer RP, Hammar SP, Tytus JS, et al. *Melanotic Schwannoma: clinical and ultrastructural studies of three cases with evidence of intracellular melanin synthesis.* Am J Surg Path 1979; 3:3-10.

26. Mennemeyer RP, Hammar SP, Bauermeister DE, et al. *Cytologic, histologic and electron microscopic correlations in poorly differentiated primary lung carcinoma: a study of 43 cases.* Acta Cytol 1979; 23:297-302.

27. Wheelis RF, Hammar SP, Yarington CT. *The ultrastructural diagnosis of tumors of the head and neck.* Laryngoscope 1979; 89:234-243.

28. Hammar SP, Bockus D, Remington F, et al. *Langerhan's cells and serum precipitating antibodies against fungal antigens in bronchioloalveolar cell carcinoma: possible association with pulmonary eosinophilic granuloma* Ultrastruct Pathol 1980; 1:19-37.

29. Hammar SP, Bartha M, Riecks L, Bockus D. *Technical aspects of thin needle aspiration biopsy.* Laboratory Medicine 1980; 11:227-231.

30. Wright PW, Hill LD, Peterson AV, Anderson RA, Hammar SP, et al. *Adjuvant immunotherapy with intrapleural BCG and levamisole in patients with resected non small cell lung cancer.* Proceedings, Second International Conference on Immunotherapy of Cancer. 1980.

31. Gleason TH, Hammar SP, Bartha M, Bockus D. *The cytological diagnosis of pulmonary cryptococcosis.* Arch Path Lab Med 1980; 104:384-387.

32. Li, W, Hammar SP, Jolly PC, Hill LD, Anderson RP. *The unpredictable course of small cell undifferentiated lung carcinoma.* J Thor Cardiovasc Surg 1981; 81:34-43.

33. Hammar SP. *Noninfectious necrotizing inflammatory lesions of the lung.* Bull Mason Clinic 1981; 35:9-18.

34. Hammar SP, Bockus D, Remington F, Hallman KO, Huff JW, et al. *Autologous red blood cell and platelet phatocytosis in hairy cell leukemia.* Ultrastruct Pathol 1982; 3:243-52.

35. Gleason TH, Hammar SP. *Plasmacytoma of the colon. Case report with lambda light chain demonstrated by immunoperoxidase studies.* Cancer 1982; 50:130-133.

36. Dail DH, Hammar SP. *Immunologic diseases of the lung.* Lab Med 1983; 14:113-118.

37. Hammar SP, Winterbauer RH, Bockus D, Remington F, Sale GE, Myers JD. *Endothelial cell damage and tubuloreticular structures in interstitial lung disease associated with collagen vascular disease and viral pneumonia.* Am Rev Respir Dis 1983; 127:77-84.

38. Dail DH, Liebow AA, Gmelich JT, Friedman PJ, Miyai K, Myer W, Patterson SD, Hammar SP. *Intravascular, bronchiolar and alveolar tumor of the lung (IVBAT). An analysis of twenty cases of a peculiar sclerosing endothelial tumor.* Cancer 1983; 51(3):452-464.

Exhibit 30-744

39. Hammar SP, Bockus D, Remington F. *Ultrastructural Pathology*. Ultrastructural Pathol. 1983; 4(4):397-400.
40. Hammar SP, Bockus D, Remington F. *More on ultrastructure of AIDS lymph nodes*. N Engl J Med 1984; 310(14):924.
41. Winterbauer RH, Van Norman G, Hammar SP. *Pulmonary histiocytosis X*. Resp Med Rev.
42. Hammar SP, Barron E, Cooper L, Bockus D, Remington F. *Lymphocyte tubuloreticular structures, serum interferon levels, and lymphocyte (2'-5') oligoadenylate synthetase levels in patients with collagen vascular syndromes*. Lab Invest 1984; 50:24A.
43. Bockus D, Remington F, Hammar S, Bean M, Sorenson L. *Tubuloreticular structure (lupus inclusions) induction in Daudi lymphoblastoid cells by gene-cloned alpha interferon*. Lab Invest 1984; 50:5A.
44. Dreis DF, Winterbauer RH, Van Norman GA, Sullivan SL, Hammar SP. *Cephalosporin-induced interstitial pneumonitis*. Chest 1984; 86(1):138-140.
45. Hammar SP, Winterbauer RH, Bockus D, Remington F, Friedman S. *Idiopathic fibrosing alveolitis: a review with emphasis on ultrastructural and immunohistochemical features*. Ultrastruct Pathol 1985; 9:345-372.
46. Hammar SP, Bolen JW. *Undifferentiated retroperitoneal small cell carcinoma*. Ultrastruct Pathol 1985; 9:71-76.
47. McNutt MA, Bolen JW, Gown AM, Hammar SP, Vogel AM. *Metastatic renal cell carcinoma*. Ultrastruct Pathol 1985; 9:45-49.
48. Hammar SP, Bockus D, Remington F, Friedman S. *Small cell undifferentiated carcinomas of the lung with non-neuroendocrine features*. Ultrastruct Pathol 1985; 9:319-330.
49. Hammar SP, Bolen JW. *Sarcomatoid pleural mesothelioma*. Ultrastruct Pathol 1985; 9:337-343.
50. Hammar SP, Bockus D, Remington F, Friedman S. *Kaposi's sarcoma in a male homosexual*. Ultrastruc Pathol 1985; 9:189-193.
51. Hammar SP, Bolen JW, Bockus D, Remington F, Friedman S. *Ultrastructural and immunohistochemical features of common lung tumors: An overview*. Ultrastruct Pathol 1985; 9:283-318.
52. Bockus D, Remington F, Friedman S, Hammar SP. *Electron microscopy what izzits*. Ultrastruct Pathol 1985; 9:1-30.
53. Hammar SP, Bolen JW. *Undifferentiated retroperitoneal tumor. "Germ cell tumor versus lymphoma"*. Ultrastruct Pathol 1985; 9:247-253.
54. Gould VE, Lee I, Hammar SP. *Neuroendocrine skin carcinoma coexpressing cytokeratin and neurofilament proteins*. Ultrastruct Pathol 1985; 9:83-90.
55. McNutt MA, Bolen JW, Gown AM, Hammar SP, Vogel AM. *Coexpression of intermediate filaments in human epithelial neoplasms*. Ultrastruct Pathol 1985; 9(1-2):31-43.
56. Winterbauer RH, Hammar SP, Van Norman G. *Why worsening dyspnea and cough in a diabetic woman?* Respir Dis 1985; :77-84.
57. Hammar SP, Bockus D, Remington F, Bartha M. *The widespread distribution of Langerhan's cells in pathologic tissue: An ultrastructural and immunohistochemical study*. Hum Pathol 1986; 17:894-905.
58. Bolen JW, Hammar SP, McNutt MA. *Reactive and neoplastic serosal tissue. A light microscopic, ultrastructural and immunocytochemical study*. Am J Surg Pathol 1986; 10:34-47.
59. Hammar S, Bockus D, Remington F. *Metastatic tumor of unknown origin*. Ultrastruct Pathol 1986; 10(3):281-288.
60. Hammar S, Weaver RA, Keranen VJ. *Left temporal lobe cerebral cortex mass in a 19-year-old male*. Ultrastruct Pathol 1986; 10(6):583-591.
61. Hammar SP. *The role of electron microscopy and immunoperoxidase methods in the diagnosis and study of lung neoplasia*. Chest 1986; 89(Suppl):315S-316S.
62. Bush RW, Hammar SP, Rudolph RH. *Sclerosing mesenteritis: response to cyclophosphamide*. Arch Intern Med 1986; 146:503-505.
63. Hammar S, Bockus D, Remington F. *Metastatic tumors of unknown origin: an ultrastructural analysis of 265 cases*. Ultrastruct Pathol 1987; 11:209-250.
64. Bolen JW, Hammar SP, McNutt MA. *Serosal tissue: reactive tissue as a model for understanding mesotheliomas*. Ultrastruct Pathol 1987; 11:251-262.
65. Mountain CF, Lukeman JM, Hammar SP, et al. *Lung cancer classification: the relationship of disease extent and cell type to survival in a clinical trials population*. J Surg Oncol. 1987; 35(3):147-156.
66. Hammar S. *Adenocarcinoma and large cell undifferentiated carcinoma of the lung*. Ultrastruct Pathol 1987; 11:263-292.

Exhibit 30-745

67. Bockus D, Remington F, Luu J, Bean M, Hammar S. *Induction of cylindrical confronting cisternae (AIDS inclusions) in Daudi lymphoblastoid cells by recombinant alpha interferon.* Hum Pathol 1988; 19(1):78-82.

68. Cryst C, Hammar S. *Acute granulomatous interstitial nephritis due to co-trimoxazole.* Am J Nephrol 1988; 8:483-488.

69. Moore ADA, Godwin JD, Muller NL, Naidich DP, Hammar SP, Buschman DL, Takasugi JE, deCarvalho CRR. *Pulmonary histiocytosis X: comparison of radiographic and CT findings.* Radiology 1989; 172:249-254.

70. Dardick I, Hammar SP, Scheithauer BW. *Ultrastructural spectrum of hemangiopericytoma: a comparative study of fetal, adult and neoplastic pericytes.* Ultrastruct Pathol 1989; 13(2-3):111-154.

71. Hammar SP, Bockus D, Remington F, Friedman S, LaZerte G. *Familial mesothelioma: a report of two families.* Human Pathol 1989; 20(2):107-112.

72. Luu J, Bockus D, Remington F, Bean A, Hammar SP. *Tubuloreticular structures and cylindrical confronting cisterna: a review.* Human Pathol 1989; 20(7):617-627.

73. Hammar SP. *Lung macrophages.* Ultrastruct Pathol. 1989; 13(4):iii-v.

74. Hammar S, Bockus D, Remington F, Cooper L. *The unusual spectrum of neuroendocrine lung neoplasms.* Ultra Pathol 1989; 13(5,6):515-560.

75. Hammar SP, Hallman KO. *Unusual primary lung neoplasms: spindle cell and undifferentiated lung carcinomas expressing only vimentin.* Ultra Pathol 1990; 14:407-422.

76. Raghu G, Depaso WJ, Cain K, Hammar SP, Wetzel CE, et al. *Azathioprine combined with prednisone in the treatment of idiopathic pulmonary fibrosis: a prospective double-blind, randomized, placebo-controlled clinical study.* Am Rev Respir Dis. 1991; 144(2):291-296.

77. Dardick I, Ramjohn S, Thomas MJ, Jeans D, Hammar SP. *Synovial sarcoma: inter-relationship of the biphasic and monophasic subtypes.* Path Res Pract 1991; 187:871-885.

78. McCaughey WTE, Colby TV, Battifora H, Churg A, Corson JM, Greenburg SD, Grimes MM, Hammar S, Roggli VL, Unni KK. *Diagnosis of diffuse malignant epithelial mesothelioma: experience of a US/Canadian mesothelioma panel.* Modern Pathol 1991; 4(3):342-353.

79. Hammar SP. *Interdigitating reticulum cell sarcoma with unusual features.* Ultra Pathol 1991; 15:631-645.

80. Hammar SP, Luu J, Bockus DE, Remington FL, Luu J, Friedman S, Bean MA. *Induction of tubuloreticular structures in cultured human endothelial cells by recombinant interferon alpha and beta.* Ultra Pathol 1992; 16:211-218.

81. Hammar SP. *Metastatic neoplasms of unknown primary origin: an overview.* Ultra Pathol 1992; 16(1-2):3-5.

82. Hammar SP, Insalaco SJ, Lee RB, Bockus DE, Remington FL, Yu A. *Amphicrine carcinoma of the uterine cervix.* Am J Surg Pathol 1992; 97(4):516-522.

83. Hammar SP. *Controversies and uncertainties concerning the pathologic features and pathologic diagnosis of asbestosis.* Semin Diag Pathol 1992; 9(2):102-109.

84. Olerud JE, Kulin PA, Chew DE, Carlsen RA, Hammar SP, Weir TW, Patterson SD, Bolen JW, Kadin ME, Barker E, Kidd PG, McNutt MA, Piepkom MW. *Cutaneous T-cell lymphoma. Evaluation of pretreatment skin biopsy specimens by a panel of pathologists.* Arch Dermatol 1992; 128:501-507.

85. Hammar SP, Hallman KO. *Localized inflammatory pulmonary disease in subjects occupationally exposed to asbestos.* Chest 1993; 103:1792-1799.

86. Hammar S, Troncoso P, Yowell R, Mackay B. *Use of electron microscopy in the diagnosis of uncommon lung tumors.* Ultra Pathol 1993; 17:319-351.

87. Hammar SP. *The pathology of benign and malignant pleural disease.* Chest Surg Clin N Amer 1994; 4(3):405-430.

88. Hammar SP. *Malignant peritoneal mesothelioma mimicking mesenteric inflammatory disease; critical commentary.* Path Res Pract 1994; 190(6):623-626.

89. Roggli VL, Hammar SP, Pratt PC, Maddox JC, Legier J, Mark EJ, Brody AR. Commentary: *Does asbestos or asbestosis cause carcinoma of the lung?* Am J Indust Med 1994; 26:835-838.

90. Dodson RF, O'Sullivan M, Corn CJ, Hammar SP. *Quantitative comparison of asbestos and talc bodies in an individual with mixed exposure.* Am J Ind Med. 1995; 27(2):207-215.

91. Hammar SP. *Granulomatous vasculitis.* Seminars in Respiratory Infection. 1995; 10(2):107-120.

92. Hammar SP. *Recurrent granulosa cell tumor with associated mullerian epithelium.* Ultra Pathol 1996; 20(1):73-78.

93. Hammar SP. Invited Commentary. re: Nakajima I, Furuse A, Teruaki O, Kohno T, Ohtsuka T. *Excellent survival in a subgroup of patients with intrapulmonary metastasis of lung cancer.* Ann Thor Surg: 1996; 61:158-162; commentary 162-163.

Exhibit 30-746

94. Hammar SP, Bockus DE, Remington FL, Rohrbach KA. *Mucin-positive epithelial mesotheliomas: a histochemical, immunohistochemical and ultrastructural comparison with mucin-producing pulmonary adenocarcinomas.* Ultra Pathol 1996; 20:293-325.

95. Omenn GS, Goodman GE, Thornquist MD, Balmes J, Cullen MR, Glass A, Keogh JP, Meyskens FI, Valanis B, Williams JH, Barnhart S, Cherniack MG, Brodkin CA, Hammar S. *Risk factors for lung cancer and for intervention effects in CARET, the beta-carotene and retinol efficacy trial.* Journal of the National Cancer Institute 1996;88(21):1550-1558.

96. Omenn GS, Goodman GE, Thornquist MD, Balmes J, Cullen MR, Glass A, Keogh JP, Meyskens FI, Valanis B, Williams JH, Barnhart S, Cherniack MG, Hammar S, Brodkin CA, et al. *Effects of a combination of beta-carotene and vitamin A on lung cancer and cardiovascular disease.* New England Journal of Medicine 1996;334:1150-5.

97. Lin BT-Y, Colby TV, Gown AM, Hammar SP, Mertens RB, Churg A, Battifora H. *Malignant vascular tumors of the serous membranes mimicking mesothelioma: a report of 14 cases.* Am J Surg Pathol. 1996; 20(12):1431-1439.

98. Dodson RF, O'Sullivan M, Corn CJ, McLarty JW, Hammar SP. *Analysis of asbestos fiber burden in lung tissue from mesothelioma patients.* Ultrastruct Pathol. 1997; 21(4):321-336.

99. Corley DE, Kirtland SH, Winterbauer RH, Hammar SP, Dail DH, Bauermeister DE, Bolen JW. *Reproducibility of the histologic diagnosis of pneumonia among a panel of four pathologists: analysis of a gold standard.* Chest. 1997; 112(2):458-465.

100. Robb JA, Hammar SP, Yooko H. *Pseudomesotheliomatous lung cancer: a rare asbestos-related malignancy readily separable from epithelial pleural mesothelioma.* Lab Invest 1993;68:134A.

101. Oury TD, Hammar SP, Roggli VL. *Ultrastructural features of diffuse malignant mesotheliomas.* Hum Pathol 1998; 29:1382-1392.

102. Hammar SP. *Metastatic adenocarcinoma of unknown primary origin.* Hum Pathol 1998; 29:1393-1402.

103. Dodson RF, Huang J, Williams MG, Bruce JR, Hammar SP. *Lack of asbestos contamination of paraffin.* Arch Pathol Lab Med 1998; 122(12):1103-1106.

104. Dodson RF, O'Sullivan MF, Huang J, Holiday DB, Hammar SP. *Asbestos in extrapulmonary sites: omentum and mesentery.* Chest 2000; 117(2):486-493;
US-Canadian Mesothelioma Reference Panel: *The separation of benign and malignant mesothelial proliferations.* Am J Surg Pathol 2000;24:1183-1200.

105. Beasley MB, Thunnissen FB, Brambilla E, Hasleton P, Steele R, Hammar SP, Colby TV, et al. *Pulmonary atypical carcinoid: predictors of survival in 106 cases.* Hum Pathol 2000; 31(10):1255-1265.

106. Rom WN, Hammar SP, Rusch V, Dodson R, Hoffman S. *Malignant mesothelioma from neighborhood exposure to anthophyllite asbestos.* Am J Ind Med 2001; 40(2):211-214.

107. Butnor KJ, Sporn TA, Hammar SP, Roggli VL. *Well-differentiated papillary mesothelioma.* Am J Surg Pathol 2001; 25(10):1304-1309.

108. Weeks DA, Hammar SP, Rader AE, Malott RL, Mierau GW. *Sclerosing hemangioma of the lung in a woman with cutaneous melanoma: the role of electron microscopy in preventing an erroneous diagnosis of metastasis.* Ultrastruct Pathol 2002; 26(4):261-265.

109. Dodson RF, O'Sullivan M, Brooks DR, Hammar SP. *Quantitative analysis of asbestos burden in women with mesothelioma.* Am J Ind Med 2003; 43(2):188-195.

110. Hammar SP, William MG, Dodson RF. *Pulmonary granulomatous vasculitis induced by soluble particulates: a case report.* Ultrastruct Pathol. 2003; 27(6):439-49.

111. Butnor KJ, Burchette JL, Sporn TA, Hammar SP, Roggli VL. *The spectrum of Kit (CD117) immunoreactivity in lung and pleural tumors: a study of 96 cases using a single-source antibody with a review of the literature.* Arch Pathol Lab Med 2004; 128(5):538-43.

112. Dodson RF, O'Sullivan M, Hammar SP. *Quality control analysis of the potential for asbestos contamination during tissue processing in pathology laboratories.* Arch Pathol Lab Med 2004; 128(7):781-4.

113. Dodson RF, Brooks DR, O'Sullivan M, Hammar, SP. *Quantitative analysis of asbestos burden in a series of individuals with lung cancer and a history of exposure to asbestos.* Inhalation Toxicology 2004; 16:637-647.

114. Cullen MR, Barnett MJ, Balmes JR, Cartmel B, Redlich CA, Brodkin CA, Barnhart S, Rosenstock L, Goodman GE, Hammar SP, Thornquist MD, Omenn GS. *Predictors of lung cancer among asbestos-exposed men in the {beta}-carotene and retinol efficacy trial.* Am J Epidemiol 2005;161(3):260-270.

115. Allen TC, Cagle PT, Churg AM, Colby TV, Gibbs AR, Hammar SP, et al. *Localized malignant mesothelioma.* Am J Surg Pathol 2005;29:866-873.

116. Hammar SP. *Macroscopic, histologic, histochemical, immunohistochemical, and ultrastructural features of mesothelioma.* Ultrastruct Pathol 2006;30:3-17.

Exhibit 30-747

117. Dodson RF, Hammar SP. *Pleural mesothelioma in a woman exposed to asbestos from smoking asbestos-containing filtered cigarettes: The comparative value of analytical electron microscopic analysis of lung and lymph node tissue.* Inhalation Toxicology 2006;18:679-684.

118. Hammar, SP. *Approach to the diagnosis of neuroendocrine lung neoplasms: Variabilities and pitfalls.* Semin Thorac Cardiovasc Surg 2006;18:183-190.

119. Warren WH, Hammar SP. *The dispersed neuroendocrine system, its bronchopulmonary elements, and neuroendocrine tumors presumed to be derived from them: myths, mistaken notions, and misunderstandings.* Semin Thorac Cardiovasc Surg 2006;18:178-182.

120. Dodson RF, Shepherd S, Levin J, Hammar, SP. *Characteristics of asbestos concentration in lung as compared to asbestos concentration in various levels of lymph nodes that collect drainage from the lung.* Ultrastruct Pathol 2007;31:95-133.

121. Dodson RF, Hammar SP, Poye LW. *A technical comparison of evaluating asbestos concentration by phase-contrast microscopy (PCM), scanning electron microscopy (SEM), and analytical transmission electron microscopy (ATEM) as illustrated from data generated from a case report.* Inhalation Toxicology 2008;20(7):723-732.

## Abstracts

1. Hammar SP, Bockus D, Wheelis RF, Hill L. *Electron microscopic studies of undifferentiated lung tumors.* Chest 1977; 72:400.

2. Hammar SP, Winterbauer RH, Hallman KO, Hays JE. *Prognostic value and sampling variability of lung histology in interstitial pneumonitis.* Am Rev Resp Dis 1978; 116:123.

3. Hammar SP, Winterbauer RH, Pratt A, Hildebandt J. *Pulmonary effects of chronic gold sodium thiomalate administration.* Amer Rev Resp Dis 1979; 119 (suppl):123.

4. Hammar SP, Winterbauer RH, Bockus D, Remington F, Sale G. *Endothelial cell damage and tubuloreticular structures (myxovirus-like particles) in interstitial lung disease associated with collagen vascular diseases and viral pneumonia.* Am Rev Resp Dis 1980; 4:144.

5. Hammar SP, Winterbauer RH, Hallman KO, Bockus D, Remington F. *Langerhan's cells in bronchioloalveolar cell carcinoma; Possible association with eosinophilic granuloma.* Am Rev Resp Dis 1980; 4:145.

6. Hammar SP. *Ultrastructural examination of bronchial tumor biopsies.* Proceedings, International Association for the Study of Lung Cancer. 2nd World Congress. June, 1980.

7. Hammar SP, Bockus D, Remington F, Bartha M. *The widespread distribution of Langerhan cells in pathologic tissues.* Lab Invest 1983; 48:11A.

8. Hammar SP, Winterbauer RH, Hallman KO, et al. *Pulmonary histiocytosis X. A clinicopathologic study of 16 cases documented by electron microscopy.* Lab Invest 1983; 48:12A.

9. Hammar SP, Barron E, Cooper L, Bockus D, Remington F. *Lymphocyte tubuloreticular structures, serum interferon levels, and lymphocyte (2'-5') oligoadenylate synthetase levels in patients with collagen vascular syndromes.* Lab Invest 1984; 50:24A.

10. Bockus D, Remington F, Hammar S, Bean M, Sorenson L. *Tubuloreticular structure (lupus inclusions) induction in Daudi lymphoblastoid cells by gene-cloned alpha interferon.* Lab Invest 1984; 50:5A.

11. Hammar S, Bockus D, Remington F, Friedman S, Cooper L. *Cylindrical confronting cisternae and tubuloreticular structures in lymphocytes from HIV+ patients: correlation with immune status and change with AZT therapy.* Lab Invest Jan 1988.

12. Bockus D, Luu JY, Luu JW, Remington F, Friedman S, Bean M, Hammar S. *Are cylindrical confronting cisternae a specific marker of virally infected cells?* Lab Invest Jan 1988.

13. Oury TD, Hammar SP, Roggli VL. *Asbestos content of lung tissue in patients with malignant peritoneal mesothelioma: A study of 40 cases.* Lung Cancer 1997;18(Suppl 1):235-236 #923.

14. Hammar SP, Roggli VL, Oury TD. Moffatt EJ. *Malignant mesothelioma in women.* Lung Cancer 1997;18(Suppl 1):236 #924.

## CHAPTERS IN BOOKS

1. Hammar SP. *Hodgkin's Disease.* In: Lapedes D (Ed). Encyclopedia of Science and Technology. New York: McGraw-Hill Inc. 1976.

2. Hammar SP. *Hepatitis.* In: Lapedes D (Ed). Encyclopedia of Science and Technology. New York: McGraw-Hill Inc. 1976.

3. Hammar SP. *Lymphoma.* In: Lapedes D (Ed). Encyclopedia of Science and Technology. New York: McGraw-Hill Inc. 1976.

4. Fogh J, Bean MA, Bruggen J, Hammar SP, et al. *Comparison of a human tumor cell line before and*

Exhibit 30-748

*after growth in nude mouse.* In: Fogh J, Giovanella BC (Eds). The Nude Mouse in Experimental and Clinical Research. Academic Press, 1978;220-224.

5. Winterbauer RH, Hammar SP. *Interstitial lung disease.* In: Bone RC (Ed). Pulmonary Disease Review. New York: John Wiley and Sons, 1981;331-350.

6. Winterbauer RH, Hammar SP. *Interstitial lung disease.* In: Bone RC (Ed). Pulmonary Disease Review. New York: John Wiley and Sons, 1982;320-349.

7. Winterbauer RH, Hammar SP. *Diffuse hypersensitivity disorders of the lung.* In: Fishman AP (Ed). Update: Pulmonary Diseases and Disorders. New York: McGraw-Hill Book Company, 1982;205-229.

8. Winterbauer, RH, Hammar SP. *Interstitial lung disease.* In: Bone RC (Ed). Pulmonary Disease Review. New York: John Wiley and Sons, 1983;491-510.

9. Winterbauer RH, Dreis DF, Hammar SP. Chapter 40: *Diffuse pulmonary infiltrates of unknown etiology.* In: Spittell JA (Ed). Clinical Medicine. Philadelphia: Harper & Rowe, 1985.

10. Winterbauer RH, Hammar SP. *Sarcoidosis and idiopathic pulmonary fibrosis: a review of recent events.* In: Simmons DH (Ed). Current Pulmonology. Chicago: Year Book Medical Publishers, 1986;117-164.

11. Winterbauer RH, Hammar SP. *Interstitial lung disease.* In: Matthay RA, Matthay MA, Wiedemann HP (Eds). Annual Review of Pulmonary and Critical Care Medicine 1986-1987. Philadelphia: Hanley & Belfus, Inc., 1986;93-104.

12. Winterbauer RH, Hammar SP. *Interstitial lung disease.* In: Bone RC (Ed). Pulmonary Disease Reviews. New York: John Wiley & Sons, Inc. 1986;199-222.

13. Winterbauer RH, Hammar SP. *Interstitial lung disease.* In: Matthay RA, Matthay MA, Wiedeman HP (Eds). Annual Review of Pulmonary and Critical Care Medicine. Philadelphia: Hanley & Belfus 1987;164-184.

14. Hammar SP. *The use of electron microscopy and immunohistochemistry in the diagnosis and understanding of lung neoplasms.* In: MacKay B (Ed). Diagnostic Electron Microscopy of Tumors. New York: W.B. Saunders. 1987;1-230.

15. Hammar SP, Gould VE. *Neuroendocrine neoplasms.* In: Azar H (Ed). Pathology of Human Neoplasms: An Atlas of Diagnostic Electron Microscopy and Immunohistochemistry. New York: Raven Press. 1988;333-404.

16. Hammar SP, Bolen JB. *Pleural neoplasms.* In: Dail DH, Hammar SP (Eds). Pulmonary Pathology. New York: Springer-Verlag Inc., 1988;973-1028.

17. Dail DH, Hammar SP. *Handling of surgical pathology specimens.* In: Dail DH, Hammar SP (Eds). Pulmonary Pathology. New York: Springer-Verlag Inc., 1988:1-16.

18. Hammar SP. *Extrinsic allergic alveolitis - pulmonary histiocytosis X.* In: Dail DH, Hammar SP (Eds). Pulmonary Pathology. New York: Springer-Verlag Inc., 1988;379-416.

19. Hammar SP. *Idiopathic fibrosis.* In: Dail DH, Hammar SP (Eds). Pulmonary Pathology. New York: Springer-Verlag Inc., 1988:483-510.

20. Hammar SP. *Common neoplasms.* In: Dail DH, Hammar SP (Eds). Pulmonary Pathology. New York: Springer-Verlag Inc., 1988:727-845.

21. Hammar S. *Hypersensitivity pneumonitis.* In: Rosen PP, Fechner RE (Eds). Pathology Annual, Nineteen Eighty-Eight. Connecticut: Appleton & Lange, 1988;23:195-215.

22. Hammar S, Gould VE. *Neuroendocrine neoplasms.* In: Azar HA (ed). Pathology of Human Neoplasms: An Atlas of Diagnostic Electron Microscopy and Immunohistochemistry. New York: Raven Press, 1988;333-404.

23. Winterbauer RH, Hammar SP. *Interstitial lung disease.* In: Matthay RA, Matthay MA, Wiedemann HP (Eds). Annual Review of Pulmonary and Critical Care Medicine. 1988;74-86.

24. Hammar SP. *Diagnostic pathology: neoplasia.* In: Schraufnagel DE (Ed). Lung Biology in Health and Disease. New York: Marcel Dekker, Inc. 1990; 48:345-427.

25. Hammar SP. *Difficulties in interpreting pleural histology.* In: Deslauriers J, Lacquet LK (Eds). Thoracic Surgery: Surgical Management of Pleural Diseases. Volume 6. International Trends in General Thoracic Surgery. The CV Mosby Co. 1990;75-100.

26. Winterbauer RH, Hammar SP, Casey KR. *Interstitial lung disease and occupational lung disease.* In: Annual Review of Pulmonary and Critical Care Medicine. Philadelphia: Hanley & Belfus Inc. 1991;57-69.

27. Winterbauer RH, Hammar SP, Casey KR. *Interstitial lung disease.* In: Annual Review of Pulmonary and Critical Care Medicine. Philadelphia: Hanley & Belfus Inc. 1993;105-122.

28. Hammar SP. *Pulmonary histiocytosis X (pulmonary Langerhan's' cell granulomatosis).* In: Pulmonary Pathology, 2nd Ed. Dail DH, Hammar SP (Eds). New York: Springer-Verlag Inc., 1994;567-596.

29. Hammar SP. *Extrinsic allergic alveolitis.* In: Pulmonary Pathology, 2nd Ed. Dail DH, Hammar SP (Eds).

Exhibit 30-749

New York:  Springer-Verlag Inc., 1994;597-614.

30. Hammar SP. *Idiopathic interstitial fibrosis*. In:  Pulmonary Pathology, 2nd Ed.  Dail DH, Hammar SP (Eds).  New York:  Springer-Verlag Inc., 1994;647-678.
31. Hammar SP, Dodson RF. *Asbestos*. In:  Pulmonary Pathology, 2nd Ed.  Dail DH, Hammar SP (Eds).  New York:  Springer-Verlag Inc., 1994;901-984.
32. Hammar SP. *Common neoplasms*. In:  Pulmonary Pathology, 2nd Ed.  Dail DH, Hammar SP (Eds).  New York:  Springer-Verlag Inc., 1994;1123-1278.
33. Hammar SP. *Pleural diseases*. In:  Pulmonary Pathology, 2nd Ed.  Dail DH, Hammar SP (Eds).  New York:  Springer-Verlag Inc., 1994;1463-1580.
34. Hammar SP. *Common Neoplasms*. In:  Pulmonary Pathology - Tumors.  Dail DH, Hammar SP, Colby TV.  New York:  Springer-Verlag Inc., 1995;1-156.
35. Hammar SP. *Mesothelioma*. In:  Practical Pulmonary Pathology, Sheppard M (Ed);  Boston:  Little Brown & Co; Edward Arnold, 1995;264-288.
36. Hammar SP. *II - Clinical and epidemiological methods*. Chapter 8: Pathologic methods.  Harber P, Schenker MB, Balmes JR (Eds).  Occupational and Environmental Respiratory Disease.  Mosby – Year Book Inc, 1995;109-125.
37. Henderson DW, Roggli VL, Shilkin KB, Hammar SP, Leigh J. *Is asbestosis an obligate precursor for asbestos-induced lung cancer?*  Peters GA, Peters BJ (Eds).  Asbestos Health Effects, Treatment and Control.  The Michie Company, 1995;97-168.
38. Hammar SP. *Lung and pleural neoplasms*. In: Diagnostic Immunohistochemistry. Dabbs DJ (Ed).  Philadelphia, PA:  Churchill Livingstone, 2002;267-312.
39. Hammar SP. *Immunohistology of lung and pleural neoplasms*. In: Diagnostic Immunohistochemistry, 2nd Ed. Dabbs DJ (Ed).  Philadelphia, PA:  Churchill Livingstone, 2006;329-403.
40. Hammar SP. *The pathologic features of asbestos-induced disease*. In: Asbestos: Risk Assessment, Epidemiology, and Health Effects.  Dodson RF, Hammar SP (Eds).  Taylor & Francis, 2006.
41. Hammar SP.  In:  Pathology of Malignant Mesothelioma.  Galateau-Salle' F (Ed).  London; Springer-Verlag, 2006.
42. Hammar SP, Allen TC.  Chapter 16: *Histiocytosis and storage diseases*.  In: Dail and Hammar's Pulmonary Pathology, 3rd Edition.  Tomashefski JF et al. (Eds.)  New York: Springer, 2008.
43. Hammar SP, Dodson RF.  Chapter 27: *Asbestos*.  In: Dail and Hammar's Pulmonary Pathology, 3rd Edition.  Tomashefski JF et al. (Eds.)  New York: Springer, 2008.
44. Hammar SP.  Chapter 30: *Non-neoplastic pleural disease*.  In: Dail and Hammar's Pulmonary Pathology, 3rd Edition.  Tomashefski JF et al. (Eds.)  New York: Springer, 2008.
45. Hammar SP.  Chapter 36: *Neuroendocrine carcinomas*.  In: Dail and Hammar's Pulmonary Pathology, 3rd Edition.  Tomashefski JF et al. (Eds.)  New York: Springer, 2008.
46. Hammar SP, Henderson DW, Klebe S, Dodson RF.  Chapter 43: *Neoplasms of the pleura*.  In: Dail and Hammar's Pulmonary Pathology, 3rd Edition.  Tomashefski JF et al. (Eds.)  New York: Springer, 2008.
47. Hammar SP, Dacic S. Chapter 12: *Immunohistology of lung and pleural neoplasms*.  In: Diagnostic Immunohistochemistry: Theranostic and Genomic Applications, 3rd Ed.  Dabbs DJ (Ed).  Philadelphia: Saunders, 2010:369-463.

## BOOKS

1. Pulmonary Pathology.  Dail DH, Hammar SP (Eds).  New York:  Springer-Verlag Inc, 1988.
2. Pulmonary Pathology, Second Edition.  Dail DH, Hammar SP (Eds).  New York:  Springer-Verlag Inc, 1994.
3. Pulmonary Pathology - Tumors.  Dail DH, Hammar SP, Colby TV (Eds).  New York:  Springer-Verlag Inc, 1995.
4. Asbestos:  Risk Assessment, Epidemiology, and Health Effects.  Dodson RF, Hammar SP (Eds).  Boca Raton: CRC Press/Taylor & Francis Group, 2006.
5. Dail and Hammar's Pulmonary Pathology, 3rd Edition.  Tomashefski JF, et al. (Eds.)  New York: Springer, 2008.
6. Asbestos: Risk Assessment, Epidemiology, and Health Effects, 2nd Edition.  Dodson RF, Hammar SP (Eds).  Pending publication in 2011.

Exhibit 30-750

# Exhibit 2

Exhibit 30-751



European Journal of Cardio-thoracic Surgery 33 (2008) 303–306

EUROPEAN JOURNAL OF
CARDIO-THORACIC
SURGERY

www.elsevier.com/locate/ejcts

# Localised malignant pleural mesothelioma: a separate clinical entity requiring aggressive local surgery✩

Apostolos Nakas, Antonio E. Martin-Ucar, John G. Edwards, David A. Waller *

*Department of Thoracic Surgery, Glenfield Hospital, Groby Road, Leicester LE3 9QP, UK*

Received 14 May 2007; received in revised form 15 August 2007; accepted 3 September 2007; Available online 21 December 2007

## Abstract

**Objective:** Localised malignant pleural mesotheliomas are very rare and although there are sporadic reports in the literature showing that they have a different biological behaviour compared to diffuse MPM there is no major series published demonstrating results of surgical treatment. We present our experience in treating these tumours. **Methods:** Over an 8-year period we performed radical or debulking surgery in 218 patients with MPM. Ten of these patients had localised chest wall tumours and a biopsy either highly suspicious or confirming malignant pleural mesothelioma. They were all male with an average age of 65.9 (56–80) years. Three of the tumours were epithelioid, three biphasic and three sarcomatoid. They all had chest wall resections, with limited lung resections where the tumours were infiltrating the lung and reconstruction using a double prolene mesh and orthopaedic cement. Perioperative events and long-term survival were analysed and survival was compared to survival following operations for diffuse malignant pleural mesothelioma. **Results:** There was no 30-day mortality with only two patients suffering from pleural collections that required ultrasound guided drainage 2 and 8 weeks after the operation. Two patients died from disease progression 3 and 10 months after the operation. Using Kaplan–Meier analysis the mean survival was 56 months. **Conclusion:** Our results suggest that surgery is indicated in treating localised MPM even in T4 (diffuse chest wall involvement) tumours but pleuropneumonectomy is not necessary. These tumours seem to have a different biological behaviour compared to diffuse MPM but further research, including identification of possibly different biological markers is necessary.
© 2007 European Association for Cardio-Thoracic Surgery. Published by Elsevier B.V. All rights reserved.

*Keywords:* Malignant pleural mesothelioma; Localised; Surgery

## 1. Introduction

Malignant mesothelioma (MM) is the most common primary tumour of the serosal membranes and diffuse malignant mesothelioma by definition is characterised by a pattern of diffuse spread across the serosal surface [1]. A small number of sharply circumscribed localised tumours demonstrating histological characteristics identical to diffuse malignant mesothelioma (MPM) have been described in the literature. These tumours have been given the designation 'localised malignant mesothelioma' [1,2]. The small number of reported cases makes it difficult to determine whether localised MM is a separate clinical entity or whether it is diffuse MM diagnosed at an early stage or with a variant pathologic presentation [1].

We have managed 10 cases of localised malignant pleural mesothelioma (localised MPM) in our department and our experience is presented here.

## 2. Patients and methods

### 2.1. Patients

Over an 8-year period we performed surgery with therapeutic intent in 218 patients with biopsy confirmed or highly suspicious of malignant pleural mesothelioma (MPM). Ten patients, all male, age 65.9 (56–80) years had undergone chest wall resection for localised MPM.

The presenting symptom was pain in seven patients, a palpable chest wall tumour in two and cough and dyspnoea in one. In eight patients a diagnosis of MPM was confirmed and in the remaining two a malignancy highly suspicious of MPM was diagnosed with CT guided biopsy. Nine patients had occupational exposure to asbestos and two patients had preoperative chemotherapy before being referred to surgery.

### 2.2. Operative technique

#### 2.2.1. Chest wall resection

In six patients with localised MPM the tumour was on the right hemithorax and in four on the left. In one patient with

✩ Presented at the 15th European Conference on General Thoracic Surgery, Leuven, Belgium, June 3–6, 2007.
* Corresponding author. Tel.: +44 116 2563959; fax: +44 116 2563139.
*E-mail address:* david.waller@uhl-tr.nhs.uk (D.A. Waller).

1010-7940/$ – see front matter © 2007 European Association for Cardio-Thoracic Surgery. Published by Elsevier B.V. All rights reserved.
doi:10.1016/j.ejcts.2007.09.043

EXHIBIT  2

Exhibit 30-752

A. Nakas et al. / European Journal of Cardio-thoracic Surgery 33 (2008) 303–306



Fig. 1. Infiltration of the sternum by localised epithelioid MPM (patient 6).



Fig. 3. Sarcomatoid localised MPM (patient 8).

right-sided disease there was involvement of the sternum (Fig. 1) and the resection included a hemisternotomy. In another case an anterior and a lateral approach were combined in order to mobilise a tumour that was involving the ribs 1 to 4.

All other cases were approached with an anterolateral or posterolateral thoracotomy. The tumour was resected en bloc with the involved ribs (3–4 in all cases) and a limited lung resection was performed in six cases where the lung was infiltrated. Subtotal parietal pleurectomy was performed in seven cases and total in three. The chest wall was reconstructed using a composite patch constructed from orthopaedic cement sandwiched between two layers of polypropylene mesh. The mesh outline was reinforced using a running No. 1 polypropylene suture and the patch was secured to the rib stumps using interrupted No. 1 poly-propylene sutures. The chest was routinely drained using 2

28F chest drains and the space between the patch and the muscles was drained using 1–2 large bore vacuum suction drains. All the patients received epidural analgesia intra- and postoperatively, were extubated in theatre and transferred to the Thoracic High Dependency Unit for postoperative recovery (Figs. 2–4).

2.3. Data acquisition and statistical methods

Data for all the patients were obtained from the prospective mesothelioma database held in our institution. Medical notes were reviewed retrospectively to retrieve data that was not immediately available from the database. Up-to-date survival data were obtained from the hospital's patient information system and from the patient's General Practitioners. Statistical analysis was carried out using the software application SPSS for Windows version 12, SPSS Inc., Chicago, USA. Survival curves were estimated using the Kaplan–Meier method.



Fig. 2. Chest wall reconstruction on CT 2 years after sarcomatoid localised MPM resection (patient 9).



Fig. 4. Biphasic localised MPM (patient 5).

Exhibit 30-753

A. Nakas et al. / European Journal of Cardio-thoracic Surgery 33 (2008) 303–306

305

Table 1
Size of tumour and cell type

| Patient | Tumour size (mm) | Cell type |
|---|---|---|
| 1 | 140 × 90 × 35 | Epithelial |
| 2 | 190 × 80 × 30 | Epithelial |
| 3 | 180 × 100 × 70 | Epithelial |
| 4 | 150 × 110 × 60 | Sarcomatoid |
| 5 | 145 × 110 × 55 | Biphasic |
| 6 | 135 × 140 × 170 | Epithelial |
| 7 | 66 × 50 × 60 | Biphasic |
| 8 | 60 × 30 × 70 | Sarcomatoid |
| 9 | 110 × 70 × 30 | Sarcomatoid |
| 10 | 70 × 70 × 45 | Sarcomatoid |

## 3. Results

### 3.1. Patients, perioperative events and adjuvant treatment

There were no early (30 days) deaths. Two patients needed CT and U/S guided drainage for loculated pleural effusions following the operation.

Microscopic complete resection (R0) was reported in two patients and macroscopic complete resection (R1) in eight. In one case the tumour was extending to the cervical tissues (T4), in a second one the tumour was necrotic and the remaining eight were staged as T3. The mean postoperative stay was 10.4 days (7–14).

Histological examination confirmed malignant pleural mesothelioma in all 10 cases. Immunohistochemistry was performed in nine specimens to confirm the diagnosis of MPM. The size of the tumours resected and the cell type are presented in Table 1. Two of the patients received preoperative chemotherapy, six postoperative chemotherapy and seven postoperative radiotherapy. The duration of follow-up was 1–74 (median 15) months.

### 3.2. Survival

Two patients in the localised group died from disease progression 3 and 10 months after the operation and a further 2 developed disease progression but were still alive at the time that data was updated. In all four patients, disease progression was in the site of surgery, not in the pleura distant to it or in the form of metastasis. Mean actuarial survival was estimated at 56 months (SE 9). It is of note that the longest survivor in the series remains disease-free 70 months after the operation.

## 4. Discussion

The first accurate pathologic description of mesothelioma was published in 1931 by Klemperer and Rabin [3]. The authors classified the disease as either localised or diffused. The diffuse form was assumed to be derived from the mesothelial cells and the localised tumours were derived from the submesothelial layer [4,5]. This started a dispute that lasted for decades over the origin of the tumours. In the first large review series of solitary fibrous tumours of the pleura published in 1981, Brisseli et al. pointed out that the

localised primary tumours of the pleura have received a variety of names, including localised mesothelioma [6]. A few years later, in 1989, England et al. suggested that the term localised fibrous tumour of the pleura should be used instead of localised mesothelioma to describe these tumours because they did not express epithelial differentiation [7]. Nomenclature in the area has been a historic problem because the term localised mesothelioma was used to describe a variety of primary localised pleural tumours [1] such as solitary fibrous tumours of the pleura [2,7], diffuse malignant pleural mesothelioma [8] and haemangiopericytomas [9]. It appears that the first series of 'true' localised malignant mesotheliomas is the one published by Crotty et al. in 1994 [2] and the largest one published by Allen et al. in 2005 [1]. Exposure to asbestos was positive in 3 out of 6 patients in the Crotty and 4 out of 23 in the Allen series. Nine out of the 10 patients in our series had occupational exposure to asbestos. Mean age at presentation was similar in our series as it was in the others (between 60 and 65 years of age) but there were no females amongst our patients (40–60% in the other series) [1,2].

Chemotherapy and radiotherapy in our series were used on the rationale that since trimodality treatment (surgery, chemotherapy, radiotherapy) is associated with the best results when treating diffuse MPM [10,11], the same logic should be applied when treating the localised variant. It is our institutional policy to refer all patients that undergo therapeutic resection for mesothelioma for adjuvant chemotherapy and radiotherapy. Some of the patients will not get adjuvant treatment because of suboptimal postoperative recovery, individual oncologist's preference and local policies. There does not appear to be any published evidence for or against the use of adjuvant treatment for localised MPM.

Our long-term results are similar to the ones published by Allen et al. [1] and Crotty et al. [2]: encouraging medium- and long-term survival in our series are similar to the result reported by others [1,2]. The disease recurrences in our series occurred locally with no patients demonstrating the metastatic pattern that Allen et al. reported [1].

The limitations of our report are evident. The number of cases is small and the follow-up period in the majority of the cases is short. We cannot assess the effect that adjuvant chemotherapy and radiotherapy had on the survival and quality of life of the patients. Nevertheless we feel that our results justify our policy to perform less radical surgery in patients with the localised variant.

In conclusion, we agree with most of the reports in the literature that localised MPM demonstrates a different biological behaviour compared to MPM. Locally aggressive surgery is justified in these patients who may not be considered suitable for EPP due to 'diffuse' chest wall invasion and who may not tolerate the combined physiological insult of EPP and chest wall resection. Adjuvant chemotherapy and radiotherapy might have a role to play in the management of localised MPM but further studies are required to assess its efficacy. Most definitely, further research regarding the origin and biological behaviour of these rare tumours is needed.

## References

[1] Allen TC, Cagle PT, Churg AM, Colby TV, Gibbs AR, Hammar SP, Corson JM, Grimes MM, Ordonez NG, Rogelj V, Travis WD, Wick MR.

Exhibit 30-754

306        *A. Nakas et al. / European Journal of Cardio-thoracic Surgery 33 (2008) 303–306*

Localized malignant mesothelioma. Am J Surg Pathol 2005;29(7): 866–73.

[2] Crotty TB, Myers JL, Katzenstein AL, Tazelaar HD, Swensen SJ, Churg A. Localized malignant mesothelioma. A clinicopathologic and flow cytometric study. Am J Surg Pathol 1994;18(4):357–63.

[3] Klemperer P, Rabin CB. Primary neoplasms of the pleura. A report of five cases. Arch Pathol 1931;11:385–412.

[4] Suter M, Gebhard S, Boumghar M, Peloponisios N, Genton CY. Localized fibrous tumours of the pleura: 15 new cases and review of the literature. Eur J Cardiothorac Surg 1998;14(5):453–9.

[5] Robinson LA, Reilly RB. Localized pleural mesothelioma. The clinical spectrum. Chest 1994;106(5):1611–5.

[6] Briselli M, Mark EJ, Dickersin GR. Solitary fibrous tumors of the pleura: eight new cases and review of 360 cases in the literature. Cancer 1981;47(11):2678–89.

[7] England DM, Hochholzer L, McCarthy MJ. Localized benign and malignant fibrous tumors of the pleura. A clinicopathologic review of 223 cases. Am J Surg Pathol 1989;13(8):640–58.

[8] Okike N, Bernatz PE, Woolner LB. Localized mesothelioma of the pleura: benign and malignant variants. J Thorac Cardiovasc Surg 1978;75(3): 363–72.

[9] Gengler C, Guillou L. Solitary fibrous tumour and haemangiopericytoma: evolution of a concept. Histopathology 2006;48(1):63–74.

[10] Sugarbaker DJ, Garcia JP. Multimodality therapy for malignant pleural mesothelioma. Chest 1997;112(4 Suppl.):272S–5S.

[11] Sugarbaker DJ, Flores RM, Jaklitsch MT, Richards WG, Strauss GM, Corson JM, DeCamp Jr MM, Swanson SJ, Bueno R, Lukanich JM, Baldini EH, Mentzer SJ. Resection margins, extrapleural nodal status, and cell type determine postoperative long-term survival in trimodality therapy of malignant pleural mesothelioma: results in 183 patients. J Thorac Cardiovasc Surg 1999;117(1):54–63.

## Appendix A. Conference discussion

*Dr G. Friedel (Stuttgart, Germany):* Did I understand it correctly that you have 80% R1 resection? What was the cause to do so much incomplete resections?

*Dr A. Nakas:* Yes. The cause was that we were fairly close to macroscopic tumour. All resections were macroscopically complete. It just happened. All these tumours were big tumours; we didn't resect any small tumours in this group so we could not really be very generous with the margins. We tried to stay at least 1 cm from the margins, but in all the cases it was actually the pleura which was infiltrated and came back as positive.

*Dr J. Pilling (London, U.K.):* In a number of reports of these localised tumours there has been a strong lymphocytic plasma cell infiltration from the tumour. Was that your experience in the tumour you have resected?

*Dr A. Nakas:* I cannot answer that, because I didn't look at the pathology specifically for this. But I will look at it.

*Dr T.W. Rice (Cleveland, OH):* I am a little confused about what you are describing. Are these fibrous tumours of the pleura which arise from the subpleural fibrous tissue or are they mesothelioma? You should separate these two. What is a localised mesothelioma? Do you think what you are describing is the malignant variant of fibrous tumours of the pleura or are you describing some form of a pleural mesothelioma? You should be able

to tell the difference! Have you mixed two entities in these 9 cases? It is confusing!

*Dr A. Nakas:* I do get your point. What was reported in the literature as the malignant variety of the solitary fibrous tumours of the pleura has been described as localised malignant mesothelioma.

*Dr T.W. Rice:* Is this a malignant variant of a pleural fibroma, a sarcoma? These are not mesotheliomas.

*Dr A. Nakas:* No, we are not talking about sarcomas, we are talking about the tumours that they have been described arising from mesothelial cells. These tumours have been described by the pathologists as malignant fibrous tumours of the pleura. Which one is mesothelioma? It is the one arising from mesothelial cells and it is malignant. This is what I am talking about.

*Dr T.W. Rice:* There is a malignant variant of benign fibrous tumour of the pleura, and I think that is what you are describing.

*Dr A. Nakas:* What I am talking about was these 9 cases, what all malignant pleural mesotheliomas, our pathologists reported them as malignant pleural mesothelioma.

*Dr T.W. Rice:* Maybe they got it wrong. Certainly your 4 sarcomatous tumours could be malignant fibrous tumours of the pleura. They are different entities, one is a diffuse mesothelioma and the other is a sarcoma of fibrous tissue.

*Dr A. Nakas:* There is a localised process which has been reported in the series that I just mentioned as localised mesothelioma before.

*Dr T.W. Rice:* I think you may have two different things mixed together and you have 9 unrelated tumours.

*Dr A. Nakas:* I think that some of the tumours are referred to as malignant fibrous tumours of the pleura, whereas they are actually malignant mesotheliomas and have been reported as mesotheliomas.

Now if pathologists in the past or even now are wrong and we are talking about two different entities that we grouped together, we don't know, but people have been reporting isolated mesothelioma of the pleura as malignant variety.

*Dr T.W. Rice:* Have they reported benign fibrous tumours as benign mesothelioma? There have been advances in pathology. They should be able to separate benign fibrous tumours of the pleura from mesotheliomas.

*Dr L. Molins (Barcelona, Spain):* It looks that it is a pretty controversial issue. The fact is that you did show that all your cases were arising from parietal pleura, not from visceral pleura.

Were perhaps those tumours from visceral pleura? The one which Dr Rice is talking about, is the malignant version of localised fibrous mesothelioma, which are very different because they are less standing tumours.

The question will be: did you find parietal pleura mesothelioma and not visceral ones?

*Dr A. Nakas:* Well 6 of these tumours were infiltrating the lung, so we can't really tell if they were rising from the parietal and they were going to the visceral pleura, or the other way round, because they were all invading the chest wall obviously. All these tumours have been tested for markers and have been reported as mesotheliomas by our pathologists. This is why I refer to these tumours as mesotheliomas.

*Dr W.H. Warren (Chicago, IL):* When you say 'these were tested from markers', were they tested for grade? What is a good marker for these solitary fibrous mesotheliomas?

*Dr A. Nakas:* I cannot answer that question. I am not sure about this. I don't think they were tested for grade. I haven't looked specifically for that.

Exhibit 30-755

# Exhibit 3

Exhibit 30-756

ORIGINAL ARTICLE

# Localized Malignant Mesothelioma

Timothy Craig Allen, MD, JD,* Philip T. Cagle, MD,* Andrew M. Churg, MD,† Thomas V. Colby, MD,‡
Allen R. Gibbs, MD,§ Samuel P. Hammar, MD,‖ Joseph M. Corson, MD,¶ Margaret M. Grimes, MD,**
Nelson G. Ordonez, MD,†† Victor Roggli, MD,‡‡ William D. Travis, MD,§§ and Mark R. Wick, MD‖‖

**Abstract:** Localized malignant mesotheliomas are uncommon sharply circumscribed tumors of the serosal membranes with the microscopic appearance of diffuse malignant mesothelioma but without any evidence of diffuse spread. Little is known about their behavior. We report 23 new cases. The mean age at presentation was 63 years, and the sex ratio was approximately 2:1 (male/female). Twenty-one tumors were pleural and 2 were peritoneal. Sixteen tumors reproduced microscopic patterns of diffuse epithelial mesotheliomas, 6 had mixed epithelial and sarcomatous patterns, and 1 was purely sarcomatous. After surgical excision of the tumor, 10 of 21 patients with follow-up data were alive without evidence of disease from 18 months to 11 years after diagnosis. Patients who died had developed local recurrences and metastases, but none had diffuse pleural spread. Localized malignant mesotheliomas should be separated from diffuse malignant mesotheliomas because of their localized presentation, quite different biologic behavior, and far better prognosis.

**Key Words:** localized malignant mesothelioma, diffuse malignant mesothelioma, pleura, peritoneum, pericarditis

*(Am J Surg Pathol 2005;29:866–873)*

Malignant mesothelioma is the most common primary tumor of the serosal membranes of the pleura, peritoneum, and pericardium. Diffuse malignant mesothelioma by definition grows widely over the serosal membrane surfaces, with tumors in the early stages showing studding of the serosal surface by tumor nodules and tumors in the later stages eventually encasing organs and surrounding the involved site (eg, lung, heart, or intestines). Diffuse malignant mesothelioma typically has a poor clinical course with death occurring in most patients within 2 years of diagnosis.

The pattern of diffuse spread over the serosal surfaces is fundamental to the diagnosis of diffuse malignant mesothelioma and is a key feature for both the radiologist and the pathologist to appreciate. However, a small number of localized serosal/subserosal neoplasms with histopathologic, histochemical, immunohistochemical, and ultrastructural features identical to those of diffuse malignant mesothelioma have been described and given the designation "localized malignant mesothelioma."[2] The rarity of reported cases has made it difficult to determine whether localized malignant mesothelioma is an entity distinct from diffuse malignant mesothelioma, sharing with it its mesothelial cell origin and microscopic features, but differing with respect to clinical course and prognosis; or whether localized malignant mesothelioma is simply a diffuse malignant mesothelioma with a variant gross pathologic presentation, but with a similarly aggressive clinical course and poor prognosis.

The United States-Canadian Mesothelioma Reference Panel reviewed cases of localized malignant mesothelioma to investigate this rare entity and compare its clinical course and prognosis to diffuse malignant mesothelioma.

## MATERIALS AND METHODS

Five members of the United States-Canadian Mesothelioma Reference Panel (P.T.C., A.M.C., T.V.C., S.P.H., A.R.G.) identified 23 localized malignant mesotheliomas from their respective institutions and consultation files. The criteria used to diagnose these cases were 1) radiologic, surgical, or pathologic evidence of a localized serosal/subserosal (but not organ-centered) tumor mass without evidence of diffuse serosal spread; and 2) a microscopic pattern identical to that found in ordinary diffuse malignant mesothelioma. Cases were reviewed for demographic information and clinical course; and for gross, histopathologic, immunohistochemical, and ultrastructural findings. In each case, hematoxylin and eosin-stained slides were reviewed to confirm the diagnosis and for any additional histopathologic findings, and all available immunonostains were examined. Information regarding survival was obtained from the referring physicians. None of the cases reported here has been previously published.

## RESULTS

Table 1 shows demographic and pathologic information for the 23 patients. All of these tumors presented as incidental

From the *Department of Pathology, Baylor College of Medicine, Houston, TX; †Department of Pathology, University of British Columbia, Vancouver, British Columbia, Canada; ‡Department of Pathology, Mayo Clinic Scottsdale, Scottsdale, AZ; §Department of Histopathology, Llandough Hospital, Penarth, Vale of Glamorgan, United Kingdom; ‖Diagnostic Specialties Laboratory, Bremerton, WA; ¶Department of Pathology, Harvard Medical School, Boston, MA; **Department of Pathology, Virginia Commonwealth University Medical Center, Richmond, VA; ††Department of Pathology, University of Texas MD Anderson Cancer Center, Houston, TX; ‡‡Department of Pathology, Duke University Medical Center, Durham, NC; §§Armed Forces Institute of Pathology, Washington, DC; and ‖‖Department of Pathology, University of Virginia, Charlottesville, VA.

Reprints: Andrew Churg, MD, Department of Pathology, University of British Columbia, 2211 Wesbrook Mall, Vancouver, BC V6T 2B5, Canada (e-mail: Canada.achurg@interchange.ubc.ca).

Copyright © 2005 by Lippincott Williams & Wilkins

866

EXHIBIT ___3___

Exhibit 30-757

*Am J Surg Pathol • Volume 29, Number 7, July 2005*
*Localized Malignant Mesothelioma*

**TABLE 1.** Demographic and Pathologic Information: 23 Localized Malignant Mesothelioma Patients

| Case | Age (yr) | Sex | Site | History | Att | Size (cm) | Type | Follow-Up |
|------|----------|-----|------|---------|-----|-----------|------|-----------|
| A | 52 | M | Pl | Lineman × 16 years | | 2.2 | E | Alive >4.5 years after diagnosis |
| B | 66 | M | Pl | | | | E | DOD < 6 months after diagnosis |
| C | 67 | F | Pl | | P | 4 | E | Alive >2 years after diagnosis |
| D | 56 | M | Per | | | 15 | E | Alive >2 years after diagnosis |
| E | 18 | F | Pl | | | | E | DOD <1.5 years after diagnosis |
| F | 76 | F | Pl | | P | 3 | E | Alive >3 years after diagnosis |
| G | 76 | M | Pl | Prior colon carcinoma | | 6 | E | Alive >8 years after diagnosis |
| H | 83 | F | Per | Hemicolectomy for cecal mass | | | E | DOD <1 year after diagnosis |
| I | 72 | M | Pl | No history of asbestos exposure | P | 11 | E | Alive >8 years after diagnosis |
| J | 61 | M | Pl | | | 7 | E | |
| K | 48 | F | Pl | Prior bilateral mastectomy | P | 3.5 | E | Alive >6.5 years after diagnosis |
| L | 43 | M | Pl | | S | 5 | E | DOD 3 years after diagnosis; mets: widespread |
| M | 65 | F | Pl | | P | 3 | E | LR 3 months; DOD 9 months after diagnosis; mets: vertebral |
| N | 67 | M | Pl | | | 7 | Mi | DOD 7 months. after diagnosis; mets: vertebral |
| O | 72 | M | Pl | | | 7 | Mi | D ruptured aortic aneurysm 1 month after diagnosis |
| P | 37 | F | Pl | | | | Mi | Alive 18 months after diagnosis |
| Q | 52 | M | Pl | | S | 8 | S | LR 6 months; DOD 6 years after diagnosis; mets: skin |
| R | 53 | M | Pl | Shipyard worker | | | Mi | DOD 18 months after diagnosis |
| S | 70 | M | Pl | Shipyard worker | | 5 | Mi | Alive 18 months after diagnosis |
| T | 60 | M | Pl | | | 8.5 | Mi | |
| U | 64 | M | Pl | No history of asbestos exposure | | | E | LR; DOD 19 months after diagnosis; mets: mediastinum |
| V | 54 | M | Pl | Shipyard worker | | 2.5 | E | DOD 15 months after diagnosis; mets: widespread |
| W | 60 | M | Pl | Prior laryngeal carcinoma | S | 3.2 | E | Alive >11 years after diagnosis |

Att, attachment to serosa: M, man; F, woman; Pl, pleural; Per, peritoneal; P, pedunculated; S, sessile; E, epithelial; M, mixed; S, sarcomatous; ANRD, alive with no recurrent disease; DOD, dead of disease; mets, metastases; LR, local recurrence; D, dead.

findings on x-ray, or with vague symptoms such as chest pain, dyspnea, malaise, fever, and night sweats. Sixteen (70%) tumors occurred in men and 7 (30%) in women. Overall, the mean age was 62 years (range, 37–83 years), with a mean age for men of 61 years (range, 43–76 years) and for women of 65 years (range, 37–83 years). Twenty-one (91%) of the localized malignant mesotheliomas were pleural, and 2 (9%) were peritoneal.

The few cases for which radiographs were available showed the presence of a circumscribed, pleural-based mass (Fig. 1). In all instances, the gross description from the surgeon and referring pathologist was that of a solitary circumscribed mass without visible evidence of diffuse tumor away from the mass. Information regarding tumor size was available for 17 cases; mean size was 5.9 cm (range, 2.2–15 cm). Exact descriptions of tumor attachment to the underlying serosal membrane were available for only 8 lesions; of these, 5 were pedunculated and 3 sessile (Fig. 2). Tumor did not grossly invade the lung or chest wall, or peritoneal organs.

The pattern of sharp circumscription evident grossly was also seen in microscopic sections (Figs. 3–5). Sixteen tumors (70%) were epithelial, 6 (26%) mixed (biphasic), and 1 (4%) sarcomatous. As is true of diffuse malignant mesotheliomas, a wide spectrum of microscopic appearances was encountered, including polygonal cells forming sheets (Fig. 6), tubules lined by cuboidal cells with large nuclei and prominent nucleoli (Fig. 7), and complex tubular patterns with more flattened monotonous cells (Figs. 8, 9). The sarcomatous components were composed of plump spindled cells, in some instances, with very high-grade cytology (Fig. 10).

Immunostains were performed in 21 cases and supported the diagnoses of localized malignant mesothelioma (Table 2). Eighteen of 18 (100%) cases in our study were immunopositive for pankeratin, including both epithelial (Fig. 5), and sarcomatous (Fig. 11) forms; 10 of 11 (91%) cases immunopositive for calretinin (Fig. 9), 4 of 5 cases (80%) immunopositive for HBME-1, and 3 of 4 (75%) positive for cytokeratin 5/6. All except 2 tumors were negative for

867

Exhibit 30-758



**FIGURE 1.** CT scan of a patient with localized malignant mesothelioma showing a circumscribed right posterior pleural mass (case L).



**FIGURE 3.** Low-power image of localized malignant mesothelioma showing a well-circumscribed mass abutting lung parenchyma (case M).

a variety of "carcinoma" markers (CEA, LeuM1, etc.); in the 2 exceptional cases, there were, respectively, focal staining for CEA and faint staining for Ber-EP4. Ultrastructural studies were performed in 2 cases (patients C and W) and showed ultrastructural features identical to diffuse malignant mesothelioma, including bundles of cytoplasmic intermediate filaments, well-developed desmosomes, and long, slender surface microvilli.

None of these lesions had gross evidence of tumor away from the solitary circumscribed nodule, and, microscopically, there was no evidence of tumor or any type of mesothelial proliferation where serosal membranes had been sampled.

All patients underwent surgical resection, and follow-up information was available for 21 (91%) cases. Ten patients

(48%) are alive without evidence of disease from 18 months to 11 years (median, 4.8 years). Eight patients died of disease less than 2 years after diagnosis, and 2 patients died at 3 and 6 years, respectively. One patient died 1 month postdiagnosis of unrelated disease. Six patients had metastatic disease at death: 2 patients had widespread metastases, 2 patients had vertebral metastases, 1 patient had mediastinal metastasis, and 1 patient had skin metastasis. None of the patients had evidence of diffuse disease on the affected serosal membrane at the time of death.

Four patients had histories that might signify significant occupational exposure to asbestos. Patient A worked for 16 years as a lineman; and patients R, S, and V had histories of working in shipyards.



**FIGURE 2.** Gross image of a localized malignant mesothelioma showing a well-circumscribed nodular mass with focal central hemorrhage (case C).



**FIGURE 4.** Low-power image of another well-circumscribed localized malignant mesothelioma, abutting subpleural adipose tissue. (case G).

© 2005 Lippincott Williams & Wilkins

Exhibit 30-759

*Am J Surg Pathol • Volume 29, Number 7, July 2005*

*Localized Malignant Mesothelioma*



**FIGURE 5.** Cytokeratin-immunopositive localized malignant mesothelioma cells highlighted within a well-circumscribed nodular mass (case A).



**FIGURE 7.** High power image of epithelial localized malignant mesothelioma showing formation of glands lined by cuboidal cells with relatively uniform nuclei and prominent nucleoli (case L).

## DISCUSSION

Since Crotty et al[2] first described a series of 6 localized malignant mesotheliomas in 1994, several case reports of additional examples have been published in the English-language literature.[2,3,7,9–12,15–17] Tables 3 and 4 show demographic and pathologic information, and corresponding immunohistochemical profiles for these previously reported cases.

Localized malignant mesotheliomas are extremely rare solitary circumscribed nodular tumors, attached either in a sessile or pedunculated manner to the surface of the pleura, peritoneum, or pericardium. Pleural localized malignant mesotheliomas predominate; however, peritoneal and pericardial localized malignant mesotheliomas have been reported. Pleural

localized malignant mesotheliomas may be attached to either visceral or parietal pleura.

Most localized malignant mesotheliomas present as incidental findings or with nonspecific symptoms. Our findings regarding presentation, age, sex, and tumor site are similar to findings from previously reported cases. Median age of the patients in our study was 62 years, and almost all patients with localized malignant mesothelioma were over 40 years of age. Unlike diffuse malignant mesothelioma, where most of cases occur in men, taking our cases and the literature cases together, the sex ratio is about 60:40 (male/female).

By definition, localized malignant mesotheliomas are histologically, immunohistochemically, and ultrastructurally



**FIGURE 6.** High power image of epithelial localized malignant mesothelioma showing a sheet of tumor cells with abundant cytoplasm (case L).



**FIGURE 8.** Another area of the case shown in Figure 6 showing glands lined by monotonous somewhat flattened cells within an epithelial localized malignant mesothelioma.

© 2005 Lippincott Williams & Wilkins

869

Exhibit 30-760

Case MDL No 875 - Document 6658-3 15 Filed 04/28/10 Page 112 of 213
Case 4:PL-cv-00761-LS Document 1-15 Filed 6/10/1 Page 27 of 22



FIGURE 9. Calretinin immunostain showing nuclear positivity within localized malignant mesothelioma cells (case M).



FIGURE 10. Sarcomatous localized malignant mesothelioma showing high-grade appearance (case Q).

identical to diffuse malignant mesothelioma (Figs. 3–11). In both our series and in the literature, epithelial-type localized malignant mesotheliomas predominate, and very few tumors are purely sarcomatous. However, as opposed to ordinary diffuse malignant mesotheliomas where epithelial forms have a better prognosis than sarcomatous forms and biphasic forms

are intermediate, histologic subtype did not correlate with survival in any obvious way in our series or the literature review. In our patients, tumor size also did not appear to affect the clinical course.

Because of the vastly different treatment and prognosis, it is crucial to separate localized malignant mesotheliomas

**TABLE 2.** Immunostains Performed on 21 of 23 Localized Malignant Mesothelioma Patients

| Case | PanK | CK7 | CKS/CK6 | Calr | HBME-I | EMA | CEA | LeuM1 | B72.3 | BerEP4 | TFF-I | Other |
|------|------|-----|---------|------|--------|-----|-----|-------|-------|--------|-------|-------|
| A | + | + | + | + | + | + | – | – | – | – | – | |
| B | + | | | – | – | +(f) | – | | | | | Vim +; Thr + |
| C | + | | | + | + | | – | | – | – | | CA125 +; CA19.9 – |
| D | + | | + | + | | | | | | | | AFP –; CD68 –; CD8 –; CD31 – |
| E | + | | | | | | | | | | | Vim +(f) |
| F | + | | – | + | | + | – | | | | | CD15 – |
| G | + | | | + | | + | – | – | | – | | SD-100 –; HMB-45 – |
| H | | + | + | | | | | | | | | CK20 –; Syn – |
| I | + | | | | | | | | | | | |
| J | + | | | | | +(f) | +(f)* | | | | | LCA –; Syn –; Chr: – |
| K | + | | | | | + | | – | | | | |
| L | + | | | | | | – | | | | | |
| M | | | | + | + | | – | | | – | | |
| N | + | | | + | | | – | – | | | | |
| O | + | | | + | | | – | | | | | |
| P | + | | | + | + | + | | | | | – | |
| Q | + | | | + | | | + | | | | | S-100 – |
| R | | | | | | | | | | | | |
| S | | | | | | | | | | | | |
| T | + | | | | | | – | | | | | Thr – |
| U | + | | | | | | | | | | | Thr –; NCAM – |
| V | + | | | + | | | – | | | | | PSA – |
| W | + | | | | – | – | – | | – | +(faint) | | CAM5.2 +; AE1/AE3 +; Vim – |

PanK, pankeratin; Calr, calretinin; (f), focal; Vim, vimentin; Thr, thrombomodulin; Syn, synaptophysin; Chr, chromogranin; NCAM, neural cell adhesion molecule; PSA, prostate specific antigen.
*Probable artifact.

© 2005 Lippincott Williams & Wilkins

Exhibit 30-761



**FIGURE 11.** Keratin staining in the same case shown in Figure 10.

from diffuse malignant mesotheliomas. Diffuse malignant mesotheliomas always show gross and/or microscopic evidence of widespread tumor on the serosal surface, as individual tumor nodules, or as a rind around viscera or as tumor caking. Although supposed recurrent spread of localized malignant mesothelioma in the manner of diffuse malignant mesothelioma has been reported,[8,11] none of the patients in our study, including patients with metastatic disease, developed diffuse serosal recurrent disease. One patient identified in the review of the literature (patient no. 22) reportedly had tumor recurrence diagnosed as diffuse malignant mesothelioma.[2,8,11] But a lingular biopsy separate from the pleural mass, taken at the time of original tumor resection, showed neoplastic cells identical to those making up the large mass covering almost the entire pleural surface of the biopsy.[8] Diffuse malignant mesothelioma was indeed diagnosed on repeat thoracotomy 19 months later.[8] This suggests that patient no. 22 had diffuse malignant mesothelioma with a dominant mass at initial diagnosis rather than a localized malignant mesothelioma. Diffuse malignant mesothelioma with a dominant mass should be considered a potential mimic of localized malignant mesothelioma; the finding of even microscopic

**TABLE 3.** Demographic and Pathologic Information – Previously Reported Cases

| Case | Study/Country | Age (yr) | Sex | Site | Att | Size (cm) | Type | Asb Exp | Follow-Up |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Okike et al/US | 45 | F | Pl | | | E | | LR 1 yr; DOD 3 yr; recurrent pleural nodules |
| 2 | | 23 | F | Pl | | | B | | LR 1 yr; DOD 2 yr |
| 3 | | 60 | M | Pl | | | B | | LR 4 and 8 yr; DOD 9 yr |
| 4 | | 68 | M | Pl | | | B | | D 5 mo; pancreatic carcinoma |
| 5 | Crotty et al/ Canada and US | 74 | F | Pl | P | 10 | E | N | LR 1.5 yr; DOD 2yr |
| 6 | | 42 | F | Pl | S | 10 | E | Y;childhood | LR 3 mo; DOD 1 yr |
| 7 | | 76 | F | Pl | S | 6 | E | N | ANRD 8 yr |
| 8 | | 63 | F | Pl | S | 7 | B | P;via husband | ANRD 8 mo |
| 9 | | 69 | M | Pl | S | 2 | B | N | ANRD 2 yr |
| 10 | | 61 | M | Pl | S | 5 | B | P;shipbuilder | LR 7 mo; DOD 8 mo |
| 11 | Umezu et al/Japan | 70 | M | Pl | S | 3.8 | E | N | LR 8 mo; alive with disease at 2 yr |
| 12 | Gomez et al/Spain | 47 | M | Pl | S | 8 | S | N | ANRD 8 mo |
| 13 | Val-Bernal et al/Spain | 76 | F | PC | S | 3.6 | E | N | |
| 14 | Imura et al/Japan | 64 | M | Per | S | | E | | |
| 15 | Shimazaki et al/Japan | 44 | F | PC | S | 11 | E | N | D 3 days postoperative hemorrhage |
| 16 | Erkilic et al/Turkey | 61 | F | Pl | S | 5 | E | N | LR 5 mo; alive with disease at 1 yr |
| 17 | Okamura et al/Japan | 56 | M | Pl | S | 7 | S | N | Contralateral recurrence at 4 mo; mets: brain 16 mo; DOD 17 mo |
| 18 | Ojeda et al/US | 66 | M | Pl | S | 7 | E | P;35 yr ceiling tile worker | Met: brain 1 mo |
| 19 | Matsukuma et al/Japan | 68 | M | Per | S | 5.5 | B | N | LR 7 mo; D 10 mo |
| 20 | Obers et al/SA | 72 | | Pl | S | | E | P | D 7 mo |
| 21 | | 40 | F | Pl | | 7 | S | N | Contralateral recurrence at 2 mo; DOD 4 mo |
| 22 | Gotfried et al/US | 61 | F | Pl | | 6.5 | E | N | Microscopic diffuse pleural involvement at diagnosis; LR as DMM 19 mo; DOD 22 mo |

Att, attachment to serosa; Asb Exp, history of alleged asbestos exposure; US, United States; SA, South Africa; M, man; F, woman; Pl, pleura; PC, pericardium; Per, peritoneum; D, dead; DOD, dead of disease; DMM, diffuse malignant mesothelioma; Met, metastasis; ANRD, alive with no recurrent disease; LR, local recurrence.

© 2005 Lippincott Williams & Wilkins

Exhibit 30-762

**TABLE 4. Immunostains – Previously Reported Cases**

| Case | Pan-K | AE1/AE3 | CAM5.2 | EMA | Calret | Vim | CEA | LeuM1 | Other |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | + | | | − | | − | | − | |
| 4 | + | | | − | | − | | − | |
| 5 | + | | | + | | − | | − | |
| 6 | + | | | + | | − | | − | |
| 7 | + | | | + | | − | | | |
| 8 | + | | | +(f) | | + | | − | |
| 9 | + | | | + | | − | | +(f) | |
| 10 | + | | | − | | − | | | |
| 11 | | + | + | − | + | + | − | | Thr −; CD15 −; S-100 −; SMA − |
| 12 | + | | + | + | + | +(f) | − | − | Thr +; BerEP4 −; CD34 − |
| 13 | + | | | + | − | | | | HMK +; LMK +; CK5/6 +; CK7 +; Thr +; BerEP4 +(f); TTF-1 − |
| 14 | + | + | + | | + | | | − | HBME-1 +; CD34 − |
| 15 | + | | | +(f) | + | + | | | S-100 −; CD15 − |
| 16 | | + | | + | | +(f) | − | − | Factor VIII −; AFP − |
| 17 | | + | | + | | + | − | | Desmin +(f); BerEP4 −; S-100 −; CD34 − |
| 18 | + | | | + | | + | − | | S-100 − |
| 19 | | | | + | | + | | | AE1 +; S-100 −; desmin −; myoglobin −; AFP − |
| 20 | | | | | | | | | |
| 21 | + | | | | | | | | |
| 22 | | + | | + | − | + | − | | Desmin +(f); BerEP4 −; Thr −; S-100 −; CD34 − |

PanK, pankeratin; Calret, calretinin; Vim, vimentin; (f), focal; Thr, thrombomodulin; HMK, high molecular weight keratin; LMK, low molecular weight keratin; AFP, alpha-fetoprotein.

evidence of tumor away from the main lesion automatically removes the cases from the category of localized malignant mesothelioma. Purported cases of localized malignant mesothelioma that recur as diffuse malignant mesothelioma should be carefully reviewed to ensure that diffuse malignant mesothelioma was not present at the time of the original diagnosis.

Nomenclature in this area has been a historic problem because the term localized mesothelioma has been used in the past to describe a variety of primary localized pleural and peritoneal neoplasms, such as solitary fibrous tumor,[1,2,4] well-differentiated papillary mesothelioma,[6] diffuse malignant mesothelioma,[13] and rarely other neoplasms such as synovial sarcoma[3] and adenocarcinoma.[8] In the past, localized (solitary) fibrous tumors were termed localized fibrous mesotheliomas; however, this term should be avoided in describing solitary fibrous tumors, as they are now considered to be of mesenchymal stem cell origin.[14]

Well-differentiated papillary mesothelioma is a distinct entity generally considered a benign tumor or tumor of low malignant potential carrying an excellent prognosis that primarily involves the peritoneum in women, and has in the past sometimes been termed "localized mesothelioma."[5] Although well-differentiated papillary mesotheliomas may grossly form polypoid or discrete nodules, the histologic appearances of well-differentiated papillary mesotheliomas are completely different from those of localized malignant mesotheliomas, and tumor nodularity per se should not prompt the designation of "localized" mesothelioma. Separation of these other lo-

calized serosal masses is usually straightforward, since none of these lesions has the microscopic appearances of a true malignant mesothelioma.

The crucial feature of localized malignant mesothelioma is that many cases can apparently be cured by surgical excision. Half of the patients with follow-up in our series were alive, many with follow-up of several years. Our cases do differ in prognosis from those in the literature review, where only 4 of 17 evaluable cases (excluding 2 deaths [patient nos. 5 and 15] from other causes, and the probable diffuse malignant mesothelioma patient no. 22) were alive without evidence of disease. It is unclear whether the more favorable prognosis in our cases reflects a slightly different case definition or other factors. But it is interesting that, when these tumors recur, they tend to metastasize in the fashion of sarcomas, emphasizing their differences from ordinary diffuse malignant mesotheliomas.

While many cases of diffuse malignant mesothelioma are associated with asbestos exposure, only 4 of our patients had such a history. One patient in our study was a lineman for 16 years and 3 patients were shipyard workers. One other patient was stated to have had no known asbestos exposure. Since information about asbestos exposure is not available for the majority of cases, we are unable to define the role of asbestos exposure in the causation of localized malignant mesothelioma.

### REFERENCES

1. Churg AM. Diseases of the pleura. In: Thurlbeck WM, Churg AM, eds. *Pathology of the Lung*, 2nd ed. New York: Thieme, 1995:1067–1110.

© 2005 Lippincott Williams & Wilkins

Exhibit 30-763

2. Crotty BT, Myers JL, Katzenstein AA, et al. Localized malignant mesothelioma. *Am J Surg Pathol.* 1994;18:357–363.
3. Dalton WT, Zolliker AS, McCaughey WTE, et al. Localized primary tumors of the pleura: an analysis of 40 cases. *Cancer.* 1979;44:1465–1475.
4. England DM, Hochholzer L, McCarthy MJ. Localized benign and malignant fibrous tumors of the pleura: a clinicopathologic review of 223 cases. *Am J Surg Pathol.* 1989;13:640–658.
5. Erkilic S, Sari I, Tuncozgur B. Localized pleural malignant mesothelioma. *Pathol Int.* 2001;51:812–815.
6. Goldblum J, Hart WR. Localized and diffuse mesotheliomas of the genital tract and peritoneum in women: a clinicopathologic study of nineteen true mesothelial neoplasms, other than adenomatoid tumors, multicystic mesotheliomas, and localized fibrous tumors. *Am J Surg Pathol.* 1995;19:1124–1137.
7. Gomez-Roman JJ, Mons-Lera R, Olmedo IS, et al. Flow cytometric analysis of a localized malignant mesothelioma. *Ann Thorac Surg.* 2002;73:1292–1294.
8. Gotfried MH, Quan SF, Sobonya RE. Diffuse epithelial pleural mesothelioma presenting as a solitary lung mass. *Chest.* 1983;84:99–101.
9. Imura J, Ichikawa K, Takeda J, et al. Localized malignant mesothelioma of the epithelial type occurring as a primary hepatic

neoplasm: a case report with review of the literature. *APMIS.* 2002;110:789–794.
10. Matsukuma S, Aida S, Hata Y, et al. Localized malignant peritoneal mesothelioma containing rhabdoid cells. *Pathol Int.* 1996;46:389–391.
11. Ojeda HF, Mech K, Hicken W. Localized malignant mesothelioma: a case report. *Am Surg.* 1998;64:881–885.
12. Okamura H, Kamei T, Mitsuno A, et al. Localized malignant mesothelioma of the pleura. *Pathol Int.* 2001;51:654–660.
13. Okike N, Bernatz PE, Woolner LB. Localized mesothelioma of the pleura: benign and malignant variants. *J Thorac Cardiovasc Surg.* 1987;75:363–372.
14. Sawada N, Toshiyuki I, Naito Z, et al. Immunohistochemical localization of endothelial cell markers in solitary fibrous tumor. *Pathol Int.* 2002;52:769–776.
15. Shimazaki H, Shinsuke A, Yasuhiro I, et al. Vacuolated cell mesothelioma of the pericardium resembling liposarcoma: a case report. *Hum Pathol.* 2000;31:767–770.
16. Uzumu H, Kazuhisa K, Yusuke E, et al. Microcystic variant of localized malignant mesothelioma accompanying an adenomatoid tumor-like lesion. *Pathol Int.* 2002;52:416–422.
17. Val-Bernal JF, Figols J, Gomez-Romain JJ. Incidental (solitary) epithelial mesothelioma of the pericardium: case report and literature review. *Cardiovasc.* 2001;11:181–185.

© 2005 Lippincott Williams & Wilkins

# Exhibit 4

Exhibit 30-765



EXHIBIT ___4___

Exhibit 30-766



Exhibit 30-767



VEST, Timothy                           DOB: 02/19/1965
Pathology to        Barry + Barry
Date Sent  03/23/2010
Total Number of Slides Sent  28; 1 block
Page 5 of 5

Exhibit 30-768



Exhibit 30-769



Exhibit 30-770



Exhibit 30-771

# Exhibit 5

Exhibit 30-772



**ValleyCare Medical Center**
5555 W. Las Positas Blvd.
Pleasanton, CA 94588
(925) 416-3423

**Valley Memorial Hospital**
1111 E. Stanley Blvd.
Livermore, CA 94550
(925) 373-4023

David P Enfield, M.D.

David F. Jensen, M.D.

Kenneth K. Wachi, M.D.

Thomas L. Yu, M.D.

**Department of Pathology**

| | |
|---|---|
| **Patient:** VEST, TIMOTHY E | |
| **Med. Rec. #:** 043464 | **Accession:** CY-09-00447 |
| **Account #:** 504753443 | **Collection Date:** 9/17/2009 |
| **DOB:** 2/19/1965 **Age:** 44 **Sex:** M | **Received Date:** 9/18/2009 |
| **Physician:** MICHAEL R ALPER | **Location:** VHS SCP 706 A |
| | **Copies To:** JOHN W YEE |
| | DANIEL E LUCAS |

## CYTOLOGY REPORT

**FINAL DIAGNOSIS:**

LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE:
- POSITIVE FOR MALIGNANT CELLS; NONSMALL CELL CARCINOMA, FAVOR
ADENOCARCINOMA, SEE COMMENT.

**MDC:** KKW

**PATHOLOGIST COMMENT:**
Dr. Yee was informed of the findings. Please see concurrent biopsy, VS09-4274, pending for immunoperoxidase stain evaluation and further classification. My colleague, Dr. Wachi, has reviewed and concurs.

**SOURCE DESCRIPTION:**
LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE

**CLINICAL HISTORY:**
Right lung mass.

**GROSS DESCRIPTION:**
Specimen received fresh, consists of fluoroscopically guided right lung biopsy. Smears are prepared.
88173

**MICROSCOPIC DESCRIPTION:**
Five smears and one ThinPrep slide are evaluated. The specimen reveals isolated and clusters of malignant epithelial cells with moderately pleomorphic, round to oval shaped, overlapping nuclei with prominent nucleoli. Occasional intranuclear inclusions are noted. Eosinophilic cytoplasm and vacuolated cytoplasm are noted in these cells.

c:mpt:/09/20/2009

Report For: MICHAEL R ALPER
MED
87 FENTON ST
SUITE 100
LIVERMORE CA, 94550

Page 1 of 2

EXHIBIT _____5_____ 9/.7

Exhibit 30-773

ValleyCare Medical Center
Pleasanton, CA. 94588
David P Enfield, M.D.

**Department of Pathology.**

David F. Jensen, M.D.

Valley Memorial Hospital
Livermore, CA. 94550
Thomas L. Yu, M.D.

Kenneth K. Wachi, M.D.

**Patient:** VEST, TIMOTHY E

**Accession:** CY-09-00447

Final Diagnosis performed by
Thomas Yu M.D.
Electronically signed 09/21/2009

Page 2 of 2

Exhibit 30-774



ValleyCare Medical Center
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

**VALLEYCARE
HEALTH
SYSTEM.**

Valley Memorial Hospital
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

David P Enfield, M.D.

David F. Jensen, M.O.

Kenneth K. Wachi, M.D.

**Department of Pathology**

Thomas L. Yu, M.D.

---

**Patient:** VEST, TIMOTHY E
**Med. Rec. #:** 043464
**Account #:** 504753443
**DOB:** 2/19/1965 **Age:** 44 **Sex:** M
**Physician:** MICHAEL R ALPER

**Accession:** CY-09-00447
**Collection Date:** 9/17/2009
**Received Date:** 9/18/2009
**Location:** VHS SCP 706 A
**Copies To:** JOHN W YEE
DANIEL E LUCAS

---

## CYTOLOGY REPORT
### **Addendum - See End of Report **

**FINAL DIAGNOSIS:**

LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE:
- POSITIVE FOR MALIGNANT CELLS; NONSMALL CELL CARCINOMA, FAVOR
ADENOCARCINOMA, SEE COMMENT.

**MDC: KKW**

**PATHOLOGIST COMMENT:**
Dr. Yee was informed of the findings. Please see concurrent biopsy, VS09-4274, pending for immunoperoxidase stain evaluation and further classification. My colleague, Dr. Wachi, has reviewed and concurs.

**SOURCE DESCRIPTION:**
LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE

**CLINICAL HISTORY:**
Right lung mass.

**GROSS DESCRIPTION:**
Specimen received fresh, consists of fluoroscopically guided right lung biopsy. Smears are prepared.
88173

**MICROSCOPIC DESCRIPTION:**
Five smears and one ThinPrep slide are evaluated. The specimen reveals isolated and clusters of malignant epithelial cells with moderately pleomorphic, round to oval shaped, overlapping nuclei with prominent nucleoli. Occasional intranuclear inclusions are noted. Eosinophilic cytoplasm and vacuolated cytoplasm are noted in these cells.
c:mpt:/09/20/2009

Report For: MICHAEL R ALPER,
MED
87 FENTON ST
SUITE 100
LIVERMORE CA, 94550

Page 1 of 2

Exhibit 30-775

**ValleyCare Medical Center**
Pleasanton, CA. 94588
David P Enfield, M.D.

**Department of Pathology.**

David F. Jensen, M.D.

Kenneth K. Wachi, M.D.

**Valley Memorial Hospital**
Livermore, CA. 94550
Thomas L. Yu, M.D.

---

**Patient:** VEST, TIMOTHY E

**Accession:** CY-09-00447

Final Diagnosis performed by
Thomas Yu M.D.
Electronically signed 09/21/2009

## ADDENDUM # 1

### STANFORD UNIVERSITY MEDICAL CENTER

**DIAGNOSIS:**
LUNG, RIGHT, FINE NEEDLE ASPIRATION (CY-09-447; 09/17/09)
- NON-SMALL CELL CARCINOMA (SEE COMMENT)
LUNG, RIGHT, CORE NEEDLE BIOPSY (VS-09-4274; 09/17/09)
- ADENOCARCINOMA (SEE COMMENT)

**COMMENT:**
Please see original pathology report from Stanford, SHS-09-33116. (Note: Patient pickup)

Addendum #1 performed by
Thomas Yu M.D.
Electronically signed 10/01/2009

Page 2 of 2

Exhibit 30-776



**ValleyCare Medical Center**
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

VALLEYCARE
HEALTH
SYSTEM.

**Valley Memorial Hospital**
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

**Department of Pathology**

David P Enfield, M.D.        David F. Jensen, M.D.        Kenneth K. Wachi        Thomas L. Yu, M.D.

| | |
|---|---|
| **Patient:** VEST, TIMOTHY E | **Accession:** VS-09-04274 |
| **Med. Rec. #:** 043464 | **Collection Date:** 9/17/2009 |
| **Account #:** 504753443 | **Received Date:** 9/17/2009 |
| **DOB:** 2/19/1965   **Age:** 44   **Sex:** M | **Location:** VHS SCP 706 A |
| **Physician:** MICHAEL R ALPER | **Copies To:** JOHN W YEE |
| | DANIEL E LUCAS |

## SURGICAL PATHOLOGY REPORT

**FINAL DIAGNOSIS:**

**RIGHT LUNG, FLUOROSCOPIC NEEDLE CORE BIOPSY:**
- NONSMALL CELL CARCINOMA, MODERATELY DIFFERENTIATED, FINAL DIAGNOSIS PENDING IHC STAINS (SEE MICROSCOPIC).

**MDC:** TLY

**SOURCE DESCRIPTION:**
MASS RIGHT LUNG

**CLINICAL HISTORY:**
Right lung mass.
Operative procedure: Fluoroscopically guided right lung biopsy.

**GROSS DESCRIPTION:**
The specimen is submitted in a container of formalin and labeled "Vest, Timothy, right lung biopsy". The specimen consists of approximately three tiny fragments of gray tissue measuring approximately 0.1 cm in length and between 0.1 and 0.3 cm in length. Totally processed.

88305

**MICROSCOPIC DESCRIPTION:**
Sections of the fluoroscopic needle core biopsy of the right lung show a moderately differentiated carcinoma. The neoplastic cells have moderate amounts of eosinophilic cytoplasm with cytoplasmic vacuoles. The nuclei show moderate nuclear enlargement and mild pleomorphism. IHC stains for lung, liver and gastrointestinal markers will be performed and reported separately. There are small fragments of benign alveolar tissue present.
g:mpt:/09/18/2009; m:mpt:/09/18/2009

Report For:    MICHAEL R ALPER
MED
87 FENTON ST
SUITE 100
LIVERMORE CA, 94550

Page 1 of 2

Exhibit 30-777

ValleyCare Medical Center
Pleasanton, CA. 94588
David P Enfield, M.D.

David F. Jensen, M.D.

**Department of Pathology.**

Kenneth K. Wachi

Valley Memorial Hospital
Livermore, CA. 94550
Thomas L. Yu, M.D.

**Patient:**   VEST, TIMOTHY E

**Accession:**   VS-09-04274

Final Diagnosis performed by
Kenneth K Wachi M.D.
Electronically signed 09/18/2009

Exhibit 30-778



**ValleyCare Medical Center**
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

# VALLEYCARE HEALTH SYSTEM.

**Valley Memorial Hospital**
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

## Department of Pathology

David P Enfield, M.D.          David F. Jensen, M.D.          Kenneth K. Wachi          Thomas L. Yu, M.D.

| Patient: VEST, TIMOTHY E | |
|---|---|
| Med. Rec. #: 043464 | **Accession:** VS-09-04274 |
| Account #: 504753443 | **Collection Date:** 9/17/2009 |
| DOB: 2/19/1965  Age: 44  Sex: M | **Received Date:** 9/17/2009 |
| Physician: MICHAEL R ALPER | **Location:** VHS SCP 706 A |
| | **Copies To:** JOHN W YEE |
| | DANIEL E LUCAS |

## SURGICAL PATHOLOGY REPORT
### **Addendum – See End of Report **

**FINAL DIAGNOSIS:**

RIGHT LUNG, FLUOROSCOPIC NEEDLE CORE BIOPSY:
- NONSMALL CELL CARCINOMA, MODERATELY DIFFERENTIATED, FINAL DIAGNOSIS PENDING IHC STAINS (SEE MICROSCOPIC).

MDC: TLY

**SOURCE DESCRIPTION:**
MASS RIGHT LUNG

**CLINICAL HISTORY:**
Right lung mass.
Operative procedure: Fluoroscopically guided right lung biopsy.

**GROSS DESCRIPTION:**
The specimen is submitted in a container of formalin and labeled " Vest, Timothy, right lung biopsy". The specimen consists of approximately three tiny fragments of gray tissue measuring approximately 0.1 cm in length and between 0.1 and 0.3 cm in length. Totally processed.

88305

**MICROSCOPIC DESCRIPTION:**
Sections of the fluoroscopic needle core biopsy of the right lung show a moderately differentiated carcinoma. The neoplastic cells have moderate amounts of eosinophilic cytoplasm with cytoplasmic vacuoles. The nuclei show moderate nuclear enlargement and mild pleomorphism. IHC stains for lung, liver and gastrointestinal markers will be performed and reported separately. There are small fragments of benign alveolar tissue present.
g:mpt/09/18/2009; m:mpt:/09/18/2009

Report For:      MICHAEL R ALPER
                 MED
                 87 FENTON ST
                 SUITE 100
                 LIVERMORE CA. 94550

Page 1 of 2

Exhibit 30-779

ValleyCare Medical Center
Pleasanton, CA. 94588
David P Enfield, M.D.

**Department of Pathology.**

David F. Jensen, M.D.          Kenneth K. Wachi

Valley Memorial Hospital
Livermore, CA. 94550
Thomas L. Yu, M.D.

**Patient:**   VEST, TIMOTHY E          **Accession:**   VS-09-04274

Final Diagnosis performed by
Kenneth K Wachi M.D.
Electronically signed 09/18/2009

ADDENDUM:

DIAGNOSIS:
RIGHT LUNG, FLUOROSCOPIC NEEDLE CORE BIOPSY:
  - NONSMALL CELL CARCINOMA, MODERATELY DIFFERENTIATED (SEE MICROSCOPIC)

IHC STAIN:
Thyroid transcription factor-1, a lung marker shows no nuclear staining of the tumor. There is positive staining of benign lung parenchyma. CDX2, a gastrointestinal marker is negative. Hepar-1, a liver marker is negative. Up to 25% of primary adenocarcinomas of the lung are negative with thyroid transcription factor-1. Controls are appropriate.

88342 x3

Addendum #1 performed by
Kenneth K Wachi M.D.
Electronically signed 09/23/2009

Page 2 of 2

Exhibit 30-780

# Exhibit 6

Exhibit 30-781



# LABORATORY OF SURGICAL PATHOLOGY

STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211      FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: VEST, TIM

Med. Rec. No.: 22642425
Sex: M          Age: 44
Date of Birth: 02/19/1965
Account No.: 131004902212

Pathology No: **SHS-09-33116**

Date of Procedure:   09/29/2009
Date Received:        09/30/2009

Physician(s):
**JOSEPH B SHRAGER, M.D.**
Dept CARDIOTHORACIC SURGERY
300 PASTEUR DRIVE, CVRB MC 5407
STANFORD, CA 94305

**KENNETH K WACHI, M.D.**
VALLEY MEMORIAL HOSPITAL
Dept PATHOLOGY
1111 E. STANLEY BLVD
LIVERMORE, CA 94550

**THOMAS L. YU, M.D.**
VALLEYCARE HEALTH SYSTEM
1111 EAST STANLEY BLVD
LIVERMORE, CA 94550

**SPECIMEN SUBMITTED:**
CY09-447, 6 SLIDES; VS-09-4274, 7 SLIDES

**CLINICAL HISTORY:** The patient is a 44-year-old man with a right upper lobe lung mass. Materials from a fine needle aspiration (Valley Care Health System, Pleasanton, CA; CY09-447; 09/17/09) and a core biopsy (VS09-4274; 09/17/09) are submitted for our review.

**COMMENT:** We agree with the originating pathologists' diagnoses. The aspirate smears and ThinPrep slide from the right lung are mildly cellular and demonstrate aggregates of atypical cells with moderate nuclear pleomorphism, irregular nuclear contours, prominent nucleoli, and delicate vacuolated cytoplasm. The findings support non-small cell carcinoma and are most suggestive of an adenocarcinoma.

The concurrent right lung core needle biopsy demonstrates a moderately differentiated adenocarcinoma infiltrating lung parenchyma. The submitted immunohistochemical studies show that the tumor is negative for TTF-1, CDX2, and Hepar-1. The findings support adenocarcinoma and are compatible although not specific for a lung primary. Up to 30% of pulmonary adenocarcinomas lack TTF-1 expression. Clinical and radiologic correlation is recommended.

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors

Page 1 of 2

EXHIBIT     6

Exhibit 30-782



# LABORATORY OF SURGICAL PATHOLOGY

**STANFORD UNIVERSITY MEDICAL CENTER**
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. -- Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. -- Associate Directors

---

Patient: VEST, TIM                    Pathology No: **SHS-09-33116**

**DIAGNOSIS:**
LUNG, RIGHT, FINE NEEDLE ASPIRATION (CY-09-447; 09/17/09)
   —       NON-SMALL CELL CARCINOMA (SEE COMMENT)
LUNG, RIGHT, CORE NEEDLE BIOPSY (VS-09-4274; 09/17/09)
   —       ADENOCARCINOMA (SEE COMMENT)

SCHWARTZ
jt/09/30/2009

I have reviewed the specimen and agree
with the interpretation above.
ERICH SCHWARTZ M.D., Ph.D.
PATHOLOGIST
Electronically signed 9/30/2009 7:53 PM

Exhibit 30-783



# LABORATORY OF SURGICAL PATHOLOGY

### STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211    FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

---

Patient: **VEST, TIM**      Pathology No: **SHS-09-34038**

Med. Rec. No.: 22642425
Sex: M    Age: 44
Date of Birth: 2/19/1965
Account No.: 131004919594

Date of Procedure: 10/7/2009
Date Received: 10/7/2009

Physician(s):
**JOSEPH B SHRAGER, M.D.**
Dept: CARDIOTHORACIC SURGERY
300 PASTEUR DRIVE, CVRB MC 5407
STANFORD, CA 94305

---

**SPECIMEN SUBMITTED:**
A. ANTERIOR MARGIN 6TH RIB
B. ANTERIOR MARGIN OF 5TH RIB
C. ANTERIOR MARGIN OF 7TH RIB
D. PORTION RIBS 5,6,7 WITH ATTACHED TUMOR
E. RIGHT LOWER LOBE CONTAINING NODULES

**SUBMITTED ICD9 CODE:** LUNG CANCER

> **IDX # 09-5530**
> This immunologic test was developed and its performance characteristics
> determined by Stanford University Immunoperoxidase Laboratory. Unless
> indicated otherwise, it has not been cleared or approved by the USFDA, although
> such approval is not required for analyte-specific reagents of this type.

**CLINICAL HISTORY:** 44-year-old male with adenocarcinoma felt to be in lung preoperatively, possibly invading chest wall.

**OPERATION:** Thoracotomy, chest wall resection, wedge resection.

**OPERATIVE FINDINGS:** No lung involvement with main tumor, appears to be primary chest wall tumor.

**CLINICAL DIAGNOSIS:** Lung cancer.

**GROSS DESCRIPTION:** Five specimens are received, each labeled with the patient's name, Tim Vest, and medical record number.

The first specimen is additionally labeled "anterior margin 6th rib" and consists of a 1.8 x 0.8 x 0.6 cm fragment of bone. The specimen is placed in decalcification overnight and entirely submitted in cassette A1.

---

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

---

Page 1 of 4

Exhibit 30-784



# LABORATORY OF SURGICAL PATHOLOGY
## STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211      FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

---

**Patient:** VEST, TIM          **Pathology No:** SHS-09-34038

The second specimen is additionally labeled "anterior margin 5th rib" and consists of two fragments of bone that each measure 1.7 x 1.2 x 0.3 cm. The specimen is placed in decalcification overnight and entirely submitted in cassette B1.

The third specimen is additionally labeled "anterior margin 7th rib" and consists of two bony fragments that each measure 1.9 x 0.9 x 0.5 cm. The specimen decalcified overnight and entirely submitted in cassette C1.

The fourth specimen is additionally labeled "portion rib 5, 6, 7 with attached tumor" and consists of an 8 x 7.5 x 1.5 cm fragment of chest wall containing ribs 5, 6, and 7. The specimen is oriented such that the long stitch is the posterior margin of the fifth rib, and the short stitch is the posterior margin of the 7th rib. On the parietal pleural surface of the chest wall, there is an encapsulated, white-tan, rounded lesion that measures 5.8 x 4.5 x 2.6 cm. The nodule appears 1.8 cm from the posterior 6th rib, 2 cm from the anterior 6th rib, 1.4 cm from the superior margin, and 1.3 cm from the inferior margin. The parietal pleural surface is entirely inked black and the exterior chest wall surface is inked blue. Of note, the ink does not stick to the parietal pleura of the chest wall mass. The chest wall mass is then serially sectioned to reveal a yellow-tan, firm cut surface with a white-tan fibrous rim in some areas. Representative sections are submitted in cassettes D1-D3, and the specimen is then decalcified. A shave of the surgical margin of the posterior 5th rib is submitted in cassette D4, of the posterior 6th rib is submitted in cassette D5, and of the posterior 7th rib is submitted in cassette D6. The specimen edge of the anterior 5th rib is submitted in cassette D7, of the anterior 6th rib is submitted in cassette D8, and of the anterior 7th rib is submitted in cassette D9. The specimen is then further decalcified with sections of tumor to bone submitted in D10 to D17.

The fifth specimen is additionally labeled "right lower lung containing nodule" and consists of 3.5 x 2.5 x 0.6 cm wedge resection specimen. The pleural surface is pink-tan and shiny with no apparent lesions. There is a 6.5 cm staple line. In the middle of the specimen, there is a nodule that is 1.1 cm from the closest resection margin. The staple line is carefully removed and the area under this is inked black. A representative section of lung containing the nodular lesion is submitted completely in cassette E1 with the remainder of the specimen submitted entirely in cassette E2. Weinzierl/mkb/sv

**Block (Original Label):** D2
*Population: Lesional Cells*

| Label | Marker For | Results | Special Pattern or Comments |
|---|---|---|---|
| BEREP4 | EPITHELIAL VS. MESOTHELIAL | NEGATIVE | ext positive control |
| CK20 | keratin 20 | NEGATIVE | ext positive control |
| CK5/6 | keratin 5 and 6 – mesothelial cells, HMW CK; spindle cell carcinoma | POSITIVE | |
| CK7 | keratin 7 | POSITIVE | |
| CALRETIN1 | MESOTHELIOMA | POSITIVE | |

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

---

Page 2 of 4

Exhibit 30-785



# LABORATORY OF SURGICAL PATHOLOGY

STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: VEST, TIM                Pathology No: **SHS-09-34038**

N
TTF1      THYROID TRANSCRIPTION      NEGATIVE      ext positive control
          FACTOR 1—LUNG AND
          THYROID MARKER

**COMMENT:** We have reviewed the prior biopsy (SHS-09-33116), and sections from the current resection specimen appear histologically similar. Histologic sections of the current specimen D (ribs 5, 6, and 7) demonstrate a tumor comprised of epithelioid cells with medium- to large-sized nuclei and prominent nucleoli, with areas of pseudoglandular and microcystic architecture. The tumor focally invades into adjacent adipose tissue. These cells demonstrate cytoplasmic immunoreactivity to CK7 and demonstrate nuclear immunoreactivity to calretinin. They are negative for TTF-1, CK20, and BerEP4. A PASd stain is negative for cytoplasmic mucin. These findings are diagnostic of a localized malignant mesothelioma that measures 5.8 cm in greatest dimension. Metaplastic bone is present in the tumor, but no invasion into rib is identified. Tumor is present at ink on its surface (slide D2); however, we are unable to determine if the opposing visceral pleura is involved, although the separately submitted right lower lobe wedge is uninvolved by tumor. All bony and soft tissue surgical margins are negative. No angiolymphatic invasion is seen. Overall, these findings demonstrate a localized malignant mesothelioma, at least pT1a pNX pMX.

**DIAGNOSIS:**
BONE, ANTERIOR MARGIN 6TH RIB, RESECTION
~      BONE WITH NO TUMOR SEEN
BONE, ANTERIOR MARGIN 5TH RIB, RESECTION
~      BONE WITH NO TUMOR SEEN
BONE, ANTERIOR MARGIN 7TH RIB, RESECTION
~      BONE WITH NO TUMOR SEEN
RIBS 5, 6, AND 7 WITH TUMOR, RESECTION
~      LOCALIZED MALIGNANT MESOTHELIOMA, 5.8 CM IN GREATEST
       DIMENSION, EPITHELIOID TYPE, SURGICAL MARGINS NOT INVOLVED (SEE
       COMMENT)
LUNG, RIGHT LOWER LOBE, WEDGE RESECTION
~      SCAR
~      NO TUMOR SEEN

TNM STAGING: at least pT1a pNX pMX
WEINZIERL/CARNEY/BERRY/PAI
mkb/10/07/2009; sv/10/08/2009
jt/10/19/2009

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

Exhibit 30-786



# LABORATORY OF SURGICAL PATHOLOGY
## STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: **VEST, TIM**                    Pathology No: **SHS-09-34038**

I have reviewed the specimen and agree
with the interpretation above.
REETESH PAI, M.D.
-Pathologist
Electronically signed 10/12/2009 9:41 AM

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

Page 4 of 4

Exhibit 30-787

# Exhibit 7

Exhibit 30-788

## DIAGNOSTIC SPECIALTIES LABORATORY (PAKC/DSL, INC., P.S.)

Samuel P. Hammar, M.D., F.C.C.P., F.C.A.P., Director
700 Lebo Boulevard
Bremerton, Washington 98310
e-mail: hammar.dsl@hotmail.com

Voice: 360-479-7707 Facsimile: 360-479-7886 Washington State: 800-762-2344

| | | | | | |
|---|---|---|---|---|---|
| *Name:* | **VEST, TIMOTHY E.** | *Age:* | **44 (M)** | | |
| | | *DOB:* | 02/19/65 | *DOD:* | **(Living)** |

*Court:*
Alameda County Superior Court, California; No. RG09489518
Timothy Vest and Caroline Vest vs. Allied Packing & Supply, Inc.

*Date Received:* **12/30/09**
*Date Transcribed:* **01/15/10**

*Requested by:* **Chehie Songstad, Litigation Paralegal**

*Pathology:* **29 slides/1 block:**
**5 slides CY09-447**
**6 slides/1 block VS-09-4274**
**18 slides 09-34038**

*Records:*
Pathology reports from:
- **Valleycare Health System**
- **Stanford University Medical Center**

*Firm:* **Kazan McClain Lyons Greenwood & Harley – Oakland, CA**
**Phone: 510-302-1000 | Fax: 510-835-4913**

Received from Chehie Songstad, Litigation Paralegal, Kazan McClain Lyons Greenwood & Harley, Oakland, California, are pathology materials and pathology reports as inventoried above.

**Review of slides:**
There are five glass slides for review designated CY09-447. According to the pathology report from the Valleycare Health System, Livermore, CA, the specimen consisted of a fine needle aspiration biopsy of a right lung mass. The slides designated CY09-447 consist of a ThinPrep and four smears. The ThinPrep shows a few aggregates of atypical epithelioid cells. The smears contain abundant blood and atypical epithelioid cells that have slightly large nuclei and recognizable nucleoli. These are in large aggregates and most likely represent neoplastic epithelioid cells. There is a suggestion of possible tubular/glandular differentiation.

There are six glass slides and one paraffin block for review designated VS-09-4274. According to the pathology report bearing this number, the specimen consisted of a right lung thoracoscopic needle biopsy. There is one slide that contains six step sections of very small pieces of tissue. These pieces of tissue consist in part of dense fibrous tissue and are involved by a malignant epithelial neoplasm showing focal glandular differentiation. Some tumor cells have nuclear-like inclusions. Most have eosinophilic cytoplasm. There are some enlarged cells. There is one slide designated TTF-1 that has a positive control. The pieces of tissue that I think are neoplastic do not show nuclear staining for TTF-1, although there are reactive or normal alveolar lining cells that do. The section stained for CDX-2 shows no staining of neoplastic cells or normal cells. The section stained for HepPar shows no staining of the neoplastic cells. There are positive controls for each of these tests and there is a negative control.

| | | |
|---|---|---|
| *L09-439* | *Vest, Timothy E.* | *Page 1 of 3* |

EXHIBIT ___7___

Exhibit 30-789

There are eighteen glass slides for review designated 09-34038. According to the pathology report bearing this number, the specimen was stated to consist of a specimen from Stanford. The case consisted of five parts. Part A was designated "anterior margin 6th rib"; part B "anterior margin 5th rib"; part C "anterior margin 7th rib"; part D "portion ribs 5, 6, 7 with attached tumor"; and E "right lower lobe containing nodules."

The slides I have are H&E stained sections designated D1, D2, and D3, and H&E stained sections designated E1, E2, and E3.

Specimen designated D was stated to consist of an 8 x 7.5 x 1.5 cm fragment of chest wall containing ribs 5, 6 and 7. On the parietal pleural surface of the chest wall, there was an encapsulated white-tan rounded lesion that measured 5.8 x 4.5 x 2.6 cm. This nodule appeared to be 1.8 cm from the posterior 6th rib, 2 cm from the anterior 6th rib, and 1.4 cm from the superior margin, and 1.3 cm from the inferior margin. Representative sections were submitted in cassettes D1 through D3.

The H&E stained sections designated D1, D2, and D3 show an epithelial neoplasm that is adjacent to markedly thickened visceral pleura that has the appearance of hyaline pleural plaque caused by asbestos. This nodule is composed of numerous cells that form glandular and sometimes adenoidcystic structures. The differential diagnosis includes an adenocarcinoma and an epithelial mesothelioma.

Slides designated D2 and D3 show more of the same with a mildly thickened visceral is consistent with hyaline pleural plaque and an adjacent tumor that is fairly solid but shows extensive glandular and adenoidcystic type changes.

Immunostains were done for CK5/6, HBME-1, calretinin, CD15, B72.3, BerEP4, Wilm's tumor suppressor gene protein, D2-40, PSA, CEA, and calretinin. There are positive controls that show the expected staining result. 100% of the neoplastic cells show moderately intense cell membrane staining for HBME-1, low intensity cytoplasmic and nuclear staining for calretinin, moderately intense cell membrane staining for D2-40, nuclear staining of about half of the neoplastic cells of low intensity for WT-1, and intense cytoplasmic immunostaining of tumor cells for broad spectrum keratin. The immunophenotype of the tumor is consistent with and characteristic of an epithelial mesothelioma.

Part E was stated to represent the right lower lob containing nodules and was stated to consist of a 3.5 x 2.5 x 0.6 cm wedge resection. The pleural surface was pink-tan and shiny with no apparent lesions. The staple line was removed. In the middle of the specimen, there was a nodule that was 1.1 cm from the closest margin. Representative section of the lung containing the nodular lesion was submitted completely in cassette E1 with the remainder of the specimen submitted entirely in cassette E2.

The slides I have for review from part E consist of H&E stained sections designated E1 and E2 and iron-stained sections designated E1 and E2.

The H&E stained sections show a nodule in the tissue that has the appearance of dense fibrous tissue surrounded by lymphoid tissue and lung tissue. The lung tissue shows mild congestion with occasional lymphoid infiltrate. The nodule appears benign.

---

| L09-439 | *Vest, Timothy E.* | *Page 2 of 3* |

Exhibit 30-790

In the iron stained section designated E2, there is one piece of lung tissue where there is hemosiderin in some tissue cells, specifically the macrophages.

**The following summary statements can be made in this case:**

1. My name is Samuel P. Hammar, M.D., and I am licensed to practice medicine in the State of Washington. My license is active. I have been Board certified in clinical and anatomic pathology since 1975.
2. Mr. Timothy E. Vest is a 44-year-old man. I am unaware of Mr. Vest's clinical history or his smoking history.
3. I reviewed five glass slides designated CY09-447 that contained highly atypical epithelioid cells that I thought were suspicious for malignancy.
4. I reviewed six glass slides designated VS-09-4274 that represented a fine needle aspiration biopsy of a right lung mass that showed an epithelial neoplasm exhibiting glandular differentiation.
5. I reviewed eighteen glass slides designated 09-34038 that represented a wedge resection. The wedge resection contained an attached tumor that measured 8 x 7.5 x 1.5 cm that showed an epithelial neoplasm with extensive glandular differentiation. The tumor had the features of an epithelioid mesothelioma. Given the localized nature of the neoplasm, I would diagnose this as a localized malignant mesothelioma.
6. Based on the tissue that I would interpret to represent hyaline pleural plaque in slides D1, D2, and D3, I conclude Mr. Vest's localized malignant mesothelioma was caused by asbestos.
7. All opinions and conclusions in my report are to a reasonable degree of medical certainty/probability.

*Samuel P. Hammar, MD*
Electronic Signature

---

**L09-439**          **Vest, Timothy E.**          *Page 3 of 3*

Exhibit 30-791

# Exhibit 8

Exhibit 30-792

## DIAGNOSTIC SPECIALTIES LABORATORY (PAKC/DSL, INC., P.S.)

Samuel P. Hammar, M.D., F.C.C.P., F.C.A.P., Director
700 Lebo Boulevard
Bremerton, Washington 98310
e-mail: hammar.dsl@hotmail.com

Voice: 360-479-7707  Facsimile: 360-479-7886  Washington State: 800-762-2344

| Name: | VEST, TIMOTHY E. | Age: | 44 (M) | | |
|---|---|---|---|---|---|
| | | DOB: | 02/19/65 | DOD: | (Living) |

Court:
Alameda County Superior Court, California; No. RG09489518
Timothy Vest and Caroline Vest vs. Allied Packing & Supply, Inc.

Date Received: **12/30/09**
Date Transcribed: **01/15/10**
Supplemental: **11/22/10**

Requested by: **Claire Copp, Legal Assistant**

Pathology: 29 slides/1 block:
5 slides CY09-447
6 slides/1 block VS-09-4274
18 slides 09-34038

Records:
Pathology reports from:
• **Valleycare Health System**
• **Stanford University Medical Center**
Supplemental records received 11/11/10:
Response to Joint Defense Interrogatories
Video Direct Depo Transcript dated 3-8-10
Deposition of Timothy Vest dated 10-21-10

Firm: **Kazan McClain Lyons Greenwood & Harley – Oakland, CA**
**Phone: 510-302-1000 | Fax: 510-835-4913**

### SUPPLEMENTAL

I previously reviewed pathology materials concerning Timothy Vest and concluded Mr. Vest had a localized malignant mesothelioma caused by asbestos based on identification of hyaline pleural plaque characteristic of plaque caused by asbestos.

Subsequently received from Claire Copp, Legal Assistant, Kazan McClain Lyons Greenwood & Harley, Oakland, California, are Response to Joint Defense Interrogatories and deposition transcripts of Timothy Vest.

**Response to Interrogatories:**
Responding party: Timothy Vest.

Response to interrogatories #3 and 4 stated Mr. Vest's father was alive at age 74 and had prostate cancer. His mother was alive at age 70.

Response to interrogatories #11 and 12 indicated Mr. Vest was receiving chemotherapy treatment for malignant mesothelioma. He underwent bronchoscopy, lung biopsy, thoracotomy, and lung resection.

---

*L09-439 Supplemental*     *Vest, Timothy E.*     *Page 1 of 4*

EXHIBIT ___8___

Exhibit 30-793

Response to interrogatory #17 indicated Mr. Vest had malignant mesothelioma and his symptoms included weight loss, fatigue, cough, shortness of breath, loss of strength and endurance, and pain.

Response to interrogatory #20 stated Mr. Vest had mild childhood asthma and no symptoms since.

Response to interrogatory #26 stated Mr. Vest smoked approximately one cigar per year over the last 25 years. He stopped smoking cigars two years previous. He did not inhale the cigar smoke.

Response to interrogatory #29 provided Mr. Vest's employment history as follows:

| Employer/Job Site | Dates | Job Title |
|---|---|---|
| Mrs. Fields Cookie, Inc. | 1983-1984 | Store Manager |
| Job duties: Not given. | | |
| Continental Airlines, Inc. | 1985-1987 | Ramp Supervisor |
| Job duties: Managed a crew of 8-10 people who off-loaded baggage. | | |
| Sandys Ski Rentals-Westwood Inc. | 1985-1986 | Certified Ski Technician |
| Job duties: Tuned, adjusted and mounted bindings. Drilled and scraped skis. | | |
| Dealin Down/Nelsen James W. Ttee | 1986 | Could not recall |
| Job duties: Mr. Vest could not recall this employer. | | |
| Ahart Aviation, Inc. | 1988-1990 | Flight Instructor |
| Job duties: Conducted pre-flight inspections. | | |
| De La Salle Institute | 1989-1990 | Soccer Coach |
| Job duties: Not given. | | |
| C.N. Fletcher Company | 1989 | Certified Ski Technician |
| Job duties: Tuned, adjusted and mounted bindings. | | |
| Emery Worldwide Airlines, Inc. (aka Leland Service Corp. & Con-Way Enterprise Services) | 1990-2001 | Pilot |
| Job duties: Piloted cargo aircraft around the world. Conducted pre-flight inspections. At times, he oversaw maintenance and repair and changed tires and brakes. Worked as an accident investigator in 2000. | | |
| JetBlue Airways Corp. | 2001-present | Commercial Pilot |
| Job duties: Not given. | | |

Response to interrogatory #30 stated that "for employment and second-hand exposure, all types of asbestos-containing products used in aircraft and construction, including but not limited to the following: block, pipe covering, pipe insulation, cement, adhesive, packing, gaskets, mud, tape, cord, rope, blankets, sheets, cloth, lagging, fireproof spray, gloves, sheet linoleum, vinyl asbestos floor tile, roofing paper, texture, stucco, joint compound, drywall compound, wall board, sheet rock, acoustical tile, duct insulation, mastic, shingles, aircraft parts, refractory materials, and skis. Plaintiff and his co-workers were regularly exposed to a dusty work environment which was created by the use of asbestos-containing materials. Discovery and investigation are continuing."

| Non-occupational/para-occupational exposure: | |
|---|---|
| FRICTION | Timothy Vest performed brake jobs on his personal vehicles and airplanes. Investigation and discovery were continuing. |
| PARAOCCUPATIONAL | From 1973-1983 Mr. Vest was stated to have been exposed to asbestos brought home on the person, clothes, shoes and belongings of his father, Warren Vest, from his employment with and work at World Airway's |

L09-439 *Supplemental*          *Vest, Timothy E.*                    *Page 2 of 4*

maintenance and headquarters hangar (Hangar 110) at the Oakland Airport. Warren Vest oversaw the hangar facility, was director of flight operations, and was chief pilot. Aircraft maintenance and conversion were done in the hangar where Warren Vest had his office. Continuous construction and remodeling was done throughout the hangar during Warren Vest's employment, including initial construction and moving walls and offices by various contractors and trades. The removal, installation and manipulation of asbestos-containing drywall, ceiling, flooring, and other materials during these activities, coupled with the 24-hour a day maintenance work of aircraft mechanics, generated asbestos-containing dust which contaminated the worksite and Warren Vest's person, clothing, shoes, and belongings. Timothy Vest's father inadvertently carried the asbestos dust to his vehicle and home. His vehicle and home became contaminated with asbestos dust which exposed Timothy to asbestos. Timothy was exposed to asbestos when he came into contact with his father during the regular course of living in the family home, including greeting him when he arrived home each night, sitting and talking each night with his father while he was still in the clothing he wore to work, and through asbestos dust released from his work clothes and person into the family home, automobiles, and asbestos from same that contaminated the family's clothing.

From 1973 until approximately 1981, Timothy accompanied his father to the hangar on weekends at least twice a month while his father worked. Timothy visited all areas of the hangar. The asbestos-containing building materials in the hangar and the continuous maintenance activities exposed Timothy to asbestos dust. On occasion, Timothy's mother would take him and his brother to visit their father at the hangar or Warren would bring his sons to the hangar to borrow a plane to take flying.

**The following summary statements can be made in this case:**

1. My name is Samuel P. Hammar, M.D., and I am licensed to practice medicine in the State of Washington. My license is active. I have been Board certified in clinical and anatomic pathology since 1975.

2. I previously reviewed five glass slides designated CY09-447 that contained highly atypical epithelioid cells that I thought were suspicious for malignancy.

3. I previously reviewed six glass slides designated VS-09-4274 that represented a fine needle aspiration biopsy of a right lung mass that showed an epithelial neoplasm exhibiting glandular differentiation.

4. I previously reviewed eighteen glass slides designated 09-34038 that represented a wedge resection. The wedge resection contained an attached tumor that measured 8 x 7.5 x 1.5 cm that showed an epithelial neoplasm with extensive glandular differentiation. The tumor had the features of an epithelioid mesothelioma. Given the localized nature of the neoplasm, I would diagnose this as a localized malignant mesothelioma.

5. Based on Mr. Vest's history of occupational and paraoccupational exposure to asbestos as described in my report, I conclude his localized malignant mesothelioma was caused by asbestos.

---

*L09-439* Supplemental          ***Vest, Timothy E.***                    *Page 3 of 4*

Exhibit 30-795

6. Based on the tissue that I would interpret to represent hyaline pleural plaque in slides D1, D2, and D3, I conclude Mr. Vest's localized malignant mesothelioma was caused by asbestos.

7. All opinions and conclusions in my report are to a reasonable degree of medical certainty/probability.

*Samuel P. Hammar, MD*

Electronic Signature

**References:**

➤ Hammar SP, Dodson RF. Chapter 27 (volume I) – Asbestos. In: Dail and Hammar's Pulmonary Pathology, 3rd edition. Tomashefski JF Jr., Cagle PT, Farver CF, Fraire AE (Eds). Springer 2008:950-1031;

➤ Hammar SP, Henderson DW, Klebe S, Dodson RF. Chapter 43 (volume II) – Neoplasms of the Pleura. In: Dail and Hammar's Pulmonary Pathology, 3rd edition. Tomashefski JF Jr., Cagle PT, Farver CF, Fraire AE (Eds). Springer 2008:558-734; and

➤ Asbestos: Risk assessment, epidemiology, and health effects. Dodson RF, Hammar SP (Eds). CRC Press/Taylor Francis 2006.

---

Exhibit 30-796

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 31

1 | James L. Oberman, Esq. (C.S.B. #120938)
Michael T. Stewart, Esq. (C.S.B. #253851)
2 | KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY
3 | A Professional Law Corporation
Jack London Market
4 | 55 Harrison Street, Suite 400
Oakland, California 94607
5 | Telephone: (510) 302-1000

6 | Attorneys for Plaintiffs

7

8 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | IN AND FOR THE COUNTY OF ALAMEDA

10 | TIMOTHY VEST and CAROLINE VEST,   No. RG09489518

11 |   Plaintiffs,   **DECLARATION OF WILLIAM R. SALYER,**

12 |   vs.   **M.D., IN SUPPORT OF PLAINTIFFS'**
**OPPOSITIONS TO DEFENDANTS'**
**MOTIONS FOR SUMMARY**
13 | ALLIED PACKING & SUPPLY, INC.,   **JUDGMENT/ADJUDICATION**

14 |   Defendants.   Dept.:   30 (Hon. Kenneth Mark Burr)
15 |   Case Filed:   December 17, 2009
Trial Date:   February 14, 2011
16 |   Res. No.:

17 | I, William R. Salyer, M.D., declare:

18 |   1. I am an adult over the age of 18 years and am not a party to this lawsuit. I have personal

19 | knowledge of the matters set forth in this declaration, except for such matters that have been made

20 | known to me in forming an opinion, in which case each such matter is of a type on which

21 | professionals in my field reasonably rely in forming such opinions. The matters stated in this

22 | declaration that are within my personal knowledge are true. If asked, I could and would testify

23 | competently to the truth of each matter and opinion asserted within this declaration, as well as to

24 | the foundation for each such matter and opinion. All opinions and conclusions in this declaration

25 | are made to a reasonable degree of medical certainty.

26 |   2. Attached as Exhibit 1 hereto, and incorporated fully herein by reference, is a true copy

27 | of my curriculum vitae, dated January 24, 2009. The information contained in my curriculum

28 | vitae is true.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Salyer Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary
Judgment/Adjudication

MSTEWART/702576.1

Exhibit 31-797

EXHIBIT _C_ 1

3. I am a pathologist. Pathology is the scientific study of the nature of disease and its causes, processes, development, and consequences. I earned my undergraduate degree from The Johns Hopkins University; earned my medical degree from Johns Hopkins; and completed post-doctorate pathology training at Johns Hopkins and Memorial Sloan-Kettering Cancer Center in New York City. I have been board-certified in anatomic pathology since 1975. I practice in the Department of Pathology at Alta Bates Medical Center, and at Pathology Services, Inc. in Berkeley, California. I have written dozens of publications in the field of pathology; and I have served as a professor of pathology at Stanford University.

4. I reviewed the pathology slides and pathology reports pertaining to Timothy Vest, which were prepared by ValleyCare Health System and Stanford University Medical Center. Attached as Exhibits 2, 3 and 4 hereto, and incorporated fully herein by reference, are true copies of the slides, the ValleyCare reports and the Stanford reports, respectively. Based on my review of those materials, I generated my own report describing the nature and cause of Timothy Vest's malignant mesothelioma. Attached as Exhibit 5 hereto, and incorporated fully herein by reference, is a true copy of my December 3, 2009 report.

5. I have treated several patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. That is, when the mesotheliomas were first detected in the patients, the tumors appeared to be localized masses – what some in the scientific literature have described as "localized malignant mesothelioma." All of those patients died of the disease soon after diagnosis. Those patients' tumors, although localized in their initial appearance, were in fact diffuse malignant mesotheliomas that were detected earlier than usual. And each patient's diffuse malignant mesothelioma was caused by exposure to asbestos.

6. I have also reviewed the scientific literature pertaining to localized malignant mesothelioma. There is no evidence that localized malignant mesothelioma is a different disease from diffuse malignant mesothelioma. Although there may appear to be a larger number of longer-term survivors whose disease was "localized," that is because the patients were very fortunate to have an early discovery of their disease and underwent surgical amelioration to slow its progression. Many of those patients developed a recurrence of the disease and died.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/702576.1

Salyer Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

2

Exhibit 31-798

7. Here, too, Timothy Vest suffers from malignant mesothelioma that was detected at an early stage of its development. According to the Stanford pathologists, the tumor initially appeared "localized," but no radiology materials or surgical descriptions were cited in support of that conclusion. Even if Mr. Vest's tumor was initially localized, he has a very high risk of local recurrence of his tumor and of metastatic disease. Mr. Vest almost certainly will die of the disease.

8. Timothy Vest's pathology slides demonstrate what are, in fact, diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest. Adjacent to the cancer cells are pleural plaques caused by asbestos. Given the presence of pleural plaques, Mr. Vest's mesothelioma was without a doubt caused by occupational-level exposure to asbestos. Pleural plaques are localized scars that form due to prolonged exposure to asbestos fibers. These scars almost never form for reasons other than asbestos exposure. But even if the pleural plaques did not exist, it remains true that Mr. Vest's mesothelioma was caused by asbestos. My conclusion that Mr. Vest's mesothelioma was without a doubt caused by asbestos is further supported by his documented exposure to asbestos in occupational and para-occupational settings.

9. Malignant mesothelioma is a cancer that starts in the cells that line certain parts of the body, including the pleura membrane that lines the lungs and the chest cavity. There is an extraordinarily strong link between malignant mesothelioma and asbestos dust. Asbestos is the only known cause of malignant mesothelioma in the United States. Where a patient with malignant mesothelioma has a known history of asbestos exposure, or has medical evidence of another abnormality – including pleural plaques – known to be caused by asbestos, then asbestos caused the patient's disease. There is no known cure for malignant mesothelioma.

10. Timothy Vest's malignant mesothelioma was caused by his total lifetime dose of asbestos. All of Mr. Vest's individual asbestos exposures contributed to his total dose and increased his risk of developing the disease. There is no known safe level of asbestos exposure.

11. Based on my review of epidemiological studies, animal studies, case reports and other scientific evidence, I know that all asbestos fiber types, including chrysotile, cause malignant mesothelioma. The disease develops when asbestos fibers are inhaled, travel through the lung

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Salyer Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary
Judgment/Adjudication

MSTEWART/702576.1

3

Exhibit 31-799

1  tissue and reach the pleura, where they cause cells to mutate and grow uncontrollably. Asbestos

2  fibers are invisible to the naked eye, and are small enough to penetrate cells and interfere with the

3  division and replication of DNA material. Chrysotile asbestos fibers cause the same types of

4  genetic errors as other asbestos fibers, and thereby cause mesothelioma. Chrysotile is more likely

5  than other fibers to reach the pleura because, once inhaled into the lung, chrysotile is moved more

6  easily by the body's lymphatic system. Short chrysotile fibers are the type of asbestos most often

7  found in the pleural tissue where mesothelioma starts.

8       I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and that I signed this declaration on December 3, 2010 in Berkeley, California.

10

11  _William R. Salyer, M.D._

12  William R. Salyer, M.D.

13

14

15

16

17

18

19

20

21

22

23

24

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA. 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25

26

27

28

Salyer Declaration in Support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment/Adjudication

4

MSTEWART/702576.1

Exhibit 31-800

# Exhibit 1

Exhibit 31-801

# CURRICULUM VITAE

## WILLIAM RAY SALYER, M.D.

January 24, 2009

| | |
|---|---|
| ADDRESSES: | Department of Pathology<br>Alta Bates Medical Center<br>2450 Ashby Avenue<br>Berkeley, California 94705 |
| | Pathology Services, Inc.<br>3017 Telegraph Avenue, Suite 100<br>Berkeley, California 94705 |
| DATE OF BIRTH: | February 1, 1946 |
| PLACE OF BIRTH: | Oneida, Kentucky |
| CITIZENSHIP: | United States |
| WIFE: | Ann Marie Sandino Salyer |
| CHILDREN: | Lara Alexander Salyer<br>DOB: 4-28-87 |
| | Kathryn Parker Salyer<br>DOB: 3-3-88 |
| HIGH SCHOOL: | Madison High School<br>Richmond, Kentucky<br>1964 |
| COLLEGE: | The Johns Hopkins University<br>Baltimore, Maryland<br>1968 |
| MEDICAL SCHOOL: | The Johns Hopkins University School of Medicine<br>Baltimore, Maryland<br>1968 |

EXHIBIT 1

Exhibit 31-802

P 2/11    Kazanlaw >> 5106442067    PSI    2009-10-26 11:06

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 2

## PROFESSIONAL TRAINING:

| | |
|---|---|
| 1971 - 1972 | Internship, Anatomic Pathology<br>Department of Pathology<br>The Johns Hopkins Hospital<br>Baltimore, Maryland |
| 1972 - 1974 | Resident, Anatomic Pathology<br>Department of Pathology<br>The Johns Hopkins Hospital<br>Baltimore, Maryland |
| 1974 -1975 | American Cancer Society Clinical Fellow<br>Department of Pathology<br>Memorial Sloan Kettering Cancer Center<br>New York, New York |
| 1975 -1976 | Chief Resident, Anatomic Pathology<br>Department of Pathology<br>The Johns Hopkins Hospital<br>Baltimore, Maryland |

## CERTIFICATION:

| | |
|---|---|
| 1972 | Diplomate<br>National Board of Medical Examiners |
| 1975 | Diplomate<br>Anatomic Pathology<br>American Board of Pathology |

## LICENSURE:

| | |
|---|---|
| 1975 | State of California, G-028686 |
| 1985 | Commonwealth of Kentucky, 23971 |

Exhibit 31-803

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 3

ORGANIZATIONS:

International Academy of Pathology
American Society of Cytology
Johns Hopkins Medical and Surgical Assoc
Memorial Sloan Kettering Pathology Alumni
Arthur Purdy Stout Society of Pathology
American College of Pathology
California Society of Pathologists
California Academy of Medicine

COURSE FACULTY:

February, 1979

California Association of Cytotechnologists
"Problems in Pulmonary Cytopathology"
Stanford University Medical Center
Stanford, California

September, 1979

Head and Neck Cancer Network
Northern California Cancer Program
"Histopathology of Head and Neck Tumors"
Children's Hospital
San Francisco, California

January, 1980

U.S.--Japan Cooperative Cancer Research
Program-Treatment Area
Joint Lung Cancer Symposium
"Histologic Questions Concerning
Oat Cell Lung Cancer"
Osaka, Japan

February, 1980

Current Concepts in Surgical Pathology
"Selected Problems in Lung Neoplasia"
Stanford University Medical Center
Stanford, California

December, 1980

Selected Problems in Surgical Pathology
California Society of Pathologists
San Francisco, California

March, 1981

Current Concepts in Surgical Pathology
"Selected Problems in Lung Carcinoma"
Stanford University Medical Center
Stanford, California

CURRICULUM  VITAE
WILLIAM  RAY  SALYER,  M.D.
PAGE  4

|  |  |
|---|---|
| March, 1982 | Current Concepts in Surgical Pathology<br>"Selected Problems in Lung Neoplasia"<br>Stanford University Medical Center<br>Stanford, California |
| March, 1983 | Current Concepts in Surgical Pathology<br>"The Mediastinum and Thymus"<br>Stanford University Medical Center<br>Stanford, California |
| May, 1983 | Professional Seminar Consultants<br>Lectures at the Beijing Medical School<br>Tianjin Medical School<br>Shanghai Oncology Hospital |
| April, 1984 | Current Concepts in Surgical Pathology<br>"The Mediastinum and Thymus"<br>Stanford University Medical Center<br>Stanford, California |
| May, 1990 | Medical/Legal Aspects of Asbestos Related Diseases<br>"Pathological Aspects of Asbestos Related Diseases"<br>Alta Bates Hospital<br>Berkeley, California |

POSITIONS:

|  |  |
|---|---|
| July 2, 1976--<br>July 1, 1978 | Major, United States Army Medical Corps<br>Staff Pathologist<br>Letterman Army Medical Center<br>San Francisco, California |
| July 1, 1978--<br>March 31, 1980 | Acting Assistant Professor<br>Co-Director, Cytopathology<br>Department of Pathology<br>Stanford University School of Medicine<br>Stanford, California |
| April 1, 1980--<br>April 15, 1985 | Staff Pathologist<br>Department of Pathology<br>Alta Bates Hospital<br>Berkeley, California |

P 5/11                    KazanLaw         << 5106442067        PSI         2009-10-26 11:07

Exhibit  31-805

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 5

| | |
|---|---|
| April 1, 1980--<br>April 15, 1985 | Assistant Clinical Professor of Pathology<br>Department of Pathology<br>Stanford University School of Medicine<br>Stanford, California |
| April 15, 1985--<br>September 28, 1985 | Director of Anatomic Pathology<br>Pathology and Cytology Laboratories<br>Lexington, Kentucky |
| October 9, 1985--<br>October 10, 1995 | Director of Anatomic Pathology<br>Alta Bates Medical Center<br>Berkeley, California<br><br>Director, Pathology Services, Inc.<br>3017 Telegraph Avenue<br>Berkeley, California<br><br>President and Director<br>Alta Anatomic Pathology Medical Group, Inc.<br>12 Littlewood Drive<br>Piedmont, California |
| October 10, 1995--<br>Present | Staff Pathologist<br>Department of Pathology<br>Alta Bates Medical Center<br>Pathology Services, Inc.<br>Berkeley, California |

ADDITIONAL POSITIONS:

| | |
|---|---|
| May, 1974 | Instructor<br>Post-Graduate Institute of Cytopathology<br>The Johns Hopkins Hospital<br>Baltimore, Maryland |
| May, 1976 | Instructor<br>Post-Graduate Institute of Cytopathology<br>The Johns Hopkins Hospital<br>Baltimore, Maryland |

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 6


1976-1978                    Consultant
                             Department of Pathology
                             Samuel Merritt Hospital
                             Oakland, California


1978-1985                    Consultant
                             Department of Pathology
                             Letterman Army Medical Center
                             San Francisco, California


1978-1980                    Member, Pathology Committee
                             Northern California Oncology Group
                             Regional Reviewer
                             Head and Neck Cancer
                             Bladder, Transitional Cell Carcinoma
                             Lung, Small Cell Carcinoma

1978-1985                    Review Consultant for Publications
                             American Journal of Clinical Pathology
                             Archives of Pathology and Lab Medicine
                             Cancer
                             Chest

Exhibit 31-807

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 7


PUBLICATIONS (BOOKS):

Salyer WR, Salyer DC: "The Mediastinum". Chapter 24, in *Principles and Practice of Surgical Pathology*, Silverberg, SG (ed), New York: John Wiley and Sons, Inc., 1983.

Salyer DC, Salyer WR: "The Mediastinum". Chapter 24, in *Principles and Practice of Surgical Pathology*, Silverberg, SG (ed), New York: John Wiley and Sons, Inc. 2nd edition, 1990.


PUBLICATIONS (SCIENTIFIC PAPERS):

Salyer WR, Salyer DC: Metastases of prostatic carcinoma to the breast. Lab Invest 26:490, 1972 (abstract).

Salyer WR, Salyer DC: Metastases of prostatic carcinoma to the breast. J Urol 109:671, 1973.

Salyer WR, Salyer DC, Hepstinstall RH: Scleroderma and microangiopathic hemolytic anemia. Ann Int Med 78:895, 1973.

Salyer WR, Keren D: Oxalosis as a complication of chronic renal failure. Kidney International 4:61, 1973.

Salyer WR, Tewari RP, Lomanitz R, Baker RD: The primary pulmonary cryptococcal nodule and complex. Lab Invest 28:396, 1973 (abstract).

Salyer WR, Moravec C, Salyer DC, Guerin P: Adrenal involvement in cryptococcosis. Amer J Clin Path 60:559, 1973.

Ostrow PT, Salyer WR, White JJ, Haller JA, Hutchins GM: Hypertensive pulmonary vascular disease in intralobar sequestration. Amer J Path 70:33a, 1973 (abstract).

Salyer WR, Salyer DC: Involvement of the kidney and prostate in cryptococcosis. J Urol 109:695, 1973.


Salyer WR, Salyer DC: Oxaluric renal failure. New Eng J Med 288:913, 1973 (letter).

West R, Salyer WR, Hutchins GM: Adult-onset primary oxalosis with complete heart block. Johns Hopkins Med J 133:195, 1973.

Exhibit 31-808

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 8

Eagan JW, Salyer WR, Hutchins GM: The pathogenesis of the renal vascular disease of progressive systemic sclerosis. Amer J Path 74:19a, 1974 (abstract).

Salyer WR, Hutchins GM: Cardiac lesions in secondary oxalosis. Arch Int Med 134:250, 1974.

Salyer WR, Page DL, Hutchins GM: The development of cardiac myxomas and papillary endocardial lesions from mural thrombi. Amer J Path 74:87a, 1974 (abstract).

Salyer WR, Salyer DC: Thiamine deficiency and oxalosis. J Clin Path 27:588, 1974.

Salyer WR, Salyer DC: Oxalosis. Arch Path 98:143, 1974 (letter).

Milgram JW, Salyer WR: Secondary oxalosis of bone in chronic renal failure. A histopathological study of three cases. J Bone Joint Surg 56:387, 1974.

Salyer WR, Hutchins GM: Glomoid lesions in systemic arteries in malignant hypertension. Arch Path 97:104, 1974.

Salyer WR, Hutchins GM: Glomoid lesions. Arch Path 98:143, 1974 (letter).

Salyer DC, Salyer WR, Hutchins GM: Local arterial wall injury caused by thromboemboli. Amer J Path 74:89a, 1974 (abstract).

Salyer WR, Salyer DC, Hutchins GM: Local arterial wall injury caused by thromboemboli. Amer J Path 75:285, 1974.

Salyer DC, Salyer WR: Sickle cell disease and the kidney: A hypothesis. Arch Int Med 134:181, 1974 (letter).

Salyer WR, Salyer DC: The vascular lesions of neurofibromatosis. Angiology 25:510, 1974.

Salyer WR, Salyer DC: Pleural involvement in cryptococcosis. Chest 66:139, 1974.

Salyer WR, Salyer DC: Intravascular angiomatosis in cutaneous vessels. Arch Derm 110:811, 1974 (letter).

Salyer WR, Salyer DC: Unilateral glomerulonephritis. J Path 113:247, 1974.

Heptinstall RH, Salyer DC, Salyer WR: Experimental hypertension. The effects of chemical ablation of the renal papilla on the blood pressure of rats with and without silver-clip hypertension. Amer J Path 78:297, 1974.

Salyer WR, Salyer DC, Baker RD: The cryptococcal primary pulmonary lymph nodal complex. J Infect Dis 130:74, 1974.

Exhibit 31-809

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 9

Salyer WR, Page DL, Hutchins GM: The development of cardiac myxomas and papillary endocardial lesions from mural thrombi. Amer Heart J 89:4, 1975.

Keren DF, Salyer WR, Hamilton CL, Charache P, Yardley JH: Demonstration by immunofluorescence of bacterial antigens in macrophages (foam cells) of Whipple's disease. Fed Proc 34:1044, 1975 (abstract).

Salyer WR, Eggleston JC, Erozan YS: The efficacy of pleural needle biopsy and pleural fluid cytopathology in the diagnosis of malignant neoplasm involving the pleura. Chest 67:536, 1975.

Salyer WR, Salyer DC: Intravascular angiomatosis: Development and distinction from angiosarcoma. Cancer 36:955, 1975.

Salyer DC, Salyer WR, Eggleston JC: Carcinoid tumors of the lung. Cancer 36:1522, 1975.

Bulkley BH, Ridolfi RL, Salyer WR, Hutchins GM: Myocardial lesions of progressive systemic sclerosis: A cause of cardiac dysfunction. Scientific Session, American College of Cardiology, February 10-13, 1975, Dallas, Texas (presentation).

Salyer WR, Salyer DC: Myxoma-like features of peripheral thrombi. Arch Path 99:307, 1975.

Stuart R, Salyer WR, Salyer DC, Heptinstall RH: Renomedullary interstitial cell lesion and hypertension. Hum Path 7:327, 1976.

Salyer WR, Eggleston JC: Thymoma: A clinical and pathologic study of 65 cases. Cancer 37:229, 1976.

Salyer WR, Salyer DC, Eggleston JC: Carcinoid tumors of the thymus. Cancer 37:958, 1976.

Bulkley BH, Ridolfi RL, Salyer WR, Hutchins GM: Myocardial lesions of progressive systemic sclerosis. A cause of cardiac dysfunction. Circulation 53:483, 1976.

Volpicelli NA, Salyer WR, Milligan FD, Yardley JH: The endoscopic appearance of the duodenum in Whipple's disease. Johns Hopkins Med J 138:19, 1976.

Keren DF, Weisburger R, Yardley JH, Salyer WR, Arthur RR, Charche P: Whipple's disease: Demonstration by immunofluorescence of similar bacterial antigens in macrophages from three cases. Johns Hopkins Med J 139:51, 1976.

Lightdale CJ, Wolf DJ, Marucci RA, Salyer WR: Herpetic esophagitis in patients with cancer: Ante-mortem diagnosis by brush cytology. Cancer 39:223, 1977.

Exhibit 31-810

CURRICULUM VITAE
WILLIAM RAY SALYER, M.D.
PAGE 10

Salyer DC, Salyer WR, Eggleston JC: Benign developmental cysts of the mediastinum. Arch Path 101:136, 1977.

Olson JL, Salyer WR: Mediastinal paragangliomas (aortic body tumor): A report of four cases and a review of the literature. Cancer 41:2405, 1978.

Pelzmann K, Salyer WR, Nagel DA: Polyostotic fibrous dysplasia with fibrochondrodysplasia. Skeletal Radiol 5:116, 1980.

Salyer WR, Eggleston JC, Erozan YS: Comparison of diagnostic value of pleural biopsies and cytologic evaluation of pleural fluids. Amer J Clin Path 73:289, 1980 (letter).

Wishnow KI, Salyer WR, Stamey TA: Recurrent colic due to desquamation of squamous cells from the renal pelvis. American Urological Association Meeting, 1980 (Presentation).

Carrie BJ, Salyer WR, Myers BD: Minimal change nephropathy. An electrochemical disorder of the glomerular membrane. Amer J Med 70:262, 1981.

Winetz JA, Robertson CR, Golbetz HV, Carrie BJ, Salyer WR, Myers BD: The nature of the glomerular injury in minimal change and focal sclerosing glomerulopathies. Amer J Kid Dis 1:91, 1981.

# Exhibit 2

Exhibit 31-812



EXHIBIT 2

Exhibit 31-813



Exhibit 31-814



VEST, Timothy                          DOB: 02/19/1965
Pathology to _Berry + Berry_____
Date Sent _03 / 23 / 2010_____
Total Number of Slides Sent _28; 1 block_____
Page _5_ of _5___

Exhibit 31-815



Exhibit 31-816



Exhibit 31-817



Exhibit 31-818

# Exhibit 3

Exhibit 31-819



**ValleyCare Medical Center**
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

**Valley Memorial Hospital**
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

David P Enfield, M.D.

David F. Jensen, M.D.

Kenneth K. Wachi, M.D.

Thomas L. Yu, M.D.

**Department of Pathology**

Patient:  VEST, TIMOTHY E
Med. Rec. #:   043464
Account #:   504753443
DOB:  2/19/1965   Age:   44   · Sex:   M
Physician:  MICHAEL R ALPER

Accession:   CY-09-00447
Collection Date:  9/17/2009
Received Date:   9/18/2009
Location:   VHS SCP 706 A
Copies To:   JOHN W.YEE
DANIEL E LUCAS

## CYTOLOGY REPORT

**FINAL DIAGNOSIS:**

LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE:
- POSITIVE FOR MALIGNANT CELLS; NONSMALL CELL CARCINOMA, FAVOR
ADENOCARCINOMA, SEE COMMENT.

MDC: KKW

**PATHOLOGIST COMMENT:**
Dr. Yee was informed of the findings. Please see concurrent biopsy, VS09-4274, pending for immunoperoxidase stain evaluation and further classification. My colleague, Dr. Wachi, has reviewed and concurs.

**SOURCE DESCRIPTION:**
LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE

**CLINICAL HISTORY:**
Right lung mass.

**GROSS DESCRIPTION:**
Specimen received fresh, consists of fluoroscopically guided right lung biopsy.  Smears are prepared.
88173

**MICROSCOPIC DESCRIPTION:**
Five smears and one ThinPrep slide are evaluated.  The specimen reveals isolated and clusters of malignant epithelial cells with moderately pleomorphic, round to oval shaped, overlapping nuclei with prominent nucleoli. Occasional intranuclear inclusions are noted.  Eosinophilic cytoplasm and vacuolated cytoplasm are noted in these cells.
c:mpt:/09/20/2009

Report For:   MICHAEL R ALPER,
MED
87 FENTON ST
SUITE 100
LIVERMORE CA. 94550

Page 1 of 2

EXHIBIT  3  9/.7

Exhibit 31-820

**ValleyCare Medical Center**
Pleasanton, CA. 94588
David P Enfield, M.D.

**Department of Pathology.**

David F. Jensen, M.D.

Kenneth K. Wachi, M.D.

**Valley Memorial Hospital**
Livermore, CA. 94550
Thomas L. Yu, M.D.

**Patient:** VEST, TIMOTHY E

**Accession:** CY-09-00447

Final Diagnosis performed by
Thomas Yu M.D.
Electronically signed 09/21/2009

Exhibit 31-821



ValleyCare Medical Center
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

**VALLEYCARE HEALTH SYSTEM.**

Valley Memorial Hospital
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

David P Enfield, M.D.                  David F. Jensen, M.D.        Kenneth K. Wachi, M.D.

**Department of Pathology**

Thomas L. Yu, M.D.

**Patient:** VEST, TIMOTHY E
Med. Rec. #:    043464
Account #:      504753443
DOB: 2/19/1965        Age:   44      Sex:    M
Physician:   MICHAEL R ALPER

**Accession:**        CY-09-00447
**Collection Date:**   9/17/2009
**Received Date:**     9/18/2009
**Location:**          VHS SCP 706 A
**Copies To:**         JOHN W YEE
                       DANIEL E LUCAS

## CYTOLOGY REPORT
### **Addendum – See End of Report **

**FINAL DIAGNOSIS:**

LUNG, RIGHT, LOBE UNSPECIFIED, FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE:
- POSITIVE FOR MALIGNANT CELLS; NONSMALL CELL CARCINOMA, FAVOR
ADENOCARCINOMA, SEE COMMENT.

**MDC:** KKW

**PATHOLOGIST COMMENT:**
Dr. Yee was informed of the findings. Please see concurrent biopsy, VS09-4274, pending for immunoperoxidase stain evaluation and further classification. My colleague, Dr. Wachi, has reviewed and concurs.

**SOURCE DESCRIPTION:**
LUNG, RIGHT, LOBE UNSPECIFIED; FLUOROSCOPICALLY GUIDED FINE NEEDLE ASPIRATE

**CLINICAL HISTORY:**
Right lung mass.

**GROSS DESCRIPTION:**
Specimen received fresh, consists of fluoroscopically guided right lung biopsy. Smears are prepared.
88173

**MICROSCOPIC DESCRIPTION:**
Five smears and one ThinPrep slide are evaluated. The specimen reveals isolated and clusters of malignant epithelial cells with moderately pleomorphic, round to oval shaped, overlapping nuclei with prominent nucleoli. Occasional intranuclear inclusions are noted. Eosinophilic cytoplasm and vacuolated cytoplasm are noted in these cells.
c:mpt:/09/20/2009

Report For:    MICHAEL R ALPER,
               MED
               87 FENTON ST
               SUITE 100
               LIVERMORE CA, 94550

Page 1 of 2

Exhibit 31-822

**ValleyCare Medical Center**
Pleasanton, CA. 94588
David P Enfield, M.D.

**Department of Pathology.**

David F. Jensen, M.D.

Kenneth K. Wachi, M.D.

**Valley Memorial Hospital**
Livermore, CA. 94550
Thomas L. Yu, M.D.

**Patient:** VEST, TIMOTHY E

**Accession:** CY-09-00447

Final Diagnosis performed by
Thomas Yu M.D.
Electronically signed 09/21/2009

## ADDENDUM # 1

### STANFORD UNIVERSITY MEDICAL CENTER

DIAGNOSIS:
LUNG, RIGHT, FINE NEEDLE ASPIRATION (CY-09-447; 09/17/09)
- NON-SMALL CELL CARCINOMA (SEE COMMENT)
LUNG, RIGHT, CORE NEEDLE BIOPSY (VS-09-4274; 09/17/09)
- ADENOCARCINOMA (SEE COMMENT)

COMMENT:
Please see original pathology report from Stanford, SHS-09-33116. (Note: Patient pickup)

Addendum #1 performed by
Thomas Yu M.D.
Electronically signed 10/01/2009

Page 2 of 2

Exhibit 31-823



ValleyCare Medical Center
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

VALLEYCARE
HEALTH
SYSTEM.

Valley Memorial Hospital
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

**Department of Pathology**

David P Enfield, M.D.    David F. Jensen, M.D.    Kenneth K. Wachi    Thomas L. Yu, M.D.

| | |
|---|---|
| **Patient:** VEST, TIMOTHY E | **Accession:** VS-09-04274 |
| Med. Rec. #: 043464 | **Collection Date:** 9/17/2009 |
| Account #: 504753443 | **Received Date:** 9/17/2009 |
| **DOB:** 2/19/1965  **Age:** 44  **Sex:** M | **Location:** VHS SCP 706 A |
| **Physician:** MICHAEL R ALPER | **Copies To:** JOHN W YEE |
| | DANIEL E LUCAS |

## SURGICAL PATHOLOGY REPORT

**FINAL DIAGNOSIS:**

RIGHT LUNG, FLUOROSCOPIC NEEDLE CORE BIOPSY:
- NONSMALL CELL CARCINOMA, MODERATELY DIFFERENTIATED, FINAL DIAGNOSIS
  PENDING IHC STAINS (SEE MICROSCOPIC).

**MDC:** TLY

**SOURCE DESCRIPTION:**
MASS RIGHT LUNG

**CLINICAL HISTORY:**
Right lung mass.
Operative procedure: Fluoroscopically guided right lung biopsy.

**GROSS DESCRIPTION:**
The specimen is submitted in a container of formalin and labeled " Vest, Timothy, right lung biopsy". The specimen consists of approximately three tiny fragments of gray tissue measuring approximately 0.1 cm in length and between 0.1 and 0.3 cm in length. Totally processed.

88305

**MICROSCOPIC DESCRIPTION:**
Sections of the fluoroscopic needle core biopsy of the right lung show a moderately differentiated carcinoma. The neoplastic cells have moderate amounts of eosinophilic cytoplasm with cytoplasmic vacuoles. The nuclei show moderate nuclear enlargement and mild pleomorphism. IHC stains for lung, liver and gastrointestinal markers will be performed and reported separately. There are small fragments of benign alveolar tissue present.
g:mpt:/09/18/2009; m:mpt:/09/18/2009

Report For:    MICHAEL R ALPER,
               MED
               87 FENTON ST
               SUITE 100
               LIVERMORE CA. 94550

Page 1 of 2

Exhibit 31-824

ValleyCare Medical Center
Pleasanton. CA. 94588
David P Enfield, M.O.

Department of Pathology.

David F. Jensen, M.D.          Kenneth K. Wachi

Valley Memorial Hospital
Livermore, CA. 94550
Thomas L. Yu, M.O.

**Patient:**   VEST, TIMOTHY E

**Accession:**   VS-09-04274

Final Diagnosis performed by
Kenneth K Wachi M.D.
Electronically signed 09/18/2009

Page 2 of 2

Exhibit 31-825



ValleyCare Medical Center
5555 W. Las Positas Blvd.
Pleasanton, CA. 94588
(925) 416-3423

# VALLEYCARE HEALTH SYSTEM.

### Department of Pathology

Valley Memorial Hospital
1111 E. Stanley Blvd.
Livermore, CA. 94550
(925) 373-4023

David P Enfield, M.D.    David F. Jensen, M.D.    Kenneth K. Wachi    Thomas L. Yu, M.D.

| | |
|---|---|
| **Patient:** VEST, TIMOTHY E | **Accession:** VS-09-04274 |
| **Med. Rec. #:** 043464 | **Collection Date:** 9/17/2009 |
| **Account #:** 504753443 | **Received Date:** 9/17/2009 |
| **DOB:** 2/19/1965  **Age:** 44  **Sex:** M | **Location:** VHS SCP 706 A |
| **Physician:** MICHAEL R ALPER | **Copies To:** JOHN W YEE |
| | DANIEL E LUCAS |

## SURGICAL PATHOLOGY REPORT
### **Addendum - See End of Report **

**FINAL DIAGNOSIS:**

RIGHT LUNG, FLUOROSCOPIC NEEDLE CORE BIOPSY:
- NONSMALL CELL CARCINOMA, MODERATELY DIFFERENTIATED, FINAL DIAGNOSIS
PENDING IHC STAINS (SEE MICROSCOPIC).

**MDC:** TLY

**SOURCE DESCRIPTION:**
MASS RIGHT LUNG

**CLINICAL HISTORY:**
Right lung mass.
Operative procedure: Fluoroscopically guided right lung biopsy.

**GROSS DESCRIPTION:**
The specimen is submitted in a container of formalin and labeled " Vest, Timothy, right lung biopsy". The specimen consists of approximately three tiny fragments of gray tissue measuring approximately 0.1 cm in length and between 0.1 and 0.3 cm in length. Totally processed.

88305

**MICROSCOPIC DESCRIPTION:**
Sections of the fluoroscopic needle core biopsy of the right lung show a moderately differentiated carcinoma. The neoplastic cells have moderate amounts of eosinophilic cytoplasm with cytoplasmic vacuoles. The nuclei show moderate nuclear enlargement and mild pleomorphism. IHC stains for lung, liver and gastrointestinal markers will be performed and reported separately. There are small fragments of benign alveolar tissue present.
g:mpt/09/18/2009; m:mpt/09/18/2009

Report For:    MICHAEL R ALPER
MED
87 FENTON ST
SUITE 100
LIVERMORE CA, 94550

Page 1 of 2

Exhibit 31-826

ValleyCare Medical Center
Pleasanton, CA. 94588
David P Enfield, M.D.

Department of Pathology.

David F. Jensen, M.D.          Kenneth K. Wachi

Valley Memorial Hospital
Livermore, CA. 94550
Thomas L. Yu, M.D.

---

**Patient:** VEST, TIMOTHY E

**Accession:** VS-09-04274

Final Diagnosis performed by
Kenneth K Wachi M.D.
Electronically signed 09/18/2009

ADDENDUM:

DIAGNOSIS:
RIGHT LUNG, FLUOROSCOPIC NEEDLE CORE BIOPSY:
- NONSMALL CELL CARCINOMA, MODERATELY DIFFERENTIATED (SEE MICROSCOPIC)

IHC STAIN:
Thyroid transcription factor-1, a lung marker shows no nuclear staining of the tumor. There is positive staining of
benign lung parenchyma. COX2, a gastrointestinal marker is negative. Hepar-1, a liver marker is negative. Up
to 25% of primary adenocarcinomas of the lung are negative with thyroid transcription factor-1. Controls are
appropriate.

88342 x3

Addendum #1 performed by
Kenneth K Wachi M.D.
Electronically signed 09/23/2009

Page 2 of 2

Exhibit 31-827

# Exhibit 4

Exhibit 31-828



# LABORATORY OF SURGICAL PATHOLOGY

STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: VEST, TIM

Med. Rec. No.: 22642425
Sex: M          Age: 44
Date of Birth: 02/19/1965
Account No.: 131004902212

Pathology No: **SHS-09-33116**

Date of Procedure: 09/29/2009
Date Received:     09/30/2009

Physician(s):
**JOSEPH B SHRAGER, M.D.**
Dept: CARDIOTHORACIC SURGERY
300 PASTEUR DRIVE, CVRB MC 5407
STANFORD, CA 94305

**KENNETH K WACHI, M.D.**
VALLEY MEMORIAL HOSPITAL
Dept: PATHOLOGY
1111 E. STANLEY BLVD
LIVERMORE, CA 94550

**THOMAS L. YU, M.D.**
VALLEYCARE HEALTH SYSTEM
1111 EAST STANLEY BLVD
LIVERMORE, CA 94550

**SPECIMEN SUBMITTED:**
CY09-447, 6 SLIDES; VS-09-4274, 7 SLIDES

**CLINICAL HISTORY:** The patient is a 44-year-old man with a right upper lobe lung mass. Materials from a fine needle aspiration (Valley Care Health System, Pleasanton, CA; CY09-447; 09/17/09) and a core biopsy (VS09-4274; 09/17/09) are submitted for our review.

**COMMENT:** We agree with the originating pathologists' diagnoses. The aspirate smears and ThinPrep slide from the right lung are mildly cellular and demonstrate aggregates of atypical cells with moderate nuclear pleomorphism, irregular nuclear contours, prominent nucleoli, and delicate vacuolated cytoplasm. The findings support non-small cell carcinoma and are most suggestive of an adenocarcinoma.

The concurrent right lung core needle biopsy demonstrates a moderately differentiated adenocarcinoma infiltrating lung parenchyma. The submitted immunohistochemical studies show that the tumor is negative for TTF-1, CDX2, and Hepar-1. The findings support adenocarcinoma and are compatible although not specific for a lung primary. Up to 30% of pulmonary adenocarcinomas lack TTF-1 expression. Clinical and radiologic correlation is recommended.

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors

Page 1 of 2

EXHIBIT 4

Exhibit 31-829



# LABORATORY OF SURGICAL PATHOLOGY

### STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: VEST, TIM                    Pathology No: **SHS-09-33116**

**DIAGNOSIS:**
LUNG, RIGHT, FINE NEEDLE ASPIRATION (CY-09-447; 09/17/09)
  –       NON-SMALL CELL CARCINOMA (SEE COMMENT)
LUNG, RIGHT, CORE NEEDLE BIOPSY (VS-09-4274; 09/17/09)
  –       ADENOCARCINOMA (SEE COMMENT)

**SCHWARTZ**
jt/09/30/2009

I have reviewed the specimen and agree
with the interpretation above.
ERICH SCHWARTZ M.D., Ph.D.
PATHOLOGIST
Electronically signed 9/30/2009 7:53 PM

Exhibit 31-830



# LABORATORY OF SURGICAL PATHOLOGY

### STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

---

**Patient:** VEST, TIM

**Pathology No:** SHS-09-34038

Med. Rec. No.: 22642425
Sex: M          Age: 44
Date of Birth: 2/19/1965
Account No.: 131004919594

Date of Procedure: 10/7/2009
Date Received: 10/7/2009

Physician(s):
JOSEPH B SHRAGER, M.D.
Dept: CARDIOTHORACIC SURGERY
300 PASTEUR DRIVE, CVRB MC 5407
STANFORD, CA 94305

---

**SPECIMEN SUBMITTED:**
A. ANTERIOR MARGIN 6TH RIB
B. ANTERIOR MARGIN OF 5TH RIB
C. ANTERIOR MARGIN OF 7TH RIB
D. PORTION RIBS 5,6,7 WITH ATTACHED TUMOR
E. RIGHT LOWER LOBE CONTAINING NODULES

**SUBMITTED ICD9 CODE:** LUNG CANCER

> **IDX # 09-5530**
> This immunologic test was developed and its performance characteristics
> determined by Stanford University Immunocytochemistry Laboratory. Unless
> indicated otherwise, it has not been cleared or approved by the USFDA, although
> such approval is not required for analyte-specific reagents of this type.

**CLINICAL HISTORY:** 44-year-old male with adenocarcinoma felt to be in lung preoperatively, possibly invading chest wall.

**OPERATION:** Thoracotomy, chest wall resection, wedge resection.

**OPERATIVE FINDINGS:** No lung involvement with main tumor, appears to be primary chest wall tumor.

**CLINICAL DIAGNOSIS:** Lung cancer.

**GROSS DESCRIPTION:** Five specimens are received, each labeled with the patient's name, Tim Vest, and medical record number.

The first specimen is additionally labeled "anterior margin 6th rib" and consists of a 1.8 x 0.8 x 0.6 cm fragment of bone. The specimen is placed in decalcification overnight and entirely submitted in cassette A1.

---

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

Page 1 of 4

Exhibit 31-831



# LABORATORY OF SURGICAL PATHOLOGY

STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: VEST, TIM          Pathology No: **SHS-09-34038**

The second specimen is additionally labeled "anterior margin 5th rib" and consists of two fragments of bone that each measure 1.7 x 1.2 x 0.3 cm. The specimen is placed in decalcification overnight and entirely submitted in cassette B1.

The third specimen is additionally labeled "anterior margin 7th rib" and consists of two bony fragments that each measure 1.9 x 0.9 x 0.5 cm. The specimen decalcified overnight and entirely submitted in cassette C1.

The fourth specimen is additionally labeled "portion rib 5, 6, 7 with attached tumor" and consists of an 8 x 7.5 x 1.5 cm fragment of chest wall containing ribs 5, 6, and 7. The specimen is oriented such that the long stitch is the posterior margin of the fifth rib, and the short stitch is the posterior margin of the 7th rib. On the parietal pleural surface of the chest wall, there is an encapsulated, white-tan, rounded lesion that measures 5.8 x 4.5 x 2.6 cm. The nodule appears 1.8 cm from the posterior 6th rib, 2 cm from the anterior 6th rib, 1.4 cm from the superior margin, and 1.3 cm from the inferior margin. The parietal pleural surface is entirely inked black and the exterior chest wall surface is inked blue. Of note, the ink does not stick to the parietal pleura of the chest wall mass. The chest wall mass is then serially sectioned to reveal a yellow-tan, firm cut surface with a white-tan fibrous rim in some areas. Representative sections are submitted in cassettes D1-D3, and the specimen is then decalcified. A shave of the surgical margin of the posterior 5th rib is submitted in cassette D4, of the posterior 6th rib is submitted in cassette D5, and of the posterior 7th rib is submitted in cassette D6. The specimen edge of the anterior 5th rib is submitted in cassette D7, of the anterior 6th rib is submitted in cassette D8, and of the anterior 7th rib is submitted in cassette D9. The specimen is then further decalcified with sections of tumor to bone submitted in D10 to D17.

The fifth specimen is additionally labeled "right lower lung containing nodule" and consists of 3.5 x 2.5 x 0.6 cm wedge resection specimen. The pleural surface is pink-tan and shiny with no apparent lesions. There is a 6.5 cm staple line. In the middle of the specimen, there is a nodule that is 1.1 cm from the closest resection margin. The staple line is carefully removed and the area under this is inked black. A representative section of lung containing the nodular lesion is submitted completely in cassette E1 with the remainder of the specimen submitted entirely in cassette E2. Weinzierl/mkb/sv

**Block (Original Label): D2**
*Population: Lesional Cells*

| Label | Marker For | Results | Special Pattern or Comments |
|---|---|---|---|
| BEREP4 | EPITHELIAL VS. MESOTHELIAL | NEGATIVE | ext positive control |
| CK20 | keratin 20 | NEGATIVE | ext positive control |
| CK5/6 | keratin 5 and 6 – mesothelial cells, HMW CK, spindle cell carcinoma | POSITIVE | |
| CK7 | keratin 7 | POSITIVE | |
| CALRETINI | MESOTHELIOMA | POSITIVE | |

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

Exhibit 31-832



# LABORATORY OF SURGICAL PATHOLOGY

STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211    FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

---

Patient: VEST, TIM                    Pathology No: **SHS-09-34038**

| | | | |
|---|---|---|---|
| **N** | | | |
| TTF1 | THYROID TRANSCRIPTION FACTOR 1–LUNG AND THYROID MARKER | NEGATIVE | ext positive control |

**COMMENT:** We have reviewed the prior biopsy (SHS-09-33116), and sections from the current resection specimen appear histologically similar. Histologic sections of the current specimen D (ribs 5, 6, and 7) demonstrate a tumor comprised of epithelioid cells with medium- to large-sized nuclei and prominent nucleoli, with areas of pseudoglandular and microcystic architecture. The tumor focally invades into adjacent adipose tissue. These cells demonstrate cytoplasmic immunoreactivity to CK7 and demonstrate nuclear immunoreactivity to calretinin. They are negative for TTF-1, CK20, and BerEP4. A PASd stain is negative for cytoplasmic mucin. These findings are diagnostic of a localized malignant mesothelioma that measures 5.8 cm in greatest dimension. Metaplastic bone is present in the tumor, but no invasion into rib is identified. Tumor is present at ink on its surface (slide D2); however, we are unable to determine if the opposing visceral pleura is involved, although the separately submitted right lower lobe wedge is uninvolved by tumor. All bony and soft tissue surgical margins are negative. No angiolymphatic invasion is seen. Overall, these findings demonstrate a localized malignant mesothelioma, at least pT1a pNX pMX.

**DIAGNOSIS:**

BONE, ANTERIOR MARGIN 6TH RIB, RESECTION
—    BONE WITH NO TUMOR SEEN
BONE, ANTERIOR MARGIN 5TH RIB, RESECTION
—    BONE WITH NO TUMOR SEEN
BONE, ANTERIOR MARGIN 7TH RIB, RESECTION
—    BONE WITH NO TUMOR SEEN
RIBS 5, 6, AND 7 WITH TUMOR, RESECTION
—    LOCALIZED MALIGNANT MESOTHELIOMA, 5.8 CM IN GREATEST
       DIMENSION, EPITHELIOID TYPE, SURGICAL MARGINS NOT INVOLVED (SEE
       COMMENT)
LUNG, RIGHT LOWER LOBE, WEDGE RESECTION
—    SCAR
—    NO TUMOR SEEN

TNM STAGING: at least pT1a pNX pMX
WEINZIERL/CARNEY/BERRY/PAI
mkb/10/07/2009; sv/10/08/2009
jt/10/19/2009

---

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

---

Page 3 of 4

Exhibit 31-833



# LABORATORY OF SURGICAL PATHOLOGY
## STANFORD UNIVERSITY MEDICAL CENTER
300 PASTEUR DRIVE, ROOM H-2110, STANFORD, CALIFORNIA 94305
TEL #: (650) 723-7211     FAX #: (650) 725-7409
Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Directors
Teri A. Longacre, M.D. & Gerald J. Berry, M.D. – Associate Directors

Patient: **VEST, TIM**                    Pathology No: **SHS-09-34038**

I have reviewed the specimen and agree
with the interpretation above.
REETESH PAI, M.D.
Pathologist
Electronically signed 10/21/2009 9:41 AM

Richard K. Sibley, M.D. & Michael R. Hendrickson, M.D. – Laboratory Directors

Exhibit 31-834

# Exhibit 5

Exhibit 31-835



ANATOMIC PATHOLOGY·CYTOPATHOLOGY·DERMATOPATHOLOGY·IMMUNO/HISTOLOGY

December 3, 2009

Mr. Gordon D. Greenwood
Kazan, McClain, Lyons, Greenwood and Harley
171 Twelfth Street, Third Floor
Oakland, California 94607


RE: TIMOTHY VEST
    DOB: 2-19-1965


Dear Mr. Greenwood

I have reviewed the medical records and the pathology materials provided in the above case. The medical records consisted of pathology reports.

In September, 2009, the patient was evaluated at the Valley Memorial Hospital, Livermore, California. He was a 44 year-old man with a right lung mass with possible invasion of the chest wall.

On September 17, 2009, a fine-needle aspiration sample from the right lung contained malignant cells--non-small cell carcinoma with adenocarcinoma favored.

On September 17, 2009, a needle biopsy of the right lung was felt to show non-small cell carcinoma, moderately differentiated. Immunohistochemical studies TTF-1, CDX2, and Hepar-1 were negative.

The materials from the fine-needle aspiration sample and from the needle biopsy were referred in consultation to the Stanford University Medical Center on September 30, 2009. The diagnosis at Stanford was adenocarcinoma.

On October 7, 2009, a resection of portions of the right chest wall and of a portion of the right lower lung lobe was performed at the Stanford University Medical Center. The surgeon noted that there was no involvement of the lung by the main tumor and that the neoplasm appeared to be a primary chest wall tumor. The resection of ribs 5, 6, and 7 and of tumor was interpreted as showing localized malignant mesothelioma, 5,8

3017 TELEGRAPH AVENUE, SUITE 100  BERKELEY, CA 94705     TELEPHONE: 510-644-0951 — FACSIMILE: 510-644-2067

EXHIBIT  5

Exhibit 31-836

December 3, 2009
Mr. Gordon D. Greenwood
RE: TIMOTHY VEST
Page Two

centimeters in greatest dimension. The resection margins were uninvolved.
Immunohistochemical studies CK5/6, CK7, and calretinin were positive.
Immunohistochemical studies BerEP4, CK20, and TTF-1 were negative. A wedge
excision of the right lower lung lobe was thought to reveal a scar.

The pathology materials provided and my diagnoses:

1. Valley Memorial Hospital, CY09-447, 5 slides

    Right lung, fine-needle aspiration: Malignant, epithelioid mesothelioma

2. Valley Memorial Hospital, VS-09-4274, 6 slides and 1 block

    Right lung, needle biopsy:

        -Malignant, epithelioid mesothelioma
        -Negative, provided immunohistochemical studies TTF-1, CDX2, and
            Hepar-1

3. Stanford University Medical Center, 09-34038, 18 slides

    Right chest wall, partial resection:

        -Malignant, epithelioid mesothelioma of the pleura with invasion of chest
            wall soft tissue and of rib
        -Positive, prepared immunohistochemical studies keratin, HBME-1
            (membrane), calretinin (nuclei and cytoplasm), WT-1 (nuclei),
            and D2-40 (membrane)
        -Negative, prepared immunohistochemical studies CEA, CD15,
            B72.3, BerEP4, PSA, and CK5/6
        -Pleural plaque

    Lung, right lower lobe, open biopsy:

        -So-called hamartoma (fibrous type)
        -Focal, peribronchiolar fibrosis
        -0 asbestos bodies in 3.5 square centimeters of lung tissue

Exhibit 31-837

December 3, 2009
Mr. Gordon D. Greenwood
RE: TIMOTHY VEST
Page Three

The patient has malignant, epithelioid mesothelioma of the pleura. The morphologic appearance of the tumor is characteristic, as are the cytologic features of the neoplastic cells.

The results of the immunohistochemical studies strongly support the diagnosis of mesothelioma.

The presence of pleural plaque indicates that the patient almost certainly had prior, occupational-level exposure to asbestos fibers. The malignant mesothelioma was related causally to that exposure.

Sincerely

William R. Salyer, M.D.

WRS/w

Exhibit 31-838

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 32

Page 1

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                        COUNTY OF ALAMEDA

3

4      TIMOTHY VEST and CAROLINE VEST,

5               Plaintiffs,

6          vs.                              No. RG09489518

7      ALLIED PACKING AND SUPPLY

       COMPANY, et al.,

8

9               Defendants.

10

11

12      _____

13

14          VIDEOTAPED DEPOSITION OF JOSEPH B. SHRAGER, M.D.

15                     Stanford, California

16                  Monday, December 13, 2010

17

18

19

20

21      REPORTED BY:

        LYNNE LEDANOIS

22      CSR No. 6811

23      Job No. 150977

24

25



Page 2

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                    COUNTY OF ALAMEDA
 3
 4    TIMOTHY VEST and CAROLINE VEST,
 5              Plaintiffs,
 6          vs.              No. RG09489518
 7    ALLIED PACKING AND SUPPLY
      COMPANY, et al.,
 8
 9              Defendants.
10
11
12    _____
13
14        Deposition of JOSEPH B. SHRAGER, M.D., taken on
15    behalf of Defendants, at Stanford Hosptial and Clinic,
16    Stanford, California, beginning at 2:03 p.m., and ending
17    at 3:57 p.m. on Monday, December 13, 2010, before LYNNE
18    LEDANOIS, CSR 6811.
19
20
21
22
23
24
25
```

Page 4

```
 1   For Defendant World Airways, Inc:
 2      BRYAN CAVE LLP
        BY: JAMES GOLDBERG
 3      Attorney at Law
        2 Embarcadero Center, Suite 1410
 4      San Francisco, California 94111
        415.675.3425
 5      jim.goldberg@bryancave.com
 6
 7   For the Witness Dr. Shrager:
 8      SHEURMAN, MARTINI @ TABARI
        BY: SUSAN O. FISH
 9      Attorney at Law
        1033 Willow Street
10      San Jose, California 95125
        408.288.9700
11      sfish@smtlaw.com
12
13   For Defendants F.P. Lathrop and Lathrop
     Construction Associates:
14
        WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
15      BY: MICHAEL W. BOLECHOWSKI
        Attorney at Law
16      525 Market Street, 17th Floor
        San Francisco, California 94105-2725
17      415.433.0990
        michael.bolechowski@wilsonelser.com
18
19   For Defendant Parker Hannifin:
20      WILLIAMS KASTNER
        BY: DAVID SHAW
21      Attorney at Law
        601 Union Street, Suite 4100
22      Seattle, Washington 98101
        206.628.6600
23      dshaw@williamskastner.com
24
25
```

Page 3

```
 1   APPEARANCE OF COUNSEL:
 2   For Plaintiff Timothy Vest:
 3      KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
        BY: STEVEN KAZAN
 4      Attorney at Law
        Jack London Market, 55 Harrison St., Suite 400
 5      Oakland, California 94607
        510.302.1000
 6      skazan@kazanlaw.com
 7
 8   For Plaintiff Caroline Vest:
 9      KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
        BY: DAVID M. McCLAIN
10      Attorney at Law
        Jack London Market, 55 Harrison St., Suite 400
11      Oakland, California 94607
        510.302.1000
12      dmcclain@kazanlaw.com
13
14   For Defendant McDonnell Douglas:
15      BRYAN CAVE LLP
        BY: ROBERT E. BOONE, III
16      Attorney at Law
        120 Broadway, Suite 300
17      Santa Monica, California 90401-2386
        310.576.2385
18      reboone@bryancave.com
19
20   For Defendant World Airways, Inc:
21      BRYAN CAVE LLP
        BY: L. LIN WOOD
22      Attorney at Law
        One Atlantic Center, 4th Floor
23      1201 W. Peachtree Street, NW
        Atlanta, Georgia 30309-3488
24      404.572.6633
        lin.wood@bryancave.com
25
```

Page 5

```
 1   For Defendant Honeywell International, Inc.,
     and Georgia Pacific LLC:
 2
        PERKINS COIE LLP
 3      BY: DIANE GORCZYCA
        Attorney at Law
 4      4 Embarcadero Center
        San Francisco, California 94111
 5      415.344.7000
        dgorczyca@perkinscoie.com
 6
 7   For Defendant Alta Building Material Company:
 8      SELMAN BREITMAN LLP
        BY: RICHARD D. DUMONT
 9      Attorney at Law
        33 New Montgomery, Sixth Floor
10      San Francisco, California 94105-4537
        415.979.0400
11      rdumont@selmanbreitman.com
12
13   For Defendant Cyprus Amax Minerals:
14      BECHERER KANNETT & SCHWEITZER
        BY: ANGUS M. MACLEOD
15      Attorney at Law
        The Water Tower, 1255 Powell Street
16      Emeryville, California 94606
        510.658.3600
17      amacleod@bkscal.com
18   For Defendant Port of Oakland:
19      LAW OFFICES HANSON BRIDGETT LLP
        BY: ERIC JUNGINGER
20      Attorney at Law
        425 Market Street, 26th Floor
21      San Francisco, California 94105
        415.777.3200
22      ejunginger@hansonbridgett.com
23
24
25
```



877.955.3855

Exhibit 32-840

**Page 6**

1  For Defendant Hexcel Corporation:
2     McKENNA, LONG & ALDRIDGE LLP
      BY: MARK GERAGHTY
3     Attorney at Law
      300 S. Grand Avenue, 14th Avenue
4     Los Angeles, California 90071
      213.688.1000
5     (Telephonic Appearance.)
6
7  For Defendant Kentile Floors, Inc:
8     McGIVNEY, KLUGER & GLASPY
      BY: GARY LUNDRY
9     Attorney at Law
      100 Pringle Avenue, Suite 750
10    Walnut Creek, California 94596
      925.947.1300
11    (Telephonic Appearance.)
12
13 For Defendant Dowman Products, Inc:
14    WALSWORTH, FRANKLIN, BEVINS & McCALL-DOWMAN
      BY: KAREN AGELSON
15    Attorney at Law
      601 Montgomery Street, 9th Floor
16    San Francisco, California 94111
      415.781.7072
17    (Telephonic Appearance.)
18
19 For Defendant George E. Masker, Inc:
20    DONGELL LAWRENCE FINNEY LLP
      BY: COURTNEY ROSS-TAIT
21    Attorney at Law
      707 Wilshire Boulevard, 45th Floor
22    Los Angeles, California 90017-3609
      213.943.6100
23    (Telephonic Appearance.)
24
25

**Page 7**

1  For Defendant Dean's Materials, Inc:
2     PRINDLE, AMARO, GOETZ, HILLYARD,
      BARNES & REINHOLTZ
3     BY: JENNIFER WAYS
      Attorney at Law
4     One California Street, Suite 1910
      San Francisco, California 94104
5     415.788.8354
      (Telephonic Appearance.)
6
7  For Defendant Kelly-Moore Paint Company, Inc:
8     HAWKINS PARNELL THACKSTON & YOUNG LLP
      BY: KATHLEEN BENTON
      Attorney at Law
9     3 Embarcadero Center, 8th Floor
      San Francisco, California 94111-4024
10    415.766.3200
      (Telephonic Appearance.)
11
12 For Defendant Kaiser Gypsum Company, Inc:
13    DEHAY & ELLISTON LLP
      BY: THOMAS BURCH
14    Attorney at Law
      1300 Clay Street, Suite 840
15    Oakland, California 94612
      510.285.0750
16    (Telephonic Appearance.)
17 For Defendant Henkel Corporation:
18    CHAPMAN & INTRIERI LLP
      BY: MARK G. INTRIERI
19    Attorney at Law
      2236 Mariner Square Drive, Suite 300
20    Alameda, California 94501
      510.864.3600
21
22 VIDEOGRAPHER:
23    SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
      BY: RAY TYLER
24
25

**Page 8**

1                  INDEX
2  WITNESS              EXAMINATION
3  JOSEPH B. SHRAGER, M.D.
4       BY MR. BOONE        12, 59
5       BY MR. WOOD         30, 87
6       BY MR. SHAW         54
7       BY MR. McLEOD       55, 74
8       BY MR. JUNGINGER    56
9       BY MR. GERAGHTY     68
10      BY MR. INTRIERI     75
11      BY MR. KAZAN        75
12
13               EXHIBITS
14 DEFENDANT'S                    PAGE
15 Exhibit 1  Curriculum Vitae;        14
16 Exhibit 2  Amended Notice of Deposition of    14
             Joseph B. Shrager, M.D.;
17
   Exhibit 3  Documents generated by Dr. Shrager;  30
18
   Exhibit 4  Documents generated by Stanford      30
19           Clinic, Stanford Hospital, and
             various others;
20
   Exhibit 5  Literature;               66
21           (to be provided by Susan Fish, Esq.,
             counsel for Dr. Shrager)
22
23
24
25

**Page 9**

1       Stanford, California, Monday, December 13, 2010
2            2:03 a.m. - 3:57 p.m.
3                  ---o0o---
4       MR. KAZAN:  This is Steve Kazan speaking for
5  those on the phone, I would like to ascertain whether
6  everybody, all counsel on the phone, as well as in the
7  courtroom are either regularly admitted to the
8  California Bar or had been admitted pro hoc in this
9  specific case.
10      If anybody is not in one of those two
11 categories, would you please identify yourself.  All
12 right.
13      Just so that the record is clear, if there is
14 anybody who has not been admitted in the California Bar
15 or pro hoc for this case, it is our position that it is
16 not proper for them to do anything other than observe
17 and listen.
18      It would be inappropriate to question the
19 witness.  And I would hope that people who might fall in
20 that category would refrain from speaking on the record
21 in this case.  Thank you.
22      VIDEOGRAPHER:  Good afternoon.  Here begins
23 media number one of the deposition of Dr. Joseph Shrager
24 in the matter of Vest versus Allied Packing and Supply,
25 et al, in the Superior Court, State of California,



**Sarnoff**
877.955.3855

3 (Pages 6 to 9)

Exhibit 32-841

| Page 10 | Page 12 |
|---|---|
| 1 County of Alameda. The case number is RG09489518.<br>2 Today's date is December 13th, 2010; the current time is<br>3 2:04 p.m.<br>4 This deposition is taking place at Stanford<br>5 Hospital and Clinics at Stanford, California. It's<br>6 being taken on behalf of the defendants.<br>7 The videographer is Ray Tyler appearing on<br>8 behalf of Sarnoff Court Reporters and Legal<br>9 Technologies.<br>10 All counsel, parties, and the deponent, please<br>11 take notice that as part of the videotaping of this<br>12 deposition, very high-quality microphones are being<br>13 used. These microphones are very sensitive.<br>14 If any party, attorney, or the deponent wishes<br>15 to make a statement or have a conversation off the<br>16 record, they should state that they are going off the<br>17 record and gain concurrence from all parties. The<br>18 videographer will then stop recording.<br>19 All recorded comments made by any party,<br>20 attorney, or the deponent during this deposition will be<br>21 assumed to be on the record and will be transcribed.<br>22 Would counsel please identify yourselves and<br>23 state whom you represent.<br>24 MR. BOONE: Good afternoon. My name is Robert<br>25 Boone and I represent defendant McDonnell Douglas | 1 and Stanford.<br>2 MR. GERAGHTY: This is Mark Geraghty for Hexcel<br>3 Corporation.<br>4 MR. LUNDRY: Gary Lundry for Kentile Floors.<br>5 MS. WAY: Jennifer Way on behalf of Dean's<br>6 Materials.<br>7 MS. BENTON: Kathleen Benton on behalf of<br>8 Kelly-Moore Paint Company, Inc.<br>9 MS. AGELSON: This is Karen Agelson on behalf<br>10 of Dowman Products, Inc., and Hamilton Materials, Inc.<br>11 MS. ROSS-TAIT: This is Courtney Ross-Tait<br>12 representing George E. Masker, Inc.<br>13 MR. BURCH: Thomas Burch representing Kaiser<br>14 Gypsum Company, Incorporated.<br>15 VIDEOGRAPHER: Would the court reporter please<br>16 swear in the witness.<br>17 JOSEPH B. SHRAGER, M.D.,<br>18 having been duly sworn, testified as follows:<br>19 ---o0o---<br>20 EXAMINATION<br>21<br>22 BY MR. BOONE:<br>23 Q Would you please state your full name for the<br>24 record.<br>25 A Joseph Ben Shrager. |

| Page 11 | Page 13 |
|---|---|
| 1 Corporation. And, Dr. Shrager, I appreciate you being<br>2 here today.<br>3 MR. WOOD: My name is Lin Wood; I represent the<br>4 defendant World Airways.<br>5 MR. GOLDBERG: Doctor, I'm Jim Goldberg. I<br>6 also represent World Airways.<br>7 MR. MCLEOD: Angus McLeod for Cyprus Amax<br>8 Minerals.<br>9 MR. DUMONT: Richard Dumont on behalf of Alta<br>10 Building Material Company.<br>11 MR. INTRIERI: Mark Intrieri for Henkel<br>12 Corporation.<br>13 MR. JUNGINGER: Eric Junginger on behalf of the<br>14 Port of Oakland.<br>15 MR. SHAW: David Shaw for Parker Hannifin.<br>16 MS. GORCZYCA: Diane Gorczyca for Georgia<br>17 Pacific LLC and Honeywell International, Inc.<br>18 MR. BOLECHOWSKI: Michael Bolechowski for FL<br>19 Lathrop Corp. and Lathrop Construction Associates.<br>20 MR. KAZAN: Steven Kazan for Mr. Vest.<br>21 MR. McCLAIN: David McClain for Mrs. Caroline<br>22 Vest.<br>23 VIDEOGRAPHER: Would those on the telephone<br>24 please introduce themselves.<br>25 MS. FISH: Susan Fish on behalf of the deponent | 1 Q And how do you spell your last name, Dr.<br>2 Shrager?<br>3 A S-H-R-A-G-E-R.<br>4 Q Dr. Shrager, again, we appreciate you taking<br>5 time to be here today. Have you ever had your<br>6 deposition taken before, sir?<br>7 A Yes, a couple of times.<br>8 Q Okay. If at any time during the deposition you<br>9 don't understand a question that's being asked, will you<br>10 let us know so we can rephrase it so that you do<br>11 understand it?<br>12 A Yes.<br>13 Q Is there any reason why you cannot give your<br>14 best and most accurate testimony here today?<br>15 A No.<br>16 Q You're a medical doctor; is that correct?<br>17 A Yes.<br>18 Q And specializing in any particular field?<br>19 A Thoracic surgery. And in particular, surgery<br>20 -- what we call noncardiac thoracic surgery or general<br>21 thoracic surgery, which means we don't do cardiac, even<br>22 though we're trained to do cardiac as well.<br>23 Q How long has that been your specialty?<br>24 A I finished my training in '97.<br>25 Q Your attorney was kind enough to provide us |



**Page 14**

1 with a copy of your curriculum vitae before the
2 deposition started. And I think you have that in front
3 of you. If you could just take a look, please, and
4 verify if that is in fact a copy of your most current
5 curriculum vitae?
6    A  Yes, it looks to be.
7    Q  I'm going to ask the court reporter to mark as
8 Exhibit 1 to the deposition a copy of Dr. Shrager's C.V.
9        (Defendant's Exhibit No. 1 was marked for
10 identification by the Court Reporter.)
11       MR. BOONE: I would ask the reporter to mark as
12 Exhibit 2 a copy of the Deposition Notice and Subpoena
13 served by my office.
14       (Defendant's Exhibit No. 2 was marked for
15 identification by the Court Reporter.)
16 BY MR. BOONE:
17    Q  Dr. Shrager, Timothy Vest is a patient of
18 yours; is that right?
19    A  Yes.
20    Q  And he became a patient of yours in September
21 of 2009; correct?
22    A  That's correct.
23    Q  And you performed surgery on Mr. Vest in
24 October of 2009; right?
25    A  If you don't mind, I'll just check dates and

**Page 15**

1 things as you ask them to make sure I don't say yes and
2 I'm wrong. Yes, October 7th, 2009.
3    Q  And you've got some documents in front of you.
4 Are those some materials that you brought with you for
5 purposes of the deposition today?
6    A  Yes. These are just copies of my office notes,
7 operative note, that our Stanford lawyer put together
8 for me so I could have them in front of me.
9    Q  Can you identify for us the dates of those
10 notes and reports so that we just have a record of what
11 you have in front of you?
12    A  You want the dates of each one?
13    Q  Yes. For example, do you have in front of you
14 a September 29, 2009 --
15    A  I do.
16    Q  -- report?
17    A  My office note from the first time I saw him,
18 yes.
19    Q  Okay. And do you also have in that -- in those
20 materials your October 7th, 2009 operative report?
21    A  Yes.
22    Q  And that was regarding the surgery you
23 performed?
24    A  Yes.
25    Q  And what other --

**Page 16**

1    A  I then -- have.
2    Q  -- other reports do you have in that package of
3 documents?
4    A  I have an October 27th, 2009 office visit,
5 follow-up office visit. I have a May 26th, 2010 office
6 visit. I have an August 10th, 2010 office visit. And I
7 have what looks like three -- I think I saw while
8 leafing through -- sort of nurses documenting phone
9 calls from the Vests saying what we did about, you know,
10 refilling prescriptions, things like that.
11    Q  Okay. And are those all of the office visits
12 regarding Mr. Vest?
13    A  I think those are all the times that I saw him
14 in the office.
15    Q  In person?
16    A  Yes.
17    Q  Okay. So the first time you saw Mr. Vest was
18 September 29, 2009; is that right?
19    A  Yes.
20    Q  And on October 7, 2009, you performed surgery,
21 and in that surgery you removed from Mr. Vest a tumor;
22 correct?
23    A  Yes.
24    Q  Resected a tumor is the medical terminology?
25    A  Yes.

**Page 17**

1    Q  And you diagnosed Mr. Vest with what's called
2 localized malignant mesothelioma; is that right?
3       MR. KAZAN: Objection, that's vague as to time.
4 BY MR. BOONE:
5    Q  At about the time of the surgery you diagnosed
6 Mr. Vest with localized malignant mesothelioma?
7    A  When the final pathology report came back, I
8 guess whenever I read the final pathology report is when
9 he was given the diagnosis of localized malignant
10 mesothelioma.
11    Q  And the date of that report, sir, is what?
12    A  That I don't have in front of me, here. So the
13 date that the report is read out is going to be
14 different than the date -- you know, on a path report
15 they put the date of the surgery and then the date that
16 the report was read out. Typically it's about a week
17 after the surgery.
18       MS. FISH: I marked the PET scans.
19       THE WITNESS: I'm sure you have it in your pile
20 of things if I don't. Here it is. What is the date of
21 surgery?
22       MR. BOONE: October 7, 2009.
23       THE WITNESS: So the date of this report is
24 October 22, 2009. And I'm actually not sure that this
25 is not just the day we printed it. Yes, electronically

Page 18

1 signed 10/22/2009 by the pathologist.
2 Q And the pathologist was who?
3 A Ritesh Pai, P-A-I.
4 Q So you reviewed the pathologist's report and
5 agreed with the pathologist's diagnosis of localized
6 malignant mesothelioma; is that right?
7 A Yes.
8 Q You had originally thought that the tumor was
9 from -- if I pronounce it correctly -- adenocarcinoma;
10 is that right?
11 THE REPORTER: What carcinoma?
12 MR. BOONE: Adenocarcinoma.
13 THE WITNESS: Yes, the transthoracic needle
14 biopsy that had been done previously was read both, as I
15 recall, at an outside hospital and at Stanford as
16 adenocarcinoma.
17 BY MR. BOONE:
18 Q And subsequent to Mr. Vest's surgery, you have
19 periodically seen him up through the present time?
20 A Yes, I have.
21 Q And up to the present time has there been a
22 recurrence of a tumor or the tumor in Mr. Vest?
23 A Not that -- not that we can document.
24 Q And during -- since the time of Mr. Vest's
25 surgery, have examinations been performed to monitor his

Page 19

1 medical condition with respect to --
2 A Yes.
3 Q -- the localized malignant mesothelioma?
4 A Yes.
5 Q What's been done in that regard?
6 A He had at least one CT scan and two PET/CT
7 scans. That's PET slash CT. There was an episode which
8 was -- probably turned out to be some sort of an
9 inflammatory episode that led to some changes on these
10 studies, which were initially suspicious for recurrence
11 but then turned out to be false alarms.
12 Q And was that something that was referred to as
13 a pleural effusion in some of the reports beginning in
14 February of 2010?
15 A Yes, there was.
16 Q And the last CT or PET/CT scan that was done
17 was in October; is that right?
18 A Yes.
19 Q Of this year?
20 A Yes.
21 Q And the inflammation that you referenced, that
22 was completely resolved as shown by the latest scan?
23 A Yes, that's correct.
24 Q As a medical doctor, the preparation of a
25 medical report is important; is that correct?

Page 20

1 A I'm sorry, please repeat.
2 Q As a medical doctor, the preparation of medical
3 reports is an important function that the doctor
4 performs?
5 A I wish it were less important. Yes, it's
6 important.
7 Q It's important because you may need to go back
8 and look at your report or other doctors may need --
9 A Yes.
10 Q -- to reference your report; right?
11 A Yes, absolutely.
12 MR. McCLAIN: Mr. Boone, I let you lead during
13 this for preliminary matters, but this is a witness you
14 subpoenaed. It's not our expert, so please do not ask
15 any leading questions. I will start to objecting.
16 MR. WOOD: For the record, the status of the
17 witness in terms of who the witness will be will be
18 determined at the time of trial.
19 MR. McCLAIN: Right.
20 MR. WOOD: So the objection to the question as
21 to protective purposes as to leading needs to be stated
22 with respect to each question.
23 BY MR. BOONE:
24 Q Is it your practice, Doctor, in performing
25 surgeries and preparing reports like an operative report

Page 21

1 to include anything in the operative report that you
2 observed during the procedure that you believe is
3 significant from a medical standpoint?
4 A Yes.
5 Q At any time during your treatment of Mr. Vest,
6 did you ever make any finding that Mr. Vest had pleural
7 plaque or a pleural plaque?
8 A I should look back to be sure.
9 Q Take your time.
10 A So, if I saw a pleural plaque, I would have
11 mentioned it at about this point in my op note. And I
12 don't mention anything about it.
13 Now, on the other hand, I was not thinking
14 mesothelioma at the time of the operation. So I
15 probably was not particularly looking for them.
16 Q Move to strike as nonresponsive the witness's
17 answer starting with, "On the other hand" to the end of
18 the answer.
19 MR. KAZAN: Overruled.
20 MR. WOOD: Judge Kazan has spoken.
21 BY MR. BOONE:
22 Q You completely removed the tumor on October 7,
23 2009?
24 A I did.
25 Q And the tumor was attached to Mr. Vest's 6th



Page 22

1   rib; is that right?
2      A   I ended up removing his -- portions of his 5th,
3   6th, and 7th ribs, so the tumor was centered on the 6th
4   rib.
5      Q   And there was no -- you found when you
6   performed the surgery -- or did you find when you
7   performed the surgery there was any involvement of the
8   lung with the tumor?
9      A   No, there was not.
10     Q   Is what you referred to, removing a section of
11  the 5th, 6th, and 7th rib what is commonly called a
12  margin in surgical terms?
13     A   Yes.  Well, the margin would be the distance
14  between the edge of the tumor and where you actually cut
15  the ribs.
16     Q   And what is the -- what were the pathology
17  results for the margin?
18     A   The margins were free of tumor.  I can look at
19  the pathology report to get any more detail than that if
20  you like.
21     Q   Sure, if you need to refer to the report.
22     A   This says cervical margins not involved.
23     Q   And what does that mean?
24     A   It means that in the area where I cut through
25  in order to remove the tumor, there were no tumor cells

Page 23

1   extending to that place we cut.  If there was tumor,
2   that would suggest that there was a tumor on the other
3   side as well left in his body.
4      Q   During your treatment of Mr. Vest, did you ever
5   observe, or from any of the pathological information see
6   any evidence of metastasis of the tumor that you
7   removed?
8      A   At any time in the post-operative course?
9      Q   Yes.
10     A   No.  We have not seen anything that turned out
11  to be evidence of spread.
12     Q   In your September 29, 2009 report, do you have
13  that in front of you?
14     A   Yes.
15     Q   On the first page, I've can orient you.  In the
16  second paragraph there is a sentence that says, There is
17  also associated pleural thickening adjacent to the mass.
18  Do you see that?
19     A   Yes.
20     Q   And are you referencing there a CT scan that
21  was taken in August of 2009?
22     A   Yes.
23     Q   Was the pleural thickening that you reference
24  in your September 29, 2009 report overlying the tumor
25  that was removed?

Page 24

1      A   Yes.  I say, Associated pleural thickening
2   adjacent to the mix.  So, as you can tell from the way
3   this is written, CT scans are not particularly sensitive
4   or specific.  Actually, I couldn't even tell it was a
5   tumor arising from the chest wall rather than from the
6   lung.
7          So my impression was that there was at least
8   pleural thickening, but I could not say it arose from
9   the chest wall.
10     Q   When you performed the surgery in October of
11  2009, was there any tumor seen elsewhere in the chest
12  other than the resected mass?
13     A   No.
14     Q   And have you ever diagnosed Mr. Vest with
15  diffuse malignant mesothelioma?
16     A   No.
17     Q   To your knowledge, have any of the doctors here
18  at Stanford treating Mr. Vest ever diagnosed or made a
19  finding that he had a pleural plaque or pleural plaques?
20     A   Not to my knowledge.
21     Q   If one of the doctors here at Stanford had made
22  such a finding or diagnosis would you be aware of it?
23         MR. KAZAN:  Objection, calls for speculation.
24  BY MR. BOONE:
25     Q   Would you expect to be aware of it?

Page 25

1          MR. KAZAN:  Same objection.
2          THE WITNESS:  Should I answer?
3          MS. FISH:  If you can.
4          THE WITNESS:  Would I be aware of it?
5          MR. BOONE:  Yes.
6          THE WITNESS:  Yes, if there were a pathology
7   report on him it would be sent to me by a computerized
8   report and I would know, assuming it was in the course
9   of his normal medical care.
10  BY MR. BOONE:
11     Q   That was what I meant, during his normal
12  treatment here at Stanford.
13     A   Right.
14     Q   Have you cleared Mr. Vest to return to work?
15         MR. KAZAN:  Objection, assumes facts not in
16  evidence related to his authority to do so.
17         MS. FISH:  From time to time, Doctor, there may
18  be objections that folks -- different folks lodge.  I'll
19  let you answer the question as long as you continue to
20  understand that they are objecting for the record only.
21  So as of your last visit, if you can answer the
22  question.
23         THE WITNESS:  Well, I'm not the only person who
24  determines whether he's able to work or not.
25  BY MR. BOONE:



Sarnoff
877.955.3855

7 (Pages 22 to 25)

Exhibit 32-845

Page 26

1  Q  I'm only asking from your --
2  A  So my impression the last time I saw him is
3  that there is no reason he would not be able physically
4  to work.  But I did have the impression he was having a
5  lot of trouble psychologically.  I didn't know what
6  relevance that would have on his ability to work.
7  Q  And you determined at what point in time that
8  physically he was able to work?  Was that in August of
9  2010?
10  A  I would have to look.  I know that's the first
11  time that I actually put it down on paper.
12  Q  When was the first time that you concluded that
13  physically he was able to return to work?
14  A  My recollection is that I didn't know whether
15  he was or was not working when I saw him in May of 2010.
16  I just don't think it came up.
17  So I did not really address -- I think he asked
18  me at the August visit, August 2010, whether he should
19  be working or told me that he was not working and we
20  talked about it to some extent at that point.
21  Q  Based on your training and experience in your
22  treatment of Mr. Vest, at what point in time was he able
23  to return to work from a physical standpoint?
24  A  For a physical standpoint, I would have said
25  some time between this may visit and this August 2010

Page 27

1  visit.
2  Q  Dr. Shrager, after the -- after you completed
3  the surgery of Mr. Vest, what was your prognosis for
4  him?
5  A  I was thinking that he had about a 50/50 chance
6  of being cured at the time.
7  Q  You mentioned -- if I can turn your attention
8  to your October 27, 2009 report.
9  A  Yes.
10  Q  Do you have that in front of you?
11  A  Yes.
12  Q  And, Doctor, just for clarification purposes,
13  in response to your answer to the last question, you
14  said your prognosis after completion of the surgery was
15  50/50, was that at the time that you had just completed
16  the surgery prior to obtaining a pathological report?
17  A  Generally -- it's just generally in that few
18  week period.
19  Q  Okay.  In your -- do you have your October 27,
20  2009 report?  You make reference in there that the
21  literature suggests that the cure rate for localized
22  malignant mesothelioma is as high as 60 or 70 percent
23  with reception alone.  Do you see that reference?
24  A  Right.  I do.
25  Q  And did you at some point in time give Mr. Vest

Page 28

1  that prognosis?
2  A  Yes.  Well, so I say here it is as high as 60
3  or 70 percent.  So what I did -- obviously I've seen --
4  this is a very rare tumor.  I've seen two previously in
5  my career.
6  And on the basis of around the time of having
7  treated him, I looked at a couple of the large -- the
8  larger series, not a large, but the larger series of
9  these tumors.  And from a quick look at that time of
10  those, I was thinking in my mind he's got about a 50/50
11  shot.
12  I tend to be a little bit optimistic with
13  patients because I think that they should generally be a
14  little positive rather than negative.  And I want to
15  document what I've said to them so that's what I would
16  say here.  That's why I said here as high as 60 or 70
17  percent.
18  Q  That's what you told Mr. Vest, is that what
19  you're saying?
20  A  I probably told him approximately 60 or 70
21  percent.
22  Q  And the two prior patients referenced in your
23  October 27 report, how long ago did you treat them?
24  A  So I moved here from University of Pennsylvania
25  about October two years ago.  And they were both at

Page 29

1  Penn.  One it was -- one was about six years ago and one
2  was about four and a half years ago.  I've reviewed this
3  recently knowing this would come up.
4  The patient from about four and a half years
5  ago is alive and well, and the patient from six years
6  ago has not been followed up at Penn, so I don't know.
7  Q  One way or the other?
8  A  No idea.
9  Q  Doctor, before we -- before I pass the baton
10  here, I'm going to ask the court reporter if we could,
11  and your attorney, Ms. Fish, if we can mark as an
12  exhibit the reports he brought with him today; the small
13  stack as an exhibit, or I have a notebook of all the
14  records subpoenaed from Stanford, and we can just mark
15  them collectively as an exhibit, whatever is your
16  preference.
17  MS. FISH:  It does not matter.  These were
18  extracted from a production which is the Stanford
19  record.  So if we put them in chronological order and
20  selected those that were authored by Dr. Shrager, so if
21  you want to use those for an exhibit, that's fine.
22  MR. BOONE:  Why don't we mark the ones that
23  have been pulled out of the big stack as Exhibit 3, and
24  if we can also mark as Exhibit 4 the larger stack.
25  MS. FISH:  That's fine.



Page 38

1      MR. WOOD:  See.
2      THE WITNESS:  I neither sought out nor found --
3      MR. WOOD:  Thank you.
4      THE WITNESS:  -- pleural plaques.
5  BY MR. WOOD:
6      Q   Clearly if you had found or seen pleural
7  plaques intraoperatively, according to your standard
8  practice and the way you were trained with respect to
9  medical records, you would have, in at least the
10  exercise of your best efforts to do so, would have noted
11  the finding of pleural plaques in your operative note;
12  true?
13      MR. McCLAIN:  Objection, leading.
14      THE WITNESS:  I probably would have noted it.
15  If it were a case where I knew it was a mesothelioma, I
16  would have definitely noted it.  But at the time I
17  didn't know it was mesothelioma.
18  BY MR. WOOD:
19      Q   Right.  But when you say -- when we talked
20  about the CT scan, you were not specifically operating
21  on Mr. Vest on October the 7th with the idea in your
22  mind that he was suffering mesothelioma; right?
23      A   Correct.
24      Q   But you, nonetheless, regardless of what your
25  differential diagnosis was, you nonetheless would have

Page 39

1  had the duty and responsibility to appreciate any
2  significant findings you made during that procedure;
3  true?
4      MR. McCLAIN:  Objection, asked and answered and
5  leading.
6      THE WITNESS:  I think I've answered the
7  question.
8  BY MR. WOOD:
9      Q   Well, I want to make sure it's clear that it's
10  equally true on the operation as it was for CT scan, if
11  you bear with me.  If it may open him up to do an
12  adenocarcinoma and you may find other significant
13  findings?
14      A   If you press me on the issue, then I'll tell
15  you that we cannot see all things in every case.  And
16  depending on what we think we're dealing with, we are
17  more or less aggressive in looking for things.
18      Q   I don't mean to suggest otherwise.  I just want
19  to make sure that, again, intraoperatively, if you had
20  found pleural plaques, you would agree with me that
21  would be a significant medical finding?
22      MR. McCLAIN:  Objection, asked and answered.
23      MS. FISH:  Has been asked and answered, I
24  believe.
25      MR. WOOD:  I think I asked him on the CT scan

Page 40

1  but I didn't ask him intraoperatively.
2      MS. FISH:  Mr. Boone asked him.
3      MR. WOOD:  Let me make sure I got it and we'll
4  move on.
5      Q   Am I right, sir?
6      A   Ask it again.
7      Q   Intraoperatively, if you had found pleural
8  plaques, you would agree with me that that would be a
9  significant medical finding; true?
10      MR. McCLAIN:  Same objections?
11      THE WITNESS:  Yes.
12  BY MR. WOOD:
13      Q   Again, as with the CT scan, it would have been
14  noted in the operative record; true?
15      MR. McCLAIN:  Same objections?
16      THE WITNESS:  Would probably have been noted in
17  the record because I would have tried to remember to
18  note it in my op note, yes.
19  BY MR. WOOD:
20      Q   And you don't -- from your review of the
21  records of Mr. Vest in preparation for this deposition,
22  or from your recall of them or with respect to your
23  treatment of Mr. Vest, there has been no pathology
24  report that indicated any finding of pleural plaques; am
25  I right?

Page 41

1      A   I'm not aware of one.
2      Q   So you would agree with that?
3      A   Yes.
4      Q   And you indicated -- you indicated that the
5  last time you saw Mr. Vest -- if you don't mind, what
6  date was that?
7      A   The last time I saw him?
8      Q   Yes, please.
9      A   Was August 10th, 2010.  We would -- either I or
10  probably one of my nurses would have had some
11  communication with him by telephone after the PET/CT
12  scan, the last PET/CT.
13      Q   And you indicated, I believe in response to a
14  question Mr. Boone asked you, that at that point in time
15  you did not see a reason that -- you did not see any
16  reason why he would not be able physically to return to
17  work.  But you indicated that he was having -- at least
18  it was your impression he has having a lot of trouble
19  psychologically; have I got that right?
20      A   Yes.
21      Q   Do you recall any specifics of what he told you
22  about his psychological state upon which you formed that
23  impression?
24      A   Yes.
25      Q   Tell me what those were.



Exhibit 32-847

**Page 42**

1    A   He was having a hard time sleeping; he was
2   having nightmares.  He had actually had -- what seemed
3   like it from his description to me -- a very severe
4   panic attack around the time that he had this finding of
5   the -- on CT scan or on the PET/CT where I guess there
6   was some suspicion of a recurrence.
7        And he just looked -- I would not normally -- I
8   usually don't get into psychology in my notes as a
9   surgeon, but it was pretty obvious that he was having
10   trouble.  So it was something that I thought was
11   significant enough that I should comment on it.
12    Q   Was it significant enough for you to ask him
13   whether he was seeking any type of medical treatment for
14   any of those psychological problems?
15    A   I'm sure I told him if he was not already
16   seeing a psychiatrist he should be seeing one.  I
17   remember that, but I didn't refer him to a psychiatrist.
18   I don't remember his answer of whether he was seeing one
19   or not.
20    Q   The types of problems that he told you about or
21   exhibited to some extent in your mind, you would believe
22   that he needed to seek treatment from a psychiatrist;
23   true?
24    A   I recommended that to him.
25    Q   These are treatable conditions that he's

**Page 43**

1   described to you, are they not, sir?
2        MS. FISH:  I'll object.  It may go beyond his
3   area of expertise.
4        THE WITNESS:  I'm not a psychiatrist but I knew
5   enough like he looked like he needed one.
6   BY MR. WOOD:
7    Q   To hopefully help him with respect to those
8   problems?
9    A   Yes.
10    Q   Do you know whether he's ever seen a
11   psychiatrist or psychologist?
12    A   I have no idea.
13    Q   Do you have any idea whether he's ever sought
14   treatment from a psychiatrist or psychologist since you
15   last saw him?
16    A   I don't know.
17    Q   When you talk about a 50/50 chance or a 60 or
18   70 percent chance of cure, are we talking about the
19   chance of a nonrecurrence?
20        MR. McCLAIN:  Objection, misstates his
21   testimony.
22        MR. WOOD:  Actually, I don't think it does.
23    Q   You can answer the question.
24    A   So if it recurs, then I would say his chances
25   of being cured are close to zero.

**Page 44**

1    Q   I'm sorry?
2    A   If it recurs, I would estimate his chances of
3   being cured are close to zero.  And I would estimate --
4   I was asked before at the time that I saw him what did I
5   think were his -- at the time that the diagnosis was
6   made, what did I think the chances were.
7        So at the time that the diagnosis was made, I
8   thought that the chances of having a nonrecurrence were
9   about 50 percent.
10    Q   That's where I appreciate that if I understood
11   you.  You're not talking about a 50/50 chance of living
12   or dying, are you?
13    A   Yes, I am.
14    Q   You're talking about a recurrence?
15    A   So a recurrence with this tumor, like pretty
16   much every thoracic tumor we deal with, is almost
17   certainly a precursor of death.
18    Q   Right.  But you're not sitting here telling me
19   at what point in time, years out, it might be a cause of
20   death if in fact it is, are you?
21    A   Is that a question?
22    Q   It was meant to be but sometimes we don't --
23   I'm not as artful as I would like to be or sometimes
24   think that I am.
25        MR. McCLAIN:  Objection, vague and ambiguous.

**Page 45**

1        MR. WOOD:  Let me withdraw it and restate it.
2    Q   I just want to make sure when you talk about
3   50/50, you're talking about 50 percent chance of a
4   nonrecurrence of the malignancy, and a 50 percent chance
5   of a recurrence; true?
6        MR. McCLAIN:  For clarification, you're talking
7   about back then at the time of the surgery?
8        MR. WOOD:  Yes.
9        THE WITNESS:  I'm talking about both.  I think
10   that he's got a 50/50 chance of dying of the disease,
11   and a 50/50 chance of having a recurrence of the
12   disease.
13   BY MR. WOOD:
14    Q   I understand what you're saying.  See if I've
15   got it right.  50 percent chance at the time that you
16   formulated this opinion that this man would not have a
17   recurrence; true?
18    A   Yes.
19    Q   And a 50 percent chance at that time in your
20   mind that this gentleman would not die from this
21   disease; true?
22    A   Right.
23    Q   And, on the other hand, you say, well, there is
24   a 50 percent chance, Mr. Wood, that this will recur;
25   true?



Page 46

1    A  Yes.
2    Q  And in my medical opinion, if there is a
3 recurrence, it will in likelihood cause his death,
4 assuming he does not die of some other disease or
5 incident prior in time; true?
6      MR. McCLAIN: Objection, misstates his
7 testimony.
8      MR. WOOD: Don't think it does.
9      MR. McCLAIN: You said "likelihood." He did
10 not use likelihood, counsel.
11      MS. FISH: You can answer the question.
12      THE WITNESS: I think that's an accurate
13 assessment.
14 BY MR. WOOD:
15    Q  Inaccurate?
16    A  Accurate.
17    Q  Thank you. Would you expect the recurrence, if
18 it happened to be a recurrence, of localized malignant
19 mesothelioma?
20    A  So I would expect it to be a recurrence of the
21 histological diagnosis, localized mesothelioma. But not
22 in a localized manner. So when these recur, they
23 typically recur diffusely, somewhere else in the body.
24 They could recur locally, but more likely to recur
25 somewhere else in the body.

Page 47

1    Q  Somewhere else in the body?
2    A  Yes.
3    Q  And what is your plan going forward in terms of
4 when you will monitor Mr. Vest as you've been doing in
5 the past with the PET scans or other types of diagnostic
6 tests or exams, every six months or --
7    A  Probably do PET/CTs. Well, it will be a little
8 bit of a negotiation between his oncologist and myself.
9 But we will probably do PET/CTs for about two and a half
10 years, and then maybe every year thereafter until we get
11 beyond five years.
12    Q  The reason for that is you want to monitor
13 carefully the idea that he may have a recurrence; true?
14    A  Yes.
15    Q  And you want to monitor carefully because if he
16 does have a recurrence, you want to try to find it and
17 treat it at the earliest possible moment; right?
18    A  Yes.
19    Q  Sooner is much better than later?
20      MR. McCLAIN: Objection, calls for speculation?
21 BY MR. WOOD:
22    Q  I hope not.
23    A  Sooner is probably a little better.
24    Q  Because, generally speaking at least, the
25 earlier you are able to diagnose the cancer and treat

Page 48

1 it, the better the chances in terms of the prognosis of
2 the patient; is that true --
3      MR. KAZAN: Objection.
4      MR. WOOD: I have to finish the question before
5 you object to it. You go ahead and I'll restate it.
6      MR. KAZAN: Your question is ambiguous. It's
7 unclear if you are now still talking about mesothelioma
8 or if you were now talking about cancer in general.
9      MR. WOOD: I'm talking about both.
10      MR. KAZAN: Then it's a compound question.
11 Pick one.
12      MR. WOOD: It was not meant to be compound.
13    Q  The bottom line is, I think that mesothelioma
14 falls within the general parameters of a cancer in that
15 the sooner you catch it, the better potentially for the
16 patient; true?
17      MR. KAZAN: Objection. Look, it would be
18 really helpful if you would ask a question instead of
19 making a speech, and then asking him if it's true.
20      MS. FISH: The doctor here is a treating
21 physician and we're here about this patient. These
22 questions should be about this patient.
23 BY MR. WOOD:
24    Q  I'm trying to simply find out, Doctor -- and I
25 apologize, I did not mean to make a speech. I'm just

Page 49

1 simply trying find out why you are going to be doing PET
2 scans on this gentleman I think you said for every six
3 months for probably the next two and a half years;
4 right?
5    A  Yes.
6    Q  As opposed to, say, doing the PET scan every
7 two years; right. Why are you doing it ever six months
8 for the next two and a half years as opposed to, say,
9 every year or two years?
10    A  Well, first you do it because if somebody has a
11 recurrence, for social reasons you would like to know,
12 if they have to get their things in order, for example.
13      Now, what you were saying about all cancers
14 being the same, I would disagree with a lot. What I
15 would say is that -- for example, with lung cancer,
16 okay, nonsmall cell lung cancer, if you have a
17 recurrence or a metastasis in another site in your body,
18 99.5 percent of the time you're going to die.
19      Now, this disease no one knows very much about.
20 So I don't know that anybody can answer the question of
21 whether a recurrence 100 percent leads to death in this
22 particular disease. But my estimation is that it's
23 probably very high.
24    Q  When you say "this particular disease," you're
25 talking about localized malignant mesothelioma; am I



**Sarnoff.**
877.955.3855

13 (Pages 46 to 49)

Exhibit 32-849

Page 50

1 right?
2    A   Yes.
3    Q   There was some -- at least maybe not
4 intended -- but some distinction of 50/50 as the
5 prognosis at the time a few weeks after surgery.
6        Has that prognosis changed in any fashion as we
7 sit here today based on your last examination of the
8 findings in, I believe you said you saw him in August?
9    A   I would say on the basis of reading that I have
10 done since having looked through -- having looked things
11 more now that I saw that this was going to trial, I kind
12 of -- I might even skirt that down a little bit and say
13 maybe he has a 40 percent chance of being cured.
14    Q   Does the chance increase the longer he goes
15 without a recurrence?
16        MR. McCLAIN:  Objection, calls for speculation.
17        THE WITNESS:  Again, without there being a ton
18 of expertise on this particular tumor, I would say
19 probably.
20 BY MR. WOOD:
21    Q   There is no crystal ball, I'm sure you'll tell
22 me.  We can hope that he's in the 50 to 60 percent
23 category where he would have no recurrence.
24        MR. McCLAIN:  Objection, misstates his
25 testimony?

Page 51

1 BY MR. WOOD:
2    Q   I didn't mean to do that.  The 40 to 50 percent
3 chance --
4        MR. McCLAIN:  Objection, misstates his
5 testimony again.
6        MR. WOOD:  Thank you.  I'm going to stand by
7 that question if you don't mind despite your objection.
8    Q   50 to 40 percent chance, from what you've told
9 me.  You said you might knock it down a little bit to
10 about 40 percent now based on some of the literature.
11        MR. KAZAN:  That's not what he said.
12        MR. WOOD:  Let me finish my question, please,
13 sir.  I know you don't mean to interrupt me, but it's
14 difficult to get record when I'm trying to question and
15 you're jumping in.
16        MR. KAZAN:  I'll stop.
17        MR. WOOD:  Listen carefully.
18    Q   You said earlier 50/50 percent chance after
19 surgery, and you said if you looked at it now, you might
20 knock it down a little bit to about a 40 percent chance
21 of no recurrence, to a 60 percent chance of recurrence.
22 Do I have that right?
23    A   Yes.
24    Q   I thought so.  I want to make sure, we don't
25 have a crystal ball here.  We hope -- I'm sure you hope

Page 52

1 for your patient -- that Mr. Vest falls into the
2 category of the 50 to 40 percent chance of a
3 nonrecurrence; right?
4        MR. McCLAIN:  Objection, misstates his
5 testimony.
6        MR. WOOD:  I don't think it does.
7    Q   That's what you hope for your patient is that
8 he comes in on that side of the equation; right.
9    A   I hope that he does not have a recurrence.
10    Q   Yes, sir.  And to the extent that he has a
11 chance for the recurrence, as you've described it, you
12 can't sit here today with a crystal ball and tell us
13 when in probability or likelihood that might occur?
14        It could be a year it, could be five years, it
15 could be longer; am I right?
16    A   I don't think that we have enough knowledge of
17 this particular disease to know, to know exactly when
18 it's most likely to recur.
19    Q   You just know that with one of the patients
20 that you treated for this disease at Penn State that was
21 followed at Penn State --
22    A   University.
23    Q   University of Pennsylvania. I'm sorry.
24        MR. KAZAN:  There is a big difference.
25        MR. WOOD:  There is a big difference.  And I

Page 53

1 guess the people at Penn State would tell me that in a
2 heartbeat.
3    Q   At the University of Pennsylvania, that one of
4 your patients you treated four years ago with this
5 diagnosis and upon last report that patient was still
6 alive and well with no recurrence?
7    A   Yes.  It was four and a half years.
8    Q   Four and a half years.  And then the other one
9 was six years ago but that patient was not followed at
10 the University of Pennsylvania, so you don't know the
11 situation with that patient?
12    A   Right.
13    Q   Those are the questions.  I have thank you very
14 much, Dr. Shrager.
15        MR. KAZAN:  Is there anybody else who has
16 questions from the defense side?
17        Have you all agreed on an order on how you're
18 going to be doing this, or is it just sort of raise your
19 hands and start talking?
20        MR. WOOD:  The latter.
21        MS. FISH:  We need to move on because the
22 doctor has patients.
23        MR. KAZAN:  I understand.  I'm trying to --
24        MR. WOOD:  Anybody want the mic?
25                EXAMINATION



Page 54

1     MR. SHAW:  Doctor, as I understand your --
2     MS. FISH:  Would you say your name?
3     MR. SHAW:  Yes, I'm sorry.  David Shaw.  Thanks.
4     Q   When you commenced the procedure on Mr. Vest,
5  it was your understanding that he had an adenocarcinoma
6  of the lung; correct?
7     A   Yes.
8     Q   Okay.  And during course of that procedure, you
9  came to understand that it was not a lung-based tumor;
10  correct?
11    A   Correct.
12    Q   And did that change the differential diagnosis
13  for you once you discovered it was a pleural-based
14  tumor?
15    A   Yes.
16    Q   And was mesothelioma among the potential
17  diagnoses in that differential?
18    A   Localized mesothelioma, yes.
19    Q   And, Doctor, once you made that, or once you
20  drew that conclusion, wouldn't that raise in your mind
21  the possibility of to look for plaque?
22    A   It might have.  I don't remember whether I then
23  looked more carefully or not.
24    Q   That's all I have.  Thank you.
25        EXAMINATION

Page 55

1     MR. MCLEOD:  Angus McLeod.  I'll wait a moment
2  until a mic gets passed to me, unless the technician
3  thinks I don't need one.
4     VIDEOGRAPHER:  Go ahead, sir.
5  BY MR. MCLEOD:
6     Q   Thank for your time today, Doctor.  The opinion
7  of 50 percent survival that you reached at one point was
8  before this gentleman had survived without recurrence
9  for, what has it been, about 14 months?
10    A   Yes.
11    Q   And irrespective of -- and then the 40 percent
12  opinion that you've reached now was based on what?  I
13  guess you said you had done some research on the
14  subject?
15    A   Yes.  Initially I looked at the two largest
16  series, and that was all, before I spoke to him I sort
17  of sent that initial letter.  But since I've looked over
18  a lot of the literature, and there seems to be, you
19  know, more than -- some people suggest that the survival
20  might be 25 percent, as low as 25 percent.
21    Q   Irrespective of what the research said most
22  recently or 14 months ago for that matter, it's a
23  positive thing in terms of chances of avoiding a
24  recurrence that he's gone 14 months without a
25  recurrence; correct?

Page 56

1     A   Yes.  I think the further you get out, the
2  better for him.  I don't know what the slope of that
3  curve is, you know, whether it's a -- whether it goes
4  like this at three years, that suddenly his survival
5  become much higher or whether it's a straight line.
6     Q   Presumably some fraction of those who are going
7  to get a recurrence will get them in the first 14
8  months; would you assume that to be true?
9     A   I don't know if that's true.  Well, there are
10  some case reports where there are some early
11  recurrences, certainly some of them would recur in the
12  first 14 months.
13    Q   Those were all the questions I had.  Thank you.
14    MR. KAZAN:  Anybody else in the room?  Anybody
15  on the phone with questions?
16    MR. WOOD:  We have a room person.
17    MR. KAZAN:  Oh, we do?  I'm sorry.
18        EXAMINATION
19  BY MR. JUNGINGER:
20    Q   Dr. Shrager, just a few follow-ups.
21    THE REPORTER:  Can I have your name, please?
22    MR. JUNGINGER:  Oh, sorry, Eric Junginger.
23    Q   Have you had any conversations with Dr. Stuart
24  Bussey about Mr. Vest?
25    A   I don't think so, and I don't think I know who

Page 57

1  that doctor is.
2     Q   If the tumor does recur again, is there any
3  chance that it could be resected again by yourself?
4     A   Can I go back to the last question?
5     Q   Okay.
6     A   So, it must be his primary care doctor or
7  someone because I see that I addressed one of the
8  letters to him.
9     MR. KAZAN:  Yes.
10    THE WITNESS:  But I did not have any
11  conversations with him.
12  BY MR. JUNGINGER:
13    Q   Okay.  Is your letter the only communication
14  you think you have had with him?
15    A   As far as I can remember.
16    Q   Okay.  Going now to the other question.
17    A   Yes.
18    Q   If it were to recur again, if the tumor were to
19  recur again, is there any chance then you could resect
20  it a second time?
21    A   There would be a very slight chance.  So from
22  what I have seen about this tumor, it's -- it does not
23  typically recur locally.
24        It behaves more like a sarcoma or a lung cancer
25  that's more likely to spread distantly, distant parts of

Exhibit 32-851

Page 58

1  his body, particularly if he's had a wide, localized
2  resection, in other words, a good operation with good
3  margins.
4      Q   It sounds like, Doctor, though, if it were to
5  recur locally, then you could resect it even though you
6  think that may not be likely; is that correct?
7      A   I don't know, it might recur diffusely in his
8  pleura, in which case he would probably not have an
9  operation.  And it might recur, you know, truly locally
10 right in the site of surgery, in which case he might be
11 able to have a resection.
12     Q   And is your opinion that you just gave based on
13 the studies you've read regarding localized
14 mesothelioma?
15     A   Yes.
16     Q   Have you ever seen a localized mesothelioma
17 metastasize into a diffuse mesothelioma?
18     A   Not my myself.
19     Q   Are those localized mesothelioma and diffuse
20 malignant mesothelioma two different diseases in your
21 opinion?
22     A   I would not hold myself out as a true expert in
23 mesothelioma in general.  If you asked me questions
24 about lung cancer, I would say I'm in the top 20 people
25 in the world in terms of my knowledge of lung cancer,

Page 59

1  and I would be comfortable being an expert witness in
2  lung cancer.  But my practice has never been focused on
3  mesothelioma, and my research is not in mesothelioma, so
4  I don't think I can answer questions to that effect.
5      MS. FISH:  And the doctor is here as a treating
6  physician, so we're going abreast of what his
7  responsibility is as a witness.  So if it's not about
8  this patient, the door is closing quickly.
9      THE WITNESS:  I'm going to answer this page, if
10 you don't mind.  Take two or three minutes?
11     VIDEOGRAPHER:  Go off the record?
12     MR. KAZAN:  Off the record, yes.
13     VIDEOGRAPHER:  Off the record, the time is
14 3:11, we're going off the record.
15     (Recess taken.)
16     VIDEOGRAPHER:  The time is 3:16.  We are back
17 on the record.
18     FURTHER EXAMINATION
19 BY MR. BOONE:
20     Q   Dr. Shrager, I have just a couple of follow-up
21 questions then I think we're going to turn it over to
22 the people on the phone for their questions, and unless
23 other counsel have questions for you.
24     Earlier when you were answering Mr. Wood's
25 questions about if a recurrence happens that the tumor

Page 60

1  could be diffuse, did you mean that, when you said
2  "diffuse," that the tumor would occur in a location
3  other than the location of the initial tumor?
4      A   Yes.
5      Q   And you also mentioned that you looked at some
6  literature, and at some point in time, and based upon
7  your review of the literature regarding localized
8  malignant mesothelioma, you revised your prognosis for
9  Mr. Vest from 50 percent to 40 percent.  At what point
10 in time was that?
11     A   When did I look at papers?
12     Q   Yes.  When did you look at the literature and
13 when did you change your prognosis?
14     A   I looked at the literature in part when I first
15 heard that he was -- that he was going to sue.  And then
16 I looked at the literature again in preparation for this
17 deposition.
18     Q   And what were those two points in time if you
19 can give me dates for each.
20     A   I can't remember when I learned -- first
21 learned that he was going to sue.
22     Q   Who did you learn that from?
23     A   I don't know to tell you the truth.
24     Q   Was it Mr. or Mrs. Vest, or someone else?
25     A   Wouldn't I have received a -- some sort of a,

Page 61

1  you know, what do you call it, a subpoena, or something
2  like that.
3      MR. McCLAIN:  Documents.
4      THE WITNESS:  Somebody requesting documents
5  probably.  Probably would have been somebody requesting
6  documents.
7  BY MR. BOONE:
8      Q   And you were served with a subpoena for your
9  deposition today.  Is that the time that you're talking
10 about, or was it earlier in time?
11     A   No, earlier, several months ago, I'm guessing
12 honestly, but I think it would be when I saw -- my
13 assistant would have come to me and said they are
14 asking -- a lawyer's office is asking for documents on
15 Mr. Vest.  Then I would have said, oh, he must be suing,
16 I should probably -- I'm certainly going to be asked to
17 be a treating physician.
18     Q   Did you become aware of -- that he was suing
19 prior to the time that you saw him in August of 2010?
20     A   I don't know.
21     Q   Have you had any contact with the lawyers for
22 Mr. and Mrs. Vest?
23     A   Yes.
24     Q   And when did you first have contact with their
25 lawyers?



Case MDL No. 875 Document 6658-31 Filed 01/28/11 Page 207 of 213
Case 4:11-cv-00061-LB Document 34-18 Filed 01/10/1 Page 592 of 65
JOSEPH B. SHRAGER, M.D.

12/13/2010

Page 94

1          I, the undersigned, a Certified Shorthand
2     Reporter of the State of California, do hereby certify:
3          That the foregoing proceedings were taken
4     before me at the time and place herein set forth; that
5     any witnesses in the foregoing proceedings, prior to
6     testifying, were duly sworn; that a record of the
7     proceedings was made by me using machine shorthand which
8     was thereafter transcribed under my direction; that the
9     foregoing transcript is a true record of the testimony
10    given.
11          Further, that if the foregoing pertains to the
12    original transcript of a deposition in a Federal Case,
13    before completion of the proceedings, review of the
14    transcript [ ] was [ ] was not requested.
15          I further certify I am neither financially
16    interested in the action nor a relative or employee of
17    any attorney or party to this action.
18          IN WITNESS WHEREOF, I have this date subscribed
19    my name.
20
21    Dated: _____
22
23          _____
                LYNNE MARIE LEDANOIS
24              CSR No. 6811
25



877.955.3855

Exhibit 32-853

*Timothy Vest and Caroline Vest v. Allied Packing & Supply, Inc., et al.*

U.S.D.C., Northern District of California Case No. C-11-00061 LB

# Exhibit 33

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| **Vest** | **No. RG09489518** |
| Plaintiff/Petitioner(s) | |
| VS. | **Minutes** |
| **Allied Packing And Supply** | |
| Defendant/Respondent(s) | |
| **(Abbreviated Title)** | |

Department  30                    Honorable  Kenneth Mark Burr          , Judge

July 02, 2010.

Matter comes on calendar in Dept. 30 for Trial Setting and further Case Management Conference.

For appearances, see Attendance Sheet scanned separately.

9:25a.m. - Court and counsel confer on the record.  This case is assigned for jury trial to Dept. 15, Judge Gordon Baranco.
Defendants Hamilton Materials, Inc. and Dowman Products, Inc.  exercise a peremptory challenge pursuant to CCP 170.6 as to Judge Baranco.  The Court accepts the challenge and re-assigns the case to Dept. 30, Judge Kenneth M. Burr.
Statutory discovery deadlines apply.
Pared down lists of expert witnesses must be served 30 days before trial date.

Issues Conference is set for 1/14/11 at 1:30p.m. in Dept. 30.
The Court orders parties to retrieve a copy of Dept. 30's Issues Conference Order from the Court's website.

Civil Jury Trial scheduled on 2/14/2011 10:00 AM in Department 30, U.S. Post Office Building, 201 13th Street, Oakland.

Matter is continued for further Case Management Conference to 9:15 AM on 09/03/2010 in Department 30, U.S. Post Office Building, 201 13th Street, Oakland.

Civil Pre-Trial Settlement Conference scheduled on 09/03/2010 10:00 AM in Department 30, U.S. Post Office Building, 201 13th Street, Oakland.

Minutes of       07/02/2010
Entered on       07/07/2010

Executive Officer / Clerk of the Superior Court

By _____
                              Deputy Clerk

---

**Minutes**

M6079564

Exhibit 33-854

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Vest VS Allied Packing And Supply | RG09489518 |

ADDITIONAL ADDRESSEES

Becherer, Kannett & Schweitzer
Attn: Bentivegna, Anthony
1255 Powell Street
Emeryville, CA   94608

WALSWORTH, FRANKLIN, BEVINS
& McCall, LLP
Attn: McCall, Michael T.
601 Montgomery Street
Ninth Floor
San Francisco, CA   94111-2612

Law Offices of Glaspy & Glaspy, Inc.
Attn: Glaspy, David M
One Walnut Creek Center
100 Pringle Avenue, Suite 750
Walnut Creek, CA   94596

PERKINS COIE LLP
Attn: McMahon, Brien F.
Four Embarcadero Center
Suite 2400
San Francisco, CA   94111____

Chapman & Intrieri  LLP
Attn: Intrieri, Mark G
2236 Mariner Square Drive
Third Floor, Suite 300
Alameda, CA   94501-1090

**Minutes**

M6079564

Exhibit 33-855

DeHay & Elliston, L.L.P.
Attn: Judin Esq, Jennifer
1300 Clay Street
Suite 840
Oakland, CA   94612


Foley & Mansfield PLLP
Attn: Foley, Stephen J.
1111 Broadway
10th Floor
Oakland, CA   94607


SELMAN * BREITMAN, LLP
Attn: Love, Mark A
33 New Montgomery Street
Sixth Floor
San Francisco, CA   94105-000


HOWARD ROME MARTIN &
RIDLEY LLP
Attn: Hopwood, Beth C.
1775 Woodside Road, Suite 200
Redwood City, CA   94061


Bryan Cave LLP
Attn: Goldberg, James
Two Embarcardo Center,
Suite 1410
San Francisco, CA   94111-3907

---

**Minutes**

M6079564

Exhibit 33-856

Steptoe & Johnson LLP
Attn: Kahn, Ruth D
633 West Fifth Street
Siute 700
Los Angeles, CA   90071


Wilson, Elser, Moskowitz, Edelman &
Dicker LLP
Attn: Gambino, Mary Ellen
525 Market Street, 17th Floor
Spear Street Tower, Thirty-Second Floor
San Francisco, CA   94105-2725


Pettis, James C
120 Broadway, Ste 300
Santa Monica, CA   90401


Law offices of Michael L. Mau
Attn: Mau, Michael L.
950 Harrison Street
Suite 213
San Francisco, CA   94107-1078


Sedgwich, Detert, Morgan & Arnold LLP
Attn: Fox, Michael L.
One Market Plaza
Steuart Tower, 8th Floor
San Francsico, CA   94105


STEPTOE & JOHNSON LLP
Attn: Swenson, John P.
633 West Fifth Street
Suite 700

---

**Minutes**

M6079564

Exhibit 33-857

Los Angeles, CA    90071


Selman Breitman LLP
Attn:  Dumont, Richard D.
33 New Montgomery, Sixth Floor
San Francisco, CA    94105


Pettis, James C
120 Broadway, Ste 300
Santa Monica, CA    90401


Finney LLP, Dongell Lawrence
707 Wilshire Boulevard, 45th Floor
Los Angeles, CA    90017-3609


Finney LLP, Dongell Lawrence
707 Wilshire Boulevard, 45th Floor
Los Angeles, CA    90017-3609