Exhibit G, Part 41 - McDonnell Douglas Corporation's Opposition to Plaintiffs' Motion to Remand and Exhibits
Case MDL No. 875 Document 6667-1 Filed 01/28/11 Page 1 of 14
Case3:11-cv-00067-JSW Document74-2 Filed01/24/11 Page1 of 29

# SUMMARY

120 ____
140 ____
130 ____
160 ____

## of

# DECISION BASIS for TYPE CERTIFICATION

### of the

# McDONNELL DOUGLAS

# KC-10A

**MARCH 1981**

# Tanker/Cargo Aircraft



DEPARTMENT OF TRANSPORTATION
Federal Aviation Administration

Ex.: 23; p.: 1364

# SUMMARY OF DECISION BASIS
## for
## TYPE CERTIFICATION
## MCDONNELL DOUGLAS KC-10A

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . I
INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . I

I. ADMINISTRATIVE BACKGROUND
   A. The Type Certification Process . . . . . . . . . . . . 2
   B. Significant Type Certification Issues . . . . . . . . 11
   C. Design Features . . . . . . . . . . . . . . . . . . . 12
   D. Certification Basis . . . . . . . . . . . . . . . . . 13
   E. General Issues . . . . . . . . . . . . . . . . . . . . 15

II. TECHNICAL ISSUES
    Introduction . . . . . . . . . . . . . . . . . . . . . 16
    A. Airframe Issues . . . . . . . . . . . . . . . . . . . 16
    B. Systems and Equipment Issues . . . . . . . . . . . . 17
    C. Propulsion Issues . . . . . . . . . . . . . . . . . . 18
    D. Flight Test Issues . . . . . . . . . . . . . . . . . 20
    E. Manufacturing Inspection Issues . . . . . . . . . . . 20
    F. Maintenance Issues . . . . . . . . . . . . . . . . . 21

III. TYPE INSPECTION AUTHORIZATION
     A. Type Inspection Authorization . . . . . . . . . . . . 21
     B. Conformity Inspection System . . . . . . . . . . . . 22
     C. Flight Test Log . . . . . . . . . . . . . . . . . . . 23
     D. Flight Test Results . . . . . . . . . . . . . . . . . 23

APPENDICES
    A. Compliance Summary
    B. Flight Test Summary Report
    C. Special Conditions
    D. Memorandum of Agreement

## KC-10A

### EXECUTIVE SUMMARY

On January 15, 1976, McDonnell Douglas Corporation (Douglas) proposed design changes to the DC-10-30 freighter in response to the Air Force's Advanced Capability Tanker Program. This report has been prepared to describe the certification process for this airplane, and to provide a summary of the decision basis upon which the final approval is based. This executive summary provides an overview of the contents of the report. The need for such a report is not a technical one, but arises from a desire on the part of the FAA Administrator to be fully responsive to Executive Order 12044 by providing for full public information on major FAA decisions and actions.

### The Certification Process

Before an airplane can be introduced into service by U.S. airlines, it must be "type certificated" by the FAA. Application for a type certificate may be made by anyone. Issuance of a type certificate by FAA reflects its finding that the aircraft meets all applicable FAA regulations regarding design, material, specifications, construction, and performance for safe operation. These regulations, by law, have been established through the public process of rule making. If the applicant for a type certificate can demonstrate compliance with the applicable regulations, he has a right to the type certificate.

The type certification process for a large airliner is a long and technically complex one. But it is only the beginning of FAA/industry air safety efforts for each type of airplane. The production facility (or facilities) for the airplane are also subject to "production certificate" requirements to ensure proper quality control and manufacturing procedures throughout the production run for each airplane. Documentation of satisfactory manufacturing and production of a type certificated airplane, at a certificated production facility, is evidenced by an individual "certificate of airworthiness" for each airplane. Without the certificate of airworthiness, the aircraft may not be operated. The airlines that operate the airplane, repair and alteration stations, pilot qualification, and recurrent training are all subject to continuous FAA surveillance to ensure that the original level of safety built into the design is not degraded. Finally, through the millions of hours of commercial service experience rapidly accumulated by a modern airliner, service difficulties are identified and corrected. The most serious ones, which could affect safety, are corrected by a mandatory design change issued by FAA called an "airworthiness directive," which requires specific corrective action on the part of all operators if their aircraft's certificates of airworthiness are to remain valid.

### Application of the Process

The KC-10A is a derivation of the DC-10-30F which was originally certificated in 1973. It is not considered a major change in type design, and type certification of the KC-10A takes the form of a customer variation and not an amendment to the original DC-10 type certificate. Although the KC-10A's design is purely military in nature, the Air Force has asked that the aircraft

Ex.: 23; p.: 1366

2

be type certificated by the FAA for two reasons. First, it is intended that the aircraft be as close to commercial DC-10's in configuration as possible to allow the Air Force to take advantage of commercial support facilities around the world. Second, in periods where the KC-10A fleet is not required to be completely operational, the FAA approval will allow these aircraft to be leased to commercial operators, provided the Air Force maintains them properly.

The FAA regulations governing type certification of an aircraft are written to ensure that newly designed aircraft meet the high level of safety expected by the traveling public. Regulations are continually being revised and updated as new safety features are made available by advancing technology, or as refinements of other kinds are developed. Thus, the regulations which establish the requirements for compliance when application is made for a new type design are those which have been established as of the date of application for a type certificate. In the case of an application for amendment to an existing type certificate or for a customer variation such as the KC-10A, however, changes to the regulations which have been adopted since the original application are generally not required to be applied to the derivative design. (As detailed in the report, there are some exceptions.)

Discussions between Douglas and FAA about the certification basis for the KC-10A resulted in FAA establishing a significantly upgraded basis upon which compliance with the regulations would be shown. Specifically, the original DC-10-30F was required to demonstrate compliance with FAR 25, as amended by Amendment 25-22. The KC-10A has demonstrated compliance with all of these Federal Aviation Regulations and, in addition, has demonstrated compliance with later damage tolerance regulations as well as a series of special tests designed to evaluate the airworthiness of the configuration changes which make up the KC-10A.

KC-10A CERTIFICATION
SUMMARY DOCUMENT

INTRODUCTION

The McDonnell Douglas KC-10A is the Air Force's new wide body air refueling tanker and cargo aircraft. Previously identified as the Advanced Tanker Cargo Aircraft (ATCA), it is a derivative of the McDonnell Douglas DC-10-30 freighter which is in service with many airlines throughout the world. The initial contract awarded to McDonnell Douglas in 1977 provided for production and logistics support for 20 to 60 aircraft and is being directed by the Air Force Logistics Command at Wright-Patterson Air Force Base, Ohio.

This aircraft is purely military in its design and function and, as such, is inappropriate for commercial air carrier service. The KC-10A is, however, receiving full type certification by the Federal Aviation Administration (FAA) as part of an Air Force program intended to take advantage of the DC-10 support resources available to commercial operators. As a result, all technical data, engineering, maintenance, and spare part support can be provided commercially, thereby simplifying the problems associated with the acquisition and operation of a new military aircraft. It is also envisioned that KC-10A aircraft could be leased to commercial air cargo carriers to operate in commercial service as certificated cargo aircraft. This conversion from military to commercial service, however, would require FAA airworthiness certification because these aircraft will not receive original airworthiness certificates.

The FAA and the Air Force were required to closely coordinate their certification efforts throughout this program. To assure that clearly defined interface guidelines controlled this activity, a Memorandum of Agreement between the FAA and the KC-10A Joint Program Office was developed. This document defines the working relations and responsibilities of the two organizations as they relate to type certification, production certification, and quality assurance efforts. A copy of this document is enclosed as an appendix to this report.

The designation "KC-10A," which will be used throughout this report, is not officially recognized by the FAA as a new model number. An official model number, _____, which is added to the type certificate and type certificate data sheet, indicates approval of a major change in type design of the basic aircraft. In this instance, the FAA has determined that the modifications made to the already certificated DC-10-30F do not constitute a major design change. The resulting configuration is therefore considered a customer variation of the DC-10-30F and, as such, will receive no new official model number. "KC-10A" is an Air Force designation only, but it will be referenced in the aircraft type certificate data sheet for purposes of clarity.

The FAA's certification of the KC-10A began on January 15, 1976, when McDonnell Douglas proposed design changes to the DC-10-30 freighter in response to the Air Force's Advanced Capability Tanker Program. The initial certification phase of the resulting project consisted of an intensive effort on the part of both the manufacturer and the FAA to assure that the modified aircraft complied with the applicable Federal Aviation Regulations (FAR) to the maximum extent possible. It was recognized that full compliance with the applicable FAR's was not possible due to the existence of unique military features not addressed by FAA rules. The applicable FAR's and a detailed discussion of those features,

Ex.: 23; p.: 1368

2

which do not comply with the FAR's, are addressed in Part D of the Administrative Background section of this report.

This report reviews the purpose, structure, conduct, and significant highlights of the KC-10A certification process. It summarizes the type certification system, describes the application of that system to the special certification problems of the KC-10A, and provides a review of the more noteworthy technical issues that were resolved during the certification program. In addition, it provides a brief review of the Type Inspection Authorization (TIA) and the associated flight test results. The report also describes the Aircraft Evaluation Group's activities and their involvement with the maintenance and operation of the aircraft. Appendices to this report are used where appropriate to provide more in-depth technical information on these subjects.

It is the intent of the FAA to present this information in a comprehensive manner that is both meaningful to the layman and informative to the expert. Simplified language and references to more detailed information will therefore be used when necessary.

Although this report is a complete review of the KC-10A certification program, it is not required by the FAR's and has not been used by the FAA engineering staff to make findings of compliance with airworthiness regulations applicable to this aircraft.

I. ADMINISTRATIVE BACKGROUND

  A. THE TYPE CERTIFICATION PROCESS

The type certification process is the method by which the FAA carries out the aircraft design approval responsibilities given to it by the Federal Aviation Act of 1958 (Act), as amended. Under the Act, the Administrator is required to prescribe "such minimum standards governing the design, materials, workmanship, construction, and performance of aircraft . . . as may be required in the interest of safety . . . ." 1/ The Act further provides that "any interested person may file . . . an application for a type certificate for an aircraft . . ." and specifies that "if the [Administrator] finds that such aircraft . . . is of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the [Administrator], he shall issue a type certificate therefor." 2/ It must be emphasized that the Administrator's authority in promulgating regulations concerning type certification requirements is thereby limited to the promulgation of _minimum_ standards, and the applicant has a _right_ to a type certificate if he has demonstrated compliance with those standards.

This process provides for the promotion of air safety through review of an aircraft design to assure that it meets the level of safety established by the applicable FAR's. Those standards appear in Title 14 of the Code of Federal Regulations (CFR), having been adopted in accordance with the full scheme of public rulemaking procedures provided by the Administrative Procedure Act.

---

1/  49 U.S.C. § 1421(a)(1)
2/  49 U.S.C. § 1423(a)(1) and (2)

3

In the introduction to this report, it was stated that the KC-10A is being certificated by the FAA as a customer variation of the DC-10-30F. A customer variation is a design change that will not, because of the limited extent of the changes, receive a new official model designation. An example of a customer variation might be a different interior design or a new avionics configuration requested by a customer of the aircraft manufacturer. Although such changes do not usually require a major reevaluation of the design of the aircraft, they are, nonetheless, fully evaluated in accordance with the applicable safety regulations and FAR 21 Subpart D which addresses changes to type certificates.

The FAA's type certification activities extend beyond design and performance approval of the new aircraft. As discussed at the end of this section, the FAA also develops requirements for initial, upgrade, and transition training of the air carrier flightcrews that will operate the new aircraft. The FAA's Maintenance Review Board (MRB) works with representatives of the aircraft manufacturer and operators to develop a comprehensive maintenance program for the aircraft. The maintenance program is based upon projected and in-service maintenance requirements, and is constantly subject to change to reflect the aircraft's service experience.

Because the KC-10A is a modification to a previously certificated aircraft and it will be operated and maintained primarily by the Air Force, the FAA's maintenance and flightcrew evaluation activities are somewhat limited. This subject is further discussed later in this section.

Although the type certification process is a major part of the FAA's responsibility in the promotion of air safety, that responsibility by no means ends there. Before the manufacturer can produce aircraft intended for sale to its customers, it must also obtain a "production certificate" from the FAA. The issuance of a production certificate represents a determination by the FAA that the manufacturer's production facilities and quality control systems have been inspected and validated, and that the manufacturer is capable of producing duplicates of the aircraft which conform to the type design contained in the type certificate.

When a new aircraft model is certificated, it is added to the production certificate in accordance with FAR 21.153. Again, because the KC-10A is a customer variation of the DC-10-30F, no production certificate amendment is planned. The aircraft will be subjected to the same FAA-approved production inspection system that is applied to commercial DC-10-30F aircraft except that they will not receive airworthiness certificates. The system which will allow the aircraft to be used in both military and commercial service will be described in section 0 of this report.

Following certification, the FAA becomes involved in assuring continuous airworthiness by imposing mandatory design changes when needed to maintain the original level of safety, by controlling later modifications to type certificated aircraft, and by surveillance of the manufacture of the aircraft including the manufacture of spare parts. In addition, the FAA reviews maintenance publications developed by the manufacturer and the specific maintenance programs employed by individual operators.

4

After type certification is completed and aircraft of that type are introduced into service, the FAA continues to monitor the safety of the design through a service difficulty reporting and analysis system. If an unsafe condition is revealed in service that is likely to exist or develop in an aircraft of the same type, the FAA issues an Airworthiness Directive (AD) to require design change, to prescribe special instructions, or to set forth special operational procedures to be followed. AD's are FAR's pursuant to 14 CFR Part 39, and no person may operate an aircraft to which an AD applies without compliance with the AD. In effect, through the AD process, the FAA's evaluation of an aircraft design continues throughout the service life of that aircraft. Furthermore, pursuant to 14 CFR Part 11, any person may petition the FAA to consider issuing an AD if he believes there is an unsafe condition to be corrected on a particular model airplane.

It is the intent of the Air Force to maintain the KC-10A in accordance with these continuous airworthiness provisions. The Air Force is considering participating in the FAA's service difficulty reporting system and is already on a distribution list for all AD's affecting civil aircraft with military counterparts. Although the military is not required to comply with these mandatory design changes, they must be accomplished before the aircraft may be converted to commercial use.

As a result of the recent FAR 25 Lead Region Reorganization, the FAA conducts such certification activities through the Los Angeles Area Aircraft Certification Office, an arm of the Northwest Region in Seattle, Washington. This office is comprised of the Office of the Chief, a technical support staff, and five operational branches (four engineering branches and one manufacturing inspection branch).

The Airframe Branch is primarily responsible for determining whether the structural integrity of the complete aircraft complies with the applicable regulations. This includes an analysis of all loads applied to the airframe, structural dynamics, materials and processing, and structural limitations of the airframe.

The Systems and Equipment Branch is responsible for the evaluation and approval of aircraft equipment items and their installations. This responsibility includes electrical, hydraulic, and pneumatic systems.

The Propulsion Branch is responsible for all systems associated with the mounting, controlling, lubricating, fueling, performance, and environmental impact of the aircraft's powerplants.

The Flight Test Branch conducts all flight tests and evaluations of engineering data necessary to demonstrate compliance with the performance, flight characteristics, and operational qualities requirements of the regulations.

Finally, the Manufacturing Inspection Branch is responsible for the inspections needed to determine that prototype aircraft conform to the approved drawings and specifications before the initiation of official FAA flight

5

testing. The Manufacturing Inspection Branch maintains two district offices which locate inspectors close to those facilities for which they are responsible.

The type certification process is initiated by the submission of an application for a type certificate by the manufacturer. 3/ In the case of a design change that does not warrant a new or amended type certificate, the proposal may be submitted in any manner acceptable to the local FAA engineering office. The category of the aircraft 4/ and the date upon which the application is made 5/ determine the standards that must be met. For a new aircraft of which no previous models exist, the applicable standards are those in effect on the date of application. 6/ For modification of an existing aircraft, when the Administrator concludes it does not require a complete investigation of compliance with the applicable regulations, the applicable standards are those that applied to the previous model. When application for type certification is made for an aircraft that is a continuation of an existing model line, and the new model incorporates one or more major changes from other aircraft of that type, the FAA designates the standards applicable for type certification after determining whether each proposed change incorporates a new design (or redesign) for which the regulations in the underlying type certificate do not provide adequate standards. 7/ If the regulations incorporated by reference in the original type certificate are found adequate, the applicant will be required to show compliance with those original regulations. If, to the contrary, the underlying regulations will not assure an adequate level of safety, the Administrator may require compliance with applicable provisions of the newer regulations in effect on the date of the application for the change, and/or compliance with special conditions, and amendments thereto, in order to provide a level of safety equal to that established by regulations incorporated by reference in the original type certificate. The type certificate referred to is the official document issued to the applicant which signifies final FAA approval of the particular aircraft. Final approval of a change which does not require a new or amended type certificate is indicated by identifying the technical data describing the change as "FAA approved" and adding it to the technical data files for that product. This process will be used for the KC-10A program.

The determination as to which type certification standards are applicable is an FAA judgment based upon a design review of the proposed aircraft. Once this determination is made, the manufacturer must comply with the regulations "found to be applicable"—unless it requests and receives an exemption under FAR Part 11. An exemption is an order issued by the FAA that relieves the recipient of the obligation to comply with an otherwise applicable regulation. 8/ In addition to the designation of applicable regulations, the FAA also has

---

3/ 14 CFR § 21.15
4/ 14 CFR § 21.21
5/ 14 CFR § 21.17
6/ 14 CFR § 21.17
7/ 14 CFR § 21.101
8/ The petitioner for an exemption must establish that the exemption sought will not adversely affect safety, and the FAA must make a finding that the exemption would be in the public interest. See 14 CFR §§ 11.25(b)(5) and 11.27(e).

Ex.: 23; p.: 1372

6

the authority to develop and impose rules that address aspects of the design not envisioned by the regulations. These rules are called special conditions. 9/ Special conditions apply to novel or unusual design features of the aircraft and provide a level of safety equivalent to that established in the applicable FAR's. The regulations which are finally applied to the certification of the aircraft, including applicable special conditions and exemptions, are collectively called the type certification basis.

Upon initiation of a design approval project such as the KC-10A, a project team is established. This team is comprised of a project engineer (and alternate) from each of the technical disciplines of the Aircraft Certification Office, as well as appropriate representative(s) from the Flight Standards Division (FSD). From this team, a project manager is selected by the office chief. This individual is given the added responsibility of overall management of the project and the project team activity. As such, he is the principal contact with the applicant on the day-to-day certification activity, particularly where a multidisciplinary issue exists. The project team members, individually and as a team, are entrusted with the bulk of the certification activity and they augment the permanent Type Certification Board (TCB), which has overall responsibility on behalf of the Director as the final regional authority in all type certification activity.

The permanent TCB is comprised of the Area Office Chief who serves as its chairman, the branch chief from each of the technical disciplines within the office, and the Flight Standards Division Chief. The TCB serves as the management level group charged with confirming that all applicable regulations have been complied with prior to final approval of the particular design under evaluation. As such, it is the forum for resolving controversial issues that arise during the certification process and serves as an advisory body to the TCB chairman. 10/

The initial step in the certification process is a request to the applicant to give a "Project Kickoff Briefing." In this briefing, the applicant presents an overview of the project in enough detail to give the FAA group in attendance enough information to identify the need for "issue papers." 11/ The issue papers outline significant certification items which are appropriate for special attention during the certification program. No attempt is made at this initial meeting to specifically define or resolve significant issues. All FAA personnel who are likely to become involved in the certification effort participate at this meeting.

Based on the information provided at the meeting, and a review of any preliminary data that may be provided by the applicant, the project team

---

9/ 14 CFR § 21.16
10/ See FAA Order WE AE 8110.4, dated 12/28/67, Ch.2, pp 5-7
11/ "Issue papers" are discussed more fully in Section I.B. of this report

Ex.: 23; p.: 1373

7

prepares the initial draft of appropriate issue papers. Upon completion of these drafts, a preliminary TCB meeting is convened with the applicant for the primary purpose of surfacing the known significant issues for discussion with the applicant. Participation at this meeting and any subsequent TCB meetings is normally limited to the TCB with support from the project manager and the executive secretary. At this preliminary meeting, the applicant is requested to provide his positions on each of the known issues so they may be reflected in the final draft issue papers which are coordinated through all TCB members and continue to be tracked throughout the certification process until resolution and final compliance is determined. Additional issue papers can be initiated at any time during the certification process by either the FAA or the applicant, as appropriate.

After the FAA's receipt and acknowledgement of the design change approval request, the applicant submits technical data to the FAA for review. The initial submittals describe how compliance with the applicable regulations will be demonstrated. Included are such items as basic design criteria, basic loads, reports of laboratory tests, and computer analyses methods which combined become a part of the applicant's proposed compliance program. After the FAA approves the manufacturer's proposed general compliance approach, the detailed design data submittals begin, including drawings, reports, analyses, test plans, and test reports. When an existing design is modified, only that data needed to substantiate the changes is required to be submitted. These data must be reviewed and any revisions or additions which are found necessary must be incorporated prior to final acceptance by the FAA. This process continues, with massive amounts of technical data being accumulated. The bulk of the FAA evaluation effort is borne by the members of the project team working with their counterparts within the applicant's staff. Only when an impasse is reached in finding compliance will the project team refer the problem to the TCB members for resolution. Countless technical meetings are convened, usually on an informal basis, to discuss and establish acceptable compliance with the applicable regulations.

Interim TCB meetings are convened as needed during the course of the certification process for the purpose of discussing the status of the issue papers 12/ with the applicant. These meetings identify any new significant issues that may require issue papers and seek resolution of any impasse regarding the manner in which compliance with a particular requirement will be shown. The last consideration results from a situation where the project team and the applicant cannot reach an agreement on the compliance method.

During the technical evaluation process, the applicant proceeds with the fabrication of components of the aircraft for test purposes as well as building complete prototype aircraft that will be used for demonstrating compliance with the flight requirements during the flight test program. Conformity inspections are conducted on components for test as well as on the prototype aircraft, on an on-going basis, to ensure that the configuration, when tested, conforms to technical data that has been found acceptable to the FAA as a result of the

---

12/ See FAA Order WE AE 8110.7, dated 7/31/78 (Appendix B)

Ex.: 23; p.: 1374

8

technical evaluation. In the case of the prototype aircraft, the conformity inspection is not completed until the final configuration is presented for flight test. Additional conformity inspections are conducted during the flight evaluation phase when changes are incorporated as a result of tests.

Prior to presenting the prototype aircraft for FAA ground and flight evaluation, and when the applicant believes that the design configuration is essentially fixed, the applicant will begin its own flight test program. This test program is normally coordinated with the FAA but is carried out without participation by FAA personnel. Due to the military involvement in the KC-10 program, some of these initial flight tests were conducted with Air Force personnel aboard. The results of the applicant's flight test program are submitted to the FAA for review to determine whether these results give reasonable indication that the aircraft will meet the applicable flight requirements. When a favorable determination has been made in this area, and the technical data evaluation has progressed sufficiently to assure safe flight, the type inspection authorization (TIA) is issued by the FAA.

The TIA authorizes the ground and flight inspections necessary to establish eligibility for final approval. Supplements to the original TIA may be issued during the course of the flight test program to outline additional tests that become necessary. The ground inspections portion of the TIA must be satisfactorily completed before the FAA flight test program is initiated. Included in these ground inspections is the conformity inspection of the entire aircraft to ensure conformity to the design configuration established at the time the flight test program is initiated. Any changes to the type design after initiation of the flight test program must be inspected for conformity, appropriate reconsideration must be given to the validity of flight tests already conducted, and additional tests must be conducted if necessary. The flight tests include coverage in such areas as flight characteristics, performance, equipment operations, operating procedures, and the establishment of necessary operating limitations. Concurrent with the flight test program, the applicant submits flight test data which must be reviewed and approved. Upon completion of the flight test program, satisfactory review of all data generated by these tests, approval of the Airplane Flight Manual (AFM), satisfactory conformity inspection, and satisfactory completion of the review of remaining technical data submittals, the aircraft is considered eligible for the issuance of a type certificate for a new model, an amendment to an existing type certiifcate, or approval of a design change as in the case of the KC-10A. The AFM mentioned above is the FAA-approved document which includes operating limitations, performance data, and operating procedures appropriate for the airplane. The type certificate signifies approval of the type design only; the manufacturer must be issued production approval in the form of a production certificate to manufacture the aircraft. FAA investigation regarding the latter consideration is in progress concurrently with the type certification process and is ususally concluded concurrently with the issuance of the type certificate.

The final documentation of the ground inspection and flight test phase of the certification program is included in the Type Inspection Report (TIR). This document is usually completed after the type certificate is issued. It

9

represents a compilation of all recorded flight test data available before issuance of the type certificate and upon which the eligibility for approval was based. A summary of the flight tests conducted is included as part of this report.

The type certification process does not end with final approval of the design. Subsequent modifications to the type design for design improvement purposes or as a result of adverse service experience must be evaluated using the same process as applied to the original type certification.

In addition to the type certification process carried out by the Aircraft Engineering Division, a concurrent effort directed by the Flight Standards Division is undertaken to review and approve the maintenance and operational procedures of the aircraft. This is primarily the responsibility of the Aircraft Evaluation Group (AEG).

The AEG provides staff and technical advisory service to the Flight Standards and Aircraft Engineering Divisions and performs that portion of the division program pertaining to the activities of various technical boards such as: Flight Operations Evaluation Boards, Maintenance Review Boards, Type Certification Boards, Flight Standardization Boards, and Flight Manual Review Boards. In addition, the group is responsible for maintaining minimum equipment lists for air carrier (transport category) aircraft type certificated in the Western Region.

Other AEG activities and responsibilities are as follows:

- Establishing and maintaining appropriate liaison with FAA Headquarters, other regions, and district offices in matters concerning evaluation of new or modified transport aircraft.

- Representing the Flight Standards Division and participating with the Aircraft Engineering Division in type certification proceedings for transport category aircraft.

- Representing the Flight Standards Division in meeting and dealing with industry, U.S. military, and other government agencies in matters concerning new or modified transport category aircraft.

- Providing surveillance of regional transport aircraft manufacturers' training programs for Part 121 air carriers.

- Providing avionics support for the General Aviation and Air Carrier Branches as required.

As part of a normal commercial transport category certification program, a Maintenance Review Board made up of FAA airworthiness inspection and engineering personnel would be convened.

10

This board is established to work with the industry Maintenance Steering Committee made up of manufacturer and airline representatives to determine the initial minimum scheduled maintenance guidelines needed to fulfill the requirements of FAR 25.1529(h), "Frequency and extent of inspections necessary for proper maintenance of the airplane." The standard MRB process, which is conducted in accordance with the guidelines of FAA Advisory Circular 121-22, involves numerous activities including analysis and review of certain airplane test data, evaluation of reliability statistics on in-service aircraft, maintenance related review of design changes, and consideration of previous service difficulty reports. The Board's evaluation of these data forms the basis of the MRB document which identifies the minimum requirements for the continued airworthiness of the aircraft. This document provides the baseline for the maintenance program, which is expanded by each operator to provide a total maintenance program as approved by the airline's FAA Principal Maintenance Inspector.

The KC-10A certification program, however, did not utilize the MRB in a conventional manner. Because of the KC-10A's similarity to a previously certificated aircraft which has had an MRB document prepared for it, and because of extensive Air Force activities in this area, no formal MRB was convened.

Instead, the AEG assisted the Air Force in an advisory capacity by coordinating on a non FAA approved document prepared by McDonnell Douglas which is essentially equivalent to the MRB document and satisfies the intent of FAR 25.1529(h). This report integrates the DC-10 "common" and KC-10A "peculiar" requirements and is appropriately annotated to indicate common items which were previously approved for the DC-10-30F and those which are unique to the KC-10A.

The Flight Operations Evaluation Board (FOEB) is responsible for establishing and maintaining a Master Minimum Equipment List for all transport category aircraft certificated by the region. The Minimum Equipment List (MEL) is designated to allow the aircraft to be operated with certain items or components inoperative provided the Administrator finds an acceptable level of safety is maintained by appropriate operations limitations, by a transfer of the last function to another operating component, or by reference to other instruments or components that provide the necesary information. Its basic purpose is to permit the operation of an aircraft with inoperative equipment within the framework of a controlled and sound program of repairs and parts replacement.

In addition to maintaining the MEL, the FOEB is responsible for determining whether a new type rating is necessary for the aircraft and for preparing recommendations to the Flight Standardization Board (FSB) concerning areas to be emphasized in ground and flightcrew training programs.

As with the Maintenance Review Board, the various air carrier operations boards described above had a limited role in the KC-10A certification program. Because the FAA is not evaluating functions of the KC-10A that are purely military in nature, the MEL will remain unchanged from that of the DC-10-30F.