Exhibit G, Part 42 - McDonnell Douglas Corporation's Opposition to Plaintiffs' Motion to Remand and Exhibits
Case MDL No. 875 Document 6667-12 Filed 01/28/11 Page 1 of 15
Case3:11-cv-00081-JSW Document74-2 Filed01/24/11 Page19 of 29

11

For the same reason, the FSB had no new training requirements or crewmember qualifications to be concerned with. Finally, the similarity of the basic KC-10A to its commercial counterpart obviated the requirement for the consideration of a new type rating.

In general, Aircraft Evaluation Group personnel functioned as Air Force advisors during this certification program. AEG representatives acted as members of the project team and were present during many of the FAA-Douglas-Air Force certification meetings. No formal recommendations or approved documents, however, were generated.

B. SIGNIFICANT TYPE CERTIFICATION ISSUES

During the type certification process, design substantiation activities inevitably raise issues which are resolved by detailed technical discussions, correspondence, and review of design data and hardware, both within the FAA project team and between FAA and the manufacturer. The FAA's Northwest Region has developed a management procedure to provide for an efficient and well documented resolution of significant issues and any other special problems anticipated or encountered during the type certification program. 13/ The project team develops an "issue paper" for each significant issue that can be identified. In addition to presenting a clear statement of the relevant issues, the issue papers are primarily intended to provide FAA and applicant management with an overview of project status, and to provide a post-certification summary statement on how significant issues were resolved for general reference on future projects that might encounter similar situations. The individual issue papers are given an alphanumeric identifier which is keyed to their technical area of prime concern 14/ and each issue paper is prepared using a standard format.

Issue papers not only cover controversial areas but also include other certification items which require special attention for resolution. As a minimum, the following items are considered significant on major projects and are the subject of issue papers: type certification basis (also describes the design features); FAA procedural requirements; environmental considerations; export requirements; rulemaking actions; equivalent safety findings; application of later requirements; areas of new technology; and special certification review team resolutions. All of the issue papers on a single project, or on several projects on a single aircraft model being handled concurrently by the same project team, are placed in a single "Issues Book."

---

13/ See FAA Order WE AE 8110.7, Subject: Aircraft Engineering Division-Type Certification Board Procedures, dated 07/31/78, pp.6-12, attached to this report as Appendix B.

14/ For example, the following first digits correspond to technical areas as indicated: G - General; A - Airframe; SE - Systems and Equipment; P - Propulsion; F - Flight Test; O - Operational; and M - Maintenance.

12

The Issues Book plays an important part in the type certification process in the Northwest Region. It is a compilation of issue papers which, by their progressive update in "stages" as they move toward resolution, have become the principal means of identifying significant type certification problem areas and recording the status and basis for their resolution. Due to this continuous updating, or staging, the issue book at any given time provides a "snapshot" of the status of all known significant issues in the type certification process. Issue papers replace the alternative procedure of documenting certification items after the fact, following Type Certification Board meetings. The issues book format provides a brief but comprehensive record of significant certification items which is readily accessible for subsequent reference or update. A separate book is prepared for each major certification program.

In short, this concept provides both the FAA and the manufacturer with a constantly updated project management information and feedback system on program status and provides an early alert of any potential problem areas. It improves communications between FAA and the manufacturer by highlighting those type certification areas which are controversial or otherwise significant. It also provides a post-certification record of all important project decisions for future reference and guidance on similar projects.

~~The T.C. Issues Book for the KC-10A is included as Appendix B.~~

C. DESIGN FEATURES

Outlined below are the major differences between the KC-10A and the DC-10-30F, the aircraft from which the KC-10A was derived.

- Aerial refueling provisions:

    refueling boom
    boom operator's station
    universal aerial refueling receptacle
    body bladder fuel tanks in the lower fuselage
    modified fuel system
    external director lights
    external lighting for night refueling
    multiple refueling system provisions in the wing

- Military avionics:

    communications
    navigations
    refueling rendezvous

- Door and window deletions for weight reduction

- Limited passenger provisions

- Cargo provisions.

Ex.: 23; p.: 1379





Case3:11-cv-00061-JSW   Document74-2   Filed01/24/11   Page17 of 29

Ex.: 23; p.: 1380

13

The aircraft is powered by three General Electric CF6-50C1 turbofan engines, a model which is currently operating in the commercial fleet. It is designed to carry a maximum cargo payload of 170,000 pounds a distance of 4,370 statute miles or deliver 200,000 pounds of fuel up to 2,200 miles from home base and return. The new fuel cells located below the main deck hold 117,500 pounds of fuel, bringing the total fuel capacity to 356,065 pounds allowing an unrefueled ferry range of 11,500 statute miles.

The aerial refueling system includes two supplementary fuel tanks, an interconnect (to the aircraft basic fuel system) and distribution system, two methods of aerial fuel delivery, and a system for receiving fuel in flight. Two supplementary tanks are located in the lower fuselage, one forward and one aft of the wing. The former consists of three cells and the latter four cells. The cells are reinforced bladder type, supported by fuselage integral tankage structure. The interconnect and distribution system consists of piping, valves, and pumps necessary for fuel management. Aerial refueling delivery can be accomplished by either an aerial refueling boom or by a hose/drogue system. The boom is located outside the lower aft fuselage. The hose reel is located inside the fuselage, aft of the aerial refueling operator's station which is located just aft of the aft supplementary fuel tank in the lower aft fuselage. A universal aerial refueling receptacle for taking fuel aboard the KC-10A is located on the forward fuselage upper surface just aft of the cockpit.

D. CERTIFICATION BASIS

The KC-10A is classified as a transport category aircraft. It is a derivative of the DC-10-30F, which was originally type certificated on March 30, 1973. The KC-10A, in accordance with FAR 21.101, must show compliance with the regulations incorporated by reference in the type certificate for that aircraft. These regulations are found in FAR 25, as amended by Amendment 25-22. In accordance with the procedures outlined in Section I.A. for establishing the certification basis, the FAA began an effort to determine what, if any, later certification requirements should be applied due to the new systems that had been added to the aircraft in order for it to perform tanker and aerial refueling operations.

The FAA, due to its commercial air carrier regulatory posture, had no rules governing such military oriented operations and, in addition, found it inappropriate to develop such regulations. As a result, an agreement was reached between the FAA and the Air Force which defined the FAA's certification responsibilities as ending with the aerial refueling mode of flight. The FAA would, therefore, not address those flight conditions or systems modes concerned with coupled flight operations. The one important exception to this agreement has to do with possible system degradation as a result of the operation of the aircraft in the aerial refueling mode. The FAA will review this flight mode from the standpoint that if coupled flight effects the subsequent or uncoupled integrity of the aircraft, appropriate limitations and procedures will be imposed. It has been determined that the certification basis need not be amended to allow the accomplishment of this evaluation.

14

In the case of one rule referenced in the certification basis, McDonnell Douglas has voluntarily elected to show compliance with a later regulation not required by FAR 21. This regulation is FAR 25.571, as amended by Amendment 25-45 which addresses the damage tolerance and fatigue evaluation of the KC-10A aerial refueling boom. This subject is addressed in greater detail in Section II.A. of this report.

The KC-10A aircraft also contains a number of design features common to the DC-10-30F for which the FAR's did not contain adequate safety standards. As a result, the FAA determined that the special conditions applied to the -30F should also apply to the KC-10A. Special conditions are certification rules issued by the FAA to cover novel or unusual design features which are not adequately addressed by the applicable regulations. The following original DC-10-30F Special Conditions were reissued without substantive change to make them applicable to the KC-10A aircraft.

A. Special Flight Conditions

   (1) Directional Stability and Control (DC-10-20 and -30)
   (1) Turbulence Criteria
   (2) Out-of-Trim
   (3) Vibration and Buffeting

B. Special Airframe Conditions

   (1) Control System
   (2) Continuous Turbulence
   (3) Emergency Landing (Wheels-Up)
   (4) Ground Load Conditions - Center Main Landing Gear Unit
   (5) Seats, Berths, Safety Belts, and Harnesses
   (6) Stowage Compartment
   (7) Retention of Items of Mass in Passenger and Crew Compartments
   (8) Passenger Information Signs
   (9) Emergency Evacuation
   (10) Emergency Exit Arrangement
   (11) Emergency Exit Arrangement - Power Operated Systems
   (12) Emergency Exit Marking
   (13) Emergency Lighting
   (14) Compartment Interiors
   (15) Cargo and Baggage Compartments
   (16) Baggage and Cargo Compartments and Ballast Location
   (17) Test Procedures

C. Special Propulsion Conditions

   (1) Turbine Engine Installation
   (2) Engine Ignition System
   (3) Lines and Fittings
   (4) Fluid Shut-off Valves
   (5) Gas Turbine APU Installation

Ex.: 23; p.: 1382

15

   (6) Installation, Fault Analysis
   (7) Engine Bleed Air System
   (8) Oil Tank Tests
   (9) Inflight Thrust Reversal

  D. Special Systems Conditions

   (1) Operation Without Normal Electrical Power
   (2) Altitude Reference Source
   (3) Electrical System Fire and Smoke Protection

Certain environmental regulations have also been made a part of the certification basis for the KC-10A. The applicable noise standards will be FAR 36, effective December 1, 1969, as amended by Amendments 36-1 through 36-9, effective April 3, 1978. This includes the retroactive requirements for an acoustical change in accordance with FAR's 36.2 and 36.7 respectively. In addition, the KC-10A must comply with the fuel venting and exhaust emission requirements of 40 CFR Part 87 of the Environmental Protection Agency's regulations, as implemented by Special FAR 27, effective February 1, 1974 (as amended to date).

 E. GENERAL ISSUES

General issue papers are incorporated as part of the Issues Book (see Appendix G) and are maintained up to date by the specific branch responsible for overall project management. The general issues applied to the KC-10A are designated G-1 through G-3 and address the certification basis, the determination of compliance, and environmental considerations respectively, as summarized below.

G-1 Type Certification Basis

This issue paper addresses the designation of applicable regulations, noise standards, exemptions, and special conditions.

G-2 Determination of Compliance

This issue paper provides a statement of the FAA's procedural requirements for type certification, including those that define the manufacturer's responsibilities for showing compliance. To be eligible for a change in type design, the applicant must show, and the FAA must find, that the design complies with the original type certification basis. In addition, FAR 21.21(b)(2) requires the FAA to determine that no feature or characteristic of the aircraft makes it unsafe for the category in which certification is requested. It is incumbent upon the applicant to develop a safe design to show compliance with the certification basis. FAR 21.21(b)(1) permits the FAA to accept deviations from the applicable airworthiness requirements if the deviation is compensated by a factor that provides an equivalent level of safety. Each "equivalent safety finding" has been made the subject of a separate issue paper.

16

G-3 Environmental Considerations

This issue paper cites the engine emissions requirements that must be satisfied prior to certification over and above the certification basis. These include EPA emissions requirements defined by 40 CFR Part 87 and implemented by Special FAR No. 27. The manufacturer will comply with this requirement by installing only new production engines which meet gaseous emission and smoke requirements applicable to such engines.

## II. TECHNICAL ISSUES

Introduction

As the DC-9-80 certification program progressed it became obvious, as with all certification programs, that certain aspects of the airplane's design would require special attention. By highlighting such issues, FAA project managers assured timely resolution of questions that did not have straightforward answers. Issues requiring special attention range from those that necessitate the development of special conditions and exemptions to much more routine concerns that require regulatory interpretation, policy development, or resolution of findings of noncompliance.

In order that the DC-9-80 program may be better understood by those not directly involved in the certification effort, each concern highlighted by FAA engineering staff, and its resolution, is summarized below. They are grouped according to the branch within the Los Angeles Area Aircraft Certification Office responsible for their resolution. Many of these items, identified by Issue Number, are addressed in the Issues Book. The remaining items are those not considered to meet Issues Book criteria but which are still non-routine in nature and are included here for completeness.

A. AIRFRAME ISSUES

1. Damage-Tolerance and Fatigue Evaluation of the Aerial Refueling Boom (Issue A-1)

McDonnell Douglas requested that the FAA, by means of an equivalent safety finding, allow the aerial refueling boom to be evaluated in accordance with the damage tolerance and fatigue evaluation requirements of FAR 25.571 Amendment 45. It was intended that this amendment be applied in lieu of FAR 25.571 Amendment 28 which is the certification basis for the KC-10A.

Damage tolerance and fatigue evaluation is a certification procedure which ensures the structural integrity of the aircraft. The type of evaluation performed throughout its service life depends on the design of the structure involved, but usually falls into either the safe-life or the fail-safe category. "Safe-life" refers to the procedure used to establish the fatigue life of aircraft structure. It is designed to show by test and analysis that the structure is able to withstand the loads expected during its service life without detectable cracks. The "fail-safe" concept, simply stated, is designed to take into consideration the fact that a piece of aircraft structure may

17

fail, be degraded, or encounter damage by means other than classical fatigue, which reduces its load carrying capability but does not render it unsafe. In such cases, the structure's residual strength would allow it to continue in service until a normally scheduled inspection could reveal the damage.

From a fatigue (safe-life) standpoint, FAR 25.571 Amendments 22 and 45 are essentially equivalent. For aircraft structure that is evaluated in accordance with the damage tolerance (fail-safe) criteria, the compliance requirements of the earlier regulations differ from those of Amendment 45. FAR 25.571 Amendment 22 incorporates what is called a single element failure concept. It requires an 80% limit load residual static strength following the failure of a single element of the structure in question. FAR 25.571 Amendment 45 requires a residual static strength of 100% of limit load following probable damage due to fatigue, corrosions, or accident, and requires residual repeated load strength consistent with crack growth analysis and with the anticipated inspection program. This has the overall effect of increasing the level of safety for structure in a damaged condition.

The design of the ARB on the KC-10A precludes the application of the earlier fail-safe strength criteria because after the failure of a single structural element the boom would not meet the residual static strength requirements. This would necessitate the application of the safe-life criteria, requiring burdensome testing. Application of the new fail-safe requirements would allow the ARB to be evaluated using updated damage tolerance methodology, resulting in an equivalent level of safety over earlier techniques. On this basis the FAA made the determination that an equivalent safety finding could be made.

B. SYSTEMS AND EQUIPMENT ISSUES

1. Emergency Equipment, Aerial Refueling Boom Operator's Compartment (Issue SE-1)

Protection of the three-man crew that occupies the aerial refueling boom operator's compartment was given special attention during the certification of the KC-10A because there are no similar crews on commercial airplanes and therefore no established policy or precedence on how such crew safety rules should be applied. The primary concern in this evaluation was the protection of the crew from safety hazards resulting from a fire in the cargo compartment. As described earlier, the boom operator's compartment is located in the lower aft section of the fuselage allowing the operator to see the aircraft being refueled. Due to the compartment's location, it is not occupiable during takeoff and landing. As a result, if an inflight fire were to occur in the cargo compartment the boom crew would be required to leave the boom compartment and reach their takeoff and landing stations located aft of the cockpit in the crew quarters. In addition to this escape requirement, it is important that the boom crew reach their takeoff and landing stations as soon as possible after the fire has been detected to minimize the possible fire-feeding effects of fresh air entering the cargo compartment as access is gained to the crew quarters. To accomplish these goals the FAA applied FAR 25.855, 25.857, and 25.1439 as they apply to cargo compartment fire protection and identified the following requirements for the KC-10A.

Case MDL No 875 Document 66712 Filed 01/28/11 Page 9 of 15
Case 3:11-cv-00015-JSW Document 74-2 Filed 01/24/11 Page 29 of 29

18

First, the boom crew must be provided with protective breathing and smoke protection equipment which can be used when returning to their takeoff and landing seat locations should a cargo compartment fire occur while they are stationed in the boom compartment. Second, appropriate fire-fighting equipment should be readily accessible to the boom crew for their use in traversing the length of the cargo compartment should a fire block access to their takeoff and landing stations. Finally, there must be a separate approved smoke or fire detection system which would allow the boom crew to reach their takeoff and landing stations early enough to minimize the effects of fresh air entering the fire area when access to the crew quarters is gained.

McDonnell Douglas complied with these requirements by installing protective and fire-fighting equipment that was evaluated and approved by the FAA.

C. PROPULSION ISSUES

1. Fuel System Lightning Protection (Issue P-1)

The KC-10A airplane and its inflight refueling equipment differs considerably from commercial DC-10 aircraft from a lightning protection standpoint. The aerial refueling boom and the drogue trail behind the aircraft, thereby providing lightning attach points that do not exist on commercial aircraft. In addition, the aerial refueling receptacle, although flush mounted, is also subject to swept lightning strokes. Because all of these likely attach points contain fuel, the lightning hazard is increased. The FAA has therefore determined that McDonnell Douglas must show by the criteria of FAR 25.954, "Fuel System Lightning Protection," that this equipment has not compromised the airplane's basic lightning protection capability.

2. Engine Fuel System Overpressure (Issue P-2)

This issue resulted from the requirements of FAR 25.951 which state that each fuel system must be constructed and arranged to ensure a flow of fuel at a rate and pressure established for proper engine and APU functioning. The maximum allowable fuel pressure for the KC-10A's engines is 50 psi but, due to the existence of crossfeed and transfer systems, it is remotely possible for the aerial refueling system to apply a 240 psi surge pressure to the engines.

The design of the aerial refueling system is such that only a very unusual condition or careless operating practice could expose the engines to this surge pressure. Although the possibility of this happening is slight, the FAA required that McDonnell Douglas submit an analysis that a surge pressure of 240 psi in the engine feed system is not detrimental to engine operation.

3. Aerial Refueling System Overpressure (Issue P-3)

Due to the high flow rate attained in the aerial refueling system, surge pressures much higher than those encountered in current commercial jet transports may be experienced. These pressures could result from such

19

operations as sudden flow stoppage, boom retraction, and component malfunctions such as surge boot failure. To assure that this system complies with the pressure fueling requirements of FAR 25.979, the FAA required McDonnell Douglas to conduct tests and analyses designed to show the highest fuel pressure attainable considering any possible system mode or malfunction. The purpose of this evaluation was to identify the proof pressure margins for the entire system so that proof pressure tests could be conducted on each production airplane. McDonnell Douglas complied with this requirement.

### 4. Fuel System Electrostatic Ignition (Issue P-4)

Again, the high fuel flow rates attained in the KC-10A's specialized refueling system was determined to be grounds for the establishment of an issue. In this case, the problem associated with high fuel rate is electrostatic buildup, a potential fire or explosion hazard. To assure that this potential safety hazard is minimized, the FAA required that McDonnell Douglas show by analysis and test that electrostatic ignition of the fuel will not occur. McDonnell Douglas agreed to comply with this requirement.

### 5. Refueling Shutoff Valve Failure (Issue P-5)

FAR 25.979 requires that an automatic fuel shutoff means be provided to prevent overfilling, thereby avoiding structural damage to the fuel tanks. In addition, a means must be provided to prevent damage to the fuel system in the event of failure of this automatic shutoff system. McDonnell Douglas originally proposed to show that these pressures are below fuel tank structural limits by analysis. The design of the KC-10A refueling system, however, allows for the possible use of six refueling nozzles simultaneously. Because of the addition of two refueling nozzles and other major changes to the basic DC-10 fuel system design, the FAA proposed that the applicant conduct a test to verify that an overpressure during refueling could not occur.

### 6. Hydraulic Fuel Leakage into Fuel Tanks (Issue P-6)

The fuel cells in the KC-10A are made of a material that is not compatible with hydraulic fluid. The six pressure fuel pumps used by the aerial refueling system are hydraulically driven and mounted to the fuel cells. If a fuel pump failure occurred that degraded the sealing provisions between the hydraulic pump and the fuel cell, resulting leakage could damage the cell. Due to this possible failure mode, the FAA required that McDonnell Douglas show that a positive design exists to prevent hydraulic fluid from contacting the fuel cell material. McDonnell Douglas agreed to comply with this requirement.

### 7. Hazardous Fuel Spillage During Aerial Refueling (Issue P-7)

The KC-10A airplane will be capable of receiving fuel from another airplane through an aerial refueling receptacle located on the fuselage above the cockpit area. Fuel spillage in this area during disconnect could result in a hazard to the airplane by entering other airplane compartments and creating a fire hazard or by entering an engine inlet. McDonnell Douglas agreed to demonstrate by test that the quantity of fuel spillage during normal disconnect would be limited to 100cc, which would not be hazardous to the airplane.

Ex.: 23; p.: 1387

20

D. FLIGHT TEST ISSUES

- Maneuvering characteristics (Issue F-1)

High mach numbers can effect stability and reduce controllability about all axes. Maneuvering characteristics requirements detailed in FAR 25.251, 25.253, and Special Condition 25-18-WE-7 were therefore applied to the KC-10A.

In determining compliance with the maneuvering characteristics regulations, the FAA reviewed the methods used for compliance with the corresponding special conditions which had applied to the previous DC-10 models. FAR 25.255 (and the previous special conditions) require that the aircraft's maneuvering stability be satisfactorily demonstrated in flight tests. FAR 25.251 further requires that probable inadvertent excursions of the aircraft into load factors (g forces) beyond the onset of buffet-induced vibration (another result of high mach number) will not result in unsafe conditions.

The FAA applied the provisions of these two regulations and required that the manufacturer demonstrate acceptable maneuvering characteristics at load factors beyond buffet onset, with the proviso that buffet levels which would clearly deter a pilot from further increasing the load factor need not be exceeded in the test.

The results of the tests showed that the KC-10A has no unsafe maneuvering characteristics at load factors beyond buffet onset, up to the aircraft's limit load factor.

E. MANUFACTURING INSPECTION ISSUE

- FAA Airworthiness and Production Certification

When a commercial U.S.-registered DC-10 comes off the production line at Douglas, the FAA's Manufacturing Inspection Branch determines that the aircraft conforms to the approved type design and that it is in condition for safe flight. Following this determination, a standard airworthiness certificate is issued. This is the final authorization for the airplane to fly.

In the case of the KC-10A, a standard airworthiness certificate will not be issued following production acceptance. Because the aircraft is being sold to the military, a "Conformity Certificate-Military Aircraft" is issued. As with its civil counterpart, this certificate indicates that the airplane is in conformity with the approved type design and is airworthy. Non FAA approved military equipment which may be installed on the aircraft is covered by an approved deviation list which is included with the certificate. When the KC-10A is converted to civil status, however, a standard airworthiness certificate must be issued. For an individual KC-10A to be eligible for commercial airworthiness certification, it must have been maintained and changed to civilian configuration in accordance with those procedures outlined in the section titled "Continuous Civil Airworthiness.

21

## F. MAINTENANCE ISSUES

- Continuous Civil Airworthiness

As stated earlier in this report, the Air Force plans to maintain the KC-10A so that it may be routinely transferred from military to civilian service. The fact that the aircraft will be certificated by the FAA does not in itself allow this. A continuous maintenance program accomplished in accordance with FAA maintenance regulations is also required to ensure the aircraft's eligibiity for civilian operation.

To accomplish this, the Air Force has developed a maintenance and logistics support plan designed to take maximum advantage of Douglas' support facilities and spare parts. According to this plan, the Air Force will perform flight line maintenance while Douglas performs all intermediate and depot maintenance functions. This maintenance will be accomplished such that it will allow continuous commercial airworthiness of the airframe, engines, and onboard equipment, including the boom refueling system. Modification maintenance and repair of systems and components will be accomplished and documented in accordance with FAA and manufacturer approved requirements, allowing an orderly transition to civil status at any time in the future.

In addition to these maintenance alteration and repair concerns, the FAA has recognized that the KC-10A may have certain military equipment installed which is both inappropriate and unapproved for use in commercial operation. To account for these areas, the FAA will add a note to the type certificate data sheet regarding modification requirements for operation of the KC-10A as a commercial aircraft. Such a procedure is currently in effect for conversion of the military C-9A to the commercial DC-9-32F.

## III. TYPE INSPECTION AUTHORIZATION

### A. TIA AND SUPPLEMENTS

Type Inspection Authorization CT6405WE-D was issued for the KC-10A on September 8, 1980. The basic TIA covered the inspections and tests necessary to flight test and evaluate the aircraft's handling characteristics, performance, system operation, and safety. It specifically outlined the conduct of tests necessary to evaluate the aircraft's highly modified fuel system, including APU operation and proper functioning of the aerial refueling boom.

Three supplements have been issued amending this TIA. The effect of these supplements is summarized below.

### January 5, 1981

No.1: Issued to add 10 notes concerning additional limits and restrictions to the operation of the aerial refueling system and the hydraulic system. It also deleted certain flutter airspeed restrictions imposed in the basic TIA.

Case: MDL No 875 Document 6667-1-2 Filed 01/28/11 Page 13 of 15
Case3:11-cv-00067-JSW Document74-2 Filed 01/24/11 Page 27 of 29

22

January 9, 1981

No.2: Issued to include additional information which indicates the proper amount of fuel necessary in certain level flight regimes to prevent aerial refueling pump overspeed.

January 28, 1981

No.3: Issued to lift the restriction imposed earlier that the aircraft not be operated in the inflight refueling mode. This supplement also added the requirement to conduct additional fuel system, hydraulic system, and maneuvering stability evaluations.

B. CONFORMITY INSPECTION SYSTEM

It is the primary responsibility of the FAA Manufacturing Inspection Branch to determine that the prototype aircraft or components conform with engineering data prior to the initiation of formal testing. As a secondary responsibility, they cooperate with the other engineering sections in the approval of certain design aspects which can best be evaluated by physical examination.

The method of conformity determination depends upon the circumstances. A manufacturer's policies, quality control procedures, experience, inspection personnel, equipment, and facilities will dictate the extent of conformity inspection to be conducted or witnessed by manufacturing inspectors. Differences between manufacturers require that the conformity program be adjusted to fit existing conditions. Regardless of the manufacturer's experience, it is the FAA inspector's responsibility to assure that a complete conformity inspection is properly recorded and reported, and that a Statement of Conformity, FAA Form 317, has been submitted to the FAA in accordance with FAR 21.53.

During the time the conformity inspection is being conducted, the manufacturer's quality control system is constantly being evaluated. This is necessary to assure that, after the type design has been approved, the manufacturer will have a quality control system that will produce duplicate articles in conformity to the approved design. Determining the conformity of flight articles, including checks of systems, is accomplished during fabrication. It is important that flight test articles conform to the data specified in the TIA and the applicant's Statement of Conformity. This statement must be submitted to the FAA before prototype flight articles are released for FAA test. Any nonconformities are brought to the attention of the appropriate FAA engineering personnel for evaluation and decision as to their effect on safety and upon the validity of the tests under consideration.

In accordance with FAR 21.33, ground inspection must be completed prior to the initiation of formal FAA flight testing. The basic purpose of the ground inspection is to physically ensure that the aircraft submitted for FAA flight tests meets the minimum requirements for quality and conforms with the technical data, and that it is safe for the flight phases intended. Throughout the FAA flight test program, the manufacturing inspector must continue to ensure

23

that the test aircraft is given adequate inspection in order to reveal any unsafe conditions that may develop and require their corrective actions prior to further FAA flight test.

The TIA issued for the KC-10A required conformity inspection of the type design changes and required that the Manufacturing Inspection Branch verify test instrumentation and cockpit instrument calibration; obtain and record flight control surface travels and cable tensions prior to flight tests; record identifying information and design change status for all major systems and components; witness weighing of the test aircraft; verify the weight and balance report; and issue an experimental airworthiness certificate for the test aircraft. In addition, the Manufacturing Inspection Branch conducted a daily inspection of the thrust reverser assembly during the test program and was required to notify the engineering staff of any discrepancies found.

C. FLIGHT TEST LOG

A flight test log was maintained by the FAA throughout the flight test certification program as an aid in following the progress of the flight testing in regard to the test requirements of the TIA.

The log is a chronological listing of certification test flights by flight number, date of test, personnel involved, and a summary of certification demonstrations accomplished.

The flight test log is presented in Appendix J of this report.

D. FLIGHT TEST RESULTS

FAA flight and ground tests were conducted as necessary to show compliance with the certification requirements defined in the TIA and its supplements. The specific tests required were outlined in item 18b of the TIA.

Detailed procedures for each test (Flight Test Plan) were discussed and agreed upon during preflight meetings between the FAA and the manufacturer. Postflight meetings were held to discuss any problem areas and to determine the acceptability of the test.

Flight test results were obtained from the manufacturer's data acquisition system, pilot comments, and manual notes. The data were processed, analyzed, documented, and transmitted to the FAA for approval. Separate reports were submitted for each test item. Each report contains a narrative of the test procedure, the purpose of the test, supporting data deemed pertinent to the test in the form of graphs or tabulations, and a summary that includes a statement of how compliance with the requirements is shown. For various reasons, some of the testing was repeated and/or reports modified before approval was granted. The flight test reports are in the possession of the FAA and will be included in the Type Inspection Report (TIR).

The flight test data requiring expansion for airplane flight manual performance data was programmed by the manufacturer's aerodynamics staff in

24

accordance with FAA-approved procedures. These data will be submitted in report form to the FAA for review and approval and will be included in the TIR.

A summary of the compliance with the flight test requirements is presented in an appendix to this report.