Exhibit G, Part 52 - McDonnell Douglas Corporation's Opposition to Plaintiffs' Motion to Remand and Exhibits
Case3:11-cv-00067-JSW Document81-3 Filed04/24/11 Page1 of 24
Case MDL No. 875 Document 6668-1 Filed 02/28/11 Page 1 of 12

BRYAN CAVE LLP
Robert E. Boone III, California Bar No. 132780
James C. Pettis, California Bar No. 223953
Linda C. Hsu, California Bar No. 239880
120 Broadway, Suite 300
Santa Monica, California 90401
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

ENDORSED FILED
ALAMEDA COUNTY

AUG 9 2010

CLERK OF THE SUPERIOR COURT
By ERICA BAKER
Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLIED PACKING AND SUPPLY, *et al.*,<br><br>Defendants. | Case No. RG09489518<br><br>Assigned for all pre-trial purposes to the Hon. Kenneth Mark Burr<br><br>**DEFENDANT MCDONNELL DOUGLAS CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>[Filed with Notice of Motion and Motion for Summary Judgment Or, in the Alternative, Summary Adjudication; Separate Statement of Material Facts; Declarations of Dr. William D. Travis, Timothy S. Lloyd, Michael J. Schmidt, and James C. Pettis; Appendix of Non-California Authority; and [Proposed] Order]<br><br>Date: January 14, 2011<br>Time: 9:36 A.M.<br>Dept.: 30<br><br>Reservation No. 1092700<br><br>Complaint Filed: December 17, 2009<br>Trial Date: February 14, 2011 |

807853\0307472

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 2 |
| | A. Plaintiff's Claims | 2 |
| | B. Plaintiff's Medical Diagnosis | 2 |
| |    1. Localized Malignant Mesothelioma | 2 |
| |    2. Plaintiff's Treating Physician Diagnosed Plaintiff with LMM | 4 |
| | C. No Evidence of Exposure To Asbestos Products Attributable To MDC | 4 |
| III. | STANDARD FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION | 8 |
| IV. | PLAINTIFF CANNOT ESTABLISH MEDICAL CAUSATION BECAUSE HE HAS NEVER SUFFERED FROM ASBESTOS-RELATED MESOTHELIOMA | 10 |
| V. | PLAINTIFF CANNOT PROVE EXPOSURE TO ASBESTOS IN ANY MDC PRODUCT | 11 |
| | A. General Testimony Regarding Being Around MDC Aircraft Cannot Establish Causation | 11 |
| | B. MDC Is Not Liable for Maintenance, Repair, and Operation of an Operator's Airplanes | 14 |
| |    1. Replacement Parts | 14 |
| |    2. Maintenance, Repair, and Operations | 16 |
| VI. | PLAINTIFF'S SPOUSE'S LOSS OF CONSORTIUM FAILS WITH HIS CAUSES OF ACTION | 16 |
| VII. | THE COURT SHOULD ALTERNATIVELY GRANT SUMMARY ADJUDICATION | 16 |
| | A. Plaintiff's Fourth Cause of Action for "Fraud/Failure To Warn" Fails | 17 |
| | B. Plaintiff's Fifth Cause of Action for "Conspiracy To Defraud/Failure to Warn" Fails | 17 |
| | C. Plaintiff's World Airways Claims Fail | 18 |
| | D. Plaintiff's Continental Airlines Claims Fails | 18 |
| | E. Plaintiff's Emery Worldwide Airlines Claims Fails | 18 |
| VIII. | CONCLUSION | 19 |

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, California 90401-2386

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abuan v. General Electric,*
   3 F.3d 329 (9th Cir. 1993) ................................................................................................12

*Acoba v. General Tire, Inc.,*
   92 Haw. 1 (1999) ................................................................................................................15

*Aguilar v. Atlantic Richfield Co.,*
   (2001) 25 Cal. 4th 826 ........................................................................................................9

*Allen v. Toten*
   (1985) 172 Cal. App. 3d 1079 ..........................................................................................16

*Applied Equip. v. Litton Saudi Arabia*
   (1994) 7 Cal. 4th 503 ........................................................................................................17

*Barlow v. John Crane-Houdaille,*
   477 N.W. 2d 133 (Mich. Ct. App. 1991) ........................................................................12

*Baughman v General Motors,*
   780 F.2d 1131 (4th Cir. 1984) ..........................................................................................15

*Beeler v. City Title Ins.*
   (1962) 201 Cal. App. 2d 702 ............................................................................................18

*Blickman Turkus v. MF Downtown Sunnyvale*
   (2008) 162 Cal. App. 4th 858 ..........................................................................................17

*Burroughs v. Precision Airmotive*
   (2000) 78 Cal. App. 4th 681 ............................................................................................16

*Daly v. General Motors*
   (1978) 20 Cal. 3d 725 ........................................................................................................15

*Eckenrod v. GAF,*
   544 A.2d 50 (Pa. Super. Ct. 1988) ..................................................................................13

*Edward Finemann v. Sup. Ct.*
   (1998) 66 Cal. App. 4th 1110 ......................................................................................9, 17

*Entm't Research Group v. Genesis Creative Group,*
   122 F.3d 1211 (9th Cir. 1997) ..........................................................................................18

*Garcia v. Joseph Vince*
   (1978) 84 Cal. App. 3d 868 ........................................................................................14, 16

*Hunter v. Pacific Mech. Corp.*
   (1995) 37 Cal. App. 4th 1282 ......................................................................................9, 12

*Jones v. Ortho Pharm.*
   (1985) 163 Cal. App. 3d 396 ......................................................................................10, 11

*Kovich v. Paseo Del Mar Homeowners' Assn.*
   (1996) 41 Cal. App. 4th 863 ............................................................................................17

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## TABLE OF AUTHORITIES

Page(s)

*Lazar v. Sup. Ct.*
(1996) 12 Cal. 4th 631 ........................................................................................... 17

*Lilienthal & Fowler v. Sup. Ct.*
(1993) 12 Cal. App. 4th 1848 ............................................................................. 9, 10

*Lindstrom v. AC Products Liability Trust,*
264 F. Supp. 2d 583 (N.D. Ohio 2003) ................................................................. 12

*Lineaweaver v. Plant Ins.*
(1995) 31 Cal. App. 4th 1409 ..................................................................... 10, 11, 12

*Lohrmann v. Pittsburgh Corning,*
782 F.2d 1156 (4th Cir. 1986) ................................................................................ 13

*McGonnell v. Kaiser Gypsum*
(2002) 98 Cal. App. 4th 1098 ........................................................................... 12, 14

*Moyer v. Teledyne Continental Motors,*
979 A.2d 336 (Pa. Super. 2009) ............................................................................. 16

*Pridgen v. Parker Hannifin,*
905 A.2d 422 (Pa. Supreme Ct. 2006) ................................................................... 15

*Roberts v. Owens-Corning Fiberglas,*
726 F. Supp. 172 (W.D. Mich. 1989) .............................................................. 12, 14

*Rochlis v. Walt Disney Co.*
(1993) 19 Cal. App. 4th 201 .................................................................................... 9

*Soule v. General Motors*
(1994) 8 Cal. 4th 548 ........................................................................................ 14, 16

*Taylor v. Elliot Turbomachinery*
(2009) 171 Cal. App. 4th 564 ................................................................................. 15

*Turner v. Anheuser-Busch, Inc.*
(1994) 7 Cal. 4th 1238 ............................................................................................. 9

*Union Bank v. Sup. Ct.*
(1995) 31 Cal. App. 4th 573 .................................................................................... 9

*Vandermark v. Ford Motor Pumps*
(1964) 61 Cal. 2d 256 ............................................................................................ 15

**Statutes**

14 C.F.R. § 145.51 .............................................................................................. 8, 16

14 C.F.R. § 21.303(d) .............................................................................................. 15

14 C.F.R. § 21.303(k) .............................................................................................. 15

40 U.S.C. § 44701(a) ............................................................................................... 15

Cal. Civ. Proc. Code § 437c(b) ................................................................................. 9

# TABLE OF AUTHORITIES

**Page(s)**

Cal. Civ. Proc. Code § 437c(c)..................................................................................8, 9
Cal. Civ. Proc. Code § 437c(f)..................................................................................17, 18
Cal. Civ. Proc. Code § 437c(f)(1)..............................................................................9
Cal. Civ. Proc. Code § 437c(o)(2).............................................................................8, 9

**Other Authorities**

Akif Turna et al., *Localized Malignant Pleural Mesothelioma Treated by a Curative Intent Lobectomy: a Case Report*, 13 ANN. THORAC. CARDIOVASC. SURG. 349 (2007) ..................3

Andrew Churg, *Localized Malignant Mesothelioma and Other Localized Pleural Tumors*, Symposium, Malignant Mesothelioma (1996).....................................3

Silvia Tazi et al., *Localized Malignant Pleural Mesothelioma, Report of Two Cases*, 4 J. THORAC. ONCOL. 1038 (2009)..................................................3

Timothy Craig Allen et al., *Localized Malignant Mesothelioma*, 49 AM. J. SURG. PATHOL. 866 2005) ..........3

WILLIAM D. TRAVIS ET AL., WORLD HEALTH ORGANIZATION CLASSIFICATION OF TUMOURS, PATHOLOGY AND GENETICS: TUMOURS OF THE LUNG, PLEURA, THYMUS AND HEART (2004)........3

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Plaintiff Timothy Vest ("Plaintiff") and his spouse filed this case as an asbestos-related personal injury action against Defendant McDonnell Douglas Corporation ("MDC") and others based on Plaintiff's alleged mesthelioma. However, Plaintiff does not have asbestos-related mesothelioma. Rather, as diagnosed by his treating physician, Plaintiff suffered from Localized Malignant Mesothelioma ("LMM"), which is not caused by exposure to asbestos, as opposed to Diffuse Malignant Mesothelioma ("DMM"), which is typically related to exposure to asbestos. Therefore, Plaintiffs' Second Amended Complaint based on Plaintiff's alleged exposure to asbestos, including its causes of action for negligence, strict liability, fraud, conspiracy to defraud, and loss of consortium against MDC, fail as a matter of law and the Court should grant MDC's Motion for Summary Judgment ("Motion").

MDC is entitled to summary judgment also because Plaintiff has no evidence that he was exposed to any asbestos from any MDC product. Plaintiff has no admissible evidence that MDC made, installed on the aircraft, or supplied to his employer any particular aircraft component part which contained asbestos, and that he breathed airborne asbestos emitted from that component. Instead, Plaintiff's case is built on conjecture and speculation that glosses over this critical link.

In the alternative, the Court should grant summary adjudication on any one of the following alleged worksites because Plaintiff's aggregation of separate alleged wrongful acts in each of his five causes of action against MDC does not prevent the Court from summarily adjudicating claims arising from Plaintiff's alleged asbestos exposure: (1) while Plaintiff's father worked at World Airways from 1973 to 1983, (2) while Plaintiff worked as a ramp agent for Continental from 1985 to 1987, and (3) while Plaintiff worked as a commercial pilot for Emery Worldwide from 1990 and 2001.

The Court should also grant summary adjudication on Plaintiff's fourth cause of action for fraud because MDC has no duty to disclose to Plaintiff and Plaintiff does not have any evidence of fraudulent conduct on the part of MDC. Finally, the Court should grant summary adjudication on Plaintiff's fifth cause of action for conspiracy because conspiracy is not an independent cause of action and Plaintiff has no evidence to support such a claim.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## II. FACTUAL BACKGROUND

### A. Plaintiff's Claims

The Second Amended Complaint ("SAC") alleges that Plaintiff was secondarily and directly exposed to asbestos and asbestos-containing products at various locations from 1965 to 2005, and asserts fifteen premises and product liability causes of action against a host of "Product" and "Premises" Defendants. (*See* SAC.) MDC is a Product Defendant and the SAC asserts only five causes of action against MDC for negligence, strict product liability, fraud, conspiracy to defraud, and loss of consortium. (Fact 12.)[1] The SAC does not identify any MDC product to which Plaintiff was allegedly occupationally or para-occupationally exposed. (*See* SAC.) As to MDC, Plaintiff testified in deposition that he was exposed to asbestos (1) while his father, Warren Vest, worked at World Airways, Inc. from 1973 to 1983 (Plaintiff alleges secondary exposure at home and when Plaintiff accompanied his father to work on weekends), (2) while Plaintiff worked as a ramp agent for Continental Airlines, Inc. from 1985 to 1987, and (3) while Plaintiff worked as a commercial pilot for Emery Worldwide Airlines from 1990 to 2001. (Facts 13, 33, and 41.)

Plaintiff broadly claims that he was exposed to asbestos from MDC's DC-8 and DC-10 airplanes (among other non-MDC airplanes) during the above time periods. However, Plaintiff has no admissible evidence that he breathed airborne asbestos fibers from any specific asbestos-containing DC-8 or DC-10 component manufactured or supplied by MDC.

### B. Plaintiff's Medical Diagnosis

Plaintiff did not and does not suffer from asbestos-related mesothelioma. (Facts 1-10.) Instead, Plaintiff suffered from an unusual and rare tumor that has no known relationship to asbestos exposure, and is commonly referred to as LMM. (*Id.*) There is no scientific medical evidence, published medical studies, or other admissible evidence establishing that LMM is caused by exposure to asbestos. (Fact 6.)

#### 1. Localized Malignant Mesothelioma

LMM is a rare tumor distinct from DMM associated with exposure to asbestos. (Facts 2, 3,

---

[1] All "Fact" references refer to MDC's Separate Statement of Undisputed Material Facts filed with this Motion.

1  7-9); *see* Timothy Craig Allen et al., *Localized Malignant Mesothelioma*, 49 AM. J. SURG. PATHOL. 866,
2  870-72 (2005) ("Because of the vastly different treatment and prognosis, it is crucial to separate
3  localized malignant mesotheliomas from diffuse malignant mesotheliomas.").) The 2004 World
4  Health Organization classification of tumors of the pleura recognized LMM as a distinct disease.
5  (Fact 3; WILLIAM D. TRAVIS ET AL., WORLD HEALTH ORGANIZATION CLASSIFICATION OF TUMOURS,
6  PATHOLOGY AND GENETICS: TUMOURS OF THE LUNG, PLEURA, THYMUS AND HEART (2004). As
7  explained in various medical studies, articles, and case reports, LMM is rare and people do not
8  contract it in the usual way they would contract DMM. (Facts 2, 5, and 6; *see* Allen et al., *supra*, at
9  866-67.) Medical studies show that LMM is not associated with asbestos exposure and that the
10 patient usually has a better prognosis than someone suffering from DMM. (*See id.* at 872 ("While
11 many cases of diffuse malignant mesothelioma are associated with asbestos exposure, only 4 [out of
12 twenty-three] of our patients had such a history."); Andrew Churg, *Localized Malignant Mesothelioma and*
13 *Other Localized Pleural Tumors*, Symposium, *Malignant Mesothelioma* (1996) ("Although some of the
14 reported cases have had asbestos exposure, probably most have not, and the high proportion of
15 tumors in women also argues against an asbestos etiology.") (Facts 2-8.)

16       In short, there is no scientific medical evidence that LMM is caused by asbestos. (*See* Fact 6.)
17 Immunohistochemical tests of both LMM and DMM yield similar results because both are types of
18 mesotheliomas. (Fact 5; *see also* Akif Turna et al., *Localized Malignant Pleural Mesothelioma Treated by*
19 *a Curative Intent Lobectomy: a Case Report*, 13 ANN. THORAC. CARDIOVASC. SURG. 349, 350 (2007) ("By
20 definition [LMM] are microscopically, immunohistochemically, and ultrastructurally identical to
21 diffuse malignant mesothelioma.") Those tests merely confirm mesothelial features; they do not
22 prove that LMM is caused by asbestos. (*Id.*) Similarly, the existence of pleural plaques does not and
23 cannot establish a causal link between LMM and asbestos exposure. (*See* Fact 10.)

24       Unlike DMM, LMM is not systemic and can be cured by surgery. (Fact 4.) "LMM should be
25 distinguished from [DMM] because of different biologic behavior and better prognosis; many cases,
26 in fact, can apparently be cured with early surgical radical intervention." (Silvia Tazi et al., *Localized*
27 *Malignant Pleural Mesothelioma, Report of Two Cases*, 4 J. THORAC. ONCOL. 1038, 1040 (2009); *Id.*) LMM
28 does not morph into DMM—it is a different form of cancer. (Fact 7.) In the largest study of LMM

patients to date, none of them, including patients with metastatic disease, developed recurrent DMM. (Fact 8; Allen et al., *supra*.) Plaintiff never had DMM, and the medical evidence shows that Plaintiff will not develop recurrent DMM. (Fact 9.)

### 2. Plaintiff's Treating Physician Diagnosed Plaintiff with LMM

Plaintiff's treating physician, Dr. Joseph B. Shrager, Chief, Division of Thoracic Surgery at The Stanford School of Medicine concluded on October 27, 2009:

> I had the pleasure of seeing Mr. Tim Vest in the office today after his recent right thoracotomy and chest wall resection and reconstruction for what turns out to be a quite unusual tumor – a localized malignant mesothelioma. We took Mr. Vest to the operating room on October 7 with the thought that this was an adenocarcinoma of the lung potentially involving the chest wall. As it turns out, the lung was completely unrelated and it was a primary pleural/chest wall tumor. It was completely resected . . . his postop course was uncomplicated . . . on physical exam, he looks great.
> **Impression**: Mr. Vest has done beautifully following a chest wall resection and prosthetic reconstruction for what turns out to be an *unusual tumor – a localized malignant mesothelioma.*

(Exhibit F to Pettis Declaration, emphasis added; Fact 1.) Dr. Shrager further stated on August 10, 2010, that:

> I do not see any clinical or radiographic evidence of recurrent disease in Mr. Vest, now 10 months out from . . . resection of the lung for a *localized malignant mesothelioma.* . . . I told him that from my point of view he could go back to work whenever he feels able physically. I do not believe that there is any contraindication to him flying at this point at least from a physical point of view.

(*Id.*, emphasis added.)

### C. No Evidence of Exposure To Asbestos Products Attributable To MDC

Plaintiff claims that his injuries are caused by exposure to asbestos-containing components in MDC DC-8 and/or DC-10 aircraft while (1) his father Warren Vest worked at World Airways as a pilot from 1973 to 1983 (Plaintiff alleges secondary exposure at home and when he accompanied his father to work on weekends); (2) he worked as a ramp agent for Continental Airlines from 1985 to 1987; and (3) he worked as a commercial pilot for Emery Worldwide Airlines from 1990 to 2001. (Exhibits B and C to Pettis Declaration; Facts 13, 33, and 41.)

***World Airways—Plaintiff's father's employer from 1973 to 1983.*** Plaintiff and his father Warren Vest testified that, as a child between the ages of 9 and 19, Plaintiff would visit Warren at

World Airways (Hangar 110) in Oakland while Warren was employed as a pilot from 1973 to 1983. (Fact 13.) Warren testified that he was often traveling and away from Hangar 110; that Plaintiff only accompanied him to the hangar 12 to 15 times a year; and that during Plaintiff's younger years, Warren insisted that Plaintiff stay close to him in his office. (Fact 14.) Warren further testified that Plaintiff was involved in other activities that would have limited the time he could have accompanied Warren to work; *e.g.*, Plaintiff was involved in soccer since he was 6 years old; skied since he was 12 years old, including weekend ski trips; and took trips to the family's Lake Tahoe house 3 to 4 times a year for 3 or 4 days at a time. (Fact 15.) Plaintiff also spent a lot of his free time in 1981 and 1982 obtaining his pilot's license, and did not accompany Warren to work. (Fact 16.) Finally, Warren testified that he was only with Plaintiff on the Hangar 110 maintenance floor 5 or 6 times between 1973 and 1983—even then, they were "probably just walking through, maybe looking at airplanes or whatever" for an average of 15 or 20 minutes. (Fact 17.) Although Warren would, on occasion, visit the Hangar 110 maintenance area to seek updates from foremen, Plaintiff did not accompany him on those occasions. (Fact 18.) Plaintiff apparently spent time away from Warren with two World security guards in 1977 or 1978; however, the maintenance area was restricted and it would have been a breach of company protocol to allow Plaintiff access to the maintenance hangar. (Fact 19.)

In any event, there is no evidence that Plaintiff's presence in the hangar exposed him to asbestos from any MDC product. Plaintiff testified that he saw others performing general maintenance work on brakes, and "some painting" on DC-10 airplanes, but he could not recall specific work done on any specific aircraft. (Fact 20.) Plaintiff did not know the name brand, manufacturer, or supplier of any components; the maintenance history, whether any of the components were original or who supplied them of any of these airplanes. (Fact 21.) Regardless, the friction components of DC-10 brakes had no asbestos content. (Fact 22.) And Warren testified that it was World's procedure to always replace the complete brake unit, rather than disturb or manipulate internal components of the system. (Fact 23.) Warren also did not recall any brake work being done when Plaintiff was at World. (*Id.*)

Plaintiff also alleges that he was secondarily exposed to asbestos brought home by Warren on his work clothes. These allegations are contradicted by Warren's deposition testimony. Warren wore

a pilot's uniform when he was flying and a suit and tie when he was in the office. (Fact 25.) Plaintiff admitted that he never saw his father performing maintenance work or manipulating any airplane components. (Fact 24.) Warren also testified that his work clothes were not dusty and were dry cleaned. (Fact 26.) Plaintiff did not have responsibility for doing any laundry. (Fact 27.) Plaintiff was not responsible for picking up his father's clothes and Warren did not recall Plaintiff ever doing so. (*Id.*) Warren did not recall getting into his car and observing that there was dust on his clothes. (Fact 28.) Warren did not recall his wife ever complaining that his clothes were dusty when he got home. (Fact 29.) Warren did not recall ever noting that Plaintiff's clothes were dusty after a visit to Hangar 110. (Fact 30.) Nevertheless, Warren testified that he did not recall observing any maintenance procedures that created any dust and that the floor of the maintenance area "was always pretty clean." (Facts 31-32.)

*Continental Airlines—ramp agent from 1985 to 1987.* Plaintiff was not a mechanic and did not perform any maintenance work while at Continental. (Fact 34.) Rather, he was a ramp agent and customer service agent. (Fact 35.) All of Plaintiff's duties as a ramp agent, including offloading and loading baggage, cargo, and mail, driving a tug to push planes to and from gates, setting chocks, wing walking and marshalling, were performed outside on the flight line. (*Id.*)

Plaintiff testified that he observed others performing "basic aircraft maintenance" on the flight line and that he occasionally saw some maintenance work being done in Continental's maintenance hangar while walking to the adjacent employee parking lot, or while in the hangar picking up large equipment with a tug. (Fact 36.) Plaintiff could not provide any specifics about the work being performed or which particular components or which maintenance personnel were working. (Fact 37.) He did not know the maintenance history of any of these airplanes, and did not know whether any of the components worked on were original or who supplied them. (Facts 38-39.) Moreover, Continental had no DC-8 airplanes in its possession between 1985 and 1987. (Fact 40.) In short, Plaintiff has no admissible evidence that he was exposed to asbestos from an aircraft component made or supplied by MDC while working for Continental.

*Emery Worldwide—pilot from 1990 to 2001.* Plaintiff was a first officer and then captain on the DC-8. (Fact 42.) His duties included preflight inspections, weight and balance computation,

1 and piloting. (*Id.*) Plaintiff was not a mechanic, never had any duties as a mechanic, and never performed any maintenance work. (Fact 43.) Emery operated DC-8s and DC-10s but did not acquire any DC-10s until almost 2000. (Fact 44.) None of the DC-8 or DC-10 airplanes operated by Emery were purchased directly from MDC, and the last DC-8 at Emery was manufactured in 1974. (Fact 45.) Plaintiff did not know the maintenance history of all the aircraft and did not know if any of the components he saw being worked on were original components. (Facts 46-47.) Most of the work Plaintiff observed was done outside on the ramp or flight line and involved replacing components rather than taking them apart or manipulating them. (Fact 48.)

Plaintiff testified that he sometimes assisted with work being performed on DC-8 airplanes. (Fact 49.) However, all of this "assistance" was done outside on the flight line or ramp and involved handing others tools or parts, holding open engine cowlings, or overseeing mechanics (looking over their shoulders while they worked)—none of it involved manipulating components or taking components apart. (*Id.*) None of this assistance could lead to asbestos exposure, including any assistance with brake work because the friction components of the DC-8 brakes did not contain asbestos. (Fact 50.) Plaintiff also testified to assisting a mechanic work on a DC-8 radome; however, the DC-8 radome assembly also did not contain asbestos. (Fact 51.)

Again, Plaintiff has no admissible evidence that he was exposed to asbestos from an aircraft component made or supplied by MDC while working for Emery.

***The Operator Controls Maintenance, Repair, and Operation of its Airplanes.*** Once a DC-8 or DC-10 airplane was delivered to its original operator from MDC, MDC had no control over the maintenance, repair, or operation of the aircraft. (Fact 52.) There is no admissible evidence establishing that the DC-8 or DC-10 components that Plaintiff observed others working on were the components originally installed by MDC at the time of delivery. (Fact 53.) Plaintiff likewise has no admissible evidence that any replacement parts used on any MDC airplane for which he may have been around were manufactured or supplied by MDC, as opposed to being made or supplied by someone else, or for that matter, whether it was even the same part as may have been installed on the plane originally. (Fact 54.)

Moreover, an operator controls its maintenance program, including the maintenance manuals