IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---o0o---

TIMOTHY VEST and CAROLINE VEST,

    Plaintiffs,

vs.               No. RG09489518

ALLIED PACKING AND SUPPLY, et al.,

    Defendants.

_____/

VIDEOTAPED DEPOSITION OF DAVID L. MILLER

Volume I

(Pages 1 to 281)

Taken before Catherine M. Meyer

CSR No. 11596

December 29, 2010

**EXHIBIT E - Page 186**

266c89cf-1c88-4945-8535-7405f22069f7

Ex.: 39; p.: 1732

Case 3:11-cv-00651-JSW Document 6669-82 Filed 01/20/11 Page 2 of 31

¹   hangar 110 because United took that hangar over.  And he
²   was a foreman over there.
³          MS. JOHNSON:  Okay.  Thank you for that
⁴   clarification, sir.
⁵          THE WITNESS:  Sure.
⁶          MS. HSU:  Can I just ask a couple follow-ups
⁷   since we have some time?
⁸   EXAMINATION BY MS. HSU:
⁹          Q.  You mentioned earlier that there were military
¹⁰  aircraft being worked on --
¹¹         A.  Yes.
¹²         Q.  -- at hangar 110.
¹³         A.  Yes.
¹⁴         Q.  You mentioned the KC-10 which had a rope around
¹⁵  it.  Do you know what type of work was being done on the
¹⁶  KC-10?
¹⁷         A.  We had a contract to do like heavy checks, like
¹⁸  a C check.  There's many different types of checks in
¹⁹  aviation.
²⁰         Q.  Do you recall how many KC-10s there were at
²¹  hangar 110 that you guys were servicing?
²²         A.  I think at the height we were doing like one a
²³  month.
²⁴         Q.  And when you said there was a rope around the
²⁵  area, it was still on the maintenance hangar floor --

Ex.: 39; p.: 1733

Case 3:11-cv-00671-JSW Document 6669-82 Filed 01/24/11 Page 3 of 31

```
1        A.   Yes.
2        Q.   -- correct, except it was just roped up; is
3   that right?
4        A.   Yes.
5        Q.   Aside from the KC-10, do you recall any other
6   type of military aircraft that were being worked on in
7   hangar 110?
8        A.   Yes.  They had the -- like Air Force One, 747.
9        Q.   Any other ones?
10       A.   No.  I think a couple C-5As came in there.  But
11  they were just parked there because of the fog up in
12  Travis.
13       Q.   You don't believe that there was any work
14  performed on the C --
15       A.   I don't believe we did any work on them.
16       Q.   And also -- sorry.  Aside from the --
17       A.   Oh, excuse me.  I'll take that back.  We had a
18  contract to paint.  I don't know what the nomenclature
19  was.  It was a small fighter trainer for the Air Force.
20  T-38s maybe.
21       Q.   And that was to paint the aircraft?
22       A.   Yes.
23       Q.   Any other ones that you can recall?
24       A.   That's all I can recall right now.
25       Q.   Okay.  Earlier when I asked you about the heat
```

Ex.: 39; p.: 1734

Case 3:11-cv-00361-JSW Document 6669-182 Filed 00/234/11 Page 4 of 31

Page 281

1    STATE OF CALIFORNIA    )

2                           )

3    COUNTY OF ALAMEDA      )

4

5         I, CATHERINE M. MEYER, do hereby certify:

6         That DAVID L. MILLER, in the foregoing deposition

7    named, was present and by me sworn as a witness in the

8    above-entitled action at the time and place therein

9    specified;

10        That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and

14   that the foregoing transcript constitutes a full, true

15   and correct report of said deposition and of the

16   proceedings that took place;

17        IN WITNESS WHEREOF, I have hereunder subscribed my

18   hand this 4th day of January 2011.

19

20

21

22

23
                           _____
                           CATHERINE M. MEYER, CSR No. 11596
24                              State of California

25

Aiken Welch Court Reporters    D. Miller    V1    12-29-10
**EXHIBIT E - Page 189**          266c89cf-1c88-4945-8535-7405f22069f7

Ex.: 39; p.: 1735

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

TIMOTHY VEST and CAROLINE
VEST,

     Plaintiffs,

vs.                 No.  RG09489518

ALLIED PACKING & SUPPLY,
INC., et al.,

     Defendants.

_____  _____/


VIDEOTAPED DEPOSITION OF MICHAEL POCIECHA



Taken before DENISE M. LOMBARDO

CSR No. 5419

January 4, 2011

af693ef4-e2e5-4de5-aef1-b1ca73a4ce97

Ex.: 40; p.: 1736

1    A.  I think that's all I can remember offhand, oh,

2    except for Daly's bomber.  I can't even remember what

3    kind it was.  And we had a DC-3 in there, too.

4    Q.  One DC-3?

5    A.  Yeah.  He had an old DC-3.  I can't remember

6    the type of -- an old green plane that he flew

7    everywhere.  I believe it was an old-time bomber.

8    Q.  Do you know who manufactured it?

9    A.  I think it was a DC, also, but I'm not sure.

10    Q.  You did paint work on that old bomber that

11   you're talking about?

12    A.  Sure did.  It was kind of fun.  He had a little

13   leprechaun painted on there.  And it was dark green at

14   the bottom and light green at the top.  Big cloverleaf

15   on the tail.  Big cloverleaf on the tail.

16    Q.  Okay.  Sounds like a good-looking plane.

17       Did you observe anyone do maintenance work on

18   that particular bomber?

19    A.  Yeah.  There was mechanics that would work on

20   it.

21    Q.  Is it fair to say there were mechanics who

22   worked on the other -- all the planes you mentioned,

23   including the military planes?

24    A.  Yes.

25    Q.  Did that work take place -- the maintenance

1    work, did that take place inside or outside?

2         MS. HUSTON: Or both.

3         THE WITNESS: Both, actually, mostly inside.

4    BY MS. SAMUELSON:

5        Q. But was most of your work on the planes inside

6    or outside?

7        A. Both, but mostly inside.

8        Q. Inside. Okay. Thank you.

9        Let's talk specifically about DC -- let's start

10   with DC-8. Did you know it by any other name or

11   designation, the DC-8s that you saw?

12       A. No.

13       Q. Who operated the DC-8s that you worked on?

14       A. World Airways.

15       Q. How many were there at the time?

16       A. Probably -- I think -- the maximum I saw at one

17   particular time was four. Occasionally we'd get in

18   others from other private owners. I don't believe

19   there was any other airlines. But we got the Shah of

20   Iran. He had a DC -- yeah, DC-8 at one point. We

21   worked on his.

22       Q. Do you know when the DC-8s that you worked on

23   were manufactured?

24       A. No.

25       Q. Do you know their maintenance -- any of their

af693ef4-e2e5-4de5-aef1-b1ca73a4ce97
Ex.: 40; p.: 1738

1    MR. GOLDBERG:  We have somebody in the room, I

2    think.  Anybody in the room?

3    MS. HUSTON:  Okay.  Counsel on the phone, go

4    ahead.

5    EXAMINATION BY MS. SAMUELSON:

6    Q.  Back to Mr. Daly's bomber for just another

7    minute.  I'm sorry.

8    Did you observe maintenance work being done on

9    the bomber?  And I apologize if I've asked this

10   already.

11   A.  Yes, I did.

12   Q.  What type of work did you observe being done on

13   the bomber?

14   A.  I'm not familiar with what aircraft work

15   mechanicalwise is being done, although I seen the

16   engine being worked on and also the landing gear and

17   all that kind of thing.

18   He actually had one particular mechanic who --

19   I can't recall his name -- was the main mechanic for

20   that plane.  Actually, when Mr. Daly flew anywhere, he

21   used to grab that mechanic and take him with him.

22   Q.  Would that plane -- strike that.

23   That's all.

24   MS. HUSTON:  Anyone else on the phone with

25   questions?

af693ef4-e2e5-4de5-aef1-b1ca73a4ce97
Ex.: 40; p.: 1739

Page 238

1

2    STATE OF CALIFORNIA      )

3                             )   ss.

4    COUNTY OF ALAMEDA        )

5

6         I, DENISE M. LOMBARDO, do hereby certify:

7         That MICHAEL POCIECHA, in the foregoing deposition

8    named, was present and by me sworn as a witness in the

9    above-entitled action at the time and place therein

10   specified;

11        That said deposition was taken before me at said

12   time and place, and was taken down in shorthand by me,

13   a Certified Shorthand Reporter of the State of

14   California, and was thereafter transcribed into

15   typewriting, and that the foregoing transcript

16   constitutes a full, true and correct report of said

17   deposition and of the proceedings that took place;

18        IN WITNESS WHEREOF, I have hereunder subscribed my

19   hand this 7th day of January 2011.

20

21

22

23
                         _____
                         DENISE M. LOMBARDO, CSR No. 5419
24                       State of California

25

Aiken Welch Court Reporters   M. Pociecha   1-4-11

af693ef4-e2e5-4de5-aef1-b1ca73a4ce97
Ex.: 40; p.: 1740

AFFIDAVIT OF ALVIN F. MEYER, JR.

## INTRODUCTION

1. My name is Alvin F. Meyer, Jr. I presently reside at 1600 Longfellow St., McLean, Va. 22101.

2. I am founder and currently president of A. F. Meyer & Associates, consultants in industrial hygiene, safety, occupational health, pollution prevention and environmental control.

3. Before founding A. F. Meyer & Associates, I spent 29 years as a career officer with the United States Air Force, retiring in 1969 as a full Colonel. In the course of my career, I received both the Legion of Merit and the Distinguished Service Medal for outstanding service. I also received an honorary Doctor of Science Degree from the Illinois College of Optometry.

4. In my Air Force career, I had many important responsibilities as a Bioenvironmental Engineer, i.e., an engineer who specializes in application of engineering to control environmental stresses and workplace hazards for the protection of health.

5. My 29 years in the Air Force culminated in being chief of Bioenvironmental Engineering for the Air Force from 1962 to 1969. Specifically, from 1962 to 1965, I headed the Bioenvironmental Engineering program; from 1965 to 1969, I was the first Chief of the newly created Biomedical Science Corps, which was responsible for directing Bioenvironmental Engineers

LA01: 72516.1

1

EX 75     PG 2428

Ex.: 41; p.: 1741

and such allied health professionals as Optometrists, Physical
Therapists, and Clinical Psychologists, among others.

6. My experiences during my Air Force career, which
are described below, enable me to state unequivocally that during
the 1960's the Air Force had a well developed environmental and
occupational health program that protected against a variety of
significant hazards. I can also unequivocally state that during
this time the Air Force, although it was aware of risks of
asbestos, considered that asbestos exposure of the limited
frequency, duration, and concentration encountered in Air Force
operations did not present a serious danger to health.
Accordingly, the Air Force decided to devote its limited monetary
and personnel resources to protection of employees from other
hazards, which had more serious implications for personnel in Air
Force maintenance and operations activities.

### PROFESSIONAL EDUCATIONAL BACKGROUND

### AND INITIAL AIR FORCE EXPERIENCE

7. I received my initial professional training at the
Virginia Military Institute, where I graduated in 1941 with a
Bachelor of Science Degree in Civil and Sanitary Engineering.

8. After graduation from the Virginia Military
Institute, I was commissioned a Second Lieutenant in the United
States Army. I was initially assigned to field artillery, but in
1943 began what was to develop as a more than 25-year career in
military sanitary engineering and environmental health.

LA01: 72516.1

2

EX 75    PG 2429

9. In 1943, I was transferred to the Sanitary Corps. I took the Advanced Course in Preventive Medicine and Military Hygiene, at Carlyle Barracks, Pennsylvania. From there I was assigned to the position of Sanitary Engineer at the Army Air Corps air station in Kerns, Utah.

10. At Kerns, Utah I was responsible for overall environmental health and sanitation, with particular emphasis on prevention of communicable diseases.

11. In 1944, I was appointed Chief Sanitary Engineer for the United States Air Forces Europe ("USAFE"), stationed in Wiesbaden, Germany. I held this position until 1948. As Chief Sanitary Engineer. I was responsible for devising and implementing engineering solutions to numerous public health problems, including those affecting occupational health.

12. During my tenure as Chief Sanitary Engineer for the USAFE, I became aware that exposure to asbestos, under certain circumstances, could be hazardous, such as in the general context of people dealing with asbestos in the asbestos mining and manufacturing industries and in the limited exposure situation that might occur under very dusty conditions. I knew that the use of asbestos in those industrial settings could produce a disease known as asbestosis. I also was aware that Air Force service personnel worked with asbestos. It was a minor component of aircraft and motor vehicles, among other uses. Based upon my experience as the officer primarily responsible for environmental and occupational health for our Europe-based military personnel, I can state without hesitation that Air Force

LA01: 72514.1

3

EX 75   PG 2430

health professionals were not aware of any problem associated
with the limited use of asbestos by Air Force personnel and took
no particular precautions with respect to this substance.
Compared to the serious public health problems facing the USAFE,
asbestos did not constitute a significant risk to military or
civilian Air Force personnel.

13. In 1948, I was transferred to the position of
Chief of Industrial Hygiene for the Air Material Command ("AMC"),
Wright Patterson Air Force Base, in Dayton, Ohio. I held this
position until 1954. During this period, the AMC was assigned
responsibility not only for industrial hygiene in its own
command, but also for providing consultative services at all Air
Force bases, worldwide. I also was responsible for preparing
directives on industrial hygiene, which were used throughout the
Air Force, for the USAF Surgeon General.

14. While I was Chief of Industrial Hygiene for the
AMC, the Air Force developed into a very highly industrialized
operation, with the myriad industrial health problems that are
associated with an enterprise of tens of thousands of military
and civilian employees fabricating, using, maintaining, and
repairing complex, state-of-the-art equipment. During this
period, the Air Force was critically concerned with several
industrial hygiene problems, but asbestos was not among them.
For example, a major effort was undertaken to find substitutes
for carbon tetrachloride and to establish safe limits for those
substitutes. The toxicity of the advanced fire extinguishing
agents required in Air Force operations was also an important

-4-

EX 75  PG 2431

Ex.: 41; p.: 1744

area of concern. Another high priority project was design and
establishment of a comprehensive occupational health program for
the Air Force. I played a major role in the design of this
program during my last three years at Wright Patterson, including
planning, organizing, and establishing the USAF Occupational and
Environmental Health Laboratory (OEHL), now located at the
Aerospace Medical Division, Brooks Air Force Base, Texas.

15. In 1954, I was appointed Chief of Sanitary and
Industrial Hygiene Engineering for the Strategic Air Command
(NSACN), at Offut Air Force Base, Omaha, Nebraska. I served in
this position until 1961. The SAC had a much greater number of
bases than the AMC, and so my direct command responsibilities in
the area of industrial hygiene expanded. Highly toxic fuels,
hydraulic fluids, and other toxic substances were involved in
these new weapons systems, and our focus was on understanding the
hazards involved and protecting personnel and the environment
against them.

16. During my years in various Air Force commands from
1944 to 1961, I observed the Air Force respond to numerous health
problems to protect its personnel (both military and civilian).
During that period, the Air Force chose to devote its
environmental and industrial hygiene resources primarily to
maintenance of healthful environments on Air Force bases
(including residential, food preparation, and waste disposal
areas) and protection of workers from toxic substances, including
those with known properties and those (such as missile fuels)
with suspected hazardous properties. Asbestos exposure was not

LA01: 72516.1

5

EX 75   PG 2432

Ex.: 41; p.: 1745

perceived as a special problem in Air Force operations, and the
Air Force therefore elected to devote its limited health
protection resources to other areas than asbestos control.

## EXPERIENCE AS CHIEF OF AIR FORCE BIOENVIRONMENTAL
## ENGINEERS AND OF THE BIOMEDICAL SCIENCE CORPS

17. In 1962 I was promoted to Chief of
Bioenvironmental Engineering and stationed at the Office of the
Air Force Surgeon General, Washington, D.C. I served in this
position until April 1966, when I was appointed the first Chief
of the newly created United States Air Force Biomedical Sciences
Corps. ("BSC"). I headed the BSC until my retirement from the
Air Force in 1969.

18. As both Chief of Bioenvironmental Engineering and
later Chief of the BSC, I was responsible for formulating Air
Force policy on industrial hygiene issues and supervising
implementation of those policies throughout the Air Force
commands. As a result, I have direct personal knowledge of what
the Air Force knew and did in the area of industrial health
during 1962-1969.

19. During 1962-1969, the Air Force had an extensive
program of preventive medicine dealing with environmental
sanitation and occupational health. The program was known as the
Preventive Aviation and Occupational Medicine Program. I was
responsible for developing policy, priorities, overview,
procedures, training, and assignment of Bioenvironmental
Engineering and other personnel for this program. The various

LAM: 72516.1                          6

EX 75     PG 2433
Ex.: 41; p.: 1746

commands within the Air Force were independently responsible for
the program's day-to-day implementation, through Bioenvironmental
Engineers and Preventive Medicine Technicians assigned to each
command.

20.   During this period (and still), Air Force
Bioenvironmental Engineers were required to have a college degree
in Engineering. Upon entry into the Air Force, they were sent to
a 19-week training program, which was initially at the Medical
Services School, Gunter Air Force Base, Montgomery, Alabama, and
was later transferred to the School of Aerospace Medicine at
Brooks Air Force Base, San Antonio, Texas. (The 19-week program
was established in 1962; prior to that, there was an 8-week
course). The Medical Services School training program was an
intensive one and, in my view, amounted to a highly condensed
Master's Degree curriculum in Environmental Engineering and
Industrial Hygiene.

21.   At the Medical Services School and School of
Aerospace Medicine, Bioenvironmental Engineers were instructed in
numerous health hazards involved in Air Force operations. Among
the hazards addressed in the course were problems with chemical
hazards, noise, and microwave radiation. Toxic substance
problems included epoxy resins (such as styrofoam and teflon),
tri-cresyl-phosphate (found in paint), components of rocket and
missile fuels, beryllium (used in tools and rocket propellants)
benzene (used in solvents), tri-chloro-ethylene (used in metal
degreasing), lead (present in fuel tanks and welding operations),

EX 75   PG 2434

Ex.: 41; p.: 1747

toluene (found in paint), and cadmium (associated with some welding operations).

22. In addition, considerable attention was paid to the problem of dust disease, and the Bioenvironmental Engineers were thoroughly trained in techniques of sampling for dust concentrations. In this regard, the course focused on the dangers of beryllium and lead. Asbestos was named, along with numerous other dusts. Although the Air Force knew that exposure to asbestos could cause asbestosis or lung disease, it was not specially identified as an Air Force problem. In short, the instruction given Bioenvironmental Engineers reflected the Air Force's established priorities in the field of industrial health. Numerous hazards were identified as of particular concern to the Air Force, but asbestos was not among them.

23. In addition to my other duties during the 1960's, I was the principal Air Force representative to the National Academy of Sciences/National Research Council working groups establishing the Interagency Coordination Group on Toxicology. This major effort was designed to bring together the talents available within the government and civilian sectors on critical issues relating to toxic hazards affecting the Armed Forces (with special reference to missile propellants). At no time during this period was asbestos an issue for the three military departments (Air Force, Army, and Navy) to consider jointly. This was so, because of the overriding concerns for severe acute and chronic toxicological problems associated with increasingly

LAM: 72516.1

8

"exotic" chemicals being considered or already approved for
fairly routine use.

24. As the above description reflects, I can state
with absolute certainty that asbestos was not considered to be a
particular medical problem in the Air Force from 1941 to 1969.
It was recognized that daily exposure to very dusty asbestos
operations over a long period could produce asbestosis. This
caused no alarm in the Air Force, however, because it did not
have the kinds of dusty asbestos operations that had been
recognized as presenting workers with asbestos-related health
risks.

25. As the individual responsible for developing the
industrial health policy for the Air Force from 1962 to 1969, I
was sensitive to the limited financial and personnel resources at
my disposal. Reconciling the need to address occupational and
environmental health needs and the fact that resources were
limited required making many difficult policy decisions. I
decided to follow what I considered to be a reasonable and
necessary approach of addressing known health hazards, rather
than marginal concerns. There were many serious health hazards
endemic to Air Force operations, many of which have been listed
above. I decided that bioenvironmental health resources should
be devoted to protecting workers from known, serious hazards, as
well as ensuring adequate environmental and industrial hygiene at
Air Force Bases. In my judgment, given the existing state of
knowledge, it would have been unwarranted to use our scarce
resources to give special attention to asbestos protection at the

LAO: 72316.1                               9

EX 75    PG  2436

Ex.: 41; p.: 1749

low levels of exposure involved in Air Force operations.
Consequently, during 1962 to 1969 the Preventive Aviation and
Occupational Medicine Program addressed hazards of direct
implication to personnel health and effectiveness.

26. As the Chief of Bioenvironmental Engineering, I
had responsibility for what information, i.e., warnings, was
provided to Air Force personnel regarding various hazardous
materials encountered in the work environment, including the
nature and content of such information in technical manuals,
i.e., maintenance manuals, for all USAF aircraft, as well as
markings on those aircraft. All warnings placed on military
equipment procured from government contractors, and warnings
placed in technical manuals for that equipment, were under the
exclusive control and required the approval of the United States
government. Since the Air Force did not consider the small
quantities of asbestos used on its aircraft to pose a medical
hazard to aircraft mechanics, the Office of the Air Force Surgeon
General considered it unnecessary to place warnings about
asbestos on aircraft or asbestos-containing aircraft components.
Consequently, the Air Force did not require warnings about
asbestos on USAF aircraft or technical manuals during that time.

27. During my tenure, even if a government contractor
such as MDC had suggested to the Air Force that asbestos warnings
should be placed on the aircraft or in manuals, those suggestions
would have been futile. Although the Air Force knew of risks of
asbestos (as described above), it did not consider aircraft to
pose a hazard or health threat insofar as asbestos was concerned.

LA01: 72916.1                    ·10

EX 75   PG 2437
Ex.: 41; p.: 1750

Consequently, the Air Force would not have approved any such warnings.

28. As is apparent from the above description of my activities, in deciding what occupational health risks the Air Force should address, I had to weigh many factors. There were no fixed guidelines pointing me toward a particular result; I had to draw upon my professional experience of over two decades in Bioenvironmental Engineering to establish priorities.

29. I can categorically and without reservation state that the guiding principle under which I operated in my lengthy career was the application of my professional knowledge and judgment to protect the health of Air Force personnel, and thus to contribute to the effectiveness of the Air Force as an instrument of national policy. In so doing, I was following the basic precepts long embodied in military philosophy and doctrine that prevention of disease and injury of military and civilian supporting personnel is essential to combat effectiveness. I can further state without reservation that if I had been required by the Department of Defense, Air Force, or other authorities to carry out the actions necessary within the guiding principle of combat effectiveness under threat of tort suits, instead of

EX 75    PG  2438

Ex.: 41; p.: 1751

professional judgment, my discretion in making decisions and
recommendations would have been severely impaired.

SIGNED _____
ALVIN F. MEYER, JR.


SUBSCRIBED AND SWORN TO THIS _17th_ DAY OF JANUARY, 1995 IN
McLEAN, VIRGINIA BEFORE _____
A NOTARY PUBLIC.

My Commission Expires: _Aug 1995_

EX 75    PG 2439

ELIZABETH S. CONLEY (4415)
DAVID W. MacARTHUR (9876)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, Utah 84845-0898
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

ROBERT E. BOONE III (CA Bar No. 132780)
JENNIFER A. JACKSON (CA Bar No. 192998)
BRYAN CAVE·LLP
120 Broadway, Suite 300
Santa Monica, California 90401-2305
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Attorneys for Defendant McDonnell Douglas Corporation

IN THE THIRD JUDICIAL DISTRICT COURT

IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| LOUIS SCHARDINE, | AFFIDAVIT OF J. LINDSEY CHALK |
|---|---|
| Plaintiff, | Case No. 020905901 AS |
| | Master Case No. 010900863 AS |
| vs. | Judge Glenn K. Iwasaki |
| ASBESTOS DEFENDANTS and DOES I-800. | |

Ex.: 42; p.: 1753

## AFFIDAVIT OF J. LINDSEY CHALK

Comes now J. Lindsey Chalk, of lawful age, having been duly sworn upon his oath, and hereby states and testifies as follows:

1. I have been employed by McDonnell Douglas Corporation ("MDC") since May 1966. Since October 1992, I have held the position of Manager, Occupational Safety and Environmental Health.

2. In my position at MDC, I supervise approximately ten industrial hygienists, ten safety engineers and a safety trainer within the Occupational Safety and Health group.

3. The Occupational Safety and Environmental Health group at MDC, and its predecessor organizations, are and have been charged with designing and implementing safety and health programs, investigating workplace accidents, ensuring compliance with governmental safety regulations and monitoring for unsafe practices within the plant, including the use of any hazardous or toxic materials. The Occupational Safety and Environmental Health group would be expected to know, and would retain in its records, if asbestos or parts containing asbestos on the F-4 were believed to constitute a health hazard.

4. In the course of performing my duties, I have had access to the records of MDC's Occupational Safety and Environmental Health group (and its predecessor organizations), which MDC keeps and maintains in the ordinary course of its business.

SLO2 254367.1.

2

5.   I have investigated the question of when MDC first
became aware that exposure to asbestos could pose a potential
health hazard. I have consulted with members of the Occupational
Safety and Environmental Health group and have reviewed materials
maintained by MDC in its business records.

6.   Based upon my information and belief and a review
of the records at MDC, the Safety Department at MDC first became
aware sometime in 1972 that exposure to asbestos could
potentially pose a health hazard, when MDC received the federal
asbestos standard from the United States Occupational Safety and
Health Administration, dated June 7, 1972. (A copy of that
notification and related internal memoranda are attached hereto
as Exhibit A).

7.   To the best of my knowledge, information and
belief, MDC was unaware of potential health hazards associated
with exposure to asbestos prior to that time.

SL03 254387.1                               3 .

_J. LINDSEY CHALK_

Subscribed and sworn to before me on this **17th** day

of January, 1995.

_Karen Satton_
Notary Public

My Commission Expires:

_July 29 1996_

KAREN SAXTON
NOTARY PUBLIC—STATE OF MISSOURI
ST. LOUIS CITY
MY COMMISSION EXPIRES JULY 29, 1996

SL02 254387.1                    4

Ex.: 42; p.: 1756

# EXHIBIT "A"

INTEROFFICE MEMO

Memo No.: EL72:H464:111
Date: 7-12-72

Subject: ASBESTOS UTILIZATION SURVEY

To: HCC Safety Depts.

From: E. Levens

Copies To: H. E. Soistman; File

Reference: (1) E. Levens Memo No. EL72:H464:110, dated 7-11-72
(2) AB 72-21, Hazardous Materials - Selection to Minimize Risk, dated 5-18-72

1. Ref (1) required conduct of a survey by 9-1-72 to identify any work involving HCC use of asbestos or potential exposure ⁿ ⁻⁻⁻ ·ˢⁿes to airborne asbestos fibers. Where such use or ṛ· is found, a program will be initiated, in accord: to substitute less hazardous materials for asbestos, feasible consistent with end-use requirements.

2. You are requested to provide this office with a copy of the results of your asbestos utilization survey, including identification of programs, locations, amounts and forms of asbestos used; and sources of potential exposure to airborne fibers. To ensure full coverage, the survey should be conducted in coordination with component Purchasing, Facilities, Materials Laboratories and other agencies, as appropriate.

3. You are also requested to ensure that all materials and process specifications and other documents related to the use of asbestos include appropriate precautionary information consistent with OSHA 29 CFR 1910.93a.

Ernest Levens

Ernest Levens
Corporate Director, Safety

EL:eu

SAFETY & MEDICAL



**WEDNESDAY, JUNE 7, 1972**

WASHINGTON, D.C.

Volume 37 ◻ Number 110

## Title 29—Labor

Chapter XVII—Occupational Safety and Health Administration, Department of Labor

**PART 1910—OCCUPATIONAL SAFETY AND HEALTH STANDARDS**

Standard for Exposure to Asbestos Dust

On December 7, 1971, an emergency temporary standard concerning exposure to asbestos fibers was published in the FEDERAL REGISTER (36 F.R. 23207). In accordance with section 6(c)(3) of the Williams-Steiger Occupational Safety and Health Act of 1970, a notice of proposed rulemaking requiring a permanent standard for exposure to asbestos fibers was published in the FEDERAL REGISTER on January 12, 1972 (37 F.R. 466). The notice invited interested persons to submit both orally and in writing, data, views, and arguments concerning the proposal.

On or about January 24, 1972, the Advisory Committee on Asbestos Dust was established and requested to make written recommendations with regard to the proposed standard on asbestos. On or about February 1, 1972, the Department of Health, Education, and Welfare transmitted to the Secretary of Labor a criteria document containing recommendations for an Occupational Exposure Standard for Asbestos by the National Institute for Occupational Safety and Health (NIOSH). Public notice was given of the receipt of the recommendations and their availability for inspection and copying. On or about February 15, 1972, the Advisory Committee on Asbestos Dust submitted its written recommendations to the Assistant Secretary of Labor for Occupational Safety and Health.

Pursuant to the notice of rule making, a hearing was held on March 14 through 16, 1972, for the purpose of receiving oral data, views, and arguments concerning the proposed standard. On or about March 31, 1972, the presiding hearing examiner certified to the Assistant Secretary of Labor for Occupational Safety and Health the record of the proceeding. The record includes pertaining written comments, a transcript of the oral presentations made at the hearing, and documents exhibits received during the course of the hearing or within the period allowed after the close of the hearing.

[*] The proposed standard dealt with (1) permissible concentrations of asbestos fibers; (2) methods of compliance; (3) warning signs; (4) monitoring; (5) medical examinations; and (6) recordkeeping. Each of these major proposals elicited comment, arguments, objections, and counterproposals. They all have been examined and considered.

1. Acceptable concentrations of asbestos dust. The proposed standard would limit occupational exposure to 8-hour time-weighted average (TWA) airborne concentrations of asbestos dust not exceeding five fibers longer than five micrometers per milliliter. Concentrations above five fibers but not to exceed 10 fibers (ceiling concentration) would be permitted up to 15 minutes in an hour, but for not more than 5 hours in any one 8-hour day.

NIOSH in effect has recommended that the five-fiber TWA and 10-fiber peak concentrations be permitted only for 2 years; thereafter, TWA concentrations should be not more than 2 fibers per cubic centimeter (cm³) of air, and peak concentrations should not exceed 10 fibers/cm³, with no time restriction. Numerous objections and counterproposals have been made, with regard to both the limits of asbestos fiber concentrations and the time periods to comply with them. Some, for example, have recommended return to a 12-fiber standard of an earlier day i.e., a level adopted under the Williams-Steiger Public Contracts Act in 1969. Others have recommended a two-fiber standard to become effective in 6 months, then a one-fiber standard for 3 years, and finally a zero-fiber standard after 3 years. These recommendations give a fair indication of the wide spread of the counterproposals.

11315

Reprinted by the U. S. DEPARTMENT OF LABOR.
Occupational :

Ex.: 42: p.: 1761

Case: MDL-No-875-JS Document 6669-3 Filed 01/28/11 Page 31 of 31

Subparagraph shall conform to the requirements of 20" x 16" vertical format as specified in § 1918.16d-16(c), and this subdivision. The signs shall display the following legend in the lower panel, with letter sizes and styles of a visibility at least equal to that specified in this subdivision.

| Legend | Notation |
|---|---|
| Asbestos ..................... | 1" Sans Serif, Gothic or Block. |
| Dust Hazard................. | ¾" Sans Serif, Gothic or Block. |
| Avoid Breathing Dust.... | ¼" Gothic. |
| Wear Assigned Protective Equipment. | ¼" Gothic. |
| Do Not Remain In Area Unless Your Work Requires It. | ¼" Gothic. |
| Breathing Asbestos Dust May Be Hazardous To Your Health. | 14 point Gothic. |

Spacing between lines shall be at least equal to the height of the upper of any two lines.

(3) Caution labels—(i) Labeling. Caution labels shall be affixed to all raw materials, mixtures, scrap, waste, debris, and other products containing asbestos fibers, or to their containers, except that the label is required where asbestos fibers have been modified by a bonding agent, coating, binder, or other material so that during any reasonably foreseeable use, handling, storage, disposal, processing, or transportation, no airborne concentrations of asbestos fibers in excess of the exposure limits prescribed in paragraph (e) of this section will be released.

(ii) Label specifications. The caution labels required by subdivision (i) of this subparagraph shall be printed in letters of sufficient size and contrast as to be readily visible and legible. The label shall state:

CAUTION

Contains Asbestos Fibers
Avoid Creating Dust
Breathing Asbestos Dust May Cause
Serious Bodily Harm

(h) Housekeeping—(1) Cleaning. All external surfaces in any place of employment shall be maintained free of accumulations of asbestos fibers if, with their dispersion, there would be an excessive concentration.

(2) Waste disposal. Asbestos waste, scrap, debris, bags, containers, equipment, and asbestos-contaminated clothing, consigned for disposal, which may produce in any reasonably foreseeable use, handling, storage, processing, disposal, or transportation airborne concentrations of asbestos fibers in excess of the exposure limits prescribed in paragraph (e) of this section shall be collected and disposed of in sealed impermeable bags, or other closed, impermeable containers.

(i) Recordkeeping—(1) Exposure records. Every employer shall maintain records of any personal or environmental monitoring required by this section. Records shall be maintained for a period of at least 3 years and shall be made available upon request to the Assistant Secretary of Labor for Occupational Safety and Health, the Director of the National Institute for Occupational Safety and Health, and to authorized representatives of either.

(2) Employee access. Every employee and former employee shall have reasonable access to any record required to be maintained by subparagraph (1) of this paragraph, which indicates the employee's own exposure to asbestos fibers.

(3) Employee notification. Any employee found to have been exposed at any time to airborne concentrations of asbestos fibers in excess of the limits prescribed in paragraph (b) of this section shall be notified in writing of the exposure as soon as practicable but not later than 5 days of the finding. The employer shall also be timely notified of the corrective action being taken.

(j) Medical examinations—(1) General. The employer shall provide or make available at his cost, medical examinations relative to exposure to asbestos required by this paragraph.

(2) Preplacement. The employer shall provide or make available to each of his employees, within 30 calendar days following his first employment in an occupation exposed to airborne concentrations of asbestos fibers, a comprehensive medical examination, which shall include, as a minimum, a chest roentgenogram (posterior-anterior 14 x 17 inches), a history to elicit symptomatology of respiratory disease, and pulmonary function tests to include forced vital capacity (FVC) and forced expiratory volume at 1 second (FEV₁.₀).

(3) Annual examinations. On or before January 31, 1973, and at least annually thereafter, every employer shall provide, or make available, comprehensive medical examinations to each of his employees engaged in occupations exposed to airborne concentrations of asbestos fibers. Such annual examination shall include, as a minimum, a chest roentgenogram (posterior-anterior 14 x 17 inches), a history to elicit symptomatology of respiratory disease, and pulmonary function tests to include forced vital capacity (FVC) and forced expiratory volume at 1 second (FEV₁.₀).

(4) Termination of employment. The employer shall provide, or make available, within 30 calendar days before or after the termination of employment of any employee engaged in an occupation exposed to airborne concentrations of asbestos fibers, a comprehensive medical examination which shall include, as a minimum, a chest roentgenogram (posterior-anterior 14 x 17 inches), a history to elicit symptomatology of respiratory disease, and pulmonary function tests to include forced vital capacity (FVC) and forced expiratory volume at 1 second (FEV₁.₀).

(5) Recent examinations. No medical examination is required of any employee, if adequate records show that the employee has been examined in accordance with this paragraph within the past 1-year period.

(6) Medical records—(i) Maintenance. Employers of employees examined pursuant to this paragraph shall cause to be maintained complete and accurate records of all such medical examinations. Records shall be retained by employers for at least 20 years.

(ii) Access. The contents of the records required by this paragraph shall be made available, for inspection and copying, to the Assistant Secretary of Labor for Occupational Safety and Health, the Director of NIOSH, to authorized physicians and medical consultants of either of them, and, upon the request of an employee or former employee, to his physician. Any physician who conducts a medical examination required by this paragraph shall furnish to the employer of the examined employee all the information specifically required by this paragraph, and any other medical information related to occupational exposure to asbestos fibers.

3. A new § 1910.15 is added to Subpart B of Part 1910, reading as follows:

§ 1910.19 Asbestos dust.

Section 1910.93a shall apply to the exposure of every employee to asbestos dust in every employment and place of employment covered by § 1910.12, § 1910.13, § 1910.14, § 1910.15, § 1910.16, in lieu of any different standard on exposure to asbestos dust which would otherwise be applicable by virtue of any of those sections.

Effective date. Paragraph (b)(2) of § 1910.93a shall become effective July 1, 1976. All other provisions of §§ 1910.93a, 1910.93, and 1910.19 shall become effective July 7, 1972. The current emergency temporary standard remains in effect until July 7, 1972.

(Secs. 6, 8, 84 Stat. 1593, 1599; 29 U.S.C. 655, 657; 29 CFR, 1910, Subpart of Labor Order No. 12-71, 36 F.R. 8754)

Signed at Washington, D.C., this 24 day of June 1972.

G. C. GUENTHER,
Assistant Secretary of Labor.
[FR Doc. 72-8874 Filed 6-6-72; 8:45 am]

Ex.: 42; p.: 1762