(CWx), DISCOVERY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:11-cv-00791-GHK -CW

Robert McNaughton v. Goodrich Corporation et al
Assigned to: Judge George H. King
Referred to: Magistrate Judge Carla Woehrle
Case in other court: Superior Court of CA Los Angeles County, BC446557
Cause: 28:1441 Notice of Removal - Asbestos Litigation

Date Filed: 01/26/2011
Jury Demand: Defendant
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Federal Question

**Plaintiff**

**Robert McNaughton**                    represented by    **Alan R Brayton**
                                                           Brayton & Purcell LLP
                                                           222 Rush Landing Road
                                                           Novato, CA 94948-6169
                                                           415-898-1555
                                                           Fax: 415-898-1247
                                                           Email: mail@braytonlaw.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **David R Donadio**
                                                           Brayton & Purcell LLP
                                                           222 Rush Landing Road
                                                           Novato, CA 94948-6169
                                                           415-898-1555
                                                           Fax: 415-898-1247
                                                           Email: ddonadio@braytonlaw.com
                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Goodrich Corporation**

**Defendant**

**General Electric Company**             represented by    **Charles T Sheldon**
                                                           Sedgwick Detert Moran and Arnold
                                                           Steuart Tower
                                                           One Market Plaza 8th Floor
                                                           San Francisco, CA 94105
                                                           415-781-7900
                                                           Fax: 415-781-2635
                                                           Email: charles.sheldon@sdma.com
                                                           *ATTORNEY TO BE NOTICED*

**Marc Brainich**
Sedgwick Detert Moran and Arnold LLP
Steuart Tower
One Market Plaza 8th Floor
San Francisco, CA 94105
415-781-7900
Fax: 415-781-2635
*ATTORNEY TO BE NOTICED*

**Defendant**

**Metropolitan Life Insurance Company**

**Defendant**

**United Technologies Corporation**                    represented by    **Curtiss L Isler**
Tucker Ellis and West LLP
515 South Flower Street 42nd Floor
Los Angeles, CA 90071-2223
213-430-3400
Fax: 213-430-3409
Email: curt.isler@tuckerellis.com
*ATTORNEY TO BE NOTICED*

**Lance Wilson**
Tucker Ellis & West LLP
135 Main Street Suite 700
San Francisco, CA 94105
415-617-2400
Fax: 415-617-2409
Email: lance.wilson@tuckerellis.com
*ATTORNEY TO BE NOTICED*

**Nathan T Newman**
Tucker Ellis and West LLP
515 South Flower Street 42nd Floor
Los Angeles, CA 90071-2223
213-430-3400
Fax: 213-430-3409
Email: nathan.newman@tuckerellis.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Western MacArthur Company**

**Defendant**

**MacArthur Company**

**Defendant**

**Western Asbestos Company**

**Defendant**

**Meggitt Aircraft Braking Systems Corporation**
*formerly known as*
Aircraft Braking Systems Corporation

represented by **Elan N Stone**
Lewis Brisbois Bisgaard and Smith LLP
221 N Figueroa Street Suite 1200
Los Angeles, CA 90012
213-250-1800
Fax: 213-580-7942
Email: estone@lbbslaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Dynamics Corporation**

represented by **Daniel D O'Shea**
Jackson & Wallace
55 Francisco Street, 6th Floor
San Francisco, CA 94133
415-982-6300
Email: doshea@jjr-law.com
*ATTORNEY TO BE NOTICED*

**Gabriel A Jackson**
Jackson Jenkins Renstrom LLP
55 Francisco Street, 6th Floor
San Francisco, CA 94133
415-982-6300
Fax: 415-982-3700
*ATTORNEY TO BE NOTICED*

**Keri A Donohue**
Jackson Jenkins Renstrom LLP
55 Francisco Street 6th Floor
San Francisco, CA 94133
415 982 3600
Fax: 415 982 3700
*ATTORNEY TO BE NOTICED*

**Defendant**

**Curtiss-Wright Corporation**

represented by **Deborah A Smith**
Gordon & Rees LLP
275 Battery Street 20th Floor
San Francisco, CA 94111
415-986-5900
Fax: 415-986-8054
Email: dasmith@gordonrees.com
*ATTORNEY TO BE NOTICED*

**Kathryn J LaFevers**
Gordon & Rees LLP
275 Battery Street Suite 2000
San Francisco, CA 94111

415-986-5900
Fax: 415-986-8054
Email: klafevers@gordonrees.com
*ATTORNEY TO BE NOTICED*

**Robert A Rich**
Gordon and Rees LLP
275 Battery Street Suite 2000
San Francisco, CA 94111
415-986-5900
Fax: 415-986-8054
*ATTORNEY TO BE NOTICED*

**Defendant**

**Acme Auto Parts Incorporated**

**Defendant**

**McDonnell Douglas Corporation**        represented by   **James C Pettis**
Bryan Cave llp
120 Broadway Suite 300
Santa Monica, CA 90401-2386
310-576-2100
Fax: 310-576-2200
Email: james.pettis@bryancave.com
*ATTORNEY TO BE NOTICED*

**Robert Edward Boone , III**
Bryan Cave LLP
120 Broadway Suite 300
Santa Monica, CA 90401-2386
310-576-2100
Fax: 310-576-2200
Email: rboone@bryancave.com
*ATTORNEY TO BE NOTICED*

**Sarah Samuelson**
Bryan Cave LLP
120 Broadway Suite 300
Santa Monica, CA 90401-2386
310-576-2100
Fax: 310-576-2200
Email: sarah.samuelson@bryancave.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lockheed Martin Corporation**          represented by   **Deborah Maria Parker**
Knott and Glazier LLP
707 Wilshire Blvd Suite 2025
Los Angeles, CA 90017
213-312-9200

Fax: 213-312-9201
Email: parker@knottglazier.com
*ATTORNEY TO BE NOTICED*

**Guy P Glazier**
Knott and Glazier LLP
707 Wilshire Blvd Suite 2025
Los Angeles, CA 90017
213-312-9200
Fax: 213-312-9201
Email: glazier@knottglazier.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Boeing Company**                    represented by    **Bo W Kim**
Perkins Coie LLP
1888 Century Park East Suite 1700
Los Angeles, CA 90067-1721
310-788-9900
Fax: 310-843-1284
Email: bkim@perkinscoie.com
*ATTORNEY TO BE NOTICED*

**Ronald A McIntire**
Perkins Coie LLP
1888 Century Park East Suite 1700
Los Angeles, CA 90067-1721
310-788-9900
Fax: 310-843-1284
Email: rmcintire@perkinscoie.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rohr Inc**                    represented by    **Brian S O'Malley**
Glaspy & Glaspy
1 Walnut Creek Ctr
100 Pringle Ave, Ste 750
Walnut Creek, CA 94596-8104
925-947-1300
Fax: 925-947-1594
*ATTORNEY TO BE NOTICED*

**David M Glaspy**
Glaspy & Glaspy
1 Walnut Creek Center
100 Pringle Ave Suite 750
Walnut Creek, CA 94596-8104
925-947-1300
Fax: 925-947-1594
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Goodyear Tire and Rubber Company**          represented by **Elan N Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Parker-Hannifin Corporation**

**Defendant**

**Scott Co of California**

**Defendant**

**Does**
*1 through 800 inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2011 | 1 | NOTICE OF REMOVAL from the Superior Court of CA, Los Angeles County, case number BC446557 with CONFORMED copies of summons and complaint. Case assigned to Judge George H. King, discovery to Magistrate Judge Carla Woehrle; (Filing fee $ 350 PAID ); filed by defendant Lockheed Martin Corporation.(esa) (Additional attachment(s) added on 1/28/2011: # 1 Part 2) (mg). (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant Lockheed Martin Corporation.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | 2 | INDEX AND ATTACHMENT OF STATE COURT PLEADINGS to Notice of Removal, 1 filed by Defendant Lockheed Martin Corporation. (esa) (Additional attachment(s) added on 1/28/2011: # 1 part 2, # 2 part 3) (mg). (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant The Goodyear Tire and Rubber Company.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 JURY DEMAND. filed by defendant General Electric Company.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant United Technologies Corporation.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant The Boeing Company.(esa) Modified on 1/27/2011 (esa). (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant General Dynamics Corporation.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant McDonnell Douglas Corporation.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant Rohr Inc.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant Meggitt Aircraft |

| | | Braking Systems Corporation.(esa) (Entered: 01/27/2011) |
|---|---|---|
| 01/26/2011 | | CONFORMED COPY OF ANSWER TO COMPLAINT, 1 filed by defendant Curtiss-Wright Corporation.(esa) (Entered: 01/27/2011) |
| 01/26/2011 | 3 | DISCLOSURE STATEMENT AND CERTIFICATION OF INTERESTED PARTIES filed by defendant Lockheed Martin Corporation. (esa) (mg). (Entered: 01/27/2011) |
| 01/26/2011 | 4 | NOTICE OF TAG-ALONG ACTION filed by defendant Lockheed Martin Corporation. (esa) (mg). (Entered: 01/27/2011) |
| 01/26/2011 | 5 | NOTICE OF PENDENCY OF OTHER ACTIONS OR PROCEEDINGS filed by defendant Lockheed Martin Corporation. (esa) (mg). (Entered: 01/27/2011) |
| 01/28/2011 | 6 | Certificate OF SERVICE filed by defendant Lockheed Martin Corporation, re Notice of Removal, 1 , Certificate/Notice of Interested Parties 3 , Notice (Other) 4 , Notice (Other) 5 , Supplement (non-motion) 2 served on January 27, 2011. (Parker, Deborah) (Entered: 01/28/2011) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/31/2011 13:19:05 | | | |
| **PACER Login:** | kg0289 | **Client Code:** | 6010.254 |
| **Description:** | Docket Report | **Search Criteria:** | 2:11-cv-00791-GHK -CW End date: 1/31/2011 |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |

1  ALAN R. BRAYTON, ESQ., S.B. #73685
   DAVID R. DONADIO, ESQ., S.B. #154436
2  BRAYTON❖PURCELL LLP
   Attorneys at Law
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, California 94948-6169
   (415) 898-1555
5
   Attorneys for Plaintiff
6

7

8              **SUPERIOR COURT OF CALIFORNIA**

9                **COUNTY OF LOS ANGELES**

10

11  ROBERT McNAUGHTON,                    )   **ASBESTOS**
                                          )   No.  **B C 4 4 6 5 5 7**
12              Plaintiff,                )
                                          )   COMPLAINT FOR PERSONAL INJURY -
13  vs.                                   )   ASBESTOS
                                          )
14                                        )
    GOODRICH CORPORATION;                 )
15  GENERAL ELECTRIC COMPANY;             )
    METROPOLITAN LIFE INSURANCE           )   Honorable _____
16    COMPANY;                            )   Department _____
    UNITED TECHNOLOGIES CORPORATION;      )
17  WESTERN MacARTHUR COMPANY;            )
    MacARTHUR COMPANY;                    )
18  WESTERN ASBESTOS COMPANY;             )
    MEGGITT AIRCRAFT BRAKING SYSTEMS      )
19    CORPORATION (FKA AIRCRAFT BRAKING   )
      SYSTEMS CORPORATION);               )
20  GENERAL DYNAMICS CORPORATION;         )
    CURTISS-WRIGHT CORPORATION;           )
21  ACME AUTO PARTS, INCORPORATED;        )
    MCDONNELL DOUGLAS CORPORATION;        )
22  LOCKHEED MARTIN CORPORATION;          )
    THE BOEING COMPANY;                   )
23  ROHR, INC.;                           )
    THE GOODYEAR TIRE & RUBBER            )
24    COMPANY;                            )
    PARKER-HANNIFIN CORPORATION;          )
25  SCOTT CO. OF CALIFORNIA;              )
    and DOES 1 through 800, inclusive,    )
26                                        )
                Defendants.               )
27  _____)

28

K:\LA\113611\PLD\cmp-1AMD\pipMet.wpd                    1
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1

## FIRST CAUSE OF ACTION
### (Negligence)

2

3      PLAINTIFF ROBERT McNAUGHTON COMPLAINS OF DEFENDANTS

4   HEREINBELOW NAMED IN PARAGRAPH 3, THEIR "ALTERNATE ENTITIES" AND

5   EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

6          1.      The true names and capacities, whether individual, corporate, associate,

7   governmental or otherwise, of defendants DOES 1 through 500, inclusive, are unknown to

8   plaintiff at this time, who therefore sues said defendants by such fictitious names.  When the true

9   names and capacities of said defendants have been ascertained, plaintiff will amend this

10  complaint accordingly.  Plaintiff is informed and believes, and thereon alleges, that each

11  defendant designated herein as a DOE is responsible, negligently or in some other actionable

12  manner, for the events and happenings hereinafter referred to, and caused injuries and damages

13  proximately thereby to the plaintiff, as hereinafter alleged.

14         2.      At all times herein mentioned, each of the defendants was the agent, servant,

15  employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

16  defendant was acting in the full course and scope of said agency, service, employment and/or

17  joint venture.

18         3.      Plaintiff is informed and believes, and thereon alleges that at all times herein

19  mentioned, defendants: GOODRICH CORPORATION; GENERAL ELECTRIC COMPANY;

20  METROPOLITAN LIFE INSURANCE COMPANY; UNITED TECHNOLOGIES CORPORATION; WESTERN

21  MacARTHUR COMPANY; MacARTHUR COMPANY; WESTERN ASBESTOS COMPANY; MEGGITT

22  AIRCRAFT BRAKING SYSTEMS CORPORATION (FKA AIRCRAFT BRAKING SYSTEMS CORPORATION);

23  GENERAL DYNAMICS CORPORATION; CURTISS-WRIGHT CORPORATION; ACME AUTO PARTS,

24  INCORPORATED; MCDONNELL DOUGLAS CORPORATION; LOCKHEED MARTIN CORPORATION; THE

25  BOEING COMPANY; ROHR, INC.; THE GOODYEAR TIRE & RUBBER COMPANY; PARKER-HANNIFIN

26  CORPORATION; SCOTT CO. OF CALIFORNIA; and DOES 1 through 300, inclusive, were

27  individuals, or corporations, partnerships and/or unincorporated associations organized and

28  existing under and by virtue of the laws of the State of California, or the laws of some other state

1   or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do

2   and are doing business in the State of California, and that said defendants have regularly

3   conducted business in the County of Los Angeles, State of California.

4       4.      At all times herein mentioned, each of the named defendants and DOES 1 through

5   300 was the successor, successor in business, successor in product line or a portion thereof,

6   assign, predecessor, predecessor in business, predecessor in product line or a portion thereof,

7   parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in

8   an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling,

9   assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting,

10  servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding,

11  manufacturing for others, packaging and advertising a certain substance, the generic name of

12  which is asbestos and other products containing said substance.  Said entities shall hereinafter

13  collectively be called "alternate entities."  Each of the herein named defendants is liable for the

14  tortious conduct of each successor, successor in business, successor in product line or a portion

15  thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or

16  partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded,

17  that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled,

18  distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed,

19  contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others and

20  advertised a certain substance, the generic name of which is asbestos and other products

21  containing said substance.  The following defendants, and each of them, are liable for the acts of

22  each and every "alternate entity," and each of them, in that there has been a virtual destruction of

23  plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have

24  acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such

25  "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy

26  against each such "alternate entity"; each such defendant has the ability to assume the risk-

27  spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill

28  originally attached to each such "alternate entity."

K:\LA\11261\PLD\cmp-1AMDziipMcl.wpd                3
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| GOODRICH CORPORATION | B.F. GOODRICH CORPORATION |
| | GARLOCK SEALING TECHNOLOGIES, LLC |
| | COLTEC INDUSTRIES, INC. |
| | COLT INDUSTRIES |
| GENERAL ELECTRIC COMPANY | MATTERN X-RAY |
| | HOTPOINT ELECTRIC APPLIANCE COMPANY LIMITED |
| | TRUMBULL ELECTRIC MANUFACTURING COMPANY |
| | G E INDUSTRIAL SYSTEMS |
| | CURTIS TURBINES |
| | PARSONS TURBINES |
| | GENERAL ELECTRIC JET ENGINES |
| UNITED TECHNOLOGIES CORPORATION | UNITED AIRCRAFT CORPORATION |
| | UNITED AIRCRAFT & TRANSPORT CORPORATION |
| | PRATT & WHITNEY |
| | HAMILTON STANDARD CO. |
| | SIKORSKY AIRCRAFT CORP. |
| WESTERN MacARTHUR COMPANY | WESTERN ASBESTOS CO. |
| | MAC ARTHUR COMPANY |
| | BAY CITIES ASBESTOS COMPANY |
| | F.K. PINNEY, INC. |
| MEGGITT AIRCRAFT BRAKING SYSTEMS CORPORATION (FKA AIRCRAFT BRAKING SYSTEMS CORPORATION) | LOCKHEED MARTIN TACTICAL SYSTEMS, INC. |
| | LORAL CORPORATION |
| | GOODYEAR AEROSPACE CORP. |
| | THE GOODYEAR TIRE & RUBBER COMPANY |
| GENERAL DYNAMICS CORPORATION | CONVAIR |
| | VULTEE AIRCRAFT INC. |
| | CONSOLIDATED VULTEE AIRCRAFT CORPORATION |
| | ASBESTOS CORPORATION LIMITED |
| CURTISS-WRIGHT CORPORATION | WRIGHT AERONAUTICAL |
| | WRIGHT AERO |
| | CURTIS AIRCRAFT |
| | CURTISS-WRIGHT FLOW CONTROL CORPORATION |
| | FARRIS ENGINEERING COMPANY |
| LOCKHEED MARTIN CORPORATION | LOCKHEED CORPORATION |
| | LOCKHEED MISSILES & SPACE CO., INC. |
| | LOCKHEED AIRCRAFT CORPORATION |
| | LOCKHEED PROPULSION COMPANY |
| | GLENN L. MARTIN AIRCRAFT COMPANY |
| | LOCKHEED MARTIN TACTICAL SYSTEMS, INC. |
| | LORAL CORPORATION |

///

///

///

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| THE BOEING COMPANY | BOEING NORTH AMERICAN, INC. |
| | BOECON CORPORATION |
| | McDONNELL DOUGLAS CORPORATION |
| | DOUGLAS AIRCRAFT CO. |
| | COLLINS RADIO COMPANY |
| | ROCKWELL INTERNATIONAL CORPORATION |
| | ROCKWELL INTERNATIONAL CORPORATION, |
| |    MEASUREMENT AND FLOW CONTROL DIVISION |
| | AUTONETICS, INC. |
| | ROCKETDYNE |
| | ROCKWELL MANUFACTURING COMPANY |
| | ROCKWELL-STANDARD, INC. |
| | ROCKWELL SPRING & AXLE CO. |
| | ROCKWELL SPRING & AXLE CO., |
| |    TIMKEN-DETROIT AXEL DIVISION |
| | NORTH AMERICAN ROCKWELL |
| | NORTH AMERICAN AVIATION, INC. |
| | NAVION |
| | VERTOL CORPORATION |
| | BOEING VERTOL COMPANY |
| | BOEING AIRPLANE COMPANY |
| | STEARMAN AIRCRAFT COMPANY |
| ROHR, INC. | ROHR CORPORATION |
| | ROHR INDUSTRIES, INC. |
| MCDONNELL DOUGLAS CORPORATION | DOUGLAS AIRCRAFT COMPANY |
| | BOEING NORTH AMERICAN, INC. |
| | CONSOLIDATED AIRCRAFT |
| THE GOODYEAR TIRE & RUBBER COMPANY | GOODYEAR AEROSPACE CORP. |
| | LOCKHEED MARTIN TACTICAL SYSTEMS, INC. |
| | LORAL CORPORATION |
| | AIRCRAFT BRAKING SYSTEMS CORP. |
| PARKER-HANNIFIN CORPORATION | SACOMA-SIERRA, INC. |
| | SACOMA MANUFACTURING COMPANY |
| | E.I.S. AUTOMOTIVE CORPORATION |
| | CONDREN CORPORATION, THE |
| | PARKER SEAL COMPANY |
| | DENISON HYDRAULICS INC. |
| | GREER HYDRAULICS CORPORATION |
| SCOTT CO. OF CALIFORNIA | SCOTT COMPANY OF CALIFORNIA |
| | SCOTT COMPANY OF NORTHERN CALIFORNIA |
| | SCOTT CO. INDUSTRIAL CONTRACTORS |
| | SCOTT-BROADWAY CONTRACTORS, INC. |
| | BROADWAY PLUMBING CO., INC. |
| | BROADWAY MECHANICAL CONTRACTORS, INC. |

5.    At all times herein mentioned, defendants, their "alternate entities," and each of

them, were and are engaged in the business of researching, manufacturing, fabricating, designing,

1  modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying,

2  selling, inspecting, servicing, installing, contracting for installation, repairing, marketing,

3  warranting, rebranding, manufacturing for others, packaging and advertising a certain substance,

4  the generic name of which is asbestos and other products containing said substance.

5        6.    At all times herein mentioned, defendants, their "alternate entities" and each of

6  them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated,

7  designed, modified, tested or failed to test, abated or failed to abate, warned or

8  failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for

9  sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

10  marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain

11  substance, the generic name of which is asbestos and other products containing said substance, in

12  that said substance proximately caused personal injuries to users, consumers, workers, bystanders

13  and others, including the plaintiff herein (hereinafter collectively called "exposed persons"),

14  while being used in a manner that was reasonably foreseeable, thereby rendering said substance

15  unsafe and dangerous for use by "exposed persons." Plaintiff's claims against defendant

16  GOODRICH CORPORATION exclude plaintiff's asbestos exposure at military and federal

17  government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against defendant

18  GENERAL ELECTRIC COMPANY exclude plaintiff's asbestos exposure at military and federal

19  government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against defendant UNITED

20  TECHNOLOGIES CORPORATION exclude plaintiff's asbestos exposure at military and federal

21  government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against defendant

22  MEGGITT AIRCRAFT BRAKING SYSTEMS CORPORATION (FKA AIRCRAFT

23  BRAKING SYSTEMS CORPORATION) exclude plaintiff's asbestos exposure at military and

24  federal government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against defendant

25  GENERAL DYNAMICS CORPORATION exclude plaintiff's asbestos exposure at military and

26  federal government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against defendant

27  CURTISS-WRIGHT CORPORATION exclude plaintiff's asbestos exposure at military and

28  federal government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against defendant

1  MCDONNELL DOUGLAS CORPORATION exclude plaintiff's asbestos exposure at military
2  and federal government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against
3  defendant LOCKHEED MARTIN CORPORATION exclude plaintiff's asbestos exposure at
4  military and federal government jobsites and aboard U.S. Navy vessels. Plaintiff's claims against
5  defendant THE BOEING COMPANY exclude plaintiff's asbestos exposure at military and
6  federal government jobsites and aboard U.S. Navy vessels.

7      7.      Defendants, their "alternate entities," and each of them, had a duty to exercise due
8  care in the pursuance of the activities mentioned above and defendants, and each of them,
9  breached said duty of due care.

10     8.      Defendant MacARTHUR COMPANY is and at all times herein was a corporation
11 organized and existing under the laws of the State of Minnesota with its principal place of
12 business in St. Paul, County of Ramsey, Minnesota.

13     9.      Defendant WESTERN MacARTHUR COMPANY is a corporation organized and
14 existing under the laws of the State of California with its principal place of business in Hayward,
15 County of Alameda, California.

16     10.     Defendant MacARTHUR COMPANY from May 1967 to present was the parent
17 corporation of WESTERN MacARTHUR COMPANY and the owner of 100% of all shares of
18 stock of WESTERN MacARTHUR COMPANY.

19     11.     There exists, and at all times herein mentioned there existed, a unity of interest
20 and ownership between MacARTHUR COMPANY and WESTERN MacARTHUR COMPANY
21 such that any individuality and separateness between MacARTHUR COMPANY and
22 WESTERN MacARTHUR COMPANY have ceased and MacARTHUR COMPANY is the alter
23 ego of WESTERN MacARTHUR COMPANY in that:

24         a.      WESTERN MacARTHUR COMPANY is and at all times herein
25 mentioned was a mere shell or sham without adequate capital assets or stockholders. WESTERN
26 MacARTHUR COMPANY was conceived, intended and used by defendant
27 MacARTHUR COMPANY as a device to avoid liability and for the purpose of substituting a
28 financially insolvent corporation in the place of defendant MacARTHUR COMPANY;

1            b.      WESTERN MacARTHUR COMPANY is and at all times herein

2    mentioned was so inadequately capitalized that compared with the business done by WESTERN

3    MacARTHUR COMPANY and the risks of loss attendant thereto, this capitalization was illusory

4    or trifling;

5            c.      MacARTHUR COMPANY used the assets of WESTERN MacARTHUR

6    COMPANY for its own uses and caused assets of WESTERN MacARTHUR COMPANY to be

7    transferred without adequate consideration and withdrew funds from WESTERN MacARTHUR

8    COMPANY's bank accounts for its own use;

9            d.      MacARTHUR COMPANY completely controlled, dominated, managed

10   and operated both WESTERN MacARTHUR COMPANY and MacARTHUR COMPANY,

11   intermingled the assets of each unit to suit the convenience of MacARTHUR COMPANY which

12   resulted in the concentration of assets in MacARTHUR COMPANY and the liabilities in

13   WESTERN MacARTHUR COMPANY to the detriment of plaintiff and creditors;

14           e.      WESTERN MacARTHUR COMPANY was a mere shell, instrumentality

15   and conduit through which MacARTHUR COMPANY carried on its business in the corporate

16   name of WESTERN MacARTHUR COMPANY exactly as it had conducted the previous

17   incorporation, exercising complete control and dominance of WESTERN MacARTHUR

18   COMPANY to such an extent that any individuality or separateness of WESTERN

19   MacARTHUR COMPANY and MacARTHUR COMPANY does not and at all times herein

20   mentioned, did not exist.

21       12.      WESTERN MacARTHUR COMPANY is and at all times herein was controlled,

22   dominated and operated by MacARTHUR COMPANY as its own business and alter ego in that

23   the activities and business of WESTERN MacARTHUR COMPANY were carried on without

24   the holding of directors' or shareholders' meetings, no records or minutes of any corporate

25   proceedings were maintained, and defendant MacARTHUR COMPANY entered into beneficial

26   transactions with WESTERN MacARTHUR COMPANY without the approval of its directors.

27       13.      Adherence to the fiction of the separate existence of WESTERN MacARTHUR

28   COMPANY as an entity distinct from MacARTHUR COMPANY would permit abuse of the

1  corporate privilege and would produce an incquitable result in that MacARTHUR COMPANY
2  made loans to WESTERN MacARTHUR COMPANY and guaranteed certain of its obligations
3  thereby enabling WESTERN MacARTHUR COMPANY to continue active business without
4  adequate financing and without capital stock which business continuation invited the public
5  generally to deal with defendant WESTERN MacARTHUR COMPANY and allowed it to
6  continue in business as a going concern.

7      14.    Defendants, their "alternate entities" and each of them, knew, or should have
8  known, and intended that the aforementioned asbestos and products containing asbestos would
9  be transported by truck, rail, ship and other common carriers, that in the shipping process the
10 products would break, crumble or be otherwise damaged; and/or that such products would be
11 used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft
12 and/or other applications, including, but not limited to sawing, chipping, hammering, scraping,
13 sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne
14 asbestos fibers, and that through such foreseeable use and/or handling "exposed persons,"
15 including plaintiff herein, would use or be in proximity to and exposed to said asbestos fibers.

16     15.    Defendants, their "alternate entities" and each of them, knew, or should have
17 known, and intended that the aforementioned asbestos and asbestos-containing products would
18 be used or handled as specified in Exhibit "A," which is attached hereto and incorporated by
19 reference herein, resulting in the release of airborne asbestos fibers, and that through such
20 foreseeable use and/or handling "exposed persons," including plaintiff herein, would be in
21 proximity to and exposed to said asbestos fibers.

22     16.    Plaintiff ROBERT McNAUGHTON has used, handled or been otherwise exposed
23 to asbestos and asbestos-containing products referred to herein in a manner that was reasonably
24 foreseeable. Plaintiff's exposure to asbestos and asbestos-containing products occurred at various
25 locations as set forth in Exhibit "A," which is attached hereto and incorporated by reference
26 herein.

27     17.    As a direct and proximate result of the conduct of the defendants, their "alternate
28 entities," and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing

1  products caused severe and permanent injury to the plaintiff, the nature of which, along with the

2  date of plaintiff's diagnosis, are set forth in Exhibit "B," which is attached hereto and

3  incorporated by reference herein.

4       18.    Plaintiff is informed and believes, and thereon alleges, that progressive lung

5  disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without

6  perceptible trauma and that said disease results from exposure to asbestos and asbestos-

7  containing products over a period of time.

8       19.    Plaintiff ROBERT McNAUGHTON suffers from a condition related to exposure

9  to asbestos and asbestos-containing products.  Plaintiff was not aware at the time of exposure that

10  asbestos or asbestos-containing products presented any risk of injury and/or disease.

11       20.    As a direct and proximate result of the aforesaid conduct of defendants, their

12  "alternate entities," and each of them, plaintiff has suffered, and continues to suffer, permanent

13  injuries and/or future increased risk of injuries to his person, body and health, including, but not

14  limited to, asbestosis, other lung damage, and cancer, and the mental and emotional distress

15  attendant thereto, from the effect of exposure to asbestos fibers, all to his general damage in the

16  sum in excess of the jurisdictional limits of the Municipal Court.

17       21.    As a direct and proximate result of the aforesaid conduct of the defendants, their

18  "alternate entities," and each of them, plaintiff has incurred, is presently incurring, and will incur

19  in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, X-rays

20  and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this

21  time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost

22  thereof is ascertained.

23       22.    As a further direct and proximate result of the said conduct of the defendants,

24  their "alternate entities," and each of them, plaintiff has incurred, and will incur, loss of income,

25  wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses,

26  the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend

27  this complaint to conform to proof at the time of trial.

28  ///

23.    Defendants, their "alternate entities," and each of them, and their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

24.    Defendants, their "alternate entities," and each of them, are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.

25.    The herein-described conduct of said defendants, their "alternate entities," and each of them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of "exposed persons." Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive damages according to proof.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

### SECOND CAUSE OF ACTION
(Products Liability)

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFF ROBERT McNAUGHTON COMPLAINS OF DEFENDANTS NAMED IN PARAGRAPH 3 HEREINABOVE, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

26.    Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 5 and 8 through 22 of the First Cause of Action herein.

27.    Defendants, their "alternate entities," and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

///

28.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, their "alternate entities," and each of them.  Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons," including plaintiff herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

29.    "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons."  Said defendants, their "alternate entities," and each of them, further failed to adequately warn of the risks to which plaintiff and others similarly situated were exposed.

30.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products, defendants, their "alternate entities," and each of them, did so with conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in that said defendants, their "alternate entities," and each of them, had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos- containing products, including, but not limited to, asbestosis, other lung disabilities and cancer.  Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their "alternate entities," and each of them, and which knowledge was obtained by said defendants, their "alternate entities," and each of them on or before 1930, and thereafter.

31.    On or before 1930, and thereafter, said defendants, their "alternate entities" and each of them, were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and

1   said defendants, their "alternate entities," and each of them, knew that members of the general

2   public and other "exposed persons," who came in contact with asbestos and asbestos-containing

3   products, would assume, and in fact did assume, that exposure to asbestos and asbestos-

4   containing products was safe, when in fact said exposure was extremely hazardous to health and

5   human life.

6         32.    With said knowledge, said defendants, their "alternate entities," and each of them,

7   opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy,

8   offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market,

9   warrant, rebrand, manufacture for others, package and advertise said asbestos and asbestos-

10   containing products without attempting to protect "exposed persons" from or warn "exposed

11   persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-

12   containing products. Rather than attempting to protect "exposed persons" from, or warn

13   "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

14   asbestos-containing products, defendants, their "alternate entities," and each of them,

15   intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed

16   and suppressed said knowledge from "exposed persons" and members of the general public, thus

17   impliedly representing to "exposed persons" and members of the general public that asbestos and

18   asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their

19   "alternate entities," and each of them, engaged in this conduct and made these implied

20   representations with the knowledge of the falsity of said implied representations.

21         33.    The above-referenced conduct of said defendants, their "alternate entities," and

22   each of them, was motivated by the financial interest of said defendants, their "alternate entities,"

23   and each of them, in the continuing, uninterrupted research, design, modification, manufacture,

24   fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale,

25   inspection, installation, contracting for installation, repair, marketing, warranting, rebranding,

26   manufacturing for others, packaging and advertising of asbestos and asbestos-containing

27   products. In pursuance of said financial motivation, said defendants, their "alternate entities,"

28   and each of them, consciously disregarded the safety of "exposed persons" and in fact were

1  consciously willing and intended to permit asbestos and asbestos-containing products to cause

2  injury to "exposed persons" and induced persons to work with and be exposed thereto, including

3  plaintiff.

4       34.    Plaintiff alleges that the aforementioned defendants, their "alternate entities," and

5  each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for

6  their intended use but that their asbestos and asbestos-containing products, created an

7  unreasonable risk of bodily harm to exposed persons.

8       35.    Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos

9  and various asbestos-containing products manufactured, fabricated, inadequately researched,

10  designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered

11  for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

12  marketed, warranted, rebranded, manufactured for others, packaged and advertised by the

13  aforementioned defendants, their "alternate entities," and each of them and that plaintiff cannot

14  identify precisely which asbestos or asbestos-containing products caused the injuries complained

15  of herein.

16       36.    Plaintiff relied upon defendants', their "alternate entities'," and each of their

17  representations, lack of warnings, and implied warranties of fitness of asbestos and their

18  asbestos-containing products.  As a direct, foreseeable and proximate result thereof, plaintiff has

19  been injured permanently as alleged herein.

20       37.    As a direct and proximate result of the actions and conduct outlined herein,

21  plaintiff has suffered the injuries and damages previously alleged.

22       WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and

23  each of them, as hereinafter set forth.

24  ///

25  ///

26  ///

27

28

## THIRD CAUSE OF ACTION
(Premises Owner/Contractor Liability)

AS AND FOR A FURTHER AND THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFF ROBERT McNAUGHTON COMPLAINS OF DEFENDANTS SCOTT CO. OF CALIFORNIA; WESTERN MacARTHUR COMPANY; MacARTHUR COMPANY; WESTERN ASBESTOS COMPANY; AND DOES 301 THROUGH 400 (hereinafter "Premises Owner/Contractor Liability Defendants") AND ALLEGES AS FOLLOWS:

38.    Plaintiff, by this reference, incorporates the allegations contained in paragraphs 18 through 24 of the First Cause of Action.

39.    Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, the Premises Owner/Contractor Liability Defendants and DOES 301 through 400, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California.

40.    At all times herein mentioned, each of the Premises Owner/Contractor Liability Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced and/or repaired on the respective premises owned, leased, maintained, managed and/or controlled by them.  Said entities shall hereinafter collectively be called "alternate entities."  Each of the herein-named defendants is liable for the tortious conduct of each successor, successor-in-business, assign, predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, that caused the presence as aforesaid of said asbestos- and silica-containing insulation and other toxic substances.  Said defendants, and each of them, are liable for the acts of each and every "alternate entity," and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such alternate entity; defendants, and each of them, have acquired

1  the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have

2  caused the destruction of plaintiff's remedy against each such alternate entity; each such

3  defendant has the ability to assume the risk-spreading role of each such alternate entity, and that

4  each such defendant enjoys the goodwill originally attached to each such alternate entity.

5      41.    At all times mentioned herein, the Premises Owner/Contractor Liability

6  Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or

7  controlled the following premises where plaintiff ROBERT McNAUGHTON was present.  The

8  following information provided is preliminary, based on recall over events covering many years

9  and further investigation and discovery may produce more reliable information:

| CONTRACTOR DEFENDANTS | LOCATION | TIME PERIOD |
|---|---|---|
| SCOTT CO. OF CALIFORNIA | Los Angeles International Airport, Los Angeles, CA, Trans World Airlines hangar | 2/1962-1980 |
| WESTERN MacARTHUR COMPANY/MacARTHUR COMPANY/WESTERN ASBESTOS COMPANY | Various | Various |

16  Additionally, plaintiff ROBERT McNAUGHTON might have been present at these or

17 other Premises Owner/Contractor Liability Defendants' premises at other locations and on other

18 occasions.

19     42.    Prior to and at said times and places, said Premises Owner/Contractor Liability

20 Defendants, and each of them, respectively, caused certain asbestos- and silica-containing

21 insulation, other building materials, products and toxic substances to be constructed, installed,

22 maintained, used, supplied, replaced, and/or repaired on each of the aforesaid respective

23 premises, by their own workers and/or by various contractors, and caused the release of

24 dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and

25 thereby created a hazardous and unsafe condition to plaintiff and other persons exposed to said

26 asbestos fibers and toxic substances while present at said premises.

27     43.    At all times mentioned herein, said Premises Owner/Contractor Liability

28 Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1  have known, that the foregoing conditions and activities created a dangerous, hazardous, and

2  unsafe condition and unreasonable risk of harm and personal injury to plaintiff and other workers

3  or persons so exposed while present on each of the aforesaid respective premises.

4       44.     At all times relevant herein, plaintiff entered said premises and used or occupied

5  each of said respective premises as intended and for each of the respective Premises

6  Owner/Contractor Liability Defendants' benefit and advantage and at each of the respective

7  Premises Owner/Contractor Liability Defendants' request and invitation.  In so doing, plaintiff

8  was exposed to dangerous quantities of asbestos fibers and other toxic substances released into

9  the ambient air by the aforesaid hazardous conditions and activities managed, maintained,

10  initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor

11  Liability Defendants, and each of them.

12       45.     Plaintiff at all times was unaware of the hazardous condition or the risk of

13  personal injury created by the aforesaid presence and use of asbestos products and materials and

14  other toxic substances on said premises.

15       46.     At all times mentioned herein, said Premises Owner/Contractor Liability

16  Defendants, and each of them, remained in control of the premises where plaintiff was

17  performing his work.

18       47.     At all times mentioned herein, the Premises Owner/Contractor Liability

19  Defendants owed to plaintiff and others similarly situated a duty to exercise ordinary care in the

20  management of such premises in order to avoid exposing workers such as plaintiff to an

21  unreasonable risk of harm and to avoid causing injury to said person.

22       48.     At all times mentioned herein, said Premises Owner/Contractor Liability

23  Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should

24  have known, that the premises that were in their control would be used without knowledge of, or

25  inspection for, defects or dangerous conditions and that the persons present and using said

26  premises would not be aware of the aforesaid hazardous conditions to which they were exposed

27  on the premises.

28  ///

1    49.    At all times mentioned herein, said Premises Owner/Contractor Liability

2    Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control

3    said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid.

4    dangerous conditions and hazards on said premises.

5    50.    Prior to and at the times and places aforesaid, said Premises Owner/Contractor

6    Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-

7    containing insulation, other building materials, products and toxic substances to be constructed,

8    installed, maintained, used, replaced, and/or repaired on each of their aforesaid respective

9    premises, by their own workers and/or by employing various contractors, and caused the release

10   of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air

11   and thereby injured plaintiff.

12   51.    At all times mentioned herein, said Premises Owner/Contractor Liability

13   Defendants, and each of them:

14          a.  Should have recognized that the work of said contractors would create during

15   the progress of the work, dangerous, hazardous, and unsafe conditions which could or would

16   harm plaintiff and others unless special precautions were taken;

17          b.  Knew or had reason to know, that the contractors it had selected and hired to

18   install, remove, abate or otherwise handle asbestos-containing materials were unfit, unskilled or

19   otherwise unqualified to do so;

20          c.  Failed to use reasonable care to discover whether the contractors it selected and

21   hired to install, remove, abate or otherwise handle asbestos-containing materials were competent

22   or qualified to do so.

23   52.    In part, plaintiff was exposed to dangerous quantities of asbestos fibers and other

24   toxic substances by reason of such contractors' failure to take the necessary precautions.

25   53.    The work of contractors on premises controlled by the Premises

26   Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of

27   the release of dangerous quantities of toxic substances including but not limited to asbestos.

28   ///

54. The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Premises Owner/Contractor Defendants. Said negligent conduct includes but is not limited to:

     a. Failure to warn of asbestos and other toxic dusts;

     b. Failure to suppress the asbestos-containing or toxic dusts;

     c. Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

     d. Failure to provide adequate breathing protection, i.e., approved respirators or masks;

     e. Failure to inspect and/or test the air;

     f. Failure to provide medical monitoring.

     g. Failure to select and hire a careful and competent contractor or subcontractor.

55. The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code §1714, and Labor Code §6400, et seq., or Health and Safety Code § 40.200, et seq., and regulations promulgated thereunder. Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

56. Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code §6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, et seq., which empowers the

1   South Coast Area Air Quality Management District to promulgate regulations including but not

2   limited to S.C.A.A.Q.M.D., Rule 1403; Title 40 Code of Federal Regulations, Chapter 1, Part 61,

3   et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required said

4   Premises Owner/Contractor Liability Defendants to provide specific safeguards or precautions to

5   prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said

6   Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and

7   precautions, or contractors employed by the Premises Owner/Contractor Liability Defendants

8   failed to provide the required safeguards and precautions.  Defendants' violations of said codes

9   include but are not limited to:

10          (a)     Failing to comply with statutes and allowing ambient levels of airborne

11   asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned

12   statutes;

13          (b)     Failing to segregate work involving the release of asbestos or other toxic

14   dusts;

15          (c)     Failing to suppress dust using prescribed ventilation techniques;

16          (d)     Failing to suppress dust using prescribed "wet down" techniques;

17          (e)     Failing to warn or educate plaintiff or others regarding asbestos or other

18   toxic substances on the premises;

19          (f)     Failing to provide approved respiratory protection devices;

20          (g)     Failing to ensure "approved" respiratory protection devices were used

21   properly;

22          (h)     Failing to provide for an on-going health screening program for those

23   exposed to asbestos on the premises;

24          (i)     Failing to provide adequate housekeeping and clean-up of the work place;

25          (j)     Failing to properly warn of the hazards associated with asbestos as

26   required by these statutes;

27          (k)     Failing to properly report renovation and disturbance of asbestos-

28   containing materials, including but not limited to S.C.A.A.Q.M.D. Rule 1403;

1        (l)    Failing to have an asbestos removal supervisor as required by regulation;

2        (m)    Failing to get approval for renovation as required by statutes; and

3        (n)    Failing to maintain records as required by statute.

4     57.    Premises Owner/Contractor Liability Defendants, and each of them, were the

5 "statutory employer" of plaintiff as defined by the California Labor Code and California case law.

6     58.    Plaintiff at all times was unaware of the hazardous condition or the risk of

7 personal injury created by defendants' violation of said regulations, ordinances or statutes.

8     59.    At all times mentioned herein, plaintiff was a member of the class of persons

9 whose safety was intended to be protected by the regulations, statutes or ordinances described in

10 the foregoing paragraphs.

11     60.    At all times mentioned herein, said Premises Owner/Contractor Liability

12 Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should

13 have known, that the premises that were in their control would be used without knowledge of, or

14 inspection for, defects or dangerous conditions, that the persons present and using said premises

15 would not be aware of the aforesaid hazardous conditions to which they were exposed on the

16 premises, and that such persons were unaware of the aforesaid violations of codes, regulations

17 and statutes.

18     61.    As a legal consequence of the foregoing, plaintiff ROBERT McNAUGHTON

19 developed an asbestos-related illness, which has caused great injury and disability as previously

20 set forth, and plaintiff has suffered damages as herein alleged.

21     WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities,"

22 and each of them, as hereinafter set forth.

23
FOURTH CAUSE OF ACTION<br>(Concert of Action)

24

25     AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

26 CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND ASSISTANCE

27 OF BREACH OF DUTY TO WARN, PLAINTIFF COMPLAINS OF DEFENDANTS GATKE

28 CORPORATION, HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL, INC. - -

1  formerly known as the Bendix Aviation Corporation), CHRYSLER CORPORATION (now

2  DAIMLERCHRYSLER CORPORATION), DANA CORPORATION (successor-in-interest to

3  ECHLIN INC. and FRICTION MATERIALS, INC. and P.T. BRAKE LINING CO. INC.),

4  GENERAL MOTORS CORPORATION, BRIDGESTONE/FIRESTONE, INC., LEAR-

5  SIEGLER, INC. (aka LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP. successor-in-interest

6  to ROYAL INDUSTRIES and H. KRASNE MANUFACTURING CO. and WORLD BESTOS

7  CO.), GARLOCK SEALING TECHNOLOGIES, LLC; OWENS-ILLINOIS, INC.;

8  MAREMONT CORPORATION, MORTON-THIOKOL CORPORATION (now MORTON

9  INTERNATIONAL, INC. successor-in-interest to THIOKOL CHEMICAL CORPORATION ),

10  H.K. PORTER, INC., JOHNS-MANVILLE CORPORATION, AUTO FRICTION

11  CORPORATION, SCANDURA, INC. (formerly known as Scandinavia Belting Company),

12  PNEUMO ABEX LLC (hereinafter "PNEUMO ABEX," and formerly known as PNEUMO

13  ABEX CORPORATION and ABEX CORPORATION and successor-in-interest to AMERICAN

14  BRAKEBLOK CORPORATION and the S. K. WELLMAN COMPANY), BRASSBESTOS

15  BRAKE LINING COMPANY,  LASCO BRAKE PRODUCTS CORPORATION, L.J. MILEY

16  COMPANY, REDDAWAY MANUFACTURING COMPANY, FORCEE MANUFACTURING

17  CORPORATION, SILVER LINE PRODUCTS, INC., SOUTHERN POWER, INC.;

18  WHEELING BRAKE BLOCK MANUFACTURING COMPANY, DOES 451-471, THEIR

19  ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter CONCERT OF ACTION

20  DEFENDANTS), AND ALLEGES AS FOLLOWS:

21       62.    Plaintiff incorporates herein by reference, as though fully set forth hereat each and

22  every allegation of the First and Second Causes of Action.

23       63.    The concerted action (hereinafter referred to as "concerted action" or

24  "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was

25  facilitated through trade and other organizations including the Friction Materials Standards

26  Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining

27  Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.

28  ///

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1  CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action,
2  members of FMSI.

3      64.    The Friction Materials Standards Institute was originally incorporated under the
4  name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership
5  corporation. It included among its avowed purposes: the maintenance and raising of standards of
6  all products manufactured by its members; the collection, assembly and dissemination to
7  members of the friction materials industry scientific, engineering, technological and other
8  relevant information pertaining to the industry; and to cooperate with governmental agencies for
9  the general benefit of the public and the enhancement of the industry.

10     65.    Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to
11 asbestos dust created grave health risks for those exposed. From 1971 forward, CONCERT OF
12 ACTION DEFENDANTS received additional information distributed through the Friction
13 Materials Standards Institute and through independent sources further confirming and elaborating
14 the serious health risks associated with exposure to airborne asbestos dust.

15     66.    CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in
16 the handling and machining of their friction products during their installation and replacement
17 created significant and dangerous quantities of airborne asbestos dust that would expose workers
18 and bystanders to hazardous levels of asbestos.

19     67.    CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger
20 posed by asbestos was not widely known by their consumers. CONCERT OF ACTION
21 DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated
22 or greatly reduced by adopting different and discrete practices in the handling and machining of
23 products and by instituting specific dust control procedures in their consumers' workplaces.

24     68.    Notwithstanding their knowledge of the dangers posed by exposure to asbestos,
25 and notwithstanding their chartered ostensible purpose to cooperate with government agencies
26 for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction
27 Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat,
28 compromise, evade, and otherwise dilute regulations, standards, and procedures designed to

1   reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by

2   consumers and friction materials workers.  Such activities include, but are not limited to the

3   following:

4         (a)  CONCERT OF ACTION DEFENDANTS, at the urging and encouragement

5   of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board

6   false and unsupportable opposition to a proposed prospective ban on the use of asbestos in

7   friction materials.

8         (b) CONCERT OF ACTION DEFENDANTS continuously undertook concerted

9   action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA

10   regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust,

11   requiring the use of safety equipment and procedures, and notification of potentially exposed

12   persons of the dangers presented by asbestos dust.  CONCERT OF ACTION DEFENDANTS

13   consistently misrepresented the state of science and knowledge to distort and confound public

14   understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos,

15   less stringent requirements in the use of safety equipment and procedures, and a reduction in the

16   scope and extent of any required notification regarding the hazards posed by asbestos.

17         (c) CONCERT OF ACTION DEFENDANTS expressly undertook to adopt

18   uniform interpretations of regulations among their membership, which interpretations

19   consistently took the stance of performing at the lowest possible level which could be considered

20   compliant.

21       69.   CONCERT OF ACTION DEFENDANT members of the Friction Materials

22   Standards Institute, despite their avowed purpose to encourage and support research into

23   materials and manufacturing processes, expressly declined to pursue a proposed initiative to

24   sponsor jointly funded research into feasible alternatives to asbestos in friction products.

25       70.   Even though they knew of the substantial risks and dangers to those who would

26   use or come into contact with their asbestos-containing products, defendants took concerted

27   action by means of explicit and tacit agreements, to delay for a period of years providing

28   notification and adequate warning of these risks and dangers, and to otherwise suppress

1  information about said hazards or otherwise compromise and confound informed consumer
2  appreciation of the asbestos hazards posed by their products.

3      71.    Defendants knew that the users of their friction products would handle such
4  products or their by-products in ways that enhanced the risks of dangerous asbestos exposure.
5  Defendants failed to discharge their duty to provide timely and adequate notice of these hazards
6  or of steps that could be taken to eliminate or ameliorate the risks and dangers. Each defendant,
7  in failing to warn of these dangers, gave assistance and encouragement to every other member
8  defendant to likewise fail to warn.

9      72.    Defendants provided substantial assistance to one another in maintaining
10  ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and
11  individually breached their duty to warn the consumers and users of their products.

12      73.    In addition to the above named defendants in this cause of action, the term
13  CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to:
14  DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THE BUDD
15  COMPANY, STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); BORG-WARNER
16  AUTOMOTIVE, INC., ASBESTOS MANUFACTURING COMPANY, FIBRE & METAL
17  PRODUCTS COMPANY, RITESET MANUFACTURING COMPANY, ROSSENDALE-
18  RUBOIL COMPANY, SOUTHERN FRICTION MATERIALS COMPANY, U.S. SPRING &
19  BUMPER COMPANY, AUTO FRICTION CORPORATION, AUTO SPECIALTIES
20  MANUFACTURING COMPANY, EMSCO ASBESTOS COMPANY, MOLDED
21  INDUSTRIAL FRICTION CORPORATION, NATIONAL TRANSPORT SUPPLY, INC.,
22  STANDCO, INC., UNIVERSAL FRICTION MATERIALS COMPANY, ASBESTOS CLAIMS
23  MANAGEMENT CORPORATION (formerly known as National Gypsum Company), BELL
24  ASBESTOS MINES LTD., Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D.,
25  Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell
26  Manufacturing (whose liabilities have been assigned by H.K. Porter Company), Union Asbestos
27  and Rubber Company, Thermoid Company (whose assets and liabilities have been purchased by
28  H.K. Porter Company), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation,

1  Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute

2  [ATI], all members of the Friction Materials Standards Institute and its predecessors, and the

3  other entities and individuals identified in this Fourth Cause of Action.

4       74.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

5  mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized

6  and existing under and by virtue of the laws of the State of California, or the laws of some other

7  state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and

8  are doing business in the State of California, and that said defendants regularly conducted and/or

9  conducts business in the County of Los Angeles, State of California.

10       75.    Plaintiff was exposed to asbestos-containing dust created by the use of the

11  asbestos products manufactured, distributed, and/or supplied by one or more of the

12  CONCERT OF ACTION DEFENDANTS named herein.  The exposure to the asbestos or

13  asbestos-related products supplied by the one or more of the CONCERT OF ACTION

14  DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

15       76.    The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one

16  another and as co-conspirators, agreed and conspired among themselves, with other asbestos

17  manufacturers and distributors, and with certain individuals including, but not limited to Anthony

18  Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET

19  LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the

20  wrongful acts of the conspirators, but a representative list):

21       (a)    Beginning in 1929, MET LIFE entered agreements with Johns-Manville

22  and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners.

23  When the data from these studies proved that Canadian asbestos miners were developing

24  asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony

25  Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian

26  study for many years thereafter to meetings of health care professionals seeking information

27  regarding asbestos exposure.

28  ///

1       (b)     In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-

2   Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and

3   conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J.

4   Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville

5   and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively

6   misrepresent material facts and conclusions about asbestos exposure; including but not limited to

7   descriptions of the seriousness of the disease process of asbestosis.  The misrepresentation was

8   accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as

9   "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a

10  disease process less serious than it was known to be by the CONCERT OF ACTION

11  DEFENDANTS.  As a result, Lanza's study was published in the medical literature containing

12  said misleading statements in 1935.  The CONCERT OF ACTION DEFENDANTS were

13  motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by

14  the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in

15  lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use

16  of their asbestos products.

17      (c)     The above-described conspiracy continued in 1936, when additional

18  CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant

19  PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant

20  GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to

21  conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing

22  (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber

23  Company and defendant USG, entered into an agreement with a leading medical research facility

24  named Saranac Laboratories.  (The following conspirators also joined the Friction Materials

25  Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation

26  (now defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY,

27  defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (through

28  Turner & Newall (T&N) alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell

K:\LA\11261\PLD\cmp-1AMDpipMet.wpd                                27
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1 │ Manufacturing (whose liabilities have been assumed by H.K. Porter Company).)  Under the

2 │ agreement, the CONCERT OF ACTION DEFENDANTS acquired the power to decide what

3 │ information Saranac Laboratories could publish regarding asbestos disease and could also control

4 │ in what form such publications were to occur.  Their agreement provided these CONCERT OF

5 │ ACTION DEFENDANTS the power and ability affirmatively to misrepresent the results of the

6 │ work at Saranac, and also gave these CONCERT OF ACTION DEFENDANTS power to

7 │ suppress material facts included in any study.  On numerous occasions thereafter, the CONCERT

8 │ OF ACTION DEFENDANTS exercised their power to prevent Saranac scientists from disclosing

9 │ material scientific data, resulting in numerous misstatements of fact regarding the health affects

10 │ of asbestos exposure being made at scientific meetings.

11 │        (d)    The conspiracy was furthered when on November 11, 1948, when

12 │ representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-

13 │ Manville headquarters:  Johns-Manville, American Brakeblok Division of American Brake and

14 │ Shoe Foundry (defendant PNEUMO ABEX), defendant GATKE CORPORATION, Keasbey &

15 │ Mattison Company (then an alter-ego to conspirator Turner & Newall (T&N)), Raybestos (now

16 │ Raymark), Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter

17 │ Company), Union Asbestos and Rubber Company, defendant USG and MET LIFE.  Defendant

18 │ U.S. GYPSUM did not send a company employee to the meeting, but instead authorized

19 │ Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on

20 │ its behalf.

21 │        (e)    At the November 11, 1948 meeting, these CONCERT OF ACTION

22 │ DEFENDANTS, and their representatives, decided to exert their influence to materially alter and

23 │ misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at

24 │ the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity

25 │ of asbestos in mice and also included an evaluation of the health effects of asbestos on humans

26 │ with a critical review of the then-existing standards for asbestos dust exposure.

27 │        (f)    At this meeting, these CONCERT OF ACTION DEFENDANTS

28 │ intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete

1 material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on
2 humans and the critique of the dust standards.  The CONCERT OF ACTION DEFENDANTS
3 then published these deceptive and fraudulent statements in the medical literature as edited by
4 Dr. Arthur Vorwald, also of the Saranac Laboratories.  These CONCERT OF ACTION
5 DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public,
6 in general, and the class of persons exposed to asbestos, including the plaintiff.

7         (g)    As a direct result of influence exerted by the CONCERT OF ACTION
8 DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial
9 Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that
10 stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS
11 wished stressed, but which omitted reference to human asbestosis and cancer, thereby
12 fraudulently and affirmatively misrepresenting the extent of the risks.  The CONCERT OF
13 ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and
14 fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

15         (h)    Such actions constitute a material affirmative misrepresentation of the
16 total context of material facts involved in Dr. Gardner's work and resulted in creating an
17 appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited
18 work indicated.

19         (i)    When Dr. Vorwald subsequently tried to publish more complete
20 information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION
21 DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to
22 publish or complete Gardner's work, and actively discouraged institutions of higher learning from
23 hiring or retaining Dr. Vorwald in any capacity.

24         (j)    The following CONCERT OF ACTION DEFENDANTS were members
25 of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-
26 Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos
27 Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National
28 Gypsum Company (now known as defendant ASBESTOS CLAIMS MANAGEMENT

1    CORPORATION), and Turner & Newell (T&N), individually and successor to defendant BELL

2    ASBESTOS MINES LTD. These conspirators, members of Q.A.M.A., participated in the above-

3    described misrepresentation of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald

4    in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in

5    this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A.,

6    as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48,

7    3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s

8    representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

9             (k)     As a furtherance of the conspiracy commenced in 1929, CONCERT OF

10   ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or

11   about 1950 to formulate a plan to influence public opinion about the relationship between

12   asbestos and cancer by influencing the medical literature on this subject and then touting and

13   disseminating this literature to the public and to organizations and legislative bodies responsible

14   for regulatory control of asbestos with the specific intent of misrepresenting the existing

15   scientific information and suppressing contrary scientific data in their possession and control.

16            (l)     This plan of misrepresentation and influence over the medical literature

17   began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac

18   Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary

19   report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship

20   might exist in experimental animals, these Q.A.M.A. members refused to further fund the study,

21   terminated the study, and prevented any public discussion of dissemination of the results.

22            (m)     As a result of the termination of Q.A.M.A./Saranac study, the CONCERT

23   OF ACTION DEFENDANTS fraudulently withheld information from the public and

24   affirmatively misrepresented to the public and responsible legislative and regulatory bodies that

25   asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF

26   ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith,

27   M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan

28   Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials,

1 │ Canadian government officials, U.S. National Cancer Institute, medical organizations, health
2 │ professionals, and the general public, including plaintiff.

3 │       (n)      Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS
4 │ contracted with the Industrial Hygienc Foundation and Dr. Daniel Braun to further study the
5 │ relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and
6 │ Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of
7 │ incurring lung cancer.

8 │       (o)      The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance
9 │ of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by
10 │ Braun and Truan in which the findings regarding increased incidence of cancer in persons with
11 │ asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of
12 │ Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the
13 │ incidence of lung cancer, a conclusion known by the conspirators to be false.

14 │       (p)      By falsifying and causing publication of studies concluding that asbestos
15 │ exposure did not cause lung cancer and simultaneously omitting documented findings that
16 │ asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS
17 │ affirmatively misrepresented to the public and concealed from the public the extent of risks
18 │ associated with inhalation of asbestos fibers.

19 │       (q)      In furtherance of the ongoing 1929 conspiracy, in approximately 1958,
20 │ these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited
21 │ works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the
22 │ public and persons exposed to asbestos that the inhalation of asbestos dust would not cause
23 │ cancer.

24 │       (r)      The fraudulent misrepresentations beginning in 1929 as elaborated above
25 │ and continuing with the publication of the 1958 Braun/Truan study influenced the standards set
26 │ for asbestos exposure. The developers of such standards failed to lower the maximum exposure
27 │ limits because a cancer risk, associated with asbestos inhalation, but had not been proven.
28 │ ///

1         (s)     In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF

2 ACTION DEFENDANTS decided, at their trade association meeting, that they would

3 intentionally mislead consumers about the extent of risks involved in inhalation of asbestos

4 products.

5         (t)     In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the

6 health effects of asbestos was held at the Saranac Laboratories. The following CONCERT OF

7 ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner &

8 Newall (T&N), Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their

9 agents, Cartier, Sabourin and LaChance.

10         (u)     At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis

11 in product users was discussed and the carcinogenic properties of all fiber types of asbestos was

12 also discussed. In an affirmative attempt to mislead the public about the extent of health risks

13 associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these

14 CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this

15 1952 Saranac Symposium and it was not published. In addition, the CONCERT OF ACTION

16 DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal

17 studies showing excess cancers in animals which thereby fraudulently misrepresented existing

18 secret data which could not be publicized owing to the secrecy provisions contained in the 1936

19 Saranac agreement heretofore described.

20         (v)     The following CONCERT OF ACTION DEFENDANTS were members

21 of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (now

22 Raymark), Johns-Manville, H.K. Porter, Keasbey & Mattison, individually and through its alter-

23 ego Turner & Newall (T&N) and National Gypsum (defendant ASBESTOS CLAIMS

24 MANAGEMENT CORPORATION), Uniroyal, Inc., individually and through its alter-egos,

25 CDU Holding Company, Uniroyal Holding Company and Uniroyal Goodrich Tire Company.

26         (w)     In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF

27 ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist

28 W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-

1    existing maximum exposure limits for asbestos exposure. These CONCERT OF ACTION

2    DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently

3    concealed material facts about asbestos exposure from the public and affirmatively

4    misrepresented to the public and class of persons exposed to asbestos that the then existing

5    maximum exposure limit for asbestos was acceptable. Thereafter, these CONCERT OF

6    ACTION DEFENDANTS withheld additional material information on the dust standards from

7    The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further

8    influencing evaluations of their Threshold Limit Values for asbestos exposure.

9           (x)    In furtherance of the forgoing conspiracy, in 1953, CONCERT OF

10   ACTION DEFENDANT National Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT

11   CORPORATION), through its agents, in response to an inquiry from the Indiana Division of

12   Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a

13   proposed response to that division indicating that respirators should be worn by applicators of the

14   products. National Gypsum's response distorted and fraudulently misrepresented the need for

15   applicators of asbestos spray products to wear respirators and fraudulently concealed from such

16   applicators the need for respirators and thereby misrepresented the risks associated with asbestos

17   exposure.

18          (y)    In furtherance of the forgoing conspiracy, in 1955, CONCERT OF

19   ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be

20   published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in

21   Asbestos Workers." This published study materially altered the results of an earlier study in

22   1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a

23   fraudulent and material misrepresentation about the extent of the risk associated with asbestos

24   inhalation.

25          (z)    In furtherance of the forgoing conspiracy, in 1955, the National Cancer

26   Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville,

27   individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT

28   OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal

1   studies concerning the relationship between asbestos exposure and cancer, when, in fact, the

2   CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed

3   studies, which demonstrated that positive evidence did exist.

4          (aa)   In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF

5   ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on

6   cancer and asbestos and this resulted in fraudulently concealing from the public material facts

7   regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-

8   existing knowledge about asbestos exposure and lung cancer.

9          (bb)   In furtherance of the forgoing conspiracy, in 1964, CONCERT OF

10   ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting

11   the association between lung cancer and asbestos exposure that had been recently published by

12   Dr. Irving J. Selikoff of the Mount Sinai Research Center. Thereafter, these members of the ATI

13   embarked upon a campaign to further misrepresent the association between asbestos exposure

14   and lung cancer.

15          (cc)   CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT

16   OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose

17   functions included involvement in research regarding the health effects of inhaling asbestos dust.

18          (dd)   Beginning in the early 1940's, the IHF was involved in a study by Hemeon

19   entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This

20   study was done in connection with members of the Asbestos Textile Institute (ATI). This study

21   found that workers exposed to less than the recommended maximum exposure level for asbestos

22   were nonetheless developing disease. As a part of the conspiracy, the IHF never published this

23   study.

24          (ee)   Beginning in the mid 1950's, the IHF and the Mellon Institute were

25   involved in the publication of works by Braun and Truan entitled An Epidemiological Study of

26   Lung Cancer in Asbestos Miners. In its original, unedited form in September, 1957, this study

27   had concluded that workers with asbestosis had an increased incidence of lung cancer and that

28   the Canadian government had been under-reporting cases of asbestosis. The final, published

1  version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered

2  an increased incidence of lung cancer and that the Canadian government had been under-

3  reporting asbestosis cases.  The IHF and the Mellon Institute conspired with the members of the

4  Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and

5  other CONCERT OF ACTION DEFENDANTS to delete the above-describe information

6  regarding asbestos and cancer.

7         (ff)    The above-described actions of the IHF and the Mellon Institute

8  constituted intentional deception and fraud in actively misleading the public about the extent of

9  the hazards connected with breathing asbestos dust.

10         (gg)    The above-described conspiratorial and fraudulent actions of the IHF and

11  the Mellon Institute substantially contributed to retarding the development of knowledge about

12  the hazards of asbestos and thereby substantially contributed to injuries suffered by the plaintiff.

13         (hh)    All CONCERT OF ACTION DEFENDANTS identified above, approved,

14  ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION

15  DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the

16  alleged co-conspirators during the date and circumstances set forth above, acted as agents, and

17  co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

18         (ii)    As evidence of Raymark's fraud, concealment, suppression, and

19  conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and

20  each of them, as herein set forth, Raymark's President and/or other senior executives

21  corresponded with other senior executives of Raymark's co-conspirators, which series of

22  correspondence and related documents and papers are commonly referenced as "The Sumner

23  Simpson Papers."

24         (jj)    Further as evidence of the fraud, concealment, suppression, and

25  conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

26  ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

27  resolutions, and related actions, recorded in "The ATI Minutes."

28  ///

1             (kk)    MET LIFE was an active participant in the foregoing conspiracy and

2    benefitted thereby.  MET LIFE benefitted from its involvement, because of the following non-

3    exclusive list:

4             (1)    by providing workers' compensation insurance to the CONCERT OF

5                  ACTION DEFENDANTS;

6             (2)    by providing life insurance for employees of the CONCERT OF ACTION

7                  DEFENDANTS;

8             (3)    by providing health insurance or health care for the employees of the

9                  CONCERT OF ACTION DEFENDANTS;

10            (4)    by providing health information and resources;

11            (5)    by purchasing substantial stock in asbestos-related companies, including

12                 stock of CONCERT OF ACTION DEFENDANTS; and

13            (6)    by developing information by which asbestos-related claims for

14                 compensation could be defeated.

15       77.    The foregoing conspiracy was furthered through the formation of the Friction

16   Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

17   Association, and the Clutch Facing and Brake Lining Standards Institute.  The members thereof

18   joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

19            (1)    The Friction Materials Standards Institute, and its predecessors, the Brake

20   Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were

21   formed to be the ears and mouthpiece of the friction materials industry.  The initial members of

22   the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF

23   ACTION DEFENDANTS ASBESTOS MANUFACTURING COMPANY, T&N, PLC. (through

24   its alter-ego Atlas Asbestos Company), BRASSBESTOS BRAKE LINING COMPANY, FIBRE

25   & METAL PRODUCTS COMPANY, GATKE CORPORATION, MAREMONT (through its

26   predecessor-in-interest Grizzly Manufacturing), H. KRASNE MANUFACTURING

27   COMPANY, LASCO BRAKE PRODUCTS, HONEYWELL, INC. (successor-in-interest to

28   ALLIEDSIGNAL INC. -- then known as Bendix Aviation Corporation), L. J. MILEY

1  COMPANY, Raymark (then known as Raybestos-Manhattan), RITESET MANUFACTURING

2  COMPANY, ROSSENDALE-RUBOIL COMPANY, Russell Manufacturing Company,

3  SCANDURA (then known as Scandinavian Belting Company), SOUTHERN FRICTION

4  MATERIALS COMPANY, U.S. SPRING & BUMPER COMPANY, PNEUMO ABEX (through

5  its predecessor-in-interest, S.K. Wellman Company) and LEAR-SIEGLER, INC. (aka

6  LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.) and BRIDGESTONE/FIRESTONE,

7  INC. (through their predecessor-in-interest World Bestos Corporation).  By 1973, the following

8  joined the Friction Materials Standards Institute: CONCERT OF ACTION DEFENDANTS

9  AUTO FRICTION CORPORATION, AUTO SPECIALTIES MANUFACTURING

10  COMPANY, CHRYSLER CORPORATION, EMSCO ASBESTOS COMPANY, FORCEE

11  MANUFACTURING CORPORATION, GENERAL MOTORS CORPORATION, H.K. Porter

12  Company (through its Thermoid division), Johns-Manville Corporation, LEAR-SIEGLER, INC.

13  (aka LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.) (through its predecessor-in-interest

14  Royal Industries), MOLDED INDUSTRIAL FRICTION CORPORATION, MORTON-

15  THIOKOL (through its predecessor-in-interest Thiokol Chemical Corporation), NATIONAL

16  TRANSPORT SUPPLY INC., PARKER-HANNIFIN CORPORATION (through its

17  predecessor-in-interest Pick Manufacturing Company), PNEUMO ABEX's American Brakeblok

18  division, SILVER LINE PRODUCTS INC., STANDCO INC., UNIVERSAL FRICTION

19  MATERIALS COMPANY, and WHEELING BRAKE BLOCK MANUFACTURING

20  COMPANY.  On information and belief, plaintiff alleges that the following manufacturers and/or

21  distributors of asbestos-containing automotive friction products joined with, ratified, and

22  furthered the conspiratorial actions of the above-identified conspirators, including the

23  conspirators who were members of the FMSI and its predecessors:  CONCERT OF ACTION

24  DEFENDANTS THE BUDD COMPANY, DANA CORPORATION, FORD MOTOR

25  COMPANY, GENERAL MOTORS CORPORATION, LEAR-SIEGLER, INC. (aka

26  LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.), MORTON-THIOKOL (now MORTON

27  INTERNATIONAL, INC. ), STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); and

28  BORG-WARNER.

(2)     Even though they disseminated materials and information to the contrary, The Friction Materials Standards Institute conspirators knew, and suppressed, that:

     (i)     OSHA regulations, even if enforced and complied with, would not prevent asbestos disease in workers exposed to their products;

     (ii)     chrysotile asbestos caused mesothelioma and other incurable disease;

     (iii)     brake workers suffered "considerable exposures" to respirable asbestos fibers during the intended use, installation, and expected replacement of friction materials;

     (iv)     there was no "safe" level of occupational exposure to respirable asbestos; and

     (v)     there was a substantial risk and danger suffered by bystanders and family members of brake mechanics, because of the release of respirable asbestos in the use of friction materials, as herein described.

(3)     Even though they knew of the substantial risks and dangers to those who would use or come into contact with their asbestos-containing products, CONCERT OF ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to delay for a period of years providing notification and adequate warning of the risks and dangers. CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle such products or their by-products in ways that enhanced the risks of dangerous asbestos exposure, but they conspired to give each other assistance and encouragement in failing to provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or ameliorate the risks and dangers.

78.     The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as described above, and each of them, constitute fraudulent concealment and/or fraudulent misrepresentation, which caused injury to the plaintiff, including, but not limited to, the following manner:

///

1           (a)     The material published or caused to be published by the CONCERT OF

2    ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION

3    DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of

4    asbestos and asbestos-related products.

5           (b)     The CONCERT OF ACTION DEFENDANTS, with intent to defraud,

6    individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION

7    DEFENDANTS, intended that the publication of false and misleading reports to the general

8    public and individuals therein, and/or the intentional suppression and nondisclosure of

9    documented reports of health hazards of asbestos:

10               (1)     maintain a favorable atmosphere for the continued sale and

11               distribution of asbestos and asbestos-related products;

12               (2)     assist in the continued pecuniary gain of CONCERT OF ACTION

13               DEFENDANTS, through the sale of their products;

14               (3)     influence in the CONCERT OF ACTION DEFENDANTS' favor

15               proposed legislation to regulate asbestos exposure and;

16               (4)     provide a defense in law suits brought for injury resulting from

17               asbestos disease.

18          (c)     The CONCERT OF ACTION DEFENDANTS, individually, as members

19   of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to

20   disclose information regarding the health hazards of asbestos within their knowledge and/or

21   control. The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached

22   this duty through their fraudulent concealment as described herein.

23          (d)     Plaintiff and others reasonably relied, both directly and indirectly, upon the

24   published medical and scientific data documenting the purported safety of asbestos and asbestos-

25   related products, and in the absence of published medical and scientific reports of the hazards of

26   asbestos continued exposure to asbestos.  Plaintiff believed asbestos to be safe and was unaware

27   of the hazards due to conspiratorial and fraudulent conduct.  Plaintiff was not warned of the

28   hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent

1   concealment. If plaintiff had known of the health hazards of asbestos, of which plaintiff was

2   unaware as a direct result of the conspirator's fraudulent concealment, plaintiff would have acted

3   differently regarding plaintiff's exposure to asbestos and asbestos-related products.

4         (e)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

5   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that

6   plaintiff rely on the deceptive and fraudulent reports that the conspiracy caused to be published

7   throughout the United States regarding the safety of asbestos and asbestos-related products and to

8   rely on the absence of published medical and scientific data (because of the CONCERT OF

9   ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related

10   products and  thereby caused plaintiff and others to continue their exposure to asbestos products.

11        (f)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

12   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a

13   position of superior knowledge regarding the health hazards of asbestos and therefore the

14   plaintiff reasonably relied, both directly and indirectly, on the published reports commissioned by

15   the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and the

16   absence of published information (because of the suppression by the CONCERT OF ACTION

17   DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

18        (g)    As a direct result of the continuing and on-going conduct of the

19   CONCERT OF ACTION DEFENDANTS, as alleged herein, the plaintiff contracted asbestos-

20   related disease and suffered injuries and incurred damages, which are described in greater detail

21   in the forgoing Paragraphs.

22      79.    MET LIFE acted in concert with the foregoing described parties (the CONCERT

23   OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to

24   cause injury to plaintiff.

25      80.    MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark),

26   defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-

27   Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was

28   coercive, fraudulent, and deceitful towards others (including plaintiff) and that CONCERT OF

1    ACTION DEFENDANTS' conduct was a breach of dut(y)(ies) owed plaintiff; and MET LIFE

2    gave substantial assistance and encouragement to Johns-Manville and the other CONCERT OF

3    ACTION DEFENDANTS in breaching their duties to plaintiff and others.

4        81.    . MET LIFE provided substantial assistance to the foregoing CONCERT OF

5    ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to

6    plaintiff.

7        82.    Plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a

8    fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy

9    which thereby caused plaintiff's asbestos-related injuries.

10       83.    The CONCERT OF ACTION DEFENDANTS made representations to plaintiff

11    and others concerning asbestos-containing products including but not limited to:

12            (a)      the statements set forth and summarized in the foregoing paragraphs

13            (b)      that asbestos in commercially used insulation products was not hazardous

14    (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

15            (c)      the amount of asbestos in the air necessary to cause disease was five

16    million particles per cubic foot (this statement was known to be false by the CONCERT OF

17    ACTION DEFENDANTS)

18            (d)      that asbestos does not cause cancer (this statement was known to be false

19    by the CONCERT OF ACTION DEFENDANTS);

20            (e)      in addition, the CONCERT OF ACTION DEFENDANTS actively and

21    fraudulently concealed facts from the plaintiff and others including, but not limited to:

22               (1)      that asbestos-related disease can be a fatal disease,

23               (2)      that asbestos causes various forms of lung cancer,

24               (3)      that individuals should protect themselves from breathing asbestos

25                    dust,

26               (4)      the extent of asbestos disease in exposed populations,

27               (5)      information regarding the levels of airborne asbestos that can cause

28                    disease,

        (6)    their experience with workers' compensation claims related to asbestos exposure,

        (7)    the statements set forth in foregoing paragraphs.

84.    Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing statements were false and that, by their acts, they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

85.    The asbestos-containing products that CONCERT OF ACTION DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

86.    Additionally and alternatively, as a direct result of MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

///

///

///

1

2

<u>FIFTH CAUSE OF ACTION</u>
(Fraud and Deceit/Negligent Misrepresentation)

3    AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

4 FRAUD AND DECEIT/NEGLIGENT MISREPRESENTATION, PLAINTIFF COMPLAINS

5 OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX

6 LLC (hereinafter "PNEUMO ABEX," and formerly known as PNEUMO ABEX

7 CORPORATION and ABEX CORPORATION and successor-in-interest to AMERICAN

8 BRAKEBLOCK CORPORATION), GARLOCK SEALING TECHNOLOGIES, LLC; GATKE

9 CORPORATION, and T&N, LTD. (formerly known as TURNER AND NEWALL and alter-ego

10 to KEASBY-MATTISON COMPANY), AMERICAN CONFERENCE OF GOVERNMENTAL

11 INDUSTRIAL HYGIENISTS, INC. (formerly known as NATIONAL CONFERENCE OF

12 GOVERNMENT INDUSTRIAL HYGIENISTS), UNDERWRITERS LABORATORIES, INC.,

13 DOES 472-480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter

14 FRAUD DEFENDANTS), AND ALLEGES AS FOLLOWS:

15    87.    Plaintiff incorporates herein by reference, as though fully set forth hereat each and

16 every allegation of the First, Second and Fourth Causes of Action as though fully set forth herein.

17    88.    Defendant UNDERWRITERS LABORATORIES, INC. conducted tests on

18 consumer products and approved, certified, endorsed, or otherwise sanctioned products for

19 safety, including asbestos containing products manufactured, designed, processed, marketed,

20 distributed, applied, and/or sold by defendants and/or conspirators, as hereinafter set forth.

21 Defendant UNDERWRITERS LABORATORIES, INC. required, or otherwise recommended or

22 sanctioned, that asbestos be used in some products. Said acts or omissions were negligent.

23 Defendant UNDERWRITERS LABORATORIES, INC. was a link in the chain of product

24 distribution. Defendant UNDERWRITERS LABORATORIES, INC. knew or should have

25 known of the dangerous propensities of asbestos and asbestos-containing products, and did

26 nothing to warn consumers of these hazards, and in fact, suppressed, minimized, understated,

27 denied, and otherwise purposefully corrupted the evidence of said hazards in its certification and

28 underwriting of product's safety, all the while knowing the importance consumers placed on

1   UNDERWRITERS LABORATORIES, INC. approval.  Defendant UNDERWRITERS

2   LABORATORIES, INC. allowed its certification label to be affixed to products, thereby

3   representing to the general public, including plaintiff herein, that said products were safe for

4   intended use, when in fact said products were not safe.

5        89.    Defendant AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

6   HYGIENISTS, INC. (ACGIH) sets guidelines for occupational health called Threshold Limit

7   Values (TLVs).  These guidelines are relied on by OSHA (the Occupational Safety and Health

8   Administration) in the United States and similar agencies around the world.  Criticisms of the

9   guide-line setting process have pointed to problems with data collection, inadequate research,

10  overwhelming dependence on data supplied by financially interested corporations, and slow

11  response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was

12  negligent in their failure to analyze or critically evaluate previously published literature, or

13  review and incorporate current literature, failure to adequately assess the financially motivated

14  scientific data provided by asbestos corporations, their insurers, and medical consultants, and

15  their limited review process, including but not limited to the following representative list:

16        (a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL

17  HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of

18  proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric

19  Concentrations, for various hazardous atmospheric substances, including asbestos.  In the

20  minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the

21  MPC's were "not to be construed as recommended safe concentrations."  In 1946, the NCGIH

22  was renamed the AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

23  HYGIENISTS, INC. (ACGIH), and despite the internally acknowledged inadequacy of the

24  asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented,

25  and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based

26  on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

27        (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,

28  fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily

function, either immediate or after years of exposure." In 1948, they changed the name of the guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted definition, describing the guideline as both an "average" and a "maximum." Despite their failure to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing the definition of the TLV, the ACGIH never performed any studies to test the scientific validity of the 5 mppcf TLV guideline.

(c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2 mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf, never intending said numeric figure to be the actual recommended guideline. Despite internally acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

(d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH ignored the carcinogenic dangers of asbestos until 1974.

90. The acts of the FRAUD DEFENDANTS, as incorporated herein and described above, constitute fraudulent negligent misrepresentation, which caused injury to the plaintiff, in the following manner:

(a)     The material published or caused to be published by the FRAUD DEFENDANTS was false, untrue, and incomplete in that the FRAUD DEFENDANTS knowingly, deliberately, and with intent to deceive made representations, product sales, and assertions regarding the safety of asbestos and asbestos-related products.

(b)     The FRAUD DEFENDANTS made these false and incomplete representations without any reasonable grounds for believing and/or relying on their truth and with the intent to induce the general consuming public and individuals therein, including plaintiff, and others' direct and indirect reliance on these false, untrue, and incomplete representations.

(c)     Plaintiff and others reasonably, justifiably, and without knowledge of the falsity of the FRAUD DEFENDANTS' misrepresentations, relied, both directly and indirectly,

1  upon published data documenting the purported safety of asbestos and asbestos-related products

2  and in the absence of published information of the hazards of asbestos and cautionary warning

3  language on or with said conspirators' product, all resulting in continued injurious exposure to

4  asbestos.  Plaintiff was unaware of the hazards due to the FRAUD DEFENDANTS' conduct.

5  WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

6  ENTITIES, and each of them, as hereinafter set forth.

7

**SIXTH CAUSE OF ACTION**
(Fraud and Deceit/Concealment)

8

9  AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

10  FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF DEFENDANTS

11  METROPOLITAN LIFE INSURANCE COMPANY, GARLOCK SEALING

12  TECHNOLOGIES, LLC; GATKE CORPORATION, PNEUMO ABEX LLC (hereinafter

13  "PNEUMO ABEX," and formerly known as PNEUMO ABEX CORPORATION and ABEX

14  CORPORATION and successor-in-interest to AMERICAN BRAKEBLOK CORPORATION),

15  AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC.,

16  DOES 472-480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter

17  FRAUD DEFENDANTS), AND ALLEGES AS FOLLOWS:

18  91.  Plaintiff incorporates herein by reference, as though fully set forth hereat, each

19  and every allegation of the First, Second, Fourth and Fifth Causes of Action as though fully set

20  forth herein.

21  92.  The term FRAUD DEFENDANTS as used herein includes but is not limited to:

22  METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville,

23  Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum

24  Company [USG]), American Brakeblok Corporation (now PNEUMO ABEX LLC [PNEUMO

25  ABEX]), Keasbey-Mattison Company (now T&N, LTD. [T&N]), all members of the Asbestos

26  Textile Institute [ATI], AMERICAN CONFERENCE OF INDUSTRIAL HYGIENISTS, INC.,

27  and the other entities and individuals identified in this Cause of Action.

28  ///

93.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of Los Angeles, State of California.

94.     FRAUD DEFENDANT AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC. (ACGIH) sets guidelines for occupational health called Threshold Limit Values (TLVs).  These guidelines are relied on by OSHA (the Occupational Safety and Health Administration) in the United States and similar agencies around the world. Criticisms of the guide-line setting process have pointed to problems with data collection, inadequate research, overwhelming dependence on data supplied by financially interested corporations, and slow response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was negligent in their failure to analyze or critically evaluate previously published literature, or review and incorporate current literature, failure to adequately assess the financially motivated scientific data provided by asbestos corporations, their insurers, and medical consultants, and their limited review process, including but not limited to the following representative list:

(a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric Concentrations, for various hazardous atmospheric substances, including asbestos.  In the minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the MPC's were "not to be construed as recommended safe concentrations."  In 1946, the NCGIH was renamed the AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC. (ACGIH), and despite the internally acknowledged inadequacy of the asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented, ///

1  and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based

2  on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

3  (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,

4  fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily

5  function, either immediate or after years of exposure." In 1948, they changed the name of the

6  guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the

7  guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted

8  definition, describing the guideline as both an "average" and a "maximum." Despite their failure

9  to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of

10  the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing

11  the definition of the TLV, the ACGIH never performed any studies to test the scientific validity

12  of the 5 mppcf TLV guideline.

13  (c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2

14  mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf,

15  never intending said numeric figure to be the actual recommended guideline. Despite internally

16  acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

17  (d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH

18  ignored the carcinogenic dangers of asbestos until 1974.

19  95.   Plaintiff was exposed to asbestos-containing dust created by the use of the

20  asbestos products manufactured, distributed and/or supplied by one or more of the

21  FRAUD DEFENDANTS. The exposure to the asbestos or asbestos-related products supplied by

22  the FRAUD DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

23  96.   Plaintiff incorporates herein by reference, as though fully set forth hereat, each

24  and every paragraph of the Fourth Cause of Action, which describes the allegations against, and

25  actions of the CONSPIRACY DEFENDANTS.

26  97.   Further, the FRAUD DEFENDANTS knew that their foregoing statements were

27  false and that by their acts they were actively and fraudulently concealing adverse information

28  regarding the health affects of asbestos including the facts set forth above; the FRAUD

1  DEFENDANTS made the false statements and concealed the information with the intent to

2  deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements

3  and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing

4  asbestos-related injuries and damages as more fully set forth herein.

5       98.    The asbestos-containing products that FRAUD DEFENDANTS manufactured,

6  marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to

7  asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries

8  as more fully set forth in the foregoing paragraphs.

9       99.    Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET

10  LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of

11  asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the

12  true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself

13  whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity

14  to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

15       WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

16  ENTITIES, and each of them, as hereinafter set forth.

17  SEVENTH CAUSE OF ACTION<br>(Fraud and Deceit/Intentional Misrepresentation)

18

19       AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF

20  ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFF

21  COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY,

22  DOES 740-750, THEIR ALTERNATE ENTITIES AND EACH OF THEM (hereinafter

23  INTENTIONAL MISREPRESENTATION DEFENDANTS), AND ALLEGES AS FOLLOWS:

24       100.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each

25  and every allegation of the First, Second, Fourth through Sixth Causes of Action as though fully

26  set forth herein.

27       101.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

28  mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corpor-

1 ations organized and existing under and by virtue of the laws of the State of California, or the

2 laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do

3 and/or were and are doing business in the State of California, and that said defendants regularly

4 conducted and/or conducts business in the County of Los Angeles, State of California.

5      102.   Plaintiff incorporates herein by reference, as though fully set forth hereat, each

6 and every paragraph of the Fourth Cause of Action that describes the allegations against, and

7 actions of the CONSPIRACY DEFENDANT MET LIFE.

8      103.   Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew

9 that their foregoing statements were false and that by their acts they were actively and

10 fraudulently concealing adverse information regarding the health affects of asbestos including the

11 facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the

12 false statements and misrepresented the information with the intent to deceive; plaintiff and

13 others relied both directly and indirectly on the foregoing false statements and their lack of

14 knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-

15 related injuries and damages as more fully set forth herein.

16      104.   The asbestos-containing products that INTENTIONAL MISREPRESENTATION

17 DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were

18 defective; plaintiff was exposed to asbestos from the INTENTIONAL MISREPRESENTATION

19 DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in

20 the foregoing paragraphs.

21      105.   Additionally and alternatively, as a direct result of INTENTIONAL

22 MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, plaintiff was

23 caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents,

24 employers and the general public to be aware of the true and full dangers of asbestos, deprive

25 plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being

26 exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of

27 asbestos and caused plaintiff's damages herein.

28 ///

1   WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

2   ENTITIES, and each of them, as hereinafter set forth.

3   ### EIGHTH CAUSE OF ACTION
    Aiding and Abetting Battery
4   [Against Metropolitan Life Insurance Company
    and Does 750-790, Inclusive]

5

6   AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF

7   ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFF COMPLAINS OF

8   DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 750-790, THEIR

9   ALTERNATE ENTITIES AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

10  106.   Plaintiff incorporates herein by reference, as though fully set forth hereat, each

11  and every allegation of the First, Second, Fourth through Sixth Causes of Action as though fully

12  set forth herein.

13  107.   This cause of action is for the aiding and abetting of battery by METROPOLITAN

14  LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director

15  Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

16  108.   Plaintiff is informed and believes, and thereon alleges, that at all times herein

17  mentioned defendant MET LIFE was and is a corporation organized and existing under and by

18  virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction,

19  and that this defendant was and is authorized to do and/or was and is doing business in the State

20  of California, and regularly conducted or conducts business in the County of Los Angeles, State

21  of California.  At times relevant to this cause of action, MET LIFE was an insurer of J-M.

22  109.   Plaintiff, was exposed to asbestos-containing dust created by the use of the

23  asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the

24  asbestos or asbestos-related products supplied by J-M caused Plaintiff's asbestos-related disease

25  and injuries.

26  110.   Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-

27  related disease in Canadian mines and mills, including those of J-M.  Those studies revealed that

28  miners and mill workers were contracting asbestosis at relatively low levels of dust.  McGill

1    University, which conducted the studies, sought permission from MET LIFE to publish the

2    results but they were never published. MET LIFE prepared its own report of these studies.

3        111.    Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S.

4    plants manufacturing asbestos-containing products, including a J-M plant. Those studies showed

5    that workers in substantial numbers were contracting asbestosis, at levels less than what became

6    the Threshold Limit Value ('TLV") of 5mppcf. The MET LIFE report was never published or

7    disseminated except to plant owners, including J-M.

8        112.    In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville,

9    New Jersey. Results were consistent with those of the Canadian and previous U.S. plant studies.

10   They were never published.

11       113.    In 1934, J-M and others whose plants MET LIFE had studied agreed with MET

12   LIFE that it should issue a report of its studies.

13       114.    MET LIFE submitted a draft of its report to J-M. J-M requested, for legal and

14   business reasons, that certain critical parts of the draft be changed. MET LIFE's official in

15   charge was Lanza. MET LIFE through Lanza did make changes that J-M requested, including:

16       (a)    Deletion of MET LIFE's conclusion that the permissible dust level for asbestos

17              should be less than that for silica;

18       (b)    Addition of the phrase that asbestosis clinically appeared to be milder than

19              silicosis.

20   The report, thus altered, was published in 1935. It was misleading, and intentionally so, because

21   it conveyed the incorrect propositions that asbestosis was a less serious disease process than

22   silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases

23   than was the case for silica dust.

24       115.    MET LIFE had a close relationship with J-M. It invested money in J-M. It

25   provided group health and life insurance to J-M. MET LIFE IN 1934 agreed to supply industrial

26   hygiene services to J-M, including dust counts, training employees to monitor dust levels,

27   examining employees, and recommending protective equipment. MET LIFE and Lanza were

28   viewed as experts on industrial dusts.

116.   In 1933, MET LIFE through Lanza issued the following advice to J-M:

(a)   Disagreeing with the recommendation of a J-M plant physician, MET LIFE advised against warning workers of the fact that asbestos dust is hazardous to their health, basing its advice in view of the extraordinary legal situation;

(b)   When the plant physician judged the best disposition of an employee with asbestosis was to remove him from the dust, MET LIFE advised instead that disposition should depend on his age, nature of work and other factors and to leave him alone if he is old and showing no disability, for, MET LIFE stated, economic and production factors must be balanced against medical factors.

117.   J-M followed the MET LIFE advices and did not warn its workers, including plaintiff, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying workers of their disease.

118.   In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation ("AHF"). One of the AHF purposes was to develop standards for dust levels that would serve as a defense in lawsuits and workers' compensation claims.

119.   MET LIFE funded partially another study that tentatively recommended in 1938 a TLV for asbestos dust of 5mpccf, the same as for silica dust. MET LIFE was aware of data from its own, unpublished reports that showed that level was too high for asbestos dust. MET LIFE nonetheless promoted that TLV as proper.

120.   In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant. That report showed that workers exposed to less than the recommended maximum levels of dust were developing disease. MET LIFE was a member of the IHF and Lanza was on its medical committee. The Hemeon report, which was supplied to J-M and other owners, never was published.

121.   In 1936, J-M and other asbestos companies agreed with a leading medical research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M and the others retained control over publication of the results. In 1943 Saranac's Dr. Leroy

1   Gardner, in charge of the research, sent a draft to J-M that revealed that 81.8% of mice exposed
2   to long fiber asbestos contracted cancer.

3       122.   Dr. Gardner died in 1946. J-M and other companies wanted parts of the Saranac
4   results published and enlisted the assistance of MET LIFE's Lanza. J-M and other companies
5   decided that Saranac's findings of cancer caused by asbestos in mice must be deleted, as well as
6   Saranac's critique of existing dust standards. Lanza directed Saranac to delete the offending
7   materials. Saranac did so, and the altered report was published in 1951 by Saranac's Dr.
8   Vorwald, in the *AMA Archives of Industrial Hygiene*.

9       123.   Lanza left MET LIFE at the end of 1948, and took a position at New York
10   University, funded by MET LIFE. He continued to misrepresent that asbestos does not cause
11   cancer into the 1950s.

12       124.   The IHF (formerly AHF), of which MET LIFE was a member and MET LIFE
13   official was on its medical committee, through Drs. Braun and Truan conducted a study of
14   Canadian miners. The original report, in 1957, found an increased incidence of lung cancer in
15   persons exposed to asbestos. The sponsors, including J-M, caused those findings to be stricken,
16   and the report published in 1958 contained the false conclusion that asbestos exposure alone did
17   not increase the risk of lung cancer.

18       125.   The false and misleading reports that a link between asbestos exposure and cancer
19   was not proven influenced the TLV, for if a substance causes cancer the TLV must be very low
20   or zero.

21       126.   J-M not later than 1933 was inflicting asbestos dust on its workers in its plants
22   knowing that the dust was hazardous and was causing workers to contract disease that could and
23   would disable and kill them. As MET LIFE advised, J-M did not warn its workers of the hazard.
24   J-M committed battery on workers in its plants, including plaintiff, by that conduct.

25       127.   MET LIFE knew that J-M's conduct constituted a breach of its duties to its
26   workers. MET LIFE gave substantial assistance to J-M in committing batteries on its workers,
27   including plaintiff, through MET LIFE's conduct described above, including by:
28   ///

(a)    Affirmatively urging J-M not to warn workers of the hazards of asbestos dust, in view of the extraordinary legal situation, such that J-M did not warn its workers, including plaintiff;

(b)    Deleting the findings of its own draft report that the allowable limits for asbestos dust should be less than those for silica dust, and promoting a false and unsafe TLV which specified maximum levels of silica dust, and promoting a false and unsafe TLV which specified maximum levels of dust for workers, including plaintiff, which MET LIFE knew was wrong through its own studies;

(c)    Advising J-M to keep certain workers continuing to work at dusty areas in the plant even after J-M was aware that their lungs showed asbestos-induced changes, lest other workers including plaintiff be alerted to the dangers of working in the dust.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as follows:

Plaintiff ROBERT McNAUGHTON:

1.    For plaintiff's general damages according to proof;

2.    For plaintiff's loss of income, wages and earning potential according to proof;

3.    For plaintiff's medical and related expenses according to proof;

4.    For plaintiff's cost of suit herein;

5.    For exemplary or punitive damages according to proof;

6.    For damages for fraud according to proof; and

7.    For such other and further relief as the court may deem just and proper, including costs and pre-judgment interest as provided in C.C.P. § 998, C.C.P. § 1032, and related provisions of law.

Dated: 9/9/10

BRAYTON❖PURCELL LLP

By: _____
David R. Donadio
Attorneys for Plaintiff

## EXHIBIT A

Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations both inside and outside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| US Air Force | US Air Force, Moody AFB, Georgia (FKA US Air Force, Valdosta AFB, GA) | Aircraft Mechanic | 1957-1960 |
| Trans World Airlines Inc., Los Angeles, CA | Los Angeles International Airport, Los Angeles, CA, Trans World Airlines hangar | Aircraft Mechanic | 2/1962-1980 |
| Trans World Airlines Inc., Los Angeles, CA | Saudi Arabian Airlines, Jeddah, Saudi Arabia | Aircraft Mechanic (Supervisor) | 1/1965-7/1970 |

NON-OCCUPATIONAL EXPOSURE:

Friction:
Plaintiff removed and replaced the brakes on his personal vehicles at least 11 times prior to 1990 using an air hose to blow dust out of the brake assembly and related areas. Plaintiff removed and replaced the original manufacturers' brakes on the following vehicles that plaintiff purchased new: a 1970 FORD (FORD MOTOR COMPANY) station wagon, a 1977 FORD (FORD MOTOR COMPANY) van, and a 1984 TOYOTA pickup (TOYOTA MOTOR SALES U.S.A., INC.) pickup truck. Plaintiff purchased his replacement brakes at ACME AUTO PARTS, Fountain Valley, California.

EXHIBIT A

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1

## EXHIBIT B

2

3          Plaintiff's exposure to asbestos and asbestos-containing products caused severe and

4 permanent injury to the plaintiff, including, but not limited to breathing difficulties and/or other

5 lung damage.  Plaintiff was diagnosed with asbestos-related pleural disease on or about

6 December 2009.

7          Plaintiff retired from his last place of employment at regular retirement age.  He has

8 therefore suffered no disability from his asbestos-related disease as "disability" is defined in

9 California Code of Civil Procedure § 340.2.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                                        EXHIBIT B