NON-COMPLIANCE

# U.S. District Court
## Southern District of California (San Diego)
### CIVIL DOCKET FOR CASE #: 3:11-cv-00284-MMA -POR

Cropper et al v. Ford Motor Company et al
Assigned to: Judge Michael M. Anello
Referred to: Magistrate Judge Louisa S Porter
Cause: 28:1332 Diversity-Account Receivable

Date Filed: 02/10/2011
Jury Demand: Defendant
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Diversity

**Plaintiff**

**Barry Cropper**                          represented by  **David R Donadio**
                                                           Brayton and Purcell
                                                           222 Rush Landing Road
                                                           Novato, CA 94945-2469
                                                           (415)898-1555
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dorothy Cropper**                        represented by  **David R Donadio**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ford Motor Company**

**Defendant**

**Union Carbide Corporation**

**Defendant**

**Rockwell Automation, Inc.**              represented by  **Anthony D Brosamle**
                                                           Tucker Ellis & West LLP
                                                           515 South Flower Street
                                                           42nd Floor
                                                           Los Angeles, CA 90071
                                                           (213)430-3400
                                                           Fax: (213)430-3409
                                                           Email:
                                                           anthony.brosamle@tuckerellis.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Metropolitan Life Insurance Company**

**Defendant**

**Mercedes-Benz USA, LLC**

**Defendant**

**Ferrari North America, Inc.**

**Defendant**

**DOES**
*1 through 800, inclusive*

**Defendant**

**Escondido Motors LTD**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2011 | 1 | NOTICE OF REMOVAL with Jury Demand from Superior Court of California, County of San Diego, case number 37-2010-0008374-CU-AS-CTL. (Filing fee $350 receipt number 23030.) Filed by Rockwell Automation, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 State Court Answer, # 6 Certificate of Service)<br><br>The new case number is 3:11-cv-284-MMA-POR. Judge Michael M. Anello and Magistrate Judge Louisa S Porter are assigned to the case. (Brosamle, Anthony)(jmd) (cap). (Entered: 02/11/2011) |
| 02/10/2011 | | ANSWER to Complaint (Notice of Removal) by Rockwell Automation, Inc. (jmd) (cap). (Entered: 02/11/2011) |
| 02/10/2011 | 2 | NOTICE of Non-Compliance with Local Rule 5.4(a) Mandatory Electronic Filing re 1 Notice of Removal. (jmd) (cap). (Entered: 02/11/2011) |
| 02/10/2011 | 3 | NOTICE of Party With Financial Interest by Rockwell Automation, Inc. (jmd) (cap). (Entered: 02/11/2011) |
| 02/10/2011 | 4 | NOTICE of Tag-Along Action by Rockwell Automation, Inc. (jmd) (cap). (Entered: 02/11/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/14/2011 15:59:43 | | |
| **PACER Login:** | te0445 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:11-cv-00284-MMA-POR |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

1  ALAN R. BRAYTON, ESQ., S.B. #73685
   DAVID R. DONADIO, ESQ., S.B. #154436
2  BRAYTON✦PURCELL LLP
   Attorneys at Law
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, California  94948-6169
   (415) 898-1555
5

6  Attorneys for Plaintiffs

7

8            SUPERIOR COURT OF CALIFORNIA

9             COUNTY OF SAN DIEGO

10

11  BARRIE CROPPER and        )  ASBESTOS
    DOROTHY CROPPER,       )  No.37-2010-00088374-CU-AS-CTL
12                        )
            Plaintiffs,   )  COMPLAINT FOR PERSONAL INJURY
13                        )  AND LOSS OF CONSORTIUM -
    vs.                     )  ASBESTOS
14                        )
    FORD MOTOR COMPANY;    )
15  UNION CARBIDE CORPORATION;  )
    ROCKWELL AUTOMATION, INC.;  )
16  METROPOLITAN LIFE INSURANCE )
      COMPANY;               )  Honorable _____
17  MERCEDES-BENZ USA, LLC;   )  Department _____
    ESCONDIDO MOTORS LTD.;    )
18  FERRARI NORTH AMERICA, INC.; )
    and DOES 1 through 800, inclusive, )
19                        )
           Defendants.   )
20                        )

21

22                FIRST CAUSE OF ACTION
                    (Negligence)
23

24     PLAINTIFF BARRIE CROPPER COMPLAINS OF DEFENDANTS HEREINBELOW

25  NAMED IN PARAGRAPH 3, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM,

26  AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

27        1.      The true names and capacities, whether individual, corporate, associate,

28  governmental or otherwise, of defendants DOES 1 through 500, inclusive, are unknown to

                                              1
  COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  plaintiff at this time, who therefore sues said defendants by such fictitious names.  When the true

2  names and capacities of said defendants have been ascertained, plaintiff will amend this

3  complaint accordingly.  Plaintiff is informed and believes, and thereon alleges, that each

4  defendant designated herein as a DOE is responsible, negligently or in some other actionable

5  manner, for the events and happenings hereinafter referred to, and caused injuries and damages

6  proximately thereby to the plaintiff, as hereinafter alleged.

7       2.     At all times herein mentioned, each of the defendants was the agent, servant,

8  employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

9  defendant was acting in the full course and scope of said agency, service, employment and/or

10  joint venture.

11       3.     Plaintiff is informed and believes, and thereon alleges that at all times herein

12  mentioned, defendants:  FORD MOTOR COMPANY; UNION CARBIDE CORPORATION; ROCKWELL

13  AUTOMATION, INC.; METROPOLITAN LIFE INSURANCE COMPANY; MERCEDES-BENZ USA, LLC;

14  ESCONDIDO MOTORS LTD.; FERRARI NORTH AMERICA, INC.; and DOES 1 through 300, inclusive,

15  were individuals, or corporations, partnerships and/or unincorporated associations organized and

16  existing under and by virtue of the laws of the State of California, or the laws of some other state

17  or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do

18  and are doing business in the State of California, and that said defendants have regularly

19  conducted business in the County of San Diego, State of California.

20       4.     At all times herein mentioned, each of the named defendants and DOES 1 through

21  300 was the successor, successor in business, successor in product line or a portion thereof,

22  assign, predecessor, predecessor in business, predecessor in product line or a portion thereof,

23  parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in

24  an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling,

25  assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting,

26  servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding,

27  manufacturing for others, packaging and advertising a certain substance, the generic name of

28  which is asbestos and other products containing said substance.  Said entities shall hereinafter

K:\Asbestos\A13117\PLD\comp-cplMtz.wpd

2

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  collectively be called "alternate entities." Each of the herein named defendants is liable for the
2  tortious conduct of each successor, successor in business, successor in product line or a portion
3  thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or
4  partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded,
5  that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled,
6  distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed,
7  contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others and
8  advertised a certain substance, the generic name of which is asbestos and other products
9  containing said substance. The following defendants, and each of them, are liable for the acts of
10 each and every "alternate entity," and each of them, in that there has been a virtual destruction of
11 plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have
12 acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such
13 "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy
14 against each such "alternate entity"; each such defendant has the ability to assume the risk-
15 spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill
16 originally attached to each such "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| FORD MOTOR COMPANY | BRITISH LEYLAND MOTORS, INC.<br>BRITISH MOTOR CORPORATION<br>JAGUAR CARS, INC.<br>TRIUMPH<br>LINCOLN CONTINENTAL<br>AUSTIN HEALEY |
| UNION CARBIDE CORPORATION | UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC.<br>UNION CARBIDE AND CARBON PRODUCTS<br>LINDE AIR PRODUCTS COMPANY |
| ROCKWELL AUTOMATION, INC. | ROCKWELL SPRING AND AXLE COMPANY<br>TIMKEN-DETROIT AXLE COMPANY (THE)<br>TIMKEN SILENT AUTOMATIC DIVISION<br>ALLEN-BRADLEY COMPANY, LLC.<br>ONEIDA ROSTONE CORPORATION<br>ROSTONE CORPORATION |
| MERCEDES-BENZ USA, LLC | MERCEDES-BENZ OF NORTH AMERICA, INC. |

3
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

5.    At all times herein mentioned, defendants, their "alternate entities," and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain substance, the generic name of which is asbestos and other products containing said substance.

6.    At all times herein mentioned, defendants, their "alternate entities" and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain substance, the generic name of which is asbestos and other products containing said substance, in that said substance proximately caused personal injuries to users, consumers, workers, bystanders and others, including the plaintiff herein (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by "exposed persons."

7.    Defendants, their "alternate entities," and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

8.    Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne
///

4
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   asbestos fibers, and that through such foreseeable use and/or handling "exposed persons,"

2   including plaintiff herein, would use or be in proximity to and exposed to said asbestos fibers.

3        9.   Defendants, their "alternate entities" and each of them, knew, or should have

4   known, and intended that the aforementioned asbestos and asbestos-containing products would

5   be used or handled as specified in Exhibit "A," which is attached hereto and incorporated by

6   reference herein, resulting in the release of airborne asbestos fibers, and that through such

7   foreseeable use and/or handling "exposed persons," including plaintiff herein, would be in

8   proximity to and exposed to said asbestos fibers.

9        10.   Plaintiff BARRIE CROPPER has used, handled or been otherwise exposed to

10   asbestos and asbestos-containing products referred to herein in a manner that was reasonably

11   foreseeable.  Plaintiff's exposure to asbestos and asbestos-containing products occurred at various

12   locations as set forth in Exhibit "A," which is attached hereto and incorporated by reference

13   herein.

14        11.   As a direct and proximate result of the conduct of the defendants, their "alternate

15   entities," and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing

16   products caused severe and permanent injury to the plaintiff, the nature of which, along with the

17   date of plaintiff's diagnosis, are set forth in Exhibit "B," which is attached hereto and

18   incorporated by reference herein.

19        12.   Plaintiff is informed and believes, and thereon alleges, that progressive lung

20   disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without

21   perceptible trauma and that said disease results from exposure to asbestos and asbestos-

22   containing products over a period of time.

23        13.   Plaintiff BARRIE CROPPER suffers from a condition related to exposure to

24   asbestos and asbestos-containing products.  Plaintiff was not aware at the time of exposure that

25   asbestos or asbestos-containing products presented any risk of injury and/or disease.

26        14.   As a direct and proximate result of the aforesaid conduct of defendants, their

27   "alternate entities," and each of them, plaintiff has suffered, and continues to suffer, permanent

28   injuries and/or future increased risk of injuries to his person, body and health, including, but not

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  limited to, asbestosis, other lung damage, and cancer, and the mental and emotional distress

2  attendant thereto, from the effect of exposure to asbestos fibers, all to his general damage in the

3  sum in excess of the jurisdictional limits of the Municipal Court.

4       15.    As a direct and proximate result of the aforesaid conduct of the defendants, their

5  "alternate entities," and each of them, plaintiff has incurred, is presently incurring, and will incur

6  in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, X-rays

7  and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this

8  time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost

9  thereof is ascertained.

10       16.    As a further direct and proximate result of the said conduct of the defendants,

11  their "alternate entities," and each of them, plaintiff has incurred, and will incur, loss of income,

12  wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses,

13  the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend

14  this complaint to conform to proof at the time of trial.

15       17.    Defendants, their "alternate entities," and each of them, and their officers,

16  directors and managing agents participated in, authorized, expressly and impliedly ratified, and

17  had full knowledge of, or should have known of, each of the acts set forth herein.

18       18.    Defendants, their "alternate entities," and each of them, are liable for the

19  fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each

20  defendant's officers, directors and managing agents participated in, authorized, expressly and

21  impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their

22  "alternate entities" as set forth herein.

23       19.    The herein-described conduct of said defendants, their "alternate entities," and

24  each of them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard

25  and indifference to the safety and health of "exposed persons." Plaintiff, for the sake of example

26  and by way of punishing said defendants, seeks punitive damages according to proof.

27       WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities,"

28  and each of them, as hereinafter set forth.

K:\Injuries\01\11\117\PLD\comp-clpMct.wpd
                                      6
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

## SECOND CAUSE OF ACTION
### (Products Liability)

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFF BARRIE CROPPER COMPLAINS OF DEFENDANTS NAMED IN PARAGRAPH 3 HEREINABOVE, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

20.  Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations contained in Paragraphs 1 through 5 and 8 through 16 of the First Cause of Action herein.

21.  Defendants, their "alternate entities," and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

22.  Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, their "alternate entities," and each of them.  Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons," including plaintiff herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

23.  "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons." Said defendants, their "alternate entities," and each of them, further failed to adequately warn of the risks to which plaintiff and others similarly situated were exposed.

24.  In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos

1   and asbestos-containing products, defendants, their "alternate entities," and each of them, did so

2   with conscious disregard for the safety of "exposed persons" who came in contact with said

3   asbestos and asbestos-containing products, in that said defendants, their "alternate entities," and

4   each of them, had prior knowledge that there was a substantial risk of injury or death resulting

5   from exposure to asbestos or asbestos- containing products, including, but not limited to,

6   asbestosis, other lung disabilities and cancer.  Said knowledge was obtained, in part, from

7   scientific studies performed by, at the request of, or with the assistance of, said defendants, their

8   "alternate entities," and each of them, and which knowledge was obtained by said defendants,

9   their "alternate entities," and each of them on or before 1930, and thereafter.

10        25.    On or before 1930, and thereafter, said defendants, their "alternate entities" and

11   each of them, were aware that members of the general public and other "exposed persons," who

12   would come in contact with their asbestos and asbestos-containing products, had no knowledge

13   or information indicating that asbestos or asbestos-containing products could cause injury, and

14   said defendants, their "alternate entities," and each of them, knew that members of the general

15   public and other "exposed persons," who came in contact with asbestos and asbestos-containing

16   products, would assume, and in fact did assume, that exposure to asbestos and asbestos-

17   containing products was safe, when in fact said exposure was extremely hazardous to health and

18   human life.

19        26.    With said knowledge, said defendants, their "alternate entities," and each of them,

20   opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy,

21   offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market,

22   warrant, rebrand, manufacture for others, package and advertise said asbestos and asbestos-

23   containing products without attempting to protect "exposed persons" from or warn "exposed

24   persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-

25   containing products.  Rather than attempting to protect "exposed persons" from, or warn

26   "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

27   asbestos-containing products, defendants, their "alternate entities," and each of them,

28   intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed

K:\Injuries\111311\PLDng\cplMsc.wpd

8

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   and suppressed said knowledge from "exposed persons" and members of the general public, thus

2   impliedly representing to "exposed persons" and members of the general public that asbestos and

3   asbestos-containing products were safe for all reasonably foreseeable uses.  Defendants, their

4   "alternate entities," and each of them, engaged in this conduct and made these implied

5   representations with the knowledge of the falsity of said implied representations.

6         27.    The above-referenced conduct of said defendants, their "alternate entities," and

7   each of them, was motivated by the financial interest of said defendants, their "alternate entities,"

8   and each of them, in the continuing, uninterrupted research, design, modification, manufacture,

9   fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale,

10  inspection, installation, contracting for installation, repair, marketing, warranting, rebranding,

11  manufacturing for others, packaging and advertising of asbestos and asbestos-containing

12  products.  In pursuance of said financial motivation, said defendants, their "alternate entities,"

13  and each of them, consciously disregarded the safety of "exposed persons"  and in fact were

14  consciously willing and intended to permit asbestos and asbestos-containing products to cause

15  injury to "exposed persons" and induced persons to work with and be exposed thereto, including

16  plaintiff.

17        28.    Plaintiff alleges that the aforementioned defendants, their "alternate entities," and

18  each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for

19  their intended use but that their asbestos and asbestos-containing products, created an

20  unreasonable risk of bodily harm to exposed persons.

21        29.    Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos

22  and various asbestos-containing products manufactured, fabricated, inadequately researched,

23  designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered

24  for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

25  marketed, warranted, rebranded, manufactured for others, packaged and advertised by the

26  aforementioned defendants, their "alternate entities," and each of them and that plaintiff cannot

27  identify precisely which asbestos or asbestos-containing products caused the injuries complained

28  of herein.

30.     Plaintiff relied upon defendants', their "alternate entities'," and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable and proximate result thereof, plaintiff has been injured permanently as alleged herein.

31.     As a direct and proximate result of the actions and conduct outlined herein, plaintiff has suffered the injuries and damages previously alleged.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

### THIRD CAUSE OF ACTION
(Premises Owner/Contractor Liability)

AS AND FOR A FURTHER AND THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFF BARRIE CROPPER COMPLAINS OF DEFENDANTS; AND DOES 301 THROUGH 400 (hereinafter "Premises Owner/Contractor Liability Defendants") AND ALLEGES AS FOLLOWS:

32.     Plaintiff, by this reference, incorporates the allegations contained in paragraphs 12 through 18 of the First Cause of Action.

33.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, the Premises Owner/Contractor Liability Defendants and DOES 301 through 400, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California.

34.     At all times herein mentioned, each of the Premises Owner/Contractor Liability Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced and/or repaired on the respective premises owned, leased, maintained, managed and/or controlled by them.  Said

1    entities shall hereinafter collectively be called "alternate entities." Each of the herein-named
2    defendants is liable for the tortious conduct of each successor, successor-in-business, assign,
3    predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned
4    entity, that caused the presence as aforesaid of said asbestos- and silica-containing insulation and
5    other toxic substances.  Said defendants, and each of them, are liable for the acts of each and
6    every "alternate entity," and each of them, in that there has been a virtual destruction of
7    plaintiff's remedy against each such alternate entity; defendants, and each of them, have acquired
8    the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have
9    caused the destruction of plaintiff's remedy against each such alternate entity; each such
10   defendant has the ability to assume the risk-spreading role of each such alternate entity, and that
11   each such defendant enjoys the goodwill originally attached to each such alternate entity.

12          35.    At all times mentioned herein, the Premises Owner/Contractor Liability
13   Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or
14   controlled premises where plaintiff BARRIE CROPPER was present.

15          Additionally, plaintiff BARRIE CROPPER might have been present at these or other
16   Premises Owner/Contractor Liability Defendants' premises at other locations and on other
17   occasions.

18          36.    Prior to and at said times and places, said Premises Owner/Contractor Liability
19   Defendants, and each of them, respectively, caused certain asbestos- and silica-containing
20   insulation, other building materials, products and toxic substances to be constructed, installed,
21   maintained, used, supplied, replaced, and/or repaired on each of the aforesaid respective
22   premises, by their own workers and/or by various contractors, and caused the release of
23   dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and
24   thereby created a hazardous and unsafe condition to plaintiff and other persons exposed to said
25   asbestos fibers and toxic substances while present at said premises.

26          37.    At all times mentioned herein, said Premises Owner/Contractor Liability
27   Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should
28   have known, that the foregoing conditions and activities created a dangerous, hazardous, and

K:\Asbestos\111112\PL\Demo-plst4st.wpd                11
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  unsafe condition and unreasonable risk of harm and personal injury to plaintiff and other workers

2  or persons so exposed while present on each of the aforesaid respective premises.

3      38.    At all times relevant herein, plaintiff entered said premises and used or occupied

4  each of said respective premises as intended and for each of the respective Premises

5  Owner/Contractor Liability Defendants' benefit and advantage and at each of the respective

6  Premises Owner/Contractor Liability Defendants' request and invitation. In so doing, plaintiff

7  was exposed to dangerous quantities of asbestos fibers and other toxic substances released into

8  the ambient air by the aforesaid hazardous conditions and activities managed, maintained,

9  initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor

10  Liability Defendants, and each of them.

11      39.    Plaintiff at all times was unaware of the hazardous condition or the risk of

12  personal injury created by the aforesaid presence and use of asbestos products and materials and

13  other toxic substances on said premises.

14      40.    At all times mentioned herein, said Premises Owner/Contractor Liability

15  Defendants, and each of them, remained in control of the premises where plaintiff was

16  performing his work.

17      41.    At all times mentioned herein, the Premises Owner/Contractor Liability

18  Defendants owed to plaintiff and others similarly situated a duty to exercise ordinary care in the

19  management of such premises in order to avoid exposing workers such as plaintiff to an

20  unreasonable risk of harm and to avoid causing injury to said person.

21      42.    At all times mentioned herein, said Premises Owner/Contractor Liability

22  Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should

23  have known, that the premises that were in their control would be used without knowledge of, or

24  inspection for, defects or dangerous conditions and that the persons present and using said

25  premises would not be aware of the aforesaid hazardous conditions to which they were exposed

26  on the premises.

27  ///

28  ///

KAJshjrefN 1111JIPLDtemp-ohMa.wpd
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

43.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid dangerous conditions and hazards on said premises.

44.   Prior to and at the times and places aforesaid, said Premises Owner/Contractor Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced, and/or repaired on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured plaintiff.

45.   At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them:

a. Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm plaintiff and others unless special precautions were taken;

b. Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were unfit, unskilled or otherwise unqualified to do so;

c. Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were competent or qualified to do so.

46.   In part, plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

47.   The work of contractors on premises controlled by the Premises Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances including but not limited to asbestos.

///

48.    The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Premises Owner/Contractor Defendants.  Said negligent conduct includes but is not limited to:

      a.    Failure to warn of asbestos and other toxic dusts;

      b.    Failure to suppress the asbestos-containing or toxic dusts;

      c.    Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

      d.    Failure to provide adequate breathing protection, i.e., approved respirators or masks;

      e.    Failure to inspect and/or test the air;

      f.    Failure to provide medical monitoring.

      g.    Failure to select and hire a careful and competent contractor or subcontractor.

49.    The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code §1714, and Labor Code §6400, et seq., or Health and Safety Code § 40.200, et seq., and regulations promulgated thereunder.  Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

50.    Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code §6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, et seq., which empowers the

K:\Injured\119117\PLD\comp-cighs.wpd

14

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   South Coast Area Air Quality Management District to promulgate regulations including but not
2   limited to S.C.A.A.Q.M.D., Rule 1403; Title 40 Code of Federal Regulations, Chapter 1, Part 61,
3   et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required said
4   Premises Owner/Contractor Liability Defendants to provide specific safeguards or precautions to
5   prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said
6   Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and
7   precautions, or contractors employed by the Premises Owner/Contractor Liability Defendants
8   failed to provide the required safeguards and precautions.  Defendants' violations of said codes
9   include but are not limited to:

10          (a)     Failing to comply with statutes and allowing ambient levels of airborne
11  asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned
12  statutes;

13          (b)     Failing to segregate work involving the release of asbestos or other toxic
14  dusts;

15          (c)     Failing to suppress dust using prescribed ventilation techniques;
16          (d)     Failing to suppress dust using prescribed "wet down" techniques;
17          (e)     Failing to warn or educate plaintiff or others regarding asbestos or other
18  toxic substances on the premises;

19          (f)     Failing to provide approved respiratory protection devices;
20          (g)     Failing to ensure "approved" respiratory protection devices were used
21  properly;

22          (h)     Failing to provide for an on-going health screening program for those
23  exposed to asbestos on the premises;

24          (i)     Failing to provide adequate housekeeping and clean-up of the work place;
25          (j)     Failing to properly warn of the hazards associated with asbestos as
26  required by these statutes;

27          (k)     Failing to properly report renovation and disturbance of asbestos-
28  containing materials, including but not limited to S.C.A.A.Q.M.D. Rule 1403;

K:\clients\U13112\PLD\cmp-pldMst.wpd                        15
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    (l)    Failing to have an asbestos removal supervisor as required by regulation;

2    (m)    Failing to get approval for renovation as required by statutes; and

3    (n)    Failing to maintain records as required by statute.

4    51.    Premises Owner/Contractor Liability Defendants, and each of them, were the

5    "statutory employer" of plaintiff as defined by the California Labor Code and California case law.

6    52.    Plaintiff at all times was unaware of the hazardous condition or the risk of

7    personal injury created by defendants' violation of said regulations, ordinances or statutes.

8    53.    At all times mentioned herein, plaintiff was a member of the class of persons

9    whose safety was intended to be protected by the regulations, statutes or ordinances described in

10    the foregoing paragraphs.

11    54.    At all times mentioned herein, said Premises Owner/Contractor Liability

12    Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should

13    have known, that the premises that were in their control would be used without knowledge of, or

14    inspection for, defects or dangerous conditions, that the persons present and using said premises

15    would not be aware of the aforesaid hazardous conditions to which they were exposed on the

16    premises, and that such persons were unaware of the aforesaid violations of codes, regulations

17    and statutes.

18    55.    As a legal consequence of the foregoing, plaintiff BARRIE CROPPER developed

19    an asbestos-related illness, which has caused great injury and disability as previously set forth,

20    and plaintiff has suffered damages as herein alleged.

21    WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities,"

22    and each of them, as hereinafter set forth.

23                                    FOURTH CAUSE OF ACTION
                                              (Concert of Action)

24

25    AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

26    CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND ASSISTANCE

27    OF BREACH OF DUTY TO WARN, PLAINTIFF COMPLAINS OF DEFENDANTS GATKE

28    CORPORATION, HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL, INC. --

K:\bbrush\11172\PLD\comp-cldsa.wpd                16
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  formerly known as the Bendix Aviation Corporation), CHRYSLER CORPORATION (now

2  DAIMLERCHRYSLER CORPORATION), DANA CORPORATION (successor-in-interest to

3  ECHLIN INC. and FRICTION MATERIALS, INC. and P.T. BRAKE LINING CO. INC.),

4  GENERAL MOTORS CORPORATION, BRIDGESTONE/FIRESTONE, INC., LEAR-

5  SIEGLER, INC. (aka LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP. successor-in-interest

6  to ROYAL INDUSTRIES and H. KRASNE MANUFACTURING CO. and WORLD BESTOS

7  CO.), GARLOCK SEALING TECHNOLOGIES, LLC; OWENS-ILLINOIS, INC.;

8  MAREMONT CORPORATION, MORTON-THIOKOL CORPORATION (now MORTON

9  INTERNATIONAL, INC. successor-in-interest to THIOKOL CHEMICAL CORPORATION ),

10  H.K. PORTER, INC., JOHNS-MANVILLE CORPORATION, AUTO FRICTION

11  CORPORATION, SCANDURA, INC. (formerly known as Scandinavia Belting Company),

12  PNEUMO ABEX LLC (hereinafter "PNEUMO ABEX," and formerly known as PNEUMO

13  ABEX CORPORATION and ABEX CORPORATION and successor-in-interest to AMERICAN

14  BRAKEBLOK CORPORATION and the S. K. WELLMAN COMPANY), BRASSBESTOS

15  BRAKE LINING COMPANY, LASCO BRAKE PRODUCTS CORPORATION, L.J. MILEY

16  COMPANY, REDDAWAY MANUFACTURING COMPANY, FORCEE MANUFACTURING

17  CORPORATION, SILVER LINE PRODUCTS, INC., SOUTHERN POWER, INC.;

18  WHEELING BRAKE BLOCK MANUFACTURING COMPANY, DOES 451-471, THEIR

19  ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter CONCERT OF ACTION

20  DEFENDANTS), AND ALLEGES AS FOLLOWS:

21       56.    Plaintiff incorporates herein by reference, as though fully set forth hereat each and

22  every allegation of the First and Second Causes of Action.

23       57.    The concerted action (hereinafter referred to as "concerted action" or

24  "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was

25  facilitated through trade and other organizations including the Friction Materials Standards

26  Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining

27  Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.

28  ///

K:\Injured\11112\PLD\cmp-pisMot.wpd

17

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action,

2  members of FMSI.

3       58.     The Friction Materials Standards Institute was originally incorporated under the

4  name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership

5  corporation. It included among its avowed purposes: the maintenance and raising of standards of

6  all products manufactured by its members; the collection, assembly and dissemination to

7  members of the friction materials industry scientific, engineering, technological and other

8  relevant information pertaining to the industry; and to cooperate with governmental agencies for

9  the general benefit of the public and the enhancement of the industry.

10      59.     Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to

11  asbestos dust created grave health risks for those exposed. From 1971 forward, CONCERT OF

12  ACTION DEFENDANTS received additional information distributed through the Friction

13  Materials Standards Institute and through independent sources further confirming and elaborating

14  the serious health risks associated with exposure to airborne asbestos dust.

15      60.     CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in

16  the handling and machining of their friction products during their installation and replacement

17  created significant and dangerous quantities of airborne asbestos dust that would expose workers

18  and bystanders to hazardous levels of asbestos.

19      61.     CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger

20  posed by asbestos was not widely known by their consumers.  CONCERT OF ACTION

21  DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated

22  or greatly reduced by adopting different and discrete practices in the handling and machining of

23  products and by instituting specific dust control procedures in their consumers' workplaces.

24      62.     Notwithstanding their knowledge of the dangers posed by exposure to asbestos,

25  and notwithstanding their chartered ostensible purpose to cooperate with government agencies

26  for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction

27  Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat,

28  compromise, evade, and otherwise dilute regulations, standards, and procedures designed to

K:\faison\A\11\1EXPLD\comp-explainr.wpd

**18**

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by

2   consumers and friction materials workers.  Such activities include, but are not limited to the

3   following:

4          (a)  CONCERT OF ACTION DEFENDANTS, at the urging and encouragement

5   of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board

6   false and unsupportable opposition to a proposed prospective ban on the use of asbestos in

7   friction materials.

8          (b) CONCERT OF ACTION DEFENDANTS continuously undertook concerted

9   action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA

10  regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust,

11  requiring the use of safety equipment and procedures, and notification of potentially exposed

12  persons of the dangers presented by asbestos dust.  CONCERT OF ACTION DEFENDANTS

13  consistently misrepresented the state of science and knowledge to distort and confound public

14  understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos,

15  less stringent requirements in the use of safety equipment and procedures, and a reduction in the

16  scope and extent of any required notification regarding the hazards posed by asbestos.

17         (c) CONCERT OF ACTION DEFENDANTS expressly undertook to adopt

18  uniform interpretations of regulations among their membership, which interpretations

19  consistently took the stance of performing at the lowest possible level which could be considered

20  compliant.

21      63.    CONCERT OF ACTION DEFENDANT members of the Friction Materials

22  Standards Institute, despite their avowed purpose to encourage and support research into

23  materials and manufacturing processes, expressly declined to pursue a proposed initiative to

24  sponsor jointly funded research into feasible alternatives to asbestos in friction products.

25      64.    Even though they knew of the substantial risks and dangers to those who would

26  use or come into contact with their asbestos-containing products, defendants took concerted

27  action by means of explicit and tacit agreements, to delay for a period of years providing

28  notification and adequate warning of these risks and dangers, and to otherwise suppress

K:\kajaros\8113112\PLD\cmp-clpMst.wpd                     19
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    information about said hazards or otherwise compromise and confound informed consumer

2    appreciation of the asbestos hazards posed by their products.

3        65.    Defendants knew that the users of their friction products would handle such

4    products or their by-products in ways that enhanced the risks of dangerous asbestos exposure.

5    Defendants failed to discharge their duty to provide timely and adequate notice of these hazards

6    or of steps that could be taken to eliminate or ameliorate the risks and dangers.  Each defendant,

7    in failing to warn of these dangers, gave assistance and encouragement to every other member

8    defendant to likewise fail to warn.

9        66.    Defendants provided substantial assistance to one another in maintaining

10   ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and

11   individually breached their duty to warn the consumers and users of their products.

12       67.    In addition to the above named defendants in this cause of action, the term

13   CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to:

14   DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THE BUDD

15   COMPANY, STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); BORG-WARNER

16   AUTOMOTIVE, INC., ASBESTOS MANUFACTURING COMPANY, FIBRE & METAL

17   PRODUCTS COMPANY, RITESET MANUFACTURING COMPANY, ROSSENDALE-

18   RUBOIL COMPANY, SOUTHERN FRICTION MATERIALS COMPANY, U.S. SPRING &

19   BUMPER COMPANY, AUTO FRICTION CORPORATION, AUTO SPECIALTIES

20   MANUFACTURING COMPANY, EMSCO ASBESTOS COMPANY, MOLDED

21   INDUSTRIAL FRICTION CORPORATION, NATIONAL TRANSPORT SUPPLY, INC.,

22   STANDCO, INC., UNIVERSAL FRICTION MATERIALS COMPANY, ASBESTOS CLAIMS

23   MANAGEMENT CORPORATION (formerly known as National Gypsum Company), BELL

24   ASBESTOS MINES LTD., Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D.,

25   Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell

26   Manufacturing (whose liabilities have been assigned by H.K. Porter Company), Union Asbestos

27   and Rubber Company, Thermoid Company (whose assets and liabilities have been purchased by

28   H.K. Porter Company), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation,

K:\Injured\11311\PLDmny-cia\Met.wpd

**20**

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute

2  [ATI], all members of the Friction Materials Standards Institute and its predecessors, and the

3  other entities and individuals identified in this Fourth Cause of Action.

4      68.   Plaintiff is informed and believes, and thereon alleges, that at all times herein

5  mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized

6  and existing under and by virtue of the laws of the State of California, or the laws of some other

7  state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and

8  are doing business in the State of California, and that said defendants regularly conducted and/or

9  conducts business in the County of San Diego, State of California.

10     69.   Plaintiff was exposed to asbestos-containing dust created by the use of the

11 asbestos products manufactured, distributed, and/or supplied by one or more of the

12 CONCERT OF ACTION DEFENDANTS named herein.  The exposure to the asbestos or

13 asbestos-related products supplied by the one or more of the CONCERT OF ACTION

14 DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

15     70.   The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one

16 another and as co-conspirators, agreed and conspired among themselves, with other asbestos

17 manufacturers and distributors, and with certain individuals including, but not limited to Anthony

18 Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET

19 LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the

20 wrongful acts of the conspirators, but a representative list):

21         (a)   Beginning in 1929, MET LIFE entered agreements with Johns-Manville

22 and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners.

23 When the data from these studies proved that Canadian asbestos miners were developing

24 asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony

25 Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian

26 study for many years thereafter to meetings of health care professionals seeking information

27 regarding asbestos exposure.

28 ///

K:\kinjure\M1311\RPLD\comp-riaMet.wpd

21

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1        (b)     In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-

2    Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and

3    conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J.

4    Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville

5    and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively

6    misrepresent material facts and conclusions about asbestos exposure; including but not limited to

7    descriptions of the seriousness of the disease process of asbestosis. The misrepresentation was

8    accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as

9    "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a

10   disease process less serious than it was known to be by the CONCERT OF ACTION

11   DEFENDANTS. As a result, Lanza's study was published in the medical literature containing

12   said misleading statements in 1935. The CONCERT OF ACTION DEFENDANTS were

13   motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by

14   the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in

15   lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use

16   of their asbestos products.

17       (c)     The above-described conspiracy continued in 1936, when additional

18   CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant

19   PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant

20   GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to

21   conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing

22   (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber

23   Company and defendant USG, entered into an agreement with a leading medical research facility

24   named Saranac Laboratories. (The following conspirators also joined the Friction Materials

25   Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation

26   (now defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY,

27   defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (through

28   Turner & Newall (T&N) alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell

K:\Injures\11311\2PLD\comp-3joMd4.wpd                     22
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   Manufacturing (whose liabilities have been assumed by H.K. Porter Company).)  Under the

2   agreement, the CONCERT OF ACTION DEFENDANTS acquired the power to decide what

3   information Saranac Laboratories could publish regarding asbestos disease and could also control

4   in what form such publications were to occur.  Their agreement provided these CONCERT OF

5   ACTION DEFENDANTS the power and ability affirmatively to misrepresent the results of the

6   work at Saranac, and also gave these CONCERT OF ACTION DEFENDANTS power to

7   suppress material facts included in any study.  On numerous occasions thereafter, the CONCERT

8   OF ACTION DEFENDANTS exercised their power to prevent Saranac scientists from disclosing

9   material scientific data, resulting in numerous misstatements of fact regarding the health affects

10  of asbestos exposure being made at scientific meetings.

11          (d)     The conspiracy was furthered when on November 11, 1948, when

12  representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-

13  Manville headquarters:  Johns-Manville, American Brakeblok Division of American Brake and

14  Shoe Foundry (defendant PNEUMO ABEX), defendant GATKE CORPORATION, Keasbey &

15  Mattison Company (then an alter-ego to conspirator Turner & Newall (T&N)), Raybestos (now

16  Raymark), Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter

17  Company), Union Asbestos and Rubber Company, defendant USG and MET LIFE.  Defendant

18  U.S. GYPSUM did not send a company employee to the meeting, but instead authorized

19  Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on

20  its behalf.

21          (e)     At the November 11, 1948 meeting, these CONCERT OF ACTION

22  DEFENDANTS, and their representatives, decided to exert their influence to materially alter and

23  misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at

24  the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity

25  of asbestos in mice and also included an evaluation of the health effects of asbestos on humans

26  with a critical review of the then-existing standards for asbestos dust exposure.

27          (f)     At this meeting, these CONCERT OF ACTION DEFENDANTS

28  intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete

K:\Mcintosh3\111\PLD\conc-cip3Ax.wpd                    23
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on

2   humans and the critique of the dust standards.  The CONCERT OF ACTION DEFENDANTS

3   then published these deceptive and fraudulent statements in the medical literature as edited by

4   Dr. Arthur Vorwald, also of the Saranac Laboratories.  These CONCERT OF ACTION

5   DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public,

6   in general, and the class of persons exposed to asbestos, including the plaintiff.

7          (g)     As a direct result of influence exerted by the CONCERT OF ACTION

8   DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial

9   Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that

10  stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS

11  wished stressed, but which omitted reference to human asbestosis and cancer, thereby

12  fraudulently and affirmatively misrepresenting the extent of the risks.  The CONCERT OF

13  ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and

14  fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

15         (h)     Such actions constitute a material affirmative misrepresentation of the

16  total context of material facts involved in Dr. Gardner's work and resulted in creating an

17  appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited

18  work indicated.

19         (i)     When Dr. Vorwald subsequently tried to publish more complete

20  information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION

21  DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to

22  publish or complete Gardner's work, and actively discouraged institutions of higher learning from

23  hiring or retaining Dr. Vorwald in any capacity.

24         (j)     The following CONCERT OF ACTION DEFENDANTS were members

25  of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-

26  Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos

27  Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National

28  Gypsum Company (now known as defendant ASBESTOS CLAIMS MANAGEMENT

K:\hisorn01\1312\PLD\comp-plnMet.wpd

24

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  CORPORATION), and Turner & Newall (T&N), individually and successor to defendant BELL

2  ASBESTOS MINES LTD.  These conspirators, members of Q.A.M.A., participated in the above-

3  described misrepresentation of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald

4  in the <u>AMA Archives of Industrial Health</u> in 1951.  Evidence of the Q.A.M.A.'s involvement in

5  this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A.,

6  as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48,

7  3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s

8  representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

9          (k)     As a furtherance of the conspiracy commenced in 1929, CONCERT OF

10  ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or

11  about 1950 to formulate a plan to influence public opinion about the relationship between

12  asbestos and cancer by influencing the medical literature on this subject and then touting and

13  disseminating this literature to the public and to organizations and legislative bodies responsible

14  for regulatory control of asbestos with the specific intent of misrepresenting the existing

15  scientific information and suppressing contrary scientific data in their possession and control.

16          (l)     This plan of misrepresentation and influence over the medical literature

17  began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac

18  Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary

19  report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship

20  might exist in experimental animals, these Q.A.M.A. members refused to further fund the study,

21  terminated the study, and prevented any public discussion of dissemination of the results.

22          (m)     As a result of the termination of Q.A.M.A./Saranac study, the CONCERT

23  OF ACTION DEFENDANTS fraudulently withheld information from the public and

24  affirmatively misrepresented to the public and responsible legislative and regulatory bodies that

25  asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF

26  ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith,

27  M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan

28  Sabourin, said misrepresentations being directed to <u>inter alia</u> U.S. Government officials,

1 | Canadian government officials, U.S. National Cancer Institute, medical organizations, health

2 | professionals, and the general public, including plaintiff.

3 |       (n)     Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS

4 | contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the

5 | relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and

6 | Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of

7 | incurring lung cancer.

8 |       (o)     The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance

9 | of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by

10 | Braun and Truan in which the findings regarding increased incidence of cancer in persons with

11 | asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of

12 | Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the

13 | incidence of lung cancer, a conclusion known by the conspirators to be false.

14 |       (p)     By falsifying and causing publication of studies concluding that asbestos

15 | exposure did not cause lung cancer and simultaneously omitting documented findings that

16 | asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS

17 | affirmatively misrepresented to the public and concealed from the public the extent of risks

18 | associated with inhalation of asbestos fibers.

19 |       (q)     In furtherance of the ongoing 1929 conspiracy, in approximately 1958,

20 | these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited

21 | works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the

22 | public and persons exposed to asbestos that the inhalation of asbestos dust would not cause

23 | cancer.

24 |       (r)     The fraudulent misrepresentations beginning in 1929 as elaborated above

25 | and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

26 | for asbestos exposure. The developers of such standards failed to lower the maximum exposure

27 | limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

28 | ///

1    (s)    In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF

2  ACTION DEFENDANTS decided, at their trade association meeting, that they would

3  intentionally mislead consumers about the extent of risks involved in inhalation of asbestos

4  products.

5    (t)    In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the

6  health effects of asbestos was held at the Saranac Laboratories.  The following CONCERT OF

7  ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner &

8  Newall (T&N),  Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their

9  agents, Cartier, Sabourin and LaChance.

10    (u)    At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis

11  in product users was discussed and the carcinogenic properties of all fiber types of asbestos was

12  also discussed.  In an affirmative attempt to mislead the public about the extent of health risks

13  associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these

14  CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this

15  1952 Saranac Symposium and it was not published.  In addition, the CONCERT OF ACTION

16  DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal

17  studies showing excess cancers in animals which thereby fraudulently misrepresented existing

18  secret data which could not be publicized owing to the secrecy provisions contained in the 1936

19  Saranac agreement heretofore described.

20    (v)    The following CONCERT OF ACTION DEFENDANTS were members

21  of the trade organization known as the Asbestos Textile Institute (ATI):  Raybestos (now

22  Raymark), Johns-Manville, H.K. Porter, Keasbey & Mattison, individually and through its alter-

23  ego Turner & Newall (T&N) and National Gypsum (defendant ASBESTOS CLAIMS

24  MANAGEMENT CORPORATION), Uniroyal, Inc., individually and through its alter-egos,

25  CDU Holding Company, Uniroyal Holding Company and Uniroyal Goodrich Tire Company.

26    (w)    In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF

27  ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist

28  W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-

27

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   existing maximum exposure limits for asbestos exposure.  These CONCERT OF ACTION
2   DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently
3   concealed material facts about asbestos exposure from the public and affirmatively
4   misrepresented to the public and class of persons exposed to asbestos that the then existing
5   maximum exposure limit for asbestos was acceptable.  Thereafter, these CONCERT OF
6   ACTION DEFENDANTS withheld additional material information on the dust standards from
7   The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further
8   influencing evaluations of their Threshold Limit Values for asbestos exposure.

9            (x)     In furtherance of the forgoing conspiracy, in 1953, CONCERT OF
10  ACTION DEFENDANT National Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT
11  CORPORATION), through its agents, in response to an inquiry from the Indiana Division of
12  Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a
13  proposed response to that division indicating that respirators should be worn by applicators of the
14  products.  National Gypsum's response distorted and fraudulently misrepresented the need for
15  applicators of asbestos spray products to wear respirators and fraudulently concealed from such
16  applicators the need for respirators and thereby misrepresented the risks associated with asbestos
17  exposure.

18           (y)     In furtherance of the forgoing conspiracy, in 1955, CONCERT OF
19  ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be
20  published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in
21  Asbestos Workers."  This published study materially altered the results of an earlier study in
22  1949 concerning the same set of workers.  This alteration of Dr. Smith's study constituted a
23  fraudulent and material misrepresentation about the extent of the risk associated with asbestos
24  inhalation.

25           (z)     In furtherance of the forgoing conspiracy, in 1955, the National Cancer
26  Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville,
27  individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT
28  OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal

K:\lclgurd\11312PLD\camp-plgMsc.wpd                                  28
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  studies concerning the relationship between asbestos exposure and cancer, when, in fact, the

2  CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed

3  studies, which demonstrated that positive evidence did exist.

4         (aa)   In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF

5  ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on

6  cancer and asbestos and this resulted in fraudulently concealing from the public material facts

7  regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-.

8  existing knowledge about asbestos exposure and lung cancer.

9         (bb)   In furtherance of the forgoing conspiracy, in 1964, CONCERT OF

10  ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting

11  the association between lung cancer and asbestos exposure that had been recently published by

12  Dr. Irving J. Selikoff of the Mount Sinai Research Center.  Thereafter, these members of the ATI

13  embarked upon a campaign to further misrepresent the association between asbestos exposure

14  and lung cancer.

15         (cc)   CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT

16  OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose

17  functions included involvement in research regarding the health effects of inhaling asbestos dust.

18         (dd)   Beginning in the early 1940's, the IHF was involved in a study by Hemeon

19  entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947.  This

20  study was done in connection with members of the Asbestos Textile Institute (ATI).  This study

21  found that workers exposed to less than the recommended maximum exposure level for asbestos

22  were nonetheless developing disease.  As a part of the conspiracy, the IHF never published this

23  study.

24         (ee)   Beginning in the mid 1950's, the IHF and the Mellon Institute were

25  involved in the publication of works by Braun and Truan entitled An Epidemiological Study of

26  Lung Cancer in Asbestos Miners.  In its original, unedited form in September, 1957, this study

27  had concluded that workers with asbestosis had an increased incidence of lung cancer and that

28  the Canadian government had been under-reporting cases of asbestosis.  The final, published

29

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered

2  an increased incidence of lung cancer and that the Canadian government had been under-

3  reporting asbestosis cases.  The IHF and the Mellon Institute conspired with the members of the

4  Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and

5  other CONCERT OF ACTION DEFENDANTS to delete the above-describe information

6  regarding asbestos and cancer.

7           (ff)      The above-described actions of the IHF and the Mellon Institute

8  constituted intentional deception and fraud in actively misleading the public about the extent of

9  the hazards connected with breathing asbestos dust.

10          (gg)     The above-described conspiratorial and fraudulent actions of the IHF and

11 the Mellon Institute substantially contributed to retarding the development of knowledge about

12 the hazards of asbestos and thereby substantially contributed to injuries suffered by the plaintiff.

13          (hh)     All CONCERT OF ACTION DEFENDANTS identified above, approved,

14 ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION

15 DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the

16 alleged co-conspirators during the date and circumstances set forth above, acted as agents, and

17 co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

18          (ii)      As evidence of Raymark's fraud, concealment, suppression, and

19 conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and

20 each of them, as herein set forth, Raymark's President and/or other senior executives

21 corresponded with other senior executives of Raymark's co-conspirators, which series of

22 correspondence and related documents and papers are commonly referenced as "The Sumner

23 Simpson Papers."

24          (jj)      Further as evidence of the fraud, concealment, suppression, and

25 conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

26 ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

27 resolutions, and related actions, recorded in "The ATI Minutes."

28 ///

K:\Injuries\13112\PLD\cop-cplnkt.wpd                    30
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1       (kk)    MET LIFE was an active participant in the foregoing conspiracy and

2 benefitted thereby.  MET LIFE benefitted from its involvement, because of the following non-

3 exclusive list:

4          (1)    by providing workers' compensation insurance to the CONCERT OF

5                ACTION DEFENDANTS;

6          (2)    by providing life insurance for employees of the CONCERT OF ACTION

7                DEFENDANTS;

8          (3)    by providing health insurance or health care for the employees of the

9                CONCERT OF ACTION DEFENDANTS;

10          (4)    by providing health information and resources;

11          (5)    by purchasing substantial stock in asbestos-related companies, including

12                stock of CONCERT OF ACTION DEFENDANTS; and

13          (6)    by developing information by which asbestos-related claims for

14                compensation could be defeated.

15     71.    The foregoing conspiracy was furthered through the formation of the Friction

16 Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

17 Association, and the Clutch Facing and Brake Lining Standards Institute.  The members thereof

18 joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

19       (1)    The Friction Materials Standards Institute, and its predecessors, the Brake

20 Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were

21 formed to be the ears and mouthpiece of the friction materials industry.  The initial members of

22 the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF

23 ACTION DEFENDANTS ASBESTOS MANUFACTURING COMPANY, T&N, PLC. (through

24 its alter-ego Atlas Asbestos Company), BRASSBESTOS BRAKE LINING COMPANY, FIBRE

25 & METAL PRODUCTS COMPANY, GATKE CORPORATION, MAREMONT (through its

26 predecessor-in-interest Grizzly Manufacturing), H. KRASNE MANUFACTURING

27 COMPANY, LASCO BRAKE PRODUCTS, HONEYWELL, INC.  (successor-in-interest to

28 ALLIEDSIGNAL INC. — then known as Bendix Aviation Corporation), L. J. MILEY

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    COMPANY, Raymark (then known as Raybestos-Manhattan), RITESET MANUFACTURING

2    COMPANY, ROSSENDALE-RUBOIL COMPANY, Russell Manufacturing Company,

3    SCANDURA (then known as Scandinavian Belting Company), SOUTHERN FRICTION

4    MATERIALS COMPANY, U.S. SPRING & BUMPER COMPANY, PNEUMO ABEX (through

5    its predecessor-in-interest, S.K. Wellman Company) and LEAR-SIEGLER, INC. (aka

6    LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.) and BRIDGESTONE/FIRESTONE,

7    INC. (through their predecessor-in-interest World Bestos Corporation).  By 1973, the following

8    joined the Friction Materials Standards Institute: CONCERT OF ACTION DEFENDANTS

9    AUTO FRICTION CORPORATION, AUTO SPECIALTIES MANUFACTURING

10   COMPANY, CHRYSLER CORPORATION, EMSCO ASBESTOS COMPANY, FORCEE

11   MANUFACTURING CORPORATION, GENERAL MOTORS CORPORATION, H.K. Porter

12   Company (through its Thermoid division), Johns-Manville Corporation, LEAR-SIEGLER, INC.

13   (aka LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.) (through its predecessor-in-interest

14   Royal Industries), MOLDED INDUSTRIAL FRICTION CORPORATION, MORTON-

15   THIOKOL (through its predecessor-in-interest Thiokol Chemical Corporation), NATIONAL

16   TRANSPORT SUPPLY INC., PARKER-HANNIFIN CORPORATION (through its

17   predecessor-in-interest Pick Manufacturing Company), PNEUMO ABEX's American Brakeblok

18   division, SILVER LINE PRODUCTS INC., STANDCO INC., UNIVERSAL FRICTION

19   MATERIALS COMPANY, and WHEELING BRAKE BLOCK MANUFACTURING

20   COMPANY.  On information and belief, plaintiff alleges that the following manufacturers and/or

21   distributors of asbestos-containing automotive friction products joined with, ratified, and

22   furthered the conspiratorial actions of the above-identified conspirators, including the

23   conspirators who were members of the FMSI and its predecessors:  CONCERT OF ACTION

24   DEFENDANTS THE BUDD COMPANY, DANA CORPORATION, FORD MOTOR

25   COMPANY, GENERAL MOTORS CORPORATION, LEAR-SIEGLER, INC. (aka

26   LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.), MORTON-THIOKOL (now MORTON

27   INTERNATIONAL, INC.), STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); and

28   BORG-WARNER.

E:\injuen\01\1117PLD\wp-pldMs.wpd                                       32

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

(2)     Even though they disseminated materials and information to the contrary, The Friction Materials Standards Institute conspirators knew, and suppressed, that:

(i)     OSHA regulations, even if enforced and complied with, would not prevent asbestos disease in workers exposed to their products;

(ii)    chrysotile asbestos caused mesothelioma and other incurable disease;

(iii)   brake workers suffered "considerable exposures" to respirable asbestos fibers during the intended use, installation, and expected replacement of friction materials;

(iv)    there was no "safe" level of occupational exposure to respirable asbestos; and

(v)     there was a substantial risk and danger suffered by bystanders and family members of brake mechanics, because of the release of respirable asbestos in the use of friction materials, as herein described.

(3)     Even though they knew of the substantial risks and dangers to those who would use or come into contact with their asbestos-containing products, CONCERT OF ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to delay for a period of years providing notification and adequate warning of the risks and dangers. CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle such products or their by-products in ways that enhanced the risks of dangerous asbestos exposure, but they conspired to give each other assistance and encouragement in failing to provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or ameliorate the risks and dangers.

72.     The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as described above, and each of them, constitute fraudulent concealment and/or fraudulent misrepresentation, which caused injury to the plaintiff, including, but not limited to, the following manner:

///

(a)      The material published or caused to be published by the CONCERT OF CONCERT OF ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)      The CONCERT OF ACTION DEFENDANTS, with intent to defraud, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that the publication of false and misleading reports to the general public and individuals therein, and/or the intentional suppression and nondisclosure of documented reports of health hazards of asbestos:

(1)      maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)      assist in the continued pecuniary gain of CONCERT OF ACTION DEFENDANTS, through the sale of their products;

(3)      influence in the CONCERT OF ACTION DEFENDANTS' favor proposed legislation to regulate asbestos exposure and;

(4)      provide a defense in law suits brought for injury resulting from asbestos disease.

(c)      The CONCERT OF ACTION DEFENDANTS, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control. The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached this duty through their fraudulent concealment as described herein.

(d)      Plaintiff and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and in the absence of published medical and scientific reports of the hazards of asbestos continued exposure to asbestos. Plaintiff believed asbestos to be safe and was unaware of the hazards due to conspiratorial and fraudulent conduct. Plaintiff was not warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent

1   concealment. If plaintiff had known of the health hazards of asbestos, of which plaintiff was

2   unaware as a direct result of the conspirator's fraudulent concealment, plaintiff would have acted

3   differently regarding plaintiff's exposure to asbestos and asbestos-related products.

4           (e)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

5   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that

6   plaintiff rely on the deceptive and fraudulent reports that the conspiracy caused to be published

7   throughout the United States regarding the safety of asbestos and asbestos-related products and to

8   rely on the absence of published medical and scientific data (because of the CONCERT OF

9   ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related

10   products and thereby caused plaintiff and others to continue their exposure to asbestos products.

11           (f)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

12   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a

13   position of superior knowledge regarding the health hazards of asbestos and therefore the

14   plaintiff reasonably relied, both directly and indirectly, on the published reports commissioned by

15   the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and the

16   absence of published information (because of the suppression by the CONCERT OF ACTION

17   DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

18           (g)    As a direct result of the continuing and on-going conduct of the

19   CONCERT OF ACTION DEFENDANTS, as alleged herein, the plaintiff contracted asbestos-

20   related disease and suffered injuries and incurred damages, which are described in greater detail

21   in the forgoing Paragraphs.

22       73.   MET LIFE acted in concert with the foregoing described parties (the CONCERT

23   OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to

24   cause injury to plaintiff.

25       74.   MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark),

26   defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-

27   Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was

28   coercive, fraudulent, and deceitful towards others (including plaintiff) and that CONCERT OF

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  ACTION DEFENDANTS' conduct was a breach of dut(y)(ies) owed plaintiff; and MET LIFE

2  gave substantial assistance and encouragement to Johns-Manville and the other CONCERT OF

3  ACTION DEFENDANTS in breaching their duties to plaintiff and others.

4        75.    MET LIFE provided substantial assistance to the foregoing CONCERT OF

5  ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to

6  plaintiff.

7        76.    Plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a

8  fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy

9  which thereby caused plaintiff's asbestos-related injuries.

10        77.    The CONCERT OF ACTION DEFENDANTS made representations to plaintiff

11  and others concerning asbestos-containing products including but not limited to:

12            (a)    the statements set forth and summarized in the foregoing paragraphs

13            (b)    that asbestos in commercially used insulation products was not hazardous

14  (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

15            (c)    the amount of asbestos in the air necessary to cause disease was five

16  million particles per cubic foot (this statement was known to be false by the CONCERT OF

17  ACTION DEFENDANTS)

18            (d)    that asbestos does not cause cancer (this statement was known to be false

19  by the CONCERT OF ACTION DEFENDANTS);

20            (e)    in addition, the CONCERT OF ACTION DEFENDANTS actively and

21  fraudulently concealed facts from the plaintiff and others including, but not limited to:

22                (1)    that asbestos-related disease can be a fatal disease,

23                (2)    that asbestos causes various forms of lung cancer,

24                (3)    that individuals should protect themselves from breathing asbestos

25                    dust,

26                (4)    the extent of asbestos disease in exposed populations,

27                 (5)    information regarding the levels of airborne asbestos that can cause

28                    disease,

36

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

(6)    their experience with workers' compensation claims related to asbestos exposure,

(7)    the statements set forth in foregoing paragraphs.

78.    Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing statements were false and that, by their acts, they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

79.    The asbestos-containing products that CONCERT OF ACTION DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

80.    Additionally and alternatively, as a direct result of MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

///
///
///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

PAGE 42

1
2

**FIFTH CAUSE OF ACTION**
(Fraud and Deceit/Negligent Misrepresentation)

3      AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

4  FRAUD AND DECEIT/NEGLIGENT MISREPRESENTATION, PLAINTIFF COMPLAINS

5  OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX

6  LLC (hereinafter "PNEUMO ABEX," and formerly known as PNEUMO ABEX

7  CORPORATION and ABEX CORPORATION and successor-in-interest to AMERICAN

8  BRAKEBLOCK CORPORATION), GARLOCK SEALING TECHNOLOGIES, LLC; GATKE

9  CORPORATION, and T&N, LTD. (formerly known as TURNER AND NEWALL and alter-ego

10  to KEASBY-MATTISON COMPANY), AMERICAN CONFERENCE OF GOVERNMENTAL

11  INDUSTRIAL HYGIENISTS, INC. (formerly known as NATIONAL CONFERENCE OF

12  GOVERNMENT INDUSTRIAL HYGIENISTS), UNDERWRITERS LABORATORIES, INC.,

13  DOES 472-480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter

14  FRAUD DEFENDANTS), AND ALLEGES AS FOLLOWS:

15      81.    Plaintiff incorporates herein by reference, as though fully set forth hereat each and

16  every allegation of the First, Second and Fourth Causes of Action as though fully set forth herein.

17      82.    Defendant UNDERWRITERS LABORATORIES, INC. conducted tests on

18  consumer products and approved, certified, endorsed, or otherwise sanctioned products for

19  safety, including asbestos containing products manufactured, designed, processed, marketed,

20  distributed, applied, and/or sold by defendants and/or conspirators, as hereinafter set forth.

21  Defendant UNDERWRITERS LABORATORIES, INC. required, or otherwise recommended or

22  sanctioned, that asbestos be used in some products.  Said acts or omissions were negligent.

23  Defendant UNDERWRITERS LABORATORIES, INC. was a link in the chain of product

24  distribution.  Defendant UNDERWRITERS LABORATORIES, INC. knew or should have

25  known of the dangerous propensities of asbestos and asbestos-containing products, and did

26  nothing to warn consumers of these hazards, and in fact, suppressed, minimized, understated,

27  denied, and otherwise purposefully corrupted the evidence of said hazards in its certification and

28  underwriting of product's safety, all the while knowing the importance consumers placed on

K:\Injures\A11311\NPLD\comp-ci.Asb.wpd                    38
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  UNDERWRITERS LABORATORIES, INC. approval.  Defendant UNDERWRITERS

2  LABORATORIES, INC. allowed its certification label to be affixed to products, thereby

3  representing to the general public, including plaintiff herein, that said products were safe for

4  intended use, when in fact said products were not safe.

5      83.     Defendant AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

6  HYGIENISTS, INC. (ACGIH) sets guidelines for occupational health called Threshold Limit

7  Values (TLVs).  These guidelines are relied on by OSHA (the Occupational Safety and Health

8  Administration) in the United States and similar agencies around the world.  Criticisms of the

9  guide-line setting process have pointed to problems with data collection, inadequate research,

10  overwhelming dependence on data supplied by financially interested corporations, and slow

11  response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was

12  negligent in their failure to analyze or critically evaluate previously published literature, or

13  review and incorporate current literature, failure to adequately assess the financially motivated

14  scientific data provided by asbestos corporations, their insurers, and medical consultants, and

15  their limited review process, including but not limited to the following representative list:

16          (a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL

17  HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of

18  proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric

19  Concentrations, for various hazardous atmospheric substances, including asbestos.  In the

20  minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the

21  MPC's were "not to be construed as recommended safe concentrations."  In 1946, the NCGIH

22  was renamed the AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

23  HYGIENISTS, INC. (ACGIH), and despite the internally acknowledged inadequacy of the

24  asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented,

25  and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based

26  on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

27          (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,

28  fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily

1   function, either immediate or after years of exposure." In 1948, they changed the name of the

2   guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the

3   guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted

4   definition, describing the guideline as both an "average" and a "maximum." Despite their failure

5   to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of

6   the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing

7   the definition of the TLV, the ACGIH never performed any studies to test the scientific validity

8   of the 5 mppcf TLV guideline.

9           (c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2

10   mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf,

11   never intending said numeric figure to be the actual recommended guideline. Despite internally

12   acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

13           (d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH

14   ignored the carcinogenic dangers of asbestos until 1974.

15       84.    The acts of the FRAUD DEFENDANTS, as incorporated herein and described

16   above, constitute fraudulent negligent misrepresentation, which caused injury to the plaintiff, in

17   the following manner:

18           (a)    The material published or caused to be published by the FRAUD

19   DEFENDANTS was false, untrue, and incomplete in that the FRAUD DEFENDANTS

20   knowingly, deliberately, and with intent to deceive made representations, product sales, and

21   assertions regarding the safety of asbestos and asbestos-related products.

22           (b)    The FRAUD DEFENDANTS made these false and incomplete

23   representations without any reasonable grounds for believing and/or relying on their truth and

24   with the intent to induce the general consuming public and individuals therein, including

25   plaintiff, and others' direct and indirect reliance on these false, untrue, and incomplete

26   representations.

27           (c)    Plaintiff and others reasonably, justifiably, and without knowledge of the

28   falsity of the FRAUD DEFENDANTS' misrepresentations, relied, both directly and indirectly,

K:\\...\\...wpd
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS                40

1  upon published data documenting the purported safety of asbestos and asbestos-related products

2  and in the absence of published information of the hazards of asbestos and cautionary warning

3  language on or with said conspirators' product, all resulting in continued injurious exposure to

4  asbestos.  Plaintiff was unaware of the hazards due to the FRAUD DEFENDANTS' conduct.

5       WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

6  ENTITIES, and each of them, as hereinafter set forth.

7  SIXTH CAUSE OF ACTION<br>(Fraud and Deceit/Concealment)

8

9       AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR

10  FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF DEFENDANTS

11  METROPOLITAN LIFE INSURANCE COMPANY, GARLOCK SEALING

12  TECHNOLOGIES, LLC; GATKE CORPORATION, PNEUMO ABEX LLC (hereinafter

13  "PNEUMO ABEX," and formerly known as PNEUMO ABEX CORPORATION and ABEX

14  CORPORATION and successor-in-interest to AMERICAN BRAKEBLOK CORPORATION),

15  AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC.,

16  DOES 472-480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter

17  FRAUD DEFENDANTS), AND ALLEGES AS FOLLOWS:

18       85.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each

19  and every allegation of the First, Second, Fourth and Fifth Causes of Action as though fully set

20  forth herein.

21       86.    The term FRAUD DEFENDANTS as used herein includes but is not limited to:

22  METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville,

23  Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum

24  Company [USG]), American Brakeblok Corporation (now PNEUMO ABEX LLC [PNEUMO

25  ABEX]), Keasbey-Mattison Company (now T&N, LTD. [T&N]), all members of the Asbestos

26  Textile Institute [ATI], AMERICAN CONFERENCE OF INDUSTRIAL HYGIENISTS, INC.,

27  and the other entities and individuals identified in this Cause of Action.

28  ///

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

87.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Diego, State of California.

88.     FRAUD DEFENDANT AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC. (ACGIH) sets guidelines for occupational health called Threshold Limit Values (TLVs). These guidelines are relied on by OSHA (the Occupational Safety and Health Administration) in the United States and similar agencies around the world. Criticisms of the guide-line setting process have pointed to problems with data collection, inadequate research, overwhelming dependence on data supplied by financially interested corporations, and slow response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was negligent in their failure to analyze or critically evaluate previously published literature, or review and incorporate current literature, failure to adequately assess the financially motivated scientific data provided by asbestos corporations, their insurers, and medical consultants, and their limited review process, including but not limited to the following representative list:

(a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric Concentrations, for various hazardous atmospheric substances, including asbestos.  In the minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the MPC's were "not to be construed as recommended safe concentrations." In 1946, the NCGIH was renamed the AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC. (ACGIH), and despite the internally acknowledged inadequacy of the asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented,

///

and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

(b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor, fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily function, either immediate or after years of exposure." In 1948, they changed the name of the guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted definition, describing the guideline as both an "average" and a "maximum." Despite their failure to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing the definition of the TLV, the ACGIH never performed any studies to test the scientific validity of the 5 mppcf TLV guideline.

(c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2 mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf, never intending said numeric figure to be the actual recommended guideline. Despite internally acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

(d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH ignored the carcinogenic dangers of asbestos until 1974.

89.     Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the FRAUD DEFENDANTS. The exposure to the asbestos or asbestos-related products supplied by the FRAUD DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

90.     Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every paragraph of the Fourth Cause of Action, which describes the allegations against, and actions of the CONSPIRACY DEFENDANTS.

91.     Further, the FRAUD DEFENDANTS knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the FRAUD

K:\Injure\0.13112\PLD\cmp-cioMa.wpd                    43
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   DEFENDANTS made the false statements and concealed the information with the intent to

2   deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements

3   and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing

4   asbestos-related injuries and damages as more fully set forth herein.

5       92.     The asbestos-containing products that FRAUD DEFENDANTS manufactured,

6   marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to

7   asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries

8   as more fully set forth in the foregoing paragraphs.

9       93.     Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET

10  LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of

11  asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the

12  true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself

13  whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity

14  to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

15      WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

16  ENTITIES, and each of them, as hereinafter set forth.

17              SEVENTH CAUSE OF ACTION
            (Fraud and Deceit/Intentional Misrepresentation)
18

19      AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF

20  ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFF

21  COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY,

22  DOES 740-750, THEIR ALTERNATE ENTITIES AND EACH OF THEM (hereinafter

23  INTENTIONAL MISREPRESENTATION DEFENDANTS), AND ALLEGES AS FOLLOWS:

24      94.     Plaintiff incorporates herein by reference, as though fully set forth hereat, each

25  and every allegation of the First, Second, Fourth through Sixth Causes of Action as though fully

26  set forth herein.

27      95.     Plaintiff is informed and believes, and thereon alleges, that at all times herein

28  mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corpor-

K:\Laine\AD3112\PLD\comp-cpMet.wpd
                                    44
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1   ations organized and existing under and by virtue of the laws of the State of California, or the
2   laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do
3   and/or were and are doing business in the State of California, and that said defendants regularly
4   conducted and/or conducts business in the County of San Diego, State of California.

5        96.     Plaintiff incorporates herein by reference, as though fully set forth hereat, each
6   and every paragraph of the Fourth Cause of Action that describes the allegations against, and
7   actions of the CONSPIRACY DEFENDANT MET LIFE.

8        97.     Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew
9   that their foregoing statements were false and that by their acts they were actively and
10  fraudulently concealing adverse information regarding the health affects of asbestos including the
11  facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the
12  false statements and misrepresented the information with the intent to deceive; plaintiff and
13  others relied both directly and indirectly on the foregoing false statements and their lack of
14  knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-
15  related injuries and damages as more fully set forth herein.

16       98.     The asbestos-containing products that INTENTIONAL MISREPRESENTATION
17  DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were
18  defective; plaintiff was exposed to asbestos from the INTENTIONAL MISREPRESENTATION
19  DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in
20  the foregoing paragraphs.

21       99.     Additionally and alternatively, as a direct result of INTENTIONAL
22  MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, plaintiff was
23  caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents,
24  employers and the general public to be aware of the true and full dangers of asbestos, deprive
25  plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being
26  exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of
27  asbestos and caused plaintiff's damages herein.
28  ///

1  WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

2  ENTITIES, and each of them, as hereinafter set forth.

3  EIGHTH CAUSE OF ACTION
Aiding and Abetting Battery
4  [Against Metropolitan Life Insurance Company
and Does 750-790, Inclusive]
5

6  AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF

7  ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFF COMPLAINS OF

8  DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 750-790, THEIR

9  ALTERNATE ENTITIES AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

10  100.  Plaintiff incorporates herein by reference, as though fully set forth hereat, each

11  and every allegation of the First, Second, Fourth through Sixth Causes of Action as though fully

12  set forth herein.

13  101.  This cause of action is for the aiding and abetting of battery by METROPOLITAN

14  LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director

15  Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

16  102.  Plaintiff is informed and believes, and thereon alleges, that at all times herein

17  mentioned defendant MET LIFE was and is a corporation organized and existing under and by

18  virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction,

19  and that this defendant was and is authorized to do and/or was and is doing business in the State

20  of California, and regularly conducted or conducts business in the County of San Diego, State of

21  California.  At times relevant to this cause of action, MET LIFE was an insurer of J-M.

22  103.  Plaintiff, was exposed to asbestos-containing dust created by the use of the

23  asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the

24  asbestos or asbestos-related products supplied by J-M caused Plaintiff's asbestos-related disease

25  and injuries.

26  104.  Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-

27  related disease in Canadian mines and mills, including those of J-M.  Those studies revealed that

28  miners and mill workers were contracting asbestosis at relatively low levels of dust.  McGill

46
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    University, which conducted the studies, sought permission from MET LIFE to publish the

2    results but they were never published.  MET LIFE prepared its own report of these studies.

3        105.    Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S.

4    plants manufacturing asbestos-containing products, including a J-M plant.  Those studies showed

5    that workers in substantial numbers were contracting asbestosis, at levels less than what became

6    the Threshold Limit Value ("TLV") of 5mppcf.  The MET LIFE report was never published or

7    disseminated except to plant owners, including J-M.

8        106.    In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville,

9    New Jersey.  Results were consistent with those of the Canadian and previous U.S. plant studies.

10   They were never published.

11       107.    In 1934, J-M and others whose plants MET LIFE had studied agreed with MET

12   LIFE that it should issue a report of its studies.

13       108.    MET LIFE submitted a draft of its report to J-M.  J-M requested, for legal and

14   business reasons, that certain critical parts of the draft be changed.  MET LIFE's official in

15   charge was Lanza.  MET LIFE through Lanza did make changes that J-M requested, including:

16       (a)    Deletion of MET LIFE's conclusion that the permissible dust level for asbestos

17              should be less than that for silica;

18       (b)    Addition of the phrase that asbestosis clinically appeared to be milder than

19              silicosis.

20   The report, thus altered, was published in 1935.  It was misleading, and intentionally so, because

21   it conveyed the incorrect propositions that asbestosis was a less serious disease process than

22   silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases

23   than was the case for silica dust.

24       109.    MET LIFE had a close relationship with J-M.  It invested money in J-M.  It

25   provided group health and life insurance to J-M.  MET LIFE IN 1934 agreed to supply industrial

26   hygiene services to J-M, including dust counts, training employees to monitor dust levels,

27   examining employees, and recommending protective equipment.  MET LIFE and Lanza were

28   viewed as experts on industrial dusts.

110.   In 1933, MET LIFE through Lanza issued the following advice to J-M:

(a)   Disagreeing with the recommendation of a J-M plant physician, MET LIFE advised against warning workers of the fact that asbestos dust is hazardous to their health, basing its advice in view of the extraordinary legal situation;

(b)   When the plant physician judged the best disposition of an employee with asbestosis was to remove him from the dust, MET LIFE advised instead that disposition should depend on his age, nature of work and other factors and to leave him alone if he is old and showing no disability, for, MET LIFE stated, economic and production factors must be balanced against medical factors.

111.   J-M followed the MET LIFE advices and did not warn its workers, including plaintiff, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying workers of their disease.

112.   In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation ("AHF"). One of the AHF purposes was to develop standards for dust levels that would serve as a defense in lawsuits and workers' compensation claims.

113.   MET LIFE funded partially another study that tentatively recommended in 1938 a TLV for asbestos dust of 5mpccf, the same as for silica dust. MET LIFE was aware of data from its own, unpublished reports that showed that level was too high for asbestos dust. MET LIFE nonetheless promoted that TLV as proper.

114.   In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant. That report showed that workers exposed to less than the recommended maximum levels of dust were developing disease. MET LIFE was a member of the IHF and Lanza was on its medical committee. The Hemeon report, which was supplied to J-M and other owners, never was published.

115.   In 1936, J-M and other asbestos companies agreed with a leading medical research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M and the others retained control over publication of the results. In 1943 Saranac's Dr. Leroy

K:\Injured\H1117\PLD\compclg14x.wpd

48

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1    (a)    Affirmatively urging J-M not to warn workers of the hazards of asbestos dust, in

2          view of the extraordinary legal situation, such that J-M did not warn its workers,

3          including plaintiff;

4    (b)    Deleting the findings of its own draft report that the allowable limits for asbestos

5          dust should be less than those for silica dust, and promoting a false and unsafe

6          TLV which specified maximum levels of silica dust, and promoting a false and

7          unsafe TLV which specified maximum levels of dust for workers, including

8          plaintiff, which MET LIFE knew was wrong through its own studies;

9    (c)    Advising J-M to keep certain workers continuing to work at dusty areas in the

10         plant even after J-M was aware that their lungs showed asbestos-induced changes,

11         lest other workers including plaintiff be alerted to the dangers of working in the

12         dust.

13    WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

14    ENTITIES, and each of them, as hereinafter set forth.

15    <u>NINTH CAUSE OF ACTION FOR CIVIL BATTERY</u>

16    AS AND FOR A FURTHER, NINTH, SEPARATE, AND DISTINCT CAUSE OF

17    ACTION FOR CIVIL BATTERY, PLAINTIFF COMPLAINS OF DEFENDANTS UNION

18    CARBIDE CORPORATION, ROCKWELL AUTOMATION, INC., HEREIN, DOES 1-800,

19    AND EACH OF THEM AND ALLEGES:

20    122.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each

21    and every allegation contained in the Second and Third Causes of Action.

22    123.    In and by the acts, omissions and other conduct herein set forth, defendants, and

23    each of them, intended the conduct, acts, omissions, consequences and results, did what they

24    intended to do and thereby caused the unlawful, harmful and dangerous injurious physical non-

25    consented to touching of and contact with plaintiff and his person with asbestos, asbestos fibers,

26    dust, and other particulates, to include, but not be limited to, plaintiff's mucociliary escalator,

27    gastrointestinal tract, upper and lower respiratory tract, lungs, bronchioles, alveoli, alveolar

28    ///

50

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1  macrophages, fibroblasts, cells, pleura, serosal membranes, lymphatics, organs and other aspects
2  of plaintiff's body.

3      124.    In and by the acts, omissions and other conduct herein set forth, plaintiff was
4  harmed as herein set forth, which physical touching was offensive to plaintiff and a reasonable
5  person in plaintiff's circumstances as herein set forth.

6      125.    As a result of the tortious conduct herein set forth, and defendant's civil battery on
7  plaintiff, plaintiff has suffered the injuries, damages, losses and harms set forth herein.

8      WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

9                          TENTH CAUSE OF ACTION
                              (Loss of Consortium)
10

11      AS AND FOR A FURTHER, SEPARATE, FURTHER AND DISTINCT CAUSE OF
12  ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF DOROTHY CROPPER COMPLAINS
13  OF DEFENDANTS, DOES 1-500, THEIR "ALTERNATE ENTITIES," AND EACH OF
14  THEM, AND ALLEGES AS FOLLOWS:

15      126.    Plaintiff incorporates by reference each and every paragraph of the First through
16  Ninth Causes of Action herein.

17      127.    Plaintiffs BARRIE CROPPER and DOROTHY CROPPER were married on April
18  3, 1965, and at all times relevant to this action were, and are now, husband and wife.

19      128.    Prior to plaintiff BARRY CROPPER's injuries as alleged, he was able and did
20  perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof, BARRY
21  CROPPER has been unable to perform the necessary duties as a spouse and the work and service
22  usually performed in the care, maintenance and management of the family home, and he will be
23  unable to perform such work, service and duties in the future.  As a proximate result thereof,
24  plaintiff DOROTHY CROPPER has been permanently deprived and will be deprived of the
25  consortium of her spouse, including the performance of duties, all to her damages, in an amount
26  presently unknown but which will be proved at the time of trial.

27      129.    Plaintiff's discovery of the cause of her loss of consortium, as herein alleged, first
28  occurred within one year of the date this complaint was filed.

K:\Injures\111112\PLD\comp-pip\Mu.wpd
                                        51
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

130.   As a direct and proximate result of the acts of defendants, their "alternate entities," and each of them, and the severe injuries caused thereby to plaintiff BARRIE CROPPER as set forth in this complaint, plaintiff DOROTHY CROPPER has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as follows:

Plaintiff BARRIE CROPPER:

1.   For plaintiff's general damages according to proof;

2.   For plaintiff's loss of income, wages and earning potential according to proof;

3.   For plaintiff's medical and related expenses according to proof;

Plaintiff DOROTHY CROPPER:

4.   For plaintiff's damages for loss of consortium according to proof;

Plaintiffs BARRIE CROPPER and DOROTHY CROPPER:

5.   For plaintiffs' cost of suit herein;

6.   For exemplary or punitive damages according to proof;

7.   For damages for fraud according to proof; and

8.   For such other and further relief as the court may deem just and proper, including costs and pre-judgment interest as provided in C.C.P. § 998, C.C.P. § 1032, and related provisions of law.

Dated: _____

BRAYTON❖PURCELL LLP

By: _____
David R. Donadio
Attorneys for Plaintiffs

R:\bisco\l\131129\13emp-cblht.wpd                    52
COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1

### EXHIBIT A

2      Plaintiff's exposure to asbestos and asbestos-containing products occurred at various

3 locations both inside and outside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Central Manufacturing and Trading Company Dudley, Worcestershire, England | Central Manufacturing and Trading Company Dudley, Worcestershire, England | Sales Engineer | 1967-1970 |
| Mycalex and Rosite (purchased by Allen Bradley Co. in 1973) Cirenchester, Gloucester, England | Mycalex and Rosite Cirenchester, Gloucester, England | Salesman (Technical Sales) | 1970-8/1974 |
| Rostone Corporation (USA) Lafayette, IN | Rostone Corporation Production Facility Research and Development Laboratory, Lafayette, IN | Engineer | 9/1974 (approx. 1 year) |

13  Mr. Cropper was, during his employment in England with Rockwell Automation, a citizen of

14  England. Therefore, any injury sustained as a result of his exposure to asbestos and/or asbestos-
   containing products while so employed is not subject to the exclusive remedy provisions of the

15  Workers' Compensation Act. Mr. Cropper's injuries did not originate from employment within
   the State of California and are, therefore, properly the subject of a third party tort action.

16

### NON-OCCUPATIONAL EXPOSURE:

17

#### Automobile repair:

18  Plaintiff recalls performing brake jobs on various personal vehicles. When performing brake
   jobs, plaintiff used the same routine on each occasion. Plaintiff recalls removing old asbestos-

19  containing brakes, cleaning the brake assemblies and drums with a brush or a rag, and installing
   new asbestos-containing brakes. From 1970 to 1990, plaintiff performed repair of the following

20  personal vehicles:

21  1970 MERCEDES 280 SL: Plaintiff removed the original equipment manufacturer's asbestos-
   containing brakes and replaced them with asbestos-containing brakes he purchased from the

22  ESCONDIDO MOTORS, West 9th Escondido, California. Plaintiff subsequently changed the
   brakes two additional times replacing the linings with asbestos-containing brakes purchased from

23  ESCONDIDO MOTORS, West 9th Avenue, Escondido, California.

24  1975 FORD TRIUMPH TR6. Plaintiff purchased asbestos-containing replacement brakes from
   European Auto Parts, Rancho Bernardo, California.

25

26  On the following cars, plaintiff opened and cleaned the original equipment manufacturer's
   asbestos-containing brakes, removing dirt and asbestos-containing dust but did not replace the
   asbestos brakes:

27

28  1976 FERRARI 308 GTB
   1989 FERRARI Mondial T Coupe

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1

Plaintiff performed a clutch job on the following vehicle, disturbing asbestos-containing friction
disks during the removal and installation process:

2

3

1975 FORD TRIUMPH TR6:  Plaintiff purchased a replacement asbestos-containing clutch from
Victoria Auto Parts, Atlanta, Georgia.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

X:\lajerel\1131\PLD\cmp-pisMot.wpd

54

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

1

## EXHIBIT B

2

3   Plaintiff's exposure to asbestos and asbestos-containing products caused severe and

4 permanent injury to the plaintiff, including, but not limited to breathing difficulties and/or other

5 lung damage.  Plaintiff was diagnosed with mesothelioma on or about July 2009.

6   Plaintiff is still employed and therefore has suffered no disability due to his asbestos-

7 related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B

K:\Injure\M13\17PLD\comp-pla54o.wpd

55

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS