E-filing

1   Robert E. Boone III, California Bar No. 132780
    James C. Pettis, California Bar No. 223953
2   Linda C. Hsu, California Bar No. 239880
    **BRYAN CAVE LLP**
3   120 Broadway, Suite 300
    Santa Monica, California 90401-2386
4   Telephone:   (310) 576-2100
    Facsimile:   (310) 576-2200
5   Emails:      reboone@bryancave.com
                 james.pettis@bryancave.com
6                linda.hsu@bryancave.com

7   Attorneys for Defendant
    McDONNELL DOUGLAS CORPORATION
8

9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11

12  TIMOTHY VEST and CAROLINE          Case No.:    **C11-00061**
    VEST,
13                                     (Alameda County Superior Court
                                       Case No. RG09489518)
14          Plaintiffs,

15     vs.                            **NOTICE OF REMOVAL OF
                                      ACTION UNDER 28 U.S.C.**
16  ALLIED PACKING AND SUPPLY;        **SECTION 1442(a)(1) (FEDERAL
    ALTA BUILDING MATERIALS CO.;      OFFICER)**
17  CYPRUS AMAX MINERALS
    COMPANY, individually, and as
18  successor in interest, parent, alter ego,
    and equitable trustee of CYPRUS MINES
19  CORPORATION, SIERRA TALC &
    CHEMICAL COMPANY, UNITED
20  SIERRA DIVISION CYPRUS MINES
    CORPORATION, and PAUL W. WOOD
21  COMPANY; DEAN'S MATERIALS,
    INC. dba CONSTRUCTION
22  MATERIAL SUPPLIER; THE DEXTER
    CORPORATION; DOWMAN
23  PRODUCTS, INC.; GARLOCK
    SEALING AND TECHNOLOGIES,
24  LLC; GEORGIA-PACIFIC LLC,
    formerly known as GEORGIA-PACIFIC
25  CORPORATION; HAMILTON
    MATERALS, INC.; HENKEL
26  CORPORATION, individually and as
    successor in interest, parent, alter ego,
27  and equitable trustee to HENKEL
    LOCTITE CORPORATION,
28  individually, and as successor in interest,

818741\0307472

NOTICE OF REMOVAL

FAXED
FIRST LEGAL SUPPORT SERVICES

Exhibit B - Page 141

TOTAL P.06

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  parent, alter ego, and equitable trustee to THE DEXTER CORPORATION;
2  HEXCEL CORPORATION; KAISER GYPSUM COMPANY, INC.; KELLY MOORE PAINT COMPANY, INC.;
3  KENTILE FLOORS, INC.; THE PORT OF OAKLAND; RAYMOND
4  INTERIOR SYSTEMS-NORTH, individually, and as successor in interest,
5  parent, alter ego, and equitable trustee to JAMES L. WHITTAKER, INC.;
6  MCDERMOTT/SEALY, INC.; PARKER HANNIFIN, individually, and as
7  successor in interest, parent, alter ego, and equitable trustee of CLEVELAND
8  WHEELS & BRAKES; GEORGE E. MASKER, INC.; F.P. LATHROP
9  CORPORATION; MCDONNELL DOUGLAS CORPORATION; LIFE
10 TECHNOLOGIES CORPORATION, successor by merger to INVITROGEN
11 CORPORATION, individually, and as successor in interest, parent, alter ego,
12 and equitable trustee of THE DEXTER CORPORATION; LATHROP
13 CONSTRUCTION ASSOCIATES, INC., individually, and as successor in interest,
14 parent, alter ego, and equitable trustee of F.P. LATHROP CONSTRUCTION
15 COMPANY; WORLD AIRWAYS, INC.; METROPOLITAN LIFE INSURANCE
16 COMPANY; and TENTH DOE through THREE HUNDRED THIRTIETH DOE,
17 inclusive,

18              Defendants.

19

20

21        TO THE CLERK OF THE ABOVE-ENTITLED COURT:

22        PLEASE TAKE NOTICE that Defendant McDonnell Douglas Corporation

23 ("MDC") files this Notice of Removal of the state court action filed by Plaintiffs

24 Timothy Vest and Caroline Vest as described below to this Court pursuant to 28

25 U.S.C. Section 1442(a)(1):

26 **I.      BACKGROUND**

27        1.    This is an asbestos personal injury action in which Plaintiffs alleges

28 that Timothy Vest contracted mesothelioma caused by his exposure to asbestos in

1   United States Government-procured and Government-furnished and/or selected

2   aircraft components, including engines, installed by MDC in the KC-10 tanker/cargo

3   military aircraft and B-23 Dragon military aircraft, among other aircraft during the

4   manufacture and assembly of such planes, as required by MDC's procurement

5   contracts with the United States Government, and under the direction and control of

6   federal officers, *i.e.*, procurement personnel and military officials from the

7   Department of the Defense, the United States Air Force, Navy and Marines.

8         2.     The KC-10 and B-23 (the "Aircraft") were military aircraft

9   manufactured by MDC for the United States military.  The Government, through the

10  Air Force, procured the Aircraft from MDC pursuant to a series of military

11  equipment procurement contracts.  MDC designed the Aircraft pursuant to

12  Government-issued and/or Government-approved detail design specifications and

13  requirements and continued to make Government-mandated changes throughout the

14  life of the Aircraft.

15        3.     As set forth in more detail below, federal officers (Air Force and

16  Department of Defense personnel) selected the Aircraft component parts, including

17  engines, brakes, and/or landing gear, approved their design, including the use of any

18  asbestos in them, independently selected and in some cases procured the component

19  parts from the engine and brake manufacturers, supplied the component parts to

20  MDC, and <u>required</u> MDC to install those components on the Aircraft.  In other

21  words, MDC had no choice but to install the component parts, including any

22  asbestos components, on such Aircraft.  Now, MDC is being sued for allegedly

23  using asbestos in those component parts.  MDC removes this action to this Court on

24  "federal officer" grounds pursuant to 28 U.S.C. Section 1422(a)(1).

25        4.     On or about December 17, 2009, Plaintiff filed a Complaint in the

26  action entitled *Timothy Vest and Caroline Vest v. Allied Packing and Supply, et al.*,

27  in the Superior Court of the State of California for the County of Alameda ("State

28  Court"), Case No. RG09489518 ("State Court Action").  MDC was served with the

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 143**

1    Complaint on January 27, 2010. MDC was served with the Second Amended

2    Complaint, which is the operative complaint, on June 3, 2010. True and correct

3    copies of the Complaint and Second Amended Complaint are attached as Exhibit A.

4         5.       Neither the Complaint nor the Second Amended Complaint identified

5    any MDC aircraft or other products that Plaintiffs claimed were a source of

6    Mr. Vest's alleged asbestos exposure. Specifically, the Complaint and Second

7    Amended Complaint do not include identification of any military aircraft or

8    component part for which Mr. Vest alleges exposure and which he claimed

9    exposure. Thus, a basis for removal jurisdiction was not apparent from the

10   Complaint or Second Amended Complaint.

11        6.       On March 16, 2010, MDC filed and served its Demurrer to the

12   Complaint in the State Court and filed and served its Answer to the Second

13   Amended Complaint on June 9, 2010, true and correct copies of which are attached

14   as Exhibit B.

15        7.       Among other alleged sources of exposure, Plaintiffs claim that

16   Mr. Vest was exposed while his father, Warren Vest, worked at World Airways,

17   Inc., Oakland Airport, Hangar 110, from 1973 to 1983 (Plaintiffs allege secondary

18   exposure at home and when Mr. Vest accompanied his father to work on weekends).

19   (*See* Ex. A at p. 5.) Plaintiffs' claims focused on alleged exposure to asbestos from

20   MDC's commercial aircraft, specifically DC-8 and DC-10 planes.

21        8.       On December 30, 2010, Plaintiffs served MDC with his Opposition to

22   MDC's Motion for Summary Judgment ("MSJ"), which was brought, in part, on the

23   grounds that Plaintiffs lacked sufficient evidence of asbestos exposure with regard

24   to the DC-8 and DC-10. Plaintiffs supported their Opposition with a declaration

25   from their retained and designated expert industrial hygienist witness John Templin.

26   A true and correct copy of John Templin's Declaration is attached as Exhibit C.

27   Mr. Templin opined in his declaration that Mr. Vest was exposed to asbestos via

28   "re-entrainment" or "re-suspension" of all asbestos fibers that were released in

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 144**

1  Hangar 110 between 1972 and 1983, and that all such asbestos fibers were a

2  significant factor in causing Mr. Vest's alleged asbestos-related injury. (Ex. C:

3  Templin Decl. ¶¶ 14, 21, 23, 24.) Pursuant to Plaintiffs' new theory that any and all

4  maintenance work done on any and all aircraft caused asbestos to be released into

5  Hangar 110 and settle in the hangar (e.g., on the rafters), and at all times after the

6  initial release, this asbestos would be disturbed and be re-introduced into the air

7  where it was inhaled by Mr. Vest, thus causing his mesothelioma.

8      9.    As part of Plaintiffs' Opposition to MDC's MSJ, Plaintiffs also stated

9  that third-party witnesses Plaintiffs had subpoenaed for deposition were scheduled

10  to be deposed and would provide testimony, upon which Plaintiffs would rely in

11  opposition to MDC's MSJ, to demonstrate that "MDC's asbestos-containing aircraft

12  parts were pervasively used in Hangar 110 from 1973 through 1983." Plaintiffs'

13  MSJ Opposition Memorandum of Points and Authorities at 20:12-14. (A true and

14  correct copy of Plaintiffs' Opposition is attached as Exhibit D.) In their Opposition,

15  Plaintiffs specifically identified non-party witnesses David Miller and Mike

16  Pociecha, both former World Airways aircraft mechanics/painters.

17      10.    On December 29 and 30, 2010, Plaintiffs deposed non-party witness

18  David Miller. Mr. Miller testified during his deposition that World Airways

19  performed "heavy checks, like a C check" in Hangar 110 on MDC's KC-10 military

20  airplanes. (Miller Dep. at 273:14-274:4, a true and correct copy is attached as

21  Ex. E.) According to Mr. Miller, this work was done by World Airways for the U.S.

22  military during the relevant time period of 1973 to 1983. MDC manufactured

23  KC-10 aircraft pursuant to stringent procurement contracts with the Government.

24  Mr. Miller's December 29, 2010 deposition testimony was the first time in the State

25  Action that Plaintiffs or any witness provided any evidence that "heavy"

26  maintenance was performed on MDC's KC-10 military aircraft in Hangar 110.

27  "Heavy" maintenance such as that normally performed during a C-check on

28  a KC-10 aircraft includes maintenance on numerous components of the aircraft,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 145**

1  including the engines, brakes, etc.

2      11.   On January 4, 2011, Plaintiffs deposed non-party witness Mike

3  Pociecha (an ex-World Airways "aircraft painter" and carpenter/construction

4  worker). Mr. Pociecha testified during his deposition that he saw maintenance being

5  performed at Hangar 110 on Edward Daly's (ex-owner of World Airways) B-23

6  military bomber aircraft, including work on brakes and landing gear during the

7  relevant time period. According to Mr. Pociecha, this maintenance work was done

8  by World Airways during the relevant time period of 1973 to 1983. Mr. Daly's

9  B-23 was originally manufactured by MDC for the Air Force pursuant to stringent

10  procurement contracts with the Government. Mr. Pociecha's January 4, 2010

11  deposition testimony was the first time in the State Action that Plaintiffs or any

12  witness provided any evidence that "heavy" maintenance was performed on MDC's

13  B-23 in Hangar 110.

14      12.   Under *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir.

15  2006), federal officer removal is not triggered until a plaintiff discloses sufficient

16  information from which it is apparent that a valid basis for federal officer removal

17  exists—that is, enough detailed facts to support each of the substantive requirements

18  for federal officer removal. MDC's right to remove was triggered with regard to the

19  KC-10 on December 30, 2010, when Plaintiffs proffered Templin's testimony that

20  Mr. Vest was exposed to asbestos from any and all aircraft on which maintenance

21  was performed in Hangar 110, and such exposure caused Mr. Vest's mesothelioma,

22  coupled with Miller's deposition testimony that World Airways performed "heavy"

23  maintenance on KC-10 military aircraft for the U.S. Government in Hangar 110.

24  The removal clock regarding the B-23 was not triggered until January 4, 2011, when

25  Pociecha testified that World Airways personnel performed maintenance on MDC's

26  B-23 military bomber aircraft in Hangar 110.

27      13.   Plaintiffs assert broad product liability claims against MDC, including

28  claims for negligence, strict liability and false representation. Further, the other 18

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 146**

1    defendants in the State Action have alleged in their answers to the Complaint and/or
2    will no doubt allege at trial that liability/fault for Plaintiffs' injuries must be
3    apportioned between and amongst each other defendant and/or non-party
4    responsible for any source of asbestos exposure to Mr. Vest, as determined by the
5    jury.  Thus, MDC must defend itself against co-defendants' comparative fault and
6    apportionment claims, which, like Plaintiffs' claims of exposure to MDC's Aircraft,
7    seek to implicate MDC for conduct under color of a federal officer and which it is
8    immune from suit under the military defenses described in this petition.

9        14.    MDC built the Aircraft for the United States Government pursuant to
10   military procurement contracts with the Air Force.  MDC built such equipment
11   while acting under the direction and control of Air Force officers.  Such
12   procurement contracts and federal officers required MDC to manufacture the
13   Aircraft in strict compliance with reasonably precise design specifications and
14   detailed design drawings, among other things, that were reviewed and approved by
15   the Air Force.  More importantly, such contracts and federal officers required MDC
16   to install on the Aircraft certain components and systems, designated by the
17   Government as "Government Furnished Aircraft Equipment" (aka "GFAE") and/or
18   "Contractor Furnished Aircraft Equipment" (aka "CFAE").  The Government
19   separately procured GFAE components from the original equipment manufacturers
20   ("OEMs") of that equipment under separate procurement contracts with those
21   OEMs, provided to MDC for installation on the Aircraft during manufacture, and
22   required MDC to install on the Aircraft.  The Government independently selected
23   CFAE components for inclusion in the aircraft design, after extensive and formal
24   reviews of the designs of such components with the OEMs for those components,
25   required MDC to procure such components from the OEMs, and required MDC to
26   install CFAE components on the Aircraft.  For example, various components,
27   including engines, brakes, and/or landing gear in the Aircraft, which Plaintiffs
28   contends contained asbestos to which Mr. Vest was allegedly exposed, were GFAE

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 147**

1  and/or CFAE.

2      15.    MDC has attached to this Notice of Removal pleadings and other

3  papers identified that it was served with in the State Court Action.  MDC will

4  supplement this Notice with an Appendix of Pleadings Filed in the State Court

5  Action as necessary within 30 days of the date of filing this Notice of Removal to

6  include any other pleadings or papers not included at this time.

7      16.    This Notice of Removal is filed within 30 days of December 30, 2010,

8  which is the day that Plaintiffs e-served their Opposition to MDC's MSJ, which

9  included the Templin Declaration.  This removal is therefore filed within the time

10 period prescribed by law.  *See* 28 U.S.C. § 1446(b).

11     17.    This action is one which may be removed to this Court by MDC, and

12 over which this Court may properly exercise jurisdiction, on the ground of federal

13 officer removal jurisdiction pursuant to 28 U.S.C. Section 1442(a)(1).

14 **II.    FEDERAL OFFICER REMOVAL IS APPROPRIATE UNDER**

15     **28 U.S.C. SECTION 1442(a)(1)**

16     18.    Removal is proper under 28 U.S.C. Section 1442(a)(1) when

17 (a) defendant seeking removal demonstrates that it is a "person" within the meaning

18 of the statute; (b) defendant demonstrates a causal nexus between defendant's

19 actions, taken pursuant to a federal officer's directions and under color of federal

20 office, and plaintiff's claims; and (c) defendant asserts a "colorable federal defense."

21 *Mesa v. California*, 489 U.S. 121, 124-25, 134-35 (1989).

22     19.    MDC is a "person" within the meaning of 28 U.S.C.

23 Section 1442(a)(1).  *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

24     20.    Plaintiffs have asserted claims against MDC for product liability based

25 on Mr. Vest's alleged exposure to asbestos-containing components MDC allegedly

26 installed in the Aircraft.  In particular, Plaintiffs assert in their Opposition to MDC's

27 MSJ, more specifically in the supporting Templin Declaration, that Mr. Vest was

28 exposed to asbestos in the Aircraft and components, including engines, brakes, and

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Exhibit B - Page 148

1  landing gear.

2      21.   MDC manufactured the Aircraft pursuant to military procurement

3  contracts with the Air Force and in compliance with reasonably precise design

4  specifications, as well as detailed design drawings, which were reviewed and

5  approved by the Air Force.  The Aircraft procurement contracts required the

6  Aircraft, as with all military aircraft, to be built in strict conformance with detailed

7  design specifications for the Aircraft, and these specifications were expressly

8  incorporated by reference in the contracts.  The Air Force were intimately involved

9  in the design, development and testing of the Aircraft and their components and

10  systems, including control of warnings, and monitored MDC's performance under

11  the contracts at all times and required MDC to construct the Aircraft in accordance

12  with the applicable and approved specifications and drawings incorporated into the

13  contracts.  All Aircraft built pursuant to these contracts were subject to inspection,

14  testing and approval by the Air Force.  Government personnel had unrestricted

15  access to MDC's plant and operations so that the Government could conduct

16  inspections and tests of all material and workmanship.  In addition, the Air Force

17  performed extensive flight tests of the aircraft and their components and systems

18  prior to commission, to ensure complete conformity with the design specifications.

19  To the extent that any part of the Aircraft from which Plaintiff was allegedly

20  exposed was installed in the Aircraft during the initial manufacturing process, any

21  asbestos contained in the Aircraft, or any component part, was explicitly and

22  directly required by the Government under the direction of one or more of the

23  following officers:  Secretary of the Air Force; the Air Force Surgeon General;

24  Office of the Air Force Representative, Air Material Command ("AMC"); Air

25  Force/AMC Contracting Officers B.N. Warren, H.R. Zahn, O.L. Weddell, G.

26  Kinnier, E.S. Jackson, H.R. Kimes, J. Grogan, A.L. Maddox, Cpt. W.H. Cobine,

27  F.H. Englehardt, L.A. Weaver, T.C. Fox, J.E. Tolnitch, H.G. Egbert, H.P. Powell,

28  Maj. J.R. Kerr, R.J. Knight, James D. Price, H.M. Zinn, V.L. Whiter, Porter B.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 149**

1  Coolidge, Maj. John J. Smythe, Lt. Col. Carl J. Chapman, Lt. Col. Horace W.

2  Lanford, Jr., G. Graham Whipple, Brig. Gen. W.B. Farnsworth, Maj. R.E. Lee, Brig.

3  Gen. P.H. Smith, Brig. Gen. M.E. Bradley, Col. B.I. Funk, Maj. Gen. O.R. Cook,

4  Brig. Gen. H.A. Shepard, Col. G.E. Schaetzel, Col. J. B. McFarland, Chief, Services

5  Branch, Services Subdivision, Procurement Division, AMC Headquarters; and/or

6  Maj. Gen. Orval R. Cook, Director, Procurement and Industrial Planning. *See Fung*,

7  816 F. Supp. 572-73.

8      22.    Military quality control representatives maintained offices at MDC's

9  production facilities at Long Beach, California (and later, Palmdale, California) and

10  St. Louis, Missouri.  Military officers, engineers, contract administrators and

11  technicians had, and exercised, complete access to MDC's facilities to oversee the

12  design, development and production of the military aircraft, including the Aircraft.

13  Military personnel also conducted aircraft inspections and acceptance flights for

14  each production Aircraft.

15      23.    The Detail Specification and design specifications and drawings that

16  the Aircraft contracts incorporated by reference defined the design of the Aircraft

17  and components, systems and parts, including warnings.  The Government had

18  authority to reject any Aircraft that failed to conform to these specifications.

19      24.    The design of the Aircraft could not be changed by MDC without

20  Government authorization.  Government approval for a major design change

21  occurred through an engineering change proposal ("ECP"), which would define the

22  change, establish a feasible production effectivity, determine retrofit activity, and

23  calculate the costs of the change, following which the Government evaluated,

24  review and approved the design change.  The Government retained absolute

25  authority to accept, reject or modify any aspect or portion of an ECP.  For example,

26  major changes controlled by the Government regarding the KC-10 involved a boom

27  control station in the rear of the fuselage, extra fuel tanks below the main deck, and

28  removal of most cargo doors and windows.  In addition, all minor changes (*i.e.*,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    non-ECP changes) also required review and approval by the Government.

2        25.    Further and perhaps more importantly, the Government required MDC

3    to install all GFAE/CFAE components on the Aircraft, including alleged

4    asbestos-containing components for which Plaintiff contends he was exposed and

5    caused him to contract an asbestos-related disease.  The Government also controlled

6    all warnings, including warnings associated with GFAE/CFAE components.  Such

7    GFAE/CFAE components include many components, including engines, brakes, and

8    landing gear.

9        26.    Insofar as these GFAE/CFAE components contained asbestos, the

10   procurement contracts and federal officers required MDC to install such asbestos on

11   the Aircraft.  MDC did not design, select and/or procure these GFAE/CFAE

12   components, including any asbestos in such components.  MDC did not know the

13   extent, if any, to which GFAE/CFAE components contained asbestos because this

14   information was proprietary to the component manufacturers, and could not provide

15   warnings relating to these components.  Rather, the Government approved the

16   design of, selected and separately procured or directed the procurement of all

17   GFAE/CFAE components from the OEM, and required MDC to install such

18   GFAE/CFAE on the Aircraft, and controlled warnings related to these components.

19       27.    Under the Aircraft procurement contracts and detail design

20   specifications and drawings, MDC was also required by the Government to comply

21   with numerous and extensive Military Specifications ("MIL specs") in the

22   manufacture of the Aircraft.  These MIL specs required MDC to use

23   Government-specified and approved materials, components, processes and/or

24   techniques that were developed by the Government over many years of procuring,

25   designing and manufacturing military equipment, including aircraft.  Pursuant to

26   various MIL specs, the Government required the use of specific materials on, and

27   controlled warning relating to, the Aircraft.

28       28.    MDC asserts a colorable federal defense, namely the "government

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 151**

contractor" immunity defense as stated in *Boyle v. United Technologies, Inc.*, 487

U.S. 500, 101 L.Ed. 442, 108 S.Ct. 2510 (1988) (government contractors are not

liable for injuries caused by design defects in equipment when the contractor built

such equipment according to reasonably precise government-approved design

specifications), and its progeny, including *Niemann v. McDonnell Douglas Corp.*,

721 F.Supp. 1019 (S.D. Ill. 1989) (in which MDC obtained a grant of summary

judgment under *Boyle* against asbestos claims regarding the manufacture of military

aircraft); *see also Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996).

*Boyle* establishes that a government contractor is not liable for injuries caused by

design defects in equipment when the contractor built such equipment according to

reasonably precise government-approved design specifications.  The government

contractor defense is satisfied because the design specifications for the Aircraft were

government-approved, the Aircraft conformed to these specifications, and, to the

extent that asbestos was known at the time to be a hazardous material, the

Government's knowledge of such hazards was superior to the knowledge of MDC.

*Fung*, 816 F. Supp. at 573.

29.     There is a causal nexus between MDC's actions under color of military

procurement officers and Mr. Vest's alleged exposure to asbestos because Miller's

December 29, 2010, and Pociecha's January 4, 2011, deposition testimony

identifying that maintenance was performed in Hangar 110 on MDC's KC-10 and

B-23 military airplanes, coupled with the extensive procurement contracts between

MDC and the Government and the Government's pervasive control over the design

of the aircraft, demonstrate that MDC as was "acting under" the direction of

a federal officer when that officer had "direct and detailed control" over MDC in the

design and manufacture of the aircraft. *See Fung v. Abex Corp.*, 816 F. Supp. 569,

572 (N.D. Cal. 1992).  "This control requirement can be satisfied by strong

government intervention and the threat that a corporate defendant will be sued in

state court 'based upon actions taken pursuant to federal direction.'" *Id.*

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 152**

MDC'S NOTICE OF REMOVAL

1    30.    Further, Mr. Vest's alleged exposure from asbestos-containing

2    components in the Aircraft built by MDC in compliance with Government

3    specifications, and  the purported asbestos that allegedly caused his injuries, was

4    installed by MDC while it was acting under the direction of the federal officers.

5    Indeed, since federal officers <u>directed and required</u> MDC to install those parts and

6    components, including controlling all warnings, such as GFAE/CFAE engines,

7    brakes, and landing gear on the Aircraft, there is an unequivocal "causal nexus"

8    between the direction MDC received from the military, which it followed, and

9    Plaintiff's alleged injury.  *Akin v. Big Three Indus.*, 851 F. Supp. 819, 823-824 (E.D.

10   Tex. 1994) ("[W]hen a government contractor builds a product pursuant to Air

11   Force specifications and is later sued because compliance with those specifications

12   allegedly causes personal injuries, the nexus requirement is satisfied."); *Fung*, 816

13   F. Supp. at 572 (causal nexus is satisfied upon showing of "strong government

14   intervention and the threat that a defendant will be sued in state court 'based upon

15   actions taken pursuant to federal direction"); *Pack v. ACandS, Inc.*, 838 F. Supp.

16   1099, 1103 (D. Md. 1993) (defendant satisfied the causal nexus requirement because

17   "the government here contracted with [defendant] to build turbine generators under

18   government specifications during the World War II period"); *see also Yearsley v.*

19   *W.A. Ross Construction Co.,* 309 U.S. 18 (1940).

20   **III.    INTRADISTRICT ASSIGNMENT**

21   31.    Because this Court is the United States District Court for the district

22   and division embracing the place where the original State Court Complaint was

23   filed, it is the appropriate court for removal under 28 U.S.C. Section 1446(a).

24   **IV.    TRANSFER OF THIS ACTION TO MULTI-DISTRICT**

25   **LITIGATION ASBESTOS PROCEEDINGS**

26   32.    MDC also intends to seek transfer of this action to the Eastern District

27   of Pennsylvania, where all Federal Court asbestos actions have been centralized in

28   a single forum, *i.e.*, *In re Asbestos Products Liability Litigation (Multi District*

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 153**

1  *Litigation Docket No. 875)*, pursuant to 28 U.S.C. Section 1407.  Accordingly,

2  MDC is concurrently filing a Notice of Pendency of Other Action regarding MDL

3  875.

4  **V.**       **PROCEDURAL COMPLIANCE**

5       33.     Because MDC satisfies the requirements for removal under 28 U.S.C.

6  Section 1442(a)(1), it is entitled to remove this entire action.  Joinder of the other

7  defendants in this action is not necessary to remove under 28 U.S.C.

8  Section 1442(a)(1).  *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d

9  1310, 1314 (9th Cir. 1981).

10       34.     MDC will give notice of the filing of this Notice as required by 28

11  U.S.C. Section 1442(a)(1).

12       **WHEREFORE**, MDC requests that this action proceed in this Court as

13  a properly removed action.

14  Dated:  January 6, 2011

                         Respectfully submitted,

16                         Robert E. Boone III
                         James C. Pettis
17                         Linda C. Hsu
                         **BRYAN CAVE LLP**
18

19                         By: _____
20                              James C. Pettis
                         Attorneys For Defendant
21                         McDONNELL DOUGLAS
                         CORPORATION
22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit B - Page 154**

1 | Gordon D. Greenwood, Esq. (C.S.B. #136097)
Justin A. Bosl, Esq. (C.S.B. #241117)
2 | KAZAN, McCLAIN, LYONS,
GREENWOOD & HARLEY
3 | A Professional Law Corporation
171 Twelfth Street, Third Floor
4 | Oakland, California 94607
Telephone: (510) 465-7728
5
Attorneys for Plaintiffs
6

ENDORSED
FILED
ALAMEDA COUNTY

DEC 17 2009

CLERK OF THE SUPERIOR COURT
By _____
Deputy

7

8            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF ALAMEDA

10

11

TIMOTHY VEST and CAROLINE VEST,

                      Plaintiffs,

vs.

ALLIED PACKING AND SUPPLY; CYPRUS
AMAX MINERALS COMPANY, individually,
and as successor in interest, parent, alter ego
and equitable trustee of CYPRUS MINES
CORPORATION, SIERRA TALC &
CHEMICAL COMPANY, UNITED SIERRA
DIVISION CYPRUS MINES CORPORATION
and PAUL W. WOOD COMPANY; THE
DEXTER CORPORATION; DOWMAN
PRODUCTS, INC.; GARLOCK SEALING
AND TECHNOLOGIES, LLC.; GEORGIA-
PACIFIC LLC, formerly known as GEORGIA-
PACIFIC CORPORATION; HAMILTON
MATERIALS, INC.; HENKEL
CORPORATION, individually and as successor
in interest, parent, alter ego and equitable
trustee to HENKEL LOCTITE
CORPORATION, individually and as successor
in interest, parent, alter ego, and equitable
trustee to THE DEXTER CORPORATION;
HEXCEL CORPORATION; KAISER
GYPSUM COMPANY, INC.; KELLY-
MOORE PAINT COMPANY, INC.; KENTILE
FLOORS, INC.; RAYMOND INTERIOR
SYSTEMS-NORTH, individually and as
successor in interest, parent, alter ego and
equitable trustee to JAMES L. WHITTAKER,
INC.; WORLD AIRWAYS, INC.;

No. RG 09489518

COMPLAINT FOR PERSONAL
INJURIES; STRICT LIABILITY;
BREACH OF WARRANTIES;
NEGLIGENCE; FRAUD; AIDING AND
ABETTING FRAUD; AIDING AND
ABETTING BATTERY; CONSPIRACY;
(ALTERNATIVE ENTERPRISE AND
CONCERT OF ACTION LIABILITY);
PREMISES LIABILITY; AND LOSS OF
CONSORTIUM

Code of Civil Procedure § 36(d)

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

OSL/467445.1

1

EXHIBIT A - Page 15

Exhibit B - Page 155

METROPOLITAN LIFE INSURANCE
COMPANY; and FIRST DOE through THREE
HUNDRED THIRTIETH DOE, inclusive,

Defendants.

Plaintiff TIMOTHY VEST alleges:

## PRODUCTS DEFENDANTS:

### FIRST CAUSE OF ACTION

**Negligence**
**[Against All Product Defendants]**

I.

Plaintiff Timothy Vest brings this action on his own behalf. The masculine form as used in this complaint, if applicable as shown by the context hereof, applies to a female person or a corporation.

II.

Plaintiff does not know the true names and capacities, whether corporate, associate or individual of defendants sued herein as FIRST DOE through THREE HUNDRED THIRTIETH DOE, inclusive, and each of them, and for that reason prays leave to insert the true names and capacities of said defendants when the same are ascertained. Plaintiff is informed and believes and therefore alleges that each of the defendants designated herein as a DOE is negligently, intentionally and/or strictly liable or responsible in some manner for the events and happenings herein referred to, and proximately caused injury and damages to plaintiff thereby as herein alleged.

III.

At all times herein mentioned, each of the defendants was the agent and employee of each of the remaining defendants, and was at all times acting within the purpose and scope of said agency and employment, and each defendant has ratified and approved the acts of the remaining defendants.

///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

:OSL/467445.1

Complaint for Personal Injuries

2

**IV.**

Defendants ALLIED PACKING AND SUPPLY; CYPRUS AMAX MINERALS COMPANY, individually, and as successor in interest, parent, alter ego and equitable trustee of CYPRUS MINES CORPORATION, SIERRA TALC & CHEMICAL COMPANY, UNITED SIERRA DIVISION CYPRUS MINES CORPORATION and PAUL W. WOOD COMPANY; THE DEXTER CORPORATION; DOWMAN PRODUCTS, INC.; GARLOCK SEALING AND TECHNOLOGIES, LLC.; GEORGIA-PACIFIC LLC, formerly known as GEORGIA-PACIFIC CORPORATION; HAMILTON MATERIALS, INC.; HENKEL CORPORATION, individually and as successor in interest, parent, alter ego and equitable trustee to HENKEL LOCTITE CORPORATION, individually and as successor in interest, parent, alter ego, and equitable trustee to THE DEXTER CORPORATION; HEXCEL CORPORATION; KAISER GYPSUM COMPANY, INC.; KELLY-MOORE PAINT COMPANY, INC.; KENTILE FLOORS, INC.; RAYMOND INTERIOR SYSTEMS-NORTH, individually and as successor in interest, parent, alter ego and equitable trustee to JAMES L. WHITTAKER, INC.; WORLD AIRWAYS, INC.; METROPOLITAN LIFE INSURANCE COMPANY; FIRST DOE through FIFTIETH DOE, inclusive, were at all times herein and still are corporations authorized to and doing business in the State of California and are hereby designated PRODUCTS defendants.

**V.**

PRODUCTS defendants' products at issue in this complaint consist of asbestos and asbestos-containing products, or products as to which PRODUCTS defendants knew or should have known that reasonably foreseeable uses of the products would expose persons such as plaintiff who worked with or around the products to friable asbestos. These products were defective in their design, manufacture, labeling, marketing and/or warning and are referred to throughout this complaint as "asbestos" or "asbestos-containing products."

**VI.**

At all times herein mentioned defendants, and each of them, were engaged in the business of mining, manufacturing, assembling, supplying, packaging, installing and labeling asbestos, and products produced therefrom, for sale to and use by the members of the general public as well as to

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
AKLAND, CA 94607
(510) 302-1000
(510) 465-7728
AX (510) 835-4913

Complaint for Personal Injuries

1    other parties for use of the said products to manufacture and supply products therefrom.

2                                        VII.

3          At all times herein mentioned, defendants FIFTY-FIRST DOE through TWO HUNDRED

4    TENTH DOE were Officers and Directors of named defendants herein as FIRST DOE through

5    FIFTIETH DOE.

6                                        VIII.

7          The defendants, and each of them, acting through their agents, servants and/or employees,

8    cause and have caused in the past, certain asbestos-containing products and asbestos-related

9    materials, to be placed in the stream of commerce with the result that said products and materials

10   came into contact and/or use by plaintiff.

11                                       IX.

12         Plaintiff Timothy Vest was exposed to asbestos brought home on his father's, Warren

13   Vest's, clothes, shoes, person and other items transported into the home from his work as a worker

14   at World Airways, Inc., located in Oakland, California from 1965 to 2005. Also, as a worker from

15   the period 1985-2001, plaintiff worked with and was exposed to asbestos, asbestos products and

16   asbestos-related insulation and building materials mined, manufactured, processed, imported,

17   converted, compound, sold and/or installed by the defendants, and each of them.  During the course

18   of his work plaintiff was exposed to asbestos and asbestos-containing materials at a number of

19   locations and in a number of employments, including, without limitation:

20         (1)    From 1985 to 1988 while working as a ramp supervisor at Continental Airlines, Inc.

21                at Los Angeles International Airport in Los Angeles, California;

22         (2)    In 1986 while working for Sandy's Ski Rentals in Santa Monica, California.

23         (3)    In 1989 while working for Fletcher's Team and Ski in Livermore, California.

24         (4)    From 1990 to 2001 while working as a Commercial Airline Pilot at Emery

25                Worldwide Airlines, Inc. in New York, New York; Dayton, Ohio; Oakland,

26                California; and Los Angeles, California.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

27   ///

28   ///

Complaint for Personal Injuries

IBOSL/457445.1

4

**X.**

During the course and scope of plaintiff's father's work and plaintiff's work, plaintiff was exposed to asbestos products and asbestos-related materials of defendants, which exposure directly and proximately caused him to develop an illness known and designated as mesothelioma.

**XI.**

The illness and disability of plaintiff is the direct and proximate result of the negligence of the defendants, and each of them, in that they produced, sold and otherwise put into the stream of commerce, the foregoing materials which the said defendants, and each of them, knew, or in the exercise of ordinary care should have known, were deleterious, poisonous and highly harmful to plaintiff's body, lungs, respiratory system, skin and health.

**XII.**

Plaintiff, exercising reasonable diligence, discovered the aforealleged conduct, misconduct and culpability of defendants, and each of them, on or after October 2009, when a physician informed him of diagnosis of his asbestos-related mesothelioma. Plaintiff could not have discovered such condition sooner because such condition was brought about without noticeable trauma until it had advanced to such a point that diagnosis could be made. Such a diagnosis required the services of an expert, and since plaintiff did not possess such expertise, he could not know, in the exercise of reasonable care, of the cause of his injury until such time as he was diagnosed and advised. Plaintiff could not know, until such advice, of the culpability of the defendants, and each of them.

**XIII.**

As a direct and proximate result of the conduct of the defendants, and each of them, plaintiff experienced and continues to experience prolonged pain and suffering, the necessity for medical treatment, injuries including, but not limited to, mesothelioma, severe shock to his nervous system, and other injuries, the exact extent of which are unknown to plaintiff.

**XIV.**

By reason of the aforesaid allegations, it has been necessary for plaintiff to engage the services of physicians, surgeons, and hospitals; plaintiff does not know the reasonable value of said

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

3OSU467445.1

5

**EXHIBIT A - Page 19**

**Exhibit B - Page 159**

1    services which were and are still reasonably required and requests leave to amend this complaint to

2    insert said sum when it is ascertained.

3                                              XV.

4         By reason of the aforesaid allegations, plaintiff has been unable to follow his normal

5    gainful occupation for certain periods after the date of said events, and plaintiff has been disabled

6    for an indefinite time; plaintiff does not now know the value of the employment which has been

7    lost to him, and requests leave to amend this complaint to insert the reasonable value thereof when

8    such is ascertained.

9                                             XVI.

10        By reason of the aforesaid negligence of defendants, and each of them, plaintiff has been

11   damaged to his health, strength, and activity in an amount in excess of $50,000.00 in addition to

12   special damages herein alleged.

13                                           XVII.

14        The foregoing acts of the defendants, and each of them, were done wantonly, willfully,

15   oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and

16   each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's

17   father's and plaintiff's employers or to those entities that installed and/or handled the asbestos

18   products to which plaintiff was exposed, knew that the foregoing materials released invisible,

19   undetectable respirable asbestos fibers when installed or handled and that said fibers were

20   extremely dangerous when inhaled.  The defendants, and each of them, either did not warn or

21   insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient

22   warning on the said material or package thereof regarding said dangerous nature, nor took any

23   action to protect those persons who foreseeably would be exposed to said asbestos products,

24   despite knowing that persons who had no knowledge of the dangerous and hazardous nature

25   thereof, such as plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to

26   punitive damages hereunder.

27        WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

28   ///

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IBOSL/467445.1

Complaint for Personal Injuries

6

EXHIBIT A - Page 20                    Exhibit B - Page 160

## SECOND CAUSE OF ACTION

### Breach of Implied Warranty
### [Against All Product Defendants]

AS AND FOR A SECOND CAUSE OF ACTION, plaintiff complains of PRODUCTS defendants, and each of them, and alleges:

#### I.

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence. Defendants made this implied warranty to plaintiff's employer, plaintiff's father, plaintiff's father's employer, and/or others with whom plaintiff was in privity.

#### II.

The defendants, and each of them, impliedly warranted that the said materials were of good and merchantable quality and fit for their intended use.

#### III.

The implied warranty made by the defendants, and each of them, that the asbestos and asbestos-related materials were of good and merchantable quality for the particular intended use was breached in that certain harmful, poisonous and deleterious matter and particles were given off into the atmosphere wherein plaintiff's father and plaintiff and others in their positions carried out their duties as workers working with such materials and other related materials.

#### IV.

As a direct and proximate result of the breach of implied warranty of good and merchantable quality and fitness for the particular intended use, plaintiff developed an illness, to wit: mesothelioma, which caused great disability, as previously set forth.

#### V.

By reason of the aforesaid, plaintiff has been damaged to his health, strength, and activity in an amount in excess of $50,000.00 in addition to special damages herein alleged.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

Complaint for Personal Injuries

BOSL/467445.1

7

## THIRD CAUSE OF ACTION

### Strict Product Liability
### Manufacturing Defect/Design Defect/Failure to Warn
### [Against All Product Defendants]

AS AND FOR A THIRD CAUSE OF ACTION, plaintiff complains of PRODUCTS defendants, and each of them, and alleges:

### I.

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence.

### II.

At all times herein mentioned, plaintiff's father's employer and plaintiff's employer or those entities that installed and/or handled the products to which plaintiff was exposed purchased from defendants, and each of them, asbestos and asbestos products hereinafter referred to as products that were defective in design, manufacturing, labeling, marketing and/or warning.

### III.

Defendants, and each of them, knew that the aforementioned products would be used without inspection for design, manufacturing, labeling, marketing and/or warning defects by the user thereof.

### IV.

At all times mentioned herein, plaintiff reasonably was unaware of the dangerous nature of the aforementioned products.

### V.

At all times mentioned herein, defendants, and each of them, were aware of the dangerous and defective nature of the design, manufacturing, labeling and/or marketing of the aforementioned products, when said products were used in the manner for which they were intended, and were aware that persons who foreseeably would be exposed to the asbestos containing products were not aware of the dangerous and defective nature of the design, manufacture, labeling and/or marketing of the products, yet defendants took no action to warn or otherwise protect those who foreseeably

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

OSL/467445.1

8

1   would be exposed to said defective and improperly labeled products.

2                                    VI.

3        PRODUCTS defendants manufactured, distributed, and sold asbestos-containing products.

4   The asbestos-containing products contained a manufacturing defect when they left PRODUCTS

5   defendants' possession, and plaintiff's father and plaintiff used those asbestos-containing products

6   in a way that was reasonably foreseeable to defendants.

7                                    VII.

8        The aforementioned products were defective in design because they did not perform as

9   safely as an ordinary consumer would have expected them to perform. At the time plaintiff's

10  father and plaintiff used the asbestos-containing products, they were substantially the same as when

11  they left PRODUCTS defendants' possession; any change made to the asbestos-containing

12  products after they left defendants' possession was reasonably foreseeable to defendants; the

13  asbestos-containing products did not perform as safely as an ordinary consumer would have

14  expected at the time of use; and Plaintiff used the products in the way that was reasonably

15  foreseeable to PRODUCTS defendants.

16                                   VIII.

17       The aforementioned products lacked sufficient instructions and warnings of potential

18  dangers. PRODUCTS defendants manufactured, distributed, and sold asbestos-containing

19  products; those asbestos-containing products had potential dangers that were known or knowable

20  by the use of scientific knowledge available at the time of the manufacture, distribution, and sale of

21  the products; the potential hazards presented a substantial danger to Plaintiff; ordinary consumers

22  would not have recognized the potential dangers; PRODUCTS defendants failed to adequately

23  warn or instruct of the potential dangers; and these asbestos-containing products were used in a

24  way that was reasonably foreseeable to PRODUCTS defendants.

25                                    IX.

26       The aforementioned products were used by plaintiff's father and plaintiff in the manner for

27  which they were intended, or plaintiff foreseeably was exposed to said products when they were

28  used in the manner for which they were intended.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

BOSU457445.1

1

## X.

2   As a direct and proximate result of the foregoing conduct, plaintiff developed an illness, to

3   wit:  mesothelioma, which caused great disability, as previously set forth.

4

## XI.

5   As a proximate result of the defective design, manufacturing, labeling, marketing and/or

6   warning  of these aforementioned materials and products, plaintiff was generally damaged as is

7   more fully set forth herein and in addition has sustained special damages hereinabove alleged.

8

## XII.

9   The foregoing acts of the defendants, and each of them, were done wantonly, willfully,

10  oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and

11  each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's

12  father's and plaintiff's employers or to those entities that installed and/or handled the asbestos

13  products to which plaintiff was exposed, knew that the foregoing products and materials released

14  invisible, undetectable respirable asbestos fibers when installed or handled and that said fibers

15  were extremely dangerous when inhaled.  The defendants, and each of them, either did not warn or

16  insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient

17  warning on the said material or package thereof regarding said dangerous nature, nor took any

18  action to protect those persons who foreseeably would be exposed to said asbestos products,

19  despite knowing that persons who had no knowledge of the dangerous and hazardous nature

20  thereof, such as plaintiff's father and plaintiff, would be exposed to and inhale asbestos fibers, and

21  plaintiff is entitled to punitive damages hereunder.

22   WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

23   ### FOURTH CAUSE OF ACTION

24   **Fraud/Failure to Warn**
     **[Against All Product Defendants]**

25   AS AND FOR A FOURTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

26

27  defendants, and each of them, and alleges:

28  ///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

10

IBOSL/467445.1

I.

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence.

II.

At all times pertinent hereto, the defendants, and each of them, owed plaintiff a duty, as provided for in Sections 1708 and 1710 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of the plaintiff. In violation of that duty, the defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as set forth herein, thereby proximately causing injury to the plaintiff as is more fully set forth herein. Such acts and omissions consisted of acts falling within Section 1710, and more specifically were suggestions of fact which were not true and which the defendants did not believe to be true, assertions of fact of that which was not true, which the defendants had no reasonable ground for believing it to be true, and the suppression of facts when a duty existed to disclose it, all as are more fully set forth herein, and the violation of which as to any one such item gave rise to a cause of action for violation of the rights of the plaintiff as provided for in the aforementioned code sections.

III.

Since 1924, the defendants, and each of them, have known and have been possessed of the true facts consisting of medical and scientific data and other knowledge which clearly indicated that the materials and products referred to herein were and are hazardous to the health and safety of plaintiff's father, plaintiff, and others in plaintiff's father's and plaintiff's position working in close proximity with such materials and have known of the dangerous propensities of other of the aforementioned materials and products prior to that time and with intent to deceive plaintiff's father and plaintiff, and others in their positions and with intent that he and such others should be and remain ignorant of such facts and with intent to induce plaintiff's father and plaintiff and such others to alter their positions to their injury and/or risk and in order to gain advantages did do the following acts:

a.    Defendants, and each of them, did not label any of the aforementioned asbestos-

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

11

1   containing materials and products as to the hazards of such materials and products

2   to the health and safety of plaintiff's father and plaintiff and others in plaintiff's

3   father's and plaintiff's position working in close proximity with such materials until

4   1964, when certain of such materials were labeled by some, but not all, of the

5   defendants herein, when the knowledge of such hazards was existing and known to

6   defendants, and each of them, since 1924. By not labeling such materials as to their

7   said hazards defendants, and each of them, caused to be suggested as a fact to

8   plaintiff's father and plaintiff and plaintiff's father's and plaintiff's employers that it

9   was safe for plaintiff's father and plaintiff to work in close proximity to such

10   materials when in fact it was not true and defendants did not believe it to be true;

11   b.   Defendants, and each of them, suppressed information relating to the danger of use

12   of the aforementioned materials by requesting the suppression of information to the

13   plaintiff and the general public concerning the dangerous nature of the

14   aforementioned materials to workers by not allowing such information to be

15   disseminated in a manner which would give general notice to the public and

16   knowledge of the hazardous nature thereof when defendants were bound to disclose

17   such information;

18   c.   Defendants, and each of them, sold the aforementioned products and materials to

19   plaintiff's father's employer and plaintiff's employer and others without advising

20   such employers and others of the dangers of use of such materials to persons

21   working in close proximity thereto, when defendants knew of such dangers, as set

22   forth herein, and, as set forth above, had a duty to disclose such dangers. Thereby,

23   defendants caused to be positively asserted to plaintiff's father's employer and

24   plaintiff's employer of that which was not true and which defendants had no

25   reasonable ground for believing it to be true, in a manner not warranted by the

26   information possessed by said defendants, and each of them, of that which was and

27   is not true, to wit, that it was safe for plaintiff's father and plaintiff to work in close

28   proximity to such materials;

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

OSU/467445.1

d.   Defendants, and each of them, suppressed from everyone, including plaintiff's father and plaintiff and plaintiff's father's employer and plaintiff's employer, and continue to suppress, medical and scientific data and knowledge of the accurate results of studies including, but not limited to, suppressing information contained in the unpublished Lanza report by participating in the influencing of A.J. Lanza to change his report, which altered version was published in *Public Health Reports*, Volume 50 at page 1 in 1935, when they were bound to disclose it unaltered, and by causing Asbestos Magazine, a widely disseminated trade journal, to omit any mention of the dangers of inhaling asbestos dust, thereby lessening the probability of notice of danger to those exposed to asbestos, and thereby caused plaintiff's father and plaintiff to be and remain ignorant thereof;

e.   Defendants, and each of them, belonged to, participated in, and financially supported the Asbestos Textile Institute and/or other industry organizations which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of defendants, and each of them, thereby misleading plaintiff's father and plaintiff and plaintiff's father's employer and plaintiff's employer to their prejudice through the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (I) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to plaintiff at this time;

f.   Commencing in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina, defendants knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis, which information was disseminated through the

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

13

1    Asbestos Textile Institute and other industry organizations to all other defendants,

2    and each of them, herein. Between 1942 and 1950 the defendants, and each of

3    them, knew and possessed medical and scientific information of the connection

4    between inhalation of asbestos fibers and cancer, which information was

5    disseminated through the Asbestos Textile Institute and other industry organizations

6    to all other defendants herein. Thereby, defendants suggested as a fact that which is

7    not true and disseminated other facts likely to mislead plaintiff's father and plaintiff

8    and plaintiff's father's employer and plaintiff's employer and which did mislead

9    them for want of communication of true facts which consisted of the aforedescribed

10   medical and scientific data and other knowledge by not giving plaintiff's father and

11   plaintiff or plaintiff's father's employer and plaintiff's employer the true facts

12   concerning such knowledge of danger, when defendants were bound to disclose it;

13   g.   Failed to warn plaintiff's father and plaintiff and plaintiff's father's employer and

14   plaintiff's employer of the nature of the said materials, to wit:  dangerous when

15   breathed, causing pathological effects without noticeable trauma, when possessed

16   with knowledge that such material was dangerous and a threat to the health of

17   persons coming into contact therewith and under a duty to disclose it;

18   h.   Failed to provide plaintiff's father and plaintiff with information concerning

19   adequate protective masks and devices for use with and application and installation

20   of the products of the defendants, and each of them, when they knew that such

21   protective measures were necessary, when they were under a duty to disclose such

22   information, and if not advised as to use would result in injury to plaintiff's father

23   and plaintiff and others applying and installing such materials;

24   i.   Concealed from plaintiff's father and plaintiff the true nature of the industrial

25   exposure of plaintiff, the fact that they and each of them, knew that plaintiff's father

26   and plaintiff and anyone similarly situated, upon inhalation of asbestos would, in

27   time develop irreversible conditions of either pneumoconiosis, asbestosis or cancer,

28   or all, and such person would immediately be in not good health, the fact that he had

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

DSU467445.1

14

1       in fact been exposed to harmful materials and the fact that the materials to which he

2       was exposed would cause pathological effects without noticeable trauma, when

3       under a duty to and bound to disclose it;

4   j.  Failed to provide information to the public at large and buyers, users and physicians

5       employed by plaintiff's father and plaintiff and plaintiff's father's employer and

6       plaintiff's employer for the purpose of conducting physical examinations of

7       plaintiff's father and plaintiff and others working in contact with asbestos as to the

8       true nature of the hazards of asbestos, in order for such physicians to diagnose, and

9       treat workers coming into contact with asbestos, in that the materials to which

10      plaintiff's father and plaintiff had been exposed would cause pathological effects

11      without noticeable trauma, when under a duty to supply such information and such

12      failure is likely to mislead for want of communication of such facts; and

13  k.  Defendants, and each of them, affirmatively misrepresented that asbestos containing

14      products were safe to use and handle, when they knew such statements were false

15      when made, or made said false statements recklessly and without regard for whether

16      the statements were true.

17                                    IV.

18      Each of the foregoing acts, suggestions, assertions and forbearances to act when a duty

19  existed to act, the said defendants, and each of them, having such knowledge, knowing plaintiff's

20  father and plaintiff did not have such knowledge and would breathe such material innocently, was

21  done falsely and fraudulently and with full intent to induce plaintiff's father and plaintiff to work in

22  a dangerous environment and to cause plaintiff's father and plaintiff to remain unaware of the true

23  facts, all in violation of Section 1710 of the Civil Code of the State of California.

24                                    V.

25      Plaintiff's father and plaintiff relied upon the said acts, suggestions, assertions and

26  forbearances; had plaintiff's father and plaintiff known the true facts, they would not have

27  continued to work in the said environment.

28  ///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

15

3OSL/467445.1

## VI.

By reason of the aforesaid premises, plaintiff has been damaged in his health, strength and activity in addition to special damages hereinabove alleged.

## VII.

Each of the said acts and forbearances to act were caused by false, fraudulent and malicious motives of the defendants, and each of them, and plaintiff is entitled to exemplary and punitive damages. The foregoing conduct of the defendants, and each of them, was done wantonly, willfully, oppressively and in conscious disregard of the safety of plaintiff's father and plaintiff herein, in that the defendants, and each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's father's employer and plaintiff's employers or to those entities that installed and/or handled the asbestos products to which plaintiff's father and plaintiff were exposed, knew that the foregoing materials released invisible, undetectable respirable asbestos fibers when installed or handled and that said fibers were extremely dangerous when inhaled. In addition to the unlawful conduct described above, the defendants, and each of them, either did not warn or insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient warning on the said material or package thereof regarding said dangerous nature, nor took any action to protect those persons who foreseeably would be exposed to said asbestos products, despite knowing that persons who had no knowledge of the dangerous and hazardous nature thereof, such as plaintiff's father and plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

## VIII.

Plaintiff had no knowledge that the foregoing acts were actionable at law when they were committed, and cannot be charged with knowledge or inquiry thereof.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

///
///
///
///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

16

## FIFTH CAUSE OF ACTION

### Conspiracy to Defraud/Failure to Warn
### [Against All Product Defendants]

AS AND FOR A FIFTH CAUSE OF ACTION, plaintiff complains of PRODUCTS defendants, and each of them, and alleges:

I.

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence and agency, and the Fourth Cause of Action herein.

II.

At all times mentioned, the defendants, and each of them, knowingly and willfully conspired and agreed among themselves to perpetrate upon plaintiff the acts complained of as set forth in the First and Fourth Causes of Action as are incorporated herein.

III.

Defendants, and each of them, did the acts and things herein alleged in Paragraph II of the Fourth Cause of Action, incorporated herein, in furtherance of the conspiracy and agreement as herein alleged and did further conspire to violate State and Federal laws and regulations, the exact nature and extent of which are unknown at this time, but known full well to defendants and each of them.

IV.

Each of the said acts and forbearances to act were caused by false, fraudulent and malicious motives of the defendants, and each of them, and plaintiff is entitled to exemplary and punitive damages. The foregoing conduct of the defendants, and each of them, was done wantonly, willfully, oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's father's employer and plaintiff's employers or to those entities that installed and/or handled the asbestos products to which plaintiff's father and plaintiff were exposed, knew that the

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

17

1 | foregoing materials released invisible, undetectable respirable asbestos fibers when installed or

2 | handled and that said fibers were extremely dangerous when inhaled. In addition to the unlawful

3 | conduct described above, the defendants, and each of them, either did not warn or insufficiently

4 | warned regarding the dangerous nature of said materials, nor placed a sufficient warning on the

5 | said material or package thereof regarding said dangerous nature, nor took any action to protect

6 | those persons who foreseeably would be exposed to said asbestos products, despite knowing that

7 | persons who had no knowledge of the dangerous and hazardous nature thereof, such as plaintiff's

8 | father and plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to

9 | punitive damages hereunder.

10 | <center>V.</center>

11 | By reason of the aforesaid acts of defendants, and each of them, plaintiff has suffered

12 | damage to his health, strength and activity.

13 | WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

14 | <center>**SIXTH CAUSE OF ACTION**</center>

15 | <center>**Market Share/Enterprise Liability/Negligence**</center>
<center>**[Against All Product Defendants]**</center>
16 |

17 | AS AND FOR A SIXTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

18 | defendants, and each of them, and alleges:

19 | <center>I.</center>

20 | Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

21 | allegation contained in the First Cause of Action.

22 | <center>II.</center>

23 | Plaintiff is informed and believes and on the basis of such information and belief alleges

24 | that at all times relevant herein, the number of producers of asbestos and asbestos products of the

25 | type that plaintiff used or was otherwise exposed to, and the nature and structure of the asbestos

26 | market and industry, was such that there is and was a substantial likelihood that plaintiff would

27 | have actually used or otherwise been exposed to the products of each of the defendants.

28 | WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

CAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
1 TWELFTH STREET
THIRD FLOOR
ARLAND, CA 94607
(510) 302-1000
(510) 465-7728
AX (510) 835-4913

Complaint for Personal Injuries

18

1       **SEVENTH CAUSE OF ACTION**

2    **Market Share/Enterprise Liability/Strict Liability/Defective Product Design, Manufacturing,**
                          **Labeling, Marketing and/or Warning**
3                          **[Against All Product Defendants]**

4           AS AND FOR A SEVENTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

5    defendants, and each of them, and alleges:

6                                          **I.**

7           Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

8    allegation contained in the Third Cause of Action and in Paragraph II of the Sixth Cause of Action.

9           WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

10                          **EIGHTH CAUSE OF ACTION**

11                    **Market Share/Concert of Action/Negligence**
                          **[Against All Product Defendants]**
12

13          AS AND FOR AN EIGHTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

14   defendants and each of them, and alleges:

15                                         **I.**

16          Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

17   allegation contained in the First Cause of Action, Paragraph II of the Fourth Cause of Action, and

18   Paragraph II of the Sixth Cause of Action.

19                                        **II.**

20          Plaintiff is informed and believes and on the basis of such information and belief alleges

21   that at all times relevant herein, each of the defendants has:

22          (1)     Cooperated in the defective design, manufacturing, labeling and/or marketing of

23   uniformly defective and dangerous asbestos products;

24          (2)     Knowingly adhered to an inadequate industry-wide standard of safety that failed to

25   warn plaintiff, or any other person likely to be exposed to the hazards caused by the use of their

26   products, that exposure to asbestos fibers could cause asbestosis, mesothelioma, and lung cancer

27   and other cancers and diseases or that it could otherwise cause death or serious permanent

28   disability;

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

OSL/457445.1

19

1    (3)    Delegated research, investigative, and other safety functions to various trade

2  associations and industry leaders that failed to adequately and accurately investigate the risks

3  caused by the use of asbestos and that minimized and suppressed the publication of the information

4  concerning the hazards of asbestos; and

5    (4)    Otherwise jointly created and controlled the risk that was the proximate cause of the

6  injuries of plaintiff.

7                                                III.

8         Plaintiff is informed and believes and thereon alleges that at all times relevant herein, the

9  nature and structure of the asbestos industry and market was such that the foregoing acts and

10 omissions of each of the defendants, acting separately and in combination, were a substantial factor

11 in bringing about the aforesaid injury-causing standards, practices and risk, and were otherwise the

12 proximate and legal cause of, and a substantial factor in, bringing about the injuries to plaintiff.

13        WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

14                              NINTH CAUSE OF ACTION

15        Market Share/Concert of Action/Strict Liability/Defective Product Design
                              [Against All Product Defendants]
16

17        AS AND FOR A NINTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

18 defendants, and each of them, and alleges:

19                                              I.

20        Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

21 allegation contained in the Third Cause of Action, Paragraph II of the Fourth Cause of Action,

22 Paragraph II of the Sixth Cause of Action, and Paragraphs II and III of the Eighth Cause of Action.

23        WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

24                              TENTH CAUSE OF ACTION

25        Market Share/Concert of Action/Conspiracy to Defraud/Failure to Warn
                              [Against All Product Defendants]
26

27        AS AND FOR A TENTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

28 defendants, and each of them, and alleges:

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

IOSL/467445.1                                                          20

## I.

Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the Fifth and Ninth Causes of Action.

## II.

Plaintiff is informed and believes and on the basis of such information and belief alleges that at all times herein, each of the defendants knew that the aforesaid failure to warn was industry-wide and that the use of their products and the products of others in the industry, without inspection and protection from the hazards of dust inhalation and without an adequate warning by any of them, created and increased the risk of death and disease from cancer, asbestosis, and other related diseases.

## III.

Plaintiff is informed and believes and on the basis of such information and belief alleges that at all times herein, each of the defendants, acting in concert and pursuant to a common plan, and in order to maximize the sale of their products and to minimize claims for damages and compensation, knowingly assisted, aided, abetted, encouraged and ratified the conduct of each other:

(1)     In the defective design, manufacturing, labeling and/or marketing of a uniformly defective and hazardous asbestos product without adequate tests and without an adequate warning to their consumers and users; and

(2)     In suppressing and discouraging the discovery and publication of information concerning the true hazards of asbestos by and to the public at large.

Said conduct was the proximate and legal cause of, and a substantial factor in, bringing about the injuries of plaintiff.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

///
///
///
///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

21

BOSU457445.1

# PREMISES DEFENDANTS:

## ELEVENTH CAUSE OF ACTION

### Negligence/Failure to Warn
### [Against All Premises Defendants]

AS AND FOR AN ELEVENTH CAUSE OF ACTION, plaintiff complains of defendants WORLD AIRWAYS, INC.; TWO HUNDRED ELEVENTH DOE through TWO HUNDRED TWENTY-FIFTH DOE, inclusive. These defendants were at all times herein and still are corporations authorized to and doing business in the State of California, and are hereafter designated the PREMISES defendants. Plaintiff alleges against the PREMISES defendants, and each of them:

### I.

Plaintiff, by this reference, hereby incorporates and makes a part thereof, as though fully set forth herein, each and every allegation contained in the First through Tenth Causes of Action herein.

### II.

Plaintiff does not know the true names or capacities of the defendants sued herein under the fictitious names of TWO HUNDRED ELEVENTH DOE through TWO HUNDRED TWENTY-FIFTH DOE, inclusive, whether corporate, associate or individual, and plaintiff prays leave to amend this complaint to allege said true names and/or capacities when the same are ascertained. Plaintiff is informed and believes and therefore alleges that each of the defendants designated herein as a DOE is negligently, intentionally and/or strictly liable or responsible in some manner for the events and happenings herein referred to, and proximately caused injury and damages to plaintiff as hereinafter alleged.

### III.

At all times herein mentioned, defendants TWO HUNDRED TWENTY-SIXTH DOE through TWO HUNDRED SEVENTY-FIFTH DOE were Officers and Directors of named defendants herein as TWO HUNDRED ELEVENTH DOE through TWO HUNDRED TWENTY-FIFTH DOE.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

22

IV.

At all times mentioned herein, the PREMISES defendants each respectively owned, maintained, managed, and/or controlled one or more of those premises where plaintiff's father worked while employed as set forth in Part VIII of the First Cause of Action, which is herein incorporated by reference.

V.

Prior to and at said times and places, each said PREMISES defendant caused certain asbestos-containing insulation and other building materials and products and machinery to be specified, manufactured, constructed, supplied, installed, maintained, used, replaced, and/or repaired and otherwise be present at the aforesaid premises, by its own workers and/or various independent contractors so as to allow and cause the release of dangerous quantities of toxic asbestos fibers into the ambient air and thereby contaminate the entire premises and create a hazardous condition and unreasonable risk of harm and personal injury to plaintiff's father and plaintiff and other persons exposed to said asbestos fibers while working on said premises, or otherwise using or coming on said premises, unless special precautions were taken.

VI.

At all relevant times mentioned herein, each said PREMISES defendant had a nondelegable duty to exercise reasonable care to inspect and make safe the premises it owned, maintained, managed and/or controlled, and to discover the aforesaid dangerous conditions. PREMISES defendants, and each of them, also created or contributed to said dangerous conditions, by specifying, manufacturing, supplying, installing, maintaining, using, replacing, repairing, and/or requiring the use and/or handling of asbestos-containing materials on said premises, and by failing to properly supervise their own employees or the employees of others over whom said defendants had control in performing work which caused the release of asbestos fibers into the ambient air and the contamination of the entire premise, when defendants knew or in the exercise of ordinary and reasonable care should have known that the foregoing conditions and activities were present on said premises and created a dangerous and hazardous condition and unreasonable risk of harm and personal injury to plaintiff and other persons coming on the aforesaid premises.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

23

## VII.

At all times relevant herein, plaintiff's father entered said premises and used and occupied said premises as intended and for the benefit and advantage of each said PREMISES defendant and at each said PREMISES defendant's request and invitation. In so doing, plaintiff's father and plaintiff were exposed to dangerous quantities of asbestos fibers released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by each said PREMISES defendant.

## VIII.

Plaintiff's father at all relevant times used the premises with due care and was unaware of and in the exercise of ordinary care could not have discovered the risk of personal injury and the hazardous conditions created by the aforesaid presence of asbestos products and materials on said premises.

## IX.

At all relevant times mentioned herein, each said PREMISES defendant knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in its control would be used as alleged without knowledge of, or inspection for, defects or dangerous conditions, which were not apparent or obvious, and that persons using said premises would not be aware of the aforesaid hazardous conditions and contamination on the premises to which they were exposed.

## X.

At all times pertinent hereto, the PREMISES defendants, and each of them, owed plaintiff's father and plaintiff a duty, as provided in Section 1708 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of plaintiff's father and plaintiff. When a duty to act was imposed, as set forth herein, the defendants, and each of them, did do the acts and omissions in violation of that duty, thereby proximately causing injury to the plaintiff as is more fully set forth herein.

///

///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

BOSU457445.1

Complaint for Personal Injuries

24

1                            **XI.**

2       At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to

3 warn plaintiff's father and plaintiff and plaintiff's father's employer that said materials were

4 dangerous when breathed and caused pathological effects without noticeable trauma, despite the.

5 fact that defendants possessed knowledge and were under a duty to disclose that such material was

6 dangerous and a threat to the health of persons coming into contact therewith.

7                           **XII.**

8       At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to

9 provide plaintiff's father and plaintiff with information concerning adequate protective masks and

10 devices to be used when applying, installing, disturbing, or otherwise working around asbestos-

11 containing products, and each of them, despite the knowledge of the PREMISES defendants and a

12 duty to disclose that such protective measures were necessary and would result in injury to the

13 plaintiff and others applying, installing, disturbing, or otherwise working around such materials if

14 not so advised.

15                          **XIII.**

16       At all relevant times mentioned herein, PREMISES defendants, and each of them,

17 concealed from plaintiff the true nature of the industrial exposure of plaintiff, and knew that

18 plaintiff and anyone similarly situated, upon inhalation of asbestos would, in time, develop

19 irreversible conditions of either pneumoconiosis, asbestosis or cancer, or all, and that the materials

20 to which he was exposed would cause pathological effects without noticeable trauma despite the

21 fact that PREMISES defendants were under a duty to and bound to disclose it.

22                          **XIV.**

23       At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to

24 provide information of the true nature of the hazards of asbestos materials and that exposure to

25 these materials would cause pathological effects without noticeable trauma to the public, including

26 buyers, users, and physicians employed by plaintiff's father and plaintiff and plaintiff's father's

27 employer so that said physicians could examine, diagnose and treat plaintiff and others who were

28 exposed to asbestos, despite the fact that PREMISES defendants, and each of them, were under a

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

25

IBOSU/457445.1

1  duty to so inform and said failure was misleading.

2  ## XV.

3      At all relevant times mentioned herein, said PREMISES defendants, and each of them,

4  negligently failed to take steps to abate or correct the dangerous conditions, or to make the

5  premises safe or to warn plaintiff's father and plaintiff of the existence of the aforesaid dangerous

6  conditions and hazards on said premises, although the risk of plaintiff's injuries was a foreseeable

7  consequence of the negligence of defendants and each of them.

8  ## XVI.

9      As a legal consequence of the foregoing, plaintiff developed an asbestos-related disease

10  which caused illness and death as previously set forth and has suffered general and special

11  damages as alleged herein.

12  ## XVII.

13      The foregoing acts of the PREMISES defendants, and each of them, were done wantonly,

14  willfully, oppressively and in conscious disregard of the safety of plaintiff herein, by the

15  defendants, and each of them, in that the defendants, and each of them knew, at the time

16  defendants manufactured, supplied or required the use and/or handling of asbestos-containing

17  materials and/or failed to properly supervise their own employees or the employees of others over

18  whom defendants had control who installed and/or handled the asbestos products to which

19  plaintiff's father and plaintiff were exposed, that the foregoing materials released invisible,

20  undetectable respirable asbestos fibers when installed or handled and that said fibers were

21  extremely dangerous when inhaled.  The defendants, and each of them, either did not warn or

22  insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient

23  warning on the said material or package thereof regarding said dangerous nature, nor took any

24  action to protect those persons who foreseeably would be exposed to said asbestos products,

25  despite knowing that persons who had no knowledge of the dangerous and hazardous nature

26  thereof, such as plaintiff's father and plaintiff, would be exposed to and inhale asbestos fibers, and

27  plaintiff is entitled to punitive damages hereunder.

    WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

IBOSL/467445.1

1

## TWELFTH CAUSE OF ACTION

2

### Negligent Hiring and Negligent Exercise of Retained Control
[Against All Premises Defendants]

3

4      AS AND FOR A TWELFTH CAUSE OF ACTION, plaintiff complains of PREMISES

5   defendants, and each of them, as follows:

6                                          I.

7      Plaintiff refers to and incorporates herein by reference the First through Eleventh Causes of

8   Action of this Complaint.

9                                          II.

10     At all relevant times herein, the PREMISES defendants and each of them negligently hired,

11   retained and kept contractors on jobs to perform asbestos related work, and knew or in the exercise

12   of reasonable care and diligence should have known that the contractors, independent contractors,

13   subcontractors, employees, manufacturers, suppliers, distributors, workers and others these

14   defendants employed or engaged to or responsible for the manufacture, distribution, installation,

15   inspection, maintenance, repair, replacement, removal and/or disposing of asbestos and asbestos-

16   containing materials on the aforementioned premises were incompetent and unfit to perform the

17   duties for which they were employed, retained, hired or used, and that an unreasonable risk of harm

18   to plaintiff's father and plaintiff and other persons on the aforesaid premises would exist as a legal

19   consequence of such initial and/or continued employment, retention or contract. PREMISES

20   defendants and each of them failed to exercise reasonable caution in selecting, retaining and

21   continuing to use each of the employees, contractors, independent contractors and/or

22   subcontractors who performed asbestos-related work, including those that employed plaintiff's

23   father, even though said PREMISES defendants knew or in the reasonable exercise of ordinary and

24   reasonable care should have known that failure to choose these persons carefully to perform

25   asbestos-related work and/or allow such persons to continue to perform asbestos-related work after

26   the PREMISES defendants, and each of them, became aware of the negligent manner in which the

27   work was being performed created a dangerous and hazardous condition and unreasonable risk of

28   harm and personal injury to plaintiff and other workers or persons so exposed while working for or

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries                                              27

1   in the vicinity of negligent contractors or exposed to asbestos fibers on such persons' clothing,

2   shoes and person.  PREMISES defendants, and each of them, also negligently exercised the control

3   they retained of the operative details – including, without limitation, the asbestos-related details –

4   of plaintiff's father's and plaintiff's work, thereby negligently exposing plaintiff's father and

5   plaintiff to asbestos that was a legal cause of plaintiff's mesothelioma.

6                                                III.

7          The foregoing acts of the PREMISES defendants, and each of them, were done wantonly,

8   willfully, oppressively and in conscious disregard of the safety of plaintiff herein, by the

9   defendants, and each of them, in that the defendants, and each of them knew – at the time

10  defendants manufactured, supplied or required the use and/or handling of asbestos-containing

11  materials to which plaintiff's father and plaintiff were exposed, and/or failed to properly train, hire

12  and/or supervise their own employees or the employees of others over whom defendants had

13  control who installed and/or handled the asbestos products to which plaintiff was exposed, and/or

14  negligently exercised the control they retained of the asbestos-related details of plaintiff's father's

15  and plaintiff's – that the foregoing materials released invisible, undetectable respirable asbestos

16  fibers when installed or handled and that said fibers were extremely dangerous when inhaled.  The

17  defendants, and each of them, either did not warn or insufficiently warned regarding the dangerous

18  nature of said materials, nor placed a sufficient warning on the said material or package thereof

19  regarding said dangerous nature, nor took any action to protect those persons who foreseeably

20  would be exposed to said asbestos products, despite knowing that persons who had no knowledge

21  of the dangerous and hazardous nature thereof, such as plaintiff's father and plaintiff, would be

22  exposed to and inhale asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

23          WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

24  ///

25  ///

26  ///

27  ///

28  ///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
- THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

JBCSU467445.1

Complaint for Personal Injuries

28

1          THIRTEENTH CAUSE OF ACTION

2          Conspiracy/Concert of Action
          [Against Metropolitan Life Insurance Company
3          and Does 276-330, Inclusive]

4                          I.

5          Plaintiff hereby incorporates by reference each and every allegation of the preceding causes

6   of action herein. (As used throughout this cause of action, "plaintiff" refers to all named

7   plaintiffs.)                          II.

8          The term "conspirators" as used in this cause of action includes, but is not limited to,

9   METROPOLITAN LIFE INSURANCE COMPANY ("MET LIFE"), Anthony Lanza, M.D.,

10   Johns-Manville Corporation ("Manville"), Raybestos-Manhattan Corporation ("Raybestos") and

11   the other entities and individuals identified in this cause of action.

12                          III.

13          Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned

14   defendant METROPOLITAN LIFE INSURANCE COMPANY was and is a corporation organized

15   and existing under and by virtue of the laws of the State of New York or the laws of some other

16   state or foreign jurisdiction, and that this defendant was and is authorized to do and/or was and is

17   doing business in the State of California, and regularly conducted or conducts business in the

18   County of Alameda, State of California. At times relevant to this cause of action, MET LIFE was

19   an insurer of Manville and Raybestos.

20                          IV.

21          Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos

22   products manufactured, distributed and/or supplied by one or more of the conspirators named

23   below. The exposure to the asbestos or asbestos-related products supplied by the conspirator(s)

24   caused plaintiff's asbestos-related disease, injuries and/or death.

25                          V.

26          The conspirators, individually and as agents of one another and as co-conspirators, agreed

27   and conspired among themselves, with other asbestos manufacturers and distributors, with certain

28   individuals including but not limited to Anthony Lanza, M.D. ("Lanza") and with defendant MET

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

IBCSL457445.1                                                                    29

1   LIFE to injure plaintiff in the following fashion (the following is not an exclusive list of the

2   wrongful acts of the conspirators, but, rather, is a representative list):

3        (a)    Beginning in 1929, MET LIFE entered agreements with Manville and others to

4   fund studies of the effects of asbestos exposure on Canadian asbestos miners. When the data from

5   these studies proved that Canadian asbestos miners were developing asbestosis, MET LIFE,

6   Manville and others suppressed its publication; further, Lanza (then a MET LIFE employee)

7   actively misrepresented the results of the Canadian study for many years thereafter to meetings of

8   health-care professionals seeking information regarding asbestos exposure.

9        (b)    In approximately 1934, conspirators Manville and MET LIFE, through their agents

10   Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos, through its agents Sumner

11   Simpson and J. Rohrback, suggested to MET LIFE associate director Lanza that Lanza publish a

12   study on asbestosis in which Lanza would affirmatively misrepresent material facts and

13   conclusions about asbestos, including but not limited to descriptions of the seriousness of the

14   asbestosis disease process. The misrepresentation was accomplished through intentional deletion

15   of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively

16   misrepresented asbestosis as a disease process less critical than it was known to be by the

17   conspirators. As a result, Lanza's study was published in the medical literature in 1935 with these

18   misleading statements. The conspirators were motivated to effectuate this fraudulent

19   misrepresentation and fraudulent non-disclosure in part by the desire to influence proposed

20   legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Manville,

21   Raybestos and MET LIFE (as Manville's and Raybestos's insurer), and to promote the use of

22   Manville's and Raybestos's asbestos products.

23        (c)    The above-described conspiracy continued in 1936, when additional co-conspirators

24   American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation,

25   Manville, Keasbey & Mattison Company (then an alter ego to conspirator Turner & Newall),

26   Raybestos, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company),

27   Union Asbestos and Rubber Company and United States Gypsum Company entered into an

28   agreement with a leading medical research facility, the Saranac Laboratories. Under the

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY A PROFESSIONAL LAW CORPORATION 171 TWELFTH STREET THIRD FLOOR OAKLAND, CA 94607 (510) 302-1000 (510) 465-7728 FAX (510) 835-4913

Complaint for Personal Injuries

30

1  agreement, the conspirators acquired the power to decide what information Saranac Laboratories

2  could publish regarding asbestos disease and could also control in what form such publications

3  were to occur.  Their agreement provided these conspirators the power and ability to affirmatively

4  misrepresent the results of the work at Saranac Laboratories, and also gave these conspirators

5  power to suppress material facts included in any of the facility's studies.  On numerous occasions

6  thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing

7  material scientific data, resulting in numerous misstatements of fact being made at scientific

8  meetings concerning the health effects of asbestos exposure.

9        (d)      The conspiracy was furthered when on November 11, 1948 representatives of the

10  following conspirators met at Manville headquarters: Manville, American Brake Block Division of

11  American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (then an

12  alter ego of conspirator Turner & Newall), Raybestos, Thermoid Company (whose assets and

13  liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company,

14  United States Gypsum Company and MET LIFE.  U.S. Gypsum did not send a company employee

15  to the meeting, but instead authorized Vandiver Brown of Manville to represent its interest at the

16  meeting and to take action on its behalf.

17        (e)      At the November 11, 1948 meeting, these conspirators and their representatives

18  decided to exert their influence to materially alter and misrepresent material facts about the

19  substance of research conducted by Dr. Leroy Gardner at the Saranac Laboratories beginning in

20  1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an

21  evaluation of the health effects of asbestos on humans with a critical review of the then-existing

22  standards for asbestos-dust exposure.

23        (f)      At this meeting, these conspirators intentionally and affirmatively decided that

24  Dr. Gardner's work should be edited to delete material facts about the cancer-causing propensity of

25  asbestos, the health effects of asbestos on humans and the critique of the dust standards.  The

26  conspirators then published these deceptive and fraudulent statements in the medical literature as

27  edited by Dr. Vorwald.  These conspirators thereby fraudulently misrepresented the risks of

28  asbestos exposure to both the public and the class of persons exposed to asbestos, including

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

1  plaintiff's father and plaintiff.

2      (g)      As a direct result of influence exerted by the conspirators, a Dr. Vorwald in 1951

3  published Dr. Gardner's edited work in *The Journal of Industrial Hygiene, AMA Archives of*

4  *Industrial Hygiene and Occupational Health* in a form that stressed those portions of Dr. Gardner's

5  work that the conspirators wished to be stressed, but that omitted reference to human asbestosis

6  and cancer, thereby fraudulently and affirmatively misrepresenting the extent of asbestos's risks.

7  The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald

8  publication to university libraries, government officials, government agencies and others.

9      (h)      Such actions constitute a material affirmative misrepresentation of the total context

10  of material facts involved in Dr. Gardner's work and resulted in creating an appearance that

11  inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

12      (I)      When Dr. Vorwald subsequently tried to publish more complete information

13  regarding Dr. Gardner's animal studies, the conspirators required his discharge from the Saranac

14  Laboratories, denied him permission to publish or complete Dr. Gardner's work and actively

15  discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

16      (j)      The following conspirators were members of the trade association known as Quebec

17  Asbestos Mining Association (Q.A.M.A.): Manville, Carey-Canada individually and as successor

18  in interest to Quebec Asbestos Corporation, the Celotex Corporation as successor in interest to

19  Quebec Asbestos Corporation, National Gypsum Company and Turner & Newall as successor in

20  interest to Bell Asbestos. These conspirators, members of Q.A.M.A., participated in the above-

21  described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the

22  *AMA Archives of Industrial Health* in 1951. Evidence of the Q.A.M.A.'s involvement in this

23  misrepresentation arises from co-conspirator Manville's membership in the Q.A.M.A., as well as

24  correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49 and 9/6/50,

25  all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin,

26  who acted on behalf of all Q.A.M.A. members.

27      (k)      In furtherance of the conspiracy that commenced in 1929, conspirators who were

28  members of the Q.A.M.A. as described above began in about 1950 to formulate a plan to influence

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

32

1  public opinion concerning the relationship between asbestos and cancer by influencing the medical

2  literature on this subject and then touting and disseminating this literature to the public and to

3  organizations and legislative bodies responsible for regulatory control of asbestos with the specific

4  intent of misrepresenting the existing scientific information and suppressing contrary scientific

5  data in their possession and control.

6      (l)     This plan of misrepresentation and influence over the medical literature began in

7  about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an

8  evaluation of whether cancer was related to asbestos. After a preliminary report authored by

9  Arthur Vorwald in 1952 indicated that, based on experiments with laboratory animals, a

10 cancer/asbestos relationship might exist, these Q.A.M.A. members refused to further fund the

11 study, terminated the study and prevented any public discussion or dissemination of the results.

12     (m)    As a result of the termination of the Q.A.M.A./Saranac study, the conspirators

13 fraudulently withheld information from the public and affirmatively misrepresented to the public

14 and responsible legislative and regulatory bodies that asbestos did not cause cancer. These

15 affirmative misrepresentations were made by conspirators and conspirators' agents K.W. Smith,

16 M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Lanza, Vandiver Brown and Ivan Sabourin and

17 were directed to, among others, U.S. government officials, Canadian government officials, the U.S.

18 National Cancer Institute, medical organizations, health professionals and the general public,

19 including plaintiff.

20     (n)     The Q.A.M.A. conspirators subsequently contracted with the Industrial Hygiene

21 Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure,

22 asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the

23 Q.A.M.A. that asbestosis did increase a worker's risk of developing lung cancer.

24     (o)     The Q.A.M.A. conspirators, in furtherance of the conspiracy that began in 1929,

25 caused the work by Braun and Truan to be published in 1958, but with the findings concerning the

26 increased incidence of cancer in asbestos-exposed persons edited out and stricken by agents of the

27 Q.A.M.A. The published version of the Braun/Truan study contained a conclusion that asbestos

28 exposure alone did not increase the incidence of lung cancer, a conclusion known by the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

33

:OSL/467445.1

1   conspirators to be false.

2   (p)   By falsifying and causing publication of studies concluding that asbestos exposure
3   did not cause lung cancer and simultaneously omitting documented findings that asbestosis did
4   increase the risk of lung cancer, the conspirators affirmatively misrepresented to, and concealed
5   from, the public the extent of the risks associated with inhaling asbestos fibers.

6   (q)   In furtherance of the ongoing 1929 conspiracy, the Q.A.M.A. in about 1958
7   publicized the fraudulently edited works of Drs. Braun and Truan at a symposium in an effort to
8   fraudulently misrepresent to the public and persons exposed to asbestos that inhaling asbestos
9   fibers did not cause cancer.

10   (r)   The foregoing fraudulent misrepresentations, which began in 1929 and continued
11   with the publication in 1958 of the Braun/Truan study, influenced the standards set for acceptable
12   levels of asbestos exposure. The developers of such standards failed to lower the maximum
13   exposure limits because a cancer risk associated with asbestos inhalation had not been proven.

14   (s)   In furtherance of the 1929 conspiracy, Q.A.M.A. conspirators decided at their trade
15   association meeting in 1967 that they would intentionally mislead consumers about the extent of
16   risks associated with inhaling asbestos.

17   (t)   In furtherance of the 1929 conspiracy, a symposium concerning the health effects of
18   asbestos was conducted at the Saranac Laboratories in 1952. The following conspirators were in
19   attendance: MET LIFE, Lanza, Manville, Turner & Newall, Raybestos and Q.A.M.A. members
20   through their agents Cartier, Sabourin and LaChance.

21   (u)   At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis in
22   product users was discussed, as was the carcinogenic properties of all asbestos-fiber types. In an
23   affirmative attempt to mislead the public about the extent of health risks associated with asbestos,
24   and in an effort to fraudulently conceal those risks from the public, these conspirators conspired to
25   prevent publication of the record of this 1952 Saranac Symposium, and it was not published. In
26   addition, the conspirators induced Vorwald not to announce the results of his and Dr. Gardner's
27   laboratory studies showing excess cancers in asbestos-exposed animals. The conspirators in this
28   way fraudulently misrepresented existing secret data that was prevented from being publicized

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

34

1   because of the secrecy provisions contained in the previously described 1936 Saranac agreement.

2       (v)    The following co-conspirators were members of the trade organization known as

3   The Asbestos Textile Institute (ATI): Raybestos, Manville, H.K. Porter, Keasbey & Mattison

4   (individually and through its alter ego, Turner & Newall), National Gypsum, Uniroyal, Inc.

5   (individually and through its alter egos, CDU Holding Company), Uniroyal Holding Company,

6   Uniroyal Goodrich Tire Company and Asbestos Corporation, Ltd..

7       (w)    In furtherance of the foregoing conspiracy, the conspirators and ATI members in

8   1942 received a report from W.C.L. Hemeon (Hemeon) concerning asbestos that suggested the

9   then-existing maximum asbestos-exposure limits be re-evaluated. These conspirators caused the

10  Hemeon report not to be published and thereby fraudulently concealed material facts about

11  asbestos exposure from the public and affirmatively misrepresented to the public and class of

12  persons exposed to asbestos that the then-existing maximum asbestos-exposure limit was safe and

13  acceptable. Thereafter, these conspirators withheld additional material information on the dust

14  standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby

15  further influencing ACGIH evaluations of its Threshold Limit Values for asbestos exposure.

16      (x)    In furtherance of the foregoing conspiracy, co-conspirator National Gypsum,

17  through its agents and following an inquiry from the Indiana Division of Industrial Hygiene (IDIH)

18  concerning the health hazards of asbestos-spray products, in 1953 refused to mail a proposed

19  response to the IDIH indicating that those applying the products should wear respirators when

20  doing so. National Gypsum's response distorted and fraudulently misrepresented the need for

21  applicators of asbestos-spray products to wear respirators, and thereby misrepresented the risks

22  associated with asbestos exposure.

23      (y)    In furtherance of the foregoing conspiracy, conspirator Manville through its agent

24  Kenneth Smith in 1955 caused to be published in *The AMA Archives of Industrial Health* an article

25  entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the

26  results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr.

27  Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk

28  associated with inhaling asbestos.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

1      (z)    In furtherance of the foregoing conspiracy, the National Cancer Institute in 1955

2 held a meeting at which conspirator Manville, individually and as agent for other co-conspirators,

3 and A. Vorwald, as agent of all the conspirators, affirmatively misrepresented that there was no

4 existing animal study indicating any relationship between asbestos exposure and cancer when, in

5 fact, the conspirators secretly possessed several suppressed studies positively demonstrating the

6 existence of such a link.

7      (aa)    In furtherance of the foregoing conspiracy, these conspirators and members of the

8 ATI in 1957 jointly rejected a proposed research study on cancer and asbestos, and this resulted in

9 their fraudulently concealing from the public material facts regarding asbestos exposure and also

10 constituted an affirmative misrepresentation of the then-existing knowledge about asbestos

11 exposure and lung cancer.

12      (bb)    In furtherance of the foregoing conspiracy, conspirators who in 1964 were members

13 of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos

14 exposure that had been recently published by Dr. Irving J. Selikoff of the Mount Sinai Research

15 Center. These members of the ATI thereafter embarked on a campaign to further misrepresent the

16 association between asbestos exposure and lung cancer.

17      (cc)    The conspirators founded and funded the Mellon Institute and the Industrial

18 Hygiene Foundation (IHF) to research issues concerning the health effects of inhaling asbestos dust

19 and for the express purpose of delaying or preventing compensation to workers who suffered

20 asbestos disease. Beginning in the early 1940's, the IHF was involved in a study by Dr. Hemeon

21 entitled "Report of Preliminary Dust Investigation for Asbestos Textile Institute," which was

22 published in June 1947. This study was conducted in conjunction with members of the Asbestos

23 Textile Institute and found that workers exposed to less than the recommended maximum asbestos-

24 exposure levels were nonetheless developing disease. As a part of the conspiracy, the IHF never

25 published this study.

26      (dd)    Beginning in the mid-1950's, the IHF and Mellon Institute were involved in the

27 publication of works by Braun and Truan entitled "An Epidemiological Study of Lung Cancer in

28 Asbestos Miners." In its original, unedited form in September 1957, this study concluded that

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

36

1  workers with asbestosis had an increased incidence of lung cancer and that the Canadian

2  government had been under-reporting occurrences of asbestosis. The final, published version of

3  this study in June 1958 deleted the conclusion that workers with asbestosis suffered an increased

4  incidence of lung cancer and that the Canadian government had been under-reporting asbestosis

5  cases. The IHF and the Mellon Institute conspired with the members of the Quebec Asbestos

6  Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other conspirators to

7  suppress the above-described information concerning asbestos and cancer.

8        (ee)    The above-described actions of the IHF and the Mellon Institute constituted

9  intentional deception and fraud in actively misleading the public about the extent of the hazards

10 linked to breathing asbestos dust. These actions also substantially contributed to retarding the

11 development of knowledge about the hazards of asbestos and thereby substantially contributed to

12 injuries suffered by plaintiffs.

13       (ff)    From the early 1920's until the 1970's, Manville, Raybestos and other conspirators

14 undertook continual and systemic monitoring of the workers employed in their plants

15 manufacturing asbestos products. The monitoring included chest x-rays taken for the purpose of

16 discovering whether the workers were suffering from asbestosis or other asbestos diseases. MET

17 LIFE and Lanza actively assisted and participated in many of the monitoring programs. The

18 conspirators, including MET LIFE, failed to disclose and actively concealed the results of the

19 monitoring. The conspirators also failed to disclose the nature, extent and frequency of asbestos

20 disease among the workers and instead encouraged the workers to continue work until they were

21 completely and totally disabled. The conspirators further intentionally concealed from the workers

22 employed in their manufacturing plants the nature and extent of the risks associated with asbestos

23 exposure.

24       (gg)    All conspirators identified herein approved, ratified and furthered the previous

25 conspiratorial acts of conspirators Manville, Raybestos, Lanza and MET LIFE, and all the alleged

26 conspirators during the time and circumstances previously described acted as agents and co-

27 conspirators of the other conspirators.

28       (hh)    MET LIFE was an active participant in the foregoing conspiracy and benefitted

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

37

IOSU467445.1

1  thereby.  MET LIFE benefitted from its involvement in the conspiracy in the following non-

2  exclusive list of ways, among others:

3    (i)    By providing workers' compensation insurance to co-conspirators.

4    (ii)   By providing life insurance for employees of the co-conspirators.

5    (iii)  By providing health insurance or health care for the employees of the co-

6           conspirators.

7    (iv)   By purchasing substantial stock in asbestos-related companies, including

8           stock of the co-conspirators.

9    (v)    By developing information by which asbestos-related claims for

10          compensation could be defeated.

11                                    VI.

12      The previously described acts of the conspirators constitute fraudulent concealment and/or

13  fraudulent misrepresentation, which caused injury to the plaintiff in the following ways, among

14  others:

15      (a)    The material published or caused to be published by the conspirators was false and

16  incomplete in that the conspirators knowingly and deliberately deleted references to the known

17  health hazards of asbestos and asbestos-related products.

18      (b)    The conspirators individually, as members of a conspiracy and as agents of other

19  conspirators, intended to – and did – publish  false and misleading reports that misrepresented or

20  failed to disclose known health hazards associated with common uses of asbestos-containing

21  products.  Their purposes were to (1) maintain a favorable business climate for the continued sale

22  and distribution of asbestos and asbestos-related products, (2) assist in the conspirators' continued

23  pecuniary gain through the sale of their products, (3) influence proposed legislation to regulate

24  asbestos exposure in a way that favored the conspirators' interests and (4) aid in defending lawsuits

25  seeking compensation for injury resulting from asbestos exposure.

26      (c)    Plaintiff's father and plaintiff and others reasonably relied, both directly and

27  indirectly, on the published medical and scientific data documenting the purported safety of

28  asbestos and asbestos-related products, and also on the absence of published medical and scientific

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

38

1  reports of the hazards of continued exposure to asbestos. Plaintiff's father and plaintiff believed

2  asbestos to be safe and was unaware of the hazards of that material because of the conspiratorial

3  conduct described herein.

4      (d)     Conspirators – individually, as members of a conspiracy and as agents of other co-

5  conspirators – were and are in a position of superior knowledge regarding the health hazards of

6  asbestos and therefore plaintiff's father and plaintiff reasonably relied (both directly and indirectly)

7  on the published reports commissioned by the conspirators regarding the health hazards of asbestos

8  and the absence of published information (because of the suppression by the conspiracy)

9  concerning the hazards of asbestos and asbestos-related products.

10     (e)     As a direct result of the continuing and ongoing conduct of the conspirators, as

11  alleged herein, the plaintiff contracted asbestos-related disease, and plaintiff suffered injuries and

12  incurred damages as described in greater detail elsewhere in the complaint.

13                                      **VII.**

14     MET LIFE acted in concert with the foregoing parties (the conspirators) and pursuant to a

15  common design, as previously delineated, to cause injury to plaintiff.

16                                      **VIII.**

17     MET LIFE knew that the conduct of Manville, Raybestos and the other conspirators was

18  coercive, fraudulent and deceitful toward others (including plaintiff's father and plaintiff) and that

19  conspirators' conduct was a breach of duty or duties owed to plaintiff's father and plaintiff; and

20  MET LIFE gave substantial assistance and encouragement to Manville and the other conspirators

21  in breaching their duties to plaintiff's father and plaintiff and others.

22                                      **IX.**

23     Plaintiff and/or plaintiff's father was insured, directly or indirectly, by MET LIFE and as

24  such was owed a fiduciary duty by MET LIFE that was breached by MET LIFE's foregoing

25  conduct and conspiracy, thereby causing plaintiff's asbestos-related injuries.

26                                      **X.**

27     The conspirators made representations to plaintiff's father and plaintiff and others

28  concerning asbestos-containing products, including but not limited to:

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

39

OSL/467445.1

1    (a)    the statements set forth and summarized in the foregoing paragraphs;

2    (b)    that asbestos in commercially used insulation products was not hazardous (this

3         statement was known to be false by the conspirators);

4    (c)    that the amount of asbestos in the air necessary to cause disease was five million

5         particles per cubic foot (this statement was known to be false by the conspirators);

6    (d)    that asbestos does not cause cancer (this statement was known to be false by the

7         conspirators);

8    In addition, the conspirators actively concealed facts from plaintiff's father and plaintiff and

9 others, including but not limited to:

10    (a)    that asbestos-related disease can be a fatal disease;

11    (b)    that asbestos causes various forms of lung cancer;

12    (c)    that individuals should protect themselves from breathing asbestos dust;

13    (d)    the extent of asbestos disease in exposed populations;

14    (e)    information regarding the levels of airborne asbestos that can cause disease;

15    (f)    their experience with workers' compensation claims related to asbestos exposure;

16    and

17    (g)    the concealment described in the other paragraphs of this cause of action.

18                  **XI.**

19    The conspirators further knew that their foregoing statements were false and that, by their

20 acts, they were actively concealing adverse information concerning the health effects of asbestos,

21 including the facts described in the preceding paragraphs of this cause of action. The conspirators

22 made these false statements and concealed these facts with the intent to deceive. Plaintiff's father

23 and plaintiff and others relied both directly and indirectly on the foregoing false statements and

24 their lack of knowledge resulting from the conspirators' fraudulent concealment. As a

25 consequence of the foregoing fraudulent misrepresentations and concealment, plaintiff was injured

26 and damaged as more fully described elsewhere in the complaint.

27                  **XII.**

28    The asbestos-containing products that conspirators manufactured, marketed, distributed,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

40

1  sold and otherwise supplied were defective in that they caused plaintiff's father and plaintiff and

2  others similarly situated to be exposed to the products' asbestos content and thereby caused the

3  injuries and damages as more fully detailed elsewhere in the complaint.

4  ### XIII.

5    Additionally and alternatively, as a direct result of defendants' and conspirators' (including,

6  without limitation, MET LIFE's) actions and omissions, plaintiff's father and plaintiff were caused

7  to remain ignorant of all the dangers of asbestos, which resulted in plaintiff's father, plaintiff,

8  his/her agents, employers and the general public being unaware of the true and full dangers of

9  asbestos. Defendants' and conspirators' actions and omissions also deprived plaintiff's father and

10  plaintiff of the opportunity to decide for himself or herself whether he/she wanted to take the risk

11  of being exposed to asbestos, denied plaintiff's father and plaintiff the opportunity to take

12  precautions against the dangers of asbestos and caused plaintiff's damages as described elsewhere

13  in this complaint.

14

15  ### XIV.

16    The foregoing conduct of defendants and the conspirators was despicable, willful and

17  carried on in conscious disregard of the rights or safety of plaintiff's father and plaintiff.

18  Defendants and the conspirators intended by such conduct to conceal and/or misrepresent material

19  facts known to them for the purpose of thereby depriving plaintiff's father and plaintiff and others

20  of property or legal rights, or otherwise causing injury. So in addition to actual damages, plaintiff

21  is entitled to recover damages from defendants and the conspirators for the sake of example and by

22  way of punishing defendants and conspirators.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

41

IOSU467445.1

**EXHIBIT A - Page 55**

**Exhibit B - Page 195**

# ALL DEFENDANTS:

## FOURTEENTH CAUSE OF ACTION

### (Loss of Consortium)

AS AND FOR A FOURTEENTH CAUSE OF ACTION, plaintiff Caroline Vest complains of all defendants, and each of them, and alleges:

### I.

This plaintiff, for and on behalf of herself, brings this action on her own behalf.

### II.

Plaintiff refers to and incorporates herein by reference the First through Thirteenth Causes of Action of this complaint.

### III.

At the time that plaintiff Timothy Vest sustained injury as more fully alleged in all the previous causes of action, and at all times thereafter, plaintiff Caroline Vest was the wife of plaintiff Timothy Vest.

### IV.

Prior to said injuries, plaintiff Timothy Vest was able to and did, perform his duties as the husband of plaintiff Caroline Vest. Plaintiff is informed and believes and thereon alleges that subsequent to said injuries and as a proximate result thereof, plaintiff Timothy Vest has been, and some time in the future will be, incapacitated and unable to perform the necessary duties as husband of plaintiff Caroline Vest and the work and service usually performed in the care, maintenance and management of the family home.

### V.

As a proximate result of said injuries, plaintiff Caroline Vest has been and will be deprived of consortium with plaintiff Timothy Vest, including the performance of her husband's duties and on plaintiff's part will be required to perform the duties previously performed by plaintiff Timothy Vest, all to plaintiff's damage in a sum which cannot be ascertained at this time. Plaintiff requests the right to amend this complaint to allege the amount of said damages when they are ascertained.

WHEREFORE, plaintiff Caroline Vest prays judgment against defendants, conspirators and

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

42

1  their "alternate entities," and each of them as follows:

2      1.    General damages in an amount in excess of $50,000.00 in accordance with the

3  proof;

4      2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

5  accordance with proof;

6      3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

7  in accordance with the proof;

8      4.    Special damages in accordance with the proof;

9      5.    Prejudgment interest and post-judgment interest in accordance with law;

10      6.    Costs of suit; and

11      7.    Such other and further relief as the Court deems just and proper in the premises.

12      WHEREFORE, plaintiff Timothy Vest prays judgment against defendants, conspirators and

13  their "alternate entities," and each of them as follows:

14      1.    General damages in an amount in excess of $50,000.00 in accordance with the

15  proof;

16      2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

17  accordance with proof:

18      3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

19  in accordance with the proof;

20      4.    Special damages in accordance with the proof;

21      5.    Prejudgment interest and post-judgment interest in accordance with law;

22      6.    Costs of suit; and

23      7.    Such other and further relief as the Court deems just and proper in the premises.

24

DATED: December 14, 2009          KAZAN, McCLAIN, LYONS,

25                             GREENWOOD & HARLEY

26                             A Professional Law Corporation

27                             By: _____

                                   Justin A. Bosl

28                             Attorneys for Plaintiffs

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Complaint for Personal Injuries

43.

8OSL/467445.1

ENDORSED
FILED
ALAMEDA COUNTY

MAY 2 8 2010

CLERK OF THE SUPERIOR COURT
By _____
                          Deputy

1  Gordon D. Greenwood, Esq. (C.S.B. #136097)
   Justin A. Bosl, Esq. (C.S.B. #241117)
2  KAZAN, McCLAIN, LYONS,
   GREENWOOD & HARLEY
3  A Professional Law Corporation
   171 Twelfth Street, Third Floor
4  Oakland, California  94607
   Telephone:  (510) 465-7728
5
   Attorneys for Plaintiffs
6

7

8          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                IN AND FOR THE COUNTY OF ALAMEDA

10

11

12  TIMOTHY VEST and CAROLINE VEST,          No. RG09489518

13              Plaintiffs,                  SECOND AMENDED COMPLAINT FOR
                                             PERSONAL INJURIES; STRICT
14  vs.                                      LIABILITY; BREACH OF WARRANTIES;
                                             NEGLIGENCE; FRAUD; AIDING AND
15  ALLIED PACKING AND SUPPLY; ALTA          ABETTING FRAUD; AIDING AND
    BUILDING MATERIALS CO.; CYPRUS           ABETTING BATTERY; CONSPIRACY;
16  AMAX MINERALS COMPANY, individually,     (ALTERNATIVE ENTERPRISE AND
    and as successor in interest, parent, alter ego   CONCERT OF ACTION LIABILITY);
17  and equitable trustee of CYPRUS MINES     PREMISES LIABILITY; AND LOSS OF
    CORPORATION, SIERRA TALC &              CONSORTIUM
18  CHEMICAL COMPANY, UNITED SIERRA
    DIVISION CYPRUS MINES CORPORATION       Code of Civil Procedure § 36(d)
19  and PAUL W. WOOD COMPANY; DEAN'S
    MATERIALS, INC. dba CONSTRUCTION
20  MATERIAL SUPPLIER; THE DEXTER
    CORPORATION; DOWMAN PRODUCTS,
21  INC.; GARLOCK SEALING AND
    TECHNOLOGIES, LLC.; GEORGIA-
22  PACIFIC LLC, formerly known as GEORGIA-
    PACIFIC CORPORATION; HAMILTON
23  MATERIALS, INC.; HENKEL
    CORPORATION, individually and as successor
24  in interest, parent, alter ego and equitable
    trustee to HENKEL LOCTITE
25  CORPORATION, individually and as successor
    in interest, parent, alter ego, and equitable
26  trustee to THE DEXTER CORPORATION;
    HEXCEL CORPORATION; KAISER
27  GYPSUM COMPANY, INC.; KELLY-
    MOORE PAINT COMPANY, INC.; KENTILE
28  FLOORS, INC.; THE PORT OF OAKLAND;
    RAYMOND INTERIOR SYSTEMS-NORTH,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

3OSL/493784.1

1

2 individually and as successor in interest, parent,
alter ego and equitable trustee to JAMES L.
3 WHITTAKER, INC.; MCDERMOTT/SEALY,
INC.; PARKER HANNIFIN, individually, and
4 as successor in interest, parent, alter ego and
equitable trustee of CLEVELAND WHEELS &
5 BRAKES; GEORGE E. MASKER, INC.; F.P.
LATHROP CORPORATION; MCDONNELL
6 DOUGLAS CORPORATION; LIFE
TECHNOLOGIES CORPORATION, successor
7 by merger to INVITROGEN CORPORATION,
individually and as successor in interest, parent,
8 alter ego, and equitable trustee of THE
DEXTER CORPORATION; LATHROP
9 CONSTRUCTION ASSOCIATES, INC.,
individually and as successor in interest, parent,
10 alter ego, and equitable trustee of F.P.
LATHROP CONSTRUCTION COMPANY;
11 WORLD AIRWAYS, INC.; METROPOLITAN
LIFE INSURANCE COMPANY; and TENTH
12 DOE through THREE HUNDRED
THIRTIETH DOE, inclusive,

13

14              Defendants.

15

16 Plaintiff TIMOTHY VEST alleges:

17           **PRODUCTS DEFENDANTS:**

18           **FIRST CAUSE OF ACTION**

19                    **Negligence**
            **[Against All Product Defendants]**

20

21                        I.

22      Plaintiff Timothy Vest brings this action on his own behalf. The masculine form as used in
this complaint, if applicable as shown by the context hereof, applies to a female person or a
23 corporation.

24

25                       II.

26      Plaintiff does not know the true names and capacities, whether corporate, associate or
individual of defendants sued herein as TENTH DOE through THREE HUNDRED THIRTIETH
27 DOE, inclusive, and each of them, and for that reason prays leave to insert the true names and
capacities of said defendants when the same are ascertained. Plaintiff is informed and believes and
28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

BOSL/493784.1

First Amended Complaint for Personal Injuries

2

**EXHIBIT A - Page 60**          **Exhibit B - Page 200**

1   therefore alleges that each of the defendants designated herein as a DOE is negligently,

2   intentionally and/or strictly liable or responsible in some manner for the events and happenings

3   herein referred to, and proximately caused injury and damages to plaintiff thereby as herein

4   alleged.

5

6                                              **III.**

7       At all times herein mentioned, each of the defendants was the agent and employee of each

8   of the remaining defendants, and was at all times acting within the purpose and scope of said

9   agency and employment, and each defendant has ratified and approved the acts of the remaining

    defendants.

10

11                                             **IV.**

12      Defendants ALLIED PACKING AND SUPPLY; ALTA BUILDING MATERIOALS CO.;

13  CYPRUS AMAX MINERALS COMPANY, individually, and as successor in interest, parent, alter

14  ego and equitable trustee of CYPRUS MINES CORPORATION, SIERRA TALC & CHEMICAL

15  COMPANY, UNITED SIERRA DIVISION CYPRUS MINES CORPORATION and PAUL W.

16  WOOD COMPANY; DEAN'S MATERIALS, INC. dba CONSTRUCTION MATERIAL

17  SUPPLIER; THE DEXTER CORPORATION; DOWMAN PRODUCTS, INC.; GARLOCK

18  SEALING AND TECHNOLOGIES, LLC.; GEORGIA-PACIFIC LLC, formerly known as

19  GEORGIA-PACIFIC CORPORATION; HAMILTON MATERIALS, INC.; HENKEL

20  CORPORATION, individually and as successor in interest, parent, alter ego and equitable trustee

21  to HENKEL LOCTITE CORPORATION, individually and as successor in interest, parent, alter

22  ego, and equitable trustee to THE DEXTER CORPORATION; HEXCEL CORPORATION;

23  KAISER GYPSUM COMPANY, INC.; KELLY-MOORE PAINT COMPANY, INC.; KENTILE

24  FLOORS, INC.; RAYMOND INTERIOR SYSTEMS-NORTH, individually and as successor in

    interest, parent, alter ego and equitable trustee to JAMES L. WHITTAKER;

25  MCDERMOTT/SEALY, INC.; PARKER HANNIFIN, individually, and as successor in interest,

26  parent, alter ego and equitable trustee of CLEVELAND WHEELS & BRAKES; GEORGE E.

27  MASKER, INC.; F.P. LATHROP CORPORATION; MCDONNELL DOUGLAS

28  CORPORATION; LIFE TECHNOLOGIES CORPORATION, successor by merger to

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1   INVITROGEN CORPORATION, individually and as successor in interest, parent, alter ego, and

2   equitable trustee of THE DEXTER CORPORATION; LATHROP CONSTRUCTION

3   ASSOCIATES, INC., individually and as successor in interest, parent, alter ego, and equitable

4   trustee of F.P. LATHROP CONSTRUCTION COMPANY; WORLD AIRWAYS, INC.;

5   METROPOLITAN LIFE INSURANCE COMPANY; and TENTH DOE through FIFTIETH DOE,

6   inclusive, were at all times herein and still are corporations authorized to and doing business in the

7   State of California and are hereby designated PRODUCTS defendants.

8                                               V.

9          PRODUCTS defendants' products at issue in this complaint consist of asbestos and

10   asbestos-containing products, or products as to which PRODUCTS defendants knew or should

11   have known that reasonably foreseeable uses of the products would expose persons such as

12   plaintiff who worked with or around the products to friable asbestos. These products were

13   defective in their design, manufacture, labeling, marketing and/or warning and are referred to

14   throughout this complaint as "asbestos" or "asbestos-containing products."

15                                              VI.

16          At all times herein mentioned defendants, and each of them, were engaged in the business

17   of mining, manufacturing, assembling, supplying, packaging, installing and labeling asbestos, and

18   products produced therefrom, for sale to and use by the members of the general public as well as to

19   other parties for use of the said products to manufacture and supply products therefrom.

20                                             VII.

21          At all times herein mentioned, defendants FIFTY-FIRST DOE through TWO HUNDRED

22   TENTH DOE were Officers and Directors of named defendants herein as TENTH DOE through

23   FIFTIETH DOE.

24                                            VIII.

25          The defendants, and each of them, acting through their agents, servants and/or employees,

26   cause and have caused in the past, certain asbestos-containing products and asbestos-related

27   materials, to be placed in the stream of commerce with the result that said products and materials

28   came into contact and/or use by plaintiff.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

### IX.

Plaintiff Timothy Vest was exposed to asbestos brought home on his father's, Warren Vest's, clothes, shoes, person and other items transported into the home from his work as a worker at World Airways, Inc., located in Oakland, California from 1965 to 2005, and was also exposed to asbestos, asbestos products and asbestos-related insulation, building materials and equipment mined, manufactured, processed, imported, converted, compound, sold and/or installed by the defendants, and each of them, when he accompanied his father to work at World Airways, Inc. from 1965 to 1987.

From the period 1972 to 1983, plaintiff was exposed to asbestos, asbestos products and asbestos-related insulation, building materials and equipment mined, manufactured, processed, imported, converted, compound, sold and/or installed by the defendants, and each of them, when he played in and around construction sites surrounding his childhood home in Dublin, California.

Also, as a worker from the period 1985-2001, plaintiff worked with and was exposed to asbestos, asbestos products and asbestos-related insulation, building materials and equipment mined, manufactured, processed, imported, converted, compound, sold and/or installed by the defendants, and each of them. During the course of his work plaintiff was exposed to asbestos and asbestos-containing materials at a number of locations and in a number of employments, including, without limitation:

(1)     From 1985 to 1988 while working as a ramp supervisor at Continental Airlines, Inc. at Los Angeles International Airport in Los Angeles, California;

(2)     In 1986 while working for Sandy's Ski Rentals in Santa Monica, California.

(3)     From 1988 to 1990 while working as a certified flight instructor at Ahart Aviation in Livermore, California;

(4)     In 1989 while working for Fletcher's Team and Ski in Livermore, California.

(5)     From 1990 to 2001 while working as a Commercial Airline Pilot at Emery Worldwide Airlines, Inc. in New York, New York; Dayton, Ohio; Oakland, California; and Los Angeles, California.

In addition, from the period 1983 to 2001, plaintiff was exposed to asbestos, asbestos

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  products and asbestos-related materials mined, manufactured, processed, imported, converted,

2  compound, sold and/or installed by the defendants, and each of them when he performed repair and

3  maintenance work on his personal aircraft, and when he was around others performing such work.

<div align="center">X.</div>

5  During the course and scope of plaintiff's father's work and plaintiff's work and activities,

6  plaintiff was exposed to asbestos products and asbestos-related materials and equipment of

7  defendants, which exposure directly and proximately caused him to develop an illness known and

8  designated as mesothelioma.

<div align="center">XI.</div>

10  The illness and disability of plaintiff is the direct and proximate result of the negligence of

11  the defendants, and each of them, in that they produced, sold and otherwise put into the stream of

12  commerce, the foregoing materials which the said defendants, and each of them, knew, or in the

13  exercise of ordinary care should have known, were deleterious, poisonous and highly harmful to

14  plaintiff's body, lungs, respiratory system, skin and health.

<div align="center">XII.</div>

16  Plaintiff, exercising reasonable diligence, discovered the aforealleged conduct, misconduct

17  and culpability of defendants, and each of them, on or after October 2009, when a physician

18  informed him of diagnosis of his asbestos-related mesothelioma. Plaintiff could not have

19  discovered such condition sooner because such condition was brought about without noticeable

20  trauma until it had advanced to such a point that diagnosis could be made. Such a diagnosis

21  required the services of an expert, and since plaintiff did not possess such expertise, he could not

22  know, in the exercise of reasonable care, of the cause of his injury until such time as he was

23  diagnosed and advised. Plaintiff could not know, until such advice, of the culpability of the

24  defendants, and each of them.

<div align="center">XIII.</div>

26  As a direct and proximate result of the conduct of the defendants, and each of them,

27  plaintiff experienced and continues to experience prolonged pain and suffering, the necessity for

28  medical treatment, injuries including, but not limited to, mesothelioma, severe shock to his nervous

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IBOSL/493784.1

<div align="center">First Amended Complaint for Personal Injuries</div>

<div align="center">**EXHIBIT A - Page 64**</div>

6

**Exhibit B - Page 204**

1   system, and other injuries, the exact extent of which are unknown to plaintiff.

2   ## XIV.

3   By reason of the aforesaid allegations, it has been necessary for plaintiff to engage the
4   services of physicians, surgeons, and hospitals; plaintiff does not know the reasonable value of said
5   services which were and are still reasonably required and requests leave to amend this complaint to
6   insert said sum when it is ascertained.

7   ## XV.

8   By reason of the aforesaid allegations, plaintiff has been unable to follow his normal
9   gainful occupation for certain periods after the date of said events, and plaintiff has been disabled
10  for an indefinite time; plaintiff does not now know the value of the employment which has been
11  lost to him, and requests leave to amend this complaint to insert the reasonable value thereof when
12  such is ascertained.

13  ## XVI.

14  By reason of the aforesaid negligence of defendants, and each of them, plaintiff has been
15  damaged to his health, strength, and activity in an amount in excess of $50,000.00 in addition to
16  special damages herein alleged.

17  ## XVII.

18  The foregoing acts of the defendants, and each of them, were done wantonly, willfully,
19  oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and
20  each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's
21  father's and plaintiff's employers or to those entities that installed and/or handled the asbestos
22  products to which plaintiff was exposed, knew that the foregoing materials released invisible,
23  undetectable respirable asbestos fibers when installed or handled and that said fibers were
24  extremely dangerous when inhaled.  The defendants, and each of them, either did not warn or
25  insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient
26  warning on the said material or package thereof regarding said dangerous nature, nor took any
27  action to protect those persons who foreseeably would be exposed to said asbestos products,
28  despite knowing that persons who had no knowledge of the dangerous and hazardous nature

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

BOSL/493784.1

First Amended Complaint for Personal Injuries

### EXHIBIT A - Page 65

**Exhibit B - Page 205**

1  thereof, such as plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to

2  punitive damages hereunder.

3  WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

4  ## SECOND CAUSE OF ACTION

5  ### Breach of Implied Warranty
6  [Against All Product Defendants except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS CORPORATION]

7

8  AS AND FOR A SECOND CAUSE OF ACTION, plaintiff complains of PRODUCTS

9  defendants, and each of them except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS

10  CORPORATION, and alleges:

11  I.

12  Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set

13  forth herein at length all and singular the allegations contained in the First Cause of Action herein,

14  excepting therefrom allegations pertaining to negligence. Defendants made this implied warranty

15  to plaintiff's employer, plaintiff's father, plaintiff's father's employer, and/or others with whom

16  plaintiff was in privity.

17  II.

18  The defendants, and each of them, impliedly warranted that the said materials were of good

19  and merchantable quality and fit for their intended use.

20  III.

21  The implied warranty made by the defendants, and each of them, that the asbestos and

22  asbestos-related materials were of good and merchantable quality for the particular intended use

23  was breached in that certain harmful, poisonous and deleterious matter and particles were given off

24  into the atmosphere wherein plaintiff's father and plaintiff and others in their positions carried out

25  their duties as workers working with such materials and other related materials.

26  IV.

27  As a direct and proximate result of the breach of implied warranty of good and

28  merchantable quality and fitness for the particular intended use, plaintiff developed an illness, to

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

3OSLM93784.1

First Amended Complaint for Personal Injuries

1   wit:  mesothelioma, which caused great disability, as previously set forth.

2                                            V.

3      By reason of the aforesaid, plaintiff has been damaged to his health, strength, and activity in

4   an amount in excess of $50,000.00 in addition to special damages herein alleged.

5      WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

6                        **THIRD CAUSE OF ACTION**

7                          **Strict Product Liability**
                 **Manufacturing Defect/Design Defect/Failure to Warn**
8           **[Against All Product Defendants Except WORLD AIRWAYS, INC.]**

9      AS AND FOR A THIRD CAUSE OF ACTION, plaintiff complains of PRODUCTS

10  defendants, and each of them except WORLD AIRWAYS, INC., and alleges:

11                                           I.

12     Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set

13  forth herein at length all and singular the allegations contained in the First Cause of Action herein,

14  excepting therefrom allegations pertaining to negligence.

15                                          II.

16     At all times herein mentioned, plaintiff's father's employer and plaintiff's employer or those

17  entities that installed and/or handled the products to which plaintiff was exposed purchased from

18  defendants, and each of them, asbestos and asbestos products hereinafter referred to as products

19  that were defective in design, manufacturing, labeling, marketing and/or warning.

20                                         III.

21     Defendants, and each of them, knew that the aforementioned products would be used

22  without inspection for design, manufacturing, labeling, marketing and/or warning  defects by the

23  user thereof.

24                                         IV.

25     At all times mentioned herein, plaintiff reasonably was unaware of the dangerous nature of

26  the aforementioned products.

27  ///

28  ///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

**V.**

1

2      At all times mentioned herein, defendants, and each of them, were aware of the dangerous

3 and defective nature of the design, manufacturing, labeling and/or marketing of the aforementioned

4 products, when said products were used in the manner for which they were intended, and were

5 aware that persons who foreseeably would be exposed to the asbestos containing products were not

6 aware of the dangerous and defective nature of the design, manufacture, labeling and/or marketing

7 of the products, yet defendants took no action to warn or otherwise protect those who foreseeably

8 would be exposed to said defective and improperly labeled products.

9

**VI.**

10      PRODUCTS defendants manufactured, distributed, and sold asbestos-containing products.

11 The asbestos-containing products contained a manufacturing defect when they left PRODUCTS

12 defendants' possession, and plaintiff's father and plaintiff used those asbestos-containing products

13 in a way that was reasonably foreseeable to defendants.

14

**VII.**

15      The aforementioned products were defective in design because they did not perform as

16 safely as an ordinary consumer would have expected them to perform. At the time plaintiff's

17 father and plaintiff used the asbestos-containing products, they were substantially the same as when

18 they left PRODUCTS defendants' possession; any change made to the asbestos-containing

19 products after they left defendants' possession was reasonably foreseeable to defendants; the

20 asbestos-containing products did not perform as safely as an ordinary consumer would have

21 expected at the time of use; and Plaintiff used the products in the way that was reasonably

22 foreseeable to PRODUCTS defendants.

23

**VIII.**

24      The aforementioned products lacked sufficient instructions and warnings of potential

25 dangers. PRODUCTS defendants manufactured, distributed, and sold asbestos-containing

26 products; those asbestos-containing products had potential dangers that were known or knowable

27 by the use of scientific knowledge available at the time of the manufacture, distribution, and sale of

28 the products; the potential hazards presented a substantial danger to Plaintiff; ordinary consumers

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1  would not have recognized the potential dangers; PRODUCTS defendants failed to adequately
2  warn or instruct of the potential dangers; and these asbestos-containing products were used in a
3  way that was reasonably foreseeable to PRODUCTS defendants.

IX.

5  The aforementioned products were used by plaintiff's father and plaintiff in the manner for
6  which they were intended, or plaintiff foreseeably was exposed to said products when they were
7  used in the manner for which they were intended.

X.

9  As a direct and proximate result of the foregoing conduct, plaintiff developed an illness, to
10  wit: mesothelioma, which caused great disability, as previously set forth.

XI.

12  As a proximate result of the defective design, manufacturing, labeling, marketing and/or
13  warning of these aforementioned materials and products, plaintiff was generally damaged as is
14  more fully set forth herein and in addition has sustained special damages hereinabove alleged.

XII.

16  The foregoing acts of the defendants, and each of them, were done wantonly, willfully,
17  oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and
18  each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's
19  father's and plaintiff's employers or to those entities that installed and/or handled the asbestos
20  products to which plaintiff was exposed, knew that the foregoing products and materials released
21  invisible, undetectable respirable asbestos fibers when installed or handled and that said fibers
22  were extremely dangerous when inhaled.  The defendants, and each of them, either did not warn or
23  insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient
24  warning on the said material or package thereof regarding said dangerous nature, nor took any
25  action to protect those persons who foreseeably would be exposed to said asbestos products,
26  despite knowing that persons who had no knowledge of the dangerous and hazardous nature
27  thereof, such as plaintiff's father and plaintiff, would be exposed to and inhale asbestos fibers, and
28  plaintiff is entitled to punitive damages hereunder.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

JBOSL/493784.1

First Amended Complaint for Personal Injuries

1   WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

2                      FOURTH CAUSE OF ACTION

3                        Fraud/Failure to Warn
                      [Against All Product Defendants]
4

5       AS AND FOR A FOURTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

6   defendants, and each of them, and alleges:

7                                    I.

8       Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set

9   forth herein at length all and singular the allegations contained in the First Cause of Action herein,

10  excepting therefrom allegations pertaining to negligence.

11                                   II.

12      At all times pertinent hereto, the defendants, and each of them, owed plaintiff a duty, as

13  provided for in Sections 1708 and 1710 of the Civil Code of the State of California, to abstain from

14  injuring the person, property or rights of the plaintiff.  In violation of that duty, the defendants, and

15  each of them, did do the acts and omissions, when a duty to act was imposed, as set forth herein,

16  thereby proximately causing injury to the plaintiff as is more fully set forth herein.  Such acts and

17  omissions consisted of acts falling within Section 1710, and more specifically were suggestions of

18  fact which were not true and which the defendants did not believe to be true, assertions of fact of

19  that which was not true, which the defendants had no reasonable ground for believing it to be true,

20  and the suppression of facts when a duty existed to disclose it, all as are more fully set forth herein,

21  and the violation of which as to any one such item gave rise to a cause of action for violation of the

22  rights of the plaintiff as provided for in the aforementioned code sections.

23                                   III.

24      Since 1924, the defendants, and each of them, have known and have been possessed of the

25  true facts consisting of medical and scientific data and other knowledge which clearly indicated

26  that the materials and products referred to herein were and are hazardous to the health and safety of

27  plaintiff's father, plaintiff, and others in plaintiff's father's and plaintiff's position working in close

28  proximity with such materials and have known of the dangerous propensities of other of the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1    aforementioned materials and products prior to that time and with intent to deceive plaintiff's

2    father and plaintiff, and others in their positions and with intent that he and such others should be

3    and remain ignorant of such facts and with intent to induce plaintiff's father and plaintiff and such

4    others to alter their positions to their injury and/or risk and in order to gain advantages did do the

5    following acts:

6        a.    Defendants, and each of them, did not label any of the aforementioned asbestos-

7            containing materials and products as to the hazards of such materials and products

8            to the health and safety of plaintiff's father and plaintiff and others in plaintiff's

9            father's and plaintiff's position working in close proximity with such materials until

10            1964, when certain of such materials were labeled by some, but not all, of the

11            defendants herein, when the knowledge of such hazards was existing and known to

12            defendants, and each of them, since 1924.  By not labeling such materials as to their

13            said hazards defendants, and each of them, caused to be suggested as a fact to

14            plaintiff's father and plaintiff and plaintiff's father's and plaintiff's employers that it

15            was safe for plaintiff's father and plaintiff to work in close proximity to such

16            materials when in fact it was not true and defendants did not believe it to be true;

17        b.    Defendants, and each of them, suppressed information relating to the danger of use

18            of the aforementioned materials by requesting the suppression of information to the

19            plaintiff and the general public concerning the dangerous nature of the

20            aforementioned materials to workers by not allowing such information to be

21            disseminated in a manner which would give general notice to the public and

22            knowledge of the hazardous nature thereof when defendants were bound to disclose

23            such information;

24        c.    Defendants, and each of them, sold the aforementioned products and materials to

25            plaintiff's father's employer and plaintiff's employer and others without advising

26            such employers and others of the dangers of use of such materials to persons

27            working in close proximity thereto, when defendants knew of such dangers, as set

28            forth herein, and, as set forth above, had a duty to disclose such dangers.  Thereby,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

13

defendants caused to be positively asserted to plaintiff's father's employer and plaintiff's employer of that which was not true and which defendants had no reasonable ground for believing it to be true, in a manner not warranted by the information possessed by said defendants, and each of them, of that which was and is not true, to wit, that it was safe for plaintiff's father and plaintiff to work in close proximity to such materials;

d. Defendants, and each of them, suppressed from everyone, including plaintiff's father and plaintiff and plaintiff's father's employer and plaintiff's employer, and continue to suppress, medical and scientific data and knowledge of the accurate results of studies including, but not limited to, suppressing information contained in the unpublished Lanza report by participating in the influencing of A.J. Lanza to change his report, which altered version was published in *Public Health Reports*, Volume 50 at page 1 in 1935, when they were bound to disclose it unaltered, and by causing Asbestos Magazine, a widely disseminated trade journal, to omit any mention of the dangers of inhaling asbestos dust, thereby lessening the probability of notice of danger to those exposed to asbestos, and thereby caused plaintiff's father and plaintiff to be and remain ignorant thereof;

e. Defendants, and each of them, belonged to, participated in, and financially supported the Asbestos Textile Institute and/or other industry organizations which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of defendants, and each of them, thereby misleading plaintiff's father and plaintiff and plaintiff's father's employer and plaintiff's employer to their prejudice through the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (I) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries
**EXHIBIT A - Page 72**                    Exhibit B - Page 212

1    information from 1946 to a date unknown to plaintiff at this time;

2    f.    Commencing in 1930 with the study of mine and mill workers at the Thetford

3    asbestos mines in Quebec, Canada, and the study of workers at Raybestos-

4    Manhattan plants in Manheim and Charleston, South Carolina, defendants knew and

5    possessed medical and scientific information of the connection between inhalation

6    of asbestos fibers and asbestosis, which information was disseminated through the

7    Asbestos Textile Institute and other industry organizations to all other defendants,

8    and each of them, herein.  Between 1942 and 1950 the defendants, and each of

9    them, knew and possessed medical and scientific information of the connection

10   between inhalation of asbestos fibers and cancer, which information was

11   disseminated through the Asbestos Textile Institute and other industry organizations

12   to all other defendants herein.  Thereby, defendants suggested as a fact that which is

13   not true and disseminated other facts likely to mislead plaintiff's father and plaintiff

14   and plaintiff's father's employer and plaintiff's employer and which did mislead

15   them for want of communication of true facts which consisted of the aforedescribed

16   medical and scientific data and other knowledge by not giving plaintiff's father and

17   plaintiff or plaintiff's father's employer and plaintiff's employer the true facts

18   concerning such knowledge of danger, when defendants were bound to disclose it;

19   g.    Failed to warn plaintiff's father and plaintiff and plaintiff's father's employer and

20   plaintiff's employer of the nature of the said materials, to wit:  dangerous when

21   breathed, causing pathological effects without noticeable trauma, when possessed

22   with knowledge that such material was dangerous and a threat to the health of

23   persons coming into contact therewith and under a duty to disclose it;

24   h.    Failed to provide plaintiff's father and plaintiff with information concerning

25   adequate protective masks and devices for use with and application and installation

26   of the products of the defendants, and each of them, when they knew that such

27   protective measures were necessary, when they were under a duty to disclose such

28   information, and if not advised as to use would result in injury to plaintiff's father

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

JBOSL/493784;1

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 73**

15

1      and plaintiff and others applying and installing such materials;

2    i.   Concealed from plaintiff's father and plaintiff the true nature of the industrial

3         exposure of plaintiff, the fact that they and each of them, knew that plaintiff's father

4         and plaintiff and anyone similarly situated, upon inhalation of asbestos would, in

5         time develop irreversible conditions of either pneumoconiosis, asbestosis or cancer,

6         or all, and such person would immediately be in not good health, the fact that he had

7         in fact been exposed to harmful materials and the fact that the materials to which he

8         was exposed would cause pathological effects without noticeable trauma, when

9         under a duty to and bound to disclose it;

10   j.   Failed to provide information to the public at large and buyers, users and physicians

11        employed by plaintiff's father and plaintiff and plaintiff's father's employer and

12        plaintiff's employer for the purpose of conducting physical examinations of

13        plaintiff's father and plaintiff and others working in contact with asbestos as to the

14        true nature of the hazards of asbestos, in order for such physicians to diagnose, and

15        treat workers coming into contact with asbestos, in that the materials to which

16        plaintiff's father and plaintiff had been exposed would cause pathological effects

17        without noticeable trauma, when under a duty to supply such information and such

18        failure is likely to mislead for want of communication of such facts; and

19   k.   Defendants, and each of them, affirmatively misrepresented that asbestos containing

20        products were safe to use and handle, when they knew such statements were false

21        when made, or made said false statements recklessly and without regard for whether

22        the statements were true.

23                                          IV.

24        Each of the foregoing acts, suggestions, assertions and forbearances to act when a duty

25   existed to act, the said defendants, and each of them, having such knowledge, knowing plaintiff's

26   father and plaintiff did not have such knowledge and would breathe such material innocently, was

27   done falsely and fraudulently and with full intent to induce plaintiff's father and plaintiff to work in

28   a dangerous environment and to cause plaintiff's father and plaintiff to remain unaware of the true

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1  facts, all in violation of Section 1710 of the Civil Code of the State of California.

2  

<div align="center">V.</div>

3  Plaintiff's father and plaintiff relied upon the said acts, suggestions, assertions and
4  forbearances; had plaintiff's father and plaintiff known the true facts, they would not have
5  continued to work in the said environment.

6  

<div align="center">VI.</div>

7  By reason of the aforesaid premises, plaintiff has been damaged in his health, strength and
8  activity in addition to special damages hereinabove alleged.

9  

<div align="center">VII.</div>

10  Each of the said acts and forbearances to act were caused by false, fraudulent and malicious
11  motives of the defendants, and each of them, and plaintiff is entitled to exemplary and punitive
12  damages.  The foregoing conduct of the defendants, and each of them, was done wantonly,
13  willfully, oppressively and in conscious disregard of the safety of plaintiff's father and plaintiff
14  herein, in that the defendants, and each of them, prior to and at the time of the sale of the
15  aforementioned products to plaintiff's father's employer and plaintiff's employers or to those
16  entities that installed and/or handled the asbestos products to which plaintiff's father and plaintiff
17  were exposed, knew that the foregoing materials released invisible, undetectable respirable
18  asbestos fibers when installed or handled and that said fibers were extremely dangerous when
19  inhaled.  In addition to the unlawful conduct described above, the defendants, and each of them,
20  either did not warn or insufficiently warned regarding the dangerous nature of said materials, nor
21  placed a sufficient warning on the said material or package thereof regarding said dangerous
22  nature, nor took any action to protect those persons who foreseeably would be exposed to said
23  asbestos products, despite knowing that persons who had no knowledge of the dangerous and
24  hazardous nature thereof, such as plaintiff's father and plaintiff, would be exposed to and inhale
25  asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

26  

<div align="center">VIII.</div>

27  Plaintiff had no knowledge that the foregoing acts were actionable at law when they were
28  committed, and cannot be charged with knowledge or inquiry thereof.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

<div align="center">First Amended Complaint for Personal Injuries
<strong>EXHIBIT A - Page 75</strong></div>

1    WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

## FIFTH CAUSE OF ACTION

### Conspiracy to Defraud/Failure to Warn
### [Against All Product Defendants]

5    AS AND FOR A FIFTH CAUSE OF ACTION, plaintiff complains of PRODUCTS
6    defendants, and each of them, and alleges:

7                                    I.

8    Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set
9    forth herein at length all and singular the allegations contained in the First Cause of Action herein,
10   excepting therefrom allegations pertaining to negligence and agency, and the Fourth Cause of
11   Action herein.

12                                   II.

13   At all times mentioned, the defendants, and each of them, knowingly and willfully
14   conspired and agreed among themselves to perpetrate upon plaintiff the acts complained of as set
15   forth in the First and Fourth Causes of Action as are incorporated herein.

16                                  III.

17   Defendants, and each of them, did the acts and things herein alleged in Paragraph II of the
18   Fourth Cause of Action, incorporated herein, in furtherance of the conspiracy and agreement as
19   herein alleged and did further conspire to violate State and Federal laws and regulations, the exact
20   nature and extent of which are unknown at this time, but known full well to defendants and each of
21   them.

22                                  IV.

23   Each of the said acts and forbearances to act were caused by false, fraudulent and malicious
24   motives of the defendants, and each of them, and plaintiff is entitled to exemplary and punitive
25   damages.  The foregoing conduct of the defendants, and each of them, was done wantonly,
26   willfully, oppressively and in conscious disregard of the safety of plaintiff herein, in that the
27   defendants, and each of them, prior to and at the time of the sale of the aforementioned products to
28   plaintiff's father's employer and plaintiff's employers or to those entities that installed and/or

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 76**

18

**Exhibit B - Page 216**

1  handled the asbestos products to which plaintiff's father and plaintiff were exposed, knew that the
2  foregoing materials released invisible, undetectable respirable asbestos fibers when installed or
3  handled and that said fibers were extremely dangerous when inhaled.  In addition to the unlawful
4  conduct described above, the defendants, and each of them, either did not warn or insufficiently
5  warned regarding the dangerous nature of said materials, nor placed a sufficient warning on the
6  said material or package thereof regarding said dangerous nature, nor took any action to protect
7  those persons who foreseeably would be exposed to said asbestos products, despite knowing that
8  persons who had no knowledge of the dangerous and hazardous nature thereof, such as plaintiff's
9  father and plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to
10  punitive damages hereunder.

11                                                V.

12       By reason of the aforesaid acts of defendants, and each of them, plaintiff has suffered
13  damage to his health, strength and activity.

14       WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

15                               SIXTH CAUSE OF ACTION

16                          Market Share/Enterprise Liability/Negligence
                            [Against All Product Defendants except WORLD AIRWAYS, INC.
17                          and MCDONNELL DOUGLAS CORPORATION, and alleges: ]

18

19       AS AND FOR A SIXTH CAUSE OF ACTION, plaintiff complains of PRODUCTS
20  defendants, and each of them except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS
     CORPORATION, and alleges:
21

22                                                I.

23       Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every
24  allegation contained in the First Cause of Action.

25                                               II.

26       Plaintiff is informed and believes and on the basis of such information and belief alleges
27  that at all times relevant herein, the number of producers of asbestos and asbestos products of the
28  type that plaintiff used or was otherwise exposed to, and the nature and structure of the asbestos

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1  market and industry, was such that there is and was a substantial likelihood that plaintiff would

2  have actually used or otherwise been exposed to the products of each of the defendants.

3  WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

4  **SEVENTH CAUSE OF ACTION**

5  **Market Share/Enterprise Liability/Strict Liability/Defective Product Design, Manufacturing,**
   **Labeling, Marketing and/or Warning**

6  **[Against All Product Defendants except WORLD AIRWAYS, INC.**
   **and MCDONNELL DOUGLAS CORPORATION, and alleges:]**

7

8  AS AND FOR A SEVENTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

9  defendants, and each of them except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS

10  CORPORATION, and alleges:

11  I.

12  Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

13  allegation contained in the Third Cause of Action and in Paragraph II of the Sixth Cause of Action.

14  WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

15  **EIGHTH CAUSE OF ACTION**

16  **Market Share/Concert of Action/Negligence**
   **[Against All Product Defendants except WORLD AIRWAYS, INC.**
   **and MCDONNELL DOUGLAS CORPORATION, and alleges:]**

17

18  AS AND FOR AN EIGHTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

19  defendants and each of them except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS

20  CORPORATION, and alleges:

21  I.

22  Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

23  allegation contained in the First Cause of Action, Paragraph II of the Fourth Cause of Action, and

24  Paragraph II of the Sixth Cause of Action.

25  II.

26  Plaintiff is informed and believes and on the basis of such information and belief alleges

27  that at all times relevant herein, each of the defendants has:

28  (1)  Cooperated in the defective design, manufacturing, labeling and/or marketing of

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  uniformly defective and dangerous asbestos products;

2  (2)  Knowingly adhered to an inadequate industry-wide standard of safety that failed to
3  warn plaintiff, or any other person likely to be exposed to the hazards caused by the use of their
4  products, that exposure to asbestos fibers could cause asbestosis, mesothelioma, and lung cancer
5  and other cancers and diseases or that it could otherwise cause death or serious permanent
6  disability;

7  (3)  Delegated research, investigative, and other safety functions to various trade
8  associations and industry leaders that failed to adequately and accurately investigate the risks
9  caused by the use of asbestos and that minimized and suppressed the publication of the information
10 concerning the hazards of asbestos; and

11 (4)  Otherwise jointly created and controlled the risk that was the proximate cause of the
12 injuries of plaintiff.

13                                      III.

14        Plaintiff is informed and believes and thereon alleges that at all times relevant herein, the
15 nature and structure of the asbestos industry and market was such that the foregoing acts and
16 omissions of each of the defendants, acting separately and in combination, were a substantial factor
17 in bringing about the aforesaid injury-causing standards, practices and risk, and were otherwise the
18 proximate and legal cause of, and a substantial factor in, bringing about the injuries to plaintiff.

19        WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

20                          NINTH CAUSE OF ACTION

21      Market Share/Concert of Action/Strict Liability/Defective Product Design
               [Against All Product Defendants except WORLD AIRWAYS, INC.
22                  and MCDONNELL DOUGLAS CORPORATION, and alleges:]

23

24      AS AND FOR A NINTH CAUSE OF ACTION, plaintiff complains of PRODUCTS
25 defendants, and each of them except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS
26 CORPORATION, and alleges:

27                                       I.

28      Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

JBOSU493784.1

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 79**                                     21

                                              **Exhibit B - Page 219**

1  allegation contained in the Third Cause of Action, Paragraph II of the Fourth Cause of Action,

2  Paragraph II of the Sixth Cause of Action, and Paragraphs II and III of the Eighth Cause of Action.

3  WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

4  ### TENTH CAUSE OF ACTION

5  **Market Share/Concert of Action/Conspiracy to Defraud/Failure to Warn**

6  **[Against All Product Defendants except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS CORPORATION, and alleges:]**

7

8  AS AND FOR A TENTH CAUSE OF ACTION, plaintiff complains of PRODUCTS

9  defendants, and each of them except WORLD AIRWAYS, INC. and MCDONNELL DOUGLAS

10  CORPORATION, and alleges:

11  I.

12  Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

13  allegation contained in the Fifth and Ninth Causes of Action.

14  II.

15  Plaintiff is informed and believes and on the basis of such information and belief alleges

16  that at all times herein, each of the defendants knew that the aforesaid failure to warn was industry-

17  wide and that the use of their products and the products of others in the industry, without

18  inspection and protection from the hazards of dust inhalation and without an adequate warning by

19  any of them, created and increased the risk of death and disease from cancer, asbestosis, and other

20  related diseases.

21  III.

22  Plaintiff is informed and believes and on the basis of such information and belief alleges

23  that at all times herein, each of the defendants, acting in concert and pursuant to a common plan,

24  and in order to maximize the sale of their products and to minimize claims for damages and

25  compensation, knowingly assisted, aided, abetted, encouraged and ratified the conduct of each

26  other:

27  (1)  In the defective design, manufacturing, labeling and/or marketing of a uniformly

28  defective and hazardous asbestos product without adequate tests and without an adequate warning

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

3OSL/493784.1

First Amended Complaint for Personal Injuries

1  to their consumers and users; and

2      (2)    In suppressing and discouraging the discovery and publication of information

3  concerning the true hazards of asbestos by and to the public at large.

4      Said conduct was the proximate and legal cause of, and a substantial factor in, bringing

5  about the injuries of plaintiff.

6      WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

7  ## PREMISES DEFENDANTS:

8  ### ELEVENTH CAUSE OF ACTION

9  ### Negligence/Failure to Warn
### [Against All Premises Defendants]

10

11      AS AND FOR AN ELEVENTH CAUSE OF ACTION, plaintiff complains of defendants

12  WORLD AIRWAYS, INC.; LATHROP CONSTRUCTION ASSOCIATES, INC., individually,

13  and as successor in interest, parent, alter ego, and or equitable trustee of F.P. LATHROP

14  CONSTRUCTION COMPANY; RAYMOND INTERIOR SYSTEMS-NORTH, individually and

15  as successor in interest, parent, alter ego and equitable trustee to JAMES L. WHITTAKER, INC.;

16  and TWO HUNDRED THIRTEENTH DOE through TWO HUNDRED TWENTY-FIFTH DOE,

17  inclusive.  These defendants were at all times herein and still are corporations authorized to and

18  doing business in the State of California, and are hereafter designated the PREMISES defendants.

19  Plaintiff alleges against the PREMISES defendants, and each of them:

20                      I.

21      Plaintiff, by this reference, hereby incorporates and makes a part thereof, as though fully set

22  forth herein, each and every allegation contained in the First through Tenth Causes of Action

23  herein.

24                      II.

25      Plaintiff does not know the true names or capacities of the defendants sued herein under the

26  fictitious names of TWO HUNDRED THIRTEENTH DOE through TWO HUNDRED TWENTY-

27  FIFTH DOE, inclusive, whether corporate, associate or individual, and plaintiff prays leave to

28  amend this complaint to allege said true names and/or capacities when the same are ascertained.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  Plaintiff is informed and believes and therefore alleges that each of the defendants designated

2  herein as a DOE is negligently, intentionally and/or strictly liable or responsible in some manner

3  for the events and happenings herein referred to, and proximately caused injury and damages to

4  plaintiff as hereinafter alleged.

5                                          III.

6        At all times herein mentioned, defendants TWO HUNDRED TWENTY-SIXTH DOE

7  through TWO HUNDRED SEVENTY-FIFTH DOE were Officers and Directors of named

8  defendants herein as TWO HUNDRED THIRTEENTH DOE through TWO HUNDRED

9  TWENTY-FIFTH DOE.

10                                          IV.

11       At all times mentioned herein, the PREMISES defendants each respectively owned,

12  maintained, managed, and/or controlled one or more of those premises where plaintiff's father

13  worked while employed as set forth in Part VIII of the First Cause of Action, which is herein

14  incorporated by reference.

15                                          V.

16       Prior to and at said times and places, each said PREMISES defendant caused certain

17  asbestos-containing insulation and other building materials and products and machinery to be

18  specified, manufactured, constructed, supplied, installed, maintained, used, replaced, and/or

19  repaired and otherwise be present at the aforesaid premises, by its own workers and/or various

20  independent contractors so as to allow and cause the release of dangerous quantities of toxic

21  asbestos fibers into the ambient air and thereby contaminate the entire premises and create a

22  hazardous condition and unreasonable risk of harm and personal injury to plaintiff's father and

23  plaintiff and other persons exposed to said asbestos fibers while working on said premises, or

24  otherwise using or coming on said premises, unless special precautions were taken.

25                                          VI.

26       At all relevant times mentioned herein, each said PREMISES defendant had a nondelegable

27  duty to exercise reasonable care to inspect and make safe the premises it owned, maintained,

28  managed and/or controlled, and to discover the aforesaid dangerous conditions. PREMISES

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  defendants, and each of them, also created or contributed to said dangerous conditions, by

2  specifying, manufacturing, supplying, installing, maintaining, using, replacing, repairing, and/or

3  requiring the use and/or handling of asbestos-containing materials on said premises, and by failing

4  to properly supervise their own employees or the employees of others over whom said defendants

5  had control in performing work which caused the release of asbestos fibers into the ambient air and

6  the contamination of the entire premise, when defendants knew or in the exercise of ordinary and

7  reasonable care should have known that the foregoing conditions and activities were present on

8  said premises and created a dangerous and hazardous condition and unreasonable risk of harm and

9  personal injury to plaintiff and other persons coming on the aforesaid premises.

10                                              **VII.**

11      At all times relevant herein, plaintiff's father entered said premises and used and occupied

12  said premises as intended and for the benefit and advantage of each said PREMISES defendant and

13  at each said PREMISES defendant's request and invitation.  In so doing, plaintiff's father and

14  plaintiff were exposed to dangerous quantities of asbestos fibers released into the ambient air by

15  the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise

16  created, controlled, or caused by each said PREMISES defendant.

17                                              **VIII.**

18      Plaintiff's father at all relevant times used the premises with due care and was unaware of

19  and in the exercise of ordinary care could not have discovered the risk of personal injury and the

20  hazardous conditions created by the aforesaid presence of asbestos products and materials on said

21  premises.

22                                              **IX.**

23      At all relevant times mentioned herein, each said PREMISES defendant knew, or in the

24  exercise of ordinary and reasonable care should have known, that the premises that were in its

25  control would be used as alleged without knowledge of, or inspection for, defects or dangerous

26  conditions, which were not apparent or obvious, and that persons using said premises would not be

27  aware of the aforesaid hazardous conditions and contamination on the premises to which they were

28  exposed.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA. 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

JBOSL493784.1

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 83**

25

**Exhibit B - Page 223**

**X.**

At all times pertinent hereto, the PREMISES defendants, and each of them, owed plaintiff's father and plaintiff a duty, as provided in Section 1708 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of plaintiff's father and plaintiff. When a duty to act was imposed, as set forth herein, the defendants, and each of them, did do the acts and omissions in violation of that duty, thereby proximately causing injury to the plaintiff as is more fully set forth herein.

**XI.**

At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to warn plaintiff's father and plaintiff and plaintiff's father's employer that said materials were dangerous when breathed and caused pathological effects without noticeable trauma, despite the fact that defendants possessed knowledge and were under a duty to disclose that such material was dangerous and a threat to the health of persons coming into contact therewith.

**XII.**

At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to provide plaintiff's father and plaintiff with information concerning adequate protective masks and devices to be used when applying, installing, disturbing, or otherwise working around asbestos-containing products, and each of them, despite the knowledge of the PREMISES defendants and a duty to disclose that such protective measures were necessary and would result in injury to the plaintiff and others applying, installing, disturbing, or otherwise working around such materials if not so advised.

**XIII.**

At all relevant times mentioned herein, PREMISES defendants, and each of them, concealed from plaintiff the true nature of the industrial exposure of plaintiff, and knew that plaintiff and anyone similarly situated, upon inhalation of asbestos would, in time, develop irreversible conditions of either pneumoconiosis, asbestosis or cancer, or all, and that the materials to which he was exposed would cause pathological effects without noticeable trauma despite the fact that PREMISES defendants were under a duty to and bound to disclose it.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
A PROFESSIONAL LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IBOSU493784.1

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 84**

**Exhibit B - Page 224**

## XIV.

At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to provide information of the true nature of the hazards of asbestos materials and that exposure to these materials would cause pathological effects without noticeable trauma to the public, including buyers, users, and physicians employed by plaintiff's father and plaintiff and plaintiff's father's employer so that said physicians could examine, diagnose and treat plaintiff and others who were exposed to asbestos, despite the fact that PREMISES defendants, and each of them, were under a duty to so inform and said failure was misleading.

## XV.

At all relevant times mentioned herein, said PREMISES defendants, and each of them, negligently failed to take steps to abate or correct the dangerous conditions, or to make the premises safe or to warn plaintiff's father and plaintiff of the existence of the aforesaid dangerous conditions and hazards on said premises, although the risk of plaintiff's injuries was a foreseeable consequence of the negligence of defendants and each of them.

## XVI.

As a legal consequence of the foregoing, plaintiff developed an asbestos-related disease which caused illness and death as previously set forth and has suffered general and special damages as alleged herein.

## XVII.

The foregoing acts of the PREMISES defendants, and each of them, were done wantonly, willfully, oppressively and in conscious disregard of the safety of plaintiff herein, by the defendants, and each of them, in that the defendants, and each of them knew, at the time defendants manufactured, supplied or required the use and/or handling of asbestos-containing materials and/or failed to properly supervise their own employees or the employees of others over whom defendants had control who installed and/or handled the asbestos products to which plaintiff's father and plaintiff were exposed, that the foregoing materials released invisible, undetectable respirable asbestos fibers when installed or handled and that said fibers were extremely dangerous when inhaled. The defendants, and each of them, either did not warn or

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 85**

**Exhibit B - Page 225**

1 insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient

2 warning on the said material or package thereof regarding said dangerous nature, nor took any

3 action to protect those persons who foreseeably would be exposed to said asbestos products,

4 despite knowing that persons who had no knowledge of the dangerous and hazardous nature

5 thereof, such as plaintiff's father and plaintiff, would be exposed to and inhale asbestos fibers, and

6 plaintiff is entitled to punitive damages hereunder.

7 WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

8 ## TWELFTH CAUSE OF ACTION

9 ### Negligent Hiring and Negligent Exercise of Retained Control
### [Against All Premises Defendants]

10

11 AS AND FOR A TWELFTH CAUSE OF ACTION, plaintiff complains of PREMISES

12 defendants, and each of them, as follows:

13 I.

14 Plaintiff refers to and incorporates herein by reference the First through Eleventh Causes of

15 Action of this Complaint.

16 II.

17 At all relevant times herein, the PREMISES defendants and each of them negligently hired,

18 retained and kept contractors on jobs to perform asbestos related work, and knew or in the exercise

19 of reasonable care and diligence should have known that the contractors, independent contractors,

20 subcontractors, employees, manufacturers, suppliers, distributors, workers and others these

21 defendants employed or engaged to or responsible for the manufacture, distribution, installation,

22 inspection, maintenance, repair, replacement, removal and/or disposing of asbestos and asbestos-

23 containing materials on the aforementioned premises were incompetent and unfit to perform the

24 duties for which they were employed, retained, hired or used, and that an unreasonable risk of harm

25 to plaintiff's father and plaintiff and other persons on the aforesaid premises would exist as a legal

26 consequence of such initial and/or continued employment, retention or contract. PREMISES

27 defendants and each of them failed to exercise reasonable caution in selecting, retaining and

28 continuing to use each of the employees, contractors, independent contractors and/or

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

OSL/493784.1

First Amended Complaint for Personal Injuries

28

1   subcontractors who performed asbestos-related work, including those that employed plaintiff's

2   father, even though said PREMISES defendants knew or in the reasonable exercise of ordinary and

3   reasonable care should have known that failure to choose these persons carefully to perform

4   asbestos-related work and/or allow such persons to continue to perform asbestos-related work after

5   the PREMISES defendants, and each of them, became aware of the negligent manner in which the

6   work was being performed created a dangerous and hazardous condition and unreasonable risk of

7   harm and personal injury to plaintiff and other workers or persons so exposed while working for or

8   in the vicinity of negligent contractors or exposed to asbestos fibers on such persons' clothing,

9   shoes and person.  PREMISES defendants, and each of them, also negligently exercised the control

10  they retained of the operative details – including, without limitation, the asbestos-related details --

11  of plaintiff's father's and plaintiff's work, thereby negligently exposing plaintiff's father and

12  plaintiff to asbestos that was a legal cause of plaintiff's mesothelioma.

13                                          III.

14       The foregoing acts of the PREMISES defendants, and each of them, were done wantonly,

15  willfully, oppressively and in conscious disregard of the safety of plaintiff herein, by the

16  defendants, and each of them, in that the defendants, and each of them knew – at the time

17  defendants manufactured, supplied or required the use and/or handling of asbestos-containing

18  materials to which plaintiff's father and plaintiff were exposed, and/or failed to properly train, hire

19  and/or supervise their own employees or the employees of others over whom defendants had

20  control who installed and/or handled the asbestos products to which plaintiff was exposed, and/or

21  negligently exercised the control they retained of the asbestos-related details of plaintiff's father's

22  and plaintiff's – that the foregoing materials released invisible, undetectable respirable asbestos

23  fibers when installed or handled and that said fibers were extremely dangerous when inhaled.  The

24  defendants, and each of them, either did not warn or insufficiently warned regarding the dangerous

25  nature of said materials, nor placed a sufficient warning on the said material or package thereof

26  regarding said dangerous nature, nor took any action to protect those persons who foreseeably

27  would be exposed to said asbestos products, despite knowing that persons who had no knowledge

28  of the dangerous and hazardous nature thereof, such as plaintiff's father and plaintiff, would be

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  exposed to and inhale asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

2  WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

3

4  ## THIRTEENTH CAUSE OF ACTION

5  ### Conspiracy/Concert of Action
6  [Against Metropolitan Life Insurance Company and Does 276-330, Inclusive]

7  I.

8  Plaintiff hereby incorporates by reference each and every allegation of the preceding causes
9  of action herein.  (As used throughout this cause of action, "plaintiff" refers to all named
10 plaintiffs.)                                    II.

11  The term "conspirators" as used in this cause of action includes, but is not limited to,
12  METROPOLITAN LIFE INSURANCE COMPANY ("MET LIFE"), Anthony Lanza, M.D.,
13  Johns-Manville Corporation ("Manville"), Raybestos-Manhattan Corporation ("Raybestos") and
14  the other entities and individuals identified in this cause of action.

15                                              III.

16  Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned
17  defendant METROPOLITAN LIFE INSURANCE COMPANY was and is a corporation organized
18  and existing under and by virtue of the laws of the State of New York or the laws of some other
19  state or foreign jurisdiction, and that this defendant was and is authorized to do and/or was and is
20  doing business in the State of California, and regularly conducted or conducts business in the
21  County of Alameda, State of California.  At times relevant to this cause of action, MET LIFE was
22  an insurer of Manville and Raybestos.

23                                              IV.

24  Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos
25  products manufactured, distributed and/or supplied by one or more of the conspirators named
26  below.  The exposure to the asbestos or asbestos-related products supplied by the conspirator(s)
27  caused plaintiff's asbestos-related disease, injuries and/or death.

28                                              V.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    The conspirators, individually and as agents of one another and as co-conspirators, agreed

2    and conspired among themselves, with other asbestos manufacturers and distributors, with certain

3    individuals including but not limited to Anthony Lanza, M.D. ("Lanza") and with defendant MET

4    LIFE to injure plaintiff in the following fashion (the following is not an exclusive list of the

5    wrongful acts of the conspirators, but, rather, is a representative list):

6         (a)    Beginning in 1929, MET LIFE entered agreements with Manville and others to

7    fund studies of the effects of asbestos exposure on Canadian asbestos miners.  When the data from

8    these studies proved that Canadian asbestos miners were developing asbestosis, MET LIFE,

9    Manville and others suppressed its publication; further, Lanza (then a MET LIFE employee)

10   actively misrepresented the results of the Canadian study for many years thereafter to meetings of

11   health-care professionals seeking information regarding asbestos exposure.

12        (b)    In approximately 1934, conspirators Manville and MET LIFE, through their agents

13   Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos, through its agents Sumner

14   Simpson and J. Rohrback, suggested to MET LIFE associate director Lanza that Lanza publish a

15   study on asbestosis in which Lanza would affirmatively misrepresent material facts and

16   conclusions about asbestos, including but not limited to descriptions of the seriousness of the

17   asbestosis disease process.  The misrepresentation was accomplished through intentional deletion

18   of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively

19   misrepresented asbestosis as a disease process less critical than it was known to be by the

20   conspirators.  As a result, Lanza's study was published in the medical literature in 1935 with these

21   misleading statements.  The conspirators were motivated to effectuate this fraudulent

22   misrepresentation and fraudulent non-disclosure in part by the desire to influence proposed

23   legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Manville,

24   Raybestos and MET LIFE (as Manville's and Raybestos's insurer), and to promote the use of

25   Manville's and Raybestos's asbestos products.

26        (c)    The above-described conspiracy continued in 1936, when additional co-conspirators

27   American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation,

28   Manville, Keasbey & Mattison Company (then an alter ego to conspirator Turner & Newall),

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1  Raybestos, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company),

2  Union Asbestos and Rubber Company and United States Gypsum Company entered into an

3  agreement with a leading medical research facility, the Saranac Laboratories.  Under the

4  agreement, the conspirators acquired the power to decide what information Saranac Laboratories

5  could publish regarding asbestos disease and could also control in what form such publications

6  were to occur.  Their agreement provided these conspirators the power and ability to affirmatively

7  misrepresent the results of the work at Saranac Laboratories, and also gave these conspirators

8  power to suppress material facts included in any of the facility's studies.  On numerous occasions

9  thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing

10  material scientific data, resulting in numerous misstatements of fact being made at scientific

11  meetings concerning the health effects of asbestos exposure.

12          (d)      The conspiracy was furthered when on November 11, 1948 representatives of the

13  following conspirators met at Manville headquarters: Manville, American Brake Block Division of

14  American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (then an

15  alter ego of conspirator Turner & Newall), Raybestos, Thermoid Company (whose assets and

16  liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company,

17  United States Gypsum Company and MET LIFE.  U.S. Gypsum did not send a company employee

18  to the meeting, but instead authorized Vandiver Brown of Manville to represent its interest at the

19  meeting and to take action on its behalf.

20          (e)      At the November 11, 1948 meeting, these conspirators and their representatives

21  decided to exert their influence to materially alter and misrepresent material facts about the

22  substance of research conducted by Dr. Leroy Gardner at the Saranac Laboratories beginning in

23  1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an

24  evaluation of the health effects of asbestos on humans with a critical review of the then-existing

25  standards for asbestos-dust exposure.

26          (f)      At this meeting, these conspirators intentionally and affirmatively decided that

27  Dr. Gardner's work should be edited to delete material facts about the cancer-causing propensity of

28  asbestos, the health effects of asbestos on humans and the critique of the dust standards.  The

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1   conspirators then published these deceptive and fraudulent statements in the medical literature as

2   edited by Dr. Vorwald.  These conspirators thereby fraudulently misrepresented the risks of

3   asbestos exposure to both the public and the class of persons exposed to asbestos, including

4   plaintiff's father and plaintiff.

5        (g)    As a direct result of influence exerted by the conspirators, a Dr. Vorwald in 1951

6   published Dr. Gardner's edited work in *The Journal of Industrial Hygiene, AMA Archives of*

7   *Industrial Hygiene and Occupational Health* in a form that stressed those portions of Dr. Gardner's

8   work that the conspirators wished to be stressed, but that omitted reference to human asbestosis

9   and cancer, thereby fraudulently and affirmatively misrepresenting the extent of asbestos's risks.

10  The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald

11  publication to university libraries, government officials, government agencies and others.

12       (h)    Such actions constitute a material affirmative misrepresentation of the total context

13  of material facts involved in Dr. Gardner's work and resulted in creating an appearance that

14  inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

15       (I)    When Dr. Vorwald subsequently tried to publish more complete information

16  regarding Dr. Gardner's animal studies, the conspirators required his discharge from the Saranac

17  Laboratories, denied him permission to publish or complete Dr. Gardner's work and actively

18  discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

19       (j)    The following conspirators were members of the trade association known as Quebec

20  Asbestos Mining Association (Q.A.M.A.):  Manville, Carey-Canada individually and as successor

21  in interest to Quebec Asbestos Corporation, the Celotex Corporation as successor in interest to

22  Quebec Asbestos Corporation, National Gypsum Company and Turner & Newall as successor in

23  interest to Bell Asbestos.  These conspirators, members of Q.A.M.A., participated in the above-

24  described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the

25  *AMA Archives of Industrial Health* in 1951.  Evidence of the Q.A.M.A.'s involvement in this

26  misrepresentation arises from co-conspirator Manville's membership in the Q.A.M.A., as well as

27  correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49 and 9/6/50,

28  all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    who acted on behalf of all Q.A.M.A. members.

2        (k)    In furtherance of the conspiracy that commenced in 1929, conspirators who were

3    members of the Q.A.M.A. as described above began in about 1950 to formulate a plan to influence

4    public opinion concerning the relationship between asbestos and cancer by influencing the medical

5    literature on this subject and then touting and disseminating this literature to the public and to

6    organizations and legislative bodies responsible for regulatory control of asbestos with the specific

7    intent of misrepresenting the existing scientific information and suppressing contrary scientific

8    data in their possession and control.

9        (l)    This plan of misrepresentation and influence over the medical literature began in

10   about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an

11   evaluation of whether cancer was related to asbestos. After a preliminary report authored by

12   Arthur Vorwald in 1952 indicated that, based on experiments with laboratory animals, a

13   cancer/asbestos relationship might exist, these Q.A.M.A. members refused to further fund the

14   study, terminated the study and prevented any public discussion or dissemination of the results.

15       (m)    As a result of the termination of the Q.A.M.A./Saranac study, the conspirators

16   fraudulently withheld information from the public and affirmatively misrepresented to the public

17   and responsible legislative and regulatory bodies that asbestos did not cause cancer. These

18   affirmative misrepresentations were made by conspirators and conspirators' agents K.W. Smith,

19   M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Lanza, Vandiver Brown and Ivan Sabourin and

20   were directed to, among others, U.S. government officials, Canadian government officials, the U.S.

21   National Cancer Institute, medical organizations, health professionals and the general public,

22   including plaintiff.

23       (n)    The Q.A.M.A. conspirators subsequently contracted with the Industrial Hygiene

24   Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure,

25   asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the

26   Q.A.M.A. that asbestosis did increase a worker's risk of developing lung cancer.

27       (o)    The Q.A.M.A. conspirators, in furtherance of the conspiracy that began in 1929,

28   caused the work by Braun and Truan to be published in 1958, but with the findings concerning the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1  increased incidence of cancer in asbestos-exposed persons edited out and stricken by agents of the
2  Q.A.M.A.  The published version of the Braun/Truan study contained a conclusion that asbestos
3  exposure alone did not increase the incidence of lung cancer, a conclusion known by the
4  conspirators to be false.

5       (p)    By falsifying and causing publication of studies concluding that asbestos exposure
6  did not cause lung cancer and simultaneously omitting documented findings that asbestosis did
7  increase the risk of lung cancer, the conspirators affirmatively misrepresented to, and concealed
8  from, the public the extent of the risks associated with inhaling asbestos fibers.

9       (q)    In furtherance of the ongoing 1929 conspiracy, the Q.A.M.A. in about 1958
10  publicized the fraudulently edited works of Drs. Braun and Truan at a symposium in an effort to
11  fraudulently misrepresent to the public and persons exposed to asbestos that inhaling asbestos
12  fibers did not cause cancer.

13       (r)    The foregoing fraudulent misrepresentations, which began in 1929 and continued
14  with the publication in 1958 of the Braun/Truan study, influenced the standards set for acceptable
15  levels of asbestos exposure.  The developers of such standards failed to lower the maximum
16  exposure limits because a cancer risk associated with asbestos inhalation had not been proven.

17       (s)    In furtherance of the 1929 conspiracy, Q.A.M.A. conspirators decided at their trade
18  association meeting in 1967 that they would intentionally mislead consumers about the extent of
19  risks associated with inhaling asbestos.

20       (t)    In furtherance of the 1929 conspiracy, a symposium concerning the health effects of
21  asbestos was conducted at the Saranac Laboratories in 1952.  The following conspirators were in
22  attendance: MET LIFE, Lanza, Manville, Turner & Newall, Raybestos and Q.A.M.A. members
23  through their agents Cartier, Sabourin and LaChance.

24       (u)    At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis in
25  product users was discussed, as was the carcinogenic properties of all asbestos-fiber types.  In an
26  affirmative attempt to mislead the public about the extent of health risks associated with asbestos,
27  and in an effort to fraudulently conceal those risks from the public, these conspirators conspired to
28  prevent publication of the record of this 1952 Saranac Symposium, and it was not published.  In

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1   addition, the conspirators induced Vorwald not to announce the results of his and Dr. Gardner's

2   laboratory studies showing excess cancers in asbestos-exposed animals.  The conspirators in this

3   way fraudulently misrepresented existing secret data that was prevented from being publicized

4   because of the secrecy provisions contained in the previously described 1936 Saranac agreement.

5.       (v)     The following co-conspirators were members of the trade organization known as

6   The Asbestos Textile Institute (ATI):  Raybestos, Manville, H.K. Porter, Keasbey & Mattison

7   (individually and through its alter ego, Turner & Newall), National Gypsum, Uniroyal, Inc.

8   (individually and through its alter egos, CDU Holding Company), Uniroyal Holding Company,

9   Uniroyal Goodrich Tire Company and Asbestos Corporation, Ltd..

10       (w)     In furtherance of the foregoing conspiracy, the conspirators and ATI members in

11   1942 received a report from W.C.L. Hemeon (Hemeon) concerning asbestos that suggested the

12   then-existing maximum asbestos-exposure limits be re-evaluated.  These conspirators caused the

13   Hemeon report not to be published and thereby fraudulently concealed material facts about

14   asbestos exposure from the public and affirmatively misrepresented to the public and class of

15   persons exposed to asbestos that the then-existing maximum asbestos-exposure limit was safe and

16   acceptable.  Thereafter, these conspirators withheld additional material information on the dust

17   standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby

18   further influencing ACGIH evaluations of its Threshold Limit Values for asbestos exposure.

19       (x)     In furtherance of the foregoing conspiracy, co-conspirator National Gypsum,

20   through its agents and following an inquiry from the Indiana Division of Industrial Hygiene (IDIH)

21   concerning the health hazards of asbestos-spray products, in 1953 refused to mail a proposed

22   response to the IDIH indicating that those applying the products should wear respirators when

23   doing so.  National Gypsum's response distorted and fraudulently misrepresented the need for

24   applicators of asbestos-spray products to wear respirators, and thereby misrepresented the risks

25   associated with asbestos exposure.

26       (y)     In furtherance of the foregoing conspiracy, conspirator Manville through its agent

27   Kenneth Smith in 1955 caused to be published in *The AMA Archives of Industrial Health* an article

28   entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IOSL/493784.1

First Amended Complaint for Personal Injuries

1   results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr.

2   Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk

3   associated with inhaling asbestos.

4         (z)    In furtherance of the foregoing conspiracy, the National Cancer Institute in 1955

5   held a meeting at which conspirator Manville, individually and as agent for other co-conspirators,

6   and A. Vorwald, as agent of all the conspirators, affirmatively misrepresented that there was no

7   existing animal study indicating any relationship between asbestos exposure and cancer when, in

8   fact, the conspirators secretly possessed several suppressed studies positively demonstrating the

9   existence of such a link.

10        (aa)   In furtherance of the foregoing conspiracy, these conspirators and members of the

11  ATI in 1957 jointly rejected a proposed research study on cancer and asbestos, and this resulted in

12  their fraudulently concealing from the public material facts regarding asbestos exposure and also

13  constituted an affirmative misrepresentation of the then-existing knowledge about asbestos

14  exposure and lung cancer.

15        (bb)   In furtherance of the foregoing conspiracy, conspirators who in 1964 were members

16  of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos

17  exposure that had been recently published by Dr. Irving J. Selikoff of the Mount Sinai Research

18  Center. These members of the ATI thereafter embarked on a campaign to further misrepresent the

19  association between asbestos exposure and lung cancer.

20        (cc)   The conspirators founded and funded the Mellon Institute and the Industrial

21  Hygiene Foundation (IHF) to research issues concerning the health effects of inhaling asbestos dust

22  and for the express purpose of delaying or preventing compensation to workers who suffered

23  asbestos disease. Beginning in the early 1940's, the IHF was involved in a study by Dr. Hemeon

24  entitled "Report of Preliminary Dust Investigation for Asbestos Textile Institute," which was

25  published in June 1947. This study was conducted in conjunction with members of the Asbestos

26  Textile Institute and found that workers exposed to less than the recommended maximum asbestos-

27  exposure levels were nonetheless developing disease. As a part of the conspiracy, the IHF never

28  published this study.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1      (dd)    Beginning in the mid-1950's, the IHF and Mellon Institute were involved in the

2  publication of works by Braun and Truan entitled "An Epidemiological Study of Lung Cancer in

3  Asbestos Miners." In its original, unedited form in September 1957, this study concluded that

4  workers with asbestosis had an increased incidence of lung cancer and that the Canadian

5  government had been under-reporting occurrences of asbestosis. The final, published version of

6  this study in June 1958 deleted the conclusion that workers with asbestosis suffered an increased

7  incidence of lung cancer and that the Canadian government had been under-reporting asbestosis

8  cases. The IHF and the Mellon Institute conspired with the members of the Quebec Asbestos

9  Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other conspirators to

10  suppress the above-described information concerning asbestos and cancer.

11      (ee)    The above-described actions of the IHF and the Mellon Institute constituted

12  intentional deception and fraud in actively misleading the public about the extent of the hazards

13  linked to breathing asbestos dust. These actions also substantially contributed to retarding the

14  development of knowledge about the hazards of asbestos and thereby substantially contributed to

15  injuries suffered by plaintiffs.

16      (ff)    From the early 1920's until the 1970's, Manville, Raybestos and other conspirators

17  undertook continual and systemic monitoring of the workers employed in their plants

18  manufacturing asbestos products. The monitoring included chest x-rays taken for the purpose of

19  discovering whether the workers were suffering from asbestosis or other asbestos diseases. MET

20  LIFE and Lanza actively assisted and participated in many of the monitoring programs. The

21  conspirators, including MET LIFE, failed to disclose and actively concealed the results of the

22  monitoring. The conspirators also failed to disclose the nature, extent and frequency of asbestos

23  disease among the workers and instead encouraged the workers to continue work until they were

24  completely and totally disabled. The conspirators further intentionally concealed from the workers

25  employed in their manufacturing plants the nature and extent of the risks associated with asbestos

26  exposure.

27      (gg)    All conspirators identified herein approved, ratified and furthered the previous

28  conspiratorial acts of conspirators Manville, Raybestos, Lanza and MET LIFE, and all the alleged

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
71 TWELFTH STREET
THIRD FLOOR
IMKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  conspirators during the time and circumstances previously described acted as agents and co-
2  conspirators of the other conspirators.

3      (hh)    MET LIFE was an active participant in the foregoing conspiracy and benefitted
4  thereby.  MET LIFE benefitted from its involvement in the conspiracy in the following non-
5  exclusive list of ways, among others:

6          (i)    By providing workers' compensation insurance to co-conspirators.

7          (ii)    By providing life insurance for employees of the co-conspirators.

8          (iii)    By providing health insurance or health care for the employees of the co-
9          conspirators.

10          (iv)    By purchasing substantial stock in asbestos-related companies, including
11          stock of the co-conspirators.

12          (v)    By developing information by which asbestos-related claims for
13          compensation could be defeated.

14  <div align="center">**VI.**</div>

15      The previously described acts of the conspirators constitute fraudulent concealment and/or
16  fraudulent misrepresentation, which caused injury to the plaintiff in the following ways, among
17  others:

18      (a)    The material published or caused to be published by the conspirators was false and
19  incomplete in that the conspirators knowingly and deliberately deleted references to the known
20  health hazards of asbestos and asbestos-related products.

21      (b)    The conspirators individually, as members of a conspiracy and as agents of other
22  conspirators, intended to – and did – publish  false and misleading reports that misrepresented or
23  failed to disclose known health hazards associated with common uses of asbestos-containing
24  products.  Their purposes were to (1) maintain a favorable business climate for the continued sale
25  and distribution of asbestos and asbestos-related products, (2) assist in the conspirators' continued
26  pecuniary gain through the sale of their products, (3) influence proposed legislation to regulate
27  asbestos exposure in a way that favored the conspirators' interests and (4) aid in defending lawsuits
28  seeking compensation for injury resulting from asbestos exposure.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
. A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   (c)   Plaintiff's father and plaintiff and others reasonably relied, both directly and
2   indirectly, on the published medical and scientific data documenting the purported safety of
3   asbestos and asbestos-related products, and also on the absence of published medical and scientific
4   reports of the hazards of continued exposure to asbestos. Plaintiff's father and plaintiff believed
5   asbestos to be safe and was unaware of the hazards of that material because of the conspiratorial
6   conduct described herein.

7   (d)   Conspirators – individually, as members of a conspiracy and as agents of other co-
8   conspirators – were and are in a position of superior knowledge regarding the health hazards of
9   asbestos and therefore plaintiff's father and plaintiff reasonably relied (both directly and indirectly)
10   on the published reports commissioned by the conspirators regarding the health hazards of asbestos
11   and the absence of published information (because of the suppression by the conspiracy)
12   concerning the hazards of asbestos and asbestos-related products.

13   (e)   As a direct result of the continuing and ongoing conduct of the conspirators, as
14   alleged herein, the plaintiff contracted asbestos-related disease, and plaintiff suffered injuries and
15   incurred damages as described in greater detail elsewhere in the complaint.

16                                              VII.

17   MET LIFE acted in concert with the foregoing parties (the conspirators) and pursuant to a
18   common design, as previously delineated, to cause injury to plaintiff.

19                                              VIII.

20   MET LIFE knew that the conduct of Manville, Raybestos and the other conspirators was
21   coercive, fraudulent and deceitful toward others (including plaintiff's father and plaintiff) and that
22   conspirators' conduct was a breach of duty or duties owed to plaintiff's father and plaintiff; and
23   MET LIFE gave substantial assistance and encouragement to Manville and the other conspirators
24   in breaching their duties to plaintiff's father and plaintiff and others.

25                                              IX.

26   Plaintiff and/or plaintiff's father was insured, directly or indirectly, by MET LIFE and as
27   such was owed a fiduciary duty by MET LIFE that was breached by MET LIFE's foregoing
28   conduct and conspiracy, thereby causing plaintiff's asbestos-related injuries.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

JBOSL/493784.1

1                                           X.

2          The conspirators made representations to plaintiff's father and plaintiff and others

3    concerning asbestos-containing products, including but not limited to:

4          (a)      the statements set forth and summarized in the foregoing paragraphs;

5          (b)      that asbestos in commercially used insulation products was not hazardous (this

6                   statement was known to be false by the conspirators);

7          (c)      that the amount of asbestos in the air necessary to cause disease was five million

8                   particles per cubic foot (this statement was known to be false by the conspirators);

9          (d)      that asbestos does not cause cancer (this statement was known to be false by the

10                  conspirators);

11         In addition, the conspirators actively concealed facts from plaintiff's father and plaintiff and

12   others, including but not limited to:

13         (a)      that asbestos-related disease can be a fatal disease;

14         (b)      that asbestos causes various forms of lung cancer;

15         (c)      that individuals should protect themselves from breathing asbestos dust;

16         (d)      the extent of asbestos disease in exposed populations;

17         (e)      information regarding the levels of airborne asbestos that can cause disease;

18         (f)      their experience with workers' compensation claims related to asbestos exposure;

19         and

20         (g)      the concealment described in the other paragraphs of this cause of action.

21                                          XI.

22         The conspirators further knew that their foregoing statements were false and that, by their

23   acts, they were actively concealing adverse information concerning the health effects of asbestos,

24   including the facts described in the preceding paragraphs of this cause of action.  The conspirators

25   made these false statements and concealed these facts with the intent to deceive.  Plaintiff's father

26   and plaintiff and others relied both directly and indirectly on the foregoing false statements and

27   their lack of knowledge resulting from the conspirators' fraudulent concealment.  As a

28   consequence of the foregoing fraudulent misrepresentations and concealment, plaintiff was injured

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1  and damaged as more fully described elsewhere in the complaint.

2                                    XII.

3        The asbestos-containing products that conspirators manufactured, marketed, distributed,

4  sold and otherwise supplied were defective in that they caused plaintiff's father and plaintiff and

5  others similarly situated to be exposed to the products' asbestos content and thereby caused the

6  injuries and damages as more fully detailed elsewhere in the complaint.

7                                    XIII.

8        Additionally and alternatively, as a direct result of defendants' and conspirators' (including,

9  without limitation, MET LIFE's) actions and omissions, plaintiff's father and plaintiff were caused

10  to remain ignorant of all the dangers of asbestos, which resulted in plaintiff's father, plaintiff,

11  his/her agents, employers and the general public being unaware of the true and full dangers of

12  asbestos. Defendants' and conspirators' actions and omissions also deprived plaintiff's father and

13  plaintiff of the opportunity to decide for himself or herself whether he/she wanted to take the risk

14  of being exposed to asbestos, denied plaintiff's father and plaintiff the opportunity to take

15  precautions against the dangers of asbestos and caused plaintiff's damages as described elsewhere

16  in this complaint.

17                                    XIV.

18        The foregoing conduct of defendants and the conspirators was despicable, willful and

19  carried on in conscious disregard of the rights or safety of plaintiff's father and plaintiff.

20  Defendants and the conspirators intended by such conduct to conceal and/or misrepresent material

21  facts known to them for the purpose of thereby depriving plaintiff's father and plaintiff and others

22  of property or legal rights, or otherwise causing injury. So in addition to actual damages, plaintiff

23  is entitled to recover damages from defendants and the conspirators for the sake of example and by

24  way of punishing defendants and conspirators.

25  ///

26  ///

27  ///

28  ///

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

## ALL DEFENDANTS:

### FOURTEENTH CAUSE OF ACTION

#### (Loss of Consortium)

AS AND FOR A FOURTEENTH CAUSE OF ACTION, plaintiff Caroline Vest complains of all defendants, and each of them, and alleges:

#### I.

This plaintiff, for and on behalf of herself, brings this action on her own behalf.

#### II.

Plaintiff refers to and incorporates herein by reference the First through Thirteenth and Fifteenth Causes of Action of this complaint.

#### III.

At the time that plaintiff Timothy Vest sustained injury as more fully alleged in the First through Thirteenth and Fifteenth Causes of Action causes of action, and at all times thereafter, plaintiff Caroline Vest was the wife of plaintiff Timothy Vest.

#### IV.

Prior to said injuries, plaintiff Timothy Vest was able to and did, perform his duties as the husband of plaintiff Caroline Vest. Plaintiff is informed and believes and thereon alleges that subsequent to said injuries and as a proximate result thereof, plaintiff Timothy Vest has been, and some time in the future will be, incapacitated and unable to perform the necessary duties as husband of plaintiff Caroline Vest and the work and service usually performed in the care, maintenance and management of the family home.

#### V.

As a proximate result of said injuries, plaintiff Caroline Vest has been and will be deprived of consortium with plaintiff Timothy Vest, including the performance of her husband's duties and on plaintiff's part will be required to perform the duties previously performed by plaintiff Timothy Vest, all to plaintiff's damage in a sum which cannot be ascertained at this time. Plaintiff requests the right to amend this complaint to allege the amount of said damages when they are ascertained.

///

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY A PROFESSIONAL LAW CORPORATION 171 TWELFTH STREET THIRD FLOOR OAKLAND, CA 94607 (510) 302-1000 (510) 465-7728 FAX (510) 835-4913

# FIFTEENTH CAUSE OF ACTION

### (For Dangerous Conditions of Premises Against Defendant THE PORT OF OAKLAND)

AS AND FOR A FIFTEENTH CAUSE OF ACTION, plaintiff complains and alleges against only defendant THE PORT OF OAKLAND as follows:

### I.

Plaintiff, by this reference, hereby incorporates and makes a part hereof as though fully set forth herein each and every allegation contained in the First through Fourteenth Causes of Action.

### II.

At all relevant times herein, defendant THE PORT OF OAKLAND (hereafter "PORT") owned, controlled and/or managed the premises known as the World Air Center, Hangar 110 located in Oakland, California.

Plaintiff TIMOTHY VEST in the course of his life from approximately 1973 through 1983, was present while work involving the use, disturbance, and manipulation of asbestos and asbestos-containing products which occurred during demonstrative, maintenance, construction, and/or renovation work at Hangar 110, as described above.

While visiting his father at Hangar 110, plaintiff TIMOTHY VEST and others in his proximity regularly disturbed and otherwise manipulated asbestos-containing products used during building maintenance, construction and renovation as specified to be used by PORT but without any precautions to prevent exposure and protect persons present during use including, but not limited to, asbestos-containing aircraft parts, thermal insulation, sheetrock, drywall products, and fireproofing on these properties owned, managed or controlled by PORT, and was thereupon exposed to and injured by asbestos and asbestos-containing products as hereinbefore set forth.

### III.

Pursuant to Government Code § 945.4, plaintiff filed claim with the Port as required.

### IV.

From 1973 and thereafter through 1983, the above-described premises were in a dangerous

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   condition that created a substantial risk of the type of injury suffered by plaintiff as hereinbefore

2   alleged.  The property was used by plaintiff TIMOTHY VEST with due care in a manner that

3   defendant PORT knew or should have foreseen it would be used in that PORT caused to have the

4   previously described asbestos and asbestos-containing products specified, installed, inspected,

5   maintained, repaired, removed and replaced on the aforementioned premises, which products

6   defendant PORT actually knew or, in the exercise of its duty of care owed to plaintiff, should have

7   known created a dangerous and hazardous condition of the public property, within the meaning of

8   Government Code §§ 830, et seq., to which plaintiff TIMOTHY VEST was foreseeably exposed.

9                                                V.

10       From 1973 and thereafter through 1983, PORT had actual knowledge of the existence of

11   the above-described condition and knew or should have known of its dangerous character a

12   sufficient time prior to the dates upon which plaintiff TIMOTHY VEST was exposed thereto to

13   have taken measures at the buildings described in Paragraph II, above, to protect or warn against

14   the dangerous conditions.  Defective asbestos-containing products were used at these sites at the

15   express behest and instruction of defendant PORT.  Plaintiff and others observed PORT workers

16   and employees at these sites during construction and saw PORT employees inspecting, approving,

17   and signing off on work including that involving the use of asbestos containing products at the

18   sites as it was performed.

19                                               VI.

20       From 1973 and thereafter through 1983, defendant PORT failed to make reasonable,

21   adequate or sufficient inspections of its own property or property within its custody or control,

22   which failure caused PORT to fail to determine whether the property complied with or violated any

23   enactments or contained or constituted any hazard to health and safety, within the meaning of

24   Government Code §§ 830, et seq.

25                                               VII.

26       From 1973 and thereafter through 1983, defendant PORT failed to protect against the

27   aforementioned unreasonably dangerous conditions on PORT's premises, in that it failed to repair,

28   remedy or correct the dangerous conditions, failed to provide safeguards against the dangerous

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   conditions and failed to warn of the dangerous conditions, which failures were the legal cause of

2   plaintiff's injuries as hereinbefore alleged.

3                                            VIII.

4       From 1973 and thereafter through 1983, defendant PORT owed a duty under Civil Code §

5   3479 to prevent, remedy, repair and abate any condition which is injurious to health or offensive to

6   the senses, or an obstruction to the free use of property, so as to interfere with the comfortable

7   enjoyment of life and defendant PORT knew, by and through their agents, employees, departments

8   and research, that asbestos was dangerous and injurious to human health.  The PORT breached said

9   duties, and have thereby created a nuisance and caused injuries to plaintiff.

10   ///

11       WHEREFORE, plaintiff Caroline Vest prays judgment against defendants, conspirators and

12   their "alternate entities," and each of them as follows:

13       1.    General damages in an amount in excess of $50,000.00 in accordance with the

14   proof;

15       2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

16   accordance with proof;

17       3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

18   in accordance with the proof (except as to defendant THE PORT OF OAKLAND);

19       4.    Special damages in accordance with the proof;

20       5.    Prejudgment interest and post-judgment interest in accordance with law;

21       6.    Costs of suit; and

22       7.    Such other and further relief as the Court deems just and proper in the premises.

23       WHEREFORE, plaintiff Timothy Vest prays judgment against defendants, conspirators and

24   their "alternate entities," and each of them as follows:

25       1.    General damages in an amount in excess of $50,000.00 in accordance with the

26   proof;

27       2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

28   accordance with proof:

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

First Amended Complaint for Personal Injuries

1     3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

2  in accordance with the proof (except as to defendant THE PORT OF OAKLAND);

3     4.    Special damages in accordance with the proof;

4     5.    Prejudgment interest and post-judgment interest in accordance with law;

5     6.    Costs of suit; and

6     7.    Such other and further relief as the Court deems just and proper in the premises.

7

8  DATED: May 28, 2010             KAZAN, McCLAIN, LYONS,
                                  GREENWOOD & HARLEY

9                           A Professional Law Corporation

10                     By:
                           Justin A. Bosl

11                     Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913
25

26

27

28

First Amended Complaint for Personal Injuries

**EXHIBIT A - Page 105**

**Exhibit B - Page 245**

1    **PROOF OF SERVICE**

2    Re:    *TIMOTHY VEST and CAROLINE VEST v. ALLIED PACKING & SUPPLY, et al.*
3    Alameda County Superior Court No. RG09489518

4    I declare that:

5    I am employed in the County of Alameda, State of California. I am over the age of
18 years and not a party to the within action. My business address is 171 Twelfth Street,
6    Third Floor, Oakland, California 94607. On **May 28, 2010**, I served the following
document(s):

7

8    **SECOND AMENDED COMPLAINT FOR PERSONAL INJURIES; STRICT LIABILITY;
BREACH OF WARRANTIES; NEGLIGENCE; FRAUD; AIDING AND ABETTING
FRAUD; AIDING AND ABETTING BATTERY; CONSPIRACY; (ALTERNATIVE
9    ENTERPRISE AND CONCERT OF ACTION LIABILITY); PREMISES LIABILITY; AND
LOSS OF CONSORTIUM**

10
by transmitting a true copy via the following method:

11

12    _____    (By Facsimile) By personally transmitting a true copy thereof via facsimile
to

13

14    _____    (By PERSONAL SERVICE) By causing to be hand delivered via Modern
Express Courier, tracking number _____, a true copy thereof to

15

16    _____    (By OVERNIGHT DELIVERY) By delivering to an authorized courier
authorized by the express service to receive documents or depositing in a
box or other facility regularly maintained by the express carrier a true copy
17    thereof, on this date, and addressed to

18    __XX__    (By U.S. MAIL) I am readily familiar with this office's business practice for
collection and processing of correspondence for mailing with the United
19    States Postal Service. This document will be sealed with postage fully
prepaid and will be deposited with the United States Postal Service this
20    date in the ordinary course of business, in envelopes addressed to
**See attached service list**

21

22    I declare under penalty of perjury that the foregoing is true and correct. Executed
on **May 28, 2010** at Oakland, California.

23

24    _____
Randi Wiener

25
KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY
A PROFESSIONAL
LAW CORPORATION
171 TWELFTH STREET
THIRD FLOOR
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

26

27

28

RWIENER/491210.1

SERVICE LIST       CASE: Vest, Timothy & Caroline [NE 1430]       ACTION #: RG09489518

May 28, 2010 2:46 PM

BECHERER, KANNETT & SCHWEITZER
1255 Powell Street, , Emeryville, CA 94608-2604
FOR: CYPRUS AMAX MINERALS CO/sii/pae/alt/eqt/CYPRUS MINES CORP; CYPRUS AMAX MINERALS
CO/sii/pae/alt/eqt/SIERRA TALC & CHEMICAL COMPANY; CYPRUS AMAX MINERALS
CO/sii/pae/alt/eqt/UNITED SIERRA DIVISION; CYPRUS AMAX MINERALS CO/sii/pae/et of PAUL W. WOOD
COMPANY; CYPRUS AMAX MINERALS COMPANY

PH: (510) 658-3600
FAX: (510) 658-1151

BERRY & BERRY
P.O. Box 16070, Oakland, CA 94610
FOR: DESIGNATED DEFENSE COUNSEL

PH: (510) 835-8330
FAX: (510) 835-5117

BRYAN CAVE LLP
2 Embarcadero Center, Suite 1410, San Francisco, CA 94111
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.

PH: 415-675-3400
FAX: 415-675-3434

BRYAN CAVE, LLP
120 Broadway, Suite 300, Santa Monica, CA 90401-2305
FOR: MCDONNELL DOUGLAS CORPORATION; WORLD AIRWAYS, INC.

PH: (310) 576-2100
FAX: (310) 576-2200

CHAPMAN & INTRIERI
2236 Mariner Square Drive, Suite 300, Alameda, CA 94501-1019
FOR: DEXTER CORPORATION; HENKEL CORPORATIO sii/pae/et to HENKEL LOCTITE CORPORATION;
HENKEL CORPORATION; HENKEL LOCTITE CORPORATION ; HENKEL LOCTITE CORPORATION
sii/pae/et to THE DEXTER CORPORATION; LIFE TECH CORP by merger to INVITROGEN CORP sii/pae/et THE
DEXTER CORP; LIFE TECHNOLOGIES CORPORATION suc by merger to INVITROGEN CORPORATION

PH: (510) 864-3600
FAX: (510) 864-3601

COUNSEL UNKNOWN
FOR: DEAN'S MATERIALS, INC. dba CONSTRUCTION MATERIAL SUPPLIER; MCDERMOTT/SEALY, INC.

DeHAY & ELLISTON, LLP
1300 CLAY STREET, SUITE 840, Oakland, CA 94612
FOR: KAISER GYPSUM COMPANY, INC.

PH: 510-285-0750
FAX: 510-285-0740

DONGELL LAWRENCE FINNEY LLP
707 Wilshire Boulevard, 45th Floor, Los Angeles, CA 90017-3609
FOR: GEORGE E. MASKER, INC.

PH: 213-943-6100
FAX: 213-943-6101

FOLEY & MANSFIELD
1111 Broadway, 10th Floor, Oakland, CA 94607
FOR: KELLY-MOORE PAINT COMPANY, INC.; RAYMOND INTERIOR SYSTEMS - NORTH; RAYMOND
INTERIOR SYSTEMS - NORTH sii/pae/eqt to JAMES L. WHITTAKER

PH: 510-590-9500
FAX: 510-590-9595

GLASPY & GLASPY
One Walnut Creek Center, 100 Pringle Ave Ste 750, Walnut Creek, CA 94596
FOR: GARLOCK SEALING TECHNOLOGIES LLC

PH: (925) 947-1300
FAX: (925) 947-1594

HERR & ZAPALA
152 North 3rd Street, Suite 500, San Jose, CA 95112
FOR: ALLIED PACKING AND SUPPLY

PH: (408) 287-7788
FAX: (408) 927-0408

McKENNA, LONG & ALDRIDGE
101 California Street, 41st Floor, San Francisco, CA 94111
FOR: HEXCEL CORPORATION

PH: (415) 267-4000
FAX: (415) 267-4198

McKENNA, LONG & ALDRIDGE LLP
300 S. Grand Avenue, 14th Floor, Los Angeles, CA 90071
FOR: HEXCEL CORPORATION

PH: 213-688-1000
FAX: 213-243-6330

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400, San Francisco, CA 94111
FOR: GEORGIA PACIFIC LLC fka GEORGIA PACIFIC CORPORATION

PH: (415) 344-7000
FAX: (415) 344-7288

SERVICE LIST     CASE: Vest, Timothy & Caroline [NE 1430]     ACTION #: RG09489518     May 28, 2010 2:46 PM
Page Two

SEDGWICK, DETERT, MORAN & ARNOLD
  One Market Plaza, Steuart Tower, 8th Floor, San Francisco, CA 94105     PH: (415) 781-7900
  FOR: PARKER HANNIFIN;  PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES     FAX: (415) 781-2635

SELMAN & BREITMAN
  33 New Montgomery Street, Sixth Floor, San Francisco, CA 94105     PH: (415) 979-0400
  FOR: KENTILE FLOORS, INC.     FAX: (415) 979-2099

STEPTOE & JOHNSON
  633 West Fifth Street, Suite 700, Los Angeles, CA 90071     PH: (213) 439-9400
  FOR: METROPOLITAN LIFE INSURANCE COMPANY     FAX: (213) 439-9599

THE MAU LAW FIRM
  950 Harrison Street, Suite 213, San Francisco, CA 94107     PH: 415-495-8082
  FOR: GEORGE E. MASKER, INC.     FAX: 415-495-8084

VASQUEZ, ESTRADA & CONWAY LLP
  Courthouse Square, 1000 Fourth Street, Suite 700, San Rafael, CA 94901     PH: (415) 453-0555
  FOR: ALTA BUILDING MATERIALS CO.     FAX: (415) 453-0549

WALSWORTH, FRANKLIN, BEVINS & McCALL
  601 Montgomery Street, 9th Floor, San Francisco, CA 94111     PH: (415) 781-7072
  FOR: HAMILTON MATERIALS, INC.     FAX: (415) 391-6258

WALSWORTH, FRANKLIN, BEVINS & McCALL - DOWMAN
  601 Montgomery Street, 9th Floor, San Francisco, CA 94111     PH: (415) 781-7072
  FOR: DOWMAN PRODUCTS, INC.     FAX: (415) 391-6258

WILLIAMS KASTNER
  Two Union Square, 601 Union Street, Suite 4100, Seattle, WA 98101     PH: 206-628-6621
  FOR: PARKER HANNIFIN;  PARKER HANNIFIN sii/pae/et of CLEVELAND WHEELS AND BRAKES     FAX: 206-628-6611

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
  525 Market Street, 17th Floor, San Francisco, CA 94105-2722     PH: (415) 433-0990
  FOR: F.P. LATHROP CORPORATION;  LATHROP CONSTRUCTION ASSOCIATES, INC.;  LATHROP     FAX: (415) 434-1370
  ONSTRUCTION ASSOC, INC. sii/pae/et F.P. LATHROP CONSTRUCTION

End of Service List

ENDORSED
FILED
ALAMEDA COUNTY

MAR 16 2010

CLERK OF THE SUPERIOR COURT
By _____ M. ORTIZ
                                Deputy

1   **BRYAN CAVE LLP**
    Robert E. Boone III, California Bar No. 132780
2   James C. Pettis, California Bar No. 223953
    M. Angela Buenaventura, California Bar No. 264130
3   120 Broadway, Suite 300
    Santa Monica, California 90401
4   Telephone:    (310) 576-2100
    Facsimile:    (310) 576-2200
5
    Attorneys for Defendant
6   MCDONNELL DOUGLAS CORPORATION

7

8                    **SUPERIOR COURT OF CALIFORNIA**

9                        **COUNTY OF ALAMEDA**

10

11   TIMOTHY VEST and CAROLINE VEST,        Case No. RG09489518

12                                          Assigned for all pre-trial purposes to the Hon.
            Plaintiff,                      Kenneth Mark Burr
13
       vs.                                  **DEFENDANT MCDONNELL DOUGLAS**
14                                          **CORPORATION'S NOTICE OF**
     ALLIED PACKING AND SUPPLY, et al.,     **DEMURRER AND DEMURRER TO**
15                                          **COMPLAINT; MEMORANDUM OF**
            Defendants.                     **POINTS AND AUTHORITIES**
16
                                            [Filed concurrently with [Proposed] Order and
17                                          Proof of Service]

18                                          Date:       April 23, 2010
                                            Time:       9:34 a.m.
19                                          Dept.:      30
                                            Reservation No: 1046731
20
                                            Complaint Filed:   December 17, 2009
21                                          Trial Date:        None set

22

23

24

25

26

27

28

**TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 23, 2010 at 9:34 a.m., or as soon after that as possible, in Department 30 of the Alameda County Superior Court located at U.S. Post Office Building, 201 13th Street, Oakland, California, Defendant McDonnell Douglas Corporation ("MDC") will and does demurrer to the second and sixth through tenth causes of action contained in Plaintiffs Timothy and Caroline Vest's Complaint pursuant to Code of Civil Procedure Code sections 430.10(e) and 430.50 on the grounds that Plaintiffs' Complaint fails to state sufficient facts to constitute those causes of action against MDC pursuant to Code of Civil Procedure section 430.10(e) because Plaintiffs have not alleged facts to support each required element of those causes of action.

This Demurrer is based on this Notice of Demurrer and Demurrer, the attached Memorandum of Points and Authorities, records on file in this case, and argument by counsel that the Court may entertain in this matter.

Dated:  March 15, 2010

Respectfully submitted,

**BRYAN CAVE LLP**
Robert E. Boone III
James C. Pettis
M. Angela Buenaventura

By: _____
James C. Pettis
Attorneys for Defendant
MCDONNELL DOUGLAS CORPORATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  **DEMURRER**

2     McDonnell Douglas Corporation demurs to the second and sixth through tenth causes of

3  action in Plaintiffs Timothy and Caroline Vest's Complaint pursuant to Code of Civil Procedure

4  sections 430.10(e) and 430.50 on the following grounds:

5  **Demurrer to Second Cause of Action**

6  (Breach of Implied Warranty)

7     MDC demurs to Plaintiffs' second cause of action for breach of implied warranty pursuant to

8  Code of Civil Procedure section 430.10(e) on the ground that the pleading does not state facts

9  sufficient to constitute a cause of action.  Plaintiffs have not and cannot allege privity between MDC

10 and Plaintiffs.

11 **Demurrer to Sixth Cause of Action**

12 (Market Share/Enterprise Liability/Negligence)

13    MDC demurs to Plaintiffs' sixth cause of action for market share/enterprise

14 liability/negligence pursuant to Code of Civil Procedure section 430.10(e) on the ground that the

15 market share theory of liability is inapplicable to asbestos actions.

16 **Demurrer to Seventh Cause of Action**

17 (Market Share/Enterprise Liability/Strict Liability/Defective Product Design, Manufacturing,

18 Labeling, Marketing and/or Warning)

19    MDC demurs to Plaintiffs' seventh cause of action for market share/enterprise

20 liability/strict liability/defective product design, manufacturing, labeling, marketing and/or

21 warning pursuant to Code of Civil Procedure section 430.10(e) on the ground that the market

22 share theory of liability is inapplicable to asbestos actions.

23 **Demurrer to Eighth Cause of Action**

24 (Market Share/Concert of Action/Negligence)

25    MDC demurs to Plaintiffs' eighth cause of action for market share/concert of

26 action/negligence pursuant to Code of Civil Procedure section 430.10(e) on the ground that the

27 market share theory of liability is inapplicable to asbestos actions.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

## Demurrer to Ninth Cause of Action

2

(Market Share/Concert of Action/Strict Liability/Defective Product Design)

3      MDC demurs to Plaintiffs' ninth cause of action for market share/concert of action/strict

4   liability/defective product design pursuant to Code of Civil Procedure section 430.10(e) on the

5   ground that the market share theory of liability is inapplicable to asbestos actions.

6

## Demurrer to Tenth Cause of Action

7

(Market Share/Concert of Action/Conspiracy to Defraud/ Failure to Warn)

8      MDC demurs to Plaintiffs' tenth cause of action for market share/concert of

9   action/conspiracy to defraud/failure to warn pursuant to Code of Civil Procedure section 430.10(e)

10   on the ground that the market share theory of liability is inapplicable to asbestos actions.

11

12   Dated:  March 15, 2010                    Respectfully submitted,

13                                            **BRYAN CAVE LLP**
                                             Robert E. Boone III
14                                            James C. Pettis
                                             M. Angela Buenaventura
15

16

17                                            By: _____
                                                 James C. Pettis
18                                            Attorneys for Defendant
                                             MCDONNELL DOUGLAS CORPORATION

19

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     ALLEGATIONS FROM PLAINTIFFS' COMPLAINT .......................................1

III.    THE COURT'S ORDER SUSTAINING (IN PART) CO-DEFENDANT WORLD
        AIRWAYS' DEMURRER WITHOUT LEAVE TO AMEND ...............................2

IV.     A DEMURRER DISREGARDS CONCLUSIONS OF LAW .................................3

V.      PLAINTIFFS' SECOND CAUSE OF ACTION FOR BREACH OF WARRANTY
        FAILS FOR LACK OF PRIVITY .......................................................................4

VI.     PLAINTIFFS' SIXTH THROUGH TENTH CAUSES OF ACTION FAIL BECAUSE
        THE MARKET SHARE THEORY IS INAPPLICABLE TO ASBESTOS ..........4

VII.    CONCLUSION.....................................................................................................7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# TABLE OF AUTHORITIES

**Page**

**Cases**

*All West Electronics, Inc. v. M-B-W, Inc.,*
  64 Cal. App. 4th 717 (1998)..................................................................................4

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
  7 Cal. 4th 503 (1994)..........................................................................................6

*Beeler v. City Title Ins. Co.,*
  201 Cal. App. 2d 702 (1962)...............................................................................6

*Blain v. Doctor's Co.,*
  222 Cal. App. 3d 1048 (1990).............................................................................7

*Bockrath v. Aldrich Chemical Co., Inc.,*
  21 Cal. 4th 71 (1999)......................................................................................3, 4

*Burr v. Sherwin Williams Co.,*
  42 Cal. 2d 682 (1954)..........................................................................................4

*Curcini v. County of Alameda,*
  164 Cal. App. 4th 629 (2008)...............................................................................3

*Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,*
  122 F.3d 1211 (9th Cir. 1997)..............................................................................6

*Jerry Setliff v. E.I. Du Pont De Nemours & Co.,*
  32 Cal. App. 4th 1525 (1995)...............................................................................3

*McKenney v. Purepac Pharmaceutical Co.,*
  167 Cal. App. 4th 72 (2008).................................................................................3

*Mountain Ranch Ass'n v. Sup. Ct.,*
  109 Cal. App. 4th 1162 (2003).............................................................................4

*Mullen v. Armstrong World Industries,*
  200 Cal. App. 3d 250 (1988).......................................................................4, 5, 6

*Rakestraw v. Cal. Physicians' Serv.,*
  81 Cal. App. 4th 39 (2000)...................................................................................3

*Sindell v. Abbott Laboratories,*
  26 Cal.3d 588 (1980)............................................................................................5

*Stevens v. Owens-Corning,*
  49 Cal. App. 4th 1645 (1996)...............................................................................5

*Wheeler v. Raybestos-Manhattan,*
  8 Cal. App. 4th 1152 (1992)............................................................................5, 6

**Statutes**

Cal. Civ. Proc. Code § 430.10(e)...........................................................................3

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2   I.   **INTRODUCTION**

3       Plaintiff Timothy Vest allegedly suffers from mesothelioma caused by exposure to asbestos.

4   His Complaint asserts ten product liability causes of action against McDonnell Douglas Corporation

5   ("MDC"), based upon his alleged (1) secondary exposure at home to asbestos supposedly retained

6   on his father's person and work clothes when his father returned home from his employ as a pilot at

7   co-defendant World Airways, Inc. from 1965 to 2005, and (2) direct exposure while working as a

8   ramp supervisor at Continental Airlines from 1985 to 1988 and while employed at a commercial

9   airline pilot for Emery Worldwide Airlines from 1990 to 2001. Mr. Vest's wife also brings a cause

10  of action for loss of consortium.

11      However, Plaintiffs cannot establish their second or sixth through tenth causes of action

12  against MDC. In fact, the Court already found that Plaintiffs have not properly alleged (and cannot

13  allege) these causes of action when it sustained World Airways' demurrer to them without leave to

14  amend. Similarly, Plaintiffs have not properly alleged (and cannot allege) these exact causes of

15  action alleged against MDC, and they should be dismissed. Specifically, Plaintiffs' second cause of

16  action for breach of implied warranty claim fails because there was no privity between Plaintiff and

17  MDC. Plaintiffs' sixth through tenth causes of action based on purported "market share liability"

18  fail because that liability theory is inapplicable. Therefore, MDC's Demurrer to Plaintiffs' second

19  and sixth through tenth causes of action should be sustained without leave to amend.

20  II.  **ALLEGATIONS FROM PLAINTIFFS' COMPLAINT**

21      The Complaint alleges that Mr. Vest was secondarily and directly exposed to asbestos and

22  asbestos-containing products at various locations from 1965 to 2005, and asserts ten product liability

23  causes of action against a host of "Product Defendants," including MDC who was added in place of

24  DOE 3. (Compl. at 3:2-17; Amend't to Compl.) Plaintiffs have not identified any particular MDC

25  product to which Mr. Vest was occupationally or para-occupationally exposed. Rather, Plaintiffs

26  have named several defendants and alleged that each manufactured, sold, distributed, or performed a

27  long list of activities related to asbestos and asbestos-containing products. (*Id.* at 3:2-5:4.)

28  Plaintiffs also assert two premises liability causes of action and a Metropolitan Life conspiracy claim

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   against other defendants. (*Id.* at 22-28.) As to MDC, the Complaint asserts that Mr. Vest was

2   secondarily exposed at home to asbestos from his father's "clothes, shoes, person" while his father

3   was employed by World Airways as a pilot from 1965 to 2005. (*Id.* at 4:12-14.) The Complaint

4   also alleges that Mr. Vest was directly exposed to asbestos through his own employment as a "ramp

5   supervisor" at Continental Airlines, Inc. at Los Angeles International Airport ("LAX") from 1985 to

6   1988; while working for Sandy's Ski Rentals in Santa Monica in 1986; while working for Fletcher's

7   Team and Ski in Livermore in 1989; and while working as a commercial airline pilot at Emery

8   Worldwide Airlines, Inc. in New York, Dayton, Ohio, Oakland and Los Angeles from 1990 to 2001.

9   (*Id.* at 4:12-26.)

10   **III.   THE COURT'S ORDER SUSTAINING (IN PART) CO-DEFENDANT WORLD**

11   **AIRWAYS' DEMURRER WITHOUT LEAVE TO AMEND**

12          On March 12, 2010, the Court issued an Order on co-defendant World Airways' demurrer to

13   Plaintiffs' Complaint wherein it sustained (in part) the demurrer without leave to amend. (Court's

14   3/12/10 Order:  Demurrer to Complaint Overruled ("3/12/10 Order").)  The Court sustained World

15   Airways' demurrer with regard to causes of actions addressed in MDC's instant Demurrer (and

16   overruled the demurrer with regard to causes of action not addressed).  In particular, the Court

17   sustained without leave to amend, the demurrer as to Plaintiffs' second and sixth through tenth

18   causes of action.

19         The demurrer to the Second Cause of Action for breach of implied warranty is

20         SUSTAINED WITHOUT LEAVE TO AMEND. Plaintiffs have not alleged that

21         World was in the business of selling goods, that plaintiff was a user of such goods,

22         or privity of contract between World and Plaintiffs. A claim for breach of implied

23         warranty requires privity of contract. All West Electronics, Inc. v. M-B-W, Inc.

24         (1998) 64 Cal.App.4th717, 725. It is apparent that Plaintiffs will not be able to

25         allege privity of contract against World. The demurrer to the Third Cause of Action

26         for strict products liability is SUSTAINED WITHOUT LEAVE TO AMEND.

27         ***

28         The demurrer to the Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action is

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   SUSTAINED WITHOUT LEAVE TO AMEND. All of these causes of action rely

2   on the theory of "market share," based on the facts alleged in para. II of the Sixth

3   Cause of Action. Plaintiffs' allegations do not show that World manufactured or

4   marketed any asbestos-containing product. In addition, the allegations do not take

5   Plaintiffs' claims outside the scope of the holding in Mullen v. Armstrong World

6   Industries, Inc. (1988) 200 Cal.App.3d 250, 255-257, in which the court held that a

7   market share claim was not viable with respect to "asbestos products" generally.

8   The facts alleged do not bring this case with the narrow circumstances present in

9   Wheeler v. Raybestos-Manhattan (1992) 8 Cal.App.4th 1152, 1155. It is apparent

10   that Plaintiffs do not possess knowledge of facts at this time to support a market

11   share theory of liability against World.

12   (3/12/10 Order.) MDC's instant Demurrer attacks the same six causes of action in Plaintiffs'

13   Complaint on the same grounds—lack of privity and inapplicability of market share liability.

14   Therefore, the Court should also sustained MDC's Demurrer without leave to amend.

15   **IV.    A DEMURRER DISREGARDS CONCLUSIONS OF LAW**

16   A party may respond to a complaint by a general demurrer if "the pleading does not state

17   facts sufficient to constitute a cause of action." Civ. Proc. Code § 430.10(e). "A demurrer tests the

18   legal sufficiency of factual allegations in a complaint." *Rakestraw v. Cal. Physicians' Serv.*, 81 Cal.

19   App. 4th 39, 42 (2000). A court "treats the demurrer as admitting all material facts properly

20   pleaded, but not contentions, deductions, or conclusions of fact or law." *Id.* at 42-43. "Conclusory

21   allegations . . . are insufficient to survive a demurrer." *Curcini v. County of Alameda*, 164 Cal. App.

22   4th 629, 650 (2008); *see also Bockrath v. Aldrich Chem. Co., Inc.*, 21 Cal. 4th 71, 80 (1999) and

23   *Jerry Setliff v. E.I. Du Pont De Nemours & Co.*, 32 Cal. App. 4th 1525, 1529 (1995). As stated in

24   *Bockrath*, plaintiff is required to plead specific factual allegations and generic allegations that a

25   plaintiff was exposed to a list of products are insufficient. *See id.* at 79- 80.

26   **V.    PLAINTIFFS' SECOND CAUSE OF ACTION FOR BREACH OF WARRANTY**

27   **FAILS FOR LACK OF PRIVITY**

28   As the Court has previously found: "A claim for breach of implied warranty requires

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  privity of contract." (3/12/10 Order.)  Further, "the general rule is that privity of contract is

2  required in an action for breach of either express or implied warranty and that there is no privity

3  between the original seller and a subsequent purchaser who is in no way a party to the original

4  sale." *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695 (1954); *Mountain Ranch Ass'n v. Sup.*

5  *Ct.*, 109 Cal. App. 4th 1162, 1169 (2003) (lack of privity justifies dismissal of implied warranty

6  claim); *see also All West Electronics, Inc. v. M-B-W, Inc.*, 64 Cal. App. 4th 717, 725 (1998).

7        The Complaint does not allege facts to establish that Mr. Vest was in privity with MDC;

8  nor can it.  MDC manufacturers military and commercial airplanes.  Plaintiffs do not allege that

9  Mr. Vest or his father were original purchasers of any military or commercial airplane attributable

10  to MDC (Compl. at 4:12-26; 7:7-11), and therefore, cannot establish privity.  Similarly, as the

11  Court stated while sustaining co-defendant World Airways' demurrer to Plaintiffs' breach of

12  implied warranty cause of action without leave to amend, "it is apparent that Plaintiffs will not be

13  able to allege privity of contract against [co-defendant] World." (3/12/10 Order.)  Therefore,

14  MDC's Demurrer to Plaintiffs' second cause of action should be also sustained without leave to

15  amend.

16  **VI.**  **PLAINTIFFS' SIXTH THROUGH TENTH CAUSES OF ACTION FAIL BECAUSE**

17       **THE MARKET SHARE THEORY IS INAPPLICABLE TO ASBESTOS**

18        As the Court has previously found:  "[T]he allegations do not take Plaintiffs' claims outside

19  the scope of the holding in *Mullen v. Armstrong World Industries* (1988) 200 Cal.App.3d 250, 255-

20  257, in which the court held that market share claim was not viable with respect to 'asbestos

21  products' generally." (3/12/10 Order.)  The market share theory of liability simply is inapplicable to

22  actions involving exposure to asbestos-containing products. *Stevens v. Owens-Corning*, 49 Cal.

23  App. 4th 1645, 1669 (1996); *Mullen v. Armstrong World Industries*, 200 Cal. App. 3d 250, 257

24  (1988).  *Mullen* held: "We thus align California, the progenitor of the market share theory of

25  liability, with the great majority of jurisdictions which have declined to extend it to the field of

26  asbestos-related injuries." *Id.; see also* Los Angeles County Superior Court, General Order 37.04

27  ("IT IS HEREBY ORDERED that the market share theory of liability established by *Sindell v.*

28  *Abbott Laboratories* (1980) 26 Cal.3d 588 is inapplicable to actions involving exposure to asbestos-

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    containing products.").

2       In their Opposition, Plaintiffs will likely cite to *Wheeler v. Raybestos-Manhattan*, 8 Cal.

3    App. 4th 1152 (1992) and attempt to argue that the market share theory of liability applies to this

4    asbestos action. As the Court has already found, this argument by Plaintiffs is without merit: "The

5    facts alleged do not bring this case within the narrow circumstances present in *Wheeler v. Raybestos-*

6    *Manhattan* (1992) 8 Cal.App.4th 1152, 1155." (3/12/10 Order.) *Wheeler* created a very narrow

7    exception to the rule that market share liability is inapplicable to actions involving exposure to

8    asbestos-containing products. *Wheeler* applied the market share theory of liability to a case in which

9    plaintiffs sought to proceed on market share theory only as to the makers of brake pads because of

10    the peculiar circumstances presented by exposure to asbestos fiber from brake pads (including the

11    inability to identify brakes pads by brand during the inspection and replacement of worn pads, and

12    that a pad of a given size can be used on a variety of vehicles, regardless of the maker). *Id.* at 1156-

13    1157. Plaintiffs do not allege that Mr. Vest was exposed to asbestos from any brake pad

14    manufactured by MDC, nor can they. Thus, the *Wheeler* exception is inapplicable, and Plaintiffs

15    cannot state a valid claim for market share liability.

16       Further, the court of appeal distinguished *Wheeler* from *Mullen*, noting that the market share

17    theory of liability was inapplicable in *Mullen* because plaintiffs alleged asbestos exposure from a

18    variety of different products rather than seeking recover for damages caused by a single fungible

19    product such as brake pads. *Id.* at 1155; *see Mullen*, 200 Cal. App. 3d at 257. Like *Mullen*, this

20    lawsuit involves allegations of exposure to asbestos from a variety of different products, and thus,

21    the market share theory of liability is inapplicable. Plaintiffs' sixth through tenth causes of action

22    fail.

23       However, even the market share theory of liability were applicable to actions involving

24    exposure to asbestos-containing products, it is inapplicable to MDC because no facts are alleged that

25    if proven would show MDC marketed any asbestos-containing product.

26       In addition, to the extent that these are causes of action for "conspiracy/concert of action",

27    they fail for two reasons. First, civil conspiracy is not an independent tort. *Applied Equip. Corp. v.*

28    *Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994); *Entm't Research Group, Inc. v. Genesis*

MDC'S DEMURRER TO PLAINTIFFS' COMPLAINT    **Exhibit B - Page 259**

1   *Creative Group, Inc.,* 122 F.3d 1211, 1228 (9th Cir. 1997).  Second, to allege conspiracy liability,

2   Plaintiffs must show (1) a concert of action between the defendants to accomplish the purpose of the

3   conspiracy, (2) that their actions were illegal and in furtherance of a common scheme or design to

4   achieve the unlawful purpose of the conspiracy, and (3) knowledge of the conspiracy and its

5   unlawful purpose.  *Beeler v. City Title Ins. Co.,* 201 Cal. App. 2d 702, 707 (1962).  The Complaint

6   fails to allege any of these elements.  Instead, it merely includes boilerplate allegations directed at

7   "Defendants," collectively.  (Compl. at 6:14-28; 19:1-28; 20:1-28; 21:1-28.)  It alleges no facts to

8   show that MDC actually acted in concert, in furtherance of any common scheme or design, or had

9   any knowledge of the alleged conspiracy.

10       Therefore, MDC's Demurrer to Plaintiffs' sixth through tenth causes of action should be

11   sustained without leave to amend.

12   **VII.**    **CONCLUSION**

13       For reasons stated above and stated in the Court's ruling sustaining (in part) co-defendant

14   World Airways' demurrer without leave to amend, MDC requests that the Court sustain its

15   Demurrer to the Second and Sixth through Tenth Causes of Action in Plaintiffs' Complaint without

16   leave to amend.

17   Dated:  March 15, 2010

18

19                   Respectfully submitted,

20                   **BRYAN CAVE LLP**
                      Robert E. Boone III

21                   James C. Pettis
                    M. Angela Buenaventura

22

23                   By: _____

24                     James C. Pettis
                    Attorneys for Defendant

25                   MCDONNELL DOUGLAS CORPORATION

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  **BRYAN CAVE LLP**
   Robert E. Boone III, California Bar No. 132780
2  James C. Pettis, California Bar No. 223953
   M. Angela Buenaventura, California Bar No. 264130
3  120 Broadway, Suite 300
   Santa Monica, California 90401-2386
4  Telephone:     (310) 576-2100
   Facsimile:     (310) 576-2200
5
   Attorneys For Defendant
6  MCDONNELL DOUGLAS CORPORATION

7

8

ENDORSED
FILED
ALAMEDA COUNTY

JUN 09 2010

CLERK OF THE SUPERIOR COURT
By _____ H. Lovett _____ Deputy

### SUPERIOR COURT OF CALIFORNIA

9

### COUNTY OF ALAMEDA

10

11

12  TIMOTHY VEST and CAROLINE VEST,      Case No. RG09489518

13          Plaintiff,                   Assigned for all pre-trial purposes to the
                                          Hon. Kenneth Mark Burr
14      vs.
                                          **MDC'S ANSWER TO PLAINTIFFS'**
15  ALLIED PACKING AND SUPPLY, et al.,   **SECOND AMENDED COMPLAINT**

16          Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

*(vertical left margin:)* BRYAN CAVE LLP · 120 BROADWAY, SUITE 300 · SANTA MONICA, CALIFORNIA 90401-2386

MDC'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

1    Defendant McDonnell Douglas Corporation ("MDC") answers the Second Amended

2    Complaint of Plaintiffs Timothy and Caroline Vest ("Plaintiffs") as follows:

3    Pursuant to Code of Civil Procedure section 431.30, MDC denies generally and

4    specifically each and every allegation of each cause of action contained in the Second Amended

5    Complaint, and further denies that Plaintiffs have been damaged in the sum or sums alleged or in

6    any other sum or sums, or at all.

7    MDC states the following defenses to each and every cause of action alleged in the Second

8    Amended Complaint:

9

10                                    FIRST DEFENSE

11    1.    The Second Amended Complaint does not state facts sufficient to constitute a cause

12    of action.

13

14                                   SECOND DEFENSE

15    2.    Plaintiffs' claims are barred by applicable statutes of limitation, including, but not

16    limited to, California Code of Civil Procedure sections 340 and 340.2.

17

18                                    THIRD DEFENSE

19    3.    Venue is improper in this Court.

20

21                                   FOURTH DEFENSE

22    4.    Plaintiffs' claims are barred by the doctrine of estoppel.

23

24                                    FIFTH DEFENSE

25    5.    Plaintiffs' claims are barred by the doctrine of laches.

26

27                                    SIXTH DEFENSE

28    6.    Plaintiffs' claims are barred by the doctrine of waiver.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

2

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

2                              SEVENTH DEFENSE

3      ·7.      Plaintiffs' claims are barred by Mr. Vest's express assumption of the risks and

4  dangers, if any, associated with the alleged conditions, conduct or injuries.

5

6                               EIGHTH DEFENSE

7      8.      Plaintiffs' claims are barred by Mr. Vest's implied assumption of the risks and

8  dangers, if any, associated with the alleged conditions, conduct or injuries.

9

10                              NINTH DEFENSE

11     9.      Some or all of the damages claimed by Plaintiffs are not recoverable under

12  applicable law.  In the event that there is a finding of damages for Plaintiff, such damages should

13  be reduced or offset by various benefits received by Plaintiffs under applicable law.

14

15                              TENTH DEFENSE

16     10.     If Plaintiffs sustained injury or damage, said injury or damage was caused wholly

17  or in part by the conduct, negligent acts or omissions, and/or fault of third parties or entities other

18  than MDC, which conduct, acts or omissions, or fault was the sole proximate cause or an

19  intervening or superseding cause of any injury or damage to Plaintiffs.  Plaintiffs' claims and

20  damages sought with respect thereto, if any, against MDC are barred completely or must be

21  reduced in proportion to the fault attributable to other third parties or entities as are found

22  culpable.

23

24                             ELEVENTH DEFENSE

25     11.     Any injury, damage or loss allegedly sustained by Plaintiffs were proximately and

26  actually caused by and contributed to by the negligence and carelessness on the part of Mr. Vest in

27  that Mr. Vest failed to exercise ordinary care on his own behalf at the times and in the places set

28  forth in the Second Amended Complaint.  Accordingly, any recovery by Plaintiffs should be

3

1    barred or reduced to the extent of such responsibility.

2

3                          TWELFTH DEFENSE

4       12.    Plaintiffs' claims are barred because Plaintiffs failed and refused to mitigate their

5    alleged damages and losses.

6

7                        THIRTEENTH DEFENSE

8       13.    The product(s) in question, if any, was/were modified by persons other than MDC

9    after leaving MDC's custody and control and before the incidents alleged in the Second Amended

10   Complaint, and said modifications were the proximate cause of Plaintiffs' alleged injury, thereby

11   barring any and all claims against MDC.

12

13                       FOURTEENTH DEFENSE

14      14.    Any and all injuries and damages allegedly suffered by Plaintiffs were solely and

15   proximately caused by the abuse or misuse by Mr. Vest and/or others of the product(s) in question,

16   which abuse and misuse was not reasonably foreseeable, thereby barring Plaintiffs from any

17   recovery from MDC.

18

19                        FIFTEENTH DEFENSE

20      15.    At all times relevant to the alleged conditions, conduct or injuries, Mr. Vest had or

21   should have had notice and knowledge of the risks and dangers, if any, associated with such

22   conditions, conduct and injuries because any such risk or danger was open, obvious and apparent

23   to Mr. Vest, he appreciated the danger or risk, and he voluntarily assumed any such danger or risk.

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

4

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1

## SIXTEENTH DEFENSE

2      16.      If Plaintiffs sustained any injury or damage as alleged in the Second Amended

3  Complaint, said injury or damage was the sole and proximate cause of conditions, circumstances

4  and/or conduct of others beyond the control of MDC which are unrelated to any use of its

5  product(s) by Mr. Vest.

6

7

## SEVENTEENTH DEFENSE

8      17.      The plans or designs, method or technique of manufacturing, assembling, testing,

9  and labeling of any product alleged in the Second Amended Complaint to have caused all or part

10 of Plaintiffs' alleged damages conformed with the state of the art at the time any such product was

11 designed, manufactured and/or sold by MDC.

12

13

## EIGHTEENTH DEFENSE

14     18.      The benefits of the design of the product(s) in question outweigh any risk

15 associated with said product(s), if any risk there actually was, which MDC denies.

16

17

## NINETEENTH DEFENSE

18     19.      The actions of MDC were in conformity with the state of the medical, industrial,

19 and scientific arts, so that there was no duty to warn Mr. Vest under the circumstances, or to the

20 extent such a duty arose, MDC provided adequate warnings, labels and/or instructions concerning

21 any product in question.  If those warnings, labels and/or instructions were not made available or

22 heeded, it is the fault of others and not MDC.

23

24

## TWENTIETH DEFENSE

25     20.      Plaintiffs have failed to join all necessary and indispensable parties.

26

27

## TWENTY-FIRST DEFENSE

28     21.      MDC did not design and/or manufacture some or all of the products alleged in the

<div align="center">5</div>

1  Second Amended Complaint.

2  <div align="center">TWENTY-SECOND DEFENSE</div>

3      22.    MDC owed no duty of care to Mr. Vest.  If MDC did, it did not breach any such

4  duty.

5

6  <div align="center">TWENTY-THIRD DEFENSE</div>

7      23.    MDC made no express or implied representations or warranties of any kind to Mr.

8  Vest.  To the extent that the alleged representations or warranties were made, they were made by

9  persons or entities other than MDC.

10

11  <div align="center">TWENTY-FOURTH DEFENSE</div>

12      24.    Mr. Vest did not rely upon any representations or warranties made by MDC.  To

13  the extent Mr. Vest relied upon any alleged representations or warranties, such reliance was

14  unjustified.

15

16  <div align="center">TWENTY-FIFTH DEFENSE</div>

17      25.    Plaintiffs' claim for punitive damages, if granted, would be grossly excessive and

18  would violate the Due Process clause of the Fourteenth Amendment to the U.S. Constitution.

19  MDC has not received fair notice that it could be subject to substantial punitive damages in this

20  State for the conduct alleged.  MDC's conduct was not deliberate, and the damages, if any, to

21  Plaintiffs were economic.  The punitive damages sought by Plaintiffs are greatly disproportionate

22  to any actual damages and far exceed any civil or criminal sanctions that could be imposed for

23  similar alleged conduct.

24

25  <div align="center">TWENTY-SIXTH DEFENSE</div>

26      26.    Plaintiffs' claim for punitive damages would violate the Eighth Amendment to the

27  U.S. Constitution and Article I, sections 1 and 17 of the California Constitution because it seeks to

28  impose an excessive fine upon MDC, is penal in nature, and seeks to punish MDC upon vague

<div align="center">BRYAN CAVE LLP<br>120 BROADWAY, SUITE 300<br>SANTA MONICA, CALIFORNIA 90401-2386</div>

<div align="center">6</div>

1   standards.

2   <div align="center">**TWENTY-SEVENTH DEFENSE**</div>

3       27.   Plaintiffs' claim for punitive damages would violate the Equal Protection clause of

4   the Fourteenth Amendment to the U.S. Constitution and Article I, section 7 of the California

5   Constitution because it discriminates against MDC on the basis of wealth and because different

6   amounts can be awarded against two or more defendants for the same act where those defendants

7   differ only in material wealth.

8

9   <div align="center">**TWENTY-EIGHTH DEFENSE**</div>

10      28.   Plaintiffs' claim for punitive damages violates the Due Process clause of the Fifth

11  and Fourteenth Amendments to the U.S. Constitution because it seeks to punish MDC based upon

12  unconstitutionally vague standards.

13

14  <div align="center">**TWENTY-NINTH DEFENSE**</div>

15      29.   Plaintiffs' claim for punitive damages would violate the Fifth Amendment to the

16  U.S. Constitution and Article I, section 15 of the California Constitution because it would expose

17  MDC to multiple punishments and fines for the same act or conduct.

18

19  <div align="center">**THIRTIETH DEFENSE**</div>

20      30.   Plaintiffs' claim for punitive damages violates the Due Process clause of the Fifth

21  and Fourteenth Amendments to the United States Constitution in the absence of an order

22  bifurcating that claim from the issue of liability.

23

24  <div align="center">**THIRTY-FIRST DEFENSE**</div>

25      31.   Any award of punitive damages in this case would violate the Separation of Powers

26  Doctrine since this Court and the jury would be usurping the exclusive power of the legislature to

27  define crimes and establish punishment.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

<div align="center">7</div>

1

## THIRTY-SECOND DEFENSE

2      32.     Any award of punitive damages in this case would be constitutionally defective as

3   an ex post facto law prohibited by the U.S. and California Constitutions. The jury, in making any

4   such punitive award, would be effectively criminalizing conduct after it has occurred and without

5   appropriate advance notice to a defendant that such conduct may subject it to criminal punishment.

6

7   ## THIRTY-THIRD DEFENSE

8      33.    The punitive damages sought by Plaintiffs would violate the Due Process clause of

9   the Fifth and Fourteenth Amendments to the U.S. Constitution because Plaintiffs seek to punish

10   MDC in California for alleged conduct that occurred elsewhere.

11

12   ## THIRTY-FOURTH DEFENSE

13      34.    Plaintiffs' burden of proof is to support a punitive damage recovery by clear and

14   convincing evidence.

15

16   ## THIRTY-FIFTH DEFENSE

17      35.    The Second Amended Complaint fails to state a cause of action against MDC upon

18   which relief can be granted.

19

20   ## THIRTY-SIXTH DEFENSE

21      36.    At no time relevant herein was Mr. Vest exposed to any asbestos from products

22   designed or manufactured by MDC.

23

24   ## THIRTY-SEVENTH DEFENSE

25      37.    Any exposure by Mr. Vest to any MDC product was so minimal as to be

26   insufficient, as a matter of law, to have constituted a substantial factor in causing any asbestos-

27   related disease.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

8

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1                  <u>THIRTY-EIGHTH DEFENSE</u>

2       38.     Any and all "market share," "enterprise," and/or "concert of action" theories of

3 liability are inapplicable to MDC and/or any of its products in question.

4

5                  <u>THIRTY-NINTH DEFENSE</u>

6       39.     Under the doctrine of forum *non conveniens*, this case should be dismissed from

7 this and any other district or jurisdiction in the United States.

8

9                    <u>FORTIETH DEFENSE</u>

10       40.     Although Plaintiffs purportedly do not allege any claims against MDC involving

11 any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

12 attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

13 Plaintiffs' claims are barred by the doctrine known as the "Government Contractor Defense"

14 adopted by the United States Supreme Court in the case of <u>Boyle v. United Technologies Corp.</u>,

15 108 S. Ct. 2510 (1988).

16

17                   <u>FORTY-FIRST DEFENSE</u>

18       41.     Although Plaintiffs purportedly do not allege any claims against MDC involving

19 any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

20 attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

21 any military products made by MDC were procured by the United States Government, which was

22 sophisticated and knowledgeable concerning the use of, and any potential hazards of, asbestos

23 products. MDC reasonably relied upon the sophistication of the United States Government and is

24 not responsible for any failure of the United States Government to warn or take proper precautions

25 for the protection of its own employees or civil servants, including Mr. Vest.

26

27                  <u>FORTY-SECOND DEFENSE</u>

28       42.     Although Plaintiffs purportedly do not allege any claims against MDC involving

<div align="center">9</div>

1  any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

2  attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

3  any products manufactured by MDC which incorporated asbestos-containing materials alleged to

4  have been a cause of any disease contracted by Mr. Vest was manufactured under and in

5  conformity with the direction and control of the United States Government, which at all times

6  material hereto had knowledge superior to that of MDC with respect to the potential hazards of

7  asbestos products; accordingly, no liability can be imposed upon MDC.

8

9                              FORTY-THIRD DEFENSE

10      43.    Although Plaintiffs purportedly do not allege any claims against MDC involving

11  any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

12  attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

13  MDC satisfied any duty to warn by providing the United States Government with detailed

14  specifications of each and every one of its products to which Mr. Vest was allegedly exposed.

15

16                              FORTY-FOURTH DEFENSE

17      44.    Although Plaintiffs purportedly do not allege any claims against MDC involving

18  any military products or equipment supplied to the U.S. Government, insofar as Plaintiffs may

19  attempt to assert any such claims against MDC in the future, MDC reserves the right to assert that

20  Plaintiffs' claims are barred by the derivative sovereign immunity defense doctrine under Yearsley

21  v. W.A. Ross Construction Co., 309 U.S. 18 (1940).

22

23                          FORTY-FIFTH AFFIRMATIVE DEFENSE

24      45.    Plaintiffs' claims are barred or preempted, in whole or in part, by federal law,

25  statutes, and regulations.

26

27

28

MDC'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Exhibit B - Page 271

1    FORTY-SIXTH AFFIRMATIVE DEFENSE

2    46.    Plaintiffs' claims may be barred by the learned intermediary and/or sophisticated

3    user doctrines.

4

5    FORTY-SEVENTH DEFENSE

6    47.    MDC was not the owner, occupier or controller of any premises at which, or

7    materials from which, Mr. Vest claims he was exposed to any asbestos.

8

9    FORTY-EIGHTH DEFENSE

10   48.    MDC did not violate any state or federal statute, regulation, or ordinance to cause

11   Plaintiffs' alleged injuries.

12

13   FORTY-NINTH DEFENSE

14   49.    Plaintiffs' causes of action are barred by California's Workers' Compensation Act,

15   Labor Code sections 3600 et seq., including more specifically the exclusive remedy rule embodied

16   therein at Labor Code sections 3601 and 3602(a).

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

11

1    MDC reserves the right, upon completion of its investigation and discovery, to assert such

2  additional defenses as may be appropriate.

3

4    WHEREFORE, MDC prays for judgment against Plaintiffs dismissing the Second

5  Amended Complaint and each and every cause of action alleged therein, and awarding to MDC

6  costs, interest, reasonable attorneys' fees and disbursements.

7

8  Dated: June 9, 2010

9                                        BRYAN CAVE LLP
                                         Robert E. Boone III
10                                       James C. Pettis
                                         M. Angela Buenaventura
11

12                                       By: _____

13                                            M. Angela Buenaventura
                                         Attorneys for Defendant
14                                       MCDONNELL DOUGLAS CORPORATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

C000109/0307472/789266.1

12

**EXHIBIT B - Page 133**

Exhibit B - Page 273

1

## PROOF OF SERVICE

2   I am employed in the City and County of Los Angeles, State of California. I am over the
    age of 18 and not a party to the within action.  My business address is 120 Broadway, Suite 300,
3   Santa Monica, CA 90401.

4   On **June 9, 2010**, I served the foregoing document, described as: **MDC'S
    ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT**, on each interested
5   parties in this action, as follows:

6   ## SEE ATTACHED SERVICE LIST

7   ☒   (BY OVERNIGHT COURIER) I deposited in a box or other facility maintained by
    Overnight Express, an express carrier service, or delivered to a courier or driver authorized by said
8   express carrier service to receive documents, a true copy of the foregoing document, in an
    envelope designated by said express service carrier, with delivery fees paid or provided for.
9

10       (BY MAIL) I am "readily familiar" with the firm's practice of collection and
    processing correspondence for mailing.  Under that practice it would be deposited with U.S. Postal
11  Service on that same day with postage thereon fully prepaid at San Francisco, California in the
    ordinary course of business.  I am aware that on motion of the party served, service is presumed
12  invalid if postal cancellation date or postage meter date is more than one day after date of deposit
    for mailing in affidavit.
13

14       (BY FAX) I caused a true copy of the foregoing document to be served by
    facsimile transmission at the time shown on each attached transmission report from sending
15  facsimile machine telephone number_____ to each interested party at the facsimile number
    shown above.  Each transmission was reported as complete and without error.  A transmission
16  report was properly issued by the sending facsimile machine for each interested party served.  A
    true copy of each such transmission report is attached hereto.
17

18  Executed on **June 9, 2010**, at San Francisco, California.  I declare under penalty of perjury
    under the laws of the State of California that the foregoing is true and correct.
19

20                                                    Alicia Moore

21

22

23

24

25

26

27

28

SM01DOCS775784.2

PROOF OF SERVICE



**SERVICE LIST**
Timothy Vest and Caroline Vest  v. Allied Packing and Supply, et al.
Alameda County Superior Court No. RG09489518

Denise Abrams, Esq.
Justin A. Bosl, Esq.
KAZAN, McCLAIN, LYONS, GREENWOOD
& HARLEY
A Professional Law Corporation
171 Twelfth Street, Third Floor
Oakland, CA 94607
Telephone:      (510) 302-1000
Facsimile:
*Attorney for Plaintiffs*

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

C146342/0306464/775784.2

1

PROOF OF SERVICE

1   James L. Oberman, Esq. (C.S.B. #120938)
    Michael T. Stewart, Esq. (C.S.B. #253851)
2   KAZAN, McCLAIN, LYONS,
    GREENWOOD & HARLEY
3   A Professional Law Corporation
    Jack London Market
4   55 Harrison Street, Suite 400
    Oakland, California 94607
5   Telephone: (510) 302-1000

6   Attorneys for Plaintiffs

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF ALAMEDA

10

| | |
|---|---|
| TIMOTHY VEST and CAROLINE VEST, | No. RG09489518 |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT McDONNELL DOUGLAS CORPORATION'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| vs. | |
| ALLIED PACKING & SUPPLY, INC., et al., | |
| Defendants. | |

Date:          January 14, 2011
Time:          9:36 am
Dept.:         30 (Hon. Kenneth Mark Burr)
Case Filed:    December 17, 2009
Trial Date:    February 14, 2011

**Reservation No: R1092700**

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25
26
27
28

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA

**EXHIBIT C - Page 136**                    **Exhibit B - Page 276**

TABLE OF CONTENTS

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'
                Hangar 110, and as a Pilot for Emery Worldwide. . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Timothy Vest's Mesothelioma was Caused by Asbestos. . . . . . . . . . . . . . . . . 12

III.    Legal Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      Moving Defendant's Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      MDC Fails to Establish Plaintiffs Lack Evidence of Causation. . . . . . . . . . . . . . 16

                1.      Plaintiffs' Additional Evidence Requires a Trial. . . . . . . . . . . . . . . . . . . 18

        C.      Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid. . . . . . . . 19

        D.      The Motion must be Continued or Denied Under CCP 437c(h). . . . . . . . . . . . . . 20

IV.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA                    i

**EXHIBIT C - Page 137**                    **Exhibit B - Page 277**

TABLE OF AUTHORITIES

<u>State Statutes</u>

Civil Code section 1708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Civil Code section 1710 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Civil Code section 3294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Code of Civil Procedure section 437c(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Code of Civil Procedure section 437c(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Code of Civil Procedure section 437c(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Code of Civil Procedure section 437c(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17, 20

Code of Civil Procedure section 437c(p)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Evidence Code section 1200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Evidence Code section 1220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Evidence Code section 1221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Evidence Code section 1222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Evidence Code section 1230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Evidence Code section 1290 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Evidence Code section 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Evidence Code section 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>State Cases</u>

*Aguilar v. Atlantic Richfield Co.*
(2001) 25 Cal.4th 826 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

*Bahl v. Bank of America*
(2001) 89 Cal.App.4th 389 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Binder v. Aetna Life Ins. Co.*
(1999) 75 Cal.App.4th 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*DeLeon v. Commercial Manufacturing & Supply Co.*
(1983) 148 Cal.App.3d 336 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Elmore v. American Motors Corp.*
(1969) 70 Cal.2d 578 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Haney v. Aramark Uniform Services, Inc.*
(2004) 121 Cal.App.4th 623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA        ii

**EXHIBIT C - Page 138**

**Exhibit B - Page 278**

1 | *Hilliard v. A.H. Robins Co.*
  | (1983) 148 Cal.App.3d 374. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
2 |
  | *Huynh v. Ingersoll-Rand*
3 | (1993) 16 Cal.App.4th 825. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4 | *Jiminez v. Sears, Roebuck & Co.*
  | (1971) 4 Cal.3d 379. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18
5 |
  | *Kahn v. East Side Union High School Dist.*
6 | (2003) 31 Cal.4th 990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7 | *Nelson v. Superior Court*
  | (2006) 144 Cal.App.4th 689. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
8 |
  | *Oddone v. Superior Court (Technicolor, Inc.)*
9 | (2009) 179 Cal.App.4th 813. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10 | *Potter v. Firestone Tire & Rubber Co.*
   | (1993) 6 Cal.4th 965. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
11 |
   | *Quirici v. Freeman*
12 | (1950) 98 Cal.App.2d 194. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

13 | *Rutherford v. Owens-Illinois, Inc.*
   | (1997) 16 Cal.4th 953. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18
14 |
   | *SKF Farms v. Super. Ct.*
15 | (1984) 153 Cal.App.3d 902. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

16 | *Stone v. Regents of University of Cal.*
   | (1999) 77 Cal.App.4th 736. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
17 |
   | *Taylor v. Elliott Turbomachinery Co., Inc.*
18 | (2009) 171 Cal.App.4th 564. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19 | *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.*
   | (2004) 129 Cal.App.4th 577. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
20 |
   | *Torres v. Xomox Corporation*
21 | (1996) 49 Cal.App.4th 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22 | *United Community Church v. Garcin*
   | (1991) 231 Cal.App.3d 327. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
23 |
   | *Vandermark v. Ford Motor Co.*
24 | (1964) 61 Cal.2d 256. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

25 | *Weber v. John Crane, Inc.*
   | (2006) 143 Cal.App.4th 1433. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17
26 |
   | *Wright v. Stang Manufacturing Co.*
27 | (1997) 54 Cal.App.4th 1218. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
28 |

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    iii

**EXHIBIT C - Page 139**

1  Other Authorities

2  5 Witkin, Cal. Procedure
   (4th ed. 1997) Pleading § 678. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
3
   Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial
4  (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

## I.      Introduction

The motion of defendant McDonnell Douglas Corporation ("MDC") for summary judgment or, in the alternative, summary adjudication fails for three reasons. First, this Court on December 10, 2010 ordered MDC to produce aircraft manuals, parts catalogues, All Operator Letters and records pertaining to MDC's historical knowledge of asbestos hazards. The order cites MDC's representation that it could and would immediately comply. But instead, MDC produced 14 encrypted CDs that cannot be printed or electronically searched without a password – which MDC will not share. And MDC bases this motion on the declarations of Larry Fogg, Timothy Lloyd and Michael Schmidt, while at the same time refusing to make these percipient witnesses available for deposition. MDC cannot benefit from its misuses of the discovery process, so this motion should be denied, and at a minimum must be continued, under Code of Civil Procedure section 437c(h).

Second, MDC demonstrates no lack of evidence in support of any cause of action or claim for damages raised in the complaint. Nothing in MDC's separate statement shows MDC propounded any special interrogatories seeking all of plaintiffs' witnesses and documents, much less that plaintiffs' responses were in any way factually devoid. Instead, MDC cites limited excerpts of the deposition testimony of plaintiff Timothy Vest and his father, Warren Vest. While ignoring the availability of other competent evidence, MDC improperly asserts all of plaintiffs' claims must fail for lack of asbestos-exposure evidence. And MDC asserts Timothy Vest's mesothelioma was not caused by asbestos exposure. But MDC's proffered declaration of Dr. Travis is easily contradicted by the opinions of plaintiffs' medical expert witnesses.

Third, plaintiffs' additional evidence, including the declarations of industrial hygienist John Templin, pathologist Samuel P. Hammar, M.D. and pathologist William R. Salyer, M.D., raises triable issues of fact as to whether MDC is liable for the injuries to Timothy Vest caused by its defective aircraft – including the planes' originally-installed asbestos-containing parts and the replacement asbestos-containing parts that MDC required to be used. Based on the relevant percipient-witness testimony and the historically available scientific knowledge, John Templin explains MDC should have known Timothy Vest and others in aircraft maintenance facilities were

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      1

**EXHIBIT C - Page 141**

**Exhibit B - Page 281**

1    at risk of mesothelioma.  Mr. Vest foreseeably inhaled substantial amounts of airborne asbestos

2    fibers from parts used on the MDC aircraft operated by World Airways and Emery Worldwide in

3    the 1970s, 1980s and 1990s. Based on Timothy Vest's tissue samples, his documented history of

4    occupational-level asbestos exposure and other scientific evidence, Dr. Hammar and Dr. Salyer

5    explain Timothy Vest's mesothelioma was unquestionably caused by asbestos.

6    **II.    Statement of Facts**

7        **A.    Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'**
             **Hangar 110, and as a Pilot for Emery Worldwide**

8
9          On May 28, 2010, plaintiffs filed their Second Amended Complaint for personal injuries,

     negligence, strict products liability, fraud, conspiracy to defraud and loss of consortium against
10
     defendants, including MDC, who are alleged to have exposed Timothy Vest to asbestos that was a
11
     substantial factor in causing his mesothelioma.[1] [Facts 64-65.] The complaint alleges, among
12
     other things, that Timothy Vest was continually exposed to defendants' asbestos-containing
13
     materials from at least 1973 to 1983 at World Airways' facilities in Oakland, California; and as a
14
     pilot for Emery Worldwide from 1990 to 2001. [*Id.*]
15
16         Timothy Vest lived in Dublin, California as a child from at least 1972 to 1983. [Facts 66-

     77.] After working abroad, his father Warren Vest lived in the family home from mid-1973
17
     onward. [*Id.*] Warren was an airline pilot based out of World's headquarters at the Oakland
18
     Airport. [*Id.*] He worked at World's new office building and maintenance hangar, known as
19
     Hangar 110, from the early 1970s through the late 1980s. [*Id.*] After the construction was
20
     finished, Timothy regularly visited Hangar 110 because his father worked in the building. [*Id.*]
21
     Timothy spent approximately an hour in the hangar before his father flew away on multi-day trips.
22
     [*Id.*] And he spent several hours in the hangar when his father did weekend office work, at least
23
     twice a month. [*Id.*] Timothy continuously visited the hangar at this rate from the time he was
24
     eight years of age until he was seventeen. [*Id.*] As a teenager he wanted to be in the hangar
25
     because he was training for his own pilot's license. [*Id.*] Timothy never was told of restrictions
26
     against being in the hangar, and there were no signs posted. [*Id.*] Nor was he warned about the
27

28       [1]The complaint is admissible here to frame the issues raised in the pleadings and to
     assess the materiality of the facts in dispute. [Rylaarsdam & Edmon, Cal. Practice Guide:
     Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.]

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1 | asbestos in the hangar. [*Id.*] He did not learn until after 2000 that asbestos is hazardous. [*Id.*]

2 | On those weekend trips, Timothy spent his time exploring the nooks and crannies

3 | throughout the hangar and watching the nearly constant aircraft maintenance work. [Facts 78-87.]

4 | The hangar had an office complex at the front entrance, and an enclosed maintenance area for the

5 | aircraft. [*Id.*] He befriended one of the security guards, so he had free run of the hangar. [*Id.*]

6 | Timothy explored throughout the internal buildings and structures, including where the aircraft

7 | maintenance tools and parts were stored. [*Id.*] He explored the maintenance facility in this way

8 | until he became a teenager, and then was more interested in aircraft. [*Id.*] Aircraft maintenance

9 | workers were nearby when Timothy was exploring. [*Id.*] The mechanics in the hangar knew he

10 | was Warren Vest's son, so they allowed Timothy near the aircraft to learn how they worked. [*Id.*]

11 | He saw McDonnell Douglas aircraft in the hangar, including the DC-10 model. [*Id.*] There was

12 | almost always aircraft maintenance and painting occurring in the hangar during the dozens of

13 | times he visited each year from the 1970s to 1980s. [*Id.*] He saw engines being worked on,

14 | airplanes jacked up off the floor and inspection panels removed, including on the DC-10s. [*Id.*]

15 | On days when Timothy did not accompany his father to the hangar, the two hugged when

16 | his father came home from work. [Facts 88-95.] Warren did not immediately change out of his

17 | work clothes. [*Id.*] Timothy's mother did most of the laundry, but Timothy helped by carrying the

18 | family's dirty clothes out to the garage, where they were shaken out and washed. [*Id.*] Timothy's

19 | own clothes were visibly dirty when he returned from the hangar. [*Id.*] His father wore varying

20 | attire, including a pilot's uniform, a suit or business-casual clothes. [*Id.*] Warren worked 12 hours

21 | per day and 6 days per week. [*Id.*] Warren's clothes appeared visibly dusty, with a chalky-white

22 | color, when he returned home from the hangar. [*Id.*] Timothy carried his father's dirty work

23 | clothes to help his mother. [*Id.*]

24 | Warren Vest confirms he started working in World's Hangar 110 a few months after its

25 | grand opening in 1973. [Facts 96-103.] He reported to the hangar every time he left for and

26 | returned from a flight. [*Id.*] From the mid-1970s to the mid-1980s, Warren spent approximately

27 | half of each month in the office, and half on flights. [*Id.*] He did his paperwork on the weekends

28 | because he was a pilot; and his son Timothy came to the hangar on those days. [*Id.*] Timothy Vest

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1 came to the hangar from 1973 through 1983, up to several times per month. [*Id.*] He spent some

2 of his time in the office area, where Warren had an office, and also spent hours in other areas of

3 the hangar. [*Id.*] Timothy Vest was allowed to be on the hangar floor, and he had the permission

4 of the security guards. [*Id.*] Aircraft maintenance occurred 24 hours per day, 7 days per week,

5 including when Timothy was present. [*Id.*]

6        Warren spent a lot of time in the maintenance area to ensure the work was on schedule and

7 the aircraft would be ready to fly. [Facts 104-115.] He was on the hangar floor up to several times

8 every day. [*Id.*] Warren spoke to the maintenance foreman in charge of a particular plane. [*Id.*]

9 His conversations lasted from 5 to 30 minutes. [*Id.*] During the 1973 to 1983 period, the planes in

10 the hangar included McDonnell Douglas DC-8 (six total) and DC-10 (ten total) models. [*Id.*]

11 Three of the DC-8s and nine of the DC-10s were purchased new by World. Those new DC-10s

12 were bought in 1979, 1980 and 1981. [*Id.*] Warren saw dust in the maintenance area, especially

13 when the large doors were opened and the wind blew in, stirring up the dust. [*Id.*] Normally only

14 one set of doors were opened, to avoid creating a dangerous wind tunnel in the hangar. [*Id.*] He

15 saw the mechanics install many parts, including engine parts, on the DC-8s and DC-10s in the

16 hangar. [*Id.*] The work included minor maintenance and major overhauls, lasting from one day to

17 several weeks. [*Id.*] Up to 40 mechanics worked on the planes together. [*Id.*]

18        Warren did not immediately change out of his work clothes when he returned home. [Facts

19 116-119.] Instead, he hugged and played with Timothy and had dinner. [*Id.*] Timothy Vest also

20 rode in the car that Warren drove to and from the hangar. [*Id.*] Warren Vest never received any

21 asbestos warnings during his employment at World. [*Id.*]

22        Claude Fross was World's facilities manager for Hangar 110 from its opening in 1973 until

23 1986. [Facts 120-127.] The hangar included an office area, shop areas and a large open space for

24 the aircraft. [*Id.*] There were "no holidays" in aircraft maintenance, so work on the planes

25 occurred all day, every day in the hangar. [*Id.*] They underwent varying degrees of maintenance

26 based on their hours in flight. [*Id.*] The planes included DC-8 and DC-10 models. [*Id.*] Every

27 time a plane was pushed out of the hangar, the cleaning crew came to clean up the mess. [*Id.*] The

28 large doors on each end of the hangar were usually closed. [*Id.*] And they were not opened at the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    same time because that would cause a wind tunnel.  [*Id.*]

2         James Hales was an aircraft maintenance controller for World at Hangar 110 from 1984 to

3    1986.  [Facts 128-139.]  He had an office job in which he coordinated the schedule and ordered

4    parts, primarily for DC-10 models and some DC-8s.  [*Id.*]  World serviced those DC-10s and DC-

5    8s in the hangar.  [*Id.*]  Mr. Hales is now vice president of technical operations for World.  [*Id.*]

6    The aircraft maintenance that occurred in Hangar 110 followed a precise schedule for each plane.

7    [*Id.*]  The work on a DC-10 plane could last from days to weeks.  [*Id.*]  The lightest scheduled

8    maintenance, an "A" check, involved opening access panels and inspecting internal components

9    and systems.  [*Id.*]  A "B" check was similar but more extensive.  [*Id.*]  A "C" check involved

10   more invasive removal of structural parts and replacement of worn components.  [*Id.*]  A "D"

11   check took at least a month to complete and returned the plane to like-new condition.  [*Id.*]  Every

12   access panel was opened, landing gear was removed, engines were replaced, the cabin was stripped

13   and the plane was repainted.  [*Id.*]  The hangar floor was swept after each job.  [*Id.*]

14        Maintenance programs for the aircraft changed as the planes aged and the airlines gave

15   feedback to the original manufacturer.  [Facts 140-154.]  The manufacturer of the plane

16   established the initial maintenance plan for an aircraft, and that plan was approved by the Federal

17   Aviation Administration.  [*Id.*]  MDC, as the manufacturer, supplied the aircraft maintenance

18   manual, the Illustrated Parts Catalogue, the wiring diagram manual and the structural repair

19   manual.  [*Id.*]  World relied on those publications and stored them in the technical library at

20   Hangar 110.  [*Id.*]  MDC also issued service bulletins and updated manuals that World conveyed

21   to its mechanics.  [*Id.*]  The mechanics working on DC-10s and DC-8s obtained replacement parts

22   by first consulting MDC's Illustrated Parts Catalogue, which showed exactly what part – listed by

23   number – needed to be retrieved from the stockroom or specially ordered.  [*Id.*]  MDC did not

24   make all the parts it specified, so some replacement parts were obtained from third-party suppliers.

25   [*Id.*]  World needed MDC's approval to make any deviations from standard maintenance

26   procedures.  [*Id.*]  Any changes in the plan required the approval of the manufacturer.  [*Id.*]  The

27   airline was required to suggest the change to the manufacturer via a formal petition, and the

28   manufacturer then relied on its own engineers to gather data and evaluate the issue.  [*Id.*]  The

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          5

**EXHIBIT C - Page 145**                                                          **Exhibit B - Page 285**

1   main reason for this process was that changes to the flight characteristics of the plane could affect

2   its safety. [*Id.*] The base design of the plane, its type certificate, could not be changed without

3   permission from the manufacturer. [*Id.*] World also contacted the manufacturer to order certain

4   parts and to obtain drawings and technical data. [*Id.*] And MDC hosted annual conferences with

5   the airlines to discuss the operation of the DC-10 and DC-8 models. [*Id.*] It also issued All

6   Operator Letters to alert the airlines to safety issues, including asbestos. [*Id.*]

7           When aircraft engine access panels were opened for inspections, there were heat shields or

8   insulation blankets placed around the pneumatic systems. [Facts 155-166.] The shields and

9   blankets were bolted or wired in place, and had to be unfastened. [*Id.*] The outside surface of a

10  heat shield was metal, with a bolt hole running through it. [*Id.*] Heat shields were among the

11  asbestos-containing products which were used on aircraft in Hangar 110, and which required

12  hands-on contact. [*Id.*] Clamps were another asbestos part. [*Id.*] The clamps had an asbestos

13  sleeve covering the metal loop, and their purpose was to hold hydraulic lines, pneumatic lines and

14  wiring. [*Id.*] Asbestos materials were typically used in hot areas, while asbestos-free materials

15  were used in cooler areas. [*Id.*] Asbestos gaskets were used in the engines, and sometimes worn

16  gaskets had to be scraped off to leave a clean surface for the replacement part. [*Id.*] A wire brush

17  or sandpaper was used to scrape the gaskets. [*Id.*] Asbestos tape was also used in planes, to seal

18  the exhaust system. [*Id.*] Worn tape had to be scraped off before applying a new strip. [*Id.*] Mr.

19  Hales also recalls the use of epoxy adhesives made by Dexter. [*Id.*]

20          Stanley Lehmann is the designated corporate witness for Henkel Corporation, manufacturer

21  of Dexter-brand adhesive products – one of the asbestos-containing materials MDC required to be

22  used on its aircraft through at least 1992. [Facts 167-179, 217.] Attached to Mr. Lehmann's

23  declaration are some historical invoices showing sales of Dexter EA 934 two-part epoxy adhesive

24  from Henkel to World at Hangar 110. [*Id.*] These invoices are dated as late as October 1981.

25  [*Id.*] In addition to such direct sales, Henkel sold products through distributors. [*Id.*] Dexter-

26  brand products were sold in distinctive packaging that bore yellow labels with black printing. [*Id.*]

27  Dexter EA 934 was capable of bonding metal to metal. [*Id.*] It consisted of two parts, one of

28  which contained chrysotile asbestos, mixed together to form the adhesive. [*Id.*] Henkel purchased

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   raw asbestos fiber from Johns-Manville for use in the Dexter epoxies. [*Id.*] Johns-Manville

2   provided some asbestos warnings to Henkel beginning in the early 1970s. [*Id.*] And OSHA

3   provided to Henkel notice of asbestos hazards in 1972. [*Id.*] But Henkel issued no asbestos

4   warnings until 1977. [*Id.*] Its products then had an OSHA-type label, and Henkel issued a

5   separate bulletin instructing how to use the products safely. [*Id.*] That bulletin, but not the

6   product packaging, instructed not to sand the epoxy adhesives without wet-down methods. [*Id.*]

7          The epoxy contained asbestos beginning in 1962, the asbestos-free version did not exist

8   until 1979, and the asbestos-containing version was still sold after that date, until at least 1985.

9   [Facts 180-188.] Henkel developed the asbestos-free version to minimize its employees' exposure

10  to asbestos. [*Id.*] It continued to sell the asbestos-containing version after 1979 because aircraft

11  products had to go through a rigorous qualification process, and not all airline customers had

12  gained approval to use the asbestos-free version. [*Id.*] This process was required to ensure the

13  new product met the aircraft manufacturer's performance specification. [*Id.*] As of 1979, only a

14  single customer had gained approval, but Mr. Lehmann does not recall who that was. [*Id.*] The

15  approval needed to be issued by McDonnell Douglas, as the aircraft manufacturer, stating that EA

16  934 "NA" (nonasbestos) had been added to its qualified products list. [*Id.*] Such approval came

17  only after a successful application process. [*Id.*] Until MDC sent Henkel written approval after

18  testing the proposed new product, Henkel did not sell the asbestos-free material for use on MDC

19  aircraft. [*Id.*] All of the available invoices from Henkel to World, dated as late as October 1981,

20  demonstrate sales of the asbestos-containing version of the Dexter epoxy to World. [*Id.*]

21         Murray Gordon, deceased, testified in 1981 as the designated corporate witness for

22  McDonnell Douglas.[2] [Facts 189-194.] His title at the time of his 1981 deposition was Director of

23  Occupational Safety and Medical Services. [*Id.*] He had the overall responsibility for the

24  company's policies and procedures for hazardous materials, including asbestos. [*Id.*] A decade

25  earlier, in 1972, MDC responded to the newly enacted OSHA rules by determining, throughout the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

26

27

28

_____

[2] This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It is also admissible because the witness is dead, and MDC satisfied its interest in cross-examination at the deposition. [Evid. Code §§ 1290, 1291, 1292.] And it is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1   company, where it was using asbestos-containing materials. [*Id.*] MDC tried to eliminate asbestos

2   "where [it] could.," and tried to change how asbestos was handled in its facilities. [*Id.*] Before

3   1972, the company took no measures to protect people exposed to asbestos from its aircraft. [*Id.*]

4        Colleen Rule testified in 1999 on behalf of McDonnell Douglas Corp. (Boeing) and was

5   represented at the deposition by the company's counsel.[3] [Facts 195-200.] Her job in the

6   company's product support group was to assist the airlines who operate MDC aircraft to ensure

7   proper maintenance. [*Id.*] Ms. Rule kept the records of all communications between the company

8   and its airline customers, including the All Operator Letters (AOL). [*Id.*] MDC also staffed a call-

9   in center where airlines could ask whether a part number is interchangeable with any other part

10  number, in order to keep the aircraft flying without delay. [*Id.*] At no time were MDC's

11  customers cut-off from the technical assistance services, even long after the aircraft was sold. [*Id.*]

12  And the subsequent owners of a used aircraft had the benefit of MDC's services. [*Id.*]

13       Attached to Ms. Rule's deposition is the October 22, 1992 All Operator Letter issued by

14  MDC to all its customers, pertaining to asbestos-containing materials used in its aircraft.[4] [Fact

15  201-217.] The 1992 AOL was a revised edition of a 1989 AOL, also involving asbestos. [*Id.*]

16  Those were the only AOLs that discussed asbestos, and they demonstrate MDC's first

17  communications with its customers about asbestos. [*Id.*] The 1992 AOL was issued to encompass

18  more models of aircraft. [*Id.*] The 1992 AOL began with a series of codes that identified what

19  model aircraft and what system was being addressed. [*Id.*] For example, the code 8-20-0 meant

20  the AOL related to chemicals and materials on all DC-8 planes. [*Id.*] The AOL also expressly

21  stated it applied to all DC-8 and DC-10 aircraft, among others. [*Id.*] The AOL included a list of

22  asbestos parts divided into several columns and rows. [*Id.*] For each asbestos part, the chart

23  identified the specification, blueprint and part numbers that corresponded to MDC's Illustrated

24  Parts Catalogue. [*Id.*] That catalogue was created and maintained by MDC's technical

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25

26   [3]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220,
1221, 1222.] It also is an admission against interest/authorized admission that would not

27   have been made if untrue. [Evid. Code §§ 1230, 1222.]

28   [4]The AOL is an admissible business record and admission. [Evid. Code §§ 1271,
1220, 1221, 1222.] It also is an admission against interest/authorized admission that would
not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1   publications department. [*Id.*] Some of the asbestos parts, but not all, were listed with a specific

2   asbestos-free replacement part. [*Id.*] The AOL explained its purpose was to warn customers of

3   the presence and dangers of all asbestos-containing materials used in MDC aircraft, including DC-

4   8s and DC-10s. [*Id.*] It stated MDC was required to share updated safety information about tasks

5   and functions needed to maintain and repair its aircraft. [*Id.*] The AOL was prompted by a

6   "foreign" customer that desired to know all asbestos materials in certain MDC aircraft, and how to

7   substitute asbestos-free alternatives. [*Id.*] It stated asbestos materials were used in high-heat

8   applications, and asbestos was mixed into sealants and adhesives. [*Id.*] The AOL warned that

9   asbestos fibers were released when the materials were sanded, creating toxic dust that was inhaled

10  by nearby persons. [*Id.*] Among the dozens of asbestos parts listed in the AOL were Dexter-brand

11  epoxy filler adhesives, heat shields, pneumatic duct insulation, gaskets, tape, and insulation. [*Id.*]

12          David Miller in his December 13, 2010 declaration explains he was an aircraft mechanic

13  for World at Hangar 110 from 1973 to 1987. [Facts 218-236.] McDonnell Douglas

14  representatives were sometimes at Hangar 110, identified by their badges. [*Id.*] Mr. Miller and

15  the other mechanics handled heat blankets and shields used in the DC-8 and DC-10 aircraft

16  exhaust systems. [*Id.*] The blankets were woven and protected the pneumatic and hydraulic lines

17  from high heat. [*Id.*] The process of obtaining replacement blankets required the mechanics to use

18  MDC's Illustrated Parts Catalogue and part-numbering system. [*Id.*] The heat shields used in the

19  DC-8s protected the pneumatic and hydraulic lines, and were held in place with stubs or hooks.

20  [*Id.*] They measured up to several feet long and six inches wide. [*Id.*] Each engine had two to

21  four shields. [*Id.*] The outer case was metal, but the interior was a non-metal thick fibrous

22  material. [*Id.*] The metal case did not completely cover the internal material at the corners and

23  edges, so that material was disturbed every time the shields were removed and replaced. [*Id.*] The

24  corners and edges became more frayed and deteriorated over time. [*Id.*] The color also varied

25  over time, but most were gray-white. [*Id.*] The shields were removed and thrown aside when the

26  mechanics needed access to the engines; and then were reinstalled. [*Id.*] The shields became bent

27  through wear and tear, and developed holes in their metal shell. [*Id.*] Engine work on the DC-8s

28  required the removal and replacement of the heat shields. [*Id.*] Mr. Miller believes, based on his

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   experience and knowledge as a mechanic, the shields contained asbestos. [*Id.*] Mr. Miller and

2   others used Dexter-brand "black and yellow" two-part epoxies. [*Id.*] He also used thousands of

3   "Adell" clamps that had an asbestos-like padding or sleeve material lining the metal portion. [*Id.*]

4   And he removed and installed fuselage insulation. [*Id.*]

5          As an adult, Timothy Vest flew planes for Emery from 1990 to 2001. [Facts 237-245.]

6   Emery operated primarily McDonnell Douglas DC-8 aircraft on cargo flights throughout the

7   United States and the world. [*Id.*] Unlike domestic flights, on international flights the planes

8   carried a mechanic and thousands of pounds of aircraft tools and parts. [*Id.*] The planes traveled

9   to third-world countries and needed to perform their own repairs to avoid getting stranded. [*Id.*]

10  Timothy observed the mechanics working on the engines, and he helped by lending a hand where

11  possible. [*Id.*] When flying domestically, Timothy observed aircraft maintenance work at all

12  airports where Emery had facilities. [*Id.*] Most of Emery's planes were old and needed repairs all

13  the time, including pneumatic-system and engine work. [*Id.*] That maintenance work occurred at

14  airports around the country. [*Id.*] Apart from Timothy's pre-flight inspections of Emery's 40 DC-

15  8 aircraft, and its several DC-10s, he saw the mechanics doing their jobs hundreds of times. [*Id.*]

16          He saw the noses and side-panels of the planes being repaired, repairs of the hydraulic

17  systems, and repairs of the engine components. [Facts 246-253.] Timothy closely observed the

18  Emery mechanics' work on the MDC aircraft to ensure they were doing a proper job, and he

19  assisted them when possible. [*Id.*] Apart from the work at Emery's airport bases, Timothy

20  observed work on the DC-8s hundreds of times at specialized maintenance facilities. [*Id.*] He saw

21  the different levels of heavy maintenance, termed A, B, C and D checks, where the planes were

22  torn apart and put back together. [*Id.*] All of the hydraulic, pneumatic, fire-protection and engine

23  systems were overhauled over a period of hours or days. [*Id.*] He has seen mechanics use epoxy

24  adhesives to repair damaged surfaces on the aircraft, which included sanding the epoxy once it

25  dried. [*Id.*] When nose-cones were damaged by bird or lightning strikes, the affected areas were

26  filled with epoxies and sanded smooth. [*Id.*] The epoxies also were used to seal leaks and for

27  other applications in the engine spaces. [*Id.*]

28          John Templin is a certified industrial hygienist who, in his accompanying declaration,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
JACK LONDON MARKET
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  explains Timothy Vest's asbestos-exposure levels and the historical knowledge of asbestos-related

2  health hazards. [Facts 254-255.] John Templin's extensive qualifications and the detailed bases

3  for his conclusions are set forth in his declaration, which is incorporated fully herein by reference.

4  [Id.] The physical and aerodynamic properties of asbestos facilitate re-entrainment and

5  re-suspension of asbestos fibers once a space is contaminated. [Id.] The respirable asbestos fibers

6  that are released into the air will remain there for up to many hours before they alight on surfaces.

7  [Id.] Those fibers, once they do come to rest, are then subject to re-entrainment. [Id.]

8  Re-entrainment describes the physical action of air, movement, vibration, and physical impact that

9  aerodynamically causes asbestos fibers to take flight and become airborne. [Id.] It can be caused

10  by ordinary movement of people and objects and also by air currents. [Id.] It is also caused by

11  disturbances to the environment such as sweeping, cleaning, blowing areas down, and even

12  walking through microscopic asbestos-containing debris or dust. [Id.] Fibers can move laterally

13  with air currents and contaminate areas far from the release point, up to hundreds of meters away.

14  [Id.] They can also move across contamination barriers with the passage of workers during

15  removal of material. [Id.] And the fibers persist almost indefinitely and create a continuous

16  source of exposure when they are present in occupied buildings. [Id.] John Templin explains that

17  these principles of re-entrainment, and the risk of asbestos exposure to those well beyond the

18  source of fiber release, have been widely scientifically known since at least the 1960s. [Id.] He

19  cites several scientific sources from the 1920s to 1940s addressing this topic. [Id.]

20      Based on John Templin's review of the case-specific evidence enumerated in his

21  declaration, Timothy Vest was exposed to substantial levels of asbestos-containing dust from the

22  aircraft parts used in Hangar 110 from 1972 to 1983; and from parts used on Emery's aircraft

23  during the 1990s. [Facts 256-258.] Timothy breathed large amounts of visible

24  asbestos-containing dust that was created by his own activities, and by work done in his and his

25  father's vicinity. [Id.] Hangar 110 at the Oakland Airport, occupied by World Airways, was the

26  primary location where Timothy Vest inhaled asbestos. [Id.] He was exposed while at the hangar

27  on dozens of occasions, and was exposed to dust tracked home on his father's clothing. [Id.] The

28  materials that released respirable asbestos fibers to which he was exposed included aircraft parts

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    used on the DC-8 and DC-10 models operated by World and continuously maintained in the

2    hangar. [*Id.*] Visible dust was released by the sanding of Dexter-brand epoxy adhesives; the

3    removal and reinstallation of worn heat blankets and shields; the handling of old insulated clamps;

4    and the scraping of gaskets and tapes. [*Id.*] Timothy Vest experienced substantial levels of

5    asbestos exposure as a pilot for Emery in the 1990s. [*Id.*] He assisted and observed aircraft

6    mechanics, on hundreds of occasions, working on Emery's fleet of McDonnell Douglas DC-8 and

7    DC-10 models. [*Id.*] The aircraft parts that released asbestos dust to which he was exposed

8    include all the materials described above: Dexter-brand epoxy adhesives, heat blankets and

9    shields, insulated clamps, gaskets and tapes. [*Id.*] Although these exposures occurred in the

10   1990s, MDC's 1992 All Operator Letter confirms the relevant asbestos-containing parts still were

11   required to be used on the aircraft. [*Id.*]

12        John Templin further explains, in great detail, that it was widely known and understood by

13   1960 – certainly within the industrial-hygiene community – that workers, bystanders and even

14   household members of those working with and around asbestos-containing products were at

15   substantially increased risk of being exposed to asbestos from the type of products and activities

16   that Timothy Vest and his father encountered; and of developing an asbestos-related disease, such

17   as mesothelioma, as a result of those exposures. [Fact 259.] In fact, by 1964 when Dr. Irving

18   Selikoff and his colleagues published their seminal epidemiological study demonstrating the

19   mortality experience of workers who had been exposed to asbestos insulation, the causal

20   connection between asbestos exposure and mesothelioma was unquestioned in the medical and

21   scientific communities in the United States. [*Id.*] When Timothy Vest inhaled asbestos-

22   containing dust from aircraft parts in the 1970s, 1980s and 1990s, it was entirely foreseeable that

23   his asbestos exposure could cause him to suffer serious or fatal diseases including, among others,

24   mesothelioma cancer. [*Id.*]

25   **B.    Timothy Vest's Mesothelioma was Caused by Asbestos**

26        Samuel P. Hammar, M.D. is a pathologist who, in his accompanying declaration, explains

27   Timothy Vest's asbestos-caused malignant mesothelioma. [Facts 260-261.] Dr. Hammar's

28   extensive qualifications and the detailed bases for his conclusions are set forth in his declaration,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA    12

**EXHIBIT C - Page 152**

**Exhibit B - Page 292**

1  which is incorporated fully herein by reference. [Id.] There is an extraordinarily strong link

2  between mesothelioma and asbestos dust, such that it is largely undisputed in the scientific

3  community that asbestos causes diffuse malignant mesothelioma. [Id.] And because diffuse and

4  localized mesothelioma cells are chemically and structurally identical, it is also true that asbestos

5  causes localized malignant mesothelioma – regardless of the tumor's size when detected. [Id.]

6  This fact is supported by the documented asbestos-exposure histories of the patients described in

7  the articles by Nakas, et al. and Allen, et al. (which Dr. Hammar co-authored) [Id.] For the Nakas,

8  et al. patients, nine out of ten had prior occupational-level exposures to asbestos. [Id.] And the

9  limited available information pertaining to the Allen, et al. patients revealed that four had prior

10  occupational-level exposures to asbestos. [Id.]

11       Timothy Vest's pathology slides demonstrate malignant mesothelioma cancer cells on the

12  pleural tissue in his chest. [Fact 262.] Adjacent to the cancer cells is mildly to markedly

13  thickened pleural tissue with a hyaline (glassy) appearance, which are pleural plaques caused by

14  asbestos. [Id.] Given the presence of pleural plaques, his mesothelioma was unquestionably

15  caused by occupational-level exposure to asbestos. [Id.] Pleural plaques are localized scars that

16  form due to prolonged exposure to asbestos fibers. [Id.] These scars almost never form for

17  reasons other than asbestos exposure. [Id.] But even if the pleural plaques did not exist, it remains

18  true that Timothy Vest's mesothelioma was caused by asbestos because of his documented

19  exposure to asbestos in occupational and para-occupational settings. [Id.] His mesothelioma was

20  caused by his total lifetime dose of asbestos. [Id.] All of Timothy Vest's individual asbestos

21  exposures contributed to his total dose and increased his risk of developing the disease. [Id.]

22  There is no known safe level of asbestos exposure. [Id.]

23       William R. Salyer, M.D. is a pathologist who, in his accompanying declaration, further

24  explains Timothy Vest's asbestos-caused diffuse malignant mesothelioma. [Facts 263-264.]

25  Dr. Salyer's extensive qualifications and the detailed bases for his conclusions are set forth in his

26  declaration, which is incorporated fully herein by reference. [Id.] Dr. Salyer has treated several

27  patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. [Id.] That

28  is, when the mesotheliomas were first detected in the patients, the tumors appeared to be localized

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   masses -- what some in the scientific literature have described as "localized malignant

2   mesothelioma." [*Id.*] All of those patients died of the disease soon after diagnosis. [*Id.*] Those

3   patients' tumors, although localized in their initial appearance, were in fact diffuse mesotheliomas

4   that were detected earlier than usual. [*Id.*] And each patient's diffuse mesothelioma was caused

5   by exposure to asbestos. [*Id.*]

6       Based on the scientific literature pertaining to "localized" malignant mesothelioma, there is

7   no evidence it is a different disease from diffuse mesothelioma. [Facts 265-266.] Although there

8   may appear to be a larger number of longer-term survivors whose disease was "localized," that is

9   because the patients were very fortunate to have an early discovery of their disease and underwent

10   surgical amelioration to slow its progression. [*Id.*] Many of those patients developed a recurrence

11   of the disease and died. [*Id.*] Timothy Vest suffers from malignant mesothelioma that was

12   detected at an early stage of its development. [*Id.*.] Even if Timothy Vest's tumor was initially

13   localized, he has a very high risk of local recurrence of his tumor and of metastatic disease. [*Id.*]

14   Timothy Vest almost certainly will die of the disease. [*Id.*] His pathology slides demonstrate

15   what are, in fact, diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest.

16   [*Id.*] Adjacent to the cancer cells are pleural plaques caused by asbestos. [*Id.*] Given the presence

17   of pleural plaques, and Timothy Vest's documented exposure to asbestos in occupational and para-

18   occupational settings, his mesothelioma was unquestionably caused by asbestos. [*Id.*] Even if the

19   pleural plaques did not exist, it remains true that Timothy Vest's mesothelioma was caused by

20   asbestos. [*Id.*] All of his individual exposures contributed to his total lifetime dose of asbestos

21   and thereby caused the disease. [*Id.*]

22  **III.**   **Legal Argument**

23      **A.**   **Moving Defendant's Burden of Proof**

24      A defendant's motion for summary judgment should be granted [only] if no triable
        issue exists as to any material fact and the defendant is entitled to a judgment as a

25      matter of law. [Code Civ. Proc. § 437c(c).] The burden of persuasion remains with
        the party moving for summary judgment. [*Aguilar v. Atlantic Richfield Co.* (2001)

26      25 Cal.4th 826, 850, 861.]

27   [*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see Code Civ. Proc.

28   § 437c(p)(2).] "[F]rom commencement to conclusion, the party moving for summary judgment

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  bears the burden of persuasion that there is no triable issue of material fact . . ." [*Aguilar*, *supra*,

2  25 Cal.4th 826, 850.] This means the moving defendant must show that if the defendant's

3  evidence is uncontroverted, no reasonable trier of fact could find for the plaintiff. [*Id.* at 851.]

4  Only if the defendant makes that showing does the burden shift to plaintiff to demonstrate the

5  existence of a triable issue of material fact. [*Id.*]

> 6  The defendant must show that the plaintiff *does not possess* needed evidence,
> because otherwise the plaintiff might be able to establish the elements of the cause
> 7  of action; the defendant must also show that the plaintiff *cannot reasonably obtain*
> needed evidence, because the plaintiff must be allowed a reasonable opportunity to
> 8  oppose the motion. [*Id.* at 854 (emphasis in original).]

9  A moving defendant must affirmatively show the plaintiff lacks the needed evidence;

10  simply pointing to a claimed absence is not enough. [*Id.* at 854-855.] The defendant's evidence

11  must include "affidavits, declarations, admissions, answers to interrogatories, depositions, and

12  matters of which 'judicial notice' must or may 'be taken.'" [*Id.* at 855, citing Code Civ. Proc. §

13  437c(b).] Nor is it enough to merely assert that plaintiff failed to provide the information. The

14  defendant must prove "plaintiffs failed to provide meaningful responses to comprehensive

15  interrogatories designed to elicit all the evidence plaintiffs had to support their contention of

16  liability." [*Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1442.]

17  Only admissible evidence may be considered, and the moving defendant must include all

18  evidence offered to meet its evidentiary burden in its "separate statement." [Code Civ. Proc.

19  § 437c(d).] "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate

20  statement, *it does not exist*." [*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327,

21  337 (emphasis in original).] The strict requirements a moving party must satisfy were explained in

22  *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631-632:

> 23  One of the more basic requirements is that the papers supporting a section 437c
> motion "shall include a separate statement setting forth plainly and concisely all
> 24  material facts which the moving party contends are undisputed." [*Id.*, Code Civ.
> Proc. § 437c(b)(1); see CRC 3.1350(d).] In addition, each material fact set forth in
> 25  the separate statement "shall be followed by a reference to the supporting
> evidence." [Code Civ. Proc. § 437c(b)(1).]

26  In ruling, "the court must consider all of the evidence and all of the inferences reasonably

27  drawn therefrom ... and must view such evidence ... and such inferences ... in the light most

28  favorable to the opposing party." [*Aguilar*, 25 Cal.4th 826, 844-845.] "'[B]ecause of the drastic

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   nature of the summary judgment procedure, and the importance of safeguarding the adverse

2   party's right to a trial, the moving party must make a strong showing. [Its] affidavits are strictly

3   construed ...On the other hand, the affidavits of the party opposing the motion are liberally

4   construed.'" [*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 838-839 (emphasis

5   added).]

6       **B.**    **MDC Fails to Establish Plaintiffs Lack Evidence of Causation**

7       MDC is responsible under products liability principles for all injuries caused by its

8   defective asbestos-containing aircraft – including the originally-installed parts and the parts MDC

9   required to be used in its planes' maintenance. [*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d

10  379, 382-383; *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261.][5] Bystander victims are

11  owed a duty of care, and are entitled to even greater protection, because they are perfectly

12  foreseeable victims of defective products and have no opportunity to discover the hazards.

13  [*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 585-586; *Nelson v. Superior Court*

14  (2006) 144 Cal.App.4th 689, 695.] Even household members injured by toxins unwittingly

15  tracked home by workers are owed a duty of care, so long as there is evidence of a specific toxin

16  that caused a specific injury. [*Oddone v. Superior Court (Technicolor, Inc.)* (2009) 179

17  Cal.App.4th 813, 872-873.]

18      The California Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953

19  established the causation standard for asbestos-cancer cases:

20

21  _____

22    [5]Manufacturers owe a duty to warn of hazards arising from the foreseeable and required uses of their products, including such uses in conjunction with other defective products. [*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129

23  Cal.App.4th 577, 581-583 (power tools and attachments); *Torres v. Xomox Corporation* (1996) 49 Cal.App.4th 1, 17-19 (valve and acid); *Huynh v. Ingersoll-Rand* (1993) 16

24  Cal.App.4th 825, 833 (grinder and disc); *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1230-1231 (water gun and fire truck); *DeLeon v. Commercial*

25  *Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 343-347 (holding bin and overhead equipment). The court in *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171

26  Cal.App.4th 564, did not hold that manufacturers would be immune if they had specifically

27  intended and required that asbestos-containing replacement parts be used with their equipment. [*Id.* at 590-591.] In fact, the court cited with approval a Washington Supreme

28  Court case that held equipment manufacturers could be liable if they specified asbestos-containing replacement components for use with their equipment. [*Id.*]

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    [P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating
     that the plaintiff's exposure to defendant's asbestos-containing product in
2    reasonable medical probability was a substantial factor in contributing to the
     aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence
3    to the *risk* of developing asbestos-related cancer . . .

4  [*Id.* at 976-977 (emphasis original).] Plaintiffs may prove Timothy Vest's mesothelioma was

5  "cumulative in nature, with many separate exposures each having constituted a 'substantial factor'

6  (citation) that contributed to his risk of injury." [*Id.* at 958.] But plaintiffs "need *not* prove that

7  fibers from the defendant's product were the ones, or among the ones, that actually began the

8  process of malignant cellular growth." [*Id.* at 982-983 (emphasis original).]

9       MDC demonstrates no lack of proof its asbestos-containing aircraft constituted a

10  substantial-factor cause of Timothy Vest's asbestos-related mesothelioma. First, MDC presents no

11  evidence it propounded comprehensive discovery requests, much less that plaintiffs' responses to

12  any such discovery it propounded were in any way devoid of facts and evidence supporting each

13  essential element of the complaint's causes of action and damages claims against MDC. [Alleged

14  Facts 1-63; *Weber, supra*, 143 Cal.App.4th 1433, 1442.] MDC in its separate statement simply

15  mentions no special interrogatories propounded by MDC to plaintiffs. [*Id.*] Instead, MDC cites

16  limited portions of Timothy Vest's and Warren Vest's deposition testimony, ignoring the portions

17  that are unfavorable to MDC's position.

18       Second, MDC cites the inadmissible declarations of Larry Fogg, Timothy Lloyd and

19  Michael Schmidt in a failed effort to prove MDC's aircraft had few asbestos-containing parts, and

20  that MDC had no involvement in those planes' maintenance. [Alleged Facts 1-63; Fact 267.] As

21  plaintiffs explain in their evidentiary objections, Mr. Fogg's declarations are inadmissible hearsay

22  created several years ago for other lawsuits. [Evid. Code § 1200; Code Civ. Proc. § 437c(b),(d).]

23  All of the declarations must be disregarded because MDC refuses to produce Mr. Fogg, Mr. Lloyd

24  and Mr. Schmidt for deposition – thereby concealing relevant evidence. [Fact 267; Code Civ.

25  Proc. § 437c(h).] At most, these witnesses set forth MDC's one-sided view of the case, all of

26  which is contradicted by plaintiffs' additional evidence. [Facts 64-267.]

27       Third, on the medical-causation issue, MDC offers no conclusive evidence that Timothy

28  Vest's mesothelioma purportedly is unrelated to his asbestos exposure. [Alleged Facts 1-63.]

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   Instead, MDC offers the unpersuasive opinion of Dr. Travis who, based on his status as a co-

2   author of a single article, opines that no scientist could ever determine the cause of Timothy Vest's

3   cancer because it has been described as "localized." [Id.] Dr. Travis's opinion demonstrates

4   nothing about plaintiffs' ability to marshal competent expert testimony to prove Timothy Vest's

5   malignant mesothelioma is, indeed, asbestos-related. [Id.] In fact, plaintiffs submit the

6   declarations of Dr. Salyer and Dr. Hammar (co-author of Dr. Travis's article), showing Timothy

7   Vest's mesothelioma was unquestionably caused by asbestos and will kill him. [Facts 260-266.]

8            **1.**    **Plaintiffs' Additional Evidence Requires a Trial**

9         Under *Jiminez, supra, Vandermark, supra* and *Rutherford, supra*, MDC is liable for its

10   supply and specification of asbestos-containing aircraft parts that were a substantial-factor cause of

11   Timothy Vest's mesothelioma. MDC installed dozens of asbestos materials on its aircraft, and

12   World operated approximately 16 of those planes when Timothy and his father were in Hangar

13   110 from 1973 to 1983. [Facts 64-259.] Many of those planes were purchased new from 1979 to

14   1981. [Facts 64-259.] Timothy Vest was also exposed to Emery's fleet of MDC planes in the

15   1990s. [Id.] Many of the toxic components – including heat shields, heat blankets, clamps,

16   gaskets, tape and insulation – remained in the aircraft for extended periods and released asbestos

17   fibers whenever they were handled, removed and reinstalled during inspections. [Id.] And MDC

18   required that other toxic components – including Dexter adhesive – were required to be used and

19   sanded in a manner that released asbestos in maintaining MDC's planes. [Id.] MDC controlled

20   every aspect of its planes' maintenance and operation, and its catalogues and manuals specified the

21   use of asbestos parts into the 1990s – decades after MDC became aware of the hazards. [Id.] Safe

22   alternative materials could not be used without MDC's analysis and express permission. [Id.]

23   MDC maintained a constant connection to its aircraft, even after they were transferred between

24   owners. [Id.]

25         Industrial hygienist John Templin explains how Timothy Vest inhaled substantial levels of

26   asbestos from these products and activities; and that the hazards were foreseeable to MDC and it

27   could have discovered and fixed the problems at any time from the 1970s through the 1990s. [Id.]

28   Pathologists Samuel Hammar and William Salyer confirm that Timothy Vest's mesothelioma –

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   whether described as "localized" or not – was unquestionably caused by Timothy's occupational-

2   levels of asbestos exposure from all sources. [*Id.*] All of these facts are supported by the sworn

3   statements of Timothy Vest, Warren Vest, Claude Fross, James Hales, Stanley Lehmann, Murray

4   Gordon, Colleen Rule, David Miller, John Templin, Samuel Hammar and William Salyer. [*Id.*]

5       **C.**    **Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid**

6       MDC may be liable under Civil Code sections 1708 and 1710 for concealing important

7   facts pertaining to hidden asbestos-related health hazards. The active concealment of facts by even

8   "a non-fiduciary is the equivalent of a false representation, i.e., *actual fraud*." [5 Witkin, Cal.

9   Procedure (4th ed. 1997) Pleading § 678, p. 136 (emphasis added); *Quirici v. Freeman* (1950) 98

10  Cal.App.2d 194, 201 (intentional concealment supports fraud claim).] And MDC may be liable

11  for asbestos exposures from <u>any</u> source caused by the conspiracy in which MDC participated to

12  suppress information about asbestos dangers. [*Stone v. Regents of University of Cal.* (1999) 77

13  Cal.App.4th 736, 748 fn. 9.] The jury may award punitive damages in intentional-tort and

14  unintentional-tort actions for negligent conduct. [*Potter v. Firestone Tire & Rubber Co.* (1993) 6

15  Cal.4th 965, 1005; *SKF Farms v. Super. Ct.* (1984) 153 Cal.App.3d 902, 907.] Punitive damages

16  may be based on a defendant's knowing and reckless failure to warn of hazards, where it is shown

17  that actions were taken in conscious disregard of the rights or safety of others, including the

18  plaintiffs. [Civ. Code § 3294; *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-401.]

19      Here, as previously explained, MDC demonstrates no absence of evidence it concealed the

20  latent asbestos hazards of its aircraft. But plaintiffs nevertheless present the testimony of Murray

21  Gordon, Colleen Rule and Stanley Lehman, proving MDC knew of asbestos hazards in 1972 and

22  took steps to protect its own workers; received further knowledge in 1977 when the manufacturer

23  of Dexter adhesives issued warnings; but MDC communicated nothing to its customers until 1989

24  and 1992, when it issued the AOLs on asbestos parts. So MDC knew it was exposing workers and

25  their families to toxic asbestos, yet MDC failed to warn or use safe products. Such evidence easily

26  supports the reasonable inference that MDC acted fraudulently and in conscious disregard of the

27  health and safety of others, including Timothy Vest and his father.

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      19

**EXHIBIT C - Page 159**

**Exhibit B - Page 299**

1    **D.    The Motion must be Continued or Denied Under CCP 437c(h)**

2        Despite the Court's order to produce specific aircraft manuals, parts catalogues, All

3    Operator Letters and documents demonstrating MDC's historical knowledge of asbestos hazards,

4    MDC has not satisfied its discovery obligations. [Fact 267] MDC provided 14 encrypted compact

5    discs, which contain images of documents that cannot be printed, cannot be electronically searched

6    and cannot be converted to a format that is electronically searchable. [*Id.*]

7        MDC relies on witnesses Timothy Lloyd, Michael Schmidt and Larry Fogg. [*Id.*] Despite

8    MDC's submission of these witnesses' declarations in support of its motion for summary

9    judgment/adjudication, MDC refuses to make Mr. Lloyd, Mr. Schmidt and Mr. Fogg available for

10   deposition. [*Id.*] These percipient witnesses have information concerning the originally-installed

11   and replacement asbestos-containing parts that MDC required to be used on its aircraft. [*Id.*]

12       David Miller's and Joseph Robison's upcoming deposition testimony will further confirm

13   that MDC's asbestos-containing aircraft parts were pervasively used in Hangar 110 from 1973

14   through 1983. [*Id.*] Both Miller and Robison worked in Hangar 110 during all relevant years and

15   are essential percipient witnesses. [*Id.*] Additional percipient witnesses who will be deposed

16   include Glen Cartwright and Mike Pociecha, both of whom worked for World in Hangar 110.

17   [*Id.*] Further, pared-down expert witness disclosures are due January 14, 2011, and the subsequent

18   depositions of all parties' medical-causation expert witnesses will produce further evidence that

19   Timothy Vest's mesothelioma was caused by asbestos. [*Id.*] Facts that further justify opposition

20   to this motion may exist, but cannot now be presented. [*Id.*] So this motion must be denied, but at

21   a minimum it must be continued. [Code Civ. Proc. § 437c(h); *Bahl v. Bank of America* (2001) 89

22   Cal.App.4th 389, 395.]

23   **IV.    Conclusion**

24       MDC demonstrates no absence of evidence in support of any cause of action or claim for
damages raised in the complaint. And plaintiffs' additional evidence requires a trial to resolve all
25   challenged causes of action and claims for damages.
DATED: December 30, 2010          KAZAN, McCLAIN, LYONS,
26                                                      GREENWOOD & HARLEY
                                                        A Professional Law Corporation
27

                                                        By
28                                                            Michael T. Stewart
                                                        Attorneys for Plaintiffs

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          20

**EXHIBIT C - Page 160**

**Exhibit B - Page 300**

1  James L. Oberman, Esq. (C.S.B. #120938)
   Michael T. Stewart, Esq. (C.S.B. #253851)
2  KAZAN, McCLAIN, LYONS,
   GREENWOOD & HARLEY
3  A Professional Law Corporation
   Jack London Market
4  55 Harrison Street, Suite 400
   Oakland, California  94607
5  Telephone:  (510) 302-1000

6  Attorneys for Plaintiffs

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF ALAMEDA

10 TIMOTHY VEST and CAROLINE VEST,     No. RG09489518

11              Plaintiffs,            **PLAINTIFFS' MEMORANDUM OF POINTS
                                       AND AUTHORITIES IN OPPOSITION TO**
12      vs.                            **DEFENDANT McDONNELL DOUGLAS
                                       CORPORATION'S MOTION FOR SUMMARY**
13 ALLIED PACKING & SUPPLY, INC., et   **JUDGMENT OR, IN THE ALTERNATIVE,**
   al.,                                **SUMMARY ADJUDICATION**
14

15              Defendants.            Date:        January 14, 2011
                                       Time:        9:36 am
16                                     Dept.:       30 (Hon. Kenneth Mark Burr)
                                       Case Filed:  December 17, 2009
17                                     Trial Date:  February 14, 2011

18                                     **Reservation No: R1092700**

19

20

21

22

23

24

25

26

27

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA

1

## TABLE OF CONTENTS

2  I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  II.   Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4        A.    Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'
             Hangar 110, and as a Pilot for Emery Worldwide. . . . . . . . . . . . . . . . . . . . . . . 2
5
       B.    Timothy Vest's Mesothelioma was Caused by Asbestos. . . . . . . . . . . . . . . . . . . 12
6
   III.  Legal Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
7
       A.    Moving Defendant's Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
8
       B.    MDC Fails to Establish Plaintiffs Lack Evidence of Causation. . . . . . . . . . . . . . 16
9
             1.    Plaintiffs' Additional Evidence Requires a Trial. . . . . . . . . . . . . . . . . . . . 18
10
       C.    Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid. . . . . . . . . 19
11
       D.    The Motion must be Continued or Denied Under CCP 437c(h). . . . . . . . . . . . . . . 20
12
   IV.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      i

1                             TABLE OF AUTHORITIES

2   <u>State Statutes</u>

3   Civil Code section 1708. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4   Civil Code section 1710. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5   Civil Code section 3294. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

6   Code of Civil Procedure section 437c(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

7   Code of Civil Procedure section 437c(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8   Code of Civil Procedure section 437c(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

9   Code of Civil Procedure section 437c(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17, 20

10  Code of Civil Procedure section 437c(p)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11  Evidence Code section 1200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12  Evidence Code section 1220. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

13  Evidence Code section 1221. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

14  Evidence Code section 1222. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

15  Evidence Code section 1230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

16  Evidence Code section 1290. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

17  Evidence Code section 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18  Evidence Code section 1292. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

19  <u>State Cases</u>

20  *Aguilar v. Atlantic Richfield Co.*
21  (2001) 25 Cal.4th 826. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

    *Bahl v. Bank of America*
22  (2001) 89 Cal.App.4th 389. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

23  *Binder v. Aetna Life Ins. Co.*
    (1999) 75 Cal.App.4th 832. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
24

25  *DeLeon v. Commercial Manufacturing & Supply Co.*
    (1983) 148 Cal.App.3d 336. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

26  *Elmore v. American Motors Corp.*
    (1969) 70 Cal.2d 578. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
27

    *Haney v. Aramark Uniform Services, Inc.*
28  (2004) 121 Cal.App.4th 623. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

*Hilliard v. A.H. Robins Co.*
(1983) 148 Cal.App.3d 374. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Huynh v. Ingersoll-Rand*
(1993) 16 Cal.App.4th 825. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jiminez v. Sears, Roebuck & Co.*
(1971) 4 Cal.3d 379. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Kahn v. East Side Union High School Dist.*
(2003) 31 Cal.4th 990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nelson v. Superior Court*
(2006) 144 Cal.App.4th 689. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Oddone v. Superior Court (Technicolor, Inc.)*
(2009) 179 Cal.App.4th 813. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Potter v. Firestone Tire & Rubber Co.*
(1993) 6 Cal.4th 965. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Quirici v. Freeman*
(1950) 98 Cal.App.2d 194. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rutherford v. Owens-Illinois, Inc.*
(1997) 16 Cal.4th 953. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*SKF Farms v. Super. Ct.*
(1984) 153 Cal.App.3d 902. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stone v. Regents of University of Cal.*
(1999) 77 Cal.App.4th 736. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Taylor v. Elliott Turbomachinery Co., Inc.*
(2009) 171 Cal.App.4th 564. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.*
(2004) 129 Cal.App.4th 577. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Torres v. Xomox Corporation*
(1996) 49 Cal.App.4th 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United Community Church v. Garcin*
(1991) 231 Cal.App.3d 327. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Vandermark v. Ford Motor Co.*
(1964) 61 Cal.2d 256. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Weber v. John Crane, Inc.*
(2006) 143 Cal.App.4th 1433. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Wright v. Stang Manufacturing Co.*
(1997) 54 Cal.App.4th 1218. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1 | Other Authorities

2 | 5 Witkin, Cal. Procedure
(4th ed. 1997) Pleading § 678. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
3

Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial
4 | (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25

26

27

28

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA     iv

**EXHIBIT D - Page 165**

## I.   Introduction

The motion of defendant McDonnell Douglas Corporation ("MDC") for summary judgment or, in the alternative, summary adjudication fails for three reasons. First, this Court on December 10, 2010 ordered MDC to produce aircraft manuals, parts catalogues, All Operator Letters and records pertaining to MDC's historical knowledge of asbestos hazards. The order cites MDC's representation that it could and would immediately comply. But instead, MDC produced 14 encrypted CDs that cannot be printed or electronically searched without a password – which MDC will not share. And MDC bases this motion on the declarations of Larry Fogg, Timothy Lloyd and Michael Schmidt, while at the same time refusing to make these percipient witnesses available for deposition. MDC cannot benefit from its misuses of the discovery process, so this motion should be denied, and at a minimum must be continued, under Code of Civil Procedure section 437c(h).

Second, MDC demonstrates no lack of evidence in support of any cause of action or claim for damages raised in the complaint. Nothing in MDC's separate statement shows MDC propounded any special interrogatories seeking all of plaintiffs' witnesses and documents, much less that plaintiffs' responses were in any way factually devoid. Instead, MDC cites limited excerpts of the deposition testimony of plaintiff Timothy Vest and his father, Warren Vest. While ignoring the availability of other competent evidence, MDC improperly asserts all of plaintiffs' claims must fail for lack of asbestos-exposure evidence. And MDC asserts Timothy Vest's mesothelioma was not caused by asbestos exposure. But MDC's proffered declaration of Dr. Travis is easily contradicted by the opinions of plaintiffs' medical expert witnesses.

Third, plaintiffs' additional evidence, including the declarations of industrial hygienist John Templin, pathologist Samuel P. Hammar, M.D. and pathologist William R. Salyer, M.D., raises triable issues of fact as to whether MDC is liable for the injuries to Timothy Vest caused by its defective aircraft – including the planes' originally-installed asbestos-containing parts and the replacement asbestos-containing parts that MDC required to be used. Based on the relevant percipient-witness testimony and the historically available scientific knowledge, John Templin explains MDC should have known Timothy Vest and others in aircraft maintenance facilities were

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  at risk of mesothelioma.  Mr. Vest foreseeably inhaled substantial amounts of airborne asbestos

2  fibers from parts used on the MDC aircraft operated by World Airways and Emery Worldwide in

3  the 1970s, 1980s and 1990s. Based on Timothy Vest's tissue samples, his documented history of

4  occupational-level asbestos exposure and other scientific evidence, Dr. Hammar and Dr. Salyer

5  explain Timothy Vest's mesothelioma was unquestionably caused by asbestos.

6  **II.    Statement of Facts**

7  **A.    Timothy Vest Inhaled Asbestos from Aircraft Parts at World Airways'
        Hangar 110, and as a Pilot for Emery Worldwide**

8

9  On May 28, 2010, plaintiffs filed their Second Amended Complaint for personal injuries,

10  negligence, strict products liability, fraud, conspiracy to defraud and loss of consortium against

11  defendants, including MDC, who are alleged to have exposed Timothy Vest to asbestos that was a

12  substantial factor in causing his mesothelioma.[1]  [Facts 64-65.] The complaint alleges, among

13  other things, that Timothy Vest was continually exposed to defendants' asbestos-containing

14  materials from at least 1973 to 1983 at World Airways' facilities in Oakland, California; and as a

15  pilot for Emery Worldwide from 1990 to 2001.  [*Id.*]

16  Timothy Vest lived in Dublin, California as a child from at least 1972 to 1983. [Facts 66-

17  77.]  After working abroad, his father Warren Vest lived in the family home from mid-1973

18  onward.  [*Id.*]  Warren was an airline pilot based out of World's headquarters at the Oakland

19  Airport.  [*Id.*]  He worked at World's new office building and maintenance hangar, known as

20  Hangar 110, from the early 1970s through the late 1980s.  [*Id.*]  After the construction was

21  finished, Timothy regularly visited Hangar 110 because his father worked in the building.  [*Id.*]

22  Timothy spent approximately an hour in the hangar before his father flew away on multi-day trips.

23  [*Id.*]  And he spent several hours in the hangar when his father did weekend office work, at least

24  twice a month.  [*Id.*]  Timothy continuously visited the hangar at this rate from the time he was

25  eight years of age until he was seventeen.  [*Id.*]  As a teenager he wanted to be in the hangar

26  because he was training for his own pilot's license.  [*Id.*]  Timothy never was told of restrictions

27  against being in the hangar, and there were no signs posted. [*Id.*]  Nor was he warned about the

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

[1] The complaint is admissible here to frame the issues raised in the pleadings and to assess the materiality of the facts in dispute. [Rylaarsdam & Edmon, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2010) ¶¶ 10:51, 10:51.1.]

1  asbestos in the hangar. [*Id.*] He did not learn until after 2000 that asbestos is hazardous. [*Id.*]

2      On those weekend trips, Timothy spent his time exploring the nooks and crannies

3  throughout the hangar and watching the nearly constant aircraft maintenance work. [Facts 78-87.]

4  The hangar had an office complex at the front entrance, and an enclosed maintenance area for the

5  aircraft. [*Id.*] He befriended one of the security guards, so he had free run of the hangar. [*Id.*]

6  Timothy explored throughout the internal buildings and structures, including where the aircraft

7  maintenance tools and parts were stored. [*Id.*] He explored the maintenance facility in this way

8  until he became a teenager, and then was more interested in aircraft. [*Id.*] Aircraft maintenance

9  workers were nearby when Timothy was exploring. [*Id.*] The mechanics in the hangar knew he

10  was Warren Vest's son, so they allowed Timothy near the aircraft to learn how they worked. [*Id.*]

11  He saw McDonnell Douglas aircraft in the hangar, including the DC-10 model. [*Id.*] There was

12  almost always aircraft maintenance and painting occurring in the hangar during the dozens of

13  times he visited each year from the 1970s to 1980s. [*Id.*] He saw engines being worked on,

14  airplanes jacked up off the floor and inspection panels removed, including on the DC-10s. [*Id.*]

15      On days when Timothy did not accompany his father to the hangar, the two hugged when

16  his father came home from work. [Facts 88-95.] Warren did not immediately change out of his

17  work clothes. [*Id.*] Timothy's mother did most of the laundry, but Timothy helped by carrying the

18  family's dirty clothes out to the garage, where they were shaken out and washed. [*Id.*] Timothy's

19  own clothes were visibly dirty when he returned from the hangar. [*Id.*] His father wore varying

20  attire, including a pilot's uniform, a suit or business-casual clothes. [*Id.*] Warren worked 12 hours

21  per day and 6 days per week. [*Id.*] Warren's clothes appeared visibly dusty, with a chalky-white

22  color, when he returned home from the hangar. [*Id.*] Timothy carried his father's dirty work

23  clothes to help his mother. [*Id.*]

24      Warren Vest confirms he started working in World's Hangar 110 a few months after its

25  grand opening in 1973. [Facts 96-103.] He reported to the hangar every time he left for and

26  returned from a flight. [*Id.*] From the mid-1970s to the mid-1980s, Warren spent approximately

27  half of each month in the office, and half on flights. [*Id.*] He did his paperwork on the weekends

28  because he was a pilot; and his son Timothy came to the hangar on those days. [*Id.*] Timothy Vest

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  came to the hangar from 1973 through 1983, up to several times per month. [*Id.*] He spent some

2  of his time in the office area, where Warren had an office, and also spent hours in other areas of

3  the hangar. [*Id.*] Timothy Vest was allowed to be on the hangar floor, and he had the permission

4  of the security guards. [*Id.*] Aircraft maintenance occurred 24 hours per day, 7 days per week,

5  including when Timothy was present. [*Id.*]

6      Warren spent a lot of time in the maintenance area to ensure the work was on schedule and

7  the aircraft would be ready to fly. [Facts 104-115.] He was on the hangar floor up to several times

8  every day. [*Id.*] Warren spoke to the maintenance foreman in charge of a particular plane. [*Id.*]

9  His conversations lasted from 5 to 30 minutes. [*Id.*] During the 1973 to 1983 period, the planes in

10 the hangar included McDonnell Douglas DC-8 (six total) and DC-10 (ten total) models. [*Id.*]

11 Three of the DC-8s and nine of the DC-10s were purchased new by World. Those new DC-10s

12 were bought in 1979, 1980 and 1981. [*Id.*] Warren saw dust in the maintenance area, especially

13 when the large doors were opened and the wind blew in, stirring up the dust. [*Id.*] Normally only

14 one set of doors were opened, to avoid creating a dangerous wind tunnel in the hangar. [*Id.*] He

15 saw the mechanics install many parts, including engine parts, on the DC-8s and DC-10s in the

16 hangar. [*Id.*] The work included minor maintenance and major overhauls, lasting from one day to

17 several weeks. [*Id.*] Up to 40 mechanics worked on the planes together. [*Id.*]

18     Warren did not immediately change out of his work clothes when he returned home. [Facts

19 116-119.] Instead, he hugged and played with Timothy and had dinner. [*Id.*] Timothy Vest also

20 rode in the car that Warren drove to and from the hangar. [*Id.*] Warren Vest never received any

21 asbestos warnings during his employment at World. [*Id.*]

22     Claude Fross was World's facilities manager for Hangar 110 from its opening in 1973 until

23 1986. [Facts 120-127.] The hangar included an office area, shop areas and a large open space for

24 the aircraft. [*Id.*] There were "no holidays" in aircraft maintenance, so work on the planes

25 occurred all day, every day in the hangar. [*Id.*] They underwent varying degrees of maintenance

26 based on their hours in flight. [*Id.*] The planes included DC-8 and DC-10 models. [*Id.*] Every

27 time a plane was pushed out of the hangar, the cleaning crew came to clean up the mess. [*Id.*] The

28 large doors on each end of the hangar were usually closed. [*Id.*] And they were not opened at the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  same time because that would cause a wind tunnel. [*Id.*]

2      James Hales was an aircraft maintenance controller for World at Hangar 110 from 1984 to

3  1986. [Facts 128-139.] He had an office job in which he coordinated the schedule and ordered

4  parts, primarily for DC-10 models and some DC-8s. [*Id.*] World serviced those DC-10s and DC-

5  8s in the hangar. [*Id.*] Mr. Hales is now vice president of technical operations for World. [*Id.*]

6  The aircraft maintenance that occurred in Hangar 110 followed a precise schedule for each plane.

7  [*Id.*] The work on a DC-10 plane could last from days to weeks. [*Id.*] The lightest scheduled

8  maintenance, an "A" check, involved opening access panels and inspecting internal components

9  and systems. [*Id.*] A "B" check was similar but more extensive. [*Id.*] A "C" check involved

10  more invasive removal of structural parts and replacement of worn components. [*Id.*] A "D"

11  check took at least a month to complete and returned the plane to like-new condition. [*Id.*] Every

12  access panel was opened, landing gear was removed, engines were replaced, the cabin was stripped

13  and the plane was repainted. [*Id.*] The hangar floor was swept after each job. [*Id.*]

14      Maintenance programs for the aircraft changed as the planes aged and the airlines gave

15  feedback to the original manufacturer. [Facts 140-154.] The manufacturer of the plane

16  established the initial maintenance plan for an aircraft, and that plan was approved by the Federal

17  Aviation Administration. [*Id.*] MDC, as the manufacturer, supplied the aircraft maintenance

18  manual, the Illustrated Parts Catalogue, the wiring diagram manual and the structural repair

19  manual. [*Id.*] World relied on those publications and stored them in the technical library at

20  Hangar 110. [*Id.*] MDC also issued service bulletins and updated manuals that World conveyed

21  to its mechanics. [*Id.*] The mechanics working on DC-10s and DC-8s obtained replacement parts

22  by first consulting MDC's Illustrated Parts Catalogue, which showed exactly what part – listed by

23  number – needed to be retrieved from the stockroom or specially ordered. [*Id.*] MDC did not

24  make all the parts it specified, so some replacement parts were obtained from third-party suppliers.

25  [*Id.*] World needed MDC's approval to make any deviations from standard maintenance

26  procedures. [*Id.*] Any changes in the plan required the approval of the manufacturer. [*Id.*] The

27  airline was required to suggest the change to the manufacturer via a formal petition, and the

28  manufacturer then relied on its own engineers to gather data and evaluate the issue. [*Id.*] The

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA   5

**EXHIBIT D - Page 170**        **Exhibit B - Page 310**

1   main reason for this process was that changes to the flight characteristics of the plane could affect

2   its safety. [*Id.*] The base design of the plane, its type certificate, could not be changed without

3   permission from the manufacturer. [*Id.*] World also contacted the manufacturer to order certain

4   parts and to obtain drawings and technical data. [*Id.*] And MDC hosted annual conferences with

5   the airlines to discuss the operation of the DC-10 and DC-8 models. [*Id.*] It also issued All

6   Operator Letters to alert the airlines to safety issues, including asbestos. [*Id.*]

7         When aircraft engine access panels were opened for inspections, there were heat shields or

8   insulation blankets placed around the pneumatic systems. [Facts 155-166.] The shields and

9   blankets were bolted or wired in place, and had to be unfastened. [*Id.*] The outside surface of a

10  heat shield was metal, with a bolt hole running through it. [*Id.*] Heat shields were among the

11  asbestos-containing products which were used on aircraft in Hangar 110, and which required

12  hands-on contact. [*Id.*] Clamps were another asbestos part. [*Id.*] The clamps had an asbestos

13  sleeve covering the metal loop, and their purpose was to hold hydraulic lines, pneumatic lines and

14  wiring. [*Id.*] Asbestos materials were typically used in hot areas, while asbestos-free materials

15  were used in cooler areas. [*Id.*] Asbestos gaskets were used in the engines, and sometimes worn

16  gaskets had to be scraped off to leave a clean surface for the replacement part. [*Id.*] A wire brush

17  or sandpaper was used to scrape the gaskets. [*Id.*] Asbestos tape was also used in planes, to seal

18  the exhaust system. [*Id.*] Worn tape had to be scraped off before applying a new strip. [*Id.*] Mr.

19  Hales also recalls the use of epoxy adhesives made by Dexter. [*Id.*]

20        Stanley Lehmann is the designated corporate witness for Henkel Corporation, manufacturer

21  of Dexter-brand adhesive products – one of the asbestos-containing materials MDC required to be

22  used on its aircraft through at least 1992. [Facts 167-179, 217.] Attached to Mr. Lehmann's

23  declaration are some historical invoices showing sales of Dexter EA 934 two-part epoxy adhesive

24  from Henkel to World at Hangar 110. [*Id.*] These invoices are dated as late as October 1981.

25  [*Id.*] In addition to such direct sales, Henkel sold products through distributors. [*Id.*] Dexter-

26  brand products were sold in distinctive packaging that bore yellow labels with black printing. [*Id.*]

27  Dexter EA 934 was capable of bonding metal to metal. [*Id.*] It consisted of two parts, one of

28  which contained chrysotile asbestos, mixed together to form the adhesive. [*Id.*] Henkel purchased

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   raw asbestos fiber from Johns-Manville for use in the Dexter epoxies. [*Id.*] Johns-Manville

2   provided some asbestos warnings to Henkel beginning in the early 1970s. [*Id.*] And OSHA

3   provided to Henkel notice of asbestos hazards in 1972. [*Id.*] But Henkel issued no asbestos

4   warnings until 1977. [*Id.*] Its products then had an OSHA-type label, and Henkel issued a

5   separate bulletin instructing how to use the products safely. [*Id.*] That bulletin, but not the

6   product packaging, instructed not to sand the epoxy adhesives without wet-down methods. [*Id.*]

7          The epoxy contained asbestos beginning in 1962, the asbestos-free version did not exist

8   until 1979, and the asbestos-containing version was still sold after that date, until at least 1985.

9   [Facts 180-188.] Henkel developed the asbestos-free version to minimize its employees' exposure

10  to asbestos. [*Id.*] It continued to sell the asbestos-containing version after 1979 because aircraft

11  products had to go through a rigorous qualification process, and not all airline customers had

12  gained approval to use the asbestos-free version. [*Id.*] This process was required to ensure the

13  new product met the aircraft manufacturer's performance specification. [*Id.*] As of 1979, only a

14  single customer had gained approval, but Mr. Lehmann does not recall who that was. [*Id.*] The

15  approval needed to be issued by McDonnell Douglas, as the aircraft manufacturer, stating that EA

16  934 "NA" (nonasbestos) had been added to its qualified products list. [*Id.*] Such approval came

17  only after a successful application process. [*Id.*] Until MDC sent Henkel written approval after

18  testing the proposed new product, Henkel did not sell the asbestos-free material for use on MDC

19  aircraft. [*Id.*] All of the available invoices from Henkel to World, dated as late as October 1981,

20  demonstrate sales of the asbestos-containing version of the Dexter epoxy to World. [*Id.*]

21         Murray Gordon, deceased, testified in 1981 as the designated corporate witness for

22  McDonnell Douglas.[2] [Facts 189-194.] His title at the time of his 1981 deposition was Director of

23  Occupational Safety and Medical Services. [*Id.*] He had the overall responsibility for the

24  company's policies and procedures for hazardous materials, including asbestos. [*Id.*] A decade

25  earlier, in 1972, MDC responded to the newly enacted OSHA rules by determining, throughout the

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

26

27

28

[2]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220, 1221, 1222.] It is also admissible because the witness is dead, and MDC satisfied its interest in cross-examination at the deposition. [Evid. Code §§ 1290, 1291, 1292.] And it is an admission against interest/authorized admission that would not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1  company, where it was using asbestos-containing materials. [*Id.*] MDC tried to eliminate asbestos

2  "where [it] could.," and tried to change how asbestos was handled in its facilities. [*Id.*] Before

3  1972, the company took no measures to protect people exposed to asbestos from its aircraft. [*Id.*]

4      Colleen Rule testified in 1999 on behalf of McDonnell Douglas Corp. (Boeing) and was

5  represented at the deposition by the company's counsel.[3] [Facts 195-200.] Her job in the

6  company's product support group was to assist the airlines who operate MDC aircraft to ensure

7  proper maintenance. [*Id.*] Ms. Rule kept the records of all communications between the company

8  and its airline customers, including the All Operator Letters (AOL). [*Id.*] MDC also staffed a call-

9  in center where airlines could ask whether a part number is interchangeable with any other part

10  number, in order to keep the aircraft flying without delay. [*Id.*] At no time were MDC's

11  customers cut-off from the technical assistance services, even long after the aircraft was sold. [*Id.*]

12  And the subsequent owners of a used aircraft had the benefit of MDC's services. [*Id.*]

13      Attached to Ms. Rule's deposition is the October 22, 1992 All Operator Letter issued by

14  MDC to all its customers, pertaining to asbestos-containing materials used in its aircraft.[4] [Fact

15  201-217.] The 1992 AOL was a revised edition of a 1989 AOL, also involving asbestos. [*Id.*]

16  Those were the only AOLs that discussed asbestos, and they demonstrate MDC's first

17  communications with its customers about asbestos. [*Id.*] The 1992 AOL was issued to encompass

18  more models of aircraft. [*Id.*] The 1992 AOL began with a series of codes that identified what

19  model aircraft and what system was being addressed. [*Id.*] For example, the code 8-20-0 meant

20  the AOL related to chemicals and materials on all DC-8 planes. [*Id.*] The AOL also expressly

21  stated it applied to all DC-8 and DC-10 aircraft, among others. [*Id.*] The AOL included a list of

22  asbestos parts divided into several columns and rows. [*Id.*] For each asbestos part, the chart

23  identified the specification, blueprint and part numbers that corresponded to MDC's Illustrated

24  Parts Catalogue. [*Id.*] That catalogue was created and maintained by MDC's technical

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25  _____

26  [3]This former testimony is admissible as MDC's admission. [Evid. Code §§ 1220,
1221, 1222.] It also is an admission against interest/authorized admission that would not

27  have been made if untrue. [Evid. Code §§ 1230, 1222.]

28  [4]The AOL is an admissible business record and admission. [Evid. Code §§ 1271,
1220, 1221, 1222.] It also is an admission against interest/authorized admission that would
not have been made if untrue. [Evid. Code §§ 1230, 1222.]

1    publications department. [*Id.*] Some of the asbestos parts, but not all, were listed with a specific

2    asbestos-free replacement part. [*Id.*] The AOL explained its purpose was to warn customers of

3    the presence and dangers of all asbestos-containing materials used in MDC aircraft, including DC-

4    8s and DC-10s. [*Id.*] It stated MDC was required to share updated safety information about tasks

5    and functions needed to maintain and repair its aircraft. [*Id.*] The AOL was prompted by a

6    "foreign" customer that desired to know all asbestos materials in certain MDC aircraft, and how to

7    substitute asbestos-free alternatives. [*Id.*] It stated asbestos materials were used in high-heat

8    applications, and asbestos was mixed into sealants and adhesives. [*Id.*] The AOL warned that

9    asbestos fibers were released when the materials were sanded, creating toxic dust that was inhaled

10   by nearby persons. [*Id.*] Among the dozens of asbestos parts listed in the AOL were Dexter-brand

11   epoxy filler adhesives, heat shields, pneumatic duct insulation, gaskets, tape, and insulation. [*Id.*]

12        David Miller in his December 13, 2010 declaration explains he was an aircraft mechanic

13   for World at Hangar 110 from 1973 to 1987. [Facts 218-236.] McDonnell Douglas

14   representatives were sometimes at Hangar 110, identified by their badges. [*Id.*] Mr. Miller and

15   the other mechanics handled heat blankets and shields used in the DC-8 and DC-10 aircraft

16   exhaust systems. [*Id.*] The blankets were woven and protected the pneumatic and hydraulic lines

17   from high heat. [*Id.*] The process of obtaining replacement blankets required the mechanics to use

18   MDC's Illustrated Parts Catalogue and part-numbering system. [*Id.*] The heat shields used in the

19   DC-8s protected the pneumatic and hydraulic lines, and were held in place with stubs or hooks.

20   [*Id.*] They measured up to several feet long and six inches wide. [*Id.*] Each engine had two to

21   four shields. [*Id.*] The outer case was metal, but the interior was a non-metal thick fibrous

22   material. [*Id.*] The metal case did not completely cover the internal material at the corners and

23   edges, so that material was disturbed every time the shields were removed and replaced. [*Id.*] The

24   corners and edges became more frayed and deteriorated over time. [*Id.*] The color also varied

25   over time, but most were gray-white. [*Id.*] The shields were removed and thrown aside when the

26   mechanics needed access to the engines; and then were reinstalled. [*Id.*] The shields became bent

27   through wear and tear, and developed holes in their metal shell. [*Id.*] Engine work on the DC-8s

28   required the removal and replacement of the heat shields. [*Id.*] Mr. Miller believes, based on his

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1 experience and knowledge as a mechanic, the shields contained asbestos. [*Id.*] Mr. Miller and

2 others used Dexter-brand "black and yellow" two-part epoxies. [*Id.*] He also used thousands of

3 "Adell" clamps that had an asbestos-like padding or sleeve material lining the metal portion. [*Id.*]

4 And he removed and installed fuselage insulation. [*Id.*]

5      As an adult, Timothy Vest flew planes for Emery from 1990 to 2001. [Facts 237-245.]

6 Emery operated primarily McDonnell Douglas DC-8 aircraft on cargo flights throughout the

7 United States and the world. [*Id.*] Unlike domestic flights, on international flights the planes

8 carried a mechanic and thousands of pounds of aircraft tools and parts. [*Id.*] The planes traveled

9 to third-world countries and needed to perform their own repairs to avoid getting stranded. [*Id.*]

10 Timothy observed the mechanics working on the engines, and he helped by lending a hand where

11 possible. [*Id.*] When flying domestically, Timothy observed aircraft maintenance work at all

12 airports where Emery had facilities. [*Id.*] Most of Emery's planes were old and needed repairs all

13 the time, including pneumatic-system and engine work. [*Id.*] That maintenance work occurred at

14 airports around the country. [*Id.*] Apart from Timothy's pre-flight inspections of Emery's 40 DC-

15 8 aircraft, and its several DC-10s, he saw the mechanics doing their jobs hundreds of times. [*Id.*]

16      He saw the noses and side-panels of the planes being repaired, repairs of the hydraulic

17 systems, and repairs of the engine components. [Facts 246-253.] Timothy closely observed the

18 Emery mechanics' work on the MDC aircraft to ensure they were doing a proper job, and he

19 assisted them when possible. [*Id.*] Apart from the work at Emery's airport bases, Timothy

20 observed work on the DC-8s hundreds of times at specialized maintenance facilities. [*Id.*] He saw

21 the different levels of heavy maintenance, termed A, B, C and D checks, where the planes were

22 torn apart and put back together. [*Id.*] All of the hydraulic, pneumatic, fire-protection and engine

23 systems were overhauled over a period of hours or days. [*Id.*] He has seen mechanics use epoxy

24 adhesives to repair damaged surfaces on the aircraft, which included sanding the epoxy once it

25 dried. [*Id.*] When nose-cones were damaged by bird or lightning strikes, the affected areas were

26 filled with epoxies and sanded smooth. [*Id.*] The epoxies also were used to seal leaks and for

27 other applications in the engine spaces. [*Id.*]

28      John Templin is a certified industrial hygienist who, in his accompanying declaration,

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1      Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      10

EXHIBIT D - Page 175                    Exhibit B - Page 315

1    explains Timothy Vest's asbestos-exposure levels and the historical knowledge of asbestos-related

2    health hazards. [Facts 254-255.] John Templin's extensive qualifications and the detailed bases

3    for his conclusions are set forth in his declaration, which is incorporated fully herein by reference.

4    [*Id.*] The physical and aerodynamic properties of asbestos facilitate re-entrainment and

5    re-suspension of asbestos fibers once a space is contaminated. [*Id.*] The respirable asbestos fibers

6    that are released into the air will remain there for up to many hours before they alight on surfaces.

7    [*Id.*] Those fibers, once they do come to rest, are then subject to re-entrainment. [*Id.*]

8    Re-entrainment describes the physical action of air, movement, vibration, and physical impact that

9    aerodynamically causes asbestos fibers to take flight and become airborne. [*Id.*] It can be caused

10   by ordinary movement of people and objects and also by air currents. [*Id.*] It is also caused by

11   disturbances to the environment such as sweeping, cleaning, blowing areas down, and even

12   walking through microscopic asbestos-containing debris or dust. [*Id.*] Fibers can move laterally

13   with air currents and contaminate areas far from the release point, up to hundreds of meters away.

14   [*Id.*] They can also move across contamination barriers with the passage of workers during

15   removal of material. [*Id.*] And the fibers persist almost indefinitely and create a continuous

16   source of exposure when they are present in occupied buildings. [*Id.*] John Templin explains that

17   these principles of re-entrainment, and the risk of asbestos exposure to those well beyond the

18   source of fiber release, have been widely scientifically known since at least the 1960s. [*Id.*] He

19   cites several scientific sources from the 1920s to 1940s addressing this topic. [*Id.*]

20          Based on John Templin's review of the case-specific evidence enumerated in his

21   declaration, Timothy Vest was exposed to substantial levels of asbestos-containing dust from the

22   aircraft parts used in Hangar 110 from 1972 to 1983; and from parts used on Emery's aircraft

23   during the 1990s. [Facts 256-258.] Timothy breathed large amounts of visible

24   asbestos-containing dust that was created by his own activities, and by work done in his and his

25   father's vicinity. [*Id.*] Hangar 110 at the Oakland Airport, occupied by World Airways, was the

26   primary location where Timothy Vest inhaled asbestos. [*Id.*] He was exposed while at the hangar

27   on dozens of occasions, and was exposed to dust tracked home on his father's clothing. [*Id.*] The

28   materials that released respirable asbestos fibers to which he was exposed included aircraft parts

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   used on the DC-8 and DC-10 models operated by World and continuously maintained in the

2   hangar. [*Id.*] Visible dust was released by the sanding of Dexter-brand epoxy adhesives; the

3   removal and reinstallation of worn heat blankets and shields; the handling of old insulated clamps;

4   and the scraping of gaskets and tapes. [*Id.*] Timothy Vest experienced substantial levels of

5   asbestos exposure as a pilot for Emery in the 1990s. [*Id.*] He assisted and observed aircraft

6   mechanics, on hundreds of occasions, working on Emery's fleet of McDonnell Douglas DC-8 and

7   DC-10 models. [*Id.*] The aircraft parts that released asbestos dust to which he was exposed

8   include all the materials described above: Dexter-brand epoxy adhesives, heat blankets and

9   shields, insulated clamps, gaskets and tapes. [*Id.*] Although these exposures occurred in the

10   1990s, MDC's 1992 All Operator Letter confirms the relevant asbestos-containing parts still were

11   required to be used on the aircraft. [*Id.*]

12       John Templin further explains, in great detail, that it was widely known and understood by

13   1960 – certainly within the industrial-hygiene community – that workers, bystanders and even

14   household members of those working with and around asbestos-containing products were at

15   substantially increased risk of being exposed to asbestos from the type of products and activities

16   that Timothy Vest and his father encountered; and of developing an asbestos-related disease, such

17   as mesothelioma, as a result of those exposures. [Fact 259.] In fact, by 1964 when Dr. Irving

18   Selikoff and his colleagues published their seminal epidemiological study demonstrating the

19   mortality experience of workers who had been exposed to asbestos insulation, the causal

20   connection between asbestos exposure and mesothelioma was unquestioned in the medical and

21   scientific communities in the United States. [*Id.*] When Timothy Vest inhaled asbestos-

22   containing dust from aircraft parts in the 1970s, 1980s and 1990s, it was entirely foreseeable that

23   his asbestos exposure could cause him to suffer serious or fatal diseases including, among others,

24   mesothelioma cancer. [*Id.*]

25     **B.**   **Timothy Vest's Mesothelioma was Caused by Asbestos**

26       Samuel P. Hammar, M.D. is a pathologist who, in his accompanying declaration, explains

27   Timothy Vest's asbestos-caused malignant mesothelioma. [Facts 260-261.] Dr. Hammar's

28   extensive qualifications and the detailed bases for his conclusions are set forth in his declaration,

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1   Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA   12

**EXHIBIT D - Page 177**   **Exhibit B - Page 317**

1   which is incorporated fully herein by reference. [*Id.*] There is an extraordinarily strong link

2   between mesothelioma and asbestos dust, such that it is largely undisputed in the scientific

3   community that asbestos causes diffuse malignant mesothelioma. [*Id.*] And because diffuse and

4   localized mesothelioma cells are chemically and structurally identical, it is also true that asbestos

5   causes localized malignant mesothelioma – regardless of the tumor's size when detected. [*Id.*]

6   This fact is supported by the documented asbestos-exposure histories of the patients described in

7   the articles by Nakas, et al. and Allen, et al. (which Dr. Hammar co-authored) [*Id.*] For the Nakas,

8   et al. patients, nine out of ten had prior occupational-level exposures to asbestos. [*Id.*] And the

9   limited available information pertaining to the Allen, et al. patients revealed that four had prior

10   occupational-level exposures to asbestos. [*Id.*]

11       Timothy Vest's pathology slides demonstrate malignant mesothelioma cancer cells on the

12   pleural tissue in his chest. [Fact 262.] Adjacent to the cancer cells is mildly to markedly

13   thickened pleural tissue with a hyaline (glassy) appearance, which are pleural plaques caused by

14   asbestos. [*Id.*] Given the presence of pleural plaques, his mesothelioma was unquestionably

15   caused by occupational-level exposure to asbestos. [*Id.*] Pleural plaques are localized scars that

16   form due to prolonged exposure to asbestos fibers. [*Id.*] These scars almost never form for

17   reasons other than asbestos exposure. [*Id.*] But even if the pleural plaques did not exist, it remains

18   true that Timothy Vest's mesothelioma was caused by asbestos because of his documented

19   exposure to asbestos in occupational and para-occupational settings. [*Id.*] His mesothelioma was

20   caused by his total lifetime dose of asbestos. [*Id.*] All of Timothy Vest's individual asbestos

21   exposures contributed to his total dose and increased his risk of developing the disease. [*Id.*]

22   There is no known safe level of asbestos exposure. [*Id.*]

23       William R. Salyer, M.D. is a pathologist who, in his accompanying declaration, further

24   explains Timothy Vest's asbestos-caused diffuse malignant mesothelioma. [Facts 263-264.]

25   Dr. Salyer's extensive qualifications and the detailed bases for his conclusions are set forth in his

26   declaration, which is incorporated fully herein by reference. [*Id.*] Dr. Salyer has treated several

27   patients whose malignant mesotheliomas presented similarly to that of Timothy Vest. [*Id.*] That

28   is, when the mesotheliomas were first detected in the patients, the tumors appeared to be localized

KAZAN, MCCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    masses – what some in the scientific literature have described as "localized malignant

2    mesothelioma." [*Id.*] All of those patients died of the disease soon after diagnosis. [*Id.*] Those

3    patients' tumors, although localized in their initial appearance, were in fact diffuse mesotheliomas

4    that were detected earlier than usual. [*Id.*] And each patient's diffuse mesothelioma was caused

5    by exposure to asbestos. [*Id.*]

6         Based on the scientific literature pertaining to "localized" malignant mesothelioma, there is

7    no evidence it is a different disease from diffuse mesothelioma. [Facts 265-266.] Although there

8    may appear to be a larger number of longer-term survivors whose disease was "localized," that is

9    because the patients were very fortunate to have an early discovery of their disease and underwent

10   surgical amelioration to slow its progression. [*Id.*] Many of those patients developed a recurrence

11   of the disease and died. [*Id.*] Timothy Vest suffers from malignant mesothelioma that was

12   detected at an early stage of its development. [*Id.*.] Even if Timothy Vest's tumor was initially

13   localized, he has a very high risk of local recurrence of his tumor and of metastatic disease. [*Id.*]

14   Timothy Vest almost certainly will die of the disease. [*Id.*] His pathology slides demonstrate

15   what are, in fact, diffuse malignant mesothelioma cancer cells on the pleural tissue in his chest.

16   [*Id.*] Adjacent to the cancer cells are pleural plaques caused by asbestos. [*Id.*] Given the presence

17   of pleural plaques, and Timothy Vest's documented exposure to asbestos in occupational and para-

18   occupational settings, his mesothelioma was unquestionably caused by asbestos. [*Id.*] Even if the

19   pleural plaques did not exist, it remains true that Timothy Vest's mesothelioma was caused by

20   asbestos. [*Id.*] All of his individual exposures contributed to his total lifetime dose of asbestos

21   and thereby caused the disease. [*Id.*]

22   **III.    Legal Argument**

23        **A.    Moving Defendant's Burden of Proof**

24        A defendant's motion for summary judgment should be granted [only] if no triable
          issue exists as to any material fact and the defendant is entitled to a judgment as a
25        matter of law. [Code Civ. Proc. § 437c(c).] The burden of persuasion remains with
          the party moving for summary judgment. [*Aguilar v. Atlantic Richfield Co.* (2001)
26        25 Cal.4th 826, 850, 861.]

27   [*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see Code Civ. Proc.

28   § 437c(p)(2).] "[F]rom commencement to conclusion, the party moving for summary judgment

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1        Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA        14

**EXHIBIT D - Page 179**                                    **Exhibit B - Page 319**

1  bears the burden of persuasion that there is no triable issue of material fact . . ." [*Aguilar, supra,*

2  25 Cal.4th 826, 850.] This means the moving defendant must show that if the defendant's

3  evidence is uncontroverted, no reasonable trier of fact could find for the plaintiff. [*Id.* at 851.]

4  Only if the defendant makes that showing does the burden shift to plaintiff to demonstrate the

5  existence of a triable issue of material fact. [*Id.*]

> 6  The defendant must show that the plaintiff *does not possess* needed evidence,
> because otherwise the plaintiff might be able to establish the elements of the cause
> 7  of action; the defendant must also show that the plaintiff *cannot reasonably obtain*
> needed evidence, because the plaintiff must be allowed a reasonable opportunity to
> 8  oppose the motion. [*Id.* at 854 (emphasis in original).]

9  A moving defendant must affirmatively show the plaintiff lacks the needed evidence;

10  simply pointing to a claimed absence is not enough. [*Id.* at 854-855.] The defendant's evidence

11  must include "affidavits, declarations, admissions, answers to interrogatories, depositions, and

12  matters of which 'judicial notice' must or may 'be taken.'" [*Id.* at 855, citing Code Civ. Proc. §

13  437c(b).] Nor is it enough to merely assert that plaintiff failed to provide the information. The

14  defendant must prove "plaintiffs failed to provide meaningful responses to comprehensive

15  interrogatories designed to elicit all the evidence plaintiffs had to support their contention of

16  liability." [*Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1442.]

17  Only admissible evidence may be considered, and the moving defendant must include all

18  evidence offered to meet its evidentiary burden in its "separate statement." [Code Civ. Proc.

19  § 437c(d).] "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate

20  statement, *it does not exist.*" [*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327,

21  337 (emphasis in original).] The strict requirements a moving party must satisfy were explained in

22  *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631-632:

> 23  One of the more basic requirements is that the papers supporting a section 437c
> motion "shall include a separate statement setting forth plainly and concisely all
> 24  material facts which the moving party contends are undisputed." [*Id.,* Code Civ.
> Proc. § 437c(b)(1); see CRC 3.1350(d).] In addition, each material fact set forth in
> 25  the separate statement "shall be followed by a reference to the supporting
> evidence." [Code Civ. Proc. § 437c(b)(1).]

26  In ruling, "the court must consider all of the evidence and all of the inferences reasonably

27  drawn therefrom ... and must view such evidence ... and such inferences ... in the light most

28  favorable to the opposing party." [*Aguilar,* 25 Cal.4th 826, 844-845.] "'[B]ecause of the drastic

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA     15

**EXHIBIT D - Page 180**                    **Exhibit B - Page 320**

1  nature of the summary judgment procedure, and the importance of safeguarding the adverse

2  party's right to a trial, the moving party must make a strong showing. [Its] affidavits are strictly

3  construed ...On the other hand, the affidavits of the party opposing the motion are liberally

4  construed.'" [*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 838-839 (emphasis

5  added).]

6  **B.    MDC Fails to Establish Plaintiffs Lack Evidence of Causation**

7      MDC is responsible under products liability principles for all injuries caused by its

8  defective asbestos-containing aircraft – including the originally-installed parts and the parts MDC

9  required to be used in its planes' maintenance. [*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d

10 379, 382-383; *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261.][5] Bystander victims are

11 owed a duty of care, and are entitled to even greater protection, because they are perfectly

12 foreseeable victims of defective products and have no opportunity to discover the hazards.

13 [*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 585-586; *Nelson v. Superior Court*

14 (2006) 144 Cal.App.4th 689, 695.] Even household members injured by toxins unwittingly

15 tracked home by workers are owed a duty of care, so long as there is evidence of a specific toxin

16 that caused a specific injury. [*Oddone v. Superior Court (Technicolor, Inc.)* (2009) 179

17 Cal.App.4th 813, 872-873.]

18      The California Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953

19 established the causation standard for asbestos-cancer cases:

20

21

22      [5]Manufacturers owe a duty to warn of hazards arising from the foreseeable and required uses of their products, including such uses in conjunction with other defective products. [*Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129

23 Cal.App.4th 577, 581-583 (power tools and attachments); *Torres v. Xomox Corporation* (1996) 49 Cal.App.4th 1, 17-19 (valve and acid); *Huynh v. Ingersoll-Rand* (1993) 16

24 Cal.App.4th 825, 833 (grinder and disc); *Wright v. Stang Manufacturing Co.* (1997) 54

25 Cal.App.4th 1218, 1230-1231 (water gun and fire truck); *DeLeon v. Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 343-347 (holding bin and

26 overhead equipment). The court in *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, did not hold that manufacturers would be immune if they had specifically

27 intended and required that asbestos-containing replacement parts be used with their equipment. [*Id.* at 590-591.] In fact, the court cited with approval a Washington Supreme

28 Court case that held equipment manufacturers could be liable if they specified asbestos-containing replacement components for use with their equipment. [*Id.*]

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1            Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA          16

EXHIBIT D - Page 181                                          Exhibit B - Page 321

1    [P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating
that the plaintiff's exposure to defendant's asbestos-containing product in
2    reasonable medical probability was a substantial factor in contributing to the
aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence
3    to the *risk* of developing asbestos-related cancer . . .

4    [*Id.* at 976-977 (emphasis original).]  Plaintiffs may prove Timothy Vest's mesothelioma was

5    "cumulative in nature, with many separate exposures each having constituted a 'substantial factor'

6    (citation) that contributed to his risk of injury." [*Id.* at 958.] But plaintiffs "need *not* prove that

7    fibers from the defendant's product were the ones, or among the ones, that actually began the

8    process of malignant cellular growth." [*Id.* at 982-983 (emphasis original).]

9        MDC demonstrates no lack of proof its asbestos-containing aircraft constituted a

10    substantial-factor cause of Timothy Vest's asbestos-related mesothelioma.  First, MDC presents no

11    evidence it propounded comprehensive discovery requests, much less that plaintiffs' responses to

12    any such discovery it propounded were in any way devoid of facts and evidence supporting each

13    essential element of the complaint's causes of action and damages claims against MDC. [Alleged

14    Facts 1-63; *Weber, supra*, 143 Cal.App.4th 1433, 1442.]  MDC in its separate statement simply

15    mentions <u>no</u> special interrogatories propounded by MDC to plaintiffs. [*Id.*]  Instead, MDC cites

16    limited portions of Timothy Vest's and Warren Vest's deposition testimony, ignoring the portions

17    that are unfavorable to MDC's position.

18        Second, MDC cites the inadmissible declarations of Larry Fogg, Timothy Lloyd and

19    Michael Schmidt in a failed effort to prove MDC's aircraft had few asbestos-containing parts, and

20    that MDC had no involvement in those planes' maintenance. [Alleged Facts 1-63; Fact 267.]  As

21    plaintiffs explain in their evidentiary objections, Mr. Fogg's declarations are inadmissible hearsay

22    created several years ago for other lawsuits. [Evid. Code § 1200; Code Civ. Proc. § 437c(b),(d).]

23    All of the declarations must be disregarded because MDC refuses to produce Mr. Fogg, Mr. Lloyd

24    and Mr. Schmidt for deposition – thereby concealing relevant evidence. [Fact 267; Code Civ.

25    Proc. § 437c(h).]  At most, these witnesses set forth MDC's one-sided view of the case, all of

26    which is contradicted by plaintiffs' additional evidence. [Facts 64-267.]

27        Third, on the medical-causation issue, MDC offers no conclusive evidence that Timothy

28    Vest's mesothelioma purportedly is unrelated to his asbestos exposure. [Alleged Facts 1-63.]

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1    Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA   17

EXHIBIT D - Page 182        Exhibit B - Page 322

1   Instead, MDC offers the unpersuasive opinion of Dr. Travis who, based on his status as a co-

2   author of a single article, opines that no scientist could ever determine the cause of Timothy Vest's

3   cancer because it has been described as "localized." [Id.] Dr. Travis's opinion demonstrates

4   nothing about plaintiffs' ability to marshal competent expert testimony to prove Timothy Vest's

5   malignant mesothelioma is, indeed, asbestos-related. [Id.] In fact, plaintiffs submit the

6   declarations of Dr. Salyer and Dr. Hammar (co-author of Dr. Travis's article), showing Timothy

7   Vest's mesothelioma was unquestionably caused by asbestos and will kill him. [Facts 260-266.]

8                   **1.    Plaintiffs' Additional Evidence Requires a Trial**

9           Under *Jiminez, supra, Vandermark, supra* and *Rutherford*, supra, MDC is liable for its

10  supply and specification of asbestos-containing aircraft parts that were a substantial-factor cause of

11  Timothy Vest's mesothelioma. MDC installed dozens of asbestos materials on its aircraft, and

12  World operated approximately 16 of those planes when Timothy and his father were in Hangar

13  110 from 1973 to 1983. [Facts 64-259.] Many of those planes were purchased new from 1979 to

14  1981. [Facts 64-259.] Timothy Vest was also exposed to Emery's fleet of MDC planes in the

15  1990s. [Id.] Many of the toxic components – including heat shields, heat blankets, clamps,

16  gaskets, tape and insulation – remained in the aircraft for extended periods and released asbestos

17  fibers whenever they were handled, removed and reinstalled during inspections. [Id.] And MDC

18  required that other toxic components – including Dexter adhesive – were required to be used and

19  sanded in a manner that released asbestos in maintaining MDC's planes. [Id.] MDC controlled

20  every aspect of its planes' maintenance and operation, and its catalogues and manuals specified the

21  use of asbestos parts into the 1990s – decades after MDC became aware of the hazards. [Id.] Safe

22  alternative materials could not be used without MDC's analysis and express permission. [Id.]

23  MDC maintained a constant connection to its aircraft, even after they were transferred between

24  owners. [Id.]

25          Industrial hygienist John Templin explains how Timothy Vest inhaled substantial levels of

26  asbestos from these products and activities; and that the hazards were foreseeable to MDC and it

27  could have discovered and fixed the problems at any time from the 1970s through the 1990s. [Id.]

28  Pathologists Samuel Hammar and William Salyer confirm that Timothy Vest's mesothelioma –

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

Plaintiffs' Memorandum of Points and Authorities in Opposition to McDonnell Douglas Corp.'s MSJ/MSA      18

**EXHIBIT D - Page 183**

**Exhibit B - Page 323**

1   whether described as "localized" or not – was unquestionably caused by Timothy's occupational-

2   levels of asbestos exposure from all sources.  [*Id.*]  All of these facts are supported by the sworn

3   statements of Timothy Vest, Warren Vest, Claude Fross, James Hales, Stanley Lehmann, Murray

4   Gordon, Colleen Rule, David Miller, John Templin, Samuel Hammar and William Salyer.  [*Id.*]

5       **C.    Plaintiffs' Fraud, Conspiracy and Punitive-Damages Claims are Valid**

6           MDC may be liable under Civil Code sections 1708 and 1710 for concealing important

7   facts pertaining to hidden asbestos-related health hazards.  The active concealment of facts by even

8   "a non-fiduciary is the equivalent of a false representation, i.e., *actual fraud*."  [5 Witkin, Cal.

9   Procedure (4th ed. 1997) Pleading § 678, p. 136 (emphasis added); *Quirici v. Freeman* (1950) 98

10  Cal.App.2d 194, 201 (intentional concealment supports fraud claim).]  And MDC may be liable

11  for asbestos exposures from any source caused by the conspiracy in which MDC participated to

12  suppress information about asbestos dangers.  [*Stone v. Regents of University of Cal.* (1999) 77

13  Cal.App.4th 736, 748 fn. 9.]  The jury may award punitive damages in intentional-tort and

14  unintentional-tort actions for negligent conduct.  [*Potter v. Firestone Tire & Rubber Co.* (1993) 6

15  Cal.4th 965, 1005; *SKF Farms v. Super. Ct.* (1984) 153 Cal.App.3d 902, 907.]  Punitive damages

16  may be based on a defendant's knowing and reckless failure to warn of hazards, where it is shown

17  that actions were taken in conscious disregard of the rights or safety of others, including the

18  plaintiffs.  [Civ. Code § 3294; *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-401.]

19          Here, as previously explained, MDC demonstrates no absence of evidence it concealed the

20  latent asbestos hazards of its aircraft.  But plaintiffs nevertheless present the testimony of Murray

21  Gordon, Colleen Rule and Stanley Lehman, proving MDC knew of asbestos hazards in 1972 and

22  took steps to protect its own workers; received further knowledge in 1977 when the manufacturer

23  of Dexter adhesives issued warnings; but MDC communicated nothing to its customers until 1989

24  and 1992, when it issued the AOLs on asbestos parts.  So MDC knew it was exposing workers and

25  their families to toxic asbestos, yet MDC failed to warn or use safe products.  Such evidence easily

26  supports the reasonable inference that MDC acted fraudulently and in conscious disregard of the

27  health and safety of others, including Timothy Vest and his father.

28

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MSTEWART/724515.1

1  **D.    The Motion must be Continued or Denied Under CCP 437c(h)**

2      Despite the Court's order to produce specific aircraft manuals, parts catalogues, All

3  Operator Letters and documents demonstrating MDC's historical knowledge of asbestos hazards,

4  MDC has not satisfied its discovery obligations. [Fact 267] MDC provided 14 encrypted compact

5  discs, which contain images of documents that cannot be printed, cannot be electronically searched

6  and cannot be converted to a format that is electronically searchable. [*Id.*]

7      MDC relies on witnesses Timothy Lloyd, Michael Schmidt and Larry Fogg. [*Id.*] Despite

8  MDC's submission of these witnesses' declarations in support of its motion for summary

9  judgment/adjudication, MDC refuses to make Mr. Lloyd, Mr. Schmidt and Mr. Fogg available for

10  deposition. [*Id.*] These percipient witnesses have information concerning the originally-installed

11  and replacement asbestos-containing parts that MDC required to be used on its aircraft. [*Id.*]

12      David Miller's and Joseph Robison's upcoming deposition testimony will further confirm

13  that MDC's asbestos-containing aircraft parts were pervasively used in Hangar 110 from 1973

14  through 1983. [*Id.*] Both Miller and Robison worked in Hangar 110 during all relevant years and

15  are essential percipient witnesses. [*Id.*] Additional percipient witnesses who will be deposed

16  include Glen Cartwright and Mike Pociecha, both of whom worked for World in Hangar 110.

17  [*Id.*] Further, pared-down expert witness disclosures are due January 14, 2011, and the subsequent

18  depositions of all parties' medical-causation expert witnesses will produce further evidence that

19  Timothy Vest's mesothelioma was caused by asbestos. [*Id.*] Facts that further justify opposition

20  to this motion may exist, but cannot now be presented. [*Id.*] So this motion must be denied, but at

21  a minimum it must be continued. [Code Civ. Proc. § 437c(h); *Bahl v. Bank of America* (2001) 89

22  Cal.App.4th 389, 395.]

23  **IV.    Conclusion**

24      MDC demonstrates no absence of evidence in support of any cause of action or claim for
damages raised in the complaint. And plaintiffs' additional evidence requires a trial to resolve all
25  challenged causes of action and claims for damages.

DATED: December 30, 2010            KAZAN, McCLAIN, LYONS,
26                                                     GREENWOOD & HARLEY
                                                       A Professional Law Corporation
27

                                                       By
28                                                            Michael T. Stewart
                                                       Attorneys for Plaintiffs

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---o0o---

TIMOTHY VEST and CAROLINE VEST,

    Plaintiffs,

vs.                      No. RG09489518

ALLIED PACKING AND SUPPLY, et al.,

    Defendants.

_____/


VIDEOTAPED DEPOSITION OF DAVID L. MILLER

Volume I

(Pages 1 to 281)



Taken before Catherine M. Meyer

CSR No. 11596

December 29, 2010

Page 273

1    hangar 110 because United took that hangar over.  And he

2    was a foreman over there.

3            MS. JOHNSON:  Okay.  Thank you for that

4    clarification, sir.

5            THE WITNESS:  Sure.

6            MS. HSU:  Can I just ask a couple follow-ups

7    since we have some time?

8    EXAMINATION BY MS. HSU:

9        Q.  You mentioned earlier that there were military

10   aircraft being worked on --

11       A.  Yes.

12       Q.  -- at hangar 110.

13       A.  Yes.

14       Q.  You mentioned the KC-10 which had a rope around

15   it.  Do you know what type of work was being done on the

16   KC-10?

17       A.  We had a contract to do like heavy checks, like

18   a C check.  There's many different types of checks in

19   aviation.

20       Q.  Do you recall how many KC-10s there were at

21   hangar 110 that you guys were servicing?

22       A.  I think at the height we were doing like one a

23   month.

24       Q.  And when you said there was a rope around the

25   area, it was still on the maintenance hangar floor --

Page 274

1      A.   Yes.

2      Q.   -- correct, except it was just roped up; is

3   that right?

4      A.   Yes.

5      Q.   Aside from the KC-10, do you recall any other

6   type of military aircraft that were being worked on in

7   hangar 110?

8      A.   Yes.  They had the -- like Air Force One, 747.

9      Q.   Any other ones?

10     A.   No.  I think a couple C-5As came in there.  But

11  they were just parked there because of the fog up in

12  Travis.

13     Q.   You don't believe that there was any work

14  performed on the C --

15     A.   I don't believe we did any work on them.

16     Q.   And also -- sorry.  Aside from the --

17     A.   Oh, excuse me.  I'll take that back.  We had a

18  contract to paint.  I don't know what the nomenclature

19  was.  It was a small fighter trainer for the Air Force.

20  T-38s maybe.

21     Q.   And that was to paint the aircraft?

22     A.   Yes.

23     Q.   Any other ones that you can recall?

24     A.   That's all I can recall right now.

25     Q.   Okay.  Earlier when I asked you about the heat

Page 281

1    STATE OF CALIFORNIA     )

2                            )

3    COUNTY OF ALAMEDA       )

4

5         I, CATHERINE M. MEYER, do hereby certify:

6         That DAVID L. MILLER, in the foregoing deposition

7    named, was present and by me sworn as a witness in the

8    above-entitled action at the time and place therein

9    specified;

10        That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and

14   that the foregoing transcript constitutes a full, true

15   and correct report of said deposition and of the

16   proceedings that took place;

17        IN WITNESS WHEREOF, I have hereunder subscribed my

18   hand this 4th day of January 2011.

19

20

21

22

23
                          _____
24                        CATHERINE M. MEYER, CSR No. 11596
                          State of California
25

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 120 Broadway, Suite 300, Santa Monica, California 90401-2386.

On January 6, 2011, I served the foregoing document, described as **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1442(a)(1) (FEDERAL OFFICER)**, on each interested party in this action, as follows:

*Attorneys for Plaintiffs*

Justin A. Bosl, Esq.
Andrea Huston, Esq.
Elina Agnoli, Esq.
Kazan, McClain, Lyons, Greenwood & Harley
55 Harrison Street, Suite 400
Oakland, California  94607
Email:     jbosl@kazanlaw.com
             ahuston@kazanlaw.com
             eagnoli@kazanlaw.com

☒     (BY MAIL) I placed a true copy (or original) of the foregoing document in a sealed envelope addressed to each interested party as set forth above. I placed each such envelope, with postage thereon fully prepaid, for collection and mailing at Bryan Cave LLP, Santa Monica, California. I am readily familiar with Bryan Cave LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

☐     (BY FAX) I caused a true copy of the foregoing document to be served by facsimile transmission from sending facsimile machine telephone number (310) 576-2200 to each interested party at the facsimile number set forth above. Each transmission was reported as complete and without error. A transmission report was properly issued by the sending facsimile machine for each interested party served.

☐     (BY E-MAIL, pursuant to agreement of the parties) I caused a true copy of the foregoing document to be served by e-mail at the e-mail address(es) set forth above. Each e-mail was complete and no reports of error were received.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 6, 2011, at Santa Monica, California.

_____
Karen Minutelli

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

818741\0307472

**Exhibit B - Page 330**