EFILE

# U.S. District Court
## United States District Court for the District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:11-cv-00651-VLB

Prokop et al v. Buffalo Pumps, Inc. et al
Assigned to: Judge Vanessa L. Bryant
Cause: 28:1442 Notice of Removal

Date Filed: 04/22/2011
Jury Demand: None
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Diversity

**Plaintiff**

**Theresa Prokop**
*Executrix to the Estate of Robert
Prokop*

represented by **Brian P. Kenney**
Early, Ludwick & Sweeney
One Century Tower
265 Church St., 11th Fl.
PO Box 1866
New Haven, CT 06508-1866
203-777-7799
Fax: 203-785-1671
Email: bkenney@elslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Theresa Prokop**
*individually as surviving spouse*

represented by **Brian P. Kenney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Buffalo Pumps, Inc.**

represented by **Bryna Rosen Misiura**
Governo Law Firm LLC
Two International Place
Boston, MA 02110
617-737-9045
Fax: 617-737-9046
Email: bmisiura@governo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Simons**
Governo Law Firm LLC
Two International Place
Boston, MA 02110
617-737-9045

Fax: 617-737-9046
Email: MSimons@governo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Foster Wheeler, LLC**

**Defendant**

**General Electric Company**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/22/2011 | 1 | NOTICE OF REMOVAL by Buffalo Pumps, Inc. from Connecticut Superior Court J.D. of Fairfield at Bridgeport, case number CV-09-6005093-S. ( Filing fee $ 350 receipt number 0205-2094680), filed by Air & Liquid Systems Corporation, As Successor by Merger to Buffalo Pumps, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Certificate of Service, # 6 List of Pending Motions, # 7 Notice to State Court of Removal)(Simons, Michael) (Entered: 04/22/2011) |
| 04/22/2011 | 2 | NOTICE of Appearance by Michael D. Simons on behalf of Air & Liquid Systems Corporation, As Successor by Merger to Buffalo Pumps, Inc. (Simons, Michael) (Entered: 04/22/2011) |
| 04/22/2011 | 3 | Corporate Disclosure Statement by Air & Liquid Systems Corporation, As Successor by Merger to Buffalo Pumps, Inc. identifying Corporate Parent Buffalo Pumps, Inc. for Air & Liquid Systems Corporation, As Successor by Merger to Buffalo Pumps, Inc.. (Simons, Michael) (Entered: 04/22/2011) |
| 04/22/2011 | 4 | NOTICE of Appearance by Bryna Rosen Misiura on behalf of Air & Liquid Systems Corporation, As Successor by Merger to Buffalo Pumps, Inc. (Misiura, Bryna) (Entered: 04/22/2011) |
| 04/22/2011 |   | Judge Vanessa L. Bryant added. (Houatchanthara, M.) (Entered: 04/25/2011) |
| 04/22/2011 | 5 | Order on Pretrial Deadlines: Motions to Dismiss due on 07/22/2011. Amended Pleadings due by 6/21/2011; Discovery due by 10/22/2011; Dispositive Motions due by 11/21/2011. Signed by Clerk on 04/22/2011. (Grady, B.) (Entered: 04/25/2011) |
| 04/22/2011 | 6 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER: Signed by Judge Vanessa L. Bryant on 04/22/2011. (Grady, B.) (Entered: 04/25/2011) |
| 04/22/2011 | 7 | ORDER RE: Judge's Chambers Practices. Counsel are directed to read and comply with the Chambers Practices and Standing Orders prior to filing any document. So ordered. Signed by Judge Vanessa L. Bryant on 04/22/2011. (Grady, B.) (Entered: 04/25/2011) |
| 04/22/2011 | 8 | Notice to Counsel (Grady, B.) (Entered: 04/25/2011) |
|            |   | |

| 04/25/2011 | 9 | NOTICE TO COUNSEL: Counsel initiating or removing this action is responsible for serving all parties with attached documents and copies of 1 Notice of Removal, 7 Order Re: Chambers Practices, 8 Notice to Counsel, 6 Electronic Filing Order, 3 Corporate Disclosure Statement, 2 Notice of Appearance, 5 Order on Pretrial Deadlines, 4 Notice of Appearance. Signed by Clerk on 04/25/2011. (Grady, B.) (Entered: 04/25/2011) |

DEC 0 2 2009

1380 A

 CT Corporation

**Service of Process Transmittal**
11/25/2009
CT Log Number 515780664

TO: Rose Hoover, Vice Pres. Admin. and Corporate Sec.
Ampco-Pittsburgh Corporation
600 Grant Street, Suite 4600
Pittsburgh, PA 15219

RE: **Process Served in New York**

FOR: Buffalo Pumps, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Theresa Prokop, Executrix to the Estate of Robert Prokop and Theresa Prokop, individually as surviving spouse, Pltf. vs. Buffalo Pumps, Inc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachments |
| **COURT/AGENCY:** | Fairfield at Bridgeport Superior Court Judicial District, CT<br>Case # None Specified |
| **NATURE OF ACTION:** | Asbestos Litigation - Fatal Injury/Wrongful Death |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, New York, NY |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 11/25/2009 postmarked on 11/19/2009 |
| **APPEARANCE OR ANSWER DUE:** | 12/08/2009 - Return Date // On or before the second day after the Return Date - File an appearance form |
| **ATTORNEY(S) / SENDER(S):** | Brian P. Kenney<br>Early, Ludwick & Sweeney, LLC<br>265 Church Street, 11th Floor<br>New Haven, CT 06510<br>203-777-7799 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 791248258976<br>Email Notification, Rose Hoover RHOOVER@AMPCOPGH.COM |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Christopher Tilton<br>111 Eighth Avenue<br>New York, NY 10011<br>212-894-8940 |



AMPCO-PITTSBURGH CORP.
LEGAL DEPARTMENT

Page 1 of 1 / EB

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**SUMMONS**
**CIVIL (except family actions)**
JD-CV-1
GEN. STAT. 51-346, 51-347, 51-349, 51-350, 52,-45a
52-48, 52-259
PR. BK. 49, 63, 66

**SUPERIOR COURT**

**INSTRUCTIONS**

| X ONE OF THE FOLLOWING |
|---|
| Amount, legal interest or property in demand, exclusive of interest and costs is |
| ☐ less than $2,500 |
| ☐ $2,500 through $14,999.99 |
| ☒ $15,000 or more |
| ☐ (if applicable) Claiming other relief in addition to or in lieu of money damages. |

1. Prepare on typewriter; sign original summons (top sheet) and conform copies of the summons (sheets, 2, 3 and 4).
2. If there are more than two defendants, prepare or photocopy conformed summons for each additional defendant.
3. Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.
4. After service by officer, file original papers and officers return with the clerk of the court.
5. The party recognized to pay costs must appear personally before the authority taking the recognizance.
6. Do not use this form for actions in which an attachment, garnishment or replevy is being sought. See Practice Book Section 49 for other exceptions.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| ☒ JUDICIAL DISTRICT<br>☐ HOUSING SESSION   ☐ G.A. | AT (Town in which writ is returnable)(Gen. Stat. 51-349)<br>Bridgeport | RETURN DATE (Mo., day, yr)<br>12.08.09 |
|---|---|---|
| ADDRESS OF CLERK OF COURT WHERE WRIT AND OTHER PAPERS SHALL BE FILED (GEN. STAT. 51-347, 51-350)(No., st., town & zip code)<br>1061 Main Street, Bridgeport, CT, 06604  (203) 579-6527 | | CASE TYPE:(From Judic. Dept. case type list-see back)<br>Major  T              Minor  20 |

| PARTIES | NOTE: Individual's Names:<br>Last, First, Middle Initial | NAME AND ADDRESS OF EACH PARTY<br>(No., street, town & zip code) | ☒ Form JD-CV-2 attached | PTY NO |
|---|---|---|---|---|
| FIRST NAMED PLAINTIFF | | Prokop, Theresa, Executrix to the Estate of Robert Prokop, 27 Walnut Hill East Lyme, CT 06333 | | 01 |
| Additional Plaintiff | | Prokop, Theresa, Surviving Spouse, 27 Walnut Hill East Lyme, CT 06333 | | 02 |
| FIRST NAMED DEFENDANT | | Buffalo Pumps, Inc., CT Corporation System, 111 Eighth Avenue, New York, NY  10011 | | 50 |
| Additional Defendant | | General Electric Company, CT Corp. System, One Commercial Plaza, Hartford, CT  06106 | | 51 |
| Additional Defendant | | Foster Wheeler, LLC, CT Corp. System, One Commercial Plaza, Hartford, CT  06106 | | 52 |
| Additional Defendant | | | | 53 |

**NOTICE TO EACH DEFENDANT**

1. You are being sued.
2. This paper is a Summons in a lawsuit.
3. The Complaint attached to these papers states the claims that each Plaintiff is making against you in this lawsuit.
4. To respond to this summons, or to be informed of further proceedings, you or your attorney must file a form called an Appearance with the Clerk of the above named Court at the above Court address on or before the second day after the above Return Date.
5. If you or your attorney do not file a written Appearance form on time, a judgment may be entered against you by default.

6. The Appearance form may be obtained at the above Court address.
7. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately take the Summons and Complaint to your insurance representative.
8. If you have questions about the Summons and Complaint, you should consult an attorney promptly. The Clerk of Court is not permitted to give advice on legal questions.

| DATE<br>11.17.09 | SIGNED<br>s/ 423477 | ☒ Commissioner of Superior Court<br>☐ Assistant Clerk | TYPE IN NAME OF PERSON SIGNING AT LEFT<br>Brian P. Kenney |
|---|---|---|---|

**FOR THE PLAINTIFF(S) ENTER THE APPEARANCE OF:**

| NAME AND ADDRESS OF ATTORNEY, LAW FIRM, OR PLAINTIFF IF PRO SE (No., street, town & zip code)<br>Early, Ludwick & Sweeney, LLC., 265 Church St., 11th Flr., New Haven, CT, 06510 | TELEPHONE NO.<br>203-777-7799 | JURIS NO. (If atty. or law firm)<br>409080 |
|---|---|---|
| NAME AND ADDRESS OF PERSON RECOGNIZED TO PROSECUTE IN THE AMOUNT OF $250 (No., street, town & zip code)<br>Alphonse Ippolito, Esq., 388 Orange St., New Haven, CT 06511 | | SIGNATURE OF PLAINTIFF IF PRO SE |

| NO. PLFS.<br>2 | NO. DEFS.<br>3 | NO. CNTS.<br>5 | SIGNED (Official taking recognizance, x proper box)<br>s/ 423477 | ☒ Commissioner of Superior Court<br>☐ Assistant Clerk | |
|---|---|---|---|---|---|

RECEIVED
NOV 30 2009
AMPCO-PITTSBURGH CORP.
LEGAL DEPARTMENT

**IF THIS SUMMONS IS SIGNED BY A CLERK:**

a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.
c. The Clerk is not permitted to give any legal

advice in connection with any lawsuit
d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Complaint, or the service thereof.

| I hereby certify I have read and understand the above. | SIGNED (Pro se plaintiff) | DATE SIGNED |
|---|---|---|

SUMMONS, Civil

A TRUE COPY
ATTEST:
T. JERRY JULIANO
STATE MARSHAL
NEW HAVEN COUNTY

| BRIDGEPORT ASBESTOS LITIGATION |
|---|

RETURN DATE:  DECEMBER 8, 2009       : SUPERIOR COURT
                                     :

THERESA PROKOP, EXECUTRIX TO THE ESTATE OF  :
ROBERT PROKOP & THERESA PROKOP,         : J. D. OF FAIRFIELD
INDIVIDUALLY AS SURVIVING SPOUSE       :
                                       :

VS.                                       : AT BRIDGEPORT
                                       :

BUFFALO PUMPS, INC.,                   :
FOSTER WHEELER, LLC,                 :
GENERAL ELECTRIC COMPANY,        : NOVEMBER 17, 2009

## COMPLAINT

### COUNT 1

1.  The plaintiff, THERESA PROKOP, EXECUTRIX TO THE ESTATE OF ROBERT PROKOP is a citizen of the State of Connecticut and resides at 27 Walnut Hill East Lyme, Connecticut.

2. The plaintiff, THERESA PROKOP, SURVIVING SPOUSE is a citizen of the State of Connecticut and resides at 27 Walnut Hill East Lyme, Connecticut.

2a.  The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Connecticut defendant.  Removal is improper.  Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of any federal officer of the U.S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.  Venue is proper in this court.

RECEIVED
NOV 3 0 2009
AMPCO-PITTSBURGH CORP.
LEGAL DEPARTMENT

3. Each of the defendants, and/or their predecessors in interest (hereinafter referred to as the "Defendants"), named in the caption above conducted business in the state of Connecticut, has produced, manufactured or distributed asbestos and/or asbestos products with the reasonable expectation that such products were so used or consumed, and/or has committed the tortious acts set forth below.

4. The employer or employers of the plaintiff were engaged in various businesses in which they bought and/or installed asbestos products and materials.

5. The plaintiff was exposed to various asbestos containing products while working as a steamfitter from 1961-1996.  Such exposure contributed in part or totally to the plaintiff's contraction of asbestos-related esophageal cancer and other asbestos-related pathologies.

6. During the period of time set forth above, the plaintiff was exposed to and did inhale and/or ingest asbestos dust, fibers, and particles, which dust fibers, and particles came from the asbestos products which were contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed and/or sold by the defendants.

7. Upon information and belief, the defendants, through their agents and employees, mined, processed, manufactured, designed, tested and/or packaged various asbestos-containing products, and supplied, distributed, delivered, marketed and/or sold said asbestos-containing products to the employer(s) of the plaintiff or to others working at the various jobsites in Connecticut where the plaintiff was employed, or to third persons who, in turn, delivered and sold such products and materials to such employers or to others working at such jobsites for use by employees, including the plaintiff.

8. At all relevant times that the plaintiff was working, the plaintiff was exposed to asbestos materials and products which, as part of the plaintiff's employment, the plaintiff was forced to come into contact with and breathe, inhale, and ingest asbestos fibers and particles coming from said asbestos products and materials.

9. At all times pertinent hereto, the defendants were engaged in the business of contracting for, mining, milling, processing, manufacturing, designing, testing, assembling, fashioning, fabricating, packaging, supplying, distributing, delivering, marketing, and/or selling asbestos and asbestos products.

10. At all times pertinent hereto, the asbestos products contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, and/or sold by the defendants reached the plaintiff without any substantial change in their condition from the time they were sold.

11. The actions of the defendants described and alleged above were wrongful under Section 52-572m, et seq., in one or more of the following ways:

(a)     Said asbestos-containing products were unreasonably defective in one or more of the following ways:

1.     in that said products were and are unavoidably unsafe, and failed to carry proper, adequate and correct warnings about their hazards about which the defendant knew or should have known;

2.     in that said products were and are unreasonably dangerous, in that they were and are dangerous to an extent beyond that which the ordinary worker in the position of the plaintiff would contemplate;

3.     in that any warnings, information and/or safety instruction said products may have carried, were improper and inadequate in that they failed to apprise users and/or others, including the plaintiff, adequately and reasonably of the full hazards and dangers of coming in contact with said products, including the risk of cancer;

(b)     The defendants knew or should have known that said asbestos-containing products were inherently dangerous to those who used them, yet the defendants failed to use reasonable and/or ordinary care in seeing to it that said products carried proper, adequate and correct warnings of the dangers of said products, and the exposure of the plaintiff and others like the plaintiff to these products was reasonably foreseeable to the defendants;

(c)     The defendants breached warranties, either implied or expressed, in that these products were not fit and/or safe for their known and intended purposes and uses.

12. As a result of the above, the plaintiff is caused to sustain severe, painful and permanent injuries referred to in Paragraph 5 and/or other asbestos-related pathologies caused by the plaintiff coming into contact with and breathing, inhaling and ingesting asbestos fibers. The injuries and diseases from which the plaintiff suffered caused the plaintiff to suffer great pain, suffering, mental anxiety, distress of mind, humiliation, emotional trauma and mental anguish.

13. The disease, diseases or injuries from which the plaintiff suffers was directly and proximately caused by the plaintiff 's exposure to asbestos and asbestos products which were mined, milled, manufactured, designed, assembled, distributed, supplied, constructed, processed, packaged, distributed, delivered, purchased and/or sold by the defendants.

14. As a result thereof, the plaintiff's life span has been shortened and the plaintiff's capacity to carry on life's activities is impaired along with the plaintiff's capacity to enjoy life and family, to engage in any gainful employment, and to participate in civic affairs.

15. As a result of said illness, the plaintiff is obligated to incur expenses for medical, hospital and surgical treatment, drugs, medicines, x-rays and medical apparatus.

16. As a further result of said illness, the plaintiff's earning capacity is impaired.

17. The defendants knew or should have known that the asbestos products and materials were inherently dangerous to those who used, handled or came in contact with said products and materials.

18. The defendants failed to provide proper, adequate and correct warnings and information concerning the dangers of the products and materials to persons using, handling, or coming into contact therewith.

19. The defendants failed to provide proper, adequate and correct warnings and instruction of safety precautions to be observed by users, handlers and persons, including the plaintiff, who would reasonably and foreseeably come into contact with the said products and materials.

20. Any warnings, information and/or instructions of safety precautions were improper and inadequate in that, among other things, they failed adequately and reasonably to apprise users, handlers and persons coming into contact with the said products and materials, including the plaintiff, of the full scope and danger to their health of contact with asbestos products and materials, including the risk of cancer.

21. The defendants have been possessed of medical and scientific data, studies and reports since approximately 1929, which information clearly indicated that asbestos and asbestos-containing products were hazardous to the health and safety of the plaintiff and other human beings.

22. The defendants, during the 1930's, 1940's, 1950's, and 1960's became possessed of voluminous medical and scientific data, studies and reports, which information conclusively established that asbestos and asbestos-containing products were hazardous to the health and safety of the plaintiff and all humans exposed to the products.

23. The defendants have since the 1930's had numerous workers' compensation claims filed against them by former asbestos workers/employees.

24. The defendants, since the 1920's, have consistently failed to acknowledge, publish, or in any way advise of studies and reports known throughout the industry, including studies conducted by or on behalf of various defendants in the asbestos industry.

25. Notwithstanding that the defendants possessed the foregoing information, the defendant wrongfully contracted for, mined milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, and sold asbestos products and materials to the plaintiff, the plaintiff 's employer(s) and/or to others working at the various jobsites and places of employment of the plaintiff and the defendants failed to render proper, adequate and correct warnings, advice, instruction and information and so acted in a grossly negligent, malicious, willful and wanton manner, failed to render proper, adequate and correct warnings, advice, instruction and information and so acted in a grossly negligent, malicious, willful and wanton manner, failed to use reasonable care under all circumstances, and wrongfully acted in other respects.

26. It was the continuing duty of the defendants to advise and warn purchasers, consumers, and users, and all prior purchasers, consumers, and users, of all dangers, characteristics, potentialities and/or defects discovered subsequent to their initial marketing or sale of said asbestos and asbestos products.

27. The defendants breached these duties by:

(a) failing to warn the plaintiff of the dangers, characteristics, and/or potentialities of the product or products when they knew or should have known that the exposure to the product(s) would cause disease and injury;

(b)     failing to warn the plaintiff of the dangers to which the plaintiff was exposed when they knew or should have known of the dangers;

(c)     failing to exercise reasonable care to warn the plaintiff of what would be safe, sufficient, and properly protective clothing, equipment, and appliances when working with, near or during exposure to asbestos and asbestos products;

(d)     supplying asbestos or asbestos products that were packaged, bagged, boxed and/or supplied to the plaintiff in packaging, bagging, boxes or other containers that were inadequate and/or improper;

(e)     supplying asbestos or asbestos products that were delivered to and reached the plaintiff without adequate or proper handling instructions, face masks and/or respirators;

(f)     failing to test the asbestos and asbestos products in order to ascertain the extent of dangers involved upon exposure;

(g)     failing to conduct such research that should have been conducted in the exercise of reasonable care in order to ascertain the dangers involved upon exposure;

(h)     failing to remove the product or products from the market when the defendants corporations knew or should have known of the hazards of exposure to asbestos and asbestos products;

(i)     failing upon discovery of the dangers, hazards, and potentialities of exposure to asbestos adequately to warn and apprise the plaintiff of the dangers, hazards, and potentialities discovered;

(j)     generally using unreasonable, careless, and negligent conduct in the contracting for, mining, milling processing, manufacturing, designing, testing, assembling, fashioning, fabricating, packaging, supplying, distributing, delivering, marketing, and/or selling of their asbestos and asbestos products.

28.   The plaintiff brings this Count pursuant to Connecticut General Statutes Sections 52-240a, 52-240b, and 52-572m et seq.

WHEREFORE, the plaintiff, THERESA PROKOP, EXECUTRIX claims damages.

## COUNT II

1.- 28. Plaintiff(s) repeat and reallege all allegations contained in all paragraphs above as is fully set forth herein.

29.  As a result of the actions of the defendants alleged in the FIRST COUNT, the plaintiff's decedent died.

30.  The plaintiff brings this cause of action as beneficiary and representative of all the beneficiaries of the plaintiff's decedent and is head of the decedent's estate, pursuant to Sections 52-555 and/or 52-572m et seq. of the Connecticut General Statutes.

## COUNT III

(As to Plaintiff THERESA PROKOP AS EXECUTRIX TO THE ESTATE OF ROBERT PROKOP, and against Defendant(s) Metropolitan Life Insurance Company Only)

1 - 30.  Plaintiff(s) repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

31.  Defendant(s), individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiff.

32.  The Defendant(s) knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the others so to conduct itself.

33.  The defendant(s) acted in the following fashion:

a.        Conspirator Metropolitan Life Insurance Company (hereinafter "Met Life") required a tangible quid pro quo from McGill University in the 1920's in exchange for them providing funding for a study of asbestos disease in Canadian miners.  The study revealed asbestos

miners suffered from asbestosis. The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

      b.     In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted co-conspirator Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of his study showed that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issues of asbestos disease. Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

      c.     Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and Attorney J. C. Hobart, and conspirator Raybestos-Manhattan, hereinafter referred to as "Raybestos", through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Association Medical Director of Met Life (insurer of conspirators Johns-Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The defendant Met Life was motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to

influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits and workers' compensation claims involving Manville, Raybestos, and others, as well as Met Life, the insurer.

       d.     In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter ego to defendant Turner & Newall), Raybestos, Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

       e.     On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company, and U. S. Gypsum Company. U. S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

f.    At this November 11, 1948 meeting, these co-conspirators and their respective representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

g.    At this meeting, the co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald.  The acts of these co-conspirators were carried out by co-conspirator Met Life's agent, Dr. Lanza.  These co-conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, Plaintiff.

h.    As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association.  The published version stressed those portions of Gardner's work that the co-conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs).  Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work.  The defendant(s) thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr.

Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

　　　i.　　Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

　　　j.　　The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation), National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

　　　k.　　The conspirators who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l. This plan of misrepresentation and influence over the medical literature began on or about 1950 when Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

m. As a result of the termination of this study, these conspirators fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. Smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, inter alia, U. S. government officials, Canadian government officials, U. S. National Cancer Institute, and the general public, including Plaintiff.

n. Subsequently, the Q.A.M.A. conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

o. The Q.A.M.A. conspirators thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the conspirators to be patently false.

p.      By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

q.      In approximately 1958, the Q.A.M.A. conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

r.      The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

s.      In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t.      In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance:  Johns-Manville, Turner & Newall, Raybestos, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

u.      At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed.  In an affirmative attempt to mislead the public about the extent of health risks

associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these conspirators conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac Agreement required by the asbestos industry members.

      v.     The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessors to Celotex), Johns-Manville, and others.

      w.     In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

      x.     The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos, Johns-Manville, H. K. Porter, Keasby & Mattison (individually and through its alter-ego defendant Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

      y.     In 1947, the members of the ATI, received a report from W. C. L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These conspirators caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these conspirators withheld additional material information on the dust standards from

The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

z.      In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

aa.      In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D., caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

bb.      In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

cc.   In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos-exposure and lung cancer.

dd.   In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ee.   In 1970, through their agents, co-conspirators, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these conspirators.

ff.   All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos, and Anthony J. Lanza, M.D., acting on behalf of conspirator Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

34. All of the aforementioned defendant(s):

a.   did a tortious act in concert with the other or pursuant to a common design with them; and/or

b.   knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

     c.     gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiff.

35. The acts of the defendant(s) as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiff in the following manner:

     a.     The material published or caused to be published by the defendant(s) was false and incomplete in that the Defendant(s) knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

     b.     Defendant(s) individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos would:

     (1)     maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

     (2)     assist in the continued pecuniary gain of the defendant(s) through the sale of their products;

     (3)     influence proposed legislation to regulate asbestos exposure to the defendant(s) benefit;

     (4)     provide a defense in lawsuits brought for injury resulting from asbestos disease.

     c.     Plaintiff(s) continued to be exposed to asbestos because of a belief that it was safe due to Plaintiff(s) reasonable reliance upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products.

     d.     Defendant(s) individually, as members of a conspiracy, and as agents of each other intended that Plaintiff(s) rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue Plaintiff's exposure to these products.

e.    Defendant(s), individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiff had a right to rely on the published reports commissioned by the defendant(s) regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

f.    Plaintiffs suffered and will continue to suffer injury as a direct result and proximate result of the acts alleged herein.

34. As a direct and proximate result of the acts of the Defendant(s), Plaintiff-worker suffered serious bodily injury, endured and will continue to endure great pain and suffering, incurred and will continue to incur medical expenses, suffered and will continue to suffer mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

## COUNT IV

(As to Plaintiff THERESA PROKOP, SURVIVING SPOUSE and all Defendants)

1.-34. Plaintiff(s) repeat and reallege all allegations contained in all paragraphs above as is fully set forth herein.

35. As a result of the foregoing injuries and damages suffered by the plaintiff, the said plaintiff's spouse has and will sustain damages by virtue of his/her loss of consortium with the plaintiff and the loss and impairment of the plaintiff's services, protection, care and assistance, society, companionship, affection, love, comfort, support, guidance, and kindly offices and advice, and other benefits of the marital relationship.

WHEREFORE, the plaintiff, THERESA PROKOP, SURVIVING SPOUSE claims damages.

## COUNT V

1.-35. Plaintiff(s) repeat and reallege all allegations contained in all paragraphs above as is fully set forth herein.

36.     The defendants have been possessed of medical and scientific data, studies and reports since approximately 1929, which information indicated that asbestos and asbestos-containing products were hazardous to their health and safety of the plaintiff and other human beings.

37.     The defendants, during the 1930's, 1940's, 1950's and 1960's became possessed of medical and scientific data, studies and reports, which information established that asbestos and asbestos-containing products were hazardous to the health and safety of the plaintiff and all humans exposed to those products.

38.     The defendants, since the 1920's, have failed to acknowledge, publish, or in any way advise of studies and reports known throughout the industry, including studies conducted by or on behalf of various defendants in the asbestos industry.

39.     Notwithstanding that the defendants possess the foregoing information, the defendants committed some or all of the wrongful acts and/or omissions described and alleged in paragraph 10 of the First Count.

40.     Said acts and omissions thus constitute misconduct that is grossly negligent, willful, wanton, malicious and/or outrageous.

WHEREFORE Plaintiffs THERESA PROKOP, EXECUTRIX and THERESA PROKOP, SURVIVING SPOUSE demand judgment and damages against the Defendant(s), jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

THE PLAINTIFFS


BY ___s/ 423477_____
      Brian P. Kenney, Esq.
      EARLY, LUDWICK & SWEENEY, L.L.C.
      One Century Tower, 11th Floor
      265 Church Street P.O. Box 1866
      New Haven, CT 06508-1866
      (203) 777-7799
      Juris No. 409080
      Their attorneys

## BRIDGEPORT ASBESTOS LITIGATION

| | | |
|---|---|---|
| RETURN DATE:  DECEMBER 8, 2009 | : | SUPERIOR COURT |
| | : | |
| THERESA PROKOP, EXECUTRIX | : | |
| TO THE ESTATE OF ROBERT PROKOP AND | : | J.D. OF FAIRFIELD: |
| THERESA PROKOP, INDIVIDUALLY AS | : | |
| SURVIVING SPOUSE | : | |
| | : | |
| VS. | : | AT BRIDGEPORT |
| | : | |
| BUFFALO PUMPS, INC., ET AL | : | NOVEMBER 17, 2009 |

WHEREFORE, the plaintiffs, THERESA PROKOP, EXECUTRIX TO THE ESTATE OF

ROBERT PROKOP AND THERESA PROKOP, INDIVIDUALLY AS SURVIVING SPOUSE,

claim as to the defendants:

      1. Full, fair and just money damages;

      2. Punitive and exemplary damages, including attorney's fees;

      3. Statutory punitive damages and reasonable attorney's fees pursuant to General Statutes

Sections 52-240a and 52-240b (First Count);

      4. Costs of this action.

THE PLAINTIFFS

BY    s/ 423477

      Brian P. Kenney, Esq.
      EARLY, LUDWICK & SWEENEY, L.L.C.
      One Century Tower, 11th Floor
      265 Church Street P.O. Box 1866
      New Haven, CT 06508-1866
      (203) 777-7799
      Juris No. 409080
      Their attorneys

## BRIDGEPORT ASBESTOS LITIGATION

| | | |
|---|---|---|
| RETURN DATE:  DECEMBER 8, 2009 | : | SUPERIOR COURT |
| | : | |
| THERESA PROKOP, EXECUTRIX | : | |
| TO THE ESTATE OF ROBERT PROKOP AND | : | J.D. OF FAIRFIELD: |
| THERESA PROKOP, INDIVIDUALLY AS | : | |
| SURVIVING SPOUSE | : | |
| | : | |
| VS. | : | AT BRIDGEPORT |
| | : | |
| BUFFALO PUMPS, INC., ET AL | : | NOVEMBER 17, 2009 |

The amount, legal interest and property in demand is not less than $15,000.00, exclusive of interest and costs.

THE PLAINTIFFS


BY   s/ 423477
   Brian P. Kenney, Esq.
   Early Ludwick & Sweeney, LLC
   One Century Tower, 11th Floor
   265 Church Street
   P.O. Box 1866
   New Haven, CT  06508-1866
   (203) 777-7799
   Juris No. 409080
   Their Attorneys