# U. S. District Court
## Eastern District of Louisiana (New Orleans)
## CIVIL DOCKET FOR CASE #: 2:11-cv-01198-SSV-SS
## Internal Use Only

Vedros v. Northrop Grumman et al
Assigned to: Chief Judge Sarah S. Vance
Referred to: Magistrate Judge Sally Shushan
Case in other court: Civil District Court for the Parish of
                     Orleans, 10-11041
Cause: 28:1441 Petition for Removal- Asbestos Litigation

Date Filed: 05/20/2011
Jury Demand: Plaintiff
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Federal Question

**Plaintiff**

**Sally Gros Vedros**          represented by   **Gerolyn Petit Roussel**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Brett Clement**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Lauren Roussel Clement**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Perry Joseph Roussel , Jr.**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Northrop Grumman Shipbuilding, Inc.**
*formerly known as*
Avondale Industries, Inc.
*formerly known as*
Avondale Shipyards, Inc.

**Defendant**

**Albert Bossier, Jr.**

**Defendant**

**Onebeacon America Insurance
Company**
*as successor to Commercial Union
Insurance Company and Employers
Commercial Union Insurance Company*

**Defendant**

**American Employers Insurance
Company**

**Defendant**

**American Motorists Insurance
Company**

**Defendant**

**Bayer CropScience, Inc.**
*as successor of liability to Rhone-Poulenc
AG Company f/k/a Amchem Products, Inc.
f/k/a Benjamin Foster Company*

**Defendant**

**Eagle, Inc.**
*formerly known as*
Eagle Asbestos & Packing Company, Inc.

**Defendant**

**Foster-Wheeler LLC**
*formerly known as*
Foster-Wheeler Corporation

represented by **John Joseph Hainkel , III**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Email: jhainkel@frilot.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela M. Bowlin**
Frilot L.L.C.

Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Fax: (504) 599-8271
Email: abowlin@frilot.com
*ATTORNEY TO BE NOTICED*

**James H. Brown , Jr.**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Email: jbrown@frilot.com
*ATTORNEY TO BE NOTICED*

**Meredith K. Keenan**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
504-599-8066
*ATTORNEY TO BE NOTICED*

**Peter R. Tafaro**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
504-599-8060
Fax: 504-524-7887
Email: ptafaro@frilot.com
*ATTORNEY TO BE NOTICED*

**Rebecca Abbott Zotti**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
504-599-8224
Email: rzotti@frilot.com
*ATTORNEY TO BE NOTICED*

**Sheri Sport Faust**

Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Fax: (504)599-8157
Email: sfaust@frilot.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Electric Company**          represented by   **John Joseph Hainkel , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela M. Bowlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James H. Brown , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith K. Keenan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter R. Tafaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Abbott Zotti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sheri Sport Faust**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Hopeman Brothers, Inc.**

**Defendant**

**McCarty Corporation**
*successor to McCarty Branton, Inc. and
Predecessor and Successor to McCarty
Insulation Sales, Inc.*

**Defendant**

**Reilly-Benton Company, Inc.**

**Defendant**

**Taylor-Seidenbach, Inc.**

**Defendant**

**CBS Corporation**                        represented by   **John Joseph Hainkel , III**
*formerly known as*                                        (See above for address)
Westinghouse Electric Corporatioin                         *LEAD ATTORNEY*
*formerly known as*                                        *ATTORNEY TO BE NOTICED*
Viacom Inc

                                                           **Angela M. Bowlin**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **James H. Brown , Jr.**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Meredith K. Keenan**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Peter R. Tafaro**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Rebecca Abbott Zotti**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Sheri Sport Faust**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Rapid American Corporation**

**Defendant**

**Maryland Casualty Company**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/20/2011 | 1 | NOTICE OF REMOVAL from Civil District Court for the Parish of Orleans, case number 2010-11041 (Filing fee $ 350 receipt number 053L-3031359) filed by Foster-Wheeler LLC, CBS Corporation, General Electric Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Notice of Manual Attachment Exhibit G, # 8 Exhibit H, # 9 Civil Cover Sheet) (Hainkel, John) Modified on 5/23/2011 to edit party (rll, ). (Entered: 05/20/2011) |

| 05/20/2011 | 2 | Statement of Corporate Disclosure by CBS Corporation identifying Corporate Parent National Amusements, Inc. for CBS Corporation (Hainkel, John) Modified on 5/23/2011 to add corp parent (rll, ). (Entered: 05/20/2011) |
|---|---|---|
| 05/20/2011 | 3 | Statement of Corporate Disclosure by Foster Wheeler LLC (Hainkel, John) (Entered: 05/20/2011) |
| 05/20/2011 | 4 | Statement of Corporate Disclosure by General Electric Company (Hainkel, John) (Entered: 05/20/2011) |
| 05/20/2011 | 5 | Notice of Compliance *and Listing of Parties* by CBS Corporation, Foster Wheeler LLC, General Electric Company re 3 Statement of Corporate Disclosure, 2 Statement of Corporate Disclosure, 1 Notice of Removal, 4 Statement of Corporate Disclosure. (Attachments: # 1 Certification of Service)(Hainkel, John) (Entered: 05/20/2011) |
| 05/20/2011 | 6 | Initial Case Assignment to Chief Judge Sarah S. Vance and Magistrate Judge Sally Shushan. (cl, ) (Entered: 05/20/2011) |
| 05/23/2011 | 7 | Correction of Docket Entry by Clerk re 2 Statement of Corporate Disclosure. Filing attorney did not enter National Amusements, Inc. as a corporate parent at the prompt 'Search for a corporate parent or other affiliate'. Clerk took corrective action. No further action is necessary. (rll, ) (Entered: 05/23/2011) |
| 05/23/2011 | 8 | Manual Attachment Received re 1 Notice of Removal, filed by Foster-Wheeler LLC, General Electric Company, CBS Corporation. (rll, ). (Entered: 05/23/2011) |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SALLY GROS VEDROS | CIVIL ACTION NO.: |
| versus | JUDGE: |
| NORTHROP GRUMMAN SHIPBUILDING, INC., ALBERT BOSSIER, JR., ONEBEACON AMERICA INSURANCE COMPANY, AMERICAN EMPLOYERS INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY, BAYER CROPSCIENCE, INC., EAGLE, INC., FOSTER-WHEELER LLC, GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., THE MCCARTY CORPORATION, REILLY-BENTON COMPANY, INC., TAYLOR-SEIDENBACH, INC., CBS CORPORATION, RAPID AMERICAN CORPORATION, MARYLAND CASUALTY COMPANY | MAG. JUDGE: |

## NOTICE OF REMOVAL

Defendants, CBS Corporation, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation ("Westinghouse"), Foster Wheeler, LLC ("Foster Wheeler"), and General Electric Company ("General Electric" or "GE") collectively "Defendants," through the undersigned counsel, hereby remove this action from the Civil District Court for the Parish of Orleans, to the United States District Court for the Eastern District of Louisiana, pursuant to 28 U.S.C. §§ 1441 and 1446. In support of this Notice of Removal, Defendants state as follows:

## I. THE STATE COURT ACTION

1.      On October 28, 2010, Plaintiff Sally Gros Vedros filed her Petition for Damages in *SALLY GROS VEDROS versus NORTHROP GRUMMAN SHIPBUILDING, INC., et. al.,* No.

10-11091 in the Civil District Court for the Parish of Orleans.  General Electric, Foster Wheeler, and Westinghouse are named as defendants.

2.      Plaintiff alleges that from 1960 through 1963 she was "employed in various positions by or on the premises of Avondale Industries, Inc." (Petition, Exh. A ¶ 8.)  Plaintiff alleges that she was exposed to "dangerously high levels of toxic substances, including asbestos, and asbestos containing products sold, manufactured, and/or distributed by the 'asbestos defendants' in the normal routine course of her work." *Id.*  Plaintiff also claims exposure because "from approximately 1943 through 1976, Alton Gros [Plaintiff's father] was employed in various positions by or on the premises of Avondale Industries, Inc.," allegedly resulting in asbestos exposure on Plaintiff's part due to her washing and handling of her father's clothing and other possessions.  (*Id.* ¶ 9-10.)  Plaintiff alleges that she contracted mesothelioma as a result of these exposures.  (*Id.* ¶ 11.)  Plaintiff's complaint provided a broad overview of her alleged exposures, but did not allege exposure relating to any specific product, equipment, or premise.

3.      On April 18, 2011, counsel for Plaintiff sent correspondence to undersigned counsel requesting dates for the depositions of witnesses listed on the Witness Lists filed by Defendants in the State Court Action.  (Plaintiff's April 18, 2011 Correspondence, Exh. B, *in globo*.)

4.      On April 19, 2011, counsel for Defendants replied to Plaintiff's counsel's April 18, 2011 correspondence, and requested identification of the work sites and equipment to which Plaintiff alleges she was exposed. (Defendants' April 19, 2011 Correspondence, Exh. C.)

5.      On May 3, 2011, Defendants received correspondence from Plaintiff's counsel, which reflected that the only work site at issue in Plaintiff's case was Avondale Shipyard, and

Plaintiff's counsel again requested dates for the depositions of Defendants' witnesses. (Plaintiff's May 3, 2011 Correspondence, Exh. D.)

6.      On May 3, 2011, counsel for Defendants replied to counsel's request in written correspondence, and asked for additional information regarding the specific vessels on which Mr. Gros allegedly worked and the equipment that Mr. Gros and/or Mrs. Vedros allegedly worked on or around while employed at Avondale Shipyard.  (Defendants' May 3, 2011 Correspondence, Exh. E.)

7.      On May 4, 2011, counsel for Plaintiff responded to the request for information, and provided correspondence that reflected the following: "In response to your letter dated May 3, 2011, **Mr. Gros allegedly worked on all vessels present at Avondale Shipyards during his employment there.  Furthermore, Mr. Gros and Mrs. Vedros were allegedly exposed to asbestos from all equipment present at Avondale Shipyards during their employment there."** (Plaintiff's May 4, 2011 Correspondence, Exh. F.)

8.      Between 1943 and 1976, the years during which exposure is alleged, the following United States Navy vessels were constructed at Avondale's Main Shipyard using asbestos-containing and/or asbestos-insulated GE products that may have contained or been insulated with asbestos: U.S.S. SEMMES and U.S.S. TATTNALL.  Upon information and belief, to the extent that Ms. Vedros may have been exposed to asbestos associated with GE products at the Avondale Main Shipyard, as plaintiff alleges, that asbestos would have been associated with marine turbines designed and manufactured at the direction of and pursuant to a contract with the United States Navy and used in the construction of the above-named Navy vessels.

9.      Between 1943 and 1976, the years during which exposure is alleged, the following United States Navy vessels were constructed at Avondale's Main Shipyard using asbestos-

3

containing and/or asbestos-insulated Westinghouse products: U.S.S. BRUMBY and U.S.S. DAVIDSON (1013);  U.S.S. CONNOLE, U.S.S. W.S. SIMS, U.S.S. PATTERSON, U.S.S. VREELAND, U.S.S. BLAKELY, U.S.S. TRIPPE, U.S.S. OUELLET, U.S.S. JOSEPH HEWES, U.S.S. BOWEN PAUL, U.S.S. AYLWIN, U.S.S. ELMER MONTGOMERY, U.S.S. COOK, U.S.S. MCCANDLESS, U.S.S. BEARY, U.S.S. BREWTON, U.S.S. KIRK, U.S.S. BARBEY, U.S.S. JESSE BROWN, U.S.S. AINSWORTH, U.S.S. MILLER, U.S.S. THOMAS HART, U.S.S. CAPODANNO, U.S.S. PHARRIS, U.S.S. TRUETT, U.S.S. VALDEZ, and, U.S.S. MOINESTER. Upon information and belief, to the extent that Ms. Vedros may have been exposed to asbestos associated with Westinghouse products at the Avondale Main Shipyard, that asbestos would have been associated with marine turbines designed and manufactured at the direction of and pursuant to a contract with the United States Navy and used in the construction of the above-named Navy vessels.

10.     Between 1943 and 1976, the years during which exposure is alleged, the following United States Navy vessels were constructed at Avondale's Main Shipyard using asbestos-containing and/or asbestos-insulated Foster Wheeler products: U.S.S. BRONSTEIN, U.S.S. MCCOY, U.S.S. BRUMBY, and U.S.S.  DAVIDSON. Upon information and belief, to the extent that Ms. Vedros may have been exposed to asbestos associated with Foster Wheeler products at the Avondale Main Shipyard, that asbestos would have been associated with marine boilers designed and manufactured at the direction of and pursuant to a contract with the United States Navy and used in the construction of the above-named Navy vessels.

11.     Under 28 U.S.C. 1446 (b), "a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or

4

has become removable." The procedural requirements for removal are satisfied, as are the requirements 28 U.S.C. § 1442(a)(1), and this Notice of Removal is filed within thirty days of receipt of correspondence from Plaintiff's counsel on May 4, 2011, the date when Defendants were first provided with "other paper" from which it could be ascertained that this case had become removable.

## II.  THE MDL PROCEEDINGS

12.     In 1991, the Judicial Panel on Multidistrict Litigation established *In re Asbestos Product Liability Litigation* (No. VI), MDL 875 (E.D. Pa.), to coordinate all federal asbestos personal injury litigation. Approximately 12,000 cases are now being coordinated by the MDL, which is presided over by Judge Eduardo C. Robreno.

13.     Defendants intend to identify this action as a potential "tag-along" to the MDL proceeding.

## III.  THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

14.     On May 4, 2011, Defendants were provided with Plaintiff's correspondence that contained information relative to Plaintiff's alleged exposure to asbestos at Avondale Shipyards associated with marine turbines and marine boilers designed and manufactured at the direction of, and pursuant to contracts with, the United States Navy.  (Plaintiff's May 4, 2011 Correspondence, Exh. F.).  Therefore, this Notice of Removal, filed May 20, 2011, is timely under 28 U.S.C. § 1446(b).  See *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999).  *See also*, *Price v. Wyeth Holdings Corp.*, 505 F.3d 624, 631 (7th Cir. 2007).

15.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, orders, and other papers filed in the State Court Action are attached hereto as Exhibit G.

16.     This Court embraces the locality in which the State Court Action is now pending, and thus is a proper forum for this action pursuant to 28 U.S.C. § 1441(a).  No previous application has been made for the relief requested herein.

17.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiff's counsel and a copy is being filed with the Clerk of the Civil District Court for the Parish of Orleans.

18.     A filing fee of $350.00 has been tendered to the Clerk of the United States District Court for the Eastern District of Louisiana.

19.     This Notice of Removal is being signed pursuant to Federal Rule of Civil Procedure 11.  A copy of the civil cover sheet and removal supplemental cover sheet are attached hereto.

20.     If any question arises regarding the propriety of removal, Defendants respectfully request the opportunity to present a brief and/or oral argument in support of its position that this case is removable.

### IV.   REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1441 AND 1442

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1442 because, in the manufacture and sale of marine turbines and marine boilers for and to the Navy, Defendants were acting under the direction of an officer of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

22.     Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party (1) demonstrates that it is a "person" within meaning of the statute; (2) demonstrates that it acted under the direction of a federal officer, meaning there is a nexus or causal connection between plaintiff's claims and its actions; and (3) raises a colorable federal defense to plaintiff's

claims. *Williams v. Todd Shipyards Co.*, 154 F.3d 416 (5th Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129, 131 (1989)).  Here, all three requirements have been satisfied, and Defendants are entitled to the federal officer removal provision.  Plaintiff claims she was exposed to asbestos from products manufactured, sold, used, distributed, or supplied by Defendants at Avondale Main Shipyard.  (Exh. A at ¶ 14; Exh. F.)

23.    Corporations, such as General Electric, Westinghouse, and Foster Wheeler, are "persons" for purposes of 28 U.S.C. § 1442(a). *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (examining the federal officer removal statute and explaining that "corporate entities qualify as 'persons' under §1442(a)(1)").

24.    Plaintiff's claims are based on Defendants' conduct in compliance with federal regulations and instructions including, but not limited to, those issued by the Department of Defense, the Secretary of the Navy, and the Navy and its officers.  As such, this case is subject to removal pursuant to 28 U.S.C. § 1442(a)(1) because it involves an action against an "officer (or any person acting under that officer) of the United States."  28 U.S.C. § 1442 (a)(1).

25.    Defendants' actions at issue in this suit took place under the direct and detailed control of a federal agency — the Navy — as well as several Navy officers and Navy-employed civilians, all acting under the command of the Secretary of the Navy.  These individuals exercised direct control over the construction and installation of General Electric marine turbines, Westinghouse marine turbines, Foster Wheeler marine boilers, as well as control over all information affixed to equipment supplied to the Navy.  Further, the Defendants' products were subject to various tests and trials supervised by the Navy before they were approved for use on military vessels.  In sum, virtually no aspect of the design and manufacture of the marine steam

turbines, marine boilers, or other products at issue escaped the close control of the Navy and its officers.

26.     As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Defendants may raise a federal defense to Plaintiff's claims — government contractor immunity from liability for injuries arising from any exposure to asbestos related to turbines or other equipment at Navy bases or onboard Navy vessels, insofar as they were constructed or repaired by Defendants. *Id.* at 511-12.  Under the government contractor defense, "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.  Here, the Navy provided Defendants with precise specifications regarding its equipment, and Defendants manufactured and delivered equipment that conformed to those specifications. Additionally, the Navy, as one of the world's leaders in industrial hygiene at the time of Plaintiff's alleged exposure to Defendants' products, possessed information equal to or superior to that possessed by Navy contractors such as General Electric, Westinghouse, and Foster Wheeler.  As such, Defendants have colorable claims that they are entitled to immunity from state tort liability under the government contractor defense.

27.     Indeed, in the MDL proceedings, Judge Robreno recently held that the government contractor defense applied to bar a plaintiff's state law duty to warn claims in a very similar case involving claims of exposure to General Electric's asbestos-containing products while the plaintiff's decedent served in the Navy aboard the U.S.S. Essex.  See *Faddish v. Gen. Elec.*

*Co.*, MDL No. 875, Civil Action No. 09-70626, 2010 WL 4146108, at *6-9 (E.D. Pa. Oct. 20, 2010). (Faddish Decision, Exh. H.)

28.     Notably, Defendants are not required to prove success on their defense for purposes of removal. *Mesa*, 489 U.S. at 133; *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) ("defense need only be plausible; its ultimate validity is not to be determined at the time of removal."); *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) ("defendant need not prove that he will actually prevail on his federal immunity defense in order to obtain removal"). Rather, Defendants are only required to show a causal connection between Plaintiff's claims and Defendants' performance as a federal contractor. Defendants can do so. See, *Williams v. Todd Shipyards Co.*, 154 F.3d 416 (5th Cir. 1998). Defendants need only present a colorable claim such that the validity of the defense should be tried in federal rather than state court. *Jefferson County v. Acker*, 527 U.S. 423, 431 ("In construing the colorable federal defense requirement, we have rejected a 'narrow, grudging interpretation' of the statute, recognizing that 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.' We therefore do not require the officer virtually to 'win his case before he can have it removed.'") (quoting *Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969)); *Venezia*, 16 F.3d at 212 ("Once the federal defendant has a plausible federal defense, removal is appropriate so that the federal court may determine whether the defense succeeds. A federal defendant need not show that he is entitled to prevail in order to have access to the federal forum").

29.     Defendants are not required to notify and obtain consent of any other defendant in this action in order to remove Plaintiff's action as a whole under section 1442(a)(1). See *O'Callaghan*, 686 F. Supp. 2d at 828 ("In the context of federal officials (or persons acting under

a federal official, courts have been clear in holding that a federal officer need not obtain the consent of other defendants to remove under Section 1442."). See also *Ely Valley Mines, Inc. v. Hartford Accident Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

WHEREFORE, Defendants respectfully request that this Action be removed to the District Court for the Eastern District of Louisiana.

Respectfully submitted:

FRILOT L.L.C.

*/s/ John J. Hainkel, III*
JOHN J. HAINKEL, III – 18246
ANGELA M. BOWLIN – 20714
SHERI S. FAUST – 26283
JAMES H. BROWN, JR. – 3564
PETER R. TAFARO - 28776
MEREDITH K. KEENAN – 29287
REBECCA A. ZOTTI – 33446
3700 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
T: (504) 599-8000; F (504) 599-8100

**Counsel for CBS Corporation, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation, Foster Wheeler, LLC, and General Electric Company**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of record by electronic transmission and/or by hand delivery, on this 20th day of May, 2011.

*/s/ John J. Hainkel, III*

FILED
2010 OCT 28 P 3:15
CIVIL
DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 10-11091

DIVISION " "

SEC: " "   M-13

SALLY GROS VEDROS

versus

NORTHROP GRUMMAN SHIPBUILDING, INC., (formerly AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.) and its executive officer, ALBERT BOSSIER, JR.; ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); AMERICAN EMPLOYERS INSURANCE COMPANY; AMERICAN MOTORISTS INSURANCE COMPANY; BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC. F/K/A BENJAMIN FOSTER COMPANY); EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); REILLY-BENTON COMPANY, INC.; TAYLOR-SEIDENBACH, INC.; CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORPORATION);RAPID AMERICAN CORPORATION; MARYLAND CASUALTY COMPANY

FILED:_____          _____
                                                                              DEPUTY CLERK

**PETITION FOR DAMAGES**

The Petition of Sally Gros Vedros, person of the full age of majority and resident of the State of Louisiana, with respect represents:

1.

Defendants, Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.), and Taylor-Seidenbach, Incorporated, are domestic corporations with their registered offices in the Parish of Orleans, State of Louisiana. Marquette Insulations, Inc. was also a domestic corporation with its registered offices in the Parish Orleans. In addition, tortious conduct of Marquette Insulations, Inc., Eagle, Inc. and Taylor-Seidenbach, Incorporated occurred in the Parish of Orleans. Moreover, C. Edwin Hartzman, Hettie "Dawes" Eaves, Henry "Zac" Carter, James Bull, Roy Barkdull, and Ewing Moore were domiciled in Orleans Parish at the time of their deaths. Also, Alton Gros was exposed to asbestos in Orleans Parish. Accordingly, venue is proper in Orleans Parish against all defendants pursuant to Louisiana Code of Civil Procedure Articles 42, 73, and 74.

2.

Defendants, NORTHROP GRUMMAN SHIPBUILDING, INC., (formerly, NORTHROP GRUMMAN SHIP SYSTEMS, INC., formerly, AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.); ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); AMERICAN EMPLOYERS INSURANCE



EXHIBIT
A

COMPANY; AMERICAN MOTORISTS INSURANCE COMPANY; BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC. F/K/A BENJAMIN FOSTER COMPANY); EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); REILLY-BENTON COMPANY, INC.; TAYLOR-SEIDENBACH, INC.; CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORPORATION); RAPID AMERICAN CORPORATION (as successor in interests to Philip Carey Manufacturing Company); MARQUETTE INSULATIONS, INC.; MARYLAND CASUALTY COMPANY (hereinafter collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws of the various states of the United States, as well as Canada, England, and Australia. Asbestos defendants all have their principal place of business in various states of the United States, as well as some foreign countries. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

At all material times herein, James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, Ewing Moore, Roy Barkdull, Peter Territo, Dr. Joseph Mabey, J. Melton Garrett, and Albert Bossier, Jr. were executive officers of Northrop Grumman Shipbuilding, Inc., (formerly Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc. and formerly Avondale Shipyards, Inc.) (hereinafter sometimes "Avondale" or "Avondale Industries, Inc.") with the specific responsibility for the health and safety of Sally Vedros and Alton Gros, and their fellow employees during the time Sally Vedros was exposed to substances which resulted in her mesothelioma and other ill effects related thereto. James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, Ewing Moore, Roy Barkdull, Peter Territo, J. Melton Garrett, and Dr. Joseph Mabey have since died, and pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against American Motorists Insurance Company, American Employer's Insurance Company, and Onebeacon America Insurance Company

- 2 -

(as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), who, at all times material herein, were the insurance carriers covering all of the foregoing individuals as well as Avondale Industries, Inc. for the liability asserted herein. These executive officers and Avondale were also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.    As stated above, Albert Bossier, Jr. was also an executive officer of Avondale with specific responsibilities for the health and safety of Sally Vedros and Alton Gros, and their fellow employees.  They, too, were covered for the liability asserted herein by Highlands Insurance Company, American Motorists Insurance Company; American Employer's Insurance Company, and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company); and Travelers Indemnity Company.  Plaintiffs assert a direct action against American Motorists Insurance Company, American Employer's Insurance Company, and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), for the liability of this individual pursuant to the Louisiana Direct Action Statute.  Likewise, this executive officer was also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.

4.

Under a buy-back contract and agreement between Northrop Grumman Shipbuilding, Inc. (Formerly, Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc., formerly Avondale Shipyards, Inc.) (hereinafter "Avondale") and Highlands Insurance Company (currently in receivership), Avondale is an additional insurer under the Highlands Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiff's petition.  The plaintiff asserts an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

5.

Under a buy-back contract and agreement between Avondale and American Motorists Insurance Company, Avondale is an additional insurer under the American Motorists Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiff's petition.  The plaintiff asserts an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

6.

American Employers Insurance Company and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company) provided coverage to Eagle, Inc. for the liability asserted herein, and plaintiff asserts a direct action pursuant to Louisiana Revised Statute 22:1269 against these insurance companies for the liability of this defendant.

7.

Pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against Maryland Casualty Company, who at all times material herein, was the general liability carrier covering Marquette Insulations, Inc. ("Marquette") for the liability asserted herein. Also, upon knowledge and belief, Marquette Insulations, Inc. has incurred a civil death by corporate dissolution. Thus, Marquette is deceased under Louisiana law allowing a direct action against its insurer, Maryland Casualty Company, pursuant to LSA-R.S. 22:1269(B)(1)(f). In addition, since Marquette Insulations, Inc. is dead, it cannot be served with citation or other process allowing a direct action against their insurer, Maryland Casualty Company, pursuant to LSA-R.S. 22:1269(B)(1)(c). Furthermore, the voluntary dissolution of Marquette Insulations, Inc. pursuant to LSA-R.S. 12:141 through 149, liquidates the assets (except insurance policies) of the corporation and renders the corporation insolvent, allowing a direct action against its insurer, Maryland Casualty Company, pursuant to LSA-R.S. 22:1269(B)(1)(b). Also, LSA-R.S. 22:1269 vested the plaintiffs with rights in the insurance contract distinct from the insured by operation of law. Additionally, the insurance policies of Maryland Casualty Company insuring Marquette Insulations, Inc. are undistributed asset of the tort debtor, Marquette Insulations, Inc. Thus, Maryland Casualty Company is subject to suit pursuant to LSA-R.S. 12:147(C) which allows a direct suit against the undistributed assets of a dissolved corporation.

8.

From approximately 1960 through 1963, Sally Vedros was employed in various positions by or on the premises of Avondale Industries, Inc. On a daily basis during this employment, Sally Vedros was exposed to dangerously high levels of toxic substances, including asbestos, and asbestos-containing products sold, manufactured, and/or distributed by the "asbestos defendants" in the normal routine course of her work.

9.

From approximately 1943 through 1976, Alton Gros was employed in various positions by or on the premises of Avondale Industries, Inc. On a daily basis during this employment,

Alton Gros was exposed to dangerously high levels of toxic substances, including asbestos, and asbestos-containing products sold, manufactured, and/or distributed by the "asbestos defendants" in the normal routine course of his work.

10.

Alton Gros was the father of Sally Vedros.  On a daily basis throughout the employment of Alton Gros, Sally Vedros was exposed to dangerously high levels of asbestos through contact with him, through the handling and washing of his clothes and other objects belonging to him, as well as being in the area where his clothes and other objects were being handled and washed.

11.

As a result of these exposures to toxic substances, including asbestos, Sally Vedros, contracted mesothelioma and other related ill health effects, which was first diagnosed on approximately March 22, 2010.

12.

Avondale and its executive officers had the responsibility of providing Sally Vedros and Alton Gros with a safe place to work and safety equipment with which to conduct their work (including disposable overalls and showers); however, they negligently and/or intentionally failed to carry out these duties and failed to protect Sally Vedros and Alton Gros from the dangers of toxic fiber and dust exposure, and failed to protect family members from said exposures to asbestos and toxic fiber.

13.

Avondale and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that Sally Vedros (and other similarly situated employees and/or family members of its working force) would suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld from Sally Vedros and Alton Gros, knowledge of the dangers to their health from exposure to asbestos fiber and other toxic substances.

14.

In addition to the foregoing acts of negligence and intentional concealment, Avondale and its executive officers are guilty of the following:

a)   Failing to reveal and knowingly concealing critical information from Sally Vedros and Alton Gros, including the ability to expose family members to asbestos through clothing of its workers;

b)   Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;

c)   Failing to provide necessary protection to Sally Vedros and Alton Gros, as well as to other employees and family members;

d)   Failing to provide clean, respirable air and proper ventilation;

e)   Failing to provide protective or disposable clothing and showers to its employees so that asbestos fiber would not be brought home to family members;

f)   Failing to advise employees that deadly asbestos fiber could be brought home to their family members; and

g)   Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

h)   Requiring employees to dump asbestos into the Mississippi River instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

I)   Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

j)   Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

k)   Failing to warn of the dangers of exposure to asbestos;

l)   Failing to warn employees and their families that asbestos fiber could be brought home on clothing and other objects, could expose innocent family members, and could cause deadly diseases to family members including mesothelioma, asbestosis, pleural thickening, and pleural plaques;

m)   Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, pleurisy, diaphragmatic calcifications, cancer, and mesothelioma;

Avondale and its executive officers intentionally or negligently committed these acts knowing full well that Sally Vedros' injuries would follow or were substantially certain to follow.

15.

Avondale and its executive officers, James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, John McQue, Ewing Moore, Peter Territo, Roy Barkdull, Dr. Joseph Mabey, J. Melton Garrett, and Albert Bossier, Jr., were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that said substances could be carried home by employees, and that employees and family members would suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld from Alton Gros and Sally Vedros, knowledge of the dangers to one's health from exposure to asbestos fiber and other toxic substances.

16.

In addition to the acts of negligence, strict liability, intentional tort, and fault identified throughout this petition, Avondale is strictly liable under a theory of premises liability. Avondale was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Sally Vedros would be exposed to asbestos and that Sally Vedros would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of these exposures, but they failed and/or willfully withheld from Alton Gros and Sally Vedros, knowledge of the dangers to their health from exposure to asbestos fiber.

17.

Defendants, OneBeacon American Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), American Employers Insurance Company, and American Motorists Insurance Company, knew or should have known of the hazardous health effects of asbestos, but failed to inform or intentionally concealed that information from Sally Vedros and Alton Gros, and their co-employees as well as from their family members.

18.

All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Sally Vedros and for which these defendants are strictly liable under Louisiana law.

19.

Defendant, Avondale, was the owner of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Sally Vedros, and for which defendant is strictly liable under Louisiana law.

20.

Defendant, Avondale, is answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Sally Vedros, and for which defendants are strictly liable under Louisiana law.

21.

Defendant, Avondale, is responsible for the conduct of those individuals and companies working on their premises with asbestos products which resulted in exposure to asbestos to Sally Vedros, which asbestos was defective and which presented an unreasonable risk of harm, and which

asbestos resulted in the injury to Sally Vedros, and for which defendants are strictly liable under Louisiana law.

22.

At all times material herein, Sally Vedros was exposed to asbestos manufactured, distributed, and sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company. The asbestos-containing products manufactured, distributed and/or sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, these defendants failed and refused to warn Sally Vedros and Alton Gros, of the danger of exposure to such products. They also failed to warn them of the invisible nature of the asbestos and that it could cause deadly diseases such as mesothelioma and cancer. As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by these "asbestos defendants," Sally Vedros was exposed to asbestos fibers proximately causing her mesothelioma, cancer, and other related ill health effects. Plaintiff further contends that said defendants are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

23.

During Sally Vedros' exposure, Hopeman Brothers, Inc. also performed contracting work wherein asbestos-containing products were used. During this contracting work, Hopeman Brothers, Inc. exposed Sally Vedros and Alton Gros to asbestos-containing products, which caused and/or contributed to Sally Vedros' asbestos-related diseases and other related ill health effects from which she suffers. Defendant, Hopeman Brothers, Inc. had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Sally Vedros and for which Hopeman Brothers, Inc. is strictly liable under Louisiana law. Moreover, defendant, Hopeman Brothers, Inc., is answerable for the conduct of those handling asbestos products over which it had control, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Sally Vedros and for which defendant is strictly liable under Louisiana law.

- 8 -

24.

In addition to the aforementioned acts of negligence, intentional tort, fraud, and strict liability, of Hopeman Brothers, Inc. and Wayne Manufacturing Co., Hopeman Brothers, Inc. is also liable because Wayne Manufacturing Corporation was the alter ego of Hopeman Brothers, Inc. at all time material herein.

25.

Plaintiff also makes additional allegations against Hopeman Brothers, Inc. who was aware of the risk of harm presented by its asbestos products. Hopeman Brothers, Inc. either through exchange of information and/or industry sponsored studies was notified, either directly by its parent companies or by its manufacturing associations, that their products presented an unreasonable risk of harm. However, Hopeman Brothers, Inc. disregarded these notices, elected to conceal these hazards from the plaintiffs and continued to use and hold out these products as safe and non-toxic.

26.

Hopeman Brothers, Inc. was informed that asbestos dust presented health risks by the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The U.S. Government issued advisories, through the U.S. Maritime Commission, to all government contractors regarding their findings of enumerated health risks in the work place. During the 1950s, the Department of Defense adopted and distributed to all government contractors, safety standards that pertained to the use of these defendants' products in various work places. In 1958, Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S. Government promulgated and published the Walsh-Healy Act which adopted safety standards and regulations regarding asbestos dust. Based on information and belief, Hopeman Brothers, their predecessor, and corporation officers were made aware of these findings at the time they were issued. Despite this knowledge Hopeman continued to manufacture, distribute, relabel, fabricate, sell and install these products at plaintiffs worksites. This was done without warning to plaintiffs and without the knowledge on the part of the plaintiffs that they were in danger. Additionally, these defendants continued to market their products without disclosing the dangers and simultaneously affirming that their products were safe and non-toxic.

27.

During Sally Vedros' exposure, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Sally Vedros and Alton Gros and/or to the owners of the premises where they worked, throughout their entire employment history at

Avondale. Such products were installed, removed, and repaired by or in close proximity to Sally Vedros and Alton Gros during their employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time Sally Vedros and Alton Gros were employed, they were exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse. At the they were exposed to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse.

28.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, Westinghouse failed and refused to warn Sally Vedros and Alton Gros of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

29.

Plaintiff further alleges that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

30.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma. Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council. Beginning in the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

31.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. IHF members included, among others, General Electric Company and Westinghouse Electric Corporation, or their predecessors in interest. All of these companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health

- 10 -

to its members.  Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins.  Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee.  The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene.  In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances.  Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases.  As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease.  In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute."  The report is dated June 1947.  The object of the investigation was stated as:  "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field."  The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period."  While the actual report does not reveal the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that other companies evaluated in the report included, among others, Garlock.  Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place.  It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease.  Some annual meetings apparently were held by the IHF.  The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest.  An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control.  A second report by Foundation Research at the

Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

32.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

33.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also

aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

34.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

35.

Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

36.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the

courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has

refused to respond to plaintiffs' request for the production of these documents principally on the

basis that said documents did not exist due to their destruction. Accordingly, plaintiffs allege

that Westinghouse's conduct constitutes fraud under Louisiana law.

37.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related

violations during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and

blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that

Westinghouse would not comply with either the EPA or OSHA and would take an attitude of

"respectful noncompliance".

38.

Westinghouse has engaged in a pattern of suppressing information with regard to its

asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of

Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial

Hygiene Department files, dating back to 1930, have been reviewed. After a general description

of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these

documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking
> gun" documents. This is so because of the nature, duties, obligations and
> responsibilities of the Industrial Hygiene Department. The approximately 57
> years of Industrial Hygiene files which are in existence today are filled with
> technical information, procedural information, safe-handling information, hazard
> information, recommendations and tests results. The files are filled with
> documentation which critiques and criticizes, from an industrial hygiene
> perspective, Westinghouse manufacturing and non-manufacturing operations.
> This documentation often times points out deficiencies in Westinghouse
> operations and suggests recommendations to correct these deficiencies. Industrial
> Hygiene's files contain information which details the various chemical substances
> used at Westinghouse sites over the years, and often times the inadequacies in
> Westinghouse's use and handling of the substances. The files contain many years
> of employee test results, some of them unfavorable. Industrial Hygiene, by
> performing its job, creates, daily, potential smoking gun documents (emphasis
> added).
>
> Plant Correspondence and Files
>
> Please see, for example, Wilber Speicher's letter...correspondence of this type was
> and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's
> correspondence might show early knowledge of the Corporation to certain health
> hazards associated with epoxy resin dissolving agents. What use did the
> Corporation make of this knowledge to protect employees and the public? If none
> or very little, then this document might become a "smoking gun" (emphasis
> added).
>
> Industrial Hygiene audit and trip reports certainly qualify as potential smoking
> guns (emphasis added). Industrial Hygiene, in each plant audit, critiques and
> criticizes the facility from an industrial hygiene perspective. Industrial Hygiene
> also makes recommendations to improve the hygiene of the plant. The smoking

gun possibilities of such documentation are readily apparent (emphasis added).
Material Cards, Materials Safety Data Sheets, Purchasing [sic] Department
Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data
Sheet Files

Again, the smoking gun possibilities of these documents are clear.  If, for
example, the safe practices detailed in safe practice data sheets are not made a part
of a site's industrial hygiene program and communicated to employees, the
potential future problems are readily apparent.  In addition, if the information is
not or was not conveyed to customers, the public, etc., again the potential future
problems are readily apparent (emphasis added).

Recommendations

Plant Correspondence Files (excluding air sampling data and employee test results
such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or
regulations.  The Westinghouse domestic records retention guidelines do not
specifically address these records.  We recommend that all such files generated
prior to 1974 should be discarded.  As stated before, these records are filled with
documentation dating back to the 1930's which critiques and criticizes
Westinghouse operations, and points out deficiencies in such operations.  The
files are filled with technical product and chemical information, hazard
information and safe-handling information, most of it generated by the industrial
Hygiene Department in a "editorializing" and opinionated manner.  The files are
not used in the daily operation of the Department.  In our opinion, the risks of
keeping these files on the whole substantially exceed the advantages of
maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an
editorializing, opinionated and verbose manner, instead of strictly factual.  In
addition, the Industrial Hygiene Department, prior to 1974, was involved in
testing and evaluating the safety of everything from water coolers to gloves.  From
a review of the files, it appears that the Department commented and editorialized
on just about everything which might have been found in the workplace.  This
"self-analysis" and "editorializing" type of information can be dangerous.  This is
just the type of documentation which should be discarded from the files.
Correspondence generated subsequent to 1974, generally speaking, does not suffer
from these drawbacks.

"Historical Files or Industrial Hygiene Department"

These records are not required pursuant to any federal, state or local laws and/or
regulations.  The Westinghouse domestic Records Retention Guidelines do not
specifically address these records.  We recommend that, with the exception of the
1974 noise survey and the testing date which is contained in these files, these files
be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation
litigation, show no signs of abating in the near future.  In fact, legislation such as
the risk notification legislation currently being considered by Congress, will,
according to many "experts", result in an increase in such litigation.
Consequently, well reasoned and conceived document retention and destruction
programs for departments such as Industrial Hygiene, and in fact the entire
Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant

documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of

its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its dangerous products. More importantly, his conclusion shows that Westinghouse had motive for destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations therein.

39.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation therof. This activity amounts to fraud and spoliation. In fact, at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

40.

The document destruction program set out in Bair's memo was actually implemented by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards associated with its products constitute fraud under the laws of the state of Louisiana.

41.

During Sally Vedros' exposure, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Sally Vedros and Alton Gros and/or to the owners of the premises where they worked, throughout their entire employment history at Avondale. Such products were installed, removed, and repaired by or in close proximity to Sally Vedros and Alton Gros during their employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time they were employed, Sally Vedros and Alton Gros were exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of their exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of GE.

42.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn Sally Vedros and Alton Gros of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

43.

Plaintiff further alleges that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

44.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos

with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

45.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

46.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

47.

Moreover, various published reports and articles available to GE, prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

(1)   Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2)    Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3)    Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.

(4)    Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s. Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis." Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.

(5)    Asbestos And Health In 1969, a published article written in 1969 by George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6)    The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7)    Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8)    Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

48.

Eagle, Inc., The McCarty Corporation (successor to McCarty Branton, Inc. and predecessor and successor to McCarty Insulation Sales, Inc.), Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach, Inc., manufactured asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, and jackets. They sold these products throughout the time that Sally Vedros was exposed to asbestos to the various sites at which Sally Vedros and Alton Gros worked and were exposed. In addition, Eagle, Inc.,

The McCarty Corporation, Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach, Inc. distributed asbestos-containing products manufactured, distributed, and sold by Bayer Cropscience, Inc. (Successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company); coatings, sealants, and mastics), Foster-Wheeler LLC--(block and boiler insulation), Riley Power, Inc. (block and boiler insulation), Rapid American Corporation (successor to Philip Carey Manufacturing Co.) (various asbestos-containing products including, but not limited to, cement, block, pipe covering, and adhesives), General Electric Company--(electric wire and cable, block and turbine insulation including, but not limited to sprayed asbestos insulation), CBS Corporation. (formerly Westinghouse Electric Corporation)–(block, boiler and turbine insulation as well as Micarta). During various periods of time from the 1950s throughout the 1980s, Eagle, Inc., The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. would package the above-described products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus making them liable as the manufacturer under Louisiana law. In addition, Eagle, Inc., The McCarty Corporation, Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach, Inc. also did contracting work at locations at which Sally Vedros and Alton Gros were working thereby exposing them during their handling of these products.

49.

The asbestos-containing products manufactured, distributed and/or sold by all "asbestos defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, defendants failed and refused to warn the Sally Vedros and Alton Gros of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

50.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants," Sally Vedros inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the mesothelioma, cancer, and other related ill health effects from which he suffers. Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a

product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

51.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants," Alton Gros carried home asbestos on his clothing, skin, hair, shoes, socks, and other objects, and Sally Vedros inhaled asbestos fibers. These loose asbestos fibers were emitted by the normal use of said products, proximately causing the asbestos-related mesothelioma and other ill health effects associated therewith, from which Sally Vedros suffers. Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

52.

Prior to the time Sally Vedros was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to asbestos-related pulmonary disease, pleural plaques, pleural thickening, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana law.

53.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

54.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Sally Vedros and Alton Gros were exposed to products manufactured, distributed, and sold by "asbestos defendants" and, as a result thereof, Sally Vedros was exposed to asbestos and contracted mesothelioma and other related ill health effects, which were first diagnosed on March 22, 2010.

55.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Sally Vedros and Alton Gros, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law and entitle plaintiffs to damages.

56.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Sally Vedros and Alton Gros.

57.

By the time Sally Vedros and Alton Gros began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed

asbestosis and silicosis as a compensable occupational disease.  Moreover, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943.  These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.  They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors.  Despite this, Sally Vedros and Alton Gros were never warned of any hazard associated with asbestos or silica, was never protected by use of adequate ventilation, was required to work next to insulators using asbestos products and with and around silica, and was required to pick up asbestos containing debris and silica.  They never saw a warning on any asbestos or silica product nor were they warned by any contractor using asbestos or silica products.  Despite the fact that all defendants were aware of the hazards of asbestos and silica and other toxic substances to which Sally Vedros and Alton Gros were exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards.  Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law.  Even after OSHA became the law in 1971, Sally Vedros and Alton Gros were not warned of the health hazards associated with exposure to asbestos and silica.

58.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioners in the following manner:

1)   The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2)   The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

a)   To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

b)   To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;

c)   To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

d)   To provide a defense against lawsuits brought for injury resulting from asbestos disease;

- 24 -

e)     To prevent relevant medical inquiry about asbestos disease;

f)     To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and

g)     To induce the Petitioner to use and continue to use asbestos products.

3)     The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

4)     Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5)     Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

59.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Sally Vedros was first exposed to asbestos and continued throughout her husband and her two sons' employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose

money on it." (See deposition of Harry J. Flynn in <u>Bradley v. Todd Shipyards, Inc.</u>, C.A. No. 85 -
05657, Div. "D", Civil District Court for the Parish of Orleans.)

60.

That all defendants and the companies that insured them knew of the health hazards
associated with exposure to asbestos since the 1930s (and suppressed this information) is shown
by numerous documents and testimony.  In fact, the knowledge was so well recognized in the
asbestos industry that the insurance industry considered confessing liability; instead, they decided
to make it "economically impossible" for plaintiffs to pursue their claims.  The minutes of
meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry
association) confirm that the hazards of asbestos exposure have been known for many years.
These minutes specifically state that  medical research in 1900 linked asbestos with asbestosis and
by 1935 it was recognized that asbestos caused cancer.  In a memorandum of a meeting of a
discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous
rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed
between themselves as to their respective losses and expenses.  That insurance companies and
their insureds were working together to discourage plaintiffs from pursuing valid claims is also
demonstrated in earlier memos.  In minutes dated May 22, 1974, discussing *Borel v. Fibreboard
Paper Products Corporation,* 493 F.2d 1076, (5th Cir. 1973), <u>cert. denied</u>, 419 U.S. 869 (1974), it
is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for
our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a
'game plan' for the continued defense of these asbestosis cases <u>with the other defendants.</u>"  In a
memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance
companies would resist pending cases "and attempt to make this economocially (sic) impossible
for the plaintiffs to pursue the other cases."  These attempts to prevent and stifle valid claims by
plaintiffs such as Sally Vedros and plaintiff herein show that the defendants, to this day, are
committing fraud.

61.

Documents and testimony of defendants herein as well as associated asbestos companies is
replete with the fact of knowledge and fraud.  Although Johns-Manville (hereinafter sometimes
referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M")
are not defendants herein, a discussion of their knowledge is necessary to show knowledge within
asbestos industry associations, within the insurance industry, and among other defendants.  In

- 26 -

1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

62.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

63.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way."' (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American, U.S. Claims Court Civ. No. 465-83C).

64.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

65.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

66.

Another trade organization was the National Insulation Manufacturers Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (defendant herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions. NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety. Charles Limerick, former manager of the Ruberoid

Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine. Ruberoid subscribed and advertised in "Asbestos". Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

67.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

68.

Defendants, Eagle, Inc. and Taylor-Seidenbach, Inc., did contracting work as early as the 1940s. Likewise, The McCarty Corporation (formerly McCarty Branton, Inc.), Marquette Insulations, Inc., and Reilly-Benton Company, Inc., have done contracting work since their initial existence. Accordingly, Eagle, Inc., The McCarty Corporation (formerly McCarty Branton, Inc.), Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed *infra*). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, these defendants, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof. Sally Vedros and Alton Gros were exposed to asbestos both through these defendants contracting work and through products manufactured, distributed, and sold by them, and they carried home fiber on their clothing and other objects thereby exposing Sa;lly Vedros. Yet at no time were Sally Vedros Alton Gros protected from these hazards nor warned of these hazards. Even after OSHA became

- 30 -

the law in 1971, Sally Vedros and Alton Gros were not advised of the hazards associated with exposure to asbestos. These defendants were aware of the hazards of asbestos but failed and refused to warn them of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. See deposition of Fred J. Schuber, Jr., 05/31/90, pages 149-155, 176-179 and exhibits attached to the deposition of Schuber taken 5/09/90; and deposition of Thomas R. Dimm, 02/03/86, pages 65-66; and Eagle, Inc.'s response #4 to plaintiffs' interrogatories in the case of Atzenhoffer, et al v. National Gypsum, Co., et al, C. A. #89-894, which responses are dated March 27, 1990; and Act No. 532 (1952) amendments to the Louisiana Workers' Compensation Act.

69.

Since the early 1940s, defendant, Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), was a major manufacturer of boilers used in the construction of both commercial and U.S. Navy vessels. Since that time through and including the time when Sally Vedros was last exposed, they supplied boilers to virtually every shipyard constructing and repairing vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time were Sally Vedros and Alton Gros advised of these hazards as defendants failed and refused to warn them of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Sally Vedros and Alton Gros, to asbestos during their operations.

70.

Rapid American Corporation (successor to Philip Carey Manufacturing Co.) (hereinafter sometimes "Carey"), in an advertisement appearing in the magazine "Asbestos", in March of 1930, boasted that it had been supplying asbestos and asbestos products for over fifty (50) years. Carey got into the insulation contracting business as well. Publicity over asbestosis among Carey's Quebec mine employees led to an asbestos strike. Moreover, Carey was named as a defendant in claims brought by Swartout, Riley, Streithorst, Gilivich, and Onofrio, with notice to

- 31 -

Carey dated from 1955-1963 and Latto in 1961-62. Additionally, Dr. Thomas Mancuso reported directly to the top management of Carey about the urgent need for measures to protect employees as well as customers of Carey's products and neighbors of Carey facilities exposed to asbestos air pollution.

Of particular note is the expose' written by Burton LeDoux on the hazards of asbestos. The newspaper report by Mr. LeDoux which appeared in the newspaper Le Devoir on January 12, 1949, recounted his investigation of the asbestos mines owned by Quebec Asbestos Corporation, Ltd., a subsidiary of Phillip Carey. LeDoux's account described case histories of workers disabled by asbestosis, local doctors who were afraid to tell them so, estimates of how much profit Carey mined out of the town, descriptions of asbestos air pollution in town, commentary on the "ample and authoritative medical literature... that the disease is incurable and fatal"; and culminates with what the author called "proof of company and government responsibility" starting in 1944.

71.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

72.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Sally Vedros contracted mesothelioma and other related ill health effects, for which all defendants are jointly, severally, and in solido liable.

73.

All of the hereinabove named defendants are jointly, severally, and in solido liable to petitioners for the damages sustained as a result of Sally Vedros' mesothelioma and other ill health effects related therewith. Petitioner, Sally Vedros, is entitled to damages for the following: past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; fear of death and complications; permanent disability; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; loss of fringe benefits; past, present, and future medical expenses; loss of personal services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; increased costs of insurance and other expenses incurred as a result of her disease; and all other general damages arising out of this action which may be shown at the trial of this matter.

74.

A trial by jury is demanded on all issues.

**WHEREFORE**, petitioner, Sally Vedros, prays that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of petitioner and against defendants for all damages suffered by petitioner together with legal interest and all costs associated with the prosecution of this claim. Petitioner further prays for all general and equitable relief.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
1714 Cannes Drive
LaPlace, LA 70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONER,
SALLY VEDROS

**PLEASE SERVE THE PETITION FOR DAMAGES, REQUESTS FOR PRODUCTION OF DOCUMENTS, and OPPOSITION TO MOTIONS FOR EXTENSION OF TIME ON THE FOLLOWING:**

1.  NORTHROP GRUMMAN SHIPBUILDING, INC.,
    (formerly NORTHROP GRUMMAN SHIP SYSTEMS, INC.
    formerly, AVONDALE INDUSTRIES, INC.
    and formerly AVONDALE SHIPYARDS, INC.
    and formerly, AVONDALE MARINE WAYS, INC.)
    Through its agent for service of process:
    CT Corporation System
    5615 Corporate Blvd., Suite 400B
    Baton Rouge, La. 70808

2.  ALBERT BOSSIER, JR.
    Through his agent for service of process:
    Brian Bossier
    3421 North Causeway Blvd.
    Suite 900
    Metairie, LA 70002

3.  J. MELTON GARRETT                    **LONG ARM SERVICE**
    7909 Enclave Way
    Dallas, Texas 75218

4.  ONEBEACON AMERICA INSURANCE COMPANY (AS SUCCESSOR TO
    COMMERCIAL UNION INSURANCE COMPANY AND EMPLOYERS
    COMMERCIAL UNION INSURANCE COMPANY)
    Through its agent for service of process:
    Secretary of State

**A TRUE COPY**

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA.

- 33 -

Legal Services Sections
8585 Archives Ave.
Baton Rouge, La. 70809

5.   AMERICAN EMPLOYERS INSURANCE COMPANY
Through its agent for service of process:
Secretary of State
Legal Services Sections
8585 Archives Ave.
Baton Rouge, La. 70809

6.   AMERICAN MOTORISTS INSURANCE COMPANY
Through its agent for service of process:
Secretary of State
Legal Archives Ave.
8585 Archives Ave
Baton Rouge, LA. 70809

7.   BAYER CROPSCIENCE, INC. (SUCCESSOR TO          **LONG ARM SERVICE**
RHONE POULENC AG COMPANY,
FORMERLY AMCHEM PRODUCTS, INC.,
FORMERLY BENJAMIN FOSTER COMPANY)
(Via Louisiana Long Arm Statute)
through their agent for service of process:
Corporation Service Company
80 State Street
Albany, New York 12207

8.   EAGLE, INC.
Through its agent for service of process:
Susan B. Kohn
1100 Poydras St, 30th Floor
New Orleans, LA 70163

9.   FOSTER WHEELER LLC                             **LONG ARM SERVICE**
(formerly FOSTER WHEELER CORPORATION)
(Via Louisiana Long Arm Statute)
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

10.  GENERAL ELECTRIC COMPANY
Through its agent for service of process:
CT Corporation System
5615 Corporate Blvd., Suite 400B
Baton Rouge, La. 70808

11.  HOPEMAN BROTHERS, INC.                         **LONG ARM SERVICE**
(Via Louisiana Long Arm Statute)
AWH Corporation
435 Essex Ave., Suite 101
Waynesboro, Virginia 22980

12.  THE MCCARTY CORPORATION
(SUCCESSOR TO MCCARTY BRANTON, INC.
AND PREDECESSOR AND SUCCESSOR TO
MCCARTY INSULATION SALES, INC.)
Through its agent for service of process:
Paul H. Spaht
445 North Blvd.
Suite 300
Baton Rouge, La. 70802

13.  RAPID AMERICAN CORPORATION   **LONG ARM SERVICE**
 (Via the Louisiana Long Arm Statute)
 The Prentice-Hall Corporation System, Inc.
 2711 Centerville Road, Suite 400
 Wilmington, DE 19808-1645

14.  REILLY-BENTON COMPANY, INC.
 Through its agent for service of process:
 Thomas L. Cougill
 Beason-Willinham, LLP (A Prof Law Firm)
 8550 United Plaza Blvd., Suite 702
 Baton Rouge, LA 70809

15.  TAYLOR-SEIDENBACH, INC.
 Through its agent for service of process:
 Ralph I. Shepard
 731 S. Scott Street
 New Orleans, Louisiana 70119

16.  CBS CORPORATION     **LONG ARM SERVICE**
 (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)
 Through its agent for service of process:
 Corporation Service Company
 2711 Centerville Road, Suite 400
 Wilmington, Delaware 19808

17.  MARYLAND CASUALTY COMPANY
 Through its agent for service of process:
 Secretary of State
 Legal Services Sections
 8585 Archives Ave.
 Baton Rouge, La. 70809

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER:                      DIVISION " "              SEC: " "

SALLY GROS VEDROS

versus

NORTHROP GRUMMAN SHIPBUILDING, INC., ET AL.

FILED:_____      _____
                                           DEPUTY CLERK

## OPPOSITION TO MOTIONS FOR EXTENSION OF TIME

MAY IT PLEASE THE COURT:

Plaintiff, Sally Vedros, objects to the granting of any and all Motions for Extension to

Time which may be filed in this matter requesting extensions to respond to plaintiffs' Petition for

Damages. Sally Vedros suffers from mesothelioma, a terminal cancer, and it is in the interest of

justice that this case be set for trial prior to her death. Granting of any Motions for Extensions of

time would unjustly delay the proceedings of this matter.

WHEREFORE, plaintiff opposes any Motions for Extension of time.

Respectfully submitted,

ROUSSEL & CLEMENT

_____
GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
1714 Cannes Drive
LaPlace, LA 70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONERS
SALLY VEDROS

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served with the Petition for
Damages upon all parties.

_____
GEROLYN P. ROUSSEL

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER:                          DIVISION " "                    SEC: " "

SALLY GROS VEDROS

versus

NORTHROP GRUMMAN SHIPBUILDING, INC.; ET AL.

FILED:_____          _____
                                        DEPUTY CLERK

## REQUESTS FOR PRODUCTION OF DOCUMENTS

TO:   **NORTHROP GRUMMAN SHIP SYSTEMS, INC.**
      (formerly Avondale Industries, Inc.,
      formerly Avondale Shipyards, Inc.),
      Through its agent for service of process:
      CT Corporation System
      5615 Corporate Blvd., Suite 400B
      Baton Rouge, La. 70808

NOW INTO COURT, through undersigned counsel, comes plaintiff, Sally Vedros, who

requests that **NORTHROP GRUMMAN SHIP SYSTEMS, INC. (f/k/a AVONDALE**

**INDUSTRIES, INC. f/k/a AVONDALE SHIPYARDS, f/k/a AVONDALE MARINE**

**WAYS)** (hereinafter "Avondale") produce at the offices of Roussel & Clement, 1714 Cannes

Drive, LaPlace, LA 70068, within fifteen (15) days, the following documents:

### DEFINITIONS

The following definitions shall apply for the purposes of this Request/subpoena:

A.      "Documents" shall mean, unless otherwise indicated, letters, papers, tests, reports, publications, studies, evaluations, correspondence, telegrams, memoranda, records, books of account, ledgers, accounts, balance sheets, journals, minutes, contracts, payroll records, employee assignment sheets, memoranda of records of telephone or personal conversations or conferences, inter-office communications, microfilm, tape, disc, or other data recordings, bulletins, circulars, schedules, guides, pamphlets, studies, surveys, notices, summaries, reports, analysis, teletype messages, work sheets, price sheets, catalogues, invoices, credit memoranda, checks, vouchers, newspaper clippings or magazine clippings, desk calendar, telephone toll records, and all writings or recordings of any nature whatsoever. Where originals are not available, copies of such documents may be produced.

B.      "All documents" shall mean every document, whether the original or copy, within a stated category, either known to the deponent or reasonable subject to identification, or that can be designated or located by the use of reasonable diligence.

1.      The entire file of Sally Gros Vedros (Social Security No.: 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; Date of Birth 1/15/41), including but not limited to:
        a.      The entire medical file of Sally Gros Vedros;
        b.      The entire first aid and group insurance file of Sally Gros Vedros;
        c.      The entire occupational/environmental history form of Sally Gros Vedros;
        d.      The entire physician's occupational/environmental history follow-up form of Sally Gros Vedros;
        e.      Each and every memorandum, document, correspondence or document of any type regarding any medical surveillance done on Sally Gros Vedros;
        f.      Any correspondence, memorandum or document of any type regarding any medical surveillance program conducted by Avondale or any division thereof at which Sally Gros Vedros did or may have worked;
        g.      All chest x-rays of Sally Gros Vedros and interpretive results of same taken by, on behalf of, or at the request of Avondale or any division thereof;

    h.       All pulmonary function studies or other medical tests conducted on Sally Gros Vedros;

    i.       Any and all correspondence, memoranda or documents of any type regarding workers compensation claims and/or disability claims of any type regarding Sally Gros Vedros;

2.    The entire file of Alton E. Gros (Social Security No.: 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; Date of Birth 11/21/11), including but not limited to:

    a.     The entire medical file of Alton Gros;

    b.     The entire first aid and group insurance file of Alton Gros;

    c.     The entire occupational/environmental history form of Alton Gros;

    d.     The entire physician's occupational/environmental history follow-up form of Alton Gros;

    e.     Each and every memorandum, document, correspondence or document of any type regarding any medical surveillance done on Alton Gros;

    f.     Any correspondence, memorandum or document of any type regarding any medical surveillance program conducted by Avondale or any division thereof at which Alton Gros did or may have worked;

    g.     All chest x-rays of Alton Gros and interpretive results of same taken by, on behalf of, or at the request of Avondale or any division thereof;

    h.     All pulmonary function studies or other medical tests conducted on Alton Gros;

    i.     Any and all correspondence, memoranda or documents of any type regarding workers compensation claims and/or disability claims of any type regarding Alton Gros;

3    The personnel files of the following alleged executive officers of Avondale:

    a.     James O'Donnell
    b.     Ollie Gatlin
    c.     John Chantrey
    d.     Earl Spooner
    e.     Burnette "Frenchy" Bordelon
    f.     Edwin Hartzman
    g.     Henry "Zac" Carter
    h.     George Kelmell
    i.     James T. Cole
    j.     Ewing Moore
    k.     Steven Kennedy
    l.     Hettie "Dawes" Eaves
    m.     Albert Bossier
    n.     Peter Territo
    o.     Edward Blanchard
    p.     Roy E. Barkdull
    q.     James Bull
    r.     J. Melton Garrett
    s.     Dr. Joseph Mabey

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon all parties along with the Petition for Damages.

_GEROLYN P. ROUSSEL_

Respectfully Submitted:

ROUSSEL & CLEMENT

GEROLYN P. ROUSSEL #1134
PERRY J. ROUSSEL, JR. #20351
JONATHAN B. CLEMENT #30444
LAUREN R. CLEMENT #31106
1714 Cannes Drive
La Place, Louisiana 70068
Telephone: (985) 651-6591
ATTORNEYS FOR PLAINTIFF,
SALLY GROS VEDROS

## ROUSSEL & CLEMENT
A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1714 CANNES DRIVE
LAPLACE, LOUISIANA 70068

NOTARY PUBLIC
PROFESSIONAL ENGINEERING
FAX (985) 651-6502
TELEPHONE (985) 651-6591



LOUISIANA          MISSISSIPPI

April 18, 2011

**By Fax: (504) 599-8100**

John J. Hainkel, III
James H. Brown, Jr.
Angela M. Bowlin
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

> *Re:*    Sally Gros Vedros vs. Northrop Grumman Ship Systems, Inc., et al
> Civil District Court for the Parish of Orleans No. 2010-11041, Div.: "M"

Dear Counselors:

Please provide a date, time, and location for the deposition of the following witnesses listed on the Witness List of your client, CBS Corporation:

Kenneth J. Boudreaux
Dan M. Cliffe
Charles de Seve, Ph.D.
Ignacio Garza
J. Stuart Wood
Dr. Gordon Bragg
Eric J. Chatfield, Ph.D.
Dr. John E. Craighead
James Lockey, M.D., M.S.
Dr. Joseph Bates
Philip T. Cagle, M.D.
Dr. Andrew Churg
Dr. Brooks Emory
Dr. Stanley B. Fiel
Dr. Gregory Foster
Dr. Joe G.N. Garcia
Dr. Allan Goldman
Dr. Michael Graham
Dr. Donald Greenberg
Dr. Peter Heidbrink
Dr. Robert Jones
Dr. David J. Kanarek
Dr. Robert Lampert
Dr. William Weiss
Dr. Russell P. Sherwin
Dr. Paul M. Stevens
Dr. Joycelyn Elders
Mark R. Wick, M.D.
Dr. Thomas Wheeler
Dr. Robert O'Neal
Dr. James Crapo
Dr. Lee Reichman
Allen Gibbs, M.D.
Thomas V. Colby, M.D.
Kathryn A. Hale, M.D
Dr. Brent Harrison
Dr. William F. Russell

Dr. Ramesh B. Patel
Dr. Jennifer E. Hamrick-Turner
Robert M. Ross, M.D
Gail Strockman, M.D.
Dr. Claude Tellis
Dr. Robert Crapo
Dr. William Ehlert
Dr. Edward Ragsdale
Joseph J. Renn, III, M.D.
William C. Bailey, M.D.
Dr. Miles Jones
Neil R. MacIntyre, Jr., M.D.
Gregory Fino, M.D.
Dr. Alvin V. Thomas, Jr.
Jack E. Nissim, M.D.
Steven A. Schonfeld
J. Bernard L. Gee, M.D.
Stephen Selinger, M.D.
Dr. Michael J. Warhol
David S. Ettinger, M.D.
Nagi F. Khouri, M.D.
Robert A. Wise, M.D.
Barry G. Simon, M.D.
Bernard Tabatznik, M.D.
Warren Israel, M.D.
Robert Wilson Morgan, M.D.
Darryl Carter, M.D.
Belur Bhagavon, M.D.
Dr. Andy Ghio
Jerome Kelienrman, M.D.
Norman LaFrance, M.D
Edward F. McCarthy, Jr., M.D.
Elliot Fishman, M.D.
Michael D. Henderson, M.D.
William H. Reid, M.D., M.P.H.
Khalil Sheibani, M.D.
Paul R. Lees-Haley, Ph.D.

Sami Brahim, M.D.
Penelope P. Scott, M.D.
David H. Garabrant, M.D.
Raymond L H. Murphy, M.D.
Elias A. Zerhouni, M.D.
Michael Rubinstein, M.D.
Anthony V. Proto, M.D.
Peter Terry, M.D.
Raymond B. Weiss, M.D.
Daniel Henry, M D
Barry F. Tillman, M.D.
Robert Smith, M.D.
Obie McNair, M.D.
James J. Wellman, M.D.
Thomas Sporn, M.D.
Tim D. Our, M.D
Dr. Russell Harley
Sidney Shindell, M.D.
Frederick B. Askin, M.D.
Horace M. DeLisser, M.D.
Roland Schwarting, M.D.
Lee Sider, M.D.
Irina Petrache, M.D.
David S. Prince, M.D.
Bruce A. Yergin, M.D.
David A. Mishkin, M.D.
Hassan Makhsoumi, M.D.
Vittorio K. Argento, Ph.D., P.E.
Howard E. Ayer, C.I.H.
J. Leroy Balzer, Ph.D.
Charles L. Blake
Frederick Boelter
Dr. Morton Corn
William L. Dyson, Ph.D.
Dennis C. Ertel, Jr., C.I.H.
Douglas P. Fowler, Ph.D.
Gayla J. McCluskey, C.I.H.

## EXHIBIT B (IN GLOBO)

John Hainkel
April 18, 2011
Page 2

Jack E. Peterson, Ph.D., C.I.H.
Charles H. Powell, Sc.D.
James O. Rasmuson, Ph.D.
John W. Spencer, C I.H.
Terrence John Stobbe, Ph.D.
Frederick Toca, Ph.D.
Frank Weir
Dr. Edward A. Gaensler
Dr. Elliot Hinkes
William G. Hughson
Dr. Gerald Kerby
Dr. William Keith Campbell Morgan
Joseph M. Miller, M.D.
Dr. Dorsett D. Smith
I. Allan Feingold, M.D.
Stacey F. Mills, M.D.
Dr. Harry Demopoulos
Dr. Bill Tranum
Dr. Peter Barrett
Dr. Hans Weill
Thompas P. Howard, M.D.
Dr. David E. Conwill
Wayne Bickerstaff
Holbrook Platts
John Tabbutt
Dr. John L. Colley
Harry Comerford
James M. Gate
John B Vander Sande, Ph.D.

Dr. Raymond D Harbison
Harris Busch, M.D,
Arthur M. Langer, Ph.D.
Dr. Joseph K. McLaughlin
Kenneth W. Nelson
James T. Sanderlin
Dr. Robert N. Sawyer
W. Thomas Shaw
Mel Whittington
Edward J. Sowinski
John Gerard Weg, M.D.
Mark J Utell, M.D.
Jerry L. Purswell, Ph.D., P.F.
Leonard Miniszak
Dr. Richard F. Krenek
Kevin W. Browne. M.D.
James J. Byrnes
Sheldon Rabinovitz, Ph.D., C.I.H.
John Doull, M.D., Ph.D.
James Duncan
Danny Joyce
Admiral Roger B. Horne, Jr
Norman Lemley
Capt. John W. Klotz
Fred Pooley, Ph.D.
Charles N. Johnson, Jr.
Mark Perriello
Richard K. Smith
Robert L. Readal

David L. Bean, P.E.
J. David Conrad
Thomas Eagar, Sc.D., P.E.
Joseph A. Falcon, P.E.
Alexander Kusko, Sc.D., P.E.
B K Kwon
John C. Lumsden, C.I.H.
Thomas E. Myers
Victor L. Roggli, M.D.
Dr. William F. Longo, Ph.D.
Dr. Samuel A. Forman, M.D.
Janet Hughes, Ph.D.
Bruce Case, M.D.
Richard J. Lee, Ph.D.
Gerald T. Benzinger
Ronald Lawrence
Douglas M. Ware
Raymond McMullen
Philip A. Edelman, M.D.
Stephen W. Borron, M.D., M.S.
James M. Miller, P.E., Ph D.
John H. Daniels
William Theo Powell
Peter Koppel
Dean Messerd
Alvin Perque
Kim Nelson
Danny Joyce
Roman Duronselet
Eugene Coincon

Also, for the following witnesses listed as testifying by deposition, please provide the complete case caption
and date on which the deposition was taken:

Eric J. Chatfield, Ph.D.
Carl A. Mangold, C.I.H.
Dr. H. Corwin Hinshaw
Dr. Forde McIver
Dr Alton Ochsner
Dr. Oscar Auerbach
Wayne Bickerstaff
Holbrook Platts
John Tabbutt
Dr. John L. Colley
Harry Comerford
James M. Gate

Arthur M. Langer, Ph.D.
James T. Sanderlin
Dr. Robert N. Sawyer
W. Thomas Shaw
Edward J. Sowinski
John Gerard Weg, M.D.
Kevin W. Browne, M.D.
John Doull, M.D., Ph.D.
Frank V. Conerly
J. David Conrad
Joseph A. Falcon, P.E.
Alexander Kusko, Sc.D., P.E.

B.K. Kwon
John Morykon
David F. Baldwin
William P. McElravy, Jr
Charles Reep
Roy Steinfurth
Andrew Haas
Gerald T. Benzinger
Douglas M Ware
Peter Territo
Ollie Gatlin
John Chantry

Finally, please provide the complete municipal address for the following witnesses:

Ignacio Garza
Harris Busch, M.D.
Dr. Joseph K. McLaughlin

Mark J. Utell, M.D.
Norman Lemley
David L. Bean, P.E.

Warren Waters
Eugene Coincon
Danny Joyce

Sincerely,

Benjamin P. Dinehart

BPD/sam

NOTARY PUBLIC
PROFESSIONAL ENGINEERING

FAX (985) 651-6592
TELEPHONE (985) 651-5591

# ROUSSEL & CLEMENT
A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1714 CANNES DRIVE
LAPLACE, LOUISIANA 70068



LOUISIANA          MISSISSIPPI

April 18, 2011

**By Fax: (504) 599-8100**

John J. Hainkel, III
James H. Brown, Jr.
Angela M. Bowlin
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

> *Re:*   Sally Gros Vedros vs. Northrop Grumman Ship Systems, Inc., et al
> Civil District Court for the Parish of Orleans No. 2010-11041, Div. "M"

Dear Counselors:

Please provide a date, time, and location for the deposition of the following witnesses listed on the Witness List of your client, Foster Wheeler LLC:

Dr. Samuel A. Forman
Dr. Robert N. Sawyer
Robert F. Tracey
Fred Bocher
John W. Spencer
Sheldon Rabinovitz
Dr. Robert J. McCunney, M.P.H,
Stephen W. Borron, MD, MS
Daryl Carter, M.D.
Dr. Philip A. Edelman, M.D.
Dr. Philip Cagle
William Butler, Jr.

Francis W. Weir, Ph.D
John E. Craighead
Vittorio K. Argento
Charles Blake, CIH
Thomas P. Howard, M.D.
Orson C. Zinglersen
Benjamin H. Safirstein, M.D.
Victor L. Roggli, M.D.
Dr. Roland Schwarting
Michael A. Graham, M.D.
William Dyson, Ph.D.
Admiral Ben J. Lehman

Dr. Lawrence Stilwell Betts
Adm. Roger B. Horne, Jr.
Capt. Richard F. Silloway, P E.
Thomas F. McCaffrey
Dr. Charles R. Cushing
Louis M. Kyriakoudes, Ph.D.
Michael K. Cummings, Ph.D.
William A. Farone, Ph.D.
Dr. Tim Oury
Tony Watson, MSPH, CIH, CSP

Also, for the following witnesses listed as testifying by deposition, please provide the complete case caption and date on which the deposition was taken:

Dr. Robert N. Sawyer

Finally, please provide the complete municipal address for the following witnesses:

Dr. Samuel A. Forman

Sincerely,

Benjamin P. Dinehart

BPD/sam

ROUSSEL & CLEMENT
A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1714 CANNES DRIVE
LAPLACE, LOUISIANA 70068

NOTARY PUBLIC
PROFESSIONAL ENGINEERING
FAX. (985) 651-6592
TELEPHONE (985) 651-6591



LOUISIANA          MISSISSIPPI

April 18, 2011

**By Fax: (504) 599-8100**

John J. Hainkel, III
James H. Brown, Jr.
Angela M. Bowlin
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

      *Re:*    Sally Gros Vedros vs. Northrop Grumman Ship Systems, Inc., et al
                  Civil District Court for the Parish of Orleans No. 2010-11041, Div.: "M"

Dear Counselors:

      Please provide a date, time, and location for the deposition of the following witnesses
listed on the Witness List of your client, General Electric Company:

| | | |
|---|---|---|
| Vittorio K. Argento. Ph.D., P.E. | Dennis C. Ertel, Jr., CIH, REM | Sheldon Rabinovitz |
| Paul Banaszewski | Joseph A. Falcon, P.E. | Dr. Jonathan Moreno |
| Dr. Lawrence Stilwell Betts | I.A. Feingold | Dr. Bennett Edward Ojserkis |
| Charles Blake, CIH | James Fillmore | Bert Price |
| Fred Boelter | Michael Graham, M.D. | James Rasmusson, Ph.D. |
| Dr. Stephen W. Borron, MD, | Mr. David Hobson | Robert N. Sawyer, M.D. |
| William Butler, Jr. | Dr. Thomas P. Howard, M.D. | John W. Spencer |
| Dr. Daryl Carter, M.D. | William G. Hughson, Ph.D. | Terrence J. Stobbe, Ph.D. |
| John E. Craighead, M.D. | Dr. Robert Jones | Lawrence P. Straight |
| James D. Crapo | Charles W. Lacey, P.E. | Francis W. Weir, Ph.D. |
| Marjorie Drucker | Dr. Robert J. McCunney, MPH | Dr. Michael Joseph Warhol |
| William D. Dyson, Ph.D. | Walter Martiny | Otto Wong, Sc.D. |
| Dr. Philip A. Edelman, M.D. | Dr. John Mendez | |

      Also, please provide the complete municipal address for the following witnesses:

| | | |
|---|---|---|
| Dr. Daryl Carter, M.D. | Walter Martiny | Dr. Jonathan Moreno |
| Marjorie Drucker | Dr. John Mendez | Bert Price |

Sincerely,

Benjamin P. Dinehart

Benjamin P. Dinehart

BPD/sam



Frilot L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana  70163
Phone: 504.599.8000
Facsimile: 504.599.8100
www.frilot.com

Meredith K. Keenan
Phone: 504.599.8066
Facsimile: 504.619.4987
mkeenan@frilot.com

April 19, 2011

Benjamin P. Dinehart, Esq.
Roussel & Clement
1714 Cannes Drive
LaPlace, LA  70068

     Re:    *Sally Gros Vedros v. Northrop Grumman Shipbuilding, Inc., et al*
              CDC No. 2010-11041, Division M, Section 13

Dear Benjamin:

    I am in receipt of your letters of April 18, 2011, which request dates, times, and locations for the witnesses listed on the recently filed Witness Lists of CBS Corporation, Foster Wheeler, LLC, and General Electric Company.  I will happily provide the requested information once we have a better idea as to which work sites and products are allegedly at issue in this case.

                 Sincerely,

                 Meredith Keenan

MK/kcb

**EXHIBIT C**



ROUSSEL & CLEMENT
A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1714 CANNES DRIVE
LAPLACE, LOUISIANA 70068

NOTARY PUBLIC
PROFESSIONAL ENGINEERING
FAX (985) 651-6502
TELEPHONE (985) 651-6691

LOUISIANA          MISSISSIPPI

May 3, 2011

**By Fax: (504) 599-8100**

Meredith Keenan
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

      ***Re:***    Sally Gros Vedros vs. Northrop Grumman Ship Systems, Inc., et al
           Civil District Court for the Parish of Orleans No. 2010-11041, Div.: "M"

Dear Meredith:

    I am in receipt of your letter from April 19, 2011, informing me that you will provide dates, times, and locations for the depositions of the witnesses found on the Witness Lists of CBS Corporation, Foster-Wheeler, LLC, and General Electric Company, after you have a better idea of the work sites and products allegedly at issue. The only work site at issue in this case is Avondale Shipyards. Furthermore, as your clients have been involved in numerous cases involving Avondale Shipyards you are already aware of which of your clients' products were used at Avondale Shipyards. Accordingly, please provide dates, times, and locations for the depositions of the witnesses specified in my letters of April 18, 2011. Your cooperation in this regard is appreciated.

                Sincerely,

                Benjamin P. Dinehart

                Benjamin P. Dinehart

BPD/sam

.

**EXHIBIT D**



FRILOT | LLC

ATTORNEYS AT LAW

Frilot L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8000
Facsimile: 504.599.8100
www.frilot.com

Meredith K. Keenan
Phone: 504.599.8066
Facsimile: 504.619-4987
mkeenan@frilot.com

May 3, 2011

Benjamin P. Dinehart, Esq.
Roussel & Clement
1714 Cannes Drive
LaPlace, LA 70068

     Re:   *Sally Gros Vedros v. Northrop Grumman Shipbuilding, Inc., et al*
           CDC No. 2010-11041, Division M, Section 13

Dear Benjamin:

    Thank you for your letter regarding Plaintiff's request for deposition dates of the witnesses listed on the Witness Lists filed by CBS, GE, and Foster Wheeler. Please provide me with information regarding the specific vessels on which Mr. Gros allegedly worked and the equipment that Mr. Gros and/or Mrs. Vedros allegedly worked on or around while employed at Avondale Shipyard. I will convey that information to my clients, and they will determine which experts will be called at the trial of this matter.

    I appreciate your cooperation in advance.

                 Sincerely,

                 Meredith Keenan

MK/kcb

**EXHIBIT E**

P. 1

```
*  *  *  COMMUNICATION  RESULT  REPORT ( MAY. 3.2011  4:44PM ) *  *  *
```

```
                                              FAX HEADER 1:  FRILOT
                                              FAX HEADER 2:
```

```
TRANSMITTED/STORED : MAY. 3.2011  4:43PM
FILE MODE          OPTION              ADDRESS               RESULT      PAGE
--------------------------------------------------------------------------------
2531 MEMORY TX                         9856516592            OK          2/2
--------------------------------------------------------------------------------
      REASON FOR ERROR
      E-1) HANG UP OR LINE FAIL             E-2) BUSY
      E-3) NO ANSWER                        E-4) NO FACSIMILE CONNECTION
```



Frilot L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Phone: 504.599.8000
Facsimile: 504.599.8100
www.frilot.com

Meredith K. Keenan
Phone: 504.599.8056
Facsimile: 504.619-4987
mkeenan@frilot.com

# Facsimile

**To:**   Benjamin P. Dinehart          **Facsimile #  985-651-6592**

**From:**  Meredith K. Keenan

**Date:** May 3, 2011

**File Title:**   Sally Gros Vedros v. Northrop Grumman Shipbuilding, Inc.

**File #:**  1995-200742, 1996-200745, 1952-200747

**Client:**   GE, CBS and FW

**Total Pages:  2**

**Comments:**

If you did not receive all pages, or if you received this facsimile in error, or are not the designated
recipient or agent thereof, please immediately contact:   Kathy Ballard at 504-599-8039

**Attention:**
The contents of this facsimile is confidential information, and may also be legally privileged, intended only
for the use of the individual/individuals of the entity named above. If you are not the intended recipient or
agent thereof, you are hereby notified that any use, review, dissemination, copying or distribution of this
document or the information contained herein is strictly prohibited.

## ROUSSEL & CLEMENT
A PROFESSIONAL CORPORATION

NOTARY PUBLIC
PROFESSIONAL ENGINEERING

FAX (985) 651-4862
TELEPHONE (985) 651-6591

ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1714 CANNES DRIVE
LAPLACE, LOUISIANA 70068



LOUISIANA          MISSISSIPPI

May 4, 2011

**By Fax: (504) 599-8100**

Meredith Keenan
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

> ### *Re:*   Sally Gros Vedros vs. Northrop Grumman Ship Systems, Inc., et al
> ### Civil District Court for the Parish of Orleans No. 2010-11041, Div.: "M"

Dear Meredith:

In response to your letter dated, May 3, 2011, Mr. Gros allegedly worked on all vessels present at Avondale Shipyards during his employment there. Furthermore, Mr. Gros and Mrs. Vedros were allegedly exposed to asbestos from all equipment present at Avondale Shipyards during their employments there. If you have any further questions, please do not hesitate to contact me.

Sincerely,

Benjamin P. Dinehart

BPD/sam

# EXHIBIT F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SALLY GROS VEDROS | CIVIL ACTION NO.: |
| versus | JUDGE: |
| NORTHROP GRUMMAN SHIPBUILDING, INC., ALBERT BOSSIER, JR., ONEBEACON AMERICA INSURANCE COMPANY, AMERICAN EMPLOYERS INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY, BAYER CROPSCIENCE, INC., EAGLE, INC., FOSTER-WHEELER LLC, GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., THE MCCARTY CORPORATION, REILLY-BENTON COMPANY, INC., TAYLOR-SEIDENBACH, INC., CBS CORPORATION, RAPID AMERICAN CORPORATION, MARYLAND CASUALTY COMPANY | MAG. JUDGE: |

## NOTICE OF MANUAL ATTACHMENT

**NOW COME** Defendants, CBS Corporation, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation ("Westinghouse"), Foster Wheeler, LLC ("Foster Wheeler"), and General Electric Company ("General Electric" or "GE") collectively "Defendants," through the undersigned counsel, who give notice that Exhibit "G" consisting of the state court record has been manually attached to the Notice of Removal and is located in the Clerk's office.

Respectfully submitted:

FRILOT L.L.C.

*/s/ John J. Hainkel, III*
JOHN J. HAINKEL, III – 18246
ANGELA M. BOWLIN – 20714
SHERI S. FAUST – 26283
JAMES H. BROWN, JR. – 3564
PETER R. TAFARO - 28776
MEREDITH K. KEENAN – 29287
REBECCA A. ZOTTI – 33446
3700 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
T: (504) 599-8000; F (504) 599-8100

**Counsel for CBS Corporation, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation, Foster Wheeler, LLC, and General Electric Company**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of record by electronic transmission and/or hand delivery, on this 20th day of May, 2011.

*/s/ John J. Hainkel, III*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUTH FADDISH, Individually | : | CONSOLIDATED UNDER |
| and as executrix of the | : | MDL 875 |
| estate of JOHN FADDISH, | : | |
| deceased, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | NO. 09-70626 |
| v. | : | |
| | : | Transferred from the Southern |
| | : | District of Florida |
| GENERAL ELECTRIC CO. ET AL., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        OCTOBER 20, 2010


Before the Court is Defendant General Electric's Motion for
Summary Judgment, and Objections to the Magistrate Judges' Report
and Recommendation that summary judgment in favor of General
Electric be denied.


## I. BACKGROUND

This case is part of MDL-875, the consolidated asbestos
products liability multidistrict litigation pending in the
Eastern District of Pennsylvania.  The instant claims are based
on failure to warn causes of action under Florida law.  (Compl.
¶5.; Pl.'s Resp. to Def.'s Mot. Summ. J., doc. no. 129, at 8.)
Plaintiff's husband and the injured party in the instant case,
John Faddish ("Mr. Faddish"), was a serviceman in the U.S. Navy.

1


EXHIBIT
H

Mr. Faddish served aboard the U.S.S. Essex from 1958-1961. (Suppl. Compl. ¶¶ 3-5.)  Plaintiff alleges that Mr. Faddish's death from mesothelioma was related to asbestos-containing General Electric ("GE") products used aboard the U.S.S. Essex. (Id.)  It is undisputed that GE manufactured four Ship Service Turbo Generators ("SSTG") that were installed on the U.S.S. Essex (Def.'s Mot. Summ. J., doc. no. 105-1, at 3.)[1]

GE moved for summary judgment, asserting that Plaintiff has failed to raise a genuine issue of material fact as to whether GE products were the cause of Mr. Faddish's asbestos-related injuries.  Pursuant to this Court's referral order, the Panel issued an R&R denying GE'S Motion for Summary Judgment on the issue of product identification only, finding that the combination of Mr. Faddish's testimony and Plaintiff's expert witness could lead a reasonable jury to find that asbestos-insulated GE products were a substantial contributing cause to Mr. Faddish's injuries.  (R&R, doc. no. 161, at 6.)

GE raises numerous objections to the Panel's R&R, including a general objection to the ultimate conclusion that summary judgment in favor of GE should be denied.  (Def.'s Objects., doc. no. 189 at 2).  GE asserts that Mr. Faddish's deposition

---

[1] Plaintiff has also offered the reports of two medical experts, Douglas A. Pohl, M.D., Ph.D. and Steven H. Dikman, M.D., who opined, with a reasonable degree of medical certainty, that Mr. Faddish's occupational asbestos exposure was the cause of his malignant mesothelioma.  (doc. no. 129, Exhibits H, I.)

testimony and Plaintiff's expert report are insufficient to raise a genuine issue of fact.  (<u>Id.</u>)

Additionally, GE moves for summary judgment on two grounds that are outside the scope of this Court's referral order to the Panel.  First, GE argues that the asbestos-containing gaskets, packing and insulation "as delivered by GE for use on the Essex in 1942 would have been removed and replaced by other parties before Faddish's arrival on that ship" and that they cannot be held liable for replacement parts that they did not manufacture or supply.  (Def.'s Mot. Summ. J., doc. no. 105-1, at 20.) Second, General Electric argues that it is entitled to summary judgment as a matter of law based on the government contractor defense.  (<u>Id.</u> at 30.)

II. LEGAL STANDARD

Pursuant to 28 U.S.C. § 636(b)(1)(C), "[a] judge of the Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  <u>Id.</u>

When evaluating a motion for summary judgment, Federal Rule of Civil Procedure 56 provides that the Court must grant judgment in favor of the moving party when "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c)(2).   A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact.  Id. at 248-49.  "In considering the evidence, the court should draw all reasonable inferences against the moving party."  El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof."  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004) (quoting Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  Once the moving party has thus discharged its burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in [Rule 56]--set out specific facts showing a genuine issue for trial."  Fed. R. Civ.

4

P. 56(e)(2).

III. DISCUSSION

    A.  GE's Objections to the Panel's R&R

    GE has raised seven objections to the Panel's R&R, in
addition to generally objecting to the ultimate determination
that there remains a genuine issue of material fact as to whether
GE products were a substantial contributing cause of Mr.
Faddish's asbestos-related injuries.  For the reasons set forth
below, each of Defendant GE's objections are overruled, and the
Court adopts the Panel's findings.

        1.  The Panel Erred in its Choice of Law Analysis by
        Failing to Recognize that Florida does not have a
        "Significant Relationship" with this Litigation

    Notably, GE objects to the Panel's choice of law approach,
but not to the Panel's ultimate determination that Florida law is
applicable to this case.  A multi-district litigation transferee
court is bound by the transferor court's substantive law,
including choice of law rules.  Menowitz v. Brown, 991 F.2d 36,
40 (2d Cir. 1993).  Therefore, Florida choice of law rules must be
applied.

    The Panel found that Florida courts apply the "significant
relationship" test to determine what law applies and concluded
that, "in accordance with this standard, the court will apply
Florida law in deciding the substantive issues in the case at

bar." (R&R at 2 n.1 (citing <u>Connell v. Riggins</u>, 994 So. 2d 1174, 1176-77 (Fla. Dist. App. Ct. 2006))).

Under Florida law, the first step in conducting the "significant relationship" test is to determine which sovereigns have an interest in applying its laws, and whether there is a "true conflict" or merely a "false conflict" between the laws of the different sovereigns. <u>Pycsa Panama, S.A. v. Tensar Earth Tech, Inc.</u>, 625 F. Supp. 2d 1198, 1218 (S.D. Fl. 2008). A "false conflict" exists "when the laws of the interested jurisdictions are the same." <u>Id.</u>

In determining the merits of an asbestos claim, Florida law and maritime law employ the same test for proximate causation. <u>Compare</u> <u>Singleton Stone v. Amquip Corp.</u>, 98-cv-4691, 2000 WL 1448817 at *3 (E.D. Pa. Sep. 29, 2000) (applying "substantial contributing factor" test in products liability case under maritime law) <u>with</u> <u>Reaves v. Armstrong World Industries, Inc.</u>, 569 So. 2d 1307, 1309 (Fl. Dist. App. Ct. 1990) (applying a "substantial contributing factor" test in an asbestos case). As no "true conflict" exists between Florida and maritime law, Florida law is applicable to the instant case. (<u>See</u> doc. no. 161, at 4 n.2.)[2]

_____

[2] The Panel's discussion of the "false conflict" was set forth in the Report and Recommendation denying Defendant Warren Pumps LLC's Motion for Summary Judgment in this case, but is equally applicable to Defendant GE's Motion for Summary Judgment.

GE does not object to the conclusion that there is no "true conflict" between Florida law and maritime law causation standards.  GE states that "it is [our] position here that the substantive law of the State of Florida on asbestos causation is coincidental with, and not different from, the recognized national standards set forth by [] maritime asbestos cases . . . [a]ccordingly, the error of the Report with regard to the jurisdiction and choice of substantive law to be applied, which is rightfully maritime in nature, may well be meaningless and a moot point."  (Def.'s Objects., doc. no. 189, at 6.)

Under these circumstances, this Court will not disturb the Panel's finding that Florida law is applicable to this case.

### 2.  The Panel Erred in Its Application of the Summary Judgment Standard

GE objects to the Panel's statement that "an issue is 'genuine' if a reasonable jury possibly could hold in the nonmovant's favor on that issue."  (R&R at 3 (citing Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998))).  GE avers that a mere possibility of a jury verdict in favor of plaintiff is not enough to survive summary judgment, but that, in accordance with Anderson v. Liberty Lobby, Inc., plaintiff must produce "sufficient evidence" to support a jury verdict in his or her favor.  477 U.S. 242 (1986); (Def.'s

7

Objects. at 7.)

First, it should be noted that the Panel's statement that summary judgment is inappropriate if a jury could "possibly" find in favor of a non-moving party is a **direct quote** from the Third Circuit Court of Appeals decision in <u>Boyle v. County of Allegheny Pennsylvania</u>, 139 F.3d 386.  GE may disagree with the Third Circuit's articulation of what gives rise to a genuine issue of material fact, but that is not grounds for objecting to the Panel's correct recitation of the standard.

Second, both the <u>Boyle</u> court and the Panel went on to say that the non-moving party has the burden of presenting "more than a scintilla" of evidence showing that there is a genuine issue for trial.  (R&R at 4 (quoting <u>Anderson</u>, 477 U.S. at 251)).  In finding that there is a "genuine issue" remaining in the instant case, the Panel determined that Plaintiff has produced evidence to support "a reasonable basis to infer that defendant's asbestos-containing product was a substantial contributing factor to Mr. Faddish's injury."  (R&R at 9.)  The Panel correctly determined that, under Fed. R. Civ. P. 56(c), Plaintiff had alleged facts to support a favorable jury verdict, and thus a genuine issue of material fact remained.

Accordingly, Defendant's objection on this ground is overruled.

    3.  The Panel Failed to Apply the "Frequency,

Regularity, Proximity" Standard.

GE avers that the Panel "erred by failing to utilize and explicitly apply" the frequency, regularity, and proximity standard applicable to asbestos claims, set forth in <u>Lohrmann v. Pittsburgh Corning Corp.</u>, 782 F.2d 1156, 1162 (4th Cir. 1986), and applied by "numerous courts." (Def.'s Objects. at 9-10). GE further argues that the Panel failed to address its argument that manufacturers cannot be held liable for products which it did not manufacture or supply. (<u>Id.</u> at 10.) Finally, GE asserts that the Panel failed to find that GE's failure to warn Mr. Faddish of the harms of asbestos caused his injuries. (<u>Id.</u>)

It is beyond argument that Florida courts have not adopted the <u>Lohrmann</u> standard. Indeed, GE does not cite to a single Florida case adopting the <u>Lohrmann</u> standard. Rather, under Florida law, a plaintiff must simply show that a defendant's product was a "substantial contributing factor" to the injury that occurred to bring a claim in Florida courts. (Asbestos and Silica Compensation Fairness Act, FLA. STAT. § 774.205). If defendant's products are identified in a given case, "traditional" methods of finding causation apply. <u>Celotex Corp. v. Copeland</u>, 471 So. 2d 533, 536 (Fla. 1985).

The traditional method of establishing causation in negligence cases requires the plaintiff to "introduce evidence which affords a reasonable basis for the conclusion that it is

9

more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." <u>Gooding v. University Hospital Bldg, Inc.</u>, 445 So. 2d 1015 (Fl. 1984)(quoting Prosser, LAW OF TORTS § 41 (4th Ed. 1971)). Therefore, the Panel was correct in its restatement of Florida law on causation.  (<u>See</u> R&R at 5 (setting forth the "substantial contributing factor" test)).

Additionally, the Panel did not consider GE's "bare metal" defense because it is outside of this Court's Referral Order to Magistrate Judges, as it entails a different analysis than product identification.  Finally, there is no dispute that no warnings were placed on GE products containing asbestos, and no dispute that asbestos was known to be hazardous at the time of Mr. Faddish's exposure.[3]  Implicit in the Panel's determination that there remains a genuine issue of material fact is the finding that there is sufficient evidence to show that GE's failure to warn Mr. Faddish of the harms of asbestos were a substantial contributing cause of Mr. Faddish's injuries.

Accordingly, GE's objection on this ground is overruled.

4.  The Panel Failed to take into Account Unrebutted Evidence Submitted by GE

_____

[3] Indeed, these two facts are the heart of GE's government contractor defense, discussed below.

10

GE avers that Mr. Faddish's own testimony indicates that the asbestos dust he cleaned off of a GE SSTG had fallen from insulation on overhead piping.  (Def.'s Objects. at 12.) Defendant asserts that its expert, David Hobson, provided uncontroverted evidence that GE was not involved in the design, manufacture, or installation of the pipes to which Mr. Faddish referred.  (Id.)

However, Mr. Faddish's testimony is not limited to cleaning. Rather, Mr. Faddish also testified to "assisting" in the performance of maintenance on both the service generators and turbines connected to service generators in the engine rooms on the U.S.S. Essex.  (Faddish Video Dep., doc. no. 129-3, at 32:14.)  Mr. Faddish testified that he worked on "all" of the turbines and steam generators aboard the U.S.S. Essex, "at one point or another standing watch, or in the case of breakdown or something."  (Id. at 31:19-23, 32:4-8.)  When asked about a "breakdown," Mr. Faddish responded, "If you drop a load, it's an old ship, you are talking of old pieces of equipment and they basically wear and tear like anything else."  (Id. at 32:9-11.)

When taken as a whole and viewed in a light most favorable to Mr. Faddish, this evidence is sufficient to show that he performed general maintenance on the GE turbo generators aboard the U.S.S. Essex.  Given the undisputed evidence on record that, at the time of Mr. Faddish's maintenance work, these GE turbines

11

were insulated with asbestos and incorporated asbestos-containing
gaskets and packing, this raises a genuine issue of fact as to
whether GE's failure to warn Mr. Faddish of the hazards inherent
in the type of work he was performing was a substantial
contributing factor to his injuries.  The Panel properly took the
testimony regarding Mr. Faddish's maintenance work into account.
(See R&R at 7,9.)

Accordingly, GE's objection on this ground is overruled.

5.  The Panel Erred in Finding that the Record Could
Support a Jury Verdict in Favor of Plaintiff and
Against GE

GE asserts that Mr. Faddish's deposition testimony relied on
by the Panel is too vague to be relied upon.  (Def.'s Objects.,
doc. no. 13.)  The Panel noted in its R&R that there seem to be
some inconsistencies in Mr. Faddish's testimony.  (R&R at 8.)  To
the extent that GE wishes to highlight these inconsistencies to
undermine Mr. Faddish's credibility, it is free to do so at
trial.  Additionally, GE incorrectly asserts that there is no
testimony indicated that Mr. Faddish ever performed maintenance
of any kind on a GE SSTG.  (Def.'s Objects. at 18.)  However, the
testimony excerpted in Section 4, supra, is to the contrary.

There is no requirement under Florida law that a Plaintiff
perform "hands on" maintenance in order to show that a
Defendant's asbestos-containing products were a cause of

12

Plaintiff's injuries.  GE makes much of the fact that Mr. Faddish's involvement with the GE SSTG was observational. However, this Court finds that observing the maintenance or overhaul of an asbestos-containing and asbestos-insulated piece of equipment can certainly give rise to a genuine issue of material fact as to whether exposure resulted.

Accordingly, GE's objection on this ground is overruled.

### 6.  The Panel's Reliance on Plaintiff's Expert's Unsworn Report and Deposition Testimony is in Error

GE asserts that Arnold Moore's expert report cannot be relied upon to defeat a motion for summary judgment, and that Mr. Moore's deposition testimony supercedes his expert report. (Def.'s Objects., doc. no. 189 at 21.)  GE is correct in its assertion that the letter from Arnold Moore to Plaintiff's counsel is not a sworn statement.  (See doc. no. 131-7.) Therefore, it cannot be relied on to defeat a motion for summary judgment.  Wolosyzyn v. County of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005); see also Coleman v. Blockbuster, Inc., 2008 U.S. LEXIS 49957 *40 n.13 (E.D. Pa 2008)(Robreno, J.) aff'd by Coleman v. Blockbuster, Inc., 352 Fed. Appx. 676 (3d Cir. 2009).

However, the Panel also relied on Mr. Moore's sworn deposition testimony.  Mr. Moore stated that he would testify at trial that the work Mr. Faddish described regarding gaskets and

packing on the GE SSTG involved asbestos.  (Moore Dep., doc. no. 129-7 at 38:9-21).  He stated that "[t]he basis for that opinion is the General Electric drawing I have seen that show[s] the locations of the gaskets and packing aboard – a GE generator onboard the destroyer."  (Id.)  GE attacks Mr. Moore's deposition testimony as speculative, and argues that Mr. Moore is attempting to supply facts about Mr. Faddish's maintenance work, which he lacks personal knowledge about.  (Def.'s Objects. at 22).

Mr. Moore was asked about the type of maintenance Mr. Faddish performed, and gave his opinion based on his reading of Mr. Faddish's testimony.  Mr. Moore then stated the basis for his opinion that Mr. Faddish would have been exposed to asbestos-containing packing and gaskets from a GE SSTG during his tenure on the U.S.S. Essex.

When taken as a whole and viewed in a light most favorable to Plaintiff, the Panel was correct in determining that a genuine issue of material fact exists as to whether GE's failure to warn Mr. Faddish of the hazards of asbestos was a substantial contributing cause to his asbestos-related injuries.

Accordingly, GE's objection on this ground is overruled. The Panel's R&R denying summary judgment in favor of GE on the issue of product identification is adopted.


B.  The Government Contractor Defense

14

In GE's Motion for Summary Judgment, GE asserted the government contractor defense, averring that it's state law duty to warn about the harms associated with its product was superceded by the United States Government's directives.  This argument was outside of this Court's referral order to the Panel, and is considered here for the first time.

As set forth by the Supreme Court in Boyle v. United Technologies Corporation, independent contractors are immune from state law tort claims when (1) the United States Government approved reasonably precise specifications for the product at issue (2) the equipment conformed to those specifications and (3) the contractor warned the United States about dangers in the use of the equipment that were known to it, but not known to the United States.  487 U.S. 500, 512 (1988).

It is now well established that the government contractor defense is not limited to design defect causes of action, but also applies to failure to warn claims.  Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th Cir. 1996), cert. denied, 520 U.S. 1116 (1997); see also In re Joint Eastern & Southern District New York Asbestos Litigation, 897 F.2d 626 (2d Cir. 1990); Chicano v. GE, 2004 U.S. Dist. LEXIS 20330 at *38 (E.D. Pa. 2004).

To satisfy the first prong of the test in a failure to warn claim, a defendant must produce evidence that the United States Government "'dictated' the content of the warnings" by producing

military specifications "discuss[ing] product warnings" and
"placing limit[s] upon any additional information a manufacturer
may have wished to convey to those using the product." <u>In re
Joint Eastern & Southern District New York Asbestos Litigation</u>,
897 F.2d at 629-30; <u>see also Oliver</u>, 96 F.3d 992 (contractor's
state law duty to warn is displaced if the government "exercised
its discretion" in approving warnings or the government "chooses
its own warnings"). <u>But see</u> <u>Dorse v. Eagle-Pitcher Industries,
Inc.</u>, 898 F.2d 1487, (11th Cir. 1990)(requiring a showing of an
express "prohibition against health warnings on the product").

Once a defendant establishes that the United States
Government exercised its discretion regarding the warnings (or
lack of warnings) to be given, and that a defendant complied with
the directive, the defendant still must show that it warned the
government of hazards in the products, <u>or</u> that the United States
Government "knew as much or more than the defendant contractor
about the hazards" of the product. <u>Beaver Valley Power Co. v.
National Engineering & Contracting Co.</u>, 883 F.2d 1210, 1216 (3d
Cir. 1989); <u>see also</u> <u>Chicano v. GE</u>, 2004 U.S. Dist. LEXIS 20330
at *38 (E.D. Pa. 2004)("Defendant can also satisfy [the third
prong] by showing that the government knew as much or more than
defendant contractor about the hazards of the equipment.").

Therefore, in the instant case, GE must show that (1) the
government provided warning directives (2) GE complied with those

16

directives and (3) GE either warned the U.S. Government about the hazards of asbestos, or the U.S. Government knew about the hazards of asbestos.

As to the first and second prongs, GE has produced the following pieces of evidence regarding the government's warning directives.[4]

- **Declaration of Ben J. Lehman, retired Rear Admiral of the United States Navy** (doc. no. 105-10 at ¶ 7).  Mr. Lehman states that, "Drawings for nameplates, texts of instruction manuals, and every other document relating to the construction, maintenance, and operation of the vessel were approved by the Navy."  This control included the decision of what warnings should or should not be included.

- **Declaration of David Hobson, Manager of Navy Customer Service for GE's Navy and Small Steam Turbine Department** (doc. no. 105-8).  Mr. Hobson states that "[U]nless expressly directed to do so by the Navy, GE was not permitted, under the specifications, associated regulations and procedures, and the actual practice as it existed in the field, to affix any type of warning to a Navy turbine that addressed alleged hazards of products . . ."  (Id. at ¶ 21.)[5]

---

[4] GE has produced extensive evidence regarding the government's involvement in the design and manufacture of GE turbines.  However, as Plaintiff's claim is limited to a failure to warn cause of action, the Court's analysis focuses on the evidence relating to the government's warning directives.

[5] Plaintiff filed a motion to strike GE's incorporation of Mr. Hobson's testimony in its Motion for Summary Judgment, which was denied by the Court on March 25, 2010.  (doc. no. 141).  Plaintiff was given thirty (30) days to take the depositions of said experts and fourteen (14) days thereafter to supplement the record.  In Plaintiff's Notice Supplementing the Summary Judgment Record, Plaintiff argues that Mr. Hobson's testimony "once again solidifies the fact that Defendant GE was **not** prohibited by the U.S. Navy from providing an asbestos-related warning with or on

- **MIL-I-15024** (SHIPS) (Interim Military Specification Identification Plates, Information Plates and Marking Information for Identification of Electric, Electronic and Mechanical Equipment)(1952).  This specification provides that "Marking information to appear on identification plates shall be in accordance with the following subparagraphs outlines . . .".  Figure 4A exhibits the plate for a generator.  (doc. no. 105-18 at 16).  There is no space designated for a warning on this plate.

- **MIL-B-15071**(SHIPS)(1950): Specifications for technical manuals that manufacturers could provide.  The manuals had to be approved by the Navy and safety warnings could be included for some types of equipment. Specific examples were provided by the Navy.

- **Letter from Philip Drinker, Chief Health Consultant to the U.S. Maritime Commission, to Captain Thomas Carter of the U.S. Navy Department's Bureau of Medicine and Surgery** (doc. no. 105-9).  The letter states that manufacturers who provided asbestos insulation to Bath Iron Works were willing to disseminate "a brief statement of precautions which should be taken" but that it was Dr. Drinker's understanding that "neither the Navy nor Maritime wants any change in the specifications as the performance with the present materials is entirely satisfactory."

In response, Plaintiff incorporated and adopted the arguments set for in her Motion to Remand to State Court (doc. no. 92) wherein Plaintiff asserts that the removing defendants "could have complied with both their contractual obligations and their state law duty to warn" and they have produced no evidence

_____

its equipment it knew required the use of thermal asbestos-containing insulation."  (doc. no. 158, at 20)(emphasis in original).  As discussed below, this Court declines to follow the Dorse standard requiring a prohibition of warnings, and this argument against Mr. Hobson's testimony is therefore unavailing.

that the United States Government "forbade" warnings, or that
Defendants tried to incorporate warnings and were prevented from
doing so.  (Id. at 9.)   Additionally, in Plaintiff's Response to
Defendant GE's Motion for Summary Judgment, Plaintiff points the
Court to Dorse v. Eagle-Pitcher Industries, Inc., 898 F.2d 1487,
to support the proposition that GE has not presented affirmative
evidence that there was a government directive specifically
prohibiting a warning from being placed.  (Pl.'s Resp., doc. no.
129, at 16.)   Plaintiff asserts that "[t]he record in this case
is completely devoid of any such specification upon which the
government exercised the requisite discretion as to warnings."
(Id. at 13.)

     However, GE has produced a record establishing that the
United States Navy was intimately involved with both the labeling
of equipment on its ships and the manufacturer-produced
information that was allowed to accompany any product.  GE has
produced military specifications (MIL-I-15024) referring to
turbines in particular, and the parameters of a label that could
be placed on that equipment.  Plaintiff is correct in asserting
that Defendants must show something more than "reasonably precise
specifications" in a failure-to warn-case.  In the instant case,
GE has made such a showing.

     It is true that Defendant has not produced evidence that the
Navy expressly forbade any warnings from being placed on GE

19

turbines.   However, this standard, articulated by the Eleventh
Circuit in <u>Dorse</u>, has been rejected by every Circuit court to
consider the issue, as well as district courts in this circuit.[6]

   The prevailing view is that an independent contractor does

--------------------

   [6] Plaintiff asserts that <u>Dorse</u>, as "Florida law . . . must
be applied by this Court as the transferee Court from the
Southern District of Florida." (Pl.'s Mot. Supp. Summ. J. Rec.,
doc. no. 158 at 2, n.1).  This is incorrect.

   First, the question of whether the government contractor
defense applies in a given case is a question of federal law, not
state law.  <u>See</u> <u>Carley v. Wheeled Coach</u>, 991 F.2d 1117, 1128 (3d
Cir. 1993)(holding that the government contractor defense is a
matter of "federal common law" and therefore it need not be
considered whether the transferee state recognizes the defense).
Federal court interpretations of the government contractor
defense, rather than Florida state substantive law, provide the
rule of decision regarding GE's government contractor defense.

   Second, it is well established that, in interpreting federal
law, the transferee circuit in multi-district litigation cases is
not bound by the transferor forum's approach to federal
questions.  <u>In Re Asbestos Prods. Liab. Litig. (Oil Field Cases)</u>,
673 F.Supp. 2d 358, 362 (E.D. Pa. 2009)("[I]n cases where
jurisdictions is based on federal question, this Court, as the
transferee court, will apply federal law as interpreted by the
Third Circuit."); <u>see also</u> <u>In Re Korean Air Lines Disaster</u>, 829
F.2d 1171, 1174 (D.C. Cir. 1987) (Ginsburg, J.) (finding that
"the transferee court should be free to decide a federal claim in
the manner it views as correct without deferring to the
interpretations of the transferor circuit.")(internal citation
omitted); <u>see also</u> <u>Menowitz v. Brown</u>, 991 F.2d 36, 40 (2d Cir.
1993) (holding that a transferee court should apply its own
"construction of relevant federal law," not the transferor's
court's construction).

   Therefore, this Court is not bound by the Eleventh Circuit's
decision in <u>Dorse</u>, and may arrive at its own interpretation of
federal law, within the bounds articulated by Third Circuit
precedent.

not have to show an express government prohibition on all
warnings, but rather, must establish that the government
"exercised its discretion" regarding warnings to be placed on
defendant's product.  <u>Oliver</u>, 96 F.3d 992 (7th Cir. 1996); <u>In re
Joint Eastern & Southern District New York Asbestos Litigation</u>,
897 F.2d 626, 630 (2d Cir. 1990); <u>Kerstetter v. Pacific
Scientific Co.</u>, 210 F.3d 431, 437 (5th Cir. 2000); <u>Tate v. Boeing
Helicopters</u>, 140 F.3d 654, 660 (6th Cir. 1998); <u>Butler v. Ingalls
Shipping, Inc.</u>, 89 F.3d 582, 586 (9th Cir. 1996); <u>Crespo v.
Unisys Corp.</u>, 1996 WL 875565 *15 (D.N.J. 1996)(adopting the 6th
Circuit's standard requiring a showing that the United States
"exercised its discretion and approved warnings").

        In the instant case, GE has established that the United
States Navy "exercised its discretion" regarding the type and
content of warnings that could be placed on GE turbines, and that
GE complied with the applicable military specifications.

        Finally, GE argues that, as to the third prong of the test,
the United States Navy possessed superior knowledge regarding the
hazards of asbestos and that GE therefore had no duty to warn the
Navy about the hazards of asbestos insulation to be applied to
its turbines.  (Def.'s Mot. Summ. J., doc. no. 105-1, at 55-61.)
GE has produced extensive evidence to this effect.  (<u>See</u>
Declaration of Lawrence Stilwell Betts, retired United Stats Navy
Captain, MD, PhD, CIH, FACOEM, doc. no. 105-9.)  Plaintiff has

allowed this evidence to go un-controverted on the record.

Therefore, there remains no genuine issue of material fact as to whether the United States Navy possessed state-of-the-art knowledge of the hazards of asbestos, thereby absolving GE of its duty to warn the Navy. As GE has satisfied all three prongs of the Boyle test (as modified for failure to warn cases) summary judgment on this ground is appropriate.


    C.  The Bare Metal Defense

Based on this Court's finding that GE is entitled to the government contractor defense, it is not necessary to address GE's argument that it is not liable for external asbestos insulation or replacement gaskets and packing applied to its turbines aboard the U.S.S. Essex.


IV.  CONCLUSION

This Court adopts the Panel's finding that Plaintiff has raised a genuine issue of material fact as to whether GE's failure to warn Mr. Faddish about the hazards of asbestos-containing components of its products were a substantial contributing factor to Mr. Faddish's injuries.

However, Plaintiff has failed to raise a genuine issue of material fact as to whether GE retained its state law duty to warn in light of the discretion exercised by the U.S. Navy in the

22

warnings to be placed on products installed on the U.S.S. Essex. Plaintiff in the instant case incorrectly relied on the minority view in Dorse, insisting that GE has failed to produce evidence that the United States Navy expressly prohibited warnings from being placed on turbines, such as those manufactured by GE.  In response, GE has produced numerous pieces of evidence showing that the Navy exercised its discretion in every aspect of the warnings to be given on ship equipment, from the labels to be placed on machinery, to the information that could accompany it. The Navy reserved the right to reject any equipment or information that did not comply with its specifications. Specifically, regarding the hazards of asbestos, the Navy was intimately involved with the warnings to be given and the procedures to follow, and GE produced significant evidence showing that the Navy possessed state-of-the-art knowledge regarding the hazards of asbestos.  Under these circumstances, GE's state law duty to warn was displaced by the Navy's directives.  As GE had no duty to warn Mr. Faddish of the hazards of asbestos, this Court need not reach the issue of whether GE can be held liable for asbestos-containing to external insulation or replacement parts incorporated into its products.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUTH FADDISH, Individually and as executrix of the estate of JOHN FADDISH, deceased, | : : : : : | CONSOLIDATED UNDER MDL 875 |
| Plaintiff, | : : | CIVIL ACTION NO. 09-70626 |
| v. | : : : | Transferred from the Southern District of Florida |
| GENERAL ELECTRIC CO. ET AL., | : : | |
| Defendants. | : | |

O R D E R

AND NOW, this **21st** day of **October 2010** it is hereby **ORDERED** that Defendant General Electric's Objections to the Magistrate Judges' Report and Recommendation (doc. no. 189) filed on June 16, 2010 are **OVERRULED**.

It is further **ORDERED** that General Electric's Motion for Summary Judgment (doc. no. 105), filed on January 29, 2010 is **GRANTED**.

AND IT IS SO ORDERED.

S/Eduardo C. Robreno
EDUARDO C. ROBRENO, J.

24

ъJS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SALLY GROSS VEDROS

**(b)** County of Residence of First Listed Plaintiff    Jefferson
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Gerolyn P. Roussel, Roussel & Clement
1714 Cannes Drive, Laplace, LA 70068  (895) 651-6591

## DEFENDANTS

NORTHROP GRUMMAN SHIPBUILDING, INC., ET AL
(CBS Corporation)
County of Residence of First Listed Defendant   Delaware County, PA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)
John J. Hainkel, III, Meredith K. Keenan, Frilot L.L.C., 1100 Poydras Street, Suite 3700, New Orleans, LA 70173  (504) 599-8000

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☒ 3  Federal Question
      (U.S. Government Not a Party)

☐ 4  Diversity
      (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN    (Place an "X" in One Box Only)

☐ 1  Original
      Proceeding

☒ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      another district
      (specify)

☐ 6  Multidistrict
      Litigation

☐ 7  Appeal to District
      Judge from
      Magistrate
      Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Federal Offrricer Removal Statute, 28 U.S.C. §1446
Brief description of cause:
Asbestos-related personal injury claim

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                    DOCKET NUMBER

DATE
5/20/11

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE