FILED
2010 OCT 28 P 3:14
CIVIL DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 10 — 11041 DIVISION " " M SEC: " " 13

SALLY GROS VEDROS

versus

NORTHROP GRUMMAN SHIPBUILDING, INC., (formerly AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.) and its executive officer, ALBERT BOSSIER, JR.; ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); AMERICAN EMPLOYERS INSURANCE COMPANY; AMERICAN MOTORISTS INSURANCE COMPANY; BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC. F/K/A BENJAMIN FOSTER COMPANY); EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); REILLY-BENTON COMPANY, INC.; TAYLOR-SEIDENBACH, INC.; CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORPORATION);RAPID AMERICAN CORPORATION; MARYLAND CASUALTY COMPANY

FILED:____________________ ____________________

DEPUTY CLERK

**PETITION FOR DAMAGES**

The Petition of Sally Gros Vedros, person of the full age of majority and resident of the State of Louisiana, with respect represents:

1.

Defendants, Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.), and Taylor-Seidenbach, Incorporated, are domestic corporations with their registered offices in the Parish of Orleans, State of Louisiana. Marquette Insulations, Inc. was also a domestic corporation with its registered offices in the Parish Orleans. In addition, tortious conduct of Marquette Insulations, Inc., Eagle, Inc. and Taylor-Seidenbach, Incorporated occurred in the Parish of Orleans. Moreover, C. Edwin Hartzman, Hettie "Dawes" Eaves, Henry "Zac" Carter, James Bull, Roy Barkdull, and Ewing Moore were domiciled in Orleans Parish at the time of their deaths. Also, Alton Gros was exposed to asbestos in Orleans Parish. Accordingly, venue is proper in Orleans Parish against all defendants pursuant to Louisiana Code of Civil Procedure Articles 42, 73, and 74.

2.

Defendants, NORTHROP GRUMMAN SHIPBUILDING, INC., (formerly, NORTHROP GRUMMAN SHIP SYSTEMS, INC., formerly, AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.); ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); AMERICAN EMPLOYERS INSURANCE



COMPANY; AMERICAN MOTORISTS INSURANCE COMPANY; BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC. F/K/A BENJAMIN FOSTER COMPANY); EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); REILLY-BENTON COMPANY, INC.; TAYLOR-SEIDENBACH, INC.; CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORPORATION); RAPID AMERICAN CORPORATION (as successor in interests to Philip Carey Manufacturing Company); MARQUETTE INSULATIONS, INC.; MARYLAND CASUALTY COMPANY (hereinafter collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws of the various states of the United States, as well as Canada, England, and Australia. Asbestos defendants all have their principal place of business in various states of the United States, as well as some foreign countries. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

At all material times herein, James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, Ewing Moore, Roy Barkdull, Peter Territo, Dr. Joseph Mabey, J. Melton Garrett, and Albert Bossier, Jr. were executive officers of Northrop Grumman Shipbuilding, Inc., (formerly Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc. and formerly Avondale Shipyards, Inc.) (hereinafter sometimes "Avondale" or "Avondale Industries, Inc.") with the specific responsibility for the health and safety of Sally Vedros and Alton Gros, and their fellow employees during the time Sally Vedros was exposed to substances which resulted in her mesothelioma and other ill effects related thereto. James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, Ewing Moore, Roy Barkdull, Peter Territo, J. Melton Garrett, and Dr. Joseph Mabey have since died, and pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against American Motorists Insurance Company, American Employer's Insurance Company, and Onebeacon America Insurance Company

(as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), who, at all times material herein, were the insurance carriers covering all of the foregoing individuals as well as Avondale Industries, Inc. for the liability asserted herein. These executive officers and Avondale were also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement. As stated above, Albert Bossier, Jr. was also an executive officer of Avondale with specific responsibilities for the health and safety of Sally Vedros and Alton Gros, and their fellow employees. They, too, were covered for the liability asserted herein by Highlands Insurance Company, American Motorists Insurance Company; American Employer's Insurance Company, and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company); and Travelers Indemnity Company. Plaintiffs assert a direct action against American Motorists Insurance Company, American Employer's Insurance Company, and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), for the liability of this individual pursuant to the Louisiana Direct Action Statute. Likewise, this executive officer was also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.

4.

Under a buy-back contract and agreement between Northrop Grumman Shipbuilding, Inc. (Formerly, Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc., formerly Avondale Shipyards, Inc.) (hereinafter "Avondale") and Highlands Insurance Company (currently in receivership), Avondale is an additional insurer under the Highlands Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiff's petition. The plaintiff asserts an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

5.

Under a buy-back contract and agreement between Avondale and American Motorists Insurance Company, Avondale is an additional insurer under the American Motorists Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiff's petition. The plaintiff asserts an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

6.

American Employers Insurance Company and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company) provided coverage to Eagle, Inc. for the liability asserted herein, and plaintiff asserts a direct action pursuant to Louisiana Revised Statute 22:1269 against these insurance companies for the liability of this defendant.

7.

Pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against Maryland Casualty Company, who at all times material herein, was the general liability carrier covering Marquette Insulations, Inc. ("Marquette") for the liability asserted herein. Also, upon knowledge and belief, Marquette Insulations, Inc. has incurred a civil death by corporate dissolution. Thus, Marquette is deceased under Louisiana law allowing a direct action against its insurer, Maryland Casualty Company, pursuant to LSA-R.S. 22:1269(B)(1)(f). In addition, since Marquette Insulations, Inc. is dead, it cannot be served with citation or other process allowing a direct action against their insurer, Maryland Casualty Company, pursuant to LSA-R.S. 22:1269(B)(1)(c). Furthermore, the voluntary dissolution of Marquette Insulations, Inc. pursuant to LSA-R.S. 12:141 through 149, liquidates the assets (except insurance policies) of the corporation and renders the corporation insolvent, allowing a direct action against its insurer, Maryland Casualty Company, pursuant to LSA-R.S. 22:1269(B)(1)(b). Also, LSA-R.S. 22:1269 vested the plaintiffs with rights in the insurance contract distinct from the insured by operation of law. Additionally, the insurance policies of Maryland Casualty Company insuring Marquette Insulations, Inc. are undistributed asset of the tort debtor, Marquette Insulations, Inc. Thus, Maryland Casualty Company is subject to suit pursuant to LSA-R.S. 12:147(C) which allows a direct suit against the undistributed assets of a dissolved corporation.

8.

From approximately 1960 through 1963, Sally Vedros was employed in various positions by or on the premises of Avondale Industries, Inc. On a daily basis during this employment, Sally Vedros was exposed to dangerously high levels of toxic substances, including asbestos, and asbestos-containing products sold, manufactured, and/or distributed by the "asbestos defendants" in the normal routine course of her work.

9.

From approximately 1943 through 1976, Alton Gros was employed in various positions by or on the premises of Avondale Industries, Inc. On a daily basis during this employment,

Alton Gros was exposed to dangerously high levels of toxic substances, including asbestos, and asbestos-containing products sold, manufactured, and/or distributed by the "asbestos defendants" in the normal routine course of his work.

10.

Alton Gros was the father of Sally Vedros. On a daily basis throughout the employment of Alton Gros, Sally Vedros was exposed to dangerously high levels of asbestos through contact with him, through the handling and washing of his clothes and other objects belonging to him, as well as being in the area where his clothes and other objects were being handled and washed.

11.

As a result of these exposures to toxic substances, including asbestos, Sally Vedros, contracted mesothelioma and other related ill health effects, which was first diagnosed on approximately March 22, 2010.

12.

Avondale and its executive officers had the responsibility of providing Sally Vedros and Alton Gros with a safe place to work and safety equipment with which to conduct their work (including disposable overalls and showers); however, they negligently and/or intentionally failed to carry out these duties and failed to protect Sally Vedros and Alton Gros from the dangers of toxic fiber and dust exposure, and failed to protect family members from said exposures to asbestos and toxic fiber.

13.

Avondale and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that Sally Vedros (and other similarly situated employees and/or family members of its working force) would suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld from Sally Vedros and Alton Gros, knowledge of the dangers to their health from exposure to asbestos fiber and other toxic substances.

14.

In addition to the foregoing acts of negligence and intentional concealment, Avondale and its executive officers are guilty of the following:

a) Failing to reveal and knowingly concealing critical information from Sally Vedros and Alton Gros, including the ability to expose family members to asbestos through clothing of its workers;

b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;

c) Failing to provide necessary protection to Sally Vedros and Alton Gros, as well as to other employees and family members;

d) Failing to provide clean, respirable air and proper ventilation;

e) Failing to provide protective or disposable clothing and showers to its employees so that asbestos fiber would not be brought home to family members;

f) Failing to advise employees that deadly asbestos fiber could be brought home to their family members; and

g) Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

h) Requiring employees to dump asbestos into the Mississippi River instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

I) Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

j) Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

k) Failing to warn of the dangers of exposure to asbestos;

l) Failing to warn employees and their families that asbestos fiber could be brought home on clothing and other objects, could expose innocent family members, and could cause deadly diseases to family members including mesothelioma, asbestosis, pleural thickening, and pleural plaques;

m) Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, pleurisy, diagphragmatic calcifications, cancer, and mesothelioma;

Avondale and its executive officers intentionally or negligently committed these acts knowing full well that Sally Vedros' injuries would follow or were substantially certain to follow.

15.

Avondale and its executive officers, James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, John McQue, Ewing Moore, Peter Territo, Roy Barkdull, Dr. Joseph Mabey, J. Melton Garrett, and Albert Bossier, Jr., were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that said substances could be carried home by employees, and that employees and family members would suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld from Alton Gros and Sally Vedros, knowledge of the dangers to one's health from exposure to asbestos fiber and other toxic substances.

16.

In addition to the acts of negligence, strict liability, intentional tort, and fault identified throughout this petition, Avondale is strictly liable under a theory of premises liability. Avondale was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Sally Vedros would be exposed to asbestos and that Sally Vedros would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of these exposures, but they failed and/or willfully withheld from Alton Gros and Sally Vedros, knowledge of the dangers to their health from exposure to asbestos fiber.

17.

Defendants, OneBeacon American Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), American Employers Insurance Company, and American Motorists Insurance Company, knew or should have known of the hazardous health effects of asbestos, but failed to inform or intentionally concealed that information from Sally Vedros and Alton Gros, and their co-employees as well as from their family members.

18.

All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Sally Vedros and for which these defendants are strictly liable under Louisiana law.

19.

Defendant, Avondale, was the owner of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Sally Vedros, and for which defendant is strictly liable under Louisiana law.

20.

Defendant, Avondale, is answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Sally Vedros, and for which defendants are strictly liable under Louisiana law.

21.

Defendant, Avondale, is responsible for the conduct of those individuals and companies working on their premises with asbestos products which resulted in exposure to asbestos to Sally Vedros, which asbestos was defective and which presented an unreasonable risk of harm, and which

asbestos resulted in the injury to Sally Vedros, and for which defendants are strictly liable under Louisiana law.

22.

At all times material herein, Sally Vedros was exposed to asbestos manufactured, distributed, and sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company. The asbestos-containing products manufactured, distributed and/or sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, these defendants failed and refused to warn Sally Vedros and Alton Gros, of the danger of exposure to such products. They also failed to warn them of the invisible nature of the asbestos and that it could cause deadly diseases such as mesothelioma and cancer. As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by these "asbestos defendants," Sally Vedros was exposed to asbestos fibers proximately causing her mesothelioma, cancer, and other related ill health effects. Plaintiff further contends that said defendants are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

23.

During Sally Vedros' exposure, Hopeman Brothers, Inc. also performed contracting work wherein asbestos-containing products were used. During this contracting work, Hopeman Brothers, Inc. exposed Sally Vedros and Alton Gros to asbestos-containing products, which caused and/or contributed to Sally Vedros' asbestos-related diseases and other related ill health effects from which she suffers. Defendant, Hopeman Brothers, Inc. had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Sally Vedros and for which Hopeman Brothers, Inc. is strictly liable under Louisiana law. Moreover, defendant, Hopeman Brothers, Inc., is answerable for the conduct of those handling asbestos products over which it had control, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Sally Vedros and for which defendant is strictly liable under Louisiana law.

24.

In addition to the aforementioned acts of negligence, intentional tort, fraud, and strict liability, of Hopeman Brothers, Inc. and Wayne Manufacturing Co., Hopeman Brothers, Inc. is also liable because Wayne Manufacturing Corporation was the alter ego of Hopeman Brothers, Inc. at all time material herein.

25.

Plaintiff also makes additional allegations against Hopeman Brothers, Inc. who was aware of the risk of harm presented by its asbestos products. Hopeman Brothers, Inc. either through exchange of information and/or industry sponsored studies was notified, either directly by its parent companies or by its manufacturing associations, that their products presented an unreasonable risk of harm. However, Hopeman Brothers, Inc. disregarded these notices, elected to conceal these hazards from the plaintiffs and continued to use and hold out these products as safe and non-toxic.

26.

Hopeman Brothers, Inc. was informed that asbestos dust presented health risks by the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The U.S. Government issued advisories, through the U.S. Maritime Commission, to all government contractors regarding their findings of enumerated health risks in the work place. During the 1950s, the Department of Defense adopted and distributed to all government contractors, safety standards that pertained to the use of these defendants' products in various work places. In 1958, Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S. Government promulgated and published the Walsh-Healy Act which adopted safety standards and regulations regarding asbestos dust. Based on information and belief, Hopeman Brothers, their predecessor, and corporation officers were made aware of these findings at the time they were issued. Despite this knowledge Hopeman continued to manufacture, distribute, relabel, fabricate, sell and install these products at plaintiff's worksites. This was done without warning to plaintiffs and without the knowledge on the part of the plaintiffs that they were in danger. Additionally, these defendants continued to market their products without disclosing the dangers and simultaneously affirming that their products were safe and non-toxic.

27.

During Sally Vedros' exposure, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Sally Vedros and Alton Gros and/or to the owners of the premises where they worked, throughout their entire employment history at

Avondale. Such products were installed, removed, and repaired by or in close proximity to Sally Vedros and Alton Gros during their employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time Sally Vedros and Alton Gros were employed, they were exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse. At the they were exposed to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse.

28.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, Westinghouse failed and refused to warn Sally Vedros and Alton Gros of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

29.

Plaintiff further alleges that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

30.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma. Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council. Beginning in the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

31.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. IHF members included, among others, General Electric Company and Westinghouse Electric Corporation, or their predecessors in interest. All of these companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health

to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee. The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The report is dated June 1947. The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period." While the actual report does not reveal the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that other companies evaluated in the report included, among others, Garlock. Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control. A second report by Foundation Research at the

Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

32.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

33.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also

aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

34.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

35.

Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

36.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the

courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has refused to respond to plaintiffs' request for the production of these documents principally on the basis that said documents did not exist due to their destruction. Accordingly, plaintiffs allege that Westinghouse's conduct constitutes fraud under Louisiana law.

37.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would not comply with either the EPA or OSHA and would take an attitude of "respectful noncompliance".

38.

Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial Hygiene Department files, dating back to 1930, have been reviewed. After a general description of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking gun" documents. This is so because of the nature, duties, obligations and responsibilities of the Industrial Hygiene Department. The approximately 57 years of Industrial Hygiene files which are in existence today are filled with technical information, procedural information, safe-handling information, hazard information, recommendations and tests results. The files are filled with documentation which critiques and criticizes, from an industrial hygiene perspective, Westinghouse manufacturing and non-manufacturing operations. This documentation often times points out deficiencies in Westinghouse operations and suggests recommendations to correct these deficiencies. Industrial Hygiene's files contain information which details the various chemical substances used at Westinghouse sites over the years, and often times the inadequacies in Westinghouse's use and handling of the substances. The files contain many years of employee test results, some of them unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential smoking gun documents (emphasis added).
>
> Plant Correspondence and Files
>
> Please see, for example, Wilber Speicher's letter...correspondence of this type was and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's correspondence might show early knowledge of the Corporation to certain health hazards associated with epoxy resin dissolving agents. What use did the Corporation make of this knowledge to protect employees and the public? If none or very little, then this document might become a "smoking gun" (emphasis added).
>
> Industrial Hygiene audit and trip reports certainly qualify as potential smoking guns (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective. Industrial Hygiene also makes recommendations to improve the hygiene of the plant. The smoking

gun possibilities of such documentation are readily apparent (emphasis added). Material Cards, Materials Safety Data Sheets, Purchasing [sic] Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files

Again, the smoking gun possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent. In addition, if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent (emphasis added).

Recommendations

Plant Correspondence Files (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic records retention guidelines do not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded. As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations. The files are filled with technical product and chemical information, hazard information and safe-handling information, most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner. The files are not used in the daily operation of the Department. In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual. In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace. This "self-analysis" and "editorializing" type of information can be dangerous. This is just the type of documentation which should be discarded from the files. Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"Historical Files or Industrial Hygiene Department"

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic Records Retention Guidelines do not specifically address these records. We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation litigation, show no signs of abating in the near future. In fact, legislation such as the risk notification legislation currently being considered by Congress, will, according to many "experts", result in an increase in such litigation. Consequently, well reasoned and conceived document retention and destruction programs for departments such as Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of

its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its dangerous products. More importantly, his conclusion shows that Westinghouse had motive for destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations therein.

39.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation therof. This activity amounts to fraud and spoliation. In fact, at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

40.

The document destruction program set out in Bair's memo was actually implemented by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards associated with its products constitute fraud under the laws of the state of Louisiana.

41.

During Sally Vedros' exposure, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Sally Vedros and Alton Gros and/or to the owners of the premises where they worked, throughout their entire employment history at Avondale. Such products were installed, removed, and repaired by or in close proximity to Sally Vedros and Alton Gros during their employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time they were employed, Sally Vedros and Alton Gros were exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of their exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of GE.

42.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn Sally Vedros and Alton Gros of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

43.

Plaintiff further alleges that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

44.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos

with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

45.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.