46.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

47.

Moreover, various published reports and articles available to GE, prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

(1)   Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2)   Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3)   Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.

(4)   Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s. Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis." Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.

(5)   Asbestos And Health In 1969, a published article written in 1969 by George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6)   The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7)   Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8)   Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

48.

Eagle, Inc., The McCarty Corporation (successor to McCarty Branton, Inc. and predecessor and successor to McCarty Insulation Sales, Inc.), Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach, Inc., manufactured asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, and jackets. They sold these products throughout the time that Sally Vedros was exposed to asbestos to the various sites at which Sally Vedros and Alton Gros worked and were exposed. In addition, Eagle, Inc.,

The McCarty Corporation, Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach, Inc. distributed asbestos-containing products manufactured, distributed, and sold by Bayer Cropscience, Inc. (Successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company); coatings, sealants, and mastics), Foster-Wheeler LLC--(block and boiler insulation), Riley Power, Inc. (block and boiler insulation), Rapid American Corporation (successor to Philip Carey Manufacturing Co.) (various asbestos-containing products including, but not limited to, cement, block, pipe covering, and adhesives), General Electric Company--(electric wire and cable, block and turbine insulation including, but not limited to sprayed asbestos insulation), CBS Corporation. (formerly Westinghouse Electric Corporation)--(block, boiler and turbine insulation as well as Micarta). During various periods of time from the 1950s throughout the 1980s, Eagle, Inc., The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. would package the above-described products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus making them liable as the manufacturer under Louisiana law. In addition, Eagle, Inc., The McCarty Corporation, Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach, Inc. also did contracting work at locations at which Sally Vedros and Alton Gros were working thereby exposing them during their handling of these products.

49.

The asbestos-containing products manufactured, distributed and/or sold by all "asbestos defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, defendants failed and refused to warn the Sally Vedros and Alton Gros of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

50.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants," Sally Vedros inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the mesothelioma, cancer, and other related ill health effects from which he suffers. Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a

product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions.  Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

51.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants," Alton Gros carried home asbestos on his clothing, skin, hair, shoes, socks, and other objects, and Sally Vedros inhaled asbestos fibers.  These loose asbestos fibers were emitted by the normal use of said products, proximately causing the asbestos-related mesothelioma and other ill health effects associated therewith, from which Sally Vedros suffers.  Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions.  Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

52.

Prior to the time Sally Vedros was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to asbestos-related pulmonary disease, pleural plaques, pleural thickening, fibrosis, asbestosis, cancer, and mesothelioma.  Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims.  Such conduct constitutes fraud under Louisiana law.

53.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

54.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Sally Vedros and Alton Gros were exposed to products manufactured, distributed, and sold by "asbestos defendants" and, as a result thereof, Sally Vedros was exposed to asbestos and contracted mesothelioma and other related ill health effects, which were first diagnosed on March 22, 2010.

55.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Sally Vedros and Alton Gros, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law and entitle plaintiffs to damages.

56.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestos was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Sally Vedros and Alton Gros.

57.

By the time Sally Vedros and Alton Gros began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed

- 23 -

asbestosis and silicosis as a compensable occupational disease.  Moreover, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943.  These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.  They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors.  Despite this, Sally Vedros and Alton Gros were never warned of any hazard associated with asbestos or silica, was never protected by use of adequate ventilation, was required to work next to insulators using asbestos products and with and around silica, and was required to pick up asbestos containing debris and silica.  They never saw a warning on any asbestos or silica product nor were they warned by any contractor using asbestos or silica products.  Despite the fact that all defendants were aware of the hazards of asbestos and silica and other toxic substances to which Sally Vedros and Alton Gros were exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards.  Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law.  Even after OSHA became the law in 1971, Sally Vedros and Alton Gros were not warned of the health hazards associated with exposure to asbestos and silica.

58.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioners in the following manner:

1)   The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2)   The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

a)   To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

b)   To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;

c)   To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

d)   To provide a defense against lawsuits brought for injury resulting from asbestos disease;

e)    To prevent relevant medical inquiry about asbestos disease;

f)    To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and

g)    To induce the Petitioner to use and continue to use asbestos products.

3)    The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

4)    Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5)    Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

59.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Sally Vedros was first exposed to asbestos and continued throughout her husband and her two sons' employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the <u>McNeely</u> case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose

money on it."  (See deposition of Harry J. Flynn in <u>Bradley v. Todd Shipyards, Inc.</u>, C.A. No. 85 -
05657, Div. "D", Civil District Court for the Parish of Orleans.)

60.

      That all defendants and the companies that insured them knew of the health hazards
associated with exposure to asbestos since the 1930s (and suppressed this information) is shown
by numerous documents and testimony.  In fact, the knowledge was so well recognized in the
asbestos industry that the insurance industry considered confessing liability; instead, they decided
to make it "economically impossible" for plaintiffs to pursue their claims.  The minutes of
meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry
association) confirm that the hazards of asbestos exposure have been known for many years.
These minutes specifically state that  medical research in 1900 linked asbestos with asbestosis and
by 1935 it was recognized that asbestos caused cancer.  In a memorandum of a meeting of a
discussion group dated April 21, 1977, it was stated:  The meeting closed with a unanimous
rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed
between themselves as to their respective losses and expenses.  That insurance companies and
their insureds were working together to discourage plaintiffs from pursuing valid claims is also
demonstrated in earlier memos.  In minutes dated May 22, 1974, discussing *Borel v. Fibreboard
Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), <u>cert. denied</u>, 419 U.S. 869 (1974), it
is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for
our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a
**'game plan'** for the continued defense of these asbestosis cases **<u>with the other defendants.</u>"**  In a
memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance
companies would resist pending cases "and attempt to make this economically (sic) impossible
for the plaintiffs to pursue the other cases."  These attempts to prevent and stifle valid claims by
plaintiffs such as Sally Vedros and plaintiff herein show that the defendants, to this day, are
committing fraud.

61.

      Documents and testimony of defendants herein as well as associated asbestos companies is
replete with the fact of knowledge and fraud.  Although Johns-Manville (hereinafter sometimes
referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M")
are not defendants herein, a discussion of their knowledge is necessary to show knowledge within
asbestos industry associations, within the insurance industry, and among other defendants.  In

- 26 -

1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

62.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

63.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way."' (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American, U.S. Claims Court Civ. No. 465-83C).

64.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

65.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

66.

Another trade organization was the National Insulation Manufacturers Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (defendant herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions. NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety. Charles Limerick, former manager of the Ruberoid

Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine. Ruberoid subscribed and advertised in "Asbestos". Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

67.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

68.

Defendants, Eagle, Inc. and Taylor-Seidenbach, Inc., did contracting work as early as the 1940s. Likewise, The McCarty Corporation (formerly McCarty Branton, Inc.), Marquette Insulations, Inc., and Reilly-Benton Company, Inc., have done contracting work since their initial existence. Accordingly, Eagle, Inc., The McCarty Corporation (formerly McCarty Branton, Inc.), Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed *infra*). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, these defendants, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof. Sally Vedros and Alton Gros were exposed to asbestos both through these defendants contracting work and through products manufactured, distributed, and sold by them, and they carried home fiber on their clothing and other objects thereby exposing Sa;lly Vedros. Yet at no time were Sally Vedros Alton Gros protected from these hazards nor warned of these hazards. Even after OSHA became

- 30 -

the law in 1971, Sally Vedros and Alton Gros were not advised of the hazards associated with exposure to asbestos. These defendants were aware of the hazards of asbestos but failed and refused to warn them of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. See deposition of Fred J. Schuber, Jr., 05/31/90, pages 149-155, 176-179 and exhibits attached to the deposition of Schuber taken 5/09/90; and deposition of Thomas R. Dimm, 02/03/86, pages 65-66; and Eagle, Inc.'s response #4 to plaintiffs' interrogatories in the case of Atzenhoffer, et al v. National Gypsum, Co., et al, C. A. #89-894, which responses are dated March 27, 1990; and Act No. 532 (1952) amendments to the Louisiana Workers' Compensation Act.

69.

Since the early 1940s, defendant, Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), was a major manufacturer of boilers used in the construction of both commercial and U.S. Navy vessels. Since that time through and including the time when Sally Vedros was last exposed, they supplied boilers to virtually every shipyard constructing and repairing vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time were Sally Vedros and Alton Gros advised of these hazards as defendants failed and refused to warn them of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Sally Vedros and Alton Gros, to asbestos during their operations.

70.

Rapid American Corporation (successor to Philip Carey Manufacturing Co.) (hereinafter sometimes "Carey"), in an advertisement appearing in the magazine "Asbestos", in March of 1930, boasted that it had been supplying asbestos and asbestos products for over fifty (50) years. Carey got into the insulation contracting business as well. Publicity over asbestosis among Carey's Quebec mine employees led to an asbestos strike. Moreover, Carey was named as a defendant in claims brought by Swartout, Riley, Streithorst, Gilivich, and Onofrio, with notice to

- 31 -

Carey dated from 1955-1963 and Latto in 1961-62.  Additionally, Dr. Thomas Mancuso reported directly to the top management of Carey about the urgent need for measures to protect employees as well as customers of Carey's products and neighbors of Carey facilities exposed to asbestos air pollution.

Of particular note is the expose' written by Burton LeDoux on the hazards of asbestos. The newspaper report by Mr. LeDoux which appeared in the newspaper Le Devoir on January 12, 1949, recounted his investigation of the asbestos mines owned by Quebec Asbestos Corporation, Ltd., a subsidiary of Phillip Carey.  LeDoux's account described case histories of workers disabled by asbestosis, local doctors who were afraid to tell them so, estimates of how much profit Carey mined out of the town, descriptions of asbestos air pollution in town, commentary on the "ample and authoritative medical literature... that the disease is incurable and fatal"; and culminates with what the author called "proof of company and government responsibility" starting in 1944.

71.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

72.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Sally Vedros contracted mesothelioma and other related ill health effects, for which all defendants are jointly, severally, and in solido liable.

73.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to petitioners for the damages sustained as a result of Sally Vedros' mesothelioma and other ill health effects related therewith.  Petitioner, Sally Vedros, is entitled to damages for the following: past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; fear of death and complications; permanent disability; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; loss of fringe benefits; past, present, and future medical expenses; loss of personal services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; increased costs of insurance and other expenses incurred as a result of her disease; and all other general damages arising out of this action which may be shown at the trial of this matter.

- 32 -

74.

A trial by jury is demanded on all issues.

**WHEREFORE**, petitioner, Sally Vedros, prays that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of petitioner and against defendants for all damages suffered by petitioner together with legal interest and all costs associated with the prosecution of this claim. Petitioner further prays for all general and equitable relief.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
1714 Cannes Drive
LaPlace, LA  70068
Telephone:  (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONER,
SALLY VEDROS

**PLEASE SERVE THE PETITION FOR DAMAGES, REQUESTS FOR PRODUCTION OF DOCUMENTS, and OPPOSITION TO MOTIONS FOR EXTENSION OF TIME ON THE FOLLOWING:**

1.  NORTHROP GRUMMAN SHIPBUILDING, INC.,
    (formerly NORTHROP GRUMMAN SHIP SYSTEMS, INC.
    formerly, AVONDALE INDUSTRIES, INC.
    and formerly AVONDALE SHIPYARDS, INC.
    and formerly, AVONDALE MARINE WAYS, INC.)
    Through its agent for service of process:
    CT Corporation System
    5615 Corporate Blvd., Suite 400B
    Baton Rouge, La. 70808

2.  ALBERT BOSSIER, JR.
    Through his agent for service of process:
    Brian Bossier
    3421 North Causeway Blvd.
    Suite 900
    Metairie, LA 70002

3.  J. MELTON GARRETT                    **LONG ARM SERVICE**
    7909 Enclave Way
    Dallas, Texas 75218

4.  ONEBEACON AMERICA INSURANCE COMPANY (AS SUCCESSOR TO
    COMMERCIAL UNION INSURANCE COMPANY AND EMPLOYERS
    COMMERCIAL UNION INSURANCE COMPANY)
    Through its agent for service of process:
    Secretary of State

Legal Services Sections
8585 Archives Ave.
Baton Rouge, La. 70809

5.   AMERICAN EMPLOYERS INSURANCE COMPANY
     Through its agent for service of process:
     Secretary of State
     Legal Services Sections
     8585 Archives Ave.
     Baton Rouge, La. 70809

6.   AMERICAN MOTORISTS INSURANCE COMPANY
     Through its agent for service of process:
     Secretary of State
     Legal Archives Ave.
     8585 Archives Ave
     Baton Rouge, LA. 70809

7.   BAYER CROPSCIENCE, INC. (SUCCESSOR TO          **LONG ARM SERVICE**
     RHONE POULENC AG COMPANY,
     FORMERLY AMCHEM PRODUCTS, INC.,
     FORMERLY BENJAMIN FOSTER COMPANY)
     (Via Louisiana Long Arm Statute)
     through their agent for service of process:
     Corporation Service Company
     80 State Street
     Albany, New York 12207

8.   EAGLE, INC.
     Through its agent for service of process:
     Susan B. Kohn
     1100 Poydras St, 30th Floor
     New Orleans, LA 70163

9.   FOSTER WHEELER LLC                              **LONG ARM SERVICE**
     (formerly FOSTER WHEELER CORPORATION)
     (Via Louisiana Long Arm Statute)
     The Corporation Trust Company
     Corporation Trust Center
     1209 Orange Street
     Wilmington, Delaware 19801

10.  GENERAL ELECTRIC COMPANY
     Through its agent for service of process:
     CT Corporation System
     5615 Corporate Blvd., Suite 400B
     Baton Rouge, La. 70808

11.  HOPEMAN BROTHERS, INC.                          **LONG ARM SERVICE**
     (Via Louisiana Long Arm Statute)
     AWH Corporation
     435 Essex Ave., Suite 101
     Waynesboro, Virginia 22980

12.  THE MCCARTY CORPORATION
     (SUCCESSOR TO MCCARTY BRANTON, INC.
     AND PREDECESSOR AND SUCCESSOR TO
     MCCARTY INSULATION SALES, INC.)
     Through its agent for service of process:
     Paul H. Spaht
     445 North Blvd.
     Suite 300
     Baton Rouge, La. 70802

13.     RAPID AMERICAN CORPORATION                          **LONG ARM SERVICE**
        (Via the Louisiana Long Arm Statute)
        The Prentice-Hall Corporation System, Inc.
        2711 Centerville Road, Suite 400
        Wilmington, DE 19808-1645

14.     REILLY-BENTON COMPANY, INC.
        Through its agent for service of process:
        Thomas L. Cougill
        Beason-Willinham, LLP (A Prof Law Firm)
        8550 United Plaza Blvd., Suite 702
        Baton Rouge, LA 70809

15.     TAYLOR-SEIDENBACH, INC.
        Through its agent for service of process:
        Ralph I. Shepard
        731 S. Scott Street
        New Orleans, Louisiana 70119

16.     CBS CORPORATION
        (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)   **LONG ARM SERVICE**
        Through its agent for service of process:
        Corporation Service Company
        2711 Centerville Road, Suite 400
        Wilmington, Delaware 19808

17.     MARYLAND CASUALTY COMPANY
        Through its agent for service of process:
        Secretary of State
        Legal Services Sections
        8585 Archives Ave.
        Baton Rouge, La. 70809