ADRMOP, E-Filing

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:11-cv-02919-EDL

Traves et al v. Foster Wheeler LLC et al
Assigned to: Magistrate Judge Elizabeth D. Laporte
Cause: 28:1332 Diversity-Asbestos Litigation

Date Filed: 06/14/2011
Jury Demand: Plaintiff
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Diversity

### Plaintiff

**Beryl Marsh Traves**
*as Wrongful Death Heir, and as*
*Successor-in-Interest to Ronald Traves,*
*Deceased*

represented by **David R. Donadio**
Brayton Purcell LLP
222 Rush Landing Road
Novato, CA 94948-6169
(415) 898-1555
Fax: 415-898-1247
Email: DDonadio@braytonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan R. Brayton**
Brayton Purcell LLP
222 Rush Landing Road
P.O. Box 6169
Novato, CA 94948-6169
415-898-1555
Fax: 415-898-1247
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Lynda Traves**
*as Legal Heir of Ronald Traves,*
*Deceased*

represented by **David R. Donadio**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan R. Brayton**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Foster Wheeler LLC**
*formerly known as*
Foster Wheeler Corporation

**Defendant**

**Owens-Illinois, Inc.**

**Defendant**

**Crane Co.**

**Defendant**

**Fisher Controls International LLC**

**Defendant**

**Metropolitan Life Insurance
Company**

**Defendant**

**Sequoia Ventures Inc.**

**Defendant**

**CBS Corporation**
*formerly known as*
Viacom Inc.
*formerly known as*
Westinghouse Electric Corporation

| Date Filed | # | Docket Text |
|---|---|---|
| 06/14/2011 | 1 | COMPLAINT for Survival, Wrongful Death - Asbestos, with Jury Demand against CBS Corporation, Crane Co., Fisher Controls International LLC, Foster Wheeler LLC, Metropolitan Life Insurance Company, Owens-Illinois, Inc., Sequoia Ventures Inc. ( Filing fee $ 350, receipt number 34611061031.). Filed by Beryl Marsh Traves, Lynda Traves. (mjj2, COURT STAFF) (Filed on 6/14/2011) (mjj2, COURT STAFF). (Additional attachment(s) added on 6/15/2011: # 1 Civil Cover Sheet) (mjj2, COURT STAFF). (Entered: 06/15/2011) |
| 06/14/2011 | 2 | ADR SCHEDULING ORDER: Case Management Statement due by 9/13/2011. Case Management Conference set for 9/20/2011 10:00 AM in Courtroom E, 15th Floor, San Francisco. (Attachments: # 1 Standing Order, # 2 Standing Order re Case Management Conference, # 3 Standing Order for all Judges) (mjj2, COURT STAFF) (Filed on 6/14/2011) (Entered: 06/15/2011) |
| 06/14/2011 | 3 | NOTICE of Tag-Along Action by Beryl Marsh Traves, Lynda Traves (mjj2, COURT STAFF) (Filed on 6/14/2011) (mjj2, COURT STAFF). (Entered: 06/15/2011) |
| 06/14/2011 | 4 | Certificate of Interested Entities by Beryl Marsh Traves, Lynda Traves (mjj2, COURT STAFF) (Filed on 6/14/2011) (mjj2, COURT STAFF). (Entered: 06/15/2011) |
| 06/14/2011 | 5 | Declination to Proceed Before a U.S. Magistrate Judge and Request for |

| | | |
|---|---|---|
| | | Assignment to a United States District Judge by Beryl Marsh Traves, Lynda Traves. (mjj2, COURT STAFF) (Filed on 6/14/2011) (mjj2, COURT STAFF). (Entered: 06/15/2011) |
| 06/14/2011 | 6 | Summons Issued as to CBS Corporation, Crane Co., Fisher Controls International LLC, Foster Wheeler LLC, Metropolitan Life Insurance Company, Owens-Illinois, Inc., Sequoia Ventures Inc. (mjj2, COURT STAFF) (Filed on 6/14/2011) (Entered: 06/15/2011) |
| 06/14/2011 | | CASE DESIGNATED for Electronic Filing. (mjj2, COURT STAFF) (Filed on 6/14/2011) (Entered: 06/15/2011) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 06/16/2011 12:25:44 | | |
| PACER Login: | bp0355 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 3:11-cv-02919-EDL |
| Billable Pages: | 2 | Cost: | 0.16 |

1  ALAN R. BRAYTON, ESQ., S.B. #73685
2  DAVID R. DONADIO, ESQ., S.B. #154436
   BRAYTON❖PURCELL LLP
   Attorneys at Law
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, California 94948-6169
   (415) 898-1555
5  (415) 898-1247 (Fax No.)          E-filing

6  Attorneys for Plaintiffs

7

8            UNITED STATES DISTRICT COURT

9         NORTHERN DISTRICT OF CALIFORNIA            EDL

10              SAN FRANCISCO DIVISION

11  BERYL MARSH TRAVES, as Wrongful          )  No. CV 11 2919
    Death Heir, and as Successor-in-Interest to )
12  RONALD TRAVES, Deceased, and             )
    LYNDA TRAVES, as Legal Heir of           )  COMPLAINT FOR SURVIVAL,
13  RONALD TRAVES, Deceased,                 )  WRONGFUL DEATH - ASBESTOS;
                                             )  DEMAND FOR JURY TRIAL
14             Plaintiffs,                   )
                                             )
15  vs.                                      )
                                             )
16  FOSTER WHEELER LLC (FKA FOSTER           )
    WHEELER CORPORATION), OWENS-             )
17  ILLINOIS, INC., CRANE CO., FISHER        )
    CONTROLS INTERNATIONAL LLC,              )
18  METROPOLITAN LIFE INSURANCE              )
    COMPANY, SEQUOIA VENTURES                )
19  INC., CBS CORPORATION (FKA               )
    VIACOM INC., FKA WESTINGHOUSE            )
20  ELECTRIC CORPORATION),                   )
                                             )
21             Defendants.                   )

22

23                         I.

24                      PARTIES

25      1.    Plaintiffs in this action are the above-captioned successor-in-interest to, or the

26  personal representative of the estate of Decedent; and the personal representatives on behalf of

27  the legal heirs, or the heirs-at-law, of the Decedent, and are all hereinafter referred to as

28  "Plaintiffs."

K:\Injured\113967\FED\PLD\cmp fed (wd) Met-survival.wpd          1
            COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

BRAYTON❖PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

1    2.    The person who sustained asbestos-related lung injuries and death as a result of

2    their inhalation of asbestos fibers through the person's occupational exposure to asbestos,

3    hereinafter "Decedent" is, with the date of death: RONALD TRAVES died June 14, 2010.

4    BERYL MARSH TRAVES is the spouse of RONALD TRAVES and is hereinafter referred to as

5    "surviving spouse."

6    3.    Decedent sustained an asbestos-related lung disease and death by precisely the

7    following mechanism: the inhalation of asbestos fibers released during the handling of asbestos-

8    containing products at Decedent's jobsites. The pathogenesis of Decedent's asbestos-related

9    diseases is explained on **Exhibit A**, attached to Plaintiffs' complaint and incorporated by

10    reference herein.

11    4.    All of Plaintiffs' claims arise out of a similar series of occurrences: repeated

12    exposure to asbestos-containing products manufactured, distributed, and/or sold by defendants

13    and supplied to, installed and/or maintained by defendants at Decedent's worksites, over a period

14    of years, caused from release of toxic asbestos fibers and subsequent inhalation by the Decedent,

15    resulting in cumulative, progressive, incurable lung diseases.

16    5.    Each of Plaintiffs' claims damages for an asbestos-related disease arising from an

17    identical series of occurrences not dependent on Decedent's worksite but on the fact that

18    asbestos-containing products, when handled in the manner in which they were intended, released

19    harmful asbestos fibers which when inhaled by Decedent, caused serious lung disease. The

20    allegations of the Plaintiff's regarding the nature of Decedent's asbestos-related diseases, the

21    nature of asbestos; the propensity of asbestos to cause disease, the criteria for diagnosis of

22    disease, are all identical.

23    6.    Plaintiffs are informed and believe, and thereon allege, that at all times herein

24    mentioned, defendants were and are corporations, partnerships, unincorporated associations, sole

25    proprietorships and/or other business entities organized and existing under and by virtue of the

26    laws of the State of California, or the laws of some other state or foreign jurisdiction, and that

27    said defendants, and each of them, were and are authorized to do and are doing business in the

28    ///

1  State of California, and that said defendants have regularly conducted business in the State of

2  California.

3  ## II.

4  ## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5      7.    Jurisdiction:  Plaintiff BERYL MARSH TRAVES is a citizen of Canada.

6  Plaintiff LYNDA TRAVES is a citizen of the State of Nevada.

7      Defendants are each corporations incorporated under the laws of and having its principal

8  places of business in the following States:

| DEFENDANT | STATE |
| --- | --- |
| FOSTER WHEELER LLC (FKA FOSTER WHEELER CORPORATION) | Delaware/New Jersey |
| OWENS-ILLINOIS, INC. | Delaware/Ohio |
| CRANE CO. | Delaware/Connecticut |
| FISHER CONTROLS INTERNATIONAL LLC | Delaware/Missouri |
| METROPOLITAN LIFE INSURANCE COMPANY | New York/New York |
| SEQUOIA VENTURES INC. | Delaware/California |
| CBS CORPORATION (FKA VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION) | Delaware/New York |

19      This Court has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action

20  between citizens of different states in which the matter in controversy exceeds, exclusive of costs

21  and interest, seventy-five thousand dollars.

22      8.    Venue / Intradistrict Assignment.  Venue is proper in the Northern District of

23  California and assignment to the San Francisco Division of said district is proper as a substantial

24  part of the events or omissions which give rise to the claims asserted by Plaintiffs herein

25  occurred within the County of San Francisco, California, and Defendants are subject to personal

26  jurisdiction in this district at the time the action is commenced.

27  ///

28  ///

### III.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Negligence - Survival)

PLAINTIFF BERYL MARSH TRAVES COMPLAINS OF DEFENDANTS FOSTER WHEELER LLC (FKA FOSTER WHEELER CORPORATION), OWENS-ILLINOIS, INC., FISHER CONTROLS INTERNATIONAL LLC, METROPOLITAN LIFE INSURANCE COMPANY, SEQUOIA VENTURES INC., CBS CORPORATION (FKA VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION), THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGE:

9.     At all times herein mentioned, each of the named defendants was the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, holding company, affiliate, venturer, co-venturer, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting, representing, endorsing servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise directing and/or facilitating the use of, or advertising a certain product, namely asbestos, and/or other products containing asbestos.  Said entities shall hereinafter collectively be called ALTERNATE ENTITIES.  Each of the herein named defendants is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, holding company, affiliate, venturer, co-venturer, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, studied, manufactured, fabricated, designed, modified, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted,

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1  rebranded, manufactured for others and advertised a certain product, namely asbestos, and other

2  products containing asbestos. The following defendants, and each of them, are liable for the acts

3  of each and every ALTERNATE ENTITY, and each of them, in that there has been a virtual

4  destruction of Plaintiffs' remedy against each such ALTERNATE ENTITY; defendants, and each

5  of them, have acquired the assets, product line, or a portion thereof, of each such ALTERNATE

6  ENTITY; defendants, and each of them, caused the destruction of Plaintiffs' remedy against each

7  such ALTERNATE ENTITY; each such defendant has the ability to assume the risk-spreading

8  role of each such ALTERNATE ENTITY; and that each such defendant enjoys the goodwill

9  originally attached to each such ALTERNATE ENTITY:

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| FOSTER WHEELER LLC | FOSTER WHEELER CORPORATION |
| OWENS-ILLINOIS, INC. | OWENS-ILLINOIS GLASS COMPANY |
| FISHER CONTROLS INTERNATIONAL, LLC | FISHER CONTROLS INTERNATIONAL, INC. |
| SEQUOIA VENTURES, INC. | BECHTEL CORPORATION (DE) |
| CRANE CO. | BARKSDALE CONTROL PRODUCTS |
| | CHAPMAN VALVE CO. |
| | COCHRANE CORP. |
| | CRANE CO. VALVE DIVISION |
| | CRANE PLUMBING & HEATING AKA CRANE PLUMBING-HEATING SHEETMETAL, INC. |
| | CRANE PUMPS & SYSTEMS, INC. |
| | CRANE SUPPLY |
| | CYCLOTHERM |
| | JENKINS BROS. |
| | JENKINS VALVES |
| | MIDWEST PIPING & SUPPLY |
| | PACIFIC STEEL BOILER CORPORATION |
| | PACIFIC VALVES |
| | REPCAL BRASS MANUFACTURING CO. |

24       10.    At all times herein mentioned, defendants, their ALTERNATE ENTITIES, and

25  each of them, were and are engaged in the business of researching, manufacturing, fabricating,

26  designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

27  supplying, selling, inspecting, endorsing, testing, authorizing, approving, certifying, facilitating,

28  promoting, representing, servicing, installing, contracting for installation, repairing, marketing,

1 warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or
2 otherwise directing and/or facilitating the use of, or advertising a certain product, namely
3 asbestos and other products containing asbestos.

4        11.     At all times herein mentioned, defendants, their ALTERNATE ENTITIES and
5 each of them, singularly and jointly, negligently, and carelessly researched, manufactured,
6 fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed
7 to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale,
8 supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted,
9 installed, represented, endorsed, contracted for installation of, repaired, marketed, warranted,
10 rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos,
11 and other products containing asbestos, in that said products caused personal injuries to users,
12 consumers, workers, bystanders and others, including the Decedent herein, (hereinafter
13 collectively called "exposed persons"), while being used in a manner that was reasonably
14 foreseeable, thereby rendering said products hazardous, unsafe, and dangerous for use by
15 "exposed persons."

16        12.     Defendants, their ALTERNATE ENTITIES, and each of them, had a duty to
17 exercise due care in the pursuance of the activities mentioned above and defendants, and each of
18 them, breached said duty of due care.

19        13.     Defendants, their ALTERNATE ENTITIES and each of them, knew, or should
20 have known, and intended that the aforementioned asbestos and products containing asbestos and
21 related products and equipment, would be transported by truck, rail, ship, and other common
22 carriers, that in the shipping process the products would break, crumble, or be otherwise
23 damaged; and/or that such products would be used for insulation, construction, plastering,
24 fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not
25 limited to unpacking, preparing, using, sawing, drilling, chipping, hammering, scraping, sanding,
26 breaking, removing, maintaining, inspecting, "rip-out," and other manipulation, resulting in the
27 release of airborne asbestos fibers, and that through such foreseeable use and/or handling
28 "exposed persons," including Decedent herein, would use or be in proximity to and exposed to

1  said asbestos fibers, which contaminated the packaging, products, environment, and clothing of
2  persons working in proximity to said products, directly or through reentrainment.

3      14.    Decedent had used, handled, or been otherwise exposed to asbestos and asbestos-
4  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's
5  exposure to asbestos and asbestos-containing products is on current information as set forth at
6  various locations and circumstances in **Exhibit A,** attached hereto and incorporated by reference
7  herein.

8      15.    As a direct and proximate result of the acts, omissions, and conduct of the
9  defendants, their ALTERNATE ENTITIES, and each of them, as aforesaid, Decedent's exposure
10  to asbestos and asbestos-containing products caused severe and permanent injury, damage, loss,
11  or harm to the Decedent as set forth in **Exhibit A**, attached to Plaintiffs' complaint and
12  incorporated by reference herein.

13      16.    Plaintiffs are informed and believe, and thereon allege, that progressive lung
14  disease, cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers
15  without perceptible trauma and that said injury, damage, loss, or harm results from exposure to
16  asbestos and asbestos-containing products over a period of time.

17      17.    Decedent suffered from a condition related to exposure to asbestos and asbestos-
18  containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-
19  containing products presented any risk of injury and/or disease.

20      18.    As a direct and proximate result of the aforesaid conduct of the defendants, their
21  "alternate entities," and each of them, Decedent incurred liability for physicians, surgeons,
22  nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the true and exact
23  amount thereof being unknown to Plaintiffs at this time, and Plaintiffs pray leave to amend this
24  complaint accordingly when the true and exact cost thereof is ascertained.

25      19.    As a direct and proximate result of the aforesaid conduct of the defendants, their
26  ALTERNATE ENTITIES, and each of them, Decedent incurred liability for the reasonable value
27  of medial care provided by Decedent's family members measured by, inter alia, the costs
28  associated with the hiring a registered nurse, home hospice, or other service provider, the true

1  and exact amount thereof being unknown to Plaintiffs at this time, and Plaintiffs pray leave to
2  amend this complaint accordingly when the true and exact costs are known or at time of trial.

3       20.    As a direct and proximate result of the aforesaid conduct of defendants, their
4  ALTERNATE ENTITIES, and each of them, Decedent suffered permanent injuries to his person,
5  body, and health, including, but not limited to, asbestosis, other lung damage, and cancer and
6  related sequelae, and the mental and emotional distress attendant thereto, and ultimately death,
7  from the effect of exposure to asbestos fibers, all to his general damage in the sums to be proven
8  at trial.

9       21.    As a further direct and proximate result of the said conduct of the defendants,
10  their ALTERNATE ENTITIES, and each of them, Decedent incurred loss of income, benefits,
11  entitlements, wages, profits, and commissions, a diminishment of earning potential, and other
12  pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs; and leave is
13  requested to amend this complaint to conform to proof at the time of trial.

14       22.    As a further direct and proximate result of the said conduct of the defendants,
15  their ALTERNATE ENTITIES, and each of them, Decedent's exposure to asbestos and asbestos-
16  containing products caused severe and permanent injury to Decedent, and ultimately Decedent
17  died on the date previously stated herein.

18       23.    Defendants, their ALTERNATE ENTITIES, and each of them, and their officers,
19  directors and managing agents participated in, authorized, expressly and impliedly ratified, and
20  had full knowledge of, or should have known of, each of the acts set forth herein.

21       24.    Defendants, their ALTERNATE ENTITIES, and each of them, are liable for the
22  fraudulent, oppressive, and malicious acts of their ALTERNATE ENTITIES, and each of them,
23  and each defendant's officers, directors, and managing agents participated in, authorized,
24  expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of
25  each of their ALTERNATE ENTITIES as set forth herein.

26       25.    The herein-described conduct of said defendants, their ALTERNATE ENTITIES,
27  and each of them, was and is despicable, willful, malicious, fraudulent, outrageous, and in
28  conscious or reckless disregard and indifference to the safety, health, and rights of "exposed

1  persons," including Decedent herein, giving rise to Decedent's claim herein alleged for punitive
2  damages against said defendants.

3      WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities," and
4  each of them, as hereinafter set forth.

5              SECOND CAUSE OF ACTION
               (Products Liability - Survival)
6

7      PLAINTIFF BERYL MARSH TRAVES AS SUCCESSOR-IN-INTEREST TO THE
8  DECEDENT RONALD TRAVES COMPLAINS OF DEFENDANTS FOSTER WHEELER
9  LLC (FKA FOSTER WHEELER CORPORATION), OWENS-ILLINOIS, INC., CRANE CO.,
10  FISHER CONTROLS INTERNATIONAL LLC, METROPOLITAN LIFE INSURANCE
11  COMPANY, SEQUOIA VENTURES INC., CBS CORPORATION (FKA VIACOM INC., FKA
12  WESTINGHOUSE ELECTRIC CORPORATION), THEIR "ALTERNATE ENTITIES,"AND
13  EACH OF THEM; EACH FOR A SECOND, SEPARATE, FURTHER AND DISTINCT
14  CAUSE OF ACTION FOR PRODUCTS LIABILITY (SURVIVAL), COMPLAIN AS
15  FOLLOWS:

16      26.    Plaintiffs incorporates herein by reference, as though fully set forth herein, each
17  paragraph of the First Cause of Action herein.

18      27.    Defendants, their "alternate entities," and each of them, knew and intended that
19  the above-referenced asbestos and asbestos-containing products would be used by the purchaser
20  or user without inspection for defects therein or in any of their component parts and without
21  knowledge of the hazards involved in such use.

22      28.    Said asbestos and asbestos-containing products were defective and unsafe for their
23  intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease
24  and/or death.  The defect existed in the said products at the time they left the possession of
25  defendants, their ALTERNATE ENTITIES, and each of them.  Said products did, in fact, cause
26  personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed
27  persons," including Decedent herein, while being used in a reasonably foreseeable manner,
28  thereby rendering the same defective, unsafe, and dangerous for use.

1       29.   "Exposed persons" did not know of the substantial danger of using said products.

2   Said dangers were not readily recognizable by "exposed persons." Said defendants, their

3   ALTERNATE ENTITIES, and each of them, further failed to adequately warn of the risks to

4   which Decedent and others similarly situated were exposed.

5       30.   In researching, manufacturing, fabricating, designing, modifying, testing or failing

6   to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for

7   sale, supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating,

8   promoting, representing, endorsing servicing, installing, contracting for installation, repairing,

9   marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos

10  and asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,

11  did so with conscious disregard for the safety of "exposed persons" who came in contact with

12  said asbestos and asbestos-containing products, in that said defendants, their ALTERNATE

13  ENTITIES, and each of them, had prior knowledge that there was a substantial risk of injury or

14  death resulting from exposure to asbestos or asbestos-containing products, including, but not

15  limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part,

16  from scientific studies performed by, at the request of, or with the assistance of, said defendants,

17  their ALTERNATE ENTITIES, and each of them, and which knowledge was obtained by said

18  defendants, their ALTERNATE ENTITIES, and each of them on or before 1930, and thereafter.

19      31.   On or before 1930, and thereafter, said defendants, their ALTERNATE

20  ENTITIES and each of them, were aware that members of the general public and other "exposed

21  persons," who would come in contact with their asbestos and asbestos-containing products, had

22  no knowledge or information indicating that asbestos or asbestos-containing products could

23  cause injury, and said defendants, their ALTERNATE ENTITIES, and each of them, knew that

24  members of the general public and other "exposed persons," who came in contact with asbestos

25  and asbestos-containing products, would assume, and in fact did assume, that exposure to

26  asbestos and asbestos-containing products was safe, when in fact said exposure was extremely

27  hazardous to health and human life.

28  ///

K:\Injured\13967\FED\PLD\cmp fed (wd) Met-survival.wpd       10

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1      32.    With said knowledge, said defendants, their ALTERNATE ENTITIES, and each
2  of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute,
3  lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair,
4  market, warrant, rebrand, manufacture for others, package and advertise said asbestos and
5  asbestos-containing products without attempting to protect "exposed persons" from, or warn
6  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and
7  asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn
8  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and
9  asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,
10  intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed
11  and suppressed said knowledge from "exposed persons" and members of the general public, thus
12  impliedly representing to "exposed persons" and members of the general public that asbestos and
13  asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their
14  ALTERNATE ENTITIES, and each of them, engaged in this conduct and made these implied
15  representations with the knowledge of the falsity of said implied representations.

16      33.    The above-referenced conduct of said defendants, their ALTERNATE ENTITIES,
17  and each of them, was motivated by the financial interest of said defendants, their ALTERNATE
18  ENTITIES, and each of them, in the continuing, uninterrupted research, design, modification,
19  manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply,
20  sale, inspection, installation, contracting for installation, repair, marketing, warranting,
21  rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise
22  directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing
23  products. In pursuance of said financial motivation, said defendants, their ALTERNATE
24  ENTITIES, and each of them, consciously disregarded the safety of "exposed persons" and in fact
25  were consciously willing and intended to permit asbestos and asbestos-containing products to
26  cause injury to "exposed persons" and induced persons to work with and be exposed thereto,
27  including Decedent.

28  ///

1    34.    Plaintiffs allege that the aforementioned defendants, their ALTERNATE

2  ENTITIES, and each of them impliedly warranted their asbestos and asbestos-containing

3  products, to be safe for their intended use, but that their asbestos and asbestos-containing

4  products, created an unreasonable risk of bodily harm to exposed persons.

5    35.    Plaintiffs relied upon defendants', their ALTERNATE ENTITIES, and each of

6  their representations, lack of warnings, and implied warranties of fitness of asbestos and their

7  asbestos-containing products.  As a direct, foreseeable, and proximate result thereof, Decedent

8  suffered permanent injury and death as alleged herein.

9    36.    As a direct and proximate result of the actions and conduct outlined herein,

10  Decedent have suffered the injuries and damages herein alleged.

11    WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities", and

12  each of them, as hereinafter set forth.

13  THIRD CAUSE OF ACTION<br>(Negligence - Wrongful Death)

14

15    PLAINTIFF BERYL MARSH TRAVES, AS WRONGFUL DEATH HEIR, AND AS

16  SUCCESSOR-IN-INTEREST TO RONALD TRAVES DECEASED, AND PLAINTIFF

17  LYNDA TRAVES AS LEGAL HEIR OF DECEDENT, COMPLAIN OF DEFENDANTS

18  FOSTER WHEELER LLC (FKA FOSTER WHEELER CORPORATION), OWENS-ILLINOIS,

19  INC., CRANE CO., FISHER CONTROLS INTERNATIONAL LLC, METROPOLITAN LIFE

20  INSURANCE COMPANY, SEQUOIA VENTURES INC., CBS CORPORATION (FKA

21  VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION), THEIR

22  "ALTERNATE ENTITIES," AND EACH OF THEM; EACH FOR A THIRD, SEPARATE,

23  FURTHER AND DISTINCT CAUSE OF ACTION FOR NEGLIGENCE (WRONGFUL

24  DEATH), COMPLAIN AS FOLLOWS:

25    37.    Plaintiffs incorporate by reference each paragraph contained within the First

26  Cause of Action as though fully set forth herein.

27    38.    The heirs at law of the Decedent and their relationship to the Decedent is set forth

28  above.

K:\Injured\113967\FED\PLD\cmp fed (wd) Met-survival.wpd                12

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1    39.    The individuals set forth as heirs constitute all of the surviving heirs of the
2    Decedent.

3    40.    As a direct and proximate result of the conduct of the defendants, their
4    ALTERNATE ENTITIES, and each of them, as aforesaid, the exposure to asbestos and asbestos-
5    containing products caused Decedent to develop diseases from which condition Decedent died.
6    Plaintiffs were unaware that the death caused by asbestos-related disease until within one year of
7    filing the complaint.

8    41.    At all times prior to his death, Decedent was a parent to Plaintiff children.

9    42.    As a direct and proximate result of the conduct of defendants, and each of them,
10   and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss
11   of care, society, comfort, attention, services, and support of Decedent all to the damage of
12   Decedent's heirs.

13   43.    As a further direct and proximate result of the conduct of defendants, and each of
14   them, and the death of Decedent, Decedent's heirs have incurred funeral expenses in an amount
15   currently not ascertained.

16   WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as
17   hereinafter set forth.

18
## FOURTH CAUSE OF ACTION
(Products Liability - Wrongful Death)

19

20   PLAINTIFF BERYL MARSH TRAVES, AS WRONGFUL DEATH HEIR, AND AS
21   SUCCESSOR-IN-INTEREST TO RONALD TRAVES DECEASED, AND PLAINTIFF
22   LYNDA TRAVES AS LEGAL HEIR OF DECEDENT COMPLAIN OF DEFENDANTS
23   FOSTER WHEELER LLC (FKA FOSTER WHEELER CORPORATION), OWENS-ILLINOIS,
24   INC., CRANE CO., FISHER CONTROLS INTERNATIONAL LLC, METROPOLITAN LIFE
25   INSURANCE COMPANY, SEQUOIA VENTURES INC., CBS CORPORATION (FKA
26   VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION), THEIR
27   "ALTERNATE ENTITIES," AND EACH OF THEM; EACH FOR A FOURTH, SEPARATE,
28   ///

1  FURTHER AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY
2  (WRONGFUL DEATH), COMPLAINS AS FOLLOWS:

3    44.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each
4  paragraph of the First, Second and Third Causes of Action herein.

5    45.    As a direct and proximate result of the conduct of defendants, and each of them,
6  Decedent's heirs have sustained the injuries and damages previously alleged.

7    WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities," and
8  each of them, as hereinafter set forth.

9                          FIFTH CAUSE OF ACTION
                    (Premises Owner/Contractor Liability)
10

11    AS AND FOR A FURTHER AND FIFTH SEPARATE AND DISTINCT CAUSE OF
12  ACTION, PLAINTIFFS COMPLAIN OF DEFENDANT FOSTER WHEELER LLC (FKA
13  FOSTER WHEELER CORPORATION), AND THEIR ALTERNATE ENTITIES (hereinafter
14  PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS), AND ALLEGE AS
15  FOLLOWS:

16    46.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each
17  paragraphs 15 through 22 of the First Cause of Action herein.

18    47.    At all times herein mentioned, each of the PREMISES OWNER/CONTRACTOR
19  LIABILITY DEFENDANTS was a successor, successor-in-business, assign, predecessor,
20  predecessor-in-business, parent, holding company, venturer, co-venturer, subsidiary, wholly or
21  partially owned by, or the whole or partial owner of an entity causing certain asbestos-containing
22  insulation, other building materials, products, and toxic substances to be constructed, installed,
23  maintained, used, replaced, repaired and/or removed on the respective premises owned, leased,
24  maintained, managed, and/or controlled by them. Said entities shall hereinafter collectively be
25  called ALTERNATE ENTITIES. Each of the herein-named defendants is liable for the tortious
26  conduct of each successor, successor-in-business, assign, predecessor-in-business, parent,
27  holding company, venturer, co-venturer, subsidiary, whole or partial owner, or wholly or partially
28  owned entity, that caused the presence as aforesaid of said asbestos-containing insulation and

1  other toxic substances. Said defendants, and each of them, are liable for the acts of each and

2  every ALTERNATE ENTITY, and each of them, in that there has been a virtual destruction of

3  plaintiffs' remedy against each such ALTERNATE ENTITY; defendants, and each of them, have

4  acquired the assets, or a portion thereof, of each such alternate entity; defendants, and each of

5  them, have caused the destruction of plaintiffs' remedy against each such alternate entity; each

6  such defendant has the ability to assume the risk-spreading role of each such

7  ALTERNATE ENTITY, and that each such defendant enjoys the goodwill originally attached to

8  each such ALTERNATE ENTITY.

9     48.    At all times mentioned herein, the PREMISES OWNER/CONTRACTOR

10  LIABILITY DEFENDANTS, and each of them, respectively, owned, leased, maintained,

11  managed, and/or controlled the premises where decedent was present. The information provided

12  herein is preliminary, based on recall over events covering many years and further investigation

13  and discovery may produce more reliable information. Additionally, Decedent might have been

14  present at these or other PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS'

15  premises at other locations and on other occasions.

16     49.    Prior to and at said times and places, said PREMISES OWNER/CONTRACTOR

17  LIABILITY DEFENDANTS, and each of them, respectively, caused certain asbestos-containing

18  insulation, other building materials, products, and toxic substances to be constructed, installed,

19  maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid

20  respective premises, by their own workers and/or by various unqualified or unskilled contractors,

21  and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances

22  into the ambient air and thereby created a hazardous and unsafe condition to Decedent and other

23  persons exposed to said asbestos fibers and toxic substances while present at said premises.

24     50.    At all times mentioned herein, said PREMISES OWNER/CONTRACTOR

25  LIABILITY DEFENDANTS, and each of them, knew or in the exercise of ordinary and

26  reasonable care should have known, that the foregoing conditions and activities created a

27  dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to

28  ///

1 Decedent and other workers or persons so exposed present on each of the aforesaid respective
2 premises.

3     51.     At all times relevant herein, Decedent entered said premises and used or occupied
4 each of said respective premises as intended and for each of the respective PREMISES OWNER/
5 CONTRACTOR LIABILITY DEFENDANTS' benefit and advantage and at each of the
6 respective PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS' request and
7 invitation. In so doing, Decedent was exposed to dangerous quantities of asbestos fibers and
8 other toxic substances released into the ambient air by the aforesaid hazardous conditions and
9 activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said
10 PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them.

11     52.     Decedent at all times was unaware of the hazardous condition or the risk of
12 personal injury created by the aforesaid presence and use of asbestos products and materials and
13 other toxic substances on said premises.

14     53.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR
15 LIABILITY DEFENDANTS, and each of them, remained in control of the premises where
16 Decedent was performing his work.

17     54.     Said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS
18 retained control over safety and other related conditions and circumstances at Decedent's job
19 site(s) and affirmatively contributed to and exercised, or failed to exercise, that control in a
20 manner that caused Decedent's injuries from asbestos-containing products.

21     55.     At all times mentioned herein, the PREMISES OWNER/CONTRACTOR
22 LIABILITY DEFENDANTS owed to Decedent and others similarly situated a duty to exercise
23 ordinary care in the management of such premises so as to avoid exposing workers such as
24 Decedent, to an unreasonable risk of harm and to avoid causing injury to said person.

25     56.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR
26 LIABILITY DEFENDANTS, and each of them, knew, or in the exercise of ordinary and
27 reasonable care should have known, that the premises that were in their control would be used
28 without knowledge of, or inspection for, defects or dangerous conditions and that the persons

1 present and using said premises would not be aware of the aforesaid hazardous conditions to
2 which they were exposed on the premises.

3     57. At all times mentioned herein, said PREMISES OWNER/CONTRACTOR
4 LIABILITY DEFENDANTS, and each of them, negligently failed to maintain, manage, inspect,
5 survey, or control said premises, or to abate, or correct, or to warn Decedent of, the existence of
6 the aforesaid dangerous conditions and hazards on or about said premises.

7     58. Prior to and at the times and places aforesaid, said PREMISES
8 OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, respectively, caused
9 certain asbestos-containing insulation, other building materials, products, and toxic substances to
10 be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their
11 aforesaid respective premises, by their own workers and/or by employing various contractors,
12 and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances
13 into the ambient air and thereby injured Decedent.

14     59. At all times mentioned herein, said PREMISES OWNER/CONTRACTOR
15 LIABILITY DEFENDANTS, and each of them:

16       a. Should have recognized that the work of said contractors would create during
17 the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would
18 harm the Decedent and others unless special precautions were taken;

19       b. Knew or had reason to know, that the contractors it had selected and hired to
20 install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled,
21 unlicenced, or otherwise unqualified to do so;

22       c. Failed to use reasonable care to discover whether the contractors it selected and
23 hired to install, remove, abate, or otherwise handle asbestos-containing materials were
24 competent, or qualified to do so.

25     60. In part, Decedent was exposed to dangerous asbestos fibers and other toxic
26 substances by reason of such contractors' failure to take the necessary precautions.

27     61. The work of contractors on premises controlled by the PREMISES
28 OWNER/CONTRACTOR LIABILITY DEFENDANTS created an unsafe premise and an unsafe

1  work place by reason of the release of dangerous quantities of toxic substances, including but not
2  limited to asbestos.

3      62.      The unsafe premise or work place was created, in part, by the negligent conduct of
4  the contractors employed by the PREMISES OWNER/CONTRACTOR LIABILITY
5  DEFENDANTS.  Said negligent conduct includes, but is not limited to:

6              a.      Failure to warn of asbestos and other toxic dusts;

7              b.      Failure to suppress the asbestos-containing or toxic dusts;

8              c.      Failure to remove the asbestos-containing and toxic dusts through
9  use of ventilation or appropriate means;

10             d.      Failure to provide adequate breathing protection, i.e., approved
11 respirators or masks;

12             e.      Failure to inspect and/or test the air;

13             f.      Failure to provide medical monitoring.

14             g.      Failure to select and hire a careful and competent contractor or
15 subcontractor.

16      63.      The PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS' duties
17 to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions
18 are non-delegable; said duties arise out of, inter alia, common law, California Civil Code § 1714,
19 and California Labor Code § 6400, et seq., or California Health and Safety Code § 40.200, et
20 seq., and regulations promulgated thereunder.  Accordingly, the PREMISES
21 OWNER/CONTRACTOR LIABILITY DEFENDANTS are responsible for any breach of said
22 duties whether by themselves or others.

23      64.      Prior to and at said times and places, said PREMISES OWNER/CONTRACTOR
24 LIABILITY DEFENDANTS were subject to certain ordinances, standards, statutes, and other
25 government regulations promulgated by the United States Government, the State of California,
26 and others, including but not limited to the General Industry Safety Orders promulgated pursuant
27 to California Labor Code § 6400 and the California Administrative Code under the Division of
28 Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII,

1  Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and § 4108,
2  and Threshold Limit Values as documented for asbestos and other toxic substances under
3  Appendix A, Table 1 of said Safety Orders; additionally, <u>California Health and Safety Code</u>
4  § 40.200, <u>et seq</u>., which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.)
5  to promulgate regulations including, but not limited to <u>B.A.A.Q.D. Regulation</u> 11, Rules 2 and
6  14, Title 40 <u>Code of Federal Regulations</u>, Chapter 1, Part 61, <u>et seq</u>. -- The National Emission
7  Standards for Hazardous Air Pollutants, which required said PREMISES OWNER/
8  CONTRACTOR LIABILITY DEFENDANTS to provide specific safeguards or precautions to
9  prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said
10  PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS failed to provide the
11  required safeguards and precautions, or contractors employed by the PREMISES
12  OWNER/CONTRACTOR LIABILITY DEFENDANTS failed to provide the required safeguards
13  and precautions.  Defendants' violations of said codes include, but are not limited to:

14         (a)    Failing to comply with statutes and allowing ambient levels of airborne
15  asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned
16  statutes;

17         (b)    Failing to segregate work involving the release of asbestos or other toxic
18  dusts;

19         (c)    Failing to suppress dust using prescribed ventilation techniques;

20         (d)    Failing to suppress dust using prescribed "wet down" techniques;

21         (e)    Failing to warn or educate Decedent or others regarding asbestos or other
22  toxic substances on the premises;

23         (f)    Failing to provide approved respiratory protection devices;

24         (g)    Failing to ensure "approved" respiratory protection devices were used
25  adequately;

26         (h)    Failing to provide for an on-going health screening program for those
27  exposed to asbestos on the premises;

28         (I)    Failing to provide adequate housekeeping and clean-up of the work place;

1        (j)    Failing to adequately warn of the hazards associated with asbestos as
2  required by these statutes;

3        (k)    Failing to adequately report renovation and disturbance of asbestos-
4  containing materials, including but not limited to B.A.A.Q.M.D. Regulation 11, Rules 2 and 14;

5        ·(l)·    Failing to have an asbestos removal supervisor as required by regulation;

6        (m)    Failing to get approval for renovation as required by statutes; and

7        (n)    Failing to maintain records as required by statute.

8     65.    PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of
9  them, were the "statutory employer" of the Decedent, as defined by the California Labor Code
10  and California case law.

11     66.    Decedent at all times was unaware of the hazardous condition or the risk of
12  personal injury created by defendants' violation of said regulations, ordinances, or statutes.

13     67.    At all times mentioned herein, Decedent was a member of the class of persons
14  whose safety was intended to be protected by the regulations, standards, statutes, or ordinances
15  described in the foregoing paragraphs.

16     68.    At all times mentioned herein, said PREMISES OWNER/CONTRACTOR
17  LIABILITY DEFENDANTS, and each of them, knew, or in the exercise of ordinary and
18  reasonable care should have known, that the premises that were in their control would be used
19  without knowledge of, or inspection for, defects or dangerous conditions, that the persons present
20  and using said premises would not be aware of the aforesaid hazardous conditions to which they
21  were exposed on the premises, and that such persons were unaware of the aforesaid violations of
22  codes, regulations, and statutes.

23     69.    As a proximate result of the foregoing, Decedent developed asbestos-related
24  illness, which has caused great injury and disability as previously set forth, and plaintiffs, have
25  suffered damages as herein alleged.

26     WHEREFORE, plaintiffs, pray judgment against defendants, their ALTERNATE
27  ENTITIES, and each of them, as hereinafter set forth.

28  ///

1

SIXTH CAUSE OF ACTION
(Concert of Action)

2

3        AS AND FOR A FURTHER, SIXTH, SEPARATE AND DISTINCT CAUSE OF

4    ACTION FOR CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND

5    ASSISTANCE OF BREACH OF DUTY TO WARN, PLAINTIFFS COMPLAIN OF

6    DEFENDANTS GATKE CORPORATION, GARLOCK SEALING TECHNOLOGIES, LLC;

7    HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL, INC. - - formerly known as the

8    Bendix Aviation Corporation); OWENS-ILLINOIS, INC.; CHRYSLER CORPORATION (now

9    DAIMLERCHRYSLER CORPORATION), DANA CORPORATION (successor-in-interest to

10   ECHLIN INC. and FRICTION MATERIALS, INC. and P.T. BRAKE LINING CO. INC.),

11   GENERAL MOTORS CORPORATION, BRIDGESTONE/FIRESTONE, INC., LEAR-

12   SIEGLER, INC. (aka LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP. successor-in-interest

13   to ROYAL INDUSTRIES and H. KRASNE MANUFACTURING CO. and WORLD BESTOS

14   CO.), MAREMONT CORPORATION, MORTON-THIOKOL CORPORATION (now

15   MORTON INTERNATIONAL, INC. successor-in-interest to THIOKOL CHEMICAL

16   CORPORATION), H.K. PORTER, INC., JOHNS-MANVILLE CORPORATION, AUTO

17   FRICTION CORPORATION, SCANDURA, INC. (formerly known as Scandinavia Belting

18   Company), PNEUMO ABEX LLC (hereinafter "PNEUMO ABEX," and formerly known as

19   PNEUMO ABEX CORPORATION and ABEX CORPORATION and successor-in-interest to

20   AMERICAN BRAKEBLOK CORPORATION and the S. K. WELLMAN COMPANY),

21   BRASSBESTOS BRAKE LINING COMPANY, LASCO BRAKE PRODUCTS

22   CORPORATION, L.J. MILEY COMPANY, REDDAWAY MANUFACTURING COMPANY,

23   FORCEE MANUFACTURING CORPORATION, SILVER LINE PRODUCTS, INC.,

24   SOUTHERN POWER, INC.; WHEELING BRAKE BLOCK MANUFACTURING

25   COMPANY, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter

26   CONCERT OF ACTION DEFENDANTS), AND ALLEGE AS FOLLOWS:

27        70.     Plaintiffs incorporate herein by reference, as though fully set forth here at each

28   and every allegation of the First and Second Causes of Action.

1    71.    The concerted action (hereinafter referred to as "concerted action" or

2 "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was

3 facilitated through trade and other organizations including the Friction Materials Standards

4 Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining

5 Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.

6 CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action,

7 members of FMSI.

8    72.    The Friction Materials Standards Institute was originally incorporated under the

9 name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership

10 corporation. It included among its avowed purposes: the maintenance and raising of standards of

11 all products manufactured by its members; the collection, assembly and dissemination to

12 members of the friction materials industry scientific, engineering, technological and other

13 relevant information pertaining to the industry; and to cooperate with governmental agencies for

14 the general benefit of the public and the enhancement of the industry.

15    73.    Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to

16 asbestos dust created grave health risks for those exposed. From 1971 forward, CONCERT OF

17 ACTION DEFENDANTS received additional information distributed through the Friction

18 Materials Standards Institute and through independent sources further confirming and elaborating

19 the serious health risks associated with exposure to airborne asbestos dust.

20    74.    CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in

21 the handling and machining of their friction products during their installation and replacement

22 created significant and dangerous quantities of airborne asbestos dust that would expose workers

23 and bystanders to hazardous levels of asbestos.

24    75.    CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger

25 posed by asbestos was not widely known by their consumers. CONCERT OF ACTION

26 DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated

27 or greatly reduced by adopting different and discrete practices in the handling and machining of

28 products and by instituting specific dust control procedures in their consumers' workplaces.

1    76.    Notwithstanding their knowledge of the dangers posed by exposure to asbestos,

2  and notwithstanding their chartered ostensible purpose to cooperate with government agencies

3  for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction

4  Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat,

5  compromise, evade, and otherwise dilute regulations, standards, and procedures designed to

6  reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by

7  consumers and friction materials workers.  Such activities include, but are not limited to the

8  following:

9        (a)  CONCERT OF ACTION DEFENDANTS, at the urging and encouragement

10  of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board

11  false and unsupportable opposition to a proposed prospective ban on the use of asbestos in

12  friction materials.

13        (b) CONCERT OF ACTION DEFENDANTS continuously undertook concerted

14  action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA

15  regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust,

16  requiring the use of safety equipment and procedures, and notification of potentially exposed

17  persons of the dangers presented by asbestos dust.  CONCERT OF ACTION DEFENDANTS

18  consistently misrepresented the state of science and knowledge to distort and confound public

19  understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos,

20  less stringent requirements in the use of safety equipment and procedures, and a reduction in the

21  scope and extent of any required notification regarding the hazards posed by asbestos.

22        (c) CONCERT OF ACTION DEFENDANTS expressly undertook to adopt

23  uniform interpretations of regulations among their membership, which interpretations

24  consistently took the stance of performing at the lowest possible level which could be considered

25  compliant.

26    77.    CONCERT OF ACTION DEFENDANT members of the Friction Materials

27  Standards Institute, despite their avowed purpose to encourage and support research into

28  ///

1  materials and manufacturing processes, expressly declined to pursue a proposed initiative to
2  sponsor jointly funded research into feasible alternatives to asbestos in friction products.

3    78.    Even though they knew of the substantial risks and dangers to those who would
4  use or come into contact with their asbestos-containing products, defendants took concerted
5  action by means of explicit and tacit agreements, to delay for a period of years providing
6  notification and adequate warning of these risks and dangers, and to otherwise suppress
7  information about said hazards or otherwise compromise and confound informed consumer
8  appreciation of the asbestos hazards posed by their products.

9    79.    Defendants knew that the users of their friction products would handle such
10  products or their by-products in ways that enhanced the risks of dangerous asbestos exposure.
11  Defendants failed to discharge their duty to provide timely and adequate notice of these hazards
12  or of steps that could be taken to eliminate or ameliorate the risks and dangers. Each defendant,
13  in failing to warn of these dangers, gave assistance and encouragement to every other member
14  defendant to likewise fail to warn.

15    80.    Defendants provided substantial assistance to one another in maintaining
16  ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and
17  individually breached their duty to warn the consumers and users of their products.

18    81.    In addition to the above named defendants in this cause of action, the term
19  CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to:
20  DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THE BUDD
21  COMPANY, STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); BORG-WARNER
22  AUTOMOTIVE, INC., ASBESTOS MANUFACTURING COMPANY, FIBRE & METAL
23  PRODUCTS COMPANY, RITESET MANUFACTURING COMPANY, ROSSENDALE-
24  RUBOIL COMPANY, SOUTHERN FRICTION MATERIALS COMPANY, U.S. SPRING &
25  BUMPER COMPANY, AUTO FRICTION CORPORATION, AUTO SPECIALTIES
26  MANUFACTURING COMPANY, EMSCO ASBESTOS COMPANY, MOLDED
27  INDUSTRIAL FRICTION CORPORATION, NATIONAL TRANSPORT SUPPLY, INC.,
28  STANDCO, INC., UNIVERSAL FRICTION MATERIALS COMPANY, ASBESTOS CLAIMS

1  MANAGEMENT CORPORATION (formerly known as National Gypsum Company), BELL

2  ASBESTOS MINES LTD., Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D.,

3  Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell

4  Manufacturing (whose liabilities have been assigned by H.K. Porter Company), Union Asbestos

5  and Rubber Company, Thermoid Company (whose assets and liabilities have been purchased by

6  H.K. Porter Company), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation,

7  Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute

8  [ATI], all members of the Friction Materials Standards Institute and its predecessors, and the

9  other entities and individuals identified in this Sixth Cause of Action.

10      82.     Plaintiffs are informed and believe, and thereon allege, that at all times herein

11  mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized

12  and existing under and by virtue of the laws of the State of California, or the laws of some other

13  state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and

14  are doing business in the State of California, and that said defendants regularly conducted and/or

15  conducts business in the State of California.

16      83.     Decedent was exposed to asbestos-containing dust created by the use of the

17  asbestos products manufactured, distributed, and/or supplied by one or more of the

18  CONCERT OF ACTION DEFENDANTS named herein.  The exposure to the asbestos or

19  asbestos-related products supplied by the one or more of the CONCERT OF ACTION

20  DEFENDANTS caused decedent's asbestos-related disease and injuries.

21      84.     The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one

22  another and as co-conspirators, agreed and conspired among themselves, with other asbestos

23  manufacturers and distributors, and with certain individuals including, but not limited to Anthony

24  Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET

25  LIFE) to injure the decedent in the following fashion (the following is not an exclusive list of the

26  wrongful acts of the conspirators, but a representative list):

27          (a)     Beginning in 1929, MET LIFE entered agreements with Johns-Manville

28  and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners.

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1    When the data from these studies proved that Canadian asbestos miners were developing
2    asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony
3    Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian
4    study for many years thereafter to meetings of health care professionals seeking information
5    regarding asbestos exposure.

6            (b)     In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-
7    Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and
8    conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J.
9    Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville
10   and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively
11   misrepresent material facts and conclusions about asbestos exposure; including but not limited to
12   descriptions of the seriousness of the disease process of asbestosis. The misrepresentation was
13   accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as
14   "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a
15   disease process less serious than it was known to be by the CONCERT OF ACTION
16   DEFENDANTS. As a result, Lanza's study was published in the medical literature containing
17   said misleading statements in 1935. The CONCERT OF ACTION DEFENDANTS were
18   motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by
19   the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in
20   lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use
21   of their asbestos products.

22           (c)     The above-described conspiracy continued in 1936, when additional
23   CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant
24   PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant
25   GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to
26   conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing
27   (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber
28   Company and defendant USG, entered into an agreement with a leading medical research facility

1  named Saranac Laboratories. (The following conspirators also joined the Friction Materials
2  Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation
3  (now defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY,
4  defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (through
5  Turner & Newall (T&N) alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell
6  Manufacturing (whose liabilities have been assumed by H.K. Porter Company).) Under the
7  agreement, the CONCERT OF ACTION DEFENDANTS acquired the power to decide what
8  information Saranac Laboratories could publish regarding asbestos disease and could also control
9  in what form such publications were to occur. Their agreement provided these CONCERT OF
10  ACTION DEFENDANTS the power and ability affirmatively to misrepresent the results of the
11  work at Saranac, and also gave these CONCERT OF ACTION DEFENDANTS power to
12  suppress material facts included in any study. On numerous occasions thereafter, the CONCERT
13  OF ACTION DEFENDANTS exercised their power to prevent Saranac scientists from disclosing
14  material scientific data, resulting in numerous misstatements of fact regarding the health affects
15  of asbestos exposure being made at scientific meetings.

16       (d)    The conspiracy was furthered when on November 11, 1948, when
17  representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-
18  Manville headquarters: Johns-Manville, American Brakeblok Division of American Brake and
19  Shoe Foundry (defendant PNEUMO ABEX), defendant GATKE CORPORATION, GARLOCK
20  SEALING TECHNOLOGIES, LLC; Keasbey & Mattison Company (then an alter-ego to
21  conspirator Turner & Newall (T&N)), Raybestos (now Raymark), Thermoid Company (whose
22  assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber
23  Company, defendant USG and MET LIFE. Defendant U.S. GYPSUM did not send a company
24  employee to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent
25  its interest at the meeting and to take action on its behalf.

26       (e)    At the November 11, 1948 meeting, these CONCERT OF ACTION
27  DEFENDANTS, and their representatives, decided to exert their influence to materially alter and
28  misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at

1  the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity

2  of asbestos in mice and also included an evaluation of the health effects of asbestos on humans

3  with a critical review of the then-existing standards for asbestos dust exposure.

4     (f) At this meeting, these CONCERT OF ACTION DEFENDANTS

5  intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete

6  material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on

7  humans and the critique of the dust standards. The CONCERT OF ACTION DEFENDANTS

8  then published these deceptive and fraudulent statements in the medical literature as edited by

9  Dr. Arthur Vorwald, also of the Saranac Laboratories. These CONCERT OF ACTION

10  DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public,

11  in general, and the class of persons exposed to asbestos, including the decedent.

12     (g) As a direct result of influence exerted by the CONCERT OF ACTION

13  DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial</u>

14  <u>Hygiene, AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that

15  stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS

16  wished stressed, but which omitted reference to human asbestosis and cancer, thereby

17  fraudulently and affirmatively misrepresenting the extent of the risks. The CONCERT OF

18  ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and

19  fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

20     (h) Such actions constitute a material affirmative misrepresentation of the

21  total context of material facts involved in Dr. Gardner's work and resulted in creating an

22  appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited

23  work indicated.

24     (I) When Dr. Vorwald subsequently tried to publish more complete

25  information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION

26  DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to

27  publish or complete Gardner's work, and actively discouraged institutions of higher learning from

28  hiring or retaining Dr. Vorwald in any capacity.

1          (j)     The following CONCERT OF ACTION DEFENDANTS were members

2    of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-

3    Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos

4    Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National

5    Gypsum Company (now known as defendant ASBESTOS CLAIMS MANAGEMENT

6    CORPORATION), and Turner & Newall (T&N), individually and successor to defendant BELL

7    ASBESTOS MINES LTD.  These conspirators, members of Q.A.M.A., participated in the above-

8    described misrepresentation of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald

9    in the AMA Archives of Industrial Health in 1951.  Evidence of the Q.A.M.A.'s involvement in

10   this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A.,

11   as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48,

12   3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s

13   representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

14          (k)     As a furtherance of the conspiracy commenced in 1929, CONCERT OF

15   ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or

16   about 1950 to formulate a plan to influence public opinion about the relationship between

17   asbestos and cancer by influencing the medical literature on this subject and then touting and

18   disseminating this literature to the public and to organizations and legislative bodies responsible

19   for regulatory control of asbestos with the specific intent of misrepresenting the existing

20   scientific information and suppressing contrary scientific data in their possession and control.

21          (l)     This plan of misrepresentation and influence over the medical literature

22   began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac

23   Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary

24   report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship

25   might exist in experimental animals, these Q.A.M.A. members refused to further fund the study,

26   terminated the study, and prevented any public discussion of dissemination of the results.

27          (m)     As a result of the termination of Q.A.M.A./Saranac study, the CONCERT

28   OF ACTION DEFENDANTS fraudulently withheld information from the public and

affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, medical organizations, health professionals, and the general public, including decedent.

(n)   Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

(o)   The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the conspirators to be false.

(p)   By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting documented findings that asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

(q)   In furtherance of the ongoing 1929 conspiracy, in approximately 1958, these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

1          (r)     The fraudulent misrepresentations beginning in 1929 as elaborated above

2 and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

3 for asbestos exposure. The developers of such standards failed to lower the maximum exposure

4 limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

5          (s)     In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF

6 ACTION DEFENDANTS decided, at their trade association meeting, that they would

7 intentionally mislead consumers about the extent of risks involved in inhalation of asbestos

8 products.

9          (t)     In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the

10 health effects of asbestos was held at the Saranac Laboratories. The following CONCERT OF

11 ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner &

12 Newall (T&N), Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their

13 agents, Cartier, Sabourin and LaChance.

14          (u)     At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis

15 in product users was discussed and the carcinogenic properties of all fiber types of asbestos was

16 also discussed. In an affirmative attempt to mislead the public about the extent of health risks

17 associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these

18 CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this

19 1952 Saranac Symposium and it was not published. In addition, the CONCERT OF ACTION

20 DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal

21 studies showing excess cancers in animals which thereby fraudulently misrepresented existing

22 secret data which could not be publicized owing to the secrecy provisions contained in the 1936

23 Saranac agreement heretofore described.

24          (v)     The following CONCERT OF ACTION DEFENDANTS were members

25 of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (now

26 Raymark), Johns-Manville, H.K. Porter, GATKE CORPORATION; GARLOCK SEALING

27 TECHNOLOGIES, LLC ; Keasbey & Mattison, individually and through its alter-ego Turner &

28 Newall (T&N) and National Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT

1 CORPORATION), Uniroyal, Inc., individually and through its alter-egos, CDU Holding
2 Company, Uniroyal Holding Company and Uniroyal Goodrich Tire Company.

3         (w)     In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF
4 ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist
5 W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-
6 existing maximum exposure limits for asbestos exposure. These CONCERT OF ACTION
7 DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently
8 concealed material facts about asbestos exposure from the public and affirmatively
9 misrepresented to the public and class of persons exposed to asbestos that the then existing
10 maximum exposure limit for asbestos was acceptable. Thereafter, these CONCERT OF
11 ACTION DEFENDANTS withheld additional material information on the dust standards from
12 The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further
13 influencing evaluations of their Threshold Limit Values for asbestos exposure.

14         (x)     In furtherance of the forgoing conspiracy, in 1953, CONCERT OF
15 ACTION DEFENDANT National Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT
16 CORPORATION), through its agents, in response to an inquiry from the Indiana Division of
17 Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a
18 proposed response to that division indicating that respirators should be worn by applicators of the
19 products. National Gypsum's response distorted and fraudulently misrepresented the need for
20 applicators of asbestos spray products to wear respirators and fraudulently concealed from such
21 applicators the need for respirators and thereby misrepresented the risks associated with asbestos
22 exposure.

23         (y)     In furtherance of the forgoing conspiracy, in 1955, CONCERT OF
24 ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be
25 published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in
26 Asbestos Workers." This published study materially altered the results of an earlier study in
27 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a
28 ///

1  fraudulent and material misrepresentation about the extent of the risk associated with asbestos
2  inhalation.

3          (z)     In furtherance of the forgoing conspiracy, in 1955, the National Cancer
4  Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville,
5  individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT
6  OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal
7  studies concerning the relationship between asbestos exposure and cancer, when, in fact, the
8  CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed
9  studies, which demonstrated that positive evidence did exist.

10          (aa)    In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF
11  ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on
12  cancer and asbestos and this resulted in fraudulently concealing from the public material facts
13  regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-
14  existing knowledge about asbestos exposure and lung cancer.

15          (bb)    In furtherance of the forgoing conspiracy, in 1964, CONCERT OF
16  ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting
17  the association between lung cancer and asbestos exposure that had been recently published by
18  Dr. Irving J. Selikoff of the Mount Sinai Research Center. Thereafter, these members of the ATI
19  embarked upon a campaign to further misrepresent the association between asbestos exposure
20  and lung cancer.

21          (cc)    CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT
22  OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose
23  functions included involvement in research regarding the health effects of inhaling asbestos dust.

24          (dd)    Beginning in the early 1940's, the IHF was involved in a study by Hemeon
25  entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This
26  study was done in connection with members of the Asbestos Textile Institute (ATI). This study
27  found that workers exposed to less than the recommended maximum exposure level for asbestos
28  ///

1  were nonetheless developing disease. As a part of the conspiracy, the IHF never published this
2  study.

3      (ee)   Beginning in the mid 1950's, the IHF and the Mellon Institute were
4  involved in the publication of works by Braun and Truan entitled An Epidemiological Study of
5  Lung Cancer in Asbestos Miners. In its original, unedited form in September, 1957, this study
6  had concluded that workers with asbestosis had an increased incidence of lung cancer and that
7  the Canadian government had been under-reporting cases of asbestosis. The final, published
8  version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered
9  an increased incidence of lung cancer and that the Canadian government had been under-
10  reporting asbestosis cases. The IHF and the Mellon Institute conspired with the members of the
11  Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and
12  other CONCERT OF ACTION DEFENDANTS to delete the above-describe information
13  regarding asbestos and cancer.

14      (ff)   The above-described actions of the IHF and the Mellon Institute
15  constituted intentional deception and fraud in actively misleading the public about the extent of
16  the hazards connected with breathing asbestos dust.

17      (gg)   The above-described conspiratorial and fraudulent actions of the IHF and
18  the Mellon Institute substantially contributed to retarding the development of knowledge about
19  the hazards of asbestos and thereby substantially contributed to injuries suffered by the decedent.

20      (hh)   All CONCERT OF ACTION DEFENDANTS identified above, approved,
21  ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION
22  DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the
23  alleged co-conspirators during the date and circumstances set forth above, acted as agents, and
24  co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

25      (ii)   As evidence of Raymark's fraud, concealment, suppression, and
26  conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and
27  each of them, as herein set forth, Raymark's President and/or other senior executives
28  corresponded with other senior executives of Raymark's co-conspirators, which series of

1 correspondence and related documents and papers are commonly referenced as "The Sumner

2 Simpson Papers."

3         (jj)     Further as evidence of the fraud, concealment, suppression, and

4 conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

5 ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

6 resolutions, and related actions, recorded in "The ATI Minutes."

7         (kk)    MET LIFE was an active participant in the foregoing conspiracy and

8 benefitted thereby.  MET LIFE benefitted from its involvement, because of the following non-

9 exclusive list:

10            (1)     by providing workers' compensation insurance to the CONCERT OF

11                  ACTION DEFENDANTS;

12            (2)     by providing life insurance for employees of the CONCERT OF ACTION

13                  DEFENDANTS;

14            (3)     by providing health insurance or health care for the employees of the

15                  CONCERT OF ACTION DEFENDANTS;

16            (4)     by providing health information and resources;

17            (5)     by purchasing substantial stock in asbestos-related companies, including

18                  stock of CONCERT OF ACTION DEFENDANTS; and

19            (6)     by developing information by which asbestos-related claims for

20                  compensation could be defeated.

21      85.     The foregoing conspiracy was furthered through the formation of the Friction

22 Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

23 Association, and the Clutch Facing and Brake Lining Standards Institute.  The members thereof

24 joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

25         (1)     The Friction Materials Standards Institute, and its predecessors, the Brake

26 Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were

27 formed to be the ears and mouthpiece of the friction materials industry.  The initial members of

28 the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF

1  ACTION DEFENDANTS ASBESTOS MANUFACTURING COMPANY, T&N, PLC. (through
2  its alter-ego Atlas Asbestos Company), BRASSBESTOS BRAKE LINING COMPANY, FIBRE
3  & METAL PRODUCTS COMPANY, GATKE CORPORATION, MAREMONT (through its
4  predecessor-in-interest Grizzly Manufacturing), H. KRASNE MANUFACTURING
5  COMPANY, LASCO BRAKE PRODUCTS, HONEYWELL, INC. (successor-in-interest to
6  ALLIEDSIGNAL INC. -- then known as Bendix Aviation Corporation), L. J. MILEY
7  COMPANY, Raymark (then known as Raybestos-Manhattan), RITESET MANUFACTURING
8  COMPANY, ROSSENDALE-RUBOIL COMPANY, Russell Manufacturing Company,
9  SCANDURA (then known as Scandinavian Belting Company), SOUTHERN FRICTION
10  MATERIALS COMPANY, U.S. SPRING & BUMPER COMPANY, PNEUMO ABEX (through
11  its predecessor-in-interest, S.K. Wellman Company) and LEAR-SIEGLER, INC. (aka
12  LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.) and BRIDGESTONE/FIRESTONE,
13  INC. (through their predecessor-in-interest World Bestos Corporation). By 1973, the following
14  joined the Friction Materials Standards Institute: CONCERT OF ACTION DEFENDANTS
15  AUTO FRICTION CORPORATION, AUTO SPECIALTIES MANUFACTURING
16  COMPANY, CHRYSLER CORPORATION, EMSCO ASBESTOS COMPANY, FORCEE
17  MANUFACTURING CORPORATION, GENERAL MOTORS CORPORATION, H.K. Porter
18  Company (through its Thermoid division), Johns-Manville Corporation, LEAR-SIEGLER, INC.
19  (aka LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.) (through its predecessor-in-interest
20  Royal Industries), MOLDED INDUSTRIAL FRICTION CORPORATION, MORTON-
21  THIOKOL (through its predecessor-in-interest Thiokol Chemical Corporation), NATIONAL
22  TRANSPORT SUPPLY INC., PARKER-HANNIFIN CORPORATION (through its
23  predecessor-in-interest Pick Manufacturing Company), PNEUMO ABEX's American Brakeblok
24  division, SILVER LINE PRODUCTS INC., STANDCO INC., UNIVERSAL FRICTION
25  MATERIALS COMPANY, and WHEELING BRAKE BLOCK MANUFACTURING
26  COMPANY. On information and belief, plaintiffs allege that the following manufacturers and/or
27  distributors of asbestos-containing automotive friction products joined with, ratified, and
28  furthered the conspiratorial actions of the above-identified conspirators, including the

1   conspirators who were members of the FMSI and its predecessors:  CONCERT OF ACTION

2   DEFENDANTS THE BUDD COMPANY, DANA CORPORATION, FORD MOTOR

3   COMPANY, GENERAL MOTORS CORPORATION, LEAR-SIEGLER, INC. (aka

4   LEAR-SIEGLER DIVERSIFIED HOLDINGS CORP.), MORTON-THIOKOL (now MORTON

5   INTERNATIONAL, INC.), STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); and

6   BORG-WARNER.

7              (2)      Even though they disseminated materials and information to the contrary,

8   The Friction Materials Standards Institute conspirators knew, and suppressed, that:

9                        (I)      OSHA regulations, even if enforced and complied with, would not

10                       prevent asbestos disease in workers exposed to their products;

11                       (ii)     chrysotile asbestos caused mesothelioma and other incurable

12                       disease;

13                       (iii)    brake workers suffered "considerable exposures" to respirable

14                       asbestos fibers during the intended use, installation, and expected

15                       replacement of friction materials;

16                       (iv)     there was no "safe" level of occupational exposure to respirable

17                       asbestos; and

18                       (v)      there was a substantial risk and danger suffered by bystanders and

19                       family members of brake mechanics, because of the release of respirable

20                       asbestos in the use of friction materials, as herein described.

21             (3)      Even though they knew of the substantial risks and dangers to those who

22   would use or come into contact with their asbestos-containing products, CONCERT OF

23   ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to

24   delay for a period of years providing notification and adequate warning of the risks and dangers.

25   CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle

26   such products or their by-products in ways that enhanced the risks of dangerous asbestos

27   exposure, but they conspired to give each other assistance and encouragement in failing to

28   ///

1  provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or

2  ameliorate the risks and dangers.

3      86.    The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as

4  described above, and each of them, constitute fraudulent concealment and/or fraudulent

5  misrepresentation, which caused injury to the decedent, including, but not limited to, the

6  following manner:

7          (a)    The material published or caused to be published by the CONCERT OF

8  ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION

9  DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of

10  asbestos and asbestos-related products.

11          (b)    The CONCERT OF ACTION DEFENDANTS, with intent to defraud,

12  individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION

13  DEFENDANTS, intended that the publication of false and misleading reports to the general

14  public and individuals therein, and/or the intentional suppression and nondisclosure of

15  documented reports of health hazards of asbestos:

16              (1)    maintain a favorable atmosphere for the continued sale and

17              distribution of asbestos and asbestos-related products;

18              (2)    assist in the continued pecuniary gain of CONCERT OF ACTION

19              DEFENDANTS, through the sale of their products;

20              (3)    influence in the CONCERT OF ACTION DEFENDANTS' favor

21              proposed legislation to regulate asbestos exposure and;

22              (4)    provide a defense in law suits brought for injury resulting from

23              asbestos disease.

24          (c)    The CONCERT OF ACTION DEFENDANTS, individually, as members

25  of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to

26  disclose information regarding the health hazards of asbestos within their knowledge and/or

27  control.  The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached

28  this duty through their fraudulent concealment as described herein.

1    (d)    Decedent and others reasonably relied, both directly and indirectly, upon

2   the published medical and scientific data documenting the purported safety of asbestos and

3   asbestos-related products, and in the absence of published medical and scientific reports of the

4   hazards of asbestos continued exposure to asbestos.  Decedent believed asbestos to be safe and

5   was unaware of the hazards due to conspiratorial and fraudulent conduct.  Decedent was not

6   warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and

7   fraudulent concealment.  If decedent had known of the health hazards of asbestos, of which

8   decedent was unaware as a direct result of the conspirator's fraudulent concealment, decedent

9   would have acted differently regarding decedent's exposure to asbestos and asbestos-related

10  products.

11   (e)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

12  conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that

13  plaintiffs rely on the deceptive and fraudulent reports that the conspiracy caused to be published

14  throughout the United States regarding the safety of asbestos and asbestos-related products and to

15  rely on the absence of published medical and scientific data (because of the CONCERT OF

16  ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related

17  products and thereby caused decedent and others to continue their exposure to asbestos products.

18   (f)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

19  conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a

20  position of superior knowledge regarding the health hazards of asbestos and therefore the

21  decedent reasonably relied, both directly and indirectly, on the published reports commissioned

22  by the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and

23  the absence of published information (because of the suppression by the CONCERT OF

24  ACTION DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

25   (g)    As a direct result of the continuing and on-going conduct of the

26  CONCERT OF ACTION DEFENDANTS, as alleged herein, the decedent contracted asbestos-

27  related disease and suffered injuries and incurred damages, which are described in greater detail

28  in the forgoing Paragraphs.

87.     MET LIFE acted in concert with the foregoing described parties (the CONCERT OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to cause injury to decedent.

88.     MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark), defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was coercive, fraudulent, and deceitful towards others (including decedent) and that CONCERT OF ACTION DEFENDANTS' conduct was a breach of dut(y)(ies) owed decedent; and MET LIFE gave substantial assistance and encouragement to Johns-Manville and the other CONCERT OF ACTION DEFENDANTS in breaching their duties to decedent and others.

89.     MET LIFE provided substantial assistance to the foregoing CONCERT OF ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to plaintiffs.

90.     Decedent was insured, directly or indirectly, by MET LIFE and as such was owed a fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy which thereby caused decedent's asbestos-related injuries.

91.     The CONCERT OF ACTION DEFENDANTS made representations to decedent and others concerning asbestos-containing products including but not limited to:

            (a)     the statements set forth and summarized in the foregoing paragraphs

            (b)     that asbestos in commercially used insulation products was not hazardous (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

            (c)     the amount of asbestos in the air necessary to cause disease was five million particles per cubic foot (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

            (d)     that asbestos does not cause cancer (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS);

            (e)     in addition, the CONCERT OF ACTION DEFENDANTS actively and fraudulently concealed facts from the plaintiffs and others including, but not limited to:

1          (1)    that asbestos-related disease can be a fatal disease,

2          (2)    that asbestos causes various forms of lung cancer,

3          (3)    that individuals should protect themselves from breathing asbestos

4                 dust,

5          (4)    the extent of asbestos disease in exposed populations,

6          (5)    information regarding the levels of airborne asbestos that can cause

7                 disease,

8          (6)    their experience with workers' compensation claims related to

9                 asbestos exposure,

10         (7)    the statements set forth in foregoing paragraphs.

11      92.    Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing

12 statements were false and that, by their acts, they were actively and fraudulently concealing

13 adverse information regarding the health affects of asbestos including the facts set forth above;

14 the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the

15 information with the intent to deceive; decedent and others relied both directly and indirectly on

16 the foregoing false statements and their lack of knowledge resulting from their fraudulent

17 concealment, resulting in and causing asbestos-related injuries and damages as more fully set

18 forth herein.

19      93.    The asbestos-containing products that CONCERT OF ACTION DEFENDANTS

20 manufactured, marketed, distributed, sold, and otherwise supplied were defective; decedent was

21 exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused

22 his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

23      94.    Additionally and alternatively, as a direct result of MET LIFE's actions and

24 omissions, decedent was caused to remain ignorant of all the dangers of asbestos resulting in

25 decedent, his agents, employers, and the general public to be aware of the true and full dangers of

26 asbestos, deprive decedent of the opportunity to decide for himself whether he wanted to take the

27 risk of being exposed to asbestos, denied decedent the opportunity to take precautions against the

28 dangers of asbestos and caused decedent's damages herein.

1  WHEREFORE, plaintiffs pray judgment against defendants, their ALTERNATE

2  ENTITIES, and each of them, as hereinafter set forth.

SEVENTH CAUSE OF ACTION
(Fraud and Deceit/Negligent Misrepresentation)

5  AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF

6  ACTION FOR FRAUD AND DECEIT/NEGLIGENT MISREPRESENTATION, PLAINTIFFS

7  COMPLAIN OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY,

8  PNEUMO ABEX LLC (hereinafter "PNEUMO ABEX," and formerly known as PNEUMO

9  ABEX CORPORATION and ABEX CORPORATION and successor-in-interest to AMERICAN

10  BRAKEBLOCK CORPORATION), GATKE CORPORATION, GARLOCK SEALING

11  TECHNOLOGIES, LLC, OWENS-ILLINOIS, INC.; and T&N, LTD. (formerly known as

12  TURNER AND NEWALL and alter-ego to KEASBY-MATTISON COMPANY), AMERICAN

13  CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, INC. (formerly known

14  as NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL HYGIENISTS),

15  UNDERWRITERS LABORATORIES, INC., THEIR ALTERNATE ENTITIES, AND EACH

16  OF THEM (hereinafter FRAUD DEFENDANTS), AND ALLEGE AS FOLLOWS:

17  95.  Plaintiffs incorporate herein by reference, as though fully set forth here at each

18  and every allegation of the First, Second and Sixth Causes of Action as though fully set forth

19  herein.

20  96.  Defendant UNDERWRITERS LABORATORIES, INC. conducted tests on

21  consumer products and approved, certified, endorsed, or otherwise sanctioned products for

22  safety, including asbestos containing products manufactured, designed, processed, marketed,

23  distributed, applied, and/or sold by defendants and/or conspirators, as hereinafter set forth.

24  Defendant UNDERWRITERS LABORATORIES, INC. required, or otherwise recommended or

25  sanctioned, that asbestos be used in some products. Said acts or omissions were negligent.

26  Defendant UNDERWRITERS LABORATORIES, INC. was a link in the chain of product

27  distribution. Defendant UNDERWRITERS LABORATORIES, INC. knew or should have

28  known of the dangerous propensities of asbestos and asbestos-containing products, and did

K:\Injured\113967\FED\PLD\cmp fed (wd) Met-survival.wpd          42
COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1   nothing to warn consumers of these hazards, and in fact, suppressed, minimized, understated,

2   denied, and otherwise purposefully corrupted the evidence of said hazards in its certification and

3   underwriting of product's safety, all the while knowing the importance consumers placed on

4   UNDERWRITERS LABORATORIES, INC. approval. Defendant UNDERWRITERS

5   LABORATORIES, INC. allowed its certification label to be affixed to products, thereby

6   representing to the general public, including decedent herein, that said products were safe for

7   intended use, when in fact said products were not safe.

8       97.     Defendant AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

9   HYGIENISTS, INC. (ACGIH) sets guidelines for occupational health called Threshold Limit

10  Values (TLVs). These guidelines are relied on by OSHA (the Occupational Safety and Health

11  Administration) in the United States and similar agencies around the world. Criticisms of the

12  guide-line setting process have pointed to problems with data collection, inadequate research,

13  overwhelming dependence on data supplied by financially interested corporations, and slow

14  response to advances in medical information. In carrying out the aforesaid acts, the ACGIH was

15  negligent in their failure to analyze or critically evaluate previously published literature, or

16  review and incorporate current literature, failure to adequately assess the financially motivated

17  scientific data provided by asbestos corporations, their insurers, and medical consultants, and

18  their limited review process, including but not limited to the following representative list:

19          (a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL

20  HYGIENISTS (NCGIH) was formed in 1938. In 1942, the NCGIH began to develop a list of

21  proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric

22  Concentrations, for various hazardous atmospheric substances, including asbestos. In the

23  minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the

24  MPC's were "not to be construed as recommended safe concentrations." In 1946, the NCGIH

25  was renamed the AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

26  HYGIENISTS, INC. (ACGIH), and despite the internally acknowledged inadequacy of the

27  asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented,

28  ///

1    and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based
2    on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

3    (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,
4    fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily
5    function, either immediate or after years of exposure." In 1948, they changed the name of the
6    guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the
7    guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted
8    definition, describing the guideline as both an "average" and a "maximum." Despite their failure
9    to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of
10   the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing
11   the definition of the TLV, the ACGIH never performed any studies to test the scientific validity
12   of the 5 mppcf TLV guideline.

13   (c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2
14   mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf,
15   never intending said numeric figure to be the actual recommended guideline. Despite internally
16   acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

17   (d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH
18   ignored the carcinogenic dangers of asbestos until 1974.

19   98.    The acts of the FRAUD DEFENDANTS, as incorporated herein and described
20   above, constitute fraudulent negligent misrepresentation, which caused injury to the decedent, in
21   the following manner:

22   (a)    The material published or caused to be published by the FRAUD
23   DEFENDANTS was false, untrue, and incomplete in that the FRAUD DEFENDANTS
24   knowingly, deliberately, and with intent to deceive made representations, product sales, and
25   assertions regarding the safety of asbestos and asbestos-related products.

26   (b)    The FRAUD DEFENDANTS made these false and incomplete
27   representations without any reasonable grounds for believing and/or relying on their truth and
28   with the intent to induce the general consuming public and individuals therein, including

1  plaintiffs, and others' direct and indirect reliance on these false, untrue, and incomplete
2  representations.

3          (c)      Decedent and others reasonably, justifiably, and without knowledge of the
4  falsity of the FRAUD DEFENDANTS' misrepresentations, relied, both directly and indirectly,
5  upon published data documenting the purported safety of asbestos and asbestos-related products
6  and in the absence of published information of the hazards of asbestos and cautionary warning
7  language on or with said conspirators' product, all resulting in continued injurious exposure to
8  asbestos. Decedent was unaware of the hazards due to the FRAUD DEFENDANTS' conduct.

9       WHEREFORE, plaintiffs pray judgment against defendants, their ALTERNATE
10 ENTITIES, and each of them, as hereinafter set forth.

11
                      EIGHTH CAUSE OF ACTION
                  (Fraud and Deceit/Concealment)
12

13      AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF
14 ACTION FOR FRAUD AND DECEIT/CONCEALMENT, PLAINTIFFS COMPLAIN OF
15 DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, GATKE
16 CORPORATION, GARLOCK SEALING TECHNOLOGIES, LLC, OWENS-ILLINOIS, INC.;
17 PNEUMO ABEX LLC (hereinafter "PNEUMO ABEX," and formerly known as PNEUMO
18 ABEX CORPORATION and ABEX CORPORATION and successor-in-interest to AMERICAN
19 BRAKEBLOK CORPORATION), AMERICAN CONFERENCE OF GOVERNMENTAL
20 INDUSTRIAL HYGIENISTS, INC., THEIR ALTERNATE ENTITIES, AND EACH OF THEM
21 (hereinafter FRAUD DEFENDANTS), AND ALLEGE AS FOLLOWS:

22      99.      Plaintiffs incorporate herein by reference, as though fully set forth here at, each
23 and every allegation of the First, Second, Sixth and Seventh Causes of Action as though fully set
24 forth herein.

25      100.     The term FRAUD DEFENDANTS as used herein includes but is not limited to:
26 METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville,
27 Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum
28 Company [USG]), American Brakeblok Corporation (now PNEUMO ABEX LLC [PNEUMO

1 ABEX]), Keasbey-Mattison Company (now T&N, LTD. [T&N]), all members of the Asbestos
2 Textile Institute [ATI], AMERICAN CONFERENCE OF INDUSTRIAL HYGIENISTS, INC.,
3 and the other entities and individuals identified in this Eighth Cause of Action.

4     101. Plaintiffs are informed and believe, and thereon allege, that at all times herein
5 mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under
6 and by virtue of the laws of the State of California, or the laws of some other state or foreign
7 jurisdiction, and that defendants were and are authorized to do and/or were and are doing
8 business in the State of California, and that said defendants regularly conducted and/or conducts
9 business in the State of California.

10     102. FRAUD DEFENDANT AMERICAN CONFERENCE OF GOVERNMENTAL
11 INDUSTRIAL HYGIENISTS, INC. (ACGIH) sets guidelines for occupational health called
12 Threshold Limit Values (TLVs). These guidelines are relied on by OSHA (the Occupational
13 Safety and Health Administration) in the United States and similar agencies around the world.
14 Criticisms of the guide-line setting process have pointed to problems with data collection,
15 inadequate research, overwhelming dependence on data supplied by financially interested
16 corporations, and slow response to advances in medical information. In carrying out the
17 aforesaid acts, the ACGIH was negligent in their failure to analyze or critically evaluate
18 previously published literature, or review and incorporate current literature, failure to adequately
19 assess the financially motivated scientific data provided by asbestos corporations, their insurers,
20 and medical consultants, and their limited review process, including but not limited to the
21 following representative list:

22     (a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL
23 HYGIENISTS (NCGIH) was formed in 1938. In 1942, the NCGIH began to develop a list of
24 proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric
25 Concentrations, for various hazardous atmospheric substances, including asbestos. In the
26 minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the
27 MPC's were "not to be construed as recommended safe concentrations." In 1946, the NCGIH
28 was renamed the AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL

1 HYGIENISTS, INC. (ACGIH), and despite the internally acknowledged inadequacy of the
2 asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented,
3 and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based
4 on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

5 (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,
6 fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily
7 function, either immediate or after years of exposure." In 1948, they changed the name of the
8 guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the
9 guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted
10 definition, describing the guideline as both an "average" and a "maximum." Despite their failure
11 to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of
12 the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing
13 the definition of the TLV, the ACGIH never performed any studies to test the scientific validity
14 of the 5 mppcf TLV guideline.

15 (c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2
16 mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf,
17 never intending said numeric figure to be the actual recommended guideline. Despite internally
18 acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

19 (d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH
20 ignored the carcinogenic dangers of asbestos until 1974.

21 103. Decedent was exposed to asbestos-containing dust created by the use of the
22 asbestos products manufactured, distributed and/or supplied by one or more of the
23 FRAUD DEFENDANTS. The exposure to the asbestos or asbestos-related products supplied by
24 the FRAUD DEFENDANTS caused decedent's asbestos-related disease and injuries.

25 104. Plaintiffs incorporate herein by reference, as though fully set forth here at, each
26 and every paragraph of the Sixth Cause of Action, which describes the allegations against, and
27 actions of the CONSPIRACY DEFENDANTS.

28 ///

105.   Further, the FRAUD DEFENDANTS knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the FRAUD DEFENDANTS made the false statements and concealed the information with the intent to deceive; decedent and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

106.   The asbestos-containing products that FRAUD DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; decedent was exposed to asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

107.   Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET LIFE's actions and omissions, decedent was caused to remain ignorant of all the dangers of asbestos resulting in decedent, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive decedent of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied decedent the opportunity to take precautions against the dangers of asbestos and caused decedent's damages herein.

WHEREFORE, plaintiffs pray judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

NINTH CAUSE OF ACTION
(Fraud and Deceit/Intentional Misrepresentation)

AS AND FOR A FURTHER, NINTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFFS COMPLAIN OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR ALTERNATE ENTITIES AND EACH OF THEM (hereinafter INTENTIONAL MISREPRESENTATION DEFENDANTS), AND ALLEGE AS FOLLOWS:

///

///

1    108.   Plaintiffs incorporate herein by reference, as though fully set forth here at, each
2  and every allegation of the First, Second, Sixth through Eighth Causes of Action as though fully
3  set forth herein.

4    109.   Plaintiffs is informed and believes, and thereon allege, that at all times herein
5  mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corpor-
6  ations organized and existing under and by virtue of the laws of the State of California, or the
7  laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do
8  and/or were and are doing business in the State of California, and that said defendants regularly
9  conducted and/or conducts business in the State of California.

10    110.   Plaintiffs incorporate herein by reference, as though fully set forth here at, each
11  and every paragraph of the Sixth Cause of Action that describes the allegations against, and
12  actions of the CONSPIRACY DEFENDANT MET LIFE.

13    111.   Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew
14  that their foregoing statements were false and that by their acts they were actively and
15  fraudulently concealing adverse information regarding the health affects of asbestos including the
16  facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the
17  false statements and misrepresented the information with the intent to deceive; decedent and
18  others relied both directly and indirectly on the foregoing false statements and their lack of
19  knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-
20  related injuries and damages as more fully set forth herein.

21    112.   The asbestos-containing products that INTENTIONAL MISREPRESENTATION
22  DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were
23  defective; decedent was exposed to asbestos from the INTENTIONAL MISREPRESENTATION
24  DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in
25  the foregoing paragraphs.

26    113.   Additionally and alternatively, as a direct result of INTENTIONAL
27  MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, decedent was
28  caused to remain ignorant of all the dangers of asbestos resulting in decedent, his agents,

1    employers and the general public to be aware of the true and full dangers of asbestos, deprive

2    decedent of the opportunity to decide for himself whether he wanted to take the risk of being

3    exposed to asbestos, denied decedent the opportunity to take precautions against the dangers of

4    asbestos and caused plaintiffs' damages herein.

5    WHEREFORE, plaintiffs pray judgment against defendants, their ALTERNATE

6    ENTITIES, and each of them, as hereinafter set forth.

7
8

### TENTH CAUSE OF ACTION
Aiding and Abetting Battery
[Against Metropolitan Life Insurance Company]

9    AS AND FOR A FURTHER, TENTH, SEPARATE AND DISTINCT CAUSE OF

10   ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFFS COMPLAIN OF

11   DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR ALTERNATE

12   ENTITIES AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

13    114.    Plaintiffs incorporate herein by reference, as though fully set forth here at, each

14   and every allegation of the First, Second, Sixth through Eighth Causes of Action as though fully

15   set forth herein.

16    115.    This cause of action is for the aiding and abetting of battery by METROPOLITAN

17   LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director

18   Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

19    116.    Plaintiffs are informed and believe, and thereon allege, that at all times herein

20   mentioned defendant MET LIFE was and is a corporation organized and existing under and by

21   virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction,

22   and that this defendant was and is authorized to do and/or was and is doing business in the State

23   of California, and regularly conducted or conducts business in the State of California. At times

24   relevant to this cause of action, MET LIFE was an insurer of J-M.

25    117.    Decedent was exposed to asbestos-containing dust created by the use of the

26   asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the

27   asbestos or asbestos-related products supplied by J-M caused Decedent's asbestos-related disease

28   and injuries.

1    118.   Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-

2  related disease in Canadian mines and mills, including those of J-M. Those studies revealed that

3  miners and mill workers were contracting asbestosis at relatively low levels of dust. McGill

4  University, which conducted the studies, sought permission from MET LIFE to publish the

5  results but they were never published. MET LIFE prepared its own report of these studies.

6    119.   Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S.

7  plants manufacturing asbestos-containing products, including a J-M plant. Those studies showed

8  that workers in substantial numbers were contracting asbestosis, at levels less than what became

9  the Threshold Limit Value ('TLV') of 5mppcf. The MET LIFE report was never published or

10  disseminated except to plant owners, including J-M.

11    120.   In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville,

12  New Jersey. Results were consistent with those of the Canadian and previous U.S. plant studies.

13  They were never published.

14    121.   In 1934, J-M and others whose plants MET LIFE had studied agreed with MET

15  LIFE that it should issue a report of its studies.

16    122.   MET LIFE submitted a draft of its report to J-M. J-M requested, for legal and

17  business reasons, that certain critical parts of the draft be changed. MET LIFE's official in

18  charge was Lanza. MET LIFE through Lanza did make changes that J-M requested, including:

19    (a)   Deletion of MET LIFE's conclusion that the permissible dust level for asbestos

20      should be less than that for silica;

21    (b)   Addition of the phrase that asbestosis clinically appeared to be milder than

22      silicosis.

23  The report, thus altered, was published in 1935. It was misleading, and intentionally so, because

24  it conveyed the incorrect propositions that asbestosis was a less serious disease process than

25  silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases

26  than was the case for silica dust.

27    123.   MET LIFE had a close relationship with J-M. It invested money in J-M. It

28  provided group health and life insurance to J-M. MET LIFE IN 1934 agreed to supply industrial

1  hygiene services to J-M, including dust counts, training employees to monitor dust levels,
2  examining employees, and recommending protective equipment. MET LIFE and Lanza were
3  viewed as experts on industrial dusts.

4      124.  In 1933, MET LIFE through Lanza issued the following advice to J-M:

5      (a)  Disagreeing with the recommendation of a J-M plant physician, MET LIFE

6      advised against warning workers of the fact that asbestos dust is hazardous to their

7      health, basing its advice in view of the extraordinary legal situation;

8      (b)  When the plant physician judged the best disposition of an employee with

9      asbestosis was to remove him from the dust, MET LIFE advised instead that

10      disposition should depend on his age, nature of work and other factors and to

11      leave him alone if he is old and showing no disability, for, MET LIFE stated,

12      economic and production factors must be balanced against medical factors.

13      125.  J-M followed the MET LIFE advices and did not warn its workers, including
14  decedent, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying
15  workers of their disease.

16      126.  In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation
17  ("AHF"). One of the AHF purposes was to develop standards for dust levels that would serve as
18  a defense in lawsuits and workers' compensation claims.

19      127.  MET LIFE funded partially another study that tentatively recommended in 1938 a
20  TLV for asbestos dust of 5mpccf, the same as for silica dust. MET LIFE was aware of data from
21  its own, unpublished reports that showed that level was too high for asbestos dust. MET LIFE
22  nonetheless promoted that TLV as proper.

23      128.  In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the
24  AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant.
25  That report showed that workers exposed to less than the recommended maximum levels of dust
26  were developing disease. MET LIFE was a member of the IHF and Lanza was on its medical
27  committee. The Hemeon report, which was supplied to J-M and other owners, never was
28  published.

1        129.    In 1936, J-M and other asbestos companies agreed with a leading medical
2  research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M
3  and the others retained control over publication of the results. In 1943 Saranac's Dr. Leroy
4  Gardner, in charge of the research, sent a draft to J-M that revealed that 81.8% of mice exposed
5  to long fiber asbestos contracted cancer.

6        130.   Dr. Gardner died in 1946. J-M and other companies wanted parts of the Saranac
7  results published and enlisted the assistance of MET LIFE's Lanza. J-M and other companies
8  decided that Saranac's findings of cancer caused by asbestos in mice must be deleted, as well as
9  Saranac's critique of existing dust standards. Lanza directed Saranac to delete the offending
10  materials. Saranac did so, and the altered report was published in 1951 by Saranac's Dr.
11  Vorwald, in the *AMA Archives of Industrial Hygiene*.

12       131.    Lanza left MET LIFE at the end of 1948, and took a position at New York
13  University, funded by MET LIFE. He continued to misrepresent that asbestos does not cause
14  cancer into the 1950s.

15       132.    The IHF (formerly AHF), of which MET LIFE was a member and MET LIFE
16  official was on its medical committee, through Drs. Braun and Truan conducted a study of
17  Canadian miners. The original report, in 1957, found an increased incidence of lung cancer in
18  persons exposed to asbestos. The sponsors, including J-M, caused those findings to be stricken,
19  and the report published in 1958 contained the false conclusion that asbestos exposure alone did
20  not increase the risk of lung cancer.

21       133.    The false and misleading reports that a link between asbestos exposure and cancer
22  was not proven influenced the TLV, for if a substance causes cancer the TLV must be very low
23  or zero.

24       134.    J-M not later than 1933 was inflicting asbestos dust on its workers in its plants
25  knowing that the dust was hazardous and was causing workers to contract disease that could and
26  would disable and kill them. As MET LIFE advised, J-M did not warn its workers of the hazard.
27  J-M committed battery on workers in its plants, including decedent, by that conduct.

28  ///

1    135.    MET LIFE knew that J-M's conduct constituted a breach of its duties to its

2    workers. MET LIFE gave substantial assistance to J-M in committing batteries on its workers,

3    including decedent, through MET LIFE's conduct described above, including by:

4        (a)    Affirmatively urging J-M not to warn workers of the hazards of asbestos dust, in

5               view of the extraordinary legal situation, such that J-M did not warn its workers,

6               including decedent;

7        (b)    Deleting the findings of its own draft report that the allowable limits for asbestos

8               dust should be less than those for silica dust, and promoting a false and unsafe

9               TLV which specified maximum levels of silica dust, and promoting a false and

10              unsafe TLV which specified maximum levels of dust for workers, including

11              decedent, which MET LIFE knew was wrong through its own studies;

12       (c)    Advising J-M to keep certain workers continuing to work at dusty areas in the

13              plant even after J-M was aware that their lungs showed asbestos-induced changes,

14              lest other workers including decedent be alerted to the dangers of working in the

15              dust.

16       WHEREFORE, plaintiffs pray judgment against defendants, their ALTERNATE

17   ENTITIES, and each of them, as hereinafter set forth.

18                         **IV.**

19                  **DAMAGES AND PRAYER**

20       WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities," and

21   each of them in an amount to be proved at trial in each individual case, as follows:

22       (a)    For Plaintiffs' general damages according to proof;

23       (b)    For Plaintiffs' loss of income, wages and earning potential according to proof;

24       (c)    For Plaintiffs' medical and related expenses according to proof;

25       (d)    For Plaintiffs' cost of suit herein;

26       (e)    For exemplary or punitive damages according to proof;

27       (f)    For damages for fraud according to proof; and

28   ///

1        (g)     For such other and further relief as the Court may deem just and proper, including

2  costs and prejudgment interest.

3  Dated: __6|14|11__                 BRAYTON❖PURCELL LLP

4

5                                By: _____

6                                   David R. Donadio
                                  Attorneys for Plaintiffs

7

8

9                           JURY DEMAND

10      Plaintiffs hereby demand trial by jury of all issues of this cause.

11

12  Dated: __6|14|11__                 BRAYTON❖PURCELL LLP

13

14                                By: _____

15                                   David R. Donadio
                                  Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

EXHIBIT A

Decedent: RONALD TRAVES, Deceased.

Decedent's injuries:  Decedent was diagnosed with mesothelioma on or about May 2010 and with asbestosis on or about June 2010.

Decedent died on June 14, 2010.

Retirement Status:  Decedent retired from his last place of employment at regular retirement age. He had therefore suffered no disability from his asbestos-related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

Defendants:  Plaintiffs contend that the asbestos-containing products to which Decedent was or may have been exposed to were manufactured, supplied, distributed, installed and/or contracted for by defendants and each of them.   Decedent's exposure to asbestos occurred at the following times and places, and involved exposure to dust created by the contractors and the products of the entities listed below. The exposure includes, but is not limited, to the following presently known contractors and the manufacturers and distributors of asbestos-containing products:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Canadian Navy Reserves | Unknown Ship | Seaman | 1949-1951 |
| | Unknown Port Near Korea | | |
| | Unknown Port Hawaii | | |
| Texaco Refinery Edmonton, Alberta, Canada | Texaco Refinery Edmonton, Alberta, Canada | Laborer<br>Supervisor | 1952-1967; 1969-1983 |
| Texaco Refinery Ghent, Belgium | Texaco Refinery Ghent, Belgium | Supervisor | 1967-1969 |