IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA L. HAGEN, Individually and as Executrix of the Estate of MALCOLM HAGEN, | : | CONSOLIDATED UNDER MDL 875 |
| Plaintiff, | : | CIVIL ACTION NO. 07-63346 |
| v. | : | |
| BENJAMIN FOSTER CO., et al., | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J. SEPTEMBER 24, 2010

TABLE OF CONTENTS

I. INTRODUCTION....2
II. BACKGROUND....3
A. Plaintiff's Suit....3
B. Defendants' Removal and Plaintiff's Motion to Remand....4
1. Affidavit of J. Thomas Schroppe....5
2. Affidavit of David Hobson....6
3. Affidavit of Admiral Ben J. Lehman....7
4. Affidavit of Admiral Roger B. Horne....9
5. Affidavit of Captain Lawrence Stilwell Betts....9
III. LEGAL STANDARD....10
IV. DISCUSSION....14
A. The Colorable Federal Defense Requirement....16
1. Legal Standard....16
i. Supreme Court Decisions....16
ii. Lower Court Decisions....18
iii. Standard to be Applied....24
2. Application....27
i. Elements of the Government Contractor Defense....27
ii. Applying the Defense to Defendants' Facts....29
B. The Acting Under Requirement....31
C. The Causal Nexus Requirement....32
V. CONCLUSION....34

Case MDL No. 875 Document 7490-1 Filed 07/11/11 Page 2 of 34

# I. INTRODUCTION

Donna L. Hagen, individually and as executrix of the estate of Malcolm Hagen ("Plaintiff"), has moved to remand this action—which is consolidated as part of the MDL-875 asbestos products liability litigation—to New Jersey state court. Plaintiff argues the Court should remand due to lack of subject matter jurisdiction. Defendants Foster Wheeler Corporation and General Electric Company (collectively, "Defendants") filed timely responses in opposition to Plaintiff's motion.

Since MDL-875 was certified by the Judicial Panel on Multidistrict Litigation (the "Panel") in 1991, thousands of individual plaintiffs have had their cases consolidated in the Eastern District of Pennsylvania for coordinated pretrial proceedings.[1] A common path to consolidation in MDL-875 is removal by one or more defendants to an appropriate federal district court, followed by transfer by the Panel to the Eastern District of Pennsylvania. In many of the MDL-875 cases, the jurisdictional basis for removal is the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which allows a defendant to remove a suit to federal court following a preliminary showing of a federal defense. This memorandum evaluates the contours of the

---

[1] For the most recent statistical breakdown, see U.S. District Court for the Eastern District of Pennsylvania, Asbestos Products Liability Litigation Caseload Statistics (2010), http://www.paed.uscourts.gov/documents/MDL/MDL875/Aug2010.pdf.

showing required by Section 1442(a)(1) and concludes Defendants have sufficiently established the jurisdictional predicate to avail themselves of this forum. Thus, for the reasons set forth below, Plaintiff's motion to remand will be denied.

## II. BACKGROUND

### A. Plaintiff's Suit

Malcolm Hagen ("Hagen") was exposed to asbestos while working as an outside machinist in close proximity to asbestos-containing machinery and insulation aboard the U.S.S. Kitty Hawk. Hagen's responsibilities included assisting mechanics as they installed and repaired machinery aboard ships at the shipyard. Hagen worked in this capacity from 1958-1961. Plaintiff alleges that, on or around February 7, 2006, Hagen was diagnosed with mesothelioma allegedly caused by exposure to asbestos while aboard the U.S.S. Kitty Hawk.

Plaintiff filed suit on July 11, 2006 in the Superior Court of New Jersey, Middlesex County, alleging products liability claims for failure to warn against thirteen named defendants and fifty unnamed defendants. Specifically, each defendant manufacturer is alleged to have carelessly or negligently processed, manufactured, packaged, distributed, delivered and sold asbestos products without warnings.[2] (Compl.

[2] Plaintiff does not assert design defect claims.

¶ 8.) Plaintiff further alleges that this failure to warn was the actual and proximate cause of Hagen's mesothelioma. (Id. ¶ 9.) On May 28, 2008, Hagen died of mesothelioma. Donna Hagen, who was already a named plaintiff in the suit, was named executrix of Hagen's estate and substituted as plaintiff in Hagen's stead.

B. Defendants' Removal and Plaintiff's Motion to Remand

On October 12, 2006, Defendants removed this case to federal court under 28 U.S.C. § 1442(a)(1). As explained below, removal under Section 1442(a)(1) is only appropriate where, amongst other things, a so-called "colorable" federal defense is raised. Plaintiff, arguing removal under Section 1442(a)(1) was improper based on this standard, filed a motion to remand to state court on October 19, 2006. Before Plaintiff's motion was ruled upon, Plaintiff's case was transferred to the Eastern District of Pennsylvania and consolidated under MDL-875. Upon transfer, Plaintiff's motion was denied without prejudice. (See doc. no. 2.) On June 10, 2009, Plaintiff renewed her motion to remand before this Court. (See doc. no. 41.)

Defendants oppose Plaintiff's motion and submit several affidavits in opposition.[3] Specifically, Defendants contend

---

[3] The Court may properly consider these materials in weighing the merits of Plaintiff's motion to remand. See, e.g., Hilbert v. McDonnell Douglas Corp., 529 F. Supp. 2d 187, 196 (D. Mass. 2008) ("[I]n seeking to determine whether the defendants have met [the removal] burden, the Court is permitted to look

Case 2:07-cv-63346-ER Document 129 Filed 09/24/10 Page 5 of 34

these affidavits establish the subject matter jurisdiction predicate under Section 1442(a)(1) insofar as they entitle Defendants to the "government contractor defense" set forth in Boyle v. United Technologies Corp., 487 U.S. 500 (1988). Thus, the affidavits all make the same basic point: that Plaintiff's failure to warn claim against Defendants relates to the government's control over the allegedly tortious product's design. These affidavits—namely, those of (1) J. Thomas Schroppe; (2) David Hobson; (3) Admiral Ben J. Lehman; (4) Admiral Roger B. Horne, Jr.;[4] and (5) Captain Lawrence Stilwell Betts—are discussed in turn.[5]

1. Affidavit of J. Thomas Schroppe

J. Thomas Schroppe ("Schroppe") is a former employee of Foster Wheeler Corporation ("Foster") who began his career at Foster as a proposal engineer in the marine department and

---

beyond the pleadings to the evidence submitted by the parties regarding the Motion to Remand.").

4 Admiral Horne's affidavit was attached as an exhibit to Plaintiff's motion.

5 The Court held a hearing on Plaintiff's motion to remand on December 4, 2009. Following the hearing, the Court permitted the parties to submit additional materials for the Court to review in resolving Plaintiff's motion. (See doc. no. 68.) Defendants' additional submissions include a copy of the relevant Military Specification manual referred to in the various affidavits. However, because the Court concludes the initial affidavits are themselves sufficient to establish that removal under Section 1442(a)(1) was proper, it is unnecessary to outline the content of any additional materials beyond those discussed in this memorandum.

ultimately became President of Foster. (Schroppe Aff. ¶ 1.) Over the course of his employment, Scroppe avers that he became "personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Foster." (Id. ¶ 2.) According to Schroppe, the control exercised required Foster to comply with precise ship specifications for each individual project, as well as military specifications. (Id. ¶¶ 5, 6.) These specifications covered all specific components of boilers built for use by the Navy. (Id.)

Schroppe further avers that Foster was obliged to provide technical manuals relating to the operation of naval boilers which included safety information. (Id. ¶ 21.) According to Schroppe, the Navy exercised "intense direction and control" over the documents and "participated intimately in the preparation of this kind of information and exercised . . . control over its contents." (Id.) Further, Schroppe represents that "the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy" which would not permit Foster to include "any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel." (Id. ¶ 22.)

2. Affidavit of David Hobson

David Hobson ("Hobson") is a former employee of General

Electric Company ("GE") who joined GE in 1969 and worked there until his retirement in 1996. (Hobson Aff. ¶ 1.) During his tenure, he worked as the manager of Navy customer service for GE's Navy and small steam turbine business. (Id. ¶ 1.) In this capacity, Hobson had "frequent and extensive business dealings" with the Navy regarding the Navy's purchase and use of marine steam turbines. (Id. ¶ 3.) According to Hobson, all such turbines were supplied to the Navy pursuant to a contract with the Navy Sea Systems Command ("NSSC") whereby NSSC's officers supervised and specified the requirements for "[a]ll aspects of the design, performance requirements and materials used for construction." (Id. ¶¶ 6, 7.)

Hobson states that any thermal insulation materials, whether or not containing asbestos, were applied to GE products after they were turned over to the Navy, and were supplied or installed by entities other than GE. (Id. ¶ 7.) Further, each turbine manufactured by GE was specifically and uniquely manufactured for the vessel or class of vessels which that contract pertained to. (Id. ¶ 10.) And, ultimately, the Navy exercised complete oversight over both the manufacture and safety testing phases of the process. (Id. ¶ 13-14.)

3. Affidavit of Admiral Ben J. Lehman

Admiral Ben J. Lehman ("Admiral Lehman") is a retired Rear Admiral of the United States Navy. (Lehman Aff. ¶ 1.)

Admiral Lehman details the level of control that the Navy asserted over all aspects of the equipment that was supplied pursuant to government contracts. (Id. ¶ 2.) He corroborates Hobson and Schroppe's averments, emphasizing the importance of adhering to government directives. (See id. ¶ 6 ("I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy . . . were drafted, approved, and maintained by the U.S. Navy . . . to encompass all aspects of shipboard equipment, including the material requirements.").)

In fact, Admiral Lehman states that "[m]ilitary specifications governed every significant characteristic of the equipment used on the U.S. Navy ships, including the instructions and warnings." (Id. ¶ 10.) "This control included the decision of which warnings should or should not be included." (Id.) And, according to Admiral Lehman, the Navy "would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment" or accompanying instructions or manuals. (Id.) This, as Admiral Lehman goes on to explain, relates to Navy specifications that "specifically limited warning information to items and events dealing with the operation of equipment." (Id. ¶ 12.) According to Admiral Lehman, "the application or removal of insulation would [necessarily] not have been included." (Id.)

4. Affidavit of Admiral Roger B. Horne

Admiral Roger B. Horne ("Admiral Horne") worked as the chief engineer and deputy commander for NSSC, and also served as the commander of several shipyards throughout the country. (Horne Aff. ¶ 2.) Admiral Horne attests to the "level of supervision, direction and control exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and auxiliary equipment . . . intended for installation on Navy vessels." (Id. ¶ 4.)

In particular, Admiral Horne states that "Navy specifications . . . covered the nature of any communication affixed to boilers or other equipment supplied to the Navy." (Id. 12.) Further, Admiral Horne avers that the specifications promulgated by the Navy "governed every characteristic of the equipment used on Navy ships, including the instructions and warnings" and covered "what warnings should or should not be included." (Id. ¶ 13.) Finally, as to written materials provided with the equipment, Admiral Horne states that "[t]he Navy was intimately involved with and had final approval of all . . . safety or hazard information and any other written information that accompanied a piece of equipment." (Id. ¶ 14.)

5. Affidavit of Captain Lawrence Stilwell Betts

Captain Lawrence Stilwell Betts ("Captain Betts") is a medical doctor and retired U.S. Navy Captain. (Betts Aff. ¶ 1.)

During his Navy career, Captain Betts was a warfare medical department officer, and became familiar with the industrial products used by the Navy in this capacity. (Id. ¶ 2.) From 1987 to 1989, Captain Betts was stationed on the U.S.S. Kitty Hawk—the naval vessel at issue in the instant case. (Id. ¶ 2.)

Captain Betts asserts that, beginning in the early 1920s, the Navy recognized that inhaling asbestos fibers in significant doses could result in pulmonary disease. (Id. ¶ 28.) In fact, Captain Betts avers that the Navy's knowledge of asbestos-related health hazards was unsurpassed. (Id. ¶ 31; see also id. ¶ 32 ("There was no information concerning any asbestos-containing hazard or danger posed by any asbestos-containing product applied to any marine boiler on a United States Navy ship known to a boiler manufacturer . . . that was not known to the United States and the United States Navy.").) However, according to Captain Betts, the Navy continued to use asbestos aboard ships due to military necessity. (Id. ¶ 5.)

**III. LEGAL STANDARD**

As a general matter, removal of an action from state court is only permissible to the extent that the action could have initially been brought in federal court. See 28 U.S.C. § 1441. Although Article III of the Constitution would permit it, see Osborn v. Bank of the United States, 22 U.S. 738, 824 (1824)

(holding Article III permits jurisdiction because "[t]he question forms an original ingredient . . . . Whether it be in fact relied on or not"), the original jurisdiction Congress has conferred on federal courts does not generally allow a defendant to remove a suit to federal court on the basis of a federal defense. See Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908) (describing the statutory grant of federal question jurisdiction to only permit jurisdiction "when the plaintiff's statement of his own cause of action shows that it is based upon [federal law]" and that it is not enough "that the plaintiff alleges some anticipated [federal law] defense").

The federal officer removal statute, which confers jurisdiction over cases in which a federal officer is a defendant by explicitly allowing defendants to remove such actions, is an exception to this general principle. See Jefferson County v. Acker, 527 U.S. 423, 431 (1999) ("Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law."); Mesa v. California, 489 U.S. 121, 136 (1989) (explaining that the federal officer removal statute is a "pure jurisdictional statute . . . [that] grant[s] district court jurisdiction over cases in which a federal officer is a defendant"). Amongst other parties, it allows the following class of defendants to remove a state

action to federal court:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). Thus, to establish subject matter jurisdiction under Section 1442(a)(1), an individual defendant must show:

> (1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir. 1998).

Here, the applicable defense raised is the government contractor defense which, based on principles of preemption, cloaks government contractors like Defendants from ordinary state-law liability. It applies where: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512. And because the government contractor defense is the basis for invoking this Court's jurisdiction in this suit against non-government entities who furnished equipment

Case 2:07-cv-63346-ER Document 129 Filed 09/24/10 Page 13 of 34

to the military, resolution of Plaintiff's motion to remand effectively turns on how colorable Defendants' federal defense really is. Thus, although the Court considers each element required for removal separately, its analysis begins (and essentially ends) with the colorable defense requirement.[6]

In so doing, the Court is cognizant that, unlike the analysis undertaken with respect to other removal statutes, see Brown v. Jevic, 575 F.3d 322, 326 (3d Cir. 2009) (explaining the general rule that removal statutes "are to be strictly construed, with all doubts to be resolved in favor of remand"), the Court must broadly construe Defendants' ability to remove under Section 1442(a)(1) as to avoid frustrating its policy objective of "hav[ing] the validity of the defense of official immunity tried

[6] However, the Court need not address the person requirement at any length. Although some courts have held corporations are not persons under Section 1442(a)(1) based on an inappropriately narrow construction of the statute, see Krangel v. Crown, 791 F. Supp. 1436, 1446 (S.D. Cal. 1992) (concluding corporations do not qualify as persons under Section 1442(a)(1) due to "the fact that ambiguities should be resolved against federal jurisdiction, and the strong interest of the states in adjudicating the rights and obligations of their citizens"), it is well settled that corporations such as Defendants do qualify as persons under the statute and that such non-government entities may seek removal under Section 1442(a)(1) based on the government contractor defense. See, e.g., Good v. Armstrong World Indus., Inc., 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996) (concluding corporation is a person under Section 1442(a)(1) and recognizing the corporation's ability to remove to federal court via the government contractor defense); see also Holdren v. Buffalo Pumps, Inc., 614 F. Supp. 2d 129, 142 (D. Mass. 2009) (collecting authority and explaining "government contractors are entitled to seek removal under the statute").

in a federal court" by applying a "narrow, grudging interpretation." Willingham v. Morgan, 395 U.S. 402, 407 (1969); see Sun Buick, Inc. v. Saab Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994) (distinguishing the general removal standard from the standard applicable in cases removed pursuant to Section 1442(a)).

With these principles in mind, the Court turns to the merits of Plaintiff's motion.

**IV. DISCUSSION**

As noted, the dispute in this case turns on whether Defendants' evidence supporting the government contractor defense suffices to meet the standard for removal under Section 1442(a)(1). Defendants assert their affidavits and supporting materials demonstrate that the Navy exercised control over the manufactured products and that, consequently, the government contractor defense precludes state-law liability for any failure to warn. On the other hand, Plaintiff claims Defendants' evidence is generic boilerplate that does not satisfy the elements for removal. In support of this contention, Plaintiff points to a series of cases rejecting Section 1442(a)(1) removal whilst considering similar—and in some instances, precisely the same—affidavits to those offered here. Defendants, in turn, point to several other cases reaching the opposite conclusion.

At its essence, the split in authority boils down to an argument over what a defendant must proffer to defeat a plaintiff's motion for remand.[7] Beneath the surface, the divide appears to be a consequence of two clashing objectives a court facing a plaintiff's motion to remand must consider: (1) the Supreme Court's mandate to broadly construe a defendant's removal under Section 1442(a)(1); and (2) the bounds of federal subject matter jurisdiction imposed by both the Constitution and the removal statute itself. After considering these competing objectives, the Court determines that a defendant is entitled to removal under Section 1442(a)(1) where the defendant identifies facts which, viewed in the light most favorable to the defendant, entitle him or her to a complete defense.[8] Defendants' pleading

---

[7] As noted, some cases have held that affidavits like those at issue in this case are insufficient because they are non-specific boilerplate. See Lindenmayer v. Allied Packing & Supply, Inc., No. 09-5800, 2010 WL 234906 (N.D. Cal. Jan. 14, 2010); Holdren, 614 F. Supp. 2d at 129; Williams v. Gen. Elec. Co., 418 F. Supp. 2d 610 (M.D. Pa. 2005); Westmiller v. Imo Indus., Inc., No. 05-945, 2005 WL 2850334 (W.D. Wash. Oct. 20, 2005). Plaintiff urges that this conclusion represents an emerging trend. However, it is clear that many cases continue to find remand appropriate in such circumstances. See Corley v. Long-Lewis, Inc., 688 F. Supp. 2d 1315 (N.D. Ala. 2010); Kirks v. Gen. Elec. Co., 654 F. Supp. 2d 220 (D. Del. 2009); Seigfried v. Allegheny Ludlum Corp., 09-125, 2009 WL 1035001 (W.D. Pa. Apr. 17, 2009); Machnik v. Buffalo Pumps, Inc., 506 F. Supp. 2d 99 (D. Conn. 2007); Ferguson v, Lorillard Tobacco Co., 475 F. Supp. 2d 725 (N.D. Ohio 2007); Nesbiet v. Gen. Elec. Co., 399 F. Supp. 2d 205 (S.D.N.Y. 2005).

[8] These facts may be cited in the answer, the notice of removal or in the response to a motion for remand. Given that the Supreme Court has referred to the colorable defense element

materials, including the affidavits, plainly satisfy this standard.

A. The Colorable Federal Defense Requirement

1. Legal Standard

i. Supreme Court Decisions

The Court's analysis begins with the colorable federal defense requirement for Section 1442(a)(1) removal, which stems from the Supreme Court's decision in Mesa v. California. In Mesa, California issued criminal complaints against several employees of the United States Postal Service who sought removal to federal court under Section 1442(a)(1). 489 U.S. at 123. The government, in opposing remand, urged the Court to adopt a reading of Section 1442(a)(1) that would permit a federal officer to remove a suit to federal court without requiring the presence of a federal defense. See id. at 964. Citing constitutional concerns about the breadth of such an interpretation, the Court determined the statute requires a federal defense as a condition precedent to removal. See id. at 969 ("Adopting the Government's

as a "pleading requirement[]" and "averment," it is debatable whether a defendant must, at this stage of the proceeding, submit affidavits or other evidentiary materials to make out a colorable federal defense. Mesa, 489 U.S. at 133. Indeed, a defendant removing an action is generally only required to file "a notice of removal signed pursuant to Rule 11 . . . containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446. However, the Court need not resolve this issue as Defendants have submitted such materials in responding to Plaintiff's motion for remand.

Case MDL No. 875 Document 7490-1 Filed 07/11/11 Page 17 of 34

view would eliminate the substantive Art. III foundation of § 1442(a)(1) and unnecessarily present grave constitutional problems. We are not inclined to abandon a longstanding reading of the officer removal statute that clearly preserves its constitutionality and adopt one which raises serious constitutional doubt.").

But while Mesa affirmatively settled that Section 1442(a)(1) requires a colorable federal defense to effect removal under the statute, it did not clarify what defenses qualify as such. Instead, it simply described the federal defense as a "pleading requirement[]" that must be satisfied for removal under the statute. Id. at 133. Nevertheless, other Supreme Court cases elucidate the colorable defense requirement. In Willingham v. Morgan, for example, the Supreme Court explained the scope of Section 1442(a)(1):

> The federal officer removal statute is not 'narrow' or 'limited.' At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law. One of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in the federal courts.

395 U.S. at 406-07. As the Court succinctly put it, an "officer need not win his case before he can have it removed." Id. at 407. Similarly, in Arizona v. Manypenny, the Court spoke of the Section 1442(a)(1)'s purpose of "ensur[ing] a federal forum in any case where a federal official is entitled to raise a defense

arising out of his official duties" as to allow a defendant the opportunity to have his or her defense adjudicated in federal court. 451 U.S. 232, 241 (1981). In Jefferson County v. Acker, the Court echoed the important policy of providing a federal forum in discussing the colorable federal defense requirement:

> In construing the colorable federal defense requirement, we have rejected a "narrow, grudging interpretation" of the statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." We therefore do not require the officer virtually to "win his case before he can have it removed."

527 U.S. at 431 (internal citations omitted) (quoting Willingham, 395 U.S. at 407).

Under these authorities, it is clear that the Supreme Court's treatment of Section 1442(a)(1)'s colorable defense requirement urges an expansive interpretation which allows jurisdiction to be exercised by the federal courts to the limits imposed by the statute. This interpretation, however, is necessarily tempered by the constitutional concerns that—as the Mesa Court stated—might emerge in the absence of a colorable defense requirement.

ii. Lower Court Decisions

Lower courts have struggled in striking the balance between the breadth of Section 1442(a)(1)'s grant of jurisdiction and the constitutional limits imposed by Article III. This is illustrated by the District of Massachusetts' discussion in

Holdren v. Buffalo Pumps, Inc., where the court granted the plaintiff's motion to remand in the face of many of the same affidavits submitted in the instant case. 614 F. Supp. 2d at 139. The Holdren Court did so because the evidence presented by the defendants purportedly did not show "that the Navy ever exercised its final authority in any fashion that either expressly barred or broadly preempted the inclusion of asbestos warnings." Id. In so holding, the Holdren Court cited "the Supreme Court's admonition that Section 1442(a) should not be subject to a 'narrow, grudging interpretation,'" id. at 140 (quoting Manypenny, 451 U.S. at 242), but expressed constitutional concerns befitting a non-deferential review of whether a defendant's defense is colorable:

> As a constitutional matter, a defendant must aver something more than his status as a federal officer in order to bring his case into a federal forum. It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases. Without this requirement, § 1442(a) would "expand[ ] the jurisdiction of the federal courts beyond the bounds established by the Constitution." Because it alone confers Article III jurisdiction, the "colorable" standard requires that a federal court carefully weigh the plausibility of the proffered defense.

Id. at 140 (internal citations omitted) (quoting Mesa, 489 U.S. at 136); see also id. at 141 ("A colorable federal defense . . . is not a requirement that may be reduced to the point of vanishing altogether."). Although not always explicit, many of the other decisions granting a plaintiff's motion to remand seem

informed by similar concerns. See, e.g., Lindenmayer, 2010 WL 234906, at *5 ("Relaxing this standard too far . . . could well err in the opposite direction—by providing a federal forum to a party whose acts were outside its federal directives." (internal marks omitted) (quoting Holdren, 614 F. Supp. 2d at 141)).

And, in accord with these concerns over a liberalization of the standard, many courts have drawn distinctions between the class of defendants involved where removal under Section 1442(a)(1) is predicated on the government contractor defense. The Holdren Court noted, for example, that "private government contractors—particularly those in failure-to-warn cases—are several degrees distant from the paradigmatic federal officer protected by 28 U.S.C. § 1442(a)(1)." 614 F. Supp. 2d at 136; see also Prewett v. Goulds Pumps (IPG), No. 09-0838, 2009 WL 2959877, at *3 (W.D. Wash. Sept. 9, 2009) ("The situation of a private contractor asserting a government contractor defense is different because the federal interest is not as obvious.").

Thus, in applying the Supreme Court's teachings, the doctrinal conflict created by the interplay of the statute's breadth and the potential constitutional limits that lurk in the background has led courts to conflicting conclusions. For example, some courts analyzing removal under Section 1442(a)(1) equivocate between the terms "plausible" and "colorable." See,

e.g., Bennett v. MIS Corp., 607 F.3d 1076, 1089 (6th Cir. 2010) ("[A] colorable federal defense need only be plausible."); see also United States v. Todd, 245 F.3d 691, 693 (8th Cir. 2001) ("For a defense to be considered colorable, it need only be plausible . . . ."); Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1427 (11th Cir. 1996) (explaining that a colorable defense "need only be plausible"). In doing so, however, many distinguish the showing required for removal from the ultimate evidentiary showing at trial, suggesting the colorable defense standard is not an onerous one to satisfy.[9] See Bennett, 607 F.3d at 1091 (holding defense was colorable insofar as it was an issue of first impression that had been accepted by other courts); Todd, 245 F.3d at 693 (deeming defense colorable because it "at the very least plausibly shields" defendants); Marley v. Elliot Turbomachinery Co., 545 F. Supp. 2d 1266, 1271-73 (S.D. Fla. 2008) (explaining a colorable defense is a plausible one, and describing it as a "low standard" that can be met even where there are disputes as to the merits of the defense). Yet other

---

[9] Indeed, the term "plausible" is generally used differently in the Section 1442(a)(1) context than in cases determining whether a complaint should be dismissed under Rule 12(b)(6) in accordance with Twombly and its progeny. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The latter standard, which defines plausible factual allegations as those that go beyond the speculative level, seems more exacting than that required by many courts deeming a colorable defense a plausible one when evaluating whether to grant a plaintiff's motion to remand.

courts follow the Holdren Court's lead and—albeit not explicitly—apply a heightened standard at the remand stage that requires courts to "carefully weigh the plausibility of the proffered defense." Holdren, 614 F. Supp. 2d at 140. This is particularly evident upon review of the series of cases resolving the same issue in this case: namely, whether the government contractor defense colorably shields defendants from failure to warn liability for asbestos-related injuries allegedly sustained on Navy ships where the defendants contend the Navy would not have allowed any such warnings.

Given the inability of lower courts to develop a consistent approach to the issue, it is unsurprising that the results have varied considerably even where identical or substantially similar evidentiary materials are submitted to the court.[10] Some, such as the Marley Court, have concluded that the affidavits establish a colorable defense. See, e.g., Marley, 545 F. Supp. 2d at 1273 (holding the affidavits establish a good faith defense even though the arguments against the defense

[10] As the court in Marley v. Elliot Turbomachinery Co. noted in considering two of the affidavits present in this case—those of Admiral Lehman and Admiral Horne—"[a]lmost identical affidavits have been filed by the defendants in lawsuits all over the country." 545 F. Supp. 2d at 1273. The affidavits of Admiral Lehman and Admiral Horne submitted to this Court appear to be similar if not identical to those submitted in Marley. The same is true of the affidavits of Captain Betts, Schroppe and Hobson which, though not discussed in Marley, are considered by courts evaluating whether to remand in several cases.

Case MDL No. 875 Document 7490-1 Filed 07/11/11 Page 23 of 34

"raise a number of questions that the defendants will have to answer to ultimately prevail"); see also Pantalone v. Aurora Pump Co., 576 F. Supp. 2d 325, 331-32 (D. Conn. 2008) ("Through the factual assertions in its notice of removal and supporting affidavits, Buffalo Pumps has met the three elements of the government-contractor defense . . . ."). Others, however, remand on the ground that the affidavits leave too many questions open to establish a colorable federal defense:

> [T]he Court's decision rests ultimately on what is missing from the record. The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever attempted to warn about asbestos on products destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military equipment they produced during the same period, by contrast to the equipment they supplied to the Navy. Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.

Holdren, 614 F. Supp. 2d at 137; see Lindenmayer, 2010 WL 234906, at *6 (holding affidavits from Captain Betts, Schroppe and Admiral Lehman did not raise a colorable defense to plaintiff's failure to warn claim because of the "absence of any effort to warn about asbestos"); Westmiller, 2005 WL 2850334, at *2 (concluding an affidavit from Admiral Lehman stating "the Navy had complete control over every aspect of each piece of equipment" and "dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings with

its ships" was insufficient to establish a colorable defense). As the language in Holdren and like cases criticizing the lack of "persuasive evidence" of a Navy policy prohibiting warnings make clear, Holdren, 614 F. Supp. 2d at 137, the decisions rejecting affidavits like those submitted in the instant case deem insufficient averments that the Navy would not have allowed any warnings to be made.

iii. Standard to be Applied

Upon review of the many thoughtful opinions and applying the Supreme Court's clear teaching that a colorable defense need not be proven at this stage of the litigation due to the broad removal right the statute creates, the Court declines to follow those courts that have seemingly required a heightened showing of a colorable federal defense. Moreover, neither the Article III concerns some courts have raised nor the fact that this particular case involves private contractors asserting the government contractor defense compels a different conclusion.

Although the Supreme Court has expressed concerns about the constitutionality of Section 1442(a)(1) if a colorable defense was not required for removal, see Mesa, 489 U.S. at 969, it did not—as cases like Holdren suggest—expressly hold the lack of a colorable defense requirement would "expand[ ] the jurisdiction of the federal courts beyond the bounds established by the Constitution." Holdren, 614 F. Supp. 2d at 140 (internal

marks omitted) (quoting Mesa, 289 U.S. at 136). Rather, it adopted a narrower interpretation of Section 1442(a)(1) to avoid resolution of this very question. See Mesa, 489 U.S. at 969. Thus, the Article III concerns that allegedly require the court to "carefully weigh the plausibility of the proffered defense," Holdren, 614 F. Supp. 2d at 140, are overstated; the colorable defense requirement is a simple statutory limit on subject matter jurisdiction that may or may not be coextensive with what Article III permits.[11] The Court, therefore, can balance the interest in broadly construing removal under Section 1442(a)(1) against its statutory limits and any associated constitutional concerns without requiring defendants to make such a significant showing of the merits of their defense at this early stage. In any event, if it later becomes evident that the relevant facts developed in the litigation do not support jurisdiction, the

---

[11] Article III extends the federal judicial power to cases "arising under" federal law and those involving diversity of citizenship, and reflects the outer bounds of the district court's authority to resolve a dispute. But it is just that, for original jurisdiction may only be exercised where and to the extent Congress allows it by statute. Because the two most common statutory bases for jurisdiction—28 U.S.C. § 1331 and 28 U.S.C. § 1332, which confer jurisdiction over federal questions and actions in which there is diversity of citizenship respectively—nearly reach that afforded by Article III, it is often unnecessary to distinguish between the jurisdiction Article III allows and that Congress permits courts to exercise. Nevertheless, it is understood that Congress has not always extended original jurisdiction to the full extent permitted by Article III. Compare, e.g., Osborn, 22 U.S. at 824 with Mottley, 211 U.S. at 153.

Case MDL No. 875 Document 7490-1 Filed 07/11/11 Page 26 of 34

Court will do what it would do in any removed case: dismiss and remand the action based on lack of subject matter jurisdiction.[12] See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action"); 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

And though it is perhaps true that the defendants in this and similar cases are not "the paradigmatic federal officer protected" by Section 1442(a)(1), Holdren, 614 F. Supp. 2d at 136, it is axiomatic that these defendants are nevertheless protected by the statute. After all, "[i]f the federal government can't guarantee its agents access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf." Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (9th Cir. 2006).

While the Court must require that the facts identified by the defendant support the federal defense, the Court is not called upon at this preliminary stage to pierce the pleadings or

---

[12] Proceeding in this fashion is particularly appropriate in view of the limited opportunity for appellate review of remand orders. See 28 U.S.C. § 1447(d) ("An order remanding a case to the State court . . . is not reviewable on appeal or otherwise . . . ."); Feidt, 153 F.3d at 126-27 (concluding the court of appeals lacked jurisdiction to review the district court's remand order where defendant had removed the action under Section 1442(a)(1)).

dissect the facts stated. Nor is it the Court's function at this stage to determine credibility, weigh the quantum of evidence or discredit the source of the defense. Cf. Black's Law Dictionary 282 (9th ed. 2009) (defining a colorable claim as "a claim that is legitimate and that may reasonably be asserted, given the facts presented and the current law (or a reasonable and logical extension or modification of the current law)"). It is the sufficiency of the facts stated—not the weight of the proof presented—that matters. For policy reasons, Congress has erected a road to federal court for litigants who can invoke a federal defense. It is not the Court's role to impose judicially created tolls on those who seek to travel on it. Thus, the Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial.[13]

2. Application

i. Elements of the Government Contractor Defense

As noted, the defense relied on in this case is the government contractor defense. The government contractor defense displaces state law where "(1) the United States approved

[13] Presumably, the merits of Defendants' defense will be tested on a motion for summary judgment or at trial. By allowing Defendants' defense to be resolved in this forum, the Court adheres to Section 1442(a)(1)'s clear mandate.

Case MDL No. 875 Document 7490-1 Filed 07/11/11 Page 28 of 34

reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512. Although the Boyle decision applied the government contractor defense to a design defect products liability claim rather than a failure to warn claim products liability claim, courts have recognized the defense's applicability to failure to warn claims like Plaintiff's. See, e.g., Feidt, 153 F.3d at 127 (suggesting the district court properly considered the government contractor defense as a basis for removal of plaintiff's failure to warn claim); see also Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th Cir. 1996) ("[W]hen state law would otherwise impose liability for a failure to warn, that law can be displaced . . . ."); Tate v. Boeing Helicopters, 55 F.3d 1150, 1157 (6th Cir. 1995) (recognizing a distinction between applying the government contractor defense to design defect claims and failure to warn claims, but holding "the rationale for applying the government contractor defense to a failure to warn claim tracks the Boyle analysis closely").

However, because "design defect and failure to warn claims differ practically as well as theoretically," courts have required the government approval to "transcend rubber stamping" for the defense to shield a government contractor from failure to

warn liability. Tate, 55 F.3d at 1156, 1157. That is, "a manufacturer asserting the federal contractor defense must show that the federal government issued reasonably precise specifications covering warnings—specifications that reflect a considered judgment about the warnings at issue." Holdren, 614 F. Supp. 2d at 143. Nevertheless, the test applied is largely derived from Boyle:

> (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.

Tate, 55 F.3d at 1157; see also Oshkosh, 96 F.3d at 1003-04 (same).

ii. Applying the Defense to Defendants' Facts

The Court's task, then, is to determine whether Defendants have a colorable claim that the government contractor defense shields them from liability to Plaintiff. As noted, this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants, and does not address the merits of the defense. Under this standard, it is clear that Defendants raise a colorable defense because Defendants would prevail on their defense at trial if the facts raised were proven.

First, the affidavits submitted show (1) that the Navy exercised direction and control over the products created; which (2) Defendants conformed to by failing to warn. The affidavits do

this by stating that Defendants would not be permitted to include "any type of warning or caution statement," (Schroppe Aff. ¶ 22), and that the applicable specifications furnished by the Navy required manufacturers to yield all oversight of the manufacture and testing phases to the Navy. (See, e.g., Hobson Aff. ¶ 13-14.) This is particularly true given that the specifications "covered the nature of any communication affixed to boilers or other equipment supplied to the Navy." (See Horne Aff. ¶ 12.) Indeed, according to Defendants' evidence, the Navy controlled "the decision of which warnings should or should not be included." (Lehman Aff. ¶ 10.) Therefore, to the extent the affidavits are true, it is clear that the Navy was responsible for the lack of warnings. This demonstrates the first two elements of the government contractor defense.

Second, the affidavits submitted satisfy the third element of the defense—namely, that Defendants warned the Navy of the dangers in Defendants' equipment that Defendants knew of but the Navy did not. As the language of this prong indicates, the defense does not require the contractor to warn the government where "the government knew as much or more than the defendant contractor about the hazards of the . . . product." Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co., 883 F.2d 1210, 1216 (3d Cir. 1989). Captain Betts' affidavit expressly speaks to this point, stating that "[t]here was no information concerning any

asbestos-containing hazard or danger posed by any asbestos-containing product applied to any marine boiler on a United States Navy ship known to a boiler manufacturer . . . that was not known to the United States and the United States Navy." (Betts Aff. ¶ 32.) Captain Betts made this statement based on his personal knowledge as a medical doctor and retired U.S. Navy Captain. (Id. ¶ 1.) It is possible that further proceedings will cast doubt on Captain Betts' claim, but—if true—Defendants would satisfy the third element of the defense insofar as they would have warned the Navy of every danger they were aware of that the Navy was unaware of. Thus, Defendants meet the third element of the government contractor defense as well, and have established a colorable federal defense that satisfies Section 1442(a)(1)'s colorable defense requirement.

B. The Acting Under Requirement

The federal officer removal statute only extends removal authority to persons acting under an officer of the United States. See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 80 (1991). A defendant acts under a federal officer where his or her actions that led to the lawsuit were based on a federal "officer's direct orders or comprehensive and detailed regulations." Good, 914 F. Supp. at 1128. That is, it is not enough for a defendant to show that "the relevant acts occurred under the general auspices of a federal officer." Fung v. Abex

Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992) (internal marks omitted) (quoting Ryan v. Dow Chem. Co., 781 F. Supp. 934, 947 (E.D.N.Y. 1992)).

Because a defendant's government contractor defense in a failure to warn case is only colorable if the defendant identifies facts demonstrating the government's actions "transcend rubber stamping," Tate, 55 F.3d at 1157, any defendant who satisfies the colorable defense requirement will necessarily meet the acting under requirement of Section 1442(a)(1) as well. That is, in cases involving assertion of the government contractor defense to a plaintiff's failure to warn suit, the burden for demonstrating the defendant acted under an officer of the United States is lower than that associated with demonstrating a colorable federal defense. Cf. Holdren, 614 F. Supp. 2d at 149 (finding defendants satisfied the acting under requirement even though they did not meet the colorable defense requirement). Accordingly, for the same reasons the Court determined Defendants' federal defense is colorable, Defendants have also established they were acting under a federal officer as to satisfy Section 1442(a)(1)'s acting under requirement.

C. The Causal Nexus Requirement

The final requirement for removal under Section 1442(a)(1) is that the defendant demonstrate a causal nexus between the conduct performed under federal direction and, in this case, Plaintiff's failure to warn claim. See Mesa, 489 U.S. at

131-34. To do so, a defendant seeking removal must "by direct averment exclude the possibility that [the defendant's action] was based on acts or conduct of his not justified by his federal duty." Id. at 132 (quoting Maryland v. Soper (No. 1), 270 U.S. 9, 33 (1926)).

Although some courts have suggested the causal nexus requirement should be more closely scrutinized than Section 1442(a)(1)'s other requirements, see Holdren, 614 F. Supp. 2d at 149 ("[A]s a jurisdictional fact, causation is judged by a somewhat stricter 'reasonable probability' standard"), it is evident that the causal nexus requirement "is closely related to evidence supporting a colorable federal defense" where a government contractor is the defendant because both elements require the "defendant [to] show that it acted at the federal government's command." Id. Indeed, just as the acting under analysis becomes redundant where a defendant in a government contractor case makes out a colorable federal defense, resolving the causal nexus requirement is not difficult in light of the Court's colorability determination because the causal nexus analysis "is essentially the same as [that associated with] the colorable defense requirement."[14] Prewett, 2009 WL 2959877, at *7.

---

[14] The similarities between the respective showings required are further demonstrated by the fact that some courts have collapsed the causal nexus and acting under prongs into one single requirement. See, e.g., Good, 914 F. Supp. at 1128 ("The 'acting under' language in the statute forces [the defendant] to show a causal nexus between the plaintiffs' claims and the

Case MDL No. 875 Document 7490-1 Filed 07/11/11 Page 34 of 34

As outlined above, Defendants have a colorable federal defense that any failure to warn relates to the Navy's control over the product Defendants manufactured for the government. Thus, the necessary causal connection exists because the liability Defendants face arises from their official duties, performed in accordance with a valid government contract. See Willingham, 395 U.S. at 409 (holding a causal nexus is established where it is shown the defendant's "relationship to [the plaintiff] derived solely from [his or her] official duties"). Therefore, the Court finds Defendants have demonstrated a causal nexus between Plaintiff's failure to warn claims and the conduct performed under color of a federal office as to satisfy Section 1442(a)(1)'s causal nexus requirement.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion to remand will be denied. An appropriate Order will follow.

---

conduct taken pursuant to direction from a federal officer.").