

1 │ MARC I. WILLICK (SBN 175379)
2 │ ATTORNEY AT LAW
   │ 2361 Rosecrans Ave., Suite 450
3 │ El Segundo, California 90245
   │ Telephone:    (310) 536-1040
4 │ Facsimile:    (510) 496-0256
5 │ Attorneys for Plaintiffs

**CONFORMED COPY**
**OF ORIGINAL FILED**
Los Angeles Superior Court

APR 14 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
A.E. LaFLEUR-CLAYTON

6

7

8 │ SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 │ FOR THE COUNTY OF LOS ANGELES

10 │ BC459657

11 │ JOHN THOMPSON and
   │ BERTHA THOMPSON
12 │
   │                           Plaintiffs,
13 │
   │              vs.
14 │
15 │ AUTOZONE, INC. *(sued individually and*
   │     *as successor-in-interest to Chief*
16 │     *Auto Parts);*
   │ AUTOZONE WEST INC.;
17 │ A.W. CHESTERTON COMPANY;
   │ BAE SYSTEMS SAN DIEGO SHIP
18 │ REPAIR INC. *(f/k/a Southwest Marine,*
   │     *Inc., and sued individually and as*
19 │     *sii to Northwest Marine Inc.)*
   │ CRANE CO. *(sued individually and as*
20 │     *successor-in-interest to* Adel
21 │     Clamps);
   │ CSK AUTO, INC. *(sued individually and*
22 │     *as sii to Kragen Auto Parts and as*
   │     *sii to Checker Auto Parts)*
23 │ DANA COMPANIES, LLC *(f/k/a Dana*
24 │     *Corporation)*;
   │ DEXTER-HYSOL AEROSPACE, INC.;
25 │ DEXTER-HYSOL AEROSPACE, LLC.;
   │ FORD MOTOR COMPANY;
26 │ FOSTER WHEELER ENERGY
27 │     CORPORATION;
   │ GENERAL ELECTRIC COMPANY;
28 │ GENUINE PARTS COMPANY

Case No.

ASBESTOS LITIGATION – SUBJECT TO THE
GENERAL ORDERS CONTAINED IN FILE NO.
C 700000 – DEPT. 59

COMPLAINT FOR PERSONAL INJURY AND
LOSS OF CONSORTIUM – ASBESTOS

CAUSES OF ACTION:

1ST - NEGLIGENCE;
2ND - STRICT LIABILITY;
3RD - FALSE REPRESENTATION;
4TH - INTENTIONAL TORT/INTENTIONAL
5TH - PREMISES OWNER / CONTRACTOR
       LIABILITY;
6TH - LOSS OF CONSORTIUM;
7TH - FRAUD (Met. Life, Pneumo Abex, OI);
8TH - NEGLIGENT MISREPRESENTATION
       (Met. Life, Pneumo Abex, OI);
9TH - NEGLIGENCE – CLUTCH AND BRAKE
       COMPONENTS;
10TH - STRICT LIABILITY – CLUTCH AND
       BRAKE COMPONENTS

1

| | |
|---|---|
| 1 | *(individually and aka NAPA Auto* ) |
| | *Parts)*; ) |
| 2 | GEORGIA-PACIFIC CORPORATION ) |
| 3 | *(sued individually and as* ) |
| | *successor-in-interest to* ) |
| 4 | Bestwall Gypsum Company); ) |
| | THE GOODYEAR TIRE & RUBBER ) |
| 5 | COMPANY; ) |
| 6 | HONEYWELL INTERNATIONAL, INC. ) |
| | *(sued individually and as successor* ) |
| 7 | *to* Allied Signal, Inc. *successor to* ) |
| | Bendix Corporation); ) |
| 8 | IMO INDUSTRIES, INC. *(sued* ) |
| | *individually and as successor-in-* ) |
| 9 | *interest to* DeLaval Steam Turbine ) |
| | Inc.); ) |
| 10 | INGERSOLL-RAND COMPANY; ) |
| | KAISER GYPSUM COMPANY, INC.; ) |
| 11 | M. SLAYEN & ASSOCIATES, INC.; ) |
| 12 | METALCLAD INSULATION ) |
| | CORPORATION; ) |
| 13 | METROPOLITAN LIFE INSURANCE ) |
| | COMPANY; ) |
| 14 | OWENS-ILLINOIS, INC.; ) |
| | PNEUMO-ABEX CORPORATION; ) |
| 15 | QUINTEC INDUSTRIES, INC. ) |
| 16 | *(individually and as successor-in-* ) |
| | *interest and by merger to* ) |
| 17 | Western Fibrous Glass Products ) |
| | Company f/k/a Western Fiberglas ) |
| 18 | Company); ) |
| | RHEEM MANUFACTURING ) |
| 19 | COMPANY; ) |
| 20 | SYD CARPENTER MARINE ) |
| | CONTRACTOR, INC.; ) |
| 21 | THE FLAMEMASTER CORPORATION; ) |
| | TRANE U.S. INC. *(f/k/a American* ) |
| 22 | *Standard, Inc.);* ) |
| | UNION CARBIDE CORPORATION; ) |
| 23 | VELAN VALVE CORPORATION; ) |
| 24 | VIACOM, INC. *(sued individually and as* ) |
| | *successor by merger to* CBS ) |
| 25 | Corporation f/k/a Westinghouse ) |
| | Electric Corporation); ) |
| 26 | WARREN PUMPS, LLC; ) |
| | YARWAY CORPORATION; and ) |
| 27 | DOES 1-500 INCLUSIVE, ) |
| | ) |
| 28 | Defendants. ) |

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

**GENERAL ALLEGATIONS**

COME NOW Plaintiffs JOHN THOMPSON and BERTHA THOMPSON (hereinafter "Plaintiffs") and complain and allege as follows:

1.    The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 500, inclusive, are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

2.    At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venture of his co-defendants, and each of them, and at all said times each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture. Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned, defendants: AUTOZONE, INC. *(sued individually and  as successor-in-interest to Chief Auto Parts);* AUTOZONE WEST INC.; A.W. CHESTERTON COMPANY; BAE SYSTEMS SAN DIEGO SHIP REPAIR INC. *(f/k/a Southwest Marine, Inc., and sued individually and as sii to Northwest Marine Inc.)* CRANE CO. *(sued individually and as successor-in-interest to* ADEL CLAMPS); CSK AUTO, INC. *(sued individually and as sii to KRAGEN AUTO PARTS and as sii to CHECKER AUTO PARTS)* DANA COMPANIES, LLC *(f/k/a DANA CORPORATION)*; DEXTER-HYSOL AEROSPACE, INC.; DEXTER-HYSOL AEROSPACE, LLC.; FORD MOTOR COMPANY; FOSTER WHEELER ENERGY CORPORATION; GENERAL ELECTRIC COMPANY; GENUINE PARTS COMPANY *(individually and aka NAPA Auto Parts)*; GEORGIA-PACIFIC CORPORATION *(sued individually and as successor-in-interest to* BESTWALL GYPSUM COMPANY); THE GOODYEAR TIRE & RUBBER COMPANY;  HONEYWELL INTERNATIONAL, INC. *(sued individually and as*

3

*successor to* ALLIED SIGNAL, INC. *successor to* BENDIX CORPORATION); IMO INDUSTRIES, INC. (*sued individually and as successor-in-interest to* DE LAVAL STEAM TURBINE, INC.); INGERSOLL-RAND COMPANY; KAISER GYPSUM COMPANY, INC.; M. SLAYEN & ASSOCIATES, INC.; METALCLAD INSULATION CORPORATION; METROPOLITAN LIFE INSURANCE COMPANY; OWENS-ILLINOIS, INC.; PNEUMO-ABEX CORPORATION; QUINTEC INDUSTRIES, INC. (*individually and as successor-in-interest and by merger to* WESTERN FIBROUS GLASS PRODUCTS COMPANY f/k/a Western Fiberglas Company); RHEEM MANUFACTURING COMPANY; SYD CARPENTER MARINE CONTRACTOR, INC.; THE FLAMEMASTER CORPORATION, INC.; TRANE U.S. INC. (*f/k/a AMERICAN STANDARD INC.*); UNION CARBIDE CORPORATION; VELAN VALVE CORPORATION; VIACOM, INC. (*sued individually and as successor by merger to* CBS CORPORATION (f/k/a Westinghouse Electric Corporation); WARREN PUMPS, LLC; YARWAY CORPORATION and DOES 1-500 inclusive, were individuals, corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California, and that said defendants have regularly conducted business in the County of Los Angeles, State of California.

       3.      Plaintiffs disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party defendant committed at the direction of an officer of the United States Government. Plaintiffs do not seek to recover against themselves, or either of themselves, as a defendant or otherwise, for any asbestos related injuries.

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

# FIRST CAUSE OF ACTION

## (Negligence)

PLAINTIFFS COMPLAIN OF DEFENDANTS AND DOES 1-350, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGE AS FOLLOWS:

4.      At all times herein mentioned, each of the named defendants and DOES 1 through 350 was the successor, successor in business, successor in product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain substance, the generic name of which is asbestos, and other products containing said substance.  Said entities shall hereinafter collectively be called "alternate entities."  Each of the herein named defendants is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, repaired, marketing, warranted, re-branded, manufactured for others and advertised a certain substance, the generic name of which is asbestos, and other products containing said asbestos.  The following defendants, and each of them, are liable for the acts of each and every "alternate entity", and each of them, in that there has been a virtual destruction of Plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; defendants, and each of them, have caused the destruction of Plaintiff's remedy against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity".

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| BAE SYSTEMS SAN DIEGO SHIP REPAIR INC. | SOUTHWEST MARINE, INC.<br>NORTHWEST MARINE, INC. |
| CRANE CO. | ADEL CLAMPS<br>CRANE ENVIRONMENTAL<br>CRANE PUMPS AND SYSTEMS<br>VALVE SERVICES<br>CRANE VALVE GROUP<br>CRANE SUPPLY<br>CHAPMAN VALVE CO.<br>DEMING PUMPS<br>JENKINS VALVES<br>COCHRANE FEED TANKS |
| CSK AUTO, INC. | KRAGEN AUTO PARTS<br>CHECKER AUTO PARTS |
| DANA COMPANIES, LLC | DANA CORPORATION<br>VICTOR GASKETS;<br>FEL-PRO;<br>MR. GASKET |
| FOSTER WHEELER ENERGY CORPORATION | FOSTER WHEELER BOILER CORPORATION<br>FOSTER WHEELER CONTRACTORS, INC.<br>FOSTER WHEELER CORPORATION<br>FOSTER WHEELER DEVELOPMENT CORP.<br>FOSTER WHEELER ENERGY RESOURCES INC.<br>FOSTER WHEELER ENERGY SERVICES, INC.<br>FOSTER WHEELER ENVIRESPONSE, INC.<br>FOSTER WHEELER ENVIRONMENTAL CORPORATION<br>FOSTER WHEELER POWER GROUP, INC.<br>FOSTER WHEELER POWER SYSTEMS, INC.<br>FOSTER WHEELER PYROPOWER, INC.<br>FOSTER WHEELER REALTY SERVICES, INC.<br>FOSTER WHEELER USA CORPORATION<br>C.H. WHEELER |
| GENUINE PARTS COMPANY | NAPA |
| GENERAL ELECTRIC COMPANY | GENERAL ELECTRIC BROADCASTING COMPANY, INC.<br>GENERAL ELECTRIC CAPITAL |

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

| | |
|---|---|
| | ASSURANCE COMPANY |
| | GENERAL ELECTRIC PROFESSIONAL<br>SERVICES COMPANY |
| | GENERAL ELECTRIC TRADING<br>COMPANY |
| GEORGIA-PACIFIC CORPORATION | BESTWALL GYPSUM COMPANY<br>GEORGIA-PACIFIC RESINS, INC.<br>GEORGIA-PACIFIC WEST, INC. |
| HONEYWELL INTERNATIONAL INC. | ALLIED SIGNAL, INC.<br>BENDIX CORPORATION<br>BENDIX AVIATION CORP.<br>THE SIGNAL COMPANIES, INC.<br>SIGNAL OIL & GAS COMPANY |
| IMO INDUSTRIES, INC. | DE LAVAL TURBINE INC.<br>WARREN PUMPS, LLC.<br>COLFAX CORPORATION<br>IMO PUMP<br>IMO AB<br>COLFAX PUMP GROUP<br>ALLWEILER<br>HOUTTUIN |
| INGERSOLL-RAND COMPANY | INGERSOLL-RAND ABG<br>DRESSER-RAND<br>POWERWORKS<br>THERMOKING<br>TERRY |
| KAISER GYPSUM COMPANY, INC. | KAISER GYPSUM COMPANY |
| METALCLAD INSULATION<br>CORPORATION | METALCLAD CORPORATION<br>NORTHERN CALIFORNIA INSULATION,<br>INC. |
| OWENS-ILLINOIS, INC. | OWENS-CORNING FIBERGLAS<br>CORPORATION<br>FENCO<br>MARINE ENGINEERING<br>FESCO<br>FIBERGLAS ENGINEERING AND SUPPLY<br>COMPANY<br>WILLIAM LANE COMPANY<br>SILICARE INSULATION<br>ASBESTOS ENGINEERING & SUPPLY CO.<br>OWENS-BROCKWAY GLASS<br>CONTAINERS BROCKWAY GLASS<br>CO., INC.<br>OWENS-ILLINOIS GLASS COMPANY<br>O-I |
| PNEUMO-ABEX CORPORATION | PNEUMO-ABEX LLC |

7

| | AMERICAN BRAKEBLOK |
| | ABEX CORPORATION |
| QUINTEC INDUSTRIES, INC. | WESTERN FIBERGLAS COMPANY |
| | WESTERN FIBROUS GLASS PRODUCTS |
| | WESTGLAS |
| | WESTGLASS |
| | INSULECTRO |
| | MULDOON INSULATION |
| SYD CARPENTER MARINE CONTRACTOR, INC. | SYD CARPENTER COMPANY |
| TRANE U.S. INC. | AMERICAN STANDARD INC. |
| UNION CARBIDE CORPORATION | THE DOW CHEMICAL COMPANY |
| | UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC. |
| | UNION CARBIDE AND CARBON CORP. |
| | LINDE AIR PRODUCRS COMPANY |
| | NATIONAL CARBON CO., INC. |
| | PREST-O-LITECO., INC. |
| | UNION CARBIDE COMPANY |
| | CARBIDE AND CARBON CHEMICALS CORPORATION |
| | BAKELITE CORPORATION |
| | UNION CARBIDE CONSUMER PRODUCTS CO. |
| | UNION CARBIDE MINING AND METALS DIVISION |
| | UNION CARBIDE ELECTRONICS DIVISION |
| | UNION CARBIDE HYDROCARBONS DIVISION |
| | UNION CARBIDE FERROALLOYS DIVISION |
| | JENNAT CORPORATION |
| | AMERCHOL CORPORATION |
| | UOP |
| | UCAR CARBON COMPANY |
| | UNION CARBIDE INDUSTRIAL GASES INC. |
| | PRAXAIR, INC. |
| | POLIMERI EUROPA S.R.1. |
| | ASIAN ACETYLS COMPANY, LTD. |
| | EQUATE PETROCHEMICALS COMPANY |
| | UNIVATION TECHNOLOGIES |
| VIACOM INC. | WESTINGHOUSE ELECTRIC CORPORATION |
| | VIACOM INTERNATIONAL, INC. |

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

| | VIACOM PLUS |
|---|---|
| WARREN PUMPS LLC | WARREN PUMPS INC.<br>WARREN PUMPS-HOUDAILLE, INC.<br>COLFAX PUMP GROUP<br>ALWEILER AG<br>HOUTTUIN BV<br>IMO PUMP<br>QUIMBY PUMP CO.<br>ZENITH PUMPS |
| YARWAY CORPORATION | YARNALL-WARING<br>TYCO FLOW CONTROL, INC.<br>TYCO INTERNATIONAL, INC. |

5.     At all times herein mentioned, defendants, their "alternate entities", and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging, and advertising a certain substance, the generic name of which is asbestos and other products containing said substance.

6.     At all times herein mentioned, defendants, their "alternate entities", and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others, packaged, and advertised a certain substance, the generic name of which is asbestos, and other products containing said substance, in that said substance proximately caused personal injuries to users, consumers, workers, bystanders, and others, including the Plaintiffs herein (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by the "exposed persons".

7.     Defendants, their "alternate entities," and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

8.      Defendants, their "alternate entities", and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, and that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to: sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out", and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons", including Plaintiffs herein, would use or be in proximity of and exposed to said asbestos fibers.

9.      Defendants, their "alternate entities", and each of them, knew, or should have known, and intended that the aforementioned asbestos and asbestos-containing products would be used or handled as specified in Exhibit "A", which is attached hereto and incorporated by reference herein, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons", including Plaintiffs herein, would be in proximity to and exposed to said asbestos fibers.

10.     Plaintiff JOHN THOMPSON has used, handled, or been otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable. Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations as set forth in Exhibit "A", which is attached hereto and incorporated by reference herein.

11.     As a direct and proximate result of the conduct of the defendants, their "alternate entities", and each of them, as aforesaid, Plaintiff JOHN THOMPSON's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the Plaintiff, the nature of which, along with the date of Plaintiff's diagnosis and the date he learned such injuries were attributable to exposure to asbestos and/or asbestos-containing products, are set forth in Exhibit "B", which is attached hereto and incorporated by reference herein.

12.     Plaintiffs are informed and believe, and thereon allege, that progressive lung disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a

10

period of time.

13.    Plaintiff JOHN THOMPSON suffers from lung cancer caused by an exposure to asbestos and asbestos-containing products. Plaintiff JOHN THOMPSON was not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

14.    As a direct and proximate result of the aforesaid conduct of defendants, their "alternate entities", and each of them, Plaintiff JOHN THOMPSON has suffered, and continues to suffer, permanent injuries and/or future increased risk of injuries to his person, body and health, including, but not limited to, lung cancer, other lung damage, and cancer, and the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his general damage in a sum in excess of the jurisdictional limit of a limited civil case.

15.    As a direct and proximate result of the aforesaid conduct of the defendants, their "alternate entities", and each of them, Plaintiff JOHN THOMPSON has incurred, is presently incurring, and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time, and Plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

16.    As a further direct and proximate result of the said conduct of the defendants, their "alternate entities", and each of them, Plaintiffs have incurred, and will incur, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiff; and leave is requested to amend this complaint to conform to proof at the time of trial.

17.    Defendants, their "alternate entities", and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

18.    Defendants, their "alternate entities", and each of them, are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities", and each of them, and each defendant's officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified,

11

and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.

19.     The herein-described conduct of said defendants, their "alternate entities", and each of them, was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of "exposed persons". Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive damages according to proof.

WHEREFORE, Plaintiffs pray for judgment against defendants, their "alternate entities", and each of them, as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Strict Liability)

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-350, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

20.     Plaintiffs incorporate herein by reference, as though fully set forth therein, the allegations contained in the First Cause of Action herein.

21.     Defendants, their "alternate entities", and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

22.     Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of the defendants, their "alternate entities," and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons", including Plaintiff JOHN THOMPSON herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

23.     "Exposed persons" did not know of the substantial danger of using said products.  Said dangers were not readily recognizable by "exposed persons".  Said defendants, their "alternate entities", and each of them, further failed to adequately warn of the risks to which Plaintiff JOHN THOMPSON and others similarly situated were exposed.

24.     In researching, manufacturing, fabricating, designing, modifying, testing, or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging, and advertising asbestos and asbestos-containing products, defendants, their "alternate entities", and each of them, did so with conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, including, but not limited to, asbestosis, other lung damages, and cancer.  Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their "alternate entities", and each of them, on or before 1930, and thereafter.

25.     On or before 1930, and thereafter, said defendants, their "alternate entities" and each of them, were aware that members of the general public and other "exposed persons", who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, their "alternate entities", and each of them, knew that members of the general public, and other "exposed persons", who came in contact with asbestos and asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

26.     With said knowledge, said defendants, their "alternate entities", and each of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market, warrant, re-brand, manufacture for others, package, and advertise said asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products.  Rather than attempting to

13

protect "exposed persons" from, or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products, defendants, their "alternate entities", and each of them, intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said knowledge from "exposed persons" and members of the general public, thus impliedly representing to "exposed persons" and members of the general public that asbestos and asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their "alternate entities", and each of them, engaged in this conduct and made these implied representations with the knowledge of the falsity of said implied representations.

27.    The above-referenced conduct of said defendants, their "alternate entities", and each of them, was motivated by the financial interest of said defendants, their "alternate entities", and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing, warranting, re-branding, manufacturing for others, packaging and advertising of asbestos and asbestos-containing products.  In pursuance of said financial motivation, defendants, their "alternate entities", and each of them, consciously disregarded the safety of "exposed persons" and in fact were consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced persons to work with and be exposed thereto, including Plaintiff.

28.    Plaintiffs allege that the aforementioned defendants, their "alternate entities", and each of them, impliedly warranted their asbestos and asbestos-containing products to be safe for their intended use, but their asbestos and asbestos-containing products created an unreasonable risk of bodily harm to "exposed persons."

29.    Plaintiffs further allege that Plaintiff JOHN THOMPSON's injuries are a result of cumulative exposure to asbestos and various asbestos-containing products manufactured, fabricated, inadequately researched, designed, modified, inadequately tested, labeled, assembled, distributed, leased, brought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others, packaged and advertised by the aforementioned defendants, their "alternate entities", and each of them, that Plaintiff

14

cannot identify precisely which asbestos or asbestos-containing products caused and/or contributed to the injuries complained of herein.  Among the injurious exposures alleged herein are Plaintiff JOHN THOMPSON's exposures to asbestos supplied with, affixed and/or added to, and/or installed on the equipment at Plaintiff's occupational locations during the dates alleged on Exhibit A.

30.    Plaintiff JOHN THOMPSON relied upon defendants', their "alternate entities'", and each of their representations, lack of warnings, and implied warranties of the fitness of asbestos and asbestos-containing products.  As a direct, foreseeable, and proximate result thereof, Plaintiffs have been injured permanently as alleged herein.

31.    As a direct and proximate result of the actions and conduct outlined herein, Plaintiff JOHN THOMPSON has suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiffs pray for judgment against defendants, and their "alternate entities", and each of them, as hereinafter set forth.

### THIRD CAUSE OF ACTION

#### (False Representation Under Restatement of Torts Section 402-B)

AS AND FOR A FURTHER, THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-350, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

32.    Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation contained in the First and Second Causes of Action.

33.    At the aforementioned time when defendants, their "alternate entities", and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others, packaged and advertised the said asbestos and asbestos-containing products, as hereinabove set forth, the defendants, their "alternate entities", and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other "exposed persons", including, without limitation, Plaintiff JOHN

15

THOMPSON and his employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

34.     The purchasers and users of said asbestos and asbestos-containing products, and other "exposed persons", including, without limitation, Plaintiff JOHN THOMPSON, and his employers, relied upon said representations of defendants, their "alternate entities", and each of them, in the selection, purchase, and use of asbestos and asbestos-containing products.

35.  Said representation by defendants, their "alternate entities", and each of them, were false and untrue, and defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products were not safe for their intended use, nor were they of merchantable quality as represented by defendants, their "alternate entities", and each of them, in that asbestos and asbestos-containing products have very dangerous properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and have other defects that cause injury and damage to the users of said products and other "exposed persons", thereby threatening the health and life of said persons, including Plaintiff JOHN THOMPSON herein.

36.     As a direct and proximate result of said false representations by defendants, their "alternate entities", and each of them, Plaintiff sustained the injuries and damages alleged herein.

WHEREFORE, Plaintiffs pray for judgment against defendants, their "alternate entities", and each of them, as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### (Intentional Tort/Intentional Failure to Warn)

AS AND FOR A FURTHER, FOURTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR AN INTENTIONAL TORT UNDER CIVIL CODE SECTIONS 1708 THROUGH 1710, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-350, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGE:

37.     Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation contained in the First through Third Causes of Action herein, excepting therefrom allegations pertaining to negligence.

16

38.    At all times pertinent hereto, the defendants, their "alternate entities", and each of them, owed Plaintiff a duty, as provided for in Section 1708, 1709, and 1710 of the Civil Code of the State of California, to abstain from injuring the person, property, or rights of the Plaintiffs.  When a duty to act was imposed, as set forth herein, the defendants, their "alternate entities", and each of them, did do the acts and omissions in violation of that duty, thereby causing injury to the Plaintiff as is more fully set forth herein.  Such acts and omissions consisted of acts falling within Section 1709 (Fraudulent Deceit) and Section 1710 (Deceit) of the Civil Code of the State of California and, more specifically, included suggestions of fact which were not true and which defendants, their "alternate entities", and each of them, did not believe to be true; assertions of fact which were not true and which defendants, their "alternate entities", and each of them, had no reasonable ground for believing to be true, and the suppression of fact when a duty existed to disclose it, all as more fully set forth herein; the violation of any one such duty gave rise to a cause of action for violation of rights of the Plaintiff as provided for in the aforementioned Civil Code sections.

39.    Since on or before 1930, the defendants, their "alternate entities", and each of them, have known and have possessed the true facts of medical and scientific data and other knowledge which clearly indicated that the asbestos and asbestos-containing products referred to in Plaintiff's First Cause of Action were and are hazardous to the health and safety of Plaintiff, and others in Plaintiff's position working in close proximity with such materials.  The defendants, their "alternate entities", and each of them, have known of the dangerous propensities of the aforementioned materials and products since before that time.   With intent to deceive Plaintiff JOHN THOMPSON, and others in Plaintiff's position, and with intent that he and such others should be and remain ignorant of such facts with intent to induce Plaintiffs and such others to alter his and their positions to his and their injury and/or risk and in order to gain advantages, the following acts occurred:

(a)    Defendants, their "alternate entities", and each of them, did not label any of the aforementioned asbestos-containing materials and products regarding the hazards of such materials and products to the health and safety of Plaintiffs and others in Plaintiff's position working in close proximity with such materials until 1964, when certain of such materials were labeled by some, but not all, of defendants, their "alternate entities", and each of them, since on or before 1930. By not labeling

17

such materials as to their said hazards, defendants, their "alternate entities", and each of them, caused to be suggested as a fact to Plaintiff that it was safe for Plaintiff to work in close proximity to such materials, when in fact it was not true; and defendants, their "alternate entities", and each of them, did not believe it to be true;

(b)     Defendants, their "alternate entities", and each of them, suppressed information relating to the danger of use of the aforementioned materials by requesting the suppression of information to the Plaintiff and the general public concerning the dangerous nature of the aforementioned materials to workers, by not allowing such information to be disseminated in a manner which would have given general notice to the public and knowledge of the hazardous nature thereof when defendant, their "alternate entities", and each of them, were bound to disclose such information;

(c)     Defendants, their "alternate entities", and each of them, sold the aforementioned products and materials to Plaintiff's father, his employers and others without advising Plaintiff, his father and others of the dangers of use of such materials to persons working in close proximity thereto when defendants, their "alternate entities", and each of them, knew of such dangers, and had a duty to disclose such dangers all as set forth herein. By said conduct, defendants, their "alternate entities", and each of them, caused to be positively asserted to Plaintiff JOHN THOMPSON that which was not true and that which defendants, their "alternate entities," and each of them had no reasonable ground for believing to be true, to wit: that it was safe for Plaintiff JOHN THOMPSON to work in close proximity to such materials;

(d)     Defendants, their "alternate entities", and each of them, suppressed from Plaintiff medical and scientific data and knowledge of the results of studies including, but not limited to, the information and contents of the "Lanza Report." Although bound to disclose it, defendants, their "alternate entities", and each of them, influenced A. J. Lanza, M.D. to change his report, the altered version of which was published in Public Health Reports, Volume 50, at page 1, in 1935, thereby causing Plaintiff and others to be and remain ignorant thereof. Defendants, their "alternate entities", and each of them, caused Asbestos Magazine, a widely disseminated trade journal, to omit mention of danger, thereby lessening the probability of notice of danger to the users thereof;

18

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

(e)     Defendants, their "alternate entities", and each of them, belonged to, participated in, and financially supported the Asbestos Textile Institute and other industry organizations which, for and on behalf of defendants, their "alternate entities", and each of them, actively promoted the suppression of information of danger to users of the aforementioned products and materials, thereby misleading Plaintiff JOHN THOMPSON by the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute, was specifically enlisted to study the subject of dust control. Discussions in this committee were held many times regarding the dangers inherent in asbestos and the dangers, which arise from the lack of control of dust, and such information was suppressed from public dissemination from 1946 to a date unknown to Plaintiff JOHN THOMPSON at this time;

(f)     Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford Mines in Quebec, Canada, and the study of the workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina, defendants, their "alternate entities", and each of them, knew and possessed medical and scientific information of the connection between the inhalation of asbestos fibers and asbestosis, which information was disseminated through the Asbestos Textile Institute and other industry organizations to all other defendants, their "alternate entities", and each of them, herein. Between 1942 and 1950, the defendants, their "alternate entities", and each of them, suggested to the public as a fact that which is not true and disseminated other facts likely to mislead Plaintiff. Such facts did mislead Plaintiff and others by withholding the afore-described medical and scientific data and other knowledge and by not giving Plaintiff JOHN THOMPSON the true facts concerning such knowledge of danger, which defendants, their "alternate entities", and each of them, were bound to disclose;

(g)     Defendants, their "alternate entities", and each of them, failed to warn Plaintiff JOHN THOMPSON and others of the nature of said materials which were dangerous when breathed and which could cause pathological effects without noticeable trauma, despite the fact that defendants, their "alternate entities", and each of them, possessed knowledge and were under a duty to disclose that said materials were dangerous and a threat to the health of persons coming into contact therewith;

19

(h)    Defendants, their "alternate entities", and each of them, failed to provide Plaintiff JOHN THOMPSON with information concerning adequate protective masks and other equipment devised to be used when applying and installing the products of the defendants, their "alternate entities", and each of them, despite knowing that such protective measures were necessary, and that they were under a duty to disclose that such materials were dangerous and would result in injury to Plaintiff JOHN THOMPSON and others applying and installing such material;

(i)    Defendants, their "alternate entities", and each of them, when under a duty to so disclose, concealed from Plaintiff JOHN THOMPSON the true nature of the industrial exposure of Plaintiff JOHN THOMPSON and knew that Plaintiff and anyone similarly situated, upon inhalation of asbestos would, in time, develop irreversible conditions of pneumoconiosis, asbestosis, and/or cancer. Defendants, their "alternate entities", and each of them, also concealed from Plaintiff JOHN THOMPSON and others that harmful materials to which they were exposed would cause pathological effects without noticeable trauma;

(j)    Defendants, their "alternate entities", and each of them, failed to provide information of the true nature of the hazards of asbestos materials and that exposure to these material would cause pathological effects without noticeable trauma to the public, including buyers, users, and physicians employed by Plaintiff JOHN THOMPSON so that said physicians could not examine, diagnose, and treat Plaintiff and others who were exposed to asbestos, despite the fact that defendants, their "alternate entities", and each of them, were under a duty to so inform and said failure was misleading; and

(k)    Defendants, their "alternate entities", and each of them, failed to provide adequate information to physicians and surgeons retained by Plaintiff's employers and their predecessor companies, for purposes of making physical examinations of Plaintiff JOHN THOMPSON and other employees as to the true nature and risk of such materials and exposure thereto when they in fact possessed such information and had a duty to disclose it.

40.    Defendants, their "alternate entities", and each of them, willfully failed and omitted to complete and file a First Report of Occupational Injury or Illness regarding Plaintiff's injuries, as required by law, and did willfully fail and omit to file a Report of Injury and Occupational Disease

20

with the State of California.  Plaintiff JOHN THOMPSON was in the class of persons with respect to whom a duty was owed to file such reports and who would have been protected thereby if the fact of danger from products complained of had become known.

41.    Defendants, their "alternate entities", and each of them, having such aforementioned knowledge, and the duty to inform Plaintiff JOHN THOMPSON about the true facts, and knowing the Plaintiff JOHN THOMPSON did not possess such knowledge and would breathe such material innocently, acted falsely and fraudulently and with full intent to cause Plaintiff JOHN THOMPSON to remain unaware of the true facts and to induce Plaintiff to work in a dangerous environment, all in violation of Sections 1708, 1709, and 1710 of the Civil Code of the State of California.

42.    As a direct and proximate result of such intentional conduct by defendants, their "alternate entities" and each of them, Plaintiff JOHN THOMPSON sustained the injuries and damages alleged herein.

WHEREFORE, Plaintiff prays for judgment against defendants, their "alternate entities," and each of them, as is hereinafter set forth.

## FIFTH CAUSE OF ACTION
### (Premises Owner/Contractor Liability)

AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFFS COMPLAIN OF DEFENDANTS DOES 351-500, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, (hereinafter "PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS") AND ALLEGE AS FOLLOWS:

43.    Plaintiffs, by this reference, incorporate the allegations contained in the General Allegations and paragraphs 10-17 of the First Cause of Action herein.

44.    At all times herein mentioned, each of the PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and/or products which caused the release of respirable asbestos fibers and/or asbestos- and silica-containing insulation, other building materials, products,

21

and/or toxic substances to be constructed, installed, maintained, used, managed, and/or controlled by them. Said entities shall hereinafter collectively be called "alternate entities". Each of the herein-named defendants is liable for the tortious conduct of each successor, successor-in-business, assign, predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, that caused the presence as aforesaid of said asbestos- and silica-containing products and insulation and other toxic substances. Said defendants, and each of them, are liable for the acts of each and every "alternate entity", and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have acquired the assets, or a portion thereof, of each such "alternate entity"; defendants, and each of them, have caused the destruction of plaintiff's remedy against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity", and that each such defendant enjoys the goodwill originally attached to each such "alternate entity".

45.     At all times mentioned herein, the PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, respectively, owned, leased, maintained, managed and/or controlled the premises Plaintiff JOHN THOMPSON worked and/or was present at as set forth and during the times set forth on Exhibit A.

46.     Prior to and at said times and places, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, respectively, caused certain asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and/or products which caused the release of respirable asbestos fibers and/or asbestos- and silica-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid respective premises, by their own workers and/or by various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to Plaintiff JOHN THOMPSON, his family members and other persons exposed to said asbestos and toxic substances while present at said premises.

47.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, knew or in the exercise or ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition and unreasonable risk of harm and personal injury to Plaintiff JOHN THOMPSON, and other workers or persons so exposed, present at each of the aforesaid respective premises.

48.     At all times relevant herein, Plaintiff JOHN THOMPSON and/or his family members entered said premises and used or occupied each of said respective premises as intended and for each of the respective PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS' benefit and advantage and at each of the respective PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS' request and invitation.  In so doing, Plaintiff JOHN THOMPSON was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them.

49.     Plaintiff JOHN THOMPSON at all times was unaware of the hazardous condition or the   risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

50.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, remained in control of the premises where Plaintiff JOHN THOMPSON's family members were performing their work.

51.     At all times mentioned herein, the PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS owed to Plaintiff JOHN THOMPSON, and others similarly situated, a duty to exercise ordinary care in the management of such premises in order to avoid exposing workers such as Plaintiff to an unreasonable risk of harm and to avoid causing injury to said persons.

52.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions; and that the persons present and using said premises

23

would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises.

53.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid dangerous conditions and hazards on said premises.

54.     Prior to and at the times and places aforesaid, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, respectively, caused certain asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and/or products which caused the release of respirable asbestos fibers and/or asbestos- and silica-containing insulation, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced, repaired, and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured Plaintiff.

55.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm Plaintiff and others unless special precautions were taken.

56.     In part, Plaintiff JOHN THOMPSON was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

57.     The work of contractors on premises controlled by the PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS created unsafe premises and an unsafe work place by reason of the release of dangerous quantities of toxic substances including, but not limited to, asbestos.

58.     The unsafe premises or work place was created, in part, by the negligent conduct of the contractors employed by the PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS. Said negligent conduct includes, but is not limited to:

      (a)     Failure to warn of asbestos and other toxic dusts;

      (b)     Failure to suppress the asbestos-containing or toxic dusts;

      (c)     Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

      (d)     Failure to provide adequate breathing protection, i.e., approved respirators or masks;

      (e)     Failure to inspect and/or test the air;

      (f)     Failure to provide medical monitoring; and

Failure to select and hire a careful and competent contractor or subcontractor.

59.     The PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code of Procedure, section 1714, and California Labor Code, section 6400, et seq., or Health and Safety Code, section 40.200, et seq., and regulations promulgated thereunder.  Therefore, the Premises Owner/Contractor Liability Defendants are responsible for any breach of said duties whether by themselves or others.

60.     Prior to and at said times and places, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS were subject to certain ordinances, statutes, and other governmental regulations promulgated by the United States Government, the State of California, and others, including, but not limited to, the General Industry Safety Orders promulgated pursuant to California Labor Code, section 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including, but not limited to: Title VIII, Group 9 (Control of Hazardous Substances), Article 81, sections 4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code, section 40.200, et seq., which empowers the South Coast Area Air Quality Management District to promulgate regulations including, but limited to: S.C.A.A.Q.M.D. Rule 1403; Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS to provide specific safeguards or

25

precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS failed to provide the required safeguards and precautions, or contractors employed by the PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS failed to provide the required safeguards and precautions. Defendants' violations of said codes include, but are not limited to:

(a)     Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

(b)     Failing to segregate work involving the release of asbestos or other toxic dusts;

(c)     Failing to suppress dust using prescribed ventilation techniques;

(d)     Failing to suppress dust using prescribed "wet down" techniques;

(e)     Failing to warn or educate plaintiff or others regarding asbestos or other toxic substances on the premises;

(f)     Failing to provide approved respiratory protection devices;

(g)     Failing to ensure "approved" respiratory protection devices were used properly;

(h)     Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

(i)     Failing to provide adequate housekeeping and clean-up of the work place;

(j)     Failing to properly warn of the hazards associated with asbestos as required by these statutes;

(k)     Failing to properly report renovation and disturbance of asbestos-containing materials, including, but not limited to: S.C.A.A.Q.M.D. Rule 1403;

(l)     Failing to have an asbestos removal supervisor as required by regulation;

(m)    Failing to get approval for renovation as required by statutes; and Failing to maintain records as required by statute.

61.     PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, were the "statutory employer" of Plaintiff JOHN THOMPSON and/or his family members as defined in the California Labor Code and California case law.

62.     Plaintiff JOHN THOMPSON at all times was unaware of the hazardous condition or the risk of personal injury created by defendants' violation of said regulations, ordinances, or statutes.

63.     At all times mentioned herein, Plaintiff JOHN THOMPSON was a member of the class of persons whose safety was intended to be protected by the regulations, statutes, or ordinances described in the foregoing paragraphs.

64.     At all times mentioned herein, said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises, and that such persons were unaware of the aforesaid violations of codes, regulations, and statutes.

65.     As a legal consequence of the foregoing, Plaintiff JOHN THOMPSON developed an asbestos-related illness, which has caused great injury and disability as previously set forth, and plaintiffs have suffered damages as alleged herein.

66.     The herein-described conduct of said PREMISES OWNER/CONTRACTOR LIABILITY DEFENDANTS, their "alternate entities", and each of them, was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of "exposed persons". Plaintiffs, for the sake of example and by way of punishing said defendants, seek punitive damages according to proof.

## SIXTH CAUSE OF ACTION

### (Loss of Consortium)

AS AND FOR A FURTHER SIXTH SEPARATE, AND DISTINCT CAUSE OF ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF BERTHA THOMPSON COMPLAINS OF DEFENDANTS, DOES 1-500, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

67.     Plaintiff BERTHA THOMPSON incorporates by reference, each and every paragraph of the First through Fifth Causes of Action herein and the following Seventh through Eleventh Causes of Action.

27

68.    Plaintiffs JOHN THOMPSON and BERTHA THOMPSON were married on November 7, 1979 and at all times relevant to this action were, and are now, husband and wife.

69.    Prior to Plaintiff JOHN THOMPSON's injuries as alleged, he was able and did perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof, plaintiff JOHN THOMPSON has been unable to perform the necessary duties as a spouse and the work and services usually performed in the care, maintenance, and management of the family home, and she will be unable to perform such work, service and duties in the future. As a proximate result thereof, BERTHA THOMPSON has been permanently deprived and will be deprived of the consortium of her spouse, including the performance of duties, all to her damages, in an amount presently unknown but which will be proved at the time of trial.

70.    Plaintiff BERTHA THOMPSON's discovery of this cause of her loss of consortium, as herein alleged, first occurred within one year of the date this Complaint was filed.

71.    As a direct and proximate result of the acts of defendants, their "alternate entities", and each of them, and the severe injuries caused thereby to plaintiff JOHN THOMPSON as set forth in this complaint, plaintiff BERTHA THOMPSON has suffered, and for a long period of time will continue to suffer, loss of consortium, including, but not limited, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

## SEVENTH CAUSE OF ACTION

### (Fraud and Deceit/Concealment)

AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/CONCEALMENT PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX CORPORATION, OWENS ILLINOIS INC., AND DOES 301-450, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

72.    Plaintiff, by this reference, incorporates and makes a part hereof as though fully set forth herein at length, each and every allegation of the First through Sixth Causes of Action.

73.    The term "conspirators", as used herein, includes, but is not limited to: METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville,

Raybestos-Manhattan Inc., Gatke Corporation, Owens-Illinois, Inc., United States Gypsum Company [USG], American Brakeblok Corporation (now Pneumo Abex Corporation [Pneumo Abex], Keasbey-Mattison Company (now T&N PLC [T&N]), all members of the Asbestos Textile Institute [ATI], and the other entities and individuals identified in this Seventh Cause of Action.

74.   Plaintiffs is informed and believe, and thereon alleges, that at all times herein mentioned, the conspirators, their "alternate entities" and each of them, were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that conspirators, their "alternate entities", and each of them, were and are authorized to do and/or were and are doing business in the State of California, and that said conspirators, their "alternate entities", and each of them, were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of Los Angeles, State of California.

75.   JOHN THOMPSON was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the conspirators and or their "alternate entities" named below. The exposure to the asbestos or asbestos-related products supplied by the conspirators caused Plaintiff's asbestos-related disease and injuries. The conspirators, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves, with other asbestos manufacturers and distributors, and with certain individuals including, but not limited to: Anthony Lanza, M.D. (Lanza), and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE') to injure the Plaintiff in the following fashion (the following is not an exclusive list of the wrongful acts of MET LIFE, but a representative list):

(a)   Beginning in 1929, MET LIFE entered agreements with Johns-Manville and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners. When the data from these studies proved that Canadian asbestos miners were developing asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian study for many years thereafter to meetings of health

29

care professionals seeking information regarding asbestos exposure.

(b)     In approximately 1934, conspirators Johns-Manville and MET LIFE', through their agents, Vandiver Brown and attorney J. C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Lanza, Associate Director, MET LIFE (insurers of Johns-Manville and Raybestos), that Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent material facts and conclusions about asbestos exposure; including, but not limited to, descriptions of the seriousness of the disease process, asbestosis. The misrepresentation was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it was known to be by the conspirators. As a result, Lanza's study was published in the medical literature containing said misleading statements in 1935. the conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent non-disclosure by the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use of their asbestos products.

(c)     The above-described conspiracy continued in 1936 when additional co-conspirators American Brakeblok Corporation (Pneumo Abex), Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall, (T&N PLC), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H. K. Porter Company), Union Asbestos and Rubber Company and USG, entered into an agreement with a leading medical research facility named Saranac Laboratories. Under the agreement, the conspirators acquired the power to decide what information Saranac Laboratories could publish regarding asbestos disease and could also control in what form such publications were to occur. Their agreement provided these conspirators the power and ability to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. In 1945, medical studies of dust from additional co-conspirator Owens-Illinois, Inc.'s insulation product Kaylo were initiated at Saranac. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact regarding the health affects of asbestos exposure being made at scientific

30

meetings.

(d)     In furtherance of the foregoing conspiracy, in 1947, these conspirators, members of the ATI, received a report from industrial hygienist W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-existing maximum exposure limits for asbestos exposure. These conspirators caused the Hemeon report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then existing maximum exposure limit for asbestos was acceptable. Thereafter, these conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of their Threshold Limit Values for asbestos exposure.

(e)     The conspirators the Mellon Institute and the Industrial Hygiene Foundation (IHF) were research institutes whose functions included involvement in research regarding the health effects of inhaling asbestos dust.

(f)     Beginning in the early 1940's, the IHF was involved in a study by Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This study was done in connection with members of the Asbestos Textile Institute (ATI). This study found that workers exposed to less than the recommended maximum exposure level for asbestos were nonetheless developing disease. As a part of the conspiracy, the IHF never published this study.

(g)     Beginning in the mid-1950's, the IHF and the Mellon Institute were involved in the publication of works by Braun and Truan entitled An Epidemiological Study of Lung Cancer in Asbestos Miners. In its original, unedited form in September 1957, this study had concluded that workers with asbestosis had an increased incidence of lung cancer and that the Canadian Government had been under-reporting cases of asbestosis. The final published version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian Government had been under-reporting asbestosis cases. The IHF and the Mellon Institute conspired with the members of the Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other conspirators to delete the above-described information regarding asbestos and cancer.

(h)     The above described actions of the IHF and the Mellon Institute constituted intention deception and fraud in actively misleading the public about the extent of the hazards connected with breathing asbestos dust.

(i)     The above-described conspiratorial and fraudulent actions of the IHF and the Mellon Institute substantially contributed to retarding the development of knowledge about the hazards of asbestos and thereby substantially contributed to injuries suffered by the Plaintiff.

(j)     The conspiracy was furthered when on November 11, 1948, representatives of the following conspirators met at the Johns-Manville headquarters: Johns-Manville, American Brakeblok Division of American Brake and Shoe Foundry (Pneumo Abex), Gatke Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall (T&N )), Raybestos-Manhattan, Thermoid Company (whose assets and liabilities were later purchased by H. K. Porter Company), Union Asbestos and Rubber Company, defendant United States Gypsum Company and MET LIFE.  Defendant U.S. GYPSUM did not send a company employee to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and take action on its behalf.

(k)     At the November 11, 1948 meeting, these conspirators, and their representatives, decided to exert their influence to materially alter and misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards for asbestos dust exposure.

(l)     At this meeting, these conspirators intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on humans, and the critique of the dust standards.  MET LIFE then published these deceptive and fraudulent statements in the medical literature as edited by Dr. Arthur Vorwald.  These conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the general public and the class of persons exposed to asbestos, including Plaintiff.

(m)     As a direct result of influence exerted by the conspirators, in 1951 a Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health, in a form that stressed those portions of Dr. Gardner's work that the

32

conspirators wished stressed, but which omitted reference to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

(n)     Such actions constitute a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's uncredited work indicated.

(o)     When Dr. Vorwald subsequently tried to publish more complete information regarding Dr. Gardner's animal studies, the conspirators required his discharge from the Saranac Laboratories, denied him permission to publish or complete Dr. Gardner's work, and actively discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

(p)     The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, The Celotex Corporation, successor to Quebec Asbestos Corporation, National Gypsum Company, and Turner & Newall (T&N), individually and successor to Bell Asbestos. These conspirators, as members of the Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the Journal of Industrial Hygiene, AMA Archives of Industrial Health 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

(q)     As a furtherance of the conspiracy commenced in 1929, conspirators who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject; and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos -- with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their

33

1    possession and control.

2        (r)    This plan of misrepresentation and influence over the medical literature began on or

3    about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an

4    evaluation of whether cancer was related to asbestos.  After a preliminary report authored by Dr. Arthur

5    Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these

6    Q.A.M.A. members refused to further fund the study, terminated the study, and prevented any public

7    discussion or dissemination of the results.

8        (s)    As a result of the termination of the Q.A.M.A/Saranac sturdy, the conspirators

9    fraudulently withheld information from the public and affirmatively misrepresented to the public and

10   responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative

11   misrepresentations by conspirators and conspirators' agents K. W. Smith, M.D., Paul Cartier, M.D., A.

12   J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan Sabourin.  Said misrepresentations

13   being directed to inter alia, U. S. Government officials, Canadian Government officials, U. S. National

14   Cancer Institute, medical organizations, health professionals, and the general public, including Plaintiff.

15       (t)    In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the health effects

16   of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance: MET

17   LIFE, Lanza, Johns-Manville, Turner & Newall (T&N), Raybestos-Manhattan, and Q.A.M.A. members

18   by way of their agents, Cartier, Sabourin and LaChance.

19       (u)    At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis in product

20   users was discussed and the carcinogenic properties of all fiber types of asbestos were also discussed.  In

21   an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and

22   in an effort to fraudulently conceal those risks from the public, these conspirators conspired to prevent

23   publication of the record of this 1952 Saranac Symposium and it was not published.  In addition, MET

24   LIFE induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing

25   excess cancers in animals which thereby fraudulently misrepresented existing secret data which could

26   not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore

27   described.

28

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

(v)     In furtherance of the foregoing conspiracy, in 1953, co-conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed form such applicators the need for respirators and thereby misrepresented the risks associated with asbestos exposure.

(w)     In furtherance of the foregoing conspiracy, in 1955, co-conspirator Johns-Manville, through its agent Dr. Kenneth Smith, caused to be published in the AMA Archives of Industrial Health an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smiths' study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

(x)     In furtherance of the foregoing conspiracy, in 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually, and as agent for other co-conspirators, and Dr. A. Vorwald, as agent of co-conspirators, affirmatively misrepresented that there was no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, MET LIFE were in secret possession of several suppressed studies which demonstrated that positive evidence did exist.

(y)     In furtherance of the foregoing conspiracy, in 1957, these conspirators and members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

(z)     Subsequently, the Q.A.M.A. conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure and asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

35

(aa)   The Q.A.M.A. conspirators as a furtherance of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work of Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of the Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the conspirators to be false.

(bb)   By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer, the conspirators affirmatively misrepresented to the public and concealed from the public the extend of risks associated with inhalation of asbestos fibers.

(cc)   In furtherance of the ongoing 1929 conspiracy, in approximately 1958, these Q.A.M.A. conspirators publicized the fraudulently edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

(dd)   The Fraudulent misrepresentations beginning in 1929 as elaborated above, and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for asbestos exposure. The developers of such standards failed to lower the maximum exposure limits because a cancer risk, associated with asbestos inhalation, had not been proven.

(ee)   In furtherance of the foregoing conspiracy, in 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of Mount Sinai Research Center. Thereafter, these members of the ATI embarked on a campaign to further misrepresent the association between asbestos exposure and lung cancer.

(ff)   In furtherance of the 1929 conspiracy, in 1967, the Q.A.M.A. conspirators decided, at their trade association meeting, that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

(gg)   The following co-conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI); Raybestos-Manhattan, Johns-Manville, H. K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall (T&N ), and National Gypsum,

36

Uniroyal, Inc., individually, and through its alter-egos, CDU Holdings Company, Uniroyal Holding Company and Uniroyal Goodrich Tire Company.

(hh)    All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos-Manhattan, Lanza, and MET LIFE, and all the alleged co-conspirators during the dates and circumstances set forth above, acted as agents and co-conspirators for the other conspirators.

(ii)    As evidence of Raybestos-Manhattan's fraud, concealment, suppression, and conspiratorial misconduct and of the referenced conspirators, and each of them, as herein set forth, Raymark-Manhattan's President and/or other senior executives corresponded with other senior executives of Raymark-Manhattan's co-conspirators, which series of correspondence and related documents and papers are commonly referenced as "The Sumner Simpson Papers."

(jj)    Further, as evidence of the fraud, concealment, suppression, and conspiratorial misconduct of the members of the ATI as herein set forth, the ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions, resolutions, and related actions, recorded in "The ATI Minutes." MET LIFE was an active participant in the foregoing conspiracy and benefited thereby. MET LIFE benefited from their involvement because of the following non-exclusive list:

(1)    By providing workers' compensation insurance to the co-conspirators;

(2)    By providing life insurance for employees of the co-conspirators;

(3)    By providing health insurance or health care for the employees of the co-conspirators;

(4)    By providing health information and resources;

(5)    By purchasing substantial stock in asbestos-related companies, including stock of co-conspirators; and

(6)    by developing information by which asbestos-related claims for compensation could be defeated.

76.    The acts of the conspirators as described above, constitute fraudulent concealment, which caused injury to the Plaintiff, in the following manner (the list is not exclusive):

(a)    The material published or caused to be published by the conspirators was false and

37

incomplete in that the conspirators knowingly and deliberately deleted, concealed, and otherwise suppressed references to and material facts regarding the known health hazards of asbestos and asbestos-related products.

(b)     The conspirators, with intent to defraud, individually, as members of a conspiracy, and as agents of other conspirators, intended that the publication of false and misleading response to the general public and individuals therein, and/or the intentional suppression and non-disclosure of documented reports of health hazards of asbestos:

(1)     Maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)     Assist in the continued pecuniary gain of conspirators through the sale of their products;

(3)     Influence in the conspirators favor proposed legislation to regulate asbestos exposure; and;

(4)     Provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)     The conspirators individually, as members of a conspiracy, and as agents of other conspirators, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control.   The conspirators knowingly and intentionally breached this duty through their fraudulent concealment as described herein.

(d)     Plaintiff and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products and in the absence of published medical and scientific reports of the hazards of asbestos and continued exposure to asbestos.  Plaintiff believed asbestos to be safe and were unaware of the hazards due to conspiratorial and fraudulent conduct.  Plaintiff was not warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent concealment.  If Plaintiff had known of the health hazards of asbestos, of which Plaintiff was unaware as a direct result of the conspirators' fraudulent concealment, Plaintiff would have acted differently regarding Plaintiff JOHN THOMPSON's exposure to asbestos and asbestos-related products.

(e)     Conspirators, individually, as members of a conspiracy, and as agents of other

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

conspirators, intended that Plaintiff relied on the deceptive and fraudulent reports that the conspiracy caused to be published throughout the United States regarding the safety of asbestos and asbestos-related products; and to rely on the absence of published medical and scientific data (because of the conspiracy's concealment) regarding the hazards of asbestos and asbestos-related products and thereby caused Plaintiff and others to continue their exposure to asbestos products.

(f)     Conspirators individually, as members of a conspiracy, and as agents of other co-conspirators, were and are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff reasonably relied (both directly and indirectly) on the published reports commissioned by MET LIFE regarding the health hazards of asbestos and the absence of published information (because of the suppression by the conspiracy) regarding the hazards of asbestos and asbestos-related products.

(g)     As a direct result of the continuing and on-going conduct of the conspirators as alleged herein, Plaintiff JOHN THOMPSON contracted asbestos-related disease and suffered injuries and incurred damages, which are described in greater detail in the foregoing paragraphs.

77.     MET LIFE acted in concert with the foregoing described parties (the conspirators) and pursuant to a common design, as previously described, to cause injury to Plaintiff.

78.     MET LIFE knew that the conduct of Johns-Manville, Raybestos-Manhattan), USG, American Brakeblok Corporation (now Pneumo Abex), Keasbey-Mattison Company (now T&N ), and the other conspirators was coercive, fraudulent, and deceitful towards others (including Plaintiff) and that conspirators' conduct was a breach of duty owed Plaintiff; and MET LIFE gave substantial assistance and encouragement to Johns-Manville and the other conspirators in breaching their duties to Plaintiff and others.

79.     MET LIFE provided substantial assistance to the foregoing conspirators in accomplishing their tortious result and their breach of duties to Plaintiff and others.

80.     Plaintiff JOHN THOMPSONwas insured, directly or indirectly, by MET LIFE and as such was owed a fiduciary duty by MET LIFE, which duty was breached by its foregoing conduct and conspiracy which thereby caused Plaintiff RICHARD W. CUNNINGHAM's asbestos-related injuries.

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

81.     The conspirators made representations to Plaintiff and others concerning asbestos-containing products including, but not limited to:

(a)     The statements set forth and summarized in the foregoing paragraphs;

(b)     That asbestos in commercially used insulation products was not hazardous (this statement was known false by the conspirators);

(c)     The amount of asbestos in the air necessary to cause disease was five million particles per cubic foot (this statement was known to be false by the conspirators);

(d)     That asbestos does not cause cancer (this statement was known to be false by the conspirators); and

(e)     In addition, the conspirators actively and fraudulently concealed facts from the Plaintiff and others, including, but not limited to:

(1)     That asbestos-related disease could be a fatal disease;

(2)     That asbestos causes various forms of lung cancer;

(3)     That individuals should protect themselves from breathing asbestos dust;

(4)     The extent of asbestos disease in exposed populations;

(5)     Information regarding the levels of airborne asbestos which can cause disease;

(6)     Experience with workers compensation claims related to asbestos exposure; and

(7)     The statements set forth in the foregoing paragraphs.

82.     Further, the conspirators knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health effects of asbestos including the facts set forth above; the conspirators made the false statements and concealed the information with the intent to deceive; Plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from the fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

83.     The asbestos-containing products that conspirators manufactured, marketed, distributed, sold and otherwise supplied were defective; Plaintiff was exposed to asbestos from the conspirators' products, which caused his asbestos-related injuries as more fully set forth in the foregoing

40

paragraphs.

84.     Additionally and alternatively, as a direct and proximate result of MET LIFE'S actions and omissions, Plaintiff JOHN THOMPSONwas caused to remain ignorant of all the dangers of asbestos resulting in Plaintiff, his agents, his employers, and the general public to be unaware of the true and full dangers of asbestos; depriving Plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos; and denying Plaintiff the opportunity to take precautions against the dangers of asbestos; and caused Plaintiff's damages herein.

85.     As a direct and proximate result of the actions and conduct outlined herein, Plaintiff has suffered the injuries and damages alleged herein.


WHEREFORE, Plaintiff prays for judgment against defendants, their "alternate entities", and each of them, as hereinafter set forth.


## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/NEGLIGENT MISREPRESENTATION, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, , PNEUMO ABEX CORPORATION, OWENS ILLINOIS INC., DOES 301-450, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

86.     Plaintiff, by this reference, incorporates and makes a part hereof each and every allegation of the First through Seventh Causes of Action as though fully set forth herein.

87.     The acts of the conspirators, as incorporated herein and described above, constitute fraudulent negligent misrepresentation, which caused injury to the Plaintiff, in the following manner:

(a)     The material published or caused to be published by the conspirators was false, untrue, and incomplete in that the conspirators knowingly, deliberately, and with intent to deceive, made representations, product sales and assertions regarding the safety of asbestos and asbestos-related products.

(b)     The conspirators made these false, untrue and incomplete representations without any reasonable grounds for believing and/or relying on their truth; and with the intent to induce the general consuming public and individuals therein, including Plaintiff and others' direct and indirect reliance on these false, untrue, and incomplete representations.

(c)     Plaintiff and others reasonably, justifiably, and without knowledge of the falsity of the conspirators' misrepresentations, relied, both directly and indirectly, upon published data documenting the purported safety of asbestos and asbestos-related products and in the absence of published information of the hazards of asbestos and cautionary warning language on or with said conspirators' product, all resulting in continued injurious exposure to asbestos.  Plaintiff was unaware of the hazards due to MET LIFE's conduct.

88. As a direct and proximate result of the actions and conduct outlined herein, Plaintiffs has has suffered the injuries and damages as alleged herein.

WHEREFORE, Plaintiff prays for judgment against defendants, their "alternate entities", and each of them, as hereinafter set forth.

## NINTH CAUSE OF ACTION
### (Negligence - Clutch & Brake Components)

AS AND FOR A FURTHER, NINTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (NEGLIGENCE) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFF JOHN THOMPSON COMPLAINS OF DEFENDANTS AUTOZONE, INC., AUTOZONE WEST INC., CSK AUTO INC., DANA COMPANIES LLC, FORD MOTOR COMPANY, GENUINE PARTS COMPANY, THE GOODYEAR TIRE AND RUBBER COMPANY, HONEYWELL INTERNATIONAL INC., PNEUMO ABEX CORPORATION, AND DOES 450–500, AND ALLEGES AS FOLLOWS:

89. Plaintiff, by this reference, incorporates the allegations contained in the First (Negligence) Cause of Action as though fully set forth herein.

90. DEFENDANTS FORD MOTOR COMPANY, HONEYWELL INTERNATIONAL INC. individually and as successor in interest, parent, alter ego and/or equitable trustee of ALLIED SIGNAL, INC., individually and as successor in interest, parent, alter ego and/or equitable trustee of BENDIX CORPORATION, PNEUMO-ABEX CORPORATION and DOES 150-

42



175, manufactured or supplied defective clutch components and brake assemblies or mechanisms which were incorporated into various makes and models of automobiles, trucks and vehicles manufactured, sold or supplied by said defendants. Said clutch components and brake assemblies or mechanisms were negligently manufactured sold or supplied in that:

a)      The design of said clutch components and brake assemblies or mechanisms incorporated the use of asbestos-containing clutch facings/plates and brake linings;

b)      Asbestos clutch components brake linings wear and/or deteriorate during regular and ordinary use thus creating friable asbestos dust, which accumulates in the clutch brake assemblies and/or mechanisms;

c)      The design of said clutch components brake assemblies require as a part of their normal operation, use and maintenance that the asbestos clutch components and brake linings be removed and replaced;

d)      Said defendants required the use of asbestos-containing clutch components and brake linings throughout the time period 1940-1985;

e)      During the removal and replacement of asbestos-containing clutch components and brake linings, asbestos-containing dust was inherently generated because of the design of the clutch components and brake assemblies and/or mechanisms;

f)      Defendants knew or should have known that the asbestos-containing dust would be generated during the regular use and maintenance of the clutch components and brake assemblies, mechanisms and linings, and that such dust created an increased risk of asbestos disease for all users, consumers, or others who breathed said asbestos-containing dust;

g)      The defendants, and each of them, failed to warn and/or properly instruct users, consumers, or others of the asbestos-containing dust hazard which existed at the time of regular maintenance or replacement of asbestos clutch components and brake linings. Such

43

failure includes, but is not limited to:

        1)    Failure to place prominent and adequate warnings or instructions in and on the clutch components and brake pads and wheel drums;

        2)    Failure to place adequate warnings or instructions in the owners' manuals accompanying said automobiles, trucks and vehicles;

        3)    Failure to place adequate warnings or instructions on various repair manuals and instructions published by defendants; and

        4)    Failure to provide adequate information regarding the asbestos hazards associated with the regular use and maintenance of the clutch components and brake mechanisms, assemblies and/or linings.

91. The clutch components and brake assemblies, mechanisms and/or linings manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer would expect, even though they performed as designed.

92. Defendants' use and design of asbestos-containing clutch components and brake linings, both as original equipment and as replacement parts, created unreasonable inherent risks which outweighed the benefits of said use and/or design.

93. The dangers inherent in asbestos-containing clutch components and brake linings were unknown and unforeseeable to the plaintiff.

94. Plaintiff's exposure to asbestos-containing dust, which caused his injury, was from his use and maintenance of defendants' clutch components and brake mechanisms, assemblies and/or linings. Said work produced the release of asbestos dust, which plaintiff inhaled, thus increasing his risk for all asbestos-related disease.

95. Defendants' negligence and defective products as described in this cause of action were a direct cause of plaintiff's injuries, and the injuries and damages thereby sustained by plaintiffs.

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

96. Nothing hereinabove claimed seeks to impose liability on the defendants named in this cause of action for the products or actions of any third party that may have supplied replacement brake linings used in the hereinabove described brake assemblies.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

## TENTH CAUSE OF ACTION
### (Strict Liability - Clutch & Brake Components)

AS AND FOR A FURTHER, TENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (STRICT LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFF JOHN THOMPSON COMPLAINS OF DEFENDANTS AUTOZONE, INC., AUTOZONE WEST INC., CSK AUTO INC., DANA COMPANIES LLC, FORD MOTOR COMPANY, GENUINE PARTS COMPANY, THE GOODYEAR TIRE AND RUBBER COMPANY, HONEYWELL INTERNATIONAL INC., PNEUMO ABEX CORPORATION, AND DOES 450–500, AND ALLEGES AS FOLLOWS:

97. Plaintiff, by this reference, incorporates the allegations contained in the Second (Strict Liability) and Ninth (Negligence-Clutch & Brake Components) Causes of Action as though fully set forth herein, excepting therefrom allegations of negligence.

98. Defendants' defective products as described in this cause of action did not perform as safely as an ordinary consumer would have expected at the time of plaintiff's use.

99. Defendants' defective products as described in this cause of action were used in a manner foreseeable by defendants.

100. The gravity of the potential harm resulting from the use of defendants' defective products as described in this cause of action, and the likelihood such harm would occur, outweighed the cost of feasible alternative designs, including providing adequate warning of such potential harm, including asbestos-related disease.

101. Defendants' conduct and defective products as described in this cause of action were a direct cause of plaintiff's injuries, and the injuries and damages thereby sustained by plaintiffs.

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

1     102.   Nothing hereinabove claimed seeks to impose liability on the defendants named

2     in this cause of action for the products or actions of any third party that may have supplied

3     replacement brake linings used in the hereinabove described brake assemblies.

4         WHEREFORE. plaintiff prays judgment against defendants. their "alternate entities," and each

5     of them. as hereinafter set forth.

6

7     Plaintiff JOHN THOMPSON:

8         1.    For plaintiff's general damages according to proof:

9         2.    For plaintiff's loss of income. wages. and earning potential according to proof:

10        3.    For plaintiff's medical and related expenses according to proof:

11    Plaintiff BERTHA THOMPSON:

12        4.    For plaintiff's damages for loss of consortium and/or society according to proof:

13

14    Plaintiffs JOHN THOMPSON and BERTHA THOMPSON:

15        5.    For plaintiffs' cost of suit herein:

16        6.    For exemplary and punitive damages according to proof:

17        For such other and further relief as the Court may deem just and proper. including costs and

18    prejudgment interest as provided in C.C.P. section 998. C.C.P. section 1032. and related provisions of

19    law.

20    DATED: April 14. 2011                         LAW OFFICE OF MARC I. WILLICK

21

22                                                  By: _____

23                                                      Marc I. Willick
                                                        Attorneys for Plaintiffs
24

25

26

27

28

1

2

## DEMAND FOR JURY TRIAL

3

Plaintiffs hereby demand trial by jury as to all issues so triable.

4

DATED: April 14, 2011                                    LAW OFFICE OF MARC I. WILLICK

5

6

By: _____

7                                                             Marc I. Willick

8                                                             Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

47

EXHIBIT "A"

Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations, including, but not limited to, the locations within the state of California set forth below:

| Employer | Location of Exposure | Job Title | Exposure Date(s) |
|---|---|---|---|
| U.S. Navy | USS Nereus<br>USS George Clymer<br>PCFs | Seaman<br><br>Gunners Mate | 12 June 1964-<br>11 June 1968 |
| National Gypsum | Medicine Lodge, Kansas | Laborer /<br>Dockworker | Approx. 1969-<br>1970 |
| Sea World | San Diego, CA | Maintenance | Approx. 1970s |
| General Dynamics | San Diego, CA<br>Long Beach, CA (Douglas Aircraft) | Aircraft Assembler | 1979-1993 |
| Home Auto Repair | Various | N/A | Through 1979 |

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

1

## EXHIBIT "B"

2

3

4          Plaintiff JOHN THOMPSON'S exposure to asbestos and asbestos-containing products

5     caused severe and permanent injury to the Plaintiff including, but not limited to, breathing difficulties,

6     asbestosis, lung cancer, mesothelioma and/or other lung damage.  Plaintiff JOHN THOMPSON was

7     diagnosed with lung cancer on or about April 16, 2010.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERSONAL INJURY / LOSS OF CONSORTIUM - ASBESTOS

(AJWx), DISCOVERY, MANADR

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:11-cv-06226-PSG -AJW

| | |
|---|---|
| Thompson et al v. Autozone Inc et al | Date Filed: 07/28/2011 |
| Assigned to: Judge Philip S. Gutierrez | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Andrew J. Wistrich | Nature of Suit: 368 P.I. : Asbestos |
| Case in other court: Superior Court of CA for the County of Los Angeles, BC45967 | Jurisdiction: Federal Question |
| Cause: 28:1441 Notice of Removal - Asbestos Litigation | |

**Plaintiff**

**John Thompson**                     represented by   **Marc Ian Willick**
                                                       Attorney at Law
                                                       2361 Rosecrans Avenue Suite 450
                                                       El Segundo, CA 90245
                                                       310-536-1040
                                                       Fax: 310-496-0256
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bertha Thompson**                   represented by   **Marc Ian Willick**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Autozone Inc**
*sued individually and as successor-
interest to Chief Auto Party*

**Defendant**

**Autozone West Inc**

**Defendant**

**A W Chesterton Company**

**Defendant**

**BAE Systems San Diego Ship Repair
Inc**
*sued individually and as sii to
Northerwest Marine Inc
formerly known as*

Southwest Marine Inc

**Defendant**

**CSK Auto Inc**
*sued individually and as sii to Kragen*
*Auto Parts and sii to Checker Auto*
*Parts*

**Defendant**

**Dana Companies LLC**
*formerly known as*
Dana Corporation

**Defendant**

**Dexter-Hysol Aerospace Inc**

**Defendant**

**Dexter-Hysol Aerospace LLC**

**Defendant**

**Ford Motor Company**

**Defendant**

**Foster Wheeler Energy Corporation**        represented by    **Charles S Park**
                                                                Brydon Hugo and Parker
                                                                135 Main Street 20th Floor
                                                                San Francisco, CA 94105
                                                                415-808-0300
                                                                Fax: 415-808-0333
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Edward R Hugo**
                                                                Brydon Hugo and Parker
                                                                135 Main Street 20th Floor
                                                                San Francisco, CA 94105
                                                                415-808-0300
                                                                Fax: 415-808-0333
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Thomas Jeffrey Moses**
                                                                Brydon Hugo and Parker
                                                                135 Main Street 20th Floor
                                                                San Francisco, CA 94105
                                                                415-808-0300
                                                                Fax: 415-808-0333
                                                                Email: tmoses@bhplaw.com
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**General Electric Company**

<u>**Defendant**</u>

**Genuine Parts Company**
*individually*
*also known as*
NAPA Auto Parts

<u>**Defendant**</u>

**Georgia-Pacific Corporation**
*sued individually and as successor-*
*interest to Bestwall Gypsum Company*

<u>**Defendant**</u>

**Goodyear Tire and Rubber Company**

*The*

<u>**Defendant**</u>

**Honeywell International Inc**
*sued individually and*
*Successor*
Allied Signal Inc
*Successor*
Bendix Corporation

<u>**Defendant**</u>

**IMO Industries Inc**
*sued individually and as successor-*
*interest to DeLaval Steam Turbine Inc*

<u>**Defendant**</u>

**Ingersoll-Rand Company**

<u>**Defendant**</u>

**Kaiser Gypsum Company Inc**

<u>**Defendant**</u>

**M Slayen and Associates Inc**

<u>**Defendant**</u>

**Metalclad Insulation Corporation**

<u>**Defendant**</u>

**Metropolitan Life Insurance**
**Company**

<u>**Defendant**</u>

**Owens-Illinois Inc**

**Defendant**

**Pneumo-Abex Corporation**

**Defendant**

**Quintec Industries Inc**
*individually and as successor-interest*
*and by merger to Western Fibrous*
*Glass-Product Company*
*formerly known as*
Western Fiberglass Company

**Defendant**

**Rheem Manufacturing Company**

**Defendant**

**SYD Carpenter Marine Contractor Inc**

**Defendant**

**Flamemaster Corporation**
*The*

**Defendant**

**Trane U S Inc**
*formerly known as*
American Standard Inc

**Defendant**

**Union Carbide Corporation**

**Defendant**

**Velan Valve Corporation**

**Defendant**

**Viacom Inc**
*sued individually and successor by*
*merger to CBS Corporation*
*formerly known as*
Westinghouse Electric Corporation

**Defendant**

**Warren Pumps LLC**

**Defendant**

**Yarway Corporation**

**Defendant**

**Does**

*1-500 Inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/28/2011 | 1 | NOTICE OF REMOVAL from Superior Court for the CA for the County of Los Angeles, case number BC459657 with conformed filed copy of summons and complaint.Case assigned to Judge Philip S. Gutierrez, Discovery to Magistrate Judge Andrew J. Wistrich. (Filing fee $ 350 Paid. ), filed by Defendant Foster Wheeler Energy Corporation.(et) (Entered: 07/28/2011) |
| 07/28/2011 | 2 | DISCLOSURE STATEMENT AND CERTIFICATION as to interested parties filed by Defendant Foster Wheeler Energy Corporation. (et) (Entered: 07/28/2011) |
| 07/28/2011 | 3 | NOTICE of Related Case(s) filed by Defendant Foster Wheeler Energy Corporation. Related Case(s): CV 07-8338 VBF (RCx); CV 08-0118 R (JTLx) CV 08-0248 R (PLAx) see original documents for more details.] (et) (Entered: 07/28/2011) |
| 07/28/2011 | 4 | NOTICE OF TAG-ALONG ACTION filed by Defendant Foster Wheeler Energy Corporation. (et) (Entered: 07/28/2011) |
| 07/28/2011 | 5 | NOTICE TO PARTIES OF ADR PROGRAM filed. (et) (Entered: 07/28/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/29/2011 09:46:03 | | |
| PACER Login: sd0076 | Client Code: | 05045-148826 |
| Description: Docket Report | Search Criteria: | 2:11-cv-06226-PSG -AJW End date: 7/29/2011 |
| Billable Pages: 4 | Cost: | 0.32 |