1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

MDL Docket No. 875 – IN RE: Asbestos Product Liability Litigation (No. VI)

*Patti Donlon, Individually and as Successor-in-Interest to the Estate of Patrick Donlon, Decedent, Sean Donlon, and Does One through Ten, Inclusive  v. AC and S, Inc., et al.,*  N.D. California, C. A. No. 3:11-cv-03376-JSW

**EXHIBITS "A" THROUGH "O" TO THE DECLARATION OF STEVEN M. HAROWITZ IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-424) OR IN THE ALTERNATIVE TO CONTINUE CTO-424 PENDING A RULING ON PLAINTIFFS' MOTION TO REMAND IN THE DISTRICT COURT**

---

**EXHIBITS "A" – "O" TO THE DECLARATION OF STEVEN M. HAROWITZ IN SUPPORT OF
PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-424)**

PAGE 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

1   STEPHEN M. TIGERMAN (Bar No. 112127)
    STEVEN M. HAROWITZ (Bar No. 71117)
2   ROGER E. GOLD (Bar No. 214802)
    HAROWITZ & TIGERMAN, LLP
3   450 Sansome Street, 3rd Floor
    San Francisco, California 94111 CASE MANAGEMENT CONFERENCE SET
4   Telephone   (415) 788-1588

5   Attorneys for Plaintiffs      JUN 1 6 2010  -1³⁰PM

6

7                     DEPARTMENT 206

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10                               CGC-09-275218

11   PATTI DONLON, Individually and as Successor-in-   )  No.
    Interest to the Estate of PATRICK THEISEN DONLON,  )
12   Decedent; SEAN DONLON; and DOES ONE through   )  COMPLAINT FOR
    TEN, inclusive,                              )    DAMAGES

13           Plaintiffs,               )  (Wrongful Death)
                                  )  Negligence,
14       vs.                      )  Strict Liability, Products
                                  )  Liability for Clutch Components
15   AC AND S, INC.; ASBESTOS CORPORATION, LTD.;  )  and Brake Assemblies,
    A.W. CHESTERTON COMPANY; CROWN, CORK &  )  Enterprise Liability,
16   SEAL COMPANY, INC., Individually and as Successor-  )  False Representation,
    in-Interest to MUNDET CORK CORP.; GARLOCK   )  [Restatement Sec, 402-B],
17   SEALING TECHNOLOGIES LLC, Individually and as  )  Survival Action,
    Successor-in-Interest to GARLOCK, INC.; GENERAL  )  Loss of Consortium,
18   ELECTRIC COMPANY; J T THORPE & SON, INC.;  )  Punitive Damages
    METROPOLITAN LIFE INSURANCE COMPANY;   )
19   PARKER-HANNIFIN CORPORATION, as Successor-  )
    in-Interest to SACOMO SIERRA; OWENS-ILLINOIS  )
20   CORPORATION; QUINTEC INDUSTRIES, INC.;   )  (Asbestos)
    SOCO-LYNCH CORPORATION, successor-in-interest  )
21   to WESTERN CHEMICAL & MANUFACTURING   )
    COMPANY; SWINERTON BUILDERS f/k/a     )
22   SWINERTON & WALBERG CO.; THOMAS DEE   )
    ENGINEERING COMPANY; TRANE U.S, INC., fka  )
23   AMERICAN STANDARD, INC.; UNION CARBIDE   )
    CORPORATION; VIACOM, INCORPORATED, as     )  THIS CASE IS SUBJECT TO
24   successor-by-merger to CBS CORPORATION, fka   )  MANDATORY ELECTRONIC FILING
    WESTINGHOUSE ELECTRIC CORPORATION;     )  PURSUANT TO AMENDED G.O. 158
25   ALLIS-CHALMERS CORPORATION PRODUCT   )
    LIABILITY TRUST; BAYER CROPSCIENCE, INC.,  )
26   successor to AMCHEM PRODUCTS, INC.; ENPRO  )
    INDUSTRIES, INC., Individually and as Successor-in-  )
27   Interest to ANCHOR PACKING COMPANY;     )
    HOPEMAN BROTHERS, INC.; SB DECKING, INC.,  )
28   formerly known as SELBY, BATTERSBY &     )

    212N/complaint.wd

ENDORSED
F I L E D
San Francisco County Superior Court.

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY: ____ PARAM MATE
             Deputy Clerk

1  COMPANY; GEORGIA-PACIFIC CORPORATION;      )
   HAMILTON MATERIALS, INC.; HANSON          )
2  PERMANENTE CEMENT, INC. fka KAISER CEMENT)
   CORPORATION; KAISER GYPSUM CO., INC.;     )
3  KELLY-MOORE PAINT COMPANY, INC.; EATON    )
   AEROQUIP, LLC; PNEUMO-ABEX CORPORATION,   )
4  Successor-in-Interest to ABEX CORPORATION; )
   HONEYWELL INTERNATIONAL, INC. fka ALLIED  )
5  SIGNAL, INC./THE BENDIX CORPORATION; BORG-)
   WARNER CORPORATION by its Successor in Interest, )
6  BORGWARNER MORSE TEC, INC.;               )
   BRIDGESTONE/FIRESTONE NORTH AMERICAN      )
7  TIRE, LLC; DANA COMPANIES, LLC; GOODRICH  )
   CORPORATION; FEDERAL-MOGUL ASBESTOS       )
8  PERSONAL INJURY TRUST, as successor to FELT )
   PRODUCTS MANUFACTURING CO.; FORD MOTOR)
9  COMPANY; GENERAL MOTORS CORPORATION;      )
   INTERNATIONAL TRUCK AND ENGINE           )
10 CORPORATION; NAVISTAR, INC.; THE          )
   GOODYEAR TIRE & RUBBER COMPANY;           )
11 AIRCRAFT BRAKING SYSTEMS CORPORATION;     )
   MEGGITT AIRCRAFT BRAKING SYSTEMS;         )
12 PARKER-HANNIFIN CORPORATION, as Successor to )
   WS and CALI-BLOK; CURTISS-WRIGHT          )
13 CORPORATION; MCDONNELL DOUGLAS            )
   CORPORATION, Individually and Successor-in-Interest )
14 to DOUGLAS AIRCRAFT COMPANY, INC.; EATON  )
   CORPORATION; UNITED TECHNOLOGIES          )
15 CORPORATION, formerly known as PRATT &    )
   WHITNEY, INC.; PRATT & WHITNEY POWER      )
16 SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES,)
   INC.; and ELEVENTH DOE through THIRE      )
17 HUNDREDTH DOE, inclusive,                 )

18                                            )
                                             )
19              Defendants.                   )

20

21

22

23

24

25              FIRST CAUSE OF ACTION-NEGLIGENCE

26                   (Wrongful Death)

27     PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A

28 CAUSE OF ACTION FOR NEGLIGENCE (WRONGFUL DEATH) ALLEGE:

1     1.     The true names and capacities, whether individual, corporate, associate,

2 governmental or otherwise, of defendants ELEVENTH DOE through THREE HUNDREDTH

3 DOE, inclusive, are unknown to plaintiffs at this time, who therefore sue said defendants by such

4 fictitious names. When the true names and capacities of said defendants have been ascertained,

5 plaintiffs will amend this Complaint accordingly. Plaintiffs are informed and believe and thereon

6 allege that each defendant designated herein as a DOE is responsible, negligently or in some other

7 actionable manner, for the events and happenings hereinafter referred to, and caused injury and

8 death to decedent and injuries and damages proximately thereby to the plaintiffs, as hereinafter

9 alleged.

10     2.     At all times herein mentioned, each of the defendants was the agent, servant,

11 employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

12 defendant was acting in the full course and scope of said agency, service, employment and/or joint

13 venture. Except as may be specifically noted herein, all allegations of this Complaint are made on

14 information and belief.

15     3.     Plaintiffs are informed and believe, and thereon allege, that at all times herein

16 mentioned, defendants AC AND S, INC.; ASBESTOS CORPORATION, LTD.; A.W.

17 CHESTERTON COMPANY; CROWN, CORK & SEAL COMPANY, INC., Individually and as

18 Successor-in-Interest to MUNDET CORK CORP.; GARLOCK SEALING TECHNOLOGIES LLC,

19 Individually and as Successor-in-Interest to GARLOCK, INC.; GENERAL ELECTRIC

20 COMPANY; J T THORPE & SON, INC.; METROPOLITAN LIFE INSURANCE COMPANY;

21 PARKER-HANNIFIN CORPORATION, as Successor-in-Interest to SACOMO SIERRA;

22 OWENS-ILLINOIS CORPORATION; QUINTEC INDUSTRIES, INC.; SOCO-LYNCH

23 CORPORATION, successor-in-interest to WESTERN CHEMICAL & MANUFACTURING

24 COMPANY; SWINERTON BUILDERS f/k/a SWINERTON & WALBERG CO.; THOMAS DEE

25 ENGINEERING COMPANY; TRANE U.S. INC., fka AMERICAN STANDARD, INC.; UNION

26 CARBIDE CORPORATION; VIACOM, INCORPORATED, as successor-by-merger to CBS

27 CORPORATION, fka WESTINGHOUSE ELECTRIC CORPORATION; ALLIS-CHALMERS

28 CORPORATION PRODUCT LIABILITY TRUST; BAYER CROPSCIENCE, INC., successor to

---

2129\complaint.wd               3                       COMPLAINT FOR DAMAGES
                                                                WRONGFUL DEATH - ASBESTOS

1  AMCHEM PRODUCTS, INC.; ENPRO INDUSTRIES, INC., Individually and as Successor-in-
2  Interest to ANCHOR PACKING COMPANY; HOPEMAN BROTHERS, INC.; SB DECKING,
3  INC., formerly known as SELBY, BATTERSBY & COMPANY; GEORGIA-PACIFIC
4  CORPORATION; HAMILTON MATERIALS, INC.; HANSON PERMANENTE CEMENT, INC.
5  fka KAISER CEMENT CORPORATION; KAISER GYPSUM CO., INC.; KELLY-MOORE
6  PAINT COMPANY, INC.; EATON AEROQUIP, LLC; PNEUMO-ABEX CORPORATION,
7  Successor-in-Interest to ABEX CORPORATION; HONEYWELL INTERNATIONAL, INC. fka
8  ALLIED SIGNAL, INC./THE BENDIX CORPORATION; BORG-WARNER CORPORATION by
9  its Successor in Interest, BORGWARNER MORSE TEC, INC.; BRIDGESTONE/FIRESTONE
10 NORTH AMERICAN TIRE, LLC; DANA COMPANIES, LLC; GOODRICH CORPORATION;
11 FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST, as successor to FELT
12 PRODUCTS MANUFACTURING CO.; FORD MOTOR COMPANY; GENERAL MOTORS
13 CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,
14 INC.; THE GOODYEAR TIRE & RUBBER COMPANY; AIRCRAFT BRAKING SYSTEMS
15 CORPORATION; MEGGITT AIRCRAFT BRAKING SYSTEMS; PARKER-HANNIFIN
16 CORPORATION, as Successor to EIS and CALL-BLOK; CURTISS-WRIGHT CORPORATION;
17 MCDONNELL DOUGLAS CORPORATION, Individually and Successor-in-Interest to
18 DOUGLAS AIRCRAFT COMPANY, INC.; EATON CORPORATION; UNITED
19 TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC.; PRATT &
20 WHITNEY POWER SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES, INC.; and
21 ELEVENTH DOE through THREE HUNDREDTH DOE, inclusive, are corporations organized and
22 existing under and by virtue of the laws of the State of California, or the laws of some state or
23 foreign jurisdiction, and that said defendants were and are authorized to do and are doing business
24 in the State of California, and that said defendants have regularly conducted business in the City and
25 County of San Francisco, State of California. The defendants identified in this paragraph are
26 hereinafter referred to as "**MANUFACTURING/DISTRIBUTING DEFENDANTS**".
27      4.      At all times herein mentioned, defendants, and each of them, were and are engaged
28 in the business of manufacturing, fabricating, designing, assembling, distributing, leasing, buying,

1   selling, inspecting, servicing, repairing, marketing, warranting and advertising a certain substance,

2   the generic name of which is asbestos, and other products containing said substance.

3       5.    Plaintiffs are informed and believe, and thereon allege, that defendant CROWN,

4   CORK & SEAL COMPANY, INC. is the successor in interest to, or otherwise liable for the acts or

5   omissions of MUNDET CORK CORP.; that defendant GARLOCK SEALING TECHNOLOGIES

6   LLC  is the successor in interest to, or otherwise liable for the acts or omissions of GARLOCK,

7   INC.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

8   otherwise liable for the acts or omissions of SACOMO SIERRA;  that defendant QUINTEC

9   INDUSTRIES, INC. is the successor in interest to, or otherwise liable for the acts or omissions of

10   WESTERN FIBERGLAS SUPPLY COMPANY, WESTERN FIBROUS GLASS PRODUCTS

11   COMPANY and/or WESGLAS; that defendant SOCO-LYNCH CORPORATION  is the successor

12   in interest to, or otherwise liable for the acts or omissions of WESTERN CHEMICAL &

13   MANUFACTURING COMPANY; that defendant BAYER CROPSCIENCE, INC.  is the successor

14   in interest to, or otherwise liable for the acts or omissions of AMCHEM PRODUCTS, INC.; that

15   defendant ENPRO INDUSTRIES, INC.  is the successor in interest to, or otherwise liable for the

16   acts or omissions of ANCHOR PACKING COMPANY; that defendant PNEUMO-ABEX

17   CORPORATION  is the successor in interest to, or otherwise liable for the acts or omissions of

18   ABEX CORPORATION; that defendant BORG-WARNER CORPORATION  is the successor in

19   interest to, or otherwise liable for the acts or omissions of BORGWARNER MORSE TEC, INC.;

20   that defendant FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST  is the successor in

21   interest to, or otherwise liable for the acts or omissions of FELT PRODUCTS MANUFACTURING

22   CO.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

23   otherwise liable for the acts or omissions of EIS and CALI-BLOK; that defendant MCDONNELL

24   DOUGLAS CORPORATION  is the successor in interest to, or otherwise liable for the acts or

25   omissions of DOUGLAS AIRCRAFT COMPANY, INC.; and that each of the defendants in this

26   paragraph and listed as a successor elsewhere in this complaint, including the caption, is liable for

27   the acts and omissions of its predecessor entities, partners, divisions, related entities, subsidiaries,

28   and co-ventures.

6.     At all times herein mentioned, defendants, and each of them, singularly and jointly, negligently and carelessly researched, tested or failed to test, warned or failed to warn, manufactured, designed, developed, distributed, labeled, advertised, marketed, warranted, inspected, repaired, fabricated, modified, serviced, and sold a certain substance, the generic name of which is asbestos, and other products containing said substance, in that said substance was capable of causing and did, in fact, proximately cause personal injuries to users, consumers, workers and others, while being used in a manner reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by the consumers, users, bystanders, or workers exposed thereto.

7.     Plaintiffs' decedent was a worker who for a substantial length of time used, handled or was otherwise exposed to asbestos and asbestos products referred to herein, in a manner that was reasonably foreseeable.

8.     As a direct and proximate result of the conduct of the defendants, and each of them, as aforesaid, the exposure to asbestos caused plaintiffs' decedent to contract mesothelioma from which he died on May 27, 2008.

9.     Plaintiff did not learn of the causal relationship between decedent's exposure to asbestos and his death until less than one year before the date on which this Complaint was filed.

10.     Plaintiffs were the heirs of PATRICK THEISEN DONLON, deceased, (herein referred to as "decedent"), as follows:

PATTI DONLON     -     SPOUSE

SEAN DONLON     -     SON

11.     As a result of the conduct of defendants, and each of them, decedent's heirs have sustained pecuniary loss resulting from the loss of love, comfort, society, attention, services and support of decedent in a sum in invoking the unlimited jurisdictional limits of the Court.

12.     As a further result of the conduct of defendants, and each of them, and the death of decedent, plaintiffs herein have incurred funeral and burial expenses in an amount to be subsequently ascertained.

13.     For purposes of the claims alleged herein, the Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship

1  due to the presence of a California defendant.  Removal is improper.  Every claim arising under the

2  Constitution, treaties, or law of the United States is expressly disclaimed, including any claim

3  arising from an act or omission on a federal enclave, or of any Officer of the U.S. or any agency or

4  person acting under him occurring under color of such of office.  No claim of admiralty or maritime

5  law is raised.  Plaintiffs sue no foreign state or agency.  By this allegation, plaintiffs are not

6  disclaiming State law claims arising exposures on Federal enclaves.  Plaintiffs are only disclaiming

7  claims which would be directed at the Federal government and/or Federal officers.  Venue is proper

8  in the City and County of San Francisco.  Plaintiff shall seek sanctions, attorneys' fees and other

9  appropriate relief in the event any defendant moves to transfer and/or remove this action to another

10 court without a reasonable period of meet and confer discussion relating to same prior to notice of

11 removal and or transfer of this action.

12      WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

13      <u>SECOND CAUSE OF ACTION – STRICT LIABILITY</u>

14      AS FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION

15 FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF

16 THEM, AND ALLEGE AS FOLLOWS:

17      14.    Plaintiffs incorporate herein by reference as though fully set forth herein all

18 paragraphs of the First Cause of Action herein.

19      15.    Defendants and each of them researched, manufactured, tested or failed to test,

20 warned or failed to warn, designed, labeled, distributed, advertised, marketed, warranted, inspected,

21 repaired, offered for sale and sold a certain substance, the generic name of which is asbestos and

22 other products contained said substance, which substance and product is defective, in that same was

23 capable of causing and did, in fact, cause personal injuries, including, but not limited to

24 mesothelioma, to the users and consumers thereof while being used in a reasonably foreseeable

25 manner, thereby rendering the same unsafe and dangerous for use by consumers, users, bystanders

26 and workers exposed thereto; said defendants, and each of them, further failed to adequately warn of

27 the risks to which decedent and others similarly situated were exposed.

28      16.    As a direct and proximate result thereof, decedent suffered the injuries from which

1   he subsequently died, and plaintiffs have suffered the injuries and damages previously alleged.

2       WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

3       THIRD CAUSE OF ACTION - PRODUCTS LIABILITY (NEGLIGENCE AND STRICT

4       LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES,

5       MECHANISMS AND LININGS

6       AS AND FOR A THIRD, SEPARATE, AND FURTHER DISTINCT CAUSE OF ACTION

7   FOR PRODUCTS LIABILITY (NEGLIGENCE AND STRICT LIABILITY) FOR CLUTCH

8   COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS

9   COMPLAIN OF DEFENDANTS FORD MOTOR COMPANY; GENERAL MOTORS

10  CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,

11  INC.; and TWO HUNDRED FIRST DOE through THREE HUNDREDTH DOE, inclusive, and

12  ALLEGE AS FOLLOWS:

13      17.     Plaintiff, by this reference, incorporates the allegations contained in the First and

14  Second Causes of Action as though fully set forth herein.

15      18.     FORD MOTOR COMPANY; GENERAL MOTORS CORPORATION;

16  INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR, INC.; and TWO

17  HUNDRED FIRST DOE through THREE HUNDREDTH DOE, inclusive, manufactured or

18  supplied defective clutch components and brake assemblies or mechanisms which were

19  incorporated into various makes and models of automobiles, trucks and vehicles manufactured, sold

20  or supplied by said defendants.  Said clutch components and brake assemblies or mechanisms were

21  negligently manufactured sold or supplied in that:

22      a)     The design of said clutch components and brake assemblies or mechanisms

23  incorporated the use of asbestos-containing clutch facings/plates and brake linings;

24      b)     Asbestos clutch components brake linings wear and/or deteriorate during regular

25  and ordinary use thus creating friable asbestos dust, which accumulates in the clutch brake

26  assemblies and/or mechanisms;

27      c)     The design of said clutch components brake assemblies require as a part of their

28  normal operation, use and maintenance that the asbestos clutch components and brake linings be

1  removed and replaced;

2      d)   Said defendants required the use of asbestos-containing clutch components and

3  brake linings throughout the time period 1940-1985;

4      e)   During the removal and replacement of asbestos-containing clutch components and

5  brake linings, asbestos-containing dust was inherently generated because of the design of the clutch

6  components and brake assemblies and/or mechanisms;

7      f)   Defendants knew or should have known that the asbestos-containing dust would be

8  generated during the regular use and maintenance of the clutch components and brake assemblies,

9  mechanisms and linings, and that such dust created an increased risk of asbestos disease for all

10  users, consumers, or others who breathed said asbestos-containing dust;

11      g)   The defendants, and each of them, failed to warn and/or properly instruct users,

12  consumers, or others of the asbestos-containing dust hazard which existed at the time of regular

13  maintenance or replacement of asbestos clutch components and brake linings.  Such failure

14  includes, but is not limited to:

15          a.   Failure to place prominent and adequate warnings or instructions in and on

16  the clutch components and brake pads and wheel drums;

17          b.   Failure to place adequate warnings or instructions in the owners' manuals

18  accompanying said automobiles, trucks and vehicles; and

19          c.   Failure to place adequate warnings or instructions on various repair manuals

20  and instructions published by defendants; and

21          d.   Failure to provide adequate information regarding the asbestos hazards

22  associated with the regular use and maintenance of the clutch components and brake mechanisms,

23  assemblies and/or linings.

24      19.   The clutch components and brake assemblies, mechanisms and/or linings

25  manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer

26  would expect, even though they performed as designed.

27      20.   Defendants' use and design of asbestos-containing clutch components and brake

28  linings, both as original equipment and as replacement parts, created unreasonable inherent risks

1 which outweighed the benefits of said use and/or design.

2     21.   The dangers inherent in asbestos-containing clutch components and brake linings were

3 unknown and unforeseeable to the decedent.

4     22.   Decedent's exposure to asbestos-containing dust, which caused his injury, was from

5 his use and maintenance of defendants' clutch components and brake mechanisms, assemblies

6 and/or linings. Said work produced the release of asbestos dust, which decedent inhaled, thus

7 increasing his risk for all asbestos-related disease.

8     23.   Defendants' negligence and defective products as described in this cause of action

9 were a direct cause of decedent's injuries, and the injuries and damages thereby sustained by

10 plaintiffs.

11     <u>FOURTH CAUSE OF ACTION - ENTERPRISE LIABILITY</u>

12     AS AND FOR A FOURTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF

13 ACTION FOR ENTERPRISE LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND

14 EACH OF THEM, AND ALLEGE AS FOLLOWS:

15     24.   Plaintiff incorporates by reference as though fully set forth herein, each of the

16 paragraphs of the First, Second and Third Causes of Action herein.

17     25.   In the event plaintiffs are unable to identify the specific defendant(s) which supplied

18 the asbestos or asbestos-containing products which caused the damage referred to above, plaintiffs

19 allege that as between an innocent plaintiff and culpable defendant(s), the latter should bear the cost

20 of injury.

21     26.   Plaintiffs' decedent was exposed to asbestos and asbestos emanating from asbestos-

22 containing products which are and were fungible in appearance as well as in composition and which

23 were used in substantially the same manner by plaintiff's decedent and/or those working in the

24 vicinity of plaintiffs' decedent. Moreover, through no fault of the plaintiffs, this asbestos and/or

25 these asbestos-containing products cannot be traced to a specific producer.

26     27.   In this action, plaintiffs have joined a substantial share of the producers of such

27 asbestos and/or asbestos-containing products which caused the injuries complained of herein, and

28 will prove at the time of trial that the defendants named herein constituted a substantial share of

1   such producers. Accordingly, liability attaches to each named defendant to the extent of their

2   percentage of market share, in a manner consistent with the rules set forth in the decision of <u>Sindell</u>

3   <u>v. Abbott Laboratories, et al.</u>

4      28.    As a direct and legal result thereof, plaintiffs have suffered the injuries and damages

5   previously alleged.

6      WHEREFORE, Plaintiffs pray judgment against the defendants, and each of them, as

7   hereinafter set forth.

8           FIFTH CAUSE OF ACTION - FALSE REPRESENTATION

9            <u>UNDER RESTATEMENT OF TORTS Sec. 402-B</u>

10      AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF ACTION

11   FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B,

12   PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND ALLEGE AS

13   FOLLOWS:

14      29.    Plaintiffs incorporate by reference all Causes of Action of this Complaint.

15      30.    At the aforementioned time when defendants, and each of them, researched,

16   manufactured, tested or failed to test, warned or failed to warn, designed, labeled, distributed,

17   advertised, marketed, warranted, inspected, repaired, offered for sale and sold the said asbestos and

18   asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly

19   and impliedly represented to members of the general public, including the purchasers and users of

20   said product, and including the decedent herein and his employers, that asbestos and asbestos-

21   containing products were of merchantable quality, and safe for the use for which they were

22   intended.

23      31.    The purchasers and users of said asbestos and asbestos-containing products,

24   including the decedent and his employer, relied upon said representations of defendants and each of

25   them, in the selection, purchase and use of asbestos and asbestos-containing products.

26      32.    Said representations by defendants, and each of them, were false and untrue, in that

27   the asbestos and asbestos-containing products were not safe for their intended use, nor were they of

28   unmerchantable quality as represented by defendants, and each of them, in that asbestos and asbestos

containing products have very dangerous properties and defects whereby said products cause mesothelioma, and have other defects that cause injury and damage to the users of said products, including decedent herein, thereby taking the life of plaintiffs' decedent.

33.    As a direct and proximate result of said false representations by defendants and each of them, the plaintiffs sustained the injuries and damages hereinabove set forth.

WHEREFORE, plaintiffs pray judgment against defendants, and each of them, as hereinafter set forth.

### SIXTH CAUSE OF ACTION - SURVIVAL ACTION

AS AND FOR A SIXTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION (SURVIVAL ACTION), PLAINTIFF PATTI DONLON AS SUCCESSOR-IN-INTEREST TO THE ESTATE OF PATRICK THEISEN DONLON COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A CAUSE OF ACTION ALLEGE:

34.    Plaintiff incorporates by reference herein each and every paragraph of all Causes of Action of this Complaint, and make them a part of this, the Sixth Cause of Action, as though fully set forth herein.

35.    Prior to his death, decedent PATRICK THEISEN DONLON had a cause of action against defendants herein for personal injuries arising from his exposure to asbestos. On May 27, 2008, with the foregoing cause of action still pending, PATRICK THEISEN DONLON, who would have been the plaintiff in this action if he had lived, died.

36.    As a proximate result of the conduct of defendants, and each of them, decedent was required to, and did, employ physicians and surgeons to examine, treat and care for him and did incur medical and incidental expenses in a sum to be subsequently determined.

37.    As a further, direct and proximate result of the conduct of defendants, and each of them, decedent was prevented from attending to his usual occupation for a period of time and thereby incurred damages for loss of earnings in a sum to be subsequently determined.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as hereinafter set forth.

### SEVENTH CAUSE OF ACTION - PUNITIVE DAMAGES

AS FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION
FOR PUNITIVE DAMAGES, PLAINTIFFS COMPLAIN OF ALL DEFENDANTS, INCLUSIVE,
AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

38.    Plaintiffs incorporate by reference each and every paragraph of all Causes of Action
of this Complaint, and make them a part of this Seventh Cause of Action as though fully set forth
herein.

39.    In researching, testing, manufacturing, distributing, labeling, and marketing asbestos
and asbestos products, defendants in this cause of action named, and each of them, did so with
conscious disregard for the safety of the users of said asbestos and asbestos products, in that
defendants has specific prior knowledge that there was a high risk of injury or death resulting from
exposure to asbestos or asbestos products, including but not limited to, mesothelioma.  Said
knowledge was obtained, in part, from scientific studies, government data, and medical data to
which defendants had access, as well as scientific studies performed by, at the request of, or with
the assistance of, said defendants, and which knowledge was obtained by said defendants on or
before 1933, and thereafter.

40.    On or before 1933, and thereafter, said defendants were aware that users of asbestos
and asbestos products, as well as members of the general public who would be exposed to asbestos
and asbestos products, had no knowledge or information indicating that asbestos could cause injury,
and said defendants knew that the users of asbestos and asbestos products, as well as members of
the general public who were exposed to asbestos and asbestos products would assume, and in fact
did assume, that exposure to asbestos and asbestos products was safe, when in fact said exposure
was extremely hazardous to human life.

41.    With said knowledge, said defendants opted to manufacture and distribute said
asbestos and asbestos products without attempting to protect users from or warn users of, the high
risk of injury or death resulting from exposure to asbestos and asbestos products.  Rather than
attempting to protect users and workers from, or warn workers and users of, the high risk of injury
or death resulting from exposure to asbestos and asbestos products, defendants intentionally failed
to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said

1  knowledge from members of the general public that asbestos and asbestos products were unsafe for
2  all reasonably foreseeable use, with the knowledge of the falsity of said implied representations.

3      42.    The above-referenced conduct of said defendants was motivated by the financial
4  interest of said defendants in the continuing, uninterrupted distribution and marketing of asbestos
5  and asbestos products.  In pursuance of said financial motivation, said defendants consciously
6  disregarded the safety of the users of, and persons exposed to, asbestos and asbestos products, and
7  were in fact, consciously willing to permit asbestos and asbestos products to cause injury to workers
8  and users thereof, and personnel exposed thereto, including plaintiff's decedent.

9      43.    As the above-referenced conduct of said defendants was and is willful, malicious,
10  outrageous, and in conscious disregard and indifferent to the safety and health of workers exposed
11  to asbestos and asbestos products, including decedent, plaintiffs, for the sake of example, and by
12  way of punishing said defendants, seeks punitive damages according to proof.

13      WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as
14  hereinafter set forth.

15               EIGHTH CAUSE OF ACTION - LOSS OF CONSORTIUM

16      AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF
17  ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF PATTI DONLON COMPLAINS OF
18  DEFENDANTS, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

19      44.    Plaintiff PATTI DONLON incorporates herein by reference and makes a part hereof
20  as though fully set forth herein, all of the paragraphs of all the Causes of Action of this complaint.

21      45.    Plaintiff PATTI DONLON was at all relevant times the lawfully wedded spouse of
22  decedent PATRICK THEISEN DONLON.

23      46.    As a direct and proximate result of the conduct of defendants, and each of them, and
24  of the severe injuries caused thereby to decedent prior to his death, as hereinabove alleged, plaintiff
25  PATTI DONLON suffered loss of consortium, including, but not by way of limitation, loss of
26  services, marital relations, society, comfort, companionship, love and affection of her said spouse,
27  and has suffered severe mental and emotional distress and general nervousness as a result thereof.

28      47.    Plaintiff PATTI DONLON, as a result of the foregoing described injuries to her said

1   spouse, has been generally damaged in a sum invoking the unlimited jurisdictional limits of the

2   Court.

3          WHEREFORE, Plaintiffs pray judgment against defendants and each of them as follows:

4      1.    For general damages according to proof;

5      2.    For burial expenses according to proof;

6      3.    For medical expenses according to proof;

7      4.    For loss of income according to proof;

8      5.    For punitive damages according to proof;

9      6.    For plaintiffs' costs of suit herein; and,

10     7.    For such other and further relief as this Court deems just and proper.

11

12  DATED: May 22, 2009                    HAROWITZ & TIGERMAN, LLP

13

14                                  BY _____

15                                       ROGER E. GOLD
                                         Attorney for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

1  STEVEN M. HAROWITZ (Bar No. 71117)
   STEPHEN M. TIGERMAN (Bar No. 112127)
2  ROGER E. GOLD (Bar No. 214802)
   HAROWITZ & TIGERMAN, LLP
3  450 Sansome Street, 3rd Floor
   San Francisco, California 94111
4  Telephone    (415) 788-1588

5  Attorneys for Plaintiffs

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10

11 PATTI DONLON, Individually and as Successor-in-
   Interest to the Estate of PATRICK THEISEN DONLON,
12 Decedent; SEAN DONLON; and DOES ONE through
   TEN, inclusive,
13

14                    Plaintiffs,

15          vs.

16 AC AND S, INC., et al.

17                    Defendants.

18

19                         N O T I C E

20

21 TO NEW DEFENDANTS SERVED IN COMPLEX ASBESTOS LITIGATION IN THE
   SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA,
22 CITY AND COUNTY OF SAN FRANCISCO:

23         You have been served with process in an action which has been designated by the Court
   as complex litigation pursuant to Standard 19 of the Standards of Judicial Administration. This
24 litigation bears the caption "In Re: Complex Litigation," [San Francisco Superior Court No.
   828684].
25
           This litigation is governed by various general orders, some of which affect the judicial
26 management and/or discovery obligations, including the responsibility to answer
   interrogatories deemed propounded in the case. You may contact the Court or Designated
27 Defense Counsel, Berry & Berry, Post Office Box 16070 (2930 Lake Shore Ave.), Oakland,
   California 94610; Telephone: (510) 250-0200; FAX: (510) 835-5117, for further information
28 and/or copies of these orders, at your expense.

---

ENDORSED
F I L E D
San Francisco County Superior Court

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY: _____ PARAM NATH
                    Deputy Clerk

No. C GC - 09 - 275218

PRELIMINARY FACT SHEET
NEW FILING/
ASBESTOS LITIGATION
(See General Order No. 129;
In Re Complex Asbestos
Litigation)

---

2120/fact.sheet.wd.wpd          1          PRELIMINARY FACT SHEET
                                            ASBESTOS LITIGATION

1    1.     State the complete name and address of each person whose claimed exposure to

2    asbestos is the basis of this lawsuit ("exposed person"):  **PATRICK THEISEN DONLON**

3    2.     Does plaintiff anticipate filing a motion for preferential trial date within the next four

4    months?     Yes         **X**   No

5    3.     Date of birth of each exposed person in item one and, if applicable, date of death:

6    Date of Birth: September 26, 1937        Date of Death: May 27, 2008

7    Social Security Number of each exposed person:  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

8    4.     Specify the nature or type of asbestos-related disease alleged by each exposed person:

9    ____ Asbestosis          **X**  Mesothelioma

10    ___ Pleural Thickening/Plaques    ____ Other Cancer: Specify: _____

11    ____ Lung Cancer Other Than Mesothelioma  Other: Specify:_____

12    5.     For purposes of identifying the nature of exposure allegations involved in this action,

13    please check one or more:

14    ___Shipyard       **X**__ Construction  **X**__ Friction-Automotive

15    ___Premises      ___ Aerospace   **X**__ Military

16    __Other: Specify all that apply: _____ _____

17    If applicable, indicate which exposure allegations apply to which exposed person.

18    6.     Identify each location alleged to be a source of an asbestos exposure, and to the extent

19    known, provide the beginning and ending year(s) of each such exposure.  Also specify each

20    exposed person's employer and job title or job description during each period of exposure.  (For

21    example: "San Francisco Naval Shipyard - Pipefitter - 1939-1948").  Examples of locations of

22    exposure might be a specific shipyard, a specific railroad maintenance yard, or perhaps more

23    generalized descriptions such as "merchant Marine" or "construction."  If an exposed person

24    claims exposure during only a portion of a year, the answer should indicate that year as the

25    beginning and ending year (e.g., 1947-1947).

26    ///

27    ///

28    ///

| Location of Exposure | Employer | Job Title at Time of Exposure | Year(s) of Exposure Beginning - Ending |
|---|---|---|---|
| Elkader, Strawberry Point, Clayton, IA | New Jersey Zinc | Worker | 1953-1955 |
| Pensacola, FL; Brooklyn NSY; Brooklyn, NYC, New York | U.S. Navy | Aviation Mechanic | 1955-1958 |

**BYSTANDER EXPOSURE:**

| | | | |
|---|---|---|---|
| Home Construction: Elkader, IA; Davis, CA | Not Applicable | Not Applicable | 1950's; 1970's |

**SECONDHAND EXPOSURE through decedent's father, Jack Donlon's employment:**

| | | | |
|---|---|---|---|
| Elkader, IA | Jack Donlon Chevrolet | Car dealership/ service manager | 1937-1955 |

7.    For each exposed person who:

a.    worked in the United States or for a U. S. agency outside the territorial United States, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Earnings authorization (Exhibit N-4 to General Order No. 129);

b.    may have had a Social Security disability award or is no longer employed and whose last employment was not with a United States government agency, attach to the copy of this fact sheet provided to Designated Defense counsel a fully executed Social Security Disability authorization (Exhibit N-5 to General Order No. 129);

c.    served at any time in the United States military, attach to the copy of this fact sheet provided to the Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129);

d.    was employed by the United States government in a civilian capacity, attach to the copy of this fact sheet provided to Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129).

8.    If there is a wrongful death claim, attach to the copy of this fact sheet provided to

1 Designated Defense Counsel a copy of the death certificate, if available. If an autopsy report
2 was done, also attach a copy of it to the copy of this fact sheet provided to Designated Defense
3 Counsel.

4 9.       State the date of the filing of the initial complaint in this matter: <u>May 22, 2009</u>

5 DATED: May 22, 2009                              HAROWITZ & TIGERMAN, LLP
6

7
                                                 BY
8                                                    ROGER B. GOLD
                                                    Attorney for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2120/fact.sheet.wd.wpd                          4                    PRELIMINARY FACT SHEET
                                                                     ASBESTOS LITIGATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "B"

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | FOR COURT USE ONLY |
|---|---|
| STEVEN M. HAROWITZ (SBN 71117)<br>HAROWITZ & TIGERMAN, LLP<br>450 Sansome Street, 3rd Floor<br>San Francisco, CA 94111<br><br>TELEPHONE NO.: (415)788-1588   FAX NO. (Optional): (415)788-1598<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Jurisdiction

PLAINTIFF/PETITIONER: Patti Donlon, et al.

DEFENDANT/RESPONDENT: AC and S, Inc., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| [X] Personal Injury, Property Damage, or Wrongful Death<br>　　[ ] Motor Vehicle  [ ] Other<br>[ ] Family Law  [ ] Eminent Domain<br>[X] Other (specify): Asbestos | CGC 09-275218 |

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) [ ] With prejudice  (2) [X] Without prejudice
   b. (1) [X] Complaint  (2) [ ] Petition
   　　(3) [ ] Cross-complaint filed by (name): 　　　　　　　　　　　　　　on (date):
   　　(4) [ ] Cross-complaint filed by (name): 　　　　　　　　　　　　　　on (date):
   　　(5) [ ] Entire action of all parties and all causes of action
   　　(6) [X] Other (specify):* See Attachment A

2. (Complete in all cases except family law cases.)
   [ ] Court fees and costs were waived for a party in this case. (This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed).

Date: June 24, 2011

STEVEN M. HAROWITZ (SBN 71117).........
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

　　　　　　　　　　　　　　(SIGNATURE)
Attorney or party without attorney for: Patti Donlon, et al.
[X] Plaintiff/Petitioner  [ ] Defendant/Respondent
[ ] Cross - complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date:

　　　　　　　　　　　　　　(SIGNATURE)
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)  Attorney or party without attorney for:

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

[ ] Plaintiff/Petitioner  [ ] Defendant/Respondent
[ ] Cross - Complainant

(To be completed by clerk)
4. [ ] Dismissal entered as requested on (date):
5. [ ] Dismissal entered on (date): 　　　　　　　　as to only (name):
6. [ ] Dismissal not entered as requested for the following reasons (specify):

7. a. [ ] Attorney or party without attorney notified on (date):
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
   　　[ ] a copy to be conformed [ ] means to return conformed copy
   Date: 　　　　　　　　　　　Clerk, by 　　　　　　　　　　　　　　, Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 (Rev. July 1, 2009)

REQUEST FOR DISMISSAL

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390

Legal
Solutions®
Plus

CIV-110

| PLAINTIFF/PETITIONER: Patti Donlon, et al. | CASE NUMBER: |
| DEFENDANT/RESPONDENT: AC and S, Inc., et al. | CGC 09-27518 |

## Declaration Concerning Waived Court Fees

The court has a statutory lien for waived fees and costs on any recovery of $10,000 or more in value by settlement, compromise, arbitration award, mediation settlement, or other recovery. The court's lien must be paid before the court will dismiss the case.

1. The court waived fees and costs in this action for *(name):*

2. The person in item 1 *(check one):*
   a. ☐ is not recovering anything of value by this action.
   b. ☐ is recovering less than $10,000 in value by this action.
   c. ☐ is recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and costs that were waived in this action have been paid to the court *(check one):* ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

                                        ▶

_____          _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)                    (SIGNATURE)

**REQUEST FOR DISMISSAL**

<u>ATTACHEMENT A to Plaintiff's Request for Dismissal Without Prejudice</u>

Plaintiffs dismiss all claims <u>except</u> their failure to warn claims as to defendants, THE BOEING

COMPANY; CONTINENTAL MOTORS, INC.; GENERAL ELECTRIC COMPANY;

CURTISS-WRIGHT CORPORATION; UNITED TECHNOLOGIES CORPORATION,

formerly known as PRATT & WHITNEY, INC., PRATT & WHITNEY POWER

SYSTEMS, INC., HAWKER BEECHCRAFT COPORATION, ONLY.

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

**SEDGWICK, LLP**
**One Market Plaza Steuart Tower, 8th Floor**
**San Francisco, CA 94105**
**(415) 781-7900**
**Counsel for: GENERAL ELECTRIC COMPANY**

via the following method of service:

X    Electronically on the recipients designated on the Transaction Receipt located on the
     Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General
     Order No. 158, Asbestos-Related Case.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

1

## PROOF OF SERVICE

2

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

3

4

### REQUEST FOR DISMISSAL

5

on the following parties:

6

7   **CSC LAWYERS**
    **2730 Gateway Oaks Drive, Suite 100**
    **Sacramento, CA 95833**

8

9   **Agent for: THE BOEING COMPANY**

10  via the following method of service:

11  X    By **Regular Mail** in a sealed envelope, addressed as noted in the attached service list

12       with postage fully prepaid and placing it for collection and mailing following the

13       ordinary business practices of Harowitz & Tigerman, LLP.

14

15       I declare under penalty of perjury that the foregoing is true and correct and that this

16  declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19                                          Robert C. Jones

20

21

22

23

24

25

26

27

28

I                                                           Proof of Service

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

**CONTINENTAL MOTORS, INC.**
**2039 Broad Street**
**Mobile, Alabama 36615**

via the following method of service:

X    **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.


Robert C. Jones

1                                                              Proof of Service

1

## PROOF OF SERVICE

2      I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3 date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

**REQUEST FOR DISMISSAL**

5

on the following parties:

6

7      **SEDGWICK, LLP**
**One Market Plaza Steuart Tower, 8th Floor**
**San Francisco, CA 94105**
8      **(415) 781-7900**
**Counsel for: GENERAL ELECTRIC COMPANY**

9

10      via the following method of service:

11      X      Electronically on the recipients designated on the Transaction Receipt located on the

12             Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General

13             Order No. 158, Asbestos-Related Case.

14

15             I declare under penalty of perjury that the foregoing is true and correct and that this

16      declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19                                          Robert C. Jones

20

21

22

23

24

25

26

27

28

1                                                                    Proof of Service

1

## PROOF OF SERVICE

2   I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3   date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.,* San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

5   **REQUEST FOR DISMISSAL**

6   on the following parties:

7   **JAMES V. MAHER, GENERAL COUNSEL**
**10 Waterview Boulevard, 2nd Floor**
**Parsippany, NJ 07054**

8

9   **AGENT FOR: CURTISS-WRIGHT CORPORATION**

10

11   via the following method of service:

X   By Regular Mail in a sealed envelope, addressed as noted in the attached service list
12
with postage fully prepaid and placing it for collection and mailing following the
13
ordinary business practices of Harowitz & Tigerman, LLP.
14

15   I declare under penalty of perjury that the foregoing is true and correct and that this
16   declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19

20   Robert C. Jones

21

22

23

24

25

26

27

28

1                                                   Proof of Service

1

## PROOF OF SERVICE

2   I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3   date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

5   **REQUEST FOR DISMISSAL**

on the following parties:

6

7   **CT CORPORATION**
**818 West 7th Street**
**Los Angeles, CA 90017**

8

9   Agent for: **UNITED TECHNOLOGIES CORPORATION**
**PRATT & WHITNEY POWER SYSTEMS, INC.**

10   via the following method of service:

11   X   **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list,

12   with postage fully prepaid and placing it for collection and mailing following the

13   ordinary business practices of Harowitz & Tigerman, LLP.

14

15   I declare under penalty of perjury that the foregoing is true and correct and that this

16   declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19   Robert C. Jones

20

21

22

23

24

25

26

27

28

1                                                              Proof of Service

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

    **GREGORY H. HALLIDAY**
    **801 South Figneroa Street, 19ᵗʰ Floor**
    **Los Angeles, CA 90017**

    Agent for: **HAWKER BEECHCRAFT CORPORATION**

via the following method of service:

X    By **Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

Proof of Service

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "C"

1 | **TUCKER ELLIS & WEST LLP**
LANCE D. WILSON – SBN 183852
2 | 135 Main Street, Suite 700
San Francisco, California 94105
3 | Telephone: 415.617.2400
Facsimile: 415.617.2409
4 |
**TUCKER ELLIS & WEST LLP**
5 | JOHN K. SON – SBN 238516
515 South Flower Street
6 | Forty-Second Floor
Los Angeles, CA 90071-2223
7 | Telephone: 213.430.3400
Facsimile: 213.430.3409
8 |
Attorneys for Defendant
9 | UNITED TECHNOLOGIES CORPORATION

ORIGINAL
FILED

JUL - 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

DMR

10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **NORTHERN DISTRICT OF CALIFORNIA**

13 | PATTI DONLON, Individually and as
Successor-in-Interest to the Estate of
14 | PATRICK THEISEN DONLON,
Decedent; SEAN DONLON; and DOES
15 | ONE through TEN, inclusive,

16 | Plaintiff,

17 | v.

18 | AC AND S, INC.; ASBESTOS
CORPORATION, LTD.; A.W.
19 | CHESTERTON COMPANY; CROWN,
CORK & SEAL COMPANY, INC.,
20 | Individually and as Successor-in-Interest
to MUNDET CORK CORP.; GARLOCK
21 | SEALING TECHNOLOGIES LLC,
Individually and as Successor-in-Interest
22 | to GARLOCK, INC.; GENERAL
ELECTRIC COMPANY; J.T. THORPE &
23 | SON, INC.; METROPOLITAN LIFE
INSURANCE COMPANY; PARK-
24 | ERHANNIFIN CORPORATION, as
Successor-in-Interest to SACOMO
25 | SIERRA; OWENS-ILLINOIS
CORPORATION; QUINTEC
26 | INDUSTRIES, INC.; SOCO-LYNCH
CORPORATION, success-in-interest to
27 | WESTERN CHEMICAL &
MANUFACTURING COMPANY;
28 | SWINERTON BUILDERS f/k/a
SWINERTON & WALBERG CO.;

Case No.: **CV 11 3376**

**DEFENDANT UNITED
TECHNOLOGIES CORPORATION'S
NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1442(a)(1)**

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

1 THOMAS DEE ENGINEERING
COMPANY; TRANE U.S. INC., fka
2 AMERICAN STANDARD, INC.; UNION
CARBIDE CORPORATION; VIACOM,
3 INCORPORATED, as successor-by-
merger to CBS CORPORATION, fka
4 WESTINGHOUSE ELECTRIC
CORPORATION; ALLIS-CHALMERS
5 CORPORATE PRODUCT LIABILITY
TRUST; BAYER CROPSCIENCE, INC.,
6 successor to AMCHEM PRODUCTS,
INC.; ENPRO INDUSTRIES, INC.,
7 Individually and as Successor-in-Interest
to ANCHOR PACKING COMPANY;
8 HOPEMAN BROTHERS, INC.; SB
DECKING, INC., formerly known as
9 SELBY, BATTERSBY & COMPANY,
GEORGIA-PACIFIC CORPORATION;
10 HAMILTON MATERIALS, INC.;
HANSON PERMANENTE CEMENT,
11 INC. fka KAISER CEMENT
CORPORATION; KAISER GYPSUM
12 CO., INC.; KELLY-MOORE PAINT
COMPANY, INC.; EATON AEROQUIP,
13 LLC; PNEUMO-ABEX CORPORATION,
Successor-in-Interest to ABEX
14 CORPORATION; HONEYWELL
INTERNATIONAL, INC. fka ALLIED
15 SIGNAL, INC./THE BENDIX
CORPORATION; BORG-WARNER
16 CORPORATION by its Successor in
Interest, BORGWARNER MORSE TEC,
17 INC.; BRIDGESTONE/FIRESTONE
NORTH AMERICAN TIRE, LLC; DANA
18 COMPANIES, LLC; GOODRICH
CORPORATION; FEDERAL-MOGUL
19 ASBESTOS PERSONAL INJURY
TRUST, as successor to FELT
20 PRODUCTS MANUFACTURING CO.;
FORD MOTOR COMPANY; GENERAL
21 MOTORS CORPORATION;
INTERNATIONAL TRUCK AND
22 ENGINE CORPORATION; NAVISTAR,
INC.; THE GOODYEAR TIRE &
23 RUBBER COMPANY; AIRCRAFT
BRAKING SYSTEMS CORPORATION;
24 MEGGITT AIRCRAFT BRAKING
SYSTEMS; PARKER-HANNIFIN
25 CORPORATION, as Successor to EIS and
CALI-BLOK; CURTISS-WRIGHT
26 CORPORATION; MCDONNELL
DOUGLAS CORPORATION,
27 Individually and Successor-in-Interest to
DOUGLAS AIRCRAFT COMPANY,
28 INC.; EATON CORPORATION;
UNITED TECHNOLOGIES

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

1 | CORPORATION, formerly known as  )
PRATT & WHITNEY, INC.; PRATT &  )
2 | WHITNEY POWER SYSTEMS, INC.;  )
VOUGHT AIRCRAFT INDUSTRIES,  )
3 | INC.; and ELEVENTH DOE through  )
THREE HUNDREDTH DOE, inclusive,  )
4 |                          )
            Defendants.      )

5

6 **TO THE CLERK OF THE COURT AND TO ALL PARTIES AND THEIR**

7 **ATTORNEYS OF RECORD:**

8        PLEASE TAKE NOTICE Defendant UNITED TECHNOLOGIES

9 CORPORATION ("UTC") hereby gives notice of the removal of the above-entitled

10 action from the Superior Court of the State of California for the County of San Francisco,

11 to the United States District Court for the Northern District of California pursuant to 28

12 U.S.C. §§ 1442(a)(1) and 1446. In support of its removal, UTC respectfully states the

13 following.

14                       **Preliminary Matters**

15     1.     On or about May 22, 2009, plaintiffs Patti Donlon, individually and as

16 successor-in-interest to the Estate of Patrick Theisen Donlon, and Sean Donlon, filed

17 their Complaint, bearing Case No. CGC-09-275218, against UTC and multiple other

18 defendants in the Superior Court of the State of California for the County of San

19 Francisco. A true and correct copy of the Summons and Complaint are attached hereto as

20 **Exhibit A.**

21     2.     In the Complaint, Plaintiffs allege that the decedent Patrick Donlon

22 developed an asbestos-related disease as a result of exposure to asbestos fibers released

23 from defendants' products.

24     3.     On June 23, 2011, plaintiffs dismissed all claims against UTC (and select

25 other defendants) except for claims based on "failure to warn." A true and correct copy

26 of the Request for Dismissal is attached hereto as **Exhibit B.**

27

28

*(left margin, vertical)* TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

1    4.    On July 5, 2011, UTC filed an Answer in the Superior Court of California

2 for the County of San Francisco. A true and correct copy of UTC's Answer is attached

3 hereto as **Exhibit C**.

4    5.    This case is removable based on federal officer jurisdiction under 28 U.S.C.,

5 § 1442(a)(1). Plaintiffs' claims against UTC are based on the decedent's alleged

6 exposure to asbestos from aircraft engines supplied to the United States Navy. Any and

7 all equipment supplied by UTC to the U.S. Navy was designed and manufactured in

8 accordance with reasonably precise specifications approved by the U.S. Navy and was

9 designed and built under the direction and control of the Navy and its officers.

10 Accordingly, this case is removable on the grounds of federal officer removal jurisdiction

11 pursuant to 28 U.S.C. § 1442(a)(1).

12    6.    This Notice is timely. The 30-day removal period prescribed by 28 U.S.C. §

13 1446(b) begins to run when the defendant receives a copy of the initial pleading setting

14 forth the claim for relief from which it may first be ascertained that the case is removable.

15 28 U.S.C. § 1446(b). UTC was served with the Summons and Complaint on June 14,

16 2011. The receipt of the Complaint put UTC on notice for the first time that plaintiffs'

17 claims in this action involve alleged exposure to asbestos from military equipment built

18 for the U.S. Navy pursuant to reasonably precise specifications approved by the Navy

19 and under the direction and control of the Navy and its officers. This Notice is being

20 filed within 30 days of service of the summons and Complaint on UTC, and therefore this

21 Notice is timely under 28 U.S.C. § 1446(b).

22    7.    The existence of a single removable claim allows removal of the entire

23 action. 28 U.S.C. § 1441(c); *National Audubon Society v. Dept. of Water*, 496 F.Supp.

24 499, 509 (E.D.Cal.1980). Section 1442(a) authorizes removal in this case without the

25 consent of any other defendant. See *Ely Valley Mines, Inc. v. Hartford Acc. & Indem.*

26 *Co.*, 644 F.2d 1310, 1314-1315 (9th Cir.1981) ("federal officer...can remove without

27 other defendants joining the petition, and the entire case is removed to the federal court").

28 ///

4

TUCKER ELLIS & WEST LLP
Cleveland • Columbus • Los Angeles • San Francisco

## Nature of the Case

8.     The case is based on allegations that decedent developed an asbestos-related disease caused by exposure to asbestos and asbestos-containing products.

9.     Plaintiffs assert wrongful death and survival claims against UTC and the other defendants, based on theories of negligence and strict liability.

## Jurisdiction, Venue and Intradistrict Assignment

10.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1442(a)(1) as set forth below under Grounds for Removal.

11.     Venue is proper in the Northern District of California because the state court action, which is subject to this removal petition, was filed in the Superior Court of the State of California for the County of San Francisco.

## Grounds for Removal

12.     This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1331, and is removable to this Court by UTC pursuant to 28 U.S.C. § 1442(a)(1). Specifically, it is a civil action in which plaintiffs' alleged right to relief necessarily depends on the resolution of a substantial question of federal law. "Federal officers, and their agents, may remove cases based on acts performed under the color of their federal office if they assert a colorable defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006). "[T]he Supreme Court has mandated a generous interpretation of the federal officer removal statute" and there is a "clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Durham*, 445 F.3d at 1252.

13.     At all relevant times, UTC was a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *Fung v. Abex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992) (corporate defendant is a "person").

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

DEFENDANT UNITED TECHNOLOGIES CORPORATION'S TO NOTICE OF REMOVAL

14.     Should plaintiffs file a motion to remand this case, UTC respectfully requests an opportunity to respond more fully in writing, including the submission of affidavits and additional authorities, but offers the following authorities at this time:

15.     Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (a) demonstrate that it acted under the direction of a federal officer, (b) raise a colorable federal defense to plaintiffs' claims, and (c) demonstrate a causal nexus between plaintiffs' claims and the acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Machnik v. Buffalo Pumps, Inc.*, 506 F.Supp.2d 99, 102 (D.Conn. 2007). Here, UTC has satisfied all three requirements and is entitled to the federal officer removal provision.

16.     <u>UTC Acted Under Direction Of Federal Officers.</u>  UTC acted under the direction of federal officers – namely officers and agents of the U.S. Navy – in designing, manufacturing, and supplying aircraft engines for use in Navy aircraft. UTC designs and manufactures aircraft engines through its unincorporated division of Pratt & Whitney. Declaration of Allan Shiffler, **Exhibit D** hereto, ¶¶ 2-3. Aircraft engines supplied by UTC to the Navy were manufactured in accordance with precise specifications prepared, drafted, and issued exclusively by the Navy. *Id.* at ¶¶ 7-11. U.S. Navy inspectors were stationed on-site at the UTC (Pratt & Whitney) manufacturing facilities to personally oversee each phase of the design and manufacturing process and to enforce compliance with the Navy's design specifications. *Id.* at ¶¶ 8-10. The military inspectors knew of, and approved, all materials and all parts contained in the Pratt & Whitney engines intended for use by the Navy. *Id.* at ¶ 9. The Navy had direct and detailed control over every aspect of the design and manufacture of the UTC (Pratt & Whitney) military aircraft engines, including written materials, product manuals, and warnings accompanying the military aircraft engines. *Id.* at ¶¶ 7-11. UTC needed consent and approval from the U.S. Navy for any warnings with its equipment, and the Navy instructed UTC to add or include warnings when deemed appropriate by the Navy. *Id.* at

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

1  ¶11. And the U.S. Navy rejected any aircraft engine that did not meet the strict standards
2  and specifications set forth by the Navy. *Id.* at ¶ 10.

3      17.   UTC Has A Colorable Federal Defense.  UTC has a colorable federal
4  defense to this action – government contractor immunity.  The government contractor
5  defense bars plaintiffs' state law tort claims for alleged injuries caused by the equipment
6  the contractor built for the U.S. military. *Boyle v. United Technologies Corp.*, 487 U.S.
7  500 (1988).  There are three elements to the defense: (a) the United States approved
8  reasonably precise specifications; (b) the equipment conformed to these specifications;
9  and (c) the equipment supplier warns the military about any hazards involved in the use
10  of the equipment that are known to the equipment supplier but not known to the military.
11  *Boyle*, 487 U.S. 500 at 512.  "The contractor's duty to warn under the third prong of
12  Boyle extends only to those dangers in the use of the equipment which are unknown to
13  the government." *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587, 590
14  (N.D.Cal.1993); *see Blackman v. Asbestos Defendants (BIIC)*, 1997 WL 703773, *3
15  (N.D.Cal. 1997) (defendant contractor had no duty to warn the Air Force about dangers
16  of asbestos use in military equipment where the contractor was not an asbestos
17  manufacturer and "had no greater opportunity to know of the dangers of asbestos in the
18  1970s than did the USAF").

19      18.   The facts in support of this Notice show that the Navy approved reasonably
20  precise specifications and exercised extensive supervision and control over the design
21  and manufacture of the engines, and that the engines would have conformed to those
22  specifications.  Additionally, the Navy had state of the art knowledge regarding any
23  potential health hazards of working with or around asbestos-containing materials dating
24  back to the 1930s.  Declaration of William P. Ringo, **Exhibit E** hereto, ¶ 9.  Conversely,
25  UTC had no reason to suspect that, at the relevant time, a manufacturer or designer of
26  aircraft engines would have considered that asbestos-containing materials used in aircraft
27  engine components presented any health hazard to individuals working on aircraft
28  engines.  Ringo Decl., ¶ 10.  In fact, there have never been any published articles

*left margin, vertical:* TUCKER ELLIS & WEST LLP  Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

7

1   suggesting that aircraft mechanics, or persons working in the vicinity of aircraft
2   mechanics, are at an increased risk of any asbestos-related disease from work on aircraft
3   engines. *Id.* at ¶ 8. Nor are there any epidemiological studies suggesting such an
4   increased risk. *Ibid.*

5         19.   <u>There Is A Causal Nexus.</u> A causal nexus exists between plaintiffs' claims
6   in this action and the acts taken by UTC under the direction of federal officers.
7   Plaintiffs' claims against UTC arise from the decedent's alleged exposure to asbestos
8   from military aircraft while serving as an aircraft mechanic in the U.S. Navy from 1955
9   to 1958. Military aircraft engines supplied by UTC (Pratt & Whitney) to the U.S. Navy
10  were designed and manufactured under strict government control and pursuant to precise
11  specifications that were provided by, scrutinized by, and/or revised by, and in all cases
12  approved by the Navy. The Navy also controlled the content of written materials and
13  warnings that accompanied the aircraft engines. UTC's actions are inseparable from the
14  government specifications, regulations, and oversight, and thus a clear causal nexus exists
15  between plaintiffs' claims and UTC's acts performed under color of federal office.
16  *Boyle,* 487 U.S. 500 (1988); *Magnin v. Teledyne Continental Motors,* 91 F.3d 1424, 1427
17  (11th Cir. 1996); *Marley v. Elliott Turbomachinery Co., Inc.,* 545 F. Supp. 2d 1266, 1271
18  (S.D. Fla. 2008); *Arness v. Boeing North American, Inc.,* 997 F.Supp. 1268 (C.D. Cal.
19  1998); *Sundstrom v. McDonnell Douglas Corp.,* 816 F.Supp. 587 (N.D. Cal. 1993);
20  *Crocker v. Borden,* 852 F.Supp. 1322 (E.D. La. 1994); *Fung v. Abex Corp.,* 816 F.Supp.
21  569 (N.D. Cal. 1992); *Pack v. AC and S, Inc.,* 838 F. Supp. 1099 (D. Md. 1993).

22        20.   Notice of this removal has been, or will be, filed with the state court and
23  provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).

24        21.   This Notice of Removal is based on this Notice and supporting declarations,
25  the Certificate of Service of Notice to Adverse Party of Removal filed in the state court
26  action, the Notice to Adverse Party of Removal to Federal Court filed in the state court
27  action, the Notice of Tag-Along Action, and any other matters which the court deems
28  applicable.

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

8

1    WHEREFORE, defendant UTC prays that this action be removed from the

2  Superior Court of the State of California for the County of San Francisco, to the United

3  States District Court for the Northern District of California, and transferred to the United

4  States District Court, Eastern District of Pennsylvania, for coordinated or consolidated

5  pretrial proceedings pursuant to 28 U.S.C. § 1407 ("MDL Transfer Order").

6

7  DATED: July _7_, 2011                    **TUCKER ELLIS & WEST LLP**

8

9                                          By: _____

10                                          Lance D. Wilson, Esq.
                                            Attorneys for Defendant
11                                          UNITED TECHNOLOGIES
                                            CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "D"

1   DEBORAH A. SMITH (SBN: 227169)
    dasmith@gordonrees.com
2   KATHRYN J. LAFEVERS (SBN: 252003)
    klafevers@gordonrees.com
3   GORDON & REES LLP
    275 Battery Street, Suite 2000
4   San Francisco, CA  94111
    Telephone: (415) 986-5900
5   Facsimile: (415) 986-8054

6   Attorneys for Defendant
    CURTISS-WRIGHT CORPORATION
7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10  PATTI DONLON, Individually and as            )   CASE NO. **4:11-cv-03376-DMR**
    Successor –in-Interest to the Estate of      )
11  PATRICK THEISEN DONLON, Decedent,            )   (San Francisco County Superior Court Case
    SEAN DONLON, and DOES ONE through            )   No. CGC-09-275218)
12  TEN, inclusive,                              )
                                                 )
13                              Plaintiffs,      )   **SPECIALLY APPEARING**
                                                 )   **DEFENDANT CURTISS-WRIGHT**
14          vs.                                  )   **CORPORATION'S JOINDER AND**
                                                 )   **NOTICE OF REMOVAL OF ACTION**
15  AC AND S, INC.; ASBESTOS                     )   **UNDER 28 U.S.C. § 1442(A) (1)**
    CORPORATION LTD.; A .W. CHESTERTON           )   **(GOVERNMENT CONTRACTOR**
16  COMPANY; CROWN, CORK & SEAL                  )   **IMMUNITY - ACTING UNDER**
    COMPANY, INC., Individually and as           )   **DIRECTION OF FEDERAL OFFICER)**
17  Successor-in-Interest to MUNDET CORK         )
    CORP.; GARLOCK SEALING                       )
18  TECHNOLOGIES LLC, Individually and as        )
    Successor-in-Interest to GARLOCK, INC.;      )
19  GENERAL ELECTRIC COMPANY; J.T.               )
    THORPE & SON INC.; METROPOLITAN              )
20  LIFE INSURANCE COMPANY;                      )
    PARKERHANNIFIN CORPORATION, as               )
21  Successor-in-Interest to SACOMO SIERRA;      )
    OWENS-ILLINOIS CORPORATION;                  )
22  QUINTEC INDUSTRIES, INC.; SOCO-              )
    LYNCH CORPORATION, success-in-interest       )
23  to WESTERN CHEMICAL &                        )
    MANUFACTURING COMPANY;                       )
24  SWINERTON BUILDERS f/k/a SWINERTON           )
    & WALBERG CO.; THOMAS DEE                     )
25  ENGINEERING COMPANY; TRANE U.S.              )
    INC., fka AMERICAN STANDARD, INC.;           )
26  UNION CARBIDE CORPORATION;                   )
    VIACOM, INCORPORATED, as successor-by-       )
27  merger to CBS CORPORATION, fka               )
    WESTINGHOUSE ELECTRIC                        )
28  CORPORATION; ALLIS-CHALMERS                  )

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

CURT/1071292/10133546v.1

-1-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1  CORPORATE PRODUCT LIABILITY )
   TRUST; BAYER CROPSCIENCE, INC., )
2  successor to AMCHEM PRODUCTS, INC.; )
   ENPRO INDUSTRIES, INC., Individually and )
3  as Successor-in-Interest to ANCHOR )
   PACKING COMPANY; HOPEMAN )
4  BROTHERS, INC.; SB DECKING, INC., )
   formerly known as SELBY, BATTERSBY & )
5  COMPANY, GEORGIA-PACIFIC )
   CORPORATION; HAMILTON MATERIALS, )
6  INC.; HANSON PERMANENTE CEMENT, )
   INC. fka KAISER CEMENT CORPORATION )
7  KAISER GYPSUM COMPANY INC.; EATON )
   AEROQUIP, LLC; PNEUMO-ABEX )
8  CORPORATION, Successor-in-Interest to )
   ABEX CORPORATION; HONEYWELL )
9  INTERNATIONAL INC. fka ALLIED )
   SIGNAL, INC./THE BENDIX )
10 CORPORATION; BORG-WARNER )
   CORPORATION by its Successor in Interest, )
11 BORGWARNER MORSE TEC, INC.; )
   BRIDGESTONE/FIRESTONE NORTH )
12 AMERICAN TIRE, LLC; DANA )
   COMPANIES, LLC; GOODRICH . )
13 CORPORATION; FEDERAL-MOGUL )
   ASBESTOS PERSONAL INJURY TRUST, as )
14 successor to FELT PRODUCTS )
   MANUFACTURING CO.; FORD MOTOR )
15 COMPANY; GENERAL MOTORS )
   CORPORATION; INTERNATIONAL TRUCK )
16 AND ENGINE CORPORATION; NAVISTAR, )
   INC.; THE GOODYEAR TIRE & RUBBER )
17 COMPANY; AIRCRAFT BRAKING )
   SYSTEMS CORPORATION; MEGGITT )
18 AIRCRAFT BRAKING SYSTEMS; PARKER- )
   HANNIFIN CORPORATION, as Successor to )
19 EIS and CORPORATION MCDONNELL )
   DOUGLAS CORPORATION, Individually and )
20 Successor-in-Interest to DOUGLAS )
   AIRCRAFT COMPANY, INC.; EATON )
21 CORPORATION; UNITED TECHNOLOGIES )
   CORPORATION, formerly known as PRATT )
22 & WHITNEY, INC.; PRATT & WHITNEY )
   POWER SYSTEMS, INC.; VOUGHT )
23 AIRCRAFT INDUSTRIES, INC.; and )
   ELEVENTH DOE through THREE )
24 HUNDREDTH DOE, inclusive, )
                                         )
25                    Defendants. )
                                         )
26 ─ ─ ─

   **TO THE CLERK OF THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS**
27
   **OF RECORD:**
28

─────────────────────────────────────────
-2-

1    Defendant CURTISS-WRIGHT CORPORATION ("Curtiss-Wright"), hereby joins in the

2  Notice of Removal filed by defendant United Technologies Corporation ("UTC") on July 8,

3  2011.[1]

4    Curtiss-Wright hereby also gives notice of the removal of the above-entitled action from

5  the Superior Court of the State of California for the County of San Francisco, to the United

6  States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1442(a)(1)

7  and 1446. In support of its joinder and notice of removal, Curtiss-Wright incorporates the UTC

8  Notice of removal by reference and alleges as follows:

9                              **PRELIMINARY MATTERS**

10    1.    This is a civil action over which this Court has subject matter jurisdiction under

11  28 U.S.C. § 1331, as the action arises under the Constitution, laws, or treaties of the United

12  States by virtue of the attempt by plaintiffs PATTI DONLON, Individually and as Successor - in-

13  Interest to the Estate of PATRICK THEISEN DONLON, Decedent, SEAN DONLON, and

14  DOES ONE through TEN, inclusive, to prosecute their claims against Curtiss-Wright, a person

15  acting under the control and supervision of an officer of the United States within the meaning of

16  28 U.S.C. § 1442(a)(1).

17    2.    Curtiss-Wright is a corporation organized and existing under the laws of the State

18  of Delaware with its principal place of business in Roseland, New Jersey.

19    3.    On May 22, 2009, Plaintiffs filed their complaint, bearing Case No. CGC-09-

20  275218, against Curtiss-Wright, UTC and other multiple defendants in the Superior Court of the

21  State of California for the City and County of San Francisco. A true and correct copy of the

22  Complaint is attached as **Exhibit A** to the UTC Notice of Removal.

23    4.    Curtiss-Wright was personally served with the summons and complaint on June

24  15, 2011. A true and correct copy of the summons issued to Curtiss-Wright on May 22, 2009 is

25  attached hereto as **Exhibit A.**

26

27  [1] Curtiss-Wright is also filing concurrently with this joinder a Motion to Dismiss Plaintiffs' Complaint for Delay in Prosecution for failure to serve within two years. For purposes of this joinder, Curtiss-Wright is specially appearing
28  and specifically does not waive its objection to the untimely service of the complaint as preserved in the Motion to Dismiss.

DEFENDANT CURTISS-WRIGHT CORPORATION'S JOINDER AND NOTICE OF REMOVAL OF ACTION

*Gordon & Rees LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*

1      5.      In the complaint, Plaintiffs allege that decedent Patrick Theisen Donlon

2  developed an asbestos-related disease as a result of exposure to asbestos fibers released from

3  products for which defendants are allegedly liable.

4      6.      This case is removable based on federal officer jurisdiction under 28 U.S.C., §

5  1442(a)(1). Plaintiffs' claims against Curtiss-Wright are based on Mr. Donlon's alleged

6  exposure to asbestos from aircraft equipment supplied to the United States Navy. Any and all

7  equipment produced and supplied by Curtiss-Wright for the U.S. Navy was specifically designed

8  and manufactured in accordance with specifications provided by the U.S. Navy and was

9  designed and built under the direction and control of the military and its officers. Accordingly,

10  this case is removable on the grounds of federal officer removal jurisdiction pursuant to 28

11  U.S.C. § 1442(a)(1).

12      7.      This notice of removal is timely. The 30-day removal period prescribed by 28

13  U.S.C. § 1446(b) begins to run when defendant receives a copy of the initial pleading setting

14  forth the claim for relief from which it may first be ascertained that the case is removable. 28

15  U.S.C. § 1446(b). Curtiss-Wright was served with the Summons and Complaint on June 15,

16  2011. The service of the Complaint put Curtiss-Wright on notice for the first time of plaintiffs'

17  claims in this action involving alleged exposure to asbestos from military equipment built for the

18  U.S. Navy pursuant to specifications provided by the U.S. Navy and under the direction and

19  control of the U.S. Navy and its officers. This Joinder and Notice of Removal, which is being

20  filed within 30 days of Curtiss-Wright's receipt of the Complaint, is timely under 28 U.S.C. §

21  1446(b).

22                          **NATURE OF THE CASE**

23      8.      The case is based on allegations that decedent Patrick Theisen Donlon developed

24  an asbestos-related disease caused by exposure to asbestos and asbestos-containing products.

25      9.      Plaintiffs assert a wrongful death and survival causes of action against Curtiss-

26  Wright for "failure to warn" only. All other claims alleged in the complaint against Curtiss-

27  Wright have been dismissed. A true and correct copy of the dismissal of all claims against

28  Curtiss-Wright except for "failure to warn" is attached as **Exhibit B** to the UTC Notice of

-4-

DEFENDANT CURTISS-WRIGHT CORPORATION'S JOINDER AND NOTICE OF REMOVAL OF ACTION

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    Removal.

2                    **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

3          10.      Jurisdiction is based on 28 U.S.C. §§ 1331 and 1442(a)(1) as set forth below

4    under Grounds for Removal.

5          11.      Venue is proper in the Northern District of California because the state court

6    action, which is subject to this removal petition, was filed in the Superior Court of the State of

7    California for the County of San Francisco, where it was alleged that all parties are subject to

8    personal jurisdiction.

9          12.      Furthermore, §1442(a) authorizes such a removal without the consent of any other

10   defendant. *See Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1314-1315

11   (9th Cir. 1981) ("federal officer...can remove without other defendants joining the petition, and

12   the entire case is removed to the federal court.").

13                              **GROUNDS FOR REMOVAL**

14         13.      This is a civil action over which this Court has original jurisdiction under 28

15   U.S.C. § 1331, and is removable to this Court by Curtiss-Wright pursuant to the provisions of 28

16   U.S.C. § 1442(a)(1) in that it is a civil action in which plaintiffs' alleged right to relief

17   necessarily depends on the resolution of a substantial question of federal law. "Federal officers,

18   and their agents, may remove cases based on acts performed under the color of their federal

19   office if they assert a colorable defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247,

20   1251 (9th Cir. 2006); *see also Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429 (11th

21   Cir. 1996). "(T)he Supreme Court has mandated a generous interpretation of the federal officer

22   removal statute ..." and there is a "clear command from both Congress and the Supreme Court

23   that when federal officers and their agents are seeking a federal forum, we are to interpret section

24   1442 broadly in favor of removal." *Durham*, 445 F.3d at 1252; *see also Jefferson County,*

25   *Alabama v. Acker*, 527 U.S. 423, 431 (1999) (noting that the Supreme Court has "rejected a

26   'narrow, grudging interpretation' of the [federal officer removal] statute.").

27         14.      At all relevant times, Curtiss-Wright was a "person(s)" within the meaning of 28

28   U.S.C. § 1442(a)(1). *Fung v. Abet Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992) (finding that a

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-5-

1  corporate defendant was a "person").

2      15.    Curtiss-Wright was acting under the direction of an officer of the United States

3  within the meaning of 28 U.S.C. § 1442(a)(1) in designing, manufacturing, and supplying

4  equipment for and to the U.S. Navy. This equipment was manufactured pursuant to precise

5  specifications provided by the U.S. Navy and Curtiss-Wright has a colorable federal defense to

6  plaintiffs' state tort claims.

7      16.    Should plaintiffs file a motion to remand this case, Curtiss-Wright respectfully

8  requests an opportunity to respond more fully in writing, including the submission of affidavits

9  and additional authorities, but offers the following authorities at this time:

10      17.    Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving

11  party can (a) demonstrate that it acted under the direction of a federal officer, (b) raise a

12  colorable federal defense to plaintiff's claims, and (c) demonstrate a causal nexus between

13  plaintiff's claims and the acts it performed under color of federal office. *See Mesa v. California*,

14  489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Fung v. Abet Corp.*, 816 F.Supp. 569 (N.D.Cal.

15  1992); *Machnik v. Buffalo Pumps, Inc.*, 506 F.Supp.2d 99, 102 (D.Conn. 2007). Here, Curtiss-

16  Wright has satisfied all three requirements and is entitled to the federal officer removal

17  provision.

18      a)    Curtiss-Wright designed and manufactured aircraft equipment. They were

19  acting under the direction of agents and officers of the U.S. Navy within the meaning of 28

20  U.S.C. § 1442(a)(1) in designing, manufacturing and supplying aircraft equipment to the U.S.

21  Navy. Aircraft equipment supplied to the U.S. Navy were manufactured in accordance with

22  precise specifications prepared, drafted and issued exclusively by the Navy.

23      b)    The U.S. Navy exercised similar control over any written materials, such

24  as warnings or product manuals, that accompanied the military aircraft equipment for which

25  Curtiss-Wright may be held responsible. Equipment suppliers like Curtiss-Wright were

26  prohibited from providing warnings on or with equipment supplied to the Navy without the prior

27  consent and approval of the Navy.

28      c)    Curtiss-Wright raises a colorable federal defense to this action under

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-6-

1   government contractor immunity in that the U.S. Navy, including military specialists, controlled

2   the design and manufacture of any aircraft equipment produced by Curtiss-Wright for the U.S.

3   Navy. The Navy provided, scrutinized and approved extensive and detailed performance and

4   construction specifications for the aircraft equipment intended for Navy use. Based on a

5   scientific analysis of available literature, there is no reason to suspect that, at the relevant time, a

6   manufacturer or designer of aircraft equipment would have considered that asbestos-containing

7   materials used in aircraft components presented any health hazard to employees working on

8   aircraft engines. Furthermore, the U.S. military had state of the art knowledge of the hazards of

9   asbestos-containing components of its equipment at all times relevant to this action.

10        d)     A causal nexus exists between plaintiffs' claims in this action and the acts

11   taken by Curtiss-Wright under the direction of federal officers. Plaintiffs' claims against Curtiss-

12   Wright arise from Mr. Donlon's alleged exposure to asbestos from military aircraft while serving

13   as an aviation mechanic in the U.S. Navy from 1955 to 1958. Military aircraft equipment

14   supplied by Curtiss-Wright to the U.S. Navy were designed and manufactured under strict

15   government control and pursuant to precise specifications that were provided by, scrutinized by,

16   and/or revised by, and in all cases approved by the U.S. Navy. Curtiss-Wright's actions are

17   inseparable from the government specifications, regulations, and oversight, and a clear causal

18   nexus exists between plaintiffs' claims and Curtiss-Wright's acts performed under color of

19   federal office. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510 (1988);

20   *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996); *Marley v. Elliott*

21   *Turbomachinery Co., Inc.*, 545 F. Supp. 2d 1266, 1271 (S.D. Fla. 2008); *Arness v. Boeing North*

22   *American, Inc.*, 997 F.Supp. 1268 (C.D. Cal. 1998); *Sundstrorm v. McDonnell Douglas Corp.*,

23   816 F.Supp. 587 (N.D. Cal. 1993); *Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994); *Fung*

24   *v. Abex Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D.

25   Md. 1993).

26        18.    Plaintiffs' claims against Curtiss-Wright are affirmatively barred by government

27   contractor immunity as set forth by the U.S. Supreme Court in *Boyle v. United Technologies*

28   *Corp.*, 487 U.S. 500, 108 S.Ct. 2510 (1988), and by the Ninth Circuit Court of Appeals in

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-7-

1   *McKay v. Rockwell International Corp.*, 704 F.2d 444 (9th Cir. 1983). Pursuant to this federal

2   defense, military equipment manufacturers, such as Curtiss-Wright, cannot be held liable under

3   state law for any injuries caused by the equipment it built for the U.S. military when: (a) the

4   United States approved reasonably precise specifications; (b) the equipment conformed to these

5   specifications; and (c) the equipment supplier warns the military about any hazards involved in

6   the use of the equipment that are known to the equipment supplier but not known to the military.

7   *See Boyle*, 487 U.S. 500 at 512; *McKay*, 704 F.2d, 444 at 451. "The contractor's duty to warn

8   under the third prong of *Boyle* extends only to those dangers in the use of the equipment which

9   are unknown to the government." *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587,

10  590 (N.D.Cal. 1993).

11          19.     Analyzing the *Boyle/McKay* factors with the facts above shows (a) that Curtiss-

12  Wright designed and manufactured the military aircraft equipment in question under strict

13  government supervision and control and that the U.S. Navy approved reasonably precise

14  specifications for the manufacture of the aircraft equipment, (b) the aircraft equipment

15  conformed to those specifications, and (c) the U.S. Navy had state of the art knowledge and was

16  aware of potential health hazards of working with or around asbestos-containing materials dating

17  back to the 1930s. Thus, Curtiss-Wright would not have had knowledge of any hazards

18  associated with the use of the equipment which was not already known to the United States.

19  Curtiss-Wright has more than a colorable federal defense to this state action under government

20  contractor immunity. *See Blackman v. Asbestos Defendants (BHC)*, 1997 WL 703773, *3

21  (N.D.Cal. 1997) (finding that defendant contractor had no duty to warn the Air Force of dangers

22  of asbestos use in military equipment where the contractor was not an asbestos manufacturer and

23  "had no greater opportunity to know of the dangers of asbestos in the 1970s than did the

24  USAF"); *see also Boyle*, 487 U.S. at 512; *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424,

25  1427 (11th Cir. 1996); *Marley v. Elliott Turbomachinery Co., Inc.*, 545 F. Supp. 2d 1266, 1271

26  (S.D. Fla. 2008); *Arness v. Boeing North American, Inc.*, 997 F.Supp. 1268 (C.D. Cal. 1998);

27  *Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994); *Sundstrom v. McDonnell Douglas Corp.*,

28  816 F.Supp. 587 (N.D. Cal. 1993); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993);

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-8-

1  *Fung v. Aber Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992).

2      20.     The existence of a single removable claim allows removal of the entire action.  28

3  U.S.C. § 1441(c).  *National Audubon Society v. Dept. of Water*, 496 F.Supp. 499, 509 (E.D. Cal.

4  1980).

5      21.     Notice of this removal has been, or will be, filed with the state court and provided

6  to all adverse parties pursuant to 28 U.S.C. § 1446(d).

7      22.     This removal is based on UTC's Notice of Removal, this Joinder and Notice of

8  Removal to the United States District Court, the Certificate of Service of Notice to Adverse Party

9  of Removal filed in the state court action, the Notice to Adverse Party of Removal to Federal

10  Court filed in the state court action, the complete file in the state court case, and any other

11  matters which the court deems applicable.

12      WHEREFORE, defendant Curtiss-Wright prays that this action be removed from the

13  Superior Court of the State of California for the County of San Francisco, to the United States

14  District Court for the Northern District of California, and transferred to the United States District

15  Court, Eastern District of Pennsylvania, for coordinated or consolidated pretrial proceedings

16  pursuant to 28 U.S.C. § 1407 ("MDL Transfer Order").

17

18  Dated: July 15, 2011                          GORDON & REES LLP

19

20                                          By: _____
                                               Deborah A. Smith

21                                          Attorneys for Defendant
                                            CURTISS-WRIGHT CORPORATION

22

23

24

25

26

27

28

-9-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

RECEIVED
JUN 1 5
LAW DEPT.

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AC and S, INC., et. al.; and ELEVENTH DOE through
THREE HUNDREDTH DOE, inclusive, {See attached list of
defendants}

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PATTI DONLON, Individually and as Successor-in-
Interest to the Estate of PATRICK THEISEN DONLON,
Decedent; SEAN DONLON; and DOES ONE through TEN,
inclusive,

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>County of San Francisco<br>400 McAllister Street<br>San Francisco, CA 94102<br>Unlimited Jurisdiction | CASE NUMBER<br>*(Número de Caso):*<br>CGC-09-275218 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Steven M. Harowitz, SBN 71117     (415)788-1588     (415)788-1598
HAROWITZ & TIGERMAN, LLP
450 Sansome Street, 3rd Floor
San Francisco, CA 94111

DATE: MAY 2 2 2009     Gordon Park-Li, Clerk, by     P. NATT     , Deputy
*(Fecha)*     *(Secretario)*     *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Curtiss-Wright Corporation
   under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

## ATTACHMENT TO SUMMONS

AC AND S, INC.; ASBESTOS CORPORATION, LTD.; )
A.W. CHESTERTON COMPANY; CROWN, CORK & )
SEAL COMPANY, INC., Individually and as Successor- )
in-Interest to MUNDET CORK CORP.; GARLOCK )
SEALING TECHNOLOGIES LLC, Individually and as )
Successor-in-Interest to GARLOCK, INC.; GENERAL )
ELECTRIC COMPANY; J T THORPE & SON, INC.; )
METROPOLITAN LIFE INSURANCE COMPANY; )
PARKER-HANNIFIN CORPORATION, as Successor- )
in-Interest to SACOMO SIERRA; OWENS-ILLINOIS )
CORPORATION; QUINTEC INDUSTRIES, INC.; )
SOCO-LYNCH CORPORATION, successor-in-interest )
to WESTERN CHEMICAL & MANUFACTURING )
COMPANY; SWINERTON BUILDERS f/k/a )
SWINERTON & WALBERG CO.; THOMAS DEE )
ENGINEERING COMPANY; TRANE U.S. INC., fka )
AMERICAN STANDARD, INC.; UNION CARBIDE )
CORPORATION; VIACOM, INCORPORATED, as )
successor-by-merger to CBS CORPORATION, fka )
WESTINGHOUSE ELECTRIC CORPORATION; )
ALLIS-CHALMERS CORPORATION PRODUCT )
LIABILITY TRUST; BAYER CROPSCIENCE, INC., )
successor to AMCHEM PRODUCTS, INC.; ENPRO )
INDUSTRIES, INC., Individually and as Successor-in- )
Interest to ANCHOR PACKING COMPANY; )
HOPEMAN BROTHERS, INC.; SB DECKING, INC., )
formerly known as SELBY, BATTERSBY & )
COMPANY; GEORGIA-PACIFIC CORPORATION; )
HAMILTON MATERIALS, INC.; HANSON )
PERMANENTE CEMENT, INC. fka KAISER CEMENT )
CORPORATION; KAISER GYPSUM CO., INC.; )
KELLY-MOORE PAINT COMPANY, INC.; EATON )
AEROQUIP, LLC; PNEUMO-ABEX CORPORATION, )
Successor-in-Interest to ABEX CORPORATION; )
HONEYWELL INTERNATIONAL, INC. fka ALLIED )
SIGNAL, INC./THE BENDIX CORPORATION; BORG- )
WARNER CORPORATION by its Successor in Interest, )
BORGWARNER MORSE TEC, INC.; )
BRIDGESTONE/FIRESTONE NORTH AMERICAN )
TIRE, LLC; DANA COMPANIES, LLC; GOODRICH )
CORPORATION; FEDERAL-MOGUL ASBESTOS )
PERSONAL INJURY TRUST, as successor to FELT )
PRODUCTS MANUFACTURING CO.; FORD MOTOR )
COMPANY; GENERAL MOTORS CORPORATION; )
INTERNATIONAL TRUCK AND ENGINE )
CORPORATION; NAVISTAR, INC.; THE )
GOODYEAR TIRE & RUBBER COMPANY; )
AIRCRAFT BRAKING SYSTEMS CORPORATION; )
MEGGITT AIRCRAFT BRAKING SYSTEMS; )
PARKER-HANNIFIN CORPORATION, as Successor to )
RIS and CALI-BLOK; CURTISS-WRIGHT )

CORPORATION; MCDONNELL DOUGLAS
CORPORATION, Individually and Successor-in-Interest
to DOUGLAS AIRCRAFT COMPANY, INC.; EATON
CORPORATION; UNITED TECHNOLOGIES
CORPORATION, formerly known as PRATT &
WHITNEY, INC.; PRATT & WHITNEY POWER
SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES,
INC.; and ELEVENTH DOE through THREE
HUNDREDTH DOE, inclusive,

Defendants.

ATTACHMENT TO SUMMONS          2 of 2

## CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is: Gordon & Rees LLP, 275 Battery Street, Suite 2000, San Francisco, CA 94111.

On July 15, 2011, I served the within document(s):

**SPECIALLY APPEARING DEFENDANT CURTISS-WRIGHT CORPORATION'S JOINDER AND NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1442(A)(1)**

[X] by electronically serving the document(s) described above via United States District Court Electronic Case Filing website (CM/ECF notification system) on the recipients designated on the electronic service list that is located on the Pacer website.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 15, 2011, at San Francisco, California.

_____
ANDREA K. BEAN

CURCT/1071298/10140619v.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "E"

1    Ronald A. McIntire, Bar No. 127407
     RMcIntire@perkinscoie.com
2    Bo W. Kim, Bar No. 217394
     BKim@perkinscoie.com
3    Hillary O. Mueri, Bar No. 272713
     HMueri@perkinscoie.com
4    PERKINS COIE LLP
     1888 Century Park E., Suite 1700
5    Los Angeles, CA  90067-1721
     Telephone:  310.788.9900
6    Facsimile:  310.788.3399

7    Attorneys for Defendant
     The Boeing Company
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12   PATTI DONLON, Individually and as        Case No. CV 11 3376
     Successor-in-Interest to the Estate of
13   PATRICK THEISEN DONLON,              **DEFENDANT THE BOEING**
     Decedent; SEAN DONLON; and          **COMPANY'S JOINDER IN**
14   DOES ONE through TEN, inclusive,     **DEFENDANT UNITED**
                                          **TECHNOLOGIES CORPORATION'S**
15                      Plaintiff,        **NOTICE OF REMOVAL OF ACTION**
                                          **UNDER 28 U.S.C. 1442(a)(1)**
16            v.

17   AC AND S, INC., et al.,

18                      Defendant.

19   _____

20

21

22

23

24

25

26

27

28

1    TO THE HONORABLE COURT ALL INTERESTED PARTIES AND THEIR

2    ATTORNEYS OF RECORD:

3        PLEASE TAKE NOTICE that Defendant The Boeing Company ("Boeing"),

4    hereby joins United Technologies Corporation's ("UTC") notice of removal of the above-

5    entitled action from the Superior Court of the State of California for the County of San

6    Francisco (Case No. CGC-09-275218), to the United States District Court for the

7    Northern District of California pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446.

8                  **I.**    **FACTUAL SUMMARY**

9        This is an asbestos wrongful death action by Plaintiffs Patti Donlon, Individually

10   and as Successor-in-Interest to the Estate of Patrick Theisen Donlon, Decedent, and Sean

11   Donlon ("Plaintiffs"). Plaintiffs claim that the decedent Patrick Donlon developed an

12   asbestos-related disease as a result of exposure to asbestos fibers released from

13   defendants' products; among the many alleged exposures, Plaintiffs claim Mr. Donlon's

14   work on U.S. Navy airplanes exposed him to asbestos fibers.

15             **II.**    **TIMELINESS OF REMOVAL**

16       28 U.S.C. §1446(b) provides in pertinent part:

17           If the case stated by the initial pleading is not removable, a

18           notice of removal may be filed within thirty days after receipt
           by the defendant, through service or otherwise, of a copy of

19           an amended pleading, motion, order or other paper from
           which it may first be ascertained that the case is one which is

20           or has become removable...

21       Boeing first received an 'other paper' from which removability could be ascertained

22   on July 12, 2011[1]. On that date, counsel for Boeing received email correspondence from

23   counsel for Plaintiffs indicating the North American Aviation T-29 and SNJ aircraft are

24   the Boeing aircraft at issue in this case.   The receipt of this email put Boeing on notice of

25

26         [1] Boeing received Plaintiffs' Notice of Entry of Order Granting Plaintiffs' *Ex Parte*
Application for an Order Allowing Amendment to Complaint Substituting the True

27   Identity of Defendants on June 27, 2011. See Declaration of Bo W. Kim in Support of
Defendant The Boeing Company's Joinder in Defendant United Technologies

28   Corporation's Notice of Removal of Action ("Kim Decl."), Exhibit A attached thereto.

the first time that Plaintiffs' claims in this action involve alleged exposure to asbestos from military equipment allegedly built by Boeing for the U.S. Navy pursuant to reasonably precise specifications approved by the Navy and under the direction and control of the Navy and its officers. This Joinder is being filed within 30 days of receipt of the "paper" by Boeing, and is therefore timely.

## III.   BASIS FOR REMOVAL

"Federal officers and their agents, may remove cases based on acts performed under color of their federal office if they assert a colorable federal defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006). A party seeking removal under § 1142 must show that: (a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a colorable federal defense. *Id.*; see also *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999); *Mesa v. California*, 489 U.S. 121, 124-25, 131-35 (1989). The Supreme Court has rejected a "narrow, grudging interpretation" of what constitutes a colorable federal defense, indicating that the defendant "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Mesa*, 489 U.S. at 431. Rather, the defendant "need only articulate its 'colorable' applicability to the plaintiff's claims." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999).

This case is properly removed under U.S.C. § 1442(a)(1) because, for the purposes of this case, Boeing was a "person" acting under the direction of the United States Air Force, and can assert the federal contractor immunity and derivative sovereign immunity defenses.

## A.   Boeing is a "Person" Within the Meaning of 28 U.S.C. § 1442(a)(1)

It is well-settled that a private corporation like Boeing is a "person" entitled to the benefit of removal under 28 U.S.C. § 1442(a)(1). *See, e.g., Winters*, 149 F.3d at 398;

1   *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992). Accordingly, Boeing meets

2   this requirement for removal under 20 U.S.C. § 1442(a)(1).

3   **B.     Boeing was Acting Under the Direction of the United States Navy**

4          In Plaintiffs' Preliminary Fact Sheet, they allege that Mr. Donlon was exposed to

5   asbestos while employed by the U.S. Navy as an aviation mechanic from 1955-1958.

6   Kim Decl. Exhib. A at 3:4-6. Additionally, Plaintiffs indicate that Mr. Donlon served in

7   the U.S. Naval Reserves through 1963. Kim Decl. Exhib. B at ¶9. Plaintiffs' counsel

8   indicated, via email, that North American Aviation T-28 and SNJ aircraft are the Boeing

9   planes at issue.[2] Kim Decl. ¶ 4. Such aircraft were designed, manufactured, and supplied

10  by Boeing predecessors under close government supervision, pursuant to comprehensive

11  and detailed contract specifications provided by the United States Navy and its officers.

12  Therefore Boeing was acting pursuant to the direction of agents and officers of the United

13  States within the meaning of § 1442(a)(1).

14         Moreover, there is a causal nexus between Boeing's actions, taken pursuant to the

15  direction of federal agents and officers, and Mr. Donlon's alleged exposure to asbestos.

16  First, his alleged exposure purportedly occurred while he was performing work on

17  military aircraft, which were built in compliance with government specifications. Second,

18  any purported asbestos which allegedly caused his injuries would have been installed by

19  Boeing at the direction of federal officers. *See Akin*, 851 F. Supp. at 823-24 ("[W]hen a

20  government contractor builds a product pursuant to [military] specifications and is later

21  sued because compliance with those specifications allegedly caused personal injuries, the

22  nexus requirement is satisfied"); *Fung*, 816 F. Supp at 572; *Pack v. AC and S, Inc.*, 838 F.

23  Supp. 1099, 1103 (D. Md. 1993). The same is true for any warnings Plaintiffs may claim

24  were absent from the aircraft, their maintenance manuals, or other sources.

25

26

27

28         [2] Boeing did not manufacture the T-28 or SNJ aircraft. Boeing's predecessor, North American
    Aviation manufactured the T-28 and SNJ pursuant to government contracts.

**C.    Boeing Asserts a Colorable Federal Defense**

**1.    Government Contractor Immunity**

Pursuant to the government contractor immunity defense, military equipment manufacturers such as Boeing cannot be held liable under state law for any injuries caused by the equipment it built for the U.S. military when: (a) the United States approved reasonably precise specifications; (b) the equipment conformed to these specifications; and (c) the equipment supplier warns the military about any hazards involved in the use of the equipment that are known to the equipment supplier but not known to the military. *Boyle v. United Technologies, Inc.*, 487 U.S. 500, 512 (1988); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir. 1983); *Sundstrom v. McDonnell Douglas Corp.*, 816 F. Supp. 587 (N.D. Cal. 1993). Given that each aspect of Boeing's involvement with the T-28 and SNJ aircraft was carried out according to detailed contract specifications dictated by the U.S. Government, Boeing has a colorable federal defense.

As stated above, the Navy approved precise specifications regarding the design and manufacture of the T-28 and SNJ, and the aircraft supplied to the Navy by Boeing conformed to those specifications. Also, there were no hazards posed by the aircraft which were known to Boeing and not the Navy. The Navy was well aware of the potential health hazards associated with working with or around asbestos-containing products and therefore Boeing had no duty to warn. *See Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019 (S.D. Ill. 1989) (defendants had no duty to warn the Government about the alleged hazards of asbestos, and thus satisfy the third prong of the Boyle test, because the Navy already had superior knowledge about those hazards); *Blackman v. Asbestos Defendants (BHC)*, No. C-97-3066, 1997 WL 703773, *3 (N.D. Cal. 1997) (finding that defendant contractor had no duty to warn the U.S. Air Force of dangers of asbestos use in military equipment where the contractor was not an asbestos manufacturer and had no greater opportunity to know of the dangers of asbestos than did the U.S. Air Force). Therefore, Boeing has more than a colorable government contractor immunity defense.

## 2.   Derivative Sovereign Immunity

Boeing also has a colorable derivative sovereign immunity defense.  A government contractor, performing at the direction and authorization of a government officer, is immune from suit based upon performance of the contract. *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).  Because the T-28 and SNJ aircraft were designed, manufactured, and supplied to the Navy at the direction and authorization of government officers and pursuant to a government contract, the *Yearly* doctrine is satisfied here.  Had the government performed these acts directly, it would be immune from suit.

### IV.   JOINDER AND CONSENT OF OTHER DEFENDANTS

Co-Defendants' consent is not necessary for removal under 28 U.S.C. § 1442. "Federal officer removal constitutes an exception to the general removal rule under 28 U.S.C. § 1441 and § 1446 which require all defendants to join in the removal petition. *Akin*, 156 F.3d at 1034; *see also, Ely Valley Mines v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

### V.   INTRA-DISTRICT ASSIGNMENT

This Court is the United States District Court for the district embracing the place where the state court action was pending prior to its removal.  The state court action was pending before the Superior Court of California for the County of San Francisco. Therefore, pursuant to 28 U.S.C. §§ 1441(b) and § 1446, the United States District Court for the Northern District of California is the appropriate court for removal.

### VI.   NOTICE TO PARTIES AND STATE COURT

Notice of this joinder will be filed with the Superior Court of California for the County of Los Angeles and served on all parties of record pursuant to 28 U.S.C. § 1446(d).

### VII.   TRANSFER OF THIS ACTION TO MULTI-DISTRICT ASBESTOS PROCEEDINGS

Boeing intends to seek transfer of this action to the Eastern District of Pennsylvania where all Federal Court asbestos actions have been centralized in a single

1  forum, *In re Asbestos Products Liability Litigation*, (Multi District Litigation Docket NO.

2  875), pursuant to 28 U.S.C. § 1407. Accordingly, Boeing will be filing a Notice of

3  Pendency of Related Actions regarding MDL 875.

4  ## VIII.  CONCLUSION

5  WHEREFORE, Boeing respectfully requests that the above-entitled action remain

6  removed from the Superior Court of the State of California for the County of San

7  Francisco, where it was filed, to the United States District Court for the Northern District

8  of California, and that this action proceed in this Court as a properly removed action.

9

10  DATED:   July 25, 2011                              **PERKINS COIE LLP**

11                                                      By:

12                                                      Bo W. Kim, Bar No. 217394
                                                        BKim@perkinscoie.com
13

14                                                      Attorneys for Defendant
                                                        The Boeing Company
15

16

17

18

19

20

21

22

23

24

25

26

27

28

01038-6096/LEGAL21394065.1                    -7-      DEFENDANT THE BOEING COMPANY'S
                                                        JOINDER IN UTC'S NOTICE OF REMOVAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "F"

1  STEVEN M. HAROWITZ (BAR NO. 71117)
   harowitz@htlawoffices.com
2  KATHERINE Y. WANG (BAR NO. 215663)
   wang@htlawoffices.com
3  **HAROWITZ & TIGERMAN, LLP**
   450 Sansome Street, 3rd Floor
4  San Francisco, California 94111
   Tel: (415) 788-1588; Fax: (415) 788-1598
5
6  Attorneys for Plaintiffs

7

8              **UNITED STATES DISTRICT COURT**

9      **NORTHERN DISTRICT OF CALIFORNIA-SAN FRANCISCO DIVISION**

10
11 PATTI DONLON, Individually and as          ) Case No. 4:11-CV-3376-SI
   Successor-in-Interest to the Estate of     )
12 PATRICK THEISEN DONLON, Decedent;          ) Superior Court of California, San Francisco
   SEAN DONLON; and DOES ONE through          ) County, Case No. CGC-09-275218
13 TEN, inclusive,                            )
                                              ) **NOTICE OF MOTION AND MOTION TO**
14           Plaintiffs,                       ) **REMAND THIS CASE TO CALIFORNIA**
                                              ) **SUPERIOR COURT**
15    vs.                                      )
                                              ) _____
16                                            )
17 AC AND S, INC., et al.                     ) Hearing Date: August 26, 2011
                                              ) Time: 9:00 a.m.
18           Defendants.                       ) Courtroom: 10, 19th Floor
                                              ) Judge: Honorable Susan Illston
19                                            )
                                              )
20                                            )
                                              )
21                                            )
                                              )
22
23
24
25
26
27
28

                                1

TO ALL DEFENDANTS IN THIS ACTION AND THEIR ATTORNEYS OF RECORD:

Notice is hereby given that at 9:00 a.m. on August 26, 2011, or as soon thereafter as this matter may be heard, in Courtroom 10, of the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, CA 94102, plaintiffs will move the Court for an order remanding this case to the Superior Court of California in and for the County of San Francisco.

The motion is based on this notice, the memorandum of points and authorities, the declaration of Katherine Wang and exhibits attached thereto, the allegations in plaintiffs' Complaint, defendant United Technologies Corporation's ("UTC") notice of removal and attachments, defendant Curtiss-Wright Corporation's ("Curtiss-Wright") joinder in UTC's notice of removal, all papers and records on file in the state and federal court files pertaining to this case, and such argument as may be made at the hearing.

As fully set forth in their accompanying Memorandum of Points and Authorities, Plaintiffs respectfully ask that the Court remand this case to state court for the following reasons:

1. As a matter of law, there is no federal subject matter jurisdiction in this case because of the express disclaimer in Plaintiffs' complaint as well as Plaintiffs' dismissal of all claims other than their failure to warn claims as to the aviation defendants, including UTC and Curtiss-Wright.

2. UTC's and Curtiss-Wright's removal are improper because they were not "federal officers" or "persons acting under a federal officer" within the meaning of 28 U.S.C §1442(a)(1).

3. UTC and Curtiss-Wright failed their burden to present evidence that there is a causal nexus between their failure to warn of the hazards of asbestos, taken pursuant to a federal officer's direction, and Plaintiffs' claims.

4. UTC and Curtiss-Wright cannot and does not establish that the government contractor defense is a colorable federal defense.

By this motion, Plaintiffs seek the immediate remand of this action to Superior Court of California, County of San Francisco on the grounds that Defendants' removal is improper and prejudicial to plaintiffs, is insufficiently supported by any evidence, and that this Court lack subject

1   matter jurisdiction under 28 U.S.C. § 1442(a)(1).

2

3   Dated: July 22, 2011                **HAROWITZ & TIGERMAN, LLP**

4

5

6                              KATHERINE Y. WANG

7                              Attorney for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEVEN M. HAROWITZ  (BAR NO. 71117)
harowitz@htlawoffices.com
KATHERINE Y. WANG (BAR NO. 215663)
wang@htlawoffices.com
**HAROWITZ & TIGERMAN, LLP**
450 Sansome Street, 3rd Floor
San Francisco, California  94111
Tel: (415) 788-1588; Fax: (415) 788-1598

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

PATTI DONLON, Individually and as
Successor-in-Interest to the Estate of
PATRICK THEISEN DONLON, Decedent;
SEAN DONLON; and DOES ONE through
TEN, inclusive,

        Plaintiffs,

    vs.

AC AND S, INC., et al.

       Defendants.

) Case No. 4:11-CV-3376-SI
)
) Superior Court of California, San Francisco
) County, Case No. CGC-09-275218
)
) **MEMORANDUM OF POINTS AND**
) **AUTHORITIES IN SUPPORT OF**
) **PLAINTIFFS' MOTION TO REMAND**
) **CASE TO CALIFORNIA SUPERIOR**
) **COURT**
) ———————————————————
)
) Hearing Date: August 26, 2011
) Time:  9:00 a.m.
) Courtroom:  10, 19th Floor
) Judge:  Honorable Susan Illston
)
)
)
)
)

# TABLE OF CONTENTS

Page

I.   INTRODUCTION...............................................................................1

II.  STATEMENT OF FACTS....................................................................4

III. LEGAL ARGUMENT..........................................................................4

    A.   THERE IS A STRONG FEDERAL PRESUMPTION AGAINST
         REMOVAL JURISDICTION .......................................................4

    B.   UTC FAILS TO ESTABLISH FEDERAL OFFICER JURISDICTION
         UNDER 28 U.S.C. §1442(a)(1)....................................................5

         1. UTC Has Not And Cannot Show That It Acted Under The Direction Of
         A Federal Officer ..................................................................6

                a.  UTC Does Not And Cannot Identify The Federal Officer Who
                Directed It To Incorporate Asbestos Into Its Engines Or Directed It
                To Exclude Safety Warnings....................................................6

                b.  Defendant Cannot Prove That It Failed To Warn At The
                Direction Of A Federal Officer .................................................8

          2.  UTC Has Not Raised A Colorable Federal Defense ...........................11

                a. The Military Contractor Defense Does Not Apply Where The
                Products At Issue Are Stock Equipment Readily Available To
                Commercial Users................................................................12

                b. Even if the Products at Issue are Considered "Military
                Equipment" And The Boyle Elements Applied to a Failure to Warn
                Case, UTC Does Not Raise a Colorable Federal Defense Since it
                Cannot Prove That in Making Decisions Regarding Warnings, It
                Was Acting in Compliance with Reasonably Precise Specifications
                Imposed by the United States...................................................14

         3.  UTC Cannot Establish Casual Nexus Between Its Actions Under The
             Control Of A Federal Officer And Plaintiffs' Failure to Warn
             Claims. ..............................................................................15

                a. Plaintiffs' Claims Against UTC Are Limited to Failure to Warn
                .........................................................................................17

                b. There Is No Jurisdiction Under §1442 In Failure To Warn Cases
                .........................................................................................18

IV.  CONCLUSION ................................................................................23

1

2

## TABLE OF AUTHORITIES

**Page**

3

### Cases

4

Accord Dorse v. Eagle-Picher Indus., Inc., 898 F.2d 1487 (11th Cir. 1990). ........................8

5

Anderson v. Owens-Corning Fiberglass Corp. (1991) 53 Cal.3d 987...........................22

Arness v. Boeing North America, Inc., 997 F.Supp. 1268 (C.D. Ca. 1998)...................6, 20

6

Arnold v. Blue Cross & Blue Shield, 973 F.Supp. 726, 739 (S.D. Texas 1997).................5, 6

Boyle v. United Tech. Corp, 487 U.S. 500

7

(1988)...................................4, 8, 9, 10, 11, 12, 13, 14, 15, 18, 21, 22, 23

California ex rel. Lockyer v. Dynegy, Inc., 375 F3d 831 (9th Cir. 2004) ..............................4

8

Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993) 509 U.S. 579..........................2, 16

Faulk v. Owens-Corning Fiberglass Corp., 48 F.Supp.2d 653

9

(E.D.Tex. 1999) ....................................9, 11, 14, 16, 19

Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F.Supp.2d 1144

10

(D. Colo. 2002) ....................................5, 19

Gaus v. Miles, Inc., 980 F.2d 564 (9th Cir. 1992).....................................5

11

Good v. Armstrong World Indus., 914 F.Supp. 1125 (E.D.Pa. 1996)....................6, 7, 9, 10

Hansen v. Johns-Manville Products Corp., 734 F.2d 1036 (5th Cir. Tex.) 1984).................9

12

Hilbert v. McDonnell Douglas Corp. 529 F.Supp.2d 187 (D. Mass. 2008),..................9, 10

Hofler v. Aetna US Healthcare, 296 F.3d 764 (9th Cir. 2002).....................................5

13

Holdren v. Buffalo Pumps, Inc., 614 F.Supp.2d 129 (D. Mass. 2009.)........................2, 10

In Re Hawaii Federal Asbestos Cases 960 F.2d at 812 .........................8, 11, 12, 13, 22

14

In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626 (2nd Cir. (N.Y.) 1990) ...9, 22, 23

In re Joint Eastern & Southern Dist. Asbestos Litig., 715 F.Supp. 1167

15

(E.D.N.Y. 1988)....................................2, 9, 10, 22

In re Maine Asbestos Cases, 44 F.Supp.2d 368 (D.Me 1999)....................................23

16

In re New York City Asbestos Litigation, 542 N.Y.S.2d 118 (1989)....................................9

In Re; Joint E. S. Dist. N. Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir. 1990)..................11

17

Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974) .....................................6

Lamb v. Martin Marietta Energy Systems, Inc., 835 F.Supp. 959 (W.D. Ky. 1993) ...........11

18

Lindenmayer v. Allied Packing & Supply, Inc., 2010 WL 234906

19

(N.D.Cal., Jan. 14, 2010) ....................................10

Madden v. Able Supply Company, 205 F.Supp.2d 695 (S.D Tex. 2002.....................23

Matheson v. Progressive Specialty Ins. Co., 319 F.3d 1089 (9th Cir. 2003)....................5

20

McGlasson v. Barger, 220 F.Supp. 938 (D. Colo. 1963).....................................3

Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804 (1986)..........................3

21

Mesa v. California, 489 U.S. 121 (1989)....................................4, 6, 9, 11, 15, 19, 20

Miller v. Diamond Shamrock Co., 275 F3d 414 (5th Cir. 2001)....................................4

22

Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. WL 690854 (N.D. Cal. 1998)...............18, 19

Nobriga v. Raybestos-Manhattan, Inc., 683 P.2d 389 (Hawaii 1984) ..........................9

23

Oliver v. Oshkosh Truck Corp., 96 F.3d 992 (7th Cir.1996,)..................................9, 10

Overly v. Raybestos- Manhattan, 1996 WL 532150 (N.D. Cal. 1996)..........................9

24

Quiles v. Sikorsky Air, 84 F. Supp. 2d 154 (D. Mass. 1999)..................................21

Rendell-Baker v Kohn, 457 U.S. 830 (1942)..................................6

25

Ruffin v. Armco Steel Corp., 959 F. Supp. 770 (S.D. Tex. 1997)..........................20, 21

Ryan v. Dow Chemical Co., 781 F. Supp. 934 (E.D.N.Y. 1992)..................................5, 6

26

Screws v. United States, 325 U.S. 91 (1945),..................................5

Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir.1995)..................................2, 10

27

Trevino v. General Dynamics Corp. 865 F. 2d. 1474..................................15

United States v. Boyd, 378 U.S. 39 (1964)..................................11

28

Viala v. Owens-Corning Fiberglas, 1994 U.S. Dist. WL 139287 (N.D. Cal. 1994) ..............18

Williams v. General Electric Company, 418 F.Supp.2d 610 (M.D. 24 Penn. 2005)...................5
Willingham v. Morgan, 395 U.S, 402 (1969) .................................................................5

## Statutes

28 U.S.C. §1442(a)(1)..............................................................4, 5, 18, 20, 21, 23

28 U.S.C. §1447(c) ......................................................................24

Fed. R. Civ. P. 56(e) ..................................................................2, 16

## I. INTRODUCTION

This is a wrongful death asbestos action. Plaintiffs are the widow and son of decedent Patrick Donlon who died of malignant mesothelioma on May 27, 2008.

Defendant United Technologies Corporation (hereinafter "UTC") removed this case from San Francisco Superior Court pursuant to 28 USC §1442(a)(1) (federal officer or agency removal) on July 8, 2011. On July 15, 2011, defendant Curtiss-Wright Corporation ("Curtiss-Wright") joined UTC's removal notice.

UTC removed this case alleging that the aircraft engines with which decedent Patrick Donlon worked and from which Plaintiffs claim he was exposed to asbestos, were subject to government approval and therefore protected under the federal officer removal statute. However, UTC completely fails to set forth any admissible evidence that either the use of asbestos in its aircraft engines or its failure to warn Plaintiffs' decedent of asbestos hazards was at the direction of a federal officer.

Most importantly, there is no evidence, nor will there be any evidence that UTC's failure to warn of the hazards of asbestos was at the direction of a federal officer. Because Plaintiffs have dismissed all causes of action, other than their failure to warn claims, as against UTC and Curtiss-Wright and the other named aircraft engine manufacturers, defendants have not and will not be able to meet their burdens pursuant to a government contractor defense.

The only evidence UTC offers to meet its strict burden of establishing alleged federal control is the declaration of Allan Shiffler. Mr. Shiffler's declaration, which is UTC's attempt to show that the Navy controlled all aspects of UTC's design and manufacture of aircraft engines, contains nothing but conclusory blanket statements. Of key significance is that upon a careful review of Mr. Shiffler's declaration, it becomes evident that he does not offer any opinion as to what the Navy told UTC to do or not do regarding asbestos warnings on defendant's aircraft engines; indeed, the words "asbestos" and "warning" are absent from Mr. Shiffler's entire declaration. It is incomprehensible that the Navy would have instructed defendants not to put warning on its asbestos-containing products. And UTC's only evidence, via the Shiffler declaration, does not establish otherwise.

Additionally, Mr. Shiffler's declaration in this case is almost identical to a declaration he executed in <u>Sandra Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co.</u>, et

1

al. (Case No. 08-4778, Middlesex County Superior Court in the Commonwealth of Massachusetts.)[1]
In the Norsworthy case, Mr. Shiffler was produced as UTC's person most knowledgeable in response
to a deposition notice seeking facts, documents and witnesses that support UTC's claim of the
government contractor defense for having supplied the Navy and the Air Force asbestos-containing
products. At his deposition, Mr. Shiffler testified that the *one and only* engine he worked on during
his tenure as UTC's employee was used *only* for the Air Force and *never* for the Navy[2]. Mr. Shiffler
further testified that he does not know if UTC possesses any military specification for its manuals nor
does he know what requirements were contained in a military specification. Mr. Shiffler testified that
he was not aware that the military ever told UTC to not warn about the hazards of asbestos in its
manuals.

Mr. Shiffler's testimony makes clear that his declaration in support of UTC's removal of this
case lacks personal knowledge regarding alleged *Navy* control and fails to affirmatively show that he
is competent to testify to any of the matters stated therein as required under Fed. R. Civ. P. 56(e) and
Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993) 509 U.S. 579. Without showing that Plaintiffs'
failure to warn claims are based on acts directed by any federal officer, UTC cannot establish federal
subject matter jurisdiction.

A litany of cases exists throughout the United States, and in this district, holding that removal
based on federal officer jurisdiction is unavailable in failure to warn cases such as the instant case.
They so hold because there is no evidence that the government directed defendants <u>not</u> to warn about
the dangers of asbestos in the products purchased by the government, and that defendants' removal
was based on speculation regarding what the United States Navy <u>would have</u> done. In re Joint Eastern
and Southern Dist. New York Asbestos Litig., 897 F.2d 626 (2d Cir.1990); Tate v. Boeing Helicopters,
55 F.3d 1150 (6th Cir.1995); Holdren v. Buffalo Pumps, Inc., 614 F.Supp.2d 129 (D. Mass. 2009.),
followed by Lindenmayer v. Allied Packing & Supply, Inc., 2010 WL 234906 (N.D.Cal., Jan. 14,
2010).

---

[1] Allan Shiffler's declaration in the Norsworthy case in attached as Exhibit E to the Declaration of
Katherine Y. Wang, filed concurrently herewith.

[2] In this case, Plaintiffs' decedent Patrick Donlon was a Navy aviation mechanic, not an Air Force
mechanic.

1    The claims in those cases, as in this case, are limited by way of disclaimer in the Complaint to

2    state law failure to warn claims. Various courts, including the U.S. Supreme Court, have repeatedly

3    confirmed that plaintiffs may use such disclaimers to prevent removal, including in asbestos and

4    product liability cases subject to potential transfer to multi-district litigation. See Merrell Dow

5    Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 809 (1986) ("Jurisdiction may not be sustained on a

6    theory that the plaintiff has not advanced."). Because the only claims alleged against the aircraft

7    engine manufacturing defendants, including UTC and Curtiss-Wright, are failure to warn, this case

8    must be remanded due to a lack of federal subject matter jurisdiction.

9    Even if assuming federal subject matter jurisdiction exists, which Plaintiffs dispute, UTC has

10   failed in its burden to show that it is entitled to the government contractor defense. UTC's Notice of

11   Removal asserts, in general terms, that:

12   UTC acted under the direction of federal officers-namely officers and agents of
     the U.S. Navy-in designing, manufacturing, and supplying aircraft engines for
13   use in Navy aircraft. Aircraft engines supplied by UTC to the Navy were
     manufactured in accordance with precise specifications prepared, drafted, and
14   issued exclusively by the Navy.

15   (See UTC's Notice of Removal, ¶16 citing the Declaration of Allan Shiffler,
16   ¶¶2-3; 7-11.)

17   UTC does not state that *any particular government officer expressly specified the use of*

18   *asbestos as an ingredient for the engines on which Mr. Donlon worked in the Navy*. Nor does UTC

19   state that *any government official prevented defendant from warning about the hazards of asbestos*

20   at the direction of the Navy. UTC has not cited to or provided *any contractual provisions, aircraft*

21   *specifications or like documents* buttressing Mr. Shiffler's generic assertions. Nor does UTC identify

22   any discretionary decision by a federal officer which caused decedent to be exposed to asbestos.

23   Moreover, UTC cannot amended or supplement its insufficient notice of removal after the time

24   for removal as expired. McGlasson v. Barger, 220 F.Supp. 938 (D. Colo. 1963).[3] A removing

25   defendant that fails to provide the requisite facts and evidence, cannot amend or supplement, after the

26

27   [3] UTC admits it was put on notice that Plaintiffs' claims are removable on June 14, 2011; Curtiss-
     Wright admits that it was put on notice on June 15, 2011. (See UTC's Notice of Removal, ¶6; see also
28   Curtiss-Wright's Notice of Joinder, ¶7.)

1  time for removal has expired. Id.  Thus should UTC or Curtiss-Wright submit untimely evidence in

2  response to this remand motion, the court must refuse to consider defendants' late evidence because in

3  essence, defendants would be attempting to amend their notices of removal beyond the time period

4  within which removal must be effected.

5      In summary, UTC removed this case based on only very general recitals concerning federal

6  control.  Without establishing that it can prove that the "government made me do it" with admissible

7  evidence, UTC cannot and has not raised a colorable federal defense.  See Boyle v. United Tech. Corp,

8  487 U.S. 500, 509 (1988).

9  **II.  STATEMENT OF FACTS**

10

11      This instant action is based on Patrick Donlon's death from mesothelioma caused by his

12  exposure to UTC's asbestos-containing products.  (See Complaint at ¶ 3-16, Wang Decl., Ex. A.)

13  Plaintiffs allege that Mr. Donlon's exposure to defendant's asbestos-containing products transpired

14  during his service in the U.S. Navy as an aviation mechanic.  (See Preliminary Fact Sheet to

15  Complaint, pg. 3, Wang Decl., Ex. A.)

16      On June 23, 2011, prior to UTC's filing of the removal notice and Curtiss-Wright's joinder in

17  the same, Plaintiffs dismissed all claims except their failure to warn claims as to the aircraft

18  defendants, including UTC and Curtiss-Wright.  (See Request for Dismissal, Wang Decl., Ex. B.)

19  **III.  LEGAL ARGUMENT**

20      **A.  THERE IS A STRONG FEDERAL PRESUMPTION AGAINST REMOVAL
      JURISDICTION**

21

22      The Supreme Court of the United States has stated that section 1442(a) is "a pure jurisdictional

23  statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal

24  officer is a defendant.  Section 1442(a), therefore, cannot independently support Art. III 'arising under'

25  jurisdiction." Mesa v. California, 489 U.S. 121, 136 (1989).

26      The defendant seeking removal of an action to federal court has the burden of showing that it

27  has established grounds for federal jurisdiction in the case. California ex rel. Lockyer v. Dynegy, Inc.,

28  375 F3d 831, 838 (9th Cir. 2004); Miller v. Diamond Shamrock Co., 275 F3d 414, 417 (5th Cir. 2001).

1   Because removal of an action to federal court implicates federalism concerns and deprives the plaintiff

2   of his chosen forum, the removal statutes must be strictly construed against jurisdiction, Hofler v.

3   Aetna US Healthcare, 296 F.3d 764, 767 (9th Cir. 2002), and if there is any doubt about the propriety

4   of removal, the case should be remanded to state court.  Matheson v. Progressive Specialty Ins. Co.,

5   319 F.3d 1089, 1090 (9th Cir. 2003).  There is a "strong presumption against removal jurisdiction" and

6   the removing defendant bears the burden of proving that removal is proper. Gaus v. Miles, Inc., 980

7   F.2d 564, 566 (9th Cir. 1992).  UTC and Curtiss-Wright fail to meet this burden.

8          In the specific context of removals under the federal officer removal statute, federal courts

9   are to avoid a "narrow, grudging interpretation" of their jurisdiction, Ryan v. Dow Chemical Co., 781

10  F. Supp. 934, 943 (E.D.N.Y. 1992) (quoting Willingham v. Morgan, 395 U.S. 402, 407 (1969), but

11  this rule only applies when actual federal officers are defendants, not when private corporate

12  defendants, such as UTC and Curtiss-Wright, attempt to exploit the statute. Freiberg v. Swinerton &

13  Walberg Property Services, Inc., 245 F.Supp.2d 1144, 1152 n. 6 (D. Colo. 2002).  Removal under

14  §1442 is "an exceptional procedure which wrests from state courts the power to try [cases under] their

15  own laws.  Thus the requirements of the showing necessary for removal are strict." Screws v. United

16  States, 325 U.S. 91, 111-112 (1945). Private actors such as UTC and Curtiss-Wright, bear *a special*

17  *burden* in establishing the official nature of their activities.'" Williams v. General Electric Company,

18  418 F.Supp.2d 610 (M.D. 24 Penn. 2005).

19          Neither UTC nor Curtiss-Wright has even come close to meeting this burden.

20      **B.  UTC  FAILS TO ESTABLISH FEDERAL OFFICER JURISDICTION UNDER 28**

21          **U.S.C. §1442(a)(1)**

22          A defendant that seeks to remove a case under Section 1442(a)(1) has the burden of proving

23  four jurisdictional elements: (1) that it is a "person" within the meaning of the statute;  (2) that it acted

24  under the direction of a federal officer;  (3) that it has a colorable federal defense to the plaintiff's

25  claims; and (4) that there is a causal nexus between the plaintiff's claims and the acts the defendant

26  performed under color of federal office.  Arnold v. Blue Cross & Blue Shield, 973 F.Supp. 726, 739

27  (S.D. Texas 1997) (*citing* Mesa v. California, 489 U.S. 121, 124-25, 129-31, 134-35 (1989)). Plaintiffs

28  particularly address UTC's failure to meet the second, third and fourth prongs of the Mesa test.

1
2

### 1. UTC Has Not And Cannot Show That It Acted Under The Direction Of A Federal Officer

3    Under the second prong of the Mesa test, UTC must demonstrate that it acted at the direction of

4    a specific federal officer when designing the aircraft engines with which Mr. Donlon worked.  UTC

5    must prove that it worked under the "direct and detailed control" of a federal officer. Arnold, 973

6    F.Supp. at 740. Establishing this element requires more than merely alleging that the acts in question

7    were generally carried-out under federal auspices. Ryan v. Dow Chemical Co.,781 F.Supp. 934, 947

8    (E.D.N.Y. 1992); Good v. Armstrong World Industries, Inc., 914, F.Supp. 1125, 1129; Arness v.

9    Boeing North America, Inc., 997 F.Supp. 1268, 1273 (C.D. Ca. 1998). "[R]emoval must be predicated

10   upon a showing that the acts that form the basis for the state civil suit . . . were performed pursuant to

11   [a federal] officer's direct orders or to comprehensive and detailed regulations." (Id.).

12   A company acts under color of federal law only when its action "may be fairly treated as that

13   of the [government] itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350-51 (1974).  The

14   fact that a corporation is performing under government contracts whose specifications it must meet

15   does not automatically transform its conduct into government action.  "Many private corporations

16   whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for

17   the government.  Acts of such private contractors do not become acts of the government by reason of

18   their significant or even total engagement in performing public contracts."  Rendell-Baker v Kohn, 457

19   U.S. 830, 841 (1942).

20
21

### a. UTC Does Not And Cannot Identify The Federal Officer Who Directed It To Incorporate Asbestos Into Its Engines Or Directed It To Exclude Safety Warnings

22   In order for UTC to successfully set forth a colorable federal defense, it must prove that it acted

23   at the direction and under the control of a *specific* federal officer.  That control must have been

24   exercised by a specific, individual federal official, not an entire agency. Good, supra, 914 F. Supp. at

25   1128-1129.  The holding in Good is instructive.  The removing defendant in that case, Westinghouse,

26   was named in the case because it manufactured turbine generators, which plaintiff worked on as a

27   Navy seaman, and which allegedly contained and emitted asbestos dust.  Westinghouse offered proof

28   that it manufactured the turbines under government contracts and was bound to meet the general

1  performance specifications set by the Navy. Its witness testified that the production of the turbines

2  was pursuant to Navy design and construction drawings and written specifications, and that Naval

3  officers and civilian employees worked at the Westinghouse plant and supervised production of

4  the turbines. (Id. at 1128.) Nevertheless, the court determined that neither Westinghouse's notice of

5  removal nor its affidavit established that any specific Navy official had the necessary control to

6  establish the "acting under" element:

> [Evidence that a] conglomerate of people employed by the United States Navy who
> had oversight authority does not support the blanket assertion by Westinghouse that
> the Secretary of the Navy provided direct and detailed control over Westinghouse. . . .
> Although it is true that the United States Navy and many individuals employed by the
> Navy worked with Westinghouse, Westinghouse does not show that the Secretary of
> the Navy or any other federal officer directly controlled and supervised the work of
> Westinghouse. Cf. Noble v. Employers Ins., 555 F.2d 1257 (5th Cir. 1977) (finding the
> 'acting under' requirement satisfied where the defendant-surgeon had acted under the
> immediate supervision of the Administrator of Veteran Affairs who evaluated the
> defendant-surgeon's performance and determined his hours and working conditions.).
> (Id. at 1129.)

14  UTC's notice of removal is clearly insufficient in this regard. It does not allege (much less

15  establish) that *any federal officer expressly required it to use asbestos-containing materials in*

16  *manufacturing aircraft engines.* Good, 914 F.Supp. at 1129. UTC fails to identify, let alone, provide

17  any contracts, agreements, regulations or specifications from the Navy requiring that asbestos be used

18  on Pratt & Whitney's engines even though its witness Allan Shiffler's averments are supposedly based

19  on his review of these very documents. (See ¶ 16, UTC's Notice of Removal; see also Declaration of

20  Allan Shiffler, ¶¶5, 7, 9.)

21  Allan Shiffler was born in 1941; he worked for Pratt & Whitney from 1966 until his retirement

22  in 2003. (See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 7,

23  2011, Wang Decl., Ex. C, pgs.9:6-12; 10:23-11:6.)[4] Contrary to the statements contained in the

24  declaration he executed in this case, Mr. Shiffler had previously admitted during his deposition in the

25  Norsworthy matter that the *one and only military aircraft engine* on which he worked during his

26  entire tenure at Pratt & Whiney was the model "TF33" used by the Air Force, but *never* used by the

27  _____

28  [4] Plaintiffs' decedent Patrick Donlon served in the Navy from 1955 to 1958, almost a decade before
Allan Shiffler began working for UTC.

*Navy:*

> 16   Q. All right. When we left off yesterday, we
> 17   were talking about the development of the dash 100A
> 18   version of the TF33, correct?
> 19      A. Yes.
> 20      *Q. All right. Other than the development of*
> 21   *that engine, were you personally involved in the*
> 22   *development of any new engine or new variant of any*
> 23   *engine for the United States military during your*
> 24   *employment at Pratt & Whitney?*
> 1       *A. No.*
> 2       *Q. And were you involved in any contract*
> 3    *negotiations for the development of any new engine*
> 4    *or new variant of any engine other than the TF33*
> 5    *during your tenure at Pratt & Whitney?*
> 6       *A. No.*
> 14   Q. Okay. Was the dash 100A engine ever sold
> 15   on the civilian side?
> 16      A. No.
> 17      Q. Was it ever put in anything other than an
> 18   AWACS aircraft by the Air Force?
> 19      A. The 100A?
> 20      Q. Yes.
> 21      A. No.
> 22      *Q. And was it ever sold to any other branch of*
> 23   *the military, the Navy?*
> 24      *A. No.*

(See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8,

2011,Wang Decl., Ex. D, pgs.103:16-104:6; 111:14-24.)

UTC's evidence via Allan Shiffler not only fails to establish that defendant acted under a

federal officer, it show that UTC has *no* evidence that it acted under *any Navy officer* because Mr.

Shiffler never worked on an engine that was supplied to the Navy.

### b.   Defendant Cannot Prove That It Failed To Warn At The Direction Of A Federal Officer

The government contractor defense applies in very narrow circumstances:

*Boyle* displaces state law only when the government, making a discretionary, safety-
related military procurement decision contrary to the requirements of state law,
incorporates this decision into a military contractor's contractual obligations, thereby
limiting the contractor's ability to accommodate safety in a different fashion. In Re:
Hawaii Federal Asbestos Cases, 960 F.2d at 813 (internal quotations omitted).
Accord Dorse v. Eagle-Picher Indus., Inc., 898 F.2d 1487, 1489 (11th Cir. 1990).

Several Courts have rejected the government contractor defense in asbestos cases or found that the defense does not apply in circumstances similar to those presented here. See In re Joint Eastern and Southern District Asbestos Litigation (I), 715 F.Supp. 1167, 1169 (E.D.N.Y. 1988) (Court rejected military contractor defense holding that federal specifications were silent on the matter of warnings and defendant could have provided adequate warnings to plaintiffs and complied with the federal specifications); Hansen v. Johns-Manville Products Corp., 734 F.2d 1036, 1044-45 (5th Cir. (Tex.) 1984), reh'g denied 744 F.2d 94, cert. denied 470 U.S. 1051; Nobriga v. Raybestos-Manhattan, Inc., 683 P.2d 389, 392 (Hawaii 1984); In re New York City Asbestos Litigation, 542 N.Y.S.2d 118, 120-21 (1989); In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 629-30, (2nd Cir. (N.Y.) 1990); In re Joint Eastern & Southern Dist. Asbestos Litig., 715 F.Supp. 1167 (E.D.N.Y. 1988); Faulk v. Owens-Corning Fiberglass Corp., 48 F.Supp.2d 653, 663-64 (E.D.Tex. 1999) (applying federal law); Good v. Armstrong World Indus., 914 F.Supp. 1125, 1131 (E.D.Pa. 1996).

In Overly v. Raybestos- Manhattan, 1996 WL 532150 (N.D. Cal. 1996) (See Wang Decl., Ex. G) defendant Avondale Industries removed an asbestos case to federal court based on federal officer jurisdiction. The Overly court explained that "plaintiffs have proceeded against Avondale on the 'failure to warn theory' of product liability." Overly at p. 1.

The Overly court stated:

> [I]n order to meet the Boyle test in a failure to warn case, the defendant must show that the government affirmatively instructed it regarding the provision of warnings. Defendant's only showing on this motion relates to the government's manufacturing and engineering specifications. Defendant has not demonstrated that the government provided "reasonably precise specifications" affecting Avondale's provision of warnings. [citation omitted] Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunity. [citation omitted] Therefore defendant fails to meet the second prong of the Mesa standard because Avondale has no colorable federal defense to the charges in this case. Overly at pp. 3-4.

In order for the federal contractor defense to apply in the failure to warn context, a defendant must show a conflict between state law and federal policy. Hilbert v. McDonnell Douglas Corp. 529 F.Supp.2d 187 (D. Mass. 2008), citing Oliver v. Oshkosh Truck Corp., 96 F.3d 992 at 1003 (7th

1  Cir.1996.); Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir.1995.); and In re Joint Eastern and

2  Southern Dist. New York Asbestos Litig., 897 F.2d 626 (2d Cir.1990.) In other words, the party

3  attempting to invoke a federal officer defense must show that "the government made me do it." In re

4  Joint Eastern and Southern Dist. New York Asbestos Litig., 897 F.2d 626 at 632 (2d Cir.1990), citing

5  Boyle v. United Tech. Corp.

6       In this context, UTC must prove both that the government made UTC incorporate asbestos-

7  containing materials in its engines and that the government prevented UTC from providing warnings

8  regarding the hazards associated with those asbestos-containing products.  Holdren v. Buffalo Pumps,

9  Inc., 614 F.Supp.2d 129 (D. Mass. 2009.), followed by Lindenmayer v. Allied Packing & Supply, Inc.,

10  2010 WL 234906 (N.D.Cal., Jan. 14, 2010) (See Wang Decl., Ex. F).

11       If both federal policy and state law can be satisfied at the same time, the contractor may not

12  assert the defense.  (Id.) *Defendant may not defeat a failure to warn claim simply by showing the*

13  *elements of the Boyle defense to a design defect claim*. In order to assert a colorable federal defense

14  in a failure to warn claim, defendant "*must* rebut the obvious inference: that it never tried to warn

15  about asbestos at all." Hilbert, supra at 202.  (Emphasis added.)

16       Here, UTC relies upon the standards set forth in Boyle in an attempt to raise a colorable

17  defense to Plaintiffs' failure to warn claim based upon Allan Shiffler's generic declaration.  Under

18  Good and Hilbert, UTC does not even come close to meeting its burden because not only has Mr.

19  Shiffler admitted that he has never worked on any Pratt & Whitney engines that were supplied to the

20  *Navy*, Mr. Shiffler previously testified that he is not aware of any response from the military to UTC

21  regarding warnings about asbestos because UTC never bothered to ask the military:

22

23       *9    Q. Was Pratt & Whitney ever told by the*
        *10   military not to put warnings about asbestos in its*

24      *11   manuals?*
        *12       MR. TABASKY: Objection.  You can answer*

25      *13   if you know.*
        *14   A. I'm not aware of them asking.*

26      *15   Q. You're not aware of Pratt asking the*
        *16   military whether they could?*

27      *17   A. Exactly.*
        *18   Q. All right.  And if Pratt didn't ask the*

28      *19   military whether they could, then there wouldn't be*

1
2

> 20  *a response from the military one way or the other,*
> 21  *correct?*
> 22        MR. TABASKY: Objection.
> 23  *A. Yes.*

3   (See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011, Wang

4   Decl., Ex. D, pg. 144:9-23.)

5        Because ample case law makes clear that the Boyle standard does not apply in failure to warn

6   cases, and because UTC did not and cannot prove that it did in fact try to warn about asbestos but was

7   not permitted to by its federal contracts, UTC has not raised a colorable defense to Plaintiffs' claims,

8   and this case must be remanded.

9            **2.  UTC Has Not Raised a Colorable Federal Defense**

10       To satisfy the third prong of the Mesa test, UTC must raise a colorable federal defense, which

11   it fails to do.  In order to assert a colorable federal defense, UTC "must do more than simply plead a

12   federal defense.  Rather, [it] must plead a *colorable* federal defense." Faulk v. Owens-Corning

13   Fiberglass, Corp., 48 F.Supp.2d 653, 664 (emphasis original).  The defense amounts to a claim that

14   "the government made me do it." In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 813 (*citing* In Re:

15   Joint E. S. Dist. N. Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir. 1990)).

16       And it is not enough for the defendant to allege that it has a colorable defense because it simply

17   supplied products to the military or supplied products to the military in compliance with government

18   specifications.  If this were the case then every lawsuit involving asbestos exposure from military ships

19   or aircraft would be in federal court.  Federal contractors do not enjoy any type of automatic

20   immunity. Lamb v. Martin Marietta Energy Systems, Inc., 835 F.Supp. 959, 962-63 (W.D. Ky. 1993)

21   (*citing* United States v. Boyd, 378 U.S. 39, 44 (1964)).  Rather, this defense applies only to specific

22   situations, which the defendant must establish through admissible evidence. *Lamb*, 835 F.Supp. at

23   959.

24       While a defendant need not prove its federal defense in order to satisfy this prong of the *Mesa*

25   test, it still must offer enough evidence to show that the defense is colorable.  This requires, at a

26   minimum, pleading each necessary element and offering some supporting evidence. *Lamb*, 835

27   F.Supp. at 966-67.  Defendant fails to do so here.

28

11

a. **The Military Contractor Defense Does Not Apply Where The Products at Issue Are Stock Equipment Readily Available to Commercial Users**

Defendant has not, and cannot, produce evidence that the asbestos-containing materials that caused Mr. Donlon's mesothelioma were nothing more than standard, stock equipment used interchangeably in its aircraft engines, as required by this Circuit in In Re: Hawaii Federal Asbestos Cases, 960 F.2d 806, 812 (9th Cir. 1992) (government contractor defense not applicable when the product is a stock item that was not ". . . manufactured with the special needs of the military in mind"). The mere selection of such standard asbestos-containing components by the government does not provide the supplier or contractor with a basis for removal. Boyle, 487 U.S. at 509 (government contractor defense does not apply to injury caused by "stock" item or "standard equipment").

In fact, the asbestos materials that Plaintiffs claim caused Mr. Donlon's mesothelioma and his death would have been the same standard asbestos products available in the private sector market. There was nothing special or unique about them as explained by Allan Shiffler:

    3  Q.  Would you consider it an unusual situation
    4  for a spare part for a Pratt & Whitney engine in an
    5  Air Force plane to come from a parts overhaul shop
    6  as opposed to through Pratt & Whitney?
    7       (Objection by multiple counsel.)
    8  A.  They may have acquired non -- what I would
    9  consider noncritical parts.
    10  *Q.  What do you consider to be a noncritical*
    11  *part?*
    12  *A.  Clamps, bolts; common bolts and nuts that*
    13  *are common throughout the industry, throughout the*
    14  *aerospace industry, those types of items; gaskets,*
    15  *MS, AN parts, those sorts of items.*
    16  Q.  And to the extent that a part like that is
    17  used on a Pratt & Whitney engine, can any part be
    18  used, or do they have to be parts that were designed
    19  and built pursuant to Pratt's specifications?
    20  A.  Our recommendation to the Air Force is that
    21  they use our recommended parts; *however, the Air*
    22  *Force themselves have the option to utilize what*
    23  *they call equivalencies.*
    24  *Q.  And when you say "equivalencies," is that*
    1  *something that the Air Force deemed to be equivalent*
    2  *to the Pratt part?*

3    *A. Yes.*
4    *Q. And it was a part that was obtained from*
5    *someone other than Pratt?*
6    *A. Yes.*

(See  Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011, Wang Decl., Ex. D, pg. 123:3-124:6)

The mere selection of such stock components by the government does not cloak the supplier or contractor with immunity from suit.  In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 806.  As the Court explained in Boyle:

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. Boyle, 487 U.S. at 509.

In applying the principles set forth in Boyle, in In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 806, the Ninth Circuit specifically addressed the instant situation.  In In Re: Hawaii Federal Asbestos Cases, the court found that the military contractor defense was not a barrier to plaintiffs' state court claims because the asbestos insulation at issue was not "military equipment" since it was used in both commercial and military applications.

The Ninth Circuit, citing Boyle, set forth as follows:

> ...the fact that a company supplies goods to the military does not, in and of itself, immunize it from liability for the injuries caused by those goods.  *Where the goods ordered by the military are those readily available, in substantially similar form, to commercial users, the military contractor defense does not apply.*

In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 811, *citing* Boyle at 512.

The court explained the rationale:

> That Boyle speaks of the military contractor defense as immunizing contractors only with respect to the military equipment they produce for the United States is consistent with the purposes the Court ascribes to that defense.  The Boyle Court noted that the military makes highly complex and sensitive decisions regarding the development of new equipment for military usage.  Allowing contractors who are hired to manufacture that equipment to be sued for the injuries caused by it would impinge unduly on the military's decision making process.  The contractors would either refuse to produce the military equipment for the Government or would raise their prices to insure against their potential liability for the Government's designs. (Id.)

1

2

    The court further explained:

3       These same concerns do not exist in respect to products readily available on the
        commercial market. The fact that the military may order such products does not make
4       them "military equipment." The products have not been developed on the basis of
        involved judgments made by the military but in response to the broader needs and
5       desires of end-users in the private sector, (Id.)

6   As set forth above, such stock equipment, used in both commercial and military applications are not

7   subject to federal officer removal, and do not give rise to a federal defense.  Allan Shiffler's deposition

8   testimony makes clear that the asbestos materials used in UTC's aircraft engines (gaskets, clamps,

9   bolts) were nothing more than ***noncritical*** and therefore non-military standard asbestos products

10  available in the commercial market. (See  Deposition of United Technologies Corporation by Allan J.

11  Shiffler, taken on April 8, 2011,Wang Decl., Ex. D, pg. 123:3-124:6),

12      By designing and manufacturing engines for use in the military that contained the same

13  asbestos-containing materials as were being used in the private sector, UTC was not and could not

14  have been acting at the direction of a federal officer.  As such, UTC does not have even a colorable

15  federal defense to Plaintiffs' claims.

16              **b.  Even if the Products at Issue are Considered "Military Equipment"
                    And The Boyle Elements Applied to a Failure to Warn Case, UTC
17                  Does not Raise a Colorable Federal Defense Since it Cannot Prove
                    That in Making Decisions Regarding Warnings, it Was Acting in
18                  Compliance with Reasonably Precise Specifications Imposed by the
                    Unites States**

19

20      The government contractor defense shields government contractors from liability only when

21  "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to

22  those specifications; and (3) the supplier warned the United States about the dangers in the use of the

23  equipment that were known to the supplier but not to the United States." Boyle v. United Technologies

24  Corp. 487 U.S. 500, 512 (1988).  The third element of the government contractor defense requires the

25  defendant to prove that it warned the government about the risks involved that it knew, but the

26  government did not.  Faulk, 48 F.Supp. at 666.

27      As the Boyle court noted:

28

The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract, but withholding it would produce no liability. Boyle, at 512.

The Court's inclusion of a warning element must indicate that approval requires some level of evaluation and review; otherwise a government contractor might argue one day that it should have the benefit of the defense despite its failure to give a warning because the government had rubber-stamped the design, because the information withheld would have been no use to the government and was not desired by the government, and because the provision of the information would not have affected the government's "approval" of the design. Trevino v. General Dynamics Corp. 865 F. 2d. 1474.

Rather than producing evidence of what it knew about the hazards of asbestos, UTC produces a declaration from industrial hygienist William Ringo, who speculates, without any foundation or citations to documentary support, that "the state-of-the-art scientific knowledge regarding asbestos-related health hazards in the 1950s, 1960s and 1970s, would not have included any information or knowledge that an aircraft engine mechanic...would be at risk for any asbestos-related disease from the work performed on aircraft engines." (Declaration of William Ringo at ¶ 10.) Mr. Ringo's declaration suffers from two notable deficiencies. First, nowhere in his declaration does Mr. Ringo introduce evidence regarding UTC's own knowledge about the dangers of its own products, versus the knowledge of the government. Second, regardless of what the Navy purportedly knew, Mr. Shiffler unequivocally testified that the military never prevented UTC from warning about asbestos hazards. Thus, Mr. Ringo's opinions regarding what the government purportedly should have known about the hazards of asbestos is a red herring that does not meet UTC's burden of establishing a colorable federal defense.

### 3. UTC Cannot Establish Causal Nexus Between Its Actions Under The Control Of A Federal Officer And Plaintiffs' Failure to Warn Claims.

The fourth prong of the *Mesa* test requires a "causal nexus" between plaintiffs' claims and defendant's acts allegedly taken under federal direction·· and again UTC fails to set forth any facts whatsoever. As explained below, Plaintiffs' claims against UTC are based on its failure to warn about the dangers of asbestos that UTC incorporated into the design and manufacture of its asbestos-

1  containing aircraft engines. In order for UTC to show that there was a causal nexus between its

2  actions under the control of a federal officer and plaintiffs' claims, it must show that a federal officer

3  specifically dictated that UTC (1) must use asbestos in its engines, and (2) must not warn about the

4  dangers of that asbestos. Faulk, 48 F.Supp.2d at 663 ("the federal government did not dictate any

5  specifications regarding the warning about asbestos-containing products").

6      UTC's only evidence anywhere in the record on this prong is again Allan Shiffler's

7  declaration. Mr. Shiffler's declaration in this case is nearly identical to the one he executed in support

8  of UTC's removal under federal officer jurisdiction in the Norsworthy case. (See Declaration of

9  Allan J. Shiffler in support of Defendant United Technologies Corporation's Notice of Removal,

10  authenticated and attached as Exhibit 4 to the Deposition of United Technologies Corporation by Allan

11  J. Shiffler, taken on April 8, 2011, Wang Decl., Ex. E.) However, as Mr. Shiffler explained during his

12  deposition in the Norsworthy matter, the statements contained in his nearly identical declaration are

13  not based on his personal knowledge since he was not employed by Pratt & Whiney before 1966. (See

14  Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011, Wang

15  Decl., Ex. D, pgs. 146:14-147:5; 149:22-151:24.)

16      Mr. Shiffler further testified that while his declaration stated that "these military specialists at

17  Pratt & Whitney controlled the design and manufacture of an aircraft engine produced at Pratt &

18  Whitney for the United States military"[5], what he really meant to say was that the military simply had

19  veto power over *defendant's own designs*:

20      11    Q. *Paragraph 8 there, if you look down at the*
             12  *last sentence of Paragraph 8, you say, "During the*
21           13  *period of my employment at Pratt & Whitney, these*
             14  *military specialists at Pratt & Whitney controlled*
22           15  *the design and manufacture of any aircraft engine*
             16  *produced at Pratt & Whitney for the United States*
23           17  *military."*
             18     *And I take it by "controlled the design*
24           19  *and manufacture" you mean that they had veto power*

25  ─────────────────────────
   [5] Mr. Shiffler's declaration in this case differs slightly from the Norsworthy case in that instead of the

26  word "military" that was used throughout his prior declaration, he has changed "military" to "Navy" in

   his declaration here. However, in light of Mr. Shiffler's testimony that he had never worked on a Pratt

27  & Whitney engine supplied to the Navy, his entire declaration lacks personal knowledge under Fed. R.

   Civ. P. 56(e) and is inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993) 509 U.S.

28  579.

16

```
20   over Pratt's designs?
21      A.  Yes.
22      Q.  They weren't the ones putting the designs
23   together?
24      A.  Right.
```

(Id. at pg. 156:11-24.)

```
 1      Q.  Let's flip to the next page, Paragraph 10.
 2   You say, "Any written material such as warnings or
 3   product manuals that accompanied the engines built
 4   by Pratt & Whitney for the United States military
 5   were similarly controlled and specified by the
 6   United States military."
 7         You don't have any personal knowledge as
 8   to what control, if any, the military exercised over
 9   manuals that were drafted by Pratt, do you?
10         MR. TABASKY:  Objection.
11      A.  Other than by the contract requirements for
12   publications.
13      Q.  Okay.
14      A.  And there is -- it does list quite a bit of
15   guidelines.
16      Q.  So the contracts for the publications not
17   only tell Pratt that it has to create manuals, but
18   it gives some information as to what has to be in
19   the manuals?
20      A.  Yes.
21      Q.  As you sit here today without the contract
22   in front of you, can you tell me what else it says
23   other than Pratt has to create manuals?
24      A.  No.
 1      Q.  We'd need the contract to know exactly what
 2   they say?
 3         MR. TABASKY:  Objection.
 4      A.  Because they vary (nodding).
 5      Q.  All right.  So when you say "were
 6   controlled and specified by the United States
 7   military," what you mean is that the written
 8   materials were subject to a contract?
 9      A.  Yes.
```

(Id. at 157:1-158:9.)

By its own admission, UTC's only evidence offered in support of its removal notice is nothing more than the speculation of a former company employee who has no personal knowledge of any of UTC's dealings with the Navy.  Such evidence fails to show that a specific federal officer directed UTC not to warn, including the failure to place appropriate warnings *on or with* its asbestos-containing engines.

1             **a.  Plaintiffs' Claims Against UTC Are Limited to Failure to Warn.**

2       Plaintiffs' claims against Defendant UTC are based on Mr. Donlon's exposure to asbestos from

3   maintenance work on aircraft operated by the U.S. Navy.  Plaintiffs' Complaint states the following:

4         "...For purposes of the claims alleged herein, the Federal Courts lack subject matter
   jurisdiction over this action, as there is no federal question and incomplete diversity of

5         citizenship due to the presence of a California defendant.  Removal is improper.  Every
   claim arising under the Constitution, treaties, or law of the United States is expressly

6         disclaimed, including any claim arising from an act or omission on a federal enclave, or
   of any Officer of the U.S. or any agency or person acting under him occurring under

7         color of such of office.  No claim of admiralty or maritime law is raised.  Plaintiffs sue
   no foreign state or agency.  By this allegation, plaintiffs are not disclaiming State law

8         claims arising exposures on Federal enclaves.  Plaintiffs are only disclaiming claims
   which would be directed at the Federal government and/or Federal officers..."

9

10  (See Complaint at ¶ 3-16, Wang Decl., Ex. A.)  If there is any doubt as to the meaning of Plaintiffs'

11  allegations, Plaintiffs' attorneys dismissed all claims as to UTC except for their failure to warn claims

12  so that they are only proceeding against UTC on a failure to warn theory of liability.  (See Complaint

13  at ¶ 3-16, Wang Decl., Ex. A; see also Request for Dismissal, Wang Decl., Ex. B.)  Thus, Plaintiffs'

14  claims against UTC are specifically limited to failure to warn of the health hazards associated with

15  asbestos exposure, as opposed to defective design of the products in question.  As will be shown

16  below, there is no federal subject matter jurisdiction over a failure to warn claim in an asbestos case.

17            **b.  There Is No Jurisdiction Under §1442 In Failure To Warn Cases**

18

19      UTC relies exclusively on the Boyle "government contractor" defense to support federal officer

20  removal jurisdiction herein.  (See UTC's Notice of Removal at ¶17.)  However, federal courts

21  throughout the country have struck the Boyle government contractor defense as a matter of law in

22  failure to warn claims.

23      Presumably due to the large number of asbestos cases in California, Hawaii and Texas, the

24  Ninth and Fifth Circuits have dealt with many attempted removals under §1442(a)(1).  The courts in

25  those Circuits have consistently held that §1442 removal is not available in failure to warn cases.

26  Viala v. Owens-Corning Fiberglas, 1994 U.S. Dist. WL 139287 (N.D. Cal. 1994) (See Wang Decl.,

27  Ex. H) ("Thus, there is no evidence that the specifications provided by the government in any way

28  conflicted with defendants' State law duty to design and manufacture safe products that did not cause

1  asbestos related illnesses. In the absence of such a conflict, the government contractor defense is not

2  colorable."); Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. WL 690854 (N.D. Cal. 1998) (See Wang

3  Decl., Ex. I) ("Although defendants present evidence showing federal direction of defendants

4  regarding the installation of insulation materials, they do not show federal direction of their activities

5  with regard to warnings attached to asbestos products. Therefore, defendants failed to meet their first

6  prong of the Mesa test."); Faulk, 48 F.Supp.2d at 665 ("Nor is there any evidence that the Federal

7  government prohibited defendants from warning about the dangers of asbestos.") & at 666 ("There is

8  no causal nexus between defendants' action under this [federal] control and the plaintiffs' claims . . .

9  thus defendants' fail to satisfy...Mesa.").

10      The Nguyen case is directly on point because it involved exposure to asbestos at a U.S. Air

11  Force base in Vietnam regarding working on military aircraft:

12          Here, defendants have produced no evidence that their contracts with the
        United States government contained contractual obligations specifically
13          prohibiting them from placing warnings on their products. Instead, *they
        produce evidence regarding government control of the specification
14          for manufacturing the aircraft, not specifications regarding warnings.*
        They also rely upon the affidavit of Alvin F. Meyer, which indicates
15          only that the government approved all warnings placed in technical
        manuals for United States Air Force aircraft. They offer no evidence
16          that they attempted to include such warnings, or that the government
        specifications and contractual provisions explicitly directed them not to
17          place warnings on their products. Therefore, the Ninth Circuit's holding
        in Hawaii Federal controls and the government contract defense cannot
18          be the basis for federal jurisdiction in a failure to warn case here
        [emphasis added].

19

20  Nguyen, at 2-3. *Nguyen* was dispositive that there was no causal nexus. As the court held:

21          The third prong of the Mesa test requires a causal nexus between the
        rules imposed by the United States on the federal contractor and the
22          liability asserted by the plaintiff. [citations omitted]   Although
        defendants include evidence regarding the control of the federal
23          government over the manufacture of its products, again, this evidence
        does not demonstrate that the federal government directed defendants
24          not to place warnings on their products. Therefore, there was no causal
        connection between the control exercised by the United States over
25          defendants and plaintiffs' legal theory of failure to warn consumers of
        the hazards of asbestos. The court therefore concludes that there is no
26          federal jurisdiction over this action. Consequently, plaintiffs' motion to
        remand must be granted.

27  Nguyen, at 4.

28

1    In Freiberg, the plaintiffs sued contractors who had used asbestos products during the

2  construction of a nuclear weapons production facility. Freiberg, 245 F. Supp. 2d at 1148. The

3  defendants removed on the basis of §1442(a)(1). Id. In the decision granting remand, the court

4  succinctly stated why no causal nexus existed for a failure to warn claim:

> In their briefs and submissions in support of removal, Defendants fail to apprehend the
> essence of the "under color" causal connection requirement. They are being sued for
> unnecessarily and negligently causing their employees and other workers to be exposed
> to asbestos dust on the job and for failing to warn these employees and workers of the
> associated dangers.  What they must establish for purpose of the §1442(a)(1) [sic] is
> that the government authority under which they worked required them to act as they
> did.  *For purposes of Plaintiffs' failure to warn claims, for example, they must
> establish the DOE's direction and control of the activities directly interfered with
> their ability to fulfill their state law obligation to warn employees of safety hazards.*
> [citation omitted]  Nothing in Prout's affidavit or the government contracts produced by
> Lummus establishes the requisite nexus between their construction and safety practices
> at Rocky Flats and government direction or control.  Accordingly, removal jurisdiction
> is not established. (Emphasis added.)

12  Id. at 1155.

13    In Ruffin v. Armco Steel Corp., 959 F. Supp. 770 (S.D. Tex. 1997), the court held there is no

14  federal officer removal jurisdiction in a case that involved even more control by the federal

15  government over the defendant than the allegations by UTC in building aircraft. Arness, 997 F. Supp.

16  at 1275. In Ruffin, the plaintiff worked at Armco's steel mill where he was exposed to asbestos.

17
   "Armco claims that its Houston steel plant was constructed under the control of federal officers, which

18  presumptively provides it with sufficient basis for removal under §1442(a)(1)." Ruffin at 959 F. Supp.

19
20  at 772. The court reasoned as follows:

> Armco claims that at all times relevant to the suit, it acted under the supervision of the
> Secretary of Commerce and other officials from the Defense Plan Corporation ("DPC"),
> one of many federal corporations created to assist in the war program.  Armco claims
> that the nexus requirement under Mesa is satisfied with proof that the plant it
> constructed was built pursuant to DPC plans and the state action against it arose from
> injuries allegedly caused from Armco's compliance with those plans.  Because the
> plaintiff's state action is predicated on a failure to warn theory, however, *Armco must
> not only show that the mill was built pursuant to DPC specifications (and asbestos
> was a government approved or mandated material) but also that DPC restricted or
> prohibited Armco from providing adequate precautions* against or otherwise notifying
> its employees of the hazards of asbestos exposure. (Emphasis added.)

27
   Ruffin, 959 F. Supp. at 774.

28

20

1    The court went on to further explain that it is not enough merely to evidence government

2    involvement in the procurement contract, but detailed control and indeed federal mandated conflicts

3    with state law duties.  As the court explained:

> The court finds that although Armco has proven that DPC supervised and extensively
> monitored the construction of the mill, Armco has failed to demonstrate that DPC
> exercised the same degree of control with respect to safety precautions that allegedly
> should have been taken to warn employees of the hazards associated with asbestos
> exposure.  There was no evidence to show that DPC prevented Armco from issuing
> adequate safety warnings or that the government enacted or even considered enacting
> its own programs or guidelines to cover workplace safety.  Nor does the evidence show
> that DPC controlled personnel matters or at all interfered with the duty of care Armco
> owed under state law to its employees.  The mere fact that the government possessed
> the power to control or regulate employee safety neither establishes that that power was
> ever used nor that operational mandates of this type were ever issued.  Without such
> proof, Armco cannot satisfy the statutory requirements for removal under §1442(a)(1).

Ruffin, 959 F. Supp. at 776.

12    The Ruffin court further explained that giving blanket immunity under Boyle and expanding

13    federal jurisdiction is not warranted by any federal policy.  As the court explained:

> The court also believes that blanket absolution of liability for all acts of neglect,
> whether or not committed under specific and direct order, would encourage laxity at the
> expense of human lives without any corresponding benefit. [¶] Finally, the court can
> find no threat to the enforcement of federal laws if the instant case is adjudicated in
> state court. . . . Furthermore, the basic intent of §1442(a)(1) removal is for protection of
> federal officials, as well as those acting under their direction, against state court
> hostility or interference with the effectuation of federal policy.  In this case, there is
> arguably no potential federal policy violation, aside from a general government interest
> in cost control, requiring a federal forum for adjudication.

Ruffin, 959 F. Supp. at 776-777.

20    These cases make clear that displacement of state law is appropriate only where "a 'significant

21    conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law.'"

22    Boyle, 487 U.S. at 507. In order "to establish that Boyle displaces any state law duty to warn,

23    defendants must show that the applicable federal contract includes warning requirements that

24    significantly conflict that those that might be imposed by state law." Quiles v. Sikorsky Air, 84 F.

25    Supp. 2d 154, 170 (D. Mass. 1999).

26    In this case, Allan Shiffler has admitted that only contracts between UTC and the Navy could

27    provide pertinent information regarding the existence of any federal specifications as he has no

28    personal knowledge about UTC's work with the Navy.  Not only has UTC failed to offer any contracts

1    between itself and the Navy, even if assuming such contracts existed, there is no evidence of federal

2    specifications in any contract between UTC and the Navy that are in conflict with the laws of

3    California. Indeed, "no 'significant conflict' exists where a defendant can comply both with the

4    federal specifications and with the standards of conduct imposed by the state." In re Joint Eastern and

5    Southern District Asbestos Litigation (1), 715 F.Supp. at 1169 (Court rejected military contractor

6    defense holding that federal specifications were silent on the matter of warnings and defendant could

7    have provided adequate warnings to plaintiffs and complied with the federal specifications); See also

8    In Re Hawaii Federal Asbestos Cases 960 F.2d at 812 (The Court said that the military contractor

9    defense would fail because there ". . . existed no conflict between their state law duty to provide

10   adequate warnings to the users of their [product] and the conditions imposed on them pursuant to the

11   agreements they had entered into with the Government").

12          Under California law, a manufacturer owes a duty to warn of risks that a reasonably prudent

13   manufacturer would have known and warned about. Anderson v. Owens-Corning Fiberglass Corp.

14   (1991) 53 Cal.3d 987, 1002. Furthermore, a manufacturer may be held strictly liable if it failed to

15   warn of a known or knowable risk. Id. Defendant does not allege that a federal officer required it not

16   to warn about the dangers of working with its products. There is no evidence of contract(s) between

17   UTC and the Navy for the design and manufacture of aircraft engines that contained any requirements

18   with regard to warnings. More specifically, there is no evidence that shows the Navy instructed it not

19   to place warnings on the asbestos-containing equipment with which Mr. Donlon worked. Without

20   evidence that the Navy specified the exclusion of warnings, there is no evidence of a conflict between

21   UTC's alleged federal contracts and Plaintiffs' state law failure to warn claims. UTC could have

22   complied with its duty under state law to warn Mr. Donlon of the dangers of working with its asbestos-

23   containing products and complied with its alleged federal directive to design and manufacture

24   equipment for the Navy.

25          Accordingly, there is no conflict between state law and a federal policy or interest that would

26   warrant the displacement of state law as to Plaintiffs' failure to warn causes of action. Under Boyle,

27   UTC would have to prove that the applicable federal contract includes warning requirements that

28   significantly conflict with those that might be imposed by California law. In re Joint E. and S. Dist.

22

1  N.Y. Asbestos Litig., 897 F.2d at 630.  In addition, the contractor must show that "whatever warnings

2  accompanied a product resulted from a determination of a government official and thus that the

3  Government itself 'dictated' the content of the warnings meant to accompany the product.  Under

4  Boyle, for the military contractor defense to apply, government officials ultimately must remain the

5  agents of decision."  Id.  Where no conflict exists between requirements imposed under a federal

6  contract and a state law duty to warn, Boyle commands that the court defer to the operation of state

7  law. Id. at 631.

8          In this case, there is no evidence that the alleged contract(s) between UTC and the Navy for the

9  manufacture of aircraft engines equipped with asbestos-containing products contained any

10  requirements with regard to warnings.  Therefore there is no evidence of a conflict between the federal

11  contract and the California laws set forth above, and jurisdiction under §1442(a)(1) is lacking.

12  **IV. CONCLUSION**

13          The attempted removal of asbestos cases is a common tactic for defendants seeking to delay or

14  deny Plaintiffs' right to a trial.  It is well-known that cases removed and then transferred to the federal

15  multi-district litigation (MDL) become mired in delay.  Merely by removing this case to federal court,

16  UTC benefits from the passage of time by delaying and depriving Plaintiffs of their rightful day in

17  court.  If Plaintiffs' state law failure to warn claims return to state court, they will proceed to

18  resolution.  If they remain in federal court they will encounter significant delay upon their transfer

19  through the MDL panel to the Eastern District of Pennsylvania where no asbestos trials or discovery

20  takes place in deference to global settlement efforts.  This delay is of economic benefit to the

21  Defendant and imposes unjust costs on the Plaintiffs.  See e.g. In re Maine Asbestos Cases, 44

22  F.Supp.2d 368,374 (D.Me 1999); Madden v. Able Supply Company, 205 F.Supp.2d 695,702 (S.D

23  Tex. 2002).

24

25  ///

26  ///

27  ///

28  ///

1    UTC's removal based on federal officer jurisdiction is improper. No basis for removal exists

2    because UTC failed to establish a "colorable" federal defense and failed to prove that the Navy

3    directed it to omit warnings about the dangers of asbestos in any of its products. Accordingly, Plaintiff

4    respectfully requests that this Court remand this action to the Superior Court of California, City and

5    County of San Francisco pursuant to 28 U.S.C. § 1447 (c).

6

7    Dated: July 22, 2011                     **HAROWITZ & TIGERMAN, LLP**

8

9                                              _____
                                               KATHERINE Y. WANG
10                                             Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   STEVEN M. HAROWITZ (BAR NO. 71117)
    harowitz@htlawoffices.com
2   KATHERINE Y. WANG (BAR NO. 215663)
    wang@htlawoffices.com
3   **HAROWITZ & TIGERMAN, LLP**
    450 Sansome Street, 3rd Floor
4   San Francisco, California 94111
5   Tel: (415) 788-1588; Fax: (415) 788-1598

6   Attorneys for Plaintiffs

7

8               **UNITED STATES DISTRICT COURT**

9     **NORTHERN DISTRICT OF CALIFORNIA-SAN FRANCISCO DIVISION**

10

| | |
|---|---|
| 11   PATTI DONLON, Individually and as | )   Case No. 4:11-CV-3376-SI |
| Successor-in-Interest to the Estate of | ) |
| 12   PATRICK THEISEN DONLON, Decedent; | )   Superior Court of California, San Francisco |
| SEAN DONLON; and DOES ONE through | )   County, Case No. CGC-09-275218 |
| 13   TEN, inclusive, | ) |
| | )   **DECLARATION OF KATHERINE Y.** |
| 14       Plaintiffs, | )   **WANG IN SUPPORT OF PLANTIFFS'** |
| | )   **MOTION TO REMAND THIS CASE TO** |
| 15       vs. | )   **CALIFORNIA SUPERIOR COURT** |
| 16 | ) |
| | ) |
| 17   AC and S, INC., et al, | )   Hearing Date: August 26, 2011 |
| | )   Time: 9:00 a.m. |
| 18       Defendants. | )   Courtroom: 10, 19th Floor |
| 19 | )   Judge: Honorable Susan Illston |
| | ) |
| 20 | ) |
| | ) |
| 21 | ) |
| 22 | |

23     I, KATHERINE Y. WANG, DECLARE:

24       1.     I am an attorney at law, duly licensed to practice before all Courts in the State of

25   California. I am counsel of record for Plaintiffs herein. I make this Declaration of my own personal

26   knowledge, and if called upon as a witness, I could and would testify competently thereto.

27       2.     Attached hereto as **Exhibit A**, is a true and correct copy of Plaintiffs' Complaint.

28

3.    Attached hereto as **Exhibit B** is a true and correct copy of the Request for Dismissal filed by Plaintiffs dismissing all claims other than their state law failure to warn claims as against the aircraft engine manufacturer defendants in this case, including removing defendants United Technologies Corporation and Curtiss-Wright Corporation.

4.    Attached hereto as **Exhibit C**, is a true and correct copy of excerpts from the Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 7, 2011 in Sandra Louis Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co. et al. (Case No. 08-4776 in Middlesex County Superior Court, Commonwealth of Massachusetts.)

5.    Attached hereto as **Exhibit D**, is a true and correct copy of excerpts from the Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011 in Sandra Louis Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co. et al. (Case No. 08-4776 in Middlesex County Superior Court, Commonwealth of Massachusetts.)

6.    Attached hereto as **Exhibit E**, is a true and correct copy of the Declaration of Allan J. Shiffler filed in support of United Technologies Corporation's Notice of Removal authenticated and attached as Exhibit 4 to the Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011 in Sandra Louis Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co. et al. (Case No. 08-4776 in Middlesex County Superior Court, Commonwealth of Massachusetts.)

7.    Attached hereto as **Exhibit F**, is a true and correct copy of Lindenmayer v. Allied Packing & Supply, Inc. 2010 U.S. Dist. WL 234906 (N.D.Cal., Jan. 14, 2010)

8.    Attached hereto as **Exhibit G**, is a true and correct copy of Overly v. Raybestos-Manhattan, 1996 U.S. Dist. WL 532150 (N.D. Cal. 1996).

9.    Attached hereto as **Exhibit H**, is a true and correct copy of Viala v. Owens-Corning Fiberglas, 1994 U.S. Dist. WL 139287 (N.D. Cal. 1994).

///

///

10.     Attached hereto as **Exhibit I**, is a true and correct copy of Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. WL 690854 (N.D. Cal. 1998).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on July 22, 2011, at San Francisco, California.

KATHERINE Y. WANG

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

1    STEPHEN M. TIGERMAN (Bar No. 112127)
     STEVEN M. HAROWITZ (Bar No. 71117)
2    ROGER E. GOLD (Bar No. 214802)
     HAROWITZ & TIGERMAN, LLP
3    450 Sansome Street, 3rd Floor
     San Francisco, California 94111
4    Telephone     (415) 788-1588
5    Attorneys for Plaintiffs

ENDORSED
F I L E D
San Francisco County Superior Court

CASE MANAGEMENT CONFERENCE SET
MAY 2 2 2009

GORDON PARK-LI, Clerk
JUN 1 6 2010 -1:30PM BY: _____ PARAM NATE
Deputy Clerk

6

7                        DEPARTMENT 206

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9     FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10                                CGC-09-275218

11    PATTI DONLON, Individually and as Successor-in-     No.
     Interest to the Estate of PATRICK THEISEN DONLON,
12    Decedent; SEAN DONLON; and DOES ONE through     COMPLAINT FOR
     TEN, inclusive,                                 DAMAGES
13           Plaintiffs,                  (Wrongful Death)
                                   Negligence,
14       vs.                                Strict Liability, Products
                                   Liability for Clutch Components
15    AC AND S, INC.; ASBESTOS CORPORATION, LTD.;     and Brake Assemblies,
     A.W. CHESTERTON COMPANY; CROWN, CORK &     Enterprise Liability,
16    SEAL COMPANY, INC., Individually and as Successor-     False Representation,
     in-Interest to MUNDET CORK CORP.; GARLOCK      [Restatement Sec. 402-B],
17    SEALING TECHNOLOGIES LLC, Individually and as     Survival Action,
     Successor-in-Interest to GARLOCK, INC.; GENERAL     Loss of Consortium,
18    ELECTRIC COMPANY; J T THORPE & SON, INC.;     Punitive Damages
     METROPOLITAN LIFE INSURANCE COMPANY;
19    PARKER-HANNIFIN CORPORATION, as Successor-
     in-Interest to SACOMO SIERRA; OWENS-ILLINOIS
20    CORPORATION; QUINTEC INDUSTRIES, INC.;     (Asbestos)
     SOCO-LYNCH CORPORATION, successor-in-interest
21    to WESTERN CHEMICAL & MANUFACTURING
     COMPANY; SWINERTON BUILDERS f/k/a
22    SWINERTON & WALBERG CO.; THOMAS DEE
     ENGINEERING COMPANY; TRANE U.S. INC., fka
23    AMERICAN STANDARD, INC.; UNION CARBIDE
     CORPORATION; VIACOM, INCORPORATED, as
24    successor-by-merger to CBS CORPORATION, fka
     WESTINGHOUSE ELECTRIC CORPORATION;
25    ALLIS-CHALMERS CORPORATION PRODUCT
     LIABILITY TRUST; BAYER CROPSCIENCE, INC.,
26    successor to AMCHEM PRODUCTS, INC.; ENPRO
     INDUSTRIES, INC., Individually and as Successor-in-
27    Interest to ANCHOR PACKING COMPANY;
     UOPHMAN BROTHERS, INC.; SB DECKING, INC.,
28    formerly known as SELBY, BATTERSBY &

THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO AMENDED G.O. 158

2120/complaint.wd                   1                      COMPLAINT FOR DAMAGES
                                                   WRONGFUL DEATH - ASBESTOS

1  COMPANY; GEORGIA-PACIFIC CORPORATION;  )
   HAMILTON MATERIALS, INC.; HANSON  )
2  PERMANENTE CEMENT, INC. fka KAISER CEMENT)
   CORPORATION; KAISER GYPSUM CO., INC.;  )
3  KELLY-MOORE PAINT COMPANY, INC.; EATON  )
   AEROQUIP, LLC; PNEUMO-ABEX CORPORATION,  )
4  Successor-in-Interest to ABEX CORPORATION;  )
   HONEYWELL INTERNATIONAL, INC. fka ALLIED  )
5  SIGNAL, INC./THE BENDIX CORPORATION; BORG-)
   WARNER CORPORATION by its Successor in Interest, )
6  BORGWARNER MORSE TEC, INC.;  )
   BRIDGESTONE/FIRESTONE NORTH AMERICAN  )
7  TIRE, LLC; DANA COMPANIES, LLC; GOODRICH  )
   CORPORATION; FEDERAL-MOGUL ASBESTOS  )
8  PERSONAL INJURY TRUST, as successor to FELT  )
   PRODUCTS MANUFACTURING CO.; FORD MOTOR)
9  COMPANY; GENERAL MOTORS CORPORATION;  )
   INTERNATIONAL TRUCK AND ENGINE  )
10 CORPORATION; NAVISTAR, INC.; THE  )
   GOODYEAR TIRE & RUBBER COMPANY;  )
11 AIRCRAFT BRAKING SYSTEMS CORPORATION;  )
   MEGGITT AIRCRAFT BRAKING SYSTEMS;  )
12 PARKER-HANNIFIN CORPORATION, as Successor to )
   EIS and CALI-BLOK; CURTISS-WRIGHT  )
13 CORPORATION; MCDONNELL DOUGLAS  )
   CORPORATION, Individually and Successor-in-Interest )
14 to DOUGLAS AIRCRAFT COMPANY, INC.; EATON  )
   CORPORATION; UNITED TECHNOLOGIES  )
15 CORPORATION, formerly known as PRATT &  )
   WHITNEY, INC.; PRATT & WHITNEY POWER  )
16 SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES,)
   INC.; and ELEVENTH DOE through THREE  )
17 HUNDREDTH DOE, inclusive,  )
                              )
18                               )
19          Defendants.  )
20

21

22

23

24

25            FIRST CAUSE OF ACTION-NEGLIGENCE

26                (Wrongful Death)

27    PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A

28 CAUSE OF ACTION FOR NEGLIGENCE (WRONGFUL DEATH) ALLEGE:

1   1.   The true names and capacities, whether individual, corporate, associate,

2   governmental or otherwise, of defendants ELEVENTH DOE through THREE HUNDREDTH

3   DOE, inclusive, are unknown to plaintiffs at this time, who therefore sue said defendants by such

4   fictitious names. When the true names and capacities of said defendants have been ascertained,

5   plaintiffs will amend this Complaint accordingly. Plaintiffs are informed and believe and thereon

6   allege that each defendant designated herein as a DOE is responsible, negligently or in some other

7   actionable manner, for the events and happenings hereinafter referred to, and caused injury and

8   death to decedent and injuries and damages proximately thereby to the plaintiffs, as hereinafter

9   alleged.

10   2.   At all times herein mentioned, each of the defendants was the agent, servant,

11   employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

12   defendant was acting in the full course and scope of said agency, service, employment and/or joint

13   venture. Except as may be specifically noted herein, all allegations of this Complaint are made on

14   information and belief.

15   3.   Plaintiffs are informed and believe, and thereon allege, that at all times herein

16   mentioned, defendants AC AND S, INC.; ASBESTOS CORPORATION, LTD.; A.W.

17   CHESTERTON COMPANY; CROWN, CORK & SEAL COMPANY, INC., Individually and as

18   Successor-in-Interest to MUNDET CORK CORP.; GARLOCK SEALING TECHNOLOGIES LLC,

19   Individually and as Successor-in-Interest to GARLOCK, INC.; GENERAL ELECTRIC

20   COMPANY; J T THORPE & SON, INC.; METROPOLITAN LIFE INSURANCE COMPANY;

21   PARKER-HANNIFIN CORPORATION, as Successor-in-Interest to SACOMO SIERRA;

22   OWENS-ILLINOIS CORPORATION; QUINTEC INDUSTRIES, INC.; SOCO-LYNCH

23   CORPORATION, successor-in-interest to WESTERN CHEMICAL & MANUFACTURING

24   COMPANY; SWINERTON BUILDERS f/k/a SWINERTON & WALBERG CO.; THOMAS DEE

25   ENGINEERING COMPANY; TRANE U.S, INC., fka AMERICAN STANDARD, INC.; UNION

26   CARBIDE CORPORATION; VIACOM, INCORPORATED, as successor-by-merger to CBS

27   CORPORATION, fka WESTINGHOUSE ELECTRIC CORPORATION; ALLIS-CHALMERS

28   CORPORATION PRODUCT LIABILITY TRUST; BAYER CROPSCIENCE, INC., successor to

1  AMCHEM PRODUCTS, INC.; ENPRO INDUSTRIES, INC., Individually and as Successor-in-
2  Interest to ANCHOR PACKING COMPANY; HOPEMAN BROTHERS, INC.; SB DECKING,
3  INC., formerly known as SELBY, BATTERSBY & COMPANY; GEORGIA-PACIFIC
4  CORPORATION; HAMILTON MATERIALS, INC.; HANSON PERMANENTE CEMENT, INC.
5  fka KAISER CEMENT CORPORATION; KAISER GYPSUM CO., INC.; KELLY-MOORE
6  PAINT COMPANY, INC.; EATON AEROQUIP, LLC; PNEUMO-ABEX CORPORATION,
7  Successor-in-Interest to ABEX CORPORATION; HONEYWELL INTERNATIONAL, INC. fka
8  ALLIED SIGNAL, INC./THE BENDIX CORPORATION; BORG-WARNER CORPORATION by
9  its Successor in Interest, BORGWARNER MORSE TEC, INC.; BRIDGESTONE/FIRESTONE
10 NORTH AMERICAN TIRE, LLC; DANA COMPANIES, LLC; GOODRICH CORPORATION;
11 FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST, as successor to FELT
12 PRODUCTS MANUFACTURING CO.; FORD MOTOR COMPANY; GENERAL MOTORS
13 CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,
14 INC.; THE GOODYEAR TIRE & RUBBER COMPANY; AIRCRAFT BRAKING SYSTEMS
15 CORPORATION; MEGGITT AIRCRAFT BRAKING SYSTEMS; PARKER-HANNIFIN
16 CORPORATION, as Successor to EIS and CALI-BLOK; CURTISS-WRIGHT CORPORATION;
17 MCDONNELL DOUGLAS CORPORATION, Individually and Successor-in-Interest to
18 DOUGLAS AIRCRAFT COMPANY, INC.; EATON CORPORATION; UNITED
19 TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC.; PRATT &
20 WHITNEY POWER SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES, INC.; and
21 ELEVENTH DOE through THREE HUNDREDTH DOE, inclusive, are corporations organized and
22 existing under and by virtue of the laws of the State of California, or the laws of some state or
23 foreign jurisdiction, and that said defendants were and are authorized to do and are doing business
24 in the State of California, and that said defendants have regularly conducted business in the City and
25 County of San Francisco, State of California.  The defendants identified in this paragraph are
26 hereinafter referred to as "MANUFACTURING/DISTRIBUTING DEFENDANTS".

27        4.      At all times herein mentioned, defendants, and each of them, were and are engaged
28 in the business of manufacturing, fabricating, designing, assembling, distributing, leasing, buying,

1  selling, inspecting, servicing, repairing, marketing, warranting and advertising a certain substance,

2  the generic name of which is asbestos, and other products containing said substance.

3       5.    Plaintiffs are informed and believe, and thereon allege, that defendant CROWN,

4  CORK & SEAL COMPANY, INC. is the successor in interest to, or otherwise liable for the acts or

5  omissions of MUNDET CORK CORP.; that defendant GARLOCK SEALING TECHNOLOGIES

6  LLC  is the successor in interest to, or otherwise liable for the acts or omissions of GARLOCK,

7  INC.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

8  otherwise liable for the acts or omissions of SACOMO SIERRA;  that defendant QUINTEC

9  INDUSTRIES, INC. is the successor in interest to, or otherwise liable for the acts or omissions of

10  WESTERN FIBERGLAS SUPPLY COMPANY, WESTERN FIBROUS GLASS PRODUCTS

11  COMPANY and/or WESGLAS; that defendant SOCO-LYNCH CORPORATION  is the successor

12  in interest to, or otherwise liable for the acts or omissions of WESTERN CHEMICAL &

13  MANUFACTURING COMPANY; that defendant BAYER CROPSCIENCE, INC.  is the successor

14  in interest to, or otherwise liable for the acts or omissions of AMCHEM PRODUCTS, INC.; that

15  defendant ENPRO INDUSTRIES, INC. is the successor in interest to, or otherwise liable for the

16  acts or omissions of ANCHOR PACKING COMPANY; that defendant PNEUMO-ABEX

17  CORPORATION  is the successor in interest to, or otherwise liable for the acts or omissions of

18  ABEX CORPORATION; that defendant BORG-WARNER CORPORATION  is the successor in

19  interest to, or otherwise liable for the acts or omissions of BORGWARNER MORSE TEC, INC.;

20  that defendant FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST  is the successor in

21  interest to, or otherwise liable for the acts or omissions of FELT PRODUCTS MANUFACTURING

22  CO.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

23  otherwise liable for the acts or omissions of EIS and CALI-BLOK; that defendant MCDONNELL

24  DOUGLAS CORPORATION  is the successor in interest to, or otherwise liable for the acts or

25  omissions of DOUGLAS AIRCRAFT COMPANY, INC.; and that each of the defendants in this

26  paragraph and listed as a successor elsewhere in this complaint, including the caption, is liable for

27  the acts and omissions of its predecessor entities, partners, divisions, related entities, subsidiaries,

28  and co-ventures.

6.  At all times herein mentioned, defendants, and each of them, singularly and jointly, negligently and carelessly researched, tested or failed to test, warned or failed to warn, manufactured, designed, developed, distributed, labeled, advertised, marketed, warranted, inspected, repaired, fabricated, modified, serviced, and sold a certain substance, the generic name of which is asbestos, and other products containing said substance, in that said substance was capable of causing and did, in fact, proximately cause personal injuries to users, consumers, workers and others, while being used in a manner reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by the consumers, users, bystanders, or workers exposed thereto.

7.  Plaintiffs' decedent was a worker who for a substantial length of time used, handled or was otherwise exposed to asbestos and asbestos products referred to herein, in a manner that was reasonably foreseeable.

8.  As a direct and proximate result of the conduct of the defendants, and each of them, as aforesaid, the exposure to asbestos caused plaintiffs' decedent to contract mesothelioma from which he died on May 27, 2008.

9.  Plaintiff did not learn of the causal relationship between decedent's exposure to asbestos and his death until less than one year before the date on which this Complaint was filed.

10.  Plaintiffs were the heirs of PATRICK THEISEN DONLON, deceased, (herein referred to as "decedent"), as follows:

PATTI DONLON    -    SPOUSE

SEAN DONLON    -    SON

11.  As a result of the conduct of defendants, and each of them, decedent's heirs have sustained pecuniary loss resulting from the loss of love, comfort, society, attention, services and support of decedent in a sum in invoking the unlimited jurisdictional limits of the Court.

12.  As a further result of the conduct of defendants, and each of them, and the death of decedent, plaintiffs herein have incurred funeral and burial expenses in an amount to be subsequently ascertained.

13.  For purposes of the claims alleged herein, the Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship

1   due to the presence of a California defendant. Removal is improper. Every claim arising under the

2   Constitution, treaties, or law of the United States is expressly disclaimed, including any claim

3   arising from an act or omission on a federal enclave, or of any Officer of the U.S. or any agency or

4   person acting under him occurring under color of such of office. No claim of admiralty or maritime

5   law is raised. Plaintiffs sue no foreign state or agency. By this allegation, plaintiffs are not

6   disclaiming State law claims arising exposures on Federal enclaves. Plaintiffs are only disclaiming

7   claims which would be directed at the Federal government and/or Federal officers. Venue is proper

8   in the City and County of San Francisco. Plaintiff shall seek sanctions, attorneys' fees and other

9   appropriate relief in the event any defendant moves to transfer and/or remove this action to another

10   court without a reasonable period of meet and confer discussion relating to same prior to notice of

11   removal and or transfer of this action.

12        WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

13                SECOND CAUSE OF ACTION - STRICT LIABILITY

14        AS FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION

15   FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF

16   THEM, AND ALLEGE AS FOLLOWS:

17        14.     Plaintiffs incorporate herein by reference as though fully set forth herein all

18   paragraphs of the First Cause of Action herein.

19        15.     Defendants and each of them researched, manufactured, tested or failed to test,

20   warned or failed to warn, designed, labeled, distributed, advertised, marketed, warranted, inspected,

21   repaired, offered for sale and sold a certain substance, the generic name of which is asbestos and

22   other products contained said substance, which substance and product is defective, in that same was

23   capable of causing and did, in fact, cause personal injuries, including, but not limited to

24   mesothelioma, to the users and consumers thereof while being used in a reasonably foreseeable

25   manner, thereby rendering the same unsafe and dangerous for use by consumers, users, bystanders

26   and workers exposed thereto; said defendants, and each of them, further failed to adequately warn of

27   the risks to which decedent and others similarly situated were exposed.

28        16.     As a direct and proximate result thereof, decedent suffered the injuries from which

1   he subsequently died, and plaintiffs have suffered the injuries and damages previously alleged.

2        WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

3        THIRD CAUSE OF ACTION - PRODUCTS LIABILITY (NEGLIGENCE AND STRICT

4        LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES,

5        MECHANISMS AND LININGS

6        AS AND FOR A THIRD, SEPARATE, AND FURTHER DISTINCT CAUSE OF ACTION

7   FOR PRODUCTS LIABILITY (NEGLIGENCE AND STRICT LIABILITY) FOR CLUTCH

8   COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS

9   COMPLAIN OF DEFENDANTS FORD MOTOR COMPANY; GENERAL MOTORS

10  CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,

11  INC.; and TWO HUNDRED FIRST DOE through THREE HUNDREDTH DOE, inclusive, and

12  ALLEGE AS FOLLOWS:

13        17.   Plaintiff, by this reference, incorporates the allegations contained in the First and

14  Second Causes of Action as though fully set forth herein.

15        18.   FORD MOTOR COMPANY; GENERAL MOTORS CORPORATION;

16  INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR, INC.; and TWO

17  HUNDRED FIRST DOE through THREE HUNDREDTH DOE, inclusive, manufactured or

18  supplied defective clutch components and brake assemblies or mechanisms which were

19  incorporated into various makes and models of automobiles, trucks and vehicles manufactured, sold

20  or supplied by said defendants.  Said clutch components and brake assemblies or mechanisms were

21  negligently manufactured sold or supplied in that:

22        a)   The design of said clutch components and brake assemblies or mechanisms

23  incorporated the use of asbestos-containing clutch facings/plates and brake linings;

24        b)   Asbestos clutch components brake linings wear and/or deteriorate during regular

25  and ordinary use thus creating friable asbestos dust, which accumulates in the clutch brake

26  assemblies and/or mechanisms;

27        c)   The design of said clutch components brake assemblies require as a part of their

28  normal operation, use and maintenance that the asbestos clutch components and brake linings be

1   removed and replaced;

2       d)   Said defendants required the use of asbestos-containing clutch components and

3   brake linings throughout the time period 1940-1985;

4       e)   During the removal and replacement of asbestos-containing clutch components and

5   brake linings, asbestos-containing dust was inherently generated because of the design of the clutch

6   components and brake assemblies and/or mechanisms;

7       f)   Defendants knew or should have known that the asbestos-containing dust would be

8   generated during the regular use and maintenance of the clutch components and brake assemblies,

9   mechanisms and linings, and that such dust created an increased risk of asbestos disease for all

10   users, consumers, or others who breathed said asbestos-containing dust;

11       g)   The defendants, and each of them, failed to warn and/or properly instruct users,

12   consumers, or others of the asbestos-containing dust hazard which existed at the time of regular

13   maintenance or replacement of asbestos clutch components and brake linings.  Such failure

14   includes, but is not limited to:

15       a.   Failure to place prominent and adequate warnings or instructions in and on

16   the clutch components and brake pads and wheel drums;

17       b.   Failure to place adequate warnings or instructions in the owners' manuals

18   accompanying said automobiles, trucks and vehicles; and

19       c.   Failure to place adequate warnings or instructions on various repair manuals

20   and instructions published by defendants; and

21       d.   Failure to provide adequate information regarding the asbestos hazards

22   associated with the regular use and maintenance of the clutch components and brake mechanisms,

23   assemblies and/or linings.

24       19.   The clutch components and brake assemblies, mechanisms and/or linings

25   manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer

26   would expect, even though they performed as designed.

27       20.   Defendants' use and design of asbestos-containing clutch components and brake

28   linings, both as original equipment and as replacement parts, created unreasonable inherent risks

1  which outweighed the benefits of said use and/or design.

2      21. The dangers inherent in asbestos-containing clutch components and brake linings were

3  unknown and unforeseeable to the decedent.

4      22. Decedent's exposure to asbestos-containing dust, which caused his injury, was from

5  his use and maintenance of defendants' clutch components and brake mechanisms, assemblies

6  and/or linings. Said work produced the release of asbestos dust, which decedent inhaled, thus

7  increasing his risk for all asbestos-related disease.

8      23. Defendants' negligence and defective products as described in this cause of action

9  were a direct cause of decedent's injuries, and the injuries and damages thereby sustained by

10  plaintiffs.

11         FOURTH CAUSE OF ACTION - ENTERPRISE LIABILITY

12      AS AND FOR A FOURTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF

13  ACTION FOR ENTERPRISE LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND

14  EACH OF THEM, AND ALLEGE AS FOLLOWS:

15      24. Plaintiff incorporates by reference as though fully set forth herein, each of the

16  paragraphs of the First, Second and Third Causes of Action herein.

17      25. In the event plaintiffs are unable to identify the specific defendant(s) which supplied

18  the asbestos or asbestos-containing products which caused the damage referred to above, plaintiffs

19  allege that as between an innocent plaintiff and culpable defendant(s), the latter should bear the cost

20  of injury.

21      26. Plaintiffs' decedent was exposed to asbestos and asbestos emanating from asbestos-

22  containing products which are and were fungible in appearance as well as in composition and which

23  were used in substantially the same manner by plaintiffs decedent and/or those working in the

24  vicinity of plaintiffs' decedent. Moreover, through no fault of the plaintiffs, this asbestos and/or

25  these asbestos-containing products cannot be traced to a specific producer.

26      27. In this action, plaintiffs have joined a substantial share of the producers of such

27  asbestos and/or asbestos-containing products which caused the injuries complained of herein, and

28  will prove at the time of trial that the defendants named herein constituted a substantial share of

1   such producers. Accordingly, liability attaches to each named defendant to the extent of their

2   percentage of market share, in a manner consistent with the rules set forth in the decision of Sindell

3   v. Abbott Laboratories, et al.

4        28.     As a direct and legal result thereof, plaintiffs have suffered the injuries and damages

5   previously alleged.

6        WHEREFORE, Plaintiffs pray judgment against the defendants, and each of them, as

7   hereinafter set forth.

8                FIFTH CAUSE OF ACTION – FALSE REPRESENTATION

9                UNDER RESTATEMENT OF TORTS Sec. 402-B

10       AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF ACTION

11  FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B,

12  PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND ALLEGE AS

13  FOLLOWS:

14       29.     Plaintiffs incorporate by reference all Causes of Action of this Complaint.

15       30.     At the aforementioned time when defendants, and each of them, researched,

16  manufactured, tested or failed to test, warned or failed to warn, designed, labeled, distributed,

17  advertised, marketed, warranted, inspected, repaired, offered for sale and sold the said asbestos and

18  asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly

19  and impliedly represented to members of the general public, including the purchasers and users of

20  said product, and including the decedent herein and his employers, that asbestos and asbestos-

21  containing products were of merchantable quality, and safe for the use for which they were

22  intended.

23       31.     The purchasers and users of said asbestos and asbestos-containing products,

24  including the decedent and his employer, relied upon said representations of defendants and each of

25  them, in the selection, purchase and use of asbestos and asbestos-containing products.

26       32.     Said representations by defendants, and each of them, were false and untrue, in that

27  the asbestos and asbestos-containing products were not safe for their intended use, nor were they of

28  merchantable quality as represented by defendants, and each of them, in that asbestos and asbestos

---

2120/complaint.wd                            11                      COMPLAINT FOR DAMAGES
                                                                    WRONGFUL DEATH - ASBESTOS

containing products have very dangerous properties and defects whereby said products cause mesothelioma, and have other defects that cause injury and damage to the users of said products, including decedent herein, thereby taking the life of plaintiffs' decedent.

33.   As a direct and proximate result of said false representations by defendants and each of them, the plaintiffs sustained the injuries and damages hereinabove set forth.

WHEREFORE, plaintiffs pray judgment against defendants, and each of them, as hereinafter set forth.

## SIXTH CAUSE OF ACTION - SURVIVAL ACTION

AS AND FOR A SIXTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION (SURVIVAL ACTION), PLAINTIFF PATTI DONLON AS SUCCESSOR-IN-INTEREST TO THE ESTATE OF PATRICK THEISEN DONLON COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A CAUSE OF ACTION ALLEGE:

34.   Plaintiff incorporates by reference herein each and every paragraph of all Causes of Action of this Complaint, and make them a part of this, the Sixth Cause of Action, as though fully set forth herein.

35.   Prior to his death, decedent PATRICK THEISEN DONLON had a cause of action against defendants herein for personal injuries arising from his exposure to asbestos.  On May 27, 2008, with the foregoing cause of action still pending, PATRICK THEISEN DONLON, who would have been the plaintiff in this action if he had lived, died.

36.   As a proximate result of the conduct of defendants, and each of them, decedent was required to, and did, employ physicians and surgeons to examine, treat and care for him and did incur medical and incidental expenses in a sum to be subsequently determined.

37.   As a further, direct and proximate result of the conduct of defendants, and each of them, decedent was prevented from attending to his usual occupation for a period of time and thereby incurred damages for loss of earnings in a sum to be subsequently determined.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as hereinafter set forth.

## SEVENTH CAUSE OF ACTION - PUNITIVE DAMAGES

AS FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION
FOR PUNITIVE DAMAGES, PLAINTIFFS COMPLAIN OF ALL DEFENDANTS, INCLUSIVE,
AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

38.     Plaintiffs incorporate by reference each and every paragraph of all Causes of Action
of this Complaint, and make them a part of this Seventh Cause of Action as though fully set forth
herein.

39.     In researching, testing, manufacturing, distributing, labeling, and marketing asbestos
and asbestos products, defendants in this cause of action named, and each of them, did so with
conscious disregard for the safety of the users of said asbestos and asbestos products, in that
defendants has specific prior knowledge that there was a high risk of injury or death resulting from
exposure to asbestos or asbestos products, including but not limited to, mesothelioma.  Said
knowledge was obtained, in part, from scientific studies, government data, and medical data to
which defendants had access, as well as scientific studies performed by, at the request of, or with
the assistance of, said defendants, and which knowledge was obtained by said defendants on or
before 1933, and thereafter.

40.     On or before 1933, and thereafter, said defendants were aware that users of asbestos
and asbestos products, as well as members of the general public who would be exposed to asbestos
and asbestos products, had no knowledge or information indicating that asbestos could cause injury,
and said defendants knew that the users of asbestos and asbestos products, as well as members of
the general public who were exposed to asbestos and asbestos products would assume, and in fact
did assume, that exposure to asbestos and asbestos products was safe, when in fact said exposure
was extremely hazardous to human life.

41.     With said knowledge, said defendants opted to manufacture and distribute said
asbestos and asbestos products without attempting to protect users from or warn users of, the high
risk of injury or death resulting from exposure to asbestos and asbestos products.  Rather than
attempting to protect users and workers from, or warn workers and users of, the high risk of injury
or death resulting from exposure to asbestos and asbestos products, defendants intentionally failed
to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said

1 knowledge from members of the general public that asbestos and asbestos products were unsafe for

2 all reasonably foreseeable use, with the knowledge of the falsity of said implied representations.

3     42.    The above-referenced conduct of said defendants was motivated by the financial

4 interest of said defendants in the continuing, uninterrupted distribution and marketing of asbestos

5 and asbestos products. In pursuance of said financial motivation, said defendants consciously

6 disregarded the safety of the users of, and persons exposed to, asbestos and asbestos products, and

7 were in fact, consciously willing to permit asbestos and asbestos products to cause injury to workers

8 and users thereof, and personnel exposed thereto, including plaintiff's decedent.

9     43.    As the above-referenced conduct of said defendants was and is willful, malicious,

10 outrageous, and in conscious disregard and indifferent to the safety and health of workers exposed

11 to asbestos and asbestos products, including decedent, plaintiffs, for the sake of example, and by

12 way of punishing said defendants, seeks punitive damages according to proof.

13     WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as

14 hereinafter set forth.

15              EIGHTH CAUSE OF ACTION - LOSS OF CONSORTIUM

16     AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF

17 ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF PATTI DONLON COMPLAINS OF

18 DEFENDANTS, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

19     44.    Plaintiff PATTI DONLON incorporates herein by reference and makes a part hereof

20 as though fully set forth herein, all of the paragraphs of all the Causes of Action of this complaint.

21     45.    Plaintiff PATTI DONLON was at all relevant times the lawfully wedded spouse of

22 decedent PATRICK THEISEN DONLON.

23     46.    As a direct and proximate result of the conduct of defendants, and each of them, and

24 of the severe injuries caused thereby to decedent prior to his death, as hereinabove alleged, plaintiff

25 PATTI DONLON suffered loss of consortium, including, but not by way of limitation, loss of

26 services, marital relations, society, comfort, companionship, love and affection of her said spouse,

27 and has suffered severe mental and emotional distress and general nervousness as a result thereof.

28     47.    Plaintiff PATTI DONLON, as a result of the foregoing described injuries to her said

1   spouse, has been generally damaged in a sum invoking the unlimited jurisdictional limits of the

2   Court.

3        WHEREFORE, Plaintiffs pray judgment against defendants and each of them as follows:

4       1.   For general damages according to proof;

5       2.   For burial expenses according to proof;

6       3.   For medical expenses according to proof;

7       4.   For loss of income according to proof;

8       5.   For punitive damages according to proof;

9       6.   For plaintiffs' costs of suit herein; and,

10      7.   For such other and further relief as this Court deems just and proper.

11

12  DATED: May 22, 2009               HAROWITZ & TIGERMAN, LLP

13

14                                BY

15                                  ROGER E. GOLD
                                    Attorney for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

1  STEVEN M. HAROWITZ  (Bar No. 71117)
   STEPHEN M. TIGERMAN (Bar No. 112127)
2  ROGER B. GOLD (Bar No. 214802)
   HAROWITZ & TIGERMAN, LLP
3  450 Sansome Street, 3rd Floor
   San Francisco, California  94111
4  Telephone      (415) 788-1588

5  Attorneys for Plaintiffs

6

7                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

9

10                                        )
   PATTI DONLON, Individually and as Successor-in-  )   No. C G C - 0 9 - 2 7 5 2 1 8
11 Interest to the Estate of PATRICK THEISEN DONLON, )
   Decedent; SEAN DONLON; and DOES ONE through  )   PRELIMINARY FACT SHEET
12 TEN, inclusive,                         )   NEW FILING/
                                           )   ASBESTOS LITIGATION
13                                         )   (See General Order No. 129;
                      Plaintiffs,          )   In Re Complex Asbestos
14                                         )   Litigation)
       vs.                                 )
15                                         )
                                           )
16 AC AND S, INC., et al.,                 )
                                           )
17                    Defendants.          )
                                           )
18

19                              N O T I C E

20

21 TO NEW DEFENDANTS SERVED IN COMPLEX ASBESTOS LITIGATION IN THE
   SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA,
22 CITY AND COUNTY OF SAN FRANCISCO:

23          You have been served with process in an action which has been designated by the Court
   as complex litigation pursuant to Standard 19 of the Standards of Judicial Administration.  This
24 litigation bears the caption "In Re: Complex Litigation," [San Francisco Superior Court No.
   828684].
25
            This litigation is governed by various general orders, some of which affect the judicial
26 management and/or discovery obligations, including the responsibility to answer
   interrogatories deemed propounded in the case.  You may contact the Court or Designated
27 Defense Counsel, Berry & Berry, Post Office Box 16070 (2930 Lake Shore Ave.), Oakland,
   California 94610; Telephone: (510) 250-0200; FAX: (510) 835-5117, for further information
28 and/or copies of these orders, at your expense.

   2120/fact.sheet.wd.wpd                     1                    PRELIMINARY FACT SHEET
                                                                   ASBESTOS LITIGATION

ENDORSED
F I L E D
San Francisco County Superior Court

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY: _____ PARAM NAIT _____
                    Deputy Clerk

1. State the complete name and address of each person whose claimed exposure to asbestos is the basis of this lawsuit ("exposed person"):    **PATRICK THEISEN DONLON**

2. Does plaintiff anticipate filing a motion for preferential trial date within the next four months?    _____ Yes    __X__ No

3. Date of birth of each exposed person in item one and, if applicable, date of death:

   Date of Birth: **September 26, 1937**    Date of Death: **May 27, 2008**

   Social Security Number of each exposed person:  **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**

4. Specify the nature or type of asbestos-related disease alleged by each exposed person:

   ___ Asbestosis    __X__ Mesothelioma

   ___ Pleural Thickening/Plaques    ___ Other Cancer: Specify: _____

   ___ Lung Cancer Other Than Mesothelioma    Other: Specify:_____

5. For purposes of identifying the nature of exposure allegations involved in this action, please check one or more:

   ___ Shipyard    __X__ Construction    __X__ Friction-Automotive

   ___ Premises    ___ Aerospace    __X__ Military

   ___ Other: Specify all that apply: _____

   If applicable, indicate which exposure allegations apply to which exposed person.

6. Identify each location alleged to be a source of an asbestos exposure, and to the extent known, provide the beginning and ending year(s) of each such exposure.  Also specify each exposed person's employer and job title or job description during each period of exposure.  (For example: "San Francisco Naval Shipyard - Pipefitter - 1939-1948").  Examples of locations of exposure might be a specific shipyard, a specific railroad maintenance yard, or perhaps more generalized descriptions such as "merchant Marine" or "construction."  If an exposed person claims exposure during only a portion of a year, the answer should indicate that year as the beginning and ending year (e.g., 1947-1947).

/ / /

/ / /

/ / /

| Location of Exposure | Employer | Job Title at Time of Exposure | Year(s) of Exposure Beginning - Ending |
|---|---|---|---|
| Elkader, Strawberry Point, Clayton, IA | New Jersey Zinc | Worker | 1953-1955 |
| Pensacola, FL; Brooklyn NSY; Brooklyn, NYC, New York | U.S. Navy | Aviation Mechanic | 1955-1958 |

**BYSTANDER EXPOSURE:**

| | | | |
|---|---|---|---|
| Home Construction: Elkader, IA; Davis, CA | Not Applicable | Not Applicable | 1950's; 1970's |

**SECONDHAND EXPOSURE through decedent's father, Jack Donlon's employment:**

| | | | |
|---|---|---|---|
| Elkader, IA | Jack Donlon Chevrolet | Car dealership/ service manager | 1937-1955 |

7.  For each exposed person who:

a.  worked in the United States or for a U. S. agency outside the territorial United States, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Earnings authorization (Exhibit N-4 to General Order No. 129);

b.  may have had a Social Security disability award or is no longer employed and whose last employment was not with a United States government agency, attach to the copy of this fact sheet provided to Designated Defense counsel a fully executed Social Security Disability authorization (Exhibit N-5 to General Order No. 129);

c.  served at any time in the United States military, attach to the copy of this fact sheet provided to the Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129);

d.  was employed by the United States government in a civilian capacity, attach to the copy of this fact sheet provided to Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129).

8.  If there is a wrongful death claim, attach to the copy of this fact sheet provided to

1  Designated Defense Counsel a copy of the death certificate, if available. If an autopsy report

2  was done, also attach a copy of it to the copy of this fact sheet provided to Designated Defense

3  Counsel.

4  9.      State the date of the filing of the initial complaint in this matter: May 22, 2009

5

6  DATED: May 22, 2009                              HAROWITZ & TIGERMAN, LLP

7

8                                                   BY _____
                                                       ROGER E. GOLD
9                                                      Attorney for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2120/fact.sheet.wd.wpd                    4                    PRELIMINARY FACT SHEET
                                                               ASBESTOS LITIGATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "B"

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| STEVEN M. HAROWITZ (SBN 71117)<br>HAROWITZ & TIGERMAN, LLP<br>450 Sansome Street, 3rd Floor<br>San Francisco, CA 94111<br><br>TELEPHONE NO: (415)788-1588  FAX NO. (Optional): (415)788-1598<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Jurisdiction

PLAINTIFF/PETITIONER: Patti Donlon, et al.

DEFENDANT/RESPONDENT: AC and S, Inc., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| [X] Personal Injury, Property Damage, or Wrongful Death<br>　　[ ] Motor Vehicle [ ] Other<br>[ ] Family Law [ ] Eminent Domain<br>[X] Other (specify):* Asbestos | CGC 09-275218 |

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
　a. (1) [ ] With prejudice (2) [X] Without prejudice
　b. (1) [X] Complaint (2) [ ] Petition
　　(3) [ ] Cross-complaint filed by (name): ⋯ 　　　　　　　　on (date):
　　(4) [ ] Cross-complaint filed by (name): 　　　　　　　　on (date):
　　(5) [ ] Entire action of all parties and all causes of action
　　(6) [X] Other (specify):* See Attachment A

2. (Complete in all cases except family law cases.)
　　[ ] Court fees and costs were waived for a party in this case. (This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed.)

Date: June 24, 2011

STEVEN M. HAROWITZ (SBN 71117)⋯⋯⋯⋯　　　　　▶　　　　　　　　　(SIGNATURE)
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)　Attorney or party without attorney for: Patti Donlon, et al.

*If dismissal requested is of specified parties only, of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

[X] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross - complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
　Date:

_____　　　　　▶
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)　Attorney or party without attorney for:　　(SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

[ ] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross - Complainant

(To be completed by clerk)
4. [ ] Dismissal entered as requested on (date):
5. [ ] Dismissal entered on (date): 　　　　　　　as to only (name):
6. [ ] Dismissal not entered as requested for the following reasons (specify):

7. a. [ ] Attorney or party without attorney notified on (date):
　b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
　　　[ ] a copy to be conformed [ ] means to return conformed copy
　Date: 　　　　　　　　　　　　Clerk, by _____, Deputy

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CIV-110 [Rev. July 1, 2009] | REQUEST FOR DISMISSAL | Legal<br>Solutions<br>⊕ Plus | Code of Civil Procedure, § 581 et seq.;<br>Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390<br>Page 1 of 2 |

CIV-110

| PLAINTIFF/PETITIONER: Patti Donlon, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: AC and S, Inc., et al. | CGC 09-27518 |

## Declaration Concerning Waived Court Fees

> The court has a statutory lien for waived fees and costs on any recovery of $10,000 or more in value by settlement, compromise, arbitration award, mediation settlement, or other recovery. The court's lien must be paid before the court will dismiss the case.

1. The court waived fees and costs in this action for (name):

2. The person in item 1 (check one):
   a. ☐ is not recovering anything of value by this action.
   b. ☐ is recovering less than $10,000 in value by this action.
   c. ☐ is recovering $10,000 or more in value by this action. (If item 2c is checked, item 3 must be completed.)

3. ☐ All court fees and costs that were waived in this action have been paid to the court (check one): ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____      _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)      (SIGNATURE)

CIV-110 [Rev. July 1, 2009]        **REQUEST FOR DISMISSAL**        Page 2 of 2

**ATTACHEMENT A to Plaintiff's Request for Dismissal Without Prejudice**

Plaintiffs dismiss all claims except their failure to warn claims as to defendants, THE BOEING COMPANY; CONTINENTAL MOTORS, INC.; GENERAL ELECTRIC COMPANY; CURTISS-WRIGHT CORPORATION; UNITED TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC., PRATT & WHITNEY POWER SYSTEMS, INC., HAWKER BEECHCRAFT COPORATION, ONLY.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE**

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**SEDGWICK, LLP**
**One Market Plaza Steuart Tower, 8th Floor**
**San Francisco, CA 94105**
**(415) 781-7900**
**Counsel for: GENERAL ELECTRIC COMPANY**

via the following method of service:

X    Electronically on the recipients designated on the Transaction Receipt located on the Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General Order No. 158, Asbestos-Related Case.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1                                                            Proof of Service

1

## PROOF OF SERVICE

2       I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3   date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4
## REQUEST FOR DISMISSAL
5

on the following parties:
6
CSC LAWYERS
7   2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833
8
Agent for: THE BOEING COMPANY
9

via the following method of service:
10

11  X.      By Regular Mail in a sealed envelope, addressed as noted in the attached service list,

12          with postage fully prepaid and placing it for collection and mailing following the

13          ordinary business practices of Harowitz & Tigerman, LLP.

14

15      I declare under penalty of perjury that the foregoing is true and correct and that this

16  declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19                                                          Robert C. Jones

20

21

22

23

24

25

26

27

28

                                   1                              Proof of Service

**PROOF OF SERVICE**

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**CONTINENTAL MOTORS, INC.**
**2039 Broad Street**
**Mobile, Alabama 36615**

via the following method of service:

X.  **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**SEDGWICK, LLP**
**One Market Plaza Steuart Tower, 8th Floor**
**San Francisco, CA 94105**
**(415) 781-7900**
**Counsel for: GENERAL ELECTRIC COMPANY**

via the following method of service:

X    Electronically on the recipients designated on the Transaction Receipt located on the Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General Order No. 158. Asbestos-Related Case.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

Proof of Service

1

## PROOF OF SERVICE

2      I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3  date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

5      **REQUEST FOR DISMISSAL**

on the following parties:

6

7      **JAMES V. MAHER, GENERAL COUNSEL**
    **10 Waterview Boulevard, 2nd Floor**
8      **Parsippany, NJ 07054**

9      **AGENT FOR: CURTISS-WRIGHT CORPORATION**

10

11  via the following method of service:

X      **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list,
12

13      with postage fully prepaid and placing it for collection and mailing following the

14      ordinary business practices of Harowitz & Tigerman, LLP.

15      I declare under penalty of perjury that the foregoing is true and correct and that this
16
declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19

20      Robert C. Jones

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

**CT CORPORATION**
**818 West 7th Street**
**Los Angeles, CA 90017**

**Agent for: UNITED TECHNOLOGIES CORPORATION**
**PRATT & WHITNEY POWER SYSTEMS, INC.**

via the following method of service:

X      **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

_____
Robert C. Jones

1

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

**GREGORY H. HALLIDAY**
**801 South Figueroa Street, 19th Floor**
**Los Angeles, CA 90017**

### Agent for: HAWKER BEECHCRAFT CORPORATION

via the following method of service:

X     **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

Proof of Service

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22                  **EXHIBIT "C"**
23
24
25
26
27
28

Allan Shiffler                    Volume I                    April 7, 2011

---

**Page 1**

VOLUME I
PAGES 1-96
EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS
Middlesex County          Superior Court

* * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,          *
Individually and as Personal       *
Representative of JOHN T.           *
NORSWORTHY                          *
          Plaintiff                 *
vs.                                 *  Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a      *  08-4778
THE GOODYEAR TIRE & RUBBER CO.,     *
et al.        Defendants            *
* * * * * * * * * * * * * * * * *

30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Thursday, April 7, 2011, 3:53 p.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

----Reporter: Joan M. Cassidy, RPR, RMR, CRR----
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795 Fax 508.478.0595
www.eppleycourtreporting.com

Page 1

---

**Page 2**

```
 1    APPEARANCES:
 2    Representing the Plaintiff:
 3      The Shepard Law Firm, P.C.
        Michael C. Shepard, Esq.
        10 High Street
 4      Boston, Massachusetts 02110
        617-451-9191  Fax 617-451-0792
 5      mshepard@shepardlawfirm.com
 6    Representing Hawker Beechcraft:
 7      Campbell Campbell Edwards & Conroy
        Adam A. Larson, Esq.
 8      One Constitution Plaza
        Boston, Massachusetts 02129
 9      617-241-3000  Fax 617-241-5115
        alarson@campbell-trial-lawyers.com
10
11    Representing Honeywell International, Inc. f/k/a
      Allied Signal, Inc. f/d/a The Bendix Corporation:
12      Cetrulo & Capone LLP
        Lawrence J. Sugarman, Esq. (via telephone)
13      Two Seaport Lane
        Boston, Massachusetts 02210
14      617-217-5500  Fax 617-217-5200
        lsugarman@cetcap.com
15
16    Representing United Technologies Corporation and the
      Witness:
17      Cooley Manion Jones LLP
        Jonathan F. Tabasky, Esq.
18      21 Custom House Street
        Boston, Massachusetts 02110
19      617-737-3100  Fax 617-737-3113
        jtabasky@cmjlaw.com
20
21    Representing Aircraft Braking Systems f/k/a The
      Goodyear Tire & Rubber Co.:
22      Cooley Manion Jones LLP
        Michael R. Brown, Esq. (via telephone)
23      21 Custom House Street
        Boston, Massachusetts 02110
24      617-737-3100  Fax 617-737-3113
        mbrown@cmjlaw.com
25
```

Page 2

---

**Page 3**

```
 1    Representing Curtiss-Wright Corporation:
 2      Govarno Law Firm LLC
        Kendra A. Christensen, Esq. (via telephone)
 3      Two International Place
        Boston, Massachusetts 02110
 4      617-737-9045  Fax 617-737-9048
        kchristensen@govarno.com
 5
 6    Representing Parker-Hannifin Corporation:
        Keegan Werlin LLP
 7      Richard B. Kirby, Esq.
        265 Franklin Street
 8      Boston, Massachusetts 02110
        617-951-1400  Fax 617-951-1354
 9      rkirby@keeganwerlin.com
10    Representing Eaton Aeroquip, Inc.:
        McElroy, Deutsch, Mulvaney & Carpenter, LLP
11      Nancy McDonald, Esq.
        1300 Mount Kemble Avenue
12      P.O. Box 2075
        Morristown, New Jersey 07962-2075
13      973-993-8100  Fax 973-425-0161
        nmcdonald@mdmc-law.com
14
15    Representing General Dynamics Corporation:
        Melick, Porter & Shea, LLP
16      John F. Rooney, III, Esq. (via telephone)
        28 State Street
17      Boston, Massachusetts 02109
        617-523-6200  Fax 617-523-8130
18      jrooney@melicklaw.com
19
        Representing General Tire Company and B.F. Goodrich
20      n/k/a Goodrich Corporation:
        Pierce, Davis & Perritano, LLP
21      Meghan L. Riordan, Esq. (via telephone)
        90 Canal Street
22      Boston, Massachusetts 02114
        617-350-0950  Fax 617-350-7760
23      mriordan@piercedavis.com
24
```

Page 3

---

**Page 4**

```
 1    Representing The Boeing Company; Boeing North
      American, Inc.; McDonnell Douglas Corporation:
 2      Sherin and Lodgen LLP
        Kathy E. Koski, Esq.
 3      101 Federal Street
        Boston, Massachusetts 02110
 4      617-646-2000  Fax: 617-646-2222
        kekoski@sherin.com
 5
 6    Representing United Technologies Corporation:
        Tucker Ellis & West LLP
 7      Curtiss L. Isler, Esq.
        Martin H. Lewis, Esq.
 8      1150 Huntington Building
        925 Euclid Avenue
 9      Cleveland, Ohio 44115
        216-592-5000  Fax: 216-592-5009
10      curt.isler@tuckerellis.com
        mlewis@tuckerellis.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

1 (Pages 1 to 4)

Allan Shiffler                Volume I                 April 7, 2011

Page 9

1  being you can't talk to counsel while the question
2  is pending. You have to answer the question. Then
3  we can take a break and you can speak with counsel.
4  Is that fair?
5    A. Sounds good.
6    Q. All right, great. Let's jump right in,
7  then. Could you state your full name for the
8  record.
9    A. Allan J. Shiffler.
10   Q. And Mr. Shiffler, what's your date of
11  birth?
12   A. March 26, 1941.
13   Q. A belated happy birthday. What is your
14  address?
15   A. 50 Mohegan Trail, South Windsor,
16  Connecticut.
17   Q. All right. And I know you've been deposed
18  before. On how many prior occasions have you given
19  a deposition?
20   A. I believe it was just one time.
21   Q. Have you ever testified at trial?
22   A. No.
23   Q. Did you ever have occasion to read that
24  deposition transcript from your other deposition?

Page 10

1    A. Yes, I believe I did.
2    Q. All right. And do you know, sir, whether
3  you made any corrections to any of the answers that
4  were given?
5    A. I don't recall.
6    Q. Can you tell me when you were first
7  contacted about this case?
8    A. About two weeks ago, thereabouts.
9    Q. And by whom were you contacted?
10   A. Curt Isler.
11   Q. Other than conversations you may have had
12  with lawyers, did you have any conversations with
13  anyone regarding your testimony in this case?
14   A. No.
15   Q. Did you review any documents in preparation
16  for your testimony?
17   A. The only thing I saw was the affidavit.
18   Q. Did you review any photographs?
19   A. No.
20   Q. And did you review any military contracts
21  or documents?
22   A. No.
23   Q. Are you presently employed?
24   A. No.

Page 11

1    Q. Okay. You have a smile on your face.
2  Believe me, I wish I wasn't presently employed right
3  now either. Can you tell me how long you have been
4  retired for?
5    A. Since 2003. March of 2003 is when I
6  retired.
7    Q. And other than this case and the case in
8  which you gave a deposition before, have you
9  assisted Pratt & Whitney in any other litigation?
10   A. No.
11   Q. And that other case was an asbestos case,
12  correct?
13   A. Yes.
14   Q. All right. So those are -- this case and
15  that case are the only two asbestos cases in which
16  you've testified or assisted Pratt & Whitney in any
17  manner?
18   A. In regards to a deposition, yes.
19   Q. Okay. And my question is a little broader.
20  Have you assisted them in an advisory capacity in
21  any other asbestos matters?
22   A. Yes.
23   Q. Okay. Approximately how many?
24   A. Maybe ten or twelve depositions.

Page 12

1    Q. When you say "depositions," what do you
2  mean by that, affidavits, perhaps?
3    MR. TABASKY: Why don't you ask him what
4  he did. That might be better.
5    MR. SHEPARD: I didn't want to go too
6  far into it, but...
7    Q. What did you do in those matters?
8    A. I reviewed and prepared -- reviewed and
9  signed some declarations --
10   Q. Okay.
11   A. -- if that clarifies it.
12   Q. It does, thank you. And do you maintain
13  copies of the declarations that you've reviewed and
14  signed?
15   A. Yes, I do.
16   Q. And where do you maintain those copies?
17   A. At my home.
18   Q. And were you provided those declarations to
19  sign by counsel?
20   A. Yes.
21   Q. Did you have the assistance of anyone other
22  than counsel in preparing those declarations?
23   A. No.
24   Q. Did these declarations involve subject

3 (Pages 9 to 12)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "D"

VOLUME II
PAGES 98-188
EXHIBITS: 4

COMMONWEALTH OF MASSACHUSETTS
Middlesex County          Superior Court

* * * * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,
Individually and as Personal
Representative of JOHN T.
NORSWORTHY
          Plaintiff
vs.                              Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a      08-4778
THE GOODYEAR TIRE & RUBBER CO.,
et al.,      Defendants
* * * * * * * * * * * * * * * * * *

CONTINUED 30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Friday, April 8, 2011, 9:00 a.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

Reporter:  Joan M. Cassidy, RPR, RMR, CRR
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795  Fax 508.478.0595
www.eppleycourtreporting.com

Page 98

1   Representing Eaton Aeroquip, Inc.:
2   McElroy, Deutsch, Mulvaney & Carpenter, LLP
    Nancy McDonald, Esq.
3   1300 Mount Kemble Avenue
    P.O. Box 2075
4   Morristown, New Jersey 07962-2075
    973-993-8100 Fax: 973-425-0161
5   nmcdonald@mdmc-law.com

6   Representing General Dynamics Corporation:
    Mellck, Porter & Shea, LLP
7   John F. Rooney, III, Esq. (via telephone)
    28 State Street
8   Boston, Massachusetts 02109
    617-523-6200 Fax: 617-523-6139
9   jrooney@pmdirklaw.com
10
    Representing General Tire Company and B.F. Goodrich
11  n/k/a Goodrich Corporation:
    Pierce, Davis & Perritano, LLP
12  Meghan L. Riordan, Esq. (via telephone)
    90 Canal Street
13  Boston, Massachusetts 02114
    617-350-0950 Fax: 617-350-7760
14  mriordan@piercedavis.com
15
    Representing The Boeing Company; Boeing North
16  American, Inc., McDonnell Douglas Corporation:
    Sherin and Lodgen LLP
17  Kathy E. Koski, Esq.
    101 Federal Street
18  Boston, Massachusetts 02110
    617-646-2000 Fax 617-646-2222
19  kekoski@sherin.com
20
21
22
23
24

Page 100

APPEARANCES:

1
2   Representing the Plaintiff:
3   The Shepard Law Firm, P.C.
    Michael C. Shepard, Esq.
4   10 High Street
    Boston, Massachusetts 02110
5   617-451-9191 Fax: 617-451-9292
6   mshepard@shepardlawfirm.com

    Representing Hawker Beechcraft:
7   Campbell Campbell Edwards & Conroy
    Adam A. Larson, Esq.
8   One Constitution Plaza
    Boston, Massachusetts 02129
9   617-241-3000 Fax: 617-241-5115
    alarson@campbell-trial-lawyers.com
10
11  Representing Honeywell International, Inc. f/k/a
    Allied Signal, Inc. f/k/a The Bendix Corporation:
12  Cetrulo & Capone LLP
    Lawrence J. Sugarman, Esq. (via telephone)
13  Two Seaport Lane
    Boston, Massachusetts 02210
14  617-217-5500 Fax: 617-217-5200
    lsugarman@cetcap.com
15
16  Representing United Technologies Corporation and the
    Witness:
17  Cooley Manion Jones LLP
    Jonathan F. Tabasky, Esq.
18  21 Custom House Street
    Boston, Massachusetts 02110
19  617-737-3100 Fax: 617-737-3113
    jtabasky@cmjlaw.com
20
21  Representing Curtiss-Wright Corporation:
    Guerrino Law Firm LLC
22  Kendra A. Christensen, Esq. (via telephone)
    Ten International Place
23  Boston, Massachusetts 02110
    617-737-9045 Fax: 617-737-9046
24  kchristensen@guverno.com

Page 99

1   Representing United Technologies Corporation:
    Tucker Ellis & West LLP
2   Curtiss L. Isler, Esq.
    Martin H. Lewis, Esq.
3   1150 Huntington Building
    925 Euclid Avenue
4   Cleveland, Ohio 44115
    216-592-5000  Fax: 216-592-5009
5   curt.isler@tuckerellis.com
    mlewis@tuckerellis.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

1 (Pages 98 to 101)

Allan Shiffler                     Volume II                     April 8, 2011

---

**Page 102**

1                I N D E X
2
3             EXAMINATIONS
4    Allan J. Shiffler
5
        BY MR. SHEPARD      103
6
7
8
9
10        EXHIBITS MARKED
11
12   Exhibit 4, Declaration of Alan J.    146
13   Shiffler in support of defendant
14   United Technology Corporation's notice
15   of removal
16
17   (Original exhibits retained by Attorney Shepard)
18
19
20
21
22
23
24

---

**Page 103**

1         P R O C E E D I N G S
2      MR. SHEPARD: This is the continued
3   deposition of Mr. Shiffler.
4      Allan J. Shiffler, Previously Sworn
5      DIRECT EXAMINATION, Continued
6   BY MR. SHEPARD:
7     Q. Good morning, Mr. Shiffler.
8     A. Good morning.
9     Q. We are back on the record, and I just want
10  to remind you that you are still under oath from
11  yesterday.
12      MR. SHEPARD: And Jon, all the same
13  stipulations apply today?
14      MR. TABASKY: Yes.
15      MR. SHEPARD: Great.
16     Q. All right. When we left off yesterday, we
17  were talking about the development of the dash 100A
18  version of the TF33, correct?
19     A. Yes.
20     Q. All right. Other than the development of
21  that engine, were you personally involved in the
22  development of any new engine or new variant of any
23  engine for the United States military during your
24  employment at Pratt & Whitney?

---

**Page 104**

1     A. No.
2     Q. And were you involved in any contract
3  negotiations for the development of any new engine
4  or new variant of any engine other than the TF33
5  during your tenure at Pratt & Whitney?
6     A. No.
7     Q. Now, we talked about the contracts that
8  Pratt entered into for the modification of a certain
9  number of dash 100As yesterday.  How many dash 100As
10  were modified from existing TF33s under that
11  contract?
12     A. I believe there were 49 or 50.
13     Q. And were those engines pulled off of any
14  existing Air Force planes?  Were they in Air Force
15  stock not attached to aircraft?
16     A. That's two questions.
17     Q. Okay.  Then let's break it down.
18     A. There you go.
19     Q. Tell me where the Air Force obtained the
20  TF33s that they gave to Pratt to modify.
21     A. Excess inventory.
22     Q. And where did the Air Force maintain its
23  excess inventory at that time?
24     A. Tinker Air Force Base, Oklahoma City.

---

**Page 105**

1     Q. Were the excess inventory engines -- strike
2  that.
3      When were the engines that were sent
4  back to Pratt & Whitney for modification first
5  manufactured by Pratt & Whitney?
6     A. I don't think I can -- I don't have records
7  of that.
8     Q. And do you -- strike that.
9      Have you seen any documents that reflect
10  the contract between Pratt & Whitney and a third
11  party for the manufacture of those 49 or 50 TF33s?
12     A. No.
13     Q. So do you have any information other than
14  there were 49 or 50 TF33s in the possession of the
15  Air Force that were provided to Pratt & Whitney for
16  modification?
17     A. I have no further information.
18     Q. How long a period of time did it take Pratt
19  to modify those 49 or 50 engines into a dash 100A?
20     A. That needs some clarification.  Pratt &
21  Whitney modified at their Southington service center
22  overhaul facility I believe half of that quantity.
23  The remaining were modified by Tinker Air Force
24  Base, Oklahoma City, utilizing modification kits

---

Allan Shiffler                     Volume II                     April 8, 2011

1    A. Yes.
2    Q. With respect to the TF33 new production,
3  how many engines were produced pursuant to that
4  contract?
5    A. Oh, my. I can only give you an
6  approximation.
7    Q. That's fine.
8    A. I think there was around 70 or so, in that
9  ballpark.
10   Q. And between the two contracts, the
11 modification contract and the new contract, how many
12 of those engines were going into the excess
13 inventory system at the Air Force versus going on a
14 plane?
15   A. That's hard to say.
16   Q. Did the Air Force at that time have a ratio
17 of engines that it maintained in excess inventory, a
18 ratio to the number of engines that were on
19 aircraft?
20   A. Yes, they had such a ratio, but I forget
21 what that was.
22   Q. Does Pratt have any documents that would
23 evidence that ratio?
24   A. Time has since gone by. I don't think so,

                                        Page 110

1  no.
2    Q. The kits that Pratt provided to the Air
3  Force that would allow the Air Force to modify its
4  TF33s into a dash 100A, approximately how many parts
5  were included with those kits?
6    A. 300 or 400.
7    Q. And can you tell me how many parts were on
8  the original TF33s that were being modified so I can
9  get a sense of what percentage of parts were
10 changed?
11   A. 3000 or 4000.
12   Q. So about 10 percent of them were changed?
13   A. Sounds reasonable.
14   Q. Okay. Was the dash 100A engine ever sold
15 on the civilian side?
16   A. No.
17   Q. Was it ever put in anything other than an
18 AWACS aircraft by the Air Force?
19   A. The 100A?
20   Q. Yes.
21   A. No.
22   Q. And was it ever sold to any other branch of
23 the military, the Navy?
24   A. No.

                                        Page 111

1    Q. So we have the two contracts, one for the
2  modification of the existing TF33s, one for new
3  construction. Were there any subsequent contracts
4  related to that project that Pratt entered into with
5  either the Air Force or Boeing?
6    A. There was a subsequent spare parts
7  contract.
8    Q. And when was that entered into?
9        MR. TABASKY: If you know.
10   A. I really don't know.
11   Q. If you can estimate, that's fine, you know.
12   A. I really don't know.
13   Q. Okay.
14   A. It was a follow-on after the production
15 ended.
16   Q. All right. And was it fairly soon after
17 the production ended --
18   A. Yes.
19   Q. -- or did a span of years go by after
20 production ended?
21   A. It was kind of an extension of the
22 production contract.
23   Q. Did you have any role in the drafting or
24 negotiation of the spares contract?

                                        Page 112

1    A. No.
2    Q. Does Pratt have in its possession any of
3  these contracts, the modification, the engine
4  manufacturer or the spares?
5    A. That I don't know.
6    Q. And can you tell me for the spare parts
7  contract what spare parts Pratt agreed to provide?
8  Was it all spare parts for the TF33-100A?
9    A. There was already in place a spare parts
10 support contract for the TF33 engine model and its
11 variants; thus, there were add-ons for spare parts
12 specific, unique to the 100A.
13   Q. So there was an existing contract that
14 covered 90 percent of the dash 100A engine, and this
15 new contract was for the new 10 percent
16 approximately of the engine?
17   A. Unique, yes.
18   Q. Unique?
19   A. Yes.
20   Q. Okay. So in that 300 to 400 parts that
21 made up the modification kit for the engine, were
22 some of those parts parts that were original to the
23 TF33?
24   A. Some may have been.

                                        Page 113

EPPLEY COURT REPORTING, LLC
508.478.9795

Allan Shiffler                    Volume II                    April 8, 2011

1    A. No.
2    Q. Is there such a thing as a civilian
3    specification for manuals?
4    A. There's guidelines.
5    Q. And who puts out those guidelines?
6    A. I don't recall right now.
7    Q. If you were to look at -- let's use our
8    JT8D as an example. If you were to look at the
9    civilian manuals for the JT8D and the Air Force
10   T.O.'s for the JT8D, would those be -- would those
11   manuals appear to be very similar?
12   A. "Similar" is a good description, but not
13   necessarily identical.
14   Q. So there may be certain formatting
15   differences between them?
16   A. Yes.
17   Q. But in terms of substance, the information
18   contained therein is going to be largely the same?
19   A. Yes.
20   Q. And would you agree that military
21   specifications for manuals state that the intent is
22   to accept a manufacturer's commercial type of manual
23   or one prepared in accordance with the commercial
24   practice whenever it is roughly equivalent to the

Page 142

1    detail requirements included in the military
2    specification?
3    MR. TABASKY: Objection.
4    A. I haven't seen that document.
5    Q. And I'm not asking you to identify the
6    document. I'm asking you if you are familiar with --
7    MR. TABASKY: That's what I was going to
8    say. Ask him, please, if he's familiar with it
9    rather than having him agree with you, because -- is
10   he supposed to just take your word for it?
11   MR. SHEPARD: Don't coach him.
12   Q. I've established that you've read the
13   military specification for manuals, correct?
14   A. Yes.
15   Q. And what I'm asking you is, are you
16   familiar with the provision in the military
17   specification for manuals that states that it's the
18   intent of the military to accept the manufacturer's
19   commercial type of manual or one prepared in
20   accordance with the commercial practice whenever
21   it's roughly equivalent to the detail requirements
22   in the military specification?
23   A. I'm not familiar with that statement.
24   Q. All right. Are you familiar with

Page 143

1    provisions or notations in aircraft manuals for
2    notes, cautions and warnings?
3    A. I'm aware they exist, but I'm not familiar
4    with how they're applied.
5    Q. So you wouldn't be able to tell me what the
6    distinction would be between a note, a caution and a
7    warning?
8    A. No.
9    Q. Was Pratt & Whitney ever told by the
10   military not to put warnings about asbestos in its
11   manuals?
12   MR. TABASKY: Objection. You can answer
13   if you know.
14   A. I'm not aware of them asking.
15   Q. You're not aware of Pratt asking the
16   military whether they could?
17   A. Exactly.
18   Q. All right. And if Pratt didn't ask the
19   military whether they could, then there wouldn't be
20   a response from the military one way or the other,
21   correct?
22   MR. TABASKY: Objection.
23   A. Yes.
24   Q. Now, the United States Air Force personnel

Page 144

1    from Wright-Patterson who were involved in the dash
2    100A project, you mentioned that they had audit
3    approval authority?
4    A. Yes.
5    Q. Can you tell me again what you mean by
6    "audit approval authority"?
7    A. They approved the final design before it
8    was released.
9    Q. So when Pratt finishes the designs of the
10   engine, it can't go into production until the Air
11   Force okays it?
12   A. Exactly.
13   Q. Did the Air Force -- are you aware of any
14   situation in which the Air Force did not okay a
15   Pratt engine design?
16   MR. TABASKY: Final design or anywhere
17   along the way or --
18   MR. SHEPARD: Any.
19   MR. TABASKY: Object to the form.
20   A. I'm not aware of any.
21   Q. Did the United States Air Force have audit
22   approval authority over the drafting of manuals?
23   A. Yes.
24   Q. And it was the same type of authority, that

Page 145

12 (Pages 142 to 145)

Allan Shiffler                    Volume II                    April 8, 2011

1    Q. All right. Well, give me a range, then.
2  Give me the model that you think has the least in
3  common and give me the model that you think has the
4  most in common, and that will establish our range.
5    A. Anywhere from 60 to 90 percent.
6    Q. Okay. So to the extent that the Air Force
7  needs a spare part for a TF33 and it's one of the 60
8  to 90 percent parts that are shared with a JT3D,
9  could the Air Force have obtained spare parts for
10  its TF33 from an airframer or another third party?
11    A. They would not get it from an airframer,
12  but the possibility does exist that they might get
13  it from a parts overhaul shop that has a Pratt &
14  Whitney part number on it.
15    Q. And a parts overhaul shop would be an
16  independent company whose business is overhauling
17  engines?
18    A. FAA-approved overhaul shop.
19    Q. Did the Air Force, to your knowledge, have
20  any of its engines serviced at such a location?
21    A. None that I was associated with, that I'm
22  aware of, no.
23    Q. Do you know whether the Air Force had any
24  arrangement with any such shop, parts overhaul shop,
                                                Page 122

1  for providing spare parts to the Air Force?
2    A. They may have.
3    Q. Would you consider it an unusual situation
4  for a spare part for a Pratt & Whitney engine in an
5  Air Force plane to come from a parts overhaul shop
6  as opposed to through Pratt & Whitney?
7    (Objection by multiple counsel.)
8    A. They may have acquired non -- what I would
9  consider noncritical parts.
10    Q. What do you consider to be a noncritical
11  part?
12    A. Clamps, bolts; common bolts and nuts that
13  are common throughout the industry, throughout the
14  aerospace industry, those types of items; gaskets,
15  MS, AN parts, those sorts of items.
16    Q. And to the extent that a part like that is
17  used on a Pratt & Whitney engine, can any part be
18  used, or do they have to be parts that were designed
19  and built pursuant to Pratt's specifications?
20    A. Our recommendation to the Air Force is that
21  they use our recommended parts; however, the Air
22  Force themselves have the option to utilize what
23  they call equivalencies.
24    Q. And when you say "equivalencies," is that
                                                Page 123

1  something that the Air Force deemed to be equivalent
2  to the Pratt part?
3    A. Yes.
4    Q. And it was a part that was obtained from
5  someone other than Pratt?
6    A. Yes.
7    Q. Did the Air Force maintain a list of
8  equivalencies?
9    A. They have an organization that supports the
10  entire DOD on such common air space industry parts,
11  all kinds of Air Force equipment, Navy equipment,
12  Marine equipment, et cetera, et cetera. They have a
13  special organization that handles all that.
14    Q. So if Pratt designs an engine -- and we
15  heard from Mr. Sumner about the design drawings that
16  are on a computer system at Pratt & Whitney. To the
17  extent that Pratt designs an engine and there is a
18  drawing for a part -- let's use a gasket for an
19  example. All right? A gasket is something you gave
20  as an example of a part that may be a noncritical
21  part, where the Air Force might have an equivalency
22  for that; is that correct?
23    MR. TABASKY: Object to the form.
24    A. They have in their repository the drawings
                                                Page 124

1  for the military engines.
2    Q. Pratt does?
3    A. The Air Force --
4    Q. Okay.
5    A. -- the military. There's a military
6  repository for drawings.
7    Q. And they have Pratt's drawings?
8    A. And they have -- some of them are their
9  drawings.
10    Q. Well, I understand that there's a lot of
11  drawings in the repository, but I'm saying, Pratt's
12  drawings for the engines that Pratt is building for
13  the Air Force, the Air Force has a copy of?
14    A. That's right.
15    Q. In addition to other drawings they have?
16    A. Many.
17    Q. I'm sure. And I want to limit now our
18  questions to the Pratt drawings.
19    A. Yes.
20    Q. Okay. The Air Force has the Pratt
21  drawings. The Air Force can then take those
22  drawings and submit them to someone other than Pratt
23  to have parts manufactured?
24    A. Yes.
                                                Page 125

                              7 (Pages 122 to 125)

EPPLEY COURT REPORTING, LLC
508.478.9795

Allan Shiffler                    Volume II                    April 8, 2011

1   they had the -- they had to okay the manuals before
2   they went to the Air Force printing?
3       A. Yes.
4       Q. Are you aware of any situation in which the
5   Air Force told Pratt to change the way it was doing
6   its manuals?
7       A. I'm not, no, I don't have any knowledge of
8   that.
9       Q. Are you aware of any situation in which the
10  Air Force rejected a Pratt draft of a manual?
11      A. I'm not aware of that.
12          MR. SHEPARD: Would you mark this,
13  please.
14          (Marked, Exhibit 4, Declaration of Alan
15  J. Shiffler in support of defendant United
16  Technology Corporation's notice of removal.)
17      Q. I've put in front of you what we have
18  marked as UTC 4. I ask you to take a look at that
19  and tell me if you recognize that document.
20      A. (Witness reviews document.) Yes.
21      Q. Okay. And on -- well, tell me what this
22  document is first.
23      A. A declaration.
24      Q. And it says, "Declaration of Alan J.

Page 146

1   Shiffler in Support of Defendant United Technology
2   Corporation's Notice of Removal," does it not?
3       A. Yes.
4       Q. Is that your signature on page 3?
5       A. Yes.
6       Q. And do you see the date there? Is that
7   when you signed this document?
8       A. Yes.
9       Q. Did you type up this document yourself?
10      A. No.
11      Q. From where did you receive it? From whom
12  did you receive it?
13      A. From Curt's law firm.
14      Q. So one of the lawyers gave it to you?
15      A. Yes.
16      Q. Did you see a rough draft of it before you
17  signed this one?
18      A. Yes.
19      Q. How many rough drafts did you see?
20      A. I don't recall how many I did see.
21      Q. Do you know whether you made any edits to
22  the initial draft you were given?
23      A. I may have.
24      Q. Do you recall?

Page 147

1       A. No.
2       Q. Do you keep -- to the extent you may have
3   edited it, do you keep copies of your edits at your
4   house?
5       A. No.
6       Q. And if you edited it, would you have done
7   it on a computer?
8       A. I would have done it by e-mail, yes.
9       Q. And do you maintain your e-mail
10  correspondence between yourself and counsel?
11      A. I don't know whether I have this or not,
12  no, I don't know.
13      Q. Okay. But in general --
14      A. I have some.
15      Q. You have some of your e-mails. You don't
16  know how far back they go?
17      A. No, I don't keep a record.
18      Q. Is the computer you're using today the same
19  computer you were using in April of 2009?
20      A. No.
21      Q. No. All right. When you got a new
22  computer, did you transfer your old information over
23  to the new computer?
24      A. Some of it.

Page 148

1       Q. As you sit here today, do you know whether
2   you scanned and sent this back to the lawyers or
3   whether you mailed it to them or handed it to them
4   in person?
5       A. I most likely would have scanned page 3 --
6       Q. Okay.
7       A. -- and sent a pdf file and then sent the
8   original.
9       Q. Is that your usual practice?
10      A. Yes.
11      Q. How many declarations like this one have
12  you filled out for the lawyers for Pratt?
13      A. Similar to this one?
14      Q. Yes.
15      A. Maybe ten.
16      Q. And do they all say pretty much the same
17  thing, or do you change each one?
18      A. There is some similarity.
19      Q. Is this the subject matter of most of those
20  affidavits, declarations?
21      A. Yes.
22      Q. All right. I want to draw your attention
23  to Paragraph 5. It says, "Based upon my work
24  experience with the engines that Pratt & Whitney

Page 149

13 (Pages 146 to 149)

Allan Shiffler                    Volume II                    April 8, 2011

1  supplied to the military from 1966 to 2003, I am
2  familiar with the manner in which Pratt & Whitney
3  military engines were designed, built and supplied
4  to the United States military."
5       Is the TF33-100A the only engine that
6  you were involved in the design process for for the
7  United States military?
8       A.  That needs clarification.
9       Q.  Okay, go ahead.
10      A.  I was involved with design
11  characterizations of numerous military legacy
12  engines and commercial, but not necessarily from the
13  original design concept through production, but in
14  an after-market capacity, yes.
15      Q.  And that's in the capacity you spoke about
16  yesterday where you were dealing with maintenance
17  issues and coming up with new maintenance procedures
18  for the engines?
19      A.  Yes.
20      Q.  Okay.  So with respect to initial design
21  and contracts --
22      A.  Yes.
23      Q.  -- with the military for Pratt engines,
24  your experience is limited to the dash 100A?

Page 150

1       Q.  All right.  Paragraph 7 on the second page:
2  "Pratt & Whitney during all aspects of its design
3  and manufacture of military aircraft engines, i.e.,
4  design, manufacture and testing of such engines,
5  performed its work under the immediate supervision
6  of the United States military."
7       Who was the immediate supervisor for the
8  military that was performing these tasks?
9       A.  There was an Air Force procurement
10  organization on site at Pratt & Whitney.
11      Q.  Okay.  And that's the person you talked
12  about yesterday?
13      A.  Yes.
14      Q.  And how many people were present on site at
15  Pratt on a daily basis from the Air Force?
16      A.  Oh, my gracious, I'd have to make a
17  guesstimate.
18      Q.  I don't want you to guesstimate.
19      A.  I don't know for sure.
20      Q.  More than one?
21      A.  Yes.
22      Q.  Less than ten?
23      A.  No.
24      Q.  More than ten?

Page 152

1       MR. TABASKY:  Object to form.
2       A.  I'm aware of having seen initial contracts
3  on other of my legacy engines that I was involved
4  with even though I wasn't a direct participant at
5  that time.
6       Q.  So you've seen the contracts?
7       A.  Yes.
8       Q.  All right.  Does Pratt still have those
9  contracts?
10      A.  That I don't know.
11      Q.  Can you tell me anything about the
12  circumstances surrounding those contracts that you
13  can't tell by reading the contract?  In other words,
14  do you have any knowledge of the contract between
15  Pratt and the military for any other engine other
16  than what you've read in the contract?
17      MR. TABASKY:  Objection.
18      A.  No.
19      Q.  And you, having not been employed by Pratt
20  prior to 1966, have no knowledge about Pratt's
21  contractual relationship with the military prior to
22  1966 apart from what you could read in a contract?
23      MR. TABASKY:  Objection.
24      A.  Correct.

Page 151

1       A.  Yes.
2       Q.  Less than twenty?
3       A.  No.
4       Q.  And were all of these people in that one
5  office, or were those people spread throughout
6  Pratt's facility?
7       A.  They had various assignments throughout
8  Pratt & Whitney.
9       Q.  Okay.  How many people were assigned to the
10  preliminary design group, if any?
11      MR. TABASKY:  For the PW --
12      MR. SHEPARD:  No, just how many --
13      Q.  Do you understand my question to be how
14  many Air Force employees or representatives were
15  assigned at Pratt to the preliminary design group?
16      MR. TABASKY:  Object to form.
17      A.  For engineering oversight?
18      Q.  Yes.
19      A.  Oh, probably half a dozen.
20      Q.  And how many were assigned to the design
21  department, or was that a separate department?
22      A.  They didn't have oversight of the design
23  department; they coordinated all of their efforts
24  through the program office, project group.

Page 153

14  (Pages 150 to 153)

Allan Shiffler                    Volume II                    April 8, 2011

1   Q. So the design department worked
2   independently, and the Air Force oversight happened
3   elsewhere?
4       MR. TABASKY: Objection.
5   A. The project group would coordinate with the
6   Air Force in lieu of the specific design group
7   itself.
8   Q. So when the designers are doing their day-
9   in-and-day-out work, there's not an Air Force person
10  sitting next to them?
11  A. No, no.
12  Q. Are the Air Force people there more to
13  coordinate and facilitate the work that's being done
14  for engines that are going to end up in the Air
15  Force inventory?
16  A. Yes, yes.
17  Q. They are not there for hands-on design
18  work?
19  A. No. However -- I wish to clarify that a
20  bit.
21  Q. Go ahead.
22  A. They do review and approve the drawings.
23  Q. Okay. So Pratt designs the engine, creates
24  the drawings; but before it can go into production,

Page 154

1   the Air Force reviews them and gives them their
2   okay?
3   A. Yes.
4   Q. All right. And what level of detail does
5   the Air Force give on the design -- each of the
6   design drawings?
7   A. There's an engineering change process which
8   they have to sign off on.
9   Q. If you're changing something?
10  A. Yes.
11  Q. All right. But let's say you're designing
12  an engine from scratch -- all right? -- and not
13  modifying or changing an existing engine, and the
14  Air Force has entered into a contract with Pratt for
15  the design and manufacture for this new engine --
16  A. Yes.
17  Q. -- the Air Force people aren't there to
18  help design the engine; they're there to oversee the
19  design and make sure that it meets the
20  specifications that the Air Force has set forth?
21  A. Yes.
22  Q. And to the extent that the Air Force
23  personnel are reviewing drawings and designs,
24  they're doing so with an eye toward making sure that

Page 155

1   the design meets their specifications?
2       MR. TABASKY: Objection.
3   A. Yes.
4   Q. You wouldn't say that Pratt & Whitney
5   engines are designed by the Air Force, would you?
6   A. No.
7   Q. So Pratt & Whitney is not simply the
8   manufacturing arm of a design -- an Air Force design
9   team?
10  A. No.
11  Q. Paragraph 8 there, if you look down at the
12  last sentence of Paragraph 8, you say, "During the
13  period of my employment at Pratt & Whitney, these
14  military specialists at Pratt & Whitney controlled
15  the design and manufacture of any aircraft engine
16  produced at Pratt & Whitney for the United States
17  military."
18      And I take it by "controlled the design
19  and manufacture" you mean that they had veto power
20  over Pratt's designs?
21  A. Yes.
22  Q. They weren't the ones putting the designs
23  together?
24  A. Right.

Page 156

1   Q. Let's flip to the next page, Paragraph 10.
2   You say, "Any written material such as warnings or
3   product manuals that accompanied the engines built
4   by Pratt & Whitney for the United States military
5   were similarly controlled and specified by the
6   United States military."
7       You don't have any personal knowledge as
8   to what control, if any, the military exercised over
9   manuals that were drafted by Pratt, do you?
10      MR. TABASKY: Objection.
11  A. Other than by the contract requirements for
12  publications.
13  Q. Okay.
14  A. And there is -- it does list quite a bit of
15  guidelines.
16  Q. So the contracts for the publications not
17  only tell Pratt that it has to create manuals, but
18  it gives some information as to what has to be in
19  the manuals?
20  A. Yes.
21  Q. As you sit here today without the contract
22  in front of you, can you tell me what else it says
23  other than Pratt has to create manuals?
24  A. No.

Page 157

1  Q. We'd need the contract to know exactly what
2  they say?
3      MR. TABASKY: Objection.
4  A. Because they vary (nodding).
5  Q. All right. So when you say "were
6  controlled and specified by the United States
7  military," what you mean is that the written
8  materials were subject to a contract?
9  A. Yes.
10 Q. The next paragraph, Paragraph 11, the last
11 sentence: "Pratt & Whitney had no knowledge that
12 handling any parts or components used in the
13 maintenance, repair or overhaul of Pratt & Whitney
14 aircraft engines during the time that John T.
15 Norsworthy is claimed to have served in the military
16 (1962 to 1990) could cause an asbestos-related
17 illness." What's the basis, your basis, for that
18 statement?
19 A. The fact that I'm not aware of any Pratt &
20 Whitney employee that has that sort of related
21 sickness or illness.
22 Q. And that's -- based on the fact that you
23 don't know of another Pratt employee with
24 mesothelioma, you were able to make that statement?

Page 158

1  A. I believe it was at the request of our
2  legal staff.
3  Q. Your lawyers?
4  A. Yes.
5  Q. Pratt's lawyers?
6  A. Yes.
7  Q. So other than the report that was put
8  together at the request of Pratt's lawyers and the
9  fact that you are not aware that any Pratt employees
10 had mesothelioma, those two things allow you to make
11 the statement that Pratt & Whitney had no knowledge
12 that handling any parts or components used in the
13 maintenance, repair or overhaul of Pratt aircraft
14 engines could cause an asbestos-related illness?
15 A. Plus information that I got -- I made
16 inquiries with a couple of the reciprocating
17 overhaul shops that I'm aware of to date.
18 Q. And what inquiries did you make?
19 A. I inquired as to whether they had any
20 employees that they were aware of that had any known
21 asbestos-related situations.
22 Q. And how many shops did you call?
23 A. Two of the major ones and really the only
24 ones that still exist.

Page 160

1  A. Along with -- what is it, the Melanyk
2  (phonetic) report?
3      MR. TABASKY: Mlynarek.
4  A. Mlynarek report.
5  Q. Okay. And what does the Mlynarek report
6  say?
7  A. It suggests that on the reciprocating
8  engines that the level of exposure is no worse than
9  the outside air.
10 Q. And did you have any role in the work that
11 was done to create that report?
12 A. No.
13 Q. Do you have any background in industrial
14 hygiene?
15 A. No.
16 Q. You have no background in medicine?
17 A. No.
18 Q. All right. And you've never worked for
19 either an industrial hygiene or a safety department
20 within Pratt & Whitney?
21 A. No.
22 Q. The fact that -- well, strike that.
23     The Mlynarek report was created at whose
24 request?

Page 159

1  Q. What are the names of those?
2  A. Covington.
3  Q. And where are they located?
4  A. In Oklahoma.
5  Q. And the other one?
6  A. Is Precision.
7  Q. And where are they located?
8  A. Oregon.
9  Q. And how many employees does Covington have?
10 A. I actually don't know what their number of
11 employees is. They have Websites.
12 Q. How many employees does Precision have?
13 A. That I don't know.
14 Q. What is the incidence rate of mesothelioma
15 in the general population?
16     MR. TABASKY: Objection.
17 A. That I don't know.
18     MR. TABASKY: He's not -- one second.
19 He's not been tendered for that subject.
20     MR. SHEPARD: Well, he's writing
21 declarations and drawing conclusions about whether
22 exposure to an engine can cause an illness.
23     MR. TABASKY: I understand that.
24     MR. SHEPARD: So what I'm trying to

Page 161

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "E"



IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDRA LOUISE NORSWORTHY, Individually
and as Personal Representative of the Estate of JOHN
T. NORSWORTHY,

    Plaintiffs,

vs.

AIRCRAFT BRAKING SYSTEMS, et al.,

    Defendants.

CASE NO.

JUDGE

DECLARATION OF ALLAN J.
SHIFFLER IN SUPPORT OF
DEFENDANT UNITED
TECHNOLOGIES CORPORATION'S
NOTICE OF REMOVAL

I, Allan J. Shiffler, declare and state as follows:

1.    I am over the age of 18 years and am competent to testify to the facts set forth in this declaration. I have personal knowledge of the facts contained in this declaration.

2.    I joined Pratt & Whitney, an unincorporated division of United Technologies Corporation, in 1966 and was an engineer within the Engineering and Customer Technical Service Groups during my career at Pratt & Whitney. I retired from Pratt & Whitney in 2003.

3.    Pratt & Whitney designs and manufactures aircraft engines for use in United States Military aircraft.

4.    During my time with Pratt & Whitney, I worked as an engineer on the development and manufacture of engines used in Military aircraft.

5.    Based upon my work experience with the engines that Pratt & Whitney supplied to the military from 1966 to 2003, I am familiar with the manner in which Pratt & Whitney military engines were designed, built and supplied to the United States Military.

6.    I have personal knowledge of the extent of involvement of the United States Military in the design, manufacture, approval, and receipt of the military engines designed and

074901.000532.1014528a.1

manufactured by Pratt & Whitney.  I submit this affidavit to attest to the level of supervision, control, and approval by the United States Military and its officers over the design and manufacture of these Pratt & Whitney aircraft engines intended for use by the United States Military.

7.      Pratt & Whitney, during all aspects of its design and manufacture of military aircraft engines (i.e., design, manufacture, and testing of such engines), performed its work under the immediate supervision of the United States Military.  This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers and military specialists on-site at Pratt & Whitney.  No aspect of the development, manufacture, and testing of the engines intended for use by the United States Military escaped this close control.

8.      The design, specification and manufacture of the Pratt & Whitney aircraft engines intended for use by the United States Military were approved by the appropriate Military personnel.  United States Military engineers and inspectors were personally present at Pratt & Whitney facilities to oversee, inspect, and approve the work performed by Pratt & Whitney engineers and other personnel, including approval of any changes to engine design or specifications on all aircraft engines intended for use by the United States Military.  During my employment with Pratt & Whitney, I personally interacted with these United States Military representatives on a regular basis.  These representatives had different areas of specialty, such as engineering, contracts and quality control.  During the period of my employment at Pratt & Whitney, these Military specialists at Pratt & Whitney controlled the design and manufacture of any aircraft engine produced at Pratt & Whitney for the United States Military.

9.      The United States Military provided extensive and detailed performance and construction specifications for the Pratt & Whitney aircraft engines intended for Military use.  The United States Military, including the on-site Military inspectors responsible for oversight

and approval of the design and manufacture of these engines, had detailed prints and drawings of every part used in such engines. These prints disclosed all materials contained in each part. The Military inspectors knew of, and approved, all materials and all parts contained in the Pratt & Whitney engines intended for use by the United States Military.

10.    Any written materials, such as warnings or product manuals, that accompanied the engines built by Pratt & Whitney for the United States Military were similarly controlled and specified by the United States Military. Any aircraft engine designed and manufactured by Pratt & Whitney for the United States Military that did not meet the strict standards and specifications set forth by the United States Military for that particular engine was rejected by the United States Military.

11.    It is my understanding that Plaintiffs claim that John T. Noxsworthy's work on Pratt & Whitney R-2800, R-4360, R-985, R-1830, R-2000 engines designed and manufactured for the United States Military during his service with the United States Air Force caused him to suffer from an asbestos-related injury. I am familiar with these engines and it is my understanding that they were in service with the U.S. Military at least through the 1960s. Pratt & Whitney had no knowledge that handling any parts or components used in the maintenance, repair or overhaul of Pratt & Whitney aircraft engines during the time that John T. Noxsworthy is claimed to have served in the Military (1962-1990) could cause an asbestos-related illness.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of April, 2009, in _SOUTH WINDSOR_, Connecticut.

By: _____
        Allan K. Shiffler, Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBITS "F" through "I" to Plaintiffs' Motion to Remand intentionally omitted.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PATTI DONLON, etc., et al.,                          No. C 11-3376 SI

            Plaintiffs,                              **RECUSAL ORDER**

    v.

A, C & S INC., et al.,

            Defendants.

_____/

    I hereby recuse myself in the above entitled matters and request that the case be reassigned
pursuant to Section F. of the Assignment Plan of this Court.


Dated: July 26, 2011

                                        SUSAN ILLSTON
                                        United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "H"

Allan Shiffler                    Volume I                    April 7, 2011

**Page 1**

VOLUME I
PAGES 1-96
EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS
Middlesex County          Superior Court

* * * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,
Individually and as Personal
Representative of JOHN T.
NORSWORTHY
        Plaintiff

vs.                          Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a      08-4778
THE GOODYEAR TIRE & RUBBER CO.,
et al.        Defendants
* * * * * * * * * * * * * * * * * *

30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Thursday, April 7, 2011, 3:53 p.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

——Reporter: Joan M. Cassidy, RPR, RMR, CRR——
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795  Fax 508.478.9595
www.eppleycourtreporting.com

**Page 2**

```
 1   APPEARANCES:
 2   Representing the Plaintiff:
       The Shepard Law Firm, P.C.
 3     Michael C. Shepard, Esq.
       10 High Street
 4     Boston, Massachusetts 02110
       617-451-9191  Fax 617-451-0022
 5     mshepard@shepardlawfirm.com
 6   Representing Honloe Bendenell:
 7     Campbell Campbell Edwards & Conroy
       Adam A. Larson, Esq.
 8     One Constitution Plaza
       Boston, Massachusetts 02129
 9     617-241-3000  Fax: 617-241-5115
       alarson@campbell-trial-lawyers.com
10
11   Representing Honeywell International, Inc. f/k/a
       Allied Signal, Inc. f/d/a The Bendix Corporation:
12     Colello & Capone LLP
       Lawrence J. Boyousei, Esq. (via telephone)
13     Two Seaport Lane
       Boston, Massachusetts 02210
14     617-217-5500  Fax: 617-217-5200
       lboyousei@colcap.com
15
16   Representing United Technologies Corporation and the
       Witness:
17     Cooley Manion Jones LLP
       Jonathan F. Tabasky, Esq.
18     21 Custom House Street
       Boston, Massachusetts 02110
19     617-737-3100  Fax: 617-737-3113
       jtabasky@cmjlaw.com
20
21   Representing Aircraft Braking Systems f/k/a The
       Goodyear Tire & Rubber Co.:
22     Cooley Manion Jones LLP
       Michael R. Brown, Esq. (via telephone)
23     21 Custom House Street
       Boston, Massachusetts 02110
24     617-737-3100  Fax 617-737-3113
       mbrown@cmjlaw.com
25
```

**Page 3**

```
 2   Representing Curtiss-Wright Corporation:
 2     Govarro Law Firm LLC
       Kerubo A. Christensen, Esq. (via telephone)
 3     Two International Place
       Boston, Massachusetts 02110
 4     617-737-9045  Fax: 617-737-0046
       kchristensen@govarro.com
 5
 6   Representing Parker-Hannifin Corporation:
       Keegan Werlin LLP
 7     Richard B. Kirby, Esq.
       265 Franklin Street
 8     Boston, Massachusetts 02110
       617-951-1400  Fax 617-951-1329
 9     rkirby@keeganwerlin.com
10   Representing Eaton Aeroquip, Inc.:
       McElroy, Deutsch, Mulvaney & Carpenter, LLP
11     Nancy McDonald, Esq.
       1300 Mount Kemble Avenue
12     P.O. Box 2075
       Morristown, New Jersey 07962-2075
13     973-993-8100  Fax: 973-425-0161
       nmcdonald@mdmc-law.com
14
15   Representing General Dynamics Corporation:
       Melick, Porter & Shea, LLP
16     John F. Rooney, III, Esq. (via telephone)
       28 State Street
17     Boston, Massachusetts 02109
       617-523-6200  Fax: 617-523-8130
18     jrooney@melicklaw.com
19
20   Representing General Tire Company and B.F. Goodrich
       f/k/a Goodrich Corporation:
21     Pierce, Davis & Perritano, LLP
       Meghan L. Riordan, Esq. (via telephone)
22     90 Canal Street
       Boston, Massachusetts 02114
23     917-350-0950  Fax: 917-350-0799
       mriordan@piercedavis.com
24
```

**Page 4**

```
 1   Representing The Boeing Company; Boeing North
 2   American, Inc.; McDonnell Douglas Corporation:
       Sherin and Lodgen LLP
 3     Kathy E. Koski, Esq.
       101 Federal Street
 4     Boston, Massachusetts 02110
       617-646-2000  Fax 617-646-2222
 5     kekoski@sherin.com
 6   Representing United Technologies Corporation:
       Tucker Ellis & West LLP
 7     Curtiss L. Isler, Esq.
       Martin H. Lewis, Esq.
 8     1150 Huntington Building
       925 Euclid Avenue
 9     Cleveland, Ohio 44115
       216-592-5000  Fax 216-592-5009
10     curt.isler@tuckerellis.com
       mlewis@tuckerellis.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Allan Shiffler                    Volume I                    April 7, 2011

**Page 9**

1  being you can't talk to counsel while the question
2  is pending. You have to answer the question. Then
3  we can take a break and you can speak with counsel.
4  Is that fair?
5  A. Sounds good.
6  Q. All right, great. Let's jump right in,
7  then. Could you state your full name for the
8  record.
9  A. Allan J. Shiffler.
10  Q. And Mr. Shiffler, what's your date of
11  birth?
12  A. March 26, 1941.
13  Q. A belated happy birthday. What is your
14  address?
15  A. 60 Mohegan Trail, South Windsor,
16  Connecticut.
17  Q. All right. And I know you've been deposed
18  before. On how many prior occasions have you given
19  a deposition?
20  A. I believe it was just one time.
21  Q. Have you ever testified at trial?
22  A. No.
23  Q. Did you ever have occasion to read that
24  deposition transcript from your other deposition?

**Page 10**

1  A. Yes, I believe I did.
2  Q. All right. And do you know, sir, whether
3  you made any corrections to any of the answers that
4  were given?
5  A. I don't recall.
6  Q. Can you tell me when you were first
7  contacted about this case?
8  A. About two weeks ago, thereabouts.
9  Q. And by whom were you contacted?
10  A. Curt Isler.
11  Q. Other than conversations you may have had
12  with lawyers, did you have any conversations with
13  anyone regarding your testimony in this case?
14  A. No.
15  Q. Did you review any documents in preparation
16  for your testimony?
17  A. The only thing I saw was the affidavit.
18  Q. Did you review any photographs?
19  A. No.
20  Q. And did you review any military contracts
21  or documents?
22  A. No.
23  Q. Are you presently employed?
24  A. No.

**Page 11**

1  Q. Okay. You have a smile on your face.
2  Believe me, I wish I wasn't presently employed right
3  now either. Can you tell me how long you have been
4  retired for?
5  A. Since 2003. March of 2003 is when I
6  retired.
7  Q. And other than this case and the case in
8  which you gave a deposition before, have you
9  assisted Pratt & Whitney in any other litigation?
10  A. No.
11  Q. And that other case was an asbestos case,
12  correct?
13  A. Yes.
14  Q. All right. So those are -- this case and
15  that case are the only two asbestos cases in which
16  you've testified or assisted Pratt & Whitney in any
17  manner?
18  A. In regards to a deposition, yes.
19  Q. Okay. And my question is a little broader.
20  Have you assisted them in an advisory capacity in
21  any other asbestos matters?
22  A. Yes.
23  Q. Okay. Approximately how many?
24  A. Maybe ten or twelve depositions.

**Page 12**

1  Q. When you say "depositions," what do you
2  mean by that, affidavits, perhaps?
3  MR. TABASKY: Why don't you ask him what
4  he did. That might be better.
5  MR. SHEPARD: I didn't want to go too
6  far into it, but...
7  Q. What did you do in those matters?
8  A. I reviewed and prepared -- reviewed and
9  signed some declarations --
10  Q. Okay.
11  A. -- if that clarifies it.
12  Q. It does, thank you. And do you maintain
13  copies of the declarations that you've reviewed and
14  signed?
15  A. Yes, I do.
16  Q. And where do you maintain those copies?
17  A. At my home.
18  Q. And were you provided those declarations to
19  sign by counsel?
20  A. Yes.
21  Q. Did you have the assistance of anyone other
22  than counsel in preparing those declarations?
23  A. No.
24  Q. Did those declarations involve subject

3 (Pages 9 to 12)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "I"**

Allan Shiffler                    Volume II                    April 8, 2011

---

**Page 98**

VOLUME II
PAGES 98-165
EXHIBITS: 4

COMMONWEALTH OF MASSACHUSETTS
Middlesex County            Superior Court

* * * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,
Individually and as Personal
Representative of JOHN T.
NORSWORTHY
        Plaintiff
vs.                          * Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a   * 08-4778
THE GOODYEAR TIRE & RUBBER CO.,  *
et al.    Defendants            *
* * * * * * * * * * * * * * * * *

CONTINUED 30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Friday, April 8, 2011, 9:00 a.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

——Reporter: Joan M. Cassidy, RPR, RMR, CRR——
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795  Fax 508.478.9695
www.eppleycourtreporting.com

---

**Page 99**

1   APPEARANCES:
2   Representing the Plaintiff:
3       The Shepard Law Firm, P.C.
        Michael C. Shepard, Esq.
4       10 High Street
        Boston, Massachusetts 02110
5       617-451-9191  Fax: 617-451-9292
6       mshepard@shepardlawfirm.com
7   Representing Honker Beechcraft:
        Campbell Campbell Edwards & Conroy
8       Adam A. Larson, Esq.
        One Constitution Plaza
9       Boston, Massachusetts 02129
        617-241-3000  Fax: 617-241-5115
10      alarson@campbell-trial-lawyers.com
11  Representing Honeywell International, Inc. f/k/a
        Allied Signal, Inc. f/k/a The Bendix Corporation:
12      Cetrulo & Capone LLP
        Lawrence J. Sugarman, Esq. (via telephone)
13      Two Seaport Lane
        Boston, Massachusetts 02210
14      617-217-5500  Fax: 617-217-5200
        lsugarman@cetcap.com
15
16  Representing United Technologies Corporation and the
        Witness:
17      Cooley Manion Jones LLP
        Jonathan F. Tabasky, Esq.
18      21 Custom House Street
        Boston, Massachusetts 02110
19      617-737-3100  Fax: 617-737-3113
        jtabasky@cmjlaw.com
20
21  Representing Curtiss-Wright Corporation:
        Governo Law Firm LLC
22      Kendra A. Christensen, Esq. (via telephone)
        Two International Place
23      Boston, Massachusetts 02110
        617-737-9045  Fax: 617-737-9046
24      kchristensen@governo.com

---

**Page 100**

1   Representing Eaton Aeroquip, Inc.:
        McElroy, Deutsch, Mulvaney & Carpenter, LLP
2       Nancy McDonald, Esq.
        1300 Mount Kemble Avenue
3       P.O. Box 2075
        Morristown, New Jersey 07962-2075
        973-993-8100  Fax: 973-425-0161
4       nmcdonald@mdmc-law.com
5
6   Representing General Dynamics Corporation:
        Melick, Porter & Shea, LLP
7       John F. Rooney, III, Esq. (via telephone)
        28 State Street
8       Boston, Massachusetts 02109
        617-523-6200  Fax: 617-523-5150
9       jrooney@melicklaw.com
10
        Representing General Tire Company and B.F. Goodrich
11  n/k/a Goodrich Corporation:
        Pierce, Davis & Perritano, LLP
12      Meghan L. Riordan, Esq. (via telephone)
        90 Canal Street
13      Boston, Massachusetts 02114
        617-350-0950  Fax: 617-350-7760
14      mriordan@piercedavis.com
15
        Representing The Boeing Company; Boeing North
16  American, Inc.; McDonnell Douglas Corporation:
        Sherin and Lodgen LLP
17      Kathy E. Koski, Esq.
        101 Federal Street
18      Boston, Massachusetts 02110
        617-646-2000  Fax: 617-646-2222
19      kekoski@sherin.com
20
21
22
23
24

---

**Page 101**

1   Representing United Technologies Corporation:
2       Tucker Ellis & West LLP
        Curtiss L. Isler, Esq.
3       Martin H. Lewis, Esq.
        1150 Huntington Building
4       925 Euclid Avenue
        Cleveland, Ohio 44115
5       216-592-5000  Fax: 216-592-5009
        curt.isler@tuckerellis.com
6       mlewis@tuckerellis.com
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Allan Shiffler                    Volume II                    April 8, 2011

| | | | |
|---|---|---|---|

1        I N D E X
2
3     EXAMINATIONS
4   Allan J. Shiffler
5
     BY MR. SHEPARD     103
6
7
8
9
10
11
12   Exhibit 4, Declaration of Alan J.   146
13   Shiffler in support of defendant
14   United Technology Corporation's notice
15   of removal
16
17   (Original exhibits retained by Attorney Shepard)
18
19
20
21
22
23
24

        EXHIBITS MARKED

Page 102

---

1    A. No,
2    Q. And were you involved in any contract
3 negotiations for the development of any new engine
4 or new variant of any engine other than the TF33
5 during your tenure at Pratt & Whitney?
6    A. No,
7    Q. Now, we talked about the contracts that
8 Pratt entered into for the modification of a certain
9 number of dash 100As yesterday.  How many dash 100As
10 were modified from existing TF33s under that
11 contract?
12   A. I believe there were 49 or 50.
13   Q. And were those engines pulled off of any
14 existing Air Force planes?  Were they in Air Force
15 stock not attached to aircraft?
16   A. That's two questions.
17   Q. Okay.  Then let's break it down.
18   A. There you go.
19   Q. Tell me where the Air Force obtained the
20 TF33s that they gave to Pratt to modify.
21   A. Excess inventory.
22   Q. And where did the Air Force maintain its
23 excess inventory at that time?
24   A. Tinker Air Force Base, Oklahoma City.

Page 104

---

1     P R O C E E D I N G S
2    MR. SHEPARD: This is the continued
3 deposition of Mr. Shiffler.
4    Allan J. Shiffler, Previously Sworn
5    DIRECT EXAMINATION, Continued
6 BY MR. SHEPARD:
7   Q. Good morning, Mr. Shiffler.
8   A. Good morning.
9   Q. We are back on the record, and I just want
10 to remind you that you are still under oath from
11 yesterday.
12   MR. SHEPARD: And Jon, all the same
13 stipulations apply today?
14   MR. TABASKY: Yes.
15   MR. SHEPARD: Great.
16   Q. All right.  When we left off yesterday, we
17 were talking about the development of the dash 100A
18 version of the TF33, correct?
19   A. Yes.
20   Q. All right.  Other than the development of
21 that engine, were you personally involved in the
22 development of any new engine or new variant of any
23 engine for the United States military during your
24 employment at Pratt & Whitney?

Page 103

---

1    Q. Were the excess inventory engines -- strike
2 that.
3    When were the engines that were sent
4 back to Pratt & Whitney for modification first
5 manufactured by Pratt & Whitney?
6   A. I don't think I can -- I don't have records
7 of that.
8   Q. And do you -- strike that.
9    Have you seen any documents that reflect
10 the contract between Pratt & Whitney and a third
11 party for the manufacture of those 49 or 50 TF33s?
12   A. No.
13   Q. So do you have any information other than
14 there were 49 or 50 TF33s in the possession of the
15 Air Force that were provided to Pratt & Whitney for
16 modification?
17   A. I have no further information.
18   Q. How long a period of time did it take Pratt
19 to modify those 49 or 50 engines into a dash 100A?
20   A. That needs some clarification. Pratt &
21 Whitney modified at their Southington service center
22 overhaul facility I believe half of that quantity.
23 The remaining were modified by Tinker Air Force
24 Base, Oklahoma City, utilizing modification kits

Page 105

2 (Pages 102 to 105)

Allan Shiffler                Volume II                April 8, 2011

Page 110

1    A. Yes.
2    Q. With respect to the TF33 new production,
3  how many engines were produced pursuant to that
4  contract?
5    A. Oh, my. I can only give you an
6  approximation.
7    Q. That's fine.
8    A. I think there was around 70 or so, in that
9  ballpark.
10    Q. And between the two contracts, the
11  modification contract and the new contract, how many
12  of those engines were going into the excess
13  inventory system at the Air Force versus going on a
14  plane?
15    A. That's hard to say.
16    Q. Did the Air Force at that time have a ratio
17  of engines that it maintained in excess inventory, a
18  ratio to the number of engines that were on
19  aircraft?
20    A. Yes, they had such a ratio, but I forget
21  what that was.
22    Q. Does Pratt have any documents that would
23  evidence that ratio?
24    A. Time has since gone by. I don't think so,

Page 111

1  no.
2    Q. The kits that Pratt provided to the Air
3  Force that would allow the Air Force to modify its
4  TF33s into a dash 100A, approximately how many parts
5  were included with those kits?
6    A. 300 or 400.
7    Q. And can you tell me how many parts were on
8  the original TF33s that were being modified so I can
9  get a sense of what percentage of parts were
10  changed?
11    A. 3000 or 4000.
12    Q. So about 10 percent of them were changed?
13    A. Sounds reasonable.
14    Q. Okay. Was the dash 100A engine ever sold
15  on the civilian side?
16    A. No.
17    Q. Was it ever put in anything other than an
18  AWACS aircraft by the Air Force?
19    A. The 100A?
20    Q. Yes.
21    A. No.
22    Q. And was it ever sold to any other branch of
23  the military, the Navy?
24    A. No.

Page 112

1    Q. So we have the two contracts, one for the
2  modification of the existing TF33s, one for new
3  construction. Were there any subsequent contracts
4  related to that project that Pratt entered into with
5  either the Air Force or Boeing?
6    A. There was a subsequent spare parts
7  contract.
8    Q. And when was that entered into?
9        MR. TABASKY: If you know.
10    A. I really don't know.
11    Q. If you can estimate, that's fine, you know.
12    A. I really don't know.
13    Q. Okay.
14    A. It was a follow-on after the production
15  ended.
16    Q. All right. And was it fairly soon after
17  the production ended --
18    A. Yes.
19    Q. -- or did a span of years go by after
20  production ended?
21    A. It was kind of an extension of the
22  production contract.
23    Q. Did you have any role in the drafting or
24  negotiation of the spares contract?

Page 113

1    A. No.
2    Q. Does Pratt have in its possession any of
3  these contracts, the modification, the engine
4  manufacturer or the spares?
5    A. That I don't know.
6    Q. And can you tell me for the spare parts
7  contract what spare parts Pratt agreed to provide?
8  Was it all spare parts for the TF33-100A?
9    A. There was already in place a spare parts
10  support contract for the TF33 engine model and its
11  variants; thus, there were add-ons for spare parts
12  specific, unique to the 100A.
13    Q. So there was an existing contract that
14  covered 90 percent of the dash 100A engine, and this
15  new contract was for the new 10 percent
16  approximately of the engine?
17    A. Unique, yes.
18    Q. Unique?
19    A. Yes.
20    Q. Okay. So in that 300 to 400 parts that
21  made up the modification kit for the engine, were
22  some of those parts parts that were original to the
23  TF33?
24    A. Some may have been.

4  (Pages 110 to 113)

Allan Shiffler                Volume II                April 8, 2011

1    A. No.
2    Q. Is there such a thing as a civilian
3    specification for manuals?
4       A. There's guidelines.
5    Q. And who puts out those guidelines?
6       A. I don't recall right now.
7    Q. If you were to look at -- let's use our
8    JT8D as an example. If you were to look at the
9    civilian manuals for the JT8D and the Air Force
10   T.O.'s for the JT8D, would those be -- would those
11   manuals appear to be very similar?
12      A. "Similar" is a good description, but not
13   necessarily identical.
14   Q. So there may be certain formatting
15   differences between them?
16      A. Yes.
17   Q. But in terms of substance, the information
18   contained therein is going to be largely the same?
19      A. Yes.
20   Q. And would you agree that military
21   specifications for manuals state that the intent is
22   to accept a manufacturer's commercial type of manual
23   or one prepared in accordance with the commercial
24   practice whenever it is roughly equivalent to the
                                              Page 142

1    detail requirements included in the military
2    specification?
3       MR. TABASKY: Objection.
4       A. I haven't seen that document.
5    Q. And I'm not asking you to identify the
6    document. I'm asking if you are familiar with --
7       MR. TABASKY: That's what I was going to
8    say. Ask him, please, if he's familiar with it
9    rather than having him agree with you, because -- is
10   he supposed to just take your word for it?
11      MR. SHEPARD: Don't coach him.
12   Q. I've established that you've read the
13   military specification for manuals, correct?
14      A. Yes.
15   Q. And what I'm asking you is, are you
16   familiar with the provision in the military
17   specification for manuals that states that it's the
18   intent of the military to accept the manufacturer's
19   commercial type of manual or one prepared in
20   accordance with the commercial practice whenever
21   it's roughly equivalent to the detail requirements
22   in the military specification?
23      A. I'm not familiar with that statement.
24   Q. All right. Are you familiar with
                                              Page 143

1    provisions or notations in aircraft manuals for
2    notes, cautions and warnings?
3       A. I'm aware they exist, but I'm not familiar
4    with how they're applied.
5    Q. So you wouldn't be able to tell me what the
6    distinction would be between a note, a caution and a
7    warning?
8       A. No.
9    Q. Was Pratt & Whitney ever told by the
10   military not to put warnings about asbestos in its
11   manuals?
12      MR. TABASKY: Objection. You can answer
13   if you know.
14      A. I'm not aware of them asking.
15   Q. You're not aware of Pratt asking the
16   military whether they could?
17      A. Exactly.
18   Q. All right. And if Pratt didn't ask the
19   military whether they could, then there wouldn't be
20   a response from the military one way or the other,
21   correct?
22      MR. TABASKY: Objection.
23      A. Yes.
24   Q. Now, the United States Air Force personnel
                                              Page 144

1    from Wright-Patterson who were involved in the dash
2    100A project, you mentioned that they had audit
3    approval authority?
4       A. Yes.
5    Q. Can you tell me again what you mean by
6    "audit approval authority"?
7       A. They approved the final design before it
8    was released.
9    Q. So when Pratt finishes the designs of the
10   engine, it can't go into production until the Air
11   Force okays it?
12      A. Exactly.
13   Q. Did the Air Force -- are you aware of any
14   situation in which the Air Force did not okay a
15   Pratt engine design?
16      MR. TABASKY: Final design or anywhere
17   along the way or --
18      MR. SHEPARD: Any.
19      MR. TABASKY: Object to the form.
20      A. I'm not aware of any.
21   Q. Did the United States Air Force have audit
22   approval authority over the drafting of manuals?
23      A. Yes.
24   Q. And it was the same type of authority, that
                                              Page 145

                                    12 (Pages 142 to 145)

Allan Shiffler                    Volume II                    April 8, 2011

1  Q. All right. Well, give me a range, then,
2  Give me the model that you think has the least in
3  common and give me the model that you think has the
4  most in common, and that will establish our range.
5  A. Anywhere from 60 to 90 percent.
6  Q. Okay. So to the extent that the Air Force
7  needs a spare part for a TF33 and it's one of the 60
8  to 90 percent parts that are shared with a JT3D,
9  could the Air Force have obtained spare parts for
10 its TF33 from an airframer or another third party?
11 A. They would not get it from an airframer,
12 but the possibility does exist that they might get
13 it from a parts overhaul shop that has a Pratt &
14 Whitney part number on it.
15 Q. And a parts overhaul shop would be an
16 independent company whose business is overhauling
17 engines?
18 A. FAA-approved overhaul shop.
19 Q. Did the Air Force, to your knowledge, have
20 any of its engines serviced at such a location?
21 A. None that I was associated with, that I'm
22 aware of, no.
23 Q. Do you know whether the Air Force had any
24 arrangement with any such shop, parts overhaul shop,

Page 122

1  for providing spare parts to the Air Force?
2  A. They may have.
3  Q. Would you consider it an unusual situation
4  for a spare part for a Pratt & Whitney engine in an
5  Air Force plane to come from a parts overhaul shop
6  as opposed to through Pratt & Whitney?
7  (Objection by multiple counsel.)
8  A. They may have acquired non -- what I would
9  consider noncritical parts.
10 Q. What do you consider to be a noncritical
11 part?
12 A. Clamps, bolts; common bolts and nuts that
13 are common throughout the industry, throughout the
14 aerospace industry, those types of items; gaskets,
15 MS, AN parts, those sorts of items.
16 Q. And to the extent that a part like that is
17 used on a Pratt & Whitney engine, can any part be
18 used, or do they have to be parts that were designed
19 and built pursuant to Pratt's specifications?
20 A. Our recommendation to the Air Force is that
21 they use our recommended parts; however, the Air
22 Force themselves have the option to utilize what
23 they call equivalencies.
24 Q. And when you say "equivalencies," is that

Page 123

1  something that the Air Force deemed to be equivalent
2  to the Pratt part?
3  A. Yes.
4  Q. And it was a part that was obtained from
5  someone other than Pratt?
6  A. Yes.
7  Q. Did the Air Force maintain a list of
8  equivalencies?
9  A. They have an organization that supports the
10 entire DOD on such common air space industry parts,
11 all kinds of Air Force equipment, Navy equipment,
12 Marine equipment, et cetera, et cetera. They have a
13 special organization that handles all that.
14 Q. So if Pratt designs an engine -- and we
15 heard from Mr. Sumner about the design drawings that
16 are on a computer system at Pratt & Whitney. To the
17 extent that Pratt designs an engine and there is a
18 drawing for a part -- let's use a gasket for an
19 example. All right? A gasket is something you gave
20 as an example of a part that may be a noncritical
21 part, where the Air Force might have an equivalency
22 for that; is that correct?
23 MR. TADASKY: Object to the form.
24 A. They have in their repository the drawings

Page 124

1  for the military engines.
2  Q. Pratt does?
3  A. The Air Force --
4  Q. Okay.
5  A. -- the military. There's a military
6  repository for drawings.
7  Q. And they have Pratt's drawings?
8  A. And they have -- some of them are their
9  drawings.
10 Q. Well, I understand that there's a lot of
11 drawings in the repository, but I'm saying, Pratt's
12 drawings for the engines that Pratt is building for
13 the Air Force, the Air Force has a copy of?
14 A. That's right.
15 Q. In addition to other drawings they have?
16 A. Many.
17 Q. I'm sure. And I want to limit now our
18 questions to the Pratt drawings.
19 A. Yes.
20 Q. Okay. The Air Force has the Pratt
21 drawings. The Air Force can then take those
22 drawings and submit them to someone other than Pratt
23 to have parts manufactured?
24 A. Yes.

Page 125

7 (Pages 122 to 125)

Allan Shiffler                    Volume II                    April 8, 2011

1   they had the -- they had to okay the manuals before
2   they went to the Air Force printing?
3       A. Yes.
4       Q. Are you aware of any situation in which the
5   Air Force told Pratt to change the way it was doing
6   its manuals?
7       A. I'm not, no, I don't have any knowledge of
8   that.
9       Q. Are you aware of any situation in which the
10  Air Force rejected a Pratt draft of a manual?
11      A. I'm not aware of that.
12          MR. SHEPARD: Would you mark this,
13  please.
14          (Marked, Exhibit 4, Declaration of Alan
15  J. Shiffler in support of defendant United
16  Technology Corporation's notice of removal.)
17      Q. I've put in front of you what we have
18  marked as UTC 4. I ask you to take a look at that
19  and tell me if you recognize that document.
20      A. (Witness reviews document.) Yes.
21      Q. Okay. And on -- well, tell me what this
22  document is first.
23      A. A declaration.
24      Q. And it says, "Declaration of Alan J.

Page 146

1       A. No.
2       Q. Do you keep -- to the extent you may have
3   edited it, do you keep copies of your edits at your
4   house?
5       A. No.
6       Q. And if you edited it, would you have done
7   it on a computer?
8       A. I would have done it by e-mail, yes.
9       Q. And do you maintain your e-mail
10  correspondence between yourself and counsel?
11      A. I don't know whether I have this or not,
12  no, I don't know.
13      Q. Okay. But in general --
14      A. I have some.
15      Q. You have some of your e-mails. You don't
16  know how far back they go?
17      A. No, I don't keep a record.
18      Q. Is the computer you're using today the same
19  computer you were using in April of 2009?
20      A. No.
21      Q. No. All right. When you got a new
22  computer, did you transfer your old information over
23  to the new computer?
24      A. Some of it.

Page 148

1   Shiffler in Support of Defendant United Technology
2   Corporation's Notice of Removal," does it not?
3       A. Yes.
4       Q. Is that your signature on page 3?
5       A. Yes.
6       Q. And do you see the date there? Is that
7   when you signed this document?
8       A. Yes.
9       Q. Did you type up this document yourself?
10      A. No.
11      Q. From where did you receive it? From whom
12  did you receive it?
13      A. From Curt's law firm.
14      Q. So one of the lawyers gave it to you?
15      A. Yes.
16      Q. Did you see a rough draft of it before you
17  signed this one?
18      A. Yes.
19      Q. How many rough drafts did you see?
20      A. I don't recall how many I did see.
21      Q. Do you know whether you made any edits to
22  the initial draft you were given?
23      A. I may have.
24      Q. Do you recall?

Page 147

1       Q. As you sit here today, do you know whether
2   you scanned and sent this back to the lawyers or
3   whether you mailed it to them or handed it to them
4   in person?
5       A. I most likely would have scanned page 3 --
6       Q. Okay.
7       A. -- and sent a pdf file and then sent the
8   original.
9       Q. Is that your usual practice?
10      A. Yes.
11      Q. How many declarations like this one have
12  you filled out for the lawyers for Pratt?
13      A. Similar to this one?
14      Q. Yes.
15      A. Maybe ten.
16      Q. And do they all say pretty much the same
17  thing, or do you change each one?
18      A. There is some similarity.
19      Q. Is this the subject matter of most of those
20  affidavits, declarations?
21      A. Yes.
22      Q. All right. I want to draw your attention
23  to Paragraph 5. It says, "Based upon my work
24  experience with the engines that Pratt & Whitney

Page 149

13 (Pages 146 to 149)

Allan Shiffler                     Volume II                     April 8, 2011

1   supplied to the military from 1966 to 2003, I am
2   familiar with the manner in which Pratt & Whitney
3   military engines were designed, built and supplied
4   to the United States military."
5        Is the TF33-100A the only engine that
6   you were involved in the design process for for the
7   United States military?
8        A. That needs clarification.
9        Q. Okay, go ahead.
10       A. I was involved with design
11   characterizations of numerous military legacy
12   engines and commercial, but not necessarily from the
13   original design concept through production, but in
14   an after-market capacity, yes.
15       Q. And that's in the capacity you spoke about
16   yesterday where you were dealing with maintenance
17   issues and coming up with new maintenance procedures
18   for the engines?
19       A. Yes.
20       Q. Okay. So with respect to initial design
21   and contracts --
22       A. Yes.
23       Q. -- with the military for Pratt engines,
24   your experience is limited to the dash 100A?

Page 150

1        Q. All right. Paragraph 7 on the second page:
2   "Pratt & Whitney during all aspects of its design
3   and manufacture of military aircraft engines, i.e.,
4   design, manufacture and testing of such engines,
5   performed its work under the immediate supervision
6   of the United States military."
7        Who was the immediate supervisor for the
8   military that was performing these tasks?
9        A. There was an Air Force procurement
10   organization on site at Pratt & Whitney.
11       Q. Okay. And that's the person you talked
12   about yesterday?
13       A. Yes.
14       Q. And how many people were present on site at
15   Pratt on a daily basis from the Air Force?
16       A. Oh, my gracious, I'd have to make a
17   guesstimate.
18       Q. I don't want you to guesstimate.
19       A. I don't know for sure.
20       Q. More than one?
21       A. Yes.
22       Q. Less than ten?
23       A. No.
24       Q. More than ten?

Page 152

1        MR. TABASKY: Object to form.
2        A. I'm aware of having seen initial contracts
3   on other of my legacy engines that I was involved
4   with even though I wasn't a direct participant at
5   that time.
6        Q. So you've seen the contracts?
7        A. Yes.
8        Q. All right. Does Pratt still have those
9   contracts?
10       A. That I don't know.
11       Q. Can you tell me anything about the
12   circumstances surrounding those contracts that you
13   can't tell by reading the contract? In other words,
14   do you have any knowledge of the contract between
15   Pratt and the military for any other engine other
16   than what you've read in the contract?
17       MR. TABASKY: Objection.
18       A. No.
19       Q. And you, having not been employed by Pratt
20   prior to 1966, have no knowledge about Pratt's
21   contractual relationship with the military prior to
22   1966 apart from what you could read in a contract?
23       MR. TABASKY: Objection.
24       A. Correct.

Page 151

1        A. Yes.
2        Q. Less than twenty?
3        A. No.
4        Q. And were all of those people in that one
5   office, or were these people spread throughout
6   Pratt's facility?
7        A. They had various assignments throughout
8   Pratt & Whitney.
9        Q. Okay. How many people were assigned to the
10   preliminary design group, if any?
11       MR. TABASKY: For the PW --
12       MR. SHEPARD: No, just how many --
13       Q. Do you understand my question to be how
14   many Air Force employees or representatives were
15   assigned at Pratt to the preliminary design group?
16       MR. TABASKY: Object to form.
17       A. For engineering oversight?
18       Q. Yes.
19       A. Oh, probably half a dozen.
20       Q. And how many were assigned to the design
21   department, or was that a separate department?
22       A. They didn't have oversight of the design
23   department; they coordinated all of their efforts
24   through the program office, project group.

Page 153

14 (Pages 150 to 153)

Allan Shiffler                    Volume II                    April 8, 2011

1    Q. So the design department worked
2  independently, and the Air Force oversight happened
3  elsewhere?
4        MR. TABASKY: Objection.
5    A. The project group would coordinate with the
6  Air Force in lieu of the specific design group
7  itself.
8    Q. So when the designers are doing their day-
9  in-and-day-out work, there's not an Air Force person
10 sitting next to them?
11   A. No, no.
12   Q. Are the Air Force people there more to
13 coordinate and facilitate the work that's being done
14 for engines that are going to end up in the Air
15 Force inventory?
16   A. Yes, yes.
17   Q. They are not there for hands-on design
18 work?
19   A. No. However -- I wish to clarify that a
20 bit.
21   Q. Go ahead.
22   A. They do review and approve the drawings.
23   Q. Okay. So Pratt designs the engine, creates
24 the drawings; but before it can go into production,
                                              Page 154

1  the design meets their specifications?
2        MR. TABASKY: Objection.
3    A. Yes.
4    Q. You wouldn't say that Pratt & Whitney
5  engines are designed by the Air Force, would you?
6    A. No.
7    Q. So Pratt & Whitney is not simply the
8  manufacturing arm of a design -- an Air Force design
9  team?
10   A. No.
11   Q. Paragraph 8 there, if you look down at the
12 last sentence of Paragraph 8, you say, "During the
13 period of my employment at Pratt & Whitney, these
14 military specialists at Pratt & Whitney controlled
15 the design and manufacture of any aircraft engine
16 produced at Pratt & Whitney for the United States
17 military."
18       And I take it by "controlled the design
19 and manufacture" you mean that they had veto power
20 over Pratt's designs?
21   A. Yes.
22   Q. They weren't the ones putting the designs
23 together?
24   A. Right.
                                              Page 156

1  the Air Force reviews them and gives them their
2  okay?
3    A. Yes.
4    Q. All right. And what level of detail does
5  the Air Force give on the design -- each of the
6  design drawings?
7    A. There's an engineering change process which
8  they have to sign off on.
9    Q. If you're changing something?
10   A. Yes.
11   Q. All right. But let's say you're designing
12 an engine from scratch -- all right? -- and not
13 modifying or changing an existing engine, and the
14 Air Force has entered into a contract with Pratt for
15 the design and manufacture for this new engine --
16   A. Yes.
17   Q. -- the Air Force people aren't there to
18 help design the engine; they're there to oversee the
19 design and make sure that it meets the
20 specifications that the Air Force has set forth?
21   A. Yes.
22   Q. And to the extent that the Air Force
23 personnel are reviewing drawings and designs,
24 they're doing so with an eye toward making sure that
                                              Page 155

1    Q. Let's flip to the next page, Paragraph 10.
2  You say, "Any written material such as warnings or
3  product manuals that accompanied the engines built
4  by Pratt & Whitney for the United States military
5  were similarly controlled and specified by the
6  United States military."
7        You don't have any personal knowledge as
8  to what controls, if any, the military exercised over
9  manuals that were drafted by Pratt, do you?
10       MR. TABASKY: Objection.
11   A. Other than by the contract requirements for
12 publications.
13   Q. Okay.
14   A. And there is -- it does list quite a bit of
15 guidelines.
16   Q. So the contracts for the publications not
17 only tell Pratt that it has to create manuals; but
18 it gives some information as to what has to be in
19 the manuals?
20   A. Yes.
21   Q. As you sit here today without the contract
22 in front of you, can you tell me what else it says
23 other than Pratt has to create manuals?
24   A. No.
                                              Page 157

                              15 (Pages 154 to 157)

Allan Shiffler                    Volume II                    April 8, 2011

1    Q. We'd need the contract to know exactly what
2    they say?
3        MR. TABASKY: Objection.
4    A. Because they vary (nodding).
5    Q. All right. So when you say "were
6    controlled and specified by the United States
7    military," what you mean is that the written
8    materials were subject to a contract?
9    A. Yes.
10   Q. The next paragraph, Paragraph 11, the last
11   sentence: "Pratt & Whitney had no knowledge that
12   handling any parts or components used in the
13   maintenance, repair or overhaul of Pratt & Whitney
14   aircraft engines during the time that John T.
15   Norsworthy is claimed to have served in the military
16   (1962 to 1990) could cause an asbestos-related
17   illness." What's the basis, your basis, for that
18   statement?
19   A. The fact that I'm not aware of any Pratt &
20   Whitney employee that has that sort of related
21   sickness or illness.
22   Q. And that's — based on the fact that you
23   don't know of another Pratt employee with
24   mesothelioma, you were able to make that statement?

Page 158

1    A. I believe it was at the request of our
2    legal staff.
3    Q. Your lawyers?
4    A. Yes.
5    Q. Pratt's lawyers?
6    A. Yes.
7    Q. So other than the report that was put
8    together at the request of Pratt's lawyers and the
9    fact that you are not aware that any Pratt employees
10   had mesothelioma, those two things allow you to make
11   the statement that Pratt & Whitney had no knowledge
12   that handling any parts or components used in the
13   maintenance, repair or overhaul of Pratt aircraft
14   engines could cause an asbestos-related illness?
15   A. Plus information that I got — I made
16   inquiries with a couple of the reciprocating
17   overhaul shops that I'm aware of to date.
18   Q. And what inquiries did you make?
19   A. I inquired us to whether they had any
20   employees that they were aware of that had any known
21   asbestos-related situations.
22   Q. And how many shops did you call?
23   A. Two of the major ones and really the only
24   ones that still exist.

Page 160

1    A. Along with — what is it, the Melanyk
2    (phonetic) report?
3        MR. TABASKY: Mlynarek.
4    A. Mlynarek report.
5    Q. Okay. And what does the Mlynarek report
6    say?
7    A. It suggests that on the reciprocating
8    engines that the level of exposure is no worse than
9    the outside air.
10   Q. And did you have any role in the work that
11   was done to create that report?
12   A. No.
13   Q. Do you have any background in industrial
14   hygiene?
15   A. No.
16   Q. You have no background in medicine?
17   A. No.
18   Q. All right. And you've never worked for
19   either an industrial hygiene or a safety department
20   within Pratt & Whitney?
21   A. No.
22   Q. The fact that — well, strike that.
23       The Mlynarek report was created at whose
24   request?

Page 159

1    Q. What are the names of those?
2    A. Covington.
3    Q. And where are they located?
4    A. In Oklahoma.
5    Q. And the other one?
6    A. Is Precision.
7    Q. And where are they located?
8    A. Oregon.
9    Q. And how many employees does Covington have?
10   A. I actually don't know what their number of
11   employees is. They have Websites.
12   Q. How many employees does Precision have?
13   A. That I don't know.
14   Q. What is the incidence rate of mesothelioma
15   in the general population?
16       MR. TABASKY: Objection.
17   A. That I don't know.
18       MR. TABASKY: He's not — one second.
19   He's not been tendered for that subject.
20       MR. SHEPARD: Well, he's writing
21   declarations and drawing conclusions about whether
22   exposure to an engine can cause an illness.
23       MR. TABASKY: I understand that.
24       MR. SHEPARD: So what I'm trying to

Page 161

16 (Pages 158 to 161)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "J"



IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDRA LOUISE NORSWORTHY, Individually
and as Personal Representative of the Estate of JOHN
T. NORSWORTHY,

    Plaintiffs,

vs.

AIRCRAFT BRAKING SYSTEMS, et al.,

    Defendants.

CASE NO.

JUDGE

DECLARATION OF ALLAN J.
SHIFFLER IN SUPPORT OF
DEFENDANT UNITED
TECHNOLOGIES CORPORATION'S
NOTICE OF REMOVAL

I, Allan J. Shiffler, declare and state as follows:

1.    I am over the age of 18 years and am competent to testify to the facts set forth in this declaration. I have personal knowledge of the facts contained in this declaration.

2.    I joined Pratt & Whitney, an unincorporated division of United Technologies Corporation, in 1966 and was an engineer within the Engineering and Customer Technical Service Groups during my career at Pratt & Whitney. I retired from Pratt & Whitney in 2003.

3.    Pratt & Whitney designs and manufactures aircraft engines for use in United States Military aircraft.

4.    During my time with Pratt & Whitney, I worked as an engineer on the development and manufacture of engines used in Military aircraft.

5.    Based upon my work experience with the engines that Pratt & Whitney supplied to the military from 1966 to 2003, I am familiar with the manner in which Pratt & Whitney military engines were designed, built and supplied to the United States Military.

6.    I have personal knowledge of the extent of involvement of the United States Military in the design, manufacture, approval, and receipt of the military engines designed and

manufactured by Pratt & Whitney. I submit this affidavit to attest to the level of supervision, control, and approval by the United States Military and its officers over the design and manufacture of these Pratt & Whitney aircraft engines intended for use by the United States Military.

7.      Pratt & Whitney, during all aspects of its design and manufacture of military aircraft engines (i.e., design, manufacture, and testing of such engines), performed its work under the immediate supervision of the United States Military. This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers and military specialists on-site at Pratt & Whitney. No aspect of the development, manufacture, and testing of the engines intended for use by the United States Military escaped this close control.

8.      The design, specification and manufacture of the Pratt & Whitney aircraft engines intended for use by the United States Military were approved by the appropriate Military personnel. United States Military engineers and inspectors were personally present at Pratt & Whitney facilities to oversee, inspect, and approve the work performed by Pratt & Whitney engineers and other personnel, including approval of any changes to engine design or specifications on all aircraft engines intended for use by the United States Military. During my employment with Pratt & Whitney, I personally interacted with these United States Military representatives on a regular basis. These representatives had different areas of specialty, such as engineering, contracts and quality control. During the period of my employment at Pratt & Whitney, these Military specialists at Pratt & Whitney controlled the design and manufacture of any aircraft engine produced at Pratt & Whitney for the United States Military.

9.      The United States Military provided extensive and detailed performance and construction specifications for the Pratt & Whitney aircraft engines intended for Military use. The United States Military, including the on-site Military inspectors responsible for oversight

2

and approval of the design and manufacture of these engines, had detailed prints and drawings of every part used in such engines. These prints disclosed all materials contained in each part. The Military inspectors knew of, and approved, all materials and all parts contained in the Pratt & Whitney engines intended for use by the United States Military.

10.    Any written materials, such as warnings or product manuals, that accompanied the engines built by Pratt & Whitney for the United States Military were similarly controlled and specified by the United States Military. Any aircraft engine designed and manufactured by Pratt & Whitney for the United States Military that did not meet the strict standards and specifications set forth by the United States Military for that particular engine was rejected by the United States Military.

11.    It is my understanding that Plaintiffs claim that John T. Norsworthy's work on Pratt & Whitney R-2800, R-4360, R-985, R-1830, R-2000 engines designed and manufactured for the United States Military during his service with the United States Air Force caused him to suffer from an asbestos-related injury. I am familiar with these engines and it is my understanding that they were in service with the U.S. Military at least through the 1960s. Pratt & Whitney had no knowledge that handling any parts or components used in the maintenance, repair or overhaul of Pratt & Whitney aircraft engines during the time that John T. Norsworthy is claimed to have served in the Military (1962-1990) could cause an asbestos-related illness.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _16TH_ day of April, 2009, in _SOUTH WINDSOR_, Connecticut.

By: _____
Allan F. Shiffler, Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "K"

Westlaw

Page 1

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

▷
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Robert LINDENMAYER and Beverly Linden-
mayer, Plaintiffs,
v.
ALLIED PACKING & SUPPLY, INC., et al., De-
fendants.

No. C09-05800 TEH.
Jan. 14, 2010.

Christopher Daniel Wasson, Gordon D. Greenwood
, James Lyndon Oberman, Kazan McClain Lyons
Greenwood & Harley, Oakland, CA, for Plaintiffs.

Mitchell Bruce Greenberg, Stephanie L. Walker,
Abbey Weitzenberg Warren & Emery, Santa Rosa,
CA, Kevin Douglas Jamison, Pond North LLP, Los
Angeles, CA, Edward R. Hugo, James Carl Parker,
Karleen Frances Murphy, Shaghig Dawn Agopian,
Thomas J. Moses, Derek S. Johnson, Sedgwick De-
tert Moran & Arnold LLP, Susanne Gheseri Arani,
Carroll Burdick & McDonough LLP, San Fran-
cisco, CA, for Defendants.

*ORDER GRANTING MOTION TO REMAND*
THELTON E. HENDERSON, District Judge.

*1 This matter came before the Court on Janu-
ary 5, 2010, on the motion to remand filed by
Plaintiffs Robert Lindenmayer ("Mr.Lindenmayer")
and his wife Beverly Lindenmayer (collectively,
"Plaintiffs" or "the Lindenmayers"). For the reas-
ons set forth below, Plaintiffs' motion is GRAN-
TED.

**BACKGROUND**

This is a tort action against Foster Wheeler
LLC and dozens of other defendants seeking dam-
ages for injuries based on Mr. Lindenmayer's ex-
posure to asbestos. Foster Wheeler removed this
matter to federal court from Alameda County Su-

perior Court on December 10, 2009. Plaintiffs
moved to remand on the following day, and simul-
taneously moved to shorten time for the hearing on
that motion, citing Mr. Lindenmayer's terminal ill-
ness.[FN1] The Court heard the motion on shortened
time, and now decides whether to remand this ac-
tion to state court.

> FN1. Mr. Lindenmayer was diagnosed
> with mesothelioma, and his doctor attested
> that there is "substantial medical doubt that
> he will survive more than six (6) months
> beyond" December 11, 2009. Decl. of
> Physician David M. Jablons, M.D. (Dkt.
> No. 13, Exh. 14), ¶ 8.

Plaintiffs allege that Mr. Lindenmayer was ex-
posed to asbestos while working as a machinist
mate in the United States Navy aboard the USS
America from 1964 to 1967. Plaintiffs bring mul-
tiple claims alleging defective design, failure to
warn and other theories against Foster Williams,
which confirms that it manufactured marine steam
generators, including boilers and economizers, for
that vessel. Because it acted under an officer or
agency of the United States in manufacturing and
selling that equipment, Foster Wheeler argues that
federal jurisdiction is proper under the federal of-
ficer removal statute, 28 U.S.C. § 1442(a)(1).
Plaintiffs dispute federal jurisdiction and seek re-
mand on that basis.

**LEGAL STANDARD**

Removal under federal-question jurisdiction is
ordinarily permissible only where the basis for fed-
eral jurisdiction appears on the face of the com-
plaint. *Jefferson County v. Acker*, 527 U.S. 423,
431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). The
federal officer removal statute, 28 U.S.C. §
1442(a)(1), constitutes an exception to that rule.
"Under the federal officer removal statute, suits
against federal officers may be removed despite the
nonfederal cast of the complaint; the federal ques-
tion element is met if the defense depends on feder-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

al law." *Jefferson County,* 527 U.S. at 431. The statute allows for the removal to federal district court of any action against the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office [.]" 28 U.S.C. § 1442(a)(1). Allowing removal ensures that, "where federal officers can raise a colorable defense arising out of their duty to enforce federal law," they "have such defenses litigated in the federal courts." *Willingham v. Morgan,* 395 U.S. 402, 406-07, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). To satisfy section 1442(a) (1), Foster Wheeler must (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) establish a causal nexus between plaintiffs' claims and acts it performed under color of federal office. *Fung v. Abex Corp.,* 816 F.Supp. 569, 571-72 (N.D.Cal.1992) (citing *Mesa v. California,* 489 U.S. 121, 124-25, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)). Foster Wheeler must also demonstrate that it is a "person" under the statute. *Id.*

\*2 Although other removal statutes are "strictly construe[d] ... against removal jurisdiction," *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992), "the Supreme Court has mandated a generous interpretation of the federal officer removal statute," *Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1252 (9th Cir.2006). "[T]he policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).' " *Ariz. v. Manypenny,* 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981) (quoting *Willingham,* 395 U.S. at 407). To justify removal, a defendant need not assert a "clearly sustainable defense," nor does he need to "win his case before he can have it removed." *Willingham,* 395 U.S. at 407.

To fulfill the second prong-the colorable federal defense-Foster Wheeler asserts the government contractor defense recognized by the Supreme Court in *Boyle v. United Technologies Corp.,* 487

U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). That defense, which "immunizes contractors who supply military equipment to the Government from the duties imposed by state tort law," *In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806, 810 (9th Cir.1992), is available to defendants who satisfy three requirements:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle,* 487 U.S. at 512. The first two elements "are intended to insure that it is indeed a discretionary decision on the part of the government that is being immunized," and the third requires the contractor to have "fully conveyed all information necessary to allow the government to make a fully informed decision." *Butler v. Ingalls Shipbuilding, Inc.,* 89 F.3d 582, 584 (9th Cir.1996). "[S]tripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.' " *In re Hawaii Fed. Asbestos Cases,* 960 F.2d at 813. The defense applies "only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." *Id.* The conflict between state law and "an identifiable 'federal policy or interest' " must be " 'significant' " before ordinary tort law liability will be displaced. *Id.* at 810 (quoting *Boyle,* 487 U.S. at 507).

Although the *Boyle* test expressly applies to product liability claims premised on design defects, the Ninth Circuit has addressed its applicability in failure to warn claims:

> Whereas the government contractor's defense

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

may be used to trump a design defect claim by proving that the government, not the contractor, is responsible for the defective design, that defense is inapplicable to a failure to warn claim in the absence of evidence that in making its decision whether to provide a warning ..., [the defendant] was "acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States."

*3 Butler, 89 F.3d at 586 (quoting In re Hawaii Fed. Asbestos Cases, 960 F.2d at 813). A defendant can therefore apply the Boyle test to failure to warn claims where "the government affirmatively instructed it regarding the provision of warnings." Overly v. Raybestos-Manhattan, No. C96-2853 SI, 1996 WL 532150, at *4 (N.D.Cal. Sept.9, 1996). The key inquiry is whether "the specifications of [the defendant's] contract with the Navy conflicted with [the defendant's] duty to warn under state law." Butler, 89 F.3d at 586.

## DISCUSSION

Plaintiffs, focusing on the second prong of the section 1442(a) (1) test, contend that Foster Wheeler's assertion of the government contractor defense does not rise to the level of a "colorable" federal defense under either the design-defect or the failure-to-warn theories. According to Plaintiffs, the Navy did not require the use of asbestos in equipment manufactured by Foster Wheeler, whose evidence only demonstrates that the Navy set performance-rather than design-specifications. As to the duty to warn theory, Plaintiffs claim that Foster Wheeler's witnesses only speculate that the Navy would have barred the company from issuing warnings, but offer no evidence that any attempt to issue such warnings was ever made. Foster Wheeler responds that the presentation of a colorable defense is a low burden that it has met.

Many district courts have assessed remand in similar contexts, and their decisions have come down on both sides of the question.[FN2] Those denying remand emphasize that a "defendant must only raise a 'colorable federal defense,' " and not

one that is "clearly sustainable." Curry v. Am. Standard, Inc., No. 08-cv-10228 (GBD), 2009 WL 308029, at *2 (S.D.N.Y. Feb. 6, 2009); see also Kirks v. Gen. Electric Co., No. 08-856-SLR, 2009 WL 2970391 (D.Del. Sept.17, 2009) (concluding that defendant raised a colorable federal defense after noting that "the provisions of the federal officer removal statute are to be construed broadly"). Others have allowed remand based on defendants' failure to show "that their contractual obligations to the government specifically prohibited them from placing warnings on their products." Nguyen v. Allied Signal, Inc., No. C98-03616 SI, 1998 WL 690854, at *4 (N.D.Cal. Sept.29, 1998); see also Prewett v. Goulds Pumps (IPG), No. C09-0838 RSM, 2009 WL 2959877 (W.D.Wash. Sept.9, 2009) (concluding "government contractor defense is not 'colorable' " where defendant failed to show "the Navy actually exercised its discretion in approving proposed warnings that conflicted with state law").

> FN2. Because remand orders are "not reviewable on appeal or otherwise," 28 U.S.C. § 1447(d), the Ninth Circuit and other courts of appeal have had little opportunity to provide guidance on this issue.

Whether or not Foster Wheeler presents a colorable federal defense hinges on its evidence. In support of its government contractor defense, Foster Wheeler submitted three statements: an affidavit by J. Thomas Schroppe, a retired Foster Wheeler executive personally involved with the Navy's procurement contracts with Foster Wheeler; an affidavit by Ben J. Lehman, a retired Navy admiral who had supervised ship overhauls and alterations and was familiar with the Navy's boiler specifications; and a declaration by Lawrence Stilwell Betts, a medical doctor and retired Navy captain who testified to the Navy's knowledge of risks associated with asbestos exposure.

*4 Lehman attests that "only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

could be installed" on Navy ships. Lehman Aff. ¶ 3. Such boilers "were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy," which "retained the 'final say' over the design of any piece of equipment." Id. ¶¶ 3, 5. The Navy "made the ultimate decisions, whether engineering or contractual," and drafted, approved, and maintained the military specifications-or "Mil Specs"-for boilers, which "included the nature of any communication affixed to" such equipment. Id. ¶¶ 5, 6, 8. As for warnings, the Navy "would not have allowed its equipment suppliers ... to affix any warning related to any asbestos hazards on their equipment." Id. ¶ 14. The hazards subject to precautionary labeling were determined only by the Navy, which "would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country." Id. ¶¶ 11-12. "In short," Lehman attests, "the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors." Id. ¶ 11. The Navy would not accept equipment that failed to comply with its specifications. Id. ¶ 4.

According to Schroppe, "the ship design for any given class of ship would be contained in a Ship Specification ('Ship Spec')," which dictated "all boiler operating criteria, performance requirements, and maximum physical dimensions of the boiler(s)." Schroppe Aff. ¶ 5. Foster Wheeler's equipment had to comply with both the Ship Spec and the Mil Specs, "which cover all specific components of the boiler, including accessories, subcomponents, and materials required to fabricate the boilers and its components." Id. ¶ 6. Boiler specifications "dictated very specific material requirements"-identifying, with respect to insulation, "the material" and the "arrangement of various bricks and insulating materials on various boiler walls." Id. ¶ 13. Schroppe, like Lehman, attested that Foster Wheeler "would not be permitted ... to affix

any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy." Id. ¶ 22.

Betts, finally, delves into the Navy's knowledge of hazards associated with asbestos. He declares that the U.S. government, by "the 1940s-1950s and thereafter," had "already recognized that the prolonged inhalation of sufficient concentration of asbestos fibers could result in pulmonary disease," and that the government's information "far exceeded" that which "possibly could have been provided by a boiler manufacturer such as Foster Wheeler." Betts Decl. ¶¶ 5-6. He documents the Navy's "sound, premier state-of-the-art occupational health program to control the recognized, potential health hazard" associated with asbestos exposure. Id. ¶ 32. Given that the Navy itself "had determined what an 'acceptable asbestos exposure' was," he declares that the Navy "would not, and could not, allow" each equipment manufacturer to "make an additional determination of what constituted an acceptable exposure." Id. Foster Wheeler, "at best," could only "have told personnel to follow the Navy's own mandates for handling asbestos," information he characterized as "redundant." Id. ¶ 34f.

*5 Foster Wheeler and the Lindenmayers each urge the Court to follow the decisions of other courts that have ruled in their favor based on substantially identical records. Foster Wheeler points to Wright v. A.W. Chesterton Co., in which Judge Jenkins denied plaintiffs' motion to remand after Foster Wheeler removed a similar asbestos action to this district. Judge Jenkins found that "the Schroppe and Lehman declarations ... satisfie[d] the first and second prongs of the Boyle test," as they established that "the United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's equipment conformed to these specifications." Wright v. A.W. Chesterton Co., No. C07 05403 MJJ, 2008 WL 512728, at *6 (N.D.Cal. Feb.25, 2008). In so ruling, Judge Jenkins emphas-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

ized that Foster Wheeler's burden was a low one: "The Court is mindful that Defendants need only present a colorable federal defense to Plaintiffs' claims and need not prove that the defense will be meritorious." *Id.* at \*7.

Plaintiffs direct the Court to *Holdren v. Buffalo Pumps, Inc.,* an asbestos case remanded from the District of Massachusetts for lack of subject-matter jurisdiction. Foster Wheeler, one of five defendants that removed the case, submitted affidavits from the same three witnesses before this Court. Judge Gertner characterized her ruling as resting "ultimately on what is missing from the record":

'The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever attempted to warn about asbestos on products destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military equipment they produced during the same period, by contrast to the equipment they supplied to the Navy. Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.

All told, the manufacturers do not claim that the Navy ever offered them any guidance on asbestos warnings, nor that they themselves ever contemplated warning about the dangers of asbestos. Their defense, instead, rests entirely on an untested hypothetical: If they had made such a proposal, the Navy *would have* refused that recommendation. This account rings of post-hoc justification.

*Holdren v. Buffalo Pumps, Inc.,* 614 F.Supp.2d 129, 137 (D.Mass.2009) (emphasis in original). While acknowledging her obligation not to assume "an unduly narrow view of federal officer removal," Judge Gertner emphasized that "the court must still satisfy itself that the defense has enough substance to trigger the right to a federal forum." *Id.* at

141. "Relaxing this standard too far, particularly in the context of a private contractor, could well err in the opposite direction–by providing a federal forum to a party whose acts were outside its federal directives." *Id.*

\*6 Noting that the "crux of the federal contractor defense is a 'significant conflict' between a federal interest and the defendant's state-law duties," the *Holdren* court observed a key distinction between design-defect and failure-to-warn claims. *Id.* at 142-43. A design-defect case presents a more "obvious conflict" with state law, in that the government's design specifications "themselves reflect a federal interest; where it is aware of potential risks in the design, the government has necessarily balanced safety and performance." *Id.* at 143. For a failure-to-warn case, "the type of conflict required by the defense may be considerably more difficult to show," because a manufacturer can typically comply "with its state-law duties to warn" without departing from "the government's design specifications and the judgments they reflect." *Id.*

With those distinctions in mind, the Court turns first to the design-defect claims against Foster Wheeler. Plaintiffs characterize the evidence as showing that the Navy had set only performance standards, not design specifications, for Foster Wheeler's equipment. The Supreme Court offered such a hypothetical in *Boyle*: if the United States, in contracting to purchase an air conditioner, had specified "the cooling capacity but not the precise manner of construction," there could be no conflict with a state law duty to include a certain safety feature. *Boyle,* 487 U.S. at 509. Contrary to Plaintiffs' assessment, however, Foster Wheeler's evidence shows that the Navy had approved "reasonably precise" *design* specifications, which dictated, among other things, what insulating material to be used. The first prong of *Boyle* is therefore met. Foster Wheeler has also demonstrated that it conformed to those specifications, based on testimony showing the Navy did not accept nonconforming equipment, and that the Navy's knowledge of the risks associ-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

ated with asbestos exceeded its own. Foster Wheeler satisfies the three-factor *Boyle* test, and therefore presents a "colorable" federal defense to the design-defect claims, as required for removal jurisdiction under section 1442(a)(1).

Foster Wheeler's evidence fails to raise a colorable defense on the failure-to-warn theory, however. Foster Wheeler must show that it was complying with "reasonably precise specifications" imposed by the United States in deciding whether to provide a warning. *Butler,* 89 F.3d at 586. Its evidence does not approach that requirement. In the absence of any effort to warn about asbestos, Foster Wheeler cannot rely on the hypothetical assertion that such an effort would have been futile. Foster Wheeler offers no evidence suggesting that its failure to warn should be attributed to the Navy, and identifies no conflicts between its duties under state law and its compliance with Navy specifications. The federal government cannot have exercised its discretion to preclude Foster Wheeler from issuing asbestos warnings if the provision of asbestos warnings was never contemplated or proposed in the first place. Foster Wheeler's defense to the failure-to-warn claims is therefore not "colorable" and not, by itself, a sufficient basis for removal.

*7 Plaintiffs represented that, should the Court find that Foster Wheeler raised a colorable federal defense to the design-defect claims but not to the failure-to-warn claims, they would waive the design-defect claims against Foster Wheeler so that the case can be remanded to state court. The Court concludes that this is the appropriate course of action.[FN3] There is no reason to confer federal jurisdiction over an entire action on the basis of a federal defense to claims that Plaintiffs choose not to pursue.

> FN3. Since Plaintiffs offered to waive the design-defect claims based on the Court's conclusion that Foster Wheeler had asserted a colorable federal defense, the Court does not need to analyze whether Foster Wheeler also met the other two require-

ments for removal under section 1442(a)(1) (acting under a federal officer and causal nexus). *Fung v. Abex Corp.,* 816 F.Supp. 569, 571-72 (N.D.Cal.1992).

Plaintiffs' motion to remand is therefore GRANTED. This matter shall be remanded to Alameda County Superior Court, where Plaintiffs shall waive any claims against Foster Wheeler based on a design-defect theory of liability.

**IT IS SO ORDERED.**

N.D.Cal.,2010.
Lindenmayer v. Allied Packing & Supply, Inc.
Slip Copy, 2010 WL 234906 (N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

# EXHIBIT "L"

22
23
24
25
26
27
28

Westlaw.

Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: 2001 WL 902642 (N.D.Cal.))

▷

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Paul **WESTBROOK** and Marlene **Westbrook**,
Plaintiffs,
v.
**ASBESTOS** DEFENDANTS (BHC), Defendants.

No. C-01-1661 VRW.
July 31, 2001.

ORDER

WALKER, J.

*1 Invoking the federal officer removal statute,
28 USC § 1442(a)(1), and the military contractor
defense, defendant Todd Shipyards Corp removed
this asbestos related tort action to federal court on
April 27, 2001. According to Todd, to the extent as-
bestos was used on its property, the United States
Navy required it, giving rise to the military con-
tractors defense and allowing removal. Presently
before the court is plaintiffs' motion to remand. For
the reasons that follow, the motion is GRANTED.

I

On March 14, 2001, plaintiffs Paul and Mar-
lene Westbrook filed suit in the San Francisco su-
perior court alleging personal injury and loss of
consortium against numerous defendants, among
them Todd. Plaintiff Paul Westbrook formerly
worked with asbestos as an insulator and now suf-
fers from asbestosis and asbestos-related pleural
disease. He has an increased risk of developing fur-
ther conditions, including cancer.

Plaintiffs' suit against Todd arises out of the
operation of a facility at which plaintiff worked for
certain subcontractors in the 1960s and 1970s.
Plaintiff indicates that he worked as an insulator for
both Owens Corning Fiberglass Corp (1960s and
1970s) and Roberts Brothers Construction Com-
pany (1974) on Todd's premises. Def Exhibits, Exh
B, Complaint at 7 & 8. It is not clear from the com-

plaint how much plaintiff worked on United States
Navy ships at Todd's facilities.

Against Todd, plaintiffs allege only loss of
consortium and "premises owner/contractor liabil-
ity." Id at 2. This is in contrast with the numerous
causes of action brought against other defendants.
Plaintiffs allege that Todd:

1. "Should have recognized that the work of
said contractors would create during the progress of
the work, dangerous, hazardous, and unsafe condi-
tions which could or would harm plaintiff and oth-
ers unless special precautions were taken;"

2. "Knew or had reason to know, that the con-
tractors it had selected and hired to install, remove,
abate or otherwise handle asbestos-containing ma-
terials were unfit or unqualified to do so;" and

3. "Failed to use reasonable care to discover
whether the contractors it selected and hired to in-
stall, remove, abate or otherwise handle asbestos-
containing materials were competent or qualified to
do so."

Id at 2-3. The precise nature of plaintiffs' alleg-
ations against Todd is murky in two ways.

First, the portions of the complaint cited above
focus on the negligent hiring of subcontractors
(numbers 2 and 3). But plaintiffs explicitly disclaim
any claims based on negligent hiring in their reply
brief in connection with this motion. In that brief,
plaintiffs assert that their cause of action for
premises owner/contractor liability has two com-
ponents: (1) failure to warn of a dangerous condi-
tion on the premises; and (2) negligent exercise of
retained control over the premises. Reply Br at 3
(citing *Grahn v. Tosco Corporation*, 58 Cal App
4th 1373, 68 Cal Rptr 2d 806 (1997)).

*2 The complaint also fails to make clear to
what extent the insulating work that caused
plaintiff's injuries was done on United States Navy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: 2001 WL 902642 (N.D.Cal.))

ships. The complaint lists United States Navy ships and no private ships. But plaintiffs have disclaimed, in writing, any claims arising out of work done on United States Navy ships. See Leroy Decl, Exh A.

In any event, on April 27, 2001, Todd removed the case to this court. Plaintiffs now move to remand to state court.

## II

Todd bears the burden of establishing that removal is proper. *Gaus v. Miles, Inc,* 980 F.2d 564, 566 (9th Cir1992). To remove a case failing within the federal-question grant of federal jurisdiction, a defendant would have to show that a federal question appears on the face of a well-pleaded complaint. See *Louisville & Nashville R Co v. Motley,* 211 U.S. 149, 152 (1908). An actual or anticipated federal defense would not justify removal. Id. Removal under the federal officer removal statute, however, is different. That statute allows removal on the basis of a federal defense.

Under 28 USC § 1442(a)(1), "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may remove to federal court. Removal is proper if the moving party can (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable defense to plaintiffs' claims; and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office. *Fung v. Abex Corp,* 816 F Supp 569, 571-72 (ND Cal 1992) (citing *Mesa v. California,* 489 U.S. 121, 124-25, 134-35 (1989)); *Jefferson County, Alabama v. Acker,* 527 U.S. 423, 431 (1999) (defense need only be colorable).

In this case, Todd claims that it is shielded from liability by military contractors immunity. This doctrine was set forth in *Boyle v. United Technologies Corp,* 487 U.S. 500 (1988). The *Boyle* Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to

state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id at 512.

Applying the *Mesa* test to the facts of this case, the court concludes that plaintiffs' motion to remand must be granted for two reasons. First, plaintiffs have asserted, in writing in the state court action, that: "Plaintiff's claims against defendant Todd Shipyards Corporation, exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." Leroy Decl, Exh A. To the extent this "stipulation" (as plaintiffs call it) is binding, Todd's ground for removal is eviscerated. If plaintiffs' claims arise only from work done on private ships, not under the direction of any federal officers, Todd's military contractor defense is unavailable.

*\*3 The question then is whether plaintiffs' written waiver is sufficient. The waiver of claims arising out of work done on federal jobsites and vessels is not a "stipulation" between the parties since Todd has not signed it. But another judge in this district has credited such a written disclaimer in a motion to remand. See *Overly v. Raybestos-Manhattan,* 1996 WL 532150 at *3 (ND Cal 1996). In *Overly,* Judge Illston accepted the plaintiffs' written waiver of claims related to design defects and therefore granted the motion to remand. The court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, Todd can always file for removal once again.

The motion to remand is also appropriate for a second reason. Even if plaintiffs' claims relate to work done on United States Navy ships, it is not clear that they even implicate the military contractors defense. In terms of the *Mesa* test, prongs (2) or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: 2001 WL 902642 (N.D.Cal.))

(3) are probably not met. This is because the cause of action plaintiffs bring, based on premises owner/contractor liability, does not turn simply on Todd's use of asbestos. Rather, the claim appears to turn on a failure to warn about the dangers of asbestos and negligent exercise of retained control. The defense: "The Navy made me do it," does not apply to either basis of liability. Todd has shown, through the declaration of Roger B Horne (Exh I), the deposition of Tom Hixson (Exh C) and various military specifications documents (Exh J, K, L & M), that the Navy required Todd to use asbestos insulation. But Todd has not shown that the Navy required it to refrain from issuing warnings. Absent such a showing, Todd has no colorable military contractor defense to a failure to warn claim. See *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 812-13 (9th Cir1992); *Overly*, 1996 WL 532150 at *4; see also *Feidt v Owens Corning Fiberglas Corp*, 153 F3d 124, 129 (3d Cir1998) (discussing district court's remand of failure to warn claim in the face of a military contractors' defense, but affirming remand based on 28 USC § 1447(d)).

Todd's military contractors defense would fare no better with respect to the negligent exercise of retained control claim. That claim, as explained in *Grahn v. Tosco*, 58 Cal App 4th 1373, 68 Cal Rptr 2d 806 (1997), is premised on the notion that "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Id at 1393. The degree of control Todd retained in this case is not clear. But accepting Todd's contention that it was required by the Navy to use asbestos, the decision to use asbestos cannot give rise to liability under this theory. Only decisions within Todd's control, whether to have the workers use breathers for example, could give rise to liability. Since Todd alleges that only the use of asbestos was required by the Navy, Todd's military contractor defense cannot shield Todd from liability for negligent exercise of retained control.

*4 As the court understands plaintiffs' claims, Todd lacks a colorable military contractor defense. This means that Todd cannot meet prong two of the *Mesa* test. Another way to describe this situation is to say that Todd does have a colorable military contractor defense, but it is limited to defending against claims arising only out of the choice to use asbestos, because that is the only action that was directed by the government. Under this rubric, it is prong three of the *Mesa* test that is not met as there is no causal connection between the acts performed under the government's orders and the claims brought by plaintiffs. Either way, given the court's understanding of plaintiffs' claims, Todd would be unable to demonstrate that removal was appropriate even if plaintiffs had not waived their claims arising out of work at government jobsites and on government vessels.

For these reasons, plaintiffs' motion to remand (Doc # 3) is GRANTED. Plaintiffs seek an award of $1563.78, the amount they incurred in attorneys' fees bringing this motion to remand. Under 28 USC § 1447(c), the court may order a removing defendant to pay plaintiffs their "just costs and any actual expenses, including attorney fees, incurred as a result of removal." Whether to grant such an award is within the court's discretion. In this case, the removal was unnecessary. The day before Todd removed this action, plaintiffs waived their claims to damages arising out of work done on federal government jobsites and vessels. As a result, the court concludes that an award of fees is appropriate and awards the requested amount, $1563.78. The amount is supported by the Leroy declaration and appears reasonable.

IT IS SO ORDERED.

N.D.Cal.,2001.
Westbrook v. Asbestos Defendants (BHC)
Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "M"

Westlaw

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

Page 1

▷
Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Robert S. **OVERLY** and Louise S. Overly Plaintiffs,
v.
RAYBESTOS-MANHATTAN, et al. Defendants.

No. C-96-2853 SI.
Sept. 9, 1996.

### ORDER REMANDING CASE TO SUPERIOR COURT

ILLSTON, District Judge.

*1 On September 6, 1996, the Court heard argument on plaintiffs' motion to remand. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiffs' motion to remand this case to San Francisco County Superior Court. The Court also GRANTS plaintiffs' motion for attorney fees and costs under 28 U.S.C. § 1447(c).

### BACKGROUND

On April 30, 1996, plaintiffs filed the complaint in this action in San Francisco County Superior Court. The Superior Court granted trial preference to the case pursuant to California Code of Civil Procedure § 36(d), because Mr. Overly is dying and is expected to survive only a few months; trial was set for October 7, 1996.

On August 9, 1996, after the trial date had been set, defendant Avondale Industries, Inc. removed the case to federal court pursuant to 28 U.S.C §§ 1441, 1442, and 1446. On August 20, 1996, plaintiffs filed a motion to remand and requested that it be heard on an expedited basis.

According to the allegations of the complaint, plaintiff Robert Overly was exposed to asbestos while working in a shipyard in the 1960's. Defendant Avondale controlled part of the premises of Mr. Overly's employment during this period of time.

Plaintiffs' complaint alleges that Avondale knew or should have known that the premises it controlled contained hazardous conditions, namely products containing asbestos. Plaintiffs further allege that defendant hired contractors and subcontractors who used products containing asbestos, but failed to warn individuals in the surrounding area of the existence of asbestos or to take precautions against human exposure to the chemical.

Plaintiffs allege that, as a result of exposure to asbestos while working in the shipyard, Mr. Overly acquired mesothelioma, a cancer usually resulting from asbestos exposure. In May of this year, Mr. Overly was diagnosed with six months remaining to live. Plaintiffs have proceeded against Avondale on the "failure to warn theory" of products liability.

Avondale does not contest Mr. Overly's assertion that he was exposed to asbestos during his work on the Avondale shipyard. Instead, it claims that the work done by Mr. Overly consisted primarily of work on naval ships, and that Avondale is therefore protected by government contractor immunity. Avondale asserts that it was under rigid guidelines by the federal government concerning the design of naval ships. Thus, Avondale asserts that it is entitled to the protection of the Federal Officer Removal Statute, thereby providing grounds for federal jurisdiction.

### LEGAL STANDARD

A suit filed in state court may be removed to federal court if the federal court would have had original subject matter jurisdiction over that suit. 28 U.S.C. § 1441(a); *Snow v. Ford Motor Co.*, 561 F.2d 787, 789 (9th Cir.1977). Three potential bases for federal subject-matter jurisdiction are relevant to this suit: (1) federal question jurisdiction under 28 U.S.C. § 1331, [FN1] (2) admiralty jurisdiction under 28 U.S.C. § 1333, [FN2] and (3) supplemental jurisdiction under 28 U.S.C. § 1367.[FN3]

FN1. 28 U.S.C. § 1331 states that "[t]he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

FN2. Under 28 U.S.C. § 1333, "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

FN3. Supplemental or pendent party jurisdiction exists where claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

The Court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. § 1367(c).

*2 A motion to remand is the proper procedure for challenging removal. Remand to state court may be ordered either for lack of subject matter jurisdiction or for any defect in removal procedure. *See* 28 U.S.C. § 1447(c). The court may remand *sua sponte* or on motion of a party, and the parties who invoked the federal court's removal jurisdiction have the burden of establishing federal jurisdiction. *See Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1195 (9th Cir.1988) (citing *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97 (1921)).

The removal statute is strictly construed against removal jurisdiction and doubt is resolved in favor

of remand. *Libhart v. Santa Monica Dairy Co.,* 592 F.2d 1062, 1064 (9th Cir.1979).

The existence of federal jurisdiction on removal must normally be determined on the face of the plaintiff's complaint. *See Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149 (1908). A "cause of action arises under federal law only when the plaintiff's well pleaded complaint raises issues of federal law." *Metropolitan Life Ins. Co v. Taylor,* 481 U.S. 58, 63 (1987).

However, the Court may examine the entire record to determine if the real nature of the claim is federal, notwithstanding plaintiff's characterization to the contrary, when the plaintiff has, by "artful pleading," attempted to defeat defendant's right to a federal forum. *See Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 397 n. 2 (1981); *Salveson,* 525 F.Supp. at 572. A complainant cannot "avoid federal jurisdiction simply by omitting from the complaint federal law essential to his claim, or by casting in state law terms a claim that can be made only under federal law." *Harper v. San Diego Transit Corp.,* 764 F.2d 663, 666 (9th Cir.1985).

The Federal Employee Removal Statute was enacted as a means for federal employees to bypass the well-pleaded complaint rule and raise immunity-related defenses as a basis for removal.

DISCUSSION

I. *Jurisdiction Under the Federal Officer Removal Statute*

The Federal Officer Removal Statute provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." Title 28 U.S.C. § 1442(a)(1). In *Mesa v. California,* 489 U.S. 121 (1989), the Supreme Court held that § 1442(a)(1) requires the moving party to: (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of feder-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

Page 3

al office. *Id.* at 124-25, 134-35. Before applying the test outlined in *Mesa*, however, a defendant must qualify as a "person" for the purposes of 28 U.S.C. § 1441(a)(1). As a corporation, defendant Avondale meets this preliminary requirement. *Fung v. Abex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal.1992).

## A. Acts Under the Direction of A Federal Officer

*3 Under the first prong of the *Mesa* test, defendant must show that it was acting under the direction of a federal officer. It is not enough to prove only that "the relevant acts occurred under the general auspices of" a federal officer, *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 946 (E.D.N.Y.1992), or that the defendant was a member of a regulated industry. *Id.; Bakalis v. Crossland Sav. Bank*, 781 F.Supp. 140, 144-45 (E.D.N.Y.1991). In the area of product liability, government contract immunity has been limited to cases where defendant companies can show "strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.' " *Fung v. Abex Corp.*, 816 F.Supp. at 573 (quoting *Gulati v. Zuckerman*, 723 F.Supp. 353 (E.D.Pa.1989)).

In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability. Plaintiffs allege that because Avondale failed to warn Mr. Overly of the existence of asbestos in his work environment, Avondale should be held liable for his resulting illness. Plaintiffs are not pursuing a design defect claim of products liability and have offered in writing to waive all potential claims related to design defects.

Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site.

## B. Colorable Federal Defense

The second prong of the *Mesa* test is that de-

fendant must possess a colorable federal defense. Defendant Avondale presents two potential federal defenses.

### 1. Longshore and Harbor Workers Compensation Act

One defense asserted by Avondale is that plaintiffs' recovery is limited to relief under the Longshore and Harbor Workers Compensation Act (LHWCA) § 1 et seq., 33 U.S.C.A. § 901 et seq. The LHWCA provides a basis for compensation from employers to certain employees injured in the course of employment while working upon navigable waters or the harbors and shipyards adjoining such waters. 33 U.S.C.A. § 903.

As an initial matter, defendant is barred from asserting a defense on this basis because the LWHCA was not mentioned in defendant's petition for removal as required under 28 U.S.C. § 1446(a).

Furthermore, even if applied to this case, the LWHCA does not constitute a colorable federal defense for Avondale. Mr. Overly was not an employee of Avondale, he was an employee of Westinghouse. The "borrowed employee" concept asserted by defendant has not been adopted by the Ninth Circuit. Furthermore, even under the Third Circuit guidelines cited by the defendant, Mr. Overly would not qualify as a "borrowed employee" for the purposes of the LWHCA because there has been absolutely no showing that he explicitly agreed to work under conditions controlled solely by Avondale. *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 942 (1990). Thus, the LWHCA does not constitute a colorable defense to plaintiffs' common law causes of action.

### 2. Government Contractor Immunity

*4 The second ground on which defendant asserts it possesses a colorable federal defense is the government contractor defense. Under this theory, contractors who supply military equipment to the government are immunized from liability under state tort law providing that they can meet the test outlined in *Boyle v. United Technologies Corp.*,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

Page 4

487 U.S. 500 (1988). In *Boyle*, the Court set the standard for finding state law liability for design defects in military equipment. *Id.* at 511. Military contractor immunity for design defects applies when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

The Ninth Circuit has ruled that in failure to warn product liability cases involving asbestos allegedly used in the construction of naval ships, a defendant must specifically show that "in making [its] decisions regarding warnings [it was] acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States." *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir.1992). Thus, in order to meet the *Boyle* test in a failure to warn case, the defendant must show that the government affirmatively instructed it regarding the provision of warnings.

Defendant's only showing on this motion relates to the government's manufacturing and engineering specifications. Defendant has not demonstrated that the government provided "reasonably precise specifications" affecting Avondale's provision of warnings. *Boyle*, 487 U.S. at 512. Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunity. *See In re Hawaii Federal Asbestos Cases*, 960 F.2d at 813. Therefore, defendant fails to meet the second prong of the *Mesa* standard because Avondale has no colorable federal defense to the charges in this case.

C. Causal Nexus

The final requirement under the *Mesa* test is that there be a causal nexus between the rules imposed by the United States on the defendant contractor by the federal government and the liability asserted by plaintiff. "[T]here must be a causal con-

nection between what the officer has done under asserted official authority and the state prosecution. It must appear that the [state] prosecution has arisen out of the acts done by the officer under color of federal authority and in enforcement of federal law." *Maryland v. Soper*, 270 U.S. 9, 22 (1926).

Defendant has produced abundant evidence attesting to the regulations imposed by the federal government on the manufacture and design of ships built by Avondale for the U.S. Navy. However, *none* of these guidelines addresses Avondale's responsibility to warn its employees of their exposure to products containing asbestos. The government in no way restricted Avondale's ability to notify individuals of the presence of asbestos in the work environment. Thus, there is no causal connection between the control exercised by the United States over Avondale and the legal theory under which plaintiffs seek to hold Avondale liable. Consequently, Avondale has no basis on which to assert application of the Federal Officer Removal Statute, and the case must be remanded to state court.

II. *Attorney Fees & Costs*

*5 Title 28 U.S.C. § 1447(c) provides that when granting a motion for remand on the basis of a lack of federal subject matter jurisdiction, a court may order the defendant to pay plaintiff "its just costs and any actual expenses, including attorney fees, incurred as a result of the removal." An award under § 1447(c) is entirely within the Court's discretion.

Under its discretion, the Court finds that the case was removed "improvidently and without jurisdiction." *Id.* The Court hereby awards plaintiffs their reasonable costs and attorney fees associated with removal, as requested, in the amount of $2,000, to be paid by defendant Avondale within ten days of the date of this order.

CONCLUSION

For the foregoing reasons and for good cause shown, plaintiffs' motion to remand is GRANTED. Plaintiffs' motion for reasonable costs and attorney

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

fees incurred as a direct consequence of removal is
GRANTED in the amount of $2,000.

IT IS SO ORDERED.

N.D.Cal.,1996.
Overly v. Raybestos-Manhattan
Not Reported in F.Supp., 1996 WL 532150
(N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT "N"

Westlaw.

Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)
(Cite as: 2002 WL 102608 (N.D.Cal.))

Page 1

▷

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Barbara SCHILZ, Plaintiff,
v.
A.P. GREEN INDUSTRIES, INC., et. al. Defendants.

No. C01-4299 MMC.
Jan. 15, 2002.

ORDER GRANTING MOTION TO REMAND;
DENYING REQUEST FOR ATTORNEY'S FEES
AND COSTS

CHESNEY, J.

*1 Before the Court is plaintiff's motion to remand, filed December 17, 2001, pursuant to 28 U.S.C. § 1447(c). Defendant United States Steel (USS) filed opposition, to which plaintiff replied. [FN] Having considered the papers filed in support of and in opposition to the motion, the Court finds the matter appropriate for decision on the papers, VACATES the hearing scheduled for January 18, 2002, and rules as follows.

> FN1. On January 11, 2002, USS moved to strike plaintiff's reply as untimely. In conjunction with the filing of her reply, plaintiff explained that the reply was filed late because "[t]he due-date for Plaintiff's Reply Brief was mistakenly miscalendared." (See Robert Barrow Decl. ¶ 2.) Under the circumstances, USS's motion to strike is hereby DENIED. As an alternative to striking plaintiff's reply, USS requests leave to file a surreply. Such request is DENIED, as USS has failed to demonstrate how a surreply would assist the Court in adjudicating the instant motion.

Plaintiff filed the instant wrongful death action in state court on June 2, 2000, alleging that her husband's death was caused by his exposure to asbestos on a Naval ship. On November 16, 2001, defendant USS, the alleged successor-in-interest to the manufacturer of the ship, removed the instant action.

In its removal notice, USS asserts that the Court has jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), which provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1). In order for removal to be proper under § 1442(a)(1), the removing party must "(1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v. Abex Corporation,* 816 F.Supp. 569, 571 (N.D.Cal.1992) (citing *Mesa v. California,* 489 U.S. 121 (1989)).

Specifically, USS asserts that plaintiff's claims are removable under the government contractor's defense defined in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), as the ship in question was constructed "pursuant to contract with the Navy and under the authority of officers of the United States or agencies thereof." (Notice of Removal ¶ 3.) This argument is not persuasive. In the instant action, plaintiff has limited her claim against USS to the failure to warn theory of liability; plaintiff is not pursuing a design defect claim against USS. (See Plaintiff's Waiver of Claim for Design Defect Product Liability, filed January 9, 2002.) The government contractor's defense on which USS relies "is inapplicable to a failure to warn claim in the absence of evidence that in making its decision whether to provide a warning ... [USS] was 'acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States.' " *Butler v. Ingalls Shipbuilding, Inc.,* 89 F.3d 582, 586 (9 th Cir.1996). Here, USS has failed to submit evidence demonstrating that it was subject to any government specifications with respect

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)
(Cite as: 2002 WL 102608 (N.D.Cal.))

to the placement of warnings on its products. Absent such showing, defendant may not rely on the government contractor's defense. *See id.* As defendant has failed to raise a colorable federal defense to plaintiff's claims, removal is not proper pursuant to 28 U.S.C. § 1442(a)(1).[FN2] *See Mesa,* 489 U.S. at 124-25, 134-35.

> FN2. In light of this finding, the Court need not address whether defendant's removal was timely under 28 U.S.C. § 1446(b). Nor, under the facts presented, would the timing of the removal warrant an award of attorney's fees. *See infra.*

*2 Pursuant to 28 U.S.C. § 1447(c), plaintiff seeks to recover her attorney's fees and other expenses resulting from defendant's removal of the action to the district court. Under § 1447(c), "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The district court has "wide discretion" to award attorney's fees and costs under § 1447(c), even in the absence of a finding that defendant acted in bad faith. *See Moore v. Permanente Medical Group, Inc.,* 981 F.2d 443, 446-47 (1992). In the instant action, at the time USS filed its notice of removal, plaintiff's claims against USS were not limited to a theory of liability based on failure to warn. Under such circumstances, the Court declines to exercise its discretion to award attorney's fees.

Accordingly, plaintiff's motion to remand is hereby GRANTED, and plaintiff's request for attorney's fees and costs is hereby DENIED.

This order closes Docket No. 5.

IT IS SO ORDERED.

N.D.Cal.,2002.
Schilz v. A.P. Green Industries, Inc.
Not Reported in F.Supp.2d, 2002 WL 102608
(N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

# EXHIBIT "O"

22
23
24
25
26
27
28

Westlaw

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Euelis "Ellau" SHEPPARD
v.
NORTHROP GRUMMAN SYSTEMS CORP., et al.

Civil Action No. 07-2208.
May 24, 2007.

Scott R. Bickford, Jeffrey Matthew Burg, Spencer R. Doody, Martzell & Bickford, New Orleans, LA, for Euelis "Ellau" Sheppard.

Brian C. Bossier, Christopher Thomas Grace, III, Edwin A. Ellinghausen, III, Blue Williams, L.L.P., Charles V. Giordano, Miranda, Warwick, Milazzo, Giordano & Hebbler, APLC, Christopher Kelly Lightfoot, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, Glenn Lyle Maximilian Swetman, Aultman, Tyner & Ruffin, Ltd., Gordon Peter Wilson, Frederick Lewis Parks, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Gary Allen Lee, Richard Marshall Perles, Lee, Futrell & Perles, LLP, Samuel Milton Rosamond, III, Crawford Lewis, PLLC, New Orleans, LA, William L. Schuette, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, Baton Rouge, LA, for Northrop Grumman Systems Corp., et al.

## ORDER AND REASONS

CARL J. BARBIER, United States District Judge.

*1 Before the Court is Plaintiff's **Motion to Remand (Rec.Doc.11)**. This motion was opposed and was set for hearing on the briefs on May 16, 2007. Upon review of the record, the memoranda of counsel, and the applicable law, this Court now finds that Plaintiff's motion should be granted.

### *Factual Background*

Plaintiff initially filed this suit against Defend-

ant, Northrop Grumman Systems Corp. ("Northrop") and several other defendants in Civil District Court for the Parish of Orleans asserting that he contracted asbestos-related lung cancer while employed as a laborer and rigger by Avondale Shipyard in Avondale, Louisiana. Northrop and Peter Territo, an executive officer (hereinafter referred to as "Defendants"), removed this action to federal court under 28 U.S.C. § 1442(a)(1) based on federal officer immunity. Defendants also stated that the Longshore and Harbor Workers' Compensation Act ("LHWCA") was a basis for removal. The day before Defendants removed this action, Plaintiff filed and served a motion for leave of court to amend his petition in state court. (Exhibit G to motion to remand). Specifically, Plaintiff sought leave to amend his petition to delete paragraphs 47 and 49, which read in pertinent part:

Avondale had the *garde* of the asbestos ... and is thereby strictly liable pursuant to Louisiana Code Article 2317.

Avondale fabricated asbestos-containing insulation products to which Petitioner was exposed and Avondale is strictly liable as a manufacturer....

Plaintiff argues that, in addition to his failure to warn claims, he erroneously asserted the above garde and product liability claims in his original petition. He claims that while neither of the above claims confer jurisdiction on this Court, he promptly (i.e., before the notice of removal was filed) sought leave to amend his petition so that Defendants could not argue that Plaintiff intended to pursue any cause of action over which this court would have jurisdiction. Five days after this action was removed, Plaintiff, again, sought leave to amend his Complaint, which was granted two days later.

### *The Parties' Arguments*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

Plaintiff argues that this Court should make its jurisdictional determination based on his amended Complaint even though the amendment was allowed *after* removal. Plaintiff notes that it is clear that he is not attempting to engage in forum shopping because he sought leave to amend his petition prior to removal.

Plaintiff next claims that Defendant has not satisfied its burden of proving that it is entitled to federal officer immunity. Plaintiff argues that Defendants have not properly invoked this Court's federal officer jurisdiction under § 1442(a)(1), because they cannot meet the criteria set forth in *Mesa v. California*, 489 U.S. 121, 124-25, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). First, Plaintiff claims Defendants have not shown that they were acting under federal direction at the time the tort was committed. Plaintiff asserts that Defendants cannot establish that a federal officer directed and controlled their safety and warning-related activities specifically. Second, Plaintiff asserts that Defendants do not have colorable federal defense under the government contractor defense because there is no conflict between Defendants' federal and state duties. Plaintiff notes that the testimony of Peter Territo, executive officer of Defendant, demonstrates that no government regulation or contract specification prevented him from providing safety warnings. (Exhibit I to motion to remand, p. 143). Third, Plaintiff asserts that Defendants have not shown a nexus between the Government's control and Plaintiff's legal theories. Plaintiff notes that Defendants have provided no evidence showing that a federal officer exercised "direct and detailed" control over safety and warnings, and thus, it is impossible for Defendants to show a causal nexus between the Government's supervision and their own tortious failure to warn. Thus, according to the *Mesa* test, Plaintiff argues that Defendants cannot invoke federal officer jurisdiction.

*2 Further, Plaintiff asserts that he has disclaimed any cause of action which could invoke federal officer jurisdiction. Plaintiff asserts that if the Court concludes that Defendant have pled a colorable federal officer defense, Plaintiff's petition disclaimed any cause of action which would ripen the defense. Specifically, plaintiff pled:

Plaintiffs [sic] disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave. *Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from any exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government.*

(Petition, ¶ 56, *emphasis added* ). Plaintiff asserts that in similar asbestos cases (which were removed to federal court by defendants asserting federal officer jurisdiction), courts have looked to similar post-removal disclaimers to remand the cases to state court. *See, Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D.Cal. Sept. 9, 1996); *Westbrook v. Asbestos Defendants*, 2001 WL 902642 ( N.D.Cal. 2001)(" The court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, [ defendant] can always file for removal once again.") Thus, Plaintiff asserts that if the Court determines that there is jurisdiction based on Defendants' federal officer defense, Plaintiff should be bound by his disclaimer. Also, unlike the plaintiffs in *Overly* and *Westbrook*, who disclaimed causes of action post-removal (arguably implicating concerns of forum shopping), Plaintiff here disclaimed these causes of action in his original petition filed in state court.

Last, Plaintiff asserts that the LHWCA does not provide a colorable federal defense. Plaintiff notes that in *Gauthe v. Asbestos Corp.*, 1997 WL 3255 (E.D.La. Jan. 2, 1997), Judge Duval addressed these same LHWCA arguments with regard to the Avondale Interests in an asbestos exposure case exactly the same as the case at bar. In rejecting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

Avondale's arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship, Inc. v. Pennsylvania*, 100 S.Ct. 2432 (1980) to hold that the LHWCA does not preempt, but supplements, state remedies available to an injured worker. Plaintiff claims that from his Petition, it is clear that he intended to do just that: i.e., sue Defendants in state court for state law claims. Plaintiff claims that he has not availed himself of any LHWCA benefits and does not seek to do so in his petition. Thus, removal is improper on the basis of his purported LHWCA claim.

In opposition, Defendants making up the Avondale Defendants (i.e., Northrop and its executive officers) [FN1] claim that they are entitled to remove this case based on federal officer jurisdiction. Specifically, Defendants assert that the intense government presence at Avondale and government control of the construction of vessels at Avondale, where Plaintiff allegedly was exposed to asbestos, was of such a direct and detailed nature that Defendants are entitled to defend this claim in federal court. (See Exhibit D to opposition). Defendant argues in essence that construction and inspection systems designed and implemented by the government to ensure that the proper materials were used and incorporated in the proper manner were thorough, all-encompassing, and included the authority for government inspectors to order that any non-compliance found be corrected by Avondale at any stage of the construction.

> FN1. An opposition advancing similar arguments was filed by Commercial Union Insurance Company (Rec.Doc.18).

**\*3** Defendants assert the importance of *Lalonde v. Delta Field Erection*, 1998 WL 34301466 (M.D.La.1998). Defendants explain that in *Lalonde*, the court held that the federal government contractor, DSM, "was acting 'under an officer of the United States or of an agency thereof' for purposes of removal under § 1442(a)(1) " because DSM "operated a federal government-owned facility, exclusively for the government, under the

oversight and ultimate control of officers of the federal government." Although Defendant admits that Avondale was not a government-owned facility, it argues that the work performed under contract with the government was performed exclusively for the government under the direct oversight and control of government officers. Defendant asserts that like DSM, Avondale acted exclusively for and under the control of the federal government in its operation under all of the government contracts. Defendants asserts that (1) government inspectors daily monitored compliance by Avondale with safety regulations made part of the contracts; (2) the government required the use of asbestos insulation; (3) the government specifically incorporated into the contracts federal asbestos safety regulations, which set standards for safe daily exposures to asbestos; and (4) government inspectors constantly monitored the ship construction process for compliance with all terms of the contract. Defendants claim these facts establish that the they were "acting under" the direction of the federal government and that the causal connection exists because the acts complained of were "under color" of federal office.

Next, Defendants claim they can successfully assert a colorable federal defense, i.e., the federal contractor defense. Defendants claims they always conformed to the exceptionally precise specifications for the construction of the vessels that were drafted and approved by the government. Defendants also argue that Avondale had no knowledge of any dangers associated with the use of asbestos about which the government was not aware, given the extensive presence and control of the construction by the government, the incorporation into the contracts of the Walsh-Healey Act, and federal asbestos safety regulations promulgated by the LHWCA.

The second of Defendants' two available federal defenses is the immunity provision contained in the LHWCA. Defendants claim that Plaintiff, Territo, and Avondale satisfy the "status" and "situs" test and are, thus, all qualify for treatment under the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

LHWCA. Defendants assert that it is without serious dispute that federal law governs the question of whether the LHWCA preempts state law. Defendants argue that decisions such as the United States Supreme Court in *Sun Ship* make clear that Congress intended that disputes between longshore workers be resolved within the exclusive framework of the LHWCA.

Defendants also claim that the recent rulings in *Melford v. Northrop Grumman Systems Corp.*, case no. 05-1405 (M.D.La.) and *McFarlain v. Northrop Grumman Systems*, case no. 05-1406 (M.D.La.) are applicable and suggest that remand should be denied. Defendants note that the *Melford* case was removed to the Middle District of Louisiana on the same grounds that were asserted here: pervasive government regulation of federal ship construction contracts entitled the defendant to federal court jurisdiction under the Federal Officer Removal statute. The Court denied the plaintiff's motion to remand, wherein the plaintiff made the same arguments as the plaintiff here makes: the government never forced the defendant "not to warn," the *Overly* test applies, and the Federal Contractor Defense is not colorable. Defendants note that the *Melford* ruling is contrary to every Eastern District ruling against Defendants to date.

\*4 In *McFarlain*, the plaintiff urged much more than "failure-to-warn" claims. Specifically, the plaintiff had alleged "strict liability" claims. Defendants note that in Plaintiff's original Petition in this case, he also makes strict liability claims that seek to attach liability to Defendants for the mere presence of asbestos at the workplace. (See paragraphs 47 and 49 of original Petition). Defendants claim that this Court should rule as the *McFarlain* Court did and find that, at least as far as the strict liability claims are concerned, Defendant's federal contractor defense is colorable and all three prongs of the removal test are met. Similarly, Defendants claim this Court should exercise its supplemental jurisdiction over the remaining claims and deny Plaintiff's motion to remand. As for Plaintiff's post-

removal amendment to delete the strict liability claims from his Petition, Defendants argue that the Court should not consider the amended Petition because what controls is the Petition as it reads at the time of removal.

### *Analysis*

**The Amended Petition:**

Although this case was properly removed based on federal question jurisdiction, a mere seven days after removal, Plaintiff was granted leave to amend his Complaint. This amendment effectively allowed Plaintiff to delete any possibility of federal claims from his Complaint. The fact that this amendment occurred so quickly after removal and the fact that Plaintiff had sought leave to amend his petition in state court the day before Defendants filed their notice of removal prompts the Court to consider the amended petition in its determination of this motion to remand. The Supreme Court has held that if a federal claim that formed the basis of federal question jurisdiction is dismissed, the court has discretion to remand the state law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (affirming remand of state claims after plaintiff's amended complaint dropped claim that was preempted). The *Carnegie-Mellon* Court held that if a federal question is eliminated relatively soon after removal, it is ordinarily preferable to remand the case. *Id.* Indeed, the Court noted that retaining a case after a fresh federal claim is dropped early in litigation may be an abuse of discretion. *Id.* Thus, the Court concludes that in this situation, the amended Complaint will be used to determine whether the case should be remanded.

**Should this Matter be Remanded?**

The Federal Officer Removal Statute provides as follows:

(a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is presiding:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

(1) The United States or any agency thereof or any officer (or any acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue....

*5 28 U.S.C. § 1442(a)(1). The Fifth Circuit has explained that removal pursuant to this statute is meant to "ensure a federal forum in any case where a federal officer is entitled to raise a defense arising out of his official duties." *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir.1998). It is the removing defendants that have the burden of establishing the existence of federal jurisdiction. *Id.* at 397. In considering whether removal was proper under the federal officer removal statute, a court must determine whether the removing defendants have established the following factors: (1) that they are "persons" under § 1442(a)(1); (2) that they acted under the direction of a federal officer; (3) that they have demonstrated a causal nexus between plaintiff's claims and defendants' actions performed under the color of a federal office; and (4) that they can raise a federal defense to plaintiff's claims. *Mesa*, 489 U.S. at 131-32; *Winters*, 149 F.3d at 398.

### (1) Are Defendants "persons" within the meaning of the statute?

Both removing defendants (Northrop as a corporation and Territo as an executive officer for the corporation) satisfy the first *Mesa* prong. *See Winters*, 149 F.3d at 398; *Bradley v. Northrop Grumman Systems, Corp.*, 2007 WL 1115246 (E.D.La. Apr., 12, 2007).

### (2) Were Defendants acting under the direction of a federal officer?

The Court concludes that Defendants' removal fails on this prong because they failed to establish their safety and warning-related activities were under the requisite direction of a federal officer. Federal direction requires "more than 'general auspices'

of a federal officer, or participation in a regulated industry." *Savoie v. Northrop Grumman Ship Systems, Inc.*, No. 05-2086 (E.D . La.2005). Defendants must show "strong government intervention and the threat that a defendant will be sued in state court" based on actions which follow federal direction. *Mouton v. Flextallic, Inc.*, 1999 WL 225438 *2-3 (E.D.La.1999).

Nothing in the record establishes that the safety procedures at issue were controlled by the government or related to government specifications in the building of ships at Avondale. *See also Bradley*, 2007 WL 1115246; *Guidroz v. The Anchor Packing Co.*, No. 98-3709 (E.D.La); *Mouton*, 1999 WL 225438 (no causal connection between the Navy's direction pursuant to design contracts and plaintiff's failure to warn claims). Territo testified that there were no federal officers on board the vessels and that Naval inspectors did not control the safety department at Avondale. (Exhibit I to motion to remand, p. 135). He also admitted that nothing in the federal regulations prevented Avondale from warning its employees of the dangers of asbestos exposure. (Exhibit I to motion to remand, p. 143). Thus, this Court finds that Defendants are not entitled to federal officer removal in this instance.

### (3) Was there a causal nexus between Plaintiff's claims and Defendants' actions performed under the color of a federal office?

*6 Because Defendants have failed to demonstrate that the government exercised the requisite authority and control over Defendants' safety procedures, there can be no causal nexus between the authority of the federal officer and Plaintiff's claims that Defendants failed to use asbestos safely. *See also Bradley*, 2007 WL 1115246, *3; *Gauthe*, 1997 WL 3255 (no causal nexus under similar facts and circumstances).

### (4) Have Defendants established a colorable federal defense?

The Court determines that Defendants have failed to establish a colorable defense under either the government contractor defense theory or the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

LHWCA defense theory. First, Defendants cannot successfully invoke the government contractor defense, as set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), because Defendants cannot carry their burden of establishing that the following two conditions are met: 1) that the case concerns a unique federal issue, and 2) that a significant conflict exists between federal policy and state law as applied to this case. *Boyle*, 108 S.Ct. at 2515. Here, there is no conflict between Defendants' federal and state duties. Territo's own testimony demonstrates that no government regulation or contract specification prevented him or Northrop from providing safety warnings:

Q: To your knowledge, is there any Federal regulation or specifications in the contracts with the Navy that would prevent you from putting up a [warning] sign in a Navy vessel?

A: If it was under construction?

Q: Yes.

A: No.

(Exhibit I to motion to remand, p. 143). There is no conflict because Defendants could comply with both their contractual obligations and the state-prescribed duty of care. Thus, Defendants cannot take advantage of this defense.

Also, the Court finds that Defendants have not established a colorable defense under the LHWCA for the same reasons previously set forth by Judge Duval in *Gauthe*, 1997 WL 3255. The *Gauthe* court addressed these same LHWCA arguments with regard to Defendants in an asbestos exposure case. In rejecting Defendants' arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship* to hold that the LHWCA does not preempt, but instead, supplements state remedies available to an injured worker. Thus, a person injured while shipbuilding may maintain an action under either the Louisiana state compensation scheme or the LHWCA. A review of

Plaintiff's petition reveals that it was Plaintiff's intent to sue Defendants in state court for state law claims. Thus, it appears that the facts of this specific case do not invoke federal officer jurisdiction.

In further support of the above conclusion is the fact that, in his original Petition filed in state court, Plaintiff disclaimed any cause of action which could invoke federal officer jurisdiction. Specifically, Plaintiff pled:

Plaintiffs [sic] disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from any exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government.

*7 (Petition, ¶ 56). Courts have looked to similar disclaimers that were filed after removal to remand cases to state court in similar asbestos cases. *Overby*, 1996 WL 532150; *Westbrook*, 2001 WL 902642 ("[ t]he court sees no reason not to hold **plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, [ defendant] can always file for removal once again.**"). Also, the Court concludes that its decision to follow Plaintiff's disclaimer is further supported by the fact that, unlike the plaintiffs in *Overby* and *Westbrook* who disclaimed causes of action post-removal, Plaintiff here disclaimed these causes of action in his original petition in state court.

The Court is unpersuaded, just as Judge McNamara was "unpersuaded" in the *Bradley* case, by the opinions out of the Middle District of Louisiana (*Lalonde; Melford;* and *McFarlain* ) that contrast with those out of this district. First, the *Lalonde* case is inapplicable because the government in *Lalonde* specifically controlled safety matters at a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
**(Cite as: 2007 WL 1550992 (E.D.La.))**

government-owned facility. Here, Avondale is a privately-owned shipyard that contracts with private and public interests, and in which safety officers such as Territo operate wholly independent of any Government control. In *McFarlain,* the Court rejected the assertions that the LHWCA conferred federal jurisdiction and also rejected the argument that the Avondale defendants met their burden of removal of the failure to warn claims based on the government contractor defense. The sticking point for the *McFarlain* Court was the fact that the plaintiff had made a strict liability claim in addition to the failure to warn claim against the Avondale defendants. Here, Plaintiff has amended his petition to omit any strict liability claim. Thus at present, Plaintiff's amended petition only states theories of liability which sound in negligence, which should be remanded according to all Eastern District precedent, as explained above. Accordingly,

**IT IS ORDERED** that Plaintiff's **Motion to Remand (Rec.Doc.11)** should be and hereby is **GRANTED.** This matter is now remanded to the state court from which it was removed.

E.D.La.,2007.
Sheppard v. Northrop Grumman Systems Corp.
Not Reported in F.Supp.2d, 2007 WL 1550992
(E.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

| | |
|---|---|
| 1 | STEPHEN M. TIGERMAN (Bar No. 112127) |
| | STEVEN M. HAROWITZ (Bar No. 71117) |
| 2 | ROGER E. GOLD (Bar No. 214802) |
| | HAROWITZ & TIGERMAN, LLP |
| 3 | 450 Sansome Street, 3RD Floor |
| | San Francisco, California 94111 CASE MANAGEMENT CONFERENCE SET |
| 4 | Telephone   (415) 788-1588 |
| 5 | Attorneys for Plaintiffs |

ENDORSED
F I L E D
San Francisco County Superior Court

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY:   PARAM MATE
         Deputy Clerk

JUN 1 0 2010   -1:30PM

DEPARTMENT 206

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

CGC-09-275218

PATTI DONLON, Individually and as Successor-in-Interest to the Estate of PATRICK THEISEN DONLON, Decedent; SEAN DONLON; and DOES ONE through TEN, inclusive,

                    Plaintiffs,

          vs.

AC AND S, INC.; ASBESTOS CORPORATION, LTD.; A.W. CHESTERTON COMPANY; CROWN, CORK & SEAL COMPANY, INC., Individually and as Successor-in-Interest to MUNDET CORK CORP.; GARLOCK SEALING TECHNOLOGIES LLC, Individually and as Successor-in-Interest to GARLOCK, INC.; GENERAL ELECTRIC COMPANY; J T THORPE & SON, INC.; METROPOLITAN LIFE INSURANCE COMPANY; PARKER-HANNIFIN CORPORATION, as Successor-in-Interest to SACOMO SIERRA; OWENS-ILLINOIS CORPORATION; QUINTEC INDUSTRIES, INC.; SOCO-LYNCH CORPORATION, successor-in-interest to WESTERN CHEMICAL & MANUFACTURING COMPANY; SWINERTON BUILDERS f/k/a SWINERTON & WALBERG CO.; THOMAS DEE ENGINEERING COMPANY; TRANE U.S, INC., fka AMERICAN STANDARD, INC.; UNION CARBIDE CORPORATION; VIACOM, INCORPORATED, as successor-by-merger to CBS CORPORATION, fka WESTINGHOUSE ELECTRIC CORPORATION; ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST; BAYER CROPSCIENCE, INC., successor to AMCHEM PRODUCTS, INC.; ENPRO INDUSTRIES, INC., Individually and as Successor-in-Interest to ANCHOR PACKING COMPANY; HOPEMAN BROTHERS, INC.; SB DECKING, INC., formerly known as SELBY, BATTERSBY &

No.

COMPLAINT FOR DAMAGES

(Wrongful Death)
Negligence,
Strict Liability, Products
Liability for Clutch Components
and Brake Assemblies,
Enterprise Liability,
False Representation,
[Restatement Sec. 402-B],
Survival Action,
Loss of Consortium,
Punitive Damages

(Asbestos)

THIS CASE IS SUBJECT TO MANDATORY ELECTRONIC FILING PURSUANT TO AMENDED G.O. 158

1  COMPANY; GEORGIA-PACIFIC CORPORATION;  )
   HAMILTON MATERIALS, INC.; HANSON       )
2  PERMANENTE CEMENT, INC. fka KAISER CEMENT)
   CORPORATION; KAISER GYPSUM CO., INC.;  )
3  KELLY-MOORE PAINT COMPANY, INC.; EATON )
   AEROQUIP, LLC; PNEUMO-ABEX CORPORATION, )
4  Successor-in-Interest to ABEX CORPORATION; )
   HONEYWELL INTERNATIONAL, INC. fka ALLIED )
5  SIGNAL, INC./THE BENDIX CORPORATION; BORG-)
   WARNER CORPORATION by its Successor in Interest, )
6  BORGWARNER MORSE TEC, INC.;            )
   BRIDGESTONE/FIRESTONE NORTH AMERICAN   )
7  TIRE, LLC; DANA COMPANIES, LLC; GOODRICH )
   CORPORATION; FEDERAL-MOGUL ASBESTOS    )
8  PERSONAL INJURY TRUST, as successor to FELT )
   PRODUCTS MANUFACTURING CO.; FORD MOTOR )
9  COMPANY; GENERAL MOTORS CORPORATION;   )
   INTERNATIONAL TRUCK AND ENGINE         )
10 CORPORATION; NAVISTAR, INC.; THE       )
   GOODYEAR TIRE & RUBBER COMPANY;        )
11 AIRCRAFT BRAKING SYSTEMS CORPORATION;  )
   MEGGITT AIRCRAFT BRAKING SYSTEMS;      )
12 PARKER-HANNIFIN CORPORATION, as Successor to )
   BIS and CALI-BLOK; CURTISS-WRIGHT      )
13 CORPORATION; MCDONNELL DOUGLAS         )
   CORPORATION, Individually and Successor-in-Interest )
14 to DOUGLAS AIRCRAFT COMPANY, INC.; EATON )
   CORPORATION; UNITED TECHNOLOGIES       )
15 CORPORATION, formerly known as PRATT & )
   WHITNEY, INC.; PRATT & WHITNEY POWER   )
16 SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES,)
   INC.; and ELEVENTH DOE through THREE    )
17 HUNDREDTH DOE, inclusive,              )
                                          )
18                                        )
                                          )
19              Defendants.               )
                                          )
20

21

22

23

24

25              FIRST CAUSE OF ACTION-NEGLIGENCE

26                   (Wrongful Death)

27    PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A

28 CAUSE OF ACTION FOR NEGLIGENCE (WRONGFUL DEATH) ALLEGE:

1        1.      The true names and capacities, whether individual, corporate, associate,

2   governmental or otherwise, of defendants ELEVENTH DOE through THREE HUNDREDTH

3   DOE, inclusive, are unknown to plaintiffs at this time, who therefore sue said defendants by such

4   fictitious names.  When the true names and capacities of said defendants have been ascertained,

5   plaintiffs will amend this Complaint accordingly.  Plaintiffs are informed and believe and thereon

6   allege that each defendant designated herein as a DOE is responsible, negligently or in some other

7   actionable manner, for the events and happenings hereinafter referred to, and caused injury and

8   death to decedent and injuries and damages proximately thereby to the plaintiffs, as hereinafter

9   alleged.

10       2.      At all times herein mentioned, each of the defendants was the agent, servant,

11  employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

12  defendant was acting in the full course and scope of said agency, service, employment and/or joint

13  venture.  Except as may be specifically noted herein, all allegations of this Complaint are made on

14  information and belief.

15       3.      Plaintiffs are informed and believe, and thereon allege, that at all times herein

16  mentioned, defendants AC AND S, INC.; ASBESTOS CORPORATION, LTD.; A.W.

17  CHESTERTON COMPANY; CROWN, CORK & SEAL COMPANY, INC., Individually and as

18  Successor-in-Interest to MUNDET CORK CORP.; GARLOCK SEALING TECHNOLOGIES LLC,

19  Individually and as Successor-in-Interest to GARLOCK, INC.; GENERAL ELECTRIC

20  COMPANY; J T THORPE & SON, INC.; METROPOLITAN LIFE INSURANCE COMPANY;

21  PARKER-HANNIFIN CORPORATION, as Successor-in-Interest to SACOMO SIERRA;

22  OWENS-ILLINOIS CORPORATION; QUINTEC INDUSTRIES, INC.; SOCO-LYNCH

23  CORPORATION, successor-in-interest to WESTERN CHEMICAL & MANUFACTURING

24  COMPANY; SWINERTON BUILDERS f/k/a SWINERTON & WALBERG CO.; THOMAS DEE

25  ENGINEERING COMPANY; TRANE U.S. INC., fka AMERICAN STANDARD, INC.; UNION

26  CARBIDE CORPORATION; VIACOM, INCORPORATED, as successor-by-merger to CBS

27  CORPORATION, fka WESTINGHOUSE ELECTRIC CORPORATION; ALLIS-CHALMERS

28  CORPORATION PRODUCT LIABILITY TRUST; BAYER CROPSCIENCE, INC., successor to

1  AMCHEM PRODUCTS, INC.; ENPRO INDUSTRIES, INC., Individually and as Successor-in-

2  Interest to ANCHOR PACKING COMPANY; HOPEMAN BROTHERS, INC.; SB DECKING,

3  INC., formerly known as SELBY, BATTERSBY & COMPANY; GEORGIA-PACIFIC

4  CORPORATION; HAMILTON MATERIALS, INC.; HANSON PERMANENTE CEMENT, INC.

5  fka KAISER CEMENT CORPORATION; KAISER GYPSUM CO., INC.; KELLY-MOORE

6  PAINT COMPANY, INC.; EATON AEROQUIP, LLC; PNEUMO-ABEX CORPORATION,

7  Successor-in-Interest to ABEX CORPORATION; HONEYWELL INTERNATIONAL, INC. fka

8  ALLIED SIGNAL, INC./THE BENDIX CORPORATION; BORG-WARNER CORPORATION by

9  its Successor in Interest, BORGWARNER MORSE TEC, INC.; BRIDGESTONE/FIRESTONE

10 NORTH AMERICAN TIRE, LLC; DANA COMPANIES, LLC; GOODRICH CORPORATION;

11 FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST, as successor to FELT

12 PRODUCTS MANUFACTURING CO.; FORD MOTOR COMPANY; GENERAL MOTORS

13 CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,

14 INC.; THE GOODYEAR TIRE & RUBBER COMPANY; AIRCRAFT BRAKING SYSTEMS

15 CORPORATION; MEGGITT AIRCRAFT BRAKING SYSTEMS; PARKER-HANNIFIN

16 CORPORATION, as Successor to EIS and CALI-BLOK; CURTISS-WRIGHT CORPORATION;

17 MCDONNELL DOUGLAS CORPORATION, Individually and Successor-in-Interest to

18 DOUGLAS AIRCRAFT COMPANY, INC.; EATON CORPORATION; UNITED

19 TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC.; PRATT &

20 WHITNEY POWER SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES, INC.; and

21 ELEVENTH DOE through THREE HUNDREDTH DOE, inclusive, are corporations organized and

22 existing under and by virtue of the laws of the State of California, or the laws of some state or

23 foreign jurisdiction, and that said defendants were and are authorized to do and are doing business

24 in the State of California, and that said defendants have regularly conducted business in the City and

25 County of San Francisco, State of California. The defendants identified in this paragraph are

26 hereinafter referred to as "MANUFACTURING/DISTRIBUTING DEFENDANTS".

27      4.      At all times herein mentioned, defendants, and each of them, were and are engaged

28 in the business of manufacturing, fabricating, designing, assembling, distributing, leasing, buying,

5120/complaint.wd                          4                    COMPLAINT FOR DAMAGES
                                                               WRONGFUL DEATH - ASBESTOS

1  selling, inspecting, servicing, repairing, marketing, warranting and advertising a certain substance,

2  the generic name of which is asbestos, and other products containing said substance.

3       5.     Plaintiffs are informed and believe, and thereon allege, that defendant CROWN,

4  CORK & SEAL COMPANY, INC. is the successor in interest to, or otherwise liable for the acts or

5  omissions of MUNDET CORK CORP.; that defendant GARLOCK SEALING TECHNOLOGIES

6  LLC  is the successor in interest to, or otherwise liable for the acts or omissions of GARLOCK,

7  INC.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

8  otherwise liable for the acts or omissions of SACOMO SIERRA;  that defendant QUINTEC

9  INDUSTRIES, INC. is the successor in interest to, or otherwise liable for the acts or omissions of

10  WESTERN FIBERGLAS SUPPLY COMPANY, WESTERN FIBROUS GLASS PRODUCTS

11  COMPANY and/or WESGLAS; that defendant SOCO-LYNCH CORPORATION  is the successor

12  in interest to, or otherwise liable for the acts or omissions of WESTERN CHEMICAL &

13  MANUFACTURING COMPANY; that defendant BAYER CROPSCIENCE, INC.  is the successor

14  in interest to, or otherwise liable for the acts or omissions of AMCHEM PRODUCTS, INC.; that

15  defendant ENPRO INDUSTRIES, INC.  is the successor in interest to, or otherwise liable for the

16  acts or omissions of ANCHOR PACKING COMPANY; that defendant PNEUMO-ABEX

17  CORPORATION  is the successor in interest to, or otherwise liable for the acts or omissions of

18  ABEX CORPORATION; that defendant BORG-WARNER CORPORATION  is the successor in

19  interest to, or otherwise liable for the acts or omissions of BORGWARNER MORSE TEC, INC.;

20  that defendant FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST  is the successor in

21  interest to, or otherwise liable for the acts or omissions of FELT PRODUCTS MANUFACTURING

22  CO.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

23  otherwise liable for the acts or omissions of EIS and CALI-BLOK; that defendant MCDONNELL

24  DOUGLAS CORPORATION  is the successor in interest to, or otherwise liable for the acts or

25  omissions of DOUGLAS AIRCRAFT COMPANY, INC.; and that each of the defendants in this

26  paragraph and listed as a successor elsewhere in this complaint, including the caption, is liable for

27  the acts and omissions of its predecessor entities, partners, divisions, related entities, subsidiaries,

28  and co-ventures.

---

5

6.  At all times herein mentioned, defendants, and each of them, singularly and jointly, negligently and carelessly researched, tested or failed to test, warned or failed to warn, manufactured, designed, developed, distributed, labeled, advertised, marketed, warranted, inspected, repaired, fabricated, modified, serviced, and sold a certain substance, the generic name of which is asbestos, and other products containing said substance, in that said substance was capable of causing and did, in fact, proximately cause personal injuries to users, consumers, workers and others, while being used in a manner reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by the consumers, users, bystanders, or workers exposed thereto.

7.  Plaintiffs' decedent was a worker who for a substantial length of time used, handled or was otherwise exposed to asbestos and asbestos products referred to herein, in a manner that was reasonably foreseeable.

8.  As a direct and proximate result of the conduct of the defendants, and each of them, as aforesaid, the exposure to asbestos caused plaintiffs' decedent to contract mesothelioma from which he died on May 27, 2008.

9.  Plaintiff did not learn of the causal relationship between decedent's exposure to asbestos and his death until less than one year before the date on which this Complaint was filed.

10.  Plaintiffs were the heirs of PATRICK THEISEN DONLON, deceased, (herein referred to as "decedent"), as follows:

      PATTI DONLON  -    SPOUSE

      SEAN DONLON  -    SON

11.  As a result of the conduct of defendants, and each of them, decedent's heirs have sustained pecuniary loss resulting from the loss of love, comfort, society, attention, services and support of decedent in a sum in invoking the unlimited jurisdictional limits of the Court.

12.  As a further result of the conduct of defendants, and each of them, and the death of decedent, plaintiffs herein have incurred funeral and burial expenses in an amount to be subsequently ascertained.

13.  For purposes of the claims alleged herein, the Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship

1    due to the presence of a California defendant. Removal is improper. Every claim arising under the

2    Constitution, treaties, or law of the United States is expressly disclaimed, including any claim

3    arising from an act or omission on a federal enclave, or of any Officer of the U.S. or any agency or

4    person acting under him occurring under color of such of office. No claim of admiralty or maritime

5    law is raised. Plaintiffs sue no foreign state or agency. By this allegation, plaintiffs are not

6    disclaiming State law claims arising exposures on Federal enclaves. Plaintiffs are only disclaiming

7    claims which would be directed at the Federal government and/or Federal officers. Venue is proper

8    in the City and County of San Francisco. Plaintiff shall seek sanctions, attorneys' fees and other

9    appropriate relief in the event any defendant moves to transfer and/or remove this action to another

10   court without a reasonable period of meet and confer discussion relating to same prior to notice of

11   removal and or transfer of this action.

12        WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

13        <u>SECOND CAUSE OF ACTION – STRICT LIABILITY</u>

14        AS FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION

15   FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF

16   THEM, AND ALLEGE AS FOLLOWS:

17        14.    Plaintiffs incorporate herein by reference as though fully set forth herein all

18   paragraphs of the First Cause of Action herein.

19        15.    Defendants and each of them researched, manufactured, tested or failed to test,

20   warned or failed to warn, designed, labeled, distributed, advertised, marketed, warranted, inspected,

21   repaired, offered for sale and sold a certain substance, the generic name of which is asbestos and

22   other products contained said substance, which substance and product is defective, in that same was

23   capable of causing and did, in fact, cause personal injuries, including, but not limited to

24   mesothelioma, to the users and consumers thereof while being used in a reasonably foreseeable

25   manner, thereby rendering the same unsafe and dangerous for use by consumers, users, bystanders

26   and workers exposed thereto; said defendants, and each of them, further failed to adequately warn of

27   the risks to which decedent and others similarly situated were exposed.

28        16.    As a direct and proximate result thereof, decedent suffered the injuries from which

1   the subsequently died, and plaintiffs have suffered the injuries and damages previously alleged.

2   WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

3   THIRD CAUSE OF ACTION - PRODUCTS LIABILITY (NEGLIGENCE AND STRICT

4   LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES,

5   MECHANISMS AND LININGS

6   AS AND FOR A THIRD, SEPARATE, AND FURTHER DISTINCT CAUSE OF ACTION

7   FOR PRODUCTS LIABILITY (NEGLIGENCE AND STRICT LIABILITY) FOR CLUTCH

8   COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS

9   COMPLAIN OF DEFENDANTS FORD MOTOR COMPANY; GENERAL MOTORS

10  CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,

11  INC.; and TWO HUNDRED FIRST DOE through THREE HUNDREDTH DOE, inclusive, and

12  ALLEGE AS FOLLOWS:

13      17.    Plaintiff, by this reference, incorporates the allegations contained in the First and

14  Second Causes of Action as though fully set forth herein.

15      18.    FORD MOTOR COMPANY; GENERAL MOTORS CORPORATION;

16  INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR, INC.; and TWO

17  HUNDRED FIRST DOE through THREE HUNDREDTH DOE, inclusive, manufactured or

18  supplied defective clutch components and brake assemblies or mechanisms which were

19  incorporated into various makes and models of automobiles, trucks and vehicles manufactured, sold

20  or supplied by said defendants. Said clutch components and brake assemblies or mechanisms were

21  negligently manufactured sold or supplied in that:

22      a)    The design of said clutch components and brake assemblies or mechanisms

23  incorporated the use of asbestos-containing clutch facings/plates and brake linings;

24      b)    Asbestos clutch components brake linings wear and/or deteriorate during regular

25  and ordinary use thus creating friable asbestos dust, which accumulates in the clutch brake

26  assemblies and/or mechanisms;

27      c)    The design of said clutch components brake assemblies require as a part of their

28  normal operation, use and maintenance that the asbestos clutch components and brake linings be

1  removed and replaced;

2      d)  Said defendants required the use of asbestos-containing clutch components and

3  brake linings throughout the time period 1940-1985;

4      e)  During the removal and replacement of asbestos-containing clutch components and

5  brake linings, asbestos-containing dust was inherently generated because of the design of the clutch

6  components and brake assemblies and/or mechanisms;

7      f)  Defendants knew or should have known that the asbestos-containing dust would be

8  generated during the regular use and maintenance of the clutch components and brake assemblies,

9  mechanisms and linings, and that such dust created an increased risk of asbestos disease for all

10  users, consumers, or others who breathed said asbestos-containing dust;

11      g)  The defendants, and each of them, failed to warn and/or properly instruct users,

12  consumers, or others of the asbestos-containing dust hazard which existed at the time of regular

13  maintenance or replacement of asbestos clutch components and brake linings.  Such failure

14  includes, but is not limited to:

15      a.  Failure to place prominent and adequate warnings or instructions in and on

16  the clutch components and brake pads and wheel drums;

17      b.  Failure to place adequate warnings or instructions in the owners' manuals

18  accompanying said automobiles, trucks and vehicles; and

19      c.  Failure to place adequate warnings or instructions on various repair manuals

20  and instructions published by defendants; and

21      d.  Failure to provide adequate information regarding the asbestos hazards

22  associated with the regular use and maintenance of the clutch components and brake mechanisms,

23  assemblies and/or linings.

24      19.  The clutch components and brake assemblies, mechanisms and/or linings

25  manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer

26  would expect, even though they performed as designed.

27      20.  Defendants' use and design of asbestos-containing clutch components and brake

28  linings, both as original equipment and as replacement parts, created unreasonable inherent risks

1   which outweighed the benefits of said use and/or design.

2       21.   The dangers inherent in asbestos-containing clutch components and brake linings were

3   unknown and unforeseeable to the decedent.

4       22.   Decedent's exposure to asbestos-containing dust, which caused his injury, was from

5   his use and maintenance of defendants' clutch components and brake mechanisms, assemblies

6   and/or linings. Said work produced the release of asbestos dust, which decedent inhaled, thus

7   increasing his risk for all asbestos-related disease.

8       23.   Defendants' negligence and defective products as described in this cause of action

9   were a direct cause of decedent's injuries, and the injuries and damages thereby sustained by

10  plaintiffs.

11              <u>FOURTH CAUSE OF ACTION - ENTERPRISE LIABILITY</u>

12       AS AND FOR A FOURTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF

13  ACTION FOR ENTERPRISE LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND

14  EACH OF THEM, AND ALLEGE AS FOLLOWS:

15       24.   Plaintiff incorporates by reference as though fully set forth herein, each of the

16  paragraphs of the First, Second and Third Causes of Action herein.

17       25.   In the event plaintiffs are unable to identify the specific defendant(s) which supplied

18  the asbestos or asbestos-containing products which caused the damage referred to above, plaintiffs

19  allege that as between an innocent plaintiff and culpable defendant(s), the latter should bear the cost

20  of injury.

21       26.   Plaintiffs' decedent was exposed to asbestos and asbestos emanating from asbestos-

22  containing products which are and were fungible in appearance as well as in composition and which

23  were used in substantially the same manner by plaintiff's decedent and/or those working in the

24  vicinity of plaintiffs' decedent. Moreover, through no fault of the plaintiffs, this asbestos and/or

25  these asbestos-containing products cannot be traced to a specific producer.

26       27.   In this action, plaintiffs have joined a substantial share of the producers of such

27  asbestos and/or asbestos-containing products which caused the injuries complained of herein, and

28  will prove at the time of trial that the defendants named herein constituted a substantial share of

1  such producers.  Accordingly, liability attaches to each named defendant to the extent of their

2  percentage of market share, in a manner consistent with the rules set forth in the decision of <u>Sindell</u>

3  <u>v. Abbott Laboratories, et al.</u>

4      28.    As a direct and legal result thereof, plaintiffs have suffered the injuries and damages

5  previously alleged.

6      WHEREFORE, Plaintiffs pray judgment against the defendants, and each of them, as

7  hereinafter set forth.

8          FIFTH CAUSE OF ACTION - FALSE REPRESENTATION

9          <u>UNDER RESTATEMENT OF TORTS Sec. 402-B</u>

10     AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF ACTION

11  FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B,

12  PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND ALLEGE AS

13  FOLLOWS:

14     29.    Plaintiffs incorporate by reference all Causes of Action of this Complaint.

15     30.    At the aforementioned time when defendants, and each of them, researched,

16  manufactured, tested or failed to test, warned or failed to warn, designed, labeled, distributed,

17  advertised, marketed, warranted, inspected, repaired, offered for sale and sold the said asbestos and

18  asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly

19  and impliedly represented to members of the general public, including the purchasers and users of

20  said product, and including the decedent herein and his employers, that asbestos and asbestos-

21  containing products were of merchantable quality, and safe for the use for which they were

22  intended.

23     31.    The purchasers and users of said asbestos and asbestos-containing products,

24  including the decedent and his employer, relied upon said representations of defendants and each of

25  them, in the selection, purchase and use of asbestos and asbestos-containing products.

26     32.    Said representations by defendants, and each of them, were false and untrue, in that

27  the asbestos and asbestos-containing products were not safe for their intended use, nor were they of

28  merchantable quality as represented by defendants, and each of them, in that asbestos and asbestos

containing products have very dangerous properties and defects whereby said products cause mesothelioma, and have other defects that cause injury and damage to the users of said products, including decedent herein, thereby taking the life of plaintiffs' decedent.

33.   As a direct and proximate result of said false representations by defendants and each of them, the plaintiffs sustained the injuries and damages hereinabove set forth.

WHEREFORE, plaintiffs pray judgment against defendants, and each of them, as hereinafter set forth.

### SIXTH CAUSE OF ACTION - SURVIVAL ACTION

AS AND FOR A SIXTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION (SURVIVAL ACTION), PLAINTIFF PATTI DONLON AS SUCCESSOR-IN-INTEREST TO THE ESTATE OF PATRICK THEISEN DONLON COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A CAUSE OF ACTION ALLEGE:

34.   Plaintiff incorporates by reference herein each and every paragraph of all Causes of Action of this Complaint, and make them a part of this, the Sixth Cause of Action, as though fully set forth herein.

35.   Prior to his death, decedent PATRICK THEISEN DONLON had a cause of action against defendants herein for personal injuries arising from his exposure to asbestos.  On May 27, 2008, with the foregoing cause of action still pending, PATRICK THEISEN DONLON, who would have been the plaintiff in this action if he had lived, died.

36.   As a proximate result of the conduct of defendants, and each of them, decedent was required to, and did, employ physicians and surgeons to examine, treat and care for him and did incur medical and incidental expenses in a sum to be subsequently determined.

37.   As a further, direct and proximate result of the conduct of defendants, and each of them, decedent was prevented from attending to his usual occupation for a period of time and thereby incurred damages for loss of earnings in a sum to be subsequently determined.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as hereinafter set forth.

### SEVENTH CAUSE OF ACTION - PUNITIVE DAMAGES

AS FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION
FOR PUNITIVE DAMAGES, PLAINTIFFS COMPLAIN OF ALL DEFENDANTS, INCLUSIVE,
AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

38.     Plaintiffs incorporate by reference each and every paragraph of all Causes of Action
of this Complaint, and make them a part of this Seventh Cause of Action as though fully set forth
herein.

39.     In researching, testing, manufacturing, distributing, labeling, and marketing asbestos
and asbestos products, defendants in this cause of action named, and each of them, did so with
conscious disregard for the safety of the users of said asbestos and asbestos products, in that
defendants has specific prior knowledge that there was a high risk of injury or death resulting from
exposure to asbestos or asbestos products, including but not limited to, mesothelioma.  Said
knowledge was obtained, in part, from scientific studies, government data, and medical data to
which defendants had access, as well as scientific studies performed by, at the request of, or with
the assistance of, said defendants, and which knowledge was obtained by said defendants on or
before 1933, and thereafter.

40.     On or before 1933, and thereafter, said defendants were aware that users of asbestos
and asbestos products, as well as members of the general public who would be exposed to asbestos
and asbestos products, had no knowledge or information indicating that asbestos could cause injury,
and said defendants knew that the users of asbestos and asbestos products, as well as members of
the general public who were exposed to asbestos and asbestos products would assume, and in fact
did assume, that exposure to asbestos and asbestos products was safe, when in fact said exposure
was extremely hazardous to human life.

41.     With said knowledge, said defendants opted to manufacture and distribute said
asbestos and asbestos products without attempting to protect users from or warn users of, the high
risk of injury or death resulting from exposure to asbestos and asbestos products.  Rather than
attempting to protect users and workers from, or warn workers and users of, the high risk of injury
or death resulting from exposure to asbestos and asbestos products, defendants intentionally failed
to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said

1  knowledge from members of the general public that asbestos and asbestos products were unsafe for

2  all reasonably foreseeable use, with the knowledge of the falsity of said implied representations.

3      42.    The above-referenced conduct of said defendants was motivated by the financial

4  interest of said defendants in the continuing, uninterrupted distribution and marketing of asbestos

5  and asbestos products. In pursuance of said financial motivation, said defendants consciously

6  disregarded the safety of the users of, and persons exposed to, asbestos and asbestos products, and

7  were in fact, consciously willing to permit asbestos and asbestos products to cause injury to workers

8  and users thereof, and personnel exposed thereto, including plaintiff's decedent.

9      43.    As the above-referenced conduct of said defendants was and is willful, malicious,

10  outrageous, and in conscious disregard and indifferent to the safety and health of workers exposed

11  to asbestos and asbestos products, including decedent, plaintiffs, for the sake of example, and by

12  way of punishing said defendants, seeks punitive damages according to proof.

13      WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as

14  hereinafter set forth.

15      EIGHTH CAUSE OF ACTION - LOSS OF CONSORTIUM

16      AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF

17  ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF PATTI DONLON COMPLAINS OF

18  DEFENDANTS, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

19      44.    Plaintiff PATTI DONLON incorporates herein by reference and makes a part hereof

20  as though fully set forth herein, all of the paragraphs of all the Causes of Action of this complaint.

21      45.    Plaintiff PATTI DONLON was at all relevant times the lawfully wedded spouse of

22  decedent PATRICK THEISEN DONLON.

23      46.    As a direct and proximate result of the conduct of defendants, and each of them, and

24  of the severe injuries caused thereby to decedent prior to his death, as hereinabove alleged, plaintiff

25  PATTI DONLON suffered loss of consortium, including, but not by way of limitation, loss of

26  services, marital relations, society, comfort, companionship, love and affection of her said spouse,

27  and has suffered severe mental and emotional distress and general nervousness as a result thereof,

28      47.    Plaintiff PATTI DONLON, as a result of the foregoing described injuries to her said

1    spouse, has been generally damaged in a sum invoking the unlimited jurisdictional limits of the

2    Court.

3          WHEREFORE, Plaintiffs pray judgment against defendants and each of them as follows:

4          1.     For general damages according to proof;

5          2.     For burial expenses according to proof;

6          3.     For medical expenses according to proof;

7          4.     For loss of income according to proof;

8          5.     For punitive damages according to proof;

9          6.     For plaintiffs' costs of suit herein; and,

10         7.     For such other and further relief as this Court deems just and proper.

11

12   DATED: May 22, 2009                          HAROWITZ & TIGERMAN, LLP

13

14                                          BY _____

15                                              ROGER E. GOLD
                                                Attorney for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

---

2120/complaint.wd                         15              COMPLAINT FOR DAMAGES
                                                        WRONGFUL DEATH - ASBESTOS

1 STEVEN M. HAROWITZ (Bar No. 71117)
  STEPHEN M. TIGERMAN (Bar No. 112127)
2 ROGER E. GOLD (Bar No. 214802)
  HAROWITZ & TIGERMAN, LLP
3 450 Sansome Street, 3rd Floor
  San Francisco, California 94111
4 Telephone    (415) 788-1588

5 Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ENDORSED**
**F I L E D**
San Francisco County Superior Court

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY:_____PARAM NATH_____
                              Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

PATTI DONLON, Individually and as Successor-in-
Interest to the Estate of PATRICK THEISEN DONLON,
Decedent; SEAN DONLON; and DOES ONE through
TEN, inclusive,

                    Plaintiffs,

         vs.

AC AND S, INC., et al.,

                    Defendants.

No. C GC - 09 - 275218

PRELIMINARY FACT SHEET
NEW FILING/
ASBESTOS LITIGATION
(See General Order No. 129;
In Re Complex Asbestos
Litigation)

**N O T I C E**

TO NEW DEFENDANTS SERVED IN COMPLEX ASBESTOS LITIGATION IN THE
SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA,
CITY AND COUNTY OF SAN FRANCISCO:

         You have been served with process in an action which has been designated by the Court
as complex litigation pursuant to Standard 19 of the Standards of Judicial Administration. This
litigation bears the caption "In Re: Complex Litigation," [San Francisco Superior Court No.
828684].

         This litigation is governed by various general orders, some of which affect the judicial
management and/or discovery obligations, including the responsibility to answer
interrogatories deemed propounded in the case. You may contact the Court or Designated
Defense Counsel, Berry & Berry, Post Office Box 16070 (2930 Lake Shore Ave.), Oakland,
California 94610; Telephone: (510) 250-0200; FAX: (510) 835-5117, for further information
and/or copies of these orders, at your expense.

2120/fact.sheet.wd.wpd                              1                    PRELIMINARY FACT SHEET
                                                                        ASBESTOS LITIGATION

1.    1.    State the complete name and address of each person whose claimed exposure to

2.    asbestos is the basis of this lawsuit ("exposed person"):   **PATRICK THEISEN DONLON**

3.    2.    Does plaintiff anticipate filing a motion for preferential trial date within the next four

4.    months? _____ Yes          X  No

5.    3.    Date of birth of each exposed person in item one and, if applicable, date of death:

6.    Date of Birth: September 26, 1937         Date of Death: May 27, 2008

7.    Social Security Number of each exposed person:  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

8.    4.    Specify the nature or type of asbestos-related disease alleged by each exposed person:

9.    ____ Asbestosis         X  Mesothelioma

10.    ___ Pleural Thickening/Plaques     ____ Other Cancer: Specify: _____

11.    ____ Lung Cancer Other Than Mesothelioma    Other: Specify:_____

12.    5.    For purposes of identifying the nature of exposure allegations involved in this action,

13.    please check one or more:

14.    ___Shipyard      X  Construction   X  Friction-Automotive

15.    ___Premises     ___ Aerospace     X  Military

16.    ___Other: Specify all that apply: _____ _____

17.    If applicable, indicate which exposure allegations apply to which exposed person.

18.    6.    Identify each location alleged to be a source of an asbestos exposure, and to the extent

19.    known, provide the beginning and ending year(s) of each such exposure. Also specify each

20.    exposed person's employer and job title or job description during each period of exposure. (For

21.    example: "San Francisco Naval Shipyard - Pipefitter - 1939-1948"). Examples of locations of

22.    exposure might be a specific shipyard, a specific railroad maintenance yard, or perhaps more

23.    generalized descriptions such as "merchant Marine" or "construction." If an exposed person

24.    claims exposure during only a portion of a year, the answer should indicate that year as the

25.    beginning and ending year (e.g., 1947-1947).

26.    ///

27.    ///

28.    ///

| Location of Exposure | Employer | Job Title at Time of Exposure | Year(s) of Exposure Beginning - Ending |
|---|---|---|---|
| Elkader, Strawberry Point, Clayton, IA | New Jersey Zinc | Worker | 1953-1955 |
| Pensacola, FL; Brooklyn NSY; Brooklyn, NY(; New York | U.S. Navy | Aviation Mechanic | 1955-1958 |

**BYSTANDER EXPOSURE:**

| | | | |
|---|---|---|---|
| Home Construction: Elkader, IA; Davis, CA | Not Applicable | Not Applicable | 1950's; 1970's |

**SECONDHAND EXPOSURE through decedent's father, Jack Donlon's employment:**

| | | | |
|---|---|---|---|
| Elkader, IA | Jack Donlon Chevrolet | Car dealership/ service manager | 1937-1955 |

7.     For each exposed person who:

a.     worked in the United States or for a U. S. agency outside the territorial United States, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Earnings authorization (Exhibit N-4 to General Order No. 129);

b.     may have had a Social Security disability award or is no longer employed and whose last employment was not with a United States government agency, attach to the copy of this fact sheet provided to Designated Defense counsel a fully executed Social Security Disability authorization (Exhibit N-5 to General Order No. 129);

c.     served at any time in the United States military, attach to the copy of this fact sheet provided to the Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129);

d.     was employed by the United States government in a civilian capacity, attach to the copy of this fact sheet provided to Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129).

8.     If there is a wrongful death claim, attach to the copy of this fact sheet provided to

1   Designated Defense Counsel a copy of the death certificate, if available. If an autopsy report
2   was done, also attach a copy of it to the copy of this fact sheet provided to Designated Defense
3   Counsel.

4   9.     State the date of the filing of the initial complaint in this matter: <u>May 22, 2009</u>

5   DATED: May 22, 2009                   HAROWITZ & TIGERMAN, LLP
6

7                                   BY
8                                          ROGER B. GOLD
9                                        Attorney for Plaintiffs

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "B"

CIV-110

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):
STEVEN M. HAROWITZ (SBN 71117)
HAROWITZ & TIGERMAN, LLP
450 Sansome Street, 3rd Floor
San Francisco, CA 94111

TELEPHONE NO: (415) 788-1588   FAX NO. (Optional): (415) 788-1598
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiffs

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Jurisdiction

PLAINTIFF/PETITIONER: Patti Donlon, et al.

DEFENDANT/RESPONDENT: AC and S, Inc., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| [X] Personal Injury, Property Damage, or Wrongful Death | CGC 09-275218 |

[X] Personal Injury, Property Damage, or Wrongful Death
  [ ] Motor Vehicle [ ] Other
[ ] Family Law [ ] Eminent Domain
[X] Other (specify): Asbestos

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) [ ] With prejudice   (2) [X] Without prejudice
   b. (1) [X] Complaint   (2) [ ] Petition
      (3) [ ] Cross-complaint filed by (name):                    on (date):
      (4) [ ] Cross-complaint filed by (name):                    on (date):
      (5) [ ] Entire action of all parties and all causes of action
      (6) [X] Other (specify):* See Attachment A

2. (Complete in all cases except family law cases.)
   [ ] Court fees and costs were waived for a party in this case. (This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed.)

Date: June 24, 2011

STEVEN M. HAROWITZ (SBN 71117)
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

                                              (SIGNATURE)
Attorney or party without attorney for: Patti Donlon, et al.
[X] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross - complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date:

                                              (SIGNATURE)
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
Attorney or party without attorney for:
** If a cross-complaint – or Response (Family Law) – seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).
[ ] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross - Complainant

(To be completed by clerk.)
4. [ ] Dismissal entered as requested on (date):
5. [ ] Dismissal entered on (date):                 as to only (name):
6. [ ] Dismissal not entered as requested for the following reasons (specify):

7. a. [ ] Attorney or party without attorney notified on (date):
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
      [ ] a copy to be conformed [ ] means to return conformed copy
   Date:                          Clerk, by _____, Deputy

                                              Page 1 of 2
Form Adopted for Mandatory Use          REQUEST FOR DISMISSAL          Code of Civil Procedure, § 581 et seq.;
Judicial Council of California                                          Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
CIV-110 [Rev. July 1, 2009]

CIV-110

| PLAINTIFF/PETITIONER: Patti Donlon, et al. | CASE NUMBER: |
| DEFENDANT/RESPONDENT: AC and S, Inc., et al. | CGC 09-27518 |

## Declaration Concerning Waived Court Fees

The court has a statutory lien for waived fees and costs on any recovery of $10,000 or more in value by settlement, compromise, arbitration award, mediation settlement, or other recovery. The court's lien must be paid before the court will dismiss the case.

1. The court waived fees and costs in this action for *(name)*:

2. The person in item 1 *(check one)*:
   a. ☐ is not recovering anything of value by this action.
   b. ☐ is recovering less than $10,000 in value by this action.
   c. ☐ is recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and costs that were waived in this action have been paid to the court *(check one)*: ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

► _____

_____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)

_____
(SIGNATURE)

**ATTACHEMENT A to Plaintiff's Request for Dismissal Without Prejudice**

Plaintiffs dismiss all claims except their failure to warn claims as to defendants, THE BOEING COMPANY; CONTINENTAL MOTORS, INC.; GENERAL ELECTRIC COMPANY; CURTISS-WRIGHT CORPORATION; UNITED TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC., PRATT & WHITNEY POWER SYSTEMS, INC., HAWKER BEECHCRAFT COPORATION, ONLY.

## PROOF OF SERVICE

1

2      I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3      date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

5      **REQUEST FOR DISMISSAL**

on the following parties:

6

7      **SEDGWICK, LLP**
**One Market Plaza Steuart Tower, 8th Floor**
**San Francisco, CA 94105**
8      **(415) 781-7900**
**Counsel for: GENERAL ELECTRIC COMPANY**

9

10     via the following method of service:

11     X      Electronically on the recipients designated on the Transaction Receipt located on the

12            Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General

13            Order No. 158, Asbestos-Related Case.

14

15            I declare under penalty of perjury that the foregoing is true and correct and that this

16     declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19            Robert G. Jones

20

21

22

23

24

25

26

27

28

                              1                              Proof of Service

## PROOF OF SERVICE

1

2    I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3    date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

**REQUEST FOR DISMISSAL**

5

on the following parties:

6

**CSC LAWYERS**
7    **2730 Gateway Oaks Drive, Suite 100**
**Sacramento, CA 95833**

8

Agent for: **THE BOEING COMPANY**
9

via the following method of service:
10

X    By **Regular Mail** in a sealed envelope, addressed as noted in the attached service list,
11

with postage fully prepaid and placing it for collection and mailing following the
12

ordinary business practices of Harowitz & Tigerman, LLP.
13

14

I declare under penalty of perjury that the foregoing is true and correct and that this
15

declaration was executed on June 24, 2011 at San Francisco, California.
16

17

18

19    Robert C. Jones
20

21

22

23

24

25

26

27

28

I                                                            Proof of Service

1

## PROOF OF SERVICE

2
    I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3
date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

5
REQUEST FOR DISMISSAL

6
on the following parties:

7
CONTINENTAL MOTORS, INC.
2039 Broad Street
8
Mobile, Alabama 36615

9

10
via the following method of service:

11
X    By Regular Mail in a sealed envelope, addressed as noted in the attached service list,

12
with postage fully prepaid and placing it for collection and mailing following the

13
ordinary business practices of Harowitz & Tigerman, LLP.

14

15
    I declare under penalty of perjury that the foregoing is true and correct and that this

16
declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19
Robert G. Jones

20

21

22

23

24

25

26

27

28

1                                  Proof of Service

1

## PROOF OF SERVICE

2      I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3   date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

### REQUEST FOR DISMISSAL

5

6   on the following parties:

7       SEDGWICK, LLP
One Market Plaza Steuart Tower, 8th Floor
San Francisco, CA 94105
8       (415) 781-7900
Counsel for: GENERAL ELECTRIC COMPANY

9

10  via the following method of service:

11  X    Electronically on the recipients designated on the Transaction Receipt located on the

12       Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General

13       Order No. 158, Asbestos-Related Case.

14

15       I declare under penalty of perjury that the foregoing is true and correct and that this

16  declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19                                              Robert C. Jones

20

21

22

23

24

25

26

27

28

1                                                              Proof of Service

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA  94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

REQUEST FOR DISMISSAL

on the following parties:

JAMES V. MAHER, GENERAL COUNSEL
10 Waterview Boulevard, 2nd Floor
Parsippany, NJ 07054

AGENT FOR: CURTISS-WRIGHT CORPORATION

via the following method of service:

X    By Regular Mail in a sealed envelope, addressed as noted in the attached service list
     with postage fully prepaid and placing it for collection and mailing following the
     ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this
declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

Proof of Service

**PROOF OF SERVICE**

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**CT CORPORATION**
**818 West 7th Street**
**Los Angeles, CA 90017**

Agent for: **UNITED TECHNOLOGIES CORPORATION**
**PRATT & WHITNEY POWER SYSTEMS, INC.**

via the following method of service:

X    By Regular Mail in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1                                                                      Proof of Service

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**GREGORY H. HALLIDAY**
**801 South Figueroa Street, 19th Floor**
**Los Angeles, CA 90017**

Agent for: **HAWKER BEECHCRAFT CORPORATION**

via the following method of service:

X       By **Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1                                                                    Proof of Service

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "C"

1   **TUCKER ELLIS & WEST LLP**
    LANCE D. WILSON – SBN 183852
2   135 Main Street, Suite 700
    San Francisco, California 94105
3   Telephone: 415.617.2400
    Facsimile: 415.617.2409
4
    **TUCKER ELLIS & WEST LLP**
5   JOHN K. SON – SBN 238516
    515 South Flower Street
6   Forty-Second Floor
    Los Angeles, CA 90071-2223
7   Telephone: 213.430.3400
    Facsimile: 213.430.3409
8
    Attorneys for Defendant
9   UNITED TECHNOLOGIES CORPORATION

10

11                  **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13  PATTI DONLON, Individually and as        ) Case No.:  **CV 11 3376**
    Successor-in-Interest to the Estate of   )
14  PATRICK THEISEN DONLON,                   ) **DEFENDANT UNITED**
    Decedent; SEAN DONLON; and DOES          ) **TECHNOLOGIES CORPORATION'S**
15  ONE through TEN, inclusive,               ) **NOTICE OF REMOVAL OF ACTION**
                                              ) **UNDER 28 U.S.C. § 1442(a)(1)**
16                 Plaintiff,                 )
                                              )
17        v.                                  )
                                              )
18  AC AND S, INC.; ASBESTOS                  )
    CORPORATION, LTD.; A.W.                   )
19  CHESTERTON COMPANY; CROWN,               )
    CORK & SEAL COMPLANY, INC.,              )
20  Individually and as Successor-in-Interest )
    to MUNDET CORK CORP.; GARLOCK            )
21  SEALING TECHNOLOGIES LLC,                )
    Individually and as Successor-in-Intcrest )
22  to GARLOCK, INC.; GENERAL                )
    ELECTRIC COMPANY; J.T. THORPE &          )
23  SON, INC.; METROPOLITAN LIFE             )
    INSURANCE COMPANY; PARK-                  )
24  ERHANNIFIN CORPORATION, as               )
    Successor-in-Interest to SACOMO          )
25  SIERRA; OWENS-ILLINOIS                   )
    CORPORATION; QUINTEC                     )
26  INDUSTRIES, INC.; SOCO-LYNCH            )
    CORPORATION, success-in-interest to      )
27  WESTERN CHEMICAL &                       )
    MANUFACTURING COMPANY;                   )
28  SWINERTON BUILDERS f/k/a                 )
    SWINERTON & WALBERG CO.;                 )

*(left margin vertical text)* TUCKER ELLIS & WEST LLP   Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

THOMAS DEE ENGINEERING
COMPANY; TRANE U.S. INC., fka
AMERICAN STANDARD, INC.; UNION
CARBIDE CORPORATION; VIACOM,
INCORPORATED, as successor-by-
merger to CBS CORPORATION, fka
WESTINGHOUSE ELECTRIC
CORPORATION; ALLIS-CHALMERS
CORPORATE PRODUCT LIABILITY
TRUST; BAYER CROPSCIENCE, INC.,
successor to AMCHEM PRODUCTS,
INC.; ENPRO INDUSTRIES, INC.,
Individually and as Successor-in-Interest
to ANCHOR PACKING COMPANY;
HOPEMAN BROTHERS, INC.; SB
DECKING, INC., formerly known as
SELBY, BATTERSBY & COMPANY,
GEORGIA-PACIFIC CORPORATION;
HAMILTON MATERIALS, INC.;
HANSON PERMANENTE CEMENT,
INC. fka KAISER CEMENT
CORPORATION; KAISER GYPSUM
CO., INC.; KELLY-MOORE PAINT
COMPANY, INC.; EATON AEROQUIP,
LLC; PNEUMO-ABEX CORPORATION,
Successor-in-Interest to ABEX
CORPORATION; HONEYWELL
INTERNATIONAL, INC. fka ALLIED
SIGNAL, INC./THE BENDIX
CORPORATION; BORG-WARNER
CORPORATION by its Successor in
Interest, BORGWARNER MORSE TEC,
INC.; BRIDGESTONE/FIRESTONE
NORTH AMERICAN TIRE, LLC; DANA
COMPANIES, LLC; GOODRICH
CORPORATION; FEDERAL-MOGUL
ASBESTOS PERSONAL INJURY
TRUST, as successor to FELT
PRODUCTS MANUFACTURING CO.;
FORD MOTOR COMPANY; GENERAL
MOTORS CORPORATION;
INTERNATIONAL TRUCK AND
ENGINE CORPORATION; NAVISTAR,
INC.; THE GOODYEAR TIRE &
RUBBER COMPANY; AIRCRAFT
BRAKING SYSTEMS CORPORATION;
MEGGITT AIRCRAFT BRAKING
SYSTEMS; PARKER-HANNIFIN
CORPORATION, as Successor to EIS and
CALI-BLOK; CURTISS-WRIGHT
CORPORATION; MCDONNELL
DOUGLAS CORPORATION,
Individually and Successor-in-Interest to
DOUGLAS AIRCRAFT COMPANY,
INC.; EATON CORPORATION;
UNITED TECHNOLOGIES

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

1  CORPORATION, formerly known as         )
   PRATT & WHITNEY, INC.; PRATT &         )
2  WHITNEY POWER SYSTEMS, INC.;           )
   VOUGHT AIRCRAFT INDUSTRIES,            )
3  INC.; and ELEVENTH DOE through         )
   THREE HUNDREDTH DOE, inclusive,        )
4                                         )
                  Defendants.             )
5  _____       )

6  **TO THE CLERK OF THE COURT AND TO ALL PARTIES AND THEIR**

7  **ATTORNEYS OF RECORD:**

8       PLEASE TAKE NOTICE Defendant UNITED TECHNOLOGIES

9  CORPORATION ("UTC") hereby gives notice of the removal of the above-entitled

10 action from the Superior Court of the State of California for the County of San Francisco,

11 to the United States District Court for the Northern District of California pursuant to 28

12 U.S.C. §§ 1442(a)(1) and 1446. In support of its removal, UTC respectfully states the

13 following.

14                              **Preliminary Matters**

15      1.    On or about May 22, 2009, plaintiffs Patti Donlon, individually and as

16 successor-in-interest to the Estate of Patrick Theisen Donlon, and Sean Donlon, filed

17 their Complaint, bearing Case No. CGC-09-275218, against UTC and multiple other

18 defendants in the Superior Court of the State of California for the County of San

19 Francisco. A true and correct copy of the Summons and Complaint are attached hereto as

20 **Exhibit A.**

21      2.    In the Complaint, Plaintiffs allege that the decedent Patrick Donlon

22 developed an asbestos-related disease as a result of exposure to asbestos fibers released

23 from defendants' products.

24      3.    On June 23, 2011, plaintiffs dismissed all claims against UTC (and select

25 other defendants) except for claims based on "failure to warn." A true and correct copy

26 of the Request for Dismissal is attached hereto as **Exhibit B.**

27

28

DEFENDANT UNITED TECHNOLOGIES CORPORATION'S TO NOTICE OF REMOVAL

1      4.      On July 5, 2011, UTC filed an Answer in the Superior Court of California

2 for the County of San Francisco.  A true and correct copy of UTC's Answer is attached

3 hereto as **Exhibit C.**

4      5.      This case is removable based on federal officer jurisdiction under 28 U.S.C.,

5 § 1442(a)(1).  Plaintiffs' claims against UTC are based on the decedent's alleged

6 exposure to asbestos from aircraft engines supplied to the United States Navy.  Any and

7 all equipment supplied by UTC to the U.S. Navy was designed and manufactured in

8 accordance with reasonably precise specifications approved by the U.S. Navy and was

9 designed and built under the direction and control of the Navy and its officers.

10 Accordingly, this case is removable on the grounds of federal officer removal jurisdiction

11 pursuant to 28 U.S.C. § 1442(a)(1).

12      6.      This Notice is timely.  The 30-day removal period prescribed by 28 U.S.C. §

13 1446(b) begins to run when the defendant receives a copy of the initial pleading setting

14 forth the claim for relief from which it may first be ascertained that the case is removable.

15 28 U.S.C. § 1446(b).  UTC was served with the Summons and Complaint on June 14,

16 2011.  The receipt of the Complaint put UTC on notice for the first time that plaintiffs'

17 claims in this action involve alleged exposure to asbestos from military equipment built

18 for the U.S. Navy pursuant to reasonably precise specifications approved by the Navy

19 and under the direction and control of the Navy and its officers.  This Notice is being

20 filed within 30 days of service of the summons and Complaint on UTC, and therefore this

21 Notice is timely under 28 U.S.C. § 1446(b).

22      7.      The existence of a single removable claim allows removal of the entire

23 action.  28 U.S.C. § 1441(c); *National Audubon Society v. Dept. of Water*, 496 F.Supp.

24 499, 509 (E.D.Cal.1980).  Section 1442(a) authorizes removal in this case without the

25 consent of any other defendant.  See *Ely Valley Mines, Inc. v. Hartford Acc. & Indem.*

26 *Co.*, 644 F.2d 1310, 1314-1315 (9th Cir.1981) ("federal officer…can remove without

27 other defendants joining the petition, and the entire case is removed to the federal court").

28 ///

*(left margin, vertical text)* TUCKER ELLIS & WEST LLP · Cleveland • Columbus • Los Angeles • San Francisco

**Nature of the Case**

8.      The case is based on allegations that decedent developed an asbestos-related disease caused by exposure to asbestos and asbestos-containing products.

9.      Plaintiffs assert wrongful death and survival claims against UTC and the other defendants, based on theories of negligence and strict liability.

**Jurisdiction, Venue and Intradistrict Assignment**

10.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1442(a)(1) as set forth below under Grounds for Removal.

11.     Venue is proper in the Northern District of California because the state court action, which is subject to this removal petition, was filed in the Superior Court of the State of California for the County of San Francisco.

**Grounds for Removal**

12.     This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1331, and is removable to this Court by UTC pursuant to 28 U.S.C. § 1442(a)(1).  Specifically, it is a civil action in which plaintiffs' alleged right to relief necessarily depends on the resolution of a substantial question of federal law.  "Federal officers, and their agents, may remove cases based on acts performed under the color of their federal office if they assert a colorable defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006).  "[T]he Supreme Court has mandated a generous interpretation of the federal officer removal statute" and there is a "clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Durham*, 445 F.3d at 1252.

13.     At all relevant times, UTC was a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *Fung v. Abex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992) (corporate defendant is a "person").

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

DEFENDANT UNITED TECHNOLOGIES CORPORATION'S TO NOTICE OF REMOVAL

14.     Should plaintiffs file a motion to remand this case, UTC respectfully requests an opportunity to respond more fully in writing, including the submission of affidavits and additional authorities, but offers the following authorities at this time:

15.     Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (a) demonstrate that it acted under the direction of a federal officer, (b) raise a colorable federal defense to plaintiffs' claims, and (c) demonstrate a causal nexus between plaintiffs' claims and the acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Machnik v. Buffalo Pumps, Inc.*, 506 F.Supp.2d 99, 102 (D.Conn. 2007). Here, UTC has satisfied all three requirements and is entitled to the federal officer removal provision.

16.     <u>UTC Acted Under Direction Of Federal Officers.</u>   UTC acted under the direction of federal officers – namely officers and agents of the U.S. Navy – in designing, manufacturing, and supplying aircraft engines for use in Navy aircraft. UTC designs and manufactures aircraft engines through its unincorporated division of Pratt & Whitney. Declaration of Allan Shiffler, **Exhibit D** hereto, ¶¶ 2-3. Aircraft engines supplied by UTC to the Navy were manufactured in accordance with precise specifications prepared, drafted, and issued exclusively by the Navy. *Id.* at ¶¶ 7-11. U.S. Navy inspectors were stationed on-site at the UTC (Pratt & Whitney) manufacturing facilities to personally oversee each phase of the design and manufacturing process and to enforce compliance with the Navy's design specifications. *Id.* at ¶¶ 8-10. The military inspectors knew of, and approved, all materials and all parts contained in the Pratt & Whitney engines intended for use by the Navy. *Id.* at ¶ 9. The Navy had direct and detailed control over every aspect of the design and manufacture of the UTC (Pratt & Whitney) military aircraft engines, including written materials, product manuals, and warnings accompanying the military aircraft engines. *Id.* at ¶¶ 7-11. UTC needed consent and approval from the U.S. Navy for any warnings with its equipment, and the Navy instructed UTC to add or include warnings when deemed appropriate by the Navy. *Id.* at

TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

DEFENDANT UNITED TECHNOLOGIES CORPORATION'S TO NOTICE OF REMOVAL

1 ¶ 11.  And the U.S. Navy rejected any aircraft engine that did not meet the strict standards

2 and specifications set forth by the Navy. *Id.* at ¶ 10.

3       17.   <u>UTC Has A Colorable Federal Defense</u>.  UTC has a colorable federal

4 defense to this action – government contractor immunity.  The government contractor

5 defense bars plaintiffs' state law tort claims for alleged injuries caused by the equipment

6 the contractor built for the U.S. military. *Boyle v. United Technologies Corp.*, 487 U.S.

7 500 (1988).  There are three elements to the defense:  (a) the United States approved

8 reasonably precise specifications; (b) the equipment conformed to these specifications;

9 and (c) the equipment supplier warns the military about any hazards involved in the use

10 of the equipment that are known to the equipment supplier but not known to the military.

11 *Boyle*, 487 U.S. 500 at 512.  "The contractor's duty to warn under the third prong of

12 Boyle extends only to those dangers in the use of the equipment which are unknown to

13 the government." *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587, 590

14 (N.D.Cal.1993); *see Blackman v. Asbestos Defendants (BIIC)*, 1997 WL 703773, *3

15 (N.D.Cal. 1997) (defendant contractor had no duty to warn the Air Force about dangers

16 of asbestos use in military equipment where the contractor was not an asbestos

17 manufacturer and "had no greater opportunity to know of the dangers of asbestos in the

18 1970s than did the USAF").

19       18.   The facts in support of this Notice show that the Navy approved reasonably

20 precise specifications and exercised extensive supervision and control over the design

21 and manufacture of the engines, and that the engines would have conformed to those

22 specifications.  Additionally, the Navy had state of the art knowledge regarding any

23 potential health hazards of working with or around asbestos-containing materials dating

24 back to the 1930s.  Declaration of William P. Ringo, **Exhibit E** hereto, ¶ 9.  Conversely,

25 UTC had no reason to suspect that, at the relevant time, a manufacturer or designer of

26 aircraft engines would have considered that asbestos-containing materials used in aircraft

27 engine components presented any health hazard to individuals working on aircraft

28 engines.  Ringo Decl., ¶ 10.  In fact, there have never been any published articles

*Left margin (vertical):* TUCKER ELLIS & WEST LLP
Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco

1  suggesting that aircraft mechanics, or persons working in the vicinity of aircraft

2  mechanics, are at an increased risk of any asbestos-related disease from work on aircraft

3  engines. *Id.* at ¶ 8. Nor are there any epidemiological studies suggesting such an

4  increased risk. *Ibid.*

5      19.   <u>There Is A Causal Nexus.</u>  A causal nexus exists between plaintiffs' claims

6  in this action and the acts taken by UTC under the direction of federal officers.

7  Plaintiffs' claims against UTC arise from the decedent's alleged exposure to asbestos

8  from military aircraft while serving as an aircraft mechanic in the U.S. Navy from 1955

9  to 1958.  Military aircraft engines supplied by UTC (Pratt & Whitney) to the U.S. Navy

10  were designed and manufactured under strict government control and pursuant to precise

11  specifications that were provided by, scrutinized by, and/or revised by, and in all cases

12  approved by the Navy.  The Navy also controlled the content of written materials and

13  warnings that accompanied the aircraft engines.  UTC's actions are inseparable from the

14  government specifications, regulations, and oversight, and thus a clear causal nexus exists

15  between plaintiffs' claims and UTC's acts performed under color of federal office.

16  *Boyle,* 487 U.S. 500 (1988); *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427

17  (11th Cir. 1996); *Marley v. Elliott Turbomachinery Co., Inc.*, 545 F. Supp. 2d 1266, 1271

18  (S.D. Fla. 2008); *Arness v. Boeing North American, Inc.*, 997 F.Supp. 1268 (C.D. Cal.

19  1998); *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587 (N.D. Cal. 1993);

20  *Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994); *Fung v. Abex Corp.*, 816 F.Supp.

21  569 (N.D. Cal. 1992); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993).

22      20.   Notice of this removal has been, or will be, filed with the state court and

23  provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).

24      21.   This Notice of Removal is based on this Notice and supporting declarations,

25  the Certificate of Service of Notice to Adverse Party of Removal filed in the state court

26  action, the Notice to Adverse Party of Removal to Federal Court filed in the state court

27  action, the Notice of Tag-Along Action, and any other matters which the court deems

28  applicable.

TUCKER ELLIS & WEST LLP
Cleveland • Columbus • Los Angeles • San Francisco

8

1   WHEREFORE, defendant UTC prays that this action be removed from the

2   Superior Court of the State of California for the County of San Francisco, to the United

3   States District Court for the Northern District of California, and transferred to the United

4   States District Court, Eastern District of Pennsylvania, for coordinated or consolidated

5   pretrial proceedings pursuant to 28 U.S.C. § 1407 ("MDL Transfer Order").

6

7   DATED: July 7, 2011                     **TUCKER ELLIS & WEST LLP**

8

9                                          By: _____

10                                         Lance D. Wilson, Esq.
                                           Attorneys for Defendant
11                                         UNITED TECHNOLOGIES
                                           CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "D"

1  DEBORAH A. SMITH (SBN: 227169)
   dasmith@gordonrees.com
2  KATHRYN J. LAFEVERS (SBN: 252003)
   klafevers@gordonrees.com
3  GORDON & REES LLP
   275 Battery Street, Suite 2000
4  San Francisco, CA  94111
   Telephone: (415) 986-5900
5  Facsimile: (415) 986-8054

6  Attorneys for Defendant
   CURTISS-WRIGHT CORPORATION
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10 PATTI DONLON, Individually and as        )  CASE NO. **4:11-cv-03376-DMR**
   Successor–in–Interest to the Estate of   )
11 PATRICK THEISEN DONLON, Decedent,        )  (San Francisco County Superior Court Case
   SEAN DONLON, and DOES ONE through        )  No. CGC-09-275218)
12 TEN, inclusive,                          )
                                            )
13                            Plaintiffs,   )  **SPECIALLY APPEARING**
                                            )  **DEFENDANT CURTISS-WRIGHT**
14      vs.                                 )  **CORPORATION'S JOINDER AND**
                                            )  **NOTICE OF REMOVAL OF ACTION**
15 AC AND S, INC.; ASBESTOS                 )  **UNDER 28 U.S.C. § 1442(A) (1)**
   CORPORATION LTD.; A .W. CHESTERTON       )  **(GOVERNMENT CONTRACTOR**
   COMPANY; CROWN, CORK & SEAL             )  **IMMUNITY - ACTING UNDER**
16 COMPANY, INC., Individually and as       )  **DIRECTION OF FEDERAL OFFICER)**
   Successor-in-Interest to MUNDET CORK     )
17 CORP.; GARLOCK SEALING                   )
   TECHNOLOGIES LLC, Individually and as    )
18 Successor-in-Interest to GARLOCK, INC.;  )
   GENERAL ELECTRIC COMPANY; J.T.           )
19 THORPE & SON INC.; METROPOLITAN          )
   LIFE INSURANCE COMPANY;                  )
20 PARKERHANNIFIN CORPORATION, as           )
   Successor-in-Interest to SACOMO SIERRA;  )
21 OWENS-ILLINOIS CORPORATION;              )
   QUINTEC INDUSTRIES, INC.; SOCO-          )
22 LYNCH CORPORATION, success-in-interest   )
   to WESTERN CHEMICAL &                    )
23 MANUFACTURING COMPANY;                   )
   SWINERTON BUILDERS f/k/a SWINERTON       )
24 & WALBERG CO.; THOMAS DEE                )
   ENGINEERING COMPANY; TRANE U.S.          )
25 INC., fka AMERICAN STANDARD, INC.;       )
   UNION CARBIDE CORPORATION;               )
26 VIACOM, INCORPORATED, as successor-by-   )
   merger to CBS CORPORATION, fka           )
27 WESTINGHOUSE ELECTRIC                    )
   CORPORATION; ALLIS-CHALMERS              )
28

CURT/1071298/10733586v.1

                                    -1-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1  CORPORATE PRODUCT LIABILITY )
   TRUST; BAYER CROPSCIENCE, INC., )
2  successor to AMCHEM PRODUCTS, INC.; )
   ENPRO INDUSTRIES, INC., Individually and )
3  as Successor-in-Interest to ANCHOR )
   PACKING COMPANY; HOPEMAN )
4  BROTHERS, INC.; SB DECKING, INC., )
   formerly known as SELBY, BATTERSBY & )
5  COMPANY, GEORGIA-PACIFIC )
   CORPORATION; HAMILTON MATERIALS, )
6  INC.; HANSON PERMANENTE CEMENT, )
   INC. fka KAISER CEMENT CORPORATION )
7  KAISER GYPSUM COMPANY INC.; EATON )
   AEROQUIP, LLC; PNEUMO-ABEX )
8  CORPORATION, Successor-in-Interest to )
   ABEX CORPORATION; HONEYWELL )
9  INTERNATIONAL INC. fka ALLIED )
   SIGNAL, INC./THE BENDIX )
10 CORPORATION; BORG-WARNER )
   CORPORATION by its Successor in Interest, )
11 BORGWARNER MORSE TEC, INC.; )
   BRIDGESTONE/FIRESTONE NORTH )
12 AMERICAN TIRE, LLC; DANA )
   COMPANIES, LLC; GOODRICH . )
13 CORPORATION; FEDERAL-MOGUL )
   ASBESTOS PERSONAL INJURY TRUST, as )
14 successor to FELT PRODUCTS )
   MANUFACTURING CO.; FORD MOTOR )
15 COMPANY; GENERAL MOTORS )
   CORPORATION; INTERNATIONAL TRUCK )
16 AND ENGINE CORPORATION; NAVISTAR, )
   INC.; THE GOODYEAR TIRE & RUBBER )
17 COMPANY; AIRCRAFT BRAKING )
   SYSTEMS CORPORATION; MEGGITT )
18 AIRCRAFT BRAKING SYSTEMS; PARKER- )
   HANNIFIN CORPORATION, as Successor to )
19 EIS and CORPORATION MCDONNELL )
   DOUGLAS CORPORATION, Individually and )
20 Successor-in-Interest to DOUGLAS )
   AIRCRAFT COMPANY, INC.; EATON )
21 CORPORATION; UNITED TECHNOLOGIES )
   CORPORATION, formerly known as PRATT )
22 & WHITNEY, INC.; PRATT & WHITNEY )
   POWER SYSTEMS, INC.; VOUGHT )
23 AIRCRAFT INDUSTRIES, INC.; and )
   ELEVENTH DOE through THREE )
24 HUNDREDTH DOE, inclusive, )

25                    Defendants. )
                                  )

26

TO THE CLERK OF THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS

27 OF RECORD:

28

1       Defendant CURTISS-WRIGHT CORPORATION ("Curtiss-Wright"), hereby joins in the

2   Notice of Removal filed by defendant United Technologies Corporation ("UTC") on July 8,

3   2011.[1]

4       Curtiss-Wright hereby also gives notice of the removal of the above-entitled action from

5   the Superior Court of the State of California for the County of San Francisco, to the United

6   States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1442(a)(1)

7   and 1446. In support of its joinder and notice of removal, Curtiss-Wright incorporates the UTC

8   Notice of removal by reference and alleges as follows:

9                               **PRELIMINARY MATTERS**

10      1.      This is a civil action over which this Court has subject matter jurisdiction under

11   28 U.S.C. § 1331, as the action arises under the Constitution, laws, or treaties of the United

12   States by virtue of the attempt by plaintiffs PATTI DONLON, Individually and as Successor - in-

13   Interest to the Estate of PATRICK THEISEN DONLON, Decedent, SEAN DONLON, and

14   DOES ONE through TEN, inclusive, to prosecute their claims against Curtiss-Wright, a person

15   acting under the control and supervision of an officer of the United States within the meaning of

16   28 U.S.C. § 1442(a)(1).

17      2.      Curtiss-Wright is a corporation organized and existing under the laws of the State

18   of Delaware with its principal place of business in Roseland, New Jersey.

19      3.      On May 22, 2009, Plaintiffs filed their complaint, bearing Case No. CGC-09-

20   275218, against Curtiss-Wright, UTC and other multiple defendants in the Superior Court of the

21   State of California for the City and County of San Francisco. A true and correct copy of the

22   Complaint is attached as **Exhibit A** to the UTC Notice of Removal.

23      4.      Curtiss-Wright was personally served with the summons and complaint on June

24   15, 2011. A true and correct copy of the summons issued to Curtiss-Wright on May 22, 2009 is

25   attached hereto as **Exhibit A**.

26

27   [1] Curtiss-Wright is also filing concurrently with this joinder a Motion to Dismiss Plaintiffs' Complaint for Delay in
     Prosecution for failure to serve within two years. For purposes of this joinder, Curtiss-Wright is specially appearing

28   and specifically does not waive its objection to the untimely service of the complaint as preserved in the Motion to
     Dismiss.

_Gordon & Rees LLP_
_275 Battery Street, Suite 2000_
_San Francisco, CA 94111_

-3-

1    5.    In the complaint, Plaintiffs allege that decedent Patrick Theisen Donlon

2    developed an asbestos-related disease as a result of exposure to asbestos fibers released from

3    products for which defendants are allegedly liable.

4    6.    This case is removable based on federal officer jurisdiction under 28 U.S.C., §

5    1442(a)(1). Plaintiffs' claims against Curtiss-Wright are based on Mr. Donlon's alleged

6    exposure to asbestos from aircraft equipment supplied to the United States Navy. Any and all

7    equipment produced and supplied by Curtiss-Wright for the U.S. Navy was specifically designed

8    and manufactured in accordance with specifications provided by the U.S. Navy and was

9    designed and built under the direction and control of the military and its officers. Accordingly,

10   this case is removable on the grounds of federal officer removal jurisdiction pursuant to 28

11   U.S.C. § 1442(a)(1).

12   7.    This notice of removal is timely. The 30-day removal period prescribed by 28

13   U.S.C. § 1446(b) begins to run when defendant receives a copy of the initial pleading setting

14   forth the claim for relief from which it may first be ascertained that the case is removable. 28

15   U.S.C. § 1446(b). Curtiss-Wright was served with the Summons and Complaint on June 15,

16   2011. The service of the Complaint put Curtiss-Wright on notice for the first time of plaintiffs'

17   claims in this action involving alleged exposure to asbestos from military equipment built for the

18   U.S. Navy pursuant to specifications provided by the U.S. Navy and under the direction and

19   control of the U.S. Navy and its officers. This Joinder and Notice of Removal, which is being

20   filed within 30 days of Curtiss-Wright's receipt of the Complaint, is timely under 28 U.S.C. §

21   1446(b).

22                              **NATURE OF THE CASE**

23   8.    The case is based on allegations that decedent Patrick Theisen Donlon developed

24   an asbestos-related disease caused by exposure to asbestos and asbestos-containing products.

25   9.    Plaintiffs assert a wrongful death and survival causes of action against Curtiss-

26   Wright for "failure to warn" only. All other claims alleged in the complaint against Curtiss-

27   Wright have been dismissed. A true and correct copy of the dismissal of all claims against

28   Curtiss-Wright except for "failure to warn" is attached as **Exhibit B** to the UTC Notice of

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-4-

1   Removal.

2   ## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

3       10.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1442(a)(1) as set forth below

4   under Grounds for Removal.

5       11.     Venue is proper in the Northern District of California because the state court

6   action, which is subject to this removal petition, was filed in the Superior Court of the State of

7   California for the County of San Francisco, where it was alleged that all parties are subject to

8   personal jurisdiction.

9       12.     Furthermore, §1442(a) authorizes such a removal without the consent of any other

10  defendant. *See Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1314-1315

11  (9th Cir. 1981) ("federal officer...can remove without other defendants joining the petition, and

12  the entire case is removed to the federal court.").

13  ## GROUNDS FOR REMOVAL

14      13.     This is a civil action over which this Court has original jurisdiction under 28

15  U.S.C. § 1331, and is removable to this Court by Curtiss-Wright pursuant to the provisions of 28

16  U.S.C. § 1442(a)(1) in that it is a civil action in which plaintiffs' alleged right to relief

17  necessarily depends on the resolution of a substantial question of federal law. "Federal officers,

18  and their agents, may remove cases based on acts performed under the color of their federal

19  office if they assert a colorable defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247,

20  1251 (9th Cir. 2006); *see also Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1429 (11th

21  Cir. 1996). "(T)he Supreme Court has mandated a generous interpretation of the federal officer

22  removal statute ..." and there is a "clear command from both Congress and the Supreme Court

23  that when federal officers and their agents are seeking a federal forum, we are to interpret section

24  1442 broadly in favor of removal." *Durham*, 445 F.3d at 1252; *see also Jefferson County,*

25  *Alabama v. Acker*, 527 U.S. 423, 431 (1999) (noting that the Supreme Court has "rejected a

26  'narrow, grudging interpretation' of the [federal officer removal] statute.").

27      14.     At all relevant times, Curtiss-Wright was a "person(s)" within the meaning of 28

28  U.S.C. § 1442(a)(1). *Fung v. Abet Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992) (finding that a

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-5-

1   corporate defendant was a "person").

2       15.     Curtiss-Wright was acting under the direction of an officer of the United States

3   within the meaning of 28 U.S.C. § 1442(a)(1) in designing, manufacturing, and supplying

4   equipment for and to the U.S. Navy. This equipment was manufactured pursuant to precise

5   specifications provided by the U.S. Navy and Curtiss-Wright has a colorable federal defense to

6   plaintiffs' state tort claims.

7       16.     Should plaintiffs file a motion to remand this case, Curtiss-Wright respectfully

8   requests an opportunity to respond more fully in writing, including the submission of affidavits

9   and additional authorities, but offers the following authorities at this time:

10      17.     Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving

11  party can (a) demonstrate that it acted under the direction of a federal officer, (b) raise a

12  colorable federal defense to plaintiff's claims, and (c) demonstrate a causal nexus between

13  plaintiff's claims and the acts it performed under color of federal office. *See Mesa v. California*,

14  489 U.S. 121, 124-25, 129-31, 134-35 (1989); *Fung v. Abet Corp.*, 816 F.Supp. 569 (N.D.Cal.

15  1992); *Machnik v. Buffalo Pumps, Inc.*, 506 F.Supp.2d 99, 102 (D.Conn. 2007). Here, Curtiss-

16  Wright has satisfied all three requirements and is entitled to the federal officer removal

17  provision.

18          a)      Curtiss-Wright designed and manufactured aircraft equipment. They were

19  acting under the direction of agents and officers of the U.S. Navy within the meaning of 28

20  U.S.C. § 1442(a)(1) in designing, manufacturing and supplying aircraft equipment to the U.S.

21  Navy. Aircraft equipment supplied to the U.S. Navy were manufactured in accordance with

22  precise specifications prepared, drafted and issued exclusively by the Navy.

23          b)      The U.S. Navy exercised similar control over any written materials, such

24  as warnings or product manuals, that accompanied the military aircraft equipment for which

25  Curtiss-Wright may be held responsible. Equipment suppliers like Curtiss-Wright were

26  prohibited from providing warnings on or with equipment supplied to the Navy without the prior

27  consent and approval of the Navy.

28          c)      Curtiss-Wright raises a colorable federal defense to this action under

1  government contractor immunity in that the U.S. Navy, including military specialists, controlled

2  the design and manufacture of any aircraft equipment produced by Curtiss-Wright for the U.S.

3  Navy. The Navy provided, scrutinized and approved extensive and detailed performance and

4  construction specifications for the aircraft equipment intended for Navy use. Based on a

5  scientific analysis of available literature, there is no reason to suspect that, at the relevant time, a

6  manufacturer or designer of aircraft equipment would have considered that asbestos-containing

7  materials used in aircraft components presented any health hazard to employees working on

8  aircraft engines. Furthermore, the U.S. military had state of the art knowledge of the hazards of

9  asbestos-containing components of its equipment at all times relevant to this action.

10          d)      A causal nexus exists between plaintiffs' claims in this action and the acts

11  taken by Curtiss-Wright under the direction of federal officers. Plaintiffs' claims against Curtiss-

12  Wright arise from Mr. Donlon's alleged exposure to asbestos from military aircraft while serving

13  as an aviation mechanic in the U.S. Navy from 1955 to 1958. Military aircraft equipment

14  supplied by Curtiss-Wright to the U.S. Navy were designed and manufactured under strict

15  government control and pursuant to precise specifications that were provided by, scrutinized by,

16  and/or revised by, and in all cases approved by the U.S. Navy. Curtiss-Wright's actions are

17  inseparable from the government specifications, regulations, and oversight, and a clear causal

18  nexus exists between plaintiffs' claims and Curtiss-Wright's acts performed under color of

19  federal office. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510 (1988);

20  *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996); *Marley v. Elliott*

21  *Turbomachinery Co., Inc.*, 545 F. Supp. 2d 1266, 1271 (S.D. Fla. 2008); *Arness v. Boeing North*

22  *American, Inc.*, 997 F.Supp. 1268 (C.D. Cal. 1998); *Sundstrom v. McDonnell Douglas Corp.*,

23  816 F.Supp. 587 (N.D. Cal. 1993); *Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994); *Fung*

24  *v. Abex Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D.

25  Md. 1993).

26          18.     Plaintiffs' claims against Curtiss-Wright are affirmatively barred by government

27  contractor immunity as set forth by the U.S. Supreme Court in *Boyle v. United Technologies*

28  *Corp.*, 487 U.S. 500, 108 S.Ct. 2510 (1988), and by the Ninth Circuit Court of Appeals in

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-7-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   *McKay v. Rockwell International Corp.*, 704 F.2d 444 (9th Cir. 1983).  Pursuant to this federal

2   defense, military equipment manufacturers, such as Curtiss-Wright, cannot be held liable under

3   state law for any injuries caused by the equipment it built for the U.S. military when: (a) the

4   United States approved reasonably precise specifications; (b) the equipment conformed to these

5   specifications; and (c) the equipment supplier warns the military about any hazards involved in

6   the use of the equipment that are known to the equipment supplier but not known to the military.

7   *See Boyle*, 487 U.S. 500 at 512; *McKay*, 704 F.2d, 444 at 451. "The contractor's duty to warn

8   under the third prong of *Boyle* extends only to those dangers in the use of the equipment which

9   are unknown to the government." *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587,

10   590 (N.D.Cal. 1993).

11        19.        Analyzing the *Boyle/McKay* factors with the facts above shows (a) that Curtiss-

12   Wright designed and manufactured the military aircraft equipment in question under strict

13   government supervision and control and that the U.S. Navy approved reasonably precise

14   specifications for the manufacture of the aircraft equipment, (b) the aircraft equipment

15   conformed to those specifications, and (c) the U.S. Navy had state of the art knowledge and was

16   aware of potential health hazards of working with or around asbestos-containing materials dating

17   back to the 1930s.  Thus, Curtiss-Wright would not have had knowledge of any hazards

18   associated with the use of the equipment which was not already known to the United States.

19   Curtiss-Wright has more than a colorable federal defense to this state action under government

20   contractor immunity.  *See Blackman v. Asbestos Defendants (BHC)*, 1997 WL 703773, *3

21   (N.D.Cal. 1997) (finding that defendant contractor had no duty to warn the Air Force of dangers

22   of asbestos use in military equipment where the contractor was not an asbestos manufacturer and

23   "had no greater opportunity to know of the dangers of asbestos in the 1970s than did the

24   USAF"); *see also Boyle*, 487 U.S. at 512; *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424,

25   1427 (11th Cir. 1996); *Marley v. Elliott Turbomachinery Co., Inc.*, 545 F. Supp. 2d 1266, 1271

26   (S.D. Fla. 2008); *Arness v. Boeing North American, Inc.*, 997 F.Supp. 1268 (C.D. Cal. 1998);

27   *Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994); *Sundstrom v. McDonnell Douglas Corp.*,

28   816 F.Supp. 587 (N.D. Cal. 1993); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993);

-8-

1    *Fung v. Aber Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992).

2       20.    The existence of a single removable claim allows removal of the entire action. 28

3 U.S.C. § 1441(c). *National Audubon Society v. Dept. of Water*, 496 F.Supp. 499, 509 (E.D. Cal.

4 1980).

5       21.    Notice of this removal has been, or will be, filed with the state court and provided

6 to all adverse parties pursuant to 28 U.S.C. § 1446(d).

7       22.    This removal is based on UTC's Notice of Removal, this Joinder and Notice of

8 Removal to the United States District Court, the Certificate of Service of Notice to Adverse Party

9 of Removal filed in the state court action, the Notice to Adverse Party of Removal to Federal

10 Court filed in the state court action, the complete file in the state court case, and any other

11 matters which the court deems applicable.

12       WHEREFORE, defendant Curtiss-Wright prays that this action be removed from the

13 Superior Court of the State of California for the County of San Francisco, to the United States

14 District Court for the Northern District of California, and transferred to the United States District

15 Court, Eastern District of Pennsylvania, for coordinated or consolidated pretrial proceedings

16 pursuant to 28 U.S.C. § 1407 ("MDL Transfer Order").

17

18 Dated: July 15, 2011               GORDON & REES LLP

19

20                          By: _____
                              Deborah A. Smith

21                          Attorneys for Defendant
                         CURTISS-WRIGHT CORPORATION

22

23

24

25

26

27

28

*Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111*

-9-

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AC and S, INC., et. al.; and ELEVENTH DOE through
THREE HUNDREDTH DOE, inclusive, (See attached list of
defendants)



FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

RECEIVED
JUN 15
LAW DEPT.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PATTI DONLON, Individually and as Successor-in-
Interest to the Estate of PATRICK THEISEN DONLON,
Decedent; SEAN DONLON; and DOES ONE through TEN,
inclusive,

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados local.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>County of San Francisco<br>400 McAllister Street<br>San Francisco, CA 94102<br>Unlimited Jurisdiction | C - 09 - 275218 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Steven M. Harowitz, SBN 71117     (415)788-1588   (415)788-1598
HAROWITZ & TIGERMAN, LLP
450 Sansome Street, 3rd Floor
San Francisco, CA 94111

DATE: MAY 2 2 2009   Gordon Park-Li, Clerk, by   P. NATT   , Deputy
*(Fecha)*                    *(Secretario)*              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Curtiss-Wright Corporation

   under: ☒ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

ATTACHMENT TO SUMMONS

AC AND S, INC.; ASBESTOS CORPORATION, LTD,; )
A.W. CHESTERTON COMPANY; CROWN, CORK & )
SEAL COMPANY, INC., Individually and as Successor- )
in-Interest to MUNDET CORK CORP.; GARLOCK )
SEALING TECHNOLOGIES LLC, Individually and as )
Successor-in-Interest to GARLOCK, INC.; GENERAL )
ELECTRIC COMPANY; J T THORPE & SON, INC.; )
METROPOLITAN LIFE INSURANCE COMPANY; )
PARKER-HANNIFIN CORPORATION, as Successor- )
in-Interest to SACOMO SIERRA; OWENS-ILLINOIS )
CORPORATION; QUINTEC INDUSTRIES, INC.; )
SOCO-LYNCH CORPORATION, successor-in-interest )
to WESTERN CHEMICAL & MANUFACTURING )
COMPANY; SWINERTON BUILDERS f/k/a )
SWINERTON & WALBERG CO.; THOMAS DEE )
ENGINEERING COMPANY; TRANE U.S. INC., fka )
AMERICAN STANDARD, INC.; UNION CARBIDE )
CORPORATION; VIACOM, INCORPORATED, as )
successor-by-merger to CBS CORPORATION, fka )
WESTINGHOUSE ELECTRIC CORPORATION; )
ALLIS-CHALMERS CORPORATION PRODUCT )
LIABILITY TRUST; BAYER CROPSCIENCE, INC., )
successor to AMCHEM PRODUCTS, INC.; ENPRO )
INDUSTRIES, INC., Individually and as Successor-in- )
Interest to ANCHOR PACKING COMPANY; )
HOPEMAN BROTHERS, INC.; SB DECKING, INC., )
formerly known as SELBY, BATTERSBY & )
COMPANY; GEORGIA-PACIFIC CORPORATION; )
HAMILTON MATERIALS, INC.; HANSON )
PERMANENTE CEMENT, INC. fka KAISER CEMENT )
CORPORATION; KAISER GYPSUM CO., INC.; )
KELLY-MOORE PAINT COMPANY, INC.; EATON )
AEROQUIP, LLC; PNEUMO-ABEX CORPORATION, )
Successor-in-Interest to ABEX CORPORATION; )
HONEYWELL INTERNATIONAL, INC. fka ALLIED )
SIGNAL, INC./THE BENDIX CORPORATION; BORG- )
WARNER CORPORATION by its Successor in Interest, )
BORGWARNER MORSE TEC, INC.; )
BRIDGESTONE/FIRESTONE NORTH AMERICAN )
TIRE, LLC; DANA COMPANIES, LLC; GOODRICH )
CORPORATION; FEDERAL-MOGUL ASBESTOS )
PERSONAL INJURY TRUST, as successor to FELT )
PRODUCTS MANUFACTURING CO.; FORD MOTOR )
COMPANY; GENERAL MOTORS CORPORATION; )
INTERNATIONAL TRUCK AND ENGINE )
CORPORATION; NAVISTAR, INC.; THE )
GOODYEAR TIRE & RUBBER COMPANY; )
AIRCRAFT BRAKING SYSTEMS CORPORATION; )
MEGGITT AIRCRAFT BRAKING SYSTEMS; )
PARKER-HANNIFIN CORPORATION, as Successor to )
RIS and CALI-BLOK; CURTISS-WRIGHT )

CORPORATION; MCDONNELL DOUGLAS )
CORPORATION, Individually and Successor-in-Interest )
to DOUGLAS AIRCRAFT COMPANY, INC.; EATON )
CORPORATION; UNITED TECHNOLOGIES )
CORPORATION, formerly known as PRATT & )
WHITNEY, INC.; PRATT & WHITNEY POWER )
SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES, )
INC.; and ELEVENTH DOE through THREE )
HUNDREDTH DOE, inclusive, )
)
)
            Defendants. )
)

ATTACHMENT TO SUMMONS            2 of 2

# CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is: Gordon & Rees LLP, 275 Battery Street, Suite 2000, San Francisco, CA 94111.

On July 15, 2011, I served the within document(s):

**SPECIALLY APPEARING DEFENDANT CURTISS-WRIGHT CORPORATION'S JOINDER AND NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1442(A)(1)**

[X]   by electronically serving the document(s) described above via United States District Court Electronic Case Filing website (CM/ECF notification system) on the recipients designated on the electronic service list that is located on the Pacer website.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 15, 2011, at San Francisco, California.

_____
ANDREA K. BEAN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "E"**

1   Ronald A. McIntire, Bar No. 127407
    RMcIntire@perkinscoie.com
2   Bo W. Kim, Bar No. 217394
    BKim@perkinscoie.com
3   Hillary O. Mueri, Bar No. 272713
    HMueri@perkinscoie.com
4   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
5   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
6   Facsimile:  310.788.3399

7   Attorneys for Defendant
    The Boeing Company
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12   PATTI DONLON, Individually and as        Case No. CV 11 3376
     Successor-in-Interest to the Estate of
13   PATRICK THEISEN DONLON,                   **DEFENDANT THE BOEING**
     Decedent; SEAN DONLON; and                **COMPANY'S JOINDER IN**
14   DOES ONE through TEN, inclusive,          **DEFENDANT UNITED**
                                               **TECHNOLOGIES CORPORATION'S**
15                        Plaintiff,           **NOTICE OF REMOVAL OF ACTION**
                                               **UNDER 28 U.S.C. 1442(a)(1)**
16        v.

17   AC AND S, INC., et al.,

18                        Defendant.

19   ─────────────────────────────

20

21

22

23

24

25

26

27

28

1   TO THE HONORABLE COURT ALL INTERESTED PARTIES AND THEIR

2   ATTORNEYS OF RECORD:

3   PLEASE TAKE NOTICE that Defendant The Boeing Company ("Boeing"),

4   hereby joins United Technologies Corporation's ("UTC") notice of removal of the above-

5   entitled action from the Superior Court of the State of California for the County of San

6   Francisco (Case No. CGC-09-275218), to the United States District Court for the

7   Northern District of California pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446.

8   ## I.      FACTUAL SUMMARY

9   This is an asbestos wrongful death action by Plaintiffs Patti Donlon, Individually

10  and as Successor-in-Interest to the Estate of Patrick Theisen Donlon, Decedent, and Sean

11  Donlon ("Plaintiffs"). Plaintiffs claim that the decedent Patrick Donlon developed an

12  asbestos-related disease as a result of exposure to asbestos fibers released from

13  defendants' products; among the many alleged exposures, Plaintiffs claim Mr. Donlon's

14  work on U.S. Navy airplanes exposed him to asbestos fibers.

15  ## II.     TIMELINESS OF REMOVAL

16  28 U.S.C. §1446(b) provides in pertinent part:

17  
18  > If the case stated by the initial pleading is not removable, a
    > notice of removal may be filed within thirty days after receipt
    > by the defendant, through service or otherwise, of a copy of
19  > an amended pleading, motion, order or other paper from
    > which it may first be ascertained that the case is one which is
20  > or has become removable...

21  
22  Boeing first received an 'other paper' from which removability could be ascertained

23  on July 12, 2011[1]. On that date, counsel for Boeing received email correspondence from

24  counsel for Plaintiffs indicating the North American Aviation T-29 and SNJ aircraft are

    the Boeing aircraft at issue in this case.   The receipt of this email put Boeing on notice of
25  

26  _____

    [1] Boeing received Plaintiffs' Notice of Entry of Order Granting Plaintiffs' *Ex Parte*
27  Application for an Order Allowing Amendment to Complaint Substituting the True
    Identity of Defendants on June 27, 2011. See Declaration of Bo W. Kim in Support of
    Defendant The Boeing Company's Joinder in Defendant United Technologies
28  Corporation's Notice of Removal of Action ("Kim Decl."), Exhibit A attached thereto.

the first time that Plaintiffs' claims in this action involve alleged exposure to asbestos from military equipment allegedly built by Boeing for the U.S. Navy pursuant to reasonably precise specifications approved by the Navy and under the direction and control of the Navy and its officers.  This Joinder is being filed within 30 days of receipt of the "paper" by Boeing, and is therefore timely.

### III.   BASIS FOR REMOVAL

"Federal officers and their agents, may remove cases based on acts performed under color of their federal office if they assert a colorable federal defense." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006).  A party seeking removal under § 1142 must show that: (a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a colorable federal defense.  *Id.*; see also *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999); *Mesa v. California*, 489 U.S. 121, 124-25, 131-35 (1989). The Supreme Court has rejected a "narrow, grudging interpretation" of what constitutes a colorable federal defense, indicating that the defendant "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Mesa*, 489 U.S. at 431.  Rather, the defendant "need only articulate its 'colorable' applicability to the plaintiff's claims." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999).

This case is properly removed under U.S.C. § 1442(a)(1) because, for the purposes of this case, Boeing was a "person" acting under the direction of the United States Air Force, and can assert the federal contractor immunity and derivative sovereign immunity defenses.

### A.   Boeing is a "Person" Within the Meaning of 28 U.S.C. § 1442(a)(1)

It is well-settled that a private corporation like Boeing is a "person" entitled to the benefit of removal under 28 U.S.C. § 1442(a)(1). *See, e.g., Winters*, 149 F.3d at 398;

1   *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992). Accordingly, Boeing meets

2   this requirement for removal under 20 U.S.C. § 1442(a)(1).

3   **B.   Boeing was Acting Under the Direction of the United States Navy**

4       In Plaintiffs' Preliminary Fact Sheet, they allege that Mr. Donlon was exposed to

5   asbestos while employed by the U.S. Navy as an aviation mechanic from 1955-1958.

6   Kim Decl. Exhib. A at 3:4-6. Additionally, Plaintiffs indicate that Mr. Donlon served in

7   the U.S. Naval Reserves through 1963. Kim Decl. Exhib. B at ¶9. Plaintiffs' counsel

8   indicated, via email, that North American Aviation T-28 and SNJ aircraft are the Boeing

9   planes at issue.[2] Kim Decl. ¶ 4. Such aircraft were designed, manufactured, and supplied

10   by Boeing predecessors under close government supervision, pursuant to comprehensive

11   and detailed contract specifications provided by the United States Navy and its officers.

12   Therefore Boeing was acting pursuant to the direction of agents and officers of the United

13   States within the meaning of § 1442(a)(1).

14       Moreover, there is a causal nexus between Boeing's actions, taken pursuant to the

15   direction of federal agents and officers, and Mr. Donlon's alleged exposure to asbestos.

16   First, his alleged exposure purportedly occurred while he was performing work on

17   military aircraft, which were built in compliance with government specifications. Second,

18   any purported asbestos which allegedly caused his injuries would have been installed by

19   Boeing at the direction of federal officers. *See Akin*, 851 F. Supp. at 823-24 ("[W]hen a

20   government contractor builds a product pursuant to [military] specifications and is later

21   sued because compliance with those specifications allegedly caused personal injuries, the

22   nexus requirement is satisfied"); *Fung*, 816 F. Supp at 572; *Pack v. AC and S, Inc.*, 838 F.

23   Supp. 1099, 1103 (D. Md. 1993). The same is true for any warnings Plaintiffs may claim

24   were absent from the aircraft, their maintenance manuals, or other sources.

25

26

27

28      [2] Boeing did not manufacture the T-28 or SNJ aircraft. Boeing's predecessor, North American Aviation manufactured the T-28 and SNJ pursuant to government contracts.

C.   **Boeing Asserts a Colorable Federal Defense**

1.   **Government Contractor Immunity**

Pursuant to the government contractor immunity defense, military equipment manufacturers such as Boeing cannot be held liable under state law for any injuries caused by the equipment it built for the U.S. military when: (a) the United States approved reasonably precise specifications; (b) the equipment conformed to these specifications; and (c) the equipment supplier warns the military about any hazards involved in the use of the equipment that are known to the equipment supplier but not known to the military. *Boyle v. United Technologies, Inc.*, 487 U.S. 500, 512 (1988); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir. 1983); *Sundstrom v. McDonnell Douglas Corp.*, 816 F. Supp. 587 (N.D. Cal. 1993). Given that each aspect of Boeing's involvement with the T-28 and SNJ aircraft was carried out according to detailed contract specifications dictated by the U.S. Government, Boeing has a colorable federal defense.

As stated above, the Navy approved precise specifications regarding the design and manufacture of the T-28 and SNJ, and the aircraft supplied to the Navy by Boeing conformed to those specifications. Also, there were no hazards posed by the aircraft which were known to Boeing and not the Navy. The Navy was well aware of the potential health hazards associated with working with or around asbestos-containing products and therefore Boeing had no duty to warn. *See Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019 (S.D. Ill. 1989) (defendants had no duty to warn the Government about the alleged hazards of asbestos, and thus satisfy the third prong of the Boyle test, because the Navy already had superior knowledge about those hazards); *Blackman v. Asbestos Defendants (BHC)*, No. C-97-3066, 1997 WL 703773, *3 (N.D. Cal. 1997) (finding that defendant contractor had no duty to warn the U.S. Air Force of dangers of asbestos use in military equipment where the contractor was not an asbestos manufacturer and had no greater opportunity to know of the dangers of asbestos than did the U.S. Air Force). Therefore, Boeing has more than a colorable government contractor immunity defense.

### 2.   Derivative Sovereign Immunity

Boeing also has a colorable derivative sovereign immunity defense.  A government contractor, performing at the direction and authorization of a government officer, is immune from suit based upon performance of the contract. *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).  Because the T-28 and SNJ aircraft were designed, manufactured, and supplied to the Navy at the direction and authorization of government officers and pursuant to a government contract, the *Yearly* doctrine is satisfied here.  Had the government performed these acts directly, it would be immune from suit.

### IV.   JOINDER AND CONSENT OF OTHER DEFENDANTS

Co-Defendants' consent is not necessary for removal under 28 U.S.C. § 1442. "Federal officer removal constitutes an exception to the general removal rule under 28 U.S.C. § 1441 and § 1446 which require all defendants to join in the removal petition. *Akin*, 156 F.3d at 1034; *see also, Ely Valley Mines v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

### V.   INTRA-DISTRICT ASSIGNMENT

This Court is the United States District Court for the district embracing the place where the state court action was pending prior to its removal.  The state court action was pending before the Superior Court of California for the County of San Francisco. Therefore, pursuant to 28 U.S.C. §§ 1441(b) and § 1446, the United States District Court for the Northern District of California is the appropriate court for removal.

### VI.   NOTICE TO PARTIES AND STATE COURT

Notice of this joinder will be filed with the Superior Court of California for the County of Los Angeles and served on all parties of record pursuant to 28 U.S.C. § 1446(d).

### VII.   TRANSFER OF THIS ACTION TO MULTI-DISTRICT ASBESTOS PROCEEDINGS

Boeing intends to seek transfer of this action to the Eastern District of Pennsylvania where all Federal Court asbestos actions have been centralized in a single

1  forum, *In re Asbestos Products Liability Litigation*, (Multi District Litigation Docket NO.

2  875), pursuant to 28 U.S.C. § 1407. Accordingly, Boeing will be filing a Notice of

3  Pendency of Related Actions regarding MDL 875.

### VIII.  CONCLUSION

5      WHEREFORE, Boeing respectfully requests that the above-entitled action remain

6  removed from the Superior Court of the State of California for the County of San

7  Francisco, where it was filed, to the United States District Court for the Northern District

8  of California, and that this action proceed in this Court as a properly removed action.

10  DATED:  July 25, 2011                    **PERKINS COIE LLP**

11                                           By:

12                                                Bo W. Kim, Bar No. 217394
13                                                BKim@perkinscoie.com

14                                           Attorneys for Defendant
15                                           The Boeing Company

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "F"

STEVEN M. HAROWITZ (BAR NO. 71117)
harowitz@htlawoffices.com
KATHERINE Y. WANG (BAR NO. 215663)
wang@htlawoffices.com
**HAROWITZ & TIGERMAN, LLP**
450 Sansome Street, 3rd Floor
San Francisco, California 94111
Tel: (415) 788-1588; Fax: (415) 788-1598

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA-SAN FRANCISCO DIVISION

| | |
|---|---|
| PATTI DONLON, Individually and as Successor-in-Interest to the Estate of PATRICK THEISEN DONLON, Decedent; SEAN DONLON; and DOES ONE through TEN, inclusive,<br><br>       Plaintiffs,<br><br>vs.<br><br>AC AND S, INC., et al.<br><br>       Defendants. | Case No. 4:11-CV-3376-SI<br><br>Superior Court of California, San Francisco County, Case No. CGC-09-275218<br><br>**NOTICE OF MOTION AND MOTION TO REMAND THIS CASE TO CALIFORNIA SUPERIOR COURT**<br><br>Hearing Date: August 26, 2011<br>Time: 9:00 a.m.<br>Courtroom: 10, 19th Floor<br>Judge: Honorable Susan Illston |

**TO ALL DEFENDANTS IN THIS ACTION AND THEIR ATTORNEYS OF RECORD:**

Notice is hereby given that at 9:00 a.m. on August 26, 2011, or as soon thereafter as this matter may be heard, in Courtroom 10, of the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, CA 94102, plaintiffs will move the Court for an order remanding this case to the Superior Court of California in and for the County of San Francisco.

The motion is based on this notice, the memorandum of points and authorities, the declaration of Katherine Wang and exhibits attached thereto, the allegations in plaintiffs' Complaint, defendant United Technologies Corporation's ("UTC") notice of removal and attachments, defendant Curtiss-Wright Corporation's ("Curtiss-Wright") joinder in UTC's notice of removal, all papers and records on file in the state and federal court files pertaining to this case, and such argument as may be made at the hearing.

As fully set forth in their accompanying Memorandum of Points and Authorities, Plaintiffs respectfully ask that the Court remand this case to state court for the following reasons:

1. As a matter of law, there is no federal subject matter jurisdiction in this case because of the express disclaimer in Plaintiffs' complaint as well as Plaintiffs' dismissal of all claims other than their failure to warn claims as to the aviation defendants, including UTC and Curtiss-Wright.

2. UTC's and Curtiss-Wright's removal are improper because they were not "federal officers" or "persons acting under a federal officer" within the meaning of 28 U.S.C §1442(a)(1).

3. UTC and Curtiss-Wright failed their burden to present evidence that there is a causal nexus between their failure to warn of the hazards of asbestos, taken pursuant to a federal officer's direction, and Plaintiffs' claims.

4. UTC and Curtiss-Wright cannot and does not establish that the government contractor defense is a colorable federal defense.

By this motion, Plaintiffs seek the immediate remand of this action to Superior Court of California, County of San Francisco on the grounds that Defendants' removal is improper and prejudicial to plaintiffs, is insufficiently supported by any evidence, and that this Court lack subject

1    matter jurisdiction under 28 U.S.C. § 1442(a)(1).

2

3    Dated: July 22, 2011                    HAROWITZ & TIGERMAN, LLP

4

5

6                                           _____
                                            KATHERINE Y. WANG
7                                           Attorney for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEVEN M. HAROWITZ  (BAR NO. 71117)
harowitz@htlawoffices.com
KATHERINE Y. WANG (BAR NO. 215663)
wang@htlawoffices.com
**HAROWITZ & TIGERMAN, LLP**
450 Sansome Street, 3rd Floor
San Francisco, California  94111
Tel: (415) 788-1588; Fax: (415) 788-1598

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATTI DONLON, Individually and as Successor-in-Interest to the Estate of PATRICK THEISEN DONLON, Decedent; SEAN DONLON; and DOES ONE through TEN, inclusive, <br><br> Plaintiffs, <br><br> vs. <br><br> AC AND S, INC., et al. <br><br> Defendants. | Case No. 4:11-CV-3376-SI <br><br> Superior Court of California, San Francisco County, Case No. CGC-09-275218 <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND CASE TO CALIFORNIA SUPERIOR COURT** <br><br> Hearing Date: August 26, 2011 <br> Time:  9:00 a.m. <br> Courtroom:  10, 19th Floor <br> Judge:  Honorable Susan Illston |

TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................1

II.     STATEMENT OF FACTS.....................................................................4

III.    LEGAL ARGUMENT...........................................................................4

        A.      THERE IS A STRONG FEDERAL PRESUMPTION AGAINST
                REMOVAL JURISDICTION ........................................................4

        B.      UTC FAILS TO ESTABLISH FEDERAL OFFICER JURISDICTION
                UNDER 28 U.S.C. §1442(a)(1)...................................................5

                1. UTC Has Not And Cannot Show That It Acted Under The Direction Of
                A Federal Officer ...................................................................6

                        a. UTC Does Not And Cannot Identify The Federal Officer Who
                        Directed It To Incorporate Asbestos Into Its Engines Or Directed It
                        To Exclude Safety Warnings...............................................6

                        b. Defendant Cannot Prove That It Failed To Warn At The
                        Direction Of A Federal Officer ..........................................8

                2. UTC Has Not Raised A Colorable Federal Defense ............................11

                        a. The Military Contractor Defense Does Not Apply Where The
                        Products At Issue Are Stock Equipment Readily Available To
                        Commercial Users ...............................................................12

                        b. Even if the Products at Issue are Considered "Military
                        Equipment" And The Boyle Elements Applied to a Failure to Warn
                        Case, UTC Does Not Raise a Colorable Federal Defense Since it
                        Cannot Prove That in Making Decisions Regarding Warnings, It
                        Was Acting in Compliance with Reasonably Precise Specifications
                        Imposed by the United States...............................................14

                3. UTC Cannot Establish Casual Nexus Between Its Actions Under The
                Control Of A Federal Officer And Plaintiffs' Failure to Warn
                Claims. .................................................................................15

                        a. Plaintiffs' Claims Against UTC Are Limited to Failure to Warn
                        .............................................................................................17

                        b. There Is No Jurisdiction Under §1442 In Failure To Warn Cases
                        .............................................................................................18

IV.     CONCLUSION ..................................................................................23

1

## TABLE OF AUTHORITIES

2

Page

3

### Cases

4

Accord Dorse v. Eagle-Picher Indus., Inc., 898 F.2d 1487 (11th Cir. 1990). ............................8

5

Anderson v. Owens-Corning Fiberglass Corp. (1991) 53 Cal.3d 987.............................................22

Arness v. Boeing North America, Inc., 997 F.Supp. 1268 (C.D. Ca. 1998)...........................6, 20

6

Arnold v. Blue Cross & Blue Shield, 973 F.Supp. 726, 739 (S.D. Texas 1997)....................5, 6

Boyle v. United Tech. Corp, 487 U.S. 500

7

(1988)........................................................4, 8, 9, 10, 11, 12, 13, 14, 15, 18, 21, 22, 23

California ex rel. Lockyer v. Dynegy, Inc., 375 F3d 831 (9th Cir. 2004) ...............................4

8

Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993) 509 U.S. 579..............................2, 16

Faulk v. Owens-Corning Fiberglass Corp., 48 F.Supp.2d 653

9

(E.D.Tex. 1999) ..........................................................9, 11, 14, 16, 19

Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F.Supp.2d 1144

10

(D. Colo. 2002) .......................................................................5, 19

Gaus v. Miles, Inc., 980 F.2d 564 (9th Cir. 1992)...........................................5

11

Good v. Armstrong World Indus., 914 F.Supp. 1125 (E.D.Pa. 1996)...................6, 7, 9, 10

Hansen v. Johns-Manville Products Corp., 734 F.2d 1036 (5th Cir. Tex.) 1984)..................9

12

Hilbert v. McDonnell Douglas Corp. 529 F.Supp.2d 187 (D. Mass. 2008),.................9, 10

Hofler v. Aetna US Healthcare, 296 F.3d 764 (9th Cir. 2002)....................................5

13

Holdren v. Buffalo Pumps, Inc., 614 F.Supp.2d 129 (D. Mass. 2009.)......................2, 10

In Re Hawaii Federal Asbestos Cases 960 F.2d at 812 ...........................8, 11, 12, 13, 22

14

In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626 (2nd Cir. (N.Y.) 1990) ...9, 22, 23

In re Joint Eastern & Southern Dist. Asbestos Litig., 715 F.Supp. 1167

15

(E.D.N.Y. 1988).................................................................2, 9, 10, 22

In re Maine Asbestos Cases, 44 F.Supp.2d 368 (D.Me 1999)....................................23

16

In re New York City Asbestos Litigation, 542 N.Y.S.2d 118 (1989)............................9

In Re: Joint E. S. Dist. N. Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir. 1990)..............11

17

Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974) ......................................6

Lamb v. Martin Marietta Energy Systems, Inc., 835 F.Supp. 959 (W.D. Ky. 1993) .............11

18

Lindenmayer v. Allied Packing & Supply, Inc., 2010 WL 234906

(N.D.Cal., Jan. 14, 2010)...............................................................10

19

Madden v. Able Supply Company, 205 F.Supp.2d 695 (S.D Tex. 2002............................23

Matheson v. Progressive Specialty Ins. Co., 319 F.3d 1089 (9th Cir. 2003)....................5

20

McGlasson v. Barger, 220 F.Supp. 938 (D. Colo. 1963).......................................3

Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804 (1986).........................3

21

Mesa v. California, 489 U.S. 121 (1989)...................................4, 6, 9, 11, 15, 19, 20

Miller v. Diamond Shamrock Co., 275 F3d 414  (5th Cir. 2001)................................4

22

Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. WL 690854 (N.D. Cal. 1998)................18, 19

Nobriga v. Raybestos-Manhattan, Inc., 683 P.2d 389 (Hawaii 1984) ...........................9

23

Oliver v. Oshkosh Truck Corp., 96 F.3d 992 (7th Cir.1996,).................................9, 10

Overly v. Raybestos- Manhattan, 1996 WL 532150 (N.D. Cal. 1996)...........................9

24

Quiles v. Sikorsky Air, 84 F. Supp. 2d 154 (D. Mass. 1999)..................................21

Rendell-Baker v Kohn, 457 U.S. 830 (1942)...................................................6

25

Ruffin v. Armco Steel Corp., 959 F. Supp. 770 (S.D. Tex. 1997)...........................20, 21

Ryan v. Dow Chemical Co., 781 F. Supp. 934 (E.D.N.Y. 1992).................................5, 6

26

Screws v. United States, 325 U.S. 91 (1945)................................................5

Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir.1995)..................................2, 10

27

Trevino v. General Dynamics Corp. 865 F. 2d. 1474..........................................15

United States v. Boyd, 378 U.S. 39 (1964)..................................................11

28

Viala v. Owens-Corning Fiberglas, 1994 U.S. Dist. WL 139287 (N.D. Cal. 1994) .............18

<u>Williams v. General Electric Company</u>, 418 F.Supp.2d 610 (M.D. 24 Penn. 2005).........................5

<u>Willingham v. Morgan</u>, 395 U.S. 402 (1969) ................................................................5

### <u>Statutes</u>

28 U.S.C. §1442(a)(1).........................................................................4, 5, 18, 20, 21, 23

28 U.S.C. §1447(c) ...........................................................................................24

Fed. R. Civ. P. 56(e) .......................................................................................2, 16

## I. INTRODUCTION

This is a wrongful death asbestos action. Plaintiffs are the widow and son of decedent Patrick Donlon who died of malignant mesothelioma on May 27, 2008.

Defendant United Technologies Corporation (hereinafter "UTC") removed this case from San Francisco Superior Court pursuant to 28 USC §1442(a)(1) (federal officer or agency removal) on July 8, 2011. On July 15, 2011, defendant Curtiss-Wright Corporation ("Curtiss-Wright") joined UTC's removal notice.

UTC removed this case alleging that the aircraft engines with which decedent Patrick Donlon worked and from which Plaintiffs claim he was exposed to asbestos, were subject to government approval and therefore protected under the federal officer removal statute. However, UTC completely fails to set forth any admissible evidence that either the use of asbestos in its aircraft engines or its failure to warn Plaintiffs' decedent of asbestos hazards was at the direction of a federal officer.

Most importantly, there is no evidence, nor will there be any evidence that UTC's failure to warn of the hazards of asbestos was at the direction of a federal officer. Because Plaintiffs have dismissed all causes of action, other than their failure to warn claims, as against UTC and Curtiss-Wright and the other named aircraft engine manufacturers, defendants have not and will not be able to meet their burdens pursuant to a government contractor defense.

The only evidence UTC offers to meet its strict burden of establishing alleged federal control is the declaration of Allan Shiffler. Mr. Shiffler's declaration, which is UTC's attempt to show that the Navy controlled all aspects of UTC's design and manufacture of aircraft engines, contains nothing but conclusory blanket statements. Of key significance is that upon a careful review of Mr. Shiffler's declaration, it becomes evident that he does not offer any opinion as to what the Navy told UTC to do or not do regarding asbestos warnings on defendant's aircraft engines; indeed, the words "asbestos" and "warning" are absent from Mr. Shiffler's entire declaration. It is incomprehensible that the Navy would have instructed defendants not to put warning on its asbestos-containing products. And UTC's only evidence, via the Shiffler declaration, does not establish otherwise.

Additionally, Mr. Shiffler's declaration in this case is almost identical to a declaration he executed in <u>Sandra Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co.</u>, et

al. (Case No. 08-4778, Middlesex County Superior Court in the Commonwealth of Massachusetts.)[1]
In the Norsworthy case, Mr. Shiffler was produced as UTC's person most knowledgeable in response
to a deposition notice seeking facts, documents and witnesses that support UTC's claim of the
government contractor defense for having supplied the Navy and the Air Force asbestos-containing
products. At his deposition, Mr. Shiffler testified that the *one and only* engine he worked on during
his tenure as UTC's employee was used *only* for the Air Force and *never* for the Navy[2]. Mr. Shiffler
further testified that he does not know if UTC possesses any military specification for its manuals nor
does he know what requirements were contained in a military specification. Mr. Shiffler testified that
he was not aware that the military ever told UTC to not warn about the hazards of asbestos in its
manuals.

Mr. Shiffler's testimony makes clear that his declaration in support of UTC's removal of this
case lacks personal knowledge regarding alleged *Navy* control and fails to affirmatively show that he
is competent to testify to any of the matters stated therein as required under Fed. R. Civ. P. 56(e) and
Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993) 509 U.S. 579. Without showing that Plaintiffs'
failure to warn claims are based on acts directed by any federal officer, UTC cannot establish federal
subject matter jurisdiction.

A litany of cases exists throughout the United States, and in this district, holding that removal
based on federal officer jurisdiction is unavailable in failure to warn cases such as the instant case.
They so hold because there is no evidence that the government directed defendants not to warn about
the dangers of asbestos in the products purchased by the government, and that defendants' removal
was based on speculation regarding what the United States Navy would have done. In re Joint Eastern
and Southern Dist. New York Asbestos Litig., 897 F.2d 626 (2d Cir.1990); Tate v. Boeing Helicopters,
55 F.3d 1150 (6th Cir.1995); Holdren v. Buffalo Pumps, Inc., 614 F.Supp.2d 129 (D. Mass. 2009.),
followed by Lindenmayer v. Allied Packing & Supply, Inc., 2010 WL 234906 (N.D.Cal., Jan. 14,
2010).

---

[1] Allan Shiffler's declaration in the Norsworthy case in attached as Exhibit E to the Declaration of
Katherine Y. Wang, filed concurrently herewith.

[2] In this case, Plaintiffs' decedent Patrick Donlon was a Navy aviation mechanic, not an Air Force
mechanic.

1    The claims in those cases, as in this case, are limited by way of disclaimer in the Complaint to

2    state law failure to warn claims.  Various courts, including the U.S. Supreme Court, have repeatedly

3    confirmed that plaintiffs may use such disclaimers to prevent removal, including in asbestos and

4    product liability cases subject to potential transfer to multi-district litigation.  See Merrell Dow

5    Pharmaceuticals, Inc., v. Thompson, 478 U.S. 804, 809 (1986) ("Jurisdiction may not be sustained on a

6    theory that the plaintiff has not advanced.").  Because the only claims alleged against the aircraft

7    engine manufacturing defendants, including UTC and Curtiss-Wright, are failure to warn, this case

8    must be remanded due to a lack of federal subject matter jurisdiction.

9    Even if assuming federal subject matter jurisdiction exists, which Plaintiffs dispute, UTC has

10   failed in its burden to show that it is entitled to the government contractor defense.  UTC's Notice of

11   Removal asserts, in general terms, that:

12       UTC acted under the direction of federal officers-namely officers and agents of
         the U.S. Navy-in designing, manufacturing, and supplying aircraft engines for
13       use in Navy aircraft.  Aircraft engines supplied by UTC to the Navy were
         manufactured in accordance with precise specifications prepared, drafted, and
14       issued exclusively by the Navy.

15       (See UTC's Notice of Removal, ¶16 citing the Declaration of Allan Shiffler,
16       ¶¶2-3; 7-11.)

17   UTC does not state that *any particular government officer expressly specified the use of*

18   *asbestos as an ingredient for the engines on which Mr. Donlon worked in the Navy*.  Nor does UTC

19   state that *any government official prevented defendant from warning about the hazards of asbestos*

20   at the direction of the Navy.  UTC has not cited to or provided *any contractual provisions, aircraft*

21   *specifications or like documents* buttressing Mr. Shiffler's generic assertions.  Nor does UTC identify

22   any discretionary decision by a federal officer which caused decedent to be exposed to asbestos.

23   Moreover, UTC cannot amended or supplement its insufficient notice of removal after the time

24   for removal as expired. McGlasson v. Barger, 220 F.Supp. 938 (D. Colo. 1963).[3]  A removing

25   defendant that fails to provide the requisite facts and evidence, cannot amend or supplement, after the

26

27   [3] UTC admits it was put on notice that Plaintiffs' claims are removable on June 14, 2011; Curtiss-
     Wright admits that it was put on notice on June 15, 2011. (See UTC's Notice of Removal, ¶6; see also
28   Curtiss-Wright's Notice of Joinder, ¶7.)

3

1   time for removal has expired. Id.   Thus should UTC or Curtiss-Wright submit untimely evidence in

2   response to this remand motion, the court must refuse to consider defendants' late evidence because in

3   essence, defendants would be attempting to amend their notices of removal beyond the time period

4   within which removal must be effected.

5       In summary, UTC removed this case based on only very general recitals concerning federal

6   control.  Without establishing that it can prove that the "government made me do it" with admissible

7   evidence, UTC cannot and has not raised a colorable federal defense.  See Boyle v. United Tech. Corp,

8   487 U.S. 500, 509 (1988).

9   **II.  STATEMENT OF FACTS**

10

11      This instant action is based on Patrick Donlon's death from mesothelioma caused by his

12  exposure to UTC's asbestos-containing products.  (See Complaint at ¶ 3-16, Wang Decl., Ex. A.)

13  Plaintiffs allege that Mr. Donlon's exposure to defendant's asbestos-containing products transpired

14  during his service in the U.S. Navy as an aviation mechanic.  (See Preliminary Fact Sheet to

15  Complaint, pg. 3, Wang Decl., Ex. A.)

16      On June 23, 2011, prior to UTC's filing of the removal notice and Curtiss-Wright's joinder in

17  the same, Plaintiffs dismissed all claims except their failure to warn claims as to the aircraft

18  defendants, including UTC and Curtiss-Wright.  (See Request for Dismissal, Wang Decl., Ex. B.)

19  **III.  LEGAL ARGUMENT**

20      **A.  THERE IS A STRONG FEDERAL PRESUMPTION AGAINST REMOVAL
          JURISDICTION**

21

22      The Supreme Court of the United States has stated that section 1442(a) is "a pure jurisdictional

23  statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal

24  officer is a defendant.  Section 1442(a), therefore, cannot independently support Art. III 'arising under'

25  jurisdiction." Mesa v. California, 489 U.S. 121, 136 (1989).

26      The defendant seeking removal of an action to federal court has the burden of showing that it

27  has established grounds for federal jurisdiction in the case. California ex rel. Lockyer v. Dynegy, Inc.,

28  375 F3d 831, 838 (9th Cir. 2004); Miller v. Diamond Shamrock Co., 275 F3d 414, 417 (5th Cir. 2001).

1   Because removal of an action to federal court implicates federalism concerns and deprives the plaintiff

2   of his chosen forum, the removal statutes must be strictly construed against jurisdiction, Hofler v.

3   Aetna US Healthcare, 296 F.3d 764, 767 (9th Cir. 2002), and if there is any doubt about the propriety

4   of removal, the case should be remanded to state court.  Matheson v. Progressive Specialty Ins. Co.,

5   319 F.3d 1089, 1090 (9th Cir. 2003).  There is a "strong presumption against removal jurisdiction" and

6   the removing defendant bears the burden of proving that removal is proper. Gaus v. Miles, Inc., 980

7   F.2d 564, 566 (9th Cir. 1992).  UTC and Curtiss-Wright fail to meet this burden.

8        In the specific context of removals under the federal officer removal statute, federal courts

9   are to avoid a "narrow, grudging interpretation" of their jurisdiction, Ryan v. Dow Chemical Co., 781

10   F. Supp. 934, 943 (E.D.N.Y. 1992) (quoting Willingham v. Morgan, 395 U.S. 402, 407 (1969), but

11   this rule only applies when actual federal officers are defendants, not when private corporate

12   defendants, such as UTC and Curtiss-Wright, attempt to exploit the statute.  Freiberg v. Swinerton &

13   Walberg Property Services, Inc., 245 F.Supp.2d 1144, 1152 n. 6 (D. Colo. 2002).  Removal under

14   §1442 is "an exceptional procedure which wrests from state courts the power to try [cases under] their

15   own laws.  Thus the requirements of the showing necessary for removal are strict." Screws v. United

16   States, 325 U.S. 91, 111-112 (1945). Private actors such as UTC and Curtiss-Wright, bear *a special*

17   *burden* in establishing the official nature of their activities.'" Williams v. General Electric Company,

18   418 F.Supp.2d 610 (M.D. 24 Penn. 2005).

19        Neither UTC nor Curtiss-Wright has even come close to meeting this burden.

20   **B.  UTC  FAILS TO ESTABLISH FEDERAL OFFICER JURISDICTION UNDER 28**

21        **U.S.C. §1442(a)(1)**

22        A defendant that seeks to remove a case under Section 1442(a)(1) has the burden of proving

23   four jurisdictional elements: (1) that it is a "person" within the meaning of the statute;  (2) that it acted

24   under the direction of a federal officer;  (3) that it has a colorable federal defense to the plaintiff's

25   claims; and (4) that there is a causal nexus between the plaintiff's claims and the acts the defendant

26   performed under color of federal office.  Arnold v. Blue Cross & Blue Shield, 973 F.Supp. 726, 739

27   (S.D. Texas 1997) (*citing* Mesa v. California, 489 U.S. 121, 124-25, 129-31, 134-35 (1989)). Plaintiffs

28   particularly address UTC's failure to meet the second, third and fourth prongs of the Mesa test.

1
2

### 1. UTC Has Not And Cannot Show That It Acted Under The Direction Of A Federal Officer

Under the second prong of the Mesa test, UTC must demonstrate that it acted at the direction of a specific federal officer when designing the aircraft engines with which Mr. Donlon worked.  UTC must prove that it worked under the "direct and detailed control" of a federal officer. Arnold, 973 F.Supp. at 740. Establishing this element requires more than merely alleging that the acts in question were generally carried-out under federal auspices. Ryan v. Dow Chemical Co.,781 F.Supp. 934, 947 (E.D.N.Y. 1992); Good v. Armstrong World Industries, Inc., 914, F.Supp. 1125, 1129; Arness v. Boeing North America, Inc., 997 F.Supp. 1268, 1273 (C.D. Ca. 1998). "[R]emoval must be predicated upon a showing that the acts that form the basis for the state civil suit . . . were performed pursuant to [a federal] officer's direct orders or to comprehensive and detailed regulations." (Id.).

A company acts under color of federal law only when its action "may be fairly treated as that of the [government] itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350-51 (1974).  The fact that a corporation is performing under government contracts whose specifications it must meet does not automatically transform its conduct into government action.  "Many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government.  Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." Rendell-Baker v Kohn, 457 U.S. 830, 841 (1942).

#### a. UTC Does Not And Cannot Identify The Federal Officer Who Directed It To Incorporate Asbestos Into Its Engines Or Directed It To Exclude Safety Warnings

In order for UTC to successfully set forth a colorable federal defense, it must prove that it acted at the direction and under the control of a *specific* federal officer.  That control must have been exercised by a specific, individual federal official, not an entire agency. Good, supra, 914 F. Supp. at 1128-1129.  The holding in Good is instructive.  The removing defendant in that case, Westinghouse, was named in the case because it manufactured turbine generators, which plaintiff worked on as a Navy seaman, and which allegedly contained and emitted asbestos dust.  Westinghouse offered proof that it manufactured the turbines under government contracts and was bound to meet the general

performance specifications set by the Navy. Its witness testified that the production of the turbines was pursuant to Navy design and construction drawings and written specifications, and that Naval officers and civilian employees worked at the Westinghouse plant and supervised production of the turbines. (Id. at 1128.) Nevertheless, the court determined that neither Westinghouse's notice of removal nor its affidavit established that any specific Navy official had the necessary control to establish the "acting under" element:

> [Evidence that a] conglomerate of people employed by the United States Navy who had oversight authority does not support the blanket assertion by Westinghouse that the Secretary of the Navy provided direct and detailed control over Westinghouse. . . . Although it is true that the United States Navy and many individuals employed by the Navy worked with Westinghouse, Westinghouse does not show that the Secretary of the Navy or any other federal officer directly controlled and supervised the work of Westinghouse. Cf. Noble v. Employers Ins., 555 F.2d 1257 (5th Cir. 1977) (finding the 'acting under' requirement satisfied where the defendant-surgeon had acted under the immediate supervision of the Administrator of Veteran Affairs who evaluated the defendant-surgeon's performance and determined his hours and working conditions.). (Id. at 1129.)

UTC's notice of removal is clearly insufficient in this regard. It does not allege (much less establish) that *any federal officer expressly required it to use asbestos-containing materials in manufacturing aircraft engines*. Good, 914 F.Supp. at 1129. UTC fails to identify, let alone, provide any contracts, agreements, regulations or specifications from the Navy requiring that asbestos be used on Pratt & Whitney's engines even though its witness Allan Shiffler's averments are supposedly based on his review of these very documents. (See ¶ 16, UTC's Notice of Removal; see also Declaration of Allan Shiffler, ¶¶5, 7, 9.)

Allan Shiffler was born in 1941; he worked for Pratt & Whitney from 1966 until his retirement in 2003. (See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 7, 2011, Wang Decl., Ex. C, pgs.9:6-12; 10:23-11:6.)[4] Contrary to the statements contained in the declaration he executed in this case, Mr. Shiffler had previously admitted during his deposition in the Norsworthy matter that the *one and only military aircraft engine* on which he worked during his entire tenure at Pratt & Whitney was the model "TF33" used by the Air Force, but *never* used by the

---

[4] Plaintiffs' decedent Patrick Donlon served in the Navy from 1955 to 1958, almost a decade before Allan Shiffler began working for UTC.

*Navy:*

> 16  Q.  All right.  When we left off yesterday, we
> 17  were talking about the development of the dash 100A
> 18  version of the TF33, correct?
> 19     A.  Yes.
> 20     *Q.  All right.  Other than the development of*
> 21  *that engine, were you personally involved in the*
> 22  *development of any new engine or new variant of any*
> 23  *engine for the United States military during your*
> 24  *employment at Pratt & Whitney?*
> 1      *A.  No.*
> 2      *Q.  And were you involved in any contract*
> 3   *negotiations for the development of any new engine*
> 4   *or new variant of any engine other than the TF33*
> 5   *during your tenure at Pratt & Whitney?*
> 6      *A.  No.*
> 14  Q.  Okay.  Was the dash 100A engine ever sold
> 15  on the civilian side?
> 16     A.  No.
> 17     Q.  Was it ever put in anything other than an
> 18  AWACS aircraft by the Air Force?
> 19     A.  The 100A?
> 20     Q.  Yes.
> 21     A.  No.
> 22     *Q.  And was it ever sold to any other branch of*
> 23  *the military, the Navy?*
> 24     *A.  No.*

(See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8,

2011, Wang Decl., Ex. D, pgs.103:16-104:6; 111:14-24.)

UTC's evidence via Allan Shiffler not only fails to establish that defendant acted under a

federal officer, it show that UTC has *no* evidence that it acted under *any Navy officer* because Mr.

Shiffler never worked on an engine that was supplied to the Navy.

### b.  Defendant Cannot Prove That It Failed To Warn At The Direction Of A Federal Officer

The government contractor defense applies in very narrow circumstances:

Boyle displaces state law only when the government, making a discretionary, safety-
related military procurement decision contrary to the requirements of state law,
incorporates this decision into a military contractor's contractual obligations, thereby
limiting the contractor's ability to accommodate safety in a different fashion. In Re:
Hawaii Federal Asbestos Cases, 960 F.2d at 813 (internal quotations omitted).
Accord Dorse v. Eagle-Picher Indus., Inc., 898 F.2d 1487, 1489 (11th Cir. 1990).

Several Courts have rejected the government contractor defense in asbestos cases or found that the defense does not apply in circumstances similar to those presented here. See In re Joint Eastern and Southern District Asbestos Litigation (I), 715 F.Supp. 1167, 1169 (E.D.N.Y. 1988) (Court rejected military contractor defense holding that federal specifications were silent on the matter of warnings and defendant could have provided adequate warnings to plaintiffs and complied with the federal specifications); Hansen v. Johns-Manville Products Corp., 734 F.2d 1036, 1044-45 (5th Cir. (Tex.) 1984), reh'g denied 744 F.2d 94, cert. denied 470 U.S. 1051; Nobriga v. Raybestos-Manhattan, Inc., 683 P.2d 389, 392 (Hawaii 1984); In re New York City Asbestos Litigation, 542 N.Y.S.2d 118, 120-21 (1989); In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 629-30, (2nd Cir. (N.Y.) 1990); In re Joint Eastern & Southern Dist. Asbestos Litig., 715 F.Supp. 1167 (E.D.N.Y. 1988); Faulk v. Owens-Corning Fiberglass Corp., 48 F.Supp.2d 653, 663-64 (E.D.Tex. 1999) (applying federal law); Good v. Armstrong World Indus., 914 F.Supp. 1125, 1131 (E.D.Pa. 1996).

In Overly v. Raybestos- Manhattan, 1996 WL 532150 (N.D. Cal. 1996) (See Wang Decl., Ex. G) defendant Avondale Industries removed an asbestos case to federal court based on federal officer jurisdiction. The Overly court explained that "plaintiffs have proceeded against Avondale on the 'failure to warn theory' of product liability." Overly at p. 1.

The Overly court stated:

> [I]n order to meet the Boyle test in a failure to warn case, the defendant must show that the government affirmatively instructed it regarding the provision of warnings. Defendant's only showing on this motion relates to the government's manufacturing and engineering specifications. Defendant has not demonstrated that the government provided "reasonably precise specifications" affecting Avondale's provision of warnings. [citation omitted] Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunity. [citation omitted] Therefore defendant fails to meet the second prong of the Mesa standard because Avondale has no colorable federal defense to the charges in this case. Overly at pp. 3-4.

In order for the federal contractor defense to apply in the failure to warn context, a defendant must show a conflict between state law and federal policy. Hilbert v. McDonnell Douglas Corp. 529 F.Supp.2d 187 (D. Mass. 2008), citing Oliver v. Oshkosh Truck Corp., 96 F.3d 992 at 1003 (7th

1    Cir.1996.); Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir.1995.); and In re Joint Eastern and

2    Southern Dist. New York Asbestos Litig., 897 F.2d 626 (2d Cir.1990.)  In other words, the party

3    attempting to invoke a federal officer defense must show that "the government made me do it."  In re

4    Joint Eastern and Southern Dist. New York Asbestos Litig., 897 F.2d 626 at 632 (2d Cir.1990), citing

5    Boyle v. United Tech. Corp.

6          In this context, UTC must prove both that the government made UTC incorporate asbestos-

7    containing materials in its engines and that the government prevented UTC from providing warnings

8    regarding the hazards associated with those asbestos-containing products.   Holdren v. Buffalo Pumps,

9    Inc., 614 F.Supp.2d 129 (D. Mass. 2009.), followed by Lindenmayer v. Allied Packing & Supply, Inc.,

10   2010 WL 234906 (N.D.Cal., Jan. 14, 2010) (See Wang Decl., Ex. F).

11         If both federal policy and state law can be satisfied at the same time, the contractor may not

12   assert the defense.  (Id.) ***Defendant may not defeat a failure to warn claim simply by showing the***

13   ***elements of the Boyle defense to a design defect claim***.  In order to assert a colorable federal defense

14   in a failure to warn claim, defendant "***must*** rebut the obvious inference: that it never tried to warn

15   about asbestos at all." Hilbert, supra at 202.  (Emphasis added.)

16         Here, UTC relies upon the standards set forth in Boyle in an attempt to raise a colorable

17   defense to Plaintiffs' failure to warn claim based upon Allan Shiffler's generic declaration.  Under

18   Good and Hilbert, UTC does not even come close to meeting its burden because not only has Mr.

19   Shiffler admitted that he has never worked on any Pratt & Whitney engines that were supplied to the

20   ***Navy***, Mr. Shiffler previously testified that he is not aware of any response from the military to UTC

21   regarding warnings about asbestos because UTC never bothered to ask the military:

22

23         9    ***Q. Was Pratt & Whitney ever told by the***
           10   ***military not to put warnings about asbestos in its***
24         11   ***manuals?***
           12        ***MR. TABASKY: Objection.  You can answer***
25         13   ***if you know.***
           14        ***A. I'm not aware of them asking.***
26         15        Q. You're not aware of Pratt asking the
           16   military whether they could?
27         17        A. Exactly,
           18        ***Q. All right.  And if Pratt didn't ask the***
28         19   ***military whether they could, then there wouldn't be***

1
    **20**  *a response from the military one way or the other,*
    **21**  *correct?*
2
    **22**       MR. TABASKY: Objection.
    **23**  *A. Yes.*

3  (See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011, Wang

4  Decl., Ex. D, pg. 144:9-23.)

5        Because ample case law makes clear that the Boyle standard does not apply in failure to warn

6  cases, and because UTC did not and cannot prove that it did in fact try to warn about asbestos but was

7  not permitted to by its federal contracts, UTC has not raised a colorable defense to Plaintiffs' claims,

8  and this case must be remanded.

9           **2.  UTC Has Not Raised a Colorable Federal Defense**

10       To satisfy the third prong of the Mesa test, UTC must raise a colorable federal defense, which

11  it fails to do.  In order to assert a colorable federal defense, UTC "must do more than simply plead a

12  federal defense.  Rather, [it] must plead a *colorable* federal defense." Faulk v. Owens-Corning

13  Fiberglass, Corp., 48 F.Supp.2d 653, 664 (emphasis original).  The defense amounts to a claim that

14  "the government made me do it." In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 813 (*citing* In Re:

15  Joint E. S. Dist. N. Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir. 1990)).

16       And it is not enough for the defendant to allege that it has a colorable defense because it simply

17  supplied products to the military or supplied products to the military in compliance with government

18  specifications.  If this were the case then every lawsuit involving asbestos exposure from military ships

19  or aircraft would be in federal court.  Federal contractors do not enjoy any type of automatic

20  immunity. Lamb v. Martin Marietta Energy Systems, Inc., 835 F.Supp. 959, 962-63 (W.D. Ky. 1993)

21  (*citing* United States v. Boyd, 378 U.S. 39, 44 (1964)).  Rather, this defense applies only to specific

22  situations, which the defendant must establish through admissible evidence. *Lamb*, 835 F.Supp. at

23  959.

24       While a defendant need not prove its federal defense in order to satisfy this prong of the *Mesa*

25  test, it still must offer enough evidence to show that the defense is colorable.  This requires, at a

26  minimum, pleading each necessary element and offering some supporting evidence. *Lamb*, 835

27  F.Supp. at 966-67.  Defendant fails to do so here.

28

### a. The Military Contractor Defense Does Not Apply Where The Products at Issue Are Stock Equipment Readily Available to Commercial Users

Defendant has not, and cannot, produce evidence that the asbestos-containing materials that caused Mr. Donlon's mesothelioma were nothing more than standard, stock equipment used interchangeably in its aircraft engines, as required by this Circuit in In Re: Hawaii Federal Asbestos Cases, 960 F.2d 806, 812 (9th Cir. 1992) (government contractor defense not applicable when the product is a stock item that was not ". . . manufactured with the special needs of the military in mind"). The mere selection of such standard asbestos-containing components by the government does not provide the supplier or contractor with a basis for removal. Boyle, 487 U.S. at 509 (government contractor defense does not apply to injury caused by "stock" item or "standard equipment").

In fact, the asbestos materials that Plaintiffs claim caused Mr. Donlon's mesothelioma and his death would have been the same standard asbestos products available in the private sector market. There was nothing special or unique about them as explained by Allan Shiffler:

```
 3  Q.  Would you consider it an unusual situation
 4  for a spare part for a Pratt & Whitney engine in an
 5  Air Force plane to come from a parts overhaul shop
 6  as opposed to through Pratt & Whitney?
 7      (Objection by multiple counsel.)
 8  A.  They may have acquired non -- what I would
 9  consider noncritical parts.
10  Q.  What do you consider to be a noncritical
11  part?
12  A.  Clamps, bolts; common bolts and nuts that
13  are common throughout the industry, throughout the
14  aerospace industry, those types of items; gaskets,
15  MS, AN parts, those sorts of items.
16  Q.  And to the extent that a part like that is
17  used on a Pratt & Whitney engine, can any part be
18  used, or do they have to be parts that were designed
19  and built pursuant to Pratt's specifications?
20  A.  Our recommendation to the Air Force is that
21  they use our recommended parts; however, the Air
22  Force themselves have the option to utilize what
23  they call equivalencies.
24  Q.  And when you say "equivalencies," is that
 1  something that the Air Force deemed to be equivalent
 2  to the Pratt part?
```

3    *A. Yes.*
4    *Q. And it was a part that was obtained from*
5    *someone other than Pratt?*
6    *A. Yes.*

(See Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8,

2011, Wang Decl., Ex. D, pg. 123:3-124:6)

The mere selection of such stock components by the government does not cloak the supplier or

contractor with immunity from suit. In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 806. As the

Court explained in Boyle:

> If, for example, the United States contracts for the purchase and installation of an air
> conditioning unit, specifying the cooling capacity but not the precise manner of
> construction, a state law imposing upon the manufacturer of such units a duty of care to
> include a certain safety feature would not be a duty identical to anything promised the
> Government, but neither would it be contrary. Boyle, 487 U.S. at 509.

In applying the principles set forth in Boyle, in In Re: Hawaii Federal Asbestos Cases, 960

F.2d at 806, the Ninth Circuit specifically addressed the instant situation. In In Re: Hawaii Federal

Asbestos Cases, the court found that the military contractor defense was not a barrier to plaintiffs'

state court claims because the asbestos insulation at issue was not "military equipment" since it was

used in both commercial and military applications.

The Ninth Circuit, citing Boyle, set forth as follows:

> ...the fact that a company supplies goods to the military does not, in and of itself,
> immunize it from liability for the injuries caused by those goods. *Where the goods
> ordered by the military are those readily available, in substantially similar form, to
> commercial users, the military contractor defense does not apply.*

In Re: Hawaii Federal Asbestos Cases, 960 F.2d at 811, *citing* Boyle at 512.

The court explained the rationale:

> That Boyle speaks of the military contractor defense as immunizing contractors only
> with respect to the military equipment they produce for the United States is consistent
> with the purposes the Court ascribes to that defense. The Boyle Court noted that the
> military makes highly complex and sensitive decisions regarding the development of
> new equipment for military usage. Allowing contractors who are hired to manufacture
> that equipment to be sued for the injuries caused by it would impinge unduly on the
> military's decision making process. The contractors would either refuse to produce the
> military equipment for the Government or would raise their prices to insure against
> their potential liability for the Government's designs. (Id.)

13

1    The court further explained:

2

3    These same concerns do not exist in respect to products readily available on the
     commercial market. The fact that the military may order such products does not make

4    them "military equipment." The products have not been developed on the basis of
     involved judgments made by the military but in response to the broader needs and

5    desires of end-users in the private sector. (Id.)

6    As set forth above, such stock equipment, used in both commercial and military applications are not

7    subject to federal officer removal, and do not give rise to a federal defense. Allan Shiffler's deposition

8    testimony makes clear that the asbestos materials used in UTC's aircraft engines (gaskets, clamps,

9    bolts) were nothing more than *noncritical* and therefore non-military standard asbestos products

10   available in the commercial market. (See Deposition of United Technologies Corporation by Allan J.

11   Shiffler, taken on April 8, 2011, Wang Decl., Ex. D, pg. 123:3-124:6),

12       By designing and manufacturing engines for use in the military that contained the same

13   asbestos-containing materials as were being used in the private sector, UTC was not and could not

14   have been acting at the direction of a federal officer. As such, UTC does not have even a colorable

15   federal defense to Plaintiffs' claims.

16                     **b.  Even if the Products at Issue are Considered "Military Equipment"
                       And The Boyle Elements Applied to a Failure to Warn Case, UTC
17                     Does not Raise a Colorable Federal Defense Since it Cannot Prove
                       That in Making Decisions Regarding Warnings, it Was Acting in
18                     Compliance with Reasonably Precise Specifications Imposed by the
                       Unites States**

19

20       The government contractor defense shields government contractors from liability only when

21   "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to

22   those specifications; and (3) the supplier warned the United States about the dangers in the use of the

23   equipment that were known to the supplier but not to the United States." Boyle v. United Technologies

24   Corp. 487 U.S. 500, 512 (1988). The third element of the government contractor defense requires the

25   defendant to prove that it warned the government about the risks involved that it knew, but the

26   government did not. Faulk, 48 F.Supp. at 666.

27       As the Boyle court noted:

28

The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract, but withholding it would produce no liability. Boyle, at 512.

The Court's inclusion of a warning element must indicate that approval requires some level of evaluation and review; otherwise a government contractor might argue one day that it should have the benefit of the defense despite its failure to give a warning because the government had rubber-stamped the design, because the information withheld would have been no use to the government and was not desired by the government, and because the provision of the information would not have affected the government's "approval" of the design. Trevino v. General Dynamics Corp. 865 F. 2d. 1474.

Rather than producing evidence of what it knew about the hazards of asbestos, UTC produces a declaration from industrial hygienist William Ringo, who speculates, without any foundation or citations to documentary support, that "the state-of-the-art scientific knowledge regarding asbestos-related health hazards in the 1950s, 1960s and 1970s, would not have included any information or knowledge that an aircraft engine mechanic...would be at risk for any asbestos-related disease from the work performed on aircraft engines." (Declaration of William Ringo at ¶ 10.) Mr. Ringo's declaration suffers from two notable deficiencies. First, nowhere in his declaration does Mr. Ringo introduce evidence regarding UTC's own knowledge about the dangers of its own products, versus the knowledge of the government. Second, regardless of what the Navy purportedly knew, Mr. Shiffler unequivocally testified that the military never prevented UTC from warning about asbestos hazards. Thus, Mr. Ringo's opinions regarding what the government purportedly should have known about the hazards of asbestos is a red herring that does not meet UTC's burden of establishing a colorable federal defense.

### 3. UTC Cannot Establish Causal Nexus Between Its Actions Under The Control Of A Federal Officer And Plaintiffs' Failure to Warn Claims.

The fourth prong of the *Mesa* test requires a "causal nexus" between plaintiffs' claims and defendant's acts allegedly taken under federal direction··· and again UTC fails to set forth any facts whatsoever. As explained below, Plaintiffs' claims against UTC are based on its failure to warn about the dangers of asbestos that UTC incorporated into the design and manufacture of its asbestos-

1   containing aircraft engines. In order for UTC to show that there was a causal nexus between its

2   actions under the control of a federal officer and plaintiffs' claims, it must show that a federal officer

3   specifically dictated that UTC (1) must use asbestos in its engines, and (2) must not warn about the

4   dangers of that asbestos. Faulk, 48 F.Supp.2d at 663 ("the federal government did not dictate any

5   specifications regarding the warning about asbestos-containing products").

6        UTC's only evidence anywhere in the record on this prong is again Allan Shiffler's

7   declaration. Mr. Shiffler's declaration in this case is nearly identical to the one he executed in support

8   of UTC's removal under federal officer jurisdiction in the Norsworthy case. (See Declaration of

9   Allan J. Shiffler in support of Defendant United Technologies Corporation's Notice of Removal,

10  authenticated and attached as Exhibit 4 to the Deposition of United Technologies Corporation by Allan

11  J. Shiffler, taken on April 8, 2011, Wang Decl., Ex. E.) However, as Mr. Shiffler explained during his

12  deposition in the Norsworthy matter, the statements contained in his nearly identical declaration are

13  not based on his personal knowledge since he was not employed by Pratt & Whiney before 1966. (See

14  Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011, Wang

15  Decl., Ex. D, pgs. 146:14-147:5; 149:22-151:24.)

16       Mr. Shiffler further testified that while his declaration stated that "these military specialists at

17  Pratt & Whitney controlled the design and manufacture of an aircraft engine produced at Pratt &

18  Whitney for the United States military"[5], what he really meant to say was that the military simply had

19  veto power over *defendant's own designs*:

20       11   Q. *Paragraph 8 there, if you look down at the*
         12   *last sentence of Paragraph 8, you say, "During the*
21       13   *period of my employment at Pratt & Whitney, these*
         14   *military specialists at Pratt & Whitney controlled*
22       15   *the design and manufacture of any aircraft engine*
         16   *produced at Pratt & Whitney for the United States*
23       17   *military."*
         18        *And I take it by "controlled the design*
24       19   *and manufacture" you mean that they had veto power*

25  _____

26  [5] Mr. Shiffler's declaration in this case differs slightly from the Norsworthy case in that instead of the
    word "military" that was used throughout his prior declaration, he has changed "military" to "Navy" in

27  his declaration here. However, in light of Mr. Shiffler's testimony that he had never worked on a Pratt
    & Whitney engine supplied to the Navy, his entire declaration lacks personal knowledge under Fed. R.

28  Civ. P. 56(e) and is inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993) 509 U.S.
    579.

```
20   over Pratt's designs?
21       A.  Yes.
22       Q.  They weren't the ones putting the designs
23   together?
24       A.  Right.
```

(Id. at pg. 156:11-24.)

```
 1       Q.  Let's flip to the next page, Paragraph 10.
 2   You say, "Any written material such as warnings or
 3   product manuals that accompanied the engines built
 4   by Pratt & Whitney for the United States military
 5   were similarly controlled and specified by the
 6   United States military."
 7           You don't have any personal knowledge as
 8   to what control, if any, the military exercised over
 9   manuals that were drafted by Pratt, do you?
10           MR. TABASKY:  Objection.
11       A.  Other than by the contract requirements for
12   publications.
13       Q.  Okay.
14       A.  And there is -- it does list quite a bit of
15   guidelines.
16       Q.  So the contracts for the publications not
17   only tell Pratt that it has to create manuals, but
18   it gives some information as to what has to be in
19   the manuals?
20       A.  Yes.
21       Q.  As you sit here today without the contract
22   in front of you, can you tell me what else it says
23   other than Pratt has to create manuals?
24       A.  No.
 1       Q.  We'd need the contract to know exactly what
 2   they say?
 3           MR. TABASKY:  Objection.
 4       A.  Because they vary (nodding).
 5       Q.  All right.  So when you say "were
 6   controlled and specified by the United States
 7   military," what you mean is that the written
 8   materials were subject to a contract?
 9       A.  Yes.
```

(Id. at 157:1-158:9.)

By its own admission, UTC's only evidence offered in support of its removal notice is nothing more than the speculation of a former company employee who has no personal knowledge of any of UTC's dealings with the Navy.  Such evidence fails to show that a specific federal officer directed UTC not to warn, including the failure to place appropriate warnings *on or with* its asbestos-containing engines.

1    **a.  Plaintiffs' Claims Against UTC Are Limited to Failure to Warn.**

2    Plaintiffs' claims against Defendant UTC are based on Mr. Donlon's exposure to asbestos from

3    maintenance work on aircraft operated by the U.S. Navy.  Plaintiffs' Complaint states the following:

4    "…For purposes of the claims alleged herein, the Federal Courts lack subject matter

5    jurisdiction over this action, as there is no federal question and incomplete diversity of
     citizenship due to the presence of a California defendant.  Removal is improper.  Every

6    claim arising under the Constitution, treaties, or law of the United States is expressly
     disclaimed, including any claim arising from an act or omission on a federal enclave, or

7    of any Officer of the U.S. or any agency or person acting under him occurring under
     color of such of office.  No claim of admiralty or maritime law is raised.  Plaintiffs sue

8    no foreign state or agency.  By this allegation, plaintiffs are not disclaiming State law
     claims arising exposures on Federal enclaves.  Plaintiffs are only disclaiming claims

9    which would be directed at the Federal government and/or Federal officers…"

10   (See Complaint at ¶ 3-16, Wang Decl., Ex. A.)  If there is any doubt as to the meaning of Plaintiffs'

11   allegations, Plaintiffs' attorneys dismissed all claims as to UTC except for their failure to warn claims

12   so that they are only proceeding against UTC on a failure to warn theory of liability.  (See Complaint

13   at ¶ 3-16, Wang Decl., Ex. A; see also Request for Dismissal, Wang Decl., Ex. B.)  Thus, Plaintiffs'

14   claims against UTC are specifically limited to failure to warn of the health hazards associated with

15   asbestos exposure, as opposed to defective design of the products in question.  As will be shown

16   below, there is no federal subject matter jurisdiction over a failure to warn claim in an asbestos case.

17   **b.  There Is No Jurisdiction Under §1442 In Failure To Warn Cases**

18

19   UTC relies exclusively on the Boyle "government contractor" defense to support federal officer

20   removal jurisdiction herein.  (See UTC's Notice of Removal at ¶17.)  However, federal courts

21   throughout the country have struck the Boyle government contractor defense as a matter of law in

22   failure to warn claims.

23   Presumably due to the large number of asbestos cases in California, Hawaii and Texas, the

24   Ninth and Fifth Circuits have dealt with many attempted removals under §1442(a)(1).  The courts in

25   those Circuits have consistently held that §1442 removal is not available in failure to warn cases.

26   Viala v. Owens-Corning Fiberglas, 1994 U.S. Dist. WL 139287 (N.D. Cal. 1994) (See Wang Decl.,

27   Ex. H) ("Thus, there is no evidence that the specifications provided by the government in any way

28   conflicted with defendants' State law duty to design and manufacture safe products that did not cause

1    asbestos related illnesses. In the absence of such a conflict, the government contractor defense is not

2    colorable."); Nguyen v. Allied Signal, Inc., 1998 U.S. Dist. WL 690854 (N.D. Cal. 1998) (See Wang

3    Decl., Ex. I) ("Although defendants present evidence showing federal direction of defendants

4    regarding the installation of insulation materials, they do not show federal direction of their activities

5    with regard to warnings attached to asbestos products.  Therefore, defendants failed to meet their first

6    prong of the Mesa test."); Faulk, 48 F.Supp.2d at 665 ("Nor is there any evidence that the Federal

7    government prohibited defendants from warning about the dangers of asbestos.") & at 666 ("There is

8    no causal nexus between defendants' action under this [federal] control and the plaintiffs' claims . . .

9    thus defendants' fail to satisfy…Mesa.").

10        The Nguyen case is directly on point because it involved exposure to asbestos at a U.S. Air

11   Force base in Vietnam regarding working on military aircraft:

12           Here, defendants have produced no evidence that their contracts with the
             United States government contained contractual obligations specifically
13           prohibiting them from placing warnings on their products.  Instead, *they
             produce evidence regarding government control of the specification
14           for manufacturing the aircraft, not specifications regarding warnings.*
             They also rely upon the affidavit of Alvin F. Meyer, which indicates
15           only that the government approved all warnings placed in technical
             manuals for United States Air Force aircraft.  They offer no evidence
16           that they attempted to include such warnings, or that the government
             specifications and contractual provisions explicitly directed them not to
17           place warnings on their products.  Therefore, the Ninth Circuit's holding
             in Hawaii Federal controls and the government contract defense cannot
18           be the basis for federal jurisdiction in a failure to warn case here
             [emphasis added].

19
20   Nguyen, at 2-3. *Nguyen* was dispositive that there was no causal nexus.  As the court held:

21           The third prong of the Mesa test requires a causal nexus between the
             rules imposed by the United States on the federal contractor and the
22           liability  asserted  by  the  plaintiff.  [citations  omitted]      Although
             defendants  include  evidence  regarding  the  control  of  the  federal
23           government over the manufacture of its products, again, this evidence
             does not demonstrate that the federal government directed defendants
24           not to place warnings on their products.  Therefore, there was no causal
             connection between the control exercised by the United States over
25           defendants and plaintiffs' legal theory of failure to warn consumers of
             the hazards of asbestos.  The court therefore concludes that there is no
26           federal jurisdiction over this action.  Consequently, plaintiffs' motion to
             remand must be granted.

27   Nguyen, at 4.

28

1    In Freiberg, the plaintiffs sued contractors who had used asbestos products during the

2    construction of a nuclear weapons production facility. Freiberg, 245 F. Supp. 2d at 1148. The

3    defendants removed on the basis of §1442(a)(1). Id. In the decision granting remand, the court

4    succinctly stated why no causal nexus existed for a failure to warn claim:

5    In their briefs and submissions in support of removal, Defendants fail to apprehend the
     essence of the "under color" causal connection requirement. They are being sued for
6    unnecessarily and negligently causing their employees and other workers to be exposed
     to asbestos dust on the job and for failing to warn these employees and workers of the
7    associated dangers. What they must establish for purpose of the §1442(a)(1) [sic] is
     that the government authority under which they worked required them to act as they
8    did. *For purposes of Plaintiffs' failure to warn claims, for example, they must
     establish the DOE's direction and control of the activities directly interfered with*
9    *their ability to fulfill their state law obligation to warn employees of safety hazards.*
     [citation omitted] Nothing in Prout's affidavit or the government contracts produced by
10   Lummus establishes the requisite nexus between their construction and safety practices
     at Rocky Flats and government direction or control. Accordingly, removal jurisdiction
11   is not established. (Emphasis added.)

12   Id. at 1155.

13   In Ruffin v. Armco Steel Corp., 959 F. Supp. 770 (S.D. Tex. 1997), the court held there is no

14   federal officer removal jurisdiction in a case that involved even more control by the federal

15   government over the defendant than the allegations by UTC in building aircraft. Arness, 997 F. Supp.

16   at 1275. In Ruffin, the plaintiff worked at Armco's steel mill where he was exposed to asbestos.

17   "Armco claims that its Houston steel plant was constructed under the control of federal officers, which

18   presumptively provides it with sufficient basis for removal under §1442(a)(1)." Ruffin at 959 F. Supp.

19   at 772. The court reasoned as follows:

20   
21   Armco claims that at all times relevant to the suit, it acted under the supervision of the
     Secretary of Commerce and other officials from the Defense Plan Corporation ("DPC"),
22   one of many federal corporations created to assist in the war program. Armco claims
     that the nexus requirement under Mesa is satisfied with proof that the plant it
23   constructed was built pursuant to DPC plans and the state action against it arose from
     injuries allegedly caused from Armco's compliance with those plans. Because the
24   plaintiff's state action is predicated on a failure to warn theory, however, *Armco must
     not only show that the mill was built pursuant to DPC specifications (and asbestos*
25   *was a government approved or mandated material) but also that DPC restricted or*
     *prohibited Armco from providing adequate precautions* against or otherwise notifying
26   its employees of the hazards of asbestos exposure. (Emphasis added.)

27   Ruffin, 959 F. Supp. at 774.

28

20

1   The court went on to further explain that it is not enough merely to evidence government

2   involvement in the procurement contract, but detailed control and indeed federal mandated conflicts

3   with state law duties.  As the court explained:

4   > The court finds that although Armco has proven that DPC supervised and extensively
   > monitored the construction of the mill, Armco has failed to demonstrate that DPC

5   > exercised the same degree of control with respect to safety precautions that allegedly
   > should have been taken to warn employees of the hazards associated with asbestos

6   > exposure.  There was no evidence to show that DPC prevented Armco from issuing
   > adequate safety warnings or that the government enacted or even considered enacting

7   > its own programs or guidelines to cover workplace safety.  Nor does the evidence show
   > that DPC controlled personnel matters or at all interfered with the duty of care Armco

8   > owed under state law to its employees.  The mere fact that the government possessed
   > the power to control or regulate employee safety neither establishes that that power was

9   > ever used nor that operational mandates of this type were ever issued.  Without such
   > proof, Armco cannot satisfy the statutory requirements for removal under §1442(a)(1).

10

11  Ruffin, 959 F. Supp. at 776.

12      The Ruffin court further explained that giving blanket immunity under Boyle and expanding

13  federal jurisdiction is not warranted by any federal policy.  As the court explained:

14  > The court also believes that blanket absolution of liability for all acts of neglect,
   > whether or not committed under specific and direct order, would encourage laxity at the

15  > expense of human lives without any corresponding benefit. [¶] Finally, the court can
   > find no threat to the enforcement of federal laws if the instant case is adjudicated in

16  > state court. . . . Furthermore, the basic intent of §1442(a)(1) removal is for protection of
   > federal officials, as well as those acting under their direction, against state court

17  > hostility or interference with the effectuation of federal policy.  In this case, there is
   > arguably no potential federal policy violation, aside from a general government interest

18  > in cost control, requiring a federal forum for adjudication.

19  Ruffin, 959 F. Supp. at 776-777.

20      These cases make clear that displacement of state law is appropriate only where "a 'significant

21  conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law.'"

22  Boyle, 487 U.S. at 507. In order "to establish that Boyle displaces any state law duty to warn,

23  defendants must show that the applicable federal contract includes warning requirements that

24  significantly conflict that those that might be imposed by state law." Quiles v. Sikorsky Air, 84 F.

25  Supp. 2d 154, 170 (D. Mass. 1999).

26      In this case, Allan Shiffler has admitted that only contracts between UTC and the Navy could

27  provide pertinent information regarding the existence of any federal specifications as he has no

28  personal knowledge about UTC's work with the Navy.  Not only has UTC failed to offer any contracts

21

1   between itself and the Navy, even if assuming such contracts existed, there is no evidence of federal

2   specifications in any contract between UTC and the Navy that are in conflict with the laws of

3   California. Indeed, "no 'significant conflict' exists where a defendant can comply both with the

4   federal specifications and with the standards of conduct imposed by the state." In re Joint Eastern and

5   Southern District Asbestos Litigation (1), 715 F.Supp. at 1169 (Court rejected military contractor

6   defense holding that federal specifications were silent on the matter of warnings and defendant could

7   have provided adequate warnings to plaintiffs and complied with the federal specifications); See also

8   In Re Hawaii Federal Asbestos Cases 960 F.2d at 812 (The Court said that the military contractor

9   defense would fail because there ". . . existed no conflict between their state law duty to provide

10  adequate warnings to the users of their [product] and the conditions imposed on them pursuant to the

11  agreements they had entered into with the Government").

12       Under California law, a manufacturer owes a duty to warn of risks that a reasonably prudent

13  manufacturer would have known and warned about. Anderson v. Owens-Corning Fiberglass Corp.

14  (1991) 53 Cal.3d 987, 1002. Furthermore, a manufacturer may be held strictly liable if it failed to

15  warn of a known or knowable risk. Id. Defendant does not allege that a federal officer required it not

16  to warn about the dangers of working with its products. There is no evidence of contract(s) between

17  UTC and the Navy for the design and manufacture of aircraft engines that contained any requirements

18  with regard to warnings. More specifically, there is no evidence that shows the Navy instructed it not

19  to place warnings on the asbestos-containing equipment with which Mr. Donlon worked. Without

20  evidence that the Navy specified the exclusion of warnings, there is no evidence of a conflict between

21  UTC's alleged federal contracts and Plaintiffs' state law failure to warn claims. UTC could have

22  complied with its duty under state law to warn Mr. Donlon of the dangers of working with its asbestos-

23  containing products and complied with its alleged federal directive to design and manufacture

24  equipment for the Navy.

25       Accordingly, there is no conflict between state law and a federal policy or interest that would

26  warrant the displacement of state law as to Plaintiffs' failure to warn causes of action. Under Boyle,

27  UTC would have to prove that the applicable federal contract includes warning requirements that

28  significantly conflict with those that might be imposed by California law. In re Joint E. and S. Dist.

1   N.Y. Asbestos Litig., 897 F.2d at 630.  In addition, the contractor must show that "whatever warnings

2   accompanied a product resulted from a determination of a government official and thus that the

3   Government itself 'dictated' the content of the warnings meant to accompany the product.  Under

4   Boyle, for the military contractor defense to apply, government officials ultimately must remain the

5   agents of decision."  Id.  Where no conflict exists between requirements imposed under a federal

6   contract and a state law duty to warn, Boyle commands that the court defer to the operation of state

7   law. Id. at 631.

8          In this case, there is no evidence that the alleged contract(s) between UTC and the Navy for the

9   manufacture of aircraft engines equipped with asbestos-containing products contained any

10  requirements with regard to warnings.  Therefore there is no evidence of a conflict between the federal

11  contract and the California laws set forth above, and jurisdiction under §1442(a)(1) is lacking.

12  **IV. CONCLUSION**

13         The attempted removal of asbestos cases is a common tactic for defendants seeking to delay or

14  deny Plaintiffs' right to a trial.  It is well-known that cases removed and then transferred to the federal

15  multi-district litigation (MDL) become mired in delay. Merely by removing this case to federal court,

16  UTC benefits from the passage of time by delaying and depriving Plaintiffs of their rightful day in

17  court.  If Plaintiffs' state law failure to warn claims return to state court, they will proceed to

18  resolution.  If they remain in federal court they will encounter significant delay upon their transfer

19  through the MDL panel to the Eastern District of Pennsylvania where no asbestos trials or discovery

20  takes place in deference to global settlement efforts.  This delay is of economic benefit to the

21  Defendant and imposes unjust costs on the Plaintiffs.  See e.g. In re Maine Asbestos Cases, 44

22  F.Supp.2d 368,374 (D.Me 1999); Madden v. Able Supply Company, 205 F.Supp.2d 695,702 (S.D

23  Tex. 2002).

24

25  / / /

26  / / /

27  / / /

28  / / /

1    UTC's removal based on federal officer jurisdiction is improper. No basis for removal exists

2  because UTC failed to establish a "colorable" federal defense and failed to prove that the Navy

3  directed it to omit warnings about the dangers of asbestos in any of its products. Accordingly, Plaintiff

4  respectfully requests that this Court remand this action to the Superior Court of California, City and

5  County of San Francisco pursuant to 28 U.S.C. § 1447 (c).

6

7  Dated: July 22, 2011                          **HAROWITZ & TIGERMAN, LLP**

8

9                                               _____
                                                KATHERINE Y. WANG
10                                              Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEVEN M. HAROWITZ  (BAR NO. 71117)
harowitz@htlawoffices.com
KATHERINE Y. WANG (BAR NO. 215663)
wang@htlawoffices.com
**HAROWITZ & TIGERMAN, LLP**
450 Sansome Street, 3rd Floor
San Francisco, California  94111
Tel: (415) 788-1588; Fax: (415) 788-1598

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA-SAN FRANCISCO DIVISION

| | |
|---|---|
| PATTI DONLON, Individually and as Successor-in-Interest to the Estate of PATRICK THEISEN DONLON, Decedent; SEAN DONLON; and DOES ONE through TEN, inclusive,<br><br>Plaintiffs,<br><br>vs.<br><br>AC and S, INC., et al.,<br><br>Defendants. | Case No. 4:11-CV-3376-SI<br><br>Superior Court of California, San Francisco County, Case No. CGC-09-275218<br><br>**DECLARATION OF KATHERINE Y. WANG IN SUPPORT OF PLANTIFFS' MOTION TO REMAND THIS CASE TO CALIFORNIA SUPERIOR COURT**<br><br>Hearing Date: August 26, 2011<br>Time: 9:00 a.m.<br>Courtroom: 10, 19th Floor<br>Judge: Honorable Susan Illston |

I, KATHERINE Y. WANG, DECLARE:

1.      I am an attorney at law, duly licensed to practice before all Courts in the State of California.  I am counsel of record for Plaintiffs herein.  I make this Declaration of my own personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit A**, is a true and correct copy of Plaintiffs' Complaint.

3.    Attached hereto as **Exhibit B** is a true and correct copy of the Request for Dismissal filed by Plaintiffs dismissing all claims other than their state law failure to warn claims as against the aircraft engine manufacturer defendants in this case, including removing defendants United Technologies Corporation and Curtiss-Wright Corporation.

4.    Attached hereto as **Exhibit C**, is a true and correct copy of excerpts from the Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 7, 2011 in Sandra Louis Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co. et al. (Case No. 08-4776 in Middlesex County Superior Court, Commonwealth of Massachusetts.)

5.    Attached hereto as **Exhibit D**, is a true and correct copy of excerpts from the Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011 in Sandra Louis Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co. et al. (Case No. 08-4776 in Middlesex County Superior Court, Commonwealth of Massachusetts.)

6.    Attached hereto as **Exhibit E**, is a true and correct copy of the Declaration of Allan J. Shiffler filed in support of United Technologies Corporation's Notice of Removal authenticated and attached as Exhibit 4 to the Deposition of United Technologies Corporation by Allan J. Shiffler, taken on April 8, 2011 in Sandra Louis Norsworthy v. Aircraft Braking Systems f/k/a The Goodyear Tire & Rubber Co. et al. (Case No. 08-4776 in Middlesex County Superior Court, Commonwealth of Massachusetts.)

7.    Attached hereto as **Exhibit F**, is a true and correct copy of Lindenmayer v. Allied Packing & Supply, Inc. 2010 U.S. Dist. WL 234906 (N.D.Cal., Jan. 14, 2010)

8.    Attached hereto as **Exhibit G**, is a true and correct copy of Overly v. Raybestos-Manhattan, 1996 U.S. Dist. WL 532150 (N.D. Cal. 1996).

9.    Attached hereto as **Exhibit H**, is a true and correct copy of Viala v. Owens-Corning Fiberglas, 1994 U.S. Dist. WL 139287 (N.D. Cal. 1994).

///

///

1    10.    Attached hereto as **Exhibit I**, is a true and correct copy of <u>Nguyen v. Allied Signal,</u>

2  <u>Inc.</u>, 1998 U.S. Dist. WL 690854 (N.D. Cal. 1998).

3          I declare under penalty of perjury under the laws of the State of California that the foregoing is

4  true and correct, and that this Declaration was executed on July 22, 2011, at San Francisco, California.

5

6                                          KATHERINE Y. WANG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

1  STEPHEN M. TIGERMAN  (Bar No. 112127)
   STEVEN M. HAROWITZ  (Bar No. 71117)
2  ROGER E. GOLD (Bar No. 214802)
   HAROWITZ & TIGERMAN, LLP
3  450 Sansome Street, 3rd Floor
   San Francisco, California  94
4  Telephone     (415) 788-1588

5  Attorneys for Plaintiffs

6

7

8

9

10

11  PATTI DONLON, Individually and as Successor-in-
    Interest to the Estate of PATRICK THEISEN DONLON,
12  Decedent; SEAN DONLON; and DOES ONE through
    TEN, inclusive,

13                  Plaintiffs,

14        vs.

15  AC AND S, INC.; ASBESTOS CORPORATION, LTD.;
    A.W. CHESTERTON COMPANY; CROWN, CORK &
16  SEAL COMPANY, INC., Individually and as Successor-
    in-Interest to MUNDET CORK CORP.; GARLOCK
17  SEALING TECHNOLOGIES LLC, Individually and as
    Successor-in-Interest to GARLOCK, INC.; GENERAL
18  ELECTRIC COMPANY; J T THORPE & SON, INC.;
    METROPOLITAN LIFE INSURANCE COMPANY;
19  PARKER-HANNIFIN CORPORATION, as Successor-
    in-Interest to SACOMO SIERRA; OWENS-ILLINOIS
20  CORPORATION; QUINTEC INDUSTRIES, INC.;
    SOCO-LYNCH CORPORATION, successor-in-interest
21  to WESTERN CHEMICAL & MANUFACTURING
    COMPANY; SWINERTON BUILDERS f/k/a
22  SWINERTON & WALBERG CO.; THOMAS DEE
    ENGINEERING COMPANY; TRANE U.S. INC., fka
23  AMERICAN STANDARD, INC.; UNION CARBIDE
    CORPORATION; VIACOM, INCORPORATED, as
24  successor-by-merger to CBS CORPORATION, fka
    WESTINGHOUSE ELECTRIC CORPORATION;
25  ALLIS-CHALMERS CORPORATION PRODUCT
    LIABILITY TRUST; BAYER CROPSCIENCE, INC.,
26  successor to AMCHEM PRODUCTS, INC.; ENPRO
    INDUSTRIES, INC., Individually and as Successor-in-
27  Interest to ANCHOR PACKING COMPANY;
    HOPEMAN BROTHERS, INC.; SB DECKING, INC.,
28  formerly known as SELBY, BATTERSBY &

ENDORSED
F I L E D
San Francisco County Superior Court

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY: _____ PARAM HATE
                    Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

JUN 1 6 2010   -1:30PM-

DEPARTMENT 206

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

C G C - 0 9 - 2 7 5 2 1 8

No.

COMPLAINT FOR
  DAMAGES

(Wrongful Death)
Negligence,
Strict Liability, Products
Liability for Clutch Components
and Brake Assemblies,
Enterprise Liability,
False Representation,
[Restatement Sec. 402-B],
Survival Action,
Loss of Consortium,
Punitive Damages

(Asbestos)

THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO AMENDED G.O. 158

2120/complaint.wd                                    1

COMPLAINT FOR DAMAGES
WRONGFUL DEATH - ASBESTOS

1  COMPANY; GEORGIA-PACIFIC CORPORATION;        )
   HAMILTON MATERIALS, INC.; HANSON             )
2  PERMANENTE CEMENT, INC. fka KAISER CEMENT)
   CORPORATION; KAISER GYPSUM CO., INC.;        )
3  KELLY-MOORE PAINT COMPANY, INC.; EATON       )
   AEROQUIP, LLC; PNEUMO-ABEX CORPORATION, )
4  Successor-in-Interest to ABEX CORPORATION;   )
   HONEYWELL INTERNATIONAL, INC. fka ALLIED     )
5  SIGNAL, INC./THE BENDIX CORPORATION; BORG-)
   WARNER CORPORATION by its Successor in Interest, )
6  BORGWARNER MORSE TEC, INC.;                  )
   BRIDGESTONE/FIRESTONE NORTH AMERICAN         )
7  TIRE, LLC; DANA COMPANIES, LLC; GOODRICH     )
   CORPORATION; FEDERAL-MOGUL ASBESTOS          )
8  PERSONAL INJURY TRUST, as successor to FELT  )
   PRODUCTS MANUFACTURING CO.; FORD MOTOR)
9  COMPANY; GENERAL MOTORS CORPORATION;         )
   INTERNATIONAL TRUCK AND ENGINE               )
10 CORPORATION; NAVISTAR, INC.; THE             )
   GOODYEAR TIRE & RUBBER COMPANY;              )
11 AIRCRAFT BRAKING SYSTEMS CORPORATION;        )
   MEGGITT AIRCRAFT BRAKING SYSTEMS;            )
12 PARKER-HANNIFIN CORPORATION, as Successor to )
   EIS and CALI-BLOK; CURTISS-WRIGHT            )
13 CORPORATION; MCDONNELL DOUGLAS               )
   CORPORATION, Individually and Successor-in-Interest )
14 to DOUGLAS AIRCRAFT COMPANY, INC.; EATON     )
   CORPORATION; UNITED TECHNOLOGIES             )
15 CORPORATION, formerly known as PRATT &       )
   WHITNEY, INC.; PRATT & WHITNEY POWER         )
16 SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES,)
   INC.; and ELEVENTH DOE through THREE         )
17 HUNDREDTH DOE, inclusive,                    )
                                                )
18                                              )
                                                )
19            Defendants.                       )
                                                )
20 _____ )

21

22

23

24

25            FIRST CAUSE OF ACTION-NEGLIGENCE

26                  (Wrongful Death)

27 PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND FOR A

28 CAUSE OF ACTION FOR NEGLIGENCE (WRONGFUL DEATH) ALLEGE:

1    1.    The true names and capacities, whether individual, corporate, associate,

2 governmental or otherwise, of defendants ELEVENTH DOE through THREE HUNDREDTH

3 DOE, inclusive, are unknown to plaintiffs at this time, who therefore sue said defendants by such

4 fictitious names.  When the true names and capacities of said defendants have been ascertained,

5 plaintiffs will amend this Complaint accordingly.  Plaintiffs are informed and believe and thereon

6 allege that each defendant designated herein as a DOE is responsible, negligently or in some other

7 actionable manner, for the events and happenings hereinafter referred to, and caused injury and

8 death to decedent and injuries and damages proximately thereby to the plaintiffs, as hereinafter

9 alleged.

10    2.    At all times herein mentioned, each of the defendants was the agent, servant,

11 employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each

12 defendant was acting in the full course and scope of said agency, service, employment and/or joint

13 venture. Except as may be specifically noted herein, all allegations of this Complaint are made on

14 information and belief.

15    3.    Plaintiffs are informed and believe, and thereon allege, that at all times herein

16 mentioned, defendants AC AND S, INC.; ASBESTOS CORPORATION, LTD.; A.W.

17 CHESTERTON COMPANY; CROWN, CORK & SEAL COMPANY, INC., Individually and as

18 Successor-in-Interest to MUNDET CORK CORP.; GARLOCK SEALING TECHNOLOGIES LLC,

19 Individually and as Successor-in-Interest to GARLOCK, INC.; GENERAL ELECTRIC

20 COMPANY; J T THORPE & SON, INC.; METROPOLITAN LIFE INSURANCE COMPANY;

21 PARKER-HANNIFIN CORPORATION, as Successor-in-Interest to SACOMO SIERRA;

22 OWENS-ILLINOIS CORPORATION; QUINTEC INDUSTRIES, INC.; SOCO-LYNCH

23 CORPORATION, successor-in-interest to WESTERN CHEMICAL & MANUFACTURING

24 COMPANY; SWINERTON BUILDERS f/k/a SWINERTON & WALBERG CO.; THOMAS DEE

25 ENGINEERING COMPANY; TRANE U.S. INC., fka AMERICAN STANDARD, INC.; UNION

26 CARBIDE CORPORATION; VIACOM, INCORPORATED, as successor-by-merger to CBS

27 CORPORATION, fka WESTINGHOUSE ELECTRIC CORPORATION; ALLIS-CHALMERS

28 CORPORATION PRODUCT LIABILITY TRUST; BAYER CROPSCIENCE, INC., successor to

1  AMCHEM PRODUCTS, INC.; ENPRO INDUSTRIES, INC., Individually and as Successor-in-
2  Interest to ANCHOR PACKING COMPANY; HOPEMAN BROTHERS, INC.; SB DECKING,
3  INC., formerly known as SELBY, BATTERSBY & COMPANY; GEORGIA-PACIFIC
4  CORPORATION; HAMILTON MATERIALS, INC.; HANSON PERMANENTE CEMENT, INC.
5  fka KAISER CEMENT CORPORATION; KAISER GYPSUM CO., INC.; KELLY-MOORE
6  PAINT COMPANY, INC.; EATON AEROQUIP, LLC; PNEUMO-ABEX CORPORATION,
7  Successor-in-Interest to ABEX CORPORATION; HONEYWELL INTERNATIONAL, INC. fka
8  ALLIED SIGNAL, INC./THE BENDIX CORPORATION; BORG-WARNER CORPORATION by
9  its Successor in Interest, BORGWARNER MORSE TEC, INC.; BRIDGESTONE/FIRESTONE
10 NORTH AMERICAN TIRE, LLC; DANA COMPANIES, LLC; GOODRICH CORPORATION;
11 FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST, as successor to FELT
12 PRODUCTS MANUFACTURING CO.; FORD MOTOR COMPANY; GENERAL MOTORS
13 CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,
14 INC.; THE GOODYEAR TIRE & RUBBER COMPANY; AIRCRAFT BRAKING SYSTEMS
15 CORPORATION; MEGGITT AIRCRAFT BRAKING SYSTEMS; PARKER-HANNIFIN
16 CORPORATION, as Successor to EIS and CALI-BLOK; CURTISS-WRIGHT CORPORATION;
17 MCDONNELL DOUGLAS CORPORATION, Individually and Successor-in-Interest to
18 DOUGLAS AIRCRAFT COMPANY, INC.; EATON CORPORATION; UNITED
19 TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC.; PRATT &
20 WHITNEY POWER SYSTEMS, INC.; VOUGHT AIRCRAFT INDUSTRIES, INC.; and
21 ELEVENTH DOE through THREE HUNDREDTH DOE, inclusive, are corporations organized and
22 existing under and by virtue of the laws of the State of California, or the laws of some state or
23 foreign jurisdiction, and that said defendants were and are authorized to do and are doing business
24 in the State of California, and that said defendants have regularly conducted business in the City and
25 County of San Francisco, State of California.  The defendants identified in this paragraph are
26 hereinafter referred to as "MANUFACTURING/DISTRIBUTING DEFENDANTS".
27         4.     At all times herein mentioned, defendants, and each of them, were and are engaged
28 in the business of manufacturing, fabricating, designing, assembling, distributing, leasing, buying,

1   selling, inspecting, servicing, repairing, marketing, warranting and advertising a certain substance,

2   the generic name of which is asbestos, and other products containing said substance.

3       5.      Plaintiffs are informed and believe, and thereon allege, that defendant CROWN,

4   CORK & SEAL COMPANY, INC. is the successor in interest to, or otherwise liable for the acts or

5   omissions of MUNDET CORK CORP.; that defendant GARLOCK SEALING TECHNOLOGIES

6   LLC  is the successor in interest to, or otherwise liable for the acts or omissions of GARLOCK,

7   INC.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

8   otherwise liable for the acts or omissions of SACOMO SIERRA;  that defendant QUINTEC

9   INDUSTRIES, INC. is the successor in interest to, or otherwise liable for the acts or omissions of

10  WESTERN FIBERGLAS SUPPLY COMPANY, WESTERN FIBROUS GLASS PRODUCTS

11  COMPANY and/or WESGLAS; that defendant SOCO-LYNCH CORPORATION  is the successor

12  in interest to, or otherwise liable for the acts or omissions of WESTERN CHEMICAL &

13  MANUFACTURING COMPANY; that defendant BAYER CROPSCIENCE, INC.  is the successor

14  in interest to, or otherwise liable for the acts or omissions of AMCHEM PRODUCTS, INC.; that

15  defendant ENPRO INDUSTRIES, INC.  is the successor in interest to, or otherwise liable for the

16  acts or omissions of ANCHOR PACKING COMPANY; that defendant PNEUMO-ABEX

17  CORPORATION  is the successor in interest to, or otherwise liable for the acts or omissions of

18  ABEX CORPORATION; that defendant BORG-WARNER CORPORATION  is the successor in

19  interest to, or otherwise liable for the acts or omissions of BORGWARNER MORSE TEC, INC.;

20  that defendant FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST  is the successor in

21  interest to, or otherwise liable for the acts or omissions of FELT PRODUCTS MANUFACTURING

22  CO.; that defendant PARKER-HANNIFIN CORPORATION  is the successor in interest to, or

23  otherwise liable for the acts or omissions of EIS and CALI-BLOK; that defendant MCDONNELL

24  DOUGLAS CORPORATION  is the successor in interest to, or otherwise liable for the acts or

25  omissions of DOUGLAS AIRCRAFT COMPANY, INC.; and that each of the defendants in this

26  paragraph and listed as a successor elsewhere in this complaint, including the caption, is liable for

27  the acts and omissions of its predecessor entities, partners, divisions, related entities, subsidiaries,

28  and co-ventures.

6.     At all times herein mentioned, defendants, and each of them, singularly and jointly, negligently and carelessly researched, tested or failed to test, warned or failed to warn, manufactured, designed, developed, distributed, labeled, advertised, marketed, warranted, inspected, repaired, fabricated, modified, serviced, and sold a certain substance, the generic name of which is asbestos, and other products containing said substance, in that said substance was capable of causing and did, in fact, proximately cause personal injuries to users, consumers, workers and others, while being used in a manner reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by the consumers, users, bystanders, or workers exposed thereto.

7.     Plaintiffs' decedent was a worker who for a substantial length of time used, handled or was otherwise exposed to asbestos and asbestos products referred to herein, in a manner that was reasonably foreseeable.

8.     As a direct and proximate result of the conduct of the defendants, and each of them, as aforesaid, the exposure to asbestos caused plaintiffs' decedent to contract mesothelioma from which he died on May 27, 2008.

9.     Plaintiff did not learn of the causal relationship between decedent's exposure to asbestos and his death until less than one year before the date on which this Complaint was filed.

10.    Plaintiffs were the heirs of PATRICK THEISEN DONLON, deceased, (herein referred to as "decedent"), as follows:

PATTI DONLON      -      SPOUSE

SEAN DONLON       -      SON

11.    As a result of the conduct of defendants, and each of them, decedent's heirs have sustained pecuniary loss resulting from the loss of love, comfort, society, attention, services and support of decedent in a sum in invoking the unlimited jurisdictional limits of the Court.

12.    As a further result of the conduct of defendants, and each of them, and the death of decedent, plaintiffs herein have incurred funeral and burial expenses in an amount to be subsequently ascertained.

13.    For purposes of the claims alleged herein, the Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship

1   due to the presence of a California defendant. Removal is improper. Every claim arising under the
2   Constitution, treaties, or law of the United States is expressly disclaimed, including any claim
3   arising from an act or omission on a federal enclave, or of any Officer of the U.S. or any agency or
4   person acting under him occurring under color of such of office. No claim of admiralty or maritime
5   law is raised. Plaintiffs sue no foreign state or agency. By this allegation, plaintiffs are not
6   disclaiming State law claims arising exposures on Federal enclaves. Plaintiffs are only disclaiming
7   claims which would be directed at the Federal government and/or Federal officers. Venue is proper
8   in the City and County of San Francisco. Plaintiff shall seek sanctions, attorneys' fees and other
9   appropriate relief in the event any defendant moves to transfer and/or remove this action to another
10   court without a reasonable period of meet and confer discussion relating to same prior to notice of
11   removal and or transfer of this action.

12        WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

13              SECOND CAUSE OF ACTION - STRICT LIABILITY

14        AS FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION

15   FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF

16   THEM, AND ALLEGE AS FOLLOWS:

17        14.     Plaintiffs incorporate herein by reference as though fully set forth herein all

18   paragraphs of the First Cause of Action herein.

19        15.     Defendants and each of them researched, manufactured, tested or failed to test,

20   warned or failed to warn, designed, labeled, distributed, advertised, marketed, warranted, inspected,

21   repaired, offered for sale and sold a certain substance, the generic name of which is asbestos and

22   other products contained said substance, which substance and product is defective, in that same was

23   capable of causing and did, in fact, cause personal injuries, including, but not limited to

24   mesothelioma, to the users and consumers thereof while being used in a reasonably foreseeable

25   manner, thereby rendering the same unsafe and dangerous for use by consumers, users, bystanders

26   and workers exposed thereto; said defendants, and each of them, further failed to adequately warn of

27   the risks to which decedent and others similarly situated were exposed.

28        16.     As a direct and proximate result thereof, decedent suffered the injuries from which

1   he subsequently died, and plaintiffs have suffered the injuries and damages previously alleged.

2       WHEREFORE, plaintiffs pray judgment as hereinafter alleged.

3       THIRD CAUSE OF ACTION - PRODUCTS LIABILITY (NEGLIGENCE AND STRICT

4       LIABILITY) FOR CLUTCH COMPONENTS AND BRAKE ASSEMBLIES,

5       MECHANISMS AND LININGS

6       AS AND FOR A THIRD, SEPARATE, AND FURTHER DISTINCT CAUSE OF ACTION

7   FOR PRODUCTS LIABILITY (NEGLIGENCE AND STRICT LIABILITY) FOR CLUTCH

8   COMPONENTS AND BRAKE ASSEMBLIES, MECHANISMS AND LININGS, PLAINTIFFS

9   COMPLAIN OF DEFENDANTS FORD MOTOR COMPANY; GENERAL MOTORS

10   CORPORATION; INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR,

11   INC.; and TWO HUNDRED FIRST DOE through THREE  HUNDREDTH DOE, inclusive, and

12   ALLEGE AS FOLLOWS:

13       17.    Plaintiff, by this reference, incorporates the allegations contained in the First and

14   Second Causes of Action as though fully set forth herein.

15       18.    FORD MOTOR COMPANY; GENERAL MOTORS CORPORATION;

16   INTERNATIONAL TRUCK AND ENGINE CORPORATION; NAVISTAR, INC.; and TWO

17   HUNDRED FIRST DOE through THREE  HUNDREDTH DOE, inclusive, manufactured or

18   supplied defective clutch components and brake assemblies or mechanisms which were

19   incorporated into various makes and models of automobiles, trucks and vehicles manufactured, sold

20   or supplied by said defendants.  Said clutch components and brake assemblies or mechanisms were

21   negligently manufactured sold or supplied in that:

22       a)    The design of said clutch components and brake assemblies or mechanisms

23   incorporated the use of asbestos-containing clutch facings/plates and brake linings;

24       b)    Asbestos clutch components brake linings wear and/or deteriorate during regular

25   and ordinary use thus creating friable asbestos dust, which accumulates in the clutch brake

26   assemblies and/or mechanisms;

27       c)    The design of said clutch components brake assemblies require as a part of their

28   normal operation, use and maintenance that the asbestos clutch components and brake linings be

1  removed and replaced;

2        d)  Said defendants required the use of asbestos-containing clutch components and
3  brake linings throughout the time period 1940-1985;

4        e)  During the removal and replacement of asbestos-containing clutch components and
5  brake linings, asbestos-containing dust was inherently generated because of the design of the clutch
6  components and brake assemblies and/or mechanisms;

7        f)  Defendants knew or should have known that the asbestos-containing dust would be
8  generated during the regular use and maintenance of the clutch components and brake assemblies,
9  mechanisms and linings, and that such dust created an increased risk of asbestos disease for all
10  users, consumers, or others who breathed said asbestos-containing dust;

11        g)  The defendants, and each of them, failed to warn and/or properly instruct users,
12  consumers, or others of the asbestos-containing dust hazard which existed at the time of regular
13  maintenance or replacement of asbestos clutch components and brake linings.  Such failure
14  includes, but is not limited to:

15        a.  Failure to place prominent and adequate warnings or instructions in and on
16  the clutch components and brake pads and wheel drums;

17        b.  Failure to place adequate warnings or instructions in the owners' manuals
18  accompanying said automobiles, trucks and vehicles; and

19        c.  Failure to place adequate warnings or instructions on various repair manuals
20  and instructions published by defendants; and

21        d.  Failure to provide adequate information regarding the asbestos hazards
22  associated with the regular use and maintenance of the clutch components and brake mechanisms,
23  assemblies and/or linings.

24      19.  The clutch components and brake assemblies, mechanisms and/or linings
25  manufactured, sold or supplied by defendants failed to perform as safely as the ordinary consumer
26  would expect, even though they performed as designed.

27      20.  Defendants' use and design of asbestos-containing clutch components and brake
28  linings, both as original equipment and as replacement parts, created unreasonable inherent risks

which outweighed the benefits of said use and/or design.

21. The dangers inherent in asbestos-containing clutch components and brake linings were unknown and unforeseeable to the decedent.

22. Decedent's exposure to asbestos-containing dust, which caused his injury, was from his use and maintenance of defendants' clutch components and brake mechanisms, assemblies and/or linings. Said work produced the release of asbestos dust, which decedent inhaled, thus increasing his risk for all asbestos-related disease.

23. Defendants' negligence and defective products as described in this cause of action were a direct cause of decedent's injuries, and the injuries and damages thereby sustained by plaintiffs.

## FOURTH CAUSE OF ACTION - ENTERPRISE LIABILITY

AS AND FOR A FOURTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR ENTERPRISE LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

24. Plaintiff incorporates by reference as though fully set forth herein, each of the paragraphs of the First, Second and Third Causes of Action herein.

25. In the event plaintiffs are unable to identify the specific defendant(s) which supplied the asbestos or asbestos-containing products which caused the damage referred to above, plaintiffs allege that as between an innocent plaintiff and culpable defendant(s), the latter should bear the cost of injury.

26. Plaintiffs' decedent was exposed to asbestos and asbestos emanating from asbestos-containing products which are and were fungible in appearance as well as in composition and which were used in substantially the same manner by plaintiffs decedent and/or those working in the vicinity of plaintiffs' decedent. Moreover, through no fault of the plaintiffs, this asbestos and/or these asbestos-containing products cannot be traced to a specific producer.

27. In this action, plaintiffs have joined a substantial share of the producers of such asbestos and/or asbestos-containing products which caused the injuries complained of herein, and will prove at the time of trial that the defendants named herein constituted a substantial share of

1 such producers. Accordingly, liability attaches to each named defendant to the extent of their

2 percentage of market share, in a manner consistent with the rules set forth in the decision of Sindell

3 v. Abbott Laboratories, et al.

4        28.    As a direct and legal result thereof, plaintiffs have suffered the injuries and damages

5 previously alleged.

6        WHEREFORE, Plaintiffs pray judgment against the defendants, and each of them, as

7 hereinafter set forth.

8       FIFTH CAUSE OF ACTION – FALSE REPRESENTATION

9       UNDER RESTATEMENT OF TORTS Sec. 402-B

10      AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF ACTION

11 FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B,

12 PLAINTIFFS COMPLAIN OF DEFENDANTS, AND EACH OF THEM, AND ALLEGE AS

13 FOLLOWS:

14        29.    Plaintiffs incorporate by reference all Causes of Action of this Complaint.

15        30.    At the aforementioned time when defendants, and each of them, researched,

16 manufactured, tested or failed to test, warned or failed to warn, designed, labeled, distributed,

17 advertised, marketed, warranted, inspected, repaired, offered for sale and sold the said asbestos and

18 asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly

19 and impliedly represented to members of the general public, including the purchasers and users of

20 said product, and including the decedent herein and his employers, that asbestos and asbestos-

21 containing products were of merchantable quality, and safe for the use for which they were

22 intended.

23        31.    The purchasers and users of said asbestos and asbestos-containing products,

24 including the decedent and his employer, relied upon said representations of defendants and each of

25 them, in the selection, purchase and use of asbestos and asbestos-containing products.

26        32.    Said representations by defendants, and each of them, were false and untrue, in that

27 the asbestos and asbestos-containing products were not safe for their intended use, nor were they of

28 merchantable quality as represented by defendants, and each of them, in that asbestos and asbestos

1  containing products have very dangerous properties and defects whereby said products cause

2  mesothelioma, and have other defects that cause injury and damage to the users of said products,

3  including decedent herein, thereby taking the life of plaintiffs' decedent.

4       33.   As a direct and proximate result of said false representations by defendants and each

5  of them, the plaintiffs sustained the injuries and damages hereinabove set forth.

6       WHEREFORE, plaintiffs pray judgment against defendants, and each of them, as hereinafter

7  set forth.

8              SIXTH CAUSE OF ACTION - SURVIVAL ACTION

9       AS AND FOR A SIXTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION

10  (SURVIVAL ACTION), PLAINTIFF PATTI DONLON AS SUCCESSOR-IN-INTEREST TO

11  THE ESTATE OF PATRICK THEISEN DONLON COMPLAIN OF DEFENDANTS, AND

12  EACH OF THEM, AND FOR A CAUSE OF ACTION ALLEGE:

13       34.   Plaintiff incorporates by reference herein each and every paragraph of all Causes of

14  Action of this Complaint, and make them a part of this, the Sixth Cause of Action, as though fully

15  set forth herein.

16       35.   Prior to his death, decedent PATRICK THEISEN DONLON had a cause of action

17  against defendants herein for personal injuries arising from his exposure to asbestos.  On May 27,

18  2008, with the foregoing cause of action still pending, PATRICK THEISEN DONLON, who would

19  have been the plaintiff in this action if he had lived, died.

20       36.   As a proximate result of the conduct of defendants, and each of them, decedent was

21  required to, and did, employ physicians and surgeons to examine, treat and care for him and did

22  incur medical and incidental expenses in a sum to be subsequently determined.

23       37.   As a further, direct and proximate result of the conduct of defendants, and each of

24  them, decedent was prevented from attending to his usual occupation for a period of time and

25  thereby incurred damages for loss of earnings in a sum to be subsequently determined.

26       WHEREFORE, plaintiff prays judgment against defendants, and each of them, as hereinafter

27  set forth.

28              SEVENTH CAUSE OF ACTION - PUNITIVE DAMAGES

AS FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR PUNITIVE DAMAGES, PLAINTIFFS COMPLAIN OF ALL DEFENDANTS, INCLUSIVE, AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

38.     Plaintiffs incorporate by reference each and every paragraph of all Causes of Action of this Complaint, and make them a part of this Seventh Cause of Action as though fully set forth herein.

39.     In researching, testing, manufacturing, distributing, labeling, and marketing asbestos and asbestos products, defendants in this cause of action named, and each of them, did so with conscious disregard for the safety of the users of said asbestos and asbestos products, in that defendants has specific prior knowledge that there was a high risk of injury or death resulting from exposure to asbestos or asbestos products, including but not limited to, mesothelioma. Said knowledge was obtained, in part, from scientific studies, government data, and medical data to which defendants had access, as well as scientific studies performed by, at the request of, or with the assistance of, said defendants, and which knowledge was obtained by said defendants on or before 1933, and thereafter.

40.     On or before 1933, and thereafter, said defendants were aware that users of asbestos and asbestos products, as well as members of the general public who would be exposed to asbestos and asbestos products, had no knowledge or information indicating that asbestos could cause injury, and said defendants knew that the users of asbestos and asbestos products, as well as members of the general public who were exposed to asbestos and asbestos products would assume, and in fact did assume, that exposure to asbestos and asbestos products was safe, when in fact said exposure was extremely hazardous to human life.

41.     With said knowledge, said defendants opted to manufacture and distribute said asbestos and asbestos products without attempting to protect users from or warn users of, the high risk of injury or death resulting from exposure to asbestos and asbestos products. Rather than attempting to protect users and workers from, or warn workers and users of, the high risk of injury or death resulting from exposure to asbestos and asbestos products, defendants intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said

1  knowledge from members of the general public that asbestos and asbestos products were unsafe for

2  all reasonably foreseeable use, with the knowledge of the falsity of said implied representations.

3      42.    The above-referenced conduct of said defendants was motivated by the financial

4  interest of said defendants in the continuing, uninterrupted distribution and marketing of asbestos

5  and asbestos products. In pursuance of said financial motivation, said defendants consciously

6  disregarded the safety of the users of, and persons exposed to, asbestos and asbestos products, and

7  were in fact, consciously willing to permit asbestos and asbestos products to cause injury to workers

8  and users thereof, and personnel exposed thereto, including plaintiff's decedent.

9      43.    As the above-referenced conduct of said defendants was and is willful, malicious,

10  outrageous, and in conscious disregard and indifferent to the safety and health of workers exposed

11  to asbestos and asbestos products, including decedent, plaintiffs, for the sake of example, and by

12  way of punishing said defendants, seeks punitive damages according to proof.

13      WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as

14  hereinafter set forth.

15          EIGHTH CAUSE OF ACTION – LOSS OF CONSORTIUM

16      AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF

17  ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF PATTI DONLON COMPLAINS OF

18  DEFENDANTS, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

19      44.    Plaintiff PATTI DONLON incorporates herein by reference and makes a part hereof

20  as though fully set forth herein, all of the paragraphs of all the Causes of Action of this complaint.

21      45.    Plaintiff PATTI DONLON was at all relevant times the lawfully wedded spouse of

22  decedent PATRICK THEISEN DONLON.

23      46.    As a direct and proximate result of the conduct of defendants, and each of them, and

24  of the severe injuries caused thereby to decedent prior to his death, as hereinabove alleged, plaintiff

25  PATTI DONLON suffered loss of consortium, including, but not by way of limitation, loss of

26  services, marital relations, society, comfort, companionship, love and affection of her said spouse,

27  and has suffered severe mental and emotional distress and general nervousness as a result thereof.

28      47.    Plaintiff PATTI DONLON, as a result of the foregoing described injuries to her said

1   spouse, has been generally damaged in a sum invoking the unlimited jurisdictional limits of the

2   Court.

3       WHEREFORE, Plaintiffs pray judgment against defendants and each of them as follows:

4       1.    For general damages according to proof;

5       2.    For burial expenses according to proof;

6       3.    For medical expenses according to proof;

7       4.    For loss of income according to proof;

8       5.    For punitive damages according to proof;

9       6.    For plaintiffs' costs of suit herein; and,

10      7.    For such other and further relief as this Court deems just and proper.

11

12  DATED: May 22, 2009              HAROWITZ & TIGERMAN, LLP

13

14                            BY

15                                ROGER E. GOLD
                              Attorney for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

1   STEVEN M. HAROWITZ  (Bar No. 71117)
    STEPHEN M. TIGERMAN (Bar No. 112127)
2   ROGER B. GOLD (Bar No. 214802)
    HAROWITZ & TIGERMAN, LLP
3   450 Sansome Street, 3rd Floor
    San Francisco, California  94111
4   Telephone     (415) 788-1588

5   Attorneys for Plaintiffs

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10
    PATTI DONLON, Individually and as Successor-in-
11  Interest to the Estate of PATRICK THEISEN DONLON,
    Decedent; SEAN DONLON; and DOES ONE through
12  TEN, inclusive,

13
                        Plaintiffs,
14
        vs.
15

16  AC AND S, INC., et al.,

17                      Defendants.

18

19                                  N O T I C E

20

21  TO NEW DEFENDANTS SERVED IN COMPLEX ASBESTOS LITIGATION IN THE
    SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA,
22  CITY AND COUNTY OF SAN FRANCISCO:

23          You have been served with process in an action which has been designated by the Court
    as complex litigation pursuant to Standard 19 of the Standards of Judicial Administration.  This
24  litigation bears the caption "In Re: Complex Litigation," [San Francisco Superior Court No.
    828684].
25
            This litigation is governed by various general orders, some of which affect the judicial
26  management and/or discovery obligations, including the responsibility to answer
    interrogatories deemed propounded in the case.  You may contact the Court or Designated
27  Defense Counsel, Berry & Berry, Post Office Box 16070 (2930 Lake Shore Ave.), Oakland,
    California 94610; Telephone: (510) 250-0200; FAX: (510) 835-5117, for further information
28  and/or copies of these orders, at your expense.

ENDORSED
F I L E D
San Francisco County Superior Court

MAY 2 2 2009

GORDON PARK-LI, Clerk
BY:_____PARAM NATT_____
                    Deputy Clerk

No. C G C - 0 9 - 2 7 5 2 1 8

PRELIMINARY FACT SHEET
NEW FILING/
ASBESTOS LITIGATION
(See General Order No. 129;
In Re Complex Asbestos
Litigation)

1. State the complete name and address of each person whose claimed exposure to asbestos is the basis of this lawsuit ("exposed person"): **PATRICK THEISEN DONLON**

2. Does plaintiff anticipate filing a motion for preferential trial date within the next four months?  _____ Yes          _X_ No

3. Date of birth of each exposed person in item one and, if applicable, date of death:

   Date of Birth: **September 26, 1937**          Date of Death: **May 27, 2008**

   Social Security Number of each exposed person: **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**

4. Specify the nature or type of asbestos-related disease alleged by each exposed person:

   ___ Asbestosis          _X_ Mesothelioma

   ___ Pleural Thickening/Plaques          ___ Other Cancer: Specify: _____

   ___ Lung Cancer Other Than Mesothelioma   Other: Specify: _____

5. For purposes of identifying the nature of exposure allegations involved in this action, please check one or more:

   ___ Shipyard     _X_ Construction   _X_ Friction-Automotive

   ___ Premises     ___ Aerospace    _X_ Military

   ___ Other: Specify all that apply: _____

   If applicable, indicate which exposure allegations apply to which exposed person.

6. Identify each location alleged to be a source of an asbestos exposure, and to the extent known, provide the beginning and ending year(s) of each such exposure. Also specify each exposed person's employer and job title or job description during each period of exposure. (For example: "San Francisco Naval Shipyard - Pipefitter - 1939-1948"). Examples of locations of exposure might be a specific shipyard, a specific railroad maintenance yard, or perhaps more generalized descriptions such as "merchant Marine" or "construction." If an exposed person claims exposure during only a portion of a year, the answer should indicate that year as the beginning and ending year (e.g., 1947-1947).

/ / /

/ / /

/ / /

| Location of Exposure | Employer | Job Title at Time of Exposure | Year(s) of Exposure Beginning - Ending |
|---|---|---|---|
| Elkader, Strawberry Point, Clayton, IA | New Jersey Zinc | Worker | 1953-1955 |
| Pensacola, FL; Brooklyn NSY; Brooklyn, NYC, New York | U.S. Navy | Aviation Mechanic | 1955-1958 |

**BYSTANDER EXPOSURE:**

| | | | |
|---|---|---|---|
| Home Construction: Elkader, IA; Davis, CA | Not Applicable | Not Applicable | 1950's; 1970's |

**SECONDHAND EXPOSURE through decedent's father, Jack Donlon's employment:**

| | | | |
|---|---|---|---|
| Elkader, IA | Jack Donlon Chevrolet | Car dealership/ service manager | 1937-1955 |

7.     For each exposed person who:

a.     worked in the United States or for a U. S. agency outside the territorial United States, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Earnings authorization (Exhibit N-4 to General Order No. 129);

b.     may have had a Social Security disability award or is no longer employed and whose last employment was not with a United States government agency, attach to the copy of this fact sheet provided to Designated Defense counsel a fully executed Social Security Disability authorization (Exhibit N-5 to General Order No. 129);

c.     served at any time in the United States military, attach to the copy of this fact sheet provided to the Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129);

d.     was employed by the United States government in a civilian capacity, attach to the copy of this fact sheet provided to Designated Defense counsel two fully executed originals of the stipulation (Exhibit N-3 to General Order No. 129).

8.     If there is a wrongful death claim, attach to the copy of this fact sheet provided to

1  Designated Defense Counsel a copy of the death certificate, if available. If an autopsy report

2  was done, also attach a copy of it to the copy of this fact sheet provided to Designated Defense

3  Counsel.

4  9.      State the date of the filing of the initial complaint in this matter: May 22, 2009

5

6  DATED: May 22, 2009                                    HAROWITZ & TIGERMAN, LLP

7

8  BY _____
                                                         ROGER E. GOLD
9                                                        Attorney for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "B"

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| STEVEN M. HAROWITZ (SBN 71117)<br>HAROWITZ & TIGERMAN, LLP<br>450 Sansome Street, 3rd Floor<br><br>San Francisco, CA 94111<br><br>TELEPHONE NO: (415) 788-1588   FAX NO. (Optional): (415) 788-1598<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Unlimited Jurisdiction

PLAINTIFF/PETITIONER: Patti Donlon, et al.

DEFENDANT/RESPONDENT: AC and S, Inc., et al.

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| [X] Personal Injury, Property Damage, or Wrongful Death<br>　[ ] Motor Vehicle [ ] Other<br>[ ] Family Law [ ] Eminent Domain<br>[X] Other (specify):* Asbestos | CGC 09-275218 |

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) [ ] With prejudice (2) [X] Without prejudice
   b. (1) [X] Complaint (2) [ ] Petition
   　(3) [ ] Cross-complaint filed by (name):　　　　　　　　　　　on (date):
   　(4) [ ] Cross-complaint filed by (name):　　　　　　　　　　　on (date):
   　(5) [ ] Entire action of all parties and all causes of action
   　(6) [X] Other (specify):* See Attachment A

2. (Complete in all cases except family law cases.)
   　[ ] Court fees and costs were waived for a party in this case. (This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed.)

Date: June 24, 2011

STEVEN M. HAROWITZ (SBN 71117)
(TYPE OR PRINT NAME OF [X] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)
*If dismissal requested is of specified parties only or of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for: Patti Donlon, et al.
[X] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross - complainant

(SIGNATURE)

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date:

(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner [ ] Defendant/Respondent
[ ] Cross - Complaint

(SIGNATURE)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

(To be completed by clerk)
4. [ ] Dismissal entered as requested on (date):
5. [ ] Dismissal entered on (date):　　　　　　　　as to only (name):
6. [ ] Dismissal not entered as requested for the following reasons (specify):

7. a. [ ] Attorney or party without attorney notified on (date):
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
   　　　[ ] a copy to be conformed [ ] means to return conformed copy
   Date:　　　　　　　　　　　　　　Clerk, by　　　　　　　　　　　　　　, Deputy

CIV-110

| PLAINTIFF/PETITIONER: Patti Donlon, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: AC and S, Inc., et al. | CGC 09-27518 |

## Declaration Concerning Waived Court Fees

The court has a statutory lien for waived fees and costs on any recovery of $10,000 or more in value by settlement, compromise, arbitration award, mediation settlement, or other recovery. The court's lien must be paid before the court will dismiss the case.

1. The court waived fees and costs in this action for *(name)*:

2. The person in item 1 *(check one)*:
   a. ☐ is not recovering anything of value by this action.
   b. ☐ is recovering less than $10,000 in value by this action.
   c. ☐ is recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and costs that were waived in this action have been paid to the court *(check one)*: ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

                                                          ▶ _____

_____                    _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)                    (SIGNATURE)

**ATTACHEMENT A to Plaintiff's Request for Dismissal Without Prejudice**

Plaintiffs dismiss all claims except their failure to warn claims as to defendants, THE BOEING COMPANY; CONTINENTAL MOTORS, INC.; GENERAL ELECTRIC COMPANY; CURTISS-WRIGHT CORPORATION; UNITED TECHNOLOGIES CORPORATION, formerly known as PRATT & WHITNEY, INC., PRATT & WHITNEY POWER SYSTEMS, INC., HAWKER BEECHCRAFT COPORATION, ONLY.

# PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Danlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

## REQUEST FOR DISMISSAL

on the following parties:

**SEDGWICK, LLP**
**One Market Plaza Steuart Tower, 8th Floor**
**San Francisco, CA 94105**
**(415) 781-7900**
**Counsel for: GENERAL ELECTRIC COMPANY**

via the following method of service:

X   Electronically on the recipients designated on the Transaction Receipt located on the Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General Order No. 158, Asbestos-Related Case.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

Proof of Service

1

## PROOF OF SERVICE

2
     I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this

3
date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

4

5
### REQUEST FOR DISMISSAL

on the following parties:

6

7
**CSC LAWYERS**
**2730 Gateway Oaks Drive, Suite 100**
**Sacramento, CA 95833**

8

9
**Agent for: THE BOEING COMPANY**

10
via the following method of service:

11
X.     By Regular Mail in a sealed envelope, addressed as noted in the attached service list,

12
     with postage fully prepaid and placing it for collection and mailing following the

13
     ordinary business practices of Harowitz & Tigerman, LLP.

14

15
     I declare under penalty of perjury that the foregoing is true and correct and that this

16
declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19
Robert C. Jones

20

21

22

23

24

25

26

27

28

1                        Proof of Service

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**CONTINENTAL MOTORS, INC.**
**2039 Broad Street**
**Mobile, Alabama 36615**

via the following method of service:

X.    **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1

**PROOF OF SERVICE**

2   I certify that I am over the age of 18 years and not a party to the within action; that my
business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this
3   date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San
Francisco Superior Court Case No. CGC 09-275218, entitled:

4

**REQUEST FOR DISMISSAL**
5

on the following parties:
6

SEDGWICK, LLP
7   One Market Plaza Steuart Tower, 8th Floor
San Francisco, CA 94105
8   (415) 781-7900
Counsel for: GENERAL ELECTRIC COMPANY
9

10   via the following method of service:

11   X   Electronically on the recipients designated on the Transaction Receipt located on the

12   Lexis Nexis File & Serve website, pursuant to San Francisco Superior Court General

13   Order No. 158. Asbestos-Related Case.

14

15   I declare under penalty of perjury that the foregoing is true and correct and that this

16   declaration was executed on June 24, 2011 at San Francisco, California.

17

18

19   Robert C. Jones

20

21

22

23

24

25

26

27

28

1                                                                    Proof of Service

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

**REQUEST FOR DISMISSAL**

on the following parties:

**JAMES V. MAHER, GENERAL COUNSEL**
**10 Waterview Boulevard, 2nd Floor**
**Parsippany, NJ 07054**

**AGENT FOR: CURTISS-WRIGHT CORPORATION**

via the following method of service:

X    **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA  94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

**CT CORPORATION**
**818 West 7ᵗʰ Street**
**Los Angeles, CA 90017**

**Agent for: UNITED TECHNOLOGIES CORPORATION**
**PRATT & WHITNEY POWER SYSTEMS, INC.**

via the following method of service:

X       **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

_____
Robert C. Jones

Proof of Service

1

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 450 Sansome Street, 3rd Floor, San Francisco, CA 94111; and that on this date I served a true copy of the document(s) in the action of *Donlon v. AC and S, Inc., et al.*, San Francisco Superior Court Case No. CGC 09-275218, entitled:

### REQUEST FOR DISMISSAL

on the following parties:

GREGORY H. HALLIDAY
801 South Figueroa Street, 19th Floor
Los Angeles, CA 90017

**Agent for: HAWKER BEECHCRAFT CORPORATION**

via the following method of service:

X    **By Regular Mail** in a sealed envelope, addressed as noted in the attached service list, with postage fully prepaid and placing it for collection and mailing following the ordinary business practices of Harowitz & Tigerman, LLP.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 24, 2011 at San Francisco, California.

Robert C. Jones

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

# EXHIBIT "C"

22
23
24
25
26
27
28

Allan Shiffler        Volume I        April 7, 2011

---

VOLUME I
PAGES 1-96
EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS
Middlesex County      Superior Court

* * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,     *
Individually and as Personal    *
Representative of JOHN T.      *
NORSWORTHY              *
     Plaintiff           *
vs.                  * Docket No.
AIRCRAFT BRAKING SYSTEMS l/k/a    * 08-4778
THE GOODYEAR TIRE & RUBBER CO.,   *
et al.,     Defendants        *

* * * * * * * * * * * * * * * * *

30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Thursday, April 7, 2011, 3:53 p.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

----Reporter: Joan M. Cassidy, RPR, RMR, CRR----
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795 Fax 508.478.0595
www.eppleycourtreporting.com

Page 1

---

1   APPEARANCES:
2
   Representing the Plaintiff:
3    The Shepard Law Firm, P.C.
     Michael C. Shepard, Esq.
     10 High Street
4    Boston, Massachusetts 02110
     617-451-9191 Fax: 617-451-0792
5    mshepard@shepardlawfirm.com
6
   Representing Hawker Beechcraft:
7    Campbell Campbell Edwards & Conroy
     Adam A. Larson, Esq.
8    One Constitution Plaza
     Boston, Massachusetts 02129
9    617-241-3000 Fax: 617-241-5115
     alarson@campbell-trial-lawyers.com
10
11   Representing Honeywell International, Inc. f/k/a
     Allied Signal, Inc. f/d/a The Bendix Corporation:
12    Cetrulo & Capone LLP
     Lawrence J. Sugarman, Esq. (via telephone)
13    Two Seaport Lane
     Boston, Massachusetts 02210
14    617-217-5500 Fax: 617-217-5200
     lsugarman@cetcap.com
15
16   Representing United Technologies Corporation and the
     Witness:
17    Cooley Manion Jones LLP
     Jonathan F. Tabasky, Esq.
18    21 Custom House Street
     Boston, Massachusetts 02110
19    617-737-3100 Fax: 617-737-3113
     jtabasky@cmjlaw.com
20
21   Representing Aircraft Braking Systems f/k/a The
     Goodyear Tire & Rubber Co.:
22    Cooley Manion Jones LLP
     Michael R. Brown, Esq. (via telephone)
23    21 Custom House Street
     Boston, Massachusetts 02110
24    617-737-3100 Fax: 617-737-3113
     mbrown@cmjlaw.com
25

Page 2

---

1   Representing Curtiss-Wright Corporation:
     Govarro Law Firm LLC
2    Kendra A. Christensen, Esq. (via telephone)
     Two International Place
3    Boston, Massachusetts 02110
     617-737-9045 Fax: 617-737-9046
4    kchristensen@govarro.com
5
   Representing Parker-Hannifin Corporation:
6    Keegan Werlin LLP
     Richard B. Kirby, Esq.
7    265 Franklin Street
     Boston, Massachusetts 02110
8    617-951-1400 Fax: 617 951 1323
     rkirby@keeganwerlin.com
9
10   Representing Eaton Aeroquip, Inc.:
     McElroy, Deutsch, Mulvaney & Carpenter, LLP
11    Nancy McDonald, Esq.
     1300 Mount Kemble Avenue
12    P.O. Box 2075
     Morristown, New Jersey 07962-2075
13    973-993-8100 Fax: 973-425-0161
     nmcdonald@mdmc-law.com
14
15   Representing General Dynamics Corporation:
     Melick, Porter & Shea, LLP
16    John F. Rooney, III, Esq. (via telephone)
     28 State Street
17    Boston, Massachusetts 02109
     617-523-6200 Fax: 617-523-8130
18    jrooney@melicklaw.com
19
   Representing General Tire Company and B.F. Goodrich
20   n/k/a Goodrich Corporation:
     Pierce, Davis & Perritano, LLP
21    Meghan L. Riordan, Esq. (via telephone)
     90 Canal Street
22    Boston, Massachusetts 02114
     617-350-0950 Fax: 617-350-7760
23    mriordan@piercedavis.com
24

Page 3

---

1   Representing The Boeing Company; Boeing North
     American, Inc.; McDonnell Douglas Corporation:
2    Sherin and Lodgen LLP
     Kathy E. Koski, Esq.
3    101 Federal Street
     Boston, Massachusetts 02110
4    617-646-2000 Fax: 617-646-2222
     kekoski@sherin.com
5
6   Representing United Technologies Corporation:
     Tucker Ellis & West LLP
7    Curtiss E. Isler, Esq.
     Martin H. Lewis, Esq.
8    1150 Huntington Building
     925 Euclid Avenue
9    Cleveland, Ohio 44115
     216-592-5000 Fax: 216-592-5009
10    curt.isler@tuckerellis.com
     mlewis@tuckerellis.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

---

1 (Pages 1 to 4)

Allan Shiffler                     Volume I                     April 7, 2011

Page 9

1  being you can't talk to counsel while the question
2  is pending. You have to answer the question. Then
3  we can take a break and you can speak with counsel.
4  Is that fair?
5     A. Sounds good.
6     Q. All right, great. Let's jump right in,
7  then. Could you state your full name for the
8  record.
9     A. Allan J. Shiffler.
10    Q. And Mr. Shiffler, what's your date of
11 birth?
12    A. March 26, 1941.
13    Q. A belated happy birthday. What is your
14 address?
15    A. 50 Mohegan Trail, South Windsor,
16 Connecticut.
17    Q. All right. And I know you've been deposed
18 before. On how many prior occasions have you given
19 a deposition?
20    A. I believe it was just one time.
21    Q. Have you ever testified at trial?
22    A. No.
23    Q. Did you ever have occasion to read that
24 deposition transcript from your other deposition?

Page 10

1     A. Yes, I believe I did.
2     Q. All right. And do you know, sir, whether
3  you made any corrections to any of the answers that
4  were given?
5     A. I don't recall.
6     Q. Can you tell me when you were first
7  contacted about this case?
8     A. About two weeks ago, thereabouts.
9     Q. And by whom were you contacted?
10    A. Curt Isler.
11    Q. Other than conversations you may have had
12 with lawyers, did you have any conversations with
13 anyone regarding your testimony in this case?
14    A. No.
15    Q. Did you review any documents in preparation
16 for your testimony?
17    A. The only thing I saw was the affidavit.
18    Q. Did you review any photographs?
19    A. No.
20    Q. And did you review any military contracts
21 or documents?
22    A. No.
23    Q. Are you presently employed?
24    A. No.

Page 11

1     Q. Okay. You have a smile on your face.
2  Believe me, I wish I wasn't presently employed right
3  now either. Can you tell me how long you have been
4  retired for?
5     A. Since 2003. March of 2003 is when I
6  retired.
7     Q. And other than this case and the case in
8  which you gave a deposition before, have you
9  assisted Pratt & Whitney in any other litigation?
10    A. No.
11    Q. And that other case was an asbestos case,
12 correct?
13    A. Yes.
14    Q. All right. So those are -- this case and
15 that case are the only two asbestos cases in which
16 you've testified or assisted Pratt & Whitney in any
17 manner?
18    A. In regards to a deposition, yes.
19    Q. Okay. And my question is a little broader.
20 Have you assisted them in an advisory capacity in
21 any other asbestos matters?
22    A. Yes.
23    Q. Okay. Approximately how many?
24    A. Maybe ten or twelve depositions.

Page 12

1     Q. When you say "depositions," what do you
2  mean by that, affidavits, perhaps?
3        MR. TABASKY: Why don't you ask him what
4  he did. That might be better.
5        MR. SHEPARD: I didn't want to go too
6  far into it, but...
7     Q. What did you do in those matters?
8     A. I reviewed and prepared -- reviewed and
9  signed some declarations --
10    Q. Okay.
11    A. -- if that clarifies it.
12    Q. It does, thank you. And do you maintain
13 copies of the declarations that you've reviewed and
14 signed?
15    A. Yes, I do.
16    Q. And where do you maintain those copies?
17    A. At my home.
18    Q. And were you provided those declarations to
19 sign by counsel?
20    A. Yes.
21    Q. Did you have the assistance of anyone other
22 than counsel in preparing those declarations?
23    A. No.
24    Q. Did these declarations involve subject

3 (Pages 9 to 12)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "D"

VOLUME II
PAGES 98-168
EXHIBITS: 4

COMMONWEALTH OF MASSACHUSETTS
Middlesex County          Superior Court

* * * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,
Individually and as Personal
Representative of JOHN T.
NORSWORTHY
        Plaintiff
vs.                                  Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a    08-4778
THE GOODYEAR TIRE & RUBBER CO.,
et al.,      Defendants
* * * * * * * * * * * * * * * * * *

CONTINUED 30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Friday, April 8, 2011, 9:00 a.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

Reporter: Joan M. Cassidy, RPR, RMR, CRR
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795 Fax 508.478.0595
www.eppleycourtreporting.com

Page 98

---

1   APPEARANCES:
2
3   Representing the Plaintiff:
        The Shepard Law Firm, P.C.
        Michael C. Shepard, Esq.
        10 High Street
        Boston, Massachusetts 02110
        617-451-9191 Fax: 617-451-9292
        mshepard@shepardlawfirm.com
6
7   Representing Hawker Beechcraft:
        Campbell Campbell Edwards & Conroy
        Adam A. Larson, Esq.
        One Constitution Plaza
        Boston, Massachusetts 02129
        617-241-3000 Fax: 617-241-5115
        alarson@campbell-trial-lawyers.com
10
11  Representing Honeywell International, Inc. f/k/a
        Allied Signal, Inc. f/k/a The Bendix Corporation:
12      Cetrulo & Capone LLP
        Lawrence J. Sugarman, Esq. (via telephone)
13      Two Seaport Lane
        Boston, Massachusetts 02210
14      617-217-5500 Fax: 617-217-5200
        lsugarman@cetcap.com
15
16  Representing United Technologies Corporation and the
        Witness:
17      Cooley Manion Jones LLP
        Jonathan F. Tabasky, Esq.
18      21 Custom House Street
        Boston, Massachusetts 02110
19      617-737-3100 Fax: 617-737-3113
        jtabasky@cmjlaw.com
20
21  Representing Curtiss-Wright Corporation:
        Guerrino Law Firm LLC
22      Kendra A. Christensen, Esq. (via telephone)
        Two International Place
23      Boston, Massachusetts 02110
        617-737-9045 Fax: 617-737-9045
24      kchristensen@guverino.com

Page 99

---

1   Representing Eaton Aeroquip, Inc.:
        McEiroy, Deutsch, Mulvaney & Carpenter, LLP
2       Nancy McDonald, Esq.
        1300 Mount Kemble Avenue
3       P.O. Box 2075
        Morristown, New Jersey 07962-2075
4       973-993-8100 Fax: 973-425-0161
        nmcdonald@mdmc-law.com
5
6   Representing General Dynamics Corporation:
        Melick, Porter & Shea, LLP
7       John F. Rooney, III, Esq. (via telephone)
        28 State Street
8       Boston, Massachusetts 02109
        617 523-6200 Fax: 617-523-6139
        jrooney@mwlicklaw.com
10
11  Representing General Tire Company and B.F. Goodrich
        n/k/a Goodrich Corporation:
12      Pierce, Davis & Perritano, LLP
        Meghan L. Riordan, Esq. (via telephone)
        90 Canal Street
13      Boston, Massachusetts 02114
        617-350-0950 Fax: 617-350-7760
14      mriordan@piercedavis.com
15
16  Representing The Boeing Company; Boeing North
        American, Inc.; McDonnell Douglas Corporation:
17      Sherin and Lodgen LLP
        Kathy E. Koski, Esq.
        101 Federal Street
18      Boston, Massachusetts 02110
        617-646-2000 Fax: 617-646-2222
19      kekoski@sherin.com
20
21
22
23
24

Page 100

---

1   Representing United Technologies Corporation:
        Tucker Ellis & West LLP
2       Curtiss L. Isler, Esq.
        Martin H. Lewis, Esq.
3       1150 Huntington Building
        925 Euclid Avenue
4       Cleveland, Ohio 44115
        216-592-5000 Fax: 216-592-5009
5       curt.isler@tuckerellis.com
        mlewis@tuckerellis.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

---

1   (Pages 98 to 101)

Allan Shiffler                    Volume II                    April 8, 2011

                        I N D E X

                      EXAMINATIONS
     Allan J. Shiffler

          BY MR. SHEPARD               103


                   EXHIBITS MARKED

     Exhibit 4, Declaration of Alan J.        146
     Shiffler in support of defendant
     United Technology Corporation's notice
     of removal

     (Original exhibits retained by Attorney Shepard)

                                                      Page 102

        P R O C E E D I N G S

        MR. SHEPARD: This is the continued
deposition of Mr. Shiffler.
        Allan J. Shiffler, Previously Sworn
        DIRECT EXAMINATION, Continued
BY MR. SHEPARD:
        Q. Good morning, Mr. Shiffler.
        A. Good morning.
        Q. We are back on the record, and I just want
to remind you that you are still under oath from
yesterday.
        MR. SHEPARD: And Jon, all the same
stipulations apply today?
        MR. TABASKY: Yes.
        MR. SHEPARD: Great.
        Q. All right. When we left off yesterday, we
were talking about the development of the dash 100A
version of the TF33, correct?
        A. Yes.
        Q. All right. Other than the development of
that engine, were you personally involved in the
development of any new engine or new variant of any
engine for the United States military during your
employment at Pratt & Whitney?

                                                      Page 103

        A. No.
        Q. And were you involved in any contract
negotiations for the development of any new engine
or new variant of any engine other than the TF33
during your tenure at Pratt & Whitney?
        A. No.
        Q. Now, we talked about the contracts that
Pratt entered into for the modification of a certain
number of dash 100As yesterday. How many dash 100As
were modified from existing TF33s under that
contract?
        A. I believe there were 49 or 50.
        Q. And were those engines pulled off of any
existing Air Force planes? Were they in Air Force
stock not attached to aircraft?
        A. That's two questions.
        Q. Okay. Then let's break it down.
        A. There you go.
        Q. Tell me where the Air Force obtained the
TF33s that they gave to Pratt to modify.
        A. Excess inventory.
        Q. And where did the Air Force maintain its
excess inventory at that time?
        A. Tinker Air Force Base, Oklahoma City.

                                                      Page 104

        Q. Were the excess inventory engines -- strike
that.
        When were the engines that were sent
back to Pratt & Whitney for modification first
manufactured by Pratt & Whitney?
        A. I don't think I can -- I don't have records
of that.
        Q. And do you -- strike that.
        Have you seen any documents that reflect
the contract between Pratt & Whitney and a third
party for the manufacture of those 49 or 50 TF33s?
        A. No.
        Q. So do you have any information other than
there were 49 or 50 TF33s in the possession of the
Air Force that were provided to Pratt & Whitney for
modification?
        A. I have no further information.
        Q. How long a period of time did it take Pratt
to modify those 49 or 50 engines into a dash 100A?
        A. That needs some clarification. Pratt &
Whitney modified at their Southington service center
overhaul facility I believe half of that quantity.
The remaining were modified by Tinker Air Force
Base, Oklahoma City, utilizing modification kits

                                                      Page 105

                           2  (Pages 102 to 105)

Allan Shiffler                   Volume II                   April 8, 2011

1  A. Yes.
2  Q. With respect to the TF33 new production,
3  how many engines were produced pursuant to that
4  contract?
5  A. Oh, my. I can only give you an
6  approximation.
7  Q. That's fine.
8  A. I think there was around 70 or so, in that
9  ballpark.
10  Q. And between the two contracts, the
11  modification contract and the new contract, how many
12  of those engines were going into the excess
13  inventory system at the Air Force versus going on a
14  plane?
15  A. That's hard to say.
16  Q. Did the Air Force at that time have a ratio
17  of engines that it maintained in excess inventory, a
18  ratio to the number of engines that were on
19  aircraft?
20  A. Yes, they had such a ratio, but I forget
21  what that was.
22  Q. Does Pratt have any documents that would
23  evidence that ratio?
24  A. Time has since gone by. I don't think so,

Page 110

1  Q. So we have the two contracts, one for the
2  modification of the existing TF33s, one for new
3  construction. Were there any subsequent contracts
4  related to that project that Pratt entered into with
5  either the Air Force or Boeing?
6  A. There was a subsequent spare parts
7  contract.
8  Q. And when was that entered into?
9  MR. TABASKY: If you know.
10  A. I really don't know.
11  Q. If you can estimate, that's fine, you know.
12  A. I really don't know.
13  Q. Okay.
14  A. It was a follow-on after the production
15  ended.
16  Q. All right. And was it fairly soon after
17  the production ended --
18  A. Yes.
19  Q. -- or did a span of years go by after
20  production ended?
21  A. It was kind of an extension of the
22  production contract.
23  Q. Did you have any role in the drafting or
24  negotiation of the spares contract?

Page 112

1  no.
2  Q. The kits that Pratt provided to the Air
3  Force that would allow the Air Force to modify its
4  TF33s into a dash 100A, approximately how many parts
5  were included with those kits?
6  A. 300 or 400.
7  Q. And can you tell me how many parts were on
8  the original TF33s that were being modified so I can
9  get a sense of what percentage of parts were
10  changed?
11  A. 3000 or 4000.
12  Q. So about 10 percent of them were changed?
13  A. Sounds reasonable.
14  Q. Okay. Was the dash 100A engine ever sold
15  on the civilian side?
16  A. No.
17  Q. Was it ever put in anything other than an
18  AWACS aircraft by the Air Force?
19  A. The 100A?
20  Q. Yes.
21  A. No.
22  Q. And was it ever sold to any other branch of
23  the military, the Navy?
24  A. No.

Page 111

1  A. No.
2  Q. Does Pratt have in its possession any of
3  these contracts, the modification, the engine
4  manufacturer or the spares?
5  A. That I don't know.
6  Q. And can you tell me for the spare parts
7  contract what spare parts Pratt agreed to provide?
8  Was it all spare parts for the TF33-100A?
9  A. There was already in place a spare parts
10  support contract for the TF33 engine model and its
11  variants; thus, there were add-ons for spare parts
12  specific, unique to the 100A.
13  Q. So there was an existing contract that
14  covered 90 percent of the dash 100A engine, and this
15  new contract was for the new 10 percent
16  approximately of the engine?
17  A. Unique, yes.
18  Q. Unique?
19  A. Yes.
20  Q. Okay. So in that 300 to 400 parts that
21  made up the modification kit for the engine, were
22  some of those parts parts that were original to the
23  TF33?
24  A. Some may have been.

Page 113

EPPLEY COURT REPORTING, LLC
508.478.9795

Allan Shiffler                     Volume II                     April 8, 2011

1     A. No.
2     Q. Is there such a thing as a civilian
3   specification for manuals?
4     A. There's guidelines.
5     Q. And who puts out those guidelines?
6     A. I don't recall right now.
7     Q. If you were to look at -- let's use our
8   JT8D as an example. If you were to look at the
9   civilian manuals for the JT8D and the Air Force
10  T.O.'s for the JT8D, would those be -- would those
11  manuals appear to be very similar?
12    A. "Similar" is a good description, but not
13  necessarily identical.
14    Q. So there may be certain formatting
15  differences between them?
16    A. Yes.
17    Q. But in terms of substance, the information
18  contained therein is going to be largely the same?
19    A. Yes.
20    Q. And would you agree that military
21  specifications for manuals state that the intent is
22  to accept a manufacturer's commercial type of manual
23  or one prepared in accordance with the commercial
24  practice whenever it is roughly equivalent to the

Page 142

1   detail requirements included in the military
2   specification?
3        MR. TABASKY: Objection.
4     A. I haven't seen that document.
5     Q. And I'm not asking you to identify the
6   document. I'm asking if you are familiar with --
7        MR. TABASKY: That's what I was going to
8   say. Ask him, please, if he's familiar with it
9   rather than having him agree with you, because -- is
10  he supposed to just take your word for it?
11       MR. SHEPARD: Don't coach him.
12    Q. I've established that you've read the
13  military specification for manuals, correct?
14    A. Yes.
15    Q. And what I'm asking you is, are you
16  familiar with the provision in the military
17  specification for manuals that states that it's the
18  intent of the military to accept the manufacturer's
19  commercial type of manual or one prepared in
20  accordance with the commercial practice whenever
21  it's roughly equivalent to the detail requirements
22  in the military specification?
23    A. I'm not familiar with that statement.
24    Q. All right. Are you familiar with

Page 143

1   provisions or notations in aircraft manuals for
2   notes, cautions and warnings?
3     A. I'm aware they exist, but I'm not familiar
4   with how they're applied.
5     Q. So you wouldn't be able to tell me what the
6   distinction would be between a note, a caution and a
7   warning?
8     A. No.
9     Q. Was Pratt & Whitney ever told by the
10  military not to put warnings about asbestos in its
11  manuals?
12       MR. TABASKY: Objection. You can answer
13  if you know.
14    A. I'm not aware of them asking.
15    Q. You're not aware of Pratt asking the
16  military whether they could?
17    A. Exactly.
18    Q. All right. And if Pratt didn't ask the
19  military whether they could, then there wouldn't be
20  a response from the military one way or the other,
21  correct?
22       MR. TABASKY: Objection.
23    A. Yes.
24    Q. Now, the United States Air Force personnel

Page 144

1   from Wright-Patterson who were involved in the dash
2   100A project, you mentioned that they had audit
3   approval authority?
4     A. Yes.
5     Q. Can you tell me again what you mean by
6   "audit approval authority"?
7     A. They approved the final design before it
8   was released.
9     Q. So when Pratt finishes the designs of the
10  engine, it can't go into production until the Air
11  Force okeys it?
12    A. Exactly.
13    Q. Did the Air Force -- are you aware of any
14  situation in which the Air Force did not okay a
15  Pratt engine design?
16       MR. TABASKY: Final design or anywhere
17  along the way or --
18       MR. SHEPARD: Any.
19       MR. TABASKY: Object to the form.
20    A. I'm not aware of any.
21    Q. Did the United States Air Force have audit
22  approval authority over the drafting of manuals?
23    A. Yes.
24    Q. And it was the same type of authority, that

Page 145

12 (Pages 142 to 145)

Allan Shiffler                    Volume II                    April 8, 2011

**Page 122**

1    Q. All right. Well, give me a range, then.
2    Give me the model that you think has the least in
3    common and give me the model that you think has the
4    most in common, and that will establish our range.
5    A. Anywhere from 60 to 90 percent.
6    Q. Okay. So to the extent that the Air Force
7    needs a spare part for a TF33 and it's one of the 60
8    to 90 percent parts that are shared with a JT3D,
9    could the Air Force have obtained spare parts for
10   its TF33 from an airframer or another third party?
11   A. They would not get it from an airframer,
12   but the possibility does exist that they might get
13   it from a parts overhaul shop that has a Pratt &
14   Whitney part number on it.
15   Q. And a parts overhaul shop would be an
16   independent company whose business is overhauling
17   engines?
18   A. FAA-approved overhaul shop.
19   Q. Did the Air Force, to your knowledge, have
20   any of its engines serviced at such a location?
21   A. None that I was associated with, that I'm
22   aware of, no.
23   Q. Do you know whether the Air Force had any
24   arrangement with any such shop, parts overhaul shop,

**Page 123**

1    for providing spare parts to the Air Force?
2    A. They may have.
3    Q. Would you consider it an unusual situation
4    for a spare part for a Pratt & Whitney engine in an
5    Air Force plane to come from a parts overhaul shop
6    as opposed to through Pratt & Whitney?
7    (Objection by multiple counsel.)
8    A. They may have acquired non -- what I would
9    consider noncritical parts.
10   Q. What do you consider to be a noncritical
11   part?
12   A. Clamps, bolts; common bolts and nuts that
13   are common throughout the industry, throughout the
14   aerospace industry, those types of items; gaskets,
15   MS, AN parts, those sorts of items.
16   Q. And to the extent that a part like that is
17   used on a Pratt & Whitney engine, can any part be
18   used, or do they have to be parts that were designed
19   and built pursuant to Pratt's specifications?
20   A. Our recommendation to the Air Force is that
21   they use our recommended parts; however, the Air
22   Force themselves have the option to utilize what
23   they call equivalencies.
24   Q. And when you say "equivalencies," is that

**Page 124**

1    something that the Air Force deemed to be equivalent
2    to the Pratt part?
3    A. Yes.
4    Q. And it was a part that was obtained from
5    someone other than Pratt?
6    A. Yes.
7    Q. Did the Air Force maintain a list of
8    equivalences?
9    A. They have an organization that supports the
10   entire DOD on such common air space industry parts,
11   all kinds of Air Force equipment, Navy equipment,
12   Marine equipment, et cetera, et cetera. They have a
13   special organization that handles all that.
14   Q. So if Pratt designs an engine -- and we
15   heard from Mr. Sumner about the design drawings that
16   are on a computer system at Pratt & Whitney. To the
17   extent that Pratt designs an engine and there is a
18   drawing for a part -- let's use a gasket for an
19   example. All right? A gasket is something you gave
20   as an example of a part that may be a noncritical
21   part, where the Air Force might have an equivalency
22   for that; is that correct?
23   MR. TABASKY: Object to the form.
24   A. They have in their repository the drawings

**Page 125**

1    for the military engines.
2    Q. Pratt does?
3    A. The Air Force --
4    Q. Okay.
5    A. -- the military. There's a military
6    repository for drawings.
7    Q. And they have Pratt's drawings?
8    A. And they have -- some of them are their
9    drawings.
10   Q. Well, I understand that there's a lot of
11   drawings in the repository, but I'm saying, Pratt's
12   drawings for the engines that Pratt is building for
13   the Air Force, the Air Force has a copy of?
14   A. That's right.
15   Q. In addition to other drawings they have?
16   A. Many.
17   Q. I'm sure. And I want to limit now our
18   questions to the Pratt drawings.
19   A. Yes.
20   Q. Okay. The Air Force has the Pratt
21   drawings. The Air Force can then take those
22   drawings and submit them to someone other than Pratt
23   to have parts manufactured?
24   A. Yes.

7 (Pages 122 to 125)

1  they had the -- they had to okay the manuals before
2  they went to the Air Force printing?
3      A. Yes.
4      Q. Are you aware of any situation in which the
5  Air Force told Pratt to change the way it was doing
6  its manuals?
7      A. I'm not, no, I don't have any knowledge of
8  that.
9      Q. Are you aware of any situation in which the
10  Air Force rejected a Pratt draft of a manual?
11      A. I'm not aware of that.
12      MR. SHEPARD: Would you mark this,
13  please.
14      (Marked, Exhibit 4, Declaration of Alan
15  J. Shiffler in support of defendant United
16  Technology Corporation's notice of removal.)
17      Q. I've put in front of you what we have
18  marked as UTC 4. I ask you to take a look at that
19  and tell me if you recognize that document.
20      A. (Witness reviews document.) Yes.
21      Q. Okay. And on -- well, tell me what this
22  document is first.
23      A. A declaration.
24      Q. And it says, "Declaration of Alan J.

Page 146

1      A. No.
2      Q. Do you keep -- to the extent you may have
3  edited it, do you keep copies of your edits at your
4  house?
5      A. No.
6      Q. And if you edited it, would you have done
7  it on a computer?
8      A. I would have done it by e-mail, yes.
9      Q. And do you maintain your e-mail
10  correspondence between yourself and counsel?
11      A. I don't know whether I have this or not,
12  no, I don't know.
13      Q. Okay. But in general --
14      A. I have some.
15      Q. You have some of your e-mails. You don't
16  know how far back they go?
17      A. No, I don't keep a record.
18      Q. Is the computer you're using today the same
19  computer you were using in April of 2009?
20      A. No.
21      Q. No. All right. When you got a new
22  computer, did you transfer your old information over
23  to the new computer?
24      A. Some of it.

Page 148

1  Shiffler in Support of Defendant United Technology
2  Corporation's Notice of Removal," does it not?
3      A. Yes.
4      Q. Is that your signature on page 3?
5      A. Yes.
6      Q. And do you see the date there? Is that
7  when you signed this document?
8      A. Yes.
9      Q. Did you type up this document yourself?
10      A. No.
11      Q. From where did you receive it? From whom
12  did you receive it?
13      A. From Curt's law firm.
14      Q. So one of the lawyers gave it to you?
15      A. Yes.
16      Q. Did you see a rough draft of it before you
17  signed this one?
18      A. Yes.
19      Q. How many rough drafts did you see?
20      A. I don't recall how many I did see.
21      Q. Do you know whether you made any edits to
22  the initial draft you were given?
23      A. I may have.
24      Q. Do you recall?

Page 147

1      Q. As you sit here today, do you know whether
2  you scanned and sent this back to the lawyers or
3  whether you mailed it to them or handed it to them
4  in person?
5      A. I most likely would have scanned page 3 --
6      Q. Okay.
7      A. -- and sent a pdf file and then sent the
8  original.
9      Q. Is that your usual practice?
10      A. Yes.
11      Q. How many declarations like this one have
12  you filled out for the lawyers for Pratt?
13      A. Similar to this one?
14      Q. Yes.
15      A. Maybe ten.
16      Q. And do they all say pretty much the same
17  thing, or do you change each one?
18      A. There is some similarity.
19      Q. Is this the subject matter of most of those
20  affidavits, declarations?
21      A. Yes.
22      Q. All right. I want to draw your attention
23  to Paragraph 5. It says, "Based upon my work
24  experience with the engines that Pratt & Whitney

Page 149

13 (Pages 146 to 149)

Allan Shiffler                    Volume II                    April 8, 2011

1   supplied to the military from 1966 to 2003, I am
2   familiar with the manner in which Pratt & Whitney
3   military engines were designed, built and supplied
4   to the United States military."
5       Is the TF33-100A the only engine that
6   you were involved in the design process for for the
7   United States military?
8       A. That needs clarification.
9       Q. Okay, go ahead.
10      A. I was involved with design
11  characterizations of numerous military legacy
12  engines and commercial, but not necessarily from the
13  original design concept through production, but in
14  an after-market capacity, yes.
15      Q. And that's in the capacity you spoke about
16  yesterday where you were dealing with maintenance
17  issues and coming up with new maintenance procedures
18  for the engines?
19      A. Yes.
20      Q. Okay. So with respect to initial design
21  and contracts --
22      A. Yes.
23      Q. -- with the military for Pratt engines,
24  your experience is limited to the dash 100A?

Page 150

1       Q. All right. Paragraph 7 on the second page:
2   "Pratt & Whitney during all aspects of its design
3   and manufacture of military aircraft engines, i.e.,
4   design, manufacture and testing of such engines,
5   performed its work under the immediate supervision
6   of the United States military."
7       Who was the immediate supervisor for the
8   military that was performing these tasks?
9       A. There was an Air Force procurement
10  organization on site at Pratt & Whitney.
11      Q. Okay. And that's the person you talked
12  about yesterday?
13      A. Yes.
14      Q. And how many people were present on site at
15  Pratt on a daily basis from the Air Force?
16      A. Oh, my gracious, I'd have to make a
17  guesstimate.
18      Q. I don't want you to guesstimate.
19      A. I don't know for sure.
20      Q. More than one?
21      A. Yes.
22      Q. Less than ten?
23      A. No.
24      Q. More than ten?

Page 152

1       MR. TABASKY: Object to form.
2       A. I'm aware of having seen initial contracts
3   on other of my legacy engines that I was involved
4   with even though I wasn't a direct participant at
5   that time.
6       Q. So you've seen the contracts?
7       A. Yes.
8       Q. All right. Does Pratt still have those
9   contracts?
10      A. That I don't know.
11      Q. Can you tell me anything about the
12  circumstances surrounding those contracts that you
13  can't tell by reading the contract? In other words,
14  do you have any knowledge of the contract between
15  Pratt and the military for any other engine other
16  than what you've read in the contract?
17      MR. TABASKY: Objection.
18      A. No.
19      Q. And you, having not been employed by Pratt
20  prior to 1966, have no knowledge about Pratt's
21  contractual relationship with the military prior to
22  1966 apart from what you could read in a contract?
23      MR. TABASKY: Objection.
24      A. Correct.

Page 151

1       A. Yes.
2       Q. Less than twenty?
3       A. No.
4       Q. And were all of these people in that one
5   office, or were these people spread throughout
6   Pratt's facility?
7       A. They had various assignments throughout
8   Pratt & Whitney.
9       Q. Okay. How many people were assigned to the
10  preliminary design group, if any?
11      MR. TABASKY: For the PW --
12      MR. SHEPARD: No, just how many --
13      Q. Do you understand my question to be how
14  many Air Force employees or representatives were
15  assigned at Pratt to the preliminary design group?
16      MR. TABASKY: Object to form.
17      A. For engineering oversight?
18      Q. Yes.
19      A. Oh, probably half a dozen.
20      Q. And how many were assigned to the design
21  department, or was that a separate department?
22      A. They didn't have oversight of the design
23  department; they coordinated all of their efforts
24  through the program office, project group.

Page 153

14 (Pages 150 to 153)

Allan Shiffler                    Volume II                    April 8, 2011

1      Q. So the design department worked
2  independently, and the Air Force oversight happened
3  elsewhere?
4          MR. TABASKY: Objection.
5      A. The project group would coordinate with the
6  Air Force in lieu of the specific design group
7  itself.
8      Q. So when the designers are doing their day-
9  in-and-day-out work, there's not an Air Force person
10  sitting next to them?
11      A. No, no.
12      Q. Are the Air Force people there more to
13  coordinate and facilitate the work that's being done
14  for engines that are going to end up in the Air
15  Force inventory?
16      A. Yes, yes.
17      Q. They are not there for hands-on design
18  work?
19      A. No. However -- I wish to clarify that a
20  bit.
21      Q. Go ahead.
22      A. They do review and approve the drawings.
23      Q. Okay. So Pratt designs the engine, creates
24  the drawings; but before it can go into production,

                                              Page 154

1  the Air Force reviews them and gives them their
2  okay?
3      A. Yes.
4      Q. All right. And what level of detail does
5  the Air Force give on the design -- each of the
6  design drawings?
7      A. There's an engineering change process which
8  they have to sign off on.
9      Q. If you're changing something?
10      A. Yes.
11      Q. All right. But let's say you're designing
12  an engine from scratch -- all right? -- and not
13  modifying or changing an existing engine, and the
14  Air Force has entered into a contract with Pratt for
15  the design and manufacture for this new engine --
16      A. Yes.
17      Q. -- the Air Force people aren't there to
18  help design the engine; they're there to oversee the
19  design and make sure that it meets the
20  specifications that the Air Force has set forth?
21      A. Yes.
22      Q. And to the extent that the Air Force
23  personnel are reviewing drawings and designs,
24  they're doing so with an eye toward making sure that

                                              Page 155

1  the design meets their specifications?
2          MR. TABASKY: Objection.
3      A. Yes.
4      Q. You wouldn't say that Pratt & Whitney
5  engines are designed by the Air Force, would you?
6      A. No.
7      Q. So Pratt & Whitney is not simply the
8  manufacturing arm of a design -- an Air Force design
9  team?
10      A. No.
11      Q. Paragraph 8 there, if you look down at the
12  last sentence of Paragraph 8, you say, "During the
13  period of my employment at Pratt & Whitney, these
14  military specialists at Pratt & Whitney controlled
15  the design and manufacture of any aircraft engine
16  produced at Pratt & Whitney for the United States
17  military."
18          And I take it by "controlled the design
19  and manufacture" you mean that they had veto power
20  over Pratt's designs?
21      A. Yes.
22      Q. They weren't the ones putting the designs
23  together?
24      A. Right.

                                              Page 156

1      Q. Let's flip to the next page, Paragraph 10.
2  You say, "Any written material such as warnings or
3  product manuals that accompanied the engines built
4  by Pratt & Whitney for the United States military
5  were similarly controlled and specified by the
6  United States military."
7          You don't have any personal knowledge as
8  to what control, if any, the military exercised over
9  manuals that were drafted by Pratt, do you?
10          MR. TABASKY: Objection.
11      A. Other than by the contract requirements for
12  publications.
13      Q. Okay.
14      A. And there is -- it does list quite a bit of
15  guidelines.
16      Q. So the contracts for the publications not
17  only tell Pratt that it has to create manuals, but
18  it gives some information as to what has to be in
19  the manuals?
20      A. Yes.
21      Q. As you sit here today without the contract
22  in front of you, can you tell me what else it says
23  other than Pratt has to create manuals?
24      A. No.

                                              Page 157

                                   15 (Pages 154 to 157)

Allan Shiftler                    Volume II                  April 8, 2011

1    Q. We'd need the contract to know exactly what
2    they say?
3        MR. TABASKY: Objection.
4    A. Because they vary (nodding).
5    Q. All right. So when you say "were
6    controlled and specified by the United States
7    military," what you mean is that the written
8    materials were subject to a contract?
9    A. Yes.
10   Q. The next paragraph, Paragraph 11, the last
11   sentence: "Pratt & Whitney had no knowledge that
12   handling any parts or components used in the
13   maintenance, repair or overhaul of Pratt & Whitney
14   aircraft engines during the time that John T.
15   Norsworthy is claimed to have served in the military
16   (1962 to 1990) could cause an asbestos-related
17   illness." What's the basis, your basis, for that
18   statement?
19   A. The fact that I'm not aware of any Pratt &
20   Whitney employee that has that sort of related
21   sickness or illness.
22   Q. And that's -- based on the fact that you
23   don't know of another Pratt employee with
24   mesothelioma, you were able to make that statement?

Page 158

1    A. Along with -- what is it, the Melanyk
2    (phonetic) report?
3        MR. TABASKY: Mlynarek.
4    A. Mlynarek report.
5    Q. Okay. And what does the Mlynarek report
6    say?
7    A. It suggests that on the reciprocating
8    engines that the level of exposure is no worse than
9    the outside air.
10   Q. And did you have any role in the work that
11   was done to create that report?
12   A. No.
13   Q. Do you have any background in industrial
14   hygiene?
15   A. No.
16   Q. You have no background in medicine?
17   A. No.
18   Q. All right. And you've never worked for
19   either an industrial hygiene or a safety department
20   within Pratt & Whitney?
21   A. No.
22   Q. The fact that -- well, strike that.
23       The Mlynarek report was created at whose
24   request?

Page 159

1    A. I believe it was at the request of our
2    legal staff.
3    Q. Your lawyers?
4    A. Yes.
5    Q. Pratt's lawyers?
6    A. Yes.
7    Q. So other than the report that was put
8    together at the request of Pratt's lawyers and the
9    fact that you are not aware that any Pratt employees
10   had mesothelioma, those two things allow you to make
11   the statement that Pratt & Whitney had no knowledge
12   that handling any parts or components used in the
13   maintenance, repair or overhaul of Pratt aircraft
14   engines could cause an asbestos-related illness?
15   A. Plus information that I got -- I made
16   inquiries with a couple of the reciprocating
17   overhaul shops that I'm aware of to date.
18   Q. And what inquiries did you make?
19   A. I inquired as to whether they had any
20   employees that they were aware of that had any known
21   asbestos-related situations.
22   Q. And how many shops did you call?
23   A. Two of the major ones and really the only
24   ones that still exist.

Page 160

1    Q. What are the names of those?
2    A. Covington.
3    Q. And where are they located?
4    A. In Oklahoma.
5    Q. And the other one?
6    A. Is Precision.
7    Q. And where are they located?
8    A. Oregon.
9    Q. And how many employees does Covington have?
10   A. I actually don't know what their number of
11   employees is. They have Websites.
12   Q. How many employees does Precision have?
13   A. That I don't know.
14   Q. What is the incidence rate of mesothelioma
15   in the general population?
16       MR. TABASKY: Objection.
17   A. That I don't know.
18       MR. TABASKY: He's not -- one second.
19   He's not been tendered for that subject.
20       MR. SHEPARD: Well, he's writing
21   declarations and drawing conclusions about whether
22   exposure to an engine can cause an illness.
23       MR. TABASKY: I understand that.
24       MR. SHEPARD: So what I'm trying to

Page 161

16 (Pages 158 to 161)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "E"



IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDRA LOUISE NORSWORTHY, Individually
and as Personal Representative of the Estate of JOHN
T. NORSWORTHY,

    Plaintiffs,

vs.

AIRCRAFT BRAKING SYSTEMS, et al.,

    Defendants.

CASE NO.

JUDGE

DECLARATION OF ALLAN J.
SHIFFLER IN SUPPORT OF
DEFENDANT UNITED
TECHNOLOGIES CORPORATION'S
NOTICE OF REMOVAL

I, Allan J. Shiffler, declare and state as follows:

1.    I am over the age of 18 years and am competent to testify to the facts set forth in this declaration. I have personal knowledge of the facts contained in this declaration.

2.    I joined Pratt & Whitney, an unincorporated division of United Technologies Corporation, in 1966 and was an engineer within the Engineering and Customer Technical Service Groups during my career at Pratt & Whitney. I retired from Pratt & Whitney in 2003.

3.    Pratt & Whitney designs and manufactures aircraft engines for use in United States Military aircraft.

4.    During my time with Pratt & Whitney, I worked as an engineer on the development and manufacture of engines used in Military aircraft.

5.    Based upon my work experience with the engines that Pratt & Whitney supplied to the military from 1966 to 2003, I am familiar with the manner in which Pratt & Whitney military engines were designed, built and supplied to the United States Military.

6.    I have personal knowledge of the extent of involvement of the United States Military in the design, manufacture, approval, and receipt of the military engines designed and

manufactured by Pratt & Whitney. I submit this affidavit to attest to the level of supervision, control, and approval by the United States Military and its officers over the design and manufacture of these Pratt & Whitney aircraft engines intended for use by the United States Military.

7.     Pratt & Whitney, during all aspects of its design and manufacture of military aircraft engines (i.e., design, manufacture, and testing of such engines), performed its work under the immediate supervision of the United States Military. This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers and military specialists on-site at Pratt & Whitney. No aspect of the development, manufacture, and testing of the engines intended for use by the United States Military escaped this close control.

8.     The design, specification and manufacture of the Pratt & Whitney aircraft engines intended for use by the United States Military were approved by the appropriate Military personnel. United States Military engineers and inspectors were personally present at Pratt & Whitney facilities to oversee, inspect, and approve the work performed by Pratt & Whitney engineers and other personnel, including approval of any changes to engine design or specifications on all aircraft engines intended for use by the United States Military. During my employment with Pratt & Whitney, I personally interacted with these United States Military representatives on a regular basis. These representatives had different areas of specialty, such as engineering, contracts and quality control. During the period of my employment at Pratt & Whitney, these Military specialists at Pratt & Whitney controlled the design and manufacture of any aircraft engine produced at Pratt & Whitney for the United States Military.

9.     The United States Military provided extensive and detailed performance and construction specifications for the Pratt & Whitney aircraft engines intended for Military use. The United States Military, including the on-site Military inspectors responsible for oversight

and approval of the design and manufacture of these engines, had detailed prints and drawings of every part used in such engines. These prints disclosed all materials contained in each part. The Military inspectors knew of, and approved, all materials and all parts contained in the Pratt & Whitney engines intended for use by the United States Military.

10.    Any written materials, such as warnings or product manuals, that accompanied the engines built by Pratt & Whitney for the United States Military were similarly controlled and specified by the United States Military. Any aircraft engine designed and manufactured by Pratt & Whitney for the United States Military that did not meet the strict standards and specifications set forth by the United States Military for that particular engine was rejected by the United States Military.

11.    It is my understanding that Plaintiffs claim that John T. Noxsworthy's work on Pratt & Whitney R-2800, R-4360, R-985, R-1830, R-2000 engines designed and manufactured for the United States Military during his service with the United States Air Force caused him to suffer from an asbestos-related injury. I am familiar with these engines and it is my understanding that they were in service with the U.S. Military at least through the 1960s. Pratt & Whitney had no knowledge that handling any parts or components used in the maintenance, repair or overhaul of Pratt & Whitney aircraft engines during the time that John T. Noxsworthy is claimed to have served in the Military (1962-1990) could cause an asbestos-related illness.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16ᵗʰ day of April, 2009, in _SOUTH WINDSOR_, Connecticut.

By: _____
Allan F. Shiffler, Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBITS "F" through "I" to Plaintiffs' Motion to Remand intentionally omitted.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "G"

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PATTI DONLON, etc., et al.,

      Plaintiffs,

  v.

A, C & S INC., et al.,

      Defendants.

No. C 11-3376 SI

**RECUSAL ORDER**

I hereby recuse myself in the above entitled matters and request that the case be reassigned pursuant to Section F. of the Assignment Plan of this Court.

Dated: July 26, 2011

SUSAN ILLSTON
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "H"

Allan Shiffler                    Volume I                    April 7, 2011

---

VOLUME I
PAGES 1-96
EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS
Middlesex County          Superior Court

* * * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,          *
Individually and as Personal       *
Representative of JOHN T.          *
NORSWORTHY                         *
          Plaintiff                *
                                   *
vs.               *        Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a    *      08-4778
THE GOODYEAR TIRE & RUBBER CO.,   *
et al.            Defendants       *
* * * * * * * * * * * * * * * * * *

30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Thursday, April 7, 2011, 3:53 p.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

-----Reporter: Joan M. Cassidy, RPR, RMR, CRR-----
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795  Fax 508.478.9595
www.eppleycourtreporting.com

Page 1

---

1    APPEARANCES:

2    Representing the Plaintiff:
       The Shepard Law Firm, P.C.
3      Michael C. Shepard, Esq.
       10 High Street
4      Boston, Massachusetts 02110
       617-451-9191  Fax 617-451-0922
5      mshepard@shepardlawfirm.com
6
     Representing Honive Benchmark:
7      Campbell Campbell Edwards & Conroy
       Adam A. Larson, Esq.
8      One Constitution Plaza
       Boston, Massachusetts 02129
9      617-241-3000  Fax 617-241-5115
       alarson@campbell-trial-lawyers.com
10
11   Representing Honeywell International, Inc. f/k/a
     Allied Signal, Inc. f/k/a The Bendix Corporation:
12     Cetrulo & Capone LLP
       Lawrence J. Buynoski, Esq. (via telephone)
13     Two Seaport Lane
       Boston, Massachusetts 02210
14     617-217-5500  Fax 617-217-5200
       lbuynoski@celcap.com
15
16   Representing United Technologies Corporation and the
     Witness:
17     Cooley Manion Jones LLP
       Jonathan P. Feeney, Esq.
18     21 Custom House Street
       Boston, Massachusetts 02110
19     617-737-3100  Fax 617-737-3113
       jfeeney@cmjlaw.com
20
21   Representing Aircraft Braking Systems f/k/a The
     Goodyear Tire & Rubber Co.:
22     Cooley Manion Jones LLP
       Michael R. Brown, Esq. (via telephone)
23     21 Custom House Street
       Boston, Massachusetts 02110
24     617-737-3100  Fax 617-737-3113
       mbrown@cmjlaw.com
25

Page 2

---

2    Representing Curtiss-Wright Corporation:
       Govotto Law Firm LLC
2      Kemba A. Christensen, Esq. (via telephone)
       Two International Place
3      Boston, Massachusetts 02110
       617-737-9045  Fax: 617-737-9046
4      kchristensen@govotto.com
5
6    Representing Parker-Hannifin Corporation:
       Keegan Werlin LLP
7      Richard B. Kirby, Esq.
       265 Franklin Street
8      Boston, Massachusetts 02110
       617-951-1400  Fax 617-951-1354
       rkirby@keeganwerlin.com
9
10   Representing Eaton Aeroquip, Inc.:
       McElroy, Deutsch, Mulvaney & Carpenter, LLP
11     Nancy McDonald, Esq.
       1300 Mount Kemble Avenue
12     P.O. Box 2075
       Morristown, New Jersey 07962-2075
13     973-993-8100  Fax: 973-425-0161
       nmcdonald@mdmc-law.com
14
15   Representing General Dynamics Corporation:
       Melick, Porter & Shea, LLP
16     John F. Rooney, III, Esq. (via telephone)
       28 State Street
17     Boston, Massachusetts 02109
       617-523-6200  Fax: 617-523-3130
18     jrooney@melicklaw.com
19
20   Representing General Tire Company and B.F. Goodrich
     n/k/a Goodrich Corporation:
21     Pierce, Davis & Perritano, LLP
       Meghan L. Riordan, Esq. (via telephone)
22     90 Canal Street
       Boston, Massachusetts 02114
       917-350-7150  Fax: 617-350-7701
       mriordan@piercedavis.com
24

Page 3

---

1    Representing The Boeing Company; Boeing North
     American, Inc.; McDonnell Douglas Corporation:
2      Sheehn and Lodgen LLP
       Kathy E. Koski, Esq.
3      101 Federal Street
       Boston, Massachusetts 02110
4      617-646-2000  Fax 617-646-2222
       kekoski@sherin.com
5
6    Representing United Technologies Corporation:
       Tucker Ellis & West LLP
7      Curtiss L. Isler, Esq.
       Martin H. Lewis, Esq.
8      1150 Huntington Building
       925 Euclid Avenue
9      Cleveland, Ohio 44115
       216-592-5000  Fax: 216-592-5009
10     curt.isler@tuckerellis.com
       mlewis@tuckerellis.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

---

1 (Pages 1 to 4)

Allan Shiffler                    Volume I                    April 7, 2011

**Page 9**

1  being you can't talk to counsel while the question
2  is pending. You have to answer the question. Then
3  we can take a break and you can speak with counsel.
4  Is that fair?
5  A. Sounds good.
6  Q. All right, great. Let's jump right in,
7  then. Could you state your full name for the
8  record.
9  A. Allan J. Shiffler.
10  Q. And Mr. Shiffler, what's your date of
11  birth?
12  A. March 26, 1941.
13  Q. A belated happy birthday. What is your
14  address?
15  A. 60 Mohegan Trail, South Windsor,
16  Connecticut.
17  Q. All right. And I know you've been deposed
18  before. On how many prior occasions have you given
19  a deposition?
20  A. I believe it was just one time.
21  Q. Have you ever testified at trial?
22  A. No.
23  Q. Did you ever have occasion to read that
24  deposition transcript from your other deposition?

**Page 10**

1  A. Yes, I believe I did.
2  Q. All right. And do you know, sir, whether
3  you made any corrections to any of the answers that
4  were given?
5  A. I don't recall.
6  Q. Can you tell me when you were first
7  contacted about this case?
8  A. About two weeks ago, thereabouts.
9  Q. And by whom were you contacted?
10  A. Curt Isler.
11  Q. Other than conversations you may have had
12  with lawyers, did you have any conversations with
13  anyone regarding your testimony in this case?
14  A. No.
15  Q. Did you review any documents in preparation
16  for your testimony?
17  A. The only thing I saw was the affidavit.
18  Q. Did you review any photographs?
19  A. No.
20  Q. And did you review any military contracts
21  or documents?
22  A. No.
23  Q. Are you presently employed?
24  A. No.

**Page 11**

1  Q. Okay. You have a smile on your face.
2  Believe me, I wish I wasn't presently employed right
3  now either. Can you tell me how long you have been
4  retired for?
5  A. Since 2003. March of 2003 is when I
6  retired.
7  Q. And other than this case and the case in
8  which you gave a deposition before, have you
9  assisted Pratt & Whitney in any other litigation?
10  A. No.
11  Q. And that other case was an asbestos case,
12  correct?
13  A. Yes.
14  Q. All right. So those are -- this case and
15  that case are the only two asbestos cases in which
16  you've testified or assisted Pratt & Whitney in any
17  manner?
18  A. In regards to a deposition, yes.
19  Q. Okay. And my question is a little broader.
20  Have you assisted them in an advisory capacity in
21  any other asbestos matters?
22  A. Yes.
23  Q. Okay. Approximately how many?
24  A. Maybe ten or twelve depositions.

**Page 12**

1  Q. When you say "depositions," what do you
2  mean by that, affidavits, perhaps?
3  MR. TABASKY: Why don't you ask him what
4  he did. That might be better.
5  MR. SHEPARD: I didn't want to go too
6  far into it, but...
7  Q. What did you do in those matters?
8  A. I reviewed and prepared -- reviewed and
9  signed some declarations --
10  Q. Okay.
11  A. -- if that clarifies it.
12  Q. It does, thank you. And do you maintain
13  copies of the declarations that you've reviewed and
14  signed?
15  A. Yes, I do.
16  Q. And where do you maintain those copies?
17  A. At my home.
18  Q. And were you provided those declarations to
19  sign by counsel?
20  A. Yes.
21  Q. Did you have the assistance of anyone other
22  than counsel in preparing those declarations?
23  A. No.
24  Q. Did those declarations involve subject

3 (Pages 9 to 12)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "I"

Allan Shiffler Volume II April 8, 2011

VOLUME II
PAGES 98-165
EXHIBITS: 4

COMMONWEALTH OF MASSACHUSETTS
Middlesex County        Superior Court

* * * * * * * * * * * * * * * * *

SANDRA LOUISE NORSWORTHY,
Individually and as Personal
Representative of JOHN T.
NORSWORTHY
        Plaintiff
vs.                                    Docket No.
AIRCRAFT BRAKING SYSTEMS f/k/a      08-4778
THE GOODYEAR TIRE & RUBBER CO.,
et al,        Defendants
* * * * * * * * * * * * * * *

CONTINUED 30(b)(6) DEPOSITION OF UNITED TECHNOLOGIES
CORPORATION BY ALLAN J. SHIFFLER
Friday, April 8, 2011, 9:00 a.m.
Cooley Manion Jones LLP
21 Custom House Street
Boston, Massachusetts

——Reporter: Joan M. Cassidy, RPR, RMR, CRR——
EPPLEY COURT REPORTING, LLC
P.O. Box 382, Hopedale, Massachusetts 01747
508.478.9795  Fax 508.478.9695
www.eppleycourtreporting.com

Page 98

1    APPEARANCES:

2    Representing the Plaintiff:
     The Shepard Law Firm, P.C.
3    Michael C. Shepard, Esq.
     10 High Street
4    Boston, Massachusetts 02110
     617-451-9191  Fax: 617-451-9292
5    mshepard@shepardlawfirm.com
6    Representing Honker Beechcraft:
     Campbell Campbell Edwards & Conroy
7    Adam A. Larson, Esq.
     One Constitution Plaza
8    Boston, Massachusetts 02129
     617-241-3000  Fax: 617-241-5115
9    alarson@campbell-trial-lawyers.com
10
11   Representing Honeywell International, Inc. f/k/a
     Allied Signal, Inc. f/k/a The Bendix Corporation:
12   Cetrulo & Capone LLP
     Lawrence J. Sugarman, Esq. (via telephone)
13   Two Seaport Lane
     Boston, Massachusetts 02210
14   617-217-5200  Fax: 617-217-5200
     lsugarman@celtap.com
15
16   Representing United Technologies Corporation and the
     Witness:
17   Cooley Manion Jones LLP
     Jonathan F. Tabasky, Esq.
18   21 Custom House Street
     Boston, Massachusetts 02110
19   617-737-3100  Fax: 617-737-3113
     jtabasky@cmjlaw.com
20
21   Representing Curtiss-Wright Corporation:
     Govoruo Law Firm LLC
22   Kendra A. Christensen, Esq. (via telephone)
     Two International Place
23   Boston, Massachusetts 02110
     617-737-9045  Fax: 617-737-0040
24   kchristensen@govoruo.com

Page 99

1    Representing Eaton Aeroquip, Inc.:
     McElroy, Deutsch, Mulvaney & Carpenter, LLP
2    Nancy McDonald, Esq.
     1300 Mount Kemble Avenue
3    P.O. Box 2075
     Morristown, New Jersey 07962-2075
4    973-993-8100  Fax: 973-425-0161
     nemcdonald@mdmc-law.com
5
6    Representing General Dynamics Corporation:
     Melick, Porter & Shea, LLP
7    John F. Rooney, III, Esq. (via telephone)
     28 State Street
8    Boston, Massachusetts 02109
     617-523-6200  Fax: 617-523-8150
9    jrooney@melicklaw.com
10
11   Representing General Tire Company and B.F. Goodrich
     n/k/a Goodrich Corporation:
12   Pierce, Davis & Perritano, LLP
     Meghan L. Riordan, Esq. (via telephone)
13   90 Canal Street
     Boston, Massachusetts 02114
14   617-350-0950  Fax: 617-350-7700
     mriordan@piercedavis.com
15
16   Representing The Boeing Company; Boeing North
     American, Inc.; McDonnell Douglas Corporation:
17   Sherin and Lodgen LLP
     Kathy E. Koski, Esq.
18   101 Federal Street
     Boston, Massachusetts 02110
19   617-646-2000  Fax: 617-646-2222
20   kekoski@sherin.com
21
22
23
24

Page 100

1    Representing United Technologies Corporation:
     Tucker Ellis & West LLP
2    Curtiss L. Isler, Esq.
     Martin H. Lewis, Esq.
3    1150 Huntington Building
     925 Euclid Avenue
4    Cleveland, Ohio 44115
     216-592-5000  Fax: 216-592-5009
5    curt.isler@tuckerellis.com
     mlewis@tuckerellis.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

1  (Pages 98 to 101)

Allan Shiffler                     Volume II                     April 8, 2011

```
 1              I N D E X
 2
 3            EXAMINATIONS
 4    Allan J. Shiffler
 5
      BY MR. SHEPARD            103
 6
 7
 8
 9
10           EXHIBITS MARKED
11
12    Exhibit 4, Declaration of Alan J.     146
13    Shiffler in support of defendant
14    United Technology Corporation's notice
15    of removal
16
17    (Original exhibits retained by Attorney Shepard)
18
19
20
21
22
23
24
                                    Page 102
```

```
 1    A. No.
 2    Q. And were you involved in any contract
 3  negotiations for the development of any new engine
 4  or new variant of any engine other than the TF33
 5  during your tenure at Pratt & Whitney?
 6    A. No.
 7    Q. Now, we talked about the contracts that
 8  Pratt entered into for the modification of a certain
 9  number of dash 100As yesterday.  How many dash 100As
10  were modified from existing TF33s under that
11  contract?
12    A. I believe there were 49 or 50.
13    Q. And were those engines pulled off of any
14  existing Air Force planes?  Were they in Air Force
15  stock not attached to aircraft?
16    A. That's two questions.
17    Q. Okay.  Then let's break it down.
18    A. There you go.
19    Q. Tell me where the Air Force obtained the
20  TF33s that they gave to Pratt to modify.
21    A. Excess inventory.
22    Q. And where did the Air Force maintain its
23  excess inventory at that time?
24    A. Tinker Air Force Base, Oklahoma City.
                                    Page 104
```

```
 1          P R O C E E D I N G S
 2    MR. SHEPARD: This is the continued
 3  deposition of Mr. Shiffler.
 4    Allan J. Shiffler, Previously Sworn
 5    DIRECT EXAMINATION, Continued
 6  BY MR. SHEPARD:
 7    Q. Good morning, Mr. Shiffler.
 8    A. Good morning.
 9    Q. We are back on the record, and I just want
10  to remind you that you are still under oath from
11  yesterday.
12    MR. SHEPARD: And Jon, all the same
13  stipulations apply today?
14    MR. TABASKY: Yes.
15    MR. SHEPARD: Great.
16    Q. All right.  When we left off yesterday, we
17  were talking about the development of the dash 100A
18  version of the TF33, correct?
19    A. Yes.
20    Q. All right.  Other than the development of
21  that engine, were you personally involved in the
22  development of any new engine or new variant of any
23  engine for the United States military during your
24  employment at Pratt & Whitney?
                                    Page 103
```

```
 1    Q. Were the excess inventory engines -- strike
 2  that.
 3      When were the engines that were sent
 4  back to Pratt & Whitney for modification first
 5  manufactured by Pratt & Whitney?
 6    A. I don't think I can -- I don't have records
 7  of that.
 8    Q. And do you -- strike that.
 9      Have you seen any documents that reflect
10  the contract between Pratt & Whitney and a third
11  party for the manufacture of those 49 or 50 TF33s?
12    A. No.
13    Q. So do you have any information other than
14  there were 49 or 50 TF33s in the possession of the
15  Air Force that were provided to Pratt & Whitney for
16  modification?
17    A. I have no further information.
18    Q. How long a period of time did it take Pratt
19  to modify those 49 or 50 engines into a dash 100A?
20    A. That needs some clarification.  Pratt &
21  Whitney modified at their Southington service center
22  overhaul facility I believe half of that quantity.
23  The remaining were modified by Tinker Air Force
24  Base, Oklahoma City, utilizing modification kits
                                    Page 105
```

                                    2 (Pages 102 to 105)

Allan Shiffler                Volume II                April 8, 2011

Page 110

1   A. Yes.
2   Q. With respect to the TF33 new production,
3   how many engines were produced pursuant to that
4   contract?
5   A. Oh, my. I can only give you an
6   approximation.
7   Q. That's fine.
8   A. I think there was around 70 or so, in that
9   ballpark.
10  Q. And between the two contracts, the
11  modification contract and the new contract, how many
12  of those engines were going into the excess
13  inventory system at the Air Force versus going on a
14  plane?
15  A. That's hard to say.
16  Q. Did the Air Force at that time have a ratio
17  of engines that it maintained in excess inventory, a
18  ratio to the number of engines that were on
19  aircraft?
20  A. Yes, they had such a ratio, but I forget
21  what that was.
22  Q. Does Pratt have any documents that would
23  evidence that ratio?
24  A. Time has since gone by. I don't think so,

Page 111

1   no.
2   Q. The kits that Pratt provided to the Air
3   Force that would allow the Air Force to modify its
4   TF33s into a dash 100A, approximately how many parts
5   were included with those kits?
6   A. 300 or 400.
7   Q. And can you tell me how many parts were on
8   the original TF33s that were being modified so I can
9   get a sense of what percentage of parts were
10  changed?
11  A. 3000 or 4000.
12  Q. So about 10 percent of them were changed?
13  A. Sounds reasonable.
14  Q. Okay. Was the dash 100A engine ever sold
15  on the civilian side?
16  A. No.
17  Q. Was it ever put in anything other than an
18  AWACS aircraft by the Air Force?
19  A. The 100A?
20  Q. Yes.
21  A. No.
22  Q. And was it ever sold to any other branch of
23  the military, the Navy?
24  A. No.

Page 112

1   Q. So we have the two contracts, one for the
2   modification of the existing TF33s, one for new
3   construction. Were there any subsequent contracts
4   related to that project that Pratt entered into with
5   either the Air Force or Boeing?
6   A. There was a subsequent spare parts
7   contract.
8   Q. And when was that entered into?
9       MR. TABASKY: If you know.
10  A. I really don't know.
11  Q. If you can estimate, that's fine, you know.
12  A. I really don't know.
13  Q. Okay.
14  A. It was a follow-on after the production
15  ended.
16  Q. All right. And was it fairly soon after
17  the production ended --
18  A. Yes.
19  Q. -- or did a span of years go by after
20  production ended?
21  A. It was kind of an extension of the
22  production contract.
23  Q. Did you have any role in the drafting or
24  negotiation of the spares contract?

Page 113

1   A. No.
2   Q. Does Pratt have in its possession any of
3   these contracts, the modification, the engine
4   manufacturer or the spares?
5   A. That I don't know.
6   Q. And can you tell me for the spare parts
7   contract what spare parts Pratt agreed to provide?
8   Was it all spare parts for the TF33-100A?
9   A. There was already in place a spare parts
10  support contract for the TF33 engine model and its
11  variants; thus, there were add-ons for spare parts
12  specific, unique to the 100A.
13  Q. So there was an existing contract that
14  covered 90 percent of the dash 100A engine, and this
15  new contract was for the new 10 percent
16  approximately of the engine?
17  A. Unique, yes.
18  Q. Unique?
19  A. Yes.
20  Q. Okay. So in that 300 to 400 parts that
21  made up the modification kit for the engine, were
22  some of those parts parts that were original to the
23  TF33?
24  A. Some may have been.

4 (Pages 110 to 113)

Allan Shiffler                    Volume II                    April 8, 2011

1   A. No.
2   Q. Is there such a thing as a civilian
3   specification for manuals?
4   A. There's guidelines.
5   Q. And who puts out those guidelines?
6   A. I don't recall right now.
7   Q. If you were to look at -- let's use our
8   JT8D as an example. If you were to look at the
9   civilian manuals for the JT8D and the Air Force
10  T.O.'s for the JT8D, would those be -- would those
11  manuals appear to be very similar?
12  A. "Similar" is a good description, but not
13  necessarily identical.
14  Q. So there may be certain formatting
15  differences between them?
16  A. Yes.
17  Q. But in terms of substance, the information
18  contained therein is going to be largely the same?
19  A. Yes.
20  Q. And would you agree that military
21  specifications for manuals state that the intent is
22  to accept a manufacturer's commercial type of manual
23  or one prepared in accordance with the commercial
24  practice whenever it is roughly equivalent to the
                                                    Page 142

1   detail requirements included in the military
2   specification?
3       MR. TABASKY: Objection.
4   A. I haven't seen that document.
5   Q. And I'm not asking you to identify the
6   document. I'm asking if you are familiar with --
7       MR. TABASKY: That's what I was going to
8   say. Ask him, please, if he's familiar with it
9   rather than having him agree with you, because -- is
10  he supposed to just take your word for it?
11      MR. SHEPARD: Don't coach him.
12  Q. I've established that you've read the
13  military specification for manuals, correct?
14  A. Yes.
15  Q. And what I'm asking you is, are you
16  familiar with the provision in the military
17  specification for manuals that states that it's the
18  intent of the military to accept the manufacturer's
19  commercial type of manual or one prepared in
20  accordance with the commercial practice whenever
21  it's roughly equivalent to the detail requirements
22  in the military specification?
23  A. I'm not familiar with that statement.
24  Q. All right. Are you familiar with
                                                    Page 143

1   provisions or notations in aircraft manuals for
2   notes, cautions and warnings?
3   A. I'm aware they exist, but I'm not familiar
4   with how they're applied.
5   Q. So you wouldn't be able to tell me what the
6   distinction would be between a note, a caution and a
7   warning?
8   A. No.
9   Q. Was Pratt & Whitney ever told by the
10  military not to put warnings about asbestos in its
11  manuals?
12      MR. TABASKY: Objection. You can answer
13  if you know.
14  A. I'm not aware of them asking.
15  Q. You're not aware of Pratt asking the
16  military whether they could?
17  A. Exactly.
18  Q. All right. And if Pratt didn't ask the
19  military whether they could, then there wouldn't be
20  a response from the military one way or the other,
21  correct?
22      MR. TABASKY: Objection.
23  A. Yes.
24  Q. Now, the United States Air Force personnel
                                                    Page 144

1   from Wright-Patterson who were involved in the dash
2   100A project, you mentioned that they had audit
3   approval authority?
4   A. Yes.
5   Q. Can you tell me again what you mean by
6   "audit approval authority"?
7   A. They approved the final design before it
8   was released.
9   Q. So when Pratt finishes the designs of the
10  engine, it can't go into production until the Air
11  Force okays it?
12  A. Exactly.
13  Q. Did the Air Force -- are you aware of any
14  situation in which the Air Force did not okay a
15  Pratt engine design?
16      MR. TABASKY: Final design or anywhere
17  along the way or --
18      MR. SHEPARD: Any.
19      MR. TABASKY: Object to the form.
20  A. I'm not aware of any.
21  Q. Did the United States Air Force have audit
22  approval authority over the drafting of manuals?
23  A. Yes.
24  Q. And it was the same type of authority, that
                                                    Page 145

                                        12 (Pages 142 to 145)

1    Q. All right. Well, give me a range, then,
2  Give me the model that you think has the least in
3  common and give me the model that you think has the
4  most in common, and that will establish our range.
5    A. Anywhere from 60 to 90 percent.
6    Q. Okay. So to the extent that the Air Force
7  needs a spare part for a TF33 and it's one of the 60
8  to 90 percent parts that are shared with a JT3D,
9  could the Air Force have obtained spare parts for
10  its TF33 from an airframer or another third party?
11    A. They would not get it from an airframer,
12  but the possibility does exist that they might get
13  it from a parts overhaul shop that has a Pratt &
14  Whitney part number on it.
15    Q. And a parts overhaul shop would be an
16  independent company whose business is overhauling
17  engines?
18    A. FAA-approved overhaul shop.
19    Q. Did the Air Force, to your knowledge, have
20  any of its engines serviced at such a location?
21    A. None that I was associated with, that I'm
22  aware of, no.
23    Q. Do you know whether the Air Force had any
24  arrangement with any such shop, parts overhaul shop,

Page 122

1    something that the Air Force deemed to be equivalent
2  to the Pratt part?
3    A. Yes.
4    Q. And it was a part that was obtained from
5  someone other than Pratt?
6    A. Yes.
7    Q. Did the Air Force maintain a list of
8  equivalencies?
9    A. They have an organization that supports the
10  entire DOD on such common air space industry parts,
11  all kinds of Air Force equipment, Navy equipment,
12  Marine equipment, et cetera, et cetera. They have a
13  special organization that handles all that.
14    Q. So if Pratt designs an engine -- and we
15  heard from Mr. Sumner about the design drawings that
16  are on a computer system at Pratt & Whitney. To the
17  extent that Pratt designs an engine and there is a
18  drawing for a part -- let's use a gasket for an
19  example. All right? A gasket is something you gave
20  as an example of a part that may be a noncritical
21  part, where the Air Force might have an equivalency
22  for that; is that correct?
23    MR. TADASKY: Object to the form.
24    A. They have in their repository the drawings

Page 124

1  for providing spare parts to the Air Force?
2    A. They may have.
3    Q. Would you consider it an unusual situation
4  for a spare part for a Pratt & Whitney engine in an
5  Air Force plane to come from a parts overhaul shop
6  as opposed to through Pratt & Whitney?
7    (Objection by multiple counsel.)
8    A. They may have acquired non -- what I would
9  consider noncritical parts.
10    Q. What do you consider to be a noncritical
11  part?
12    A. Clamps, bolts; common bolts and nuts that
13  are common throughout the industry, throughout the
14  aerospace industry, those types of items; gaskets,
15  MS, AN parts, those sorts of items.
16    Q. And to the extent that a part like that is
17  used on a Pratt & Whitney engine, can any part be
18  used, or do they have to be parts that were designed
19  and built pursuant to Pratt's specifications?
20    A. Our recommendation to the Air Force is that
21  they use our recommended parts; however, the Air
22  Force themselves have the option to utilize what
23  they call equivalencies.
24    Q. And when you say "equivalencies," is that

Page 123

1  for the military engines.
2    Q. Pratt does?
3    A. The Air Force --
4    Q. Okay.
5    A. -- the military. There's a military
6  repository for drawings.
7    Q. And they have Pratt's drawings?
8    A. And they have -- some of them are their
9  drawings.
10    Q. Well, I understand that there's a lot of
11  drawings in the repository, but I'm saying, Pratt's
12  drawings for the engines that Pratt is building for
13  the Air Force, the Air Force has a copy of?
14    A. That's right.
15    Q. In addition to other drawings they have?
16    A. Many.
17    Q. I'm sure. And I want to limit now our
18  questions to the Pratt drawings.
19    A. Yes.
20    Q. Okay. The Air Force has the Pratt
21  drawings. The Air Force can then take those
22  drawings and submit them to someone other than Pratt
23  to have parts manufactured?
24    A. Yes.

Page 125

7 (Pages 122 to 125)

Allan Shiffler                    Volume II                         April 8, 2011

1  they had the -- they had to okay the manuals before
2  they went to the Air Force printing?
3      A. Yes.
4      Q. Are you aware of any situation in which the
5  Air Force told Pratt to change the way it was doing
6  its manuals?
7      A. I'm not, no, I don't have any knowledge of
8  that.
9      Q. Are you aware of any situation in which the
10  Air Force rejected a Pratt draft of a manual?
11      A. I'm not aware of that.
12          MR. SHEPARD: Would you mark this,
13  please.
14          (Marked, Exhibit 4, Declaration of Alan
15  J. Shiffler in support of defendant United
16  Technology Corporation's notice of removal.)
17      Q. I've put in front of you what we have
18  marked as UTC 4. I ask you to take a look at that
19  and tell me if you recognize that document.
20      A. (Witness reviews document.) Yes.
21      Q. Okay. And on -- well, tell me what this
22  document is first.
23      A. A declaration.
24      Q. And it says, "Declaration of Alan J.

Page 146

1      A. No.
2      Q. Do you keep -- to the extent you may have
3  edited it, do you keep copies of your edits at your
4  house?
5      A. No.
6      Q. And if you edited it, would you have done
7  it on a computer?
8      A. I would have done it by e-mail, yes.
9      Q. And do you maintain your e-mail
10  correspondence between yourself and counsel?
11      A. I don't know whether I have this or not,
12  no, I don't know.
13      Q. Okay. But in general --
14      A. I have some.
15      Q. You have some of your e-mails. You don't
16  know how far back they go?
17      A. No, I don't keep a record.
18      Q. Is the computer you're using today the same
19  computer you were using in April of 2009?
20      A. No.
21      Q. No. All right. When you got a new
22  computer, did you transfer your old information over
23  to the new computer?
24      A. Some of it.

Page 148

1  Shiffler in Support of Defendant United Technology
2  Corporation's Notice of Removal," does it not?
3      A. Yes.
4      Q. Is that your signature on page 3?
5      A. Yes.
6      Q. And do you see the date there? Is that
7  when you signed this document?
8      A. Yes.
9      Q. Did you type up this document yourself?
10      A. No.
11      Q. From where did you receive it? From whom
12  did you receive it?
13      A. From Curt's law firm.
14      Q. So one of the lawyers gave it to you?
15      A. Yes.
16      Q. Did you see a rough draft of it before you
17  signed this one?
18      A. Yes.
19      Q. How many rough drafts did you see?
20      A. I don't recall how many I did see.
21      Q. Do you know whether you made any edits to
22  the initial draft you were given?
23      A. I may have.
24      Q. Do you recall?

Page 147

1      Q. As you sit here today, do you know whether
2  you scanned and sent this back to the lawyers or
3  whether you mailed it to them or handed it to them
4  in person?
5      A. I most likely would have scanned page 3 --
6      Q. Okay.
7      A. -- and sent a pdf file and then sent the
8  original.
9      Q. Is that your usual practice?
10      A. Yes.
11      Q. How many declarations like this one have
12  you filled out for the lawyers for Pratt?
13      A. Similar to this one?
14      Q. Yes.
15      A. Maybe ten.
16      Q. And do they all say pretty much the same
17  thing, or do you change each one?
18      A. There is some similarity.
19      Q. Is this the subject matter of most of those
20  affidavits, declarations?
21      A. Yes.
22      Q. All right. I want to draw your attention
23  to Paragraph 5. It says, "Based upon my work
24  experience with the engines that Pratt & Whitney

Page 149

13 (Pages 146 to 149)

Allan Shiffler                    Volume II                    April 8, 2011

1  supplied to the military from 1966 to 2003, I am
2  familiar with the manner in which Pratt & Whitney
3  military engines were designed, built and supplied
4  to the United States military."
5      Is the TF33-100A the only engine that
6  you were involved in the design process for for the
7  United States military?
8      A. That needs clarification.
9      Q. Okay, go ahead.
10     A. I was involved with design
11 characterizations of numerous military legacy
12 engines and commercial, but not necessarily from the
13 original design concept through production, but in
14 an after-market capacity, yes.
15     Q. And that's in the capacity you spoke about
16 yesterday where you were dealing with maintenance
17 issues and coming up with new maintenance procedures
18 for the engines?
19     A. Yes.
20     Q. Okay. So with respect to initial design
21 and contracts --
22     A. Yes.
23     Q. -- with the military for Pratt engines,
24 your experience is limited to the dash 100A?

Page 150

1      Q. All right. Paragraph 7 on the second page:
2  "Pratt & Whitney during all aspects of its design
3  and manufacture of military aircraft engines, i.e.,
4  design, manufacture and testing of such engines,
5  performed its work under the immediate supervision
6  of the United States military."
7      Who was the immediate supervisor for the
8  military that was performing these tasks?
9      A. There was an Air Force procurement
10 organization on site at Pratt & Whitney.
11     Q. Okay. And that's the person you talked
12 about yesterday?
13     A. Yes.
14     Q. And how many people were present on site at
15 Pratt on a daily basis from the Air Force?
16     A. Oh, my gracious, I'd have to make a
17 guesstimate.
18     Q. I don't want you to guesstimate.
19     A. I don't know for sure.
20     Q. More than one?
21     A. Yes.
22     Q. Less than ten?
23     A. No.
24     Q. More than ten?

Page 152

1      MR. TABASKY: Object to form.
2      A. I'm aware of having seen initial contracts
3  on other of my legacy engines that I was involved
4  with even though I wasn't a direct participant at
5  that time.
6      Q. So you've seen the contracts?
7      A. Yes.
8      Q. All right. Does Pratt still have those
9  contracts?
10     A. That I don't know.
11     Q. Can you tell me anything about the
12 circumstances surrounding those contracts that you
13 can't tell by reading the contract? In other words,
14 do you have any knowledge of the contract between
15 Pratt and the military for any other engine other
16 than what you've read in the contract?
17     MR. TABASKY: Objection.
18     A. No.
19     Q. And you, having not been employed by Pratt
20 prior to 1966, have no knowledge about Pratt's
21 contractual relationship with the military prior to
22 1966 apart from what you could read in a contract?
23     MR. TABASKY: Objection.
24     A. Correct.

Page 151

1      A. Yes.
2      Q. Less than twenty?
3      A. No.
4      Q. And were all of those people in that one
5  office, or were these people spread throughout
6  Pratt's facility?
7      A. They had various assignments throughout
8  Pratt & Whitney.
9      Q. Okay. How many people were assigned to the
10 preliminary design group, if any?
11     MR. TABASKY: For the PW --
12     MR. SHEPARD: No, just how many --
13     Q. Do you understand my question to be how
14 many Air Force employees or representatives were
15 assigned at Pratt to the preliminary design group?
16     MR. TABASKY: Object to form.
17     A. For engineering oversight?
18     Q. Yes.
19     A. Oh, probably half a dozen.
20     Q. And how many were assigned to the design
21 department, or was that a separate department?
22     A. They didn't have oversight of the design
23 department; they coordinated all of their efforts
24 through the program office, project group.

Page 153

14 (Pages 150 to 153)

Allan Shiffler                    Volume II                          April 8, 2011

Q. So the design department worked
independently, and the Air Force oversight happened
elsewhere?

MR. TABASKY: Objection.

A. The project group would coordinate with the
Air Force in lieu of the specific design group
itself.

Q. So when the designers are doing their day-
in-and-day-out work, there's not an Air Force person
sitting next to them?

A. No, no.

Q. Are the Air Force people there more to
coordinate and facilitate the work that's being done
for engines that are going to end up in the Air
Force inventory?

A. Yes, yes.

Q. They are not there for hands-on design
work?

A. No. However -- I wish to clarify that a
bit.

Q. Go ahead.

A. They do review and approve the drawings.

Q. Okay. So Pratt designs the engine, creates
the drawings; but before it can go into production,

Page 154

the design meets their specifications?

MR. TABASKY: Objection.

A. Yes.

Q. You wouldn't say that Pratt & Whitney
engines are designed by the Air Force, would you?

A. No.

Q. So Pratt & Whitney is not simply the
manufacturing arm of a design -- an Air Force design
team?

A. No.

Q. Paragraph 8 there, if you look down at the
last sentence of Paragraph 8, you say, "During the
period of my employment at Pratt & Whitney, these
military specialists at Pratt & Whitney controlled
the design and manufacture of any aircraft engine
produced at Pratt & Whitney for the United States
military."

And I take it by "controlled the design
and manufacture" you mean that they had veto power
over Pratt's designs?

A. Yes.

Q. They weren't the ones putting the designs
together?

A. Right.

Page 156

the Air Force reviews them and gives them their
okay?

A. Yes.

Q. All right. And what level of detail does
the Air Force give on the design -- each of the
design drawings?

A. There's an engineering change process which
they have to sign off on.

Q. If you're changing something?

A. Yes.

Q. All right. But let's say you're designing
an engine from scratch -- all right? -- and not
modifying or changing an existing engine, and the
Air Force has entered into a contract with Pratt for
the design and manufacture for this new engine --

A. Yes.

Q. -- the Air Force people aren't there to
help design the engine; they're there to oversee the
design and make sure that it meets the
specifications that the Air Force has set forth?

A. Yes.

Q. And to the extent that the Air Force
personnel are reviewing drawings and designs,
they're doing so with an eye toward making sure that

Page 155

Q. Let's flip to the next page, Paragraph 10.
You say, "Any written material such as warnings or
product manuals that accompanied the engines built
by Pratt & Whitney for the United States military
were similarly controlled and specified by the
United States military."

You don't have any personal knowledge as
to what control, if any, the military exercised over
manuals that were drafted by Pratt, do you?

MR. TABASKY: Objection.

A. Other than by the contract requirements for
publications.

Q. Okay.

A. And there is -- it does list quite a bit of
guidelines.

Q. So the contracts for the publications not
only tell Pratt that it has to create manuals; but
it gives some information as to what has to be in
the manuals?

A. Yes.

Q. As you sit here today without the contract
in front of you, can you tell me what else it says
other than Pratt has to create manuals?

A. No.

Page 157

15 (Pages 154 to 157)

Allan Shiffler       Volume II       April 8, 2011

**Page 158**

1   Q. We'd need the contract to know exactly what
2 they say?
3     MR. TABASKY: Objection.
4   A. Because they vary (nodding).
5   Q. All right. So when you say "were
6 controlled and specified by the United States
7 military," what you mean is that the written
8 materials were subject to a contract?
9   A. Yes.
10   Q. The next paragraph, Paragraph 11, the last
11 sentence: "Pratt & Whitney had no knowledge that
12 handling any parts or components used in the
13 maintenance, repair or overhaul of Pratt & Whitney
14 aircraft engines during the time that John T.
15 Norsworthy is claimed to have served in the military
16 (1962 to 1990) could cause an asbestos-related
17 illness." What's the basis, your basis, for that
18 statement?
19   A. The fact that I'm not aware of any Pratt &
20 Whitney employee that has that sort of related
21 sickness or illness.
22   Q. And that's — based on the fact that you
23 don't know of another Pratt employee with
24 mesothelioma, you were able to make that statement?

**Page 159**

1   A. Along with -- what is it, the Melanyk
2 (phonetic) report?
3     MR. TABASKY: Mlynarek.
4   A. Mlynarek report.
5   Q. Okay. And what does the Mlynarek report
6 say?
7   A. It suggests that on the reciprocating
8 engines that the level of exposure is no worse than
9 the outside air.
10   Q. And did you have any role in the work that
11 was done to create that report?
12   A. No.
13   Q. Do you have any background in industrial
14 hygiene?
15   A. No.
16   Q. You have no background in medicine?
17   A. No.
18   Q. All right. And you've never worked for
19 either an industrial hygiene or a safety department
20 within Pratt & Whitney?
21   A. No.
22   Q. The fact that — well, strike that.
23     The Mlynarek report was created at whose
24 request?

**Page 160**

1   A. I believe it was at the request of our
2 legal staff.
3   Q. Your lawyers?
4   A. Yes.
5   Q. Pratt's lawyers?
6   A. Yes.
7   Q. So other than the report that was put
8 together at the request of Pratt's lawyers and the
9 fact that you are not aware that any Pratt employees
10 had mesothelioma, those two things allow you to make
11 the statement that Pratt & Whitney had no knowledge
12 that handling any parts or components used in the
13 maintenance, repair or overhaul of Pratt aircraft
14 engines could cause an asbestos-related illness?
15   A. Plus information that I got -- I made
16 inquiries with a couple of the reciprocating
17 overhaul shops that I'm aware of to date.
18   Q. And what inquiries did you make?
19   A. I inquired us to whether they had any
20 employees that they were aware of that had any known
21 asbestos-related situations.
22   Q. And how many shops did you call?
23   A. Two of the major ones and really the only
24 ones that still exist.

**Page 161**

1   Q. What are the names of those?
2   A. Covington.
3   Q. And where are they located?
4   A. In Oklahoma.
5   Q. And the other one?
6   A. Is Precision.
7   Q. And where are they located?
8   A. Oregon.
9   Q. And how many employees does Covington have?
10   A. I actually don't know what their number of
11 employees is. They have Websites.
12   Q. How many employees does Precision have?
13   A. That I don't know.
14   Q. What is the incidence rate of mesothelioma
15 in the general population?
16     MR. TABASKY: Objection.
17   A. That I don't know.
18     MR. TABASKY: He's not -- one second.
19 He's not been tendered for that subject.
20     MR. SHEPARD: Well, he's writing
21 declarations and drawing conclusions about whether
22 exposure to an engine can cause an illness.
23     MR. TABASKY: I understand that.
24     MR. SHEPARD: So what I'm trying to

16 (Pages 158 to 161)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "J"



EXHIBIT
VTC
4
Rec.  4/87/y

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRA LOUISE NORSWORTHY, Individually and as Personal Representative of the Estate of JOHN T. NORSWORTHY, | CASE NO. |
| Plaintiffs, | JUDGE |
| vs. | DECLARATION OF ALLAN J. SHIFFLER IN SUPPORT OF DEFENDANT UNITED TECHNOLOGIES CORPORATION'S NOTICE OF REMOVAL. |
| AIRCRAFT BRAKING SYSTEMS, et al., | |
| Defendants. | |

I, Allan J. Shiffler, declare and state as follows:

1.    I am over the age of 18 years and am competent to testify to the facts set forth in this declaration. I have personal knowledge of the facts contained in this declaration.

2.    I joined Pratt & Whitney, an unincorporated division of United Technologies Corporation, in 1966 and was an engineer within the Engineering and Customer Technical Service Groups during my career at Pratt & Whitney. I retired from Pratt & Whitney in 2003.

3.    Pratt & Whitney designs and manufactures aircraft engines for use in United States Military aircraft.

4.    During my time with Pratt & Whitney, I worked as an engineer on the development and manufacture of engines used in Military aircraft.

5.    Based upon my work experience with the engines that Pratt & Whitney supplied to the military from 1966 to 2003, I am familiar with the manner in which Pratt & Whitney military engines were designed, built and supplied to the United States Military.

6.    I have personal knowledge of the extent of involvement of the United States Military in the design, manufacture, approval, and receipt of the military engines designed and

manufactured by Pratt & Whitney. I submit this affidavit to attest to the level of supervision, control, and approval by the United States Military and its officers over the design and manufacture of these Pratt & Whitney aircraft engines intended for use by the United States Military.

7.    Pratt & Whitney, during all aspects of its design and manufacture of military aircraft engines (i.e., design, manufacture, and testing of such engines), performed its work under the immediate supervision of the United States Military. This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers and military specialists on-site at Pratt & Whitney. No aspect of the development, manufacture, and testing of the engines intended for use by the United States Military escaped this close control.

8.    The design, specification and manufacture of the Pratt & Whitney aircraft engines intended for use by the United States Military were approved by the appropriate Military personnel. United States Military engineers and inspectors were personally present at Pratt & Whitney facilities to oversee, inspect, and approve the work performed by Pratt & Whitney engineers and other personnel, including approval of any changes to engine design or specifications on all aircraft engines intended for use by the United States Military. During my employment with Pratt & Whitney, I personally interacted with these United States Military representatives on a regular basis. These representatives had different areas of specialty, such as engineering, contracts and quality control. During the period of my employment at Pratt & Whitney, these Military specialists at Pratt & Whitney controlled the design and manufacture of any aircraft engine produced at Pratt & Whitney for the United States Military.

9.    The United States Military provided extensive and detailed performance and construction specifications for the Pratt & Whitney aircraft engines intended for Military use. The United States Military, including the on-site Military inspectors responsible for oversight

2

and approval of the design and manufacture of these engines, had detailed prints and drawings of every part used in such engines. Those prints disclosed all materials contained in each part. The Military inspectors knew of, and approved, all materials and all parts contained in the Pratt & Whitney engines intended for use by the United States Military.

10.   Any written materials, such as warnings or product manuals, that accompanied the engines built by Pratt & Whitney for the United States Military were similarly controlled and specified by the United States Military. Any aircraft engine designed and manufactured by Pratt & Whitney for the United States Military that did not meet the strict standards and specifications set forth by the United States Military for that particular engine was rejected by the United States Military.

11.   It is my understanding that Plaintiffs claim that John T. Norsworthy's work on Pratt & Whitney R-2800, R-4360, R-985, R-1830, R-2000 engines designed and manufactured for the United States Military during his service with the United States Air Force caused him to suffer from an asbestos-related injury. I am familiar with these engines and it is my understanding that they were in service with the U.S. Military at least through the 1960s. Pratt & Whitney had no knowledge that handling any parts or components used in the maintenance, repair or overhaul of Pratt & Whitney aircraft engines during the time that John T. Norsworthy is claimed to have served in the Military (1962-1990) could cause an asbestos-related illness.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _16TH_ day of April, 2009, in _SOUTH WINDSOR_, Connecticut.

By: _Allan F. Shiffler, Declarant_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "K"

Westlaw

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

Page 1

▷
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Robert LINDENMAYER and Beverly Linden-
mayer, Plaintiffs,
v.
ALLIED PACKING & SUPPLY, INC., et al., De-
fendants.

No. C09-05800 TEH.
Jan. 14, 2010.

Christopher Daniel Wasson, Gordon D. Greenwood
, James Lyndon Oberman, Kazan McClain Lyons
Greenwood & Harley, Oakland, CA, for Plaintiffs.

Mitchell Bruce Greenberg, Stephanie L. Walker,
Abbey Weitzenberg Warren & Emery, Santa Rosa,
CA, Kevin Douglas Jamison, Pond North LLP, Los
Angeles, CA, Edward R. Hugo, James Carl Parker,
Karleen Frances Murphy, Shaghig Dawn Agopian,
Thomas J. Moses, Derek S. Johnson, Sedgwick De-
tert Moran & Arnold LLP, Susanne Gheseri Arani,
Carroll Burdick & McDonough LLP, San Fran-
cisco, CA, for Defendants.

*ORDER GRANTING MOTION TO REMAND*
THELTON E. HENDERSON, District Judge.

\*1 This matter came before the Court on Janu-
ary 5, 2010, on the motion to remand filed by
Plaintiffs Robert Lindenmayer ("Mr.Lindenmayer")
and his wife Beverly Lindenmayer (collectively,
"Plaintiffs" or "the Lindenmayers"). For the reas-
ons set forth below, Plaintiffs' motion is GRAN-
TED.

**BACKGROUND**
This is a tort action against Foster Wheeler
LLC and dozens of other defendants seeking dam-
ages for injuries based on Mr. Lindenmayer's ex-
posure to asbestos. Foster Wheeler removed this
matter to federal court from Alameda County Su-

perior Court on December 10, 2009. Plaintiffs
moved to remand on the following day, and simul-
taneously moved to shorten time for the hearing on
that motion, citing Mr. Lindenmayer's terminal ill-
ness.[FN1] The Court heard the motion on shortened
time, and now decides whether to remand this ac-
tion to state court.

> FN1. Mr. Lindenmayer was diagnosed
> with mesothelioma, and his doctor attested
> that there is "substantial medical doubt that
> he will survive more than six (6) months
> beyond" December 11, 2009. Decl. of
> Physician David M. Jablons, M.D. (Dkt.
> No. 13, Exh. 14), ¶ 8.

Plaintiffs allege that Mr. Lindenmayer was ex-
posed to asbestos while working as a machinist
mate in the United States Navy aboard the USS
America from 1964 to 1967. Plaintiffs bring mul-
tiple claims alleging defective design, failure to
warn and other theories against Foster Williams,
which confirms that it manufactured marine steam
generators, including boilers and economizers, for
that vessel. Because it acted under an officer or
agency of the United States in manufacturing and
selling that equipment, Foster Wheeler argues that
federal jurisdiction is proper under the federal of-
ficer removal statute, 28 U.S.C. § 1442(a)(1).
Plaintiffs dispute federal jurisdiction and seek re-
mand on that basis.

**LEGAL STANDARD**
Removal under federal-question jurisdiction is
ordinarily permissible only where the basis for fed-
eral jurisdiction appears on the face of the com-
plaint. *Jefferson County v. Acker,* 527 U.S. 423,
431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). The
federal officer removal statute, 28 U.S.C. §
1442(a)(1), constitutes an exception to that rule.
"Under the federal officer removal statute, suits
against federal officers may be removed despite the
nonfederal cast of the complaint; the federal ques-
tion element is met if the defense depends on feder-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

Page 2

al law." *Jefferson County*, 527 U.S. at 431. The statute allows for the removal to federal district court of any action against the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office [.]" 28 U.S.C. § 1442(a)(1). Allowing removal ensures that, "where federal officers can raise a colorable defense arising out of their duty to enforce federal law," they "have such defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 406-07, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). To satisfy section 1442(a) (1), Foster Wheeler must (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) establish a causal nexus between plaintiffs' claims and acts it performed under color of federal law. *Fung v. Abex Corp.*, 816 F.Supp. 569, 571-72 (N.D.Cal.1992) (citing *Mesa v. California*, 489 U.S. 121, 124-25, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)). Foster Wheeler must also demonstrate that it is a "person" under the statute. *Id.*

*2 Although other removal statutes are "strictly construe[d] ... against removal jurisdiction," *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992), "the Supreme Court has mandated a generous interpretation of the federal officer removal statute," *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir.2006). "[T]he policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).' " *Ariz. v. Manypenny*, 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981) (quoting *Willingham*, 395 U.S. at 407). To justify removal, a defendant need not assert a "clearly sustainable defense," nor does he need to "win his case before he can have it removed." *Willingham*, 395 U.S. at 407.

To fulfill the second prong the colorable federal defense-Foster Wheeler asserts the government contractor defense recognized by the Supreme Court in *Boyle v. United Technologies Corp.*, 487

U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). That defense, which "immunizes contractors who supply military equipment to the Government from the duties imposed by state tort law," *In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806, 810 (9th Cir.1992), is available to defendants who satisfy three requirements:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 512. The first two elements "are intended to insure that it is indeed a discretionary decision on the part of the government that is being immunized," and the third requires the contractor to have "fully conveyed all information necessary to allow the government to make a fully informed decision." *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 584 (9th Cir.1996). "[S]tripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.' " *In re Hawaii Fed. Asbestos Cases*, 960 F.2d at 813. The defense applies "only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." *Id.* The conflict between state law and "an identifiable 'federal policy or interest' " must be " 'significant' " before ordinary tort law liability will be displaced. *Id.* at 810 (quoting *Boyle*, 487 U.S. at 507).

Although the *Boyle* test expressly applies to product liability claims premised on design defects, the Ninth Circuit has addressed its applicability in failure to warn claims:

Whereas the government contractor's defense

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

may be used to trump a design defect claim by proving that the government, not the contractor, is responsible for the defective design, that defense is inapplicable to a failure to warn claim in the absence of evidence that in making its decision whether to provide a warning ..., [the defendant] was "acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States."

\*3 *Butler,* 89 F.3d at 586 (quoting *In re Hawaii Fed. Asbestos Cases,* 960 F.2d at 813). A defendant can therefore apply the *Boyle* test to failure to warn claims where "the government affirmatively instructed it regarding the provision of warnings." *Overly v. Raybestos-Manhattan,* No. C96-2853 SI, 1996 WL 532150, at \*4 (N.D.Cal. Sept.9, 1996). The key inquiry is whether "the specifications of [the defendant's] contract with the Navy conflicted with [the defendant's] duty to warn under state law." *Butler,* 89 F.3d at 586.

**DISCUSSION**

Plaintiffs, focusing on the second prong of the section 1442(a) (1) test, contend that Foster Wheeler's assertion of the government contractor defense does not rise to the level of a "colorable" federal defense under either the design-defect or the failure-to-warn theories. According to Plaintiffs, the Navy did not require the use of asbestos in equipment manufactured by Foster Wheeler, whose evidence only demonstrates that the Navy set performance-rather than *design*-specifications. As to the duty to warn theory, Plaintiffs claim that Foster Wheeler's witnesses only speculate that the Navy would have barred the company from issuing warnings, but offer no evidence that any attempt to issue such warnings was ever made. Foster Wheeler responds that the presentation of a colorable defense is a low burden that it has met.

Many district courts have assessed remand in similar contexts, and their decisions have come down on both sides of the question.[FN2] Those denying remand emphasize that a "defendant must only raise a 'colorable federal defense,' " and not

one that is "clearly sustainable." *Curry v. Am. Standard, Inc.,* No. 08-cv-10228 (GBD), 2009 WL 308029, at \*2 (S.D.N.Y. Feb. 6, 2009); *see also Kirks v. Gen. Electric Co.,* No. 08-856-SLR, 2009 WL 2970391 (D.Del. Sept.17, 2009) (concluding that defendant raised a colorable federal defense after noting that "the provisions of the federal officer removal statute are to be construed broadly"). Others have allowed remand based on defendants' failure to show "that their contractual obligations to the government specifically prohibited them from placing warnings on their products." *Nguyen v. Allied Signal, Inc.,* No. C98-03616 SI, 1998 WL 690854, at \*4 (N.D.Cal. Sept.29, 1998); *see also Prewett v. Goulds Pumps (IPG),* No. C09-0838 RSM, 2009 WL 2959877 (W.D.Wash. Sept.9, 2009) (concluding "government contractor defense is not 'colorable' " where defendant failed to show "the Navy actually exercised its discretion in approving proposed warnings that conflicted with state law").

> FN2. Because remand orders are "not reviewable on appeal or otherwise," 28 U.S.C. § 1447(d), the Ninth Circuit and other courts of appeal have had little opportunity to provide guidance on this issue.

Whether or not Foster Wheeler presents a colorable federal defense hinges on its evidence. In support of its government contractor defense, Foster Wheeler submitted three statements: an affidavit by J. Thomas Schroppe, a retired Foster Wheeler executive personally involved with the Navy's procurement contracts with Foster Wheeler; an affidavit by Ben J. Lehman, a retired Navy admiral who had supervised ship overhauls and alterations and was familiar with the Navy's boiler specifications; and a declaration by Lawrence Stilwell Betts, a medical doctor and retired Navy captain who testified to the Navy's knowledge of risks associated with asbestos exposure.

\*4 Lehman attests that "only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

could be installed" on Navy ships. Lehman Aff. ¶ 3. Such boilers "were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy," which "retained the 'final say' over the design of any piece of equipment." *Id.* ¶¶ 3, 5. The Navy "made the ultimate decisions, whether engineering or contractual," and drafted, approved, and maintained the military specifications-or "Mil Specs"-for boilers, which "included the nature of any communication affixed to" such equipment. *Id.* ¶¶ 5, 6, 8. As for warnings, the Navy "would not have allowed its equipment suppliers ... to affix any warning related to any asbestos hazards on their equipment." *Id.* ¶ 14. The hazards subject to precautionary labeling were determined only by the Navy, which "would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country." *Id.* ¶¶ 11-12. "In short," Lehman attests, "the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors." *Id.* ¶ 11. The Navy would not accept equipment that failed to comply with its specifications. *Id.* ¶ 4.

According to Schroppe, "the ship design for any given class of ship would be contained in a Ship Specification ('Ship Spec')," which dictated "all boiler operating criteria, performance requirements, and maximum physical dimensions of the boiler(s)." Schroppe Aff. ¶ 5. Foster Wheeler's equipment had to comply with both the Ship Spec and the Mil Specs, "which cover all specific components of the boiler, including accessories, subcomponents, and materials required to fabricate the boilers and its components." *Id.* ¶ 6. Boiler specifications "dictated very specific material requirements"-identifying, with respect to insulation, "the material" and the "arrangement of various bricks and insulating materials on various boiler walls." *Id.* ¶ 13. Schroppe, like Lehman, attested that Foster Wheeler "would not be permitted ... to affix

any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy." *Id.* ¶ 22.

Betts, finally, delves into the Navy's knowledge of hazards associated with asbestos. He declares that the U.S. government, by "the 1940s-1950s and thereafter," had "already recognized that the prolonged inhalation of sufficient concentration of asbestos fibers could result in pulmonary disease," and that the government's information "far exceeded" that which "possibly could have been provided by a boiler manufacturer such as Foster Wheeler." Betts Decl. ¶¶ 5-6. He documents the Navy's "sound, premier state-of-the-art occupational health program to control the recognized, potential health hazard" associated with asbestos exposure. *Id.* ¶ 32. Given that the Navy itself "had determined what an 'acceptable asbestos exposure' was," he declares that the Navy "would not, and could not, allow" each equipment manufacturer to "make an additional determination of what constituted an acceptable exposure." *Id.* Foster Wheeler, "at best," could only "have told personnel to follow the Navy's own mandates for handling asbestos," information he characterized as "redundant." *Id.* ¶ 34f.

*5 Foster Wheeler and the Lindenmayers each urge the Court to follow the decisions of other courts that have ruled in their favor based on substantially identical records. Foster Wheeler points to *Wright v. A.W. Chesterton Co.,* in which Judge Jenkins denied plaintiffs' motion to remand after Foster Wheeler removed a similar asbestos action to this district. Judge Jenkins found that "the Schroppe and Lehman declarations ... satisfie[d] the first and second prongs of the *Boyle* test," as they established that "the United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's equipment conformed to these specifications." *Wright v. A.W. Chesterton Co.,* No. C07 05403 MJJ, 2008 WL 512728, at *6 (N.D.Cal. Feb.25, 2008). In so ruling, Judge Jenkins emphas-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

Page 5

ized that Foster Wheeler's burden was a low one: "The Court is mindful that Defendants need only present a colorable federal defense to Plaintiffs' claims and need not prove that the defense will be meritorious." *Id.* at \*7.

Plaintiffs direct the Court to *Holdren v. Buffalo Pumps, Inc.*, an asbestos case remanded from the District of Massachusetts for lack of subject-matter jurisdiction. Foster Wheeler, one of five defendants that removed the case, submitted affidavits from the same three witnesses before this Court. Judge Gertner characterized her ruling as resting "ultimately on what is missing from the record":

The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever attempted to warn about asbestos on products destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military equipment they produced during the same period, by contrast to the equipment they supplied to the Navy. Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.

All told, the manufacturers do not claim that the Navy ever offered them any guidance on asbestos warnings, nor that they themselves ever contemplated warning about the dangers of asbestos. Their defense, instead, rests entirely on an untested hypothetical: If they had made such a proposal, the Navy *would have* refused that recommendation. This account rings of post-hoc justification.

*Holdren v. Buffalo Pumps, Inc.*, 614 F.Supp.2d 129, 137 (D.Mass.2009) (emphasis in original). While acknowledging her obligation not to assume "an unduly narrow view of federal officer removal," Judge Gertner emphasized that "the court must still satisfy itself that the defense has enough substance to trigger the right to a federal forum." *Id.* at

141. "Relaxing this standard too far, particularly in the context of a private contractor, could well err in the opposite direction-by providing a federal forum to a party whose acts were outside its federal directives." *Id.*

\*6 Noting that the "crux of the federal contractor defense is a 'significant conflict' between a federal interest and the defendant's state-law duties," the *Holdren* court observed a key distinction between design-defect and failure-to-warn claims. *Id.* at 142-43. A design-defect case presents a more "obvious conflict" with state law, in that the government's design specifications "themselves reflect a federal interest; where it is aware of potential risks in the design, the government has necessarily balanced safety and performance." *Id.* at 143. For a failure-to-warn case, "the type of conflict required by the defense may be considerably more difficult to show," because a manufacturer can typically comply "with its state-law duties to warn" without departing from "the government's design specifications and the judgments they reflect." *Id.*

With those distinctions in mind, the Court turns first to the design-defect claims against Foster Wheeler. Plaintiffs characterize the evidence as showing that the Navy had set only performance standards, not design specifications, for Foster Wheeler's equipment. The Supreme Court offered such a hypothetical in *Boyle:* if the United States, in contracting to purchase an air conditioner, had specified "the cooling capacity but not the precise manner of construction," there could be no conflict with a state law duty to include a certain safety feature. *Boyle*, 487 U.S. at 509. Contrary to Plaintiffs' assessment, however, Foster Wheeler's evidence shows that the Navy had approved "reasonably precise" *design* specifications, which dictated, among other things, what insulating material to be used. The first prong of *Boyle* is therefore met. Foster Wheeler has also demonstrated that it conformed to those specifications, based on testimony showing the Navy did not accept nonconforming equipment, and that the Navy's knowledge of the risks associ-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 234906 (N.D.Cal.)
(Cite as: 2010 WL 234906 (N.D.Cal.))

ated with asbestos exceeded its own. Foster Wheeler satisfies the three-factor *Boyle* test, and therefore presents a "colorable" federal defense to the design-defect claims, as required for removal jurisdiction under section 1442(a)(1).

Foster Wheeler's evidence fails to raise a colorable defense on the failure-to-warn theory, however. Foster Wheeler must show that it was complying with "reasonably precise specifications" imposed by the United States in deciding whether to provide a warning. *Butler*, 89 F.3d at 586. Its evidence does not approach that requirement. In the absence of any effort to warn about asbestos, Foster Wheeler cannot rely on the hypothetical assertion that such an effort would have been futile. Foster Wheeler offers no evidence suggesting that its failure to warn should be attributed to the Navy, and identifies no conflicts between its duties under state law and its compliance with Navy specifications. The federal government cannot have exercised its discretion to preclude Foster Wheeler from issuing asbestos warnings if the provision of asbestos warnings was never contemplated or proposed in the first place. Foster Wheeler's defense to the failure-to-warn claims is therefore not "colorable" and not, by itself, a sufficient basis for removal.

*7 Plaintiffs represented that, should the Court find that Foster Wheeler raised a colorable federal defense to the design-defect claims but not to the failure-to-warn claims, they would waive the design defect claims against Foster Wheeler so that the case can be remanded to state court. The Court concludes that this is the appropriate course of action.[FN3] There is no reason to confer federal jurisdiction over an entire action on the basis of a federal defense to claims that Plaintiffs choose not to pursue.

> FN3. Since Plaintiffs offered to waive the design-defect claims based on the Court's conclusion that Foster Wheeler had asserted a colorable federal defense, the Court does not need to analyze whether Foster Wheeler also met the other two requirements for removal under section 1442(a)(1) (acting under a federal officer and causal nexus). *Fung v. Abex Corp.*, 816 F.Supp. 569, 571-72 (N.D.Cal.1992).

Plaintiffs' motion to remand is therefore GRANTED. This matter shall be remanded to Alameda County Superior Court, where Plaintiffs shall waive any claims against Foster Wheeler based on a design-defect theory of liability.

**IT IS SO ORDERED.**

N.D.Cal.,2010.
Lindenmayer v. Allied Packing & Supply, Inc.
Slip Copy, 2010 WL 234906 (N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "L"

Westlaw.

Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: 2001 WL 902642 (N.D.Cal.))

Page 1

▷

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Paul **WESTBROOK** and Marlene **Westbrook**,
Plaintiffs,
v.
**ASBESTOS** DEFENDANTS (BHC), Defendants.

No. C-01-1661 VRW.
July 31, 2001.

ORDER

WALKER, J.

*1 Invoking the federal officer removal statute, 28 USC § 1442(a)(1), and the military contractor defense, defendant Todd Shipyards Corp removed this asbestos related tort action to federal court on April 27, 2001. According to Todd, to the extent asbestos was used on its property, the United States Navy required it, giving rise to the military contractors defense and allowing removal. Presently before the court is plaintiffs' motion to remand. For the reasons that follow, the motion is GRANTED.

I

On March 14, 2001, plaintiffs Paul and Marlene Westbrook filed suit in the San Francisco superior court alleging personal injury and loss of consortium against numerous defendants, among them Todd. Plaintiff Paul Westbrook formerly worked with asbestos as an insulator and now suffers from asbestosis and asbestos-related pleural disease. He has an increased risk of developing further conditions, including cancer.

Plaintiffs' suit against Todd arises out of the operation of a facility at which plaintiff worked for certain subcontractors in the 1960s and 1970s. Plaintiff indicates that he worked as an insulator for both Owens Corning Fiberglass Corp (1960s and 1970s) and Roberts Brothers Construction Company (1974) on Todd's premises. Def Exhibits, Exh B, Complaint at 7 & 8. It is not clear from the complaint how much plaintiff worked on United States Navy ships at Todd's facilities.

Against Todd, plaintiffs allege only loss of consortium and "premises owner/contractor liability." Id at 2. This is in contrast with the numerous causes of action brought against other defendants. Plaintiffs allege that Todd:

1. "Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm plaintiff and others unless special precautions were taken;"

2. "Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were unfit or unqualified to do so;" and

3. "Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were competent or qualified to do so."

Id at 2-3. The precise nature of plaintiffs' allegations against Todd is murky in two ways.

First, the portions of the complaint cited above focus on the negligent hiring of subcontractors (numbers 2 and 3). But plaintiffs explicitly disclaim any claims based on negligent hiring in their reply brief in connection with this motion. In that brief, plaintiffs assert that their cause of action for premises owner/contractor liability has two components: (1) failure to warn of a dangerous condition on the premises; and (2) negligent exercise of retained control over the premises. Reply Br at 3 (citing *Grahn v. Tosco Corporation*, 58 Cal App 4th 1373, 68 Cal Rptr 2d 806 (1997)).

*2 The complaint also fails to make clear to what extent the insulating work that caused plaintiffs' injuries was done on United States Navy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: 2001 WL 902642 (N.D.Cal.))

ships. The complaint lists United States Navy ships and no private ships. But plaintiffs have disclaimed, in writing, any claims arising out of work done on United States Navy ships. See Leroy Decl, Exh A.

In any event, on April 27, 2001, Todd removed the case to this court. Plaintiffs now move to remand to state court.

### II

Todd bears the burden of establishing that removal is proper. *Gaus v. Miles, Inc*, 980 F.2d 564, 566 (9th Cir 1992). To remove a case failing within the federal-question grant of federal jurisdiction, a defendant would have to show that a federal question appears on the face of a well-pleaded complaint. See *Louisville & Nashville R Co v. Motley*, 211 U.S. 149, 152 (1908). An actual or anticipated federal defense would not justify removal. Id. Removal under the federal officer removal statute, however, is different. That statute allows removal on the basis of a federal defense.

Under 28 USC § 1442(a)(1), "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may remove to federal court. Removal is proper if the moving party can (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable defense to plaintiffs' claims; and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office. *Fung v. Abex Corp*, 816 F Supp 569, 571-72 (ND Cal 1992) (citing *Mesa v. California*, 489 U.S. 121, 124-25, 134-35 (1989)); *Jefferson County, Alabama v. Acker*, 527 U.S. 423, 431 (1999) (defense need only be colorable).

In this case, Todd claims that it is shielded from liability by military contractors immunity. This doctrine was set forth in *Boyle v. United Technologies Corp*, 487 U.S. 500 (1988). The *Boyle* Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to

state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id at 512.

Applying the *Mesa* test to the facts of this case, the court concludes that plaintiffs' motion to remand must be granted for two reasons. First, plaintiffs have asserted, in writing in the state court action, that: "Plaintiffs claims against defendant Todd Shipyards Corporation, exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." Leroy Decl, Exh A. To the extent this "stipulation" (as plaintiffs call it) is binding, Todd's ground for removal is eviscerated. If plaintiffs' claims arise only from work done on private ships, not under the direction of any federal officers, Todd's military contractor defense is unavailable.

*3 The question then is whether plaintiffs' written waiver is sufficient. The waiver of claims arising out of work done on federal jobsites and vessels is not a "stipulation" between the parties since Todd has not signed it. But another judge in this district has credited such a written disclaimer in a motion to remand. See *Overly v. Raybestos-Manhattan*, 1996 WL 532150 at *3 (ND Cal 1996). In *Overly*, Judge Illston accepted the plaintiffs' written waiver of claims related to design defects and therefore granted the motion to remand. The court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, Todd can always file for removal once again.

The motion to remand is also appropriate for a second reason. Even if plaintiffs' claims relate to work done on United States Navy ships, it is not clear that they even implicate the military contractors defense. In terms of the *Mesa* test, prongs (2) or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: 2001 WL 902642 (N.D.Cal.))

(3) are probably not met. This is because the cause of action plaintiffs bring, based on premises owner/ contractor liability, does not turn simply on Todd's use of asbestos. Rather, the claim appears to turn on a failure to warn about the dangers of asbestos and negligent exercise of retained control. The defense: "The Navy made me do it," does not apply to either basis of liability. Todd has shown, through the declaration of Roger B Horne (Exh I), the deposition of Tom Hixson (Exh C) and various military specifications documents (Exh J, K, L & M), that the Navy required Todd to use asbestos insulation. But Todd has not shown that the Navy required it to refrain from issuing warnings. Absent such a showing, Todd has no colorable military contractor defense to a failure to warn claim. See *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 812-13 (9th Cir1992); *Overly*, 1996 WL 532150 at '4; see also *Feidt v Owens Corning Fiberglas Corp*, 153 F3d 124, 129 (3d Cir1998) (discussing district court's remand of failure to warn claim in the face of a military contractors' defense, but affirming remand based on 28 USC § 1447(d)).

Todd's military contractors defense would fare no better with respect to the negligent exercise of retained control claim. That claim, as explained in *Grahn v. Tosco*, 58 Cal App 4th 1373, 68 Cal Rptr 2d 806 (1997), is premised on the notion that "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Id at 1393. The degree of control Todd retained in this case is not clear. But accepting Todd's contention that it was required by the Navy to use asbestos, the decision to use asbestos cannot give rise to liability under this theory. Only decisions within Todd's control, whether to have the workers use breathers for example, could give rise to liability. Since Todd alleges that only the use of asbestos was required by the Navy, Todd's military contractor defense cannot shield Todd from liability for negligent ex-

ercise of retained control.

*4 As the court understands plaintiffs' claims, Todd lacks a colorable military contractor defense. This means that Todd cannot meet prong two of the *Mesa* test. Another way to describe this situation is to say that Todd does have a colorable military contractor defense, but it is limited to defending against claims arising only out of the choice to use asbestos, because that is the only action that was directed by the government. Under this rubric, it is prong three of the *Mesa* test that is not met as there is no causal connection between the acts performed under the government's orders and the claims brought by plaintiffs. Either way, given the court's understanding of plaintiffs' claims, Todd would be unable to demonstrate that removal was appropriate even if plaintiffs had not waived their claims arising out of work at government jobsites and on government vessels.

For these reasons, plaintiffs' motion to remand (Doc # 3) is GRANTED. Plaintiffs seek an award of $1563.78, the amount they incurred in attorneys' fees bringing this motion to remand. Under 28 USC § 1447(c), the court may order a removing defendant to pay plaintiffs their "just costs and any actual expenses, including attorney fees, incurred as a result of removal." Whether to grant such an award is within the court's discretion. In this case, the removal was unnecessary. The day before Todd removed this action, plaintiffs waived their claims to damages arising out of work done on federal government jobsites and vessels. As a result, the court concludes that an award of fees is appropriate and awards the requested amount, $1563.78. The amount is supported by the Leroy declaration and appears reasonable.

IT IS SO ORDERED.

N.D.Cal.,2001.
Westbrook v. Asbestos Defendants (BHC)
Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "M"

Westlaw

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

Page 1

▷

Only the Westlaw citation is currently available.

United States District Court, N.D. California,
Robert S. **OVERLY** and Louise S. Overly Plaintiffs,
v.
RAYBESTOS-MANHATTAN, et al. Defendants.

No. C-96-2853 SI.
Sept. 9, 1996.

### ORDER REMANDING CASE TO SUPERIOR COURT

ILLSTON, District Judge.

*1 On September 6, 1996, the Court heard argument on plaintiffs' motion to remand. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiffs' motion to remand this case to San Francisco County Superior Court. The Court also GRANTS plaintiffs' motion for attorney fees and costs under 28 U.S.C. § 1447(c).

### BACKGROUND

On April 30, 1996, plaintiffs filed the complaint in this action in San Francisco County Superior Court. The Superior Court granted trial preference to the case pursuant to California Code of Civil Procedure § 36(d), because Mr. Overly is dying and is expected to survive only a few months; trial was set for October 7, 1996.

On August 9, 1996, after the trial date had been set, defendant Avondale Industries, Inc. removed the case to federal court pursuant to 28 U.S.C §§ 1441, 1442, and 1446. On August 20, 1996, plaintiffs filed a motion to remand and requested that it be heard on an expedited basis.

According to the allegations of the complaint, plaintiff Robert Overly was exposed to asbestos while working in a shipyard in the 1960's. Defendant Avondale controlled part of the premises of Mr. Overly's employment during this period of time.

Plaintiffs' complaint alleges that Avondale knew or should have known that the premises it controlled contained hazardous conditions, namely products containing asbestos. Plaintiffs further allege that defendant hired contractors and subcontractors who used products containing asbestos, but failed to warn individuals in the surrounding area of the existence of asbestos or to take precautions against human exposure to the chemical.

Plaintiffs allege that, as a result of exposure to asbestos while working in the shipyard, Mr. Overly acquired mesothelioma, a cancer usually resulting from asbestos exposure. In May of this year, Mr. Overly was diagnosed with six months remaining to live. Plaintiffs have proceeded against Avondale on the "failure to warn theory" of products liability.

Avondale does not contest Mr. Overly's assertion that he was exposed to asbestos during his work on the Avondale shipyard. Instead, it claims that the work done by Mr. Overly consisted primarily of work on naval ships, and that Avondale is therefore protected by government contractor immunity. Avondale asserts that it was under rigid guidelines by the federal government concerning the design of naval ships. Thus, Avondale asserts that it is entitled to the protection of the Federal Officer Removal Statute, thereby providing grounds for federal jurisdiction.

### LEGAL STANDARD

A suit filed in state court may be removed to federal court if the federal court would have had original subject matter jurisdiction over that suit. 28 U.S.C. § 1441(a); Snow v. Ford Motor Co., 561 F.2d 787, 789 (9th Cir.1977). Three potential bases for federal subject-matter jurisdiction are relevant to this suit: (1) federal question jurisdiction under 28 U.S.C. § 1331, [FN1] (2) admiralty jurisdiction under 28 U.S.C. § 1333, [FN2] and (3) supplemental jurisdiction under 28 U.S.C. § 1367.[FN3]

FN1. 28 U.S.C. § 1331 states that "[t]he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

FN2. Under 28 U.S.C. § 1333, "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

FN3. Supplemental or pendent party jurisdiction exists where claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

The Court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. § 1367(c).

*2 A motion to remand is the proper procedure for challenging removal. Remand to state court may be ordered either for lack of subject matter jurisdiction or for any defect in removal procedure. See 28 U.S.C. § 1447(c). The court may remand *sua sponte* or on motion of a party, and the parties who invoked the federal court's removal jurisdiction have the burden of establishing federal jurisdiction. See *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir.1988) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)).

The removal statute is strictly construed against removal jurisdiction and doubt is resolved in favor of remand. *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir.1979).

The existence of federal jurisdiction on removal must normally be determined on the face of the plaintiff's complaint. See *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149 (1908). A "cause of action arises under federal law only when the plaintiff's well pleaded complaint raises issues of federal law." *Metropolitan Life Ins. Co v. Taylor*, 481 U.S. 58, 63 (1987).

However, the Court may examine the entire record to determine if the real nature of the claim is federal, notwithstanding plaintiff's characterization to the contrary, when the plaintiff has, by "artful pleading," attempted to defeat defendant's right to a federal forum. See *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n. 2 (1981); *Salveson*, 525 F.Supp. at 572. A complainant cannot "avoid federal jurisdiction simply by omitting from the complaint federal law essential to his claim, or by casting in state law terms a claim that can be made only under federal law." *Harper v. San Diego Transit Corp.*, 764 F.2d 663, 666 (9th Cir.1985).

The Federal Employee Removal Statute was enacted as a means for federal employees to bypass the well-pleaded complaint rule and raise immunity-related defenses as a basis for removal.

## DISCUSSION
### I. *Jurisdiction Under the Federal Officer Removal Statute*

The Federal Officer Removal Statute provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." Title 28 U.S.C. § 1442(a)(1). In *Mesa v. California*, 489 U.S. 121 (1989), the Supreme Court held that § 1442(a)(1) requires the moving party to: (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of feder-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

al office. *Id.* at 124-25, 134-35. Before applying the test outlined in *Mesa*, however, a defendant must qualify as a "person" for the purposes of 28 U.S.C. § 1441(a)(1). As a corporation, defendant Avondale meets this preliminary requirement. *Fung v. Abex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal.1992).

**A. Acts Under the Direction of A Federal Officer**

*3 Under the first prong of the *Mesa* test, defendant must show that it was acting under the direction of a federal officer. It is not enough to prove only that "the relevant acts occurred under the general auspices of" a federal officer, *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 946 (E.D.N.Y.1992), or that the defendant was a member of a regulated industry. *Id.; Bakalis v. Crossland Sav. Bank*, 781 F.Supp. 140, 144-45 (E.D.N.Y.1991). In the area of product liability, government contract immunity has been limited to cases where defendant companies can show "strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.' " *Fung v. Abex Corp.*, 816 F.Supp. at 573 (quoting *Gulati v. Zuckerman*, 723 F.Supp. 353 (E.D.Pa.1989)).

In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability. Plaintiffs allege that because Avondale failed to warn Mr. Overly of the existence of asbestos in his work environment, Avondale should be held liable for his resulting illness. Plaintiffs are not pursuing a design defect claim of products liability and have offered in writing to waive all potential claims related to design defects.

Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site.

**B. Colorable Federal Defense**

The second prong of the *Mesa* test is that de-

fendant must possess a colorable federal defense. Defendant Avondale presents two potential federal defenses.

**1. Longshore and Harbor Workers Compensation Act**

One defense asserted by Avondale is that plaintiffs' recovery is limited to relief under the Longshore and Harbor Workers Compensation Act (LHWCA) § 1 et seq., 33 U.S.C.A. § 901 et seq. The LHWCA provides a basis for compensation from employers to certain employees injured in the course of employment while working upon navigable waters or the harbors and shipyards adjoining such waters. 33 U.S.C.A. § 903.

As an initial matter, defendant is barred from asserting a defense on this basis because the LWHCA was not mentioned in defendant's petition for removal as required under 28 U.S.C. § 1446(a).

Furthermore, even if applied to this case, the LWHCA does not constitute a colorable federal defense for Avondale. Mr. Overly was not an employee of Avondale, he was an employee of Westinghouse. The "borrowed employee" concept asserted by defendant has not been adopted by the Ninth Circuit. Furthermore, even under the Third Circuit guidelines cited by the defendant, Mr. Overly would not qualify as a "borrowed employee" for the purposes of the LWHCA because there has been absolutely no showing that he explicitly agreed to work under conditions controlled solely by Avondale. *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 942 (1990). Thus, the LWHCA does not constitute a colorable defense to plaintiffs' common law causes of action.

**2. Government Contractor Immunity**

*4 The second ground on which defendant asserts it possesses a colorable federal defense is the government contractor defense. Under this theory, contractors who supply military equipment to the government are immunized from liability under state tort law providing that they can meet the test outlined in *Boyle v. United Technologies Corp.*,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

487 U.S. 500 (1988). In *Boyle*, the Court set the standard for finding state law liability for design defects in military equipment. *Id.* at 511. Military contractor immunity for design defects applies when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

The Ninth Circuit has ruled that in failure to warn product liability cases involving asbestos allegedly used in the construction of naval ships, a defendant must specifically show that "in making [its] decisions regarding warnings [it was] acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States." *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir.1992). Thus, in order to meet the *Boyle* test in a failure to warn case, the defendant must show that the government affirmatively instructed it regarding the provision of warnings.

Defendant's only showing on this motion relates to the government's manufacturing and engineering specifications. Defendant has not demonstrated that the government provided "reasonably precise specifications" affecting Avondale's provision of warnings. *Boyle*, 487 U.S. at 512. Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunity. *See In re Hawaii Federal Asbestos Cases*, 960 F.2d at 813. Therefore, defendant fails to meet the second prong of the *Mesa* standard because Avondale has no colorable federal defense to the charges in this case.

C. Causal Nexus

The final requirement under the *Mesa* test is that there be a causal nexus between the rules imposed by the United States on the defendant contractor by the federal government and the liability asserted by plaintiff. "[T]here must be a causal con-

nection between what the officer has done under asserted official authority and the state prosecution. It must appear that the [state] prosecution has arisen out of the acts done by the officer under color of federal authority and in enforcement of federal law." *Maryland v. Soper*, 270 U.S. 9, 22 (1926).

Defendant has produced abundant evidence attesting to the regulations imposed by the federal government on the manufacture and design of ships built by Avondale for the U.S. Navy. However, *none* of these guidelines addresses Avondale's responsibility to warn its employees of their exposure to products containing asbestos. The government in no way restricted Avondale's ability to notify individuals of the presence of asbestos in the work environment. Thus, there is no causal connection between the control exercised by the United States over Avondale and the legal theory under which plaintiffs seek to hold Avondale liable. Consequently, Avondale has no basis on which to assert application of the Federal Officer Removal Statute, and the case must be remanded to state court.

II. *Attorney Fees & Costs*

*5 Title 28 U.S.C. § 1447(c) provides that when granting a motion for remand on the basis of a lack of federal subject matter jurisdiction, a court may order the defendant to pay plaintiff "its just costs and any actual expenses, including attorney fees, incurred as a result of the removal." An award under § 1447(c) is entirely within the Court's discretion.

Under its discretion, the Court finds that the case was removed "improvidently and without jurisdiction." *Id.* The Court hereby awards plaintiffs their reasonable costs and attorney fees associated with removal, as requested, in the amount of $2,000, to be paid by defendant Avondale within ten days of the date of this order.

CONCLUSION

For the foregoing reasons and for good cause shown, plaintiffs' motion to remand is GRANTED. Plaintiffs' motion for reasonable costs and attorney

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: 1996 WL 532150 (N.D.Cal.))

fees incurred as a direct consequence of removal is
GRANTED in the amount of $2,000.

    IT IS SO ORDERED.

N.D.Cal.,1996.
Overly v. Raybestos-Manhattan
Not Reported in F.Supp., 1996 WL 532150
(N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

# EXHIBIT "N"

22
23
24
25
26
27
28

Westlaw.

Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)
(Cite as: 2002 WL 102608 (N.D.Cal.))

▷
Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Barbara SCHILZ, Plaintiff,
v.
A.P. GREEN INDUSTRIES, INC., et. al. Defendants.

No. C01-4299 MMC.
Jan. 15, 2002.

ORDER GRANTING MOTION TO REMAND;
DENYING REQUEST FOR ATTORNEY'S FEES
AND COSTS

CHESNEY, J.

*1 Before the Court is plaintiff's motion to remand, filed December 17, 2001, pursuant to 28 U.S.C. § 1447(c). Defendant United States Steel (USS) filed opposition, to which plaintiff replied. [FN] Having considered the papers filed in support of and in opposition to the motion, the Court finds the matter appropriate for decision on the papers, VACATES the hearing scheduled for January 18, 2002, and rules as follows.

> FN1. On January 11, 2002, USS moved to strike plaintiff's reply as untimely. In conjunction with the filing of her reply, plaintiff explained that the reply was filed late because "[t]he due-date for Plaintiff's Reply Brief was mistakenly miscalendared." (See Robert Barrow Decl. ¶ 2.) Under the circumstances, USS's motion to strike is hereby DENIED. As an alternative to striking plaintiff's reply, USS requests leave to file a surreply. Such request is DENIED, as USS has failed to demonstrate how a surreply would assist the Court in adjudicating the instant motion.

Plaintiff filed the instant wrongful death action in state court on June 2, 2000, alleging that her husband's death was caused by his exposure to asbestos on a Naval ship. On November 16, 2001, defendant USS, the alleged successor-in-interest to the manufacturer of the ship, removed the instant action.

In its removal notice, USS asserts that the Court has jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), which provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1). In order for removal to be proper under § 1442(a)(1), the removing party must "(1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v. Abex Corporation*, 816 F.Supp. 569, 571 (N.D.Cal.1992) (citing *Mesa v. California*, 489 U.S. 121 (1989)).

Specifically, USS asserts that plaintiff's claims are removable under the government contractor's defense defined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), as the ship in question was constructed "pursuant to contract with the Navy and under the authority of officers of the United States or agencies thereof." (Notice of Removal ¶ 3.) This argument is not persuasive. In the instant action, plaintiff has limited her claim against USS to the failure to warn theory of liability; plaintiff is not pursuing a design defect claim against USS. (See Plaintiff's Waiver of Claim for Design Defect Product Liability, filed January 9, 2002.) The government contractor's defense on which USS relies "is inapplicable to a failure to warn claim in the absence of evidence that in making its decision whether to provide a warning ... [USS] was 'acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States.' " *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir.1996). Here, USS has failed to submit evidence demonstrating that it was subject to any government specifications with respect

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)
(Cite as: 2002 WL 102608 (N.D.Cal.))

to the placement of warnings on its products. Absent such showing, defendant may not rely on the government contractor's defense. *See id.* As defendant has failed to raise a colorable federal defense to plaintiff's claims, removal is not proper pursuant to 28 U.S.C. § 1442(a)(1).[FN2] *See Mesa,* 489 U.S. at 124-25, 134-35.

> FN2. In light of this finding, the Court need not address whether defendant's removal was timely under 28 U.S.C. § 1446(b). Nor, under the facts presented, would the timing of the removal warrant an award of attorney's fees. *See infra.*

*2 Pursuant to 28 U.S.C. § 1447(c), plaintiff seeks to recover her attorney's fees and other expenses resulting from defendant's removal of the action to the district court. Under § 1447(c), "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The district court has "wide discretion" to award attorney's fees and costs under § 1447(c), even in the absence of a finding that defendant acted in bad faith. *See Moore v. Permanente Medical Group, Inc.,* 981 F.2d 443, 446-47 (1992). In the instant action, at the time USS filed its notice of removal, plaintiff's claims against USS were not limited to a theory of liability based on failure to warn. Under such circumstances, the Court declines to exercise its discretion to award attorney's fees.

Accordingly, plaintiff's motion to remand is hereby GRANTED, and plaintiff's request for attorney's fees and costs is hereby DENIED.

This order closes Docket No. 5.

IT IS SO ORDERED.

N.D.Cal.,2002.
Schilz v. A.P. Green Industries, Inc.
Not Reported in F.Supp.2d, 2002 WL 102608
(N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "O"

Westlaw

Page 1

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Euelis "Ellau" SHEPPARD
v.
NORTHROP GRUMMAN SYSTEMS CORP., et al.

Civil Action No. 07-2208.
May 24, 2007.

Scott R. Bickford, Jeffrey Matthew Burg, Spencer R. Doody, Martzell & Bickford, New Orleans, LA, for Euelis "Ellau" Sheppard.

Brian C. Bossier, Christopher Thomas Grace, III, Edwin A. Ellinghausen, III, Blue Williams, L.L.P., Charles V. Giordano, Miranda, Warwick, Milazzo, Giordano & Hebbler, APLC, Christopher Kelly Lightfoot, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, Glenn Lyle Maximilian Swetman, Aultman, Tyner & Ruffin, Ltd., Gordon Peter Wilson, Frederick Lewis Parks, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Gary Allen Lee, Richard Marshall Perles, Lee, Futrell & Perles, LLP, Samuel Milton Rosamond, III, Crawford Lewis, PLLC, New Orleans, LA, William L. Schuette, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, Baton Rouge, LA, for Northrop Grumman Systems Corp., et al.

**ORDER AND REASONS**

CARL J. BARBIER, United States District Judge.

*1 Before the Court is Plaintiff's **Motion to Remand (Rec.Doc.11)**. This motion was opposed and was set for hearing on the briefs on May 16, 2007. Upon review of the record, the memoranda of counsel, and the applicable law, this Court now finds that Plaintiff's motion should be granted.

*Factual Background*

Plaintiff initially filed this suit against Defend-

ant, Northrop Grumman Systems Corp. ("Northrop") and several other defendants in Civil District Court for the Parish of Orleans asserting that he contracted asbestos-related lung cancer while employed as a laborer and rigger by Avondale Shipyard in Avondale, Louisiana. Northrop and Peter Territo, an executive officer (hereinafter referred to as "Defendants"), removed this action to federal court under 28 U.S.C. § 1442(a)(1) based on federal officer immunity. Defendants also stated that the Longshore and Harbor Workers' Compensation Act ("LHWCA") was a basis for removal. The day before Defendants removed this action, Plaintiff filed and served a motion for leave of court to amend his petition in state court. (Exhibit G to motion to remand). Specifically, Plaintiff sought leave to amend his petition to delete paragraphs 47 and 49, which read in pertinent part:

> Avondale had the *garde* of the asbestos ... and is thereby strictly liable pursuant to Louisiana Code Article 2317.

> Avondale fabricated asbestos-containing insulation products to which Petitioner was exposed and Avondale is strictly liable as a manufacturer....

Plaintiff argues that, in addition to his failure to warn claims, he erroneously asserted the above garde and product liability claims in his original petition. He claims that while neither of the above claims confer jurisdiction on this Court, he promptly (i.e., before the notice of removal was filed) sought leave to amend his petition so that Defendants could not argue that Plaintiff intended to pursue any cause of action over which this court would have jurisdiction. Five days after this action was removed, Plaintiff, again, sought leave to amend his Complaint, which was granted two days later.

*The Parties' Arguments*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

Page 2

Plaintiff argues that this Court should make its jurisdictional determination based on his amended Complaint even though the amendment was allowed *after* removal. Plaintiff notes that it is clear that he is not attempting to engage in forum shopping because he sought leave to amend his petition prior to removal.

Plaintiff next claims that Defendant has not satisfied its burden of proving that it is entitled to federal officer immunity. Plaintiff argues that Defendants have not properly invoked this Court's federal officer jurisdiction under § 1442(a)(1), because they cannot meet the criteria set forth in *Mesa v. California*, 489 U.S. 121, 124-25, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). First, Plaintiff claims Defendants have not shown that they were acting under federal direction at the time the tort was committed. Plaintiff asserts that Defendants cannot establish that a federal officer directed and controlled their safety and warning-related activities specifically. Second, Plaintiff asserts that Defendants do not have colorable federal defense under the government contractor defense because there is no conflict between Defendants' federal and state duties. Plaintiff notes that the testimony of Peter Territo, executive officer of Defendant, demonstrates that no government regulation or contract specification prevented him from providing safety warnings. (Exhibit I to motion to remand, p. 143). Third, Plaintiff asserts that Defendants have not shown a nexus between the Government's control and Plaintiff's legal theories. Plaintiff notes that Defendants have provided no evidence showing that a federal officer exercised "direct and detailed" control over safety and warnings, and thus, it is impossible for Defendants to show a causal nexus between the Government's supervision and their own tortious failure to warn. Thus, according to the *Mesa* test, Plaintiff argues that Defendants cannot invoke federal officer jurisdiction.

*2 Further, Plaintiff asserts that he has disclaimed any cause of action which could invoke federal officer jurisdiction. Plaintiff asserts that if

the Court concludes that Defendant have pled a colorable federal officer defense, Plaintiff's petition disclaimed any cause of action which would ripen the defense. Specifically, plaintiff pled:

> Plaintiffs [sic] disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave. *Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from any exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government.*

(Petition, ¶ 56, *emphasis added* ). Plaintiff asserts that in similar asbestos cases (which were removed to federal court by defendants asserting federal officer jurisdiction), courts have looked to similar post-removal disclaimers to remand the cases to state court. *See, Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D.Cal. Sept. 9, 1996); *Westbrook v. Asbestos Defendants*, 2001 WL 902642 ( N.D.Cal. 2001)(" The court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal job-sites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, [ defendant] can always file for removal once again.") Thus, Plaintiff asserts that if the Court determines that there is jurisdiction based on Defendants' federal officer defense, Plaintiff should be bound by his disclaimer. Also, unlike the plaintiffs in *Overly* and *Westbrook*, who disclaimed causes of action post-removal (arguably implicating concerns of forum shopping), Plaintiff here disclaimed these causes of action in his original petition filed in state court.

Last, Plaintiff asserts that the LHWCA does not provide a colorable federal defense. Plaintiff notes that in *Gauthe v. Asbestos Corp.*, 1997 WL 3255 (E.D.La. Jan. 2, 1997), Judge Duval addressed these same LHWCA arguments with regard to the Avondale Interests in an asbestos exposure case exactly the same as the case at bar. In rejecting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

Avondale's arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship. Inc. v. Pennsylvania*, 100 S.Ct. 2432 (1980) to hold that the LHWCA does not preempt, but supplements, state remedies available to an injured worker. Plaintiff claims that from his Petition, it is clear that he intended to do just that: i.e., sue Defendants in state court for state law claims. Plaintiff claims that he has not availed himself of any LHWCA benefits and does not seek to do so in his petition. Thus, removal is improper on the basis of his purported LHWCA claim.

In opposition, Defendants making up the Avondale Defendants (i.e., Northrop and its executive officers) [FN1] claim that they are entitled to remove this case based on federal officer jurisdiction. Specifically, Defendants assert that the intense government presence at Avondale and government control of the construction of vessels at Avondale, where Plaintiff allegedly was exposed to asbestos, was of such a direct and detailed nature that Defendants are entitled to defend this claim in federal court. (See Exhibit D to opposition). Defendant argues in essence that construction and inspection systems designed and implemented by the government to ensure that the proper materials were used and incorporated in the proper manner were thorough, all-encompassing, and included the authority for government inspectors to order that any non-compliance found be corrected by Avondale at any stage of the construction.

> FN1. An opposition advancing similar arguments was filed by Commercial Union Insurance Company (Rec.Doc.18).

*3 Defendants assert the importance of *Lalonde v. Delta Field Erection*, 1998 WL 34301466 (M.D.La.1998). Defendants explain that in *Lalonde*, the court held that the federal government contractor, DSM, "was acting 'under an officer of the United States or of an agency thereof' for purposes of removal under § 1442(a)(1) " because DSM "operated a federal government-owned facility, exclusively for the government, under the

oversight and ultimate control of officers of the federal government." Although Defendant admits that Avondale was not a government-owned facility, it argues that the work performed under contract with the government was performed exclusively for the government under the direct oversight and control of government officers. Defendant asserts that like DSM, Avondale acted exclusively for and under the control of the federal government in its operation under all of the government contracts. Defendants asserts that (1) government inspectors daily monitored compliance by Avondale with safety regulations made part of the contracts; (2) the government required the use of asbestos insulation; (3) the government specifically incorporated into the contracts federal asbestos safety regulations, which set standards for safe daily exposures to asbestos; and (4) government inspectors constantly monitored the ship construction process for compliance with all terms of the contract. Defendants claim these facts establish that the they were "acting under" the direction of the federal government and that the causal connection exists because the acts complained of were "under color" of federal office.

Next, Defendants claim they can successfully assert a colorable federal defense, i.e., the federal contractor defense. Defendants claims they always conformed to the exceptionally precise specifications for the construction of the vessels that were drafted and approved by the government. Defendants also argue that Avondale had no knowledge of any dangers associated with the use of asbestos about which the government was not aware, given the extensive presence and control of the construction by the government, the incorporation into the contracts of the Walsh-Healey Act, and federal asbestos safety regulations promulgated by the LHWCA.

The second of Defendants' two available federal defenses is the immunity provision contained in the LHWCA. Defendants claim that Plaintiff, Territo, and Avondale satisfy the "status" and "situs" test and are, thus, all qualify for treatment under the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

LHWCA. Defendants assert that it is without serious dispute that federal law governs the question of whether the LHWCA preempts state law. Defendants argue that decisions such as the United States Supreme Court in *Sun Ship* make clear that Congress intended that disputes between longshore workers be resolved within the exclusive framework of the LHWCA.

Defendants also claim that the recent rulings in *Melford v. Northrop Grumman Systems Corp.*, case no. 05-1405 (M.D.La.) and *McFarlain v. Northrop Grumman Systems*, case no. 05-1406 (M.D.La.) are applicable and suggest that remand should be denied. Defendants note that the *Melford* case was removed to the Middle District of Louisiana on the same grounds that were asserted here: pervasive government regulation of federal ship construction contracts entitled the defendant to federal court jurisdiction under the Federal Officer Removal statute. The Court denied the plaintiff's motion to remand, wherein the plaintiff made the same arguments as the plaintiff here makes: the government never forced the defendant "not to warn," the *Overly* test applies, and the Federal Contractor Defense is not colorable. Defendants note that the *Melford* ruling is contrary to every Eastern District ruling against Defendants to date.

*4 In *McFarlain*, the plaintiff urged much more than "failure-to-warn" claims. Specifically, the plaintiff had alleged "strict liability" claims. Defendants note that in Plaintiff's original Petition in this case, he also makes strict liability claims that seek to attach liability to Defendants for the mere presence of asbestos at the workplace. (See paragraphs 47 and 49 of original Petition). Defendants claim that this Court should rule as the *McFarlain* Court did and find that, at least as far as the strict liability claims are concerned, Defendant's federal contractor defense is colorable and all three prongs of the removal test are met. Similarly, Defendants claim this Court should exercise its supplemental jurisdiction over the remaining claims and deny Plaintiff's motion to remand. As for Plaintiff's post-

removal amendment to delete the strict liability claims from his Petition, Defendants argue that the Court should not consider the amended Petition because what controls is the Petition as it reads at the time of removal.

*Analysis*

**The Amended Petition:**

Although this case was properly removed based on federal question jurisdiction, a mere seven days after removal, Plaintiff was granted leave to amend his Complaint. This amendment effectively allowed Plaintiff to delete any possibility of federal claims from his Complaint. The fact that this amendment occurred so quickly after removal and the fact that Plaintiff had sought leave to amend his petition in state court the day before Defendants filed their notice of removal prompts the Court to consider the amended petition in its determination of this motion to remand. The Supreme Court has held that if a federal claim that formed the basis of federal question jurisdiction is dismissed, the court has discretion to remand the state law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (affirming remand of state claims after plaintiff's amended complaint dropped claim that was preempted). The *Carnegie-Mellon* Court held that if a federal question is eliminated relatively soon after removal, it is ordinarily preferable to remand the case. *Id.* Indeed, the Court noted that retaining a case after a fresh federal claim is dropped early in litigation may be an abuse of discretion. *Id.* Thus, the Court concludes that in this situation, the amended Complaint will be used to determine whether the case should be remanded.

**Should this Matter be Remanded?**

The Federal Officer Removal Statute provides as follows:

(a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is presiding:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

(1) The United States or any agency thereof or any officer (or any acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue....

*5 28 U.S.C. § 1442(a)(1). The Fifth Circuit has explained that removal pursuant to this statute is meant to "ensure a federal forum in any case where a federal officer is entitled to raise a defense arising out of his official duties." *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir.1998). It is the removing defendants that have the burden of establishing the existence of federal jurisdiction. *Id.* at 397. In considering whether removal was proper under the federal officer removal statute, a court must determine whether the removing defendants have established the following factors: (1) that they are "persons" under § 1442(a)(1); (2) that they acted under the direction of a federal officer; (3) that they have demonstrated a causal nexus between plaintiff's claims and defendants' actions performed under the color of a federal office; and (4) that they can raise a federal defense to plaintiff's claims. *Mesa*, 489 U.S. at 131-32; *Winters*, 149 F.3d at 398.

### (1) Are Defendants "persons" within the meaning of the statute?

Both removing defendants (Northrop as a corporation and Territo as an executive officer for the corporation) satisfy the first *Mesa* prong. *See Winters*, 149 F.3d at 398; *Bradley v. Northrop Grumman Systems, Corp.*, 2007 WL 1115246 (E.D.La., Apr., 12, 2007).

### (2) Were Defendants acting under the direction of a federal officer?

The Court concludes that Defendants' removal fails on this prong because they failed to establish their safety and warning-related activities were under the requisite direction of a federal officer. Federal direction requires "more than 'general auspices'

of a federal officer, or participation in a regulated industry." *Savoie v. Northrop Grumman Ship Systems, Inc.*, No. 05-2086 (E.D . La.2005). Defendants must show "strong government intervention and the threat that a defendant will be sued in state court" based on actions which follow federal direction. *Mouton v. Flextallic, Inc.*, 1999 WL 225438 *2-3 (E.D.La.1999).

Nothing in the record establishes that the safety procedures at issue were controlled by the government or related to government specifications in the building of ships at Avondale. *See also Bradley*, 2007 WL 1115246; *Guidroz v. The Anchor Packing Co.*, No. 98-3709 (E.D.La); *Mouton*, 1999 WL 225438 (no causal connection between the Navy's direction pursuant to design contracts and plaintiff's failure to warn claims). Territo testified that there were no federal officers on board the vessels and that Naval inspectors did not control the safety department at Avondale. (Exhibit I to motion to remand, p. 135). He also admitted that nothing in the federal regulations prevented Avondale from warning its employees of the dangers of asbestos exposure. (Exhibit I to motion to remand, p. 143). Thus, this Court finds that Defendants are not entitled to federal officer removal in this instance.

### (3) Was there a causal nexus between Plaintiff's claims and Defendants' actions performed under the color of a federal office?

*6 Because Defendants have failed to demonstrate that the government exercised the requisite authority and control over Defendants' safety procedures, there can be no causal nexus between the authority of the federal officer and Plaintiff's claims that Defendants failed to use asbestos safely. *See also Bradley*, 2007 WL 1115246, *3; *Gauthe*, 1997 WL 3255 (no causal nexus under similar facts and circumstances).

### (4) Have Defendants established a colorable federal defense?

The Court determines that Defendants have failed to establish a colorable defense under either the government contractor defense theory or the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
(Cite as: 2007 WL 1550992 (E.D.La.))

LHWCA defense theory. First, Defendants cannot successfully invoke the government contractor defense, as set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), because Defendants cannot carry their the burden of establishing that the following two conditions are met: 1) that the case concerns a unique federal issue, and 2) that a significant conflict exists between federal policy and state law as applied to this case. *Boyle*, 108 S.Ct. at 2515. Here, there is no conflict between Defendants' federal and state duties. Territo's own testimony demonstrates that no government regulation or contract specification prevented him or Northrop from providing safety warnings:

Q: To your knowledge, is there any Federal regulation or specifications in the contracts with the Navy that would prevent you from putting up a [warning] sign in a Navy vessel?

A: If it was under construction?

Q: Yes.

A: No.

(Exhibit I to motion to remand, p. 143). There is no conflict because Defendants could comply with both their contractual obligations and the state-prescribed duty of care. Thus, Defendants cannot take advantage of this defense.

Also, the Court finds that Defendants have not established a colorable defense under the LHWCA for the same reasons previously set forth by Judge Duval in *Gauthe*, 1997 WL 3255. The *Gauthe* court addressed these same LHWCA arguments with regard to Defendants in an asbestos exposure case. In rejecting Defendants' arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship* to hold that the LHWCA does not preempt, but instead, supplements state remedies available to an injured worker. Thus, a person injured while shipbuilding may maintain an action under either the Louisiana state compensation scheme or the LHWCA. A review of

Plaintiff's petition reveals that it was Plaintiff's intent to sue Defendants in state court for state law claims. Thus, it appears that the facts of this specific case do not invoke federal officer jurisdiction.

In further support of the above conclusion is the fact that, in his original Petition filed in state court, Plaintiff disclaimed any cause of action which could invoke federal officer jurisdiction. Specifically, Plaintiff pled:

Plaintiffs [sic] disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from any exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government.

*7 (Petition, ¶ 56). Courts have looked to similar disclaimers that were filed after removal to remand cases to state court in similar asbestos cases. *Overly*, 1996 WL 532150; *Westbrook*, 2001 WL 902642 ("[ t]he court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, [ defendant] can always file for removal once again."). Also, the Court concludes that its decision to follow Plaintiff's disclaimer is further supported by the fact that, unlike the plaintiffs in *Overly* and *Westbrook* who disclaimed causes of action post-removal, Plaintiff here disclaimed these causes of action in his original petition in state court.

The Court is unpersuaded, just as Judge McNamara was "unpersuaded" in the *Bradley* case, by the opinions out of the Middle District of Louisiana (*Lalonde; Melford;* and *McFarlain* ) that contrast with those out of this district. First, the *Lalonde* case is inapplicable because the government in *Lalonde* specifically controlled safety matters at a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)
**(Cite as: 2007 WL 1550992 (E.D.La.))**

government-owned facility. Here, Avondale is a privately-owned shipyard that contracts with private and public interests, and in which safety officers such as Territo operate wholly independent of any Government control. In *McFarlain*, the Court rejected the assertions that the LHWCA conferred federal jurisdiction and also rejected the argument that the Avondale defendants met their burden of removal of the failure to warn claims based on the government contractor defense. The sticking point for the *McFarlain* Court was the fact that the plaintiff had made a strict liability claim in addition to the failure to warn claim against the Avondale defendants. Here, Plaintiff has amended his petition to omit any strict liability claim. Thus at present, Plaintiff's amended petition only states theories of liability which sound in negligence, which should be remanded according to all Eastern District precedent, as explained above. Accordingly,

**IT IS ORDERED** that Plaintiff's **Motion to Remand (Rec.Doc.11)** should be and hereby is **GRANTED.** This matter is now remanded to the state court from which it was removed.

E.D.La.,2007.
Sheppard v. Northrop Grumman Systems Corp.
Not Reported in F.Supp.2d, 2007 WL 1550992 (E.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.