IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| IN RE: | ) | |
| HAWAII STATE ASBESTOS CASES | ) | CIVIL NO. 11-00406 |
| | ) | (Toxic Tort/Asbestos Personal Injury) |
| This Document Applies To: | ) | |
| | ) | |
| ROGER E. NELSON and ROSALIE J. | ) | |
| NELSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | (No Assigned Trial Date) |
| vs. | ) | |
| | ) | |
| CRANE COMPANY, etc., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT SAMUEL A. FORMAN, M.D.

SAMUEL A. FORMAN., being duly sworn, deposes and states under the penalties of perjury, as follows:

### I. BACKGROUND

1.  I am a medical doctor specializing in preventive medicine and occupational medicine. I received a B.A. degree from the University of Pennsylvania majoring in history and biology, graduating *magna cum laude* in 1973. I attended Cornell Medical School, graduating with an M.D. degree in 1977. I also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, I became board certified in occupational medicine after attending a residency at the Harvard School of Public Health.

2.  From 1973 to 1977, I participated in Ensign 1975, a Navy program that permitted me to engage in active duty service and obtain hands-on training during the

summers between medical school sessions.  My participation in this program gave me

background and experience different from that of many other prospective medical

officers at that time, because very few medical officers engage in operational and

administrative rotations as part of their service and training.  In the summer of 1974, I

engaged in a midshipmen cruise aboard the *USS Shreveport* (LPD-12) for the purpose of

obtaining a general understanding of ship operations outside the medical department.  I

attended training classes and observed activities in all parts of the ship including the

engineering department, command information center, commissary department, supply

and repair divisions, and aviation division. In the summer of 1975, I did a rotation at the

Navy Bureau of Medicine and Surgery ("BUMED"), known at times as the Naval

Medical Command.  While there, I participated in medical administration in the office

overseeing all medical training for the Navy and worked directly with a number of high-

ranking officers in BUMED, including William M. McDermott, who at that time held the

rank of Captain but who later became Deputy Commander of the Naval Medical

Command.  During this rotation, I had an extended assignment to analyze Navy

expenditures for medical education at civilian universities to ensure the Navy's needs

were being met.  In the summer of 1976, I did a clinical rotation on the general and

internal medicine wards at San Diego Naval Hospital, the largest military hospital in the

world.  By the time I graduated medical school, I had already accumulated approximately

six months of active duty service from my summer internships.  These internships gave

me a fundamental understanding of the needs of sailors at sea, a general understanding of

ship operations, including ship propulsion systems, and insight into the leadership and

administrative side of the Navy.

3.  In 1977, I graduated from medical school and went on full-time active duty in the Navy.  I performed my internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978.  I remained on active duty in the Navy until 1983. Thereafter, I continued to work for the Navy as a civilian employee until 1986.  My qualifications and credentials are more fully described in my curriculum vitae (Exhibit A).

4.  Over the course of my active duty service in the Navy, I served aboard Navy ships whose primary purpose was to fulfill national defense missions of the United States. Assignments aboard ship, involving duty at sea, included, in addition to the *Shreveport* in the North Atlantic, *USS Duluth* (LPD-6) in the Eastern Pacific, and *USS St. Louis* (LKA-116) in the Western Pacific.  At all times, these ships were performing missions and activities aimed at preparing for or deterring combat.  In the military setting, a major goal of training is combat readiness.  This training is intended to simulate combat and combat conditions.  For example, the Navy hands out "battle efficiency" ribbons to ships that perform well in war exercises.  Even combat support ships are required to remain ready to assist ships and sailors on the front line and, at times, these support ships must themselves go into harm's way.  To achieve its mission, the Navy had to be willing to put life and limb at risk not just on the front line but also in support operations.

5.  One of the highest profile operations in which I was involved occurred aboard the *St. Louis*, which was an amphibious attack transport ship deployed at the time to the Western Pacific for the purpose of carrying Marines, cargo (including heavily armored Marine Corps vehicles used in amphibious assault), equipment and supplies to Navy shore-based facilities.  In March 1979, President Carter ordered the Navy to rescue a

wave of Vietnamese and Southeast Asian refugees who were escaping communist Vietnam and local pirates into the South China Sea. The *St. Louis* was the first ship of the Seventh Fleet to arrive on the scene. Fortunately the *St. Louis* was able to perform this mission without exchanging hostile fire; however, in order to perform this humanitarian rescue operation, the *St. Louis* had to travel just outside the twelve mile international limit and sail directly into an area threatened by actively hostile Communist interests. This situation represented an intense Cold War scenario, one of but many types of hazardous scenarios and missions for which the Navy must be prepared.

6.  In the course of my active duty service, I also worked in Navy shore facilities, including shipyards such as the Long Beach Naval Shipyard. These facilities contributed to the defense of the country by engaging in industrial efforts to construct, repair and overhaul the Navy's combat and combat support vessels. My role was to ensure that the Navy personnel and civilians involved in these efforts performed their duties as safely as possible.

7.  From 1980 to 1982, I ran an occupational health clinic at the Naval Weapons Station at Seal Beach, California, and assisted in the medical programs at the Long Beach Naval Shipyard. Among other responsibilities, I assisted in the asbestos medical surveillance program for over 2,000 federal Civil Service employees and uniformed sailors. At any one time, I was following 200 cases of asbestos disease.

8.  In 1982, I was assigned to the Naval Environmental Health Center at Norfolk, Virginia. While stationed there, I designed occupational medicine programs with regard to Navy-specific occupational diseases, performed health hazard evaluations, inspected the occupational health programs of government facilities as part of the Navy

Occupational Safety and Health, or "NAVOSH," program, carried out epidemiologic studies, and trained Navy doctors and nurses in occupational medicine.

9.   In 1983, a JAG officer for the Naval Medical Command requested that I become part of a team to locate, digest and organize government documents for production in asbestos litigation.  Over the next year and a half, I investigated the Navy's historical handling and knowledge of various industrial hygiene issues, including asbestos disease.

10.   In 1985, pursuant to Navy orders, I completed my review of Navy knowledge and practice in industrial hygiene, including its awareness of and response to health hazards of asbestos, as a formal assignment.  My search for documents took me to the National Archives, other warehouses and storage facilities for records of the Navy's Bureau of Medicine and Surgery.  I was given full security clearances for and unimpeded access to these facilities.  I also conducted research at private facilities such as Harvard University's Countway Library of Medicine's section for rare books and manuscripts.

11.   Following my research, and with the approval of the U.S. Navy's Bureau of Medicine and Surgery, I published an article entitled "U.S. Navy Shipyard Occupational Medicine Through World War II" in the *Journal of Occupational Medicine*, Vol. 30, No. 1 (Jan. 1988) (Exhibit B).

12.   Though I no longer hold any formal position with the Navy, since I left I have been asked on a number of occasions to speak to Navy medical and safety personnel on issues relating to the history of occupational medicine and industrial hygiene in the Navy.

13.   I also am currently a Visiting Scientist in the Department of Environmental Health at the Harvard University School of Public Health.

14.   Based on my personal experience in the Navy and the results of my researches, I have been asked to provide my opinions with respect to the questions set forth below.

## QUESTION 1:

## WHAT WAS THE EXTENT OF THE NAVY'S KNOWLEDGE OF ASBESTOS – RELATED HEALTH ISSUES BETWEEN 1920 AND 1970?

15.   From my review of countless Navy documents and my studies while employed by the Navy, I acquired extensive knowledge as to the state of Navy knowledge and awareness regarding the hazards of asbestos.

16.   The Navy has always taken responsibility for the health and safety of its uniformed and civilian personnel.  It has consistently exercised its discretion regarding hazard recognition and appropriate controls in Navy workplaces.  As Navy Captain Ernest W. Brown, M.D., recognized as the architect of the Navy's formal occupational health program prior to World War II, wrote in 1940:  "One of the most important concerns of the Medical Department of the United States Navy today is industrial hygiene, especially in navy yard practice."  (Exhibit C).

17.   This commitment was reflected in numerous other Navy statements and documents.  In 1943, Secretary of the Navy, Frank Knox, in a statement co-signed by the Chairman of the U.S. Maritime Commission, E. S. Lamb accompanying "Minimum Requirements for Safety and Industrial Health in Contract Shipyards," stressed the Navy's commitment in this regard:

> The necessity for conserving manpower and promoting the physical welfare, health, and safety of what shortly will amount to one million workers in shipyards required that careful observance of standards for the prevention of accidents and protection of health be accorded.  Aside from the weight which must be given

humanitarian consideration, it is simply good common sense that as much care and attention be given to protecting the human factors in the war production program as is given machines.

(Exhibit D).  Similarly, in a 1955 Naval Institute publication called *The Human Machine*, Captain Charles W. Shilling of the Navy Medical Corps described the "paramount importance" of Navy health:  "[T]he medical component of the Navy has a heavy responsibility" with a mission to promote physical fitness, prevent and control diseases and injuries and treat and care for the sick and injured.  (Exhibit E).

18.  The most senior Medical Corps officer in the Navy is the Navy Surgeon General, who is also the Chief of BUMED and who reports to the Chief of Naval Operations ("CNO").  The Navy Surgeon General has responsibility to spell out health programs, including prevention and injury care, for sailors and civilian workers (as appropriate).  Medical Corps, allied health professions and enlisted hospital corpsmen are responsible for advising operational line commands to carry out preventive practices and to provide specialized industrial hygiene services.  It is the responsibility of the Navy line authorities (the operational chain of command) to carry out these recommendations.  The Navy Surgeon General's objective is that all personnel receive the highest level of services that the Navy can deliver and that these services are appropriate to the environments in which the personnel work.  The Navy Surgeon General achieves this objective through the development of standardized programs for medical care.  As a General Medical Officer, I was not permitted to deviate from the programs developed by the Navy Surgeon General without approval from a more senior Navy officer except in extraordinary circumstances, such as if a ship was isolated or out of contact with more senior, knowledgeable and experienced officers.

19.  All Navy personnel including medical officers must follow their chain of command to maintain good order and discipline.  Enlisted personnel are indoctrinated during boot camp and training with the understanding that they must conduct all activities "the Navy way," meaning that Navy orders and instructions supersede any information or directions received from any source outside the Navy.  Sailors must follow orders trusting that their chain of command will have the mission of the Navy in mind and will address safety as best as possible.  Unlike in the civilian community, all military personnel who refuse to perform an order could be subject to various penalties pursuant to the Uniform Code of Military Justice ("UCMJ").  Absent extraordinary circumstances, the Navy demands and enforces rigid adherence to the chain of command.  It does so because it is the military's method for institutionalizing strategic considerations, highly specialized expertise, and prior experience and then transforming this information in an effective and predictable way into programs and orders for all personnel to follow.

20.  Collective and uniform communication and implementation of Navy programs and orders are key to the Navy's operational flexibility.  The Navy has numerous sailors with specialized capabilities.  The Navy also maintains many ships and multiple shipyards with specialized capabilities.  The Navy strives to ensure that each sailor is consistently trained, and that each ship in its fleet is predictably constructed so that it can rely on both the sailors and the ships to perform critical operations without endangering sailors any more than is necessary to achieve mission success.

21.  Consistent with the Navy's interpretation of the importance of industrial hygiene and occupational health, the Navy's programs in these areas have paralleled, and at times led, the development of occupational medicine and industrial hygiene in general,

and asbestos-related issues in particular.  The Navy's knowledge in the areas of asbestos and associated health conditions has been quite complete when compared to available knowledge over time, and at least by the early 1940s, the Navy had become a leader in the field of occupational medicine relating to, among other things, asbestos dust inhalation exposure.

22.  As early as 1922, the Navy recognized, as exemplified by its instructions to officers published in the *Navy Medical Bulletin*, the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure.  These included the use of water to dampen dust, exhaust systems to remove dust, enclosed chambers to prevent escape of dust and respirators.  (Exhibit F).  The Navy's knowledge of potential asbestos-related health problems, and of the means to control against them, continued to expand throughout the following decades, as senior Navy officers actively assessed, evaluated, controlled, and made recommendations concerning Navy policy regarding disease and injury prevention, including asbestos related occupational health hazards.

23.  The Navy's health and safety apparatus on the eve of World War II was described in the 1939 Handbook of the Navy Hospital Corps published by the Bureau of Medicine and Surgery under the direction of the Secretary of the Navy:

> The United State Navy is one of the largest of the industries maintained by this Government.  An organization has been set up in the Navy to protect its personnel, both civilian and naval.  A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy.  He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like.  He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities.  A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents

prevented.  Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization.  It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of the medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea.  In each of these places a variety of health hazards exist.  It is therefore necessary that this [sic] personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

(Exhibit G).

24.  The Handbook of the Navy Hospital Corps also explained that all Navy yards have a commandant who "is responsible to the Navy Department for the protection of employees, as well as Navy personnel, under his command.  He is familiar with . . . the health and accident hazards presented."  Thus, the Commandant was "responsible for the appointment of the safety engineers [who will] make inspections and recommend proper protective measures."  The Handbook further called for the Navy medical officer to "advise the safety engineer and instruct the employees in safety measures and encourage them to cooperate in protective measures."  These safety measures included required "masks for asbestos workers."

25.  Also in 1939, the Annual Report of the Surgeon General of the Navy addressed the "Hazard of Asbestos," and described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods."  The Report noted the risk from "continued exposure to present occupational conditions" at Navy facilities, and directed appropriate methods for preventing such exposures, recommending the use of local exhaust ventilation to control asbestos dust exposure for insulators in the fabrication shop.  (Exhibit H).

26. At about the same time, Navy Captain E.W. Brown undertook an assessment of asbestos exposure, and its prevention, in Navy yards. In an article entitled "Industrial Hygiene and the Navy in National Defense" published in 1941, Captain Brown prescribed appropriate measures for the prevention of asbestos exposure. These included use of respirators, local exhaust ventilation, and wetting of asbestos containing materials. (Exhibit C).

27. Health and safety issues, including those relating to asbestos exposure, continued to be a major focus of the Navy and the United States Maritime Commission throughout World War II. In 1943, the Navy, along with the Maritime Commission declared its responsibility for the safety and health of their workers and took charge of implementing and staffing safety and health programs for those workers. Following extensive discussion with various constituencies, the Navy and the Maritime Commission jointly issued "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" ("Minimum Requirements"). (Exhibit D). The specific requirements imposed by the document enunciated for private and contract shipyards expectations that were already in effect and implemented at the Navy's own facilities.

28. The Minimum Requirements identified asbestos-related disease as a potential hazard of shipyard work, explaining that exposure could result from handling, sawing, cutting, molding and welding rod salvage around asbestos or asbestos mixtures. The document advised that such jobs "can be done safely with:

    1. Segregation of dusty work and,

    2. (a) Special ventilation: Hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or

        (b) Wearing of special respirators.

3.  Periodic medical examination."

The Minimum Requirements also warn that jobs involving exposure to asbestos require "respiratory protective equipment," in particular a "dust respirator."  A ventilation supervisor (the safety engineer) was required to be trained to handle the entire ventilation program in the yard, which was to include classes, demonstrations and short talks on proper procedures.

29.  The Minimum Requirements further called for employee safety training:  "the time for the safety training of an employee to start is at the inception of his employment." "Employees shall have in their possession, and be instructed in the proper use of, all necessary personal protective equipment before being started on any job."  Safety bulletin boards were to be located at each hull and shop, with "[s]afety posters and other material on the bulletin boards" changed at least semi-monthly.  The type of safety posters used in these worker educational campaigns included materials reinforcing the use of masks for protection against disease-causing dusts.  One such poster stated, "His mask keeps him on the job."  (Exhibit I).

30.  This commitment by the Navy to address the asbestos-related health concerns of Navy workers, as set forth in the 1939 Handbook of the Hospital Corps and the Minimum Requirements document, is further evidenced by dozens of other documents generated by the Navy and consultants it retained during the war years.

31.  Later in the war, following extensive study of asbestos-related health issues, Dr. Philip Drinker, a Harvard professor and Chief Health Consultant to the Division of Shipyard Labor Relations and consultant to the Navy Surgeon General since 1941, wrote on January 31, 1945 to Captain Thomas J. Carter at the Navy's Bureau of Medicine and

Surgery.  In his letter, he reported on analyses of airborne dust collected at Bath Iron Works, a leading contractor for construction of Navy vessels.  Dr. Drinker summarized the results of the analysis:  "This evidence is enough to indicate a fairly serious dust risk at Bath and to make it very probable that the same sort of thing will be found in other plants and yards where the same type of [asbestos] pipe covering materials are used." (Exhibit J).

32.  In addition to asbestos health concerns revealed at Bath Iron Works, experience in some of the contract shipyards also came to the attention of Dr. Drinker and Navy authorities.  For example, union and worker complaints regarding asbestos-containing insulation at New York Shipbuilding led Dr. Drinker to meet with manufacturers of asbestos pipe insulating materials used by the Navy.  Dr. Drinker recorded that "they would be glad to get out a brief statement of precautions which should be taken in the light of their own experience."  However, Dr. Drinker wrote that he "underst[oo]d that neither Navy nor Maritime [Commission] wants any change in the specifications as the performance with the present materials is entirely satisfactory."

33.  In the effort to achieve its mission, the Navy made trade-offs between the use of asbestos and the potential health impact on personnel.  In the Navy's judgment, the beneficial aspects of asbestos from an engineering standpoint (technical performance, cost, weight, etc.) made it the best thermal insulation available and a critical war material. As knowledge of asbestos health risks evolved, the Navy made sensitive military mission-related decisions about deriving the benefits of asbestos while controlling its risks.  Moreover, when the hazards of asbestos became more fully known to the Navy and the scientific community in the late 1960s, the Navy determined not to do an

immediate fleet-wide elimination of asbestos.  At the time, Navy leaders were concerned that a large scale, immediate asbestos removal program would pose at least three problems: excessive cost; mission impairment; and increased health hazards to removal crews from disturbing fixed, in-place asbestos.

34.   Dr. Drinker and his Navy colleagues published the results of the study he had suggested in W.E. Fleischer, et al., "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels," 28 *Journal of Industrial Hygiene & Toxicology* 9-16 (Jan. 1946).  (Exhibit K).  The study reaffirmed the Navy's position regarding acceptable occupational dust exposure levels and dust control strategies.  They offered the conclusion that "[asbestos] pipe covering is not a dangerous trade."

35.   The conclusions of this study were carried into practice in Navy workplaces following World War II.  The January 1947 issue of the Navy's *Safety Review* publication noted that "[e]xposure to asbestos dust is a health hazard which cannot be overlooked in maintaining an effective industrial hygiene program."  (Exhibit L).

36.   Also during the second half of the 1940s, the American Conference of Governmental Industrial Hygienists ("ACGIH") evaluated the issue of asbestos exposures.  This entity, comprised entirely of industrial hygienists with links to the government and academia, published threshold limit values for acceptable exposures to asbestos dust in the workplace.  These standards were periodically updated over the years.  Representatives of the Navy, trained as industrial hygienists, participated in the ACGIH.  In recognition of the potential hazards associated with exposure to asbestos dust, a 1955 Navy Bureau of Medicine instruction adopted the ACGIH's threshold limit value for exposure to asbestos dust among Navy personnel.  (Exhibit M).  The 1955

threshold limit value as promulgated in the Navy instruction was the same level to which the Navy had sought to control exposures during World War II.

37.  During the 1950s, the Navy continued to prescribe safe work practices to address potential shipyard hazards associated with exposure to asbestos dust.  For example, a 1950 General Safety Rules Manual issued by the Puget Sound Naval Shipyard instructed workers to "[w]ear dust type or air-fed respirators for . . . handling amosite [asbestos] insulating materials. . . ."  (Exhibit N).

38.  In 1957, the Navy convened at the Boston Naval Shipyard a "Pipe and Copper Shop Master Mechanics' Conference" to address issues of concerns to those in the pipefitters' trade.  At the conference were personnel from all twelve Navy shipyards and the Navy's Bureau of Ships in Washington, D.C.

39.  The prepared remarks of a Long Beach Naval Shipyard official, included in the Minutes of the Conference reflect the Navy's stated policy that pipe insulators and laggers who handle asbestos products should wear respirators:

> Asbestos, when handled dry, produces vast amounts of silica dust. . . .  [T]he material can be dampened to reduce the amount of dust liberated.  However, the specified type of amosite [asbestos] for use on cold water piping is water repellent.  Also material which must be removed from an existing installation is dry and powdery, being an excellent dust producer. . . .

> [D]uring 1956 eleven deaths from asbestosis were reported on the Pacific Coast alone. . . .

> I know that two of my insulators are now afflicted with this condition. How many more will become afflicted is something which I hesitate to predict.

> Again the solution is obvious. Remove the cause by substituting other products. . .

> In the meantime, the answer is the wearing of respirators by all who handle asbestos products.

(Exhibit O).

40. A New York Naval Shipyard official added that if those working with asbestos insulation have not been "told . . . to put on masks, you are more or less the cause of their trouble." That same official added:

> I think everyone, who has people doing this type work, should warn their people regarding the handling of this material. With the proper handling of it on the job, and it has always posed a very big problem, because the men don't want to wear the masks, or get this dread disease. It is difficult to protect them. After a couple of years of mandatory wearing masks, I think they should realize the danger. I think everyone ought to enforce the wearing of masks. Don't forget this is something that injures people's health. We should do something about it – and fast, and I am convinced that what we are doing is not enough. We should not have people handle this material withou[t] protection.

41. On January 7, 1958, the Department of the Navy issued a "Safety Handbook for Pipefitters," which explicitly addressed the asbestos hazard and again set forth Navy policy for controlling this hazard. (Exhibit P). This handbook – one of many safety handbooks issued by the Navy – stressed that "[a]sbestos dust is injurious if inhaled," and warned those working with asbestos insulation materials to "[w]ear an approved dust respirator for protection against this hazard."

42. The early 1960s brought still further development of the Navy's policies and practices to protect workers from asbestos-related health concerns. For example,Captain H.M. Robbins, a Navy physician, and W.T. Marr, a Navy industrial hygienist from the Long Beach Naval Shipyard, published the article entitled "Asbestosis" in the October 1962 issue of the Navy's internal *Safety Review* publication. The article addressed the potential for exposure to asbestos aboard ships:

> Aboard ship, a great variety of insulation is performed. Insulation blocks are shaped with a saw, pads are supplied to fittings, insulation cement is applied to blocks and covered with asbestos cloth. These and other operations take place in nearly all compartments; however, most work is done in the machinery spaces. By far the greatest potential exposure to asbestos fibers occurs during ripout of old insulation for ship overhaul or reconversions.

The article concluded that "[t]he worker's best protection is to avoid careless creation of dusty conditions, use damp material when possible, and wear respiratory protection constantly." (Exhibit Q).

## QUESTION 2:

## HOW DID THE NAVY ADDRESS HEALTH AND SAFETY ISSUES RELATING TO ITS PERSONNEL IN THE 1940s, 1950s AND 1960s?

43. By way of general background with respect to the issue of warnings, an overarching aspect of the Navy's approach to this issue during the 1940s, 1950s and 1960s was its commitment to maintaining complete control over existing military specifications, policies and procedures with respect to asbestos-containing materials and worker practices with those materials. The Navy maintained a fierce autonomy over hazard recognition and control, because the Navy considered itself the ultimate authority on naval systems and military workplaces. Regardless of the source of other information, the Navy viewed its unique knowledge as a strategic advantage in addressing hazard identification and control in its workplaces.

44. The Navy has historically directed all aspects of policy and procedure addressing the health and safety of Navy personnel. This direction has encompassed policies, practices and procedures to protect workers from dangers posed by exposure to asbestos.

45. The Navy asserted for itself the role as final arbiter of what was best with respect to industrial hygiene in its unique workplaces to carry out its national defense mission. The Navy's reasons for this approach include: harmonizing industrial hygiene

with its overall operations; maintaining security of its facilities; and unifying communications to its workers.

46. The Navy's insistence on autonomy in this area dates to the earliest days of the Navy's involvement in industrial hygiene in its facilities and on its vessels. For example, in 1941, the U.S. Labor Department's Bureau of Labor Standards offered to conduct inspections of health and safety conditions in Navy shipyards. Navy leaders rejected this offer. In a memorandum to Navy Surgeon General McIntire (Exhibit P), Commander Charles S. Stephenson, head of the Division of Preventive Medicine within the Navy's Bureau of Medicine and Surgery, offered "[n]otes for consideration when you call on Assistant Secretary [of the Navy Ralph A.] Bard." Commander Stephenson advised Admiral McIntire that Assistant Secretary Bard

> asks specifically what the policy is concerning invitation of…the Bureau of Labor Standards, Labor Department into the Navy Yards to make a survey of the welding and other hazards. I told him that we had never done that sort of work and recommended against it, as I know who [the Bureau of Labor Standards] intends to send if it should be done.

Navy leaders recognized that other government departments had a high level of expertise, while rejecting the offers of assistance:

> I gave Mr. Bard and the two officers present a complete story of the beginning of this controversy from the Federal Administrator's letter: that is, that the United States Public Health Service had four teams of traveling scientists alleged to be able to make surveys of all of the Navy Yards and make recommendations for the correction of such hazards as were discovered.

He then emphasized:

> I told Mr. Bard that this was not considered the best policy, due to the fact that we had medical officers in the Yards and that in practically all instances recommendations of sound character had been made by medical officers. We saw no need of inviting the United States Public Health Service on its own invitation to do this job.

47.   The Navy's reluctance to accept these offers of assistance was based on concerns regarding possible upset of labor relations, and also for security at Navy facilities.  Stephenson's memorandum makes clear that these concerns originated at the highest levels of Government:

> Likewise, I told him that I had spoken to you and that you had indicated that President Roosevelt thought that this might not be the best policy, due to the fact that they might cause disturbance in the labor element.

(President Roosevelt was familiar with the structure and operation of the Navy's shipyards and other facilities – and in particular with the functioning of the Navy during wartime – from his tenure as Assistant Secretary of the Navy from 1913 until 1920. Admiral McIntire was President Roosevelt's personal physician in addition to being the Surgeon General of the Navy.)

48.   Stephenson's positions were taken even in light of knowledge that not all industrial hazards were adequately controlled at Navy facilities:  "I doubt if any of our foundries would be tolerated if the State industrial health people were to make surveys of them."  Asbestos, too, was discussed as an issue:  "I am certain that we are not protecting the men as we should."

49.   In the late 1960s, as the Navy came under scrutiny for its handling of asbestos-related health issues, its insistence on determining for itself what practices and procedures were appropriate with respect to asbestos in the Navy's unique working environments was again evdient.  On July 30, 1968, Murray C. Brown, Medical Director of the Public Health Service, wrote to Vice-Admiral R.B. Brown, the Chief of the Navy's Bureau of Medicine and Surgery, stating that "[o]ne of our grantees, Dr. Irving Selikoff of New York University, has recently completed a study of non-insulation shipyard

workers' exposure to asbestos," and that "Dr. Selikoff reports he has some interesting

data and has requested that we arrange an information meeting with your Department and

the U.S. Department of Labor to discuss his findings." (Exhibit R). On December 5 of

that same year, Admiral Brown reported to others in the Navy health establishment that

"Doctor I.J. Selikoff of Mount Sinai Hospital, through the news media, stated that he has

warned the Navy and other Federal departments of his findings relating to the unusual

incidence of asbestosis among shipyard asbestos workers. The newspaper articles stated

that the Federal agencies including the Navy have not publicized the hazards." (Exhibit

S).

    50. In a "Hazard Analysis" commissioned in response to this external criticism of

the Navy's safety practices, Commander Rosenwinkel of the Navy's Bureau of Medicine

assured that:

> [T]he Navy's shipyards have for many years been aware of the hazards of
> asbestos and have initiated appropriate safety precautions. Insofar as possible, all
> fabrication work [with insulation] is performed in the shops where adequate
> safety precautions can be observed. These precautions include controlled
> ventilation, use of respirators, and wetting down of the material. During "rip out"
> operations, respirators are worn and ventilation is controlled as far as possible.

Similar language was prepared "for inclusion in a statement to be issued by Rear Admiral

J.J. Stilwell, Shipyard Management Directorate":

> The United States Navy is well aware of the hazards of asbestos to its employees
> engaged in ship construction and ship repair at naval shipyards. Hazard control
> measures implemented by the shipyard medical departments and practices are in
> accordance with accepted standards of industrial hygiene practices in the United
> States. Stringent efforts are directed at keeping the concentration of air borne
> asbestos dust below the level recommended by the American Conference of
> Governmental Industrial Hygienists. An energetic periodic physical examination
> program insures the health of personnel exposed to this hazard.
>
> For more than two years, the Naval Ship Systems Command and the Commander
> of Boston Naval Shipyard have been cooperating with a prominent investigator in

> a study whose ultimate goal is to define safe working conditions with respect to
> air borne asbestos.  Upon the development of further objective, well founded
> recommendations for the control of this hazard, the Naval Ship Systems
> Command, in cooperation with the Bureau of Medicine and Surgery, will take the
> necessary steps to implement them at the naval shipyards and all naval activities.

(Exhibit T).  The message was clear, and consistent:  the Navy would handle asbestos

issues in its own way and through its own channels.

51.   The Navy rejected participation from manufacturers in its efforts to alert its

personnel to potential asbestos hazards in Navy operations.  The Navy pursued the issue

in its own way.  In a 1945 memorandum, Professor Drinker recorded:

> I met with the manufacturers of the materials used at Bath and they stated they
> would be glad to get out a brief statement of precautions which should be taken in
> the light of their own experience and that they would inform their competitors that
> I had asked them to do so.  I understand that neither Navy nor Maritime wants any
> change in the specifications as the performance with the present materials is
> entirely satisfactory.  From a health standpoint we do not believe any
> specification changes are needed.
>
> I suggested to Admiral Mills that it would be very desirable for Navy to examine
> men handling the preparation of [asbestos] pipe coverings and their installation in
> at least two Navy Yards and two Navy contract yards as this is much more a Navy
> than a Maritime problem because the materials are used especially on Navy
> vessels with high pressure steam power plants.  Admiral Mills agreed that such
> studies would be wise before Navy or Maritime accepted this asbestos risk as
> being significant in our general ship construction program.

(Exhibit J).

## QUESTION 3:

**DO THE NAVY'S UNIFORM LABELING PROGRAM AND ITS CONSOLIDATED HAZARDOUS ITEM LIST REFLECT A DESIRE, OR A REQUIREMENT, THAT EQUIPMENT MANUFACTURERS PLACE ASBESTOS-RELATED HEALTH WARNINGS ON THEIR EQUIPMENT OR IN TECHNICAL MANUALS ACCOMPANYING THAT EQUIPMENT?**

52.    The Navy's Industrial Hygiene program with respect to long term occupational health hazards did not depend on the Uniform Labeling Program, SECNAV [Secretary of the Navy] Instruction 6260.3, the Consolidated Health Hazards List, NAVSUP Publication 4500 or manufacturers' technical manuals.

53. The Uniform Labeling Program, had as its stated purpose "to standardize on [sic] labeling requirements for hazardous chemical products. . . ." (Exhibit U).

54.    The Uniform Labeling Program does not require any actions of parties outside of the Navy, including manufacturers of equipment.  It is also clear that the Navy's Uniform Labeling Program was strictly an internal document.  In other words, the program was designed by the Navy, for implementation by the Navy.  It was not intended as a set of requirements governing the activities of outside parties.  The Uniform Labeling Program is an internal Navy program whose addressees are Navy Commands:

> "2. Scope: The instruction applies to the labeling of all hazardous materials throughout the Naval Establishment wherever distribution of hazardous chemical and materials is made to the actual consumer (shop, office, or unit)"

55.    The internal nature of the program is evident from even a cursory review of its provisions:

(a) The Navy Department Standardization Office was directed to assign a Navy project to "standardize the printed labels in respect to quality of paper, size, color, shape, insignia, wording, and design; quality of the glue; specifications for inks including colors of inks); and other related matters."  (Exhibit U at 4.a.);

(b) The Navy's Bureau of Supplies and Accounts was directed to "initiate procedures to have the necessary labels stocked as General Store items for use by all naval activities."  (Exhibit U at 4.b.);

(c)  Classification of hazardous chemicals was to "be accomplished through the joint efforts of the technical bureaus in that each Bureau shall be responsible for passing on those aspects, of any single item, which fall within its technical purview."  (Exhibit U at 4.c.).

(d)  The document listed the responsibilities of a Navy Safety Precautions Board, and of Navy bureaus and offices, and of the Marine Corps, in implementing the program.  (Exhibit U at 4.d & 4.e.).

56.  Indeed, the Uniform Labeling Program expressly states that it does not impose any requirements on manufacturers of products.  Consistent with its focus on chemical materials and substances, the document makes reference to container labeling that may be necessary for intrastate or interstate shipping, and to labeling by "manufacturers of chemicals" in accordance with Manufacturing Chemists' Association guidelines.  (Exhibit U at 2.a.).

57.  The Uniform Labeling Program was prompted by "[t]he rapid development of new chemical products and the introduction of new chemical processes," and by the Navy's view that "[w]arning labels affixed to containers of hazardous chemicals are one

of the most practical means of accomplishing th[e] objective" of ensuring that Navy personnel take "precautionary measures . . . during the handling of toxic and dangerous chemicals." (Exhibit U at 3).

58. Throughout the SECNAV Instruction describing the Uniform Labeling Program, as the foregoing language makes clear, the focus is on *chemical* products, and on the appropriate labeling for containers of *chemical* products. The document includes as an enclosure an alphabetical listing of materials it covers, all of which are toxic chemicals or materials. There is no mention of or suggestion that the program has any applicability to equipment such as pumps or valves, or to products such as gaskets or packing. Notably as well, there is no mention anywhere in Uniform Labeling Program of asbestos.

59. The documents referenced in the Uniform Labeling Program also refer to labeling of containers of hazardous *chemicals*. For instance, there is reference to the Manufacturing Chemists' Association's Manual L1, "A Guide for the Preparation of Warning Labels for Hazardous Chemicals." (Exhibit V). Like the Uniform Labeling Program itself, Manual L1 expressly states that it is intended to provide information to "every person using, handling or storing *chemicals*." It expresses the view that "[t]he most practical means" of disseminating such information is "by warnings affixed to containers of hazardous *chemicals*." (Exhibit V at 5 (emphasis supplied)). There is nothing in the document to suggest that it relates to instructional or other documentation accompanying machinery or equipment, or that it relates to finished products such as gaskets or packing.

60.   Any suggestion that the Uniform Labeling Program imposed internally within the Navy, much less to manufacturers of machinery or equipment, the responsibility for labeling of asbestos-containing materials is belied by the Navy's own implementation of the program.  For example, in a January 15, 1960 Occupational Hazards Release (Exhibit W) summarizing significant information on occupational health and industrial hygiene from through the Navy and distributed by the Chief of the Navy's Bureau of Medicine and Surgery, reports on the review by a Navy shipyard of new products "[i]n accordance with SECNAV Instruction 6260.3 and BUSHIPS Instruction 6260.3 on labelling toxic materials."  With respect to "Hy-Temp Block Insulation," an insulating material containing 12-15% asbestos, the Navy concluded as follows:  "No label."  (Exhibit W).  The fact that the Navy determined that no hazard label was appropriate for an asbestos-containing insulation material of the type whose hazards it had been aware of and discussing since the 1920s is inconsistent with the notion that the Navy sought, or would have accepted, asbestos-related warnings affixed to equipment or machinery or in technical documentation relating to such items.

61.   A review of the Navy's 1969 Consolidated Hazardous Item List, NAVSUP Publication 4500 (Exhibit X) issued more than a decade later reveals that the document had the same focus and purpose as the Uniform Labeling Program.  The document expressly relates to labeling of "containers," and it states that the purpose of labeling it requires is "to warn users of the potential dangers involving the use of the material in the container."  (Exhibit X at VIII).  There is no suggestion that the document applies to equipment or its manufacturers.  Indeed, as with the Uniform Labeling Program, the

25

Consolidated Hazardous Item List is an internal Navy document, describing procedures intended to be implemented by the Navy.

## QUESTION 4:

**DID THE NAVY'S OCCUPATIONAL HEALTH AND INDUSTRIAL HYGIENE PROGRAMS TO CONTROL LONG-TERM HEALTH HAZARDS SUCH AS ASBESTOS IN THE 1940s, 1950s AND 1960s ENCOMPASS MILITARY SPECIFICATIONS FOR EQUIPMENT AND DOCUMENTATION ACCOMPANYING EQUIPMENT?**

62.  As a former Navy officer I have a general understanding of Military Specifications.  Military specifications were not among the means by which the Navy sought to protect its personnel against long-term health issues such as asbestos exposure. Rather, protection against such hazards was undertaken, through the Navy's Bureau of Medicine & Surgery, through a comprehensive system aimed at identifying and evaluating potential threats to the long-term well-being of Navy personnel , and developing appropriate training and procedures to mitigate those threats.

63.  Military specifications were an important component of the process by which the Navy interacted with various vendors and ensured that products and material it acquired met the Navy's needs.

64.  During my direct experience as an officer and occupational medicine physician in the Navy, and as a member of the occupational health and safety structure of the Navy, along with my research and my analysis of thousands of Navy documents, have revealed no documentation or other mention of any Navy discussion of military specifications as a component of control of asbestos-related health issues.  Rather, such issues were, as discussed above, the subject of extensive research, investigation and discussion, with appropriate guidance and information disseminated through channels

26

other than military specifications.  This was appropriate in that, while military specifications were outward looking – directed to vendors outside the Navy – development and implementation of protective measures regarding asbestos was viewed as an internal Navy issue.

65.  The language in military specifications governing technical manuals for equipment utilizes language that is wholly consistent with my overall experience that the Navy did not view manufacturer labeling or warning as an important, or in many instances an appropriate, means of protecting against exposure to ubiquitous, well-known, long-term potential health hazards such as asbestos.  For example, MIL-M-15071D, dated June 6, 1961 and governing "Manual, Service (Instruction Books) for Shipboard Electrical and Mechanical Equipment" (Exhibit Y), states that use of cautionary language "should be as sparing as is consistent with real need."  (Para. 3.3.6).

66.  The Navy's direction that warnings in technical manuals be "sparing" is wholly consistent with my experience that the Navy saw little value, and much potential for confusion, in extensive use of caution labels addressing common hazards or conditions, particularly when no threat of immediate injury or harm to individuals or equipment was present.  Rather than depending on equipment signage or labeling, the Navy put its efforts into work practice training, specifications for materials being used in its unique workplaces, and the hierarchy of industrial hygiene controls.

67.  The notion that the Navy sought through military specifications relating to equipment or machinery to implement an occupational health or industrial hygiene program with respect to common, long-term health hazards also is inconsistent with the fact that, despite years of research and investigation into the Navy's programs for such

matters – both in general and with specific reference to asbestos – I have not located or become aware of a single instance in which the Navy, at any time during the 1920s through the 1960s, instructed or permitted a supplier of engineering equipment for a Navy vessel or facility to affix or provide any asbestos-related warning with its equipment.  The Navy has not depended on equipment warnings in its workplaces concerning long-term occupational health issues.

68.   In addition, a warning in technical manuals regarding equipment relating to gasket or packing materials associated with that equipment would, during the period in question, have been inconsistent with the Navy's own thinking regarding the potential for asbestos-related hazards from those materials.  For example, a December 9, 1968 U.S. Department of the Navy Memorandum regarding "Hazards of Asbestos" stated that

> [a]ll of the asbestos in [gasket and packing materials] is fabricated as cloth, rope or compressed sheet with binders, so that the items are not friable when they are cut.  Thus, these items do not cause dust in shipboard applications.  In addition, in many instances, they are received already incorporated in the finished assembly such as a valve, and do not require fabrication by the shipyard.  For these reasons, packings and gaskets containing asbestos are not considered to be a significant health hazard.

(Exhibit Z).  In my experience, the Navy would not have permitted warnings labeling as to matters it did not believe presented a hazard.

## QUESTION 5:

## DOES THE FACT THAT THE NAVY PERMITTED SOME WARNINGS IN EQUIPMENT TECHNICAL MANUALS RELATING TO SOLVENTS SHOW THAT NAVY WOULD HAVE PERMITTED ASBESTOS-RELATED WARNINGS ON MACHINERY OR IN TECHNICAL MANUALS RELATING TO IT?

69. Examples of warnings that were permitted in technical manuals reinforced my opinion of the Navy's focus on immediate hazards to life and equipment operation as being appropriate for inclusion in equipment manuals. Examples of health issues that present an immediate hazard to life and equipment include solvents which have long been recognized as material that present both inhalation and flammability hazards. Both of these hazards can, of course, result in immediate, severe injury or damage.

70. Even carbon tetrachloride which, while a solvent, is not flammable, is hazardous based in part on its potential to break down and release toxic phosgene gas at elevated temperatures. The release of phosgene gas, which was a much-feared and terrible chemical weapon during World War I, presents an immediate hazard to users or others in the vicinity. Carbon tetrachloride also presents an immediate and life-threatening asphyxia hazard when volatilized in enclosed spaces.

71. The potential for immediate injury due to inhalation or explosion presented by solvents presents a hazard fundamentally different from the type of long-term disease risk that the Navy has long known to be associated with exposure to asbestos.

72. An acute injury or accident hazard of the type associated with solvents is a type of "safety" risk long viewed by the Navy as the responsibility of safety officer and the line command. By contrast, asbestos presents a long-term, environment threat to "health" of personnel. The Navy has traditionally handled such health risks under the

technical perview of the medical department.  The fundamental distinction between safety and industrial health is evident, for example, from the "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" (Exhibit D), which present separately "Minimum Requirements for Industrial Health" and "Minimum Requirements for Safety."

73.  As a consequence, I do not regard the fact that the Navy permitted, or perhaps required, warnings regarding solvents in some equipment technical manuals as supporting the proposition that it likewise wanted, or would have permitted, asbestos-related cautionary language in those documents during the period in question.

## SUMMARY OF OVERALL OPINIONS AND CONCLUSIONS

74.  The Navy made its decisions with respect to the use of asbestos in accordance with Navy operating requirements and in furtherance of Navy missions, and in light of the Navy's knowledge of associated health hazards at the time and of its perception of the requirements of federal law.  The Navy's extensive and evolving knowledge of the hazards of exposure to asbestos and the means to control those hazards were weighed by the Navy against the benefits provided by its use.  These benefits included meeting national defense needs in a standardized, efficient and low-cost manner that would not delay or hinder ship availability, especially during times of war.  The Navy was informed in this decision-making by close contacts and liaison with relevant academic communities, professional organizations and other government agencies.

75.  Similarly, the Navy's handling of and programs regarding workplace safety and hazard communication, as they related to asbestos and other issues, reflected the

Navy's balance of various considerations, including combat readiness, maintenance of the necessary command structure, the needs of discipline and the hierarchy of risks presented by life and work aboard a combat vessel.  In general, the Navy chose to address long-term workplace health issues in the course of training for various trades and jobs, rather than using labeling or other written materials to accompany products into the workplace.

76.  The Navy's occupational health program in no way depended upon, required or sought advice from equipment manufacturers regarding long-term occupational health issues, including those posed by exposure to asbestos dust.  I have not uncovered – nor would I have expected to based on my research and experience and the extent of the Navy's knowledge in these areas – situations in which the Navy solicited from suppliers of shipboard equipment any information or guidance regarding the appropriate methods for the prevention of exposure to asbestos.   Given the Navy's state-of-the-art knowledge concerning asbestos related hazards and its robust safety and health program, it would be unreasonable to assume that the Navy would have accepted any advice pertaining to asbestos related safety precautions from a manufacturer of equipment.

77.  My opinions set forth herein are held to a reasonable degree of scientific certainty.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.   Executed on this 6TH day of August 2011 at _Brookline, MA_

Samuel A. Forman, M.D.