MEALEY'S LITIGATION REPORT: Asbestos

Vol. 24, #15 September 2, 2009

# Commentary

## The Naming Game

By
Charles E. Bates
Charles H. Mullin
and
A. Rachel Marquardt

*[Editor's Note: Charles E. Bates, Ph.D., and Charles H. Mullin, Ph.D., are both from Bates White in Washington, D.C. A. Rachel Marquardt, Ph.D., is from Bates White in San Diego, Calif. Copyright 2009 by Charles E. Bates, Charles H. Mullin, and A. Rachel Marquardt. Replies to this commentary are welcome.]*

## Introduction

During the bankruptcy wave of the early 2000s, the most significant asbestos defendants of the prior decade disappeared from the tort system. The departure of these major defendants removed the source of about two-thirds of all the money plaintiffs had been receiving. This upheaval radically changed the litigation landscape. The solvent defendants that remained faced litigation without their prior codefendants, and new defendants were tested. Recently, many of the former tort defendants finally emerged from bankruptcy with new 524(g) trusts, which they established to cover their tort liability. One of our prior papers examined the size of these trusts and the amount of money available in them to compensate claimants.[1] This paper examines in more detail how these bankruptcies affected the asbestos litigation environment.

Specifically, we discuss (1) the changing pattern of defendant naming conventions in mesothelioma complaints and (2) the ways that the emergence of the recent 524(g) trusts changed and will continue to change total recoveries for mesothelioma claimants.

We used mesothelioma tort claims from Alameda County, California, as the basis for our study. This venue has a well-established history of asbestos litigation and provides a web site with the requisite defendant information for each claim. Exhibit 1 shows that, as bankrupt defendants were leaving the system, the remaining solvent defendants were named twice as often. Additionally, plaintiffs identified new defendants to test as viable targets. In total, the number of defendants named in a typical complaint rose, on average, from fewer than 30 in the 1990s to more than 60 between 2003 and 2006. More recently this number has dropped back down to about 40. This is not surprising, because dismissal rates increased substantially as the remaining solvent defendants were tested subsequent to the bankruptcy of their codefendants.



1



Exhibit 1: Average number of defendants in a mesothelioma complaint by filing years

While the solvent defendants were being tested, the bankrupt defendants were going through Chapter 11 reorganizations. Some of these bankrupt companies now have confirmed plans of reorganization and have established 524(g) trusts to compensate claimants. A typical mesothelioma plaintiff could collect up to $1.3 million from confirmed trusts today. Moreover, other bankrupt companies are working through reorganization plans that will set up additional asbestos trusts. Once these additional trusts are established, a typical mesothelioma plaintiff could recover about $2 million, assuming that a plaintiff could collect from every trust. This potential recovery greatly exceeds the average tort recovery of a mesothelioma claimant today or in the past. These totals assume that a plaintiff could collect from every trust, but every plaintiff might not qualify for every trust. Assuming instead that historical naming patterns prevail, a plaintiff would collect $1.2 million. This is about the same as a plaintiff would recover on average from the solvent defendants that have "stepped into the tort shoes" of their bankrupt codefendants.

## Naming Patterns In Alameda County

Alameda County, California, served as the basis for this study. Since the 1970s, this jurisdiction has been one of the established venues for asbestos litigation. We examined in detail the named defendants on the Alameda County mesothelioma docket over the last 19 years. The Superior Court in Alameda County maintains a web site that provides information related to complaints, such as parties and actions. From this web site, we obtained a sample of about 800 mesothelioma complaints filed after 1990.

For each complaint, we captured information on filing date, defendants, and dismissals. Related-party complaints were combined. For example, because California is a two-injury state, one disease incidence can yield both a personal injury complaint and a wrongful death complaint. Whenever two complaints were associated with the same disease incidence, the information on the complaints was combined. The compiled data set was used to establish the naming patterns and dismissal rates over time.

Prior to the bankruptcy wave, a typical mesothelioma plaintiff named about 25 to 30 defendants. Exhibit 2 displays the total number of defendants named, on average, during the 1990s and distinguishes between

defendants that remained solvent and those that subsequently went bankrupt. Exhibit 2 shows that this latter group constitutes the majority of defendants listed in a typical mesothelioma complaint in the 1990s. These bankrupt defendants were the largest payers at that time, including Owens Corning and members of the Center for Claims Resolution (CCR).

The number of defendants named was significantly affected by the bankruptcy wave. Certain defendants, like G-I Holdings and Owens Corning, were, before their bankruptcies, named in almost every mesothelioma complaint. Once they became insolvent, these companies were rarely mentioned in complaints. Similar patterns were observed for numerous prominent defendants like Turner Newall, Armstrong, and others. Exhibit 3 shows the corresponding percentages for 11 defendants that went bankrupt during the bankruptcy wave.



Exhibit 2: Average number of defendants in a mesothelioma complaint by filing year

Exhibit 3: Examples of established bankrupt defendants and the percentage of mesothelioma tort complaints in Alameda County in which they were named

| Company | Percentage of complaints prior to the bankruptcy |
|---|---|
| G-I Holdings | 95% |
| Turner Newall | 95% |
| Keene Corporation | 94% |
| Fibreboard | 90% |
| Armstrong | 93% |
| Owens Corning | 88% |
| AP Green Industries | 63% |
| Babcock & Wilcox | 78% |
| Flexitallic | 74% |
| Pittsburgh Corning | 53% |
| US Gypsum | 40% |

How did the departures of numerous established defendants affect the naming patterns? Exhibit 4 shows how the naming pattern changed from the 1990s through today. Despite the fact that many of the established defendants disappeared from the tort environment, the number of defendants named in each complaint did not decrease after the bankruptcy wave.

Additionally, Exhibit 4 illustrates a change in the type of defendants listed on complaints. As major defendants exited the tort environment during the bankruptcy wave, plaintiffs typically expanded the list of established codefendants that they named in each complaint. The number doubled from 13 in the late 1990s to 26 in 2003. A closer look at a list of 25 solvent defendants that had a substantial naming his-



Exhibit 4: Average number of defendants in a complaint by filing years

In fact, Exhibit 4 clearly shows that the average number of defendants listed in each complaint started to increase during the bankruptcy wave and continued to go up until recently. As the bankrupt companies exited the tort environment, the number of defendants named in a complaint increased, on average, from fewer than 30 on average to more than 60 defendants per complaint. More recently, this number has dropped back to about 40.

tory illustrates this point. Exhibit 5 shows the average likelihood that these 25 solvent defendants would be named over time. While the companies faced a moderate risk, less than 30%, of being named in a mesothelioma complaint prior to the bankruptcy wave, the likelihood went up to nearly 60% in 2002 through 2006. In more recent years, the likelihood decreased, but at over 40%, it is still substantially higher than what it was prior to the bankruptcy wave.

**Exhibit 5: Average likelihood of selected established defendants to be named**

| Year | Likelihood of being named |
|---|---|
| 1990–1999 | ~28% |
| 2000 | ~40% |
| 2001 | ~48% |
| 2002 | ~55% |
| 2003–2006 | ~51% |
| 2007–2009 | ~41% |

The biggest change in naming patterns, however, originated from new defendants appearing in complaints after the bankruptcy wave. Exhibit 4 shows that on average more than 50% of all defendants appearing in a post-2003 mesothelioma complaint had not been named prior to the bankruptcy wave. This latter group of defendants (new defendants) is mostly comprised of small companies. While some companies in the group, like Imo Industries or A. W. Chesterton, are now frequently named in Alameda County complaints, the majority of the newly named companies appeared in fewer than three complaints in the last decade. This is a different pattern than that which existed in the 1990s, when the same companies appeared repeatedly in most complaints.

The number of defendants listed in a complaint has declined since 2006. After a period of unprecedentedly high numbers of defendants named in each complaint following the bankruptcy wave, plaintiffs recently became more selective about which companies they name. This makes sense because plaintiffs were getting dismissed without payment on a much larger share of the defendants they named from 2003 to 2006 than they did in the 1990s.

In fact, the rise in the number of defendants listed in a complaint corresponded to an increase in the number of dismissals.[2] As demonstrated in Exhibit 6, over 70% of all post-2002 complaints against individual defendants were dismissed without payment. The dismissal rate is highest for new defendants — companies that have been named as defendants in Alameda County in more recent years but that historically were not part of the asbestos tort environment. As the number of established, solvent defendants listed in a typical mesothelioma complaint doubled from the pre- to postbankruptcy period, so did the dismissal rate for this group of defendants.

**Exhibit 6: Dismissal rate of resolved Alameda County complaints by type of defendant**

| | Bankrupt defendants | Solvent established defendants | | Solvent new defendants |
|---|---|---|---|---|
| | Prebankruptcy wave | Prebankruptcy wave | Postbankruptcy wave | Postbankruptcy wave |
| Percentage settled | 77% | 67% | 29% | 27% |
| Percentage dismissed | 23% | 33% | 71% | 73% |

**Total Recoveries**

Today plaintiffs have two recovery sources for mesothelioma complaints: tort-based settlements and verdicts (the "Tort System") and compensation from 524(g) trusts (the "Trust System"). Our previous study (reported in our article "Show Me The Money")[3] showed that today the typical mesothelioma plaintiff recovers between $1.0 million and $1.4 million from the Tort System. This is an increase of about 4% per year since 2000, which is the year the Rand Corporation valued the average mesothelioma claim at $900,000. That is, the average mesothelioma recovery amount increased slightly more quickly than the general monetary inflation rate in recent years.

trates the above point. About 30 former defendants that filed for bankruptcy protection have established 524(g) trusts. On average, each of the trusts associated with bankruptcies of the last decade can compensate a mesothelioma claimant at over $50,000. Additionally, 11 former defendants filed for bankruptcy protection and are expected to set up trusts in the future.

If a mesothelioma claimant were to collect from all current and future trusts, the estimated average recovery would be about $2 million; this is almost twice the average tort recovery amount. Exhibit 7 summarizes the potential trust recoveries.

**Exhibit 7: Estimated trust recoveries for mesothelioma claimants**

| Trust category | Number of trusts | Face value[4] | Cash value | Estimated recovery |
|---|---|---|---|---|
| Confirmed trusts | 30 | $4,600,000 | $1,300,000 | $800,000 |
| Upcoming trusts | 11 | $2,700,000 | $800,000 | $400,000 |
| Total | 41 | $7,200,000 | $2,000,000 | $1,200,000 |

The recoveries from the Trust System are not known. Currently, 524(g) trusts do not disclose their filings or payments to claimants; they only disclose aggregate claim counts and expenditures and the scheduled face values and the payment amounts (cash values) for each disease class. This precludes a claim-by-claim analysis of trust recoveries. However, we can estimate typical recoveries from the Trust System by using the aggregate information provided by the trusts, together with the naming patterns observed in Alameda County. That is, if we assume that the typical plaintiff submits claims to trusts with the same frequency that now-bankrupt defendants were named in the Tort System, we can use the historical naming pattern to estimate how much a typical claimant will recover in total from trusts.

We find that the trust-based recovery amount is approaching the typical Tort System recovery amount. In essence, the latest bankruptcy wave has resulted in two parallel systems of compensation for individuals with asbestos-related disease, and both of these systems provide complete compensation.

A closer examination of Alameda County data illus-

The group of confirmed trusts in Exhibit 7 includes those associated with companies that filed for bankruptcy protection early on, such as Johns-Manville and National Gypsum. The cash values for each of these old trusts are rather small; they do not exceed $30,000. The majority of the confirmed trusts, however, are associated with defendants that filed for bankruptcy protection after 2000. These trusts include among others, Owens Corning Fibreboard Asbestos Personal Injury Trust, United States Gypsum Asbestos Personal Injury Settlement Trust, and Federal Mogul U.S. Asbestos Personal Injury Trust. The average mesothelioma cash value for this group is $54,000.

Finally, the group of upcoming trusts comprises 11 defendants that filed for Chapter 11 bankruptcy protection but which have not yet established 524(g) trusts. Companies in this group include some from the beginning of the bankruptcy wave, such as G-I Holdings, and others that only recently filed for bankruptcy protection, e.g., Plant Insulation, which filed for bankruptcy protection in April 2009.

As illustrated in Exhibit 7, if a mesothelioma claim-

ant were to collect from all confirmed trusts today, the recovery would be $1.3 million. This amount is on the high side of the average tort system recovery of between $1.0 and $1.4 million. Given that additional trusts will be established in the near future, the trust recovery could rise above $2 million. This amount would well exceed the average tort recovery.

Historically, not all defendants were named on every mesothelioma complaint. Presumably, not every plaintiff will file a claim against every trust, just as not every defendant will be named in every complaint. The estimated recovery amount in Exhibit 7 assumed that a trust would receive claims at the same rate as the associated defendant in the Tort System did. If claimants in the Trust System continue to name trusts in the same manner as they named the formerly solvent defendants in the Tort System, the average recovery for a mesothelioma claimant today would be $800,000. Given that additional trusts will be established in the future, the trust recovery per claimant will likely go up to about $1.2 million. This is about the same as the average tort recovery today.

This amount probably underestimates the typical mesothelioma plaintiff's recovery from the Trust System. The propensity to file a claim against a trust is higher than the propensity to name the predecessor defendant in the Tort System. Filing a claim against a trust is an administrative procedure. The metrics, the recovery amount, and the documents required are well known. Finally, the Trust Distribution Procedures' requirements for collection against a trust are typically less strict than the burden of proof in the Tort System.

In summary, the many trusts that have been established since the bankruptcy wave in 2000 to compensate individuals with asbestos-related injuries have resulted in an administrative system parallel to the Tort System. Today, the compensation that a plaintiff can receive from the trusts is comparable to the compensation they can receive under the Tort System. After additional trusts are funded, the total compensation from the trusts will exceed the average tort recovery.

### Endnotes

1. Charles E. Bates and Charles H. Mullin, "Having Your Tort and Eating It Too?" *MEALEY'S Asbestos Bankruptcy Report* 6, no. 4 (2006): 1–5.

2. The web site provides the register of actions that shows if a particular defendant was dismissed with or without prejudice, and this information tells us, in turn, which defendants were dismissed without making a payment.

3. Charles E. Bates and Charles H. Mullin, "Show Me The Money," *MEALEY'S Litigation Report: Asbestos* 22, no. 21 (2007): 1–7.

4. Average mesothelioma value was used whenever available. If not available, scheduled value was used instead. ■