## U. S. District Court
### Eastern District of Louisiana (New Orleans)
### CIVIL DOCKET FOR CASE #: 2:11-cv-02097-JCZ-KWR

Dupre et al v. Todd Shipyards Corporation
Assigned to: Judge Jay C. Zainey
Referred to: Magistrate Judge Karen Wells Roby
Case in other court: Civil District Court, Parish of Orleans,
           10-11337 L/6
Cause: 28:1441 Petition for Removal- Asbestos Litigation

Date Filed: 08/24/2011
Jury Demand: Plaintiff
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Diversity

**Plaintiff**

**Ronald Joseph Dupre**           represented by    **Gerolyn Petit Roussel**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Brett Clement**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Lauren Roussel Clement**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Perry Joseph Roussel , Jr.**
Roussel & Clement
1714 Cannes Dr.
Laplace, LA 70068
985-651-6591
Email: rousselp@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marvin Andrew Dupre**         represented by    **Gerolyn Petit Roussel**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Jonathan Brett Clement**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Roussel Clement**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Perry Joseph Roussel , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian Anthony Dupre**                  represented by   **Gerolyn Petit Roussel**
*major child of Freddie Joseph Dupre*                     (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jonathan Brett Clement**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lauren Roussel Clement**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Perry Joseph Roussel , Jr.**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Freddie Joseph Dupre**                 represented by   **Gerolyn Petit Roussel**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jonathan Brett Clement**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lauren Roussel Clement**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Perry Joseph Roussel , Jr.**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rose Mae Naquin Dupre**              represented by   **Gerolyn Petit Roussel**
*widow of Freddie Joseph Dupre*                        (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jonathan Brett Clement**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Lauren Roussel Clement**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Perry Joseph Roussel , Jr.**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eagle, Inc.**                        represented by   **Douglas Kinler**
                                                       Simon, Peragine, Smith & Redfearn,
                                                       LLP
                                                       Energy Centre
                                                       1100 Poydras St.
                                                       30th Floor
                                                       New Orleans, LA 70163-3000
                                                       (504) 569-2030
                                                       Email: dkinler@spsr-law.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michael David Harold**
                                                       Simon, Peragine, Smith & Redfearn,
                                                       LLP
                                                       Energy Centre
                                                       1100 Poydras St.
                                                       30th Floor
                                                       New Orleans, LA 70163-3000
                                                       (504) 569-2030
                                                       Email: michaelh@spsr-law.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Susan Beth Kohn**
                                                       Simon, Peragine, Smith & Redfearn,
                                                       LLP
                                                       Energy Centre
                                                       1100 Poydras St.
                                                       30th Floor

New Orleans, LA 70163-3000
(504) 569-2030
Email: suek@spsr-law.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Foster Wheeler LLC**                    represented by   **John Joseph Hainkel , III**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Email: jhainkel@frilot.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela M. Bowlin**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Fax: (504) 599-8271
Email: abowlin@frilot.com
*ATTORNEY TO BE NOTICED*

**James H. Brown , Jr.**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
(504) 599-8000
Email: jbrown@frilot.com
*ATTORNEY TO BE NOTICED*

**Meredith K. Keenan**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
504-599-8066

**Peter R. Tafaro**
Frilot L.L.C.
Energy Centre
1100 Poydras St.

Suite 3700
New Orleans, LA 70163-3700
504-599-8060
Fax: 504-524-7887
Email: ptafaro@frilot.com
*ATTORNEY TO BE NOTICED*

**Rebecca Abbott Zotti**
Frilot L.L.C.
Energy Centre
1100 Poydras St.
Suite 3700
New Orleans, LA 70163-3700
504-599-8224
Email: rzotti@frilot.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Electric Company**                    represented by   **John Joseph Hainkel , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela M. Bowlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James H. Brown , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith K. Keenan**
(See above for address)

**Peter R. Tafaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Abbott Zotti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CBS Corporation**                    represented by   **John Joseph Hainkel , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Angela M. Bowlin**
(See above for address)

*ATTORNEY TO BE NOTICED*

**James H. Brown , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith K. Keenan**
(See above for address)

**Peter R. Tafaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Abbott Zotti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Todd Shipyards Corporation**
*and its insurer*

represented by **Sherman Gene Fendler**
Liskow & Lewis (New Orleans)
One Shell Square
701 Poydras St.
Suite 5000
New Orleans, LA 70139-5099
504-581-7979
Email: sgfendler@liskow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles B. Wilmore**
Liskow & Lewis (New Orleans)
One Shell Square
701 Poydras St.
Suite 5000
New Orleans, LA 70139-5099
504-581-7979
Email: cbwilmore@liskow.com
*ATTORNEY TO BE NOTICED*

**Joseph I. Giarrusso , III**
Liskow & Lewis (New Orleans)
One Shell Square
701 Poydras St.
Suite 5000
New Orleans, LA 70139-5099
504-556-4056
Email: jigiarrusso@liskow.com
*ATTORNEY TO BE NOTICED*

**Scott C. Seiler**

Liskow & Lewis (New Orleans)
One Shell Square
701 Poydras St.
Suite 5000
New Orleans, LA 70139-5099
504-581-7979
Email: scseiler@liskow.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Continental Insurance Company**
*(as successor to Fidelity & Casualty
Company of New York)*

represented by **Gerald A. Melchiode**
Galloway, Johnson, Tompkins, Burr &
Smith (New Orleans)
One Shell Square
701 Poydras St.
40th Floor
New Orleans, LA 70139
504-525-6802
Email: jmelchiode@gjtbs.com
*ATTORNEY TO BE NOTICED*

**James Jerauld Reeves , II**
Galloway, Johnson, Tompkins, Burr &
Smith (New Orleans)
One Shell Square
701 Poydras St.
40th Floor
New Orleans, LA 70139
504-525-6802
Email: jreeves@gjtbs.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Owens-Illinois, Inc.**

represented by **Ann Russell Chandler**
Forman, Perry, Watkins, Krutz , LLP
(Jackson)
City Centre Bldg.
200 South Lamar Street
Suite 100
Jackson, MS 39201
601-973-5944
Email: chandlerar@fpwk.com
*ATTORNEY TO BE NOTICED*

**Ronald Dean Church , Jr.**
Forman, Perry, Watkins, Krutz &
Tardy, LLP (New Orleans)
1515 Poydras St.
Suite 1300
New Orleans, LA 70112

504-799-4383
Email: churchd@fpwk.com
*ATTORNEY TO BE NOTICED*

**Walter G. Watkins , III**
Forman, Perry, Watkins, Krutz , LLP
(Jackson)
City Centre Bldg.
200 South Lamar Street
Suite 100
Jackson, MS 39201
601-960-8600
Email: trey@fpwk.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer CropScience, Inc.**
*as successor of liability to Rhone-*
*Poulenc AG Company*
*TERMINATED: 08/24/2011*
*formerly known as*
Amchem Products, Inc.
*TERMINATED: 08/24/2011*
*formerly known as*
Benjamin Foster Co
*TERMINATED: 08/24/2011*

**Defendant**

**Uniroyal, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/24/2011 | 1 | NOTICE OF REMOVAL from Civil District Court, case number 2010-11337 (Filing fee $ 350 receipt number 053L-3159576) filed by Foster Wheeler LLC, General Electric Company, CBS Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H - Notice of Manual Attachment, # 9 Exhibit I, # 10 Civil Cover Sheet)(Hainkel, John) Modified on 8/25/2011 (gbw, ). (Copy to Julie H.) (Entered: 08/24/2011) |
| 08/24/2011 | 2 | Statement of Corporate Disclosure by CBS Corporation identifying Corporate Parent National Amusements, Inc. for CBS Corporation (Hainkel, John) Modified on 8/25/2011 (gbw, ). (Entered: 08/24/2011) |
| 08/24/2011 | 3 | Statement of Corporate Disclosure by General Electric Company (Hainkel, John) (Entered: 08/24/2011) |
| 08/24/2011 | 4 | Notice of Compliance by CBS Corporation, Foster Wheeler LLC, General Electric Company re 1 Notice of Removal. (Attachments: # 1 Certification of Service)(Hainkel, John) Modified to remove linkage on 8/25/2011 (gbw, ). |

| | | |
|---|---|---|
| | | (Entered: 08/24/2011) |
| 08/24/2011 | 5 | Initial Case Assignment to Judge Jay C. Zainey and Magistrate Judge Sally Shushan. (cl, ) (Entered: 08/24/2011) |
| 08/26/2011 | 6 | Statement of Corporate Disclosure by Foster Wheeler LLC identifying Corporate Parents Foster Wheeler Energy Corporation, Foster Wheeler AG, Foster Wheeler AG Switzerland, Foster Wheeler Ltd. Bermuda, Foster Wheeler Holdings Ltd. Bermuda, Foster Wheeler LLC Delaware, Foster Wheeler Energy Corporation Delaware, FMR LLC (Hainkel, John) Modified on 8/29/2011 (gbw, ). (Entered: 08/26/2011) |
| 08/26/2011 | 7 | ORDER OF RECUSAL. Magistrate Judge Sally Shushan recused. Case reassigned to Magistrate Judge Karen Wells Roby for all further proceedings. Signed by Magistrate Judge Sally Shushan on 8/25/2011.(tsf, ) (Entered: 08/29/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/30/2011 13:08:13 | | |
| PACER Login: | ft2212 | Client Code: | 1995-200752 |
| Description: | Docket Report | Search Criteria: | 2:11-cv-02097-JCZ-KWR |
| Billable Pages: | 8 | Cost: | 0.64 |

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 10- 11337          DIVISION " L "          SEC. " "
                                                          06

FREDDIE JOSEPH DUPRE

VERSUS

TODD SHIPYARDS CORPORATION and its insurer, CONTINENTAL INSURANCE COMPANY (as successor to Fidelity & Casualty Company of New York); EAGLE, INC.; OWENS-ILLINOIS, INC.; BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC. F/K/A BENJAMIN FOSTER COMPANY); CBS CORPORATION (F/K/A WESTINGHOUSE ELECTRIC CORPORATION); FOSTER WHEELER LLC; GENERAL ELECTRIC COMPANY; AND UNIROYAL, INC.

FILED:_____          _____
                                              DEPUTY CLERK

## PETITION FOR DAMAGES

The petition of Freddie Joseph Dupre, a person of the full age of majority and resident of the State of Louisiana, with respect represents:

1.

Defendants, Todd Shipyards Corporation (f/k/a Todd-Johnson Dry Docks, Inc.); Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.); Foster-Wheeler, LLC (formerly Foster Wheeler Corporation); Owens-Illinois, Inc.; Bayer Cropscience, Inc. (Successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company); General Electric Company; CBS Corporation (f/k/a Westinghouse Electric Corporation); and Uniroyal, Inc. (hereinafter collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws of the various states of the United States. Asbestos defendants all have their principal place of business in various states of the United States. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

2.

Defendant, Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.), is a domestic corporation with its registered offices in the Parish of Orleans, State of Louisiana. In addition, tortious conduct of Eagle, Inc. and Todd Shipyards Corporation occurred in the Parish

of Orleans. Moreover, Todd Shipyards Corporation is a foreign corporation which, at the time of Freddie Dupre's exposure while employed there, was licensed to do and doing business in the Parish of Orleans, State of Louisiana, with its principal business establishment as designated in its application to do business in the Parish of Orleans. Freddie Dupre's exposure to asbestos occurred in Orleans Parish. Accordingly, venue is proper in Orleans Parish against all defendants pursuant to Louisiana Code of Civil Procedure Articles 42, 73, and 74.

3.

At all material times herein, A. H. Smith, Jack S. Smith, Jr., and J. N. Pharr, were executive officers of Todd Shipyards Corporation with the specific responsibility for the health and safety of Freddie Dupre and his fellow employees during the time Mr. Dupre was exposed to substances which resulted in his mesothelioma and other ill effects related thereto. A. H. Smith, Jack S. Smith, Jr., and J. N. Pharr, have since died or cannot be located, and pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against Continental Insurance Company (as successor by merger to Fidelity and Casualty Company of New York), who sold insurance coverage to Todd Shipyards Corporation and, at all times material herein, were the insurance carriers covering all of the foregoing individuals.

4.

Pursuant to Louisiana Revised Statute 22:1269 (formerly 22:655), plaintiff herein asserts a direct action against Continental Insurance Company (as successor to The Fidelity and Casualty Company of New York), who at all times material herein, was the general liability carrier covering Todd Shipyards Corporation and its executive officers for the liability asserted herein.

5.

Freddie Dupre was employed in various positions by or on the premises of the Todd Shipyards Corporation, from approximately 1944 through 1945. On a daily basis during this employment, Mr. Dupre was exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of his work.

6.

As a result of these exposures to toxic substances, including asbestos, Freddie Dupre contracted asbestos-related mesothelioma and other ill-health effects associated therewith, which was first diagnosed on approximately September 29, 2010.

7.

Defendants, Todd Shipyards Corporation and its executive officers, had the responsibility for the health and safety of Freddie Dupre and his fellow employees during the time Mr. Dupre was exposed to the substances which resulted in his mesothelioma and other ill health effects related thereto. Todd Shipyards Corporation and its executive officers had the responsibility of providing Mr. Dupre with a safe place to work; however, Todd Shipyards Corporation and its executive officers failed to protect Mr. Dupre from the dangers of asbestos dust exposure, for which Todd Shipyards Corporation and its executive officers are liable to plaintiff.

8.

Defendants, Todd Shipyards Corporation and its executive officers, had the responsibility of providing Freddie Dupre with a safe place to work and safety equipment; however they negligently and/or intentionally failed to carry out these duties and failed to protect Mr. Dupre from the dangers of toxic fiber and asbestos dust exposure. Todd Shipyards Corporation allowed and caused Mr. Dupre to be exposed to asbestos and failed to provide a safe place to work. As owner of the premise containing toxic asbestos, Todd Shipyards Corporation failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Mr. Dupre from the unreasonably dangerous conditions created by asbestos which existed on their premises and/or over which defendants had care, custody or control. At all times material herein, standards were in existence which required defendants herein to provide to Mr. Dupre and his co-workers who handled or were exposed to harmful material with protection from the harms of asbestos. Todd Shipyards Corporation failed and/or willfully refused to comply with these standards thereby resulting in exposure to asbestos to Mr. Dupre, thereby resulting in his injuries.

9.

In addition to the above acts of negligence, strict liability, absolute liability, and fault identified throughout this petition, Todd Shipyards Corporation is strictly liable under a theory of premises liability. Todd Shipyards Corporation was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Mr. Dupre would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Dupre knowledge of the dangers to their health from exposure to asbestos fiber.

10.

In addition to the foregoing acts of negligence and intentional concealment, Todd Shipyards Corporation and its executive officers are guilty of the following:

    a) Failing to reveal and knowingly concealing critical medical information to and from Mr. Dupre;

    b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process and/or in connection with the work which exposed Mr. Dupre;

    c) Failing to provide necessary protection to Mr. Dupre;

    d) Failing to provide clean, respirable air and proper ventilation;

    e) Failing to provide necessary showers and special clothing;

    f) Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

    g) Failing to provide necessary and adequate respiratory protection;

    h) Failing to warn employees of the dangers associated with exposure to asbestos;

    I) Failing to use non-asbestos containing products including on jobs where non-asbestos containing products should have been used;

    j) Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

    k) Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

    l) Failing to warn of the dangers of exposure to asbestos;

    m) Requiring employees to dispose of asbestos without precautions to prevent exposure;

    n) Failing to post warnings regarding asbestos and the hazards of same;

    o) Failing to warn employees that exposure to asbestos could cause deadly diseases including mesothelioma, asbestosis, pleural thickening, and pleural plaques; and

    p) Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, and mesothelioma;

These defendants committed these intentional acts knowing full well that Mr. Dupre's injuries would follow or were substantially certain to follow.

-4-

11.

Freddie Dupre was employed in various positions by and on the premises of Todd Shipyards Corporation at their facilities in Orleans Parish. On a daily basis during this employment, he was exposed to dangerously high levels of asbestos in the normal routine course of his work. At all times during these employments, Mr. Dupre was exposed to asbestos and asbestos-containing products manufactured, distributed, and sold by the "asbestos defendants."

12.

As a result of his exposure to asbestos fibers, Freddie Dupre contracted mesothelioma, which was first diagnosed on or around September 29, 2010.

13.

Defendants, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.); Uniroyal, Inc., CBS Corporation (f/k/a Westinghouse Electric Corporation); General Electric Company; Bayer Cropscience, Inc., Foster-Wheeler, LLC (formerly Foster Wheeler Corporation); and Owens-Illinois, Inc. were in the business of manufacturing, fabricating, selling and/or distributing asbestos-containing products, including but not limited to asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, jackets, turbines and/or boilers. These defendants sold, installed, removed and/or abated these products to and/or at Todd Shipyards Corporation at various times while Freddie Dupre was employed at Todd Shipyards Corporation. Additionally, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.), General Electric, and Westinghouse Electric Corporation, and Foster Wheeler LLC would package asbestos products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus, making them liable as the manufacturer under Louisiana law. Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.) also did contracting work at Todd Shipyards Corporation where Mr. Dupre was working thereby exposing Mr. Dupre during their handling of asbestos-containing products. Mr. Dupre was exposed to asbestos-containing products manufactured, distributed and sold by all "asbestos defendants" named in this petition.

14.

The asbestos-containing products manufactured, distributed, sold, and/or used by all "asbestos-defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, defendants failed and refused to warn Freddie Dupre of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos, and that it could cause diseases such as lung cancer, asbestosis, pleural calcification, pleural thickening, mesothelioma, and other cancers.

15.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, sold and/or used by the "asbestos defendants," Freddie Dupre inhaled asbestos fibers. These loose asbestos fibers were emitted by the normal use of said products, proximately causing Mr. Dupre's mesothelioma and other related ill health effects. Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, selling and/or using an unreasonable dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

16.

Prior to the time Mr. Dupre was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana law.

-6-

17.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

18.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Freddie Dupre was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma which was first diagnosed on or around September 29, 2010.

19.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Dupre and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

20.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer, Strabo, and the Roman historian, Pliny the Elder, both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause

asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Freddie Dupre.

21.

By the time Freddie Dupre began working with and around asbestos products, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh-Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, Freddie Dupre was never warned of any hazard associated with asbestos, was never protected by use of adequate ventilation, was required to work next to insulators using asbestos products and worked with and around asbestos-containing products. He never saw a warning on any asbestos product, nor was he warned by any contractor using asbestos products. Despite the fact that all defendants were aware of the hazards of asbestos and other toxic substances to which Freddie Dupre was exposed, they failed and refused to warn of these dangers, and, furthermore, they concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law.

22.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioner in the following manner:

1. The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2. The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:
   a.) To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;
   b.) To assist in the continued pecuniary gain of the defendants

through the sale of asbestos products to an ignorant public;

c.) To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

d.) To provide a defense against lawsuits brought for injury resulting from asbestos disease;

e.) To prevent relevant medical inquiry about asbestos disease;

f.) To mislead the general public, and the workers, including Freddie Dupre, about the hazards associated with asbestos products; and

g.) To induce workers including Freddie Dupre, to use and continue to use asbestos products.

3.) Workers, including Freddie Dupre, reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because plaintiff believed it to be safe.

4.) Defendants, intended for the plaintiff and other similarly situated to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5.) Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the plaintiff and others deciding to use the said asbestos-containing products to which plaintiff was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

23.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insureds who manufactured, used, and/or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Freddie Dupre was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the *McNeely* case and others like it

injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at
practicable rates"; he wrote that even though rates for those in the asbestos business were high,
"their adequacy . is generally doubted." To avoid losing money, insurance companies instituted a
practice of servicing claims as well as providing the insurance—"sort of a right pocket to left
pocket...in other words there wasn't any way (insurance companies) could lose money on it."
(*See* <u>Deposition of Harry J. Flynn</u> in *Bradley v. Todd Shipyards, Inc.*, C.A. No. 85 - 05657, Div.
"D", Civil District Court for the Parish of Orleans.)

24.

That all defendants and the companies that insured them knew of the health hazards
associated with exposure to asbestos since the 1930s (and suppressed this information) is shown
by numerous documents and testimony. In fact, the knowledge was so well recognized in the
asbestos industry that the insurance industry considered confessing liability; instead, they decided
to make it "economically impossible" for plaintiffs to pursue their claims. The minutes of
meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry
association) confirm that the hazards of asbestos exposure have been known for many years.
These minutes specifically state that  medical research in 1900 linked asbestos with asbestosis
and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a
discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous
rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed
between themselves as to their respective losses and expenses. That insurance companies and
their insureds were working together to discourage plaintiffs from pursuing valid claims is also
demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard
Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974),
it is stated:  "The appeals court decision in the *Borel* case of course sets a very bad precedence
for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a
'**game plan**' for the continued defense of these asbestosis cases <u>**with the other defendants.**</u>" In
a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance

-10-

companies would resist pending cases "and attempt to make this economically (sic) impossible for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by plaintiffs and employees such as Freddie Dupre, and plaintiff herein shows that the defendants, to this day, are committing fraud. All defendants, especially the premise owners and employers of Freddie Dupre, had intimate knowledge of the dangers of asbestos from their own dealings with insurance and their insurance carriers.

25.

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M") and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M

-11-

facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the

Metropolitan Life Insurance Company should advise the companies of the types of respirators

which should be provided to the employees engaged in making a study of this problem. On

December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof"

of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of

Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated

to representatives of Raybestos-Manhattan, who prepared editorial comments and

recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville

prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-

Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis;

that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis

to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could

be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr.

Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers"

in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

26.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson,

President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to

participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr.

Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works

was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in

turn sent it to Dr. Lanza for his comments.

27.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob

Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and

Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung

changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be

-12-

informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of X-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way'." (Deposition Charles H. Roemer taken April 25, 1984, *Johns-Manville Corp. et al. v. the United States of American*, U.S. Claims Court Civ. No. 465-83C.)

28.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

29.

The "Air Hygiene Foundation" was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organization's name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering

-13-

bulletins. Since 1937, member companies have been kept informed on occupational health issues by the *Industrial Hygiene Digest*, a monthly publication which is sent to all members in return for their annual membership fee. The *Digest* is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the *Digest* included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The report is dated June 1947. The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases.... An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period." Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An

-14-

Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed

*inter alia* dust particle size and dust control. A second report by Foundation Research at the

Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts," authored by Dr. Leroy

Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on

Workers' Compensation cases. A case involving the death of a North Carolina man was

discussed, the minutes indicating that the claimant sought compensation on grounds that the

defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the

award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also

recommended that pre-employment and periodic chest x-rays be conducted by a reputable

radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the

levels of dust in the air, and that various procedures be implemented to reduce the dust in

manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene

Foundation was invited to attend a meeting of the American Textile Institute (discussed *infra*) to

respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member

companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute

(ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C.

L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of

asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950)

of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed

to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold

limit value for asbestos was not safe. In addition, this criticism was published in the scientific

literature and all defendants were put on notice of the hazards of the suggested threshold limit

value.

30.

In addition to the IHF, there were other trade associations which were formed to aid and

service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI),

founded on November 16, 1944, included companies which produced asbestos containing cloth.

-15-

At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard.'" While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

31.

Plaintiff also makes additional allegations against Todd Shipyards Corporation (and its executive officers) who were aware of the risk of harm presented by asbestos-containing products used on its premises and was a manufacturer and owner of asbestos-containing products, and who had care, custody, and control of same. Todd Shipyards Corporation, a multi-state/multi-national corporation, (and its executive officers) either through exchange of information and/or industry sponsored studies were notified, either directly by its parent companies, manufacturing associations, U.S. Government or agencies that these asbestos presented an unreasonable risk of harm. However, Todd Shipyards Corporation and its executive officers, disregarded these notices, elected to conceal these hazards from the plaintiff and continued to use and hold out these products as safe and non-toxic.

32.

Todd Shipyards Corporation and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that said asbestos and asbestos fiber would cause Mr. Dupre (and others similarly situated) to suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects related thereto, but they failed and/or willfully withheld from Mr. Dupre knowledge of the dangers to his health from exposure to asbestos and asbestos fiber.

33.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

34.

Eagle, Inc. has done contracting work since its initial existence. U.S. Navy vessels were being constructed at this time. Accordingly, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.) was aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, this defendant, being an asbestos insulation contractor, had to pay higher insurance premiums as a consequence thereof the plaintiff and other similarly situated were exposed to asbestos both

-17-

through these defendants' contracting work and through products manufactured, distributed, sold, and/or used by said defendants. This defendant was aware of the hazards of asbestos but failed and refused to warn Freddie Dupre of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law.

35.

Since the early 1940s, defendant, Foster Wheeler LLC (formerly Foster Wheeler Corporation) was a major manufacturer of boilers used in the construction of U.S. Navy vessels. Their position was derived through government contacts at a national level, and since that time through and including 1970, they supplied boilers to virtually every shipyard constructing and repairing U.S. Navy vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time was Freddie Dupre, advised of these hazards as defendants failed and refused to warn Mr. Dupre of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Freddie Dupre to asbestos during their operations.

36.

During Freddie Dupre's exposure, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Freddie Dupre and/or to the owners of the premises where he worked, throughout his entire employment history. Such products were installed, removed, and repaired by or in close proximity to Freddie Dupre and during his employment, thus exposing him to asbestos dust released by the installation, removal,

-18-

and repair of said products.  Throughout the time Freddie Dupre was employed, he was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse.  At the they were exposed to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse.

37.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers.  Further, Westinghouse failed and refused to warn Freddie Dupre of the danger of exposure to such products.  They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

38.

Plaintiff further alleges that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

39.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma.  Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council.  Beginning in the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

40.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh).  The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation."  J-M joined in 1936.  IHF members included, among others, General Electric Company and Westinghouse Electric Corporation, or their predecessors in interest.  All of these

-19-

companies are defendants in this case.  The IHF was founded to conduct occupational health
research, particularly with respect to the health effects of dust in the work place.  One of the
functions of the IHF was to gather and disseminate information regarding occupational health to
its members.  Since its inception, it has published special bulletins on items of general interest
under the headings of legal bulletins, medical bulletins, management bulletins and engineering
bulletins.  Since 1937, member companies have been kept informed on occupational health
issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in
return for their annual membership fee.  The Digest is a compilation of abstracts, grouped by
topic, of the published domestic and foreign scientific and medical literature pertaining to
industrial health and hygiene.  In addition to scientific abstracts, the Digest included a section on
legal developments, and also provide notice of any proposed changes in threshold limit values for
various substances.  Correspondence between members and the IHF established that members
either participated in or knew of a number of studies and surveys dating as far back as the 1930's
which had linked asbestos with various lung diseases.  As part of its consultative services for its
members, the IHF undertook a number of studies involving evaluations of asbestos dust
conditions and asbestos-related disease.  In 1947, the fruits of an industry survey conducted by
the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for
Asbestos Textile Institute."  The report is dated June 1947.  The object of the investigation was
stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its
phases....An original objective of most immediate importance was to facilitate the exchange of
information between member companies on successful methods of dust control and otherwise to
promote a general improvement in that field."  The preliminary survey to be divided into three
parts designated as "Engineering, Medical and Physical Testing" was based on visits made to
member companies' plants over a three month period."  While the actual report does not reveal
the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that
other companies evaluated in the report included, among others, Garlock.  Minutes of the Air
Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and

-20-

presentations pertaining to appropriate medical practices and industrial hygiene approaches to the

problem of asbestos dust in the work place. It was continually stressed that both pre-employment

and periodic follow-up medical examinations were essential to monitor the health of employees,

the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of

asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes

for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on

November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An

Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed

inter alia dust particle size and dust control. A second report by Foundation Research at the

Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy

Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on

Workers' Compensation cases. A case involving the death of a North Carolina man was

discussed, the minutes indicating that the claimant sought compensation on grounds that the

defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the

award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also

recommended that pre-employment and periodic chest x-rays be conducted by a reputable

radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the

levels of dust in the air, and that various procedures be implemented to reduce the dust in

manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene

Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to

respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member

companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute

(ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C.

L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of

asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950)

of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed

to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold

limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

41.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

42.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

43.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

44.

Westinghouse was also aware of the excessive dust produced from its Micarta product during

the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

45.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has refused to respond to plaintiff's request for the production of these documents principally on the basis that said documents did not exist due to their destruction. Accordingly, plaintiff alleges that Westinghouse's conduct constitutes fraud under Louisiana law.

46.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations

-23-

during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket

plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would

not comply with either the EPA or OSHA and would take an attitude of "respectful

noncompliance".

47.

Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-

containing products and the health hazards associated with same. Jeffrey J. Bair of

Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial

Hygiene Department files, dating back to 1930, have been reviewed. After a general description

of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these

documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking gun"
> documents. This is so because of the nature, duties, obligations and responsibilities of the
> Industrial Hygiene Department. The approximately 57 years of Industrial Hygiene files
> which are in existence today are filled with technical information, procedural information,
> safe-handling information, hazard information, recommendations and tests results. The
> files are filled with documentation which critiques and criticizes, from an industrial
> hygiene perspective, Westinghouse manufacturing and non-manufacturing operations.
> This documentation often times points out deficiencies in Westinghouse operations and
> suggests recommendations to correct these deficiencies. Industrial Hygiene's files
> contain information which details the various chemical substances used at Westinghouse
> sites over the years, and often times the inadequacies in Westinghouse's use and handling
> of the substances. The files contain many years of employee test results, some of them
> unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential smoking
> gun documents (emphasis added).

> Plant Correspondence and Files

> Please see, for example, Wilber Speicher's letter...correspondence of this type was and
> continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's
> correspondence might show early knowledge of the Corporation to certain health hazards
> associated with epoxy resin dissolving agents. What use did the Corporation make of this
> knowledge to protect employees and the public? If none or very little, then this document
> might become a "smoking gun" (emphasis added).

> Industrial Hygiene audit and trip reports certainly qualify as potential smoking guns
> (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the
> facility from an industrial hygiene perspective. Industrial Hygiene also makes
> recommendations to improve the hygiene of the plant. The smoking gun possibilities of
> such documentation are readily apparent (emphasis added). Material Cards, Materials
> Safety Data Sheets, Purchasing [sic] Department Specification Cards, Safe Practice Data
> Sheets and Historical Safe Practice Data Sheet Files

-24-

Again, the smoking gun possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent. In addition, if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent (emphasis added).

Recommendations

Plant Correspondence Files (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic records retention guidelines do not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded. As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations. The files are filled with technical product and chemical information, hazard information and safe-handling information, most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner. The files are not used in the daily operation of the Department. In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual. In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace. This "self-analysis" and "editorializing" type of information can be dangerous. This is just the type of documentation which should be discarded from the files. Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"Historical Files or Industrial Hygiene Department"

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic Records Retention Guidelines do not specifically address these records. We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation litigation, show no signs of abating in the near future. In fact, legislation such as the risk notification legislation currently being considered by Congress, will, according to many "experts", result in an increase in such litigation. Consequently, well reasoned and conceived document retention and destruction programs for departments such as Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of

-25-

its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its dangerous products. More importantly, his conclusion shows that Westinghouse had motive for destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations therein.

48.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation therof. This activity amounts to fraud and spoliation. In fact, at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

49.

The document destruction program set out in Bair's memo was <u>actually implemented</u> by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards associated with its products constitute fraud under the laws of the state of Louisiana.

50.

During Freddie Dupre's exposure, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Freddie Dupre and/or to the owners of the premises where he worked, throughout his entire employment history. Such products were installed, removed, and repaired by or in close proximity to Freddie Dupre during his employment, thus exposing him to asbestos dust released by the installation, removal, and repair of said products. Throughout the time they were

-26-

employed, Freddie Dupre was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of his exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of GE.

51.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn Freddie Dupre of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

52.

Plaintiff further alleges that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

53.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch

indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

54.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of

their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

55.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including

-29-

exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance

programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow,

better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of

saw and apparatus, checking filters at regular intervals to insure working properly, and the

cutting of cloth where asbestos dust should be minimized.  More specifically, in  letters dated

1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around

asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos.  Also, he

informed that the workers who sweep the area should wear respiratory equipment.  Therefore,

General Electric knew or should have known that asbestos could be harmful to those individuals

exposed to this dust.

56.

Moreover,  various published reports and articles available to GE, prove that GE was

empowered with the knowledge that asbestos caused several diseases.  Some of the reports and

articles include:

(1) Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2) Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3) Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.

(4)    Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s.  Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis."  Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.

(5) Asbestos And Health In 1969, a published article written in 1969 by

-30-

George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6) The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7)    Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8) Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

57.

Defendant, Owens-Illinois, Inc., (O-I) began the manufacture and sale of the asbestos

containing insulation product "Kaylo" in the 1940's. Defendant's knowledge of the hazards posed

by the inhalation of asbestos fiber released from Kaylo can be documented as far back as the

early 1940's. Much of the evidence arises out of testing done of Kaylo at the Saranac Laboratory

at Saranac Lake New York. The following is a brief description of some of the evidence

pertaining to O-I's knowledge of the health hazards posed by inhalation of asbestos dust released

from its Kaylo product. On February 12, 1943, O-I's director of research, U. E. Bows, sent a

letter to L. U. Gardner of the Saranac Laboratory stating: "(The health hazard) should be

considered from the standpoint of employees working in the plant where the material is made or

where it may be sawed to the desired dimensions and also considered from the standpoint of

-31-

applicators or erectors at the point of use." On November 16, 1948, A. J. Vorwald of the Saranac

Laboratory sent a letter to U. E. Bows regarding the effects of inhalation of Kaylo dust in animal

studies. This letter provides in pertinent part:

> In all animals sacrificed after more than 30 months of exposure to Kaylo dust
> unmistakable evidence of asbestosis has developed, showing that Kaylo on
> inhalation is capable of producing asbestos and must be regarded as a potentially
> hazardous material.
>
> * * *
>
> I realize that our findings regarding Kaylo are less favorable than anticipated.
> However, since Kaylo is capable of producing asbestosis, it is better to discover it
> now in animals rather then later in industrial workers. Thus, the company, being
> forewarned, would be in a better position to institute adequate control measures
> for safeguarding exposed employees and protecting its own interest.

Along with the November 16 letter of Vorwald was an interim report to the Owens-Illinois

Glass Company regarding the ability of dust generated by Kaylo to cause lung disease. Pertinent

portions of that report provide:

> Kaylo is capable, on prolonged inhalation of producing asbestosis in the lungs of
> guinea pigs and it should be handled industrially as a hazardous dust.
>
> * * *
>
> The animals were exposed to atmospheric suspensions of Kaylo dust for 8 hours
> daily, 5 and ½ days a week throughout the experiment. The dust concentration
> which varied somewhat from time to time has averaged 116 particles per cubic
> foot of air over the entire course of the experiment to date.
>
> * * *
>
> All nine animals sacrificed subsequent to 30 months in the present
> experiment...have developed true fibrosis of a type characteristic of the response
> of guinea pigs to asbestos.
>
> While the lesions up to 30 months showed no fibrosis, certain aspects of them
> were compatible with a preliminary stage in the development of asbestosis. These
> aspects were masked by the inert type of reaction to the materials other than
> asbestos in the dust.
>
> * * *
>
> Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is
> capable of producing asbestosis and should be handled as a hazardous industrial
> dust.

The Saranac Laboratory report clearly informed O-I that the asbestos content in the air in

-32-

certain parts of its plant were potentially hazardous to human health. The report further

recommended that respirators be used by workers loading Kaylo material into box cars. In the

same report O-I was also warned against reliance on compliance with government and industry

standards in order to completely protect against the possibility of occupational disease. On

February 7, 1952, Vorwald sent a letter to W. G. Hazard enclosing the final report on "The

Capacity of Inhaled Kaylo Dust to Injure the Lung." A copy of the report was sent to O-I

corporate medical director, Shook. The report states in pertinent part:

> Kaylo dust is capable of producing peribronchiolar fibrosis typical of asbestosis.
> The dust also has a slightly unfavorable influence upon a tuberculosis infection.
> Although extrapolation from animal to human experience is difficult,
> nevertheless, the results of the study indicate that every precaution should be
> taken to protect workers against inhaling the dust.

Despite the information made know to O-I concerning the ability of dust generated form its

Kaylo product to cause asbestosis and other ailments, O-I actually drafted a pamphlet stating that

Kaylo could be used without the danger of developing asbestosis. See December 12, 1950, letter

from Willis G. Hazard to A. G. Vorwald; December 9, 1952, correspondence from C. W.

Howard to George White. O-I continued to promote Kaylo as safe and "non-toxic". See

advertisement in Petroleum Engineer C-55 to C-62 April, 1952, Hydros Calcium Silicate Heat

Insulation.

58.

Other evidence of knowledge include the fact that in May 1952, Willis Hazard of O-I

attended the Seventh Saranac Symposium where considerable discussion of asbestosis and cancer

took place. On October 5, 1955, Hazard of O-I concerning a report of Saranac Lake contained in

Arch. Indust. Health, 12:348-360, (1955) entitled "Effect of Inhaled Commercial Hydrous

Calcium Silicate Dust on Animal Tissues." The report was published by Dr. Scheepers of the

Saranac Laboratory and contained some of the Saranac Laboratory's findings pertaining to Kaylo.

The report was not shown to O-I officials prior to publication. In his October 5, 1955, Hazard

stated:

> We had felt (publication of the research) would be the proper procedure for
> the long run, even though the experiments did not show Kaylo to be lily-white.

-33-

> They showed to be specific, the Kaylo dust could cause asbestosis, an incurable
> lung condition; and they showed the dust could reactivate tuberculosis....

* * *

The name "Kaylo" and O-I appear no where in the article. Its completely anonymous.

The above aptly demonstrates that O-I possessed the requisite knowledge of the hazards posed by inhalation of asbestos fiber as far back as the 1940's. Despite that knowledge, defendant chose not to warn the plaintiffs or others similarly situated of the hazards posed to their health by working with or near defendant's products. Further, defendant's suppression of known health hazards associated with exposure to their products constitute fraud under Louisiana law.

Moreover, O-I sold its design and trademark for Kaylo to Owens-Corning Fiberglas Corporation knowing that it was a defective product capable of causing disease and death. O-I is liable for the defective Kaylo product which continued to be sold throughout the 1970s. O-I is liable to plaintiffs both for designing a defective product as well as for plaintiff, Elodie Rome, being exposed to this product as manufactured by O-I and later by Owens-Corning Fiberglas Corp. O-I is liable for designing a defective product and for selling the design of this defective product to Owens Corning Fiberglass Corporation. OI is also liable for fraud as its suppressed knowledge of the defectiveness in its product. In addition, O-I breached its continuing duty to warn under Louisiana law. Additionally, O-I suppressed its knowledge of the health effects associated with Kaylo and, thus, committed fraud under Louisiana law.

59.

All asbestos defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Dupre and for which these defendants are strictly liable under Louisiana law.

60.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

-34-

61.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Freddie Dupre was exposed to products manufactured, distributed, sold and/or used by "asbestos defendants," and he contracted malignant mesothelioma, an incurable cancer of the lining of the lung, which was first diagnosed on or around September 29, 2010.

62.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Freddie Dupre and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law and entitle plaintiff to damages.

63.

All asbestos defendants were the owners of asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Freddie Dupre, and for which defendants are strictly liable under Louisiana law.

64.

Defendant, Todd Shipyards Corporation, is answerable for the conduct of those handling asbestos products on its premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in Freddie Dupre's mesothelioma, and for which defendant is strictly liable under Louisiana law.

65.

Defendant, Todd Shipyards Corporation, is responsible for the conduct of those individuals and companies working on its premises with asbestos products which resulted in exposure to asbestos to Freddie Dupre, which asbestos was defective and which presented an unreasonable risk of harm, and which asbestos resulted in Mr. Dupre's mesothelioma and other ill health effects related thereto, and for which defendant is strictly liable under Louisiana law.

66.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Freddie Dupre, contracted malignant mesothelioma and other ill health effects related thereto, for which all defendants are jointly, severally, and in solido liable.

67.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to petitioner for the damages sustained as a result of Mr. Dupre's contraction of asbestos-related mesothelioma, and other ill health effects related therewith. Petitioner, Freddie Dupre is entitled to damages for the following: past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; fear of cancer and fear of death and complications; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; loss of fringe benefits; past, present, and future medical expenses; loss of personal services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; increased costs of insurance and other expenses incurred as a result of his disease; and all other general damages arising out of this action which may be shown at the trial of this matter.

68.

All of the defendants named herein are jointly, severally, and *in solido* liable to petitioner for the damages sustained as a result of Mr. Dupre's contraction of asbestos-related mesothelioma, and other related ill health effects from which he suffers.

-36-

69.

A trial by jury is demanded on all issues.

**WHEREFORE**, petitioner, Freddie Dupre, prays that the defendants named herein be duly

cited to appear and answer, and that after all due proceedings are had, there be judgment rendered

herein in favor of petitioner and against defendants for all damages suffered by petitioner,

together with legal interest and all costs associated with the prosecution of this claim.  Petitioner

further prays for all general and equitable relief to which he may be entitled.

Respectfully submitted,

ROUSSEL & CLEMENT

GEROLYN P. ROUSSEL – 1134
PERRY J. ROUSSEL, JR. – 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
LEONARD K. FISHER, III- 31456
1714 Cannes Drive
LaPlace, LA  70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONER/
FREDDIE DUPRE

**PLEASE SERVE THE PETITION FOR DAMAGES; OPPOSITION TO MOTIONS FOR
EXTENSION OF TIME; PLAINTIFF'S REQUESTS FOR PRODUCTION OF
DOCUMENTS AND/OR THINGS, and NOTICE OF VIDEOTAPED DEPOSITION FOR
ALL PURPOSES, INCLUDING PERPETUATION PURPOSES ON THE FOLLOWING:**

1.   **TODD SHIPYARDS CORPORATION          (LONG ARM SERVICE)**
     Through its agent for service of process:
     The Corporation Trust Company
     Corporate Trust Center
     1209 Orange Street
     Wilmington, Delaware 19801

2.   **EAGLE, INC. (formerly EAGLE ASBESTOS & PACKING
     COMPANY, INC.)**
     Through its agent for service of process:
     Susan B. Kohn
     1100 Poydras St, 30th Floor
     New Orleans, LA 70163

3.   **FOSTER WHEELER LLC          (LONG ARM SERVICE)**
     **(FORMERLY FOSTER WHEELER CORPORATION)**
     (Via Louisiana Long Arm Statute)

-37-

A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

FILED

· · · · · 18 P 2:55

CIVIL
: : : : :

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2010-11337                    DIVISION "L"                              SEC. "6"

FREDDIE JOSEPH DUPRE

VERSUS

TODD SHIPYARDS CORPORATION, ET AL

FILED:_____

                                                      DEPUTY CLERK

## FIRST SUPPLEMENTAL AND AMENDING PETITION

**NOW INTO COURT**, through undersigned counsel, come plaintiffs, Rose Mae Naquin Dupre, widow of Freddie Joseph Dupre, and Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre, major child of Freddie Joseph Dupre, all residents of the State of Louisiana, and upon suggesting to the Court that they desire to supplement and amend the Original Petition filed herein, in the following respects, to-wit:

I.

By amending the caption, body, and prayer of the Original Petition to include as plaintiffs, Rose Mae Naquin Dupre, surviving spouse of Freddie Joseph Dupre (a/k/a Joseph Freddie Dupre) (hereinafter Freddie Joseph Dupre or Freddie Dupre), and Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre, major children of Freddie Joseph Dupre, and to assert any and all rights and claims to which they are entitled as a result of the injuries and death of Freddie Joseph Dupre, as well as to assert any and all survival and wrongful death claims to which they are entitled.

II.

By adding an additional paragraph to be numbered "70" to read as follows:

"70."

On January 16, 2011, original plaintiff, Freddie Joseph Dupre, died in the State of Louisiana; at the time of his death, he was survived by his wife, Rose Mae Naquin Dupre, and three children, Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre, who wish to be substituted as plaintiffs for all survival damages currently existing against all defendants. In addition, Rose Mae Naquin Dupre, widow of Freddie Joseph Dupre, and Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre, major child of Freddie Joseph Dupre, assert any and all rights and claims for wrongful death damages against all defendants.

Jan-19-11  03:24pm  From-ROUSSEL & CLEMENT                985-651-6592              T-833  P.03/06  F-759

III.

By adding an additional paragraph to be numbered "71" to read as follows:

"71."

Decedent, Freddie Joseph Dupre, died on January 16, 2011, as a result of mesothelioma, complications therefrom, and other ill health effects which resulted therefrom and/or from exposure to asbestos.

IV.

By adding an additional paragraph to be numbered "72" to read as follows:

"72."

As a result of the acts of negligence, intentional tort, fraud, and strict liability of all of the defendants named herein and in the original petition, Freddie Joseph Dupre contracted mesothelioma and other ill effects related thereto which caused and/or contributed to his death on January 16, 2011.

V.

By adding an additional paragraph to be numbered "73" to read as follows:

"73."

Petitioners are entitled to damages for the following: physical pain and suffering of Freddie Joseph Dupre; mental pain, suffering, and anguish (including but not limited to fear of death and fear of complications) which Freddie Joseph Dupre suffered; humiliation and emotional distress suffered by Freddie Joseph Dupre; loss of income and earning capacity of Freddie Joseph Dupre; disability; medical expenses; care and personal assistance provided to Freddie Joseph Dupre; loss of personal services; loss of fringe benefits; loss of enjoyment of life and lifestyle; loss of support; loss of consortium and society, love, and affection; loss of services, loss of companionship; mental pain and anguish which Rose Mae Naquin Dupre, Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre endured from watching the suffering and death of their husband and father; emotional distress and grief suffered by Rose Mae Naquin Dupre, Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre as a result of the death of Freddie Joseph Dupre; funeral and burial expenses; lost income and expenses related to the travel and medical treatment for the injuries and death of Freddie Joseph Dupre, funds expended by each of the plaintiffs herein for the care and treatment of their husband and father as well as loss of income and benefits associated therewith, and all other damages arising out of this survival and wrongful death action which may be shown at the trial of this matter.

VI.

By adding an additional paragraph to be numbered "74" to read as follows:

"74."

All of the defendants named in this First Supplemental and Amending Petition for Damages as well as in the Original Petition for Damages, are jointly, severally, and in solido liable to petitioners for the damages sustained as a result of Freddie Joseph Dupre's contraction of mesothelioma and other ill effects related thereto and complications therefrom as well as from and for his death.

Jan-19-11  03:25pm   From-ROUSSEL & CLEMENT                   985-651-6592          T-833  P.04/05  F-759

### VII.

Petitioners reaver and incorporate herein by reference as if copied herein in extenso all allegations of the Original Petition.

### VIII.

A trial by jury is demanded on all issues.

**WHEREFORE,** petitioners, Rose Mac Naquin Dupre, widow of Freddie Joseph Dupre, and Ronald Joseph Dupre, Marvin Andrew Dupre, and Brian Anthony Dupre, major child of Freddie Joseph Dupre, reiterating the prayer of the Original Petition, as though set forth at length herein, pray that the Original Petition be supplemented and amended in the above particulars, that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, there be judgment rendered herein in favor of petitioners and against defendants for all damages suffered by Freddie Joseph Dupre as well as by petitioners, together with legal interest and all costs associated with the prosecution of this claim. Petitioners further pray for all general and equitable relief to which they may be entitled.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
1714 Cannes Drive
LaPlace, LA 70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel for all parties by FAX, hand delivery, or mailing same to each, properly addressed and postage prepaid, on this 18th day of January, 2011.

GEROLYN P. ROUSSEL

- 3 -

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2010-11337                DIVISION "L"                              SEC. "6"

FREDDIE JOSEPH DUPRE

VERSUS

TODD SHIPYARDS CORPORATION, ET AL

FILED:_____

                                    DEPUTY CLERK

### O R D E R

LET THE FOREGOING First Supplemental and Amending Petition be filed into the record of this matter in accordance with law.

Signed this _18th_ day of _January_, 2011.

                                    ~d.) Kern A. Reese
                                    DISTRICT JUDGE

THE FIRST SUPPLEMENTAL AND AMENDING PETITION WILL BE SERVED ON THE FOLLOWING:

1.      TODD SHIPYARDS CORPORATION
        Through its counsel of record:
        S. Gene Fendler, T.A.
        Liskow & Lewis
        One Shell Square, Suite 5000
        701 Poydras Street
        New Orleans, La. 70139

2.      EAGLE, INC. (formerly EAGLE ASBESTOS & PACKING COMPANY, INC.)
        Through its counsel of record:
        Susan B. Kohn
        Simon, Peragine, Smith & Redfearn
        30th Floor - Energy Centre
        1100 Poydras Street
        New Orleans, LA 70163-3000

3.      FOSTER WHEELER LLC (FORMERLY FOSTER WHEELER CORPORATION)
        Through its counsel of record:
        John J. Hainkel, III
        Frilot, LLC
        1100 Poydras Street
        Suite 3700, Energy Centre
        New Orleans, Louisiana 70163

-4-

4. OWENS-ILLINOIS, INC.
Through its counsel of record:
Walter G. Watkins, III
Forman, Perry, Watkins, Krutz & Tardy LLP
1515 Poydras Street, Suite 1300
New Orleans, LA 70112

5. CONTINENTAL INSURANCE COMPANY
Through its counsel of record:
Gerald A. Melchiode
Galloway, Johnson
One Shell Square, 40th Floor
701 Poydras Street
New Orleans, La. 70139

6. UNIROYAL, INC.
Through its counsel of record:
Walter G. Watkins, III
Forman, Perry, Watkins, Krutz & Tardy LLP
1515 Poydras Street, Suite 1300
New Orleans, LA 70112

7. CBS CORPORATION (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)
Through its counsel of record:
John J. Hainkel, III
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

8. GENERAL ELECTRIC COMPANY
Through its counsel of record:
John J. Hainkel, III
Frilot, LLC
1100 Poydras Street
Suite 3700, Energy Centre
New Orleans, Louisiana 70163

9. BAYER CROPSCIENCE, INC. (SUCCESSOR TO RHONE POULENC AG COMPANY, FORMERLY AMCHEM PRODUCTS, INC., FORMERLY BENJAMIN FOSTER COMPANY)
Through its counsel of record:
Michael Abraham
KUCHLER, POLK, SCHELL, WEINER, & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112