1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

MDL Docket No. 875 – IN RE: Asbestos Product Liability Litigation (No. VI)

*Patti Donlon, Individually and as Successor-in-Interest to the Estate of Patrick Donlon, Decedent, Sean Donlon, and Does One through Ten, Inclusive  v. AC and S, Inc., et al.,*  N.D. California, C. A. No. 3:11-cv-03376-JSW

**DECLARATION OF STEVEN M. HAROWITZ IN SUPPORT OF PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-424) OR IN THE ALTERNATIVE TO CONTINUE CTO-424 PENDING A RULING ON PLAINTIFFS' MOTION TO REMAND IN THE DISTRICT COURT**

DECLARATION OF STEVEN M. HAROWITZ IN SUPPORT OF PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-424)

PAGE 1

1   I, STEVEN M. HAROWITZ, declare:

2   1.   I am an attorney at law, duly licensed to practice before all Courts in the State of

3   California.  I am a partner with the law firm of Harowitz & Tigerman, counsel of record for

4   Plaintiffs herein.  I make this Declaration of my own personal knowledge, and if called upon as a

5   witness, I could and would testify competently thereto.

6   2.   Attached hereto as **Exhibit A** is a true and correct copy of <u>Villarreal v. Chrysler</u>

7   <u>Corp.</u>, 1996 WL 116832.

8   3.   Attached hereto as **Exhibit B** is a true and  correct copy of <u>Madden v. A.H. Voss</u>,

9   2009 WL 3415377.

10   4.   Attached hereto as **Exhibit C** is a true and  correct copy of <u>Getz v. The Boeing</u>

11   <u>Company</u>, 2011 WL 3275957.

12   I declare under the penalty of perjury under the laws of the State of California that the

13   above is true and correct.  Executed on this 6th day of September, 2011, in San Francisco,

14   California.

15

16   _____
         Steven M. Harowitz

17

18

19

20

21

22

23

24

25

26

27

28

---

**DECLARATION OF STEVEN M. HAROWITZ IN SUPPORT OF PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-424)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

Westlaw.

Not Reported in F.Supp., 1996 WL 116832 (N.D.Cal.)
**(Cite as: 1996 WL 116832 (N.D.Cal.))**

▷
Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Susan VILLARREAL and Brad Bergantz et al.,
Plaintiffs,
v.
CHRYSLER CORPORATION, Defendant.

No. C-95-4414 FMS.
March 12, 1996.

ORDER GRANTING MOTION TO REMAND TO
STATE COURT
FERN M. SMITH, District Judge.

ISSUES

**\*1** Defendant Chrysler Corporation's ("defendant") motion for a stay of proceedings requires the Court to decide whether to stay the putative class action brought by plaintiffs Susan Villarreal and Brad Bergantz ("plaintiffs") because defendant petitioned the Judicial Panel on Multidistrict Litigation ("Panel") to transfer this and other related class actions to the Eastern District of Michigan.

If the Court declines to stay the action, plaintiffs' motion requires the Court to determine whether defendant has failed to establish that the amount in controversy for every class member exceeds the $50,000 federal jurisdictional requirement so that the action should be removed.[FN1] Specifically, the Court must determine whether plaintiffs have a common and undivided interest in the alleged punitive damage award so that plaintiffs' claim can be aggregated for jurisdictional purposes.

Alternatively, if defendant proves that the claim of the named representatives exceed the jurisdictional requirement, the Court must decide whether to exercise supplemental jurisdiction over the claims of the putative class members whose claims fall below the jurisdictional requirement.

BACKGROUND

Plaintiffs filed a class action in Santa Clara County Superior Court on behalf of all persons and entities residing in California who own at least one, but less than fifty, Chrysler vehicles equipped with the Bendix 10 Anti-Lock Brake System ("ABS"). Plaintiffs allege five causes of action stemming from the allegedly defective ABS and claims for: (1) breach of warranty under California Civil Code section 1790 *et seq.;* (2) unfair and fraudulent business practices under California Business and Professions Code section 17200 *et seq.;* (3) fraud and deceit under California Civil Code section 1710; and (4) negligent misrepresentation under California Civil Code section 1710. Plaintiffs seek compensatory and punitive damages as well as equitable relief.

Defendant removed the action to federal court on the basis of diversity jurisdiction. Subsequently, defendant petitioned the Panel to transfer this and related ABS cases to the Eastern District of Michigan. Plaintiffs then filed this motion to remand, contending that the claimed damages are not in excess of the $50,000 jurisdictional requirement. Plaintiffs also seek costs and attorneys' fees as a result of the removal.

DISCUSSION

I. Legal Standard For Stay

A court has the inherent power to stay proceedings. *Landis v. North Am. Co.,* 299 U.S. 248, 254 (1936). Petitions for consolidation and transfer pending before the Panel, however, do "not affect ... pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court." Panel Rule 18, 147 F.R.D. 589, 601 (1993).

Defendant requests a stay on the basis that this and two other putative class actions will be consolidated and transferred to the Eastern District of Michigan by the Panel pursuant to 28 U.S.C. § 1407. Consistent with the directives of the Panel, a stay is improper. Judicial economy will best be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 116832 (N.D.Cal.)
**(Cite as: 1996 WL 116832 (N.D.Cal.))**

served by addressing the remand issue because a determination on this issue will facilitate litigation in the appropriate forum. The appropriate forum, moreover, is a threshold issue to class certification and defendant's petition to the Panel does not affect scheduled pretrial proceedings.

**\*2** For the foregoing reasons, defendant's request for a stay of the action is DENIED. Accordingly, the Court will address the merits of plaintiffs' motion to remand.

II. Removal and Remand

A. Legal Standard for Remand

In a removal action, a district court is required to remand a case to state court if, at any time before final judgment, the court determines that it lacks subject matter jurisdiction. *See* 28 U.S.C. § 1447(c) . Where the jurisdiction of the court is challenged, the party invoking federal jurisdiction bears the burden of demonstrating that its jurisdictional allegations are supported by competent proof. *Enrich v. Touche Ross & Co.,* 846 F.2d 1190, 1195 (9th Cir. 1988). The removal statute is strictly construed against removal jurisdiction. *Id.*

Where the plaintiff's complaint does not allege a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds $50,000. *Gaus v. Miles,* 980 F.2d 564, 566 (9th Cir. 1992) (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936)). Moreover, where state law prohibits pleading a specific amount of damages, the burden is on the defendant to present underlying facts in support of its contention that the amount in controversy exceeds $50,000. *Id.* Conclusory allegations that the damages are in excess of $50,000 do not satisfy defendant's burden. *Id.*

The preponderance of the evidence standard applies to the case at bar because defendant seeks federal jurisdiction over the action, and California

pleading laws prohibit plaintiffs from setting forth a specific amount of punitive damages in their complaint.[FN2] *See* Cal. Civ. Code § 3294(e) (Deering 1996) ("No claim for exemplary damages shall state an amount or amounts.").

B. Amount in Controversy

In the class action context, the defendant must prove that each plaintiff and every class member has an amount in controversy in excess of $50,000. *Snyder v. Harris,* 394 U.S. 332, 338 (1969); *Zahn v. International Paper,* 414 U.S. 291, 300 (1973) ("[A]ny plaintiff without jurisdictional amount must be dismissed from the case, even though others allege jurisdictionally sufficient claims.").

As a general rule, the "separate and distinct" claims of class action plaintiffs cannot be aggregated to reach the $50,000 jurisdictional requirement. *Snyder,* 394 U.S. at 336-37. Aggregation is permissible, however, when "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Id.* at 335. Thus, an "integrated" claim of class action plaintiffs may be aggregated to determine the jurisdictional requirement. *Id.*

1. Aggregation: Common and Undivided Interest
Aggregation of damages so as to meet the jurisdictional requirement is prohibited in diversity-based class actions. *See Zahn,* 414 U.S. at 300. Defendant, therefore, argues that punitive damage claims are "integrated," and thus aggregation is permissible.

**\*3** Under Ninth Circuit law, claims constitute a common and undivided interest only if plaintiffs hold their rights in a group status. *Eagle v. American Tel. and Tel. Co.,* 769 F.2d 541, 546 (9th Cir. 1969); *Potrero Hill Community Action Com. v. Housing Authority,* 410 F.2d 974, 978 (9th Cir. 1969). Class members may not aggregate their claims to satisfy the amount in controversy requirement unless the claims are "joint and common." *United States v. Southern Pacific Trans. Co.,* 543 F.2d 676, 683 (9th Cir. 1976). Common questions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 116832 (N.D.Cal.)
**(Cite as: 1996 WL 116832 (N.D.Cal.))**

of law and fact are not sufficient in determining whether the jurisdictional requirement is satisfied. *Id.*

2. Punitive Damages

In determining the amount in controversy, a court must consider not only actual pecuniary damages, but also potential punitive damages. *Bell v. Preferred Life Assur. Soc. of Montgomery,* 320 U.S. 238, 240 (1943). The Ninth Circuit, however, has not directly addressed whether a punitive damages claim constitutes a "common and undivided interest," thereby allowing aggregation in determining the amount in controversy. *See Borgeson v. Archer Daniels Midland Co. et. al,* 1995 WL 743800 (C.D. Cal. 1995).

Consistent with *Southern Pacific ,* several district courts have held that a class action plaintiffs' claim for punitive damages cannot be aggregated as a common and undivided interest. *See, e.g., Harris v. Chase Manhattan Bank, N.A.,* 1992 U.S. Dist. LEXIS 19986, No. C-92-1483 JPV (N.D. Cal. 1992); *Kasky v. Perrier Group of Am.,* 1991 U.S. Dist. LEXIS 21177, No. C-91-0489-R(M) (S.D. Cal. 1991); *Smiley v. Citibank (South Dakota), N.A.,* 863 F. Supp. 1156, 1162-64 (C.D. Cal. 1993).

Plaintiffs' complaint expressly states that the claimed damages do not exceed $50,000, yet defendant contends that punitive damages may be aggregated as a "common and undivided interest" of the plaintiffs.[FN3] *See* Complaint at ¶ 9. The Court finds the *Harris, Kasky,* and *Smiley* decisions persuasive and concludes that plaintiffs assert separate and distinct rights respecting the allegedly defective ABS.[FN4] Each plaintiff's claim is derived from the allegedly defective ABS component in an individual vehicle; therefore, aggregation is not warranted.

B. Supplemental Jurisdiction

Defendants alternatively contend that if Villarreal and Bergantz as the named representatives satisfy the jurisdictional requirement, the claims of other class members can be brought in federal court based on supplemental jurisdiction. *See* 28 U.S.C. §

1367.

The named plaintiffs seek attorneys' fees pursuant to California Civil Code section 1780. Cal. Civ. Code § 1780 (Deering 1996). Defendant contends that the award of attorneys' fees pushes the amount in controversy over the jurisdictional threshold for the named representatives. Under Ninth Circuit law, however, attorneys' fees must be pro rated to each class member rather than attributed to the named plaintiff only. *Goldberg v. CPC Int'l Inc.,* 678 F.2d 1365, 1367 (9th Cir.), *cert. denied,* 459 U.S. 945 (1982).

*4 Although the amount of attorneys' fees in class actions can be significant, it is too speculative to conclude that each plaintiff's attorney will recover fees in excess of $50,000. Further, unlike an action for personal injuries which may have a high potential for punitive damages, plaintiffs here are seeking only compensatory damages for the cost of the replacement of the brakes, diminution in value for the cars, and injunctive relief. The ABS is one component of the car which has a total value of $20,000, and thus defendant has not demonstrated that the claims are likely to be in excess of $50,000. Defendant, therefore, has not sustained its burden of demonstrating that the potential recovery of the named representatives, including attorneys' fees, satisfies the $50,000 threshold.

Because the complaint does not plead damages in excess of $50,000 for the named representatives, the Court need not address whether to exercise supplemental jurisdiction. The jurisdictional requirement is not met.

III. Attorneys' Fees

Plaintiffs seek costs and fees associated with defendant's removal pursuant to 28 U.S.C. § 1447(c). A court has discretion to impose sanctions. *Moore v. Kaiser Foundation Hosps.,* 765 F. Supp. 1464, 1466 (N.D. Cal. 1991). Generally, removal must be unjustifiable prior to such imposition. *Samura v. Kaiser Foundation Health Plan, Inc.,* 715 F. Supp. 970, 972 (N.D. Cal. 1989).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 116832 (N.D.Cal.)
**(Cite as: 1996 WL 116832 (N.D.Cal.))**

Here, defendant's removal does not warrant an imposition of attorneys' fees. The issue of whether punitive damages constitute a common and undivided interest is not entirely clear, and defendant had some authority for its assertions. A legitimate question of the existence of federal subject matter jurisdiction was presented.[FN5] Accordingly, the Court declines to award costs and fees.

CONCLUSION

For the reasons set forth above, the Court GRANTS plaintiffs' request to remand this action to the Santa Clara County Superior Court but DENIES plaintiffs' request for costs and attorneys' fees. As this action has been remanded to state court, defendant's motion to dismiss noticed for March 29, 1996, is hereby withdrawn.

The Clerk of the Court shall close the file.

SO ORDERED.

FN1. For the purposes of determining jurisdiction, the Court will assume the suit has been certified as a class action. *City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 951 (9th Cir. 1971).

FN2. In contrast to the preponderance of the evidence standard, a court applies the "legal certainty" test when the plaintiff seeks to confer federal jurisdiction over the action by alleging damages in excess of $50,000. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938).

Both plaintiffs and defendant incorrectly rely on the "legal certainty" standard. The cases applying this standard are inapposite to the case at bar. *See United States v. Southern Pacific Trans. Co.,* 543 F.2d 676, 682 (9th Cir. 1976) (class action plaintiffs' motion for summary judgment shifted burden to plaintiffs to show it did not appear to a legal cer-

tainty that claims were for less than jurisdictional requirement).

FN3. Defendant does not seek an aggregation of damages on the basis of plaintiffs' potential equitable relief. Even assuming such an argument were raised, the Ninth Circuit has held that "'the ban on aggregation [ [applies] with equal force to ... equitable as well as ... monetary relief.'" *Snow v. Ford,* 561 F.2d 787, 790 (9th Cir. 1977) (quoting *Barton Chem. Corp. v. Avis Rent a Car Sys., Inc.,* 402 F. Supp. 1195 (N.D. Ill. 1975)).

FN4. Defendant's reliance on *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326 (5th Cir. 1995), for the proposition that punitive damages constitute a common and undivided interest, is unpersuasive. The *Allen* Court's holding "specifically reflects a result under the Mississippi law of punitive damages and is not to be construed as a comment on any similar case that might arise under the law of any other state." *Allen,* 70 F.3d 26 (5th Cir. 1995) (per curiam). Accordingly, the Court must consider whether punitive damages awards constitute a "common and undivided interest" under California law.

FN5. The Court notes, however, that defendant has unsuccessfully raised the same arguments regarding the aggregation of punitive damages in prior cases. The state of the law on this issue is becoming clearer and may be a factor for awarding fees in any subsequent removals by defendant.

N.D.Cal.,1996.
Villarreal v. Chrysler Corp.
Not Reported in F.Supp., 1996 WL 116832 (N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "B"

Westlaw.

Slip Copy, 2009 WL 3415377 (N.D.Cal.)
(Cite as: 2009 WL 3415377 (N.D.Cal.))

Page 1

**C**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. California.
John MADDEN, Plaintiff,
v.
A.H. VOSS COMPANY, et al., Defendants.

No. C 09-03786 JSW.
Oct. 21, 2009.

David R. Donadio, Lindsey E. Manroel, Brayton & Purcell LLP, Novato, CA, for Plaintiff.

Richard Martin Grant, Brayton & Purcell LLP, Novato, CA.

Kevin Douglas Jamison, Pond North LLP, Los Angeles, CA, Thomas J. Moses, Edward R. Hugo, James Carl Parker, San Francisco, CA, for Defendants.

### ORDER (1) GRANTING PLAINTIFF'S MOTION TO REMAND AND (2) DENYING MOTION TO STAY AS MOOT

JEFFREY S. WHITE, District Judge.

*1 Now before the Court are the motions to remand and to stay this action pending a ruling on a motion to transfer the action by the Judicial Panel on Multidistrict Litigation ("MDL"). This matter is now fully briefed and ripe for decision. The Court finds that this matter is appropriate for disposition without oral argument and the matter is deemed submitted. *See* N.D. Civ. L.R. 7-1(b). Accordingly, the hearing set for October 23, 2009 is VACATED. Having considered the parties' arguments, relevant legal authority, and having had the benefit of oral argument, the Court GRANTS the motion to remand and DENIES AS MOOT the motion to stay.

### BACKGROUND

On June 30, 2009, Plaintiff John Madden ("Plaintiff") filed this action in San Francisco Superior Court. On August 18, 2009, Plaintiff filed, in state court, a declaration by David R. Donadio in which he states that "Plaintiff's claims against defendant LESLIE CONTROLS, INC. exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." (Declaration of Richard M. Grant ("Grant Decl."), Ex. A.) On the same date, Plaintiff also filed a request for dismissal in state court "[a]s to LESLIE CONTROLS, INC, only for claims in plaintiff's Complaint at military and federal government jobsites and aboard U.S. Navy vessels." (*Id.*, Ex. B.)

On August 18, 2009, Defendant Leslie Controls, Inc. ("Leslie Controls") removed this matter on the grounds that Plaintiff's alleged occupational exposure to asbestos occurred aboard various United States Naval ships, and that Leslie Controls, in its manufacture and sale of equipment for the United States Navy, was acting under the direction of an officer of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

Plaintiff now moves to remand this action and Leslie Controls moves to stay this action pending a ruling on a motion to transfer the action by the MDL. Both parties argue that the Court should address their motion first.

### ANALYSIS

"Generally, jurisdiction is a preliminary matter that should be resolved before all others." *Leeson v. Merck & Co., Inc.,* 2006 WL 3230047, *2 (E.D.Cal. Jan.27, 2006); *see also Villarreal v. Chrysler Corp.,,* 1996 WL 116832, at *1 (N.D.Cal. Mar.12, 1996) ("Judicial economy will best be served by addressing the remand issue [before a party's motion to stay] because a determination on this issue will facilitate litigation in the appropriate forum."). However, some courts have held that "the calculus

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3415377 (N.D.Cal.)
**(Cite as: 2009 WL 3415377 (N.D.Cal.))**

changes somewhat when deference to a MDL court will further 'the uniformity, consistency, and predictability in litigation that underlies the MDL system.' " *Leeson,* 2006 WL 3230047, *2 (quoting *Conroy v. Fresh Del Monte Produce Inc.,* 325 F.Supp.2d 1049, 1053 (N.D.Cal.2004)). "In deciding whether to rule on the motion to remand, courts consider whether the motion raises issues likely to arise in other actions pending in the MDL transferee court." *Conroy,* 325 F.2d 1053. Here, Leslie Controls has not even argued, let alone supplied any evidence to demonstrate, that the pending motion to remand has raised issues that are likely to arise in other actions even if the MDL grants the motion to transfer. Therefore, the Court will address the motion to remand first.

**A. Legal Standards Relevant to Removal.**
   *2 "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant ... to the district court of the United States for the district and division embracing the place where such action is pending." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 7-8, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (citation omitted); *see also* 28 U.S.C. § 1441. However, federal courts are courts of limited jurisdiction. *See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Accordingly, the burden of establishing federal jurisdiction for purposes of removal is on the party seeking removal. *Valdez v. Allstate Ins. Co.,* 372 F.3d 1115, 1117 (9th Cir.2004); *see also Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992). Generally, the removal statute is strictly construed against removal and any doubt as to the right of removal should be resolved in favor of remand. *Gaus,* 980 F.2d at 566. However, that is not the case concerning the federal officer removal statute. *See Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1252 (9th Cir.2006) (noting that, because it is important to the federal government to protect federal officers, removal rights under 28 U.S.C. § 1442 are much broader

than those under § 1441). Section 1442 is interpreted broadly in favor of removal. *Id.*

**B. Plaintiff's Motion to Remand.**
   Leslie Controls removed this matter pursuant to the federal officer removal statute. Under 28 U.S.C. § 1442(a)(1), "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may remove to federal court. Removal is proper if the moving party can (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable defense to the plaintiff's claims; and (3) demonstrate a causal nexus between the plaintiff's claims and acts it performed under color of federal office. *Fung v. Abex Corp.,* 816 F.Supp. 569, 571-72 (N.D.Cal.1992) (citing *Mesa v. California,* 489 U.S. 121, 124-25, 134-35, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)); *Jefferson County, Alabama v. Acker,* 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) (defense need only be colorable).

   Leslie Controls claims that it is shielded from liability by military contractors immunity as set forth in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In *Boyle,* the Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. However, before Leslie Controls removed this matter, Plaintiff filed the following waiver in state court: "Plaintiff's claims against defendant LESLIE CONTROLS, INC. exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." Plaintiff also filed a request for dismissal in state court, requesting dismissal "As to LESLIE

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3415377 (N.D.Cal.)
**(Cite as: 2009 WL 3415377 (N.D.Cal.))**

CONTROLS, INC., only for claims in plaintiff's complaint at military and federal government job-sites and abroad U.S. Navy vessels." (Grant Decl., Exs. A, B.) Courts have found similar disclaimers sufficient to eviscerate Leslie Controls' grounds for removal. *See Westbrook v. Asbestos Defendants,* 2001 WL 902642, *2-3 (N.D.Cal. July 31, 2001) (finding similar disclaimer waiving claims arising out of work done on federal jobsites and vessels sufficient to warrant remand); *Dobrocke v. Allis-Chalmers Corp. Prod. Liability Trust,* Case No. C 09-01456 CW (N.D.Cal. May 26, 2009) (attached as Exhibit F to Plaintiff's Motion to Remand).

 *3 The cases cited to by Leslie Controls in which the courts held that waivers were not sufficient to warrant remand are distinguishable. In those cases, the plaintiffs only waived federal claims, but still intended to bring state law failure to warn claims against the military contractors. *O'Connell v. Fosterwheeler Energy Corp.,* 544 F.Supp.2d 51 (D.Mass.2008); *Ballenger v. Agco Corp.,* 2007 U.S. Dist. LEXIS 47042, *4, 2007 WL 1813821, (N.D. Cal. June 22, 2007) (distinguishing *Westbrook* because plaintiffs did not disclaim in writing any claims arising out of work done on U.S. Navy vessels); (*Jenkins v. Allied Packing & Supply, Inc.,* Case No. 09-cv0101 DMS (LSP) (S.D.Cal. March 25, 2009) (attached as Exhibit F to Leslie Controls' Opposition); *Oberstar v. CBS Corp.,* CV 08-118 PA (JWJx) (C.D.Cal. Feb. 11, 2008) (attached as Exhibit G to Leslie Controls' Opposition); *Nelson v. Alfa Laval, Inc.,* CV 07-8338 VBF (Rcx) (C.D.Cal. Feb. 8, 2008) (attached as Exhibit H to Leslie Controls' Opposition); *Wright v. A.W. Chesterton Co. Inc.,* Case No. C07-05403 MJJ (N.D.Cal. Feb.21, 2008) (attached as Exhibit I to Leslie Controls' Opposition); *Reaser v. Allis Chambers Corp.,* CV 08-1296 SVW (Ssx) (C.D. Cal. June 23, 2008) (attached as Exhibit J to Leslie Controls' Opposition). In those cases, the waivers or disclaimers at issue were not as broad as the waiver filed by Plaintiff in this matter. The Court thus finds that these authorities are inapposite.

Leslie Controls argues that Plaintiff's waiver was not effective. However, as the court held in *Westbrook,* this Court "sees no reason not to hold plaintiff[ ] to [his] waiver of claims arising out of work done on federal jobsites and vessels" against Leslie Controls. *See Westbrook,* 2001 WL 902642, *3. If Plaintiff subsequently attempts to bring such claims against Leslie Controls, and is allowed to by the state court despite Plaintiff's waiver and dismissal, Leslie Controls can remove this matter at that time. Accordingly, the Court GRANTS Plaintiff's motion to remand.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion to remand is GRANTED and this matter shall be remanded to the Superior Court for the City and County of San Francisco. Because this Court is remanding the case, Leslie Controls' motion to stay is DENIED AS MOOT.

**IT IS SO ORDERED.**

N.D.Cal.,2009.
Madden v. A.H. Voss Co.
Slip Copy, 2009 WL 3415377 (N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "C"

Westlaw.

Page 1

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

**H**

United States Court of Appeals,
Ninth Circuit.
Deborah GETZ, individually and as a surviving heir
of decedent Kristofer D.S. Thomas; Rodney
Thomas, individually and as surviving heir of de-
cedent, Kristopher D.S. Thomas; Mary Duffman,
individually and as a surviving heir of decedent,
Scott E. Duffman; Sophia Duffman, a minor, indi-
vidually and as a surviving heir of decedent Scott
E. Duffman, by and through her Guardian ad Litem,
Mary Duffman; Christine Vaughn, individually and
as a surviving heir of decedent, Travis R. Vaughn;
Brad Vaughn, individually and as a surviving heir
of decedent, Travis R. Vaughn; Heather Vaughn,
individually and as a surviving heir of decedent,
Travis R. Vaughn; Taylin Vaughn, a minor, indi-
vidually and as a surviving heir of decedent Travis
R. Vaughn, by and through his Guardian ad Litem,
Heather Vaughn; Jill Garbs, individually 9949 and
as a surviving heir of decedent Ryan Garbs; Doug
Garbs, individually and as a surviving heir of de-
cedent, Ryan Garbs; Paul Wilkinson, individually
and as surviving heir of decedent Adam Wilkinson;
Felicia Wilkinson, individually and as surviving
heir of decedent Adam Wilkinson; Tyffanie Wilkin-
son, individually and as surviving heir of decedent
Adam Wilkinson; Carson Wilkinson, a minor, indi-
vidually and as surviving heir of decedent Adam
Wilkinson, by and through his Guardian ad Litem,
Tyffanie Wilkinson; Robert J. Quinlan, individually
and as surviving heir of decedent John Quinlan;
Kathleen T. Quinlan, individually and as surviving
heir of decedent John Quinlan; Julie Quinlan, indi-
vidually and as a surviving heir of decedent John
Quinlan; Keely Quinlan, a minor, individually and
as a surviving heir of decedent John Quinlan, by
and through her Guardian ad Litem, Julie Quinlan;
Madeline Quinlan, a minor, individually and as a
surviving heir of decedent John Quinlan, by
through her 9950 Guardian ad Litem, Julie Quinlan;
Erin Quinlan, a minor, individually and as a surviv-

ing heir of decedent John Quinlan, by and through
her Guardian ad Litem, Julie Quinlan; Hershel Mc-
Cants, Sr., individually and as a surviving heir of
Hershel McCants, Jr.; Goldie Murphy, individually
and as a surviving heir of decedent Hershel Mc-
Cants, Jr.; Shannon McCants, individually and as a
surviving heir of decedent Hershel McCants, Jr.;
Trevor McCants, a minor, individually and as a sur-
viving heir of decedent Hershel McCants, Jr., by
and through his Guardian ad Litem, Shannon Mc-
Cants; Kylie McCants, a minor, individually and as
a surviving heir of decedent Hershel McCants, Jr.,
by and through her Guardian ad Litem, Shannon
McCants; Jordan Lanham; Jerry Goldsmith; Ryanne
Noss, individually and as spouse of Scot Noss;
Timothy Brauch; Chris Trisko; Mark Daniel
Houghton; Chuck Isaacson; Brenda Isaacson, 9951
individually and as spouse of Chuck Isaacson,
Plaintiffs–Appellants,
v.
THE BOEING COMPANY, a corporation; Honey-
well International, Inc., a corporation; Goodrich
Pump and Engine Control Systems, Inc., a corpora-
tion; at Engine Controls Ltds.; Does, 1 through 200,
inclusive, Defendants–Appellees.

No. 10–15284.
Argued and Submitted March 18, 2011.
Filed Aug. 2, 2011.

**Background:** Crash survivors and heirs of military
personnel that were killed in Army helicopter acci-
dent in Afghanistan brought action against various
companies that designed, assembled, manufactured,
inspected, tested, marketed, and sold the helicopter.
The United States District Court for the Northern
District of California, Claudia A. Wilken, J., 2009
WL 636086 and 690 F.Supp.2d 982, granted sum-
mary judgment for defendants. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Wallace, Senior
Circuit Judge, held that:
(1) claims for product liability, negligence, wrong-
ful death, and loss of consortium did not arise under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

federal law for purposes of federal long-arm stat- ute;

(2) United States Army approved reasonably precise specifications for helicopter's ignition system without continuous or automatic relight function;

(3) Army approved reasonably precise specifications for design of engine control system and on-board computer;

(4) contractor's prior development of similar engine control system for Great Britain's Royal Air Force did not deprive contractor of government contractor defense;

(5) contractor that had contracted to configure aircraft and deliver final product containing defective ignition system and engine control system and on-board computer was entitled to government contractor defense;

(6) ignition system and engine control system and on-board computer conformed with reasonably precise design specifications approved by Army;

(7) failure of helicopter to maintain flight in adverse weather conditions as specified in government contract did not deprive contractor of government contractor defense; and

(8) government contractor defense applied to bar state-law failure to warn claims.

Affirmed.

West Headnotes

**[1] Removal of Cases 334 ⚖➞21**

334 Removal of Cases
    334II Origin, Nature, and Subject of Contro- versy
        334k21 k. Actions Against or for Acts of United States Officers. Most Cited Cases

**Removal of Cases 334 ⚖➞111**

334 Removal of Cases
    334VIII Proceedings in Case After Removal
        334k111 k. Jurisdiction Acquired by United States Court in General. Most Cited Cases
    Claims for product liability, negligence,

wrongful death, and loss of consortium did not arise under federal law for purposes of federal long-arm statute that permitted federal courts to exercise personal jurisdiction over defendant that lacked contacts with any single state; although case had been removed from state court under Federal Officer Removal Statute and defendant contractors asserted federal defense in their removal petition, contractors' decision to assert federal defense merely provided court with subject-matter jurisdiction over action and plaintiffs did not seek to vindicate federal right. 28 U.S.C.A. § 1442(a); Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

**[2] Federal Courts 170B ⚖➞76.1**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.1 k. In General. Most Cited Cases
    The federal long-arm statute permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

**[3] Federal Courts 170B ⚖➞96**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk96 k. Affidavits and Other Evidence. Most Cited Cases
    Where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, a court need not permit even limited discovery.

**[4] Products Liability 313A ⚖➞177**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A &#128073;200**

313A Products Liability
   313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    United States Army approved reasonably precise specifications for helicopter's ignition system without continuous or automatic relight function, as required for state-law claims to be barred by government contractor defense, where Army specifically had reviewed contractor's design analyses, reports, and test plans, and attended multiple formal design meetings, and Army was well aware of availability of automatic relight system, but chose to forego that technology; although some of specifications were performance based, provision identifying absence of "continuous ignition capability" described particular aspect of ignition system's design, not performance characteristic.

**[5] Products Liability 313A &#128073;177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    The government contractor defense protects government contractors from tort liability that arises as a result of the contractor's compliance with the specifications of a federal government contract.

**[6] Products Liability 313A &#128073;177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    To successfully invoke the government contractor defense, the contractor must establish three elements: (1) the United States approved reason-

ably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

**[7] Products Liability 313A &#128073;177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    The government approved reasonably precise specifications, as required for the government contractor defense to apply to state-law claims, when the government engages in a thorough review of the allegedly defective design and takes an active role in testing and implementing that design.

**[8] Products Liability 313A &#128073;177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A &#128073;200**

313A Products Liability
   313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    United States Army approved reasonably precise specifications for design of helicopter engine control system and on-board computer, as required for state-law claims to be barred by government contractor defense, where contractor had provided Army personnel with lengthy and detailed design specifications describing both control system as whole and on-board computer, and Army carefully scrutinized, tested, and made necessary changes to those specifications before approving them; although contractor had some discretion, that discretion was limited to "implementation" of specific design requirements contained within approved specifications.

**[9] Products Liability 313A &#128073;177**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A ☜═══200**

313A Products Liability
   313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Contractor's prior development of similar helicopter engine control system for Great Britain's Royal Air Force did not deprive contractor of government contractor defense to bar state-law claims, since potential for increased liability could dissuade contractors from providing United States with sophisticated military equipment that they had initially designed for another nation's armed forces and that ultimately would put United States military at competitive disadvantage.

**[10] Products Liability 313A ☜═══177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A ☜═══200**

313A Products Liability
   313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Contractor that had contracted to configure aircraft and deliver final product containing defective ignition system and engine control system and on-board computer was entitled to government contractor defense to bar state-law claims, since government had approved reasonably precise design specifications for both of those component parts of helicopter.

**[11] Products Liability 313A ☜═══177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most

Cited Cases

**Products Liability 313A ☜═══200**

313A Products Liability
   313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Ignition system for helicopter, engine control system, and on-board computer conformed with reasonably precise design specifications approved by United States Army, as required for state-law claims to be barred by government contractor defense; although Army officer expressed frustration with contractors over their failure to provide promised "input/output table" to Army personnel and that I/O data might have provided evidence of "electrical anomaly," notion that measurements would have identified deviation from approved design specifications was speculative.

**[12] Products Liability 313A ☜═══177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    Under the government contractor defense, the operative test for conformity with reasonably precise specifications turns on whether the alleged defect existed independently of the design itself; absent some evidence of a latent manufacturing defect, a military contractor can establish conformity with reasonably precise specifications by showing extensive government involvement in the design, review, development, and testing of a product and by demonstrating extensive acceptance and use of the product following production.

**[13] Products Liability 313A ☜═══177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A ☜═══200**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

313A Products Liability
    313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Failure of helicopter to maintain flight in adverse weather conditions as specified in government contract did not deprive contractor of government contractor defense to bar state-law claims, since non-conformance with specification, as required to preclude that defense, meant more than that ultimate design feature did not achieve its intended goal.

**[14] Products Liability 313A ☜⇒177**

313A Products Liability
    313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    The government contractor defense does not depend upon satisfaction of some general performance goal; otherwise, a product involved in a design-induced accident would, as a definitional matter, always be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident.

**[15] Products Liability 313A ☜⇒177**

313A Products Liability
    313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    A government contractor is responsible only for warning the government of dangers about which it has actual knowledge under the final element of the government contractor defense which requires government contractors to warn the United States about the dangers in the use of the equipment that were known to the contractor but not to the United States.

**[16] Products Liability 313A ☜⇒177**

313A Products Liability
    313AII Elements and Concepts

      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A ☜⇒200**

313A Products Liability
    313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Contractor's knowledge of potential for helicopter engine to suffer water-induced flameout, or ice-induced flameout, did not deprive contractor of government contractor defense to bar state-law claims, since United States Army already was aware of that particular risk and approved specifications affirmatively acknowledged absence of continuous relight function, which would have allowed engine to restart automatically in that situation.

**[17] Products Liability 313A ☜⇒177**

313A Products Liability
    313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases
    The government contractor defense does not require a contractor to warn about dangers of which it merely should have known.

**[18] Products Liability 313A ☜⇒177**

313A Products Liability
    313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most Cited Cases

**Products Liability 313A ☜⇒200**

313A Products Liability
    313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Contractor's knowledge of electrical anomaly with helicopter's engine control system and on-board computer did not deprive contractor of government contractor defense to bar state-law claims, since other helicopters previously had experienced engine anomalies and that helicopter had been operated exclusively by United States Army, and thus

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

government personnel were necessarily aware of
that potential problem.

**[19] Products Liability 313A ⟨⟩177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most
Cited Cases

**Products Liability 313A ⟨⟩200**

313A Products Liability
   313AIII Particular Products
      313Ak200 k. Aircraft. Most Cited Cases
    Government contractor defense applied to bar
state-law failure to warn claims regarding electrical
anomaly with helicopter's engine control system
and on-board computer of which contractors should
have known, since United States Army considered,
reviewed, and determined which warnings to
provide, Army was fully responsible for operator's
manual and its contents based on government's
agreement with contractors, contractors delivered
operator's manual, and government had equal
awareness of allegedly undisclosed risks.

**[20] Products Liability 313A ⟨⟩177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most
Cited Cases
    A contractor cannot defeat a failure-to-warn
claim simply by establishing the elements of the
government contractor defense as it applies to
design and manufacturing defect claims; rather, the
contractor must show that it acted in compliance
with reasonably precise specifications imposed on
it by the United States in deciding whether to
provide a warning.

**[21] Products Liability 313A ⟨⟩177**

313A Products Liability
   313AII Elements and Concepts
      313Ak177 k. Government Contractors. Most

Cited Cases
    To defeat a failure-to-warn claim, a govern-
ment contractor must demonstrate that the govern-
ment approved reasonably precise specifications,
and thereby limited the contractor's ability to com-
ply with its duty to warn.

**[22] Federal Civil Procedure 170A ⟨⟩2553**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determina-
tion
            170Ak2553 k. Time for Considera-
tion of Motion. Most Cited Cases
    District court did not abuse its discretion in de-
clining plaintiffs' request for additional discovery,
where plaintiffs did not proffer sufficient facts to
show that evidence sought existed and that it would
prevent summary judgment. Fed.Rules
Civ.Proc.Rule 56(f), 28 U.S.C.A.

**[23] Federal Courts 170B ⟨⟩625**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(D) Presentation and Reservation in
Lower Court of Grounds of Review
        170BVIII(D)2 Objections and Exceptions
          170Bk625 k. Proceedings Preliminary
to Trial or Hearing. Most Cited Cases
    Plaintiffs waived any appellate challenge on
admissibility of summary judgment evidence intro-
duced in reply to motion for summary judgment,
where they did not object to, or otherwise chal-
lenge, introduction of that evidence in district court.
Fed.Rules Civ.Proc.Rule 56(f), 28 U.S.C.A.

Thomas J. Brandi, Daniel Dell'Osso (argued), and
Brian J. Malloy, The Brandi Law Firm, San Fran-
cisco, CA, for the appellants.

Steven S. Bell (argued), Charles W. Mulaney, and
Kathleen M. O'Sullivan, Perkins Coie, Seattle, WA,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

for appellee The Boeing Company.

Joanna E. Herman, James W. Huston (argued), William V. O'Connor, and Greg Reilly, Morrison & Foerster, San Diego, CA, for appellee Honeywell International, Inc.

Alan H. Collier (argued) and Mark R. Irvine, Fitzpatrick & Hunt, Tucker, Collier, Pagano, Aubert, Los Angeles, CA, for appellee Goodrich Pump & Engine Control Systems, Inc.

Michael A. Hession and Kevin R. Sutherland (argued), Clyde & Co., San Francisco, CA, for appellee AT Engine Controls Ltd.

Appeal from the United States District Court for the Northern District of California, Claudia A. Wilken, District Judge, Presiding. D.C. No. 4:07–cv–06396–CW.

Before J. CLIFFORD WALLACE, JOHN T. NOONAN, and RICHARD R. CLIFTON, Circuit Judges.

## OPINION

WALLACE, Senior Circuit Judge:

*1 This case arises from the tragic February 2007 crash of an Army Special Operations Aviation Regiment helicopter in Afghanistan. Plaintiffs, who include those injured and the heirs of those killed in the crash, appeal from the district court's dismissal of AT Engine Controls (ATEC) for lack of personal jurisdiction and from the court's summary judgment in favor of The Boeing Company (Boeing), Honeywell International, Inc. (Honeywell), and Goodrich Pump and Engine Control (Goodrich). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

**I.**

In February 2007, an Army-operated MH–47E Chinook helicopter crashed in the Kabul Province of Afghanistan. The helicopter was transporting military personnel to Bagram Airbase when it en-

countered snow, rain, and ice. Then, without warning, one of the Chinook's engines suddenly shut down, and the aircraft crashed. Eight servicemen were killed and fourteen were severely injured.

Two investigations into the cause of the crash revealed that it occurred after one of the helicopter's two engines suddenly flamed out. An initial Army investigation suggested that the aircraft's engine control system—the Full Authority Digital Electronic Control (FADEC)—unexpectedly shut down, causing the engine to fail. According to investigators, the engine's Digital Electronic Control Unit (DECU)—the onboard computer that controls fuel flow to the engine—malfunctioned due to some kind of electrical anomaly.

A second investigation, conducted primarily by the manufacturers of the MH–47E, suggested that the crash occurred for a different reason. According to these investigators, the aircraft's engine flamed out because it ingested an inordinate amount of water and ice during the inclement weather. This investigation further suggested, however, that the flameout might have been avoided if the MH–47E's ignition system had been equipped with a continuous or automatic relight feature, which would have allowed the engine to restart automatically in the event of a water- or ice-induced flameout.

Six months after the crash, Plaintiffs filed an action against the contractors that designed and manufactured the allegedly defective aircraft. These contractors include: Boeing, which designed the helicopter's airframe; Honeywell, which designed and built the engines (including the ignition system); Goodrich, which designed the FADEC and was responsible for the DECU; and ATEC, a British company that designed the hardware and software for the DECU.

Initially, Plaintiffs sought relief in California state court, alleging that defendants were liable on theories of product liability, negligence, wrongful death, and loss of consortium. Boeing, however, quickly removed the action to federal court pursu-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

ant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a), which allows federal officers and agents to remove state-law claims to federal court by asserting a federal defense.

In a series of written orders, the district court rejected each of Plaintiffs' claims. First, in a March 10, 2009 order, the district court ruled that it lacked personal jurisdiction over ATEC. Then, in January 2010, the district court granted summary judgment to Boeing, Honeywell, and Goodrich (collectively the Contractors). *Getz v. Boeing Co.,* 690 F.Supp.2d 982 (N.D.Cal.2010). According to the district court, Plaintiffs' state-law claims against the Contractors were preempted by the government contractor defense. *Id.*

## II.

**\*2** [1][2] In resolving Plaintiffs' appeal, we turn first to the district court's dismissal of ATEC, the British company, for lack of personal jurisdiction. According to Plaintiffs, ATEC is subject to personal jurisdiction in California pursuant to Federal Rule of Civil Procedure 4(k)(2). This Rule, which is commonly known as the federal long-arm statute, permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole. Rule 4(k)(2), titled "Federal Claim Outside State–Court Jurisdiction," provides:

For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

The only question presented here is whether Plaintiffs satisfy the first part of Rule 4(k)(2). That is, do any of their claims against ATEC—pure

state-law claims for product liability, negligence, wrongful death, and loss of consortium—arise under federal law?

Until now, we have not examined the precise parameters of the arising-under-federal-law element of Rule 4(k)(2). We need not, however, navigate through uncharted terrain without a compass. Here, the commentary to the Rule and the well-reasoned decisions of our sister circuits agree that Rule 4(k)(2)'s reach is limited to substantive federal claims.

First, the commentary explains that Rule 4(k)(2) was enacted to "correct [ ] a gap in the enforcement of federal law." Fed.R.Civ.P. 4(k)(2), Advisory Committee Note. Under the former rules for service of process, federal courts looked to state law, even in federal question cases, whenever a federal statute was silent about the proper mechanism for service. *Id.; see also Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 111, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987) (recognizing the predecessor rule's limitations). As a result, foreign defendants having sufficient contacts with the United States as a whole, but not satisfying the applicable state long-arm statute, would be "shielded from the enforcement of federal law by the fortuity" of the Fourteenth Amendment's "favorable limitation on the power of state courts." Fed.R.Civ.P. 4(k)(2), Advisory Committee Note.

Rule 4(k)(2) eliminates this anomaly. Whereas foreign defendants lacking sufficient contacts with any single state could previously avoid responsibility for civil violations of our federal laws, the revised Rule allows federal courts to exercise jurisdiction over these defendants, subject only to the limitations of the Fifth Amendment's due process clause. *Id.* In this manner, Rule 4(k)(2) provides aggrieved plaintiffs with a mechanism for vindicating their federal rights in cases involving defendants that lack single-state contacts, but who possess minimum contacts with the United States as a whole. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

**\*3** However, Rule 4(k)(2) was narrowly tailored so as to avoid conflict with the Fourteenth Amendment's jurisdictional limits in cases alleging only state-law claims:

> This narrow extension of the federal reach applies only if a claim is made against the defendant under federal law. It does not establish personal jurisdiction if the *only claims are those arising under state law* or the law of another country, even though there might be diversity or alienage subject matter jurisdiction as to such claims.

*Id.* (emphasis added). Thus, in order to preserve the proper constitutional balance, Rule 4(k)(2) is available only to plaintiffs who allege a "federally created cause of action." 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1068 .1 (3d ed.1998).

Those circuits to address Rule 4(k)(2) have followed the approach set forth in the commentary. The Fifth Circuit, for instance, has limited the Rule to "substantive federal law claims." *World Tanker Carriers Corp. v. M/V Ya Mawlaya,* 99 F.3d 717, 722 (5th Cir .1996). Agreeing with *World Tanker,* the First Circuit has held that a claim that finds its "roots in ... a federal source" satisfies Rule 4(k)(2). *United States v. Swiss Am. Bank, Ltd.,* 191 F.3d 30, 45(1st Cir.1999); *see also Touchcom, Inc. v. Bereskin & Parr,* 574 F.3d 1403, 1413 (Fed.Cir.2009) (to meet the arising under requirement of Rule 4(k)(2), federal law must be "a necessary element of one of the [plaintiff's] well-pleaded complaints").

Based on the commentary and this authority, we hold that Plaintiffs' claims for product liability, negligence, wrongful death, and loss of consortium do not arise under federal law for purposes of Rule 4(k)(2). None of these purely statelaw claims alleges any violation of a federal right and none seeks "the enforcement of federal law." *See* Fed.R.Civ.P. 4(k)(2), Advisory Committee Note. Unfortunately for Plaintiffs, their complaint simply does not assert any "substantive federal law claim" or a claim that finds its "roots in a federal source." *See World Tanker Carriers,* 99 F.3d at 722; *Swiss Am. Bank,* 191 F.3d at 45.

Despite the non-federal basis of their complaint, Plaintiffs insist that their claims arise under federal law because the Contractors removed this action pursuant to the Federal Officer Removal Statute. *See* 28 U.S.C. § 1442(a)(permitting federal officers and agents to remove an otherwise statelaw action to federal court by raising a federal defense). According to Plaintiffs, their claims became substantively federal when the Contractors asserted a federal defense in their removal petition. The problem, at least for Plaintiffs, is that the Supreme Court's decision in *Arizona v. Manypenny,* 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981), forecloses their argument. There, the Court explained that "the invocation of removal jurisdiction by a federal officer does not revise or alter the underlying law to be applied." *Id.* at 242. Section 1442(a) confers "a purely derivative form of jurisdiction, neither enlarging nor contracting the rights of the parties." *Id* . Hence, the Contractors' decision to assert a federal defense merely provides us with subject-matter jurisdiction over this action. *See Mesa v. California,* 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) (section 1442(a) "serves to overcome the 'well-pleaded complaint' rule[, ] which would otherwise preclude removal even if a federal defense were alleged").

**\*4** Here, the "underlying law to be applied" is California state law. The only federal interest at issue—the Contractors' eligibility for a federal defense—has no bearing on Plaintiffs' ability to vindicate a *federal* right and it does not constitute an essential element of Plaintiffs' well-pleaded complaint. *See Cal. Shock Trauma Air Rescue v. State Compensation Ins. Fund,* 636 F.3d 538, 541 (9th Cir.2011). The existence of a federal defense does not transform purely state-law claims into "federally created cause[s] of action." *See* Wright & Miller, *supra,* § 1068.1 (the reach of Rule 4(k)(2)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

is limited to substantive federal-law claims). Accordingly, Rule 4(k)(2) does not apply. *See Manypenny,* 451 U.S. at 242.

[3] As for Plaintiffs' allegations that ATEC might nonetheless have minimum contacts with California, which they assert independently of their reliance on Rule 4(k)(2), we reject Plaintiffs' contention that the district court should have permitted additional jurisdictional discovery on this issue. "[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1160 (9th Cir.2006) (internal quotation marks omitted). Here, Plaintiffs fail to identify any specific facts, transactions, or conduct that would give rise to personal jurisdiction over ATEC in California. In light of their purely speculative allegations of attenuated jurisdictional contacts, the district court did not abuse its discretion when it denied Plaintiffs' request for further discovery. *See id.*

**III.**

[4][5] We turn now to the main issue presented in this appeal: whether Plaintiffs' state-law claims are barred by the government contractor defense. This defense protects government contractors from tort liability that arises as a result of the contractor's "compli[ance] with the specifications of a federal government contract." *In re Hanford Nuclear Reservation Litig.,* 534 F.3d 986, 1000 (9th Cir.2008); *see also Rodriguez v. Lockheed Martin Corp.,* 627 F.3d 1259, 1265(9th Cir.2010) (describing the defense as a shield to tort liability).

[6] The Supreme Court established the framework of the government contractor defense in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). There, the Court explained that procurement of military equipment involves "uniquely federal interests" that sometimes preempt a plaintiff's product liability claims against government contractors. *Id.* at 504. To invoke the defense successfully, the contractor

must establish three elements: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. In their appeal, Plaintiffs raise several challenges to each of these elements.

**A.**

*\*5* [7] Under *Boyle's* first element, a contractor must demonstrate that the government "approved reasonably precise specifications." *Id.* As we explained in *Snell v. Bell Helicopter Textron, Inc.,* the government's approval of a particular specification must be more than a cursory "rubber stamp" approving the design. 107 F.3d 744, 748 (9th Cir.1997). Rather, approval must result from a "continuous exchange " and "back and forth dialogue" between the contractor and the government. *Butler v. Ingalls Shipbuilding, Inc. .,* 89 F.3d 582, 585 (9th Cir.1996). When the government engages in a thorough review of the allegedly defective design and takes an active role in testing and implementing that design, *Boyle's* first element is met. *Id.*

Plaintiffs argue that the necessary specifications are lacking with respect to the following design features of the MH-47E Chinook: (i) the engine's ignition system, (ii) the FADECDECU, and (iii) the aircraft itself.

**1.**

According to Plaintiffs, the ignition system was defective because it was manufactured without a continuous relight function, which would have allowed the engine to restart automatically in the event of a water-induced flameout. Upon careful review of the record, we are confident that the United States Army approved reasonably precise specifications for this aspect of the MH-47E's ignition system, which was manufactured by Honeywell.

Under the terms of its contract with the Army, Honeywell was required to construct the MH-47E's engine pursuant to "Military Specification

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

AV–E–8593D." This provision, which is titled "General Specification for Engines, Aircraft, Turboshaft, and Turboprop," provides design criteria, performance expectations, and mandatory quality assurance testing for all military aircraft. Among other things, the Army's specification includes diagrams and drawings for engine controls; engine configuration requirements; and tests for the engine's ignition system. Specification AV–E–8593D also required Honeywell to submit a proposed "complete engine specification" for governmental approval.

Honeywell did just that when it submitted its Prime Item Development Specifications to the Army. These specifications contain numerous drawings, figures, and schematics for the engine used in the MH–47E Chinook. They also provide a detailed description of the allegedly defective ignition system. Most importantly, at least for purposes of resolving this appeal, Honeywell's specifications explicitly state:"Continuous duty ignition capability is not provided." Hence, the specifications explicitly identify the "design of the particular feature at issue" and expressly observe that feature's absence. *See Snell,* 107 F.3d at 747. In this sense, Honeywell's specifications describe, in reasonable detail, the design feature alleged to be defective. *See id.; Boyle,* 487 U.S. at 512.

It is also clear that the Army's approval of this specification resulted from careful deliberation, not a"rubber stamp." *See Snell,* 107 F.3d at 748. The undisputed record provides that the Aviation Engineering Directorate—which is charged with evaluating designs, performing quality assurance tests, and approving aviation equipment—specifically reviewed Honeywell's design analyses, reports, and test plans, and attended multiple formal design meetings. Members of the Directorate also attested that the government was well aware of the availability of an automatic relight system, but chose to forego that technology. This type of "continuous exchange" and "back and forth dialogue" is what is necessary to demonstrate that the Army exercised

its judgment in approving Honeywell's design for the ignition system. *Butler,* 89 F.3d at 585.

**\*6** We also reject the notion that the approved specifications constitute mere performance criteria, instead of design specifications. *See In re Haw. Fed. Asbestos Cases,* 960 F.2d 806, 813 (9th Cir.1992) (to qualify for the government contractor defense, approved specifications must do more than merely identify "a certain level of performance"). Although some of the specifications identified by the parties are performance based—for example, the "Ignition System Performance" specification—the key specifications at issue pertain to the MH–47E's design. In particular, the provision identifying the absence of "continuous ignition capability" describes a particular aspect of the ignition system's design, not a performance characteristic.

**2.**

[8] The Army also approved reasonably precise specifications for the design of the FADEC–DECU, which, again, is the engine control system and computer that allegedly malfunctioned immediately prior to the February 2007 crash. According to the undisputed record, Goodrich—the contractor directly responsible for this component—provided Army personnel with lengthy and detailed design specifications describing both the FADEC (the control system as a whole) and the DECU (the FADEC's onboard computer). Among other things, these specifications include complex diagrams and design drawings of the FADEC, a description of fault monitoring procedures for the DECU, algorithms for troubleshooting, and a system for engine fail detection.

Undisputed affidavit evidence also establishes that the Army carefully reviewed these specifications, scrutinized their content, and evaluated the reported test results before approving Goodrich's specifications. Army engineers attended regular technical meetings pertaining to the FADECDECU throughout the procurement process. These engineers also issued formal requests for information pertaining to various design aspects of the FADEC

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

system and called periodic meetings to discuss and test the fuel control design, software design, and the design of the electronics (that is, the DECU). At one point, Army engineers even rejected the "FADEC control system specification," insisting that Goodrich address certain technical concerns. Such critical and substantive review ultimately culminating in approval is the type of careful consideration necessary to demonstrate that the government made a discretionary decision when it approved the FADEC–DECU. *See Butler,* 89 F.3d at 585.

Plaintiffs present no contrary evidence. Instead, they rely heavily on a single statement contained in Goodrich's approved specifications for the FADEC–DECU:

Specific implementations used to describe the functional requirements throughout this document are for informational understanding only. Actual implementations used to meet these requirements will be at the discretion of the designer unless specifically stated otherwise.

According to Plaintiffs, the government could not have exercised actual discretion over the design because that discretion was left to Goodrich. There are at least two flaws in Plaintiffs' argument. First, the statement at issue cannot reasonably be construed as a broad grant of discretion over the final product. Rather, discretion was limited to "implementation" of the specific design requirements contained within the approved specifications and thus does not defeat the government contractor defense. *See, e.g., McKay v. Rockwell Int'l Corp.,* 704 F.2d 444, 450 (9th Cir.1983) (government contractor defense may still apply if the specifications leave some "discretion to the supplier in the formulation of the product's design"); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 999 (7th Cir.1996) ("[T]he fact that Oshkosh may have retained some discretion to position the fuel tanks and exhaust system *within the envelope permitted by the specifications,* standing alone, [does not] defeat the government contractor defense" (emphasis added)). Second, and perhaps more importantly, the evid-

ence discussed earlier establishes that the Army carefully scrutinized, tested, and made necessary changes to the FADECDECU. This type of exchange and scrutiny is sufficient to demonstrate that the government exercised judgment in approving this product's design. *See Butler,* 89 F.3d at 585 .

*7 [9] Contrary to Plaintiffs' view, it makes no difference, for purposes of our analysis, that a similar engine control system had previously been developed for Great Britain's Royal Air Force. Although *Boyle* makes the government contractor defense inapplicable when "a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with" a particular design feature, 487 U.S. at 509, this defense does not require the government to create the design or the specifications. As long as the United States makes "a significant policy judgment" in approving the design, nothing precludes the government from procuring designs and products that were initially developed for other nations. *Id.* at 513; *see also Carley v. Wheeled Coach,* 991 F.2d 1117, 1125 (3d Cir.1993) ("[I]t is necessary only that the government approve, rather than create, the specifications").

If we were to hold otherwise, the potential for increased liability could dissuade contractors from providing the United States with sophisticated military equipment that they had initially designed for another nation's armed forces. This ultimately would put the United States military at a competitive disadvantage: either the government would be unable to obtain necessary equipment or it would be forced to pay higher prices to offset the contractor's increased risk of liability. Therefore, we are persuaded by the Eleventh Circuit's recent decision in *Brinson v. Raytheon Co.,* 571 F.3d 1348 (11th Cir.2009). There, the court imposed the government contractor defense even though the product design had been patented before it was approved by the United States Air Force. *Id.* at 1357. The court did so because it was clear that the Air Force carefully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

"considered" and "reviewed" the design prior to approval and implementation. *Id. Boyle* does not require more than this.

**3.**

[10] While they do not identify any additional defect, Plaintiffs argue that "the helicopter as a whole" was defective. As far as we can tell, this argument is premised on the theory that Boeing, which was contracted to configure the aircraft, delivered a final product containing a defective ignition system and/or FADEC–DECU. We reject Plaintiffs' argument for the reasons expressed above: the government approved reasonably precise design specifications for both of these component parts.

**B.**

[11] We turn now to the second element of the government contractor defense. That element requires a defendant to establish that the product conformed with approved specifications. *Boyle,* 487 U.S. at 512. Until now, we have not provided a detailed examination of this requirement. In *Snell,* for instance, we refused to reach the conformity question because the contractor did not establish *Boyle's* first element as a matter of law. 107 F.3d at 748–49. Other circuits, however, have extensively examined the conformity element, and their analysis provides persuasive guidance.

**\*8** [12] Following our sister circuits' lead, we hold that the operative test for conformity with reasonably precise specifications turns on whether "the alleged defect ... exist[ed] independently of the design itself." *Miller v. Diamond Shamrock Co.,* 275 F.3d 414, 421 (5th Cir.2001) (internal alteration omitted) (internal quotation marks omitted)."To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." *Harduvel v. Gen. Dynamics Corp.,* 878 F.2d 1311, 1321(11th Cir.1989). Therefore, absent some evidence of a latent manufacturing defect, a military contractor can establish conformity with reasonably precise specifications by showing "[e]xtensive government involvement in the design, review, development and testing of a product" and by demonstrating "extensive acceptance and use of the product following production." *Kerstetter v. Pac. Scientific Co.,* 210 F.3d 431, 435–36 (5th Cir.2000).

Upon careful review of the record, we conclude that the MH-47E conformed with the approved specifications for both the ignition system and the FADEC–DECU. The government invested years in reviewing, developing, and testing both the MH-47E and its engine. When the finished helicopter was delivered, Army officials again carefully examined the engine, inspected the aircraft's component parts, conducted test flights, and administered rigorous tests and examinations to ensure conformity. Army officials then executed a DD Form 250—a Material Inspection and Receiving Report—for both the ignition system and the FADEC–DECU. Through that form, the Army officially certified "that all articles delivered [were] inspected and found to conform in all respects ... to all applicable blueprints, specifications, and standards." Because Plaintiffs do not present any evidence of a latent manufacturing defect that was undiscovered at the time of acceptance, the government's careful scrutiny and subsequent certification of the MH-47E provide sufficient proof of conformity. *See Miller,* 275 F.3d at 421; *Kerstetter,* 210 F.3d at 435–36.

In an effort to overcome summary judgment, Plaintiffs place great emphasis on a post-accident email addressed to the Contractors. In it, an Army officer expressed frustration with the Contractors over their failure to provide a promised "input/output table" to Army personnel. Apparently, this table would have measured "the electrical parameters used by the DECU to control" the engines on the MH-47E. The email states:

> For the record, the request for the I/O table was made because a FADEC/DECU Electrical Interface Control Document was apparently never written during the design, development, and testing of the FADEC System. Action item 33/34 directly requested that Boeing and Honeywell

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

provide the Aircraft to DECU and the Engine to DECU I/O, respectively, contractually required to be delivered back in 1988. We are still waiting for the [sic ] a copy of the data delivered by either company that met that specific contractual obligation.

*9 This email leaves unclear how the absence of a 1988 I/O table has any bearing on whether the DECU conformed with reasonably precise design specifications. *See Boyle,* 487 U.S. at 512. Significantly, nothing in the record explains how the I/O data might have implicated a manufacturing aberration in the DECU's component parts that existed "independently of the design itself." *See Miller,* 275 F.3d at 421. Thus, while Plaintiffs suggest that the I/O data *might* have provided evidence of an "electrical anomaly," the notion that the measurements would have identified a deviation from the approved design specifications is speculative and thus insufficient to defeat summary judgment. *See Nelson v. Pima Cmty. Coll.,* 83 F.3d 1075, 1081–82 (9th Cir.1996) (a litigant may not rely on mere speculation and conjecture to avoid summary judgment).

[13] In addition, while the MH–47E Chinook's engine obviously did not perform like it was supposed to—the aircraft's engine stalled midflight—this does not preclude the Contractors from establishing the defense. Here, Plaintiffs are quick to point out that the government contracted for a helicopter that would have maintained flight in the adverse weather conditions encountered by the MH–47E. Likewise, they assert that "the failure or shutdown of one engine" was not supposed to "compromise the remaining engine or *safety of flight systems.* " The problem for Plaintiffs is that "[n]onconformance with a specification means more than that the ultimate design feature does not achieve its intended goal." *Kerstetter,* 210 F.3d at 435; *see also Oliver,* 96 F.3d at 1000(mere allegation of nonperformance is insufficient).

[14] The government contractor defense does not depend upon satisfaction of some general per-

formance goal. Otherwise, "[a] product involved in a design-induced accident would, as a definitional matter, always be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident." *Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698, 703 (4th Cir.1989). For the defense to have any substance, "[n]onconformance to precise specifications must mean more than that the design does not work in compliance with some 'general admonition against an unwanted condition.' " *Id.* at 703, *quoting Harduvel,* 878 F.2d at 1319 n. 3. Here, the Contractors present undisputed evidence that the ignition system and the DECU conformed with the reasonably precise design specifications approved by the Army. That is the end of the matter for purposes of *Boyle's* test for conformity.

**C.**

[15] The final element of the government contractor defense requires government contractors to warn the United States "about the dangers in the use of the equipment that were known to the [contractor] but not to the United States." *Boyle,* 487 U.S. at 512. Under this element,"a government contractor is only responsible for warning the government of dangers about which it has actual knowledge." *Kerstetter,* 210 F.3d at 436 (internal quotation marks omitted).

*10 [16] We conclude that the Contractors satisfied this final requirement. With respect to the potential for a water- or ice-induced flameout, it is clear that the Army was already aware of this particular risk. As Honeywell points out, a 1990 Army Field Manual stated explicitly that "[t]urbine engines sometimes tend to flameout" and that "ingestion of ice broken loose at the engine inlet may cause such a situation." In addition, the Army was well aware of an automatic relight feature to overcome this problem. The Chief of the Aviation Engineering Directorate, which approved the design specifications for the MH–47E, stated in his undisputed affidavit that "automatic re-light ... techno-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

logy has always been known to the Army, but the Army elected not to include it" on the Chinook line of helicopters. Moreover, because the approved specifications affirmatively acknowledged the absence of a continuous relight function, Plaintiffs cannot seriously argue that the Army was unaware of that component's existence. *See Boyle,* 487 U.S. at 512.

[17] Plaintiffs nonetheless insist that issues of fact remain because the Army had never heard of an engine *actually* flaming out due to water or ice ingestion. The problem for Plaintiffs is that the Contractors were equally unaware of any prior incidents. At most, Plaintiffs' evidence suggests that the Contractors should have been aware of the alleged defect. *Boyle,* however, does not require a contractor to warn about dangers of which it merely should have known. 487 U.S. at 512; *Kerstetter,* 210 F.3d at 436.

[18] To the extent that the crash may have occurred as a result of an electrical anomaly with the FADEC–DECU, summary judgment is likewise appropriate. According to Plaintiffs, the Contractors should have warned of this potential defect because they were aware of other Chinook aircraft that had experienced engine anomalies prior to the February 2007 crash. A review of these other incidents, however, makes clear that all of these aircraft were MH–47Es. Because the MH–47E is operated exclusively by the United States Army, government personnel were necessarily aware of the potential problem prior to the crash. Again, *Boyle* does not require government contractors to warn of dangers that were already known to the United States. 487 U.S. at 512.

**IV.**

[19][20][21] Our analysis to this point leaves us with just one additional issue to resolve: whether Plaintiffs can state a claim against the Contractors for allegedly violating their state-law duty to warn of dangers of which the Contractors should have known. Although federal courts, including ours, have unanimously held that the government con-

tractor defense may preempt these types of claims, a contractor cannot defeat a failure-to-warn claim simply by establishing the elements of the *Boyle* defense as it applies to design and manufacturing defect claims. *See e.g., Butler,* 89 F.3d at 586. Rather, the contractor must show that it "act[ed] in compliance with 'reasonably precise specifications' imposed on it by the United States" in deciding whether "to provide a warning." *Id.* (internal alteration omitted). As the Seventh Circuit has explained:

**\*11** [W]hen state law would otherwise impose liability for a failure to warn, that law can be displaced when the contractor can show that: (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government.

*Oliver,* 96 F.3d at 1003–04. This means that the contractor must demonstrate that the government "approved reasonably precise specifications" thereby limiting the contractor's "ability to comply with [its] duty to warn." *Snell,* 107 F.3d at 749 (internal quotation marks omitted).

According to Plaintiffs, the Contractors violated their duty to warn because they knew or should have known of an electrical problem with the FADEC–DECU, but failed to provide timely warnings to the operators of the MH–47E Chinook.

It is beyond dispute that the "government exercised its discretion" when it selected relevant warnings for the MH47E. *Oliver,* 96 F.3d at 1003. Here, the complete set of warnings is contained in the helicopter's Operator's Manual. That Manual sets forth specific "warnings," "emergency procedures," and "critical instructions" for the aircraft. Significantly, based on the government's agreement with the Contractors, the Army was fully responsible for the Operator's Manual and its contents. Thus, because the Army, not the Contractors, selected which warnings to include in the Manual, Plaintiffs' con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16
--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))

tention that the government did not exercise discretion over the content of these warnings is meritless. Where "the government chooses its own warnings, the contractor has certainly fulfilled [*Boyle* 's] first condition." *Id.* at 1004; *see also Tate v. Boeing Helicopters,* 55 F.3d 1150, 1157 (6th Cir.1995) ("[W]here the government goes beyond approval and actually determines for itself the warnings to be provided, the contractor has surely" demonstrated that "the government exercised its discretion").

The Contractors easily satisfy the second and third elements of the government contractor defense as it applies to Plaintiffs' state-law failure to warn claims. The second element—providing the warning required by the government—is satisfied by the Contractor's delivery of the Operator's Manual. As for the final element—whether the Contractors "warned the government about dangers in the equipment's use that were known to the [C]ontractor[s] but not to the government"—this element is satisfied for the reasons explained earlier in connection with Plaintiffs' design and manufacturing defect claims: the Contractors and the government had equal awareness of the allegedly undisclosed risks. *See Oliver,* 96 F.3d at 1004.

We are not persuaded by Plaintiffs' suggestion that our decisions in *Butler* and *Hawaii Federal Asbestos* limit the defense to cases in which the government specifically forbids warnings altogether or to instances where the government explicitly dictates the content of the warnings adopted. These cases only require that governmental approval (or disapproval) of particular warnings "conflict" with the contractor's "duty to warn under state law." *Butler,* 89 F.3d at 586; *see also Haw. Fed. Asbestos,* 960 F.2d at 813(rejecting the defense where the government's specifications were silent about warnings). To read these cases as limiting preemption to those instances where the government forbids additional warning or dictates the precise contents of a warning would be inconsistent with the Court's decision in *Boyle. See Oliver,* 96 F.3d at 1004 n. 8 (rejecting plaintiff's argument that *Butler* and

*Hawaii Federal Asbestos* could be interpreted as imposing such a "rigid" rule). *Boyle* makes clear that government discretion, rather than dictation, is the standard. 487 U.S. at 512–13. Accordingly, given that the Army considered, reviewed, and determined which warnings to provide, the government's exercise of discretion necessarily"conflicts" with the Contractors' "duty to warn under state law." *See Butler,* 89 F.3d at 586.

**V.**

***12** [22] Finally, we address two evidentiary issues. First, we hold that the district court did not abuse its discretion in declining Plaintiffs' request for additional discovery pursuant to Federal Rule of Civil Procedure 56(f). Here, Plaintiffs failed to "proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Blough v. Holland Realty, Inc .,* 574 F.3d 1084, 1091 n. 5 (9th Cir.2009) (internal quotation marks omitted) (rejecting similar arguments asserted pursuant to Rule 56(f)).

[23] Similarly, the district court did not abuse its discretion by entering summary judgment based on the MH–47E's Operator's Manual, which the Contractors submitted for the first time in their reply to the motion for summary judgment. According to Plaintiffs, the district court was not permitted to consider this evidence without first giving them an opportunity to respond. *Provenz v. Miller,* 102 F.3d 1478, 1483(9th Cir.1996) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the nonmovant an opportunity to respond" (internal alteration omitted) (internal quotation marks omitted)). However, by failing to object to or otherwise challenge the introduction of the Operator's Manual in the district court, Plaintiffs have waived any challenge on the admissibility of this evidence. *See Yamashita v. Territory of Guam,* 59 F.3d 114, 117 (9th Cir.1995) (holding a similar evidentiary challenge as waived).

**VI.**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589
**(Cite as: 2011 WL 3275957 (C.A.9 (Cal.)))**

We have considered each of Plaintiffs' arguments challenging the district court's dismissal of ATEC for lack of personal jurisdiction and its summary judgment in favor of the Contractors. None of these arguments are persuasive.

Finally, because the government contractor defense bars each of Plaintiffs' state-law claims, we need not consider the Contractors' alternative argument—based on the combatant activities exception—for upholding the district court's summary judgment. *See Morse v. Frederick,* 551 U.S. 393, 431, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) ("[T]he cardinal principle of judicial restraint is that if it is not necessary to decide more, it is necessary not to decide more" (Breyer, J., concurring in the judgment in part and dissenting in part) (internal quotation marks omitted)).

**AFFIRMED.**

C.A.9 (Cal.),2011.
Getz v. The Boeing Co.
--- F.3d ----, 2011 WL 3275957 (C.A.9 (Cal.)), 11 Cal. Daily Op. Serv. 9710, 2011 Daily Journal D.A.R. 11,589

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.