CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 10 – 11337   DIVISION " "   SEC. " "

FREDDIE JOSEPH DUPRE

VERSUS

TODD SHIPYARDS CORPORATION and its insurer, CONTINENTAL INSURANCE COMPANY (as successor to Fidelity & Casualty Company of New York); EAGLE, INC.; OWENS-ILLINOIS, INC.; BAYER CROPSCIENCE, INC. (AS SUCCESSOR OF LIABILITY TO RHONE-POULENC AG COMPANY F/K/A AMCHEM PRODUCTS, INC. F/K/A BENJAMIN FOSTER COMPANY); CBS CORPORATION (F/K/A WESTINGHOUSE ELECTRIC CORPORATION); FOSTER WHEELER LLC; GENERAL ELECTRIC COMPANY; AND UNIROYAL, INC.

FILED:_____     _____
                                                                              DEPUTY CLERK

### PETITION FOR DAMAGES

The petition of Freddie Joseph Dupre, a person of the full age of majority and resident of the State of Louisiana, with respect represents:

1.

Defendants, Todd Shipyards Corporation (f/k/a Todd-Johnson Dry Docks, Inc.); Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.); Foster-Wheeler, LLC (formerly Foster Wheeler Corporation); Owens-Illinois, Inc.; Bayer Cropscience, Inc. (Successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company); General Electric Company; CBS Corporation (f/k/a Westinghouse Electric Corporation); and Uniroyal, Inc. (hereinafter collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws of the various states of the United States. Asbestos defendants all have their principal place of business in various states of the United States. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

2.

Defendant, Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.), is a domestic corporation with its registered offices in the Parish of Orleans, State of Louisiana. In addition, tortious conduct of Eagle, Inc. and Todd Shipyards Corporation occurred in the Parish

EXHIBIT 1

Exhibit 1 - Volume 1

of Orleans. Moreover, Todd Shipyards Corporation is a foreign corporation which, at the time of

Freddie Dupre's exposure while employed there, was licensed to do and doing business in the

Parish of Orleans, State of Louisiana, with its principal business establishment as designated in

its application to do business in the Parish of Orleans. Freddie Dupre's exposure to asbestos

occurred in Orleans Parish. Accordingly, venue is proper in Orleans Parish against all defendants

pursuant to Louisiana Code of Civil Procedure Articles 42, 73, and 74.

3.

At all material times herein, A. H. Smith, Jack S. Smith, Jr., and J. N. Pharr, were executive

officers of Todd Shipyards Corporation with the specific responsibility for the health and safety

of Freddie Dupre and his fellow employees during the time Mr. Dupre was exposed to substances

which resulted in his mesothelioma and other ill effects related thereto. A. H. Smith, Jack S.

Smith, Jr., and J. N. Pharr, have since died or cannot be located, and pursuant to Louisiana

Revised Statute 22:1269, plaintiffs herein assert a direct action against Continental Insurance

Company (as successor by merger to Fidelity and Casualty Company of New York), who sold

insurance coverage to Todd Shipyards Corporation and, at all times material herein, were the

insurance carriers covering all of the foregoing individuals.

4.

Pursuant to Louisiana Revised Statute 22:1269 (formerly 22:655), plaintiff herein asserts a

direct action against Continental Insurance Company (as successor to The Fidelity and Casualty

Company of New York), who at all times material herein, was the general liability carrier

covering Todd Shipyards Corporation and its executive officers for the liability asserted herein.

5.

Freddie Dupre was employed in various positions by or on the premises of the Todd Shipyards

Corporation, from approximately 1944 through 1945. On a daily basis during this employment, Mr.

Dupre was exposed to dangerously high levels of toxic substances, including asbestos, in the normal

routine course of his work.

6.

As a result of these exposures to toxic substances, including asbestos, Freddie Dupre contracted asbestos-related mesothelioma and other ill-health effects associated therewith, which was first diagnosed on approximately September 29, 2010.

7.

Defendants, Todd Shipyards Corporation and its executive officers, had the responsibility for the health and safety of Freddie Dupre and his fellow employees during the time Mr. Dupre was exposed to the substances which resulted in his mesothelioma and other ill health effects related thereto. Todd Shipyards Corporation and its executive officers had the responsibility of providing Mr. Dupre with a safe place to work; however, Todd Shipyards Corporation and its executive officers failed to protect Mr. Dupre from the dangers of asbestos dust exposure, for which Todd Shipyards Corporation and its executive officers are liable to plaintiff.

8.

Defendants, Todd Shipyards Corporation and its executive officers, had the responsibility of providing Freddie Dupre with a safe place to work and safety equipment; however they negligently and/or intentionally failed to carry out these duties and failed to protect Mr. Dupre from the dangers of toxic fiber and asbestos dust exposure. Todd Shipyards Corporation allowed and caused Mr. Dupre to be exposed to asbestos and failed to provide a safe place to work. As owner of the premise containing toxic asbestos, Todd Shipyards Corporation failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Mr. Dupre from the unreasonably dangerous conditions created by asbestos which existed on their premises and/or over which defendants had care, custody or control. At all times material herein, standards were in existence which required defendants herein to provide to Mr. Dupre and his co-workers who handled or were exposed to harmful material with protection from the harms of asbestos. Todd Shipyards Corporation failed and/or willfully refused to comply with these standards thereby resulting in exposure to asbestos to Mr. Dupre, thereby resulting in his injuries.

9.

In addition to the above acts of negligence, strict liability, absolute liability, and fault identified throughout this petition, Todd Shipyards Corporation is strictly liable under a theory of premises liability.  Todd Shipyards Corporation was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Mr. Dupre would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Dupre knowledge of the dangers to their health from exposure to asbestos fiber.

10.

In addition to the foregoing acts of negligence and intentional concealment, Todd Shipyards Corporation and its executive officers are guilty of the following:

a) Failing to reveal and knowingly concealing critical medical information to and from Mr. Dupre;
b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process and/or in connection with the work which exposed Mr. Dupre;
c) Failing to provide necessary protection to Mr. Dupre;
d) Failing to provide clean, respirable air and proper ventilation;
e) Failing to provide necessary showers and special clothing;
f) Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;
g) Failing to provide necessary and adequate respiratory protection;
h) Failing to warn employees of the dangers associated with exposure to asbestos;
I) Failing to use non-asbestos containing products including on jobs where non-asbestos containing products should have been used;
j) Wanton and reckless disregard in the storage, handling, and transportation of asbestos;
k) Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;
l) Failing to warn of the dangers of exposure to asbestos;
m) Requiring employees to dispose of asbestos without precautions to prevent exposure;
n) Failing to post warnings regarding asbestos and the hazards of same;
o) Failing to warn employees that exposure to asbestos could cause deadly diseases including mesothelioma, asbestosis, pleural thickening, and pleural plaques; and
p) Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, and mesothelioma;

These defendants committed these intentional acts knowing full well that Mr. Dupre's injuries would follow or were substantially certain to follow.

-4-

11.

Freddie Dupre was employed in various positions by and on the premises of Todd Shipyards Corporation at their facilities in Orleans Parish. On a daily basis during this employment, he was exposed to dangerously high levels of asbestos in the normal routine course of his work. At all times during these employments. Mr. Dupre was exposed to asbestos and asbestos-containing products manufactured, distributed, and sold by the "asbestos defendants."

12.

As a result of his exposure to asbestos fibers, Freddie Dupre contracted mesothelioma, which was first diagnosed on or around September 29, 2010.

13.

Defendants, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.); Uniroyal, Inc., CBS Corporation (f/k/a Westinghouse Electric Corporation); General Electric Company; Bayer Cropscience, Inc., Foster-Wheeler, LLC (formerly Foster Wheeler Corporation); and Owens-Illinois, Inc. were in the business of manufacturing, fabricating, selling and/or distributing asbestos-containing products, including but not limited to asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, jackets, turbines and/or boilers. These defendants sold, installed, removed and/or abated these products to and/or at Todd Shipyards Corporation at various times while Freddie Dupre was employed at Todd Shipyards Corporation. Additionally, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.), General Electric, and Westinghouse Electric Corporation, and Foster Wheeler LLC would package asbestos products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus, making them liable as the manufacturer under Louisiana law. Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.) also did contracting work at Todd Shipyards Corporation where Mr. Dupre was working thereby exposing Mr. Dupre during their handling of asbestos-containing products. Mr. Dupre was exposed to asbestos-containing products manufactured, distributed and sold by all "asbestos defendants" named in this petition.

14.

   The asbestos-containing products manufactured, distributed, sold, and/or used by all "asbestos-defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, defendants failed and refused to warn Freddie Dupre of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos, and that it could cause diseases such as lung cancer, asbestosis, pleural calcification, pleural thickening, mesothelioma, and other cancers.

15.

   As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, sold and/or used by the "asbestos defendants," Freddie Dupre inhaled asbestos fibers. These loose asbestos fibers were emitted by the normal use of said products, proximately causing Mr. Dupre's mesothelioma and other related ill health effects. Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, selling and/or using an unreasonable dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

16.

   Prior to the time Mr. Dupre was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana law.

17.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

18.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Freddie Dupre was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma which was first diagnosed on or around September 29, 2010.

19.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Dupre and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

20.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer, Strabo, and the Roman historian, Pliny the Elder, both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause

asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Freddie Dupre.

21.

By the time Freddie Dupre began working with and around asbestos products, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh-Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, Freddie Dupre was never warned of any hazard associated with asbestos, was never protected by use of adequate ventilation, was required to work next to insulators using asbestos products and worked with and around asbestos-containing products. He never saw a warning on any asbestos product, nor was he warned by any contractor using asbestos products. Despite the fact that all defendants were aware of the hazards of asbestos and other toxic substances to which Freddie Dupre was exposed, they failed and refused to warn of these dangers, and, furthermore, they concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law.

22.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioner in the following manner:

1.  The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2.  The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:
    a.)    To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;
    b.) To assist in the continued pecuniary gain of the defendants

through the sale of asbestos products to an ignorant public;

   c.) To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

   d.) To provide a defense against lawsuits brought for injury resulting from asbestos disease;

   e.) To prevent relevant medical inquiry about asbestos disease;

   f.) To mislead the general public, and the workers, including Freddie Dupre, about the hazards associated with asbestos products; and

   g.) To induce workers including Freddie Dupre, to use and continue to use asbestos products.

3.) Workers, including Freddie Dupre, reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because plaintiff believed it to be safe.

4.) Defendants, intended for the plaintiff and other similarly situated to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5.) Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the plaintiff and others deciding to use the said asbestos-containing products to which plaintiff was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

23.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insureds who manufactured, used, and/or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Freddie Dupre was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the *McNeely* case and others like it

injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates"; he wrote that even though rates for those in the asbestos business were high, "their adequacy . is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance—"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose money on it." (*See* Deposition of Harry J. Flynn in *Bradley v. Todd Shipyards, Inc.*, C.A. No. 85 - 05657, Div. "D", Civil District Court for the Parish of Orleans.)

24.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) is shown by numerous documents and testimony. In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims. The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insureds were working together to discourage plaintiffs from pursuing valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the *Borel* case of course sets a very bad precedence for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a **'game plan'** for the continued defense of these asbestosis cases **with the other defendants.**" In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance

companies would resist pending cases "and attempt to make this economically (sic) impossible for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by plaintiffs and employees such as Freddie Dupre, and plaintiff herein shows that the defendants, to this day, are committing fraud. All defendants, especially the premise owners and employers of Freddie Dupre, had intimate knowledge of the dangers of asbestos from their own dealings with insurance and their insurance carriers.

25.

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M") and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M

facilities and facilities of other members of the asbestos industry.  Dr. Lanza felt that the

Metropolitan Life Insurance Company should advise the companies of the types of respirators

which should be provided to the employees engaged in making a study of this problem.  On

December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof"

of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of

Inhalation of Asbestos Dust on the Lungs of Asbestos Workers."  This "draft" was also circulated

to representatives of Raybestos-Manhattan, who prepared editorial comments and

recommendations for Dr. Lanza concerning the final publication of the report.  Johns-Manville

prepared similar comments.  The Metropolitan report informed Raybestos-Manhattan and Johns-

Manville of the following:  that prolonged exposure to asbestos dust caused pulmonary fibrosis;

that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis

to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could

be substantially reduced.  After incorporating some of J-M's and R-M's editorial suggestions, Dr.

Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers"

in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

26.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson,

President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to

participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute.  Dr.

Leroy U. Gardner was the director of the Trudeau Foundation at the time.  A report of these works

was prepared by Dr. Gardner on April 18, 1938.  The report was sent to Vandiver Brown, who in

turn sent it to Dr. Lanza for his comments.

27.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob

Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and

Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung

changes which he believed were due to asbestos exposure.  Dr. Roemer advised that the men be

informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of X-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way'." (Deposition Charles H. Roemer taken April 25, 1984, *Johns-Manville Corp. et al. v. the United States of American*, U.S. Claims Court Civ. No. 465-83C.)

28.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

29.

The "Air Hygiene Foundation" was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organization's name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering

bulletins.  Since 1937, member companies have been kept informed on occupational health

issues by the *Industrial Hygiene Digest*, a monthly publication which is sent to all members in

return for their annual membership fee.  The *Digest* is a compilation of abstracts, grouped by

topic, of the published domestic and foreign scientific and medical literature pertaining to

industrial health and hygiene.  In addition to scientific abstracts, the *Digest* included a section on

legal developments, and also provide notice of any proposed changes in threshold limit values for

various substances.  Correspondence between members and the IHF established that members

either participated in or knew of a number of studies and surveys dating as far back as the 1930's

which had linked asbestos with various lung diseases.  As part of its consultative services for its

members, the IHF undertook a number of studies involving evaluations of asbestos dust

conditions and asbestos-related disease.  In 1947, the fruits of an industry survey conducted by

the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for

Asbestos Textile Institute."  The report is dated June 1947.  The object of the investigation was

stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its

phases.... An original objective of most immediate importance was to facilitate the exchange of

information between member companies on successful methods of dust control and otherwise to

promote a general improvement in that field."  The preliminary survey to be divided into three

parts designated as "Engineering, Medical and Physical Testing" was based on visits made to

member companies' plants over a three month period."  Minutes of the Air Hygiene Committee

meetings throughout the 1940's and 1950's reflect frequent discussions and presentations

pertaining to appropriate medical practices and industrial hygiene approaches to the problem of

asbestos dust in the work place.  It was continually stressed that both pre-employment and

periodic follow-up medical examinations were essential to monitor the health of employees, the

necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of

asbestos-related disease. Some annual meetings apparently were held by the IHF.  The minutes

for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on

November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest.  An

Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed *inter alia* dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts," authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed *infra*) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

30.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth.

At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard.'" While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

31.

Plaintiff also makes additional allegations against Todd Shipyards Corporation (and its executive officers) who were aware of the risk of harm presented by asbestos-containing products used on its premises and was a manufacturer and owner of asbestos-containing products, and who had care, custody, and control of same. Todd Shipyards Corporation, a multi-state/multi-national corporation, (and its executive officers) either through exchange of information and/or industry sponsored studies were notified, either directly by its parent companies, manufacturing associations, U.S. Government or agencies that these asbestos presented an unreasonable risk of harm. However, Todd Shipyards Corporation and its executive officers, disregarded these notices, elected to conceal these hazards from the plaintiff and continued to use and hold out these products as safe and non-toxic.

32.

Todd Shipyards Corporation and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that said asbestos and asbestos fiber would cause Mr. Dupre (and others similarly situated) to suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects related thereto, but they failed and/or willfully withheld from Mr. Dupre knowledge of the dangers to his health from exposure to asbestos and asbestos fiber.

33.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

34.

Eagle, Inc. has done contracting work since its initial existence. U.S. Navy vessels were being constructed at this time. Accordingly, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.) was aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, this defendant, being an asbestos insulation contractor, had to pay higher insurance premiums as a consequence thereof the plaintiff and other similarly situated were exposed to asbestos both

through these defendants' contracting work and through products manufactured, distributed, sold, and/or used by said defendants. This defendant was aware of the hazards of asbestos but failed and refused to warn Freddie Dupre of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law.

35.

Since the early 1940s, defendant, Foster Wheeler LLC (formerly Foster Wheeler Corporation) was a major manufacturer of boilers used in the construction of U.S. Navy vessels. Their position was derived through government contacts at a national level, and since that time through and including 1970, they supplied boilers to virtually every shipyard constructing and repairing U.S. Navy vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time was Freddie Dupre, advised of these hazards as defendants failed and refused to warn Mr. Dupre of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Freddie Dupre to asbestos during their operations.

36.

During Freddie Dupre's exposure, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Freddie Dupre and/or to the owners of the premises where he worked, throughout his entire employment history. Such products were installed, removed, and repaired by or in close proximity to Freddie Dupre and during his employment, thus exposing him to asbestos dust released by the installation, removal,

and repair of said products.  Throughout the time Freddie Dupre was employed, he was exposed
to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold
by Westinghouse.  At the they were exposed to these products, they were being used in the
manner and for the purpose for which they were intended; and these products were in the same
condition as when they left the control and possession of Westinghouse.

37.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse
were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty
from said manufacturers.  Further, Westinghouse failed and refused to warn Freddie Dupre of the
danger of exposure to such products.  They also failed to warn of the invisible nature of the asbestos
and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

38.

Plaintiff further alleges that Westinghouse has through its actions sought to fraudulently
conceal and suppress the truth about the dangerous nature of its asbestos containing products that
it manufactured, sold and distributed.

39.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease,
asbestosis, lung cancer, and mesothelioma.  Throughout the 1930s, 1940s, and 1950s,
Westinghouse was a member of the IHF, American Ceramic Society and National Safety
Council.  Beginning in the 1930's, Westinghouse received asbestos scientific and medical
information through these organizations.

40.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon
Institute (then a part of the University of Pittsburgh).  The organizations' name was changed to
"Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health
Foundation."  J-M joined in 1936.  IHF members included, among others, General Electric
Company and Westinghouse Electric Corporation, or their predecessors in interest.  All of these

-19-