companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee. The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The report is dated June 1947. The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period." While the actual report does not reveal the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that other companies evaluated in the report included, among others, Garlock. Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and

presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold

limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

41.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

42.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

43.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

44.

Westinghouse was also aware of the excessive dust produced from its Micarta product during

the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

45.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has refused to respond to plaintiff's request for the production of these documents principally on the basis that said documents did not exist due to their destruction. Accordingly, plaintiff alleges that Westinghouse's conduct constitutes fraud under Louisiana law.

46.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations

during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would not comply with either the EPA or OSHA and would take an attitude of "respectful noncompliance".

47.

Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial Hygiene Department files, dating back to 1930, <u>have been reviewed</u>. After a general description of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are <u>potential</u> "smoking gun" documents. This is so because of the nature, duties, obligations and responsibilities of the Industrial Hygiene Department. The approximately 57 years of Industrial Hygiene files which are in existence today are <u>filled</u> with technical information, procedural information, safe-handling information, hazard information, recommendations and tests results. The files are filled with documentation which critiques and criticizes, from an industrial hygiene perspective, Westinghouse manufacturing and non-manufacturing operations. This documentation often times points out <u>deficiencies</u> in Westinghouse operations and suggests recommendations to correct these deficiencies. Industrial Hygiene's files contain information which details the various chemical substances used at Westinghouse sites over the years, and often times the inadequacies in Westinghouse's use and handling of the substances. The files contain many years of employee test results, some of them unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential <u>smoking gun documents</u> (emphasis added).

Plant Correspondence and Files

> Please see, for example, Wilber Speicher's letter...correspondence of this type was and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's correspondence might show early knowledge of the Corporation to certain health hazards associated with epoxy resin dissolving agents. What use did the Corporation make of this knowledge to protect employees and the public? If none or very little, then this document might become a "<u>smoking gun</u>" (emphasis added).

> Industrial Hygiene audit and trip reports certainly qualify as <u>potential smoking guns</u> (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective. Industrial Hygiene also makes recommendations to improve the hygiene of the plant. The <u>smoking gun possibilities</u> of such documentation are readily apparent (emphasis added). <u>Material Cards, Materials Safety Data Sheets, Purchasing</u> [sic] <u>Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files</u>

-24-

Again, the smoking gun possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent. In addition, if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent (emphasis added).

Recommendations

Plant Correspondence Files (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic records retention guidelines do not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded. As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations. The files are filled with technical product and chemical information, hazard information and safe-handling information, most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner. The files are not used in the daily operation of the Department. In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual. In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace. This "self-analysis" and "editorializing" type of information can be dangerous. This is just the type of documentation which should be discarded from the files. Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"Historical Files or Industrial Hygiene Department"

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic Records Retention Guidelines do not specifically address these records. We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation litigation, show no signs of abating in the near future. In fact, legislation such as the risk notification legislation currently being considered by Congress, will, according to many "experts", result in an increase in such litigation. Consequently, well reasoned and conceived document retention and destruction programs for departments such as Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant

documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of

its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its dangerous products. More importantly, his conclusion shows that Westinghouse had motive for destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations therein.

48.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation therof. This activity amounts to fraud and spoliation. In fact, at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

49.

The document destruction program set out in Bair's memo was <u>actually implemented</u> by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards associated with its products constitute fraud under the laws of the state of Louisiana.

50.

During Freddie Dupre's exposure, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Freddie Dupre and/or to the owners of the premises where he worked, throughout his entire employment history. Such products were installed, removed, and repaired by or in close proximity to Freddie Dupre during his employment, thus exposing him to asbestos dust released by the installation, removal, and repair of said products. Throughout the time they were

-26-

employed, Freddie Dupre was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of his exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of GE.

51.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn Freddie Dupre of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

52.

Plaintiff further alleges that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

53.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch

indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

54.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of

-28-

their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

55.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including

exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

56.

Moreover, various published reports and articles available to GE, prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

> (1) Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;
>
> (2) Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;
>
> (3) Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.
>
> (4)   Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s. Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis." Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.
>
> (5) Asbestos And Health In 1969, a published article written in 1969 by

George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6) The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7) Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8) Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

57.

Defendant, Owens-Illinois, Inc., (O-I) began the manufacture and sale of the asbestos containing insulation product "Kaylo" in the 1940's. Defendant's knowledge of the hazards posed by the inhalation of asbestos fiber released from Kaylo can be documented as far back as the early 1940's. Much of the evidence arises out of testing done of Kaylo at the Saranac Laboratory at Saranac Lake New York. The following is a brief description of some of the evidence pertaining to O-I's knowledge of the health hazards posed by inhalation of asbestos dust released from its Kaylo product. On February 12, 1943, O-I's director of research, U. E. Bows, sent a letter to L. U. Gardner of the Saranac Laboratory stating: "(The health hazard) should be considered from the standpoint of employees working in the plant where the material is made or where it may be sawed to the desired dimensions and also considered from the standpoint of

applicators or erectors at the point of use." On November 16, 1948, A. J. Vorwald of the Saranac Laboratory sent a letter to U. E. Bows regarding the effects of inhalation of Kaylo dust in animal studies. This letter provides in pertinent part:

> In all animals sacrificed after more than 30 months of exposure to Kaylo dust unmistakable evidence of asbestosis has developed, showing that Kaylo on inhalation is capable of producing asbestos and must be regarded as a potentially hazardous material.
>
> * * *
>
> I realize that our findings regarding Kaylo are less favorable than anticipated. However, since Kaylo is capable of producing asbestosis, it is better to discover it now in animals rather then later in industrial workers. Thus, the company, being forewarned, would be in a better position to institute adequate control measures for safeguarding exposed employees and protecting its own interest.

Along with the November 16 letter of Vorwald was an interim report to the Owens-Illinois Glass Company regarding the ability of dust generated by Kaylo to cause lung disease. Pertinent portions of that report provide:

> Kaylo is capable, on prolonged inhalation of producing asbestosis in the lungs of guinea pigs and it should be handled industrially as a hazardous dust.
>
> * * *
>
> The animals were exposed to atmospheric suspensions of Kaylo dust for 8 hours daily, 5 and ½ days a week throughout the experiment. The dust concentration which varied somewhat from time to time has averaged 116 particles per cubic foot of air over the entire course of the experiment to date.
>
> * * *
>
> All nine animals sacrificed subsequent to 30 months in the present experiment...have developed true fibrosis of a type characteristic of the response of guinea pigs to asbestos.
>
> While the lesions up to 30 months showed no fibrosis, certain aspects of them were compatible with a preliminary stage in the development of asbestosis. These aspects were masked by the inert type of reaction to the materials other than asbestos in the dust.
>
> * * *
>
> Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is capable of producing asbestosis and should be handled as a hazardous industrial dust.

The Saranac Laboratory report clearly informed O-I that the asbestos content in the air in

certain parts of its plant were potentially hazardous to human health. The report further recommended that respirators be used by workers loading Kaylo material into box cars. In the same report O-I was also warned against reliance on compliance with government and industry standards in order to completely protect against the possibility of occupational disease. On February 7, 1952, Vorwald sent a letter to W. G. Hazard enclosing the final report on "The Capacity of Inhaled Kaylo Dust to Injure the Lung." A copy of the report was sent to O-I corporate medical director, Shook. The report states in pertinent part:

> Kaylo dust is capable of producing peribronchiolar fibrosis typical of asbestosis. The dust also has a slightly unfavorable influence upon a tuberculosis infection. Although extrapolation from animal to human experience is difficult, nevertheless, the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust.

Despite the information made know to O-I concerning the ability of dust generated form its Kaylo product to cause asbestosis and other ailments, O-I actually drafted a pamphlet stating that Kaylo could be used without the danger of developing asbestosis. See December 12, 1950, letter from Willis G. Hazard to A. G. Vorwald; December 9, 1952, correspondence from C. W. Howard to George White. O-I continued to promote Kaylo as safe and "non-toxic". See advertisement in Petroleum Engineer C-55 to C-62 April, 1952, Hydros Calcium Silicate Heat Insulation.

58.

Other evidence of knowledge include the fact that in May 1952, Willis Hazard of O-I attended the Seventh Saranac Symposium where considerable discussion of asbestosis and cancer took place. On October 5, 1955, Hazard of O-I concerning a report of Saranac Lake contained in Arch. Indust. Health, 12:348-360, (1955) entitled "Effect of Inhaled Commercial Hydrous Calcium Silicate Dust on Animal Tissues." The report was published by Dr. Scheepers of the Saranac Laboratory and contained some of the Saranac Laboratory's findings pertaining to Kaylo. The report was not shown to O-I officials prior to publication. In his October 5, 1955, Hazard stated:

> We had felt (publication of the research) would be the proper procedure for the long run, even though the experiments did not show Kaylo to be lily-white.

> They showed to be specific, the Kaylo dust could cause asbestosis, an incurable lung condition; and they showed the dust could reactivate tuberculosis....

\* \* \*

The name "Kaylo" and O-I appear no where in the article. Its completely anonymous.

The above aptly demonstrates that O-I possessed the requisite knowledge of the hazards posed by inhalation of asbestos fiber as far back as the 1940's. Despite that knowledge, defendant chose not to warn the plaintiffs or others similarly situated of the hazards posed to their health by working with or near defendant's products. Further, defendant's suppression of known health hazards associated with exposure to their products constitute fraud under Louisiana law. Moreover, O-I sold its design and trademark for Kaylo to Owens-Corning Fiberglas Corporation knowing that it was a defective product capable of causing disease and death. O-I is liable for the defective Kaylo product which continued to be sold throughout the 1970s. O-I is liable to plaintiffs both for designing a defective product as well as for plaintiff, Elodie Rome, being exposed to this product as manufactured by O-I and later by Owens-Corning Fiberglas Corp. O-I is liable for designing a defective product and for selling the design of this defective product to Owens Corning Fiberglass Corporation. OI is also liable for fraud as its suppressed knowledge of the defectiveness in its product. In addition, O-I breached its continuing duty to warn under Louisiana law. Additionally, O-I suppressed its knowledge of the health effects associated with Kaylo and, thus, committed fraud under Louisiana law.

59.

All asbestos defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Dupre and for which these defendants are strictly liable under Louisiana law.

60.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

61.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Freddie Dupre was exposed to products manufactured, distributed, sold and/or used by "asbestos defendants," and he contracted malignant mesothelioma, an incurable cancer of the lining of the lung, which was first diagnosed on or around September 29, 2010.

62.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Freddie Dupre and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law and entitle plaintiff to damages.

63.

All asbestos defendants were the owners of asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Freddie Dupre, and for which defendants are strictly liable under Louisiana law.

64.

Defendant, Todd Shipyards Corporation, is answerable for the conduct of those handling asbestos products on its premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in Freddie Dupre's mesothelioma, and for which defendant is strictly liable under Louisiana law.

65.

Defendant, Todd Shipyards Corporation, is responsible for the conduct of those individuals and companies working on its premises with asbestos products which resulted in exposure to asbestos to Freddie Dupre, which asbestos was defective and which presented an unreasonable risk of harm, and which asbestos resulted in Mr. Dupre's mesothelioma and other ill health effects related thereto, and for which defendant is strictly liable under Louisiana law.

66.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Freddie Dupre, contracted malignant mesothelioma and other ill health effects related thereto, for which all defendants are jointly, severally, and in solido liable.

67.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to petitioner for the damages sustained as a result of Mr. Dupre's contraction of asbestos-related mesothelioma, and other ill health effects related therewith. Petitioner, Freddie Dupre is entitled to damages for the following: past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; fear of cancer and fear of death and complications; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; loss of fringe benefits; past, present, and future medical expenses; loss of personal services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; increased costs of insurance and other expenses incurred as a result of his disease; and all other general damages arising out of this action which may be shown at the trial of this matter.

68.

All of the defendants named herein are jointly, severally, and *in solido* liable to petitioner for the damages sustained as a result of Mr. Dupre's contraction of asbestos-related mesothelioma, and other related ill health effects from which he suffers.

69.

A trial by jury is demanded on all issues.

**WHEREFORE,** petitioner, Freddie Dupre, prays that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, there be judgment rendered herein in favor of petitioner and against defendants for all damages suffered by petitioner, together with legal interest and all costs associated with the prosecution of this claim. Petitioner further prays for all general and equitable relief to which he may be entitled.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL – 1134
PERRY J. ROUSSEL, JR. – 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
LEONARD K. FISHER, III- 31456
1714 Cannes Drive
LaPlace, LA 70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONER/
FREDDIE DUPRE

**PLEASE SERVE THE PETITION FOR DAMAGES; OPPOSITION TO MOTIONS FOR EXTENSION OF TIME; PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS AND/OR THINGS, and NOTICE OF VIDEOTAPED DEPOSITION FOR ALL PURPOSES, INCLUDING PERPETUATION PURPOSES ON THE FOLLOWING:**

1. **TODD SHIPYARDS CORPORATION** (LONG ARM SERVICE)
   Through its agent for service of process:
   The Corporation Trust Company
   Corporate Trust Center
   1209 Orange Street
   Wilmington, Delaware 19801

2. **EAGLE, INC. (formerly EAGLE ASBESTOS & PACKING COMPANY, INC.)**
   Through its agent for service of process:
   Susan B. Kohn
   1100 Poydras St, 30th Floor
   New Orleans, LA 70163

3. **FOSTER WHEELER LLC** (LONG ARM SERVICE)
   **(FORMERLY FOSTER WHEELER CORPORATION)**
   (Via Louisiana Long Arm Statute)

-37-

    The Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington, Delaware 19801

4.  **OWENS-ILLINOIS, INC.**    **(LONG ARM SERVICE)**
    (via Louisiana Long-Arm Statute)
    Owens-Illinois, Inc.
    One Seagate
    Toledo OH 43666

5.  **CONTINENTAL INSURANCE COMPANY**
    (As Successor to The Fidelity & Casualty Company of New York)
    Through its agent for service of process:
    Secretary of State
    Legal Services Sections
    8585 Archives Ave.
    Baton Rouge, La. 70809

6.  **UNIROYAL, INC.**    **LONG ARM SERVICE**
    (Via the Louisiana Long Arm Statute)
    70 Great Hill Road
    Naugatuck, CT 06770

7.  **CBS CORPORATION**    **LONG ARM SERVICE**
    **(F/K/A WESTINGHOUSE ELECTRIC CORPORATION)**
    Through its agent for service of process:
    Corporation Service Company
    2711 Centerville Road, Suite 400
    Wilmington, Delaware 19808

8.  **GENERAL ELECTRIC COMPANY**
    Through its agent for service of process:
    CT Corporation System
    5615 Corporate Blvd., Suite 400B
    Baton Rouge, La. 70808

9.  **BAYER CROPSCIENCE, INC. (SUCCESSOR TO**    **LONG ARM SERVICE**
    **RHONE POULENC AG COMPANY,**
    **FORMERLY AMCHEM PRODUCTS, INC.,**
    **FORMERLY BENJAMIN FOSTER COMPANY)**
    (Via Louisiana Long Arm Statute)
    through their agent for service of process:
    Corporation Service Company
    80 State Street
    Albany, New York 12207