## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------X

DOUGLAS LEON COCKRAM and
DENA COCKRAM,                                     Civil Action No.:

        Plaintiffs,

        -against-

3M COMPANY a/k/a Minnesota Mining &              Plaintiff demands a trial by jury
Manufacturing, and
MINE SAFETY APPLIANCES, INC.

        Defendants.

-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs, as and for their Complaint, by their attorneys, LEVY PHILLIPS &

KONIGSBERG LLP and GOLDBERG PERSKY & WHITE, P.C. and respectfully allege

as follows:

### NATURE OF THE ACTION

1.     Plaintiff DOUGLAS COCKRAM is a 72-year old resident of Virginia who

suffers from mesothelioma, a cancer linked to asbestos exposure. Plaintiff Douglas

Cockram files this lawsuit to recover compensatory and punitive damages against

Defendants.

2.     Plaintiff DENA COCKRAM is the spouse of Douglas Cockram.

### JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §

1333 (a) the matter in controversy exceeds $75,000 exclusive of interests and costs; and (b)

the matter is between citizens of different states.

{00236596.DOC}

4.      Venue is proper under 28 U.S.C. §1391 (a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Specifically, at the relevant times, Plaintiff used Mine Safety Appliances, Inc.'s ("MSA") respirators in a manner in which they were intended while working with and around asbestos and asbestos-containing products.[1]  Plaintiff and Plaintiff's employer relied on MSA's assurances regarding the safety and adequacy of its products and the ability of the MSA products to protect workers from harmful dusts, including those that were asbestos-containing.   During the relevant period, MSA's corporate decisions regarding design, marketing, manufacture, distribution, supply and selling of its inadequate respirators and other breathing equipment occurred at its headquarters and corporate center in this judicial district in Pittsburgh, Pennsylvania.

5.      All other Defendant(s) are either licensed to do business in the Commonwealth of Pennsylvania or have done business in the State by putting their products into a stream of commerce in the Commonwealth of Pennsylvania.

## THE PARTIES

### I.       THE PLAINTIFF

6.      Plaintiff DOUGLAS COCKRAM was born on November 22, 1938.  Mr. Cockram is a citizen of the Commonwealth of Virginia and he and his wife, Plaintiff DENA COCKRAM, reside in Stuart, Virginia.

7.      Plaintiff DOUGLAS COCKRAM was employed from January 1963 to November 1994 at E.I. DuPont de Nemours & Company's ("DuPont") facility in Martinsville, Virginia.

---

[1] Throughout this Complaint, Plaintiff's references to "asbestos-containing products" includes asbestos, asbestos-containing products, products designed to be used with asbestos-containing products, and/or products that it was foreseeable would be used with asbestos-containing products.

8.      While employed at DuPont, Plaintiff began work in 1963 as a line operator cutting nylon.  Plaintiff did not work with, or work in the vicinity of others working with, asbestos or asbestos-containing products during his work as a line operator.

9.      Thereafter, in 1974, Plaintiff began work as an insulator at the facility, continuing such work until 1992.

10.     As an insulator, Plaintiff worked directly with and in the vicinity of other employees working with asbestos and asbestos-containing products, including, but not limited to: asbestos fiber, asbestos insulation, asbestos pipe covering, asbestos cement, asbestos cloth, asbestos packing and gaskets.

11.     As an insulator, Plaintiff was aware that he was working with and around asbestos and was aware that asbestos was dangerous.

12.     At all times that Plaintiff was an insulator working with asbestos fiber and other asbestos-containing materials, Plaintiff's employer required that Plaintiff wear, and provided Plaintiff with, a respirator and/or other breathing equipment designed, marketed, manufactured, distributed, supplied and sold by Defendants.

13.     Specifically, upon commencing his job as an insulator at DuPont, Plaintiff's employer required Plaintiff to wear for his protection, and Plaintiff wore for his protection, a 3M 8710 respirator.  Thereafter, DuPont required Plaintiff to wear for his protection, and again Plaintiff wore for his protection, an MSA Dustfoe 66 respirator.

14.     When Plaintiff put on Defendants' respirators, he believed the respirators protected him from breathing in asbestos, he felt that they were easy to wear, and that, despite the dusty conditions, the respirators allowed him to perform his work with asbestos longer without sneezing or coughing.

3

15.     During the relevant periods of time, Defendants claimed that their respective respirators used by Plaintiff and others would protect workers from the dangerous effects of inhaling, ingesting and absorbing dusts created by asbestos and asbestos-containing products.

16.     Plaintiff always used Defendants' respirators in the manner in which they were intended, and in so doing, the Plaintiff believed he was protecting himself from harmful asbestos dusts.

17.     Plaintiff and his employer relied on Defendants' assurances regarding the safety of their products and the ability of their products to protect workers from harmful dusts, fumes and other asbestos-containing products.

18.     In fact, Defendants representations were false.  The respirators did not protect workers from breathing in asbestos dust.  Moreover, Defendants knew testing of their masks did not address asbestos dust, small particle dust, proper fit testing and fit checking of the masks, and efficiency of the mask in relation to environmental factors such as temperature and humidity.  Despite this knowledge, Defendants marketed and sold their masks as efficient, one-size-fits-all respirators that sufficiently protected the user from asbestos dusts and failed to make aware the public, and Plaintiff, of said limitations and shortcomings of the respirators with respect to asbestos dusts.

19.     On or about April 5, 2011, Plaintiff Douglas Cockram was diagnosed with mesothelioma, a cancer caused by exposure to asbestos.

20.     At present, the Plaintiff Douglas Cockram is undergoing medical treatment for his disease, including surgeries and chemotherapy treatments, at Duke University Medical Center in Durham, North Carolina.

## II.    DEFENDANT 3M COMPANY

21.    Upon information and belief, and at all times hereinafter mentioned, 3M COMPANY a/k/a Minnesota Mining & Manufacturing (hereinafter "3M") is a Minnesota business entity with its principal place of business located in Minnesota.  For the purposes of this Complaint, 3M shall include the present business entity, as well as all of its predecessor corporations and entities as applicable. Upon information and belief and at all times hereinafter mentioned, 3M: (a) was and still is a foreign corporation, duly authorized to do business in the Commonwealth of Pennsylvania; (b) in person or through an agent, transacts business in the Commonwealth of Pennsylvania; (c) regularly does and/or solicits business within the Commonwealth of Pennsylvania; (d) derives substantial revenue from goods used or consumed in the Commonwealth of Pennsylvania; (e) expected or should have expected its acts to have consequences within the Commonwealth of Pennsylvania and derives substantial revenue from interstate and/or international commerce; and (f) owns, uses or possesses real property situated within the Commonwealth of Pennsylvania. At all relevant times, 3M designed, marketed, manufactured, distributed, supplied, sold, and made misrepresentations regarding its 8710 respirators and/or other breathing equipment.

3M 8710 Respirator

22.    In 1972, the 3M 8710 was approved by the National Institute for Occupational Safety & Health ("NIOSH").

23.    At the time of 8710's approval, 3M knew that the approval was based on testing for a coarse dust that did not evaluate penetration of fine particles 0.1 to 1.0 microns in size that 3M considered such particles to be lung damaging.  In addition, 3M knew that

the approval did not include a fit test, fit check, or a quality assurance program, and only consisted of minimal criteria based on 1930s technology.

24.     In fact, regarding the limitations of the approval process during that time, 3M stated that the respirator approval tests did not assure worker protection, and that "NIOSH testing does more harm than good based on the fact that the tests have little, if any, correlation to actual field conditions..." 3M went on to state that "NIOSH approvals are a marketing device having no true merit..." and that the "present system of the MSHA ("Mine Safety & Health Administration") and NIOSH approval of devices does not guarantee end user utility or safety." In spite of these 3M criticisms of their own approval, 3M promoted the 8710 respirator as being "so effective it has received Bureau of Mines approval." 3M made this assurance despite the statements by the Bureau of Mines and NIOSH stated that "approval was not an endorsement of the respirator by the Bureau of Mines and NIOSH, and such endorsement shall not be stated or implied in advertisements or other publicity."

3M 8710 Fit Checking

25.     The aforementioned approval did not evaluate the fit of a facemask. However, effective usage necessitated the application of fit checks and fit tests as recommended in national concordance standards and government regulations. In fact, 3M knew that fit checking as recommended in the 1950's and mandated by OSHA in the early-1970's "may be difficult or impossible to carry out on valve-less respirators," like the 8710; and 3M stated that fit checks were imprecise and only capable of detecting large leaks. Moreover, in the relevant period, the 3M fit check instructions never recommended

6

that the user evaluate fit during inhalation, and 3M's instructions were never field tested or evaluated in a group of unscreened, unbiased and untrained subjects.

26.     Los Alamos National Laboratory reported that one-size-fits-all masks cannot provide protection for the large range of facial sizes that will be encountered. They noted that other respirator manufacturers provided masks in three sizes.

27.     3M also inaccurately claimed that the 8710 passed NIOSH fit checks 100s of times over 20 years.  Though, as discussed above, NIOSH never evaluated the fits of these masks, and that certification is not a guarantee that the mask will perform well.

28.     Despite this knowledge, 3M continued to state through the mid 1970s on the 8710 packaging that the 8710 mask fit all faces (even thought the 8710 was only available in one size).

<u>3M 8710 Fit Testing</u>

29.     Like fit checking, 3M knew that fit testing the respirator the was also recommended in the 1950's and mandated by OSHA in the early-1970's, but was not possible or practical for the 8710 prior to 1982.  3M also knew that there was a tremendous risk of exposure to the wearer of any respirator that had not been properly fit tested.  Again, despite this knowledge, 3M misrepresented that the 8710 had passed government fit tests for 20 years.  In fact, NIOSH never evaluated the effectiveness, reliability and safety of the fit checking or fit testing procedures as a condition of granting certificates of approval.

30.     When fit testing of the 8710 was finally possible in 1982, 3M used a subjective, non-standardized, qualitative test utilizing a large 2.0 micron aerosol that could not be used to evaluate faceseal leakage to smaller particles that 3M considered lung damaging.

7

31.     Even as late as November 1992, 3M stated that, "a stage where test protocols, data analyses, and data interpretation can be standardized has not been reached...Further research on how sampling bias and other variables affect in-facepiece sampling results in the workplace appears necessary before validated methods for determining and interpreting protection factors can be agreed upon."

3M 8710 Filter Efficiency

32.     In addition to fit, 3M also misrepresented the filter efficiency of the 8710.

33.     In this regard, 3M promoted that the respirator had 99% efficiency against particles with a mean diameter of 0.4-0.6 microns.  3M made these statements despite 8710 laboratory testing in the 1970s and early 1980s indicating up to 50% filter penetration for sub-micron particles for the 8710 with the omega filter.

34.     In 1975, 3M internally reported that the current version of the 8710 had a protection factor of 3, meaning that 33% of the contaminants passed through or around the mask.

35.     None of the above information was ever passed on to purchasers and/or users of the 8710.

36.     3M even promoted the use of the 8710 in a children's hospital bone marrow transplant ward for protection against sub-micron viruses, without any limitations, falsely stating that it was 99% efficient against a monodispersed aerosol particle size with a narrow range 0.4-0.6 microns.

3M 8710 Advertising

37.     3M knew that the 8710 was not a high-efficiency respirator, could not fit all workers, and did not protect workers from asbestos exposure.

38.     During the relevant period, 3M also stated that distributors should present their products "strictly in accordance with our product literature, setting forth the use capabilities and limitations of the products."

39.     But 3M advertised the 8710 as a high efficiency, one size fits all, respirator that provides maximum protection against dust.

40.     In addition, 3M improperly promoted the 8710 for use in high asbestos exposure areas, such as asbestos insulating, asbestos processing and asbestos mining.  3M also advertised that the 8710 stops pneumoconiosis and fibrosis dusts from ever reaching the lungs, was for use in thick choking dusts, can be used in high dust concentration jobs, and was efficient enough to filter out everything harmful to a worker's lungs.

3M Representations on the 8710 Container and in 8710 Advertisements

41.     3M 8710 usage information on the packaging was false and misleading.

42.     On the 8710 container, 3M represented that the 8710 was approved and could provide protection against dusts and mists, including asbestos and lead.  As set forth, 3M knew that the NIOSH/MSHA approval process did not test particle sizes of asbestos dust, and did not include fit testing or fit checking for the respirator.

43.     In an advertisement by 3M for its 8710 respirator, 3M warranted that its 8710 respirator offered maximum protection against dusts, including asbestos.

9

44.     In another advertisement for the 8710 respirator, 3M represented that the 8710 "stops pneumoconiosis and fibrosis producing dusts from ever reaching the lungs. Included in the list of dusts that the 8710 protected the user against was asbestos.

3M 8710 Asbestos-Related Chronology

45.     In the late-1960's prior to Plaintiff's use of the 8710 as an insulator at DuPont, 3M was aware that asbestos was a suspected carcinogen.  They also knew asbestos caused asbestosis and that such disease frequently resulted in disability and death.  3M had a 1971 medical report stating that even one single asbestos fiber can produce microscopic changes in the lung such as asbestosis.

46.     Despite this knowledge, 3M recommended in the 1970s that the 8710 could be used to protect against user exposure to asbestos.

47.     In 1980, NIOSH reported that without a good fit test, the 8710 (and masks like it) should no longer be used around asbestos.  In response, while other manufacturers asked NIOSH to withdraw their asbestos approval, and some added a warning "not approved for asbestos," 3M continued to recommend the 8710 for any level of asbestos until 1982.

48.     From 1982-1986, 3M continued to recommend the 8710 for exposures of asbestos up to 10 times permissible exposure limits.

49.     In 1986, 3M petitioned the court to stay the OSHA standard that would have prevented the 8710 for use around asbestos. In support of its petition, 3M argued that it would suffer irreparable financial harm.  In response, OSHA criticized 3M's workplace protection studies.  3M's petition was denied.

50.     In 1987, after selling 450,000,000 8710 masks 3M finally took asbestos off its usage.

51.     3M never put a plain language warning on its mask or packaging stating that the mask should not be worn around activities that were often associated with asbestos exposure.

52.     In 1992, Donald Wimes of 3M co-chaired the subcommittee that drafted the American National Standard for Respiratory Protection and it recommended that only high efficiency filters, which 8710 was not, be used if the particle size is not known or less than 2 microns in size.

53.     3M never passed this information on to employers, purchasers and/or users, of the 8710.

**DEFENDANT MINE SAFETY APPLIANCES, INC.**

54.     Upon information and belief, and at all times hereinafter mentioned, Mine Safety Appliances, Inc. (hereinafter "MSA") is currently a Pennsylvania corporation with its principal place of business located in Pennsylvania. For the purposes of this Complaint, MSA shall include the present corporation, as well as all of its predecessor corporations and entities as applicable. Upon information and belief and at all times hereinafter mentioned, MSA: (a) was, at the relevant time, a Pennsylvania corporation with its headquarters in this judicial district in Pittsburgh, Pennsylvania; (b) is now a foreign corporation, duly authorized to do business in the Commonwealth of Pennsylvania; (c) in person or through an agent, transacts business in the Commonwealth of Pennsylvania; (d) regularly does and/or solicits business within the Commonwealth of Pennsylvania; (e) derives substantial revenue from goods used or consumed in Commonwealth of

11

Pennsylvania; (f) expected or should have expected its acts to have consequences within the Commonwealth of Pennsylvania and derives substantial revenue from interstate and/or international commerce; and (g) owns, uses or possesses real property situated within the Commonwealth of Pennsylvania. At all relevant times, MSA designed, marketed, manufactured, distributed, supplied and sold, as well as made misrepresentations regarding, respirators and other breathing equipment.

55.     MSA designed, marketed, manufactured and sold to Plaintiff's employer the Dustfoe 66 respirator. The Dustfoe 66 was approved under the 1934 Bureau of Mines Schedule 21 for non-toxic dusts.

56.     Schedule 21 used a coarse dust filter and a crude qualitative face-fit test on only 3 subjects who were sprayed with coal dust a majority of which measured greater than 74 microns for a three-minute period without performing any body, head or facial movements. This was only a qualitative visual inspection. Most respirators passed this qualitative visual inspection because the test subjects were required to tighten the respirator head harness, irrespective of comfort, to obtain the tight fit. Moreover, even if a respirator initially failed, the test subjects would retighten the respirator and repeat the test.

57.     Despite the obvious shortcomings of this testing method, MSA promoted its Dustfoe 66 with upper usage limits as respiratory protection against all dust concentrations, fibrosis-producing dusts, toxic dusts, and mists.

58.     In 1941, MSA claimed that the MSA Dustfoe respirator face piece fits any face, and assured its user a dust-tight seal. MSA made these representations even though its respirator only came in one size, and there was never a practical and effective fit-testing or fit-checking method.

12

59.     In fact, even in the 1970's, during which time the Plaintiff wore the Dustfoe 66 respirator, MSA did not have any recommended pressure fit-check for the Dustfoe.

60.     In 1947, MSA catalog continued these claims and stated that the Dustfoe could be easily formed by the user to fit individual facial contours, and that the dust filter provides maximum efficiency against all dust.

61.     In 1955 MSA further represented that the Dustfoe affords a positive and comfortable fit on workers with widely varying facial features and sizes, and produces a good seal on any face.

62.     In 1957 MSA represented that the Dustfoe provides an automatic fit and airtight seal.

63.     Throughout the 1960's, the MSA catalogs stated that the Dustfoe provides the ultimate in lightweight breathing protection. MSA further represented in those catalogs that the electrostatic precipitation and fine mechanical filtration provide maximum filter effectiveness, and that the mask could be shaped to fit any face, assuring a comfortable, airtight seal.

64.     In 1969, MSA stated that the MSA Dustfoe facepiece could be custom-formed to individual facial contours providing increased comfort and improved sealing qualities.

65.     In the early-1970's, MSA again represented that the Dustfoe can be custom-formed to fit individual facial contours and that the face cushion makes an airtight seal.

66.     However, again during that time, MSA did not have any recommended pressure fit-check.  Accordingly, there was no way for the user to evaluate the face seal.

13

67.    MSA performed no tests on the Dustfoe 66 to support the aforementioned claims. On the contrary, test results for the Dustfoe 66 refute the claims.

68.    Specifically, in the late 1960's the Dustfoe 66 cushion/body seal was tested to determine if leakage would occur between the cushion and the respirator body. During the test, the face cushion was taped to the test figure, the exhalation valves were taped shut, the snap fasteners on the sides were taped, and the ultra filter was used instead of the resin wool. Results indicate that the MSA Dustfoe 66 respirator experienced leakage four times the maximum allowable for Schedule 21A for just the filter.

69.    Moreover, in December 1970, MSA conducted a study which concluded that the Dustfoe 66 had to be modified to include a face flap and chin cup to seal against the cheeks and prevent leakage during facial movements. This problem was never reported to individuals who used the mask without these modifications.

70.    Even after 1970, despite the Bureau of Mines standards for schedule 21B being tightened in 1965, the original Dustfoe 66 approved under the 1934 Schedule 21 continued to be sold to most industries.

71.    In 1972, Los Alamos Scientific Laboratory tested and noted problems with the Dustfoe 66 exhalation valve. Specifically, the testing revealed MSA Dustfoe 66 exhalation valve malfunction with large leakage issues. It further stated that MSA representatives were present and observed the problem firsthand.

72.    In 1973, further testing by Los Alamos reported that the Dustfoe 66 filter degraded with temperature and humidity allowing penetration.

73.    On January 12, 1973, the Chief of the Testing and Certification Branch Robert Schutz sent a letter to the acting deputy director of the Department of Land

14

Conservation and Development regarding the approval of the MSA Dustfoe 66.  In the letter, Mr. Schultz which he discussed the MSA Dustfoe 66's major design and approval problems testing by the Bureau has found leakage between the rubber face cushion and metal body; in many instances it was necessary to seal the metal body to the test fixture to obtain a satisfactory low dust or mist leakage; there have been reports and observations of users noting leakage between the face cushion and metal body generally caused by accidental or purposeful bending of the body; MSA advises bending the metal frame to improve the face fit of the respirator, and that the problem has been increased within the past few years by MSA's replacement of a foam rubber face cushion that had a fair metal sealing property by a header rubber face cushion that had a poorer metal seating ability.

74.     Mr. Schutz further stated that: "We have now advised MSA that we cannot approve the Dustfoe 66 in its present form. Our reason is a strong possibility of leakage between the rubber face cushion and metal body.  Our justification for non-approval is that portion of part 11 section 11.61 paragraph (a) which reads: "respirators will not be accepted by the Bureau (NIOSH) for examination, inspection and testing unless they are designed on sound engineering and scientific principles, constructed of suitable materials, and evidence of good workmanship."

75.     In a subsequent letter dated March 1973, Schutz stated that MSA was reluctant to make recommended changes to the Dustfoe 66 because MSA believed the presence on the market of two models of Dustfoe 66 respirators, one model significantly better than the other, would be a potential source of liability against them.

76.     In August 1973, months after Mr. Schutz's letter, MSA contemplated testing of its Dustfoe 66 to determine the masks' limitations in industrial uses as well as the effect

15

that storage in various atmospheric conditions, including temperature, humidity and radioactivity, have on the efficiency of the mask. MSA never conducted any of these tests.

77.     In May 1974, Los Alamos Scientific Labs tests reported that there was up to 55% initial dust filter penetration, and an average NaCl test penetration up to 11%, for MSA's Dustfoe 66 respirator.

78.     While MSA has represented that the Dustfoe filter provides maximum efficiency against all dusts, and that electrostatic precipitation and fine mechanical filtration provide maximum filter effectiveness; it was known to MSA that oily smokes, high humidity, various temperature conditions, certain dusts, sub-micron particles, organic vapors, and/or alpha-radiation can or may cause a loss of filtration efficiency of resin felt media due to a discharging effect of the electrostatic properties, resulting in contaminants entering the respiratory zone of the wearer. Respirator approval tests do not evaluate any of these conditions, and neither had MSA; however, Los Alamos has conducted tests that have shown that the Dustfoe filter degrades with temperature and humidity allowing up to 38% penetration.

79.     MSA's Director of Product Planning and Engineering Wade Miller testified that he was aware, and MSA recognized since the 1960s, that humidity adversely affects (degradation) the resin impregnated filters of the Dustfoe 66. He also stated that he was unaware of any steps taken by MSA to compensate for the effects of humidity on resin impregnated filters and was not aware of any changes in the method of storing the filter media prior to shipment.

80.     Moreover, John Miller of MSA, who became supervisor of the air purifying respirator group at MSA in 1964, testified that a non-impregnated filter would fail the

approval test. He further testified that the approval criteria does not address deteriorating the filter prior to testing, that there was a degrading effect of oil mist on resin impregnated electrostatically charged felt, and that, despite this deficiency, MSA never recalled any of its air purifying respirators.

81.    Charles Siebel of MSA, who worked as a design engineer on air purifying respirators from 1977 to 1991, and is now the manager of product safety at MSA, testified that though he was aware that humidity and temperature could degrade the Dustfoe 66 filters, he was still unaware of any MSA testing regarding filter degradation as late as 2004.

82.    There is no information accompanying the Dustfoe 66 respirator or the filters that the filter is electrostatically charged and could degrade under the various environmental conditions noted above.

83.    In addition to not informing purchasers and users, MSA never informed their sales personnel of the aforementioned filter problems.

84.    In this regard, Joseph Helm, a sales manager for MSA from 1949 to 1979, has testified that although he was given training regarding respiratory protection once or twice a year over that 30 year period, at no time did MSA explain that its filters had an electrostatic charge. Moreover, Chris Haebich, who worked in sales for MSA from 1978 until 1988, has testified that he does not know anything about the Dustfoe 66 respirator's electrostatic charge, and does not know if anything would degrade an electrostatic charge.

85.    Despite these defects, MSA never recalled the respirator or informed the purchasers or users of its inadequacies.

86.    Under Bureau of Mines Schedule 21 by which the Dustfoe 66 obtained approval, MSA had a continued duty to affix warnings or cease marketing if information

gathered after approval evidenced that the mask will prove inadequate protection or an unusual hazard.

87.     MSA did not include any warnings, instructions or limitations addressing any of the above inadequacies or unusual hazards, even though all were known to MSA while the Dustfoe was still in production and should have been incorporated into a warning.

## RELEVANT NATIONAL OCCUPATIONAL HEALTH STANDARDS

88.     During the relevant time, there existed occupational safety standards supposedly designed to protect individuals working in or around industrial operations.

89.     However, these standards were undermined and/or defeated by Defendants who often participated in the development of the standards, were aware of the deficiencies of the standards and their respirators, and, in order to promote their equipment, provided misinformation about the effectiveness and applicability of their products in the workplace.

90.     In 1955, the Bureau of Mines published criteria for approving respirators. This standard included testing methods for respirators to be used by workers exposed to respirable silica dust.  Over the years, this standard was updated by the Bureau of Mines and NIOSH.  As set forth, Defendants were fully aware that the approval tests only evaluated loading by mass, did not adequately evaluate the true efficiency of the filter to small sub-micron particles, the effects of filter degradation, or the fit of the respirator.

91.     In 1959, national concordance standards were published to help provide guidance for the selection and application of respiratory protection.  This standard relies on the respirator manufacturer to provide information on the usage and limitations of their equipment; however, the information provided by Defendants was misleading and inadequate for the proper selection, application and protection of the worker.

92.    In 1971, the Occupational Safety and Health Administration established federal workplace standards.  The respirator manufacturer necessarily plays a vital role in the proper application of these standards, and can undermine their effectiveness and contribute to over-exposure.

93.    Specifically, Section 1910.134 requires the user's employer to perform a certain function.  First, the employer must establish a written respiratory protection program.  To do so, the employer relies on the respirator manufacturer for much of this information.

94.    In this case, Defendants were aware of approval, fitting, leakage, filter penetration or concentration usage deficiencies that they did not disclose to the employers and users.

95.    Section 1910.134 also requires employers to conduct dust monitoring to select the proper respirator.  However, Defendants represented that their masks were completely protective, misrepresented the contaminants they would protect against and did not provide an upper usage limit until the 1980s, and never provided a particle size limitation.  These actions necessarily discouraged the employer from conducting any dust monitoring, provided Defendants' masks were used.

96.    Employers are also required to establish safe work practices to be used in conjunction with selected respiratory protection, including selecting the appropriate respirator for various activities.  False or unsubstantiated claims made by Defendants, as set forth above, left the employer unable to select the appropriate respirator.

97.    Section 1910.134 requires that employers provide properly fitting approved respirators for work around contaminants.  However, the Defendants' respirators only came

in one-size, and Defendants were aware that their respirators could not fit everyone. Despite this knowledge, Defendants still claimed that their respirators fit, or could be formed to fit, all faces and sizes. Relying on Defendants' misrepresentation an employer would not believe it had to fit test a respirator that fit everyone. In addition, the fit of the Defendants' respirators could not be evaluated with suitable, practical or effective qualitative fit check or fit test or quantitative fit test. In effect, as a result of Defendants' misrepresentations and inactions, the employer was left unable to comply with this part of the standard.

98.     The employer was also required to inform of the consequences of exposure. However, Defendants representations that its respirators fit everyone and could it be used in any contaminant level, as long as employees wore the respirator in the manner it was intended, there could not be exposure or subsequent consequences.

99.     The employer was also required to monitor work practices to assure that appropriate equipment was supplied, used and maintained. Once again, the employer would necessarily have to rely, at least in part, on the respirator manufacturer to help him select the appropriate respirator, and provide instructions to assure that it is used properly. Defendants' misrepresentations regarding their respirators, as set forth above, defrauded employers and the users of the respirators.

100.     Finally, the employer was required to periodically medically evaluate the workers. However, if the employer relied on the assurances of Defendants that, by following the manufacturer's recommendations, the employee will not be over-exposed, the employer would be less likely to have the employee medically evaluated or would reduce the frequency of these evaluations.

**COUNT I**
**FRAUD – MISREPRESENTATION AND CONCEALMENT**

101.    The allegations in paragraphs One (1) through Ninety-Five (95) above are realleged and incorporated by reference within this Count.

102.    The information distributed to the public, the insulation and commercial industry and the Plaintiff, Douglas Cockram, by Defendants contained material misrepresentations and/or failed to disclose material facts.   Such misrepresentations and concealment include, but are not limited to:

   a.   Falsely claiming that the 8710 and Dustfoe 66 respirators offered protection against the inhalation of dusts, including asbestos dusts;

   b.   Falsely claiming that a one-size-fits-all respirator can provide protection against asbestos dusts for all users;

   c.   Falsely claiming that said respirators provided a dust-tight seal;

   d.   Falsely claiming that the MSHA and NIOSH approval of said respirators guaranteed end user utility and safety;

   e.   Falsely claiming that said respirators passed NIOSH fit checks despite knowledge that NIOSH never evaluated the fit of masks;

   f.   Falsely claiming that said respirators had passed government fit tests despite knowledge that NIOSH never evaluated the effectiveness, reliability and safety of the fit checking or fit testing procedures as a condition of approval;

   g.   Falsely claiming that said respirators had 99% efficiency against particles with a mean diameter of 0.4-0.6 microns;

   h.   Falsely claiming that said respirators were high-efficiency;

21

i.  Falsely claiming that said respirators were designed and appropriate for use in high asbestos exposure areas;

j.  Falsely claiming that said respirators stop pneumoconiosis and fibrosis dusts from ever reaching the lungs, were for use in thick choking dusts, can be used in high dust concentration jobs, and were efficient enough to filter out everything harmful to a worker's lungs;

k.  Falsely claiming that said respirators could be used around any level of asbestos;

l.  Falsely promoting said respirators as providing respiratory protection against all dust concentrations, fibrosis-producing dusts, toxic dusts and mists;

m.  Concealing limitations of said respirators with respect to asbestos dusts;

n.  Concealing filter degradation from humidity, temperature and other environmental conditions; and

o.  Concealing test results which would have led to greater knowledge and awareness on the part of the respirator user with respect to the respirator limitations.

103.   Defendants knew that such statement, information and representation were false, in and of themselves, and in light of the true facts which were concealed or failed to be disclosed.

104.   It was the purpose and intent of Defendants in making these representation, and in failing to disclose the true facts, to deceive and defraud the public, including Plaintiff and Plaintiff's employer, to gain the confidence of the public, to falsely ensure the

22

quality and fitness for use of said respirators and to induce the public to purchase and use said respirators and remain brand-loyal.

105.    Plaintiff and Plaintiff's employer actually and reasonably relied upon the false statements, as well as the overall fraudulent message, conveyed by Defendants, and relied upon the omission of material facts, and was thereby induced to purchase and use the 8710 and Dustfoe 66 respirators, which did not, in fact, protect Plaintiff from asbestos exposure.

106.    At the time that Defendants fraudulently misrepresented and concealed material facts, Plaintiff Douglas Cockram did not know the true facts about said respirators which were misrepresented and concealed by Defendants.

107.    As a proximate result of Defendants' misconduct, Plaintiff Douglas Cockram has developed mesothelioma; he has endured, and will continue to endure rounds of debilitating cancer treatments and medical procedures; he has experienced, and will experience, physical pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, disabilities, and loss of bodily functions; he has incurred, and will continue to incur medical expenses; and he has suffered from any and all other damages associated with the diagnosis, treatment, and medical course of his cancer and has otherwise suffered injury and damages. Plaintiff Douglas Cockram has incurred and will continue to incur substantial loss of income.

## COUNT II
## NEGLIGENCE AND STRICT LIABILITY – FAILURE TO WARN

108.    The allegations in paragraphs One (1) through One Hundred Two (102) above are realleged and incorporated by reference within this Count.

109.   That all times material hereto, Defendants knew or should have known of the harmful effects of exposure to asbestos dust and fibers to human health, including the health of Plaintiff Douglas Cockram.

110.   At all times herein relevant, the Defendants had a duty to exercise reasonable care and caution for the safety of Plaintiff Douglas Cockram and others working with and around the Defendants' asbestos-containing products.

111.   Moreover, Defendants had a duty to provide adequate warnings of all latent dangers of use of Defendants' respirators and masks, including the limitations of said respirators and masks with respect to their inability to protect its user from asbestos dusts.

112.   Defendants manufactured and marketed respirators and dust masks which Defendants sold and distributed claiming said respirators and masks would protect workers from the dangers of breathing, inhaling and absorbing asbestos dusts.

113.   Defendants negligently produced, sold, supplied or otherwise put into the stream of commerce asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products.

114.   The Plaintiff used Defendant 3M's 8710 respirator and MSA's Dustfoe 66 respirator in the manner in which they were intended.

115.   Plaintiff did not know that his use of Defendants' respirators during his work with asbestos products would not protect him from airborne asbestos dust.

116.   In fact, Defendants falsely represented that their respirators were safe and provided protection against the inhalation of asbestos dusts.

117.    The Defendants knew or should have known that its respirators and masks were not adequate protection against asbestos fibers and their toxic, poisonous, and highly deleterious effect upon persons such as Plaintiff.

118.    Although Defendants knew or reasonably should have known that their respiratory protection products were inadequate to protect their users from asbestos dusts and posed a highly harmful threat to Plaintiff's health, the Defendants were negligent in that they failed to exercise ordinary care and caution for the safety of Douglas Cockram in one or more of the following respects:

a.    Failed to provide any or adequate warnings to persons using their respirators and masks while working with and around asbestos-containing products and their airborne dusts;

b.    Failed to advise or warn Plaintiff of the inadequacies and limitations inherent in their respirators and masks;

c.    Failed to provide any or adequate instructions concerning the methods of using said respirators and masks, including specific instructions on how to fit test and fit check the respirator and the limitations of the respirators as a protection against asbestos;

d.    Failed to place any warnings on the respirator or its container regarding the product's limitations and inadequacies in protecting the user from the inhalation and/or absorption of harmful asbestos dusts;

e.    Failed to conduct tests on the masks with respect to asbestos dusts to determine the limitations of the masks for users; and,

f.    Designed, manufactured and sold masks that failed to adequately protect its users from asbestos and other dusts.

g.    Failed to provide Plaintiff with the knowledge to protect himself from being harmed by exposure to asbestos and asbestos-containing products;

h.   Failed to take reasonable precautions or to exercise reasonable care to publish, adopt and enforce a safety plan, including fit check, fit test and efficiency tests for the respirators.

119.   The lack of adequate warnings on Defendants' respirators or their containers rendered the products defective and unreasonably dangerous.

120.   The Plaintiff was exposed to asbestos-containing products and their airborne dusts because of the inadequacy, defect, and unreasonably dangerous nature of the Defendants' respirators.

121.   As a proximate result of Defendants' misconduct, Plaintiff Douglas Cockram has developed mesothelioma and suffered all damages as set forth above in paragraph 103.

**COUNT III**
**STRICT PRODUCT LIABILITY – DEFECTIVE DESIGN**

122.   The allegations in paragraphs One (1) through One Hundred Sixteen (116) above are realleged and incorporated by reference within this Count.

123.   Defendants, while regularly engaged in the business activities aforementioned, did design, develop, manufacture, sell, market and distribute their 8710 and Dustfoe 66 respirators, which were purchased by Plaintiff's employer and used by Plaintiff.

124.   The Defendants placed their inadequate respiratory protection products on the market and knew or should have known they would be used without inspection for defects.

125.   3M's 8710 respirator and MSA's Dustfoe 66 respirator were expected to reach and did reach the usual consumers, including Plaintiff Douglas Cockram, without

26

substantial change in the condition in which they were designed, produced, manufactured, sold, distributed and marketed by Defendants.

126.     Defendants failed to design, develop, manufacture, sell, market and distribute their respirators in such a manner as to render them safe for their intended and foreseeable uses by companies and users to which Defendants marketed these products. By way of example and not limitation, Defendants:

    a.    Failed to design, develop, manufacture and test their respiratory protection products in such a manner as to render them safe for their intended and foreseeable users, when Defendants knew or should have known that the foreseeable use of intended purpose of its products was by persons, specifically Plaintiff, who worked with and around asbestos products;

    b.    Marketed and sold said products as sufficient respiratory protection against asbestos dusts while the same was in an unreasonably dangerous and defective condition, presenting a hazardous risk to Plaintiff's well-being;

    c.    Failed to recall or attempt to repair the defective products when Defendants were and had been aware of the propensity of said products to injure Plaintiff;

127.     Moreover, when Defendants' respiratory protection products left the Defendants' possession and were placed on the market, the products were defective in that:

    a.    When used in the intended or reasonably foreseeable manner, the products were not reasonably safe for their intended use;

    b.    When used in the intended or reasonably foreseeable manner, the products failed to perform as safely as would be expected by an ordinary user or consumer;

    c.    When used in the intended or reasonably foreseeable manner, the products caused a risk of harm beyond that which would be contemplated by the ordinary user or consumer.

128.   Defendants knew that their respiratory protection products were in a defective condition with respect to asbestos dusts and not reasonably safe for their marketed and intended use.

129.   With this knowledge, Defendants voluntarily designed, manufactured and distributed their respective 8710 and Dustfoe 66 respirators in a defective condition for use by the public and, in particular, plaintiff Douglas Cockram.

130.   As a direct and proximate result of using Defendants' defective products for the general purpose for which they were designed and intended, Douglas Cockram was overexposed to asbestos, contracted mesothelioma and has suffered and continues to suffer the injuries and damages set forth herein.

131.   Accordingly, Defendants are strictly liable to Plaintiff Douglas Cockram for defective design and manufacture and/or marketing, distributing, supplying and selling a defective product.

132.   As a proximate result of Defendants' misconduct, Plaintiff Douglas Cockram has developed mesothelioma and suffered all damages as set forth above in paragraph 103.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

133.   The allegations in paragraphs One (1) through One Hundred Sixteen (116) above are realleged and incorporated by reference within this Count.

134.   Defendants affirmatively represented their 8710 and Dustfoe 66 respirators (respectively) to be safe and effective protection against asbestos dusts in their advertising, promotional and safety materials, and information disseminated to employers and end-users like Plaintiff.

135.    Defendants promoted and marketed said respirators as providing respiratory protection against asbestos dusts when the purported benefits were unfounded.

136.    Defendants promotional and safety materials and representations constitute affirmations, promises and descriptions, which became part of the basis of the bargain and created an express warranty that said respirators should confirm to Defendants' affirmations or promises.

137.    At the time that Plaintiff and Plaintiff's employer paid for said respirators, Defendants' express warranties were not true and said respirators did not provide protection against asbestos dusts, were not safe, and were not reasonably suitable and fit for use around asbestos as advertising and represented by Defendants.

138.    The foregoing statements, descriptions and misrepresentations caused Plaintiff to suffer ascertainable losses in that he and his employer purchased respirators without knowing the true and complete risks and benefits of said respirators as it relates to providing protection against the inhalation, ingestion and absorption of asbestos dusts.

139.    Plaintiff would not have used said respirators had Plaintiff known the true and complete risks inherent with said respirators.

140.    As a proximate result of Defendants' breach of express warranty, Plaintiff Douglas Cockram has developed mesothelioma and suffered all damages as set forth above in paragraph 103.

**COUNT V**
**BREACH OF IMPLIED WARRANTY**

141.    The allegations in paragraphs One (1) through One Hundred Twenty-Seven (127) above are realleged and incorporated by reference within this Count.

142.    At all relevant times herein, Defendants marketed, tested, manufactured, promoted, distributed and sold their respective 8710 and Dustfoe 66 respirators for use by the public at large, including Plaintiff. Defendants knew the uses for which their respirators were intended and impliedly warranted said products to be of merchantable quality, safe and fit for the uses Defendants marketed.

143.    Plaintiff and Plaintiff's employer reasonably relied on the skill and judgment of Defendants, and as such, the implied warranty, in using the 8710 and Dustfoe 66 respirators when working with or around asbestos dusts.

144.    Contrary to the implied warranty, said respirators were not of merchantable quality or safe or fit for their intended use around asbestos dusts, which rendered the respirators unreasonably dangerous and unfit for the purpose for which it was intended to be used.

145.    As a proximate result of Defendants' breach of implied warranty, Plaintiff Douglas Cockram has developed mesothelioma and suffered all damages as set forth above in paragraph 103.

**COUNT V**
**FRAUDULENT CONDUCT. MALICE AND GROSS NEGLIGENCE**

146.    The allegations in paragraph One (1) through One Hundred Thirty-Two (132) above are realleged and incorporated by reference within this Count.

147.    The Defendants had a duty to refrain from gross negligence, fraud and/or malicious acts or omissions which would harm Plaintiff.

148.    Defendants are guilty of one or more of the following acts or omissions amounting to fraudulent misconduct, malice and gross negligence:

30

a.     Intentionally or with gross negligence for the safety of Plaintiff, manufactured, sold and distributed respiratory protection products inadequate to protect against airborne asbestos dusts, even though it was completely foreseeable and could or should have been anticipated that persons such as Plaintiff would wear the respirator while working with or around airborne asbestos dusts;

b.     Intentionally or with gross negligence for the safety of Plaintiff, designed, manufactured, marketed, sold and distributed a defective product which was unreasonably dangerous when used in the manner for which it was marketed and intended to be used;

c.     Intentionally or with gross negligence for the safety of Plaintiff, failed to provide any or adequate warnings to persons using their products believing them to sufficiently protect against the inhalation, ingestion or absorption of asbestos fibers;

d.     Intentionally or with gross negligence for the safety of Plaintiff, failed to provide any or adequate instructions concerning the limitations and inadequacies of their respirators to protect against asbestos dust, including specific instructions on how to avoid using said respirators while working with or around airborne asbestos dust;

e.     Intentionally or with gross negligence for the safety of Plaintiff, failed to conduct tests to determine the limitations and inadequacies of the respirators in protecting against the inhalation, ingestion and absorption of asbestos dusts in order to determine the hazards to which persons such as Plaintiff might be exposed while working with and around asbestos products;

f.     Intentionally or with gross negligence for the safety of Plaintiff, failed to adequately label, warn, package, market or distribute the respirator in a reasonable manner which would minimize or eliminate the penetration of asbestos dust fibers through the respirators, thereby adding to the exposure of Plaintiff and others similarly situated; and

g.     Intentionally or with gross negligence for the safety of Plaintiff, failed to take adequate steps to remedy the above failures, including but not limited to: (1) failure to recall the respirators; (2) ongoing failure to conduct research to determine the respirator's limitations, capabilities and efficiency; and (3) failure to promptly remedy the inadequacies and shortcomings of the respirators to or to warn he end user of same.

149.    As a direct and proximate result of one or more of the foregoing actions and/or omissions of Defendants, Plaintiff Douglas Cockram was exposed to asbestos, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as described herein despite his continued and proper use of Defendants' respirators, which Defendants' claimed would protect Plaintiff against asbestos dust exposure.

150.    Defendants' actions, as stated herein, constitute a flagrant disregard for the rights and safety of Plaintiffs and by engaging in such actions, Defendants acted with gross negligence, fraud, recklessness, willfulness, wantonness and/or malice and should be held liable in punitive and exemplary damages to Plaintiffs.

### COUNT VI
### LOSS OF CONSORTIUM, SERVICES AND SOCIETY

151.    The allegations in paragraph One (1) through One Hundred Thirty-Seven (137) above are realleged and incorporated by reference within this Count.

152.    Plaintiff Dena Cockram is married to Plaintiff Douglas Cockram and, as such, is entitled to the services, society and companionship of her spouse.

153.    As a result of the foregoing misconduct by Defendants, and resulting injuries to her husband, Plaintiff Dena Cockram was caused to sustain the loss of services, society, consortium and companionship of Plaintiff Douglas Cockram and was caused to incur medical expenses on behalf of Douglas Cockram.

154.    Based on the foregoing, Plaintiffs demand compensatory and punitive damages in an amount sufficient to punish Defendants for their misconduct and to deter similarly situated parties from committing like acts of misconduct in the future

**WHEREFORE,** Plaintiffs, as a direct and proximate result of the negligence and conduct of each Defendant, have suffered and will continue to suffer great pain and severe mental anguish.

Plaintiffs, as a direct and proximate result of the negligence of other conduct of Defendants, have incurred expenses for medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined, and will continue to incur such expenses into the future.

Plaintiffs, as a direct and proximate result of the negligence and other conduct of Defendants, have suffered economic damages and will continue to suffer them throughout their lifetimes.

The aforesaid acts and/or omissions of Defendants were grossly negligent, fraudulent and malicious.

Plaintiffs demand judgment against Defendants jointly and severally in an amount in excess of Seventy-Five Dollars ($75,000.00); punitive damages in an amount sufficient to punish Defendants for their misconduct and to deter similarly situated parties from committing like acts of misconduct in the future; and such other and further relief that this Court deems appropriate.

A trial by jury is hereby demanded as to all counts.

Respectfully submitted,

GOLDBERG PERSKY & WHITE, P.C.

BY: */s/ Jason E. Luckasevic*
Jason E. Luckasevic
1030 Fifth Avenue
Pittsburgh, PA 15219
Telephone: (412) 471-3980
Fax: (412) 471-8308

-and-

LEVY PHILLIPS & KONIGSBERG, LLP
Jerome H. Block, Esq.
Donald P. Blydenburgh, Esq.
800 Third Avenue
New York, NY 10022
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys for Plaintiff

Dated: July 12, 2011

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Douglas Leon Cockram and Dena Cockram

**DEFENDANTS**
3M Company a/k/a Minnesota Mining & Manufacturing, and
Mine Safety Appliances, Inc.

**(b)** County of Residence of First Listed Plaintiff   Patrick
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Ramsey
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Jason E. Luckasevic, Esquire
Goldberg, Persky & White, PC

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | X 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1333
Brief description of cause:
Asbestos Personal INjury

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ in excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
N/A
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE  7/12/11

SIGNATURE OF ATTORNEY OF RECORD   Jason E Luckasevic /JTS

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44AREVISED June, 2009
IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
THIS CASE DESIGNATION SHEET MUST BE COMPLETED

**PART A**

This case belongs on the (  ⭘ Erie      ⭘ Johnstown      ⦿ Pittsburgh) calendar.

1. **ERIE CALENDAR -** If cause of action arose in the counties of Crawford, Elk, Erie,
   Forest, McKean. Venang or Warren, OR any plaintiff or defendant resides in one of said
   counties.

2. **JOHNSTOWN CALENDAR -** If cause of action arose in the counties of Bedford, Blair,
   Cambria, Clearfield or Somerset OR any plaintiff or defendant resides in one of
   said counties.

3. Complete if on **ERIE CALENDAR**: I certify that the cause of action arose in_____
   County and that the _____resides in_____County.

4. Complete if on **JOHNSTOWN CALENDAR**:  I certify that the cause of action arose in
   _____County and that the_____resides in _____County.

**PART B (You are to check ONE of the following)**

1. ⦿ This case is related to Number_____. Short Caption_____
2. ⊗XXThis case is not related to a pending or terminated case.

**DEFINITIONS OF RELATED CASES:**

**CIVIL:**  Civil cases are deemed related when a case filed relates to property included in
another suit or involves the same issues of fact or it grows out of the same transactions
as another suit or involves the validity or infringement of a patent involved in another
suit **EMINENT DOMAIN:**  Cases in contiguous closely located groups and in common ownership
groups which will lend themselves to consolidation for trial shall be deemed related.
**HABEAS CORPUS & CIVIL RIGHTS:**  All habeas corpus petitions filed by the same individual
shall be deemed related. All pro se Civil Rights actions by the same individual shall be
deemed related.

**PARTC**

I. CIVIL CATEGORY (Place x in only applicable category).

   1. ⊔   Antitrust and Securities Act Cases
   2. ⭘   Labor-Management Relations
   3. ⭘   Habeas corpus
   4. ⭘   Civil Rights
   5. ⭘   Patent, Copyright, and Trademark
   6. ⭘   Eminent  Domain
   7. ⭘   All  other federal question cases
   8. ⊗XX All  personal  and property damage tort cases,  including  maritime,  FELA,
        Jones Act, Motor vehicle, products liability, assault, defamation,  malicious
        prosecution, and false arrest
   9. ⭘   Insurance indemnity, contract and other diversity cases.
   10.⭘   Government Collection Cases (shall include HEW Student Loans (Education),
        V A  Overpayment, Overpayment of Social Security, Enlistment
        Overpayment  (Army,  Navy,  etc.),   HUD Loans, GAO Loans (Misc. Types),
        Mortgage Foreclosures, SBA Loans, Civil Penalties and Coal Mine
        Penalty and Reclamation Fees.)

I certify that to the best of my knowledge the entries on this Case Designation
Sheet are true and correct

Date: ___7/12/11___           _____
                                        ATTORNEY AT LAW

NOTE: ALL SECTIONS OF BOTH SIDES MUST BE COMPLETED BEFORE CASE CAN BE PROCESSED.

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Pennsylvania

| | |
|---|---|
| Cockram, et al. | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No. |
| 3M Company, et al. | ) |
| _____ | ) |
| *Defendant* | ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   3M Company
3M Center
Building 0220-9E-02
Saint Paul, MN 55144

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Jason E. Luckasevic, Esquire
Goldberg, Persky & White, P.C.
1030 Fifth Avenue
Pitsburgh, PA 15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑  I returned the summons unexecuted because _____ ; or

❑  Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: