# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BONNIE VON DELL and<br>JOHN VON DELL,<br><br>      Plaintiffs,<br><br>v.<br><br>THE BOEING COMPANY (individually and as<br>successor to MCDONNELL DOUGLAS<br>CORPORATION), et. al.,<br><br>      Defendants. | Case No. 1:11-cv-786 SLR |

## SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING PLAINTIFFS' EMERGENCY MOTION TO REMAND

Upon consideration of Plaintiffs Bonnie Von Dell's and John Von Dell's ("Plaintiffs")

Emergency Motion to Remand to the Delaware Superior Court (the "Motion") [D.I. 6], the

Special Master[1] concludes that Defendant The Boeing Company ("Defendant") did not timely

remove this action under 28 U.S.C. § 1446(b) for the reasons set forth herein. The Motion

should therefore be granted.

### BACKGROUND

Plaintiffs filed this action on September 16, 2010 in the Delaware Superior Court,

alleging that "Plaintiff Bonnie Von Dell experienced occupational exposure to asbestos while

working as a wire harness assembler from 1978 to 1992 at Rohr Industries Aerospace Plant in

Auburn Washington." (D.I. 7, Ex. A (Plaintiffs' First Amended Complaint ¶28(a)).) Defendant

removed this action on September 7, 2011 pursuant to the federal officer removal statute, 28

U.S.C. § 1442(a)(1). (D.I. 1.) On September 15, 2011 the United States Judicial Panel on

---

[1] The case was referred to the Special Master by order dated June 8, 2011 (D.I. 5).

Multidistrict Litigation entered CTO-445, conditionally transferring this case to MDL-875 in the Eastern District of Pennsylvania. (D.I. 7 at 2.) On September 20, 2011 Plaintiffs filed the instant Emergency Motion to Remand. (D.I. 6).

By Order dated September 29, 2011 the parties agreed to submit for decision the issue of the timeliness of Defendant's removal before a consideration of the merits of the removal. (D.I. 9.) The Special Master conducted a telephonic hearing on October 19, 2011.

## LEGAL STANDARDS

Pursuant to 28 U.S.C. § 1446(b):

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable . . . .

28 U.S.C. § 1446(b) (2010).

"Other paper" includes "various discovery documents such as deposition transcripts, answers to interrogatories and requests for admissions . . . ." 14C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3731 at 539-40 (West 2009). Federal courts interpret § 1446(b) to be "in keeping with its intended purpose of assuring that a defendant has an opportunity to assert the Congressionally bestowed right to remove upon receiving notice that the right exists in a particular case." *Id.* at 526-36.

The party seeking removal under § 1446(b) bears the burden to establish federal jurisdiction. *See Connecticut Bank of Commerce v. Republic of Congo*, 440 F. Supp. 2d 346, 349 (D. Del. 2006). The purpose of the thirty-day period in § 1446(b) is "to allow the defendant to intelligently ascertain removability . . . ." *Graphic Scanning Corp. v. Yampol*, 677 F. Supp. 256,

2

259 (D. Del. 1988) (quoting *DeBry v. Transamerica Corp.*, 601 F.2d 480, 489 (10th Cir. 1979));
*see also Pantalone v. Aurora Pump Co.*, 576 F. Supp 2d 325, 332 (D. Conn. 2008) (holding that
the defendant needs to "apply a reasonable amount of intelligence in ascertaining removability.").
This court has held that, "the thirty-day time period for removal does not begin to run until the
grounds for removal are clearly established." *Graphic Scanning Corp.*, 677 F. Supp. at 258;
*accord Connecticut Bank of Commerce*, 440 F. Supp. 2d at 352. The ground for removal is
"clearly established" when the decision to remove is an informed one, leaving the defendant no
room to speculate. *Graphic Scanning Corp.*, 677 F. Supp. at 258-59. "If the statute is going to
run, the notice ought to be unequivocal." *Id.* at 259 (quoting *DeBry*, 601 F.2d at 489).

In the context of this case where the claim is for injury and damages caused by
occupational exposure to asbestos, it is clear that, "Until the military products [are] specifically
identified, defendant ha[s] no basis for removal." *In re Asbestos Prods. Liab. Litig.* ("*Vest*"), No.
11-cv-63520, 2011 WL 2039218, at *2 (E.D. Pa. May 25, 2011).

## DISCUSSION

Bonnie Von Dell worked with Mark Sargent at the Rohr Industries Aerospace Plant
("Rohr"). (D.I. 7, Ex. C (Deposition of Mark Sargent ("Sargent Dep.") at 22:20-23.) "Four
months after [Bonnie] Von Dell's deposition, Plaintiffs proferred . . . Sargent, as a product
identification witness." (D.I. 19 at 3.) On May 24, 2011 Sargent was deposed by a member of
the Delaware defense counsel coordinating team. (*Id.* at 6:25.) Sargent testified that he worked
in Rohr's production control stores area. (*Id.* at 35:4-7.) His duties included receiving, stocking,
and issuing aircraft components and components for the electrical wire harness department, such
as wires, plugs, conduits, sleeving, and pins. (*Id.* at 35:4-12; 35:22-24).

Sargent testified that Bonnie Von Dell worked in Rohr's electrical wire harness

department assembling harnesses for various engines, among which was the Boeing 707

AWACS—the Special Master takes judicial notice of the fact that the AWACS is the military

aircraft developed under the United States Air Force's Airborne Warning and Control System

Program.

> The relevant references to Mr. Sargent's testimony are as follows:
>
> Q: Let's go back, generally. What, to your knowledge, did Rohr make, what
> kinds of products?
> A: They assembled. They didn't make anything.
> Q: What did they assemble?
> A: 747 GE, Rolls, and Pratt & Whitney engines. 727, 737 Pratt & Whitney
> engines. 707 AWACS engines. (D.I. 7, Ex. C (Sargent Dep.) at 39:21-40:1).
> ...
>
> Q: Do you know what [Bonnie] Von Dell's job was at Rohr?
> A: Yes. She worked in the electrical wire harness department. (*Id.* at 40:17-22).
> ...
>
> Q: Would [the workers in the electrical department] all perform the same job or
> were they doing different things?
> A: Same job.
> Q: To your knowledge, what would the electrical department do?
> A: They would cut wire, route it on a schematic that was on a board. They would
> strip those wire. They would install pins. They would install the Cannon plugs,
> any other hardware that's required on that harness before it's taken to the engine.
> (*Id.* at 44:1-12).
> ...
>
> Q: The person who would make this harness would they just get all these
> components in a big bin?
> A: They would get the small components in a tote, small plastic tote. The wire
> would come down in rolls. They would roll that out to length, and cut it, strip it,
> and terminate it.
> Q: Who would cut it?
> A: The person building the harness.
> Q: So to your knowledge, the person building the harness wouldn't have had
> already precut write?
> A: Correct.
> Q: Looking at your diagram that you put for us, could you tell me where those
> rolls of wire would have been located?
> A: There were rolls of wire on the floor in the electrical area. (*Id.* at 49:5-50:1).

...

Q: Do you know if the harnesses that they were making at the electrical department were all for the same type of plane? Or were they working on different kinds of harnesses?

A: Different type of aircraft. (*Id.* at 50:20-51:1).

...

Q: Do you know what model Boeing plane those harnesses were made for?

A: 727, 737, 747, and 707.

Q: Would those harnesses be exactly the same or would they vary in size and length?

A: They would vary in size.

Q: Would they also vary in what components were put in them?

A: Yes.

Q: As for the Boeing planes, they would only be used on commercial Boeing planes, correct?

A: Correct. Well, the 707—at that time, the 707 AWACS was not a commercial aircraft. (*Id.* at 51:14-52:3).

...

Q: How do you know that these harnesses were made for Boeing planes?

A: Because the engines were, that we built up, we used those harnesses on and they were tagged with whatever aircraft model that they went to. (*Id.* at 51:9-13).

...

Q: Do you have any specific personal knowledge of [Bonnie] Von Dell ever working on a harness for Boeing?

A: That's pretty—she worked in that area. She would have worked on Boeing wire harnesses.

Q: But do you have any specific recollection of her working on Boeing harnesses?

A: No. (*Id.* at 68:24-69:8).

Notwithstanding Sargent's clear and unequivocal identification of the AWACS engines and its components as being Defendant's products at Rohr, Defendant did not file a notice of removal within thirty days following the Sargent deposition. In this regard, Defendant argues that Sargent's deposition testimony failed to give unequivocal notice that a clearly established nexus existed between Bonnie Von Dell's allegations and Defendant's alleged actions under color of federal office to trigger the thirty-day period under 28 U.S.C. § 1446(b). Rather, Defendant asserts that the triggering event was correspondence dated August 9, 2011 from Chris

5

Panatier, counsel for Plaintiffs, to Christian Singewald, Delaware counsel for Defendant, wherein Panatier clarified the subject areas for a Fed. R. Civ. P. 30(b)(6) deposition testimony from The Boeing Company, specifically stating that, "For purposes of this area, the subject aircraft shall be limited to the Boeing 707, 727, 737, 747 and 707AWACS." [3] (D.I. 7, Ex. D, at 2, 4-5). In the Special Master's view, it is noteworthy that the Boeing aircrafts identified in the correspondence are no different than those identified by Sargent. (*See* D.I. 7, Ex. C (Sargent Dep.) at 51:14-52:3).

While the parties do not dispute that the August 9, 2011 correspondence would trigger the thirty-day period under 28 U.S.C. § 1446(b), the question at issue is whether Sargent's deposition satisfies the standard articulated in *Graphic Scanning Corp.*—that is, does the Sargent deposition, where he specifically identified the military aircraft AWACS, give unequivocal notice to Defendant that a nexus between Plaintiffs' claim and Defendant's alleged actions under color of federal office was clearly established. *See Graphic Scanning Corp.*, 677 F. Supp. at 258-59. The Special Master concludes that it does.

A number of facts are clear from the Sargent deposition. It is clear from the deposition that Bonnie Von Dell worked in the electrical wire harness department at Rohr; that everyone in the department did the same job; that the workers in the department made wire harnesses for various engines, including the Boeing 707 AWACS. It is also clear from Sargent's testimony that all wire harnesses were assembled in the same space by each and all of Rohr's wire harness assemblers, including Bonnie Von Dell. Indeed, Defendant concedes that "Mr. Sargent's testimony established that assembly of wire harnesses for the AWACS took place at the Rohr Facility." (D.I. 19 at 10).

---

[3] The Special Master notes that in the four areas where Plaintiffs tailored their discovery request to specific Boeing aircrafts, the first listed the Boeing 707, 727, 737 and AWACS, and the next three listed the Boeing 707, 727, 737, 747 and 707AWACS.

Moreover, based on Plaintiffs' complaint and Sargent's testimony, it is clear to the Special Master that Defendant knew (1) Bonnie Von Dell claimed to have suffered occupational exposure to asbestos while working as a wire harness assembler at Rohr, and (2) some of the wire harnesses, made in the same space where Bonnie Von Dell worked, were for the Boeing 707 AWACS. Given the description of the electrical wire harness department and the work done there, it does not matter whether Sargent testified that Bonnie Von Dell worked on an AWACS wire harness. The fact remains that someone in the electrical wire harness department did. (*See* D.I. 7, Ex. C (Sargent Dep.) at 50:20-51:1.)

In the Special Master's view, Bonnie Von Dell's claim coupled with the work performed in the electrical wire harness department provided the clear nexus between Plaintiffs' claim and the United States military aircraft-engine assemblage at Rohr. As such, the Special Master concludes that the Sargent deposition gave Defendant unequivocal notice of the basis for federal officer removal.

Defendant's argument that removability was unclear due to a conflict between Bonnie Von Dell's testimony and Sargent's testimony is, in the Special Master's view, unavailing. On the one hand, Bonnie Von Dell testified that Rohr assembled only commercial-aircraft engines; on the other hand, Sargent identified the Boeing 707 AWACS as a military aircraft engine assembled at Rohr. (*Compare* D.I. 19, Ex. A (Videotaped Deposition of Bonnie Von Dell dated January 25, 2011) at 68:8-22, *with* D.I. 7, Ex. C (Sargent Dep.) 52:2-3.)

Defendant's position is that because of this conflicting testimony, "Boeing was put in a position at that point to guess or speculate about what exactly Mrs. Von Dell was claiming. [Sargent's] testimony did not clarify, but it rather muddied the waters." (Transcript of Teleconference dated October 19, 2011 at 20:5-21:7.) Indeed, Defendant admits that had Bonnie

7

WM1A 1012791v6 10/25/11

Von Dell identified AWACS at her deposition, it would have been unequivocal notice that a federal officer removal basis was clearly established. (*Id.* at 20:15-22). Defendant appears to concede that the triggering event is when it learned that AWACS engines and its components were being assembled at Rohr. At the same time, Defendant asserts that since Bonnie Von Dell failed to make the identification, the conflicting testimony made it impossible "for it to have been clearly established that there was a causal nexus between [Bonnie] Von Dell's allegations and Boeing's alleged actions under color of federal office based solely on looking at her deposition testimony and Sargent's deposition testimony. In fact, [Defendant] think[s] it's exactly the opposite of clear." (*Id.* at 22:22-23:4.)

In the Special Master's view, Defendant's attempt to conflate the conflicting testimony with equivocal notice fails. The Special Master concludes that based on the testimony by Sargent, Plaintiffs' product identification witness, it is clear that Bonnie Von Dell was mistaken in her testimony that Rohr assembled only commercial-aircraft engines and that Rohr, in fact, assembled engines for both commercial and military aircrafts. In the Special Master's view, Bonnie Von Dell's lack of, or mistaken, knowledge does not result in any uncertainty about the nexus between her claim of occupational exposure to asbestos at Rohr and Defendant's military product AWACS at Rohr.

In this regard, AWACS was referenced six times during the Sargent deposition. (*See* D.I. 7, Ex. C ("Sargent Dep.") at 40:1-46:12.) Moreover, at defense counsel's request, after Sargent first referenced AWACS, he was asked to show where each department was located on a sketch. (*Id.* at 45:3-7.) On that sketch, Sargent designated the upper-left corner as the "AWACS Line." (D.I. 21, Ex. G.) Defense counsel's questions to Sargent about the sketch are as follows:

> Q: He describes an – is that an AWACS line?
> A: AWACS.

WM1A 1012791v6 10/25/11

> Q: AWACS line to the left-hand side, which would be north[.]
>
> ....
>
> Q: The mezzanine would have been located above the northeast and southeast
> portion of the building on top of the AWACS line and the shipping as well as the
> 727 line?
>
> A: This area here was open over the AWACS line.

(D.I. 7, Ex. C. ("Sargent Dep.") at 46:9-12; 50:7-16). In the Special Master's view, Sargent's references to AWACS were clear and unequivocal, and defense counsel's questions concerning AWACS could not have been more direct. Indeed, given the testimony of Bonnie Von Dell four months earlier, defense counsel certainly did not, "in applying a reasonable amount of intelligence" on behalf of Defendant, take the opportunity to challenge the testimony of Plaintiffs' product identification witness. *See Pantalone*, 576 F. Supp 2d at 332.

In addition, Defendant's arguments that Sargent's testimony failed "to provide any specific testimony regarding [Bonnie] Von Dell's work at the Rohr Facility," and Sargent was unable to "link [Bonnie] Von Dell to any specific wire or aircraft" are both futile (D. I. 19 at 9-10.) While it is true that Sargent did not claim to have any personal knowledge nor specific details regarding the types of wire harnesses Bonnie Von Dell assembled at Rohr, his testimony unequivocally demonstrated that Bonnie Von Dell worked in the space where wire harnesses destined for AWACS were being assembled. This fact in conjunction with Plaintiffs' complaint alleging occupational exposure to asbestos while working as a wire harness assembler at Rohr, in the Special Master's view, amounts to "Plaintiffs claiming that [Bonnie] Von Dell was [also] exposed to asbestos from wire destined for AWACS." (D.I. 19 at 10). Moreover, although Plaintiffs' complaint did not allege Bonnie Von Dell's asbestos exposure came from handling wire harness components, speculation of whether she personally assembled wire harnesses for the Boeing 707 AWACS does not, in the Special Master's view, diminish the nexus between

Plaintiffs' claim of occupational exposure to asbestos and AWACS component and engine assemblage at Rohr, as clearly described in Sargent's deposition.

Defendant also takes issue with the fact that Bonnie Von Dell herself did not identify the Boeing 707 AWACS at Rohr. (*See* Transcript of Teleconference dated October 19, 2011 at 20:15-22.) However, the Special Master is not aware of any case law that requires the plaintiff to be the vehicle that provides the unequivocal notice, and none has been brought to the Special Master's attention. Indeed, this court, in determining when a set of remaining defendants in an asbestos case received clear notice that the non-diverse defendants had settled and that the case had become removable, concluded that the letters sent between the defense counsels and the statements the defense counsel and the plaintiff counsel made before the court, both stating that the non-diverse defendants had settled, gave the remaining defendants clear notice. *See Hessler v. Armstrong World Indus., Inc.*, 684 F. Supp. 393, 394 (D. Del. 1988). The Special Master also gives weight to the fact that Sargent is Plaintiffs' product identification witness, whose identification is analogous to product identification made in an expert report. *See Contois v. Able Indus., Inc.*, 523 F. Supp. 2d 155, 158-59 (D. Conn. 2007) (holding that the expert report identifying the defendant's products established the federal officer removal basis).

Finally, Defendant's assertion that by virtue of the August 9, 2011 correspondence Plaintiffs "alter[ed] the character of [their] action . . . to one involving a federal basis jurisdiction" lacks merit. (D.I. 19 at 10. ) While it cannot be disputed that the correspondence tailored Plaintiffs' discovery request to include AWACS, it also cannot be disputed that Plaintiffs' claim of injury from occupational exposure to asbestos has remained the same. From Plaintiffs' complaint, to Bonnie Von Dell's deposition, to Sargent's deposition, to the

10

correspondence, Bonnie Von Dell has been claiming occupational exposure to asbestos while working as a wire harness assembler at Rohr.

In sum, Sargent, Plaintiffs' product identification witness for the purpose of establishing the nexus between Plaintiffs' claim and Defendant's products, simply connected Bonnie Von Dell's allegation to specific products that included AWACS.

On this rather uncomplicated record, the Special Master is convinced that had Defendant exercised a reasonable amount of intelligence, Defendant would have ascertained clear and unequivocal ground for removal on the date of the Sargent deposition. Stated differently, Defendant has not carried its burden to demonstrate that it could not, with a reasonable amount of intelligence, have ascertained clear and unequivocal ground for removal before the August 9, 2011 correspondence.

## CONCLUSION

For the reasons set forth above, the Special Master therefore concludes that Defendant did not timely remove this action under 28 U.S.C. § 1446(b) within thirty days of ascertaining a basis for removal under the federal officer removal statute. Accordingly, Plaintiffs' Emergency Motion to Remand should be GRANTED.

**The Special Master's Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g) or other agreement of the parties.**

ENTERED this

25th day of October, 2011

Vincent J. Poppiti (DSBA No. 100614),
Special Master

11

WM1A 1012791v6 10/25/11