ASBESTOS

# U.S. District Court
## Western District of North Carolina (Asheville)
## CIVIL DOCKET FOR CASE #: 1:11−cv−00325−MR

McSwain v. BASF Catalysts LLC et al
Assigned to: District Judge Martin Reidinger
Demand: $100,000
Cause: 28:1332 Diversity−Asbestos Litigation

Date Filed: 12/07/2011
Jury Demand: Plaintiff
Nature of Suit: 368 P.I. : Asbestos
Jurisdiction: Diversity

**Plaintiff**

**Rebecca Horton McSwain**
*individually and*
*as Executrix of the Estate of*
Jacque Truett McSwain

represented by **William M. Graham**
Wallace &Graham
525 North Main Street
Salisbury, NC 28144
704−633−5244
Fax: 704−633−9434
Email: bgraham@wallacegraham.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BASF Catalysts LLC**
*Individually and*
*as successor to*
Engelhard Corporation
*as successor to*
Engelhard Industries
*as successor to*
Engelhard Minerals &Chemicals
Corporation
*as successor to*
Minerals &Chemicals Phillip Corporation
*as successor to*
Eastern Magnesia Talc Company
*as successor to*
Porocel Corporation and Pita Realty
Limited

**Defendant**

**Eastern Magnesia Talc Company**

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/07/2011 | 1 | 3 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 350 receipt number 0419−1534091), filed by Rebecca Horton McSwain.(Graham, William) (Entered: 12/07/2011) |

| 12/07/2011 | | | Case assigned to District Judge Martin Reidinger. Notice: You must click this link to retrieve the **Case Assignment Packet**. *This is your only notice − you will not receive a separate document.*(ejb) (Entered: 12/07/2011) |
|---|---|---|---|
| 12/07/2011 | <u>2</u> | | **ASBESTOS PRETRIAL ORDER that this case shall be included in the Coordinated Proceeding In Re: Asbestos−Related Litigation, WDCP−83−1. Signed by Clerk, Frank G. Johns on 12/7/11. (ejb)** (Entered: 12/07/2011) |
| 12/07/2011 | | | In Re: Asbestos Products Liability Litigation − MDL #875. Notice to Clerk of MDL Panel of tag−along case. (Copy of complaint and docket sheet emailed to the Panel) (ejb) (Entered: 12/07/2011) |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | : | Civil Action No.  MDL 875 |
| _____ | : | |
| This Document Relates to: | : | |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
File No.: 1:11-cv-325

| | | |
|---|---|---|
| REBECCA HORTON MCSWAIN, individually and as Executrix of the Estate of Jacque Truett McSwain, | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | **JURY TRIAL DEMANDED** |
| | : | |
| BASF CATALYSTS LLC, individually and as successor to Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited; and EASTERN MAGNESIA TALC COMPANY, | : | |
| | : | |
| Defendants. | : | |

## <u>COMPLAINT</u>

Plaintiff, Rebecca Horton McSwain, individually and as Executrix of the Estate of Jacque Truett McSwain, deceased, hereby sues the above-named Defendants for damages related to asbestos exposure as alleged hereinbelow.  Plaintiff shows that this action is appropriate for inclusion in the coordinated MDL proceeding as an asbestos related action.  This action is further appropriate for treatment as a "tag-along" action as required by 28 U.S.C. § 1407, given the transfer of asbestos-related personal injury actions by the Judicial Panel on Multi-District Litigation to the Eastern District of Pennsylvania.

## PARTIES – PLAINTIFFS

1.      Plaintiff Rebecca Horton McSwain, executrix of the estate of Jacque Truett McSwain, resides at 835 Gist Road in Rock Hill, South Carolina. She is the surviving spouse of Jacque Truett McSwain.

2.      Plaintiff's deceased husband was pertinently employed from on or about February 7, 1972 when he was hired as a tire construction technician, through in or about 2006, by Continental Tire of the Americas, LLC, f/k/a Continental Tire North America, Inc., f/k/a Continental General Tire, Inc., at its facility in the vicinity of Charlotte, Mecklenburg County, North Carolina.

3.      At relevant times during his career, Jacque Truett McSwain was exposed to dust from asbestos and asbestos-containing products, including asbestos-containing talc and asbestos-containing talc products from which he contracted mesothelioma.  Mr. McSwain died from mesothelioma on December 10, 2009 after suffering greatly.

4.      Plaintiff Rebecca Horton McSwain was during relevant times, legally married to Jacque Truett McSwain and has been named Executrix of the Estate of Jacque Truett McSwain.

5.      This action is brought pursuant to the Wrongful Death Act, N.C. Gen. Stat. § 28A-18-1 *et seq*., for the wrongful death of the decedent, Jacque Truett McSwain.

## PARTIES – DEFENDANTS

6.      Defendant BASF Catalysts, LLC is upon information and belief a limited liability company organized under the law of Delaware and with a principle place of business in New Jersey and which is registered to do business in the State of North Carolina.  Defendant may be served with process at its headquarters address, 25 Middlesex/Essex Turnpike, Iselin, NJ 08830-0770; through its North Carolina Registered Agent, CT Corporation System, 150 Fayetteville St.,

2

Box 1011, Raleigh NC 27601; and/or through its office address at 100 Campus Drive, Florham Park NJ 07932.

7.      Defendant BASF Catalysts, LLC is successor in interest to by merger to Engelhard Corporation and the following Engelhard subsidiary companies: Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (when context requires, these BASF predecessor companies are collectively referred to herein as "Engelhard" and unless context indicates otherwise, "BASF" refers to and includes BASF Catalysts LLC, Engelhard Corporation and the Engelhard predecessor companies.)  BASF and Engelhard are or were business entities who are or were, and at times material herein, upon information and belief doing business in the State of North Carolina.  BASF is sued in its own right and as successor by merger to Engelhard.

8.      Defendant Eastern Magnesia Talc Company is upon information and belief a corporation that was and/or is incorporated under the laws of a State other than North Carolina and with a current or former principle place of business in the State of New Jersey, and may be served with process through its successor, Defendant BASF Catalysts, LLC.

9.      The forgoing Defendants are corporations organized under the laws of the various states of the United States of America that were and/or are doing business in the State of North Carolina.  Defendants or their respective predecessors in interest mined, milled, manufactured, sold, supplied, purchased, marketed, installed, and/or removed asbestos, asbestos-containing products or components, to which Plaintiff's decedent was exposed.

## JURISDICTION AND VENUE

10.     The Court has diversity subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

11.     Venue is proper in the first instance in the Western District of North Carolina under 28 U.S.C. § 1391 in that subject matter jurisdiction is founded on diversity of citizenship and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND FACTS

### A.     Engelhard's (BASF's) Emtal Talc Products and Asbestos.

12.     Plaintiff Rebecca Horton McSwain, individually and as Executrix of the Estate of Jacque Truett McSwain, upon information and belief and based upon the investigation of counsel, states and alleges against Defendant BASF that it fraudulently concealed relevant conduct proximately causing harm to the Plaintiff's decedent and engaged in spoliation, and that Plaintiff has instituted the instant Complaint within a reasonable time of the discovery of this fraudulent concealment, all as alleged hereinbelow.

13.     The investigation of counsel includes the results of spoliation-related discovery taken in *Paduano v. Ace Scientific Supply Co.*, MID-L-2976-09 (N.J. Super. Ct. Law Div.) (the "*Paduano* case") described *infra*. The *Paduano* case was one of several companion asbestos cases filed in Middlesex County, New Jersey in which the trial court permitted amendment of complaints to assert fraudulent concealment claims based upon alleged spoliation of evidence. The Hon. Jack L. Lintner, P.J.A.D. (Ret.) was appointed as Discovery Master in *Paduano* and its companion cases to resolve privilege issues relating to discovery. As observed by Judge Lintner in his initial discovery opinion in these cases:

4

Here, during the hearing on plaintiffs' motion to amend, Judge McCormick specifically noted there was evidence that documents reflecting asbestos content in EMTAL's talc were not produced over a period of twenty years and, as a result, plaintiffs' cases were dismissed. In determining that plaintiffs had pled a *prima facie* case of fraudulent concealment, Judge McCormick intimated that plaintiffs should be able to pursue discovery as to why those documents had been concealed and not produced over the twenty-year period.

14.     Talc is a naturally occurring mineral that is mined and then processed or used in manufacturing by companies in numerous parts of the United States.

15.     Asbestos has been identified as a contaminant of some talc mines.

16.     BASF's predecessor Engelhard (as defined above) either directly or indirectly through a subsidiary owned or operated a talc mine located in Johnson, Vermont (the "Johnson Mine") from 1967 until 1983.

17.     The Johnson Mine was closed in 1983.

18.     At some time presently unknown to Plaintiff and according to information provided by BASF in the *Paduano* case, the Johnson Mine became flooded with water, thereby preventing the obtaining of any future valid samples of its talc.

19.     BASF's predecessor Engelhard processed or manufactured the Johnson Mine's talc ore into talc products that were marketed under the trade name "Emtal talc." The "Emtal" trademark was owned and utilized by BASF's subsidiary, Eastern Magnesia. Emtal talc products also included "G&S Talc," talc that contained serpentine asbestos fiber.

20.     Emtal talc ore and products were used across the nation in diverse industries for many purposes.   As examples, it was an ingredient, component of, or coating in or on the following products and manufacturing processes: tire manufacture, wall board, joint compound, auto body "filler," dusting agents and children's balloons.

21. Plaintiff's decedent worked in the vicinity of talc and/or talc products manufactured and/or sold by Defendants while employed at the Continental Tire plant and was exposed to the talc and the asbestos therein.

22. Emtal talc and talc products produced, processed and/or manufactured by BASF, contained chrysotile asbestos fibers, as well as other asbestos forms including tremolite and serpentine asbestos.

23. During the 1970s and continuing through the early 1980s, BASF, then known as Engelhard, through its internal personnel or outside consultants or laboratories, conducted tests and assays on its talc ore and products, as well as in, about, or on, areas or environments where the talc was mined, processed, or used. Third parties also conducted tests and assays on BASF talc ore and products.  A number of the tests and assays were to determine if the Johnson Mine's talc and processed Emtal talc products contained asbestos fibers.

24. BASF had knowledge of testing and assays performed on talc obtained from the Johnson Mine and Emtal talc products, and had knowledge of the test results, including findings that the talc and talc products contained asbestos fibers and that certain environments in its facilities, including laboratories, had high levels of airborne asbestos fibers.

25. The tests and assay results are scientific and business records that BASF and predecessors regularly kept and maintained in New Jersey.

26. The test and assay results conducted on Johnson Mine talc ore and processed Emtal talc products found asbestos fibers in the ore and products.

27. Among the testing and assays of Emtal talc which found the presence of asbestos fibers in the Emtal talc which were uncovered in the *Paduano* case discovery are:

   a. a 1972 Royal Globe Insurance test with results indicating four out of five Emtal talc samples contained asbestos fibers;

6

b.  a May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal talc samples;

c.  a 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc;

d.  a 1978 test which established the presence of asbestos in all Emtal talc sampled;

e.  a 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc; and

f.  three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

28.    The above identified tests and assays, on information and belief, are not an exhaustive list of the asbestos tests and assays with positive findings for asbestos in Emtal talc. Plaintiff believes there are or were other tests and assays of Emtal talc and/or talc from the Johnson Mine that had positive findings of asbestos, which BASF claims are privileged and refuses to divulge or, as described below, were reported in documents collected by BASF in or about 1984 and then either destroyed or secreted away once BASF's management and/or in-house counsel had become aware of the implications of the positive test and assay findings on BASF's liability exposure and national risk management program regarding asbestos injury claims. Relevant management and counsel include Engelhard's Vice-President of research and development, Dr. Glenn Hemstock, Ph.D. ("Hemstock"), its Vice-President, General Counsel and Corporate Secretary, Arthur A. Dornbusch II, Esq. ("Dornbusch") and/or in-house attorney, Thomas D. Halket, Esq. ("Halket"), together with BASF's former national asbestos defense counsel, Cahill Gordon & Reindel LLP ("Cahill Gordon") (including Cahill Gordon New York office based partner Howard G. Sloane (a/k/a "Peter Sloane") ("Sloane").

29.    Upon information and belief, BASF's management and in-house counsel, including Hemstock, Dornbush and Halket, and its outside national counsel, Cahill Gordon,

including Sloane, had knowledge and were aware of the test results and other non-publically available data, opinions, findings and conclusions of experts which established that the Johnson Mine's talc and/or Emtal talc products contained asbestos.

30.     Despite the findings from these tests and assays to the contrary, BASF represented to its customers, industry trade groups and the Federal Government that Emtal talc was asbestos-free and even marketed the product as a viable asbestos substitute, thereby causing widespread and unknowing exposure to asbestos to United States citizens, including workers and workers' spouses and children, nationwide, and Plaintiff's decedent in particular.

### B.     The *Westfall* Asbestos Lawsuit's Emtal Talc Discovery.

31.     In 1979, Mr. David Howard Westfall, a family member of a deceased rubber and rubberized product industry worker, filed an asbestos injury lawsuit based upon his decedent's exposure to asbestos-containing talc products in the United States District Court for the District of Rhode Island captioned *Westfall v. Whittaker,* C.A. No. 79-0269 (the "*Westfall* case").

32.     In the *Westfall* case, plaintiff indentified one of the Engelhard companies, Eastern Magnesia Talc Company, as a company that manufactured the talc his decedent was exposed to and which caused the mesothelioma injury underlying the case.

33.     BASF was represented and defended in the *Westfall* case by, among others, Cahill Gordon, its national counsel.  BASF was aware of the *Westfall* case and participated in and/or oversaw BASF's defense of the case along with Cahill Gordon.

34.     BASF was aware of, participated in and/or oversaw the investigation of the defense of the *Westfall* case, and in such capacity was aware of its internal and external investigations, tests and assays relating to the Johnson Mine talc ore and Emtal talc products.

35.     In response to document discovery requests served on BASF by the *Westfall* case's attorneys, documents that established the existence of asbestos fibers in Emtal talc, including test and assay results that were in BASF's possession, were produced in or about 1983 to Westfall's attorneys by BASF through its counsel, Cahill Gordon. BASF's in-house attorneys were aware of and knowledgeable of what was produced.

36.     In 1983, as part of the *Westfall* case discovery, Hemstock was deposed in New Jersey under oath over two days in his capacity as an employee of Engelhard.  The exhibits identified in Hemstock's depositions were not produced by BASF in the *Paduano* suit discovery, despite request.

37.     At the time of his deposition in the *Westfall* case, Hemstock was one of Engelhard's top scientists and held a management (Vice-President of Research and Development) position with Engelhard. Cahill Gordon attorney Sloane was also present at and represented Hemstock and BASF at Hemstock's deposition in the *Westfall* case.  BASF in-house attorney Halket was also present at Dr. Hemstock's *Westfall* case deposition in his capacity as BASF in-house counsel.

38.     During his deposition in the *Westfall* case, Hemstock testified that the Emtal talc did in fact contain asbestos fibers. He was aware of the issue of Emtal talc's asbestos content in asbestos claims and was aware that evidence relating to same was pertinent to asbestos claims against BASF.

39.     During his deposition in the *Westfall* case, Hemstock was questioned by Mr. Westfall's lawyer about assays and tests on Emtal talc that had been conducted at the Engelhard's laboratory in New Jersey. During his deposition, Hemstock admitted that various

9

tests performed throughout the 1970s and 1980s, both by BASF employees and by third parties, indicated the presence of asbestos fibers in Emtal talc.

40.     During his deposition, Hemstock was shown and then questioned about various documents, including apparent test or assay results.  These documents were produced to Mr. Westfall's attorney by BASF, through its attorneys, Cahill Gordon, during discovery in the *Westfall* case and were marked as exhibits during the course of Hemstock's deposition.

41.     During his deposition in the *Westfall* case, Hemstock was shown the results of various tests and assays which characterized the Emtal talc as having "high levels of chrysotile" which is a form of asbestos.

42.     BASF was aware of and appreciated the negative implications to BASF's asbestos injury claim liability and BASF's future asbestos risk management created by Hemstock's testimony and by the test and assay results showing the presence of asbestos fiber in BASF products indentified during his deposition in the *Westfall* case.

43.      Following Hemstock's deposition, BASF and/or Cahill Gordon obtained a full and complete copy of Hemstock's deposition transcripts as well as a copy of the documents upon which he was examined that were identified in the transcript.

44.     On or about March 29, 1983, Cahill Gordon attorney Sloane in the *Westfall* case took the deposition of a former Engelhard research and development employee, Peter Gale ("Gale") in New Jersey. Gale, during his employment with Engelhard in the 1970's, had conducted analytical testing research on Emtal talc.  He also during that time visited and took samples of talc ore from the Johnson Mine.

45.     During his deposition, Gale testified in response to Sloane's questioning that he kept laboratory notebooks of his work and analysis which were considered confidential records

of Engelhard and were stored in its library. In response to the *Paduano* suit's spoliation investigation of discovery that was conducted once the fraudulent concealment described herein was uncovered, BASF stated that it was not able to produce Gale's laboratory notebooks.

46.     After Gale was identified as a possible expert witness for the plaintiff in the *Westfall* case, BASF through Cahill Gordon objected to his serving as an expert for the *Westfall* plaintiff. Gale acquiesced to BASF's demand that he not serve as an expert to the *Westfall* case's plaintiff based on the terms of his employment contract with Engelhard and BASF's objection to his voluntarily testifying.

47.     On or about April 7, 1983, a deposition under oath of another research and development employee of Engelhard, Mr. Emil J. Triglia ("Triglia"), was taken in the *Westfall* case in Metuchen, New Jersey. During his deposition, Triglia testified that Emtal talc contained asbestos fibers.

48.     During his deposition, Mr. Triglia was shown various documents relating to Emtal talc which were subsequently identified and marked as exhibits during the deposition. In response to requests for copies of the marked exhibits in the *Paduano* suit's spoliation discovery, BASF stated that it was not able to produce copies of the actual marked exhibits referred to in the deposition transcript. BASF offered instead an attempted partial reconstruction of the deposition exhibits in which it produced copies of some (but not all) of documents purportedly matching the description of the documents referenced during the deposition.

49.     According to the Triglia deposition transcript produced in the *Paduano* case, BASF's in-house attorney Halket along with Cahill Gordon attorneys were identified as being present at the Triglia deposition. After Triglia's deposition was transcribed, BASF and/or their counsel obtained a full and complete copy of Triglia's deposition transcripts, as well as a copy of

the documents that were identified during the depositions and about which he was questioned during the deposition.

50.     On or about or about May 6, 1983, Sloane wrote a letter to the court reporter who recorded and transcribed Triglia's deposition and requested that the transcript record be corrected to reflect that Halket and Cahill Gordon's attorneys were not present at the deposition because, according to Sloane in his letter, they were not invited to attend the deposition.  Sloane's letter further transmitted to the court reporter for inclusion with the deposition transcripts *errata* sheets by Triglia purporting to correct his testimony and the transcript.

51.     Whether present at the disposition or not, Sloane did receive the transcript of the Triglia deposition and was aware of its contents as he reviewed it sufficiently to provide the court reporter with *errata* information.  Further, copies of Triglia's deposition were circulated or mailed to BASF's in-house attorneys including Halket, and to Cahill Gordon.

52.     BASF was aware and appreciated the implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management of Triglia's testimony and the test and assay results showing the presence of asbestos fiber in BASF products identified during Triglia's deposition.

53.     At the time of the *Westfall* case, BASF and/or its attorneys such as Dombusch, Halket and Cahill Gordon, knew that BASF could and would in the future be sued by other asbestos injury claimants who were exposed to BASF's Emtal talc products.  The existence of such potential claims created a substantial national asbestos risk management and liability problem for BASF.

C.     **The *Westfall* Case's Settlement and Confidentiality Agreement and the Origins of the BASF's Fraudulent Asbestos Defense Scheme and Spoliation Enterprise.**

12

54.     BASF's management had knowledge of the *Westfall* case discovery at the time it was occurring.  Also, at or about that time BASF's management and in-house counsel, including Hemstock, BASF's in-house lawyer, Dornbusch, BASF's general counsel, and Halket, an in-house lawyer handling asbestos matters, were aware of the negative implications that BASF's production of positive test/assay results and internal documents establishing Emtal talc products contained asbestos that were produced in the *Westfall* case had upon not only the *Westfall* case, but upon BASF's asbestos claim liability and asbestos liability risk management in general. This created a significant liability and risk management problem for BASF given the widespread distribution and use of Emtal talc products, including use by the Plaintiff and/or by coworkers in the vicinity of the Plaintiff at the Continental Tire plant and others similarly situated.

55.     Sometime following the depositions of Hemstock and Mr. Triglia in 1983 and prior to March 7, 1984, members of BASF's management and in-house general counsel's office and its outside counsel, Cahill Gordon, including but not limited to Dornbusch, Hemstock, Halket and Sloane, a Cahill Gordon partner, devised and agreed to a strategy, plan and scheme to control and even possibly eliminate BASF's (then Engelhard's) future asbestos injury claim liability and asbestos risk management exposure.

56.     Under this plan and scheme: (a) the *Westfall* case would be resolved by a settlement that required a confidentiality agreement which prevented BASF discovery responses, deposition transcripts, and other evidence of asbestos fiber present in BASF talc products gathered in the discovery of that case from becoming disclosed or otherwise known and available to other asbestos claimants and their counsel; (b) steps would then taken under the pretense or guise of record retention management to gather up and then limit access to, conceal or destroy all evidence and documents in Engelhard's possession and control relating to Emtal talc ore and

products, including the discovery in the *Westfall* case; and (c) all claimants and experts consulted from that time forward would be told by BASF and/or its attorneys that Emtal talc ore and products did not contain asbestos and/or that there was no evidence to the contrary, and in support of these representations only samples, test results or documents consistent with these representations would be provided or referred to in connection with asbestos injury claims, thus misleading claimants and corrupting, biasing and tainting the opinions of such experts. Thus began the fraudulent asbestos defense scheme and the collusion and conspiracy among BASF and Cahill Gordon, and members of each company, to implement the scheme and conceal its existence and operation from all persons and institutions outside of BASF and Cahill Gordon.

57.     On information and belief, sometime following the depositions of Hemstock and Mr. Triglia in 1983 and prior to March 7, 1984, members of BASF's management and in-house General Counsel's New Jersey office, including but not limited to Dornbusch, Hemstock and Halket, obtained BASF's (then Engelhard's) management's consent and authorization to implement and execute the strategy, plan and scheme.

58.     To execute, manage and control the asbestos defense plan and scheme, which due to the nature of asbestos injury claims was foreseeably expected to continue on for decades, an association in fact arose in or about 1983 or 1984, the exact date being presently unknown to Plaintiffs, that was comprised of BASF and Cahill Gordon related personnel over time. BASF, through Cahill Gordon, settled the *Westfall* case.

59.     The terms of the *Westfall* case settlement included a confidentiality agreement that bound the *Westfall* case's plaintiff and his attorneys to not discuss the case or share or otherwise disclose the discovery and evidence obtained in the matter. Upon information and

belief, the inculpatory evidence developed in the *Westfall* case was either destroyed or secreted away by BASF after the case was settled.

60.      The *Westfall* case settlement and confidentiality agreement were parts of BASF's plan, scheme and agreement to mislead, deceive and defraud asbestos injury claimants and their attorneys, and in some circumstances the courts directly, regarding the merit of asbestos injury claims against BASF based upon Emtal talc products.

## D.      The Gathering and Spoliation of Evidence after Settlement of the *Westfall* Case.

61.      After the *Westfall* case was settled, a memorandum dated March 7, 1984, signed by Hemstock entitled "DOCUMENT RETRIEVAL – DISCONTINUED OPERATIONS" ("Document Retrieval Memorandum") was sent to employees of Engelhard.

62.      The Document Retrieval Memorandum directed all Engelhard minerals division employees to search for, retrieve, and gather "all notebooks, duplicate copies of notebooks, technical service requests and responses, memoranda, and reports" relating to operations of Engelhard Minerals Ltd. and Emtal, among other BASF predecessor companies.

63.      BASF's employees were directed by the Document Retrieval Memorandum and BASF to place the documents they gathered in response to the memorandum in file boxes for discard, and to make the boxes available for pick-up on March 16, 1984.

64.      All documentary evidence relating to Engelhard's asbestos-containing talc was thereafter gathered up, collected by BASF or their agents and subsequently was either destroyed or secreted away by BASF.

65.      The evidence gathered as a result of the Document Retrieval Memorandum is believed to include, among other things, Emtal talc sales and inventory records, laboratory notebooks, which would include data and test or assay results on Emtal talc products and talc ore

from the Johnson Mine, and test and assay result documents on tests or assays performed by third parties, such as Royal Globe Insurance, Johns Manville and Georgia Institute of Technology ("Georgia Tech").

66.     The collection of the documents in March 1984 was not for legitimate record retention purposes and any claim that the collection of the documents was on such a basis is and was pretext and in bad faith on BASF's part. The collection of documents and other evidence relating to asbestos in Engelhard's talc ore and talc products took place at a time and under circumstances during which BASF knew or foresaw that BASF was or would be the subject of asbestos injury claims in which it was or it would be alleged that its talc ore and Emtal talc products contained asbestos fibers.  Because of this knowledge, BASF had a duty to preserve evidence and documents relevant to such asbestos claims that were in BASF's possession or control, which duty BASF was well aware of.

67.     BASF breached its duties regarding the preservation of evidence and documents by not preserving and/or by otherwise spoliating same and/or by gathering such evidence for purposes of denying access to that evidence to those who were then, or could in the future be asserting claims against BASF for injuries caused by asbestos in its talc and talc products, including but not limited to the Plaintiff herein.

68.     Despite being asked in the *Paduano* case for an inventory of the documents collected pursuant to the Document Retrieval Memorandum and for a clear, unequivocal statement as to the fate and, if applicable, current location of the Engelhard talc and asbestos documents, BASF has to date neither provided an inventory nor stated the fate or current whereabouts of all of the documents collected in 1984.

69.     The collection and destruction or secreting away of Engelhard's documents in 1984 were parts of BASF's plan, scheme, collusion  and agreement to mislead, deceive and defraud asbestos claimants and their attorneys regarding the viability or merit of asbestos injury claims against BASF based upon Emtal talc products.

70.     The collection and destruction or secreting away of Engelhard's documents in 1984 were overt acts in furtherance of BASF's conspiracy to mislead, deceive and defraud asbestos claimants and asbestos claimant attorneys regarding the viability or merit of asbestos injury claims against BASF.

**E.     Defendants' Twenty-Five Year Long Pattern and Practice of Misleading and Deceiving Asbestos Injury Claimants, Claimants' Counsel and Courts.**

71.     After the collection and subsequent destruction or secreting away of BASF's asbestos documents and other evidence was completed in or about March 1984, BASF began executing the second element of the fraudulent plan and scheme to end and ward off asbestos injury claims and lawsuits,  namely: whenever an asbestos injury claim or lawsuit was filed or came to BASF's attention, the asbestos injury claimant, their lawyers and, when and where applicable, the court in which such claim was pending, were systematically and uniformly told (often in identical language authored by Cahill Gordon and approved by BASF management in New Jersey) that Emtal talc ore and products did not contain asbestos and/or there was not any evidence that it did.

72.     As a result of the execution of the fraudulent asbestos defense scheme, Defendants were able to obtain either the dismissal or termination of claims voluntarily or, if required, involuntarily by order or judgment, or, when circumstances warranted, pay a small token settlement amount in exchange for a full release of claims or equivalent agreement.

F.    **Representative Misrepresentations and Material Omissions in Furtherance of BASF's Fraudulent Asbestos Defense Scheme.**

73.    After the *Westfall* case was settled and BASF's asbestos documents were collected and either destroyed or secreted away, whenever an asbestos claim was made against BASF between 1984 and 2009, BASF, by and through counsel, would systematically and uniformly communicate with the claimant's counsel either directly through Cahill Gordon personnel or indirectly through BASF's local counsel and state or otherwise represent that: (a) BASF's talc ore, Emtal talc and Emtal products did not contain any asbestos and/or there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos; and, (b) there was in fact no good faith basis to allege or claim that BASF's talc ore, Emtal talc and Emtal products contained asbestos and thereby injured the claimant.

74.    To purportedly support and corroborate these false and misleading representations, BASF's counsel, with BASF's knowledge, authorization and/or assistance, would routinely supply, or would routinely direct BASF's local counsel to supply, asbestos injury claimants' counsel handling cases against BASF with one or more of the following documents which BASF knew were false and misleading when considered without the contrary evidence in BASF's  possession or which they had destroyed or otherwise spoliated:

   a.   The May 8, 1989 affidavit by Mr. William H. Ashton ("Ashton Affidavit").  In this affidavit Mr. Ashton, a purported expert on asbestos in talc, averred that Emtal talc did not contain asbestos fibers based upon data and information he reviewed that was supplied by Cahill Gordon and/or BASF.  While Mr. Ashton cited to a few studies supporting his claimed conclusion, the data and studies he reviewed notably did not include any of the studies with positive asbestos findings that BASF's Dr. Hemstock and Mr. Triglia testified about during their 1983 *Westfall* case depositions even though his affidavit cited to, and included as an exhibit, excerpts of deposition testimony of another witness taken in the *Westfall* case which purportedly demonstrated that the talc ore and products did not contain asbestos.

   b.   A report purportedly prepared by Dr. F. D. Pooley ("Pooley Report").  Dr. Pooley, based on a purported analysis of two Johnson Mine talc samples that were allegedly

collected in 1961, found and concluded that the two Johnson Mine talc samples made available to him did not contain any fibrous mineral particles.

c. One or more affidavits by Mr. Charles D. Carter, a BASF employee who self-identified himself in his affidavits as "Director of Joint Ventures and Resources of Engelhard Corporation" ("Carter Affidavits"). Similar in content, the Carter Affidavits over the years averred some or all of the following alleged facts: (i) that the Johnson Mine was acquired by Eastern Magnesia Talc Company in 1967; (ii) that the mine was closed in 1983 for economic reasons; (iii) that the mine following its closure and non-use became filled with water making it impossible to obtain any samples of talc; (iv) that Engelhard did not possess any samples of the mine talc; and (v) that "Engelhard does not currently possess any testing data other than the data provided…by way of the Ashton Affidavit and the report of Dr. Pooley."

d. Interrogatory answers verified by Mr. Carter or other BASF employees, in which BASF, under oath, represented Emtal talc did not contain any asbestos and/or provided selected references to tests or studies indicating Johnson Mine talc did not contain asbestos, such as the Pooley Report or other studies referenced in the Ashton Affidavit, but omitted to mention or reference: (1) any of the studies which had positive findings for asbestos that were in BASF's possession or knowledge at the time the *Westfall* case discovery was conducted; or, (2) any of Hemstock's and Mr. Triglia's *Westfall* case deposition testimony stating that the asbestos was found in tests and assays of Emtal talc.

75.     While the full and entire extent and scope of BASF's and its agents' and confederates' pattern and practice of conduct and material omissions is not known to Plaintiff due to the clandestine nature of their wrongful actions, conduct and concealments, along with BASF's refusal to provide complete details regarding same in the *Paduano* case, the existence, continuity, collusiveness, breadth, culpability and longstanding nature of Defendant's  pattern and practice of fraudulent and unlawful activity are indicated, illustrated and exemplified by the incidents and events set forth in the following paragraphs.

### 1. *Misrepresentations and Material Omissions to Tireworker Asbestos Injury Litigation Claimants Suing BASF in the United States Eastern District Court of Pennsylvania and Southeastern Pennsylvania State Courts.*

76.     On or about May 17, 1989, BASF's counsel sent via Federal Express a letter to a Philadelphia, Pennsylvania lawyer who was representing at the time twenty-eight (28) tireworker plaintiffs in then-pending Pennsylvania Federal and State Court asbestos injury lawsuits that had

19

named Engelhard and Eastern Magnesia as defendants in the suits (hereinafter referred as the "Pennsylvania Tireworker Claimants").   In this letter, counsel stated that during an August 1988 face-to-face meeting at the Montgomery County, Pennsylvania Courthouse, between Cahill Gordon attorneys, Messrs. Craig Newman and Eric S. Sarner ("Sarner"), BASF's local counsel and the Pennsylvania Tireworker Claimants' lawyer, BASF's attorneys affirmatively represented that "the talc manufactured by Emtal [sic] did not contain any asbestos."

77.     According to the May 17, 1989 letter,  between August 1988 and May 17, 1989, a number of in-person meetings, telephone calls and letters by and between BASF's local counsel and the Pennsylvania Tireworker Claimants' counsel occurred during which BASF and its attorneys requested that the claimants' asbestos injury claims be voluntarily ended against BASF. During these communications, BASF's counsel reiterated and repeated the misrepresentations and omissions of material fact regarding absence of any asbestos in Emtal talc and the nonexistence of any contrary evidence.  One letter, according to the May 17, 1989 letter, tendered to the Pennsylvania Tireworker Claimants' lawyer a copy of the Carter Affidavits concerning the location of the Johnson Mine and its alleged closure for "economic reasons."

78.     The purpose and intent of counsel's May 17, 1989 letter was to further BASF's efforts to convince the Pennsylvania Tireworker Claimants' lawyer to voluntarily dismiss BASF. In furtherance of this goal, counsel's May 17, 1989 letter continued the misrepresentations and misleading omissions of material facts by offering the then newly-coined Ashton Affidavit.  In previewing the contents of the Ashton Affidavit for claimants' counsel, the May 17, 1989 letter twice called to the claimants' counsel's attention the claimed fact that various assays and tests on Johnson Mine talc referred to in the Ashton Affidavit established that no asbestos was present.

79.     On June 21, 1989, BASF counsel sent via Federal Express another letter and enclosures to the Pennsylvania Tireworker Claimants' lawyer.  In this letter, BASF's lawyers provided the claimants' counsel with a copy of Dr. Pooley's purported exculpatory analysis of Johnson Mine talc along with another Carter Affidavit, this one dated June 19, 1989.  In this June 19, 1989 affidavit also executed in New Jersey, Mr. Carter averred that the closed Johnson Mine was now filled with water so no samples could be obtained and, additionally, that Engelhard did not currently possess any samples of the talc produced by the Johnson Mine.

80.     On or about July 19, 1989, the Pennsylvania Tireworker Claimants' lawyer sent a letter to BASF questioning BASF's representations that Emtal talc did not contain any asbestos, based upon references to the Johnson Mine appearing in a report issued by the Mine Health and Safety Administration ("MHSA") that he had obtained through a Freedom of Information Act request.  The MHSA report referred to in the letter indicated that samples of Johnson Mine's talc that MHSA had obtained and analyzed contained fibrous mineral contaminants. The Pennsylvania Tireworker Claimants' lawyer's letter additionally informed BASF  that:

> [W]e had obtained definitive product identification evidence of the presence of [Engelhard/Eastern Magnesia's] talc at Firestone in Pottstown, PA, and [would] name [Engelhard/Eastern Magnesia] in all future Firestone cases. If, of course, we ultimately decide to let your client out of the B.F. Goodrich litigation, we will also dismiss them from the Firestone cases.

81.     On or about July 28, 1989, BASF's counsel faxed a letter replying to the claimants' lawyer's letter.  BASF purportedly explained how and why the MHSA report was flawed, incorrect, and contrary to the evidence BASF had previously provided the claimants' lawyer by means of the Ashton Affidavit and Pooley Report, in the July 28, 1989 letter, and once again falsely represented that BASF's talc did not contain asbestos, stating: "Thus no EmTal [sic] talc was found to contain asbestos fibers," and "[w]e again urge that on the basis of all of

the affidavits supplied to you there is no good faith basis for keeping Engelhard and EmTal [sic] in these cases."

82.     On or about August 21, 1989, BASF through counsel sent another letter via Federal Express to the Pennsylvania Tireworker Claimants' lawyer.  In this letter, BASF submitted, in lieu of answering interrogatories, the original of another Carter Affidavit, which was dated August 18, 1989.  In the referenced Carter Affidavit, Mr. Carter under oath stated: "In addition, Engelhard does not currently possess any testing data other than the data provided to you by way of the Ashton Affidavit and the report of Dr. Pooley."

83.     At no time was there ever any mention or reference to the fact that contrary and inculpatory evidence developed in the *Westfall* case's discovery existed.  Neither was there any mention or reference whatsoever to BASF's gathering and spoliation of all contrary and inculpatory evidence in 1984.  These material omissions occurred and were committed despite the fact BASF was aware of these facts and knew and appreciated the relevance of such material information to asbestos injury claimants.

84.     Following the exchange of correspondence and documents described above, and in obvious, natural and reasonable reliance on the communications, correspondence, corroborating affidavits and corroborating reports set forth above, some time in or about September of 1989, the Pennsylvania Tireworker Claimants voluntarily discontinued or dismissed their asbestos claims as to the Engelhard Defendants, to their detriment and loss.

85.     As soon as the Pennsylvania Tireworker Claimants agreed to voluntarily dismiss their State and Federal lawsuits against Engelhard, BASF then began executing a campaign to extend and parlay this successful execution of the fraudulent asbestos defense scheme to other asbestos injury litigation around the country.

86.     Even before the dismissals and discontinuances of the Pennsylvania Tireworker Claimants' cases were filed in the presiding courts, starting in late August 1989, BASF put in motion what would become, over the years, a systematic pattern and practice to obtain voluntary dismissals or cheap token settlements by writing to asbestos claimants' counsel, either through Cahill Gordon or local BASF defense counsel: (a) providing copies of the false and misleading Ashton Affidavit, Pooley report and Carter Affidavits; (b) informing the claimant's lawyer that the Pennsylvania Tireworker Claimants' counsel (and later other claimant lawyers as well) had voluntarily dismissed Engelhard based upon Engelhard's representations and purported corroborating expert reports stating that there was not any asbestos in Emtal talc (*i.e.*, Ashton Affidavit and Pooley Report); and (c) requesting that the claimant's counsel likewise voluntarily dismiss their asbestos suits against BASF in order to avoid putting BASF through unnecessary litigation expenses without a good faith basis to sue, thereby intimating that the claimants and their counsel might risk of being assessed sanctions for pursuing a claim not brought in good faith.  Exemplifying BASF's efforts in this vein are two similar October 2, 1989 letters sent by different BASF local counsel; one mailed to a Cleveland, Ohio tire worker asbestos claimants' lawyer, and another mailed to a Kansas City, Missouri tire worker claimant's lawyer.

### 2.     Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge (Circuit Court, Wayne County, Michigan).

87.     BASF's predecessor was a defendant in a number of asbestos injury suits filed and pending in the Wayne County, Michigan, Circuit Court in the late 1980s and/or early 1990s. In response to standard interrogatories directed to BASF by the asbestos claimants in the Wayne County State Court actions ("Wayne County Interrogatories"), which sought disclosure of information about Engelhard's talc products, verified answers on behalf of BASF's predecessor

Pita Realty Limited (identified in the Answers to Interrogatories as being successor to Eastern Magnesia) were served on the claimants' counsel on or about November 19, 1990.  The Answers were verified under oath on behalf of BASF by Mr. Carter in Middlesex County, New Jersey.

88.      In BASF's "Preliminary Statement" in its Answers to the Wayne County Interrogatories, BASF stated in pertinent part:

> … Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….
>
> Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

89.      In response to Interrogatory No. 34 of the Wayne County Interrogatories, which inquired into whether any person ever served as a consultant to BASF's Engelhard companies in any manner regarding the potential medical, toxicologic, or industrial hygiene aspects of asbestos or any asbestos-containing product, BASF responded:

> Not Applicable. In addition, Defendant has previously supplied documents to plaintiffs' counsel that indicate that its talc products did not contain asbestos, including an affidavit prepared by William Ashton. These documents are in the possession of plaintiffs' counsel.

90.      In response to Interrogatory No. 108 of the Wayne County Interrogatories, which inquired into whether BASF's Engelhard companies pursuant to its record destruction or retention policy, or otherwise, destroyed any documents, records or writings pertaining to health hazards of asbestos, BASF responded: "Pita does not believe that it destroyed such records."

91.      At no time in any of BASF answers to the Wayne County Interrogatories were the claimants or their counsel ever fairly (or otherwise) informed by BASF that inculpatory facts and evidence existed which contradicted that which had been represented in the verified interrogatory answers or in the Ashton Affidavit that was referred to in the interrogatory answers, such as that

which had been developed and obtained by the plaintiff in the *Westfall* case prior to BASF implementing its fraudulent scheme.  There was no mention or reference in the Answers to the Wayne County Interrogatories to BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence in 1984.  These material omissions occurred and were committed despite the fact BASF was aware of these facts, appreciated the relevance of the subject information to injury claimants, and was under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

92.     BASF's fraudulent and deceitful efforts aimed at the Michigan asbestos injury claimants were successful.  According to an April 23, 1992 letter addressed to other asbestos claimants' counsel in Ohio, the Michigan asbestos injury cases against BASF's predecessors were voluntarily dismissed after "the plaintiffs' counsel had been … provided with the Ashton materials…."

### 3.  *Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in In Re: Northern Ohio Tireworker Asbestos Litigation (C.P. Summit Cty., Ohio).*

93.     In or about the late 1980s and/or early 1990's, BASF's predecessors, Engelhard Corporation, Eastern Magnesia and Pita Realty Limited, were parties to a number of tireworker asbestos injury suits that were filed and pending in the Court of Common Pleas for Summit County, Ohio, and assigned to Judge William H. Victor.  In connection with these Northern Ohio cases, BASF's predecessor responded under oath to Plaintiffs' Questionnaire and First Request for Production of Documents ("Tireworkers' Questionnaire") and Plaintiffs' Master Discovery Requests ("Summit County Master Interrogatories").

94.     The Tireworkers' Questionnaire sought disclosure of information from BASF's predecessors about Engelhard's talc products used at a number of rubber product manufacturing

companies. On or about November 21, 1990, BASF's counsel served verified responses to this

discovery upon Plaintiffs' counsel by regular U.S. Mail.

95.     BASF's predecessors' Preliminary Statement to the Tireworkers' Questionnaire

reads in pertinent part:

> …For purposes of simplifying the responses to this Questionnaire, the name Pita
> when used herein shall refer collectively to Pita, EmTal [Eastern Magnesia], and,
> Engelhard.

> ….Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the
> mining and milling of talc from a single mine located in Johnson, Vermont from
> 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and
> supporting materials demonstrating that the talc from this mine did not contain
> asbestos….

> Pita hereby incorporates by reference this preliminary statement into the response
> to each question.

96.     In its answer to Question No. 2 of the Tireworkers' Questionnaire, which

generally sought information about whether BASF's predecessors had been involved in the

mining, milling, manufacture, processing, sale, supplying or distribution of talc, soapstone, or

asbestos-containing products at any time, BASF predecessors stated under oath:

> With respect to talc only, yes. Pita did not mine, mill, manufacture, process,
> market, distribute, or sell asbestos or asbestos-containing products. Pita was
> engaged in the mining and milling of talc from a single mine located in Johnson,
> Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel
> an affidavit and supporting materials demonstrating that the talc from this mine
> did not contain asbestos.

97.     In its answer to Question No. 2(e) of the Tireworkers' Questionnaire, which

specifically asked whether BASF's predecessors' products contained crocidolite, amosite,

tremolite or chrysotile asbestos, or any combination of them, and to specify the qualitative

percentage of the particular form of asbestos fiber in the product, BASF's predecessors stated

under oath: "(e). No. Plaintiffs' counsel has previously been provided with evidence, including

an affidavit, which proves that Emtal talc did not contain asbestos."

98.     In answer to Question No. 4 of the Tireworkers' Questionnaire, which asked how BASF's predecessors' talc, soapstone, or asbestos-containing products were packaged and shipped, BASF predecessors stated under oath: "Pita did not mine, mill, manufacture, process, market, distribute, or sell asbestos or asbestos-containing products…."

99.     At no time in any of BASF's answers to the Tireworkers' Questionnaire, were the Northern Ohio claimants or their counsel ever informed by BASF that inculpatory facts and evidence existed that contradicted what was represented on behalf of BASF's predecessors in the answers to the Tireworkers' Questionnaire or in the affidavit referred to therein, such as that which was developed and obtained by the plaintiff in the *Westfall* case.  There was no mention or reference in the questionnaire answers to BASF's gathering and spoliation of contrary and inculpatory asbestos evidence in 1984.  These material omissions occurred and were committed despite the facts BASF was aware of these facts, appreciated the relevance of the subject information to claimants, and was under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

100.     The Summit County Master Interrogatories sought disclosure of information from BASF's predecessors about Engelhard's talc products.   In or about October 1991, verified answers to the Summit County Master Interrogatories on behalf of BASF's predecessors were served on the Northern Ohio claimants' counsel.   The answers were verified under oath by BASF's Mr. Carter based upon, according to his verification, information gathered by others.

101.     BASF's predecessors' "Preliminary Statement" to its answers to the Summit County Master Interrogatories reads in pertinent part:

> …Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and

27

supporting materials demonstrating that the talc from this mine did not contain asbestos….

Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

102.    In answer to Interrogatory No. 30 of the Summit County Master Interrogatories, which asked about testing, studies or surveys on BASF's products, the response listed a number of studies purporting to corroborate BASF's general denial that its talc products contained any asbestos.  However, not one of the contrary and inculpatory studies on Engelhard's talc showing it contained asbestos or any of the contrary and inculpatory statements about the existence of asbestos in Engelhard's talc that were made during the Hemstock and Triglia *Westfall* case depositions were disclosed to the claimants' counsel.  There was no qualification or disclosure provided in the answers to the Summit County Master Interrogatories that alerted or informed claimants' counsel of the fact that BASF had collected all documents relating to Emtal talc in 1984 following the settlement of the *Westfall* case.  There also was not any disclosure of the fate or the whereabouts of the talc documents and evidence BASF had collected in 1984 following the *Westfall* case settlement.  These material omissions occurred and were committed despite the fact BASF was aware of these facts, knew the relevance of the subject information to asbestos claimants, and was under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

103.    In response to Interrogatory No. 66 of the Summit County Master Interrogatories, which inquired into whether BASF was contending the Northern Ohio Tireworker claimants' injuries were not causally related to asbestos exposure, BASF stated:  "Pita does not currently make any contentions on the subject, but asserts that if plaintiffs have injuries related to asbestos exposure, Pita cannot be liable therefore since its talc did not contain asbestos."

104.    Here, once again, not one of the contrary and inculpatory talc studies showing the presence of asbestos in Emtal talc or statements made or discussed during Hemstock's and Triglia's *Westfall* case depositions was disclosed to the claimants' counsel.  There were also not any disclosures about BASF's collection of all documents relating to Emtal talc in 1984 following the *Westfall* case settlement, or the existence or fate of the documents and evidence.

105.    The misrepresentations and material omissions embodied in the Answers to the Summit County Master Interrogatories were repeated and renewed years later on or about August 31, 1994, when BASF adopted them in their entirety as the Response of Eastern Magnesia Talc Company to Master Interrogatories in the Summit County case captioned *William F. Clark, et al. v. Owens Corning Fiberglass Corp*., *et al*., Case No. ACV-94-04-11074.

**4.  *Misrepresentations in Engelhard's Correspondence and in Responses to Plaintiffs' First Standard Set of Liability Interrogatories in the New York City Asbestos Litigation Matter of Steven Chernick, et al. v. ABB Lumus Global, Inc.***

106.    On or about October 29, 2001, BASF's predecessor Engelhard Minerals and Chemical Corporation was named and joined as a defendant in a bodily injury suit filed in the Supreme Court of New York captioned *Steven Chernick et al. v. ABB Lumus Global, Inc*., Index No. 01-010116741 (the "*Chernick* case").  The *Chernick* case contended that Engelhard's talc was used as a component ingredient of "Bondo" auto body repair filler, which product caused the plaintiff Mr. Chernick's asbestos injury. The *Chernick* case was part of the New York Supreme Court's "New York City Asbestos Litigation Program."

107.    On or about April 15, 2002, a local New York City defense attorney who had been retained to defend BASF's predecessor, Engelhard, sent a letter and several enclosures, including a copy of the Ashton Affidavit and the Pooley Report.  The purpose of the letter was to convince the *Chernick* plaintiffs to voluntarily dismiss Engelhard from the case on the claimed,

but false, basis that Engelhard's talc did not contain asbestos. The letter was sent via Federal Express, and subsequently, on May 10, 2002, a copy was also telefaxed to another recipient.

108.   The April 15, 2002 letter's representations about the nature and content of Engelhard's talc were supported by Mr. Mark's references to the Ashton Affidavit, the Pooley Report, and a third study, all and all of which purported to establish, in the letter's own words, "that the talc Engelhard Corporation … or any of its present or former subsidiaries allegedly sold to Bondo Corporation was asbestos free." After summarizing the purported exculpatory findings of the studies provided, Mr. Mark's letter then concluded: "Given the foregoing, there appears to be no basis for your clients to assert claims against Engelhard. We hereby request that you dismiss Engelhard from this action.…"

109.   Acting with intent to deceive, BASF's predecessor, Engelhard, authorized and/or consented to sending the letter which contained false and misleading material misrepresentations and omissions.

110.   On or about April 16, 2002, BASF's predecessor, Engelhard, responded under oath to "Plaintiffs' First Standard Set of Liability Interrogatories" served in the *Chernick* case (the *"Chernick* Interrogatories"). Engelhard's answers to the *i*nterrogatories were verified on its behalf by Mr. Mark on April 16, 2002. His verification states: "Working in conjunction with Engelhard, I have prepared and reviewed the foregoing Responses to First Standard Set of liability Interrogatories. I know the contents thereof to be true, based on factual analyses conducted with and on behalf of Engelhard."

111.   The response to Interrogatory No. 1 of the *Chernick* Interrogatories states that Michael J. Hassett, Esq., who is identified as Associate General Counsel for Engelhard Corporation, coordinated Engelhard's Responses to the interrogatories.

112.    The Responses to the *Chernick* Interrogatories repeatedly and falsely with intention to deceive,  stated and represented that Engelhard had not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos-containing products. Exemplifying such representations was the response to Interrogatory No. 52, which read:

Interrogatory No. 52:

Does your company recognize that it was foreseeable that people working in the same area where your asbestos products were being used or installed would inhale and/or ingest asbestos fibers emitted from your product?

Response to Interrogatory No. 52:

Engelhard recognizes that, in general, it might be foreseeable that people working in the same area where asbestos products are being used or installed might inhale and/or ingest asbestos fibers. However, Engelhard has not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products.

113.    The responses to the interrogatories referred to the same three purported exculpatory studies of Engelhard's talc that were provided to the *Chernick* claimants' counsel in the April 15, 2002 letter in support of Engelhard's representations that "the talc supplied to Bondo by Engelhard's former subsidiary, EMTal [sic] was asbestos-free."

114.    Interrogatory No. 63 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about prior depositions of its employees.  Asked whether "any of your employees or officers have testified at trial or by deposition … concerning asbestos exposure, pulmonary or asbestos-related diseases or Industrial hygiene relating to asbestos use, Engelhard responded falsely, "No."

115.    Interrogatory No. 81 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about the destruction of pertinent documents. Asked whether "you destroyed any documents, records or writings pertaining to ….. asbestos ….. [or] studies about health hazards of asbestos," Engelhard responded under oath, "No, so far as Engelhard is able to

31

ascertain -- with the possible exception of any documents that might have been routinely destroyed as part of Engelhard's record retention policy."

116.    Counsel's April 15, 2002 letter requesting voluntary dismissal of the *Chernick* case and Engelhard's subsequent and related April 16, 2002 answers to the *Chernick* Interrogatories were false, fraudulent and misleading to one reading and reasonably relying on them regarding BASF's predecessor's liability. At no time did these documents timely and fairly reveal or disclose that evidence existed that was contrary to that which was represented in the letter, in the Responses to Interrogatories and/or contained or referred to in the Ashton Affidavit, Poole Report and the other report mentioned in the documents, such as the inculpatory documents and deposition testimony in the *Westfall* case. Without disclosure of such information, the affidavit and reports were materially misleading. There was also not any mention or reference in any of these documents or answers to interrogatories to the fact of and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory evidence relating to Engelhard's talc in 1984 following the settlement of the *Westfall* case.

117.    These misrepresentations and material omissions occurred and were committed despite the fact that BASF was aware of the facts, knew the relevance of the subject information to asbestos claimants, and was under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation. Subsequently, BASF's predecessor moved for summary judgment in the New York Supreme Court asking the Court to dismiss it from the *Chernick* case.  Relying on the forgoing letter, attachments and Responses to Interrogatories, *Chernick's* counsel concluded that there was no evidence or basis to continue the claim against Engelhard and oppose the Motion for Summary Judgment.  Based on her attorney's conclusion that Engelhard's talc did not contain asbestos and relying on that information, the *Chernick* plaintiff consented to

her attorneys voluntarily executing and providing to BASF's predecessors' counsel for filing a consent "No Opposition Summary Judgment Motion Order," by which they, on behalf of the *Chernick* Defendants, agreed to the presiding court granting a summary judgment dismissal of the *Chernick* case's claims as to the Engelhard defendants.

118.    On or about December 22, 2010, BASF's local New York City counsel, sent an e-mail to *Chernick*'s counsel asking them to execute another consent "No Opposition Summary Judgment Motion Order" which was attached to the email.  The e-mail explained that the earlier order had not, according to BASF's counsel, been timely filed in accordance with New York State's civil procedure rules.  On or about December 23, 2010, the *Chernick* plaintiffs' counsel's office by e-mail acknowledged the request and that the consent order would be given to the attorney handling the matter.  The requested order was in due course executed by *Chernick* plaintiffs' counsel and returned to BASF's local counsel's office.  When asking for the consent order, BASF's counsel did not correct any of the previous misrepresentations or material omissions it had made to the *Chernick* plaintiffs' counsel as set forth above.  BASF also failed to disclose or reveal on December 22, 2010, that there was evidence that Engelhard's talc contained asbestos and/or that evidence relating to same had been spoliated by BASF.  The order was then in due course signed by New York Supreme Court Justice Sherry Klein Heitler and then filed with the New York Supreme Court Clerk on February 3, 2011.

### 5.   *Continuing Fraudulent and Misleading Representations.*

119.    The northern Ohio law firm of Bevan & Economus and later the firm of Bevan & Associates LPA, Inc. (collectively "Bevan Law Firm") represented numerous asbestos injury claimants over the years who sued BASF and its predecessors relating to Emtal talc.  These

plaintiffs asserted asbestos injury claims against BASF's predecessors in Northern Ohio federal or state court lawsuits, hereinafter referred to as the Cuyahoga County Tireworker Actions.

120.    On or about April 23, 1992, BASF by and through its counsel sent a letter to the Cuyahoga County Tireworker Plaintiffs requesting voluntary dismissal in three of the actions "on the basis that the talc produced by EmTal [sic] contained no asbestos."

121.    The April 23, 1992 letter's representations that Engelhard's talc did not contain asbestos and the request for voluntary dismissal of BASF's predecessors were supported with copies of the Ashton Affidavit, the Pooley Report and several Carter Affidavits.

122.    With respect to the Ashton Affidavit, BASF's counsel stated and represented in pertinent part: "The Affidavit of William H. Ashton summarizes numerous investigations, examinations, and studies of the Johnson mine. The conclusion derived from all these studies is that the talc produced from this mine did not contain asbestos…."

123.    As further support for its request, BASF's predecessor's counsel represented that the Pennsylvania Tireworkers Asbestos Claimants, as well as Tireworker cases in the District of Kansas and Michigan State Courts, were dismissed by their respective counsel after they were provided the "Ashton materials."

124.    On or about May 18, 1992, BASF's counsel wrote the Bevan Law Firm again after it filed a fourth asbestos suit, *Gonzalez v. Abex Corp.*, naming Engelhard as a defendant. The May 18, 1992 letter, which was sent via Federal Express, represented to the Bevan Law Firm that the various documents sent to it the previous month demonstrated "that the talc produced by Emtal [sic] from its sole mine and mill in Johnson, Vermont contained no asbestos." The letter then again requested that Engelhard be promptly dismissed from the Cuyahoga County

34

Tireworker Actions because "under the circumstances there appears to be no basis in fact for maintaining Engelhard as a Defendant."

125.    In his December 21, 1992 letter, counsel for BASF's predecessor once again renewed the request for a voluntarily dismissal of the claims against Engelhard and Eastern Magnesia on the basis and representation that the talc did not contain any asbestos, stating:

> Engelhard was named in these cases solely because its former subsidiary, Eastern Magnesia Talc Company ("EMTal") allegedly sold talc to plaintiffs' employers. As demonstrated in the various affidavits and other documents forwarded to you with my previous correspondence, talc produced by EMTal from its sole mine and mill in Johnson, Vermont <u>contained no asbestos</u>. The alleged diagnosis of the plaintiff in each of the actions in which Engelhard is named as a defendant is an asbestos-related disease, which cannot be attributed to EMTal talc.

(Emphasis in original).  According to BASF's predecessors counsel's February, 4, 1993 letter, the Bevan Law Firm was agreeing to sign and file the voluntary dismissals in the five cases "on the basis of [Cahill Gordon's] correspondence demonstrating" that talc produced by Engelhard's former subsidiary, Eastern Magnesia Talc Company, contained no asbestos.

126.    On February 11, 1993 the Bevan Law Firm advised Cahill Gordon that it was reconsidering its decision to dismiss Engelhard based on its recent uncovering of some correspondence dating to 1950 from the Vermont Department of Health that purportedly discussed the propensity of employees at Eastern Magnesia Talc Company to develop pneumoconiosis among other things. The Bevan Law Firm invited comments on this information as well as an opportunity to review the results of any studies on the relevant employees and any publication mentioned in the 1950 Vermont Department of Health correspondence.  The Bevan Law Firm's letter also requested copies of invoices or purchase orders indicating the years and volumes of talc sold to Goodyear, Goodrich and Goodyear Aerospace plants in Akron.

127.    On or about February 22, 1993, BASF's predecessor responded to the Bevan Law

Firm's letter, and stated that the 1950 Vermont Health Department correspondence "should in no

way alter your previous expressed decision to dismiss Engelhard from these cases."  The letter

then proceeded to distinguish and deflect the information contained in the 1950 Vermont Health

Department correspondence by explaining that the 1950 letter referenced workers who were not

employed at Engelhard's subsidiary's Johnson Mine, but rather were workers employed at some

other company's mine. The letter then reiterated once more BASF's purported uncontradicted

exculpatory evidence and information previously provided stating:

> Beginning with my first request for dismissal last April I sent your firm
> voluminous materials concerning the Johnson mine. In reaching your decision to
> dismiss Engelhard, your firm reviewed, inter alia, the Affidavit of William H.
> Ashton, which summarizes numerous investigations examinations and studies of
> the Johnson mine. The conclusion derived from all of these studies is that talc
> produced from this mine did not contain asbestos. The only analysis which we
> have not previously forwarded to you is one just completed by the R.J. Lee
> Group which showed no evidence of asbestos minerals nor of their non-fibrous
> analogs, and found the talc to be a platy, non fibrous variety.

(Emphasis in original).

128.    Shortly after receipt of this February 22, 1993 letter, and reasonably relying upon

its representations and the various communications referred to above, the Bevan Law Firm

proceeded to recommend to its clients that Engelhard be voluntarily dismissed from their claims.

In or about late February or March, 1993, the Bevan Law Firm, acting and relying upon BASF's

representations and supplied materials as set out above, filed Notices of Voluntary Dismissal

dismissing claims against BASF's predecessor in the five Cuyahoga County Tireworker Actions.

129.    At no time in any of the aforementioned communications or correspondence with

or to the Bevan Law Firm during 1992 and 1993, or in any of the affidavits or reports supplied or

referred to in BASF's counsel's communications or letters seeking the voluntary dismissal of

Engelhard from the Cuyahoga County Tireworker Action cases, was the Bevan Law Firm ever fairly (or otherwise) informed that evidence existed that was contrary to that represented in BASF's counsel's letter and in the supplied Ashton Affidavit, Poole Report, Carter Affidavits or other material provided. There additionally was no mention in any of the communications to the Bevan Law Firm, or in any of the affidavits or reports supplied to it, as to BASF's gathering and spoliation of all contrary and inculpatory asbestos injury claim evidence relating to Engelhard's talc in 1984.  These misrepresentations and material omissions occurred and were committed despite the fact that BASF was aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and was under a duty to truthfully and fairly answer and provide information and discovery to adverse parties in litigation.

130.   Had BASF fully, fairly and timely disclosed the truth about its talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc, the Bevan law firm would not have recommended to its clients that they voluntarily dismiss their claims and the clients would not have given their authorization to voluntarily dismiss their asbestos claims against BASF's predecessor without first receiving full, fair and just compensation for their injury claims.

131.   During and throughout the 1990s and continuing into and throughout the 2000s, the Bevan Law Firm also represented thousands of other tireworker and industrial worker clients who were exposed to hazardous workplace dusts and fibrous materials during and at their employment that caused them to develop asbestos and/or other occupational pulmonary diseases and disorders, such as mesothelioma, asbestos-induced cancers, asbestosis, pneumoconiosis and

pulmonary talcosis.  When and where such clients (or their decedents) were diagnosed with an asbestos and/or industrial dust related exposure and a lawsuit was commenced, Engelhard, Eastern Magnesia and, eventually, BASF were named in such suits as a co-defendant along with other parties in accordance with the accepted asbestos practice in the Northern Ohio area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed.

132.    In connection with the lawsuits filed by the Bevan Law Firm during the 1990s through the 2000s, BASF and its predecessors periodically responded under oath to written discovery relating to Engelhard's talc products.  In BASF's or its predecessors' responses to written discovery, BASF or its predecessors continued to uniformly represent that Engelhard's talc did not contain any asbestos and/or there was no evidence to the contrary.  Representative of such written discovery responses are BASF and its predecessors' 1991 responses to the discovery in the Summit County, Ohio *Clark* case and October 19, 2007 Answers to Interrogatories in "Bevan Group 14" cases that were electronically served by BASF local counsel through the LexisNexis File & Serve system ("2007 Bevan Group 14 Interrogatories").

133.    In response to Interrogatory No. 5 of the 2007 Bevan Group 14 Interrogatories, an interrogatory answer that is thereafter referred to in response to numerous subsequent questions, BASF states under oath in response to the question, "Has Defendant ever engaged in the mining, manufacturing, selling, marketing, installation or distribution of asbestos-containing products (including equipment of any kind containing asbestos in any form)?" with the answer, "No."

134.    Following the dismissal of the Cuyahoga County Tireworker Action cases in early 1993, during and throughout the ensuing mid-1990s and continuing throughout the 2000s, a number of periodic aggregate settlements occurred by and between several talc suppliers and

manufacturers and Bevan Law Firm clients. From time to time BASF and its predecessors participated in these aggregate settlements when doing so enabled it or them to cheaply settle and obtain releases of liability from thousands of asbestos injury claimants. When negotiating these aggregate settlements and deciding to recommend and obtain its clients' authorization to participate in them, the Bevan Law Firm reasonably relied and acted upon and BASF's (or its predecessors') representations that purported to show Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary as set out above.

135.    Had BASF fully, fairly, honestly  and timely disclosed to the Bevan Law Firm the truth about Engelhard's talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984, as was BASF's duty, the Bevan  law firm would not have negotiated and agreed to the terms of the aggregate settlements with BASF or its predecessors on the terms that were offered, and, further, it would not have recommended to its clients that they agree to participate in such aggregate settlements and dismiss their cases.

136.    On or about November 12, 2008, BASF's Northern Ohio area local defense attorney, mailed a letter with enclosures to the Bevan Law Firm requesting voluntary dismissal of two of the firm's then pending asbestos injury matters it had filed in the Cuyahoga County, Ohio, Court of Common Pleas.

137.    The  November 12, 2008 letter requested the Bevan Law Firm to "voluntarily dismiss Eastern Magnesia Talc and, in the *Young* case, both Eastern Magnesia Talc and

Engelhard Corporation, from these cases on the basis that talc produced by EmTal contained no asbestos."

138.    In support of both requests for voluntary dismissal and representations that Engelhard's talc "contained no asbestos," BASF provided again copies of the Ashton Affidavit and Pooley Report, along with other purported analyses that allegedly indicated that talc from the mine did not contain asbestos.  The letter and enclosures were further intended, according to the letter, to serve as BASF's responses to discovery initiatives in the two cases

139.    To further bolster its request for voluntary dismissal the letter served by BASF by and through its counsel noted that Engelhard and Emtal had been named as Defendants and subsequently dismissed voluntarily in 567 asbestos claims as a result of the enclosed materials in various jurisdictions including four (4) plaintiffs in Arkansas, 191 plaintiffs in Kansas, forty (40) plaintiffs in Michigan, thirty-one (31) plaintiffs in Mississippi, over 300 plaintiffs in Pennsylvania, and one (1) plaintiff in Florida.

140.    The November 12, 2008 letter and enclosures on behalf of BASF did not fairly, candidly and truthfully inform the Bevan Law Firm and its asbestos injury clients that evidence existed that was contrary to the information contained in the letter and in the supplied Ashton Affidavit, Poole Report and/or other materials provided such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  Neither was there any information provided as to BASF's gathering and spoliation of contrary evidence relating to Engelhard's talc in 1984. These misrepresentations and material omissions occurred and were committed despite the fact that BASF was aware of these facts, knew the relevance of the information to claimants, and was under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

141.    During the pertinent times, BASF did not take any steps or measures to correct the misrepresentations.  BASF also did not take any steps or measures to prevent its counsel from making such misrepresentations and material omissions in the future.

142.    In the *Graham* case, when the Plaintiff did not voluntary dismiss BASF from her mother's asbestos injury case as requested by BASF in its November 12, 2008 letter, BASF thereafter filed a Motion for Summary Judgment.   Asking the Cuyahoga County Court of Common Pleas to dismiss this case, BASF claimed that there was no proof that Engelhard's talc was present in Ms. Graham's workplace at the Goodyear tire and rubber plant, and, in any event, no evidence that Engelhard's talc contained asbestos.

143.    The Bevan Firm in or about early 2009 opposed BASF's motion in the *Graham* case by establishing that there was an outstanding question of fact on Ms. Graham's exposure to Engelhard talc at the Goodyear plant in which she worked. It was not able, however, due to misrepresentations and material omissions set forth above, to mount any opposition to BASF's claim to the presiding court that there was not any evidence Engelhard's talc contained asbestos. Thus in a reply brief on behalf of BASF electronically filed in February, 2009, it stated:

> Lastly, plaintiff attempts to rely on her own answers to interrogatories. In her answers, she states that one of the asbestos containing products she was exposed to at Goodyear was talc. She does not identify EMT as the seller of the talc. Additionally, plaintiff has provided no evidence that EMT's talc is an asbestos-containing product. <u>On the other hand, EMT filed numerous materials in response to plaintiff's discovery request that indicate that the talc mined by EMT was asbestos-free.</u> (See Letter to John Mismas and attachments filed November 12, 2008) These materials included:
>
> 1) A copy of an Affidavit prepared by William H. Ashton dated May 8, 1989, with attached Exhibits A through G;
>
> 2) A copy of a report prepared by Dr. F.D. Pooley concerning an examination of talc samples taken from EMT's Johnson, Vermont mine;
>
> 3) A copy of a 1977 NIOSH study entitled "Analysis of Talc By XRay Diffraction and Polarized Light Microscopy"; and

4) A copy of a letter from RJ Lee Group, Inc. dated January 27, 1993 reporting the results of their analysis of a sample of EMT talc.

It is elementary that plaintiff must show that she was exposed to an asbestos-containing product to survive summary judgment. In this case, plaintiff has failed to produce any evidence that either she was exposed to any talc sold by EMT or that the talc sold by EMT contained asbestos.

(Emphasis added).

144.    In the Motion for Summary Judgment filed by BASF in the *Graham* case, BASF failed to fairly, honestly and candidly inform the presiding court that evidence that BASF's talc contained asbestos existed and/or that there was contrary evidence to that which was represented in the motion such as the inculpatory documents and deposition testimony that had been obtained in the *Westfall* case.  Neither was there any reference in BASF's Motion for Summary Judgment, nor in any of the corroborating affidavits or materials filed in support of the motion, to the fact of BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc. These misrepresentations and material omissions occurred and were committed despite the fact that BASF was aware of the facts, knew the relevance of the subject information to asbestos claimants, was under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation, and was under a duty of candor to the presiding court.

145.    As the direct and proximate result of BASF's misrepresentations and material omissions as set forth above, on June 18, 2009, the Cuyahoga County Court of Common Pleas granted BASF's motion for summary judgment and dismissed Ms. Graham's case as to BASF thereby depriving Plaintiff of their right to full, fair and just compensation from BASF on the asbestos injury claim.

146.    On or about May 15, 2009, a notice of voluntary dismissal of Engelhard, as well as three other defendants, was electronically filed in the lawsuit relating to Mr. Young's asbestos

injury.  In agreeing to and obtaining its client's consent to this dismissal, the Bevan Law Firm relied and acted upon the misrepresentations and material omissions set forth above.

**G.      The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme.**

147.    The longstanding fraudulent asbestos defense scheme started to unravel during a June 15, 2009 deposition of Mr. David Swanson, a former BASF research and development employee, that was taken in connection with the above-referenced *Paduano* case, MID-L-2976-09 (N.J. Super. Ct.) (the "Swanson deposition").

148.    Mr. Swanson was a chemist for Engelhard in Menlo Park, New Jersey.  During his tenure at Engelhard, Swanson conducted experiments and assays with talc in his laboratory. He also visited the Johnson Mine.

149.    Mr. Swanson's daughter, Donna Paduano, developed mesothelioma and contended the asbestos causing same was from, *inter alia*, BASF's talc her father worked with or was exposed to at Engelhard, to which she came into contact.

150.    During his deposition Mr. Swanson testified that:

    a.   He was aware that Emtal talc contained asbestos fibers based on his work for the company;

    b.   Engelhard's talc mine was shut down after it was determined that the talc contained asbestos;

    c.   sometime after the BASF talc mine was shut down, he was given a directive by the head of Engelhard's research and development department, Hemstock, to gather all of his lab notebooks and records regarding Engelhard's talc;

    d.   Hemstock explained to him that the directive to gather up the documents  had come from BASF's legal department;

    e.   he understood and believed that the materials gathered were to be shredded or destroyed;

    f.   he complied with the instructions and gathered his documents on Emtal talc, including his laboratory notebooks, and turned over all of his records as directed;

g. BASF's legal department checked with all employees to ensure that all documents that revealed that the talc contained asbestos had been recovered and subsequently destroyed or secreted away; and

h. he never saw his Emtal talc documents again.

151. The Swanson Deposition led to an investigation by the *Paduano* case's plaintiffs' counsel into whether BASF had spoliated evidence (the "*Paduano* spoliation investigation").

152. The *Paduano* spoliation investigation ultimately led to the discovery of evidence that prompted and grounded a successful motion to amend before the New Jersey Superior Court to plead a New Jersey spoliation "Fraudulent Concealment" claim against BASF in the *Paduano* suit, and three other pending New Jersey state court asbestos laws suits, based upon the spoliation of Emtal talc documents described herein.

153. The *Paduano* spoliation investigation also eventually led to BASF producing documents relating to its 1984 gathering of documents relating to Emtal talc and portions of some, but not all, of the *Westfall* case's depositions.

154. During the *Paduano* spoliation investigation plaintiffs' counsel reviewed thousands of pages of documents produced by BASF relating to its corporate knowledge of asbestos in Johnson Mine talc ore and Emtal talc products and what BASF had produced and represented to asbestos claimants' counsel over the years regarding same. Additionally, interrogatories were served and depositions of BASF designated representatives taken on topics relating to the spoliation of evidence and documents.

155. During the *Paduano* spoliation investigation, BASF withheld numerous documents from its production that were responsive to the investigation, on claims of attorney-client privilege. The *Paduano* plaintiffs challenged BASF's withholding of documents based upon the "crime-fraud" exception to the privilege. This dispute led to the appointment of retired

New Jersey Superior Court Appellate Division Judge Jack L. Lintner as Special Discovery Master in *Paduano* and three related asbestos cases.

156.    Judge Lintner requested briefing from the parties on the applicability of the crime-fraud exception and following his review of same rendered an initial opinion in October, 2010 in which he determined that an *in camera* review of BASF's withheld documents was warranted. On November 4, 2010, following his review of the withheld documents, Judge Lintner advised the *Paduano* parties that he was going to report his opinion concerning which documents should be produced by BASF under the crime-fraud exception to the attorney-client privilege. Thereafter, on November 10, 2010, and with notice to all *Paduano* parties, Judge Lintner provided BASF's counsel, and only it, with a copy of his tentative report setting forth his determinations in order to allow BASF's counsel to review and make any objections it had to his recommendations as well as to production of his report to the plaintiff's counsel.

157.    After Judge Lintner submitted his tentative report to BASF's counsel, the *Paduano* case settled.  Pursuant to the order of the court the tentative report is confidential.

158.    The terms of the *Paduano* settlement and the order appointing Judge Lintner require Judge Lintner and his law firm, Norris McLaughlin & Marcus, P.A., to hold both a copy of his tentative report and the withheld documents he reviewed in escrow for seven (7) years. Plaintiff is seeking production of the documents held in escrow.

159.    The *Paduano* spoliation investigation  led to the discovery of the following tests and assays of Emtal talc that found the presence of asbestos fibers in the Emtal talc:

> a.  A 1972 Royal Globe Insurance test which established four out of five Emtal talc samples contained asbestos fibers;
>
> b.  A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal samples;

45

    c.   A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc;

    d.   A 1978 test which established the presence of asbestos in all Emtal talc;

    e.   A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.; and

    f.   Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

160.    In the twenty five (25) years between the *Westfall* case settlement and the Swanson deposition in the *Paduano* case, upon information and belief, none of the above referenced tests or the underlying data were ever produced to any asbestos claimant or their counsel even though they were often well within the scope of discovery requests made by claimants' counsel. These tests and their underlying data were also not referred to in correspondence or reports sent to claimants' counsel or in court submissions that were filed by BASF. These tests and data represent only a portion of the original evidence relating to the presence of asbestos in Emtal talc, and are an indication of the once-extensive evidence which Defendants possessed regarding the presence of asbestos in the Emtal talc.

161.    The documents produced during the *Paduano* spoliation investigation, many of which are stamped by BASF's counsel with the document management prefix "FC," revealed the existence of the spoliation enterprise and how BASF used it to repeatedly mislead and deceive asbestos injury claimants, their counsel and presiding courts.

162.    Many of the exhibits and test and assay results referred to in the depositions of Hemstock and Triglia still have not been produced to any asbestos injury claimant lawyer other than counsel in the *Westfall* case who was and is bound to a confidentiality agreement.

163.    The following exhibits from the Hemstock deposition are missing or have otherwise not been produced:  Exhibits 1, 5, 13, 15, 16, 18, 19, 21, 22, 23, 24, 25, 29, 30, 32, 34, 37, 39, 43, 44, 46, 47, 49, 50 (partially), and 51.  The following exhibits from the Triglia

deposition are missing or have otherwise not been produced: Exhibits 1, 2, 5, 6, 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 23, 24, 26, 27, 28 and 30.

164.   Many other presently unknown tests, studies, and other evidence which Defendants conducted, possessed, or had access to have been destroyed, secreted away and/or due to the passage of time caused by BASF's spoliation and tortious conduct, are otherwise no longer accessible or recoverable.

165.   The evidence spoliated by BASF includes the Engelhard internal lab notebooks which have never been located or produced and may be presumed to have been permanently destroyed. Based upon information and belief, these lab notebooks would have contained testing and assay data regarding the composition of the Emtal talc including but limited to the asbestos content of the Emtal talc.

166.   Due to the spoliation of this evidence, asbestos victims, their counsel and courts across the country have been prevented from obtaining or receiving material evidence and accordingly may never know the full nature, extent and breadth of the asbestos fibers in BASF's talc and talc products including Emtal talc.

**H.   Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense.**

167.   In connection with the *Paduano* suit, BASF designated and produced for deposition Ms. Ellen Poole as its representative concerning the sale, supply and distribution of BASF-Engelhard's talc to National Gypsum Facilities, as well as its designee to testify on matters relating to the *Paduano* spoliation investigation.

168.   In her deposition on May 25, 2010, Ms. Poole admitted as a designee of BASF that:

     a.   There are documents which show the existence of asbestos in Emtal talc;

47

b.  testing on Emtal talc performed throughout the 1970s showed the presence of asbestos fibers in BASF products;

c.  testing on Emtal talc conducted by Georgia Tech and by BASF  were in agreement that the asbestos fiber count in Emtal talc varied from trace amounts to abundant;

d.  a geologist named "Gale" who it is believed was Peter Gale, a former Engelhard research and development employee who BASF sought to restrain from being retained as an expert by the *Westfall* case's plaintiff, confirmed the existence of asbestos in Emtal talc in 1979;

e.  sworn affidavits and statements made and used in the fraudulent asbestos defense scheme, such as the Ashton Affidavit and Eastern Magnesia's October 19, 2007 answers to interrogatories, which stated that BASF's asbestos knowledge was irrelevant because it never sold asbestos containing products, are contradicted by tests and studies that were known to BASF; and

f.  Cahill Gordon had maintained the storage facility where some of the documents establishing the presence of asbestos fibers in the Emtal talc had been secretly held for the past twenty-five years.

**I.  Plaintiff Learns That She and Other Asbestos Claimants Similarly Situated Were Victimized and Harmed by the Fraudulent Asbestos Defense Scheme.**

169.  Plaintiff and her North Carolina attorneys first learned that she, her decedent and others were the victims of the BASF fraudulent asbestos defense scheme in 2011 when her counsel first learned of the foregoing alleged facts and circumstances through contact with attorneys aware of and/or conducting the *Paduano* spoliation investigation.

170.  The existence and/or scope of the fraudulent concealment and the defense scheme was not known to Plaintiff prior to that time, and, because of its covert nature, was not reasonably knowable until such time as Plaintiff was first advised of its existence.

171.  Plaintiff and her attorneys specifically relied on Defendants not having engaged in fraudulent spoliation, in their research and work-up of asbestos-related claims of Plaintiff and her decedent.  Plaintiff's North Carolina attorneys, who are knowledgeable and experienced asbestos

litigation attorneys, specifically did not earlier institute litigation against the subject Defendants herein because Defendants' wrongful scheme had been successful in concealing the relevant facts and evidence. Plaintiff and her counsel have brought the instant lawsuit within a reasonable time after learning of the actual state of affairs.

172. Plaintiff has been harmed by the misrepresentations, omissions of material fact and deceitful conduct involved in the Defendants' fraudulent scheme. Furthermore, any applicable statute of limitation or repose or other time-bar defense is properly waived, tolled and otherwise not applicable in light of the facts reflecting fraudulent concealment and spoliation as alleged hereinabove.

## COUNT I -- NEGLIGENCE

173. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 172.

174. At all material times, Defendants are or were miners, manufacturers, distributors, processors, importers, converters, compounders, and/or retailers of asbestos and/or asbestos-containing products, materials or equipment.

175. The Defendants, acting through their agents, servants, and/or employees caused, and have caused, certain asbestos and asbestos-containing materials, products or equipment to be placed in the stream of commerce with the result of that said asbestos and asbestos-containing materials, products or equipment came into use by the Plaintiff's decedent or by others in his vicinity.

176. Throughout the course of his employment, Plaintiff's decedent worked with and was exposed to the asbestos and asbestos-containing materials manufactured and/or sold by the Defendants, most or all of the relevant exposure occurring within the State of North Carolina.

177.    During the course and scope of his employment, Plaintiff's decedent was exposed to Defendants' asbestos and asbestos-containing materials, which exposure directly and proximately caused him to develop an illness known and designated as mesothelioma.

178.    Defendants, acting by and through its servants, agents and employees, duly authorized and acting within the scope and authority of their employment, had a duty to design, manufacture and sell products that were not unreasonably dangerous or defective and/or a duty to warn the Plaintiff's decedent and foreseeable users of said products of the dangers and defects which the Defendants created, knew, or, within the exercise of reasonable care, should have known.

179.    Plaintiff's decedent, whose livelihood was dependent upon the work that he did for his pertinent employer Continental Tire, was required to work with and around asbestos and/or asbestos-containing products, materials or equipment that manufactured, processed, distributed, supplied and/or sold by Defendants.   Defendants knew or should have known that persons employed as Plaintiff's decedent would be required to and would come into contact with and would work in close proximity to said products.

180.    Plaintiff's decedent sustained injuries caused by no fault of his own and which could not be avoided through the use of reasonable care.   Plaintiff's decedent's development of an asbestos-related disease was directly and proximately caused by the negligence and carelessness of Defendants in that they manufactured, processed, sold, supplied or otherwise put said asbestos or asbestos-containing products, materials or equipment, into the market and into the stream of interstate commerce, while they knew, or in the exercise of ordinary care should have known, that said products were deleterious, poisonous, cancer-causing and/or inherently dangerous and harmful to Plaintiff's decedent's body, lungs, respiratory system, skin, health, and general well-being.

Further, defendants knew or in the exercise of reasonable care should have known that Plaintiff's decedent would not know of such danger to his health.

181.    Plaintiff's decedent's illness and death are the direct and proximate result of the negligence and carelessness of Defendants, jointly and severally, in that, in that the Defendants knew, or in the exercise of ordinary care should have known, that the asbestos and asbestos-containing materials, products or equipment were deleterious, poisonous, and highly harmful to Plaintiff's decedent's body, lungs, respiratory system, skin, and health.

182.    Defendants breached their duties and were negligent including by the following acts and/or omissions in that they:

(a)    Failed to advise Plaintiff's decedent of the dangerous characteristics of their asbestos and/or asbestos-containing materials, products or equipment;

(b)    Failed or omitted to provide the Plaintiff's decedent with the knowledge as to what would be reasonably safe and sufficient apparel and protective equipment and appliances to reduce exposure to inhalable asbestos fibers, if in truth they were in any way able to protect him from being poisoned and disabled as he was by exposure to such deleterious and harmful asbestos-containing materials, products or equipment;

(c)    Failed and omitted to place any warnings or sufficient warnings on their containers of said asbestos and asbestos-containing materials, products or equipment to warn the handlers of the dangers to health in coming in contact with said asbestos and asbestos-containing materials, products or equipment;

(d)    Failed and omitted to take reasonable precautions or to exercise reasonable care to publish, adopt, and enforce a safety plan and a safe method of handling and installing said asbestos-containing materials, products or equipment;

(e)    Inadequately warned, if, in fact, they warned at all, persons such as Plaintiff's decedent of the dangers to their health in coming in contact with and breathing said asbestos fibers  from asbestos and/or asbestos-containing materials, products or equipment;

(f)    Did not recommend methods to improve the work environment and did not develop alternative products;

(g)    Became aware during the relevant times of the asbestos-containing nature of the subject talc, yet instead of properly ceasing the sale of the product and issuing effective warnings and instructions for its use, Defendant knowingly engaged in a scheme to suppress

and destroy relevant data and evidence, and continued to use a known cancer-causing product, to-wit:  asbestos; and

(h)     After discovering that the asbestos exposure caused a progressive lung disease, did not inform the Plaintiff's decedent of the need for monitoring and periodic evaluations.

183.    Defendants, at the time of designing, manufacturing, distributing, selling, or otherwise placing asbestos and/or asbestos-containing products, materials or equipment into the stream of commerce, knew, or in the exercise of reasonable care, should have known about the risks associated with their products.  The products in question were defective at the time that they left the control of the Defendants.

184.    Defendants were negligent and breached their duty of due care to Plaintiff's decedent by taking or failing to take the actions as previously alleged to avoid harm to the Plaintiff's decedent and other foreseeable users, in light of the reasonably foreseeable dangers caused by the design, manufacture, sale, distribution of the asbestos and/or asbestos-containing products, materials or equipment at issue in the stream of commerce.

185.    The hazards posed by exposure to asbestos and/or asbestos-containing products, materials or equipment and the resulting injuries and damages to plaintiff were reasonably foreseeable, or should have been reasonably foreseen by Defendants.

186.    Defendants were manufacturers and/or sellers within the meaning of the North Carolina Products Liability Act (N.C. Gen. Stat. § 99B-1 *et seq.*) and acted unreasonably in failing to provide a warning, and that the failure to warn was a proximate cause of the harm. Additionally, at the time the product left Defendants' control the Defendants knew or should have known that it posed a substantial risk of harm if sold without a warning; and/or, after the product left the Defendants' control they became aware or should have become aware of the risk and failed to take reasonable steps to give an adequate warning.

187.     As a direct and proximate result of the aforesaid negligent acts and/or omissions by the Defendants, the Plaintiff's deceased spouse developed mesothelioma, as a consequence of which, through no fault of his own, he was severely injured, disabled and damaged.

188.     As a result of the above, Plaintiff seeks damages as are hereinafter demanded.

## COUNT II -- BREACH OF IMPLIED WARRANTY

189.     Plaintiff hereby incorporates by reference paragraphs 1 through 188 inclusive, as if the same were fully plead herein.

190.     The Defendants impliedly warranted that said asbestos materials were of good and merchantable quality and fit for their intended use.

191.     The implied warranty made by the Defendants that the asbestos-containing materials, products, or equipment were of good and merchantable quality and for the particular intended use was breached and that certain harmful, poisonous, and deleterious matter was given off into the atmosphere wherein the Plaintiff's decedent carried out his duties while working with or in the vicinity of asbestos and asbestos-containing materials, products, or equipment.

192.     As a direct and proximate result of the implied warranty of good and merchantable quality and fitness for the particular intended use and Defendants' breach thereof, Plaintiff's decedent developed mesothelioma.

193.     As a result of the above, Plaintiff seeks damages as are hereinafter demanded.

## COUNT III -- GROSS NEGLIGENCE, WILLFUL, WANTON, AND RECKLESS CONDUCT AND PUNITIVE DAMAGES

194.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 193.

195.    Plaintiff's decedent and others in his position worked in close proximity to the asbestos-related materials mined and manufactured by the Defendants, and the exposure and hazard was known, or in the exercise of reasonable care should have been anticipated, by the Defendants.

196.    Defendants have known or should have known during the pertinent times of medical and scientific data which clearly indicates that the asbestos and asbestos-containing products were hazardous to the health and safety of the Plaintiff's deceased and others in his position, and prompted by pecuniary motives, the Defendants ignored and failed to act upon said medical and scientific data and conspired to deprive the public of said medical and scientific data, depriving them, therefore, of the opportunity of free choice as to whether or not to expose themselves to the asbestos products.  As a result, the Plaintiff's decedent was severely damaged.

197.    Defendants intentionally and fraudulently concealed the dangers of asbestos exposure and specifically of their products, thus denying Plaintiff's decedent the knowledge with which to take necessary safety precautions such as periodic x-rays and medical examinations, and action to avoid further dust exposure. Defendants' misconduct included that Defendants engaged in a pattern and practice of fraudulent concealment and spoliation as alleged herein.

198.    The acts of the Defendants, and each of them, as hereinabove set forth were intentional and willful and done with willful disregard of the safety of Plaintiff's decedent and others similarly situated at a time when Defendants had knowledge of the dangerous effect of asbestos and asbestos-containing materials, products or equipment upon the body of human beings, including Plaintiff's decedent and others similarly situated, and even though forewarned by tests, standards, promulgations of rules and regulations, statutes, and ordinances recognized by the defendants and subscribed to by them, nevertheless placed into the stream of commerce, for their own profit, dangerous asbestos material with full knowledge that it was being used and would be

54

used in the future to the detriment of the health of Plaintiff's decedent and others similarly situated, and Plaintiff is thereby entitled to punitive damages.

199.    Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendants are properly liable for punitive damages in this action in that Defendants are liable for compensatory damages and have committed one or more aggravating factors justifying an award of punitive damages, including acts of egregious and reckless behavior, and specific instances of willful and wanton conduct including without limitation those alleged hereinabove.

200.    Defendants are properly liable for punitive damages under Chapter 1D of the North Carolina General Statutes in light of:  (A)  the reprehensibility of Defendants' motives and conduct as alleged above;  (B)  the knowledge that by their wrongful conduct they would cause harm to asbestos claimants and persons similarly situated to the Plaintiff; (C) Defendants' awareness of what they were doing to harm the rights of asbestos claimants and persons similarly situated; (E) the multi-year duration of the Defendants' illegal scheme; and (F) the Defendants' profiting from their misconduct.

201.    Accordingly, as a result of the Defendants' conduct in which they acted in willful, wanton, gross negligence and in total disregard for the health and safety and rights of the user or consumer, Plaintiff therefore seeks exemplary and punitive damages against Defendants to punish the Defendants for their actions.

### COUNT IV -- CLAIM FOR SPOLIATION AND FOR SPOLIATION REMEDY

202.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 201.

203.    At all times material herein, BASF and its predecessors in interest, Engelhard had a duty to preserve and/or produce in response to discovery evidence regarding BASF's and

Engelhard's asbestos talc ore and talc products, including but not limited to reports which concluded that talc from BASF's talc mine contained chrysotile and other forms of asbestos, which duties BASF and its predecessors, aided and abetted by its former national counsel, Cahill Gordon, deliberately, repeatedly and continuously breached.

204.    Such duty to preserve evidence has existed for decades given the circumstances and litigation involving the Defendant, and existed at the time that BASF through its predecessors gathered and destroyed or secreted material evidence regarding Engelhard's talc ore and talc products. The gathering and destruction of documents was in bad faith and not for legitimate document management purposes.  At the time of the destruction or secreting away of this material evidence the Defendant BASF knew of the existence and the likelihood of litigation regarding its asbestos-containing products.

205.    Further, the duty to preserve evidence existed because BASF and its predecessors had control over the only and/or best concrete evidence that established whether its talc products contained asbestos and because destruction of this evidence would cause foreseeable harm to individuals with an asbestos-related disease who were exposed to the Defendant's products.  The evidence destroyed or concealed was and is directly relevant to litigation and is necessary to establish the relationship between Plaintiff's decedent's asbestos-related disease and the Defendant's asbestos-containing products.

206.    Defendant BASF has and had a legal obligation to disclose the evidence of its asbestos-containing products.  Defendant BASF was the sole holder of this information, and Plaintiff could not have reasonably obtained it from any other source.  In fact, this information has not been produced in any litigation for more than 25 years until the *Paduano* suit.

207. The fraudulently concealed and spoliated evidence is directly relevant and material to the litigation. It is the only evidence that directly demonstrates that the Defendant BASF's talc ore and talc products contained asbestos. This fraudulently concealed and spoliated evidence is critical to establish liability of the Defendants and without this evidence, the Plaintiff would likely be forced to dismiss its suit or suffer a involuntary dismissal, as have numerous other asbestos Plaintiffs who have brought suit against BASF in the past.

208. As a proximate result of the foregoing fraudulent concealment of evidence, Plaintiff has been damaged, hampered and disadvantaged in proving the causes of Plaintiff's injury and harm.

209. As a direct and proximate result of Defendants' acts and/or omissions of fraudulent concealment set forth herein, Plaintiff has incurred or likely will incur pecuniary damages, including but not limited to the expenses and costs of proceeding without this evidence, and expenses and costs incurred in the effort to replace, locate, or identify this evidence, which Plaintiff would not otherwise have incurred.

210. Plaintiff is entitled to an assessment of exemplary damages against BASF for its fraudulent concealment and spoliation of evidence, and/or, to the imposition of sanctions and jury instructions including but not limited to the striking of Defendant's pleadings and defenses and the providing of an adverse inference jury instruction to the jury at the trial of this matter.

## COUNT V -- DAMAGES AND LOSS OF CONSORTIUM

211. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 210.

212.     As a direct and proximate result of the injury suffered by the Plaintiff's decedent and his subsequent wrongful death, the Plaintiff has suffered the loss of consortium, general services, companionship and society.

213.     Accordingly, Plaintiff is entitled to loss of consortium damages in an amount to be proven at trial.

214.     Plaintiff pursuant to N.C. Gen. Stat. §§ 28A-18-1, *et seq.* seeks to recover any and all damages allowable to and incurred by the Estate of Jacque Truett McSwain and all beneficiaries.

215.     As a result of the above-alleged conduct of the Defendants, the decedent developed mesothelioma, as a consequence of which, Plaintiff and Plaintiff's decedent are entitled to damages for hospital and medical expenses incidental to decedent's last illness; for loss of earnings and future earning power of the decedent; for the loss of decedent's general health, strength, and vitality; for the loss of pecuniary contributions to the Plaintiff; for the loss of consortium, society, aid, companionship and services to the Plaintiff; for the future loss of consortium, society, aid, companionship and services to Plaintiff; for the pain and suffering of the decedent; and for all other damages recoverable under said Act.

### **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays that this Court:

A.     Award the Plaintiff actual and compensatory damages, in an amount to be determined at trial, for the negligent and wrongful acts of the Defendants;

B.     Award the Plaintiff pre-judgment and post-judgment interest;

C.     Award the Plaintiff punitive damages;

D.     Award the Plaintiff attorney fees and costs,

E.     Award appropriate sanctions and remedies for Defendants' spoliation and fraudulent concealment of evidence; and

F.      Award such other and further relief as may be just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

This the 7th day of December 2011.

Respectfully submitted,

s/William M. Graham
William M. Graham
NC Bar No. 17972
Mona Lisa Wallace
NC Bar No. 9021
Cathy A. Williams
NC Bar No. 33534
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC  28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
E-Mail: bgraham@wallacegraham.com
E-Mail: mwallace@wallacegraham.com
E-Mail: cwilliams@wallacegraham.com

Christopher M. Placitella, Esq.
Michael S. Noonan, Esq.
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, New Jersey 07701
Phone: (732) 747-9003
Fax: (732) 747-9004
Cell: (732) 423-7559
E-Mail: cplacitella@cprlaw.com
E-Mail: mnoonan@cprlaw.com

*To be admitted pro hac vice*