

1 of 7 DOCUMENTS

DEBORAH GETZ, individually and as a surviving heir of decedent Kristofer D.S. Thomas; RODNEY THOMAS, individually and as surviving heir of decedent, Kristopher D.S. Thomas; MARY DUFFMAN, individually and as a surviving heir of decedent, Scott E. Duffman; SOPHIA DUFFMAN, a minor, individually and as a surviving heir of decedent Scott E. Duffman, by and through her Guardian ad Litem, Mary Duffman; CHRISTINE VAUGHN, individually and as a surviving heir of decedent, Travis R. OPINION Vaughn; BRAD VAUGHN, individually and as a surviving heir of decedent, Travis R. Vaughn; HEATHER VAUGHN, individually and as a surviving heir of decedent, Travis R. Vaughn; TAYLIN VAUGHN, a minor, individually and as a surviving heir of decedent Travis R. Vaughn, by and through his Guardian ad Litem, Heather Vaughn; JILL GARBS, individually and as a surviving heir of decedent Ryan Garbs; DOUG GARBS, individually and as a surviving heir of decedent, Ryan Garbs; PAUL WILKINSON, individually and as a surviving heir of decedent Adam Wilkinson; FELICIA WILKINSON, individually and as surviving heir of decedent Adam Wilkinson; TYFFANIE WILKINSON, individually and as surviving heir of decedent Adam Wilkinson; CARSON WILKINSON, a minor, individually and as a surviving heir of decedent Adam Wilkinson, by and through his Guardian ad Litem, Tyffanie Wilkinson; ROBERT J. QUINLAN, individually and as surviving heir of decedent John Quinlan; KATHLEEN T. QUINLAN, individually and as surviving heir of decedent John Quinlan; JULIE QUINLAN, individually and as a surviving heir of decedent John Quinlan; KEELY QUINLAN, a minor, individually and as a surviving heir of decedent John Quinlan, by and through her Guardian ad Litem, Julie Quinlan; MADELINE QUINLAN, a minor, individually and as a surving heir of decedent John Quinlan, by and through her Guardian ad Litem, Julie Quinlan; ERIN QUINLAN, a minor, individually and as a surviving heir of decedent John Quinlan, by and through her Guardian ad Litem, Julie Quinlan; HERSHEL MCCANTS, Sr., individually and as a surviving heir of Hershel McCants, Jr.; GOLDIE MURPHY, individually and as a surviving heir of decedent Hershel McCants, Jr.; SHANNON MCCANTS, individually and as a surviving heir of decedent Hershel McCants, Jr.; TREVOR MCCANTS, a minor, individually and as a surviving heir of decedent Hershel McCants, Jr., by and through his Guardian ad Litem, Shannon McCants; KYLIE MCCANTS, a minor, individually and as a surviving heir of decedent Hershel McCants, Jr., by and through her Guardian ad Litem, Shannon McCants; JORDAN LANHAM; JERRY GOLDSMITH; RYANNE NOSS, individually and as spouse of Scot Noss; TIMOTHY BRAUCH; CHRIS TRISKO; MARK DANIEL HOUGHTON; CHUCK ISAACSON; BRENDA ISAACSON, individually and as spouse of Chuck Isaacson, Plaintiffs-Appellants, v. THE BOEING COMPANY, a corporation; HONEYWELL INTERNATIONAL, INC., a corporation; GOODRICH PUMP AND ENGINE CONTROL SYSTEMS, INC., a corporation; AT ENGINE CONTROLS LTDS.; DOES, 1 through 200, inclusive, Defendants-Appellees.

No. 10-15284

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*2011 U.S. App. LEXIS 15877*

**March 18, 2011, Argued and Submitted, San Francisco, California**
**August 2, 2011, Filed**

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Northern District of California. D.C. No. 4:07-cv-06396-CW. Claudia A. Wilken, District Judge, Presiding.
*Getz v. Boeing Co., 690 F. Supp. 2d 982, 2010 U.S. Dist. LEXIS 5127 (N.D. Cal., 2010)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** Thomas J. Brandi, Daniel Dell'Osso (argued), and Brian J. Malloy, The Brandi Law Firm, San Francisco, California, for the appellants.

Steven S. Bell (argued), Charles W. Mulaney, and Kathleen M. O'Sullivan, Perkins Coie, Seattle, Washington, for appellee The Boeing Company.

Joanna E. Herman, James W. Huston (argued), William V. O'Connor, and Greg Reilly, Morrison & Foerster, San Diego, California, for appellee Honeywell International, Inc.

Alan H. Collier (argued) and Mark R. Irvine, Fitzpatrick & Hunt, Tucker, Collier, Pagano, Aubert, Los Angeles, California, for appellee Goodrich Pump & Engine Control Systems, Inc.

Michael A. Hession and Kevin R. Sutherland (argued), Clyde & Co., San Francisco, California, for appellee AT Engine Controls Ltd.

**JUDGES:** Before: J. Clifford Wallace, John T. Noonan, and Richard R. Clifton, Circuit Judges. Opinion by Judge Wallace.

**OPINION BY:** J. Clifford Wallace

**OPINION**

WALLACE, Senior Circuit Judge:

This case arises from the tragic February 2007 crash of an Army Special Operations Aviation Regiment helicopter in Afghanistan. [*2] Plaintiffs, who include those injured and the heirs of those killed in the crash, appeal from the district court's dismissal of AT Engine Controls (ATEC) for lack of personal jurisdiction and from the court's summary judgment in favor of The Boeing Company (Boeing), Honeywell International, Inc. (Honeywell), and Goodrich Pump and Engine Control (Goodrich). We have jurisdiction pursuant to *28 U.S.C. § 1291*, and we affirm.

I.

In February 2007, an Army-operated MH-47E Chinook helicopter crashed in the Kabul Province of Afghanistan. The helicopter was transporting military personnel to Bagram Airbase when it encountered snow, rain, and ice. Then, without warning, one of the Chinook's engines suddenly shut down, and the aircraft crashed. Eight servicemen were killed and fourteen were severely injured.

Two investigations into the cause of the crash revealed that it occurred after one of the helicopter's two engines suddenly flamed out. An initial Army investigation suggested that the aircraft's engine control system--the Full Authority Digital Electronic Control (FADEC)--unexpectedly shut down, causing the engine to fail. According to investigators, the engine's Digital Electronic Control Unit [*3] (DECU)--the onboard computer that controls fuel flow to the engine--malfunctioned due to some kind of electrical anomaly.

A second investigation, conducted primarily by the manufacturers of the MH-47E, suggested that the crash occurred for a different reason. According to these investigators, the aircraft's engine flamed out because it ingested an inordinate amount of water and ice during the inclement weather. This investigation further suggested, however, that the flameout might have been avoided if the MH-47E's ignition system had been equipped with a continuous or automatic relight feature, which would have allowed the engine to restart automatically in the event of a water- or ice-induced flameout.

Six months after the crash, Plaintiffs filed an action against the contractors that designed and manufactured the allegedly defective aircraft. These contractors include: Boeing, which designed the helicopter's airframe; Honeywell, which designed and built the engines (including the ignition system); Goodrich, which designed the FADEC and was responsible for the DECU; and ATEC, a British company that designed the hardware and software for the DECU.

Initially, Plaintiffs sought relief in [*4] California state court, alleging that defendants were liable on theories of product liability, negligence, wrongful death, and loss of consortium. Boeing, however, quickly removed the action to federal court pursuant to the Federal Officer Removal Statute, *28 U.S.C. § 1442(a)*, which allows federal officers and agents to remove state-law claims to federal court by asserting a federal defense.

In a series of written orders, the district court rejected each of Plaintiffs' claims. First, in a March 10, 2009 order, the district court ruled that it lacked personal jurisdiction over ATEC. Then, in January 2010, the district court granted summary judgment to Boeing, Honeywell, and Goodrich (collectively the Contractors). *Getz v. Boeing Co.*, 690 F. Supp. 2d 982 (N.D. Cal. 2010). According to the district court, Plaintiffs' state-law claims against the Contractors were preempted by the government contractor defense. *Id.*

II.

In resolving Plaintiffs' appeal, we turn first to the district court's dismissal of ATEC, the British company, for lack of personal jurisdiction. According to Plaintiffs, ATEC is subject to personal jurisdiction in California pursuant to *Federal Rule of Civil Procedure 4(k)(2)*. [*5] This Rule, which is commonly known as the federal long-arm statute, permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole. *Rule 4(k)(2)*, titled "Federal Claim Outside State-Court Jurisdiction," provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

The only question presented here is whether Plaintiffs satisfy the first part of *Rule 4(k)(2)*. That is, do any of their claims against ATEC--pure state-law claims for product liability, negligence, wrongful death, and loss of consortium--arise under federal law?

Until now, we have not examined the precise parameters of the arising-under-federal-law element of *Rule 4(k)(2)*. We need not, however, navigate through uncharted terrain without a compass. Here, the commentary to the Rule [*6] and the well-reasoned decisions of our sister circuits agree that *Rule 4(k)(2)*'s reach is limited to substantive federal claims.

First, the commentary explains that *Rule 4(k)(2)* was enacted to "correct[ ] a gap in the enforcement of federal law." *Fed. R. Civ. P. 4(k)(2)*, Advisory Committee Note. Under the former rules for service of process, federal courts looked to state law, even in federal question cases, whenever a federal statute was silent about the proper mechanism for service. *Id.*; *see also Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 111, 108 S. Ct. 404, 98 L. Ed. 2d 415 (1987) (recognizing the predecessor rule's limitations). As a result, foreign defendants having sufficient contacts with the United States as a whole, but not satisfying the applicable state long-arm statute, would be "shielded from the enforcement of federal law by the fortuity" of the *Fourteenth Amendment's* "favorable limitation on the power of state courts." *Fed. R. Civ. P. 4(k)(2)*, Advisory Committee Note.

*Rule 4(k)(2)* eliminates this anomaly. Whereas foreign defendants lacking sufficient contacts with any single state could previously avoid responsibility for civil violations of our federal laws, the revised Rule allows federal [*7] courts to exercise jurisdiction over these defendants, subject only to the limitations of the *Fifth Amendment's due process clause*. *Id.* In this manner, *Rule 4(k)(2)* provides aggrieved plaintiffs with a mechanism for vindicating their federal rights in cases involving defendants that lack single-state contacts, but who possess minimum contacts with the United States as a whole. *Id.*

However, *Rule 4(k)(2)* was narrowly tailored so as to avoid conflict with the *Fourteenth Amendment's* jurisdictional limits in cases alleging only state-law claims:

> This narrow extension of the federal reach applies only if a claim is made against the defendant under federal law. It does not establish personal jurisdiction if the *only claims are those arising under state law* or the law of another country, even though there might be diversity or alienage subject matter jurisdiction as to such claims.

*Id.* (emphasis added). Thus, in order to preserve the proper constitutional balance, *Rule 4(k)(2)* is available only to plaintiffs who allege a "federally created cause of action." 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1068.1 (3d ed. 1998).

Those circuits to address *Rule 4(k)(2)* have [*8] followed the approach set forth in the commentary. The Fifth Circuit, for instance, has limited the Rule to "substantive federal law claims." *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 722 (5th Cir. 1996). Agreeing with *World Tanker*, the First Circuit has held that a claim that finds its "roots in . . . a federal source" satisfies *Rule 4(k)(2)*. *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 45 (1st Cir. 1999); *see also*

*Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1413 (Fed. Cir. 2009)* (to meet the arising under requirement of *Rule 4(k)(2)*, federal law must be "a necessary element of one of the [plaintiff's] well-pleaded complaints").

Based on the commentary and this authority, we hold that Plaintiffs' claims for product liability, negligence, wrongful death, and loss of consortium do not arise under federal law for purposes of *Rule 4(k)(2)*. None of these purely state-law claims alleges any violation of a federal right and none seeks "the enforcement of federal law." *See Fed. R. Civ. P. 4(k)(2)*, Advisory Committee Note. Unfortunately for Plaintiffs, their complaint simply does not assert any "substantive federal law claim" or a claim that finds its "roots in [*9] a federal source." *See World Tanker Carriers, 99 F.3d at 722; Swiss Am. Bank, 191 F.3d at 45*.

Despite the non-federal basis of their complaint, Plaintiffs insist that their claims arise under federal law because the Contractors removed this action pursuant to the Federal Officer Removal Statute. *See 28 U.S.C. § 1442(a)* (permitting federal officers and agents to remove an otherwise state-law action to federal court by raising a federal defense). According to Plaintiffs, their claims became substantively federal when the Contractors asserted a federal defense in their removal petition. The problem, at least for Plaintiffs, is that the Supreme Court's decision in *Arizona v. Manypenny, 451 U.S. 232, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)*, forecloses their argument. There, the Court explained that "the invocation of removal jurisdiction by a federal officer does not revise or alter the underlying law to be applied." *Id. at 242. Section 1442(a)* confers "a purely derivative form of jurisdiction, neither enlarging nor contracting the rights of the parties." *Id.* Hence, the Contractors' decision to assert a federal defense merely provides us with subject-matter jurisdiction over this action. *See Mesa v. California, 489 U.S. 121, 136, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)* [*10] (*section 1442(a)* "serves to overcome the 'well-pleaded complaint' rule[,] which would otherwise preclude removal even if a federal defense were alleged").

Here, the "underlying law to be applied" is California state law. The only federal interest at issue--the Contractors' eligibility for a federal defense--has no bearing on Plaintiffs' ability to vindicate a *federal* right and it does not constitute an essential element of Plaintiffs' well-pleaded complaint. *See Cal. Shock Trauma Air Rescue v. State Compensation Ins. Fund, 636 F.3d 538, 541 (9th Cir. 2011)*. The existence of a federal defense does not transform purely state-law claims into "federally created cause[s] of action." *See* Wright & Miller, *supra*, § 1068.1 (the reach of *Rule 4(k)(2)* is limited to substantive federal-law claims). Accordingly, *Rule 4(k)(2)* does not apply. *See Manypenny, 451 U.S. at 242*.

As for Plaintiffs' allegations that ATEC might nonetheless have minimum contacts with California, which they assert independently of their reliance on *Rule 4(k)(2)*, we reject Plaintiffs' contention that the district court should have permitted additional jurisdictional discovery on this issue. "[W]here a plaintiff's claim of personal [*11] jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1160 (9th Cir. 2006)* (internal quotation marks omitted). Here, Plaintiffs fail to identify any specific facts, transactions, or conduct that would give rise to personal jurisdiction over ATEC in California. In light of their purely speculative allegations of attenuated jurisdictional contacts, the district court did not abuse its discretion when it denied Plaintiffs' request for further discovery. *See id.*

## III.

We turn now to the main issue presented in this appeal: whether Plaintiffs' state-law claims are barred by the government contractor defense. This defense protects government contractors from tort liability that arises as a result of the contractor's "compli[ance] with the specifications of a federal government contract." *In re Hanford Nuclear Reservation Litig., 534 F.3d 986, 1000 (9th Cir. 2008); see also Rodriguez v. Lockheed Martin Corp., 627 F.3d 1259, 1265 (9th Cir. 2010)* (describing the defense as a shield to tort liability).

The Supreme Court established [*12] the framework of the government contractor defense in *Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. There, the Court explained that procurement of military equipment involves "uniquely federal interests" that sometimes preempt a plaintiff's product liability claims against government contractors. *Id. at 504*. To invoke the defense successfully, the contractor must establish three elements: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id. at 512*. In their appeal, Plaintiffs raise several challenges to each of these elements.

### A.

Under *Boyle*'s first element, a contractor must demonstrate that the government "approved reasonably precise specifications." *Id.* As we explained in *Snell v. Bell Helicopter Textron, Inc.*, the government's approval of a particular specification must be more than a cursory "rubber stamp" approving the design. *107 F.3d 744, 748*

*(9th Cir. 1997)*. Rather, approval must result from a "continuous exchange" and "back and forth dialogue" [*13] between the contractor and the government. *Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 585 (9th Cir. 1996)*. When the government engages in a thorough review of the allegedly defective design and takes an active role in testing and implementing that design, *Boyle*'s first element is met. *Id.*

Plaintiffs argue that the necessary specifications are lacking with respect to the following design features of the MH-47E Chinook: (i) the engine's ignition system, (ii) the FADECDECU, and (iii) the aircraft itself.

**1.**

According to Plaintiffs, the ignition system was defective because it was manufactured without a continuous relight function, which would have allowed the engine to restart automatically in the event of a water-induced flameout. Upon careful review of the record, we are confident that the United States Army approved reasonably precise specifications for this aspect of the MH-47E's ignition system, which was manufactured by Honeywell.

Under the terms of its contract with the Army, Honeywell was required to construct the MH-47E's engine pursuant to "Military Specification AV-E-8593D." This provision, which is titled "General [*14] Specification for Engines, Aircraft, Turboshaft, and Turboprop," provides design criteria, performance expectations, and mandatory quality assurance testing for all military aircraft. Among other things, the Army's specification includes diagrams and drawings for engine controls; engine configuration requirements; and tests for the engine's ignition system. Specification AV-E-8593D also required Honeywell to submit a proposed "complete engine specification" for governmental approval.

Honeywell did just that when it submitted its Prime Item Development Specifications to the Army. These specifications contain numerous drawings, figures, and schematics for the engine used in the MH-47E Chinook. They also provide a detailed description of the allegedly defective ignition system. Most importantly, at least for purposes of resolving this appeal, Honeywell's specifications explicitly state: "Continuous duty ignition capability is not provided." Hence, the specifications explicitly identify the "design of the particular feature at issue" and expressly observe that feature's absence. *See Snell, 107 F.3d at 747*. In this sense, Honeywell's specifications describe, in reasonable detail, the design [*15] feature alleged to be defective. *See id.; Boyle, 487 U.S. at 512*.

It is also clear that the Army's approval of this specification resulted from careful deliberation, not a "rubber stamp." *See Snell, 107 F.3d at 748*. The undisputed record provides that the Aviation Engineering Directorate--which is charged with evaluating designs, performing quality assurance tests, and approving aviation equipment--specifically reviewed Honeywell's design analyses, reports, and test plans, and attended multiple formal design meetings. Members of the Directorate also attested that the government was well aware of the availability of an automatic relight system, but chose to forego that technology. This type of "continuous exchange" and "back and forth dialogue" is what is necessary to demonstrate that the Army exercised its judgment in approving Honeywell's design for the ignition system. *Butler, 89 F.3d at 585*.

We also reject the notion that the approved specifications constitute mere performance criteria, instead of design specifications. *See In re Haw. Fed. Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992)* (to qualify for the government contractor defense, approved specifications must do more than merely [*16] identify "a certain level of performance"). Although some of the specifications identified by the parties are performance based--for example, the "Ignition System Performance" specification--the key specifications at issue pertain to the MH-47E's design. In particular, the provision identifying the absence of "continuous ignition capability" describes a particular aspect of the ignition system's design, not a performance characteristic.

**2.**

The Army also approved reasonably precise specifications for the design of the FADEC-DECU, which, again, is the engine control system and computer that allegedly malfunctioned immediately prior to the February 2007 crash. According to the undisputed record, Goodrich--the contractor directly responsible for this component--provided Army personnel with lengthy and detailed design specifications describing both the FADEC (the control system as a whole) and the DECU (the FADEC's onboard computer). Among other things, these specifications include complex diagrams and design drawings of the FADEC, a description of fault monitoring procedures for the DECU, algorithms for troubleshooting, and a system for engine fail detection.

Undisputed affidavit evidence also [*17] establishes that the Army carefully reviewed these specifications, scrutinized their content, and evaluated the reported test results before approving Goodrich's specifications. Army engineers attended regular technical meetings pertaining to the FADECDECU throughout the procurement process. These engineers also issued formal requests for information pertaining to various design aspects of the FADEC system and called periodic meetings to discuss and test the fuel control design, software design, and the design of the electronics (that is, the DECU). At one

point, Army engineers even rejected the "FADEC control system specification," insisting that Goodrich address certain technical concerns. Such critical and substantive review ultimately culminating in approval is the type of careful consideration necessary to demonstrate that the government made a discretionary decision when it approved the FADEC-DECU. *See Butler, 89 F.3d at 585.*

Plaintiffs present no contrary evidence. Instead, they rely heavily on a single statement contained in Goodrich's approved specifications for the FADEC-DECU:

> Specific implementations used to describe the functional requirements throughout this document are [*18] for informational understanding only. Actual implementations used to meet these requirements will be at the discretion of the designer unless specifically stated otherwise.

According to Plaintiffs, the government could not have exercised actual discretion over the design because that discretion was left to Goodrich. There are at least two flaws in Plaintiffs' argument. First, the statement at issue cannot reasonably be construed as a broad grant of discretion over the final product. Rather, discretion was limited to "implementation" of the specific design requirements contained within the approved specifications and thus does not defeat the government contractor defense. *See, e.g., McKay v. Rockwell Int'l Corp., 704 F.2d 444, 450 (9th Cir. 1983)* (government contractor defense may still apply if the specifications leave some "discretion to the supplier in the formulation of the product's design"); *Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 999 (7th Cir. 1996)* ("[T]he fact that Oshkosh may have retained some discretion to position the fuel tanks and exhaust system *within the envelope permitted by the specifications*, standing alone, [does not] defeat the government contractor defense" [*19] (emphasis added)). Second, and perhaps more importantly, the evidence discussed earlier establishes that the Army carefully scrutinized, tested, and made necessary changes to the FADECDECU. This type of exchange and scrutiny is sufficient to demonstrate that the government exercised judgment in approving this product's design. *See Butler, 89 F.3d at 585.*

Contrary to Plaintiffs' view, it makes no difference, for purposes of our analysis, that a similar engine control system had previously been developed for Great Britain's Royal Air Force. Although *Boyle* makes the government contractor defense inapplicable when "a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with" a particular design feature, *487 U.S. at 509,* this defense does not require the government to create the design or the specifications. As long as the United States makes "a significant policy judgment" in approving the design, nothing precludes the government from procuring designs and products that were initially developed for other nations. *Id. at 513; see also Carley v. Wheeled Coach, 991 F.2d 1117, 1125, 28 V.I. 310 (3d Cir. 1993)* ("[I]t is necessary only that the government [*20] approve, rather than create, the specifications").

If we were to hold otherwise, the potential for increased liability could dissuade contractors from providing the United States with sophisticated military equipment that they had initially designed for another nation's armed forces. This ultimately would put the United States military at a competitive disadvantage: either the government would be unable to obtain necessary equipment or it would be forced to pay higher prices to offset the contractor's increased risk of liability. Therefore, we are persuaded by the Eleventh Circuit's recent decision in *Brinson v. Raytheon Co., 571 F.3d 1348 (11th Cir. 2009).* There, the court imposed the government contractor defense even though the product design had been patented before it was approved by the United States Air Force. *Id. at 1357.* The court did so because it was clear that the Air Force carefully "considered" and "reviewed" the design prior to approval and implementation. *Id. Boyle* does not require more than this.

3.

While they do not identify any additional defect, Plaintiffs argue that "the helicopter as a whole" was defective. As far as we can tell, this argument is premised on the [*21] theory that Boeing, which was contracted to configure the aircraft, delivered a final product containing a defective ignition system and/or FADEC-DECU. We reject Plaintiffs' argument for the reasons expressed above: the government approved reasonably precise design specifications for both of these component parts.

B.

We turn now to the second element of the government contractor defense. That element requires a defendant to establish that the product conformed with approved specifications. *Boyle, 487 U.S. at 512.* Until now, we have not provided a detailed examination of this requirement. In *Snell*, for instance, we refused to reach the conformity question because the contractor did not establish *Boyle's* first element as a matter of law. *107 F.3d at 748-49.* Other circuits, however, have extensively examined the conformity element, and their analysis provides persuasive guidance.

Following our sister circuits' lead, we hold that the operative test for conformity with reasonably precise specifications turns on whether "the alleged defect . . . exist[ed] independently of the design itself." *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 421 (5th Cir. 2001) (internal alteration omitted) (internal [*22] quotation marks omitted). "To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1321 (11th Cir. 1989). Therefore, absent some evidence of a latent manufacturing defect, a military contractor can establish conformity with reasonably precise specifications by showing "[e]xtensive government involvement in the design, review, development and testing of a product" and by demonstrating "extensive acceptance and use of the product following production." *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435-36 (5th Cir. 2000).

Upon careful review of the record, we conclude that the MH-47E conformed with the approved specifications for both the ignition system and the FADEC-DECU. The government invested years in reviewing, developing, and testing both the MH-47E and its engine. When the finished helicopter was delivered, Army officials again carefully examined the engine, inspected the aircraft's component parts, conducted test flights, and administered rigorous tests and examinations to ensure conformity. Army officials then executed a DD Form 250-a Material Inspection and [*23] Receiving Report—for both the ignition system and the FADEC-DECU. Through that form, the Army officially certified "that all articles delivered [were] inspected and found to conform in all respects . . . to all applicable blueprints, specifications, and standards." Because Plaintiffs do not present any evidence of a latent manufacturing defect that was undiscovered at the time of acceptance, the government's careful scrutiny and subsequent certification of the MH-47E provide sufficient proof of conformity. *See Miller, 275 F.3d at 421; Kerstetter, 210 F.3d at 435-36.*

In an effort to overcome summary judgment, Plaintiffs place great emphasis on a post-accident email addressed to the Contractors. In it, an Army officer expressed frustration with the Contractors over their failure to provide a promised "input/output table" to Army personnel. Apparently, this table would have measured "the electrical parameters used by the DECU to control" the engines on the MH-47E. The email states:

> For the record, the request for the I/O table was made because a FADEC/DECU Electrical Interface Control Document was apparently never written during the design, development, and testing of the FADEC System. [*24] Action item 33/34 directly requested that Boeing and Honeywell provide the Aircraft to DECU and the Engine to DECU I/O, respectively, contractually required to be delivered back in 1988. We are still waiting for the [sic] a copy of the data delivered by either company that met that specific contractual obligation.

This email leaves unclear how the absence of a 1988 I/O table has any bearing on whether the DECU conformed with reasonably precise design specifications. *See Boyle, 487 U.S. at 512.* Significantly, nothing in the record explains how the I/O data might have implicated a manufacturing aberration in the DECU's component parts that existed "independently of the design itself." *See Miller, 275 F.3d at 421.* Thus, while Plaintiffs suggest that the I/O data *might* have provided evidence of an "electrical anomaly," the notion that the measurements would have identified a deviation from the approved design specifications is speculative and thus insufficient to defeat summary judgment. *See Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir. 1996)* (a litigant may not rely on mere speculation and conjecture to avoid summary judgment).

In addition, while the MH-47E Chinook's engine [*25] obviously did not perform like it was supposed to—the aircraft's engine stalled midflight—this does not preclude the Contractors from establishing the defense. Here, Plaintiffs are quick to point out that the government contracted for a helicopter that would have maintained flight in the adverse weather conditions encountered by the MH-47E. Likewise, they assert that "the failure or shutdown of one engine" was not supposed to "compromise the remaining engine or *safety of flight systems.*" The problem for Plaintiffs is that "[n]onconformance with a specification means more than that the ultimate design feature does not achieve its intended goal." *Kerstetter, 210 F.3d at 435; see also Oliver, 96 F.3d at 1000* (mere allegation of nonperformance is insufficient).

The government contractor defense does not depend upon satisfaction of some general performance goal. Otherwise, "[a] product involved in a design-induced accident would, as a definitional matter, always be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident." *Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 703 (4th Cir. 1989).* [*26] For the defense to have any substance, "[n]onconformance to precise specifications must mean more than that the design does not work in compliance with some 'general admonition

against an unwanted condition.'" *Id. at 703, quoting Harduvel, 878 F.2d at 1319 n.3*. Here, the Contractors present undisputed evidence that the ignition system and the DECU conformed with the reasonably precise design specifications approved by the Army. That is the end of the matter for purposes of *Boyle*'s test for conformity.

C.

The final element of the government contractor defense requires government contractors to warn the United States "about the dangers in the use of the equipment that were known to the [contractor] but not to the United States." *Boyle, 487 U.S. at 512*. Under this element, "a government contractor is only responsible for warning the government of dangers about which it has actual knowledge." *Kerstetter, 210 F.3d at 436* (internal quotation marks omitted).

We conclude that the Contractors satisfied this final requirement. With respect to the potential for a water- or ice-induced flameout, it is clear that the Army was already aware of this particular risk. As Honeywell points out, a 1990 Army [*27] Field Manual stated explicitly that "[t]urbine engines sometimes tend to flameout" and that "ingestion of ice broken loose at the engine inlet may cause such a situation." In addition, the Army was well aware of an automatic relight feature to overcome this problem. The Chief of the Aviation Engineering Directorate, which approved the design specifications for the MH-47E, stated in his undisputed affidavit that "automatic re-light . . . technology has always been known to the Army, but the Army elected not to include it" on the Chinook line of helicopters. Moreover, because the approved specifications affirmatively acknowledged the absence of a continuous relight function, Plaintiffs cannot seriously argue that the Army was unaware of that component's existence. *See Boyle, 487 U.S. at 512*.

Plaintiffs nonetheless insist that issues of fact remain because the Army had never heard of an engine *actually* flaming out due to water or ice ingestion. The problem for Plaintiffs is that the Contractors were equally unaware of any prior incidents. At most, Plaintiffs' evidence suggests that the Contractors should have been aware of the alleged defect. *Boyle*, however, does not require a contractor [*28] to warn about dangers of which it merely should have known. *487 U.S. at 512*; *Kerstetter, 210 F.3d at 436*.

To the extent that the crash may have occurred as a result of an electrical anomaly with the FADEC-DECU, summary judgment is likewise appropriate. According to Plaintiffs, the Contractors should have warned of this potential defect because they were aware of other Chinook aircraft that had experienced engine anomalies prior to the February 2007 crash. A review of these other incidents, however, makes clear that all of these aircraft were MH-47Es. Because the MH-47E is operated exclusively by the United States Army, government personnel were necessarily aware of the potential problem prior to the crash. Again, *Boyle* does not require government contractors to warn of dangers that were already known to the United States. *487 U.S. at 512*.

IV.

Our analysis to this point leaves us with just one additional issue to resolve: whether Plaintiffs can state a claim against the Contractors for allegedly violating their state-law duty to warn of dangers of which the Contractors should have known. Although federal courts, including ours, have unanimously held that the government contractor defense [*29] may preempt these types of claims, a contractor cannot defeat a failure-to-warn claim simply by establishing the elements of the *Boyle* defense as it applies to design and manufacturing defect claims. *See e.g., Butler, 89 F.3d at 586*. Rather, the contractor must show that it "act[ed] in compliance with 'reasonably precise specifications' imposed on it by the United States" in deciding whether "to provide a warning." *Id.* (internal alteration omitted). As the Seventh Circuit has explained:

> [W]hen state law would otherwise impose liability for a failure to warn, that law can be displaced when the contractor can show that: (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government.

*Oliver, 96 F.3d at 1003-04*. This means that the contractor must demonstrate that the government "approved reasonably precise specifications" thereby limiting the contractor's "ability to comply with [its] duty to warn." *Snell, 107 F.3d at 749* (internal quotation marks omitted).

According [*30] to Plaintiffs, the Contractors violated their duty to warn because they knew or should have known of an electrical problem with the FADEC-DECU, but failed to provide timely warnings to the operators of the MH-47E Chinook.

It is beyond dispute that the "government exercised its discretion" when it selected relevant warnings for the MH-47E. *Oliver, 96 F.3d at 1003*. Here, the complete set of warnings is contained in the helicopter's Operator's

Manual. That Manual sets forth specific "warnings," "emergency procedures," and "critical instructions" for the aircraft. Significantly, based on the government's agreement with the Contractors, the Army was fully responsible for the Operator's Manual and its contents. Thus, because the Army, not the Contractors, selected which warnings to include in the Manual, Plaintiffs' contention that the government did not exercise discretion over the content of these warnings is meritless. Where "the government chooses its own warnings, the contractor has certainly fulfilled [*Boyle*'s] first condition." *Id. at 1004*; *see also Tate v. Boeing Helicopters, 55 F.3d 1150, 1157 (6th Cir. 1995)* ("[W]here the government goes beyond approval and actually determines for [*31] itself the warnings to be provided, the contractor has surely" demonstrated that "the government exercised its discretion").

The Contractors easily satisfy the second and third elements of the government contractor defense as it applies to Plaintiffs' state-law failure to warn claims. The second element--providing the warning required by the government--is satisfied by the Contractor's delivery of the Operator's Manual. As for the final element--whether the Contractors "warned the government about dangers in the equipment's use that were known to the [C]ontractor[s] but not to the government"--this element is satisfied for the reasons explained earlier in connection with Plaintiffs' design and manufacturing defect claims: the Contractors and the government had equal awareness of the allegedly undisclosed risks. *See Oliver, 96 F.3d at 1004*.

We are not persuaded by Plaintiffs' suggestion that our decisions in *Butler* and *Hawaii Federal Asbestos* limit the defense to cases in which the government specifically forbids warnings altogether or to instances where the government explicitly dictates the content of the warnings adopted. These cases only require that governmental approval (or disapproval) [*32] of particular warnings "conflict" with the contractor's "duty to warn under state law." *Butler, 89 F.3d at 586*; *see also Haw. Fed. Asbestos, 960 F.2d at 813* (rejecting the defense where the government's specifications were silent about warnings). To read these cases as limiting preemption to those instances where the government forbids additional warning or dictates the precise contents of a warning would be inconsistent with the Court's decision in *Boyle*. *See Oliver, 96 F.3d at 1004 n.8* (rejecting plaintiff's argument that *Butler* and *Hawaii Federal Asbestos* could be interpreted as imposing such a "rigid" rule). *Boyle* makes clear that government discretion, rather than dictation, is the standard. *487 U.S. at 512-13*. Accordingly, given that the Army considered, reviewed, and determined which warnings to provide, the government's exercise of discretion necessarily "conflicts" with the Contractor's "duty to warn under state law." *See Butler, 89 F.3d at 586*.

V.

Finally, we address two evidentiary issues. First, we hold that the district court did not abuse its discretion in declining Plaintiffs' request for additional discovery pursuant to *Federal Rule of Civil Procedure 56(f)*. Here, Plaintiffs [*33] failed to "proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Blough v. Holland Realty, Inc., 574 F.3d 1084, 1091 n.5 (9th Cir. 2009)* (internal quotation marks omitted) (rejecting similar arguments asserted pursuant to *Rule 56(f)*).

Similarly, the district court did not abuse its discretion by entering summary judgment based on the MH-47E's Operator's Manual, which the Contractors submitted for the first time in their reply to the motion for summary judgment. According to Plaintiffs, the district court was not permitted to consider this evidence without first giving them an opportunity to respond. *Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996)* ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond" (internal alteration omitted) (internal quotation marks omitted)). However, by failing to object to or otherwise challenge the introduction of the Operator's Manual in the district court, Plaintiffs have waived any challenge on the admissibility of this evidence. *See Yamashita v. Territory of Guam, 59 F.3d 114, 117 (9th Cir. 1995)* [*34] (holding a similar evidentiary challenge as waived).

VI.

We have considered each of Plaintiffs' arguments challenging the district court's dismissal of ATEC for lack of personal jurisdiction and its summary judgment in favor of the Contractors. None of these arguments are persuasive.

Finally, because the government contractor defense bars each of Plaintiffs' state-law claims, we need not consider the Contractors' alternative argument--based on the combatant activities exception--for upholding the district court's summary judgment. *See Morse v. Frederick, 551 U.S. 393, 431, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007)* ("[T]he cardinal principle of judicial restraint is that if it is not necessary to decide more, it is necessary not to decide more" (Breyer, J., concurring in the judgment in part and dissenting in part) (internal quotation marks omitted)).

**AFFIRMED.**



STEPHANIE RODRIGUEZ, individually and as Guardian Ad Litem of J.C., a minor; SAMUEL OYOLA-PEREZ; JULIUS RIGGINS; NILDA MEYER, individually and as Personal Representative of the Estate of Wilfredo Dayandante, Plaintiffs-Appellees, v. LOCKHEED MARTIN CORPORATION; ALEXIS INTERNATIONAL, INC.; COMMONWEALTH ALUMINUM SALES CORPORATION; JOHN DOE CORPORATION, Defendants, and GENERAL DYNAMICS ARMAMENT AND TECHNICAL PRODUCTS, INC., Defendant-Appellant.

No. 10-15813

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

627 F.3d 1259; 2010 U.S. App. LEXIS 24430; CCH Prod. Liab. Rep. P18,541

August 9, 2010, Argued and Submitted, San Francisco, California
November 30, 2010, Filed

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the District of Hawaii. D.C. No. 1:08-cv-00189-SOM-KSC. Susan Oki Mollway, Chief District Judge, Presiding.
*Rodriguez v. General Dynamics Armament & Tech. Prods.*, 696 F. Supp. 2d 1163, 2010 U.S. Dist. LEXIS 22484 (D. Haw., 2010)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, injured soldiers and a decedent's heirs, brought suit against defendant manufacturer alleging, inter alia, products liability and negligence claims under Hawaii law. The action arose from the premature explosion of a mortar cartridge manufactured by the manufacturer during an army training exercise. The United States District Court for the District of Hawaii denied the manufacturer's summary judgment motion. The manufacturer appealed.

**OVERVIEW:** The manufacturer contended that the government contractor defense conferred an immunity from suit and that the denial of summary judgment could have been reviewed immediately under the collateral order doctrine. The court found that the government contractor defense did not confer sovereign immunity on contractors. Until the requisite facts were determined, the manufacturer was not entitled to the government contractor defense. The district court's order did not qualify for an interlocutory appeal under the collateral order doctrine. The denial of the government contractor defense at the summary judgment stage did not conclusively determine the manufacturer's liability or even determine whether it was entitled to the government contractor defense. Even if the court treated the government contractor defense as a claim of qualified immunity, the district court's ruling raised factual issues, rather than legal questions, and thus would not have been reviewable on interlocutory appeal. Finally, the manufacturer failed to make the type of extraordinary showing required for the court to treat its appeal as a petition for an extraordinary writ of mandamus.

**OUTCOME:** The appeal was dismissed for lack of jurisdiction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Appealability*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN1] Under *28 U.S.C.S. § 1291*, an appellate court's jurisdiction is limited to appeals from final judgments. A denial of a summary judgment motion is generally not reviewable because it is not a final judgment. In particular, a denial of summary judgment on the basis of an issue of material fact is ordinarily not a final judgment and not a basis for an interlocutory appeal.

Page 2

627 F.3d 1259, *; 2010 U.S. App. LEXIS 24430, **;
CCH Prod. Liab. Rep. P18,541

*Civil Procedure > Summary Judgment > Appellate Review > Appealability*
*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*
[HN2] A denial of summary judgment may be appealable under the collateral order doctrine. A decision of a district court is appealable if it falls within that small class which finally determines claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. Under the collateral order doctrine, a party may appeal from an order that: (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) would effectively be unreviewable on appeal from a final judgment.

*Civil Procedure > Summary Judgment > Appellate Review > Appealability*
*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*
*Torts > Public Entity Liability > Immunity > Qualified Immunity*
*Torts > Public Entity Liability > Immunity > Sovereign Immunity*
[HN3] A denial of a claim of immunity may be an immediately appealable order within Cohen's narrow exception. The United States Court of Appeals for the Ninth Circuit has accepted interlocutory appeals under the collateral order doctrine where the issue is a sovereign's absolute immunity from suit and where qualified immunity is at issue. The rationale for allowing an interlocutory appeal when a court denies a motion for summary judgment grounded on immunity is that the claimed right to immunity includes the right not to proceed to trial; this right would be lost if not immediately reviewable. The availability of an interlocutory appeal from a denial of qualified immunity is also limited to the purely legal question of immunity. Where the district court denies immunity on the basis that material facts are in dispute, an appellate court generally lacks jurisdiction.

*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*
[HN4] In applying the collateral order doctrine, it must never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered. The justification for immediate appeal must therefore be sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes.

*Torts > Products Liability > Design Defects*
*Torts > Products Liability > Manufacturing Defects*
[HN5] In general, the government contractor defense shields contractors from tort liability in state or federal actions where plaintiffs allege they sustained injuries as a result of exposure to defective products or equipment manufactured or supplied under a government contract. The U.S. Supreme Court has stated that the government contractor defense involved uniquely federal interests that could preempt and bar the plaintiffs' state law design-defect claim where the facts supported each of the three elements of the defense. To be invoked successfully by a government contractor, the defense requires that: Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The government contractor defense also applies to actions involving manufacturing defects. Whether the facts establish the conditions for the defense is a question for the jury.

*Torts > Products Liability > Design Defects*
*Torts > Products Liability > Manufacturing Defects*
*Torts > Public Entity Liability > Immunity > Sovereign Immunity*
[HN6] Although the source of the government contractor defense is the United States' sovereign immunity, the government contractor defense does not confer sovereign immunity on contractors.

*Torts > Products Liability > Design Defects*
*Torts > Products Liability > Manufacturing Defects*
*Torts > Public Entity Liability > Immunity > Sovereign Immunity*
[HN7] The government contractor defense allows a contractor-defendant to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract. The government contractor defense is not a grant of immunity but is only a corollary financial benefit flowing from the government's sovereign immunity. The government contractor defense applies only when a contractor meets its burden of establishing three facts: (1) the United States set forth reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier pro-

Case MDL No. 875 Document 8189-3 Filed 12/09/11 Page 13 of 17

Page 3

627 F.3d 1259, *; 2010 U.S. App. LEXIS 24430, **;
CCH Prod. Liab. Rep. P18,541

vided the United States with adequate warnings of the dangers.

*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*

[HN8] The writ of mandamus is an extraordinary remedy limited to extraordinary causes. An appellate court treats an appeal as a writ of mandamus only in exceptional circumstances amounting to a judicial usurpation of power, or where a clear abuse of discretion will justify the invocation of this extraordinary remedy. Although the appellate court may treat an appeal from an otherwise nonappealable order as a petition for a writ of mandamus, whether the court construes the appeal as a writ of mandamus depends on whether mandamus is itself justified.

*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*

[HN9] An appellate court will issue the writ of mandamus only under very limited circumstances: The appellate court reviews the district court's orders, not for an abuse of discretion, but for clear error. Under this standard, the appellate court will only issue the writ for usurpation of judicial power or a clear abuse of discretion. Five objective principles guide the inquiry: whether (1) the appealing party has no other adequate means, such as direct appeal, to attain the relief, (2) he will be damaged or prejudiced in a way not correctable on appeal, (3) the district court's order is clearly erroneous as a matter of law, (4) the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules, or (5) the district court's order raises new and important problems, or issues of law of first impression. Not every factor must be satisfied, and the appellate court may deny the petition even where the factors are satisfied, because granting the writ is discretionary.

*Civil Procedure > Summary Judgment > Appellate Review > Appealability*
*Civil Procedure > Appeals > Appellate Jurisdiction > Collateral Order Doctrine*
*Torts > Products Liability > Design Defects*
*Torts > Products Liability > Manufacturing Defects*
*Torts > Public Entity Liability > Immunity > General Overview*

[HN10] The government contractor defense does not confer absolute or qualified immunity. Accordingly, the denial of a motion for summary judgment based on the government contractor defense is not usually appealable under the collateral order doctrine.

**COUNSEL:** Peter K. Batalden (argued) and Lisa Perrochet of Horvitz & Levy LLP, Encino California; J. Stan Sexton and Gregory L. Fowler of Shook Hardy & Bacon, LLP, Kansas City, Missouri; James J. Yukevich of Yukevich Calfo & Cavanaugh, Los Angeles, California; and Edmund Burke and John Reyes Burke of Burke McPheeters Bordner & Estes, Honolulu, Hawaii, for defendant-appellant General Dynamics Armament and Technical Products, Inc.

Ward K. Brown (argued) and David E. Larson of Withers, Brant, Igoe & Mullennix, P.C., Liberty, Missouri; and Dennis E.W. O'Connor, Jr. of O'Connor Playdon & Guben LLP, Honolulu, Hawaii, for plaintiff-appellees Stephanie Rodriguez, Julius Riggins, Samuel Oyola-Perez, Nilda Meyer, individually and as personal representative of the estate of Wilfredo Dayandante.

Jonathan M. Hoffman and Joan L. Volpert of Martin Bischoff Templeton Langslet & Hoffman, LLP, Portland, Oregon, for amicus curiae The Product Liability Counsel.

**JUDGES:** Before: Susan P. Graber, Consuelo M. Callahan, and Carlos T. Bea, Circuit Judges. Opinion by Judge Callahan.

**OPINION BY:** Consuelo M. Callahan [**2]

**OPINION**

[*1262] CALLAHAN, Circuit Judge:

Defendant-appellant General Dynamics Armament and Technical Products, Inc. ("General Dynamics"), seeks to appeal from the district court's denial of its summary judgment motion in an action arising from the premature explosion of a mortar cartridge manufactured by General Dynamics during an army training exercise in Hawaii.[1] The explosion killed Oscar Rodriguez and injured Samuel Oyola-Perez, Julius Riggins, and Wilfredo Dayandante (collectively, "Plaintiffs"), the other soldiers in the training detail, who brought suit against General Dynamics alleging, *inter alia*, products liability and negligence claims under Hawaii law. General Dynamics moved for summary judgment on the merits of the Plaintiffs' claims and also on the ground that the government contractor defense, first articulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988), barred Plaintiffs' claims. The district court denied both motions, holding that a genuine issue of material fact as to what caused the explosion precluded summary judgment. General Dynamics filed a

Case MDL No. 875 Document 8189-3 Filed 12/09/11 Page 14 of 17

Page 4

627 F.3d 1259, *; 2010 U.S. App. LEXIS 24430, **;
CCH Prod. Liab. Rep. P18,541

timely notice of appeal challenging the portion of the district court's order denying summary judgment on the [**3] basis of the government contractor defense. General Dynamics contends that the government contractor defense confers an immunity from suit and that the denial of summary judgment may be reviewed immediately under the collateral order doctrine. We disagree and hold that the government contractor defense is not a grant of immunity. Accordingly, the denial of summary judgment is not immediately appealable, and we dismiss the appeal.

> 1 The parties stipulated that General Dynamics manufactured the mortar cartridge, although it was actually manufactured by General Dynamics's predecessor-in-interest, Martin Marietta Aluminum Sales, Inc. ("Martin Marietta").

I.

A.

During a live-fire U.S. Army training exercise in Hawaii on March 10, 2006, an 81mm M374A3 HE (High Explosive) mortar cartridge exploded prematurely in the barrel of a mortar. Shrapnel from the explosion killed Staff Sergeant Rodriguez and caused serious injuries to Oyola-Perez, Riggins, and Dayandante.

Following the explosion, the Army conducted an investigation, which identified several possible causes of the explosion including material defects in the cartridge and a "double loading" scenario in which a cartridge was already in the [**4] tube when another cartridge was loaded. The Army's report concluded that "the evidence and test data cannot identify the exact cause of the malfunction incident."

B.

The Plaintiffs brought suit against General Dynamics as the successor to Martin Marietta alleging, *inter alia*, strict products liability and negligence claims under Hawaii state law. The complaint alleged that the explosion was caused by a manufacturing defect in the mortar cartridge and that the cartridge did not comply with the design and specifications issued by the government. General Dynamics's theory of the case was that human error, specifically [*1263] double-loading of the mortar cartridges, caused the explosion.

General Dynamics moved to exclude the Plaintiffs' expert's opinions and also filed two motions for summary judgment. The first motion sought summary judgment on the merits of Plaintiffs' strict liability negligence claims. The second motion rested on, *inter alia*, the government contractor defense.

In its order addressing all of General Dynamics's motions, the district court first denied General Dynamics's motion to exclude the Plaintiffs' expert's opinions. The Plaintiffs' expert stated opinions about the cause of [**5] the mortar explosion and the court found that he was qualified to do so and that his opinions would be helpful to the trier of fact within the meaning of *Rule 702 of the Federal Rules of Evidence.* In particular, the court found that the expert's opinion that the premature explosion was caused by a defect in the cartridge body, voiding or cracking in the high explosive filling, or a foreign body in the high explosive filling, was reliable and based on techniques generally accepted in the relevant expert community.

In support of its summary judgment motions, General Dynamics introduced the Army's specification documents for the cartridges, as well as affidavits attesting to Martin Marietta's compliance with the Army's requirements, to demonstrate that it had complied with the government's specifications.

After reviewing the inconclusive results of the Army's investigation, the district court noted that the Plaintiffs' expert opined, to a reasonable degree of scientific certainty, that "the explosion was caused by a defect in the cartridge body . . . , excessive voiding or cracking of the high explosive filling, or a foreign body in the high explosive filling." On the other hand, one of [**6] General Dynamics's experts opined, also to a reasonable degree of scientific certainty, that the explosion was caused by human error in double-loading cartridges in the mortar. General Dynamics' other expert testified that, absent human error, if a mortar cartridge were manufactured according to the government's specifications it would not explode inside the mortar. The court also noted that Oyola-Perez, who was injured during the explosion, asserted that double loading was not the cause of the explosion; and that, as part of its investigation, the Army conducted double-load tests and none of the mortars exploded in the barrel.

Addressing the negligence and strict liability claims on the merits, and viewing the evidence in the light most favorable to Plaintiffs, the district court held that there were disputed issues of fact sufficient to defeat General Dynamics' motions for summary judgment. The district court ruled that there were triable issues of fact as to whether the cause of the explosion was double-loading, or a defect in the cartridge at the manufacturing stage, or some other cause (e.g., defects in the fabricated parts that third-party companies manufactured and that Martin [**7] Marietta then assembled as part of the manufacturing process). The court further noted that there was a question of fact as to whether Martin Marietta manufactured the cartridge according to the government's specifications.

Case MDL No. 875 Document 8189-3 Filed 12/09/11 Page 15 of 17

Page 5

627 F.3d 1259, \*; 2010 U.S. App. LEXIS 24430, \*\*;
CCH Prod. Liab. Rep. P18,541

General Dynamics filed a timely notice of appeal, challenging only the portion of the district court's order denying the government contractor defense. It also filed a "Motion to Confirm a Stay of all Proceedings," which the district court denied, commenting that General Dynamics was "clearly attempting to appeal a nonappealable order."

[\*1264] II.

A.

We first determine whether we have jurisdiction over this interlocutory appeal. [HN1] Under *28 U.S.C. § 1291*, our jurisdiction is limited to appeals from final judgments. A denial of a summary judgment motion is generally not reviewable because it is not a final judgment. *See, e.g., Brodheim v. Cry, 584 F.3d 1262, 1274 (9th Cir. 2009)* (citing *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc., 973 F.2d 688, 693-94 (9th Cir. 1992)*). In particular, a denial of summary judgment on the basis of an issue of material fact is ordinarily not a final judgment and not a basis for an interlocutory appeal. *See Johnson v. Jones, 515 U.S. 304, 315-18, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995)*.

However, [\*\*8] [HN2] a denial of summary judgment may be appealable under the collateral order doctrine. "[A] decision of a district court is appealable if it falls within 'that small class which finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.' " *Mitchell v. Forsyth, 472 U.S. 511, 524-25, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)* (quoting *Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)*). Under the collateral order doctrine, a party may appeal from an order that: (1) "conclusively determine[s] the disputed question"; (2) "resolve[s] an important issue completely separate from the merits of the action"; and (3) would effectively be "unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)*.

[HN3] A denial of a claim of immunity may be an immediately appealable order within *Cohen's* "narrow exception." *Del Campo v. Kennedy, 517 F.3d 1070, 1074 (9th Cir. 2008)*. We have accepted interlocutory appeals under the collateral order doctrine where the issue is a sovereign's absolute [\*\*9] immunity from suit and where qualified immunity is at issue. *See, e.g., Paine v. City of Lompoc, 265 F.3d 975, 980-81 (9th Cir. 2001)* ("As a general matter, appeals from denials on summary judgment of claims of absolute immunity come within the collateral issue doctrine . . . ."); *Schwenk v. Hartford, 204 F.3d 1187, 1195 (9th Cir. 2000)* ("Although the denial of a summary judgment motion is not ordinarily an appealable order, this court has jurisdiction to consider an interlocutory appeal where the ground for the motion in question is qualified immunity.").

The rationale for allowing an interlocutory appeal when a court denies a motion for summary judgment grounded on immunity is that the claimed right to immunity includes the right not to proceed to trial; this right would be lost if not immediately reviewable. *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*.

The availability of an interlocutory appeal from a denial of qualified immunity is also "limited to the purely legal question of immunity." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist., 605 F.3d 703, 707 (9th Cir. 2010)*. " '[W]here the district court denies immunity on the basis that material facts are in dispute, we generally lack [\*\*10] jurisdiction.' " *Id.* (quoting *Cunningham v. Gates, 229 F.3d 1271, 1286 (9th Cir. 2000)*).

In addition, the Supreme Court has stressed that, [HN4] in applying the collateral order doctrine, "it must 'never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred [\*1265] until final judgment has been entered.' " *Mohawk Indus., Inc. v. Carpenter, 130 S. Ct. 599, 605, 175 L. Ed. 2d 458 (2009)* (quoting *Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868, 114 S. Ct. 1992, 128 L. Ed. 2d 842 (1994)*). "The justification for immediate appeal must therefore be sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes." *Id.*

B.

General Dynamics frames the district court's order as a denial of its government contractor defense, and therefore as a denial of immunity from suit, rather than as a denial of summary judgment based on a disputed issue of material fact. Framed this way, General Dynamics contends that it has established each of the elements of the government contractor defense and, therefore, the district court erred by denying it immunity. It also asserts that it has satisfied each of the three elements allowing for an interlocutory appeal under the collateral order [\*\*11] doctrine. Because we hold that the government contractor defense is not a grant of immunity and that the district court denied summary judgment on the basis of a disputed issue of material fact, we dismiss this appeal.

[HN5] In general, the government contractor defense shields contractors from tort liability in state or federal actions where plaintiffs allege they sustained injuries as a result of exposure to defective products or equipment manufactured or supplied under a government

Case MDL No. 875 Document 8189-3 Filed 12/09/11 Page 16 of 17

Page 6

627 F.3d 1259, *; 2010 U.S. App. LEXIS 24430, **;
CCH Prod. Liab. Rep. P18,541

contract. In *Boyle*, the Supreme Court stated that the government contractor defense involved "uniquely federal interests" that could preempt and bar the plaintiffs' state law design-defect claim where the facts supported each of the three elements of the defense. *487 U.S. at 505-14*. To be invoked successfully by a government contractor, the defense requires that:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to [**12] the United States.

*Id. at 512*. Although *Boyle* was limited to design defects, we have held that the government contractor defense also applies to actions involving manufacturing defects. *Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744, 749 n.3. (9th Cir. 1997)*. The Court in *Boyle* noted that "whether the facts establish the conditions for the defense is a question for the jury." *Id. at 514*.

[HN6] Although the source of the government contractor defense is the United States' sovereign immunity, we have explicitly stated that "the government contractor defense does not confer sovereign immunity on contractors." *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall, 355 F.3d 1140, 1147 (9th Cir. 2004)* We reiterated this statement in *Del Campo, 517 F.3d at 1078 n.10*.

Our decision in *Phillips v. E.I. DuPont deNemours & Co. (In re Hanford Nuclear Reservation Litigation), 534 F.3d 986 (9th Cir)*, cert. denied, *129 S. Ct. 762, 172 L. Ed. 2d 754 (2008)*, is in accord. There we held that, because the government contractor defense was not well established when Congress enacted the Price-Anderson Act, it did not apply to the claims there in issue. *Id. at 1002*. We noted, in passing, that [HN7] the defense "allows a contractor-defendant [**13] to *receive the benefits* of sovereign immunity *when a contractor complies* with the specifications of a [*1266] federal government contract." *Id. at 1000* (emphasis added). This wording implicitly recognizes our consistent position that the government contractor defense is not a grant of immunity but is only a corollary financial benefit flowing from *the government's* sovereign immunity.

The government contractor defense applies only when a contractor meets its burden of establishing three facts: (1) the United States set forth "reasonably precise specifications"; (2) "the equipment conformed to those specifications"; and (3) the supplier provided the United States with adequate warnings of the dangers. *Boyle, 487 U.S. at 512*. Here, there is no proof to establish as a matter of law that the equipment conformed to the government's precise specifications. In fact, the plaintiffs' expert determined that the premature explosion was caused by a defect in the cartridge body, voiding or cracking in the high explosive filling, or a foreign body in the high explosive filling. This evidence could allow a finding of noncompliance with the government's precise specifications.

There is evidence from which the [**14] factfinder could conclude that General Dynamics complied with the government's specifications, in which case General Dynamics will be entitled to the government contractor defense. However, contrary evidence also appears in the record and, until the requisite facts are determined, General Dynamics is not entitled to the government contractor defense.

Once the relationship of the government contractor defense to the underlying claims is understood, it is clear that the district court's order does not qualify for an interlocutory appeal under the collateral order doctrine. The denial of the government contractor defense at the summary judgment stage does not conclusively determine General Dynamics' liability or even determine whether it is entitled to the government contractor defense. Also, the ruling does not resolve any "important issue completely separate from the merits of the action." *Coopers & Lybrand, 437 U.S. at 468*. Questions as to the government's specifications and as to General Dynamics' conformance with those specifications go to the heart of Plaintiffs' claims for negligence and strict liability, as well as to General Dynamics' assertion of the government contractor defense. [**15] Finally, the trial court's denial of the government contractor defense will be reviewable on appeal from a final judgment. In contrast, the denial of a claim of qualified immunity is not fully correctable on appeal from a final judgment because immunity includes the right not to be required to go to trial, as well as a defense against a judgment. *See, e.g., Mitchell, 472 U.S. at 525-27; Mueller v. Auker, 576 F.3d 979, 987 (9th Cir. 2009)*.

Even if we were to treat the government contractor defense as a claim of qualified immunity, we could not grant General Dynamics relief. "Our jurisdiction to review an interlocutory appeal of a denial of qualified immunity . . . is limited exclusively to questions of law." *Wilkinson v. Torres, 610 F.3d 546, 550 (9th Cir. 2010)*. Here, the district court's denial of summary judgment rested on its finding that there is a disputed issue of material fact as to whether the cause of the explosion was double loading, a defect in the cartridge at the manufac-

Case MDL No. 875 Document 8189-3 Filed 12/09/11 Page 17 of 17

Page 7

627 F.3d 1259, *; 2010 U.S. App. LEXIS 24430, **;
CCH Prod. Liab. Rep. P18,541

turing stage, or some other cause. This ruling raises factual issues, rather than legal questions, and thus would not be reviewable on interlocutory appeal. *See Rodriguez, 605 F.3d at 707.*

### III.

We also decline [**16] General Dynamics' request that its notice of appeal be [*1267] treated as a petition for writ of mandamus to resolve the *Boyle* defense on the merits. [HN8] "The writ of mandamus is an 'extraordinary' remedy limited to 'extraordinary' causes." *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court (Cebull), 408 F.3d 1142, 1146 (9th Cir. 2005)* (quoting *Cheney v. U.S. Dist. Court, 542 U.S. 367, 380, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (2004)).* We treat an appeal as a writ of mandamus "only [in] exceptional circumstances amounting to a judicial 'usurpation of power,'" or where a "clear abuse of discretion[ ] will justify the invocation of this extraordinary remedy." *Cheney, 542 U.S. at 380* (citation omitted). Although "[w]e may treat an appeal from an otherwise nonappealable order as a petition for a writ of mandamus," "[w]hether we construe the appeal as a writ of mandamus depends on whether mandamus is itself justified." *Hernandez v. Tanninen, 604 F.3d 1095, 1099 (9th Cir. 2010)* (citation omitted).

[HN9] The court will issue the writ only under very limited circumstances:

> [W]e review the district court's orders, not for an abuse of discretion, but for clear error. Under this standard, we will only issue the writ for usurpation of judicial power [**17] or a clear abuse of discretion. Five "objective principles" guide the inquiry: whether (1) [the appealing party] has no other adequate means, such as direct appeal, to attain the relief, (2) he will be damaged or prejudiced in a way not correctable on appeal, (3) the district court's order is clearly erroneous as a matter of law, (4) the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules, or (5) the district court's order raises new and important problems, or issues of law of first impression.

*Cordoza v. Pac. States Steel Corp., 320 F.3d 989, 998 (9th Cir. 2003)* (citations omitted). Not every factor must be satisfied, and the court may deny the petition even where the factors are satisfied, because granting the writ is discretionary. *See, e.g., San Jose Mercury News, Inc. v. U.S. Dist. Court (Ware), 187 F.3d 1096, 1099 (9th Cir. 1999).*

Here no extraordinary circumstances justify issuance of a writ. As we have noted, the government contractor defense does not confer an immunity from suit, the district court's finding of a genuine issue of material fact is not clearly erroneous, and General Dynamics has not shown that it will be damaged [**18] in a manner not correctable on appeal. Rather, General Dynamics retains the right to raise the government contractor defense both at trial and on appeal from a final order of the district court. *See Cordoza, 320 F.3d at 998.*

### IV.

We dismiss this appeal for lack of jurisdiction. Consistent with our prior decisions, we hold that [HN10] the government contractor defense does not confer absolute or qualified immunity. Accordingly, the denial of a motion for summary judgment based on the government contractor defense is not usually appealable under the collateral order doctrine. Certainly, the district court's order in issue here, grounded on genuine issues of material fact, is not immediately appealable. General Dynamics has also failed to make the type of extraordinary showing required for us to treat its appeal as a petition for an extraordinary writ of mandamus. The appeal is

**DISMISSED.**