# Exhibit E

1    James L. Oberman, Esq. (C.S.B. #120938)
     Ian A. Rivamonte, Esq. (C.S.B. #232663)
2    KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
     A Professional Law Corporation
3    Jack London Market
     55 Harrison Street, Suite 400
4    Oakland, California  94607
     Telephone:  (510) 302-1000

5

6    Attorneys for Plaintiffs

7

8                IN THE UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10   JAMES DEASON and MARY DEASON, | No. 11-cv-05667 (JSW) |
| 11           Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND** |
| 12       vs. | **MOTION TO IMMEDIATELY REMAND DYING PLAINTIFF'S LIVING-** |
| 13   A.W. CHESTERTON COMPANY, et al., | **MESOTHELIOMA CASE TO CALIFORNIA SUPERIOR COURT** |
| 14           Defendants. | Date:       March 2, 2012 |
| 15 | Time:      9:00 a.m. |
| 16 | Courtroom:   Hon. Jeffrey S. White<br>Courtroom 11, 19th Floor |

17        TO DEFENDANT NATIONAL STEEL AND SHIPBUILDING COMPANY, AS WELL

18   AS TO ALL OTHER DEFENDANTS, AND THEIR ATTORNEYS OF RECORD HEREIN:

19        NOTICE IS HEREBY GIVEN THAT, on March 2, 2012, or as soon as this matter may be

20   heard in the courtroom of the Honorable Jeffrey S. White, located at 450 Golden Gate Avenue,

21   Courtroom 11, 19th floor in San Francisco, California, **gravely ill and dying** plaintiff James

22   Deason and his wife, plaintiff Mary Deason, will, and hereby do, move the Court on an expedited

23   basis for an order remanding this case to the Superior Court of California, County of Alameda,

24   pursuant to 28 U.S.C. § 1442(a)(1).  By this motion, plaintiffs seek the immediate remand of this

25   action to the Superior Court of California, County of Alameda on the ground that **plaintiffs waive**

26   **all claims against removing defendant National Steel and Shipbuilding Company**

27   **("NASSCO") stemming from James Deason's asbestos exposure from any federal-**

28   **government job-site, and from Navy ships or any other military vessel.  In fact, James**

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

EXHIBIT __E__

1 | **Deason was exposed to asbestos only from commercial, non-Navy ships at the private**

2 | **NASSCO shipyard.**   Therefore, plaintiffs' claims against NASSCO will be – and are – limited to

3 | James Deason's asbestos exposures from commercial, non-military vessels that were designed,

4 | manufactured or otherwise serviced at NASSCO's privately-owned shipyard, and from

5 | NASSCO's own failure to warn and negligent exercise of retained control of its premises.

6 | Plaintiffs' waiver compels remand because it moots NASSCO's military-contractor defense.

7 | Thus, this action involving a plaintiff who is dying from asbestos-caused sarcomatoid

8 | mesothelioma must be remanded as quickly as possible.

9 | The motion is based on this Notice; the accompanying Memorandum of Points and

10 | Authorities; the Declaration of James Deason; the Declaration of Ian A. Rivamonte and attached

11 | exhibits thereto; the attached proposed order; the files and records in this case; and such evidence

12 | and argument as is made and presented at the hearing of this motion.

13 |

14 | DATED:  December 5, 2011                    Respectfully submitted,

15 |                                             KAZAN, McCLAIN, LYONS,
16 |                                             GREENWOOD & HARLEY
                                                A Professional Law Corporation
17 |

18 |                                             By:   _____
                                                      Ian A. Rivamonte

19 |                                             Attorneys for Plaintiffs

20 |

21 |

22 |

23 |

24 |

KAZAN, McCLAIN, 25
LYONS,
GREENWOOD & 26
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, 27
SUITE 400
OAKLAND, CA 94607
(510) 302-1000 28
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

1  James L. Oberman, Esq. (C.S.B. #120938)
   Ian A. Rivamonte, Esq. (C.S.B. #232663)
2  KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
   A Professional Law Corporation
3  Jack London Market
   55 Harrison Street, Suite 400
4  Oakland, California 94607
   Telephone: (510) 302-1000
5
6  Attorneys for Plaintiffs
7
8                    IN THE UNITED STATES DISTRICT COURT
9               FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

| JAMES DEASON and MARY DEASON, | No. 11-cv-05667 (JSW) |
|---|---|
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO IMMEDIATELY REMAND DYING PLAINTIFF'S LIVING-MESOTHELIOMA CASE TO CALIFORNIA SUPERIOR COURT** |
| vs. | |
| A.W. CHESTERTON COMPANY, et al., | |
| Defendants. | |
| | Date:        March 2, 2012 |
| | Time:        9:00 a.m. |
| | Courtroom: Hon. Jeffrey S. White |
| | Courtroom 11, 19th Floor |

11
12
13
14
15
16
17
18
19
20
21
22
23
24

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

25
26
27
28

IRIVAMONTE/1061656.4

## I.   INTRODUCTION

Plaintiff James Deason is expected to die imminently of asbestos-caused sarcomatoid mesothelioma and, under California law, will lose his right to recover his obviously substantial pain-and-suffering damages arising from his illness if his case is not tried while he remains alive. In an obvious attempt to deprive Mr. Deason of this right and a trial in his precious few remaining days, National Steel and Shipbuilding Company ("NASSCO") has filed a Notice of Removal to this Court even before the parties have deposed Mr. Deason.  But NASSCO does not and cannot assert a colorable military-contractor defense in this action because James Deason attests in his accompanying declaration that his asbestos-exposure claims against NASSCO stem only from his work on three commercial, <u>non-military</u> merchant ships.  Accordingly, and in any event, **plaintiffs waive all claims against NASSCO stemming from James Deason's asbestos exposure from any federal-government job-site, and aboard Navy ships or any other military vessel**, in order to ensure that this case is promptly remanded to California Superior Court, where this lawsuit may be tried within the remaining weeks Mr. Deason has to live.[1]  As Mr. Deason's physician attests in her declaration supporting the contemporaneously filed motion to expedite the hearing of this remand motion, Mr. Deason has perhaps two months left to live.

Plaintiffs' proposed waiver is itself sufficient to eliminate NASSCO's grounds for removal and compels remand because the waiver moots NASSCO's military-contractor defense.  In fact, Your Honor in *Madden v. A.H. Voss Co.*, 2009 WL 3415377 (N.D. Cal. Oct. 21, 2009), as well as various other judges of the Northern District of California in a number of orders, have given effect to such a waiver and, on that basis, remanded plaintiffs' asbestos-related lawsuits to state court. As there is no alleged or actual exposure for which NASSCO can be liable relating to Navy or military vessels, or to any premises under federal control, there is no claim for which a military-contractor defense is available to NASSCO.  Thus, because this Court has no subject-matter jurisdiction over this dying mesothelioma patient's personal-injury action, this case must be

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

---

[1]  Plaintiffs do not concede that NASSCO has raised a colorable military-contractor defense.  Nevertheless, plaintiffs do not address herein the substance of NASSCO's showing because plaintiffs' proffered waiver independently compels remand, rendering such analysis unnecessary.

1    remanded as soon as possible.

2       NASSCO's true motive in removing this case to federal court is to delay the terminally ill

3    James Deason from prosecuting his lawsuit in the transparent hope he will die before his

4    deposition, but certainly well before his case can be tried.  For it is only in California state court

5    that this case may be set for a trial that will commence no later than 120 days after plaintiffs'

6    calendar-preference motion is granted.  [Cal. Code Civ. Proc. § 36, subds. (d) and (f).]  And if Mr.

7    Deason dies before his lawsuit proceeds to trial, he not only loses his day in court, but his estate

8    and successor-in-interest lose the substantial damages to which Mr. Deason is entitled for the pain,

9    suffering and disfigurement that have been inflicted upon him by his sarcomatoid mesothelioma.

10   [Cal. Code Civ. Proc. § 377.34.]

11   **II.      STATEMENT OF ISSUE TO BE DECIDED**

12          A.    Does plaintiffs' waiver of all claims against NASSCO arising out of James
             Deason's exposure to asbestos from any federal-government job-site, and from
13          Navy ships or any other military vessel, warrant remanding this action to state court
             when plaintiffs' waiver effectively limits their claims against NASSCO to work
14          done on private ships and on private premises, instead of any ship or premise where
             work was done under the direction of any federal officer (and no evidence exists of
15          work done at any federal-government job-site and aboard Navy ships or any other
             military vessel involving NASSCO)?

16

17   **III.     STATEMENT OF FACTS**

18          **A.    Plaintiff James Deason is Dying of Sarcomatoid Mesothelioma**

19          Plaintiff James Deason has been diagnosed with mesothelioma, an asbestos-caused and

20   incurable cancer.  [Deason Decl. at ¶ 2; and Exhibits to Rivamonte Decl.: Dr. Broaddus Decl. (Ex.

21   1) at ¶¶ 1-4; American Cancer Society's "Mesothelioma Overview" (Ex. 2) at pp. 1-4, 10, 17, 20;

22   Article from the Journal *Chest* (Ex. 3) at p. 109; and Complaint (Ex. 4) at 4:26-5:15.][2]

23   Mesothelioma patients have a grim prognosis and the disease is invariably fatal.  [*Id.*]

24          As will be more fully set forth in plaintiffs' forthcoming motion to have their remand

25   motion heard on shortened time, the physician who examined James Deason and extensively

26   reviewed his medical records, V. Courtney Broaddus, M.D., attests in her declaration that Mr.

27   Deason's mesothelioma has metastasized and estimates that Mr. Deason will die of his illness

28   _____
     [2]  All exhibits are attached to the accompanying Rivamonte Declaration.

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

1  within approximately two months. [Rivamonte Decl. at ¶ 2 and attached Ex. 1 thereto at ¶¶ 1-17.]

2  According to the American Cancer Society, the sarcomatoid mesothelioma that afflicts Mr.

3  Deason is the second rarest form of mesothelioma, with about 1 to 2 out of 10 mesotheliomas

4  being of this type. [American Cancer Society's "Mesothelioma Overview," Ex. 2 at p. 2.] Persons

5  diagnosed with sarcomatoid mesothelioma have a far worse prognosis compared to persons with

6  other types of mesotheliomas, thus making sarcomatoid the worst type of mesothelioma. [Dr.

7  Broaddus Decl. (Ex. 1) at ¶ 16 and Article from the Journal *Chest* (Ex. 3) at pp. 110, 113-114.]

8  **B.     Plaintiffs' Allegations Against NASSCO**

9      On October 24, 2011, plaintiffs filed their first amended personal-injury complaint in

10  California state court against a number of defendants who are alleged to have exposed plaintiff

11  James Deason to asbestos that was a legal cause of his mesothelioma. [Complaint, Ex. 4 at 2:7-

12  29:28.] In part, plaintiffs in their complaint allege that Mr. Deason was exposed to asbestos at

13  a number of locations, including at NASSCO's shipyard, while he "repaired, broke down and

14  rebuilt boilers aboard commercial ships and U.S. Navy ships" from approximately 1975 through

15  1985. [*Id.* at 4:16-24, 8:2-4, 21:19-21, 26:13-14, 28:9-10.]

16      NASSCO is named as a defendant in all 13 of the complaint's causes of action, including,

17  among others, those alleging strict products liability (consumer-expectations and failure-to-warn

18  defects) and premises liability (failure to warn and negligent exercise of retained control). [*Id.* at

19  2:7-6:21, 7:23-10:18, 21:8-29:28.] First, the complaint pleads, under a design-defect theory, that

20  NASSCO defectively designed asbestos-containing products that did not perform as safely as an

21  ordinary consumer would have expected them to perform. [*Id.* at 8:2-25, 9:4-10.] Second, under

22  failure-to-warn theories, the complaint pleads that NASSCO's asbestos-containing products lacked

23  sufficient instructions and warnings about potential asbestos-related hazards and, further, that

24  NASSCO intentionally concealed such hazards. [*Id.* at 8:2-25, 9:12-19.] Finally, the complaint's

25  premises-liability causes of action allege that NASSCO: (1) owned, maintained and/or controlled

26  the premises where Mr. Deason worked; (2) caused certain asbestos-containing products to be

27  specified and used at its premises either by its own workers or various independent contractors; (3)

28  failed to warn of such dangerous conditions on its premises; and (4) negligently hired contractors

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

1   on its premises who were unfit or unqualified to handle asbestos-containing products. [*Id.* at 21:8-

2   28:1.] In sum, NASSCO's defective design of its asbestos-containing products and its failure to

3   warn Mr. Deason of asbestos-related hazards associated with its products and control of its

4   premises were the legal cause of Mr. Deason's mesothelioma. [*Id.* and 7:23-10:18.]

5        NASSCO filed its Notice of Removal of this action on November 23, 2011. [Notice of

6   Removal, Doc. No. 1.] James Deason has yet to be deposed, and no party thus far has propounded

7   or responded to any case-specific discovery. [Rivamonte Decl. at ¶ 3.][3] No other defendant has

8   asserted that this Court has subject-matter jurisdiction over this case, filed its own notice of

9   removal or joined in NASSCO's notice of removal. [*Id.*]

10       **C.   NASSCO Builds and Repairs All Types of Commercial Ships**

11       NASSCO is one of three private shipyards in the Marine Systems group of General

12   Dynamics Corporation. [NASSCO Website (Ex. 5) at pp. 1 and Excerpts of General Dynamics'

13   Form S-4 (Ex. 7) at pp. 4, 35.] In part, NASSCO in its November 10, 1959 Articles of

14   Incorporation states that the nature of its business is to build, equip and sell:

15       [S]hips, vessels and boats of every nature and kind whatsoever, together with all
         materials, articles, tools, machinery and appliances entering into or suitable and
16       convenient for the constructions, maintenance, repair or equipment thereof, together
         with engines, boilers, machinery, appurtenances, tackle, apparel and furniture of all
17       kinds . . .

18   [Ex. 7 to Rivamonte Decl.: Excerpts of General Dynamics' Form S-4 at pp. 4, 35, 100, and

19   attached Ex. 3.27 thereto, NASSCO's 1959 Articles of Incorporation, at p. 1.]

20       NASSCO has been designing and building commercial and Navy ships since 1960.

21   [NASSCO's Website, Ex. 5 at p. 1.] According to NASSCO itself (on its website), NASSCO at

22   its shipyard in San Diego, California is "capable of building commercial cargo ships and tankers ...

23   ─────────────────────

24   [3] Plaintiffs are unable to conduct any discovery in this action because such conduct may
     constitute a waiver of plaintiffs' procedural remand arguments. [*See Financial Timing
25   Publications, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 940 (8th Cir. 1990) (plaintiff
     waived its procedural remand arguments because it participated in discovery); *Lanier v.
26   American Board of Endodontics*, 843 F.2d 901, 905 (6th Cir. 1988) (same); *Johnson v.
     Odeco Oil and Gas Co.*, 864 F.2d 40, 42 (5th Cir. 1989) (the plaintiff waived his procedural
27   remand arguments because he attended depositions noticed by others); and *Harris v.
     Edward Hyman Co.*, 664 F.2d 943, 944-945 (5th Cir. 1981) (plaintiff waived her procedural
28   remand arguments because she proceeded with discovery).]

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  and servicing or repairing any vessel sailing on the West Coast of the United States." [*Id.* at p. 2.]

2        NASSCO has "aggressively" pursued the commercial-ship-repair aspect of its business.

3  [*Id.* at p. 3.] As NASSCO touts on its website, it is "a leading commercial ship designer and

4  shipbuilder in the [United States]" and is qualified to service or repair any commercial vessel on

5  the West Coast of the United States. [*Id.* at pp. 3-6.] By its own admission, NASSCO "has been

6  responsible for the design and construction of 53 commercial ships since 1960." [*Id.* at p. 6.]

7  Among the types of commercial ships NASSCO manufactured and sold during the mid-1970s and

8  early 1980s – when James Deason was present at the NASSCO shipyard working on commercial

9  ships – were oil tankers, ferries and cargo ships. [Commercial Ship Portfolio, Ex. 6 at pp. 2-4.]

10       **D.**    **All of James Deason's Asbestos-Exposure Claims Against NASSCO Stem from**

11            **His Work on Non-Military, Civilian Merchant Ships**

12        Plaintiff James Deason makes clear in his accompanying declaration in support of

13  plaintiffs' motion that the <u>only</u> ships on which he worked at NASSCO's privately-owned and

14  operated shipyard were <u>commercial</u>, <u>non-military</u> merchant ships. [Deason Decl. at ¶¶ 5-6;

15  NASSCO Website (Ex. 5) at pp. 1 and Excerpts of General Dynamics' Form S-4 (Ex. 7) at pp. 4,

16  35.] At certain times between the mid-1970s and early 1980s, Mr. Deason did boiler-related work

17  aboard ships. [Deason Decl. at ¶ 3.] During those years, he and several other tradesmen

18  "jumboized"[4] three commercial, non-military merchant ships at NASSCO's shipyard in San

19  Diego, California. [*Id.* at ¶¶ 4-5.] At no time while Mr. Deason worked at NASSCO was he ever

20  involved in any project involving a Navy or any other United States military vessel. [*Id.* at ¶ 6.]

21  Other than the three commercial, non-military merchant ships, he did no work on any other ships

22  at NASSCO. [*Id.*]

23        Thus, James Deason's alleged exposure to asbestos for which NASSCO is responsible is

24  limited to <u>purely</u> non-military vessels that were present at NASSCO's privately-owned and

25  operated shipyard. [Deason Decl. at ¶¶ 1-6; NASSCO Website (Ex. 5) at pp. 1 and General

26  Dynamics' Form S-4 (Ex. 7) at pp. 4, 35.] Lest there be any doubts about Mr. Deason's

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

27

28

---

4  To "jumboize" a ship means that the ship was lengthened by either replacing an existing
section of the ship with a longer section, or by inserting an additional section to the ship.
[Deason Decl. at ¶ 5.]

IRIVAMONTE/1061656.4

1   attestations, plaintiffs waive their asbestos-exposure claims against NASSCO that may in any way

2   stem from Mr. Deason's work on any Navy or other U.S. military-owned vessel or premises.

3   [Rivamonte Decl. at ¶ 3.] Hence, plaintiffs will proceed against NASSCO solely on their asbestos-

4   exposure claims stemming from Mr. Deason's work on non-military, civilian ships at the private

5   NASSCO shipyard. [*Id.*]

6   **IV.    PLAINTIFFS' WAIVER OF ANY PURPORTED MILITARY CLAIMS AGAINST
        NASSCO ELIMINATES THIS COURT'S JURISDICTION AND COMPELS**

7   **REMAND**

8           NASSCO is wrong when it states in its Notice of Removal that "without the federal

9   government having asked NASSCO to build and/or repair its ships, Plaintiffs would not have a

10  claim against [NASSCO]." [Notice of Removal, Doc. No. 1 at ¶ 22.] First, plaintiffs in their

11  complaint state that their claims against NASSCO do involve commercial ships. [Complaint, Ex.

12  4 at 4:16-24, 8:2-4, 21:19-21, 26:13-14, 28:9-10.] Second, in his accompanying declaration,

13  plaintiff James Deason makes it even clearer that plaintiffs' claims against NASSCO stem <u>only</u>

14  from his work on three commercial, non-military merchant ships that were jumboized at NASSCO

15  between the mid-1970s and early 1980s. [Deason Decl. at ¶¶ 1-6.] Thus, **plaintiffs waive all**

16  **their claims against NASSCO stemming from Mr. Deason's asbestos exposures at any**

17  **federal-government job-site, and aboard Navy ships or any other military vessel (and no**

18  **evidence exists that James Deason ever worked on any Navy and/or U.S. military ships at the**

19  **private NASSCO shipyard).** [Rivamonte Decl. at ¶ 3.] In fact, Your Honor gave effect to such

20  waiver in his order granting plaintiffs' motion to remand in *Madden v. A.H. Voss Co.*, 2009 WL

21  3415377, **2-3 (N.D. Cal. Oct. 21, 2009), because the plaintiff in *Madden* waived all claims

22  against the removing defendant for "plaintiff's asbestos exposure at military and federal

23  government jobsites and aboard U.S. Navy vessels." Plaintiffs' waiver in this action requires this

24  Court to remand this case to state court because it divests the Court of subject-matter jurisdiction

25  over plaintiffs' state-law-based claims against NASSCO for Mr. Deason's exposure to asbestos

26  from civilian vessels manufactured or serviced at NASSCO's private shipyard.

27          "Federal courts are courts of limited jurisdiction and they possess only that power

28  authorized by Constitution and statute." [*Kokkonen v. Guardian Life Ins. Co. of America*, 511

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1  U.S. 375, 377 (1994).] Several orders have issued from the Northern District of California,

2  including, among others, *Westbrook v. Asbestos Defendants (BHC)*, 2001 WL 902642 (N.D. Cal.

3  July 31, 2001) and *Madden*, 2009 WL 3415377, holding that plaintiff's waiver of his military-

4  based claims against the removing defendant, even if made post-removal, is entirely valid and

5  warrants remanding the case because the waiver conclusively eliminates the federal district court's

6  subject-matter jurisdiction over the action.

7      In *Westbrook*, removing defendant Todd Shipyards ("Todd") invoked the federal-officer-

8  removal statute and the military-contractor defense because of plaintiff's claims that he was

9  exposed to asbestos on Todd's property and from his work aboard Navy ships that were serviced at

10  Todd's shipyard. [*Westbrook*, 2001 WL 902642, *1.] In their suit against Todd, the *Westbrook*

11  plaintiffs alleged only claims for loss of consortium and premises liability, while plaintiffs asserted

12  numerous other causes of action against the other defendants. [*Id.*] In their reply to Todd's

13  opposition to their remand motion, the *Westbrook* plaintiffs expressly excluded from their claims

14  all "asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels."

15  [*Id.* at *2.] Relying on *Overly v. Raybestos Manhattan*, 1996 WL 532150, *3 (N.D. Cal. Sept. 9,

16  1996), the federal district court held that plaintiffs' written disclaimer eliminated Todd's military-

17  contractor defense because plaintiffs' remaining claims against Todd arose "only from work done

18  on private ships, not under the direction of any federal officers." [*Id.* at *3.] Holding the plaintiffs

19  to their written disclaimer, the district court granted their motion to remand. [*Id.* at **3-4.]

20      This Court's October 21, 2009 order granting plaintiffs' remand motion in *Madden*, 2009

21  WL 3415377, **2-3, followed the holding in *Westbrook* and *Dobrocke v. Allis-Chalmers Corp.*

22  *Product Liability Trust*, 2009 WL 1464153, *2 (N.D. Cal. May 26, 2009), and remanded the

23  plaintiff's action to state court because he expressly waived all of his asbestos-exposure claims

24  against the removing defendant "at military and federal government jobsites and aboard U.S. Navy

25  vessels." In so holding, this Court in *Madden* distinguished plaintiff's sufficient waiver of claims

26  against the removing defendant in *Westbrook* and *Dobrocke* with those decisions where the

27  plaintiff's waiver of claims against the removing defendant was deemed insufficient because the

28  plaintiff still sought to assert state-law failure-to-warn claims arising out of the plaintiff's work on

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

1   military vessels or military-specified equipment against the removing defendant. [*Madden*, 2009

2   WL 3415377, *3 (distinguishing *Westbrook* from: *O'Connell v. Foster Wheeler Energy Corp.*, 544

3   F.Supp.2d 51 (D. Mass. 2009); *Ballenger v. Agco Corp.*, 2007 WL 1813821 (N.D. Cal. June 22,

4   2007); *Jenkins v. Allied Packing & Supply, Inc.*, Case No. 09-cv-0101 DMS (LSP) (S.D. Cal.

5   March 25, 2009); *Oberstar v. CBS Corp.*, 2008 U.S. Dist. LEXIS 14023, (C.D. Cal. Feb. 11,

6   2008); *Nelson v. Alfa Laval, Inc.*, No. C 07-8338 VBF (C.D. Cal. Feb. 8, 2008); *Wright v. A.W.

7   Chesterton Co.*, 2008 WL 512728 (N.D. Cal. Feb. 25, 2008); and *Reaser v. Allis Chalmers Corp.*,

8   2008 U.S. Dist. LEXIS 112344 (C.D. Cal. June 23, 2008)).] Thus, this Court in *Madden* held that

9   remand of plaintiff's case back to state court was warranted because the Court saw ". . . 'no reason

10   [not] to hold plaintiff[ ] to [his] waiver of claims arising out of work done on federal jobsites and

11   vessels' against [removing defendant] Leslie Controls.'" [*Madden*, 2009 WL 3415377, *2.]

12          In numerous other decisions, various judges of this Court have followed the holding in

13   *Westbrook*, *Madden* and *Dobrocke*, and granted remand because the plaintiff had expressly waived

14   all military-based claims against the removing defendant. [*Powers v. Allis-Chalmers Corp.

15   Product Liability Trust*, 2010 WL 2898287, *2 (N.D. Cal. July 21, 2010) (plaintiff's waiver of all

16   asbestos-exposure claims against the removing defendant at military and federal government

17   jobsites, and aboard Navy vessels, was sufficient to remand entire action to state court); *Ball v.

18   Asbestos Defendants (BP)*, No. C 09-4929 PJH (N.D. Cal. Jan. 22, 2010)[5] (same); and *Pratt v.

19   Asbestos Corp. Ltd.*, 2011 WL 4433724, *1 (N.D. Cal. Sept. 22, 2011) (same; following the

20   holdings in *Westbrook*, *Dobrocke*, *Madden* and *Ball*).]

21          Here, plaintiffs' waiver of all of their claims against NASSCO arising out of James

22   Deason's asbestos exposure at any federal-government job-site, and while he was aboard Navy

23   ships or any other military vessel, "is equally as comprehensive" as the plaintiffs' waivers in

24   *Westbrook*, *Madden*, *Dobrocke*, *Powers*, *Ball* and *Pratt*. [*Id.*] NASSCO asserts only the federal-

25   officer removal statute as the basis on which this Court purportedly has subject-matter jurisdiction

26   over this action. But James Deason in his declaration makes plain that his only asbestos-exposure

27   claims against NASSCO arise only from his work jumboizing three commercial, non-military

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

28

_____
[5]  A true and correct copy of the remand order in *Ball* is attached as Exhibit 8.

1  merchant ships between the mid-1970s and early 1980s. [Deason Decl. at ¶¶ 1-6.] NASSCO is a

2  privately-owned shipyard, rather than a military or federal-government job-site, and NASSCO

3  admits that it is "a leading commercial ship designer and shipbuilder in the [United States]."

4  [NASSCO and General Dynamics Documents, Exhibits 5-6.] The fact that NASSCO did

5  manufacture and service Navy ships is irrelevant in this action because Mr. Deason attests that he

6  did no work on Navy ships at any time while he was at NASSCO and plaintiffs have waived their

7  military-based claims against NASSCO, which moots NASSCO's assertion of the military-

8  contractor defense. [*See Westbrook*, 2001 WL 2001 WL 902642, **2-3; *Madden*, 2009 WL

9  3415377, **2-3.] Clearly, NASSCO has no colorable military-contractor defense in this action

10  because Mr. Deason worked only aboard private ships at a private shipyard that were not under the

11  direction of any federal officers.

12       Therefore, plaintiffs' waiver divests this Court of subject-matter jurisdiction over this case,

13  thus requiring this Court to remand this case to state court, where plaintiffs may still assert state-

14  law-based claims against NASSCO for James Deason's exposure to asbestos while he was aboard

15  only civilian, rather than military, vessels, and while he was present at NASSCO's **private**

16  shipyard. [*Westbrook*, 2001 WL 902642, **2-3.] Plaintiffs' waiver is irrevocable, but to the

17  extent NASSCO argues it may not be, if plaintiffs "later attempt to reverse course, and are allowed

18  to do so by the state court despite their express waiver," NASSCO "can file for removal once

19  again." [*Id.* at *3; *Madden*, 2009 WL 3415377, *3; *Powers*, 2010 WL 2898287, *2; *Pratt*, 2011

20  WL 4433724, *2.][6]

21  **V.    CONCLUSION**

22       Plaintiffs' waiver of all their claims against NASSCO stemming from James Deason's

23  exposure to asbestos from any **military** vessel and at any federal-government job-site is full and

24

---

25  [6] As previously noted, no defendant has joined in NASSCO's removal of this action or in
   any way implicated or sought to invoke this Court's subject-matter jurisdiction.
26  [Rivamonte Decl. at ¶ 3.] Thus, there is no basis for this Court to exercise jurisdiction over
   this action because plaintiffs' waiver moots all claims as to which NASSCO contends this
27  Court has original jurisdiction. [28 U.S.C. § 1367(c)(3).] Nor is the "specter of potential
   cross-claims against" NASSCO a basis upon which this Court may deny plaintiffs' remand
28  motion. [*See Pratt*, 2011 WL 4433724, *2.]

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

1   complete (and there is no evidence that NASSCO exposed James Deason to asbestos aboard any

2   military ship or at any federal facility).  NASSCO may not interpose a military-contractor defense

3   to a non-existent claim, nor may jurisdiction be sustained on a theory plaintiffs have not advanced.

4   There is simply no military-contractor defense applicable to plaintiffs' case against NASSCO and

5   remand is entirely appropriate.  Thus, the Court must immediately remand this case to state court,

6   where state law enables the gravely and terminally ill James Deason to obtain a trial of his case

7   while he is still alive and within a matter of months.  [Cal. Code Civ. Proc. § 36.]

8

9   DATED:  December 5, 2011           Respectfully submitted,

10                                     KAZAN, McCLAIN, LYONS,
                                       GREENWOOD & HARLEY
11                                     A Professional Law Corporation

12                                     By: _____
13                                           Ian A. Rivamonte

14                                     Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

KAZAN, McCLAIN,   25
LYONS,
GREENWOOD &       26
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,   27
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728   28
FAX (510) 835-4913

_____
                Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Remand
                Case No.: 11-cv-05667 (JSW)                                            10

1  James L. Oberman, Esq. (C.S.B. #120938)
   Ian A. Rivamonte, Esq. (C.S.B. #232663)
2  KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY
   A Professional Law Corporation
3  Jack London Market
   55 Harrison Street, Suite 400
4  Oakland, California  94607
   Telephone:  (510) 302-1000
5
   Attorneys for Plaintiffs
6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
   JAMES DEASON and MARY DEASON,          No. 11-cv-05667 (JSW)
11
              Plaintiffs,                  **DECLARATION OF IAN A. RIVAMONTE IN**
12                                         **SUPPORT OF PLAINTIFFS' MOTION TO**
                                           **IMMEDIATELY REMAND DYING**
13     vs.                                 **PLAINTIFF'S LIVING-MESOTHELIOMA**
                                           **CASE TO CALIFORNIA SUPERIOR COURT**
   A.W. CHESTERTON COMPANY, et al.,
14
              Defendants.                  Date:      March 2, 2012
15                                         Time:      9:00 a.m.
                                           Courtroom: Hon. Jeffrey S. White
16                                                    Courtroom 11, 19th Floor

17          I, Ian A. Rivamonte, declare:

18          1.    I am an attorney licensed to practice in all courts of the State of California and am

19  an associate of Kazan, McClain, Lyons, Greenwood & Harley, a Professional Law Corporation,

20  attorneys of record for the plaintiffs herein. I have personal knowledge of the facts expressed in

21  this declaration and, if asked, could and would testify competently to the truth of those facts.

22          2.    I am one of the attorneys charged with the management of this action and am the

23  attorney charged with principal responsibility for all aspects of plaintiffs' motion to remand. In

24  addition to plaintiffs' motion to remand, plaintiffs will also file a motion to have their remand

25  motion heard on shortened time because of James Deason's rapidly declining health. As more

26  fully set forth in the Declaration of V. Courtney Broaddus, M.D. in support of plaintiffs'

27  forthcoming motion for shortening time, a true and correct copy of which is attached as Exhibit 1

28  hereto and incorporated fully herein by reference, James Deason has sarcomatoid mesothelioma.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

1  Dr. Broaddus further attests that sarcomatoid is the worst type of mesothelioma and that patients

2  diagnosed with sarcomatoid mesothelioma do not live as long as patients with other cell types.

3  Finally, based on her personal examination of Mr. Deason and her review of his medical records,

4  Dr. Broaddus is of the opinion that Mr. Deason's mesothelioma raises a substantial medical doubt

5  that he will survive more than two months beyond December 4, 2011.

6      3.    James Deason has yet to be deposed, and no party has propounded or responded to

7  any discovery in this case.  Also, as of the date plaintiffs' remand motion was filed, no other

8  defendant has asserted federal-officer jurisdiction over this case, filed its own notice of removal or

9  joined in NASSCO's notice of removal.  Accompanying plaintiffs' remand motion is the

10  December 1, 2011 Declaration of James Deason.  Mr. Deason attests in his declaration that the

11  only ships he worked on while he was at the shipyard of defendant National Steel and

12  Shipbuilding Company ("NASSCO") were <u>commercial</u>, <u>non-military</u> merchant ships.  Plaintiffs in

13  their complaint allege, in part, that Mr. Deason was exposed to asbestos for which NASSCO was

14  responsible while he worked on Navy and commercial ships.  Accordingly, and in any event,

15  <u>plaintiffs waive all claims against NASSCO stemming from Mr. Deason's asbestos exposure from</u>

16  <u>any federal-government job-site, and from Navy ships or any other military vessel.</u>

17      4.    Attached as Exhibit 2 hereto, and incorporated fully herein by reference, is a true

18  and correct copy of a document from the American Cancer Society's website entitled "Malignant

19  Mesothelioma Overview."  I downloaded this document from the American Cancer Society's

20  website on December 1, 2011 at Universal Resource Locator http://www.cancer.org/Cancer/

21  MalignantMesothelioma/OverviewGuide/malignant-mesothelioma-overview-pdf.

22      5.    Attached as Exhibit 3 hereto, and incorporated fully herein by reference, is a true

23  and correct copy of the January 1, 1996 article from the journal *Chest*, which is an official

24  publication of the American College of Chest Physicians, entitled "Aspects of Histopathologic

25  Subtype as a Prognostic Factor in 85 Mesotheliomas."  I downloaded a copy of this article from

26  the website of the American College of Chest Physicians on December 1, 2011 at Universal

27  Resource Locator http://chestjournal.chestpubs.org/ content/109/1/109.full.pdf

28      6.    Attached as Exhibit 4 hereto, and incorporated fully herein by reference, is a true

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1   and correct endorsed-filed copy of plaintiffs' October 24, 2011 First Amended Complaint.

2       7.      Attached collectively as Exhibit 5 hereto, and incorporated fully herein by

3   reference, are true and correct copies of excerpts of NASSCO's website.  These excerpts were

4   downloaded from the sections entitled "Who We Are" and "Products and Services" at Universal

5   Resource Locator http://www.nassco.com on November 30, 2011.

6       8.      Attached as Exhibit 6 hereto, and incorporated fully herein by reference, is a true

7   and correct copy of a page from NASSCO's website entitled "Commercial Ship Portfolio." I

8   downloaded this page from NASSCO's website on November 30, 2011 at Universal Resource

9   Locator http://www.nassco.com/products-and-services/comm-dc/commercial-ship-portfolio.html.

10      9.      Attached collectively as Exhibit 7 hereto, and incorporated fully herein by

11  reference, are true and correct copies of all excerpts of General Dynamics Corporation's Form S-4,

12  which was filed with the Securities and Exchange Commission on January 18, 2002, and its

13  accompanying Exhibit 3.27 entitled "Articles of Incorporation of National Steel and Shipbuilding

14  Company." I downloaded these documents from the website of the Securities and Exchange

15  Commission on November 30, 2011 at Universal Resource Locators http://www.sec.gov/Archives/

16  edgar/data/40533/000095013302000174/w56437s-4.htm and http://www.sec.gov/Archives/edgar/

17  data/40533/000095013302000174/w56437ex3-27.txt.

18      10.     Attached as Exhibit 8 hereto, and incorporated fully herein by reference, is a true

19  and correct copy of Judge Phyllis J. Hamilton's January 22, 2010 Order Granting Motion to

20  Remand in *Ball v. Asbestos Defendants (BP)*, United States District Court for the Northern District

21  of California Case No. C 09-4929 PJH.

22      I declare under penalty of perjury under the laws of the State of California and the United

23  States of America that the foregoing is true and correct and that I executed this declaration on

24  December 5, 2011 at Oakland, California.

25

26

27  Ian A. Rivamonte

28

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

IRIVAMONTE/1061656.4

Case MDL No. 875   Document 8238-5   Filed 12/21/11   Page 18 of 133
Exhibit 1 - Declaration of V. Courtney Broaddus, M.D. in Support of Plaintiffs' Motion to Shorten Hearing Time
Case3:11-cv-05667-JSW   Document14-3   Filed12/05/11   Page1 of 7

# Exhibit 1

Exhibit 1 - 1

James L. Oberman, Esq. (C.S.B. #120938)
Gloria C. Amell, Esq. (C.S.B. #230255)
KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, California  94607
Telephone:  (510) 302-1000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES DEASON and MARY DEASON,<br><br>Plaintiffs,<br><br>vs.<br><br>A.W. CHESTERTON CO., et al.,<br><br>Defendants. | Case No. C 3:11-CV-05667 RS<br><br>[Alameda County Superior Court Case No. RG11601088]<br><br>**DECLARATION OF V. COURTNEY BROADDUS, M.D. IN SUPPORT OF PLAINTIFFS' MOTION TO SHORTEN HEARING TIME RE EMERGENCY MOTION TO IMMEDIATELY REMAND ASBESTOS-CANCER CASE TO CALIFORNIA SUPERIOR COURT**<br><br>Dept.: Hon. Richard Seeborg, Courtroom 3, San Francisco<br><br>Action Removed:  November 23, 2011 |

I, V. Courtney Broaddus, M.D., declare:

1.      I am an adult, over the age of 18 years and am not a party to this lawsuit.  I have personal knowledge of the facts set forth in this declaration, except for such facts that have been made known to me in forming an opinion, in which case each such fact is of a type on which professionals in my field reasonably rely in forming such opinions.  The facts stated in this declaration that are within my personal knowledge are true.  If asked, I could and would testify competently to the truth of each fact and opinion asserted within this declaration, as well as to the

GAMELL/1050998.1

1

Exhibit 1 - 2

foundation for each such fact and opinion.

2.      I am a licensed physician in the State of California. I am a Professor of Medicine at the University of California San Francisco. For the last 11 years, I have served as the Chief of the Division of Pulmonary and Critical Care Medicine at San Francisco General Hospital, where I attend regularly on the Pulmonary Consult and ICU services.

3.      In my practice of pulmonary medicine, I have been involved in the diagnosis of many individuals with asbestos-related pleural diseases, including mesothelioma. I am not an oncologist, but am intimately familiar with the cause of mesothelioma and the course of the disease. I do not treat patients with mesothelioma, but know the limitations of chemotherapy and other treatments for the disease. In the last year, I have prepared causation and prognosis reports pertaining to five patients with mesothelioma, and two patients with asbestos-caused lung cancer. Of these, I have personally interviewed and examined two patients, both of whom had mesothelioma, including James Deason. Before the last year, I have also interviewed and examined, then prepared causation and prognosis reports pertaining to six patients with asbestos caused disease, including mesothelioma.

4.      Mesothelioma is a progressive cancer with a grave prognosis that is invariably fatal with no known cure. The interval between diagnosis and death is often short. The risk of adverse effects for Mr. Deason, including death, the probability that severe complications from treatment will occur, and the likelihood of pneumonia, other infections, or unexpected rapid tumor progression, is very high. Death can occur suddenly from complications from treatment, pneumonia, other infections, or unexpected rapid tumor progression.

5.      I examined James Deason on November 22, 2011. I spent approximately 2.5 hours examining him, discussing his personal and work history and discussing the course of his disease. A copy of my report is attached herein as Exhibit A. In conjunction with that visit, I reviewed and

2

Exhibit 1 - 3

evaluated the medical records from Grossmont Hospital, Grossmont Imaging, the Mayo Clinic, UCSF and Dr. William Salyer pertaining to Mr. Deason's diagnosis and treatment of mesothelioma.

6.      In March 2010, Mr. Deason began experiencing severe left-sided chest pains and dizziness. His wife took him to the Grossmont Hospital Emergency Room, where he was evaluated for cardiac disease, a workup that was basically negative. While there, Mr. Deason had a chest x-ray that revealed pleural nodularity, and it was recommended that he have a CT scan. The CT scan showed multiple calcified and non-calcified pleural plaques consistent with asbestos exposure. Mr. Deason was referred to Dr. Kaveh Bagheri, a pulmonologist, who continued to follow Mr. Deason for the next year.

7.      In May 2011, based on Mr. Deason's continuing severe chest pain, new onset shortness of breath and decreased exercise tolerance, he underwent pulmonary function tests which showed a significant decrease in lung function.

8.      On May 20, 2011 Mr. Deason had a chest CT scan with contrast. Compared to the CT scan taken in March 2010, the CT scan now showed increased pleural nodularity and decreased lung volume suggesting an underlying neoplasm (tumor).

9.      Because of the abnormal chest CT scan, Mr. Deason underwent a bronchoscopy with an endobronchial evaluation and diagnostic bronchoalveolar lavage of the left lower lobe on June 3, 2011. A cytologic study from the bronchial washing showed no evidence of any tumor.

10.     Suspecting mesothelioma, Dr. Bagheri ordered an image-guided pleural biopsy. On June 15, 2011, Mr. Deason underwent a CT-guided fine needle aspiration and core biopsy of lobular pleural thickening at the lower left posterior chest. During the biopsy, diffuse left pleural thickening, volume loss, and mediastinal shift to the left was observed.

11.     While the results of the needle biopsy came back negative for malignancy, because

3

Exhibit 1 - 4

of severe circumferential left pleural thickening consistent with mesothelioma, Mr. Deason was

admitted for surgery on June 28, 2011. He underwent a left thoracotomy (incision of the chest

wall). The surgeon encountered a large mass in Mr. Deason's chest wall that was invading into

his ribs. In all, some of the left chest wall mass and a portion of the left lower lobe were resected

(surgically removed), and a portion of pleura was sent for pleural biopsy. A chest tube was then

placed between Mr. Deason's ribs to allow for drainage.

   12.     The initial pathologic report failed to find malignancy. Pathologists at the Mayo

clinic examined the tissue removed from Mr. Deason during the June 28, 2011 surgery, and

generated a report of their findings on July 18, 2011. Dr. Henry Tazelaar described a sarcomatoid

mesothelioma, with tumefactive growth and invasion into underlying adipose tissue and abundant

chronic inflammation. Pathologists at the University of California, San Francisco also confirmed

the diagnosis of mesothelioma.

   13.     On August 8, 2011, Dr. David J. Bodkin, an oncologist treating Mr. Deason,

ordered a PET CT scan. The scan revealed circumferential nodular thickening of the left pleura

and post-operative changes in the left lower lobe. There was extensive increased hypermetabolic

activity in the pleura indicative of widespread tumor.

   14.     Mr. Deason has undergone two rounds of Alimta/Cisplatin chemotherapy. The first

round began on October 18, 2011 and the second round began on November 11, 2011. At this

time, it is unknown whether Mr. Deason will need additional chemotherapy, but the results of a

PET scan scheduled for December 5, 2011 may indicate whether more chemotherapy is

recommended. Chemotherapy does not cure mesothelioma, though in some cases it may slow the

disease progression. Mr. Deason has suffered side effects from the chemotherapy, including

weight loss, nausea, fatigue and pain. Despite an initial decrease in chest pain, he now has

recurrent chest pain, a sign that his tumor may not have responded to the chemotherapy.

4

Exhibit 1 - 5

15.     I have reviewed Mr. Deason's August 8, 2011 PET CT scan, which shows extensive spread of his tumor. His tumor is widespread and unresectable (inoperable). During my November 22, 2011 examination of Mr. Deason, I noted that he has a shrunken chest on his left side. He is unable to breathe well on that side of his chest. In addition to chest pain, fatigue and shortness of breath, Mr. Deason is now experiencing difficulty swallowing food because it gets stuck halfway down his throat. He has severe right leg pain, pain that is not yet explained but may also be due to malignant metastasis.

16.     Based on the pathology reports from the Mayo Clinic, UCSF and Dr. William Salyer, I have concluded that Mr. Deason has sarcomatoid mesothelioma. The histopathologic subtype of mesothelioma is an important prognostic factor in pleural mesothelioma. Sarcomatoid mesothelioma cells are more resistant to treatments for mesothelioma, including surgery, chemotherapy and radiation therapy. This makes sarcomatoid the worst type of mesothelioma, and sarcomatoid mesothelioma patients generally do not live as long as patients with other cell types.

17.     Based on my own examination of Mr. Deason, as well as my review of his medical records and radiology, the widespread and inoperable nature of his tumor, the histology of his mesothelioma (sarcomatoid), the ineffectiveness of his chemotherapy treatments and his rapid and increasing debilitation, and my experience following the treatment of other patients with malignant mesothelioma, it is my professional medical opinion that Mr. Deason's mesothelioma raises a substantial medical doubt that he will survive more than two months beyond the date of this declaration. In addition, as his illness progresses he will become physically less able to attend depositions and/or trial and participate in litigation. My opinions are expressed with a reasonable degree of medical probability.

I declare under penalty of perjury under the laws of the United States and the laws of the

5

Exhibit 1 - 6

State of California that the foregoing is true and correct. Executed on December 4, 2011 in San

Francisco, California.

V. Courtney Broaddus, M.D.

6

Exhibit 1 - 7

# Exhibit 2

Exhibit 2 - 1



# Malignant Mesothelioma Overview

The information that follows is an overview of this type of cancer. It is based on the more detailed information in our document, *Malignant Mesothelioma*. This document and other information can be obtained by calling 1-800-227-2345 or visiting our Web site at www.cancer.org.

## What is cancer?

The body is made up of trillions of living cells. Normal body cells grow, divide, and die in an orderly way. During the early years of a person's life, normal cells divide faster to allow the person to grow. After the person becomes an adult, most cells divide only to replace worn-out, damaged, or dying cells.

Cancer begins when cells in a part of the body start to grow out of control. There are many kinds of cancer, but they all start because of this out-of-control growth of abnormal cells.

Cancer cell growth is different from normal cell growth. Instead of dying, cancer cells keep on growing and form new cells. These cancer cells can grow into (invade) other tissues, something that normal cells cannot do. Being able to grow out of control and invade other tissues are what makes a cell a cancer cell.

In most cases the cancer cells form a tumor. But some cancers, like leukemia, rarely form tumors. Instead, these cancer cells are in the blood and bone marrow.

When cancer cells get into the bloodstream or lymph vessels, they can travel to other parts of the body. There they begin to grow and form new tumors that replace normal tissue. This process is called *metastasis* (muh-**tas**-tuh-sis).

No matter where a cancer may spread, it is always named for the place where it started. For instance, breast cancer that has spread to the liver is still called breast cancer, not liver cancer. Likewise, prostate cancer that has spread to the bone is called metastatic prostate cancer, not bone cancer.

Exhibit 2 - 2

Different types of cancer can behave very differently. For example, lung cancer and breast cancer are very different diseases. They grow at different rates and respond to different treatments. That is why people with cancer need treatment that is aimed at their own kind of cancer.

Not all tumors are cancerous. Tumors that aren't cancer are called *benign* (be-**nine**). Benign tumors can cause problems-- they can grow very large and press on healthy organs and tissues. But they cannot grow into other tissues. Because of this, they also can't spread to other parts of the body (metastasize). These tumors are almost never life threatening.

# What is mesothelioma?

Malignant mesothelioma is cancer that starts in the cells that line certain parts of the body, especially the chest and belly (abdomen). The lining formed by these cells is called *mesothelium*. These cells protect organs by making a special fluid that allows the organs to move. For instance, this fluid makes it easier for the lungs to move during breathing.

The mesothelium has different names in different parts of the body:

- In the chest it is called the *pleura*.
- In the belly it is called the *peritoneum*.
- In the space around the heart it is called the *pericardium*.

Tumors of the mesothelium can be benign or they can be cancer. A cancer tumor of the mesothelium is called a *malignant mesothelioma*, but this is often shortened to just mesothelioma.

**The information that follows covers only those mesotheliomas that are cancer.**

## Main types of mesothelioma

There are 4 main types of mesotheliomas based on how the cells look under a microscope.

- **Epithelioid:** This is the most common type. It tends to have a better outlook (prognosis) than the other types.
- **Sarcomatoid (fibrous):** About 1 to 2 out of 10 mesotheliomas are of this type.
- **Mixed (biphasic):** This type has features of the 2 types above. About 3 to 4 out of 10 mesotheliomas are the mixed type.
- **Desmoplastic:** These are rare.

About 3 out of 4 mesotheliomas start in the chest cavity. These are called *pleural mesotheliomas*. Another 10%-20% begin in the abdomen (belly). These are called

2

Exhibit 2 - 3

*peritoneal mesotheliomas.* Those starting around the heart are very rare. This cancer can also start in the tissue around the testicles, but this is also very rare.

# How many people get mesothelioma?

Mesothelioma is fairly rare. There are about 3,000 new cases of mesothelioma each year in the United States. The rate of mesotheliomas in the United States increased from the 1970s to the early 1990s and since then has slowly decreased. These changes have largely been seen in men, and are thought to be linked to changes in workplace exposures to asbestos (see "What are the risk factors for malignant mesothelioma?"). The rate of mesothelioma is lower in women and has been fairly steady for some time. Mesothelioma is more common in whites and Hispanics/Latinos than in African Americans or Asian Americans.

# What are the risk factors for mesothelioma?

A risk factor is anything that affects a person's chance of getting a disease such as cancer. Different cancers have different risk factors. Some risk factors, such as smoking, can be controlled. Others, like a person's age or family history, can't be changed. But risk factors don't tell us everything. Having a risk factor, or even several risk factors, does not mean that you will get the disease. And some people who get the disease may have few or no risk factors.

Researchers have found some risk factors that increase a person's risk of mesothelioma.

## Asbestos

The main risk factor for mesothelioma is contact with asbestos. In fact, most cases of mesothelioma have been linked to asbestos in the workplace. Asbestos is a group of minerals that occur naturally as bundles of fibers.

In the past, asbestos was used in insulation, and in other things like floor tiles, door gaskets, roofing, patching compounds, and more. Since asbestos is a natural mineral, it can also be found in dust and rocks in certain parts of the United States. Most asbestos use stopped after 1989, but it is still used in some products.

When asbestos fibers are breathed in, some can travel to the ends of the small air passages and reach the lining of the lungs. There they can damage the cells lining the lungs and, with time, lead to pleural mesothelioma. If swallowed, these fibers can also reach the lining of the abdominal cavity (belly) where they play a part in causing peritoneal mesothelioma.

People who may be at risk for asbestos exposure include some miners, factory workers, makers of insulation, railroad workers, ship builders, gas mask makers, and construction workers. Studies have shown that family members of people exposed to asbestos at work have an increased risk of mesothelioma, too, because asbestos fibers are carried home on the clothes of the workers.

3

Exhibit 2 - 4

Asbestos was used in the insulation of many older homes and public buildings around the country, including some schools. Because the asbestos is contained within the building materials, a large amount is not likely to be found in the air. The risk is thought to be much less unless the asbestos is somehow released into the air, such as when building materials begin to rot over time, or during remodeling or removal.

The risk of getting mesothelioma depends on how much asbestos a person was exposed to and for how long. Mesotheliomas take a long time to develop. The time between the first exposure and finding the disease is often between 20 and 50 years. Also, once you have been exposed to asbestos, the risk of mesothelioma appears to be lifelong and it does not go down over time. To learn more, see our document called *Asbestos*.

## Other risk factors

**Radiation:** There have been a few published reports of mesotheliomas that developed after exposure to high doses of radiation to the chest or abdomen as a treatment for another cancer. But this is very rare. There is some evidence linking thorium dioxide (Thorotrast) to mesothelioma. Thorotrast was once used in certain x-rays. It has not been used for many decades.

**SV40 virus:** Some studies have suggested that infection with simian virus 40 (SV40) might increase the risk of mesothelioma. Some polio vaccines made between 1955 and 1963 were contaminated with SV40. Research into this is still going on.

**Age:** Mesothelioma is rare in people under age 45. The chance of having it goes up with age. About 3 out of 4 people with mesothelioma are over 65 years old.

**Gender:** The disease affects men about 4 times more often than women. This is most likely because men more often worked in jobs with heavy exposure to asbestos.

# Can mesothelioma be prevented?

The best way to lower your risk of this disease is to avoid contact with asbestos in homes, public buildings, and at work. People who could be exposed to asbestos at work include miners, factory workers, insulation workers, railroad workers, ship builders, makers of gas masks, and construction workers.

If there is a chance of exposure, say, in fixing up old buildings, then workers should take special measures to protect themselves. If you live in an older home, there may be asbestos in the insulation or in other materials. An expert can check your home to see if there is any danger. Even if asbestos is in the materials used to build the home, it may not pose a danger if the materials are in good condition. If you decide to have the asbestos removed, you should hire a qualified person to do this job. You should not do it yourself.

4

Exhibit 2 - 5

# How is mesothelioma found?

It is not clear how useful chest x-rays or CT scans are in finding mesothelioma early, but some doctors may advise them for people who have been exposed to asbestos.

One test being studied is a blood test. This test measures the blood levels of certain substances that are higher in people who have mesothelioma. But right now blood tests are used mainly to follow the course of the disease in people who are already known to have mesothelioma.

## Symptoms of mesothelioma

Most of the time mesothelioma is found when a person goes to a doctor because of symptoms. Early symptoms are not specific to the disease, and people often ignore them or mistake them for common, minor problems. Most people with this type of cancer have symptoms for only a few months before the cancer is found.

Symptoms of pleural mesothelioma (lining of the chest) can include:

- Pain in the lower back or at the side of the chest
- Shortness of breath
- Trouble swallowing
- Hoarseness
- Cough
- Fever
- Sweating
- Tiredness
- Weight loss
- Swelling of the face and arms
- Muscle weakness

Symptoms of peritoneal mesothelioma (lining of the abdominal cavity) can include:

- Belly pain
- Weight loss
- Nausea and vomiting
- Fluid or swelling in the abdomen (belly)

Of course, these same symptoms can also be caused by other problems. But if you have worked with asbestos and you have any of these symptoms, you should see a doctor right away.

5

Exhibit 2 - 6

## Medical history and physical exam

If you have any signs or symptoms that suggest you might have mesothelioma, your doctor will want to take a complete medical history to check for symptoms and possible risk factors, especially about asbestos. You will also be asked about your general health, and the doctor will do a physical exam. The exam can help tell if you have fluid in the chest, belly, or around the heart. This fluid can be a sign of mesothelioma.

If symptoms or the results of the exam suggest you might have mesothelioma, tests will be needed to make sure. These might include imaging tests, blood tests, and other tests.

## Imaging tests

These tests allow the doctor to see pictures of the inside of your body. They might be done for a number of reasons, such as to help find an area that might be cancer, to learn how far cancer has spread, and to see if treatment is working.

**Chest x-ray:** This is often the first test done if someone has symptoms such as a constant cough or shortness of breath. An x-ray might show thickening of the lining of the lungs or other changes caused by asbestos. It can also show changes that may suggest mesothelioma.

**CT scan:** A CT scan (or CAT scan) is like an x-ray but it gives detailed cross-sectional pictures of your body. Instead of taking one picture, a CT scanner takes many pictures as it moves around you. A computer then combines these pictures to show slices of your body.

CT scans are often used to help decide if you have mesothelioma and to help find the exact place of the cancer. They can also help show how much the cancer has spread.

Before any pictures are taken, you may be asked to drink a liquid that helps outline your intestines (gut). You may also get an IV (intravenous) line which is used to put a different kind of contrast dye into your blood. This helps better outlines parts of in your body. Some people are allergic to the dye and get hives, a flushed feeling, or -- rarely -- more serious problems like trouble breathing and low blood pressure. Be sure to tell your doctor if you have any allergies or have ever had a problem from any dye used for x-rays.

CT scans take longer than regular x-rays, and you need to lie still on a table while they are being done. During the test, the table slides in and out of the scanner, a ring-shaped machine that goes around the table. Some types of CT scans use a faster machine.

**PET scan:** A PET scan uses glucose (a form of sugar) that contains a radioactive substance. Cancer cells in the body take in large amounts of the radioactive sugar and a special camera can find these radioactive spots. This test can help tell whether a thickening of the tissues is cancer or just scar tissue. It can also show the spread of cancer. A PET scan can also be useful if your doctor thinks the cancer may have spread but doesn't know where. The picture from a PET scan is not detailed, but shows the whole body at once. Some newer machines are able to do both a PET and CT scan at the same time.

6

Exhibit 2 - 7

**MRI scan:** This test uses radio waves and strong magnets instead of x-rays to take pictures. It gives a very detailed picture of your insides. MRI scans may be useful in looking at the thin band of breathing muscle below the lungs (the diaphragm). Mesothelioma can spread there.

A contrast dye might be used just as with CT scans. MRI scans take longer than CT scans -- often up to an hour. Also, you are placed inside a narrow tube, which is confining and can upset people with a fear of enclosed spaces. The machine makes a thumping noise; some places will give you earplugs to help block out the sound.

## Blood tests

Blood levels of certain substances are often high in people with mesothelioma. They may help show if a person likely has mesothelioma. But so far, these blood tests have proven more useful in people who already have mesothelioma to follow their progress during and after treatment.

If you are found to have mesothelioma, other blood tests will be done to check blood cell counts and levels of certain chemicals in the blood. These tests can give the doctor an idea of how much the disease has spread and how well organs like the liver and kidneys are working.

## Tests of fluid and tissue samples

### Removing fluid for testing

If you have a buildup of fluid in the body that may be caused by mesothelioma, a sample of this fluid can be taken. The skin is numbed and a needle is put through the skin into the fluid, which is drawn out and sent to the lab. The fluid is tested to see if there are cancer cells in it.

This test has different names depending on where the fluid is:

- **Thoracentesis** removes fluid from the chest.

- **Paracentesis** removes fluid from the abdomen (belly).

- **Pericardiocentesis** removes fluid from the sac around the heart.

Finding cancer cells tells the doctor that cancer is present, but not finding any cancer cells in the fluid does not always mean there is no cancer. In many cases, doctors need to get a sample of the tissue (called a *biopsy*) to find out if you have mesothelioma.

### Biopsy methods

For a biopsy, a small amount of tissue is taken out and looked at under a microscope to see whether it contains cancer.

7

Exhibit 2 - 8

**Needle biopsy:** Tumors in the chest are sometimes sampled by *needle biopsy*. A long, hollow needle is passed through the skin in the chest, between the ribs, and into the tumor. A small sample can be removed to be looked at under the microscope. But sometimes the sample is not big enough to tell for sure whether there is cancer. If this happens, another kind of biopsy may be needed.

**Endoscopic biopsies:** An *endoscope* (scope) is a thin, tube-like tool used to look inside the body. It has a light and a lens (or camera) on the end and tools that can be used to remove tissue that looks like it may be cancer. There are a number of different types of scopes. They are named after the part of the body that they are used to look at. For instance:

- A **thoracoscope** is used to look inside the chest.
- A **mediastinoscope** is used to look at the space between the lungs.
- A **bronchoscope** is used to look at the lining of the lungs.
- A **laparoscope** is used to look inside the belly.

**Open surgical biopsy:** In some cases, surgery may be needed to get a large enough tissue sample. This allows the doctor to remove a larger sample of tumor or, sometimes, the whole tumor.

### Testing the samples in the lab

No matter which approach is used to get them, biopsy and fluid samples are sent to the pathology lab. There, a doctor will look at them under a microscope and do other tests to decide whether cancer is present (and if so, what type of cancer it is).

It is often hard to tell whether it is mesothelioma by just looking at the cells from fluid samples (or even tissue samples). So special lab tests that look at things like proteins may be done, too.

## Pulmonary function tests

Pulmonary function tests (PFTs) may be done after mesothelioma is found to see how well your lungs are working. This is important if you might need surgery to take out part or all of a lung. The doctors need to know how well the lungs are working before the surgery. These tests can give the doctor an idea of how much lung can safely be removed. For PFTs, you breathe in and out through a tube that is hooked up to a machine that measures lung function.

# After the tests: Staging

Staging is the process of finding out how far the cancer has spread. Staging is based on the results of the physical exam, biopsies, and other tests which are described in the section, "How is malignant mesothelioma found?" This is very important because your treatment and the outlook for your recovery depend on the stage of your cancer.

8

Exhibit 2 - 9

At this time, there is a staging system only for mesothelioma around the lung (pleural mesothelioma). The AJCC (American Joint Committee on Cancer) staging system uses Roman numerals from I to IV (1 to 4) for the different stages. As a rule, the lower the number, the less the cancer has spread. A higher number, such as stage IV, means a more advanced cancer.

After looking at your test results, the doctor will tell you the stage of your cancer. Be sure to ask your doctor to explain your stage in a way you understand. This will help you decide on the best treatment for you.

## Resectable versus unresectable cancer

To help decide about treatment, doctors often group mesotheliomas based on whether or not it is likely that the cancer can be removed by surgery. If it can be removed it is called *resectable*. If it cannot be removed it is *unresectable*. Whether or not the cancer can be removed is based not only on the size of the tumor and how far it has spread, but also on the mesothelioma subtype, where the tumor is, and whether the patient is healthy enough to have surgery.

Even if the cancer can be removed, in most cases there are cancer cells that cannot be seen and that are left behind after surgery. For this reason, many doctors advise using other forms of treatment (like radiation therapy and/or chemotherapy) along with surgery when possible.

## Other factors that affect outlook

While the stage of this cancer is important in looking at a patient's chances for survival, other factors should also be taken into account. Some that point to a better outlook include:

- Being able to carry out normal tasks of daily life

- Younger age

- Epithelioid subtype

- Not having chest pain

- Not too much weight loss

- Normal levels of a substance in the blood called LDH

- Normal red blood cell counts, white blood cell counts, and blood platelet counts

9

Exhibit 2 - 10

## Survival rates for mesothelioma

Some people with cancer may want to know the survival rates for their type of cancer. Others may not find the numbers helpful, or may even not want to know them. Whether or not you want to read about survival rates is up to you.

Mesothelioma is a serious disease. By the time the symptoms appear the disease is often advanced. No matter what the extent of the cancer, it can be very hard to treat.

The *average* survival times for people with mesothelioma have been between 4 and 18 months. But some people live much longer. Between 5 and 10% of people with mesothelioma live at least 5 years after their cancer is found. These numbers are from patients treated many years ago. Better treatments since then mean that the survival rates for people now may be higher.

As a rule, survival times are likely to be higher for people with mesotheliomas that can be operated on than for those with cancers that have spread widely.

While numbers provide an overall picture, keep in mind that every person is unique and that statistics can't predict exactly what will happen in your case. Talk with your cancer care team if you have questions about your own chances of a cure, or how long you might survive your cancer. They know your case best.

# How is mesothelioma treated?

*This information represents the views of the doctors and nurses serving on the American Cancer Society's Cancer Information Database Editorial Board. These views are based on their interpretation of studies published in medical journals, as well as their own professional experience.*

*The treatment information in this document is not official policy of the Society and is not intended as medical advice to replace the expertise and judgment of your cancer care team. It is intended to help you and your family make informed decisions, together with your doctor.*

*Your doctor may have reasons for suggesting a treatment plan different from these general treatment options. Don't hesitate to ask him or her questions about your treatment options.*

## About treatment

After the tumor is found and staged, your doctor will talk to you about treatment options. The main factors in choosing a treatment are the size and place of the tumor, whether it has spread, your overall health, and your own preferences.

Because this is a rare cancer, it has been hard for doctors to compare the value of different treatments. Since many doctors have little or no experience treating this disease, you may be referred to a specialist at a large medical center. Treatment options may include surgery, chemotherapy, radiation therapy, or more than one of these combined. One problem with treating mesothelioma is that it does not grow as a single tumor. Instead, it tends to spread along surfaces, nerves, and blood vessels. This makes it hard for treatment to get rid of all of the disease.

10

Exhibit 2 - 11

You may have different types of doctors on your treatment team, depending on the stage of your cancer and your treatment options. These doctors may include:

- **A thoracic surgeon:** a doctor who treats diseases of the lungs and chest with surgery.

- **A radiation oncologist:** a doctor who treats cancer with radiation therapy.

- **A medical oncologist:** a doctor who treats cancer with medicines such as chemotherapy.

- **A pulmonologist:** a doctor who specializes in medical treatment of diseases of the lungs.

Many other experts may be involved in your care as well, such as nurse practitioners, nurses, respiratory therapists, social workers, and other health professionals.

Mesothelioma is rare, so if time permits it is a good idea to get an opinion from a doctor who has a lot of experience in treating people with this cancer. A second opinion can give you more information and help you feel better about the treatment choice you make.

## Surgery

Surgery for some types of mesothelioma might be done to try to bring about a cure or to relieve symptoms. Surgery to relieve symptoms (called *palliative surgery*) is often done in cases where the tumor has already spread or when the patient is too sick to go through more involved surgery.

To attempt a cure, major surgery might be needed. This might be done if the patient is in good health (other than the cancer) and if it seems as if the tumor is only in one place. While surgery is not likely to cure the cancer, it might extend the patient's life.

But in most cases the cancer has spread to other places before it is found. So the role of surgery in treating this cancer is not clear. If your doctor recommends surgery, ask for more details about the operation and what the goal is.

### Surgery for pleural mesothelioma

There are 2 types of surgery that could be used if you have mesothelioma in the linings of the lungs. One is a bigger operation that attempts to remove all or most of the cancer and some of the tissues around it. (This surgery is called an *extrapleural pneumonectomy* or *EPP*.) This is a complex operation and is done only by surgeons in large medical centers. You must be in good overall health with good lung function and no other serious illnesses in order to have this surgery.

The other type of surgery that may be used is called a *pleurectomy/decortication* or *P/D*. This smaller operation may be done to try to cure some cancers, but it is more often used to relieve symptoms in cases where the whole tumor cannot be removed. It can help control the build-up of fluid, improve breathing, and decrease pain caused by the cancer.

11

Exhibit 2 - 12

An even smaller surgery called *debulking* might be done to remove as much of the mesothelioma as possible.

## Surgery for peritoneal mesothelioma

These tumors are often too advanced to be removed completely. Palliative surgery may be an option in some cases. The goal of this surgery is to relieve or prevent symptoms, instead of trying to cure the cancer.

Debulking might be done to remove as much of the mesothelioma as possible. Sometimes this means removing pieces of the intestine.

The omentum is an apron-like layer of fatty tissue that drapes over the contents of the abdomen. Cancers involving the peritoneum often spread to this tissue, so it may be removed as part of surgery.

## Surgery for pericardial mesothelioma

Operations can be done to remove a mesothelioma from the pericardium (the sac around the heart).

## Surgery for mesothelioma of the tunica vaginalis testis

Surgery for these mesotheliomas, which occur in the groin, rarely cures this cancer. Most of the time surgery is done because the tumor looks like a hernia. The surgeon attempts to treat a suspected hernia and only learns that it is cancer after the surgery is begun. This kind of mesothelioma typically can't be removed entirely.

## Other ways to relieve symptoms

In many cases, surgery may not be a good option, even to relieve symptoms. Other, less invasive treatments may be used instead. While these methods can relieve symptoms, they are not meant to cure the cancer.

Fluid in the chest can be removed by putting a needle into the chest cavity and drawing the fluid out. Sometimes talc or drugs are then put into the chest. This causes the linings of the lung and chest wall to stick together, sealing the space and keeping fluid from building up.

Fluid in the abdomen (belly) or around heart can be removed by putting a long, hollow needle through the skin, into the fluid, and removing it. Numbing medicine is used on the skin before the needle is put in. This may be done in a doctor's office or in the hospital.

If the above methods don't work, a shunt might be put in the chest. A shunt is a device that allows fluid to move from one part of the body to another. The shunt is a long, thin tube with a small pump in the middle. In the operating room, the doctor puts one end of the shunt into the chest cavity and the other end into the abdomen (belly). Once the shunt is in place, the patient uses the pump (which is just under the skin) several times a day to

12

Exhibit 2 - 13

move the fluid from the chest to the abdomen, where it is more likely to be absorbed by the body.

Another approach sometimes used to control the build-up of fluid is a catheter -- a thin flexible tube. One end of the catheter is put in the chest or abdomen and the other end is left outside the body. This is done in a doctor's office or hospital. Once in place, the catheter can be attached to a special bottle or other device to allow the fluid to drain out.

## Radiation therapy

Radiation therapy is treatment with high energy rays (such as x-rays) to kill cancer cells or shrink tumors. The radiation may come from outside the body (external radiation) or from radioactive materials put right into the tumor (brachytherapy).

External radiation is the preferred type for mesothelioma. It is given in the same way as an x-ray used to find a broken bone, but it takes longer. Treatments are usually given 5 days a week for several weeks.

As a rule, it is hard to treat mesothelioma with radiation. It is not easy to aim the radiation just at the cancer without affecting nearby healthy areas such as the lungs. But radiation may be used in different ways to treat mesothelioma:

- It can be used after surgery to try to kill any small deposits of cancer that could not be seen and removed during surgery.

- It can be used to ease symptoms of mesothelioma such as shortness of breath, pain, bleeding, and trouble swallowing.

There can be side effects from radiation. Most of these will go away over time after treatment ends. The skin in the area treated may look sunburned and then become darker. You may also feel tired. Be sure to talk with your doctor about any side effects. Often there are medicines or other things that can be done to help control them.

To learn more about radiation treatment, please see *Understanding Radiation Therapy: A Guide for Patients and Families.*

## Chemotherapy

Chemotherapy ("chemo") is the use of drugs to kill cancer cells. The drugs can be swallowed in pill form or they can be put into a vein or muscle with a needle. Once the drugs enter the bloodstream, they spread throughout the body.

In treating mesothelioma, these drugs may also be given right into the chest (or abdominal) cavity at the site of the tumor through a small catheter (tube). Chemo drugs given this way are sometimes heated first which may help them work better. In most cases, more than one drug is used.

Chemo may be given before surgery to shrink the cancer and lower the risk of spread. It can also be given after surgery to try to try to kill any cancer cells that were left behind because they were too small to be seen.

13

Exhibit 2 - 14

If surgery is not an option, chemo may be given as the main treatment, either alone or along with radiation. Chemo in this case is given to slow the growth of the cancer or to relieve symptoms, but it is not likely to cure the cancer.

Doctors usually give chemo in cycles, with a rest period in between cycles to allow the body time to recover. Chemo cycles often last about 3 to 4 weeks. Chemo is often not recommended for patients in poor health, but being older should not keep a person from getting chemo.

Chemo can cause side effects. These side effects will depend on the type of drugs given, the amount taken, and how long treatment lasts. Side effects could include:

- Nausea and vomiting
- Diarrhea
- Loss of appetite
- Hair loss
- Mouth sores
- Increased risk of infection
- Easy bleeding or bruising
- Tiredness
- Shortness of breath

Most side effects go away once treatment is over. Anyone who has problems with side effects should talk with their doctor or nurse, as there are often ways to help.

To learn more about chemo, please see our document *Understanding Chemotherapy: A Guide for Patients and Families*.

## Clinical trials

You may have had to make a lot of decisions since you've been told you have cancer. One of the most important decisions you will make is deciding which treatment is best for you. You may have heard about clinical trials being done for your type of cancer. Or maybe someone on your health care team has mentioned a clinical trial to you.

Clinical trials are carefully controlled research studies that are done with patients who volunteer for them. They are done to get a closer look at promising new treatments or procedures.

If you would like to take part in a clinical trial, you should start by asking your doctor if your clinic or hospital conducts clinical trials. You can also call our clinical trials matching service for a list of clinical trials that meet your medical needs. You can reach this service at 1-800-303-5691 or on our Web site at www.cancer.org/clinicaltrials. You can also get a list of current clinical trials by calling the National Cancer Institute's Cancer Information Service toll-free at 1-800-4-CANCER (1-800-422-6237) or by visiting the NCI clinical trials Web site at www.cancer.gov/clinicaltrials.

There are requirements you must meet to take part in any clinical trial. If you do qualify for a clinical trial, it is up to you whether or not to enter (enroll in) it.

Clinical trials are one way to get state-of-the art cancer treatment. They are the only way for doctors to learn better methods to treat cancer. Still, they are not right for everyone.

You can get a lot more information on clinical trials, in our document called *Clinical Trials: What You Need to Know*. You can read it on our Web site or call our toll-free number and have it sent to you.

## Complementary and alternative therapies

When you have cancer you are likely to hear about ways to treat your cancer or relieve symptoms that your doctor hasn't mentioned. Everyone from friends and family to Internet groups and Web sites may offer ideas for what might help you. These methods can include vitamins, herbs, and special diets, or other methods such as acupuncture or massage, to name a few.

### What are complementary and alternative therapies?

It can be confusing because not everyone uses these terms the same way, and they are used to refer to many different methods. We use *complementary* to refer to treatments that are used *along with* your regular medical care. *Alternative* treatments are used *instead of* a doctor's medical treatment.

**Complementary methods:** Most complementary treatment methods are not offered as cures for cancer. Mainly, they are used to help you feel better. Some examples of methods that are used along with regular treatment are meditation to reduce stress, acupuncture to help relieve pain, or peppermint tea to relieve nausea. Some complementary methods are known to help, while others have not been tested. Some have been proven not be helpful, and a few are even harmful.

**Alternative treatments:** Alternative treatments may be offered as cancer cures. These treatments have not been proven safe and effective in clinical trials. Some of these methods may be harmful, or have life-threatening side effects. But the biggest danger in most cases is that you may lose the chance to be helped by standard medical treatment. Delays or interruptions in your medical treatments may give the cancer more time to grow and make it less likely that treatment will help.

### Finding out more

It is easy to see why people with cancer think about alternative methods. You want to do all you can to fight the cancer, and the idea of a treatment with few or no side effects sounds great. Sometimes medical treatments like chemo can be hard to take, or they may no longer be working. But the truth is that most of these alternative methods have not been tested and proven to work in treating cancer.

As you think about your options, here are 3 important steps you can take:

15

Exhibit 2 - 16

- Look for "red flags" that suggest fraud. Does the method promise to cure all or most cancers? Are you told not to have regular medical treatments? Is the treatment a "secret" that requires you to visit certain providers or travel to another country?

- Talk to your doctor or nurse about any method you are thinking of using.

- Contact us at 1-800-227-2345 to learn more about complementary and alternative methods in general and to find out about the specific methods you are looking at.

**The choice is yours**

Decisions about how to treat or manage your cancer are always yours to make. If you want to use a non-standard treatment, learn all you can about the method and talk to your doctor about it. With good information and the support of your health care team, you may be able to safely use the methods that can help you while avoiding those that could be harmful.

# Some questions to ask your doctor

As you cope with cancer and cancer treatment, you need to have honest, open talks with your doctor. You should feel free to ask any question that's on your mind, no matter how small it might seem. Here are some questions you might want to ask. Be sure to add your own questions as you think of them. Nurses, social workers, and other members of the treatment team may also be able to answer many of your questions.

- Would you please write down the exact kind of cancer I have?

- Has the cancer spread beyond the place where it started?

- What is the stage of the cancer and what does that mean for me?

- Are there other tests that need to be done before we can decide on treatment?

- Are there other doctors I need to see?

- How often have you treated this type of cancer?

- What treatment choices do I have?

- What do you recommend and why?

- How long will treatment last? What will it involve? Where will it be done?

- Should I get a second opinion?

- What is the goal of this treatment?

- What are the risks or side effects of the treatment?

- What should I do to be ready for treatment?

16

Exhibit 2 - 17

- How will treatment affect my daily life?

- What type of follow-up might I need after treatment?

- What are the chances my cancer will come back after the treatments you suggest?

- What would we do if the treatment doesn't work or if the cancer comes back?

Add your own questions below:

# Moving on after treatment

For some people with mesothelioma, treatment may remove or destroy the cancer. Completing treatment can be both stressful and exciting. You may be relieved to finish treatment, but find it hard not to worry about cancer growing or coming back. (When cancer comes back after treatment, it is called *recurrence.*) This is a very common concern in people who have had cancer.

It may take a while before your fears lessen. But it may help to know that many cancer survivors have learned to live with this uncertainty and are living full lives. Our document, *Living With Uncertainty: The Fear of Cancer Recurrence* gives more detailed information on this.

For many people, the mesothelioma may never go away completely. These people may get regular treatments with chemo, radiation, or other treatments to help keep the cancer in check. Learning to live with cancer that doesn't go away can be hard and very stressful. It has its own type of uncertainty.

## Follow-up care

If you have finished treatment, your doctors will still want to watch you closely. During these visits, your doctors will ask about symptoms, do physical exams, and order blood tests or imaging studies (like CT scans or MRIs). Follow-up is needed to watch for treatment side effects and to check for cancer that has come back or spread. Your doctor will most likely want to see you fairly often (every couple of months or so) at first. The time between visits may be longer if there are no problems.

Almost any cancer treatment can have side effects. Some may last for a few weeks or months, but others can be permanent. Please tell your cancer care team about any symptoms or side effects that bother you so they can help you manage them. Use this time to ask your health care team questions and discuss any concerns you might have.

It is also important to keep health insurance. While you hope your cancer won't come back, it could happen. If it does, you don't want to have to worry about paying for treatment. If the cancer does recur at some point, further treatment will depend on the

17

Exhibit 2 - 18

place of the cancer, what treatments you've had before, and your health. Our document *When Your Cancer Comes Back: Cancer Recurrence* helps you manage and cope with this phase of your treatment.

## Seeing a new doctor

At some point after your cancer is found and treated, you may find yourself in the office of a new doctor who does not know about your cancer. It is important that you be able to give your new doctor the exact details of your diagnosis and treatment. Make sure you have this information handy and always keep copies for yourself:

- A copy of your pathology report from any biopsy or surgery

- If you had surgery, a copy of your operative report

- If you were in the hospital, a copy of the discharge summary that the doctor wrote when you were sent home from the hospital

- If you had radiation treatment, a summary of the type and dose of radiation and when and where it was given

- If you had chemo or targeted therapies, a list of your drugs, drug doses, and when you took them

## Lifestyle changes

You can't change the fact that you have had cancer. What you can change is how you live the rest of your life — making choices to help you stay healthy and feel as well as you can. This can be a time to look at your life in new ways. Maybe you are thinking about how to improve your health over the long term. Some people even start during cancer treatment.

### Make healthier choices

For many people, a finding out they have cancer helps them focus on their health in ways they may not have thought much about in the past. Are there things you could do that might make you healthier? Maybe you could try to eat better or get more exercise. Maybe you could cut down on the alcohol, or give up tobacco. Even things like keeping your stress level under control may help. Now is a good time to think about making changes that can have positive effects for the rest of your life. You will feel better and you will also be healthier.

You can start by working on those things that worry you most. Get help with those that are harder for you. For instance, if you are thinking about quitting smoking and need help, call the American Cancer Society at 1-800-227-2345.

18

Exhibit 2 - 19

## Eating better

Eating right can be hard for anyone, but it can get even tougher during and after cancer treatment. Treatment may change your sense of taste. Nausea can be a problem. You may not feel like eating and lose weight when you don't want to. Or you may have gained weight that you can't seem to lose. All of these things can be very hard to deal with.

If treatment caused weight changes or eating or taste problems, do the best you can and keep in mind that these problems usually get better over time. You may find it helps to eat small portions every 2 to 3 hours until you feel better. You may also want to ask your cancer team about seeing a dietitian, an expert in nutrition who can give you ideas on how to deal with these treatment side effects.

One of the best things you can do after cancer treatment is put healthy eating habits into place. You may be surprised at the long-term benefits of some simple changes, like increasing the variety of healthy foods you eat. Try to eat 5 or more servings of vegetables and fruits each day. Choose whole grain foods instead of those made with white flour and sugars. Try to limit meats that are high in fat. Cut back on processed meats like hot dogs, bologna, and bacon. Better yet, don't eat any of these, if you can. If you drink alcohol, limit yourself to 1 or 2 drinks a day at the most.

## Rest, fatigue, and exercise

Feeling tired (fatigue) is a very common problem during and after cancer treatment. This is not a normal type of tiredness but a "bone-weary" exhaustion that doesn't get better with rest. For some people, fatigue lasts a long time after treatment and can keep them from staying active. But exercise can actually help reduce fatigue and the sense of depression that sometimes comes with feeling so tired.

If you are very tired, though, you will need to balance activity with rest. It is OK to rest when you need to. To learn more about fatigue, please see our document, *Fatigue in People With Cancer*.

If you were very ill or weren't able to do much during treatment, it is normal that your fitness, staying power, and muscle strength declined. You need to find an exercise plan that fits your own needs. Talk with your health care team before starting. Get their input on your exercise plans. Then try to get an exercise buddy so that you're not doing it alone.

Exercise can improve your physical and emotional health.

- It improves your cardiovascular (heart and circulation) fitness.

- It makes your muscles stronger.

- It reduces fatigue.

- It lowers anxiety and depression.

- It makes you feel generally happier.

19

Exhibit 2 - 20

- It helps you feel better about yourself.

Long term, we know that exercise plays a role in preventing some cancers. The American Cancer Society recommends that adults be physically active for at least 30 minutes a day on 5 or more days of the week.

### Can I lower my risk of the cancer spreading or coming back?

Most people want to know if there are lifestyle changes they can make to reduce their risk of cancer growing further or coming back. Unfortunately, for most cancers there is little solid evidence to guide people. This doesn't mean that nothing will help – it's just that for the most part this is an area that hasn't been well studied. Most studies have looked at lifestyle changes as ways of preventing cancer in the first place, not slowing it down or preventing it from coming back.

At this time, not enough is known about mesothelioma to say for sure if there are things you can do that will be helpful. Healthy behaviors such as eating well and keeping a healthy weight may help, but no one knows for sure. But we do know that these types of changes can have positive effects on your health that can extend beyond your risk of cancer.

## How about your emotional health?

During and after treatment, you may find yourself overcome with many different emotions. This happens to a lot of people.

You may find yourself thinking about death and dying. Or maybe you're more aware of the effect the cancer has on your family, friends, and career. You may take a new look at your relationships with those around you. Other issues may also cause concern. For instance, you may see your health care team less often after treatment and have more time on your hands. These changes can make some people anxious.

This is a good time to look for emotional and social support. You need people you can turn to. Support can come in many forms: family, friends, cancer support groups, church or spiritual groups, online support communities, or private counselors.

The cancer journey can feel very lonely. You don't need to go it alone. Your friends and family may feel shut out if you decide not to include them. Let them in – and let in anyone else who you feel may help. If you aren't sure who can help, call your American Cancer Society at 1-800-227-2345 and we can put you in touch with a group or resource that may work for you.

You can't change the fact that you have had cancer. What you can change is how you live the rest of your life – making healthy choices and helping your body and mind feel well.

## If treatment stops working

When a person has had many different treatments and the cancer has not been cured, over time the cancer tends to resist all treatment. At this time you may have to weigh the

20

Exhibit 2 - 21

possible benefits of a new treatment against the downsides, like treatment side effects and clinic visits.

This is likely to be the hardest time in your battle with cancer – when you have tried everything within reason and it's just not working anymore. Your doctor may offer you new treatment, but you will need to talk about whether the treatment is likely to improve your health or change your outlook for survival.

No matter what you decide to do, it is important for you to feel as good as possible. Make sure you are asking for and getting treatment for pain, nausea, or any other problems you may have. This type of treatment is called "palliative" treatment. It helps relieve symptoms but is not meant to cure the cancer.

At some point you may want to think about hospice care. Your cancer may be causing symptoms or problems that need to be treated. Hospice focuses on your comfort. Most of the time it is given at home. You should know that having hospice care doesn't mean you can't have treatment for the problems caused by your cancer or other health issues. It just means that the purpose of your care is to help you live life as fully as possible and to feel as well as you can, rather than trying to slow or cure the cancer. You can learn more about this in our document, *Hospice Care*.

Staying hopeful is important, too. Your hope for a cure may not be as bright, but there is still hope for good times with family and friends – times that are filled with happiness and meaning. Pausing at this time in your cancer treatment gives you a chance to focus on the most important things in your life. Now is the time to do some things you've always wanted to do and to stop doing the things you no longer want to do. Though the cancer may be beyond your control, there are still choices you can make.

# What's new in mesothelioma research?

There is always research going on in the area of mesothelioma. Scientists are looking for ways to prevent, find, and treat the disease. Despite recent progress, there is still a lot to be learned about the best way to treat these cancers.

## Causes and prevention

A lot of research has focused on learning exactly how asbestos changes normal cells and their DNA to cause cancer. Understanding how these fibers produce cancer might help us find ways to prevent those changes.

Now that we know about the dangers of asbestos, we can limit or stop its use in homes, public buildings, and the workplace. But rules to protect people from asbestos are much less strict (or they do not exist at all) in some other countries.

Research is also going on to learn about the role (if any) of a virus (SV40) that has been linked to mesothelioma in some studies.

21

Exhibit 2 - 22

## Treatment

Mesothelioma remains a hard cancer to treat, and doctors are always trying to improve on current methods.

### Chemo

Chemotherapy drugs have not worked very well against advanced mesothelioma, but several newer chemo drugs are now being tested in clinical trials, together with other types of treatment.

Doctors are also looking at giving chemo drugs right into the chest or abdominal cavity, often right after surgery. In some cases the drugs are heated before they are given. Doctors hope that putting the drugs directly into contact with the tumors may allow them to work better, while causing fewer side effects in the rest of the body.

### Photodynamic therapy

Another technique now being studied is called *photodynamic therapy* (PDT). For this treatment, a drug that is "turned on" by light is put into a vein. The drug spreads throughout the body and tends to collect in cancer cells. A few days later (usually just after surgery for the mesothelioma), a special red light on the end of a tube is placed into the chest. The light causes a chemical change that turns on the drug and causes the cancer cells to die. This approach may cause fewer side effects than use of drugs that spread throughout all tissues of the body. Several clinical trials are now looking at the use of PDT for mesothelioma.

### Targeted drugs

As a rule, chemo drugs do not work very well against advanced mesothelioma. As researchers have learned more about the changes in cells that cause cancer, they have been able develop newer drugs that are aimed (target) these changes. Targeted drugs work in a different way from standard chemo drugs. They often have different (and less severe) side effects.

One group of these drugs keeps new blood vessels from forming. Tumors need these blood vessels to grow larger. Some of these drugs are already used to treat other types of cancer and are now being studied for use against mesotheliomas. Other new drugs have different targets.

### Gene therapy

Another new treatment is *gene therapy*. This treatment uses special viruses that have been changed in the lab. The virus is put into the space around the lungs where it infects the cancer cells. When this happens, the virus in turn injects a gene into the cancer cells that may help immune system cells to attack them. Research on this type of treatment is still in the early stages.

22

Exhibit 2 - 23

# How can I learn more?

## From your American Cancer Society

We have some related information that may also be helpful to you. These materials may be ordered from our toll-free number, 1-800-227-2345.

After Diagnosis: A Guide for Patients and Families (also available in Spanish)

Asbestos (also available in Spanish)

Caring for the Patient With Cancer at Home (also available in Spanish)

Clinical Trials: What You Need to Know (also available in Spanish)

Endoscopy

Living With Uncertainty: The Fear of Cancer Recurrence

Pain Control (also available in Spanish)

Surgery (also available in Spanish)

Understanding Radiation Therapy: A Guide for Patients and Families (also available in Spanish)

Understanding Chemotherapy: A Guide for Patients and Families (also available in Spanish)

When Your Cancer Comes Back: Cancer Recurrence

**The following books are available from the American Cancer Society. Call us to ask about costs or to place your order.**

*American Cancer Society Complete Guide to Complementary & Alternative Cancer Therapies*

*American Cancer Society Complete Guide to Nutrition for Cancer Survivors*

*American Cancer Society's Guide to Pain Control*

*Cancer in the Family: Helping Children Cope With a Parent's Illness*

*Caregiving: A Step-By-Step Resource for Caring for the Person With Cancer at Home*

*What Helped Me Get Through: Cancer Patients Share Wisdom and Hope*

*What to Eat During Cancer Treatment*

*When the Focus Is on Care: Palliative Care and Cancer*

23

Exhibit 2 - 24

## National organizations and Web sites*

Along with the American Cancer Society, other sources of information and support include:

**Agency for Toxic Substances and Disease Registry**
Toll-free number: 1-800-232-4636
Web site: www.atsdr.cdc.gov

**Environmental Protection Agency**
Telephone: 1-202-272-0167
Web site: www.epa.gov

**Mesothelioma Applied Research Foundation**
Toll-free number: 1-877-363-6376 (1-877-END-MESO)
Web site: www.curemeso.org

**National Cancer Institute**
Toll-free number: 1-800-422-6237 (1-800-4-CANCER)
Web site: www.cancer.gov

**Occupational Safety and Health Administration (OSHA)**
Toll-free number: 1-800-321-6742 (1-800-321-OSHA)
Web site: www.osha.gov

*Inclusion on this list does not imply endorsement by the American Cancer Society*

No matter who you are, we can help. Contact us anytime, day or night, for information and support. Call us at **1-800-227-2345** or visit www.cancer.org.

Last Medical Review: 6/28/2011

Last Revised: 6/28/2011

2011 Copyright American Cancer Society

For additional assistance please contact your American Cancer Society
1 · 800 · ACS·2345 or www.cancer.org

24

Exhibit 2 - 25

# Exhibit 3

Exhibit 3 - 1

# CHEST

Official publication of the American College of Chest Physicians



## Aspects of Histopathologic Subtype as a Prognostic Factor in 85 Pleural Mesotheliomas

Leif Johansson and Carl-Johan Lindén

*Chest* 1996;109;109-114
DOI 10.1378/chest.109.1.109

The online version of this article, along with updated information and services can be found online on the World Wide Web at:
http://chestjournal.chestpubs.org/content/109/1/109

*Chest* is the official journal of the American College of Chest Physicians. It has been published monthly since 1935. Copyright1996by the American College of Chest Physicians, 3300 Dundee Road, Northbrook, IL 60062. All rights reserved. No part of this article or PDF may be reproduced or distributed without the prior written permission of the copyright holder. (http://chestjournal.chestpubs.org/site/misc/reprints.xhtml) ISSN:0012-3692



AMERICAN COLLEGE OF CHEST PHYSICIANS®

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Exhibit 3 - 2

# Aspects of Histopathologic Subtype as a Prognostic Factor in 85 Pleural Mesotheliomas*

*Leif Johansson, MD; and Carl-Johan Lindén, MD*

*Background:* The prognosis of patients with pleural mesothelioma is more dependent on "pretreatment factors" than on the effect of therapeutic interventions. Histopathologic subtype is one of several important prognostic factors in pleural mesothelioma, and several studies indicate that the epithelial subtype of pleural mesothelioma has a more favorable prognosis than the sarcomatoid. In this study, we retrospectively evaluated qualitative and quantitative aspects of the tissue specimens used for histopathologic diagnosis in 85 patients with pleural mesothelioma.

*Materials and methods:* The prognostic roles of two different histopathologic classification systems were evaluated in 85 consecutive cases of pleural mesotheliomas. Efficiency of different diagnostic procedures, influence of the size of the biopsy specimens on the histopathologic diagnosis, and immunohistochemical profiles for histopathologic subtypes of mesotheliomas were also evaluated.

*Results:* Patients with pure epithelial mesotheliomas (n=35), and especially those with the tubulopapillary subtype (n=18) of epithelial mesotheliomas, survived significantly longer than those with a sarcomatoid component (n=50). With larger biopsy specimens (surgical biopsy, autopsy), more tumors were classified as biphasic (36/78 vs 9/44, p<0.005). The sarcomatoid

mesotheliomas comprised about 20% of the tumors regardless of type of biopsy. Staining intensity for cytokeratin CAM 5.2 was equal in all types of mesotheliomas, while intensity with cytokeratin AE1/AE3 decreased from the epithelial to the sarcomatoid mesotheliomas. Staining with vimentin was most intense among the sarcomatoid mesotheliomas, while with epithelial membrane antigen it was most intense among the epithelial mesotheliomas.

*Conclusions:* The quality of the biopsy specimens has considerable impact on the possibility to arrive at a correct histopathologic diagnosis. Based on our results, we suggest tubulopapillary mesotheliomas be regarded as "low-grade mesotheliomas" and other types, including the epithelioid type of epithelial mesotheliomas, as "high-grade mesotheliomas." This should be taken into account when designing clinical trials.                    *(CHEST 1996; 109:109-14)*

CEA=carcinoembryonic antigen; EMA=epithelial membrane antigen; PR=partial response; WHO=World Health Organization

Key words: histopathology; immunohistochemistry; pleural mesothelioma; prognosis

The incidence of malignant mesothelioma, the primary malignant tumor of the pleural cavity, is increasing. This is mainly due to asbestos exposure.[1] The influence of treatment on survival has been difficult to separate from the impact of various background prognostic factors in randomized studies. For instance, Law et al[2] found no difference in survival in an uncontrolled comparison of treated and nontreated patients. The impact of extensive surgery, including extrapleural pneumonectomy with resection of the pericardium and diaphragm, alone or in combination with radiotherapy and chemotherapy, has yielded only occasional

reports of supposed cure of the disease.[3] The role of single or combined chemotherapy,[4] and radiotherapy,[5] in the treatment of pleural mesothelioma has been questioned. Several prognostic factors have been recognized; age,[6,7] performance status,[6,8,9] tumor stage,[6,7] chest pain,[9] asbestos exposure,[10] gender,[11] and histologic subtype.[6,9,11,12] As all these factors may mask effects of given treatment, they should be optimally and equally distributed to minimize confounding in clinical randomized studies.

As to histologic subtype, several reports have indicated that patients with epithelial mesothelioma have a better prognosis than those with the sarcomatoid type,[6,10,13-15] even if some authors[8,16] have not found such prognostic differences. Also, it has been reported that the size of the tissue specimens obtained for histopathologic diagnosis influence the diagnosis;[17] ie, more biphasic mesotheliomas are diagnosed with large (obtained by thoracotomy or autopsy), than with small (thoracoscopy, Abrams' biopsies), biopsy technique.

*From the Departments of Pathology and Cytology (Dr. Johansson) and Pulmonary Medicine (Dr. Lindén), University Hospital, Lund, Sweden.

Supported by grants from the Swedish Heart-Lung Foundation, the Medical Faculty, University of Lund, and the Royal Physiographic Association, Lund.

Manuscript received December 20, 1994; revision accepted June 22, 1995.

Reprint requests: Dr. Johansson, Department of Pathology & Cytology, University Hospital, S-221 85 Lund, Sweden*

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Exhibit 3 - 3

**Table 1—***Classification of Malignant Mesotheliomas According to Hammar and Bolen[19] (1988) Among the 122 Specimens**

| Mesothelioma | No. |
|---|---|
| Epithelial | |
| Tubulopapillary | 64 |
| Epithelioid | 51 |
| Glandular | 4 |
| Large cell-giant cell | 6 |
| Small cell | 1 |
| Adenoid-cystic | 0 |
| Signet ring | 0 |
| Sarcomatoid | 53 |
| Biphasic | 42 |
| Transitional | 4 |
| Desmoplastic | 6 |
| No. of observations | 241 |

*For each tumor, up to three components were recorded.

We therefore have analyzed several qualitative aspects of the histopathologic prognostic factor. According to the 1982 World Health Organization (WHO) typing of lung tumors,[18] pleural mesotheliomas are classified into epithelial, sarcomatoid (fibrous), and mixed (biphasic) types. In this study, we use a modified WHO classification with the biphasic mesotheliomas divided into predominantly epithelial and predominantly sarcomatoid. We also analyze the influence of type of tissue specimens on the histopathologic diagnosis and to what extent different diagnostic procedures (thoracoscopy, thoracotomy, or Abrams' biopsies) will give a correct diagnosis. Moreover, a new classification scheme suggested by Hammar and Bolen[19] is applied to examine if it is a more versatile instrument in separating tumors with different prognosis than the current WHO classification. Besides, as immunohistochemistry has been an important diagnostic adjunct in pathology, we try to obtain an immunohistochemical profile for different subtypes of mesotheliomas and we discuss the role of immunohistochemistry in routine pathology as regards pleural mesothelioma.

MATERIALS AND METHODS

Histopathologic material from pleural neoplasms diagnosed during the period September 1, 1979 to July 1, 1990 at the Department of Pulmonary Medicine, University Hospital, Lund, Sweden, were reviewed by one of us (L.J.). Slides were cut from formalin-fixed and paraffin-embedded blocks and stained with haematoxylin-eosin and connective tissue stain according to van Gieson. The tumors were reclassified without knowledge of original diagnosis or outcome. Cases were accepted as mesothelioma only if light microscopic examination was consistent with the diagnosis (most important, a growth pattern). The criteria also included that sarcomatoid mesotheliomas were accepted only as such if staining for cytokeratin was positive, and that cases with strong staining for carcinoembryonic antigen (CEA) would not be accepted. However, during the reclassification work, we were not in conflict with any of the two last criteria. Finally, a thorough clin-

ical examination had been performed, except in the 12 cases not diagnosed before autopsy, to exclude other primaries. Moreover, the autopsy rate was 58%. In the 85 cases (80 men and 5 women) finally accepted as mesotheliomas, the diagnosis was confirmed only by biopsy (thoracoscopic or open pleural biopsy) in 36 cases, only by autopsy in 12 cases, and by both methods in 37 cases.

Usually mesotheliomas are classified according to the 1982 revised WHO classification of lung tumors into epithelial, sarcomatoid (fibrous), and biphasic. In this study, we used a modified classification with the biphasic type divided into predominantly epithelial and predominantly sarcomatoid. It is then anticipated that one of the components is dominating over the other. When available, immunohistochemical stainings were used to evaluate the phenotype, either epithelial or sarcomatoid. In total, 122 histologic specimens were available. Five cases were obtained by Abrams' biopsy, 39 by thoracoscopy, 29 by thoracotomy, and 49 by autopsy. For correlation with survival, surgical biopsy specimens were regarded as best evidence, followed in descending order by thoracoscopic biopsy specimens, necropsies, and Abrams' biopsy specimens. A complete follow-up was available for all patients. The tumors were staged according to Butchart et al[20] by means of CT, plain chest radiograph, autopsy, or by biopsy specimen-proved distant metastasis. Survival was calculated from start of symptoms to death.

All 122 specimens were also classified according to a scheme (Table 1) proposed by Hammar and Bolen.[19] We then recorded all histologic components (the heterogeneity) in the tumors separately (maximum three in each tumor).

Immunohistochemical results for the population under study have been reported previously.[21] Staining intensity was scored 0 to 3. The following antibodies were used: vimentin, cytokeratins CAM 5.2 (cytokeratins 7, 8, 18, and 19 in the Moll catalog) and AE1/AE3 (most cytokeratins, except 18, in the Moll catalog), epithelial membrane antigen (EMA), and CEA. The following positive controls were used: uterus (vimentin), carcinoma of the breast (cytokeratins, EMA), and large bowel (CEA). For this study, immunohistochemical examinations were available for 106 of the 122 specimens. Average staining intensity (sum of the scores divided by the number of cases) was calculated and related to histologic subtype of mesothelioma.

*Statistics*

For comparison between groups, the Mann-Whitney U test was used, and for correlations, the Spearman's rank correlation test was used. Proportions were compared with $\chi^2$ test.

RESULTS

From Table 2, which gives the efficacy of different procedures in obtaining a histologic diagnosis, it is obvious that open pleural biopsy is superior to thoracoscopy as a diagnostic procedure (94% vs 70% diagnostic). Abrams' biopsies are too few for conclusions.

The histological typing of all 122 specimens according to the modified WHO classification is given in Table 3. There were 45% epithelial mesotheliomas, 24% predominantly epithelial, 13% predominantly sarcomatoid, and 18% sarcomatoid. Table 3 also gives the histologic type in relation to type of specimen. There was a significantly higher proportion of biphasic mesotheliomas (predominantly epithelial, predominantly sarcomatoid) among the large (surgical biopsy, autopsy) compared with the small (Abrams' biopsy, thoracoscopic biopsy) specimens (p<0.005, $\chi^2$ test). As the

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Clinical Investigations

Exhibit 3 - 4

**Table 2—Methods of Histologic Diagnosis in 85 Patients With Pleural Mesothelioma***

| Diagnostic Procedure | N | D | % |
|---|---|---|---|
| Abrams' biopsy | 5 | 4 | 80 |
| Thoracoscopic biopsy | 50† | 35‡ | 70 |
| Open pleural biopsy | 31 | 29 | 94 |
| Autopsy | 49 | 13 | 27§ |
| Other methods | 4 | 4 | |
| Total | 139 | 85 | |

*N=number of procedures performed; D=number of successful diagnostic procedures.
†In another 12 cases, thoracoscopy was not possible due to adhesions and other technical difficulties.
‡In three patients, two thoracoscopies were performed.
§Diagnosed at autopsy.



FIGURE 1. Photomicrograph with low-power view of an epithelial mesothelioma of pure tubulopapillary type. In this cytokeratin staining the tubulopapillary way of growth can be easily appreciated due to the lack of background staining (cytokeratin CAM 5.2, original magnification ×25).

purely sarcomatoid mesotheliomas comprised about 20% of the tumors regardless of type of specimen (Table 3), it seems that it was the sarcomatoid (fibrous) component in the biphasic mesotheliomas that was not recognized in the small biopsy specimens.

In Table 1, the type of mesothelioma is given according to the classification proposed by Hammar and Bolen.[19] Only three types (tubulopapillary, epithelioid, and sarcomatoid (Figs 1 through 3), occurred frequently. Adenoid-cystic and signet ring types were not encountered at all.

The immunohistochemical staining intensity for different histologic types of mesothelioma is given in Table 4. For vimentin, staining intensity increased from the epithelial to the sarcomatoid mesotheliomas. Concerning the cytokeratins, staining intensity for CAM 5.2 was almost equal in all types, while with AE1/AE3, the intensity decreased from the epithelial to the sarcomatoid type. Also with EMA, the staining



FIGURE 2. Photomicrograph with high-power view of an epithelial mesothelioma of the epithelioid type. The tumor cells are growing in large sheets, the nuclear atypia is more pronounced, and the plasma membranes are often pronounced. This type of mesothelioma was previously often referred to as polygonal (hematoxylin-eosin, original magnification ×100).

**Table 3—Histologic Type of Mesothelioma in Relation to Type of Specimen in 122 Biopsy Specimens From 85 Cases***

| | Nonbiphasic | | Biphasic | | |
|---|---|---|---|---|---|
| | E | S | PE | PS | N |
| Small specimens | | | | | |
| Abrams' biopsy | 3 | 1 | — | 1 | 5 |
| Thoracoscopic biopsy | 23 | 8 | 7 | 1 | 39 |
| Sum | 35 | | 9 | | 44 |
| Large specimens | | | | | |
| Surgical biopsy | 11 | 6 | 6 | 6 | 29 |
| Autopsy | 18 | 7 | 16 | 8 | 49 |
| Sum | 42 | | 36 | | 78 |
| Total | 55 | 22 | 29 | 16 | 122 |

*E=epithelial type; S=sarcomatoid; PE=predominantly epithelial; PS=predominantly sarcomatoid. $p<0.005$, $\chi^2$-test, proportion between biphasic and nonbiphasic tumors in the small and large specimen groups.



FIGURE 3. High-power view of a biphasic mesothelioma stained with cytokeratin. With this staining the growth pattern is easily recognized as epithelial at the top and at the right side of the photomicrograph and as sarcomatoid in the middle and at the left (cytokeratin CAM 5.2, original magnification ×100).

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Exhibit 3 - 5

was most intense among the epithelial mesotheliomas and decreased via the predominantly epithelial and predominantly sarcomatoid to the sarcomatoid mesotheliomas.

### Prognosis

Survival expressed as time from start of symptom to death is given in Table 5. Each histologic type was tested vs the three other types. Patients with purely epithelial mesotheliomas (n=35) survived significantly longer than those with a sarcomatoid component (n=50), (674 vs 471 days; p=0.01, Mann-Whitney $U$ test). No differences were found between the other histologic types.

Patients with an exclusively tubulopapillary mesothelioma (n=17) had a significantly prolonged survival compared with those with other (n=68) subtypes (775 vs 500 days; p=0.03). However, the survival of the patients with tubulopapillary mesotheliomas was not significantly different from those with epithelial mesotheliomas of nonpapillary (n=18) type (775 vs 580 days; p=0.36). The longer survival of the patients with tubulopapillary mesotheliomas could not be explained by an earlier histopathologic diagnosis, as the time from first symptoms to a biopsy specimen-proved diagnosis was 117 days for patients with tubulopapillary vs 150 days for those with nontubulopapillary mesotheliomas (Mann-Whitney $U$ test; p=0.93). Furthermore, the clinical stage at diagnosis according to Butchart et al[20] was 2.0 for the patients with tubulopapillary vs 1.7 for those with nonpapillary mesotheliomas (Mann Whitney $U$ test; p=0.63) and this is consequently not the explanation for the observed difference in survival.

### DISCUSSION

It was suggested by Klemperer and Rabin[22] in 1931 that mesotheliomas were derived from the serosal linings of the body cavities and that they could express both epithelial and mesenchymal histologic features. McCaughey[22] (1958)[23] classified them into epithelial, mesenchymal, mixed, and anaplastic. Today, the WHO classification recognizes three types of mesotheliomas: ie, epithelial, biphasic, and sarcomatoid. In this study, a modified WHO classification was used with the biphasic type divided into predominantly epithelial and predominantly sarcomatoid. Besides, a new classification scheme[19] was applied to investigate if it was a more

**Table 5—Survival in Relation to Histologic Type for Patients With Pleural Mesotheliomas***

| Histologic Type | N | Symptom-Death, d | | |
|---|---|---|---|---|
| | | Mean | Median | p[1] Value |
| Epithelial | 35 | 674 | 534 | 0.01 |
| Predominantly epithelial | 21 | 468 | 405 | — |
| Predominantly sarcomatoid | 14 | 452 | 332 | — |
| Sarcomatoid | 15 | 492 | 390 | — |
| Sum | 85 | | | |

*Modified WHO histologic typing.
[1]Mann-Whitney $U$ test, epithelial vs all other types.

versatile instrument in separating tumors with different prognosis than the current WHO classification. This classification scheme includes several distinct subtypes of epithelial mesotheliomas and a transitional type, ie, a type that cannot be reliably classified either as an epithelial or a sarcomatoid mesothelioma (Table 1). Thus, this scheme points to the different growth patterns and actual histologic variation found in many mesotheliomas, and may then, apart from providing prognostic information, be a useful guide for pathologists to what other tumors a mesothelioma may mimic.

### Type of Specimen and Histologic Classification

Since this study was performed before the introduction of the video-assisted thoracoscopy, we used a conventional rigid thoracoscope (Olympus) without video equipment to obtain the thoracoscopic biopsy specimens. The procedure was performed with local anesthesia and with the patient fully awake restricting the sampling of tumor tissue due to pain. Today, however, at least in hospitals where thoracic surgery is available, open lung and pleural biopsies are usually performed with video-assisted thoracoscopy under general anesthesia.[24]

In our study, open pleural biopsy was superior to the other diagnostic procedures (Table 2) as 94% provided a definite diagnosis. Abrams' biopsies, however, were too few for indisputable conclusions. Already in 1976 Elmes and Simpson[13] reported 70% correct diagnosis with "excision biopsy," 38% with a "limited open procedure," and 26% with needle biopsy. Ruffie et al[10] and Van Gelder et al[17] found that more than 90% of open

**Table 4—Average of the Immunohistochemical Staining Intensity for Different Histologic Types of Mesothelioma***

| Histologic Type | N | Vimentin | CAM 5.2 | AE1/AE3 | CEA | EMA |
|---|---|---|---|---|---|---|
| Epithelial | 46 | 1.04 | 2.80 | 2.50 | 0.04 | 1.80 |
| Predominantly epithelial | 23 | 1.30 | 2.70 | 2.26 | 0 | 1.60 |
| Predominantly sarcomatoid | 15 | 1.73 | 2.40 | 1.87 | 0 | 1.29 |
| Sarcomatoid | 22 | 2.09 | 2.40 | 1.22 | 0 | 0.64 |

*Staining intensity scored 0 to 3. There were 106 specimens from 70 patients.

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Clinical Investigations

Exhibit 3 - 6

biopsy specimens and about 85% of thoracoscopically obtained biopsy specimens, but considerably less (68% and 36%) of needle biopsy specimens provided a definite diagnosis. Thus, type of diagnostic procedure has considerable impact on the possibility to arrive at a correct diagnosis.

In 1991, Van Gelder et al[17] proposed that the size of the specimens influences the histopathologic diagnosis of type of mesothelioma. They reported 36% biphasic tumors among the small specimens (Abrams') and 63% among the large specimens (thoracoscopy, thoracotomy, autopsy). We included the thoracoscopic biopsy specimens in the small specimen group, mainly because there were only five Abrams' biopsy specimens. However, the distribution of the histologic types among the specimens obtained with thoracotomy and autopsy (large specimens) was closely related to each other, and distinct from the distribution among the thoracoscopically obtained specimens (Table 3). Despite the discrepancies in defining the small and large specimen groups, our findings confirm the results of Van Gelder et al[17] that larger specimens result in a larger proportion of biphasic tumors. Regardless of type of specimen, the sarcomatoid mesotheliomas comprised about 20% of the tumors, which indicates that the increase of the biphasic type among the large specimens was on behalf of the epithelial type. Thus, a sarcomatoid mesothelioma diagnosed with small biopsy technique may seldom show another phenotype in a large specimen; however, an epithelial mesothelioma diagnosed with small biopsy technique may often, in addition, display sarcomatoid features in a large specimen.

*Immunohistochemistry*

Although we agree with Sheibani[25] that the diagnosis of mesothelioma is still often a diagnosis of exclusion, immunohistochemistry has considerably improved the reliability of the histopathologic diagnosis. Thus, we found weak staining with CEA in only one of our cases (Table 4). Also, most authors agree that mesotheliomas should be negative (or weakly positive) with CEA (Table 4).[26] Cytokeratin CAM 5.2, containing only low molecular weight cytokeratins, was positive with all histologic subtypes of mesotheliomas. The remaining part of our immunohistochemical examinations may be concluded thus: when the phenotype becomes more sarcomatoid, the average staining intensity is increasing for vimentin and decreasing for cytokeratin AE1/AE3 and EMA. Therefore, the typical pattern for a mesothelioma with an epithelial or predominantly epithelial phenotype is negative (or weak) reaction with vimentin, strong reaction with the cytokeratins (CAM 5.2, AE1/AE3), and a considerably strong reaction with EMA. For the sarcomatoid and predominantly sarcomatoid mesotheliomas, the typical pattern is strong reaction with vimentin and cytokeratin CAM 5.2, considerably weaker reaction with cytokeratin AE1/AE3, and negative (or weak) reaction with EMA. Thus, a relatively small panel of antibodies may be contributing in the efforts to define an immunophenotypic profile for most mesotheliomas.

*Prognosis*

When survival rates are related to a histopathologic classification, the results are influenced by the criteria employed by the pathologist; for mesothelioma, the difficulty is to define the borderline between epithelial and biphasic tumors on the one end of the scale, and biphasic and sarcomatoid on the other. Because immunohistochemical stainings usually lack disturbing background, and as intermediate filaments usually outline the contours of the cytoplasm in such a way that it becomes much easier to decide if the growth pattern is epithelial or sarcomatoid (Fig 3), they may be used as an adjunct in routine histopathologic study. Thus, immunohistochemical stainings for intermediate filaments (cytokeratin and vimentin) were used in this study to maintain strict diagnostic criteria.

The autopsy rate was exceedingly high in the population under study (58%). But, as indicated above, for correlation with survival, surgical biopsy specimens were regarded as best evidence, followed in descending order by thoracoscopic biopsy specimens, necropsy specimens, and Abrams' biopsy specimens. Autopsies were thus regarded as important to establish the diagnosis of mesothelioma by examination of the gross morphologic growth pattern and exclusion of other primaries. However, tissue specimens from autopsies are usually of inferior quality, mainly due to autolysis, compared with those obtained at thoracoscopy or open pleural surgery, and were thus regarded as less important to establish the histopathologic subtype.

We were able to show that patients with purely epithelial mesotheliomas, especially those with the tubulopapillary subtype of epithelial mesothelioma, had a significantly longer survival than those having tumors that contained neoplastic mesenchymal cells (predominantly epithelial, predominantly sarcomatoid, and sarcomatoid, Table 5). Although no differences in survival have been found in some studies,[8,16] most reports[6,10,13-15] have indicated longer survival for patients with epithelial mesotheliomas. In previous studies, the prognosis of the biphasic mesotheliomas has been comparable either to the epithelial[6,10] or the sarcomatoid type.[14,15] To analyze if prognostic information was hidden in the large group of biphasic mesotheliomas, we divided them into predominantly epithelial and predominantly sarcomatoid. However, this was obviously not the situation as all tumors with a sarcomatoid component displayed a worse prognosis than the purely epithelial mesotheliomas. The negative prog-

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Exhibit 3 - 7

nostic influence of a sarcomatoid (fibrous) growth pattern was also demonstrated by Sugarbaker et al[15] (1993) in a study of 52 patients treated with extrapleural pneumonectomy, chemotherapy, and radiotherapy. Overall median survival was 16 months. However, no patients with sarcomatoid or biphasic mesotheliomas (n=20) survived more than 25 months and, above all, patients with epithelial mesotheliomas and normal mediastinal lymph nodes (n=25) had a 5-year survival rate of 45%.

Owing to advanced age or lack of histopathologic diagnosis before autopsy, only palliative therapy was given to 21 patients. Radiotherapy, usually 40 Gy in 20 fractions, was administered to 36 patients and radiotherapy supplemented with chemotherapy was given to 19 patients. Two patients had parietal pleurectomy. Radiotherapy and chemotherapy gave three partial responses (PRs) each. Combination chemotherapy with cisplatin and mitomycin induced one PR and a combination of doxorubicin and cyclophosphamide induced two PRs after pretreatment radiotherapy. For evaluation of tumor response, CT of the chest and upper abdomen was used before, and 1 month after, cessation of treatment. Ideally no interventions, such as treatments, should have been applied to the population under study as it may influence survival and be a confounded factor on prognosis. However, most studies of mesotheliomas dealing with prognostic factors include patients treated in one way or another and the general lack of ascertained effect of radiotherapy[5] and chemotherapy[4] on pleural mesothelioma probably reduces the power of this confounding factor. Besides, not only survival, but also clinical behavior and the effect of radiotherapy and chemotherapy are influenced by the histologic subtype.[2,27]

We conclude that type and size of the tissue specimens may influence the type of mesothelioma diagnosed and may thus be a confounding factor in studies concerning prognosis. Immunohistochemistry is important not only to establish the diagnosis of mesothelioma, but also in the efforts of arriving at a correct histopathologic subtyping. Finally, we suggest, based on histologic study and actual survival rates, that epithelial mesotheliomas, and especially the tubulopapillary subtype, be regarded as low-grade mesotheliomas, a fact that should be taken into account when designing and analyzing clinical trials.

### References

1 Gibbs AR. Role of asbestos and other fibres in the development of diffuse malignant mesothelioma. Thorax 1990; 45:649-54

2 Law MR, Gregor A, Hodson ME, et al. Malignant mesothelioma of the pleura: a study of 52 treated and 64 untreated patients. Thorax 1984; 39:255-59

3 Vogelzang NJ. Malignant mesothelioma: diagnostic and management strategies for 1992. Semin Oncol 1992; 19(suppl 11):64-71

4 Kramp-Hansen A, Hansen HH. Chemotherapy in malignant mesothelioma: a review. Cancer Chemother Pharmacol 1991; 28:319-30

5 Mattson K, Holsti LR, Tammilehto L, et al. Multimodality treatment programs for malignant pleural mesotheliomas using high-dose hemithorax irradiation. Int J Radiat Oncol Biol Phys 1992; 24:643-50

6 Manzini VP, Brollo A, Franceschi S, et al. Prognostic factors of malignant mesothelioma of the pleura. Cancer 1993; 72:410-17

7 Van Gelder T. Prognostic factors and survival in malignant pleural mesothelioma. Eur Respir J 1994; 7:1035-38

8 Alberts AS, Falkson G, Goedhals L, et al. Malignant pleural mesothelioma: a disease unaffected by current therapeutic manoeuvres. J Clin Oncol 1988; 6:527-35

9 Antman KH, Shemin R, Klegar K, et al. Malignant mesothelioma: prognostic variables in a registry of 180 patients, the Dana-Farber Cancer Institute and Brigham and Women's Hospital experience over two decades, 1965-1985. J Clin Oncol 1988; 6:607-13

10 Ruffie P, Feld R, Cormier S, et al. Diffuse malignant mesothelioma of the pleura in Ontario and Quebec: a retrospective study of 332 patients. J Clin Oncol 1989; 7:1157-68

11 Chahinian AP, Pajak TF, Holland JF, et al. Diffuse malignant mesothelioma: prospective evaluation of 69 patients. Ann Intern Med 1982; 96(pt 1):746-55

12 Fusco V, Ardizzoni A, Merlo F, et al. Malignant pleural mesothelioma: multivariate analysis of prognostic factors on 113 patients: clinical study. Anticancer Res 1993; 13:683-90

13 Elmes PC, Simpson MJC. The clinical aspects of mesothelioma. Q J Med 1976; 45:427-49

14 Hartmann CA, Schütze H. Survival and frequency of metastasis in histological subtypes of pleural mesothelioma: autopsy study of 106 cases. Pathologe 1992; 13:259-68

15 Sugarbaker DJ, Strauss GM, Lynch TJ, et al. Node status has prognostic significance in the multimodality therapy of diffuse, malignant mesothelioma. J Clin Oncol 1993; 11:1172-78

16 Hulks G, Thomas J SJ, Waclawski E. Malignant pleural mesothelioma in western Glasgow 1980-86. Thorax 1989; 44:496-500

17 Van Gelder T, Hoogsteden HC, Vandenbroucke JP, et al. The influence of the diagnostic technique on the histopathological diagnosis of malignant mesotheliomas. Virchows Arch A Pathol Anat 1991; 418:315-17

18 The World Health Organization histological typing of lung tumours. Am J Clin Pathol 1982; 77:123-36

19 Hammar SP, Bolen JW. Pleural neoplasms. In: Dail DH, Hammar SP, eds. Pulmonary pathology. New York: Springer-Verlag, 1988; 973-1028

20 Butchart EG, Ashcroft T, Barnsley WA, et al. Pleuro-pneumonectomy in the management of diffuse malignant mesothelioma of the pleura. Thorax 1976; 31:15-24

21 Johansson L, Lindén CJ. Review of malignant mesotheliomas in Lund 1980-90: histopathological and immunohistochemical features: preliminary results. Eur Respir Rev 1993; 3:61-3

22 Klemperer P, Rabin CB. Primary neoplasms of the pleura: a report of five cases. Arch Pathol 1931; 11:385-412

23 McCaughey WT. Primary tumours of the pleura. J Pathol Bact 1958; 76:517-29

24 Loddenkemper R, Boutin C. Thoracoscopy: present diagnostic and therapeutic indications. Eur Respir J 1993; 10:1544-55

25 Sheibani K. Immunopathology of malignant mesothelioma [editorial]. Hum Pathol 1994; 25:219-20

26 Mezger J, Lamerz R, Permanetter W. Diagnostic significance of carcinoembryonic antigen in the differential diagnosis of malignant mesothelioma. J Thorac Cardiovasc Surg, 1990; 100:860-66

27 Law MR, Hodson ME, Heard BE. Malignant mesothelioma of the pleura: relation between histological type and clinical behaviour. Thorax 1982; 37:810-15

Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS
Exhibit 3 - 8

# Aspects of Histopathologic Subtype as a Prognostic Factor in 85 Pleural Mesotheliomas

Leif Johansson and Carl-Johan Lindén

*Chest* 1996;109; 109-114
DOI 10.1378/chest.109.1.109

## This information is current as of December 1, 2011

**Updated Information & Services**
Updated Information and services can be found at:
http://chestjournal.chestpubs.org/content/109/1/109

**Cited Bys**
This article has been cited by 10 HighWire-hosted articles:
http://chestjournal.chestpubs.org/content/109/1/109#related-urls

**Permissions & Licensing**
Information about reproducing this article in parts (figures, tables) or in its entirety can be found online at:
http://www.chestpubs.org/site/misc/reprints.xhtml

**Reprints**
Information about ordering reprints can be found online:
http://www.chestpubs.org/site/misc/reprints.xhtml

**Citation Alerts**
Receive free e-mail alerts when new articles cite this article. To sign up, select the "Services" link to the right of the online article.

**Images in PowerPoint format**
Figures that appear in *CHEST* articles can be downloaded for teaching purposes in PowerPoint slide format. See any online figure for directions.



Downloaded from chestjournal.chestpubs.org by guest on December 1, 2011
1996 BY THE AMERICAN COLLEGE OF CHEST PHYSICIANS

Exhibit 3 - 9

# Exhibit 4

Exhibit 4 - 1

1   Gordon D. Greenwood, Esq. (C.S.B. #136097)
    Matthew L. Thiel, Esq. (C.S.B. #237564)
2   Barbra Ferre, Esq. (C.S.B. #237662)
    KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
3   Jack London Market
    55 Harrison Street, Suite 400
4   Oakland, California 94607
    Telephone: (510) 302-1000
5
    Attorneys for Plaintiffs
6

7

8

9                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      IN AND FOR THE COUNTY OF ALAMEDA

11

| | |
|---|---|
| 12  JAMES DEASON and MARY DEASON, | No. RG11601088 |
| 13        Plaintiffs, | FIRST AMENDED |
| | COMPLAINT FOR PERSONAL |
| 14     vs. | INJURIES; STRICT LIABILITY; |
| | BREACH OF WARRANTIES; |
| 15  A.W. CHESTERTON COMPANY; ASTRA | NEGLIGENCE; FRAUD; CONSPIRACY; |
| FLOORING COMPANY; ALLIED PACKING | (ALTERNATIVE ENTERPRISE AND |
| 16  & SUPPLY, INC.; CBS CORPORATION, a | CONCERT OF ACTION LIABILITY); |
| Delaware Corporation, formerly known as | PREMISES LIABILITY; AND LOSS OF |
| 17  VIACOM INC., successor by merger to CBS | CONSORTIUM |
| CORPORATION, a Pennsylvania Corporation, | |
| 18  formerly known as WESTINGHOUSE | Code of Civil Procedure §36(d) |
| ELECTRIC CORPORATION; CLEAVER- | |
| 19  BROOKS, INC., formerly known as AQUA- | |
| CHEM, INC.; FOSTER WHEELER LLC; | |
| 20  GENERAL ELECTRIC COMPANY; | |
| GEORGIA-PACIFIC LLC; GOULDS PUMPS, | |
| 21  INCORPORATED; HILL BROTHERS | |
| CHEMICAL COMPANY; HOPEMAN | |
| 22  BROTHERS, INC.; IMO INDUSTRIES, INC., | |
| individually and as successor in interest, parent, | |
| 23  alter ego and equitable trustee to DELAVAL | |
| STEAM TURBINE CO.; INGERSOLL-RAND | |
| 24  COMPANY, individually and as successor in | |
| interest, parent, alter ego and equitable trustee to | |
| 25  TERRY STEAM TURBINE COMPANY and | |
| THE WHITON MACHINE COMPANY; | |
| 26  KAMAN INDUSTRIAL TECHNOLOGIES | |
| CORPORATION; LAMONS GASKET | |
| 27  COMPANY, individually and as successor in | |
| interest, parent, alter ego and equitable trustee to | |
| 28  POWER ENGINEERING & EQUIPMENT CO.; | |
| M. SLAYEN AND ASSOCIATES, INC.; | |

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
Jack London Market
55 Harrison Street,
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

OCT 2 4 2011

S. McMullen

MDHEU1038054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                    1

Exhibit 4 - 2

1 | POWER ENGINEERING & EQUIPMENT CO.;
2 | SYD CARPENTER MARINE CONTRACTOR, INC.; NATIONAL STEEL AND
3 | SHIPBUILDING COMPANY; and FIRST DOE through THREE HUNDREDTH DOE, inclusive,
4 |
  |    Defendants.
5 |

6

7   Plaintiff JAMES DEASON alleges:

8       **FIRST CAUSE OF ACTION**
         Negligence
9      **[Against All Products Defendants]**

10          **I.**

11   Plaintiff James Deason brings this action on his own behalf.  The masculine form as used

12 in this complaint, if applicable as shown by the context hereof, applies to a female person or a

13 corporation.

14          **II.**

15   Plaintiff does not know the true names and capacities, whether corporate, associate or

16 individual of defendants sued herein as FIRST DOE through TWO HUNDRED TENTH DOE,

17 inclusive, and each of them, and for that reason prays leave to insert the true names and capacities

18 of said defendants when the same are ascertained.  Plaintiff is informed and believes and therefore

19 alleges that each of the defendants designated herein as a DOE is negligently, intentionally and/or

20 strictly liable or responsible in some manner for the events and happenings herein referred to, and

21 proximately caused injury and damages to plaintiff thereby as herein alleged.

22          **III.**

23   At all times herein mentioned, each of the defendants was the agent and employee of each

24 of the remaining defendants, and was at all times acting within the purpose and scope of said

25 agency and employment, and each defendant has ratified and approved the acts of the remaining

26 defendants.

27 //

28 //

KAZAN, MCCLAIN, LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1036054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES      2

Exhibit 4 - 3

IV.

Defendants A.W. CHESTERTON COMPANY; ASTRA FLOORING COMPANY; ALLIED PACKING & SUPPLY, INC.; CBS CORPORATION, a Delaware Corporation, formerly known as VIACOM INC., successor by merger to CBS CORPORATION, a Pennsylvania Corporation, formerly known as WESTINGHOUSE ELECTRIC CORPORATION; CLEAVER-BROOKS, INC., formerly known as AQUA-CHEM, INC.;FOSTER WHEELER LLC; GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC LLC; GOULDS PUMPS, INCORPORATED; HILL BROTHERS CHEMICAL COMPANY; HOPEMAN BROTHERS, INC.; IMO INDUSTRIES, INC., individually and as successor in interest, parent, alter ego and equitable trustee to DELAVAL STEAM TURBINE CO.; INGERSOLL-RAND COMPANY, individually and as successor in interest, parent, alter ego and equitable trustee to TERRY STEAM TURBINE COMPANY and THE WHITON MACHINE COMPANY; KAMAN INDUSTRIAL TECHNOLOGIES CORPORATION; LAMONS GASKET COMPANY, individually and as successor in interest, parent, alter ego and equitable trustee to POWER ENGINEERING & EQUIPMENT CO.; M. SLAYEN AND ASSOCIATES, INC.; POWER ENGINEERING & EQUIPMENT CO.; SYD CARPENTER MARINE CONTRACTOR, INC.; NATIONAL STEEL AND SHIPBUILDING COMPANY; and FIRST DOE through FIFTIETH DOE, inclusive, were at all times herein and still are corporations authorized to and doing business in the State of California.

V.

Defendants' products at issue in this complaint consist of asbestos and asbestos-containing products, or products as to which defendants knew or should have known that reasonably foreseeable uses of the products would expose persons such as plaintiff who worked with or around the products to friable asbestos.  These products were defective in their design, manufacture, labeling, marketing and/or warning and are referred to throughout this complaint as "asbestos" or "asbestos-containing products."

//

//

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET, SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

---

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

3

MTHIEL/1038054.1

Exhibit 4 - 4

**VI.**

At all times herein mentioned defendants, and each of them, were engaged in the business of mining, manufacturing, assembling, supplying, packaging, installing and labeling asbestos, and products produced therefrom, for sale to and use by the members of the general public as well as to other parties for use of the said products to manufacture and supply products therefrom.

**VII.**

At all times herein mentioned, defendants FIFTY-FIRST DOE through TWO HUNDRED TENTH DOE were Officers and Directors of named defendants herein as FIRST DOE through FIFTIETH DOE.

**VIII.**

The defendants, and each of them, acting through their agents, servants and/or employees, cause and have caused in the past, certain asbestos-containing products and asbestos-related materials, to be placed in the stream of commerce with the result that said products and materials came into contact and/or use by plaintiff and his co-workers which caused exposure to plaintiff.

**IX.**

Plaintiff James Deason was a worker who, from approximately 1975 through 1985, worked with and was exposed to asbestos and asbestos-containing products manufactured, designed, specified, sold and/or installed by the defendants, and each of them while he repaired, broke down and rebuilt boilers aboard commercial ships and U.S. Navy ships. During the course of his career, plaintiff was exposed to asbestos and asbestos-containing products at various shipyards including, but not limited to, San Diego Naval Shipyard, Long Beach Naval Shipyard, Alameda Naval Air Station, National Steel and Shipbuilding Company, and Todd Shipyard in San Pedro, California while working for Camass Co., Inc., Frasers Boiler Service, Inc., S.E. Young Boiler Co., Triple A Machine Shop, Inc., and Superior Boiler Repairs, Inc.

**X.**

During the course and scope of his attendance and work, plaintiff was exposed to asbestos products and asbestos-related materials of defendants, which exposure directly and proximately caused him to develop an illness known and designated as mesothelioma.

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
JACK LONDON MARKET
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1038054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                    4

Exhibit 4 - 5

### XI.

The illness and disability of plaintiff is the direct and proximate result of the negligence of the defendants, and each of them, in that they produced, sold and otherwise put into the stream of commerce, the foregoing materials which the said defendants, and each of them, knew, or in the exercise of ordinary care should have known, were deleterious, poisonous and highly harmful to plaintiff's body, lungs, respiratory system, skin and health.

### XII.

Plaintiff, exercising reasonable diligence, discovered the aforealleged conduct, misconduct and culpability of defendants, and each of them, on or after 2010, when informed of his diagnosis by a physician. Plaintiff could not have discovered such condition sooner because such condition was brought about without noticeable trauma until it had advanced to such a point that diagnosis could be made. Such a diagnosis required the services of an expert, and since plaintiff did not possess such expertise, he could not know, in the exercise of reasonable care, of the cause of his injury until such time as he was diagnosed and advised. Plaintiff could not know, until such advice, of the culpability of the defendants, and each of them.

### XIII.

As a direct and proximate result of the conduct of the defendants, and each of them, plaintiff experienced and continues to experience prolonged pain and suffering, the necessity for medical treatment, injuries including, but not limited to, mesothelioma, severe shock to his nervous system, and other injuries, the exact extent of which are unknown to plaintiff.

### XIV.

By reason of the aforesaid allegations, it has been necessary for plaintiff to engage the services of physicians, surgeons, and hospitals; plaintiff does not know the reasonable value of said services which were and are still reasonably required and requests leave to amend this complaint to insert said sum when it is ascertained.

### XV.

By reason of the aforesaid allegations, plaintiff has been unable to follow his normal gainful occupation for certain periods after the date of said events, and plaintiff has been disabled

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

5

M1V4EL/1038054.1

Exhibit 4 - 6

1   for an indefinite time; plaintiff does not now know the value of the employment which has been

2   lost to him, and requests leave to amend this complaint to insert the reasonable value thereof when

3   such is ascertained.

4                                            **XVI.**

5          By reason of the aforesaid negligence of defendants, and each of them, plaintiff has been

6   damaged to his health, strength, and activity in an amount in excess of $50,000.00 in addition to

7   special damages herein alleged.

8                                            **XVII.**

9          The foregoing acts of the defendants, and each of them, were done wantonly, willfully,

10  oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and

11  each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's

12  employers or to those entities that installed and/or handled the asbestos products to which plaintiff

13  was exposed, knew that the foregoing materials released invisible, undetectable respirable asbestos

14  fibers when installed or handled and that said fibers were extremely dangerous when inhaled. The

15  defendants, and each of them, either did not warn or insufficiently warned regarding the dangerous

16  nature of said materials, nor placed a sufficient warning on the said material or package thereof

17  regarding said dangerous nature, nor took any action to protect those persons who foreseeably

18  would be exposed to said asbestos products, despite knowing that persons who had no knowledge

19  of the dangerous and hazardous nature thereof, such as plaintiff, would be exposed to and inhale

20  asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

21         WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

22                                **SECOND CAUSE OF ACTION**

23                                **Breach of Implied Warranty**
                                  **[Against All Products Defendants]**

24

25         AS AND FOR A SECOND CAUSE OF ACTION, plaintiff complains of defendants, and

26  each of them, and alleges:

27  //

28  //

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

**I.**

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence.

**II.**

The defendants sold and/or supplied asbestos and asbestos-related materials to plaintiff's employers, and each defendant impliedly warranted that the said materials were of good and merchantable quality and fit for their intended use.

**III.**

The implied warranty made by the defendants, and each of them, that the asbestos and asbestos-related materials were of good and merchantable quality for the particular intended use was breached in that certain harmful, poisonous and deleterious matter and particles were given off into the atmosphere wherein plaintiff and others in his position carried out their duties as workers working with such materials and other related materials.

**IV.**

As a direct and proximate result of the breach of implied warranty of good and merchantable quality and fitness for the particular intended use, plaintiff developed an illness, to wit:  mesothelioma, which caused great disability, as previously set forth.

**V.**

By reason of the aforesaid, plaintiff has been damaged to his health, strength, and activity in an amount in excess of $50,000.00 in addition to special damages herein alleged.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

### THIRD CAUSE OF ACTION

**Strict Product Liability**
**Manufacturing Defect/Design Defect/Failure to Warn**
**[Against All Products Defendants]**

AS AND FOR A THIRD CAUSE OF ACTION, plaintiff complains of defendants, and each of them, and alleges:

//

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                                                7

MTHIEL/1038054.1

Exhibit 4 - 8

**I.**

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence.

**II.**

At all times herein mentioned, plaintiff's employers or those entities that installed and/or handled the products to which plaintiff was exposed purchased from defendants, and each of them, asbestos and asbestos products hereinafter referred to as products that were defective in design, manufacturing, labeling, marketing and/or warning.

**III.**

Defendants, and each of them, knew that the aforementioned products would be used without inspection for design, manufacturing, labeling, marketing and/or warning defects by the user thereof.

**IV.**

At all times mentioned herein, plaintiff reasonably was unaware of the dangerous nature of the aforementioned products.

**V.**

At all times mentioned herein, defendants, and each of them, were aware of the dangerous and defective nature of the design, manufacturing, labeling and/or marketing of the aforementioned products, when said products were used in the manner for which they were intended, and were aware that persons who foreseeably would be exposed to the asbestos containing products were not aware of the dangerous and defective nature of the design, manufacture, labeling and/or marketing of the products, yet defendants took no action to warn or otherwise protect those who foreseeably would be exposed to said defective and improperly labeled products.

**VI.**

Defendants manufactured, distributed, and sold asbestos-containing products. The asbestos-containing products contained a manufacturing defect when they left defendants'

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
JACK LONDON MARKET
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 485-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                    8

MTHEIJ1038054.1

Exhibit 4 - 9

1    possession, and plaintiff used those asbestos-containing products in a way that was reasonably

2    foreseeable to defendants. .

3                                 **VII.**

4       The aforementioned products were defective in design because they did not perform as

5    safely as an ordinary consumer would have expected them to perform.  At the time plaintiff used

6    the asbestos-containing products, they were substantially the same as when they left defendants'

7    possession; any change made to the asbestos-containing products after they left defendants'

8    possession was reasonably foreseeable to defendants; the asbestos-containing products did not

9    perform as safely as an ordinary consumer would have expected at the time of use; and plaintiff

10   used the products in the way that was reasonably foreseeable to defendants.

11                                **VIII.**

12       The aforementioned products lacked sufficient instructions and warnings of potential

13   dangers.  Defendants manufactured, distributed, and sold asbestos-containing products; those

14   asbestos-containing products had potential dangers that were known or knowable by the use of

15   scientific knowledge available at the time of the manufacture, distribution, and sale of the

16   products; the potential hazards presented a substantial danger to plaintiff; ordinary consumers

17   would not have recognized the potential dangers; defendants failed to adequately warn or instruct

18   of the potential dangers; and these asbestos-containing products were used in a way that was

19   reasonably foreseeable to defendants.

20                                **IX.**

21       The aforementioned products were used by plaintiff in the manner for which they were

22   intended, or plaintiff foreseeably was exposed to said products when they were used in the manner

23   for which they were intended.

24                                **X.**

25       As a direct and proximate result of the foregoing conduct, plaintiff developed an illness, to

26   wit:  mesothelioma, which caused great disability, as previously set forth.

27   //

28   //

Kazan, McClain,
Lyons,
Greenwood &
Harley, PLC
Jack London Market
55 Harrison Street,
Suite 400
Oakland, CA 94607
(510) 302-1000
(510) 465-7728
Fax (510) 835-4913

MTHIEL/1038054.1

---

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES            9

Exhibit 4 - 10

## XI.

As a proximate result of the defective design, manufacturing, labeling, marketing and/or warning of these aforementioned materials and products, plaintiff was generally damaged as is more fully set forth herein and in addition has sustained special damages hereinabove alleged.

## XII.

The foregoing acts of the defendants, and each of them, were done wantonly, willfully, oppressively and in conscious disregard of the safety of plaintiff herein, in that the defendants, and each of them, prior to and at the time of the sale of the aforementioned products to plaintiff's employers or to those entities that installed and/or handled the asbestos products to which plaintiff was exposed, knew that the foregoing products and materials released invisible, undetectable respirable asbestos fibers when installed or handled and that said fibers were extremely dangerous when inhaled. The defendants, and each of them, either did not warn or insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient warning on the said material or package thereof regarding said dangerous nature, nor took any action to protect those persons who foreseeably would be exposed to said asbestos products, despite knowing that persons who had no knowledge of the dangerous and hazardous nature thereof, such as plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

### FOURTH CAUSE OF ACTION

#### Fraud/Failure to Warn
#### [Against All Products Defendants]

AS AND FOR A FOURTH CAUSE OF ACTION, plaintiff complains of defendants, and each of them, and alleges:

## I.

Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set forth herein at length all and singular the allegations contained in the First Cause of Action herein, excepting therefrom allegations pertaining to negligence.

//

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1038054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

10

Exhibit 4 - 11

## II.

At all times pertinent hereto, the defendants, and each of them, owed plaintiff a duty, as provided for in Sections 1708 and 1710 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of the plaintiff.  In violation of that duty, the defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as set forth herein, thereby proximately causing injury to the plaintiff as is more fully set forth herein. Such acts and omissions consisted of acts falling within Section 1710, and more specifically were suggestions of fact which were not true and which the defendants did not believe to be true, assertions of fact of that which was not true, which the defendants had no reasonable ground for believing it to be true, and the suppression of facts when a duty existed to disclose it, all as are more fully set forth herein, and the violation of which as to any one such item gave rise to a cause of action for violation of the rights of the plaintiff as provided for in the aforementioned code sections.

## III.

Since 1924, the defendants, and each of them, have known and have been possessed of the true facts consisting of medical and scientific data and other knowledge which clearly indicated that the materials and products referred to herein were and are hazardous to the health and safety of the plaintiff, and others in plaintiff's position working in close proximity with such materials and have known of the dangerous propensities of other of the aforementioned materials and products prior to that time and with intent to deceive plaintiff, and others in his position and with intent that he and such others should be and remain ignorant of such facts and with intent to induce plaintiff and such others to alter their positions to their injury and/or risk and in order to gain advantages did do the following acts:

     a.    Defendants, and each of them, did not label any of the aforementioned asbestos-containing materials and products as to the hazards of such materials and products to the health and safety of plaintiff and others in his position working in close proximity with such materials until 1964, when certain of such materials were labeled by some, but not all, of the defendants herein, when the knowledge of such

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

11

Exhibit 4 - 12

1 hazards was existing and known to defendants, and each of them, since 1924. By

2 not labeling such materials as to their said hazards defendants, and each of them,

3 caused to be suggested as a fact to plaintiff and plaintiff's employers that it was safe

4 for plaintiff to work in close proximity to such materials when in fact it was not

5 true and defendants did not believe it to be true;

6  b. Defendants, and each of them, suppressed information relating to the danger of use

7 of the aforementioned materials by requesting the suppression of information to

8 plaintiff and the general public concerning the dangerous nature of the

9 aforementioned materials to workers by not allowing such information to be

10 disseminated in a manner which would give general notice to the public and

11 knowledge of the hazardous nature thereof when defendants were bound to disclose

12 such information;

13  c. Defendants, and each of them, sold the aforementioned products and materials to

14 plaintiff's employers and others without advising such employers and others of the

15 dangers of use of such materials to persons working in close proximity thereto,

16 when defendants knew of such dangers, as set forth herein, and, as set forth above,

17 had a duty to disclose such dangers.  Thereby, defendants caused to be positively

18 asserted to plaintiff's employers of that which was not true and which defendants

19 had no reasonable ground for believing it to be true, in a manner not warranted by

20 the information possessed by said defendants, and each of them, of that which was

21 and is not true, to wit, that it was safe for plaintiff to work in close proximity to

22 such materials;

23  d. Defendants, and each of them, suppressed from everyone, including plaintiff and

24 plaintiff's employers, and continue to suppress, medical and scientific data and

25 knowledge of the accurate results of studies including, but not limited to,

26 suppressing information contained in the unpublished Lanza report by participating

27 in the influencing of A.J. Lanza to change his report, which altered version was

28 published in *Public Health Reports*, Volume 50 at page 1 in 1935, when they were

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES  12

Exhibit 4 - 13

1   bound to disclose it unaltered, and by causing Asbestos Magazine, a widely

2   disseminated trade journal, to omit any mention of the dangers of inhaling asbestos

3   dust, thereby lessening the probability of notice of danger to those exposed to

4   asbestos, and thereby caused plaintiff to be and remain ignorant thereof;

5   e.   Defendants, and each of them, belonged to, participated in, and financially

6   supported the Asbestos Textile Institute and other industry organizations which

7   actively promoted the suppression of information of danger to users of the

8   aforementioned products and materials for and on behalf of defendants, and each of

9   them, thereby misleading plaintiff and plaintiff's employers to their prejudice

10   through the suggestions and deceptions set forth above in this cause of action.  The

11   Dust Control Committee, which changed its name to the Air Hygiene Committee,

12   of the Asbestos Textile Institute was specifically enjoined to study the subject of

13   dust control; discussions in such committee were held many times of (i) the dangers

14   inherent in asbestos and the dangers which arise from the lack of control of dust

15   and (ii) the suppression of such information from 1946 to a date unknown to

16   plaintiff at this time;

17   f.   Commencing in 1930 with the study of mine and mill workers at the Thetford

18   asbestos mines in Quebec, Canada, and the study of workers at Raybestos-

19   Manhattan plants in Manheim and Charleston, South Carolina, defendants knew

20   and possessed medical and scientific information of the connection between

21   inhalation of asbestos fibers and asbestosis, which information was disseminated

22   through the Asbestos Textile Institute and other industry organizations to all other

23   defendants, and each of them, herein.  Between 1942 and 1950 the defendants, and

24   each of them, knew and possessed medical and scientific information of the

25   connection between inhalation of asbestos fibers and cancer, which information

26   was disseminated through the Asbestos Textile Institute and other industry

27   organizations to all other defendants herein.  Thereby, defendants suggested as a

28   fact that which is not true and disseminated other facts likely to mislead plaintiff

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

13

MTHIEU/1038054.1

Exhibit 4 - 14

and plaintiff's employers and which did mislead them for want of communication of

true facts which consisted of the aforedescribed medical and scientific data and

other knowledge by not giving plaintiff or plaintiff's employers the true facts

concerning such knowledge of danger, when defendants were bound to disclose it;

g.    Failed to warn plaintiff and plaintiff's employers of the nature of the said materials,

to wit:  dangerous when breathed, causing pathological effects without noticeable

trauma, when possessed with knowledge that such material was dangerous and a

threat to the health of persons coming into contact therewith and under a duty to

disclose it;

h.    Failed to provide plaintiff with information concerning adequate protective masks

and devices for use with and application and installation of the products of the

defendants, and each of them, when they knew that such protective measures were

necessary, when they were under a duty to disclose such information, and if not

advised as to use would result in injury to the plaintiff and others applying and

installing such materials;

i.    Concealed from plaintiff the true nature of the industrial exposure of plaintiff, the

fact that they and each of them, knew that plaintiff and anyone similarly situated,

upon inhalation of asbestos would, in time develop irreversible conditions of either

pneumoconiosis, asbestosis or cancer, or all, and such person would immediately be

in not good health, the fact that he had in fact been exposed to harmful materials

and the fact that the materials to which he was exposed would cause pathological

effects without noticeable trauma, when under a duty to and bound to disclose it;

j.    Failed to provide information to the public at large and buyers, users and physicians

employed by plaintiff and plaintiff's employers for the purpose of conducting

physical examinations of plaintiff and others working in contact with asbestos as to

the true nature of the hazards of asbestos, in order for such physicians to diagnose,

and treat workers coming into contact with asbestos, in that the materials to which

plaintiff had been exposed would cause pathological effects without noticeable

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    trauma, when under a duty to supply such information and such failure is likely to

2    mislead for want of communication of such facts; and

3    k.    Defendants, and each of them, affirmatively misrepresented that asbestos

4    containing products were safe to use and handle, when they knew such statements

5    were false when made, or made said false statements recklessly and without regard

6    for whether the statements were true.

7                                    IV.

8        Each of the foregoing acts, suggestions, assertions and forbearances to act when a duty

9    existed to act, the said defendants, and each of them, having such knowledge, knowing plaintiff

10   did not have such knowledge and would breathe such material innocently, was done falsely and

11   fraudulently and with full intent to induce plaintiff to work in a dangerous environment and to

12   cause plaintiff to remain unaware of the true facts, all in violation of Section 1710 of the Civil

13   Code of the State of California.

14                                   V.

15       Plaintiff relied upon the said acts, suggestions, assertions and forbearances; had plaintiff

16   known the true facts, plaintiff would not have continued to work in the said environment.

17                                  VI.

18       By reason of the aforesaid premises, plaintiff has been damaged in his health, strength and

19   activity in addition to special damages hereinabove alleged.

20                                 VII.

21       Each of the said acts and forbearances to act were caused by false, fraudulent and malicious

22   motives of the defendants, and each of them, and plaintiff is entitled to exemplary and punitive

23   damages.  The foregoing conduct of the defendants, and each of them, was done wantonly,

24   willfully, oppressively and in conscious disregard of the safety of plaintiff herein, in that the

25   defendants, and each of them, prior to and at the time of the sale of the aforementioned products to

26   plaintiff's employers or to those entities that installed and/or handled the asbestos products to

27   which plaintiff were exposed, knew that the foregoing materials released invisible, undetectable

28   respirable asbestos fibers when installed or handled and that said fibers were extremely dangerous

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES            15

MTHIEU1038054.1

Exhibit 4 - 16

1   when inhaled.  In addition to the unlawful conduct described above, the defendants, and each of

2   them, either did not warn or insufficiently warned regarding the dangerous nature of said materials,

3   nor placed a sufficient warning on the said material or package thereof regarding said dangerous

4   nature, nor took any action to protect those persons who foreseeably would be exposed to said

5   asbestos products, despite knowing that persons who had no knowledge of the dangerous and

6   hazardous nature thereof, such plaintiff, would be exposed to and inhale asbestos fibers, and

7   plaintiff is entitled to punitive damages hereunder.

8                                          **VIII.**

9        Plaintiff had no knowledge that the foregoing acts were actionable at law when they were

10  committed, and cannot be charged with knowledge or inquiry thereof.

11       WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

12                              **FIFTH CAUSE OF ACTION**

13                      **Conspiracy to Defraud/Failure to Warn**
                        **[Against All Products Defendants]**

14

15       AS AND FOR A FIFTH CAUSE OF ACTION, plaintiff complains of defendants, and

16  each of them, and alleges:

17                                           **I.**

18       Plaintiff by this reference hereby incorporates and makes a part hereof as though fully set

19  forth herein at length all and singular the allegations contained in the First Cause of Action herein,

20  excepting therefrom allegations pertaining to negligence and agency, and the Fourth Cause of

21  Action herein.

22                                          **II.**

23       At all times mentioned, the defendants, and each of them, knowingly and willfully

24  conspired and agreed among themselves to perpetrate upon plaintiff the acts complained of as set

25  forth in the First and Fourth Causes of Action as are incorporated herein.

26                                         **III.**

27       Defendants, and each of them, did the acts and things herein alleged in Paragraph II of the

28  Fourth Cause of Action, incorporated herein, in furtherance of the conspiracy and agreement as

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1039054.1

1  herein alleged and did further conspire to violate State and Federal laws and regulations, the exact

2  nature and extent of which are unknown at this time, but known full well to defendants and each of

3  them.

4                                                    IV.

5          Each of the said acts and forbearances to act were caused by false, fraudulent and malicious

6  motives of the defendants, and each of them, and plaintiff is entitled to exemplary and punitive

7  damages.  The foregoing conduct of the defendants, and each of them, was done wantonly,

8  willfully, oppressively and in conscious disregard of the safety of plaintiff herein, in that the

9  defendants, and each of them, prior to and at the time of the sale of the aforementioned products to

10 plaintiff's employers or to those entities that installed and/or handled the asbestos products to

11 which plaintiff was exposed, knew that the foregoing materials released invisible, undetectable

12 respirable asbestos fibers when installed or handled and that said fibers were extremely dangerous

13 when inhaled.  In addition to the unlawful conduct described above, the defendants, and each of

14 them, either did not warn or insufficiently warned regarding the dangerous nature of said materials,

15 nor placed a sufficient warning on the said material or package thereof regarding said dangerous

16 nature, nor took any action to protect those persons who foreseeably would be exposed to said

17 asbestos products, despite knowing that persons who had no knowledge of the dangerous and

18 hazardous nature thereof, such as plaintiff, would be exposed to and inhale asbestos fibers, and

19 plaintiff is entitled to punitive damages hereunder.

20                                                    V.

21         By reason of the aforesaid acts of defendants, and each of them, plaintiff has suffered

22 damage to his health, strength and activity.

23         WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

24                                    **SIXTH CAUSE OF ACTION**

25                          **Market Share/Enterprise Liability/Negligence**
                                 **[Against All Products Defendants]**

26

27         AS AND FOR A SIXTH CAUSE OF ACTION, plaintiff complains of defendants, and

28 each of them, and alleges:

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

M1HEL/1036054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                                    17

Exhibit 4 - 18

I.

Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First Cause of Action.

II.

Plaintiff is informed and believes and on the basis of such information and belief alleges that at all times relevant herein, the number of producers of asbestos and asbestos products of the type that plaintiff used or was otherwise exposed to, and the nature and structure of the asbestos market and industry, was such that there is and was a substantial likelihood that plaintiff would have actually used or otherwise been exposed to the products of each of the defendants.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

**SEVENTH CAUSE OF ACTION**

**Market Share/Enterprise Liability/Strict Liability/Defective Product Design, Manufacturing, Labeling, Marketing and/or Warning**
**[Against All Products Defendants]**

AS AND FOR A SEVENTH CAUSE OF ACTION, plaintiff complains of defendants, and each of them, and alleges:

I.

Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the Third Cause of Action and in Paragraph II of the Sixth Cause of Action.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

**EIGHTH CAUSE OF ACTION**

**Market Share/Concert of Action/Negligence**
**[Against All Products Defendants]**

AS AND FOR AN EIGHTH CAUSE OF ACTION, plaintiff complains of defendants and each of them, and alleges:

I.

Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First Cause of Action, Paragraph II of the Fourth Cause of Action, and Paragraph II of the Sixth Cause of Action.

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510)302-1000
(510)465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

18

MTHEU1038054.1

Exhibit 4 - 19

## II.

Plaintiff is informed and believes and on the basis of such information and belief alleges that at all times relevant herein, each of the defendants has:

(1)    Cooperated in the defective design, manufacturing, labeling and/or marketing of uniformly defective and dangerous asbestos products;

(2)    Knowingly adhered to an inadequate industry-wide standard of safety that failed to warn plaintiff, or any other person likely to be exposed to the hazards caused by the use of their products, that exposure to asbestos fibers could cause asbestosis, mesothelioma, and lung cancer and other cancers and diseases or that it could otherwise cause death or serious permanent disability;

(3)    Delegated research, investigative, and other safety functions to various trade associations and industry leaders that failed to adequately and accurately investigate the risks caused by the use of asbestos and that minimized and suppressed the publication of the information concerning the hazards of asbestos; and

(4)    Otherwise jointly created and controlled the risk that was the proximate cause of the injuries of plaintiff.

## III.

Plaintiff is informed and believes and thereon alleges that at all times relevant herein, the nature and structure of the asbestos industry and market was such that the foregoing acts and omissions of each of the defendants, acting separately and in combination, were a substantial factor in bringing about the aforesaid injury-causing standards, practices and risk, and were otherwise the proximate and legal cause of, and a substantial factor in, bringing about the injuries to plaintiff.

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

### NINTH CAUSE OF ACTION

**Market Share/Concert of Action/Strict Liability/Defective Product Design
[Against All Products Defendants]**

AS AND FOR A NINTH CAUSE OF ACTION, plaintiff complains of defendants, and

KAZAN, MCCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

1    each of them, and alleges:

2                                              I.

3          Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

4    allegation contained in the Third Cause of Action, Paragraph II of the Fourth Cause of Action,

5    Paragraph II of the Sixth Cause of Action, and Paragraphs II and III of the Eighth Cause of Action.

6          WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

7                                **TENTH CAUSE OF ACTION**

8          **Market Share/Concert of Action/Conspiracy to Defraud/Failure to Warn**
                        **[Against All Products Defendants]**

9

10         AS AND FOR A TENTH CAUSE OF ACTION, plaintiff complains of defendants, and

11   each of them, and alleges:

12                                             I.

13         Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every

14   allegation contained in the Fifth and Ninth Causes of Action.

15                                             II.

16         Plaintiff is informed and believes and on the basis of such information and belief alleges

17   that at all times herein, each of the defendants knew that the aforesaid failure to warn was industry-

18   wide and that the use of their products and the products of others in the industry, without

19   inspection and protection from the hazards of dust inhalation and without an adequate warning by

20   any of them, created and increased the risk of death and disease from cancer, asbestosis, and other

21   related diseases.

22                                             III.

23         Plaintiff is informed and believes and on the basis of such information and belief alleges

24   that at all times herein, each of the defendants, acting in concert and pursuant to a common plan,

25   and in order to maximize the sale of their products and to minimize claims for damages and

26   compensation, knowingly assisted, aided, abetted, encouraged and ratified the conduct of each

27   other:

28         (1)      In the defective design, manufacturing, labeling and/or marketing of a uniformly

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1038054.1

                    FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                    20

Exhibit 4 - 21

1    defective and hazardous asbestos product without adequate tests and without an adequate warning

2    to their consumers and users; and

3          (2)      In suppressing and discouraging the discovery and publication of information

4    concerning the true hazards of asbestos by and to the public at large.

5          Said conduct was the proximate and legal cause of, and a substantial factor in, bringing

6    about the injuries of plaintiff.

7          WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

8                          **PREMISES DEFENDANTS:**

9                          **ELEVENTH CAUSE OF ACTION**

10                         **Negligence/Failure to Warn**
                           **[Against All Premises Defendants]**

11

12         AS AND FOR AN ELEVENTH CAUSE OF ACTION, plaintiff complains of defendants

13    NATIONAL STEEL AND SHIPBUILDING COMPANY; TWO HUNDRED ELEVENTH DOE

14    through THREE HUNDREDTH DOE, inclusive. These defendants were at all times herein and

15    still are corporations authorized to and doing business in the State of California, and are hereafter

16    designated the PREMISES defendants.  Plaintiff alleges against the PREMISES defendants, and

17    each of them:

18                                   I.

19         Plaintiff, by this reference, hereby incorporates and makes a part thereof, as though fully

20    set forth herein, each and every allegation contained in the First through Tenth Causes of Action

21    herein.

22                                   II.

23         Plaintiff does not know the true names or capacities of the defendants sued herein under

24    the fictitious names of TWO HUNDRED ELEVENTH DOE through TWO HUNDRED

25    FIFTIETH DOE, inclusive, whether corporate, associate or individual, and plaintiff prays leave to

26    amend this complaint to allege said true names and/or capacities when the same are ascertained.

27    Plaintiff is informed and believes and therefore alleges that each of the defendants designated

28    herein as a DOE is negligently, intentionally and/or strictly liable or responsible in some manner

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEU/1036054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                21

Exhibit 4 - 22

1  for the events and happenings herein referred to, and proximately caused injury and damages to

2  plaintiff as hereinafter alleged.

3  **III.**

4      At all times herein mentioned, defendants TWO HUNDRED FIFTY-FIRST DOE through

5  THREE HUNDREDTH DOE were Officers and Directors of named defendants herein as TWO

6  HUNDRED ELEVENTH DOE through TWO HUNDRED FIFTIETH DOE.

7  **IV.**

8      At all times mentioned herein, the PREMISES defendants each respectively owned,

9  maintained, managed, and/or controlled one or more of those premises where plaintiff worked

10  while employed as set forth in Paragraph IX of the First Cause of Action, which is herein

11  incorporated by reference.

12  **V.**

13      Prior to and at said times and places, each said PREMISES defendant caused certain

14  asbestos-containing insulation and other building materials and products and machinery to be

15  specified, manufactured, constructed, supplied, installed, maintained, used, replaced, and/or

16  repaired and otherwise be present at the aforesaid premises, by its own workers and/or various

17  independent contractors so as to allow and cause the release of dangerous quantities of toxic

18  asbestos fibers into the ambient air and thereby contaminate the entire premises and create a

19  hazardous condition and unreasonable risk of harm and personal injury to plaintiff and other

20  persons exposed to said asbestos fibers while working on said premises, or otherwise using or

21  coming on said premises, unless special precautions were taken.

22  **VI.**

23      At all relevant times mentioned herein, each said PREMISES defendant had a

24  nondelegable duty to exercise reasonable care to inspect and make safe the premises it owned,

25  maintained, managed and/or controlled, and to discover the aforesaid dangerous conditions.

26  PREMISES defendants, and each of them, also created or contributed to said dangerous

27  conditions, by specifying, manufacturing, supplying, installing, maintaining, using, replacing,

28  repairing, and/or requiring the use and/or handling of asbestos-containing materials on said

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1039054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

22

Exhibit 4 - 23

1   premises, and by failing to properly supervise their own employees or the employees of others over

2   whom said defendants had control in performing work which caused the release of asbestos fibers

3   into the ambient air and the contamination of the entire premise, when defendants knew or in the

4   exercise of ordinary and reasonable care should have known that the foregoing conditions and

5   activities were present on said premises and created a dangerous and hazardous condition and

6   unreasonable risk of harm and personal injury to plaintiff and other persons coming on the

7   aforesaid premises.

8                                    **VII.**

9        At all times relevant herein, plaintiff entered said premises and used and occupied said

10  premises as intended and for the benefit and advantage of each said PREMISES defendant and at

11  each said PREMISES defendant's request and invitation. In so doing, plaintiff was exposed to

12  dangerous quantities of asbestos fibers released into the ambient air by the aforesaid hazardous

13  conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or

14  caused by each said PREMISES defendant.

15                                   **VIII.**

16       Plaintiff at all relevant times used the premises with due care and was unaware of and in

17  the exercise of ordinary care could not have discovered the risk of personal injury and the

18  hazardous conditions created by the aforesaid presence of asbestos products and materials on said

19  premises. .

20                                    **IX.**

21       At all relevant times mentioned herein, each said PREMISES defendant knew, or in the

22  exercise of ordinary and reasonable care should have known, that the premises that were in its

23  control would be used as alleged without knowledge of, or inspection for, defects or dangerous

24  conditions, which were not apparent or obvious, and that persons using said premises would not be

25  aware of the aforesaid hazardous conditions and contamination on the premises to which they were

26  exposed.

27  //

28  //

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1038054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                        23

Exhibit 4 - 24

### X.

At all times pertinent hereto, the PREMISES defendants, and each of them, owed plaintiff a duty, as provided in Section 1708 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of plaintiff. When a duty to act was imposed, as set forth herein, the defendants, and each of them, did do the acts and omissions in violation of that duty, thereby proximately causing injury to the plaintiff as is more fully set forth herein.

### XI.

At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to warn plaintiff and plaintiff's employer that said materials were dangerous when breathed and caused pathological effects without noticeable trauma, despite the fact that defendants possessed knowledge and were under a duty to disclose that such material was dangerous and a threat to the health of persons coming into contact therewith.

### XII.

At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to provide plaintiff with information concerning adequate protective masks and devices to be used when applying, installing, disturbing, or otherwise working around asbestos-containing products, and each of them, despite the knowledge of the PREMISES defendants and a duty to disclose that such protective measures were necessary and would result in injury to the plaintiff and others applying, installing, disturbing, or otherwise working around such materials if not so advised.

### XIII.

At all relevant times mentioned herein, PREMISES defendants, and each of them, concealed from plaintiff the true nature of the industrial exposure of plaintiff, and knew that plaintiff and anyone similarly situated, upon inhalation of asbestos would, in time, develop irreversible conditions of either pneumoconiosis, asbestosis or cancer, or all, and that the materials to which he was exposed would cause pathological effects without noticeable trauma despite the fact that PREMISES defendants were under a duty to and bound to disclose it.

//

//

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEL/1038054.1

---

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

24

Exhibit 4 - 25

**XIV.**

2    At all relevant times mentioned herein, PREMISES defendants, and each of them, failed to

3 provide information of the true nature of the hazards of asbestos materials and that exposure to

4 these materials would cause pathological effects without noticeable trauma to the public, including

5 buyers, users, and physicians employed by plaintiff and plaintiff's employers so that said

6 physicians could examine, diagnose and treat plaintiff and others who were exposed to asbestos,

7 despite the fact that PREMISES defendants, and each of them, were under a duty to so inform and

8 said failure was misleading.

**XV.**

10    At all relevant times mentioned herein, said PREMISES defendants, and each of them,

11 negligently failed to take steps to abate or correct the dangerous conditions, or to make the

12 premises safe or to warn plaintiff of the existence of the aforesaid dangerous conditions and

13 hazards on said premises, although the risk of plaintiff's injuries was a foreseeable consequence of

14 the negligence of defendants and each of them.

**XVI.**

16    As a legal consequence of the foregoing, plaintiff developed an asbestos-related disease

17 which caused his illness as previously set forth and has suffered general and special damages as

18 alleged herein.

**XVII.**

20    The foregoing acts of the PREMISES defendants, and each of them, were done wantonly,

21 willfully, oppressively and in conscious disregard of the safety of plaintiff herein, by the

22 defendants, and each of them, in that the defendants, and each of them knew, at the time

23 defendants manufactured, supplied or required the use and/or handling of asbestos-containing

24 materials and/or failed to properly supervise their own employees or the employees of others over

25 whom defendants had control who installed and/or handled the asbestos products to which plaintiff

26 was exposed, that the foregoing materials released invisible, undetectable respirable asbestos fibers

27 when installed or handled and that said fibers were extremely dangerous when inhaled.  The

28 defendants, and each of them, either did not warn or insufficiently warned regarding the dangerous

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510)302-1000
(510)465-7728
FAX (510) 835-4913

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

25

MTHIEL/1036054.1

Exhibit 4 - 26

1   nature of said materials, nor placed a sufficient warning on the said material or package thereof

2   regarding said dangerous nature, nor took any action to protect those persons who foreseeably

3   would be exposed to said asbestos products, despite knowing that persons who had no knowledge

4   of the dangerous and hazardous nature thereof, such as plaintiff, would be exposed to and inhale

5   asbestos fibers, and plaintiff is entitled to punitive damages hereunder.

6       WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

7                           **TWELFTH CAUSE OF ACTION**

8           **Negligent Hiring and Negligent Exercise of Retained Control**
            **[Against All Premises Defendants]**

9

10      AS AND FOR A TWELFTH CAUSE OF ACTION, plaintiff complains of PREMISES

11  defendants, and each of them, as follows:

12                                    **I.**

13      Plaintiff refers to and incorporates herein by reference the First through Eleventh Causes of

14  Action of this Complaint.

15                                    **II.**

16      At all relevant times herein, the PREMISES defendants and each of them negligently hired,

17  retained and kept contractors on jobs to perform asbestos related work, and knew or in the exercise

18  of reasonable care and diligence should have known that the contractors, independent contractors,

19  subcontractors, employees, manufacturers, suppliers, distributors, workers and others these

20  defendants employed or engaged to or responsible for the manufacture, distribution, installation,

21  inspection, maintenance, repair, replacement, removal and/or disposing of asbestos and asbestos-

22  containing materials on the aforementioned premises were incompetent and unfit to perform the

23  duties for which they were employed, retained, hired or used, and that an unreasonable risk of

24  harm to plaintiff and other persons on the aforesaid premises would exist as a legal consequence of

25  such initial and/or continued employment, retention or contract. PREMISES defendants and each

26  of them failed to exercise reasonable caution in selecting, retaining and continuing to use each of

27  the employees, contractors, independent contractors and/or subcontractors who performed

28  asbestos-related work, excluding those that employed plaintiff, even though said PREMISES

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEU/1038054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                    26

Exhibit 4 - 27

1  defendants knew or in the reasonable exercise of ordinary and reasonable care should have known

2  that failure to choose these persons carefully to perform asbestos-related work and/or allow such

3  persons to continue to perform asbestos-related work after the PREMISES defendants, and each of

4  them, became aware of the negligent manner in which the work was being performed created a

5  dangerous and hazardous condition and unreasonable risk of harm and personal injury to plaintiff

6  and other workers or persons so exposed while working for or in the vicinity of negligent

7  contractors or exposed to asbestos fibers on such persons' clothing, shoes and person. PREMISES

8  defendants, and each of them, also negligently exercised the control they retained of the operative

9  details -- including, without limitation, the asbestos-related details -- of plaintiff's work, thereby

10 negligently exposing plaintiff to asbestos that was a legal cause of plaintiff's mesothelioma.

11                                         **III.**

12        The foregoing acts of the PREMISES defendants, and each of them, were done wantonly,

13 willfully, oppressively and in conscious disregard of the safety of plaintiff herein, by the defendants,

14 and each of them, in that the defendants, and each of them knew -- at the time defendants

15 manufactured, supplied or required the use and/or handling of asbestos-containing materials to which

16 plaintiff was exposed, and/or failed to properly train, hire and/or supervise their own employees or

17 the employees of others over whom defendants had control who installed and/or handled the

18 asbestos products to which plaintiff was exposed, and/or negligently exercised the control they

19 retained of the asbestos-related details of plaintiff's -- that the foregoing materials released invisible,

20 undetectable respirable asbestos fibers when installed or handled and that said fibers were

21 extremely dangerous when inhaled. The defendants, and each of them, either did not warn or

22 insufficiently warned regarding the dangerous nature of said materials, nor placed a sufficient

23 warning on the said material or package thereof regarding said dangerous nature, nor took any

24 action to protect those persons who foreseeably would be exposed to said asbestos products,

25 despite knowing that persons who had no knowledge of the dangerous and hazardous nature

26 thereof, such as plaintiff, would be exposed to and inhale asbestos fibers, and plaintiff is entitled to

27 punitive damages hereunder.

28 //

KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 485-7728
FAX (510) 835-4913

MTHIEL/1038054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

27

Exhibit 4 - 28

WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

## THIRTEENTH CAUSE OF ACTION

### (Loss of Consortium)

AS AND FOR A THIRTEENTH CAUSE OF ACTION, plaintiff MARY DEASON complains of all defendants, and each of them, and alleges:

**I.**

This plaintiff, for and on behalf of herself, brings this action on her own behalf.

**II.**

Plaintiff refers to and incorporates herein by reference the First through Twelfth Causes of Action of this complaint.

**III.**

At the time that plaintiff James Deason sustained injury as more fully alleged in all the previous causes of action, and at all times thereafter, plaintiff Mary Deason is the wife of plaintiff James Deason.

**IV.**

Prior to said injuries, plaintiff James Deason was able to and did, perform his duties as the husband of plaintiff Mary Deason.  Plaintiff is informed and believes and thereon alleges that subsequent to said injuries and as a proximate result thereof, plaintiff James Deason has been, and some time in the future will be, incapacitated and unable to perform the necessary duties as husband of plaintiff Mary Deason and the work and service usually performed in the care, maintenance and management of the family home.

**V.**

As a proximate result of said injuries, plaintiff Mary Deason has been and will be deprived of consortium with plaintiff James Deason, including the performance of her husband's duties and on plaintiff's part will be required to perform the duties previously performed by plaintiff James Deason, all to plaintiff's damage in a sum which cannot be ascertained at this time.  Plaintiff requests the right to amend this complaint to allege the amount of said damages when they are ascertained.

KAZAN, McCLAIN, LYONS, GREENWOOD & HARLEY, PLC
JACK LONDON MARKET
55 HARRISON STREET,
SUITE 400
OAKLAND, CA 94607
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913

MTHIEU/1036054.1

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

28

Exhibit 4 - 29

1      WHEREFORE, plaintiff MARY DEASON prays judgment against defendants,

2  conspirators and their "alternate entities," and each of them as follows:

3      1.    General damages in an amount in excess of $50,000.00 in accordance with the

4  proof;

5      2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

6  accordance with proof;

7      3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

8  in accordance with the proof;

9      4.    Special damages in accordance with the proof;

10      5.    Prejudgment interest and post-judgment interest in accordance with law;

11      6.    Costs of suit; and

12      7.    Such other and further relief as the Court deems just and proper in the premises.

13      WHEREFORE, plaintiff JAMES DEASON prays judgment against defendants,

14  conspirators and their "alternate entities," and each of them as follows:

15      1.    General damages in an amount in excess of $50,000.00 in accordance with the proof;

16      2.    Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

17  accordance with proof:

18      3.    Punitive and exemplary damages in an amount found appropriate by the trier of fact

19  in accordance with the proof;

20      4.    Special damages in accordance with the proof;

21      5.    Prejudgment interest and post-judgment interest in accordance with law;

22      6.    Costs of suit; and

23      7.    Such other and further relief as the Court deems just and proper in the premises.

24  DATED: October 24, 2011          KAZAN, McCLAIN, LYONS,
                                     GREENWOOD & HARLEY, PLC

25
KAZAN, McCLAIN,
LYONS,
GREENWOOD &
HARLEY, PLC  26          By  _____
55 HARRISON STREET,                      Matthew L. Thiel
SUITE 400
OAKLAND, CA 94607  27
(510) 302-1000
(510) 465-7728
FAX (510) 835-4913  28     Attorneys for Plaintiffs

JACK LONDON MARKET

_____

FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES                    29

MTHIEL/1003805A.1

Exhibit 4 - 30

# Exhibit 5

Exhibit 5 - 1

# GENERAL DYNAMICS
nassco

## Who We Are



U.S. Navy photo by Chief Mass Communication Specialist Joe Kane

## COMPANY OVERVIEW



General Dynamics NASSCO has been designing and building ships since 1960, specializing in auxiliary and support ships for the U.S. Navy and oil tankers and dry cargo carriers for commercial markets. Located in San Diego, California, NASSCO employs about 3,300 people and is the only major ship construction yard on the West Coast of the United States.

General Dynamics NASSCO is one of three shipyards in the Marine Systems group of General Dynamics Corporation (NYSE: GD). General Dynamics, headquartered in Falls Church, Virginia, employs approximately 90,000 people worldwide. The company is a market leader in business aviation; land and expeditionary combat systems, armaments and munitions; shipbuilding and marine systems; and information systems and technologies. More information about the company is available at www.generaldynamics.com (http://www.generaldynamics.com) .

You are invited to explore this web site to learn more about the commercial and military shipbuilding and repair capabilities of NASSCO.

General Dynamics NASSCO dry-docked the USS *Bonhomme Richard* (LHD 6) on December 1, 2010. Over a five month period, the 844-foot long amphibious assault ship vessel received maintenance, repairs, and mid-life upgrades.

View a time lapse video of the USS *Bonhomme Richard* entering NASSCO's dry dock here:
http://www.youtube.com/user/LHD6PAO?feature=mhum (http://www.youtube.com/user/LHD6PAO?feature=mhum)

# GENERAL DYNAMICS
## nassco

## Who We Are

### COMPANY INFORMATION



NASSCO's shipyard facilities are capable of building commercial cargo ships and tankers and Navy auxiliary ships up to 1,000 feet in length and servicing or repairing any vessel sailing on the West Coast of the United States.

## Facilities

The shipyard is located on San Diego Bay, which has a channel depth of 35 feet. To reach NASSCO, ships pass under the Coronado Bridge, which has a vertical clearance of 195 feet. The shipyard encompasses 80 acres of land and 46 acres of water and offers:

2 inclined building ways, 950-feet long and 108-feet wide
8 fully serviced berths ranging from 600 to 1,000 feet
A 1,000-foot long, 174-foot wide graving dock with a lift capacity of 30,000 long tons
10 whirley/portal cranes with individual lift capacities up to 300 tons and multi-crane lifts up to 620 tons
An 820-foot long, 136-foot wide floating drydock with an ABS-certified lift capacity of 44,000 long tons
6 production workshops and 10 assembly areas
2 blast cells and 5 paint cells for indoor prep and coating of hull blocks (52'x52'x30')

# GENERAL DYNAMICS
## nassco

## Products And Services



## COMMERCIAL REPAIR

NASSCO operates a separate ship repair organization within its larger new construction and design shipyard that is capable of responding quickly to commercial ship owners' needs and schedules.

NASSCO is qualified to service any commercial vessel on the West Coast of the United States. The company can supply all of the labor, materials and expertise required to support the full spectrum of commercial customers' needs, including periodic maintenance, scheduled repairs, emergency repairs, overhaul and major structural modifications.

NASSCO's commercial ship repair activity is a growing part of our business. We have undertaken a continuous improvement program over the last several years to aggressively improve cycle time and quality and to become internationally competitive in the commercial repair marketplace.

Return to top

General Dynamics/NASSCO Commercial Repair Capabilities   Filed12/05/11   Page5 of 7

# GENERAL DYNAMICS
## nassco

---

**Products And Services** COMMERCIAL REPAIR CAPABILITIES

---



NASSCO operates a separate ship repair organization within its larger new construction and design shipyard that is capable of responding quickly to commercial ship owners' needs and schedules.

NASSCO is qualified to service any commercial vessel on the West Coast of the United States. The company can supply all of the labor, materials and expertise required to support the full spectrum of commercial customers' needs, including periodic maintenance, scheduled repairs, emergency repairs, overhaul and major structural modifications.

NASSCO's commercial ship repair activity is a growing part of our business. We have undertaken a continuous improvement program over the last several years to aggressively improve cycle time and quality and to become internationally competitive in the commercial repair marketplace.

Return to top

Exhibit 5 - 5

4

# GENERAL DYNAMICS
## nassco

**Products And Services** COMMERCIAL REPAIR FACILITIES

NASSCO's shipyard facilities are capable of servicing or repairing any ocean-going vessel. Because our ship repair operations are part of a full-service shipyard, NASSCO's repair customers benefit from the facilities and capabilities that are in place for full new ship construction.

Our shipyard encompasses 80 acres of land and 46 acres of water and offers:

2 inclined building ways, 950-feet long and 108-feet wide
8 fully serviced berths ranging from 600 to 1,000 feet
A 1,000-foot long, 174-foot wide graving dock with a lift capacity of 30,000 long tons
10 whirley/portal cranes with individual lift capacities up to 300 tons and multi-crane lifts up to 620 tons
An 820-foot long, 136-foot wide floating drydock with an ABS-certified lift capacity of 44,000 long tons
6 production workshops and 10 assembly areas
2 blast cells and 5 paint cells for indoor prep and coating of hull blocks (52'x52'x30')

Return to top

Exhibit 5 - 6

5

# GENERAL DYNAMICS
## nassco

**Products And Services**



## COMMERCIAL DESIGN AND CONSTRUCTION

NASSCO has extensive experience in all phases of new ship construction for commercial customers.



As a leading commercial ship designer and shipbuilder in the U.S., NASSCO has been responsible for the design and construction of 53 commercial ships since 1960. NASSCO-built ships have included a variety of propulsion plants including steam turbine, gas turbine, geared diesel, diesel-electric, and slow-speed diesel.

Working closely with customers -- from earliest stages of conceptual and preliminary design, through contract design and detail design -- NASSCO's Engineering Department tailors a ship design to meet owners' requirements while maintaining a highly producible, cost-effective product.

Commercial Ship Portfolio

Return to top

http://www.nassco.com/products-and-services/comm-design-construction.html

*6*

Exhibit 5 - 7

# Exhibit 6

Exhibit 6 - 1

# GENERAL DYNAMICS
## NASSCO

**Products And Services** **COMMERCIAL SHIP PORTFOLIO**

Click the ship icon to view a large color photograph.

### PC-1 TANKERS



Number Built: 5
Years Delivered: 2009- 2010
Owner: U.S. Shipping Partners LP, USA
Tonnage: 43,300 dwt
L x B x D: 183m (600') x 32.2m (106') x 12m (39')
Cargo Capacity: 53,500m3 (331,000 bbls)
Propulsion: Single screw, slow speed diesel plant
Speed: 15 knots

PC-1 Tanker Fact Sheet

### BP TANKERS



Number Built: 4
Years Delivered: 2004-2006
Owner: BP Oil Shipping Company USA

Tonnage: 185,000 dwt
L x B x D: 287m (941') x 50m (164') x 18.75m (61.5')
Total Installed Power: 20 MW
Integrated Diesel-Electric Propulsion
Twin screw; segregated engine rooms
Speed: 15.3 Knots

BP Tanker Fact Sheet

### ORCA CLASS ALASKAN TRAILERSHIP

Number Built: 2
Year Delivered: 2003
Owner: Totem Ocean Trailer Express, Inc. (TOTE)

Displacement: 45,472 long tons

Lightship Weight: 22,675 long tons
L x B x D: 839' x 118' x 29.5'
Prop. HP: 53,000 bhp
Type: Twin-Screw, Diesel-Electric
Speed at 90% MCR: 24 knots

Cargo Deck: 360,000 sq. ft.

Cargo Capacity: 600 feu; 200 autos

Tote Orca Class Trailership Fact Sheet

## HAWAII II CLASS CONTAINERSHIP



Number Built: 1
Year Delivered: 1992
Owner: Matson Navigation Company

Displacement: 21,500 L. Tons
L x B x D x T: 713' x 105' x 66.5' x 34.5'
Prop. HP: 33,680 BHP
Type: Slow-Speed Diesel
Speed: 22 Knots

Containership Pfeiffer Fact Sheet

## EXXON TANKERS

Number Built: 2
Years Delivered: 1986-1987
Owner: Exxon Shipping Company

Tonnage: 209,000 dwt
L x B x D x T: 987' x 166' x 88' x 64.5'
Prop. HP: 31,650 BHP
Type: Slow-Speed Diesel
Speed: 15.8 Knots

Exxon Tanker Fact Sheet

## LA JOLLA CLASS TANKERS



Number Built: 3
Years Delivered: 1982-1986
Owner(s): American Trading Transportation

Tonnage: 44,000 dwt
L x B x D x T: 658.5' x 105.8' x 53.5' x 36'
Prop. HP: 11,244 BHP
Type: Slow-Speed Diesel
Speed: 14.5 Knots

## INGRAM CLASS TANKERS

Number Built: 2
Years Delivered: 1982-1985
Owner(s): Ingram Corporation

Tonnage: 37,500 dwt
L x B x D x T: 658.5' x 90' x 53.5' x 36'
Prop. HP: 11,244 BHP

Exhibit 6 - 3

Type: Slow-Speed Diesel
Speed: 15.5 Knots

## CARLSBAD CLASS TANKERS



Number Built: 3
Years Delivered: 1981
Owner(s): Union Oil Company

Tonnage: 37,500 dwt
L x B x D x T: 658.5' x 100' x 49.5' x 33.3'
Prop. HP: 13,000 SHP
Type: Steam
Speed: 15.5 Knots

## SAN DIEGO CLASS TANKERS



Number Built: 4
Years Delivered: 1978-1980
Owner(s): Shell Oil Company
Atlantic Richfield Company

Tonnage: 188,500 dwt
L x B x D x T: 952.7' x 166' x 78' x 59.3'
Prop. HP: 28,000 SHP
Type: Steam
Speed: 14.5 Knots

## SAN CLEMENTE CLASS TANKERS



Number Built: 13
Years Delivered: 1974-1978
Owner(s): Aeron Marine Shipping Co.
Third Group, Inc.
Overseas Shipholding Group
Chestnut Shipping Co.

Tonnage: 89,700 dwt
L x B x D x T: 894' x 105.8' x 64.5' x 49.2'
Prop. HP: 24,500 HP
Type: Steam
Speed: 16.5 Knots

## CORONADO CLASS TANKERS



Number Built: 6
Years Delivered: 1973-1977
Owner(s): Margate Shipping
Moore-McCormack Lines

Tonnage: 38,300 dwt
L x B x D x T: 688.5' x 90' x 47' x 35'
Prop. HP: 15,000 HP
Type: Steam
Speed: 16.5 Knots

General Dynamics/NASSCO Commercial Ship Portfolio14-8   Filed12/05/11   Page5 of 5          11/30/2011

## SAN CLEMENTE CLASS OBO



Number Built: 2
Years Delivered: 1973-1974
Owner(s): Aries Marine Shipping Co.

Tonnage: 80,500 dwt
L x B x D x T: 892' x 105.5' x 62.5' x 45.9'
Prop. HP: 24,000 HP
Type: Steam
Speed: 16.5 Knots

## HYAK CLASS WASHINGTON STATE FERRIES



Number Built: 4
Years Delivered: 1967-1968
Owner(s): State of Washington

Displacement: 2,493 L. Tons
L x B x D x T: 382.3' x 73.2' x 24.3' x 17.3'
Prop. HP: 8,000 HP
Type: Diesel-Electric
Speed: 20 Knots

## C-3 AND C-4 DRY CARGO SHIPS



Number Built: 13
Years Delivered: 1961-1966
Owner(s): American Export Lines
States Lines
American Mail Lines
American President Lines

Tonnage: 16,810 and 23,000 dwt
L x B x D x T: 492.5' x 73' x 42.2' x 73'
565' x 76' x 44.5' x 31.5'
Prop. HP: 13,750 HP
19,250 HP
Type: Steam
Speed: 18.5 Knots
20.4 Knots

Return to top

# Exhibit 7

Exhibit 7 - 1

As filed with the Securities and Exchange Commission on January 18, 2002

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form S-4

### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# General Dynamics Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **3731** | **13-1673581** |
|---|---|---|
| (State or jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**3190 Fairview Park Drive**
**Falls Church, VA 22042-4523**
**(703) 876-3000**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

---

**David A. Savner, Esq.**
**Senior Vice President and General Counsel**
**3190 Fairview Park Drive**
**Falls Church, VA 22042-4523**
**(703) 876-3000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

---

Copy to:

**Charles J. McCarthy, Esq.**
**Jenner & Block, LLC**
**One IBM Plaza**
**Chicago, IL 60611**
**(312) 222-9350**

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after this Registration Statement becomes effective.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, as amended (the "Securities Act"), please check the following box and list the Securities Act registration statement number of the

earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to Be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit (1) | Proposed Maximum Aggregate Offering Price (1) | Amount of Registration Fee |
|---|---|---|---|---|
| Floating Rate Notes Due 2004 | $500,000,000 | 100% | $500,000,000 | $46,000 |
| Guarantees of Floating Rate Notes Due 2004 | — | — | — | (2) |
| Total | $500,000,000 | 100% | $500,000,000 | $46,000 |

(1)  Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(f) under the Securities Act.

(2)  No further fee is payable pursuant to Rule 457(n) under the Securities Act.

   **The Registrants hereby amend this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrants shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

## TABLE OF ADDITIONAL REGISTRANT GUARANTORS

| Exact name of registrant as specified in its charter | State or Jurisdiction of incorporation or organization | I.R.S. Employer Identification No. | Primary Standard Industrial Classification Code Number | Address, including zip code, and telephone number, including area code, of registrant's principal executive offices |
|---|---|---|---|---|
| American Overseas Marine Corporation | Delaware | 42-1273477 | 4499 | 116 East Howard Street Quincy, MA 02169-8712 (617) 786-8300 |
| Bath Iron Works Corporation | Maine | 39-1343528 | 3731 | 700 Washington Street Bath, ME 04530 (207) 443-3311 |
| Electric Boat Corporation | Delaware | 51-0369496 | 3731 | 75 Eastern Point Road Groton, CT 06340-4989 (860) 433-3000 |
| General Dynamics Advanced Technology Systems, Inc. | Delaware | 54-1863210 | 3661 | P.O. Box 28002 Greensboro, NC 27420-8002 (336) 698-8000 |
| General Dynamics Armament Systems, Inc. | Delaware | 54-1828437 | 3483 | Lakeside Avenue Burlington, VT 05401 (802) 657-6000 |
| General Dynamics Defense Systems, Inc. | Delaware | 54-1828438 | 3812 | 100 Plastics Avenue Pittsfield, MA 01201 (413) 494-1110 |
| General Dynamics Government Systems Corporation | Delaware | 16-1190245 | 3663 | 3190 Fairview Park Drive Falls Church, VA 22042-4523 (703) 876-3000 |
| General Dynamics Information Systems, Inc. | Delaware | 54-1873854 | 3812 | 8800 Queen Avenue South Bloomington, MN 55431 (612) 921-6700 |
| General Dynamics Land Systems Inc. | Delaware | 54-0582680 | 3795 | P.O. Box 2074 Warren, MI 48090-2074 (810) 825-4000 |
| General Dynamics Ordnance and Tactical Systems, Inc. | Virginia | 06-1458069 | 3483 | 10101 9th Street North St. Petersburg, FL 33716 (727) 578-8100 |
| Gulfstream Aerospace Corporation | Delaware | 13-3554834 | 3721 | 500 Gulfstream Road Savannah, GA 31408 (912) 965-3000 |
| Material Service Resources Company | Delaware | 36-3817444 | 1422 | 222 North LaSalle Street Chicago, IL 60601-1090 (312) 372-3600 |
| National Steel and Shipbuilding Company | Nevada | 95-2076637 | 3731 | P.O. Box 85278 San Diego, CA 92186-5278 (619) 544-3400 |

## TABLE OF CONTENTS

| | |
|---|---|
| About this Prospectus | i |
| Special Note on Forward-Looking Statements | i |
| Where You Can Find More Information | ii |
| Summary | 1 |
| Risk Factors | 7 |
| Use of Proceeds | 9 |
| Ratio of Earnings to Fixed Charges | 9 |
| Capitalization | 9 |
| Selected Financial Data | 10 |
| Condensed Consolidating Financial Statements | 11 |
| Business | 19 |
| The Exchange Offer | 20 |
| Description of the Exchange Notes and Guarantees | 30 |
| United States Federal Income Tax Consequences | 41 |
| Plan of Distribution | 44 |
| Legal Matters | 44 |
| Experts | 45 |

## ABOUT THIS PROSPECTUS

As used in this prospectus, except as the context otherwise requires, the "Company," "we," "us" and "our" mean General Dynamics Corporation, "Guarantors" means American Overseas Marine Corporation, Bath Iron Works Corporation, Electric Boat Corporation, General Dynamics Advanced Technology Systems, Inc., General Dynamics Armament Systems, Inc., General Dynamics Defense Systems, Inc., General Dynamics Government Systems Corporation, General Dynamics Information Systems, Inc., General Dynamics Land Systems Inc., General Dynamics Ordnance and Tactical Systems, Inc., Gulfstream Aerospace Corporation, Material Service Resources Company and National Steel and Shipbuilding Company, and references to "General Dynamics" mean General Dynamics Corporation, together with our consolidated subsidiaries, including the Guarantors.

You should rely only on the information contained or incorporated by reference in this prospectus or provided in any amendments hereto. We have not authorized anyone else to provide you with different information. You should not assume that the information in this prospectus or any amendments hereto is accurate as of any date other than the date on the front of these documents.

## SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This prospectus contains or incorporates by reference forward-looking statements, which are based on management's expectations, estimates, projections and assumptions. Words such as "expects," "anticipates," "plans," "believes," "scheduled," "estimates" and variations of these words and similar expressions are intended to identify forward-looking statements, which include, but are not limited to, projections of revenues, earnings, segment performance, cash flows, contract awards, aircraft production, deliveries and backlog stability. Forward-looking statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. These statements are not guarantees of future performance and involve certain risks and uncertainties, which are difficult to predict. Therefore, actual future results and trends

i

## BUSINESS

The Company is a Delaware corporation formed in 1952 as successor to the Electric Boat Company. General Dynamics' primary businesses focus on shipbuilding and marine systems, business aviation, information systems and land and amphibious combat systems. Each of these businesses involves design, manufacturing and program management expertise, advanced technology and integration of complex systems. The primary customers for our businesses are the United States military, the armed forces of allied nations, other government organizations and a diverse base of corporate and industrial buyers.

General Dynamics operates in four primary business groups: Marine Systems, Aerospace, Information Systems and Technology, and Combat Systems.

*Marine Systems.* Marine Systems is a leading supplier of combat vessels, including nuclear submarines, surface combatants and auxiliary ships. Marine Systems has the broadest range of integration, design, engineering and production skills in naval shipbuilding. It also supplies niche commercial shipbuilding markets and manages 23 ready-reserve, fast sealift and prepositioning ships for the U.S. government. Marine Systems includes our Electric Boat Corporation, Bath Iron Works Corporation, National Steel and Shipbuilding Company and American Overseas Marine Corporation subsidiaries.

*Aerospace.* Aerospace is the leading designer, developer, manufacturer and marketer of technologically advanced intercontinental business jet aircraft, and a major provider of maintenance and refurbishment services for a wide variety of business jets. The Aerospace group is comprised of Gulfstream Aerospace Corporation and General Dynamics Aviation Services. Gulfstream has produced approximately 1,230 aircraft for customers around the world and offers a range of aircraft products and services. Gulfstream's primary products are the Gulfstream IV-SP, which serves the large-cabin business jet aircraft market, the Gulfstream V, which serves the ultra-long range market, and the Gulfstream V-SP, which will serve the ultra-long range market and begin customer delivery in 2003. Gulfstream introduced the mid-size Gulfstream 100 and the super mid-size Gulfstream 200 (previously the Astra SPX and Galaxy aircraft, respectively) upon the completion of its acquisition of the assets of Galaxy Aerospace Company, LP in June 2001.

*Information Systems and Technology.* The Information Systems and Technology group provides defense and commercial customers with infrastructure and systems integration skills required to process, communicate and manage information effectively. The group has market-leading positions in the design, deployment and maintenance of wireline and wireless voice and data networks; command, control and communications systems; telecommunications system security; encryption; fiber optics; intelligence systems; computing hardware; and lifecycle management and support. The Information Systems and Technology group is pursuing new opportunities in networks and C4ISR systems for defense customers, as well as selected opportunities in the international and commercial markets.

*Combat Systems.* Combat Systems is a leading supplier of land and amphibious combat system development, production and support. Its product line includes a full spectrum of armored vehicles, suspensions, engines, transmissions, medium caliber guns, ammunition handling systems, turrets and turret drive systems, reactive armor and ordnance. Combat Systems includes our Land Systems, Armament Systems, Ordnance and Tactical Systems (formerly Primex Technologies, Inc. which was acquired in January 2001) and Santa Barbara de Industrias Sistemas, S.A. (which was formed in July 2001 upon the acquisition of Empresa Nacional Santa Barbara de Industrias Militaires, S.A. and Santa Barbara Blindados, S.A.) subsidiaries.

19

believe that his conduct was unlawful. NASSCO must indemnify directors and officers against expenses actually and reasonably incurred if the person has been successful on the merits in defense of any action, suit or proceeding. Any indemnification not ordered by a court or resulting from the successful defense based on the merits of a claim must be authorized by either the stockholders, the board of directors by majority vote of a quorum consisting of directors who are not parties to the proceeding, or if such quorum either so orders or cannot be obtained, by independent legal counsel in a written opinion.

### Other

The registrants may purchase and maintain insurance on behalf of their directors and officers against any liability asserted against such persons. The registrants have purchased and currently maintain insurance on behalf of their directors and officers.

## ITEM 21. EXHIBITS.

| Exhibit No. | Document |
|---|---|
| 3.1 | Restated Certificate of Incorporation of General Dynamics Corporation, effective August 2, 1999 (incorporated herein by reference from the Company's current report on Form 8-K filed with the Commission on August 11, 1999) |
| 3.2 | Restated By-Laws of General Dynamics Corporation, effective March 7, 2001 (incorporated herein by reference from the Company's annual report on Form 10-K for the year ended December 31, 2000, and filed with the Commission on March 29, 2001) |
| 3.3 | Certificate of Incorporation of Braintree VI Maritime Corporation, effective October 13, 1978 |
| 3.3.1 | Certificate of Amendment of Certificate of Incorporation of Braintree Maritime Transportation Corporation, effective October 15, 1984 |
| 3.4 | Amended and Restated By-Laws of American Overseas Marine Corporation, effective September 15, 2000 |
| 3.5 | Restated Articles of Incorporation of Bath Iron Works Corporation, effective September 27, 1995 |
| 3.6 | Amended and Restated By-Laws of Bath Iron Works Corporation, effective September 15, 2000 |
| 3.7 | Restated Certificate of Incorporation of Electric Boat Corporation, effective February 26, 1999 |
| 3.8 | Amended and Restated By-Laws of Electric Boat Corporation, effective September 15, 2000 |
| 3.9 | Restated Certificate of Incorporation of General Dynamics Advanced Technology Systems, Inc., effective February 26, 1999 |
| 3.10 | Amended and Restated By-Laws of General Dynamics Advanced Technology Systems, Inc., effective September 15, 2000 |
| 3.11 | Restated Certificate of Incorporation of General Dynamics Armament Systems, Inc., effective February 8, 1999 |
| 3.12 | Amended and Restated By-Laws of General Dynamics Armament Systems, Inc., effective September 15, 2000 |
| 3.13 | Restated Certificate of Incorporation of General Dynamics Defense Systems, Inc., effective February 8, 1999 |
| 3.14 | Amended and Restated By-Laws of General Dynamics Defense Systems, Inc., effective September 15, 2000 |
| 3.15 | Amended and Restated Certificate of Incorporation of General Dynamics Government Systems Corporation, effective September 8, 1999 |
| 3.16 | Amended and Restated By-Laws of General Dynamics Government Systems Corporation, effective September 15, 2000 |
| 3.17 | Restated Certificate of Incorporation of General Dynamics Information Systems, Inc., effective February 8, 1999 |

II-4

Exhibit 7 - 7

## EXHIBIT INDEX

| Exhibit No. | Document |
|---|---|
| 3.1 | Restated Certificate of Incorporation of General Dynamics Corporation, effective August 2, 1999 (incorporated herein by reference from the Company's current report on Form 8-K filed with the Commission on August 11, 1999) |
| 3.2 | Restated By-Laws of General Dynamics Corporation, effective March 7, 2001 (incorporated herein by reference from the Company's annual report on Form 10-K for the year ended December 31, 2000, and filed with the Commission on March 29, 2001) |
| 3.3 | Certificate of Incorporation of Braintree VI Maritime Corporation, effective October 13, 1978 |
| 3.3.1 | Certificate of Amendment of Certificate of Incorporation of Braintree Maritime Transportation Corporation, effective October 15, 1984 |
| 3.4 | Amended and Restated By-Laws of American Overseas Marine Corporation, effective September 15, 2000 |
| 3.5 | Restated Articles of Incorporation of Bath Iron Works Corporation, effective September 27, 1995 |
| 3.6 | Amended and Restated By-Laws of Bath Iron Works Corporation, effective September 15, 2000 |
| 3.7 | Restated Certificate of Incorporation of Electric Boat Corporation, effective February 26, 1999 |
| 3.8 | Amended and Restated By-Laws of Electric Boat Corporation, effective September 15, 2000 |
| 3.9 | Restated Certificate of Incorporation of General Dynamics Advanced Technology Systems, Inc., effective February 26, 1999 |
| 3.10 | Amended and Restated By-Laws of General Dynamics Advanced Technology Systems, Inc., effective September 15, 2000 |
| 3.11 | Restated Certificate of Incorporation of General Dynamics Armament Systems, Inc., effective February 8, 1999 |
| 3.12 | Amended and Restated By-Laws of General Dynamics Armament Systems, Inc., effective September 15, 2000 |
| 3.13 | Restated Certificate of Incorporation of General Dynamics Defense Systems, Inc., effective February 8, 1999 |
| 3.14 | Amended and Restated By-Laws of General Dynamics Defense Systems, Inc., effective September 15, 2000 |
| 3.15 | Amended and Restated Certificate of Incorporation of General Dynamics Government Systems Corporation, effective September 8, 1999 |
| 3.16 | Amended and Restated By-Laws of General Dynamics Government Systems Corporation, effective September 15, 2000 |
| 3.17 | Restated Certificate of Incorporation of General Dynamics Information Systems, Inc., effective February 8, 1999 |
| 3.18 | Amended and Restated By-Laws of General Dynamics Information Systems, Inc., effective September 15, 2000 |
| 3.19 | Restated Certificate of Incorporation of General Dynamics Land Systems Inc., effective December 7, 1998 |
| 3.20 | Amended and Restated By-Laws of General Dynamics Land Systems Inc., effective September 15, 2000 |
| 3.21 | Amended and Restated Articles of Incorporation of General Dynamics Ordnance and Tactical Systems, Inc., effective January 27, 2001 |
| 3.22 | By-Laws of Primex Technologies, Inc., effective January 27, 2001 |
| 3.23 | Restated Certificate of Incorporation of Gulfstream Aerospace Corporation, effective October 16, 1996 |
| 3.24 | Amended and Restated By-Laws of Gulfstream Aerospace Corporation, effective September 15, 2000 |

II-23

| Exhibit No. | Document |
|---|---|
| 3.25 | Certificate of Incorporation of Material Service Resources Company, effective March 5, 1992 |
| 3.26 | By-Laws of Material Service Resources Company, effective March 5, 1992 |
| 3.27 | Articles of Incorporation of National Steel and Shipbuilding Company, effective November 10, 1959 |
| 3.27.1 | Certificate of Amendment of Articles of Incorporation of National Steel and Shipbuilding Company, effective April 19, 1989 |
| 3.28 | Amended and Restated By-Laws of National Steel and Shipbuilding Company, effective June 15, 2001 |
| 4.1 | Indenture dated as of August 27, 2001 among General Dynamics Corporation, the Guarantors (as defined therein) and The Bank of New York, as Trustee |
| 4.2 | First Supplemental Indenture dated as of August 27, 2001 among General Dynamics Corporation, the Guarantors (as defined therein) and The Bank of New York, as Trustee |
| 4.3 | Registration Rights Agreement dated as of August 22, 2001 among General Dynamics Corporation, the Guarantors (as defined therein) and Bear Stearns & Co. Inc. |
| 4.4 | Form of Floating Rate Notes due 2004 — (Outstanding Notes) (included in Exhibit 4.2) |
| 4.5 | Form of Floating Rate Notes due 2004 — (Exchange Notes) |
| 5 | Opinion of Jenner & Block, LLC regarding the legality of the securities being registered hereby |
| 12 | Statement re computation of ratios |
| 23.1 | Consent of Arthur Andersen LLP |
| 23.2 | Consent of Deloitte & Touche LLP |
| 23.3 | Consent of Ernst & Young LLP |
| 23.4 | Consent of Jenner & Block, LLC (included in Exhibit 5) |
| 24.1 | Power of Attorney of General Dynamics Corporation (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.2 | Power of Attorney of American Overseas Marine Corporation (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.3 | Power of Attorney of Bath Iron Works Corporation (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.4 | Power of Attorney of Electric Boat Corporation (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.5 | Power of Attorney of General Dynamics Advanced Technology Systems, Inc. (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.6 | Power of Attorney of General Dynamics Armament Systems, Inc. (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.7 | Power of Attorney of General Dynamics Defense Systems, Inc. (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.8 | Power of Attorney of General Dynamics Government Systems Corporation (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.9 | Power of Attorney of General Dynamics Information Systems, Inc. (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.10 | Power of Attorney of General Dynamics Land Systems Inc. (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.11 | Power of Attorney of General Dynamics Ordnance and Tactical Systems, Inc. (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.12 | Power of Attorney of Gulfstream Aerospace Corporation (contained in, and incorporated by reference to the signature page of this registration statement) |

II-24

| Exhibit No. | Document |
|---|---|
| 24.13 | Power of Attorney of Material Service Resources Company (contained in, and incorporated by reference to the signature page of this registration statement) |
| 24.14 | Power of Attorney of National Steel and Shipbuilding Company (contained in, and incorporated by reference to the signature page of this registration statement) |
| 25 | Statement of Eligibility on Form T-1 of The Bank of New York |
| 99.1 | Form of Letter of Transmittal for the Outstanding Notes |
| 99.2 | Form of Notice of Guaranteed Delivery for the Outstanding Notes |
| 99.3 | Opinion of Arthur Andersen LLP |
| 99.4 | Financial Statements of Primex Technologies, Inc. as of December 31, 2000 |

II-25

```
<DOCUMENT>
<TYPE>EX-3.27
<SEQUENCE>28
<FILENAME>w56437ex3-27.txt
<DESCRIPTION>ARTICLES OF INC. NATIONAL STEEL AND SHIPBUILDING
<TEXT>
<PAGE>
```

Exhibit 3.27

ARTICLES OF INCORPORATION

OF

NATIONAL STEEL AND SHIPBUILDING COMPANY

FIRST: The name of this corporation is

NATIONAL STEEL AND SHIPBUILDING COMPANY.

SECOND: Its principal office in the State of Nevada is located at No. 206 North Virginia Street, in the City of Reno, County of Washoe. The name and address of its resident agent will be The Corporation Trust Company of Nevada, No. 206 North Virginia Street, Reno, Nevada.

THIRD: The nature of the business or objects or purposes to be transacted, promoted or carried on by the corporation are:

(a)    To build, equip, operate, maintain, buy, sell, deal in and with, own, charter and otherwise dispose of ships, vessels and boats of every nature and kind whatsoever, together with all materials, articles, tools, machinery and appliances entering into or suitable and convenient for the construction, maintenance, repair or equipment thereof, together with engines, boilers, machinery, appurtenances, tackle, apparel and furniture of all kinds; to buy, lease or otherwise acquire, construct, maintain and operate wharves, piers, docks, ship yards and warehouses; to construct and maintain graving and other docks and other conveniences for the building, maintaining, repairing or docking of ships and other vessels, and to aid in or contribute to the construction of any such works; to buy or otherwise acquire ships and vessels, complete or not complete, sound or out of repair, for the purpose of improving, reselling, chartering or otherwise making a profit out of the same.

```
<PAGE>
```

(b)    To buy, sell, manufacture, fabricate, erect and otherwise deal in or with all kinds, forms, and combinations of steel, iron, or other metals, or any of them, and in the products of iron, steel, or other metals, or any of them, or in which steel, iron, or any other metal forms a part or is related, including tools, machinery, equipment, buildings, kilns, bridges, docks and other structures, and to transact a general steel manufacturing, fabricating, foundry, jobbing, machining, machinery, and supply business, and to do any and all things incidental thereto and necessary, suitable or convenient in connection therewith.

(c)    To carry on the business of builders and contractors for the purpose of building, erecting, altering, repairing or doing any other work in connection with any and all classes of building and improvements of any kind and nature, whatsoever, including the building, rebuilding, alteration, repairing or improvement of houses, factories, schools, and other buildings, works or erections of every kind and description, whatsoever, including the locating, laying out and constructing of ships, pipe lines, roads, avenues, docks, sewers, bridges, dams, wells, walls, canals, railroads or street

railways, power plants and generally in all classes of buildings, erections and works, both public and private, or integral parts thereof, and to perform engineering and architectural works, including the preparation of plans and specifications, and expert work as acting and consulting and superintending engineers and architects and generally to do and perform such and all works as builders and contractors and with that end in view to solicit, obtain, make, perform and carry out contracts covering the building and contracting business and the work connected therewith.

     (d)    To manufacture, buy, sell and deal in any and all kinds of construction, engineering, building, shipbuilding and ship repair materials, tools, implements, accessories, equipment and supplies of every description, and to erect, or acquire by purchase, lease or otherwise, ship yards, manufactories, kilns, foundries and buildings; to establish and maintain and operate ship yards, manufactories, kilns, foundries, warehouses, agencies, and

2

<PAGE>

depots for manufacturing, fabricating, treating and storing its products, and for their sale and distribution, and to transport, or cause the same to be transported, as articles of commerce, and to do any and all things incidental thereto and necessary and proper to be done in connection with its business as aforesaid.

     (e)    To manufacture, purchase, or otherwise acquire, goods, wares, merchandise, and personal property of every class and description, and to hold, own, sell or otherwise dispose of, trade, deal in and deal with the same, and in general, to engage in any manufacturing business of any kind and character whatsoever.

     (f)    To enter into, make, perform and carry out contracts of every sort and kind which may be necessary or convenient for the business of this corporation with any person, firm, corporation, private, public or municipal, body politic, any state, territory or municipality of the United States or any foreign government, colony or body politic.

     (g)    To acquire by purchase, subscription or otherwise hold, mortgage, pledge, sell, assign, transfer, exchange or otherwise dispose of shares of the stock, or voting trust certificates for shares of the stock of, or any bonds or other securities, evidences of indebtedness or obligations created by, any other corporation or corporations organized under the laws of the State of Nevada or of any other state, or of any country, nation or government, and to pay therefor, in whole or in part, with cash or other property or with shares, bonds or other obligations of this corporation, and, while the owner or holder of any such shares, or voting trust certificates for shares, or bonds or other securities or evidences of indebtedness, or obligations of any such other corporation or corporations, to possess and exercise in respect thereof all the powers, rights and privileges of ownership, including the right to vote thereon and to consent in respect thereof for any and all purposes.

     (h)    To act as financial, commercial or general agent, other than fiscal or transfer agent, factor or representative, of individuals, partnerships, trustees, associations,

3

<PAGE>

joint stock companies, corporations or syndicates, and as such to develop and

extend their business and to aid in any of their lawful enterprises, in so far as a corporation organized under the laws of the State of Nevada may lawfully do so; and to the same extent, to manufacture, buy or otherwise acquire, sell or otherwise dispose of, import, export, distribute and deal in, either as principal or agent, goods, wares and merchandise of every kind and description.

        (i)     To promote, aid and assist, financially or otherwise, corporations, copartnerships, joint stock companies, syndicates, trustees, associations, and individuals to the extent legally permissible to a corporation organized under the laws of the State of Nevada; and to a like extent to endorse or underwrite the shares, bonds, debentures, notes, securities or other obligations or undertakings of any corporation, copartnership, joint stock company, association, syndicate, trustee, or individual, and to guarantee the payment of any dividends on shares, or the principal or interest upon bonds, notes, debentures or other obligations, of, or the performance of any contracts by, any corporation, copartnership, joint stock company, association, syndicate, trustee or individual.

        (j)     To adopt, apply for, obtain, register, purchase, lease or otherwise acquire, and to maintain, protect, hold, use, own, exercise, develop, operate and introduce, and to sell, grant licenses or other rights in respect of, assign, or otherwise dispose of or turn to account any trademarks, trade names, patents, patent rights, copyrights and distinctive marks and rights analogous thereto, and inventions, improvements, processes, formulae, and the like, including such thereof as may be covered by, used in connection with, or secured or received under, letters patent of the United States of America or elsewhere, which may be deemed capable of use in connection with the business of this corporation, and to acquire, use, exercise or otherwise turn to account licenses in respect of any such trademarks, trade

4

<PAGE>

names, patents, patent rights, copyrights, inventions, improvements, processes, formulae, and the like.

        (k)     To purchase, lease as lessee, take in exchange or otherwise acquire and to own, hold, develop, operate, sell, assign, transfer, convey, exchange, lease as lessor, mortgage, pledge or otherwise dispose of and encumber, real and personal property of every class and description, and rights and privileges therein, in the State of Nevada, and in any or all other states, territories, districts, possessions, colonies and dependencies of the United States of America, and in any or all foreign countries, which may be suitable or convenient in connection with the business of this corporation.

        (l)     To acquire all or any part of the good will, rights, assets and business of any person, firm, association or corporation heretofore or hereafter engaged in any business, in whole or in part, similar to the business of this corporation, and to hold, utilize and in any manner dispose of, the whole or any part of the right and assets so acquired, and to conduct in any lawful manner the whole or any part of the business thus acquired.

        (m)     To borrow or raise moneys for any of the purposes of this corporation without limit as to amount, and, from time to time, to issue bonds, debentures, notes or other obligations, secured or unsecured, of this corporation for moneys so borrowed, or in payment for property acquired, or for any of the other objects or purposes of this corporation or in connection with its business; to secure such bonds, debentures, notes and other obligations by mortgage or mortgages, or deed or deeds of trust, or pledge or other lien upon any or all of the property, rights, privileges or franchises of this corporation, wheresoever situated, acquired or to be acquired, and to pledge,

sell or otherwise dispose of any or all of such bonds, debentures, notes and other obligations of this corporation for its corporate purposes.

(n)     To promote or to aid in any manner financially or otherwise any other corporations or associations and for this purpose to guarantee or to become surety upon the

5

<PAGE>

contracts, dividends, stocks, bonds, notes, and other obligations of such other corporations or associations, and to do any other acts or things designed to protect, preserve, improve, or enhance the value of the stocks, bonds, or other evidences of indebtedness or securities of such other corporations.

(o)     To join and become a party to, and to participate in, any plan or agreement for the reorganization of, or the readjustment of the capital structure of, or for the composition of the creditors of, any other corporation, shares of which, or voting trust certificates for the shares of which, or bonds or other securities or evidences of indebtedness or obligations created by which, this corporation may own, hold or be possessed of, or entitled to a beneficial interest in, and to possess, exercise, and enjoy any and all rights, powers and privileges, for any purpose under the terms of such plan or agreement, to the same extent that an individual would be entitled to do.

(p)     To guarantee the payment of dividends upon, or any sinking fund payments in respect of, any shares, or the payment of the principal of, or interest on, or sinking fund payments in respect of, any bonds or other securities or evidences of indebtedness, or the performance of any contract, of any other corporation or corporations in so far as, and to the extent that, a guaranty in respect thereof by this corporation may be permitted by law.

(q)     In connection with the purchase, lease or other acquisition by this corporation of any property of whatsoever nature, to pay therefor in cash or property or to issue in exchange therefor shares, bonds or other securities or evidences of indebtedness of this corporation, and to assume in connection with any such acquisition any liabilities of any person, association or corporation.

(r)     To carry out all or any part of the foregoing objects and purposes as principal, agent, contractor or otherwise, either alone or in conjunction with any person, firm,

6

<PAGE>

association or other corporation, and to become a joint venturer or partner with any other person, firm or corporation, and in any part of the world; and in carrying on its business and for the purpose of attaining or furthering any of its objects or purposes, to make and perform such contracts of any kind and description, to do such acts and things, and to exercise any and all such powers, as a natural person could lawfully make, perform, do or exercise, provided that the same be not inconsistent with the laws of the State of Nevada.

(s)     To conduct its business in any or all of its branches in the State of Nevada and in any or all other states, territories, possessions, colonies and dependencies of the United States of America, and in the District of Columbia, and in any or all foreign countries, and to have one or more offices within and outside the State of Nevada.

       (t)     To do any and all things necessary, suitable, convenient or proper for, or in connection with, or incidental to, the accomplishment of any of the purposes or attainment of any one or more of the objects herein ennumerated, or designed directly or indirectly to promote the interests of this corporation, or to enhance the value of any of its properties; and in general to do any and all things and exercise any and all powers which it may now or hereafter be lawful for the corporation to do or to exercise under the laws of the State of Nevada that may now or hereafter be applicable to the corporation.

       (u)     The business or purpose of this corporation is, from time to time and at any time, to do one or more of the acts and things herein set forth, and to have all the powers, rights and privileges now or hereafter conferred by the laws of the State of Nevada upon corporations organized under the laws of Nevada authorizing the formation of corporations; providing, however, that nothing herein contained shall be deemed to authorize this corporation to construct, hold, maintain or operate in Nevada urban railroads, or interurban or street railways or telephone lines, or to carry on within said state, the business of a gas,

7

<PAGE>

electric, steam, heat or power company, or to carry on within said state any other public utility business.

       (v)     The objects specified herein shall, except as otherwise expressed, be in no way limited or restricted by reference to or inference from the terms of any other clause or paragraph of these articles. The objects, purposes and powers specified in each of the clauses or paragraphs in these articles of incorporation shall be regarded as independent objects, purposes or powers.

       The foregoing shall be construed as objects and powers, and the enumeration thereof shall not be held to limit or restrict in any manner the powers now or hereafter conferred on this corporation by the laws of the State of Nevada.

       FOURTH: The corporation is authorized to issue only one class of shares of stock. The total authorized capital stock of the corporation is $100,000, to consist of 10,000 shares of the par value of $10 each.

       After such time as there shall be issued and outstanding stock of the corporation, upon the sale for cash of any new stock of the corporation, every stockholder of the corporation shall have the right to purchase all or any part of his pro rata share of such new stock at the price at which it is offered or to be offered to others, provided, however, that in the event that one or more of such stockholders shall fail, refuse or otherwise omit to purchase all or any part of his or their pro rata share of such new stock within 20 days from the date such pro rata share of new stock is offered to him or them, any stockholder or stockholders desiring to purchase such new stock shall have the right to purchase all or any part of his or their pro rata share of the new stock not so purchased by the other stockholder or stockholders in addition to shares to which he or they shall otherwise be entitled to purchase pursuant to this Article FOURTH of these articles of incorporation. Any shares of such new stock not purchased by such other stockholders within 10 days after having been

8

<PAGE>

offered to them may be offered for sale to others who are not stockholders of the corporation. The provisions of this Article FOURTH with respect to the pre-emptive rights of stockholders may be waived by the written consent of the holders of all of the outstanding shares of the corporation.

FIFTH: The members of the governing board shall be known as "directors" and the number thereof shall be not less than three nor more than fifteen, the exact number to be fixed by the by-laws of the corporation; provided, that the number so fixed by the by-laws may be increased or decreased within the limit above specified from time to time by the by-laws.

The names and post office addresses of the first board of directors are as follows:

<TABLE>
<CAPTION>

| Names | Addresses |
| ----- | --------- |
| | |
| Thomas M. Lacey | 111 Sutter St., San Francisco, Calif. |
| Arthur L. Brown | 111 Sutter St., San Francisco, Calif. |
| Dick I. Oberholtzer | 111 Sutter St., San Francisco, Calif. |

</TABLE>

SIXTH: The capital stock, after the amount of the subscription price has been paid in, shall be subject to no further assessment to pay debts of the corporation.

SEVENTH: The names and post office addresses of each of the incorporators signing the articles of incorporation are as follows:

<TABLE>
<CAPTION>

| Names | Addresses |
| ----- | --------- |
| | |
| Thomas M. Lacey | 111 Sutter St., San Francisco, Calif. |
| Arthur L. Brown | 111 Sutter St., San Francisco, Calif. |
| Dick I. Oberholtzer | 111 Sutter St., San Francisco, Calif. |

</TABLE>

EIGHTH: This corporation is to have perpetual existence.

NINTH: In furtherance, and not in limitation of the powers conferred by statute, the board of directors is expressly authorized:

9

<PAGE>

(a)      To fix the amount to be reserved as working capital over and above its capital stock paid in; to authorize and cause to be executed mortgages and liens upon the real and personal property of this corporation.

(b)      From time to time to determine whether and to what extent, and at what times and places, and under what conditions and regulations, the accounts and books of this corporation (other than the original or duplicate stock ledger) or any of them, shall be open to inspection of stockholders, and

no stockholder shall have any right of inspecting any account, book or document of this corporation except as conferred by statute, unless authorized by a resolution of the stockholders or directors.

(c)     If the by-laws so provide, to designate three or more of its number to constitute an executive committee, which committee, for the time being, as provided in said resolution or in the by-laws of this corporation, shall have and may exercise any or all of the powers of the board of directors in the management of the business and affairs of this corporation, other than the power to declare dividends, and shall have power to authorize the seal of this corporation to be affixed to all papers which may require it.

This corporation may in its by-laws confer powers upon its directors in addition to the foregoing, and in addition to the powers and authorities expressly conferred upon them by the statutes.

TENTH: Meetings of stockholders may be held outside of the State of Nevada, if the by-laws so provide. The books of this corporation may be kept (subject to the provisions of the statutes) outside of the State of Nevada at such places as may be from time to time designated by the board of directors or in the by-laws of the corporation.

ELEVENTH: At all elections of directors, each stockholder at the time entitled to vote shall have the right of cumulative voting, that is, each stockholder shall be entitled to as many votes as shall equal the number of his voting shares of stock, multiplied

10

<PAGE>

by the number of directors to be elected, and he may cast all of such votes for a single director or may distribute them among the number to be voted for, or any two or more of them, as he may see fit.

TWELFTH: The original by-laws of the corporation may be adopted by the stockholders or the directors. Thereafter any and all by-laws may be made, adopted, amended, altered or repealed only by the vote or written consent of stockholders entitled to exercise at least two-thirds (2/3) of the voting power of the corporation.

THIRTEENTH: This corporation reserves the right to amend, alter, change or repeal any provision contained in these articles of incorporation, in the manner now or hereafter prescribed by statute or by these articles of incorporation, and all rights conferred upon stockholders herein are granted subject to this reservation, provided, however, that Article ELEVENTH of these articles of incorporation shall not be amended or repealed if the holders of the number of shares equal to the quotient arrived at when the total number of outstanding shares of the corporation is divided by one plus the authorized number of directors either vote against the proposed amendment or repeal of said Article ELEVENTH or refuse, decline, fail or otherwise omit to consent in writing to the proposed amendment or repeal thereof, and provided further, however, that Article TWELFTH of these articles of incorporation may be amended, altered or repealed only by the vote or written consent of stockholders entitled to exercise at least two-thirds (2/3) of the voting power of the corporation.

WE, THE UNDERSIGNED, being all of the original incorporators hereinbefore named for the purpose of forming a corporation under the laws of the State of Nevada and in pursuance of the General Corporation Law of the State of Nevada, being Chapter 78, Title 7 revised Statutes of Nevada, and the acts amendatory thereof and

11

<PAGE>

supplemental thereto, do make and file these articles of incorporation, hereby
declaring and certifying that the facts herein stated are true.

IN WITNESS WHEREOF, we accordingly have hereunto set our hands
this 9th day of November, A.D. 1959.

/s/ Thomas M. Lacey
_____
Thomas M. Lacey

/s/ Arthur L. Brown
_____
Arthur L. Brown

/s/ Dick I. Oberholtzer
_____
Dick I. Oberholtzer

STATE OF CALIFORNIA                     )
                                        ) ss:
CITY AND COUNTY OF SAN FRANCISCO        )

On this __ day of November, 1959, before me Abby E. Wigney, a Notary
Public in and for the City and County and State aforesaid, personally appeared
THOMAS M. LACEY, ARTHUR L. BROWN and DICK L. OBERHOLTZER, known to me to be the
persons described in and who executed the foregoing instrument, and who
acknowledged to me that they executed the same freely and voluntarily and for
the uses and purposes therein mentioned.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

/s/ Abby E. Wigney
_____
Notary Public in and for the City and
    County of San Francisco, State of
                            California

12

</TEXT>
</DOCUMENT>

# Exhibit 8

Exhibit 8 - 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDWIN BALL,

        Plaintiff,                No. C 09-4929 PJH

    v.                     **ORDER GRANTING MOTION
TO REMAND**

ASBESTOS DEFENDANTS (B P)

        Defendants.
_____/

      Plaintiff's motion for an order remanding the above-entitled action to the Superior

Court of California, County of San Francisco, came on for hearing before this court on

January 20, 2010.  Plaintiff appeared by his counsel Richard M. Grant, and defendant

McDonnell Douglas Corporation appeared by its counsel James C. Pettis.  Having read the

parties' papers and carefully considered their arguments, and good cause appearing, the

court hereby rules as follows.

      The motion is GRANTED, based on plaintiff's allegation that "[p]laintiff's claims

against defendant McDonnell Douglas Corporation exclude plaintiff's asbestos exposure at

military and federal government jobsites and aboard U.S. Navy vessels."  Cplt ¶ 5.

However, if plaintiff later attempts to proceed on any claims against McDonnell Douglas

arising from asbestos exposure at military and federal government jobsites and aboard

U.S. Navy vessels, and is allowed to do so by the state court despite the express waiver,

McDonnell Douglas can remove the case once again.  The request to stay is DENIED as

moot.

**IT IS SO ORDERED.**

Dated: January 22, 2010

                                  PHYLLIS J. HAMILTON
                                  United States District Judge

United States District Court
For the Northern District of California

Exhibit 8 - 2

# Exhibit F

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES DEASON and MARY DEASON,

        Plaintiffs,

        v.

A.W. CHESTERTON COMPANY, et al.,

        Defendants.

No. C 11-05667 JSW

**AMENDED ORDER GRANTING PLAINTIFFS' REQUEST TO SHORTEN TIME**

      Now before the Court is Plaintiffs' motion to shorten time on their motion to remand. The Court HEREBY GRANTS Plaintiffs' motion. Any opposition to Plaintiff's motion to remand shall be filed by no later than December 15, 2011. Plaintiffs' reply, if any, shall be filed by no later than noon on December 19, 2011. The hearing on Plaintiffs' motion is ADVANCED from March 2, 2012 to January 6, 2012.

      **IT IS SO ORDERED.**

Dated:   December 12, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

EXHIBIT __F__

Exhibit G

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID B. GRAVER and <br> FRANCES GRAVER, h/w <br>                               Plaintiffs <br><br>            v. <br><br> ALLENTOWN CEMENT COMPANY, <br> UNITED CONVEYOR CORPORATION, <br> BRAND INSULATION, <br> ALLEN-BRADLEY COMPANY, <br> FOSTER WHEELER CORPORATION, <br> GENERAL ELECTRIC, et al <br>                                Defendants | |

## ALLENTOWN CEMENT COMPANY'S NOTICE OF REMOVAL

Defendant Allentown Cement Company (hereinafter "Allentown Cement"), by and through its undersigned counsel, BONNER KIERNAN TREBACH & CROCIATA, LLP, and pursuant to 28 U.S.C. §§1441 and 1332, hereby removes to this Court an action pending in the Court of Common Pleas of Philadelphia County, Pennsylvania. The grounds for this Removal are set forth below:

1.      On or about June 25, 2010, Plaintiffs, David B. Graver and Frances Graver, filed a Complaint sounding in personal injury in the Court of Common Pleas of Philadelphia County, Pennsylvania, entitled *DAVID B. GRAVER and FRANCES GRAVER, h/w v. ALLEN-BRADLEY COMPANY, et al.*, JUNE TERM, 2010, NO. 2723. In accordance with 28 U.S.C. § 1446(a), a true and correct copy of the Complaint is attached hereto and incorporated herein as Exhibit "A."

2.      On or about March 17, 2011, Defendant Allentown Cement filed its Short Form Answer to Plaintiffs' Complaint, denying all averments of fact in Plaintiffs' Complaint and asserting affirmative defenses. In accordance with 28 U.S.C. §

EXHIBIT  G

1446(a), a true and correct copy of the Short Form Answer is attached hereto and incorporated herein as Exhibit "B."

        3.     Plaintiffs David and Frances Graver resided at 2162 Millersville Road in Lancaster and were citizens of the State of Pennsylvania at the time the Complaint was filed. *See* plaintiffs' Complaint attached hereto as Exhibit "A" at paragraph 1.

        4.     Allentown Cement Company is a Delaware corporation with a principal place of business located in Irving, Texas.

        5.     United Conveyor Corporation is an Illinois corporation with a principal place of business located in Waukegan, Illinois.

        6.     Brand Insulation is an Illinois corporation with a principal place of business in Park Ridge, Illinois.

        7.     Allen-Bradley Company is a Delaware corporation with a principal place of business located in Milwaukee, Wisconsin.

        8.     Foster Wheeler Corporation is a Delaware corporation with a principal place of business located in Clinton, New Jersey.

        9.     General Electric is a New York corporation with a principal place of business located in Fairfield, Connecticut.

        10.    This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332, and which may be removed on the petition of the Defendants to this District Court pursuant to 28 U.S.C. §§ 1441 and 1446.

11.     Upon information and belief, the amount in controversy in this action which includes the costs of indemnity for any adverse judgment against defendant, exceeds $75,000, exclusive of interests and costs.

12.     Pursuant to 28 U.S.C. §§ 1332(a), and 1441(a), this Court possesses original jurisdiction of this action because the amount in controversy exceeds $75,000 and because this action is between citizens of different states.  That is, all Plaintiffs are diverse from all Defendants.  Moreover, none of the Defendants are citizens of the Commonwealth of Pennsylvania, where the original action was filed.  Further, the Eastern District of Pennsylvania embraces Philadelphia County, where the current action is pending in the Court of Common Pleas of Philadelphia County in the Commonwealth of Pennsylvania.

13.     This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) because it was filed less than thirty days from April 11, 2011, the date upon which the action became removable by the Court Order of The Honorable Sandra Moss granting Defendant Crown Cork & Seal Company's Motion for Summary Judgment, and it is less than one year after the commencement of the action.  Defendant Crown Cork & Seal Company was the only remaining Defendant subject to personal jurisdiction in the Commonwealth of Pennsylvania.  No previous Notice of Removal has been filed or made to this court for the relief sought herein.  *See* a certified copy of the docket entries and Order confirming the Order granting Summary Judgment in favor of Crown Cork & Seal Company dated April 11, 2011 and attached hereto as Exhibit "C" and "D" respectively.[1]

---

[1] Upon information and belief, all other defendants in this case have either been dismissed or settled with plaintiffs.

14.     Pursuant to the United States Supreme Court's holding in *Chicago, R. I. & P. Ry. Co. v. Martin,*, 178 U.S. 245 (1900), this Notice of Removal is properly filed because all defendants served in the state court action have consented to removal. *See* Exhibit "E."

15.     Accordingly, this lawsuit is properly removable from Pennsylvania State court to the United States District Court, Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1332(a)(1), 1441(a) and 1446(b).

16.     Defendants Allentown Cement Company, United Conveyor Corporation, Brand Insulation, Allen-Bradley Company, Foster Wheeler Corporation, and General Electric, expressly reserve the right to raise all defenses and objections in this action after it is removed to this Honorable Court.

17.     A true and correct copy of this Notice of Removal is being filed with the Prothonotary of Philadelphia County Court of Common Pleas Law Division, as provided by 28 U.S.C. §  1446(d).

18.     Written Notice of the filing of this Notice of Removal will be given to all served parties as required by 28 U.S.C. § 1446(d).

19.     No admission of fact, law or liability is intended by this Notice of Removal, and all defenses, affirmative defenses and motions are hereby reserved to the Defendants.

WHEREFORE Defendant Allentown Cement Company hereby removes

the above-captioned action, which is now pending in the Court of Common Pleas of

Philadelphia County, Pennsylvania, to the United States District Court for the Eastern

District of Pennsylvania.

BONNER KIERNAN TREBACH & CROCIATA, LLP

BY: _____

MARK A. LOCKETT, ESQUIRE
Attorney ID No. 50023
ALYSSA A. BROOKLAND, ESQUIRE
Attorney ID No. 306593
Eight Penn Center Plaza, Suite 200
1628 John F. Kennedy Boulevard
Philadelphia, PA 19103
Tel.: (215)569-4433
Fax: (215)569-4434
Attorneys for Defendants,
Allentown Cement Company

## CERTIFICATE OF SERVICE

I, Mark A. Lockett, Esquire, hereby certify that a copy of Defendants' Notice of Removal was served via U.S. First Class Mail, postage prepaid, on this 18th day of April, 2011, upon all interested counsel.

BONNER KIERNAN TREBACH & CROCIATA, LLP

BY: _____

MARK A. LOCKETT, ESQUIRE
Attorney ID No. 50023
ALYSSA A. BROOKLAND, ESQUIRE
Attorney ID No. 306593
Eight Penn Center Plaza, Suite 200
1628 John F. Kennedy Boulevard
Philadelphia, PA 19103
Tel.: (215)569-4433
Fax: (215)569-4434
Attorneys for Defendants,
Allentown Cement Company

6

PAUL, REICH & MYERS, P.C.
By:  Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500          Attorney for Plaintiff
Philadelphia, PA  19103
(215) 735-9200

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL SECTION:  TRIAL DIVISION

| | |
|---|---|
| DAVID B. GRAVER and | :CIVIL ACTION |
| FRANCES GRAVER, h/w | : |
| | : |
| vs. | :NO.  11-2636 |
| | : |
| ALLENTOWN CEMENT, et al. | : |

**EMERGENCY MOTION TO REMAND, SCHEDULE EMERGENCY
HEARING TO REQUIRE ANSWER TO BE FILED WITHIN ONE HOUR**

1.  This is a living mesothelioma case.

2.  The matter was commenced on June 25, 2010 in the Court of
Common Pleas of Philadelphia County.

3.  The matter was scheduled to commence on April 18, 2011
with testimony.

4.  Jury selection occurred on April 14, 2011.

5.  Defendant removed the matter to this Court on _____ at
_____ asserting diversity jurisdiction.

6.  Plaintiff requests an emergency hearing today so that the
Court can rule on the narrow question of whether there was, in
fact, diversity jurisdiction.

7.  If it rules there was none, then the matter can be
remanded back immediately and plaintiff has a chance not to lose
his trial date.

8.  Any further delay will deprive him of his chance.

9.    Since  there  was  no  legitimate  basis  for  removal,
defendants should be assessed costs in the sum of $100,000 and fees
in the sum of $50,000.

10.  The  legal  reasons  for  remand  is  that  since  non  diverse
defendants  remain  in  the  case  as  is  clear  from  the  caption  and
plaintiff's  resistance  to  the  motions  of  non  diverse  defendants
Certain Teed and Crown Cork there was no basis for removal.

Wherefore, remand should be Ordered forthwith.


PAUL,  REICH & MYERS,  P.C.

BY:_____
        ROBERT E.  PAUL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
IN RE: ASBESTOS PRODUCTS        :    CONSOLIDATED UNDER
LIABILITY LITIGATION (No. VI) :      MDL 875
                                :
                                :
GRAVER                          :
                                :    Civil Action No. 11-02636
                                :
                                :
        v.                      :
                                :
                                :
VARIOUS DEFENDANTS              :
```

### O R D E R

**AND NOW,** this **19th** day of **April 2011**, it is hereby **ORDERED**
that Defendant Allentown Cement Company shall file an answer to
Plaintiff's Emergency Motion to Remand (doc. no. 3) by **Wednesday,**
**April 20th at 9:00a.m.**

AND IT IS SO ORDERED.

EDUARDO C. ROBRENO, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | CONSOLIDATED UNDER |
| LIABILITY LITIGATION (No. VI) | : | MDL 875 |
| | : | |
| GRAVER | : | |
| | : | Civil Action No. 11-02636 |
| | : | |
| v. | : | |
| | : | |
| VARIOUS DEFENDANTS | : | |

## O R D E R

**AND NOW**, this **20th** day of **April 2011**, it is hereby **ORDERED**
that Defendant Allentown Cement Company may file a response to
Plaintiff's Emergency Motion to Remand (doc. no. 3) by **Thursday,
April 21st at 1:00p.m.**[1]

It is further **ORDERED** that a telephone conference regarding
Plaintiff's emergency motion to remand is scheduled to take place
on **Thursday, April 21st, 2011 at 4:30p.m.** Plaintiff shall
initiate the phone call to 215.597.4073 when all parties are on
the line.

**AND IT IS SO ORDERED.**

_____
**EDUARDO C. ROBRENO, J.**

------------------------

[1] The Clerk's office has confirmed that counsel for
Defendant Allentown Cement Company did not receive electronic
notification of Plaintiff's motion or of this Court's Order of
April 18, 2011, ordering a response.  Therefore, additional time
will be granted.  However, due to the emergency nature of
Plaintiff's motion, a quick disposition of this issue is
necessary.