**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | : | |
| | : | |
| JAMES ALLAN BROWN and CAROL | : | ED-PA Case No.: 2:11-cv-60063-ER |
| ELIZEBETH BROWN, husband and wife, | : | |
| Plaintiffs, | : | |
| v. | : | (Transfer District Court No.) |
| KAISER GYPSUM COMPANY, INC., et al, | : | WD-WA Case No. 10-05873 |
| Defendants. | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S MOTION
TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER**

# EXHIBIT  1

## Memorandum of Honorable Eduardo C. Robreno, dated March 12, 2012

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S
MOTION TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER - 1
s:\clients\b\brown, james\brown_nj_pleadings_usdc\brown_pld_p's response to carrier's motion to modify remand
order_exhibit cover sheets.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, FOURTH FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALENT RABOVSKY, et al., | : | CONSOLIDATED UNDER |
| | : | MDL NO. 875 |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 10-3202 |
| | : | |
| AIR & LIQUID SYSTEMS | : | |
| CORP., et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              MARCH 12, 2012

Objections to U.S. Magistrate Judge Strawbridge's orders denying Defendant Pennsylvania Electric Company's ("Pennsylvania Electric's") motion for judgment on the pleadings and denying Defendant Crane Company's ("Crane's") motion in limine are before the Court. For the reasons that follow, the Court overrules the objections.

## I.    BACKGROUND

On March 30, 2010, husband and wife, Valent and Ann Rabovsky ("Plaintiffs"), commenced this asbestos personal injury action in the Philadelphia Court of Common Pleas. Notice of Removal ¶ 1, ECF No. 1. Plaintiffs allege, inter alia, that Mr. Rabovsky was exposed to asbestos-containing valves, pumps, and boilers without proper precautions or warnings while he worked

as a millwright at plants and factories in Pennsylvania. Compl. ¶¶ 4M, 6, ECF No. 1.

On June 9, 2010, Defendants began taking Mr. Rabovsky's deposition, which took four days. Notice of Removal ¶ 8. Mr. Rabovsky testified that at a certain power plant, he was under the chain of command of a federal officer. Id. ¶ 22. On July 1, 2010, Defendant Duquesne Light Company removed the case to the U.S. District Court for the Eastern District of Pennsylvania, pursuant to the federal officer removal statute. See 28 U.S.C. § 1442 (2006).

On October 19, 2011, Pennsylvania Electric moved for judgment on the pleadings for lack of jurisdiction. Mot. for J. on the Pleadings 1, ECF No. 120. Judge Strawbridge denied the motion. Order 1 n.1, Nov. 1, 2011, ECF No. 133. Pennsylvania Electric objected. Pa. Elec.'s Objections 1, ECF No. 149. And Plaintiffs responded. Resp. to Pa. Elec.'s Objections 1, ECF No. 151.

On October 14, 2011, Crane and other Defendants moved to exclude the expert testimony of John Maddox, M.D., Arnold Brody, Ph.D., and Edwin Holstein, M.D. Crane's Mot. in Limine 1-2, ECF No. 115. On January 25, 2012, Judge Strawbridge issued a

memorandum opinion and order denying the motion.[1] Mem. Op. 1,
Jan. 25, 2012, ECF No. 173; Order 1, Jan. 25, 2012, ECF. No.
174. On February 9, 2012, Crane objected.[2] Crane's Objections 1,
ECF No. 175. Plaintiffs responded. Resp. to Crane's Objections
1, ECF No. 178.

> The objections to both orders are ripe for
disposition.

## II.   REVIEW OF MAGISTRATE JUDGE'S ORDERS

> Judge Strawbridge's orders trigger two different
standards of review. First, the order of November 1, 2011,
denied Pennsylvania Electric's Motion for Judgment on the
Pleadings. As a general rule, a magistrate judge cannot
"determine" a motion for judgment on the pleadings. See 28
U.S.C. § 636(b)(1)(A) (2006). However, the Court may refer
motions for judgment on the pleadings to a magistrate judge for
a report and recommendation. See id. § 636(b)(1)(B)-(C). A party
may file written objections to the report and recommendation.
Id. § 636(b)(1). And the Court conducts a de novo review of
those portions of the report and recommendation to which a party

_____

[1]      Judge Strawbridge also denied a motion in limine
submitted by Goulds Pumps, Inc., to which objections were not
filed.

[2]      Defendants Goulds Pumps, Inc., and The Doe Run
Resources Corporation joined in Crane's objections.

objects and may, if appropriate, "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." See id. Therefore, the Court construes Judge Strawbridge's denial of the motion for judgment on the pleadings as a report and recommendation to deny the motion and conducts a de novo review of those parts to which Pennsylvania Electric objects.

Second, the order of January 25, 2012, denied Crane's Motion in Limine to Exclude the "Each and Every Exposure Opinion." A magistrate judge may "determine" these pretrial matters. See id. (b)(1)(A). The Court also considers objections to such nondispositive orders, but reviews the order for whether it is "clearly erroneous or contrary to law." See id.; Fed. R. Civ. P. 72(a). Therefore, the Court reviews Judge Strawbridge's order denying the motion in limine for whether it is clearly erroneous or contrary to law.

## III. MOTION FOR JUDGMENT ON THE PLEADINGS

Pennsylvania Electric moved for judgment on the pleadings because Plaintiffs failed to perfect service on Pennsylvania Electric.[3] Notwithstanding their admitted failure to

_____

[3]        At the close of pleadings, a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). The Court's review of a motion for judgment on the pleadings is plenary and similar to the standard of review for a motion for summary judgment. See Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 219

serve Pennsylvania Electric, Plaintiffs argue, and Judge
Strawbridge agreed, Pennsylvania Electric waived this defense
either by failing to raise it in its first responsive pleading
or by continuing to litigate the case without raising the
defense by motion. Upon de novo review, Judge Strawbridge did
not err in denying the motion for judgment on the pleadings.

A party may assert a defense of insufficient process
by motion before pleading if a responsive pleading is allowed.
See Fed. R. Civ. P. 12(b)(4). However, a party waives the
defense of insufficient process by failing either to make it by
motion or include it in a responsive pleading." See id.
(h)(1)(B); see also McCurdy v. Am. Bd. of Plastic Surgery, 157
F.3d 191, 194 (3d Cir. 1998). Pennsylvania Electric did not move
to dismiss for insufficient process before filing a responsive
pleading. Furthermore, Pennsylvania Electric did not include a
defense of insufficient process in its Answer. Answer 1-2, ECF
No. 23. Therefore, Pennsylvania Electric waived the defense of
insufficient process.

Pennsylvania Electric objects that Judge Strawbridge
failed to address Plaintiffs' failure to perfect service when

_____

(3d Cir. 2005). "Judgment will not be granted unless the movant
clearly establishes there are no material issues of fact, and he
is entitled to judgment as a matter of law. [The Court] must
view the facts presented in the pleadings and the inferences to
be drawn therefrom in the light most favorable to the nonmoving
party." Id. at 220 (internal citations removed).

the case was pending in state court. This objection is
immaterial because whether Pennsylvania Electric waived the
defense of insufficient service is a question of federal, not
state, law. See Paramount Aviation Corp. v. Agusta, 178 F.3d
132, 139 n.3 (3d Cir. 1999) ("Once removed, jurisdiction in the
District Court is original and federal procedure applies.").

Pennsylvania Electric objects that Judge Strawbridge
determined that it waived the defense of "insufficient service
of process" when the issue at hand is "failure to perfect
service." Pa. Elec.'s Objections 2-3. The distinction in
terminology, however, is without a difference. In any event,
Pennsylvania Electric waived any objection to service by failing
to raise the defense by motion before responsive pleading or in
its Answer.

Pennsylvania Electric objects that it asserted the
defense of insufficient process in its Answer by incorporating a
1986 Order issued by Judge Weiner in In re Asbestos Litigation,
No. 86-0457. That order is not currently in effect. Indeed, the
1986 order predates Multidistrict Litigation No. 875.[4] The 1986

_____

[4]       The 1986 order is not among the few administrative
orders currently in effect in MDL-875 as specified on the MDL-
875 website. See U.S. Dist. Court, E. Dist. of Pa., MDL 875
Administrative Orders, http://www.paed.uscourts.gov/mdl875d.asp#
(last visited Mar. 5, 2012). And Pennsylvania Electric's
reliance on the 1986 order is curious. The 1986 order, inter
alia, directs defendants to respond to each "Master Long Form
Complaint" by collectively asserting "all affirmative defenses

order only applied to the asbestos-related Eastern District of
Pennsylvania cases over which Judge Weiner had original
jurisdiction and does not apply to the current multidistrict
litigation.

Pennsylvania Electric's remaining objections that
Plaintiffs failed to effectuate service within the 120-day
deadline set by Federal Rule of Civil Procedure 4(m) are
immaterial. For the reasons provided, Pennsylvania Electric
waived any defense of insufficient process. Therefore, the Court
overrules Pennsylvania Electric's objections and adopts Judge
Strawbridge's recommendation.


## IV.   MOTIONS IN LIMINE

Crane moved to exclude from the trial any expert
testimony by John Maddox, M.D., Arnold Brody, Ph.D., and Edwin
Holstein, M.D., that "each and every exposure to asbestos
sustained by an individual contributes to cause a later case of
mesothelioma." Crane's Mot. in Limine 1, ECF No. 115. Judge
Strawbridge denied the motion and held that the "each and every
exposure" opinions were admissible under Daubert and Federal

---

on behalf of all defendants." No such defenses have been filed
of record in this case. Pennsylvania Electric should have
answered the Complaint according to the Federal Rules of Civil
Procedure. See Fed. R. Civ. P. 8(b).

Rule of Evidence 702.[5] Judge Strawbridge's opinion is not clearly erroneous or contrary to law.

A witness qualified as an expert may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court interprets the rule liberally in favor of admission because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993).

_____

[5]     In response to Crane's arguments that the experts' opinions are not supported by adequate testing, Judge Strawbridge first explained that, given the long gestation period of asbestos-related diseases, specific testing relating to a particular plaintiff is "exceedingly problematic." Mem. Op. 6. Noting that scientific testing is only one factor in the Daubert analysis, Judge Strawbridge concluded, "when considered in relation to the full scope of the three experts' opinions, the questions with respect to the adequacy of the testing do not lead us to exclude their testimony." Id. at 7. Furthermore, Judge Strawbridge reviewed the relevant state and federal law, especially this Court's decisions allowing similar expert testimony, to conclude that the proposed testimony is reliable. Id. at 7-9.

Before proposed expert testimony is presented to a jury, the Court must determine whether the evidence is relevant and reliable under the following test: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, i.e., reliability; and (3) the expert's testimony must assist the trier of fact, i.e., fit." United States v. Schiff, 602 F.3d 152, 172 (3d Cir. 2010) (internal editorial marks removed). Crane's objections relate to the reliability and fit of the proposed expert testimony.

First, Crane objects that the each-and-every-exposure opinions are legally insufficient to establish substantial-factor causation under Pennsylvania law. Specifically, Crane argues that under Gregg v. V-J Auto Parts, Inc., 943 A.2d 216 (Pa. 2007), Plaintiffs' experts must evaluate the frequency, regularity, and proximity of the alleged exposure to establish that Crane's products were a substantial factor in causing Mr. Rabovsky's mesothelioma. Gregg, however, does not bar the proposed expert testimony.

In Gregg, the Pennsylvania Supreme Court considered whether, to overcome summary judgment, a plaintiff in an asbestos products liability action must show frequency, regularity, and proximity to an asbestos-containing product even if plaintiff presents direct evidence of inhalation. 943 A.2d at

221. The court held that, at the summary judgment stage, courts must "make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury." Id. at 227.

Gregg has no bearing on the issue here. The Gregg court did not consider the scientific merit of expert testimony or, for that matter, the methodologies employed by a proposed expert. Furthermore, despite Crane's contention, the Gregg court did not determine that each-and-every-exposure opinions are legally insufficient to prove substantial-factor causation.[6] Therefore, Judge Strawbridge's denial of Crane's motion was not clearly erroneous or contrary to law.

Second, Crane objects that Judge Strawbridge erroneously based his decision on the existence of peer-reviewed literature for the proposed testimony. Crane argues that the

---

[6]      The Pennsylvania Superior Court has similarly rejected a defendant's reliance on Gregg to bar an each-and-every-exposure opinion. See Betz. v. Pneumo Abex, L.L.C., 998 A.2d 962, 982-83 (Pa. Super. Ct. 2010) ("[W]e will not equate the Gregg Court's analysis of a de minimis exposure under the 'regularity, frequency and proximity' test for product identification purposes with a de minimis exposure of asbestos for purposes of a Frye challenge to the methodology used to reach an opinion on causation.").

proposed testimony is unreliable because it is not supported by peer-reviewed studies, the proposed experts did not apply a scientific method in reaching their conclusion for the each-and-every-exposure opinion, and that the experts' opinions treat all asbestos fibers as similarly harmful.

As noted by Judge Strawbridge, this Court has allowed plaintiffs to present similar expert testimony to a jury under Rule 702. See Anderson v. Saberhagen Holdings, Inc. (In re Asbestos Prods. Liab. Litig. (No. VI)), No. 10-61118, 2011 WL 605801, at *6 (E.D. Pa. Feb. 16, 2011) (Robreno, J.); Schumacher v. Amtico (In re Asbestos Prods. Liab. Litig. (No. VI)), No. 10-1627 (E.D. Pa. Nov. 2, 2010) (Robreno, J.) (order permitting each-and-every exposure testimony under Rule 702). Crane's objections are fodder to challenge Plaintiffs' experts' testimony during trial, wherein the Court will provide Crane ample opportunity for cross-examination. Therefore, Judge Strawbridge's denial of Crane's motion was not clearly erroneous or contrary to law.

## V.    CONCLUSION

For the reasons provided, the Court will overrule Pennsylvania Electric's objections, adopt Judge Strawbridge's report and recommendation, and deny Pennsylvania Electric's Motion for Judgment on the Pleadings. Furthermore, the Court

will overrule Crane's objections and affirm Judge Strawbridge's
order denying Crane's Motion in Limine.

1

2

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

3

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | : | |
| | : | |
| JAMES ALLAN BROWN and CAROL | : | ED-PA Case No.: 2:11-cv-60063-ER |
| ELIZEBETH BROWN, husband and wife, | : | |
| Plaintiffs, | : | |
| v. | : | (Transfer District Court No.) |
| KAISER GYPSUM COMPANY, INC., et al, | : | WD-WA Case No. 10-05873 |
| Defendants. | : | |

4

5

6

7

8

9

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S MOTION
TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER**

10

11

12

13

# EXHIBIT  2

14

15

16

17

## Order filed on November 2, 2010

18

19

20

21

22

23

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S
MOTION TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER - 1
c:\client\bb\brown_james\brown_pleadings_usdc\brown\j_pld_p's response to carrier's motion to modify remand
order_exhibit cover sheets.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, FOURTH FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS        :    CONSOLIDATED UNDER
LIABILITY LITIGATION (No. VI)   :    MDL 875
                                :
                                :
JOHN SCHUMACHER,                :    CIVIL ACTION
                                :    NO. 2:10-1627
      Plaintiff,                :
                                :
      v.                        :
                                :    Eastern District of
AMTICO, ET AL.,                 :    Pennsylvania Case
                                :
      Defendants.               :

FILED

O R D E R

AND NOW, this 2nd day of November, 2010, it is hereby

ORDERED that Defendants' Motion in Limine to Preclude Expert

Testimony and Argument, filed on July 6, 2010 (doc. no. 25) is

DENIED.[1]

----------------------------

[1] Plaintiff has offered the opinion testimony of Dr. John C.
Maddox, who will testify that Defendants' products caused, or
contributed to causing Plaintiff's mesothelioma.  Defendants
challenge the admissibility of Dr. Maddox's opinion under Federal
Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579 (1993).

   As interpreted by the Third Circuit Court of Appeals, "Rule
702 embodies a trilogy of restrictions on expert testimony:
qualification, reliability, and fit." Schneider v. Fried, 320
F.3d 396, 404 (3d Cir. 2003)(citing Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993)). Dr. Maddox's
qualifications are not challenged by Defendants in this case.
The issue before the Court is whether Dr. Maddox's opinion
satisfied the reliability and fit prongs of the Rule 702
analysis.

   To determine the reliability of a scientific principle or
method, a court may examine numerous factors, including whether

the principle or method has been tested or is capable of being
tested, whether the potential rate of error in the method can be
ascertained, whether it has been subjected to peer review and
publication, and whether it is generally accepted within the
scientific community.  Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579, at 593-94.  The test for reliability is
"flexible," and a court has "broad latitude" in how it chooses to
determine reliability.  Kumho Tire Co., Ltd. v. Carmichael, 526
U.S. 137, 141 (1999).  The approach to determining reliability of
expert testimony is "tied to the facts" of a particular case, and
highly dependent on the nature of the expert testimony presented.
Id. at 149 (quoting United States v. Downing, 753 F.2d 1224, 1242
(3d Cir. 1985)).  Similarly, the "fit" requirement of a Daubert
analysis has shades of both reliability and relevance, and
requires that an expert's analysis fits the facts of the case at
hand.  See Paoli R.R. Yard PCB Litigation, 35 F.3d 593 (3d Cir.
1994).

     The standard for admissibility is "lower than the merits
standard of correctness."  Id. at 744.  Indeed, even if a judge
believes that "there are better grounds for an alternative
conclusion" and that the experts methods may have "some flaws"
these concerns are appropriate fodder for cross examination, but
do not render an expert's opinion inadmissible.  Heller v. Shaw
Industries, 167 F.3d 146, 152-53 (3d Cir. 1999)(internal
citations omitted).

     In the instant case, the argument revolves around the so-
called "every exposure" theory of causation, that is, Dr.
Maddox's opinion that, "every exposure to asbestos above
background levels contributes to cause mesothelioma."  (Expert
Report of Dr. John C. Maddox, doc. no. 58-7, at 14).  Defendants
argue that this is "absurd, extreme, and incorrect science."
(Def.'s Mot. at 16)(internal citations omitted).  Defendants cite
literature stating that, "[f]rom an inability to delineate a
lower threshold [at which an exposure to asbestos becomes
harmful], one cannot necessarily conclude that no such threshold
exists and that asbestos is oncogenic in humans at any level of
exposure, no matter how small."  (Id. at 13-14).  Defendants
maintain that there is a threshold level below which exposure to
asbestos does not cause disease, as the body can expel or process
asbestos fibers.

     However, Defendants arguments mischaracterize Dr. Maddox's
testimony in this case.  Dr. Maddox does not assert that a single
fiber can cause mesothelioma.  (Doc. no. 58-7 at 14) ("Without

question, I do not believe that exposure to a single asbestos fiber can cause mesothelioma or any other asbestos related disease.") Rather, Dr. Maddox opines that cumulative low-level exposures can result in mesothelioma. Dr. Maddox asserts that "[a]ttempts to define any such a minimum level of exposure [threshold level] above background levels of asbestos have been dismissed as 'logical nonsense.'" (Id. at 20)(internal citations omitted).

Dr. Maddox relies on variety peer-reviewed studies and reports to form his ultimate opinion. One of the studies he relies on to form this opinion is Consensus Report, Asbestos Asbestosis and Cancer: The Helsinki Criteria for Diagnosis and Attribution, Scan J. Work Environ Health, which was published by a consortium of 19 participants from around the world from numerous medical fields, and states that Mesothelioma can occur in cases with low asbestos exposure. Dr. Maddox is prepared to testify that it is the "generally accepted view of the medical community . . . that if someone gets [mesothelioma], any non-trivial exposure to asbestos that is above background levels contributes to causation." (Dr. Maddox Report, doc. no. 17 at 17).

Dr. Maddox's underlying methodology involves reviewing Plaintiff's testimony and Defendant's answers to interrogatories regarding the percent of chrysotile asbestos contained in Defendants' respective products, and to cross-referencing this information to studies conducted by entities such as the Environmental Protection Agency, the United States Navy regarding the amount of fibers released from such products. (Id. at 5-8). Then, Dr. Maddox looks to case studies linking the specific products at issue in the instant case (floor tile, joint compounds, and gaskets and packing, respectively) to incidents of asbestos-related disease. (Id. at 5-14.)

Defendants respond that Dr. Maddox's opinion that "low dose chrysotile asbestos fibers cause mesothelioma is devoid of proof, contrary to epidemiological and pathology research, and is lacking in supportive empirical data." (Def. American Biltrite's Mot. in Limine, doc. no. 25 at 6). Defendants assert that, contrary to Dr. Maddox's opinion, there is a threshold below which exposure to asbestos is "safe," because the body can process and expel asbestos fibers, and their experts will testify to this effect. Defendants also take issue with the fact that state of the science on mesothelioma is such that one cannot tell from a diagnosis of mesothelioma which particular Defendants'

AND IT IS SO ORDERED.

EDUARDO C. ROBRENO, J.

products caused the disease.

However, Dr. Maddox will testify that, to a reasonable degree of medical certainty, it is his opinion that Defendants' products, respectively, in the instant case caused Plaintiff's mesothelioma. His opinion is based on numerous studies showing the link between working with the particular product at issue and asbestos-related diseases. Defendants' arguments are fodder for cross-examination, and do not preclude the admissibility of Dr. Maddox's opinion in the instant case. The Third Circuit has held that an expert's causation opinion should not be per se excluded simply because there is no published literature regarding the "level" at which exposure to a harmful element can cause the injury complained of. Heller v. Shaw Industries, Inc., 167 F.3d 146, 154-155 (3d Cir. 1999). In the instant case, there is a wealth of published literature regarding the "level" of exposure to asbestos needed to cause mesothelioma. However, there is a bona fide debate within the scientific community regarding what the threshold level is, and indeed, whether a numeric threshold can be ascertained at all. Simply, Dr. Maddox takes one position, and Defendants' experts take another.

In rendering his opinion that there are no safe levels of exposure above background levels, Dr. Maddox relied on numerous published studies and reports, drawing from the fields of pathology, radiology, epidemiology, and industrial hygienics. He has cited case studies of individuals with occupational histories similar to that of Plaintiff who later developed an asbestos-related disease. He will testify that his conclusions represent those generally accepted by the medical community. Under these circumstances, the Court concludes, in its gatekeeping role, that Dr. Maddox's testimony satisfies the reliability and fit requirements of Federal Rule of Evidence 702 and Daubert.

1

2

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

3

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | : | |
| | : | |
| JAMES ALLAN BROWN and CAROL | : | ED-PA Case No.: 2:11-cv-60063-ER |
| ELIZABETH BROWN, husband and wife, | : | |
| Plaintiffs, | : | |
| v. | : | (Transfer District Court No.) |
| KAISER GYPSUM COMPANY, INC., et al, | : | WD-WA Case No. 10-05873 |
| Defendants. | : | |

4

5

6

7

8

9

10
**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S MOTION
TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER**

11

12

13

14
# EXHIBIT  3

15

16

17

18
## Order by Magistrate Judge M. Faith Angell, dated May 27, 2010

19

20

21

22

23

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S
MOTION TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER - 1
s:\clients\bbrown, james\brown\_pleadings_usdc\brown\_pld_p's response to carrier's motion to modify remand
order_exhibit cover sheets.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, FOURTH FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | Consolidated Under |
| LIABILITY LITIGATION (No. IV) | : | MDL DOCKET NO. 875 |
| | : | |
| DIANNA K. LARSON, et al. | : | |
| | : | E.D. PA Civil Action No. |
| | : | 09-69123 |
| v. | : | |
| | : | Transferor Court |
| | : | District of Utah (Central) |
| BONDEX INTERNATIONAL, et al. | : | 08-cv-00333 |

O R D E R

AND NOW, this 24th day of May, 2010, after hearing argument on pending

*Daubert* motions, and for the reasons stated in the accompanying memorandum,  it is hereby

**ORDERED** that:

(1) Defendant Georgia Pacific LLC's Motion To Exclude Testimony
Of Plaintiffs' Experts Under Federal Rule Of Evidence 702 [Docket Entry
No. 19] is **DENIED.**

(2) Defendant Bondex International, Inc., RPM, Inc., And RPM
International, Inc.'s Motion To Strike The Testimony Of Experts
Arnold R. Brody, Ph.D. And Jacques Legier, M.D. [Docket Entry
No. 23] is **DENIED.**  Consistent with Plaintiffs' representations,
Dr. Brody's testimony at trial will be limited to general testimony
about how asbestos causes cancer and may not include any opinion
as to specific causation in this case.

(3) Plaintiffs' Motion *In Limine* To Exclude Or Limit Dose
Reconstruction Testimony Pursuant To *Daubert* And Rules 702
And 703 Of The Federal Rules Of Evidence [Docket Entry No. 20]
is **DENIED.**  Dr. William L. Dyson will be permitted to testify
as an expert industrial hygienist and may opine as to Dianna Larson's
asbestos exposure dose and risk while working with joint compound
as alleged.

(4)  Plaintiffs' Motion *In Limine* To Exclude Or Limit Testimony
Pursuant To *Daubert* And Rules 702 And 703 Of The Federal
Rules Of Evidence [Docket Entry No. 25] is **DENIED.**

BY THE COURT:

 S/M. FAITH ANGELL
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**
**Robert N.C. Nix Federal Building**
**900 Market Street, Suite 211**
**Philadelphia, PA    19107**

**Chambers of**
**M. FAITH ANGELL**                                    P:    **(215) 597-6079**
**United States Magistrate Judge**              F:    **(215) 580-2165**


*FAX / MAIL COVER SHEET*


**CASE NO.**    09-69123 (ED Pa #)                **DISTRICT COURT JUDGE:** ER
                                                                          215-580-2362

**TODAY'S DATE**: May 24, 2010                **LAW CLERK'S INITIALS**: JJK


**NAME**                                                              **FAX NUMBER**


(1)    Julie L. Celum, Esq./Charles E. Valles, Esq.          214-357-7252

(2)    Mark F. James, Esq./Brent O. Hatch, Esq.            801-363-6666

(3)    Richard W. Pruett, Esq./Dennis H. Markusson, Esq.    303-595-3780

(4)    Timothy C. Houpt, Esq.                                       801-328-0537

(5)    Joshua D. Scheets, Esq.                                     215-575-0856

(6)    John P. Ball, Jr., Esq./Katherine E. Venti, Esq./
        Nicole G. Farrell, Esq.                                      801-536-6111

(7)    Kevin J. O'Brien, Esq.                                      215-564-2526

(8)    Mary Price Birk, Esq./Ronald L. Hellbusch, Esq.       303-861-7805

(9)    Patricia W. Christensen, Esq.                             801-532-7750

(10)   James P. Hadden, Esq.                                     302-425-0180

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | Consolidated Under |
| LIABILITY LITIGATION (No. IV) | : | MDL DOCKET NO. 875 |
| | : | |
| DIANNA K. LARSON, et al. | : | |
| | : | E.D. PA Civil Action No. |
| | : | 09-69123 |
| v. | : | |
| | : | Transferor Court |
| | : | District of Utah (Central) |
| BONDEX INTERNATIONAL, et al. | : | 08-cv-00333 |

**MEMORANDUM**

M. FAITH ANGELL                                        May 24, 2010
UNITED STATES MAGISTRATE JUDGE

Presently before this Court for decision are four motions challenging various experts.  I

held oral argument on all four *Daubert* motions on March 8, 2010.  I will address the motions in

the order in which they were argued.

**I. Background.**

Plaintiff Dianna Larson was diagnosed with mesothelioma in 2006.  Plaintiffs allege that

the mesothelioma is the result of exposure to asbestos in joint compound products which Dianna

Larson used in the 1970's when she and her first husband built two homes in Utah.  Named

Defendants s are alleged to have manufactured, sold or distributed chrysotile-containing joint

compound products.[1]

_____

[1]        This case was originally filed in 2007 in the District Court of Harris County
Texas.  It was voluntarily dismissed and in March 2008, Plaintiffs re-filed their case in the Third
Judicial District Court, Salt Lake County, Utah.  The action was then removed to the United
States District Court, District of Utah and transferred to the MDL in June 2008.  Fact-based and
expert discovery has been completed in this forum.  *Defendant Georgia-Pacific LLC's
Memorandum To Exclude Testimony of Plaintiffs' Experts Under Rule Of Evidence 702 and
Request for Hearing* [Docket Entry No. 19] at pp. 2-3. [Hereinafter "Georgia Pacific's *Daubert*
Motion."]

Plaintiffs allege that Dianna Larson and her first husband constructed the two homes from the ground up with virtually no outside assistance.  According to Plaintiffs,

> "[Dianna] Larson was regularly and frequently exposed to asbestos in the construction of both homes as a result of sanding down the asbestos containing joint compound products manufactured and/or distributed by Defendants that Ms. Larson and her husband used to sheetrock the walls and ceilings, being in the sites where her husband was working with asbestos containing products, cleaning up the sites where asbestos containing products were used, and washing her and her husband's asbestos exposed clothes."

*Plaintiffs' Memorandum Of Law In Support Of Their Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant to Daubert and Rules 702 And 703 Of The Federal Rules Of Evidence* [Docket Entry No. 20-2] at p. 3.[2]

Defendants dispute Dianna Larson's diagnosis[3] and further deny that her alleged exposure to chrysotile asbestos fibers contained in joint compound products caused or contributed to her mesothelioma.  At oral argument, Defendants argued:

> "There is a very real question about whether chrysotile causes peritoneal mesothelioma, which is the type of mesothelioma that Ms. Larson has.  There is a very real question about whether Ms. Larson was ever exposed to a sufficient amount of chrysotile to have caused the disease."

*N.T. 3/8/10* at p. 9 (Argument on Defendant Georgia Pacific's Motion to Exclude Plaintiffs' causation experts, Dr. Brody and Dr. Legier).

---

[2]      Hereinafter "Plaintiffs' Dose Reconstruction *Daubert* Motion."

[3]      The dispute centers on whether Dianna Larson has diffuse malignant mesothelioma of the peritoneum or well-differentiated papillary mesothelioma.  According to Plaintiffs, Ms. Larson's treating pathologists "favor a diagnosis of malignant mesothelioma, specifically well differentiated epithelial mesothelioma."  *Plaintiffs' Dose Reconstruction Daubert Motion* at p. 3 n.2.  Defendants' expert, Gary R. Epler, opines that Dianna Larson's correct diagnosis is peritoneal well-differentiated papillary mesothelioma.  *Expert Report of Gary R. Epler*, attached to Plaintiffs' Motion *In Limine* To Exclude Or Limit Testimony Pursuant To *Daubert* And Rules 702 And 703 Of The Federal Rules Of Evidence at Docket Entry No. 25-18 at p. 4.

## II.  Legal Standards.

The standard for admitting expert testimony is set forth in Federal Rule of Evidence 702, as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

Federal Rule of Evidence 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Federal Rules of Evidence 702 (2000).*

The Third Circuit has explained that "Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [*i.e.*, reliability]; and (3) the expert's testimony must assist the trier of fact [*i.e.*, fit]."  "Under the Federal Rules of Evidence, a trial judge acts as a gatekeeper to ensure than any and all expert testimony or evidence is not only relevant, but also reliable."  *United States v. Schiff*,  ---- F.3d ----, 2010 WL 1338141 at *15 (3d Cir. April 7, 2010)(quoting *Pineda v. Ford Motor Co.*, 502 F.3d 237, 243-44 (3d Cir. 2008)).

The second requirement, reliability, is at issue in the present *Daubert* motions.  The Third Circuit has recognized that

"[ . . . ] pursuant to the second requirement, 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'  *Paoli*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786).  While a litigant has to make more than a prima facie showing that his expert's methodology is reliable, we have cautioned that '[t]he evidentiary requirement of

Page 3 of  18

reliability is lower than the merits standard of correctness.' *Id.* at 744; *see also TMI*, 193 F.3d at 665 (stating that 'the standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702' (internal quotation marks and citation omitted)); *Kannankeril*, 128 F.3d at 806 ('Admissibility decisions focus on the expert's method and reasoning; credibility decisions arise after admissibility has been determined.')."

*Pineda v. Ford Motor Company*, 520 F.3d 237, 247 (3d Cir. 2008).

In evaluating whether a particular methodology is reliable, the inquiry is a flexible one to be tailored to the specific case. Factors drawn from *Daubert* and Third Circuit precedent which may be applicable include:

"(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. [citation omitted]"

*Id.* at pp. 247-48.

### III.  Analysis.

A.  <u>The Testimonies Of Dr. Legier And Dr. Brody Are Sufficient To Meet Rule 702 Reliability Requirements.</u>

The Georgia Pacific, Bondex and Union Carbide Defendants seek to exclude the testimony of Plaintiffs' causation experts, Jacques Legier, M.D. and Arnold R. Brody, Ph.D.[4] They argue that Dr. Brody, a cellular biologist, and Dr. Legier, a pathologist, have both opined that inhaled chrysotile fibers can cause peritoneal mesothelioma, and that these opinions are not

---

[4]     Defendant Union Carbide joined in *Daubert* motions filed by the Georgia Pacific and Bondex Defendants.  *See Docket Entry No. 24* ("Defendant Union Carbide Corporation's Joinder in Georgia-Pacific LLC and Bondex International's Motions filed on November 4, 2009").

supported by proper and accepted scientific evidence.  According to the Defendants, "the overwhelming weight of authority demonstrates that chrysotile does not cause either type of peritoneal mesothelioma [either diffuse malignant peritoneal mesothelioma or well-differentiated papillary mesothelioma of the peritoneum]."  *Georgia Pacific's Daubert Motion* at p. 4.

       *1.  The Testimony of Dr. Arnold Brody.*

      With regard to Dr. Brody, Defendants assert that: (1) he is not qualified "to give an opinion as to the distinctions in causation between the competing diagnoses in this case," (2) his failure to recognize the distinction between the diagnoses is fatal to his causation opinions because "the distinction between well-differentiated papillary mesothelioma and diffuse malignant mesothelioma is crucial, both in terms of causation and prognosis," and (3) any opinions of Dr. Brody on the issue of causation or increased risk from exposure to joint compound are unreliable because Dr. Brody is unfamiliar with the exposures specifically alleged by Ms. Larson, he has undertaken no review of the literature to determine what level of exposure, if any, could be causally linked to Ms. Larson's particular condition, and he broadly opines that chrysotile exposures are causally related to mesothelioma generally but fails to distinguish specifically as to the product or manner of exposure and also fails to distinguish the disease at issue. *Defendant Bondex International, Inc. And RPM International, Inc.'s Memorandum In Support Of Motion To Strike The Testimony Of Experts Arnold R. Brody, Ph.D. And Jacques Legier, M.D.* [Docket Entry No. 23-2][5] at pp. 7-9.  Defendant Georgia Pacific argues that Dr. Brody ignores "the available and published epidemiology" which is the "gold standard in proving causation."  *Georgia Pacific's Daubert Motion* at p. 11.

--------------------------------

[5]      Hereinafter "Bondex's *Daubert* Motion."

With regard to the criticism that Dr. Brody is not qualified to give an opinion as to the distinctions in causation between the competing diagnoses, Plaintiffs respond by asserting that Dr. Brody's testimony is not being offered to establish what specifically caused Ms. Larson's cancer, "but rather to generally inform and educate the jury about how asbestos causes cancer. Plaintiffs intend for Dr. Brody to testify about the physiological design and function of the lungs, how asbestos fibers migrate throughout the body and are deposited in the lungs, the different types of asbestos fibers, and how all exposures to asbestos contribute to cause an individual's disease." *Plaintiff's Memorandum In Opposition To Defendants' Motions To Strike And Exclude The Testimony Of Plaintiffs' Experts Drs. Jacques Legier And Arnold Brody* [Docket Entry No. 43] at p. 21.[6]  Consistent with Plaintiffs' representation, Dr. Brody's expert testimony at trial will be limited to general testimony about how asbestos causes cancer and may not include any opinion as to specific causation in this case.

I have reviewed Dr. Brody's "expert report," and note that it is a generic document entitled "Asbestos Induced Lung Diseases. " This document is not case specific and speaks broadly as to "four major diseases" caused by the inhalation of asbestos fibers.  It is Dr. Brody's opinion that all of the asbestos fiber varieties (chrysotile, crocidolite and amosite) cause asbestosis, pleural fibrosis, lung cancer and mesothelioma.  *"Asbestos Induced Lung Diseases "* *by Arnold R. Brody, Ph.D.* (attached as Exhibit "I" to Georgia Pacific's *Daubert* Motion) at p. 2.[7]

---

[6]      Hereinafter "Plaintiffs' Opposition to Defendants' *Daubert* Motions."

[7]      *See* Docket Entry No. 19-12.

In support of his opinion, Dr. Brody states:

> "The basic cellular and molecular mechanisms through which asbestos causes the four diseases have been established at varying levels of knowledge through scientific investigations on humans and correlative animal and cell studies (see CV attached and references therein)."

*Id.*

Attached to Dr. Brody's report is his curriculum vitae in which he lists one hundred and forty-six "peer-reviewed publications," and approximately fifty chapters, of which Dr. Brody is an author or co-author. Many of these articles relate to how exposure to chrysotile fibers affects cells on a molecular level and include, for example, "Chrysotile Asbestos Inhalation In Rats; Deposition Pattern And Reaction Of Alveolar Epithelium And Pulmonary Macrophages," "Interstitial Accumulation Of Inhaled Chrysotile Asbestos Fibers And Consequent Formation of Microcalcifications," "Characterization Of Three Types Of Chrysotile Asbestos After Aerosolization," "Chrysotile Asbestos Inhalation Induces Tritiated Thymidine Incorporation By Epithelial Cells Of Distal Bronchioles," "Cellular And Molecular Bases Of The Asbestos-Related Diseases," and "Asbestos Fiber Type In Malignant Mesothelioma: An Analytical Scanning Electron Microscopic Study Of 94 Cases."[8]

I have little trouble concluding that Dr. Brody's methodology is reliable and meets the flexible *Daubert* criteria for admissibility. His opinions are supported by citations to various peer-reviewed articles, rest upon "good grounds," and are not simply "personal subjective

---

[8]      These articles are listed as Nos. 32, 34, 42, 78, 93, and 102 on Dr. Brody's curriculum vitae.

opinions."[9]  *See Heller v. Shaw Industries*, 167 F.3d 146, 152-53 (3d Cir. 1999)("even if the judge believes 'there are better grounds for some alternative conclusion,' and that there are some flaws in the scientist's methods, if there are 'good grounds' for the expert's conclusions, it should be admitted").  Any concerns about the lack of specific citations to support Dr. Brody's general causal assessment and the role cellular and molecular mechanisms should play in causation analyses may be aired on cross examination, and can be considered by the jury in assessing the weight which they assign to Dr. Brody's opinion.  *See Johnson v. Vane Line Bunkering*, Civ.A. 01-5819, 2003 WL 23162433 at *8 (E.D. Pa. December 30, 2003)(noting, in rejecting a *Daubert* challenge for alleged failure to meet the reliability requirement, that "the Third Circuit does not require that an expert review every medical report available to him or her and does not require that a physician make citations to publications to support his medical conclusions.  At most, the shortcomings alleged by defendant render [plaintiff's expert's] opinion 'shaky,' but admissible nonetheless.  '[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . .'[quoting *Heller*, 167 F3d at 152]").

---

[9]      *See Expert Report of Douglas L. Weed* (attached as Exhibit "D" to Georgia Pacific's *Daubert* Motion) at p. 17.

2. *The Testimony of Dr. Jacques Legier.*

Defendants challenge the expert testimony of Dr. Jacques Legier as unreliable, arguing that it should be excluded because: (1) Dr. Legier did not write his own supplemental report, it was written by Plaintiffs' Counsel; (2) Dr. Legier's opinion that Dianna Larson was properly diagnosed with diffuse malignant mesothelioma of the peritoneum is "equivocal and as such is inherently suspect;" and (3) Dr. Legier's opinions contain fatal methodological flaws, his methodology is both personal and idiosyncratic, and his opinion is not based on proper scientific methodology.  *See Georgia Pacific's Daubert Motion* at pp. 13-18; and *Bondex's Daubert Motion* at pp. 9-12.

As a preliminary matter, I find that Dr. Legier's failure to write his own supplemental expert report does not, under the circumstances of this case, violate Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.  Rule 26(a)(2)(B) requires that an expert's testimony "be accompanied by a written report - prepared and signed by the witness." *Fed. R. Civ. P. 26(a)(2)(B)(2007).*  As both parties acknowledge Rule 26 (a)(2)(B) "does not preclude counsel from providing assistance to experts in preparing reports [. . . ] Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and must be signed by the witness." *Fed. R. Civ. P. 26 Advisory Committee Note* (1993 Amendments).

When a Rule 26(a)(2)(B) challenge is raised, the proper focus of the court's inquiry is whether the expert witness "offered substantial input into what was put into the report." *Crowley v. Chait*, 322 F.Supp.2d 530, 544 (D.N.J. 2004).  In this case, Dr. Legier testified at deposition that while he did not write his supplemental report, he agreed with the content of the report.

Page 9 of  18

*Exhibits to Plaintiffs' Opposition to Defendants' Daubert Motions* [Docket Entry No. 48]:

*Exhibit "6"* (Deposition of Dr. Jacques Legier) at pp. 14-16.  In addition, Dr. Legier has

submitted a "Declaration," notarized on November 30, 2009, in which he attests that his

supplemental report "is based on personal knowledge and [his] professional experience in the

field of Occupational Medicine."  *Id.: Exhibit "46"* (Declaration of Dr. Jacques Legier).  While

Dr. Legier does not have a specific recollection of discussing his supplemental report with

Plaintiffs' attorneys before he reviewed the supplemental report and signed it, he

> "[has] discussed the topics in the [supplemental] report and the literature cited
> concerning on [sic] general and specific causation involving chrysotile asbestos
> exposure and pleural and peritoneal mesothelioma with Waters & Kraus attorneys
> on many occasions.  The [supplemental] report summarizes [his] opinions as [he
> has] relayed them to the Waters & Kraus attorneys in this and many other cases.
> [He] agreed with all of the statements in the [supplemental] report and although
> an attorney from Waters & Kraus may have typed the document, the opinions and
> the bases therefore are [his] alone."

*Id.*  Dr. Legier's Declaration, the veracity of which I have no reason to question, reflects the fact

that he was sufficiently involved in the preparation of the supplemental report that this document

may be considered as setting forth Dr. Legier's opinions and not those of counsel.  *See Crowley*,

322 F.Supp.2d at pp. 544-45 (D.N.J. 2004)(holding, where counsel organized the expert's

opinions and wrote his report after discussion with the expert, that "while the type of assistance

rendered by [counsel] in the compilation of this report may approach the limits of what Rule

26(a)(2)(B) will allow, it does not run afoul of those limits.").

Dr. Legier personally reviewed Dianna Larson's medical records and concluded "with a

reasonable degree of medical certainty and medical probability, that Mrs. Larson has a low-grade

malignant epithelial mesothelioma of the peritoneum, with partial features of papillary well-

differentiated mesothelioma, which, on the basis of her occupational history, was caused by her occupational exposure to asbestos." *August 14, 2008 Surgical Pathology Report of Dr. Legier* (attached as Exhibit "L" to Georgia Pacific's *Daubert* Motion) at p. 2.

The Third Circuit has recognized differential diagnosis as a reliable methodology. *Heller*, 167 F.3d at 154 (3d Cir. 1999)("Both a differential diagnosis and a temporal analysis, properly performed, would generally meet the requirements of *Daubert* and *Paoli*"). Therefore, I reject the argument that differential diagnosis is "inherently suspect."

As with Dr. Brody, I have little difficulty concluding that Dr. Legier's opinions rest upon "good grounds." In the supplemental report, Dr. Legier opines that it is

> "widely accepted in the scientific and medical community that both mesothelioma, including peritoneal mesothelioma, can be caused in humans by exposure to asbestos, including chrysotile asbestosis. [ . . . ]
> The consensus of the medical and scientific community supports the conclusion that both pleural and peritoneal mesothelioma are signature diseases caused by exposure to asbestos, including chrysotile asbestos."

*Supplemental Expert Report of Jacques Legier, M.D.* (dated April 24, 2009 and attached as Exhibit "L" to Georgia Pacific's *Daubert* Motion) at p. 2.

In support of this opinion, Dr. Legier cites *inter alia*:

> (1) peer-reviewed medical literature linking chrysotile fibers with peritoneal mesothelioma;
> (2) case reports of individuals who suffered peritoneal mesothelioma and were exposed to chrysotile fibers;
> (3) animal injection studies which show that chrysotile fibers placed in direct contact with the peritoneum have the capacity to cause malignant changes in the mesothelial cells;
> (4) fiber migration studies which demonstrate that inhaled chrysotile fibers reach the peritoneum in insulation workers exposed to chysotile and amosite fibers; and
> (5) a review of epidemiological evidence by Dr. Paulo Boffetta in which he found that studies of workers exposed only to, or predominantly to, chrysotile fibers

resulted in a lower proportion of total deaths than studies of workers exposed to amphibole or mixed type of asbestos.

*Id.* at pp. 2-5.

Defendants argue that although Dr. Legier's supplemental report "has features of various scientific methods, they have been used in incomplete and misleading ways. [. . . ] His reliance on case reports or case series, animal studies, and fiber migration studies, while ignoring relevant epidemiological studies, is contrary to the reliability requirements set forth in Rule 702 and *Daubert* and its progeny." *Georgia Pacific's Daubert Motion* at pp. 16-17.

In the Third Circuit, a medical expert does not always need to cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness. Epidemiology studies are not *per se* required, and may not be needed, if an expert offers a reliable causation opinion through the use of some other valid scientific methodology. *Heller v. Shaw Industries,* 167 F.3d at pp. 155-56 (3d Cir. 1999*).

Dr. Legier did not ignore relevant epidemiological studies. He notes a consensus that the predominant cause of peritoneal mesothelioma is exposure to asbestos and opines that "there are no studies that link a specific fiber type - chrysotile, amosite, crocidolite or tremolite - to the occurrence of peritoneal mesothelioma in a statistical format because of the combination of the extreme rarity of peritoneal mesothelioma and the lack of any significant cohort of workers who were exposed to only one type of asbestos." *Supplemental Expert Report of Jacques Legier, M.D.* (dated April 24, 2009 and attached as Exhibit "L" to Georgia Pacific's *Daubert* Motion) at p. 5. Defendants' experts disagree, however, this does not negate the fact that Dr. Legier's

opinions are based on generally accepted scientific methods and procedures, and that he gave a

reasoned explanation for his preferred methodology.  Defendants are free to argue credibility to

the jury.[10]

    B. The Dose Reconstruction Testimony of Dr. Dyson Is Sufficiently Relevant
    And Reliable To Meet Rule 702 Requirements.

    Plaintiffs seek to exclude testimony by any defense expert (including but not limited to

William L. Dyson) relating to dose reconstruction. Plaintiffs argue that Dr. Dyson's dose

reconstruction testimony to estimate the total exposure of an individual, rather than the average

exposure of a group, is unreliable.  *Plaintiffs' Reply In Support Of Their Motion In Limine To*

*Exclude Or Limit Dose Reconstruction Testimony Pursuant To Daubert And Rules 702 and 703*

*Of The Federal Rules Of Evidence* [Docket Entry No. 53][11] at p. 4.  Specifically, Plaintiffs

> "agree that dose reconstruction assessment studies may be admissible in certain
> situations to provide reference ranges or data points of the average exposures of a
> group or cohort of persons with similar asbestos exposure histories.  Plaintiffs ask
> only that this Court preclude Defendants from offering any testimony as to a
> purported numerical value of the total dose of asbestos to which Ms. Larson was
> exposed, or a range of exposure numbers that are meant to replicate any particular
> exposure of Ms. Larson's, because given the complete lack of competent data, any
> such figures are inherently speculative and unreliable, and thus fail to satisfy the
> standards for admissibility under *Daubert* and the Federal Rules of Evidence."

*Id.* at pp. 2-3.[12]

---

[10]    To the extent that the Defendants argue that the testimony of Plaintiffs' experts is
not sufficient to prove causation, this is a separate question from the threshold question of
admissibility of expert evidence.

[11]    Hereinafter "Plaintiffs' Dose Reconstruction *Daubert* Reply Brief."

[12]    At oral argument, Plaintiffs' Counsel argued: "If Dr. Dyson wants to come in and
testify that he has reviewed the exposure, and it's not enough, that's one thing.  For Dr. Dyson to
come and put a number on what he believes that exposure is, is quite another."  *N.T. 3/8/10* at
p. 132.

Plaintiffs do not challenge dose reconstruction methodology *per se*, instead they argue that there is not a good fit between this methodology and the facts of this case, and that there is no data to support Dr. Dyson's estimation of Ms.. Larson's total exposure. *Id.* at pp. 5-6 and *N.T. 3/8/10* at p. 114 ("[ . . .] not only must an expert employ sound methodology, but there must be a good fit between the methodology the expert attempts to employ and the facts of the case. [ . . . ] We have good qualitative evidence of exposure. Ms. Larson, in a qualitative manner explained the nature of her exposure in breathing the dust. We just don't have the quantification that would be necessary for Dr. Dyson to do this.").

Defendants offer Dr. Dyson as an expert industrial hygienist who will testify as to Ms. Larson's potential exposure to asbestos while working with joint compound as alleged. They argue that in making his calculations Dr. Dyson relied upon information provided by Plaintiffs in answers to discovery, medical reports and deposition testimony, and on multiple studies regarding the use of joint compound and exposure levels of asbestos. "With this information, combined with Dr. Dyson's knowledge, experience and education, he opines as to potential exposure dose." *Memorandum In Opposition To Plaintiffs' Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant To Daubert and Rules 702 and 703 Of The Federal Rules Of Evidence And Joinder In Responses To Same Submitted By Defendants Union Carbide And/Or Georgia Pacific*[13] at pp. 6-7.

_____

[13]        Hereinafter "Bondex's Opposition To Plaintiffs' Dose Reconstruction Daubert Motion."

Dr. Dyson's dose reconstruction testimony may assist the trier of fact in determining

causation and, therefore, meets the "fit" requirement of Rule 702.  *See Meadows v. Anchor*

*Longwall, et al.*, 306 Fed.Appx. 781, 790 (3d Cir. 2009)("The third element under Rule 702,

namely, whether the expert testimony would assist the trier of fact, 'goes primarily to relevance.'

The expert's testimony must 'fit' under the facts of the case so that 'it will aid the jury in

resolving a factual dispute.'  The standard for the factor is not high; it is met when there is a clear

'fit' connecting the issue in the case with the expert's opinion that will aid the jury in

determining an issue in the case. [citations omitted]").

In addition, Dr. Dyson's dose reconstruction assessments are based on a sufficient

foundation.  When it is impossible to calculate actual exposure levels, the mere fact that an

expert makes reasonable calculations to support his opinion is not enough to render that opinion

unreliable.  Dr. Dyson, using his knowledge and experience, applied an accepted methodology to

information garnered from Ms. Larson's medical records, deposition testimony and answers to

discovery requests, and reached conclusions that reliably flow from the available data and

methodology.  To the extent that Defendants believe that Dr. Dyson's calculations are based on

inaccurate evidence or otherwise are in error, such concerns can be addressed through cross-

examination and/or rebuttal evidence.  However, they do not provide a basis for finding his

opinions unreliable within the meaning of Rule 702.

C.  <u>The Testimony Of Defendants' Causation Experts Are Sufficient To Meet
Rule 702 Reliability Requirements.</u>

Plaintiffs have moved to exclude testimony from any of Defendants' experts regarding

the following opinions:

"(1) the quantification of asbestos fiber potency, including any opinions made in
reliance on the risk assessment of Hodgson and Darnton, one of the various
iterations of the Berman & Crump risk assessment, or the similar Brattin &
Crump quantitative risk assessment model; (2) the alleged inability of chrysotile

asbestos to cause pleural or peritoneal mesothelioma; and (3) that there is any 'safe level' or 'threshold dose' of asbestos exposure, below which such exposures cannot cause mesothelioma."

*"Plaintiffs' Reply In Support Of Plaintiffs' Motion In Limine To Exclude Or Limit Testimony Pursuant To Daubert and Rules 702 And 703 Of The Federal Rules Of Evidence"* [Docket Entry No. 56][14] at p. 2.

In support of their *Daubert* motion, Plaintiffs argue that (1) there is no reliable data upon which to base a quantification of the relative potency of chrysotile asbestos[15], (2) the consensus of the scientific community is that chrysotile asbestos is capable of causing peritoneal mesothelioma[16]; and (3) testimony that there is a safe or threshold level of asbestos has no reliable basis.[17] *Id.* at pp. 5-22.

In response, Defendants allege that testimony of differing potencies of types and sizes of asbestos fibers, of the inability of chrysotile to cause mesothelioma, and of a minimum level of asbestos exposure below which there is no evidence that such exposure causes disease

---

[14]     Hereinafter "Plaintiffs' Reply Brief In Support of Causation *Daubert* Motion."

[15]     According to Plaintiffs' "although testimony regarding *the existence* of a potency difference may be admissible, testimony regarding any purported *quantification* of the relative potency of chrysotile is unreliable because the data necessary to perform such quantifications simply does not exist." *Id.* at p. 5.

[16]     Plaintiffs contend "[t]here is an ample amount of peer reviewed medical literature and other reliable sources that support the proposition that chrysotile can cause peritoneal mesothelioma." *Id.* at p.16.

[17]     Plaintiffs argue that "[b]ecause the science is so well established that very brief, minimal asbestos exposures can and do cause mesothelioma, the law almost everywhere is that any identifiable exposure to asbestos is sufficient to support specific causation in a mesothelioma case." *Id.* at p. 20.

"is routinely admitted in asbestos litigation across the nation.  The science behind these issues is well established.  Plaintiffs have done nothing more than cherry pick out of thousands of research materials on the subject to dispute these positions.  However, noting in F.R.E. 702 or any *Daubert* analysis requires an expert's opinion to be wholly without dispute anywhere in the worldwide scientific community."

*"Memorandum In Opposition To Plaintiffs' Motion In Limine To Exclude Or Limit Testimony Pursuant to Daubert And Rules 702 And 703 Of The Federal Rules Of Evidence And Joinder In Responses To Same Submitted By Defendants Union Carbide And/Or Georgia Pacific Corporation"* [Docket Entry No. 30][18] at p. 2.

Having reviewed Defendants' causation experts' reports, I conclude that they used valid scientific methodology, citing to peer-reviewed scientific studies, in reaching their conclusions regarding the varying potency of different asbestos fiber types, the lack of a causal link between chrysotile and peritoneal mesothelioma, and the concept of a threshold level of asbestos exposure.  The fact that Plaintiffs can cite other studies which challenge the studies relied upon by Defendants' causation experts does not render their opinions unreliable.  *See Johnson v. Van Line Bunkering*, 2003 WL 23162433 at * 6 (E.D. Pa. December 30, 2003)(" '*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology. Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.' *Kannankeril*, 128 F.3d at 806.  If disagreements on particular points between

---

[18]        Hereinafter "Bondex' Response To Plaintiffs' Causation *Daubert* Motion."

proposed experts and others in their field were a proper basis for questioning the reliability and relevance of the methods employed by the experts, it is likely that very few expert opinions would be admissible at trial.").

**IV.  Conclusion.**

Having heard oral argument on the *Daubert* motions, and having reviewed the various pleadings and exhibits, I find that the relative positions of the parties can be summarized in one sentence: "the opinions of my experts are reliable because they're mine and yours aren't because they're yours."  *See Crowley v. Chait*, 322 F.Supp.2d at p. 552 (D. N.J. 2004).  Each of the challenged experts' testimonies meet the admissibility requirements under Rule 702.  "If this test is met and the expert's testimony is [. . . ] admissible, it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.  The ultimate determination of whether expert testimony is correct and 'reliable' in this sense remains with the jury."  *Cook v. Rockwell International Corp.*, 580 F.Supp.2d 1071, 1085 (D. Colo. 2006).  *See Heller*, 167 F.3d at p. 157 (3d Cir. 1999)("[W]e have emphasized that the district court should take care not to 'mistake credibility questions for admissibility questions.").

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | : | |
| | : | |
| JAMES ALLAN BROWN and CAROL | : | ED-PA Case No.: 2:11-cv-60063-ER |
| ELIZEBETH BROWN, husband and wife, | : | |
| Plaintiffs, | : | |
| v. | : | (Transfer District Court No.) |
| KAISER GYPSUM COMPANY, INC., et al, | : | WD-WA Case No. 10-05873 |
| Defendants. | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S MOTION
TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER**

# EXHIBIT  4

**Authority:**

**2011 WL 605801 (E.D.Pa)**

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S
MOTION TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER - 1
s:\client\sbibrown\_james\brown_j_pleadings_usdc\brown\_j_pld_p's response to carrier's motion to modify remand
order_exhibit cover sheets.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, FOURTH FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

Westlaw.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
**(Cite as: 2011 WL 605801 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In re ASBESTOS PRODUCTS LIABILITY LITIG-
ATION (No. VI).
This Document Relates To:
Richard E. Anderson, and Lillian M. Anderson,
husband and wife, Plaintiffs
v.
Saberhagen Holdings, Inc., et al., Defendants.

MDL No. 875.
Civil Action No. 10–cv–61118.
Feb. 16, 2011.

Glenn S. Draper, Law Offices of Matthew Berg-
man, Vashon, WA, Anna D. Knudson, Brian F.
Ladenburg, Bergman Draper & Frockt PLLC,
Seattle, WA, for Plaintiffs.

Jeanne F. Loftis, Bullivant Houser Bailey PC, Port-
land, OR, Christopher S. Marks, Jeffrey M. Wolf,
Williams Kastner Gibbs, Aaron P. Riensche, Robert
Gregory Andre, Ogden Murphy Wallace PLLC,
Howard Terry Hall, Wolfstone Panchot & Bloch,
Richard G. Gawlowski, Wilson Smith Cochran &
Dickerson, Daniel Ruttenberg, Perkins Coie LLP,
Seattle, WA, for Defendants.

***MEMORANDUM OPINION***
DAVID R. STRAWBRIDGE, United States Magis-
trate Judge.
**I. Introduction**
    **\*1** Richard and Lillian Anderson (collectively
"Plaintiffs"), husband and wife, filed this asbestos
personal injury action in the Superior Court of
Washington for Pierce County on September 3,
2009, asserting claims against multiple parties in-
cluding defendant Salmon Bay and Gravel Com-
pany, Inc. (alternatively "Salmon Bay" or
"Defendant"), a Seattle-area retailer of tools and
construction supplies. The matter was removed to

the United States District Court for the Western
District of Washington and then, on February 8,
2010, transferred to the Eastern District of
Pennsylvania to be included in the multi-district
Asbestos Liability Litigation (MDL 875). (Docs.1,
2.)

    Presently before the Court is Salmon Bay's
"Motion to Preclude Certain Testimony of Experts
Sam Hammar, MD, Andrew Brodkin, MD and
Arnold Brody, MD" (Doc. 41) ("Motion"),
Plaintiffs' Response (Doc. 49) ("Resp.") and Sal-
mon Bay's Reply (Doc. 81) ("Reply"). Oral argu-
ment was heard on November 17, 2010, and the
motion is now ripe for review.

**II. The "Every Exposure" Opinion**
    Defendant asks this Court to preclude
Plaintiffs' experts Drs. Hammar, Brodkin and
Brody from offering "the opinion that any exposure
to asbestos above 'background' is a significant con-
tributing factor" to the development of Mr. Ander-
son's mesothelioma. (Motion at 1.) Preliminarily,
we note that the admissibility standard embodied in
the Rules of Evidence applies only to the particular
opinions to be offered by an expert in the case in
which they will be called to testify. See
FED.R.EVID. 702. We may therefore consider De-
fendant's arguments only to the extent they apply to
Plaintiffs' particular expert opinions, and find it ne-
cessary to first clarify the opinion(s) offered by the
experts the Defendant has challenged. This clarific-
ation is particularly important in light of Plaintiffs'
assertion that only Dr. Hammar has offered the
opinion challenged by Defendant.

    First, with regard to Dr. Brodkin, Plaintiffs
have submitted an affidavit wherein Dr. Brodkin
states unequivocally that it is not his opinion that
each exposure above background is a significant
contributing factor to the development of mesothe-
lioma. (Brodkin Decl. [Doc. 49–1] at ¶ 4.) Rather,
he has opined that "the *identified* occupational and
environmental asbestos exposures in Mr. Ander-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
**(Cite as: 2011 WL 605801 (E.D.Pa.))**

son's case, specifically those associated with his work as a career cement mason, environmental use of asbestos-containing drywall joint compound and friction products, were of high concentration—far exceeding ambient levels-sufficient to overcome the body's respiratory defense mechanisms and adding to Mr. Anderson's lung burden of asbestos." (*Id.* at ¶ 6 (emphasis in original).) We have reviewed his report, and find that it confirms what Dr. Brodkin states in his affidavit. (See Brodkin Report [Doc. 43] at 31.) We therefore conclude, based on Dr. Brodkin's affidavit and expert report, that he has not offered the opinion challenged by Defendant. Defendant's arguments against the admissibility of that opinion are therefore inapplicable to Dr. Brodkin's testimony.

*2 Second, with regard to Dr. Brody, Plaintiffs state that he was provided no case-specific materials and offers opinions only as to general causation. (Resp. at 5.) Plaintiffs also allege that Dr. Brody did not express the challenged opinion in either his report or at deposition. (*Id.*) Unfortunately, no party has made any of Dr. Brody's materials (i.e. his expert report or a transcript of his deposition testimony) a part of the record. Accordingly, we are unable determine what opinions he has offered or evaluate the reliability of those opinions or the validity of Defendant's arguments for preclusion of his testimony.

We are therefore left to consider the expert opinions offered by Dr. Hammar, who is Plaintiffs' specific causation expert. He was also the pathologist who diagnosed Mr. Anderson's mesothelioma, and has been familiar with his illness since early in its progression. (Hammar Decl. [Doc. 49–2] at ¶ 5.) He opines that "every occupational and bystander exposure to asbestos above background was a substantial contributing factor in causing Mr. Anderson's ... mesothelioma." (Motion Ex. 5 [Doc. 43–3] at ¶ 19) (hereinafter "Hammar Report.") In reaching that conclusion, Dr. Hammar considered Mr. Anderson's medical records, pathology slides and the "exposure history" provided to him by

Plaintiffs' counsel. (See Hammar Report.) He then applied his opinions regarding the nature of mesothelioma and other asbestos-related diseases, and the asbestos exposures necessary to cause them, in order to render specific opinions with regard to Mr. Anderson.

Dr. Hammar's general opinion is that where an individual has been diagnosed with mesothelioma, all asbestos exposures above "background" must be considered "substantial factors" in the development of that mesothelioma. This conclusion is derived from several other scientific opinions, which are supported by various studies, articles and other published materials. As the principal focus of Defendant's motion is the reliability of Dr. Hammar's final conclusion, we find it necessary to examine the precepts which underlie it.

Dr. Hammar first opines that the risk of contracting mesothelioma is dependent upon the cumulative exposure to asbestos a particular individual has suffered. In other words, "the greater the exposure to asbestos or inhalation of asbestos, the greater the risk is of developing mesothelioma." (Hammar Decl. at ¶ 13.) We do not understand Defendant's motion to challenge this fundamental precept.

He next opines that susceptibility to asbestos-related disease varies within the population and the dose of asbestos necessary to cause the disease is different for each individual, and largely dependent upon genetic predisposition. (Hammar Decl. at ¶¶ 8–9.) Dr. Hammar supports this opinion by discussing his own research, conducted with Dr. Ronald Dodson, where they examined the lung tissue of individuals with mesothelioma and found "a wide range of concentrations of asbestos fibers/bodies." (*Id.*) He also provides citations to several published articles supporting the opinion that susceptibility to asbestos-related disease varies according to genetics. (*Id.* at ¶¶ 9–11 (citing Neri M., et al. *Genetic Susceptibility to Malignant Pleural Mesothelioma and Other Asbestos–Associated Diseases,* 659 Mutat Res 126–36 (2008); Bockus D., et al., *Familial Mesothelioma: a Report of Two Families,* 20

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
**(Cite as: 2011 WL 605801 (E.D.Pa.))**

Human Pathol 107–12 (1989); Hillerdal G., *Mesotherlioma: Cases Associated with Non–Occupational and Low Dose Exposures*, 56 Occup Environ Med 506–13 (1999); Polan, et al., *Non-occupational Exposure to Asbestos and Malignant Mesothelioma in Females*, 1 Lancet 1061–63 (1978); Goldberg, *The Health Impact of Nonoccupational Exposure to Asbestos: What do we know?*, European J. Cancer Prevention (2009).) Based on this variation within the population, Dr. Hammar opines that "it is impossible to know in any individual person how much exposure to asbestos it would take" to bring about disease. (Hammar Decl. at ¶ 8.) Some individuals may experience high-dose asbestos exposures and never develop an asbestos related disease, while others will develop such a disease from very low-dose exposures.

*3 According to Dr. Hammar, epidemiological studies have established that exposures as low as 0.1 f/cc-years [FN1] cause mesothelioma in some individuals within the population, and the effects of lower dose exposures are unknown. (Hammar Decl. at ¶ 26 (citing Roggli, et al., *Pathology of Asbestos–Associated Diseases*, 2d Ed. at 26 (2003)).) He notes that 0.1 f/cc-years is the current "permissible exposure level" ("PEL") in the United States, and was established by OSHA in 1994. (*Id.*) He also discusses two epidemiological studies which found an increased risk of mesothelioma for even very low-dose exposures to asbestos. The first epidemiological study is Iwatsubo, et al., *Pleural Mesothelioma: Dose Response Relation at Low Levels of Asbestos Exposure in a French Population-based Case–Control Study*, 148 Am J of Epidem 133–42 (1998), which found an excess of mesothelioma associated with exposures between 0.001 and 0.49 f/cc-yrs. The second study, Rodelsperger et al., *Asbestos and Man–Made Vitreous Fibers as Risk Factors for Diffuse Malignant Mesothelioma: Results from a German Hospital–Based Case–Control Study*, 39 Am J Ind Med 262–75 (2001), similarly concluded that there was a significantly increased risk of developing mesothelioma even in the lowest exposure group, which experienced exposures

between 0 and 0.15 f/cc-yrs.

FN1. Concentrations of asbestos fibers are generally measured in "f/cc" or "fibers per cubic centimeter" of air. A cubic centimeter is also equal to a milliliter. Cumulative asbestos exposure is measured by a time weighted average of the concentration of asbestos multiplied by the length of exposure. This measurement is usually expressed in units of f/cc-years, but can be scaled for any unit of time.

Dr. Hammar also discusses a quantitative risk assessment by Hodgson and Darnton, where the authors attempted to construct a linear model representing the risk of developing mesothelioma in relation to cumulative asbestos exposure. Hodgson, JT, Darnton A., *The Quantitative Risk of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure*, 44 Ann Occup Hyg 565–601 (2000). The authors examined numerous epidemiological studies and created quantitative dose-risk models for the development of mesothelioma. The authors concluded by stating "we do not believe there is a good case for assuming any threshold for mesothelioma risk." *Id.* at 585.

Finally, Dr. Hammar notes that several governmental agencies and international organizations have stated that there is no level of exposure to asbestos below which disease has been shown not to occur. (Hammar Decl. at ¶ 12.) These include the National Institute for Occupational Safety and Health (NIOSH), the Occupational Safety and Health Agency (OSHA), the World Health Organization (WHO) and the World Trade Organization (WTO). (*Id.*)

Upon review of these epidemiological studies, Hodgson and Darnton's quantitative risk assessment and the statements of the various organizations, Dr. Hammar opines that there is no established "threshold" of exposure to asbestos below which mesothelioma is known not to occur. He does, however, acknowledge that there is some small

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
**(Cite as: 2011 WL 605801 (E.D.Pa.))**

concentration of asbestos fibers present in the ambient air to which we are all exposed, a concentration which he terms "background" levels. These levels vary by geographic area, but according to Dr. Hammar they are below 10–4 f/cc (0.0001 f/cc) in most areas. (Hammar Decl. at ¶ 14 (citing Roggli, et al., *Pathology of Asbestos Associated Diseases,* Little, Brown & Co., Boston (1992) at 28–30).) He states that in the United States background levels have been reported to range from 0.00005 f/cc to 0 .00023 f/cc, far lower than the 0.1 f/cc PEL shown to increase the risk of mesothelioma.

  **\*4** Applying these principles to Mr. Anderson, Dr. Hammar states the medical records and pathology slides demonstrate that he suffered from pleural mesothelioma caused by asbestos exposure. He notes that Mr. Anderson had a "mixed exposure to amphiboles and chrysotile" asbestos fibers, based both on the fibers found in his lung tissue and his exposure history. (*Id.* at ¶ 24.) He opines that any of the occupational or bystander exposures could have been sufficient to cause Mr. Anderson's mesothelioma, as it is impossible to know where within the population he falls (i.e. the precise extent of exposure necessary to cause disease in Mr. Anderson specifically). Further, each exposure contributed to his cumulative dose of asbestos exposure, which determines his overall risk of developing an asbestos-related disease. Therefore, according to Dr. Hammar, each such exposure was a substantial contributing factor in the development of Mr. Anderson's mesothelioma, and the magnitude of the contribution of each exposure is a question of the extent of that particular exposure in proportion to the others. (*Id.* at ¶ 20.)

**III. Legal Standard**

  The standard for the admissibility of expert testimony is set forth in Federal Rule of Evidence 702, as interpreted by the United States Supreme Court in *Daubert v. Merrel Dow Pharmaceutical, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that an expert opinion is admissible to assist the trier of fact to determine a fact in issue if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702. Rule 702, as is true with regard to the Federal Rules of Evidence generally, is to be interpreted liberally in favor of admission since "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. 579 at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469.

  The Third Circuit has described Rule 702 as being comprised of three major requirements: "(1) that the proferred witness must be an expert, *i.e.,* must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [i.e. reliability]; and (3) the expert's testimony must assist the trier of fact [i.e. fit]." *United States v. Schiff,* 602 F.3d 152, 172 (3d Cir. April 7, 2010) (quoting *Pineda v. Ford Motor Co.,* 502 F.3d 237, 243–44 (3d Cir.2008)).

  Defendant has not challenged the qualification of Plaintiffs' experts, so only the "reliability" and "fit" prongs are at issue. With regard to reliability, the analysis is focused upon the expert's process or technique rather than his conclusions, and is a flexible test to be tailored to the specific case at issue. *Daubert,* 509 U.S. at 593–94. Both the Supreme Court and the Third Circuit have suggested several non-exclusive factors to guide the lower courts in the reliability inquiry. *Daubert* directs the court to consider, among other factors, whether the theory or technique can be objectively tested, has been subject to peer review and publication, what the known or potential rate of error is for the particular technique, whether there are standards that exist and are maintained that control the technique's operation, and whether the theory or technique is "generally accepted." *Id.* The Third Circuit has added additional factors which may further guide the lower court's determination, including "the relation-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
**(Cite as: 2011 WL 605801 (E.D.Pa.))**

ship of the technique to methods which have been established to be reliable; the qualifications of the expert testifying based on the methodology; and the non-judicial uses to which the method has been put." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 742, n. 8 (3d Cir.1994).

**\*5** The "fit" requirement is derived from Rule 702's imperative that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." FED.R.EVID. 702. The Third Circuit has described the relevant inquiry as follows:

> It is typically understood in terms of whether there is a sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider. In assessing whether an expert's proposed testimony 'fits,' we are asking whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. Put another way, this is a question of relevance, and Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact. The standard is not that high, but is higher than bare relevance.

*Schiff,* 602 F.3d at 172–73 (internal quotations omitted).

**IV. Discussion**

Defendant argues that Dr. Hammar's testimony is inadmissible under Rule 702 in that his opinions are the product of an unreliable and unscientific method. It has not challenged Dr. Hammar's qualifications. Plaintiffs counter that his opinions are based on valid scientific studies, and are generally accepted in the scientific community. We find that Dr. Hammar's opinions are sufficiently reliable to be admissible under Rule 702, and that Defendant's arguments are more appropriate for cross examination at trial.

Defendant's main argument for preclusion of Plaintiffs' experts, which it characterizes as one of

"fit," relates to a fundamental factual dispute in the case—the precise type of asbestos fibers present in the Salmon Bay products to which Mr. Anderson was allegedly exposed. Defendant argues that their product contained only "Grade 7 Chrysotile" [FN2] fibers, and that Dr. Hammar's reliance upon the Iwatsubo and Rodelsperger studies is misplaced in that those studies discussed exposure to mixed amphibole and chrysotile fibers. (Motion at 8–10.) Salmon Bay argues that Dr. Hammar should have also considered other epidemiological studies which allegedly show that Grade 7 chrysotile fibers do not cause mesothelioma. (*Id.*) Plaintiffs, however, assert that the Salmon Bay products to which Mr. Anderson was exposed did contain both amphiboles and chrysotile asbestos. (Resp. at 6–7.) Dr. Hammar also states that Mr. Anderson's lung tissue and exposure history indicate that he likely suffered mixed-fiber exposures, and his opinions are based on that assumption. (Hammar Decl. at ¶ 13–14, 24.) The record before us demonstrates that there is a factual dispute not only as to what exposure Mr. Anderson may have had to Salmon Bay products, but also as to the fiber types that may or may not have been present in those products. In light of this dispute, and subject of course to the consideration of the fact finder's determination of the evidence presented, Plaintiff will be permitted to offer Dr. Hammar's testimony at trial. Defendant of course will be provided ample opportunity to test his assumptions and conclusions on cross-examination.

> FN2. "Asbestos" is actually the name used for six different fibrous minerals with similar characteristics: amosite, crocidolite chrysotile and the fibrous varieties of tremolite, actinolite and anthophyllite. *Asbestos Fact Sheet,* AGENCY FOR TOXIC SUBSTANCES & DISEASE REGISTRY, *available at* http://www.atsdr.cdc.gov/toxfaqs.tf.asp?id=2 9 & tid=4 (Feb. 3, 2011). Fibers may then be distinguished on the basis of "grades" which describe fibers of different lengths.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
(Cite as: 2011 WL 605801 (E.D.Pa.))

The most common grading system is the Quebec Standard dry classification method, which classifies fibers into nine grades based on fiber length. Under the Quebec system, a lower grade corresponds to a longer fiber. *Asbestos,* ENCYCLOPEDIA.COM, *available at* http://www.encyclopedia.com/topic/asbestos.aspx (Feb. 3, 2011). Fibers are generally measured in "microns" (an abbreviation for micrometer, which is equal to 0.000001 meters).

**\*6** Defendant also argues that the "every exposure" opinion is an "unproven hypothesis" unsupported by reliable and scientific method. (Motion at 6.) As support for this argument, Defendant first points to the following exchange between Dr. Hammar and defense counsel in a deposition from another case:

Q Do you agree that your statement that [every breath of asbestos containing air above background was a potential contributing factor in causing plaintiff's mesothelioma] is a statement which is an unproven hypothesis?

A Well, I would look at it this way, is that, yeah, there's no way that you are going to prove that but there's no way that somebody is going to disprove it either.

(Motion Ex. 6 [Doc. 43–3], Deposition of Samuel Hammar in *Free v. Ametek, Inc.,* No. 07–2–04091 SEA (King County Superior Court, Dec. 13 2007) at 103:7–14.) (hereinafter "Hammar Dep. in *Free."* )

According to Defendant, this exchange demonstrates that Dr. Hammar's opinion is a mere unproven hypothesis, unsupported by reliable scientific evidence. (Motion at 7.) However, Defendant's argument ignores the exchange immediately following the quoted dialogue, where Dr. Hammar states that "I think that could be proven from carcinogenic theory to a reasonable degree of medical

certainty." (Hammar Dep. in *Free* at 104.) Dr. Hammar then agrees that it is reasonable to interpret "above background" as meaning "above .1 f/cc-years." (*Id.*) In his submissions in this case, Dr. Hammar has supported this particular opinion by reference to numerous governmental and organizational standards, as well as the Rodelsperger and Iwatsubo studies and the Hodgson and Darnton risk assessment. (Hammar Decl. at ¶¶ 12–14.) We find that the opinions offered by Dr. Hammar and discussed in the testimony cited by Defendant, considered in their entirety, are sufficiently supported by reliable scientific evidence to be admissible under Rule 702.

Additionally, as it relates to Defendant in particular, Dr. Hammar's opinion is that Mr. Anderson's exposures to asbestos from their products were substantial contributing factors to the development of his disease. Plaintiffs do not allege mere low-dose exposure to Salmon Bay products; rather they allege Mr. Anderson was exposed to asbestos from those products on a regular basis for a period of years while working at the Seattle School District. (Vol. III Anderson Dep. [Doc. 145–3] at 62–63, 131; Resp. at 3–4.) In this context, Dr. Hammar's opinion on specific causation is made arguably more reliable. While Defendant does not agree with Plaintiffs' version of the facts, this point does not mean that Plaintiff's experts should be precluded. It must be left to the jury to sort out the facts and apply these facts as they see fit to the causation theories advanced. Defendants will of course actively participate in the process and advance their arguments by cross examination as well as their own experts.

Defendant next argues that the opinions are unreliable in that Plaintiffs' experts "have no facts or data at all regarding Mr. Anderson's exposure to products allegedly sourced from Salmon Bay." (*Id.* at 9.) With regard to Dr. Hammar, we find this to be an incorrect assertion of fact. Dr. Hammar reviewed Mr. Anderson's "exposure history," which included his alleged exposures to Beadex joint

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 605801 (E.D.Pa.)
**(Cite as: 2011 WL 605801 (E.D.Pa.))**

compound, an asbestos-containing product sold by Salmon Bay (Resp. at 3–4), while working at the Seattle School District. (Hammar Report at 1–2.) Salmon Bay is also listed in Mr. Anderson's exposure history as a manufacturer of products to which he was exposed. (*Id.*) We therefore conclude that this argument is without merit.

**\*7** Finally, Defendant argues that the opinions should be precluded in that they were "formulated for the purposes of litigation" and that Dr. Hammar has "a long history of testifying in asbestos litigation" and changed his opinion with regard to the threshold of exposure necessary to cause asbestos-related disease. (Motion at 11–13.) We acknowledge that the development of a particular opinion for the express purpose of litigation may be considered as a factor weighing in favor of preclusion. However, we also recognize that Dr. Hammar's "long history" of testifying indicates that multiple courts have found his opinions to be sufficiently reliable to meet the admissibility standard. Indeed, as Plaintiffs point out, Dr. Hammar has testified in hundreds of asbestos cases throughout the county. (Resp. at 27–30.) The circumstance that Dr. Hammar may have formulated certain opinions for the purposes of litigation is not a sufficient basis to justify preclusion of his testimony.

**V. Conclusion**

We find that only Dr. Hammar has offered the opinion challenged by Defendant, and find their arguments for preclusion of that opinion to be inapplicable to Drs. Brody and Brodkin. Additionally, we find Dr. Hammar's opinion that "every occupational and bystander exposure to asbestos above background was a substantial contributing factor in causing Mr. Anderson's ... mesothelioma" is sufficiently reliable to meet the admissibility standard of Rule 702, and Defendant's arguments to the contrary are more appropriately reserved for cross examination.

Our order will follow.

E.D.Pa.,2011.

In re Asbestos Products Liability Litigation
Slip Copy, 2011 WL 605801 (E.D.Pa.)

END OF DOCUMENT

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | : | |
| | : | |
| JAMES ALLAN BROWN and CAROL | : | ED-PA Case No.: 2:11-cv-60063-ER |
| ELIZABETH BROWN, husband and wife, | : | |
| Plaintiffs, | : | |
| v. | : | (Transfer District Court No.) |
| KAISER GYPSUM COMPANY, INC., et al, | : | WD-WA Case No. 10-05873 |
| Defendants. | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S MOTION
TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER**

# EXHIBIT 5

**Administrative Order No. 18**

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S
MOTION TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER - 1
s:\clients\b\brown, james\brown\j_pleadings_usdc\brown\j_pld_p's response to carrier's motion to modify remand
order_exhibit cover sheets.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, FOURTH FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (No. VI) | : | |
| | : | |
| | : | Civil Action No. |
| | : | 2:01-md-875 |
| THIS DOCUMENT RELATES TO | : | |
| ALL ACTIONS | : | |

**ADMINISTRATIVE ORDER NO. 18**

Upon consideration of the motion to alter or amend Administrative Orders 3, 14, 15, and 16, filed on behalf of certain Plaintiffs by Motley Rice, LLC, the Court will institute a set procedure for Counsel seeking remand of an individual Plaintiff's case to the appropriate transferor District Court. Plaintiffs seeking to have their case remanded must file a motion for a suggestion of remand that conforms to the requirements set forth in this Administrative Order.

A motion for a suggestion of remand must contain, at a minimum, the following information with regard to each individual claim:

    1.) The civil action number of the case in the district where it was originally filed.

    2.) The civil action number of the case in the Eastern District of Pennsylvania, if the case has been assigned an E.D. Pa. civil action number.

    3.) The name of the plaintiff in the case.

    4.) The diagnosing report or opinion relied upon by plaintiff in compliance with Administrative Order no.

12.

5.) The identity of defendants that are still viable[1] in the case.

6.) A certification that the motion requesting the suggestion of remand has been served upon counsel for all other parties to the action.

7.) The specific reasons why remand is appropriate in this case.  Plaintiff should specify:

   a.) Whether Plaintiff has complied with Administrative Orders 12 and 12A.

   b.) Whether the injured Plaintiff is alive.

   c.) Whether the parties have submitted a Rule 26(f) report to the Court.

   d.) Whether all relevant discovery has been completed or has been substantially completed.  If not, identify the discovery still to be completed.

   e.) The extent to which settlement conferences have been held in the case and the status of settlement negotiations.

   f.) Whether there are any outstanding motions in the case.  Counsel seeking remand should be able to certify that there are no outstanding motions remaining in the case.

---

[1]     A viable defendant is a defendant which has not been dismissed from the case and is not in bankruptcy proceedings.

g.) Whether, if the case is remanded, the Plaintiff is prepared for trial without delay once on the transferor court's normal docket.

h.) The status of congestion in the transferor court docket.

After a motion for a suggestion of remand is filed with the Court, any Defendant opposing the suggestion of remand will be given 15 days to file a response. If there is no response filed and the Court determines that a suggestion of remand is appropriate, the motion will be granted as uncontested, pursuant to Local Rule of Civil Procedure 7.1(c). If there is a response, the Court will make a ruling on the parties' filings or schedule a hearing on the matter, if necessary.

Additionally, if a Plaintiff's case is prepared to proceed to trial, and all of the parties provide the necessary consent, both Article I and Article III Judges are available to hold trials in the Eastern District of Pennsylvania. Details on the procedure for requesting trial in the Eastern District of Pennsylvania, as well other MDL 875 case information, can be found on the MDL 875 website, available at www.paed.uscourts.gov/mdl875.asp.

**AND IT IS SO ORDERED.**

_____

_____**EDUARDO C. ROBRENO, J.**

1

2

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

3

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | MDL DOCKET NO. 875 |
| LIABILITY LITIGATION (NO. VI) | : | |
| | : | |
| JAMES ALLAN BROWN and CAROL | : | ED-PA Case No.: 2:11-cv-60063-ER |
| ELIZEBETH BROWN, husband and wife, | : | |
| Plaintiffs, | : | |
| v. | : | (Transfer District Court No.) |
| KAISER GYPSUM COMPANY, INC., et al, | : | WD-WA Case No. 10-05873 |
| Defendants. | : | |

4

5

6

7

8

9

10

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S MOTION
TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER**

11

12

13

14

# EXHIBIT   6

15

16

17

## Chart:

18

## Case is Listed for Hearing

19

20

21

22

23

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CARRIER'S
MOTION TO MODIFY THE PANEL'S CONDITIONAL REMAND ORDER - 1
s:\client\b\brown, james\brown-nj_pleading_nj-usdc\brown-nj_pld_p's response to carrier's motion to modify remand
order_exhibit cover sheets.doc

BERGMAN DRAPER & FROCKT, PLLC
614 FIRST AVENUE, FOURTH FLOOR
SEATTLE, WA 98104
TELEPHONE: 206.957.9510
FACSIMILE: 206.957.9549

