(JCGx), DISCOVERY, MANADR, RELATED-P

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)**
**CIVIL DOCKET FOR CASE #: 2:12-cv-02284-DSF-JCG**
**Internal Use Only**

| | |
|---|---|
| Lee E. Knowles v. A.W. Chesterton Company et al | Date Filed: 03/19/2012 |
| Assigned to: Judge Dale S. Fischer | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Jay C. Gandhi | Nature of Suit: 368 P.I. : Asbestos |
| Case in other court: Superior Court of CA, Los Angeles County, BC474820 | Jurisdiction: Federal Question |
| Cause: 28:1441 Notice of Removal - Asbestos Litigation | |

**Plaintiff**

**Lee E. Knowles**                   represented by  **Jennifer L Bartlett**
Simon Greenstone Panatier Bartlett, PC
301 E Ocean Blvd Suite 1950
Long Beach, CA 90802
562-590-3400
Fax: 562-590-3412
*ATTORNEY TO BE NOTICED*

**Jonah D King**
Simon Greenstone Panatier Bartlett PC
301 E Ocean Blvd Suite 1950
Long Beach, CA 90802
562-590-3400
Fax: 562-590-3412
Email: jking@sgpblaw.com
*ATTORNEY TO BE NOTICED*

**Jordan Blumenfeld-James**
Simon Greenstone Panatier Bartlett, PC
301 East Ocean Boulevard Suite 1950
Long Beach, CA 90802
562-590-3400
Fax: 562-590-3412
Email: jbj@seglaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joyce Knowles**                   represented by  **Jennifer L Bartlett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonah D King**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jordan Blumenfeld-James**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**A.W. Chesterton Company**

**Defendant**

**Alfa Laval, Inc.**
*sued individually adn as successor-in-interest to The Delaval
Separator Company and Sharples Corporation*

**Defendant**

**Amtrol, Inc.**
*sued individually and as successor-in-interest to Thrush
Company and H.A. Thrush Company*

**Defendant**

**Armstrong International, Inc.**

<u>Defendant</u>

**Atlantic Richfield Company**

<u>Defendant</u>

**Blackmer Pump Company**

<u>Defendant</u>

**Bridgestone Americas, Inc.**
*sued as successor-in-interest to Firestone Tire and Rubber*
*Company*

<u>Defendant</u>

**BW IP International, Inc.**
*sued individually and as successor-in-interest to Byron*
*Jackson Pump Company*

represented by **Keith M Ameele**
Foley & Mansfield PLLP
300 South Grand Ave, Suite 2800
Los Angeles, CA 90071
213-283-2100
Fax: 213-283-2101
Email: kameele@foleymansfield.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Calaveras Asbestos, Ltd**

<u>Defendant</u>

**CBS Corporation**
*fka Viacom, Inc. sued as successor-by-merger to CBS*
*Corporation fka Westinghouse Electric Corporation*

<u>Defendant</u>

**Certainteed Corporation**

<u>Defendant</u>

**Chevron USA, Inc.**

<u>Defendant</u>

**CLA-VAL Co.**

<u>Defendant</u>

**Cleaver-Brooks, Inc.**
*fka Aqua-Chem, Inc., dba Cleaver-Brooks Division*

<u>Defendant</u>

**ConocoPhillips Company**
*sued as successor to Tidewater Oil Company*

<u>Defendant</u>

**Crane Co.**
*sued individually and as successor-in-interest to Cochrane*
*Corporation and Deming Pump Company*

<u>Defendant</u>

**Crane Environmental, Inc.**
*sued individually and as successor-in-interest to Cochrane*
*Corporation*

<u>Defendant</u>

**Crown Cork and Seal Company, Inc.**
*sued individually and as successor-in-interest to Mundet Cork*
*Company*

<u>Defendant</u>

**Dover Corporation**
*sued as successor to Blackmer Pump Co.*

<u>Defendant</u>

**Eaton Corporation**
*sued as successor to Cutler Hammer, Inc.*

**Defendant**

| | |
|---|---|
| **Familian Corporation**<br>*sued individually and as successor-in-interest to Familian*<br>*Pipe and Supply* | represented by    **Jennifer C Rasmussen**<br>Pond North LLP<br>100 Spear Street, Suite 1200<br>San Francisco, CA 94105<br>415-217-1240<br>Fax: 415-644-0578<br>Email: jrasmussen@pondnorth.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | **Arash Nematollahi**<br>Pond North LLP<br>350 South Grand Ave, Suite 3300<br>Los Angeles, CA 90071<br>213 617 6170<br>Fax: 213 623 3694<br>Email: anematollahi@pondnorth.com<br>*ATTORNEY TO BE NOTICED* |
| | **Francis D Pond**<br>Pond North LLP<br>350 South Grand Avenue Suite 3300<br>Los Angeles, CA 90071<br>213-617-6170<br>Fax: 213-623-3594<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**Ferguson Enterprises, Inc.**
*sued as successor-in-interest to Industry Supply*

**Defendant**

**Fisher Controls International, LLC**

**Defendant**

**Flowserve US, Inc.**
*as successor to Byron Jackson Pump Company*

**Defendant**

**FMC Corporation**
*sued individually and as successor-in-interest to Peerless*
*Pump Company*

**Defendant**

**Formosa Plastics Corporation U.S.A.**
*sued individually and as parent, alter ego and*
*successor-in-interest to J-M AC Pipe Corporation*

**Defendant**

| | |
|---|---|
| **Foster Wheeler Energy Corporation** | represented by    **Edward R Hugo**<br>Brydon Hugo and Parker<br>135 Main Street 20th Floor<br>San Francisco, CA 94105<br>415-808-0300<br>Fax: 415-808-0333<br>*ATTORNEY TO BE NOTICED* |
| | **Karleen Frances Murphy**<br>Brydon Hugo and Parker<br>135 Main street 20th Fl<br>San Francisco, CA 94105<br>415-808-0300<br>Fax: 415-808-0333<br>*ATTORNEY TO BE NOTICED* |
| | **Shaghig D Agopian** |

Brydon Hugo & Parker
135 Main Street 20th Floor
San Francisco, CA 94105
415-808-0300
Fax: 415-808-0333
Email: sagopian@bhplaw.com
*ATTORNEY TO BE NOTICED*

**Thomas Jeffrey Moses**
Brydon Hugo and Parker
135 Main Street 20th Floor
San Francisco, CA 94105
415-808-0300
Fax: 415-808-0333
Email: tmoses@bhplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Freeport-McMoRan Copper and Gold, Inc.**      represented by   **Robert D Eassa**
*sued as successor-by-merger to Phelps Dodge Corporation*            Brown Eassa and McLeod LLP
Lake Merritt Plz
1999 Harrison Street 18th Fl
Oakland, CA 94612-3541
510-444-3131
Fax: 510-839-7940
Email: rpereda@browneassa.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron J Hoyler**
Brown Eassa and McLeod LLP
1999 Harrison Street Suite 1800
Oakland, CA 94612-3520
510-444-3131
Fax: 510-839-7940
Email: choyler@browneassa.com
*ATTORNEY TO BE NOTICED*

**James Mink**
Brown Eassa and McLeod LLP
1999 Harrison Street Suite 1800
Oakland, CA 94612-3520
510-444-3131
Fax: 510-839-7940
Email: jmink@browneassa.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Electric Company**      represented by   **Katherine Paige Gardiner**
Sedgwick LLP
333 Bush Street
San Francisco, CA 94104-2834
415-781-7900
Fax: 415-781-2635
Email: katherine.gardiner@sdma.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Mills, Inc.**

**Defendant**

**General Petroleum Corporation**

**Defendant**

**The Goodyear Tire and Rubber Company**      represented by   **Elan N Stone**
Lewis Brisbois Bisgaard and Smith LLP
221 N Figueroa Street Suite 1200
Los Angeles, CA 90012
213-250-1800
Fax: 213-580-7942
Email: estone@lbbslaw.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Goulds Pumps, Inc.**

**Defendant**

**Grinnell LLC**
*dba Grinnell Corporation*

**Defendant**

**Hajoca Corporation**

**Defendant**

**Hanson Permanente Cement, Inc.**
*fka Kaiser Cement Corporation*

**Defendant**

**Hopeman Brothers Inc.**

**Defendant**

**IMO Industries, Inc.**
*suec individually and as successor-in-interest to Delaval Turbine, Inc. and also to C.H. Wheeler Manufacturing Company*

**Defendant**

**Industrial Holdings Corporation**
*fka The Carborundum Company*

**Defendant**

**Ingersoll Rand Company**
*sued individually and as successor-in-interest to Terry Steam Turbine Company, Whiton Machine Co. and Aldrich Pump Company*

**Defendant**

**ITT Corporation**
*fka ITT Industries, Inc. sued individually and as succesor-in-interest to Bell and Gossett*

**Defendant**

**J.T. Thorpe and Son, Inc.**

**Defendant**

**John Crane, Inc.**

**Defendant**

**Keenan Properties, Inc.**

**Defendant**

**Kimberly-Clark Corporation**

**Defendant**

**Metropolitan Life Insurance Company**            represented by **Kirsten Hicks Spira**
Steptoe & Johnson LLP
633 West Fifth Street Suite 700
Los Angeles, CA 90071
213-439-9400
Fax: 213-439-9599
Email: kspira@steptoe.com
*ATTORNEY TO BE NOTICED*

**Lisa Marie Petrovsky**
Steptoe & Johnson LLP
633 West 5th Street Suite 700
Los Angeles, CA 90071
213-439-9400
Fax: 213-439-9599

Email: lpetrovsky@steptoe.com
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**MS2G, Inc.**
*sued individually and as successor-in-interest to Marden Susco, Incorporated*

<u>Defendant</u>

**The Nash Engineering Company**

<u>Defendant</u>

**Occidental Chemical Corporation**
*fka Hookers Chemical Co.*

<u>Defendant</u>

**Pabst Brewing Company**
*sued individually and as successor to Joseph-Schlitz Brewing Company*

<u>Defendant</u>

**Pacific Abrasive Supply Company**

<u>Defendant</u>

**Rio Tinto Minerals, Inc.**
*sued as successor to Pacific Coast Borax*

<u>Defendant</u>

**Saint-Gobain Abrasives, Inc.**
*sued as successor to Norton Company*

<u>Defendant</u>

**San Diego Gas and Electric Company**

<u>Defendant</u>

**Schneider Electric USA, Inc.**
*fka Square D Company*

<u>Defendant</u>

**Southern California Edison Company**

<u>Defendant</u>

**Sterling Fluid Systems USA, LLC**
*fka Peerless Pump Company*

<u>Defendant</u>

**Sulzer Pumps US, Inc.**
*dba Sulzer Pumps Houston, Inc. sued as successor-in-interest to Paco Pumps fka Pacific Pumping Company*

<u>Defendant</u>

**Syd Carpenter, Marine, Contractor, Inc.**

<u>Defendant</u>

**Thrush Co., Inc.**

<u>Defendant</u>

**TXI Riverside, Inc.**

<u>Defendant</u>

**Union Carbide Corporation**

<u>Defendant</u>

**United States Steel Corporation**

<u>Defendant</u>

**Velan Valve Corporation**

<u>Defendant</u>

**Warren Pumps, LLC.**

<u>Defendant</u>

**Weir Valves and Controls USA, Inc.**
*fka Atwood and Morrill*

<u>Defendant</u>

**Westburne Supply, Inc.**
*sued as successor to P.E. O'Hair and Company fka O'Hair
Supply Company, successor to J.R. Deterding, Inc.*

<u>Defendant</u>

**The William Powell Company**

<u>Defendant</u>

**Wilsey Bennett, Inc.**
*sued as successor-by-merger to Vegetable Oil Products
Company, Inc.*

<u>Defendant</u>

**Yarway Corporation**

<u>Defendant</u>

**Yeager Enterprises Corporation**
*sued individually and as successor-in-interest to Pacific
Abrasive Supply Company*

<u>Defendant</u>

**John Does**
*1-450*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/19/2012 | 1 | NOTICE OF REMOVAL from the Superior Court of CA, Los Angeles County, case number BC474820 with CONFORMED copies of summons and complaint.Case assigned to Judge Ronald S.W. Lew, discovery to Magistrate Judge Jay C Gandhi; (Filing fee $ 350 PAID );filed by defendant Foster Wheeler Energy Corporation.(esa) (Additional attachment(s) added on 3/22/2012: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M) (mg). (Additional attachment(s) added on 3/22/2012: # 14 Exhibit N 1 OF 6, # 15 Exhibit N 2 of 6, # 16 Exhibit N 2 OF 6 part 2, # 17 Exhibit N 2 of 6 part 3, # 18 Exhibit N 3 of 6 pgs 1-30, # 19 Exhibit N of 6 pgs 31-60, # 20 Exhibit N 3 of 6 pgs 61-90, # 21 Exhibit N 3 OF 6 pgs 91-110, # 22 Declaration N 4 OF 6 pgs 1-30, # 23 Exhibit N 4 of 6 pgs 31-60, # 24 Exhibit N 4 OF 6 pgs 61-88) (mg). (Additional attachment(s) added on 3/22/2012: # 25 Exhibit N 5 OF 6 pgs 1-25, # 26 Exhibit N 5 of 6 pgs 26-56, # 27 Exhibit N 5 of 6 pgs 57-76, # 28 Exhibit N 6 of 6 pgs 1-30, # 29 Exhibit N 6 of 6 pgs 31-60, # 30 Exhibit N 6 of 6 pgs 61-90) (mg). (Additional attachment(s) added on 3/22/2012: # 31 Exhibit N 6 of 6 pgs 91-104) (mg). (Entered: 03/21/2012) |
| 03/19/2012 | 2 | DISCLOSURE STATEMENT AND CERTIFICATION AS TO INTERESTED PARTIES filed by defendant Foster Wheeler Energy Corporation. (esa) (mg). (Entered: 03/21/2012) |
| 03/19/2012 | 3 | NOTICE OF RELATED CASES filed by defendant Foster Wheeler Energy Corporation. Related Case(s): CV07-8338 VBF (RCx); CV 08-0118 R (JTLx); CV 08-0248 R (PLAx); CV 08-00282 VBF (AGRx); CV 08-00501 GPS (AJWx) [SEE DOCUMENT FOR MORE CASES] (esa) (mg). (Entered: 03/21/2012) |
| 03/19/2012 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed.(esa) (Entered: 03/21/2012) |
| 03/22/2012 | 5 | CERTIFICATE OF SERVICE filed by Defendant Foster Wheeler Energy Corporation, re Notice of Related Case(s) 3 , Corporate Disclosure Statement 2 , Notice of Removal,,,,, 1 served on March 20, 2012. (Moses, Thomas) (Entered: 03/22/2012) |
| 03/22/2012 | 6 | Notice of Interested Parties filed by Defendant General Electric Company, (Gardiner, Katherine) (Entered: 03/22/2012) |
| 03/22/2012 | 7 | NOTICE of Refiling State Court Answer to Complaint for Damages filed by defendant General Electric Company. (Gardiner, Katherine) (Entered: 03/22/2012) |
| 03/23/2012 |  | (Court only) PREPARED ORDER RE TRANSFER Pursuant to General Order 08-05 (Related Case) by Clerk; related to CV07-02241 R (JTLx). (at) (Entered: 03/23/2012) |
| 03/23/2012 | 8 | ORDER RETURNING CASE FOR REASSIGNMENT by Judge Ronald S.W. Lew. ORDER case returned to the Clerk for random reassignment pursuant to General Order 08-05. Case randomly reassigned from Judge Ronald S.W. Lew to Judge Christina A. Snyder for all further proceedings. The case number will now reflect the initials of the transferee Judge CV 12-02284 CAS(JCGx). (rn) (Entered: 03/23/2012) |
| 03/26/2012 | 9 | NOTICE of Appearance filed by attorney Keith M Ameele on behalf of Defendant BW IP International, Inc. (Ameele, Keith) (Entered: 03/26/2012) |

| | | |
|---|---|---|
| 03/26/2012 | 10 | NOTICE of Change of Attorney Information for attorney Keith M Ameele counsel for Defendant BW IP International, Inc.. Adding Keith M. Ameele as attorney as counsel of record for BW/IP, INC. for the reason indicated in the G-06 Notice. Filed by Defendant BW/IP, Inc. (Ameele, Keith) (Entered: 03/26/2012) |
| 03/26/2012 | 11 | First NOTICE of Appearance filed by attorney Robert D Eassa on behalf of Defendant Freeport-McMoRan Copper and Gold, Inc. (Eassa, Robert) (Entered: 03/26/2012) |
| 03/26/2012 | 12 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Freeport-McMoRan Copper and Gold, Inc. (Eassa, Robert) (Entered: 03/26/2012) |
| 03/26/2012 | 13 | Certificate of Interested Parties filed by Defendant Freeport-McMoRan Copper and Gold, Inc., (Eassa, Robert) (Entered: 03/26/2012) |
| 03/26/2012 | 14 | ANSWER to Notice of Removal,,,,, *1 Notice of Re-Filing State Court Answer to Complaint* filed by Defendant Freeport-McMoRan Copper and Gold, Inc.. (Attachments: # 1 Exhibit Exhibit A)(Eassa, Robert) (Entered: 03/26/2012) |
| 03/26/2012 | 15 | NOTICE of Appearance filed by attorney Elan N Stone on behalf of Defendant The Goodyear Tire and Rubber Company (Stone, Elan) (Entered: 03/26/2012) |
| 03/26/2012 | 16 | CORPORATE DISCLOSURE STATEMENT *AND CERTIFICATE OF INTERESTED PARTIES* filed by Defendant The Goodyear Tire and Rubber Company identifying THE GOODYEAR TIRE & RUBBER COMPANY as Corporate Parent. (Stone, Elan) (Entered: 03/26/2012) |
| 03/26/2012 | 17 | NOTICE OF FILING STATE COURT ANSWER TO PLAINTIFFS' COMPLAINT filed by DEFENDANT The Goodyear Tire and Rubber Company. *AND DEMAND FOR JURY TRIAL* (Attachments: # 1 Exhibit, # 2 Exhibit)(Stone, Elan) (Entered: 03/26/2012) |
| 03/26/2012 | 18 | NOTICE of Appearance filed by attorney Lisa Marie Petrovsky on behalf of Defendant Metropolitan Life Insurance Company (Petrovsky, Lisa) (Entered: 03/26/2012) |
| 03/26/2012 | 19 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Metropolitan Life Insurance Company identifying MetLife, Inc. as Corporate Parent. (Petrovsky, Lisa) (Entered: 03/26/2012) |
| 03/26/2012 | 20 | CERTIFICATE of Interested Parties filed by Defendant Metropolitan Life Insurance Company, (Petrovsky, Lisa) (Entered: 03/26/2012) |
| 03/26/2012 | 21 | NOTICE of Filing State Court Answer to Complaint filed by Defendant Metropolitan Life Insurance Company. (Petrovsky, Lisa) (Entered: 03/26/2012) |
| 03/26/2012 | 22 | NOTICE filed by Defendant Familian Corporation. *of Filing State Court Answer to Complaint and Demand for Jury Trial* (Rasmussen, Jennifer) (Entered: 03/26/2012) |
| 03/26/2012 | 23 | *Disclosure Statement Pursuant to Federal Rules of Civil Procedure, Rule 7.1 and Local Rule 7.1-1* of Interested Parties filed by Defendant Familian Corporation, (Rasmussen, Jennifer) (Entered: 03/26/2012) |
| 03/26/2012 | 24 | ORDER TO REASSIGN CASE due to self-recusal pursuant to General Order 08-05 by Judge Christina A. Snyder. Case transferred from Judge Christina A. Snyder to the calendar of Judge Dale S. Fischer for all further proceedings. Case number now reads as CV 12-02284 DSF(JCGx). (rn) (Entered: 03/26/2012) |
| 03/26/2012 | | (Court only) ***Attorney James Mink,Cameron J Hoyler for Freeport-McMoRan Copper and Gold, Inc. added. (shb) (Entered: 03/27/2012) |
| 03/26/2012 | | (Court only) ***Attorney Kirsten Hicks Spira for Metropolitan Life Insurance Company added. (shb) (Entered: 03/27/2012) |
| 03/26/2012 | | (Court only) ***Attorney Francis D Pond,Arash Nematollahi for Familian Corporation added. (shb) (Entered: 03/27/2012) |
| 03/27/2012 | | TEXT ONLY ENTRY: INITIAL STANDING ORDER FOR CASES ASSIGNED TO JUDGE DALE S. FISCHER. The Court refers counsel the Courts Standing Order found on the Courts website under Judge Fischers Procedures and Schedules. Read the Order carefully. It governs this case and differs in some respects from the Local Rules. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dp) TEXT ONLY ENTRY (Entered: 03/27/2012) |



FILED

1  Edward R. Hugo [Bar No. 124839]
   Karleen F. Murphy [Bar No. 197245]
2  Shaghig D. Agopian [Bar No. 237947]
   Thomas J. Moses [Bar No. 116002]
3  BRYDON HUGO & PARKER
   135 Main Street, 20th Floor
4  San Francisco, CA 94105
   Telephone: (415) 808-0300
5  Facsimile: (415) 808-0333
   Email: service@bhplaw.com
6
7  Attorneys for Defendant
   FOSTER WHEELER ENERGY CORPORATION
8

2012 MAR 19  AM 11: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

9            UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11  LEE E. KNOWLES and JOYCE
    KNOWLES,                            U.S.D.C. Case No. **CV12-2284** (SWL
12                                                          (JCGx)
                    Plaintiffs,          Los Angeles Superior Court Case No.
13  vs.                                  BC474820

14  A.W. CHESTERTON COMPANY; ALFA       DEFENDANT FOSTER WHEELER
    LAVAL, INC. (sued individually and as ENERGY CORPORATION'S NOTICE OF
15  successor-in-interest to THE DELAVAL REMOVAL
    SEPARATOR COMPANY and
16  SHARPLES CORPORATION); AMTROL,
    INC. (sued individually and as successor-
17  in-interest to THRUSH COMPANY and
    H.A. THRUSH COMPANY);
18  ARMSTRONG INTERNATIONAL, INC.;
    ATLANTIC RICHFIELD COMPANY;
19  BLACKMER PUMP COMPANY;
    BRIDGESTONE AMERICAS, INC. (sued
20  as successor-in-interest to FIRESTONE
    TIRE & RUBBER COMPANY); BW/IP
21  INTERNATIONAL, INC. (sued
    individually and as successor-in-interest
22  to BYRON JACKSON PUMP
    COMPANY); CALAVERAS ASBESTOS,
23  LTD; CBS CORPORATION f/k/a
    VIACOM, INC. (sued as successor-by-
24  merger to CBS CORPORATION f/k/a
    WESTINGHOUSE ELECTRIC
25  CORPORATION); CERTAINTEED
    CORPORATION; CHEVRON USA, INC.;
26  CLA-VAL CO.; CLEAVER-BROOKS,
    INC. f/k/a AQUA-CHEM, INC., d/b/a
27  CLEAVER-BROOKS DIVISION;
    CONOCOPHILLIPS COMPANY (sued as
28  successor to TIDEWATER OIL

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1

COMPANY); CRANE CO. (sued individually and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP COMPANY); CRANE ENVIRONMENTAL, INC. (sued individually and as successor-in-interest to COCHRANE CORPORATION); CROWN CORK & SEAL COMPANY, INC. (sued individually and as successor-in-interest to MUNDET CORK COMPANY); DOVER CORPORATION (sued as successor to BLACKMER PUMP CO.); EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.); FAMILIAN CORPORATION (sued individually and successor-in-interest to FAMILIAN PIPE & SUPPLY); FERGUSON ENTERPRISES, INC. (sued as successor-in-interest to INDUSTRY SUPPLY); FISHER CONTROLS INTERNATIONAL, LLC; FLOWSERVE US, INC. (as successor to BYRON JACKSON PUMP COMPANY); FMC CORPORATION (sued individually and as successor-in-interest to PEERLESS PUMP COMPANY); FORMOSA PLASTICS CORPORATION U.S.A. (sued individually and as parent, alter ego and successor-in-interest to J-M A/C PIPE CORPORATION); FOSTER WHEELER ENERGY CORPORATION; FREEPORT-McMoRan COPPER & GOLD, INC. (sued as successor-by-merger to PHELPS DODGE CORPORATION); GENERAL ELECTRIC COMPANY; GENERAL MILLS, INC.; GENERAL PETROLEUM CORPORATION; THE GOODYEAR TIRE & RUBBER COMPANY; GOULDS PUMPS, INC.; GRINNELL LLC d/b/a GRINNELL CORPORATION; HAJOCA CORPORATION; HANSON PERMANENTE CEMENT, INC. f/k/a KAISER CEMENT CORPORATION); HOPEMAN BROTHERS INC.; IMO INDUSTRIES, INC. (sued individually and as successor-in-interest to DELAVAL TURBINE, INC. and also to C.H. WHEELER MANUFACTURING COMPANY); INDUSTRIAL HOLDINGS CORPORATION f/k/a THE CARBORUNDUM COMPANY; INGERSOLL RAND COMPANY (sued individually and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON MACHINE CO. AND ALDRICH PUMP COMPANY); ITT

1  CORPORATION, f/k/a ITT INDUSTRIES,
   INC. (sued individually and as successor-
2  in-interest to BELL & GOSSETT); J.T.
   THORPE & SON, INC.; JOHN CRANE,
3  INC.; KEENAN PROPERTIES, INC.;
   KIMBERLY-CLARK CORPORATION;
4  METROPOLITAN LIFE INSURANCE
   COMPANY; MS2G, INC. (sued
5  individually and as successor-in-interest
   to MARDEN SUSCO, INCORPORATED);
6  THE NASH ENGINEERING COMPANY;
   OCCIDENTAL CHEMICAL
7  CORPORATION f/k/a HOOKERS
   CHEMICAL CO.; PABST BREWING
8  COMPANY (sued individually and as
   successor to JOSEPH SCHLITZ
9  BREWING COMPANY); PACIFIC
   ABRASIVE SUPPLY COMPANY; RIO
10 TINTO MINERALS, INC. (sued as
   successor to PACIFIC COAST BORAX);
11 SAINT-GOBAIN ABRASIVES, INC. (sued
   as successor to NORTON COMPANY);
12 SAN DIEGO GAS & ELECTRIC
   COMPANY; SCHNEIDER ELECTRIC
13 USA, INC. f/k/a SQUARE D COMPANY;
   SOUTHERN CALIFORNIA EDISON
14 COMPANY; STERLING FLUID
   SYSTEMS (USA), LLC f/k/a PEERLESS
15 PUMP COMPANY); SULZER PUMPS
   (US), INC. d/b/a SULZER PUMPS
16 HOUSTON, INC. (sued as successor-in-
   interest to PACO PUMPS f/k/a PACIFIC
17 PUMPING COMPANY); SYD
   CARPENTER, MARINE CONTRACTOR,
18 INC.; THRUSH CO., INC.; TXI
   RIVERSIDE, INC.; UNION CARBIDE
19 CORPORATION; UNITED STATES
   STEEL CORPORATION; VELAN VALVE
20 CORPORATION; WARREN PUMPS,
   LLC.; WEIR VALVES & CONTROLS
21 USA, INC. f/k/a ATWOOD & MORRILL;
   WESTBURNE SUPPLY, INC. (sued as
22 successor to P.E. O'HAIR & COMPANY
   f/k/a O'HAIR SUPPLY COMPANY,
23 successor to J.R. DETERDING, INC.);
   THE WILLIAM POWELL COMPANY;
24 WILSEY BENNETT, INC. (sued as
   successor-by-merger to VEGETABLE OIL
25 PRODUCTS COMPANY, INC.);
   YARWAY CORPORATION; YEAGER
26 ENTERPRISES CORPORATION (sued
   individually and as successor-in-interest
27 to PACIFIC ABRASIVE SUPPLY
   COMPANY); and JOHN DOES 1-450,

28                Defendants.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendant FOSTER WHEELER ENERGY CORPORATION ("Foster Wheeler") gives notice of removal of an action filed against it in the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California. In support, Foster Wheeler respectfully offers the following:

**Preliminary Matters**

1.      On or about December 7, 2011, Plaintiffs LEE E. KNOWLES and JOYCE KNOWLES ("Plaintiffs") filed this lawsuit, entitled *Lee E. Knowles, et al. v. A.W. Chesterton Company, et al*, Case No. BC474820, against Foster Wheeler Energy Corporation ("Foster Wheeler") and several other defendants in the Superior Court of California, County of Los Angeles. (See Plaintiffs' Summons and Complaint, attached hereto as Exhibit A.)

2.      Plaintiffs served Foster Wheeler with the Summons and Complaint on December 21, 2011. The Complaint did not state Plaintiffs' claims in a manner or in sufficient detail to inform Foster Wheeler that the case was removable. (See *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 698 (S.D. Tex. 2002) [stating that if the initial pleading does not provide details of a plaintiff's claims, the 30-day time period begins on the date defendant receives "other paper" specifically indicating grounds for removal].) However, on or about February 16, 2012, Foster Wheeler received a copy of Plaintiffs' Responses to General Order Standard Interrogatories ("Plaintiffs' Interrogatory Responses"). (See Plaintiffs' 2/16/12 Responses to General Order Standard Interrogatories, attached hereto as Exhibit B.) In those responses, Plaintiffs allege, for the first time, that Plaintiff LEE E. KNOWLES ("Mr. Knowles") was exposed to asbestos while employed as an instrumentation mechanic for Bailey Controls from 1958 to 1964. (See Exhibit B, at 36:5-39:10.) There are also allegations of Mr. Knowles' working aboard Navy ships, including the USS MORTON (DD-949). (See Exhibit B, Work History Sheet [Exhibit A to Plaintiffs' Complaint], at p. 6.)

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

3.      Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by Foster Wheeler of "other paper" from which it ascertained that this case is removable.  (28 U.S.C. § 1446(b).)

**Nature Of The Case**

4.      The case is based on Plaintiffs' allegations that Mr. Knowles' asbestos-related disease, specifically mesothelioma, was caused by his exposure to asbestos dust and/or fibers.

5.      Plaintiffs assert failure to warn claims, manufacturing and design defect claims, along with negligence and strict liability claims against Foster Wheeler and the other defendants based on various theories.

**Grounds For Removal**

6.      This Notice of Removal is filed within thirty (30) days of defendant's receipt of Plaintiffs' Interrogatory Responses, which constitutes "other paper."  (28 U.S.C. § 1446(b).)  Foster Wheeler manufactured marine boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy.  Foster Wheeler has confirmed that it manufactured the boilers and economizers on the USS MORTON (DD-949).  Thus, the basis for removal is that, in the manufacture and sale of boilers and auxiliary equipment for the Navy, including all aspects of warnings associated with that equipment, Foster Wheeler was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.      Should Plaintiffs file a motion to remand this case, Foster Wheeler respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

8.      Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to the plaintiff's claims, and (3) demonstrate a causal nexus between the plaintiff's claims and acts it performed under color of federal office. (*Mesa v. California*, 489 U.S. 121, 124-125, 129-131, 134-135 (1989).)  As was recently

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR

5

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

recognized in a landmark decision by the United States District Court for the Eastern District of Pennsylvania (MDL-875) in *Hagen v. Benjamin Foster Co.*, 739 F.Supp.2d 770 (E.D.Pa. Sept. 24, 2010) (attached hereto as Exhibit C), Foster Wheeler has a federal defense to this action. In examining virtually identical evidence submitted in the case at bar, Judge Eduardo C. Robreno found that Foster Wheeler raised a colorable defense to Plaintiffs's failure to warn claims, *i.e.*, government contractor immunity from liability for injuries arising from any exposure to asbestos related to boilers and auxiliary equipment aboard Navy vessels, insofar as they were designed and manufactured by Foster Wheeler according to strict Navy specifications.

9.     In reaching his conclusion, Judge Robreno discussed in detail the three elements necessary for removal under this statute. First, a defendant must demonstrate that it is a "person" within the meaning of the statute. (*Hagen, supra,* 739 F.Supp.2d at 776.) The definition of a "person" includes a corporation. (*Id.*) Second, defendants must raise a colorable claim to a federal law defense. (*Id.*) A colorable claim to a federal defense can be predicated upon the federal government contractor defense. (*Id.*) Third, the defendant must establish that the suit is for any act under color of federal office, *i.e.*, there is a causal connection between the charged conduct and asserted official authority. (*Id.*) Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office. (*Hagen, supra,* 739 F.Supp.2d at 784-785.)

10.     The first and third elements require a substantial degree of direct and detailed federal control over defendant's work and a causal nexus between the defendant's actions under the federal officer and Plaintiffs' state court claims. (*Id.*) Although set forth in the statute as two separate requirements, Judge Robreno recognized that the evidentiary similarities between the "acting under" and "causal nexus" prongs have often prompted courts to collapse them into one single requirement. (*Hagen, supra,* 739 F.Supp.2d at 785, fn. 14, *citing Good v. Armstrong World Indus., Inc.* 914 F.Supp. 1125, 1128 (E.D. Pa 1996) ["The 'acting under' language in the statute forces [the

1  defendant] to show a causal nexus between the plaintiff's claims and the conduct taken

2  pursuant to direction from a federal officer"].)

3      11.    What constitutes sufficient federal control is often central to a court's

4  decision to uphold removal or remand a case.  Like the Eastern District of Pennsylvania

5  in *Hagen*, federal courts across the country have upheld removal because defendants

6  were sued as a result of designing and manufacturing products pursuant to detailed and

7  strict military specifications. (See *Corley v. Long-Lewis, Inc.*, 688 F.Supp.2d 1315, 1331 (N.D.

8  Ala. 2010), attached hereto as Exhibit D [removal upheld where affidavits stated Navy

9  dictated all aspects of design, performance requirements and materials for construction

10  of turbines]; *Fellows v. Foster Wheeler, et al.*, Case No. 3:09cv10015JG (N.D. Ohio Aug. 21,

11  2009), attached hereto as Exhibit E [Foster Wheeler provided "ample substantiation" to

12  establish a colorable government contractor defense)]; *Curry v. American Standard, Inc.*, et

13  al., 08-cv-10228(GBD)(S.D.N.Y. Feb. 6, 2009), attached hereto as Exhibit F [Foster Wheeler

14  proffered sufficient evidence of government control over the contract specifications,

15  manuals and warnings to demonstrate that it had a colorable government contractor

16  defense]; *Salamante v. Quintec Indus., Inc., et al.*, CV 08-4674 PA (JTLx)(C.D.Cal Sept. 22,

17  2008), attached hereto as Exhibit G [Foster Wheeler submitted sufficient evidence for

18  purposes of section 1442(a)(1) to demonstrate that the Navy's control over warnings

19  directly interfered with its duty to warn under state law]; *Kirks v. General Electric Co.*,

20  Case No. 08-856SLR, and *Wiersma v. General Electric Co.*, Case No. 08-857SLR (D. Del.

21  Sept. 17, 2009, attached hereto as Exhibit H [affidavits submitted by GE demonstrated

22  that defendant established a colorable government contractor defense and thus GE

23  satisfied the requirements of the federal officer removal statute]; *Allen v. General Electric

24  Co., et al.*, Case No. 3:09-cv-0497 (JCH)(D.Conn. Aug. 27, 2009), attached hereto as Exhibit

25  I [denying remand where Defendants' affidavits established the existence of a colorable

26  government contractor defense]; *Wright v. Foster Wheeler, et al.*, C07-05403 MJJ (N.D.Cal.

27  Feb. 21, 2008, attached hereto as Exhibit J [removal was proper as Foster Wheeler

28  provided sufficient evidence supporting a finding that the Navy had direct and detailed

1   control over its ability to place warnings on its equipment manufactured for the Navy

2   and according to precise Navy specifications]; *Marley v. Elliot Turbomachinery Co., et al.*,

3   545 F.Supp.2d 1266, 1275 (S.D.Fla. 2008), attached hereto as Exhibit K [affidavits

4   submitted by defendants sufficient to advance a colorable government contractor defense

5   and establish a nexus between Plaintiffs's injuries and defendants' official duties].)

6       12.    As detailed in *Hagen*, critical to the defendant's evidence is whether

7   defendant has demonstrated sufficient facts establishing that its government contractor

8   defense is "colorable"[1] or "plausible." (See *Hagen, supra,* 739 F.Supp.2d at 776.) In the

9   context of a "failure to warn" case, **the defendant need not show that the Navy**

10  **expressly barred or broadly preempted the inclusion of asbestos warnings on its**

11  **products.** (*Hagen, supra,* 739 F.Supp.2d at 782-785; see also *Kerstetter v. Pacific Scientific*

12  *Co.*, 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S. 919 (2000) [government contractor

13  defense is available in "failure to warn" claims where the evidence shows that the lack of

14  a warning reflects governmental direction or control rather than the unfettered discretion

15  of the product's manufacturer, and applies wherever: 1) the government approved or

16  authorized the warnings which the Plaintiffs contends were inadequate or incomplete; 2)

17  the warnings provided by the manufacturer conformed to the warnings as approved or

18  authorized by the government; and 3) the manufacturer warned the government as to

19  any product hazards known by the manufacturer but unknown by the government].)

20      13.    As stressed in *Kerstetter*, "[t]he government need not prepare the

21  specifications to be considered to have approved them." (*Id.* at 435.) The only material

22  issue is whether the manufacturer's designs and specifications were subjected to

23  "substantial review" rather than a mere "rubber stamp" approval. (*Id.*) While this

24  _____

25  [1] The *Hagen* court distinguished the showing of a "colorable" defense required for
    removal from the ultimate evidentiary showing at trial, and ruled that the colorable
26  defense standard for purposes of removal "is not an onerous one to satisfy." (*Hagen,*
    *supra,* 739 F.Supp.2d at 780.) Thus, "a defense is colorable for purposes of determining
27  jurisdiction under Section 1442 (a)(1) if the defendant asserting it identifies facts which,
    viewed in the light most favorable to the defendant, would establish a complete defense
28  at trial." (*Hagen, supra,* 739 F.Supp.2d at 783.)

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

8

1    determination is necessarily fact specific, "substantial review" has plainly been shown

2    upon evidence of a "'continuous back and forth' between the contractor and the

3    government." (*Id.*) In this regard, "[t]he specifications need not address the specific

4    defect alleged; the government need only evaluate the design feature in question." (*Id.*)

5    Once again, applying these general principles to "failure to warn" claims, the fact that

6    governmental specifications or regulations did not specifically preclude the exact

7    warning desired by the Plaintiffs does not take a "failure to warn" claim outside the scope

8    of the government contractor defense so long as the government was involved generally

9    as to the issue of product warnings (or specifically approved the warnings provided by

10   the contractor) and was generally aware of the hazard in question. (*Id.* at 438.) Stated

11   another way, "[i]nadequacy [of a warning] is not an issue when it is the government's

12   warning in the first place." (*Id.* at 438.)

13          14.     The present case is substantially similar, if not identical, to *Kerstetter* and

14   *Hagen, supra.* As explained by J. Thomas Schroppe:

15       The Navy exercised intense direction and control over all written
     documentation to be delivered with its naval boilers…The Navy required
16   that every piece of equipment be supplied with a defined number of copies
     of one or more technical manuals. Navy personnel participated intimately
17   in the preparation of this kind of information and exercised specific
     direction and control over its contents. These manuals included safety
18   information related to the operation of naval boilers and economizers only
     to the extent directed by the Navy. Furthermore, the Navy had precise
19   specifications, practices and procedures that governed the content of any
     communication affixed to machinery supplied by Foster Wheeler to the
20   Navy. Foster Wheeler would not be permitted, under the specifications,
     associated regulations and procedures, and especially under actual practice
21   as it evolved in the field, to affix any type of warning or caution statement
     to a piece of equipment intended for installation onto a Navy vessel,
22   beyond those required by the Navy.

23

24

25

26

27   (See Affidavit of J. Thomas Schroppe, attached hereto as Exhibit L, at ¶¶ 21 and 22.)

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

9

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

15.     In further support of the removal, Foster Wheeler provides the Affidavit of Admiral Ben J. Lehman, U.S. Navy, Ret. (See Affidavit of Admiral Lehman, attached hereto as Exhibit M.) Admiral Lehman joined the Navy in 1942 and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1054. (Exhibit L, at ¶ 1.) During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment over hauls at the Brooklyn Navy Yard. (Exhibit L, at ¶ 3.) Admiral Lehman states in his Affidavit the Navy controlled every aspect of the design and manufacture of equipment intended for installation on Navy vessels and that the Navy could not, and did not, permit its contractors to implement changes from military specifications. (Exhibit L, at ¶¶ 2, 3.) He further states:

> The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel. (Exhibit L, at ¶ 14.)

Thus, as determined by the MDL court in *Hagen*, the presence or absence of warnings regarding Foster Wheeler equipment was strictly controlled by the Navy, and a clear basis for removal exists under § 1442(a)(1). The Schroppe and Lehman Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to Foster Wheeler's actions has been established.

16.     In further support of the removal, Foster Wheeler provides the Declaration of Lawrence Stillwell. See Declaration of Lawrence Stillwell Betts (attached hereto as Exhibit M). Dr. Betts is a medical doctor and retired Navy captain who holds a Ph.D. in

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

10

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

occupational health and is board certified in occupational medicine and industrial

hygiene.  According to Dr. Betts' declaration, Foster Wheeler manufactured and

delivered boilers and auxiliary equipment to the Navy pursuant to government

contracts, some of which may or may not have ended up on this ship.  However, any

such boiler and auxiliary equipment manufactured and supplied by Foster Wheeler in

fulfillment of government contracts followed exact specifications set forth by the United

States Government detailing the performance requirements of such equipment and the

materials, including the particular insulation to be used.  The U.S. Navy would have

accepted delivery of such boilers and auxiliary equipment only if it met their exact

specifications.  (Exhibit M, at ¶ 4.)

17.    According to Dr. Betts, since the 1920s, the Navy has had state-of-the art

knowledge concerning potential health hazards of asbestos and would not have allowed

a manufacturer to unilaterally deviate from Navy specifications by including warning

labels on equipment or on any materials that were supplied to the Navy.  (Exhibit M, at ¶

9.)

18.    According to Dr. Betts, among the requirements imposed on private

contractors by the Navy was the use of asbestos-containing materials in the

maintenance and repair of naval vessels.  This requirement reflected the state of the art

at the time, as well as the demands and requirements of combat ready Navy vessels.

The Navy also issued specifications as to the nature and content of all written materials

that were delivered with each piece of equipment and materials, and determined the

hazards to be subject to precautionary labeling and the contents of such labeling.

Further the Navy determined the nature of any oral warnings that were to be given

about the use of the products and materials aboard its ships.  In short, according to

Admiral Lehman and Dr. Betts, the Navy dictated ever aspect of the design,

manufacture, installation, overhaul, written documentation and warnings associated

with its ships, and did not permit deviations from any of its contractors, including

Foster Wheeler.  (Exhibit M, at ¶¶ 33, 34; see also Exhibit L, at ¶¶ 3-6, 14.)  The U.S.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

11

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

1    Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix

2    any warnings related to any asbestos hazards on their equipment, including its boilers

3    or in their technical and operations manuals.  To do so would have interfered with the

4    U.S. Navy's mission and control of its ships and personnel.  (Exhibit M, at ¶¶ 33, 34; see

5    also Exhibit L, at ¶ 14.)

6         19.    Beginning in the 1930s, the U.S. Navy conducted extensive research

7    concerning the hazard of exposure to asbestos.  In the early 1940s, the Navy's Bureau of

8    Medicine and Surgery, in coordination with U.S. Maritime Commission, set standards

9    based on the report of Dr. Philip Drinker, then Chief Health Consultant for the United

10   States Maritime Commission, as well as studies conducted by Fleischer, Viles, Gade,

11   and Drinker, called the "Fleischer-Drinker study."  (Exhibit M, at ¶ 18.)  Based on these

12   various studies, the Navy adopted a recommended "maximum allowable concentration

13   (M.A.C.)" value for asbestos of 5 MPPCF.  (Exhibit M, at ¶ 19.)  The U.S. Navy made a

14   conscious and informed decision about how asbestos would be used on its ships and

15   how exposures would be controlled, if at all, on its ships.  (Exhibit M, at ¶ 13.)

16        20.    As Dr. Betts attests, the Navy had superior knowledge of the dangers of

17   asbestos prior to and during the time that Foster Wheeler provided "military

18   equipment," and would not have allowed any warnings to be affixed to its equipment.

19        Dr. Betts states in his declaration:

20        a.    The information possessed by the Navy with respect to the
             specification and use of asbestos, and the health hazards associated
21           with each of its uses aboard Navy vessels, represented the state-of-
             the-art and far exceeded any information that possibly could have
22           been provided by a boiler manufacturer, like Foster Wheeler.  Based
             upon the state of knowledge at given period in time, that Navy
23           fully aware of the recognized health hazards of asbestos and had a
             robust program to control exposure of personnel and monitor their
24           health.

25        b.    There was no information concerning any asbestos containing
             hazards, or danger posed by any asbestos-containing material used
26           in boiler and auxiliary equipment supplied under Navy material
             specifications on a United States Navy ship which was known to a
27           boiler and auxiliary equipment manufacturer, like Foster Wheeler
             that was not known to the United States government and the United
28           States Navy.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

12

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

c.   It would be unreasonable to assume that the Navy would have accepted gratuitous, "non-expert" comments from manufacturers and vendors about hazards associated with a product – especially for one about which the Navy was already fully aware and much more knowledgeable than the manufacturer or vendor. (Exhibit M, at ¶ 36.)

Thus, as determined by the MDL court in *Hagen*, the presence or absence of warnings regarding Foster Wheeler equipment was strictly controlled by the Navy, and a clear basis for removal exists under § 1442(a)(1). The Schroppe, Lehman and Betts Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to Foster Wheeler's actions has been established.

21.   Thus, as established by the MDL court in *Hagen*, the affidavits provided by J. Thomas Schroppe, Admiral Ben J. Lehman, and Lawrence S. Betts in this case are more than sufficient to establish "federal officer" jurisdiction, as well as a colorable defense under the "government contractor" doctrine. Nowhere is it required that Foster Wheeler produce physical contracts to prove the Navy's extensive direction and control over product specifications to satisfy the requirements of § 1442(a)(1). To promote judicial efficiency and consistency, the central purpose behind MDL-875, this Court should defer to the decision made by the MDL court in *Hagen*, and uphold removal.

22.   A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. (28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976).) The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). (*Willingham v. Morgan*, 395 U.S. 402, 405 (1960).)

23.   Foster Wheeler is not required to notify and obtain the consent of any other defendant in this action in order to remove Plaintiffs' action as a whole under § 1442(a)(1). (See *Torres v. CBS News*, 854 F.Supp. 245 (S.D.N.Y. 1994).)

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

13

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

24. As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon Foster Wheeler are being filed with this Notice of Removal.

<u>Conclusion</u>

25. Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(1), because Foster Wheeler was acting under an officer or agency of the United States.

WHEREFORE, Defendant FOSTER WHEELER ENERGY CORPORATION, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the Superior Court of the State of California, County of Los Angeles, on this 16 day of March, 2012.

BRYDON HUGO & PARKER

By: _____
Edward R. Hugo
Karleen F. Murphy
Shaghig D. Agopian
Thomas J. Moses
Attorneys for Defendant
FOSTER WHEELER ENERGY
CORPORATION

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

1    **cc: Via Hand Delivery**

2    Jennifer L. Bartlett, Esq.
     SIMON GREENSTONE PANATIER BARTLETT, PC
3    301 E. Ocean Blvd., Suite 1950
     Long Beach, CA 90802
4    Tel. (562) 590-3400
     Fax (562) 590-3412
5
     All Known Defense Counsel (via regular mail)
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

DEFENDANT FOSTER WHEELER ENERGY CORPORATION'S NOTICE OF REMOVAL

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| LEE E. KNOWLES and JOYCE KNOWLES | FOSTER WHEELER ENERGY CORPORATION |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Jennifer L. Bartlett (CA SBN 183154) SIMON GREENSTONE PANATIER BARTLETT, PC 301 E. Ocean Blvd., Suite 1950 Long Beach, CA 90802 Tel. (562) 590-3400 Fax (562) 590-3412 | Thomas J. Moses (CA SBN 116002) BRYDON HUGO PARKER 135 Main Street, 20th Floor San Francisco, CA 94105 Tel. (415) 808-0300 Fax (415) 808-0333 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding ☒ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Title 28 U.S.C. § 1442(a)(1) and 1446

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☒ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | IMMIGRATION | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | ☐ 463 Habeas Corpus- Alien Detainee | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | ☐ 440 Other Civil Rights | | ☐ 871 IRS - Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:** Case Number: CV12-2284

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|
| | | CCD-JS44 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No [ ] Yes

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [ ] No [X] Yes

If yes, list case number(s): **List is attached.**

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    [ ] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Thomas J. Moses_    Date _March 16, 2012_

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## List of Related Cases
*Lee E. Knowles, et al. v. A.W. Chesterton Company*

1. *Nelson v. Alfa Laval, et al,* case number CV 07-8338 VBF (RCx);

2. *Oberstar v. CBS Corporation, et al,* case number CV 08-0118 R (JTLx);

3. *Munn v. Cla-Val, et al,* case number CV 08-0248 R (PLAx);

4. *Munn v. Cla-Val, et al,* case number CV 08-00282 VBF (AGRx);

5. *Lindquist, et al v. Cla-Val Co., et al,* case number CV 08-00501 GPS (AJWx);

6. *Reaser v. Allis Chambers, et al,* case number CV 08-1296 R (JTLx);

7. *Christiansen v. CBS Corporation, et al* case number CV 08-3133 R (JTLx);

8. *Vidergar v. Buffalo Pumps, et al,* case number CV 08-04735 R (JTLx);

9. *Vaught v. CBS Corporation, et al,* case number CV 08-04736 R (JCx);

10. *Demko, et al v. CBS Corporation, et al* case number CV 08-05156 JFW (SSx);

11. *Diana Calkins, et al v. Allied Packing & Supply, et al.,* case number CV-08-06004 R (JTLx);

12. *Gwendolyn Glenn, et al v. Allied Packing & Supply, et al.,* case number CV-08-6007 R (JTLX);

13. *Carol S. Dudash, et al v. Alstom Power, Inc., et al.,* case number CV 08-07434 SVW (CTx);

14. *Ellis Michael Staton, et al. v. American Standard, et al.,* case number CV 09-03724 R (VBK;)

15. *Nancy Jo Banchik, et al., v. Buffalo Pumps, Inc., et al.,* case number CV-4744 R.

16. *Sally A. Grammer, et al., v. Advocate Mines, Ltd., et al.,* case number CV 09-7599 R.

17. *Sally A. Grammer, et al., v. Advocate Mines, Ltd., et al.,* case number CV 09-7669 R.

18. *Michael Langlois, et al. v. A.W. Chesterton Company, et al.* case number CV09-7932 R (JTLx).

19. *James H. Prange, et al., v. Alfa Laval, Inc.,* et al., case number CV09-6698 R.

20. *Charles Richard Garver v. Alfa Laval, Inc., et al.* case number CV09-8795 R.

21. *Frederick B. Hartsfield, et al. vs. Albay Construction Co., et al.* case number CV09-9186 RSWL.

22. *Ronald Alvin Geist v. Air & Liquid Systems Corporation, et al.* case number CV10-1413 R (VBKx).

23. *Michael Eugene Morgan, et al. vs. Air & Liquid Systems Corporation, et al.* case number CV10-01583 R (VBKx).

24. *Duane Smith vs. Air & Liquid Systems Corporation, et al.,* case number CV10-1952 PSG (AJWx).

25. *Helena Rieniets, et al. vs. A.O. Smith Corporation, et al.* case number CV10-02074 (RGL (AJWx).

26. *Helena Rieniets, et al. vs. A.O. Smith Corporation,* et al. case number CV10-2313 MMM (SSx).

27. *David Overby, et al. vs. Air & Liquid Systems Corporation, et al.* case number CV10-9658 DSF (SHx).

28. *Richard Keeney, et al. v. A.W. Chesterton Company, et al.,* case number 2:11-cv-6192 PA (AGRx).

29. *Katherine Brueggeman v. 3M Company, et al* case number *2:11-cv-09418* SVW.

30. *Ronald Seguine, et al., v. Ajax Boiler, Inc.., et al.,* case number 2:11-cv-10316-R-VBK.

31. *Geoffrey Lockwood v. Crane Co., et al.* case number 2:12-cv-01473-JHN-CW.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV12- 2284 RSWL (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division** | **[ ] Southern Division** | **[ ] Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

# EXHIBIT A



**Service of Process**
**Transmittal**
12/12/2011
CT Log Number 519629948

**TO:** Frederick C Wolsky
Foster Wheeler Inc.
Perryville Corporate Park
Clinton, NJ 08809

**RE:** **Process Served in California**

**FOR:** Foster Wheeler Energy Corporation (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Lee E. Knowles and Joyce Knowles, Pltfs. vs. A.W. Chesterton Company, et al. Including Foster Wheeler Energy Corporation, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Complaint, Jury Demand, Exhibit(s), Notice(s), ADR Packets, Cover Sheet, First Amended Order, Addendum and Statement, Minutes |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Hill Street, CA Case # BC474820 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 12/12/2011 at 15:37 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Jennifer L. Bartlett Simon Greenstone Panatier Bartlett, PC 301 E. Ocean Blvd. Ste. 1950 Long Beach, CA 90802 562-590-3400 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/12/2011, Expected Purge Date: 01/11/2012 Image SOP Email Notification, Colleen Zanon Colleen_Zanon@fwc.com Email Notification, Elaine McIntosh elaine_mcintosh@fwc.com Email Notification, Frederick C Wolsky Fred_Wolsky@fwc.com Email Notification, Mike Lovitto mike_lovitto@fwc.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of 1 / WE

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

*12-12 11    24 5—*

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** A.W. CHESTERTON COMPANY
*(AVISO AL DEMANDADO):* See Attached Defendants List

FOR COURT USE ONLY
CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

DEC 07 2011

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Shaunya Wesley

**YOU ARE BEING SUED BY PLAINTIFF:** LEE E. KNOWLES and JOYCE
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* KNOWLES

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: *(El nombre y dirección de la corte es):* Superior Court of California, County of Los Angeles 111 North Hill Street Los Angeles, California 90012 | CASE NUMBER: *(Número del Caso):* **BC 474820** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jennifer L. Bartlett, SIMON GREENSTONE PANATIER BARTLETT, PC
301 E Ocean Blvd., Suite 1950, Long Beach, CA 90802                      562-590-3400

| DATE: *(Fecha)* DEC 07 2011 | Clerk, *(Secretario)* Shaunya Wesley | , Deputy *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Foster Wheeler Energy Corp.

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
proDOC®

**SUM-200(A)**

| SHORT TITLE: LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON COMPANY, et al. | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

ALFA LAVAL, INC. (sued individually and as successor-in-interest to THE DELAVAL SEPARATOR COMPANY and SHARPLES CORPORATION);
AMTROL, INC. (sued individually and as successor-in-interest to THRUSH COMPANY and H.A. THRUSH COMPANY);
ARMSTRONG INTERNATIONAL, INC.;
ATLANTIC RICHFIELD COMPANY;
BLACKMER PUMP COMPANY;
BRIDGESTONE AMERICAS, INC. (sued as successor-in-interest to FIRESTONE TIRE & RUBBER COMPANY);
BW/IP INTERNATIONAL, INC. (sued individually and as successor-in-interest to BYRON JACKSON PUMP COMPANY);
CALAVERAS ASBESTOS, LTD;
CBS CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION);
CERTAINTEED CORPORATION;
CHEVRON USA, INC.;
CLA-VAL CO.;
CLEAVER-BROOKS, INC. f/k/a AQUA-CHEM, INC., d/b/a CLEAVER-BROOKS DIVISION;
CONOCOPHILLIPS COMPANY (sued as successor to TIDEWATER OIL COMPANY);
CRANE CO. (sued individually and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP COMPANY);
CRANE ENVIRONMENTAL, INC. (sued individually and as successor-in-interest to COCHRANE CORPORATION );
CROWN CORK & SEAL COMPANY, INC. (sued individually and as successor-in-interest to MUNDET CORK COMPANY);
DOVER CORPORATION (sued as successor to BLACKMER PUMP CO.);
EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.);
FAMILIAN CORPORATION (sued individually and successor-in-interest to FAMILIAN PIPE & SUPPLY);
FERGUSON ENTERPRISES, INC. (sued as successor-in-interest to INDUSTRY SUPPLY);
FISHER CONTROLS INTERNATIONAL, LLC;
FLOWSERVE US, INC. (as successor to BYRON JACKSON PUMP COMPANY);
FMC CORPORATION (sued individually and as successor-in-interest to PEERLESS PUMP COMPANY);
FORMOSA PLASTICS CORPORATION U.S.A (sued individually and as parent, alter ego and successor-in-interest to J-M A/C PIPE CORPORATION);
FOSTER WHEELER ENERGY CORPORATION;
FREEPORT-McMoRan COPPER & GOLD, INC. (sued as successor-by-merger to PHELPS DODGE CORPORATION);
GENERAL ELECTRIC COMPANY;
GENERAL MILLS, INC.;
GENERAL PETROLEUM CORPORATION;
THE GOODYEAR TIRE & RUBBER COMPANY;
GOULDS PUMPS, INC.;
GRINNELL LLC d/b/a GRINNELL CORPORATION;
HAJOCA CORPORATION;
HANSON PERMANENTE CEMENT, INC. f/ka KAISER CEMENT CORPORATION );
HOPEMAN BROTHERS INC.;

Page ___1___ of ___1___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

ProDoc®

SUM-200(A)

| SHORT TITLE: LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON COMPANY, et al. | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff ☒ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

IMO INDUSTRIES, INC. (sued individually and as successor in-interest to DELAVAL TURBINE, INC, and also to C.H. WHEELER MANUFACTURING COMPANY);
INDUSTRIAL HOLDINGS CORPORATION f/k/a THE CARBORUNDUM COMPANY;
INGERSOLL RAND COMPANY (sued individually and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON MACHINE CO, AND ALDRICH PUMP COMPANY);
ITT CORPORATION, f/k/a ITT INDUSTRIES, INC. (sued individually and as successor-in-interest to BELL & GOSSETT);
J.T. THORPE & SON, INC.;
JOHN CRANE, INC.;
KEENAN PROPERTIES, INC.;
KIMBERLY-CLARK CORPORATION;
METROPOLITAN LIFE INSURANCE COMPANY;
MS2G, INC. (sued individually and as successor-in-interest to MARDEN SUSCO, INCORPORATED);
THE NASH ENGINEERING COMPANY;
OCCIDENTAL CHEMICAL CORPORATION f/k/a HOOKERS CHEMICAL CO.;
PABST BREWING COMPANY (sued individually and as successor to JOSEPH SCHLITZ BREWING COMPANY);
PACIFIC ABRASIVE SUPPLY COMPANY;
RIO TINTO MINERALS, INC. (sued as successor to PACIFIC COAST BORAX);
SAINT-GOBAIN ABRASIVES, INC. (sued as successor to NORTON COMPANY);
SAN DIEGO GAS & ELECTRIC COMPANY;
SCHNEIDER ELECTRIC USA, INC. f/k/a SQUARE D COMPANY;
SOUTHERN CALIFORNIA EDISON COMPANY;
STERLING FLUID SYSTEMS (USA), LLC f/k/a PEERLESS PUMP COMPANY);
SULZER PUMPS (US), INC. d/b/a SULZER PUMPS HOUSTON, INC. (sued as successor-in-interest to PACO PUMPS f/k/a PACIFIC PUMPING COMPANY);
SYD CARPENTER, MARINE CONTRACTOR, INC.;
THRUSH CO., INC.;
TXI RIVERSIDE, INC.;
UNION CARBIDE CORPORATION;
UNITED STATES STEEL CORPORATION;
VELAN VALVE CORPORATION;
WARREN PUMPS, LLC.;
WEIR VALVES & CONTROLS USA, INC. f/k/a ATWOOD & MORRILL;
WESTBURNE SUPPLY, INC. (sued as successor to P. E. O'HAIR & COMPANY f/k/a O'HAIR SUPPLY COMPANY, successor to J.R. DETERDING, INC.);
THE WILLIAM POWELL COMPANY;
WILSEY BENNETT, INC. (sued as successor-by-merger to VEGETABLE OIL PRODUCTS COMPANY, INC.);
YARWAY CORPORATION;
YEAGER ENTERPRISES CORPORATION (sued individually and as successor-in-interest to PACIFIC ABRASIVE SUPPLY COMPANY);
and JOHN DOES 1-450.

Page ___1___ of ___1___
Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

ProDoc®

1   JENNIFER L. BARTLETT, CA Bar No. 183154
    JORDAN BLUMENFELD-JAMES, CA Bar No. 235185
2   JONAH D. KING, CA Bar No. 270196
3   **SIMON GREENSTONE PANATIER BARTLETT, PC**
    301 E. Ocean Blvd., Ste. 1950
4   Long Beach, California 90802
    Telephone (562) 590-3400
5   Facsimile (562) 590-3412

6   Attorneys for Plaintiffs

7

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

DEC 07 2011

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Shaunya Wesley

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF LOS ANGELES

10                                          B C 4 7 4 8 2 0

11  LEE E. KNOWLES and JOYCE        )   Case No.
    KNOWLES                         )
12                                  )
                                    )   THIS ACTION CONSTITUTES COMPLEX
13                      Plaintiffs, )   ASBESTOS LITIGATION – SUBJECT TO THE
                                    )   GENERAL ORDERS CONTAINED IN FILE NO.
14          vs.                     )   C 700000 – DEPT. 59
    A.W. CHESTERTON COMPANY;        )
15  ALFA LAVAL, INC. *(sued individually* )   **COMPLAINT FOR PERSONAL INJURY –**
    *and as successor-in-interest to THE* )   **ASBESTOS (NEGLIGENCE; STRICT**
16  *DELAVAL SEPARATOR COMPANY and* )   **LIABILITY; PREMISE LIABILITY, LOSS OF**
    *SHARPLES CORPORATION);*        )   **CONSORTIUM)**
17  AMTROL, INC. *(sued individually and as* )
    *successor-in-interest to THRUSH* )
18  *COMPANY and H.A. THRUSH*       )
    *COMPANY);*                     )
19  ARMSTRONG INTERNATIONAL,        )
    INC.;                           )
20  ATLANTIC RICHFIELD COMPANY;     )
    BLACKMER PUMP COMPANY;          )
21  BRIDGESTONE AMERICAS, INC.      )
22  *(sued as successor-in-interest to* )
    *FIRESTONE TIRE & RUBBER*       )
23  *COMPANY);*                     )
    BW/IP INTERNATIONAL, INC. *(sued* )
24  *individually and as successor-in-interest to* )
25  *BYRON JACKSON PUMP COMPANY);*  )
    CALAVERAS ASBESTOS, LTD;        )
26  CBS CORPORATION f/k/a VIACOM,   )
    INC. *(sued as successor-by-merger to CBS* )
27  *CORPORATION f/k/a WESTINGHOUSE* )
    *ELECTRIC CORPORATION);*        )
28  CERTAINTEED CORPORATION;        )

                                    1

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1  CHEVRON USA, INC.; )
   CLA-VAL CO.; )
2  CLEAVER-BROOKS, INC. f/k/a AQUA- )
   CHEM, INC., d/b/a CLEAVER-BROOKS )
3  DIVISION; )
4  CONOCOPHILLIPS COMPANY *(sued* )
   *as successor to TIDEWATER OIL* )
5  *COMPANY)*; )
   CRANE CO. *(sued individually and as* )
6  *successor-in-interest to COCHRANE* )
   *CORPORATION and DEMING PUMP* )
7  *COMPANY)*; )
8  CRANE ENVIRONMENTAL, INC. )
   *(sued individually and as successor-in-* )
9  *interest to COCHRANE CORPORATION )*; )
   CROWN CORK & SEAL COMPANY, )
10 INC. *(sued individually and as successor-* )
   *in-interest to MUNDET CORK* )
11 *COMPANY)*; )
12 DOVER CORPORATION *(sued as* )
   *successor to BLACKMER PUMP CO.)*; )
13 EATON CORPORATION *(sued as* )
   *successor to CUTLER HAMMER, INC.)*; )
14 FAMILIAN CORPORATION *(sued* )
   *individually and successor-in-interest to* )
15 *FAMILIAN PIPE & SUPPLY)*; )
16 FERGUSON ENTERPRISES, INC. )
   *(sued as successor-in-interest to* )
17 *INDUSTRY SUPPLY)*; )
   FISHER CONTROLS )
18 INTERNATIONAL, LLC; )
   FLOWSERVE US, INC. *(as successor to* )
19 *BYRON JACKSON PUMP COMPANY)*; )
   FMC CORPORATION *(sued individually* )
20 *and as successor-in-interest to PEERLESS* )
   *PUMP COMPANY)*; )
21 FORMOSA PLASTICS )
   CORPORATION U.S.A *(sued* )
22 *individually and as parent, alter ego and* )
   *successor-in-interest to J-M A/C PIPE* )
23 *CORPORATION)*; )
24 FOSTER WHEELER ENERGY )
   CORPORATION; )
25 FREEPORT-McMoRan COPPER & )
   GOLD, INC. *(sued as successor-by-* )
26 *merger to PHELPS DODGE* )
   *CORPORATION)*; )
27 GENERAL ELECTRIC COMPANY; )
   GENERAL MILLS, INC.; )
28 GENERAL PETROLEUM )

2

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1  CORPORATION;
   THE GOODYEAR TIRE & RUBBER
2  COMPANY;
   GOULDS PUMPS, INC.;
3  GRINNELL LLC d/b/a GRINNELL
4  CORPORATION;
   HAJOCA CORPORATION;
5  HANSON PERMANENTE CEMENT,
   INC. f/ka KAISER CEMENT
6  CORPORATION );
   HOPEMAN BROTHERS INC.;
7  IMO INDUSTRIES, INC. *(sued*
8  *individually and as successor in-interest to*
   *DELAVAL TURBINE, INC, and also to*
9  *C.H. WHEELER MANUFACTURING*
   *COMPANY);*
10 INDUSTRIAL HOLDINGS
11 CORPORATION f/k/a THE
   CARBORUNDUM COMPANY;
12 INGERSOLL RAND COMPANY *(sued*
   *individually and as successor-in-interest to*
13 *TERRY STEAM TURBINE COMPANY,*
   *WHITON MACHINE CO, AND ALDRICH*
14 *PUMP COMPANY);*
15 ITT CORPORATION, f/k/a ITT
   INDUSTRIES, INC. *(sued individually*
16 *and as successor-in-interest to BELL &*
   *GOSSETT);*
17 J.T. THORPE & SON, INC.;
   JOHN CRANE, INC.;
18 KEENAN PROPERTIES, INC.;
   KIMBERLY-CLARK
19 CORPORATION;
   METROPOLITAN LIFE INSURANCE
20 COMPANY;
   MS2G, INC. (sued individually and as
21 successor-in-interest to MARDEN SUSCO,
   INCORPORATED);
22 THE NASH ENGINEERING
   COMPANY;
23 OCCIDENTAL CHEMICAL
24 CORPORATION f/k/a HOOKERS
   CHEMICAL CO.;
25 PABST BREWING COMPANY *(sued*
   *individually and as successor to JOSEPH*
26 *SCHLITZ BREWING COMPANY);*
   PACIFIC ABRASIVE SUPPLY
27 COMPANY;
   RIO TINTO MINERALS, INC, *(sued as*
28 *successor to PACIFIC COAST BORAX);*

3

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1   SAINT-GOBAIN ABRASIVES, INC. )
2   *(sued as successor to NORTON* )
   *COMPANY);* )
3   SAN DIEGO GAS & ELECTRIC )
   COMPANY; )
4   SCHNEIDER ELECTRIC USA, INC. )
   f/k/a SQUARE D COMPANY; )
5   SOUTHERN CALIFORNIA EDISON )
   COMPANY; )
6   STERLING FLUID SYSTEMS (USA), )
   LLC f/k/a PEERLESS PUMP )
7   COMPANY); )
8   SULZER PUMPS (US), INC. d/b/a )
   SULZER PUMPS HOUSTON, INC. )
9   *(sued as successor-in-interest to PACO* )
   PUMPS f/k/a PACIFIC PUMPING )
10   COMPANY); )
   SYD CARPENTER, MARINE )
11   CONTRACTOR, INC.; )
   THRUSH CO., INC.; )
12   TXI RIVERSIDE, INC.; )
13   UNION CARBIDE CORPORATION; )
   UNITED STATES STEEL )
14   CORPORATION; )
   VELAN VALVE CORPORATION; )
15   WARREN PUMPS, LLC.; )
   WEIR VALVES & CONTROLS USA, )
16   INC. f/k/a ATWOOD & MORRILL; )
   WESTBURNE SUPPLY, INC. *(sued as* )
17   *successor to P. E. O'HAIR & COMPANY* )
   *f/k/a O'HAIR SUPPLY COMPANY,* )
18   *successor to J.R. DETERDING, INC.);* )
19   THE WILLIAM POWELL COMPANY; )
   WILSEY BENNETT, INC. *(sued as* )
20   *successor-by-merger to VEGETABLE OIL* )
   *PRODUCTS COMPANY, INC.);* )
21   YARWAY CORPORATION; )
   YEAGER ENTERPRISES )
22   CORPORATION *(sued individually and* )
   *as successor-in-interest to PACIFIC* )
23   *ABRASIVE SUPPLY COMPANY);* )
24   and JOHN DOES 1-450. )
    )
25           Defendants. )
    )
26

27

28

4

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

<center>GENERAL ALLEGATIONS</center>

COME NOW Plaintiffs, **LEE E. KNOWLES** and **JOYCE KNOWLES**, (hereinafter "Plaintiffs") and complain and allege as follows:

1. The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of Defendants DOES 1 through 450, inclusive, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. When the true names and capacities of said Defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

2. At all times herein mentioned, each of the Defendants was the agent, servant, employee and/or joint venture of his co-Defendants, and each of them, and at all said times each Defendant was acting in the full course and scope of said agency, service, employment and/or joint venture. Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned, Defendants **A.W. CHESTERTON COMPANY; ALFA LAVAL, INC.** *(sued individually and as successor-in-interest to THE DELAVAL SEPARATOR COMPANY and SHARPLES CORPORATION);* **AMTROL, INC.** *(sued individually and as successor-in-interest to THRUSH COMPANY and H.A. THRUSH COMPANY);* **ARMSTRONG INTERNATIONAL, INC.; ATLANTIC RICHFIELD COMPANY; BLACKMER PUMP COMPANY; BRIDGESTONE AMERICAS, INC.** *(sued as successor-in-interest to FIRESTONE TIRE & RUBBER COMPANY);* **BW/IP INTERNATIONAL, INC.** *(sued individually and as successor-in-interest to BYRON JACKSON PUMP COMPANY);* **CALAVERAS ASBESTOS, LTD; CBS CORPORATION f/k/a VIACOM, INC.** *(sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION);* **CERTAINTEED CORPORATION; CHEVRON USA, INC.; CLA-VAL CO.; CLEAVER-BROOKS, INC. f/k/a** AQUA-CHEM, INC., d/b/a CLEAVER-BROOKS DIVISION; **CONOCOPHILLIPS COMPANY** *(sued as successor to TIDEWATER OIL COMPANY);* **CRANE CO.** *(sued individually and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP COMPANY);* **CRANE**

<center>5</center>

<u>COMPLAINT FOR PERSONAL INJURY – ASBESTOS</u>

1   ENVIRONMENTAL, INC. *(sued individually and as successor-in-interest to COCHRANE*
2   *CORPORATION )*; **CROWN CORK & SEAL COMPANY, INC.** *(sued individually and as*
3   *successor-in-interest to MUNDET CORK COMPANY)*; **DOVER CORPORATION** *(sued as*
4   *successor to BLACKMER PUMP CO.)*; **EATON CORPORATION** *(sued as successor to CUTLER*
5   *HAMMER, INC.)*; **FAMILIAN CORPORATION** *(sued individually and successor-in-interest to*
6   *FAMILIAN PIPE & SUPPLY)*; **FERGUSON ENTERPRISES, INC.** *(sued as successor-in-interest to*
7   *INDUSTRY SUPPLY)*; **FISHER CONTROLS INTERNATIONAL, LLC; FLOWSERVE US,**
8   **INC.** *(as successor to BYRON JACKSON PUMP COMPANY)*; **FMC CORPORATION** *(sued*
9   *individually and as successor-in-interest to PEERLESS PUMP COMPANY)*; **FORMOSA PLASTICS**
10  **CORPORATION U.S.A** *(sued individually and as parent, alter ego and successor-in-interest to J-M*
11  *A/C PIPE CORPORATION)*; **FOSTER WHEELER ENERGY CORPORATION; FREEPORT-**
12  **McMoRan COPPER & GOLD, INC.** *(sued as successor-by-merger to PHELPS DODGE*
13  *CORPORATION)*; **GENERAL ELECTRIC COMPANY; GENERAL MILLS, INC.; GENERAL**
14  **PETROLEUM CORPORATION; THE GOODYEAR TIRE & RUBBER COMPANY;**
15  **GOULDS PUMPS, INC.; GRINNELL LLC d/b/a GRINNELL CORPORATION; HAJOCA**
16  **CORPORATION; HANSON PERMANENTE CEMENT, INC.** f/ka KAISER CEMENT
17  CORPORATION ); **HOPEMAN BROTHERS INC.; IMO INDUSTRIES, INC.** *(sued individually*
18  *and as successor in-interest to DELAVAL TURBINE, INC, and also to C.H. WHEELER*
19  *MANUFACTURING COMPANY)*; **INDUSTRIAL HOLDINGS CORPORATION** f/k/a **THE**
20  **CARBORUNDUM COMPANY; INGERSOLL RAND COMPANY** *(sued individually and as*
21  *successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON MACHINE CO, AND*
22  *ALDRICH PUMP COMPANY)*; **ITT CORPORATION,** f/k/a **ITT INDUSTRIES, INC.** *(sued*
23  *individually and as successor-in-interest to BELL & GOSSETT)*; **J.T. THORPE & SON, INC.;**
24  **JOHN     CRANE,    INC.;    KEENAN    PROPERTIES,    INC.;    KIMBERLY-CLARK**
25  **CORPORATION; METROPOLITAN LIFE INSURANCE COMPANY; MS2G, INC.** (sued
26  individually and as successor-in-interest to MARDEN SUSCO, INCORPORATED); **THE NASH**
27  **ENGINEERING COMPANY; OCCIDENTAL CHEMICAL CORPORATION** f/k/a HOOKERS
28  CHEMICAL CO.; **PABST BREWING COMPANY** *(sued individually and as successor to JOSEPH*

6
COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1  *SCHLITZ BREWING COMPANY); **PACIFIC ABRASIVE SUPPLY COMPANY; RIO TINTO**

2  **MINERALS, INC.** *(sued as successor to PACIFIC COAST BORAX);* **SAINT-GOBAIN**

3  **ABRASIVES, INC.** *(sued as successor to NORTON COMPANY);* **SAN DIEGO GAS &**

4  **ELECTRIC COMPANY; SCHNEIDER ELECTRIC USA, INC. f/k/a SQUARE D COMPANY;**

5  **SOUTHERN CALIFORNIA EDISON COMPANY; STERLING FLUID SYSTEMS (USA),**

6  **LLC** f/k/a PEERLESS PUMP COMPANY); **SULZER PUMPS (US), INC. d/b/a  SULZER**

7  **PUMPS HOUSTON, INC.** *(sued as successor-in-interest to* PACO PUMPS f/k/a PACIFIC

8  PUMPING COMPANY); **SYD CARPENTER, MARINE CONTRACTOR, INC.; THRUSH CO.,**

9  **INC.; TXI RIVERSIDE, INC.; UNION CARBIDE CORPORATION; UNITED STATES**

10  **STEEL CORPORATION;  VELAN VALVE CORPORATION; WARREN PUMPS, LLC.;**

11  **WEIR VALVES & CONTROLS USA, INC.** f/k/a ATWOOD & MORRILL; **WESTBURNE**

12  **SUPPLY, INC.** *(sued as successor to P. E. O'HAIR & COMPANY f/k/a O'HAIR SUPPLY*

13  *COMPANY, successor to J.R. DETERDING, INC.);* **THE WILLIAM POWELL COMPANY;**

14  **WILSEY BENNETT, INC.** *(sued as successor-by-merger to VEGETABLE OIL PRODUCTS*

15  *COMPANY, INC.);* **YARWAY CORPORATION; YEAGER ENTERPRISES CORPORATION**

16  *(sued individually and as successor-in-interest to PACIFIC ABRASIVE SUPPLY COMPANY);*  and

17  DOES 1-450 inclusive, were individuals, corporations, partnerships and/or unincorporated associations

18  organized and existing under and by virtue of the laws of the State of California, or the laws of some

19  other state or foreign jurisdiction, and that said Defendants, and each of them, were and are authorized

20  to do and are doing business in the State of California, or the laws of some other state or foreign

21  jurisdiction, and that said Defendants, and each of them, were and are authorized to do and are doing

22  business in the State of California, and that said Defendants have regularly conducted business in the

23  County of Los Angeles, State of California.

24       3.       Plaintiffs allege herein that Plaintiff LEE E. KNOWLES developed malignant

25  mesothelioma as a result of exposure to asbestos from Defendants' asbestos, asbestos-containing

26  products and/or products designed to be used in association with asbestos products ("Defendants'

27  Products"), including:  **A.W. CHESTERTON COMPANY** (for gaskets and packing); **ALFA**

28  **LAVAL, INC.** *(sued individually and as successor-in-interest to THE DELAVAL SEPARATOR*

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

COMPANY and SHARPLES CORPORATION) (for DeLaval purifiers and Sharples oil purifiers); **AMTROL, INC.** *(sued individually and as successor-in-interest to THRUSH COMPANY and H.A.* *THRUSH COMPANY)* (for HA Thrush pumps); **ARMSTRONG INTERNATIONAL, INC.** for Armstrong steam traps); **ATLANTIC RICHFIELD COMPANY** (as a Premise Defendant); **BLACKMER PUMP COMPANY** (for Blackmer pumps); **BRIDGESTONE AMERICAS, INC.** *(sued as successor-in-interest to FIRESTONE TIRE & RUBBER COMPANY)* (as a Premise Defendant); **BW/IP INTERNATIONAL, INC.** *(sued individually and as successor-in-interest to* *BYRON JACKSON PUMP COMPANY)* (for Byron Jackson pumps); **CALAVERAS ASBESTOS,** **LTD** (as a supplier of asbestos fiber); **CBS CORPORATION f/k/a VIACOM, INC.** *(sued as* *successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION)* (for Westinghouse blowers, turbines, exhausters, valves, pumps, emergency generators and diesel generators, and as a Premise Defendant); **CERTAINTEED CORPORATION** (for transite pipe); **CHEVRON USA, INC.** (as a Premise Defendant); **CLA-VAL CO.** (for Cla-Val valves); **CLEAVER-BROOKS, INC.** f/k/a AQUA-CHEM, INC., d/b/a CLEAVER-BROOKS DIVISION (for Cleaver-Brooks boilers); **CONOCOPHILLIPS COMPANY** *(sued as successor to TIDEWATER OIL* *COMPANY)* (as a Premise Defendant); **CRANE CO.** *(sued individually and as successor-in-interest* *to COCHRANE CORPORATION and DEMING PUMP COMPANY)* (for Crane valves, Cranite gaskets, Deming pumps and Cochrane heaters); **CRANE ENVIRONMENTAL, INC.** *(sued* *individually and as successor-in-interest to COCHRANE CORPORATION )* (for Cochrane heaters); **CROWN CORK & SEAL COMPANY, INC.** *(sued individually and as successor-in-interest to* *MUNDET CORK COMPANY)* (for Mundet block insulation, cement and pipe covering); **DOVER** **CORPORATION** *(sued as successor to BLACKMER PUMP CO.)* (for Blackmer pumps); **EATON** **CORPORATION** *(sued as successor to CUTLER HAMMER, INC.)* (for Cutler Hammer control panels); **FAMILIAN CORPORATION** *(sued individually and successor-in-interest to FAMILIAN* *PIPE & SUPPLY)* (as a supplier of transite pipe); **FERGUSON ENTERPRISES, INC.** *(sued as* *successor-in-interest to INDUSTRY SUPPLY)* (as a supplier of transite pipe); **FISHER CONTROLS** **INTERNATIONAL, LLC** (for Fisher valves); **FLOWSERVE US, INC.** *(as successor to BYRON* *JACKSON PUMP COMPANY)* (for Byron Jackson pumps); **FMC CORPORATION** *(sued*

8

1  *individually and as successor-in-interest to PEERLESS PUMP COMPANY)* (for Peerless pumps);

2  **FORMOSA PLASTICS CORPORATION U.S.A** *(sued individually and as parent, alter ego and*

3  *successor-in-interest to J-M A/C PIPE CORPORATION)* (as a supplier of asbestos-containing cement

4  pipe); **FOSTER WHEELER ENERGY CORPORATION** (for Foster Wheeler land-based boilers);

5  **FREEPORT-McMoRan COPPER & GOLD, INC.** *(sued as successor-by-merger to PHELPS*

6  *DODGE CORPORATION)* (as a Premise Defendant); **GENERAL ELECTRIC COMPANY** (for

7  General Electric turbines, ship's service generators and condensers); **GENERAL MILLS, INC.** (as a

8  Premise Defendant); **GENERAL PETROLEUM CORPORATION** (as a Premise Defendant); **THE**

9  **GOODYEAR TIRE & RUBBER COMPANY** (as a Premise Defendant); **GOULDS PUMPS, INC.**

10  (for Goulds pumps); **GRINNELL LLC d/b/a GRINNELL CORPORATION** (as a supplier of

11  transite pipe); **HAJOCA CORPORATION** (as a supplier of transite pipe); **HANSON**

12  **PERMANENTE CEMENT, INC.** f/ka KAISER CEMENT CORPORATION) (as a Premise

13  Defendant); **HOPEMAN BROTHERS INC.** (for asbestos-containing marinate and micarta board);

14  **IMO INDUSTRIES, INC.** *(sued individually and as successor in-interest to DELAVAL TURBINE,*

15  *INC, and also to C.H. WHEELER MANUFACTURING COMPANY)* (for DeLaval turbines and pumps,

16  and C.H. Wheeler air ejectors and condensers); **INDUSTRIAL HOLDINGS CORPORATION f/k/a**

17  **THE CARBORUNDUM COMPANY** (for grinding wheels); **INGERSOLL RAND COMPANY**

18  *(sued individually and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON*

19  *MACHINE CO, AND ALDRICH PUMP COMPANY)* (for Ingersoll Rand pumps and compressors,

20  Aldrich pumps, Terry Turbines, and Whiton turbines); **ITT CORPORATION, f/k/a ITT**

21  **INDUSTRIES, INC.** *(sued individually and as successor-in-interest to BELL & GOSSETT)* (for Bell

22  & Gossett pumps); **J.T. THORPE & SON, INC.** (as a boiler contractor and supplier of asbestos-

23  containing insulation); **JOHN CRANE, INC.** (for land-based gaskets and packing); **KEENAN**

24  **PROPERTIES, INC.** (as a distributor of transite pipe); **KIMBERLY-CLARK CORPORATION**

25  (as a Premise Defendant); **METROPOLITAN LIFE INSURANCE COMPANY** (as a Conspiracy

26  Defendant); **MS2G, INC.** (sued individually and as successor-in-interest to MARDEN SUSCO,

27  INCORPORATED) (as a supplier of asbestos-containing pipe); **THE NASH ENGINEERING**

28  **COMPANY** (for Nash pumps); **OCCIDENTAL CHEMICAL CORPORATION f/k/a HOOKERS**

9

1 | CHEMICAL CO. (as a supplier of asbestos fiber); **PABST BREWING COMPANY** *(sued*
2 | *individually and as successor to JOSEPH SCHLITZ BREWING COMPANY)* (as a Premise
3 | Defendant); **PACIFIC ABRASIVE SUPPLY COMPANY** (as a distributor of abrasives and cutting
4 | tools); **RIO TINTO MINERALS, INC.** *(sued as successor to PACIFIC COAST BORAX)* (as a
5 | Premise Defendant); **SAINT-GOBAIN ABRASIVES, INC.** *(sued as successor to NORTON*
6 | *COMPANY)* (for Norton grinding wheels); **SAN DIEGO GAS & ELECTRIC COMPANY** (as a
7 | Premise Defendant); **SCHNEIDER ELECTRIC USA, INC. f/k/a SQUARE D COMPANY** (for
8 | Square D electrical panels); **SOUTHERN CALIFORNIA EDISON COMPANY** (as a Premise
9 | Defendant); **STERLING FLUID SYSTEMS (USA), LLC f/k/a PEERLESS PUMP COMPANY)**
10 | (for Peerless Pumps); **SULZER PUMPS (US), INC. d/b/a SULZER PUMPS HOUSTON, INC.**
11 | *(sued as successor-in-interest to PACO PUMPS f/k/a PACIFIC PUMPING COMPANY)* (for Paco
12 | pumps); **SYD CARPENTER, MARINE CONTRACTOR, INC.** (as an insulation and decking
13 | contractor); **THRUSH CO., INC.** (for H.A. Thrush pumps); **TXI RIVERSIDE, INC.** (as a Premise
14 | Defendant); **UNION CARBIDE CORPORATION** (as a supplier of asbestos fibers); **UNITED**
15 | **STATES STEEL CORPORATION** (as a Premise Defendant); **VELAN VALVE**
16 | **CORPORATION** (for Velan valves); **WARREN PUMPS, LLC.** (for Warren pumps); **WEIR**
17 | **VALVES & CONTROLS USA, INC. f/k/a** ATWOOD & MORRILL (for Atwood & Morrill valves);
18 | **WESTBURNE SUPPLY, INC.** *(sued as successor to P. E. O'HAIR & COMPANY f/k/a O'HAIR*
19 | *SUPPLY COMPANY, successor to J.R. DETERDING, INC.)* (as a supplier of transite pipe); **THE**
20 | **WILLIAM POWELL COMPANY** (for Powell valves); **WILSEY BENNETT, INC.** *(sued as*
21 | *successor-by-merger to VEGETABLE OIL PRODUCTS COMPANY, INC.)* (as a Premise Defendant);
22 | **YARWAY CORPORATION** (for Yarway valves and steam traps); and **YEAGER ENTERPRISES**
23 | **CORPORATION** *(sued individually and as successor-in-interest to PACIFIC ABRASIVE SUPPLY*
24 | *COMPANY)* (as a distributor of abrasives and cutting tools).
25 |     4.     Plaintiffs hereby disclaim any cause of action or claim for recovery that could give rise
26 | to federal subject matter jurisdiction or removal under 28 U.S.C. § 1442, subdivision (a)(1).
27 | Specifically, Plaintiffs disclaim any cause of action or claim for recovery based on any exposure to
28 | asbestos caused by any Defendant acting under the authority of a federal officer or agency.

<div align="center">10</div>

**COMPLAINT FOR PERSONAL INJURY – ASBESTOS**

FIRST CAUSE OF ACTION
(Negligence)

PLAINTIFFS COMPLAIN OF DEFENDANTS AND DOES 1-450, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGE AS FOLLOWS:

5.    Plaintiffs incorporate herein by reference, as though fully set forth therein, the general allegations set forth above.

6.    At all times herein mentioned, each of the named Defendants and DOES 1 through 450 was the successor, successor-in-business, successor-in-product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising asbestos, and products containing asbestos, including but not limited to, those products identified in paragraph 3 above. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein named Defendants is liable for the tortious conduct of each successor, successor-in-business, successor-in-product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, repaired, marketing, warranted, re-branded, manufactured for others and advertised asbestos, and asbestos products  The following Defendants, and each of them, are liable for the acts of each and every "alternate entity", and each of them, in that there has been a virtual destruction of Plaintiffs' remedy against each such "alternate entity"; Defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; Defendants, and each of them, have caused the destruction of Plaintiffs' remedy against each such "alternate entity"; each such Defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such Defendant enjoys the goodwill originally attached to each such "alternate entity".

11

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| ALFA LAVAL, INC. | SHARPLES, INC.<br>ALFA-LAVAL SEPARATION, INC.<br>DE LAVAL SEPARATOR COMPANY |
| AMITROL, INC. | THRUSH COMPANY<br>H.A. THRUSH COMPANY |
| BRIDGESTONE AMERICAS, INC. | FIRESTONE TIRE & RUBBER COMPANY |
| CBS CORPORATION | VIACOM INC.<br>WESTINGHOUSE ELECTRIC CORPORATION<br>BF STURTEVANT<br>VIACOM INTERNATIONAL, INC.<br>VIACOM PLUS |
| CERTAINTEED CORPORATION | KEASBY & MATTISON<br>GUSTIN BACON MANUFACTURING CO. |
| CLEAVER-BROOKS, INC. | AQUA-CHEM, INC.<br>CLEAVER-BROOKS COMPANY, INC. |
| CONOCOPHILLIPS COMPANY | PHILLIPS PETROLEUM COMPANY<br>TIDEWATER OIL COMPANY |
| CRANE CO. | CRANE ENVIRONMENTAL<br>CRANE PUMPS AND SYSTEMS<br>VALVE SERVICES<br>CRANE VALVE GROUP<br>CRANE SUPPLY<br>DEMING PUMPS<br>COCHRANE FEED TANKS<br>COCHRANE DIVISION |
| CRANE ENVIRONMENTAL, INC. | COCHRANE CORPORATION |
| CROWN CORK & SEAL CO., INC. | CROWN CORK & SEAL COMPANY (USA), INC.<br>CROWN HOLDINGS, INC.<br>MUNDET CORK COMPANY |
| DOVER CORPORATION | BLACKMER PUMP CO. |
| EATON CORPORATION | CUTLER HAMMER, INC. |
| FAMILIAN CORPORATION | FAMILIAN PIPE & SUPPLY |
| FERGUSON ENTERPRISES, INC. | INDUSTRY SUPPLY |

12

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

| | |
|---|---|
| FLOWSERVE (US), INC. | BW/IP INTERNATIONAL, INC. (f/k/a BYRON JACKSON PUMP DIVISION) BYRON JACKSON PUMP COMPANY PACIFIC PUMPS |
| FMC CORPORATION | PEERLESS PUMP COMPANY |
| FORMOSA PLASTICS CORPORATION | J-M A/C PIPE CORPORATION |
| FOSTER WHEELER ENERGY CORPORATION | FOSTER WHEELER BOILER CORPORATION FOSTER WHEELER CONTRACTORS, INC. FOSTER WHEELER CORPORATION FOSTER WHEELER DEVELOPMENT CORP. FOSTER WHEELER ENERGY RESOURCES INC. FOSTER WHEELER ENERGY SERVICES, INC. FOSTER WHEELER ENVIRESPONSE, INC. FOSTER WHEELER ENVIRONMENTAL CORPORATION FOSTER WHEELER POWER GROUP, INC. FOSTER WHEELER POWER SYSTEMS, INC. FOSTER WHEELER PYROPOWER, INC. FOSTER WHEELER REALTY SERVICES, INC. FOSTER WHEELER USA CORPORATION |
| FREEPORT-McMoRan COOPER & GOLD | PHELPS DODGE CORPORATION |
| GENERAL ELECTRIC COMPANY | GENERAL ELECTRIC BROADCASTING COMPANY, INC. GENERAL ELECTRIC CAPITAL ASSURANCE COMPANY GENERAL ELECTRIC PROFESSIONAL SERVICES COMPANY GENERAL ELECTRIC TRADING COMPANY |
| HANSON PERMANENTE CEMENT, INC. | KAISER CEMENT CORP. |
| IMO INDUSTRIES, INC. | DE LAVAL TURBINE INC. C.H. WHEELER |
| INGERSOLL-RAND COMPANY | INGERSOLL-RAND ABG ALDRICH PUMP COMPANY TERRY STEAM TURBINE COMPANY WHITON MACHINE CO. |
| INTERNATIONAL VALVE CORPORATION | KIELEY & MUELLER, INC. K & M CONTROL VALVE CO. CHECK-ALL VALVE MFG. CO. |
| ITT INDUSTRIES, INC. | BELL & GOSSETT |
| JOHN CRANE, INC. | JOHN CRANE-HOUDAILLE, INC. |

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

| | | |
|---|---|---|
| 1 | | HOUDAILLE JOHN CRANE, INC. |
| 2 | MS2G, INC. | MARDEN SUSCO, INCORPORATED |
| 3 | OCCIDENTAL CHEMICAL CORPORATION | HOOKERS CHEMICAL COMPANY |
| 4 | PABST BREWING COMPANY | JOSEPH SCHLITZ BREWING COMPANY |
| 5 | RIO TINTO MINERALS, INC. | PACIFIC COAST BORAX |
| 6 | SAINT-GOBAIN ABRASIVES, INC. | NORTON COMPANY |
| 7 8 | SCHNEIDER ELECTRIC USA, INC. | SQUARE D COMPANY |
| 9 10 11 | STERLING FLUID SYSTEMS (AMERICAS) INC. | STERLING FLUID SYSTEMS (CANADA) LTD. STERLING FLUID SYSTEMS (COLOMBIA) LTD. PEERLESS PUMP COMPANY STERLING PEERLESS PUMPS |
| 12 13 | SULZER PUMPS (US), INC. | SULZER PUMPS HOUSTON, INC. PACO PUMPS PACIFIC PUMPING COMPANY |
| 14 15 16 | WESTBURN SUPPLY, INC. | P.E. O'HAIR & COMPANY O'HAIR SUPPLY COMPANY J.R. DETERDING, INC. |
| 17 18 19 20 21 22 23 24 25 26 27 28 | UNION CARBIDE CORPORATION | THE DOW CHEMICAL COMPANY UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC. UNION CARBIDE AND CARBON CORPORATION LINDE AIR PRODUCTS COMPANY NATIONAL CARBON CO., INC. PREST-O-LITE CO., INC. UNION CARBIDE COMPANY CARBIDE AND CARBON CHEMICALS CORPORATION BAKELITE COROPORATION UNION CARBIDE CONSUMER PRODUCTS CO. UNION CARBIDE MINING AND METALS DIVISION UNION CARBIDE ELECTRONICS DIVISION UNION CARBIDE HYDROCARBONS DIVISION UNION CARBIDE FERROALLOYS DIVISION JENNAT CORPORATION AMERCHOL CORPORATION UOP UCAR CARBON COMPANY |

14

|  |  |
|---|---|
|  | UNION CARBIDE INDUSTRIAL GASES INC. |
|  | PRAXAIR, INC. |
|  | POLIMERI EUROPA S.r.l. |
|  | ASIAN ACETYLS COMPANY, LTD. |
|  | EQUATE PETROCHEMICAL COMPANY |
| WEIR VALVE & CONTROLS USA, INC. | ATWOOD & MORRILL CO.,INC. |
|  | THE WEIR GROUP PLC |
|  | WEIR MINERALS |
|  | WEIR CLEAR LIQUID |
|  | WEIR VALVES & CONTROLS |
|  | WEIR SERVICES |
|  | WEIR TECHNA |
|  | A & M VALVE |
|  | HOPHOLD A & M, INC. |
| WILSEY BENNETT, INC. | VEGETABLE OIL PRODUCTS CO, INC. |
| YEAGER ENTERPRISES CORPORATION | PACIFIC ABRASIVE SUPPLY COMPANY |

7.    At all times herein mentioned, Defendants, their "alternate entities", and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, renting, marketing, warranting, re-branding, manufacturing for others, packaging, and advertising asbestos and asbestos products (hereinafter Defendants' Products).

8.    At all times herein mentioned, Defendants, their "alternate entities", and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, specified, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, rented, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded, manufactured for others, packaged, and advertised Defendants' Products, including but not limited to those products identified in paragraph 3 above, in that the Defendants' Products were unreasonably dangerous because they released respirable asbestos fibers which resulted in personal injuries to users, consumers, workers, bystanders, and others, including Plaintiff LEE E. KNOWLES herein (hereinafter collectively called "exposed person"). Said products were used at all times in a manner that was

15

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

reasonably foreseeable to Defendants, their "alternate entities," and each of them, thereby rendering said products unsafe and dangerous for use by "exposed person". Plaintiffs herein allege that LEE E. KNOWLES' exposure to Defendants' Products, including but not limited to those products identified in paragraph 3 above (hereinafter referred to as "Defendants' products" or "Defendants' asbestos and asbestos-containing products"), were a substantial contributing factor in the development of his malignant mesothelioma, and therefore proximately caused Plaintiff LEE E. KNOWLES' injuries.

9. Defendants, their "alternate entities," and each of them, had a duty to exercise reasonable care while engaging in the activities mentioned above and each Defendant breached said duty of reasonable care in that Defendants, and each of them, failed to safely and adequately design, manufacture and/or sell Defendants' products; failed to test said products; failed to investigate the hazards of said products; failed to warn "exposed person", including Plaintiff LEE E. KNOWLES, of the health hazards of using Defendants' products; failed to disclose the known or knowable dangers of using Defendants' products; failed to obtain suitable alternative materials to asbestos when such alternatives were available; and as otherwise stated herein.

10. The Defendants' products were and are hazardous to the health and safety of Plaintiff, and others in Plaintiff's position working with and in close proximity to such products, and since on or before 1930, the hazards and dangerous propensities of the Defendants' products were both known and knowable to the Defendants, their "alternate entities", and each of them, through the use of medical and/or scientific data and other knowledge available to Defendants, their "alternate entities", and each of them at the time of Defendants' manufacture, distribution, sale, research, study, fabrication, design, modification, labeling, assembly, leasing, buying, offering for sale, supply, inspection, service, installation, contracting for installation, repair, marketing, warranting, re-branding, re-manufacturing for others, packaging and advertising, of those products, which clearly indicated the hazards and dangerous propensities of asbestos presented a substantial danger to users, including Plaintiff LEE E. KNOWLES, of Defendants' Products through the intended and reasonably foreseeable use of those products.

11. Defendants, their "alternate entities", and each of them, knew, or reasonably should have known, that Defendants' Products were dangerous and were likely to be dangerous when used in their intended and reasonably foreseeable manner.

16

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

12.    Defendants, their "alternate entities", and each of them, knew, or reasonably should have known, that Defendants' Products would be installed, repaired, maintained, overhauled, removed, sawed, chipped, hammered, mixed, scraped, sanded, swept, broken, "ripped out," or otherwise disturbed in their ordinary, intended and foreseeable use, resulting in the release of airborne hazardous and dangerous asbestos fibers, and that through such activity, "exposed person," including Plaintiff LEE E. KNOWLES herein, would be exposed to said hazardous and dangerous asbestos fibers. Defendants, their "alternate entities", and each of them, knew or reasonably should have known that users, such as Plaintiff LEE E. KNOWLES and others in his position, working with and in close proximity to Defendants' Products would not realize or know the danger. Defendants, their "alternate entities," and each of them negligently failed to adequately warn or instruct of the dangers of the products. A reasonable designer, manufacturer, distributor, seller, installer, buyer or supplier, under the same or similar circumstances, would have warned of the dangers to avoid exposing others to a foreseeable risk of harm. The negligent failure of Defendants, their "alternate entities," and each of them to warn was a substantial factor in causing harm to Plaintiff LEE E. KNOWLES.

13.    Plaintiff LEE E. KNOWLES used, handled, or was otherwise exposed to asbestos from Defendants' Products referred to herein in a manner that was reasonably foreseeable to Defendants and each of them. Plaintiff's exposure to Defendants' Products occurred at various locations set forth in **Exhibit "A"**, which is attached hereto and incorporated by reference herein.

14.    As a direct and proximate result of the conduct of the Defendants, their "alternate entities", and each of them, as aforesaid, Plaintiff LEE E. KNOWLES' exposure to asbestos from use of Defendants' Products caused severe and permanent injury to the Plaintiff, the nature of which, along with the date of Plaintiff's diagnosis and the date he learned such injuries were attributable to exposure to Defendants' Products, are set forth in **Exhibit "B"**, which is attached hereto and incorporated by reference herein. Plaintiffs are informed and believe, and thereon allege, that progressive lung disease, cancer and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to Defendants' Products over a period of time.

15.    Plaintiff LEE E. KNOWLES suffers from malignant pleural mesothelioma, caused by exposure to asbestos from Defendants' Products including those products identified in paragraph 3

17

above. Plaintiff LEE E. KNOWLES was not aware at the time of exposure that Defendants' Products presented any risk of injury and/or disease.

16.    As a direct and proximate result of the aforesaid conduct of Defendants, their "alternate entities," and each of them, Plaintiff LEE E. KNOWLES has suffered and will continue to suffer permanent injuries and future injuries to his person, body and health, including, but not limited to, pain, discomfort, loss of weight, loss of appetite, fatigue, somnolence, lethargy, dyspnea, dysphagia, and other physical symptoms, and the mental and emotional distress attendant thereto, as Plaintiff's malignant mesothelioma progresses, all to his general damage in a sum in excess of the jurisdictional limit of a limited civil case.

17.    As a direct and proximate result of the aforesaid conduct of the Defendants, their "alternate entities", and each of them, Plaintiff LEE E. KNOWLES has incurred, is presently incurring, and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the true and exact amount thereof being presently unknown to Plaintiffs, subject to proof at trial.

18.    As a further direct and proximate result of the said conduct of the Defendants, their "alternate entities", and each of them, Plaintiffs have incurred, and will incur, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the true and exact amount thereof being presently unknown to Plaintiffs, subject to proof at trial.

19.    Plaintiffs further allege that Defendants, their "alternate entities", and each of them, also engaged in the following wrongful acts:

(a)    Defendants, their "alternate entities", and each of them, suppressed from all consumers, including Plaintiff LEE E. KNOWLES, medical and scientific information concerning the health hazards associated with inhalation of asbestos, including the substantial risk of injury or death therefrom.  Although Defendants, and each of them, knew of the substantial risks associated with exposure to asbestos, they willfully and knowingly concealed such information from the users of their asbestos and/or asbestos-containing products in conscious disregard of the rights, safety and welfare of "exposed person", including Plaintiff LEE E. KNOWLES.

(b)    Defendants, their "alternate entities", and each of them, belonged to, participated in, and

18

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

financially supported industry organizations, including but not limited to the Gypsum Association, Asbestos Information Association, Industrial Hygiene Foundation and others, which, for and on behalf of Defendants, their "alternate entities", and each of them, actively promoted the suppression of information about the dangers of asbestos to users of the aforementioned products and materials, thereby misleading Plaintiff LEE E. KNOWLES as to the safety of their products. Through their participation and association with such industry organizations, Defendants and each of them knowingly and deliberately concealed and suppressed the true information regarding asbestos and its dangers, and propagated misinformation intended to instill in users of Defendants' Products a false security about the safety of their products. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute, was specifically enlisted to study the subject of dust control. Discussions in this committee were held many times regarding the dangers inherent in asbestos and the dangers, which arise from the lack of control of dust, and such information was suppressed from public dissemination from 1946 to a date unknown to Plaintiff LEE E. KNOWLES at this time;

(c)   Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford Mines in Quebec, Canada, and the study of the workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina, Defendants, their "alternate entities", and each of them, knew and possessed medical and scientific information of the connection between the inhalation of asbestos fibers and asbestosis, which information was disseminated through the Asbestos Textile Institute and other industry organizations to all other Defendants, their "alternate entities", and each of them, herein. Between 1942 and 1950, the Defendants, their "alternate entities", and each of them, failed to provide this information to consumers;

(d)   Defendants, their "alternate entities", and each of them, failed to warn Plaintiff LEE E. KNOWLES and others of the nature of said materials which were dangerous when breathed and which could cause pathological effects without noticeable trauma, despite the fact that Defendants, their "alternate entities", and each of them, possessed knowledge and were under a duty to disclose that said materials were dangerous and a threat to the health of persons coming into contact therewith;

(e)   Defendants, their "alternate entities", and each of them, failed to provide Plaintiff LEE E. KNOWLES with information concerning adequate protective masks and other equipment devised to be

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

used when applying, mixing, installing and sanding the products of the Defendants, their "alternate entities", and each of them, despite knowing that such protective measures were necessary, and that they were under a duty to disclose that such materials were dangerous and would result in injury to Plaintiff LEE E. KNOWLES and others applying and installing such material;

(f)     Defendants, their "alternate entities", and each of them, knew and failed to disclose that Plaintiff LEE E. KNOWLES and anyone similarly situated, upon inhalation of asbestos would, in time, have a substantial risk of developing irreversible conditions of pneumoconiosis, asbestosis, mesothelioma and/or cancer;

(g)     Defendants, their "alternate entities", and each of them, failed to provide information of the true nature of the hazards of asbestos materials and that exposure to these material would cause pathological effects without noticeable trauma to the public, including buyers, users, and physicians employed by Plaintiff LEE E. KNOWLES so that said physicians could not examine, diagnose, and treat Plaintiff and others who were exposed to asbestos, despite the fact that Defendants, their "alternate entities", and each of them, were under a duty to so inform and said failure was misleading.

20.     Defendants, their "alternate entities", and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein. Defendants, their "alternate entities", and each of them, are liable for the oppressive and malicious acts of their "alternate entities", and each of them, and each Defendant's officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.

21.     The herein-described conduct of said Defendants, their "alternate entities", and each of them, was and is willful, malicious, oppressive, outrageous, and in conscious disregard and indifference to the safety and health of "exposed person," including Plaintiff LEE E. KNOWLES, in that Defendants, and each of them, continued to manufacture, market and/or sell dangerous products known to cause severe, permanent injuries and death, despite possessing knowledge of the substantial hazards posed by use of their products, in order to continue to profit financially therefrom. Defendants, their "alternate entities", and each of them, engaged in such conduct so despicable, contemptible, base, vile, miserable,

20

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1  wretched and loathsome as to be looked down upon and despised by ordinary people and justifies an

2  award of punitive and exemplary damages pursuant to Civil Code section 3294. Plaintiffs, for the sake

3  of example and by way of punishing said Defendants, seek punitive damages according to proof.

4      22.    Defendants and each of them engaged in conduct which was intended by Defendants and

5  each of them to cause injury to the Plaintiffs, and despicable conduct which was carried on by the

6  Defendant with a willful and conscious disregard of the rights or safety of others, including Plaintiff

7  LEE E. KNOWLES.

8      23.    Defendants, and each of them, engaged in the despicable conduct described herein that

9  subjected persons, including Plaintiff LEE E. KNOWLES, to cruel and unjust hardship in the form of

10  severe, debilitating and fatal diseases like asbestosis, lung cancer and mesothelioma, in conscious

11  disregard of those persons' rights.

12     24.    As a direct and proximate result of such intentional conduct by Defendants, their

13  "alternate entities" and each of them, Plaintiff LEE E. KNOWLES sustained the injuries and damages

14  alleged herein.

15     WHEREFORE, Plaintiffs pray for judgment against Defendants, their "alternate entities", and

16  each of them, as hereinafter set forth.

17

18                          **SECOND CAUSE OF ACTION**
                                   (Strict Liability)
       AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION
19  FOR STRICT LIABILITY, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-450, THEIR
    "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGE AS FOLLOWS:
20

21     25.    Plaintiffs incorporate herein by reference, as though fully set forth therein, each and

22  every one of the general allegations and the allegations contained in the First Cause of Action

23  herein.

24     26.    Defendants, their "alternate entities", and each of them, sold the aforementioned

25  Defendants' Products and failed to adequately warn or instruct of the known and knowable dangers and

26  risks of the ordinary, intended, and foreseeable use of their products, which dangers and risks would not

27  have been, and were not, recognized by ordinary consumers of the products, including Plaintiff, LEE E.

28  KNOWLES, and the lack of sufficient instructions and/or warnings was a substantial factor in causing

                                    21

1   harm to Plaintiff LEE E. KNOWLES and others in Plaintiff's position working with and in close
2   proximity to such products.

3          27.    Defendants' Products were defective and unsafe for their intended purpose and
4   foreseeable use in that, when used, handled, installed, repaired, maintained, overhauled, removed,
5   sawed, chipped, hammered, mixed, scraped, sanded, swept, broken, "ripped out," or otherwise disturbed,
6   said products would result in the release, and therefore inhalation of, hazardous and dangerous asbestos
7   fibers by exposed person, including Plaintiff LEE E. KNOWLES. The defect existed in all of said
8   products when they left the possession of the Defendants, their "alternate entities," and each of them. At
9   the time Defendants' Products were used by Plaintiff, and others in Plaintiff's position working with and
10  in close proximity to such products, the products were substantially the same as when they left the
11  possession of the Defendants, their "alternate entities," and each of them and/or any changes made to the
12  products after they left the possession of Defendants, their "alternate entities", and each of them were
13  reasonably foreseeable to Defendants, their "alternate entities", and each of them. Defendants' asbestos
14  and asbestos products were used by Plaintiff LEE E. KNOWLES, and others in Plaintiff's position
15  working with and in close proximity to such products, in a way that was reasonably foreseeable to
16  Defendants, and each of them. The defect in said products was a substantial factor in causing harm and
17  personal injuries to Plaintiff LEE E. KNOWLES, including malignant mesothelioma, while being used
18  in a reasonably foreseeable manner, thereby rendering said products defective, unsafe, and unreasonably
19  dangerous for their ordinary and intended use.

20         28.    As a direct and proximate result of the actions and conduct outlined herein, Defendants'
21  Products failed to perform as safely as an ordinary consumer would have expected in that Defendants'
22  products, and each of them, during their ordinary and intended use, and such hazardous exposures
23  lacked any perceptible qualities to the human body, yet they cause severe and fatal diseases, including
24  asbestosis, lung cancer, mesothelioma and other cancers in humans. Plaintiffs further allege that
25  "exposed person", including Plaintiff LEE E. KNOWLES, were unaware of the harmful effects of
26  asbestos and further unaware of the harmful exposures to Defendants' Products when such exposures
27  occurred, and thus failure of Defendants' products to perform as safely as Plaintiff LEE E. KNOWLES
28  had reason to expect was a substantial factor in causing his injuries.

                                                    22
COMPLAINT FOR PERSONAL INJURY – ASBESTOS

29.     As a direct and proximate result of the actions and conduct outlined herein, Plaintiff LEE E. KNOWLES has suffered the injuries and damages alleged herein.

30.     Plaintiffs further allege that Defendants, their "alternate entities", and each of them, also engaged in the following wrongful acts:

(a)     Defendants, their "alternate entities", and each of them, suppressed from all consumers, including Plaintiff LEE E. KNOWLES, medical and scientific information concerning the health hazards associated with inhalation of asbestos, including the substantial risk of injury or death therefrom.  Although Defendants, and each of them, knew of the substantial risks associated with exposure to asbestos, they willfully and knowingly concealed such information from the users of their asbestos and/or asbestos-containing products in conscious disregard of the rights, safety and welfare of "exposed person", including Plaintiff LEE E. KNOWLES.

(b)     Defendants, their "alternate entities", and each of them, belonged to, participated in, and financially supported industry organizations, including but not limited to the Gypsum Association, Asbestos Information Association, Industrial Hygiene Foundation and others, which, for and on behalf of Defendants, their "alternate entities", and each of them, actively promoted the suppression of information about the dangers of asbestos to users of the aforementioned products and materials, thereby misleading Plaintiff LEE E. KNOWLES as to the safety of their products.  Through their participation and association with such industry organizations, Defendants and each of them knowingly and deliberately concealed and suppressed the true information regarding asbestos and its dangers, and propagated misinformation intended to instill in users of Defendants' Products a false security about the safety of their products.  The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute, was specifically enlisted to study the subject of dust control.  Discussions in this committee were held many times regarding the dangers inherent in asbestos and the dangers, which arise from the lack of control of dust, and such information was suppressed from public dissemination from 1946 to a date unknown to Plaintiff LEE E. KNOWLES at this time;

(c)     Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford Mines in Quebec, Canada, and the study of the workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina, Defendants, their "alternate entities", and each of them, knew and possessed

23

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1 medical and scientific information of the connection between the inhalation of asbestos fibers and

2 asbestosis, which information was disseminated through the Asbestos Textile Institute and other

3 industry organizations to all other Defendants, their "alternate entities", and each of them, herein.

4 Between 1942 and 1950, the Defendants, their "alternate entities", and each of them, failed to provide

5 this information to consumers;

6     (d)     Defendants, their "alternate entities", and each of them, failed to warn Plaintiff LEE E.

7 KNOWLES and others of the nature of said materials which were dangerous when breathed and which

8 could cause pathological effects without noticeable trauma, despite the fact that Defendants, their

9 "alternate entities", and each of them, possessed knowledge and were under a duty to disclose that said

10 materials were dangerous and a threat to the health of persons coming into contact therewith;

11     (e)     Defendants, their "alternate entities", and each of them, failed to provide Plaintiff LEE E.

12 KNOWLES with information concerning adequate protective masks and other equipment devised to be

13 used when applying, mixing, installing and sanding the products of the Defendants, their "alternate

14 entities", and each of them, despite knowing that such protective measures were necessary, and that they

15 were under a duty to disclose that such materials were dangerous and would result in injury to Plaintiff

16 LEE E. KNOWLES and others applying and installing such material;

17     (f)     Defendants, their "alternate entities", and each of them, knew and failed to disclose that

18 Plaintiff LEE E. KNOWLES and anyone similarly situated, upon inhalation of asbestos would, in time,

19 have a substantial risk of developing irreversible conditions of pneumoconiosis, asbestosis,

20 mesothelioma and/or cancer;

21     (g)     Defendants, their "alternate entities", and each of them, failed to provide information of

22 the true nature of the hazards of asbestos materials and that exposure to these material would cause

23 pathological effects without noticeable trauma to the public, including buyers, users, and physicians

24 employed by Plaintiff LEE E. KNOWLES so that said physicians could not examine, diagnose, and treat

25 Plaintiff and others who were exposed to asbestos, despite the fact that Defendants, their "alternate

26 entities", and each of them, were under a duty to so inform and said failure was misleading; and

27     31.     Defendants, their "alternate entities", and each of them, and their officers, directors, and

28 managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of,

24

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

or should have known of, each of the acts set forth herein. Defendants, their "alternate entities", and each of them, are liable for the oppressive and malicious acts of their "alternate entities", and each of them, and each Defendant's officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.

32.     The herein-described conduct of said Defendants, their "alternate entities", and each of them, was and is willful, malicious, oppressive, outrageous, and in conscious disregard and indifference to the safety and health of "exposed person," including Plaintiff LEE E. KNOWLES, in that Defendants, and each of them, continued to manufacture, market and/or sell dangerous products known to cause severe, permanent injuries and death, despite possessing knowledge of the substantial hazards posed by use of their products, in order to continue to profit financially therefrom.  Defendants, their "alternate entities", and each of them, engaged in such conduct so despicable, contemptible, base, vile, miserable, wretched and loathsome as to be looked down upon and despised by ordinary people and justifies an award of punitive and exemplary damages pursuant to Civil Code section 3294.  Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

33.     Defendants and each of them engaged in conduct which was intended by Defendants and each of them to cause injury to the Plaintiffs, and despicable conduct which was carried on by the Defendant with a willful and conscious disregard of the rights or safety of others, including Plaintiff LEE E. KNOWLES.

34.     Defendants, and each of them, engaged in the despicable conduct described herein that subjected persons, including Plaintiff LEE E. KNOWLES, to cruel and unjust hardship in the form of sever, debilitating and fatal diseases like asbestosis, lung cancer and mesothelioma, in conscious disregard of those persons' rights.

35.     As a direct and proximate result of such intentional conduct by Defendants, their "alternate entities" and each of them, Plaintiff LEE E. KNOWLES sustained the injuries and damages alleged herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and their "alternate entities", and each of them, as hereinafter set forth.

25

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

## THIRD CAUSE OF ACTION
(Conspiracy)

AS AND FOR A FURTHER THIRD SEPARATE, AND DISTINCT CAUSE OF ACTION FOR CONSPIRACY, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-450, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

36.  Defendant **METROPOLITAN LIFE INSURANCE COMPANY** rendered substantial aid and assistance to the manufacturers of asbestos containing products to which LEE E. KNOWLES was exposed, and such assistance by Metropolitan Life aided and abetted the negligence and the marketing of unreasonably dangerous asbestos containing products by such manufacturers which proximately caused LEE E. KNOWLES' illness, injuries, and disabilities.

37.  In both conducting tests and in publishing their alleged results, **METROPOLITAN LIFE** failed to exercise reasonable care to conduct or publish complete, adequate and accurate tests of the health effects of asbestos. **METROPOLITAN LIFE** also caused to be published intentionally false, misleading, inaccurate and deceptive information about the health effects of asbestos exposure.

38.  LEE E. KNOWLES unwittingly but justifiably relied upon the thoroughness of **METROPOLITAN LIFE's** tests and information dissemination, the results of which Metropolitan Life published in leading medical journals.

39.  As a direct and proximate contributing result of **METROPOLITAN LIFE's** failures to conduct or accurately publish adequate tests or disseminate accurate and truthful information, after undertaking to do so; (i) the risk of harm to LEE E. KNOWLES from asbestos exposure was increased, and (ii) LEE E. KNOWLES suffered the injuries described below.

40.  In failing to test fully and adequately for the adverse health effects from exposure to asbestos; in delaying the publication of such results; and in falsely editing such results as were obtained; in suppressing relevant medical inquiry and knowledge about those hazards to promote the sale and distribution of asbestos as a harmless product; and in collaborating with the other Defendants materially to understate the hazards of asbestos exposure, all for its own profit and gain, **METROPOLITAN LIFE** acted recklessly, wantonly, and in calculated disregard for the welfare of the general public, including LEE E. KNOWLES.

26

## FOURTH CAUSE OF ACTION
(Premises Defendant)

AS AND FOR A FOURTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR PREMISES DEFENDANTS, PLAINTIFFS COMPLAIN OF DEFENDANTS, DOES 1-450, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGE AS FOLLOWS:

41.     Plaintiff LEE E. KNOWLES worked at premises owned and/or controlled by **ATLANTIC RICHFIELD COMPANY; BRIDGESTONE AMERICAS, INC.** *(sued as successor-in-interest to FIRESTONE TIRE & RUBBER COMPANY);* **CBS CORPORATION f/k/a VIACOM, INC.** *(sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION);* **CHEVRON USA, INC.; CONOCOPHILLIPS COMPANY** *(sued as successor to TIDEWATER OIL COMPANY);* **FREEPORT-McMoRan COPPER & GOLD, INC.** *(sued as successor-by-merger to PHELPS DODGE CORPORATION);* **GENERAL MILLS, INC.; GENERAL PETROLEUM CORPORATION; THE GOODYEAR TIRE & RUBBER COMPANY; HANSON PERMANENTE CEMENT, INC.** f/ka KAISER CEMENT CORPORATION ); **KIMBERLY-CLARK CORPORATION; PABST BREWING COMPANY** *(sued individually and as successor to JOSEPH SCHLITZ BREWING COMPANY);* **RIO TINTO MINERALS, INC.** *(sued as successor to PACIFIC COAST BORAX);* **SAN DIEGO GAS & ELECTRIC COMPANY; SOUTHERN CALIFORNIA EDISON COMPANY; TXI RIVERSIDE, INC.; UNITED STATES STEEL CORPORATION;** and **WILSEY BENNETT, INC.** *(sued as successor-by-merger to VEGETABLE OIL PRODUCTS COMPANY, INC.,)* (hereinafter "Premise Defendants") at which he was exposed to asbestos products and dust from asbestos products.

42.     While present at premises owned and/or controlled by the Premise Defendants, Plaintiff LEE E. KNOWLES was continuously exposed to asbestos and asbestos-containing dust without the provision of appropriate safeguards by the Premise Defendants who had the responsibility for such.

43.     Plaintiff LEE E. KNOWLES' injuries and disease were the result of intentional acts and/or omissions and/or negligence, gross negligence and malice in the use of asbestos at the Premise Defendants in that these entities had a duty to properly remove and/or abate said asbestos at these facilities before or during his presence, but failed to do so. The unreasonably dangerous conditions at

27

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

these facilities was of such a nature and existed long enough so that it was, or reasonably should have been, discovered and corrected by a premises owner using reasonable care.

44.     Plaintiffs would also show that the Premise Defendants were negligent, grossly negligent and malicious, and committed certain intentional acts, all of which were the proximate cause of LEE E. KNOWLES' disease and injuries resulting in mesothelioma from exposure to asbestos.

45.     In particular, Plaintiffs would show that the Premise Defendants demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to the rights, safety, and welfare of the Plaintiff LEE E. KNOWLES, and that such intentional acts and omissions were substantial factors in causing his disease and injuries.

46.     Specific intentional acts and·acts constituting negligence, gross negligence and malice committed by the Premise Defendants that proximately caused LEE E. KNOWLES' injuries and disease include:

(a)     Failure to provide safe equipment for LEE E. KNOWLES to use;

(b)     Failure to provide adequate safety measures and protection against deadly and life-threatening asbestos dust, all despite the Premise Defendants' knowledge of the extreme risk of harm inherent to asbestos exposure;

(c)     Failure to adequately warn LEE E. KNOWLES of the inherent dangers of asbestos contamination;

(d)     Failure to maintain the ambient and environmental conditions of the premises in proper and safe condition;

(e)     Failure to follow and adhere to various states and U.S. Government statutes, regulations and guidelines pertaining to asbestos and the exposure to asbestos of individuals. Such failure constituted negligence per se at a minimum. Plaintiffs are not making claims for damages under federal law.

47.     Plaintiffs would further show that the Premise Defendants intentionally, knowingly, and/or due to negligence, gross negligence and malice, failed to ensure that individuals such as Plaintiff LEE E. KNOWLES were protected from the inhalation of asbestos and asbestos fibers. Such actions proximately caused LEE E. KNOWLES' injuries and illness.

28

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

48.     Additionally, specific actions or omissions on the part of the Premise Defendants that proximately caused LEE E. KNOWLES' injuries and illness were:

(a)     Attempting to remove asbestos dust in Plaintiff LEE E. KNOWLES' workplace without taking adequate precautions for the protection of workers in the vicinity and/or in the premises generally;

(b)     Failing to provide proper protective gear for individuals exposed to asbestos;

(c)     Failing to provide adequate ventilation to ensure that individuals in the vicinity were not exposed to asbestos;

(d)     Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

(e)     Failing to adhere to industry safe standards and other established measures to protect workers from harm;

(f)     Failing to adequately warn of the extreme risk of danger of inherent to asbestos exposure.

(g)     The Premise Defendants demonstrated such an entire want of care as to establish that their acts and omissions alleged above were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff LEE E. KNOWLES.

## FIFTH CAUSE OF ACTION

### (Loss of Consortium)

AS AND FOR A FURTHER FIFTH SEPARATE, AND DISTINCT CAUSE OF ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF JOYCE KNOWLES COMPLAINS OF DEFENDANTS, DOES 1-450, THEIR "ALTERNATE ENTITIES", AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

49.     Plaintiff JOYCE KNOWLES incorporates by reference, each and every allegation contained in the general allegations and in the First, Second, Third and Fourth Causes of Action herein.

50.     Plaintiffs LEE E. KNOWLES and JOYCE KNOWLES were married on April 14, 1973, and at all times relevant to this action were, and are now, husband and wife.

51.     Prior to Plaintiff LEE E. KNOWLES' injuries as alleged, he was able and did perform duties as a spouse.  Subsequent to the injuries and as a proximate result thereof, Plaintiff LEE E. KNOWLES has been unable to perform the necessary duties as a spouse and the work and services usually performed in the care, maintenance, and management of the family home, and he will be unable

29

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1  to perform such work, service and duties in the future.  As a proximate result thereof, JOYCE

2  KNOWLES has been permanently deprived and will be deprived of the consortium of her spouse,

3  including the performance of duties, all to her damages, in an amount presently unknown but which will

4  be proved at the time of trial.

5       52.     Plaintiff JOYCE KNOWLES' discovery of this cause of her loss of consortium, as herein

6  alleged, first occurred within one year of the date this Complaint was filed.

7       53.     As a direct and proximate result of the acts of Defendants, their "alternate entities", and

8  each of them, and the severe injuries caused thereby to Plaintiff LEE E. KNOWLES as set forth in this

9  complaint, Plaintiff JOYCE KNOWLES has suffered, and for a long period of time will continue to

10  suffer, loss of consortium, including, but not limited, loss of services, marital relations, society, comfort,

11  companionship, love and affection of said spouse, and has suffered severe mental and emotional distress

12  and general nervousness as a result thereof.

13       WHEREFORE, Plaintiffs pray for judgment against Defendants, their "alternate entities", and

14  each of them, in an amount to be proved at trial in each individual case, as follows:

15            Plaintiff LEE E. KNOWLES:

16            1.     For Plaintiff's general damages according to proof;

17            2.     For Plaintiff's loss of income, wages, and earning potential according to proof;

18            3.     For Plaintiff's medical and related expenses according to proof;

19            Plaintiff JOYCE KNOWLES:

20            4.     For Plaintiff's damages for loss of consortium and/or society according to proof;

21

22

23

24

25

26

27

28

30

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

Plaintiffs LEE E. KNOWLES and JOYCE KNOWLES:

5.  For Plaintiffs' cost of suit herein;

6.  For exemplary or punitive damages according to proof;

7.  For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided in C.C.P. section 998, C.C.P. section 1032, and related provisions of law.

DATED:   December 6, 2011                    **SIMON GREENSTONE PANATIER BARTLETT, PC**

By: _____

JENNIFER L. BARTLETT
JORDAN BLUMENFELD-JAMES
JONAH D. KING
Attorneys for Plaintiffs

31

DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues so triable.

DATED: December 6, 2011       **SIMON GREENSTONE PANATIER BARTLETT, PC**

By

JENNIFER L. BARTLETT
JORDAN BLUMENFELD-JAMES
JONAH D. KING
Attorneys for Plaintiffs

32

# EXHIBIT "A"

Plaintiff LEE E. KNOWLES' exposure to asbestos and asbestos-containing products occurred at various locations within the State of California, including, but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Date(s) |
|---|---|---|---|
| Bailey Controls | Facilities including, but not limited to, power, steam, cement and sewage plants, steel and paper mills, Navy and civilian ships, breweries, and oil refineries at various locations in and around CA, AZ, and HI | Instrumentation Mechanic | 1958-1964 |
| Guthrie Construction | Spokane, WA | Laborer | 1953 |
| Ketchikan Pulp Mill | Ketchikan, WA | Instrumentation Mechanic | 1964-1969 |
| Inland Empire Paper Mill | Millwood, WA | Instrumentation Mechanic | 1955-1958; 1970-1975 |
| British Petroleum | Prudhoe Bay, AK | Instrumentation Mechanic | 1975-1992 |

33

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

1

## EXHIBIT "B"

2          Plaintiff LEE E. KNOWLES' exposure to Defendants' Products caused severe and

3    permanent injury to Plaintiff LEE E. KNOWLES including, but not limited to, mesothelioma.

4    Plaintiff was diagnosed with mesothelioma on or about December 22, 2010.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERSONAL INJURY – ASBESTOS

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE

BC 474820

Case Number _____

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 7.3(c)). There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|---|
| Hon. Carolyn B. Kuhl | 1 | 534 | | Hon. Holly E. Kendig | 42 | 416 | |
| Hon. J. Stephen Czuleger | 3 | 224 | | Hon. Mel Red Recana | 45 | 529 | |
| Hon. Luis A. Lavin | 13 | 630 | | Hon. Debre Katz Weintraub | 47 | 507 | |
| Hon. Terry A. Green | 14 | 300 | | Hon. Elizabeth Allen White | 48 | 506 | |
| Hon. Richard Fruin | 15 | 307 | | Hon. Deirde Hill | 49 | 509 | |
| Hon. Rita Miller | 16 | 306 | | Hon. John L. Segal | 50 | 508 | |
| Hon. Richard E. Rico | 17 | 309 | | Hon. Abraham Khan | 51 | 511 | |
| Hon. Rex Heeseman | 19 | 311 | | Hon. Susan Bryant-Deason | 52 | 510 | |
| Hon. Kevin C. Brazile | 20 | 310 | | Hon. Steven J. Kleifield | 53 | 513 | |
| Hon. Zaven V. Sinanian | 23 | 315 | | Hon. Ernest M. Hiroshige | 54 | 512 | |
| Hon. Robert L. Hess | 24 | 314 | | Hon. Malcolm H. Mackey | 55 | 515 | |
| Hon. Mary Ann Murphy | 25 | 317 | | Hon. Michael Johnson | 56 | 514 | |
| Hon. James R. Dunn | 26 | 316 | | Hon. Ralph W. Dau | 57 | 517 | |
| Hon. Yvette M. Palazuelos | 28 | 318 | | Hon. Rolf M. Treu | 58 | 516 | |
| Hon. Barbara Scheper | 30 | 400 | | Hon. David L. Minning | 61 | 632 | |
| Hon. Alan S. Rosenfield | 31 | 407 | | Hon. Michael L. Stern | 62 | 600 | |
| Hon. Mary H. Strobel | 32 | 406 | | Hon. Kenneth R. Freeman | 64 | 601 | |
| Hon. Charles F. Palmer | 33 | 409 | | Hon. Mark Mooney | 68 | 617 | |
| Hon. Amy D. Hogue | 34 | 408 | | Hon. Ramona See | 69 | 621 | |
| Hon. Daniel Buckley | 35 | 411 | | Hon. Soussan G. Bruguera | 71 | 729 | |
| Hon. Gregory Alarcon | 36 | 410 | | Hon. Ruth Ann Kwan | 72 | 731 | |
| Hon. Joanne O'Donnell | 37 | 413 | | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| Hon. Maureen Duffy-Lewis | 38 | 412 | | Hon. William F. Fahey | 78 | 730 | |
| Hon. Michael C. Solner | 39 | 415 | | **Hon. Emilie H. Elias*** | **324** | **CCW** | |
| Hon. Michelle R. Rosenblatt | 40 | 414 | | Other | | | |
| Hon. Ronald M. Sohigian | 41 | 417 | | | | | |

*Class Actions

All class actions are initially assigned to Judge Emilie H. Elias in Department 324 of the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005). This assignment is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the class action case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____   JOHN A. CLARKE, Executive Officer/Clerk

By _____, Deputy Clerk

NOTICE OF CASE ASSIGNMENT –
UNLIMITED CIVIL CASE

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

### APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under **Trial Court Delay Reduction.** Careful reading and compliance with the actual Chapter Rules is absolutely imperative.

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE
[CRC 3.221 Information about Alternative Dispute Resolution]
For additional ADR information and forms visit the Court ADR web application at www.lasuperiorcourt.org (click on ADR).

The plaintiff shall serve a copy of this Information Package on each defendant along with the complaint (Civil only).

**What is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation (NE), and settlement conferences, are less formal than a court process and provide opportunities for parties to reach an agreement using a problem-solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

### Cases for Which Mediation May Be Appropriate
Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

### Cases for Which Mediation May Not Be Appropriate
Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." Binding arbitration means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Nonbinding arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

### Cases for Which Arbitration May Be Appropriate
Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

### Cases for Which Arbitration May Not Be Appropriate
If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

### Cases for Which Neutral Evaluation May Be Appropriate
Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

### Cases for Which Neutral Evaluation May Not Be Appropriate
Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences:**
Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

## LOS ANGELES SUPERIOR COURT ADR PROGRAMS

**CIVIL:**
- **Civil Action Mediation** (Governed by Code of Civil Procedure (CCP) sections 1775-1775.15, California Rules of Court, rules 3.850-3.868 and 3.870-3.878, Evidence Code sections 1115-1128, and Los Angeles Superior Court Rules, chapter 12.)
- **Retired Judge Settlement Conference**
- **Neutral Evaluation** (Governed by Los Angeles Superior Court Rules, chapter 12.)
- **Judicial Arbitration** (Governed by Code of Civil Procedure sections 1141.10-1141.31, California Rules of Court, rules 3.810-3.830, and Los Angeles Superior Court Rules, chapter 12.)
- **Eminent Domain Mediation** (Governed by Code of Civil Procedure section 1250.420.)
- **Civil Harassment Mediation**
- **Small Claims Mediation**

**FAMILY LAW (non-custody):**
- **Mediation**
- **Forensic Certified Public Accountant (CPA) Settlement Conference**
- **Settlement Conference**
- **Nonbinding Arbitration** (Governed by Family Code section 2554.)

**PROBATE:**
- **Mediation**
- **Settlement Conference**

### NEUTRAL SELECTION

Parties may select a mediator, neutral evaluator, or arbitrator from the Court Party Select Panel or may hire someone privately, at their discretion. If the parties utilize the Random Select Mediation or Arbitration Panel, the parties will be assigned on a random basis the name of one neutral who meets the case criteria entered on the court's website.

### COURT ADR PANELS

| | |
|---|---|
| **Party Select Panel** | The Party Select Panel consists of mediators, neutral evaluators, and arbitrators who have achieved a specified level of experience in court-connected cases. The parties (collectively) may be charged $150.00 per hour for the first three hours of hearing time. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| **Random Select Panel** | The Random Select Panel consists of trained mediators, neutral evaluators, and arbitrators who have not yet gained the experience to qualify for the Party Select Panel, as well as experienced neutrals who make themselves available pro bono as a way of supporting the judicial system. It is the policy of the Court that all Random Select Panel volunteer mediators, neutral evaluators, and arbitrators provide three hours hearing time per case. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| **Private Neutral** | The market rate for private neutrals can range from $300-$1,000 per hour. |

### ADR ASSISTANCE

For assistance regarding ADR, please contact the ADR clerk at the courthouse in which your case is filed.

| COURTHOUSE | ADDRESS | ROOM | CITY | PHONE | FAX |
|---|---|---|---|---|---|
| Antonovich | 42011 4th St. West | None | Lancaster, CA 93534 | (661) 974-7275 | (661) 974-7050 |
| Chatsworth | 9425 Penfield Ave. | 1200 | Chatsworth, CA 91311 | (818) 576-8565 | (818) 576-8687 |
| Compton | 200 W. Compton Blvd. | 1002 | Compton, CA 90220 | (310) 603-3072 | (310) 223-0357 |
| Glendale | 600 E. Broadway | 273 | Glendale, CA 91206 | (818) 500-3160 | (818) 548-5470 |
| Long Beach | 415 W. Ocean Blvd. | 316 | Long Beach, CA 90802 | (562) 491-6272 | (562) 437-3802 |
| Norwalk | 12720 Norwalk Blvd. | 308 | Norwalk, CA 90650 | (562) 807-7243 | (562) 462-9019 |
| Pasadena | 300 E. Walnut St. | 109 | Pasadena, CA 91101 | (626) 356-5685 | (626) 666-1774 |
| Pomona | 400 Civic Center Plaza | 106 | Pomona, CA 91766 | (909) 620-3183 | (909) 629-6283 |
| San Pedro | 505 S. Centre | 209 | San Pedro, CA 90731 | (310) 519-6151 | (310) 514-0314 |
| Santa Monica | 1725 Main St. | 203 | Santa Monica, CA 90401 | (310) 260-1829 | (310) 319-6130 |
| Stanley Mosk | 111 N. Hill St. | 113 | Los Angeles, CA 90012 | (213) 974-5425 | (213) 633-5115 |
| Torrance | 825 Maple Ave. | 100 | Torrance, CA 90503 | (310) 222-1701 | (310) 782-7326 |
| Van Nuys | 6230 Sylmar Ave. | 418 | Van Nuys, CA 91401 | (818) 374-2837 | (818) 902-2440 |

Partially Funded by the Los Angeles County Dispute Resolution Program
A complete list of the County Dispute Resolution Programs is available online and upon request in the Clerk's Office

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Jennifer L. Bartlett                                    SBN: 183154
SIMON GREENSTONE PANATIER BARTLETT, PC   e-mail:
301 E. Ocean Blvd., Suite 1950, Long Beach, CA 90802
 TELEPHONE NO.: 562-590-3400                 FAX NO.:
ATTORNEY FOR *(Name):* Plaintiffs LEE E. KNOWLES and JOYCE KNOWLES

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
  STREET ADDRESS: 111 North Hill Street
  MAILING ADDRESS: 111 North Hill Street
  CITY AND ZIP CODE: Los Angeles, 90012
  BRANCH NAME: Stanley Mosk Courthouse

**CASE NAME:** LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON
COMPANY, et al.

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

DEC 07 2011

John A. Clarke, Executive Officer/Clerk
BY _____ Deputy
       Shaunya Wesley

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | **CASE NUMBER:** |
|---|---|---|
| [X] Unlimited   [ ] Limited | [ ] Counter   [ ] Joinder | BC 474820 |
| (Amount demanded exceeds $25,000) | (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: |
| | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [X] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [X] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties       d. [ ] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve                 in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence          f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* 4
5. This case [ ] is   [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 6, 2011

Jennifer L. Bartlett
_____
 (TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**   ProDoc®

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (*if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto*)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability (*not asbestos or
toxic/environmental*) (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) (*not civil
harassment*) (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
(*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract (*not unlawful detainer
or wrongful eviction*)
Contract/Warranty Breach–Seller
Plaintiff (*not fraud or negligence*)
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage (*not provisionally
complex*) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (*not eminent
domain, landlord/tenant, or
foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
(*arising from provisionally complex
case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment (*non-
domestic relations*)
Sister State Judgment
Administrative Agency Award
(*not unpaid taxes*)
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified
above*) (42)
Declaratory Relief Only
Injunctive Relief Only (*non-
harassment*)
Mechanics Lien
Other Commercial Complaint
Case (*non-tort/non-complex*)
Other Civil Complaint
(*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition (*not specified
above*) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

FILED

JUN 09 1995

BY T. ACUNA DEP

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| In re Los Angeles Asbestos<br>Litigation - General Orders | )<br>)<br>) | No. C 700000 |
| | )<br>) | FIRST AMENDED<br>GENERAL ORDER NO. 1 |

The Court, having conducted a hearing on its own motion, issues the orders as hereafter set forth.

IT IS HEREBY ORDERED that all actions currently pending and hereafter filed in the above-entitled Court alleging personal injury or wrongful death due to exposure to an asbestos-containing product (hereafter "Los Angeles Asbestos Litigation") are determined to be complex litigation within the meaning of California Rules of Court, Appendix, Division 1, Standards of Judicial Administration Recommended by the Judicial Council (hereafter "Standards of Judicial Administration"), Section 19.

IT IS FURTHER ORDERED that all Los Angeles Asbestos Litigation actions shall continue to be filed in the Central District of the above-entitled Court both before and after the distribution of such cases into the Central District's Independent Calendaring ("I/C") courts. The certificate of assignment for each Los Angeles Asbestos Litigation case shall

-1-

contain the following language: "Filed in the Central District
pursuant to First Amended General Order No. 1 contained in the
general order file, File No. C 700000."

Dated: *6-9-95*

_Bruce McMitchell_ (signature)
BRUCE E. MITCHELL
Commissioner of the Superior Court

-2-

| SHORT TITLE: LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON COMPANY, et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☒ YES    CLASS ACTION? ☐ YES  LIMITED CASE? ☐ YES  TIME ESTIMATED FOR TRIAL 15  ☐ HOURS/ ☒ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☒ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

---

| SHORT TITLE: LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON COMPANY, et al. | | CASE NUMBER |

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons –<br>See Step 3 Above |
|---|---|---|
| **Business Tort (07)** | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| **Civil Rights (08)** | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| **Defamation (13)** | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| **Fraud (16)** | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| **Professional Negligence (25)** | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| **Other (35)** | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Wrongful Termination (36)** | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| **Other Employment (15)** | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Breach of Contract/ Warranty (06)<br>(not insurance)** | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| **Collections (09)** | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| **Insurance Coverage (18)** | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| **Other Contract (37)** | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Eminent Domain/Inverse Condemnation (14)** | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| **Wrongful Eviction (33)** | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| **Other Real Property (26)** | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ A6032  Quiet Title | 2., 6. |
| | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer-Commercial (31)** | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| **Unlawful Detainer-Residential (32)** | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| **Unlawful Detainer-Post-Foreclosure (34)** | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| **Unlawful Detainer-Drugs (38)** | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

Row labels (left margin, spanning groups): Non-Personal Injury/Property Damage/ Wrongful Death Tort · Employment · Contract · Real Property · Unlawful Detainer

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON COMPANY, et al. | CASE NUMBER |
|---|---|

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2., 9. |
| | | ☐ A6160 Abstract of Judgment | 2., 6. |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment | 2., 3., 9. |
| | | ☐ A6123 Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190 Election Contest | 2. |
| | | ☐ A6110 Petition for Change of Name | 2., 7. |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100 Other Civil Petition | 2., 9. |

| SHORT TITLE: LEE E. KNOWLES and JOYCE KNOWLES v. A. W. CHESTERTON COMPANY, et al. | CASE NUMBER: |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>818 W. 7th STREET |
|---|---|

| CITY:<br>LOS ANGELES | STATE:<br>CA | ZIP CODE:<br>90017 | |
|---|---|---|---|

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the MAIN _____ courthouse in the CENTRAL _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: December 6, 2011 _____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:                          FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lasuperiorcourt.org** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)              (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation.

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR PLAINTIFF)

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR DEFENDANT)

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR DEFENDANT)

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR DEFENDANT)

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR _____ )

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR _____ )

Date:

_____     ➢   _____
(TYPE OR PRINT NAME)                  (ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:  FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

   i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

   ii. Include a brief summary of the dispute and specify the relief requested; and

   iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

   i. Also be filed on the approved form (copy attached);

   ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | | CASE NUMBER: |
|---|---|---|
| | | |

**The following parties stipulate:**

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR PLAINTIFF)

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR DEFENDANT)

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR DEFENDANT)

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR DEFENDANT)

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR _____ )

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR _____ )

Date:
_____  ➤  _____
    (TYPE OR PRINT NAME)           (ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| | | |

TELEPHONE NO.:  FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE** (pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   - ☐ Request for Informal Discovery Conference
   - ☐ Answer to Request for Informal Discovery Conference
2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).
3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).
4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

---

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 10/17/11 | | | | DEPT. 324 |
|---|---|---|---|---|
| HONORABLE EMILIE H. ELIAS | JUDGE | A. MORALES | | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | | ELECTRONIC RECORDING MONITOR |
| E. MUNOZ, C.A. | Deputy Sheriff | NONE | | Reporter |

| 2:00 pm | JCCP4674 | Plaintiff Counsel | NONE |
|---|---|---|---|
| | Coordination Proceeding Special Title Rule (3.550) | Defendant Counsel | |
| | LAOSD ASBESTOS CASES | | |

NATURE OF PROCEEDINGS:

COURT ORDER

Pursuant to the assignment as coordination judge for the LAOSD Asbestos Cases, JCCP4674, this Court issues the following order:

Effective immediately all asbestos personal injury/wrongful death complaints are to continue being filed at the Stanely Mosk Courthouse. They will be assigned to Honorable Emilie H. Elias sitting in Department 324 at Central Civil West. All further filings in the case shall be made in Department 324 under the JCCP4674 case number and title.

The cases will be presumptively "add on" cases to JCCP4674. Plaintiff shall have 10 days from the date of filing the complaint to file an objection to the "add on." Defense counsel shall have 10 days from the date of appearance in the action to file an objection. If an objection is filed, the objecting party has 15 additional days to file points and authorities in support of the objection.

If the objection to the "add on" is sustained, the underlined case will be sent to Department 1 for reassignment.

Counsels for plaintiffs are ordered to give notice

Page 1 of 2 DEPT. 324

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 10/17/11 | | | DEPT. 324 |
|---|---|---|---|
| HONORABLE EMILIE H. ELIAS | JUDGE | A. MORALES | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| E. MUNOZ, C.A. | Deputy Sheriff | NONE | Reporter |

| 2:00 pm | JCCP4674 | | | |
|---|---|---|---|---|
| | Coordination Proceeding Special Title Rule (3.550) | Plaintiff Counsel | NONE | |
| | LAOSD ASBESTOS CASES | Defendant Counsel | | |

NATURE OF PROCEEDINGS:

of the above order to all parties.

A copy of this minute order is served on all plaintiffs' counsel as follows:

### CLERK'S CERTIFICATE OF MAILING/
### NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 10-17-11 upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully prepaid.

Date: 10-17-11

John A. Clarke, Executive Officer/Clerk

By: _____
          A. MORALES

****SEE MAILING LIST ATTACHED TO****
        THIS MINUTE ORDER

Page    2 of    2    DEPT. 324

MINUTES ENTERED
10/17/11
COUNTY CLERK

Case MDL No. 975 Document 8585-1 Filed 03/30/12 Page 91 of 352

# EXHIBIT B

1  Jordan Blumenfeld-James (State Bar No. 235185)
2  Jonah D. King (State Bar No. 270196)
   **SIMON GREENSTONE PANATIER BARTLETT, P.C.**
3  301 E. Ocean Blvd., Ste. 1950
   Long Beach, California 90802
4  Telephone (562) 590-3400
   Facsimile (562) 590-3412
5
6  Attorneys for Plaintiffs
7
8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9                 **FOR THE COUNTY OF LOS ANGELES**
10
11  Coordinated Proceeding           J.C.C.P. No. 4674
    Special Title (Rule 3.550)
12                                   Los Angeles Superior Court
13  **LAOSD ASBESTOS CASES**         No. BC 474820

14  ─────────────────────────        Assigned for All Purposes to:
                                     Honorable Emilie H. Elias
15  **LEE E. KNOWLES and JOYCE**     Dept. 324
    **KNOWLES**
16                                   **PLAINTIFFS' RESPONSES TO**
                          Plaintiffs,  **GENERAL ORDER STANDARD**
17                                   **INTERROGATORIES PROPOUNDED BY**
        vs.                          **DEFENDANTS**
18  **A.W. CHESTERTON COMPANY, et**
    **al.,**
19
                          Defendants.
20
                                     Action Filed:    December 7, 2011
21                                   Trial Date:      None
22
23
24  PROPOUNDING PARTY: DEFENDANTS

25  RESPONDING PARTY:   PLAINTIFFS LEE E. KNOWLES and JOYCE KNOWLES

26  SET:              ONE

27  I.    BACKGROUND

28  INTERROGATORY NO. 1:

                                     1
          PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1      State your full name, present address, date and place of birth, social security number,

2  height and weight, and, if you have a driver's license, the state of issuance and the number of

3  that driver's license.

4  **RESPONSE TO INTERROGATORY NO. 1:**

5      **Name:**    Lee E. Knowles

6      **Address:**    8574 Grand Teton, Rathdrum, ID 83858

7      **Date/Place of Birth:**    October 22, 1928 – Spokane, WA

8      **Social Security No.:**    WITH HELD

9      **Drivers License State and Number: ID – CB180204H**

10  INTERROGATORY NO 2:

11      State any other name or names by which you have been known, including nickname(s),

12  and the inclusive dates of use of that name or names.

13  **RESPONSE TO INTERROGATORY NO. 2:**

14      **None.**

15  INTERROGATORY NO 3:

16      State your former residence addresses for a period of 10 years prior to the date of these

17  interrogatories, giving the dates during which you lived at each address.

18  **RESPONSE TO INTERROGATORY NO. 3:**

19      **Not applicable as Plaintiffs have resided at the above listed address for over 10**

20  **years.**

21  INTERROGATORY NO. 4:

22      If you are married, state the name of your spouse, his/her age and present address, and the

23  date and place of your marriage.

24  **RESPONSE TO INTERROGATORY NO. 4:**

25      **Name:**    **Joyce Knowles**

26      **Age:**    **84**

27      **Address:**    8574 Grand Teton, Rathdrum, ID 83858

28      **Date/Place of Marriage:**    **April 14, 1973 – Spokane, WA**

INTERROGATORY NO. 5:

State the names of any previous spouses, the dates and places of those marriages, and the circumstances under which those marriages were dissolved or terminated.

**RESPONSE TO INTERROGATORY NO. 5:**

    **Name:**    **Norma Sieweke**

    **Date of Marriage:  1950 – Idaho**

    **Date of Divorce:  1968**

INTERROGATORY NO. 6:

If your spouse is currently employed, state:

    a.    The name and address of his/her employer;

    b.    Whether he/she is employed on full or part time basis; and

    c.    The amount of his/her average weekly or monthly salary.

**RESPONSE TO INTERROGATORY NO. 6 a-c:**

    **Plaintiff Joyce Knowles is a fulltime homemaker and caretaker.**

INTERROGATORY NO. 7:

State the names, ages and present addresses of each of your children.

**RESPONSE TO INTERROGATORY NO. 7:**

    1)    **Valerie Farrington (Daughter)**

          **Age:  57**

          **Address:  6797 Rycroft Drive Riverside, CA 92506**

    2)    **Patrick Knowles (Son)**

          **Age: 55**

          **Address:  13306 51st Avenue NE, Marysville, WA 98271**

    3)    **Denice Gordon (Daughter)**

          **Age:  53**

          **Address:  1601 E. 8th Street, Spokane, WA 99202**

    4)    **Karl Knowles (Son)**

          **Died at the age of 43**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

INTERROGATORY NO. 8:

If any children, relatives or other persons are financially dependent upon you, state with respect to each such person:

a.  His/her full name and present residence address;

b.  His/her relationship to you and degree of financial dependency upon you;

c.  The amounts contributed from all sources to his/her support during the five years preceding your responses to these interrogatories; and

d.  The last year when he/she was claimed as a dependent by you for federal income tax purposes.

**RESPONSE TO INTERROGATORY NO. 8 a-d:**

**None.**

INTERROGATORY NO. 9:

If any of the members of your immediate family (i.e. parents, siblings, children and grandchildren are suffering or have suffered from any respiratory impairment, illness or condition, identify each such person, specifying:

a.  The nature of that respiratory impairment (e.g., bronchitis, asthma, pneumonia);

b.  When that respiratory impairment first developed;

c.  Whether that respiratory impairment is totally or partially disabling; and

d.  Whether that respiratory impairment is or has been treated by any physician and, if so, the name and address of that physician.

**RESPONSE TO INTERROGATORY NO. 9 a-d:**

**Not to Plaintiff's knowledge.**

INTERROGATORY NO. 10:

If any of the members of your immediate family (i.e., parents, siblings, children, and grandchildren) are suffering of or have suffered from any form of cancer, identify such persons, specifying:

a.  The nature and site of that cancer;

b.  When that cancer first developed and/or was diagnosed; and

4

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

c. 1     The name and address of all treating or diagnosing physicians.

2  **RESPONSE TO INTERROGATORY NO. 10 a-c:**

3       **Plaintiff Lee Knowles' sister, Luella Knowles, was diagnosed with breast cancer**

4  **during the 1990's.**

5  INTERROGATORY NO. 11:

6       If any member of your immediate family (i.e., parents, siblings, children, and

7  grandchildren) died because of cancer or a pulmonary condition or currently has a pulmonary

8  disease or cancer, state the following for each such person:

9       a.     The nature of his/her physical complaint and its duration;

10      b.     His/her name, address and relationship to you;

11      c.     If deceased, his/her age at the time of death and the detailed cause of death.

12  **RESPONSE TO INTERROGATORY NO. 11:**

13      **Plaintiff Lee Knowles' son, Karl Knowles, died of cancer at the age of 43.  The**

14  **origin of the cancer is unknown.**

15  INTERROGATORY NO. 12:

16      State the year that you completed high school or state the highest-grade level you have

17  completed, together with the date completed, name and location of the school you attended.

18  **RESPONSE TO INTERROGATORY NO. 12 a-e:**

19      **Year Completed High School:  1947**

20      **Name/Location of School attended: West Valley High School, Millwood, WA**

21  INTERROGATORY NO. 13:

22      If you have received any education or vocational training or degrees in addition to your

23  response to the previous interrogatory state:

24      a.     The name and address of each school or other institution you attended;

25      b.     The dates you attended;

26      c.     The nature of the education and/or training you received; and

27      d.     The type of degree or certificate you received.

28  **RESPONSE TO INTERROGATORY NO. 13 a-e:**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

a. **Perry Technical Institute**

b. **1953 – 1955**

c. **Industrial Instrumentation/Industrial Electronics**

d. **Certificate of Completion**

INTERROGATORY NO. 14:

If you have been or are licensed by any agency, governmental or non-governmental, to perform any profession, trade or occupation, state the following:

a. The date the license was issued;

b. The name and address of the agency issuing the license;

c. The profession, trade or occupation for which the license was issued;

d. Whether the license was revoked or suspended; and if so, the date and reason for each revocation and suspension; and

e. The amount of time you engage in the profession, trade or occupation, as authorized by the license.

**RESPONSE TO INTERROGATORY NO. 14 a-g:**

**Not applicable.**

INTERROGATORY NO. 15:

If you have been convicted of a felony, state the date, place and nature of each felony conviction.

**RESPONSE TO INTERROGATORY NO. 15:**

**Not applicable.**

INTERROGATORY NO. 16:

If you have ever been a member of the Armed Forces of the United States; state:

a. The branch of service, your serial number, and the highest rank or grade you held;

b. The dates you began and ended your military service;

c. The type of discharge you received;

d. At what locations or on what ships you served, if any, and the dates of such services;

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1      e.      The specific nature of your duties at each of the above locations or ships.

2      f.      A description of the work environment at each of the above locations or ships; and:

3      g.      Your veteran's administration number.

4 **RESPONSE TO INTERROGATORY NO. 16 a-g:**

5      **a)**      **U.S. Marine Corp, Serial No. 1057778, Cpl**

6      **b)**      **1948-1950 Reserves; 1950-1952 Active Duty**

7      **c)**      **Honorable**

8      **d)**      **Spokane, WA; San Diego, CA; Korea**

9      **e)**      **Infantry**

10      **f)**      **See response to Interrogatory No. 59**

11      **g)**      **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**

12 **INTERROGATORY NO. 17:**

13      If you received or participated in any technical or vocational training as a member of

14 the Armed Forces, state the type of training you received and the length of the training period.

15 **RESPONSE TO INTERROGATORY NO. 17:**

16      **Plaintiff was trained in infantry.**

17      II.      EMPLOYMENT

18 **INTERROGATORY NO. 18:**

19      If you are presently employed, state:

20      a.      The name and address of your present employer;

21      b.      The name and address of your immediate superior, boss or foreman'

22      c.      The nature of the work you do and your job title;

23      d.      The number of hours, per week, you normally work;

24      e.      The date of your employment began and your starting position if different from

25 your current position;

26      f.      Your present rate of pay; and

27      g.      The average number of hours of overtime you work per month and the rate of pay

28 you receive for overtime work.

1 **RESPONSE TO INTERROGATORY NO. 18:**

2     **Not applicable.**

3 INTERROGATORY NO. 19:

4     If you are not presently employed, describe the reason why.

5 **RESPONSE TO INTERROGATORY NO. 19:**

6     **Plaintiff retired in 1992.**

7 INTERROGATORY NO. 20:

8     If you are receiving any form of disability pension, state from whom it is received, the

9 amount received on a weekly, monthly, or yearly basis, and the length of time during which

10 you will continue to receive this pension.

11 **RESPONSE TO INTERROGATORY NO. 20:**

12     **Plaintiff is considered 100% disabled as a result of a military injury. Plaintiff**

13 **receives $2924.00 per month from Veteran's Administration.**

14 INTERROGATORY NO. 21:

15     List all occasions during the last ten years of your life on which you have lost time from

16 work as a result of any of the following, and for each such loss indicate the amount of time lost

17 and the reason for the lost time:

18     a.    Illness;

19     b.    Injury

20 **RESPONSE TO INTERROGATORY NO. 21 a-b:**

21     **Not applicable.**

22 INTERROGATORY NO. 22:

23     If you have ever been discharged or voluntarily left a position due to health problems,

24 state in detail the dates, names of employers, places of employment and circumstances

25 surrounding each discharge or voluntary termination.

26 **RESPONSE TO INTERROGATORY NO. 22:**

27     **Not applicable.**

28 INTERROGATORY NO. 23:

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1    If you are or have ever been a member of any labor union, state for each union

2    membership;

3        a.    The name, address and telephone number of the union, the union local or chapter

4    number of each union, and your membership number, if any;

5        b.    The dates and time periods during which you maintained membership in each such

6    union;

7        c.    All offices you have held or committee on which you have served, together with

8    places and date; and

9        d.    The date or dates that your membership ended and the reason.

10   **RESPONSE TO INTERROGATORY NO. 23 a-d:**

11       **Not Plaintiff's recollection.**

12   INTERROGATORY NO. 24:

13       Identify all past employers in whose employ you came into contact with chromium,

14   cadmium, mercury, or beryllium, or materials, alloys or pigments containing any of these metals.

15   Include in your answer for each such employer:

16       a.    Its name, address, telephone number; and

17       b.    Your job title and work description;

18       c.    The type, identity and extent of work with or exposure to each of these metals or

19   materials with which you had contact;

20       d.    Whether your employer provided safety equipment to reduce or prevent

21   exposure to these metals or materials and, if so, describe such equipment;

22       e.    Whether use by employees of the safety equipment referred in subpart (d) was

23   required or recommended by your employer;

24       f.    Whether your employer provided showers for employees; and

25       g.    Whether your employer provided separate lockers for work and personal clothing.

26   **RESPONSE TO INTERROGATORY NO. 24 a-f:**

27       **See response to Interrogatory No. 59.**

28   INTERROGATORY NO. 25:

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1    Have you ever personally performed or worked adjacent to others performing any of the

2    following job duties: sandblasting; anodizing; electroplating; acid dipping; welding; grinding;

3    chipping, or sanding of metal; steel making; alloy manufacturing, smelting or other steel-related

4    industries; remelting of scrap metal products; jewelry making; engraving, lithography, metal

5    primer application?  If so, state:

6         a.    The name, address, and telephone number of employer for whom you performed

7    these job duties or worked adjacent to others performing these job duties;

8         b.    Your job title and work description;

9         c.    The inclusive dates of your employment;

10        d.    The frequency with which you performed these job duties or worked adjacent to

11   others performing these job duties;

12        e.    The safety precautions and equipment, if any, which your employer made

13   available; and

14        f.    The safety precautions and equipment which you used while performing your job

15   duties.

16   **RESPONSE TO INTERROGATORY NO. 25:**

17        **Please see Plaintiff's Work History Sheet, which is attached hereto as Exhibit A, for**

18   **the dates of Plaintiff's employment and a description of the work he performed.   Plaintiff's**

19   **investigation and discovery are continuing and Plaintiff reserves the right to amend this**

20   **response at any time.**

21   III.    EXPOSURE TO ASBESTOS

22   INTERROGATORY NO. 26:

23        For each product, material or compound (collectively referred to as "product") which you

24   contend contains asbestos allegedly manufactured, produced, prepared, distributed or sold by any

25   defendant named in this action or by its predecessors, subsidiaries, subdivisions or affiliates, and

26   which you claim to have been exposed to at any time.

27        a.    Describe each product as specifically as possible, including its trade name, product

28   type, asbestos content, color, packaging, and manufacturer, together with a detailed description

1    of when and how you become aware of this information;

2        b.     State the date(s) on which and places where you were exposed or your best

3    estimate thereof, together with the circumstances surrounding such exposure (i.e. were you

4    working with it or simply near an area where it is being used?) to the product;

5        c.     Describe all instructions, recommendations or warnings of any kind that

6    accompanied the product, together with the location(s) where this information appeared (e.g.,

7    printed on tag, tag covering, instruction sheet accompanying product, etc.);

8        d.     Describe all instructions and recommendations given to you regarding the product

9    by your employer or superior at any time, together with the name, job title, and address of the

10    person who gave you the information or recommendations and the date you were given the

11    instructions or recommendations;

12        e.     State the purpose for which you used the product; and

13        f.     State the date you first became aware that the product allegedly contained asbestos,

14    together with a detailed description of the circumstances by which you so became aware.

15    **RESPONSE TO INTERROGATORY NO. 26 a-d:**

16        **a.     Please see Plaintiff's Work History Sheet, attached hereto as Exhibit "A".**

17    **Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to**

18    **amend his response to this interrogatory at any time.**

19        **b.     Please see Plaintiff's Work History Sheet, attached hereto as Exhibit "A". For**

20    **further response, upon information and belief, Plaintiff states that, to the best of his**

21    **knowledge, the dates and locations of his exposure to asbestos-containing products are set**

22    **forth in his response to General Order Standard Interrogatory No. 59,** *infra*, **which**

23    **response is incorporated by reference as if fully set forth herein. Plaintiffs' investigation**

24    **and discovery are continuing and Plaintiff reserves the right to amend his response to this**

25    **interrogatory at any time.**

26        **c.     Please see Plaintiff's Work History Sheet, attached hereto as Exhibit "A". For**

27    **further response, upon information and belief, Plaintiff does not recall reading, hearing or**

28    **otherwise receiving any warnings, written instructions or recommendations regarding the**

use or hazards of asbestos products, including the products to which he claims exposure in this case. Plaintiff does not recall seeing instructions and warnings for other hazards either on the packaging of the product or in the technical manual. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend his response to this interrogatory at any time.

    d.    Please see Plaintiff's Work History Sheet, attached hereto as Exhibit "A". Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend his response to this interrogatory at any time.

    e.    Please see Plaintiff's Work History Sheet, attached hereto as Exhibit "A". For further response, upon information and belief, all of the products to which Plaintiff claims exposure were used, to the best of Plaintiff's knowledge, in the course of his work, as set out in his Work History Sheet. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend his response to this interrogatory at any time.

    f.    Plaintiff objects to this interrogatory on the grounds that it calls for the disclosure of information protected by the attorney-client privilege.

    Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend his response to this interrogatory or any of its subparts at any time.

INTERROGATORY NO. 27:

    If you have ever worked with asbestos manufactured, produced, prepared, distributed or sold by any other entity not named as a defendant in this lawsuit, identify each such entity.

**RESPONSE TO INTERROGATORY NO. 27:**

    Not to Plaintiff's knowledge.

INTERROGATORY NO. 28:

    If you believe you were ever exposed to asbestos other than at the time or locations identified in your responses to interrogatories Nos. 26 and 27, state:

    a.    The date(s) and place(s) of such exposure;

    b.    The circumstances surrounding such exposure;

    c.    The nature of the asbestos, the trade name of the asbestos product; if any, and the

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1   name and address of their manufacturer;

2       d.      Describe what precautions you took, if any, to avoid exposure.

3   **RESPONSE TO INTERROGATORY NO. 28:**

4       **Upon information and belief, no.  Plaintiff's investigation and discovery are**

5   **continuing and Plaintiff reserves the right to amend this response at any time.**

6   INTERROGATORY NO. 29:

7       If any of your employers ever suggested or recommended that you should use any device

8   to reduce your possible exposure to, or inhalation of, asbestos, state for each and every such

9   employer:

10      a.      Its name, address, and telephone number;

11      b.      The date, time and place when the suggestion or recommendation was made,

12  together with the a name, and employment position of the person making the suggestion or

13  recommendation;

14      c.      The name, address and telephone number of each person present when such

15  suggestion or recommendation was made to or received by you;

16      d.      The exact wording and content of the suggestion or recommendation;

17      e.      Whether the suggestion or recommendation was written or oral; and

18          1.      If written, identify in detail each such writing;

19          2.      If oral, please set forth all persons involved and details as to the manner in

20  which the suggestion or recommendation was presented;

21      f.      The type, make and model of each device referred to in each suggestion or

22  recommendation;

23      g.      The nature of any action, if any, taken by you in response to the suggestions; and

24      h.      A detailed description of your reasons for any response to the suggestions and

25  recommendations, short of complete conformance thereto.

26  **RESPONSE TO INTERROGATORY NO. 29:**

27      **Plaintiff was not specifically warned about the hazards of working with and/or**

28  **around asbestos-containing products and/or inhaling asbestos dust.  He did not learn about**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1  the dangers associated with asbestos exposure until well after he had already been exposed

2  to Defendants' asbestos-containing products.

3  INTERROGATORY NO. 30:

4        If you have ever seen signs, warnings, labels, instructions, or safety precautions

5  pertaining to the use, storage, or disposal of asbestos or asbestos-containing products other

6  than as described in your answer to subpart (c) of Interrogatory No. 26, state:

7        a.      When and where you saw the signs, warnings, labels, instructions, or safety

8  precautions; and

9        b.      The nature of the signs, warnings, labels, instructions or safety precautions.

10 **RESPONSE TO INTERROGATORY NO. 30:**

11       Plaintiff did not see any such warning on any of the asbestos-containing products

12 that he used and/or to which he was exposed. For further response, Plaintiff's response to

13 Interrogatory No. 26 (c), supra, is incorporated by reference as if fully set forth herein.

14 Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to

15 amend this response at any time.

16 IV.    INJURIES ALLEGEDLY RELATED TO ASBESTOS EXPOSURE

17 INTERROGATORY NO. 31:

18       If you contend that you have incurred any injuries as a result of exposure to asbestos,

19 describe separately and in complete detail each and every complaint, symptom, adverse

20 reaction or other injury (hereinafter collectively referred to as "symptom") which you contend

21 resulted from exposure. Include in your answer:

22       a.      The date, or if unknown, your best approximation of the date on which you first

23 began exhibiting each symptom;

24       b.      The progression, if any, of each symptom;

25       c.      The date each symptom ceased to affect you;

26       d.      The name, address, and telephone number of each physician to whom each

27 symptom was reported, together with the date each symptom was reported;

28       e.      What each physician told you was the cause of each symptom, together with the

1  date you were told this;

2      f.    Whether you have followed the medication or therapy regime prescribed by each

3  physician for the treatment of each symptom; and

4      g.    The names and addresses of any other physicians or practitioners subsequently

5  affirming or contradicting any diagnosis, as to the cause of each symptom together with the

6  date this affirmation or contradiction was made.

7  **RESPONSE TO INTERROGATORY NO. 31:**

8      In approximately October 2010, Plaintiff began experiencing severe shortness of

9  breath. He was taken to Kootenai Medical Center in Idaho where he was given a chest x-

10  ray which revealed fluid around his left lung. A thoracentesis was performed and one

11  liter of fluid was drained from his lungs. The fluid was tested and returned positive for

12  cancer cells. Plaintiff was then referred to an oncologist who ordered a second

13  thoracentesis on December 22, 2010, which resulted in the diagnosis of malignant pleural

14  mesothelioma.

15      For further response, Plaintiff defers to his medical records. Please see Plaintiff's

16  List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and

17  C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they

18  have obtained to date. Authorizations for the Release of Records, including medical

19  records, are attached hereto as Exhibit D. Pursuant to General Order No. 23, the

20  medical, imaging, and billing records presently within Plaintiff's possession, custody and

21  control can be obtained from our record service by contacting them as follows: Written

22  Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972) 488-

23  5555 (Knowles, Lee). Additionally, Plaintiffs' records are available to Defendants

24  through subpoena.

25  INTERROGATORY NO. 32:

26      If you have complained to anyone at any place of employment within the last ten years

27  of inability to perform the employment assigned to you, state the following for each such

28  complaint:

a.    The date you made the complaint;

b.    The nature of the complaint you made; and

c.    The name and address of your employer and the name of the person to whom you made the complaint.

**RESPONSE TO INTERROGATORY NO. 32 a-c.:**

    **Not applicable as Plaintiff was retired at the time of diagnosis.**

INTERROGATORY NO. 33:

    If you have ever had any reason to believe or suspect that your complaints, symptoms, adverse reactions or injuries described in Interrogatory No. 31 may have been caused by factors other than exposure to asbestos (including, but not limited to, smoking, heart disease, exposure to lung irritants other than asbestos, or pulmonary diseases such as emphysema, pneumonia, asthma, or bronchitis), state:

a.    The other factors or reasons you believe or suspect are involved;

b.    The names, addresses and telephone numbers of any physicians who indicated that other factors or reasons could be involved; and

c.    The dates those physicians told you that they believed or suspected that other factors or reasons might be involved.

**RESPONSE TO INTERROGATORY NO. 33:**

    **Upon information and belief, no.**

INTERROGATORY NO. 34:

    If you claim that injuries you have sustained from asbestos exposure have limited or adversely affected your ability to work in any way, state the following:

a.    The nature of the limitation, when it began, and how it has progressed; and

b.    The change, if any, in your job duties as a result of the limitation.

**RESPONSE TO INTERROGATORY NO. 34 a-b:**

    **Plaintiff has been retired since 1992.**

INTERROGATORY NO. 35:

    If you claim that injuries you have sustained from asbestos exposure have limited or

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

adversely affected your non-occupational lifestyle and activities, state the nature of the limitation or change, when it began, and how it has progressed.

**RESPONSE TO INTERROGATORY NO. 35:**

Since October 2010, Plaintiff has developed multiple physical symptoms and undergone numerous medical tests and procedures, which resulted in the diagnosis of malignant pleura mesothelioma on December 22, 2010. Plaintiff incorporates his response to General Order Standard Interrogatory Number 31, above, as if set forth fully herein, for a more detailed description of same. Each of these tests and procedures caused pain, discomfort, and required recovery time, limiting Plaintiff's mobility, activity, and enjoyment of life.

Plaintiff's current symptoms include general pain as well as feelings of weakness and lethargy, and continuing shortness of breath. Plaintiff's medical treatments, medications and increasing pain levels have affected his ability to engage in his usual activities of daily living in the same manner as before the onset of symptoms and complications of his mesothelioma. Further, his relationships with family and friends have been adversely affected and he is limited in enjoying his favorite recreational activities.

In addition to the physical changes he has experienced, Plaintiff has also experienced changes in his mental state. Upon information and belief, Plaintiff has experienced many of the recognized emotional stressors associated with dealing with mesothelioma including but not limited to: fear, anger, and apprehension over his future; anxiety over his diminished and dwindling ability to care for himself and provide for his wife and the stress of adjusting to being dependent upon others for his daily needs. Plaintiff has no further information responsive to this interrogatory at the present time. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend this response at any time.

V.     SMOKING HISTORY

**INTERROGATORY NO. 36:**

1    If you have ever used tobacco products of any type, state fully and in detail:

2    a.    The type of tobacco product you have used;

3    b.    Whether you inhaled the smoke;

4    c.    The daily frequency with which you smoke or have smoked;

5    d.    The dates and time periods during which you have smoked;

6    e.    For any time period during which you ceased using tobacco products, your reasons

7    for stopping;

8    f.    For any time period that you commenced using tobacco products after a period of

9    having stopped, your reasons for beginning again;

10    g.    If you have smoked cigarettes, state the brand name and the average number of

11   packs smoked per day for each year you have smoked, together with the inclusive dates you have

12   smoked cigarettes (e.g. Lucky Strikes; one pack per day between 1930 and 1931, two packs per

13   day between 1931 and 1960; 1930-1960);

14    h.    If you have smoked cigarettes, whether they were or are filtered or unfiltered;

15    i.    If you have ever been advised by any physician to stop smoking or to stop using

16   other tobacco products and, if so, the date and the name and address of each physician who gave

17   any such advice, and whether you followed such advice;

18    j.    If you have ever been advised by any physician that you suffered from any illness,

19   disease or physician condition as a result of smoking or the use of other tobacco products, and if

20   so, the date, and the name and address of each physician who gave such advice.

21   **RESPONSE TO INTERROGATORY NO. 36:**

22    **a.   Cigarettes**

23    **b.   Yes.**

24    **c.   Approximately one pack per day.**

25    **d.   On and Off from 1948 - 1972**

26    **e.   Not applicable**

27    **f.   Not applicable**

28    **g.   Pall Mall, Camel**

1    **h. Filtered and Unfiltered**

2    **i. No.**

3    **j. No.**

4  INTERROGATORY NO. 37:

5      If you have ever given a smoking history to a physician, nurse, insurance carrier, worker's

6  compensation board, or employer that is inconsistent in any way with the smoking history given

7  in response to the previous interrogatory state:

8      a.    The date the inconsistent smoking history was given;

9      b.    The name and address of the individual or entity to whom the inconsistent smoking

10  history was given;

11      c.    The discrepancy between the inconsistent smoking history and the smoking history

12  given in response to the previous interrogatory; and

13      d.    The reason for the inconsistency.

14  **RESPONSE TO INTERROGATORY NO. 37:**

15      **Not applicable.**

16  VI.    DAMAGES

17  INTERROGATORY NO. 38:

18      State the total hospital expenses, if any, that you have incurred to date as a result of the

19  injuries, complaints, etc., which you attribute to your alleged exposure to asbestos, itemizing

20  each charge, if more than one hospital is involved.

21  **RESPONSE TO INTERROGATORY NO. 38:**

22      **Plaintiff's total hospital expense is unknown at this time, is ongoing, continues to**

23  **accrue and will be subject to proof at the trial of this case. For further response, Plaintiff**

24  **defers to his medical records. Please see Plaintiff's List of Physicians and his List of**

25  **Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches**

26  **hereto as Exhibit F copies of the medical records they have obtained to date.**

27  **Authorizations for the Release of Records, including medical records, are attached**

28  **hereto as Exhibit G. Pursuant to General Order No. 23, the medical, imaging, and billing**

1 records presently within Plaintiff's possession, custody and control can be obtained from
2 our record service by contacting them as follows: Written Deposition Service, LP, 1750
3 Valley View Lane, Suite 210, Dallas, TX 75234 (972) 488-5555. (Knowles, Lee).
4 Additionally, Plaintiff's records are available to Defendants through subpoena.

5 INTERROGATORY NO. 39:

6 State the total medical expenses (other than hospitalization) which you have incurred, or
7 which has been incurred on your behalf, to date, as a result of the injuries, complaints, etc., which
8 you attribute to your alleged exposure to asbestos, itemizing each such charge.

9 **RESPONSE TO INTERROGATORY NO. 39:**

10 Plaintiff's total medical expenses are unknown at this time, are ongoing, continue
11 to accrue and will be subject to proof at the trial of this case. For further response,
12 Plaintiff defers to his medical records. Please see Plaintiff's List of Physicians and his
13 List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff
14 attaches hereto as Exhibit F copies of the medical records they have obtained to date.
15 Authorizations for the Release of Records, including medical records, are attached
16 hereto as Exhibit D. Pursuant to General Order No. 23, the medical, imaging, and billing
17 records presently within Plaintiff's possession, custody and control can be obtained from
18 our record service by contacting them as follows: Written Deposition Service, LP, 1750
19 Valley View Lane, Suite 210, Dallas, TX 75234 (972) 488-5555 (Knowles, Lee).
20 Additionally, Plaintiff's records are available to Defendants through subpoena.

21 INTERROGATORY NO. 40:

22 If any person has contributed any money, goods, services, or benefits of any kind,
23 during the previous ten years for the support of either yourself or your spouse, identify each
24 such person, and, in addition, state:

25     a.    Their relationship to you;
26     b.    If deceased, the date and place of their death; and
27     c.    The nature and amount of any money, goods, services or benefits contributed to the
28 support of yourself or your spouse, together with dates on which or during which such support

1  was received.

2  **RESPONSE TO INTERROGATORY NO. 40:**

3      Not applicable.

4  INTERROGATORY NO. 41:

5      If any insurance company, union, or other person, firm or corporation has paid for or

6  reimbursed you or anyone on your behalf for, or has become obligated to pay for or reimburse

7  you or anyone on your behalf for, any medical or hospital expense incurred by the alleged

8  exposure to asbestos, list such expenses, itemizing the dates incurred, the nature of such

9  expense, and the name and address of the insurance company, union person, firm or

10  corporation who or which has paid or is obligated for the payment for, or reimbursement for,

11  said expenses.

12  **RESPONSE TO INTERROGATORY NO. 41:**

13      **Plaintiff has medical coverage through Medicare A & B, ID No. 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 and**

14  **TriCare for Life, ID No. 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. For further response, Plaintiff defers to his medical**

15  **records. Please see Plaintiff's List of Physicians and his List of Hospitals, which are**

16  **attached hereto as Exhibits B and C, respectively. Plaintiffs attach hereto as Exhibit F**

17  **copies of the medical records they have obtained to date. Authorizations for the Release of**

18  **Records, including medical records, are attached hereto as Exhibit D. Pursuant to**

19  **General Order No. 23, the medical, imaging, and billing records presently within**

20  **Plaintiffs' possession, custody and control can be obtained from our record service by**

21  **contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite**

22  **210, Dallas, Houston, TX 75234 (800-346-4405) (Knowles, Lee). Additionally, Plaintiff's**

23  **records are available to Defendants through subpoena.**

24  INTERROGATORY NO. 42:

25      If you claim you have suffered any wage or earning loss as a result of your alleged

26  exposure to asbestos, state:

27      a.    The amount of time lost from work or employment, together with the date(s)

28  involved and the name and address of the employer;

b.     The gross amount of salary or earnings which you received from each payday, stating the intervals of such paydays;

c.     The gross amount of salary or earnings actually lost;

d.     Of the total sum stated in the response to subpart (c) of this interrogatory, the amount that would be your net take-home pay after deduction of taxes and all other authorized deductions;

e.     If self-employed, state the total time lost from business, listing the dates involved and the gross financial loss to you, stating the nature of such loss and how incurred; and

f.     Of the total sum stated in response to subpart (e) of this interrogatory, the amount that would be your net loss after deduction of taxes.

**RESPONSE TO INTERROGATORY NO. 42 a-f:**

    **Plaintiff has been retired since 1992.**

INTERROGATORY NO. 43:

    If you have incurred any expense or financial loss, including property damage, other than as listed above, which you attribute in any degree to your exposure to asbestos, state such financial losses, expenses and property damage, giving the dates incurred, the amount involved, and the nature of each such expense or loss.

**RESPONSE TO INTERROGATORY NO. 43:**

    **In addition to medical expenses and hospital expenses, Plaintiff has incurred prescription medication and travel expenses while seeking consultation/treatment with his doctors. The total amount of these expenses is unknown at the present time. These expenses began accruing shortly after Plaintiff's diagnosis of malignant mesothelioma, are ongoing, continuing to accrue and will be subject to proof at trial.**

    **For further response, Plaintiff defers to his medical records. Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have obtained to date. Authorizations for the Release of Records, including medical records, are attached hereto as Exhibit D. Pursuant to General Order No. 23, the medical, imaging,**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1  and billing records presently within Plaintiff's possession, custody and control can be

2  obtained from our record service by contacting them as follows: Written Deposition

3  Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972) 488-5555 (Knowles,

4  Lee). Additionally, Plaintiff's records are available to Defendants through subpoena.

5       Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right

6  to amend this response at any time.

7  INTERROGATORY NO. 44:

8       If any insurance company, union or other person, firm or corporation has paid for or

9  reimbursed you for, or has become obligated to pay for or reimburse you or anyone on your

10 behalf for, any sums or money (excluding medical or hospital expenses) to provide any of the

11 following: disability or other benefits, loss of earnings, property damage or any other item

12 resulting from the alleged exposure to asbestos, state:

13       a.    The sum or sums of money expended, itemizing the dates incurred;

14       b.    The nature of the obligation giving rise to the payment or reimbursement; and

15       c.    The name and address of the insurance company, union or other person, firm or

16 corporation, which has paid for, or is obligated for payment or reimbursement for, such sums of

17 money.

18 RESPONSE TO INTERROGATORY NO. 44 a-c:

19       Plaintiff has medical coverage through Medicare A & B, ID No. 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 and

20 TriCare for Life, ID No. 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. For further response, Plaintiff defers to his medical

21 records. Please see Plaintiff's List of Physicians and his List of Hospitals, which are

22 attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F

23 copies of the medical records they have obtained to date. Authorizations for the Release of

24 Records, including medical records, are attached hereto as Exhibit D. Pursuant to

25 General Order No. 23, the medical, imaging, and billing records presently within

26 Plaintiff's possession, custody and control can be obtained from our record service by

27 contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite

28 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are

1  available to Defendants through subpoena.  Plaintiff's investigation and discovery are

2  continuing and Plaintiff reserves the right to amend this response at any time.

3  INTERROGATORY NO. 45:

4      If you claim any damages for pain and suffering, state:

5      a.    The amount of damages so claimed;

6      b.    The extent, duration, intensity and nature of the pain and suffering;

7      c.    The specific cause of such pain and suffering;

8      d.    The treatment, if any, prescribed for relief of such pain and suffering and the name

9  and address of each person prescribing such treatment;

10      e.    All drugs used for the relief of pain or other symptoms of the diseases alleged,

11  specifically identifying the precise name of the drug, precise quantity prescribed for each dose

12  and the number of doses or applications of all such drugs;

13      f.    Provide the information sought in subpart (e) of this interrogatory with respect to

14  all medicines other than drugs.

15  **RESPONSE TO INTERROGATORY NO. 45 a-f:**

16      a.  Plaintiff believes this should be determined by the jury in this case and therefore

17  defers to the empanelled jury to determine the appropriate amount of damages.  It is

18  believed that the evidence will support a verdict for damages in the amount of

19  $6,000,000.00 to $12,000,000.00, or more.

20      b.  Plaintiff has sustained and will continue to experience physical pain and mental

21  suffering directly resulting from, but not limited to: his medical procedures and

22  treatments, including those referenced above in Plaintiff's response to General Order

23  Standard Interrogatory number 31, which is incorporated by reference as if set forth fully

24  herein;  anxiety and apprehension in knowing that he is suffering from a life threatening

25  disease; impaired enjoyment of life, including being unable to partake in routine daily

26  activities in the same manner as he did prior to the onset of his symptoms and diagnosis;

27  the inability to engage in social and recreational activities and most importantly, the

28  inability to engage in normal family activities.  Plaintiff daily faces the certainty of a

1  painful and fatal disease, knowing that his pain and discomfort will increase and suffers

2  anxiety and apprehension over his worsening condition. Plaintiff's investigation and

3  discovery are continuing and Plaintiff reserves the right to amend this response at any

4  time.

5      c.    Malignant Pleural Mesothelioma.

6      d-f.  Plaintiff defers to his medical records as the best source of information for

7  the treatments prescribed to treat his condition and its pain and the medications he is

8  taking to diminish his physical symptoms.  For further response, Plaintiff defers to his

9  medical records.  Please see Plaintiff's List of Physicians and his List of Hospitals, which

10 are attached hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit

11 F copies of the medical records they have obtained to date. Authorizations for the Release

12 of Records, including medical records, are attached hereto as Exhibit D.  Pursuant to

13 General Order No. 23, the medical, imaging, and billing records presently within

14 Plaintiff's possession, custody and control can be obtained from our record service by

15 contacting them as follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite

16 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee).  Additionally, Plaintiff's records are

17 available to Defendants through subpoena.   Plaintiff is not currently receiving any

18 treatment for his mental pain and suffering.

19     Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right

20 to amend this response at any time.

21 VII.   KNOWLEDGE RE ASBESTOS

22 INTERROGATORY NO. 46:

23     If you ever received newspapers, newsletters or any other publications which discussed

24 the subject of worker exposure to asbestos, state:

25     a.    The name and type of publication;

26     b.    The date or dates that you recall such publication discussing the subject of asbestos

27 and the nature of said discussion.

28 **RESPONSE TO INTERROGATORY NO. 46:**

Plaintiff does not recall any such publications at this time. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend this response at any time.

INTERROGATORY NO. 47:

If you have ever attended any international or local union meetings, seminars, conferences or conventions where the subjects of occupational health and, in particular, exposure to asbestos was discussed, state:

    a.    The date and place of each such meeting, seminar, conference or convention;

    b.    Your reason and/or official capacity for attending;

    c.    The name and address of the speaker or speakers;

    d.    A summary of the information presented concerning exposure to asbestos; and

    e.    The names and addresses of any person with whom you discussed the information presented.

**RESPONSE TO INTERROGATORY NO. 47:**

**Upon information and belief, not applicable. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend this response at any time.**

INTERROGATORY NO. 48:

If you have ever been informed by any person in your local or international union of any possible hazards associated with exposure to asbestos, state:

    a.    The name and address of the individual(s) who furnished you with such information;

    b.    The date and place such information was furnished;

    c.    The manner in which such information was communicated to you;

    d.    The nature of such information furnished;

    e.    What action, if any, you took in response to such information.

**RESPONSE TO INTERROGATORY NO. 48:**

**Upon information and belief, not applicable. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend this response at any time.**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

INTERROGATORY NO. 49:

If you have ever completed, in whole or in part, or been requested to complete a questionnaire provided to you by any labor union, relating to the subjects of occupational health and/or exposure to asbestos, state as to each questionnaire:

    a.    The date you received the questionnaire;

    b.    The date you completed the questionnaire;

    c.    The name of the union providing the questionnaire;

    d.    The name and address of the individual, union or entity to whom the questionnaire was returnable;

    e.    Whether or not you possess a copy of the questionnaire as completed by you;

    f.    The name and address of each individual, union or entity possessing a copy of your completed questionnaire.

**RESPONSE TO INTERROGATORY NO. 49:**

**Upon information and belief, not applicable. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend this response at any time.**

INTERROGATORY NO. 50:

If you have ever received "dirty" pay, "dusty" pay, "asbestos" pay or any other similar additional compensation from any employer, state the name and address of the employer and dates of such payment.

**RESPONSE TO INTERROGATORY NO. 50:**

**Upon information and belief, not applicable. Plaintiff's investigation and discovery are continuing and Plaintiff reserves the right to amend this response at any time.**

INTERROGATORY NO. 51:

Did you at any time receive, have knowledge of, or possess a tangible copy of any advice, publication, warning, order, directive, requirement or recommendation, whether written or oral, which purported to:

    a.    Advise or warn you of the possible harmful effects of exposure to, or inhalation of, asbestos; or

b.     Advise or recommend as to techniques, methods, or equipment which would serve
to reduce or guard against such potentially dangerous exposure?

**RESPONSE TO INTERROGATORY NO. 51:**

Plaintiff objects to this interrogatory on the grounds that it calls for the disclosure of
information protected by the attorney-client privilege and/or the attorney work-product
doctrine. Subject to these objections and without waiving the same, upon information and
belief, Plaintiff did not learn about the hazardous nature of asbestos until well after he had
been exposed.

INTERROGATORY NO. 52:

If your response to the preceding interrogatory is yes, please state:

a.     The nature and exact wording of such advice, warning, recommendation, etc.;

b.     The complete identify of each source of such advice, warning, recommendation,
etc.; and

c.     The date, time, place, manner and circumstances when each such advice, warning,
recommendation, etc., was given, and to whom it was given.

**RESPONSE TO INTERROGATORY NO. 52:**

Plaintiff objects to this interrogatory on the grounds that it calls for the disclosure
of information protected by the attorney-client privilege and/or the attorney work-
product doctrine. Subject to these objections and without waiving the same, upon
information and belief, Plaintiff did not learn about the hazardous nature of asbestos until
well after he had been exposed.

VII.    PRIOR AND SUBSEQUENT CLAIMS AND LITIGATION

INTERROGATORY NO. 53:

If you have ever made a claim for personal injury or filed an action or proceeding in any
court of other forum, other than in the present matter, please state:

a.     The nature of such injury or injuries;

b.     The date when such injury or injuries were sustained in each instance, the place of
occurrence, and the nature of the incident or accident causing the injury;

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

c.      The names and addresses of all persons and companies to whom such claims were made;

d.      The present status of such claims (pending, settled, dismissed, etc.,);

**RESPONSE TO INTERROGATORY NO. 53:**

     **Not applicable.**

INTERROGATORY NO. 54:

     If you have ever filed a claim in order to receive benefits from either F.E.L.A., F.E.C.A., L.H.W.C.A. or the State of California (or any other state) Workers' Compensation Fund for an occupational injury, including, but not limited to, one arising out of exposure to asbestos, for each claim state:

a.      The date the claim was filed;

b.      The basis for the claim;

c.      The organization to whom the claim was presented;

d.      The present status of the claim;

e.      Whether you have received benefits as a result of the claim;

f.      The amount of any benefit received; and

g.      The date you first received such benefits.

**RESPONSE TO INTERROGATORY NO. 54:**

     **Not applicable.**

IX.     INSURANCE

INTERROGATORY NO. 55:

     Identify all insurance policies by which you are currently covered, including health, life, disability or accident insurance. As to each, state fully and in detail:

a.      The name and address of each insurance carrier and number;

b.      The amount of insurance coverage provided by the policy;

c.      The name and address of the person or entity having possession of the policy;

d.      The name and address of the person or entity having possession of the policy;

e.      The named insured of the insured policy;

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1    f.    The type of policy;

2    g.    The date and place of any medical examination you underwent incidental to

3    applying for, obtaining or retaining the policy;

4    h.    The name of the physician or other medical personnel conducting any examination

5    identified in response to subpart (g);

6    i.    The results or findings of any such examination; and

7    j.    The identity of any written reports or other documents prepared with respect to any

8         such examination.

9    **RESPONSE TO INTERROGATORY NO. 55 a-j:**

10   **a-f.   Plaintiff has medical coverage through Medicare A & B, ID No. 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**

11   **and TriCare for Life, ID No. 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.   Please see Plaintiff's List of Physicians and his**

12   **List of Hospitals, which are attached hereto as Exhibits B and C, respectively.   Plaintiffs**

13   **attach hereto as Exhibit F copies of the medical records they have obtained to date.**

14   **Authorizations for the Release of Records, including medical records, are attached hereto**

15   **as Exhibit D.   Pursuant to General Order No. 23, the medical, imaging, and billing records**

16   **presently within Plaintiffs' possession, custody and control can be obtained from our**

17   **record service by contacting them as follows:   Written Deposition Service, LP, 1750 Valley**

18   **View Lane, Suite 210, Dallas, TX 75234 (800)-346-4405 (Knowles, Lee).   Additionally,**

19   **Plaintiff's records are available to Defendants through subpoena.**

20   **g-j.    Not applicable.**

21   **INTERROGATORY NO. 56:**

22        If you have ever been refused insurance coverage for health, life, disability or accident

23   insurance, whether by way of denial of the initial application, refusal to renew an existing policy

24   or cancellation of an existing policy, state:

25   a.    The date your application was made;

26   b.    The name and address of the insurance carrier and the insurance carrier's agent to

27   whom your application was made;

28   c.    The type of insurance for which you applied;

30

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1       d.      The date and reason your application was rejected; and

2       e.      The date, nature, and findings of any physical examination (including x-rays)

3   which was performed on you in connection with your application, together with the name and

4   address of the examining physician, nurse, or institution.

5   **RESPONSE TO INTERROGATORY NO. 56 a-e:**

6       **Not applicable.**

7   INTERROGATORY NO. 57:

8       If you have ever at any time made a claim for or received any health or accident

9   insurance benefits, workers' compensation payment, disability benefits, pensions, accident

10  compensation payments or veteran's disability compensation awards, state for each claim:

11      a.      The circumstances under which you made the claim for benefits, awards, or

12  payments;

13      b.      The illness, injury or injuries for which you made the claim for benefits, awards or

14  payments;

15      c.      The name and address of your employer(s) at the time of the injury or illness for

16  which you made the claim;

17      d.      The name and address of the examining doctor(s) for each injury or illness;

18      e.      The name and address of the superiors, officers, boards, or tribunals before which

19  or to whom the claim was made or filed, and the date the claim was made or filed;

20      f.      The amount of the benefits, awards, or payments you received or will receive, if

21  any;

22      g.      The dates you received the benefits, awards or payments; and

23      h.      The identity of the agencies or insurance companies from whom you received the

24  awards, benefits or payments.

25  **RESPONSE TO INTERROGATORY NO. 57 a-h:**

26      **See response to Interrogatory No. 20.**

27  X.      MEDICAL RECORDS

28  INTERROGATORY NO. 58:

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

If you or your attorney have any medical reports from any persons, hospitals, doctors or medical practitioners or institutions that have ever treated or examined you at any time, please attach copies of your reports to these interrogatories. If you will not voluntarily attach copies of the reports to the answer to these interrogatories, then state:

    a.    The identity of each report date, subject matter, name, address, or job title or capacity of the person(s) to whom it is addressed or directed, and the job title or capacity of the person or persons who prepared the same;

    b.    The reason why each report was prepared;

    c.    The name, job title, address, and present whereabouts of the person who has present custody or control thereof.

**RESPONSE TO INTERROGATORY NO. 58:**

**Plaintiff defers to his medical records. Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have obtained to date. Authorizations for the Release of Records, including medical records, are attached hereto as Exhibit D. Pursuant to General Order No. 23, the medical, imaging, and billing records presently within Plaintiff's possession, custody and control can be obtained from our record service by contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to Defendants through subpoena.**

XI.    EMPLOYMENT

INTERROGATORY NO. 59:

For each employer in whose employ you believe you were exposed to asbestos, state:

    a.    The employer's name, address, and telephone number, and the dates of your employment;

    b.    Your job title and a description of your duties;

    c.    The manner of exposure, the duration and time period of exposure and the type of products (e.g., insulation, cement, etc.) to which you were exposed;

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

d. The location of each job site, including the name of each plant and the state and city where located, along with the beginning and ending dates of each such job;

e. If you have at any time worked in a shipyard, identify the names of all ships upon which you worked;

f. For each such job with regard to subparts (d) and (e), state the name and last known address of all persons with whom you worked regularly on such jobs;

g. For reach such job with regard to subparts (d) and (e), state the name and lat known address of all person with whom you worked regularly on such job.

RESPONSE TO INTERROGATORY NO. 59 a-g:

See Plaintiff's Work History Sheet attached hereto as Exhibit "A."

Upon information and belief, Plaintiffs believe, and therefore allege, that Plaintiff LEE E. KNOWLES was exposed to various asbestos-containing products and/or equipment through his work from 1953 through 1992:

In 1953, LEE E. KNOWLES worked as a laborer for Guthrie Construction. Doing this various work, Plaintiff recalls working with and around products and equipment designed, manufactured, and/or distributed by the following entities: CALAVERAS ASBESTOS, LTD (as a supplier of asbestos fiber); CERTAINTEED CORPORATION (for transite pipe); FAMILIAN CORPORATION (sued individually and successor-in-interest to FAMILIAN PIPE & SUPPLY) (as a supplier of transite pipe); FERGUSON ENTERPRISES, INC. (sued as successor-in-interest to INDUSTRY SUPPLY) (as a supplier of transite pipe); FORMOSA PLASTICS CORPORATION U.S.A (sued individually and as parent, alter ego and successor-in-interest to J-M A/C PIPE CORPORATION) (as a supplier of asbestos-containing cement pipe); GRINNELL LLC d/b/a GRINNELL CORPORATION (as a supplier of transite pipe); HAJOCA CORPORATION (as a supplier of transite pipe); KEENAN PROPERTIES, INC. (as a distributor of transite pipe); MS2G, INC. (sued individually and as successor-in-interest to MARDEN SUSCO, INCORPORATED) (as a supplier of asbestos-containing pipe); METROPOLITAN LIFE INSURANCE COMPANY (as a Conspiracy Defendant);

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1  OCCIDENTAL CHEMICAL CORPORATION f/k/a HOOKERS CHEMICAL CO. (as a

2  supplier of asbestos fiber); UNION CARBIDE CORPORATION (as a supplier of asbestos

3  fibers); and WESTBURNE SUPPLY, INC. (sued as successor to P. E. O'HAIR &

4  COMPANY f/k/a O'HAIR SUPPLY COMPANY, successor to J.R. DETERDING, INC.)

5  (as a supplier of transite pipe).

6       Further, from 1955 to 1958 and then again from 1970 to 1975, LEE E. KNOWLES

7  worked as an instrumentation mechanic at Inland Empire Paper Company. Doing this

8  various work, Plaintiff recalls working with and around products and equipment

9  designed, manufactured, and/or distributed by the following entities: ABB, INC. (s/b/m to

10  ELSAG BAILEY, INC. (sued individually and as successor-in-interest to BAILEY

11  CONTROLS COMPANY) (for Bailey controls); A.W. CHESTERTON COMPANY (for

12  gaskets and packing); ALFA LAVAL, INC. (sued individually and as successor-in-interest

13  to THE DELAVAL SEPARATOR COMPANY and SHARPLES CORPORATION) (for

14  DeLaval purifiers and Sharples oil purifiers); AMTROL, INC. (sued individually and as

15  successor-in-interest to THRUSH COMPANY and H.A. THRUSH COMPANY) (for HA

16  Thrush pumps); ARMSTRONG INTERNATIONAL, INC. for Armstrong steam traps);

17  BLACKMER PUMP COMPANY (for Blackmer pumps); BW/IP INTERNATIONAL,

18  INC. (sued individually and as successor-in-interest to BYRON JACKSON PUMP

19  COMPANY) (for Byron Jackson pumps); CALAVERAS ASBESTOS, LTD (as a supplier

20  of asbestos fiber); CBS CORPORATION f/k/a VIACOM, INC. (sued as successor-by-

21  merger  to  CBS  CORPORATION  f/k/a  WESTINGHOUSE  ELECTRIC

22  CORPORATION) (for Westinghouse blowers, turbines, exhausters, valves, pumps,

23  emergency generators and diesel generators); CLA-VAL CO. (for Cla-Val valves);

24  CRANE  CO.  (sued individually  and  as  successor-in-interest  to  COCHRANE

25  CORPORATION and DEMING PUMP COMPANY) (for Crane valves, Cranite gaskets,

26  Deming pumps and Cochrane heaters); CRANE ENVIRONMENTAL, INC. (sued

27  individually and as successor-in-interest to COCHRANE CORPORATION ) (for

28  Cochrane heaters); CROWN CORK & SEAL COMPANY, INC. (sued individually and

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

as successor-in-interest to MUNDET CORK COMPANY) (for Mundet block insulation, cement and pipe covering); DOVER CORPORATION (sued as successor to BLACKMER PUMP CO.) (for Blackmer pumps); EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.) (for Cutler Hammer control panels); FISHER CONTROLS INTERNATIONAL, LLC (for Fisher valves); FMC CORPORATION (sued individually and as successor-in-interest to PEERLESS PUMP COMPANY) (for Peerless pumps); GOULDS PUMPS, INC. (for Goulds pumps); HOPEMAN BROTHERS INC. (for asbestos-containing marinate and micarta board); IMO INDUSTRIES, INC. (sued individually and as successor in-interest to DELAVAL TURBINE, INC, and also to C.H. WHEELER MANUFACTURING COMPANY) (for DeLaval turbines and pumps, and C.H. Wheeler air ejectors and condensers); INDUSTRIAL HOLDINGS CORPORATION f/k/a THE CARBORUNDUM COMPANY (for grinding wheels); INGERSOLL RAND COMPANY (sued individually and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON MACHINE CO, AND ALDRICH PUMP COMPANY) (for Ingersoll Rand pumps and compressors, Aldrich pumps, Terry Turbines, and Whiton turbines); ITT CORPORATION, f/k/a ITT INDUSTRIES, INC. (sued individually and as successor-in-interest to BELL & GOSSETT) (for Bell & Gossett pumps); J.T. THORPE & SON, INC. (as a boiler contractor and supplier of asbestos-containing insulation); JOHN CRANE, INC. (for land-based gaskets and packing); METROPOLITAN LIFE INSURANCE COMPANY (as a Conspiracy Defendant); THE NASH ENGINEERING COMPANY (for Nash pumps); OCCIDENTAL CHEMICAL CORPORATION f/k/a HOOKERS CHEMICAL CO. (as a supplier of asbestos fiber); SAINT-GOBAIN ABRASIVES, INC. (sued as successor to NORTON COMPANY) (for Norton grinding wheels); STERLING FLUID SYSTEMS (USA), LLC f/k/a PEERLESS PUMP COMPANY) (for Peerless Pumps); SULZER PUMPS (US), INC. d/b/a SULZER PUMPS HOUSTON, INC. (sued as successor-in-interest to PACO PUMPS f/k/a PACIFIC PUMPING COMPANY) (for Paco pumps); THRUSH CO., INC. (for H.A. Thrush pumps); UNION CARBIDE CORPORATION (as a supplier of asbestos fibers); VELAN

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

VALVE CORPORATION (for Velan valves); WARREN PUMPS, LLC. (for Warren pumps); WEIR VALVES & CONTROLS USA, INC. f/k/a ATWOOD & MORRILL (for Atwood & Morrill valves); THE WILLIAM POWELL COMPANY (for Powell valves); and YARWAY CORPORATION (for Yarway valves and steam traps).

Further, from 1958 to 1964, LEE E. KNOWLES worked as an instrumentation mechanic at Bailey Controls. Doing this various work, Plaintiff recalls working with and around products and equipment designed, manufactured, and/or distributed by the following entities: ABB, INC. (s/b/m to ELSAG BAILEY, INC. (sued individually and as successor-in-interest to BAILEY CONTROLS COMPANY) (for Bailey controls); A.W. CHESTERTON COMPANY (for gaskets and packing); ALFA LAVAL, INC. (sued individually and as successor-in-interest to THE DELAVAL SEPARATOR COMPANY and SHARPLES CORPORATION) (for DeLaval purifiers and Sharples oil purifiers); AMTROL, INC. (sued individually and as successor-in-interest to THRUSH COMPANY and H.A. THRUSH COMPANY) (for HA Thrush pumps); ARMSTRONG INTERNATIONAL, INC. for Armstrong steam traps); BLACKMER PUMP COMPANY (for Blackmer pumps); BECHTEL CORPORATION (as a contractor); BW/IP INTERNATIONAL, INC. (sued individually and as successor-in-interest to BYRON JACKSON PUMP COMPANY) (for Byron Jackson pumps); CALAVERAS ASBESTOS, LTD (as a supplier of asbestos fiber); CBS CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION) (for Westinghouse blowers, turbines, exhausters, valves, pumps, emergency generators and diesel generators, and as a Premises Defendant); CLA-VAL CO. (for Cla-Val valves); CLEAVER-BROOKS, INC. f/k/a AQUA-CHEM, INC., d/b/a CLEAVER-BROOKS DIVISION (for Cleaver-Brooks boilers); CRANE CO. (sued individually and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP COMPANY) (for Crane valves, Cranite gaskets, Deming pumps and Cochrane heaters); CRANE ENVIRONMENTAL, INC. (sued individually and as successor-in-interest to COCHRANE CORPORATION ) (for Cochrane heaters); CROWN CORK &

1  SEAL COMPANY, INC. (sued individually and as successor-in-interest to MUNDET
2  CORK COMPANY) (for Mundet block insulation, cement and pipe covering); DOVER
3  CORPORATION (sued as successor to BLACKMER PUMP CO.) (for Blackmer pumps);
4  EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.) (for Cutler
5  Hammer control panels); FISHER CONTROLS INTERNATIONAL, LLC (for Fisher
6  valves); FMC CORPORATION (sued individually and as successor-in-interest to
7  PEERLESS PUMP COMPANY) (for Peerless pumps); FOSTER WHEELER ENERGY
8  CORPORATION (for Foster Wheeler land-based boilers); GENERAL ELECTRIC
9  COMPANY (for General Electric turbines, ship's service generators and condensers);
10 GOULDS PUMPS, INC. (for Goulds pumps); HOPEMAN BROTHERS INC. (for
11 asbestos-containing marinate and micarta board); IMO INDUSTRIES, INC. (sued
12 individually and as successor in-interest to DELAVAL TURBINE, INC, and also to C.H.
13 WHEELER MANUFACTURING COMPANY) (for DeLaval turbines and pumps, and
14 C.H. Wheeler air ejectors and condensers); INDUSTRIAL HOLDINGS CORPORATION
15 f/k/a THE CARBORUNDUM COMPANY (for grinding wheels); INGERSOLL RAND
16 COMPANY (sued individually and as successor-in-interest to TERRY STEAM
17 TURBINE COMPANY, WHITON MACHINE CO, AND    ALDRICH PUMP
18 COMPANY) (for Ingersoll Rand pumps and compressors, Aldrich pumps, Terry
19 Turbines, and Whiton turbines); ITT CORPORATION, f/k/a ITT INDUSTRIES, INC.
20 (sued individually and as successor-in-interest to BELL & GOSSETT) (for Bell & Gossett
21 pumps); J.T. THORPE & SON, INC. (as a boiler contractor and supplier of asbestos-
22 containing insulation); JOHN CRANE, INC. (for land-based gaskets and packing);
23 METROPOLITAN LIFE INSURANCE COMPANY (as a Conspiracy Defendant);
24 MS2G, INC. (sued individually and as successor-in-interest to MARDEN SUSCO,
25 INCORPORATED) (as a supplier of asbestos-containing pipe); THE NASH
26 ENGINEERING COMPANY (for Nash pumps); OCCIDENTAL CHEMICAL
27 CORPORATION f/k/a HOOKERS CHEMICAL CO. (as a supplier of asbestos fiber);
28 SAINT-GOBAIN ABRASIVES, INC. (sued as successor to NORTON COMPANY) (for

1  Norton grinding wheels); SCHNEIDER ELECTRIC USA, INC. f/k/a SQUARE D
2  COMPANY (for Square D electrical panels); STERLING FLUID SYSTEMS (USA), LLC
3  f/k/a PEERLESS PUMP COMPANY) (for Peerless Pumps); SULZER PUMPS (US), INC.
4  d/b/a  SULZER PUMPS HOUSTON, INC. (sued as successor-in-interest to PACO
5  PUMPS f/k/a PACIFIC PUMPING COMPANY) (for Paco pumps); SYD CARPENTER,
6  MARINE CONTRACTOR, INC. (as an insulation and decking contractor); THRUSH
7  CO., INC. (for H.A. Thrush pumps); UNION CARBIDE CORPORATION (as a supplier
8  of asbestos fibers); VELAN VALVE CORPORATION (for Velan valves); WARREN
9  PUMPS, LLC. (for Warren pumps); WEIR VALVES & CONTROLS USA, INC. f/k/a
10  ATWOOD & MORRILL (for Atwood & Morrill valves); THE WILLIAM POWELL
11  COMPANY (for Powell valves); and YARWAY CORPORATION (for Yarway valves
12  and steam traps).

13      While Plaintiff LEE E. KNOWLES did the aforementioned work for Bailey
14  Controls between 1958 and 1964, Plaintiff recalls working with and around the products
15  and equipment designed, manufactured, and/or distributed by the entities listed above in
16  and on the real property of the following entities: AMCORD, INC. d/b/a RIVERSIDE
17  CEMENT COMPANY (as a Premises Defendant); ATLANTIC RICHFIELD COMPANY
18  (as a Premises Defendant); BRIDGESTONE AMERICAS, INC. (sued as successor-in-
19  interest to FIRESTONE TIRE & RUBBER COMPANY) (as a Premises Defendant); CBS
20  CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to CBS
21  CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION) (as a Premises
22  Defendant); CITY OF LOS ANGELES (as a Premises Defendant); CONOCOPHILLIPS
23  COMPANY (sued as successor to TIDEWATER OIL COMPANY) (as a Premises
24  Defendant); FREEPORT-McMoRan COPPER & GOLD, INC. (sued as successor-by-
25  merger to PHELPS DODGE CORPORATION) (as a Premises Defendant); GENERAL
26  MILLS, INC. (as a Premises Defendant); GENERAL PETROLEUM CORPORATION
27  (as a Premises Defendant); THE GOODYEAR TIRE & RUBBER COMPANY (as a
28  Premises Defendant); HANSON PERMANENTE CEMENT, INC. f/ka KAISER

1  CEMENT CORPORATION) (as a Premises Defendant); KIMBERLY-CLARK

2  CORPORATION (as a Premises Defendant); LOS ANGELES DEPARTMENT OF

3  WATER AND POWER (as a Premises Defendant); PABST BREWING COMPANY

4  (sued individually and as successor to JOSEPH SCHLITZ BREWING COMPANY) (as a

5  Premises Defendant); RIO TINTO MINERALS, INC. (sued as successor to PACIFIC

6  COAST BORAX) (as a Premises Defendant); SAN DIEGO GAS & ELECTRIC

7  COMPANY (as a Premises Defendant); SOUTHERN CALIFORNIA EDISON

8  COMPANY (as a Premises Defendant); and UNITED STATES STEEL CORPORATION

9  (as a Premises Defendant); WILSEY BENNETT, INC. (sued as successor-by-merger to

10  VEGETABLE OIL PRODUCTS COMPANY, INC.) (as a Premises Defendant).

11      Further, from 1964 to 1969, LEE E. KNOWLES worked as an instrumentation

12  mechanic at Ketchikan Pulp. Doing this various work, Plaintiff recalls working with and

13  around products and equipment designed, manufactured, and/or distributed by the

14  following entities: ABB, INC. (s/b/m to ELSAG BAILEY, INC. (sued individually and as

15  successor-in-interest to BAILEY CONTROLS COMPANY) (for Bailey controls); A.W.

16  CHESTERTON COMPANY (for gaskets and packing); ALFA LAVAL, INC. (sued

17  individually and as successor-in-interest to THE DELAVAL SEPARATOR COMPANY

18  and SHARPLES CORPORATION) (for DeLaval purifiers and Sharples oil purifiers);

19  AMTROL, INC. (sued individually and as successor-in-interest to THRUSH COMPANY

20  and H.A. THRUSH COMPANY) (for HA Thrush pumps); ARMSTRONG

21  INTERNATIONAL, INC. for Armstrong steam traps); BLACKMER PUMP COMPANY

22  (for Blackmer pumps); BW/IP INTERNATIONAL, INC. (sued individually and as

23  successor-in-interest to BYRON JACKSON PUMP COMPANY) (for Byron Jackson

24  pumps); CALAVERAS ASBESTOS, LTD (as a supplier of asbestos fiber); CBS

25  CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to CBS

26  CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION) (for

27  Westinghouse blowers, turbines, exhausters, valves, pumps, emergency generators and

28  diesel generators); CLA-VAL CO. (for Cla-Val valves); CRANE CO. (sued individually

1  and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP

2  COMPANY) (for Crane valves, Cranite gaskets, Deming pumps and Cochrane heaters);

3  CRANE ENVIRONMENTAL, INC. (sued individually and as successor-in-interest to

4  COCHRANE CORPORATION ) (for Cochrane heaters); CROWN CORK & SEAL

5  COMPANY, INC. (sued individually and as successor-in-interest to MUNDET CORK

6  COMPANY) (for Mundet block insulation, cement and pipe covering); DOVER

7  CORPORATION (sued as successor to BLACKMER PUMP CO.) (for Blackmer pumps);

8  EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.) (for Cutler

9  Hammer control panels); FISHER CONTROLS INTERNATIONAL, LLC (for Fisher

10  valves); FMC CORPORATION (sued individually and as successor-in-interest to

11  PEERLESS PUMP COMPANY) (for Peerless pumps); GOULDS PUMPS, INC. (for

12  Goulds pumps); HOPEMAN BROTHERS INC. (for asbestos-containing marinate and

13  micarta board); IMO INDUSTRIES, INC. (sued individually and as successor in-interest

14  to DELAVAL TURBINE, INC, and also to C.H. WHEELER MANUFACTURING

15  COMPANY) (for DeLaval turbines and pumps, and C.H. Wheeler air ejectors and

16  condensers); INDUSTRIAL HOLDINGS CORPORATION f/k/a THE CARBORUNDUM

17  COMPANY (for grinding wheels); INGERSOLL RAND COMPANY (sued individually

18  and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON

19  MACHINE CO, AND ALDRICH PUMP COMPANY) (for Ingersoll Rand pumps and

20  compressors, Aldrich pumps, Terry Turbines, and Whiton turbines); ITT

21  CORPORATION, f/k/a ITT INDUSTRIES, INC. (sued individually and as successor-in-

22  interest to BELL & GOSSETT) (for Bell & Gossett pumps); J.T. THORPE & SON, INC.

23  (as a boiler contractor and supplier of asbestos-containing insulation); JOHN CRANE,

24  INC. (for land-based gaskets and packing); METROPOLITAN LIFE INSURANCE

25  COMPANY (as a Conspiracy Defendant); MS2G, INC. (sued individually and as

26  successor-in-interest to MARDEN SUSCO, INCORPORATED) (as a supplier of asbestos-

27  containing pipe); THE NASH ENGINEERING COMPANY (for Nash pumps);

28  OCCIDENTAL CHEMICAL CORPORATION f/k/a HOOKERS CHEMICAL CO. (as a

supplier of asbestos fiber); SAINT-GOBAIN ABRASIVES, INC. (sued as successor to NORTON COMPANY) (for Norton grinding wheels); SCHNEIDER ELECTRIC USA, INC. f/k/a SQUARE D COMPANY (for Square D electrical panels); STERLING FLUID SYSTEMS (USA), LLC f/k/a PEERLESS PUMP COMPANY) (for Peerless Pumps); SULZER PUMPS (US), INC. d/b/a SULZER PUMPS HOUSTON, INC. (sued as successor-in-interest to PACO PUMPS f/k/a PACIFIC PUMPING COMPANY) (for Paco pumps); THRUSH CO., INC. (for H.A. Thrush pumps); UNION CARBIDE CORPORATION (as a supplier of asbestos fibers); VELAN VALVE CORPORATION (for Velan valves); WARREN PUMPS, LLC. (for Warren pumps); WEIR VALVES & CONTROLS USA, INC. f/k/a ATWOOD & MORRILL (for Atwood & Morrill valves); and THE WILLIAM POWELL COMPANY (for Powell valves); YARWAY CORPORATION (for Yarway valves and steam traps).

Further, from 1975 to 1992, LEE E. KNOWLES worked as an instrumentation mechanic and maintenance supervisor at British Petroleum. Doing this various work, Plaintiff recalls working with and around products and equipment designed, manufactured, and/or distributed by the following entities: ABB, INC. (s/b/m to ELSAG BAILEY, INC. (sued individually and as successor-in-interest to BAILEY CONTROLS COMPANY) (for Bailey controls); A.W. CHESTERTON COMPANY (for gaskets and packing); ALFA LAVAL, INC. (sued individually and as successor-in-interest to THE DELAVAL SEPARATOR COMPANY and SHARPLES CORPORATION) (for DeLaval purifiers and Sharples oil purifiers); AMTROL, INC. (sued individually and as successor-in-interest to THRUSH COMPANY and H.A. THRUSH COMPANY) (for HA Thrush pumps); ARMSTRONG INTERNATIONAL, INC. for Armstrong steam traps); BP EXPLORATION (ALASKA), INC. (as a contractor); BLACKMER PUMP COMPANY (for Blackmer pumps); BW/IP INTERNATIONAL, INC. (sued individually and as successor-in-interest to BYRON JACKSON PUMP COMPANY) (for Byron Jackson pumps); CALAVERAS ASBESTOS, LTD (as a supplier of asbestos fiber); CBS CORPORATION f/k/a VIACOM, INC. (sued as successor-by-merger to CBS

CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION) (for Westinghouse blowers, turbines, exhausters, valves, pumps, emergency generators and diesel generators); CLA-VAL CO. (for Cla-Val valves); CRANE CO. (sued individually and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP COMPANY) (for Crane valves, Cranite gaskets, Deming pumps and Cochrane heaters); CRANE ENVIRONMENTAL, INC. (sued individually and as successor-in-interest to COCHRANE CORPORATION ) (for Cochrane heaters); CROWN CORK & SEAL COMPANY, INC. (sued individually and as successor-in-interest to MUNDET CORK COMPANY) (for Mundet block insulation, cement and pipe covering); DOVER CORPORATION (sued as successor to BLACKMER PUMP CO.) (for Blackmer pumps); EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.) (for Cutler Hammer control panels); FISHER CONTROLS INTERNATIONAL, LLC (for Fisher valves); FMC CORPORATION (sued individually and as successor-in-interest to PEERLESS PUMP COMPANY) (for Peerless pumps); GOULDS PUMPS, INC. (for Goulds pumps); HOPEMAN BROTHERS INC. (for asbestos-containing marinate and micarta board); IMO INDUSTRIES, INC. (sued individually and as successor in-interest to DELAVAL TURBINE, INC, and also to C.H. WHEELER MANUFACTURING COMPANY) (for DeLaval turbines and pumps, and C.H. Wheeler air ejectors and condensers); INDUSTRIAL HOLDINGS CORPORATION f/k/a THE CARBORUNDUM COMPANY (for grinding wheels); INGERSOLL RAND COMPANY (sued individually and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON MACHINE CO, AND ALDRICH PUMP COMPANY) (for Ingersoll Rand pumps and compressors, Aldrich pumps, Terry Turbines, and Whiton turbines); ITT CORPORATION, f/k/a ITT INDUSTRIES, INC. (sued individually and as successor-in-interest to BELL & GOSSETT) (for Bell & Gossett pumps); J.T. THORPE & SON, INC. (as a boiler contractor and supplier of asbestos-containing insulation); JOHN CRANE, INC. (for land-based gaskets and packing); METROPOLITAN LIFE INSURANCE COMPANY (as a Conspiracy Defendant); MS2G, INC. (sued individually and as

1  successor-in-interest to MARDEN SUSCO, INCORPORATED) (as a supplier of asbestos-

2  containing pipe); THE NASH ENGINEERING COMPANY (for Nash pumps);

3  OCCIDENTAL CHEMICAL CORPORATION f/k/a HOOKERS CHEMICAL CO. (as a

4  supplier of asbestos fiber); SAINT-GOBAIN ABRASIVES, INC. (sued as successor to

5  NORTON COMPANY) (for Norton grinding wheels); SCHNEIDER ELECTRIC USA,

6  INC. f/k/a SQUARE D COMPANY (for Square D electrical panels); STERLING FLUID

7  SYSTEMS (USA), LLC f/k/a PEERLESS PUMP COMPANY) (for Peerless Pumps);

8  SULZER PUMPS (US), INC. d/b/a  SULZER PUMPS HOUSTON, INC. (sued as

9  successor-in-interest to PACO PUMPS f/k/a PACIFIC PUMPING COMPANY) (for Paco

10  pumps); THRUSH CO., INC. (for H.A. Thrush pumps); UNION CARBIDE

11  CORPORATION (as a supplier of asbestos fibers); VELAN VALVE CORPORATION

12  (for Velan valves); WARREN PUMPS, LLC. (for Warren pumps); WEIR VALVES &

13  CONTROLS USA, INC. f/k/a ATWOOD & MORRILL (for Atwood & Morrill valves);

14  THE WILLIAM POWELL COMPANY (for Powell valves); and YARWAY

15  CORPORATION (for Yarway valves and steam traps).

16      At the time Plaintiff was working with these products and/or equipment, Plaintiff

17  does not recall or believe there were any warnings, written instructions or

18  recommendations, regarding the hazards of asbestos, on these products and equipment.

19  As a result, Plaintiff was unaware of his need for any type of safety devices to specifically

20  reduce his possible exposure to, or inhalation of, asbestos and did not use any such devices

21  during this work.

22

23  INTERROGATORY NO. 60:

24      For all previous employment, including self-employment, not listed in your answer to the

25  previous interrogatory, state the following:

26      a.    The name and address of each person, firm, or other entity for whom you have

27  worked;

28      b.    The dates such employment began and terminated, and the reason for each

termination; and

     c.    The nature of the work performed, the job title and the rate of pay at each place of employment.

**RESPONSE TO INTERROGATORY NO. 60 a-c:**

    **Not applicable.**

INTERROGATORY NO. 61:

    Please identify by name and address those employers who provided safety equipment (including, but not limited to ventilation systems, respirators or protective clothing) to protect against the inhalation of lung irritants or toxic substances, describe the equipment provided, and state the frequency with which you used this equipment.

**RESPONSE TO INTERROGATORY NO. 61:**

    **None of Plaintiff's employers provided safety equipment to protect him from exposure to or inhalation of asbestos.**

INTERROGATORY NO. 62:

    State the name and address of the following persons at each place of employment listed in response to interrogatory No. 59.

     a.    Your supervisor;

     b.    Your shop steward; and

     c.    Your union representative.

**RESPONSE TO INTERROGATORY NO. 62:**

    **Plaintiff had a variety of supervisors, whose identity may be contained in his employment records. Authorizations for the release of records, including employment records, are attached hereto as Exhibit D. Additionally, Plaintiff's records are available to Defendants through subpoena.**

XII.   MEDICAL HISTORY

INTERROGATORY NO. 63:

    State whether you have ever been diagnosed as suffering from any of the following illnesses, diseases or abnormal physical conditions:

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

a.  Infectious disease (e.g. tuberculosis, pneumonia, typhoid fever, hepatitis);

b.  Cardiac disease;

c.  Gastrointestinal disease;

d.  Gentio-urinary disease or infection;

e.  Skin disease;

f.  Blood disease;

g.  Neurological disease (including fainting spells, emotional upset, epilepsy, etc.);

h.  Kidney disease;

i.  Liver disease or dysfunction;

j.  Cerebrovascular accident;

k.  Personality disturbance or diseases;

l.  Metabolic disease;

m.  Allergy;

n.  Peripheral-vascular disease or circulatory disturbances;

o.  Glandular disease;

p.  An abnormal physical condition symptomatic of disease such as edema of the extremities, chest pains, prolonged subnormal or elevated temperature, recurring headaches, jaundice, excessive hunger or thirst, etc.;

q.  Pulmonary or other respiratory condition or disease;

r.  Rib injuries;

s.  Obesity;

t.  Parasitic disease;

u.  Cancer.

**RESPONSE TO INTERROGATORY NO. 63:**

Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have obtained to date. Authorizations for the Release of Records, including medical records, are attached hereto as Exhibit D. Pursuant to General Order

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

No. 23, the medical, imaging, and billing records presently within Plaintiffs' possession, custody and control can be obtained from our record service by contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to Defendants through subpoena. For further response:

a. No.

b. Yes. Mild Heart Attack.

c. No.

d. No.

e. No.

f. No.

g. No.

h. No.

i. No.

j. No.

k. No.

l. No.

m. No.

n. No.

o. No.

p. No.

q. No.

r. No.

s. No.

t. No.

u. Yes. Malignant Pleural Mesothelioma

INTERROGATORY NO. 64:

If your response to any of subpart of the previous interrogatory is "yes", state the

46

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

following for each such illness, disease or physical condition:

    a.    The name and a precise description of each such sensitivity, illness, disease or abnormal physical condition;

    b.    The date on which you contracted or became aware of same;

    c.    The names and addresses of all physicians or other practitioners who treated you for same;

    d.    The name and addresses of all hospitals or other institutions where you were confined for same;

    e.    Whether you are presently suffering from one or more such conditions or abnormal physical conditions, and if so, identify which condition or conditions.

**RESPONSE TO INTERROGATORY NO. 64 a-e:**

**u. Mesothelioma**

    **a.**    **Malignant Pleural Mesothelioma**

    **b.**    **December 22, 2010**

    **c-e.**    **Please see Plaintiff's Physician List, attached hereto as Exhibit "B" and Plaintiff's Hospital List, attached hereto as Exhibit "C". For further response, Plaintiff defers to his medical records, which Authorizations for the Release of records, including medical records are enclosed herewith as Exhibit "D". Pursuant to General Order No. 23, the medical, imaging, and billing records presently within Plaintiff's possession, custody and control can be obtained from our record service by contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (Knowles, Lee). Additionally, Plaintiff's records are available to Defendants through subpoena.**

<u>INTERROGATORY NO. 65</u>:

    If you have ever received any nursing care or housekeeping services, or been confined to your bed or home as a result of any injury, illness, emotion or psychological illness or distress state:

    a.    The dates during which you received the nursing care or housekeeping services or

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1  were confined to your bed or home;

2        b.    The addresses where such confinement took place;

3        c.    The name, address and relationship to you of all persons administering any care or

4  services to you; and

5       d.    The injury, physical condition or illness which necessitated such care or services.

6  **RESPONSE TO INTERROGATORY NO. 65 a-d:**

7       **Not applicable.**

8  INTERROGATORY NO. 66:

9       If any of your employers or prospective employers either required or made available

10 physical examinations for their employees, state the frequency, dates, and locations of such

11 examinations, and whether chest x-rays of you were taken at such examinations.

12 **RESPONSE TO INTERROGATORY NO. 66:**

13      **Not applicable.**

14 INTERROGATORY NO. 67:

15      If you have ever been told or received a diagnosis that you are or were suffering from any

16 pulmonary disease, state with regard to each diagnosis:

17       a.    The date the diagnosis was made;

18       b.    The name, address and telephone number of the person who made the diagnosis,

19 together with the name, address, and telephone number of any concurring physician;

20       c.    The method and information upon which the diagnosis was made;

21       d.    The name, address, and telephone number of each and every hospital, medical

22 institution, laboratory, physician, nurse, lab technician, etc., involved in any part of the

23 diagnosis;

24       e.    A detailed description of the specific course of treatment or therapy, including any

25 medication, prescribed as a result of the diagnosis, and the name, address and telephone number

26 of each prescribing physician;

27       f.    Whether you have followed the prescribed course of treatment, including

28 medication prescribed for you by said physicians;

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1     g.     The name, address and telephone number of each and every person, including your

2 relatives, employer or anyone acting on your behalf, to whom such diagnosis was made known,

3 including the date, time, and place the diagnosis was made known.

4     h.     The name of your employer at the time of said diagnosis.

5 **RESPONSE TO INTERROGATORY NO. 67:**

6 **Malignant Mesothelioma**

7     **a-d.  Please see Plaintiff's response to Interrogatory Nos. 31 and 64, *supra,* which are**

8 **incorporated by reference as if fully set forth herein for a more complete description. For**

9 **further response, Plaintiff defers to his medical records. Please see Plaintiff's List of**

10 **Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C,**

11 **respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have**

12 **obtained to date. Authorizations for the Release of Records, including medical records, are**

13 **attached hereto as Exhibit D. Pursuant to General Order No. 23, the medical, imaging,**

14 **and billing records presently within Plaintiff's possession, custody and control can be**

15 **obtained from our record service by contacting them as follows: Written Deposition**

16 **Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972)-488-5555 (Knowles,**

17 **Lee). Additionally, Plaintiff's records are available to Defendants through subpoena.**

18     **e.  Plaintiff defers to his medical records as the best source of detailed information**

19 **regarding the course of treatment, therapy and medications Plaintiff has received. Please**

20 **see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as**

21 **Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical**

22 **records they have obtained to date. Authorizations for the Release of Records, including**

23 **medical records, are attached hereto as Exhibit D. Pursuant to General Order No. 23, the**

24 **medical, imaging, and billing records presently within Plaintiff's possession, custody and**

25 **control can be obtained from our record service by contacting them as follows: Written**

26 **Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972)-488-**

27 **5555 (Knowles, Lee). Additionally, Plaintiff's records are available to Defendants**

28 **through subpoena.**

1   f.  Plaintiff has followed all prescribed recommendations.

2   g.  Plaintiff does not and could not know the name, address and telephone

3 number of each and every person to whom the diagnosis was made known. Plaintiff is

4 aware that the diagnosis has been made known to his wife and children. Discovery is

5 ongoing and Plaintiff reserves the right to supplement this answer at any time.

6   h.  Plaintiff was retired at the time of diagnosis.

7 INTERROGATORY NO. 68:

8   If you contend that the pulmonary disease(s) referred to in your response to the previous

9 interrogatory is related in any way to your alleged exposure to asbestos, state all facts upon

10 which this contention is based.

11 **RESPONSE TO INTERROGATORY NO. 68:**

12   Please see Plaintiff's Work History Sheet attached hereto as Exhibit "A" and

13 Plaintiff's response to Interrogatory No. 59, supra, which is incorporated by reference as if

14 fully set forth herein.  For further response, Plaintiff believes that he was exposed to

15 asbestos from asbestos-containing products, as set forth in Interrogatory 59, and Plaintiff

16 has been diagnosed with malignant pleural mesothelioma, a type of cancer caused from the

17 inhalation of asbestos dust.  Upon information and belief, one or more of Plaintiff's

18 physicians has advised him that his malignant mesothelioma resulted from his exposure to

19 and/or inhalation of asbestos dust.  For further response, Plaintiff defers to his medical

20 records.  Please see Plaintiff's List of Physicians and his List of Hospitals, which are

21 attached hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit F

22 copies of the medical records they have obtained to date. Authorizations for the Release of

23 Records, including medical records, are attached hereto as Exhibit D.  Pursuant to

24 General Order No. 23, the medical, imaging, and billing records presently within

25 Plaintiff's possession, custody and control can be obtained from our record service by

26 contacting them as follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite

27 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee).  Additionally, Plaintiff's records are

28 available to Defendants through subpoena.

INTERROGATORY NO. 69:

If any diagnosis referred to in your responses to interrogatory no. 67 resulted in any prescribed or recommended change in your occupation, behavior, lifestyle, working habits, or conditions, state:

    a.    The nature, extent and exact content of the prescription or recommendation;

    b.    What action you took in response to the prescription or recommendation; and

    c.    Your reasons for failing to comply with such prescriptions or recommendations.

**RESPONSE TO INTERROGATORY NO. 69 a-c:**

**Many of plaintiff's activities have been limited or curtailed as a result of his illness. His doctors have advised him to rest and conserve his energy, which limits his activities. He is experiencing shortness of breath, weakness and fatigue, which further limit his mobility and activities. Plaintiff has not failed to comply with any prescribed medical treatment.**

**For further response, Plaintiff defers to his medical records for a more complete description. Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have obtained to date. Authorizations for the Release of Records, including medical records, are attached hereto as Exhibit D. Pursuant to General Order No. 23, the medical, imaging, and billing records presently within Plaintiff's possession, custody and control can be obtained from our record service by contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to Defendants through subpoena.**

INTERROGATORY NO. 70:

If you have ever been told or received a diagnosis that you are or were suffering from any form of cancer whether benign or malignant, state with regard to each such diagnosis:

    a.    The date the diagnosis was made;

    b.    The name, address and telephone number of the person who made the diagnosis,

together with the name, address and telephone number of any concurring physician;

    c.    The method and information upon which the diagnosis was made;

    d.    The name, address and telephone number of each and every hospital, medical institution, laboratory, physician, nurse, lab technician, etc., involved in any part of the diagnosis;

    e.    A detailed description of the specific course of treatment or therapy, including any medication, prescribed as a result of the diagnosis, and the name, address and telephone number of each prescribing physician;

    f.    Whether you have followed the prescribed course of treatment, including medication prescribed for you by said physicians;

    g.    The name, address and telephone number of each and every person, including your relatives, employer, or anyone acting on your behalf, to whom such diagnosis was made known;

    h.    The name of your employer at the time of said diagnosis;

**RESPONSE TO INTERROGATORY NO. 70:**

    a.    **Plaintiff was diagnosed with malignant pleural mesothelioma on December 22, 2010. Plaintiff incorporates his responses to General Order Standard Interrogatory Nos. 31 and 64 as if set forth fully herein.**

    b.    **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have obtained to date. Authorizations for the Release of Records, including medical records, are attached hereto as Exhibit D. Pursuant to General Order No. 23, the medical, imaging, and billing records presently within Plaintiffs' possession, custody and control can be obtained from our record service by contacting them as follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX 75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiffs' records are available to Defendants through subpoena.**

    c.    **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the medical records they have obtained to date. Authorizations for the Release of**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1  Records, including medical records, are attached hereto as Exhibit D.  Pursuant to

2  General Order No. 23, the medical, imaging, and billing records presently within

3  Plaintiffs' possession, custody and control can be obtained from our record service by

4  contacting them as follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite

5  210, Dallas, Houston, TX 75234 (972) 488-5555 (Knowles, Lee).  Additionally, Plaintiff's

6  records are available to Defendants through subpoena.

7         d.       Please see Plaintiff's List of Physicians and his List of Hospitals, which are

8  attached hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit F

9  copies of the medical records they have obtained to date. Authorizations for the Release of

10  Records, including medical records, are attached hereto as Exhibit D.  Pursuant to General

11  Order No. 23, the medical, imaging, and billing records presently within Plaintiff's

12  possession, custody and control can be obtained from our record service by contacting

13  them as follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas,

14  TX 75234 (942)-488-5555 (Knowles, Lee).  Additionally, Plaintiff's records are available to

15  Defendants through subpoena.

16         e.       Please see Plaintiff's List of Physicians and his List of Hospitals, which are

17  attached hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit F

18  copies of the medical records they have obtained to date. Authorizations for the Release of

19  Records, including medical records, are attached hereto as Exhibit D.  Pursuant to General

20  Order No. 23, the medical, imaging, and billing records presently within Plaintiff's

21  possession, custody and control can be obtained from our record service by contacting

22  them as follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas,

23  TX 75234 (972)-488-5555  (Knowles, Lee).  Additionally, Plaintiff's records are available to

24  Defendants through subpoena.

25         f.       Plaintiff has followed the prescribed recommendations.

26         g.       Plaintiff does not know the name, address and telephone number of each and

27  every person to whom the diagnosis was made known.  Plaintiff is aware that the diagnosis

28  has been made known to his immediate family, including his wife and children.  Discovery

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1  is ongoing and Plaintiff reserves the right to supplement this answer as discovery continues.

2       **h.**     **Plaintiff was retired at the time of diagnosis.**

3  INTERROGATORY NO. 71:

4       If you contend that the cancer referred to by your response to the previous interrogatory is

5  related in any way to your alleged exposure to asbestos, state all facts upon which this contention

6  is based.

7  **RESPONSE TO INTERROGATORY NO. 71:**

8       **Please see Plaintiff's responses to Interrogatories Nos. 59 and 68, *supra*, which are**

9  **incorporated herein by reference as if fully set forth herein.**

10  INTERROGATORY NO. 72:

11       If any diagnosis referred to in your responses to interrogatory no. 70 resulted in any

12  prescribed or recommended change in your occupation, behavior, lifestyle, working habits or

13  conditions, state:

14       a.     The nature, extent and exact content of the prescription or recommendation;

15       b.     What action you took in response to the prescription or recommendations; and

16       c.     Your reasons for failing to comply with such prescriptions or recommendations.

17  **RESPONSE TO INTERROGATORY NO. 72 a-c:**

18       **Please see Plaintiff's response to Interrogatory No. 69, *supra*, which is incorporated**

19  **by reference as if fully set forth herein.  Plaintiff has complied with his doctor's**

20  **prescriptions and recommendations.**

21  INTERROGATORY NO. 73:

22       If you were ever hospitalized as a result of the injuries which you claim resulted from your

23  exposure to asbestos, state the name and address of the hospital, the date(s) of your

24  hospitalization, and the name of the physician(s) who treated or examined you during your

25  hospitalization.

26  **RESPONSE TO INTERROGATORY NO. 73:**

27       **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached**

28  **hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit F copies of**

1   the medical records they have obtained to date. **Authorizations for the Release of Records,**

2   **including medical records, are attached hereto as Exhibit D. Pursuant to General Order**

3   **No. 23, the medical, imaging, and billing records presently within Plaintiff's possession,**

4   **custody and control can be obtained from our record service by contacting them as**

5   **follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX**

6   **75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to**

7   **Defendants through subpoena.**

8   INTERROGATORY NO. 74:

9        If you have ever been treated or examined by a physician, nurse, or therapist for injuries

10   you claim resulted from your exposure to asbestos, and which is not identified in your answer to

11   interrogatory no. 67, state the name, and address and telephone number of each such physicians,

12   nurse or therapist, together with the date(s) of your treatment or examination.

13   **RESPONSE TO INTERROGATORY NO. 74:**

14        **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached**

15   **hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of**

16   **the medical records they have obtained to date. Authorizations for the Release of Records,**

17   **including medical records, are attached hereto as Exhibit D. Pursuant to General Order**

18   **No. 23, the medical, imaging, and billing records presently within Plaintiffs' possession,**

19   **custody and control can be obtained from our record service by contacting them as**

20   **follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX**

21   **75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to**

22   **Defendants through subpoena.**

23   INTERROGATORY NO. 75:

24        If you have ever been hospitalized, operated upon or confined to an institution other than

25   those occasions identified in your answer to interrogatory no. 73, state for each such

26   hospitalization or confinement:

27       a.     The name and address of the hospital or institution;

28       b.     The beginning and ending dates of the period of hospitalization or confinement;

1      c.     Your patient identification number;

2      d.     The nature of the illness, injury or complaint for which you were hospitalized or

3  confined;

4      e.     The names and addresses of all persons who examined or treated you;

5      f.     The nature and extent of any permanent disability or residual effects; and

6      a.     The nature, sources and amount of any disability benefits or other remuneration

7  received.

8  **RESPONSE TO INTERROGATORY NO. 75:**

9      **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached**

10  **hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit F copies of**

11  **the medical records they have obtained to date. Authorizations for the Release of Records,**

12  **including medical records, are attached hereto as Exhibit D.  Pursuant to General Order**

13  **No. 23, the medical, imaging, and billing records presently within Plaintiff's possession,**

14  **custody and control can be obtained from our record service by contacting them as**

15  **follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX**

16  **75234 (972)-488-5555 (Knowles, Lee).  Additionally, Plaintiff's records are available to**

17  **Defendants through subpoena.**

18  INTERROGATORY NO. 76:

19      If you have ever had x-rays taken of your chest, state the following for each set of x-rays

20  taken:

21      a.     The name and address of the office or hospital where the x-rays were taken;

22      b.     The date or dates on which the x-rays were taken;

23      c.     The date or dates you were given the results of those x-rays and the nature of the

24  results.

25  **RESPONSE TO INTERROGATORY NO. 76:**

26      **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached**

27  **hereto as Exhibits B and C, respectively.  Plaintiff attaches hereto as Exhibit F copies of**

28  **the medical records they have obtained to date. Authorizations for the Release of Records,**

1  including medical records, are attached hereto as Exhibit D. Pursuant to General Order

2  No. 23, the medical, imaging, and billing records presently within Plaintiffs' possession,

3  custody and control can be obtained from our record service by contacting them as

4  follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX

5  75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to

6  Defendants through subpoena.

7  INTERROGATORY NO. 77:

8      If you have ever been treated or examined by a physician, nurse or therapist other than

9  on those occasions identified in your answer to the above interrogatories, state for each such

10  treatment or examinations:

11      a.    The name, address, and telephone number of the physician, nurse, or therapist;

12      b.    The date of your treatment or examination;

13      c.    The reason for the treatment or examination; and

14      d.    The diagnosis, if any, of the physician, nurse or therapist.

15  **RESPONSE TO INTERROGATORY NO. 77:**

16      Plaintiff's response to Interrogatory No. 76, *supra*, is incorporated by reference as

17  if fully set forth herein.

18  INTERROGATORY NO. 78:

19      If you have had a pulmonary or respiratory system related examination conducted upon

20  you during your lifetime, state for each such examination:

21      a.    The date, place, and circumstances of the examination;

22      b.    The name, address and telephone number of the physician conducting the

23  examination;

24      c.    The name, address and telephone number of the physician conducting the

25  examination;

26      d.    The name, address and telephone number of the medical institution or laboratory,

27  public or private, in which the examination was conducted;

28      e.    The name, address and telephone number of the present or last known custodian of

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1   the results of the examination;

2       f.     The interpretative or diagnostic results derived from the examination, together

3   with the date that these results were made known to you or to anyone acting on your behalf.

4   **RESPONSE TO INTERROGATORY NO. 78:**

5       **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached**

6   **hereto as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of**

7   **the medical records they have obtained to date. Authorizations for the Release of Records,**

8   **including medical records, are attached hereto as Exhibit D. Pursuant to General Order**

9   **No. 23, the medical, imaging, and billing records presently within Plaintiff's possession,**

10   **custody and control can be obtained from our record service by contacting them as**

11   **follows: Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX**

12   **75234 (972)-488-5555 (Knowles, Lee). Additionally, Plaintiff's records are available to**

13   **Defendants through subpoena.**

14   INTERROGATORY NO. 79:

15       If any treatment, recommendation or prescribed therapy resulted from the examinations

16   described in your response to interrogatory no. 78 state with regard to each such examination:

17       a.     The purpose and objective of the treatment;

18       b.     The date, time and duration of the treatment;

19       c.     The name and dosage of any prescribed medication;

20       d.     The degree of successes or failure of each treatment; and

21       e.     Whether you cooperated with or ignored the recommendations or treatments. If

22   you chose to ignore the recommendations, state you reasons for doing so.

23   **RESPONSE TO INTERROGATORY NO. 79:**

24   **Please see Plaintiff's List of Physicians and his List of Hospitals, which are attached hereto**

25   **as Exhibits B and C, respectively. Plaintiff attaches hereto as Exhibit F copies of the**

26   **medical records they have obtained to date. Authorizations for the Release of Records,**

27   **including medical records, are attached hereto as Exhibit D. Pursuant to General Order**

28   **No. 23, the medical, imaging, and billing records presently within Plaintiff's possession,**

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

1   custody and control can be obtained from our record service by contacting them as

2   follows:  Written Deposition Service, LP, 1750 Valley View Lane, Suite 210, Dallas, TX

3   75234 (972)-488-5555 (Knowles, Lee).  Additionally, Plaintiff's records are available to

4   Defendants through subpoena.

5   DATED:   February 16, 2012                    SIMON GREENSTONE PANATIER BARTLETT, PC

6

7                                                      By: _____

8                                                      JENNIFER L. BARTLETT
                                                       JORDAN BLUMENFELD-JAMES
9                                                      JONAH D. KING
                                                       Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

# VERIFICATIONS TO FOLLOW

# PROOF OF SERVICE

STATE OF CALIFORNIA     )

COUNTY OF LOS ANGELES   )

I am employed in the County of Los Angeles, State of California. I am over eighteen years of age and not a party to the within action; my business address is 301 East Ocean Blvd., Suite 1950, Long Beach, California. I am employed in Los Angeles County, California.

On the date set forth below, I served the foregoing document(s) described as:

## PLAINTIFFS' RESPONSES TO
## GENERAL ORDER STANDARD INTERROGATORIES PROPOUNDED BY DEFENDANTS

On all interested parties in this action by placing a true copy thereof enclosed in a sealed envelope(s) addressed and sent as follows:

## SEE LEXIS-NEXIS SERVICE LIST

[XX]  **BY E-SERVICE:** I caused such document to be transmitted by electronic service via Lexis Nexis for the same day delivery to the offices of the addressee(s).

[]  **BY MAIL:** I caused such envelope(s) to be deposited in the mail at Long Beach, California with postage thereon fully prepaid to the office of the addressee(s) as indicated above. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

[]  **BY FACSIMILE:** I caused a courtesy copy to be transmitted by facsimile to the facsimile number of the offices of the addressee(s) as indicated above and below (see service list).

[ ]  **BY FEDERAL EXPRESS:** I caused such envelope to be transmitted by federal express for next day delivery (by 10:30 a.m.) to the offices of the addressee(s).

[ ]  **BY ELECTRONIC MAIL:** I caused such document to be transmitted by electronic mail for the same day delivery to the offices of the addressee(s).

I declare under penalty of perjury, under the laws of the State of California that the above is true and correct.

Executed this 16th day of February, 2012 at Long Beach, California.

_____
Lupe Hill

PLAINTIFFS' RESPONSES TO GENERAL ORDER STANDARD INTERROGATORIES

# WORK HISTORY

### Exhibit "A"

## WORK HISTORY SHEET

NAME: <u>LEE KNOWLES</u>
NICKNAMES: <u>NONE</u>

EMPLOYER: <u>GUTHRIE CONSTRUCTION</u>   SUPERVISOR: <u>VARIOUS</u>
JOB SITE: <u>CONSTRUCTION SITES</u>     CITY:  <u>SPOKANE</u>
STATE: <u>WASHINGTON</u>               COWORKERS AND JOB TITLES:
DATE OF JOB: <u>1953</u>
DUTIES AT THIS JOB SITE: <u>LABORER</u>   ON THE JOB EXPOSURE:

|  | YES | NO | DON'T KNOW |
|---|---|---|---|
| WAS THE JOB NEW CONSTRUCTION? CHEMICALS |  |  | X |
| __X__ REPAIR WORK___ BOTH? |  |  |  |
| WAS THE JOB INDOORS? ___ OUTDOORS? FUMES |  |  | X |
| ___ BOTH? X |  |  |  |
| REASON FOR LEAVING?    GASES |  |  | X |
|  |  |  |  |
| WAGE RATE/HOUR? _____  CHROMIUM |  |  | X |
| AVERAGE HOURS WORKED/WEEK? _____ CADMIUM |  |  | X |
| PERCENTAGE OF TIME EXPOSED TO ANY OTHER | X |  |  |

PERCENTAGE OF TIME EXPOSED TO
ASBESTOS PRODUCTS: ___%

PRODUCT      Asbestos-containing
LIST:        products, see list

ASBESTOS MATERIALS USED ON THIS   DID YOU WEAR A RESPIRATOR,
JOB:                              MASK, OR OTHER PROTECTIVE
                                  DEVICE ON THIS JOB TO AVOID
(SEE ATTACHED EXHIBIT A)          INHALATION OF ANY DUST OR FUMES
                                  INCLUDING ASBESTOS DUST?
                                  YES ___ NO_X___

<u>WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 1.</u>

## EXHIBIT A

ASBESTOS MATERIALS USED ON THIS JOB:
ASBESTOS CEMENT PIPE:

WORKED
WITH AROUND

CERTAINTEED                                           X       X

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 2.

**WORK HISTORY SHEET**

NAME: <u>LEE KNOWLES</u>
NICKNAMES:<u>NONE</u>

EMPLOYER: <u>INLAND EMPIRE PAPER</u>      SUPERVISOR:
<u>COMPANY</u>
JOB SITE: <u>PAPER MILL</u>                          CITY: <u>MILLWOOD</u>
STATE: <u>WASHINGTON</u>                          COWORKERS AND JOB TITLES:
DATE OF JOB: <u>1955-1958, 1970-1975</u>
DUTIES AT THIS JOB SITE:                       ON THE JOB EXPOSURE:
<u>INSTRUMENTATION MECHANIC</u>

|  | YES | NO | DON'T KNOW |
|---|---|---|---|
| CHEMICALS |  |  | X |
| FUMES |  |  | X |
| GASES |  |  | X |
| CHROMIUM |  |  | X |
| CADMIUM |  |  | X |
| ANY OTHER |  | X |  |

WAS THE JOB NEW CONSTRUCTION?
___ REPAIR WORK___ BOTH? _____
WAS THE JOB INDOORS? ___ OUTDOORS?
___ BOTH? _____
REASON FOR LEAVING?
_____

WAGE RATE/HOUR? _____
AVERAGE HOURS WORKED/WEEK? _____
PERCENTAGE OF TIME EXPOSED TO
ASBESTOS PRODUCTS: ___%

PRODUCT      Asbestos-containing
LIST:          products, see list
DID YOU WEAR A RESPIRATOR,
MASK, OR OTHER PROTECTIVE
DEVICE ON THIS JOB TO AVOID
INHALATION OF ANY DUST OR FUMES
INCLUDING ASBESTOS DUST?
YES ___ NO X__

ASBESTOS MATERIALS USED ON THIS
JOB:

(SEE ATTACHED EXHIBIT B)

<u>WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 3.</u>

## EXHIBIT B

|                                    | WORKED |        |
|------------------------------------|--------|--------|
| ASBESTOS MATERIALS USED ON THIS JOB: | WITH | AROUND |

CONTROLS:

| | | |
|---|---|---|
| FISHER | X | X |
| CUTLER HAMMER | X | X |
| BAILEY | X | X |

VALVES:

| | | |
|---|---|---|
| BAILEY CONTROL VALVES | X | X |
| WESTINGHOUSE | X | X |
| CLA-VAL | X | X |
| CRANE | X | X |
| FISHER | X | X |
| VELAN | X | X |
| ATWOOD & MORRILL | X | X |
| POWELL | X | X |
| YARWAY | X | X |

BLOCK INSULATION:

| | | |
|---|---|---|
| MUNDET | X | X |

HEATERS:

| | | |
|---|---|---|
| COCHRANE | X | X |

PUMPS:

| | | |
|---|---|---|
| THRUSH | X | X |
| BLACKMER | X | X |
| BYRON JACKSON | X | X |
| WESTINGHOUSE | X | X |
| DEMING | X | X |
| PEERLESS | X | X |
| GOULDS | X | X |
| DELAVAL | X | X |
| INGERSOLL RAND | X | X |
| ALDRICH | X | X |
| BELL & GOSSETT | X | X |
| NASH | X | X |
| PACO | X | X |
| WARREN | X | X |

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 4.

BLOWERS:
WESTINGHOUSE                                       X    X

GASKETS AND PACKING:
A.W. CHESTERTON                                    X    X
CRANITE                                            X    X
JOHN CRANE                                         X    X

PURIFIERS:
DELAVAL                                            X    X
SHARPLES                                           X    X

STEAM TRAPS:
ARMSTRONG                                          X    X
YARWAY                                             X    X

MARINITE AND MICARTA BOARD:
HOPEMAN BROTHERS                                   X    X

GRINDING WHEELS:
CARBORUNDUM                                        X    X
NORTON                                             X    X

TURBINES:
WESTINGHOUSE                                       X    X
DELAVAL                                            X    X
TERRY                                              X    X
WHITON                                             X    X

EXHAUSTERS:
WESTINGHOUSE                                       X    X

GENERATORS:
WESTINGHOUSE                                       X    X

AIR EJECTORS:
C.H. WHEELER                                       X    X

CONDENSERS:
C.H. WHEELER                                       X    X

COMPRESSORS:
INGERSOLL RAND                                     X    X


**WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 5.**

## WORK HISTORY SHEET

NAME: LEE KNOWLES
NICKNAMES: NONE

EMPLOYER: BAILEY CONTROLS
JOB SITE: SEE LIST BELOW
STATE:  CA, AZ, HI, & NV
DATE OF JOB: 1958-1964
DUTIES AT THIS JOB SITE:
INSTRUMENTATION MECHANIC

SUPERVISOR: VARIOUS
CITY: VARIOUS
COWORKERS AND JOB TITLES:

ON THE JOB EXPOSURE:

|  | YES | NO | DON'T KNOW |
|---|---|---|---|
| CHEMICALS |  |  | X |
| FUMES |  |  | X |
| GASES |  |  | X |
| CHROMIUM |  |  | X |
| CADMIUM |  |  | X |
| ANY OTHER |  | X |  |

WAS THE JOB NEW CONSTRUCTION? ____ REPAIR WORK ____ BOTH? ____
WAS THE JOB INDOORS? ____ OUTDOORS? ____ BOTH? X
REASON FOR LEAVING? ____

WAGE RATE/HOUR? ____
AVERAGE HOURS WORKED/WEEK? ____
PERCENTAGE OF TIME EXPOSED TO ASBESTOS PRODUCTS: ____%

ASBESTOS MATERIALS USED ON THIS JOB:

(SEE ATTACHED EXHIBIT C)

PRODUCT LIST: Asbestos-containing products, see list
DID YOU WEAR A RESPIRATOR, MASK, OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES ___ NO X___

JOB SITES:
 ➢ Joseph Schlitz Brewery, San Fernando, CA
 ➢ Cholla Power Plant, AZ
 ➢ Arizona Public Service, Joseph City, AZ
 ➢ Southwest Forest Industries, Snowflake, AZ
 ➢ Phelps-Dodge Smelting Co., Morenci, AZ
 ➢ SS Bengelen – Dutch tanker
 ➢ SS Mormac – Oil tanker
 ➢ USS Morton (DD-948)
 ➢ Kimberly-Clark Plant, Fullerton, CA

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 6.

- ➢ Waiau Power Plant, Honolulu, HI
- ➢ Kahe Power Plant, Honolulu, HI
- ➢ Tidewater Oil, Ventura, CA
- ➢ Pabst Brewery, Los Angeles, CA
- ➢ Los Angeles City Heating & Refrigeration, Los Angeles, CA
- ➢ Container Corp., Vernon, CA
- ➢ Southwestern Portland Cement, Victorville, CA
- ➢ Goodyear Plant, Vernon, CA
- ➢ Encina Power Plant, San Diego, CA
- ➢ Johns Manville Plant, Watson, CA
- ➢ Pacific Light & Gas, Montebello, CA
- ➢ Lockheed Aircraft, Burbank, CA
- ➢ El Segundo Power Plant, El Segundo, CA
- ➢ Container Corp., Los Angeles, CA
- ➢ Scattergood Steam Plant, Playa Del Ray, CA
- ➢ General Petroleum, Vernon, CA
- ➢ USS Frontier (AD-25) - dry-docked in Long Beach, CA
- ➢ USS Eldorado (AGC-11) - dry-docked in Long Beach, CA
- ➢ Pacific Coast Borax, Long Beach, CA
- ➢ General Mills, Vernon, CA
- ➢ Hyperion Sewage Plant, Los Angeles, CA
- ➢ Riverside Sewage Plant, Riverside, CA
- ➢ SS Carillo - Dutch tanker
- ➢ Kaiser Cement Plant, Cushenberry, CA
- ➢ Yuma Axis Steam Plant, Yuma, AZ
- ➢ Agua Fria Steam Plant, Glendale, AZ
- ➢ Fiberboard Paper, Antioch, CA
- ➢ National Aero & Space Administration, Sunnyvale, CA
- ➢ Camarillo State Hospital, Camarillo, CA
- ➢ Sawtelle VA Hospital, Westwood, CA
- ➢ Kaiser Steel, Fontana, CA
- ➢ US Gypsum, South Gate, CA
- ➢ Redondo Power Plant, Redondo Beach, CA
- ➢ US Navy Base, Port Hueneme, CA
- ➢ USS Hull (DD-945)
- ➢ Times Mirror Co., Los Angeles, CA
- ➢ Firestone Tire & Rubber, South Gate, CA
- ➢ Huntington Beach Power Plant, Huntington Beach, CA
- ➢ Malibu Power Plant, Santa Monica, CA
- ➢ USS Edson (DD-946)
- ➢ Douglas Aircraft, El Segundo, CA

**WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 7.**

- ➢ Bireley's Plant, Hollywood, CA
- ➢ Patton State Hospital, Patton, CA
- ➢ Los Alamitos Naval Air Station, Long Beach, CA
- ➢ Oahu Sugar Plant, Oahu, HI
- ➢ Honokaa Sugar Plant, Honokaa, HI
- ➢ Southern California Edison, Huntington Beach, CA
- ➢ Columbia Records, Santa Maria, CA
- ➢ USS Monticello (LSD-35)
- ➢ EWA Plantation Co, Oahu, HI
- ➢ Mandalay Power Plant, Oxnard, CA
- ➢ Queensville, Norwegian tanker
- ➢ Riverside Cement Plant, Oro Grande, CA
- ➢ Long Beach Naval Air Station, Long Beach, CA
- ➢ Kalof Pulp & Paper, Oxnard, CA
- ➢ Standard Oil Refinery, El Segundo, CA
- ➢ Vegetable Oil Products, Wilmington, CA
- ➢ USS Norfolk (DL-1)
- ➢ Olive Avenue Power Plant, Burbank, CA
- ➢ Richfield Oil, Wilmington, CA
- ➢ USS Edwards (DD-950)
- ➢ Aquagem, Greek tanker
- ➢ SS Montana, Texaco tanker
- ➢ Ocotillo Power Plant, Tempe, AZ
- ➢ Arizona Public Service, Tempe, AZ
- ➢ US Steel - Columbia - Geneva Division, Torrance, CA

**WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 8.**

## EXHIBIT C

| ASBESTOS MATERIALS USED ON THIS JOB: | WORKED WITH | AROUND |
|---|---|---|
| CONTROLS: | | |
| FISHER | X | X |
| CUTLER HAMMER | X | X |
| BAILEY | X | X |
| | | |
| VALVES: | | |
| BAILEY CONTROL VALVES | X | X |
| WESTINGHOUSE | X | X |
| CLA-VAL | X | X |
| CRANE | X | X |
| FISHER | X | X |
| VELAN | X | X |
| ATWOOD & MORRILL | X | X |
| POWELL | X | X |
| YARWAY | X | X |
| | | |
| BLOCK INSULATION: | | |
| MUNDET | X | X |
| | | |
| HEATERS: | | |
| COCHRANE | X | X |
| | | |
| PUMPS: | | |
| THRUSH | X | X |
| BLACKMER | X | X |
| BYRON JACKSON | X | X |
| WESTINGHOUSE | X | X |
| DEMING | X | X |
| PEERLESS | X | X |
| GOULDS | X | X |
| DELAVAL | X | X |
| INGERSOLL RAND | X | X |
| ALDRICH | X | X |
| BELL & GOSSETT | X | X |
| NASH | X | X |
| PACO | X | X |
| WARREN | X | X |

BLOWERS:

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 9.

| | | |
|---|---|---|
| WESTINGHOUSE | X | X |
| GASKETS AND PACKING: | | |
| A.W. CHESTERTON | X | X |
| CRANITE | X | X |
| JOHN CRANE | X | X |
| | | |
| PURIFIERS: | | |
| DELAVAL | X | X |
| SHARPLES | X | X |
| | | |
| STEAM TRAPS: | | |
| ARMSTRONG | X | X |
| YARWAY | X | X |
| | | |
| MARINITE AND MICARTA BOARD: | | |
| HOPEMAN BROTHERS | X | X |
| | | |
| GRINDING WHEELS: | | |
| CARBORUNDUM | X | X |
| NORTON | X | X |
| | | |
| TURBINES: | | |
| WESTINGHOUSE | X | X |
| DELAVAL | X | X |
| TERRY | X | X |
| WHITON | X | X |
| GENERAL ELECTRIC | X | X |
| | | |
| EXHAUSTERS: | | |
| WESTINGHOUSE | X | X |
| | | |
| GENERATORS: | | |
| WESTINGHOUSE | X | X |
| | | |
| AIR EJECTORS: | | |
| C.H. WHEELER | X | X |
| | | |
| CONDENSERS: | | |
| C.H. WHEELER | X | X |
| GENERAL ELECTRIC | X | X |
| | | |
| BOILERS: | | |
| CLEAVER-BROOKS | X | X |
| FOSTER WHEELER | X | X |

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 10.

COMPRESSORS:
INGERSOLL RAND                                       X    X

SHIP'S SERVICE GENERATORS
GENERAL ELECTRIC                                     X    X

ELECTRICAL PANELS:
SQUARE D                                            X    X

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 11.

## WORK HISTORY SHEET

NAME: LEE KNOWLES
NICKNAMES:NONE

EMPLOYER: KETCHIKAN PULP
JOB SITE: PULP PLANT
STATE: WASHINGTON
DATE OF JOB: 1964-1969
DUTIES AT THIS JOB SITE:
INSTRUMENTATION MECHANIC

SUPERVISOR: VARIOUS
CITY: KETCHIKAN
COWORKERS AND JOB TITLES:

ON THE JOB EXPOSURE:

|  | YES | NO | DON'T KNOW |
|---|---|---|---|
| CHEMICALS |  |  | X |
| FUMES |  |  | X |
| GASES |  |  | X |
| CHROMIUM |  |  | X |
| CADMIUM |  |  | X |
| ANY OTHER | X |  |  |

WAS THE JOB NEW CONSTRUCTION? _____ REPAIR WORK___ BOTH? _____
WAS THE JOB INDOORS? ___ OUTDOORS? _____ BOTH?
REASON FOR LEAVING? _____

WAGE RATE/HOUR? _____
AVERAGE HOURS WORKED/WEEK? _____
PERCENTAGE OF TIME EXPOSED TO ASBESTOS PRODUCTS: ___%

ASBESTOS MATERIALS USED ON THIS JOB:

(SEE ATTACHED EXHIBIT D)

PRODUCT LIST: Asbestos-containing products, see list
DID YOU WEAR A RESPIRATOR, MASK, OR OTHER PROTECTIVE DEVICE ON THIS JOB TO AVOID INHALATION OF ANY DUST OR FUMES INCLUDING ASBESTOS DUST?
YES __ NO_X__

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 12.

## WORK HISTORY SHEET

NAME: LEE KNOWLES
NICKNAMES: NONE

EMPLOYER: BRITISH PETROLEUM          SUPERVISOR: VARIOUS
JOB SITE: PIPELINE FACILITY          CITY: PRUDHOE BAY
STATE: ALASKA                        COWORKERS AND JOB TITLES:
DATE OF JOB: 1975-1992
DUTIES AT THIS JOB SITE:             ON THE JOB EXPOSURE:
INSTRUMENTATION
MECHANIC/MAINTENANCE SUPERVISOR                 YES  NO  DON'T KNOW

WAS  THE  JOB  NEW  CONSTRUCTION?  CHEMICALS            X
_____ REPAIR WORK ___ BOTH? ____
WAS THE JOB INDOORS? ___ OUTDOORS?  FUMES              X
_____ BOTH? ____
REASON FOR LEAVING?                GASES               X

WAGE RATE/HOUR? _____    CHROMIUM           X
AVERAGE HOURS WORKED/WEEK? _____    CADMIUM            X
PERCENTAGE  OF  TIME  EXPOSED  TO   ANY OTHER    X
ASBESTOS PRODUCTS:  ___%
                                   PRODUCT      Asbestos-containing
                                   LIST:        products, see list
ASBESTOS  MATERIALS  USED  ON  THIS  DID  YOU  WEAR  A  RESPIRATOR,
JOB:                               MASK,   OR   OTHER   PROTECTIVE
                                   DEVICE  ON  THIS  JOB  TO  AVOID
(SEE ATTACHED EXHIBIT D)           INHALATION OF ANY DUST OR FUMES
                                   INCLUDING ASBESTOS DUST?
                                   YES ___ NO X___

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 13.

EXHIBIT D

| | WORKED | |
|---|---|---|
| ASBESTOS MATERIALS USED ON THIS JOB: | WITH | AROUND |

CONTROLS:

| | | |
|---|---|---|
| FISHER | X | X |
| CUTLER HAMMER | X | X |
| BAILEY | X | X |

VALVES:

| | | |
|---|---|---|
| BAILEY CONTROL VALVES | X | X |
| WESTINGHOUSE | X | X |
| CLA-VAL | X | X |
| CRANE | X | X |
| FISHER | X | X |
| VELAN | X | X |
| ATWOOD & MORRILL | X | X |
| POWELL | X | X |
| YARWAY | X | X |

BLOCK INSULATION:

| | | |
|---|---|---|
| MUNDET | X | X |

HEATERS:

| | | |
|---|---|---|
| COCHRANE | X | X |

PUMPS:

| | | |
|---|---|---|
| THRUSH | X | X |
| BLACKMER | X | X |
| BYRON JACKSON | X | X |
| WESTINGHOUSE | X | X |
| DEMING | X | X |
| PEERLESS | X | X |
| GOULDS | X | X |
| DELAVAL | X | X |
| INGERSOLL RAND | X | X |
| ALDRICH | X | X |
| BELL & GOSSETT | X | X |
| NASH | X | X |
| PACO | X | X |
| WARREN | X | X |

BLOWERS:

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 14.

```
WESTINGHOUSE                              X    X
GASKETS AND PACKING:
A.W. CHESTERTON                           X    X
CRANITE                                   X    X
JOHN CRANE                                X    X


PURIFIERS:
DELAVAL                                   X    X
SHARPLES                                  X    X


STEAM TRAPS:
ARMSTRONG                                 X    X
YARWAY                                    X    X


MARINITE AND MICARTA BOARD:
HOPEMAN BROTHERS                          X    X


GRINDING WHEELS:
CARBORUNDUM                               X    X
NORTON                                    X    X


TURBINES:
WESTINGHOUSE                              X    X
DELAVAL                                   X    X
TERRY                                     X    X
WHITON                                    X    X
GENERAL ELECTRIC                          X    X


EXHAUSTERS:
WESTINGHOUSE                              X    X


GENERATORS:
WESTINGHOUSE                              X    X


AIR EJECTORS:
C.H. WHEELER                              X    X


CONDENSERS:
C.H. WHEELER                              X    X
GENERAL ELECTRIC                          X    X


COMPRESSORS:
INGERSOLL RAND                            X    X
```

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 15.

ELECTRICAL PANELS:
SQUARE D                                          X      X

WORK HISTORY SHEET FOR LEE KNOWLES, PAGE 16.

# DOCTOR LIST

## Exhibit "B"

LEE KNOWLES
8574 GRAND TETON
RATHDRUM, ID 83858
DOB: 10/22/1928

### DOCTOR HOSPITAL LIST

**Kootenai Medical Center**
2003 Kootenai Health Center
Coeur d' Alene, ID 83814

**Dr. Naseer Ahmad**
700 W. Ironwood Dr. Ste 103
Coeur d' Alene, ID 83814

**Northwest Heart & Lung Surgical Associates**
**Dr. Robert John Burnett**
2003 Lincoln Way Ste 300
Coeur d' Alene, ID 83814

**Integrative Medicine Associates**
**Dr. William Corell**
3424 S. Grand Blvd.
Spokane, WA 99203

**Dr. Kevin J. Chang**
700 W. Ironwood Dr. Ste 336
Coeur d' Alene, ID 83814

**Incyte Pathology**
2003 Lincoln Way
Coeur d' Alene, ID 83814

# HOSPITAL LIST

### Exhibit "C"

LEE KNOWLES
8574 GRAND TETON
RATHDRUM, ID 83858
DOB: 10/22/1928

### DOCTOR HOSPITAL LIST

**Kootenai Medical Center**
2003 Kootenai Health Center
Coeur d' Alene, ID 83814

**Dr. Naseer Ahmad**
700 W. Ironwood Dr. Ste 103
Coeur d' Alene, ID 83814

**Northwest Heart & Lung Surgical Associates**
**Dr. Robert John Burnett**
2003 Lincoln Way Ste 300
Coeur d' Alene, ID 83814

**Integrative Medicine Associates**
**Dr. William Corell**
3424 S. Grand Blvd.
Spokane, WA 99203

**Dr. Kevin J. Chang**
700 W. Ironwood Dr. Ste 336
Coeur d' Alene, ID 83814

**Incyte Pathology**
2003 Lincoln Way
Coeur d' Alene, ID 83814

# AUTHORIZATIONS

# Exhibit "D"

<u>AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION</u>

DIRECTED TO: _____

RE: _____

    I   HEREBY   AUTHORIZE   AND   REQUEST   YOU   TO   FURNISH   TO
_____ THE FOLLOWING:

☐ History Physical                 ☐ Discharge Summaries
☐ Doctor's Notes/Nurse's Notes    ☐ Correspondence between Physicians
☐ Initial Visit Information        ☐ Laboratory Reports
~~☐ Mental Health Records~~        ~~☐ Psychiatric Evaluations~~
☐ Copy of Entire Health Record    ☐ Itemized Billing Statements/Billing Records
~~☐ Psychological Records~~       ~~☐ Counseling Records~~

☐ I UNDERSTAND THAT THE INFORMATION IN MY HEALTH RECORD MAY INCLUDE INFORMATION RELATING TO SEXUALLY TRANSMITTED DISEASE, ACQUIRED IMMUNE DEFICIENCY SYNDROME (AIDS), OR HUMAN IMMUNE DEFICIENCY VIRUS (HIV). IT MAY ALSO INCLUDE INFORMATION ABOUT BEHAVIORAL OR MENTAL HEALTH SERVICES, INFORMATION CONCERNING ALCOHOL OR DRUG ABUSE AND SOCIAL AND FAMILY MATTERS.

☐ A PHOTOSTATIC COPY OF THIS AUTHORIZATION IS CONSIDERED AS EFFECTIVE AS THE ORIGINAL AND WILL EXPIRE 180 DAYS FROM DATE SIGNED.

☐ THIS RELEASE DOES NOT AUTHORIZE ANY ORAL EXCHANGE OF MEDICAL INFORMATION BETWEEN MY PHYSICIAN(S) AND ANY OTHER INDIVIDUAL.

☐ THIS RELEASE OF THE AFOREMENTIONED RECORDS IS ONLY FOR EVALUATION AND USE IN CONNECTION WITH CIVIL LITIGATION REFERENCED ABOVE.

☐ I UNDERSTAND I HAVE THE RIGHT TO REVOKE THIS AUTHORIZATION AT ANY TIME PROVIDED THAT THE REVOCATION IS IN WRITING.

☐ I UNDERSTAND THAT AUTHORIZING THE DISCLOSURE OF THIS HEALTH INFORMATION IS VOLUNTARY. I UNDERSTAND THAT I MAY INSPECT OR COPY THE INFORMATION TO BE USED OR DISCLOSED, AS PROVIDED IN CPR 164.524. I UNDERSTAND THAT ANY DISCLOSURE OF INFORMATION CARRIES WITH IT THE POTENTIAL FOR AN UNAUTHORIZED RE-DISCLOSURE AND THE INFORMATION MAY NOT BE PROTECTED BY FEDERAL CONFIDENTIALITY RULES.

☐ I UNDERSTAND THAT MY REFUSAL TO SIGN THIS FORM DOES NOT AFFECT MY HEALTH CARE TREATMENT OR THE PAYMENT OF MY HEALTHCARE TREATMENT.

_____
SIGNATURE OF PATIENT
(If other than patient, please state your relationship to patient:_____

Date: _____

Social Security Administration
Consent for Release of Information

Form Approved
OMB No. 0960-0566

### Instructions for Using this Form

Complete this form only if you want us to give information or records about you, a minor, or a legally incompetent adult, to an individual or group (for example, a doctor or an insurance company). If you are the natural or adoptive parent or legal guardian, acting on behalf of a minor, you may complete this form to release only the minor's non-medical records. If you are requesting information for a purpose not directly related to the administration of any program under the Social Security Act, a fee may be charged.

NOTE: Do not use this form to:

- Request us to release the medical records of a minor. Instead, contact your local office by calling 1-800-772-1213 (TTY-1-800-325-0778), or

- Request information about your earnings or employment history. Instead, complete form SSA-7050-F4 at any Social Security office or online at www.ssa.gov/online/ssa-7050.pdf.

### How to Complete this Form

We will not honor this form unless all required fields are completed. An asterisk (*) indicates a required field. Also, we will not honor blanket requests for "all records" or the "entire file." You must specify the information you are requesting and you must sign and date this form.

- Fill in your name, date of birth, and social security number or the name, date of birth, and social security number of the person to whom the information applies.

- Fill in the name and address of the individual (or organization) to whom you want us to release your information.

- Indicate the reason you are requesting us to disclose the information.

- Check the box(es) next to the type(s) of information you want us to release including the date ranges, if applicable.

- You, the parent or legal guardian acting on behalf of a minor, or the legal guardian of a legally incompetent adult, must sign and date this form and provide a daytime phone number where you can be reached.

- If you are not the person whose information is requested, state your relationship to that person. We may require proof of relationship.

### PRIVACY ACT STATEMENT

Section 205(a) of the Social Security Act, as amended, authorizes us to collect the information requested on this form. The information you provide will be used to respond to your request for SSA records information or process your request when we release your records to a third party. You do not have to provide the requested information. Your response is voluntary; however, we cannot honor your request to release information or records about you to another person or organization without your consent.

We rarely use the information provided on this form for any purpose other than to respond to requests for SSA records information. However, in accordance with 5 U.S.C. § 552a(b) of the Privacy Act, we may disclose the information provided on this form in accordance with approved routine uses, which include but are not limited to the following: 1. To enable an agency or third party to assist Social Security in establishing rights to Social Security benefits and/or coverage; 2. To make determinations for eligibility in similar health and income maintenance programs at the Federal, State, and local level; 3. To comply with Federal laws requiring the disclosure of the information from our records; and, 4. To facilitate statistical research, audit, or investigative activities necessary to assure the integrity of SSA programs.

We may also use the information you provide when we match records by computer. Computer matching programs compare our records with those of other Federal, State, or local government agencies. Information from these matching programs can be used to establish or verify a person's eligibility for Federally-funded or administered benefit programs and for repayment of payments or delinquent debts under these programs.

Additional information regarding this form, routine uses of information, and other Social Security programs are available from our Internet website at www.socialsecurity.gov or at your local Social Security office

### PAPERWORK REDUCTION ACT STATEMENT

This information collection meets the requirements of 44 U.S.C. § 3507, as amended by section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 3 minutes to read the instructions, gather the facts, and answer the questions. SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. You can find your local Social Security office through SSA's website at www.socialsecurity.gov. Offices are also listed under U.S. Government agencies in your telephone directory or you may call 1-800-772-1213 (TTY 1-800-325-0778). You may send comments on our time estimate above to: SSA, 6401 Security Blvd., Baltimore, MD 21235-6401. Send only comments relating to our time estimate to this address, not the completed form.

Form SSA-3288 (07-2010) EF (07-2010) Destroy Prior Editions

Social Security Administration
Consent for Release of Information

Form Approved
OMB No. 0960-0666

*SSA will not honor this form unless all required fields have been completed (*signifies required field).*

TO: Social Security Administration

_____     _____     _____
\*Name                        \*Date of Birth                \*Social Security Number

I authorize the Social Security Administration to release information or records about me to:

\*NAME                                        \*ADDRESS

_____          _____

_____          _____

_____          _____

\*I want this information released because:
*There may be a charge for releasing information.*

_____

_____

\*Please release the following information selected from the list below:
*You must check at least one box. Also, SSA will not disclose records unless applicable date ranges are included.*

☐ Social Security Number

☐ Current monthly Social Security benefit amount

☐ Current monthly Supplemental Security Income payment amount

☐ My benefit/payment amounts from _____ to _____

☐ My Medicare entitlement from _____ to _____

☐ Medical records from my claims folder(s) from _____ to _____
*If you want SSA to release a minor's medical records, do not use this form but instead contact your local SSA office.*

☐ Complete medical records from my claims folder(s)

☐ Other record(s) from my file (e.g. applications, questionnaires, consultative examination reports, determinations, etc.)

_____

I am the individual to whom the requested information/record applies, or the parent or legal guardian of a minor, or the legal guardian of a legally incompetent adult. I declare under penalty of perjury in accordance with 28 C.F.R. § 16.41(d)(2004) that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeking or obtaining access to records about another person under false pretenses is punishable by a fine of up to $5,000. I also understand that any applicable fees must be paid by me.

\*Signature: _X_ _Lee Knowles_ _____          \*Date: _____

Relationship (if not the individual): _____          \*Daytime Phone: _____

Form SSA-3288 (07-2010) EF (07-2010)

## REQUEST FOR SOCIAL SECURITY EARNINGS INFORMATION

1. From whose record do you need the earnings information?

Print the Name, Social Security Number (SSN), and date of birth below.

Name _____

Social Security
Number _____

Other Name(s) Used
(Include Maiden Name) _____

Date of Birth
(Mo/Day/Yr) _____

2. What kind of information do you need?

☐ Detailed Earnings Information
(If you check this block, tell us below
why you need this information.)

For the period(s)/year(s): _____

_____
_____

☐ Certified Total Earnings For Each Year.
(Check this box only if you want the information
certified. Otherwise, call 1-800-772-1213 to
request Form SSA-7004, Request for Earnings
and Benefit Estimate Statement)

For the year(s): _____

3. If you owe us a fee for this detailed earnings information, enter the amount due
using the chart on page 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A. $ _____

Do you want us to certify the information?     ☐ Yes    ☐ No

If yes, enter $15.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B. $ _____

ADD the amounts on lines A and B, and
enter the TOTAL amount . . . . . . . . . . . . . . . . . . . . . . . . . . . C. $ _____

* You can pay by CREDIT CARD by completing and returning the form on page 4, or
* Send your CHECK or MONEY ORDER for the amount on line C with the request
  and make check or money order payble to "Social Security Administration"
* DO NOT SEND CASH.

4. I am the individual to whom the record pertains (or a person who is authorized to sign on behalf of that
individual). I understand that any false representation to knowingly and willfully obtain information from
Social Security records is punishable by a fine of not more than $5,000 or one year in prison.

SIGN your name here
(Do not print)  > X _Lee Knowles_     Date _____

Daytime Phone Number _____
(Area Code) (Telephone Number)

5. Tell us where you want the information sent. (Please print)

Name _____     Address _____

City, State & Zip Code _____

6. Mail Completed Form(s) To:          Exception: If using private contractor (e.g., FedEx) to mail form(s), use:

Social Security Administration
Division of Earnings Record Operations
P.O. Box 33003
Baltimore Maryland 21290-3003

Social Security Administration
Division of Earnings Record Operations
300 N. Greene St.
Baltimore Maryland 21290-0300

Form SSA-7050-F4 (1-2004) EF (01-2004)          2

## PAYROLL AND PERSONNEL RECORDS AUTHORIZATION

TO WHOM IT MAY CONCERN:

    I hereby authorize you to provide to:

_____

              at this address:

_____

_____

a complete copy of all records pertaining to my employment, including but not limited to

all personnel, payroll, medical or hospital records pertaining to:

Full Name _____

Date of Birth _____ Social Security No. _____

My dates of employment were from _____ to _____

I worked in the following departments:

_____

_____

I was employed at the following office:

_____

_____

SIGNED: X _Lee Knowles_____

DATE: _____

| EXHIBIT D |
|:---:|

OMB Number: 2900-0260
Estimated burden: 2 minutes
Expiration Date: 10/31/2003

| **VA** Department of Veterans Affairs | **REQUEST FOR AND AUTHORIZATION TO RELEASE MEDICAL RECORDS OR HEALTH INFORMATION** |

The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Act. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a valid OMB number. We expect that the time expended by all individuals completing this form will average 2 minutes. This includes the time to read instructions, gather the necessary facts and fill out the form. The purpose of this form is to specifically outline the circumstances under which we may disclose data.

The execution of this form does not authorize the release of information other than that specifically described below. The information requested on this form is solicited under Title 38, U.S.C. The form authorizes release of information in accordance with the Health Insurance Portability and Accountability Act, 45 CFR Parts 160 and 164, 5 U.S.C. 552a, and 38 U.S.C. 5701 and 7332 that you specify. Your disclosure of the information requested on this form is voluntary. However, if the information including Social Security Number (SSN) the SSN will be used to locate records for release) is not furnished completely and accurately, Department of Veterans Affairs will be unable to comply with the request. The Veterans Health Administration may not condition treatment, payment, enrollment or eligibility on signing the authorization.

ENTER BELOW THE PATIENT'S NAME AND SOCIAL SECURITY NUMBER IF THE PATIENT DATA CARD IMPRINT IS NOT USED.

| TO: DEPARTMENT OF VETERANS AFFAIRS (Print or type name and address of health care facility) | PATIENT NAME (Last, First, Middle Initial) |
| | |
| | SOCIAL SECURITY NUMBER |

NAME AND ADDRESS OF ORGANIZATION, INDIVIDUAL OR TITLE OF INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

VETERAN'S REQUEST: I request and authorize Department of Veterans Affairs to release the information specified below to the organization or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

☐ DRUG ABUSE   ☐ ALCOHOLISM OR ALCOHOL ABUSE   ☐ TESTING FOR OR INFECTION WITH HUMAN IMMUNODEFICIENCY VIRUS (HIV)   ☐ SICKLE CELL ANEMIA

INFORMATION REQUESTED (Check applicable box(es) and state the extent or nature of the information to be disclosed, giving the dates or approximate dates covered by each)

☐ COPY OF HOSPITAL SUMMARY   ☐ COPY OF OUTPATIENT TREATMENT NOTE(S)   ☐ OTHER (Specify)

PURPOSE(S) OR NEED FOR WHICH THE INFORMATION IS TO BE USED BY INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

NOTE: ADDITIONAL ITEMS OF INFORMATION DESIRED MAY BE LISTED ON THE BACK OF THIS FORM

AUTHORIZATION: I certify that this request has been made freely, voluntarily and without coercion and that the information given above is accurate and complete to the best of my knowledge. I understand that I will receive a copy of this form after I sign it. I may revoke this authorization, in writing, at any time except to the extent that action has already been taken to comply with it. Written revocation of my medical records by those receiving the above authorized information may be accomplished without my further written authorization and may no longer be protected. Without my express revocation, the authorization will automatically expire: (1) upon satisfaction of the need for disclosure; (2) on _____ (date supplied by patient); or (3) under the following conditions(s):

I understand that the VA health care practitioner's opinions and statements are not official VA decisions regarding whether I will receive other VA benefits or, if I receive VA benefits, their amount. They may, however, be considered with other evidence when these decisions are made at a VA Regional Office that specializes in benefit decisions.

| DATE | SIGNATURE OF PATIENT OR PERSON AUTHORIZED TO SIGN FOR PATIENT (Attach authority to sign, e.g., POA) |
| | |

| FOR VA USE ONLY | |
| IMPRINT PATIENT DATA CARD (Name, Address, Social Security Number) | TYPE AND EXTENT OF MATERIAL |
| | |
| | DATE | RELEASED BY |

VA FORM
MAR 2003   10-5345   THIS SUPERSEDES VA FORM 10-5345, DATED JUN. 2001, WHICH WILL NOT BE USED.

Standard Form 180 (Rev. 10/10) (Page 1)
Prescribed by NARA (36 CFR 1228.168(b))

Authorized for local reproduction
Previous edition unusable

OMB No. 3095-0029 Expires 10/31/2011

# REQUEST PERTAINING TO MILITARY RECORDS

\* Requests from veterans or deceased veteran's next-of-kin may be submitted online by using eVetRecs at http://www.archives.gov/veterans/evetrecs/ \*

*(To ensure the best possible service, please thoroughly review the accompanying instructions before filling out this form. Please print clearly or type.)*

## SECTION I - INFORMATION NEEDED TO LOCATE RECORDS (Furnish as much as possible.)

| 1. NAME USED DURING SERVICE (last, first, and middle) | 2. SOCIAL SECURITY NO. | 3. DATE OF BIRTH | 4. PLACE OF BIRTH |
|---|---|---|---|

5. SERVICE, PAST AND PRESENT    (For an effective records search, it is important that all service be shown below.)

| | BRANCH OF SERVICE | DATE ENTERED | DATE RELEASED | OFFICER | ENLISTED | SERVICE NUMBER (If unknown, write "unknown.") |
|---|---|---|---|---|---|---|
| a. ACTIVE COMPONENT | | | | | | |
| b. RESERVE COMPONENT | | | | | | |
| c. NATIONAL GUARD | | | | | | |

6. IS THIS PERSON DECEASED? If "YES" enter the date of death. ☐ NO ☐ YES

7. IS (WAS) THIS PERSON RETIRED FROM MILITARY SERVICE? ☐ NO ☐ YES

## SECTION II - INFORMATION AND/OR DOCUMENTS REQUESTED

1. CHECK THE ITEM(S) YOU WOULD LIKE TO REQUEST A COPY OF:

☐ DD Form 214 or equivalent. This form contains information normally needed to verify military service. A copy may be sent to the veteran, the deceased veteran's next of kin, or other persons or organizations if authorized in Section III, below. NOTE: If more than one period of service was performed, even in the same branch, there may be more than one DD214. Check the appropriate box below to specify a deleted or undeleted copy. When was the DD Form(s) 214 issued? YEAR(S):

   ☐ UNDELETED: Ordinarily required to determine eligibility for benefits. Sensitive items, such as, the character of separation, authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and dates of time lost are usually shown.

   ☐ DELETED: The following items are deleted: authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and for separations after June 30, 1979, character of separation and dates of time lost.

☐ All Documents in Official Military Personnel File (OMPF)

☐ Medical Records (Includes Service Treatment Records (outpatient), inpatient and dental records.) If hospitalized, the facility name and date for each admission must be provided.

☐ Other (Specify):

2. PURPOSE: (An explanation of the purpose of the request is strictly voluntary; however, such information may help to provide the best possible response and may result in a faster reply. Information provided will in no way be used to make a decision to deny the request.) Check appropriate box:

☐ Benefits  ☐ Employment  ☐ VA Loan Programs  ☐ Medical  ☐ Medals/Awards  ☐ Genealogy  ☐ Correction  ☐ Personal

☐ Other, explain:

## SECTION III - RETURN ADDRESS AND SIGNATURE

1. REQUESTER IS:   (Signature Required in 3 below of veteran, next of kin, legal guardian, authorized government agent or "other" authorized representative. If "other" authorized representative, provide copy of authorization letter.)

☐ Military service member or veteran identified in Section I, above

☐ Legal guardian (Must submit copy of court appointment.)

☐ Next of kin of deceased veteran  (Must provide proof of death.)

☐ Other (specify)

Show relationship: _____
(See item 2a on accompanying instructions.)

2. SEND INFORMATION/DOCUMENTS TO:
(Please print or type. See Item 4 on accompanying instructions.)

3. AUTHORIZATION SIGNATURE REQUIRED (See Items 2a or 3a on accompanying instructions.)  I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this Section III is true and correct.

Name _____

_Signature Required - Do not print_

Street _____ Apt. _____

Date of this request _____ Daytime phone ( ) _____

City _____ State _____ Zip Code _____

Email address _____

*This form is available at http://www.archives.gov/research/order/standard-form-180.pdf on the National Archives and Records Administration (NARA) web site *

Standard Form 180 (Rev. 10/10) (Page 2)
Prescribed by NARA (36 CFR 1223.16(b)(1))

Authorized for local reproduction
Previous editions unusable.

OMB No. 3095-0029  Expires 10/31/2011

## LOCATION OF MILITARY RECORDS

The various categories of military service records are described in the chart below. For each category there is a code number which indicates the address at the bottom of the page to which this request should be sent. Please refer to the Instruction and Information Sheet accompanying this form as needed.

| BRANCH | CURRENT STATUS OF SERVICE MEMBER | ADDRESS CODE | |
|---|---|---|---|
| | | Personnel Record | Service Treatment Record |
| AIR FORCE | Discharged, deceased, or retired before 5/1/1994 | 14 | 14 |
| | Discharged, deceased, or retired 5/1/1994 – 9/30/2004 | 14 | 11 |
| | Discharged, deceased, or retired on or after 10/1/2004 | 1 | 11 |
| | Active (including National Guard on active duty in the Air Force), TDRL, or general officers retired with pay | 1 | |
| | Reserve, retired reserve in nonpay status, current National Guard officers not on active duty in the Air Force, or National Guard released from active duty in the Air Force | 2 | |
| | Current National Guard enlisted not on active duty in the Air Force | 13 | |
| COAST GUARD | Discharge, deceased, or retired before 1/1/1898 | 6 | |
| | Discharged, deceased, or retired 1/1/1898 – 3/31/1998 | 14 | 14 |
| | Discharged, deceased or retired on or after 4/1/1998 | 14 | 11 |
| | Active, reserve, or TDRL | 3 | |
| MARINE CORPS | Discharged, deceased, or retired before 1/1/1905 | 6 | |
| | Discharged, deceased, or retired 1/1/1905 – 4/30/1994 | 14 | 14 |
| | Discharged, deceased, or retired 5/1/1994 – 12/31/1998 | 14 | 11 |
| | Discharged, deceased, or retired on or after 1/1/1999 | 4 | 11 |
| | Individual Ready Reserve | 5 | |
| | Active, Selected Marine Corps Reserve, TDRL | 4 | |
| ARMY | Discharged, deceased, or retired before 11/1/1912 (enlisted) or before 7/1/1917 (officer) | 6 | |
| | Discharged, deceased, or retired 11/1/1912 – 10/15/1992 (enlisted) or 7/1/1917 – 10/15/1992 (officer) | 14 | 14 |
| | Discharged, deceased, or retired after 10/16/1992 | 14 | 11 |
| | Active enlisted, officers (including National Guard and Army Reserve on active duty in the U.S. Army) | 7 | |
| | National Guard enlisted and officers not on active duty in Army | 13 | |
| NAVY | Discharged, deceased, or retired before 1/1/1886 (enlisted) or before 1/1/1903 (officer) | 6 | |
| | Discharged, deceased, or retired 1/1/1886 – 1/30/1994 (enlisted) or 1/1/1903 – 1/30/1994 (officer) | 14 | 14 |
| | Discharged, deceased, or retired 1/31/1994 – 12/31/1994 | 14 | 11 |
| | Discharged, deceased, or retired on or after 1/1/1995 | 10 | 11 |
| | Active, reserve, or TDRL | 10 | |
| PHS | Public Health Service – Commissioned Corps officers only | 12 | |

### ADDRESS LIST OF CUSTODIANS (BY CODE NUMBERS SHOWN ABOVE) – Where to write/send this form

| | | | | | |
|---|---|---|---|---|---|
| 1 | Air Force Personnel Center HQ AFPC/DPSSRP 550 C Street West, Suite 19 Randolph AFB, TX 78150-4721 | 6 | National Archives & Records Administration Old Military and Civil Records (NWCTB-Military) Textual Services Division 700 Pennsylvania Ave., N.W. Washington, DC 20408-0001 | 11 | Department of Veterans Affairs Records Management Center P.O. Box 5020 St. Louis, MO 63115-5020 |
| 2 | Air Reserve Personnel Center /DSMR HQ ARPC/DPSSA/B 6760 E. Irvington Place, Suite 4600 Denver, CO 80280-4600 | 7 | U.S. Army Human Resources Command www.hrc.army.mil | 12 | Division of Commissioned Corps Officer Support ATTN: Records Officer 1101 Wootton Parkway, Plaza Level, Suite 100 Rockville, MD 20852 |
| 3 | Commander, CGPC-adm-3 USCG Personnel Command 4200 Wilson Blvd., Suite 1100 Arlington, VA 22203-1804 | 8 | Reserved. | 13 | The Adjutant General (of the appropriate state, DC, or Puerto Rico) |
| 4 | Headquarters U.S. Marine Corps Personnel Management Support Branch (MMSB-10) 2008 Elliot Road Quantico, VA 22134-5030 | 9 | Reserved. | 14 | National Personnel Records Center (Military Personnel Records) 9700 Page Ave. St. Louis, MO 63132-5100 eVetRecs: www.archives.gov/veterans/evetrecs/ |
| 5 | Marine Forces Reserve 4400 Dauphine St. New Orleans, LA 70146-5400 | 10 | Navy Personnel Command (PERS-312E) 5720 Integrity Drive Millington, TN 38055-3120 | | |

AUTHORIZATION FOR UNION RECORDS

TO WHOM IT MAY CONCERN:

This authorization specifically allows the law firm of _____
_____, or any of its representatives
to obtain all information requested from the unions of which plaintiff/decedent, _____
_____, was a member, including but not limited to, payroll
records and information, worker's compensation claim records, if any, health and dental
records, and any and all reports pertaining to medical screening, annual physical
examinations, including X-rays, medical examination reports, and plaintiff/decedent
waives any privilege which plaintiff/decedent may have regarding such reports, records
and information for the purposes of this lawsuit.

    A copy of this authorization bearing my signature shall be as valid as the original.

Name of Union: _____
Address of Union: _____
_____
Dates of Union Membership: _____

Plaintiff/Decedent: _____
Social Security No: _____
Date of Birth: _____

Signature: _Lee Knowles_____
Name of Representative, if applicable: _____
Date: _____

# SMOKING HISTORY

# Exhibit "E"

## PLAINTIFF'S SMOKING HISTORY

NAME:     **LEE E. KNOWLES**

DID YOU EVER USE:     CIGARETTES ( **X** )  CHEWING TOBACCO ( )  CIGARS (X)
PIPE ( )  SNUFF ( )

IF YOU SMOKED CIGARS OR CIGARETTES, DID YOU INHALE?  **YES.**

DATES YOU HAVE SMOKED:     **ON AND OFF 1948 - 1972**

HOW MUCH TOBACCO PRODUCT DO YOU USE EACH DAY?  **ONE PACK PER DAY.**

IF YOU HAVE EVER STOPPED SMOKING, PLEASE STATE YOUR REASONS FOR
QUITTING:  **DID NOT WANT TO EXPOSE FAMILY TO SMOKE.**

IF, AFTER QUITTING SMOKING, YOU STARTED SMOKING AGAIN, PLEASE GIVE THE
REASON YOU RESTARTED:  **NEVER STARTED AGAIN**

NAME ALL BRANDS OF TOBACCO YOU HAVE USED:  **PALL MALL, CAMEL**

HAVE YOU EVER BEEN ADVISED TO QUIT SMOKING?  **NO**

NAME AND ADDRESS OF PHYSICIAN ADVISING YOU TO QUIT:  **N/A**

DID YOU QUIT?  **YES.**

HAVE YOU BEEN ADVISED THAT CIGARETTE SMOKING IS HARMFUL?  **NO.**

HAVE YOU BEEN ADVISED THAT CIGARETTE SMOKING CAN CAUSE CANCER?  **YES.**

HOW DID YOU LEARN THIS INFORMATION?  **MEDIA**

ARE YOU AWARE OF THE WARNING BY THE SURGEON GENERAL REGARDING THE
DANGERS OF SMOKING?  **YES.**

IF YES, WHEN DID YOU FIRST LEARN?  **DATE UNCERTAIN**

HAVE YOU EVER READ THE SURGEON GENERAL'S WARNING?  **NO**

HAVE YOU USED TOBACCO PRODUCTS SINCE READING THE SURGEON GENERAL'S
WARNING?  **NOT APPLICABLE**

DOES YOUR SPOUSE SMOKE?  **NO**

# MEDICAL RECORDS

### Exhibit "F"

```
                           Kootenai Medical Center           PAGE 1
             2003 Kootenai Health Way  Coeur d'Alene, ID   (208) 666-2800
                           Inquiry/Broadcast Report
                  PCI User: TAD16   Lab Database: LAB.KMC
```

| Patient | Age/Sex | Location | Account# | Attending Physician |
|---|---|---|---|---|
| KNOWLES,LEE E | 82/M | KM.SSU | KM5228450 | Chang,Kevin Joe |

This is a corrected report.
Any previous versions are stored internally and are available if necessary.

Specimen: KC-10-713    Received: 12/22/10-0955  Status: SOUT   Req#: 02621071
                       Spec Type: CYTOLOGY       Subm Dr: Chang,Kevin Joe

Cyto Question

                    Source: THORACENTESIS
         Clinical Findings: NOT GIVEN
          Preoperative Dx: PLEURAL EFFUSION
     Specimen Description: LT PLEURAL FLUID FROM THORACENTESIS


CYTODIAGNOSIS

    PLEURAL FLUID:
    - POSITIVE FOR MALIGNANCY; NEOPLASTIC CELLS WITH IMMUNOPHENOTYPIC FEATURES OF
      MESOTHELIAL ORIGIN (MESOTHELIOMA).

    COMMENT: Additional immunohistochemical studies are requested by Dr. Ahmad to
    distinguish mesothelial from epithelial origin. Those studies were performed at InCyte
    Pathology and reported separately (PS-11-2224). Mesothelial tumors can demonstrate a
    wide variety of morphology, including patterns that very closely mimic the morphology
    of an adenocarcinoma. This mesothelial tumor exhibits this pattern of growth. The
    additional immunohistochemical studies, however, confirm a mesothelial immunophenotype.

    As part of our quality assurance program, another member of our pathology
    staff has reviewed this case.

        Dictated by: DeTar,Michael W


SPECIMEN COMMENTS:
    APPROX 20 ML KEPT AT KMC MICRO X1 WEEK

    CELL COUNT, LDH, PROTEIN, GLUCOSE, AMYLASE AND PH DONE AT
    KMC MAIN LAB

| KNOWLES,LEE E | DOB: 10/22/28 | Acct#: KM5228450 | Unit#: KM00155096 |
|---|---|---|---|
| Status: REG SDC | | Reg: 12/22/10 | Disch: |

RUN DATE: 10/26/11     Kootenai Medical Center   PAGE 2
RUN TIME: 1512  2003 Kootenai Health Way Coeur d'Alene, ID (208) 666-2800
RUN USER: TAD16     Inquiry/Broadcast Report
       PCI User: TAD16  Lab Database: LAB.KMC

Patient: KNOWLES,LEE E     DOB: 10/22/28 KM5228450  (Continued)

Specimen: KC-10-713   Received: 12/22/10-0955    (Continued)

## Clinical History

 NONE GIVEN

## Tissues

 A. Cytologic material, NOS - LT PLEURAL FLUID FROM THORACENTESIS

## Microscopic Examination

GROSS DESCRIPTION:
Received is 1000 mL of cloudy, red fluid with clot. This is now processed for
Papanicolaou-stained ThinPrep and hematoxylin-eosin stained cell block sections.

MICROSCOPIC DESCRIPTION:
Smears and cell block show a background of blood and fibrin, through which are
scattered moderate numbers of cohesive epithelial groups and single cells, these
showing moderate to abundant cytoplasm and large nuclei with prominent nucleoli. Some
groups suggest an Acinar or duct-like pattern. A panel of immunohistochemical stains is
performed with results as follows:

  * Cytokeratin 7: Positive.
  * Cytokeratin 20: Negative.
  * TTF-1: Negative.
  * CA19-9: Positive.

While the specific site of tumor origin is not evident, the morphology and
immunohistochemical staining pattern of this lesion, in a male patient, suggest origin
from the upper gastrointestinal tract, including pancreas. While a carcinoma primary in
lung cannot be ruled out, the absence of TTF-1 staining makes a lung primary less
likely.

* Immunohistochemical studies were performed on this case with the appropriate negative
and positive controls that react as expected. This test was developed and its
performance characteristics determined by InCyte Pathology. It has not been cleared or
approved by the U.S. Food and Drug Administration. The FDA has determined that such
clearance or approval is not necessary. This test is used for clinical purposes. It
should not be regarded as investigational or for research. InCyte Pathology is
certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) as
qualified to perform high complexity clinical laboratory testing.

KNOWLES,LEE E    DOB: 10/22/28  Acct#: KM5228450 Unit#: KM00155096
 Status: REG SDC        Reg: 12/22/10 Disch:

RUN DATE: 10/26/11                    Kootenai Medical Center                  PAGE 3
RUN TIME: 1512        2003 Kootenai Health Way   Coeur d'Alene, ID   (208) 666-2800
RUN USER: TAD16                       Inquiry/Broadcast Report
                         PCI User: TAD16   Lab Database: LAB.KMC

Patient: KNOWLES, LEE E              DOB: 10/22/28   KM5228450        (Continued)

Specimen: KC-10-713          Received: 12/22/10-0955               (Continued)

COPIES TO:
    Chang, Kevin Joe
    700 Ironwood Drive
    Coeur d'Alene, ID 83814
    208 765-1252

    No, Family Doctor

InCyte Pathology / Kootenai Medical Center / Department of Pathology (208) 666-2800

Signed _____ (signature on file)_____ DeTar, Michael W 01/26/11

KNOWLES, LEE E            DOB: 10/22/28      Acct#: KM5228450    Unit#: KM00155096
            Status: REG SDC                 Reg: 12/22/10    Disch:

Case MDL No. 375   Document 8585-1   Filed 03/30/12   Page 190 of 352

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA L. HAGEN, Individually and as Executrix of the Estate of MALCOLM HAGEN, | : : : | CONSOLIDATED UNDER MDL 875 |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | NO. 07-63346 |
| v. | : | |
| | : | |
| BENJAMIN FOSTER CO., et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    SEPTEMBER 24, 2010

TABLE OF CONTENTS

I.     INTRODUCTION...........................................................2
II.    BACKGROUND.............................................................3
       A.    Plaintiff's Suit...............................................3
       B.    Defendants' Removal and Plaintiff's Motion to
             Remand.........................................................4
             1.    Affidavit of J. Thomas
                   Schroppe.................................................5
             2.    Affidavit of David Hobson...............................6
             3.    Affidavit of Admiral Ben J. Lehman......................7
             4.    Affidavit of Admiral Roger B. Horne.....................9
             5.    Affidavit of Captain Lawrence Stilwell Betts.....9
III.   LEGAL STANDARD........................................................10
IV.    DISCUSSION............................................................14
       A.    The Colorable Federal Defense Requirement..................16
             1.    Legal Standard..........................................16
                   i.    Supreme Court Decisions...........................16
                   ii.   Lower Court Decisions.............................18
                   iii.  Standard to be Applied............................24
             2.    Application.............................................27
                   i.    Elements of the Government Contractor
                         Defense...........................................27
                   ii.   Applying the Defense to Defendants'
                         Facts.............................................29
       B.    The Acting Under Requirement...............................31
       C.    The Causal Nexus Requirement...............................32
V.     CONCLUSION............................................................34

## I.   INTRODUCTION

Donna L. Hagen, individually and as executrix of the estate of Malcolm Hagen ("Plaintiff"), has moved to remand this action—which is consolidated as part of the MDL-875 asbestos products liability litigation—to New Jersey state court. Plaintiff argues the Court should remand due to lack of subject matter jurisdiction.  Defendants Foster Wheeler Corporation and General Electric Company (collectively, "Defendants") filed timely responses in opposition to Plaintiff's motion.

Since MDL-875 was certified by the Judicial Panel on Multidistrict Litigation (the "Panel") in 1991, thousands of individual plaintiffs have had their cases consolidated in the Eastern District of Pennsylvania for coordinated pretrial proceedings.[1] A common path to consolidation in MDL-875 is removal by one or more defendants to an appropriate federal district court, followed by transfer by the Panel to the Eastern District of Pennsylvania.  In many of the MDL-875 cases, the jurisdictional basis for removal is the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which allows a defendant to remove a suit to federal court following a preliminary showing of a federal defense.  This memorandum evaluates the contours of the

---

[1]   For the most recent statistical breakdown, see U.S. District Court for the Eastern District of Pennsylvania, Asbestos Products Liability Litigation Caseload Statistics (2010), http://www.paed.uscourts.gov/documents/MDL/MDL875/Aug2010_pdf.

showing required by Section 1442(a)(1) and concludes Defendants
have sufficiently established the jurisdictional predicate to
avail themselves of this forum.  Thus, for the reasons set forth
below, Plaintiff's motion to remand will be denied.


II.  BACKGROUND

   A.   Plaintiff's Suit

      Malcolm Hagen ("Hagen") was exposed to asbestos while
working as an outside machinist in close proximity to asbestos-
containing machinery and insulation aboard the U.S.S. Kitty Hawk.
Hagen's responsibilities included assisting mechanics as they
installed and repaired machinery aboard ships at the shipyard.
Hagen worked in this capacity from 1958-1961.  Plaintiff alleges
that, on or around February 7, 2006, Hagen was diagnosed with
mesothelioma allegedly caused by exposure to asbestos while
aboard the U.S.S. Kitty Hawk.

      Plaintiff filed suit on July 11, 2006 in the Superior
Court of New Jersey, Middlesex County, alleging products
liability claims for failure to warn against thirteen named
defendants and fifty unnamed defendants.  Specifically, each
defendant manufacturer is alleged to have carelessly or
negligently processed, manufactured, packaged, distributed,
delivered and sold asbestos products without warnings.[2]  (Compl.

---

   [2]   Plaintiff does not assert design defect claims.

3

¶ 8.) Plaintiff further alleges that this failure to warn was the actual and proximate cause of Hagen's mesothelioma. (Id. ¶ 9.) On May 28, 2008, Hagen died of mesothelioma. Donna Hagen, who was already a named plaintiff in the suit, was named executrix of Hagen's estate and substituted as plaintiff in Hagen's stead.

      B.   <u>Defendants' Removal and Plaintiff's Motion to Remand</u>

On October 12, 2006, Defendants removed this case to federal court under 28 U.S.C. § 1442(a)(1). As explained below, removal under Section 1442(a)(1) is only appropriate where, amongst other things, a so-called "colorable" federal defense is raised. Plaintiff, arguing removal under Section 1442(a)(1) was improper based on this standard, filed a motion to remand to state court on October 19, 2006. Before Plaintiff's motion was ruled upon, Plaintiff's case was transferred to the Eastern District of Pennsylvania and consolidated under MDL-875. Upon transfer, Plaintiff's motion was denied without prejudice. (See doc. no. 2.) On June 10, 2009, Plaintiff renewed her motion to remand before this Court. (See doc. no. 41.)

Defendants oppose Plaintiff's motion and submit several affidavits in opposition.[3] Specifically, Defendants contend

---

    [3]   The Court may properly consider these materials in weighing the merits of Plaintiff's motion to remand. <u>See, e.g.</u>, <u>Hilbert v. McDonnell Douglas Corp.</u>, 529 F. Supp. 2d 187, 196 (D. Mass. 2008) ("[I]n seeking to determine whether the defendants have met [the removal] burden, the Court is permitted to look

these affidavits establish the subject matter jurisdiction predicate under Section 1442(a)(1) insofar as they entitle Defendants to the "government contractor defense" set forth in Boyle v. United Technologies Corp., 487 U.S. 500 (1988). Thus, the affidavits all make the same basic point: that Plaintiff's failure to warn claim against Defendants relates to the government's control over the allegedly tortious product's design. These affidavits—namely, those of (1) J. Thomas Schroppe; (2) David Hobson; (3) Admiral Ben J. Lehman; (4) Admiral Roger B. Horne, Jr.;[4] and (5) Captain Lawrence Stilwell Betts—are discussed in turn.[5]

> 1. Affidavit of J. Thomas Schroppe

J. Thomas Schroppe ("Schroppe") is a former employee of Foster Wheeler Corporation ("Foster") who began his career at Foster as a proposal engineer in the marine department and

---

beyond the pleadings to the evidence submitted by the parties regarding the Motion to Remand.").

[4] Admiral Horne's affidavit was attached as an exhibit to Plaintiff's motion.

[5] The Court held a hearing on Plaintiff's motion to remand on December 4, 2009. Following the hearing, the Court permitted the parties to submit additional materials for the Court to review in resolving Plaintiff's motion. (See doc. no. 68.) Defendants' additional submissions include a copy of the relevant Military Specification manual referred to in the various affidavits. However, because the Court concludes the initial affidavits are themselves sufficient to establish that removal under Section 1442(a)(1) was proper, it is unnecessary to outline the content of any additional materials beyond those discussed in this memorandum.

5

ultimately became President of Foster. (Schroppe Aff. ¶ 1.)
Over the course of his employment, Scroppe avers that he became
"personally familiar with the degree of supervision and control
exercised by the Navy and its agencies in procurement contracts
with Foster." (Id. ¶ 2.) According to Schroppe, the control
exercised required Foster to comply with precise ship
specifications for each individual project, as well as military
specifications. (Id. ¶¶ 5, 6.) These specifications covered all
specific components of boilers built for use by the Navy. (Id.)

Schroppe further avers that Foster was obliged to
provide technical manuals relating to the operation of naval
boilers which included safety information. (Id. ¶ 21.)
According to Schroppe, the Navy exercised "intense direction and
control" over the documents and "participated intimately in the
preparation of this kind of information and exercised . . .
control over its contents." (Id.) Further, Schroppe represents
that "the Navy had precise specifications, practices and
procedures that governed the content of any communication affixed
to machinery supplied by Foster Wheeler to the Navy" which would
not permit Foster to include "any type of warning or caution
statement to a piece of equipment intended for installation onto
a Navy vessel." (Id. ¶ 22.)

_____ 2.   Affidavit of David Hobson

David Hobson ("Hobson") is a former employee of General

6

Electric Company ("GE") who joined GE in 1969 and worked there until his retirement in 1996.  (Hobson Aff. ¶ 1.)  During his tenure, he worked as the manager of Navy customer service for GE's Navy and small steam turbine business.  (Id. ¶ 1.)  In this capacity, Hobson had "frequent and extensive business dealings" with the Navy regarding the Navy's purchase and use of marine steam turbines.  (Id. ¶ 3.)  According to Hobson, all such turbines were supplied to the Navy pursuant to a contract with the Navy Sea Systems Command ("NSSC") whereby NSSC's officers supervised and specified the requirements for "[a]ll aspects of the design, performance requirements and materials used for construction."  (Id. ¶¶ 6, 7.)

Hobson states that any thermal insulation materials, whether or not containing asbestos, were applied to GE products after they were turned over to the Navy, and were supplied or installed by entities other than GE.  (Id. ¶ 7.)  Further, each turbine manufactured by GE was specifically and uniquely manufactured for the vessel or class of vessels which that contract pertained to.  (Id. ¶ 10.)  And, ultimately, the Navy exercised complete oversight over both the manufacture and safety testing phases of the process.  (Id. ¶ 13-14.)

3.   Affidavit of Admiral Ben J. Lehman

Admiral Ben J. Lehman ("Admiral Lehman") is a retired Rear Admiral of the United States Navy.  (Lehman Aff. ¶ 1.)

7

Admiral Lehman details the level of control that the Navy asserted over all aspects of the equipment that was supplied pursuant to government contracts. (Id. ¶ 2.) He corroborates Hobson and Schroppe's averments, emphasizing the importance of adhering to government directives. (See id. ¶ 6 ("I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy . . . were drafted, approved, and maintained by the U.S. Navy . . . to encompass all aspects of shipboard equipment, including the material requirements.").)

In fact, Admiral Lehman states that "[m]ilitary specifications governed every significant characteristic of the equipment used on the U.S. Navy ships, including the instructions and warnings." (Id. ¶ 10.) "This control included the decision of which warnings should or should not be included." (Id.) And, according to Admiral Lehman, the Navy "would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment" or accompanying instructions or manuals. (Id.) This, as Admiral Lehman goes on to explain, relates to Navy specifications that "specifically limited warning information to items and events dealing with the operation of equipment." (Id. ¶ 12.) According to Admiral Lehman, "the application or removal of insulation would [necessarily] not have been included." (Id.)

8

4.  Affidavit of Admiral Roger B. Horne

Admiral Roger B. Horne ("Admiral Horne") worked as the chief engineer and deputy commander for NSSC, and also served as the commander of several shipyards throughout the country. (Horne Aff. ¶ 2.)  Admiral Horne attests to the "level of supervision, direction and control exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and auxiliary equipment . . . intended for installation on Navy vessels."  (Id. ¶ 4.)

In particular, Admiral Horne states that "Navy specifications . . . covered the nature of any communication affixed to boilers or other equipment supplied to the Navy." (Id. 12.)  Further, Admiral Horne avers that the specifications promulgated by the Navy "governed every characteristic of the equipment used on Navy ships, including the instructions and warnings" and covered "what warnings should or should not be included."  (Id. ¶ 13.)  Finally, as to written materials provided with the equipment, Admiral Horne states that "[t]he Navy was intimately involved with and had final approval of all . . . . safety or hazard information and any other written information that accompanied a piece of equipment."  (Id. ¶ 14.)

5.  Affidavit of Captain Lawrence Stilwell Betts

Captain Lawrence Stilwell Betts ("Captain Betts") is a medical doctor and retired U.S. Navy Captain.  (Betts Aff. ¶ 1.)

During his Navy career, Captain Betts was a warfare medical department officer, and became familiar with the industrial products used by the Navy in this capacity. (Id. ¶ 2.) From 1987 to 1989, Captain Betts was stationed on the U.S.S. Kitty Hawk—the naval vessel at issue in the instant case. (Id. ¶ 2.)

Captain Betts asserts that, beginning in the early 1920s, the Navy recognized that inhaling asbestos fibers in significant doses could result in pulmonary disease. (Id. ¶ 28.) In fact, Captain Betts avers that the Navy's knowledge of asbestos-related health hazards was unsurpassed. (Id. ¶ 31; see also id. ¶ 32 ("There was no information concerning any asbestos-containing hazard or danger posed by any asbestos-containing product applied to any marine boiler on a United States Navy ship known to a boiler manufacturer . . . that was not known to the United States and the United States Navy.").) However, according to Captain Betts, the Navy continued to use asbestos aboard ships due to military necessity. (Id. ¶ 5.)

## III. LEGAL STANDARD

As a general matter, removal of an action from state court is only permissible to the extent that the action could have initially been brought in federal court. See 28 U.S.C. § 1441. Although Article III of the Constitution would permit it, see Osborn v. Bank of the United States, 22 U.S. 738, 824 (1824)

10

(holding Article III permits jurisdiction because "[t]he question forms an original ingredient . . . . Whether it be in fact relied on or not"), the original jurisdiction Congress has conferred on federal courts does not generally allow a defendant to remove a suit to federal court on the basis of a federal defense. See Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908) (describing the statutory grant of federal question jurisdiction to only permit jurisdiction "when the plaintiff's statement of his own cause of action shows that it is based upon [federal law]" and that it is not enough "that the plaintiff alleges some anticipated [federal law] defense").

The federal officer removal statute, which confers jurisdiction over cases in which a federal officer is a defendant by explicitly allowing defendants to remove such actions, is an exception to this general principle. See Jefferson County v. Acker, 527 U.S. 423, 431 (1999) ("Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law."); Mesa v. California, 489 U.S. 121, 136 (1989) (explaining that the federal officer removal statute is a "pure jurisdictional statute . . . [that] grant[s] district court jurisdiction over cases in which a federal officer is a defendant"). Amongst other parties, it allows the following class of defendants to remove a state

11

action to federal court:

> The United States or any agency thereof or any officer (or
> any person acting under that officer) of the United States
> or of any agency thereof, sued in an official or individual
> capacity for any act under color of such office or on
> account of any right, title or authority claimed under any
> Act of Congress for the apprehension or punishment of
> criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). Thus, to establish subject matter
jurisdiction under Section 1442(a)(1), an individual defendant
must show:

> (1) it is a "person" within the meaning of the statute; (2)
> the plaintiff's claims are based upon the defendant's
> conduct "acting under" a federal office; (3) it raises a
> colorable federal defense; and (4) there is a causal nexus
> between the claims and the conduct performed under color of
> a federal office.

Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d
Cir. 1998).

Here, the applicable defense raised is the government
contractor defense which, based on principles of preemption,
cloaks government contractors like Defendants from ordinary
state-law liability. It applies where: "(1) the United States
approved reasonably precise specifications; (2) the equipment
conformed to those specifications; and (3) the supplier warned
the United States about the dangers in the use of the equipment
that were known to the supplier but not to the United States."
Boyle, 487 U.S. at 512. And because the government contractor
defense is the basis for invoking this Court's jurisdiction in
this suit against non-government entities who furnished equipment

12

to the military, resolution of Plaintiff's motion to remand effectively turns on how colorable Defendants' federal defense really is.  Thus, although the Court considers each element required for removal separately, its analysis begins (and essentially ends) with the colorable defense requirement.[6]

In so doing, the Court is cognizant that, unlike the analysis undertaken with respect to other removal statutes, see Brown v. Jevic, 575 F.3d 322, 326 (3d Cir. 2009) (explaining the general rule that removal statutes "are to be strictly construed, with all doubts to be resolved in favor of remand"), the Court must broadly construe Defendants' ability to remove under Section 1442(a)(1) as to avoid frustrating its policy objective of "hav[ing] the validity of the defense of official immunity tried

---

[6]    However, the Court need not address the person requirement at any length.  Although some courts have held corporations are not persons under Section 1442(a)(1) based on an inappropriately narrow construction of the statute, see Krangel v. Crown, 791 F. Supp. 1436, 1446 (S.D. Cal. 1992) (concluding corporations do not qualify as persons under Section 1442(a)(1) due to "the fact that ambiguities should be resolved against federal jurisdiction, and the strong interest of the states in adjudicating the rights and obligations of their citizens"), it is well settled that corporations such as Defendants do qualify as persons under the statute and that such non-government entities may seek removal under Section 1442(a)(1) based on the government contractor defense.  See, e.g., Good v. Armstrong World Indus., Inc., 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996) (concluding corporation is a person under Section 1442(a)(1) and recognizing the corporation's ability to remove to federal court via the government contractor defense); see also Holdren v. Buffalo Pumps, Inc., 614 F. Supp. 2d 129, 142 (D. Mass. 2009) (collecting authority and explaining "government contractors are entitled to seek removal under the statute").

in a federal court" by applying a "narrow, grudging interpretation." <u>Willingham v. Morgan</u>, 395 U.S. 402, 407 (1969); <u>see Sun Buick, Inc. v. Saab Cars USA, Inc.</u>, 26 F.3d 1259, 1262 (3d Cir. 1994) (distinguishing the general removal standard from the standard applicable in cases removed pursuant to Section 1442(a)).

 With these principles in mind, the Court turns to the merits of Plaintiff's motion.


## IV.  DISCUSSION

 As noted, the dispute in this case turns on whether Defendants' evidence supporting the government contractor defense suffices to meet the standard for removal under Section 1442(a)(1).  Defendants assert their affidavits and supporting materials demonstrate that the Navy exercised control over the manufactured products and that, consequently, the government contractor defense precludes state-law liability for any failure to warn.  On the other hand, Plaintiff claims Defendants' evidence is generic boilerplate that does not satisfy the elements for removal.  In support of this contention, Plaintiff points to a series of cases rejecting Section 1442(a)(1) removal whilst considering similar—and in some instances, precisely the same—affidavits to those offered here.  Defendants, in turn, point to several other cases reaching the opposite conclusion.

Case 2:09-md-2047-JCD Document 8585-3 Filed 03/30/12 Page 205 of 352 Page ID
#:211
Case 2:07-cv-63 ER Document 129 Filed 09/24/1 Page 15 of 34

At its essence, the split in authority boils down to an argument over what a defendant must proffer to defeat a plaintiff's motion for remand.[7] Beneath the surface, the divide appears to be a consequence of two clashing objectives a court facing a plaintiff's motion to remand must consider: (1) the Supreme Court's mandate to broadly construe a defendant's removal under Section 1442(a)(1); and (2) the bounds of federal subject matter jurisdiction imposed by both the Constitution and the removal statute itself. After considering these competing objectives, the Court determines that a defendant is entitled to removal under Section 1442(a)(1) where the defendant identifies facts which, viewed in the light most favorable to the defendant, entitle him or her to a complete defense.[8] Defendants' pleading

---

[7] As noted, some cases have held that affidavits like those at issue in this case are insufficient because they are non-specific boilerplate. See Lindenmayer v. Allied Packing & Supply, Inc., No. 09-5800, 2010 WL 234906 (N.D. Cal. Jan. 14, 2010); Holdren, 614 F. Supp. 2d at 129; Williams v. Gen. Elec. Co., 418 F. Supp. 2d 610 (M.D. Pa. 2005); Westmiller v. Imo Indus., Inc., No. 05-945, 2005 WL 2850334 (W.D. Wash. Oct. 20, 2005). Plaintiff urges that this conclusion represents an emerging trend. However, it is clear that many cases continue to find remand appropriate in such circumstances. See Corley v. Long-Lewis, Inc., 688 F. Supp, 2d 1315 (N.D. Ala. 2010); Kirks v. Gen. Elec. Co., 654 F. Supp. 2d 220 (D. Del. 2009); Seigfried v. Allegheny Ludlum Corp., 09-125, 2009 WL 1035001 (W.D. Pa. Apr. 17, 2009); Machnik v. Buffalo Pumps, Inc., 506 F. Supp. 2d 99 (D. Conn. 2007); Ferguson v. Lorillard Tobacco Co., 475 F. Supp. 2d 725 (N.D. Ohio 2007); Nesbiet v. Gen. Elec. Co., 399 F. Supp. 2d 205 (S.D.N.Y. 2005).

[8] These facts may be cited in the answer, the notice of removal or in the response to a motion for remand. Given that the Supreme Court has referred to the colorable defense element

15

materials, including the affidavits, plainly satisfy this standard.

    A.   The Colorable Federal Defense Requirement

        1.   Legal Standard

            i.   Supreme Court Decisions

      The Court's analysis begins with the colorable federal defense requirement for Section 1442(a)(1) removal, which stems from the Supreme Court's decision in <u>Mesa v. California</u>. In <u>Mesa</u>, California issued criminal complaints against several employees of the United States Postal Service who sought removal to federal court under Section 1442(a)(1). 489 U.S. at 123. The government, in opposing remand, urged the Court to adopt a reading of Section 1442(a)(1) that would permit a federal officer to remove a suit to federal court without requiring the presence of a federal defense. <u>See id.</u> at 964. Citing constitutional concerns about the breadth of such an interpretation, the Court determined the statute requires a federal defense as a condition precedent to removal. <u>See id.</u> at 969 ("Adopting the Government's

_____

as a "pleading requirement[]" and "averment," it is debatable whether a defendant must, at this stage of the proceeding, submit affidavits or other evidentiary materials to make out a colorable federal defense. <u>Mesa</u>, 489 U.S. at 133. Indeed, a defendant removing an action is generally only required to file "a notice of removal signed pursuant to Rule 11 . . . containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446. However, the Court need not resolve this issue as Defendants have submitted such materials in responding to Plaintiff's motion for remand.

view would eliminate the substantive Art. III foundation of §
1442(a)(1) and unnecessarily present grave constitutional
problems. We are not inclined to abandon a longstanding reading
of the officer removal statute that clearly preserves its
constitutionality and adopt one which raises serious
constitutional doubt.").

But while Mesa affirmatively settled that Section
1442(a)(1) requires a colorable federal defense to effect removal
under the statute, it did not clarify what defenses qualify as
such. Instead, it simply described the federal defense as a
"pleading requirement[]" that must be satisfied for removal under
the statute. Id. at 133. Nevertheless, other Supreme Court
cases elucidate the colorable defense requirement. In Willingham
v. Morgan, for example, the Supreme Court explained the scope of
Section 1442(a)(1):

> The federal officer removal statute is not 'narrow' or
> 'limited.' At the very least, it is broad enough to cover
> all cases where federal officers can raise a colorable
> defense arising out of their duty to enforce federal law.
> One of the primary purposes of the removal statute—as its
> history clearly demonstrates—was to have such defenses
> litigated in the federal courts.

395 U.S. at 406-07. As the Court succinctly put it, an "officer
need not win his case before he can have it removed." Id. at
407. Similarly, in Arizona v. Manypenny, the Court spoke of the
Section 1442(a)(1)'s purpose of "ensur[ing] a federal forum in
any case where a federal official is entitled to raise a defense

Case 2:09-md-02075-JCB  Document 8585-1  Filed 03/30/12  Page 208 of 352  Page ID
#:214
Case 2:07-cv-63... ER  Document 129  Filed 09/24/1  age 18 of 34

arising out of his official duties". as to allow a defendant the

opportunity to have his or her defense adjudicated in federal

court.  451 U.S. 232, 241 (1981).  In <u>Jefferson County v. Acker</u>,

the Court echoed the important policy of providing a federal

forum in discussing the colorable federal defense requirement:

> In construing the colorable federal defense requirement, we
> have rejected a "narrow, grudging interpretation" of the
> statute, recognizing that "one of the most important reasons
> for removal is to have the validity of the defense of
> official immunity tried in a federal court."  We therefore
> do not require the officer virtually to "win his case before
> he can have it removed."

527 U.S. at 431 (internal citations omitted) (quoting <u>Willingham</u>,

395 U.S. at 407).

Under these authorities, it is clear that the Supreme

Court's treatment of Section 1442(a)(1)'s colorable defense

requirement urges an expansive interpretation which allows

jurisdiction to be exercised by the federal courts to the limits

imposed by the statute.  This interpretation, however, is

necessarily tempered by the constitutional concerns that—as the

<u>Mesa</u> Court stated—might emerge in the absence of a colorable

defense requirement.

     ii.  <u>Lower Court Decisions</u>

Lower courts have struggled in striking the balance

between the breadth of Section 1442(a)(1)'s grant of jurisdiction

and the constitutional limits imposed by Article III.  This is

illustrated by the District of Massachusetts' discussion in

Case 2:Case-N2de-ADS75-JCB oDurneht8585-3 Filed 03/30/42 Page 209 of 352 Page ID
#:215
Case 2:07-cv-63    ER  Document 129  Filed 09/24/1 · Page 19 of 34

Holdren v. Buffalo Pumps, Inc., where the court granted the
plaintiff's motion to remand in the face of many of the same
affidavits submitted in the instant case. 614 F. Supp. 2d at
139. The Holdren Court did so because the evidence presented by
the defendants purportedly did not show "that the Navy ever
exercised its final authority in any fashion that either
expressly barred or broadly preempted the inclusion of asbestos
warnings." Id. In so holding, the Holdren Court cited "the
Supreme Court's admonition that Section 1442(a) should not be
subject to a 'narrow, grudging interpretation,'" id. at 140
(quoting Manypenny, 451 U.S. at 242), but expressed
constitutional concerns befitting a non-deferential review of
whether a defendant's defense is colorable:

> As a constitutional matter, a defendant must aver something
> more than his status as a federal officer in order to bring
> his case into a federal forum. It is only the assertion of
> a colorable federal defense that justifies the federal
> court's limited Article III jurisdiction in these cases.
> Without this requirement, § 1442(a) would "expand[ ] the
> jurisdiction of the federal courts beyond the bounds
> established by the Constitution." Because it alone confers
> Article III jurisdiction, the "colorable" standard requires
> that a federal court carefully weigh the plausibility of the
> proffered defense.

Id. at 140 (internal citations omitted) (quoting Mesa, 489 U.S.
at 136); see also id. at 141 ("A colorable federal defense . . .
is not a requirement that may be reduced to the point of
vanishing altogether."). Although not always explicit, many of
the other decisions granting a plaintiff's motion to remand seem

informed by similar concerns. See, e.g., Lindenmayer, 2010 WL 234906, at *5 ("Relaxing this standard too far . . . could well err in the opposite direction—by providing a federal forum to a party whose acts were outside its federal directives." (internal marks omitted) (quoting Holdren, 614 F. Supp. 2d at 141)).

And, in accord with these concerns over a liberalization of the standard, many courts have drawn distinctions between the class of defendants involved where removal under Section 1442(a)(1) is predicated on the government contractor defense. The Holdren Court noted, for example, that "private government contractors—particularly those in failure-to-warn cases—are several degrees distant from the paradigmatic federal officer protected by 28 U.S.C. § 1442(a)(1)." 614 F. Supp. 2d at 136; see also Prewett v. Goulds Pumps (IPG), No. 09-0838, 2009 WL 2959877, at *3 (W.D. Wash. Sept. 9, 2009) ("The situation of a private contractor asserting a government contractor defense is different because the federal interest is not as obvious.").

Thus, in applying the Supreme Court's teachings, the doctrinal conflict created by the interplay of the statute's breadth and the potential constitutional limits that lurk in the background has led courts to conflicting conclusions. For example, some courts analyzing removal under Section 1442(a)(1) equivocate between the terms "plausible" and "colorable." See,

e.g., Bennett v. MIS Corp., 607 F.3d 1076, 1089 (6th Cir. 2010)

("[A] colorable federal defense need only be plausible."); see

also United States v. Todd, 245 F.3d 691, 693 (8th Cir. 2001)

("For a defense to be considered colorable, it need only be

plausible . . . ."); Magnin v. Teledyne Cont'l Motors, 91 F.3d

1424, 1427 (11th Cir. 1996) (explaining that a colorable defense

"need only be plausible"). In doing so, however, many

distinguish the showing required for removal from the ultimate

evidentiary showing at trial, suggesting the colorable defense

standard is not an onerous one to satisfy.[9] See Bennett, 607

F.3d at 1091 (holding defense was colorable insofar as it was an

issue of first impression that had been accepted by other

courts); Todd, 245 F.3d at 693 (deeming defense colorable because

it "at the very least plausibly shields" defendants); Marley v.

Elliot Turbomachinery Co., 545 F. Supp. 2d 1266, 1271-73 (S.D.

Fla. 2008) (explaining a colorable defense is a plausible one,

and describing it as a "low standard" that can be met even where

there are disputes as to the merits of the defense). Yet other

---

[9] Indeed, the term "plausible" is generally used differently in the Section 1442(a)(1) context than in cases determining whether a complaint should be dismissed under Rule 12(b)(6) in accordance with Twombly and its progeny. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The latter standard, which defines plausible factual allegations as those that go beyond the speculative level, seems more exacting than that required by many courts deeming a colorable defense a plausible one when evaluating whether to grant a plaintiff's motion to remand.

21

courts follow the <u>Holdren</u> Court's lead and—albeit not
explicitly—apply a heightened standard at the remand stage that
requires courts to "carefully weigh the plausibility of the
proffered defense." <u>Holdren</u>, 614 F. Supp. 2d at 140. This is
particularly evident upon review of the series of cases resolving
the same issue in this case: namely, whether the government
contractor defense colorably shields defendants from failure to
warn liability for asbestos-related injuries allegedly sustained
on Navy ships where the defendants contend the Navy would not
have allowed any such warnings.

Given the inability of lower courts to develop a
consistent approach to the issue, it is unsurprising that the
results have varied considerably even where identical or
substantially similar evidentiary materials are submitted to the
court.[10] Some, such as the <u>Marley</u> Court, have concluded that the
affidavits establish a colorable defense. <u>See, e.g.</u>, <u>Marley</u>, 545
F. Supp. 2d at 1273 (holding the affidavits establish a good
faith defense even though the arguments against the defense

---

[10] As the court in <u>Marley v. Elliot Turbomachinery Co.</u>
noted in considering two of the affidavits present in this
case—those of Admiral Lehman and Admiral Horne—"[a]lmost
identical affidavits have been filed by the defendants in
lawsuits all over the country," 545 F. Supp. 2d at 1273. The
affidavits of Admiral Lehman and Admiral Horne submitted to this
Court appear to be similar if not identical to those submitted in
<u>Marley</u>. The same is true of the affidavits of Captain Betts,
Schroppe and Hobson which, though not discussed in <u>Marley</u>, are
considered by courts evaluating whether to remand in several
cases.

"raise a number of questions that the defendants will have to answer to ultimately prevail"); see also Pantalone v. Aurora Pump Co., 576 F. Supp. 2d 325, 331-32 (D. Conn. 2008) ("Through the factual assertions in its notice of removal and supporting affidavits, Buffalo Pumps has met the three elements of the government-contractor defense . . . ."). Others, however, remand on the ground that the affidavits leave too many questions open to establish a colorable federal defense:

> [T]he Court's decision rests ultimately on what is missing
> from the record. The defendants have submitted no evidence
> that the Navy expressly prohibited asbestos warnings by
> manufacturers; no evidence that they ever attempted to warn
> about asbestos on products destined for the Navy; no
> evidence that the Navy ever rejected any other
> manufacturer's proposed asbestos warning; and no evidence
> that defendants warned of asbestos on other, non-military
> equipment they produced during the same period, by contrast
> to the equipment they supplied to the Navy. Finally, they
> offer no persuasive evidence of an overall Navy-wide policy
> that would have conflicted with manufacturer asbestos
> warnings.

Holdren, 614 F. Supp. 2d at 137; see Lindenmayer, 2010 WL 234906, at *6 (holding affidavits from Captain Betts, Schroppe and Admiral Lehman did not raise a colorable defense to plaintiff's failure to warn claim because of the "absence of any effort to warn about asbestos"); Westmiller, 2005 WL 2850334, at *2 (concluding an affidavit from Admiral Lehman stating "the Navy had complete control over every aspect of each piece of equipment" and "dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings with

23

its ships" was insufficient to establish a colorable defense).
As the language in Holdren and like cases criticizing the lack of
"persuasive evidence" of a Navy policy prohibiting warnings make
clear, Holdren, 614 F. Supp. 2d at 137, the decisions rejecting
affidavits like those submitted in the instant case deem
insufficient averments that the Navy would not have allowed any
warnings to be made.

### iii. Standard to be Applied

Upon review of the many thoughtful opinions and
applying the Supreme Court's clear teaching that a colorable
defense need not be proven at this stage of the litigation due to
the broad removal right the statute creates, the Court declines
to follow those courts that have seemingly required a heightened
showing of a colorable federal defense. Moreover, neither the
Article III concerns some courts have raised nor the fact that
this particular case involves private contractors asserting the
government contractor defense compels a different conclusion.

Although the Supreme Court has expressed concerns about
the constitutionality of Section 1442(a)(1) if a colorable
defense was not required for removal, see Mesa, 489 U.S. at 969,
it did not—as cases like Holdren suggest—expressly hold the lack
of a colorable defense requirement would "expand[ ] the
jurisdiction of the federal courts beyond the bounds established
by the Constitution." Holdren, 614 F. Supp. 2d at 140 (internal

24

marks omitted) (quoting <u>Mesa</u>, 289 U.S. at 136). Rather, it
adopted a narrower interpretation of Section 1442(a)(1) to avoid
resolution of this very question. <u>See</u> <u>Mesa</u>, 489 U.S. at 969.
Thus, the Article III concerns that allegedly require the court
to "carefully weigh the plausibility of the proffered defense,"
<u>Holdren</u>, 614 F. Supp. 2d at 140, are overstated; the colorable
defense requirement is a simple statutory limit on subject matter
jurisdiction that may or may not be coextensive with what Article
III permits.[11] The Court, therefore, can balance the interest in
broadly construing removal under Section 1442(a)(1) against its
statutory limits and any associated constitutional concerns
without requiring defendants to make such a significant showing
of the merits of their defense at this early stage. In any
event, if it later becomes evident that the relevant facts
developed in the litigation do not support jurisdiction, the

---

[11] Article III extends the federal judicial power to cases
"arising under" federal law and those involving diversity of
citizenship, and reflects the outer bounds of the district
court's authority to resolve a dispute. But it is just that, for
original jurisdiction may only be exercised where and to the
extent Congress allows it by statute. Because the two most
common statutory bases for jurisdiction—28 U.S.C. § 1331 and 28
U.S.C. § 1332, which confer jurisdiction over federal questions
and actions in which there is diversity of citizenship
respectively—nearly reach that afforded by Article III, it is
often unnecessary to distinguish between the jurisdiction Article
III allows and that Congress permits courts to exercise.
Nevertheless, it is understood that Congress has not always
extended original jurisdiction to the full extent permitted by
Article III. <u>Compare, e.g.</u>, <u>Osborn</u>, 22 U.S. at 824 <u>with</u> <u>Mottley</u>,
211 U.S. at 153.

Court will do what it would do in any removed case: dismiss and remand the action based on lack of subject matter jurisdiction.[12] See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action"); 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

And though it is perhaps true that the defendants in this and similar cases are not "the paradigmatic federal officer protected" by Section 1442(a)(1), Holdren, 614 F. Supp. 2d at 136, it is axiomatic that these defendants are nevertheless protected by the statute. After all, "[i]f the federal government can't guarantee its agents access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf." Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (9th Cir. 2006).

While the Court must require that the facts identified by the defendant support the federal defense, the Court is not called upon at this preliminary stage to pierce the pleadings or

---

[12] Proceeding in this fashion is particularly appropriate in view of the limited opportunity for appellate review of remand orders. See 28 U.S.C. § 1447(d) ("An order remanding a case to the State court . . . is not reviewable on appeal or otherwise . . . ."); Feidt, 153 F.3d at 126-27 (concluding the court of appeals lacked jurisdiction to review the district court's remand order where defendant had removed the action under Section 1442(a)(1)).

26

dissect the facts stated. Nor is it the Court's function at this stage to determine credibility, weigh the quantum of evidence or discredit the source of the defense. Cf. Black's Law Dictionary 282 (9th ed. 2009) (defining a colorable claim as "a claim that is legitimate and that may reasonably be asserted, given the facts presented and the current law (or a reasonable and logical extension or modification of the current law)"). It is the sufficiency of the facts stated—not the weight of the proof presented—that matters. For policy reasons, Congress has erected a road to federal court for litigants who can invoke a federal defense. It is not the Court's role to impose judicially created tolls on those who seek to travel on it. Thus, the Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial.[13]

    2. Application

        i. Elements of the Government Contractor Defense

As noted, the defense relied on in this case is the government contractor defense. The government contractor defense displaces state law where "(1) the United States approved

---

[13] Presumably, the merits of Defendants' defense will be tested on a motion for summary judgment or at trial. By allowing Defendants' defense to be resolved in this forum, the Court adheres to Section 1442(a)(1)'s clear mandate.

27

reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512.  Although the Boyle decision applied the government contractor defense to a design defect products liability claim rather than a failure to warn claim products liability claim, courts have recognized the defense's applicability to failure to warn claims like Plaintiff's.  See, e.g., Feidt, 153 F.3d at 127 (suggesting the district court properly considered the government contractor defense as a basis for removal of plaintiff's failure to warn claim); see also Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th Cir. 1996) ("[W]hen state law would otherwise impose liability for a failure to warn, that law can be displaced . . . ."); Tate v. Boeing Helicopters, 55 F.3d 1150, 1157 (6th Cir. 1995) (recognizing a distinction between applying the government contractor defense to design defect claims and failure to warn claims, but holding "the rationale for applying the government contractor defense to a failure to warn claim tracks the Boyle analysis closely").

However, because "design defect and failure to warn claims differ practically as well as theoretically," courts have required the government approval to "transcend rubber stamping" for the defense to shield a government contractor from failure to

28

warn liability. Tate, 55 F.3d at 1156, 1157. That is, "a
manufacturer asserting the federal contractor defense must show
that the federal government issued reasonably precise
specifications covering warnings—specifications that reflect a
considered judgment about the warnings at issue." Holdren, 614 F.
Supp. 2d at 143. Nevertheless, the test applied is largely
derived from Boyle:

> (1) the United States exercised its discretion and approved
> the warnings, if any; (2) the contractor provided warnings
> that conformed to the approved warnings; and (3) the
> contractor warned the United States of the dangers in the
> equipment's use about which the contractor knew, but the
> United States did not.

Tate, 55 F.3d at 1157; see also Oshkosh, 96 F.3d at 1003-04
(same).

    ii.  Applying the Defense to Defendants' Facts

       The Court's task, then, is to determine whether
Defendants have a colorable claim that the government contractor
defense shields them from liability to Plaintiff. As noted, this
inquiry is undertaken whilst viewing the facts in the light most
favorable to Defendants, and does not address the merits of the
defense. Under this standard, it is clear that Defendants raise a
colorable defense because Defendants would prevail on their
defense at trial if the facts raised were proven.

       First, the affidavits submitted show (1) that the Navy
exercised direction and control over the products created; which
(2) Defendants conformed to by failing to warn. The affidavits do

this by stating that Defendants would not be permitted to include "any type of warning or caution statement," (Schroppe Aff. ¶ 22), and that the applicable specifications furnished by the Navy required manufacturers to yield all oversight of the manufacture and testing phases to the Navy. (See, e.g., Hobson Aff. ¶ 13-14.) This is particularly true given that the specifications "covered the nature of any communication affixed to boilers or other equipment supplied to the Navy." (See Horne Aff. ¶.12.) Indeed, according to Defendants' evidence, the Navy controlled "the decision of which warnings should or should not be included." (Lehman Aff. ¶ 10.) Therefore, to the extent the affidavits are true, it is clear that the Navy was responsible for the lack of warnings. This demonstrates the first two elements of the government contractor defense.

Second, the affidavits submitted satisfy the third element of the defense—namely, that Defendants warned the Navy of the dangers in Defendants' equipment that Defendants knew of but the Navy did not. As the language of this prong indicates, the defense does not require the contractor to warn the government where "the government knew as much or more than the defendant contractor about the hazards of the . . . product." Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co., 883 F.2d 1210, 1216 (3d Cir. 1989). Captain Betts' affidavit expressly speaks to this point, stating that "[t]here was no information concerning any

asbestos-containing hazard or danger posed by any asbestos-containing product applied to any marine boiler on a United States Navy ship known to a boiler manufacturer . . . that was not known to the United States and the United States Navy." (Betts Aff. ¶ 32.) Captain Betts made this statement based on his personal knowledge as a medical doctor and retired U.S. Navy Captain. (Id. ¶ 1.) It is possible that further proceedings will cast doubt on Captain Betts' claim, but—if true—Defendants would satisfy the third element of the defense insofar as they would have warned the Navy of every danger they were aware of that the Navy was unaware of. Thus, Defendants meet the third element of the government contractor defense as well, and have established a colorable federal defense that satisfies Section 1442(a)(1)'s colorable defense requirement.

    B.    The Acting Under Requirement

         The federal officer removal statute only extends removal authority to persons acting under an officer of the United States. See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 80 (1991). A defendant acts under a federal officer where his or her actions that led to the lawsuit were based on a federal "officer's direct orders or comprehensive and detailed regulations." Good, 914 F. Supp. at 1128. That is, it is not enough for a defendant to show that "the relevant acts occurred under the general auspices of a federal officer." Fung v. Abex

31

Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992) (internal marks
omitted) (quoting Ryan v. Dow Chem. Co., 781 F. Supp. 934, 947
(E.D.N.Y. 1992)).

Because a defendant's government contractor defense in a
failure to warn case is only colorable if the defendant identifies
facts demonstrating the government's actions "transcend rubber
stamping," Tate, 55 F.3d at 1157, any defendant who satisfies the
colorable defense requirement will necessarily meet the acting
under requirement of Section 1442(a)(1) as well. That is, in
cases involving assertion of the government contractor defense to
a plaintiff's failure to warn suit, the burden for demonstrating
the defendant acted under an officer of the United States is lower
than that associated with demonstrating a colorable federal
defense. Cf. Holdren, 614 F. Supp. 2d at 149 (finding defendants
satisfied the acting under requirement even though they did not
meet the colorable defense requirement). Accordingly, for the
same reasons the Court determined Defendants' federal defense is
colorable, Defendants have also established they were acting under
a federal officer as to satisfy Section 1442(a)(1)'s acting under
requirement.

    C.   The Causal Nexus Requirement

The final requirement for removal under Section
1442(a)(1) is that the defendant demonstrate a causal nexus
between the conduct performed under federal direction and, in this
case, Plaintiff's failure to warn claim. See Mesa, 489 U.S. at

131-34.  To do so, a defendant seeking removal must "by direct
averment exclude the possibility that [the defendant's action] was
based on acts or conduct of his not justified by his federal
duty."  Id. at 132 (quoting Maryland v. Soper (No. 1), 270 U.S. 9,
33 (1926)).

Although some courts have suggested the causal nexus
requirement should be more closely scrutinized than Section
1442(a)(1)'s other requirements, see Holdren, 614 F. Supp. 2d at
149 ("[A]s a jurisdictional fact, causation is judged by a
somewhat stricter 'reasonable probability' standard"), it is
evident that the causal nexus requirement "is closely related to
evidence supporting a colorable federal defense" where a
government contractor is the defendant because both elements
require the "defendant [to] show that it acted at the federal
government's command."  Id.  Indeed, just as the acting under
analysis becomes redundant where a defendant in a government
contractor case makes out a colorable federal defense, resolving
the causal nexus requirement is not difficult in light of the
Court's colorability determination because the causal nexus
analysis "is essentially the same as [that associated with] the
colorable defense requirement."[14]  Prewett, 2009 WL 2959877, at *7.

---

[14]    The similarities between the respective showings
required are further demonstrated by the fact that some courts
have collapsed the causal nexus and acting under prongs into one
single requirement.  See, e.g., Good, 914 F. Supp. at 1128 ("The
'acting under' language in the statute forces [the defendant] to
show a causal nexus between the plaintiffs' claims and the

33

As outlined above, Defendants have a colorable federal defense that any failure to warn relates to the Navy's control over the product Defendants manufactured for the government. Thus, the necessary causal connection exists because the liability Defendants face arises from their official duties, performed in accordance with a valid government contract. See Willingham, 395 U.S. at 409 (holding a causal nexus is established where it is shown the defendant's "relationship to [the plaintiff] derived solely from [his or her] official duties"). Therefore, the Court finds Defendants have demonstrated a causal nexus between Plaintiff's failure to warn claims and the conduct performed under color of a federal office as to satisfy Section 1442(a)(1)'s causal nexus requirement.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion to remand will be denied. An appropriate Order will follow.

---

conduct taken pursuant to direction from a federal officer.").

34

Case MDL No. 375   Document 85-1   Filed 03/30/12   Page 225 of 352

# EXHIBIT D

dismisses them. The court hereby dismisses Newton's employment claims based on procedural due process and equal protection. The court denies summary judgment on Newton's procedural due process claim pertaining to his ATCS certificate. Due to the *Feres* doctrine, however, Newton may only challenge the procedural actions of Major Teter and Lt. Col. Lee relating to Newton's ATCS certificate suspension and the withdrawal.



Charles CORLEY, et al., Plaintiffs

v.

LONG–LEWIS, INC., et al., Defendants.

Case No. 2:09–cv–01812–HGD.

United States District Court,
N.D. Alabama,
Southern Division.

Jan. 28, 2010.

**Background:** Former Naval shipyard worker brought action in state court against manufacturers, distributors, and owners of asbestos-containing products and/or materials to recover damages for asbestos-related injuries arising from exposure to asbestos-containing products and/or materials. After removal, worker moved to remand.

**Holdings:** The District Court, Harwell G. Davis, III, United States Magistrate Judge, held that:

(1) removal on basis of federal enclave jurisdiction was proper, and

(2) "federal officer" removal statute applied to worker's claims against federal contractor for design defect and failure to warn of danger of exposure to asbestos.

Motion denied.

**1. United States ⟨⟩3**

Jurisdiction exercised by the United States over federal enclaves is exclusive unless the deed of cession provides to the contrary or unless the cession is not accepted in the manner required by law. U.S.C.A. Const. Art. 1, § 8, cl. 17.

**2. Evidence ⟨⟩10(4), 17**

Courts may take judicial notice of such scientific, historical, and geographical facts as the boundaries of a state or the time of sunset. Fed.Rules Evid.Rule 201(b), 28 U.S.C.A.

**3. Removal of Cases ⟨⟩19(1)**

Removal on basis of federal enclave jurisdiction was proper with respect to worker's suit seeking to recover for injuries sustained as result of his exposure to asbestos while performing his duties on board United States Navy vessels while they were tied to the dock at U.S. Naval bases that were federal enclaves and while they were in dry dock within the facilities; worker was not simply a seaman on a ship that simply passed through the ports on his way to another location, but rather, was there to specifically use the facilities for performing work on the ships. U.S.C.A. Const. Art. 1, § 8, cl. 17; 16 U.S.C.A. § 457.

**4. Removal of Cases ⟨⟩79(1)**

"Advance notice" provided to defendants' counsel via email that plaintiff intended to file complaint did not start the clock for purposes of determining timeliness of removal; rather, clock commenced upon receipt by the defendant of a copy of the initial pleading setting forth the claim for relief upon which the action was based. 28 U.S.C.A. § 1446(b).

**5. Removal of Cases ⟨⟩21**

A state-court action against any person acting under the direction of an officer of the United States or its agencies can be

**688 FEDERAL SUPPLEMENT, 2d SERIES**

removed to federal court pursuant to "federal officer" removal statute. 28 U.S.C.A. § 1442(a)(1).

**6. Removal of Cases ⬅21**

Purpose of "federal officer" removal statute is to permit the removal of those actions commenced in state court that expose a federal official to potential civil liability or criminal penalty for an act performed under color-of-office. 28 U.S.C.A. § 1442(a)(1).

**7. Removal of Cases ⬅21**

Removal under "federal officer" removal statute generally requires defendant to advance a colorable defense arising out of his duty to enforce federal law and to establish that the suit is for acts performed "under the color of office"; colorable defense is a defense that is plausible, and "under the color of office" requirement is satisfied by showing a causal connection between what the officer has done under asserted official authority and the action against the defendants. 28 U.S.C.A. § 1442(a)(1).

**8. Removal of Cases ⬅21**

"Federal officer" removal statute applied to Naval shipyard worker's claims against federal contractor for design defect and failure to warn of danger of exposure to asbestos; contractor established a colorable defense to the extent it was required to design turbines for ship under the direct supervision and control of the U.S. Navy according to specifications from which it could not deviate without advance approval from the Navy, and satisfied "causal nexus" requirement by showing that worker's claims arose from contractor's performance of its duties under its contract with the Navy. 28 U.S.C.A. § 1442(a)(1).

**9. Removal of Cases ⬅21**

Government contractor's right to remove design defects claims under "federal officer" removal statute could not be defeated by plaintiff's disclaimer of any claim arising from any act or omission compelled by a government agency. 28 U.S.C.A. § 1442(a)(1).

---

G. Patterson Keahey, Jr., Tracey C. Dotson, Law Offices of G. Patterson Keahey PC, James Arthur Butts, John D. Saxon, John D. Saxon PC, Birmingham, AL, for Plaintiffs.

Jeffrey E. Friedman, Friedman Leak, Lee Taylor Patterson, Friedman Leak Dazzio Zulanas & Bowling PC, Frank E. Lankford, Jr., Huie Fernambucq & Stewart LLP, Brian M. Blythe, Bradley Arant Boult Cummings LLP, James A. Harris, III, Nicole Mapp Hardee, Harris & Harris LLP, James Alexander Wyatt, III, Parsons Lee & Juliano PC, W. Larkin Radney, IV, Lightfoot Franklin & White LLC, Allan R. Wheeler, C. Paul Cavender, Burr & Forman LLP, Janelle R. Evans, Julian Houston Smith, III, S. Allen Baker, Jr., Balch & Bingham LLP, Michael A. Vercher, Christian & Small LLP, William T. Mills, II, Porterfield Harper Mills & Motlow PA, Edwin B. Nichols, Maynard Cooper & Gale PC, Anthony C. Harlow, Starnes & Atchison LLP, Birmingham, AL, F. Grey Redditt, Jr., Timothy Allen Clarke, Vickers Riis Murray & Curran LLC, Edward B. McDonough, Jr., Anne Laurie McClurkin, Walter T. Gilmer, Jr., Frederick G. Helmsing, Jr., McDowell, Knight, Roedder & Sledge, LLC, Mobile, AL, James G. House, III, Forman Perry Watkins Krutz & Tardy LLP, Jackson, MS, for Defendants.

*ORDER*

HARWELL G. DAVIS, III, United States Magistrate Judge.

Plaintiffs, Charles Corley and Myra Corley, have filed a Motion to Remand.

(Doc. #21). On July 7, 2009, plaintiffs filed a First Amended Complaint naming, *inter alia*, CBS Corporation, a Delaware corporation, f/k/a Viacom, Inc., Successor by Merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation; Garlock Sealing Technologies, LLC; and Owens–Illinois, Inc., as defendants. These defendants removed this action to federal court within 30 days of service of process. (Doc. #1). The First Amended Complaint seeks recovery of damages arising from the allegation that plaintiff Charles Corley suffered asbestos-related injuries arising from exposure to asbestos-containing products and/or materials.

*The Amended Complaint*

In the First Amended Complaint, Charles Corley asserts that he was continually exposed to asbestos-containing products that were "produced, manufactured, specified for use, installed, distributed, sold and/or placed into the stream of commerce by the defendants in this case during his employment as a boiler room technician, ship-wide maintenance worker, HVAC repairman, and shade tree auto mechanic, *inter alia*, including but not limited to the following locations:...." He then lists his employer from 1946 to 1973 as the U.S. Navy, employed as a boiler room technician and ship-wide maintenance worker aboard the USS Cavalier, USS George Clymer, USS Seminole, USAT Monterray, USS Franklin Delano Roosevelt, USS Intrepid, USS Valley Forge, USNS Mississinewa, USS Albany USS YR-65, USNS Calocsa Hatchee, and the USS West Milton. He further lists himself as self-employed from 1973 to the 1990s as a shade-tree auto mechanic and operator of a small HVAC repair business at various locations within Jefferson County, Alabama.

The Amended Complaint asserts that during the course of his employment, plaintiff worked in and around asbestos-containing turbines, motors, generators, gaskets, pumps, valves, electrical equipment, brakes, furnaces, cements, air compressors, boilers, joint compounds, grinders, rope packing, HVAC equipment and HVAC-related materials, automotive friction products, and other industrial equipment and other industrial equipment. It is alleged that Corley discovered that he had asbestos-related malignant mesothelioma on February 27, 2009.

According to the Amended Complaint, "[e]ach and every one of the following defendants produced, distributed, manufactured, installed, insured, owned, and/or maintained or controlled the premises, facilities and worksites (sic) containing asbestos-containing products and/or materials, including their own asbestos-containing products and/or materials and those produced or manufactured by others...." (Amended Complaint at ¶ 5). The Amended Complaint then lists every named defendant, including CBS Corporation, a Delaware corporation, f/k/a Viacom, Inc., Successor by Merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation; Garlock Sealing Technologies, LLC; and Owens–Illinois, Inc.

In addition to identifying these defendants, the Corleys allege, *inter alia*, that defendant CBS Corporation produced asbestos-containing products, including, but not limited to, air compressors, pumps, and valves. (*Id.* at ¶ 5(6)). They allege that Garlock Sealing Technologies, LLC (Garlock) produced asbestos-containing products, including gaskets, packing asbestos cloth, ring packing, rope packing, sheet packing, sheet gaskets and valve packing. (*Id.* at ¶ 5(42)). Plaintiffs also allege that defendant Owens–Illinois, Inc., produced asbestos-containing products, including insulation, pipe insulation, kaylo pipe insula-

tion, kaylo block, cement and adhesives. (*Id.* at ¶ 5(44)).

In the body of the Amended Complaint, perhaps anticipating the removal of this action, plaintiffs assert, *inter alia*, that this action is improper for removal because (a) the federal court lacks subject-matter jurisdiction, (b) the action does not involve a federal question, (c) there is a lack of complete diversity-of-citizenship between the parties,[1] and (d) plaintiffs expressly disclaim every claim arising under the Constitution, treaties or laws of the United States, including any claim arising from an act or omission on a federal enclave, or by any officer of the United States or any agency or person acting under him/her under color of such office. (*Id.* at ¶¶ 6–7).

In Count One, plaintiffs assert that defendants are strictly liable for Mr. Corley's mesothelioma because their "asbestos-containing products to which Charles Corley was exposed were in a defective condition and were unreasonably dangerous to the user, consumer or bystander; the asbestos machinery, products, or equipment were in a defective condition and unreasonably dangerous" to the plaintiff, who was an intended and foreseeable user or bystander during the use of the asbestos, in that it was, among other things, known to have an unreasonably high potential for causing respiratory diseases and cancer and lacked sufficient warnings of this potential. (*Id.* at ¶ 10).

Plaintiffs also allege that the asbestos-containing products were defective due to, among other things, a lack of warning of the dangerous properties of these products and due to their defective design resulting from the use of asbestos where it was not required and other equally suitable alternative substances were available. (*Id.* at ¶ 11(b), (g), & (h)). They further allege

that the asbestos machinery and other asbestos-containing products produced by the defendants were unreasonably dangerous to the intended users and bystanders. (*Id.* at ¶ 11). Plaintiffs also allege that the defendants and/or their predecessor entities were engaged in, or materially participated in, selling asbestos and materials containing asbestos, representing to Charles Corley and the public that the asbestos was not dangerous. (*Id.* at ¶ 12).

In Count Two, plaintiffs allege negligence in that "[e]ach of the Defendants had, but breached, duties to the plaintiffs to exercise the highest standard of care in designing, testing, manufacturing, marketing, selling asbestos and equipment or machinery which is an extraordinarily and inherently substance," including failing to use less-dangerous alternative materials, to warn of its inherent dangerousness to health, to instruct in methods to reduce the dangers of inhalation and ingestion of asbestos, to remove asbestos products from the stream of commerce, and to inspect the asbestos products for adequate warnings and instructions. (*Id.* at ¶ 16).

Plaintiffs also claim that the "contractors and subcontractors are sued for negligently installing, removing, selecting, selling sanding, cutting, and otherwise disturbing asbestos-containing products in such a manner to cause the release of asbestos fibers." Premises owners are alleged to have been negligent in "installing, removing, maintaining, or disturbing asbestos and failing to warn contractor employees of the hazards in their facilities, including their exposure to asbestos." (*Id.* at ¶ 17).

It is alleged that defendants acted intentionally and/or with gross negligence, and/or recklessly, maliciously and wanton-

---

1. Defendant Long-Lewis is an Alabama corporation, and plaintiffs are Alabama residents.

ly in that each of the defendants knew or should have known, through data available exclusively to them, that asbestos was inherently and extraordinarily dangerous if used in the manner intended and foreseen by defendants. (*Id.* at ¶ 19).

Count Three alleges breaches of warranties by the defendants "who were manufacturers, sellers, or distributors of asbestos-containing products," for failing to exercise their skills and judgment to select and furnish goods of a suitable and reasonably safe nature, to furnish products fit for the particular purposes intended, and to supply products in a merchantable condition. (*Id.* at ¶ 22).

In Count Four, titled "Conspiracy—As to Metropolitan Life Insurance Company Only," plaintiffs allege that Metropolitan Life Insurance Company (Metropolitan) agreed and conspired with defendants and others to suppress and misrepresent the hazards of exposure to asbestos. Plaintiffs allege that Metropolitan, the defendants and others engaged in actions and research as to the hazards of asbestos and "often edited out material deemed to be potentially harmful to the asbestos industry and only published favorable portions of their findings and/or refrained from publishing anything." According to plaintiffs, Metropolitan financially aided the asbestos industry in its endeavor to mislead and obfuscate.

Plaintiffs further allege that defendants knowingly and willfully conspired among themselves to perpetuate the actions and omissions referred to in the Amended Complaint in order to keep Charles Corley and others ignorant of the risks they faced when exposed to asbestos and asbestos-containing products, with the knowledge that those at risk would not discover the danger presented by asbestos. (*Id.* at ¶¶ 26–28).

Plaintiffs further assert that defendants misrepresented that "asbestos was not

hazardous and/or could be used safely when they (a) had no adequate basis for such representations; and (b) knew that a significant health hazard to human life existed from asbestos." In addition, even after the dangers of asbestos became known to plaintiffs and others, defendants conspired to "mislead and misrepresent the extent of past wrongful actions and omissions." (*Id.* at ¶¶ 29–31). It is alleged that defendants "destroyed records, hid witnesses and other evidence, and committed such other wrongful and unnecessary actions so as to: (a) prevent and delay the plaintiffs and others similarly situated from filing legal action to recover these false injuries; and/or (b) defeat and/or delay such legal actions and the final collection of any judgment." (*Id.* at ¶ 31).

According to plaintiffs, defendants "aided and abetted the manufacturers, miners, suppliers, and users of asbestos and asbestos products in keeping the true dangers of asbestos exposure secret and/or misrepresented." As a direct result of these actions, plaintiffs allege that Charles Corley was exposed to asbestos and inhaled or ingested this material, resulting in mesothelioma. Plaintiffs demand judgment under this count "against the defendants jointly, severally, and collectively." (*Id.* at ¶¶ 32–35).

In Count Five, plaintiff, Myra Corley, alleges that she has suffered a loss of consortium. She seeks damages for this, as well. (*Id.* at ¶¶ 36–38).

In their claim for damages, plaintiffs assert that "Charles Corley's asbestos-related malignant mesothelioma was due to his exposure to asbestos containing products, and each and every exposure to asbestos and asbestos-containing materials contributed to the cause of his asbestos-related mesothelioma." Plaintiffs demand judgment against defendants, jointly and severally. (*Id.* at 40).

688 FEDERAL SUPPLEMENT, 2d SERIES

*The Motion to Remand*

Defendants Garlock and Owens–Illinois removed this case based on "federal enclave" jurisdiction. (Doc. # 1, Notice of Removal). *See* U.S. Const. art. I, § 8, cl. 17.[2] CBS Corporation also sought removal of this action to federal court based on "federal officer" removal under 28 U.S.C. § 1442(a)(1). (Doc. # 2, CBS Corporation's Additional Grounds for Removal). Plaintiffs filed a timely Motion to Remand this case to state court on September 23, 2009. (Doc. # 21). In their motion, the Corleys assert that the Amended Complaint specifically disclaims any cause of action based on federal law or other theory that would invoke federal jurisdiction. They state that Mr. Corley's causes of action relate solely to defendants' failure to warn Corley of the dangers posed by their asbestos. (*Id.* at ¶ 1).

Plaintiffs note that Garlock and Owens–Illinois filed a notice of removal by relying on U.S. Constitution, Article I, Section 8, Clause 17, alleging that "a Naval Shipyard would be a 'federal enclave' within which the United States has exclusive jurisdiction." Plaintiffs state that defendants have asserted that Mr. Corley's deposition gives rise to the claim of federal enclave jurisdiction based on Mr. Corley's alleged exposure to asbestos at several shipyards that occurred during limited periods when he served in the United States Navy. They allege that Mr. Corley's deposition testimony does not support this allegation. (*Id.* at ¶¶ 2–3).

According to plaintiffs, in several of the shipyards, Mr. Corley was never exposed to asbestos and, in fact, specifically stated that he was not exposed to asbestos at the Boston Naval Shipyard, *citing* Charles Corley Depo. at 271. Plaintiffs claim that "[n]owhere in his deposition does Mr. Corley clearly and unambiguously state [that he] was exposed to asbestos at any of the shipyards." (*Id.* at ¶ 4).

Plaintiffs also assert that "federal jurisdiction is only proper when resolution of the complaint will necessarily raise substantial questions of federal law," citing *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir.2004). (*Id.* at ¶ 6). They further state that defendants have not demonstrated that there is any claim that would support the federal contractor defense as set out in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).[3] (*Id.* at ¶ 7).

---

2. In this clause, the U.S. Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." The federal courts have held that such places are "federal enclaves" wherein jurisdiction is exclusively in the United States. *Lord v. Local Union No.2088, Int'l Bhd. of Elec. Workers, AFL–CIO*, 646 F.2d 1057, 1059 (5th Cir.1981).

3. In *Boyle v. United Techs. Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court recognized a broad formulation of the government contractor defense that shields manufacturers of products made for the government from tort liability for flaws in product design. The Court recognized that in certain areas of "uniquely federal interests," state law must be preempted, and if necessary replaced, by federal common law. In this case, the Supreme Court noted that one such area of uniquely federal interest is the government's procurement of military hardware. The Court grounded the contours of the defense in the "discretionary function" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), that protects the United States from liability for its agents' performance of duties involving discretionary decisions. 108 S.Ct. at 2514–18. Without this defense, the government's own tort immunity for its discretionary functions would be undermined. Contractors held liable for design features that were the subject of discretionary approval by the government would predictably pass on the costs of liability, ultimately

Plaintiffs also claim that defendants' notice of removal was untimely because, while Garlock and Owens-Illinois filed a notice of removal within 30 days after Garlock was served with the Amended Complaint, it was 95 days after Garlock had been given advance notice of the suit and 48 days after notice to Owens-Illinois regarding their impending involvement. As will be addressed below, this particular argument is without merit.

### DISCUSSION

### Federal Enclave Jurisdiction

[1]    The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const. art. I, § 8, cl. 17. The jurisdiction exercised by the United States over federal enclaves is exclusive unless the deed of cession provides to the contrary or unless the cession is not accepted in the manner required by law. *Lord v. Local Union No.2088, Int'l Bhd. of Elec. Workers, AFL-CIO,* 646 F.2d 1057, 1059 (5th Cir.1981).[4]

In addition, 16 U.S.C. § 457 provides:

Action for death or personal injury within national park or other place

under jurisdiction of United States; application of State laws

In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

The United States District Courts have jurisdiction over actions both under a statute giving jurisdiction in cases arising under the Constitution, laws and treaties of United States (Article I, Section 8, Clause 17) and under a statute providing that actions for death or injuries within a national park or other place subject to the exclusive jurisdiction of the United States shall exist as though the place were under the jurisdiction of the state within whose boundaries it is located. 16 U.S.C. § 457; *Stokes v. Adair,* 265 F.2d 662 (4th Cir. 1959). The latter is known as "federal enclave" jurisdiction.

---

imposing costs on the government that its immunity was intended to preclude. *See id.* at 2518.

The defense derives from the principle that where a contractor acts under the authority and direction of the United States, it shares the sovereign immunity that is enjoyed by the government. *See Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). In the military context, this immunity serves the further important purpose of shielding sensitive military decisions from scrutiny by the judiciary, the branch of government least competent to review them. Application of ordinary tort law

to military design and procurement decisions is not appropriate, for the government "is required by the exigencies of our defense effort to push technology towards its limits and thereby incur risks beyond those that would be acceptable for ordinary consumer goods." *Tozer v. LTV Corp.,* 792 F.2d 403, 406 (4th Cir.1986) (quoting *McKay v. Rockwell Int'l Corp.,* 704 F.2d 444, 449–50 (9th Cir.1983)).

4.    Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

Defendants note that plaintiffs claim that "each and every exposure to asbestos and asbestos-containing materials contributed to" his mesothelioma. They also cite Charles Corley's deposition testimony as proof that his indivisible injury was a result of exposure to asbestos-containing products which he worked with or around at the Philadelphia Naval Shipyard, Long Beach Naval Shipyard, and Norfolk Shipyard.

In reference to working on an overhaul of the USAT Monterrey at the Philadelphia Shipyard, Charles Corley discussed his possible exposure to the asbestos-containing product, Kaylo. (Charles Corley, Aug. 25, 26, 27 and 31, 2009, Depo. at 177–79; Charles Corley, Sept. 1, 2009, Depo. at 97–102). Corley worked on the Monterrey at the government-owned Philadelphia Shipyard for about 30 days in 1953. (Charles Corley, Aug. 25, 26, 27 and 31, 2009, Depo. at 177–79). This overhaul included installing the asbestos-containing product Kaylo. With regard to this exposure, the following exchanges occurred:

Q. (Defense Counsel): ... To continue on on (sic) the Monterrey, I think, did you all—do you recall on the Monterrey that you testified that you all went into overhaul in a Philadelphia shipyard?

A. (Corley): Yes.

* * *

Q. On the Kaylo product at the Philadelphia shipyard, did you ever personally work with that?

A. Not in the yard, no.

Q. On the ship, then, did you ever work with it on the Monterrey?

A. The way I came into contact with it on the Monterrey is when they were putting it on in the shipyard, I watched them and inspected it, because it was a shipyard known for lousy work.

* * *

So the only way I would have been exposed to Kaylo on the Monterrey would have been in that shipyard, because I,—we did not, to my knowledge, change any of it after we left. We may have used it on some other lines, but it wasn't me.

Q. And when you saw the Kaylo product used in Philadelphia shipyard, how often was it used? Was it used every day, every week, or how often?

A. Well, laggers are usually the last one, the insulation. We call them laggers and it would only be in probably the last two weeks of the two month overhaul.

* * *

Q. Did you ever see them have to cut or saw it or modify it in any way in order to put it on?

A. Well, that's part of it. You have to do that, because there's very few straight steam lines on a ship.

Q. And when you saw them do this type of modification on the Kaylo product, did you see any kind of dust created?

A. Yes, there had to be dust from their saw.

Q. How close were you to that dust?

A. Well, sometimes I was right there with it, but most of the time I come up and looked at it after they finished it. But it had to be cleaned up, because they didn't clean up.

Q. How would you clean it up?

A. Just fox tails and dust pans.

Q. When you cleaned it up, would you see dust created?

A. Oh, yeah, there was dust everywhere, not just from that. There was all kinds of dust and debris.

Q. When you were cleaning up and this dust was created where this Kaylo product was used, did you breathe that dust?

A. It was in the air, I had to breathe it.

(*Id.* at 97–102) (emphasis added). He further testified that, to the best of his knowledge, the Kaylo pipe covering contained asbestos. (Charles Corley, Sept. 1, 2009, Depo. at 102–03). Mr. Corley also testified that, after leaving the Philadelphia Naval Shipyard, it was necessary to stop in Norfolk to repair faulty asbestos-containing gaskets, some of which were manufactured by Garlock. (*Id.* at 80–81).

Mr. Corley testified also that he was assigned to the USNS Missisinewa when it docked at the government-owned Norfolk Naval Shipyard for approximately three months in early 1960. During that time, he supervised removing and replacing tubes on the ship's boilers. (*Id.* at 262). He also oversaw the removal and overhaul of all the pumps on board this ship. During part of the time this work was being performed, the ship was in dry dock, but most work was performed while the ship was tied to a pier. (*Id.* at 263–64). According to Mr. Corley, there were asbestos-insulated pipes all over the ship. There was "asbestos everywhere," including the fire pumps, heat exchangers, boiler evaporators and water evaporators. (*Id.* at 257–58). The only manufacturer of any of these products that Mr. Corley can recall is General Electric which manufactured the heat exchangers on "the main one in the engine room." (*Id.* at 258).

Mr. Corley also testified that he spent time at the government-owned Long Beach Naval Shipyard. (Charles Corley Aug. 25, 26, 27 and 31, 2009, Depo. at 101). He testified that he recalls seeing Kaylo for the first time while at the Long Beach Naval Shipyard in 1949 or 1950. At that time, he was instructed in how to use it. He stated that he used it to repair dam-

aged pipe. (Charles Corley Sept. 1, 2009, Depo. at 48–51). Corley specifically states that he handled Kaylo while working at the Long Beach shipyard. (Charles Corley Aug. 25, 26, 27 and 31, 2009, Depo. at 120–21). Consequently, there is evidence in the record that Mr. Corley was exposed to asbestos while working on ships located at these shipyards for the specific purpose of overhauling a part or all of the ships.

[2] Despite plaintiffs' claims to the contrary, there is ample evidence that these facilities are federal enclaves. Defendants acknowledged that they are government-owned facilities. In addition, a fact may be judicially noticed if it is not subject to reasonable dispute, either because it is generally known within the district court's territorial jurisdiction or because it can be accurately and readily determined using sources whose accuracy cannot reasonably be questioned. Fed. R.Evid. 201(b). "[T]he taking of judicial notice of facts is ... a highly limited process" because it bypasses the usual procedural safeguards involved in proving facts through competent evidence. *Shahar v. Bowers,* 120 F.3d 211, 214 (11th Cir.1997). Courts may take judicial notice of such scientific, historical, and geographical facts as the boundaries of a state or the time of sunset. *Id.* The Eleventh Circuit has held that a district court may take judicial notice of matters of public record. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999); *see also Universal Express, Inc. v. S.E.C.,* 177 Fed.Appx. 52, 53–54 (11th Cir.2006) (per curiam) (holding that a district court could take judicial notice of filing in a separate case without turning motion to dismiss into motion for summary judgment). The fact that the United States Supreme Court recognized the Norfolk Naval Shipyard as a federal enclave in *Western Union Tel. Co. v. Chiles,* 214

**688 FEDERAL SUPPLEMENT, 2d SERIES**

U.S. 274, 29 S.Ct. 613, 53 L.Ed. 994
(1909), is thus considered as bolstering
this testimony. Finally, in *United States
v. Rowe*, 599 F.2d 1319 (4th Cir.1979), the
Fourth Circuit Court of Appeals recog-
nized the Norfolk Naval Station, which
encompasses the shipyard, as a federal
enclave.[5]

The court also takes judicial notice of
the Pennsylvania statute which cedes con-
trol of the land that encompasses the Phil-
adelphia Naval Yard (League Island) to
the exclusive use of the United States.
*See* 74 Pa. Stat. 120.46. *See also Kiker v.
City of Philadelphia*, 346 Pa. 624, 31 A.2d
289, 292–93 (1943) (noting that it is clear
that Pennsylvania granted to the United
States government exclusive jurisdiction to
the Philadelphia Naval Yard).

There are also business records from
the custodian of records for the Port of
Long Beach which appear to establish that
the Long Beach Naval Yard, before it was
closed, was under the exclusive jurisdiction
of the United States. However, the evi-
dence of this is not as clear as it is with the
other locations. Nevertheless, defendants
have clearly established that the Philadel-
phia and Norfolk Naval Shipyards are fed-
eral enclaves and have submitted sufficient
evidence that the Long Beach Naval Yard
was one as well.

[3] Plaintiffs also assert that their mo-
tion to remand is appropriate because Mr.
Corley's exposure to asbestos occurred on
ships which were only temporarily docked
at the Philadelphia and Norfolk (and Long
Beach) Naval Shipyards. They aver that
nowhere is there any evidence that the
exposure actually occurred on any of the
shipyards' lands. This is the position tak-
en by two U.S. District Courts in Virginia.

In *Anderson v. Crown Cork & Seal*, 93
F.Supp.2d 697 (E.D.Va.2000), the District
Court for the Eastern District of Virginia
reasoned as follows:

> Finally, the defendants argue that be-
> cause some of the exposure occurred
> while the vessel was docked in the Ship-
> yard, federal jurisdiction is appropriate.
> In their supplemental memorandum, the
> defendants concede that the Fourth Cir-
> cuit has not specifically addressed the
> issue of whether remand is required if a
> portion of the plaintiffs' injury occurred
> outside the federal enclave, as is the
> case here. However, as identified by
> the defendants, the Eastern District of
> Texas has twice addressed similar issues
> and both times denied a motion for re-
> mand. *See Reed v. Fina Oil & Chem.
> Co.*, 995 F.Supp. 705 (E.D.Tex.1998);
> *Akin v. Big Three Industries, Inc.*, 851
> F.Supp. 819 (E.D.Tex.1994).

> In *Reed*, the most recent of the two
> Texas cases, the plaintiff estate sued for
> damages associated with leukemia alleg-
> edly developed as a result of working in
> a synthetics plant. During some part of
> the decedent's employment, the plant
> was owned and operated by the United
> States. The United States sold the
> plant in 1955 to the private industry, and
> the decedent continued to work at the
> plant until 1979. In 1995, the plaintiffs
> filed a complaint in state court, and in
> 1997, the defendants removed the case
> pursuant to federal enclave jurisdiction.
> As in this case, the plaintiffs filed a
> motion to remand. The Eastern Dis-
> trict of Texas court denied the plaintiffs'
> motion for remand finding that federal
> officer jurisdiction existed because the
> decedent "acted under a federal officer

5. Plaintiffs object to the late production of
some of the items presented to establish that
these locations are federal enclaves. Howev-
er, to the extent that any of the material is
subject to judicial notice, the court can con-

sider it even if it was not presented by defen-
dants at all. Therefore, the fact that it is
presented in an untimely manner has no ef-
fect on the court's ability to consider such
material.

CORLEY v. LONG–LEWIS, INC.     1325

Cite as 688 F.Supp.2d 1315 (N.D.Ala. 2010)

at least from 1944–55, and [had] satisfied each of the requirements necessary to assert federal officer removal jurisdiction." *Id.* at 712–13. Although it did not need to, the court additionally addressed the asserted federal enclave jurisdiction as an alternative basis for denying the motion to remand. *Id.* at 713. As to federal enclave jurisdiction, the court found that because the plaintiffs asserted a single, indivisible injury resulting from exposure to leukemia inducing agents between 1944 and 1979, and the injury could not be divided between the times of federal and private control of the facility, the entire claim was subject to federal enclave jurisdiction. *Id.* at 713.

In a prior case, *Akin v. Big Three Ind., Inc.,* the District Court similarly denied the motion to remand finding that "in a toxic exposure case ... when the plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their employment duties, enclave jurisdiction is properly invoked." *Akin,* 851 F.Supp. at 822. The defendants argue that the plaintiff in this case, like the plaintiffs in *Reed* and in *Akin,* alleges one indivisible injury as a result of his exposure to asbestos on the U.S.S. Laffey, which was at some times located in the Norfolk Naval Shipyard, a federal enclave. The defendants contend that simply because a portion of the exposure may have occurred while the vessel was located outside of the Shipyard, this Court is not deprived of jurisdiction.

First, the decisions from the Eastern District of Texas are not binding on this Court. Second, to the extent the decisions are persuasive, the Court believes that the facts in both *Akin* and *Reed* are distinguishable from the facts in this case. Most importantly, the federal facilities in *Akin* and in *Reed,* an Air Force base and a synthetics plant, are not comparable to a vessel that moves from port to port. The plaintiffs or decedents in *Reed* and *Akin* actually worked in federal enclaves at some point. Based on the evidence before this Court, the same cannot be said for the decedent in this case. His employment was at all times on board the vessel, the U.S.S. Laffey, which, as set forth above, is not in and of itself a federal enclave. Conversely, an Air Force base is a federal enclave, and the synthetics plant in *Reed* was at some point a federal enclave. *See Akin,* 851 F.Supp. at 825; *see also Akin v. Ashland Chem. Co.,* 156 F.3d 1030, 1035, n. 5 (10th Cir.1998) (noting responses to interrogatories "that all exposure occurred on base), *cert. denied,* 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999). However, the vessel in this case never was a federal enclave, but simply moved in and out of federal enclaves. This distinction is essential to the Court's consideration of the issues. The court in *Akin* specifically noted that "[h]ad some of the exposure occurred off-base, the defendants' burden of establishing enclave jurisdiction would have been heavier." *Akin,* 851 F.Supp. at 825. The court further expounded in a footnote, "[w]hen exposures allegedly occur partially inside and partially outside the boundaries of an enclave an argument would surface that the state's interest increases proportionally, while the federal interest decreases." *Id.* at n. 4. For these reasons, the Court is not persuaded by the decision in *Akin,* as the facts are dissimilar.

While the facts in *Reed* are more similar to the facts in this case, the facts are nevertheless distinguishable based on the different nature of Reed's and Thomas' (the decedents in each case) employment. In *Reed,* the decedent was a plant worker who developed leukemia allegedly based on his work in the

synthetics plant, which was admittedly a
federal enclave, during some portion of
the plaintiff's exposure.  In this case, the
federal enclave at issue is the Shipyard.
The plaintiff was employed by the U.S.
Navy as a seaman.  There is no evidence that any of his work was associated with the Shipyard or off the U.S.S.
Laffey.  See Adams Affidavit.  Thomas'
association with the Shipyard was coincidental to his employment with the Navy.
Such was not the case with the plaintiff
in Reed. Additionally, as set forth above,
at most the court's decision in Reed as to
federal enclave jurisdiction was in the
alternative, and therefore, it is merely
dicta contained in decision outside of
this District.

In this case, it is undisputed that the
deceased was a Navy seaman, not a
shipyard worker.  It is additionally undisputed that the plaintiff was stationed
on a vessel, the U.S.S. Laffey, which was
sometimes docked at the Norfolk Naval
Shipyard.  However, the plaintiff claims,
and the defendant has not shown otherwise, that during the majority of the
plaintiff's assignment to the U.S.S. Laffey, the Laffey was at sea and not in the
Norfolk Naval Shipyard.  See Adams
Affidavit.  For these reasons, to the extent the cases from the Eastern District
of Texas are persuasive to this Court's
consideration of the issues in this case,
the Court FINDS the facts in those
cases clearly distinguishable from the
facts before this Court.

93 F.Supp.2d. at 701-03.

In another, earlier, case relied on by the
court in Anderson, another District Court
for the Eastern District of Virginia addressed this issue, stating:

To begin, federal enclave jurisdiction
grows out of Article I, section 8, clause
17 of the United States Constitution
which provides:

To exercise exclusive Legislation in all
Cases whatsoever, over such District
(not exceeding ten Miles square) as
may, by Cession of particular States,
and the Acceptance of Congress, become the Seat of the Government of
the United States, and to exercise like
Authority over all Places Purchased
by the Consent of the Legislature of
the State in which the Same shall be,
for other Erection of Forts, Magazines, Arsenals, dock-Yards, and other
needful buildings.

Accordingly, suits regarding property
purchased in the manner stated above
are to occur in the federal courts of the
United States.

However, Plaintiffs argue that this "federal enclave" provision of the Constitution applies only to lands owned by the
United States.  Thus, contrary to the
contentions of Defendant, a navy vessel,
standing alone, cannot be considered a
"federal enclave."

Indeed, in the vast majority of situations, a federal enclave is created only
when the federal government acquires
exclusive jurisdiction over land with the
consent of the state or commonwealth
containing the land.  See United States
v. Johnson, 994 F.2d 980, 984–85 (2d
Cir.1993).  The amount of authority suggesting that this ground for federal jurisdiction should extend beyond torts
that occur on federally procured lands is
imperceptible.  Even when considering
federal jurisdiction surrounding military
properties, the overwhelming weight of
authority focuses on land.  See id. at 984
(Brooklyn Naval Yard is a federal enclave); DeKalb County v. Henry C. Beck
Co., 382 F.2d 992, 994–95 (5th Cir.1967)
(federal enclave jurisdiction extends to
land owned by the Veterans Administration); Stokes v. Adair, 265 F.2d 662 (4th
Cir.1959) (Fort Leavenworth Military
Reservation is a federal enclave support-

ing jurisdiction); *St. Louis–San Francisco Ry. Co. v. Satterfield,* 27 F.2d 586, 588–89 (8th Cir.1928).

Arguing to the contrary, Defendant has relied upon a case where individuals exposed to asbestos while working on naval vessels were subject to federal jurisdiction under this provision. *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992). However, that court's basis for jurisdiction is difficult to discern. It is unclear whether the *Fung* court was emphasizing the submarine's identity with federal lands, or going against the weight of authority and declaring the vessels themselves "federal enclaves." Accordingly, this Court rejects any suggestion that the USS NIMITZ is or ever was a "federal enclave" sufficient to establish jurisdiction in this case.

In the alternative, Defendant claims that although the USS NIMITZ was built, and Plaintiff began his duty, at the Newport News Shipyard, the decedent's service aboard the vessel took him elsewhere. The vessel was commissioned in May of 1975 and deployed soon thereafter. Accordingly, Defendant argues, some of decedent's exposure to asbestos would have logically occurred while the vessel was docked at the Norfolk Naval Station and several other Naval stations around the world. All of which, they argue, are "federal enclaves."

Plaintiffs counter arguing that the motion for judgment alleges the entirety of decedent's exposure to asbestos products occurred while aboard the USS NIMITZ, not in any part while on land at various military installations around the world. It is clear that the NIMITZ was docked at the Norfolk Naval Base for at least part of the decedent's tour. It is also clear that this facility was considered a "federal enclave" during the relevant period. *See Rivers v. Woodfield,* 1990 WL 303324 (E.D.Va.

1990). However, all the evidence before the Court, and Defendant has proffered none to the contrary, suggests that decedent's exposure has no connection to governmental lands. Accordingly, federal jurisdiction based upon the "federal enclave" provision of the Constitution is, at best, doubtful and cannot support Defendant's removal. *See Mulcahey,* 29 F.3d at 151.

*McCormick v. C.E. Thurston & Sons, Inc.,* 977 F.Supp. 400, 402–08 (E.D.Va.1997).

However, not every case holds that a U.S. Navy vessel is not a federal enclave or that working on a ship while docked at a federal enclave is not the same as actually performing work within the enclave itself. One holding to the contrary is found in *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992). The court in *Fung* found that both federal enclave and federal officer jurisdiction existed in a case where the plaintiff alleged that he had been exposed to asbestos. In response to a motion to remand, the defendant, General Dynamics, argued that many of plaintiffs' allegations stemmed from their employment by the United States Navy at Mare Island Shipyard, a United States Naval facility, as well as other Naval facilities. With regard to the federal enclave jurisdiction, the court held as follows:

> Defendant also argues that the claims of asbestos exposure involve plaintiffs' duties while on board United States Navy submarines constructed by General Dynamics pursuant to federal contract.
>
> Although plaintiffs do not mention in their complaint that the alleged exposure to asbestos took place while on federally procured submarines which were docked at Mare Island and other federal enclaves, they claim that the injuries were a consequence of their working on naval vessels under the supervi-

sion of General Dynamics. Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status. Like the facts in *Mater [v. Holley*, 200 F.2d 123 (5th Cir. 1952) ], plaintiffs' actions arise under the laws of the United States as stated in § 1331 and are properly the subject of federal jurisdiction.

*Id.*

Unfortunately, the decision is unclear as to whether the federal enclave jurisdiction is based on the fact that the submarine was a Navy vessel or because it was docked at facilities that were federal enclaves. However, both situations are present in the case at bar, just as they were in *Fung.*

In addition, Mr. Corley testified that he worked in and on these ships while they were tied to the dock at federal facilities and while they were in dry dock within the facilities. He further testified that, on occasion, it was necessary to turn off all the systems on the ship in order to perform needed work, making it necessary to obtain water and electricity "from the beach." Thus, Mr. Corley was not simply a seaman on a ship that simply passed through these ports on his way to another location. He was there to specifically use the facilities for performing work on the ship. He was clearly exposed to asbestos while working at these locations.

In a similar case, *Akin v. Big Three Indus., Inc.*, 851 F.Supp. 819 (E.D.Tex. 1994), the plaintiffs performed maintenance on jet engines at Tinker Air Force Base in Texas. In performing this maintenance, the plaintiffs were exposed to toxic chemicals which formed the basis of the lawsuit. The court held that in a toxic exposure case such as this, when the plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their em-

ployment duties, enclave jurisdiction is properly invoked. *Id.* at 821–22.

It is difficult to discern the difference between working on a jet engine attached to a jet that has flown in for that purpose from maintenance on a ship, especially when performed in dry deck. *See also In re Welding Rod Products*, 2005 WL 147081 (N.D.Ohio Jan. 13, 2005) wherein the court stated:

> It is notable, moreover, that a not-insignificant portion of Buteaux's exposure to welding rod fumes occurred on a federal enclave-the guided missile destroyer on which Buteaux was stationed was drydocked at the United States Navy's Charleston Naval Shipyard. Accordingly, this Court also has federal enclave jurisdiction over Buteaux's case.

(*Id.* at *7).

In this case, plaintiff performed a substantial amount of work where he was exposed to asbestos while performing his duties on board a United States Navy vessel both at sea and at U.S. Naval bases that are federal enclaves. Within these bases, he was exposed to asbestos while working on the ship both while in the water and in dry dock. The work in dry dock also occasionally required the use of base utilities such as electricity and water. Though the above-noted cases highlight the differing opinions on when federal enclave jurisdiction exists, the undersigned believes the federal enclave jurisdiction is applicable under the facts of this case.

Plaintiffs also argue that federal law is not a substantial part of this case and that no substantial conflict exists between state and federal law. This concept is only applicable to the federal officer defense which is discussed *infra*.

Plaintiffs emphasize that Mr. Corley was subject to much more exposure to asbestos outside these locations than inside. How-

ever, plaintiffs have provided no authority for the proposition that establishes a requirement that the federal enclave have a substantial relationship, or nexus, to the plaintiff's injury. The fact that the injury occurred there is sufficient when removal is pursuant to 16 U.S.C. § 457. *See e.g., Holliday v. Exten,* 2005 WL 2158488, *4 (D.Hawai'i July 6, 2005) (the fact that a helicopter crash occurred within the bounds of Volcano National Park was sufficient to give federal court jurisdiction over negligence claim against pilot and engine manufacturer).

Plaintiffs also state that their Amended Complaint specifically disavows any federal claims. However, plaintiffs cannot avoid federal jurisdiction by attempting to "artfully plead" the defendants out of federal jurisdiction when they allege, as they do here, that Mr. Corley's exposure was ongoing over a period of years. Mr. Corley cannot avoid the federal enclave jurisdiction simply by stating that, while he is suing Garlock and Owens–Illinois for exposing him to asbestos, he is leaving out those times he was exposed while working in a federal enclave. Plaintiff has alleged that his mesothelioma is the result of ongoing exposure to asbestos. He cannot simply omit those times the ongoing exposure occurred in a federal enclave to avoid federal jurisdiction. *See Harper v. San Diego Transit Corp.,* 764 F.2d 663 (9th Cir.1985). Several other courts which have considered this issue have found precisely such a disclaimer ineffective. *See, e.g., Holdren v. Buffalo Pumps, Inc.,* 614 F.Supp.2d 129, 150–51 (D.Mass.2009); *O'Connell v. Foster Wheeler Energy Corp.,* 544 F.Supp.2d 51, 54 n. 6 (D.Mass.2008); *Machnik v. Buffalo Pumps, Inc.,* 506 F.Supp.2d 99, 103 n. 1 (D.Conn.2007). Plaintiffs could avoid federal enclave jurisdiction only by dismissal of all claims against Owens–Illinois and Garlock. Since this has not occurred, these defendants are entitled to assert federal jurisdiction pursuant to the federal enclave statute.

[4] Plaintiffs also allege that removal is untimely because they gave "advance notice" via email to defendants' counsel that they intended to file an Amended Complaint adding Owens–Illinois and Garlock to the suit. If this were a basis for starting the clock for purposes of removal, a plaintiff could simply notify a defendant of its intentions and then wait 31 days before filing the complaint, thereby avoiding the possibility of removal. A plain reading of the removal statute applicable in this case does not allow for tricks of this nature. Pursuant to 28 U.S.C. § 1446(b), a defendant's notice of removal "shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based" "If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, or order or other paper from which it may first be ascertained that the case which is or has become removable...." *Id.*

In rejecting a reading of 28 U.S.C. § 1446(b) in a manner similar to that advocated here by plaintiffs, the U.S. Supreme Court has held:

The Eleventh Circuit relied on the "plain meaning" of § 1446(b) that the panel perceived. *See* 125 F.3d, at 1398. In the Eleventh Circuit's view, because the term " '[r]eceipt' is the nominal form of 'receive,' which means broadly 'to come into possession of or to acquire,' " the phrase " '[receipt] through service or otherwise' opens a universe of means besides service for putting the defendant in possession of the complaint." *Ibid.* What are the dimensions of that "uni-

verse"? The Eleventh Circuit's opinion is uninformative. Nor can one tenably maintain that the words "or otherwise" provide a clue. *Cf. Potter v. McCauley*, 186 F.Supp. 146, 149 (D.Md.1960) ("It is not possible to state definitely in general terms the precise scope and effect of the word 'otherwise' in its context here because its proper application in particular situations will vary with state procedural requirements."); *Apache Nitrogen Products, Inc. v. Harbor Ins. Co.*, 145 F.R.D. 674, 679 (D.Ariz.1993) ("[I]f in fact the words 'service or otherwise' had a plain meaning, the cases would not be so hopelessly split over their proper interpretation.").

The interpretation of § 1446(b) adopted here adheres to tradition, makes sense of the phrase "or otherwise," and assures defendants adequate time to decide whether to remove an action to federal court. As the court in *Potter* observed, the various state provisions for service of the summons and the filing or service of the complaint fit into one or another of four main categories. *See* 186 F.Supp. at 149. In each of the four categories, the defendant's period for removal will be no less than 30 days from service, and in some categories, it will be more than 30 days from service, depending on when the complaint is received. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 352–54, 119 S.Ct. 1322, 1328, 143 L.Ed.2d 448 (1999). The basis for this holding was summarized as follows:

> Furthermore, the so-called "receipt rule"—starting the time to remove on receipt of a copy of the complaint, however informally, despite the absence of any formal service—could, as the District Court recognized, operate with notable unfairness to individuals and entities in foreign nations. *See* App. A–24. Because facsimile machines transmit instantaneously, but formal service abroad

may take much longer than 30 days, plaintiffs "would be able to dodge the requirements of international treaties and trap foreign opponents into keeping their suits in state courts." *Ibid.*

*Id.* at 356, 119 S.Ct. at 1329 (footnote omitted).

Consequently, plaintiffs' claim that removal was untimely has been clearly rejected by the Supreme Court. Therefore, this claim is without merit.

*Federal Officer Defense*

Plaintiffs have alleged that CBS, the successor corporation to Westinghouse, is liable for plaintiff Charles Corley's exposure to asbestos used in the manufacture of Navy turbines used on board ships upon which Corley was deployed and worked during certain times in his 17 years in the U.S. Navy.

Westinghouse asserts that it has established federal jurisdiction under 28 U.S.C. § 1442(a)(1), the "federal officer" removal statute. Plaintiffs object to this. In their Complaint, plaintiffs state, *inter alia*:

10. The Defendants' asbestos-containing products to which Charles Corley was exposed were in a defective condition and were unreasonably dangerous to the user, consumer or bystander for the following reasons:

    a. The defendants' asbestos-containing products released respirable asbestos fibers when used in a manner that was intended and/or reasonably foreseeable by the defendants.

    b. These defendants knew or should have known that the respirable asbestos fibers were hazardous to the health of users, consumers, or bystanders in that when inhaled these fibers caused a variety of diseases, including, but not limited to asbestosis and mesothelioma.

11. The asbestos machinery, products or equipment were in a defective condition and were unreasonably dangerous to the plaintiff, who was an intended and foreseeable user or bystander during the use of the asbestos. These defects include, without limitation, the following:

* * *

b. Lack of warning or lack of sufficient warnings by the defendants, who were in a position of superior knowledge concerning the dangerous properties of asbestos when used for the purpose for which it was manufactured and sold, and which dangerous propensities were unknown to the plaintiff;

c. Lack of instructions or lack of sufficient instructions by the defendants for eliminating or minimizing the health risks inherent in the use of asbestos;

* * *

g. Defective design by the defendants calling for the inclusion of asbestos in products that did not require asbestos, and where alternate, equally suitable substances were available;

h. Lack of warnings or lack of sufficient warnings by the defendants upon their discovering the full extent of the dangers presented by asbestos-containing materials and products;

* * *

Plaintiffs assert that, when taken in conjunction with their disclaimer of any claim arising under the U.S. Constitution, including any claim against a federal officer or person acting under color of such office, Paragraph 11(g) does not make out a design defect claim against Westinghouse. They assert that they are only pursuing Westinghouse under its liability for failure to warn.

Westinghouse/CBS asserts that, assuming without conceding, that the only claim against Westinghouse is a failure to warn claim, the federal officer defense remains. In support of this claim, Westinghouse/CBS has presented the affidavit of James M. Gate, former manager of Design Verification of the Marine Division of Westinghouse Electric Corporation. (Doc. # 28–2, Aff. of James M. Gate). In his affidavit, Gate states that he is personally familiar with the extent of the U.S. Navy's control over the production of turbines built by Westinghouse for the U.S. Navy because he participated in the design, manufacture, testing, and sea trials of these turbines, and personally interacted with the Navy's machinery inspectors and other personnel at the Navy command in charge of obtaining and deploying these engines, known as the Naval Seas Systems Command or "NAVSEA." (Id. at ¶ 4).

According to Gate, all aspects of the design, performance requirements, and materials, including thermal insulation, used for construction of the turbines supplied by Westinghouse for use on board the USS Cavalier, were specified by NAVSEA. Gate states that compliance with the specifications could not be changed without direct approval of the appropriate Navy personnel. (Id. at ¶ 8). In addition, in the case of the USS Cavalier, NAVSEA specifications required the use of asbestos-containing thermal insulation for the turbines. The Navy, not Westinghouse, provided the insulation to be used with these turbines. (Id. at ¶ 9).

Gate further states that the Navy had precise specifications as to the nature of any communication affixed to machinery supplied by Westinghouse. According to Gate, Westinghouse would not have been permitted, under the specifications, associated regulations and procedures, to affix any type of warning or caution statement

688 FEDERAL SUPPLEMENT, 2d SERIES

to equipment intended for installation onto a Navy vessel beyond those required by the Navy without prior discussion with and approval by the Navy. (*Id.* at ¶ 31). The same was true with respect to the preparation of written materials delivered with the turbines, such as instruction books or technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. The manuals contained safety information to the extent, and only to the extent, directed by the Navy. (*Id.* at 32).

[5, 6] A state-court action against any person acting under the direction of an officer of the United States or its agencies can be removed to federal court pursuant to § 1442(a)(1). The purpose of § 1442(a)(1) is to permit the removal of "those actions commenced in state court that expose a federal official to potential civil liability or criminal penalty for an act performed ... under color of office." *See Magnin v. Teledyne Cont'l Motors,* 91 F.3d 1424, 1427 (11th Cir.1996)(internal citations omitted). The statute reflects Congress' intent "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties." *See id.* As such, § 1442(a)(1) is an exception to the well-pleaded complaint rule, which generally precludes removal where a federal question is not apparent within the four corners of the complaint. *See Mesa v. California,* 489 U.S. 121, 136–37, 109 S.Ct. 959, 968–69, 103 L.Ed.2d 99 (1989).

[7] Removal under § 1442(a)(1) generally depends on the satisfaction of two separate requirements. First, the defendant must "advance a 'colorable defense arising out of [his] duty to enforce federal law.'" *See Magnin,* 91 F.3d at 1427 (internal citations omitted). Second, the defendant must establish that the suit is for acts performed "under the color of office." This requirement is satisfied by showing

" 'a causal connection' between what the officer has done under asserted official authority and the action against the defendants." *See id. See also Jefferson County v. Acker,* 527 U.S. 423, 431, 119 S.Ct. 2069, 2075, 144 L.Ed.2d 408 (1999) (internal citations omitted).

A colorable defense is a defense that is "plausible." *See Magnin,* 91 F.3d at 1427 (citing *Mesa,* 489 U.S. at 129, 109 S.Ct. at 964–65). In construing the colorable federal defense requirement, the Supreme Court has rejected "a narrow grudging interpretation" of the term, "recognizing that 'one of the most important reasons for removal is to have the validity' of the defense of official immunity tried in a federal court." *See Jefferson County,* 527 U.S. at 431, 119 S.Ct. at 2075 (internal citations omitted). *See also Willingham v. Morgan,* 395 U.S. 402, 407, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969) (We ... do not require the officer virtually to "win his case before he can have it removed."). Thus, a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage. All a removing defendant needs to do is to make a showing that his federal defense "is not without foundation and made in good faith." *See Marley v. Elliot Turbomachinery Co.,* 545 F.Supp.2d 1266, 1271 (S.D.Fla.2008).

## 1. "Colorable" Defense

[8] CBS (Westinghouse) has raised a federal contractor defense to the plaintiffs' design defect and failure to warn claims. In *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court addressed the issue of "when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect." *Id.* at 502, 108 S.Ct. at 2513. The court

recognized two necessary conditions for the displacement of state law. The predicate for presumption is that the case must concern an area of uniquely federal interest, such as procurement of equipment by the United States. After this inquiry has been satisfactorily addressed, displacement will occur only where "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* at 507, 108 S.Ct. at 2516 (citations omitted). The Supreme Court found that the facts in *Boyle* presented a case involving an area of uniquely federal interest in which a significant conflict existed between federal policy and state law.

Lieutenant Boyle, a United States Marine helicopter pilot, was killed when his helicopter crashed off the coast of Virginia during a training exercise. Although he survived the impact of the crash, Lieutenant Boyle drowned. He was unable to exit through the escape hatch because water pressure prevented it from being opened. The helicopter had been designed by a private contractor pursuant to government contract specifications. The government contract specified an escape hatch that swung outward. The complaint alleged that the escape hatch was defectively designed and should have opened inward.

After deciding procurement of military equipment is an area of uniquely federal interest, the court concluded that the state-imposed duty of care that was the asserted basis of the contractor's liability was "precisely contrary" to the duty imposed by the government contract. *Boyle,* 487 U.S. at 509, 108 S.Ct. at 2517. The court cautioned, however, that even in clear situations in conflict, a "significant interest" of federal policy must also exist to justify replacement of state law. *Id.* The court concluded that liability for de-

sign defects in military equipment cannot be imposed, pursuant to state law, when

1. the United States approved reasonably precise specifications;

2. the equipment conformed to those specifications; and

3. the supplier warned the United States about the dangers in the use of equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518.

The Eleventh Circuit extended the holding of *Boyle* to failure to warn claims in *Dorse v. Eagle–Picher Indus., Inc.,* 898 F.2d 1487, 1489 (11th Cir.1990). Like this case, *Dorse* involved a claim that a manufacturer had failed to warn about the hazards of asbestos. The court noted that the federal contractor defense bars liability when (1) the case concerns an area of uniquely federal interest and (2) there is "a significant conflict" between an identifiable federal policy or requirement and a state law duty. The defense fails as a matter of law, however, if the contractor can "comply with both its contractual obligations and the state-prescribed duty of care." *See id.* at 1489 (internal citation omitted). The parties do not dispute that the procurement of Navy vessels (and parts for those vessels) is an area of uniquely federal interest. *See Boyle,* 487 U.S. at 504–05, 108 S.Ct. at 2514–15 (civil liability arising from performance of procurement contracts with government is an area of "uniquely federal interest"); *Dorse,* 898 F.2d at 1489 ("procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest"). The dispute in this case is whether defendants have shown a "good faith foundation" to argue that there was a conflict between their contractual obligations with the Navy and the state law duty to warn.

To satisfy their burden, defendants have filed the affidavit of James Gate referenced above in which he states that the Navy controlled every aspect of the building of the Westinghouse turbines, from the design specifications down to the warnings and instruction manuals. No deviation was allowed without specific approval of the Navy.

Gate has direct knowledge of the matters stated in his affidavit by virtue of his employment and the work he performed in relation to the acquisition and installation of the Westinghouse turbines on the USS Cavalier. The affidavit raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning. The affidavit states that the Navy exercised complete control over all warnings placed on equipment or in accompanying technical manuals by its contractors. By virtue of the position he occupied at Westinghouse during the relevant time period, Gate is competent to make the statements contained in his affidavit. In sum, Gate's affidavit establishes, for the purposes of this motion, that the Navy controlled the nature of warnings to be included on all equipment (or in the accompanying technical manuals) to be installed on its ships. This evidence in turn supports the inference that no warnings appeared on the turbines or in the written materials because the Navy prohibited them.

Plaintiffs argue that defendants have not shown that they tried to have the Navy approve warnings on the turbines regarding exposure to asbestos that the Navy rejected. Likewise, they contend that there is no evidence that an attempt was made by Westinghouse to have warnings placed in the instruction manuals or technical manuals supplied to the Navy personnel working on and around these turbines. However, in order to satisfy the first

prong of § 1442(a), Westinghouse must demonstrate merely that its claim to the military contractor defense is "colorable." *Marley v. Elliot Turbomachinery Co*, 545 F.Supp.2d 1266, 1273 (S.D.Fla.2008) (*citing Nesbiet v. General Electric Co.*, 399 F.Supp.2d 205, 212 (S.D.N.Y.2005)).

Although these arguments may undermine the credibility of Mr. Gate and raise a number of questions that the defendants will have to answer to ultimately prevail on their defense, it is unnecessary—and, at this stage, inappropriate—to determine credibility or likelihood of success. Unlike *Dorse*, which involved a motion for summary judgment, this matter concerns a motion to remand. Factual disputes about Mr. Gate's testimony should be resolved in federal court because defendants have a good faith foundation for their contractor defense. *See Magnin*, 91 F.3d at 1427-28; *Marley*, 545 F.Supp.2d at 1273. Therefore, CBS/Westinghouse has established a colorable defense to the extent required by § 1441(a)(1).

## II. Causal Nexus and "Acting Under" Requirements

It is undisputed that defendants designed the turbines for the USS Cavalier under the direct supervision and control of the U.S. Navy according to specifications from which Westinghouse could not deviate without advance approval from the Navy. The Navy controlled all aspects of the design and testing of these turbines, including any specific warnings to be placed on the turbines or in the written material supplied with the turbines. Therefore, there is no question that defendants' relationship with plaintiff derived solely from defendants' official duties.

Plaintiffs suggest that defendants need to show that the Navy actually prohibited asbestos warnings to establish a "causal nexus" at the removal stage. The court

disagrees. "Just as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County*, 527 U.S. at 432, 119 S.Ct. at 2075. All a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract with the Navy. *See Magnin*, 91 F.3d at 1427-28. Defendants have done this. Defendants having provided a causal connection sufficient to meet the requirements of § 1442(a)(1), the Motion to Remand is due to be denied.

### III. Disclaimer

[9] Plaintiffs make the argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand. In their complaint, plaintiffs expressly disclaim every claim arising under the Constitution, treaties or laws of the United States, including any claim arising from an act or omission on a federal enclave, or by any officer of the United States or any agency or person acting under him/her under color of such office. However, as noted above, there is still a colorable "federal officer" defense to the failure to warn claim which plaintiffs have expressly stated that they are pursuing against Westinghouse/CBS. It is also questionable as to whether this disclaimer is valid as to plaintiffs' design defects claims against Westinghouse/CBS.

The court finds the treatment of this issue by the U.S. District Court in *Marley* to be most sensible wherein it stated:

Finally, I reject the plaintiffs' argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand.

In their complaint, the plaintiffs allege that:

Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office.)

Compl. at ¶ 5.

This disclaimer is circular. Its applicability depends on a determination of the core question in this case: whether the defendants' purported omission—the failure to warn—was required or caused by their contractual relationship with the Navy. If the failure to warn was required by the Navy, the disclaimer applies and the plaintiffs' claims fail as a matter of law. If the failure to warn was not required by the Navy, then the disclaimer does not apply. The problem with this argument is that the defendants have the right to have this question decided in federal court. *See Jefferson*, 527 U.S. at 432, 119 S.Ct. 2069, 144 L.Ed.2d 408 (defendants have a right to have " "the validity" of the defense of official immunity tried in a federal court").

I understand that a number of courts have found that federal liability disclaimers defeat removal under § 1442(a)(1). *See e.g., Westbrook v. Asbestos Defendants*, 2001 WL 902642, *3 (N.D.Cal. July 31, 2001).

The disclaimers in those cases, however, waived any liability arising out of work done on federal premises, irrespective of whether the work was done under the requirements of a federal agency or not. In contrast, the disclaimer here is more limited and is contingent on the Navy's

**1336**     **688 FEDERAL SUPPLEMENT, 2d SERIES**

contractual limitations and specifica-tions. I am reluctant to find that the plaintiffs can defeat a government-con-tractor's right to remove by disclaiming any claim arising from any act or omis-sion compelled by a government agency. Such a circular disclaimer would defeat the purpose § 1442(a)(1) as it would force federal contractors to prove in state court that they were acting under the direction of the government.

*Marley*, 545 F.Supp.2d at 1274–75.

In addition, the court notes that several other courts to consider the issue have found similar such disclaimers ineffective. *See, e.g.*, *O'Connell v. Foster Wheeler Energy Corp.*, 544 F.Supp.2d 51, 54 n. 6 (D.Mass.2008); *Machnik v. Buffalo Pumps, Inc.*, 506 F.Supp.2d 99, 103 n. 1 (D.Conn.2007).

CONCLUSIONS

Based on the foregoing analysis, the un-dersigned magistrate judge believes that defendants have sufficiently established that some of the events alleged in the Complaint with regard to Owens–Illinois and Garlock occurred on a federal enclave. It further appears that defendants have made a colorable showing of a "federal officer" defense. Therefore, it is OR-DERED that plaintiffs' Motion to Remand hereby is DENIED.



NORTH AMERICAN CLEARING, INC., Plaintiff,

v.

BROKERAGE COMPUTER SYSTEMS, INC., Defendant.

Brokerage Computer Systems, Inc., Plaintiff,

v.

Richard L. Goble, Defendant.

Case Nos. 6:07–cv–1503–Orl–19KRS, 6:08–cv–1567–Orl–19KRS.

United States District Court, M.D. Florida, Orlando Division.

Feb. 4, 2010.

**Background:** Software licensor brought action against licensee, its principal, and officers to recover for breach of contract, conversion, violation of Lanham Act, fraud, and unfair trade practices by decompiling source code. After entry of summary judg-ment in principal's favor, 666 F.Supp.2d 1299, principal moved for attorney fees.

**Holdings:** The District Court, Patricia C. Fawsett, J., adopted report and recom-mendation of Karla R. Spaulding, United States Magistrate Judge, and held that:

(1) principal was not entitled to recover attorney fees under licensing agree-ment;

(2) principal was not entitled to recover attorney fees under Lanham Act; and

(3) principal failed to demonstrate that he was entitled to attorney fees under Florida Deceptive and Unfair Trade Practices Act (FDUTPA).

Motion denied.

Case MDL No. 875 Document 8585-1 Filed 09/30/12 Page 1 of 8

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ray Fellows,                                          Case No. 3:09CV10015

     Plaintiff,

v.                                                    ORDER

Foster Wheeler LLC, et al.,

     Defendant,


This is an asbestos product liability case in which the defendant Foster Wheeler, LLC, filed a notice of removal in the Cuyahoga County, Ohio, Court of Common Pleas. Pending is plaintiff's motion to remand [Doc. 10], which defendant opposes. [Doc. 15].

Defendant based its notice of removal on 28 U.S.C. § 1442(a)(1), which permits removal by a defendant which contends that it conducted the acts giving rise to this lawsuit at the direction of a person acting under the authority of an officer of the United States. In his motion to remand, plaintiff contends that defendant has not sufficiently substantiated that contention, and thus is not entitled to removal.

Defendant's opposition provides ample substantiation to establish at this stage that, among other defenses, it will be asserting a colorable government contractor defense. No more is needed to overcome the motion to remand.

This is certainly so given the fact that plaintiff did not file a reply to defendant's contentions and supporting documentation.

This is, no doubt, not the first time this defendant has been sued for work allegedly done several decades ago on Navy ships, and thus, to some degree of likelihood, at government direction. Had there been any merit to plaintiff's contentions that removal under § 1442(a)(1) was not proper, some other court would have said so by now. It has not, and plaintiff has not shown any reasonable basis for doubting that defendant has a colorable government contractor defense.

While in this instance I will not call on plaintiff to show cause why it should not be assessed costs under Fed. R. Civ. P. 11, doing so might be appropriate in future instances where easily refutable challenges are made to removal by this defendant in a similar case.

For now, it suffices to say that defendant's opposition to the remand motion shows more than adequate grounds for keeping this case in this court. For the reasons stated therein and in this order, it is

ORDERED THAT:

1. Plaintiff's motion to remand [Doc. 10] be, and the same hereby is overruled;

2. The Clerk shall reassign this case by random draw to the docket of a District Judge in this Court's Eastern Division.

So ordered.

/s/ James G. Carr
Chief Judge

*Case reassigned to Judge James S. Gwin.*

Case MDL No. 875 Document 8585-1 Filed 09/30/12 Page 251 of 352

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

MICHAEL CURRY,

                        Plaintiff,

          - against -

AMERICAN STANDARD, INC., ET AL.,

                    Defendants.

----------------------------------------x

MEMORANDUM DECISION
AND ORDER
08-CV-10228 (GBD)

GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE:

    Plaintiff filed this action in the Supreme Court of the State of New York. Defendant
Foster Wheeler subsequently removed the case on the basis of a federal officer defense asserted
under 28 U.S.C. § 1442(a)(1) (2006). Plaintiff moves to remand this proceeding back to New
York State court. Plaintiff's motion is denied.

    On October 8, 2008 plaintiff commenced this action against defendant Foster Wheeler
and approximately twenty other defendants, alleging that plaintiff was exposed to asbestos-
containing products while he served in the United States Navy. Plaintiff maintains that he
developed asbestos-related mesothelioma and that his illness was caused by exposure to marine
steam generators on the U.S.S. Kitty Hawk from 1963-1965. Plaintiff maintains that "[h]e was
exposed to asbestos while he worked on asbestos-containing Foster Wheeler boilers." Pl. Memo.
at 1. Plaintiff's only asserted claim against Foster Wheeler is for defendant's alleged failure to
warn him about asbestos hazards.

Defendant Foster Wheeler received service of the complaint on or about October 31, 2008 and filed a timely notice of removal on November 24, 2008. Foster Wheeler based its removal on the asserted federal defense that, during the time period relevant to plaintiff's claims, it acted under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).[1]

Under the federal officer removal statute, a civil action commenced in a state court against "The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may be removed by that defendant to the appropriate district court. 28 U.S.C. 1442(a)(1); see also Willingham v. Morgan, 395 U.S. 402, 406, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969) ("[T]he right of removal ... is made absolute whenever a suit in a state court is for any act 'under color' of federal office"). Removal under the federal officer removal statute "must be predicated upon averment of a federal defense." Mesa v. California, 489 U.S. 121, 109, 103 L.Ed.2d 99 (1989).

In order for a defendant to qualify for removal under 28 U.S.C. § 1442(a)(1), it must establish by a preponderance of the evidence that: 1) it is a "person" who assisted, helped or carried out duties and tasks of a federal superior, thus "acting under" a federal agent; 2) plaintiff's claims relate directly to acts defendant committed under color of federal authority; and 3) defendant has a colorable federal defense to such claims. See Isaacson v. Dow Chemical Co.,

---

[1] Defendant also filed a petition pursuant to 28 U.S.C. § 1407 to transfer this matter to the multidistrict litigation proceeding entitled In re: Asbestos Products Liability currently pending in the U.S. District Court for the Eastern District of Pennsylvania. The Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order on January 9, 2009.

-2-

517 F.3d 129 (2d Cir. 2008); United, Food & Comm. Workers Union, Local 919, AFL-CIO v. Centermark Prop. Meriden Sq., Inc., 30 F.3d 298, 305 (2d Cir. 1994) ("party asserting jurisdiction must support [challenged jurisdictional] facts with competent proof and justify its allegations by a preponderance of the evidence"). The federal officer removal statute should be construed broadly. See Arizona v. Manypenny, 451 U.S. 232, 242, 101 S.Ct. 1657, 1664, 68 L.Ed.2d 58 (1981). Accordingly, the defendant need not present "a clearly sustainable defense" in order to invoke the removal statute. Willingham, 395 U.S. at 407, 89 S.Ct. at 1816. Rather, removal will be proper if the relationship between the federal officer defendant and the plaintiff giving rise to the claims "derived solely from [defendant's] official duties." Id. at 409, 89 S.Ct. at 1817.

Defendant argues that the "government contractor defense" articulated by the Supreme Court in Boyle v. United Technologies Corporation, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) shields it from liability for plaintiff's injury. It presents evidence sufficient to demonstrate at this stage of the litigation, that it acted as an agent of the United States Navy for the purpose of producing and delivering naval equipment. Defendant "supplied boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy." See Notice of Removal at ¶ 6. Although defendant has not proven that it will prevail on its federal defense, it has proffered sufficient evidence of government control over the contract specifications, manuals, and warnings to demonstrate that it has a colorable defense.

To provide an evidentiary basis for its "government contractor defense", Foster Wheeler attached to its Notice of Removal, inter alia, affidavits indicating that the United States Navy maintained strict control over the products manufactured by its contractors, including Foster

-3-

Wheeler, The Inspectors of Naval Machinery exercised complete control over the equipment supplied by its contractors and "retained the 'final say' over the design of any piece of equipment." Lehman Affidavit at ¶¶4-5. Navy personnel "exercised specific direction and control over" the contents of manuals and written documentation supplied by Foster Wheeler in connection with the boilers it created. Schroppe Affidavit at ¶21, "These manuals included safety information related to the operation of naval boilers only to the extent directed by the Navy." Id.

Plaintiff does not dispute that Foster Wheeler acted under color of federal authority or that plaintiff's claims relate only to marine equipment defendant produced at the United States Navy's request. Rather, plaintiff argues that defendant's removal of this action is improper because "the Navy never prohibited warnings with regard to hazardous materials such as asbestos," Plaintiff's Memo. at 3-4 (emphasis in original). Plaintiff further discounts defendant's affidavits for failing to cite "any military specifications that would call for the removal of asbestos warnings from technical manuals submitted by equipment manufacturers" or any "specific instance in which a manufacturer was ever required to remove any safety warning." Id. at 5 (emphasis in original). Plaintiff maintains that defendant fails to satisfy the third prong of the Isaacson test because defendant has not proven unequivocally that the "government contractor defense" shields it from liability since it has not clearly demonstrated that it was prohibited from issuing its own warnings.

The Supreme Court has rejected plaintiff's contention that removal under 28 U.S.C. § 1442(a)(1) is only proper "when the officers ha[ve] a clearly sustainable defense," Willingham, 395 U.S. at 407, 89 S.Ct. at 1816. On the contrary, defendant must only raise a "colorable

-4-

federal defense." Isaacson, 517 F.3d at 135. In this action, defendant has demonstrated that it has sufficient facts to assert the "government contractor defense" elucidated in Boyle in an attempt to shield it from liability. The Second Circuit has made clear that the "government contractor defense" may be asserted against duty to warn claims such as those raised by plaintiff here. See In re Joint Eastern and Southern District N.Y. Asbestos Lit., 897 F.2d 626, 629 (2d Cir. 1990) ("we follow the other federal courts which already have held that Boyle may apply to a state law failure-to-warn claim"). This Court has jurisdiction over this matter since defendant has articulated a colorable federal defense sufficient to satisfy all three prongs of the Isaacson analysis.

Plaintiff's motion to remand this action to the Supreme Court of the State of New York is DENIED.

Dated: New York, New York
February 6, 2009

SO ORDERED:

GEORGE B. DANIELS
United States District Judge

-5-

# EXHIBIT G

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Karen Park | Not Reported | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**     IN CHAMBERS - COURT ORDER

    Before the Court is a Motion to Remand filed by plaintiffs Edgardo R. Salamante and Nola Salamante ("Plaintiffs") (Docket No. 26). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for September 22, 2008, is vacated, and the matter taken off calendar.

    Plaintiffs allege claims for negligence, breach of warranty, strict liability, and loss of consortium arising out of Mr. Salamante's exposure to asbestos-containing products manufactured, fabricated, installed, or otherwise distributed by defendants. Specifically, Plaintiffs' claims that defendants violated their obligations imposed under state law to warn Mr. Salamante of the dangers associated with their asbestos-containing products. Plaintiffs allege that Mr. Salamante was exposed to the asbestos contained in defendants' products between 1957 and 1996 when he was a steward aboard various United States Navy vessels, as well as a shipwright and mechanic at the Long Beach Naval Shipyard in Long Beach, California. Plaintiffs commenced the action in Los Angeles Superior Court on June 2, 2008 and served defendant Foster Wheeler Energy Corp. ("Foster Wheeler") on June 19, 2008. Foster Wheeler removed the action to this Court on July 17, 2008. Foster Wheeler based its Notice of Removal on 28 U.S.C. § 1442(a)(1)'s federal officer removal statute. 28 U.S.C. § 1442(a) provides, in relevant part:

> A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place where it is pending: (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442(a).

    Suits against federal officers are an exception to the general rule that a case is removable only if the federal question appears on the face of a properly pleaded complaint. See Jefferson County v.

SEND

# UNITED-STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |

| | |
|---|---|
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |

Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." Id. "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting Jefferson County, 527 U.S. at 431, 119 S. Ct. at 2075, and citing Mesa v. California, 489 U.S. 121, 124–25, 131–35, 109 S. Ct. 959, 962, 965–67, 103 L. Ed. 2d 99 (1989)).

In establishing the propriety of removal under the federal officer removal statute, the defendant need not prove a valid federal defense, only a colorable defense:

> In construing the colorable federal defense requirement, we have rejected a "narrow, grudging interpretation" of the statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." We therefore do not require the officer virtually to "win his case before he can have it removed."

Jefferson County, 527 U.S. at 431, 119 S. Ct. at 2075 (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969)). Indeed, unlike other removal statutes, which are to be interpreted strictly, "the Supreme Court has mandated a generous interpretation of the federal officer removal statute . . . ." Durham, 445 F.3d at 1252. The Supreme Court has held that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 1664, 68 L. Ed. 2d 58 (1981) (quoting Willingham, 395 U.S. at 407, 89 S. Ct. at 1816); see also Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").[1]

---

[1] Plaintiffs argue that Foster Wheeler, a private actor, has a "special burden" in establishing the official nature of its activities, relying on Williams v. General Elec. Co., 418 F. Supp. 2d 610, 614 (M.D. Pa. 2005) (citing Freiberg v. Swinerton & Walberg Prop. Servs., Inc., 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002). Plaintiffs cite no Ninth Circuit case for this proposition. On the contrary, in Durham, discussed above, the Ninth Circuit found that a broad interpretation of the federal officer removal statute was appropriate as applied to a government contractor. See 445 F.3d at 1252. In the absence of binding authority to the contrary, the Court follows the Ninth Circuit's articulation of the appropriate interpretation of the statute. See id.

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV-08-4674 PA (JTLx)                    Date   September 22, 2008

Title      Edgardo Salamante, et al. v. Quintec Indus., Inc., et al.

In removing the action pursuant to the federal officer removal statute, Foster Wheeler claims that it is entitled to assert the "military contractor defense." The military contractor defense shields contractors from liability for state tort law for defects in military equipment supplied to the United States when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle v. United Tech. Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 2518, 101 L. Ed. 2d 442 (1988). Although originally developed in the design defect context, the military contractor defense also applies in cases where a plaintiff alleges that the government contractor breached a state law duty to warn of potential dangers. In actions alleging a failure to warn claim against a military contractor, the supplier cannot be liable when it can show: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003–04 (7th Cir. 1996); see also In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992).

Plaintiffs argue in their Motion to Remand that they have disclaimed any claim that could allow this Court to exercise jurisdiction pursuant to the federal officer removal statute. Specifically, the Complaint alleges:

> Plaintiff specifically disclaims any federal cause of action or any claim that would give rise to federal jurisdiction. To the extent that any of Plaintiff's asbestos exposure took place on a federal enclave, or to the extent that any of Plaintiff's asbestos exposure occurred on board vessels of the United States military (including Naval ships) or in the construction, maintenance and/or repair of United States military vessels and/or aircraft, Plaintiff's negligence claims against manufacturers, sellers and suppliers of asbestos-containing products installed on such vessels and/or aircraft are not based on the theory of defective design, but rather are based only on the theory of failure to warn. Since there is no evidence that the United States Government, or any of its military branches, specifically instructed manufacturers from which it purchased asbestos-containing products not to warn about the health hazards associated with exposure to asbestos, there can be no valid claim to federal jurisdiction pursuant to federal enclave, federal officer or federal contractor provisions of the United States Code. This disclaimer pertains to all of plaintiffs' claims, including those of negligence and products liability, as asserted herein.

(Complaint; ¶ 4.) Despite their purported disclaimer, Plaintiffs specifically seek damages from defendants for exposure to asbestos Mr. Salamante may have come in contact with while he served on

Case 2:12-cv-02204-DSF-JCG Document 85-1 Filed 09/30/12 Page 261 of 352 Page ID #:267

Case 2:08-cv-0467  A-JTL    Document 40    Filed 09/2   )08    Page 4 of 7.

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | | Date | September 22, 2008 |
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. | | | |

various United States Navy vessels, as well as at the Long Beach Naval Shipyard. First, because removals pursuant to the federal officer removal statute are premised on the existence of a federal defense, rather than a plaintiff's artfully constructed complaint, neither Plaintiffs' disclaimer nor its characterization of their claims are determinative. See Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007) ("[Plaintiff's] argument that the suit must be remanded because his complaint disclaimed any federal claims is unavailing . . . . Subject matter jurisdiction under § 1442(a)(1) is based upon a federal defense, regardless of whether the plaintiff's cause of action rests on state law. . . . [O]nce [Defendant] meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction."); Ballenger v. Agco Corp., No. C 06-2271 CW, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007) (denying motion to remand despite complaint's disclaimer of "any claim arising from any act or omission of the United States, any agency thereof, any officer of the United States, or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States"). Moreover, Plaintiffs' disclaimer is based on an alleged lack of evidence by the defendants that the government prevented the defendants from providing warnings regarding asbestos-related health hazards. To the extent that Foster Wheeler does have such evidence, Plaintiffs' disclaimer is ineffective for this reason as well.

In their Motion to Remand, Plaintiffs state that their "complaint contains causes of action limited to state-based failure to warn claims." (Motion to Remand, p. 7, ll. 27–28.) Plaintiffs argue that Foster Wheeler has not met its burden to establish the existence of a valid defense to Plaintiffs' claims. Specifically, while conceding that Foster Wheeler is a "person" within the meaning of § 1442(a)(1), Plaintiffs contend that Foster Wheeler has not demonstrated that it can assert either a "causal nexus" between its actions taken at the direction of a federal officer and Plaintiffs' claims or a "colorable federal defense" based on military contractor immunity. See Durham, 445 F.3d at 1251. According to Plaintiffs, absent evidence of specific facts that Foster Wheeler was prevented from placing warnings on its products, Foster Wheeler cannot meet its burden to prove either the requisite causal nexus or the applicability of the military contractor defense. Contrary to Plaintiffs' assertions, however, Foster Wheeler's burden at this stage of the proceedings is not so exacting.

To establish their military contractor defense, defendants rely in large part on the declarations of J. Thomas Schroppe, Ben Lehman, and Lawrence Betts. Schroppe is a retired engineer who worked at Foster Wheeler from 1962 to 1999. Lehman is a retired Rear Admiral, who joined the Navy in 1942 and served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944 and as Ship Superintendent at the San Francisco Naval Shipyard from 1952 to 1954. Lehman also worked as an engineer at GE from 1946 to 1948. Betts, a physician, served in the Navy from 1972 until 2001 when he retired with the rank of Captain.

Lehman's declaration indicates that during the period during Mr. Salamante's service in the Navy, "the U.S. Navy had complete control over every aspect of every piece of equipment" used on Navy ships. (Lehman Decl., ¶ 10.) According to Lehman:

SEND

# UNITED STATES-DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. | | |

Military specifications governed every significant characteristic of the equipment used on U.S. Navy Ships, including instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to the construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of what warnings should or should not be included. Thus, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals with accompanied the equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy Ships were built or repaired that might cause Sailors or workers to deviate from their mission . . . .

In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, to be supplied to the U.S. Navy. . . . In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. . . . Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would have been included.

. . . .

The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical operations manuals. To do so would have

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-4674 PA (JTLx) | Date | September 22, 2008 |

| | |
|---|---|
| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |

interfered with the U.S. Navy's mission and control of its ships and personnel.

(Lehman Decl., ¶¶ 10–14 (first alteration in original).) In reviewing a similar declaration submitted by Lehman, the court in Nesbiet v. General Elec. Co. concluded that Lehman's declaration raised "the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning." 399 F. Supp. 2d. 205, 208 (S.D.N.Y. 2005).

Schroppe, who is personally familiar with the degree of supervision and control exercised by the Navy in procurement contracts with Foster Wheeler for boilers and other auxiliary equipment, stated that technical manuals accompanying naval boilers "included safety information related to the operation of naval boilers only to the extent directed by the Navy." (Schroppe Decl., ¶ 21.)

> Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

(Id., ¶ 22.) Although the Lehman and Schroppe Declarations may not establish the absence of a triable issue of fact with respect to the first two prongs of the Boyle test, as modified by Oliver for a failure to warn claim, Foster Wheeler need not prove so much at this preliminary stage of the proceedings. See Oliver, 96 F.3d at 1003 (applying military contractor defense when "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government . . . ."). Again, to establish the propriety of their removal, Foster Wheeler must only show a "colorable" federal defense, not a winning one.

The third prong of the military contractor defense requires the contractor to have "warned the government about dangers in the equipment's use that were known to the contractor but not to the government." Id. at 1004. Defendants rely on the Betts Declaration to meet this third factor of the Boyle test. Through his training and experience, Betts became familiar with "the history and practice of the Navy occupational health program from its early days before World War II until the present time." (Betts Decl., ¶ 2.) According to Betts, the "Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art. During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a marine steam boiler on United States Navy ships known by a boiler manufacturer, like Foster Wheeler, that were not known by the United States and the United States Navy." (Id., ¶ 31.) Based upon the Betts Declaration, Foster Wheeler has provided sufficient evidence that there were no dangers known by

SEND

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 08-4674 PA (JTLx) | | Date | September 22, 2008 |
|---|---|---|---|---|

| Title | Edgardo Salamante, et al. v. Quintec Indus., Inc., et al. |
|---|---|

it that were not known by the government. See Nesbiet, 399 F. Supp. 2d at 209 ("[A]ccording to Betts's affidavit, [Defendant] could not have possessed any information regarding the dangers posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.").

The Court therefore concludes that Foster Wheeler has met its burden, at this stage of the proceedings, to establish a "colorable" military contractor defense for purposes of removal under 1442(a)(1).[2] The Court also finds that Foster Wheeler has submitted sufficient evidence of a "causal nexus" between Plaintiffs' claims and the actions Foster Wheeler took at the direction of a federal officer. As did the court in Nesbiet, this Court finds that Foster Wheeler's evidence "is sufficient for purposes of section 1442(a) to demonstrate that the Navy's control over warnings directly interfered with [Defendant's] duty to warn under state law. Thus, [Defendant] has satisfied the 'causal nexus' requirement." Id. at 213.

For all of the foregoing reasons, the Court finds that defendants have raised a "colorable" federal defense to the claims alleged in Plaintiffs' Complaint. As a result, Foster Wheeler's removal pursuant to § 1442(a)(1) was proper. Plaintiffs' Motion to Remand is therefore denied.

In its Opposition, Foster Wheeler asks that the Court stay determination of the Motion to Remand pending a decision by the Multidistrict Litigation Panel whether to transfer this case to the Eastern District of Pennsylvania as a potential "tag-along action" to MDL No. 875. The Court notes that Foster Wheeler did not move for a stay, but rather simply asked for one in its Opposition. Foster Wheeler argues that a stay would serve judicial economy. The Court, however, finds that judicial economy would best be served by moving this case forward so it may be litigated in the proper forum. Determining that federal jurisdiction exists appears to be an appropriate prerequisite to determining which federal forum is best. The Court therefore denies Foster Wheeler's request for a stay.

IT IS SO ORDERED.

---

[2]     The Court recognizes that when faced with arguably similar evidence, other courts have reached a different result. See, e.g., Barrett v. CLA-VAL Co., Case No. 07-7774 PSG (FFMx) (C.D. Cal. Feb. 5, 2008); Hilbert v. McDonnell Douglas Corp., No. 07CV11900-NG, 2008 WL 53266 (D. Mass. Jan. 3, 2008). The Court declines to follow these cases because, in the Court's view, they place too high a burden on a defendant to prove its military contractor defense at such an early stage in the litigation. Given the liberality with which removals under § 1442 are to be considered, this more exacting standard appears to conflict with Ninth Circuit precedent. See Durham, 445 F.3d at 1252 ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.").

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WILBERT KIRKS and DENNIS KIRKS,    )
    )
       Plaintiffs,    )
    )
    v.    )  Civ. No. 08-856-SLR
    )
GENERAL ELECTRIC COMPANY, et al.,    )
    )
       Defendants.    )


LEE WIERSMA and JANICE WIERSMA,    )
    )
       Plaintiffs,    )
    )
    v.    )  Civ. No. 08-857-SLR
    )
GENERAL ELECTRIC COMPANY, et al.,    )
    )
       Defendants.    )

---

Thomas C. Crumplar, Esquire, of Jacobs & Crumplar, P.A., Wilmington, Delaware. Counsel for Plaintiffs.

Josette F. Spivak, Esquire, of Hollstein Keating Cattell Johnson & Goldstein P.C., Wilmington, Delaware. Counsel for Defendant General Electric Company.

---

**MEMORANDUM OPINION**

Dated:  September 17, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Pending before the court are motions to remand separate but substantially identical cases. (Civ. No. 08-856, D.I. 4; Civ. No. 08-857, D.I. 4) Both cases involve asbestos claims against a number of defendants, including General Electric Company ("GE"). In each, GE removed the case from the Superior Court of the State of Delaware to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1442(a)(1)[1] ("federal officer removal statute"). Plaintiffs[2] in both cases filed motions to remand their respective actions to State court pursuant to § 1447(c). In its opposition to both motions to remand, GE attached the same three affidavits, which it claims support removal to federal court and will require this court to deny the motions to remand.

## II. BACKGROUND

### A. *Kirks v. Carborundum Corp.*, Civ. No. 08-856

Plaintiff Dennis Kirks brought suit on November 13, 2007 against numerous defendants on behalf of plaintiff-decedent Wilbert Kirks. Dennis Kirks is the executor of Wilbert Kirks' estate. (Civ. No. 08-856, D.I. 1, ex. A at ¶ 7) Wilbert Kirks served aboard the USS Leyte between 1953 and 1957 as a boatswain's mate, and allegedly was exposed to asbestos through turbines manufactured by GE. (*Id.*, D.I. 1, ex. A; D.I. 5, ex. A) Wilbert Kirks died from mesothelioma on May 7, 2007. (*Id.*, D.I. 1, ex. A at ¶¶ 5,

---

[1] All section number references herein refer to Title 28 of the United States Code.

[2] Plaintiffs in each case are represented by the same counsel, and have filed substantially identical motions and arguments in support of remand.

1

6)

## B. *Wiersma v. A.W. Chesterton Co.*, Civ. No. 08-857

Plaintiff Janice Wiersma brought suit on or about January 29, 2008 against numerous defendants on behalf of plaintiff-decedent Lee Wiersma. Janice Wiersma is the executrix of Lee Wiersma's estate. (Civ. No. 08-857, D.I. 1, ex. A at ¶ 8) Lee Wiersma served as a radio operator aboard the USS Wright between 1965 and 1969, and allegedly was exposed to asbestos through turbines manufactured by GE. (*Id.*, D.I. 1, ex. A at ¶ 13; D.I. 5, ex. A) Lee Wiersma died from mesothelioma on July 1, 2007. (*Id.*, D.I. 1, ex. 1)

## III. STANDARD OF REVIEW

The federal officer removal statute reads in pertinent part:

(a) **A civil action** . . . commenced in State court against any of the following **may be removed by** them to the district court of the United States for the district and division embracing the place where it is pending.

(1) The United States or any agency thereof or **any officer (or any person acting under that officer) of the United States** or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

§ 1442(a)(1) (emphasis added). The party removing an action to federal court bears the burden of proving that removal is appropriate. *See Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990). The Third Circuit has held that the provisions of the federal officer removal statute, § 1442(a)(1), are to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994); *see also, Megill v. Worthington Pump, Inc.*, Civ. No. 98-076, 1999 WL 191565, at *2 (D. Del. Mar. 26, 1999). Indeed, the Supreme Court has held that "the right of removal is absolute for

2

conduct performed under color of federal office, and has insisted that the policy

favoring removal 'should not be frustrated by a narrow, grudging interpretation of §

1442(a)(1).' "  *Ariz. v. Manypenny,* 451 U.S. 232, 242 (1981) (citation omitted)

(emphasis added).

To establish removal jurisdiction under § 1442(a)(1), a defendant must establish

the following:

> (1)  it is a "person" within the meaning of the statute;
> (2)  the plaintiff's claims are based upon the defendant's conduct "acting
> under" a **federal office**;
> (3)  it raises a colorable federal defense; and
> (4)  there is a causal nexus between the claims and the conduct performed
> **under color of a federal office**.

*Feidt v. Owens Corning Fiberglas Corp.,* 153 F.3d 124, 127 (3d Cir. 1998) (citing *Mesa*

*v. California,* 489 U.S. 121, 129 (1989)) (emphasis added).  There is no dispute that

GE, as a corporation, is a "person" within the meaning of the statute.  *See Good v.*

*Armstrong World Indus., Inc.,* 914 F. Supp. 1125, 1128 (E.D. Pa. Jan. 18, 1996).

With respect to the second element, GE must establish that a "federal office"[3]

was the source of the specific act for which the contractor now faces suit.  *See Holdren*

*v. Buffalo Pumps, Inc.,* 614 F. Supp. 2d 129, 138 (D. Mass. May 4, 2009).  In both

cases at bar, the gravamen of the complaints is GE's alleged failure to warn of the

---

[3]As seen above, the Third Circuit in *Feidt* used the phrase "federal office"
(consistent with the Supreme Court's decision in *Arizona v. Manypenny,* 451 U.S. at
242), not the phrase "federal officer."  As a result, the distinction made by some courts
between direction by the Navy and direction by a specific federal officer is not
compelling.  *See, e.g., Good v. Armstrong World Indus.,* 914 F. Supp. at 1129.

3

dangers of asbestos.[4]  In order to show that a government contract displaces the state

tort law duty to warn under the federal contractor defense, a defendant

> must show that the applicable federal contract includes warning
> requirements that significantly conflict with those that might be imposed by
> state law. . . . The contractor must show that whatever warnings
> accompanied a product resulted from a determination of a government
> official, . . . and thus that the government itself "dictated" the content of
> the warnings meant to accompany the product.

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 630 (2d Cir. 1990).

To demonstrate that the federal government sufficiently controlled the warnings

issued in connection with GE's turbines, GE has submitted three affidavits.  GE's first

affidavit is the declaration of Admiral Ben J. Lehman ("Admiral Lehman").  (D.I. 5, ex.

B)[5]  Admiral Lehman is a retired Rear Admiral of the United States Navy.  While in the

Navy, Admiral Lehman served in a number of positions, including Ship Superintendent

at the Brooklyn Navy Yard (1942-44), Ship Superintendent at the San Francisco Naval

Shipyard (1950-52), and Planning Officer at the Assistant Industrial  Management

Office in San Francisco (1952-54).  He was promoted to Rear Admiral in the Naval

Reserve in 1977.  During his time away from the Navy, Admiral Lehman worked as an

engineer at GE (1946-48), and as the director of engineering and vice-president of

engineering at two major shipbuilding companies (1969-75).  In his affidavit, Admiral

Lehman attests "to the level of supervision and control by the United States Navy and

---

[4]Although plaintiffs have asserted claims which are not based on the failure to warn, for simplicity, the remaining discussion focuses on their failure-to-warn claims.

[5]Because of the duplicative nature of the records of these two actions, all docket index references henceforth are made to Civ. No 08-856.

4

its officers over every aspect of design and manufacture of equipment intended for installation on Navy vessels." (*Id.* at ¶ 2) The declaration states that, in "the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment used on Navy ships. . . . **This control included the decision of what warnings should or should not be included.**" (*Id.* at ¶ 5) (emphasis added) Based on his experience, Admiral Lehman believes that "equipment suppliers were prohibited from providing any warnings on or to accompany equipment supplied to the Navy without the consent and approval of the Navy." (*Id.* at ¶ 7)

GE also filed the affidavit of Lawrence Stillwell Betts, MD, PhD ("Dr. Betts") to support the proposition that the Navy possessed state of the art knowledge on the dangers of asbestos. (D.I. 5, ex. C)[6] Dr. Betts served in the Navy from 1972 to 2001. In his affidavit, Dr. Betts states that, "[d]uring the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos-containing products on a marine steam turbine on United States Navy ships known by a turbine manufacturer, like [GE], that was not known by the United States and the United States Navy." (*Id.* at ¶ 29) Dr. Betts concludes that "[i]t would be unreasonable to assume that the Navy would have accepted unsolicited and gratuitous comments from equipment manufacturers about the hazards" of asbestos when the equipment manufacturers were not experts on the subject matter. (*Id.* at ¶ 31)

David Hobson ("Hobson") was employed by GE between 1969 and 1996. His

---

[6]This affidavit includes a voluminous appendix of more than 500 pages which provides documents showing the knowledge the Navy possessed with regard to asbestos during the relevant time period.

last position at GE was Manager of Navy Customer Service for GE's Navy and Small-Steam Turbine Department. Hobson's affidavit attests "to the extensive level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery, over GE's design and manufacture of Navy turbines." (D.I. 5, ex. D at ¶ 3) According to Hobson, GE performed all of its work on Navy turbines under the immediate supervision of the Navy. (*Id.* at ¶ 7) The Navy exercised control over all aspects of the design, manufacture and testing of turbines through "contract documents, . . . written specifications and personal oversight." (*Id.*) Specifically, government contracts which bound GE would incorporate pertinent specifications that "spell[ed] out in minute detail the Navy's requirements concerning every aspect of the materials and composition of devices like Navy turbines." (*Id.* at ¶ 8) Hobson states that the Navy "exercised absolute authority to determine precisely what hazards aboard ship would be subject to warnings and the . . . content of any such warnings." (*Id.* at ¶ 24)

Consistent with the above affidavits, the court concludes that GE has satisfied its burden to prove that plaintiffs' failure-to-warn claims are based upon GE's conduct "acting under" the office of the Navy and its officers. With respect to the next element, that is, whether GE has raised a colorable federal defense, GE has asserted the federal common law government contract defense. According to the Supreme Court, a federal contractor will not be liable for design defects in military equipment under state tort laws when:

(1) the United States approved reasonably precise specifications;
(2) the equipment conformed to those specifications; and
(3) the supplier warned the United States about the dangers in the use of the

6

equipment that were known to the supplier but not to the United States.[7]
*Boyle*, 487 U.S. at 512-513. Based on the three affidavits provided by GE, the court
concludes that GE has raised a colorable federal defense, that is, the federal common
law government contract defense. Moreover, the three affidavits satisfy the
requirement that GE sufficiently demonstrate a causal nexus between plaintiffs' failure-
to-warn claims and the Navy's control over the warnings provided by GE on its turbines.
Therefore, GE has established federal officer removal jurisdiction.

This conclusion is supported by similar decisions, based upon one or more of
these affidavits, that the federal officer removal statute has been satisfied where Navy
regulations required the use of asbestos and mandated what warnings were required
concerning asbestos.[8] *See e.g., Pease v. A.W. Chesterton Co.*, Civ. No. 08-624, D.I.
36 (D. Del. Dec. 1, 2008);[9] *Chicano v. General Electric Co.*, Civ. No. 03-5126, 2004 WL

---

[7]"The first two of these conditions assure that . . . the design feature in question
was considered by a Government officer, and not merely by the contractor itself. The
third condition is necessary because, in its absence, the displacement of state tort law
would create some incentive for the manufacturer to withhold knowledge of risks, since
conveying that knowledge might disrupt the contract but withholding it would produce no
liability." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512-13 (1988).

[8]The court recognizes that its decision in *Megill* is contrary to the above
conclusion. However, the *Megill* decision was based on a different record, notably,
evidence such as that presented in the three affidavits filed in the cases at bar was not
presented by the defendant in *Megill*. 1999 WL 191565, at *4.

[9]The plaintiff, alleging injuries caused by asbestos exposure through GE turbines
aboard Navy ships, was represented by the same counsel who represents both
plaintiffs in the cases at bar. (Civ. No. 08-624, D.I. 1) In *Pease*, GE similarly removed
the case to federal court based on the federal officer removal statute. *Id.* GE relied on
the affidavits of Lehman, Betts, and Hobson to support removal to federal court. (*Id.*,
D.I. 12) Relying on the affidavits, the court found that GE had satisfied all the elements
of the federal officer removal statute.

2250990 (E.D. Pa. Apr. 6, 2004); *Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99

(D. Conn. Sept. 17, 2007) (holding that Lehman affidavit shows a causal nexus

between the claims and conduct performed under the color of a federal office); *Reaser

v. Allis Chambers Corp.*, Civ. No. 08-1296 (C.D. Cal. June 23, 2008) (relying on

Lehman and Betts affidavits to find removal appropriate for failure-to-warn claims

against GE related to asbestos use aboard Navy ships); *Nesblet v. General Electric

Co.*, 399 F. Supp. 2d 205 (S.D.N.Y. Mar. 28, 2005) (relying on Hobson, Lehman and

Betts affidavits to find removal appropriate for failure-to-warn claims against GE related

to asbestos use in turbines on Navy ships).

   The court notes that there are decisions rejecting evidence such as that

proffered by GE, instead requiring a higher threshold of evidence to establish federal

officer removal jurisdiction. For instance, in *Holdren v. Buffalo Pumps, Inc.*, the district

court not only required the contractor to demonstrate that "the decision to warn must be

the government's, not the contractor's," but that the decision also "reflect a federal

interest incompatible with the important health and safety requirements of state law."

614 F. Supp. 2d at 137. *See also, Good v. Armstrong World Indus.*, 914 F. Supp. at

1131 (because "asbestos is no longer used in the design and manufacture of

equipment," the lawsuit "does not threaten the enforcement of a federal policy sufficient

to warrant removal."). While these considered opinions have merit, given that the

provisions of the federal officer removal statute are to be construed broadly,[10] and given

---

[10]Unlike the general removal statute, § 1441, which is to be construed so that all
doubts are to be resolved in favor of remand. *Compare Sun Buick, Inc. v. Saab Cars
USA, Inc.*, 26 F.3d at 1262, *with Boyer v. Snap-on Tools Corp.*, 913 F.2d at 111.

8

that GE has produced evidence demonstrating a significant degree of control by a
federal office over the warnings related to the dangers of asbestos, I respectfully reach
a contrary conclusion.

## V. CONCLUSION

For the reasons stated above, the court denies plaintiffs' motions to remand the
cases to State court.  An appropriate order will issue.

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAMUEL ALLEN, ET AL., | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3-09-cv-0497 (JCH) |
| | : | |
| GENERAL ELECTRIC CO. AND | : | |
| BUFFALO PUMPS, INC. | : | |
| | : | |
| | : | |
| Defendants. | : | AUGUST 27, 2008 |

**RULING RE: PLAINTIFF'S MOTION TO REMAND TO STATE COURT (Doc. No. 12)**

I.    **INTRODUCTION**

On March 3, 2009, Samuel Allen and eleven other plaintiffs filed a personal

injury action in the Connecticut Superior Court, Judicial District of Fairfield at Bridgeport.

On March 27, defendant Buffalo Pumps, Inc., removed this case to federal court. See

Not. of Removal (Doc. No. 1). On March 30, defendant General Electric Company

("GE") joined in the petition for removal. See Joinder in Removal Pet. (Doc. No. 11).

The defendants removed pursuant to the federal officer statute, which permits removal

of state actions brought against an officer or agency of the United States, or a person

working under a federal officer. 28 U.S.C. § 1442(a)(1). Plaintiffs now move to remand

to state court, arguing that this court does not have subject matter jurisdiction. See

Mot. to Remand (Doc. No. 12). For the reasons stated below, the court denies

plaintiffs' Motion for Remand.

## II.   FACTS

Plaintiffs are twelve men[1] who were employed by General Dynamics Corporation, Electric Boat Division, in Groton, Connecticut for various periods between 1956 and the present.  All worked in areas where they were exposed to asbestos and now suffer from asbestos-related diseases such as lung cancer, lung disease, asbestosis, and loss of lung function.  See Pl.'s Mem. in Supp. of Mot. to Remand ("Pl.'s Mem.") at 1-4 (Doc. No. 12).  Plaintiffs allege that their exposure to asbestos came at least in part from products the defendants manufactured for the Navy.  See Compl., Ex. 1 to Not. of Removal.

Buffalo Pumps manufactured and supplied pumps for Navy ships pursuant to contracts which included specifications for the use of asbestos.  See Not. of Removal at ¶¶ 5, 8.  GE manufactured marine steam turbines for use on Navy ships and submarines pursuant to detailed specifications and contracts, which included directions for the use of asbestos.  See Joinder in Removal Pet. ("Joinder") at ¶¶ 6-8.  In support of their Petition for Removal, Buffalo Pumps has provided affidavits from retired Rear Admiral Roger B. Horne and Martin A. Kraft, Buffalo Pumps' Production Manager, and an article by Samuel A. Forman, a specialist in preventative and occupational medicine, former Navy doctor, and expert in asbestos-related diseases.  GE provided several affidavits from David Hobson, a former engineer in the Coast Guard who served as the Manager of Navy Customer Service for GE's Navy and Small Steam Turbine

---

[1] Samuel Allen, Robert Benjamin, Charles Spralling, Gary Chapman, Michael Gladue, Ralph Godfrey, William Holland, Kenneth Jones, Billings Miner, William Molonson, Alan Patridge, and Charles Sprague.

Department.  GE also provided an affidavit from Lawrence Stillwell Betts, a retired Navy

Captain and current president of a medical corporation that specializes in preventive

medicine, and one from retired Rear Admiral Ben J. Lehman.  Plaintiffs provided the

court with an affidavit from Robert Bruce Woodruff, a retired Navy Captain who served

as a vice president and Division General Manager for a company manufacturing steam

turbines following his retirement from the Navy.

III.   DISCUSSION

        This case is nearly identical to a number of other cases recently removed to this

district.  In fact, many of those cases involved either Buffalo Pumps, or GE, or both, as

defendants.  Buffalo Pumps and GE provided the court with the same supporting

documents that they presented in the previous cases.  See, e.g., Pantalone v. Aurora

Pump Co., et al., 576 F. Supp. 2d 325 (D.Conn. 2008) (Arterton, J.) (finding federal

officer removal appropriate but denying removal as untimely filed); DeMatties v. Acmat

Corp., 2008 U.S. Dist. LEXIS 86717 (D. Conn. 2008) (Eginton, J.) (finding federal

officer removal appropriate); Carroll v. Buffalo Pumps, 2008 U.S. Dist. LEXIS 86715 (D.

Conn. 2008) (Eginton, J.) (same); Machnik v. Buffalo Pumps, 506 F. Supp. 2d 99 (D.

Conn. 2007) (Droney, J.) (same); Contois v. Able Industries, Inc., 523 F. Supp. 2d. 155

(D. Conn. 2007) (Thompson, J.) (same).  In all of these cases, the court found that

federal officer removal was appropriate.  The plaintiffs have failed to distinguish these

cases.[2]

_____

[2] Plaintiffs argue that it is significant that the plaintiffs in this case were civilians, not employees of the U.S. Navy.  See Pl.'s Mem. at 5.  However, it is the defendants' status as government contractors which is relevant for federal officer removal; plaintiffs' status is immaterial.

3

The federal officer removal statute permits removal of cases brought against "[t]he United States or any agency thereof or officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official capacity for any act under color of such office. . . ." 28 U.S.C. § 1442(a)(1). This is a statutory exception to the well-pleaded complaint rule that a federal defense alone does not qualify a case for removal to federal court. See Louisville-Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908).

Because Buffalo Pumps and General Electric are not federal officers, in order to remove this case they must demonstrate: (1) that they are persons within the meaning of the statute who acted under a federal officer; (2) that they performed the actions for which they are being sued under color of federal office; and (3) that they have a colorable federal defense. See Isaacson v. Dow Chemical Co., 517 F3d. 129, 135 (2d Cir. 2008) (citing Jefferson County v. Acker, 527 U.S. 423, 431 (1991)). Although the burden of showing that federal jurisdiction exists lies with the party seeking removal, the Supreme Court has held that federal officer removal should not be constrained by a "narrow, grudging interpretation." See Jefferson County, 527 U.S. at 431. The defendant need not "virtually win his case before he can have it removed," because the purpose of section 1442(a)(1) is to have the federal defense tried and determined in federal court. See id. In determining whether jurisdiction is proper, the court should "look only to the jurisdictional facts alleged in the Notice[] of Removal." See In re Methyl Tertiary Butyl Ether Prods. Liabl. Litig., 488 F.3d 112, 124 (2d Cir. 2007).

A.    "Persons" "Acting Under" a Federal Officer

Buffalo Pumps and GE are "persons" within the meaning of the federal removal statute, which includes corporate persons.  See Isaacson 517 F.3d at 136.  However, defendants must also show that they were "acting under" a federal officer: "an entity 'acts under' a federal officer when it 'assists, or helps carry out, the duties or tasks of the federal superior.'"  See Isaacson, 517 F.3d at 137 (quoting Watson v. Philip Morris Cos., 551 U.S. 142, 152 (2007)).  Just as the defendants in Isaacson "contracted with the Government to provide a product that the Government was using during war -- a product that, in the absence of defendants, the Government would have had to produce itself," so did Buffalo Pumps and GE provide pumps and marine steam turbines, respectively, to the U.S. Navy pursuant to specific contracts.  See Isaacson, 517 F.3d at 137; Not. of Removal at ¶ 4; Joinder at ¶ 6.  Buffalo Pumps and GE had "received delegated authority" to complete their contracts and were therefore helping carry out the duties of their federal superior.  See Isaacson, 517 F.3d at 137.  Buffalo Pumps and GE thus fulfill the "acting under" requirement for federal officer removal.

B.    "Under Color of" Federal Office

The second requirement for federal officer removal is that the defendant performed the actions for which they are being sued "under color of" federal office.  This is known as the causation requirement.  See Isaacson, 517 F.3d at 137.  The plaintiffs argue that Buffalo Pumps and GE must provide "credible, specific, or candid evidence" that the Navy prohibited them from including warnings about asbestos in their products in order to fulfill this prong.  See Pl.'s Mem. at 28.  This is too high a bar for this requirement, which only calls for a general connection between the action sued

5

upon and the governmental function defendants were fulfilling. The Second Circuit recently stated that the bar for this requirement is "quite low." See Isaacson, 517 F.3d at 137. "To show causation, defendants must only establish that the act that is the subject of plaintiffs' attack . . . occurred while defendants were performing their official duties." Id. at 137-38 (internal citations omitted). Courts should "credit defendants' theory of the case when determining whether a causal connection exists." Id. at 137.

The actions sued upon in this case are plaintiffs' personal injuries, which they claim are a result of asbestos exposure while working in a shipyard. See Compl., Ex. 1 to Not. of Removal. Defendants argue that the Navy exercised complete control over all aspects of their production of asbestos-containing components, including written materials and warnings.[3] See Def. Buffalo Pumps' Opp. to Pl.'s Mot. for Remand ("Buffalo's Opp.") at 5-10. In Isaacson, the Second Circuit found that defendants had fulfilled the causation requirement because they were carrying out detailed contracts with the government for the manufacture of Agent Orange. See id. Because Buffalo Pumps and GE are in a similar position, they have demonstrated a causal link between the action on which plaintiffs sued and their official duties.

C.    Colorable Federal Defense

Finally, defendants must raise a colorable federal defense. Buffalo Pumps and GE raise the government contractor defense, as set forth in Boyle v. United Techs.

---

[3] As noted above, plaintiffs argue that defendants must provide "credible, specific or candid evidence that they were required or directed by the Navy to omit warnings from their products" in order to satisfy this requirement. See Pl.'s Mem. at 28. Even if the plaintiffs' high burden were the law, Buffalo Pumps and GE have met it – because they have provided affidavits stating that the Navy would have rejected any products onto which they added their own warnings. See Affidavit of Roger B. Horne, Jr., Ex. 2 to Not. of Removal ("Horne Aff."), at ¶ 22; Affidavit of David Hobson, Jan. 28, 2008 ("Hobson Jan. 2008 Aff."), Ex. 6 to Def. GE's Mem. in Opp. of Pl.'s Mot. to Remand ("GE's Opp."), at ¶ 21.

6

Corp., 487 U.S. 500, 512 (1987), and modified to fit a failure-to-warn case[4] in In re Joint E. and S.D.N.Y. Asbestos Litig. ("Grispo"), 897 F.2d 626, 630 (2d. Cir. 1990). Buffalo Pumps and GE must show: (1) "government control over the nature of product warnings"; (2) "compliance with the Government's directions"; and (3) "communication to the Government of all product dangers known to it but not to the Government." See Densberger v. United Techs. Corp., 297 F.3d 66, 75 (2d Cir. 2002) (quoting Grispo, 897 F.2d at 630 n.4). It is important to note that to earn federal officer removal, the federal defense need only be colorable – not "clearly sustainable" or one that "will ultimately prevail." See Willingham v. Morgan, 395 U.S. 402, 407 (1969); Isaacson 517 F.3d at 139. Additionally, it is enough here to rely on defendants' assertions. See Isaacson 517 F.3d at 139. "One of the most important reasons for [federal officer] removal is to have the validity of the defense . . . tried in a federal court." See Willingham, 395 U.S. at 407. Through their notices for removal and supporting affidavits, Buffalo Pumps and GE have met the three elements of the government contractor defense.

      1.      Government Control Over the Nature of Product Warnings

     The Navy tightly controlled the nature of warnings that government contractors could place on the products they created. According to Rear Admiral Horne, "the Navy . . . had detailed specifications that governed the form and content of written materials to be delivered with equipment . . . supplied to the Navy." See Horne Aff. at ¶ 12. David Hobson supports this: "The Navy exercised intense direction and control over all written documentation and any safety or caution information that the Navy, in its sole

_____

[4] For the purposes of their Motion to Remand, the plaintiffs have focused solely on their failure-to-warn claims. See Pl.'s Mem. at 10 n.5.

discretion, directed be provided with these turbines." See Affidavit of David Hobson,

Feb.4, 2005, Ex. 5 to GE's Opp., at ¶ 2.

2.    Compliance with the Government's Directions

As for the second element, defendants argue that they did not provide warnings

because they were complying with the Navy's requirements.  "A manufacturer such as

Buffalo Pumps would not have been permitted to include a warning regarding asbestos

in an equipment manual or on a product label."  See Horne Aff. at ¶ 14.  "Unless

expressly directed to do so by the Navy, GE was not permitted, under the

specifications, associated regulations and procedures, and the actual practice as it

existed in the field, to affix any type of warning to a Navy turbine. . . .  To affix such

extraneous matter . . . would take the turbine out of compliance."  See Hobson Jan.

2008 Aff. at ¶ 21.  These statements demonstrate that defendants were acting in

compliance with the Navy's directions.

Plaintiffs argue that defendants must "establish with affirmative evidence that, in

fact, the federal agency would have or did prohibit them from affixing warnings to their

products."  See Pl.'s Mem. at 21.  Plaintiffs provide evidence rebutting defendants'

claims of compliance in the form of an affidavit from Captain Robert Bruce Woodruff,

who argues that it is "more likely than not [that] such a warning label would definitely

have been considered."  See Affidavit of Robert Bruce Woodruff, Ex. 3 to Pl.'s Mem., at

14.  This dispute goes beyond the issues to be resolved in a motion for remand and into

the issues to be resolved at trial.  While Buffalo Pumps and GE may need to prove with

"affirmative evidence" that the Navy prohibited them from adding warnings to their

products in order to avoid liability, the defendant need not "virtually win his case before

he can have it removed." See Jefferson County, 527 U.S. at 431.

> 3.    Communication of All Dangers Known to Defendants but not to the
> Government

Finally, both Buffalo Pumps and GE state that the Navy was well aware of the dangers that asbestos posed, and was the leading expert in the field of asbestos hazard control.[5]  There were no dangers known to the defendants that were not also known to the Navy.  See Affidavit of Lawrence Stillwell Betts, Ex. 7 to GE's Opp. at ¶¶ 27-28, 30; see also Samuel A. Forman, U.S. Navy Shipyard Occupational Medicine through World War II, 30 J. Occup. Med. 28 (1988), Ex. 4 to Not. of Removal. Therefore, Buffalo Pumps and GE met all three elements and have demonstrated that they have a colorable government contractor defense.

Buffalo Pumps and GE have satisfied the test for federal officer removal by "persons" not themselves federal officers: they demonstrated that they were acting under a federal officer, that there was a causal connection between the action sued upon and their official duties, and that they have a colorable federal defense.  Because Buffalo Pumps and GE have satisfied the Isaacson test, the court denies plaintiffs' motion for remand.

---

[5] Plaintiffs argue that the Navy's leadership in occupational medicine and its health monitoring programs are irrelevant because they were civilian employees of a civilian employer. See Pl.'s Mem. at 5-6.  However, defendants do not need to demonstrate that the Navy had "exclusive control and regulatory authority over the health and safety of these plaintiffs," as plaintiffs argue. Id. at 6.  The government contractor defense only requires the defendant to demonstrate that they communicated "all product dangers known to [them] but not to the [Navy]." See Densberger, 297 F.3d at 75.  The Navy's leadership in the field of occupational medicine is relevant to what it knew about asbestos, and it is undisputed that the Navy was well aware of the potential health hazards of using asbestos.  Therefore, this argument fails.

IV.    CONCLUSION

Plaintiffs' Motion for Remand is DENIED.

SO ORDERED.

Dated at Bridgeport, Connecticut this 27th day of August, 2009.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

Case MDL No. 375 Document 8585-1 Filed 03/30/12 Page 287 of 352

# EXHIBIT J



United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALBERT WRIGHT JR.,                        No. C07-05403 MJJ

       Plaintiff,                         **ORDER DENYING MOTION TO REMAND**

   v.

A.W. CHESTERTON COMPANY INC,

       Defendant.

## INTRODUCTION

Before the Court is Plaintiffs Albert Wright, Jr. ("Mr. Wright") and Marva Wright's (collectively, "Plaintiffs") Motion to Remand. (Docket No. 23.) Defendants Foster Wheeler ("Foster Wheeler") and Leslie Controls ("Leslie Controls") (collectively, "Defendants") oppose the Motion.[1] For the following reasons, the Court **DENIES** the Motion.

## FACTUAL BACKGROUND

This is a personal injury action arising out of injuries allegedly sustained by Mr. Wright due

---

[1] Plaintiff objects to Leslie Controls' Joinder in Foster Wheeler's Notice of Removal and Leslie Controls' Joinder in Foster Wheeler's Opposition to this Motion. Whether or not Leslie Controls may join the Notice of Removal is not, however, dispositive of this Motion because any defendant can unilaterally remove a case under § 1442. *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (explaining that a federal officer or agency defendant can unilaterally remove a case under § 1442). Therefore, for purposes of this Motion, the Court need not determine whether Leslie Controls' may join in Foster Wheeler's Notice of Removal. However, once the case is removed by Foster Wheeler, the Court perceives no reason why Leslie Controls may not join in Foster Wheeler's Opposition to Plaintiff's Motion to Remand. In addition, Leslie Controls filed its joinder in the opposition not less than 21 days before the hearing date with both the Court and Plaintiffs. (*See* Plf.'s Objection, Docket No. 44 at 2.) The Court therefore perceives no prejudice from Leslie Control's failure to efile. *See* Civ. L.R. 7-3(a).

1   to exposure to Defendants' asbestos and asbestos-containing products. (See Keller Decl., Exh. A

2   ("Complaint") ¶¶ 10-15.)  Plaintiffs allege that Mr. Wright contracted lung cancer as a result of his

3   exposure to these products during his employment as a machinist and flange turner, among other

4   places, for the Navy. (Id. ¶¶ 11, 36-37, Exh. A.)  Mr. Wright worked aboard twenty-six or more

5   Navy ships and vessels in his career.[2] (See id. at Exh. A.)

6          Plaintiffs filed this asbestos action on September 13, 2007 in San Francisco County Superior

7   Court against Defendant Foster Wheeler, Leslie Controls and dozens of other defendants. (See

8   Keller Decl., Exh. A ("Complaint").)  Plaintiffs brought claims of negligence, strict liability, false

9   representation, intentional tort, premises owner/contractor liability and loss of consortium. (See

10  Complaint at 1.)  Plaintiffs argue, in this Motion, that Plaintiffs' claims against Foster Wheeler are

11  based only on its failure to warn about the dangers of asbestos that Foster Wheeler incorporated into

12  the design and manufacture of its boilers. (Plfs.' Mem. of P. & A. at 14.)  Indeed, in the Complaint,

13  Plaintiffs "disclaim any cause of action or recovery for any injuries and damages resulting from

14  exposure to asbestos caused by the acts or omissions of defendants committed at the specific

15  direction of an officer of the United States Government acting within his official capacity." (See

16  Complaint ¶ 9a.)  Foster Wheeler filed a Notice of Removal on October 23, 2007. (See Notice of

17  Removal, Docket No. 1.)  Plaintiffs now seek an order remanding this case to state court.

                              **LEGAL STANDARD**

19          Pursuant to 28 U.S.C. § 1441(a), a defendant in a civil action may remove a case from state

20  court to federal district court if the district court has subject matter jurisdiction over the case.  The

21  Court strictly construes the removal statute against removal and Defendants have the burden of

22  establishing that removal jurisdiction is proper.  See Gaus v. Miles, Inc., 980 F.2d 564, 566-67 (9th

23  Cir. 1992).

24          Removal pursuant to 28 U.S.C. § 1442, however, is different.  Pursuant to 28 U.S.C. §

25  1442(a)(1), a civil action may be removed by "[a]ny officer of the United States or any agency

26

27  _____
    [2] Mr. Wright worked aboard various Navy vessels including, but not limited to, the USS Midway, USS Enterprise,
    USS Kitty Hawk, USS Coral Sea, USS Oriskany, USS Constellation, USS Mount Hood, USS John F Kennedy, USS

28  Hancock, USS Ticonderoga, USS Providence, USS Mount Baker, USS Mauna Kea, USS Pigeon, USS Pyro, USS Guitarro,
    USS Drum, USS Pintado USS Hawkbill, USS Permit, USS Swordfish, USS Halibut, USS Grayback, USS Brinkley Bass,
    USS Trigger, and USS Wahoo.

United States District Court
For the Northern District of California

1   thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1).

2   To satisfy this provision a party must "(1) demonstrate that it acted under the direction of a federal

3   officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus

4   between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v.*

5   *Abex Corp.*, 816 F.Supp. 569, 517 (N.D.Cal. 1992) (citing *Mesa v. California*, 489 U.S. 121, 124-

6   125, 134-135 (1989)).[3]

7         Unlike removal under § 1441(a), the presumption under § 1442 is in favor of removal. *See*

8   *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252-53 (9th Cir. 2006). In *Durham*, after a

9   review of the relevant case law, the Ninth Circuit stated that "when federal officers and their agents

10  are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* at

11  1252. The Court further explained that "[b]ecause it's so important to the federal government to

12  protect federal officers, removal rights under section 1442 are much broader than those under

13  section 1441." *Id.* at 1253 (noting that the breadth of the removal rights are exemplified by, inter

14  alia, the fact that under § 1442 a federal officer can remove a case even if the plaintiff could not have

15  filed the case in federal court to begin with, that removal under § 1442 is not subject to the well-

16  pleaded complaint rule and that a federal officer or agency can unilaterally remove a case under

17  section 1442).[4]

18                                    **ANALYSIS**

19         Plaintiffs argue that Defendants fail to establish that Foster Wheeler acted under the direction

20  of a federal officer, raised a colorable federal defense, or established a causal nexus between its

21  alleged action under the control of a federal officer and Plaintiffs' claims. Plaintiffs also raise

22  evidentiary objections to Defendants' evidence.

---

23        [3] The removing party must also qualify as a federal officer or person acting under the same. As a corporation,
24  Foster Wheeler meets this requirement. *See Fung*, 816 F.Supp. at 572. Additionally, the parties do not contend otherwise.

25        [4] Plaintiffs correctly argue that the Ninth Circuit, in *Durham*, was confronted with the question of whether the
    removal petition was timely, so the court did not reach the merits of the defendant's removal petition. Plaintiff understates,
26  however, the breadth of the holding in *Durham*. While *Durham* needed only to determine the timeliness question, the Court
    analyzed the history of § 1442. In so doing, the Circuit's determination that there should be a presumption in *favor* of
27  removal was not limited to the mere question of timeliness. In addition, the Circuit makes the presumption determination
    in order to come to its final holding. Thus, the language regarding the breadth and presumption in favor of removal was not
28  dicta, but essential to the holding and thus binding. A recent decision from this court interpreted it as such and accordingly
    denied a motion to remand. *See Ballenger v. AGCO*, No. C 06-2271, 2007 WL 1813821 (N.D. Cal. June 22, 2007).

1    Defendants, on the other hand, argue that they have submitted sufficient evidence on each of

2    the required elements for removal under § 1442 in both their Notice of Removal and the exhibits

3    attached to their Opposition to this Motion. The Court turns first to the evidentiary challenges, then

4    to the merits.

5    I.    Evidentiary Issues

6        In the instant case, Defendants submit four declarations. Plaintiff raises evidentiary

7    objections to all four. The general contours of these objections are outlined in this section. Below,

8    in the discussion on the merits, if the outcome relies on evidence that is specifically challenged, it

9    shall be so noted and the objection resolved.

10        The first two declarations, attached to Defendant's Notice of Removal, are the declarations

11   of J. Thomas Schroppe, a retired Foster Wheeler executive, and Ben J. Lehman, a retired Rear

12   Admiral of the United States Navy. These declarations are offered for the purpose of demonstrating

13   that Foster Wheeler was subject to government specifications and oversight in all aspects of the

14   design of its boilers, including the relevant warnings attached thereto. (*See* Affidavit of J. Thomas

15   Schroppe, Notice of Removal, Exhibit B and Affidavit of Ben J. Lehman, Notice of Removal,

16   Exhibit C). Plaintiffs object to the admissibility of these affidavits for four reasons. (*See* Plfs.'

17   Evid. Obj.) First, Plaintiffs argue that under Federal Rule of Evidence ("FRE") 402, the challenged

18   evidence is not relevant. Next, under FRE 602, Plaintiffs contend that the witnesses do not have

19   personal knowledge of the matters asserted. Third, some of the evidence is purportedly inadmissible

20   hearsay under FRE 802. Finally, Plaintiffs argue that these declarations violate the best evidence

21   rule, under FRE 1002-1004.[5]

22        As a general matter, none of these objections are meritorious. First, the declarations are

23   relevant to this Motion because they are related to the Navy's level of control over Foster Wheeler's

24   production activities. (*See* Notice of Removal, Exhs. B, C.) Mr. Wright alleges that his injuries

25   were caused by his work on at least twenty-six Navy ships, not just one or even a small handful.

26   While Defendants only cite one ship by name in their Notice of Removal, they note that the

27

28        [5] While Plaintiffs refer to the "secondary evidence rule" and cite FRE 1003, the Court presumes, given the description of the objection, that the objection is based on FRE 1002.

4

1   allegations are related to "exposure while working on, among other ships, the USS Constellation."

2   (*See* Notice of Removal at 2.) Thus, evidence regarding general navy practices, as it relates to the

3   Navy's contracts with Foster Wheeler, is both relevant and appropriate. Insofar as Plaintiff argues

4   that the testimony is not relevant because these declarations are dated prior to the inception of this

5   action in state court, this argument is unavailing. The fact that the declaration pre-dates the

6   inception of the suit does not undermine the relevance of the practices testified to, all of which

7   occurred prior to the date the declaration was signed.

8          Next, both Schroppe and Lehman testify to their personal knowledge of the facts contained in

9   the declaration. Schroppe states that he is personally familiar with the degree of supervision and

10  control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for

11  boilers and auxiliary equipment because he was personally involved in such contracts at all the

12  various stages of contracting. (*See id.*, Exh. B at 2.) Lehman testifies that his years of experience

13  with the Navy have caused him to be thoroughly familiar with U.S. Navy specifications and the

14  means by which the U.S. Navy controlled its contracts and inspection procedures. (*See id.*, Exh. C

15  at 9.) Thus, Schroppe and Lehman's testimony regarding the Navy's contracting and specifications

16  related to Foster Wheeler boilers is based on personal knowledge. Third, insofar as specific

17  statements are inadmissible hearsay, this will be taken up as is relevant, below. However, as a

18  general matter, the majority of the challenged statements are based on personal knowledge, not an

19  out of court statement, and are not inadmissible hearsay. Finally, these declarations do not violate

20  the Best Evidence Rule. Under FRE 1002, "to prove the content of a writing, recording, or

21  photograph, the original writing, recording, or photograph is required." Here, Schroppe and

22  Lehman, in their declarations, do not attempt to prove the content of a writing, recording or

23  photograph. While the declarations cite various specifications that are also written, such as the

24  Military Specifications ("Mil Specs"), they rely on their independent knowledge of the contents and

25  therefore need not submit the document/s themselves.

26         The third declaration, by Thomas J. Moses, counsel for Foster Wheeler, includes a copy of

27  Plaintiffs' Preliminary Asbestos Litigation Statement, a copy of a Government Purchase Order, and

28  a copy of a District Court case. (Moses Decl., Exhs. A-C.) Plaintiff objects to the Purchase Order,

United States District Court

For the Northern District of California

5

1 arguing that it never references the USS Constellation and Defendant's attorney never establishes a

2 foundation for its authenticity or how he is qualified to submit or interpret it. (Plfs.' Reply at 9.)

3 The Court agrees that the Government Purchase Order lacks some foundation and specificity.

4 However, the Court need not determine the admissibility of this document as the Court need not rely

5 on it to resolve this Motion.

6          Finally, the fourth declaration, by Lawrence Stilwell Betts ("Betts"), includes forty-five

7 exhibits. Plaintiffs generally object to the entire declaration on the same grounds that they object to

8 the Schroppe and Lehman declarations. As above, as a general matter, these objections are not

9 meritorious. However, insofar as the Court's decision relies on specific portions of the Betts

10 declarations, the objections thereto are considered below.

11          Plaintiffs also argue that the Court should not consider the Betts declaration because it was

12 untimely. The Court, however, finds this argument unavailing. First, Plaintiffs contend that a

13 removal notice cannot be amended or supplemented after the time for removal has expired. (See

14 Plfs.' Reply at 5.) While this may be the case, Defendants do not seek to amend their removal

15 notice. In addition, the issues raised in the Betts declaration, and attached exhibits, were generally

16 raised in Defendants' Notice of Removal. (See Notice of Removal, Exh. C at 14-15.) Thus, the

17 untimeliness argument is unavailing. In addition, the Betts declaration was filed with the Court on

18 December 17, 2007, more than the requisite time in advance of the January 29, 2008 hearing in this

19 matter. While Defendants failed to efile the exhibits, the Court received copies on December 17,

20 2007 and Plaintiffs received copies on December 18, 2007, also more than 21 days before the

21 hearing in this matter. Thus, while Defendants may have committed a procedural error in filing this

22 declaration, the Court perceives no prejudice from the Court's consideration of the Betts declaration

23 in resolving this matter.

24 II.    **The Merits**

25      a.    **The First and Third *Mesa* Prongs: Foster Wheeler acted under the direction of a**

26             **federal officer and Foster Wheeler demonstrated a causal nexus.**

27          Under *Mesa*, Defendants must establish that Foster Wheeler acted under the direction of a

28 federal officer. 489 U.S. at 121, 134-45. In addition, Defendants must establish that there is a

6

1   causal nexus between Plaintiff's claims and Foster Wheeler's actions under the control of a federal

2   officer. *See id.* Defendants contend that they have established both of these prongs. The Court

3   agrees.

4        To show that Defendants acted under the direction of a federal officer, Foster Wheeler cannot

5   simply show that the "relevant acts occurred under the general auspices of a federal officer, such as

6   being a participant in a regulated industry." *Fung*, 816 F. Supp. at 572 (quotations omitted).

7   Instead, "[a] majority of courts have held that the federal official must have 'direct and detailed

8   control' over the defendant." *Id.* (quoting *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947

9   (E.D.N.Y. 1992).

10        Relying on *Good v. Armstrong World Industries*, 914 F.Supp. 1125 (E.D.Pa. 1996), Plaintiffs

11   contend that Foster Wheeler must also cite a specific federal officer who designed, manufactured or

12   even directed the design and manufacture of the boilers present in the Navy vessels and installations

13   identified in Plaintiffs' Complaint. (Plfs.' Mem. of P. & A. at 8-9.) Plaintiffs, however, provide no

14   authority establishing that this is a requirement in the Ninth Circuit. In fact, such a finding would be

15   in potential conflict with the removal standard enunciated in *Durham*. Thus, Plaintiffs have not

16   shown that Defendants, in this circuit, are required to cite a specific federal officer, as long as they

17   show that they acted under the requisite direct and detailed control of a federal official. *See Fung*,

18   816 F. Supp. at 572.

19        Here, Defendants have provided sufficient evidence supporting a finding that the Navy had

20   direct and detailed control over their ability to place asbestos warnings on their boilers provided to

21   the Navy. Under contracts between Foster Wheeler and the Navy for boilers and auxiliary

22   equipment, the Navy was responsible for all design aspects and approved the equipment at multiple

23   steps along the way. (*See* Notice of Removal, Exh. B. ("Schroppe Decl") ¶¶ 2, 5, 8, 9, 12, 14, 19.)

24   In addition, the Navy exercised significant direction and control over the contents of all written

25   documentation to be delivered with the naval boilers. (*Id.* ¶ 21.) Under the Navy's precise

26   specifications, Foster Wheeler was not permitted to affix any type of warning or caution statement to

27   a piece of equipment intended for installation onto a Navy vessel, beyond those required by the

28

United States District Court
For the Northern District of California

7

<div style="margin-left:2em">

1  Navy. (*Id.* ¶ 22.)[6]

2       Plaintiffs offer no contradictory evidence. Instead, Plaintiffs argue that there is no evidence

3  that the asbestos-containing components were anything other than standard stock equipment. (Plfs.'

4  Mem. of P. & A. at 10.) However, the evidence presented by Defendants establishes that the boilers

5  that Foster Wheeler designed and manufactured for the Navy were subject to specific design

6  requirements and control that resulted in equipment that was specific to the needs of the Navy and

7  not standard stock equipment. In addition, Plaintiffs argue that Defendants' evidence is insufficient

8  and contradictory. However, perceiving no real contradictions in the evidence, and given the

9  presumption in favor of removal under *Durham*, this evidence is sufficient to establish the Navy's

10  direct and detailed control over Defendants' design of the boilers and the warnings attached thereto.

11       Next, Plaintiffs argue that there is no causal nexus because there is no proof that a specific

12  federal officer directed Foster Wheeler about warnings specifically. However, as discussed above,

13  there is no requirement that Defendants cite a specific federal officer by name, as long as the

14  requisite direction, control and causal nexus is established. In addition, Defendants offer evidence

15  that the Navy would not permit Foster Wheeler to affix any type of warning or caution statement to a

16  piece of equipment intended for installation onto a navy vessel, beyond those required by the Navy.

17  (*See* Schroppe Decl. ¶ 22; Lehman Decl. ¶ 14.) As Lehman testified, "[t]o do so would have

18  interfered with the U.S. Navy's mission and control of its ships and personnel." (Lehman Decl. ¶

19  14.) Thus, Defendants have established a causal nexus between Plaintiff's claims and Foster

20  Wheeler's actions under the control of a federal officer.[7]

21      **b.**    **Second *Mesa* Prong: Foster Wheeler raises a colorable federal defense to**

22            **Plaintiffs' claims.**

23       Foster Wheeler urges the Court to determine its right to remove under 28 U.S.C. 1442(a)(1)

24  in light of the government contractor's defense set forth in *Boyle v. United Technologies Corp.*, 487

25

26       [6] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
The objections to these sections of the Schroppe declaration are the same boilerplate objections discussed above and the

27  evidence is admissible for the same reasons already stated.

28       [7] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
The objections to these sections of the Schroppe and Lehman declarations are the same boilerplate objections discussed above
and the evidence is admissible for the same reasons already stated.

</div>

<div style="text-align:center">8</div>

United States District Court
For the Northern District of California

1    U.S. 500 (1988). As discussed more fully below, the Court finds that there is sufficient evidence in

2    the record to raise a colorable government contractor defense.

3         In *Boyle*, the Supreme Court found that liability arising from state law, here the duty to warn,

4    may not be imposed in instances where "(1) the United States approved reasonably precise

5    specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the

6    United States about the dangers in the use of the equipment that were known to the supplier but not

7    to the United States." *Id.* at 512. As noted above, Plaintiffs waive all claims against Foster Wheeler

8    save for those arising from a failure to warn. (*See* Complaint ¶ 9a.) The Ninth Circuit clarified the

9    contractor defense as it applies to failure to warn claims in *Butler v. Ingalls Shipbuilding, Inc.*, 89

10   F.3d 582, 586 (9th Cir. 1996). The court in *Butler* found the contractor defense to be "inapplicable

11   to a failure to warn claim in the absence of evidence that in making its decision whether to provide a

12   warning . . . [defendant] was acting in compliance with reasonably precise specifications imposed on

13   [it] by the United States." *Id.* at 586 (quotations omitted).

14        In the instant case, as discussed above, Defendants provide sufficient evidence, by way of the

15   Schroppe and Lehman declarations, that satisfies the first and second prongs of the *Boyle* test; the

16   United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's

17   equipment conformed to these specifications. The outstanding question, therefore, is whether

18   Defendants submit sufficient evidence to establish the third prong; whether Foster Wheeler warned

19   the United States about the dangers in the use of the equipment that were known to Foster Wheeler

20   but not to the United States.

21        Defendants submit two declarations to support their contention that Foster Wheeler did not

22   have any knowledge about the dangers of the use of asbestos that were not known to the United

23   States Navy. First, Lehman testified that the U.S. Navy was well aware of the dangers of asbestos

24   and conducted extensive research concerning the hazard of exposure to asbestos, thus staying abreast

25   of the latest information, including the results of research. (Lehman Decl. ¶ 13.) The Navy made

26   deliberate decisions on the allocation of its resources in light of this knowledge. (*Id.*) Next,

27   Defendants submit the declaration of Lawrence Stilwell Betts, a retired Navy captain and medical

28   professional who is familiar with the industrial products used by the Navy, the Navy work

9

1  environments and the Navy occupational health program. Betts testified that the Navy controlled

2  asbestos exposure consistent with the then current state of accepted scientific and medical

3  knowledge balanced by needs for national defense. (Betts Decl. ¶ 31.) Betts further testified that

> [t]he Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art. During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos containing products used on or in boilers and auxiliary equipment on United States Navy ships known by a boiler manufacturer, like Foster Wheeler, that was not known by the United States government and the United States Navy.

(Betts Decl. ¶ 32.)[8]

Plaintiff, in response, argues that, inter alia, Defendants have failed to establish that the Navy had knowledge about the dangers of using Foster Wheeler's asbestos-containing equipment or boilers specifically. However, the testimony above regarding the Navy's superior knowledge is only part of the record before the Court. Betts testifies that the Navy had the most current knowledge regarding the dangers of asbestos. Schroppe and Lehman's testimony further establishes that the Navy knew of, and in fact required, the specific design parameters for the boilers made by Foster Wheeler. Thus, if the boilers contained asbestos, then it was by design, known by the Navy, and was approved and/or required by the Navy. The warnings regarding such asbestos were also according to, and limited by, the specifications set forth by the Navy. Thus, Plaintiff's argument that the Navy did not have knowledge about the asbestos contained in Foster Wheeler's boilers is unavailing. Plaintiffs also present other related arguments challenging the Betts declaration. Each argument, like their primary argument, discussed above, is similarly unavailing given the totality of the evidence in the record.

The Court is mindful that Defendants need only present a colorable federal defense to Plaintiff's claims and need not prove that the defense will be meritorious. *See Mesa*, 489 U.S. at 128; *Ballenger*, 2007 WL 1813821 at *4. Here, on this record, the Court finds that Defendants have established that they have a colorable federal defense.

//

United States District Court<br>For the Northern District of California

---

[8] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Lehman and Betts declarations are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

# CONCLUSION

For the foregoing reasons, the Court **DENIES** the Motion to Remand.  Pursuant to the clear language in *Durham*, the Court must interpret § 1442 broadly in favor of removal.  Given the evidence in the record, Defendants have established the requisite basis for removal.

**IT IS SO ORDERED.**

Dated: February 21, 2008

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

11

# EXHIBIT K

plies to surplus line insurers). Prior to this Motion, however, Plaintiffs acted in such a manner indicating that they were subject to the statute's provisions. By agreeing to fully comply with Fla. Stat. § 627.4187, Plaintiffs agreed to act in a manner consistent with a statutory provision that may be otherwise inapplicable. The question still remains whether Plaintiffs complied with the statute when they furnished a statement from Mr. Utermark swearing to the authenticity of the policy.

[3] It is fair to read the statute to allow a corporate executive of a surplus lines insurer to attest to the validity of a policy. Five days after Defendant sent Plaintiffs a new settlement offer requesting full compliance with the statute, they received a copy of the policy with a signed affidavit from Mr. Utermark, president of American Shield Group, Plaintiffs' surplus lines agent. This affidavit attested to the validity of the document. Moreover, as Plaintiffs note, "[a]ny surplus lines agent who knowingly or negligently issues a false certificate, cover note, or confirmation of insurance ... shall, upon conviction, be subject to the penalties provided by *s. 624.15* or to any greater applicable penalty otherwise provided by law." Fla. Stat. § 626.922(5). It is fair to say that based on the unique nature of an insurance contract when surplus lines agents are involved it is permissible for Mr. Utermark, as the top corporate executive for American Shield Group, to certify under penalty the policy's authenticity.[3] Accordingly, the parties entered into a binding settlement agreement.

### CONCLUSION

Having read the parties' Joint Motion for Reconsideration, this Court find suffi-

---

3. The later submission of Duncan Smith's affidavit, although not dispositive, indicates Plaintiffs' willingness to at least provide a

cient cause to reconsider the parties' respective motions. Accordingly, it is:

ORDERED that the parties Joint Motion for Reconsideration (Dkt. 132) be Granted, in that the Court has decided both issue of this case as a matter of law. The previous order (Dkt. 166) be Vacated. Further, it is ORDERED that the Plaintiffs' amended motion for summary judgment (Dkt. 97) be Granted, and Defendant's counter-motion for summary judgment (Dkt. 87) be Denied, since the Court has found that no factual issues are in dispute. Therefore, the Court orders the Clerk of Court to enter judgment for the Plaintiffs and against the Defendants finding a valid settlement agreement exists between the parties, and close this case and terminate all other pending motions as Moot.



David A. MARLEY, et al., Plaintiffs,

v.

ELLIOT TURBOMACHINERY CO.,
INC., et al., Defendants.

No. 07–23042–CIV.

United States District Court,
S.D. Florida,
Miami Division.

March 13, 2008.

**Background:** Veteran and wife sued contractors retained by Navy to manufacture parts and devices for ship on which veter-

---

certified copy of the policy under Fla. Stat. § 627.4137.

an was assigned, claiming that contractors failed to warn of asbestos in products to which veteran was allegedly exposed and as result developed mesothelioma. After removal, invoking federal officer jurisdiction, veteran moved to remand.

**Holdings:** The District Court, Adalberto Jordan, J., held that:

(1) contractors provided good faith foundation to advance colorable federal contractor defense, as required for removal;

(2) contractors were acting under federal authority, as required for removal; and

(3) federal liability disclaimer did not defeat removal.

Motion denied.

**1. Removal of Cases ⚙21**

The purpose of statute providing for removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies is to permit the removal of actions exposing a federal official to potential civil liability or criminal penalty for an act performed under color of office.   28 U.S.C.A. § 1442(a)(1).

**2. Removal of Cases ⚙21, 25(1)**

Statute providing for removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies is an exception to the well-pleaded complaint rule, which generally precludes removal where a federal question is not apparent within the four corners of the complaint.   28 U.S.C.A. § 1442(a)(1).

**3. Removal of Cases ⚙21**

Removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies generally depends on the satisfaction of two separate require-

ments: (1) the defendant must advance a colorable defense arising out of his duty to enforce federal law, and (2) the defendant must establish that the suit is for acts performed under the color of office, which is satisfied by showing a causal connection between acts done under asserted official authority and the action against the defendants.   28 U.S.C.A. § 1442(a)(1).

**4. Removal of Cases ⚙21**

A "colorable defense," as required for removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies, is a defense that is plausible.   28 U.S.C.A. § 1442(a)(1).

See publication Words and Phrases for other judicial constructions and definitions.

**5. Removal of Cases ⚙21**

A defense may be colorable, as required for removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies, even if the district court ultimately rejects it.   28 U.S.C.A. § 1442(a)(1).

**6. Removal of Cases ⚙21, 107(7)**

For removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies, no determination of fact is required at the removal stage, but rather, all a removing defendant needs to do is to make a showing that his federal defense is not without foundation and made in good faith.   28 U.S.C.A. § 1442(a)(1).

**7. Removal of Cases ⚙107(7)**

Contractors that manufactured products for Navy ship advanced colorable federal contractor defense to veteran's state-court suit, claiming that he developed mesothelioma from exposure to asbestos in

contractors' products that lacked warning, as required for removal, under federal officer removal statute, since contractors provided good faith foundation to show conflict between obligations under Navy contract and state law duty to warn, pursuant to contractor defense requirements, by affidavits of former Navy admirals averring that Navy controlled every aspect of warnings to be affixed on equipment and likely would have rejected any warning as contrary to policy of dealing with asbestos problem solely by training. 28 U.S.C.A. § 1442(a)(1).

**8. Removal of Cases ⟐21**

Credibility or likelihood of success of claims are not determined at the removal stage, under federal officer removal statute. 28 U.S.C.A. § 1442(a)(1).

**9. Removal of Cases ⟐21**

Under federal officer removal statute, the requirement of a causal nexus between acts conducted under asserted official authority and state suit against defendants and requirement that defendant establish that plaintiff's suit is for acts performed under color of office, both tend to collapse into a single requirement that the acts that form the basis for the state civil or criminal suit were performed pursuant to an official direct order or to comprehensive detailed regulations; in other words, the defendant needs to show that his relationship to the plaintiff derived solely from official duties. 28 U.S.C.A. § 1442(a)(1).

**10. Removal of Cases ⟐107(7)**

Contractors that manufactured and supplied parts and devices for Navy ship were "acting under" federal authority by helping carry out Navy's duties or tasks, within meaning of federal officer removal statute, as required for removal of veteran's state-court suit, claiming that he developed mesothelioma from exposure to asbestos in contractors' products that

lacked warnings, since averments of former Navy admirals that Navy had control over decision of whether or not warnings would be affixed on every piece of equipment were sufficient to establish causal nexus that contractors' relationship with veteran derived solely from contractors' official duties. 28 U.S.C.A. § 1442(a)(1).

See publication Words and Phrases for other judicial constructions and definitions.

**11. Removal of Cases ⟐21**

Just as requiring a clearly sustainable defense rather than a colorable defense would defeat the purpose of the federal official removal statute, so would demanding an airtight case on the merits in order to show the required causal connection between acts conducted under asserted official authority and action against federal contractor defendants; rather, all a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract with the federal government. 28 U.S.C.A. § 1442(a)(1).

**12. Removal of Cases ⟐21**

For removal to federal court of state-court action against any person acting under the direction of an officer of the United States or its agencies, under federal officer removal statute, the term "acting under" requires an effort to assist, or to help carry out the duties or tasks of the federal superior. 28 U.S.C.A. § 1442(a)(1).

**13. Removal of Cases ⟐21**

Veteran's disclaimer of "any claim arising from an act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office" did not defeat removal of veteran's state-court suit against government contractor, pursuant to federal officer removal statute, for veteran's claims that he developed mesotheli-

oma from exposure to asbestos in contractors' products manufactured and supplied to Navy without warnings, since disclaimer was limited and contingent on Navy's contractual limitations and specifications, and would force contractors to prove in state court that they were acting under direction of federal government.  28 U.S.C.A. § 1442(a)(1).

---

Case A. Dam, David Aaron Jagolinzer, Ferraro Law Firm, Miami, FL, for Plaintiffs.

Edward Joy Briscoe, Helaine S. Goodner, Fowler White Burnett, Rebecca Carrie Kibbe, Kirkpatrick & Lockhart Preston Gates Ellis LLP, M. Stephen Smith, III, Rumberger Kirk & Caldwell, Frank Joseph Sioli, Jr., Brown Sims, P.C., Lori Anne M. Rovner, Virginia Easley Johnson, Foley & Mansfield, P.L.L.P., Sergio Edward Pagliery, Shook Hardy & Bacon, Miami, FL, Abigail Morrison Cohen, Conroy Simberg Ganon Krevans & Abel, Hollywood, FL, Timothy Clark, Timothy Clark, Plantation, FL, Kathleen Margaret Labarge, Bice Cole Law Firm, Steven A. Edelstein, The Biltmore Hotel, Coral Gables, FL, Evelyn Fletcher, Frances Spinthourakis, Hawkins & Parnell, Atlanta, GA, David M. Hawthorne, Hugh J. Turner, Jr., Akerman Senterfitt & Eidson, Fort Lauderdale, FL, Henry Salas, Cole, Scott, & Kissane P.A., South Miami, FL, for Defendants.

### Amended Order Denying Motion to Remand

ADALBERTO JORDAN, District Judge.

Elliott Turbomachinery and Viad removed this action to federal court pursuant

---

1. Viad joined Elliot's removal filings.

---

to 28 U.S.C. § 1442(a)(1). Pending is the plaintiffs' motion to remand, arguing that the defendants had not sufficiently shown a federal colorable defense and a nexus between this action and their official duties.  For the reasons stated below, the motion to remand [D.E. 2] is DENIED.

### I. Factual Background

This action is in essence a dispute about the defendants' ability, under their contract with the Navy, to warn Mr. Marley that unprotected asbestos exposure could cause mesothelioma and other ailments. The defendants were retained by the Navy in the 1940s to manufacture numerous ship parts and devices for the *U.S.S. Lake Champlain*. The manufactured products contained asbestos but did not have any type of warning about the dangers of unprotected asbestos exposure.

Mr. Marley was a Navy sailor assigned to the *Lake Champlain* from 1959–1963. During his assignment, he was allegedly exposed to the asbestos contained in the defendants' products. As a result of this exposure, he allegedly developed mesothelioma. This suit is brought by Mr. Marley and his wife.

Elliot and Viad removed this action under § 1442(a)(1), invoking federal officer jurisdiction. In support of removal, Elliot filed the affidavits of retired Admiral Ben J. Lehman and retired Admiral Roger B. Horne.[1]

#### A. Admiral Lehman

Admiral Lehman joined the United States Navy in 1942 and remained on active duty until 1946. He served as ship superintendent and dry docking officer at the Brooklyn Navy Yard between 1942 and 1944. In 1950, he was assigned as a ship superintendent at the San Francisco Naval

Shipyard. During his Naval service, he was personally responsible for the creation of Navy specifications for the procurement of materials and machinery used on Navy vessels. He is familiar with Navy specifications, equipment manuals, and qualified product lists, which are used in the construction and repair of Navy and commercial ships. *See* Lehman Aff. at ¶¶ 1–2.

Admiral Lehman states that in the 1940s and 1950s, "the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings … Thus the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment." *See id.* at ¶ 7. Admiral Lehman further states that the "Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment … The Navy determined the nature of hazards to be subject to any precautionary handling and the content of any such labeling." *See id.* at ¶ 8.

Admiral Lehman's conclusion is (1) that manufacturers and suppliers were prohibited from providing any warning without the consent of the Navy, and (2) that "certain types of warnings would not have been approved by the Navy given the necessary performance needs and capabilities of the shipboard equipment, the ships, and Navy personnel. This would have included, but not been limited to, any potential warnings associated with asbestos including, but not limited to, recommendations regarding respiratory protection and repair and maintenance practices." *See id.* at ¶ 10. According to Admiral Lehman, prior to the mid 1960s, the Navy relied on its own occupational health program to provide training and prevent the hazards

of asbestos to shipyard workers. *See id.* at ¶¶ 11, 13(c).

### B. Admiral Horne

Admiral Horne is a retired rear admiral of the United States Navy. He began his career in 1956. Throughout his Navy career, he concentrated in the areas of ship design, engineering, construction, overhaul, and inspection. He achieved the rank of chief engineer and deputy commander at the Naval Sea Systems Command for Ship Design and Engineering. *See* Horne Aff. at ¶ 2.

According to Admiral Horne, it was common for the Navy to send inspectors to the plants of manufacturers to assure conformance with the Navy specifications and requirements. *See id.* at ¶ 7. He also states that the Navy specifications covered the nature of any communication affixed to products supplied to the Navy by third parties. "Vendors such as Defendants would not have been permitted (either under the specifications or, as a matter of Navy practice) to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos, without prior discussion, approval and acceptance by the Navy." *Id.* at ¶ 12.

Admiral Horne concludes that any warning affixed by a vendor "would have been rejected as contrary to the Navy protocols for instruction and training relating to use of asbestos materials." *See id.* "The Navy determined to address the potential hazards of asbestos on Navy ships through training and not through warnings." *See id.* at ¶ 14.

### II. Analysis

I conclude that removal of this action was appropriate under the federal officer removal statute.

[1, 2]    A state-court action against any person acting under the direction of an

MARLEY v. ELLIOT TURBOMACHINERY CO., INC.        1271
Cite as 545 F.Supp.2d 1266 (S.D.Fla. 2008)

officer of the United States or its agencies can be removed to federal court pursuant to § 1442(a)(1). The purpose of § 1442(a)(1) is to permit the removal of "those actions commenced in state court that expose a federal official to potential civil liability or criminal penalty for an act performed ... under color of office." *See Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir.1996)(internal citations omitted). The statute reflects Congress' intent "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties." *See id.* As such, § 1442(a)(1) is an exception to the well-pleaded complaint rule, which generally precludes removal where a federal question is not apparent within the four corners of the complaint. *See Mesa v. California*, 489 U.S. 121, 136–37, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).

[3] Removal under § 1442(a)(1) generally depends on the satisfaction of two separate requirements. First, the defendant must "*advances* a colorable defense arising out of [his] duty to enforce federal law.'" *See Magnin*, 91 F.3d at 1427 (internal citations omitted, emphasis added). Second, the defendant must establish that the suit is for acts performed "under the color of office." This requirement is satisfied by showing "'a causal connection' between what the officer has done under asserted official authority and the action against the defendants." *See id. See also Jefferson Co. v. Acker*, 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999)(internal citations omitted). I find that the defendants have made a sufficient showing on both requirements.

A. A COLORABLE DEFENSE

[4–6] The defendants have advanced a colorable federal defense to the plaintiffs' claims. A colorable defense is a defense that is "plausible." *See Magnin*, 91 F.3d

at 1427 (*citing Mesa*, 489 U.S. at 129, 109 S.Ct. 959). In construing the colorable federal defense requirement, the Supreme Court has rejected "a narrow grudging interpretation" of the term, "recognizing that 'one of the most important reasons for removal is to have the validity' of the defense of official immunity tried in a federal court." *See Jefferson*, 527 U.S. at 432, 119 S.Ct. 2069 (internal citations omitted). *See also Willingham v. Morgan*, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) (We ... do not require the officer virtually to "win his case before he can have it removed.") Thus, a defense may be colorable even if the court ultimately rejects it. Indeed, no determination of fact is required at the removal stage. All a removing defendant needs to do is to make a showing that his federal defense "is not without foundation and made in good faith." *See Nesbiet v. Gen. Electric*, 399 F.Supp.2d 205, 211 n. 44 (S.D.N.Y. 2005) (internal citations omitted).

With this standard in mind, I turn to the federal defense advanced in this case. The defendants have raised a federal contractor defense to the plaintiffs' failure to warn claims. *See Not. of Removal [D.E. 1]* at ¶ 9. The defendants contend that their "alleged failure to warn of the hazards of asbestos resulted from the Navy's prohibition of such warnings." *See id.* at 10.

The Supreme Court recognized the federal contractor defense in *Boyle v. United Tech., Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). *Boyle* involved the crash of a United States Marine helicopter in a training exercise off the Virginia coast. The pilot survived the accident impact, but he could not open the helicopter's outward escape hatch and drowned. The pilot's estate sued the manufacturer of the helicopter, alleging that the escape hatch should have been designed to open inward to facilitate escape. The manufac-

turer's defense was that it had designed the helicopter pursuant to government specifications requiring an escape hatch that swung outward. On these facts, the Court held that liability for design defects in military equipment could not be imposed under state law when (1) the government approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about dangers known to the supplier but not known to the United States. *See* 487 U.S. at 512, 108 S.Ct. 2510.

The Eleventh Circuit extended the holding of *Boyle* to failure to warn claims in *Dorse v. Eagle–Picher Indus., Inc.*, 898 F.2d 1487, 1489 (11th Cir.1990).[2] Like this case, *Dorse* involved a claim that a manufacturer had failed to warn about the hazards of asbestos. The court noted that the federal contractor defense bars liability when (1) the case concerns an area of uniquely federal interest and (2) there is "a significant conflict" between an identifiable federal policy or requirement and a state law duty. The defense fails as a matter of law, however, if the contractor can "comply with both its contractual obligations and the state-prescribed duty of care." *See id.* at 1489 (internal citation omitted).[3]

The parties do not dispute that the procurement of Navy vessels (and parts for those vessels) is an area of uniquely federal interest. *See Boyle*, 487 U.S. at 504–505, 108 S.Ct. 2510 (civil liability arising from performance of procurement contracts with government is an area of

"uniquely federal interest"); *Dorse*, 898 F.2d at 1489 ("procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest"). The dispute in this case is whether the defendants have shown a "good faith foundation" to argue that there was a conflict between their contractual obligations with the Navy and the state law duty to warn.

[7]    To satisfy their burden, the defendants have filed the affidavits of Admiral Lehman and Admiral Horne. According to Admiral Lehman, in the 1940s and the 1950s the Navy dictated every aspect of the warnings associated with its ships and did not permit deviation by any of its contractors. He concludes that the Navy would have rejected any asbestos warning suggested by the defendants as contrary to their policy to deal with the asbestos problem through training and not through warning. *See* Lehman Aff. at ¶ 10. Admiral Horne concurs with Admiral Lehman and states that "any request to include a warning regarding asbestos in an equipment manual would have been rejected as contrary to Navy protocols for instruction and training relating to use of asbestos materials." *See* Horne Aff. at ¶ 15.

The affidavits of Admiral Lehman and Admiral Horne are not unique to this case. Almost identical affidavits have been filed by the defendants in lawsuits all over the country. District courts, however, are split on whether these are sufficient to "advance" a colorable government contractor defense.

In *Nesbiet*, for example, the court concluded that the affidavits were sufficient to

---

2.    The *Dorse* panel adopted the reasoning of the district court's order granting summary judgment in favor of the plaintiff on the defendant's government contractor defense.

3.    The Eleventh Circuit ultimately concluded that the defendant had failed to produce sufficient evidence indicating that his contractual

obligations prevented compliance with the state law duty to warn and entered summary judgment in favor of the plaintiff. *See* 898 F.2d at 1489. The summary judgment standard is obviously significantly higher than the colorable defense standard.

satisfy the removing defendant's burden. The court emphasized that at this stage of the proceedings the defendant had to "demonstrate merely that its claim to the military contractor defense is 'colorable.'" *See* 399 F.Supp.2d at 212. Similarly, in *Harris v. Rapid American Corp.*, the court recently held that the affidavits, albeit general in nature, were sufficient to support removal. *See* 532 F.Supp.2d 1001 (N.D.Ill.2007). *See also Contois v. Able Indus., Inc.*, 523 F.Supp.2d 155, 160 (D.Conn.2007); *Ballenger v. Agco Corp.*, 2007 WL 1813821 (N.D.Cal. June 22, 2007).

On the other hand, several courts have held that these type of affidavits are too general and vague to satisfy the removal burden of proof. *See e.g.*, *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187 (D.Mass.2008); *Westmiller v. Imo Indus., Inc.*, 2005 WL 2850334, *2 (W.D.Wash. Oct.20, 2005); *Schilz v. A.P. Green Indus., Inc.*, 2002 WL 102608, *1 (N.D.Cal. Jan.15, 2002).

After reviewing these cases, I conclude that the affidavits of Admirals Lehman and Horne are sufficient to "advance" a colorable federal contractor defense. Without a doubt, the affidavits are lacking on specificity and leave a lot of room for speculation. But at this stage, they do provide a good faith foundation to show (1) that the Navy controlled the warnings to be affixed on parts manufactured by independent contractors, and (2) that the Navy was likely to reject any asbestos warning given its policy to deal with the asbestos problem exclusively through training.

[8] I agree that the Admirals' depositions in other cases suggest that they do not know of any instance when the Navy prohibited a warning proposed by a manufacturer or supplier. I also understand that there is a dispute as to whether the Navy manuals encouraged or prohibited the use of warnings. These arguments

undermine the credibility of the Admirals, and raise a number of questions that the defendants will have to answer to ultimately prevail on their defense. But that is a merits question for another day. I do not need to determine credibility or likelihood of success at the removal stage. Factual disputes about the Admirals' testimony should be resolved in federal court as long as the defendants have a good faith foundation for their contractor defense. *See Magnin*, 91 F.3d at 1427–28. Because I find that the defendants have satisfied this low standard, removal was proper.

### B. CAUSAL NEXUS AND "ACTING UNDER" REQUIREMENTS

[9] Although some courts treat the causal nexus and "acting under" requirements separately, both issues tend to "collapse into a single requirement: that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct order or to comprehensive detailed regulations." *See In re Methyl Tertiary Butyl Ether Prod.*, 488 F.3d 112, 125 (2d Cir.2007). *See also Magnin*, 91 F.3d at 1429 (analyzing both requirements together). In other words, the defendants need to show that "his relationship to the plaintiff 'derived solely from his official duties.'" *See Magnin*, 91 F.3d at 1427–28 (*citing Willingham*, 395 U.S. at 406, 89 S.Ct. 1813).

[10] It is undisputed at this stage that the defendants manufactured and supplied the asbestos-containing products in the course of their contractual relationship with the Navy. Admiral Lehman's affidavit sufficiently establishes that the defendants were acting under federal authority when they supplied the asbestos-containing parts without warnings. Admiral Lehman generally states that the Navy has control over "what warnings should or should not be included." *See* Lehman Aff. at ¶ 7. He

further states that "the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment." *See id.* Therefore, there is no question that the defendants' relationship with the plaintiff derived solely from the defendants' official duties. This is sufficient to establish a causal nexus under *Magnin. See* 91 F.3d at 1429

[11, 12]  The plaintiffs suggest that the defendants need to show that the Navy actually prohibited asbestos warnings to establish a "causal nexus" at the removal stage. I disagree. "Just as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute ... so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County,* 527 U.S. at 432–33, 119 S.Ct. 2069. All a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under their contract with the Navy. *See Magnin,* 91 F.3d at 1427–28. This the defendants have done.[4]

## C. DISCLAIMER

[13]  Finally, I reject the plaintiffs' argument that the disclaimer of any claim arising from an act or omission compelled by the Navy warrants remand. In their complaint, the plaintiffs allege that:

> Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including

any claim arising from an act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office.)

Compl. at ¶ 5.

This disclaimer is circular. Its applicability depends on a determination of the core question in this case: whether the defendants's purported omission—the failure to warn—was required or caused by their contractual relationship with the Navy. If the failure to warn was required by the Navy, the disclaimer applies and the plaintiffs' claims fail as a matter of law. If the failure to warn was not required by the Navy, then the disclaimer does not apply. The problem with this argument is that the defendants have the right to have this question decided in federal court. *See Jefferson,* 527 U.S. at 482, 119 S.Ct. 2069 (defendants have a right to have "the validity' of the defense of official immunity tried in a federal court").

I understand that a number of courts have found that federal liability disclaimers defeat removal under § 1442(a)(1). *See e.g., Westbrook v. Asbestos Defendants,* 2001 WL 902642, *3 (N.D.Cal. July 31, 2001). The disclaimers in those cases, however, waived any liability arising out of work done on federal premises, irrespective of whether the work was done under the requirements of a federal agency or not. In contrast, the disclaimer here is more limited and is contingent on the Navy's contractual limitations and specifi-

---

4.  The recent Supreme Court decision in *Watson v. Philip Morris Companies,* —— U.S. ——, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007) is not helpful to the plaintiffs' position. *Watson* stands for the proposition that "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *See* 127 S.Ct. at 2308. As the Court explained the term "acting under" requires "an effort to assist, or to help carry out the

duties or tasks of the federal superior." *See id.* at 2307. Here, plaintiffs' own complaint indicate that the defendants were hired by the Navy to manufacture the ship parts and devices that the Navy ultimately installed in the *Lake Champlain. See* Compl. Exposure Sheets. This is sufficient to show that the defendants helped carry out the Navy's duties or tasks.

cations. I am reluctant to find that the plaintiffs can defeat a government contractor's right to remove by disclaiming any claim arising from any act or omission compelled by a government agency. Such a circular disclaimer would defeat the purpose § 1442(a)(1) as it would force federal contractors to prove in state court that they were acting under the direction of the government.

### III. CONCLUSION

In sum, while Admiral Lehman's and Admiral Horne's affidavits fall far short from establishing that the defendants were not able to warn Mr. Marley about the danger of unprotected asbestos exposure, they are sufficient to "advance" a colorable government contractor defense and establish a nexus between this action and the defendants' official duties. Removal was appropriate. Accordingly, the plaintiffs' motion to remand is denied.

Unless this case is transferred to the Multi-District Litigation Panel before then, the parties shall file the joint scheduling report required by Local Rule 16.1(B)(2) by March 21, 2008.

DONE and ORDERED.



Donelle KEATON, Plaintiff,

v.

COBB COUNTY, Georgia,
et al., Defendants.

Civil Action File No. 1:06–
CV–1436–RWS–AJB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 19, 2008.

**Background:** As result of her failure to be selected for Clerk of Court and Judicial Administrative Supervisor (JAS) positions in county's juvenile court, African-American female court employee, a Judicial Administrative Tech (JAT) III, filed action against Georgia county and court's clerk and director in their individual and official capacities, alleging that county engaged in race discrimination in violation of Fourteenth Amendment equal protection and Title VII, and that individual defendants engaged in race discrimination under color of state law, in violation of equal protection. Defendants moved for leave to file excess pages, and for summary judgment. The District Court, Alan J. Baverman, United States Magistrate Judge, issued report and recommendation that summary judgment be granted in part and denied in part. Defendants filed objection.

**Holdings:** The District Court, Richard W. Story, J., held that:

(1) to survive summary judgment, employee had to rebut each of the legitimate, nondiscriminatory reasons for employment action proffered by defendants;

(2) employer's legitimate, nondiscriminatory reasons for not promoting employee over successful candidate for Clerk of Court position were not shown to be a pretext for race discrimination;

(3) as for JAS position, proffered legitimate, nondiscriminatory reasons for not promoting plaintiff were not shown to be pretext for discrimination;

(4) county was not liable under § 1983 for promotion decisions by Director, who was not a "final policymaker";

(5) individual defendants were not liable under Title VII; and

(6) individual defendants were not liable under § 1983, absent showing that their reasons for not promoting her violated equal protection.

EXHIBIT L

**AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER
WHEELER'S NOTICE OF REMOVAL**

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1.      I am a 1962 graduate of the New York State Maritime College with a degree in
Marine Engineering. For three months in 1962, I worked as a Third Assistant Engineer for
American Export Lines. I began my career at Foster Wheeler in 1962 as a Proposal
Engineer in the Marine Department. As a Proposal Engineer, I was responsible for taking
shipyard specifications and designing a boiler to meet the thermal performance and physical
requirements of those specifications. In 1967, I became the Manager of the Proposal
Department and reviewed all proposals. In 1977, I was promoted to Vice President of
Engineering at which point I supervised both proposal and contract execution activities.
From 1978 to 1982, I was President of Foster Wheeler Boiler Corporation. In 1982, I
became Managing Director of Foster Wheeler U.K. From 1984 to my retirement in 1999, I
was Executive Vice President of Foster Wheeler Power Systems.

2.      I am personally familiar with the degree of supervision and control exercised by the
Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary
equipment because I was personally involved in such contracts at all the various stages of
development, from inquiry and bid through production, testing, and sea trials and, ultimately,
acceptance.

3.      I submit this affidavit to attest to the degree of involvement, supervision, direction and
control exercised by the U.S. Navy and its authorized agents and officers in connection with
procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval
vessels. The following paragraphs describe the contract process from the perspective of Foster
Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the
Navy agents and personnel through the various stages of a given contract.

4.      Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary
systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between
Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized
agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5.      The Navy was responsible for all phases of the design of a vessel, which was
accomplished by the Naval architect. Specifically, the Naval architect would prepare the
ship design which involved the entire vessel, including the machinery space, and all
performance requirements. In general, the ship design for any given class of ship would be
contained in a Ship Specification ("Ship Spec") which covers all aspects of the vessel including the
machinery space. As it relates to the boiler, the Ship Spec would cover all boiler operating criteria,
performance requirements, and maximum physical dimension of the boiler(s). In general, the
Ship Spec was written and prepared by the naval architect and approved by the Navy and, in
the course of its projects with the Navy, Foster Wheeler was required to design, fabricate and
furnish equipment which complied strictly with the requirements in the Ship Spec.

6.      In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military
Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7. The normal process by which Foster Wheeler sold marine boilers and economizers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer at Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8. The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9. During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10. Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11. The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter to the entity requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12. The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec, at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13. The boiler specifications would provide detailed requirements for the boiler and economizer and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a)     Boiler, superheater and economizer tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b)     Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c)     Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14.     At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15.     The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16.     During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17.     Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The economizers were always shop assembled since they could be shipped by rail. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18.     The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19.     A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20.     Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21.     In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers and economizers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent

directed by the Navy.

22.    Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy.  Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 18th day of December, 2009 at Newark, New Jersey.

J. Thomas Schroppe

THE STATE OF NEW JERSEY

ESSEX COUNTY                    )

Personally appeared before me this 18th day of December, 2009, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this 18th day of December, 2009.

My commission expires 11/9/2010

Notary Public

MARIAN P. TIGHE-KRUSHINSKY
Notary Public of New Jersey
My Commission Expires 11/9/2010

## AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
## IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.  I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S. Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I attended the College of the City of New York. I had been a "student engineer" at the Mack Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College of the City of New York in order to complete my course work there and then enter military service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S. Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2.    I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3.    During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4.    The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships; for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5. Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5.     The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6.     Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7.     These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8.     The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9.     The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

      a.     it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

      b.     it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

      c.     every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10.     The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.     In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.     The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.     Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14.     The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal  acknowledge.

Executed this _12th_ day of _July_ 2007.

On this 12 day of 07, 2007, before me, a Notary Public,

Josh Martin

MY COMMISSION EXPIRES _August 28, 2010_

JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-109087-5
MY APPT. EXPIRES AUGUST 28, 2010

Case MDL No. 875   Document 8585-1   Filed 03/19/12   Page 4 of 75

# EXHIBIT N 1 OF 6

1  Edward R. Hugo [Bar No. 124839]
   Karleen F. Murphy [Bar No. 197245]
2  Shaghig D. Agopian [Bar No. 237947]
   Thomas J. Moses [Bar No. 116002]
3  BRYDON HUGO & PARKER
   135 Main Street, 20th Floor
4  San Francisco, CA 94105
   Telephone: (415) 808-0300
5  Facsimile: (415) 808-0333
   Email: service@bhplaw.com
6
   Attorneys for Defendant
7  FOSTER WHEELER ENERGY CORPORATION

8                 UNITED STATES DISTRICT COURT
9
                 CENTRAL DISTRICT OF CALIFORNIA
10

11 LEE E. KNOWLES and JOYCE
   KNOWLES,                          U.S.D.C. Case No. _____
12
                Plaintiffs,          Los Angeles Superior Court Case No.
13 vs.                               BC474820

14 A.W. CHESTERTON COMPANY; ALFA     DECLARATION OF LAWRENCE
   LAVAL, INC. (sued individually and as  STILWELL BETTS IN SUPPORT OF
15 successor-in-interest to THE DELAVAL  NOTICE OF REMOVAL OF DEFENDANT
   SEPARATOR COMPANY and             FOSTER WHEELER ENERGY
16 SHARPLES CORPORATION); AMTROL,   CORPORATION
   INC. (sued individually and as successor-
17 in-interest to THRUSH COMPANY and
   H.A. THRUSH COMPANY);
18 ARMSTRONG INTERNATIONAL, INC.;
   ATLANTIC RICHFIELD COMPANY;
19 BLACKMER PUMP COMPANY;
   BRIDGESTONE AMERICAS, INC. (sued
20 as successor-in-interest to FIRESTONE
   TIRE & RUBBER COMPANY); BW/IP
21 INTERNATIONAL, INC. (sued
   individually and as successor-in-interest
22 to BYRON JACKSON PUMP
   COMPANY); CALAVERAS ASBESTOS,
23 LTD; CBS CORPORATION f/k/a
   VIACOM, INC. (sued as successor-by-
24 merger to CBS CORPORATION f/k/a
   WESTINGHOUSE ELECTRIC
25 CORPORATION); CERTAINTEED
   CORPORATION; CHEVRON USA, INC.;
26 CLA-VAL CO.; CLEAVER-BROOKS,
   INC. f/k/a AQUA-CHEM, INC., d/b/a
27 CLEAVER-BROOKS DIVISION;
   CONOCOPHILLIPS COMPANY (sued as
28 successor to TIDEWATER OIL

1

COMPANY); CRANE CO. (sued individually and as successor-in-interest to COCHRANE CORPORATION and DEMING PUMP COMPANY); CRANE ENVIRONMENTAL, INC. (sued individually and as successor-in-interest to COCHRANE CORPORATION); CROWN CORK & SEAL COMPANY, INC. (sued individually and as successor-in-interest to MUNDET CORK COMPANY); DOVER CORPORATION (sued as successor to BLACKMER PUMP CO.); EATON CORPORATION (sued as successor to CUTLER HAMMER, INC.); FAMILIAN CORPORATION (sued individually and successor-in-interest to FAMILIAN PIPE & SUPPLY); FERGUSON ENTERPRISES, INC. (sued as successor-in-interest to INDUSTRY SUPPLY); FISHER CONTROLS INTERNATIONAL, LLC; FLOWSERVE US, INC. (as successor to BYRON JACKSON PUMP COMPANY); FMC CORPORATION (sued individually and as successor-in-interest to PEERLESS PUMP COMPANY); FORMOSA PLASTICS CORPORATION U.S.A. (sued individually and as parent, alter ego and successor-in-interest to J-M A/C PIPE CORPORATION); FOSTER WHEELER ENERGY CORPORATION; FREEPORT-McMoRan COPPER & GOLD, INC. (sued as successor-by-merger to PHELPS DODGE CORPORATION); GENERAL ELECTRIC COMPANY; GENERAL MILLS, INC.; GENERAL PETROLEUM CORPORATION; THE GOODYEAR TIRE & RUBBER COMPANY; GOULDS PUMPS, INC.; GRINNELL LLC d/b/a GRINNELL CORPORATION; HAJOCA CORPORATION; HANSON PERMANENTE CEMENT, INC. f/k/a KAISER CEMENT CORPORATION); HOPEMAN BROTHERS INC.; IMO INDUSTRIES, INC. (sued individually and as successor-in-interest to DELAVAL TURBINE, INC. and also to C.H. WHEELER MANUFACTURING COMPANY); INDUSTRIAL HOLDINGS CORPORATION f/k/a THE CARBORUNDUM COMPANY; INGERSOLL RAND COMPANY (sued individually and as successor-in-interest to TERRY STEAM TURBINE COMPANY, WHITON MACHINE CO. AND ALDRICH PUMP COMPANY); ITT

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

2

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1 CORPORATION, f/k/a ITT INDUSTRIES, INC. (sued individually and as successor-
2 in-interest to BELL & GOSSETT); J.T. THORPE & SON, INC.; JOHN CRANE,
3 INC.; KEENAN PROPERTIES, INC.; KIMBERLY-CLARK CORPORATION;
4 METROPOLITAN LIFE INSURANCE COMPANY; MS2G, INC. (sued
5 individually and as successor-in-interest to MARDEN SUSCO, INCORPORATED);
6 THE NASH ENGINEERING COMPANY; OCCIDENTAL CHEMICAL
7 CORPORATION f/k/a HOOKERS CHEMICAL CO.; PABST BREWING
8 COMPANY (sued individually and as successor to JOSEPH SCHLITZ
9 BREWING COMPANY); PACIFIC ABRASIVE SUPPLY COMPANY; RIO
10 TINTO MINERALS, INC. (sued as successor to PACIFIC COAST BORAX);
11 SAINT-GOBAIN ABRASIVES, INC. (sued as successor to NORTON COMPANY);
12 SAN DIEGO GAS & ELECTRIC COMPANY; SCHNEIDER ELECTRIC
13 USA, INC. f/k/a SQUARE D COMPANY; SOUTHERN CALIFORNIA EDISON
14 COMPANY; STERLING FLUID SYSTEMS (USA), LLC f/k/a PEERLESS
15 PUMP COMPANY); SULZER PUMPS (US), INC. d/b/a SULZER PUMPS
16 HOUSTON, INC. (sued as successor-in-interest to PACO PUMPS f/k/a PACIFIC
17 PUMPING COMPANY); SYD CARPENTER, MARINE CONTRACTOR,
18 INC.; THRUSH CO., INC.; TXI RIVERSIDE, INC.; UNION CARBIDE
19 CORPORATION; UNITED STATES STEEL CORPORATION; VELAN VALVE
20 CORPORATION; WARREN PUMPS, LLC.; WEIR VALVES & CONTROLS
21 USA, INC. f/k/a ATWOOD & MORRILL; WESTBURNE SUPPLY, INC. (sued as
22 successor to P.E. O'HAIR & COMPANY f/k/a O'HAIR SUPPLY COMPANY,
23 successor to J.R. DETERDING, INC.); THE WILLIAM POWELL COMPANY;
24 WILSEY BENNETT, INC. (sued as successor-by-merger to VEGETABLE OIL
25 PRODUCTS COMPANY, INC.); YARWAY CORPORATION; YEAGER
26 ENTERPRISES CORPORATION (sued individually and as successor-in-interest
27 to PACIFIC ABRASIVE SUPPLY COMPANY); and JOHN DOES 1-450,
28 Defendants.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

3

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

I, LAWRENCE STILWELL BETTS, MD, PhD, CIH, FACOEM, declare that:

1.  My name is Lawrence Stilwell Betts.  I am a "retired" United States Navy Captain with an active professional practice based in Poquoson, Virginia.  As reflected in my Curriculum Vitae (Exhibit 1), I am the President of a medical corporation that is based upon applying the principles and methods of preventive medicine.  I routinely integrate and apply occupational and environmental medicine, toxicology, and industrial hygiene to consult or work with difficult or complex medical cases where treatment, or exposure, or possible consequences of exposure, is in question.  However, the emphasis of my entire career has been prevention of illness and the promotion of health through the integration of my scientific and medical knowledge and experience.  After my retirement from the Navy in 2001, I was presented the VADM Richard A. Nelson Award for my career contributions to Navy and Marine Corps readiness through leadership in prevention of disease and promotion of health.  My professional practice still includes work with the Navy and other armed force services, as well as non-military federal agencies, industry, professional organizations, and academically- and privately- practicing professionals.  In addition to recurrent consultations, I teach, mentor, perform research, develop prevention and treatment protocols, and write medical articles and text chapters.  I am a Professor at the Eastern Virginia Medical School in the Department of Family and Community Medicine and a Clinical Professor of Physiological Sciences. With approval from my superiors in the Navy, I have been academically affiliated with Eastern Virginia Medical School for the past twenty-seven years.  I serve on several national committees addressing broad, as well as specific, issues in occupational and environmental health.  I am board certified in both Occupational Medicine by the American Board of Preventive Medicine, and in the comprehensive practice of Industrial Hygiene by the American Board of Industrial Hygiene.  In the practice and application of toxicology, it is well known that ALL chemicals are toxic as a consequence of dose (Paraselsus [1493-1541]: "*Sola dosis facit venenum*" – "Dose alone makes the poison") and that "hazard" is a consequence of how a chemical is used.  The anticipation, recognition,

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1   evaluation, and control of hazardous conditions are the fundamentals of industrial

2   hygiene, as well as my practice of preventive medicine and public health.

3       2.    During my Navy career spanning three decades, I had experiences ranging

4   from the provision of "field" services underway and on shore as a junior industrial

5   hygiene officer, to the oversight of the medical and scientific aspects of a robust

6   occupational health program as a senior Navy officer. I have spent time at sea on a

7   number of United States Navy and United States Naval ships. I served as a physician on

8   the USS KITTY HAWK (CV-63) during its Service Life Extension Program (SLEP) in the

9   Philadelphia Naval Shipyard from 1987 to 1989. My experiences and training enabled me

10  to become qualified as a Surface Warfare Medical Department Officer (SWMDO). Based

11  upon my scientific and medical training, and experience as a Navy officer for three

12  decades, I am generally familiar with the industrial products that were used by the Navy

13  and the Navy work environments, both ashore and afloat. I am also familiar with the

14  history and practice of the Navy occupational health program from its early days before

15  World War II until the present time.

16      3.    I understand that the Plaintiffs are claiming that the Plaintiff, Lee E.

17  Knowles, while employed as a civilian "Instrumentation Mechanic" for Bailey Controls

18  during the period of 1958-1964, performed work aboard several United States Navy

19  ships, including, but not limited to, the USS MORTON (DD-948). I further understand

20  that as a result of this work, the Plaintiffs are claiming that Mr. Knowles developed an

21  asbestos-related condition, and that Defendant FOSTER WHEELER ENERGY

22  CORPORATION ("Foster Wheeler") is one of a number of companies responsible for

23  providing asbestos-containing products to which the Plaintiffs allege that Mr. Knowles

24  was occupationally exposed.

25      4.    During the time period that the ships on which Mr. Knowles worked were

26  built, it is my understanding that Foster Wheeler manufactured and delivered boiler and

27  auxiliary equipment to the Navy pursuant to Navy contracts, some of which may or may

28  not have ended up on ships that Mr. Knowles worked onboard. In any event, however,

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

5

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1 any such boiler and auxiliary equipment manufactured and supplied by Foster Wheeler

2 in fulfillment of government contracts followed the specifications set forth by the United

3 States Government detailing required components, materials, and performance

4 characteristics. The U.S. Navy would have accepted delivery of such boiler, auxiliary

5 equipment, and related manuals only if they met these specifications. The Navy would

6 not have accepted, commissioned, or permitted a Navy vessel to steam with boiler and

7 auxiliary equipment that did not comply with precise specifications set forth by the

8 Navy, which includes providing any labeling of the equipment.

9   5. To the extent that Foster Wheeler ever delivered boiler and auxiliary

10 equipment to the government for use on Navy vessels in the 1940s – 1950s and thereafter,

11 the U.S. Government already recognized that the prolonged inhalation of sufficient

12 concentration of asbestos fibers could result in pulmonary disease. Indeed, this

13 knowledge was held by the U.S. Government prior to the period of construction, and Mr.

14 Knowles's work, on any such ships. Based upon that scientific and medical knowledge,

15 the U.S. Government generally, and the Navy specifically, by the early to mid 1940s had

16 already developed an active and robust program to control exposure to asbestos

17 concentrations recognized to be harmful, and medically monitored personnel exposed to

18 those levels. Additionally, the Navy established engineering control procedures

19 (including isolation, exhaust ventilation, wet methods, and process changes to minimize

20 dust release) and training, and required the use of respiratory protection for personnel

21 considered to be at risk of excessive exposure during dusty operations.

22   6. The information possessed by the U.S. Government during this period (and

23 the comprehensive occupational health program based upon this information), and

24 thereafter and until such time as Mr. Knowles's work on Navy vessels ended, with

25 respect to the specification and use of asbestos, and the health hazards associated with its

26 use aboard Navy vessels, far exceeded the information that possibly could have been

27 provided by a boiler manufacturer such as Foster Wheeler. Based upon the state-of-the-

28 art knowledge at that period, the U.S. Government was fully aware of the health hazards

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

6

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

of asbestos and had a program to control exposure of personnel and monitor their health. This existed before World War II and through the period that Mr. Knowles was working on any Navy vessels – and it continues until this day.

7.    In preparing this declaration, I have relied upon my personal and professional knowledge and experience as an industrial hygienist and an occupational medicine physician, my operational and industrial experiences from my total Navy career, my review of historical documents regarding the Navy's knowledge and the scientific and medical communities' knowledge of the hazards of asbestos, and my numerous communications with industrial hygienists and physicians who worked for the Navy and the United States Public Health Service dating back to the 1940s.

8.    The Navy's specification and use of asbestos aboard ships, including in or on boilers and other high temperature equipment, was not by chance or based on any requirements of Foster Wheeler. The extensive use of asbestos was predicated upon military necessity. As discussed in their landmark paper addressing the use of asbestos in the Navy, Fleischer and coworkers (1946) (Exhibit 5) state:

> "An important ingredient of pipe covering material used on U.S. Navy vessels is amosite...The chief reasons for the wide use of amosite felt and pipe covering in naval work are its low thermal conductivity, light weight, strength and refractoriness. When the felt and pipe covering were first developed, we were still building vessels under the Washington Treaty of Limitations in Tonnage, and every pound saved meant that much more armor, guns or ammunition for a given displacement, to say nothing of more economic operation for the weight involved in insulation.
>
> Amosite pipe covering weighs about 14 pounds per cubic foot, with a temperature limit of 750°F, as compared to magnesia with a weight of 16 pounds per cubic foot, and a temperature limit of 500°F. High temperature amosite pipe covering weighs about 18 pounds per cubic foot as compared to 26 pounds per cubic foot for other high temperature insulations. Because of the lower conductivity and the higher temperature limit of the amosite type, less of it need be used in a combination covering than other types of insulations.
>
> The development of amosite felt started in 1934 when a need existed to secure a thermal insulation lighter in weight and thermally more efficient than the materials (blocks and cement or asbestos blankets) which were then being used on destroyer turbines. The Navy approved the type developed by a manufacturer in September, 1934. Originally amosite was used only for turbine insulation, but it proved so satisfactory that its field of application enlarged to include insulation of valves, fittings, flanges, etc. From the initial destroyer, it has been used on almost all the destroyers built since that time and on all other combat vessels built since before the War.

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

7

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

*Pipe covering was a later development in late 1935 and early 1936. Due to the manufacturing problems involved, it took a longer time to evolve into a satisfactory shape, and its first use on naval vessels was in 1937. Since that time its use has spread markedly and it was used on the great majority of naval combat vessels built during World War II.*

*Water-repellent amosite felt was developed during the early part of 1942, as a replacement for hair felt in the insulation of cold water lines to prevent sweating. Hair felt had the disadvantage of being combustible and as it was organic, when it became wet it molded or rotted and could harbor vermin. At this time fires on board certain naval vessels convinced the Navy of the desirability of eliminating any combustible material from on board ship. Eventually water-repellent amosite was made in strips of 50 foot lengths and of suitable width to enclose the circumference of the pipe and enclosed in an extremely light-weight muslin to facilitate the handling and reduce the dust, which the water-repellent agent accentuated."*

9.     The United States Navy recognized that the inhalation of asbestos fibers in sufficient amounts (dose = concentration × time) could result in pulmonary disease since at least the early 1920s and had an active program to identify hazardous exposures and control recognized health effects. In the *"Instructions to Medical Officers"* (*Notes on Preventive Medicine for Medical Officers, United States Navy* (Dublin, 1922) (Exhibit 9)), asbestos was listed as one of the many inorganic and organic dusts that could cause pulmonary disease when inhaled in a sufficient quantity for a significant period of time. Dublin recognized several methods to prevent the inhalation of these dusts including: the use of water to control the release of dust; the use of local exhaust systems to remove the dust at the point of origin; the use of inclosing (sic) chambers; and the use of respirators and helmets. He stated: "No one of these can apply to all conditions, but the particular method to be used must be adapted to the peculiarities of the process." From the extensive list of inorganic, as well as organic, dusts and "occupations which offer such exposure," it is obvious that his perception of dust control was based upon the avoidance of recognizable disease, and not the mere presence of a given, or visible, amount of dust being generated.

10.     The United States Navy expanded the scope of its asbestos hazard control program by including the enlisted corpsmen of the medical department in the hazard control process. In the *Handbook of the Hospital Corps* (Bureau of Medicine and Surgery, 1939) (Exhibit 12), the Bureau of Medicine and Surgery discussed the organization used

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

8

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

for disease and injury prevention in the United States Navy, and took a lead position in the prevention of industrial disease:

> "The Government having passed such laws must therefore lead the way in protecting its own employees ....An organization has been set up in the Navy to protect its personnel, both civilian and naval. A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy. He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like. He is also a consultant in all matter pertaining to safety aboard ships, at training stations and other Navy Department activities. A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented. Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea. In each of these places a variety of health hazards exist. It is therefore necessary that this personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.
>
> \* \* \*
>
> At all navy yards, the Commandant is the head of the organization. He is responsible to the Navy Department for the protection of the employees, as well as the naval personnel, under his command. He is familiar with the nature of the work being performed by the employees at his station and the health and accident hazards presented. Accordingly, he appoints, as the working head of the organization, a safety officer or a safety engineer, as he is better known. The safety engineer must be of sufficient rank to have become familiar with the various trades in a navy yard, a knowledge of machinery, a man of cooperative ability and well liked, and having sufficient knowledge of safety devices and appliances to intelligently make inspections and recommend proper protective measures. His duties are primarily, to prevent accidents and promote healthy working conditions. It is his duty to inspect all working places, make a general survey of all mechanical conditions and to recommend the addition of all necessary safety appliances for the protection of the workers...
>
> The Commandant further assigns a medical officer to act as advisor to the safety engineer. The medical officer must be of the same qualifications as the safety engineer, with the addition that he must be thoroughly versed in the diseases connected with Industry....[I]t is well for members of the Hospital Corps to understand the nature of these duties in order that they may be of assistance to him in the performance of these duties:: [ ]...He acts as consultant to the safety engineer in all matters pertaining to the general welfare and health of employees. Hygiene and sanitation are his important duties. He must interest himself in the employees and instruct them in the every day principles of personal hygiene and self preservation. He must instruct the employees in safety measures and encourage them to cooperate in protective measures. They must be made 'safety conscious' or 'safety minded.' The morale must be kept up....
>
> The medical officer must inspect all working places in order to have a better understanding as to the actual conditions under which the men work. He must make appropriate recommendations to improve deficiencies noted and must then

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

9

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

see that these recommendations are carried out."

The text further notes that the safety engineer is assisted by other personnel:

*"The safety engineer is assisted in his work by the foremen of the shops and in some instances by safety committees in each shop elected by the employees. These men or committees are generally chosen from among the older employees and from men who have considerable experience in their trade....[ ] The organization of the medical advisor is composed of junior medical officers, dental officers, to some extent, members of the Hospital Corps, and nurses. The duties of the hospital corpsmen are to assist the medical officer in his inspections, assist in the treatment of the injured and to prepare the necessary reports and returns in cases of accident, occupational disease, and the physical examination of employees."*

A similar organization is described for *"... a battleship or in other places."*

To this end, the enlisted Hospital Corpsmen were informed of the hazards presented by asbestos and instructed to "locate these hazards and afford protection accordingly." Two of the hazards that the hospital corpsmen were specifically instructed to evaluate in a questionnaire (inspection or survey form) are:

*"What precautions are exercised to prevent damage from pipe covering compounds?"*

*"What asbestos hazards exist?"*

Also, the hospital corpsman was instructed to help keep the workforce healthy:

*"Proper working places must be provided and maintained. Hygienic and sanitary conditions must be kept on a high plane. All moving parts of machinery must be guarded, goggles provided for workers required to use them; helmets and masks for sand blasters; proper ventilation for the chrome workers; masks for asbestos workers; protection for workers in X-ray and radium; protective gloves, shoes, and other garments for foundry workers, and other means of protection too numerous to mention here must be available and used. [ ] Special physical examinations must be made of all sand blasters, asbestos handlers, those exposed to radium and its compounds, lead workers, those engaged in dusty or smoky trades, handlers of T.N.T. and other explosives, etc., to prevent the occurrence of the diseases associated with those trades from injuring the men."*

11.     This type of active assessment, evaluation, and recommendation for control was embraced by senior United States Navy officers. In his memorandum to the Manager of the Navy Yard, Boston, Captain H.E. Jenkins, MC, USN (Jenkins, 1939) (Exhibit 13) discussed his findings and recommendations from his survey of the pipe covering shop and work shack at that yard. Although he stated that the health hazards to personnel were very remote, based upon his evaluation of the amount of dust released, Captain Jenkins recommended that a dust respirator and gloves be worn to supplement the "conscientiously and intelligently enforced" practice of wetting down

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

10

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1   insulating material.  Captain Jenkins also addressed the impractical use of respirators

2   during shipboard lagging operations and recommended sufficient wetting to prevent

3   dust generation as far as practicable.  Less than one week later, C.D. Headlee (1939)

4   (Exhibit 14), issued a Production Division Notice (Number 996) implementing these

5   recommendations.

6         12.    Captain E.W. Brown, in the *Annual Report of the Surgeon General, U.S. Navy*

7   *to the Secretary of the Navy* (Surgeon General, U.S. Navy, 1941) (Exhibit 15) and in the

8   scientific publication of his presentation made to the Fifth Annual Meeting of the Air

9   Hygiene Foundation of America (Brown, 1940, printed 1941) (Exhibit 16), discussed the

10  findings of his medical survey at the New York Navy Yard.  Captain Brown, recognized

11  as the founder of the Navy's formal occupational health program, assessed asbestos

12  exposure and medical findings of eleven workers at the New York Navy Yard.  With

13  knowledge of occupational exposure to silica and its delayed medical findings, and under

14  the conditions that he observed, Captain Brown found no indication of pulmonary

15  disease in these workers at that time.  He noted that wet methods and local exhaust

16  ventilation were implemented, and that the workers wore a respirator "during the

17  dustiest aspect of the process."  He stated that similar findings were reported in two

18  other yards and recommended that the study be extended to all men in this trade.  These

19  references further demonstrate that senior Navy personnel actively monitored and

20  controlled the Navy policy regarding disease and injury prevention, and were indeed the

21  leaders in field assessment and control of occupational health hazards, including

22  asbestos.

23        13.    When quantitative assessment (counting) of asbestos particles in air was

24  available, the Navy followed the recommendations of the United States Public Health

25  Service.  Based upon the findings of Dreessen and coworkers' 1938 study (Exhibit 17) of

26  asbestosis in the textile industry prepared by direction of the United States Surgeon

27  General, the United States Navy accepted an exposure level of 5 million particles per

28  cubic foot (5 MPPCF) as the time-weighted average (TWA) for occupational exposure.

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1  Dreessen et al. concluded: "It would seem that if the dust concentration in asbestos

2  factories was kept below 5 million particles (the engineering section of this report has

3  shown how this may be accomplished), new cases of asbestosis would probably not

4  appear." This TWA is the average airborne concentration of asbestos particles to which

5  an individual could be exposed in an eight hour period. Shorter periods of higher

6  concentrations were acceptable as long as the average exposure calculated over eight

7  hours did not exceed the TWA.

8        14.    A 1941 memorandum from the Officer-in-Charge of the Navy's Division of

9  Preventive Medicine to the Surgeon General (Stephenson, 1941; Exhibit 18) addressed the

10  policy of inviting the Bureau of Labor Standards or the United States Public Health

11  Service into the Navy yards for the purpose of surveying welding and other hazards.

12  Commander Stephenson writes:

13       *"I told Mr. Bard [Assistant Secretary of the Navy] that this was not considered*
     *the best policy, due to the fact that we had medical officers in the Yards and that*

14       *in practically all instances recommendations of sound character had been made by*
     *medical officers. We saw no need of inviting the United States Public Health*

15       *Service on its own invitation to do this job. Likewise, I told him that I had spoken*
     *to you and that you had indicated that President Roosevelt thought that this*

16       *might not be the best policy, due to the fact that they might sense disturbance in*
     *the labor element."*

17  Under *"Points of great interest,"* Commander Stephenson expressed concern about

18  silicosis, sand blasting, welding, solvents, hydrogenated (sic) hydrocarbons, eye flashes,

19  cadmium dust, smokes and fumes, chromium trioxide, and asbestosis. With respect to

20  asbestos, he stated:

21       *"We are having a considerable amount of work done in asbestos and from my*
     *observations I am certain that we are not protecting the men as we should. This*

22       *is a matter of official report from several of our Navy Yards."*

23        15.    As mentioned by Captains Jenkins and Brown, they found asbestos

24  exposure conditions that were not fully satisfactory and required changes.

25  Recommendations for correction of the exposure conditions were made. In both of these

26  instances, only a qualitative assessment was made and actual exposure levels were not

27  determined. Brown (1941; Exhibit 16) found no significant clinical findings in the limited

28  number of workers observed during the relatively short, post-exposure period. The

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

12

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

Navy's occupational health program was based upon internal support for the identification and control of occupational health hazards. In order to develop a sufficient cadre of physicians and scientists, the Navy developed training programs with Columbia University's DeLamar Institute of Public Health and the Harvard School of Public Health. By the end of World War II, over one hundred physicians, scientists, and engineers had been trained in occupational health at these two leading institutions of US public health.

16.     The *Minimum Requirements for Safety and Health in Contract Shipyards* (United States Navy Department and United States Maritime Commission, 1943; Exhibit 19) were drafted in 1942 by representatives from labor management committees, labor unions, management of private shipyards, insurance companies, the United States Maritime Commission, and the United States Navy. When approved by the US Maritime Commission and the U.S. Navy in early 1943, compliance with these standards was expected:

> *"Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and Maritime Commission, and each is requested to give full cooperation to the consultants on health and safety who will be charged with the coordination and supervision of the safety and health program of the two agencies.*

> H-13. *A Guide for Prevention of Industrial Disease in Shipyards*

> *13.1 Eight common types of disease and methods for their prevention are given in the following sections. Help in applying these methods will be given by the local Safety Department and by safety and medical consultants of the Navy Department and the Maritime Commission.*

> ....

> *13.7 Asbestosis*

> *a. Sources: In general, any job in which asbestos dust is breathed. For example:*

> | Job: | When Material Is: |
> |---|---|
> | *Handling* | *Asbestos* |
> | *Sawing* | *Asbestos mixtures* |
> | *Cutting* | |
> | *Molding* | |
> | *Welding rod salvage* | |

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

13

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

    *b. Job can be done safely with:*

        *1. Segregation of dusty work and,*

        *2. (a) Special ventilation: hood enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or*

           *(b) Wearing of special respirators.*

        *3. Periodic medical examination"*

Less than six months after the Minimum Requirements were issued, the Secretary of the Navy (Forrestal, 1943 (Exhibit 20)) reaffirmed these requirements for all private shipyards having Navy contracts. The minimum requirements did not provide a specific occupational exposure value for asbestos. They gave general requirements for safe (healthful) operations. The Navy's occupational health team was responsible for assisting in interpreting the standards for implementation at Navy and contract yards throughout the country. Any significant inspection findings, whether favorable or adverse, were to be discussed first with the shipyard management, thus allowing management the opportunity to take corrective action for imminent dangers. The actual written report was to be submitted in draft form to the regional director of the Maritime Commission for final typing.

17.     In addressing exposure to asbestos, Philip Drinker, then Chief Health Consultant for the United States Maritime Commission, and Professor in the Harvard School of Public Health program that was training the Navy physicians, scientists, and engineers, recommended an occupational exposure level of 5 MPPCF. (Drinker, 1944 (Exhibit 21)). This is the same value as recommended by Dreessen and coworkers (1938) (Exhibit 17) to prevent the development of asbestosis.

18.     In January 1945, Philip Drinker (1945) (Exhibit 22) informed Captain T. J. Carter, Bureau of Medicine and Surgery, of a serious health risk from asbestos dust exposure at Bath Iron Works. He was concerned that similar risks might be found in other yards where the same type of pipe covering was used. In this letter, Professor Drinker stated that the manufacturers of the asbestos materials used at Bath would:

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

14

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

> "...be glad to get out a brief statement of precautions which should be taken in light of their own experience and that they would inform their competitors that I had asked them to do so. I understand that neither the Navy nor Maritime wants any change in the specifications as the performance with the present materials is entirely satisfactory. From a health standpoint we do not believe any specification changes are needed."

Drinker recommended that a study be performed to evaluate asbestos exposure and disease among workers. "Admiral Mills agreed that such studies would be wise before Navy or Maritime accepted this asbestosis risk as being significant in our general ships construction program." Four shipyards in the New York area, two contract and two U.S. Navy yards, were selected for this study of exposure levels and health status. The study, conducted by Fleischer, Viles, Gade, and Drinker-also called the "Fleischer-Drinker study"-was promptly undertaken and reported in September, 1945 by Drinker to Admiral Mills (Chief, BuSHIPS) (Drinker, 1945b: Exhibit 23); (Fleischer et al., 1946; Exhibit 5). The results of this study reaffirmed the Navy's position on adherence to an occupational exposure level of 5 MPPCF. The conclusions were:

> "1. The character of asbestos pipe covering on board naval vessels is such that conclusions drawn from other asbestos industries such as textiles, cannot be applied.
>
> 2. The operations of band saw cutting, grinding, cement mixing, and installation aboard ship should be equipped with exhaust ventilation to keep the total dust concentration low.
>
> 3. The incidence of asbestosis among pipe coverers in the shipyards studied was low, 0.29 per cent or 3 cases out of 1074.
>
> 4. Since each of the 3 cases of asbestosis had worked at asbestos pipe covering in shipyards for more than 20 years, it may be concluded that such pipe covering is not a dangerous trade.

19. The results of this well-designed study, measuring actual asbestos exposure values and performing health assessments on the exposed workers, became established as Navy policy. The Navy adopted a recommended "maximum allowable concentration (M.A.C.)" value for asbestos of 5 MPPCF. This was the same value discussed by Dreessen and coworkers (1938) (Exhibit 17) when assessing the asbestos textile industry with much longer daily exposure periods and primarily the chrysotile type of asbestos. It was also the value recommended by the National Conference of Governmental Industrial Hygienists in 1942, and later adopted by the American Conference of Governmental

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

15

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

Industrial Hygienists (ACGIH) in 1946 (ACGIH, 1946 (Exhibit 24)). Among the members of the ACGIH in 1946, a private organization which did not offer membership to individuals affiliated with industry, were three representatives of the Navy Department and forty-two representatives from the United States Public Health Service. There were no federal, state, or local occupational exposure standards. The Navy used the occupational exposure level that the best scientific and medical evidence supported. In 1955, the Navy adopted the "Threshold limit values for toxic materials" promulgated by the American Conference of Governmental Industrial Hygienists as a basic reference and "to provide guidance toward the reduction of potential health hazards encountered in the industrial environment for both military and naval civilian personnel." (Chief, Bureau of Medicine and Surgery, 1955; Exhibit 25) The Navy recognized that the:

> "threshold limit values should be used as a guide in the control of health hazards and should not be regarded as fine lines between safe and dangerous combinations. The most desirable levels in all cases are those approaching zero, but practical considerations frequently require the acceptance of higher levels which are safe, but not ideal."

Moreover, the Navy recognized that the:

> "threshold limit values… are based on the best available toxicological information, long-term industrial experience, and experimental studies. In as much as these values are constantly being reevaluated, revisions or additions will be made as further information becomes available."

(Chief, BUMED, 1955 (Exhibit 25).)

20.     On January 7, 1958, the Department of the Navy issued its *Safety Handbook for Pipefitters* (Bureau of Ordnance, 1958) (Exhibit 26). This handbook was one of many safety handbooks issued by the Navy as an aid in safety indoctrination and accident prevention. This handbook provides, in part:

> "*Asbestos.* Asbestos dust is injurious if inhaled. Wear an approved dust respirator for protection against this hazard."

21.     In the 1960 publication of *Safety and Health Regulations for Ship Repairing*, the Department of Labor (Exhibit 27) recommended an occupational exposure level of 5 MPPCF for asbestos. For comparison to the degree of risk and hazard, the Department of Labor also used the occupational exposure level of 5 MPPCF as the same absolute value for high "free" crystalline silica dust (greater than 50% free silica). The silica value is also

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

the same value established by the ACGIH in 1942 and promulgated in 1946.

22.     The use of the 5 MPPCF level as the occupational exposure value continued to be generally accepted by professionals practicing occupational health in the United States.  This value was based upon controlling the development of the fibrotic disease, asbestosis.  This occupational exposure value, and the widespread use of asbestos, continued in the Navy until the late 1960s when the scientific and medical communities (Selikoff, 1965 (Exhibit 28) and Selikoff, 1967 (Exhibit 29)) and the United States Navy (Commander NAVSEC, 1969 (Exhibit 30) and Officer-in-Charge NAVSEC Philadelphia, 1969 (Exhibit 31)) had evidence that it was not sufficient to adequately control the health effects of exposure.

23.     Selikoff, in a paper written with Lee in 1979 (Lee and Selikoff, 1979 (Exhibit 32)) wrote:

> "'What's past is prologue!'  The decade of the 1960s provides a convenient time at which to terminate a historical view of asbestos disease.  With admirable hindsight from the late 1970s we can see that the essential evidence had already been reported, but not yet assembled or vested with sufficient credibility to be entirely convincing.  With few exceptions, the evidence at that time rested on scattered reports of small numbers of cases, and the cases themselves suffered from being either selected or simply those that happened to come to the attention of the reporter.  The population base from which the cases came was seldom mentioned. The significance of pleural changes and the occurrence of mesothelioma in persons without a distinct history of exposure remained in considerable doubt.  The idea that asbestos could be at least a cofactor in the production of bronchogenic carcinoma was far from fully accepted.  That parenchymal asbestosis was very likely to occur in those who had been exposed to heavy dosage in the early years of the industry was clear enough, but what effect environmental controls that had been introduced in the late 1930s might have upon its future prevalence was unknown.  The possibility that quite low dosages might have grave consequences 30 or more years after first exposure was still unproven.
>
> Many things were needed to confirm the suggestions that were emerging from the studies up to that time.  Most importantly, systematic epidemiologic investigation was needed of large cohorts drawn from various types of industry, with the inclusion of adequate control populations.  Some of these were already organized, but it was too early for the results to be meaningful.  We now know that much of the negative evidence stemmed from coming to conclusions prematurely, before the slow processes of carcinogenesis had had a chance to make themselves evident. We now know also that reduction of heavy exposures that lead to early death would reveal such slowly developing diseases as mesothelioma and bronchogenic carcinoma with increasing clarity.  But foreknowledge was not available at the time, although some investigators suspected that the auguries were not good. More sophisticated and sensitive ways of recognizing the disease processes at an early stage, before the appearance of marked radiographic changes, were badly needed.  A series of international conferences, some already in the planning stages, were to accelerate these developments greatly.  Those who felt that it was

BRYDON
HUGO & PARKER
135 MAIN STREET
26TH FLOOR
San Francisco, CA 94105

17

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

*an exciting time were not to be disappointed. The excitement has not even yet been entirely dissipated."*

24.    Captain N.E. Rosenwinkel, representing the Navy's Bureau of Medicine and Surgery, provided information regarding the Navy's knowledge of asbestos hazards to shipyard employees for inclusion in a statement issued by Rear Admiral J.J. Stilwell of the Shipyard Management Directorate, Naval Sea Systems Command in 1968 (Rosenwinkel, 1968 (Exhibit 33)):

> *"The United States Navy is well aware of the hazards of asbestos to its employees engaged in ship construction and ship repair at naval shipyards. Hazard control measures implemented by the shipyard medical departments and safety divisions are in accordance with accepted standards of industrial hygiene practices in the United States. Stringent efforts are directed at keeping the concentration of airborne asbestos dust below the level recommended by the American Conference of Governmental Industrial Hygienists. An energetic periodic physical examination program insures the health of personnel exposed to this hazard."*

25.    During the period of the late 1960s, asbestos exposure and control were being addressed at different levels of command throughout the Navy. The Naval Ship Engineering Center was searching for substitutes that could meet the rigorous engineering requirements for shipboard applications (NAVSEC, 1969 (Exhibit 30)). A meeting between senior engineering, safety, and medical personnel was held to evaluate possible methods for reducing exposure and to make recommendations to the Chief of Naval Operations (Turnbull, 1969 (Exhibit 34)). Major Navy shipyards were sharing their research on asbestos exposure and control measures (Mangold, 1970 (Exhibit 10)).

26.    It was not until 1970, that the Occupational Safety and Health Act (PL 91-596) (Exhibit 2) established national permissible exposure levels (PEL) for the first time using the federal standard established under the Walsh-Healey Public Contracts Act. These standards applied to shipyards, as well as other industries using asbestos. At the time of enactment in 1971, the PEL for asbestos was 12 fibers per cubic centimeter (f/cc). Based upon current scientific and medical recommendations by that time, the Occupational Safety and Health Administration (OSHA) emergently lowered the PEL to 5 f/cc (ceiling value of 10 f/cc) in 1971, with a permanent standard of 2 f/cc becoming effective in 1976. In 1975, OSHA recognized sufficient medical and scientific evidence of

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

18

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1 human carcinogenicity to reduce the permissible exposure level to 0.2 f/cc. After legal

2 challenges, OSHA reduced the PEL to 0.2 f/cc in 1986, and further reduced it to its current

3 value of 0.1 f/cc in 1994. Requirements from the highest levels of authority in the United

4 States Navy established the permissible exposure levels as they changed during this post-

5 OSHA era (Naval Ship Systems Command (NAVSHIPS), 1971 (Exhibit 35); Bureau of

6 Medicine and Surgery (BUMED), 1973 (Exhibit 36); and Chief of Naval Operations

7 (CNO), 1974 (Exhibit 37)).

8       27.    The Navy has continued to follow the policy of using occupational exposure

9 levels based upon the best available scientific and medical information (BUMED, 1955

10 (Exhibit 25)). The federal PELs, established by the Occupational Safety and Heath Act of

11 1970, are generally based upon the American Conference of Governmental Industrial

12 Hygienists' Threshold Limit Values (TLVs) published in 1968. Due to statutory

13 requirements, changes to the limited number of chemical PELs have generally been slow.

14 PELs have been changed for a relatively few chemicals since the enactment of OSHA in

15 1970. The TLVs are periodically reviewed and an updated list is published annually. The

16 TLVs more closely reflect the current state of knowledge and professional practice in

17 occupational health. The Navy continues to use the most appropriate occupational

18 exposure levels in the assessment of exposures and follows the requirements stated in the

19 Chief of Naval Operations Instruction OPNAVINST 5100.23 F (Chief of Naval

20 Operations, 2002) (Exhibit 38) to provide workplaces that reflect the state-of-the-art

21 knowledge and technology, consistent with its defined mission:

22     *"The maintenance of a safe and healthful workplace is a responsibility of*
*commands throughout the Navy. A successful Navy Occupational Safety and*
23 *Health (NAVOSH) program, one that truly reduces work-related risks and*
*mishaps, results only when support and commitment to the program permeate*
24 *every level of an organization. Within the Navy, the Chief of Naval Operations*
*(CNO) has overall responsibility for the NAVOSH program and implements the*
25 *program through the chain of command. Line management is responsible for the*
*maintenance of safe and healthful working conditions."*

26

27       28.    The Navy's Safety Program was driven from the highest level of authority

28 and operational command. The "United States Navy Safety Precautions," OPNAV 34P1,

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

19

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

was signed out by the Acting Secretary of the Navy, C.S. Thomas, on 8 June 1953 (Exhibit 39). In his "charge" written in this instruction, Mr. Thomas states:

> "The safety of its personnel and the preservation of its materials have always been a major concern of the Navy Department. Evidence of this is the provision in Article 0406 of U.S. Navy Regulations, that "Each Naval Technical Assistant shall prepare and issue to the Naval Establishment the safety precautions, and instructions pertaining thereto, which are necessary or appropriate in connection with matters under his technical direction."

>       *         *         *

> "In recognition of the burden of responsibility which a commanding officer has for the personnel and material under his command, a governing article, 01104 Basic Rule of Responsibility, has been included to allow for adjustments to local conditions and unusual circumstances. The complete text of this article not only appears in Chapter 1, but is reprinted on the title page of each chapter of the book."

The "Basic Rule of Responsibility" states:

> "Safety is a command function. Responsibility for the safety of personnel is vested in the commanding officer. Because these safety precautions apply only to usual conditions, commanding officers or others in authority may find it necessary to issue special precautions to their commands to cover local conditions and unusual circumstances. In addition to the posting of appropriate precautions, careful instruction and indoctrination of all personnel are necessary to ensure effective compliance with these precautions."

In order to coordinate sharing of occupational health information between organizationally distinct, and geographically distant, naval activities, the Bureau of Medicine and Surgery instituted the quarterly publishing of Occupational Health Reports: Occupational Health Hazards during World War II. These reports were initially received by the Bureau of Medicine and Surgery from all field commands staffed with occupational health professionals, condensed, and redistributed to all the submitting commands. (BUMED 1955 (Exhibit 40), 1959 (Exhibit 41), 1961a (Exhibit 42), and 1961b (Exhibit 43).) Later, the Navy Environmental Health Center continued this function until the late 1990s when electronic information sharing made the process obsolete. These reports demonstrate that the sharing of industrial hygiene and other occupational health information and services between commands was common early in World War II.

    29. Based on my education, training, and experience, it is my professional opinion that the Navy was well aware of the health hazards associated with the use of asbestos from the early 1920s. The Navy's decision to use asbestos materials was based

1  upon naval operating requirements and missions in light of the known health hazards at

2  various periods in time. The Navy had a longstanding and notable occupational safety

3  and health program that addressed asbestos and other health hazards, and that provided

4  exposure control recommendations and methods that were consistent with the state-of-

5  the-art knowledge in science and medicine. The Navy operated under the premise that

6  control of asbestos exposure could essentially eliminate the hazard of a material

7  considered essential for sustained Navy operations. Using established scientific and

8  medical knowledge, the Navy developed an active program to control the release of

9  asbestos fibers in dusty operations, as well as to monitor the health of workers at risk.

10  The landmark study of Fleischer-Drinker, reported in 1946 (Exhibit 5), confirmed the

11  general thought that exposures in the Navy to asbestos containing materials could be

12  controlled and health effects could be limited by medical surveillance. Navy industrial

13  programs were directed at controlling what was considered significant releases of dust.

14  During the period from about 1938 through the later 1960s, the widely accepted

15  occupational exposure limit was 5 MPPCF. In the mid-to-late 1960s, the Navy led the

16  way is assessing asbestos exposure of personnel and developing a program and process

17  to eliminate the material based upon new scientific and medical information that was

18  becoming available.

19      30.    The information possessed by the Navy, with respect to the specification

20  and use of asbestos, and the health hazards associated with its use aboard Navy vessels,

21  far exceeded any information that possibly could have been provided by a boiler and

22  auxiliary equipment manufacturer. Additionally, the boiler and auxiliary equipment

23  manufacturer has absolutely no responsibility or control over the operating workplace or

24  personnel—both essential aspects of hazard communication. Concomitant with the huge

25  increase in shipbuilding of World War II, the Navy developed a robust and multi-faceted

26  occupational health program which addressed many health risks. Over a quarter-of-a-

27  century before the enactment of the Occupational Safety and Health Act of 1970 (OSHA,

28  1970; PL 91-596), the Navy had an asbestos control program in place which contained

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

21

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1    most of what was later required for NON-military workplaces under this first national

2    legislation controlling occupational exposure to asbestos. The Navy's program far

3    exceeded the mere provision of a warning placard or note in an instruction or operation

4    manual. The major aspects of the Navy asbestos control program existed before OSHA

5    and have continued, with modifications, to remain consistent with the evolving state-of-

6    the-art (SOTA) knowledge and statutory requirements of OSHA. The Navy's early

7    program included the:

8    (1)    adoption of an occupational exposure level (five million particle per cubic

9    foot (5 MPPCF);

10   (2)    establishment of the methodology to evaluate exposures;

11   (3)    training and equipping an occupational health team with state-of-the-art

12   knowledge and equipment;

13   (4)    development and specification of engineering and administrative controls

     where required;

14   (5)    establishment of a proactive medical surveillance program applying SOTA

15   monitoring techniques incorporating pulmonary function testing to detect

16   early changes with greater sensitivity than using chest radiographs alone

17   (chest radiographs reveal later-developing changes);

18   (6)    the wearing of respiratory protection for tasks performed when exposure

     levels were expected to exceed the accepted, "time-weighted"

19   concentration;

20   (7)    recordkeeping; and

21   (8)    training.

22        The Navy used the accepted occupational exposure level of 5 MPPCF before the

23   enactment of OSHA. After OSHA was enacted, the permissible exposure level (PEL) was

24   established as 12 fibers per cubic centimeter (f/cc) in 1971. This initial PEL was reduced to

25   5 f/cc later that year, and then 2 f/cc in 1976. In accordance with the OSHA rulemaking

26   process, the PEL was reduced to 0.2 f/cc in 1986, and then to the current level of 0.1 f/cc in

27   1994. The last feature included in the Navy's asbestos control program, namely worker

28   training, was not specifically addressed in the 1972 OSHA asbestos standard. It must

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

22

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1    also be noted that the Occupational Safety and Health Act did not apply to Executive

2    Branch Departments. However, it was extended to "non-military unique" federal

3    workplaces under Executive Order 11612. It is obvious that the addition of a simple

4    warning by an equipment manufacturer—especially one addressing an additional

5    product, which may or may not have been used in conjunction with a supplied piece of

6    equipment—was not only unnecessary, but would be inherently disruptive in a military

7    setting. If an equipment manufacturer was required to warn about the possible

8    composition of the thermal insulation which could be applied, should the equipment

9    manufacturers also have been required to address lead-based paint, fuel components

10   (polynuclear aromatic hydrocarbons), feedwater additives, "stack gas" (exhaust)

11   emissions, and even the hazards presented by the enemy, the sea, and the nutritional

12   content and food value of their Navy-provided diet?.

13       31.    The Navy controlled asbestos exposure consistent with the then current state

14   of accepted scientific and medical knowledge balanced by needs for national defense.

15   Sailors did not have the option to avoid all exposure to asbestos-containing products or

16   environments in which asbestos was used while on active duty; this was especially true

17   during World War II.

18       32.    The Navy's knowledge regarding the applications of asbestos and the health

19   effects represented the state of the art. During the period from the early 1920s to the late

20   1960s, there was nothing about the hazards associated with the use of asbestos containing

21   products used on or in boilers and auxiliary equipment on United States Navy ships

22   known by a boiler manufacturer, like Foster Wheeler, that was not known by the United

23   States government and the United States Navy. The association of asbestos with the

24   development of a rare and uncommon type of cancer, mesothelioma, was not

25   demonstrated until the work of Wagner and his coworkers in 1960 (Wager et al, 1960).

26   The proven association of amosite (the type of asbestos used extensively on Navy

27   combatant vessels of this period) and mesothelioma was not established until the work of

28   Selikoff and his associates in 1972 (Selikoff et al, 1972). In light of the Navy's knowledge

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

regarding the potential, known asbestos-related health hazards from exposure since the 1920s (well before the large increase in specification of use by Navy designers, architects, and engineers), and the known military and technologic benefits or advantages afforded by the use of asbestos as thermal insulation and in other applications, the Navy made an informed decision to use asbestos-containing products. The Navy was fully cognizant of the potential health hazard when it specified the use of asbestos in applications critical to national defense and the conduct of war (McArthur, 1978). To insure that the health of its military and civilian personnel was maintained, the Navy established a sound, premier state-of-the-art occupational health program to control the recognized, potential health hazard. To carry the concept involving the offering of a written warning by an equipment manufacturer further, as the Navy had determined what an "acceptable asbestos exposure" was, the Navy would not, and could not, allow each individual to make an additional determination of what constituted an acceptable exposure on an individual basis.

33. A further question has been asked of me as to whether Navy specifications such as MIL-M-15071D (Department of the Navy, 1961) (Exhibit 3) or Navy instructions such as SECNAV Instruction 5100.8 ("Uniform Labeling Program – Navy," 24 September 1956) (Secretary of the Navy, 1956) (Exhibit 4) support the notion that manufacturers of equipment such as Navy boilers and auxiliary equipment were free to provide their own additional warning information about hazards associated with asbestos-containing products that they did not manufacture.

34. Based upon review of these documents, many other documents regarding the Navy's hazard communication program, my career experiences as an Industrial Hygiene Officer and physician in the Navy dating back to 1972, and personal knowledge of the Navy's hazard communication program and Naval practices generally, I can state as follows:

        a.      Uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy simply could not operate if various personnel were trained differently, and additionally received

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

inconsistent information from different manufacturers. In fact, SECNAV Instruction 5100.8, Para.1 (Secretary of the Navy, 1956; Exhibit 4) states: *"the purpose of this Instruction is to standardize labeling requirements for hazardous chemical products during usage…"*

b.   SECNAV Instruction 5100.8 does not apply to a Navy boiler as it is not a chemical. It is a piece of mechanical equipment.

c.   SECNAV Instruction 5100.8 is not addressed to manufacturers (please see "SCOPE" on page one of this instruction), but rather it directs internal Navy "ACTION" as specifically written on page 2 of this instruction. SECNAV Instructions are commands from the Secretary of the Navy directing Navy personnel on the manner in which to carry out their obligations. Requirements for manufacturers seeking to be compensated for materials supplied to the Navy are covered in military specifications, not SECNAV instructions.

d.   SECNAV 5100.8 did apply to hazardous materials as discussed under the "BACKGROUND" for promulgation of this instruction on page 2, and, in fact, did contemplate that labels affixed by the *manufacturer* of the material pursuant to state, federal, and other guidelines (such as MSDSs published by the Manufacturing Chemists' Association) would be part of the Navy's hazard communication program (see, Para. 2(a)). In fact, asbestos insulation products began containing hazard warning labels from the insulation manufacturers in the mid-1960s. Prior to that time, beginning more than two decades earlier, the Navy's own occupational health program provided training, engineering and administrative controls, personal protective equipment, and medical surveillance to prevent the hazards of asbestos.

e.   Any additional warning about the hazards of asbestos by an equipment manufacturer would be only partial in scope as well as inherently redundant, eventually obsolete, and possibly inconsistent with the Navy's own training. In the heat of battle, there is simply no time to be interpreting inconsistent hazard labels.

f.   At best, an equipment manufacturer such as Foster Wheeler, which delivered equipment to Navy specifications could merely have told personnel to follow the Navy's own mandates for handling asbestos. This redundant information is not informative, diverts attention from hazards inherent in the equipment, and would certainly become obsolete. Boilers last many years and the Navy's asbestos hazard communication program has evolved over the years to keep pace with scientific developments and changes in materials.

g.   If every equipment manufacturer (and conceivably even the pipe and structural steel manufacturers) provided its own warning about asbestos insulation that might be used on or around its product, inconsistent warnings would certainly have resulted. And, keep in mind, many other hazardous

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

25

substances (e.g. boiler feed water chemicals, fuels, solvents, heavy metals) are used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances.

h. Some types of insulation used by the Navy on equipment were non-asbestos (e.g., fiberglass blankets) and any warning about asbestos on such equipment would simply be wrong.

i. MILSPEC-M-15071D, Para. 3.3.1 (Department of the Navy, 1961; Exhibit 3) makes clear that equipment manufacturers' manuals must first be approved by the Bureau of Ships and the "manual shall not be modified without approval of the Bureau of Ships." Moreover, it cautions: *"Notes, cautions, and warnings should be used to emphasize important critical instructions. The use should be as sparing as is consistent with real need."* This specification applied to risks inherent in the operation of the equipment (as distinguished from repair and/or overhaul). Gratuitous warnings about the possible use of materials made by others do not comport with this specification. Any suggestion that Foster Wheeler was free to depart from Navy-approved manuals is incorrect.

35. As an important note, Foster Wheeler, as a manufacturer of boilers and auxiliary equipment, was not a subject matter expert regarding the health effects or industrial hygiene controls associated with the use of asbestos-containing materials in naval applications. It is unreasonable to assume that the Navy would have accepted "helpful comments" from a vendor or equipment manufacturer who was not a subject matter expert. The Navy had this specific knowledge and more. The Navy had a robust and encompassing occupational health program that far exceeded just the mere labeling of a material. This program included aspects appropriate for the degree of recognized hazard at various times, including training, engineering controls, medical examinations, provision of personal protective equipment, and use of alternative products when possible.

36. The military setting is unique and distinct from the civilian environment, and although management structure is generally similar, the command hierarchy of rank is well-defined and the authority of the Commanding Officer approaches absolute. This authority is based in Federal statute, as well as in Navy Regulations and Instructions. Over time, there have been evolutionary changes in these to incorporate changing

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION

1    societal values, but the authority of the individual in command remains constant. When

2    routine "orders" are given, prompt and appropriate response is expected. The failure to

3    obey a lawful order is a punishable offense, and depending upon the situation (war time,

4    national emergency, misconduct), the punishment can be severe. Individual freedoms

5    that are common civilians are not as universally applied to military members. Civil

6    liberties indeed exist, but they are tempered to the strict Uniform Code of Military Justice

7    (UCMJ) and the requirements of individuals serving in the Country's national defense.

8    Personnel are told what to wear and how to wear it. They are told when to rise in the

9    day, and when to eat. Military members ask for permission to leave the presence of a

10    senior in a formal setting, and juniors initiate salutes when in uniform. Even though the

11    actual work tasks and duties may be identical, military personnel are not civilians "just

12    doing a job."

14        37.    Therefore, I conclude:

16        a.    The information possessed by the Navy with respect to the specification and use of asbestos, and the health hazards associated with its uses aboard Navy vessels, represented the state-of-the-art and far exceeded any information that possibly could have been provided by a boiler manufacturer, like Foster Wheeler. Based upon the state of knowledge at a given period in time, the Navy was fully aware of the recognized health hazards of asbestos and had a robust program to control exposure of personnel and monitor their health.

22        b.    There was no information concerning any asbestos hazards, or dangers posed by any asbestos-containing materials used in boiler and auxiliary equipment supplied under Navy material specifications on a United States Navy ship that was known to a boiler and auxiliary equipment manufacturer, like Foster Wheeler, that was not known to the United States government and the United States Navy.

26        c.    It would be unreasonable to assume that the Navy would have accepted gratuitous, "non-expert" comments from equipment manufacturers and vendors about hazards associated with products they did not make – and especially for one about which the Navy was already fully aware and

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

27

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF
DEFENDANT FOSTER WHEELER ENERGY CORPORATION

much more knowledgeable than the manufacturer or vendor.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 10th day of March, 2012.

_Lawrence Stilwell Betts, MD, PhD_

Lawrence Stilwell Betts, MD, PhD

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

DECLARATION OF LAWRENCE STILWELL BETTS IN SUPPORT OF NOTICE OF REMOVAL OF DEFENDANT FOSTER WHEELER ENERGY CORPORATION