# EXHIBIT C

1   Kevin M. Jordan (Texas State Bar No. 11014800)
    Andrew J. Yoder (Texas State Bar No. 24051552)
2   BAKER BOTTS L.L.P.
    One Shell Plaza
3   910 Louisiana Street
    Houston, Texas 77002
4   (713) 229-1827
    (713) 229-2827
5   kevin.jordan@bakerbotts.com
    drew.yoder@bakerbotts.com

ATTORNEYS FOR DEFENDANT
UNION CARBIDE CORPORATION

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION<br><br>(NO VI)<br><br>This Document Relates To:<br><br>*Robert F. Lyman and Samantha Lyman v. Asbestos Defendants,*<br><br>Before the United States District Court for the Northern District of California<br>Cause No. C-07-4240-SBA | MDL 875 (2:01-md-00875-ER)<br>**Cause No. C 09-62999-ER**<br><br><br>**DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** |

      Defendant Union Carbide Corporation ("Union Carbide") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. In the accompanying brief, Union Carbide demonstrates that Plaintiffs can present no credible evidence demonstrating that Decedent, Robert F. Lyman, was exposed to any product containing Union Carbide asbestos fibers. Thus, there is no genuine issue of material fact and Union Carbide is entitled to judgment as a matter of law.

1

## TABLE OF CONTENTS

2  Table of Contents .............................................................................................. i

3  Table of Authorities ......................................................................................... ii

4  Summary of Argument....................................................................................... 1

5  Introduction ....................................................................................................... 2

6  Factual and Procedural Background .................................................................. 2

7  Applicable Law .................................................................................................. 6

8  Summary Judgment Standard ............................................................................ 6

9  Argument ............................................................................................................ 7

10      **I.**    There is no genuine issue of material fact regarding Decedent's alleged exposure to Union Carbide asbestos fibers......................................... 7

11

12          **A.**    Decedent's original deposition testimony and discovery responses provide no evidence that Decedent was exposed to any product containing Union Carbide asbestos fibers............... 9

13

14          **B.**    Decedent's declaration and perpetuation deposition testimony should be disregarded because they create no genuine issue of material fact......................................................... 12

15

16                  **1.**    Decedent's declaration creates no genuine issue of fact under the rule declared by the California Supreme Court in *D'Amico v. Board of Medical Examiners*.............................................................................. 12

17

18                  **2.**    Under the "sham affidavit doctrine," Decedent's declaration creates no genuine issue of fact....................... 14

19

20                  **3.**    Under either *D'Amico* or the sham affidavit doctrine, Decedent's declaration should be disregarded. ........................................................................ 15

21

22                  **4.**    Decedent's subsequent deposition testimony should be ignored under a corollary rule. ...................................... 17

23          **C.**    Plaintiffs have no additional evidence demonstrating that Decedent was exposed to Union Carbide asbestos fibers. ............. 19

24

25      **II.**    Even if the Court finds that Decedent's perpetuation testimony was not a sham, it cannot support the survival claims brought by Decedent's estate.............................................................................. 20

26

27  Conclusion ....................................................................................................... 22

Certificate of Service........................................................................................ 23

28

i

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

**CASES**

3

*Associated/ACC Int'l, Ltd. v. DuPont Flooring Sys. Franchise Co.,*
    89 Fed. App'x 758 (3d Cir. 2004) ................................................................. 7

4

5

*Bank of Illinois v. Allied Signal Safety Restraint Sys.,*
    75 F.3d 1162 (7th Cir. 1996) ...................................................... 17, 18, 19

6

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................... 6, 7

7

8

*Cleveland v. Policy Mgmt. Sys. Corp.,*
    526 U.S. 795 (1999) .................................................................................. 14

9

*Daddario v. Snow Valley, Inc.,*
    43 Cal. Rptr. 2d 726 (Cal. Ct. App. 1995) ............................................... 13

10

11

*D'Amico v. Board of Medical Examiners,*
    520 P.2d 10 (Cal. 1974) .................................................. 12, 13, 15, 16

12

13

*Drewitt v. Pratt,*
    999 F.2d 774 (4th Cir. 1993) .................................................................... 6

14

*Dumin v. Owens Corning Illinois,*
    33 Cal. Rptr. 2d 702 (Cal. Ct. App. 1994) ................................................ 7

15

16

*Hogston v. Allis-Chalmers Corp.,*
    672 F. Supp. 2d 705 (E.D. Pa. 2009) ........................................................ 6

17

18

*In re Dow Sarabond Prods. Liab. Litig.,*
    666 F. Supp. 1466 (D. Colo. 1987) ........................................................... 6

19

*Kennedy v. Allied Mut. Ins. Co.,*
    952 F.2d 262 (9th Cir. 1991) ................................................................... 14

20

21

*Kimberly-Clark Corp. v. Continental Casualty Corp.,*
    No. 3-05-CV-0475, 2006 WL 2468712 (N.D. Tex. Aug. 25, 2006) ..................... 21

22

23

*Leasman v. Beech Aircraft Corp.,*
    121 Cal. Rptr. 768 (Cal. Ct. App. 1975) ........................................... 12, 13

24

25

*Lineaweaver v. Plant Insulation Co.,*
    37 Cal. Rptr. 2d 902 (Cal. Ct. App. 1995) .............................................. 17

26

*McGonnell v. Kaiser Gypsum Co.,*
    120 Cal. Rptr. 2d 23 (Cal. Ct. App. 2002) .......................................... 7, 8

27

28

*Messick v. Horizon Indust., Inc.,*
  62 F.3d 1227 (9th Cir. 1995)............................................................. 19

*Milne v. Nat'l Sch. of Health Tech.,*
  73 F.R.D. 628 (E.D. Pa. 1997)........................................................... 19

*Pacific Ins. Co. v. Kent,*
  120 F. Supp. 2d 1205 (C.D. Cal. 2000) ......................................... 18, 19

*Radobenko v. Automated Equipment Corp.,*
  520 F.2d 540 (9th Cir. 1975)......................................................... 14, 17

*Rutherford v. Owens-Illinois, Inc.,*
  941 P.2d 1203 (Cal. 1997) ........................................................ 7, 8, 17

*Schoonejongen v. Curtiss-Wright Corp.,*
  143 F.3d 120 (3d Cir. 1998)....................................................... 6, 7, 11

*Thompson v. Williams,*
  259 Cal. Rptr. 518 (Cal. Ct. App. 1989) .......................................... 12

*Van Dusen v. Barrack,*
  376 U.S. 612 (1964)........................................................................... 6

*Vonckx v. Allstate Ins. Co.,*
  No. 02-C-8474, 2004 WL 1427105 (N.D. Ill. June 23, 2004)........... 18, 19

*Whitmire v. Ingersoll-Rand Co.,*
  No. 5210211 (Cal. Ct. App. Apr. 22, 2010)
  (unpub. op.) (copy attached, App. 24) ........................................... 13

STATUTES

28 U.S.C. § 1332 ................................................................................. 6

28 U.S.C. § 1407 ................................................................................. 5

28 U.S.C. § 1441 ................................................................................. 4

28 U.S.C. § 1446 ................................................................................. 4

OTHER AUTHORITIES

FED. R. CIV. P. 26(a)(1)(A)(i)................................................................. 20

FED. R. CIV. P. 37(c)(1) ....................................................................... 20

FED. R. CIV. P. 56(c)............................................................................ 6

FED. R. CIV. P. 27(a)(4) .................................................................. 1, 21

- iii -

**SUMMARY OF ARGUMENT**

Union Carbide is entitled to judgment as a matter of law because there is no credible evidence that Robert F. Lyman ("Decedent") was exposed to a product containing Union Carbide asbestos fibers.  Decedent's deposition testimony, along with the other evidence collected in this case, conclusively establishes that Plaintiffs cannot adduce sufficient evidence to allow a reasonable jury to find in their favor.  Plaintiffs' only product identification evidence consists of Decedent's specious, self-serving declaration and perpetuation deposition testimony, both offered in a transparent attempt to manufacture a triable issue of fact.  This is not credible summary judgment evidence.  It directly contradicts Decedent's original deposition testimony and is properly disregarded under both California law and the federal "sham affidavit" doctrine.  Under either set of principles, there is no *genuine* issue of material fact and Union Carbide is entitled to judgment as a matter of law.  Accordingly, pursuant to Rule 56, Union Carbide seeks summary judgment as to all of Plaintiffs' claims against it.

Even if the Court determines that Decedent's perpetuation deposition creates a triable issue of fact, however, Union Carbide is nevertheless entitled to partial summary judgment as to the survival claims brought by Decedent's estate.  A state court judge in California has explicitly limited the admissibility of Decedent's perpetuation deposition to Plaintiffs' wrongful death causes of action.  Pursuant to Federal Rule of Civil Procedure 27(a)(4), the testimony is subject to the same limitation in this Court.  Therefore, this testimony cannot be relied upon in the survival claims brought by Decedent's estate and Union Carbide is entitled to partial summary judgment as to all such claims brought by Plaintiffs.

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### INTRODUCTION

This motion presents discrete issues of product identification. The outcome is determined by whether Plaintiffs can demonstrate that Decedent was exposed to some product containing asbestos fibers attributable to Union Carbide. They cannot. Plaintiffs alleged in state court that Decedent was exposed to Union Carbide asbestos fibers through contact with asbestos-containing drilling fluid additives. In discovery, however, Plaintiffs could not identify *any* Union Carbide product to which Decedent was exposed. Only when Union Carbide moved for summary judgment did Decedent file a self-serving declaration, contradicting his original testimony in this case and offering up product identification facts. On this basis, the state court erroneously denied Union Carbide's well-taken motion. After removal and transfer to this Court, Plaintiffs still cannot produce any credible evidence indentifying a Union Carbide asbestos-containing product to which Decedent was exposed. For this reason, Union Carbide is entitled to judgment as a matter of law as to all claims brought by Plaintiffs in this case.

### FACTUAL AND PROCEDURAL BACKGROUND

Decedent, a life-long smoker, was born on August 13, 1939. (Lyman Dir. Dep. 11:19 (App. 1).) He died of lung cancer on May 20, 2008. (Pls.' 1st Am. Compl. ¶ 2.) Plaintiffs claim that Decedent's death was caused by occupational exposure to asbestos[1] (*see* Compl. ¶ 2) and not by the hundreds of thousands of cigarettes he smoked over his lifetime. By the time he entered the Marine Corps in 1956 at the age of 17, Decedent was smoking two packs of cigarettes per day. (App. 1 at 16:3-21.) For the next

---

[1]    Decedent held nearly fifty jobs during his 48-year working life, and Plaintiffs now claim that Decedent was exposed to asbestos through much of that work. (*See* Compl. Ex. A at 1-16.) Plaintiffs also contend that Decedent was subject to "para-occupational" exposure to asbestos, due to his father's employment as a pipefitter in the Boston Naval Shipyard. (Compl. Ex. A at 16.) It is undisputed that, except for the oilfield services employers discussed below, none of this alleged exposure implicates Union Carbide.

- 2 -

fifty years, Decedent smoked between two and three packs of cigarettes a day.  (App. 1 at 16:14-18.)  Plaintiffs allege that Decedent was exposed to Union Carbide asbestos fibers during his oilfield employment from 1981 to 1986.  (Compl. Ex. A at 12-13.)  Specifically, Plaintiffs claim that Decedent was exposed to asbestos-containing drilling mud additives while employed at Cudd Pressure Control, Inc. and Baker Hughes Oilfield.  (Compl. Ex. A at 12-13.)

    "Drilling mud" is a shorthand term for a sophisticated mixture of fluids and solids pumped down the borehole of a well being drilled for oil or gas.  (Smith Dep. 19:17-22:2, 23:11-24:2 (App. 2).)  After being pumped down the hole, the drilling mud is discharged from the drill bit and flows back up the hole where it is recycled and used again.  This mixture performs several critical functions, including lifting rock and soil "cuttings" created by the drill bit, and cooling and lubricating the drill bit.  (*Id.* at 20:16-21:8.)  Drilling mud also helps create "wall cake," a layer of material deposited along the borehole walls that protects the overall hole stability, contains the fluids trapped in the geologic formations, and prevents water loss from the mud into these formations.  (*Id.* at 21:8-11, 21:18-22, 23:11-16.)

    Beginning in the 1960s, mud companies began using raw asbestos fiber as a specialty additive in drilling muds.  (*Id.* at 27:6-17.)  Asbestos was used as an additive in freshwater drilling mud because it rapidly increased the viscosity of the mud mixture being used on a given well.  (*Id.* at 28:4-8.)  Practitioners found that asbestos provided rapid increases in viscosity, referred to as "yield" in oilfield parlance.  (*See id.* at 34:4-9 ("It's just that asbestos was found was quicker yielding, and a little more efficient in doing what we wanted it to do.").)  As a result, asbestos was used to run "sweeps," which are large batches of additives pumped into the mud in close proximity, used to quickly clean

Case MDL No. 875   Document 8875-3   Filed 07/11/12   Page 9 of 28

Case 2:09-cv-62999-ER   Document 28   Filed 05/03/10   Page 8 of 27


loose cuttings out of the hole. (*Id.* at 34:3-35:17.)  Asbestos was thus used as a specialty additive providing highly efficient sweeps in drilling mud from the 1960s until the 1980s. (*See id.* at 35:16-20.)

Union Carbide sold asbestos for use in drilling mud through its exclusive distributor, Montello, Inc., from 1968 until 1985.   (Walsh Decl. ¶¶ 5, 7, 9 (App. 3).) These additives were sold under the following Montello brand names: Visbestos, Super Visbestos, Oilbestos, Telvis, and Univis. (*Id.* ¶ 7.)   Montello also sold Union Carbide asbestos to IMCO Services, which packaged the asbestos under its own label under the names IMCO Shurlift, IMCO Best, and IMCO Super Best.  (*Id.*)  Each of the drilling mud additives containing Union Carbide asbestos fiber was packaged in dry form and shipped in 50-pound bags. (*See id.* ¶¶ 7, 8.)

This lawsuit was originally filed in California state court on December 29, 2006.   After the seven-day deposition of Decedent, the deposition of his wife, Plaintiff Samantha Lyman, and extensive written discovery, one thing became clear—Plaintiffs could not identify a single asbestos-containing Union Carbide product to which Decedent had been exposed.   Accordingly, on July 5, 2007, Union Carbide moved for summary judgment.  (*See* Mem. P. & A. in Supp. Def.'s Mot. Summ. J. (App. 4).)   In response, Decedent filed an unsigned,[2] two-page declaration stating the names of two products containing Union Carbide asbestos to which he had allegedly been exposed.  (*See* Lyman Decl. (App. 5) (identifying Super Visbestos and Univis).)   On this basis, Union Carbide's motion for summary judgment was erroneously denied.

On August 17, 2007, Union Carbide removed the case to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1441 and

---

[2]   Decedent did eventually submit a signed version of the declaration, attached as App. 5

- 4 -

1446, based upon the existence of complete diversity between Plaintiffs and the remaining defendants. Union Carbide then filed a Notice of Tag-Along Action, informing the Northern District of California that this case was a tag-along action, subject to transfer to this Court for consolidated pre-trial proceedings, pursuant to 28 U.S.C. § 1407.

Prior to the removal, knowing that there was no admissible evidence of product identification for the trial, Plaintiffs twice tried to convince the California state court to allow a second deposition of Decedent. Both requests were denied. Later, Plaintiff Samantha Lyman sought and obtained permission from a Discovery Commissioner in California state court to take a second deposition of the Decedent to perpetuate his testimony for the purpose of an anticipated state court wrongful death action. (*See* Order Granting Am. Pet. to Perp. Test. of Robert F. Lyman (App. 6).) In granting the motion, the judge specifically refused to allow the use of the "perpetuation testimony" in the personal injury action. (*Id.*)

In his perpetuation deposition, Decedent was presented with a series of photographs of drilling mud additive products containing Union Carbide asbestos. (*See* Lyman Perp. Dep. 42:15-22 (App. 7); Lyman Perp. Dep. Exs. 6-A to 6-O (App. 8).) Under the pretext that the photographs had refreshed his memory, Decedent blatantly contradicted his original testimony, identifying several products containing Union Carbide asbestos fibers and claiming that he was exposed extensively to each. (App. 7 at 43:10-47:15.)

After removal to federal court, and the death of Decedent in May 2008, Union Carbide deposed all of Decedent's heirs. All but one of the surviving Plaintiffs stipulated that they could not provide any product identification testimony.[3] The one

---

[3] *See* Samantha Lyman Dep. 10:7-23 (App. 17); Stephen Lyman Dep. 5:20-6:15 (App. 18); Kenneth

- 5 -

1  exception, Robert Lyman, Jr., would not agree to the stipulation but testified that he had

2  "no clue" what kind of products his father worked with while employed as an oilfield

3  services worker.  (Robert F. Lyman, Jr. Dep. 77:24-78:4 (App. 23).)

### APPLICABLE LAW

Because federal jurisdiction in this case is based upon diversity of

citizenship under 28 U.S.C. § 1332, the Court must apply state substantive law.  *See Van

Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *In re Dow Sarabond Prods. Liab. Litig.*, 666

F. Supp. 1466, 1468 (D. Colo. 1987).  As to matters of procedure, the Court appropriately

applies Rule 56 and federal authorities applying it.  *See Hogston v. Allis-Chalmers Corp.*,

672 F. Supp. 2d 705, 707-08 (E.D. Pa. 2009).

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, on the basis of the pleadings,

discovery materials, and any affidavits, there is no genuine issue of material fact and the

moving party is entitled to a judgment as a matter of law.  *See* FED. R. CIV. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A fact is 'material' if, under the

substantive law of the case, it is outcome determinative."  *Schoonejongen v. Curtiss-

Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998).  "A 'genuine' issue is one where a

reasonable jury, based on the evidence presented, could hold in the nonmovant's favor

with regard to that issue."  *Id.*  "Where no genuine issue of material fact exists," it is the

"affirmative obligation of the trial judge to prevent factually unsupported claims and

defenses from proceeding to trial."  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)

(internal quotation marks omitted).

---

Christie Dep. 21:10-22 (App. 19); Laura Jean Lyman Dep. 6:23-7:7 (App. 20); Lisa Marie Carawan Dep.
43:5-25 (App. 21); Michael Lyman Dep. 10:11-24; 15:18-17:15 (App. 22) (Michael Lyman accepted the
stipulation with the caveat that he had accompanied his father to work in the oilfield, but when questioned
about this experience, Mr. Lyman nevertheless could not offer any product identification testimony.).

Specifically, "summary judgment must be entered against a party who bears the burden of proof at trial but fails to establish the existence of evidence necessary for an essential element of that case." *Associated/ACC Int'l, Ltd. v. DuPont Flooring Sys. Franchise Co.*, 89 Fed. App'x 758, 760 (3d Cir. 2004) (citing *Celotex*, 477 U.S. at 322). "Summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor." *Schoonejongen*, 143 F.3d at 130.

ARGUMENT

**I.    There is no genuine issue of material fact regarding Decedent's alleged exposure to Union Carbide asbestos fibers.**

Under California law, asbestos plaintiffs have the burden of proving causation. *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1214 (Cal. 1997). While California courts have yet to articulate a precise standard for proving causation in asbestos cases, even under the most lenient standard a plaintiff must at least establish that a particular manufacturer's asbestos-containing product was at his specific work site and provide sufficient circumstantial evidence to allow a reasonable inference of exposure. *See Dumin v. Owens Corning Illinois*, 33 Cal. Rptr. 2d 702, 704-05 (Cal. Ct. App. 1994). In other words, in order to defeat summary judgment, Plaintiffs must provide sufficient evidence that Decedent was exposed to Union Carbide asbestos fibers to allow a reasonable inference that such fibers were a legal cause of his injury, "taking into account the length, frequency, proximity and intensity of exposure." *See Rutherford*, 941 P.2d at 1218. This Plaintiffs cannot do.

Though this standard can seem abstract in formulation, it is concrete in application. For instance, in *McGonnell v. Kaiser Gypsum Co.*, an asbestos plaintiff testified that he was familiar with the name "Kaiser Cement Company" and had seen bags

- 7 -

1    with that name on them, but could not recall where.   120 Cal. Rptr. 2d 23, 25 (Cal. Ct.

2    App. 2002).   He had not heard of a company called Kaiser Gypsum and had no

3    recollection of working near or with Kaiser Gypsum products.   *Id.*   McGonnell relied

4    upon invoices and other evidence which showed: (1) Kaiser Cement products might have

5    been used once at the site, though he produced no evidence that those products contained

6    asbestos, and (2) a few years before McGonnell began working at the job site, Kaiser

7    Gypsum had sold joint compound, which might have contained asbestos, to a contractor

8    for a project at the same site. *Id.*   Based on this evidence, the court acknowledged that it

9    was "at least within the realm of possibility that McGonnell encountered a wall with

10   Kaiser joint compound during his 24 years of employment at [that site]." *Id.*

11

12          Nonetheless, the court found this possibility insufficient to create a triable

13   issue of fact because, "[a]ll that exists . . . is speculation that at some time McGonnell

14   might have cut into a wall that might have contained Kaiser joint compound that might

15   have contained asbestos." *Id.* at 1105.   The court concluded by noting that, "[t]he

16   evidence create[d] only a dwindling stream of probabilities that narrow[ed] into

17   conjecture." *Id.* (internal quotations and citation omitted).

18

19          Here, Plaintiffs cannot even manage the weak showing made in

20   *McGonnell.*   There is no competent evidence that any Union Carbide product was ever

21   present at one of Decedent's worksites.   All that exists is speculation—speculation that at

22   some time products containing Union Carbide asbestos fibers might have been present.

23   Furthermore, Decedent's deposition testimony establishes that even if such products were

24   present, his "exposure" was far too remote—in length, frequency, proximity and

25   intensity—to establish causation.   There is no triable issue of material fact and Union

26   Carbide is entitled to judgment as a matter of law.

27

28

- 8 -

Neither Decedent's declaration, filed in state court on the eve of trial after extensive discovery, nor the testimony elicited during his perpetuation deposition should be considered by this Court in its consideration of this motion. This evidence—developed to frustrate Union Carbide's well-taken state court motion—directly conflicts with Decedent's original deposition testimony. As such, this evidence should be disregarded and Union Carbide's motion for summary judgment should be granted.

> **A.** **Decedent's original deposition testimony and discovery responses provide no evidence that Decedent was exposed to any product containing Union Carbide asbestos fibers.**

Plaintiffs allege that Decedent worked with or around asbestos-containing drilling mud additives while employed at Cudd Pressure Control, Inc. (1981-82) and Baker Hughes Oilfield (1982-86). (Compl. Ex. A at 12-13.) Decedent's deposition testimony, however, exposed the flaw in Plaintiffs' case—Decedent could not identify a single product containing Union Carbide asbestos fibers to which he was exposed.[4]

While working for Cudd, Decedent observed a tanker marked "drilling fluid," deliver some form of *liquid* to an oilfield where he was working. (Lyman Dep.

---

[4]    Plaintiffs also alleged in their Complaint that Decedent was exposed to asbestos fibers contained in "Bakelite" manufactured by Union Carbide. But Plaintiffs' failure to identify Union Carbide bakelite as a possible source of asbestos exposure in their responses to Union Carbide's special interrogatories suggests that it has been abandoned. (*See* Pls.' Resp. Def.'s Spec. Interrogs., Set 1 at 2-3 (App. 8).) Even if Plaintiffs intend to resurrect this claim, it has no merit. There is no credible evidence that Decedent was ever exposed to any bakelite product containing Union Carbide asbestos fibers.

During his original deposition, Decedent testified that he believed he saw a product called bakelite "maybe back in the '70s," and that it was "probably [at] Baker [Hughes,]" where Decedent worked from 1982-1986. (Lyman Dep. vol. VI 542:14-21 (App. 9).)  However, he "ha[d] no specific memory" of what kind of product bakelite was. (App. 9 at 542:2-3.)  Further, Decedent could not remember what, if anything, he did with bakelite or whether it contained asbestos. (App. 9 at 544:13-23.)

While "Bakelite" was at one time a registered trade name of Union Carbide, the term had become genericized well before Decedent was even born. (Moalli Aff. ¶ 6 (App. 10).)  "Bakelite" is now used to describe all kinds of plastic products in the same way that Kleenex® is used to refer to all tissue products. (Martino Decl. ¶ 9 (App. 11).)  Until approximately 1974, some of the products marketed by Union Carbide as "Bakelite" contained asbestos fibers as filler. (App. 11 ¶ 6.)  However, many of these compounds used alternative fillers, such as wood flour, cotton flock, mica, coal, or talc. (App. 11 ¶ 6.)  Therefore, Decedent's vague recollections of this "bakelite" is wholly inadequate to create a reasonable inference of exposure to Union Carbide asbestos fibers.

- 9 -

vol. IV 428:1-429:19 (App. 13).)   However, Decedent did not know whether "drilling fluid" in this context was the same as "drilling mud."   (*Id.* at 429:16-19.)   Nor could Decedent state whether the "drilling fluid" contained asbestos, from Union Carbide or otherwise.   (*Id.* at 429:16-19.)   Decedent also admitted that he never witnessed the mixing of *dry* drilling mud additives.   (*Id.* at 432:9-11, 432:17-433:3.)   This admission itself is fatal, since *all* of Union Carbide's drilling mud additives were packaged in dry form. (App. 3 ¶ 7, 8.)   Therefore, Decedent cannot demonstrate exposure to Union Carbide asbestos fibers contained in drilling mud additives while working for Cudd.

Similarly, Decedent cannot demonstrate exposure to Union Carbide asbestos during his tenure with Baker Hughes.   Decedent did witness dry ingredients being mixed with liquid drilling mud in a revolving tanker truck.   (Lyman Dep. vol. V 470:11-23 (App. 14).)   But he always observed this from a distance of at least 40 to 50 feet.   (*Id.* at 471:2-3.)   Decedent readily admitted that this vantage "was too far away to really see" the brand names, manufacturers, or suppliers of any of those materials.   (*Id.* at 471:7-10.)   As a result, Decedent never testified that he inhaled any dust from this mixing process.   Moreover, Decedent could not say whether any of these materials contained asbestos.   (*Id.* at 493:11-14.)

Furthermore, with only one exception, Decedent was unable to specifically identify the name of a single drilling mud product containing Union Carbide asbestos fiber, despite being asked about each one by name.   (App. 10 at 527:4-530:1.)   Indeed, Decedent was specifically asked about both Univis and Super Visbestos, the drilling mud additives that Decedent later claimed to "most clearly recall" in his sham declaration. (App. 5 ¶ 4.)   The one exception was Decedent's "vague" recollection of seeing the name "Shurlift" on "four or five" containers being stored on Baker Hughes property.   (App. 10

1   at 527:21-528:15.)   But he did not personally handle any of the material in these

2   containers, nor was he around anyone who did.   (*Id.* at 528:20-25.)

3          Even if this were enough to create a fact issue regarding exposure to

4   Shurlift (and it is not), there is no evidence that the Shurlift that Decedent vaguely recalled

5   seeing contained asbestos supplied by Union Carbide.   "Shurlift" was a product

6   distributed by IMCO Services, which supplied drilling mud additives to drilling mud

7   contractors.   (Floyd Dep. 53:16-54:8, 153:8-25 (App. 15).)   Union Carbide, however, was

8   only one fiber supplier to IMCO, which sold asbestos-containing drilling mud additives

9   manufactured by various suppliers but packaged under its own private label .   (*See* Walsh

10  Dep. 66:23-67:7 (App. 16).)   For example, a company called Drilling Specialties supplied

11  IMCO with its asbestos-containing mud additive "Flosal," which IMCO then packaged as

12  its own product, also under the trade name Shurlift.   (App. 15 at 153:2-25.)   Therefore,

13  Plaintiffs cannot establish that the Shurlift that Decedent remembered actually contained

14  Union Carbide asbestos, as opposed to asbestos supplied by Drilling Specialties.

15

16          To sum up, even after extensive pretrial discovery in state court, Decedent

17  could adduce no "evidence or inferences that would allow a reasonable mind" to find that

18  he was exposed to Union Carbide asbestos fibers.   *Schoonejongen*, 143 F.3d at 130.

19  Decedent could not testify to working with a single Union Carbide asbestos product.   He

20  did not personally work with drilling mud additives containing Union Carbide asbestos

21  fibers, and he was never in close proximity to others working with them.   While Decedent

22  recognized the name "Montello," he could not say where he had seen the logo, or whether

23  he had ever been exposed to any material packaged by Montello.   (App. 10 at 529:10-

24  530:4.)   Therefore, there is no issue of material of fact regarding Decedent's exposure to

25

26

27

28

- 11 -

1    Union Carbide asbestos fibers and Union Carbide is entitled to judgment as a matter of

2    law.

3            **B.      Decedent's declaration and perpetuation deposition testimony should**

4                    **be disregarded because they create no genuine issue of material fact.**

5                    **1.      Decedent's declaration creates no genuine issue of fact**
                            **under the rule declared by the California Supreme**

6                            **Court in *D'Amico v. Board of Medical Examiners*.**

7                    Despite   seven   days   of   deposition   testimony   and   comprehensive

8    interrogatories designed to elicit all the evidence Plaintiffs had to support their contention

9    of liability against Union Carbide, Decedent failed to provide any evidence of exposure to

10   a single product containing Union Carbide asbestos.   When Union Carbide moved for

11   summary judgment on this basis, however, Decedent submitted a declaration conjuring up

12   the consummate exposure evidence.

13

14                   Under  California  law,  Decedent's  subsequent  declaration  should  be

15   disregarded.   It is black-letter law in California that: "[a]fter-the-fact attempts to reverse

16   prior admissions are impermissible because a party cannot rely on contradictions in his

17   own testimony to create a triable issue of fact."   *Thompson v. Williams*, 259 Cal. Rptr.

18   518, 523 (Cal. Ct. App. 1989).   This principle is firmly rooted in the summary judgment

19   jurisprudence of California.   Decades ago, the California Supreme Court held in *D'Amico*

20   *v. Board of Medical Examiners* that a party cannot create a triable issue of material fact

21

22   simply by submitting a self-serving declaration that contradicts his or her prior sworn

23   deposition testimony.   520 P.2d 10, 25-26 (Cal. 1974).   As California courts have

24   reasoned, "When a defendant can establish his defense with the plaintiff's admissions . . .

25   the credibility of the admissions are valued so highly that controverting affidavits may be

26   disregarded as irrelevant, inadmissible or evasive."   *Leasman v. Beech Aircraft Corp.*, 121

27

28

- 12 -

1   Cal. Rptr. 768, 772 (Cal. Ct. App. 1975).  In the words of the California Supreme Court in

2   *D'Amico,*

> this is especially true when, as in this case, the admission is
> obtained not in the normal course of human activities and
> affairs but in the context of an established pretrial
> procedure whose purpose is to elicit facts.  Accordingly,
> when such an admission becomes relevant to the
> determination, on motion for summary judgment, of
> whether or not there exist triable issues of *fact* (as opposed
> to legal issues) between the parties, it is entitled to and
> should receive a kind of deference not normally accorded
> evidentiary allegations in affidavits.

520 P.2d at 25 (citing Bauman, *California Summary Judgment: A Search for a Standard,*

10 U.C.L.A. L. Rev. 347, 350-51, 357-60 (1963)) (emphasis in original).

Under the rule set forth in *D'Amico,* California courts reject or disregard

the contrary affidavit testimony when considering whether the non-movant has created a

genuine issue of material fact sufficient to preclude summary judgment.  *See D'Amico,*

520 P.2d at 25 (disregarding affidavit of plaintiff which contradicted his prior deposition

testimony); *Daddario v. Snow Valley, Inc.,* 43 Cal. Rptr. 2d 726, 734-35 (Cal. Ct. App.

1995) (affirming trial court decision to disregard plaintiff's declaration contradicting her

previous deposition testimony); *Leasman,* 121 Cal. Rptr. at 772 (declaring "that as a

matter of law the evidentiary facts in the counterdeclaration are irrelevant and evasive"

when they contradicted the plaintiff's previous sworn testimony).  Furthermore, California

courts routinely apply the *D'Amico* rule in asbestos cases.  *See, e.g., Whitmire v.*

*Ingersoll-Rand Co.,* No. 5210211 (Cal. Ct. App. Apr. 22, 2010) (unpub. op.) (affirming

trial court grant of summary judgment to defendant Bechtel, finding that the plaintiff's

affidavit created no triable issue of fact preventing summary judgment) (copy attached,

App. 24).

- 13 -

1

2       **2.     Under the "sham affidavit doctrine," Decedent's
                  declaration creates no genuine issue of fact.**

3           Decedent's subsequent declaration also should be disregarded under the

4    complementary "sham affidavit doctrine," which provides that a party cannot create a

5    genuine issue of fact by simply submitting an affidavit which contradicts his prior

6    deposition testimony. *See, e.g., Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67

7    (9th Cir. 1991) (noting that doctrine applies to "sham testimony that flatly contradicts

8    earlier testimony in an attempt to create an issue of fact and avoid summary judgment").

9    The sham affidavit doctrine is a well-recognized principle of summary judgment practice

10   under Rule 56; indeed, some version of it has been employed in every federal circuit. *See*

11   *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (recognizing "sham

12   affidavit" holdings in every circuit).

13

14          Under this doctrine, federal courts considering summary judgment motions

15   can and do disregard affidavits that contradict prior deposition testimony.  For example,

16   the Ninth Circuit in *Radobenko v. Automated Equipment Corp.* considered conflicting

17   testimony given by the plaintiff: "If there is any issue of fact in the proofs, it exists only

18   because of the inconsistent statements made by Radobenko the deponent and Radobenko

19   the affiant."  520 F.2d 540, 543 (9th Cir. 1975).  Then the court framed the precise issue

20   presented here: "whether contradictory testimony of a plaintiff alone can be used by him

21   to defeat a defendant's summary judgment motion where the only issue of fact results

22   from the necessity of choosing between the plaintiff's two conflicting versions." *Id.* at

23   543-44.  Finding that the purported issues created by Radobenko's affidavit were merely

24   "sham issues," the Ninth Circuit approved of the trial court's determination that there was

25

26   no genuine issue as to any material fact and upheld the summary judgment for the

27   defendant. *Id.* at 544.

28

                                    - 14 -

3.   **Under either *D'Amico* or the sham affidavit doctrine, Decedent's declaration should be disregarded.**

Decedent's declaration should be disregarded, either under the *D'Amico* rule applied in California or the sham affidavit doctrine applied in federal courts around the country.   Decedent originally testified, unequivocally, that he did not know who manufactured the drilling mud additives that he saw while working at Baker Hughes. (App. 14 at 471:7-10.)   Specifically questioned about every asbestos-containing drilling mud additive ever manufactured by Union Carbide, Decedent could not remember being exposed to a single one.   (App. 10 at 527:4-529:9.)   When faced with the potential for summary judgment as to all of his claims, however, Decedent's recollection was magically refreshed as to two products containing Union Carbide asbestos: Univis and Super Visbestos.   (App. 5 ¶ 4.)   Juxtaposed against his clear and unqualified deposition statements, however, Decedent's convenient epiphany rings hollow.

Decedent originally testified that, while working at Baker Hughes, he sometimes witnessed oilfield workers mixing drilling mud in the field:

| | |
|---|---|
| Q. | Okay.  How did that mud come packaged that was mixed in the field? |
| A. | I just know they mixed it.  They had dry ingredients and mixed it with some sort of liquid. |
| Q. | Was this mixed in the mud tank? |
| A. | No.  They mixed it in a truck, the rotating mixers. |
| Q. | Okay. |
| A. | They'd put it all in there and mix it. |
| Q. | Were you actually present when any of the materials were mixed in this mixing truck? |
| A. | I was near it. |
| Q. | How close were you? |
| A. | Maybe 40, 50 feet. |
| Q. | Okay.  Do you know how any of the dry materials came packaged? |
| A. | Usually in bags; 50-pound bags, I guess, 55. |
| Q. | Do you know the brand name, manufacturer, or supplier of any of those dry materials that came in 55-pound bags? |
| A. | No. *I was too far away to really see that.* |

1   (App. 14 at 470:11-471:10)   Decedent also testified that, although he remembered the

2   name "Montello," he "[did]n't remember what it was." (App. 10 at 529:10-14.)   He did

3   not associate Montello with asbestos or drilling mud. (*Id.* at 529:20-22.)   Nor could he

4   remember on what kind of containers he saw Montello's logo, what kind of material was

5   in these containers, or even precisely when he saw the logo. (*Id.* at 529:15-22.)   Decedent

6   could provide no testimony that he ever personally handed any Montello product or

7   worked around anybody who did. (*Id.* at 529:23-530:4.)

8

9          This testimony flatly contradicts Decedent's declaration, where he asserted:

10             At the time of my deposition I could not recall which
               products I had seen the Montello logo on *but did recall that*
11             *it was on paper sacks*. . . . The drilling mud products I most
               clearly recall . . . is asbestos containing *Super Visbestos* and
12             *Univis* throughout the years I worked in the oil fields. *The*
               *sacks were filled with a dry powdery substance,* [sic] that
13             they mixed with fluids. *I worked in close proximity to*
               *workers who opened these sacks* [sic] emptied the contents
14             and threw the empty sacks aside. *This process created*
               *large amounts of visible dust which I breathed and landed*
15             *on my clothes.*
16

17   (App. 5 ¶¶ 4, 5 (emphasis added).)   These critical details were either conspicuously absent

18   from, or directly contradicted by, Decedent's prior sworn testimony.   Moreover, these

19   details are fundamentally irreconcilable with the prior testimony given the specific detail

20   with which he recalled the mixing process.   Decedent's assertion that his "memory [was]

21   refreshed by photographs" (*Id.* ¶ 4) is simply not a credible explanation for these glaring

22
     contradictions.
23

24          In sum, just like in *Radobenko*, the Court is presented with inconsistent

25   statements made by Robert F. Lyman the Deponent and Robert F. Lyman the Declarant.

26   *See* 520 F.2d at 543.   *Accord D'Amico*, 520 P.2d at 25.   Because these contradictions do

27   not create genuine issues of fact, they should be ignored. *See Radobenko*, 520 F.2d at

28

1    543; *D'Amico*, 520 P.2d at 25.  Properly viewed, Decedent's declaration is nothing more

2    than a "sham affidavit" and it should be disregarded by this Court.

3           Even if the Court considers the substance of the declaration, however, it

4    does not create a fact issue as to causation under *Rutherford*, 941 P.2d at 1218.  *See also*

5
     *Lineaweaver v. Plant Insulation Co.*, 37 Cal. Rptr. 2d 902, 906-07 (Cal. Ct. App. 1995)
6
7    (discussing requirements of frequency of exposure, regularity of exposure, and proximity

8    of the asbestos product to plaintiff).  Because the declaration does not describe in detail

9    facts sufficient to meet the *Rutherford* or *Lineaweaver* standards, it creates no triable issue

10   of fact here.

11                    **4.      Decedent's subsequent deposition testimony should be
12                              ignored under a corollary rule.**

13          This case presents a unique twist on the traditional sham affidavit scenario.

14   After being apprised of the holes in his original deposition, Decedent was given an

15   additional opportunity to patch them in the form of his perpetuation deposition—a second

16   bite at the apple.  The simple fact that Decedent compounded the contradictions contained

17   in his declaration by repeating them in a subsequent deposition changes nothing—there is

18
     no genuine issue of material fact.
19
20          The Seventh Circuit has explicitly recognized that a trial judge should not

21   hesitate to disregard a party's deposition testimony when it is inherently inconsistent with

22   her prior sworn statements.  *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d

23   1162, 1171 (7th Cir. 1996).  This is especially true when the contradictory deposition

24   testimony is clearly offered in an attempt to evade summary judgment.  *See id.* at 1173

25
     (Cudahy, J., concurring) ("Whether a later submission is a 'sham' is not entirely a matter
26
27   of how baldly the second statement contradicts the first or how easily the two may be

28   reconciled in light of new evidence. . . . [T]he concern is with 'sham' testimony that flatly

1    contradicts earlier testimony in an attempt to 'create' an issue of fact." (internal quotations

2    and citation omitted)).

3            The rule announced in *Bank of Illinois* has been applied by various trial

4    courts dealing with deposition testimony that contradicted prior sworn testimony.   *See*

5    *Vonckx v. Allstate Ins. Co.*, No. 02-C-8474, 2004 WL 1427105, at *18 (N.D. Ill. June 23,

6

7    2004) ("[T]he Court disregards Plaintiff's contradictory deposition and affidavit testimony

8    to the extent it contradicts unambiguous prior sworn testimony before the IDES.") (citing

9    *Bank of Illinois*, 75 F.3d at 1169); *Pacific Ins. Co. v. Kent*, 120 F. Supp. 2d 1205, 1213

10   (C.D. Cal. 2000) (finding that subsequent deposition testimony was a sham because it

11   "flatly contradicted" earlier testimony in an attempt to create an issue of fact).   The

12   reasoning of *Bank of Illinois* and the cases following it applies with equal force here.

13

14           In his subsequent deposition, Decedent specifically identified numerous

15   products containing Union Carbide asbestos.  (App. 7 at 42:15-44:2.)  He stated that these

16   sacks were broken open within ten feet of where he was working "dozens" of times.  (*Id.*

17   at 46:7-13.)  Decedent further testified that when these sacks were opened, dust would fill

18   the air and he was forced to inhale it.   (*Id.* at 47:2-3.)  Decedent's explanation for the

19   sudden recollection of this compelling product identification evidence was his reliance on

20   a series of photographs shown to him by his attorneys.  (*See* App. 10 at 42:15-43:19; App.

21   11 at 6-A to 6-O.)  Most of the products depicted in his counsels' photographs were

22   emblazoned  with  the  logo  of  either  Montello  or  Union  Carbide.    (*See id.*)    Not

23

24   surprisingly, Decedent wholly failed to give any reasoned explanation as to how he

25   remembered some but not others, or how seeing the photos refreshed his memory as to his

26   proximity and frequency of exposure.

27

28

1   Decedent's subsequent testimony is not the sort of statement that merely

2   "elaborates upon, explains, or clarifies prior testimony" such that it should be considered

3   to create a fact issue.  *See Kent*, 120 F. Supp. 2d at 1213 (citing *Messick v. Horizon*

4   *Indust., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995)).  Like the testimony in *Bank of Illinois*

5   and the subsequent opinions following it, there is only one reasonable explanation for

6   Decedent's contradictory testimony—it was manufactured to create an issue of fact in

7

8   anticipation of this very motion and should be disregarded.

9      C.   **Plaintiffs have no additional evidence demonstrating that Decedent**
         **was exposed to Union Carbide asbestos fibers.**
10

11         Discovery in this case has stretched over three years.  After two rounds of

12   extensive discovery, there is nothing left for Plaintiffs to say.  Union Carbide has deposed

13   each Plaintiff in turn.  Not one could identify a single product containing Union Carbide

14   asbestos fibers to which Decedent was exposed.  In its latest set of interrogatories, Union

15   Carbide once again requested that Plaintiffs "[i]dentify all bases for your contention that

16   [Union Carbide] is liable to you as alleged."  (App. 9 at 2.)  Plaintiffs' response: During

17   his employment in the oilfield service industry, Decedent "worked within 10-feet of others

18   ripping open 50 lb. bags of Vibestos [*sic*] drilling mud/fluid bearing Union Carbide and

19

20   Montello insignias."  (*Id.*)  This regurgitation of Decedent's self-serving declaration and

21   perpetuation testimony not only fails to create a genuine issue of material fact, it is wholly

22   inadequate to discharge Plaintiffs' duty to provide "complete, explicit, and responsive"

23   answers to written discovery.  *See Milne v. Nat'l Sch. of Health Tech.*, 73 F.R.D. 628, 632

24   (E.D. Pa. 1997) ("Answers must be complete, explicit and responsive. If a party cannot

25   furnish details, he should say so under oath, say why and set forth the efforts he used to

26

27   obtain the information.").

28

1            What Plaintiffs lack is other evidence that would support their claims, such

2    as an additional fact witness.  The problem is that Plaintiffs have none.  After initially

3    identifying David Weatherford, a former co-worker, as a person with relevant knowledge

4    of Decedent's injuries (*see* App. 8 at 10), Plaintiffs have repeatedly refused to disclose his

5    contact information or allow Union Carbide to depose him.  This is impermissible.  A

6    party cannot keep a fact witness hidden from discovery, only to produce him with a

7    flourish in response to a motion for summary judgment.

8

9            In addition, under Rule 26, Plaintiffs were required to provide "the name

10   and, if known, the address and telephone number of each individual likely to have

11   discoverable information—along with the subjects of that information . . . ."  FED. R. CIV.

12   P. 26(a)(1)(A)(i).  Plaintiffs' failure to do so here creates two possible inferences: 1) Mr.

13   Weatherford's whereabouts are unknown, and he can provide no additional evidence

14   regarding Decedent's exposure to Union Carbide asbestos; or 2) Plaintiffs have willfully

15   withheld information that they are obligated to disclose under Rule 26(a).  The rules are

16   clear in prescribing the consequences of such conduct: "If a party fails to provide

17   information or identify a witness as required by Rule 26(a) or 26(e), *the party is not*

18   *allowed to use that information or witness to supply evidence on a motion*, at a hearing, or

19   at a trial, unless the failure was substantially justified or is harmless."  FED. R. CIV. P.

20   37(c)(1) (emphasis supplied).  Either way, whatever information the elusive

21   Mr. Weatherford may have cannot be considered here.

22

23   **II.**   **Even if the Court finds that Decedent's perpetuation testimony was not a sham, it cannot support the survival claims brought by Decedent's estate.**

24           Even if the Court finds that Decedent's testimony offered during his

25   perpetuation deposition creates a genuine issue of fact, that evidence is only admissible in

26

27

28

1    the wrongful death actions brought by his survivors.  Thus, Union Carbide is still entitled

2    to judgment as a matter of law on all claims brought by Decedent's estate.

3            Although Plaintiffs were allowed to take a second deposition of Decedent

4    in order to perpetuate testimony for their pending wrongful death action, the California

5    court specifically ordered that: "The testimony shall not be admissible in any other action

6    as the court has previously denied requests to take additional depositions in the personal

7    injury case."  (App. 6 at 1.)  Moreover, the Federal Rules explicitly provide that

8
9    perpetuation deposition testimony "may be used . . . in any later-filed district-court action

10   involving the same subject matter [only] if the deposition either was taken under these

11   rules or, although not so taken, *would be admissible in evidence in the courts of the state*

12   *where it was taken.*"  FED. R. CIV. P. 27(a)(4) (emphasis supplied).  In other words, a

13   deposition to perpetuate testimony taken in state court is admissible in federal court only

14
15   to the extent that it would be admissible in courts of the state where it is taken.  *See, e.g.,*

16   *Kimberly-Clark Corp. v. Continental Casualty Corp.*, No. 3-05-CV-0475, 2006 WL

17   2468712, at *9 (N.D. Tex. Aug. 25, 2006) (admitting perpetuation deposition only to the

18   extent that it would be admissible in Texas state court).

19           In granting leave for the perpetuation deposition, the California state court

20   judge explicitly limited its admissibility to subsequently-filed wrongful death actions.

21
22   (*See* App. 6.)  Thus, pursuant Rule 27(A)(4), this testimony is subject to the same

23   limitations here—it cannot be relied upon in survival claims brought by his estate.

24   Therefore, the only evidence of exposure admissible to support the estate's survival claims

25   is Decedent's sham declaration.  As set forth above, this declaration is properly

26   disregarded under either *D'Amico* or the federal sham affidavit doctrine.  Thus, even if the

27   Court chooses to consider Decedent's manufactured perpetuation deposition testimony,

28

1  Union Carbide is still entitled to summary judgment on all survival claims brought by the

2  estate and Union Carbide moves for partial summary judgment as to those claims.

3                                              CONCLUSION

4          Plaintiffs have failed to demonstrate any genuine issue of fact regarding

5  Decedent's exposure to Union Carbide asbestos.   Therefore, this Court should grant

6
   summary judgment as to all claims brought by Plaintiffs against Union Carbide.   In the
7
   alternative, if the Court finds an issue of fact created by Decedent's perpetuation
8
9  testimony, Union Carbide is entitled to partial summary judgment as to claims brought by

10 Decedent's estate.

11
                                          Respectfully submitted,
12
                                          BAKER BOTTS L.L.P.
13

14
   Dated: May 3, 2010                     BY: _____
15                                             Andrew J. Yoder

16                                        ATTORNEYS FOR DEFENDANT
                                          UNION CARBIDE CORPORATION
17

18

19

20

21

22

23

24

25

26

27

28

                                          - 22 -

1

**CERTIFICATE OF SERVICE**

2

      I certify that a true and correct copy of the foregoing was served via the Court's CM/ECF system on the following counsel of record, each of whom has consented

3

to electronic service via the CM/ECF system, on the 3rd day of May, 2010:

4

      David R. Donadio
Frank J. Anders

5

Brayton Purcell LLP

6

222 Rush Landing Road
P.O. Box 6169

7

Novato, California 94948-6169

8

      Molly Mrowka

9

Hartman, Blackstock & Moore, PPC
182 Howard Street #414

10

San Francisco, CA  94105

11

      Catherine Morris Krow
Nikka N. Rapkin

12

Orrick, Herrington & Sutcliffe LLP
The Orrick Building

13

405 Howard Street

14

San Francisco, CA  94105

15

16

_____
Andrew J. Yoder

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -