1  ALAN R. BRAYTON, ESQ., CA S.B. #73685
   DAVID R. DONADIO, ESQ., CA S.B. #154436
2  RICHARD M. GRANT, ESQ., CA S.B. #55677
   E-Mail:  rgrant@braytonlaw.com
3  BRAYTON✦PURCELL LLP
   Attorneys at Law
4  222 Rush Landing Road
   P.O. Box 6169
5  Novato, California  94948-6169
   (415) 898-1555
6  (415) 898-1247 (Facsimile)

7  Attorneys for Plaintiffs

8              BEFORE THE JUDICIAL PANEL ON

9              MULTIDISTRICT LITIGATION

10

11  IN RE: ASBESTOS PRODUCTS          )   MDL DOCKET NO. 875
    LIABILITY LITIGATION (NO. VI)     )   2:01-md-00875-ER
12                                    )
                                      )
13  _____    )   _____
                                      )
14  SAMANTHA LYMAN, as Wrongful       )   DECLARATION OF KIMBERLY J. CHU
    Death Heir, and as Successor-in-Interest to )   IN SUPPORT OF PLAINTIFFS'
15  ROBERT LYMAN, Deceased; and       )   OPPOSITION TO DEFENDANTS UNION
    ROBERT LYMAN, JR., LAURA          )   CARBIDE CORPORATION AND
16  LYMAN, LISA CARAWAN, STEPHEN      )   MONTELLO INC.'S JOINT MOTION TO
    LYMAN, MICHAEL LYMAN, and         )   VACATE  CONDITIONAL REMAND
16  KENNETH CHRISTIE, as Legal Heirs of )   ORDER
    ROBERT LYMAN, Deceased,           )
17                                    )   Hon. Eduardo C. Robreno
18              Plaintiffs,           )   E.D. PA No. 2:09-cv-62999-ER
                                      )
19  vs.                               )   This document relates to:
                                      )
20  UNION CARBIDE CORPORATION and     )   *Robert Lyman, Jr., et al. v. Asbestos
    MONTELLO, INC.,                   )   Defendants (B✦P),* United States District
21                                    )   Court, Northern District of California,
                Defendants.           )   Case No. 4:07-cv-04240-SBA
22  _____    )   _____

23       I, Kimberly J. Chu, declare as follows:

24       1.  I am an attorney at law duly licensed to practice before this Court and the Courts of the

25  State of California.  I am an associate with the law firm of Brayton✦Purcell LLP, attorneys of

26  record for plaintiffs herein.  I have been an associate with Brayton✦Purcell LLP for over ten

27  years.  As such, I am fully familiar with the facts of this case, and have personal knowledge of

28  ///

BRAYTON✦PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P.O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

1  the procedures described below, and if called as a witness regarding the matters set forth below, I

2  would so testify.

3      2.  Attached to this declaration as <u>Exhibit A</u> is a true and correct copy of relevant portions

4  of the deposition transcript of Barry Ben-Zion, Ph.D., taken in the this matter on July 18, 2007,

5  when the case was still in San Francisco Superior Court.  Plaintiffs served Dr. Ben-Zion's Rule

6  26 report in this case on September 30, 2010.

7      3.  Attached to this declaration as <u>Exhibit B</u> is a true and correct copy of relevant portions

8  of the deposition transcript of William Salyer, M.D., taken in the this matter on July 24, 2007,

9  when the case was still in Superior Court.  Plaintiffs served Dr. Salyer's Rule 26 Report in this

10  case on September 30, 2010, and his supplemental report on February 9, 2012.

11      4.  Attached to this declaration as <u>Exhibit C</u> is a true and correct copy of relevant portions

12  of the deposition transcript of Charles Ay, taken in the this matter on July 24, 2007, when the

13  case was still in San Francisco Superior Court.  Plaintiffs served Mr. Ay's Rule 26 Report in this

14  case on September 30, 2010, and his supplemental report on February 9, 2012.

15      5.  Attached to this declaration as <u>Exhibit D</u> is a true and correct copy of relevant portions

16  of the deposition transcript of Richard Cohen, M.D., taken in the this matter on July 25, 2007,

17  when the case was still in San Francisco Superior Court.  Plaintiffs served Dr. Richard Cohen's

18  Rule 26 report in this case on September 30, 2010, and his supplemental report on February 9,

19  2012.  Attached collectively to this declaration as <u>Exhibit E</u> are true and correct copies of both of

20  Dr. Cohen's reports in this case.

21      6.  Attached to this declaration as <u>Exhibit F</u> is a true and correct copy of relevant portions

22  of the deposition transcript of Arnold Brody, Ph.D., taken in the this matter on July 27, 2007,

23  when the case was still in San Francisco Superior Court.  Plaintiffs served Dr. Brody's Rule 26

24  report in this case on September 30, 2010.

25      7.  Attached to this declaration as <u>Exhibit G</u> is a true and correct copy of relevant portions

26  of the deposition transcript of Daniel Raybin, M.D., taken in the this matter on July 27, 2007,

27  when the case was still in San Francisco Superior Court.  Plaintiffs served Dr. Raybin's Rule 26

28  report in this case on September 30, 2010.

DECLARATION OF KIMBERLY J. CHU IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS
UNION CARBIDE CORPORATION AND MONTELLO INC.'S JOINT MOTION TO VACATE
CONDITIONAL REMAND ORDER, CASE NO. 2:09-cv-62999

1     8.  Attached to this declaration as <u>Exhibit H</u> is a true and correct copy of relevant portions

2  of the deposition transcript of Samuel P. Hammar, M.D., taken in the this matter on August 9,

3  2007, when the case was still in San Francisco Superior Court.  Plaintiffs served Dr. Hammar's

4  Rule 26 report in this case on September 30, 2010.

5     9.  Attached to this declaration as <u>Exhibit I</u> is a true and correct copy of Judge Rueter's

6  September 23, 2010, Order.

7     10.  Attached to this declaration as <u>Exhibit J</u> is a true and correct copy of Judge Rueter's

8  January 19, 2011, Order.

9     11.  Attached to this declaration as <u>Exhibit K</u> is a true and correct copy of the February 9,

10  2011, letter from Kimberly J. Chu to Drew Yoder.

11     I declare under penalty of perjury under the laws of the United States of America and the

12  State of California that the foregoing is true and correct.

13     Executed on August 1, 2012, at Novato, California.

14

15               /s/ Kimberly J. Chu
                      Kimberly J. Chu, Esq., CA S.B. #206817

16               kchu@braytonlaw.com
                      Tel: (415) 898-1555

17               Fax: (415) 898-1247
                      Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KIMBERLY J. CHU IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS
UNION CARBIDE CORPORATION AND MONTELLO INC.'S JOINT MOTION TO VACATE
CONDITIONAL REMAND ORDER, CASE NO. 2:09-cv-62999

**EXHIBIT A**

BEN-ZION, PH. D., BARRY.                     July 18, 2007

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

---oOo---

ROBERT F. LYMAN,                )
                                )
          Plaintiff,            )
                                )
     -vs-                       )   No. 459162
                                )
ASBESTOS DEFENDANTS, (BP),      )
                                )
          Defendants.           )
_____     )

DEPOSITION OF BARRY BEN-ZION, Ph.D.

WEDNESDAY, JULY 18, 2007

(Pages 1 through 20)

Reported by:

EMILY HUSARY

CSR NO. 12148

BEN-ZION, PH. D., BARRY                                          July 18, 2007

---

Page 2

```
 1              I N D E X
 2
 3  Witness:
 4     BARRY BEN-ZION, Ph.D.
 5
 6  Examination by:                    Page
 7     MR. THE                          4
 8
 9          ---oOo---
10
11        INDEX OF EXHIBITS
12
13  Defendant's Exhibits:
14     1  Five-page "Robert F. Lyman Economic Loss
15        Personal Injury"              5
16     2  Five-page "Summary of Financial Loss
17        Robert F. Lyman"              6
18     3  Four-page "Information Needed for
19        Economic Evaluation Normal Retirement
20        Before Illness"               6
21     4  One-page e-mail from Amy Claypole dated
22        July 13, 2007                 6
23          ---oOo---
24
25
```

Page 3

```
 1       BE IT REMEMBERED that, pursuant to Notice of
 2  Taking Deposition, and on WEDNESDAY, JULY 18, 2007,
 3  commencing at the hour of 11:02 a.m. thereof, at
 4  CalNorth Reporting Service, 3510 Unocal Place, Suite
 5  111, Santa Rosa, California 95403, before me, EMILY
 6  HUSARY, CSR No. 12148, a Certified Shorthand Reporter in
 7  and for the State of California, there personally
 8  appeared
 9            BARRY BEN-ZION, Ph.D.,
10  called as a witness by the Defendants herein; who,
11  having been first duly sworn, was thereupon examined and
12  testified as is hereinafter set forth.
13          ---oOo---
14       Brayton, Purcell, 222 Rush Landing Road, Novato,
15  California 94948, represented by OREN P. NOAH, Esquire,
16  appeared as Counsel on behalf of the Plaintiff; and
17       Brydon, Hugo & Parker, 135 Main Street, Twentieth
18  Floor, San Francisco, California 94105, represented by
19  ROLAND THE, Esquire, appeared telephonically as Counsel
20  on behalf of the Defendant, Union Carbide Corp.; and
21       Dillingham & Murphy, LLP, 225 Bush Street, Sixth
22  Floor, San Francisco, California 94104, represented by
23  MOLLY MROWKA, Esquire, appeared telephonically as
24  Counsel on behalf of the Defendant, Montello Inc.
25          ---oOo---
```

Page 4

```
 1  WEDNESDAY, JULY 18, 2007               11:02 a.m.
 2           ---oOo---
 3       (Reporter's Disclosure:  I am an independent
 4  Certified Shorthand Reporter representing CalNorth
 5  Reporting Service.  Neither CalNorth Reporting Service
 6  nor I have an ongoing contractual relationship with any
 7  party or legal representative to this action.  I am an
 8  impartial and unbiased reporter.  This is being
 9  disclosed with reference to the California Certified
10  Shorthand Reporters' and the National Court Reporters
11  Association's Code of Professional Conduct and CalNorth
12  Reporting Service's interpretation of Business and
13  Professions Code §8025(c).)
14           ---oOo---
15        EXAMINATION BY MR. THE
16       MR. THE:  Q.  Doctor, you've been deposed many
17  times before.  Is it okay if I dismiss with the usual
18  admonition?
19       A.  I think that that will be appropriate.
20       Q.  Thank you.  Doctor, I have a copy of your
21  report and the report that I have is dated March 19th,
22  2007.  It this the report that is your most recent
23  report in this case?
24       A.  It's the most recent and the only.
25       Q.  Okay.  Thank you.  And just to make sure I
```

Page 5

```
 1  have the entire report, excluding the proof of service,
 2  is yours three pages long with a letter to the Brayton
 3  office constituting a fourth page with the fifth page
 4  being entitled "Robert F. Lyman, Economic Loss Personal
 5  Injury"?
 6       A.  Correct.
 7       MR. THE:  If we can go ahead, to the Court
 8  Reporter, and attach a copy of this as Defense Exhibit
 9  1.
10       (Five pages were marked Defendant's
11       Exhibit 1 for identification.)
12       MR. THE:  Q.  And, Doctor, I think we've
13  touched on this already, but just to be clear, other
14  than this one report that we've talked about, you
15  haven't prepared any other type of notes or reports in
16  this case?
17       A.  Well, that's not quite correct.  If you mean
18  by -- depending on what you mean by "notes."  I have in
19  my file several pages of computer-generated calculations
20  that I have prepared prior to the preparation of the
21  report that are in my file.  Also in the file I have
22  information that I received from the Brayton office
23  consisting of a form of information, as well as letters
24  from Social Security, a letter -- a document of a
25  deposit from Kroger, K-r-o-g-e-r, in Cincinnati.  So I
```

BEN-ZION, PH. D., BARRY                    July 18, 2007

**Page 18**

1     Q. Okay. What do you currently charge for
2 deposition, Doctor?
3     A. Six hundred.
4     Q. Okay. Doctor, what is your minimum deposition
5 fee?
6     A. Six hundred.
7     Q. Thank you, Doctor. I'll be sending the check.
8 Thank you.
9     Are there any other questions from other
10 counsel?
11     MS. MROWKA: No, thank you.
12     THE WITNESS: Before you hang up, Molly, do
13 you need a copy of this transcript?
14     MS. MROWKA: Yes, please.
15     THE WITNESS: Mr. The, how does your firm take
16 the depo transcript? Do they take it condensed? How do
17 you take it?
18     MR. THE: Let me take it condensed and
19 electronic would be good.
20     (The deposition concluded at 11:30 a.m.)
21     ---oOo---
22
23
24
25

**Page 20**

2     DECLARATION OF WITNESS
3     I, BARRY BEN-ZION, Ph.D., hereby declare that I
4 have read the foregoing testimony recorded on pages 4 to
5 18, inclusive, and the same is a true and correct
6 transcription of my testimony, except as I have
7 indicated on the errata sheet attached hereto.
8
9
10 _____
11          WITNESS
12
13 1. ( ) The Deponent failed to appear to read, correct,
14 or   sign his or her deposition.
15 2. ( ) The Deponent refused to read, review, or sign his
16     or her deposition for the following reason:
17 _____
18
19 3. ( ) The Deponent approved his or her deposition by
20
21     letter (with) or (without) corrections attached
22     hereto and made a part of this deposition herein.
23
24
25

**Page 19**

1     REPORTER'S CERTIFICATE
2 STATE OF CALIFORNIA   )
            )
3 COUNTY OF SONOMA    )
4     I, EMILY HUSARY, Certified Shorthand Reporter
5 No. 12148 for the State of California, certify:
6     That BARRY BEN-ZION, Ph.D., the witness in the
7 foregoing deposition, was by me first duly sworn to
8 testify to the truth in said cause;
9     That said deposition was reported at the time
10 and place therein stated by me and was thereafter
11 transcribed by me on computer, after which the witness
12 was afforded the opportunity to read, correct, and sign
13 the deposition;
14     That if unsigned, the witness shall not have
15 availed himself of the opportunity to sign, or signature
16 has been waived.
17     I further certify that I am not interested in
18 the outcome of said action, nor connected with nor
19 related to any of the parties in said action, nor to
20 their respective counsel.
21     IN WITNESS WHEREOF, I have hereunto set my hand
22 this 19th day of July, 2007.
23
24 _____
25     Emily Husary, CSR No. 12148

**Page 21**

1     DEPONENT'S CHANGES OR CORRECTIONS
2 Note: If you are adding to your testimony, print the exact
    words you want to add. If you are deleting from your
3 testimony, print the exact words you want to delete.
    Specify with "Add" or "Delete," and sign this form.
4
    DEPOSITION OF:         BARRY BEN-ZION, Ph.D.
5 NAME OF CASE:         LYMAN vs ASBESTOS
    DATE OF DEPOSITION:     JULY 18, 2007
6
    I, BARRY BEN-ZION, Ph.D., have the following corrections to
7 make to my deposition:
8 PAGE   LINE     CHANGE-ADD-DELETE
9 ___ ___   _____
10 ___ ___   _____
11 ___ ___   _____
12 ___ ___   _____
13 ___ ___   _____
14 ___ ___   _____
15 ___ ___   _____
16 ___ ___   _____
17 ___ ___   _____
18 ___ ___   _____
19 ___ ___   _____
20 ___ ___   _____
21 ___ ___   _____
22 ___ ___   _____
23 ___ ___   _____
24 ___ ___   _____
25 SIGNATURE _____ DATE _____

**EXHIBIT B**

Scanned Copy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

---oOo---

ROBERT F. LYMAN,

    Plaintiff,

vs.                    No. 459162

ASBESTOS DEFENDANTS (BP),

    Defendants.

_____/

TELEPHONIC DEPOSITION OF WILLIAM SALYER, M.D.

Taken before ERIN F. FERREYRA

CSR No. 12199

July 24, 2007

Page 2

```
1              I N D E X
2                          PAGE
3    EXAMINATION BY MR. BUDDELL          5
4
5
6
7
8
9
10
11           E X H I B I T S
12   DEFENDANTS'              PAGE
13   1    Transmittal letter dated 2-13-07    25
14   2    Notes dated 2-17-07           25
15   3    Second transmittal letter      25
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       JACK HENNING, Dillingham & Murphy, 225 Bush
2    Street, 6th Floor, San Francisco, California 94104, was
3    present telephonically on behalf of the Defendant
4    Montello, Inc.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1       DEPOSITION OF WILLIAM SALYER, M.D.
2
3       BE IT REMEMBERED, that pursuant to Notice, and on
4    the 24th day of July 2007, commencing at the hour of
5    10:12 a.m., in the offices of Aiken & Welch, One Kaiser
6    Plaza, Suite 505, Oakland, California, before me, ERIN
7    F. FERREYRA, a Certified Shorthand Reporter, WILLIAM
8    SALYER, M.D., was present telephonically, produced as a
9    witness in said action, and being by me first duly
10   sworn, was thereupon examined as a witness in said
11   cause.
12
13           ---oOo---
14
15       EDWARD SMITH, Brayton Purcell, 222 Rush Landing
16   Road, Novato, California 94948, was present
17   telephonically on behalf of the Plaintiff.
18
19       BRIAN BUDDELL, Brydon, Hugo & Parker, 135 Main
20   Street, 20th Floor, San Francisco, California 94105,
21   was present telephonically on behalf of the Defendant
22   Union Carbide.
23
24
25
```

Page 5

```
1          WILLIAM SALYER, M.D.,
2            sworn as a witness,
3             testified as follows:
4    EXAMINATION BY MR. BUDDELL:
5       Q. Good morning, Dr. Salyer. This is Brian
6    Buddell at the Brydon Hugo law firm. We're here to
7    take your deposition in the Robert Lyman case in which
8    you've been designated as an expert; is that correct?
9       A. Yes.
10      Q. Before we begin, I'm not even sure if there's
11   other counsel here on this case, but assuming if there
12   is and anybody joins in later, I'd ask plaintiff's
13   counsel if he'll stipulate that an objection by one is
14   an objection by all as well as a motion to strike for
15   all present and on the phone.
16      MR. SMITH: Yes, if they identify themselves.
17   BY MR. BUDDELL:
18      Q. Dr. Salyer, what was the date you were first
19   retained by the Brayton office in connection with the
20   Lyman matter?
21      A. On approximately February 13th, 2007.
22      Q. How were you contacted?
23      A. I received a package that contained pathology
24   materials and limited medical records along with a
25   transmittal letter addressed to me from the Brayton law
```

## Page 22

1    in one or more of those bodies. Is that clear?
2        Q. Sure. Do you expect to offer any opinions with
3    respect to Mr. Lyman's prognosis?
4        A. No.
5        Q. Were you made aware of any other medical
6    conditions suffered by Mr. Lyman?
7        A. No.
8        Q. If I were to represent to you that he suffered
9    from peripheral vascular disease, would that have any
10   impact on your opinions?
11       A. No.
12       Q. How about coronary artery disease?
13       A. No.
14       Q. How about a history of hypertension?
15       A. No.
16       Q. Have you had any discussions with the Brayton
17   office concerning your review of the materials or your
18   opinions at any point prior to today's deposition?
19       A. Sorry. The answer is no.
20       Q. I believe I know the answer to this question,
21   but you've never seen Dr. Breyer's report, have you, in
22   this case?
23       A. Correct. No, I have not.
24       Q. Nor have you seen Dr. Sheibani's report,
25   correct?

## Page 23

1        A. That is correct.
2        Q. Now, I'll represent to you, Doctor, that
3    Dr. Sheibani has opined that the presence of emphysema
4    suggests that the focal peribronchiolar fibrosis was
5    probably caused by cigarette smoking and not asbestos.
6           Would that be an opinion with which you would
7    disagree?
8        A. My opinion with regard to that is I have in
9    part already said that I think that it's likely that
10   the emphysema was due to smoking since both asbestos --
11   since either asbestos or cigarette smoke or the
12   combination of the two can cause peribronchiolar
13   fibrosis, which has an identical appearance regardless
14   of the cause. I have no idea which, or perhaps both,
15   is the cause.
16       Q. And the presence of that fibrosis as we've
17   covered would be part of the Cap NIOSH standards to
18   diagnose asbestosis, correct?
19       A. That's correct.
20       Q. Would a determination of the cause of that
21   fibrosis be necessary for satisfaction of the Cap NIOSH
22   standards?
23       A. I think it's reasonable to state from the
24   conceptual standpoint if one knew with certainty that
25   the peribronchiolar fibrosis were caused by asbestos,

## Page 24

1    then the matter would be closed. And similarly, if one
2    knew that it were -- that if it were caused by smoking,
3    then I don't think it would be reasonable to use the
4    peribronchiolar fibrosis as evidence of asbestosis.
5        Q. And as you've testified in Mr. Lyman's case,
6    there's no way to determine with any degree of
7    probability one way or the other the cause of that
8    fibrosis, given the smoking history, correct?
9        A. That is my opinion.
10          MR. BUDDELL: Great. That's all the questions
11   I have for you, Doctor. Thank you very much.
12          MR. HENNING: This is Jack. I don't have any
13   questions. My only issue is I don't think we marked as
14   an exhibit the second cover letter from the Brayton
15   office, but I could be wrong.
16          MR. BUDDELL: You're right. Why don't we go
17   ahead and do that. My understanding is for exhibits
18   we've got the initial cover letter, both reports and
19   then the second cover letter.
20          Does that sound right, Doctor?
21          THE WITNESS: Yes, it does.
22          MR. BUDDELL: All right. Then we'll go ahead
23   and mark that last cover letter as the last in order.
24          And that would represent your complete file in
25   this case, correct, Doctor?

## Page 25

1        THE WITNESS: That is correct.
2        MR. BUDDELL: All right. That's all I have for
3    you. And I've forgotten what your hourly rate is.
4        THE WITNESS: 450.
5        MR. BUDDELL: So I owe you 450.
6        THE WITNESS: That's correct.
7        MR. BUDDELL: And I've got all your
8    information. And if not, I know how to track you down.
9        THE WITNESS: Okay. No problem.
10       MR. BUDDELL: Thank you very much, Doctor.
11   (Defendants' Exhibit Nos. 1, 2 and 3 marked for
12   Identification.)
13   (Whereupon, the deposition was concluded at
14   10:50 a.m.)
15
16
_____
SIGNATURE OF WITNESS
17
18
19
20
21
22
23
24
25

Scanned Copy

# Deposition of

# AY, CHARLES

## ROBERT F. LYMAN v. ASBESTOS DEFENDANTS

*Taken On*
*July 24, 2007*

Transcript provided by:

**HUTCHINGS**SM
COURT REPORTERS, LLC
CSR 849

GLOBAL LEGAL SERVICES

**800.697.3210**

# EXHIBIT C

CERTIFIED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | | |
|---|---|---|
| ROBERT F.LYMAN and<br>SAMANTHA LYMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 459162 |
| | ) | |
| ASBESTOS DEFENDANTS, | ) | |
| | ) | |
| Defendants. | ) | |

DEPOSITION OF CHARLES AY, a witness herein,

noticed by BRYDON HUGO & PARKER, taken at

400 North Tustin Avenue, Suite 301, Santa Ana,

California, at 2:26 p.m., on Tuesday, July 24,

2007, before Julie Heyward, CSR 7907.

Hutchings Number 165671-SA

ROBERT F. LYMAN vs. ASBESTOS DEFENDANTS     July 24, 2007                    AY, CHARLES

---

Page 2

```
 1   APPEARANCES OF COUNSEL:
 2
 3   For Plaintiff:
 4   BRAYTON PURCELL
 5   BY JENELLE MOULYN (Present Telephonically)
 6   222 Rush Landing Road
 7   Novato, California 94948-6169
 8
 9   For Defendant MONTELLO, INC.:
10   DILLINGHAM & MURPHY
11   BY JACK HENNING (Present Telephonically)
12   225 Bush Street, Sixth Floor
13   San Francisco, California 94104
14
15   For Defendant UNION CARBIDE CORPORATION:
16   BAKER BOTTS
17   BY KEVIN JORDAN (Present Telephonically)
18   One Shell Plaza
19   910 Louisiana
20   Houston, Texas 77002
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL (Continued):
 2
 3   For Defendant INTERNATIONAL TRUCK & ENGINE CORPORATION:
 4   HAIGHT BROWN & BONESTEEL, LLP
 5   BY DAN LaCOUNT (Present Telephonically)
 6   71 Stevenson Street, 20th Floor
 7   San Francisco, California 94105-2981
 8
 9
10
11                I N D E X
12   WITNESS: CHARLES AY
13   EXAMINATION BY:            PAGE
14   MR. JORDAN                4, 50
15   MR. LACOUNT               48
16
17
18
19              E X H I B I T S
20   Exhibit identification within the transcript is flagged
     with "[EXH]" as an identifier.
21
22   DEFENSE DESCRIPTION          IDENTIFIED MARKED
23   1    Exhibit A          9      53
          [EXH-1]
24
25
```

Page 4

```
14:26   1                CHARLES AY,
        2   a witness herein, having been sworn, testifies as
        3   follows:
        4
14:26   5              -EXAMINATION-
        6
        7   BY MR. JORDAN:
        8       Q. Mr. Ay, my name is Kevin Jordan. I'm with
        9   Baker Botts in Houston. I represent Union Carbide in
14:27  10   this lawsuit.
       11       I understand that you've been retained to give
       12   testimony on behalf of the Brayton Purcell law firm; is
       13   that correct?
       14       A. That is correct.
14:27  15       Q. By my count, you've been retained for at least
       16   three cases today alone.
       17       Are there more today?
       18       A. Yes, sir. I have one more this afternoon.
       19       Q. So today you're giving testimony on behalf
14:27  20   of -- being retained by the Brayton Purcell law firm --
       21   So today alone you're giving five different depositions
       22   for plaintiffs represented by the Brayton Purcell law
       23   firm; is that correct?
       24       A. No, I believe it's four. We've had two so far.
14:27  25       Q. Something settled, though; right?
```

Page 5

```
14:27   1       A. We've had two earlier, we have this one here
        2   and we have one more this afternoon.
        3       Q. You were scheduled to give a deposition in
        4   another case, but it settled; correct?
14:27   5       A. That is correct.
        6       Q. That was for the Brayton Purcell law firm also?
        7       A. That is also correct.
        8       Q. How many depositions did you give for the
        9   Brayton Purcell law firm yesterday?
14:28  10       A. None.
       11       Q. How about last week?
       12       A. None.
       13       Q. Week before?
       14       A. Oh, probably four. No, one. One. Cantley.
14:28  15   It took all day, yeah. Cantley. One.
       16       Q. You've estimated in the other depositions that
       17   you have been retained on hundreds of occasions by the
       18   Brayton Purcell law firm as an expert; is that correct?
       19       A. That is correct.
14:28  20       Q. When did they start -- When did those hundreds
       21   of occasions start? When did you start working for
       22   them?
       23       A. Oh, gosh, I think probably 1984.
       24       Q. 1984.
14:28  25       And have you worked for them or done cases for them
```

2 (Pages 2 to 5)

ROBERT F. LYMAN vs. ASBESTOS DEFENDANTS     July 24, 2007                          AY, CHARLES

Page 50

15:28  1  in place.
      2     Q. And in the installation process or the removal
      3  process of the universal joint, is it your opinion that
      4  there would be no asbestos exposure?
15:28  5     A. Well, you wouldn't have the -- I wouldn't
      6  expect the exposure from the joint itself. You're
      7  working in close proximity to asbestos, other materials,
      8  i.e., the exhaust system or the braking system, and on
      9  large rigs where you have open drums you could have some
15:29 10  exposure, but it would not be from the U joint itself.
     11     Q. Would you also say it would not be from the
     12  actual installation and removal of the U joint?
     13     A. I would not expect that, no.
     14     MR. LACOUNT: That's all I have.
15:29 15  Thank you.
     16     THE WITNESS: Thank you very much, sir.
     17     MR. LACOUNT: Thank you.
     18     THE WITNESS: Yes.
     19
15:29 20             -EXAMINATION-
     21
     22  BY MR. JORDAN:
     23     Q. Mr. Ay, this is Kevin Jordan.
     24  I have a few other questions.
15:29 25     A. Before you start, is Jack Henning still

Page 51

15:29  1  available?
      2     MR. HENNING: I am still available.
      3     THE WITNESS: Okay.
      4  Did you have any questions?
15:29  5     MR. HENNING: I do not today.
      6     THE WITNESS: Okay. Very good.
      7  I'm sorry, Kevin.
      8  Go ahead.
      9     MR. JORDAN:
15:29 10     Q. Okay.
     11  The time you were out in exploration fields, did
     12  you ever observe people pumping either diesel oil
     13  number 2 or nitrogen down holes to force the oil out?
     14     A. No, I don't recall that, sir.
15:30 15     Q. Okay.
     16  And the times that you were in the production
     17  areas, production fields, did you see anyone introduce
     18  any chemicals or fluids or anything at the Christmas
     19  tree?
15:30 20     A. I don't recall any of that, sir.
     21     Q. When you were in the production fields
     22  themselves, where the oil was being taken out of the
     23  ground and taken to the pipeline, was there any drilling
     24  activity even going on around you?
15:30 25     A. Well, there was some drill- -- there was some

Page 52

15:30  1  holes that were being drilled, or for whatever reason
      2  redrilling. I don't know what the term would be, but --
      3     Q. Work over, W-O-R-K O-V-E-R, have you heard that
      4  term?
15:31  5     A. Well, I've heard of it, but not associated with
      6  the oil industry so my interpretation of it may be
      7  incorrect.
      8  But they were doing some -- what I would call
      9  redrilling of a hole for one reason or another,
15:31 10  something happened. And so I have been around that, but
     11  I don't recall much about it.
     12     Q. Okay. All right.
     13  Do you know -- Just I need to make sure I
     14  understand what your baseline knowledge is.
15:31 15  Do you know the difference between a drilling rig
     16  and a work over rig?
     17     A. No. Well, I would imagine -- No. I mean,
     18  technically, I don't. I'm assuming the work over rig is
     19  something that may be, you know, on the back of a truck
15:32 20  and they back in and they use the hydraulic lift or the
     21  crane to set the rig upright and they start doing some
     22  drilling in something that's existing, you know, and
     23  then after, I don't know, a day, a week, a month, they
     24  break it down and drive it off opposed to something that
15:32 25  is more permanent. I don't know, sir.

Page 53

15:32  1     Q. That's fine. I appreciate that.
      2  All right.
      3  I appreciate your time, sir.
      4     A. All right.
15:32  5  Thank you.
      6     Q. I'm going to go ahead and go off.
      7     A. Okay.
      8  Before you do that -- Okay.
      9  We'll just call it one hour.
15:32 10  Is that going to be from Brydon Hugo, they'll send
     11  the hour?
     12     MR. JORDAN: That's the easiest way.
     13     THE REPORTER: Does anyone want to order a copy?
     14     MR. HENNING: Yes, please.
     15     (Whereupon the document referred to is marked by
     16  the reporter as Defense Exhibit 1 for identification.)
     17     (The proceedings concluded at 3:32 p.m.)
     18     (Signature line on the following page.)
     19             ***
     20
     21
     22
     23
     24
     25

14 (Pages 50 to 53)

# EXHIBIT D

Scanned Copy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

ROBERT LYMAN and
SAMANTHA LYMAN,

     Plaintiffs,

vs.                                    NO. 459162

CLEAVER-BROOKS, et al.,

     Defendants.
                      /

TELEPHONIC DEPOSITION OF RICHARD COHEN, M.D.

Taken before MICKELE R. ZRONEK

CSR No. 12242

July 25, 2007

Page 2

I N D E X

                      PAGE

EXAMINATION BY MR. OTSTOTT       5, 17

EXAMINATION BY MS. CARGILL       16


      E X H I B I T S

DEFENDANTS'               PAGE

A   Exhibit A Reviewed by Dr. Cohen   5*

*Not Provided to Reporter

Page 3

TELEPHONIC DEPOSITION OF RICHARD COHEN, M.D.

BE IT REMEMBERED, that pursuant to Notice, and on the 25th day of July 2007, commencing at the hour of 6:53 p.m., at 4449 East 14th Street, Long Beach, California, before me, MICKELE R. ZRONEK, a Certified Shorthand Reporter, telephonically appeared RICHARD COHEN, M.D., produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

CHRISTINA FRENCH, Brayton Purcell, 222 Rush Landing Road, Novato, California 94948-6169, appeared via speakerphone on behalf of the Plaintiffs.

GEORGE OTSTOTT, Brydon, Hugo & Parker, 135 Main Street, 20th Floor, San Francisco, California 94105, appeared via speakerphone on behalf of the Defendant Union Carbide.

Page 4

MOLLY MROWKA, Dillingham & Murphy, 225 Bush Street, Sixth Floor, San Francisco, California 94104, appeared via speakerphone on behalf of the Defendant Montello, Inc.

CHRISTIANE CARGILL, Wright, Robinson, Osthimer & Tatum, 44 Montgomery Street, 18th Floor, San Francisco, California 94104, appeared via speakerphone on behalf of the Defendant Freightliner.

Page 5

RICHARD COHEN, M.D.,
sworn as a witness,
testified as follows:

EXAMINATION BY MR. OTSTOTT:

Q. Okay. Doctor, I've taken your deposition many times, as have many people at our firm. Could you -- when were you first contacted in this case, please?

A. Oh, sometime in the last month or two.

Q. And you understand we're here today on the Robert and Samantha Lyman case?

A. Right.

Q. Okay. Do you have a file in this case?

A. Yes.

Q. And what is that?

A. The file consists solely of the Exhibit A, which is a chronological work history for this person, for Robert Lyman, that's about 16 pages long.

Q. Okay. Does that -- is that something that you drafted or that you were provided?

A. The Brayton firm provided it to me.

Q. Okay. Is it -- let's mark that as Exhibit A, please, Mickele -- or Mickele. And can you please arrange to have that sent to the court reporter?

A. Right. I wonder if the Brayton attorney can e-mail it.

Page 14

1  say that it's probable.
2      Q.  Okay.  And can you say with any confidence
3  whether or not -- where -- let me -- let me withdraw
4  that question and phrase it this way.  Do you have an
5  understanding as to the context in which drilling muds
6  are even used?
7      A.  No.
8      Q.  Okay.  Or in which they were or might have been
9  used in the early to mid '80s?
10     A.  No.
11     Q.  Okay.  Okay.  So, if we go to page 12, I'm
12  going to ask you, you know, a similar question there.
13  Are you -- do you have an opinion as to whether or not
14  the plaintiff was occupationally exposed or had an
15  opportunity for such exposure while working for Baker
16  Hughes Oil Field?
17     A.  I -- again, to me, it looks like the same type
18  of activity.  And I can't -- I don't know enough about
19  those activities to really have an opinion as to the
20  likelihood of his breathing asbestos dust.
21     Q.  Right.  And, you know, just -- I figured you
22  would say that.  I'm just -- I have to ask the
23  questions just so we have a continuity as to the
24  questions and answers.
25     A.  That's fine.

Page 15

1      Q.  And let me see, here.  Is there any -- as you
2  look through, if you could, Exhibit A very -- you know,
3  it doesn't even have to be an all-day thing.  But as
4  you look through there, is there any other exposure
5  that you can find in Exhibit A or an opportunity for
6  exposure other than what we've already discussed?
7      A.  Let's see.  I'm just thumbing through this
8  thing.  We talked about him working at the -- while he
9  was -- there was some mention of it there.  We talked
10  about that.  We talked about his work as a
11  longshoreman.  Or at least, I mentioned it.
12     Q.  And that would be primarily -- well, do you
13  have an opinion as to whether or not that would be
14  primarily chrysotile or amphibole exposure?
15     A.  I do not have an opinion about that.
16     Q.  Okay.
17     A.  I think we've covered -- I think we've covered
18  it.  One other thing -- I guess we didn't.  He said he
19  was a production -- he was a foreman on a production
20  line at U.S. Gypsum.  Now, I don't know if they used
21  asbestos at the particular factory he worked at.  I
22  don't know.
23     Q.  Right.
24     A.  But if they did, then I'd say he probably had
25  some exposure.  But if they didn't, then he wouldn't

Page 16

1  have had.  But I just don't know enough detail about
2  that.
3      Q.  Okay.  If I were to ask you to assume that
4  Union Carbide never supplied that particular plant
5  ever, would you have an opinion as to whether or not
6  the plaintiff was occupationally exposed or potentially
7  so to any Union Carbide calidria?
8          MS. FRENCH:  Incomplete hypothetical.
9          THE WITNESS:  Well, I don't have an opinion --
10  BY MR. OTSTOTT:
11     Q.  I'm sorry, it looks like somebody beeped out
12  there.  Could you repeat that?
13     A.  I don't know.
14     Q.  Okay.  Okay.  Just give me half a second, sir.
15  I -- you know, we're about wrapped up here, I think.
16  One second.  Okay.  Does anybody -- I'm going to pass
17  for now if anybody else has any questions.  Molly, do
18  you have anything?
19          MS. MROWKA:  No.  Thank you.
20          MR. OTSTOTT:  Well, Doctor --
21          MS. CARGILL:  I'd like to ask one question.
22          MR. OTSTOTT:  Oh, I'm sorry.
23  EXAMINATION BY MS. CARGILL:
24     Q.  No worries.  This is Christiane Cargill for
25  Freightliner.  Doctor, do you have any opinion on

Page 17

1  whether there was any occupational exposure or an
2  opportunity for exposure when plaintiff was doing any
3  work on Freightliner vehicles?
4      A.  Do you know where that's mentioned in here, in
5  the Exhibit A?
6      Q.  It may not be.  And I don't have the benefit of
7  having Exhibit A in front of me.  So, if it's not, then
8  -- then I assume you won't be offering any factual
9  opinions based about Freightliner vehicle work but --
10     A.  That's a -- here -- I'm sorry, I'm looking
11  through.  I see Freightliner is mentioned when he was a
12  fleet operations manager.  And I -- I don't know if he
13  had exposure to asbestos in relation to Freightliner.
14     Q.  Okay.  Thank you very much.  That's all I have.
15  EXAMINATION BY MR. OTSTOTT:
16     Q.  Okay.  This is George again.  Actually, Doctor,
17  do you have a file on Montello?
18     A.  No.
19     Q.  Okay.  I didn't think so, just checking, there.
20  I think that's about it.  If there's nobody else, here,
21  then I think we're good to go.  Okay.  I guess that's
22  it.  Your testimony is -- your deposition is concluded.
23  And I appreciate your time, as always.
24     A.  Thank you.
25

Page 18

1    (Whereupon, the deposition was concluded at
2    7:11 p.m.)
3
4
5              SIGNATURE OF WITNESS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1    STATE OF CALIFORNIA        )
2                              )
3    COUNTY OF LOS ANGELES      )
4
5        I, MICKELE R. ZRONEK, do hereby certify:
6        That RICHARD COHEN, M.D., in the foregoing
7    deposition named, was by me sworn as a witness in the
8    above-entitled action at the time and place therein
9    specififed;
10       That said deposition was taken before me at
11   said time and place, and was taken down in shorthand by
12   me, a Certified Shorthand Reporter of the State of
13   California, and was thereafter transcribed into
14   typewriting, and that the foregoing transcript
15   constitutes a full, true and correct report of said
16   deposition and of the proceedings that took place;
17       IN WITNESS WHEREOF, I have hereunder subscribed
18   my hand this 26th day of July 2007.
19
20
21
             MICKELE R. ZRONEK, CSR No. 12242
22           State of California
23
24
25

# EXHIBIT E

**Richard Cohen, M.D., M.P.H.**
Occupational Medicine and Industrial Toxicology.
19242 Panorama Drive
Saratoga, California
408 395 9379

February 7, 2011

Nancy Williams
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94949

      Re:    <u>Samantha Lyman, et al. (C 09-cv-62999-ER)</u>
                Revised Rule 26 Report

Dear Ms. Williams:

        In response to your request concerning the matter above-captioned I prepared this revised report according to the instructions received from your office regarding comments made by the court and related requirements of the applicable federal rules.

        You have asked for statements as to: a) my compensation for testimony in this case which will be $500 per hour for trial and deposition testimony and $400 per hour for research and reports; b) a listing of all the cases in which I have testified, either at trial or by deposition in the last 4 years, and I have attached the most updated version of a report maintained in connection with this information; and c) my qualifications, including publications authored within the past 10 years, I have attached a copy of my current curriculum vitae, which contains that information, and I will further address my qualifications below.

        I am a licensed physician and currently a Clinical Professor in the Division of Occupational and Environmental Medicine in the Department of Internal Medicine at the University of California San Francisco School of Medicine.  Additionally, I have a Masters of Public Health degree from the UCLA School of Public Health in Epidemiology and a private practice in Occupational Medicine and Industrial Toxicology.  I am Board-certified by the American Board of Preventive Medicine in General Preventive Medicine and also in Occupational Medicine.

        My private practice focuses on occupational medicine and industrial toxicology, providing consultative services to industrial and other clients regarding occupational medicine and industrial toxicology.  This includes interpretation and application of OSHA Occupational Health Standards; workplace assessment and recommendations regarding existing health hazards; interpretation of industrial hygiene data with assessment of health risk; interpretation of biological monitoring and medical surveillance data with recommendations, where appropriate, for further actions regarding health hazard identification and control; analysis of injury and exposure data; development of programs for management and employee training in medical,

1

Nancy Williams
2/8/2011

safety and industrial hygiene; and research and investigation in industrial toxicology including investigation of illness clusters and scientific literature review.

I have researched and published numerous articles on occupational health and industrial toxicology. This research includes the area of asbestos, what was known about the health hazards of asbestos, and when such information would have been reasonably known.

I have been qualified as an expert and have testified in numerous asbestos cases regarding the above, especially with regard to the issue of when knowledge of the health hazards of asbestos became available. This subject is known as "asbestos historical state of the art". I have reviewed historical scientific and medical literature regarding asbestos disease hazards at the request of defense and plaintiffs attorneys beginning in the early 1980s for the purpose of providing asbestos state of the art testimony at trial in asbestos personal injury and wrongful death cases and other asbestos related litigation. I am qualified and routinely testify as to the medical issues involved in these cases, including but not limited to medical causation, asbestos risks and disease, epidemiology, state of the medical and scientific art concerning asbestos-related diseases at relevant times, the nature and use of asbestos products, and the individual's exposure to asbestos. I am qualified and also often testify as to asbestos products defects, the release of asbestos fibers from asbestos products, disease causing potential of various asbestos products, asbestos health hazards, industry awareness, and state of the art relating to the hazards of asbestos, applicable rules and regulations, and other industrial hygiene related issues.

You have asked for a statement of all of the opinions I will express in this case and the basis for them. In that regard, I am of the opinion as to the medical issues involved in this case, that medical causation was established, in whole, in part or in combination with, the inhalation of asbestos fibers, possibly in combination with or synergistically enhanced by, other toxins. In my view, the knowledge of and risk(s) for the pertinent asbestos-related diseases was demonstrated by the related epidemiologic and exposure related publications concerning such asbestos-related diseases. This information was available to the scientific and medical community, thus also to the public. This information would include the state of the medical and scientific art concerning asbestos-related diseases at relevant times and information regarding the nature and use of asbestos or asbestos-containing materials or products.

My opinions can also be expressed in reference to specific products and/or applications. Such products would include but not be limited to: various insulating products [i.e.: pipe covering, block, cement, refractory, cloth] and other high and low temperature insulation materials. These materials were used in ship building and repair work and also in numerous land-based operations [i.e.: refineries]. These asbestos materials, and others, were often incorporated into ship building and repair products and equipment, or used with products like pumps, turbines, valves [i.e.: insulation, gaskets and packing] and also on other equipment and in other systems. Asbestos friction, electrical, and automotive materials are related to these activities, as with the operation of shipboard cranes or winches, and aircraft. Similarly, my opinions will be expressed as relevant and related to industrial, commercial and residential building and repair materials and supplies; and hundreds of other products used or still in use in situations and applications which previously contained or do now contain or involve asbestos. Such products and/or applications in my opinion presented and/or still present a risk of asbestos exposure to those using such products and/or those being around others who were using or manipulating such products. In my opinion this is specifically true as to the products or

2

Nancy Williams
2/8/2011

applications attributable to each of the defendants in this case whose products or activities are alleged to have caused exposures in this case.

I am of the opinion that there are defects in asbestos or asbestos-containing products, such as those mentioned above, which include, but are not limited to, the presence of asbestos itself or the release of asbestos fibers from such asbestos products. I believe and will testify that these defects relate to the disease potential of the various asbestos products, and their ability to cause disease or create asbestos health hazards. I will testify there existed an awareness of such diseases and/or hazards within the asbestos and related industries generally, or defendants specifically, and that this awareness was either actually known or knowable to such parties. This was because the information concerning asbestos hazards was available to and shared by members of the relevant industries [e.g. asbestos mining and manufacturing companies; asbestos product users such as railroads, petroleum, equipment manufacturers] as well as in the public domain. The latter is evidenced by documents which describe and memorialize the state of the art relating to the hazards of asbestos. These documents include applicable governmental rules and regulations, and industrial hygiene, scientific, medical and related publications and articles discussing and addressing such issues.

I am of the further opinion that there is no reliable scientific method for determination of which asbestos exposures that a person suffered were a substantial factor in causing his illness and which ones were not. Instead, it is my opinion that almost all individuals who contract an asbestos-related illness encounter a variety and number of exposures from several sources over their lifetime prior to disease occurrence. Due to the long latency period for asbestos-related illnesses, it is impossible to exclude any exposures, as being a substantial factor in causing the illness. In my opinion, any exposures that an individual suffered that were in addition to ambient air levels, such as those alleged in this case as to each defendant, would, on a more likely than not basis, have been a substantial factor in causing the alleged disease.

It is further my opinion, that when a person with a reliable history of asbestos exposure contracts an asbestos-related disease, after exposures to multiple asbestos-containing products, given sufficient minimum latency, each and every exposure contributes to the person's total dose that caused the asbestos related disease. Thus, all the asbestos, such as that attributable to each defendant in this case, to which a person is exposed (given sufficient minimum latency) contributed to cause the asbestos-related disease. My opinion is that, given sufficient minimum latency, there is no scientific basis upon which one can look back and exclude some exposures and include other exposures as being causally related to the asbestos-related disease which the caused an individual's asbestos-related disease.

Based on my education, training, and experience in Occupational and Preventive Medicine, and in epidemiology, it is my opinion that any asbestos exposure that an individual suffered, such as those attributable to each defendant in this case, that was in addition to ambient air levels would, on a more likely than not basis, have been a substantial factor in causing him to suffer from his asbestos related disease.

If asked as it may relate to this case, my opinion is that lung cancer is a disease that can be caused by asbestos exposure and thus a subject of legitimate concern for anyone who has been exposed to asbestos. In those cases in which lung cancer, asbestos exposure, and cigarette smoking are prevalent concerns, my opinions regarding the smoking aspects of lung cancer are

3

Nancy Williams
2/8/2011

based upon research and information addressing the addictive nature of cigarettes, the addictive properties of tobacco products and tobacco smoke, issues involved with smoking cessation, and the effects of cigarette smoke on the brain, body and central nervous system.  It is also my opinion that asbestos exposure in synergy/combination with cigarette smoking increases one's risk of developing lung cancer far above the expected occurrence of such cancer in the populations exposed to only one or the other of these carcinogens or to the sum of their individual risks when combined.

As to the data or other information, in addition to case-specific material, which I have considered in formulating my opinions in this case, this would be, generally, the body of medical, scientific and epidemiological studies, case reports, investigations, government documents, public media and industry documents published and reported upon since the late 1890's in the USA, Britain, Africa, Germany, Italy, Russia and other industrial areas abound the world.  Attached is a copy of the bibliography I compiled that includes the documents that form the basis of the opinions I will express at trial.

Based on my above mentioned experience and training, and historical review, in as further support for my opinions in this case to those stated above, I would observe that it is my opinion that the medical and scientific literature makes it clear that, at least as early as 1931, it was known in the medical and scientific community that breathing asbestos dust was harmful and dangerous to human health.  As stated by Dr. Frederick Willson in 1931, "We do know, however, that breathing of dust under the following conditions is seriously harmful: . . . asbestos and every operation in which it is used." (Wilson, Frederick, The Very Least An Employer Should Know About Dust And Fume Diseases, Safety Engineering, November 1931, Volume 62(5), pp. 317-318, emphasis added.)  (This article is fully incorporated herein by this reference.) Additionally, the fact that asbestos exposure causes asbestosis, and the need for safety precautions, including masks, respirators, education, ventilation, dust control, and substitution, to prevent asbestos-related diseases, was known as early as the 1930s, as referenced in articles contained in my Bibliography, including Merewether ERA, Price CW, Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry, His Majesty's Stationery Office, London, 1930, pp. 1-34.  Many of the preventive techniques to address asbestos exposures are still in use today as standard industrial hygiene.  Further, based upon my research, education, experience, and the articles referenced in my bibliography, it is my professional opinion that it was clear by 1952 that, regardless of the setting, a person exposed to airborne asbestos was at an increased risk of developing cancer.

Based on my above mentioned experience and training and historical review, in my opinion a brief summary of only a few of the many articles I have studied indicates the following, which are also my opinions about, the historical state of knowledge about the hazards of asbestos:

a.  As early as 1898, the Annual Report of the Chief Inspector of Factories and Workshops in England identified increased health problems among workers in asbestos textile mills.

b. In 1924, Cooke wrote an article in the British Medical Journal titled "Fibrosis of the Lungs Due to the Inhalation of Asbestos Dust".

4

Nancy Williams
2/8/2011

c. In 1931 an article was published in the magazine Safety Engineering, which was a publication intended for people who had responsibility for preventing injury and illness. This article, titled "The Very Least an Employer Should Know About Dust and Fume Diseases," lists a number of conditions under which breathing of dust is seriously harmful. That list includes the entry: "Asbestos and every operation in which it is used."

d. In 1934, in an article titled "Pulmonary Asbestosis" published in The Lancet, two physicians reported 100 cases of people with asbestosis. The occupations of the people involved revealed that it was not only workers in the asbestos textile factories who developed asbestosis, but also people who worked with asbestos in other applications. The significance of the article is that it demonstrated that what was important was not the job or its location, or the product involved, but the fact that one had inhaled asbestos dust.

e. A publication by the Commonwealth of Pennsylvania, Department of Labor and Industry, in 1935, titled "Asbestosis," was remarkable because it contained a bibliography of over 100 reference works pertaining to asbestos related disease. The significance of the article is that as of 1935, a doctor in the U.S. in a relatively small town, Harrisburg, PA., could become aware of over 100 articles published about asbestos and disease and written in various languages.

f. In 1944 an editorial in the Journal of the American Medical Association identified asbestos as one of the causes of environmental cancer. The significance of the article is that by this time in 1944, credible and respected authorities in the medical community considered that asbestos was suspected of or known to cause cancer.

g. In 1949 an article appeared in Scientific American titled "Cancer and the Environment." It was one of the first articles to appear in the popular media to discuss the subject of asbestos being a possible cause of cancer. I have also found reference to asbestos as a cause of cancer in newspaper articles as early as 1949.

h. In 1950, Dr. Hueper, the Chief of the Carcinogen Study Section, National Cancer Institute, National Institute of Health, published a monograph titled "A Methodology for Environmental and Occupational Cancer Surveys" in Public Health Technical Monograph No. 1, 1950. In that article he listed agents, chemicals, metals, dusts, etc. which were known to cause cancer. Among those substances was asbestos. Under asbestos he listed various asbestos-related trades or jobs that he considered to be at increased risk for cancer because they involved asbestos exposure. The significance of the article is that it reveals that there was a cancer concern not only for the asbestos factory workers, but for other trades exposed to asbestos working with asbestos containing products. Among the at-risk trades identified by Dr. Hueper were: asbestos construction material workers, asbestos insulation workers, asbestos brake lining workers, people that use asbestos brake lining, carpenters, plumbers, roofers, gasket makers, insulation workers (pipe and boiler), and pump packing mechanics.

i. By 1952 the Encyclopedia Britannica contained an entry indicating that asbestos is a cause of cancer.

j. By 1958 the American Conference of Governmental Industrial Hygienists had established a maximum atmospheric concentration for asbestos dust of five million particles per cubic foot of air. This amount of asbestos in the air was then known not to be visible and could

5

Nancy Williams
2/8/2011

only be detected by air sampling measurements.

      k. In 1960, Dr. Wagner published a study of mesothelioma victims in South Africa. His study unequivocally established asbestos as the cause of mesothelioma.

      l. In 1964 Dr. Selikoff published his seminal article on asbestos disease in insulation workers. He performed the first large scale asbestos mortality study and reported increased rates of death from lung cancer, mesothelioma, asbestosis, and gastrointestinal cancer. In addition to its scientific contribution, it was politically and socially significant because it received widespread media exposure. It was reported to American newspapers by the Associated Press wire service and brought public attention to the health risks associated with asbestos.

      Based on my above-mentioned experience and training and historical review, in my opinion I can further state the following facts about the historical knowledge of the dangers of asbestos:

      A) By the 1960s, there were at least 300 articles published in English concerning the hazards of asbestos. There were a similar number published in foreign languages.

      B) In the late 1920s and certainly by the 1930s it was clear that breathing asbestos dust caused asbestosis. Dr. Merewether's report in 1930, published by the British government, lists various actions that he recommended to prevent the disease. Other publications in the 1930s indicate clearly that people at that time understood that they could prevent the disease by preventing individuals from breathing the dust. They suggested this could be done by either eliminating the dust at its source or by providing gas masks as breathing protection. In the late 1940s and early 1950s it became clear that asbestos could cause asbestosis in a large variety of settings. It was demonstrated clearly in the literature by the early 1950s that asbestos related disease could occur in any locale or with any task or with any product involving sufficient asbestos exposure.

      C) Information regarding asbestos hazards, as well as remedial steps to eliminate or reduce those hazards, was not confined to those involved in academia or medical research. The availability of information to business and industry is illustrated by documents generated by private industry dating from the 1930s:

      a. The 1935 Minutes of the Medical and Surgical Section of the American Association of Railroads show that the physicians who were responsible for medical issues among railroad employees discussed exposure to asbestos and related risk to railroad workers. They included discussion of preventive measures that are still used today, including: using masks to filter the air; using techniques to wet down the dust lying on the floor so it doesn't get re-circulated; using apparatus that would pull dust away from the worker, and doing medical exams on the workers to determine if they are sufficiently protected from asbestos so as to not develop asbestos related disease. The historical state of the art evolved in such a way that it was clear in the early 1950s, that people performing tasks or in situations that generated airborne asbestos, regardless of the product involved, were going to be at risk for asbestos-related disease.

      b. In 1937, Roy Bonsib conducted a study of dust hazards present in the oil refinery setting on behalf of Standard Oil Company of New Jersey. He included asbestos as a

Nancy Williams
2/8/2011

hazardous dust and noted the greater level of hazard presented by the removal of asbestos insulation materials. He recommended the use of well-recognized procedures to minimize the creation of dust and reduce or eliminate exposures to hazardous dust (asbestos) including engineering controls, wet down, containment, isolation of work, and the use of respirators.

      c. In addition to what was knowable through medical and industrial hygiene literature and industry publications, businesses in California for example were additionally on notice as to the hazards of asbestos from an early point in time by virtue of various governmental regulations and orders. Commencing in the 1930s, the California General Industry Safety Orders prescribed procedures for minimizing exposure to asbestos dust including requirements for exhausting asbestos dust, dust suppression procedures, and isolation of dust-creating work from other workers. After the creation of OSHA in 1971, federal exposure standards regarding asbestos were imposed commencing in 1971. These regulations were published expressly to notify those working with asbestos containing material of its hazards and the precautions which were necessary to be employed to reduce the risk of harmful exposures. The regulations included descriptions of the previously-described protective measures that should be followed to eliminate or minimize exposures and which had been recognized and recommended since at least the 1930s.

      Finally, you have asked about the exhibits that will be used to summarize or support my opinions. I expect that the exhibits I might use would be graphs, charts and other scientific data contained within the literature described above to serve as an aid for the jury to understand the details of my opinions.

      If you require yet another further response, please let me know.

                Sincerely,

                Richard
                Cohen MD
                MPH

                Richard Cohen, MD, MPH

Enclosures

# EXHIBIT F

Scanned Copy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

---oOo---

ROBERT LYMAN and SAMANTHA

LYMAN,

    Plaintiffs,

vs.                   No.  459162

CLEAVER-BROOKS,

    Defendants.

_____/

TELEPHONIC DEPOSITION OF ARNOLD BRODY, Ph.D.

Taken before JANET M. MCCLEARY

CSR No. 3008

July 27, 2007

Page 2

1    DEPOSITION OF ARNOLD BRODY, Ph.D.
2
3    BE IT REMEMBERED, that pursuant to Notice, and on
4    the 27th day of July 2007, commencing at the hour of
5    11:00 a.m., in the offices of Aiken & Welch, One Kaiser
6    Plaza, Oakland, California, before me, JANET M.
7    MCCLEARY, a Certified Shorthand Reporter,
8    telephonically appeared ARNOLD BRODY, Ph.D., produced
9    as a witness in said action, and being by me first duly
10   sworn, was thereupon examined as a witness in said
11   cause.
12
13       ---o0o---
14
15   ERIC SOLOMON, Brayton Purcell, 222 Rush Landing
16   Road, Novato, California 94948, appeared telephonically
17   on behalf of the Plaintiffs.
18
19   GEORGE OTSTOTT, Brydon, Hugo & Parker, 135 Main
20   Street, 20th Floor, San Francisco, California 94105,
21   appeared telephonically on behalf of the Defendant
22   Union Carbide.
23
24
25

Page 3

1    CHRISTINE CARGILL, Wright, Robinson, Osthimer &
2    Tatum, 44 Montgomery Street, 18th Floor, San Francisco,
3    California 94104, appeared telephonically on behalf of
4    the Defendant Freightliner.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            ARNOLD BRODY, Ph.D.,
2            sworn as a witness,
3            testified as follows:
4    EXAMINATION BY MR. OTSTOTT:
5    Q. Hello, doctor. We spoke very briefly off the
6    record. My name is George Otstott. I represent Union
7    Carbide this morning, and I will be taking your brief
8    deposition this morning.
9        Have you received anything case-specific in
10   this matter?
11   A. No.
12   Q. Have you ever spoken to anybody in this case
13   other than the plaintiffs' attorneys?
14   A. No.
15   Q. Your going rate is $400 an hour?
16   A. That's correct.
17   Q. And you are at 1910 Glenmartin -- one word --
18   Drive at Raleigh, North Carolina 27615?
19   A. Correct.
20   Q. Excellent. If you could just briefly give me
21   your -- you are a pathologist, correct?
22   A. Experimental pathologist, right.
23   Q. If you could just give me very quickly a brief
24   rundown of what you have been retained for in this
25   case, that would be great.

Page 5

1    A. Right. So I haven't been retained in the sense
2    that, you know, I have been -- any money has changed
3    hands. The idea is that I was asked to find time to be
4    deposed in this case. And if I am called to trial, I
5    would expect to offer the same testimony I have in
6    every other case I have ever testified in.
7        And that is to explain how asbestos injures the
8    lungs and causes disease.
9        So what I would explain is where the asbestos
10   fibers lay in the lung, and how they injure the cells
11   that they interact with, and then how those fibers are
12   transported to various anatomic sites in the lung, the
13   mechanisms of transport, how those fibers cause cell
14   injury, membrane injury and, if I am asked, genetic
15   injury to cause cancer.
16   Q. This is a lung cancer case. So you would have
17   the same testimony regarding lung cancer?
18   A. Sure.
19   Q. As opposed to mesothelioma or asbestosis or
20   something like that.
21   A. Right. The difference is the target cells --
22   of course, I would be asked what are the target cells
23   for lung cancer; in other words, from which cells does
24   the disease develop. And the answer is the airway
25   lining cells. So I would have to show how the fibers

Page 6

1   deposit on the airway lining cells.
2       I would be asked to assume whether or not there
3   is a cigarette history, and if so, I could explain how
4   cigarette smoke, if it is there, would synergize with
5   asbestos. If it is not a mesothelioma, as you
6   indicated, then I would probably not spend much time
7   describing translocation to the pleural regions of the
8   lung.
9       Q. Right, exactly, okay. Honestly, I have taken
10  your deposition so many times that -- you still have
11  your slides, correct?
12      A. Right.
13      Q. And you don't have any other documents or notes
14  in this matter, right?
15      A. Correct.
16      Q. And so I honestly can't think of one single
17  other question.
18      A. That's brilliant. You are a good man to admit
19  it. Most of the characters really just don't want to
20  admit that, and have to stay on here for nothing. So
21  let's go ahead. I appreciate that.
22      Q. Who knows? Years and years ago maybe I was
23  that way, but not any more. Does anybody else have any
24  questions for the good doctor?
25      MR. SOLOMON: All I need to establish is you do

Page 7

1   realize you need to pay him his hourly fee although I
2   do appreciate you did not use the hourly unnecessarily.
3   There won't be any problem with that I assume?
4       MR. OTSTOTT: No. I am aware we are going to
5   pay the full hour.
6       MR. SOLOMON: Thank you.
7       (The deposition was concluded at 11:10 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1   STATE OF CALIFORNIA   )
2                         )
3   COUNTY OF ALAMEDA     )
4
5       I, JANET M. MCCLEARY, do hereby certify:
6       That ARNOLD BRODY, Ph.D., in the foregoing
7   deposition named, was present and by me sworn as a
8   witness in the above-entitled action at the time and
9   place therein specified;
10      That said deposition was taken before me at said
11  time and place, and was taken down in shorthand by me,
12  a Certified Shorthand Reporter of the State of
13  California, and was thereafter transcribed into
14  typewriting, and that the foregoing transcript
15  constitutes a full, true and correct report of said
16  deposition and of the proceedings that took place;
17      IN WITNESS WHEREOF, I have hereunder subscribed my
18  hand this 27th day of July 2007.
19
20
21
22
23
        _____
        JANET M. MCCLEARY, CSR No. 3008
24      State of California
25

3 (Pages 6 to 8)

Aiken & Welch Reporters          Arnold Brody, Ph.D.          7-27-07

**EXHIBIT G**

Scanned Copy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

ROBERT LYMAN and
SAMANTHA LYMAN,

     Plaintiffs,

vs.                            NO. 459162

CLEAVER-BROOKS, et al.,

     Defendants.

                        /

TELEPHONIC DEPOSITION OF DANIEL RAYBIN, M.D.

Taken before MICKELE R. ZRONEK

CSR No. 12242

July 27, 2007

Page 2

```
1              I N D E X
2                          PAGE
3   EXAMINATION BY MR. JORDAN        5
4
5
6
7
8          E X H I B I T S
9   DEFENDANTS'              PAGE
10  1   Dr. Raybin's Report        6*
11  2   Curriculum Vitae           7*
12  3   CT Report Dated 4/27/07 by
        Great Basin Imaging        20
13
    4   Workers' Compensation Application
14      for Adjudication of Claims  27*
15  *Not Provided to Reporter
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1      MOLLY MROWKA, Dillingham & Murphy, 225 Bush
2   Street, Sixth Floor, San Francisco, California 94104,
3   appeared via speakerphone on behalf of the Defendant
4   Montello, Inc.
5
6      DIANE CRAGG, Wright, Robinson, Osthimer &
7   Tatum, 44 Montgomery Street, 18th Floor, San Francisco,
8   California 94104, appeared via speakerphone on behalf
9   of the Defendant Freightliner.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1      TELEPHONIC DEPOSITION OF DANIEL RAYBIN, M.D.
2
3      BE IT REMEMBERED, that pursuant to Notice, and
4   on the 27th day of July 2007, commencing at the hour of
5   1:03 p.m., at 4449 East 14th Street, Long Beach,
6   California, before me, MICKELE R. ZRONEK, a Certified
7   Shorthand Reporter, telephonically appeared DANIEL
8   RAYBIN, M.D., produced as a witness in said action, and
9   being by me first duly sworn, was thereupon examined as
10  a witness in said cause.
11
12              ---oOo---
13
14      JOHN GOLDSTEIN, Brayton Purcell, 222 Rush
15  Landing Road, Novato, California 94948-6169, appeared
16  via speakerphone on behalf of the Plaintiffs.
17
18      KEVIN JORDAN, Baker, Botts, One Shell Plaza,
19  910 Louisiana Street, Houston, Texas 77002-4995,
20  appeared via speakerphone on behalf of the Defendant
21  Union Carbide Corporation.
22
23
24
25
```

Page 5

```
1          DANIEL RAYBIN, M.D.,
2              sworn as a witness,
3              testified as follows:
4      MR. JORDAN:  Before we go on, John, I assume we
5   have a stipulation that it's fine that the oath is
6   being administered outside the presence of the witness.
7      MR. GOLDSTEIN:  Plaintiffs don't object to
8   that.  Anyone else object?  I don't hear any objection.
9      MR. JORDAN:  I take it there's not one.
10  EXAMINATION BY MR. JORDAN:
11      Q.  Okay.  I'm sorry.  Would you please state your
12  name for the record?
13      A.  Daniel -- that's D-A-N-I-E-L -- M. Raybin,
14  R-A-Y-B-I-N.
15      Q.  And I understand, Dr. Raybin, that you have
16  been retained in this matter by the law firm
17  representing Mr. Lyman.  Is that correct?
18      A.  That's my understanding, yes.
19      Q.  All right.  And we have the benefit of -- at
20  least, I have the benefit of receiving a report that
21  you generated on Tuesday July 24 that is, oh, 30 pages
22  long.
23      A.  Well, the only difference between that is I
24  have July 23rd.
25      Q.  That's interesting.  Well, that's okay.  Yes,
```

Page 58

1    Q. Right.
2    A. And I'm of the school of thought, as is your
3  expert, Mr. -- Dr. Victor Roggli, that you don't have
4  to have asbestosis. And since you consider him an
5  expert, you should read his opinions on the subject.
6    Q. I've read his opinions. And he's not an expert
7  in this case. But that's fine.
8    A. But you did cite his textbook as expert
9  opinion.
10   Q. I certainly did. Do you have -- have you
11  performed an analysis of the total exposure --
12  cumulative life exposure Mr. Lyman would have received
13  from asbestos in this case under the Helsinki criteria?
14       MR. GOLDSTEIN: Beyond the scope.
15       THE WITNESS: No.
16  BY MR. JORDAN:
17   Q. Do you know what his cumulative lifetime
18  exposure would have been?
19   A. No.
20   Q. Do you whether -- do you know whether or not
21  his cumulative lifetime exposure would be sufficient
22  enough to say that he had significant -- a significant
23  enough exposure to double his risk for lung cancer,
24  regardless of whether he has asbestosis?
25   A. I don't know within medical certainty. But

Page 59

1  it's medically probable.
2    Q. And you're talking his cumulative asbestos
3  exposure, correct?
4    A. Right. It's not just exposure to one particle
5  that causes the problem. It's the sum total of all of
6  them.
7    Q. Are you -- do you recognize that there are --
8  that asbestosis is a dose/response disease?
9    A. That's my understanding.
10   Q. Do you have any idea what type of level of
11  exposure in fiber years per CC one needs to contract
12  asbestosis?
13   A. No. But when you say dose/response, what that
14  means to me is that the greater the dose the greatly
15  the likelihood that you'll have asbestosis, not that
16  everybody exposed to a given dose will get it or won't
17  get it.
18   Q. Can you tell me what you think the minimal
19  level threshold of exposure someone would be subjected
20  to and you would feel comfortable attributing that
21  exposure to lung cancer in the absence of asbestosis?
22       MR. GOLDSTEIN: Objection, vague and incomplete
23  hypothetical.
24       THE WITNESS: I don't know how to answer that
25  question.

Page 60

1  BY MR. JORDAN:
2    Q. Well, do you agree that all persons who have
3  exposure to asbestos are at an increased risk -- well,
4  let me strike that. If you have someone who has no
5  asbestosis, no clinical evidence of asbestosis, no
6  pathological evidence of asbestosis, I'm trying to
7  understand when it is you will say or you won't say
8  that person's lung cancer in a smoker is related to
9  asbestos.
10   A. Well, that has a lot of hypotheticals in it. I
11  usually do it on a case by case basis.
12   Q. Do you believe that someone has to be
13  occupationally exposed to asbestos before you will
14  agree that a smoker who has no diagnosis of asbestosis
15  is -- where you will attribute the lung cancer to the
16  asbestos?
17   A. You know, I don't think your lungs care where
18  the asbestos exposure came from. It's how much
19  asbestos you were exposed to. It's true that more
20  often than not heavy exposure is occupational. But it
21  doesn't matter how you happen to get it.
22   Q. So, if I'm exposed to one fiber and I'm a
23  hundred and 50 pack year smoker, you're going to say
24  that the asbestos -- that one fiber is attributable to
25  the lung cancer in addition to the 150 packs of --

Page 61

1  years of smoking history I have?
2       MR. GOLDSTEIN: Objection, misstates,
3  mischaracterizes and an incomplete hypothetical.
4       THE WITNESS: And even worse, you haven't asked
5  me a question. You made a statement.
6  BY MR. JORDAN:
7    Q. I'm asking if you agree with that.
8       MR. GOLDSTEIN: Same objections.
9       THE WITNESS: No.
10  BY MR. JORDAN:
11   Q. Okay. And I'm trying to understand at what
12  level -- when you have a hundred -- a 50 to 150 pack
13  year smoker who does not have a diagnosis of
14  asbestosis, at what level of exposure, however you want
15  to characterize it, you will be willing to say that the
16  asbestos played a part in the development --
17  causatively played a part in the development of the
18  lung cancer.
19       MR. GOLDSTEIN: Objection, incomplete
20  hypothetical, assumes facts.
21       THE WITNESS: I just don't know how to answer
22  the question or what you're asking me to say.
23  BY MR. JORDAN:
24   Q. So, even non occupationally exposed persons --
25  if you have someone who is non occupationally exposed,

Page 62

1 they walk around the city of San Francisco -- you
2 recognize -- let me start all over. You recognize that
3 persons walking around the city of San Francisco or New
4 York are going to have a baseline level of exposure to
5 asbestos --
6     A. That's generally agreed by all experts, not
7 just me.
8     Q. All right. And if you had someone who was --
9 if you were asked to make a determination of someone
10 who was a hundred to 150 pack year smoking history
11 person who had baseline level asbestos exposure,
12 background level, and no asbestosis, are you saying
13 that you would attribute that baseline level of
14 asbestos exposure as causative of the lung cancer?
15         MR. GOLDSTEIN: Objection --
16         THE WITNESS: Of course not. I'm a credible,
17 well-known expert. I wouldn't say anything so
18 ridiculous. You're setting me up to look foolish. And
19 I won't take it.
20 BY MR. JORDAN:
21     Q. I'm trying to get where between -- we know you
22 agree that baseline level -- background level of
23 exposure, you wouldn't attribute to lung cancer. Where
24 do you start?
25     A. Well, obviously not at background because

Page 63

1 that's trivial. It has to be substantial.
2     Q. Okay. And what is substantial? How do you
3 measure that?
4     A. That --
5         MR. GOLDSTEIN: Objection, calls for a legal
6 conclusion, incomplete hypothetical.
7         THE WITNESS: I'm not able to answer that
8 question for you. But I'll give you the -- obviously,
9 the trivial exposure wouldn't do it.
10 BY MR. JORDAN:
11     Q. Trivial exposure. So something less than
12 background would not be a substantial exposure in your
13 mind?
14     A. Of course not.
15     Q. Okay. And something less than background would
16 not be a substantial cause of the lung cancer, correct?
17         MR. GOLDSTEIN: Objection, vague as to
18 "background."
19         THE WITNESS: Someone who has the usual ambient
20 urban exposures would not be at increased risk for lung
21 cancer from asbestos.
22 BY MR. JORDAN:
23     Q. All right. Now, your impairment in this case,
24 you find that he's 15 percent impaired of the whole
25 person attributable to his occupational asbestos

Page 64

1 exposure, correct?
2     A. Excuse me, I've just got to catch up to where
3 you are. Okay. You're on page -- the very last page.
4     Q. Yes, sir.
5     A. All right. And I used the reasoning in the
6 paragraph before to come to that conclusion.
7     Q. I understand. And that's 15 percent associated
8 with all of his occupational asbestos exposure,
9 correct?
10     A. Sure. I mean because I -- I've already said I
11 think it's the cumulative exposure rather than the
12 individual exposure that causes the harm. Or
13 cumulative means all of the individual exposures rather
14 than one of them. It's impossible to identify which
15 one it would be.
16     Q. Okay. I think that's all I have, Doctor. I
17 appreciate your time. Anybody else?
18         UNIDENTIFIED SPEAKER: No, thank you.
19         THE WITNESS: You can't -- you guys can't go,
20 though, because we have to settle whom I'm faxing what
21 to once we're off the record.
22 BY MR. JORDAN:
23     Q. And you need to tell me how much I owe you or
24 how much I --
25     A. Okay. So are we off the record now?

Page 65

1     Q. Yes, we're off the record.
2         (Whereupon, the deposition was concluded at
3         2:25 p.m.)
4         (Defendants' Exhibit No. 3 was marked for
5         identification after the deposition.)
6
7
8         SIGNATURE OF WITNESS
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT H

Transcript of the Testimony of

# Hammar, M.D., Samuel P.
August 9, 2007

# Lyman v. Asbestos Defendants
459162



## Byers and Anderson, Inc.
**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

ROBERT F. LYMAN and SAMANTHA   )
LYMAN,                         )
                               )
              Plaintiffs,      )
                               ) No. 459162
          vs.                  )
                               )
ASBESTOS DEFENDANTS,           )
                               )
              Defendants.      )

DEPOSITION OF SAMUEL P. HAMMAR, M.D.

August 9, 2007

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square      2208 North 30th Street, Suite 202
600 University St.    Tacoma, WA 98403
Suite 2300            (253) 627-6401
Seattle, WA 98101     (253) 383-4884 Fax

(206) 340-1316        scheduling@byersanderson.com

(800) 649-2034        www.byersanderson.com

Serving Washington's Legal Community Since 1980

Hammar, M.D., Samuel P.
August 9, 2007

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

---

**Page 2**

1  APPEARANCES (All attorneys appearing via telephone)
2
   For the Plaintiffs:
3
4       Dave Backenstoe
        Brayton Purcell
5       222 Rush Landing Road
        Novato, CA 94948
6       415.898.1555
        415.898.2147 Fax
7
8  For Defendant Union Carbide Corporation:
9
10      Kevin M. Jordan
        Baker Botts LLP
11      One Shell Plaza
        910 Louisiana Street
12      Houston, TX 77002
        713.229.1322
        713.229.7722 Fax
13
14  For Defendant Montello:
15
16      Jack C. Henning
        Dillingham & Murphy
17      225 Bush Street
        6th Floor
18      San Francisco, CA 94104
        415.397.2700
        415.397.3300 Fax
19
20  For Defendant Freightliner LLC:
21
22      Christiane Cargill
        Wright, Robinson, Osthimer & Tatum
23      888 S. Figueroa Street
        Suite 1800
24      Los Angeles ,CA 90017
        213.337.3214
        213.624.3755 Fax
25

---

**Page 3**

1            EXAMINATION INDEX
2  EXAMINATION BY:              PAGE NO.
3  MR. JORDAN              4
4
5
6
7            EXHIBIT INDEX
8  EXHIBIT NO.   DESCRIPTION        PAGE NO.
9
10 Exhibit No. 1   1-page letter to Dr. Hammar     5
               from Shakena Hall, dated
11             6/19/07.
12 Exhibit No. 2   38 pages of medical records.     8
13 Exhibit No. 3   8-page report of            29
               Dr. Hammar's, date
14             transcribed 7/31/07.
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1            BE IT REMEMBERED that on Thursday,
2  August 9, 2007, at 600 University Street, Suite 2300,
3  Seattle, Washington, at 8:00 a.m., before KARMEN M.
4  FOX, CCR, RPR, CRR, Notary Public in and for the State
5  of Washington, appeared SAMUEL P. HAMMAR, M.D., the
6  witness herein;
7            WHEREUPON, the following proceedings
8  were had, to wit:
9
10           <<<<<< >>>>>>
11
12 SAMUEL P. HAMMAR, M.D., having been first duly sworn
13           by the Notary, deposed and
14           testified as follows:
15
16
17            EXAMINATION
18 BY MR. JORDAN:
19 Q  Dr. Hammar, my name is Kevin Jordan. I'm with the law
20    firm of Baker Botts. I represent the Union Carbide
21    Corporation in the Lyman lawsuit.
22       I understand that you have been tendered as an
23    expert by the Brayton Purcell law firm on behalf of
24    Mr. Lyman. Is that correct?
25 A  Yes.

---

**Page 5**

1  Q  All right. You've given numerous depositions in the
2     past, so if it's okay with you, we can dispense with
3     the normal pleasantries and admonitions, if that's
4     okay.
5  A  It is okay.
6  Q  All right. When were you first contacted by the
7     Brayton Purcell law firm to perform work in this
8     particular case?
9  A  June 20, 2007.
10 Q  And what manner were you contacted? By electronic
11    mail? By telephone? By -- what manner?
12 A  By a letter.
13 Q  Letter?
14 A  I believe so.
15 Q  Do you have a copy -- I'm sorry. Could --
16 A  A letter, yes.
17 Q  All right. Do you have a copy of the letter?
18 A  Yes.
19          MR. JORDAN: Madam Court Reporter,
20    could we please attach the letter as Exhibit No. 1 to
21    this deposition?
22          (Exhibit No. 1 marked
23          for identification.)
24
25 Q  (By Mr. Jordan) Can you tell me what -- I'm sorry.

Hammar, M.D., Samuel P.
August 9, 2007

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 50

1  not occur, would the person still get the disease.
2     Certainly in this case, the answer would be yes.
3  Q  I'm sorry, could you repeat that last part? Just
4     because he has the disease, you said substantial --
5  A  I said if -- you asked about the word "substantial,"
6     and the question would be, is that without that
7     exposure, would the person get the disease. And the
8     question [sic] is, basically, who knows, but they
9     certainly might.
10     But that's a hard thing to really figure out. And
11     as Steve Johnson of Owens-Illinois fame, he always
12     makes the point, especially with respect to lung
13     cancers and mesotheliomas, that how do you know that a
14     relatively short exposure was not a key exposure that
15     caused a certain mutation that resulted in the
16     development of a single cancer cell, that then gives
17     rise to the cancer.
18     So all I can say is that who knows whether it's a
19     substantial or nonsubstantial, but it is a potential
20     contributing factor.
21  Q  So you cannot say one way or the other whether it was
22     a substantial contributing factor; you're simply
23     stating it is a contributing factor?
24  A  Well, yeah.
25     MR. BACKENSTOE: Objection. It's

Page 51

1  vague as to substantial -- in the context of calling
2  for a legal conclusion.
3     And you can go ahead and respond, Dr. Hammar.
4  A  I'm not sure exactly the substantial versus
5  nonsubstantial makes any sense to me. I think if it's
6  a factor, it's a factor, or it has the ability to be a
7  factor. There's no way that you're going to be able
8  to look inside a person's body and say, well, this
9  asbestos went to this part of the person's lung tissue
10  and this went to this part of the person's lung
11  tissue, this asbestos caused this change, this one
12  caused that change. It's just not possible to do
13  that.
14     All I can say is that asbestos-related diseases
15  are dose response related, and that all the exposures
16  that are nontrivial -- and by that, I mean basically
17  the background exposure, which is basically zero at
18  this point in time, and has been for probably the last
19  20 years -- that that's not going to contribute to the
20  disease. But anytime they have an occupational
21  setting where there's really a significant exposure or
22  a bystander exposure, which also can be significant,
23  that those exposures have the ability to contribute.
24     MR. JORDAN: All right, Doctor, I
25  appreciate your time. I don't think I have any

Page 52

1  further questions. We'll see you at trial.
2     THE WITNESS: Okay. Thank you.
3     MR. JORDAN: Thank you.
4     MR. HENNING: This is Jack Henning.
5  I have no questions.
6     THE WITNESS: So is that it, then?
7     MR. BACKENSTOE: Yes, Dr. Hammar.
8  Could you make arrangements to pay Dr. Hammar?
9     MR. JORDAN: I'm sorry. Dr. Hammar,
10  how much time do I owe you for?
11     THE WITNESS: You owe me for an hour
12  and a half. $750.
13     MR. JORDAN: Actually, if it's all
14  right with you, Dr. Hammar, and you, Dave, I'll have
15  the Brydon Hugo people send him a check, because I
16  don't know --
17     THE WITNESS: That is fine with me.
18     MR. BACKENSTOE: Okay. If
19  Dr. Hammar is happy, I'm happy.
20     MR. JORDAN: All right. I will send
21  an e-mail to them today, telling them to send a check.
22     MR. BACKENSTOE: Very good.
23     MR. JORDAN: Thank you very much.
24     MR. BACKENSTOE: And I don't know
25  what your guys' trial situation is. Are you going to

Page 53

1  have this expedited?
2     MR. JORDAN: I was about to get to
3  that. I do want it expedited. We could be,
4  theoretically, starting trial tomorrow.
5     MR. BACKENSTOE: I see. Okay. I'm
6  not involved in the case, so I don't know.
7     And I'll take a copy, Ms. Reporter.
8     THE REPORTER: Do you want this to
9  be off the record or on the record?
10     MR. BACKENSTOE: We can be off the
11  record.
12     (Signature waived.)
13     (Deposition concluded at
14     9:17 a.m.)
15
16
17
18
19
20
21
22
23
24
25

14 (Pages 50 to 53)

Hammar, M.D., Samuel P.
August 9, 2007

**EXHIBIT I**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI)                    **Civil Action No. MDL 875**

This Document Relates To:

SAMANTHA LYMAN, et al                    §
                                         §        *Transferred from:*
        Plaintiff(s),                    §
                                         §        *U.S. District Court for the Northern*
v.                                       §        *District of California -*
                                         §        *Civil Action No. 07-4240*
UNION CARBIDE CORPORATION, et al.        §
                                         §        *Eastern District of Pennsylvania*
        Defendant(s).                    §        *Civil Action No. 09-62999*
                                         §

## ORDER

AND NOW, this 23rd day of September, 2010, upon consideration of defendant

Union Carbide Corporation's Motion to Exclude Testimony of Plaintiffs' Expert Witnesses

(Doc. 36) (the "Motion"), defendant Montello, Inc.'s joinder thereto (Doc. 37), plaintiffs'

response in opposition to defendants' Motion to Exclude Expert Testimony (Doc. 40), and

defendants' joint reply (Doc. 45), it is hereby

### ORDERED

that defendants' Motion to Exclude Testimony of Plaintiffs' Expert Witnesses (Doc. 36) is

**GRANTED IN PART** and **DENIED IN PART**.

1.      Within seven (7) days of the date of this Order, plaintiffs shall serve all

economic and medical causation expert reports that have not previously been served.  Any and all

experts retained by plaintiffs whose reports are not disclosed within seven (7) days of the date of

this Order are excluded from offering any opinions at trial, including oral testimony and prior

deposition testimony.

2.      The court's Amended Scheduling Order dated December 3, 2009 (Doc. 17) is further amended such that any expert depositions must be completed by November 30, 2010.

3.      Plaintiffs' attorneys shall pay all reasonable expenses, including attorney's fees, incurred by defendants Union Carbide Corporation and Montello, Inc. in connection with bringing the Motion.  Plaintiffs' attorneys violated the terms of this court's Amended Scheduling Order and have proffered frivolous reasons for doing so.  See Fed. R. Civ. P. 16(f).

4.      Defendants' request for plaintiffs to bear all costs associated with discovery related to all of their experts, including costs of preparing for, traveling to, and taking the depositions of each expert witness that plaintiffs intend to call, is denied.

BY THE COURT:

___/s/  Thomas J. Rueter_____
THOMAS J. RUETER
Chief United States Magistrate Judge

# EXHIBIT J

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI)          **Civil Action No. MDL 875**

This Document Relates To:

SAMANTHA LYMAN, et al            §
                                  §          *Transferred from:*
          Plaintiff(s),           §
                                  §          *U.S. District Court for the Northern*
v.                                §          *District of California -*
                                  §          *Civil Action No. 07-4240*
UNION CARBIDE CORPORATION, et al. §
                                  §          *Eastern District of Pennsylvania*
          Defendant(s).           §          *Civil Action No. 09-62999*

### ORDER

AND NOW, this 19th day of January, 2011, upon consideration of defendant Union Carbide Corporation's Renewed Motion to Exclude Testimony of Plaintiffs' Expert Witnesses (Doc. 50)(the "Motion"), plaintiffs' response in opposition to defendants' Renewed Motion to Exclude Expert Testimony (Doc. 52), and after a telephonic conference held today, it is hereby

### ORDERED

that defendants' Renewed Motion to Exclude Testimony of Plaintiffs' Expert Witnesses (Doc. 50) is **DENIED**. It is further **ORDERED** that within twenty-one days of this order, plaintiffs shall file Supplemental Reports for those experts reports which do not fully comply with Fed. R. Civ. P. 26(a)(2)(B). This is without prejudice to the right of defendants to file any motions in limine regarding these experts in the Transferor Court. Since discovery is complete and the Court has denied defendants' motions for Summary Judgment, the Court recommends that the Honorable Eduardo C. Robreno remand this case for trial in the Transferor Court.

BY THE COURT:

/s/ Thomas J. Rueter
THOMAS J. RUETER
Chief United States Magistrate Judge

# EXHIBIT K

# Brayton❖Purcell LLP

### TRIAL LAWYERS

ALAN R. BRAYTON
GILBERT L. PURCELL

DAVID R. DONADIO
LLOYD F. LEROY

OF COUNSEL
JEFFREY D. EISENBERG*
WILLIAM G. McDEVITT

* ADMITTED ONLY IN STATES
OTHER THAN CALIFORNIA

222 Rush Landing Road
P O Box 6169
Novato, California 94948-6169
Telephone: (415) 898-1555
Facsimile: (415) 898-1247

Portland: (503) 295-4931
Los Angeles: (415) 898-1555
Salt Lake City: (801) 366-9100

Email: mail@braytonlaw.com
www.braytonlaw.com

ANNE T. ACUÑA
JENNIFER A. ALESSIO
FRANK J. ANDERS
RON C. ARCHER
K. DOUGLAS ATKINSON
TARLAN BANANZADEH
VENUS BAREKATAIN
ROBERT L. BARROW
JENNIFER C. BENADERET
P. DUSTIN BODAGHI
ROBERT U. BOKELMAN
GARY L. BRAYTON
CAMERON D. CARTER*
CINA JANE GASILLI
ANDREW CHEW
KIMBERLY L. CHU
HUGH C. COOK
JUSTIN F. FISH
CORRINE L. GAXIOLA
JANETTE M. GLASER
JOHN B. GOLDSTEIN
RICHARD M. GRANT
STEPHEN J. HEALY
CHRIS E. HOKSOM
BRIAN O. HOLMBERG*
GARY V. JUDD
CLAYTON W. KENT

KATHERINE Y. LEE
MATTHEW B. LEE
ELISABETH A. LEONARD, Ph.D
MICHAEL D. LEVINSON
KRISTEN A. LOUIS
MAUREEN E. MCGOWAN
KIMBERLY L. MEYER
MICHAEL T. MILLER
NANCY A. MULLIKIN
JULIET K. MUSKET
EMMA NELSON-MUNSON
JAMES P. NEVIN
OREN P. NOAH
MEGAR PIRZADEH
JASON M. ROSE
AMIR S. SARBESHTEHDARY
CHRISTINA C. SKUBIC
GEOFF T. SLONIKER
KSENIA L. SNYLYK
ERIC C. SOLOMON
ROBYN L. STEIN
LANCE R. STEWART
LINH K. TAFISI
JANE K. VITTIP
NANCY T. WILLIAMS
NOAH J. WOODS

February 9, 2011

To All Counsel
(See Attached Service List)

    Re:    <u>Samantha Lyman, et al. v. Union Carbide Corporation, et al.</u>
            United States District Court, E.D.P.A. Case No. 2:09-cv-62999-ER

Dear Counsel:

      Plaintiffs in the above-referenced matters, in compliance with Judge Reuter's January 19, 2011, Order regarding F.R.C.P. Rule 26 Expert Witness Reports, enclose the following supplemental/amended reports and information for the following experts:

    1) Charles Ay;

    2) Kenneth S. Cohen;

    3) Richard Cohen, M.D.;

    4) William Salyer, M.D.

      While we believe plaintiffs' initial reports complied with Rule 26, in a good-faith effort to be reasonable and address defendants' and the court's concerns, our experts have once again made attempts to address these alleged deficiencies in compliance with Judge Rueter's Order, as well as what we believe to be well-taken readings of <u>Jenkins v. Bartlett</u> (7th Cir. 2007) 487 F.3d 482 and <u>Poulis v. State Farm</u> (3rd Cir, 1984) 427 F.2d 863. The reliance materials to which each expert refers in their supplemental/amended reports are the same as those attached to each expert's previous report.

      In addition, in further compliance with F.R.C.P. Rule 26, plaintiffs are also enclosing updated trial testimony lists for their disclosed experts. Please also note that plaintiffs' counsel and their experts have made all reasonable efforts to work with those other law firms for whom each expert has done work in an effort to compile comprehensive prior testimony lists that encompass the last 4 years. Many of these experts and/or law firms do not maintain such lists

February 9, 2011                                                                    Page 2

and are working to create them in further compliance with Rule 26.  As such, we are producing what we have to date and will supplement these lists as additional information becomes available.

    Should you have any questions or concerns, please do not hesitate to contact either Noah Woods or myself.

                                        Very truly yours,

                                        DICTATED BUT NOT SIGNED TO EXPEDITE

                                        Kimberly J. Chu

KJC:did
Enclosure(s)

<u>PROOF OF SERVICE BY MAIL</u>

I am employed in the County of Marin, State of California. I am over the age of 18 years and am not a party to the within action. My business address is 222 Rush Landing Road, P.O. Box 6169, Novato, California 94948-6169.

On February 9, 2011, I served the following document(s) described as:

1.      **Supplemental** expert witness reports with updated attachments as to deposition history pursuant to FRCP 26(a) (2) et seq. (either in electronic format or in printed form if timing precluded electronic replication) - As stated in Chu letter [see #2]

2.      Letter of Kimberly J. Chu to Counsel of Record dated 02/09/11 regarding plaintiff's supplemental expert witness reports.

on the interested party(ies) in this action as follows:

__x__   BY PERSONAL MAILING:

I deposited in the U.S. Mail at Petaluma California, the above-described document(s), in a sealed envelope, with postage fully prepaid, addressed to the party(ies) as stated above.

Executed February 9, 2011, Petaluma, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

<u>Samantha Lyman, et al. v. Union Carbide Corporation, et al.</u>
United States District Court, E.D.P.A. Case No. 2:09-cv-62999-ER

BRAYTON✦PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

Date Created: 2/9/2011-3:06:23 PM
Created by: LitSupport - ServiceList - Reporting
Matter Number: 107053.001 - Samantha Lyman

Run By : Guerrero, Silvia (SXG)

**S6**

**Baker Botts LLP**
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
713-229-1322   713-229-7722 (fax)
**Defendants:**
  Union Carbide Corporation (UNIONC) ①

**Hartman, Blackstock & Moore**
182 Howard Street
# 414
San Francisco, CA 94105
415-658-7447   415-963-3471 (fax)
**Defendants:**
  Montello Inc. (MONTLL)

**Law Offices of Nancy E. Hudgins**
565 Commercial, 4ᵗʰ Floor
San Francisco, CA 94111
415-979-0100   415-979-0747 (fax)
**Defendants:**
  Uniroyal Holding, Inc. (UNIROY)

**Orrick, Herrington & Sutcliffe LLP**
405 Howard Street
San Francisco, CA 94105
415-392-1122   415-773-5759 (fax)
**Defendants:**
  Union Carbide Corporation (UNIONC) ②