**EXHIBIT G**



8 RUJLPP 50 Page 1
8 Rutgers J. L. & Pub. Pol'y 50

Rutgers Journal of Law & Public Policy
Fall, 2010

Current Issues in Public Policy

PUNITIVE DAMAGES IN ASBESTOS PERSONAL INJURY LITIGATION: THE BASIS FOR DEFERRAL REMAINS SOUND

Mark A. Behrens [FNa1]

Cary Silverman [FNaa1] [FNd1]

Copyright © 2010 by the Rutgers Journal of Law & Public Policy; Mark A. Behrens, Cary Silverman

In 1991, the federal court system took an important step to slow the tide of asbestos-related bankruptcies that still threatens compensation for the sick. The judge then managing the federal **asbestos** multidistrict litigation docket ( **MDL** 875), United States District Court Judge Charles Weiner of the Eastern District of Pennsylvania, chose to sever and retain jurisdiction over demands for punitive damages while allowing the issues of liability and compensation matters to proceed to trial. [FN1] Judge Weiner's practice was affirmed and strongly supported on public policy grounds by the U.S. Court of Appeals for the Third Circuit. [FN2] Forward-thinking state court judges who were managing large asbestos personal injury dockets in jurisdictions including New York, Pennsylvania and Baltimore City also chose to defer punitive damages claims to promote sound public policy. [FN3]

All of these judges wisely understood that there is a finite pool of resources available for those who suffer illnesses resulting from asbestos exposure. [FN4] If earlier-filing claimants are able to obtain windfall punitive damages awards, then assets are depleted and may become exhausted due to the length and enormity of asbestos litigation, [FN5] jeopardizing tort recoveries for later-filing claimants with mesothelioma, asbestos-related lung cancer, or debilitating asbestosis. [FN6] As Georgetown University Law School Professor Paul Rothstein said, "Continuing to award punitive damages in asbestos cases no longer makes sense." [FN7]

Recently, federal **asbestos MDL** 875 and the Philadelphia and New York City **asbestos** dockets have come under new management, perhaps raising the hopes of plaintiffs' lawyers that there will be opportunities to revisit long-standing practices in those courts, such as allowing the re-introduction of punitive damages at trial. This article considers whether changes in the asbestos litigation environment warrant such a stark reversal. First, the article examines the origin and public policy underlying the deferral practices currently in place in federal MDL 875, Philadelphia, and New York City. Next, the article examines some of the potential rationales for permitting punitive damages awards in asbestos litigation. The article concludes that the continued deferral of punitive damages claims remains important as a matter of sound public policy. The concerns that led pioneering judges to defer punitive damages claims persist today and will remain ongoing as "[t]ypical projections based on epidemiological studies assume that mesothelioma claims arising from occupational exposure to asbestos will continue for the next 35 to 50 years." [FN8]

I. DEFERRAL OF PUNITIVE DAMAGES CLAIMS IN FEDERAL **MDL** 875 AND **ASBESTOS** CASES IN PHILADELPHIA AND NEW YORK CITY TO PRESERVE ASSETS FOR THE SICK

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 RUJLPP 50                                                                                                                                                Page 2
8 Rutgers J. L. & Pub. Pol'y 50

A. FEDERAL MDL 875

   After being appointed manager of MDL 875 in 1991, [FN9] United States District Court Judge Charles Weiner made the decision to sever and retain jurisdiction over demands for punitive damages while allowing the compensatory matters to proceed to trial. [FN10] As stated, Judge Weiner's practice was affirmed and strongly supported on public policy grounds by the U.S. Court of Appeals for the Third Circuit. [FN11] The Court understood that "[t]he resources available to persons injured by asbestos are steadily being depleted." [FN12] The circuit court concluded:

>    It is responsible public policy to give priority to compensatory claims over exemplary punitive damage windfalls; this prudent conservation more than vindicates the Panel's decision to withhold punitive damages claims on remand. It is discouraging that while the Panel and transferee court follow this enlightened practice, some state courts allow punitive damages in asbestos cases. The continued hemorrhaging of available funds deprives current and future victims of rightful compensation. [FN13]

Judge Weiner, who managed **MDL** 875 until his death in 2005, [FN14] viewed the deferral of punitive damages, along with the deferral of claims filed by the non-sick, [FN15] as key parts in a strategy intended to help preserve resources needed to compensate sick claimants in the face of mounting **asbestos**-related bankruptcies. Judge Weiner's practice of deferring punitive damages claims in MDL 875 cases has been continued by his successors, United States District Judges James Giles, the presiding MDL 875 judge from 2005 through 2008, and Eduardo Robreno, the current manager of the MDL 875 docket. [FN16]

B. PHILADELPHIA COURT OF COMMON PLEAS

   The practice of deferring punitive damages claims in asbestos cases in the Philadelphia Court of Common Pleas originated in a November 1986 memorandum opinion stemming from the bankruptcy of Philadelphia-based, Pacor, Inc., a distributor of asbestos products, and four other "major defendant[s]" in the asbestos litigation. [FN17] Plaintiffs in civil cases pending at the time asked the court to sever Pacor from the litigation and order trial to proceed against the remaining defendants. [FN18] Judge Richard Klein, who was then serving as the asbestos judge for Philadelphia (and later served on the Pennsylvania Superior Court), [FN19] found that there was "no question that both the plaintiffs and the non-bankrupt defendants ... suffered from the bankruptcy petitions filed by major participants in the asbestos litigation." [FN20] For example, the solvent defendants were "being called upon to pay all of the costs of the litigation and to pay more than their share of compensatory damages ...." [FN21] Judge Klein also noted: "If punitive damages are allowed in the face [of] so many major defendants filing for bankruptcy, it is very possible that some plaintiffs will get the windfall of punitive damages while others find that the money is gone by the time their cases come to trial." [FN22] Judge Klein decided to allow the cases to proceed against the non-bankrupt defendants upon the condition that the plaintiffs would defer claims for punitive damages "until the situation with the bankrupts becomes clearer." [FN23] He indicated that the deferral period would last one year, at which point he would consider several options, including that "punitive damages may be further deferred." [FN24]

   In November 1987, Judge Klein found that the rate of new asbestos case filings had "gotten worse, not better," [FN25] that another major company, Nicolet, Inc., had filed bankruptcy, [FN26] and that a major defendant, Raymark, Inc., had "drastically reduced" its settlement payments and threatened bankruptcy. [FN27] Consequently, he chose to extend the severance and deferral of punitive damages for another year, until November 12, 1988. [FN28] Since then, the Complex Litigation Center (CLC), the mass tort program of the Philadelphia Court of Common Pleas, has by "custom and practice" continued to defer punitive damages claims in asbestos cases. [FN29]

C. NEW YORK CITY

   In 1996, Justice Helen Freedman, who managed the New York City asbestos litigation from 1987 until she was elevated to the appellate bench in 2008, [FN30] "deferred" all punitive damages claims indefinitely in a Case Management Order (CMO) governing all asbestos personal injury and wrongful death cases. [FN31] Justice Freedman

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

has explained that precluding punitive damages "seemed like the fair thing to do for a number of reasons." [FN32] She summarized those reasons as follows:

> First, to charge companies with punitive damages for wrongs committed twenty or thirty years before, served no corrective purpose. In many cases, the wrong was committed by a predecessor company, not even the company now charged. Second, punitive damages, infrequently paid as they are, only deplete resources that are better used to compensate injured parties. Third, since some states did not permit punitive damages, and the federal MDL court precluded them, disparate treatment among plaintiffs would result. Finally, no company should be punished repeatedly for the same wrong. [FN33]

## II. REVISITING THE DEFERRAL OF ASBESTOS-RELATED PUNITIVE DAMAGES CLAIMS IN NEW YORK CITY, PHILADELPHIA, AND MDL 875

In September 2008, Justice Sherry Klein Heitler was assigned to manage the New York City asbestos docket to replace Justice Freedman after her promotion. [FN34] Just a few months later, attorneys at Weitz & Luxenberg, a prominent law firm that represents plaintiffs in asbestos cases, requested that the court amend the CMO governing asbestos cases in several respects, including elimination of the deferral of punitive damages claims. [FN35] In a March 2009 letter to Justice Heitler, Weitz & Luxenberg attorneys noted that "[m]ost, if not all" of the largest manufacturers of asbestos-containing thermal insulation products who were originally the primary defendants in asbestos litigation have filed bankruptcy, despite the punitive damages practice in New York City. [FN36] The letter also asserted that "there was never a valid reason for defendants in New York City Asbestos Litigation to be immune from punitive damages and certainly no valid reason exists today." [FN37]

Attorneys for defendants named in the New York City asbestos litigation opposed the change, stating that "[i]f there is one unassailable truth in the asbestos litigation, it is that there is a finite pool of resources to compensate impaired plaintiffs. It is a zero sum game--money spent on one claimant today may not be available for another claimant tomorrow." [FN38] Defense attorneys have also noted that restoration of punitive damages would undermine the substantial public policies that led Justice Freedman to adopt and continue the deferral policy. [FN39] As of the time of publication, Justice Heitler has not modified the CMO or otherwise permitted a punitive damages claim to proceed.

A few months after Justice Heitler took over the New York City asbestos litigation, Philadelphia Court of Common Pleas Judge Sandra Mazer Moss, the founder and first Supervising Judge of the CLC, replaced Judge Allan Tereshko as coordinating judge of Philadelphia's asbestos litigation. [FN40] Judge Tereshko had been the CLC's coordinating judge since 2001. [FN41]

Judge Moss has commented that "[i]t is a new day" in the Philadelphia CLC. [FN42] This new day was reflected by Common Pleas President Judge Pamela Pryor Dembe, who undertook a "public campaign to lay out a welcome mat for increased mass torts filings." [FN43] For example, in a January 2009 interview, Judge Dembe reportedly said that the court's budgetary woes could be helped by making the CLC even more attractive to attorneys "so we're taking business away from other courts." [FN44] In addition to generating substantial filing fees for the court, out-of-state lawyers are an economic engine for Philadelphia, according to Judge Dembe. [FN45] "Litigation tourists" stimulate the local economy by eating at local restaurants, staying in city hotels, and hiring local counsel. [FN46] In this context, lifting the longstanding practice of deferring punitive damages claims could be viewed as an incentive for lawyers to file asbestos cases in Philadelphia. As of the time of publication, however, Judge Moss has continued the court's historical and sound policy with respect to punitive damages in the asbestos litigation.

In federal MDL 875, United States District Judge Eduardo Robreno continued the practice of his predecessors with respect to the treatment of punitive damages claims. To try to bring MDL 875 to a conclusion, Judge Robreno and magistrate judges of the Eastern District of Pennsylvania have developed and are implementing a summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment protocol to address the remaining cases on the docket. [FN47] Plaintiffs' lawyers may question whether the historical practice relating to punitive damages will continue in light of the individual approach the court is now undertaking on summary judgment motions.

III. DOES SOUND PUBLIC POLICY SUPPORT THE RETURN OF PUNITIVE DAMAGES CLAIMS IN ASBESTOS LITIGATION?

The asbestos litigation environment has improved in recent years because of actions taken by courts and legislatures to address some abuses of the past, such as mass filings by the uninjured and questionable mass screening practices. [FN48] The litigation has also evolved. Most of the traditional asbestos product manufacturer defendants have filed bankruptcy. In their place, "many lawsuits are filed against peripheral defendants, e.g., those who manufactured products in which asbestos was encapsulated, distributed products containing asbestos, or owned premises that contained asbestos." [FN49] Asbestos claims are becoming more peripheral too. When the litigation began, "most claims came from workers ... in an atmosphere thick with asbestos fibers." [FN50] Now, many claimants come from nontraditional industries, "such as textiles, paper, glass, and food and beverage." [FN51] In addition, plaintiffs' lawyers are now targeting property owners for alleged harms to the workers' family members who have been exposed to asbestos off-site, typically through contact with a directly exposed worker or that person's soiled work clothes. [FN52]

Does sound public policy support a return of punitive damages in this latest phase of asbestos litigation? Would punitive damages in today's asbestos cases serve their intended purpose: to deter bad behavior and punish wrongful conduct? Is there a reason to believe that punitive damages windfalls will no longer jeopardize resources available to compensate those unfortunate individuals who will develop an asbestos-related malignancy in the future?

A. CHANGES IN THE LITIGATION ENVIRONMENT DO NOT SUPPORT A CHANGE

1. Increasingly Remote Peripheral Defendants

The first asbestos-related bankruptcy filings by UNARCO Industries, Inc. and Manville Corporation in 1982 kicked off a succession of bankruptcies by companies in the asbestos-related manufacturing and installation industries. [FN53] Many of these early target defendants were subjected to repeated punitive damages. [FN54] As more of the so-called "traditional defendants" sought bankruptcy protection, a domino effect began, whereby each subsequent bankruptcy placed increasing pressure on the remaining solvent defendants. [FN55] By 2006, asbestos-related liabilities forced over eighty-five companies into bankruptcy. [FN56] More recently, "[p]arties that follow asbestos litigation have identified 96 companies that have filed for bankruptcy in which liability for asbestos tort cases was addressed." [FN57]

As a result of these bankruptcies, "the net has spread from the asbestos makers to companies far removed from the scene of any putative wrongdoing." [FN58] The dockets reflect that the litigation has moved far beyond the era in which manufacturers and producers of friable asbestos products, raw asbestos, or asbestos insulation, are the defendants. This expanded range of defendants has produced exponential growth in the dimensions of asbestos litigation and compounded the burden on the courts. [FN59]

By 2002, there were at least 8,400 defendants named in the litigation. [FN60] The Towers Watson consulting firm has now identified more than 10,000 companies, including subsidiaries, named as asbestos defendants. [FN61] At least one company in nearly every U.S. industry is involved in asbestos litigation. [FN62] Nontraditional defendants account for more than half of asbestos expenditures. [FN63]

One well-known former plaintiffs' attorney candidly described the litigation as an "endless search for a solvent bystander." [FN64] Some plaintiffs' attorneys advocate that makers of non-defective products (such as pumps or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

valves) should be held liable for harms allegedly caused by asbestos-containing replacement parts manufactured or sold by third parties (such as replacement internal gaskets, packing or replacement external flange gaskets, or asbestos-containing external thermal insulation manufactured and sold by third parties) and attached post-sale (such as by the U.S. Navy). [FN65] Plaintiffs' lawyers are also increasingly bringing claims for de minimis or remote exposures, such as "shade tree" brake work on the family car or one remodeling job using asbestos-containing joint compound. [FN66]

    As the litigation has grown more attenuated, so has any foundation that otherwise might support the imposition of punitive damages. As summarized in one recent report:

> The causal connection between earlier peripheral defendants and asbestos was clear (e.g., where asbestos was used as in insulating material by boiler manufacturers). However, the relationship of asbestos to some of the more recent peripheral defendants in not as obvious (e.g., Campbell's Soup, Gerber [baby food maker], and Sears Roebuck). *This later group of peripheral defendants was not as likely to have known of the dangers of asbestos*. [FN67]

Other commentators have stated that "most traditional asbestos companies have already declared for bankruptcy protection, thus, the burden of paying punitive damages falls to the peripheral defendants who have generally not engaged in conscious, flagrant wrongdoing." [FN68]

    Furthermore, while there may be more "players" in the litigation, the same concerns that drove the decisions to defer punitive damages claims against the traditional asbestos defendants remain. Asbestos-related bankruptcies have not ended. "Since 2000, dozens of companies have sought to use the trust provisions of § 524(g) of the Bankruptcy Code to globally resolve their asbestos liabilities." [FN69]

    It is just a matter of time before additional defendants are forced to seek bankruptcy court protection from their asbestos liabilities. As Stanford Law Professor Deborah Hensler has explained in summarizing the evolution of the litigation:

> To make up the difference between the total amount of money that had been available from asbestos defendants to compensate asbestos claimants and the smaller amount of money that was now available [due to major defendants filing bankruptcy], asbestos plaintiff attorneys turned to "peripheral" defendants: corporations that had not previously been central to the litigation but against whom there were colorable claims of negligence or strict liability. For many years, many of these corporations had settled claims for modest amounts of money, essentially "nuisance value," in order to avoid greater litigation expense. Now asbestos plaintiff attorneys told these defendants that they would have to put more money on the table to avoid litigation-perhaps several times the amount paid previously by these defendants-explaining that they needed to make up for what was no longer available from target defendants. *Within a very short time, some peripheral defendants became central to the litigation, and their asbestos liability exposure ballooned. The result might have been anticipated: the once peripheral defendant corporations followed the target defendants into bankruptcy*. [FN70]

Actions taken by courts that could accelerate this process would be irresponsible absent a clear and compelling justification that does not exist with respect to the awarding of punitive damages in modern asbestos cases.

### 2. Fewer Overall Filings Due to Sound Reforms

    Those seeking a return of punitive damages may also be emboldened by a recent decline in overall asbestos filings. [FN71] They may argue that since the litigation appears to have "turned the corner," the specter of additional bankruptcies is reduced. It must be remembered, however, that improvements in the litigation are the result of reforms adopted by courts and legislatures, such as to give priority to the sick by suspending the claims of the uninjured, [FN72] or requiring claimants to have an actual injury, [FN73] and because of greater judicial scrutiny of liti-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

gation screening practices. [FN74] For instance, Justice Freedman estimated that the deferred docket she instituted in the New York City litigation reduced the number of cases actually pending by eighty percent. [FN75] "[A]lthough fewer overall asbestos personal injury claims are being filed in the U.S., the number of high-risk mesothelioma and other cancer cases has remained fairly stable." [FN76]

If asbestos litigation reforms are undone or weakened, then the problems of the past may return. Courts must continue to enforce policies that preserve assets for those unfortunate individuals who will develop an asbestos-related impairment in the future. The continued deferral of punitive damages claims serves this goal.

B. PUNITIVE DAMAGES IN ASBESTOS LITIGATION NO LONGER SERVE A PURPOSE

The purposes of punitive damages generally are to punish wrongdoers and to deter those actors and others from future misconduct. [FN77] The twin purposes of punitive damages do not justify imposing punitive damages in **asbestos** cases or reintroducing such awards in federal **MDL** 875, Philadelphia, or New York City.

First, the deterrent function of punitive damages is not served because the asbestos litigation today arises from exposures that took place long ago. In 1972, the federal Occupational Safety and Health Administration (OSHA) issued permanent standards regulating occupational exposure to asbestos. [FN78] "The OSHA regulations established standards for exposure to asbestos dust and mandated methods of compliance with the exposure requirements, including monitoring work sites, compelling medical examinations, and, for the first time, labeling products with warnings." [FN79] OSHA's asbestos regulations "became increasing [sic] stringent over time" and most uses of asbestos ceased in the United States. [FN80]

Second, as Vanderbilt University Law School Professor Kip Viscusi has recognized, "[f]or long-term risks, such as asbestos, the economic players today are quite different from those who made the risk decisions decades ago at the time of exposure." [FN81] When Justice Freedman decided to defer punitive damages in the New York City asbestos litigation, she understood that in "many cases, the wrong was committed by a predecessor company, not even the company now charged." [FN82] "[L]ater victims, not the enterprise, effectively bear the punishment [of punitive awards in asbestos cases]." [FN83]

Third, the "message of deterrence, both specific and general, has been heard loud and clear in asbestos cases." [FN84] In fact, as far back as 1998, when Northampton County (Bethlehem and Easton), Pennsylvania Administrative Judge Jack Panella deferred punitive damages claims in asbestos cases, he did so partly because the "onslaught of bankruptcies of asbestos producers" had sufficiently instructed manufacturers of all types that selling defective products "is not a profitable industry." [FN85] Even earlier, in 1994, when Delaware Superior Court Judge Richard Gebelein held that further awards against Owens-Corning Fiberglas Corp. in asbestos litigation "would be contrary to the public policy concerns underlying compensatory and punitive damages," [FN86] he found that "the compensatory awards in thousands of cases, the cost of years of litigation and previous punitive awards [were] so large already that [the] policy goals of [punishment and deterrence had] clearly already been met." [FN87]

Fourth, Yale Law School Professor George Priest has stated, "Punitive damages can be justified only where it is believed that compensatory damages alone will be insufficient to fully internalize injury costs to defendants." [FN88] "Total spending on asbestos litigation through 2002 was about $70 billion." [FN89]

C. REINTRODUCING PUNITIVE DAMAGES WOULD PLACE FURTHER PRESSURE ON SOLVENT DEFENDANTS AND COULD DELAY RESOLUTION OF CLAIMS

Proponents of re-introducing punitive damages claims asbestos cases may point out that there could be few such awards, and they might be right. The vast majority of asbestos cases are settled. State-enacted statutory limits on the size of punitive damages awards, a higher burden of proof (i.e. "clear and convincing evidence"), and the United

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

States Supreme Court's reining in of awards through constitutional due process safeguards have also helped to reduce the chance for jackpot punitive damages verdicts. [FN90]

Yet, the risk of an extraordinary punitive damages award remains where such awards are allowed; defendants that proceed to trial under such circumstances play a game of Russian roulette. For instance, of approximately 4,000 asbestos cases set for trial in Madison County, Illinois, between 1996 and 2003, only four went to verdict. [FN91] Three of the four resulted in huge awards that, on top of compensatory damages, included punitive damages in amounts of $200 million, $7 million, and $25 million. [FN92] More recently, a Los Angeles jury awarded a record $200 million in punitive damages, on top of $8.8 million in compensatory damages to a woman who alleged that she contracted mesothelioma from washing her husband's work clothes. [FN93]

The genuine threat of a punitive award also can inflate settlement values, further depleting resources for future claimants. As Judge Joseph Weis, Jr. of the United States Court of Appeals for the Third Circuit observed:

> [T]he potential for punitive awards is a weighty factor in settlement negotiations and inevitability results in a larger settlement agreement than would ordinarily be obtained. To the extent that this premium exceeds what would otherwise be a fair and reasonable settlement for compensatory damages, assets that could be available for satisfaction of future compensatory claims are dissipated. [FN94]

In addition, the reintroduction of punitive damages into the settlement equation could post a major obstacle to the prompt resolution of legitimate claims, [FN95] particularly with respect to New York City claims since this approach could unravel a negotiated and agreed-upon CMO that has governed the litigation for many years.

Some plaintiffs' lawyers may suggest that increasing settlement values is beneficial in that it provides needed additional compensation to their clients or that higher settlement values are needed to provide them with a full recovery. That is not the case, however, because plaintiffs have an avenue for recovery outside the tort system through trusts established to pay claims involving the products of companies that have exited bankruptcy. In fact, one recent study concluded: "For the first time ever, trust recoveries may fully compensate asbestos victims." [FN96] Today, the combination of trust fund payments and litigation settlements are providing some asbestos claimants with two substantial sources of recovery.

CONCLUSION

For many years, the judges managing federal **asbestos MDL** 875, and the state court **asbestos** dockets in Philadelphia and New York City, among others, have recognized that it is sound public policy to take steps to preserve resources needed by future claimants with **asbestos**-related malignancies, such as by deferring punitive damages claims and suspending the claims of the presently uninjured. Thousands of individuals are expected to contract mesothelioma, lung and other asbestos-related cancers, and impairing asbestosis as a result of prior exposure to asbestos for decades to come. The reasoning supporting deferral of punitive damages awards in asbestos cases remains sound both to help ensure timely and adequate compensation for sick claimants and to provide fundamental fairness for defendants given that the purposes of punitive damages no longer serve a legitimate purpose in the litigation.

[FNa1]. Mark A. Behrens is a partner in the Public Policy Group of Shook, Hardy & Bacon L.L.P. in Washington, D.C. and a Distinguished Visiting Practitioner in Residence at Pepperdine University School of Law (Fall 2010). He received his B.A. from the University of Wisconsin-Madison in 1987 and his J.D. from Vanderbilt University Law School in 1990, where he was a member of the *Vanderbilt Law Review*.

[FNaa1]. Cary Silverman is Of Counsel in the Public Policy Group of Shook, Hardy & Bacon L.L.P. in Washington, D.C. He received a B.S. in Management Science from the State University of New York College at Geneseo, and an M.P.A. and a J.D. with honors from The George Washington University Law School.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FNd1]. Research support for this Article was provided by the Coalition for Litigation Justice, Inc. The views discussed herein are those of the authors.

[FN1]. *See In re* Patenaude, 210 F.3d 135, 140 n.3 (3d Cir. 2000) (explaining that the MDL 875 court "has a practice when it does remand cases of severing and retaining jurisdiction over punitive damages claims.").

[FN2]. *See In re* Collins, 233 F.3d 809, 812 (3d Cir. 2000).

[FN3]. *See* Mark A. Behrens, *Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation*, 54 BAYLOR L. REV. 331, 355-57 (2002); Mark A. Behrens & Barry M. Parsons, *Responsible Public Policy Demands an End to The Hemorrhaging Effect of Punitive Damages in Asbestos Cases*, 6 TEX. REV. L. & POL. 137, 154 n.97, 154-56 (2001). More recently, in 2005, Florida enacted a law banning punitive damages "in any civil action alleging an asbestos or silica claim." *See* FLA. STAT. ANN. §774.207(1) (West, Westlaw through 2010 Reg. Sess.). Members of Congress have periodically introduced legislation that would eliminate punitive damages in asbestos cases. S*ee, e.g.*, Asbestos Compensation Fairness Act of 2005, H.R. 1957, 109th Cong. § 6(c) (2005).

[FN4]. *See, e.g.,* R. Barclay Surrick, *Punitive Damages and Asbestos Litigation in Pennsylvania: Punishment or Annihilation?*, 87 DICK. L. REV. 265, 296 (1983) ("Balancing the benefits to be derived from continued imposition of punitive damages against the social and economic consequences of such a course of action, it appears that the continued imposition of punitive damages simply cannot be justified.").

[FN5]. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 200 (3d Cir. 2005) ("For decades, the state and federal judicial systems have struggled with an avalanche of asbestos lawsuits."). Through 2002, approximately 730,000 claims had been filed. STEPHEN J. CARROLL ET AL., ASBESTOS LITIGATION xxiv (Rand Inst. for Civil Justice 2005), available at http:// www.rand.org/pubs/monographs/2005/RAND_MG162.pdf.

[FN6]. *See* Behrens, *supra* note 3, at 336, 354.

[FN7]. Paul F. Rothstein, *What Courts Can Do in the Face of the Never-Ending Asbestos Crisis*, 71 MISS. L.J. 1, 26 (2001).

[FN8]. *See* Jenni Biggs et al., *A Synthesis of Asbestos Disclosures From Form 10-Ks - Insights*, TOWERS WATSON, 4 (Apr. 2010), http:// www.towerswatson.com/assets/pdf/1492/Asbestos_Disclosures_Insights_4-15-10.pdf. *See also* CARROLL ET AL., *supra* note 5, at 15-19.

[FN9]. *See In re* Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. 415, 424 (J.P.M.L. 1991) (transferring all pending asbestos-related personal injury and wrongful death cases filed in federal courts to the U.S. District Court for the Eastern District of Pennsylvania, assigning them to Judge Charles R. Weiner for coordinated pretrial proceedings).

[FN10]. *See* Dunn v. HOVIC, 1 F.3d 1371, 1400 n.13 (3d Cir.) (Weis, J., dissenting), *modified in part*, 13 F.3d 58 (3d Cir. 1993). Earlier, the Judicial Conference Ad Hoc Committee on Asbestos Litigation, appointed by United States Supreme Court Chief Justice William Rehnquist, called for Congress to review the role of punitive damages in mass torts, including provisions to limit or eliminate exposure to punitive damages, because "[m]eritorious claims may go uncompensated while earlier claimants enjoy a windfall unrelated to their actual damages." *In re* Collins, 233 F.3d 809, 812 (3d Cir. 2000) (quoting JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION, REPORT ON ASBESTOS LITIGATION 32 (Mar. 1991)).

[FN11]. *See In re* Collins, 233 F.3d at 812.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN12]. *Id.*

[FN13]. *Id.*

[FN14]. *See* Mark A. Behrens & Phil Goldberg, *In Memoriam: Senior United States District Judge Charles R. Weiner*, 20-22 MEALEY'S LITIG. REP.: ASBESTOS 24 (Dec. 21, 2005).

[FN15]. Judge Weiner was among the first judges to defer the claims of unimpaired plaintiffs to give priority to claimants with cancers and other serious asbestos-related conditions. *See, e.g.*, *In re* Asbestos Prods. Liab. Litig. (No. VI), Civ. A. No. MDL 875, 1996 WL 539589, at *1 (E.D. Pa. Sept. 16, 1996) (unpublished order denying remand) ("[T]he Court has prioritized malignancies and other serious disease cases.").

[FN16]. *See* Miriam Doyle & Gaylene Gordon Patterson, *Dusting Off MDL 875: Reforms Reduce Dormant Cases, Get Viable Cases Moving Again*, LEGAL INTELLIGENCER, June 22, 2010, at LIT2, *available at* 2010 WLNR 12610515.

[FN17]. Yancey v. Raymark Indus., Inc., No. 1186 (832), slip op. at 4 (Ct. Com. Pl., Phila., Pa. Nov. 12, 1986).

[FN18]. *Id.*

[FN19]. Richard Klein, *Judicial Biography*, WORDPRESS, http:// judgeklein.wordpress.com/judicial-biography/ (last visited Nov. 22, 2010).

[FN20]. Yancey v. Raymark Indus., Inc., No. 1186 (832), slip op. at 5 (Ct. Com. Pl., Phila., Pa. Nov. 12, 1986).

[FN21]. *Id.* at 9.

[FN22]. *Id.* at 10.

[FN23]. *Id.* at 5.

[FN24]. *Id.* at 9; *see also* Yancey v. Raymark Indus., Inc., No. 1186 (832) (Ct. Com. Pl., Phila., Pa. June 10, 1987) (first amended order to sever Pacor, Inc.) ("All claims for punitive damages shall be severed and deferred for a period of one year from November 12, 1986 (the date or the original order). At that point, the Court may continue to defer them ....").

[FN25]. Yancey v. Raymark Indus., Inc., No. 1186 (832) (Ct. Com. Pl., Phila., Pa. Nov. 25, 1987) (second amended order to sever Pacor, Inc.); *In re* Phila. Asbestos Cases, No. 1186 (832), (Ct. Com. Pl., Phila., Pa. Nov. 24, 1987) (first amended order to sever Nicolet, Inc.).

[FN26]. *See* Yancey v. Raymark Indus., Inc., No. 1186 (832) (Ct. Com. Pl., Phila., Pa. Nov. 25, 1987) (second amended order to sever Pacor, Inc.).

[FN27]. *See In re* Phila. Asbestos Cases, No. 1186 (832) (Ct. Com. Pl., Phila., Pa. Nov. 24, 1987) (first amended order to sever Nicolet, Inc.).

[FN28]. *See id.*; Yancey v. Raymark Indus., Inc., No. 1186 (832) (Ct. Com. Pl., Phila., Pa. Nov. 25, 1987) (second

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 RUJLPP 50                                                                                                                         Page 10
8 Rutgers J. L. & Pub. Pol'y 50

order to sever Pacor, Inc.).

[FN29]. According to our research, the only punitive damages verdict in an asbestos personal injury case in the Philadelphia Court of Common Pleas since Judge Klein's 1986 memorandum opinion occurred in a 2008 case decided under Kentucky law. *See* Gina Passarella, *Phila. Jury Awards $25.2 Million in Asbestos Case*, LEGAL INTELLIGENCER, Mar. 20, 2008, at 1, *available at* 2008 WLNR 27141611.

[FN30]. *See Justices of the Court*, N.Y. ST. UNIFIED CT. SYS., http://www.courts.state.ny.us/courts/adl/justicesofthecourt/justices_freedman.shtml (last visited Nov. 22, 2010).

[FN31]. *See In re* N.Y.C. Asbestos Litig., No. 40000/88, slip op. at 46 (N.Y. Sup. Ct. Sept. 20, 1996, amended as of Feb. 19, 2003), (amended case management order) ("Counts for punitive damages are deferred until such time as the Court deems otherwise, upon notice and hearing.") *available at* http://www.nycal.net/PDFs/cmo/CMO_revised_21903.pdf.

[FN32]. *See* Helen E. Freedman, *Selected Ethical Issues in Asbestos Litigation*, 37 SW. U. L. REV. 511, 527 (2008).

[FN33]. *Id.* at 527-28.

[FN34]. *News and Announcements,* N.Y. ST. UNIFIED CT. SYS., http://www.nycourts.gov/supctmanh/news_&_announcements.htm (last visited Nov. 22, 2010).

[FN35]. *See* Letter from Frank M. Ortiz, Weitz & Luxenberg, P.C., to Hon. Sherry Klein Heitler, N.Y. State Supreme Court, Appellate Term - First Dep't 10 (Mar. 20, 2009), *available at* http://www.nycal.net/PDFs/cmo/Ortiz_Ltr_to_ Heitler_re_CMO.pdf.

[FN36]. *Id.*

[FN37]. *Id.* The Weitz firm also sought punitive damages in a 2009 filing, asking that the court grant an exception in a particular case. *See* Reply Affirmation and Affirmation in Opposition to Plaintiff's Cross Motions at 2-3 Hertling *ex rel.* Estate of Swift v. Alliance Laundry Sys. LLC (No. 107382/08) (N.Y. Sup. Ct. Feb. 17, 2010).

[FN38]. Letter from Robert C. Malaby, Malaby & Bradley, LLC, to Hon. Sherry Klein Heitler, N.Y. State Supreme Court, Appellate Term - First Dep't 7 (Apr. 15, 2009), *available at* http://www.nycal.net/PDFs/cmo/Proposed_CMO_Revisions_ 041509.pdf.

[FN39]. *See id.* (quoting Freedman, *supra* note 32, at 527).

[FN40]. *See* Amaris Elliott-Engel, *Moss to Again Lead Complex Litigation Center*, LEGAL INTELLIGENCER, Jan. 5, 2009, at 1, *available at* 2009 WLNR 22652434.

[FN41]. *Id.*

[FN42]. Amaris Elliott-Engel, *For Mass Torts, A New Judge and a Very Public Campaign*, LEGAL INTELLIGENCER Mar. 16, 2009, at 1, *available at* 2009 WLNR 22652648.

[FN43]. Amaris Elliott-Engel, *Common Pleas Court Seeing More Diabetes Drug Cases*, LEGAL INTELLIGENCER, Mar. 19, 2009, at 1, *available at* 2009 WLNR 22652701.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN44]. Elliott-Engel, *supra* note 42.

[FN45]. *Id.*

[FN46]. *Id. See also* Amaris Elliott-Engel, *Dembe: Next Round of Budget Cuts Might Involve Layoffs*, LEGAL INTELLIGENCER, JAN. 28, 2009, at 1, *available at* 2009 WLNR 22652102.

[FN47]. *See* David Craig Landin, *No More Parking at the Asbestos MDL*, MARTINDALE.COM (May 18, 2010), http://www.martindale.com/litigationlaw/article_ Hunton-Williams-LLP_1026480.htm.

[FN48]. *See* Mark A. Behrens, *Asbestos Litigation Screening Challenges: An Update*, 26 T.M. COOLEY L. REV. 721 (2009); Mark A. Behrens, *What's New in Asbestos Litigation?*, 28 REV. LITIG. 501, 504-07 (2009); Mark A. Behrens & Phil Goldberg, *The Asbestos Litigation Crisis: The Tide Appears To Be Turning*, 12 CONN. INS. L.J. 477, 488-93 (2006).

[FN49]. *Overview of Asbestos Claims Issues and Trends,* AM.ACAD.ACTUARIES, 3 (Aug. 2007), http://www.actuary.org/pdf/casualty/asbestos_aug07.pdf.

[FN50]. *See* CARROLL ET AL., *supra* note 5, at xxv.

[FN51]. *Id.*

[FN52]. *See* Behrens, *What's New in Asbestos Litigation?, supra* note 48, at 545-49.

[FN53]. *See* Michelle J. White, *Why the Asbestos Genie Won't Stay in the Bankruptcy Bottle*, 70 U. CIN. L. REV. 1319, 1322 (2002).

[FN54]. *See, e.g.*, Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483, 488 (Fla. 1999) (affirming $31 million punitive damages verdict, in addition to $1.8 million compensatory award); Cathey v. Johns-Manville Sales Corp., 776 F.2d 1565, 1572 (6th Cir. 1985) (affirming $1.5 million punitive damages verdict, in addition to $800,000 compensatory award).

[FN55]. *See* Christopher F. Edley, Jr. & Paul C. Weiler, *Asbestos: A Multi-Billion-Dollar Crisis*, 30 HARV. J. ON LEGIS. 383, 392 (1993) (explaining that each time a defendant declares bankruptcy, "mounting and cumulative" financial pressure is placed on the "remaining defendants, whose resources are limited"); *In re* Asbestos Prods. Liab. Litig. (No. VI), No. MDL 875, 1996 WL 539589, at *1 (E.D. Pa. Sept. 16, 1996) ("The loss of any defendant to bankruptcy shifts a greater burden to the remaining defendants.").

[FN56]. *See* Martha Neil, *Backing Away from the Abyss*, A.B.A. J., Sept. 2006, at 26, 29, *available at* http://www.abajournal.com/magazine/article/backing_ away_from_the_abyss/. These bankruptcies have had devastating impacts on defendant companies' employees, retirees, shareholders, and surrounding communities. *See* Joseph E. Stiglitz et al., *The Impact of Asbestos Liabilities on Workers in Bankrupt Firms*, 12 J. BANKR. L. & PRAC. 51, 70-71 (2003).

[FN57]. LLOYD DIXON ET AL., ASBESTOS BANKRUPTCY TRUSTS: AN OVERVIEW OF TRUST STRUCTURE AND ACTIVITY WITH DETAILED REPORTS ON THE LARGEST TRUSTS 25 (2010), *available at* http://www.rand.org/technical_reports/2010/RAND_TR872.pdf.

[FN58]. *See* Editorial, *Lawyers Torch the Economy*, WALL ST. J., Apr. 6, 2001, at A14. *See also* Steven B. Hantler

8 RUJLPP 50 Page 12
8 Rutgers J. L. & Pub. Pol'y 50

et al., *Is the "Crisis" in the Civil Justice System Real or Imagined?*, 38 LOY. L.A. L. REV. 1121, 1151-52 (2005) (discussing spread of asbestos litigation to "peripheral defendants"); *The Economics of U.S. Tort Liability: A Primer,* CONG. BUDGET OFF., 8 (Oct. 2003), http://www.cbo.gov/ftpdocs/46xx/doc4641/10-22-TortReform-Study.pdf ("Over time, the targets of asbestos suits have expanded from the original manufacturers of asbestos-related products to include customers who may have used those products in their facilities.").

[FN59]. *See* Susan Warren, *Asbestos Quagmire: Plaintiffs Target Companies Whose Premises Contained Any Form of Deadly Material*, WALL ST. J., Jan. 27, 2003, at B1; Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., Apr. 12, 2000, at B1.

[FN60]. CARROLL ET AL., *supra* note 5, at xxv, 79.

[FN61]. *See* Biggs, *supra* note 8, at 1.

[FN62]. AM.ACAD.ACTUARIES', *supra* note 49, at 5.

[FN63]. CARROLL ET AL., *supra* note 5, at 94.

[FN64]. *'Medical Monitoring and Asbestos Litigation' - A Discussion with Richard Scruggs and Victor Schwartz*, 17-3 MEALEY'S LITIG. REP.: ASBESTOS 19 (Mar. 1, 2002) (quoting Mr. Scruggs).

[FN65]. *See* James A. Henderson, Jr., *Sellers of Safe Products Should Not Be Required to Rescue Users from Risks Presented by Other, More Dangerous Products,* 37 SW. U. L. REV. 595, 596-601 (2008); Paul J. Riehle et al., *Product Liability for Third Party Replacement or Connected Parts: Changing Tides From the West,* 44 U.S.F. L. REV. 33, 38 (2009). This novel theory has not gained traction. *See, e.g.,* Braaten v. Saberhagen Holdings, 198 P.3d 493, 495 (Wash. 2008); Simonetta v. Viad Corp., 197 P.3d 127, 133 (Wash. 2008).

[FN66]. *See, e.g.*, *In re* Grossman's, Inc., 389 B.R. 384, 387 (Bankr. D. Del. 2008) (alleging that exposure to asbestos-containing products during 1977 remodeling projects of plaintiff's home caused her injuries); Chavers v. Gen. Motors Corp., 79 S.W.3d 361, 364 (Ark. 2002) (involving the estate of a self-described "shade tree mechanic" who alleged that exposure to manufacturers' asbestos-containing products while working on his and relatives' vehicles caused his mesothelioma). *See generally* Mark A. Behrens & William L. Anderson, *The "Any Exposure" Theory: An Unsound Basis for Asbestos Causation and Expert Testimony,* 37 SW. U. L. REV. 479 (2008).

[FN67]. AM. ACAD. ACTUARIES, *supra* note 49, at 3 (emphasis added). *See also* Joseph Sanders et al., *The Insubstantiality of the "Substantial Factor" Test for Causation,* 73 MO. L. REV. 399, 428 (2008) ("[D]efendants of today - like Borg-Warner and V-J Auto Parts - are likely to be far less culpable than the major asbestos manufacturers who have all been through bankruptcy.").

[FN68]. *See* Victor E. Schwartz et al., *A Letter to the Nation's Trial Judges: Serious Asbestos Cases - How to Protect Cancer Claimants and Wisely Manage Assets,* 30 AM. J. TRIAL ADVOC. 295, 327-28 (2006).

[FN69]. William P. Shelley et al., *The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts*, 17 NORTON J. BANKR. L. & PRAC. 257, 257 (2008), *available at* http://www.cozen.com/admin/files/publications/JBLP_v17n2_ShelleyCohnArnold_sent% 20040208.pdf.

[FN70]. Deborah R. Hensler, *Asbestos Litigation in the United States: Triumph and Failure of the Civil Justice System,* 12 CONN. INS. L.J. 255, 272 (2006) (emphasis added).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN71]. Charles E. Bates & Charles H. Mullin, *State of the Asbestos Litigation Environment - October 2008*, 23-19 MEALEY'S LITIG. REP.: ASBESTOS 14 (Nov. 3, 2008) (finding that the major asbestos trusts had between one-sixth to one-twelfth as many claims filed in 2007 as they had in 2002). *See also* Alison Frankel, *Asbestos Removal*, AM. LAW., July 2006, at 15 ("A lot of companies that were seeing 40,000 cases in 2002 and 2003 have dropped to the 15,000 level.") (quoting Jennifer Biggs, Chair of the Mass Torts Subcommittee of the American Academy of Actuaries (internal quotations omitted)).

[FN72]. The list of jurisdictions with inactive asbestos dockets now includes Cleveland, Ohio (Mar. 2006); Minnesota (June 2005) (coordinated litigation); St. Clair County, Illinois (Feb. 2005); Portsmouth, Virginia (Aug. 2004) (applicable to cases filed by the Law Offices of Peter T. Nicholl); Madison County, Illinois (Jan. 2004); Syracuse, New York (Jan. 2003); New York City, New York (Dec. 2002); Seattle, Washington (Dec. 2002); Baltimore City, Maryland (Dec. 1992); Cook County (Chicago), Illinois (Mar. 1991); and Massachusetts (Sept. 1986) (coordinated litigation). *See* Behrens, *What's New in Asbestos Litigation, supra* note 48, at 507-08. *See also In re* USG Corp., 290 B.R. 223, 226 n.3 (Bankr. D. Del. 2003) ("The practical benefits of dealing with the sickest claimants ... have led to the adoption of deferred claims registries in various jurisdictions."); Freedman, *supra* note 32, at 513 ("Perhaps the most dramatic change since the dawn of the new century has been the restriction of the litigation to the functionally impaired.").

In addition, medical criteria procedures for asbestos cases have been enacted in Oklahoma, *see* Asbestos and Silica Claims Priorities Act, §§ 54-65, 2009 Okla. Sess. Law Serv. 228 (West) (codified at OKLA. STAT. tit. 76, §§ 60-71 (West, Westlaw through 2d Reg. Sess. 52d Leg. (2010))). Georgia, *see* 2007 Ga. Code Ann. Adv. Legis. Serv. 9 (West) (codified as amended at GA. CODE ANN. §§ 51-14-1 to 51-14-13, 51-15-1 to 51-15-8 (West, Westlaw through 2010 Reg. Sess.)); South Carolina, *see* Asbestos and Silica Claims Procedure Act of 2006, 2006 S.C. Acts 303 (codified as amended at S.C. CODE ANN. §§ 44-135-30 to 44-135-110 (West, Westlaw through 2009 Reg. Sess.)); Kansas, *see* Silica and Asbestos Claims Act, 2006 Kan. Legis. Serv. 196 (Westlaw) (codified as amended at KAN. STAT. ANN. §§ 60-4901 to 60-4911 (West, Westlaw through 2010 Reg. Sess.)); Texas, *see* Act effective Sept. 1, 2005, § 2, 2005 Tex. Sess. Law Serv. 97 (West) (codified as amended at TEX. CIV. PRAC. & REM. CODE ANN. §§ 90.001-.012 (West, Westlaw through 2009 Reg. Sess. 81st Leg.)); Florida, *see* Asbestos and Silica Compensation Fairness Act, 2005 Fla. Sess. Law Serv. 274 (West) (codified as amended at FLA. STAT. ANN §§ 774.201-.209 (West, Westlaw through 2010 2d Reg.. Sess. 21st Leg.)); and Ohio, *see* Act effective Sept. 2, 2004, 2004 Ohio Legis. Serv. Ann. 88 (West) (codified as amended at OHIO REV. CODE ANN. §§ 2307.91-.96, - .98, 2505.02 (West, Westlaw through 2010 File 54 128th Gen. Assemb.)).

[FN73]. *See In re* Haw. Fed. Asbestos Cases, 734 F. Supp. 1563, 1567-68 (D. Haw. 1990); Burns v. Jaquays Mining Corp., 752 P.2d 28, 31 (Ariz. Ct. App. 1987), *review dismissed*, 781 P.2d 1373 (Ariz. 1989); *In re* Asbestos Litig., Nos. 87C-09-24, 90C-09-79, 88C-09-78, 1994 WL 721763, at *6-7 (Del. Super. Ct. June 14, 1994), *rev'd on other grounds*, 670 A.2d 1339 (Del. 1995); Bernier v. Raymark Indus., Inc., 516 A.2d 534, 543 (Me. 1986); Owens-Ill., Inc. v. Armstrong, 591 A.2d 544, 560-61 (Md. Ct. Spec. App. 1991), *aff'd in part, rev'd in part on other grounds*, 604 A.2d 47 (Md. 1992); Giffear v. Johns-Manville Corp., 632 A.2d 880, 889 (Pa. Super. Ct. 1993), *aff'd sub nom.* Simmons v. Pacor, Inc., 674 A.2d 232 (Pa. 1996); Kelley v. Cowesett Hills Assocs., 768 A.2d 425, 430 (R.I. 2001); *In re* Mass. Asbestos Cases, 639 F. Supp. 1, 2-3 (D. Mass 1985); Ford Motor Co. v. Miller, 260 S.W.3d 515, 518 (Tex. App. 2008) (applying Mich. law).

[FN74]. *See generally In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563 (S.D. Tex. 2005); *see also* Lester Brickman, *On the Applicability of the Silica MDL Proceeding to Asbestos Litigation*, 12 CONN. INS. L.J. 289, (2006) (evaluating the practical implications of the federal silica litigation on the "entrepreneurial model" of **asbestos** litigation); Barbara Rothstein, *Perspectives on Asbestos Litigation: Keynote Address*, 37 SW. U. L. REV. 733, 739 (2008) (Judge Rothstein is the Director of the Federal Judicial Center and stated in her remarks that, "[o]ne of the most important things ... I think judges are now alert for is fraud, particularly since the silicosis case ..., and the backward look we now have at the radiology in the **asbestos** case."); Elise Gelinas, Comment, *Asbestos Fraud Should Lead to Fairness: Why Congress Should Enact the Fairness in Asbestos Injury Resolution Act*, 69 MD. L. REV. 162, 163 (2009) ("Although her opinion dealt with silica litigation, Judge Jack's findings [in the federal court silica litigation]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

significantly affect asbestos reform. By conducting Daubert hearings and court depositions that exposed the prevalence of fraud in silica litigation, Judge Jack exposed the prevalence of fraud in asbestos litigation as well."); *see generally In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563 (S.D. Tex. 2005); Mark A. Behrens & Corey Schaecher, *RAND Institute for Civil Justice Report on the Abuse of Medical Diagnostic Practices in Mass Tort Litigation: Lessons Learned from the "Phantom" Silica Epidemic That May Deter Litigation Screening Abuse*, 73 ALB. L. REV. 521 (2010).

[FN75]. *See* Freedman, *supra* note 32, at 514.

[FN76]. Steven Napolitano, *2009 Litigation Trends: Asbestos Litigation in the U.S.*, SKADDEN, 3 (Mar. 4, 2009), http:// www.skadden.com/content/Publications/Publications1710_0.pdf.

[FN77]. *See* State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003).

[FN78]. *See Regulatory History of Asbestos,* OCCUPATIONAL SAFETY & HEALTH ADMIN., http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=PREAMBLES&p_id=784 (last visited Sept. 17, 2010). For current OSHA Asbestos regulations, *see* 29 C.F.R. § 1910.1001 (2008), *available at* http:// www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARDS&p_id=9995 (last visited Sept. 17, 2010).

[FN79]. Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276, 280 (4th Cir. 1993).

[FN80]. *In re* Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 310 (E. & S.D.N.Y. 2002). *See also Regulatory History of Asbestos*, *supra* note 78.

[FN81]. W. Kip Viscusi, *Why There is No Defense of Punitive Damages*, 87 GEO. L.J. 381, 383 (1998).

[FN82]. Freedman, *supra* note 32, at 527.

[FN83]. Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 526 (5th Cir. 1984).

[FN84]. David C. Landin et al., *Lessons Learned from the Frontlines: A Trial Court Checklist for Promoting Order and Sound Policy in Asbestos Litigation*, 16 J. L. & POL'Y 589, 652-53 (2008).

[FN85]. Behrens & Parsons, *supra* note 3, at 155 (citing Zambor v. Owens-Ill. Glass Co., No 1988-C-4532, at 6-7 (Ct. Com. Pl., Northampton County, Pa. Jan. 11, 2001) (order severing punitive damages)).

[FN86]. *In re* Asbestos Litig. (Pusey Trial Group), Nos. 90C-03-18, 90C-07-101, 86C-09-57, 1994 Del. Super. LEXIS 392 at *19 (Del. Super. Ct. Sept. 19, 1994).

[FN87]. *Id.* at *14.

[FN88]. George L. Priest, *The* Cumulative Sources of the Asbestos Litigation Phenomenon, 31 PEPP. L. REV. 261, 266 (2003).

[FN89]. CARROLL ET AL., *supra* note 5, at xxvi.

[FN90]. *See generally* Victor E. Schwartz et al., *Reining in Punitive Damages "Run Wild": Proposals for Reform by Courts and Legislatures*, 65 BROOK. L. REV. 1003 (1999).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 RUJLPP 50 Page 15
8 Rutgers J. L. & Pub. Pol'y 50

[FN91]. *See* Victor E. Schwartz et al., *Asbestos Litigation in Madison County, Illinois: The Challenge Ahead*, 16 WASH. U. J. L. & POL'Y 235, 251-52 (2004).

[FN92]. *Id.* (further citations omitted).

[FN93]. Kate Moser, *Jury Awards $200 Million in Punitive Damages in Asbestos Case*, THE RECORDER, May 3, 2010, *available at* http:// www.law.com/jsp/article.jsp?id=1202457545735 (last visited Sept. 17, 2010). Attorneys expect the trial court to reduce the punitive damages award. *See id.*

[FN94]. *See* Dunn v. HOVIC, 1 F.3d 1371, 1398 (3d Cir. 1993) (Weis, J., dissenting) *modified in part*, 13 F.3d 58 (3d Cir. 1993) (citing *Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcomm. on Intellectual Prop. and Judicial Admin. of the H. Comm. of the Judiciary*, 102d Cong., 2d Sess. 132-33 (1992) (statement of Hon. William W. Schwarzer)).

[FN95]. *See* William W. Schwarzer, *Punishment Ad Absurdum*, CAL. LAWYER, Oct. 1991, at 116 ("Barring successive punitive damage[s] awards against a defendant for the same conduct would remove the major obstacle to settlement of mass tort litigation and open the way for the prompt resolution [of legitimate claims.]").

[FN96]. Charles Bates & Charles Mullin, *Having Your Tort and Eating it Too?*, 6-4 MEALEY'S ASBESTOS BANKR. REP., Nov. 2006, at 1. For example, it is estimated that mesothelioma plaintiffs in Alameda County (Oakland) will receive an average $1.2 million from active and emerging asbestos bankruptcy trusts, *see* Charles E. Bates et al., and could receive as much as $1.6 million. *See* Charles E. Bates et al. *The Claiming Game*, 25-1 MEALEY'S LITIG. REP.: ASBESTOS 19 (Feb. 3, 2010); *see also The Naming Game*, 24-15 MEALEY'S LITIG. REP.: ASBESTOS 18 (Sept. 2, 2009).

8 Rutgers J. L. & Pub. Pol'y 50

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.